68

- 13 -

under this escrow), provided $3 million has not already been paid-out to the Purchaser under this escrow and all disputes brought by the Sellers contesting Purchaser's right to a claim under this escrow have been resolved (or if still ongoing, would amount to less than $3 million). Following the second anniversary of the Closing (or the date on which the last remaining period under the Transition Services Agreement expires or terminates, if such date is earlier) remaining amounts under this escrow shall be released to the Sellers (less claims by the Purchaser under this escrow); thereafter, and upon resolution of all disputes between the parties regarding Purchaser's rights to amounts under this escrow, any remaining amounts under this escrow shall be released to Sellers;

o The Purchaser may claim under the Transition Services Financial Performance Escrow in addition to the Transition Services General Service Level Escrow, unless (and only to the extent that) a failure giving rise to a claim under the Transition Services General Service Level Escrow had no material impact on the transition services other than with respect to the Purchaser's ability to meet its financial reporting obligations;

o The entire $30 million amount (representing the sum of the Transition Services Financial Performance Escrow Amount and the Transition Services General Service Level Escrow Amount) stands as security for any claims made by the Purchaser which are outstanding at the time of a scheduled release, but only to the extent of the amount of the claim outstanding. Accordingly, if the Purchaser has an outstanding claim against the Sellers (not relating to the two aforementioned escrows) and a portion of the funds in the transition services escrow are due for release, the funds representing the claim would continue to be held back until the claim is resolved.

6 ？

- 14 -

- the Tax Escrow Amount, the EMEA Tax Escrow Amount and the Italian Tax Escrow Amount of $10 million (which amount may be adjusted pursuant to the terms of the Ciena Agreement), $2.5 million and $5 million (which amount may be adjusted pursuant to the terms of the Ciena Agreement), respectively, to · secure certain claims that might be made against the Purchaser by certain tax authorities in respect of Taxes that are Excluded Liabilities; and

- an additional amount to secure the Sellers' obligations with respect to Cure Costs, the terms of which are set forth in the Sellers Disclosure Schedule.

*Post-Closing Purchase Price Working Capital Adjustment*

39.  Within 90 days of Closing, the Purchaser shall deliver to the Main Sellers and the EMEA Sellers a Closing Statement of the Closing Date Net Working Capital Transferred, which is calculated as the Closing Inventory Amount, plus Closing CIP Accounts Receivable Amount, minus Closing Warranty Provision, minus Closing KPD Provision, minus Closing Net Deferred Revenues, minus Closing Other Accrued and Contractual Liabilities, minus Closing Accrued Vacation and Service Award Amount, minus Closing Retirement Obligation Amount, minus Excess ARD Employees Amount. The Main Sellers shall have 30 days from the date of receipt of such Closing Statement to notify the Purchaser of a disagreement with the Closing Statement. The Purchaser and the Main Sellers shall use commercially reasonable efforts to resolve any disagreements for a period of 30 days thereafter, after which a mutually agreed Accounting Arbitrator will be appointed to resolve any remaining disagreements.

40.  The Base Cash Purchase Price will be adjusted by the Adjustment Amount, which is calculated by deducting the Estimated Closing Date Net Working Capital Transferred from the Closing Date Net Working Capital Transferred.

- If the Adjustment Amount is positive, then the Purchaser will pay to the Distribution Agent such amount (with interest from the Closing Date to the date of payment at the Prime Rate) and the Escrow Agent shall pay to the

70·

- 15 -

Distribution Agent the full Working Capital Escrow Amount (with interest
from the Closing Date to the date of payment at the Prime Rate), and

- If the Adjustment Amount is negative, then the Escrow Agent will pay to the
Purchaser the lesser of the absolute value of the Adjustment Amount (with
interest from the Closing Date to the date of payment at the Prime Rate) and the
Working Capital Escrow Amount.  In addition, if the absolute value of the
Adjustment Amount exceeds the Working Capital Escrow Amount, then the
Distribution Agent will pay to the Purchaser an amount equal to that by which
the absolute value of the Adjustment Amount (with interest from the Closing
Date to the date of payment at the Prime Rate) exceeds the Working Capital
Escrow Amount.  Any portion of the Working Capital Escrow Amount
remaining after payment of the Adjustment Amount will be returned to the
Distribution Agent.

### *Assumed Liabilities*

41.    The Purchaser will assume the following liabilities:

- all liabilities of the MEN Business arising after the Closing Date to the extent
related to the operation of the MEN Business by the Purchaser following
Closing including (i) all liabilities with respect to the ownership and operation
of the Purchased Assets; (ii) all liabilities related to actions or claims brought
against the MEN Business; and (iii) all liabilities under any product liability
laws or similar laws concerning defective products manufactured or sold by the
MEN Business;

- all liabilities arising from or in connection with the performance (or breach) of
the Assigned Contracts after the Closing Date and all liabilities with respect to
Cure Costs payable by the Purchaser pursuant to the Ciena Agreement,
obligations to buy back from relevant resellers the products sold to resellers
under Seller Contracts that are Assigned Contracts, obligations under any
warranty liabilities including Known Product Defects relating to the Products

71.

- 16 -

and Services supplied under any Assigned Contract or any Bundled Contract which is subcontracted to the Purchaser, and all liabilities accrued in the financial statements of the MEN Business as Other Accrued and Contractual Liabilities to the extent reflected in the calculation of Net Working Capital Transferred;

- all liabilities resulting from any licensing assurances, declarations, agreements or undertakings relating to the Transferred Intellectual Property which the Sellers may have granted or committed to third parties including standard setting bodies, that are listed in the Sellers Disclosure Schedule;

- all liabilities for, or related to any obligation for, any Tax that the Purchaser bears pursuant to the Ciena Agreement;

- except to the extent otherwise set forth in the Ciena Agreement, all liabilities related to any of the following: (i) the Purchaser's employment or termination of employment (whether or not arising under or in respect of any Purchaser Employee Plan) of Transferred Employees after Closing; (ii) the Purchaser's failure make an offer of employment to any employee that violates applicable law; and (iii) the failure of the Purchaser to satisfy its obligations with respect to the Employees, including the Transferred Employees as set out in the Ciena Agreement;

- all liabilities that arise under any Purchaser Employee Plan;

- any obligation to provide continuation coverage pursuant to COBRA or any similar law under any Purchaser Employee Plan that is a "group health plan" (as defined in section 5000(b)(1) of the Code) to Transferred Employees and/or their qualified beneficiaries who have a qualifying event on or after such Transferred Employees' Effective Hire Date;

- all liabilities related to the Transferred Employees as set forth in the Sellers Disclosure Schedule; and

72

- 17 -

- all liabilities related to Transferred Employees expressly assumed by the Purchaser as set out in the Ciena Agreement.

*Employees*

42. The Purchaser has committed to offer employment to no less than 2,000 employees of the MEN Business, including all EMEA employees and all employees whose employment transfers by operation of law. For employees employed in Canada or the United States, the Purchaser's employment offers shall provide terms and conditions that will consist of: i) either the same wage and target bonus or a substantially comparable overall compensation package; ii) employment reasonably close to the employee's current location; and iii) employee benefits that are substantially comparable in the aggregate to the Sellers' benefits or the Purchaser's benefits for similarly situated employees. For employees in countries outside of Canada and the United States but excluding EMEA, and where the number of employees in such country is 10 or more, the Purchaser will make employment offers on terms and conditions that are no less favourable in the aggregate than current employment terms and conditions, subject to certain adjustments to conform to the Purchaser's standard employment policies where legally possible, provided that, following the Employee Transfer Date, the Purchaser shall be entitled to make changes to such terms and conditions that are generally applicable and broadly based across the Purchaser's employee population in the particular country. Other than as required by applicable Law, the Purchaser will not be required to offer any defined benefit pension plans or take into account any defined pension benefits, post-retirement health and welfare benefits, severance or employee retention plans such as KEIP or KERP, or equity compensation when determining whether employee benefits are no less favourable in the aggregate. For employees outside of Canada and the United States but excluding EMEA, and where the number of employees is less than 10, the Purchaser will make employment offers on terms and conditions that are reasonably competitive with those received by similarly situated employees in the local market. Employees whose employment transfers automatically by operation of Law to the Purchaser will have terms and conditions of employment governed by such applicable Laws, but, at a minimum, shall receive terms and conditions of employment that are no less favourable than those

73.

- 18 -

received by the employees described above (not including those employed in Canada or the United States), based on the number of the Sellers' employees in the country where such Employees are employed, provided that Employees located in the Province of Quebec shall be treated as if they were Employees employed in Canada or the United States.

43.    Prior to Closing, the Sellers will take all action permitted under applicable Law legally necessary to cause the termination of employment (effective prior to Closing) of those Employees that will not be offered employment with the Purchaser and whose employment would have transferred by operation of law.

44.    With respect to any Employees who do not accept or who reject an offer of employment from the Purchaser, the Purchaser shall reimburse the Sellers for payments made by them in an aggregate amount up to $2 million in respect of pay in lieu of notice (including WARN Act notice) and/or severance liability relating to such Employees, provided that any such payments shall have been made by the Sellers as required by applicable law, certain Seller Employee Plans or pursuant to a Contract in effect as of the date of the Ciena Agreement, and a copy of which will be delivered to the Purchaser at the time such liability is incurred.

*Assignment of Contracts*

45.    The Purchaser will assume certain customer contracts associated with the MEN Business. The Purchaser may also assume selected supplier contracts, real estate leases and certain other contracts identified by the Purchaser within certain prescribed time periods.

*Cure Costs*

46.    To the extent that the transactions contemplated by the Ciena Agreement give rise to a liability for any Cure Cost or Customer Cure Cost, as defined in the Sellers Disclosure Schedule, the payment of such Cure Costs by the Purchaser and Sellers, as applicable, shall be made in accordance with the terms set out in the Sellers Disclosure Schedule. The Sellers Disclosure Schedule also sets out certain circumstances in relation to the payment

74.

- 19 -

of certain Cure Costs in respect of which the Purchaser may terminate the Ciena
Agreement. In the event of such termination, the Purchaser shall be entitled to a
termination payment of $21,392,000.

### Additional Adverse Bankruptcy Proceedings

47. Prior to Closing, if any Seller (a "Restricted Seller") that is a Non-Debtor Seller
commences insolvency proceedings or any law or order comes into effect preventing the
Seller from assigning the assets in its jurisdiction (the "Restricted Assets") to the
Purchaser, then the Parties shall use their commercially reasonable efforts to cause the
transfer of the Restricted Seller's interest in the Restricted Assets to the Purchaser
provided that, if such transfer is prevented due to any law or order, then the Sellers and the
Purchaser shall be relieved of their obligations to sell and purchase, respectively, the
Restricted Assets and the Purchaser shall be relieved from its obligation to assume any
Assumed Liabilities in respect thereof, or to make offers of employment or employ any
Employee who is employed by any Restricted Seller or who devotes more than 50% of his
or her working time to the business of any such Restricted Seller. The Purchase Price shall
be reduced by an amount equal to the 2008 revenues of the Restricted Seller (as set out in
the Sellers Disclosure Schedule) multiplied by 0.4088, provided that if the 2008 revenues
for all Restricted Sellers exceeds $120 million, then the Purchase Price shall be reduced by
an amount equal to the 2008 revenues of the Restricted Seller(s) multiplied by 0.5314.

### Exclusion of Sellers

48. The Sellers Disclosure Schedule sets out the manner in which the Purchaser may elect to
exclude from the transaction any one Seller (and such Seller's assets and liabilities) from
the Ciena Agreement.

### Sale Free and Clear

49. The Purchased Assets to be transferred by the Sellers will be transferred free and clear of
all liens, claims and interests, other than those expressly assumed by the Purchaser or
otherwise expressly permitted under the Ciena Agreement.

75.

- 20 -

*Representations and Warranties or Covenants*

50.   The Ciena Agreement contains a number of representations, warranties and covenants by
      the Main Sellers or the Sellers, as applicable, with respect to various matters including title
      to assets, sufficiency of assets, preparation of financial statements, status of real property,
      environmental matters, compliance with laws, taxes, employee matters, undisclosed
      liabilities and status of litigation.  In addition, the Ciena Agreement includes a number of
      covenants with respect to matters including pre-Closing cooperation and access to
      information, preparation and filings regarding antitrust and other Regulatory Approvals,
      preparation and delivery of certain financial statements of the MEN Business, pre-Closing
      conduct of the Business, post-Closing assistance and maintenance of books and records,
      post-Closing arrangements with respect to certain non-assignable and/or Bundled
      Contracts, post-Closing assistance for litigation, negotiation and completion of Ancillary
      Agreements, and insurance and real estate matters including the sub-lease of certain real
      property to the Purchaser.

*Survival of Representations and Warranties or Covenants*

51.   No representations or warranties, covenants, or agreements of the Sellers contained in the
      Ciena Agreement shall survive beyond the Closing Date, except for covenants and
      agreements that by their terms shall survive until satisfied in accordance with their terms.

*Termination Rights*

52.   The Ciena Agreement may be terminated prior to Closing in a number of instances
      including:

- by mutual consent of the Purchaser and the Main Sellers;

- by either the Purchaser or the Main Sellers:

  o if the Closing does not take place by April 30, 2010;

76.

- 21 -

    o  in the event of a material breach by the other Primary Party of the Ciena Agreement, which breach would result in a failure of certain of the conditions to Closing which is not cured within a specified period of time;

    o  if the U.S. Bidding Procedures Order and the Canadian Sales Process Order have not been entered by October 19, 2009, in the case of termination by the Purchaser, or October 30, 2009 in the case of termination by the Main Sellers;

    o  if the U.S. Sale Order and the Canadian Approval and Vesting Order are not entered into by December 17, 2009;

    o  if this Honourable Court or the U.S. Court approves an Alternative Transaction;

    o  if the EMEA ASA is terminated in accordance with its terms;

    o  an antitrust law or order is issued in the U.S., Canada or the United Kingdom prohibiting the transaction; or

    o  if the Auction is not completed by December 11, 2009.

- by the Purchaser if the Sellers fail to consummate the Closing in breach of the Ciena Agreement within 10 Business Days of a demand by the Purchaser to do so;

- by the Purchaser if any of the Sellers withdraw or seek authority to withdraw the Canadian Approval and Vesting Order Motion or the U.S. Bidding Procedures and Sale Motion, or publicly announce any stand-alone plan of reorganization or plan of arrangement in respect of the MEN Business or liquidation or winding-up of all or substantially all of the Purchased Assets or the EMEA Assets or any of the Sellers or the EMEA Sellers (or support any such plan filed by any other Person);

77

- 22 -

- by the Main Sellers upon the entry of an order by the U.S. Court or this Honourable Court authorizing a Sponsored Reorganization Plan; or

- by the Purchaser if Lab 10 of the Carling Property is destroyed or substantially damaged.

*Break-Up Fee*

53. The Sellers shall pay to the Purchaser an aggregate Break-Up Fee of $16,044,000 (2/3 to be paid by the Main Sellers and 1/3 by the EMEA Sellers) if the Ciena Agreement is terminated:

- by either the Purchaser or the Main Sellers as a result of the approval by this Honourable Court or the U.S. Court of an Alternative Transaction;

- by the Purchaser:

  o as a result of a material breach by the Sellers of the Sellers' representations, warranties, agreements, or covenants that would result in the failure of certain conditions to Closing and that is not cured by the Sellers within a specified period of time;

  o if the Sellers fail to consummate the Closing in breach of the Ciena Agreement within 10 Business Days of a demand by the Purchaser to do so; or

  o if any of the Sellers withdraw or seek authority to withdraw the Canadian Approval and Vesting Order Motion or the U.S. Bidding Procedures and Sale Motion, or publicly announce any stand-alone plan of reorganization or plan of arrangement in respect of the MEN Business or liquidation or winding-up of all or substantially all of the Purchased Assets or the EMEA Assets or any of the Sellers or the EMEA Sellers (or support any such plan filed by any other Person);

78

- 23 -

- by the Main Sellers if:

  o the U.S. Bidding Procedures Order and the Canadian Sales Process
    Order are not entered by the respective courts by October 30, 2009;

  o the U.S. Sale Order and Canadian Approval and Vesting Order are not
    entered into by December 17, 2009;

  o the Auction is not completed by December 11, 2009;

  o the U.S. Court or this Honourable Court enters an order authorizing a
    Sponsored Reorganization Plan; or

  o the EMEA ASA is terminated in certain circumstances.

*Expense Reimbursement*

54. The Sellers shall reimburse the Purchaser for all reasonable and documented fees, costs
    and expenses incurred in connection with the transaction to a maximum of $5,348,000 (2/3
    to be paid by the Main Sellers and 1/3 by the EMEA Sellers) if the Ciena Agreement is
    terminated pursuant to its termination provisions except where such termination is: i) by
    mutual consent; or ii) as a result of a material breach by the Purchaser of the Ciena
    Agreement or the EMEA ASA which breach would result in a failure to satisfy certain
    conditions to Closing and which are not cured within a specified period of time.

*Limitation of Liability*

55. Termination of the Ciena Agreement and payment of the Break-Up Fee and Expense
    Reimbursement, if payable, are the sole and exclusive remedies of the Purchaser against
    the Sellers for termination of the Ciena Agreement.

*Ancillary Agreements*

56. On or before Closing, the Purchaser and the relevant Sellers and EMEA Sellers will enter
    into the following ancillary agreements, forms of which have been agreed:

79.

- 24 -

- Intellectual Property License Agreement - an intellectual property license agreement between NNL and the Purchaser pursuant to which i) NNL and its affiliates will grant to the Purchaser a non-exclusive license and an exclusive license (within an exclusive field of use) to, among other things, make, use, distribute, sell, develop and service certain retained intellectual property assets; and ii) NNL and its affiliates will receive a license back to all intellectual property included for use in Nortel's other businesses.

- Trademark License Agreement – an agreement between NNL and the Purchaser permitting the Purchaser and its affiliates to, among other things, use the "Nortel" trademark and logo and certain other Nortel marks in its sales of the Products and Services for a transitional period of 18 months after Closing.

- Transition Services Agreement – an agreement between NNL, NNC, NNI, NNUK, NN Ireland, certain Other Sellers, the U.K. Administrators and the Purchaser pursuant to which the Sellers and their affiliates will agree to provide certain information technology, business transition and related services to the Purchaser for up to 24 months post-Closing. The final form of the Transition Services Agreement will set forth the fees to be paid by the Purchaser to the Sellers for these services as well as certain other terms that will regulate the provision of services thereunder. The agreed form of Transition Services Agreement sets out the general scope of transition services to be provided and the parties have agreed to negotiate in good faith to refine the description of the transitional services to be provided in accordance with the terms and guidelines set forth in the Sellers Disclosure Schedule. The parties have agreed to an arbitration procedure to resolve any disputes regarding, among other things, the services to be provided or the amount to be billed for such services. Pursuant to the Ciena Agreement, the Purchaser and the TSA Sellers or the TSA Arbitrator (as defined in the Sellers Disclosure Schedules), shall determine, among other things, whether the information technology systems and business processes to be used in the performance of TSA services for the Purchaser are First Day

80·

- 25 -

Ready. If First Day Ready is not achieved prior to April 30, 2010, then, as long as the conditions to Closing have otherwise been satisfied or waived, the Closing shall occur on such date (subject to the penalty discussed below)Effective March 22, 2010, if First Day Ready has not been achieved, then the Sellers shall incur a penalty of $2 million per weekday to a maximum penalty of $60 million until First Day Ready is achieved (which amount shall be deducted from the Cash Purchase Price). Failure to achieve First Day Ready shall not fall within the scope of the Purchaser's closing condition pertaining to no breach of covenants until after April 30, 2010.

- <u>Loaned Employee Agreement</u> – an agreement between the relevant Sellers and the Purchaser pursuant to which certain employees of the Sellers that cannot be transferred to the Purchaser at Closing will be seconded to the Purchaser for a period of, in certain cases, up to 90 days. The Loaned Employees will remain on the payroll of the applicable Seller and will continue to participate in the Seller's pension and benefit plans. The Purchaser shall reimburse the Sellers for the cost of retaining the Loaned Employees, subject to certain exceptions.

The Purchaser and the relevant Sellers and EMEA Sellers will also enter into, among other things, the following ancillary agreements:

- <u>Real Estate Agreements</u> - agreements between the relevant Sellers and the Purchaser with respect to the post-Closing direct lease, sublease or occupancy by the Purchaser of certain owned and leased properties of the Sellers on the following terms:

  o   Lab 10 and Lab 2 Lease Agreements – NNTC and the Purchaser shall enter into leases for Lab 10 (for a 10 year term) and a portion of Lab 2 (for an initial term of 2.5 years, renewable for an additional 7.5 years) of the Carling Property under terms negotiated between the parties. This Lab 10 lease shall be subject to a termination right by NNTC exercisable at any time, to be effective no earlier than 5 years from the Closing Date. Any

81.

- 26 -

termination by NNTC prior to the end of the lease shall obligate the
Sellers to pay a termination fee as described above. The Sellers and the
Purchaser shall each contribute to any demising costs of the Lab 2 space.

o    Montreal Premises Lease – The Sellers have entered into an LOI with the
Montreal Landlord to restructure the existing lease for the Montreal
Premises to meet the preferred space requirements of the Purchaser under
the same rental terms as the existing lease or, if unsuccessful, to obtain the
consent of the Montreal Landlord to the sublease of such premises. The
Sellers and the Purchaser shall each contribute to any demising costs
associated with the Montreal Premises. As noted previously, should the
Sellers be unable to secure the consent of the Montreal Landlord to the
restructured lease arrangement, or obtain its consent to the sublease, the
Purchase Price payable at Closing shall be reduced by $5 million, and
such amount shall be held in escrow and released to the Purchaser
following the date on which it has vacated the Montreal Premises and
removed all Assets therefrom  In the event that the Purchaser elects not to
accept an assignment of the lease for the Montreal Premises, the Purchaser
shall pay to NNL, or to the Montreal Landlord if directed by NNL, the
negotiated early termination penalty due to the Montreal Landlord of
Cdn$2,931,000.

o    Subleases and Occupancy Agreements: The Real Estate Terms and
Conditions appended to the Ciena Agreement sets forth the terms whereby
the Sellers and the Purchaser shall enter into subleases or occupancy
agreements with respect to leased premises of the Sellers designated by
the Purchaser for subletting. The size and configuration of subleased
premises will be reasonably agreed by the Sellers and the Purchaser prior
to Closing by reference to certain specified factors. Alternatively, if
certain specific conditions are met, the Purchaser shall have the right to
negotiate with the landlord a direct lease of the space. The Sellers'
obligation under any subleases entered into with the Purchaser shall be

82.

subject to the Sellers' right to reject the related lease. If the Sellers reject such lease prior to Closing, the Sellers shall, at their expense, remove and store any Purchased Assets until Closing. If the rejection of the lease is effective on or after Closing, the Purchaser shall vacate the subleased premises upon notice from the Sellers. If the Sellers are required to obtain Consents from landlords in order to permit the occupancy of any Critical Locations (as described in the Real Estate Terms and Conditions), are unable to obtain such Consents on or prior to Closing and are unable to relocate the Purchaser to equivalent premises in accordance with the Real Estate Terms and Conditions, then the Purchaser is entitled to a credit on Closing against the Cash Purchase Price in the amount of $100,000 per affected occupancy.

In addition, the Main Sellers and the Purchaser will use their commercially reasonable efforts to negotiate between themselves and, when applicable, with the relevant third parties, the following ancillary agreements, among others, in good faith:

- LGN/Korea Distribution Agreement – an agreement between LGN and the Purchaser with respect to the sale of certain products by the MEN Business to LGN for resale in South Korea.

- NETAS Distribution Agreement – an agreement between NETAS and the Purchaser with respect to the sale of certain products by the MEN Business to NETAS for resale in Turkey.

- NGS Distribution Agreement – an agreement between Nortel Government Services ("NGS") and the Purchaser with respect to the sale of certain products by the MEN Business to NGS.

- Mutual Development Agreement - an agreement between the Sellers and the Purchaser with respect to the ongoing development by either party of new features for certain of the products used by either party.

8.3

- 28 -

- **EFA Development Agreement** - an agreement between LGN and the Purchaser with respect to development services for Ethernet Fiber Access products to be provided by the Purchaser to LGN.

- **Contract Manufacturing Inventory Agreements** – agreements between the Purchaser, the Sellers and certain Contract Manufacturers of the Sellers to sell Contract Manufacturer Inventories related to the Business to the Purchaser after Closing.

- **Flextronics Back-to-Back Supply Agreement** – an agreement between the Sellers and the Purchaser, which may be executed if the Purchaser has not executed a new supply agreement with Flextronics prior to Closing, for the provision of products by Flextronics to the Purchaser after Closing on the same terms and conditions as the existing contract between the Sellers and Flextronics.

- **Seller Supply Agreement** – an agreement between the Sellers or the purchaser of the Sellers' Enterprise Solutions business and the Purchaser for the supply of certain components of the Products to the Purchaser. If the parties are unable to agree to the terms of the Seller Supply Agreement, then, until January 18, 2010, the Purchaser is entitled to require that the Sellers purchase the components intended to be supplied to the Purchaser under the Seller Supply Agreement, and such components shall be transferred to the Purchaser as part of the Owned Inventory under the Ciena Agreement.

*Closing*

57.   Closing shall occur on the date which is the later of: i) February 1, 2010; ii) the date that is the earlier of: a) 10 Business Days after the date that First Day Ready is achieved and b) April 30, 2010; and iii) 5 Business Days after the date upon which all Closing conditions have been satisfied or waived.

84.

- 29 -

*Closing Conditions*

58.    The obligation of the Purchaser to close the sale is subject to satisfaction of the following
conditions, among others:

- the U.S. Bidding Procedures Order and the Canadian Sales Process Order shall
  have been entered and shall not have been stayed and such orders shall have
  become Final Orders;

- the receipt of all antitrust and other regulatory approvals in a number of
  jurisdictions including approval in Canada pursuant to the *Investment Canada
  Act*;

- no law or order of any Court or other Governmental Entity in Canada, the U.S.
  or the United Kingdom, prohibiting the consummation of any of the
  transactions contemplated by the Ciena Agreement or the EMEA ASA;

- the U.S. Sale Order and the Canadian Approval and Vesting Order shall have
  been entered and shall not have been stayed and such orders shall have become
  Final Orders;

- the satisfaction of conditions to closing under the EMEA ASA and the
  simultaneous consummation of the transaction governed by the EMEA ASA;

- the Sellers' representations and warranties being true and correct, except as
  would not reasonably be expected to result in a Material Adverse Effect;

- the Sellers' material pre-Closing covenants, obligations and agreements
  pursuant to the Ciena Agreement shall not have been breached in any material
  respect;

- the performance by the Sellers of: i) all pre-Closing covenants relating to the
  delivery of certain Audited Financial Statements and Unaudited September 30,

*E.5.*

- 30 -

2008 Financial Statements; and ii) all Closing deliveries (subject to certain exceptions); and

- Lab 10 of the Carling Property shall not have been destroyed or substantially damaged;

*Standstill Period*

59.   From the date of the Ciena Agreement to the entry of the U.S. Bidding Procedures Order and from the conclusion of the Auction to Closing or termination of the Ciena Agreement, the Sellers and their affiliates are prohibited from soliciting, initiating, encouraging or engaging in any discussions or negotiations with any party, or taking any other action with respect to a proposal or offer relating to the acquisition, divestiture, recapitalization, business combination or reorganization of all or a substantial part of the MEN Business, with the exception of the selection of an Alternate Bid at Auction or seeking approval of such Alternate Bid. Notwithstanding the foregoing, from the date of the Ciena Agreement to the entry of the U.S. Bidding Procedures Order, the Sellers may continue to provide written due diligence materials in an electronic data room to parties that already have access to the electronic data room and have satisfied the Participation Requirements as set out in the U.S. Bidding Procedures Order.

**BIDDING PROCEDURES AND AUCTION PROCESS**

60.   Given that certain of the U.S. Debtors are parties to the Ciena Agreement and given the desire to maximize value for the benefit of stakeholders in relation to the assets which are the subject of the Ciena Agreement, Nortel has determined and has agreed with Ciena that the Ciena Agreement is subject to higher or better offers being obtained pursuant to a sale process under section 363 of the Code and that the Ciena Agreement shall serve as a "stalking horse" bid pursuant to that process. The Purchased Assets may be sold in a single sale to a single purchaser or in parts to several purchasers.

86.

- 31 -

61.    The U.S. Debtors have filed a bidding procedures motion with the U.S. Court. A copy of
the proposed bidding procedures is attached as Appendix "C" (the "Bidding Procedures").

62.    It is a covenant of the Ciena Agreement that the Sellers that are U.S. Debtors shall have
filed the U.S. Bidding Procedures and Sale Motion with the U.S. Court within 2 Business
days after signing of the Ciena Agreement. This motion was filed with the U.S. Court on
October 7, 2009. It is also a condition of the Ciena Agreement that the Sellers that are
Canadian Debtors shall have filed the Canadian Sales Process Order Motion with this
Honourable Court within 5 days after the signing of the Ciena Agreement. This motion
was filed with this Honourable Court on October 9, 2009.

63.    Pursuant to the Ciena Agreement, the Sellers who are U.S. Debtors shall use their
reasonable best efforts to cause the U.S. Court to schedule a hearing to consider the U.S
Bidding Procedures and Sale Motion and to enter the U.S. Bidding Procedures Order
within two Business Days of the hearing to approve the Bidding Procedures.

64.    The Monitor understands that the Applicants and the U.S. Debtors will seek approval of
the Bidding Procedures at a videoconference joint hearing between this Honourable Court
and the U.S. Court scheduled for October 15, 2009, conducted pursuant to the Cross-
Border Insolvency Protocol previously approved by both Courts.

65.    The Bidding Procedures provide that all bids must be received by the Sellers not later than
4:00 p.m. (Eastern Time) on November 9, 2009 and that the Sellers will conduct an
auction of the Purchased Assets on November 13, 2009 at 9:30 a.m. (the "Auction").

66.    Pursuant to the Ciena Agreement, the Sellers who are U.S. Debtors shall request the U.S.
Court to schedule a Sale Hearing on the fourth Business Day following the conclusion of
the Auction and shall use their reasonable best efforts to cause the Sale Hearing to be
heard on that date or the earliest date thereafter permitted by the U.S. Court's schedule. In
no event later than three Business Days following completion of the Auction, the Canadian
Debtors shall file a motion for the Canadian Approval and Vesting Order with this
Honourable Court.

87·

- 32 -

67.    The Monitor recognizes the expeditious nature of the proposed sale process.  However, given the extensive process conducted to date and that there are likely to be a limited number of parties interested in acquiring the MEN Business, the Monitor is supportive of the proposed sale process.  In addition, Nortel has consulted with, among others, the Committee and the Bondholder Group regarding the Bidding Procedures and believes that these parties are supportive of the timing of this sale process.

68.    As described in the relevant motion materials filed with the U.S. Court, the key provisions of the Bidding Procedures are outlined in the paragraphs that follow.

**Bid Deadline**

69.    A Qualified Bidder (as defined below) that desires to make a bid will deliver written copies of its bid to: the Sellers, counsel and financial advisors to the Sellers, counsel and financial advisors to the Committee, counsel to the Bondholders' Committee, the Monitor, the U.K. Administrators and counsel to the U.K. Administrators (collectively, the "Notice Parties"); so as to be received not later than 4:00 p.m. (Eastern Time) on November 9, 2009 (the "Bid Deadline").

**Provisions Governing Qualifications of Bidders**

70.    Unless otherwise ordered by the U.S. Court and this Honourable Court and accepted by the U.K. Administrators, for cause shown, or as otherwise determined by the Sellers, in consultation with the Committee, the Bondholder Group and the Monitor, in order to participate in the bidding process, each person (a "Potential Bidder"), other than Ciena, must deliver (unless previously delivered) to the Notice Parties:

   a)    an executed confidentiality agreement (to be delivered prior to the distribution of any confidential information by the Sellers to a Potential Bidder) in form and substance satisfactory to the Sellers and on terms that are substantially similar to those contained in the confidentiality agreement executed by Ciena;

   b)    financial information that will allow the Sellers and their financial advisors, in consultation with the Committee, the Bondholders' Committee and the

88.

- 33 -

Monitor, to make a reasonable determination as to the Potential Bidder's financial and other capabilities to consummate a purchase of the Purchased Assets; and

c)  a preliminary (non-binding) written proposal regarding: (i) the purchase price range (including liabilities to assumed by the Potential Bidder); (ii) any Purchased Assets expected to be excluded or any additional assets desired to be included; (iii) the structure and financing of the transaction (including, but not limited to, the sources of financing for the purchase price and all requisite financial assurance); (iv) any anticipated corporate, stockholder, internal or regulatory approvals required to close the transaction, the anticipated time frame and any anticipated impediments for obtaining such approvals; (v) the proposed number of employees of the Sellers who will become employees of the Potential Bidder, and any proposed measures associated with their continued employment; and (vi) any conditions to closing that the Potential Bidder may wish to impose in addition to those set forth in the Ciena Agreement.

71. A Potential Bidder that satisfies the above requirements, whose financial information and credit quality support or enhancement demonstrate to the Sellers' satisfaction the financial capability of the Potential Bidder to consummate the transaction, and who has submitted a reasonably competitive and realistic non-binding proposal, as described above, and who has executed a confidentiality agreement, as described above, and that the Sellers determine in their reasonable business judgement, after consultation with their counsel and financial advisors, the Committee, the Bondholder Group and the Monitor, is likely (based on availability of financing, experience and other considerations) to be able to consummate the transaction, will be deemed a "Qualified Bidder". The determination as to whether a Potential Bidder meets the requirements of a Qualified Bidder will be made as promptly as practicable and the Sellers will so notify the Potential Bidder. The Sellers will immediately allow Qualified Bidders to begin to conduct due diligence with respect to the Purchased Assets as provided in the Bidding Procedures.

89.

- 34 -

*Provisions Governing Qualified Bids*

72.   A bid submitted pursuant to the Bidding Procedures will be considered a Qualified Bid
      only if the bid is submitted by a Qualified Bidder and complies with all of the following
      (a "Qualified Bid"):

      a)   the Qualified Bidder offers to purchase the Purchased Assets upon the terms
          and conditions substantially as set forth in the Ciena Agreement, or pursuant to
          alternate terms and conditions that the Sellers determine, after consultation with
          the Committee, the Bondholder Group and the Monitor, are no less favourable
          than the terms and conditions of the Ciena Agreement;

      b)   the Qualified Bidder's offer is irrevocable until the selection of the Successful
          Bidder (as defined below) and, if applicable, the Alternate Bidder (as defined
          below), provided that if such bidder is selected as the Successful Bidder or the
          Alternative Bidder, its offer shall remain irrevocable until the earlier of (i)
          closing of the sale to the Successful Bidder or the Alternate Bidder, and (ii) (x)
          with respect to the Successful Bidder only, March 1, 2010 and (y) with respect
          to the Alternate Bidder only, the Alternate Bid Expiration Date (as defined
          below);

      c)   it includes a duly authorized and executed sale agreement, including the
          purchase price for the Purchased Assets expressed in U.S. Dollars (the
          "Purchase Price"), together with all exhibits and schedules thereto including to
          the extent required by such bid, all applicable ancillary agreements as well as
          copies of such materials marked to show those amendments and modifications
          to the Ciena Agreement, the EMEA ASA and related ancillary agreements and
          proposed orders to approve the sale by the U.S. Court, this Honourable Court
          and any other applicable court(s) whose approval may be required, as  proposed
          by the Qualified Bidder;

      d)   it includes written evidence of a firm, irrevocable commitment for financing, or
          other evidence of ability to consummate the proposed transaction;

- 35 -

e)   it is not conditioned on (i) the outcome of unperformed due diligence by the bidder and/or (ii) obtaining financing;

f)   it fully discloses the identity of each entity that will be bidding for the Purchased Assets or otherwise sponsoring or participating in connection with such bid, and the complete terms of any such participation;

g)   it has a value to the Sellers, in the Sellers' reasonable business judgment, after consultation with their financial advisors, the Committee, the Bondholder Group and the Monitor that either individually or, when evaluated in conjunction with any other Qualified Bid for the Purchased Assets, is greater than or equal to the sum of the value offered under the Ciena Agreement plus (i) the amount of the Break-Up Fee and Expense Reimbursement plus (ii) $5 million;

h)   it includes an acknowledgement and representation with respect to the executory contracts and unexpired leases which the Qualified Bidder proposes to assume or not assume, the Qualified Bidder's proposal for the treatment of related Cure Costs and any executory contract or unexpired lease the assumption and assignment of which is a condition to Closing;

i)   it includes an acknowledgement and representation that the Qualified Bidder: (i) has had an opportunity to conduct and all required due diligence regarding the Purchased Assets prior to making its offer; ii) has relied solely upon its own independent review, investigation and/or inspection of any documents and/or the Purchased Assets; (iii) has not relied upon any written or oral statements, representations, promises, warranties or guaranties whatsoever, except as expressly stated in its bid; and (iv) is not entitled to any expense reimbursement or break-up fee in connection with its bid;

j)   it includes evidence of authorization and approval from the Qualified Bidder's board of directors (or comparable governing body);

*91*

- 36 -

    k)    it is accompanied by a good faith deposit in an amount equal to 5% of the Purchase Price;

    l)    it contains full details of the proposed number of employees of the Sellers (apportioned by jurisdiction) who will become employees of the Qualified Bidder and any proposed measures associated with their continued employment and identifies any pension liabilities and assets related to any employees currently covered under the Nortel Retirement Income Plan who will become employees of the Qualified Bidder that the Qualified Bidder intends to assume or purchase;

    m)    it includes evidence of the Qualified Bidder's ability to comply with Section 365 of the Code (to the extent applicable), including providing adequate assurance of such Qualified Bidder's ability to perform in the future the contracts and leases proposed to be assigned or subleased to the Potential Bidder;

    n)    it contains other information reasonably requested by the Sellers; and

    o)    it is received by the Bid Deadline.

73.    The Sellers will determine, in their reasonable business judgment, after consultation with the Committee, the Bondholder Group and the Monitor, whether to deem bids for the Purchased Assets that do not conform to one or more of the requirements specified in the Bidding Procedures to be Qualified Bids provided that the Sellers may not waive substantial compliance with any items in paragraphs d), e), f), i)(iv), j) and o) above without the consent of Ciena, the Committee, the Bondholder Group and the Monitor, and such consent shall not be unreasonably withheld in connection with any bid that (i) would otherwise fully satisfy the requirements of a Qualified Bid hereunder but for a de minimums failure to comply with those criteria; and (ii) such noncompliance is cured within 24 hours of the Bid Deadline.

9ユ

- 37 -

74.    The Sellers shall deliver copies of any bids deemed to be Qualified Bids to Ciena on the day that such bid is determined to be a Qualified Bid and in no event later than 48 hours prior to the commencement of the Auction. The Sellers shall promptly notify Ciena and all Qualified Bidders in writing as to whether or not any bids constitute Qualified Bids and in no event later than two Business Days following the expiration of the Bid Deadline.

75.    Notwithstanding the foregoing, Ciena will be deemed a Qualified Bidder, and the Ciena Agreement will be deemed a Qualified Bid, for all purposes in connection with the bidding process, the Auction, and the sale.

76.    A Qualified Bid will be valued based upon several factors including, without limitation, items such as the purchase price and the net value provided by such bid, the claims likely to be created by such bid in relation to other bids, the counterparties to such transaction, the proposed revisions to the relevant transaction documents, the effect of the transaction on the value of the ongoing businesses of Sellers, other factors affecting the speed, certainty and value of the transaction, the assets included or excluded from the bid, the estimated number of in-scope employees of the Sellers (apportioned by jurisdiction) to be offered post-closing employment by the Qualified Bidder and any proposed measures associated with their continued employment, the transition services required from the Sellers post-closing and any related restructuring costs, and the likelihood and timing of consummating such transaction, each as determined by the Sellers, in consultation with their advisors, the Committee, the Bondholder Group and the Monitor.

77.    If the Sellers do not receive any Qualified Bids other than the Ciena Agreement, the Auction shall be cancelled and the Sellers shall promptly proceed to complete the transactions contemplated by the terms of the Ciena Agreement subject to obtaining any relevant court approvals.

*Auction Process*

78.    If the Sellers receive one or more Qualified Bids in addition to the Ciena Agreement, the Sellers will conduct the Auction of the Purchased Assets, upon notice to all Qualified Bidders who have submitted Qualified Bids, on November 13, 2009, which Auction may

*93.*

- 38 -

be cancelled or adjourned without the prior consent of Ciena, subject to the terms of the Ciena Agreement and the Bidding Procedures.

79.     The Auction shall run in accordance with the following procedures:

- only the Sellers, the Purchaser, the Committee, the Bondholder Group, the Monitor and the U.K. Administrators (and the advisors to each of the foregoing), any creditor of the U.S. Debtors or the Applicants and any other Qualified Bidder that has timely submitted a Qualified Bid, shall attend the Auction in person, and only the Purchaser and such other Qualified Bidders will be entitled to make any subsequent bids at the Auction;

- each Qualified Bidder shall be required to confirm that it has not engaged in any collusion with respect to the bidding or the sale;

- at least one business day prior to the Auction, each Qualified Bidder who has timely submitted a Qualified Bid must inform the Sellers whether it intends to attend the Auction;

- at least one business day prior to the Auction, the Sellers will provide copies of the Qualified Bid or combination of Qualified Bids which the Sellers believe, in their reasonable business judgment, after consultation with the Committee, the Bondholder Group and the Monitor, is the highest or otherwise best offer (the "Starting Bid") to the Purchaser and all other Qualified Bidders;

- all Qualified Bidders who have timely submitted Qualified Bids will be entitled to be present for all Subsequent Bids (as explained below) at the Auction with the understanding that the true identity of each Qualified Bidder at the Auction will be fully disclosed to all other Qualified Bidders at the Auction and that all material terms of each Subsequent Bid will be fully disclosed to all other bidders throughout the entire Auction;

94.

- 39 -

- the Sellers, after consultation with their counsel and financial advisors, the Committee, the Bondholder Group and the Monitor, may employ and announce at the Auction additional procedural rules that are reasonable under the circumstances for conducting the Auction provided that such rules are (i) not inconsistent with the Bidding Procedures, the Code, or any order of the U.S. Court, this Honourable Court or any other applicable court entered in connection herewith, and (ii) disclosed to each Qualified Bidder at the Auction;

- bidding at the Auction will begin with the Starting Bid and continue, in one or more rounds of bidding, so long as during each round at least one subsequent bid is submitted by a Qualified Bidder that in the determination of the Sellers, in consultation with their advisers, the Committee, the Bondholder Group and the Monitor, improves upon the Starting Bid or previous Leading Bid (as defined below). Each incremental bid at the Auction shall provide net value to the estate of at least $5 million, or such amount to be determined by the Sellers, in consultation with the UCC, the Bondholder Group and the Monitor, over the Starting Bid or the Leading Bid. After each round of bidding, the Sellers shall announce the bid or combination of bids (and the value of such bid(s)) that it believes to be the highest or otherwise better offer (the "Leading Bid"). A round of bidding will conclude after each participating Qualified Bidder has had the opportunity to submit a Subsequent Bid with full knowledge of the Leading Bid.

*Selection of Successful Bid*

80.    Prior to the conclusion of the Auction, the Sellers, in consultation with their advisors, the Committee, the Bondholder Group and the Monitor, will (a) review each Qualified Bid and evaluate each Qualified Bid on the basis of a number of financial and other factors, (b) identify the highest or otherwise best offer or offers for the Purchased Assets received at the Auction (the "Successful Bid" and the bidder making such bid, the "Successful Bidder"), and (c) communicate to Ciena and the other Qualified Bidders the identity of the Successful Bidder, the Alternate Bidder (as defined below), if any, and the details of the

95

- 40 -

Successful Bid and Alternate Bid (as defined below), if any. The determination of the Successful Bid and Alternate Bid shall be final and subject to approval by the U.S. Court and this Honourable Court.

81.  The Sellers will sell the Purchased Assets to the Successful Bidder pursuant to the terms of the Successful Bid (or, under certain circumstances described herein, the Alternate Bidder) upon approval of such Successful Bid by the U.S. Court at the Sale Hearing, this Honourable Court and any required approvals of any other applicable court(s) and execution by the U.K. Administrators of the relevant Successful Bid transaction documents (or, under certain circumstances described herein, the Alternate Bidder).

### Closing with Alternative Bidders

82.  If the Sellers receive one or more additional Qualified Bid(s), then, at the Sale Hearing and at any other hearings of any other applicable court(s) to approve the entering into agreements with respect to the Successful Bid, the Sellers will seek approval of the Successful Bid, and, at the Sellers' election, the next highest or best Qualified Bid (the "Alternate Bid," and such bidder, the "Alternate Bidder"). Following approval of the sale to the Successful Bidder, if the Successful Bidder fails to consummate the sale for any reason, then the Alternate Bid will be deemed to be the Successful Bid and the Sellers will be authorized, but not directed, to effectuate a sale to the Alternate Bidder subject to the terms of the Alternate Bid. If a Qualified Bid other than the Ciena Agreement is selected as the Alternate Bid, then the Alternate Bid shall remain open until the earlier of (a) December 15, 2009 or (b) the consummation of the sale to the Successful Bidder (the "Alternate Bid Expiration Date").

83.  Notwithstanding the foregoing, under no circumstance will the Purchaser be deemed the Alternate Bidder.

96.

- 41 -

*Court Approval*

84.   The Bidding Procedures are being submitted to this Honourable Court and to the U.S.
      Court for approval and the Ciena Agreement is being submitted for approval as the
      stalking horse bid pursuant to those Bidding Procedures. The final sale and assignment of
      the Purchased Assets will also be submitted to this Honourable Court and to the U.S. Court
      for approval. With respect to those assets owned by the EMEA Debtors, the U.K.
      Administrators have the power and authority to sell the assets without seeking a separate
      order from the U.K. Court.

*Reservation of Rights*

85.   The Bidding Procedures are subject to the rights of the Sellers, in consultation with the
      Committee, the Bondholder Group and the Monitor, to: a) after each round of bidding at
      the Auction, determine which Qualified Bid is the highest or best offer; b) reject, at any
      time, any bid that: is inadequate or insufficient; not in conformity with the requirements of
      the Code, the Bidding Procedures, any orders of this Honourable Court or any other
      applicable orders; contrary to the best interests of the Sellers, their estates and
      stakeholders; or contrary to the statutory duties or legal obligations of the U.K.
      Administrators; and c) modify the Bidding Procedures or impose at, or prior to the
      Auction, additional customary terms and conditions on the sale of the Purchased Assets.

86.   The Sellers may not, without prior written consent of the Committee, the Bondholder
      Group, the Monitor and the Purchaser adjourn the Auction for more than three Business
      Days or subject to the availability of the U.S. Court and this Honourable Court, adjourn the
      Sale Hearing for more than three Business Days if the Auction has concluded.

## ALLOCATION OF PROCEEDS OF SALE AMONGST NORTEL ENTITIES AND THE
## SIDE AGREEMENT

87.   As previously indicated, the MEN Business is not operated through a dedicated legal entity
      or stand-alone division. The Applicants have an interest in intellectual property of the

97

MEN Business which, in turn, is subject to various intercompany licensing agreements with other Nortel legal entities around the world, in some cases on an exclusive basis and in other cases, on a non-exclusive basis. Therefore, the task of allocating the sale proceeds stemming from a sale agreement amongst the various Nortel entities in the various jurisdictions is complex.

88.    As set out in the Fifteenth Report, the Applicants, U.S. Debtors, and certain of the EMEA entities, through the U.K. Administrators, entered into the Interim Funding and Settlement Agreement ("IFSA") which was approved by this Honourable Court on June 29, 2009. Pursuant to the IFSA, each of the Applicants, U.S. Debtors, and EMEA Debtors agreed that their execution of definitive documentation with a purchaser of any material Nortel assets shall not be conditional upon reaching an agreement regarding the allocation of the sale proceeds or binding procedures for the allocation of the sale proceeds. In addition, the parties agreed that in the absence of any agreement regarding the allocation of any sale proceeds, the proceeds shall be deposited in an escrow account and any distribution from the escrow account shall be contingent upon (i) the agreement of all of the Selling Debtors or (ii) in the case where the Selling Debtors fail to reach an agreement, a determination of the allocation by the relevant dispute resolvers. The parties to the IFSA agreed to negotiate in good faith and attempt to reach an agreement on a protocol for resolving disputes concerning the allocation of sales proceeds, including binding procedures for the allocation of sales proceeds where the Selling Debtors have been unable to reach an agreement regarding such allocation.

89.    As of the current date, no agreement has been reached regarding the allocation of any sales proceeds and the terms of a protocol with respect to the resolution of disputes in connection with the allocation of sale proceeds are still under discussion.

90.    In the interim, the Applicants, the U.S. Debtors and the EMEA Sellers have engaged in discussions with respect to a draft side agreement (the "Side Agreement") which will, amongst other things, implement, certain elements of the framework set forth in the IFSA and set out certain agreements between the Nortel parties with respect to a process to allocate the Break-Up Fee, Expense Reimbursement and termination fee as amongst the

98.

- 43 -

Applicants, the U.S. Debtors and the EMEA Sellers, and a process to appoint the Distribution Agent and the selling agent to hold and deal with the Shares. The Monitor expects that the Applicants will bring a further motion before this Honourable Court for approval of the Side Agreement once the same has been finalized. The Monitor will provide a supplementary report in respect of the Side Agreement in advance of such motion.

**THE MONTREAL PREMISES LOI**

91.  NNL currently leases the Montreal Premises pursuant to a lease dated as of June 27, 2007 and amended as of October 8, 2008 (the "Montreal Lease"). The Montreal Premises comprise the 3rd and 4th floors of a building located at 2351 Alfred-Nobel Blvd, Saint-Laurent, Quebec. The Montreal Lease is currently set to expire on June 30, 2012. A significant portion of the Montreal Premises is used in the operation of the MEN Business. As a result of employee and business reductions, the MEN Business does not currently need the full space available on both the 3rd and 4th floors. The Purchaser has advised the Company that it wishes to consolidate the MEN Business operations onto the 3rd floor and lease only the 3rd floor portion of the Montreal Premises.

92.  Accordingly, concurrent with its negotiations with the Purchaser, NNL entered into discussions with the Montreal Landlord with respect to an amendment to the Montreal Lease that would permit the Purchaser to receive an assignment of the restructured lease, but be responsible for the lease obligations pertaining to the 3rd floor premises only and therefore, facilitate the transaction contemplated by the Ciena Agreement. As a result of those negotiations, NNL and the Montreal Landlord entered into the Montreal LOI dated as of October 1, 2009. A redacted copy of the Montreal LOI is attached at Appendix "D". An unredacted copy of the Montreal LOI is attached as confidential Appendix "E". As the unredacted version contains sensitive information with respect to the identity of certain potential purchasers of the MEN Business, the Monitor requests that Appendix "E" to this

99.

- 44 -

Twenty-Fourth Report be sealed by this Honourable Court. A summary of the key terms of the Montreal LOI is as follows:

- the term of the Montreal Lease for the 3rd floor premises shall be extended to June 30, 2014, while the term of the 4th floor premises shall be amended to be 9 months from the date the Montreal LOI is approved by this Honourable Court;

- NNL agrees to consolidate the MEN Business onto the 3rd floor premises within 90 days of the Closing Date, the costs of such consolidation to be shared with the purchaser;

- the Montreal Landlord agrees that it will grant its consent to the assignment of the entire Montreal Lease to a purchaser of the MEN Business provided that such purchaser is Ciena, certain other specified entities or another purchaser who meets certain financial criteria;

- if the Montreal Lease is not assigned to a purchaser by May 31, 2010, the consent to the assignment shall expire, NNL shall pay a penalty of CDN$500,000 plus applicable taxes and the term of the Montreal Lease in respect of the 3rd floor premises shall revert to June 30, 2012;

- in the event that the Montreal Lease is assigned to a purchaser: a) Nortel shall remain liable for all obligations under the Montreal Lease for the period ending on June 30, 2012; and b) the 4th floor premises shall be subleased from the purchaser to NNL for the remainder of the amended term for the 4th floor premises, and the purchaser shall not be liable for, and its use and occupancy of the 3rd floor premises shall not be affected by, any default by NNL in respect of the 4th floor premises, NNL dealing directly with the Montreal Landlord in respect of the 4th floor premises (the effect being that the purchaser is effectively leasing and responsible only for the 3rd floor premises);

100

- 45 -

- in the event that the ultimate purchaser of the MEN Business does not wish to take an assignment of the Montreal Lease, NNL shall have a right to surrender the 3rd floor premises on or about June 30, 2010 upon payment to the Montreal Landlord of a surrender penalty of CDN$2,931,000;

- the Montreal Landlord may, on 90 days notice to NNL, require that half or all of the 4th floor premises be surrendered to the Montreal Landlord in which case NNL's consolidation of the MEN Business operations onto the 3rd floor premises may be accelerated;

- the Montreal LOI is conditional upon, among other things, approval of this Honourable Court on or before October 19, 2009; and

- notwithstanding any provisions in the Initial Order, NNL shall not have the right to repudiate the Montreal Lease, and any amounts payable to the Montreal Landlord pursuant to the Montreal LOI shall not be claims affected or compromised under any proposed plan of arrangement pursuant to the CCAA.

## MONITOR'S ANALYSIS AND RECOMMENDATIONS

93.   The Monitor has reviewed Nortel's efforts to divest the MEN Business and is of the view that the Applicants are acting in good faith to maximize value. The Monitor recommends approval of the Ciena Agreement as a "stalking horse" bid and approval of the Bidding Procedures as described above. In so doing, the Monitor considers the potential payment of the Break Fee and Expense Reimbursement to Ciena as reasonable in the circumstances.

94.   The Monitor has also reviewed the terms of the Montreal LOI and is of the view that the amendments to the Montreal Lease are necessary to facilitate the completion of a transaction with respect to the MEN Business and that the Montreal LOI is therefore reasonable in the circumstances. Accordingly, the Monitor recommends approval of the Montreal LOI.

101

- 46 -

95.    For the reasons described in Paragraphs 28 and 92, the Monitor recommends that confidential Appendix "B" and confidential Appendix "E" to this Twenty-Fourth Report be sealed by this Honourable Court.


All of which is respectfully submitted this 13th day of October, 2009.

**ERNST & YOUNG INC.**
In its capacity as Monitor of the Applicants

Per:


Murray A. McDonald
President