**TAB 4**

*102*

Court File No: 09-CL-7950

**ONTARIO**
**SUPERIOR COURT OF JUSTICE**
**(COMMERCIAL LIST)**

**IN THE MATTER OF THE** ***COMPANIES' CREDITORS ARRANGEMENT ACT,***
**R.S.C. 1985, c. C-36, AS AMENDED**

**AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF**
**NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL**
**NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL**
**CORPORATION AND NORTEL NETWORKS TECHNOLOGY CORPORATION**

**APPLICATION UNDER THE** ***COMPANIES' CREDITORS ARRANGEMENT ACT,***
**R.S.C. 1985, c. C-36, AS AMENDED**

**AFFIDAVIT OF GEORGE RIEDEL**
**(sworn November 25, 2009)**

I, George Riedel, of the city of Boston in the State of Massachusetts, MAKE OATH
AND SAY:

1.  I am the Chief Strategy Officer of Nortel Networks Corporation ("NNC") and Nortel
    Networks Limited ("NNL") and have held those positions since February, 2006.  As
    such, I have personal knowledge of the matters to which I hereinafter depose in this
    Affidavit.  Where I do not possess personal knowledge, I have stated the source of my
    information and, in all such cases, believe it to be true.

2.  I swear this Affidavit in support of the motion to approve, among other things, an
    amended and restated asset sale agreement dated as of November 24, 2009 (as amended,
    the "Sale Agreement") among NNC, NNL and Nortel Networks Inc. ("NNI") and certain
    of their affiliates, as vendors, certain other entities defined therein as Sellers (collectively,
    the "Sellers") and Ciena Corporation, as purchaser ("Ciena" or the "Purchaser"), in
    respect of the sale of certain of the Sellers' assets relating to the MEN Business (as such
    phrase is defined and described in further detail below) (the "Assets"). I am aware that a
    copy of the Sale Agreement (without exhibits or schedules) will be attached as an
    appendix to the Monitor's twenty-eighth report (the "Twenty-Eighth Report") to be filed

103.

- 2 -

in connection with this motion. References to "Nortel" herein are references to the global enterprise of NNC, NNL, NNI and their respective affiliates as a whole. In connection with entering into the Sale Agreement, certain Nortel entities in EMEA (defined below), as vendors (the "EMEA Sellers") and the Purchaser, as purchaser, entered into an asset sale agreement relating to the sale and purchase dated as of October 7, 2009 (as amended by an amendment dated October 20, 2009 and as further amended by an EMEA Amendment Agreement dated as of November 24, 2009, the "EMEA Agreement" and together with the Sale Agreement, the "Purchase Agreements") in respect of the sale of certain of the assets of the EMEA Sellers relating to the MEN Business.

3.      All dollar references are US$ unless otherwise indicated.

**BACKGROUND**

4.      On January 14, 2009 (the "Filing Date"), NNC, NNL, Nortel Networks Technology Corporation, Nortel Networks Global Corporation and Nortel Networks International Corporation (collectively, the "Applicants") were granted protection under the *Companies' Creditors Arrangement Act*, R.S.C. 1985, c. C-36, as amended (the "CCAA") pursuant to an initial order (as subsequently amended and restated, the "Initial Order") of this Honourable Court and Ernst & Young Inc. was appointed as monitor (the "Monitor") in the CCAA proceedings.

5.      Also on January 14, 2009, certain of NNC's U.S. subsidiaries, including its principal U.S. operating subsidiary NNI (together with the other U.S. filing entities, the "Chapter 11 Debtors"), made voluntary filings in the United States Bankruptcy Court for the District of Delaware (the "U.S. Court") under Chapter 11 of the United States Bankruptcy Code (the "Code"). On the same date, this Honourable Court granted an Order pursuant to Section 18.6(4) of the CCAA recognizing the Chapter 11 cases as "foreign proceedings" in Canada and giving effect in Canada to the automatic stay under the Code.

6.      Additionally, on January 15, 2009, Nortel Networks UK Limited ("NNUK") and certain subsidiaries of the Nortel group incorporated in Europe, the Middle East or Africa ("EMEA") each obtained an administration order for the appointment of administrators from the English High Court of Justice under the Insolvency Act 1986.

104

- 3 -

7.    On February 27, 2009, the U.S. Court granted petitions recognizing these proceedings as "foreign main proceedings" pursuant to Chapter 15 of the Code.

8.    On May 28, 2009, the Commercial Court of Versailles, France (the "French Court") ordered the commencement of secondary insolvency proceedings in respect of Nortel Networks S.A. ("NNSA"), which consist of liquidation proceedings during which NNSA was originally authorized to continue to operate as a going concern for an initial period of three months which period was subsequently extended. On October 1, 2009, the French Court approved an order to (i) suspend the liquidation operation relating to the sale of the assets and/or business of NNSA for a renewal period of two months; and (ii) authorize the continuation of the business of NNSA so long as the liquidation operations are suspended; and (iii) maintain the powers of the French administrator and liquidator during that period except with respect to the sale of assets and/or businesses of NNSA. In accordance with the European Union's Counsel Regulation, the English law proceedings remain the main proceedings in respect of NNSA.

9.    On June 8, 2009, the Joint Administrators appointed in respect of NNUK filed a petition with the U.S. Court for the recognition of the Administration Proceedings as they relate to NNUK (the "English Proceedings") under Chapter 15 of the Code.  On June 26, 2009, the U.S. Court entered an order recognizing the English Proceedings as foreign main proceedings under Chapter 15 of the Code.

10.    On July 14, 2009, Nortel Networks (CALA) Inc. made a voluntary filing with the U.S. Court under Chapter 11 of the Code.

11.    Further details regarding the background to these proceedings are set out in the affidavit of John Doolittle sworn January 14, 2009 (the "Initial Order Affidavit") previously filed in these proceedings as well as my affidavit sworn October 9, 2009 (the "October 9 Affidavit") in support of the motion for the approval of the bidding procedures for the sale of the MEN Business and are therefore not repeated herein.

12.    Capitalized terms used in this section of my Affidavit not otherwise defined herein shall have the meanings given to them in the Sale Agreement.

*105*

- 4 -

**The MEN Business**

13.    As was set out in my October 9 Affidavit as well as the twenty-fourth report of the
       Monitor dated October 13, 2009 (the "Twenty-Fourth Report"), Nortel's Metro Ethernet
       Networks business (the "MEN Business") includes optical networking, carrier Ethernet
       switching and multiservice switching products, delivering carrier-grade Ethernet
       transport capabilities for higher performance and lower cost for emerging video-intensive
       applications.

14.    The MEN Business's optical networking portfolio includes the 40G Adaptive Optical
       Engine technology, which can quadruple network capacity while being deployable over
       any fiber, allowing service providers to reduce engineering and equipment expense and
       upgrade quickly and cost-effectively from 10G to 40G. The MEN Business also is in the
       process of developing the industry's first optical technology that can deliver both 40G
       and 100G network capacity, enabling four times the network throughput immediately,
       while providing the foundation to simply and affordably increase capacity tenfold as
       required.

15.    Nortel's principal competitors in the global optical market are large communications
       companies such as Alcatel-Lucent, Huawei Technologies Co., Ltd., Nokia Siemens
       Networks B.V., Fujitsu Limited, Ericsson and Cisco Systems, Inc., as well as others that
       address specific niches within this market, such as Ciena, ADVA AG Optical
       Networking, Meiningen, Tellabs, Inc. and Infinera Corporation.

**Pre-filing Marketing Efforts**

16.    As was set out in my October 9 Affidavit, even prior to the commencement of the CCAA
       proceedings, Nortel had begun exploring a divestiture of the MEN Business. In
       connection with this initial effort, Nortel, in consultation with its financial advisors,

       (a)    approached approximately fifty (50) parties likely to be interested and able to
              acquire the MEN Business, including a mix of financial investors and strategic
              buyers.

*106.*

- 5 -

(b)  An information memorandum was provided to the twenty-one (21) parties who had executed confidentiality agreements. Of those parties who subsequently submitted expressions of interest, Nortel conducted management presentations with the entities it deemed able to consummate a transaction for the MEN Business, and ultimately gave five (5) companies access to an electronic data room containing confidential diligence materials regarding the MEN Business.

(c)  As of the Filing Date, Nortel was in serious discussions with three (3) potential bidders, including Ciena. The commencement of CCAA proceedings forced Nortel to put its plans to divest the MEN Business on hold in order to evaluate the future of the company as a whole.

17.  After the commencement of the proceedings, the Applicants reinitiated their efforts to divest the MEN Business, re-canvassing many of the entities originally contacted in connection with the previous sale, plus five (5) additional parties. As a result of these efforts, thirteen (13) parties expressed interest in purchasing the assets, executed confidentiality agreements and were provided confidential information memoranda. All thirteen (13) were given access to the electronic data room, and management presentations were conducted with seven (7) entities.

**The Sale and Bid Process**

18.  As part of a joint hearing between this Court and the U.S. Court held on October 15, 2009, the asset sale agreement dated as of October 7, 2009 among the parties (as amended, the "Stalking Horse Offer") and bidding procedures (the "Bidding Procedures") for the sale of the MEN Business were approved pursuant to orders (the "Bidding Procedures Orders") of each of the Courts.

19.  The Bidding Procedures contemplated, among other things:

(a)  a process pursuant to which interested parties could become "Qualified Bidders";

(b)  an initial bid deadline of 4pm (ET) on November 9, 2009 (the "Initial Bid Deadline");

*107*

- 6 -

    (c)     criteria for designating bids as "Qualified Bids"; and

    (d)     an auction (the "Auction") scheduled to be held at the offices of Cleary Gottlieb Steen & Hamilton LLP in New York City on November 13, 2009.

20.    Upon obtaining the Bidding Procedures Orders, Nortel, with the assistance of its financial advisor, Lazard Frères & Co. ("Lazard") renewed its marketing efforts with respect to the MEN Business. In particular,

    (a)     Notices were published in the Globe and Mail (National Edition), the Financial Times (National Edition) and The Wall Street Journal (National Edition);

    (b)     Nortel or Lazard contacted fourteen (14) potentially interested parties in connection with the MEN Business;

    (c)     five (5) interested parties executed non-disclosure agreements or acknowledgments in respect of their existing non-disclosure agreement;

    (d)     two (2) parties submitted expressions of interest and sufficient financial information and were deemed "Qualified Bidders"; and

    (e)     these two (2) Qualified Bidders were provided access to extensive due diligence information including management presentations.

21.    As of 4 p.m. on November 9, 2009, the Sellers had not received any bids in addition to the Stalking Horse Offer. As such, the Sellers, after consultation with Lazard, the Monitor, the ad hoc bondholders' committee (the "Bondholders' Committee") and the official committee of unsecured creditors of NNI (the "UCC") decided to extend the Initial Bid Deadline to 4 p.m. (ET) on Thursday, November 12, 2009. Subsequent decisions were made to further the Initial Bid Deadline to the ultimately expire on Tuesday, November 17, 2009 (the "Extended Bid Deadline").[1]

---

[1] Pursuant to the Bidding Procedures, the Sellers are entitled to extend the Initial Bid Deadline for up to five (5) Business Days without the consent of Ciena.

108

- 7 -

22.    During the extension period, two (2) additional parties executed non-disclosure agreements or acknowledgements and were provided access to due diligence information in accordance with the Bidding Procedures.

23.    As a result of the extension of the Initial Bid Deadline, the Sellers received one (1) additional bid (the "MEN Acquisition Bid") from MEN Acquisition LLC[2] ("MEN Acquisition"). In accordance with the Bidding Procedures and after consultation with the Monitor, Lazard, the Bondholders' Committee and the UCC, on Wednesday, November 18, 2009, the Sellers informed MEN Acquisition as well as the Purchaser that the MEN Acquisition Bid was deemed a "Qualified Bid".

24.    In accordance with the Bidding Procedures and after consultation with the Monitor, Lazard, the Bondholders' Committee and the UCC, on Thursday, November 19, 2009, the Sellers declared the MEN Acquisition Bid as the "Starting Bid" for the purposes of the Auction and informed both MEN Acquisition and the Purchaser of that decision.

**The Auction**

25.    As contemplated by the Bidding Procedures, the Auction commenced at 10:00 a.m. on Friday, November 20, 2009 at the offices of Cleary Gottlieb Steen and Hamilton LLP.[3] A brief summary of the Auction is as follows:

a)    during the course of the Auction, there were eleven (11) rounds of bidding in which bids were submitted;

b)    in the eleventh round of bidding, Ciena made a bid (the "Final Bid") contemplating a purchase price of US$530 million in cash plus US$239 million Convertible Notes (the terms of which are described in more detail below);

c)    subsequent to the submission of the Final Bid, MEN Acquisition indicated that it would not be submitting a subsequent bid; and

d)    the Final Bid was selected as the winning bid, an MEN Acquisition bid offered in

---

[2] MEN Acquisition is an entity formed between two of the Qualified Bidders.

[3] In accordance with the Stalking Horse ASA, Ciena consented to the Auction commencing less than 48 hours after it had received the MEN Acquisition Bid.

- 8 -

round 8 of the Auction was declared the Alternate Bid (as defined and discussed in further detail below) and the auction was adjourned pending signing of final documents.

**The Stalking Horse Offer and the Sale Agreement**

26.     A detailed summary of the Stalking Horse Offer was set out in my October 9 Affidavit as well as the Twenty-Fourth Report and is therefore not repeated herein. During the course of the Auction, Ciena agreed to make a number of changes to the Stalking Horse Offer as part of its bids. I am aware that the Twenty-Eighth Report will contain a detailed summary of the changes between the Stalking Horse Offer and the Sale Agreement. A summary of the significant changes are as follows:

(a)     The cash portion of the Purchase Price has been increased to US$530 million;

(b)     The Share consideration contained in the Stalking Horse Offer has been replaced with US$239 million of 6% Senior convertible notes (the "Convertible Notes") convertible at the holder's option into Common Stock at a conversion price equal to US$16.4625 subject to adjustments contemplated in the Indenture, provided, however, that the Purchaser may, by written notice to the Sellers on or before the Closing Date, elect to increase the Cash Purchase Price and the Base Cash Purchase Price payable by up to the Aggregate Principal Amount in lieu of issuing the corresponding face amount of the Convertible Notes and provided further, that if the Market Value of the Common Stock on the date of the notice of such election (or in the case the replacement is made with the proceeds of a simultaneous convertible security offering the most recent closing price per share of the Common Stock on the NASDAQ Global Select Market at the time such convertible security offering is priced) is equal to or greater than US$17.00 per share of Common Stock, then in lieu of increasing the Cash Purchase Price by the Aggregate Principal Amount such increase will equal the Optional Redemption Price corresponding to such Aggregate Principal Amount;

(c)     Approximately eighty-four patents that were previously included as part of the transferred intellectual property were removed from the Transferred Intellectual

Property and instead, the Purchaser accepted a non-exclusive license in respect of those patents; and

(d)    The Purchaser agreed to cooperate in respect of the negotiation of agreement or agreements to address certain interdependencies to the extent any bilateral relationships with other businesses, business segments or divisions (or former businesses, business segments or divisions) of certain Sellers for the supply of products are required to be in place in order to fulfill customer commitments existing as of the Closing Date and which will continue thereafter.

27.    Additionally, as per the Bidding Procedures Orders, the Purchaser has agreed to make a good faith deposit of US$38.45 million, representing 5% of the Purchase Price on or before November 25, 2009.

28.    All of the remaining terms and conditions of the Stalking Horse Offer remain substantially the same.

**Closing Conditions**

29.    The completion of the transactions contemplated by the Sale Agreement is subject to certain customary closing conditions including approval of the transactions by both this Court as well as the U.S. Court.  Further, the Sale Agreement includes the following closing conditions: (i) the Sellers' delivery to the Purchaser of its Audited Financial Statements and the Unaudited September 30, 2008 Financial Statements pursuant to the Sale Agreement at least five (5) days prior to the Closing Date, and (ii) the performance in all material respects of all material covenants, obligations and agreements required to be performed by the Sellers on or before the Closing.

**Alternate Bid**

30.    The Bidding Procedures contemplated the approval of one or more "Alternate Bids" in the event that the transaction with the Purchaser does not close.  At the auction, MEN Acquisition (the "Alternative Bidder") was chosen as the alternative bidder with a bid on substantially similar terms contained in the Sale Agreement, with a purchase price of

||| ·

- 10 -

US$710 million (the "Alternate Bid"). Further details regarding the Alternate Bid will be set out in the Twenty-Eighth Report.

**Sealing**

31.    I am aware that the Monitor has or will be filing confidential appendices to the Twenty-Eighth Report which contain the disclosure schedules and exhibits to the Sale Agreement. The disclosure schedules and exhibits contain sensitive competitive and, in some instances, personal information.

32.    I believe sealing this confidential appendix is appropriate in the circumstances.

**CONCLUSION**

33.    I believe that the Sale Agreement is the product of a vigorous, comprehensive and fair process.

34.    Based on the Applicants' previous consideration of potential transactions involving the MEN Business and after re-canvassing the marketplace since the commencement of these proceedings including since the entry of the Bidding Procedures Orders, I believe that the proposed transaction as set out in the Sale Agreement is the best offer available for the Assets and that the Alternate Bid represents the second best offer available for the Assets.

SWORN BEFORE ME at the City of Boston, in the State of Massachusetts on this 25th day of November, 2009.

_____
Commissioner for Taking Affidavits or Notary Public

George Riedel

ANNIE B. LO
Notary Public
Commonwealth of Massachusetts
My Commission Expires
November 30, 2012

112

Court File No: 09-CL-7950

IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL
NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL NETWORKS
GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL CORPORATION AND
NORTEL NETWORKS TECHNOLOGY CORPORATION

*ONTARIO*
**SUPERIOR COURT OF JUSTICE**
**(COMMERCIAL LIST)**

Proceeding commenced at Toronto

**AFFIDAVIT OF GEORGE RIEDEL**
(sworn November 25, 2009)

**OGILVY RENAULT LLP**
Suite 3800
Royal Bank Plaza, South Tower
200 Bay Street
P.O. Box 84
Toronto, Ontario M5J 2Z4, Canada

**Derrick Tay LSUC#: 21152A**
Tel: (416) 216-4832
Email: dtay@ogilvyrenault.com

**Mario Forte  LSUC#: 27293F**
Tel: (416) 216-4870
Email: mforte@ogilvyrenault.com

**Jennifer Stam LSUC #46735J**
Tel: (416) 216-2327
Email: jstam@ogilvyrenault.com
Fax: (416) 216-3930

Lawyers for the Applicants

DOCSTOR: 1815894\3

**TAB 5**

113·

Court File No:  09-CL-7950

***ONTARIO***
**SUPERIOR COURT OF JUSTICE**
**COMMERCIAL LIST**

THE HONOURABLE MR.                )        WEDNESDAY, THE 2nd DAY
                                                  )
JUSTICE MORAWETZ                  )        OF DECEMBER, 2009


**IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,
R.S.C. 1985, c. C-36, AS AMENDED**

**AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF
NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL
NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL
CORPORATION AND NORTEL NETWORKS TECHNOLOGY CORPORATION**

**APPLICATION UNDER THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,
R.S.C. 1985, c. C-36, AS AMENDED**


**APPROVAL AND VESTING ORDER**
**(Metro Ethernet Networks Business)**


THIS MOTION, made by Nortel Networks Corporation ("NNC"), Nortel Networks
Limited ("NNL"), Nortel Networks Technology Corporation, Nortel Networks International
Corporation and Nortel Networks Global Corporation (collectively, the "Applicants") for an
order approving the sale transaction (the "Transaction") contemplated by an amended and
restated asset sale agreement dated as of November 22, 2009 (the "Sale Agreement") among
Ciena Corporation (the "Purchaser"), as buyer, and NNC, NNL and Nortel Networks Inc.
(collectively, the "Main Sellers") and the affiliates of the Main Sellers identified in the Sale
Agreement as Other Sellers (and together with the Main Sellers and the EMEA Sellers (as
defined in the Sale Agreement), the "Sellers") as vendors, in respect of the sale of certain assets
relating to Nortel's Metro Ethernet Networks business and as appended to the Affidavit of

- 2 -

114

George Riedel, sworn November 25, 2009 (the "Riedel Affidavit"), and vesting in the Purchaser or the appropriate Designated Purchaser, as the case may be, the Applicants' right, title and interest in and to the Assets (as defined in the Sale Agreement), was heard this day at 393 University Avenue, Toronto, Ontario.

ON READING the Riedel Affidavit, the Twenty-Eighth Report of Ernst & Young Inc. in its capacity as monitor (the "Monitor") dated ●, 2009 (the "Twenty-Eighth Report") and on hearing the submissions of counsel for the Applicant and for the Monitor and those other parties present, no one appearing for any other person on the service list, although properly served as appears from the affidavit of Katie Legree sworn ●, 2009 and filed:

1.     THIS COURT ORDERS that the time for the service of the Notice of Motion, the Twenty-Eighth Report and the Motion Record is hereby abridged so that this Motion is properly returnable today and hereby dispenses with further service thereof.

2.     THIS COURT ORDERS that capitalized terms used herein and not otherwise defined shall have the meaning given to them in the Sale Agreement.

3.     THIS COURT ORDERS AND DECLARES that the Transaction is hereby approved. The execution of the Sale Agreement and the Ancillary Agreements by the Applicants party thereto is hereby authorized and approved, and the Applicants and the Monitor are hereby authorized and directed to take such additional steps and execute such additional documents as may be necessary or desirable for the completion of the Transaction and for the conveyance of the Applicants' right, title and interest in and to the Assets to the Purchaser.

4.     THIS COURT ORDERS that in the event that the Transaction contemplated by the Sale Agreement cannot be consummated in accordance with the Sale Agreement, the Alternate Bid (as defined in the Riedel Affidavit) be and is hereby approved and the execution of the asset sale agreement pursuant to the Alternate Bid by the Applicants is approved and the Applicants and the Monitor shall be authorized to take such additional steps and execute such additional documents, as may be necessary or desirable for the completion of the transaction contemplated by the Alternate Bidder and for the conveyance of the Applicants' right, title and interest in and to the Assets to the Alternative Bidder.

115

- 3 -

5.    THIS COURT ORDERS that the Applicants are authorized and directed to perform their obligations under the Sale Agreement and each of the Ancillary Agreements.

6.    THIS COURT ORDERS AND DECLARES that upon the delivery of a Monitor's certificate to the Purchaser substantially in the form attached as Schedule "A" hereto (the "Monitor's Certificate"), all of the Applicants' right, title and interest in and to the Assets shall vest absolutely in the Purchaser or the appropriate Designated Purchaser, as the case may be, free and clear of and from any and all security interests (whether contractual, statutory, or otherwise), hypothecs, mortgages, pledges, deeds of trust, trusts or deemed trusts (whether contractual, statutory, or otherwise), liens (statutory or otherwise), executions, levies, charges, or other financial or monetary claims, options, rights of use, rights of first offer or first refusal, real property licenses but only in respect of the Montreal Premises (which, for greater certainty, does not include any rights of sublease or occupation which may be in the Montreal Premises Restructured Lease), encumbrances, conditional sale arrangements or other similar restrictions of any kind, whether or not they have attached or been perfected, registered or filed and whether secured, unsecured or otherwise (collectively, the "Claims"), including, without limiting the generality of the foregoing: (i) any encumbrances or charges created by the Order of the Honourable Justice Morawetz dated January 14, 2009 (as amended and restated); and (ii) all charges, security interests or claims evidenced by registrations pursuant to the *Personal Property Security Act* (Ontario) or any other personal property registry system, excluding present zoning, entitlement, building and land use regulations, covenants, minor defects of title, easements, rights of way, development agreements, restrictions and other similar charges or encumbrances, and Assumed Liabilities. For greater certainty, this Court orders that all of the Claims affecting or relating to the Assets are hereby expunged and discharged as against the Assets.

7.    THIS COURT ORDERS that for the purposes of determining the nature and priority of Claims, the net proceeds from the sale of the Applicants' right, title and interest in and to the Assets shall stand in the place and stead of the Assets, and that from and after the delivery of the Monitor's Certificate all Claims shall attach to the net proceeds from the sale of the Applicants' right, title and interest in and to the Assets with the same priority as they had with respect to the Assets immediately prior to the sale, as if the Applicants' right, title and interest in and to the Assets had not been sold and remained in the possession or control of the person having that possession or control immediately prior to the sale.

- 4 -

116

8.    THIS COURT ORDERS that all proceeds of the Transaction, subject to the price adjustments and the Purchaser's rights under the Sale Agreement and less applicable transfer or value added taxes incurred by the Sellers, shall be deposited into an escrow account pursuant to an escrow agreement to be negotiated and agreed to by all of the Sellers and in accordance with Section 12.g. of the Interim Funding and Settlement Agreement entered into on June 9, 2009 (the "IFA"), and such proceeds shall not be distributed in advance of either (i) agreement by all of the Sellers as to the distribution of such proceeds (in accordance with Section 12.g. of the IFA) or (ii) in the case where the Sellers fail to reach such agreement, determination by the relevant dispute resolver(s) in accordance with the terms of the Interim Sales Protocol (as such term is defined in the IFA and subject to the requirements of Section 12.g of the IFA), which Interim Sales Protocol shall be approved by this Court.

9.    THIS COURT ORDERS AND DIRECTS the Monitor to file with the Court a copy of the Monitor's Certificate, forthwith after delivery thereof.

10.    THIS COURT ORDERS that, notwithstanding:

(a)    the pendency of these proceedings;

(b)    any applications for a bankruptcy order now or hereafter issued pursuant to the *Bankruptcy and Insolvency Act* (Canada) in respect of the Applicants and any bankruptcy order issued pursuant to any such applications; and

(c)    any assignment in bankruptcy made in respect of the Applicants;

the provisions of the Transaction Documents, the vesting of the Applicants' right, title and interest in and to the Assets in the Purchaser pursuant to this Order shall be binding on any trustee in bankruptcy that may be appointed in respect of any of the Applicants and shall not be void or voidable by creditors of the Applicants, nor shall it constitute oppressive conduct nor constitute or be deemed to be a preference, fraudulent conveyance, transfer at undervalue, or other challengeable or voidable transaction under the *Bankruptcy and Insolvency Act* (Canada) or any other applicable federal or provincial legislation, nor shall it constitute oppressive or unfairly prejudicial conduct pursuant to any applicable federal or provincial legislation.

- 5 -

117

11.    THIS COURT ORDERS that the Sale Agreement and the Ancillary Agreements shall not be repudiated, disclaimed or otherwise compromised in these proceedings.

12.    THIS COURT ORDERS AND DECLARES that the Transaction is exempt from the application of the *Bulk Sales Act* (Ontario).

13.    THIS COURT ORDERS that confidential appendix "●" to the Twenty-Eighth Report be and is hereby sealed pending further Order of the Court.

14.    THIS COURT HEREBY REQUESTS the aid and recognition of any court, tribunal, regulatory or administrative body having jurisdiction in Canada, the United States, the United Kingdom or elsewhere, to give effect to this Order and to assist the Applicants, the Monitor and their respective agents in carrying out the terms of this Order. All courts, tribunals, regulatory and administrative bodies are hereby respectfully requested to make such orders and to provide such assistance to the Applicants and to the Monitor, as an officer of this Court, as may be necessary or desirable to give effect to this Order, to grant representative status to the Monitor in any foreign proceeding, or to assist the Applicants and the Monitor and their respective agents in carrying out the terms of this Order.

15.    THIS COURT ORDERS that each of the Applicants and the Monitor be at liberty and is hereby authorized and empowered to apply to any court, tribunal, regulatory or administrative body, wherever located, for the recognition of this Order and for assistance in carrying out the terms of this Order.

11 8·

**Schedule A – Form of Monitor's Certificate**

Court File No. 09-CL-7950

**ONTARIO**

**SUPERIOR COURT OF JUSTICE**

**COMMERCIAL LIST**

**IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,
R.S.C. 1985, c. C-36, AS AMENDED**

**AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL
NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL NETWORKS
GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL CORPORATION
AND NORTEL NETWORKS TECHNOLOGY CORPORATION**

**APPLICATION UNDER THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,
R.S.C. 1985, c. C-36, AS AMENDED**

**MONITOR'S CERTIFICATE
(Metro Ethernet Networks Business)**

**RECITALS**

A.      Pursuant to an Order of the Honourable Justice Morawetz of the Ontario Superior Court of Justice (the "Court") dated January 14, 2009 (as amended and restated), Nortel Networks Corporation ("NNC"), Nortel Networks Limited ("NNL") and certain of their Canadian affiliates (collectively, the "Applicants") commenced proceedings pursuant to the *Companies' Creditors Arrangement Act* (Canada) and Ernst & Young Inc. was appointed as monitor (the "Monitor") in those proceedings.

B.      Pursuant to an Order of the Court dated ●, 2009, the Court approved an amended and restated asset sale agreement dated as of November 22, 2009 (the "Sale Agreement") among Ciena Corporation (the "Purchaser"), as buyer, and NNC, NNL and Nortel Networks Inc. (collectively, "Main Sellers"), affiliates of the Main Sellers identified as Other Sellers in the Sale Agreement and the EMEA Sellers, as vendors, in respect of the sale of certain assets relating to Nortel's Metro Ethernet Networks business and provided for the vesting in the Purchaser or a Designated Purchaser, as the case may be, of the Applicants' right, title and interest in and to the Assets, which vesting is to be effective with respect to

119

the Assets upon the delivery by the Monitor to the Purchaser of a certificate confirming receipt of confirmation from NNC and NNL that (i) the Purchaser has paid the Purchase Price as set out in the Sale Agreement; (ii) that the conditions to Closing as set out in Article IX of the Sale Agreement have been satisfied or waived by the Sellers and/or the Purchaser, as applicable; and (iii) the Transaction has been completed to the satisfaction of the Applicants.

C.      Unless otherwise indicated herein, terms with initial capitals have the meanings set out in the Sale Agreement.

THE MONITOR CERTIFIES the following:

1.      NNC and NNL have advised the Monitor that the Purchaser has paid [**and the Escrow Agent**] has received the Purchase Price payable on the Closing Date pursuant to the Sale Agreement;

2.      NNC and NNL have advised the Monitor that the conditions to Closing as set out in Article IX of the Sale Agreement have been satisfied or waived by the Sellers and/or the Purchaser, as applicable; and

3.      NNC and NNL have advised the Monitor that the Transaction has been completed to the satisfaction of the Applicants.

This Certificate was delivered by the Monitor at _____ [TIME] on _____ [DATE].

**ERNST & YOUNG INC. in its capacity as monitor in the Applicants' CCAA proceedings and not in its personal capacity**

Per:    _____

        Name:

        Title:

120.

Court File No: 09-CL-7950

IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL CORPORATION AND NORTEL NETWORKS TECHNOLOGY CORPORATION

*ONTARIO*
SUPERIOR COURT OF JUSTICE
(COMMERCIAL LIST)

Proceeding commenced at Toronto

**APPROVAL AND VESTING ORDER**
**(Metro Ethernet Networks Business)**

**OGILVY RENAULT LLP**
Suite 3800
Royal Bank Plaza, South Tower
200 Bay Street
P.O. Box 84
Toronto, Ontario  M5J 2Z4, Canada

**Derrick Tay LSUC#: 21152A**
Tel: (416) 216-4832
Email: dtay@ogilvyrenault.com

**Mario Forte  LSUC#: 27293F**
Tel: (416) 216-4870
Email: mforte@ogilvyrenault.com

**Jennifer Stam LSUC #46735J**
Tel: (416) 216-2327
Email: jstam@ogilvyrenault.com
Fax: (416) 216-3930
Lawyers for the Applicants

**TAB 6**

/2/

Court File No. ~~========~~: 09-CL-7950

### *ONTARIO*
### SUPERIOR COURT OF JUSTICE
### COMMERCIAL LIST

| | | |
|---|---|---|
| THE HONOURABLE ~~======~~MR. | ) | ~~========DAY~~WEDNESDAY, THE~~====~~. |
| | ) | 2nd DAY |
| JUSTICE | ) | |
| ~~==============~~MORAWETZ | | OF ~~==========~~DECEMBER, 200~~7~~9 |

~~B E T W E E N:~~

#### ~~PLAINTIFF~~

~~Plaintiff~~

~~- and -~~

#### ~~DEFENDANT~~

~~Defendant~~

#### IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED

#### AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL CORPORATION AND NORTEL NETWORKS TECHNOLOGY CORPORATION

#### APPLICATION UNDER THE *COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED

### APPROVAL AND VESTING ORDER
### (Metro Ethernet Networks Business)

THIS MOTION, made by ~~[RECEIVER'S NAME] in its capacity as the Court-appointed interim receiver and receiver (the "Receiver") of the undertaking, property and assets of~~

2

*122*

[DEBTOR] (the "Debtor"Nortel Networks Corporation ("NNC"), Nortel Networks Limited ("NNL"), Nortel Networks Technology Corporation, Nortel Networks International Corporation and Nortel Networks Global Corporation (collectively, the "Applicants") for an order approving the sale transaction (the ""Transaction"") contemplated by an amended and restated asset sale agreement of purchase and sale (the "Sale Agreement") between the Receiver and [NAME OF PURCHASER] (the "Purchaser") made as of [DATE] and appended to the Report of the Receiver dated [DATE] (the "Report"dated as of November 22, 2009 (the "Sale Agreement") among Ciena Corporation (the "Purchaser"), as buyer, and NNC, NNL and Nortel Networks Inc. (collectively, the "Main Sellers") and the affiliates of the Main Sellers identified in the Sale Agreement as Other Sellers (and together with the Main Sellers and the EMEA Sellers (as defined in the sale agreement), the "Sellers") as vendors, in respect of the sale of certain assets relating to Nortel's Metro Ethernet Networks business and as appended to the Affidavit of George Riedel, sworn November 25, 2009 (the "Riedel Affidavit"), and vesting in the Purchaser the Debtor'sor the appropriate Designated Purchaser, as the case may be, the Applicants' right, title and interest in and to the assets describedAssets (as defined in the Sale Agreement (the "Purchased Assets"), was heard this day at 3930 University Avenue, Toronto, Ontario.

ON READING the Riedel Affidavit, the Twenty-Eighth Report of Ernst & Young Inc. in its capacity as monitor (the "Monitor") dated ●, 2009 (the "Twenty-Eighth Report") and on hearing the submissions of counsel for the Receiver, [NAMES OF OTHER PARTIES APPEARING]Applicant and for the Monitor and those other parties present, no one appearing for any other person on the service list, although properly served as appears from the affidavit of [NAME]Katie Legree sworn [DATE]●, 2009 and filed[1]:

1.      THIS COURT ORDERS that the time for the service of the Notice of Motion, the Twenty-Eighth Report and the Motion Record is hereby abridged so that this Motion is properly returnable today and hereby dispenses with further service thereof.

2.      THIS COURT ORDERS that capitalized terms used herein and not otherwise defined shall have the meaning given to them in the Sale Agreement.

---

[1] This model order assumes that the time for service does not need to be abridged.  The motion seeking a vesting order should be served on all persons having an economic interest in the Purchased Assets, unless circumstances warrant a different approach.

3

123

3.    ~~THIS COURT ORDERS~~ AND DECLARES that the Transaction is hereby approved, ~~and that the Sale Agreement is commercially reasonable and in the best interests of the Debtor and its stakeholders~~. The execution of the Sale Agreement and the Ancillary Agreements by the ~~Receiver²~~Applicants party thereto is hereby authorized and approved, and the ~~Receiver is~~Applicants and the Monitor are hereby authorized and directed to take such additional steps and execute such additional documents as may be necessary or desirable for the completion of the Transaction and for the conveyance of the ~~Purchased~~Applicants' right, title and interest in and to the Assets to the Purchaser.

4.    THIS COURT ORDERS that in the event that the Transaction contemplated by the Sale Agreement cannot be consummated in accordance with the Sale Agreement, the Alternate Bid (as defined in the Riedel Affidavit) be and is hereby approved and the execution of the asset sale agreement pursuant to the Alternate Bid by the Applicants is approved and the Applicants and the Monitor shall be authorized to take such additional steps and execute such additional documents, as may be necessary or desirable for the completion of the transaction contemplated by the Alternate Bidder and for the conveyance of the Applicants' right, title and interest in and to the Assets to the Alternative Bidder.

5.    THIS COURT ORDERS that the Applicants are authorized and directed to perform their obligations under the Sale Agreement and each of the Ancillary Agreements.

6.    ~~2.~~ THIS COURT ORDERS AND DECLARES that upon the delivery of a ~~Receiver~~Monitor's certificate to the Purchaser substantially in the form attached as Schedule "A" hereto (the "~~Receiver~~" "Monitor's Certificate³"), all of the ~~Debtor's~~Applicants' right, title and interest in and to the ~~Purchased Assets described in the Sale Agreement [and listed on Schedule B hereto]³~~Assets shall vest absolutely in the Purchaser or the appropriate Designated Purchaser, as the case may be, free and clear of and from any and all security interests (whether contractual, statutory, or otherwise), hypothecs, mortgages, pledges, deeds of trust, trusts or deemed trusts (whether contractual, statutory, or otherwise), liens (statutory or otherwise), executions, levies, charges, or other financial or monetary claims, options, rights of use, rights of first offer or first

---

² ~~In some cases, the Debtor will be the vendor under the Sale Agreement, or otherwise actively involved in the Transaction. In those cases, care should be taken to ensure that this Order authorizes either or both of the Debtor and the Receiver to execute and deliver documents, and take other steps.~~

³ ~~To allow this Order to be free-standing (and not require reference to the Court record and/or the Sale Agreement), it may be preferable that the Purchased Assets be specifically described in a Schedule.~~

4

124.

refusal, real property licenses but only in respect of the Montreal Premises (which, for greater certainty, does not include any rights of sublease or occupation which may be in the Montreal Premises Restructured Lease), encumbrances, conditional sale arrangements or other similar restrictions of any kind, whether or not they have attached or been perfected, registered or filed and whether secured, unsecured or otherwise (collectively, the ~~"~~"Claims~~"4"~~), including, without limiting the generality of the foregoing: (i) any encumbrances or charges created by the Order of the Honourable Justice [NAME]Morawetz dated [DATE]January 14, 2009 (as amended and restated); and (ii) all charges, security interests or claims evidenced by registrations pursuant to the *Personal Property Security Act* (Ontario) or any other personal property registry system; and (iii) those Claims listed on Schedule C hereto (all of which are collectively referred to as the "Encumbrances", which term shall not include the permitted encumbrances, easements and restrictive covenants listed on Schedule D) and, for, excluding present zoning, entitlement, building and land use regulations, covenants, minor defects of title, easements, rights of way, development agreements, restrictions and other similar charges or encumbrances, and Assumed Liabilities. For greater certainty, this Court orders that all of the EncumbrancesClaims affecting or relating to the Purchased Assets are hereby expunged and discharged as against the Purchased Assets.

3.      THIS COURT ORDERS that upon the registration in the Land Registry Office for the [Registry Division of {LOCATION} of a Transfer/Deed of Land in the form prescribed by the *Land Registration Reform Act* duly executed by the Receiver][Land Titles Division of {LOCATION} of an Application for Vesting Order in the form prescribed by the *Land Titles Act* and/or the *Land Registration Reform Act*]5, the Land Registrar is hereby directed to enter the Purchaser as the owner of the subject real property identified in Schedule B hereto (the "Real Property") in fee simple, and is hereby directed to delete and expunge from title to the Real Property all of the Claims listed in Schedule C hereto.

---

4 The "Claims" being vested out may, in some cases, include ownership claims, where ownership is disputed and the dispute is brought to the attention of the Court. Such ownership claims would, in that case, still continue as against the net proceeds from the sale of the claimed asset. Similarly, other rights, titles or interests could also be vested out, if the Court is advised what rights are being affected, and the appropriate persons are served. It is the Subcommittee's view that a non-specific vesting out of "rights, titles and interests" is vague and therefore undesirable.

5 Elect the language appropriate to the land registry system (Registry vs. Land Titles).

5

125.

7.    4. THIS COURT ORDERS that for the purposes of determining the nature and priority of Claims, the net proceeds[6] from the sale of the ~~Purchased~~Applicants' right, title and interest in and to the Assets shall stand in the place and stead of the ~~Purchased~~ Assets, and that from and after the delivery of the ~~Receiver'~~Monitor's Certificate all Claims ~~and Encumbrances~~ shall attach to the net proceeds from the sale of the ~~Purchased~~Applicants' right, title and interest in and to the Assets with the same priority as they had with respect to the ~~Purchased~~ Assets immediately prior to the sale[7], as if the ~~Purchased~~Applicants' right, title and interest in and to the Assets had not been sold and remained in the possession or control of the person having that possession or control immediately prior to the sale.

8.    5. THIS COURT ORDERS that all proceeds of the Transaction, subject to the price adjustments and the Purchaser's rights under the Sale Agreement and less applicable transfer or value added taxes incurred by the Sellers, shall be deposited into an escrow account pursuant to an escrow agreement to be negotiated and agreed to by all of the Sellers and in accordance with Section 12.g. of the Interim Funding and Settlement Agreement entered into on June 9, 2009 (the "IFA"), and such proceeds shall not be distributed in advance of either (i) agreement by all of the Sellers as to the distribution of such proceeds (in accordance with Section 12.g. of the IFA) or (ii) in the case where the Sellers fail to reach such agreement, determination by the relevant dispute resolver(s) in accordance with the terms of the Interim Sales Protocol (as such term is defined in the IFA and subject to the requirements of Section 12.g of the IFA), which Interim Sales Protocol shall be approved by this Court.

9.    THIS COURT ORDERS AND DIRECTS the ~~Receiver~~Monitor to file with the Court a copy of the ~~Receiver'~~Monitor's Certificate, forthwith after delivery thereof.

6.    ~~THIS COURT ORDERS that, pursuant to clause 7(3)(c) of the Canada *Personal Information Protection and Electronic Documents Act*, the Receiver is authorized and permitted to disclose and transfer to the Purchaser all human resources and payroll information in the Company's records pertaining to the Debtor's past and current employees, including personal~~

---

[6] ~~The Report should identify the disposition costs and any other costs which should be paid from the gross sale proceeds, to arrive at "net proceeds".~~

[7] ~~This provision crystallizes the date as of which the Claims will be determined. If a sale occurs early in the insolvency process, or potentially secured claimants may not have had the time or the ability to register or perfect proper claims prior to the sale, this provision may not be appropriate, and should be amended to remove this crystallization concept.~~

6

*1̇26.*

~~information of those employees listed on Schedule "●" to the Sale Agreement.  The Purchaser~~
~~shall maintain and protect the privacy of such information and shall be entitled to use the~~
~~personal information provided to it in a manner which is in all material respects identical to the~~
~~prior use of such information by the Debtor.~~

10.    ~~7.~~ THIS COURT ORDERS that, notwithstanding:

    (a)    the pendency of these proceedings;

    (b)    any applications for a bankruptcy order now or hereafter issued pursuant to the *Bankruptcy and Insolvency Act* (Canada) in respect of the ~~Debtor~~Applicants and any bankruptcy order issued pursuant to any such applications; and

    (c)    any assignment in bankruptcy made in respect of the ~~Debtor~~Applicants;

the provisions of the Transaction Documents, the vesting of the ~~Purchased~~Applicants' right, title and interest in and to the Assets in the Purchaser pursuant to this Order shall be binding on any trustee in bankruptcy that may be appointed in respect of any of the ~~Debtor~~Applicants and shall not be void or voidable by creditors of the ~~Debtor~~Applicants, nor shall it constitute ~~nor~~oppressive conduct nor constitute or be deemed to be a ~~settlement, fraudulent~~ preference, ~~assignment,~~ fraudulent conveyance, transfer at undervalue, or other ~~reviewable~~challengeable or voidable transaction under the *Bankruptcy and Insolvency Act* (Canada) or any other applicable federal or provincial legislation, nor shall it constitute oppressive or unfairly prejudicial conduct pursuant to any applicable federal or provincial legislation.[8]

11.    THIS COURT ORDERS that the Sale Agreement and the Ancillary Agreements shall not be repudiated, disclaimed or otherwise compromised in these proceedings.

12.    ~~8.~~ THIS COURT ORDERS AND DECLARES that the Transaction is exempt from the application of the *Bulk Sales Act* (Ontario).

---

[8] ~~Please note that an appeal is pending before the Ontario Court of Appeal (Impact Tool & Mould Inc. (Re), Court~~
~~of Appeal file no. C47464), in which the appellant has challenged whether the Court can make the type of~~
~~declaratory relief set out in this paragraph.~~

7                                                     /27 ·

13.    THIS COURT ORDERS that confidential appendix "●" to the Twenty-Eighth Report be and is hereby sealed pending further Order of the Court.

14.    9.~THIS COURT HEREBY REQUESTS the aid and recognition of any court, tribunal, regulatory or administrative body having jurisdiction in Canada~or~in, the United States, the United Kingdom or elsewhere, to give effect to this Order and to assist the Receiver~and~ itsApplicants, the Monitor and their respective agents in carrying out the terms of this Order. All courts, tribunals, regulatory and administrative bodies are hereby respectfully requested to make such orders and to provide such assistance to the ReceiverApplicants and to the Monitor, as an officer of this Court, as may be necessary or desirable to give effect to this Order, to grant representative status to the Monitor in any foreign proceeding, or to assist the Receiver~and~ itsApplicants and the Monitor and their respective agents in carrying out the terms of this Order.

15.    THIS COURT ORDERS that each of the Applicants and the Monitor be at liberty and is hereby authorized and empowered to apply to any court, tribunal, regulatory or administrative body, wherever located, for the recognition of this Order and for assistance in carrying out the terms of this Order.

*128.*

**Schedule A – Form of ~~Receiver~~Monitor's Certificate**

Court File No. ~~============~~09-CL-7950

**ONTARIO**

**SUPERIOR COURT OF JUSTICE**

**COMMERCIAL LIST**

~~B E T W E E N:~~

~~PLAINTIFF~~

~~Plaintiff~~

~~- and -~~

~~DEFENDANT~~

~~Defendant~~

**IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT,*
R.S.C. 1985, c. C-36, AS AMENDED**

**AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL
NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL NETWORKS
GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL CORPORATION
AND NORTEL NETWORKS TECHNOLOGY CORPORATION**

**APPLICATION UNDER THE *COMPANIES' CREDITORS ARRANGEMENT ACT,*
R.S.C. 1985, c. C-36, AS AMENDED**

**~~RECEIVER~~MONITOR'S CERTIFICATE**
**(Metro Ethernet Networks Business)**

**RECITALS**

A.       Pursuant to an Order of the Honourable ~~[NAME OF JUDGE]~~Justice Morawetz of the Ontario
Superior Court of Justice (the "~~"~~Court"~~)~~ ~~dated [DATE OF ORDER], [NAME OF RECEIVER] was
appointed as the interim receiver and receiver (the "Receiver") of the undertaking, property and assets of
[DEBTOR] (the "Debtor")~~")~~ dated January 14, 2009 (as amended and restated), Nortel Networks

129.

-2-

Corporation ("NNC"), Nortel Networks Limited ("NNL") and certain of their Canadian affiliates (collectively, the "Applicants") commenced proceedings pursuant to the *Companies' Creditors Arrangement Act* (Canada) and Ernst & Young Inc. was appointed as monitor (the "Monitor") in those proceedings.

B.     Pursuant to an Order of the Court dated [DATE]●, 2009, the Court approved the agreement of purchase and sale made as of [DATE OF AGREEMENT] (the "Sale Agreement") between the Receiver [Debtor] and [NAME OF PURCHASER] (the "Purchaser")an amended and restated asset sale agreement dated as of November 22, 2009 (the "Sale Agreement") among Ciena Corporation (the "Purchaser"), as buyer, and NNC, NNL and Nortel Networks Inc. (collectively, "Main Sellers"), affiliates of the Main Sellers identified as Other Sellers in the Sale Agreement and the EMEA Sellers, as vendors, in respect of the sale of certain assets relating to Nortel's Metro Ethernet Networks business and provided for the vesting in the Purchaser or a Designated Purchaser, as the case may be, of the Debtor'sApplicants' right, title and interest in and to the Purchased Assets, which vesting is to be effective with respect to the Purchased Assets upon the delivery by the ReceiverMonitor to the Purchaser of a certificate confirming receipt of confirmation from NNC and NNL that (i) the payment by the Purchaser ofhas paid the Purchase Price foras set out in the Purchased AssetsSale Agreement; (ii) that the conditions to Closing as set out in section ●Article IX of the Sale Agreement have been satisfied or waived by the ReceiverSellers and/or the Purchaser, as applicable; and (iii) the Transaction has been completed to the satisfaction of the ReceiverApplicants.

C.     Unless otherwise indicated herein, terms with initial capitals have the meanings set out in the Sale Agreement.

THE RECEIVERMONITOR CERTIFIES the following:

1.     TheNNC and NNL have advised the Monitor that the Purchaser has paid [and the ReceiverEscrow Agent] has received the Purchase Price for the Purchased Assets payable on the Closing Date pursuant to the Sale Agreement;

2.     TheNNC and NNL have advised the Monitor that the conditions to Closing as set out in section ●Article IX of the Sale Agreement have been satisfied or waived by the ReceiverSellers and/or the Purchaser, as applicable; and

130.

~2~

3.    ~~The~~NNC and NNL have advised the Monitor that the Transaction has been completed to the satisfaction of the ~~Receiver~~Applicants.

4.    This Certificate was delivered by the ~~Receiver~~Monitor at _____ [TIME] on _____ [DATE].

<div style="margin-left:40%">

**~~[NAME OF RECEIVER],~~ERNST & YOUNG INC.** in its capacity as ~~Receiver of the undertaking, property and assets of [DEBTOR],~~**monitor in the Applicants' CCAA proceedings** and not in its personal capacity

Per:    _____

       Name:

       Title:

</div>

131

Court File No: 09-CL-7950

IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL
NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL NETWORKS
GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL CORPORATION AND
NORTEL NETWORKS TECHNOLOGY CORPORATION

*ONTARIO*
**SUPERIOR COURT OF JUSTICE**
**(COMMERCIAL LIST)**

Proceeding commenced at Toronto

**APPROVAL AND VESTING ORDER**
(Metro Ethernet Networks Business)

**OGILVY        RENAULT        LLP**
Suite                                        3800
Royal    Bank    Plaza    South    Tower
200                Bay                  Street
P.O.           Box                         84
Toronto, Ontario M5J 2Z4 Canada

Derrick    Tay    LSUC#:    21152A
Tel:        (416)        216-4832
Email:    dtay@ogilvyrenault.com

Mario    Forte    LSUC#:    27293F
Tel:        (416)        216-4870
Email: mforte@ogilvyrenault.com

Jennifer    Stam    LSUC    #46735J
Tel:        (416)        216-2327
Email:    jstam@ogilvyrenault.com
Fax:        (416)        216-3930
Lawyers for the Applicants

Schedule B – Purchased Assets

DOCSTOR: 1328040457\140

132

Schedule C — Claims to be deleted and expunged from title to Real Property

DOCSTOR: 1014254.1

133

Schedule D – Permitted Encumbrances, Easements and Restrictive Covenants
related to the Real Property

(unaffected by the Vesting Order)

DOCSTOR: 1854520\1

Court File No: 09-CL-7950

IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL
NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL NETWORKS
GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL CORPORATION AND
NORTEL NETWORKS TECHNOLOGY CORPORATION

| | |
|---|---|
| | *ONTARIO*<br>**SUPERIOR COURT OF JUSTICE**<br>**(COMMERCIAL LIST)** |
| | Proceeding commenced at Toronto |
| | **MOTION RECORD**<br>**Approval and Vesting Order**<br>**Metro Ethernet Networks Business**<br>**(returnable December 2, 2009)** |
| | **OGILVY RENAULT LLP**<br>Suite 3800<br>Royal Bank Plaza, South Tower<br>200 Bay Street<br>P.O. Box 84<br>Toronto, Ontario M5J 2Z4<br><br>**Derrick Tay LSUC#: 21152A**<br>Tel: (416) 216-4832<br>Email: dtay@ogilvyrenault.com<br><br>**Mario Forte LSUC#: 27293F**<br>Tel: (416) 216-4870<br>Email: mforte@ogilvyrenault.com<br><br>**Jennifer Stam LSUC #46735J**<br>Tel: (416) 216-2327<br>Email: jstam@ogilvyrenault.com<br>Fax: (416) 216-3930<br><br>Lawyers for the Applicants |