## EXHIBIT A

Court File No. 09-CL-7950

### *ONTARIO*
### SUPERIOR COURT OF JUSTICE
### (COMMERCIAL LIST)

IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL CORPORATION AND NORTEL NETWORKS TECHNOLOGY CORPORATION

APPLICATION UNDER THE *COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED

### MOTION RECORD
### Approval of Various Relief
### (returnable December 2, 2009)

November 25, 2009

**OGILVY RENAULT LLP**
Suite 3800
Royal Bank Plaza, South Tower
200 Bay Street
P.O. Box 84
Toronto Ontario  M5J 2Z4

Derrick Tay LSUC#: 21152A
Tel:  (416) 216-4832
Email: dtay@ogilvyrenault.com

Mario Forte  LSUC#: 27293F
Tel: (416) 216-4870
Email: mforte@ogilvyrenault.com

Jennifer Stam LSUC #46735J
Tel: (416) 216-2327
Email: jstam@ogilvyrenault.com
Fax: (416) 216-3930

Lawyers for the Applicants

# INDEX

***ONTARIO***
**SUPERIOR COURT OF JUSTICE**
**(COMMERCIAL LIST)**

**IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,
R.S.C. 1985, c. C-36, AS AMENDED**

**AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF
NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED,
NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS
INTERNATIONAL CORPORATION AND NORTEL NETWORKS TECHNOLOGY
CORPORATION**

**APPLICATION UNDER THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,
R.S.C. 1985, c. C-36, AS AMENDED**

## INDEX

| TAB | DOCUMENT | PAGE |
|---|---|---|
| 1. | Notice of Motion returnable December 2, 2009 | 001 |
| 2. | Affidavit of John Doolittle, sworn November 25, 2009 | 026 |
| 3. | Draft Order (APAC Agreement) | 122 |
| 4. | Draft Order (Next Generation Packet Core Business Escrow Agreement) | 125 |
| 5. | Draft Amended Approval and Vesting Order (Next Generation Packet Core Business) | 128 |
| 6. | Blackline Amended Approval and Vesting Order (Next Generation Packet Core Business) to Original Approval and Vesting Order (Next Generation Packet Core) | 137 |
| 7. | Draft Order (Employee Hardship Application Process Extension) | 147 |

# TAB 1

Court File No. 09-CL-7950

***ONTARIO***
**SUPERIOR COURT OF JUSTICE**
**(COMMERCIAL LIST)**

**IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,**
**R.S.C. 1985, c. C-36, AS AMENDED**

**AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF**
**NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED,**
**NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS**
**INTERNATIONAL CORPORATION AND NORTEL NETWORKS TECHNOLOGY**
**CORPORATION**

**APPLICATION UNDER THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,**
**R.S.C. 1985, c. C-36, AS AMENDED**

**NOTICE OF MOTION**
**(returnable December 2, 2009)**

Nortel Networks Corporation, Nortel Networks Limited ("NNL"), Nortel Networks Technology Corporation ("NNTC"), Nortel Networks International Corporation and Nortel Networks Global Corporation (collectively, the "Applicants") will make a motion to Justice Morawetz of the Commercial List court on **Wednesday, December 2, 2009 at 11:00 a.m.**, or as soon after that time as the motion can be heard, at **393 University Avenue**, Toronto, Ontario.

**PROPOSED METHOD OF HEARING**: The motion is to be heard orally.

**THE MOTION IS FOR AN ORDER :**

(a)     Abridging the time for service of the Notice of Motion and Motion Record in respect of this motion and dispensing with further service thereof;

(b)     Approving the Asia Restructuring Agreement dated as of November 5, 2009 (the "APAC Agreement") among, *inter alia*, the Applicants, the Chapter 11 Debtors, the EMEA Debtors (as each is defined in the Affidavit of John Doolittle, sworn

- 2 -

November 25, 2009 (the "Doolittle Affidavit") (collectively the "Filed Entities"), the APAC Entities (as defined below) and for purposes of Section 16 of the APAC Agreement only, the Joint Administrators (as defined in the Doolittle Affidavit);

(c)     Authorizing and approving an escrow agreement (the "Escrow Agreement") among Nortel Networks Inc. ("NNI"), the Applicants, the EMEA Debtors, the Chapter 11 Debtors and the Estate Fiduciaries (as defined in the Escrow Agreement), and JPMorgan Chase Bank, N.A. as escrow agent;

(d)     Amending the Next Generation Packet Core Business Approval and Vesting Order (as defined below) to include references to NNTC as one of the "Sellers";

(e)     Approving the extension of the application period for receipt of employee hardship applications pursuant to the Employee Hardship Process (as defined below) to January 31, 2010; and

(f)     Such further and other relief as counsel may request and this Honourable Court deems just.

**THE GROUNDS FOR THE MOTION ARE:**

(a)     Pursuant to an Order of this Honourable Court made on January 14, 2009 (the "Filing Date") (as subsequently amended and restated, the "Initial Order"), the Applicants obtained protection pursuant to the *Companies' Creditors Arrangement Act* ("CCAA");

(b)     Under the Initial Order, Ernst & Young Inc., was appointed as monitor (the "Monitor") in the CCAA proceedings;

*The APAC Agreement*

(c)     Nortel carries on business around the world and has locally incorporated companies in many or all of the jurisdictions in which it carries on business. A number of the Nortel entities that have remained out of bankruptcy proceedings have been impacted

- 3 -

by the filings in North America and EMEA. Included in that group are certain of the Nortel affiliates in the Asia-Pacific region (collectively, the "APAC Entities");

(d)     Certain of the APAC Entities have experienced financial difficulties as certain amounts or balances of intercompany payables owing by the Filed Entities to the APAC Entities as of the Filing Date have become impaired. As a result, certain APAC Entities, although generating cash flow from continuing operations, have liquidity and/or balance sheet constraints after conducting a proper pre-filing setoff of the corresponding intercompany debt owing to them as of the Filing Date;

(e)     These issues have been the center of discussions over the past several months among the APAC Entities, the Filed Entities, the Monitor, certain key stakeholders and the Joint Administrators;

(f)     The parties have now agreed upon an Asia-Pacific restructuring plan the terms of which are set forth in the APAC Agreement;

(g)     The terms of the APAC Agreement were agreed to after extensive good faith negotiations and enable the APAC Entities to continue to operate their respective business operations while allowing the Filed Entities and the APAC Entities to continue to participate in the sale of global businesses or other assets to third parties;

(h)     The approval of the APAC Agreement is in the best interest of all parties involved;

*The Escrow Agreement*

(i)     On October 28, 2009, the Applicants obtained an Order (the "Next Generation Packet Core Business Approval and Vesting Order") from this Honourable Court approving and authorizing the transactions (the "Transaction") contemplated by a transaction agreement dated October 25, 2009 (the "Sale Agreement") and related Ancillary Agreements (as defined in the Sale Agreement) among NNL and NNI, as sellers and Hitachi, Ltd. as purchaser (the "Purchaser"), in respect of the Assets (as defined in the Sale Agreement) relating to Nortel's Next Generation Packet Core (as defined in the

- 4 -

4$^i$

Sale Agreement) research and development activities, and providing for the vesting in the Purchaser NNL's right, title and interest in and to the Assets;

(j)     As set out in the Next Generation Packet Core Business Approval and Vesting Order, the Applicants are required to place the net proceeds of sale into escrow pending the resolution of allocation matters amongst the estates.  Additionally, an interim funding and settlement agreement (the "IFSA") entered into between the Applicants, the U.S. Debtors, the EMEA Debtors and the Joint Administrators requires that proceeds be placed into an escrow;

(k)     The parties have now negotiated and substantially agreed upon the terms of the Escrow Agreement in the form attached as Exhibit "B" to the Doolittle Affidavit;

(l)     The Escrow Agreement has been negotiated in consultation with the Monitor as well as certain key stakeholders and the terms of same are fair and reasonable in the circumstances;

(m)    The approval of the Escrow Agreement will facilitate the completion of the Transaction, as the Escrow Agreement must be in place prior to closing of the Transaction and is currently the only outstanding approval required for the Transaction to close;

(n)     Concurrently with this Motion to approve the Escrow Agreement, the Applicants are seeking a motion to amend the Next Generation Packet Core Business Approval and Vesting Order to include NNTC as one of the sellers pursuant to the Sale Agreement, as NNTC is the owner of certain of the tangible assets that are being sold pursuant to the Sale Agreement;

*The Employee Hardship Process*

(o)     Pursuant to an Order of this Honourable Court made on July 30, 2009, an employee hardship process (the "Employee Hardship Process") was approved in recognition of the fact that there may be cases in which former employees of one of the Applicants is

experiencing financial hardship due to illness or healthcare costs, or due to ineligibility for pension or employment insurance benefits;

(p)    The maximum amount that was made available for the Employee Hardship Process was $750,000. Further, any hardship payments are considered advances against future distributions based on the claims of these former employees;

(q)    The period for receipt of employee hardship applications will conclude on November 30, 2009;

(r)    As there will continue to be terminations and the potential for hardship, the Applicants are requesting that the period for receipt of hardship applications be extended to January 31, 2010 and the document "Eligibility Requirements and Procedure with Respect to Hardship Payment Applications" be amended accordingly;

**MISCELLANEOUS**

(s)    The provisions of the CCAA; and

(t)    Further and other grounds as counsel may advise and this Honourable Court permit.

**THE FOLLOWING DOCUMENTARY EVIDENCE** will be used at the hearing of the motion:

(a)    The Doolittle Affidavit;

(b)    One or more reports of the Monitor to be filed; and

(c)    Such further and other evidence as counsel may request and this Honourable Court deem just.

- 6 -

November 25, 2009

**Ogilvy Renault LLP**
Suite 3800
Royal Bank Plaza, South Tower
200 Bay Street, P.O. Box 84
Toronto, Ontario  M5J 2Z4

**Derrick Tay LSUC#: 21152A**
Tel:  (416) 216-4832
Email: dtay@ogilvyrenault.com

**Mario Forte  LSUC#: 27293F**
Tel: (416) 216-4870
Email: mforte@ogilvyrenault.com

**Jennifer Stam LSUC #46735J**
Tel: (416) 216-2327
Email: jstam@ogilvyrenault.com

Fax: (416) 216-3930
Lawyers for the Applicants

TO:        Attached Service List

Court File No. 09-CL-7950

***ONTARIO***
**SUPERIOR COURT OF JUSTICE**
**(COMMERCIAL LIST)**

**IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,**
**R.S.C. 1985, c. c-36, AS AMENDED**

**AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF**
**NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL**
**NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL**
**CORPORATION AND NORTEL NETWORKS TECHNOLOGY CORPORATION**

**APPLICATION UNDER THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,**
**R.S.C. 1985, c. C-36, AS AMENDED**

**SERVICE LIST**

TO:      **OGILVY RENAULT LLP**
         Royal Bank Plaza, South Tower
         200 Bay Street, Suite 3800
         Toronto, Ontario M5J 2Z4

         Derrick Tay
         Mario Forte
         Jennifer Stam

         Email:    dtay@ogilvyrenault.com
                   mforte@ogilvyrenault.com
                   jstam@ogilvyrenault.com

         Tel:      416.216.4000
         Fax:      416.216.3930

         Lawyers for the Applicants

- 2 -

*8*

TO:   **ERNST & YOUNG INC.**
      Ernst & Young Tower
      222 Bay Street, P.O. Box 251
      Toronto, ON  M5K 1J7

      Murray McDonald
      Brent Beekenkamp

      Email:   nortel.monitor@ca.ey.com

      Tel:    416.943.3016
      Fax:    416.943.3300

AND
TO:   **GOODMANS LLP**
      250 Yonge Street
      Suite 2400
      Toronto, ON  M5B 2M6

      Jay Carfagnini
      Joseph Pasquariello
      Gail Rubenstein
      Chris Armstrong

      Email:   jcarfagnini@goodmans.ca
               jpasquariello@goodmans.ca
               grubenstein@goodmans.ca
               carmstrong@goodmans.ca

      Tel:    416.597.4107
      Fax:    416.979.1234

      Lawyers for the Monitor, Ernst & Young Inc.

AND
TO:   **OSLER HOSKIN AND HARCOURT
      LLP**
      100 King Street West
      1 First Canadian Place
      Suite 6100
      P.O. Box 50
      Toronto, ON  M5X 1B8

      Lyndon Barnes
      Rupert Chartrand
      Edward Sellers
      Adam Hirsh

      Email:   lbarnes@osler.com
               rchartrand@osler.com
               esellers@osler.com
               ahirsh@osler.com

      Tel:    416.362.2111
      Fax:    416.862.6666

      Lawyers for the Boards of Directors of
      Nortel Networks Corporation and Nortel
      Networks Limited

AND
TO:   **FASKEN MARTINEAU DUMOULIN LLP**
      66 Wellington Street West
      Toronto Dominion Bank Tower
      P.O. Box 20, Suite 4200
      Toronto, ON  M5K 1N6

      Donald E. Milner
      Aubrey Kauffman
      Edmond Lamek
      Jon Levin

      Email:   dmilner@fasken.com
               akauffman@fasken.com
               elamek@fasken.com
               jlevin@fasken.com

      Tel:    416.868.3538
      Fax:    416.364.7813

      Lawyers for Export Development Canada

- 3 -

AND TO:
**EXPORT DEVELOPMENT CANADA**
151 O'Connor Street
Ottawa, ON  K1A 1K3

Jennifer Sullivan

Email:   jsullivan@edc.ca

Tel:    613.597.8651
Fax:    613.598.3113

AND TO:
**THORNTON GROUT FINNIGAN LLP**
3200-100 Wellington Street West
Toronto-Dominion Centre, Canadian Pacific Tower
Toronto, ON  M5K 1K7

Robert I. Thornton
Michael Barrack
Rachelle Moncur
Leanne M. Williams

Email:   rthornton@tgf.ca
         mbarrack@tgf.ca
         rmoncur@tgf.ca
         lwilliams@tgf.ca

Tel:    416.304.1616
Fax:    416.304.1313

Lawyers for Flextronics Telecom Systems Ltd.

AND TO:
**McINNES COOPER**
Purdy's Wharf Tower II
1300 – 1969 Upper Water Street
Halifax, NS  B3J 2V1

John Stringer, Q.C.
Stephen Kingston

Email:   john.stringer@mcinnescooper.com
         stephen.kingston@mcinnescooper.com

Tel:    902.425.6500
Fax:    902.425.6350

Lawyers for Convergys EMEA Limited

AND TO:
**MILLER THOMSON LLP**
Scotia Plaza
40 King Street West, Suite 5800
P.O. Box 1011
Toronto, ON  M5H 3S1

Jeffrey Carhart
Margaret Sims

Email:   jcarhart@millerthomson.com
         msims@millerthomson.com

Tel:    416.595.8615/8577
Fax:    416.595.8695

Lawyers for Toronto-Dominion Bank

AND TO:
**CAW-CANADA**
Legal Department
205 Placer Court
Toronto, ON M2H 3H9

Barry E. Wadsworth
Lewis Gottheil

Email:   barry.wadsworth@caw.ca
         lewis.gottheil@caw.ca

Tel.:   416.495.3776
Fax:    416.495.3786

Lawyers for all active and retired Nortel
employees represented by the CAW-Canada

AND TO:
**BOUGHTON LAW CORPORATION**
Suite 700
595 Burrard Street
Vancouver, BC  V7X 1S8

R. Hoops Harrison

Email:   hharrison@boughton.ca

Tel:    604.687.6789
Fax:    604.683.5317

Lawyers for Tonko Realty Advisors (BC) Ltd.

*10*

| | | | |
|---|---|---|---|
| AND TO: | **BORDEN LADNER GERVAIS LLP**<br>Scotia Plaza, 40 King Street West<br>Toronto, ON  M5H 3Y4 | AND TO: | **LANG MICHNER LLP**<br>Brookfield Place, Suite 2500<br>181 Bay Street<br>Toronto, ON  M5J 2T7 |

**BORDEN LADNER GERVAIS LLP**
Scotia Plaza, 40 King Street West
Toronto, ON  M5H 3Y4

Michael J. MacNaughton
Roger Jaipargas
Sam P. Rappos

Email:  mmacnaughton@blgcanada.com
Tel:    416. 367.6646
Fax:    416. 682.2837

Email:  rjaipargas@blgcanada.com
Tel:    416.367.6266
Fax:    416.361.7067

Email:  srappos@blgcanada.com
Tel:    416.367.6033
Fax:    416.361.7306

Lawyers for Bell Canada

**LANG MICHNER LLP**
Brookfield Place, Suite 2500
181 Bay Street
Toronto, ON  M5J 2T7

Leslie A. Wittlin
John Contini
Aaron Rousseau

Email:  lwittlin@langmichener.ca
Tel:    416.307.4087
Fax:    416.304.3855

Email   jcontini@langmichener.ca
Tel:    416.307.4148
Fax:    416.304.3767

Email   arousseau@langmichener.ca
Tel:    416.307.4081
Fax:    416.365.1719

Lawyers for ABN AMRO Bank N.V.

AND TO:

**SISKINDS LLP**
680 Waterloo Street
London, ON  N6A 3V8

Raymond F. Leach
A. Dimitri Lascaris
Monique L. Radlein

Email:  ray.leach@siskinds.com
        dimitri.lascaris@siskinds.com
        monique.radlein@siskinds.com

Tel:    519.672.2121
Fax:    519.672.6065

Lawyers for Indiana Electrical Workers Pension
Trust Fund IBEW, Laborers Local 100 and 397
Pension Fund, and Bruce William Lapare

AND TO:

**BENNETT JONES LLP**
1 First Canadian Place
Suite 3400
Toronto, ON  M5X 1A4

Kevin Zych
S. Richard Orzy
Gavin Finlayson

Email:  zychk@bennettjones.com
Tel:    416.777.5738
Fax:    416.863.1716

Email:  orzyr@bennettjones.com
Tel:    416.777.5737
Fax:    416.863.1716

Email:  finlaysong@bennettjones.com
Tel:    416.777.5762
Fax:    416.863.1716

Canadian Lawyers for The Informal Nortel
Noteholder Group

- 5 -

AND TO:
**KOSKIE MINSKY**
20 Queen Street West
Suite 900
Toronto, ON  M5H 3R3

Mark Zigler
Susan Philpott
Demetrios Yiokaris
Andrea McKinnon

| | |
|---|---|
| Email: | mzigler@kmlaw.ca |
| Tel: | 416.595.2090 |
| Fax: | 416.204.2877 |

| | |
|---|---|
| Email: | sphilpott@kmlaw.ca |
| Tel: | 416.595.2104 |
| Fax: | 416.204.2882 |

| | |
|---|---|
| Email: | dyiokaris@kmlaw.ca |
| Tel: | 416.595.2130 |
| Fax: | 416.204.2810 |

| | |
|---|---|
| Email: | amckinnon@kmlaw.ca |
| Tel: | 416.595.2150 |
| Fax: | 416.204.2874 |

Lawyers for the Former Employees of Nortel

AND TO:
**MILLER THOMSON LLP**
Scotia Plaza
40 King Street West, Suite 5800
P.O. Box 1011
Toronto, ON  M5H 3S1

Jeffrey Carhart
Margaret Sims

| | |
|---|---|
| Email: | jcarhart@millerthomson.com |
| Tel: | 416.595.8615 |
| Fax: | 416.595.8695 |

| | |
|---|---|
| Email | msims@millerthomson.com |
| Tel: | 416.595.8577 |
| Fax: | 416.595.8695 |

Canadian Lawyers for Telmar Network
Technology, Inc. and Precision Communication
Services, Inc.

AND TO:
**MILLER THOMSON LLP**
Scotia Plaza
40 King Street West, Suite 5800
P.O. Box 1011
Toronto, ON  M5H 3S1

Jeffrey Carhart
Margaret Sims
James Klotz

| | |
|---|---|
| Email: | jcarhart@millerthomson.com |
| Tel: | 416.595.8615 |
| Fax: | 416.595.8695 |

| | |
|---|---|
| Email: | msims@millerthomson.com |
| Tel: | 416.595.8577 |
| Fax: | 416.595.8695 |

| | |
|---|---|
| Email: | jmklotz@millerthomson.com |
| Tel: | 416.595.4373 |
| Fax: | 416.595.8695 |

Lawyers for LG Electronics Inc.

AND TO:
**LG ELECTRONICS INC.**
11/F, LG Twin Towers (West)
20 Yeouido-dong, Yeongduengpo-gu
Seoul 150-721, Korea

Joseph Kim

| | |
|---|---|
| Email: | joseph.kim@lge.com |

| | |
|---|---|
| Tel: | +82.2.3777.3171 |
| Fax: | +82.2.3777.5345 |

*12*

- 6 -

AND TO: **CHAITONS LLP**
185 Sheppard Avenue West
Toronto, ON M2N 1M9

Harvey G. Chaiton

Email:   harvey@chaitons.com

Tel:   416.218.1129
Fax:   416.218.1849

Lawyers for IBM Canada Limited

AND TO: **FRASER MILNER CASGRAIN LLP**
1 First Canadian Place
100 King Street West
Toronto, ON M5X 1B2

R. Shayne Kukulowicz
Alex MacFarlane
Michael J. Wunder

Email:   Shayne.kukulowicz@fmc-law.com
Alex.macfarlane@fmc-law.com
Michael.wunder@fmc-law.com

Tel:   416.863.4511
Fax:   416.863.4592

Canadian Lawyers for the Official Committee of
Unsecured Creditors

AND TO: **PALIARE ROLAND ROSENBERG
ROTHSTEIN LLP**
Suite 501
250 University Avenue
Toronto, ON M5H 3E5

Kenneth T. Rosenberg
Massimo (Max) Starnino
Lily Harmer
Tina Lie

Email:   ken.rosenberg@paliareroland.com
Tel:   416.646.4304
Fax:   416.646.4301

Email:   max.starnino@paliareroland.com
Tel:   416.646.7431
Fax:   416.646.4301

Email:   lily.harmer@paliareroland.com
Tel:   416.646.4326
Fax:   416.646.4301

Email:   tina.lie@paliareroland.com
Tel:   416.646.4332
Fax:   416.646.4301

Lawyers for the Superintendent of Financial
Services as Administrator of the Pension
Benefits Guarantee Fund

AND TO: **GOWLING LAFLEUR HENDERSON LLP**
Suite 1600, First Canadian Place
100 King Street West
Toronto, ON M5X 1G5

E. Patrick Shea

Email:   patrick.shea@gowlings.com

Tel:   416.369.7399
Fax:   416.862.7661

Lawyers for Westcon Group

- 7 -

13

AND TO:
**MINDEN GROSS LLP**
145 King Street West, Suite 2200
Toronto, ON M5H 4G2

Raymond M. Slattery
David T. Ullmann

Email: rslattery@mindengross.com
        dullmann@mindengross.com
Tel:   416.369.4149
Fax:   416.864.9223

Lawyers for Verizon Communications Inc.

AND TO:
**GARDINER ROBERTS LLP**
Suite 3100, Scotia Plaza
40 King Street West
Toronto, ON M5H 3Y2

Jonathan Wigley
Vern W. DaRe

Email: jwigley@gardiner-roberts.com
Tel:   416.865.6655
Fax:   416.865.6636

Email: vdare@gardiner-roberts.com
Tel:   416.865.6641
Fax:   416.865.6636

Lawyers for Andrew, LLC

AND TO:
**AIRD & BERLIS LLP**
Barristers & Solicitors
Brookfield Place, P.O. Box 754
181 Bay Street, Suite 1800
Toronto, ON M5J 2T9

Steven L. Graff
Ian E. Aversa

Email: sgraff@airdberlis.com
Tel:   416.865.7726
Fax:   416.863.1515

Email: iaversa@airdberlis.com
Tel:   416.865.3082
Fax:   416.863.1515

Canadian Lawyers for Tellabs, Inc.

AND TO:
**AIRD & BERLIS**
Brookfield Place
181 Bay Street, Suite 1800
Toronto, ON M5J 2T9

Harry Fogul
Peter K. Czegledy

Email: hfogul@airdberlis.com
Tel:   416.865.7773
Fax:   416.863.1515

Email: pczegledy@airdberlis.com
Tel:   416.865.7749
Fax:   416.863.1515

Lawyers for Microsoft Corporation

AND TO:
**AIRD & BERLIS LLP**
Barristers & Solicitors
Brookfield Place, P.O. Box 754
181 Bay Street, Suite 1800
Toronto, ON M5J 2T9

D. Robb English
Sanjeev P. R. Mitra

Email: renglish@airdberlis.com
        smitra@airdberlis.com

Tel:   416.863.1500
Fax:   416.863.1515

Lawyers for Tata Consultancy Services Limited
and Tata America International Corporation

AND TO:
**ALEXANDER HOLBURN BEAUDIN &
LANG LLP**
Barristers and Solicitors
700 West Georgia Street
Suite 2700
Vancouver, British Columbia V7Y 1B8

Sharon M. Urquhart

Email: surquhart@ahbl.ca
Tel:   604.484.1757
Fax:   604.484.1957

Lawyers for Algo Communication Products Ltd.

- 8 -

14

AND
TO:

**MILLER THOMSON LLP**
Scotia Plaza
40 King Street, West, Suite 5800
P.O. Box 1011
Toronto, ON  M5H 3S1

Maurice Fleming

Email:    mfleming@millerthomson.com
Tel:       416.595.8686
Fax:      416.595.8695

Lawyers for Verint Americas Inc. and Verint
Systems, Inc.

AND
TO:

**DAVIS LLP**
1 First Canadian Place
Suite 5600
100 King Street West
Toronto, ON  M5X 1E2

Bruce Darlington
Jonathan Davis-Sydor

Email:    bdarlington@davis.ca
Tel:       416.365.3529
Fax:      416.369.5210

Email:    jdavissydor@davis.ca
Tel:       416.941.5397
Fax:      416.365.7886

Lawyers for Brookfield LePage Johnson Controls
Facility Management Services

AND
TO:

**McMILLAN LLP**
Brookfield Place, Suite 4400
181 Bay Street
Toronto, Ontario  M5J 2T3

Andrew F. Kent
Tushara Weerasooriya
Hilary E. Clarke

Email:    andrew.kent@mcmillan.ca
Tel:       416.865.7160
Fax:      416.865.7048

Email:    hilary.clarke@mcmillan.ca
Tel:       416.865.7286
Fax:      416.865.7048

Email:    tushara.weerasooriya@mcmillan.ca
Tel:       416.865.7262
Fax:      416.865.7048

Lawyers for Royal Bank of Canada

AND
TO:

**AIRD & BERLIS LLP**
Barristers & Solicitors
Brookfield Place, P.O. Box 754
181 Bay Street, Suite 1800
Toronto, ON  M5J 2T9

Steven L. Graff
Ian E. Aversa

Email:    sgraff@airdberlis.com
Tel:       416.865.7726
Fax:      416.863.1515

Email:    iaversa@airdberlis.com
Tel:       416.865.3082
Fax:      416.863.1515

Lawyers for Perot Systems Corporation

- 9 -

AND TO:
**McMILLAN LLP**
Brookfield Place, Suite 4400
181 Bay Street
Toronto, Ontario  M5J 2T3

Lawrence J. Crozier
Adam C. Maerov

Email:    lawrence.crozier@mcmillan.ca
Tel:       416.865.7178
Fax:      416.865.7048

Email:    adam.maerov@mcmillan.ca
Tel:       416.865.7285
Fax:      416.865.7048

Lawyers for Citibank

AND TO:
**BLANEY McMURTRY LLP**
Barristers and Solicitors
1500 – 2 Queen Street East
Toronto, Ontario  M5C 3G5

Domenico Magisano

Email:    dmagisano@blaney.com
Tel:       416.593.2996
Fax:      416.593.5437

Lawyers for Expertech Network Installation Inc.

AND TO:
**LANG MICHENER LLP**
Brookfield Place
Suite 2500, 181 Bay Street
P.O. Box 747
Toronto, Ontario  M5J 2T7

Leslie Wittlin
Aaron Rousseau

Email:    lwittlin@langmichener.ca
Tel:       416.307.4087
Fax:      416.365.1719

Email:    arousseau@langmichener.ca
Tel:       416.307.4081
Fax:      416.365.1719

Lawyers for Right Management Inc.

AND TO:
**CASSELS BROCK & BLACKWELL LLP**
40 King Street West,
Suite 2100
Toronto, Ontario  M5H 3C2

Deborah S. Grieve

Email:    dgrieve@casselsbrock.com
Tel:       416.860.5219
Fax:      416.350.6923

Lawyers for Alvarion Ltd.

AND TO:
**GARDINER ROBERTS LLP**
Suite 3100, Scotia Plaza
40 King Street West
Toronto, ON  M5H 3Y2

Jonathan Wigley
Vern W. DaRe

Email:    jwigley@gardiner-roberts.com
Tel:       416.865.6655
Fax:      416.865.6636

Email:    vdare@gardiner-roberts.com
Tel:       416.865.6641
Fax:      416.865.6636

Lawyers for Amphenol Corporation

AND TO:
**AIRD & BERLIS LLP**
Barristers & Solicitors
Brookfield Place, P.O. Box 754
181 Bay Street, Suite 1800
Toronto, Ontario  M5J 2T9

Sanjeev P.R. Mitra
Sandra A. Vitorovich

Email:    smitra@airdberlis.com
             svitorovich@airdberlis.com

Tel:       416.863.1500
Fax:      416.863.1515

Lawyers for Enbridge Gas Distribution Inc.

- 10 -

AND TO:
**NELLIGAN O'BRIEN PAYNE LLP**
Barristers and Solicitors
50 O'Connor Street
Suite 1500
Ottawa, Ontario  K1P 6L2

Janice B. Payne
Ainslie Benedict
Steven Levitt
Christopher Rootham

Email:   janice.payne@nelligan.ca
ainslie.benedict@nelligan.ca
steven.levitt@nelligan.ca
christopher.rootham@nelligan.ca

Tel:   613.231.8245
Fax:   613.788.3655

Lawyers for the Steering Committee of Recently
Severed Canadian Nortel Employees

AND TO:
**CALEYWRAY**
Labour/Employment Lawyers
1600-65 Queen Street West
Toronto, Ontario  M5H 2M5

Gail E. Misra

Email:   misrag@caleywray.com

Tel:   416.775.4680
Fax:   416.366.3293

Lawyers for the Communication, Energy and
Paperworkers Union of Canada

AND TO:
**COLBY, MONET DEMERS, DELAGE &
CREVIER LLP**
Tour McGill College
1501 McGill College Avenue
Suite 2900
Montreal, Quebec  H3A 3M8

David J. Dropsy

Email:   ddropsy@colby-monet.com
Tel:   514.284.3663
Fax:   514.284.1961

Lawyers for GFI INC., a division of Thomas &
Betts Manufacturing Inc.

AND TO:
**CASSELS BROCK & BLACKWELL LLP**
2100 Scotia Plaza
40 King Street West
Toronto, Ontario  M5H 3C2

E. Bruce Leonard
Harvey Garman
Michael Casey

Email:   bleonard@casselsbrock.com
hgarman@casselsbrock.com
mcasey@casselsbrock.com

Tel:   416.860.6455
Fax:   416.640.3054

Lawyers for the UK Pension Protection Fund and
Nortel Networks UK Pension Trust Limited

AND TO:
**MCFARLANE LEPSOE**
Barristers & Solicitors
70 Gloucester Street, Third Floor
Ottawa, Ontario  K2P 0A2

Paul K. Lepsoe

Email:   pklepsoe@mcfarlanelaw.com

Tel:   613.233.2679
Fax:   613.233.3774

Lawyers for Iron Mountain Canada Corporation
and Iron Mountain Information Management, Inc.

AND TO:
**SCHNEIDER & GAGGINO**
375 Lakeshore Drive
Dorval, Quebec  H9S 2A5

Dan Goldstein
Marco Gaggino

Email:   dgoldstein@schneidergaggino.com
mgaggino@schneidergaggino.com

Tel:   514.631.8787
Fax:   514.631.0220

Lawyers for the Teamsters Quebec Local 1999

17

AND TO:  **NELLIGAN O'BRIEN PAYNE LLP**
Barristers and Solicitors
50 O'Connor Street
Suite 1500
Ottawa, Ontario  K1P 6L2

Janice B. Payne
Steven Levitt
Christopher Rootham

Email:   janice.payne@nelligan.ca
steven.levitt@nelligan.ca
christopher.rootham@nelligan.ca

Tel:   613.231.8245
Fax:   613.788.3655

Lawyers for the Steering Committee of Nortel
Canadian Continuing Employees – Post CCAA
as at January 14, 2009

AND TO:  **BENNETT JONES LLP**
1 First Canadian Place
Suite 3400
Toronto, Ontario  M5X 1A4

Robyn M. Ryan Bell
Mark Laugesen

Email:   ryanbellr@bennettjones.com
laugesenm@bennettjones.com

Tel:   416.863.1200
Fax:   416.863.1716

Lawyers for Tel-e Connect Systems Ltd. and
Tel-e Connect Systems (Toronto) Ltd.

AND TO:  **MINDEN GROSS LLP**
145 King Street West, Suite 2200
Toronto, Ontario  M5H 4G2

Timothy R. Dunn

Email:   tdunn@mindengross.com
Tel:   416.369.4335
Fax:   416.864.9223

Lawyers for 2748355 Canada Inc.

AND TO:  **BAKER & McKENZIE LLP**
Brookfield Place, P.O. Box 874
181 Bay Street, Suite 2100
Toronto, Ontario  M5J 2T3

Chris Besant
Lydia Salvi

Email:   chris.besant@bakernet.com

Tel:   416.865.2318
Fax:   416.863.6275

Email:   lydia.salvi@bakernet.com

Tel:   416.865.6944
Fax:   416.863.6275

Lawyers for Jabil Circuit Inc.

AND TO:  **McCARTHY TETRAULT LLP**
Suite 5300, Toronto Dominion Bank Tower
Toronto, Ontario  M5K 1E6

Thomas G. Heintzman
Junior Sirivar

Email:   theintzm@mccarthy.ca
Tel:   416.601.7627
Fax:   416.868.0673

Email:   jsirivar@mccarthy.ca
Tel:   416.601.7750
Fax:   416.868.0673

Lawyers for Frank Andrew Dunn

AND TO:  **EURODATA**
2574 Sheffield Road
Ottawa, Ontario  K1B 3V7

Nanci Shore

Email:   nanci@eurodata.ca
Tel:   613.745.0921
Fax:   613.745.1172

- 12 -

18

AND TO:  **BALDWIN LAW PROFESSIONAL CORPORATION**
54 Victoria Avenue
Belleville, Ontario K8N 5J2

Ian W. Brady

Email:   lbrady@baldwinlaw.ca
Tel:      613.771.9991
Fax:     613.771.9998

Lawyers for Sydney Street Properties Corp.

AND TO:  **AIRD & BERLIS LLP**
Barristers & Solicitors
Brookfield Place, P.O. Box 754
181 Bay Street, Suite 1800
Toronto, ON  M5J 2T9

Steven L. Graff
Ian E. Aversa

Email:   sgraff@airdberlis.com
Tel:      416.865.7726
Fax:     416.863.1515

Email:   iaversa@airdberlis.com
Tel:      416.865.3082
Fax:     416.863.1515

Lawyers for Huawei Technologies Co. Ltd.

AND TO:  **SHIBLEY RIGHTON LLP**
Barristers and Solicitors
250 University Avenue, Suite 700
Toronto, Ontario M5H 3E5

Arthur O. Jacques
Thomas McRae

Email:   arthur.jacques@shibleyrighton.com
Tel:      416.214.5213
Fax:     416.214.5413

Email :   thomas.mcrae@shibleyrighton.com
Tel :     416.214.5206
Fax :     416.214.5400

Co-Counsel for the Steering Committee of
Nortel Canadian Continuing Employees – Post
CCAA as at January 14, 2009

AND TO:  **AETL TESTING, INC.**
130 Chaparral Court, Suite 250
Anaheim, California 92808

Cynthia R. Maher

Email:   cynthia.maher@ntscorp.com
Tel:      714.998.4351
Fax:     714.998.7142

Lawyers for AETL Testing, Inc.

AND TO:  **SHIBLEY RIGHTON LLP**
Barristers and Solicitors
250 University Avenue, Suite 700
Toronto, Ontario M5H 3E5

Arthur O. Jacques
Thomas McRae

Email:   arthur.jacques@shibleyrighton.com
Tel:      416.214.5213
Fax:     416.214.5413

Email :   thomas.mcrae@shibleyrighton.com
Tel :     416.214.5206
Fax :     416.214.5400

Lawyers for The Recently Severed Canadian
Nortel Employees Committee

AND TO:  **LAVERY, DE BILLY, LLP**
Barristers & Solicitors
Suite 2400, 600 de la Gauchetière West
Montreal, Quebec H3B 4L8

Jean-Yves Simard

Email :   jysimard@lavery.ca
Tel :     514.871.1522
Fax :     514.871.8977

Lawyers for Texas Landlords to Nortel Networks
Inc.

- 13 -

AND
TO:

**NATIONAL TECHNICAL SYSTEMS**
130 Chaparral Ct., Suite 250
Anaheim, California, U.S.A.
92808

Cynthia Maher

Email:  cynthia.maher@ntscorp.com
Tel:      714.998.4351

AND
TO:

**GOWLING LAFLEUR HENDERSON LLP**
Suite 1600, First Canadian Place
100 King Street West
Toronto, ON  M5X 1G5

David F.W. Cohen

Email:   david.cohen@gowlings.com

Tel:      416.369.6667
Fax:     416.862.7661

Lawyers for General Electric Canada Equipment
Finance G.P. and GE Capital Canada Leasing
Services Inc.

AND
TO:

**DAVIS LLP**
1 First Canadian Place
Suite 5600
100 King Street West
Toronto, ON  M5X 1E2

Bruce Darlington
Jonathan Davis-Sydor

Email:   bdarlington@davis.ca
Tel:      416.365.3529
Fax:     416.369.5210

Email:   jdavissydor@davis.ca
Tel:      416.941.5397
Fax:     416.365.7886

Lawyers for Computershare Trust Company of
Canada

AND
TO:

**DAVIES WARD PHILLIPS & VINEBERG
LLP**
44th Floor
1 First Canadian Place
Toronto, ON  M5X 1B1

Robin B. Schwill
Matthew P. Gottlieb

Email:   rschwill@dwpv.com
Tel:      416.863.0900
Fax:     416.863.0871

Email:   mgottlieb@dwpv.com
Tel:      416.863.0900
Fax:     416.863.0871

Lawyers for Nortel Networks UK Limited (In
Administration)

AND
TO:

**LAX O'SULLIVAN SCOTT LLP**
Counsel
Suite 1920, 145 King Street West
Toronto, Ontario  M5H 1J8

Terrence O'Sullivan
Shaun F. Laubman

E-mail:  tosullivan@counsel-toronto.com
Tel:      416.598.1744
Fax:     416.598.3730

Email:   slaubman@counsel-toronto.com
Tel:      416.598.1744
Fax:     416.598.3730

Lawyers for William A. Owens

AND
TO:

**BAKER & McKENZIE LLP**
Brookfield Place, P.O. Box 874
181 Bay Street, Suite 2100
Toronto, Ontario  M5J 2T3

Lydia Salvi

Email:   lydia.salvi@bakernet.com

Tel:      416.865.6944
Fax:     416.863.6275

Lawyers for Wipro Limited

- 14 -

AND
TO:

**AIRD & BERLIS LLP**
Barristers & Solicitors
Brookfield Place, P.O. Box 754
181 Bay Street, Suite 1800
Toronto, ON  M5J 2T9

Steven L. Graff
Ian E. Aversa

Email:   sgraff@airdberlis.com
Tel:      416.865.7726
Fax:      416.863.1515

Email:   iaversa@airdberlis.com
Tel:      416.865.3082
Fax:      416.863.1515

Lawyers for the Current and Former Employees of
Nortel Networks Inc. who are or were Participants
in the Long-Term Investment Plan Sponsored by
Nortel Networks Inc.

AND
TO:

**TORYS LLP**
79 Wellington Street West, Suite 3000
Box 270, TD Centre
Toronto, Ontario  M5K 1N2

Scott Bomhof

Email:   sbomhof@torys.com
Tel:      416.865.7370
Fax:      416.865.7380

Lawyers for Nokia Siemens Networks B.V.

AND
TO:

**McCARTHY TETRAULT LLP**
Suite 5300, TD Bank Tower
Toronto Dominion Centre
Toronto, Ontario  M5K 1E6

Heather Meredith

Email:   hmeredith@mccarthy.ca
Tel:      416.601.8342
Fax:      416.868.0673

Lawyers for Hitachi Communications
Technologies, Ltd.

AND
TO:

**DEPARTMENT OF JUSTICE**
Ontario Regional Office
The Exchange Tower, Box 36
130 King Street W., Suite 3400
Toronto, Ontario  M5X 1K6

Diane Winters

Email:   dwinters@justice.gc.ca
Tel:      416.973.3172
Fax:      416.973.0810

- 15 -

2)

AND
TO:

**BLAKE, CASSELS & GRAYDON LLP**
199 Bay Street, Suite 2800
Commerce Court West
Toronto, Ontario  M5L 1A9

Pamela Huff
Milly Chow
Hugh DesBrisay
Craig Thorburn

Email:  pamela.huff@blakes.com
Tel:     416.863.2958
Fax:    416.863.2653

Email:  milly.chow@blakes.com
Tel:     416.863.2594
Fax:    416.863.2653

Email:  hugh.desbrisay@blakes.com
Tel:     416.863.2426
Fax:    416.863.2653

Email:  craig.thorburn@blakes.com
Tel:     416.863.2965
Fax:    416.863.2653

Lawyers for MatlinPatterson Global Advisers LLC,
MatlinPatterson Global Opportunities Partners III
L.P. and MatlinPatterson Opportunities Partners
(Cayman) III L.P.

AND
TO:

**BLAKE, CASSELS & GRAYDON LLP**
199 Bay Street, Suite 2800
Commerce Court West
Toronto, Ontario  M5L 1A9

Susan M. Grundy
Marc Flynn

Email:  susan.grundy@blakes.com
Tel:     416.863.2572
Fax:    416.863.2653

Email:  marc.flynn@blakes.com
Tel:     416.863.2685
Fax:    416.863.2653

Lawyers for Telefonaktiebolaget L M Ericsson
(publ)

AND
TO:

**LANG MICHENER LLP**
Brookfield Place
181 Bay Street, Suite 2500
Toronto, Ontario, M5J 2T7

Sheryl E. Seigel

Email:  sseigel@langmichener.ca
Tel:     416.307.4063
Fax:    416.365.1719

Lawyers for The Bank of New York Mellon

AND
TO:

**McCARTHY TETRAULT LLP**
Suite 5300, Toronto Dominion Bank Tower
Toronto, Ontario  M5K 1E6

Kevin P. McElcheran
Ryan Stabile

Email:   kmcelcheran@mccarthy.ca
Tel:     416.601.7730
Fax:    416.868.0673

Email:   rstabile@mccarthy.ca
Tel:     416.601.8335
Fax:    416.868.0673

Lawyers for Avaya Inc.

*22*

- 16 -

AND
TO:

**SACK GOLDBLATT MITCHELL LLP**
20 Dundas Street West
Suite 1100
Toronto, Ontario  M5G 2G8

James McDonald
Darrell Brown

Email:    jmcdonald@sgmlaw.com
Tel:       416.979.6425
Fax:       416.591.7333

Email:    dbrown@sgmlaw.com
Tel:       416.979.4050
Fax:       416.591.7333

Lawyers for Edmund Fitzgerald

AND
TO:

**STIKEMAN ELLIOTT LLP**
5300 Commerce Court West
199 Bay Street
Toronto, ON  M5L 1B9

Ashley John Taylor

Email:    ataylor@stikeman.com
Tel:       416.869.5236
Fax:       416.947.0866

Lawyers for Ciena Corporation

AND
TO:

**FOGLER, RUBINOFF LLP**
Barristers and Solicitors
Suite 1200
Toronto-Dominion Centre
95 Wellington Street West
Toronto, Ontario  M5J 2Z9

Jeffrey K. Spiegelman

Email:    jspiegelman@foglers.com
Tel:       416.864.9700
Fax:       416.941.8852

Lawyers for Belden (Canada) Inc.

23

- 17 -

## COURTESY COPIES:

AND
TO:
**LEWIS AND ROCA**
40 North Central Avenue
Phoenix, Arizona
USA 85004-4429

Scott K. Brown

Email:  sbrown@lrlaw.com

Tel:    602.262.5321
Fax:    602.734.3866

Lawyers for The Prudential Insurance
Company of America

AND
TO:
**AKIN GUMP STRAUSS HAUER &**
**FELD LLP**
One Bryant Park
New York, NY 10036

Fred S. Hodara
Ryan C. Jacobs

Email:  fhodara@akingump.com
        rjacobs@akingump.com

Tel:    212.872.1000
Fax:    212.872.1002

U.S. Lawyers for the Official Committee of
Unsecured Creditors

AND
TO:
**CURTIS, MALLET-PREVOST, COLT &**
**MOSLE LLP**
101 Park Avenue
New York, New York 10178-0061

Steven J. Reisman
James V. Drew

E-mail:  sreisman@curtis.com
         jdrew@curtis.com

Tel:    212.696.6000
Fax:    212-697-1559

Lawyers for Flextronics International

AND
TO:
**MILBANK, TWEED, HADLEY**
**McCLOY LLP**
1 Chase Manhattan Plaza
New York, NY 10005

Dennis F. Dunne
Andrew M. Leblanc
Albert A. Pisa

Email:  DDunne@milbank.com
Tel:    212.530.5770
Fax:    212.530.5219

Email:  ALeblanc@milbank.com
Tel:    212.835.7574
Fax:    212.530.5219

Email:  APisa@milbank.com
Tel:    212.530.5319
Fax:    212.530.5219

U.S. Lawyers for The Informal Nortel
Noteholder Group

- 18 -

24

<table>
<tr>
<td>AND<br>TO:</td>
<td><strong>VEDDER PRICE P.C.</strong><br>1633 Broadway, 47th Floor<br>New York, New York 10019</td>
<td>AND<br>TO:</td>
<td><strong>BRYAN CAVE LLP</strong><br>161 North Clark Street, Suite 4300<br>Chicago, Illinois 60601</td>
</tr>
</table>

AND | **VEDDER PRICE P.C.**
TO: | 1633 Broadway, 47th Floor
New York, New York 10019

Michael L. Schein

Email:   mschein@vedderprice.com

Tel:     212.407.6920
Fax:     212.407.7799

U.S. Lawyers for Telmar Network Technology,
Inc. and Precision Communication Services, Inc.

AND | **MACLEOD DIXON LLP**
TO: | 3700 Canterra Tower
400, 3rd Avenue N.W.
Calgary, Alberta  T2P 4H2

Andrew Robertson
Caylee M. Rieger

Email :   andrew.robertson@macleoddixon.com
         caylee.rieger@macleoddixon.com

Tel :     403.267.8222
Fax :     403.264.5973

Agent for Nelligan O'Brien Payne LLP, lawyers
for the Steering Committee of Recently Severed
Canadian Nortel Employees and lawyers for the
Steering Committee of Nortel Canadian
Continuing Employees -- Post CCAA as at
January 14, 2009

AND | **BRYAN CAVE LLP**
TO: | 161 North Clark Street, Suite 4300
Chicago, Illinois 60601

Eric S. Prezant

Email:   eric.prezant@bryancave.com
Tel:     312.602.5033
Fax:     312.602.5050

U.S. Lawyers for Tellabs, Inc.

Court File No: 09-CL-7950

IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL CORPORATION AND NORTEL NETWORKS TECHNOLOGY CORPORATION

*ONTARIO*
**SUPERIOR COURT OF JUSTICE**
**COMMERCIAL LIST**

Proceeding commenced at Toronto

**NOTICE OF MOTION**
**(returnable December 2nd, 2009)**

Ogilvy Renault LLP
Suite 3800
Royal Bank Plaza, South Tower
200 Bay Street, P.O. Box 84
Toronto, Ontario M5J 2Z4

**Derrick Tay LSUC#: 21152A**
Tel: (416) 216-4832
Email: dtay@ogilvyrenault.com

**Mario Forte LSUC#: 27293F**
Tel: (416) 216-4870
Email: mforte@ogilvyrenault.com

**Jennifer Stam LSUC #46735J**
Tel: (416) 216-2327
Email: jstam@ogilvyrenault.com
Fax: (416) 216-3930

Lawyers for the Applicants

DOCSTOR: 1810851\6

# TAB 2

26

*ONTARIO*
**SUPERIOR COURT OF JUSTICE**
**(COMMERCIAL LIST)**

**IN THE MATTER OF THE** *COMPANIES' CREDITORS ARRANGEMENT ACT*,
**R.S.C. 1985, c. C-36, AS AMENDED**

**AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF**
**NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL**
**NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL**
**CORPORATION AND NORTEL NETWORKS TECHNOLOGY CORPORATION**

**APPLICATION UNDER THE** *COMPANIES' CREDITORS ARRANGEMENT ACT*,
**R.S.C. 1985, c. C-36, AS AMENDED**

**AFFIDAVIT OF JOHN DOOLITTLE**
**(sworn November 25, 2009)**

I, John Doolittle, of the city of Oakville, in the Province of Ontario, MAKE OATH AND
SAY:

1.    I am the Senior Vice-President, Finance and Corporate Services of Nortel Networks
Corporation ("NNC") and Nortel Networks Limited ("NNL"). I am also the Treasurer of
NNC and NNL and have held those positions since June 23, 2008. From January 7, 2009
to August 10, 2009, I was the vice-president of Nortel Networks Inc. ("NNI") and from
October 14, 2002 to June 12, 2006 I was the Vice-President, Tax for NNC and NNL. As
such, I have personal knowledge of the matters to which I hereinafter depose in this
Affidavit. Where I do not possess personal knowledge, I have stated the source of my
information and, in all such cases, believe it to be true.

2.    I swear this Affidavit in support of the motions to:

(a)    approve the Asia Restructuring Agreement dated as of November 5, 2009 (the
"APAC Agreement") among, *inter alia*, the Applicants (as defined below), the
Chapter 11 Debtors (as defined below), the EMEA Debtors (as defined below)
(collectively the "Filed Entities"), the APAC Entities (as defined below) and for
purposes of Section 16 of the APAC Agreement only, the Joint Administrators (as

- 2 -

27

defined below).   A copy of the APAC Agreement (without Exhibits or Appendices) is attached as Exhibit "A" hereto;

(b)   authorize and approve, *inter alia*, the form of an escrow agreement (the "Escrow Agreement") among NNI, the Applicants (as defined below), the EMEA Debtors, the Chapter 11 Debtors and the Estate Fiduciaries (as defined in the Escrow Agreement), and JPMorgan Chase Bank, N.A., as escrow agent ("JP Morgan" or the "Escrow Agent").   A copy of the Escrow Agreement is attached as Exhibit "B" hereto; and

(c)   approve the extension of the application period for receipt of employee hardship applications pursuant to the Employee Hardship Process (as defined below) to January 31, 2010.

3.   Capitalized terms used herein and not otherwise defined shall have the meaning given to them in the APAC Agreement or the Escrow Agreement as the case may be.

4.   All dollar references are US$ unless otherwise indicated.   All references to "Nortel" herein are references to the enterprise as a whole.

**BACKGROUND**

5.   On January 14, 2009 (the "Filing Date"), NNC, NNL, Nortel Networks Technology Corporation ("NNTC"), Nortel Networks Global Corporation and Nortel Networks International Corporation (collectively, the "Applicants") were granted protection under the *Companies' Creditors Arrangement Act*, R.S.C. 1985, c. C-36, as amended (the "CCAA") pursuant to an initial order (as subsequently amended and restated, the "Initial Order") of this Honourable Court and Ernst & Young Inc. was appointed as monitor (the "Monitor") in the CCAA proceedings.

6.   Also on the Filing Date, certain of NNC's U.S. subsidiaries, including its principal U.S. operating subsidiary NNI (together with the other U.S. filing entities, the "Initial Chapter 11 Debtors"), made voluntary filings in the United States Bankruptcy Court for the District of Delaware (the "U.S. Court") under Chapter 11 of the United States



- 3 -

Bankruptcy Code (the "Code"). On the same date, this Honourable Court granted an Order pursuant to Section 18.6(4) of the CCAA recognizing the Chapter 11 cases as "foreign proceedings" in Canada and giving effect in Canada to the automatic stay under the Code.

7.     Additionally, on January 15, 2009, NNUK and certain subsidiaries (the "EMEA Debtors") of the Nortel group incorporated in Europe, the Middle East or Africa ("EMEA") each obtained an administration order for the appointment of administrators (the "Joint Administrators") from the English High Court of Justice under the Insolvency Act 1986.

8.     On February 27, 2009, the U.S. Court granted petitions recognizing these proceedings as "foreign main proceedings" pursuant to Chapter 15 of the Code.

9.     On May 28, 2009, the Commercial Court of Versailles, France (the "French Court") ordered the commencement of secondary insolvency proceedings in respect of Nortel Networks S.A. ("NNSA"), which consist of liquidation proceedings during which NNSA was originally authorized to continue to operate as a going concern for an initial period of three months which period was subsequently extended. On October 1, 2009, the French Court approved an order to (i) suspend the liquidation operations relating to the sale of the assets and/or business of NNSA for a renewal period of two months; (ii) authorize the continuation of the business of NNSA so long as the liquidation operations are suspended; and (iii) maintain the powers of the French administrator and liquidator during that period except with respect to the sale of assets and/or businesses of NNSA. In accordance with the European Union's Counsel Regulation, (EC) No. 1346/2000 on Insolvency Proceedings, the English law proceedings remain the main proceedings in respect of NNSA.

10.    On June 8, 2009, the Joint Administrators appointed in respect of NNUK filed a petition with the U.S. Court for the recognition of the Administration Proceedings as they relate to NNUK (the "English Proceedings") under Chapter 15 of the Code. On June 26, 2009, the U.S. Court entered an order recognizing the English Proceedings as foreign main proceedings under Chapter 15 of the Code.

- 4 -

11.    On July 14, 2009, Nortel Networks (CALA) Inc. (together with the Initial Chapter 11 Debtors, the "Chapter 11 Debtors") made a voluntary filing with the U.S. Court under Chapter 11 of the Code.

12.    Further details regarding the background to these proceedings are set out my affidavit sworn January 14, 2009 (the "Initial Order Affidavit") previously filed in these proceedings and are therefore not repeated herein.

**THE ASIA RESTRUCTURING AGREEMENT**

*Background*

13.    As was set out in my Initial Order Affidavit, Nortel carries on business around the world. In doing so, Nortel has locally incorporated companies in many or all of the jurisdictions in which it carries on business. As is to be expected, a number of the Nortel entities that have remained out of bankruptcy proceedings have been impacted by the filings in North America and EMEA. Included in that group are certain of the Nortel affiliates in the Asia-Pacific region (collectively, the "APAC Entities"). Certain of the APAC Entities have experienced financial difficulties as certain amounts or balances of intercompany payables owing by the Filed Entities to the APAC Entities as of the Filing Date have become impaired. As a result, certain APAC Entities, although generating cash flow from continuing operations, have liquidity and/or balance sheet constraints after conducting a proper pre-filing setoff of the corresponding intercompany debt owing to them as of the Filing Date.

14.    These issues have been the center of discussions over the past several months among the APAC Entities, the Filed Entities, the Monitor, certain key stakeholders and the Joint Administrators. In particular, the parties have discussed and considered the ways the APAC Entities might address their ongoing financial issues so they may continue their respective business operations and preserve their assets and businesses in order to facilitate and participate in potential sales of Nortel's global business units.

- 5 -



*The APAC Agreement*

15. The parties have now agreed upon an Asia-Pacific restructuring plan the terms of which are set forth in the APAC Agreement. The key terms of the APAC Agreement are as follows:

   (a) *Initial Payments.* A portion of each APAC Entity's Pre-Petition Intercompany Debt (as defined in the APAC Agreement) will be repaid to the Filed Entities;

   (b) *Subsequent Payments.* A further portion of each APAC Entity's Pre-Petition Intercompany Debt will be repayable in monthly amounts, but only to the extent of such APAC Entity's net cash balance, after provision for its estimated working capital requirements, certain estimated severance payments, certain estimated costs for reinstatement of leased premises, estimated future taxes and certain other specified costs, expenses and provisions;

   (c) *Subordination.* The remainder of each APAC Entity's Pre-Petition Intercompany Debt will be subordinated and postponed to the prior payment in full of certain other debts, including (i) obligations owed to non-affiliated third parties and certain non-filed Nortel affiliates; (ii) intercompany obligations incurred after the Filing Date; and (iii) the portions of the Pre-Petition Intercompany Debt to be repaid in accordance with the provisions described above;

   (d) *Appointment of Restructuring Manager.* APAC Entities have agreed to appoint Ernst & Young Solutions LLP as the restructuring manager to provide financial consulting and advisory services to the APAC Entities as described in Annex G of the APAC Agreement;

   (e) *Global Sale Transactions.* Lastly, the APAC Entities have agreed to cooperate and participate in the sale of global businesses or other assets to third parties (the "Global Sale Transactions"). The APAC Entities have also agreed to enter into future agreements to terminate intellectual property licenses extended to such APAC Entities by the Applicants. The APAC Entities have agreed that their participation in the Global Sale Transactions will not be conditioned upon any minimum allocation of the sale proceeds from such Global Sale Transactions;

- 6 -

31

(f)     *Conditions to Effectiveness.*     Implementation of the APAC Agreement is conditioned on receipt of the approval of this Court and the U.S. Court and, if so sought, a direction of the English Court confirming the Joint Administrators are at liberty to enter into the APAC Agreement on behalf of each of the EMEA Debtors (excluding NNSA). In addition, the participation of certain of the APAC Entities in the restructuring and other matters provided for in the APAC Agreement is conditioned on receipt of certain regulatory approvals in their respective jurisdictions of incorporation.

16.     The terms of the APAC Agreement were agreed to after extensive good faith negotiations and enable the APAC Entities to continue to operate their respective business operations while allowing the Filed Entities and the APAC Entities to continue to participate in the sale of global businesses or other assets to third parties. I believe the terms of the APAC Agreement are fair and reasonable in the circumstances and the approval of the APAC Agreement is in the best interest of all parties involved.

**THE ESCROW AGREEMENT**

17.     On June 9, 2009, the Applicants, the Chapter 11 Debtors, the EMEA Debtors and the Joint Administrators (as each is defined in the IFSA (as defined below)) entered into an Interim Funding and Settlement Agreement (the "IFSA") governing certain intercompany matters and provided essential funding for the Applicants for an interim period. The IFSA was approved by this Court on June 29, 2009 and by the U.S. Court on the same day. The IFSA calls for an escrow agreement for the deposit of Sale Proceeds. The Sale Proceeds (as defined in the IFSA) (less applicable transfer or value-added taxes and, to the extent agreed upon by the Selling Debtors (as defined in the IFSA), transaction costs) shall be deposited in an escrow account pursuant to the Escrow Agreement, pending the distribution of the Sale Proceeds.

18.     On October 28, 2009, the Applicants obtained an Order (the "Next Generation Packet Core Business Approval and Vesting Order") from this Court approving and authorizing the transactions (the "Transaction") contemplated by a transaction agreement dated October 25, 2009 (the "Sale Agreement") and related Ancillary Agreements (as defined

- 7 -

*32*

in the Sale Agreement) among NNL and NNI, as sellers (collectively, the "Sellers") and Hitachi, Ltd. as purchaser (the "Purchaser"), in respect of the Assets (as defined in the Sale Agreement) relating to Nortel's Next Generation Packet Core (as defined in the Sale Agreement) research and development activities.

19.     Additionally, the Next Generation Packet Core Business Approval and Vesting Order, among other things, provided that:

(a)     NNL's interest in the assets were to be vested in the Purchaser; and

(b)     all proceeds of the Transaction, subject to certain adjustments, were to be deposited by the Sellers upon receipt from the Purchaser into an Escrow Account (as such term is defined in the IFSA).

20.     Concurrently with this Motion, the Applicants are seeking a motion to amend the Next Generation Packet Core Business Approval and Vesting Order to add NNTC as one of the Sellers, as NNTC owns certain of the tangible assets being sold pursuant to the Sale Agreement.

21.     The Applicants, in consultation with, among others, the Monitor, have now negotiated and substantially agreed upon the terms of the Escrow Agreement in the form attached as Exhibit "B". Among other things, the Escrow Agreement provides as follows:

(a)     The EMEA Debtors, the Applicants and the Chapter 11 Debtors (collectively, the "Depositors") shall jointly nominate, constitute and appoint JP Morgan as Escrow Agent to hold escrow funds in an Escrow Account.

(b)     The Escrow Agent shall agree that deposits to, and disbursements from, the Escrow Account, or applicable portions thereof, shall only be made in accordance with the terms and conditions of the Escrow Agreement.

(c)     The Depositors and the Escrow Agent shall agree that any action specified in the Escrow Agreement as to be taken by all of the Depositors, acting jointly, shall be binding upon each of the Depositors, and the Escrow Agent shall be entitled to act and rely upon any such action.

- 8 -

(d)    *Deposit of Escrow Deposit or Property.*  Funds shall be deposited in an escrow account as follows:

    (i)    At the Closing, the Sellers shall instruct the Purchaser to deposit the Deposited Purchase Price with the Escrow Agent, in immediately available funds, in the Escrow Account.

    (ii)    At the Closing, NNI shall deposit the Good Faith Deposit, in immediately available funds, in the Escrow Account.

(e)    *Investment of Escrow Funds*:

    (i)    Until otherwise jointly directed by all of the Depositors, the Escrow Agent shall invest the Escrow Funds in Permitted Investments as defined in the Escrow Agreement.

    (ii)    The Escrow Agent shall have the right to liquidate investments as necessary to distribute Escrow Funds pursuant to the Escrow Agreement.

(f)    *Distribution of Escrow Funds.*  Until the termination of the escrow established pursuant to the Escrow Agreement, the Escrow Agent shall hold the Escrow Funds and not disburse any amounts from the Escrow Account except in accordance with the terms and conditions of the Escrow Agreement:

    (i)    The Escrow Agent shall disburse to any person amounts from the Escrow Funds if and as so instructed pursuant to (i) letter of direction jointly executed by the Depositors and the Estate Fiduciaries[1], a copy of which shall be provided by the Depositors to the Bondholder Group or (ii) where the Depositors have entered into the Allocation Protocol in accordance with clause 12 of the IFSA (the existence of the Allocation Protocol shall be set forth in a written notice jointly executed by the Depositors and delivered to the Escrow Agent), any Depositor's delivery to the Escrow Agent, with copies to the other Depositors, the Estate Fiduciaries and the

---

[1] The Estate Fiduciaries shall consist of the Official Committee of Unsecured Creditors of NNI and the Monitor.

- 9 -



Bondholder Group, of a duly authenticated copy of the binding decision made by the relevant dispute resolver(s) under that protocol regarding the allocation of sales proceeds (a "Decision") which is not stayed or subject to appeal, accompanied by a certificated from such Depositor certifying as to the finality of the Decision.

(ii)   The Depositors understand and agree that no payments or reimbursements in respect of Transfer Taxes shall constitute any part of the Deposited Purchase Price or the Escrow Funds, or shall be required to be paid by the Purchaser into the Escrow Account.

(iii)   The Escrow Agent shall have no responsibility or obligation for investigating or determining the validity or sufficiency of any matter asserted in a letter of direction or of any pending claim for entitlement to release of funds from the Escrow Account. The Escrow Agent shall have the right to withhold an amount equal to the amount due and owing to the Escrow Agent, plus any reasonable costs and expenses incurred by Escrow Agent in accordance with the terms of this Agreement in connection with the termination of the Escrow Account.

(g)   *Termination of Escrow Account.* The Escrow Agreement shall terminate upon the distribution of all Escrow Funds from the Escrow Account, subject to the survival of provisions, which expressly survive the termination of the Escrow Agreement.

22.   As set out in the Next Generation Packet Core Business Approval and Vesting Order itself, the net proceeds of sale are required to be placed into escrow pending the resolution of allocation matters amongst the estates. Additionally, as set out above, the IFSA requires that proceeds be placed into escrow.

23.   Court approval and authorization to enter into the Escrow Agreement is a complementary and necessary step to finalize the larger sale process of the Next Generation Packet Core Network research and development activities and related assets to the Purchaser. Under the Sale Agreement, failure to consummate the sale by December 31, 2009 is grounds for termination by either the Sellers or the Purchaser. Furthermore, failure to close within

- 10 -

five (5) business days of written demand by the Purchaser to consummate the Closing is grounds for termination by the Purchaser.

24. The Escrow Agent requires Court approval of the Escrow Agreement and a closing may take place as early as December 4, 2009. The Escrow Agreement must be in place prior to closing and is currently the only additional outstanding approval required for the sale to close.

25. The Escrow Agreement has been negotiated in consultation with the Monitor as well as certain key stakeholders. I believe that the terms of the Escrow Agreement are fair and reasonable in the circumstances. They are substantially the same as the terms of the escrow agreement previously approved by this Honourable Court in connection with the CDMA sale transaction, and the approval of the Escrow Agreement will further facilitate the completion of the Next Generation Packet Core Business Sale Agreement.

**EMPLOYEE HARDSHIP PROCESS**

26. Pursuant to an Order of this Court made on July 30, 2009, an employee hardship process (the "Employee Hardship Process") was approved in recognition of the fact that there may be cases in which former employees of one of the Applicants is experiencing financial hardship due to illness or healthcare costs, or due to ineligibility for pension or employment insurance benefits. As was set out in my affidavit sworn June 24, 2009, the process provided for the following:

    (a)    a former employee resident in Canada is eligible if he or she has no available source of income, and (i) is unable to work due to illness, or is incurring certain levels of costs for treatment of illness or for healthcare, or (ii) is not receiving a Nortel pension or employment insurance;

    (b)    notice of the application process will be posted on the Monitor's website and on the website of the Nortel Retiree Protection Committee;

    (c)    a person designated by the Monitor will review all Applications for Hardship Payments, and make an initial determination. That determination can be appealed

- 11 -

to an informal committee, and ultimately to a Judge of this Court or a person designated by that Judge; and

(d)    the first of each hardship payments is to proceed within seven business days of the approval of the Application for Hardship Payments.

27.    The maximum amount that was made available for the Employee Hardship Process was $750,000.    Further, any hardship payments are considered advances against future distributions based on the claims of these former employees.

28.    The period for receipt of employee hardship applications will conclude on November 30, 2009.    I am aware that the Monitor will be filing a report providing details as to claims and payments made to date.    As there will continue to be terminations and the potential for hardship, the Applicants are requesting that the period for receipt of hardship applications be extended to January 31, 2010, and that the document "Eligibility Requirements and Procedure with Respect to Hardship Payment Applications", attached as Exhibit "C", be amended accordingly.

SWORN BEFORE ME at the City of Toronto, in the Province of Ontario on this 25th day of November, 2009.

_____
Commissioner for Taking Affidavits or Notary Public

_____
John Doolittle

# TAB A

This is Exhibit ........ 4 ........ referred to in the
affidavit of ..... John Doolittle ........
sworn before me, this ........
day of ..... March ........ 20.22

........
A COMMISSIONER FOR TAKING AFFIDAVITS

**EXECUTION VERSION**

## ASIA RESTRUCTURING AGREEMENT

This agreement (including the Schedules and Annexes attached hereto and as amended or supplemented from time to time, this "<u>Agreement</u>") is entered into by and among Nortel Networks Limited ("<u>NNL</u>") and the other entities set forth in <u>Schedule 1</u> attached hereto, Nortel Networks Inc. ("<u>NNI</u>") and the other entities set forth in <u>Schedule 2</u> attached hereto, the Joint Administrators (as defined below) and the entities set forth in <u>Schedule 3</u> attached hereto (each, an "<u>EMEA Debtor</u>" and collectively, the "<u>EMEA Debtors</u>") and the entities set forth in <u>Schedule 4</u> attached hereto (each, an "<u>APAC Debtor</u>" and collectively, the "<u>APAC Debtors</u>"), dated as of November 5, 2009. The Canadian Debtors (as defined below), the US Debtors (as defined below), the EMEA Debtors and the APAC Debtors are sometimes referred to herein individually as a "<u>Party</u>" and collectively as the "<u>Parties</u>". The Joint Administrators, in their personal capacity, shall be party to this Agreement as provided in Section 16 and solely for the purpose of obtaining the benefit of the provisions of this Agreement expressed to be conferred on or given to the Joint Administrators and references to the Parties shall be construed accordingly.

### RECITALS

1.      WHEREAS, on January 14, 2009 (the "<u>Filing Date</u>"), Nortel Networks Corporation ("<u>NNC</u>"), NNL and certain of NNC's other Canadian affiliates included in <u>Schedule 1</u> (collectively, the "<u>Canadian Debtors</u>," and NNC and its debtor and non-debtor affiliates are sometimes referred to herein as the "<u>Nortel Group</u>"), commenced creditor protection proceedings before the Ontario Superior Court of Justice (Commercial List) (the "<u>Canadian Court</u>") under the Companies' Creditors Arrangement Act (Canada) (the "<u>Canadian Proceedings</u>"), in connection with which Ernst & Young Inc. was appointed monitor (the "<u>Monitor</u>"); and

2.      WHEREAS, on the Filing Date and on July 14, 2009 (with respect to Nortel Networks (CALA) Inc.), NNI and certain of NNI's United States affiliates included in <u>Schedule 2</u> (collectively, the "<u>US Debtors</u>" and, together with the Canadian Debtors and the EMEA Debtors, the "<u>Filed Debtors</u>" and, together with the Canadian Debtors, the EMEA Debtors and the APAC Debtors, the "<u>Debtors</u>") filed petitions in the United States Bankruptcy Court for the District of Delaware (the "<u>US Court</u>") under chapter 11 of title 11 of the United States Code (the "<u>US Proceedings</u>"); and

3.      WHEREAS, on the Filing Date, Nortel Networks UK Limited ("<u>NNUK</u>"), Nortel Networks (Ireland) Limited ("<u>NNIR</u>"), Nortel Networks S.A. ("<u>NNSA</u>") and certain of NNUK's affiliates in the Europe, Middle East and Africa ("<u>EMEA</u>") region, including those in <u>Schedule 3</u> attached hereto, commenced administration proceedings (the "<u>UK Proceedings</u>" and, together with the Canadian Proceedings and the US Proceedings, the "<u>Proceedings</u>") before the High Court of Justice in London, England (the "<u>UK Court</u>" and, together with the Canadian Court and the US Court, the "<u>Courts</u>"), and the UK Court appointed individuals from Ernst & Young LLP (the "<u>UK Administrator</u>" and, in the case of NNIR only, Ernst & Young Chartered Accountants (the "<u>NNIR Administrator</u>"), as administrators in the UK Proceedings (the UK Administrator and the NNIR Administrator collectively, and including their respective successors, replacements and any subsequent office holders appointed to the relevant EMEA Debtors, the "<u>Joint Administrators</u>"); and

1



4.    WHEREAS, subsequent to the Filing Date, NNSA commenced secondary insolvency proceedings within the meaning of Article 27 of the European Union's Council Regulation (EC) No 1346/2000 on Insolvency Proceedings in the Republic of France pursuant to which a liquidator (the "NNSA Liquidator") and an administrator (the "NNSA Administrator") have been appointed by the Versailles Commercial Court (Docket No. 2009P00492) for NNSA; and

5.    WHEREAS, prior to the Filing Date, certain members of the Nortel Group made quarterly payments (the "Transfer Pricing Payments") to other Nortel Group entities pursuant to a transfer pricing methodology ("Transfer Pricing") provided for in the Transfer Pricing Agreements, where "Transfer Pricing Agreements" means (i) the Master Research and Development Agreement dated as of December 22, 2004 (as amended by, and together with the related understandings contained in, the documents listed in Annex A hereto, the "Master R&D Agreement") and (ii) certain distribution agreements, whether written or oral, between one or more Nortel Group entities, including without limitation the agreements listed in Annex B and Annex H hereto and any other agreements similar to the agreements listed in Annex B and Annex H hereto (as amended, supplemented or otherwise modified, the "Distribution Agreements"); and

6.    WHEREAS, subsequent to the Filing Date, NNL, NNI and the Joint Administrators have accepted that, subject to this Agreement, the APAC Debtors will pay their respective third party and intercompany debts on the following basis: (i) firstly, payment of all Third Party Liabilities (as defined below) and the Post-Filing Intercompany Debt (as defined below) on a pro rata basis, and (ii) secondly, payment of the Pre-Filing Intercompany Debt (as defined below) on a pro rata basis; and

7.    WHEREAS, the Parties intend to continue to meet their respective obligations to make the monthly payments in respect of the intercompany trading of goods and services supplied by Nortel Group entities subsequent to the Filing Date, pursuant to the arrangements existing prior to or entered into subsequent to the Filing Date; and

8.    WHEREAS, as a consequence of the Proceedings, certain amounts or balances of intercompany payables owing by the Filed Debtors to the APAC Debtors as of the Filing Date became impaired, and certain members of the APAC Debtors, although generating cash flow from continuing operations, have liquidity and/or balance sheet constraints after conducting a proper pre-filing setoff of the corresponding intercompany debt as of the Filing Date; and

9.    WHEREAS, on July 25, 2009, NNC announced that NNL and certain of NNL's subsidiaries, including NNI, had concluded a successful auction of substantially all of their CDMA business and LTE Access assets whereby Telefonaktiebolaget LM Ericsson emerged as the winning bidder for such assets, which bid was approved by the Canadian Court and the US Court on July 28, 2009, and on September 14, 2009, NNC announced that NNL and certain of NNL's subsidiaries, including NNI, had concluded a successful auction of their North American, Caribbean, Latin America and Asia Enterprise Solutions business and the EMEA portion of their Enterprise Solutions business whereby Avaya Inc. ("Avaya") emerged as the winning bidder for such assets, which bid was approved by the Canadian Court and the US Court on September 16, 2009; and

2

10.     WHEREAS, NNC has also announced that it is actively engaged in discussions with external parties to sell its other businesses and that it has determined that the sale of its businesses maximizes value while preserving innovation platforms, customer relationships and jobs to the greatest extent possible; and

11.     WHEREAS, to enable the APAC Debtors to address applicable solvency issues so as to continue their respective business operations and to preserve their assets and businesses in order to facilitate and participate in any potential sale of the assets, undertakings or businesses of the Nortel Group entities, an Asia-Pacific restructuring plan has been discussed and developed with the Filed Debtors, the Monitor, the Joint Administrators together with the Creditors' Committee (as defined below) and the Bondholders' Committee (as defined below), and this Agreement represents the outcome of those discussions.

NOW THEREFORE, THE PARTIES HEREBY AGREE THAT:

PART A – DEFINITIONS

<table>
<thead>
<tr><th>Term</th><th>Defined in Section</th></tr>
</thead>
<tbody>
<tr><td>Adjustment Payments</td><td>8</td></tr>
<tr><td>Agreement</td><td>Preamble</td></tr>
<tr><td>Allocation Protocol</td><td>11.c.</td></tr>
<tr><td>APAC Debtors</td><td>Preamble</td></tr>
<tr><td>APAC Debtor Person</td><td>17.a.</td></tr>
<tr><td>APAC Distribution Agreements</td><td>8</td></tr>
<tr><td>APAC Selling Debtor</td><td>11.a.</td></tr>
<tr><td>Asset Sale</td><td>10.a.</td></tr>
<tr><td>Avaya</td><td>Recital 9</td></tr>
<tr><td>Bondholders' Committee</td><td>3.a.</td></tr>
<tr><td>BOT Condition</td><td>12.a.iv.</td></tr>
<tr><td>Business Day</td><td>14</td></tr>
<tr><td>Canadian Court</td><td>Recital 1</td></tr>
<tr><td>Canadian Debtors</td><td>Recital 1</td></tr>
<tr><td>Canadian Proceedings</td><td>Recital 1</td></tr>
<tr><td>Cash and Cash Equivalents</td><td>2.a.i.(A)</td></tr>
<tr><td>Category I Pre-Filing Intercompany Debt</td><td>1.a.i.</td></tr>
<tr><td>Category II Pre-Filing Intercompany Debt</td><td>1.a.ii.</td></tr>
<tr><td>Category III Pre-Filing Intercompany Debt</td><td>1.a.iii.</td></tr>
<tr><td>Collateral</td><td>13.c.</td></tr>
<tr><td>Conditions</td><td>12.a.iv.</td></tr>
<tr><td>Courts</td><td>Recital 3</td></tr>
<tr><td>Covenant Event of Default</td><td>13.a.</td></tr>
<tr><td>Creditors' Committee</td><td>3.a.</td></tr>
<tr><td>Cross-Border Protocol</td><td>15.b.</td></tr>
<tr><td>Debtors</td><td>Recital 2</td></tr>
<tr><td>Determination Date</td><td>3.b.</td></tr>
</tbody>
</table>

3

40

| Term | Defined in Section |
|---|---|
| Distribution Agreements | Recital 5 |
| D&O Insurance | 18 |
| EMEA | Recital 3 |
| EMEA Debtors | Preamble |
| Escrow Account | 11.b. |
| Estimated Premise Reinstatement Costs | 2.a.ii.(y) |
| Estimated Restructuring Costs | 2.a.ii.(x) |
| Estimated Taxes | 2.a.ii.(z) |
| Estimated Working Capital Requirements | 2.a.ii.(w) |
| Excluded Affiliates | 2.a.ii.(v) |
| Excluded Affiliate Liabilities | 5 |
| Excluded Affiliate Pre-Filing Intercompany Debt | 2.a.ii.(v) |
| Excluded Affiliate Restructuring Agreement | 5 |
| Filed Debtors | Recital 2 |
| Filing Date | Recital 1 |
| Final Effective Date | 12.b. |
| Final Effective Date Payment Amount | 2.c. |
| Indemnified Liabilities | 17.b. |
| Identified Debtors | 4.a. |
| Indebtedness | 6.d.iii. |
| Initial Conditions | 12.a.ii. |
| Initial Determination Date | 2.a. |
| Initial Effective Date | 12.b. |
| Initial Effective Date Payment Amount | 2.b. |
| Initial Payment Amount | 2.c. |
| Intercompany Creditors | 1.a. |
| Joint Administrators | Recital 3 |
| License Termination Agreement | 10.b. |
| Master R&D Agreement | Recital 5 |
| Matured Indemnity Obligation | 2.a. |
| Monitor | Recital 1 |
| NCB Determination Procedure | 2.a. |
| NCB Items | 2.a. |
| Net Cash Balance | 2.a. |
| NN Asia Group | Schedule 4 |
| NN Australia | Schedule 4 |
| NN Australia Note Facility | 6.d.iii. |
| NN India (Private) | Schedule 4 |
| NN Indonesia | Schedule 4 |
| NN Japan | Schedule 4 |
| NN Korea | Schedule 4 |
| NN Malaysia | Schedule 4 |
| NN New Zealand | Schedule 4 |
| NN Singapore Group | Schedule 4 |

41

| Term | Defined in Section |
|------|--------------------|
| NN Thailand | Schedule 4 |
| NN Vietnam | Schedule 4 |
| NNC | Recital 1 |
| NNI | Preamble |
| NNIR | Recital 3 |
| NNIR Administrator | Recital 3 |
| NNL | Preamble |
| NNSA | Recital 3 |
| NNSA Administrator | Recital 4 |
| NNSA Liquidator | Recital 4 |
| NNUK | Recital 3 |
| Non-Filed Affiliates | 11.c.i. |
| Nortel Group | Recital 1 |
| North American Court Condition | 12.a.i. |
| Ordinary Course Cash Collateral | 6.d.iii. |
| Parties | Preamble |
| Payment Event of Default | 13.a. |
| Permitted Severance Payments | 2.a.ii.(x) |
| Post-Filing Intercompany Debt | 4.a.ii. |
| Pre-Filing Intercompany Debt | 1.a. |
| Professional Advice | 2.a. |
| Proceedings | Recital 3 |
| Purchaser | 11.a. |
| RBI Condition | 12.a.iii. |
| Relevant Parties | 3.a. |
| Restructuring Manager | 7 |
| Reversion Date | 4.d. |
| Reverted Subordinated Debt | 4.d. |
| Sale Proceeds | 11.a. |
| Sale Transaction | 11.a. |
| Secured Obligations | 13.c. |
| Selling Debtor | 11.a. |
| Senior Indebtedness | 4.a. |
| Subordinated Debt | 4.a. |
| Subsequent Determination Date | 3.b. |
| Subsequent Payment Amount | 3.c. |
| Suspended Subordinated Debt | 4.d. |
| Suspension Date | 4.d. |
| Suspension Period | 4.d. |
| Third Party Liabilities | 4.a.i. |
| Transfer Pricing | Recital 5 |
| Transfer Pricing Agreements | Recital 5 |
| Transfer Pricing Payments | Recital 5 |
| UK Administrator | Recital 3 |

5

42

| Term | Defined in Section |
|------|--------------------|
| UK Court | Recital 3 |
| UK Court Condition | 12.a.ii. |
| UK Court's Directions | 12.a.ii. |
| UK Proceedings | Recital 3 |
| US Court | Recital 2 |
| US Debtors | Recital 2 |
| US Proceedings | Recital 2 |

## PART B – PRE-FILING INTERCOMPANY DEBT RESTRUCTURING

1.  Pre-Filing Intercompany Debt.

    a.  Each APAC Debtor acknowledges and confirms, and each Intercompany Creditor (as defined below) of such APAC Debtor acknowledges and confirms that Annex C-1 sets out the unpaid amount of loans, credits and obligations owing by such APAC Debtor to such Intercompany Creditor as of the Filing Date (after setting off against any receivables owing to such APAC Debtor by such Intercompany Creditor as of the Filing Date to the extent not prohibited or restricted under applicable laws and regulations) (the "Pre-Filing Intercompany Debt") and further sets out, as of the Initial Effective Date (as defined below):

        i.  the amount of such Pre-Filing Intercompany Debt to be repaid with the aggregate Initial Payment Amount (as defined below) in accordance with Section 2 (the "Category I Pre-Filing Intercompany Debt"),

        ii. the amount of such Pre-Filing Intercompany Debt to be repaid with the aggregate Subsequent Payment Amount (as defined below) in accordance with Section 3 (the "Category II Pre-Filing Intercompany Debt"), and

        iii. the amount of such Pre-Filing Intercompany Debt to be subordinated in accordance with Section 4 (the "Category III Pre-Filing Intercompany Debt").

    For the purposes of this Agreement, with respect to each APAC Debtor, the Parties to whom such APAC Debtor owes any Pre-Filing Intercompany Debt shall be referred to individually as an "Intercompany Creditor" and collectively, as the "Intercompany Creditors".

    b.  The Parties hereby agree that, effective as of the Final Effective Date (as defined below), the amounts of the Category I Pre-Filing Intercompany Debt, the Category II Pre-Filing Intercompany Debt and the Category III

43

Pre-Filing Intercompany Debt set out in <u>Annex C-1</u> shall be automatically revised to the corresponding amounts set forth in <u>Annex C-2</u>.

c.   The Parties hereby agree, that to the extent any APAC Debtor makes a Subsequent Payment Amount to its Intercompany Creditors between the Initial Effective Date and the Final Effective Date, <u>Annex C-2</u> shall be further revised on or prior to the Final Effective Date to give effect to the payment of such Subsequent Payment Amount.

d.   The Parties hereby agree, that to the extent NNSA does not become a Party to this Agreement in accordance with Section 6.a., the amounts set forth in the Annexes C-1, C-2, D, E-1 and E-2 hereto (which have been calculated based on the assumption that NNSA shall be a party to this Agreement), shall be further revised, in a manner consistent with the methodology and standards initially employed to calculate such amounts, on or prior to the Initial Effective Date to give effect to the exclusion of NNSA from the scope of this Agreement.

2.   <u>Initial Payments</u>.

a.   Each APAC Debtor having Category I Pre-Filing Intercompany Debt represents and warrants that as of July 10, 2009 (the "<u>Initial Determination Date</u>"), it has complied with the NCB Determination Procedure (as defined below) and determined its Net Cash Balance (as defined below) to be as set forth in <u>Annex D</u>.  For the purposes of this Agreement, the "<u>Net Cash Balance</u>" means, as of each Determination Date (as defined below) and with respect to each APAC Debtor, without duplication:

i.   the sum of:

(A)   its (1) cash in U.S. dollars or other local currencies held by such APAC Debtor and (2) readily marketable government securities, certificates of deposit, time deposits and other readily marketable fixed income instruments, in each case, that are immediately available and freely remittable (the "<u>Cash and Cash Equivalents</u>") (for the avoidance of doubt, such Cash and Cash Equivalents shall not include any cash or cash equivalents that are considered to be restricted by reason of having been posted by such APAC Debtor as collateral to a third party), <u>plus</u>

(B)   (with respect to the calculation of the Net Cash Balance on each Subsequent Determination Date (as defined below) pursuant to Section 3 only) the net cash proceeds received by such APAC Debtor from a Sale Transaction (as defined below);

<u>minus</u>

ii.   the sum of:

7

(v)     the amount of loans, credits and obligations owing by such APAC Debtor to the entities set forth in <u>Schedule 6</u> as of the Filing Date (respectively, the "<u>Excluded Affiliate Pre-Filing Intercompany Debt</u>" and the "<u>Excluded Affiliates</u>"), <u>plus</u>

(w)     its estimated working capital required for the four (4) weeks immediately following such Determination Date to carry on its business and to satisfy its liabilities as they fall due, together with appropriate provision for any contingent liabilities and anticipated future liabilities, including, without limitation, the Third Party Liabilities, the Post-Filing Intercompany Debt and the Matured Indemnity Obligation (as defined below) of such APAC Debtor (the "<u>Estimated Working Capital Requirements</u>"), <u>plus</u>

(x)     its estimated costs and expenses arising from or in connection with the restructuring of its indebtedness and its business or potential eventual liquidation or winding down of the business of such APAC Debtor, including, but not limited to:

    (1)     potential statutory severance and redundancy payments,

    (2)     potential severance and redundancy payments pursuant to binding contractual commitments existing as of the Filing Date and

    (3)     other potential severance and redundancy payments disclosed to the Relevant Parties (as defined below) as of the date hereof or in such greater aggregate amount approved by the Relevant Parties from time to time

(collectively, the "<u>Permitted Severance Payments</u>") (the "<u>Estimated Restructuring Costs</u>"; *provided, however,* any potential severance or redundancy payments in excess of the Permitted Severance Payments based on past or existing practices and/or policies of the Debtors or otherwise shall not be included in the calculation of the Estimated Restructuring Costs), <u>plus</u>

(y)     its estimated costs of reinstatement of premises under the leases to which such APAC Debtor is a party (the "<u>Estimated Premise Reinstatement Costs</u>"), <u>plus</u>

(z)      its estimated provision for all taxes, levies, duties,
deductions, charges or withholdings and all penalties, costs
and interest relating thereto, whether actual, contingent,
present or future, imposed or which may be imposed by
any governmental or regulatory authority, central bank or
court of competent jurisdiction (the "Estimated Taxes").

For the purposes of determining the Net Cash Balance of any APAC
Debtor, the amounts of the Excluded Affiliate Pre-Filing Intercompany
Debt (subject to Section 5), the Matured Indemnity Obligation, the
Estimated Working Capital Requirements, the Permitted Severance
Payments, the Estimated Restructuring Costs, the Estimated Premise
Reinstatement Costs and the Estimated Taxes (each, an "NCB Item" and
collectively, the "NCB Items") have been and shall be determined by the
board of directors of such APAC Debtor acting reasonably and in good
faith after consultation with the Restructuring Manager (as defined below)
and after taking into account any written opinions obtained from its legal,
financial, tax or other professional advisors (such determination
procedure, the "NCB Determination Procedure" and such opinions, the
"Professional Advice"). Each APAC Debtor hereby agrees and covenants
that the Net Cash Balance and the NCB Items to be determined on any
Subsequent Determination Date shall be calculated using the same
methodology and standards employed to calculate such amounts on the
Initial Determination Date. In addition, in calculating its Net Cash
Balance as of any Subsequent Determination Date, each APAC Debtor
shall give effect to any material amount of cash received by such APAC
Debtor during the period after such Subsequent Determination Date but
prior to the delivery of its Net Cash Balance calculation to the Relevant
Parties in accordance with Section 3.b. Furthermore, each APAC Debtor
hereby agrees and covenants that, with respect to any indemnity
obligations of such APAC Debtor pursuant to Section 17.b., the Net Cash
Balance and the NCB Items shall only take into account (or otherwise hold
amounts in reserve to provide for) solely bona fide claims for indemnity
that have been made by any APAC Debtor Person (as defined below) of
such APAC Debtor against such APAC Debtor in accordance with Section
17.b. and after taking into account the availability of any liability
insurance as contemplated by Section 18 or otherwise available to cover
such claims for indemnity and consistent with the applicable accounting
standards (such amount, the "Matured Indemnity Obligation").

b.      Effective upon the Initial Effective Date, each APAC Debtor having
Category I Pre-Filing Intercompany Debt as set forth in Annex C-1 shall
make the cash payment (the amount of such cash payment, an "Initial
Effective Date Payment Amount") to each of its Intercompany Creditors
of its Category I Pre-Filing Intercompany Debt owing to such
Intercompany Creditor utilizing its Net Cash Balance as of the Initial
Determination Date on a pro rata basis according to the proportion in

9

4\0

which the Category I Pre-Filing Intercompany Debt of such APAC Debtor owing to each of its Intercompany Creditors bears to the aggregate amount of all Category I Pre-Filing Intercompany Debt of such APAC Debtor owing to all of its Intercompany Creditors, as set forth in Annex E-1. Annex E-1 sets forth the payment tranches for the Initial Effective Date Payment Amount to be paid by each APAC Debtor to each of its Intercompany Creditors and the respective deadlines by which payment of each tranche must be made.

c.    Effective upon the Final Effective Date, each APAC Debtor having any remaining Category I Pre-Filing Intercompany Debt as set forth in Annex C-2 shall make the cash payment (the amount of such cash payment, a "Final Effective Date Payment Amount" and, together with an Initial Effective Date Payment Amount, an "Initial Payment Amount") to each of its Intercompany Creditors of its remaining Category I Pre-Filing Intercompany Debt owing to such Intercompany Creditor utilizing its Net Cash Balance as of the Initial Determination Date on a pro rata basis according to the proportion in which the remaining Category I Pre-Filing Intercompany Debt of such APAC Debtor owing to each of its Intercompany Creditors bears to the aggregate amount of all remaining Category I Pre-Filing Intercompany Debt of such APAC Debtor owing to all of its Intercompany Creditors, as set forth in Annex E-2. Annex E-2 sets forth the payment tranches for the Final Effective Date Payment Amount to be paid by each APAC Debtor to each of its Intercompany Creditors and the respective deadlines by which payment of each tranche must be made.

3.    Subsequent Payments.

a.    Following the date of this Agreement, each APAC Debtor shall provide to the Relevant Parties, once every week and substantially in the form provided by such APAC Debtor to NNL as of the date hereof, (i) rolling 13-week cash flow forecasts and (ii) reports on actual weekly cash flow results. Each APAC Debtor shall hold conference calls from time to time with the Relevant Parties to discuss such financial information at the request of any of the Relevant Parties. For the purposes of this Agreement, the "Relevant Parties" means (1) NNL (on behalf of the Canadian Debtors), (2) the Monitor, (3) NNI (on behalf of the US Debtors), (4) the Official Committee of Unsecured Creditors appointed in the US Proceedings (the "Creditors' Committee"), (5) the steering committee members of the ad hoc group of bondholders that have executed confidentiality or non-disclosure agreements with NNL (the "Bondholders' Committee"), (6) the Joint Administrators (on behalf of the EMEA Debtors) and (7) the Restructuring Manager (on behalf of the APAC Debtors).

10

47

b.  Each APAC Debtor shall, on a monthly basis, commencing on October 30, 2009 and on the last day of each month thereafter (each such date, a "Subsequent Determination Date," and each of the Initial Determination Dates and a Subsequent Determination Date, a "Determination Date"), calculate the amount of its Net Cash Balance and shall provide, no later than 14th calendar day following each Subsequent Determination Date, its calculation of its Net Cash Balance as of such Subsequent Determination Date to the Relevant Parties in reasonable detail, together with (A) a report by the Restructuring Manager which report shall provide its commentary regarding the basis for such APAC Debtor's calculation of its Net Cash Balance and such APAC Debtor's compliance with the NCB Determination Procedure and (B) any reasonably available supporting documents, including, without limitation, any material Professional Advice; *provided, however*, that if in the reasonable opinion of such APAC Debtor's counsel, the provision of any such Professional Advice would result in the loss or waiver of any lawful privilege that may be asserted with respect thereto, such APAC Debtor may provide, in lieu thereof, a summary of the conclusions set forth in such Professional Advice in a manner designed to preserve such lawful privilege. During the seven (7) calendar days following the delivery of its calculation of its Net Cash Balance as of each Subsequent Determination Date, each APAC Debtor shall consult, acting reasonably and in good faith, with the Relevant Parties in respect of its calculation of its Net Cash Balance. The determination by the board of directors of each APAC Debtor of its Net Cash Balance, if made in accordance with the NCB Determination Procedure and following such consultation process with the Relevant Parties, shall be final and binding on all Parties, absent manifest error.

c.  Each APAC Debtor shall, no later than the deadlines set forth in Annex F, make the cash payment (the amount of any such payment, a "Subsequent Payment Amount") to each of its Intercompany Creditors of a portion of its Category II Pre-Filing Intercompany Debt owing to such Intercompany Creditor utilizing its Net Cash Balance as of a Subsequent Determination Date on a pro rata basis according to the proportion in which the Category II Pre-Filing Intercompany Debt of such APAC Debtor owing to each of its Intercompany Creditors bears to the aggregate amount of all Category II Pre-Filing Intercompany Debt of such APAC Debtor owing to all of its Intercompany Creditors.

d.  Subject to Section 4, once all of its Senior Indebtedness (as defined below) has been paid or satisfied in full, each APAC Debtor shall, no later than the deadlines set forth in Annex F, make a Subsequent Payment Amount to each of its Intercompany Creditors of a portion of its Category III Pre-Filing Intercompany Debt owing to such Intercompany Creditor utilizing, and only to the extent of, its Net Cash Balance as of a Subsequent Determination Date on a pro rata basis according to the proportion in which the Category III Pre-Filing Intercompany Debt of such APAC

11

48

Debtor owing to each of its Intercompany Creditors bears to the aggregate amount of all Category III Pre-Filing Intercompany Debt of such APAC Debtor owing to all of its Intercompany Creditors.

e.  The obligations set forth in this Section 3 shall apply only to the APAC Debtors having Category II Pre-Filing Intercompany Debt or Category III Pre-Filing Intercompany Debt and shall cease to apply to such APAC Debtors once all of their respective Category II Pre-Filing Intercompany Debt and Category III Pre-Filing Intercompany Debt have been paid or satisfied in full.

4.  Subordination.

a.  Subject to Sections 4.d. and 12, the Category III Pre-Filing Intercompany Debt owing by each of NN Asia Group, NN Australia, NN Malaysia, NN India (Private), NN Singapore Group, NN Korea, NN Thailand and NN Vietnam (each, an "Identified Debtor," and collectively, the "Identified Debtors") to its Intercompany Creditors (the "Subordinated Debt") shall be subordinated and junior in right of payment to the prior payment in full of the following debts of such Identified Debtor (the "Senior Indebtedness"), and each Intercompany Creditor agrees not to enforce the Subordinated Debt prior to such payment of the Senior Indebtedness:

i.  subject to Section 5, all liabilities and obligations of such Identified Debtor, whether actual, contingent, present or future, to the Excluded Affiliates or non-affiliated third parties, in each case, whether incurred before or after the Filing Date (the "Third Party Liabilities");

ii.  subject to Section 8, all intercompany loans, credits and obligations owing by such Identified Debtor to its Intercompany Creditors incurred after the Filing Date after setting off against the receivables owing to it by the relevant Intercompany Creditors after the Filing Date to the extent not prohibited or restricted under applicable laws and regulations (the "Post-Filing Intercompany Debt");

iii.  all Category I Pre-Filing Intercompany Debt owing by such Identified Debtor to its Intercompany Creditors and to be repaid pursuant to Section 2; and

iv.  all Category II Pre-Filing Intercompany Debt owing by such Identified Debtor to its Intercompany Creditors and to be repaid pursuant to Section 3.

b.  Each of the Identified Debtors shall only be obligated to make payment of the Subordinated Debt (i) only if no Senior Indebtedness remains outstanding and (ii) subject to Section 4.c., only to the extent of its Net

12

Cash Balance (after full payment or satisfaction of all of its Senior Indebtedness) as of the applicable Subsequent Determination Date. Any such payment of the Subordinated Debt shall be made on a pro rata basis according to the proportion in which the Subordinated Debt of such Identified Debtor owing to each of its Intercompany Creditors bears to the aggregate amount of all Subordinated Debt of such Identified Debtor owing to all of its Intercompany Creditors.

c.  Upon any distribution of assets of an Identified Debtor in any dissolution, winding up, liquidation or reorganization of such Identified Debtor (whether in bankruptcy, insolvency or receivership proceedings or upon an assignment for the benefit of creditors or otherwise):

   i.  the holders of all Senior Indebtedness of such Identified Debtor shall first be entitled to receive payment in full in cash of all Senior Indebtedness of such Identified Debtor before any Intercompany Creditor of the Subordinated Debt of such Identified Debtor is entitled to receive any payment of any kind or character on account of the principal of or interest on or any other amount owing in respect of such Subordinated Debt;

   ii.  any payment or distribution of assets of such Identified Debtor of any kind or character, whether in cash, property or securities, to which any Intercompany Creditor of the Subordinated Debt of such Identified Debtor would be entitled except for the provisions of this Section 4, shall be paid by the liquidating trustee or agent making such payment or distribution, whether a trustee in bankruptcy, a receiver or liquidating trustee or other trustee or agent, directly to the holders of Senior Indebtedness of such Identified Debtor to the extent necessary to make payment in full in cash of all Senior Indebtedness of such Identified Debtor remaining unpaid after giving effect to any concurrent payment or distribution to the holders of such Senior Indebtedness; and

   iii.  in the event that, notwithstanding the foregoing provisions of this Section 4.c., any payment or distribution of assets of such Identified Debtor of any kind or character, whether in cash, property or securities, shall be received by any Intercompany Creditor of the Subordinated Debt of such Identified Debtor on account of the Subordinated Debt of such Identified Debtor before all Senior Indebtedness of such Identified Debtor is paid in full in cash, such payment or distribution shall be received and held by such Intercompany Creditor for the sole benefit of, and shall forthwith be paid over to, the holders of the Senior Indebtedness of such Identified Debtor remaining unpaid for application to the payment of such Senior Indebtedness until all such Senior Indebtedness shall have been paid in full in cash, after giving effect

13



to any concurrent payment or distribution to the holders of such Senior Indebtedness.

The applicable Identified Debtor shall give prompt written notice to each Intercompany Creditor of the Subordinated Debt of such Identified Debtor and the other Relevant Parties of any dissolution, winding up, liquidation or reorganization of such Identified Debtor (whether in bankruptcy, insolvency or receivership proceedings or upon assignment for the benefit of creditors or otherwise); *provided, however,* that failure to give such notice shall not affect the subordination effected hereby or in any way modify the provisions of this Section 4.

d.  Notwithstanding anything herein to the contrary, with respect to any Identified Debtor, during any period of time that a Payment Event of Default (as defined below) has occurred and is continuing under this Agreement (the date of the occurrence of such Payment Event of Default, the "Suspension Date"), the provisions of this Section 4 shall be suspended and not be applicable to the portion of Subordinated Debt of such Identified Debtor equal to the amount relating to such Payment Event of Default (the "Suspended Subordinated Debt") to the effect that the Suspended Subordinated Debt shall not be deemed to be Subordinated Debt during the Suspension Period (as defined below). In the event that on any subsequent date (the "Reversion Date"), such Identified Debtor cures such Payment Event of Default, the provisions of this Section 4 shall again be applicable to the Suspended Subordinated Debt equal to the amount so cured (the "Reverted Subordinated Debt") and the Reverted Subordinated Debt shall thereafter again be deemed to be Subordinated Debt. For the purposes of this Agreement, the period of time between the Suspension Date and the Reversion Date is referred to as the "Suspension Period". The applicable Identified Debtor shall deliver written notice promptly to the Relevant Parties notifying of any event set forth in this Section 4.d.

5.  Excluded Affiliate Liabilities. Notwithstanding anything herein to the contrary, if any Excluded Affiliate enters into an agreement with any APAC Debtor subsequent to the date of this Agreement (an "Excluded Affiliate Restructuring Agreement") which provides for a less favorable treatment with respect to such APAC Debtor's Third Party Liabilities owed to such Excluded Affiliate (the "Excluded Affiliate Liabilities") than the treatment thereof provided herein, then the treatment of such Excluded Affiliate Liabilities hereunder shall be in accordance with the terms of such Excluded Affiliate Restructuring Agreement from the effective date thereof and subsequent calculations of such APAC Debtor's Net Cash Balance shall give effect to such Excluded Affiliate Restructuring Agreement.

6.  Covenants.

a.  NNSA may, prior to the Initial Effective Date, by notice in writing to the Parties hereto, accede to this Agreement as an EMEA Debtor on the same

14