5\

terms and conditions as an EMEA Debtor (such accession conditioned, if applicable, on French court approval), and the Parties shall forthwith on receipt of such notice enter into an appropriate form of accession agreement with NNSA. The Parties agree that the provisions of this Section 6.a. are for the benefit of NNSA and may be enforced by NNSA.

b. Without limiting the generality of Section 11, each APAC Debtor hereby agrees, upon receipt of a written request from NNL, to enter into one or more asset sale agreements to transfer such APAC Debtor's assets relating to the Enterprise Solutions and Metro Ethernet Networks business units of the Nortel Group and any and all agreements and documents contemplated thereby and/or agreements between the Selling Debtors (as defined below) entered into in relation thereto.

c. To the extent any APAC Debtor is restricted from remitting cash or making the Initial Payment or any Subsequent Payment by any applicable law or regulation, such APAC Debtor covenants to use its reasonable best efforts to undertake all necessary or desirable actions in order for such APAC Debtor to be able to freely remit cash and/or make the Initial Payment or the Subsequent Payment as soon as practicable.

d. Each APAC Debtor hereby covenants that until such APAC Debtor's Pre-Filing Intercompany Debt has been paid or satisfied in full, such APAC Debtor shall not take any of the following actions without the prior written consent of the Monitor, the Creditors' Committee, the Bondholders' Committee and the Joint Administrators (which consent shall not be unreasonably withheld or delayed):

   i. The distribution of profits among the shareholders of such APAC Debtor by way of dividend, return of capital or otherwise;

   ii. The adoption or modification of any significant accounting policies of such APAC Debtor, except as required under any applicable laws, regulations or accounting standards;

   iii. Except as contemplated by this Agreement, the entry into any material agreements, including, without limitation, any contractual agreements to make any severance or redundancy payments, to incur any obligation for the payment or repayment of money borrowed (such obligation, the "Indebtedness"), or any financing or lease agreement, or by mortgaging or creating a security interest or other encumbrance over the assets of such APAC Debtor, in each case, other than (A) in relation to the standby note facility among NN Australia, NN Japan and NN New Zealand in the aggregate amount not exceeding US$7.0 million (the "NN Australia Note Facility") and the related security interest to be provided by NN Australia to secure its obligations thereunder, (B)

52

in relation to (1) any existing or future posting of any cash or cash equivalents by such APAC Debtor to banks or other third parties as collateral or (2) any escrow arrangements entered into or to be entered into between such APAC Debtor, its customers or vendors and any financial institutions, in each case, in connection with the provision or issuance of performance, advance payment, warranty, tax, customs duty or other types of bonds, guarantees or security in the ordinary course of business and/or in the fulfillment of any contractual obligation to provide the same ("Ordinary Course Cash Collateral") and (C) in the ordinary course of such APAC Debtor's business consistent with past practice and applicable corporate policies and procedures, as such practice and corporate policies and procedures may be modified from time to time to the extent necessary to enter or consummate any Sale Transaction or the Proceedings of the shareholders of such APAC Debtor; or

iv. The payment of any Indebtedness of such APAC Debtor other than as specifically permitted by this Agreement.

e. Each APAC Debtor hereby covenants that until such APAC Debtor's Pre-Filing Intercompany Debt has been paid or satisfied in full, such APAC Debtor shall use its reasonable best efforts to provide written notice to and to consult with the Monitor, the Creditors' Committee, the Bondholders' Committee and the Joint Administrators prior to taking any of the following actions: liquidate, commence bankruptcy proceedings, suspend payments, assign to or make any other arrangement with such APAC Debtor's creditors or put such APAC Debtor into judicial management or administration and/or consolidation, or merge or amalgamate such APAC Debtor with any other company and/or cease to conduct or carry on such APAC Debtor's business or any part thereof other than as a result of a Sale Transaction where such APAC Debtor is a Selling Debtor.

f. Each Party which is a shareholder of any APAC Debtor hereby agrees that to the extent required or desirable and upon receipt of a written request from such APAC Debtor, such Party shall execute shareholder(s)' resolutions (solely in its capacity as a shareholder of such APAC Debtor) approving and/or ratifying the entry of this Agreement by such APAC Debtor and the consummation of the transactions contemplated by this Agreement.

7. Appointment of Restructuring Manager. The APAC Debtors shall appoint, with effect from the date hereof, Ernst & Young Solutions LLP as the restructuring manager (the "Restructuring Manager") to carry out the duties set out in Annex G. The fees, costs and expenses of the Restructuring Manager shall be borne jointly and severally by NN Japan, NN India (Private), NN Australia, NN Singapore Group and NN Asia Group. If the Restructuring Manager resigns or is removed or a vacancy exists in the office of the Restructuring Manager for

53

any reason, then the APAC Debtors shall promptly appoint a successor Restructuring Manager in consultation with the other Relevant Parties.

8. Full and Final Settlement. In consideration of the obligations, covenants and rights of the Parties set forth in this Agreement, including without limitation the APAC Debtor's agreement to enter into the relevant sale agreements under Section 6.b. and to cooperate fully and participate in one or more Sale Transactions under Section 11, the Parties hereby agree that this Agreement shall constitute a full and final settlement of any and all Adjustment Payments (as defined below) owing and that may, or could be owing between (a) the APAC Debtors *inter se* and (b) an APAC Debtor, on the one hand, and a Canadian Debtor, on the other hand, under the APAC Distribution Agreements (as defined below) for all calculation periods or parts thereof during, or with respect to, the period from and including the Filing Date through and including December 31, 2009. For the purposes of this Section 8, "Adjustment Payments" means the quarterly and/or annual adjustment payments payable pursuant to the APAC Distribution Agreements; and "APAC Distribution Agreements" means certain distribution agreements, whether written or oral, in effect between two or more APAC Debtors or between one or more APAC Debtors, on the one hand, and a Canadian Debtor, on the other hand, including without limitation, the agreements listed in Annex H (as amended, supplemented or otherwise modified from time to time).

PART C – PROVISIONS OF GENERAL APPLICATION

9. Scope of this Agreement. The Parties hereto agree that:

a. this Agreement is not, and shall not be deemed to be, an acknowledgement by any Party of the assumption, ratification, adoption or rejection of the Transfer Pricing Agreements or any other Transfer Pricing methodology employed by the Nortel Group or its individual members for any purpose nor shall it be determinative of, or have any impact whatsoever on, the allocation of proceeds to any Debtor from any sale of assets, undertakings or businesses of Nortel Group entities;

b. except as specifically provided herein, that payments required hereunder shall be made in accordance with the terms hereof regardless of any actual or purported right of offset or other defense;

c. this Agreement shall not serve as the basis for any claim by any Party against any other Party in respect of Transfer Pricing or any other theory of cost reimbursement or allocation of any sale proceeds, or any ownership of intellectual property;

d. each Party approves all payments to be made in accordance with this Agreement and all other matters contemplated hereby, to the extent that such Party is a creditor of the Party making such payment; and

e. this Agreement shall not, and is not intended to, have any impact whatsoever on the rights and obligations of the various parties to the certain Interim Funding and Settlement Agreement dated June 9, 2009.



10. Relinquishment of Intellectual Property Licenses.

a. Upon the written request of NNL, each of the APAC Debtors hereby agrees to enter into a License Termination Agreement (as defined below) with respect to the licenses and rights granted by NNL to such APAC Debtors for the purposes of facilitating, and in consideration of a right to an allocation, to be determined in accordance with Section 11, to such APAC Debtors of a portion of the sale proceeds from, the sale of any material assets of any of the Canadian Debtors and/or the US Debtors to a third party (an "Asset Sale"); *provided, however*, such APAC Debtor shall not be required to enter into any License Termination Agreement if a License Agreement (as defined in the License Termination Agreement) contains terms that are materially inconsistent with the terms of the License Termination Agreement.

b. For the purposes of this Agreement, the term "License Termination Agreement" means an agreement substantially in the form attached hereto as Annex I.

c. Where any APAC Debtor enters into any License Termination Agreement in accordance with the provisions of this Section 10, such APAC Debtor shall be deemed to be a Selling Debtor (as defined below), and the proceeds of such Asset Sale shall be deemed to be Sale Proceeds (as defined below), for the purposes of Sections 11.b., 11.c. and 11.d., and Sections 11.b., 11.c. and 11.d. shall apply accordingly.

11. Entry into Sale Transactions.

a. Subject to (i) compliance with applicable laws and regulations and (ii) the determination by the board of directors of each APAC Debtor, acting reasonably and in good faith and after consultation with the Relevant Parties, that the applicable Sale Transaction is in the best economic interests of such APAC Debtor's relevant stakeholders generally, each APAC Debtor hereby agrees to cooperate fully and participate in one or more Sale Transactions. Such cooperation shall include implementation of any reasonable operational or corporate structure changes required by the Filed Debtors or any purchaser (or, in the case of any auction, the successful bidder in any such auction) (a "Purchaser") and the execution of definitive documentation, including any ancillary or related documents necessary or reasonably desirable to participate in the Sale Transactions, with the Purchaser in accordance with the terms of such definitive documentation. Each APAC Debtor hereby agrees that its execution of definitive documentation with a Purchaser of, or closing of any sale of, material assets, undertakings or businesses of any of the APAC Debtors to which such APAC Debtor (an "APAC Selling Debtor") is proposed to be a party, together with each of the other Parties hereto that is proposed to be a party thereto (together with the APAC Selling Debtors, the "Selling



Debtors") (each, a "Sale Transaction") shall not be conditioned upon such APAC Selling Debtor reaching agreement with the other Selling Debtors regarding (i) allocation of the sale proceeds (the "Sale Proceeds") from the relevant Sale Transaction or (ii) the Allocation Protocol (as defined below).

b. Pending the distribution of the Sale Proceeds as described in the second sentence of this Section 11.b., the entire amount of the Sale Proceeds from a Sale Transaction (less applicable transfer or value-added taxes and, to the extent agreed by the Selling Debtors, transaction costs (including any applicable break fee or expense reimbursement) and other agreed amounts) shall be deposited in an escrow account (the "Escrow Account"). In no case shall there be any distribution from the Escrow Account in advance of either (i) agreement of all of the Selling Debtors or (ii) in the case where the Selling Debtors fail to reach agreement, determination by the relevant dispute resolver(s) under the terms of the Allocation Protocol applicable to the Sale Proceeds, and subject in each case to payment of the agreed or determined amount of allocation of Sale Proceeds to all Selling Debtors.

c. Without derogating from the obligations provided in Section 11.a., each APAC Debtor shall, as soon as reasonably practicable following the execution of the Allocation Protocol by the Filed Debtors, accede to a common protocol for resolving disputes concerning the allocation of Sale Proceeds from Sale Transactions, which shall provide in substance the following general principles, among others (the "Allocation Protocol"):

i. APAC Debtors, along with one or more affiliates of the Filed Debtors that have not commenced any bankruptcy or other creditor protection proceedings and so elect, (such affiliates together with the APAC Debtors, the "Non-Filed Affiliates"), shall be collectively represented in the procedures under the Allocation Protocol by an independent counsel and financial advisor, and the fees and expenses of such counsel and financial advisor shall be paid from the Sale Proceeds allocated to the Non-Filed Affiliates;

ii. Subject to Section 11.c.iv. of this Agreement, the representatives of the Non-Filed Affiliates shall have the right to participate and present the claims of the Non-Filed Affiliates to the relevant Sale Proceeds in the proceedings under the Allocation Protocol; the manner and terms of such participation and presentation shall be determined by the dispute resolver(s);

iii. In the event the Selling Debtors fail to reach agreement regarding the allocation of Sale Proceeds under the Allocation Protocol, such dispute shall be automatically referred to the dispute resolver(s) pursuant to the Allocation Protocol;

5Q

iv. It is the intention of the Parties that the procedures under the Allocation Protocol shall be designed to avoid unnecessary delay or expense, so as to provide a fair and efficient means for the final resolution of the relevant dispute among the Selling Debtors. The rights of the Non-Filed Affiliates to participate and present as contemplated by Section 11.c.ii, as determined by the dispute resolver(s), shall reflect, to the extent reasonably practicable and determinable under the circumstances, the relative contribution, if any, of the assets (tangible and intangible) and the rights transferred or relinquished by and liabilities assumed from the Non-Filed Entities in comparison to other Selling Debtors in such Sale Transaction; and

v. The written decision of the dispute resolver(s) allocating the Sale Proceeds among the Selling Debtors shall be conclusive, final and binding upon each of the parties as may be provided in the Allocation Protocol, including, without limitation, the Non-Filed Affiliates, subject to the terms of the Allocation Protocol.

d. All Selling Debtors shall, immediately following entry into any Sale Transaction, negotiate in good faith and on a timely basis to attempt to reach agreement regarding the allocation of the Sale Proceeds from such Sale Transaction within a reasonable period of time or as may be otherwise provided in the Allocation Protocol, failing which the Allocation Protocol shall apply to determine the allocation of the relevant Sale Proceeds.

e. For the purposes of Sections 11.a. through 11.d. (inclusive):

i. the US Debtors hereby agree that with respect to any of the matters referred to in such Sections as to which the agreement or determination of any of the US Debtors is required, the US Debtors shall include the Creditors' Committee and the Bondholders' Committee in any negotiations on such issues with the other Debtors or any related proceedings and any agreement or determination by the US Debtors shall require the prior consent of the Creditors' Committee and the Bondholders' Committee acting in good faith; and

ii. the Canadian Debtors hereby agree that with respect to any of the matters referred to in such Sections as to which the agreement or determination of any of the Canadian Debtors is required, the Canadian Debtors shall include the Monitor and the Bondholders' Committee in any negotiations on such issues with the other Debtors or any related proceedings and any agreement or determination by the Canadian Debtors shall require the prior



consent of the Monitor and the Bondholders' Committee acting in good faith.

12. Effectiveness.

a. Subject to Sections 12.b. and 12.f., the effectiveness of the provisions of this Agreement shall be subject to the satisfaction of the following conditions:

i. each of the US Court and the Canadian Court approving the entirety of this Agreement and all of the provisions hereof (the "North American Court Condition");

ii. the UK Court giving a direction (the "UK Court's Directions") that, if so sought, the Joint Administrators be at liberty to enter into this Agreement (the "UK Court Condition" and, together with the North American Court Condition, the "Initial Conditions," and each, an "Initial Condition"), *provided, however,* the Joint Administrators may at their election waive the UK Court Condition;

iii. (A) the Reserve Bank of India approving (1) the setting-off of the unpaid amount of loans, credits and obligations owing by NN India (Private) to each of its Intercompany Creditors as of the Filing Date against any receivables owing to NN India (Private) by such Intercompany Creditors as of the Filing Date, as contemplated under Section 1.a., (2) the setting-off of the unpaid amount of loans, credits and obligations owing by NN India (Private) to its Intercompany Creditors incurred after the Filing Date against any receivables owing to NN India (Private) by the relevant Intercompany Creditors as contemplated under Section 4.a.ii and (3) Section 4 and 8 of this Agreement and (B) the satisfaction of all conditions, if any, which the Reserve Bank of India may attach or impose on such approvals (collectively, the "RBI Condition"); and

iv. (A) the Bank of Thailand or any commercial bank that is an authorized agent of the Bank of Thailand approving the setting-off of the unpaid amount of loans, credits and obligations owing by NN Thailand to each of its Intercompany Creditors as of the Filing Date against any receivables owing to NN Thailand by such Intercompany Creditors as of the Filing Date, as contemplated under Section 1.a. and (B) the satisfaction of all conditions, if any, which the Bank of Thailand or an authorized agent of the Bank of Thailand may attach or impose on such approvals (collectively, the "BOT Condition" and, together with the Initial Conditions and the RBI Condition, the "Conditions," and each, a "Condition").



b. Upon the satisfaction of each of the Initial Conditions, (i) all provisions of this Agreement shall be effective with respect to all the Parties (other than NN India (Private) and NN Thailand), (ii) all provisions of this Agreement other than Sections 1-4 and 8 shall be effective with respect to NN India (Private) and (iii) all provisions of this Agreement other than Sections 1-4 shall be effective with respect to NN Thailand, in each case, as of the date of the satisfaction of the last Initial Condition (the "Initial Effective Date"). Upon the satisfaction of the RBI Condition, Sections 1-4 and 8 shall be effective with respect to NN India (Private) as of the date of the satisfaction of the RBI Condition. Upon the satisfaction of the BOT Condition, Sections 1-4 shall be effective with respect to NN Thailand. The last date of the satisfaction of the RBI Condition and the BOT Condition is referred to in this Agreement as the "Final Effective Date."

c. Each Party hereto (including NN India (Private) and NN Thailand but excluding the other APAC Debtors) shall:

i. use commercially reasonable efforts to satisfy the Conditions as soon as possible, taking into account the availability of the respective Courts to address the matters set forth in this Agreement;

ii. keep all other Parties, the Monitor, the Creditors' Committee and the Bondholders' Committee reasonably apprised of the progress of the satisfaction of the Conditions and provide such other information regarding the satisfaction of the Conditions as reasonably requested by other Parties; and

iii. use commercially reasonable efforts to allow any other Party, the Monitor, the Creditors' Committee or the Bondholders' Committee which so requests in writing reasonable participation in connection with any proceedings in any Court related to the satisfaction of the Conditions.

d. Each APAC Debtor hereto shall use commercially reasonable efforts to make or obtain all applicable governmental notifications, consents, authorizations and approvals required for such APAC Debtor to enter into this Agreement and/or to consummate the transactions contemplated herein and set forth in Schedule 5 as soon as practicable.

e. If the Joint Administrators elect to seek the UK Court's Directions, then the EMEA Debtors shall (i) use commercially reasonable efforts to obtain the UK Court's Directions as soon as possible, taking into account the availability of the UK Court, (ii) keep all other Parties, the Monitor, the Creditors' Committee and the Bondholders' Committee reasonably apprised of the progress of the efforts to obtain UK Court's Directions and provide such other information regarding the efforts to obtain UK Court's

69

Directions as reasonably requested by other Parties, and (iii) use commercially reasonable efforts to allow any other Party, the Monitor, the Creditors' Committee or the Bondholders' Committee which so requests in writing reasonable participation in connection with any proceedings in the UK Court related to the UK Court's Directions.

f. Notwithstanding any of the foregoing but subject to Section 12.b., the following provisions of the Agreement shall be effective as of the date hereof: Sections 3.a., 3.b., 5, 6, 7, 8, 10, 11, 12, 13.c. and 14-27.

13. Events of Default; Remedies.

a. For the purposes of this Agreement, (i) a "Payment Event of Default" shall mean, with respect to an APAC Debtor, a default for ten (10) or more calendar days in the payment of any Initial Payment Amount or any Subsequent Payment Amount of such APAC Debtor when due (whatever the reason for such Payment Event of Default and whether it shall be voluntary or involuntary or be effected by operation of law or pursuant to any judgment, decree or order of any court or any order, rule or regulation of any administrative or governmental body) and (ii) a "Covenant Event of Default" shall mean, with respect to an APAC Debtor, a failure for ten (10) or more calendar days after receipt by such APAC Debtor of written notice given by NNL or NNI to comply with its agreements set forth in Sections 10 and 11.

b. Subject to Section 4.d. and without derogating from the obligations provided in Sections 2.b. and 3.c., upon the occurrence of a Payment Event of Default by an APAC Debtor, to the extent that such APAC Debtor has a Net Cash Balance as of the applicable Determination Date, such APAC Debtor shall make payment of a portion of the Initial Payment Amount or the Subsequent Payment Amount (as the case may be) to each of its Intercompany Creditors of its Category I Pre-Filing Intercompany Debt (in the case of an Initial Payment Amount) or its Category II Pre-Filing Intercompany Debt (in the case of a Subsequent Payment Amount) owing to such Intercompany Creditor utilizing its Net Cash Balance as of the applicable Determination Date on a pro rata basis according to the proportion in which the Category I Pre-Filing Intercompany Debt (in the case of an Initial Payment Amount) or the Category II Pre-Filing Intercompany Debt (in the case of a Subsequent Payment Amount) of such APAC Debtor owing to each of its Intercompany Creditors bears to the aggregate amount of all Category I Pre-Filing Intercompany Debt (in the case of an Initial Payment Amount) or the aggregate amount of all Category II Pre-Filing Intercompany Debt (in the case of a Subsequent Payment Amount) of such APAC Debtor owing to all of its Intercompany Creditors.



c. Subject to compliance with all applicable laws and regulations, each APAC Debtor's obligation to comply with its agreements set forth in Sections 10 and 11, and the expenses, costs, losses, liabilities and damages that may be incurred by the other Selling Debtors by reason of such APAC Debtor's non-compliance with such agreements (the "Secured Obligations"), shall be secured by the following assets of such APAC Debtor (collectively, the "Collateral"): perfected first-priority security interests in all present and future tangible and intangible assets, properties and undertakings (including, without limitation, bank accounts, investment property, intercompany receivables and any other receivables, equipment, contractual rights, intellectual property and other general intangibles) but in each case excluding those assets over which granting of a security interest in such assets would be prohibited or limited (but if limited, only excluded to the extent of such limitation and for so long as such limitation is in force) by law and/or contract; *provided, however*, that with respect to any Collateral that also secures the obligations of NN Australia under the NN Australia Note Facility, the Secured Obligations shall be secured by second-priority security interest that shall be junior to the security interests of the secured parties under the NN Australia Note Facility, and the lien priority and the relative rights issues in respect thereof will be set forth in a customary intercreditor agreement, which shall be reasonably acceptable to the secured parties under the NN Australia Note Facility, and *provided, further,* that such security interests shall not prevent any APAC Debtor from posting Ordinary Course Cash Collateral. Subject to compliance with all applicable laws and regulations, all of the above-described security interests with respect to NN Japan, NN Asia Group and NN Singapore Group shall be created for the benefit of the other Selling Debtors on or prior to the Initial Effective Date (or with respect to the other APAC Debtors within 45 days from the date hereof) on terms, and pursuant to documentation reasonably satisfactory to the Relevant Parties, and shall provide for the ability of the secured parties thereof to enforce such security interests upon the occurrence of a Covenant Event of Default. Notwithstanding the foregoing, assets may be excluded from the Collateral in circumstances where such APAC Debtor and the Relevant Parties agree that the cost of obtaining a security interest in such assets are excessive in relation to the value afforded thereby. Each APAC Debtor shall bear all reasonable costs and expenses that may be incurred by the Parties in creating the security interests relating to such APAC Debtor in accordance with this Section 13.c.

14. Amendments. This Agreement may be amended or any rights under the Agreement may be waived, on no less than 5 Business Days' notice, only in writing signed by all Parties, and approved by the Monitor, Creditors' Committee and the Bondholders' Committee, which amendments or waivers, if material in the judgment of the Parties, must be approved by all of the Courts that initially approved this Agreement or gave directions in respect of this Agreement (in the case of the UK Court). For the purposes of this Section 14, "Business Day"

61

shall mean a day that is not a Saturday, Sunday or national public holiday in Canada, the United States or the United Kingdom.

15. Governing Law and Jurisdiction.

a. This Agreement shall be governed exclusively by the laws of the State of New York without regard to the rules of conflict of the laws of the State of New York; *provided, however,* that Sections 1-5, 6.c., 6.d., 6.e., 7, 12.d., 13.a., 13.b., 16 and 26 shall be governed exclusively by English law and Section 8 shall be governed by Ontario law.

b. To the fullest extent permitted by applicable law, each Party (i) agrees to submit to the non-exclusive jurisdiction of the US and Canadian Courts (in a joint hearing conducted under the cross-border protocol previously approved by the US Court and the Canadian Court, as it may be in effect from time to time (the "Cross-Border Protocol"), for purposes of all legal proceedings to the extent relating to the matters agreed in this Agreement (but not, for the avoidance of doubt, any Transfer Pricing Agreement matter generally), (ii) agrees that any claim, action or proceeding by such Party seeking any relief whatsoever to the extent relating to the matters agreed in this Agreement must be commenced in (A) the US Court if such claim, action or proceeding would solely involve the US Debtors, (B) the Canadian Court if such claim, action or proceeding would solely involve the Canadian Debtors, (C) a joint hearing of both the US and Canadian Courts conducted under the Cross-Border Protocol if such claim, action or proceeding would involve the Canadian Debtors and the US Debtors, (D) the English courts if such claim, action or proceeding would solely involve the EMEA Debtors and (E) the English courts if such claim, action or proceeding would solely involve the APAC Debtors, (iii) waives and agrees not to assert any objection that it may now or hereafter have to the laying of the venue of any such action brought in such a Court or any claim that any such action brought in such a Court has been brought in an inconvenient forum, (iv) agrees that mailing of process or other papers in connection with any such action or proceeding or any other manner as may be permitted by law shall be valid and sufficient service thereof, and (v) agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by applicable law; *provided, however,* that (1) any claim, action or proceeding brought against the Joint Administrators in relation to any potential liability or their capacity be it personal or otherwise under this Agreement shall be brought exclusively in the English courts, (2) any claim, suit, action or proceeding against any APAC Debtor Person shall be brought exclusively in the courts of the place of incorporation of the relevant APAC Debtor in which such APAC Debtor Person is a director, officer or employee (as the case may be) and (3) any claim, suit, action or proceeding relating to the matters set forth in Section 8 shall be brought exclusively in the Canadian Court.



16. No Personal Liability of the Joint Administrators.

a. The Parties agree that the Joint Administrators have negotiated and are entering into this Agreement as agents for the EMEA Debtors to which they are appointed and that none of the Joint Administrators, their firm, partners, employees, advisers, representatives or agents shall incur any personal liability whatsoever whether on their own part or in respect of any failure on the part of any Nortel Group company to observe, perform or comply with any of its obligations under this Agreement or under or in relation to any associated arrangements or negotiations.

b. The Joint Administrators are a Party to this Agreement: (i) as agents of the respective EMEA Debtors of which they are administrators; and (ii) in their own capacities solely for taking the benefit of the statutory charges under Paragraph 99(3) of Schedule B1 of the United Kingdom Insolvency Act 1986 and for the purposes of obtaining the benefit of the provisions of this Agreement expressed to be conferred on or given to the Joint Administrators and enforcing the obligations of certain other Parties to this Agreement.

17. No Personal Liability of the APAC Debtor Persons.

a. To the fullest extent permitted by applicable law, each of the Parties (other than the relevant APAC Debtor) agrees that it shall have no claim against any director, officer or employee of each APAC Debtor (each, an "APAC Debtor Person" and collectively, the "APAC Debtor Persons") and none of the APAC Debtor Persons shall have any personal liability to any Party (other than the relevant APAC Debtor) whatsoever based upon him being or having been or having done any act or omitting anything to be done as a director, officer or employee (as the case may be) of the relevant APAC Debtor, or in respect of any failure on the part of the relevant APAC Debtor to observe, perform or comply with any of its obligations under this Agreement or under or in relation to any associated arrangements or negotiations and each of such Parties, to the fullest extent permitted by applicable law, waives and releases and agrees and undertakes not to allege any such liability or assert, promote or support any such claim, except to the extent a liability arises out of fraud, willful misconduct or gross negligence on the part of such APAC Debtor Person.

b. Each APAC Debtor hereby unconditionally and irrevocably and to the fullest extent permitted by applicable law, agrees and undertakes to fully and effectively indemnify and keep indemnified and hold harmless each APAC Debtor Person of such APAC Debtor from and against all and any actions, suits, proceedings, claims, liabilities, demands, losses, charges, costs and expenses (including, without limitation, all reasonable costs and expenses incurred in disputing or defending or the settlement of any claims or actions or other proceedings as such APAC Debtor Person may

63

in his reasonable discretion decide to dispute, defend or settle, on a full indemnity basis) (collectively, the "Indemnified Liabilities") which may be made or brought, or threatened to be made or brought by any party (including by that APAC Debtor) against such APAC Debtor Person, or which such APAC Debtor Person may sustain, suffer or incur, based upon him being or having been or having done any act or omitting anything to be done as a director, officer or employee (as the case may be) of such APAC Debtor, or the failure on the part of such APAC Debtor to observe, perform or comply with any of its obligations under this Agreement or under or in relation to any associated arrangements or negotiations; provided, however, that nothing in this Section 17.b. shall exclude liability of any APAC Debtor Person of such APAC Debtor to such APAC Debtor for fraud, wilful misconduct or gross negligence. Without prejudice to the generality of the foregoing, each APAC Debtor shall forthwith upon the written demand(s) of any APAC Debtor Person of such APAC Debtor from time to time, pay to such APAC Debtor Person any Indemnified Liabilities which may be payable by such APAC Debtor Person. Notwithstanding any of the foregoing, NN Japan shall not indemnify, keep indemnified or hold harmless any director of NN Japan from and against any Indemnified Liabilities which may be made or brought by, or threatened to be made or brought by, NN Japan or the shareholders of NN Japan on behalf of NN Japan pursuant a derivative shareholders' suit against such director.

c. Notwithstanding anything in Section 15, any claim, suit, action or proceeding against any APAC Debtor Person shall be governed exclusively by the laws of, and shall be subject to the exclusive jurisdiction of the courts of, the place of incorporation of the relevant APAC Debtor in which such APAC Debtor Person is a director, officer or employee (as the case may be), provided that in the case of a director, officer or employee of NN Australia, any claim, suit, action or proceeding against such APAC Debtor Person shall be governed exclusively by the laws of New York and shall be subject to exclusive jurisdiction of the courts of the State of New York and of the United States sitting in the Borough of Manhattan.

d. The Parties agree that the provisions of this Section 17 are for the benefit of each APAC Debtor Person and may be enforced by each APAC Debtor Person.

18. D&O Insurance. In consultation with the Relevant Parties and to the fullest extent permitted by applicable law, the APAC Debtors may obtain and maintain liability insurance, or procure that liability insurance be obtained and maintained, for their directors and officers ("D&O Insurance") so long as (a) such insurance covers all directors and officers of all of the APAC Debtors and (b) the total cost of such insurance shall not exceed US$1 million per annum. The APAC Debtors hereby agree that if the cost of D&O Insurance would exceed US$1 million

64

per annum, then no such insurance shall be obtained by the APAC Debtors without the prior written consent of the Relevant Parties.

19. Representations and Warranties. Subject to the satisfaction of the Conditions and the execution of the shareholder(s)' resolutions described in Section 6.f., each Party (but, for the avoidance of doubt, not the Joint Administrators in their personal capacities) hereby severally represents and warrants to each other that, as of the date hereof:

a. it has the power and authority to enter into this Agreement and to carry out its obligations hereunder;

b. the execution of this Agreement, and the consummation of the transactions contemplated herein, have been authorized by all necessary corporate approvals, and no other act or proceeding on its part is necessary to authorize the execution of this Agreement; and

c. this Agreement has been duly executed by it and constitutes its legal, valid and binding obligations.

20. Reservation of Rights. Except as set forth in Section 8 of this Agreement, nothing in this Agreement shall constitute an amendment, modification or waiver of rights of any Party (a) under any other agreement, including, without limitation, group supplier protocol agreements approved in the applicable Proceedings from time to time and the Transfer Pricing Agreements, applicable law or otherwise, including, without limitation, the right to object to the propriety of any payments made under or in connection with the Transfer Pricing Agreements or any offset arising therefrom or otherwise or (b) with respect to any potential tax contingencies, assessments, rulings or agreements arising from Transfer Pricing Payments pursuant to the Transfer Pricing Agreements or any offset arising therefrom or otherwise. The use of the term Transfer Pricing Payment (or any similar term) or reference to the Transfer Pricing Agreements (or similar agreement) in this Agreement is for convenience only and shall have no evidentiary effect or be used by any of the Parties hereto in any proceeding to determine the pre-petition or post-petition validity, applicability, assumption, affirmation or ratification by any Party of the Transfer Pricing Agreements or any transfer pricing methodology provided in the Transfer Pricing Agreements.

21. Counterparts. This Agreement may be executed in separate counterparts (which may include counterparts delivered by facsimile transmission) and all of said counterparts taken together shall be deemed to be an original and shall be binding on the Party who signed the counterpart and all of which together shall constitute a single agreement.

22. Entire Agreement. This Agreement embodies all the terms and conditions agreed upon between the Parties as to the subject matter of this Agreement and supersedes and cancels in all respects all previous term sheets, agreements and undertakings, if any, between the Parties with respect to the subject matter hereof, whether such be written or oral.

23. Costs and Expenses. Each Party shall bear its own costs and expenses incurred in connection with the preparation, negotiation and execution of this Agreement.



24. Specific Performance. Each Party hereby agrees and acknowledges that it will be impossible to measure in money the damages that would be suffered if such Party fails to comply with any of its obligations in this Agreement and that, in the event of any such failure, an aggrieved party will be irreparably damaged and will not have an adequate remedy at law. Any such party shall, therefore, be entitled (in addition to any other remedy to which such party may be entitled at law or in equity) to seek injunctive relief, including specific performance, to enforce such obligations.

25. Severability. In the event that any provision of this Agreement shall be illegal, invalid or unenforceable, such provision shall be construed by limiting it in such a way so as to render it legal, valid and enforceable to the maximum extent provided by applicable law, and the legality, validity and enforceability of the remaining provisions shall not in any way be affected or impaired by any illegality, invalidity or unenforceability of any provision. The Parties shall negotiate in good faith with respect to any provision to this Agreement found to be illegal, invalid or unenforceable, in order to agree on a substitute provision giving effect, to the maximum extent possible, to the original intent of such provision.

26. Contracts (Rights of Third Parties) Act 1999. Except as specifically set forth in this Agreement, no rights are conferred on any person who is not a party to this Agreement under the Contracts (Rights of Third Parties) Act 1999 of the United Kingdom to enforce any term of this Agreement, but this does not affect any right or remedy which exists or is available apart from that Act.

27. NN Korea. NN Korea hereby represents and warrants that (except for accounts receivable owing by certain of the APAC Debtors and Filed Debtors, and a small cash balance) it has no material tangible or intangible assets, including, without limitation, any intellectual property rights that are contemplated to be included in any Asset Sale or Sale Transaction. In consideration of this representation, the Parties hereby agree that, notwithstanding anything to the contrary in this Agreement, Sections 6.b., 10, 11 and 13.c. of this Agreement shall not apply to NN Korea.

28. Several Obligations. Except as specifically set forth in this Agreement, the obligations of each Party hereunder are several, and not joint and several.

IN WITNESS WHEREOF, the Parties hereto have caused this Agreement to be duly executed and delivered as of the date hereof.

NORTEL NETWORKS CORPORATION

By: ______________________
Name: John Doolittle
Title: SVP, Finance and Corporate Finance

NORTEL NETWORKS LIMITED

By: ______________________
Name: John Doolittle
Title: SVP, Finance and Corporate Finance

NORTEL NETWORKS GLOBAL CORPORATION

By: ______________________
Name: John Doolittle
Title: President

NORTEL NETWORKS INTERNATIONAL CORPORATION

By: ______________________
Name: John Doolittle
Title: President

NORTEL NETWORKS CORPORATION

By ______________________
Name: Anna Ventresca
Title: General Counsel-Corporate and Corporate Secretary

NORTEL NETWORKS LIMITED

By ______________________
Name: Anna Ventresca
Title: General Counsel-Corporate and Corporate Secretary

NORTEL NETWORKS GLOBAL CORPORATION

By ______________________
Name: Anna Ventresca
Title: Secretary

NORTEL NETWORKS INTERNATIONAL CORPORATION

By ______________________
Name: Anna Ventresca
Title: Secretary

NORTEL NETWORKS TECHNOLOGY CORPORATION

By ______________________
Name: Anna Ventresca
Title: Secretary

67

NORTEL NETWORKS INC.

By ______________________
Name: Anna Ventresca
Title: Chief Legal Officer

ARCHITEL SYSTEMS (U.S.) CORPORATION

By ______________________
Name: John Doolittle
Title: President

CORETEK, INC.

By ______________________
Name: John Doolittle
Title: President

NORTEL ALTSYSTEMS, INC.

By ______________________
Name: John Doolittle
Title: President

NORTEL ALTSYSTEMS INTERNATIONAL INC.

By ______________________
Name: John Doolittle
Title: President

NORTEL NETWORKS APPLICATIONS MANAGEMENT SOLUTIONS INC.

By ______________________
Name: John Doolittle
Title: President

68

NORTEL NETWORKS CABLE SOLUTIONS INC.

By ______________________
Name: Anna Ventresca
Title: Chief Legal Officer

NORTEL NETWORKS CAPITAL CORPORATION

By ______________________
Name: John Doolittle
Title: President

NORTEL NETWORKS (CALA) INC.

By: ______________________
Name: John Doolittle
Title: Treasurer

NORTEL NETWORKS (CALA) INC.

By ______________________
Name: Peter Look
Title: President

NORTEL NETWORKS HPOCS INC.

By ______________________
Name: John Doolittle
Title: President

NORTEL NETWORKS INTERNATIONAL INC.

By ______________________
Name: John Doolittle
Title: President

NORTEL NETWORKS OPTICAL COMPONENTS INC.

By ______________________
Name: John Doolittle
Title: President

69

NORTHERN TELECOM INTERNATIONAL INC.

By ______________________
Name: John Doolittle
Title: President

QTERA CORPORATION

By ______________________
Name: John Doolittle
Title: President

SONOMA SYSTEMS

By ______________________
Name: John Doolittle
Title: President and Treasurer

XROS, INC.

By ______________________
Name: John Doolittle
Title: President

70

NORTHERN TELECOM
INTERNATIONAL INC.

By ______________________________
Name:
Title:

QTERA CORPORATION

By ______________________________
Name:
Title:

SONOMA SYSTEMS

By ______________________________
Name:
Title:

XROS, INC.

By ______________________________
Name:
Title:

NORTEL NETWORKS (ASIA) LIMITED

By ______________________________
Name: ALAIN FOSTER
Title:

NORTEL NETWORKS AUSTRALIA PTY. LIMITED

By ______________________________
Name: ALAIN FOSTER
Title:

71

NORTEL NETWORKS (INDIA) PRIVATE LIMITED

By ______________________
Name: ALAIN FOSTER
Title:

PT NORTEL NETWORKS INDONESIA

By James Demers
Name: JAMES DEMERS
Title:

NORTEL NETWORKS KABUSHIKI KAISHA

By See attached
Name: RAYMOND TESKE
Title:

NORTEL NETWORKS KOREA LIMITED

By ______________________
Name: ANDREW GRANT
Title:

NORTEL NETWORKS MALAYSIA SDN. BHD. (COMPANY NO: 54799-M)

By ______________________
Name: ALAIN FOSTER
Title:

NORTEL NETWORKS NEW ZEALAND LIMITED

By ______________________
Name: ALAIN FOSTER
Title:

72

NORTEL NETWORKS (INDIA) PRIVATE LIMITED

By ______________________
Name: ALAIN FOSTER
Title:

PT NORTEL NETWORKS INDONESIA

By James Demers
Name: JAMES DEMERS
Title:

NORTEL NETWORKS KABUSHIKI KAISHA

By ______________________ original
Name: RAYMOND TESKE
Title: REPRESENTATIVE DIRECTOR

NORTEL NETWORKS KOREA LIMITED

By ______________________
Name: ANDREW GRANT
Title:

NORTEL NETWORKS MALAYSIA SDN. BHD. (COMPANY NO: 54799-M)

By ______________________
Name: ALAIN FOSTER
Title:

NORTEL NETWORKS NEW ZEALAND LIMITED

By ______________________
Name: ALAIN FOSTER
Title:

23

NORTEL NETWORKS SINGAPORE PTE LTD

By ____________________
Name: ANDREW GRANT
Title:

NORTEL NETWORKS (THAILAND) LIMITED

By ____________________
Name: JAMES DEMERS
Title:

NORTEL VIETNAM LIMITED

By See attached
Name: NICHOLAS VREUGDENHIL
Title:

74

NORTEL NETWORKS SINGAPORE PTE LTD

By ______________________
Name: ANDREW GRANT
Title:

NORTEL NETWORKS (THAILAND) LIMITED

By ______________________
Name: JAMES DEMERS
Title:

NORTEL VIETNAM LIMITED

By ______________________ original
Name: NICHOLAS VREUGDENHIL
Title:



Signed by **ALAN BLOOM** as Joint Administrator on behalf of the Joint Administrators of each of the EMEA Debtors without personal liability as provided in Section 16 of this Agreement and solely for the purpose of obtaining the benefit of the provisions of this Agreement expressed to be conferred on or given to each of the Joint Administrators

By ______________________
Name:
Title:

**SIGNED** for and on behalf of **NORTEL NETWORKS UK LIMITED (IN ADMINISTRATION)** by **ALAN BLOOM** as Joint Administrator (acting as agent and without personal liability) in the presence of: ) ) ) ) **ALAN BLOOM**

Witness signature W. Graham

Name: WILMA GRAHAM
Address: No 1 MORE LONDON PLACE LONDON SE1 2AF

**SIGNED** for and on behalf of **NORTEL NETWORKS (IRELAND) LIMITED (IN ADMINISTRATION)** by **ALAN BLOOM** as Joint Administrator (acting as agent and without personal liability) in the presence of: ) ) ) ) **ALAN BLOOM**

Witness signature W. Graham

Name: WILMA GRAHAM
Address: No 1 MORE LONDON PLACE LONDON SE1 2AF

**SIGNED** for and on behalf of **NORTEL NETWORKS NV (IN ADMINISTRATION)** by ~~**ALAN BLOOM**~~ CHRISTOPHER HILL as Joint Administrator (acting as agent and without personal liability) in the presence of: ) ) ) )

~~**ALAN BLOOM**~~ CHRISTOPHER HILL

Witness signature

Name: B. DANDRIDGE
Address: C/o NORTEL NETWORKS MAIDENHEAD UK

**SIGNED** for and on behalf of **NORTEL NETWORKS SPA (IN ADMINISTRATION)** by ~~**ALAN BLOOM**~~ CHRISTOPHER HILL as Joint Administrator (acting as agent and without personal liability) in the presence of: ) ) ) )

~~**ALAN BLOOM**~~ CHRISTOPHER HILL

Witness signature

Name: B. DANDRIDGE
Address: C/o NORTEL NETWORKS MAIDENHEAD UK

**SIGNED** for and on behalf of **NORTEL NETWORKS BV (IN ADMINISTRATION)** by ~~**ALAN BLOOM**~~ CHRISTOPHER HILL as Joint Administrator (acting as agent and without personal liability) in the presence of: ) ) ) )

~~**ALAN BLOOM**~~ CHRISTOPHER HILL

Witness signature

Name: B. DANDRIDGE
Address: C/o NORTEL NETWORKS MAIDENHEAD UK

**SIGNED** for and on behalf of **NORTEL** )

77

NETWORKS POLSKA SP Z.O.O. (IN ADMINISTRATION) by ~~ALAN BLOOM~~ CHRISTOPHER HILL as Joint Administrator (acting as agent and without personal liability) in the presence of: ) ~~ALAN BLOOM~~ CHRISTOPHER HILL



Witness signature

Name: B. DANDRIDGE
Address: C/O NORTEL NETWORKS MAIDENHEAD UK

**SIGNED** for and on behalf of **NORTEL NETWORKS HISPANIA SA (IN ADMINISTRATION)** by ~~ALAN BLOOM~~ CHRISTOPHER HILL as Joint Administrator (acting as agent and without personal liability) in the presence of: ) ~~ALAN BLOOM~~ CHRISTOPHER HILL



Witness signature

Name: B. DANDRIDGE
Address: C/O NORTEL NETWORKS MAIDENHEAD UK

**SIGNED** for and on behalf of **NORTEL NETWORKS (AUSTRIA) GMBH (IN ADMINISTRATION)** by ~~ALAN BLOOM~~ CHRISTOPHER HILL as Joint Administrator (acting as agent and without personal liability) in the presence of: ) ~~ALAN BLOOM~~ CHRISTOPHER HILL



Witness signature

Name: B DANDRIDGE
Address: C/O NORTEL NETWORKS MAIDENHEAD UK

78

**SIGNED** for and on behalf of **NORTEL NETWORKS SRO (IN ADMINISTRATION)** by ~~**ALAN BLOOM**~~ CHRISTOPHER HILL as Joint Administrator (acting as agent and without personal liability) in the presence of: ) ) ) )

~~**ALAN BLOOM**~~ CHRISTOPHER HILL



Witness signature

Name: B. DANDRIDGE
Address: C/O NORTEL NETWORKS
MAIDENHEAD UK

**SIGNED** for and on behalf of **NORTEL NETWORKS ENGINEERING SERVICES KFT (IN ADMINISTRATION)** by ~~**ALAN BLOOM**~~ CHRISTOPHER HILL as Joint Administrator (acting as agent and without personal liability) in the presence of: ) ) ) )

~~**ALAN BLOOM**~~ CHRISTOPHER HILL



Witness signature 

Name: B. DANDRIDGE
Address: C/O NORTEL NETWORKS
MAIDENHEAD UK

**SIGNED** for and on behalf of **NORTEL NETWORKS PORTUGAL SA (IN ADMINISTRATION)** by ~~**ALAN BLOOM**~~ CHRISTOPHER HILL as Joint Administrator (acting as agent and without personal liability) in the presence of: ) ) ) )

~~**ALAN BLOOM**~~ CHRISTOPHER HILL



Witness signature 

Name: B DANDRIDGE
Address: C/O NORTEL NETWORKS
MAIDENHEAD UK

Signature page to Asia Restructuring Agreement

79

**SIGNED** for and on behalf of **NORTEL NETWORKS SLOVENSKO SRO (IN ADMINISTRATION)** by ~~**ALAN BLOOM**~~ CHRISTOPHER HILL as Joint Administrator (acting as agent and without personal liability) in the presence of:

Witness signature

Name: B. DANDRIDGE
Address: C/o NORTEL NETWORKS MAIDENHEAD UK

) ) ) )

~~**ALAN BLOOM**~~ CHRISTOPHER HILL



**SIGNED** for and on behalf of **NORTEL NETWORKS ROMANIA SRL (IN ADMINISTRATION)** by ~~**ALAN BLOOM**~~ CHRISTOPHER HILL as Joint Administrator (acting as agent and without personal liability) in the presence of:

Witness signature

Name: B. DANDRIDGE
Address: C/o NORTEL NETWORKS MAIDENHEAD UK

) ) ) )

~~**ALAN BLOOM**~~ CHRISTOPHER HILL



**SIGNED** for and on behalf of **NORTEL NETWORKS FRANCE S.A.S. (IN ADMINISTRATION)** by ~~**ALAN BLOOM**~~ CHRISTOPHER HILL as Joint Administrator (acting as agent and without personal liability) in the presence of:

Witness signature

Name: B. DANDRIDGE
Address: C/o NORTEL NETWORKS MAIDENHEAD UK.

) ) ) )

~~**ALAN BLOOM**~~ CHRISTOPHER HILL



80

**SIGNED** for and on behalf of **NORTEL GMBH (IN ADMINISTRATION)** by ~~**ALAN BLOOM**~~ CHRISTOPHER HILL as Joint Administrator (acting as agent and without personal liability) in the presence of: )

~~**ALAN BLOOM**~~ CHRISTOPHER HILL



Witness signature

Name: B. DANDRIDGE
Address: C/O NORTEL NETWORKS
MAIDENHEAD UK

**SIGNED** for and on behalf of **NORTEL NETWORKS OY (IN ADMINISTRATION)** by ~~**ALAN BLOOM**~~ CHRISTOPHER HILL as Joint Administrator (acting as agent and without personal liability) in the presence of: )

~~**ALAN BLOOM**~~ CHRISTOPHER HILL



Witness signature

Name: B. DANDRIDGE
Address: C/O NORTEL NETWORKS
MAIDENHEAD UK

**SIGNED** for and on behalf of **NORTEL NETWORKS INTERNATIONAL FINANCE & HOLDING BV (IN ADMINISTRATION)** by ~~**ALAN BLOOM**~~ CHRISTOPHER HILL as Joint Administrator (acting as agent and without personal liability) in the presence of: )

~~**ALAN BLOOM**~~ CHRISTOPHER HILL



Witness signature

Name: B. DANDRIDGE
Address: C/O NORTEL NETWORKS
MAIDENHEAD UK.

8

**SIGNED** for and on behalf of **NORTEL NETWORKS AB (IN ADMINISTRATION)** by ~~**ALAN BLOOM**~~ CHRISTOPHER HILL as Joint Administrator (acting as agent and without personal liability) in the presence of: ) ) ) ) ~~**ALAN BLOOM**~~ CHRISTOPHER HILL

Witness signature

Name: B. DANDRIDGE
Address: C/O NORTEL NETWORKS
MAIDENHEAD UK

# TAB B