**<u>EXHIBIT A</u>**

EXECUTION VERSION

---

## ASSET SALE AGREEMENT

BY AND AMONG

**NORTEL NETWORKS CORPORATION**

**NORTEL NETWORKS LIMITED**

**NORTEL NETWORKS INC.**

AND

**THE OTHER ENTITIES IDENTIFIED HEREIN AS SELLERS**

AND

**TELEFONAKTIEBOLAGET L M ERICSSON (PUBL)**

**DATED AS OF NOVEMBER 24, 2009**

---

## TABLE OF CONTENTS

**Page**

ARTICLE I INTERPRETATION ...................................................................................... 3

    Section 1.1.    Definitions. ................................................................................ 3

    Section 1.2.    Interpretation. ........................................................................ 29

        1.2.1.    Gender and Number. ............................................................ 29

        1.2.2.    Certain Phrases and Calculation of Time. ............................ 29

        1.2.3.    Headings, etc. ...................................................................... 30

        1.2.4.    Currency. .............................................................................. 30

        1.2.5.    Statutory References. ........................................................... 30

ARTICLE II PURCHASE AND SALE OF ASSETS ................................................... 30

    Section 2.1.    Purchase and Sale. ................................................................ 30

        2.1.1.    Assets. .................................................................................. 30

        2.1.2.    Excluded Assets. .................................................................. 31

        2.1.3.    Assumed Liabilities. ............................................................ 33

        2.1.4.    Excluded Liabilities. ............................................................ 34

        2.1.5.    Assumption and Assignment of 365 Contracts. ................... 35

        2.1.6.    Assignment of Non-365 Contracts. ...................................... 37

        2.1.7.    Cure Costs; Adequate Assurance; Efforts ............................ 38

        2.1.8.    Local Sale Agreements. ........................................................ 40

        2.1.9.    EMEA Asset Sale Agreement; NNSA Irrevocable Offer. ..... 40

        2.1.10.    Non-Assignable Assets. ........................................................ 40

    Section 2.2.    Purchase Price. ...................................................................... 41

        2.2.1.    Purchase Price. ..................................................................... 41

        2.2.2.    Estimated Purchase Price. .................................................... 41

        2.2.3.    Purchase Price Adjustment. .................................................. 42

        2.2.4.    Good Faith Deposit. ............................................................. 45

    Section 2.3.    Closing. ................................................................................. 45

        2.3.1.    Closing Date. ....................................................................... 45

        2.3.2.    Closing Actions and Deliveries. ........................................... 46

    Section 2.4.    Designated Purchaser(s). ...................................................... 47

**TABLE OF CONTENTS**
(Continued)

**ARTICLE III REPRESENTATIONS AND WARRANTIES OF THE PURCHASER** ................................................................................... **48**

Section 3.1.    Organization and Corporate Power. ...................................... 48

Section 3.2.    Authorization; Binding Effect; No Breach. ........................... 48

Section 3.3.    Financing. ............................................................................ 49

Section 3.4.    Adequate Assurance of Future Performance. ....................... 49

Section 3.5.    Purchaser's Acknowledgments; Exclusivity of Representations and Warranties. ................................................................... 49

Section 3.6.    Brokers. ............................................................................... 50

**ARTICLE IV REPRESENTATIONS AND WARRANTIES OF THE SELLERS** ............. **50**

Section 4.1.    Organization and Corporate Power. ...................................... 50

Section 4.2.    Authorization; Binding Effect; No Breach. ........................... 51

Section 4.3.    Title to Tangible Assets. ...................................................... 52

Section 4.4.    Material Contracts. .............................................................. 52

Section 4.5.    Intellectual Property. ........................................................... 53

Section 4.6.    Litigation. ............................................................................ 54

Section 4.7.    Financial Statements ............................................................ 55

Section 4.8.    Compliance with Laws; Consents. ....................................... 55

Section 4.9.    Environmental Matters. ....................................................... 56

Section 4.10.   Labor and Employee Benefits Matters. ................................. 56

Section 4.11.   Brokers. ............................................................................... 58

Section 4.12.   Tax. ..................................................................................... 58

Section 4.13.   Investment Canada Act ........................................................ 58

Section 4.14.   Real Property. ...................................................................... 58

Section 4.15.   Trade Matters ...................................................................... 60

Section 4.16.   Competition Act. .................................................................. 61

Section 4.17.   Representations and Warranties by the Other Sellers. ........... 61

    4.17.1.    Organization and Corporate Power. ...................................... 61

    4.17.2.    Authorization; Binding Effect; No Breach. ........................... 61

**TABLE OF CONTENTS**
(Continued)

Page

**ARTICLE V COVENANTS AND OTHER AGREEMENTS** ............................................... 62

| | | |
|---|---|---|
| Section 5.1. | U.S. Bankruptcy Actions. | 62 |
| Section 5.2. | Canadian Bankruptcy Actions. | 62 |
| Section 5.3. | Consultation; Notification. | 63 |
| Section 5.4. | Pre-Closing Cooperation. | 64 |
| Section 5.5. | Antitrust and Other Regulatory Approvals | 65 |
| Section 5.6. | Pre-Closing Access to Information. | 68 |
| Section 5.7. | Public Announcements. | 69 |
| Section 5.8. | Further Actions. | 69 |
| Section 5.9. | Conduct of Business. | 69 |
| Section 5.10. | Transaction Expenses. | 71 |
| Section 5.11. | Confidentiality. | 71 |
| Section 5.12. | Certain Payments or Instruments Received from Third Parties. | 72 |
| Section 5.13. | Non-Assignable Contracts. | 73 |
| Section 5.14. | Inbound License Agreements. | 74 |
| Section 5.15. | Bundled Contracts. | 75 |
| Section 5.16. | Post-Closing Assistance for Litigation. | 76 |
| Section 5.17. | Delivery of Assets. | 76 |
| Section 5.18. | Termination of Overhead and Shared Services. | 77 |
| Section 5.19. | Financing. | 77 |
| Section 5.20. | Insurance Matters. | 77 |
| Section 5.21. | Guarantees and Other Credit Support of the Business. | 78 |
| Section 5.22. | Use of Trademarks. | 78 |
| Section 5.23. | Sellers' Accessible Information; Cooperation. | 78 |
| Section 5.24. | Maintenance of Books and Records. | 79 |
| Section 5.25. | Sasken Agreements. | 80 |
| Section 5.26. | Finalization of Schedules to Transition Services Agreement; Disputes. | 81 |
| Section 5.27. | Casualty. | 84 |
| Section 5.28. | Ancillary Agreements. | 84 |

**TABLE OF CONTENTS**
(Continued)

Page

Section 5.29.   Patents to be Reviewed.................................................................... 84

Section 5.30.   China Assets. ................................................................................. 85

Section 5.31.   Subleases. ..................................................................................... 85

Section 5.32.   Direct Leases. ............................................................................... 85

Section 5.33.   Licenses. ....................................................................................... 85

Section 5.34.   Disclosure Schedules and Certain Information. ..................... 86

Section 5.35.   Affiliates. ...................................................................................... 86

**ARTICLE VI TAX MATTERS** ............................................................................ 87

Section 6.1.    Transfer Taxes. .............................................................................. 87

Section 6.2.    Withholding Taxes. ........................................................................ 88

Section 6.3.    Tax Characterization of Payments Under This Agreement................ 88

Section 6.4.    Apportionment of Taxes. ................................................................ 88

Section 6.5.    Records. ......................................................................................... 89

Section 6.6.    Tax Returns. ................................................................................... 90

Section 6.7.    Allocation of Purchase Price. ......................................................... 91

Section 6.8.    Tax Elections. ................................................................................ 92

**ARTICLE VII EMPLOYMENT MATTERS**.......................................................... 93

Section 7.1.    Employment Obligations................................................................. 93

      7.1.1.    Employment Terms. ............................................................... 93

      7.1.2.    Employee Benefits.................................................................. 94

Section 7.2.    Other Employee Covenants. ........................................................... 96

Section 7.3.    Excluded Employee Liabilities........................................................ 97

Section 7.4.    Canadian Pension Plans.................................................................. 98

Section 7.5.    Sole Benefit of Sellers and Purchaser. ........................................... 99

**ARTICLE VIII CONDITIONS TO THE CLOSING** ............................................... 99

Section 8.1.    Conditions to Each Party's Obligation. ........................................... 99

Section 8.2.    Conditions to Sellers' Obligation. ................................................. 100

Section 8.3.    Conditions to Purchaser's Obligation............................................ 100

iv

**TABLE OF CONTENTS**
(Continued)

**Page**

ARTICLE IX TERMINATION ............................................................................ 101

    Section 9.1.    Termination. .................................................................... 101

    Section 9.2.    Effects of Termination. ...................................................... 102

ARTICLE X MISCELLANEOUS ..................................................................... 103

    Section 10.1.    No Survival of Representations and Warranties or Covenants. ........... 103

    Section 10.2.    Remedies. ....................................................................... 103

    Section 10.3.    No Third Party Beneficiaries. ................................................ 103

    Section 10.4.    Consent to Amendments; Waivers. ........................................ 103

    Section 10.5.    Successors and Assigns. ...................................................... 103

    Section 10.6.    Governing Law; Submission to Jurisdiction; Waiver of Jury Trial. ........................................................................... 104

    Section 10.7.    Notices. ......................................................................... 105

    Section 10.8.    Exhibits; Sellers Disclosure Schedule. .................................... 108

    Section 10.9.    Counterparts. ................................................................... 109

    Section 10.10.    No Presumption. ............................................................... 109

    Section 10.11.    Severability. ................................................................... 109

    Section 10.12.    Headings ....................................................................... 109

    Section 10.13.    Entire Agreement. ............................................................. 109

    Section 10.14.    Availability of Equitable Relief; Sole Remedy. ......................... 110

    Section 10.15.    Bulk Sales Laws. ............................................................. 110

    Section 10.16.    Main Sellers as Representatives of Other Sellers. ...................... 110

    Section 10.17.    Execution by Other Sellers. ................................................. 111

    Section 10.18.    Obligations of the Sellers. ................................................... 111

### TABLE OF CONTENTS
(Continued)

### EXHIBITS

Exhibit A – Other Sellers

Exhibit B – EMEA Sellers

Exhibit C – Canadian Debtors; U.S. Debtors; EMEA Debtors; Non-Debtor Sellers

Exhibit D – EMEA Asset Sale Agreement

Exhibit E – Contract Manufacturing Inventory Agreement Term Sheet

Exhibit F – Intellectual Property License Agreement

Exhibit G – Real Estate Agreements Term Sheet

Exhibit H – Loaned Employee Agreement

Exhibit I – Antitrust Approvals – Relevant Antitrust Jurisdictions/Authorities

Exhibit J – Subcontract Agreement

Exhibit K – Trademark License Agreement

Exhibit L – Transition Services Agreement

Exhibit M – Dual Use Platform Agreement

Exhibit N – Development and Supply Agreement

Exhibit O – Adjusted Net Working Capital Statement

Exhibit P – Contract Manufacturing Agreements Term Sheet

Exhibit Q – GDNT Back-to-Back Agreement Term Sheet

Exhibit R – Purchaser Supply Agreement

Exhibit 5.1 – Form of U.S. Sale Order

Exhibit 5.2 – Form of Canadian Approval and Vesting Order

Exhibit 5.9 – Purchaser's Representatives for Interim Covenants Consent

## ASSET SALE AGREEMENT

This Asset Sale Agreement is dated as of November 24, 2009, among Nortel Networks Corporation, a corporation organized under the laws of Canada ("**NNC**"), Nortel Networks Limited, a corporation organized under the laws of Canada ("**NNL**"), Nortel Networks Inc., a corporation organized under the laws of Delaware ("**NNI**" and, together with NNC and NNL, the "**Main Sellers**"), the Affiliates (as defined below) of the Main Sellers listed in Exhibit A hereto (the "**Other Sellers**" and, together with the Main Sellers, the "**Sellers**") and Telefonaktiebolaget L M Ericsson (publ), a corporation organized under the laws of Sweden (the "**Purchaser**").

### W I T N E S S E T H :

WHEREAS, the Sellers beneficially own and operate the Business (as defined below);

WHEREAS, on the Petition Date, NNC, NNL and the Other Sellers listed in part 1 of Exhibit C hereto (together, the "**Canadian Debtors**") filed with the Canadian Court (as defined below) an application for protection under the Companies' Creditors Arrangement Act (the "**CCAA**") (the proceedings commenced by such application, the "**CCAA Cases**") and were granted certain initial creditor protection pursuant to an order issued by the Canadian Court on the same date, which also appointed Ernst & Young Inc. as "**Monitor**" in connection with the CCAA Cases and was extended by further order of the Canadian Court on February 10, 2009, April 28, 2009, July 30, 2009 and October 28, 2009, as the same may be amended and restated from time to time by the Canadian Court;

WHEREAS, NNI and the Other Sellers listed in part 2 of Exhibit C hereto (the "**U.S. Debtors**") are debtors-in-possession under the U.S. Bankruptcy Code (as defined below) which commenced cases under Chapter 11 of the U.S. Bankruptcy Code on the Petition Date by filing voluntary petitions for relief in the U.S. Bankruptcy Court for the District of Delaware (the "**Chapter 11 Cases**");

WHEREAS, the entities listed under the heading "EMEA Debtors" in part 3 of Exhibit C hereto (the "**EMEA Debtors**") on the Petition Date filed applications with the English Court (as defined below), pursuant to the Insolvency Act of 1986, as amended (the "**Insolvency Act**") and the European Union's Council Regulation (EC) No 1346/2000 on Insolvency Proceedings (the proceedings commenced by such applications, the "**EMEA Cases**") and the English Court appointed Alan Bloom, Stephen Harris, Chris Hill and Alan Hudson of Ernst & Young LLP as joint administrators of all the EMEA Debtors (other than Nortel Networks (Ireland) Limited, for which David Hughes and Alan Bloom serve as joint administrators) (the "**Joint Administrators**") under the Insolvency Act;

WHEREAS, on May 28, 2009, liquidation proceedings with temporary continuation of the business have been commenced in France with respect to NNSA pursuant to the European Union's Council Regulation (EC) No 1346/2000 on Insolvency Proceedings and articles L. 640-1 *seq.* of the French Code of commerce, and the Commercial Court of Versailles,

France (the "**French Court**") appointed Cosme Rogeau as liquidator and Franck Michel as judicial administrator (together, the "**French Administrators**");

WHEREAS, the Other Sellers listed in part 4 of Exhibit C hereto (the "**Non-Debtor Sellers**") are not subject to any Bankruptcy Proceedings (as defined below) as of the date hereof;

WHEREAS, the Sellers have agreed to transfer to the Purchaser and/or the Designated Purchasers (as defined below), and the Purchaser has agreed to purchase and assume, and cause the Designated Purchasers to purchase and assume, including, to the extent applicable, pursuant to Sections 363 and 365 of the U.S. Bankruptcy Code and pursuant to the Canadian Approval and Vesting Order, the Assets and the Assumed Liabilities (each as defined below) from the Sellers, upon the terms and conditions set forth hereinafter;

WHEREAS, simultaneously with the execution of this Agreement, the EMEA Sellers (as defined below), the Joint Administrators, and Kapsch CarrierCom AG, a corporation organized under the laws of Austria (the "**EMEA Purchaser**"), are entering into a separate agreement in the form set forth in Exhibit D hereto (the "**EMEA Asset Sale Agreement**") providing for the sale to the EMEA Purchaser (and/or the EMEA Designated Purchasers (as defined therein)) of the assets of the EMEA Business (as defined in the EMEA Asset Sale Agreement) held by such EMEA Sellers;

WHEREAS, Schedule 6 to the EMEA Asset Sale Agreement contains the terms of an irrevocable offer (the "**NNSA Irrevocable Offer**") by the EMEA Purchaser to purchase the NNSA Assets (as defined in the EMEA Asset Sale Agreement), which will be submitted for approval to the French Court;

WHEREAS, the Parties (as defined below) acknowledge and agree that the purchase by the Purchaser (and the Designated Purchasers, if any) of the Assets, the license of Intellectual Property under the Intellectual Property License Agreement and the Trademark License Agreement (each as defined below), and the assumption by the Purchaser and the Designated Purchasers, as applicable, of the Assumed Liabilities (as defined below) are being made at arms' length and in good faith and without intent to hinder, delay or defraud creditors of the Sellers and their Affiliates;

WHEREAS, the Purchaser (and each of the Designated Purchasers, where applicable) intends to purchase only those Assets that relate to the Business;

WHEREAS, in accordance with the U.S. Bidding Procedures Order, the Purchaser has delivered to the Sellers and the EMEA Sellers the Good Faith Deposit (as defined below); and

WHEREAS, in addition, at the Closing, the Purchaser (or Affiliates of the Purchaser), and certain Sellers (or Affiliates of the Sellers) will enter into the following ancillary agreements ((i) through (xvii) together, the "**Ancillary Agreements**"): (i) the Local Sale Agreements, (ii) the Intellectual Property License Agreement, (iii) the Real Estate Agreements (each as defined below), (iv) certain Subcontract Agreements, if any, (v) the Transition Services Agreement, (vi) the Trademark License Agreement, (vii) the Loaned Employee Agreement,

(viii) the Dual Use Platform Agreement, (ix) the Development and Supply Agreement, (x) the GDNT Agreements, (xi) the China Purchase Agreement, (xii) the Sasken Agreements, (xiii) the Contract Manufacturing Inventory Agreements, (xiv) the Purchaser Supply Agreement and (xv) the Contract Manufacturing Agreements, and will use their reasonable efforts to enter into (xvi) any distribution agreements to be determined, and (xvii) any other agreements or arrangements to be entered into pursuant to the provisions of this Agreement.

NOW, THEREFORE, in consideration of the respective covenants, representations and warranties made herein, and of the mutual benefits to be derived hereby (the sufficiency of which is acknowledged), the Parties agree as follows:

## ARTICLE I

## INTERPRETATION

Section 1.1.    Definitions.Capitalized terms used but not otherwise defined herein shall have the meanings set forth below:

"**Accounting Arbitrator**" has the meaning set forth in Section 2.2.3.1(c).

"**Accrued Vacation Amount**" means, at any given time, the amount of compensation with respect to the accrued and unused vacation hours that is due and owing to the Specified Transferred Employees from their respective employer, to be calculated in accordance with the Calculation Principles.

"**Action**" means any litigation, action, suit, charge, binding arbitration, Tax audit or other legal, administrative, regulatory or judicial proceeding.

"**Acquired Actions**" means any avoidance or recovery actions as used under Section 542, 543, 544, 545, 546, 547, 548 or 550 of the Bankruptcy Code or the equivalent provisions or recovery under other applicable Laws that the Sellers have against any counterparty to an Assumed and Assigned Contract arising out of or relating to the Assigned Contracts that are actually assigned to the Purchaser or a Designated Purchaser hereunder.

"**Adjusted Net Working Capital**" has the meaning set forth in Section 2.2.2(c).

"**Adjusted Net Working Capital Statement**" means the statement of certain specified asset and liability accounts and certain accounting principles, methodologies and policies used in the determination of such accounts, consistent with the Calculation Principles, in the form provided in Exhibit **O** hereto.

"**Affiliate**" means, as to any Person, any other Person that directly or indirectly through one or more intermediaries Controls, or is under common Control with, or is Controlled by, such Person; provided, that neither any EMEA Seller or Subsidiary of an EMEA Seller (other than those Subsidiaries that are Sellers hereunder) nor NNSA shall be deemed an Affiliate of any Seller.

"**Agreement**" means this Asset Sale Agreement, the Sellers Disclosure Schedule and all Exhibits and Schedules attached hereto and thereto and all amendments hereto and thereto made in accordance with Section 10.4.

"**Ancillary Agreements**" has the meaning set forth in the recitals to this Agreement.

"**Antitrust Approvals**" means the HSR Approval, the MOFCOM Approval, and any other decision, in whatever form (including a declaration of lack of jurisdiction or a mere filing or notification, if the Closing can take place, pursuant to the applicable Antitrust Law, without a decision or the expiry of any waiting period), by any Government Entity under the Laws of any of the jurisdictions listed in Exhibit **I** or the expiry of the applicable waiting period, as applicable, under the Antitrust Laws of any of the jurisdictions listed in Exhibit **I**, authorizing or not objecting to the transactions contemplated by this Agreement, which includes any decision or consent by any such Government Entity setting forth conditions or obligations on the Purchaser or any of its Affiliates if such conditions have been or, pursuant to Section 5.5(e) are required, to be accepted by the Purchaser.

"**Antitrust Laws**" means the HSR Act, the Anti-monopoly Law of the People's Republic of China, and any competition, merger control and antitrust Law of any other applicable supranational, national, federal, state, provincial or local Law designed or intended to prohibit, restrict or regulate actions having the purpose or effect of monopolizing or restraining trade or lessening competition of any other country or jurisdiction, to the extent applicable to the transactions contemplated by this Agreement.

"**Assets**" has the meaning set forth in Section 2.1.1.

"**Assigned Contracts**" means, collectively, (i) the Assumed and Assigned Contracts, (ii) the Designated Non-365 Contracts (other than the Non-Assigned Contracts) and (iii) the Purchase Orders.

"**Assumed and Assigned Contracts**" has the meaning set forth in Section 2.1.5(e).

"**Assumed and Subleased Real Estate Leases**" has the meaning set forth in Section 2.1.5(b).

"**Assumed Liabilities**" has the meaning set forth in Section 2.1.3.

"**Balance Sheet Date**" has the meaning set forth in Section 4.7.

"**Bankruptcy Consents**" has the meaning set forth in Section 4.1(a).

"**Bankruptcy Court**" means the U.S. Bankruptcy Court, the Canadian Court, the English Court, the French Court or any other court before which Bankruptcy Proceedings are filed.

4

"**Bankruptcy Laws**" means the U.S. Bankruptcy Code, the CCAA, the Insolvency Act, Book VI of the French Code of commerce (*Code de commerce*) and the other applicable bankruptcy, insolvency, administration or similar Laws of any jurisdiction where Bankruptcy Proceedings are held.

"**Bankruptcy Proceedings**" means the Chapter 11 Cases, the CCAA Cases, the EMEA Cases and, in each case, any proceedings thereunder, as well as any other voluntary or involuntary bankruptcy, insolvency, administration, liquidation or similar judicial proceedings concerning any of the Sellers, the EMEA Sellers or NNSA from time to time.

"**Bidding Procedures**" means Exhibit I attached to the U.S. Bidding Procedures Order.

"**Bundled Contract**" has the meaning set forth in Section 5.15.

"**Business**" means the GSM infrastructure business of the Sellers consisting of:

(a)     researching, designing, developing and/or causing to design or develop the Products;

(b)     causing the manufacture, assembling and testing of the Products;

(c)     marketing, distributing, selling and supplying the Products and the support and warranties thereon; and

(d)     marketing, selling and supplying of the Services;

all as conducted by the Sellers in the United States and Canada or with respect to customers in the United States and Canada and, with respect to the research and development activities described above, in China, all as at the Closing Date, but excludes:

(i)     the Excluded Products and Services;

(ii)     Overhead and Shared Services (other than Transferred Overhead and Shared Services); and

(iii)     the GSM infrastructure business of the Sellers conducted by the Sellers in any territory other than the United States and Canada or with respect to customers in any territory other than the United States and Canada.

"**Business Day**" means a day on which the banks are opened for business (Saturdays, Sundays, statutory and civic holidays excluded) in (i) New York, New York, United States, (ii) Toronto, Ontario, Canada, (iii) London, England, United Kingdom, (iv) Paris, France and (v) Stockholm, Sweden.

"**Business Information**" means all books, records, files, research and development log books, ledgers, documentation, sales literature or similar documents in the possession or under control of the Sellers and to the extent that such information relates to the

Business, including policies and procedures, Owned Equipment manuals and materials and procurement documentation; provided, that, to the extent any of the foregoing is also used in any business or business segment of any Seller other than the Business, then such portion of the Business Information as used in such business or business segment of any Seller other than the Business shall be segregated and shall not form part of Business Information, provided further that, where such segregation shall be impracticable, Business Information shall be limited to copies of the foregoing. Business Information shall not include any Employee Records.

"**Business Registered IP**" has the meaning set forth in Section 4.5(b).

"**Calculation Principles**" means the Nortel Accounting Principles, applied in a manner consistent with historical practices, to the extent applicable to the determination of the Inventory Value, the CIP Receivables Amount, the Warranty Provision Amount, the Accrued Vacation Amount, the Adjusted Net Working Capital, the Contractual Liability Amount, the Deferred Revenue Liability Amount and the Royalty Liability Amount, and the other accounting principles, methodologies and policies for the determination of the Inventory Value, the CIP Receivables Amount, the Warranty Provision Amount, the Accrued Vacation Amount, the Adjusted Net Working Capital, the Contractual Liability Amount, the Deferred Revenue Liability Amount and the Royalty Liability Amount, as set forth in Section 1.1(a) of the Sellers Disclosure Schedule and in the Adjusted Net Working Capital Statement.

"**Canadian Approval and Vesting Order**" has the meaning set forth in Section 5.2.

"**Canadian Approval and Vesting Order Motion**" has the meaning set forth in Section 5.2.

"**Canadian Court**" means the Ontario Superior Court of Justice.

"**Canadian Debtors**" has the meaning set forth in the recitals to this Agreement.

"**Canadian Sales Process Order**" means that certain order (GSM/GSM-R Bidding Procedures Order), which was entered on October 15, 2009 by the Canadian Court.

"**CCAA**" has the meaning set forth in the recitals to this Agreement.

"**CCAA Cases**" has the meaning set forth in the recitals to this Agreement.

"**CFIUS**" means the Committee on Foreign Investment in the United States.

"**CFIUS Approval**" means that the Parties shall have received a written notification issued by CFIUS that it has concluded a review of any notification voluntarily provided pursuant to the Exon-Florio Amendment of the Defense Production Act of 1950, as amended and Section 5.5(f) hereof and determined not to conduct an investigation or, if an investigation is deemed to be required, notification that the U.S. government will not take action to prevent the transactions contemplated by this Agreement from being consummated.

"**Chapter 11 Cases**" has the meaning set forth in the recitals to this Agreement.

"**China Assets**" has the meaning set forth in Section 5.30.

"**China Purchase Agreement**" has the meaning set forth in Section 5.30.

"**China Purchase Amount**" has the meaning set forth in Section 5.30.

"**CIP Receivables**" means, as of a given date, amounts classified in construction-in-process accounts determined in accordance with the Calculation Principles.

"**CIP Receivables Amount**" means, as of any given date, the amount of CIP Receivables of the Business determined in accordance with the Calculation Principles.

"**Claim**" has the meaning set forth in Section 101(5) of the U.S. Bankruptcy Code.

"**Closing**" has the meaning set forth in Section 2.3.1.

"**Closing Accrued Vacation Amount**" has the meaning set forth in Section 2.2.3.1(a).

"**Closing Adjusted Net Working Capital**" has the meaning set forth in Section 2.2.3.1(a).

"**Closing CIP Receivables Amount**" has the meaning set forth in Section 2.2.3.1(a)

"**Closing Contractual Liability Amount**" has the meaning set forth in Section 2.2.3.1(a).

"**Closing Date**" has the meaning set forth in Section 2.3.1.

"**Closing Deferred Revenue Liability Amount**" has the meaning set forth in Section 2.2.3.1(a).

"**Closing Inventory Value**" has the meaning set forth in Section 2.2.3.1(a).

"**Closing Royalty Liability Amount**" has the meaning set forth in Section 2.2.3.1(a).

"**Closing Statement**" has the meaning set forth in Section 2.2.3.1(a).

"**Closing Warranty Provision Amount**" has the meaning set forth in Section 2.2.3.1(a).

"**COBRA**" means the continuation coverage required by Section 4980B of the Code or any similar Law.

"**Code**" means the United States Internal Revenue Code of 1986, as amended.

"**Collective Labor Agreement**" means any written agreement that a Seller or any of its Affiliates has entered into with any union, works council or collective bargaining agent with respect to terms and conditions of employment of the employees of such Seller or its Affiliates.

"**Competition Act**" means the Competition Act (Canada), as amended, and includes the regulations promulgated thereunder.

"**Complaining Party**" has the meaning set forth in Section 5.26(e).

"**Confidentiality Agreement**" means the confidentiality agreement between Purchaser and the other parties listed therein dated March 30, 2009, as amended or supplemented from time to time in accordance with its terms.

"**Confirmed Designated Purchaser**" has the meaning set forth in Section 2.4(a).

"**Consent**" means any approval, authorization, consent, order, license, permission, permit, qualification, exemption or waiver by any Government Entity or other Third Party.

"**Contract**" means any binding contract, agreement, subcontract, purchase order, work order, sales order, indenture, note, bond, instrument, lease, mortgage, ground lease, commitment, covenant or undertaking.

"**Contract Manufacturing Agreements**" means those agreements to be entered into by and between the Purchaser and/or any Designated Purchasers, the relevant Sellers, and the contract manufacturers of the Business parties thereto on or before the Closing based substantially on the Contract Manufacturing Agreements Term Sheet.

"**Contract Manufacturing Agreements Term Sheet**" means the term sheet attached hereto as Exhibit **P**.

"**Contract Manufacturing Inventory Agreements**" means the agreements between the Purchaser and/or any Designated Purchasers, the relevant Sellers, and the contract manufacturers of the Business listed in Section 1.1(b) of the Sellers Disclosure Schedule that the relevant Parties will use their reasonable efforts to execute on or before the Closing in the form that shall be negotiated in good faith on the basis of the term sheet attached hereto as Exhibit **E**.

"**Contractual Liability Amount**" means, as of any given date, the amount of liabilities of the Business under Assigned Contracts (other than Excluded Liabilities) determined in accordance with the Calculation Principles.

"**Control**", including, with its correlative meanings, "Controlled by" and "under common Control with", means, in connection with a given Person, the possession, directly or indirectly, or as trustee or executor, of the power to either (i) elect more than fifty percent (50%) of the directors of such Person or (ii) direct or cause the direction of the management and

policies of such Person, whether through the ownership of securities, contract, credit arrangement or otherwise.

"**Covered Assets and Persons**" means the Business and the assets (including the Assets), tangible or intangible property, Liabilities, ownership, activities, businesses, operations, current and former shareholders, and current and former directors, officers, employees and agents of, the Business.

"**Cross-Border Protocol**" means that certain Cross-Border Insolvency Protocol approved by the U.S. Bankruptcy Court pursuant to Section 105(a) of the U.S. Bankruptcy Code in an order dated January 15, 2009 and by the Canadian Court pursuant to an order, dated January 14, 2009, as the same may be amended from time to time.

"**Cure Cost**" means (i) any amounts required by Section 365(b)(1) of the U.S. Bankruptcy Code to cure any defaults by the relevant U.S. Debtor under a 365 Contract and to pay any actual pecuniary losses that have resulted from such defaults under such 365 Contract, and (ii) with respect to any Designated Non-365 Contract, any amounts required to cure any defaults and to pay any actual pecuniary losses under such Seller Contract in respect of the period prior to the Closing Date that are required by the counterparty thereto to be paid in order for such Designated Non-365 Contract to be assigned.

"**Designated Non-365 Contracts**" has the meaning set forth in Section 2.1.6(d).

"**Designated Non-365 Real Estate Leases**" has the meaning set forth in Section 2.1.6(a)(ii).

"**Deferred Revenue Liability Amount**" means, as of any given date, the amount of deferred revenue of the Business determined in accordance with the Calculation Principles.

"**Designated Purchaser**" has the meaning set forth in Section 2.4(a).

"**Development and Supply Agreement**" means the agreement to be entered into between the relevant Sellers, on the one hand, and the Purchaser (or the relevant Designated Purchasers), on the other hand, on or prior to the Closing in the form attached hereto as Exhibit **N**.

"**Direct Lease**" has the meaning set forth in Section 5.32.

"**Direct Lease Real Estate**" has the meaning set forth in Section 5.32.

"**Disagreement Notice**" has the meaning set forth in Section 2.2.3.1(b).

"**Distribution Agent**" means a distribution agent to be appointed by the Sellers and the EMEA Sellers prior to the Closing Date.

"**Dual Use Platform Agreement**" means the agreement to be entered into between the relevant Sellers, on the one hand, and the Purchaser (or the relevant Designated

Purchasers), on the other hand, on or prior to the Closing in the form attached hereto as Exhibit **M**.

"**Effective Hire Date**" means the day on which the employment of an Employee commences or continues with the Purchaser or its Affiliates as provided in this Agreement.

"**EMEA Asset Sale Agreement**" has the meaning set forth in the recitals to this Agreement.

"**EMEA Business**" has the meaning attributed to that term in the EMEA Asset Sale Agreement.

"**EMEA Cases**" has the meaning set forth in the recitals to this Agreement.

"**EMEA Debtors**" has the meaning set forth in the recitals to this Agreement.

"**EMEA Designated Purchaser**" has the meaning attributed to that term in the EMEA Asset Sale Agreement.

"**EMEA Purchaser**" has the meaning set forth in the recitals of this Agreement.

"**EMEA Sellers**" means the sellers under the EMEA Asset Sale Agreement as listed on Exhibit B.

"**Employee**" means any employee, as of the date hereof, of the Sellers or their Affiliates (other than the EMEA Sellers, NNSA or their respective Subsidiaries) who (i) for the twelve months prior to the date hereof (or such shorter time as such employee was employed by the Sellers or such Affiliates) performed services which were all or substantially all related to the Business or (ii) was hired into, transferred into, or assigned to the Business prior to the Closing in the Ordinary Course and whose services are all or substantially all related to the Business, or (iii) whose services are necessary to the operation of the Business, provided that if the employee is at a Job Complexity Indicator 6 or above, such hire, transfer or assignment is subject to Purchaser's consent and in each case is listed in Section 4.10(b) of the Sellers Disclosure Schedule.

"**Employee Information**" has the meaning set forth in Section 4.10(b).

"**Employee Records**" means books, records, files, or other documentation, whether in electronic or other form, with respect to Employees.

"**Employee Transfer Date**" means, with respect to each jurisdiction where Employees will become Transferred Employees in accordance with this Agreement, 12:01 a.m. local time in such jurisdiction on the day following the Closing Date.

"**English Court**" means the High Court of Justice of England and Wales.

"**Environmental Law**" means any applicable Law relating to or regulating (i) the handling, generation, management, Release or remediation of Hazardous Materials; (ii) the

exposure of persons to Hazardous Materials; (iii) occupational health and safety; or (iv) pollution or protection of human health, the environment or natural resources, including the United States Resource Conservation and Recovery Act, the Comprehensive Environmental Response Compensation and Liability Act, the Clean Air Act, the Federal Water Pollution Control Act, the Safe Drinking Water Act, the Occupational Safety and Health Act and the Toxic Substances Control Act, all as amended, and any requirements of a Government Entity promulgated pursuant to these applicable Laws or any analogous supranational, foreign, state, provincial, territorial, municipal or local Laws.

"**Environmental Permit**" means any Consent required under any Environmental Law for the Business as currently conducted.

"**Equipment**" means tangible property, including all trade fixtures and fixtures, furniture, furnishings, fittings, equipment, apparatus, appliances, test labs, trial equipment and other articles of personal property, which are owned by the Sellers and held or used predominantly in connection with the Business, including that located at the Direct Lease Real Estate or the demised premises which are (i) the subject of any real property lease included in the Assigned Contracts or (ii) the subject of any Sublease, provided, however that "Equipment" shall not include fixtures other than trade fixtures located at the Direct Lease Real Estate and shall not include any leasehold improvements owned by the head landlord and located at the demised premises which are the subject of any Sublease, any Inventory, items of tangible property personally assigned to Employees who are not (a) Transferred Employees as of the Employee Transfer Date or (b) Visa Employees, or any Intellectual Property covering, embodied in or connected to any Equipment.

"**ERISA**" means the Employee Retirement Income Security Act of 1974, as amended.

"**ERISA Affiliate Liability**" means any obligation, liability, or expense of any Seller which arises under or relates to any Seller Employee Plan that is subject to Title IV of ERISA, Section 302 of ERISA, Section 412 of the Code, COBRA or any other statute or regulation that imposes liability on a so-called "controlled group" basis with or without reference to any provision of Section 414 of the Code or Section 4001 of ERISA, including by reason of any Seller's affiliation with any of its ERISA Affiliates or the Purchaser being deemed a successor to any ERISA Affiliate of any Seller.

"**Escrow Agent**" means Citibank, N.A.

"**Estimated Accrued Vacation Amount**" has the meaning set forth in Section 2.2.2(a).

"**Estimated Adjusted Net Working Capital**" has the meaning set forth in Section 2.2.2(a).

"**Estimated CIP Receivables Amount**" has the meaning set forth in Section 2.2.2(a).

"**Estimated Contractual Liability Amount**" has the meaning set forth in Section 2.2.2(a).

"**Estimated Deferred Revenue Liability Amount**" has the meaning set forth in Section 2.2.2(a).

"**Estimated Inventory Value**" has the meaning set forth in Section 2.2.2(a).

"**Estimated Purchase Price**" has the meaning set forth in Section 2.2.2(b).

"**Estimated Royalty Liability Amount**" has the meaning set forth in Section 2.2.2(a).

"**Estimated Warranty Provision Amount**" has the meaning set forth in Section 2.2.2(a).

"**Excluded Assets**" has the meaning set forth in Section 2.1.2.

"**Excluded Contracts**" means any Contract that is not assigned to the Purchaser under this Agreement. For the avoidance of doubt, Excluded Contracts shall include (i) the Excluded 365 Contracts, (ii) the Excluded Non-365 Contracts, (iii) the Qualcomm Cross License, and (iv) Addendum No. 9 to the OEM iPlanet Software Products (Binary) Exhibit to the Global Account Agreement Master Terms between Sun Microsystems, Inc. and NNI, Binary License and Redistribution Agreement for Java 2 Standard Edition dated October 5, 2006.

"**Excluded Employee Liabilities**" has the meaning set forth in Section 7.3.

"**Excluded Liabilities**" has the meaning set forth in Section 2.1.4.

"**Excluded Non-365 Contract**" has the meaning set forth in Section 2.1.6(e).

"**Excluded Products and Services**" means (a) all products and services provided by businesses or business segments of any Seller other than the Products and Services, and including (b) the following products and all associated development and PLM resources: Evolved Packet Core (including the Access Gateway, MME, and next-generation GPRS support nodes), ATCA Core, LTE radio access products and services, WiMAX products and services, XACore Hardware and platform software and associated peripherals (LPP, MS/ENET, SPM, DTC, MTM, DRAM IWSPM), ERS8600, Passport (MSS), associated Software (PCR) and associated OAM MultiService Data Manager(MDM).

"**Excluded 365 Contract**" has the meaning set forth in Section 2.1.5(g).

"**Executory Contract**" means an "executory contract" for the purposes of Section 365 of the U.S. Bankruptcy Code.

"**Extra Services**" has the meaning set forth in Section 5.26(b).

"**Financial Statements**" has the meaning set forth in Section 4.7.

"**Final Order**" means an order of any Bankruptcy Court or other court of competent jurisdiction (i) as to which no appeal, notice of appeal, motion to amend or make additional findings of fact, motion to alter or amend judgment, motion for rehearing or motion for new trial has been timely filed by any party (other than the Purchaser) or, if any of the foregoing has been timely filed, it has been disposed of in a manner that upholds and affirms the subject order in all material respects without the possibility for further appeal or rehearing thereon; (ii) as to which the time for instituting or filing an appeal, motion for rehearing or motion for new trial shall have expired; and (iii) as to which no stay is in effect; provided, however, that, with respect to an order issued by the U.S. Bankruptcy Court, the filing or pendency of a motion under Federal Rule of Bankruptcy Procedure 9024 ("**Rule 9024**") or Federal Rule of Civil Procedure 60 ("**Rule 60**") shall not cause an order not to be deemed a "Final Order" unless such motion shall be filed within ten (10) days of the entry of the order at issue.

"**Final Purchase Price**" has the meaning set forth in Section 2.2.3.1(a).

"**French Administrators**" has the meaning set forth in the preamble to this Agreement.

"**French Court**" has the meaning set forth in the recitals to this Agreement.

"**GAAP**" means the United States generally accepted accounting principles.

"**GDNT Agreements**" means the agreements to be entered into between the relevant Sellers, the Purchaser (and/or any Designated Purchasers), and Guangdong-Nortel Telecommunications Equipment Co. Ltd., on or prior to the Closing based substantially on the GDNT Back-to-Back Agreement Term Sheet.

"**GDNT Back-to-Back Agreement Term Sheet**" means the term sheet attached hereto as Exhibit **Q**.

"**General Scope of Included Services**" has the meaning set forth in Section 5.26(a).

"**Good Faith Deposit**" has the meaning set forth in Section 2.2.4.

"**Government Entity**" means any U.S., Canadian, supranational, foreign, domestic, federal, territorial, provincial, state, municipal or local governmental authority, quasi-governmental authority, instrumentality, court, government or self-regulatory organization, commission, tribunal, arbitral body or organization or any regulatory, administrative or other agency, or any political or other subdivision, department or branch of any of the foregoing.

"**GSM**" means Global System for Mobile communications.

"**GST**" means goods and services tax payable under Part IX of the Excise Tax Act (Canada).

"**Hazardous Materials**" means any chemical, material, waste, heat, sound, radiation or substance defined by or regulated under any Environmental Law as a hazardous waste, hazardous material, hazardous substance, extremely hazardous waste, restricted hazardous waste, pollutant, contaminant, toxic substance or toxic waste, including without limitation petroleum, petroleum products, asbestos, lead or polychlorinated biphenyls.

"**Headcount Forecast**" has the meaning attributed to that term in the Transition Services Agreement.

"**HSR Act**" means the United States Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended.

"**HSR Approval**" means expiration of all applicable waiting periods under the HSR Act (including any voluntary agreed extensions) or earlier termination thereof.

"**ICA Approval**" means:  (a) if subsection 448(1) of the *Budget Implementation Act, 2009* (Canada), comes into force on or before the Closing Date and as a result the transactions contemplated by this Agreement are subject to review under Part IV of the *Investment Canada Act*, the Purchaser shall have received notification from the responsible Minister under the *Investment Canada Act* that he is satisfied or is deemed to be satisfied that the transactions contemplated in this Agreement are likely to be of net benefit to Canada, on terms and conditions satisfactory to the Purchaser, in its reasonable discretion, and (b) the Purchaser shall not have received notice from the responsible Minister under either subsection 25.2(1) of the *Investment Canada Act* or subsection 25.3(2) of the *Investment Canada Act* within the period prescribed under the *Investment Canada Act* or, if the Purchaser has received such a notice, the Purchaser shall have subsequently received one of the following notices, as applicable: (i) under paragraph 25.2(4)(a) of the *Investment Canada Act* indicating that no order for the review of the transactions contemplated by this Agreement will be made under subsection 25.3(1) of the *Investment Canada Act*, (ii) under paragraph 25.3(6)(b) of the *Investment Canada Act* indicating that no further action will be taken in respect of the transactions contemplated by this Agreement, or (iii) under subsection 25.4(1) of the *Investment Canada Act* that the Governor in Council authorizes the completion of the transactions contemplated by this Agreement, on terms and conditions satisfactory to the Purchaser, in its reasonable discretion.

"**Inactive Employees**" means Employees on a Seller-approved leave of absence who are expected to return and actually return to work within the relevant time period set out below.  An Employee shall be an Inactive Employee for purposes hereof only if such individual is absent as a result of military service, pregnancy or parental leave, disability leave, medical leave, jury duty or any leave provided under applicable Law and, in the case of leaves provided under applicable Law, is expected to return to work and actually returns to work in the time permitted for such leave under applicable Law and, for any other leave, is expected to return to work and actually returns to work in accordance with the terms of such leave but not longer than ninety (90) days (or, if such Employee is located in Canada, six (6) months) following the Closing Date.

"**Inbound License Agreements**" has the meaning set forth in Section 4.5(f).

"**Included Services**" has the meaning set forth in Section 5.26(a).

"**Indebtedness**" of any Person means at any date, without duplication, all obligations of such Person to the extent incurred for the Business (i) for indebtedness for borrowed money (including any unpaid principal, premium and accrued and unpaid interest or fees), (ii) for indebtedness evidenced by bonds, debentures, notes or similar instruments, (iii) in respect of leases whether or not capitalized in accordance with the Nortel Accounting Principles under which such Person is the lessee, (iv) in respect of letters of credit issued for the account of such Person (to the extent drawn), (v) in respect of guarantees of the obligations of other Persons of the type referred to in clauses (i) through (iv) above and (vi) any termination fees, prepayment penalties, "breakage" cost or similar payments associated with the repayment or default under any of the Indebtedness referred to in items (i) and (ii) above.

"**Independent Auditor**" means Grant Thornton LLP or, in the case such firm cannot carry-out its duties for whatever reason, such other auditing firm of international reputation that is jointly selected by the Primary Parties.

"**Intellectual Property**" means all intellectual and industrial property rights and any and all forms of protection having equivalent or similar effect anywhere in the world as recognized under the Laws of all countries and jurisdictions, whether registered or unregistered and including applications for the registration or grant of any such rights, including rights in or to any of the following: (a) Trademarks; (b) Patents; (c) works of authorship; (d) mask works; (e) trade secrets, know-how and confidential technical or business information; (f) Software; (g) databases; and (h) industrial designs.

"**Intellectual Property License Agreement**" means the agreement to be entered into between the relevant Sellers, on the one hand, and the Purchaser (or the relevant Designated Purchasers), on the other hand, on or prior to the Closing in the form attached hereto as Exhibit **F**.

"**Interdependencies Letter**" means that letter agreement, dated as of the date hereof, by and among the Purchaser and the Sellers, addressing certain matters relating to the interdependencies between the Business and the EMEA Business.

"**Inventory**" means any inventories of raw materials, manufactured and purchased parts, works in process, packaging, stores and supplies, unassigned finished goods inventories (which are finished goods not yet assigned to a specific customer order) and merchandise; provided, that inventory not located within the United States or Canada shall not be included in "Inventory", unless it (i) has been manufactured abroad; (ii) is, in the Ordinary Course, destined for shipment to the United States or Canada; (iii) is not older than ninety (90) days; (iv) is the current product release/revision; and (v) is saleable.

"**Inventory Value**" means, as of any given date, the book value of the Owned Inventory, net of applicable provisions, reflected on a balance sheet of the Business as of such date prepared consistent with the Calculation Principles.

"**Investment Canada Act**" means the Investment Canada Act, as amended.

"**IRS**" means the United States Internal Revenue Service.

"**Joint Administrators**" has the meaning set forth in the EMEA Asset Sale Agreement.

"**KEIP**" means the Nortel Networks Corporation Key Executive Incentive Plan approved by the U.S. Bankruptcy Court in the District of Delaware pursuant to orders entered on March 5, 2009 and on March 20, 2009, and approved by the Canadian Court pursuant to orders entered on March 6, 2009 and on March 20, 2009, as the same may be amended, modified, supplemented or replaced from time to time.

"**KERP**" means the Nortel Networks Corporation Key Employee Retention Plan approved by the U.S. Bankruptcy Court in the District of Delaware on March 5, 2009, and approved by the Canadian Court on March 6, 2009, as the same may be amended, modified, supplemented or replaced from time to time.

"**Knowledge**" or "**aware of**" or "**notice of**" or a similar phrase means, with reference to the Sellers, the actual knowledge of those Persons listed on Section 1.1(d) of the Sellers Disclosure Schedule.

"**KPD Provision**" means the provision for "Known Product Defects" to be recognized and measured by the Business pursuant to the Calculation Principles with respect to defects (other than defects covered by the Non-KPD Warranty Provision) of Products and/or Services that have been sold by the Sellers and the EMEA Sellers.

"**Latest Lease Rejection Date**" means the latest of (i) the date as set forth in Sections 2.1.5(a) and 2.1.6(a) of the Sellers Disclosure Schedule, if any, with respect to each parcel of Leased Real Property, or (ii) if Sellers (in their sole discretion) request and a landlord of a Leased Real Property agrees to an extension of the date by which the relevant Seller must elect to either assume or reject the related lease to a date later than that specified on Sections 2.1.5(a) and 2.1.6(a) of the Sellers Disclosure Schedule, then with respect to such lease, the date to which such deadline has been extended by agreement of Sellers and such landlord.

"**Law**" means any U.S., Canadian, and any other applicable foreign, supranational, domestic, federal, territorial, state, provincial, local or municipal statute, law, common law, ordinance, rule, regulation, judicial, administrative or other order, writ, injunction, directive, judgment, decree or policy or guideline having the force of law.

"**Lease(s)**" means all leases, subleases, real-property licenses and other agreements, including all amendments, extensions and renewals thereof, pursuant to which real property is held or occupied.

"**Leased Real Property**" means all real property subject to a Lease which is an Assigned Contract, an Assumed and Subleased Real Estate Lease, a Non-365 Subleased Real Estate Lease, a Licensed Real Estate Lease or a Non-365 Licensed Real Estate Lease.

"**LGN Joint Venture**" means LG-Nortel Co. Ltd., which was established in November 2005 as a joint venture between NNL and LG Electronics Inc. for the purpose of jointly developing and marketing certain telecommunications equipment and network solutions.

"**Liabilities**" means debts, liabilities and obligations, whether accrued or fixed, direct or indirect, liquidated or unliquidated, absolute or contingent, matured or unmatured or determined or undeterminable, known or unknown, including those arising under any Law or Action and those arising under any Contract or otherwise, including any Tax liability.

"**License**" has the meaning set forth in Section 5.33.

"**Licensed Intellectual Property**" means the Intellectual Property being licensed to the Purchaser or the relevant Designated Purchasers under the Intellectual Property License Agreement and the Trademark License Agreement.

"**Licensed Real Estate Lease**" has the meaning set forth in Section 2.1.5(c).

"**Lien**" means any lien (statutory or otherwise), mortgage, pledge, security interest, charge, right of first refusal, hypothecation, encumbrance, easement, encroachment, right-of-way, restrictive covenant on real property, real property license, prior claim, lease or conditional sale arrangement.

"**Loaded Devices**" has the meaning set forth in Section 2.1.1.

"**Loaned Employee Agreement**" means the agreement between the Main Sellers, on the one hand, and the Purchaser and/or any Designated Purchasers, on the other hand, to be executed on or before the Closing attached hereto as Exhibit **H**.

"**Local Sale Agreements**" has the meaning set forth in Section 2.1.8.

"**Losses**" means all losses, damages, Liabilities, deficiencies, interest, awards, judgments, fines, penalties and reasonable and documented out-of-pocket costs and expenses (including reasonable attorneys' fees and disbursements and the costs of litigation, including reasonable amount paid in investigation, defense or settlement of an Action).

"**Main Sellers**" has the meaning set forth in the preamble to this Agreement.

"**Mandatory Antitrust Filings**" means all notifications and filings which the Purchaser and/or the Sellers, in respect of the transactions contemplated by this Agreement, is required under the Laws of any jurisdiction to deliver, prior to Closing, to any Government Entity having jurisdiction over mergers and/or similar transactions under any Antitrust Laws applying to any of the parties or to the transactions contemplated by the Agreement.

"**Material Adverse Effect**" means any circumstance, state of fact, event, change or effect (each an "**Effect**") that, individually or in the aggregate with all other Effects, (a) is or could reasonably be materially adverse to the business, operations, assets, liabilities, results of operations or financial condition of the Business, taken as a whole, or (b) prevents or could reasonably be expected to prevent the ability of the Sellers to perform their material obligations

17

under this Agreement or the timely consummation of the transactions contemplated by this Agreement, but excluding, for purposes of clauses (a) and (b), (i) Effects resulting from changes in general economic conditions in the United States or Canada, (ii) Effects arising from the execution or delivery of this Agreement or the Transactions or the public announcement thereof, (iii) Effects that result from any action required to be taken pursuant to this Agreement or any action taken pursuant to the written request or with the prior written consent of the Purchaser, (iv) Effects relating to the industries and markets in which the Business operates, (v) Effects relating to changes in Law, generally accepted accounting principles or official interpretations of the foregoing, (vi) Effects relating to or including the attrition of customers prior to the Closing Date, or (vii) Effects relating to the pendency of the Bankruptcy Proceedings and any action approved by, or motion made before, the Bankruptcy Courts; it being understood that the failure of the Business to achieve internal or external financial forecasts or projections, by itself, will not constitute a Material Adverse Effect; provided, that, with respect to clauses (i), (iv), and (v), any such Effect shall be included to the extent such Effect has a materially disproportionate effect on the Business, taken as a whole, as compared to other industry participants.

"**Material Contracts**" has the meaning set forth in Section 4.4.

"**MOFCOM Approval**" means the Parties shall have received confirmation that the transaction contemplated by this Agreement has been cleared by the Anti-monopoly Bureau of the Ministry of Commerce of the People's Republic of China without any restrictions or conditions pursuant to the then applicable Anti-monopoly Law of the People's Republic of China.

"**Monetary Cost**" has the meaning attributed to that term in the Transition Services Agreement.

"**Monitor**" means Ernst & Young Inc., in its capacity as the Canadian Court-appointed Monitor in connection with the CCAA Cases.

"**New York Courts**" has the meaning set forth in Section 10.6(b)

"**NNC**" has the meaning set forth in the preamble to this Agreement.

"**NNI**" has the meaning set forth in the preamble to this Agreement.

"**NNL**" has the meaning set forth in the preamble to this Agreement.

"**NNSA**" means Nortel Networks S.A., a corporation incorporated under the laws of France.

"**NNSA Assets**" has the meaning attributed to that term in the EMEA Asset Sale Agreement.

"**NNSA Irrevocable Offer**" has the meaning set forth in the recitals to this Agreement.

"**NNTC**" means Nortel Networks Technology Corporation.

"**NN Turkey**" means Nortel Networks Netas Telekomunikasyon A.S., a joint stock corporation formed under the laws of Turkey.

"**NNUK**" means Nortel Networks UK Limited.

"**Non-Assignable Contracts**" has the meaning set forth in Section 5.13(a).

"**Non-Assigned Contract**" means a Non-Assignable Contract as to which all applicable Consents to assignment have not been granted prior to the Closing Date.

"**Non-Assignable Customer Contract**" has the meaning set forth in Section 5.13(c).

"**Non-Assignable Customer Contracts Indemnitees**" has the meaning set forth in Section 5.13(c).

"**Non-Assignable Customer Counterparty**" has the meaning set forth in Section 5.13(c).

"**Non-Assignable Customer Period**" has the meaning set forth in Section 5.13(c).

"**Non-Business Information**" has the meaning set forth in Section 5.11(b).

"**Non-Debtor Sellers**" has the meaning set forth in the recitals to this Agreement.

"**Non-KPD Warranty Provision**" means the provision to be recognized and measured by the Business pursuant to the Calculation Principles for potential claims by customers under the Warranty Obligations.

"**Non-Solicitation Period**" means the twenty-four (24) month period immediately following the Closing Date.

"**Non-365 Contracts**" has the meaning set forth in Section 2.1.6(a)(i).

"**Non-365 Contract List**" has the meaning set forth in Section 2.1.6(a)(i).

"**Non-365 Licensed Real Estate Leases**" has the meaning set forth in Section 2.1.6(c).

"**Non-365 Real Estate Leases**" has the meaning set forth in Section 2.1.6(a)(ii).

"**Non-365 Subleased Real Estate Leases**" has the meaning set forth in Section 2.1.6(b).

"**Nortel Accounting Principles**" means the accounting principles employed in the preparation of the Financial Statements, as set forth in Section 1.1(e) of the Sellers Disclosure Schedule.

**"Open Source Software"** means Software that is made available under a license agreement that (i) conditions use, modification or distribution of any Software program, or any Software integrated with or derived from such Software program, or into which such Software program is incorporated, on the disclosure, licensing or distribution of the source code of such Software program (or such Software) or (ii) otherwise materially limits the licensee's freedom of action with regard to seeking compensation in connection with sublicensing, licensing or distributing such Software program or Software.

**"Order"** means any decision, judgment, order, writ, injunction, decree, award or determination of any Government Entity.

**"Ordinary Course"** means the ordinary course of the Business consistent with recent past practice since the filing of the Bankruptcy Proceedings, as such practice may be modified from time to time to the extent necessary to reflect the Bankruptcy Proceedings and as such practice may be modified from time to time to reflect the separation of the Business from the other businesses of the Sellers in a manner consistent with the terms hereof.

**"Other Seller"** has the meaning set forth in the preamble of this Agreement.

**"Outbound License Agreements"** has the meaning set forth in Section 4.5(f).

**"Overhead and Shared Services"** means corporate or shared services provided to or in support of the Business that are general corporate or other overhead services or provided to both (i) the Business and (ii) other businesses or business segments of any Seller, including travel and entertainment services, temporary labor services, office supplies services (including copiers and faxes), personal telecommunications services, computer hardware and software services, fleet services, energy/utilities services, procurement and supply arrangements, research and development, treasury services, public relations, legal, compliance and risk management services (including workers' compensation), payroll services, sales and marketing support services, information technology and telecommunications services, accounting services, tax services, human resources and employee relations management services, employee benefits services, credit, collections and accounts payable services, logistics services, property management services, environmental support services and customs and excise services, in each case including services relating to the provision of access to information, operating and reporting systems and databases and including all hardware and software or other Intellectual Property necessary for or used in connection therewith.

**"Owned Equipment"** means (i) Equipment owned by any of the Sellers that is held or used predominantly in connection with the Business, and (ii) the other Equipment listed in Section 1.1(f) of the Sellers Disclosure Schedule, excluding, in each case, any Owned Inventory and any Intellectual Property.

**"Owned Inventory"** means (i) Inventory owned and paid for by any of the Sellers that is held or used predominantly in connection with the Business, including any such Inventory which is owned by the Sellers but remains in the possession or control of a contract manufacturer or another Third Party, and (ii) the other Inventory listed in Section 1.1(g) of the

Sellers Disclosure Schedule all as reflected on Sellers' general ledger as of the Closing Date an estimate of which will be provided to the Purchaser at least three days prior to Closing.

"**Partial Allocation**" has the meaning set forth in Section 6.7(b).

"**Party**" or "**Parties**" means individually or collectively, as the case may be, the Sellers and the Purchaser.

"**Patent Cross Licenses**" means all Contracts between the Sellers or their Affiliates and a Third Party under which the Sellers or such Affiliates, as applicable, both (i) grant a license under patents and patent applications owned by (or licensed to) them, and (ii) receive from the counter-party a license under patents and patent applications owned by (or licensed to) such counter-party (but other than inbound or outbound license agreements where the only grant back from the licensee is under improvements on the licensed Intellectual Property).

"**Patents**" means all national and multinational statutory invention registrations, invention disclosures, patents, utility models, patent applications, provisional patent applications, including all reissues, divisions, continuations, continuations-in-part, extensions and re-examinations thereof and all rights therein provided by multinational treaties or conventions.

"**Permitted Encumbrances**" means (i) statutory Liens for Taxes or governmental assessments, charges or claims the payment of which is not yet due, or if due, for Taxes the validity of which is being contested in good faith by appropriate proceedings and for which adequate reserves have been established to the extent required by GAAP, other than Liens that may be discharged at Closing pursuant to the terms of the Canadian Approval and Vesting Order and the U.S. Sale Order; (ii) mechanics', carriers', workers', repairers', landlords', warehouses and similar Liens arising or incurred in the Ordinary Course for sums not yet delinquent or overdue or which are being contested in good faith by appropriate proceedings and for which adequate reserves have been established to the extent required by GAAP; (iii) any Liens imposed by any Bankruptcy Court in connection with the Bankruptcy Proceedings that are to be discharged at Closing pursuant to the terms of the Canadian Approval and Vesting Order and the U.S. Sale Order; (iv) any other Liens set forth in Section 1.1(h) of the Sellers Disclosure Schedule; and (v) present or future zoning, entitlement, building and land use regulations, customary covenants, defects of title, easements, rights of way, restrictions and other similar charges or encumbrances which do not impair in any material respect the use or value of the related assets in the Business as currently conducted.

"**Person**" means an individual, a partnership, a corporation, an association, a limited or unlimited liability company, a joint stock company, a trust, a joint venture, an unincorporated organization or other legal entity or Government Entity.

"**Petition Date**" means January 14, 2009, except with respect to Nortel Networks (CALA) Inc. means July 14, 2009.

"**Pre-Closing Taxable Period**" means any Taxable period ending on or prior to the Closing Date.

"**Primary Party**" means (i) each of the Main Sellers, on the one hand, and (ii) the Purchaser, on the other hand.

"**Products**" means the prior, if currently supported, current versions and versions under development of all products set forth in Section 1.1(i) of the Sellers Disclosure Schedule.

"**Purchase Order**" means any purchase order, work order, statement of work or similar Contract pursuant to which a Third Party is providing products or services to Sellers exclusively for use in the Business, which products or services have been fully paid for by the Sellers and pursuant to which the Sellers have no remaining liability, that is not otherwise included in: (i) the Assumed and Assigned Contracts; (ii) the Designated Non-365 Contracts; or (iii) the Non-Assigned Contracts.

"**Purchase Price**" has the meaning set forth in Section 2.2.1.

"**Purchaser**" has the meaning set forth in the preamble to this Agreement..

"**Purchaser Employee Plan**" means any "employee benefit plan" within the meaning of Section 3(3) of ERISA and any other employee benefit plan or agreement, including any profit sharing plan, savings plan, bonus plan, performance awards plan, incentive compensation plan, deferred compensation plan, stock purchase plan, stock option plan, vacation plan, leave of absence plan, employee assistance plan, automobile leasing/subsidy/allowance plan, expense reimbursement plan, meal allowance plan, redundancy or severance plan or agreement, termination or retirement indemnity plan, relocation plan, family support plan, pension plan, supplemental pension plan, retirement plan, early or ill health retirement plan, retirement savings plan, post-retirement plan, medical, health, hospitalization or life insurance plan, disability plan, sick leave plan, retention plan, education assistance plan, expatriate assistance plan, compensation arrangement, including any base salary arrangement, overtime, on-call or call-in policy, death benefit plan, or any other similar plan, program, arrangement or policy that is maintained or otherwise contributed to, or required to be maintained or contributed to, by or on behalf of the Purchaser or any of its Subsidiaries or Affiliates with respect to their employees employed in those countries where they will employ Transferred Employees pursuant to this Agreement.

"**Purchaser Portion of Cure Costs**" has the meaning set forth in Section 2.1.7(f).

"**Purchaser Supply Agreement**" means the agreement to be entered into between the relevant Sellers, on the one hand, and the Purchaser (or the relevant Designated Purchasers), on the other hand, on or prior to the Closing in the form attached hereto as Exhibit **R**.

"**Qualcomm Cross-License**" means that certain Patent Cross-License Agreement, dated December 27, 2006, by and between Qualcomm Incorporated and NNL.

"**Qualified Arbitrator**" has the meaning set forth in Section 5.26(e).

"**Qualified Expenditures**" has the meaning set forth in Section 6.5(b).

"**Real Estate Agreements**" means the leases, sub-leases or license agreements between the relevant Sellers, on the one hand, and the Purchaser and/or any Designated Purchasers, on the other hand, to be executed on or prior to Closing in accordance with and as provided by the Real Estate Agreements Term Sheet.

"**Real Estate Agreements Term Sheet**" means the Real Estate Agreements Term Sheet attached hereto as Exhibit **G**.

"**Real Estate Lease**" means a Seller Contract that is a lease, sublease, license or other agreement for use and occupancy of real property including all amendments, extensions and renewals thereof and is an Assigned Contract, an Assumed and Subleased Real Estate Lease, a Non-365 Subleased Real Estate Lease, a Licensed Real Estate Lease or a Non-365 Licensed Real Estate Lease.

"**Records Custodian**" means Deloitte & Touche LLP or in case such firm is unable to carry out its duties for whatever reason, such other auditing firm of international reputation that is acceptable to each of the Purchaser and the Sellers, each acting reasonably.

"**Regulatory Approvals**" means the (i) Antitrust Approvals, (ii) the CFIUS Approval, (iii) the ICA Approval and (iv) the Trade Approvals.

"**Release**" when used in conjunction with Hazardous Materials, means any spilling, leaking, pumping, emitting, emptying, pouring, discharging, depositing, injecting, escaping, leaching, migrating, dumping, or disposing of Hazardous Materials (including the abandonment or discarding of barrels, containers or other receptacles containing Hazardous Materials) into the environment.

"**Representatives**" means as to any Person, the attorneys, accountants, consultants, financial advisors and other similar representatives and agents of such Person.

"**Respective Affiliates**" has the meaning set forth in Section 10.16(c).

"**Responding Party**" has the meaning set forth in Section 5.26(e).

"**Restricted Technical Records**" means the Livelink database or any other similar database containing only all necessary documents with respect to the technical aspects of the Qualified Expenditures of NNTC or NNL in their 2002 and subsequent taxation years.

"**Royalty Liability Amount**" means, as of any given date, the amount of the royalty liabilities determined in accordance with the Calculation Principles.

"**Sasken**" has the meaning set forth in Section 5.25.

"**Sasken Agreements**" has the meaning set forth in Section 5.25.

"**Scope Guidelines**" has the meaning set forth in Section 5.26(a).

"**Security Deposits**" has the meaning set forth in Section 5.21.

"**Seller(s)**" has the meaning set forth in the recitals to this Agreement.

"**Seller Consents**" has the meaning set forth in Section 2.1.1(h).

"**Seller Contracts**" means those Contracts of a Seller that (i) relate predominantly to the Business (including Inbound License Agreements that are used, as of the date hereof, predominantly in connection with the Business, but excluding any other licenses of Intellectual Property), or (ii) are otherwise material to the operation of the Business and not commercially available to the Purchaser.

"**Seller Employee Plan**" means (i) any "employee benefit plan" within the meaning of Section 3(3) of ERISA and any other employee benefit plan or agreement including any employee agreement other than immaterial employment agreements, profit sharing plan, savings plan, bonus plan, performance awards plan, incentive compensation plan, deferred compensation plan, stock purchase plan, stock option plan, vacation plan, leave of absence plan, employee assistance plan, automobile leasing/subsidy/allowance plan, expense reimbursement plan, meal allowance plan, redundancy or severance plan or agreement, relocation plan, family support plan, pension plan, supplemental pension plan, retirement plan, retirement savings plan, post retirement plan, medical, health, hospitalization or life insurance plan, disability plan, sick leave plan, retention plan, education assistance plan, expatriate assistance plan, compensation arrangement, including any base salary arrangement, overtime, on-call or call-in policy, death benefit plan, or any other similar plan, program, arrangement or policy under which the Sellers or any of their Subsidiaries or Affiliates (other than the EMEA Sellers or NNSA) have any Liabilities, or that is maintained or otherwise contributed to, or required to be maintained or contributed to, by or on behalf of the Sellers or any of their Subsidiaries or Affiliates (other than the EMEA Sellers or NNSA) with respect to Employees, or former employees of the Business, or pursuant to which payments are made, or benefits are provided to, or an entitlement to payments or benefits may arise with respect to any Employees or former employees of the Business (or any spouses, dependants or beneficiaries of any such individuals) and (ii) any other employee benefit plan with respect to which the Purchaser or any of its Affiliates could have any Liability as a result of the Sellers or any of their Subsidiaries or Affiliates (other than the EMEA Sellers or NNSA) maintaining such plan prior to the Closing Date.

"**Seller Insurance Policies**" means all current or previous insurance policies of the Sellers and their Affiliates, including all environmental, directors' and officers' Liability, fiduciary Liability, employed lawyers, property and casualty flood, ocean marine, contaminated products insurance policies and all other insurance policies or programs arranged or otherwise provided or made available by the Sellers or their Affiliates that cover (or covered) any of the Covered Assets and Persons at any time prior to the Closing.

"**Sellers Disclosure Schedule**" means the disclosure schedule delivered by the Sellers to the Purchaser on the date hereof.

"**Sellers' Trademarks**" has the meaning set forth in Section 5.22.

"**Services**" means the GSM network implementation services, the GSM network managed services and the GSM network support services associated with the Products provided

by the Sellers, individually, jointly or in collaboration or pursuant to contractual arrangements with Affiliates of Sellers or Third Parties, as of the Closing Date, including, without limitation, services associated with GSM extended service plans, extended warranty, maintenance, technical support, RF optimization, training and documentation.

"**Software**" means any and all (i) computer programs, whether in source code or object code, (ii) computerized databases and compilations, and (iii) documentation, compilation tools, development tools and support tools associated with (i) and/or (ii).

"**Specified Employee Liabilities**" has the meaning set forth in Section 2.1.3(k).

"**Specified Transferred Employees**" has the meaning set forth in Section 7.1.2(c)(i).

"**Straddle Period**" has the meaning set forth in Section 6.4(b).

"**Subcontract Agreement**" means one or more agreements between the relevant Seller(s), on the one hand, and the Purchaser and/or any Designated Purchasers, on the other hand, that such parties will use their reasonable effort to negotiate and execute on or prior to the Closing in the form attached hereto as Exhibit **J**.

"**Subleases**" has the meaning set forth in Section 5.31.

"**Subsidiary**" of any Person means any Person Controlled by such first Person; provided, that none of the EMEA Sellers shall be deemed a Subsidiary of any Seller.

"**Successful Bidder**" as defined in the Bidding Procedures.

"**Tax**" means (a) any domestic or foreign federal, state, local, provincial, territorial or municipal taxes or other impositions by or on behalf of any Government Entity, including the following taxes and impositions: net income, gross income, individual income, capital, value added, goods and services, gross receipts, sales, use, *ad valorem*, business rates, transfer, franchise, profits, business, environmental, real property, personal property, service, service use, withholding, payroll, employment, unemployment, severance, occupation, social security, excise, stamp, stamp duty reserve, customs, and all other taxes, fees, duties, assessments, deductions, withholdings or charges of the same or of a similar nature, however denominated, together with any interest and penalties, additions to tax or additional amounts imposed or assessed with respect thereto, and (b) any obligation to pay Taxes of a Third Party, whether by contract, as a result of transferee or successor liability, as a result of being a member of an affiliated, consolidated, combined or unitary group for any period or otherwise.

"**Tax Authority**" means any local, municipal, governmental, state, provincial, territorial, federal, including any U.S., Canadian or other fiscal, customs or excise authority, body or officials (or any entity or individual acting on behalf of such authority, body or officials) anywhere in the world with responsibility for, and competent to impose, collect or administer, any form of Tax.

"**Tax Credit Purchaser**" has the meaning set forth in Section 6.5(b).

"**Tax Records**" means books, records, files, or other documentation, whether in electronic or other form, with respect to Tax.

"**Tax Returns**" means all returns, reports (including elections, declarations, disclosures, schedules, estimates and information returns) and other information filed or required to be filed with any Tax Authority relating to Taxes, including any amendments thereto.

"**Termination Fee Side Agreement**" means that certain GSM Termination Fee Agreement, dated the date hereof, between the Main Sellers and the Purchaser.

"**Third Party**" means any Person that is neither a Party nor an Affiliate of a Party.

"**Third Party Beneficiaries**" has the meaning set forth in Section 10.3.

"**Third Party Provisions**" has the meaning set forth in Section 10.3.

"**365 Contract(s)**" has the meaning set forth in Section 2.1.5(a)(i).

"**365 Contract List**" has the meaning set forth in Section 2.1.5(a)(i).

"**365 Real Estate Lease**" has the meaning set forth in Section 2.1.5(a)(ii).

"**365 Real Estate Lease List**" has the meaning set forth in Section 2.1.5(a)(ii).

"**Trade Approvals**" means the timely submission by the Sellers of any and all necessary requests to the appropriate Governmental Authority for the assignment or issuance, which may be conditional on Closing, to Purchaser of all material Consents held by the Sellers which would be required under any Trade Law for Purchaser to continue to carry on, after Closing, the Business as currently conducted and the receipt and acceptance of such requests by the Governmental Authority without any objection.

"**Trade Laws**" means any applicable Law relating to, regulating, prohibiting or imposing requirements with respect to the import, export or transfer of goods, materials, technology or information, including the *Export Act*, *Export and Import Permits Act*, *Special Import Measures Act*, *Special Economic Measures Act*, *International Emergency Economic Powers Act and the Arms Export Control Act*, all as amended, and any requirements of a Government Entity promulgated pursuant to such Laws or any analogous supranational foreign, state, provincial, territorial, municipal or local Law.

"**Trade Permit**" means any Consent required under any Trade Law for the Business as currently conducted.

"**Trademarks**" means, together with the goodwill associated therewith, all trademarks, service marks, trade dress, logos, distinguishing guises and indicia, trade names, corporate names, business names, domain names, whether or not registered, and all common law rights, and registrations, applications for registration and renewals thereof, including without

limitation, all marks registered in the trademark offices of any nation throughout the world, and all rights therein provided by multinational treaties or conventions.

"**Trademark License Agreement**" means the trademark license agreement between the relevant Sellers, on the one hand, and the Purchaser and/or any Designated Purchasers, on the other hand, to be entered into on or before the Closing in the form attached hereto as Exhibit **K**.

"**Transaction Documents**" means this Agreement, the Ancillary Agreements, the Termination Fee Side Agreement and all other ancillary agreements to be entered into, or documentation delivered by, any Party and/or any Designated Purchaser pursuant to this Agreement or any Local Sale Agreement.

"**Transfer Tax Returns**" has the meaning set forth in Section 6.6(a).

"**Transfer Taxes**" means all goods and services, sales, excise, use, transfer, gross receipts, documentary, filing, recordation, value-added, stamp, stamp duty reserve, and all other similar Taxes, duties or other like charges, however denominated (including any real property transfer Taxes and conveyance and recording fees and notarial fees), together with interest, penalties and additional amounts imposed with respect thereto.

"**Transferred Employee**" means (i) Employees who accept an offer of employment by, and commence employment with, the Purchaser or a Designated Purchaser in accordance with the terms of Section 7.1 and (ii) those Employees whose employment transfers by operation of Law.

"**Transferred Employee Plan**" means any Seller Employee Plan that is transferred (or the Liabilities of which are transferred) to the Purchaser or Designated Purchaser by operation of Law, but excluding the Specified Employee Liabilities assumed by the Purchaser or the Designated Purchaser pursuant to Section 2.1.3(k).

"**Transferred Intellectual Property**" means (i) the Transferred Patents, (ii) the Transferred Trademarks, (iii) the Intellectual Property (other than Patents and Trademarks) in the Software used exclusively in the Products as of the date hereof as set forth in Section 1.1(j) of the Sellers Disclosure Schedule) and (iv) any other Intellectual Property (other than Patents, Trademarks and Software) owned by any of the Sellers that is used exclusively in connection with the Business as of the date hereof.

"**Transferred Overhead and Shared Services**" means Overhead and Shared Services to be provided to or in support of the Business post-Closing by Transferred Employees as set forth in Section 1.1(k) of the Sellers Disclosure Schedule.

"**Transferred Patents**" means the Patents listed in Section 1.1(l) of the Sellers Disclosure Schedule.

"**Transferred Trademarks**" means the Trademarks exclusively used in the Business as of Closing and owned as of the Closing Date by any of the Sellers or their Affiliates as set forth in Section 1.1(j) of the Sellers Disclosure Schedule.

"**Transition Services Agreement**" means an agreement between relevant Sellers and/or their Affiliates party thereto, on the one hand, and the Purchaser and/or any Designated Purchasers, on the other hand, to be executed on or prior to the Closing Date, in the form attached hereto as Exhibit **L**, except that the Schedules to such agreement shall be agreed between the Parties in accordance with Section 5.26 hereof.

"**TSA EMEA Sellers**" means NNUK and Nortel Networks (Ireland) Limited.

"**TSA Escrow Amount**" has the meaning set forth in the Transition Services Agreement.

"**TSA Sellers**" means the Main Sellers and those entities listed on Exhibit A attached to the form Transition Services Agreement attached hereto as Exhibit **L**.

"**Unexpired Leases**" means leases that constitute "unexpired leases" for the purposes of Section 365 of the U.S. Bankruptcy Code.

"**Uni-Nortel**" means Uni-Nortel Communication Technologies (Hellas), S.A., a company organized under the laws of Greece, which was established in July 2005 as a joint venture between Nortel Networks International Finance & Holding, B.V. and UniSystems, S.A. for the purposes of marketing and selling certain telecommunications equipment and systems in Greece and the Republic of Cyprus.

"**U.S. Bankruptcy Code**" means Title 11 of the United States Code.

"**U.S. Bankruptcy Court**" means the United States Bankruptcy Court for the District of Delaware.

"**U.S. Bankruptcy Rules**" means the U.S. Federal Rules of Bankruptcy Procedure.

"**U.S. Bidding Procedures Order**" means that certain Order Authorizing and Approving (I) Bidding Procedures, (II) Notice Procedures, and (III) Setting a Date for Sale Heating, for the Sale of Certain Assets of Debtors" GSM/GSM-R Business, which was entered on October 15, 2009 by the U.S. Bankruptcy Court [D.I. 1587].

"**U.S. Debtor Contract**" means any Seller Contract to which a U.S. Debtor is a party.

"**U.S. Debtors**" has the meaning set forth in the recitals to this Agreement.

"**U.S. Sale Order**" means the sale order of the U.S. Bankruptcy Court, substantially in the form attached hereto as Exhibit 5.1, approving the sale of the Assets to the Purchaser (or a Designated Purchaser) and the assignment by the U.S. Debtors to, and assumption thereof by, the Purchaser (or a Designated Purchaser) of the Assumed and Assigned Contracts and the Assumed Liabilities pursuant to Sections 105, 363 and 365 of the U.S. Bankruptcy Code.

**"Visa Employees"** means Employees (other than Employees whose employment transfers by operation of Law) who are identified as having a visa or permit in Section 4.10(b) of the Sellers Disclosure Schedule and whose employment with Purchaser or a Designated Purchaser cannot commence until the required visa or permit for a transfer of employment to Purchaser or a Designated Purchaser (with respect to such Employee) is obtained. An Employee shall be a Visa Employee for purposes hereof only if such Employee receives and accepts an employment offer from Purchaser as provided in Section 7.1 and has an Effective Hire Date that occurs within twelve (12) months following the Closing Date.

**"WARN Act"** means the Worker Adjustment and Retraining Notification Act of 1989, as amended, or any similar Law requiring notice to employees in the event of a plant closing or mass layoff.

**"Warranty Obligations"** means the warranty obligations relating to Products and Services assumed by the Purchaser and/or a Designated Purchaser pursuant to Section 2.1.3(b) and Section 2.1.3(g).

**"Warranty Provision Amount"** means the sum of (i) the KPD Provision and (ii) the Non-KPD Warranty Provision.

**"Wholly-Owned Subsidiary"** means any Subsidiary all of the capital stock or capital which is held directly or indirectly by the Purchaser, except for any capital stock which is held by a director of such Subsidiary as required by applicable Laws.

Section 1.2.    Interpretation.

1.2.1.    Gender and Number.Any reference in this Agreement to gender includes all genders and words importing the singular include the plural and vice versa.

1.2.2.    Certain Phrases and Calculation of Time.In this Agreement (i) the words "including" and "includes" mean "including (or includes) without limitation", (ii) the terms "hereof," "herein," and "herewith" and words of similar import shall, unless otherwise stated, be construed to refer to this Agreement and not to any particular provision of this Agreement, and Article, Section, paragraph, Exhibit and Schedule references are to the Articles, Sections, paragraphs, Exhibits and Schedules to this Agreement unless otherwise specified, and (iii) in the computation of periods of time from a specified date to a later specified date, unless otherwise expressly stated, the word "from" means "from and including" and the words "to" and "until" each mean "to but excluding", and (iv) in determining whether an asset is "exclusively" used in connection with the Business, incidental, *de minimis* or casual uses outside the Business shall not be considered. If the last day of any such period is not a Business Day, such period will end on the next Business Day.

When calculating the period of time "within" which, "prior to" or "following" which any act or event is required or permitted to be done, notice given or steps taken, the date which is the reference date in calculating such period is excluded from the calculation. If the last day of any such period is not a Business Day, such period will end on the next Business Day.

The reference to any "list" set forth in the Sellers Disclosure Schedule shall mean a list that is complete and accurate, taking into account that disclosure in one section of the Sellers Disclosure Schedule of any facts or circumstances shall be deemed an adequate response and disclosure of such facts and circumstances with respect to any other representations or warranties by Seller calling for disclosure of such information whether or not such disclosure is specifically associated with it or purports to respond to one or more of such other representations or warranties if it is reasonably apparent on the face of the Sellers Disclosure Schedule that such disclosure is applicable.

        1.2.3.    Headings, etc.The inclusion of a table of contents, the division of this Agreement into Articles and Sections and the insertion of headings are for convenient reference only and are not to affect or be used in the construction or interpretation of this Agreement.

        1.2.4.    Currency.All monetary amounts in this Agreement, unless otherwise specifically indicated, are stated in United States currency. All calculations and estimates to be performed or undertaken, unless otherwise specifically indicated, are to be expressed in United States currency. All payments required under this Agreement shall be paid in United States currency in immediately available funds, unless otherwise specifically indicated herein. Where another currency is to be converted into United States currency it shall be converted on the basis of the exchange rate published in the Wall Street Journal (Eastern Edition) for the day in question.

        1.2.5.    Statutory References.Unless otherwise specifically indicated, any reference to a statute in this Agreement refers to that statute and to the regulations made under that statute as in force from time to time.

## ARTICLE II

## PURCHASE AND SALE OF ASSETS

        Section 2.1.    Purchase and Sale.

        2.1.1.    Assets.Subject to the terms and conditions of this Agreement, at the Closing, the Purchaser shall, and shall cause the relevant Designated Purchasers to, purchase or be assigned and assume from the relevant Sellers, and each Seller shall sell, transfer or assign to the Purchaser or the relevant Designated Purchasers, all of such Seller's right, title and interest in and to the assets predominantly (except in the case of the assets described in clauses (f) and (h), exclusively) used or held for use in the conduct of the Business, (such assets, excluding the Excluded Assets, the "**Assets**") (x) in the case of Assets that are transferred or assigned by U.S. Debtors, free and clear of all Liens and Claims (other than Permitted Encumbrances and Liens created by or through the Purchaser, the Designated Purchasers or any of their Affiliates) pursuant to Sections 363 and 365 of the U.S. Bankruptcy Code, (y) in the case of Assets that are transferred or assigned by the Canadian Debtors, free and clear of all Liens (other than Permitted Encumbrances and Liens created by or through the Purchaser, the Designated Purchasers or any of their Affiliates) pursuant to the Canadian Approval and Vesting Order, when granted, and (z) in the case of Assets that are transferred or assigned by the Non-Debtor Sellers, free and clear

of all Liens (other than Permitted Encumbrances and Liens created by or through the Purchaser, the Designated Purchasers or any of their Affiliates).  The Assets include:

        (a)     the Owned Inventory as of the Closing Date;

        (b)     the CIP Receivables as of the Closing Date;

        (c)     the Owned Equipment as of the Closing Date;

        (d)     the Assigned Contracts in force as of the Closing Date;

        (e)     the Business Information existing as of the Closing Date, subject to Section 2.1.2(h);

        (f)     the Transferred Intellectual Property as of the Closing Date, subject to any and all licenses granted prior to the Closing Date under such Intellectual Property, together with all claims against Third Parties for infringement, misappropriation or other violation of any Law with respect to any of the Transferred Intellectual Property, whether for any past, present or future infringement, misappropriation or other violation;

        (g)     all rights as of the Closing (i) under all warranties, representations and guarantees made by suppliers, manufacturers and contractors to the extent related to the Business or Assets, and (ii) with respect to Acquired Actions; and

        (h)     to the extent assignable under applicable Law, all Consents of Government Entities exclusively pertaining to the Business (the "**Seller Consents**").

        2.1.2.    Excluded Assets.Notwithstanding anything in this Section 2.1 or elsewhere in this Agreement or in any of the Transaction Documents to the contrary, nothing herein shall be deemed to sell, transfer, assign or convey (or require Sellers to do any of the foregoing as to) the following assets to the Purchaser or any Designated Purchaser, and the Sellers shall retain all of their respective rights, title and interests in and to, and the Purchaser and the Designated Purchasers shall have no rights with respect to, the rights, title and interests of the Sellers in and to any of the following assets (collectively, the "**Excluded Assets**"):

        (a)     cash and cash equivalents, accounts receivable (including intercompany receivables but excluding CIP Receivables), bank account balances and all petty cash of the Sellers;

        (b)     any refunds due from, or payments due on, claims with the insurers of any of the Sellers in respect of losses arising prior to the Closing Date (except as provided in Section 5.27);

        (c)     all rights to Tax refunds, credits or similar benefits relating to the Assets or the Business allocable to a Pre-Closing Taxable Period or to the portion of a Straddle Period ending on and including the Closing Date;

(d)     all claims, causes of action and rights of Sellers or any Subsidiary thereof to the extent relating to any Excluded Liabilities or to any Liabilities for which Sellers are responsible under this Agreement (including rights of set-off, rights to refunds and rights of recoupment from or against any Third Party but excluding any Acquired Actions);

(e)     any security deposits made by or on behalf of the Sellers (including those relating to Assigned Contracts);

(f)     any rights of the Sellers under any Non-Assigned Contract (except as provided for in Section 5.13);

(g)     the minute books, stock ledgers and Tax Records of the Sellers;

(h)     (i) any books, records, files, documentation or sales literature other than the Business Information (subject to clauses (ii) and (iii) below of this subsection and the last paragraph of this Section 2.1.2), (ii) the Employee Records other than those required to be delivered to the Purchaser pursuant to Article VII, and (iii) such portion of the Business Information that the Sellers are required by Law (including Laws relating to privilege or privacy but subject to any exemption from those Laws included in the Canadian Approval and Vesting Order or the U.S. Sale Order) or by any agreement with a Third Party to retain and/or not to disclose (provided that copies of such information shall be provided to the Purchaser and to the extent permitted by applicable Law or such agreement);

(i)     except for (i) the Transferred Intellectual Property and the rights described in Section 2.1.1(f) above, and (ii) Intellectual Property to the extent rights are granted thereto pursuant to the Intellectual Property License Agreement, the Trademark License Agreement or any other Transaction Documents, any rights to (A) any Intellectual Property of any of the Sellers (including Sellers' names) or any Affiliates of any of the Sellers or (B) Intellectual Property owned by a Third Party, except to the extent licensed under an Assigned Contract;

(j)     all rights of the Sellers under this Agreement and the Transaction Documents;

(k)     all of the rights and claims of the U.S. Debtors available to the U.S. Debtors under the U.S. Bankruptcy Code, of whatever kind or nature, as set forth in Sections 544 through 551, inclusive, 553, 558 and any other applicable provisions of the U.S. Bankruptcy Code, and any related claims and actions arising under such Sections by operation of Law or otherwise, including any and all proceeds of the foregoing but excluding the Acquired Actions;

(l)     all records containing personal communications or notes related to the negotiations in connection with the sale of the Assets to the Purchaser and the Designated Purchasers that were not shared with the Purchaser;

(m)     all stock or other equity interests in any Person;

(n)     any assets set forth on Section 2.1.2(n) of the Sellers Disclosure Schedule;

(o)     any business asset, product or service run, owned, managed and/or provided by NN Turkey, the LGN Joint Venture, Uni-Nortel and any other joint venture (or similar arrangement) of the Sellers unless expressly included in the Assets;

(p)     the Excluded Contracts;

(q)     all Seller Employee Plans, and any related assets or insurance policies;

(r)     any freehold or leasehold interest in any real estate other than the tenancy, subtenancy or occupancy interest, if any, if and to the extent created pursuant to a Sublease, Direct Lease or License in accordance with Section 5.31, Section 5.32 and Section 5.33, respectively; and

(s)     any rights of the Sellers under Assumed and Subleased Real Estate Leases, Excluded 365 Contracts, Bundled Contracts (except as provided for in Section 5.15), Excluded Non-365 Contracts and Seller Insurance Policies.

2.1.3.    Assumed Liabilities. On the terms and subject to the conditions set forth in this Agreement, at the Closing, the Purchaser shall, and shall cause the relevant Designated Purchasers to, assume and become responsible for, and perform, discharge and pay, when due, solely the following Liabilities (the "**Assumed Liabilities**"):

(a)     all Liabilities arising on or after the Closing Date to the extent related to the conduct, operation or ownership of the Assets after the Closing Date, including (i) all such Liabilities with respect to the ownership, exploitation and operation of the Assets incurred on or after the Closing Date and (ii) all such Liabilities related to Actions or claims brought against the Assets arising from events occurring after the Closing Date;

(b)     all Liabilities arising from or in connection with the performance of the Assigned Contracts after the Closing Date, the Purchaser Portion of Cure Costs pursuant to Sections 2.1.7(a) and 2.1.7(b), or any arrangements entered into pursuant to Section 5.15 after the Closing Date;

(c)     any obligations under any warranty liabilities relating to Products and Services which have been supplied under any Assigned Contract, but excluding any Cure Costs payable by Sellers pursuant to Section 2.1.7;

(d)     the obligation to post any deposits, bonds or other security in replacement of security posted under any Assigned Contract pursuant to Section 5.21 of this Agreement;

(e)     all Liabilities resulting from any licensing assurances, declarations, agreements or undertakings relating to the Transferred Intellectual Property which the Sellers may have granted or committed to Third Parties, including Liabilities resulting from the assurances, declarations and undertakings made to standard setting bodies that are listed in Section 2.1.3(e) of the Sellers Disclosure Schedule;

(f)     all Liabilities for, or related to any obligation for, any Tax that the Purchaser or any Designated Purchaser bears under ARTICLE VI;

(g)     all obligations of the Sellers under any warranty Liabilities relating to Products and Services which have been supplied by the Purchaser or any Designated Purchaser under any Bundled Contract subcontracted to the Purchaser or any Designated Purchaser under any Subcontract Agreement or the benefit and burden of which has otherwise been transferred in accordance with Section 5.15(b);

(h)     except to the extent otherwise expressly set forth in ARTICLE VII and the Loaned Employee Agreement, all Liabilities related to or arising from any of the following: (i) the Purchaser's or any Designated Purchaser's (or any of their Affiliates') employment or termination of employment (whether or not arising under or in respect of any Purchaser Employee Plan) of Transferred Employees arising after the Closing Date; (ii) the terms of any offer of employment or notice of continued employment, as applicable, to any Employee who is provided an offer pursuant to the terms of Section 7.1 (including the Purchaser's or any Designated Purchaser's failure to offer employment to any employee that constitutes a violation of applicable Law);

(i)     all Liabilities relating to or arising from or in connection with any Purchaser Employee Plan;

(j)     any obligation to provide continuation coverage pursuant to COBRA or any similar Law under any Purchaser Employee Plan that is a "group health plan" (as defined in Section 5000(b)(1) of the Code) to Transferred Employees and/or their qualified beneficiaries with respect to a qualifying event that occurs on or after such Transferred Employees' Effective Hire Date;

(k)     Accrued Vacation Amount as of the Closing Date set forth on Section 2.1.3(k) of the Sellers Disclosure Schedule (the "**Specified Employee Liabilities**");

(l)     all Liabilities related to Transferred Employees expressly assumed by Purchaser or a Designated Purchaser as set out in ARTICLE VII;

(m)     all Liabilities reflected in the computation of Adjusted Net Working Capital;

(n)     all other Liabilities listed in Section 2.1.3(n) of the Sellers Disclosure Schedule; and

(o)     with respect to any Products supplied under any Bundled Contract with a customer of a Seller prior to the Closing Date that is amended in accordance with Section 5.15, (i) any obligations under any warranty liabilities relating to such Products, but excluding any Cure Costs payable by the Sellers pursuant to Section 2.1.7; (ii) any Liabilities arising from or in connection with any non-cash incentives relating to Products supplied under such Bundled Contract; and (iii) Liabilities arising from the requirement to provide maintenance services in connection with such Products.

2.1.4.    Excluded Liabilities. Except as expressly provided in Section 2.1.3, neither the Purchaser nor any Designated Purchasers shall assume or be deemed to have assumed any Liabilities of the Sellers or their Affiliates other than the Assumed Liabilities

(collectively, the "**Excluded Liabilities**"). Without limiting the generality of the foregoing, Excluded Liabilities include:

        (a)    all Indebtedness of the Sellers and their Affiliates;

        (b)    all Liabilities arising out of the Contracts that are not Assigned Contracts (including Liabilities arising out of any Excluded Contracts and Liabilities arising out of that portion of any arrangement entered into pursuant to Section 5.15 for which Sellers are responsible by the terms thereof);

        (c)    all accounts payable and trade payables of the Sellers, including intercompany payables;

        (d)    all fees or commissions of any brokers, funds or investment banks in connection with the transactions contemplated by this Agreement and the other Transaction Documents based upon arrangements made by or on behalf of the Sellers or any of their Affiliates;

        (e)    any Cure Costs payable by the Sellers pursuant to Section 2.1.7;

        (f)    any Liabilities arising from or based on events or conditions occurring or existing prior to the Closing Date and connected with, arising out of or relating to (x) the Release or threatened Release of any Hazardous Materials at any location currently or formerly owned, operated or used by the Business or at any location to which Hazardous Materials generated, stored, handled or processed by the Business were sent, released or disposed of, or (y) compliance or the alleged non-compliance by the Business with any Environmental Law or Environmental Permit;

        (g)    all Liabilities for, or related to any obligation for, any Tax that is not expressly assumed by the Purchaser or any of the Designated Purchasers pursuant to ARTICLE VI (including, for the avoidance of doubt, any income or gross receipts Tax imposed on any of the Sellers);

        (h)    all Excluded Employee Liabilities;

        (i)    all Liabilities of the Sellers arising under this Agreement and the Ancillary Agreements; and

        (j)    all Liabilities of NN Turkey, the LGN Joint Venture, Uni-Nortel.

        2.1.5.    <u>Assumption and Assignment of 365 Contracts</u>.

        (a)    Section 2.1.5(a) of the Sellers Disclosure Schedule sets forth:

        (i)    a list (the "**365 Contract List**") of the U.S. Debtor Contracts (including Inbound License Agreements that are used, as of the date hereof, exclusively in connection with the Business, but excluding (a) other licenses of Intellectual Property and (b) Leases) that are (x) Executory Contracts, (y) were entered into prior to the

Petition Date and (z) are not Contracts with contract manufacturers or other suppliers to the Business (each such U.S. Debtor Contract, a "**365 Contract**") that the Purchaser has elected to have the U.S. Debtors assume and assign to the Purchaser or a Designated Purchaser at Closing pursuant to Section 365 of the U.S. Bankruptcy Code; and

(ii)    a list (the "**365 Real Estate Lease List**") of all Leases of a U.S. Debtor which were entered into prior to the Petition Date and are Unexpired Leases (each such Lease, a "**365 Real Estate Lease**") that the Purchaser has elected to have the relevant U.S. Debtor pursuant to Section 365 of the U.S. Bankruptcy Code assume and assign to the Purchaser or a Designated Purchaser at Closing, in accordance with, and as provided by, the Real Estate Agreements Term Sheet; provided that, subject to the terms of the Real Estate Agreements Term Sheet, the applicable U.S. Debtor shall (i) not be required to assume a 365 Real Estate Lease prior to the Closing Date in connection with an assumption and assignment to Purchaser and (ii) have the right to reject any 365 Real Estate Lease designated for assumption and assignment in the event that the Closing shall not have occurred on or before the date that is three (3) Business Days prior to the Latest Lease Rejection Date.

(b)    Section 2.1.5(b) of the Sellers Disclosure Schedule sets forth a list of all 365 Real Estate Leases that the Purchaser has elected to have the relevant U.S. Debtor, pursuant to Section 365 of the U.S. Bankruptcy Code, assume and under which the Purchaser or a Designated Purchaser will enter into a Sublease, to the extent permitted by, and in accordance with, the terms of the related 365 Real Estate Lease and applicable Law (the "**Assumed and Subleased Real Estate Leases**"), at Closing, in accordance with, and as provided by, the Real Estate Agreements Term Sheet; provided that, subject to the terms of the Real Estate Agreements Term Sheet, the applicable U.S. Debtor shall (i) not be required to assume an Assumed and Subleased Real Estate Lease prior to the Closing Date in connection with a Sublease to Purchaser and (ii) have the right to reject any Assumed and Subleased Real Estate Lease designated for Sublease in the event that the Closing shall not have occurred on or before the date that is three (3) Business Days prior to the Latest Lease Rejection Date.

(c)    Section 2.1.5(c) of the Sellers Disclosure Schedule sets forth a list of 365 Real Estate Leases, certain of which may be available for the Purchaser to elect to have the relevant Seller enter into a License at Closing with the Purchaser or a Designated Purchaser to the extent permitted by, and in accordance with (i) the terms of the related 365 Real Estate Lease and applicable Law (each such 365 Real Estate Lease, the "**Licensed Real Estate Lease**", such Schedule to be supplemented as expressly set forth in the Real Estate Agreements Term Sheet), and (ii) the Real Estate Agreements Term Sheet; provided, that, the applicable U.S. Debtor shall (i) not be required to assume a Licensed Real Estate Lease prior to the Closing Date in connection with a License to Purchaser and (ii) have the right to reject any Licensed Real Estate Lease designated for License in the event that the Closing shall not have occurred on or before the date that is three (3) Business Days prior to the Latest Lease Rejection Date.

(d)    Prior to the Closing Date, the Purchaser or the Sellers shall be entitled to add 365 Contracts or 365 Real Estate Leases to Sections 2.1.5(a), 2.1.5(b), or 2.1.5(c), respectively, of the Sellers Disclosure Schedule, provided that any such additions proposed by the Sellers shall only be added to such Sections of the Sellers Disclosure Schedules if the

Purchaser has agreed in writing prior to such addition that the U.S. Debtors should assume and assign to (or enter into a Sublease or License with) the Purchaser or a Designated Purchaser at Closing such additional 365 Contracts or 365 Real Estate Leases pursuant to Section 365 of the U.S. Bankruptcy Code (any such additional 365 Contracts added to Section 2.1.5(a) of the Sellers Disclosure Schedule, the "**Additional Assigned and Assumed Contracts**").

(e)    The Contracts listed on the 365 Contract List and the 365 Real Estate List, as updated pursuant to Section 2.1.5(d), are those 365 Contracts and 365 Real Estate Leases for assumption and assignment by the U.S. Debtors and are collectively referred to as the "**Assumed and Assigned Contracts**".

(f)    The U.S. Debtors shall seek the approval of the U.S. Bankruptcy Court to permit (i) the assumption and assignment of all the Assumed and Assigned Contracts and (ii) if and to the extent the landlord of the applicable Assumed and Subleased Real Estate Lease or Licensed Real Estate Lease has consented to the applicable Sublease or License, the assumption of the Assumed and Subleased Real Estate Leases and the entry into Subleases in connection therewith, and the assumption of Licensed Real Estate Leases and the entry into Licenses in connection therewith in accordance with Section 5.1.

(g)    Any (x) 365 Contract not listed on the 365 Contract List, or (y) any 365 Real Estate Lease not listed on the 365 Real Estate Lease List or under which the Purchaser has not elected to enter into a Sublease pursuant to Section 2.1.5(b) or a License pursuant to Section 2.1.5(c) are those that the Purchaser has elected not to have assumed and assigned (or Subleased or Licensed) pursuant to this Section 2.1.5 and shall be referred to as an "**Excluded 365 Contract**" and shall not be an Assigned Contract hereunder.

2.1.6.    Assignment of Non-365 Contracts.

(a)    Section 2.1.6(a) of the Sellers Disclosure Schedule sets forth:

(i)    a list (the "**Non-365 Contract List**") of all the Contracts (including Inbound License Agreements that are used, as of the date hereof, exclusively in connection with the Business, but excluding any (a) other licenses of Intellectual Property, (b) 365 Contracts and (c) Leases) that the Purchaser has elected to have the relevant Seller assign to the Purchaser or a Designated Purchaser at Closing (Contracts that may be included on the Non-365 Contract List, the "**Non-365 Contracts**"); and

(ii)    a list of all the Leases other than 365 Real Estate Leases ("**Non-365 Real Estate Leases**") relating to the Business that the Purchaser has elected to have the relevant Seller assign to the Purchaser or a Designated Purchaser at Closing, in accordance with, and as provided by, the Real Estate Agreements Term Sheet (the "**Designated Non-365 Real Estate Leases**"); provided that, subject to the terms of the Real Estate Agreements Term Sheet, the applicable Seller shall have the right to repudiate any Designated Non-365 Real Estate Lease designated for assignment in the event that the Closing shall not have occurred on or before the date that is three (3) Business Days prior to the Latest Lease Rejection Date.

(b)    Section 2.1.6(b) of the Sellers Disclosure Schedule sets forth a list of Non-365 Real Estate Leases (other than the Assumed and Subleased Real Estate Leases) under which the Purchaser has elected to have the relevant Seller enter into a Sublease at Closing with the Purchaser or a Designated Purchaser to the extent permitted by, and in accordance with, the terms of the related Non-365 Real Estate Lease and applicable Law (the **"Non-365 Subleased Real Estate Leases"**), in accordance with, and as provided by, the Real Estate Agreements Term Sheet; provided, that, subject to the terms of the Real Estate Agreements Term Sheet, the applicable Seller shall have the right to repudiate any Non-365 Subleased Real Estate Lease designated for Sublease in the event that the Closing shall not have occurred on or before the date that is three (3) Business Days prior to the Latest Lease Rejection Date.

(c)    Section 2.1.6(c) of the Sellers Disclosure Schedule sets forth a list of Real Estate Leases, certain of which may be available for the Purchaser to elect to have the relevant Seller enter into a License (as defined in Section 5.33) at Closing, with the Purchaser or a Designated Purchaser to the extent permitted by, and in accordance with, (i) the terms of the related Real Estate Lease and applicable Law (the Non-365 Real Estate Leases on such Schedule, the **"Non-365 Licensed Real Estate Leases"**, such Schedule to be supplemented as expressly set forth in the Real Estate Agreements Term Sheet), and (ii) the Real Estate Agreements Term Sheet; provided, that the applicable Seller shall have the right to repudiate any Non-365 Licensed Real Estate Lease designated for License in the event that the Closing shall not have occurred on or before the date that is three (3) Business Days prior to the Latest Lease Rejection Date.

(d)    The Contracts listed in the Non-365 Contract List and the Designated Non-365 Real Estate Leases are collectively referred to as the **"Designated Non-365 Contracts"**.

(e)    Any (x) Non-365 Contract that the Purchaser has not elected to have assigned, or (y) any Non-365 Real Estate Lease that the Purchaser has not elected to have assumed and assigned pursuant to Section 2.1.6(a)(ii) or under which the Purchaser has not elected to enter into a Sublease pursuant to Section 2.1.6(b) or a License pursuant to Section 2.1.6(c), shall be referred to as an **"Excluded Non-365 Contract"** and shall not be an Assigned Contract hereunder.

(f)    Subject to Section 2.1.7(e), Section 2.1.10, Section 5.13 and the receipt of any required Consents, all the Designated Non-365 Contracts in effect as of the Closing shall be assigned to the Purchaser or a Designated Purchaser at the Closing pursuant to Section 2.1.1(d).

2.1.7.    Cure Costs; Adequate Assurance; Efforts

(a)    To the extent that assumption and assignment of any Assumed and Assigned Contract entails the payment of any Cure Cost, NNI shall, or shall cause the relevant U.S. Debtor to, pay or otherwise provide for payment of such Cure Cost as required by the U.S. Bankruptcy Code and provided in the U.S. Sale Order or such separate orders of the U.S. Bankruptcy Court approving and authorizing the assumption and assignment of such Assumed and Assigned Contract; provided that, (x) subject to Section 2.1.7(f), with respect to Assumed and Assigned Contracts that are customer contracts (other than the Additional Assigned and

Assumed Contracts), the Purchaser shall pay one-half (1/2) of such Cure Costs (such amount to be paid by the Purchaser, the "**Purchaser's Portion of Existing 365 Cure Costs**"), and (y) with respect to the Additional Assigned and Assumed Contracts, the Purchaser shall pay one-half (1/2) of the first US$5,000,000 of such Cure Costs and all of such Cure Costs in excess of the first US$5,000,000.

(b)     To the extent that assignment to the Purchaser or a Designated Purchaser of any Designated Non-365 Contract entails the payment of any Cure Cost, the relevant Main Sellers shall, or shall cause the relevant Seller to, pay such amounts directly to such counterparty, on or prior to Closing, in a manner agreed between such Main Seller or such relevant Seller, as applicable, and such counterparty or ordered by a court of competent jurisdiction; provided that, subject to Section 2.1.7(f), with respect to such Designated Non-365 Contracts that are customer contracts, the Purchaser shall pay one-half (1/2) of such Cure Costs (the "**Purchaser's Portion of Non-365 Cure Costs**" and together with the Purchaser's Portion of Existing 365 Cure Costs, the "**Purchaser's Portion of Cure Costs**").

(c)     To the extent that the assumption and sublease or license of any Assumed and Subleased Real Estate Leases or Licensed Real Estate Leases entails the payment of any Cure Cost, NNI shall, or shall cause the relevant U.S. Debtor to pay or otherwise provide for payment of such Cure Cost as required by the U.S. Bankruptcy Code. To the extent that the assignment, sublease or license to the Purchaser or a Designated Purchaser of any Non-365 Real Estate Leases or the Non-365 Subleased Real Estate Leases or Non-365 Licensed Real Estate Leases entails the payment of any amount to any party other than a Seller, the relevant Main Sellers shall, or shall cause the relevant Seller to, pay such amounts directly to such contracting party and shall offer to do so on or prior to Closing, in a manner agreed between such Main Seller or such relevant Seller, as applicable and such contracting party or ordered by a court of competent jurisdiction.

(d)     Prior to the hearing before the U.S. Bankruptcy Court to approve the assumption and assignment of the Assumed and Assigned Contracts, the Purchaser shall provide, as necessary, adequate assurance of its and the relevant Designated Purchasers' future performance under each Assumed and Assigned Contract to the parties thereto (other than the U.S. Debtors) in satisfaction of Section 365(f)(2)(B) of the U.S. Bankruptcy Code and to the extent required by the U.S. Sale Order or separate order of the U.S. Bankruptcy Court approving and authorizing the assumption and assignment of the Assumed and Assigned Contracts.

(e)     Sellers shall use reasonable best efforts, both before and after Closing, to obtain all Consents in form and substance reasonably satisfactory to the Purchaser required to permit the assignment, sublease or license, as applicable, to the Purchaser (or, if specified by the Purchaser, a Designated Purchaser) of the Assigned Contracts in force as of the Closing Date, and the entry into Subleases and Licenses, as applicable, and the Purchaser shall reasonably cooperate with Sellers to the extent necessary to obtain the same; provided, however, that the Sellers shall be under no obligation to compromise any right, asset or benefit or to expend any amount or incur any Liability in seeking such Consents (other than the payment of Cure Costs pursuant to this Section 2.1.7) and provided further that, except as set forth in Section 8.3(c), the failure to obtain any or all of such Consents shall not in itself entitle the Purchaser to terminate

this Agreement or fail to complete the transactions contemplated hereby or entitle the Purchaser to any adjustment to the Purchase Price.

(f)    Notwithstanding anything to the contrary contained in this Agreement or elsewhere, in no event shall the Purchaser's Portion of Cure Costs exceed an aggregate amount of US$2,500,000.

2.1.8.    Local Sale Agreements.Subject to the terms and conditions hereof, if reasonably requested in writing by the Purchaser to effect the Closing on the terms hereof, the relevant Sellers shall, and the Purchaser shall, and shall cause the relevant Designated Purchasers to, enter into such agreements or instruments, including bills of sale and/or assignment and assumption agreements (the "**Local Sale Agreements**"), providing for (i) the sale, transfer, assignment or other conveyance to the Purchaser and relevant Designated Purchasers, in accordance with the requirements of applicable local Law, of any Assets located in countries where such Local Sale Agreements are required or desirable, and (ii) the assumption by the Designated Purchasers of any Assumed Liability that the Purchaser intends to allocate to them.  In the event of a conflict between this Agreement and the Local Sale Agreement, this Agreement shall prevail.

2.1.9.    EMEA Asset Sale Agreement; NNSA Irrevocable Offer.Except as otherwise set forth in Section 5.26, none of the EMEA Sellers, NNSA, the Joint Administrator, or the French Administrators shall assume, or be deemed to assume, any Liability whatsoever under this Agreement and nothing in this Agreement (except to the extent expressly incorporated into EMEA Asset Sale Agreement or the NNSA Irrevocable Offer) shall apply to, or govern, the sale, assignment, transfer, retention or assumption of assets, rights, properties or Liabilities of, or by, NNSA, the French Administrators, any EMEA Sellers or the Joint Administrators in any manner whatsoever.  The only assets, rights, properties and Liabilities of NNSA or the French Administrators that are being sold, assigned or transferred to, and assumed by, the EMEA Purchaser or the EMEA Designated Purchaser(s), and the terms and conditions thereof, and representations with respect thereto, are solely as expressly set forth in the NNSA Irrevocable Offer.  The only assets, rights, properties and Liabilities of the EMEA Sellers or Joint Administrators that are being sold, assigned or transferred to, and assumed by, the EMEA Purchaser or the EMEA Designated Purchasers, and the terms and conditions thereof, and representations with respect thereto, are solely as expressly set forth in the EMEA Asset Sale Agreement.  Neither the Purchaser nor any Designated Purchaser shall be entitled to make any claim under this Agreement, or assert any right hereunder, against any Person other than the Sellers.

(b)    None of the Purchaser or any Designated Purchaser shall assume, or be deemed to assume, any Liability whatsoever under the EMEA Asset Sale Agreement or the NNSA Irrevocable Offer.

2.1.10.    Non-Assignable Assets.Notwithstanding anything in this Agreement to the contrary, if a Consent of a Third Party (including a Government Entity) has not been obtained on or prior to Closing, then, unless such Consent is subsequently obtained, this Agreement shall not constitute an agreement to sell, transfer, lease or sublease or assign, directly or indirectly, any Asset or any obligation or benefit arising thereunder if an attempted direct or

40

indirect sale, transfer, lease, sublease or assignment thereof, without such Consent, would constitute a breach, default, violation or other contravention of the rights of such Third Party or would be ineffective with respect to any party to a Contract concerning such Asset; provided, however, that the Sellers shall use their reasonable best efforts to cooperate with the Purchaser in connection with any commercially reasonable arrangement to provide the Purchaser the same interest, benefits and rights with respect to such Asset as the applicable Seller had immediately prior to the Closing.  For greater certainty, except as set forth in Section 8.3(c), failure to obtain any such Consent shall not entitle the Purchaser to terminate or rescind this Agreement or fail to complete the transactions contemplated hereby or entitle the Purchaser to any adjustment of the Purchase Price.

     Section 2.2.   Purchase Price.

     2.2.1.   Purchase Price.Pursuant to the terms and subject to the conditions set forth in this Agreement, in consideration of the sale, transfer and assignment of the Assets pursuant to the terms hereof, and of the rights granted by certain Sellers under the Intellectual Property License Agreement and the Trademark License Agreement, the Purchaser, on its own behalf and as agent for the relevant Designated Purchasers, shall (x) assume and become obligated to pay, perform and discharge, when due, the Assumed Liabilities and (y) pay to the Distribution Agent an amount of cash (the "**Purchase Price**") equal to Seventy Million dollars (US$70,000,000) to be adjusted pursuant to Section 2.2.3 of this Agreement.

     2.2.2.   Estimated Purchase Price.

     (a)    For purposes of determining the amount of cash to be paid as the Estimated Purchase Price by the Purchaser to the Sellers at the Closing pursuant to Section 2.3.2(c), at least three (3) Business Days prior to the Closing Date, the Main Sellers shall deliver to the Purchaser a statement prepared in good faith in accordance with the Calculation Principles (in all cases without double-counting of Cure Costs) and the terms hereof setting forth:

     (i)    the estimated amount of the Inventory Value as of the Closing Date (the "**Estimated Inventory Value**");

     (ii)    the estimated amount of the CIP Receivables Amount as of the Closing Date (the "**Estimated CIP Receivables Amount**");

     (iii)    the estimated amount of the Warranty Provision Amount as of the Closing Date (the "**Estimated Warranty Provision Amount**");

     (iv)    the estimated amount of the Accrued Vacation Amount as of the Closing Date (the "**Estimated Accrued Vacation Amount**");

     (v)    the estimated amount of the Contractual Liability Amount as of the Closing Date (the "**Estimated Contractual Liability Amount**");

     (vi)    the estimated amount of the Deferred Revenue Liability Amount as of the Closing Date (the "**Estimated Deferred Revenue Liability Amount**");

(vii)    the estimated amount of the Royalty Liability Amount as of the Closing Date (the "**Estimated Royalty Liability Amount**");

(viii)   the estimated amount of the Adjusted Net Working Capital (the "**Estimated Adjusted Net Working Capital**"); and

(ix)    the Estimated Purchase Price.

(b)    As used in this Agreement, "**Estimated Purchase Price**" means an amount equal to:

(i)    the Purchase Price; plus

(ii)    an amount, which may be positive or negative, equal to the Estimated Adjusted Net Working Capital plus US$19,200,000; minus

(iii)   the Estimated Accrued Vacation Amount; minus

(iv)    the China Purchase Amount.

(c)    As used in this Agreement and shown in the attached Adjusted Net Working Capital Statement in Exhibit **O**, the "**Adjusted Net Working Capital**" means an amount equal to:

(i)    the Inventory Value; plus

(ii)    the CIP Receivables Amount; minus

(iii)   the Warranty Provision Amount; minus

(iv)    the Contractual Liability Amount; minus

(v)    the Deferred Revenue Liability Amount; minus

(vi)    the Royalty Liability Amount.

2.2.3.    Purchase Price Adjustment.

2.2.3.1    Closing Statement; Dispute Resolution.

(a)    As promptly as practicable after the Closing (and in any event within thirty (30) days after the Closing), the Purchaser shall deliver to the Main Sellers a written statement (the "**Closing Statement**"), which shall be prepared in accordance with the Calculation Principles and the terms hereof (in each case to the extent applicable) and contain the Purchaser's final calculation of:

(i)    the Inventory Value as of the Closing (the "**Closing Inventory Value**");

(ii)    the CIP Receivables Amount as of the Closing (the "**Closing CIP Receivables Amount**");

(iii)    the Warranty Provision Amount as of the Closing (the "**Closing Warranty Provision Amount**");

(iv)    the Accrued Vacation Amount as of the Closing Date (the "**Closing Accrued Vacation Amount**");

(v)    the Contractual Liability Amount as of the Closing Date (the "**Closing Contractual Liability Amount**");

(vi)    the Deferred Revenue Liability Amount as of the Closing Date (the "**Closing Deferred Revenue Liability Amount**");

(vii)    the Royalty Liability Amount as of the Closing Date (the "**Closing Royalty Liability Amount**");

(viii)    the Adjusted Net Working Capital as of the Closing (the "**Closing Adjusted Net Working Capital**");

(ix)    the Accrued Vacation Amount as of the Closing Date; and

(x)    the final Purchase Price adjusted as provided in this Section and based on the foregoing (the "**Final Purchase Price**"), which shall be equal to:

(A)    the Purchase Price; <u>plus</u>

(B)    an amount, which may be positive or negative, equal to the Closing Adjusted Net Working Capital <u>plus</u> US$19,200,000; <u>minus</u>

(C)    the Closing Accrued Vacation Amount; <u>minus</u>

(D)    the China Purchase Amount.

(b)    If the Main Sellers disagree with the determination of the Closing Statement, the Main Sellers shall notify the Purchaser of such disagreement within thirty (30) days after delivery of the Closing Statement (such notice, the "**Disagreement Notice**"). The Disagreement Notice shall set forth, in reasonable detail, any disagreement with, and any requested adjustment to, the Closing Statement. If the Main Sellers fail to deliver the Disagreement Notice by the end of such thirty- (30-) day period, the Main Sellers shall be deemed to have accepted as final the Closing Statement delivered by the Purchaser. Matters included in the calculations in the Closing Statement to which the Main Sellers do not object in the Disagreement Notice shall be deemed accepted by the Main Sellers and shall not be subject to further dispute or review. Throughout the periods during which the Closing Statement is being prepared and any disputes that may arise under this Section 2.2.3 are being resolved, the Purchaser shall, promptly upon request, provide the Main Sellers and their accountants access to the books, records and personnel of the Business and all documents, schedules and workpapers

used by the Purchaser in the preparation of the Closing Statement or that are otherwise reasonably necessary for the Main Sellers and their accountants to review the Closing Statement (other than any such documents, schedules, workpapers and other information the disclosure of which could jeopardize any attorney-client or legal privilege or contravene any applicable Law, fiduciary duty or agreement; it being understood, however, that Purchaser and the Designated Purchasers shall cooperate in any reasonable efforts and requests for waivers that would enable otherwise required disclosure to the Main Sellers or their representatives to occur without so jeopardizing privilege or contravening such Law, duty or agreement). The Main Sellers and the Purchaser shall negotiate in good faith to resolve any disagreement with respect to the Closing Statement, and any resolution agreed to in writing by the Main Sellers and the Purchaser shall be final and binding upon the Parties.

(c)     If the Main Sellers and the Purchaser are unable to resolve any disagreement as contemplated by Section 2.2.3.1(b) within thirty (30) days after delivery of a Disagreement Notice by the Main Sellers, the Independent Auditor shall serve as arbitrator (the "**Accounting Arbitrator**") to resolve such disagreement. The Primary Parties shall instruct the Accounting Arbitrator to consider only those items and amounts set forth in the Closing Statement as to which the Main Sellers and the Purchaser have not resolved their disagreement and to conduct such hearing as it considers necessary to resolve such disagreement. The Main Sellers and the Purchaser shall use their reasonable efforts to cause the Accounting Arbitrator to deliver to the Primary Parties, as promptly as practicable (and in no event later than fifteen (15) days after its appointment), a written report setting forth the resolution of any such disagreement determined in accordance with the terms of this Agreement. Such report and the Closing Statement, as adjusted thereby, shall be final and binding upon the Sellers and the Purchaser. In the event the Accounting Arbitrator concludes that the Purchaser was correct as to a majority (by dollar amount) of the disputed items, then the Sellers shall pay the Accounting Arbitrator's fees, costs and expenses. In the event the Accounting Arbitrator concludes that the Main Sellers were correct as to a majority (by dollar amount) of the disputed items, then the Purchaser shall pay the Accounting Arbitrator's fees, costs and expenses.

2.2.3.2     Calculation and Payment of the Purchase Price Adjustment.

(a)     If the Final Purchase Price, as finally determined in accordance with this Section 2.2.3, is less than the Estimated Purchase Price, then the Main Sellers shall cause the Distribution Agent to pay to the Purchaser, acting on its own behalf and as agent of the Designated Purchasers, the excess of the Estimated Purchase Price over the Final Purchase Price.

(b)     If the Final Purchase Price, as finally determined in accordance with this Section 2.2.3, exceeds the Estimated Purchase Price, the Purchaser, acting on its own behalf and as agent of the Designated Purchasers, shall pay to the Distribution Agent the amount by which the Final Purchase Price exceeds the Estimated Purchase Price.

(c)     Any payment to be made under this Section 2.2.3.2 shall include interest thereon calculated from the Closing Date to the date of payment at a rate per annum of three (3)%. Such interest shall accrue from day to day.

(d)     All amounts payable under this Section 2.2.3.2 to any Party shall be paid in cash by wire transfer of immediately available funds to the bank account(s) designated in writing by the Main Sellers in case of payment to the Distribution Agent or by the Purchaser in case of payment to the Purchaser within five (5) Business Days of the final determination of the Closing Statement in accordance with Section 2.2.3.1.

2.2.4.   Good Faith Deposit.

(a)     The Purchaser has delivered to the Escrow Agent an amount in United States dollars equal to US$5,000,000 (the "**Good Faith Deposit**") in the form of wire transfer of immediately available funds to serve as earnest money under this Agreement.

(b)     The Good Faith Deposit shall:

(i)     be held by the Escrow Agent and shall not become property of the Sellers or the bankruptcy estates of the Sellers that have commenced Bankruptcy Proceedings;

(ii)     be applied to the Estimated Purchase Price to be paid by the Purchaser pursuant to Section 2.3.2(c) and therefore be paid by the Escrow Agent to the Distribution Agent (as agent of the Sellers) pursuant to Section 2.3.2(d) at Closing; or

(iii)     be returned to the Purchaser, within three (3) Business Days after the termination of this Agreement, free and clear of any claim, counterclaim, offset, recoupment Lien or encumbrance; provided, that in the case of (x) termination of this Agreement by the Sellers pursuant to Section 9.1(c)(i) or (y) termination by the EMEA Sellers of the EMEA Asset Sale Agreement pursuant to Clause 15.4.3 thereof (material breach thereof by the EMEA Purchaser that is not or could not be cured in accordance with the terms thereof), the Good Faith Deposit shall become the property of the Main Sellers.

Section 2.3.   Closing.

2.3.1.   Closing Date.The completion of the purchase and sale of the Assets and the assumption of the Assumed Liabilities (the "**Closing**") shall occur simultaneously with the closing of the transaction contemplated by the EMEA Asset Sale Agreement, and shall take place at the offices of Cleary Gottlieb Steen & Hamilton LLP in New York, New York, commencing at 12:00 p.m. local time on the date which is five (5) Business Days after the day upon which all of the conditions set forth under ARTICLE VIII (other than conditions to be satisfied at the Closing, but subject to the waiver or fulfillment of those conditions) have been satisfied or, if permissible, waived by the Main Sellers and/or the Purchaser (as applicable), or on such other place, date and time as shall be mutually agreed upon in writing by the Purchaser and the Main Sellers (the day on which the Closing takes place being the "**Closing Date**").

Subject to the terms and conditions of this Agreement, legal title, equitable title and risk of Loss with respect to the Assets will transfer to the Purchaser or the relevant Designated Purchaser, and the Assumed Liabilities will be assumed by the Purchaser and the relevant Designated Purchasers, at the Closing.

45

2.3.2.    Closing Actions and Deliveries. At the Closing:

(a)    the Sellers and the Purchaser shall, and shall cause their respective Affiliates to, enter into (i) the Ancillary Agreements to which it is contemplated that they will be parties, to the extent such agreements have not yet been entered into (except as otherwise provided in the Real Estate Agreements Term Sheet) and subject to Section 5.26, and (ii) instruments of assignment and assumption effecting the transfer of the Assets and the Transferred Intellectual Property from the Sellers to the Purchaser or the Designated Purchaser(s), as applicable;

(b)    each Seller shall deliver to the Purchaser:

(i)    in the case of a Seller that is a "United States person" within the meaning of Section 7701 of the Code and applicable Treasury Regulations, a duly executed certificate of non-foreign status in accordance with Section 1445 of the Code and applicable Treasury Regulations; and

(ii)    (x) a duly executed certificate certifying that such Seller is not a non-resident of Canada for purposes of section 116 of the Income Tax Act (Canada), or (y) in the case of a Seller that is a non-resident of Canada for purposes of section 116 of the Income Tax Act (Canada), a duly executed certificate certifying that the Assets transferred or assigned to the Purchaser pursuant to this Agreement or any of the other Transaction Documents by such Seller do not include any taxable Canadian property as defined in the Income Tax Act (Canada), of such non-resident Seller;

(c)    the Purchaser shall deliver:

(i)    to the Distribution Agent, an amount equal to the Estimated Purchase Price, less the Good Faith Deposit, less the TSA Escrow Amount, by wire transfer in immediately available funds to an account or accounts designated at least two (2) Business Days prior to the Closing Date by the Main Sellers in a written notice to the Purchaser; and

(ii)    to the Main Sellers, a duly executed certificate of an executive officer of the Purchaser certifying the fulfillment of the conditions set forth in Section 8.2;

(d)    NNL, NNI and NNUK shall cause the Escrow Agent to deliver to the Distribution Agent (as agent for the Sellers) all amounts of cash held by the Escrow Agent by wire transfer in immediately available funds to an account or accounts designated at least two Business Days prior to the Closing Date by the Distribution Agent in a written notice to NNL, NNI and NNUK;

(e)    NNI shall deliver or cause to be delivered:

(i)    an updated Section 4.10(b) of the Sellers Disclosure Schedule (if applicable) with respect to those Employees who have accepted Purchaser's or the Designated Purchaser's offer of employment pursuant to Section 7.1.1 or whose

46

employment will transfer to the Purchaser or Designated Purchaser by operation of Law, dated as of a date no earlier than three (3) days prior to the Closing; and

        (ii)      a duly executed certificate of an executive officer of NNI certifying the fulfillment of the conditions set forth in Section 8.3; and

        (f)      each Party shall deliver, or cause to be delivered, to the other any other documents reasonably requested by such other Party in order to effect, or evidence the consummation of, the transactions contemplated herein.

        Section 2.4.    Designated Purchaser(s).

        (a)      The Purchaser shall be entitled to designate, in accordance with the terms and subject to the limitations set forth in this Section 2.4, one or more Affiliates of the Purchaser, the EMEA Purchaser or one or more Affiliates of the EMEA Purchaser to (i) purchase specified Assets (including specified Assigned Contracts), (ii) assume specified Assumed Liabilities, and/or (iii) employ Transferred Employees on and after the Closing Date (any Affiliate of the Purchaser that shall be properly designated by the Purchaser in accordance with this clause, a **"Designated Purchaser"**); it being understood and agreed, however, that any such right of the Purchaser to designate a Designated Purchaser is conditioned upon (x) such Designated Purchaser being able to perform the applicable covenants under Section 2.1.7 and ARTICLE VII and demonstrate satisfaction of the applicable requirements of Section 365 of the U.S. Bankruptcy Code (to the extent applicable), including the provision of adequate assurance for future performance, with respect to the Assumed and Assigned Contracts and (y) any such designation not creating any Liability (including any Liability relating to Taxes) for the Sellers or their Affiliates that would not have existed had the Purchaser purchased the relevant Assets, assumed the relevant Specified Employee Liabilities and/or employed the relevant Transferred Employees; provided, further, however, that the Sellers acknowledge and agree that each of Ericsson Inc., Ericsson Canada Inc., or Ericsson AB (each, a **"Confirmed Designated Purchaser"**) shall be deemed to satisfy the foregoing conditions and may be a Designated Purchaser. In addition, the EMEA Purchaser shall be a Confirmed Designated Purchaser; provided that, unless otherwise agreed by the Main Sellers, (i) the EMEA Purchaser shall not assume any Assumed Liabilities, and (ii) such designation shall not result in any material delay in the consummation of the transactions contemplated hereunder. If the designation of a Confirmed Designated Purchaser creates any Liability relating to Taxes for the Sellers or their Affiliates that would not have existed had the Purchaser purchased the relevant Assets, the Purchaser or the Designated Purchasers shall, notwithstanding anything to the contrary in Article VI, pay such additional amounts to the Sellers such that the total amount received by the applicable Sellers, after reducing such amount by the additional Liability relating to Taxes for the Sellers or their Affiliates created by the designation of such Confirmed Designated Purchaser, will equal the full amount such Seller would have received from the Purchaser had the designation not been made. No such designation shall relieve the Purchaser of any of its obligations hereunder and any breach hereof by a Designated Purchaser shall be deemed a breach by Purchaser. Except if the Designated Purchaser is a Confirmed Designated Purchaser, the Purchaser and each Designated Purchaser shall be jointly and severally liable for any obligations delegated or assigned to or assumed by any of them hereunder.

(b)    The above designation shall be made by the Purchaser by way of a written notice to be delivered to the Sellers as soon as reasonably practicable after the date hereof and in no event later than the fifteenth (15th) day prior to the Closing, which written notice shall (i) for any Designated Purchasers other than the Confirmed Designated Purchasers, contain appropriate information about the Designated Purchaser(s), (ii) indicate which Assets, Assumed Liabilities and Transferred Employees the Purchaser intends such Designated Purchaser(s) to purchase, assume and/or employ, as applicable, hereunder and (iii) include a signed counterpart to this Agreement in a form acceptable to the Main Sellers, agreeing to be bound by the terms of this Agreement as Designated Purchaser(s) and authorizing the Purchaser to act as such Designated Purchaser(s)' agent for all purposes hereunder.

## ARTICLE III

## REPRESENTATIONS AND WARRANTIES OF THE PURCHASER

The Purchaser hereby represents and warrants to the Sellers as follows:

Section 3.1.    Organization and Corporate Power.

(a)    The Purchaser is a corporation duly organized, validly existing and in good standing under the Laws of Sweden. Each of the Purchaser and the Designated Purchasers has the requisite corporate power and authority to (i) enter into, deliver and perform its obligations pursuant to each of the Transaction Documents to which it is or will become a party and (ii) to own, lease and operate its assets and to carry on its business as it is now being conducted.

(b)    Each of Purchaser and the Designated Purchasers is duly qualified or licensed to own or lease and operate its properties and assets (including the Assets), and is in good standing, in each jurisdiction in which its ownership of assets or operation of business requires it to so qualify or to be so licensed, except to the extent that the failure to be so qualified or licensed would not materially hinder, delay or impair the Purchaser's or any such Designated Purchaser's ability to carry out its obligations under, and to consummate the transactions contemplated by, this Agreement and the Ancillary Agreements to which it is or will become a party.

Section 3.2.    Authorization; Binding Effect; No Breach.

(a)    The execution, delivery and performance of each Transaction Document to which the Purchaser or any of the Designated Purchasers is a party have been duly authorized by the Purchaser and the relevant Designated Purchasers, as applicable. This Agreement has been duly executed and delivered by the Purchaser, and the other Transaction Documents to which the Purchaser or any Designated Purchaser is, or on the Closing Date will become, a party have been or will be duly executed and delivered by the Purchaser and each Designated Purchaser party thereto. Assuming due authorization, execution and delivery by the relevant Sellers, each Transaction Document to which the Purchaser or any Designated Purchaser is a party constitutes, or upon execution thereof will constitute, a valid and binding obligation of the Purchaser or such Designated Purchaser, as applicable, enforceable against such Person in

48

accordance with its respective terms, except as such enforceability is limited by bankruptcy, insolvency, reorganization, moratorium or other Laws affecting creditors' rights generally and subject to general principles of equity, regardless of whether considered in a proceeding in equity or at Law.

(b)     The execution, delivery and performance by each of the Purchaser and the Designated Purchasers of the Transaction Documents to which the Purchaser or such Designated Purchaser is, or on the Closing Date will be, a party do not and will not conflict with or result in a breach of the terms, conditions or provisions of, constitute a default under, result in a violation of, give to any Person any right of termination, amendment, modification, acceleration or cancellation or any preemptive right or right to the payment of any penalty under, or require any Consent (other than the Regulatory Approvals) or other action by or declaration or notice to any Government Entity pursuant to (i) the articles, charter or by-laws of the Purchaser or the relevant Designated Purchaser, (ii) any material Contract to which the Purchaser or the relevant Designated Purchaser is a party or to which any of its assets is subject or (iii) any Laws to which the Purchaser, the relevant Designated Purchaser, or any of their assets is subject, except, in the case of (ii) and (iii) above, for such defaults, violations, actions and notifications that have not materially hindered, delayed or impaired, and would not reasonably be expected to, individually or in the aggregate, materially hinder, delay or impair, the performance by the Purchaser or the Designated Purchasers of any of their obligations under the Transaction Documents.

Section 3.3.    Financing.

The Purchaser has, as of the date hereof, and will have as of the Closing (i) sufficient funds available for purposes of funding the transactions contemplated herein and paying any other amount due hereunder or in respect hereof and (ii) the resources and capabilities (financial or otherwise) to perform its obligations hereunder. The Purchaser has not, as of the date hereof, and will not have as of the Closing, incurred any obligation, commitment, restriction or liability of any kind, which would materially impair or adversely affect such resources and capabilities. Notwithstanding anything to the contrary herein, the Purchaser's obligations to consummate the transactions contemplated by this Agreement are not conditioned or contingent in any way upon the receipt of financing from any Person.

Section 3.4.    Adequate Assurance of Future Performance.

To the extent required by any Bankruptcy Laws or other Laws, the Purchaser will be able to provide, at Closing or on such earlier date as is designated by the U.S. Bankruptcy Court, adequate assurance of its and/or the relevant Designated Purchasers' future performance under each Assumed and Assigned Contract to the parties thereto (other than the U.S. Debtors) in satisfaction of Section 365(f)(2)(B) of the U.S. Bankruptcy Code, and no other or further assurance will be necessary thereunder with respect to any Assumed and Assigned Contract.

Section 3.5.    Purchaser's Acknowledgments; Exclusivity of Representations and Warranties.

(a)     The Purchaser acknowledges and agrees that:

(i) except for the representations and warranties expressly set forth herein or in any Ancillary Agreement, the Purchaser has not relied on any representation or warranty from the Sellers or any Affiliate of the Sellers or any employee, officer, director, accountant, financial, legal or other representative of the Sellers or their Affiliates in determining whether to enter into this Agreement;

(ii) except for the representations and warranties expressly set forth herein or in any Ancillary Agreement, none of the Sellers, any Affiliates of the Sellers or any employee, officer, director, accountant, financial, legal or other representative of the Sellers or their Affiliates has made any representation or warranty, express or implied, as to the Business (or the value or future thereof), the Assets, (including any implied representation or warranty as to the condition, merchantability, suitability or fitness for a particular purpose of any of the Assets, including under the International Convention on Contracts for the Sale of Goods (Geneva Convention) and any other applicable sale of goods Laws), the Assumed Liabilities, or the accuracy or completeness of any information regarding any of the foregoing that the Sellers or any other Person furnished or made available to the Purchaser and its representatives (including any projections, estimates, budgets, offering memoranda, management presentations or due diligence materials); and

(iii) the enforceability of this Agreement against the Sellers is subject to receipt of the Bankruptcy Consents.

Section 3.6. <u>Brokers.</u>Except for fees and commissions that will be paid by the Purchaser, no broker, finder or investment banker is entitled to any brokerage, finder's or similar fee or commission in connection with the transactions contemplated by this Agreement and the other Transaction Documents based upon arrangements made by or on behalf of the Purchaser or any of its Affiliates.

## ARTICLE IV

## REPRESENTATIONS AND WARRANTIES OF THE SELLERS

Except (a) as set forth in the Sellers Disclosure Schedule, (b) as expressly contemplated by this Agreement or (c) to the extent relating to the Excluded Assets or the Excluded Liabilities, each of the Main Sellers jointly and severally represents and warrants to the Purchaser as set forth in this ARTICLE IV:

Section 4.1. <u>Organization and Corporate Power.</u>

(a) Each Seller is duly organized and validly existing and in good standing under the Laws of the jurisdiction in which it is organized.  Subject to entry of the U.S. Sale Order in the case of the U.S. Debtors and the Canadian Approval and Vesting Order in the case of the Canadian Debtors and receipt of other Consents from the U.S. Bankruptcy Court and the Canadian Court in connection with the transactions contemplated hereby and in the other Transaction Documents (collectively, the "**Bankruptcy Consents**"), each of the Sellers has the requisite corporate power and authority to (i) enter into, deliver and perform its obligations

pursuant to each of the Transaction Documents to which it is or will become a party and (ii) own, lease and operate its assets, including the Assets, as applicable, and to carry on the Business as it is now being conducted.

(b)     Each of the Sellers is duly qualified or licensed to do business and to own, lease and operate its assets, including the Assets, and to carry on the Business as it is currently being conducted, as applicable in each jurisdiction in which its ownership of property or conduct of business relating to the Business requires it to so qualify or to be so licensed and is in good standing in each jurisdiction in which its ownership of property or conduct of business relating to the Business requires it to so qualify or be licensed, except to the extent that the failure to be so qualified, licensed or in good standing would not have, or would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

Section 4.2.    Authorization; Binding Effect; No Breach.

(a)     Subject to the receipt of the Bankruptcy Consents (i) the execution, delivery and performance by each Main Seller of the Transaction Documents to which such Main Seller is, or at the Closing will be, a party have been duly authorized by such Main Seller and (ii) the execution, delivery and performance by each Other Seller of the Transaction Documents to which such Seller will be a party will have been duly authorized by such Other Seller by the time such Other Seller executes this Agreement.  Subject to receipt of the Bankruptcy Consents, and assuming due authorization, execution and delivery by the Purchaser and the Designated Purchasers parties thereto, the Transaction Documents to which any Seller is or will be a party, will constitute, a legal, valid and binding obligation of such Seller, enforceable against it in accordance with its terms, subject to (in the case of Non-Debtor Sellers) applicable bankruptcy, insolvency, reorganization, moratorium or other Laws affecting creditors' rights generally and subject to general principles of equity, regardless of whether considered in a proceeding in equity or at Law.

(b)     Subject to receipt of the Bankruptcy Consents and the Regulatory Approvals, the execution, delivery and performance by each Seller of the Transaction Documents to which such Seller is, or on the Closing Date will be, a party do not and will not conflict with or result in a breach of the terms, conditions or provisions of, constitute a default under, result in a violation of, result in the creation or imposition of any Lien upon any of the Assets, or (subject to the receipt of Consents in connection with the Assigned Contracts and any other Consents expressly provided for herein) require any Consent (other than the Regulatory Approvals and the Bankruptcy Consents) or other action by or declaration or notice to any Government Entity pursuant to (i) the articles, charter or by-laws of the relevant Sellers, (ii) any Material Contract to which the relevant Seller is a party or to which any of its or their assets are subject, (iii) any order of any Government Entity applicable to any Seller or by which any of their respective properties or Assets are bound or (iv) any Laws to which any of the Sellers, or any of the Assets are subject, except, in the case of (ii), (iii) and (iv) above, for such defaults, violations, actions and notifications that would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

Section 4.3.    Title to Tangible Assets.

Except for Permitted Encumbrances, the Owned Inventory and the Owned Equipment is owned beneficially by one or more of the Sellers, free and clear of all Liens, and such Sellers have good and marketable title thereto.

Section 4.4.    Material Contracts.

(a)    Section 4.4(a) of the Sellers Disclosure Schedule sets forth, as of the date hereof, a list of every Seller Contract but excluding all licenses of Intellectual Property, all of which are addressed in Section 4.5 below, other than purchase orders and invoices and any third-party or intercompany agreements related to Overhead and Shared Services, that:

(i)    in the most recent fiscal year of the Main Sellers resulted in, or is reasonably expected by its terms in the future to result in, (A) the payment of more than US$7,500,000 per annum in the aggregate or (B) the receipt by the Business of more than US$7,500,000 per annum in the aggregate, except any Contracts referred to in any other subsection;

(ii)    materially restricts the Business from engaging in any business activity anywhere in the world;

(iii)    is a material joint venture, partnership or alliance Contract;

(iv)    is a research and development Contract involving consideration or expenditures in excess of US$7,500,000 per annum;

(v)    is a manufacturing or supply Contract involving the purchase of Products for the Business;

(vi)    contains (i) any non-competition, non-solicitation or similar agreements or arrangements or (ii) any "earn-out" or similar agreements or arrangements; or

(vii)    is a Contract with a Government Entity

(all the above, collectively, the "**Material Contracts**").

(b)    The Sellers have made available to the Purchaser true, correct and complete copies of all of the Seller Contracts. Each Seller Contract is legal, valid, binding and enforceable against the Seller party thereto and, to the Knowledge of Seller, each other party thereto and is in full force and effect (in each case, subject to the Bankruptcy Proceedings and subject to applicable bankruptcy, insolvency, reorganization, moratorium or other Laws affecting creditors' rights generally and subject to general principles of equity, regardless of whether considered in a proceeding in equity or at Law).

(c)    As of the date hereof, except as disclosed in Section 4.4(c) of the Sellers Disclosure Schedule, the Sellers (or any Affiliate of the Sellers) have not been notified in writing

that any of them is in breach or default under any Material Contract (other than as a result of the Bankruptcy Proceedings), and, to the Knowledge of Seller, no other party to any Material Contract is in breach or default thereof, nor have the Sellers or any of their respective Affiliates been notified in writing of such other party's intention to terminate any Material Contract.

(d)     Since December 31, 2008, the Sellers (or any Affiliate of the Sellers) have not received written notification that any of the customers or suppliers party to the Material Contracts intends to materially reduce the level of Products it purchases from the Business subsequent to Closing or materially reduce the level of supplies it provides to the Business subsequent to Closing, as applicable.

Section 4.5.    Intellectual Property.

(a)     The Transferred Intellectual Property and the Licensed Intellectual Property and the Intellectual Property licensed to the Sellers and/or their Affiliates under the Inbound License Agreements and the Patent Cross Licenses include all the material Intellectual Property that, as of the date hereof, is used in connection with the conduct and operation of the Business, except with respect to any Intellectual Property included in Overhead and Shared Services.

(b)     A list of all the Transferred Intellectual Property registered in the name of the Sellers is set forth in Section 4.5(b) of the Sellers Disclosure Schedule (such listed Intellectual Property, the "**Business Registered IP**"). To the Knowledge of the Sellers, the Business Registered IP is subsisting and in full force and effect. The foregoing will not be construed as a warranty that any Patent or Trademark will issue or be registered based on any application.

(c)     The Transferred Intellectual Property is not subject to any Liens other than Permitted Encumbrances. The Sellers own all material rights, title and interest in and to each such item of Transferred Intellectual Property.

(d)     Except as set forth in Section 4.5(d) of the Sellers Disclosure Schedule, to the Knowledge of the Sellers, no Seller has received any written assertions during the two (2) years prior to the date hereof alleging that: (i) a Seller's operations of the Business, including such Seller's use, performance, licensing, copying, distribution, sale, offer for sale, lease, manufacture, having made, importation, or any other exploitation of the Products sold by the Business or of the Services rendered by the Business infringes, misappropriates or violates any Intellectual Property right of any Third Party; or (ii) the use or exploitation of any of the Transferred Intellectual Property infringes or violates any Intellectual Property of or was misappropriated from a Third Party.

(e)     To the Knowledge of the Sellers, as of the date hereof, there has been no assertion or claim made in writing to Sellers during the two (2) years prior to the date hereof asserting invalidity, misuse or unenforceability of any Transferred Intellectual Property or challenging the Sellers' right to use, right to transfer, or ownership of the Transferred Intellectual Property.

(f)     Section 4.5(f)(i) of the Sellers Disclosure Schedule sets forth a list of Patent Cross Licenses, indicating for each Patent Cross License, the title and the parties thereto, except to the extent a Patent Cross License prohibits disclosure of its existence without consent of the relevant Third Party, which consent the Sellers were unable to reasonably obtain, in which case such Patent Cross License has been omitted from Section 4.5(f)(i) of the Sellers Disclosure Schedule.  Section 4.5(f)(ii) of the Sellers Disclosure Schedule sets forth a list of all material Contracts granting to the Sellers or any of their Affiliates any license under or to any Intellectual Property owned by a Third Party (other than Patent Cross Licenses) that is, as of the date hereof, incorporated in or used in connection with the design, development, testing, manufacturing, sale, distribution, support or servicing of any Products or the provision of Services (collectively, the "**Inbound License Agreements**"), indicating for each Inbound License Agreement, the title and the parties thereto, except to the extent an Inbound License Agreement prohibits disclosure of its existence without consent of the relevant Third Party, which consent the Sellers were unable to reasonably obtain, in which case such agreement has been omitted from Section 4.5(f)(ii) of the Sellers Disclosure Schedule, but the number of such Inbound License Agreements that have been omitted is set out in Section 4.5(f)(ii) of the Sellers Disclosure Schedule and the Sellers shall use reasonable efforts to provide such other information as reasonably requested by the Purchaser regarding such Inbound License Agreements, the disclosure of which does not breach such prohibition.  Section 4.5(f)(iii) of the Sellers Disclosure Schedule sets forth a list of all material Contracts (other than Patent Cross Licenses) under which the Sellers grant a license to a Third Party under Transferred Patents where the predominant purpose of the Contract is the grant of a Patent license (collectively, the "**Outbound License Agreements**"), indicating for each Outbound License Agreement the title and the parties thereto, except to the extent an Outbound License Agreement prohibits disclosure of its existence without consent of the relevant Third Party, which consent the Sellers were unable to reasonably obtain, in which case such agreement has been omitted from Section 4.5(f)(iii) of the Sellers Disclosure Schedule, but the number of such Outbound License Agreements that have been omitted is set out in Section 4.5(f)(iii) of the Sellers Disclosure Schedule and the Sellers shall use reasonable efforts to provide such other information as reasonably requested by the Purchaser regarding such Outbound License Agreements, the disclosure of which does not breach such prohibition.

(g)     To the Knowledge of the Sellers, Section 4.5(g) of the Sellers Disclosure Schedule sets forth a list of any Open Source Software incorporated into any of the Products and, whenever possible, describes (i) the specific Open Source Software used; (ii) the specific Open Source Software version; (iii) the vendor of the specific Open Source Software; and (iv) the Products or portions thereof into which such Open Source Software is incorporated.

(h)     Notwithstanding any provision herein to the contrary, this Section 4.5 consists of the sole representation and warranty in this Agreement regarding non-infringement, non-violation and non-misappropriation of Intellectual Property.

Section 4.6.    <u>Litigation.</u>As of the date hereof, except for the Bankruptcy Proceedings, there is no Action pending or, to the Knowledge of the Sellers, threatened before any Government Entity against, involving or affecting the Business or the Assets, that would be reasonably expected to result in, individually or in the aggregate, a Material Adverse Effect. As of the date hereof, except for Orders and settlements entered in connection with the Bankruptcy Proceedings, there is no Order or settlement to which Sellers are subject that directly and

materially affects or restricts the ownership of the Assets, Assumed Liabilities or the Business, and no Action is pending or, to the Knowledge of Sellers, threatened against the Sellers that questions the validity of this Agreement or the Transaction Documents or any action taken or to be taken by the Sellers in connection with this Agreement or the Transaction Documents.

Section 4.7.    Financial Statements.Section 4.7 of the Sellers Disclosure Schedule sets forth the unaudited management statements of certain assets and liabilities of the Business and the other GSM and GSM-R infrastructure businesses conducted by the Sellers and the EMEA Sellers as of September 30, 2009 (the "**Balance Sheet Date**") and the related unaudited management statements of income of the Business and the other GSM and GSM-R infrastructure businesses conducted by the Sellers and the EMEA Sellers for the one- (1-) year period ended on the Balance Sheet Date (together, the "**Financial Statements**"). Except as set forth in the Financial Statements, such Financial Statements were prepared based on the financial books and records maintained by the Sellers and their Affiliates for the Business and the other GSM and GSM-R infrastructure businesses conducted by the Sellers and the EMEA Sellers on the basis of the Nortel Accounting Principles and represent Sellers' good faith estimate of the selected balance sheet accounts and income statements set forth therein for the Business and the other GSM and GSM-R infrastructure businesses conducted by the Sellers and the EMEA Sellers, in each case as of the dates and for the periods presented therein. The Financial Statements (a) have not been prepared in accordance with GAAP, (b) include estimated costs that do not necessarily represent the costs that were actually allocated to the Business for the relevant periods (or that the Business will incur after the Closing), (c) include assets that have not been tested for impairment or otherwise adjusted for fair value, (d) reflect the estimated historical operation of the Business and the other GSM and GSM-R infrastructure businesses conducted by the Sellers and the EMEA Sellers (including the Overhead and Shared Services and the Excluded Assets) for the periods specified therein and (e) do not represent the balance sheet accounts or the income statements that would have occurred if the Business had been operated by the Sellers as a "stand alone" entity.

Section 4.8.    Compliance with Laws; Consents.

(a)    To the Knowledge of the Sellers, no Seller is in violation of any applicable Law in connection with the Business, in each case except for such violations as would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect. None of the Sellers has received any written notice or written claims from any Government Entity within the twelve (12) months preceding the date hereof relating to any material non-compliance of the Business or the Assets with any applicable Law nor are there, any such notice or claims threatened or pending, except where such claims would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

(b)    To the Knowledge of the Sellers, (i) all the Consents of Government Entities necessary for, or otherwise material to, the conduct of the Business as conducted by the Seller on the date hereof, have been duly obtained and are in full force and effect and (ii) the relevant Sellers are in compliance with the terms of each of such Consents, in each case except for such violations as would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect. None of the Sellers has received any written notice or written claims from any Government Entity relating to any material non-compliance of the Business or the

Assets with such Consents nor are there, any such notice or claims threatened or pending, except where such claims would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

Section 4.9.    Environmental Matters.

(a)    To the Knowledge of the Sellers, the Business is in compliance with Environmental Laws and has obtained and is in compliance with all Environmental Permits, except where failure to comply with Environmental Laws, or to obtain or comply with Environmental Permits, would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

(b)    There are no Actions or Orders relating to the Business pending, or to the Knowledge of the Sellers threatened and the Sellers have not received any written notice, claim, subpoena or summons from any Person alleging: (i) any Liability under any Environmental Law relating to the Business or any property currently or formerly owned or operated in conjunction with the Business, or (ii) any violation by the Business of any Environmental Law, in each case except where such matters would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

(c)    No Hazardous Materials are present or have been Released at, on, or under, or migrated from, to or through, any real property currently or formerly owned or operated in conjunction with the Business that could reasonably be anticipated to result in liabilities or obligations pursuant to Environmental Laws, in each case except where such matters would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

(d)    Notwithstanding anything in this ARTICLE IV to the contrary, none of the representations and warranties in this ARTICLE IV other than this Section 4.9 shall relate to environmental matters.

Section 4.10.    Labor and Employee Benefits Matters.

(a)    Section 4.10(a) of the Sellers Disclosure Schedule contains a list of all material Seller Employee Plans.  The Sellers have provided the Purchaser with a true and complete copy of the plan document or summary plan description of each material Seller Employee Plan or, if such plan document or summary plan description does not exist, an accurate written summary of such material Seller Employee Plan.

(b)    The information contained in Section 4.10(b) of the Sellers Disclosure Schedule in respect of the Employees (the "**Employee Information**") is accurate in all material respects as of the date hereof, and sets forth with respect to each Employee (except where that is not permissible under applicable data privacy Laws): (i) unique identifier, (ii) service date, (iii) position, (iv) annual base salary and annual target incentive, (v) work location, (vi) visa type, if any, (vii) vacation accrual rate, (viii) status as full-time or part-time, (ix) telecommuter arrangement, if any, and (x) status as an Inactive Employee and expected date of return to work, if known.

(c)     There has not been for a period of twelve (12) consecutive months prior to the date hereof, nor is there existent or, to the Sellers' Knowledge, has been threatened in writing, any strike, slowdown, lockout, picketing or work stoppage against the Sellers by or on behalf of the Employees.

(d)     There are no Collective Labor Agreements in effect with respect to the Employees. For a period of twelve (12) consecutive months prior to the date hereof, no petition has been filed or proceedings instituted by a union, works council, collective bargaining agent, employee or group of employees with any Government Entity seeking recognition of a collective bargaining agent with respect to any Employees, no voluntary recognition has been given by the Sellers or any Affiliate, and, to the Sellers' Knowledge, no such organizational effort is currently being made or has been threatened in writing by or on behalf of any union, employee, group of employees or collective bargaining agent to organize any Employees.

(e)     Except as set forth in Section 4.10(e) of the Sellers Disclosure Schedule, with respect to the Employees, the Sellers and their Affiliates are in material compliance with all applicable Laws respecting employment and employment practices, including, without limitation, all Laws respecting terms and conditions of employment, health and safety, wages and hours, child labor, immigration, employment discrimination, disability rights or benefits, equal opportunity, plant closures and layoffs, affirmative action, workers' compensation, labor relations, employee leave issues and unemployment insurance.

(f)     To the Knowledge of the Sellers, the Sellers have not received written notice that any Employee is in any respect in violation of any term of any nondisclosure agreement, common law nondisclosure obligation, fiduciary duty, noncompetition agreement, or restrictive covenant of any such employee, or any similar employment arrangement relating (i) to the right of any such Employee to be employed by the Sellers or (ii) to the knowledge or use of trade secrets or proprietary information with respect to any such Employee's employment with the Sellers, in each case except for such violation as would not have, individually or in the aggregate, a Material Adverse Effect.

(g)     To the Knowledge of the Sellers, no Employee at the level of Job Complexity Indicator 55 has given written Notice of his or her intention to terminate his or her employment.

(h)     To the Knowledge of the Sellers, no event or circumstance exists that has affected or is likely to adversely affect the qualified status of any Seller Employee Plan intended to qualify under Section 401(a), 401(k) or 403(a) of the Code.

(i)     No liability under Title IV or section 302 of ERISA has been incurred by the Sellers or any trade or business, whether or not incorporated, that together with the Seller would be deemed a "single employer" within the meaning of Section 4001(b) of ERISA (including any entity that during the past six years was a Subsidiary of the Seller) (an "ERISA Affiliate") that has not been satisfied in full, and no condition exists that presents a material risk to the Sellers or any ERISA Affiliate of incurring any such liability, other than liability for premiums due the Pension Benefit Guaranty Corporation (which premiums have been paid when due). No "employee benefit plan" of the Sellers or any ERISA Affiliate that is subject to section

57

302 or Title IV of ERISA or section 412 of the Code (a "Title IV Plan") or any trust established thereunder has incurred any "accumulated funding deficiency" (as defined in section 302 of ERISA and section 412 of the Code), whether or not waived, as of the last day of the most recent fiscal year of each Title IV Plan ended prior to the Closing Date.  Except as set forth in Section 4.10(i) of the Sellers Disclosure Schedule, all contributions required to be made with respect to any Title IV Plan on or prior to the Closing Date have been timely made.  None of the Sellers nor any ERISA Affiliate has now or at any time contributed to, sponsored, or maintained a Multiemployer Plan (as defined in Section 3(37) of ERISA) that is subject to ERISA or a multi employer pension plan (as defined in applicable Federal and Provincial legislation in Canada) that is subject to such legislation.

(j)    The consummation of the transactions contemplated by this Agreement will not, either alone or in combination with another event, (i) entitle any Employee to severance pay or any other payment, except to the extent such severance pay is required under applicable Law or any Seller Employee Plan or (ii) accelerate the time of payment or vesting, or increase the amount of compensation due any such Employee.

(k)    There are no Transferred Employee Plans.

Section 4.11.    Brokers.Except for fees and commissions that will be paid or otherwise settled or provided for by the Sellers, no broker, finder or investment banker is entitled to any brokerage, finder's or other similar fee or commission in connection with the transactions contemplated by this Agreement and the other Transaction Documents based upon arrangements made by or on behalf of the Sellers or any of their Affiliates.

Section 4.12.    Tax. To the extent not covered by any of the other representations and warranties in this ARTICLE IV, no Liens for Taxes (other than Permitted Encumbrances) exist with respect to any of the Assets.

(b)    No Seller that is not a "United States person" as such term is defined in Section 7701(a)(30) of the Code, is transferring pursuant to this Agreement or any of the Transaction Documents any "United States real property interest," as such term is defined in Section 897(c)(1) of the Code and Treasury Regulations section 1.897-1(c).

Section 4.13.    Investment Canada Act.The aggregate value of the Assets in Canada, determined in accordance with, and for the purpose of, the *Investment Canada Act*, is less than Cdn.$312 million and the Business is not a cultural business within the meaning of the *Investment Canada Act*.

Section 4.14.    Real Property.

(a)    Section 4.14(a) of the Sellers Disclosure Schedule sets forth the address of each parcel of Leased Real Property, and a list of all Real Estate Leases, Licensed Real Estate Leases and Non-365 Licensed Real Estate Leases that will be leased, subleased or licensed for each such parcel of Leased Real Property, each of which Lease is legal, valid, binding, enforceable in accordance with its terms and in full force and effect. The Sellers have made available to Purchaser a true and complete copy of each such Real Estate Lease, Licensed Real Estate Lease and Non-365 Licensed Real Estate Lease. Each of the Real Estate Leases is a valid

and existing leasehold interest of the applicable Seller free of Liens created by Sellers (other than Permitted Encumbrances or as otherwise provided in the Real Estate Agreements Term Sheet) and is a binding obligation of the applicable Seller. To the Knowledge of the Sellers, no party is in material default under any Real Estate Lease, and no event has occurred and is continuing that constitutes or, with notice or the passage of time, or both, would constitute a material default under any such Real Estate Lease, Licensed Real Estate Lease or Non-365 Licensed Real Estate Lease. A schedule will be provided to Purchaser promptly after signing, but in no event later than fifteen (15) days after the date hereof, including with respect to the Real Estate Leases, other than the Licensed Real Estate Leases and the Non-365 Licensed Real Estate Leases, the date and name of the parties to such Lease or sublease document, the rent payable under such Lease and the date through which any such rent has been paid.

(b)     Section 4.14(b) of the Sellers Disclosure Schedule sets forth a list of (i) each Real Estate Lease (other than Licensed Real Estate Leases and Non-365 Licensed Real Estate Leases) for which the Sellers have made a security deposit and (ii) the amount of each such security deposit. To the Knowledge of the Sellers, no such security deposit or portion thereof deposited with respect to any Real Estate Lease (other than Licensed Real Estate Leases and Non-365 Licensed Real Estate Leases) has been applied in respect of a breach of, or default under, such Lease that has not been redeposited in full, and to the Knowledge of the Sellers, there has been no material breach or material default, and there exists no condition or circumstance, that would provide a basis for the application of any such security deposit or portion thereof.

(c)     Except as set forth in Section 4.14(c) of the Sellers Disclosure Schedule, with respect to each parcel of Leased Real Property: (i) the transactions contemplated by this Agreement do not require the consent of any other party to such Real Estate Lease (except for those landlord consents to be obtained by the Sellers pursuant to Section 2.1.7(e) of this Agreement and the Real Estate Agreements Term Sheet), will not result in a material breach of or material default under such Real Estate Lease, or otherwise cause such Real Estate Lease to cease to be legal, valid, binding, enforceable in accordance with its terms and in full force and effect on identical terms following the Closing; (ii) there are no material disputes with respect to such Leased Real Property; (iii) the Sellers do not owe, nor will they owe in the future, any brokerage commissions or finder's fees with respect to the transactions contemplated by this Agreement with respect to such Leased Real Property; (iv) the other party to such Real Estate Lease is not an affiliate of, and otherwise does not have any economic interest in, any of the Sellers; (v) except as otherwise provided by the Real Estate Agreements Term Sheet, the Sellers have not subleased, licensed or otherwise granted any Person the right to use or occupy such portion of the Leased Real Property that is used for the Business; and (vi) the Sellers have not collaterally assigned or granted any other security interest in such Leased Real Property or any interest therein. Sellers shall provide information regarding any landlord consent required for the Licenses upon finalization of the license schedules as set forth in the Real Estate Agreements Term Sheet.

(d)     With respect to each parcel of Direct Lease Real Estate, except as set forth in Section 4.14(d) of the Sellers Disclosure Schedule (i) the Sellers have good and marketable fee title to all Direct Lease Real Estate, free and clear of all Liens of any nature except for Liens set forth in Section 4.14(d) of the Sellers Disclosure Schedule and Seller Encumbrances; (ii) the

Sellers have not leased or otherwise granted to any person the right to use or occupy such portion of the Direct Lease Real Estate used for the Business and (iii) there are no outstanding options, rights of first offer, rights of reverter or rights of first refusal to purchase such Direct Lease Real Estate or any portion thereof or interest therein.

(e)     All requisite certificates of occupancy and other permits or approvals required with respect to the buildings, structures and improvements on any of the Direct Lease Real Estate and the occupancy and use thereof have been obtained and are currently in effect.

(f)     Each parcel of Direct Lease Real Estate has direct vehicular and pedestrian access to a public street adjoining such parcel or has vehicular and pedestrian access to a public street via an insurable, permanent, irrevocable and appurtenant easement benefiting such parcel, and such access is not dependent on any land or other real property interest which is not included in that parcel of Direct Lease Real Estate.

(g)     To the Knowledge of the Sellers, no Seller, as applicable, has received written notice from any Government Entity of any condemnation, expropriation or other proceeding in eminent domain, pending or threatened, affecting any parcel of Leased Real Property or Direct Lease Real Estate used for the Business or interest therein that, to the extent it relates to such Leased Real Property or Direct Lease Real Estate, could reasonably be expected to have a Material Adverse Effect on the use and operation of the Business at such Leased Real Property or Direct Lease Real Estate. The use and operation of the Leased Real Property and Direct Lease Real Estate in the conduct of business of the Sellers does not violate any instrument of record, agreement, occupancy restriction or Law affecting or applicable to the Leased Real Property or Direct Lease Real Estate, and the Sellers have not received any notice of violation thereof, except for violations that, individually or in the aggregate, would not reasonably be expected to have a Material Adverse Effect. The Sellers have no Knowledge of any proposed change to any such instrument of record, agreement, occupancy restriction or Law affecting or applicable to the Leased Real Property or Direct Lease Real Estate that would so affect any of the Leased Real Property or Direct Lease Real Estate or its use.

(h)     Neither the Main Sellers nor any of the Main Sellers' Affiliates has received any written notice of any currently pending or, to the Knowledge of the Sellers, threatened litigation, condemnation or expropriation proceedings.

Section 4.15.  Trade Matters.

(a)     The Business is in compliance with Trade Laws and has obtained and is in compliance with all Trade Permits, except where failure to comply with Trade Laws, or to obtain or comply with Trade Permits, would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

(b)     There are no Actions or Orders relating to the Business pending, or to the Knowledge of the Sellers threatened and the Sellers have not received any written notice, claim, subpoena or summons from any Person alleging: (i) any Liability under any Trade Law or Trade Permit relating to the Business or any property currently or formerly owned or operated in conjunction with the Business, or (ii) any violation by the Business of any Trade Law or Trade

Permit, in each case except where such matters would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

Section 4.16.   Competition Act.

For the purposes of the threshold set out at subsection 110(2) of the *Competition Act*, the aggregate value of the Assets in Canada does not exceed Cdn.$70 million, nor does the aggregate gross revenues from sales in or from Canada generated from those assets exceed Cdn.$70 million, all as determined in accordance with Part IX of the *Competition Act*.

Section 4.17.   Representations and Warranties by the Other Sellers. Except (a) as set forth in the Sellers Disclosure Schedule, (b) as expressly contemplated by this Agreement or (c) to the extent relating to the Excluded Assets or the Excluded Liabilities, each Other Seller will, as of the Closing Date, severally but not jointly represent and warrant to the Purchaser as follows:

4.17.1.   Organization and Corporate Power.

(a)      Such Other Seller is duly organized and validly existing and in good standing under the Laws of the jurisdiction in which it is organized.  Subject to the receipt of the Bankruptcy Consents, such Other Seller has the requisite corporate power and authority to enter into, deliver and perform its obligations pursuant to each of the Transaction Documents to which it is a party.

(b)      Such Other Seller is duly qualified or licensed to do business and to own, lease and operate its assets, including the Assets, and to carry on the Business as it is currently conducted, as applicable in each jurisdiction in which its ownership of property or conduct of business relating to the Business requires it to so qualify or to be so licensed and is in good standing in each jurisdiction in which its ownership of property or conduct of business relating to the Business requires it to so qualify or to be so licensed, except to the extent that the failure to be so qualified, licensed or in good standing would not have, or would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

4.17.2.   Authorization; Binding Effect; No Breach.

(a)      Subject to the receipt of the Bankruptcy Consents, the execution, delivery and performance by such Other Seller of each Transaction Document to which such Other Seller is a party has been duly authorized by such Other Seller.  This Agreement has been duly executed and delivered by such Other Seller, and the other Transaction Documents to which such Other Seller is a party have been duly executed and delivered by such Other Seller party thereto. Subject to the receipt of the Bankruptcy Consents, and assuming due authorization, execution and delivery by the Purchaser, each Transaction Document to which such Other Seller is a party constitute, a legal, valid and binding obligation of such Other Seller, enforceable against it in accordance with its terms, subject to (in the case of Non-Debtor Sellers) applicable bankruptcy, insolvency, reorganization, moratorium or other Laws affecting creditors' rights generally and subject to general principles of equity, regardless of whether considered in a proceeding in equity or at Law.

(b)    The execution, delivery and performance by such Other Seller of the Transaction Documents to which such Other Seller is a party do not conflict with or result in a breach of the terms, conditions or provisions of, constitute a default (or an event that, with notice or lapse of time or both, would become a default) under, result in a violation of, give to any Person any right of termination, amendment, modification, acceleration or cancellation or any preemptive right or right to the payment of any penalty under, result in the creation or imposition of any Lien upon any of the Assets owned by such Other Seller, or (subject to the receipt of Consents in connection with the Assigned Contracts and other Consents expressly provided for herein) require any Consent (other than the Regulatory Approvals and the Bankruptcy Consents) or other action by or declaration or notice to any Government Entity pursuant to (i) the articles, charter or by-laws of such Other Seller, (ii) any Material Contract to which such Other Seller is a party or to which any of the Assets or the Business is subject or (iii) any Laws to which such Other Seller, or any of the Assets owned by such Other Seller, is subject, except, in the case of (ii) and (iii), for such defaults, violations, actions and notifications that would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

## ARTICLE V

## COVENANTS AND OTHER AGREEMENTS

Section 5.1.    U.S. Bankruptcy Actions.    Within two (2) Business Days of the date hereof, the Sellers who are U.S. Debtors shall (x) file with the U.S. Bankruptcy Court one or more motions and proposed orders to seek approval of the (i) transactions contemplated by the Transaction Documents (to the extent necessary), and (ii) procedures for the assignment and assumption of the Assumed and Assigned Contracts, (y) file with the U.S. Bankruptcy Court a notice that the Purchaser has been designated by the Sellers as the Successful Bidder, and (z) notify, as required by the U.S. Bankruptcy Code, the U.S. Bankruptcy Rules and any order of the U.S. Bankruptcy Court, all parties entitled to notice of such motions and orders, as modified by orders in respect of notice which may be issued at any time and from time to time by the U.S. Bankruptcy Court, and such additional parties as the Purchaser may reasonably request.  In addition, subject to the provisions of this Agreement, the U.S. Debtors shall use their reasonable best efforts to obtain U.S. Bankruptcy Court approval of such motions and orders, including, without limitation, the U.S. Sale Order, which shall be substantially in the form of Exhibit 5.1 (with such changes thereto as the Purchaser and the Sellers both approve in their reasonable discretion).

Section 5.2.    Canadian Bankruptcy Actions.

(a)    As promptly as practicable, but in no event later than the second (2nd) Business Day after the date hereof, the Canadian Debtors shall file with the Canadian Court one or more motions (the "**Canadian Approval and Vesting Order Motion**") seeking to obtain entry of an order substantially in the form set forth in Exhibit 5.2 with such changes thereto as the Purchaser and the Sellers both shall approve in their respective reasonable discretion (such order as approved, the "**Canadian Approval and Vesting Order**") of the Canadian Court approving this Agreement and the transactions contemplated herein and shall use their reasonable best efforts to obtain Canadian Court approval of the Canadian Approval and Vesting Order.

(b)     In connection with the foregoing, the Canadian Debtors shall seek in good faith in the Canadian Approval and Vesting Order Motion to (i) have the Canadian Approval and Vesting Order include a finding that, to the extent permitted by Law, neither the Purchaser nor any relevant Designated Purchaser is a successor to the Sellers or their bankruptcy estate by reason of any theory of Law or equity, and neither the Purchaser nor any Designated Purchaser shall assume or in any way be responsible for any Liability of any of the Sellers and/or their bankruptcy estates, except as otherwise expressly provided in this Agreement or the Transaction Documents; and (ii) have the endorsement of the Canadian Approval and Vesting Order or the order itself, include a finding that the consideration provided by the Purchaser and any Designated Purchaser pursuant to this Agreement constitutes reasonably equivalent value and fair consideration for the Assets.  For greater certainty, nothing herein shall require the items in the preceding sentence to be included in the Canadian Approval and Vesting Order or any endorsement thereof, notwithstanding that such provisions may be included in the form set forth of the order set forth in Exhibit 5.2.

Section 5.3.    Consultation; Notification.

(a)     The Purchaser and the U.S. Debtors shall cooperate with filing and obtaining entry of the U.S. Sale Order, and the U.S. Debtors shall deliver to the Purchaser prior to filing, and as early in advance as is practicable to permit adequate and reasonable time for the Purchaser and its counsel to review and comment, copies of all proposed pleadings, motions, objections, responses to objections, notices, statements schedules, applications, reports and other material papers to be filed by the U.S. Debtors in connection with such motions and relief requested therein and any challenges thereto.

(b)     The Purchaser and the Canadian Debtors shall cooperate with filing and prosecuting the Canadian Approval and Vesting Order Motion and in obtaining entry of the Canadian Approval and Vesting Order, and the Canadian Debtors shall deliver to the Purchaser prior to filing, and as early in advance as is practicable to permit adequate and reasonable time for the Purchaser and its counsel to review and comment, copies of all proposed pleadings, motions, notices, statements, schedules, applications, reports (other than the draft Monitor's report) and other material papers to be filed by the Canadian Debtors in connection with such motions and relief requested therein and any challenges thereto.

(c)     If the U.S. Sale Order or any other order of the U.S. Bankruptcy Court relating to this Agreement shall be appealed by any Person (or a petition for certiorari or motion for rehearing, re-argument or stay shall be filed with respect thereto), the U.S. Debtors agree to take all reasonable steps, and use their reasonable best efforts, including incurring reasonable expenses, to defend against such appeal, petition or motion, and the Purchaser agrees to cooperate in such efforts.  Each of the Parties hereby agrees to take all reasonably steps, and use its reasonable efforts, to obtain an expedited resolution of such appeal; provided, however, that, subject to the conditions set forth herein and assuming the Parties are not precluded pursuant to Section 5.3(d) from consummating the transactions contemplated by this Agreement, nothing contained in this Section shall preclude the Parties from consummating the transactions contemplated hereby if the U.S. Sale Order shall have been entered and shall not have been stayed, modified, revised or amended, in which event the Purchaser and the relevant Designated

Purchasers shall be able to assert the benefits of Section 363(m) of the U.S. Bankruptcy Code and, as a consequence of which, such appeal shall become moot.

(d)    If the Canadian Approval and Vesting Order or any other order of the Canadian Court relating to this Agreement shall be appealed by any Person (or a motion for rehearing, re-argument or stay shall be filed with respect thereto), the Canadian Debtors agree to, and to cause their Affiliates to, take all reasonable steps, and use their reasonable best efforts, including incurring reasonable expenses, to defend against such appeal or motion, and the Purchaser agrees to cooperate in such efforts. Each of the Parties hereby agrees to take all reasonable steps, and use its reasonable best efforts, to obtain an expedited resolution of such appeal; provided, however, that, subject to the conditions set forth herein and assuming the Parties are not precluded pursuant to Section 5.3(c) from consummating the transactions contemplated by this Agreement, nothing in this Section shall preclude the Parties from consummating the transactions contemplated hereby if the Canadian Approval and Vesting Order shall have been entered and shall not have been stayed, modified, revised or amended.

Section 5.4.    Pre-Closing Cooperation.

(a)    In addition to the efforts to obtain any requisite Consent in respect of Contracts, which are covered by Section 2.1.7, prior to the Closing, upon the terms and subject to the conditions of this Agreement, each of the Parties shall use its reasonable efforts to take, or cause to be taken, all actions and to do, or cause to be done, and cooperate with each other in order to do, all things necessary, proper or advisable under applicable Law to consummate the transactions contemplated by this Agreement as soon as practicable and cause the fulfillment at the earliest practicable date of all of the conditions to the other Parties' obligations to consummate the transactions contemplated by this Agreement, including using reasonable efforts in connection with: (i) the preparation and filing of all forms, registrations and notices required to be filed to consummate the Closing and the taking of such actions as are necessary to obtain any requisite Consent; provided, that the Sellers shall not be obligated to make any payment or deliver anything of value to any Government Entity in order to obtain any such Consent (other than filing and application fees to Government Entities all of which shall be paid or reimbursed by the Purchaser), (ii) taking all reasonable actions to defend all lawsuits and other proceedings by or before any Government Entity challenging this Agreement or the consummation of the Closing, (iii) using all reasonable efforts to cause to be lifted or rescinded any injunction, decree, ruling, order or other action of any Government Entity that would prohibit, prevent, restrict or materially delay the consummation of the transactions contemplated by this Agreement, and (iv) assisting the Purchaser in the offer process and facilitating the transactions contemplated hereby.

(b)    Each Primary Party shall promptly notify the other Primary Party of the occurrence, to such Party's Knowledge or knowledge, as applicable, of any event or condition, or the existence, to such Party's Knowledge or knowledge, as applicable, of any fact, that would reasonably be expected to result in any of the conditions set forth in ARTICLE VIII not being satisfied.

(c)    Seller and Purchaser agree to negotiate in good faith to agree on execution versions (on the terms and conditions contained in and otherwise in accordance with the Real

Estate Agreements Term Sheet) of (i) such License(s) as are reasonably required, before the Closing; and (ii) such other Real Estate Agreement(s) as are reasonably required, before the Closing Date, or as promptly as possible thereafter.

Section 5.5.    Antitrust and Other Regulatory Approvals.

(a)    In furtherance and not in limitation of the provisions of Section 5.4, each of the Parties, as applicable, agrees to (i) prepare and file as promptly as practicable, and in any event by no later than ten (10) Business Days from the date of this Agreement, an appropriate Notification and Report Form pursuant to the HSR Act; and (ii) prepare and file as promptly as practicable the Mandatory Antitrust Filings (with the exception of the filings required in (i) above) and all other necessary documents, registrations, statements, petitions, filings and applications for other Regulatory Approvals and any other Consent of any other Government Entities either required or that the Primary Parties mutually agree are advisable to satisfy the condition set forth in Section 8.1(a).

(b)    If a Party or any of its Affiliates receives a request for information or documentary material from any Government Entity with respect to this Agreement or any of the transactions contemplated by this Agreement, then such Party shall endeavor in good faith to make, or cause to be made, as soon as reasonably practicable and after consultation with the other Party, an appropriate response in compliance with such request.

(c)    The Parties shall keep each other apprised of the status of matters relating to the completion of the transactions contemplated by this Agreement and work cooperatively in connection with obtaining the Regulatory Approvals of each applicable Government Entity, including:

(i)    cooperating with each other in connection with the Mandatory Antitrust Filings, the Regulatory Approvals, and any other filings required to be made, or considered advisable to make, or information required to be provided by any Party under the applicable Antitrust Laws or any Laws regulating foreign investment of any jurisdiction in connection with the transactions contemplated by this Agreement including the Investment Canada Act (if applicable), and each Antitrust Approval, and liaising with each other in relation to each step of the procedure before the relevant Government Entities and as to the contents of all communications with such Government Entities. In particular, to the extent permitted by Law or Government Entity, no Party will make any notification or other submission in relation to the transactions contemplated hereunder without first providing the other Parties or their outside counsel with a copy of such notification or submission in draft form and giving such other party or counsel a reasonable opportunity to discuss its content before it is filed with the relevant Government Entities, and such first Party shall consider and take account of all reasonable comments timely made by the other Parties in this respect; provided, however, that no Party shall be required to provide the other Party with such portions of notifications or submissions that would jeopardize any attorney-client or other legal privilege (it being understood, however, that the Parties shall cooperate in any reasonable efforts and requests that would enable otherwise required disclosure to the other Parties to occur without so jeopardizing privilege); provided, further, that a Party may provide

such portions of notifications or submissions solely to the other Party's outside counsel pursuant to a common interest agreement and non-disclosure agreement, each to be negotiated by the Parties in good faith, if such Party determines, acting reasonably, that the provision to the other Party of such portions of notifications or submissions could reasonably be expected to have a material adverse effect upon it if the transactions contemplated by this Agreement are not consummated;

(ii)    furnishing to the other Primary Parties or their outside counsel all information within its possession that is required for the Mandatory Antitrust Filings, obtaining the Antitrust Approvals, and any application or other filing to be made or information required to be provided by the other Party pursuant to the applicable Antitrust Laws or any Laws regulating foreign investment of any jurisdiction, including the Investment Canada Act (if applicable), in connection with the transactions contemplated by this Agreement; provided, however, that (a) no such information shall be required to be provided by a Party if it determines, acting reasonably, that, such information is material and competitively sensitive or that the provision of such information could reasonably be expected to have a material adverse effect upon it if the transactions contemplated by this Agreement were not completed or that the provision of such information would jeopardize any attorney-client or other legal privilege (it being understood, however, that the parties shall cooperate in any reasonable efforts and requests that would enable otherwise required disclosure to the other parties to occur without so jeopardizing privilege), and (b) in any such case the Purchaser and the Main Sellers shall cooperate with a view to establishing a mutually satisfactory procedure for providing such information directly to the Government Entity requiring or requesting such information, and the relevant Main Seller or the Purchaser or the relevant Designated Purchaser required to provide such information shall provide it directly to such Government Entity requiring or requesting such information;

(iii)    promptly notifying each other of any communications from or with any Government Entity with respect to the transactions contemplated by this Agreement and ensuring to the extent permitted by Law or Government Entity that each of the Primary Parties is entitled to attend any meetings with or other appearances before any Government Entity with respect to the transactions contemplated by this Agreement;

(iv)    consulting and cooperating with one another in connection with all analyses, appearances, presentations, representations, memoranda, briefs, arguments, opinions and proposals made or submitted by or on behalf of any Party hereto in connection with proceedings under or relating to the Mandatory Antitrust Filings, the Antitrust Approvals, the applicable Antitrust Laws or any Laws regulating foreign investment of any jurisdiction (including the Investment Canada Act) in connection with the transactions contemplated by this Agreement; and

(v)    without prejudice to any rights of the Parties hereunder, consulting and cooperating in all respects with the other in defending all lawsuits and other proceedings by or before any Government Entity challenging this Agreement or the consummation of the transactions contemplated by this Agreement.

(d)     In addition, subject to any limitations set forth in Section 5.5(e), the Purchaser shall, and shall cause each of the Designated Purchasers to, use its reasonable efforts to satisfy (or cause the satisfaction of) the conditions precedent to the Purchaser's obligations hereunder as set forth in Section 8.1(a) to the extent the same is within its control and to take, or cause to be taken, all other actions and to do, or cause to be done, all other things necessary, proper or advisable under all applicable Laws to consummate the transactions contemplated by this Agreement, including using its reasonable efforts to make all required filings and obtain all Regulatory Approvals and any other Consent of a Government Entity required to be obtained, in order for the Parties to consummate the transactions contemplated by this Agreement.

(e)     Subject to the proviso below, the obligations of the Purchaser pursuant to Section 5.5(d) shall include an obligation to commit, and cause the Designated Purchasers to use their respective reasonable efforts to commit, to any and all undertakings, divestitures, licenses or hold separate or similar arrangements with respect to their respective assets and/or the Assets and/or to any and all arrangements for the conduct of any business and/or termination of any and all existing relationships and contractual rights and obligations as a condition to obtaining any and all Regulatory Approvals and other Consents from any Government Entity necessary to consummate the transactions contemplated by this Agreement, including without limitation an obligation to take any and all actions necessary in order to ensure the receipt of the necessary Consents, the obtaining of all Regulatory Approvals, or the termination, waiver or expiration of the necessary waiting periods, under the HSR Act, or any other applicable Antitrust Laws or investment or similar Law; provided, however, that nothing in this Agreement shall require or be construed to require Purchaser or the Designated Purchasers to commit to any undertaking, divestiture, license or hold separate or similar arrangement or conduct of business arrangement or to terminate any relationships, rights or obligations or to do any other act, to the extent such commitment, termination or action would be reasonably likely to be materially adverse to the business, financial condition, or prospects of the Business or the Purchaser or the Designated Purchasers. In addition, subject to the terms and conditions herein provided, the Purchaser shall not, and shall cause the Designated Purchasers not to, take or cause to be taken any action which would reasonably be expected to prevent or materially delay the consummation of the transactions contemplated by this Agreement. This Section 5.5(e) shall not apply to the Investment Canada Act or any related Regulatory Approvals.

(f)     Each of the Parties agrees to use reasonable efforts (i) to prepare and file, as promptly as practicable, a joint filing to be made with CFIUS with regard to the transactions contemplated herein for the purpose of securing the CFIUS Approval, and (ii) to timely respond to any inquiries from CFIUS or any other interested Government Entity.

(g)     Upon the Purchaser's request, the Sellers shall cooperate with the Purchaser in connection with any filings or submissions to be made by it under the Investment Canada Act with regard to the transactions contemplated. In furtherance thereof, the Purchaser shall be entitled to submit a notification to the Director of Investments under Part III of the *Investment Canada Act* in respect of the transactions contemplated by this Agreement before or within 30 days following Closing, at the Purchaser's discretion and the Sellers hereby agree to provide the Purchaser on a prompt basis all necessary information and otherwise render assistance to allow the Purchaser to reasonably promptly complete preparation and submission of any such filings or submissions and to respond to any enquiries from any Government Entity

67

responsible for or administering the Investment Canada Act, including at Purchaser's request attending or participating in meetings or writing in support of Purchaser's acquisition of the Business. The Purchaser shall keep the Sellers apprised of the status of matters related to obtaining the ICA Approval.

(h)    Upon the Purchaser's request, which may occur no later than the Closing Date, the Sellers shall cooperate with the Purchaser in connection with any filing required to be made with the Federal Communications Commission, or any other Government Entity with jurisdiction over authorization of telecommunications equipment, for any approvals or required notifications; provided that, the Purchaser shall take primary responsibility for preparation and submission of any such filing, and the Sellers hereby agree to provide the Purchaser on a reasonably prompt basis all necessary information and otherwise to render reasonable assistance to allow the Purchaser to reasonably promptly complete preparation and submission of the filing and to respond to any inquiries from the Federal Communications Commission or any such Government Entity.

(i)    For the avoidance of doubt, the covenants under this Section 5.5 shall not apply to any action, effort, filing, Consent, proceedings, or other activity or matter relating to the Bankruptcy Courts, the Bankruptcy Proceedings and/or the Bankruptcy Consents.

Section 5.6.    Pre-Closing Access to Information.

(a)    Prior to the Closing, the Main Sellers shall, and shall cause their Subsidiaries to, (i) give the Purchaser and its authorized Representatives, upon reasonable advance notice and during regular business hours, reasonable access to all books, records, personnel, officers, advisors, agents, bankers and other Representatives and other facilities and properties of the Business (including physical access to any Leased Real Property and/or Direct Lease Real Estate), (ii) permit the Purchaser and its Representatives to make such copies and inspections thereof, upon reasonable advance notice and during regular business hours, as the Purchaser may reasonably request and (iii) furnish the Purchaser with such unaudited financial and operating data and other information with respect to the Business as is regularly prepared in the Ordinary Course that the Purchaser may from time to time reasonably request; provided, however, that (A) any such access by the Purchaser shall be conducted at Purchaser's own expense, in accordance with Law (including any applicable Antitrust Law and Bankruptcy Law), at a reasonable time, under the supervision of the Sellers' personnel and in such a manner as to maintain confidentiality and not to interfere with the normal operations of the businesses of the Sellers and their Affiliates, and (B) the Sellers will not be required to provide to the Purchaser access to or copies of any Employee Records unless consented to by such Employee.

(b)    Notwithstanding anything contained in this Agreement or any other agreement between the Purchaser and the Sellers executed on or prior to the date hereof, the Sellers shall not have any obligation to make available to the Purchaser or its Representatives, or provide the Purchaser or its Representatives with, (i) any income Tax Return or any combined or consolidated Tax Return filed by the Sellers or any of their Affiliates or predecessors, or any related material, or (ii) more generally, any information if making such information available would (A) jeopardize any attorney-client or other legal privilege or (B) potentially cause the Sellers to be found in contravention of any applicable Law or contravene any fiduciary duty or

68

agreement (including any confidentiality agreement to which the Sellers or any of their Affiliates are a party), it being understood that the Sellers shall cooperate in any reasonable efforts and requests for waivers that would enable otherwise required disclosure to the Purchaser to occur without so jeopardizing privilege or contravening such Law, duty or agreement.

Section 5.7.    Public Announcements.Subject to (a) the provisions of ARTICLE VII with respect to communications and announcements to the Employees and the employees of the Purchaser and the Designated Purchasers and (b) each Party's disclosure obligations imposed by Law or stock exchange regulation (including any obligations under any Bankruptcy Laws), during the period from the date hereof until the Closing Date, the Purchaser and the Main Sellers shall, and shall cause their respective Affiliates to, (i) cooperate with the other Primary Party in the development and distribution of all news releases, other public information disclosures and announcements, including announcements and notices to customers, suppliers and Employees, with respect to this Agreement, or any of the transactions contemplated by this Agreement and the other Transaction Documents and (ii) not issue any such announcement or statement prior to consultation with, and the approval of, the other Primary Parties (such approval not to be unreasonably withheld or delayed); provided that approval shall not be required where the disclosing Primary Party determines, based on advice of counsel and after consultation with the other Primary Parties, that such disclosure is required by Law or stock exchange regulation.

Section 5.8.    Further Actions.Each of the Parties shall execute and deliver such documents and other papers and take such further actions as may reasonably be required to carry out the provisions of this Agreement and the Ancillary Agreements and give effect to the transactions contemplated herein and therein, including (i) the execution and delivery of such assignments, deeds and other documents as may be necessary to transfer any Assets as provided in this Agreement and (ii) the assumption and assignment of the Assumed and Assigned Contracts and the assignment of the Designated Non-365 Contracts, in each case, that were not previously elected by the Purchaser to have them assumed and assigned to the Purchaser, provided that the Sellers shall have no obligation to assume and assign any such contracts if they have already been rejected by the Sellers at the time of the request from the Purchaser to assume and assign such contract.

Section 5.9.    Conduct of Business.The Sellers covenant that, subject to any limitation imposed as a result of being subject to the Bankruptcy Proceedings and except as (i) the Purchaser may approve otherwise in writing as set forth below (such approval not to be unreasonably withheld or delayed), (ii) set forth in Section 5.9 of the Sellers Disclosure Schedule, (iii) otherwise expressly required by this Agreement or another Transaction Document, (iv) as permitted by the Real Estate Agreements Term Sheet, (v) required by Law (including any applicable Bankruptcy Law) or by any order of a Bankruptcy Court entered as of the date hereof, or (vi) relates solely to Excluded Assets or Excluded Liabilities, the Sellers shall and shall cause their Affiliates to (A) conduct the Business and maintain the level of operations and maintenance expenses at an adequate level, all in the Ordinary Course and (B) abstain from any of the following actions:

(a)    sell, lease or dispose of the Assets, in any single transaction or series of related transactions, other than sale of Inventory in the Ordinary Course, or enter into any

exclusive agreement that would restrict the Business or the Assets after the Closing in any material respect;

(b)      incur any Lien on any Assets, other than Liens that will be discharged at or prior to Closing and Permitted Encumbrances;

(c)      (x) grant any license or sublicense of any rights under or with respect to any Transferred Intellectual Property owned by the Sellers as of the date hereof intended to be included in the Assets, unless (i) such license or sublicense is to customers, contractors, distributors or suppliers in the Ordinary Course, or (ii) such license or sublicense would be permitted by the grant back license rights set forth in Section 2.06 of the Intellectual Property License Agreement (after the Intellectual Property License Agreement becomes effective), or (iii) such licenses or sublicenses granted pursuant to source code escrow arrangements listed in Section 5.9(c) of the Sellers Disclosure Schedule; (y) enter into any exclusive license agreement that would restrict the Business or the Assets after the Closing in any material respect or which is in conflict with the provisions of this Agreement or the Intellectual Property License Agreement; or (z) sell, transfer, or assign any Intellectual Property that is intended as of the date hereof to be (i) acquired by the Purchaser or Designated Purchaser at Closing, or (ii) licensed to Purchaser under the Intellectual Property License Agreement unless the relevant Sellers receive a written license from the buyer of such Licensed Intellectual Property sufficient for the Purchaser to retain all its rights in such Licensed Intellectual Property as set out in the Intellectual Property License Agreement;

(d)      grant any lease, sublease, license, sublicense or other occupancy rights under or with respect to any portion of Leased Real Property or the Direct Lease Real Estate used in the Business or amend any Real Estate Leases in any material respect or in any manner which would impose on the assignee thereof any financial obligation thereunder that does not currently exist or terminate or surrender or agree to a release of any such Real Estate Lease, in whole or in part;

(e)      construct, or permit to be constructed any capital improvements or major alterations at any portion of the Leased Real Property or Direct Lease Real Estate used for the Business;

(f)      increase the rate of cash compensation or other fringe, incentive, equity incentive, pension, welfare or other employee benefits paid or payable to the Transferred Employees, other than increases required by applicable Law, Contracts or Seller Employee Plans in effect as of the date hereof (including pursuant to the KEIP or KERP, or any annual incentive plan), or as otherwise approved by the Bankruptcy Court from time to time, or increases in the Ordinary Course that apply to substantially all similarly situated employees (including the Transferred Employees) of the Sellers or the applicable Affiliates of the Sellers;

(g)      enter into, adopt, amend or modify any Collective Labor Agreement affecting Employees, except as required by applicable Law;

(h)      voluntarily terminate, waive any right under, or amend in any material respect any Assigned Contract, Bundled Contract, Inbound License Agreement, Outbound License Agreement or Patent Cross License;

(i)      enter into any Contract that would be a Material Contract, other than any manufacturing or supply agreement with annual costs not to exceed US$1,000,000 individually or US$10,000,000 in the aggregate;

(j)      waive, release, assign, settle or compromise any material claim, litigation or arbitration relating to the Business to the extent that such waiver, release, assignment, settlement or compromise imposes any binding obligation, whether contingent or realized, on the Business that will bind the Purchaser and/or any of the Designated Purchasers after the Closing Date and is materially adverse to the Business;

(k)      solicit bids for the sale, transfer or other disposition, directly or indirectly, including through an asset sale, stock sale, merger, amalgamation, plan of arrangement or other similar transaction of any part of the Business;

(l)      manage the Adjusted Net Working Capital other than in the Ordinary Course;

(m)      take any action to cause any employee of the Sellers who would otherwise be an Employee as of the Closing not to be an Employee (other than termination for cause or termination of Employees who failed to receive an offer of employment from Purchaser or a Designated Purchaser pursuant to this Agreement provided Sellers make a reasonable effort to provide notice to Purchaser prior to such employment termination); or take any action to cause any employee of the Sellers who does not provide all or substantially all of his or her services to the Business as of the date of this Agreement, to become an Employee; or

(n)      authorize, or commit or agree to take, any of the foregoing actions. If a Seller desires to take any action in this Section 5.9 requiring Purchaser's consent, the Main Sellers may, prior to any such action being taken, request the Purchaser's consent via an electronic mail or facsimile sent to the individual(s) at the addresses listed on Exhibit 5.9. The Purchaser shall respond to such notice in writing by 11:59 p.m. (New York time) on the second Business Day after the day of delivery of such email or facsimile. The failure of the Purchaser to respond within such two (2) Business Days shall not be deemed to be consent to such action.

Section 5.10.    Transaction Expenses. Except as otherwise provided in this Agreement or the Ancillary Agreements, each of the Purchaser and the Sellers shall bear its own costs and expenses (including brokerage commissions, finders' fees or similar compensation, and legal fees and expenses) incurred in connection with this Agreement, the other Transaction Documents and the transactions contemplated hereby and thereby.

Section 5.11.    Confidentiality.

(a)      The Parties acknowledge that the Confidentiality Agreement remains in full force and effect in accordance with its terms, which are incorporated herein by reference, and the Parties agree to be bound thereby in the same manner and to the same extent as if the

terms had been set forth herein in full, except that the Sellers shall be at liberty to disclose the terms of this Agreement to any court or to any liquidator or in connection with any auction process approved by the Bankruptcy Court and show appropriate figures in their administration records, accounts and returns and (ii) the Purchaser or the Designated Purchaser shall be at liberty to disclose the terms of this Agreement and other "Evaluation Materials" (as defined under the Confidentiality Agreement) to the EMEA Purchaser or any Designated EMEA Purchaser; provided, that after the Closing Date, the Purchaser's confidentiality obligations under this Section 5.11 and the Confidentiality Agreement with respect to information and data relating to the Business and/or the Assets shall terminate.  Any Business Information or copies thereof retained by the Sellers pursuant to Section 5.24(c) shall be deemed to constitute "Evaluation Material" as such term is defined under the Confidentiality Agreement and, from and after the Closing Date, the Sellers shall treat such Business Information on the same terms and conditions applicable to the Purchaser's treatment of "Evaluation Material" as such term is defined under the Confidentiality Agreement.

(b)     To the extent a copy of any Bundled Contract is provided to Purchaser or a Designated Purchaser pursuant to Section 5.15 or otherwise, Purchaser or such Designated Purchaser shall not use or disclose any information therein that relates exclusively to a business of a Seller other than the Business (such information, "**Non-Business Information**"), including, without limitation, information related to product pricing, pricing strategy, production levels, production capacity or product inventories, current bids or potential bids for particular products or services, plans relating to the production, distribution, marketing, or introduction dates of specific products, including proposed territories and potential customers, matters relating to actual or potential suppliers or customers, current or project costs of procurement, development, manufacture or product research and development efforts of any specific product; provided, however, that Non-Business Information shall not include information that (i) was rightfully in Purchaser's or a Designated Purchaser's possession without a duty of confidentiality before receipt from Seller, (ii) is or has been disclosed publicly through no fault of Purchaser or a Designated Purchaser and without breach of any third parties' confidentiality obligations, (iii) is rightfully received by Purchaser or a Designated Purchaser without a duty of confidentiality, (iv) is independently developed by Purchaser or a Designated Purchaser without access to the Non-Business Information, as substantiated by written records or other documentation of Purchaser or such Designated Purchaser, or (v) is disclosed by Purchaser or a Designated Purchaser with a Seller's or its successors' or assigns' prior written approval; provided, further, that the Purchaser or the Designated Purchaser may disclose the Non-Business Information to the EMEA Purchaser or any Designated EMEA Purchaser.  Furthermore, the rights of the Sellers under this Section 5.11(b) shall inure to the benefit of any buyer of a business of the Seller to which such Non-Business Information relates.  Notwithstanding the foregoing, Purchaser or the relevant Designated Purchaser shall not be deemed in breach hereunder in the event that Purchaser or such Designated Purchaser is required by applicable law, regulation, legal process, or the regulations or rules of the stock exchange, or requested by a regulatory body, agency or stock exchange, to disclose any of the Non-Business Information.

Section 5.12.  Certain Payments or Instruments Received from Third Parties. To the extent that, after the Closing Date, (a) the Purchaser and/or any Designated Purchaser receives any payment or instrument that is for the account of a Seller according to the terms of any Transaction Document or relates primarily to any business or business segment of the Sellers

other than the Business, the Purchaser shall, and shall cause the Designated Purchasers to, promptly deliver such amount or instrument to the relevant Seller, and (b) any of the Sellers receives any payment that is for the account of the Purchaser, any of the Designated Purchasers according to the terms of any Transaction Document or relates primarily to the Business, the Sellers shall, and shall cause the other Sellers to, promptly deliver such amount or instrument to the Purchaser or the relevant Designated Purchaser, as applicable. All amounts due and payable under this Section 5.12 shall be due and payable by the applicable Party in immediately available funds, by wire transfer to the account designated in writing by the relevant Party. Notwithstanding the foregoing, each Party hereby undertakes to use its reasonable efforts to direct or forward all bills, invoices or like instruments to the appropriate Party.

Section 5.13.  Non-Assignable Contracts.

(a)     To the extent that any Assigned Contract or any Seller Consent is not capable of being assigned under Section 365 of the U.S. Bankruptcy Code (or, if inapplicable, pursuant to other applicable Laws or the terms of such Contract or Consent) to the Purchaser or a Designated Purchaser at the Closing (i) without the Consent of the issuer thereof or the other party thereto or any Third Party (including a Government Entity), and such Consent cannot be obtained pursuant to Section 2.1.7 or (ii) whether or not Consent is required, without Sellers' and their Affiliates' compromising any right, asset or benefit or expending any amount or incurring any Liability or providing any other consideration other than as provided in Section 2.1.7 (collectively, the "**Non-Assignable Contracts**"), this Agreement will not constitute an assignment thereof, or an attempted assignment, unless and until any such Consent is obtained; provided, however, that the Sellers will use their reasonable efforts to (i) cooperate with the Purchaser in connection with any commercially reasonable arrangement to provide the Purchaser the same interest, benefits and rights under any such Non-Assignable Contracts as the applicable Seller had immediately prior to the Closing, including entering into one or more mutually agreed commercially reasonable Subcontract Agreements, and (ii) facilitate Purchaser's negotiation with the other party to each Non-Assignable Contract that is a license of Intellectual Property to provide the Purchaser the same interest, benefits and rights under any such Non-Assignable Contracts as the applicable Seller had immediately prior to the Closing (including paying Cure Costs in order to obtain such Consent). If, and only for so long as, the arrangements described in clause (i) of the immediately preceding sentence are made such that Purchaser has obtained the same interest, benefits and rights under any such Non-Assignable Contracts, then, as between the Sellers and the Purchaser (or the relevant Designated Purchaser), such Non-Assignable Contracts shall be deemed to be assigned and the Purchaser (or the relevant Designated Purchaser) shall perform all obligations and covenants thereunder. Notwithstanding the foregoing sentences, (w) nothing in this Section 5.13 shall require any Seller to renew, modify or amend any Non-Assignable Contract once it has expired. The Parties acknowledge that the fact that any Contract constitutes a Non-Assignable Contract by itself shall not (i) constitute a breach of any covenant hereunder, (ii) except as otherwise provided in Section 8.3(c), entitle Purchaser to terminate this Agreement or (iii) result in any reduction of the Purchase Price payable hereunder. Any Non-Assignable Contract assigned pursuant to the terms of this Section 5.13 shall, when assigned, constitute an Assigned Contract hereunder from and after such date.

(b)     For the purposes of this Agreement (including Section 5.13(a) and all representations and warranties of the Sellers contained herein), the relevant Sellers shall be

deemed to have obtained all required Consents in respect of the assignment of any Assumed and Assigned Contract if, and to the extent that, pursuant to the U.S. Sale Order or any separate order of the U.S. Bankruptcy Court approving and authorizing the assumption and assignment of the Assumed and Assigned Contracts, the Sellers are authorized to assume and assign to the Purchaser or a Designated Purchasers such Seller Contract pursuant to Section 365 of the U.S. Bankruptcy Code and any applicable Cure Cost has been satisfied as provided in Section 2.1.7.

(c)    If, after the Closing, the Purchaser or the relevant Designated Purchaser receives a purchase order on account of any Non-Assignable Contract that is a contract between a Seller and a customer of such Seller (each, a "**Non-Assignable Customer Contract**" and the customer counterparty thereto a "**Non-Assignable Customer Counterparty**"), Purchaser or the relevant Designated Purchaser shall request that such Non-Assignable Customer Counterparty consent in writing to the assignment of such Non-Assignable Customer Contract to Purchaser or the relevant Designated Purchaser. For the period in which such consent is not forthcoming (the "**Non-Assignable Period**"), Purchaser or the relevant Designated Purchaser shall process such purchase order and Seller shall provide the Purchaser or the relevant Designated Purchaser with the interest, benefits and rights under such Non-Assignable Customer Contract in accordance with Section 5.13(a); provided, however, that Seller's obligation to provide Purchaser or the relevant Designated Purchaser with the interest, benefits and rights under such Non-Assignable Customer Contract will terminate upon the earliest of (i) the effective date of such consent, (ii) the effective date of any direct agreement between Purchaser (or the relevant Designated Purchaser) and such Non-Assignable Customer Counterparty or (iii) in accordance with Section 5.13(a); provided further, however, that Purchaser and the relevant Designated Purchaser agree to indemnify, defend and hold Sellers and each Seller's respective directors, officers and personnel (collectively, the "**Non-Assignable Customer Contracts Indemnitees**") harmless from and against any and all losses, costs, damages, expenses and liabilities whatsoever (including reasonable legal fees) which may be suffered or incurred by any Non-Assignable Customer Contracts Indemnitee arising out of claims made by a Non-Assignable Customer Counterparty relating to Seller's providing Purchaser and/or the relevant Designated Purchaser with the interests, benefits and rights under the relevant Non-Assignable Customer Contract during the Non-Assignable Period.

Section 5.14.   Inbound License Agreements.

Each of the Purchaser and the Sellers shall, and the Purchaser shall cause any relevant Designated Purchaser and the Sellers shall cause any Affiliate to, use reasonable efforts and work cooperatively in good faith to facilitate the Purchaser's negotiation with the licensor under any Inbound License Agreement that is not assigned to the Purchaser or a Designated Purchaser to obtain rights for the Purchaser or a Designated Purchaser to use the Intellectual Property that is licensed under that Inbound License Agreement, or, if that negotiation is unsuccessful, the Sellers shall use reasonable efforts to provide the same interests, benefits and rights under such Inbound License Agreement, in each case, as reasonably necessary to effectively operate the Business from and after Closing, including in the case of the Sellers requesting Consent to the grant of these rights from the relevant third party; provided, however, that the Sellers shall be under no obligation to compromise any right, asset or benefit (including relinquishment of rights in the Retained Field of Use, as defined in the Intellectual Property

License Agreement) or to expend any amount or incur any Liability or provide any other consideration in complying with their obligations under this Section 5.14.

Section 5.15.  Bundled Contracts.

(a)      Each of the Purchaser and the Sellers shall, and the Purchaser shall, and shall cause any relevant Designated Purchaser, as applicable, to use its reasonable efforts to, prior to the Closing Date, enter into arrangements with the counterparty to each Contract of a Seller that involves the sale or provision of Products and/or Services to a customer of the Business and the sale or provision of other products and/or services of the Sellers or their Affiliates and is listed in Section 5.15 of the Sellers Disclosure Schedule (a "**Bundled Contract**"), to amend such Bundled Contract so as to delete all obligations and Liabilities therefrom as they relate to the Products and the Services and enter into a new Contract (effective as of, and conditioned upon the occurrence of, the Closing) with the applicable counterparty and which only relates to Products and Services, on substantially the same terms and conditions as are in effect for the sale or provision of Products and/or Services under the Bundled Contract or as otherwise acceptable to Purchaser, in which event such new Contract shall be deemed to be an Assigned Contract, and such Bundled Contract shall cease to be a Bundled Contract.  Seller shall generally be responsible for all administrative costs, fees and expenses connected with the amendment of a Bundled Contract and entry into a new Contract to replace a Bundled Contract as provided in the preceding sentence (other than the costs, fees and expenses of Purchaser or any counsel to Purchaser); provided, however, that the Sellers shall be under no obligation to compromise any right, asset or benefit in obtaining such arrangements and the failure to enter into such arrangements with respect to any Bundled Contract shall not, except as otherwise provided in Section 8.3(c), entitle the Purchaser to terminate this Agreement, not to complete the transactions contemplated hereby or reduce the Purchase Price payable hereunder.  In the event Sellers' efforts do not result in the separation of a Bundled Contract, then Purchaser and Sellers shall cooperate in good faith to enter into reasonable arrangements to provide the Purchaser or Designated Purchaser, as applicable, the same interest, benefits, rights and obligations under such Bundled Contract, only to the extent relating to the Business.

(b)      For those Bundled Contracts for which the arrangements mentioned in Section 5.15(a) could not be entered into prior to the Closing Date, the relevant Sellers shall either: (i) continue to use their reasonable efforts to facilitate the entry by the Purchaser or the relevant Designated Purchaser and the other party to each such Bundled Contract into a new Contract that only relates to Products and/or Services on substantially the same terms and conditions as are in effect for the sale or provision of Products and/or Services under the Bundled Contracts or as otherwise acceptable to the Purchaser and/or (ii) use their reasonable best efforts to cooperate with the Purchaser in any commercially reasonable arrangement to provide the Purchaser or Designated Purchaser, as applicable, the same interest, benefits and rights under any such Bundled Contract only to the extent relating to Products and/or Services as the applicable Seller had immediately prior to the Closing, including using its reasonable efforts to enter into one or more mutually agreed commercially reasonable Subcontract Agreements with respect to such Bundled Contracts; provided that (A) nothing in this Section 5.15 shall require the Sellers to renew any Bundled Contract once it has expired, (B) the Sellers shall have the right, any time after December 31, 2010, to exercise any right to terminate any Bundled Contract, and (C) the Sellers shall be under no obligation to compromise any right, asset or benefit or to incur any

Liability in order to comply with its obligations under this sentence.  Notwithstanding the foregoing, the Sellers shall not take any action to terminate or reject any Bundled Contract, or take any action or fail to take any action that would permit the other party to any Bundled Contract to terminate such Bundled Contract, in each case, prior to December 31, 2010.

Section 5.16.  Post-Closing Assistance for Litigation.

(a)    After the Closing, the Purchaser shall, upon the request of the Sellers, and at the Sellers' cost (including reimbursement of out of pocket expenses of the Purchaser and the Designated Purchasers and payment of a reasonable *per diem* to the Purchaser or a Designated Purchaser which per diem shall be based on the total compensation of the affected Transferred Employees at the time), require the Transferred Employees to make themselves reasonably available at reasonable times and cooperate in all reasonable respects with the Sellers and their Affiliates in the preparation for, and defense of, any lawsuit, arbitration or other Action (whether disclosed or not disclosed in the Sellers Disclosure Schedule) filed or claimed against the Sellers or any of their Affiliates or any of the respective agents, directors, officers and employees of the Sellers and their Affiliates, whether currently pending or asserted in the future, concerning the operation or conduct of the Business prior to the Closing Date; provided, however, that the obligations of the Purchaser hereunder shall only extend to the Transferred Employees who remain employed by the Purchaser or a Designated Purchaser as of the date of the Seller's request and shall not apply to former employees no longer employed by the Purchaser or a Designated Purchaser as of such date and shall not require the Purchaser or a Designated Purchaser to continue the employment of any such employee.

(b)    After the Closing, the Sellers shall, upon the request of the Purchaser, and at the Purchaser's cost (including reimbursement of out of pocket expenses of the Sellers and payment of a reasonable *per diem* to the Sellers which *per diem* shall be based on the total compensation of the affected employees of the Sellers at the time), require their employees that were not Transferred Employees to make themselves reasonably available and cooperate in all reasonable respects with the Purchaser and the Designated Purchasers and their Affiliates in the preparation for, and defense of, any lawsuit, arbitration or other Action filed or claimed against the Purchaser, any of the Designated Purchasers, any of their Affiliates or any of the respective agents, directors, officers and employees of any of the foregoing, whether currently pending or asserted in the future, concerning the operation or conduct of the Business; provided, that the obligations of the Sellers or their Affiliates under this Section 5.16(b) shall only extend to the employees of such Sellers or Sellers' Affiliates as of the date of Purchaser's request and shall not apply to former employees no longer employed by such Sellers or Seller's Affiliates as of such date and shall not require Sellers or Seller's Affiliates to continue the employment of any such employee.

Section 5.17.  Delivery of Assets.

(a)    To the extent not provided for in the Transition Services Agreement or the Real Estate Agreements Term Sheet, the Purchaser shall, and shall cause the relevant Designated Purchasers to, within ninety (90) days after the Closing Date, relocate all tangible Assets and Purchaser's activities from all premises owned or leased by the Sellers or their Affiliates after the Closing other than those premises to be occupied by the Purchaser or any Designated Purchasers

after the Closing Date pursuant to the provisions of the Real Estate Agreements, the Direct Leases or the Assumed and Assigned Contracts.

(b)     As promptly as reasonably practicable, and in no event more than thirty (30) days, after the Closing Date, the Sellers shall deliver to the Purchaser copies of correspondence, notices, filings, prosecution files, dockets, certifications and other documents relating to the filing, prosecution, issuance, renewal and enforcement of the Business Registered IP, provided that all items to be delivered hereunder shall be delivered solely by remote telecommunication to the extent the Purchaser may so request. Without limiting the generality of the foregoing, within thirty (30) days of Closing, the Sellers shall and shall cause their Affiliates to, instruct their current attorneys and agents to deliver to the Purchaser, or attorneys designated by Purchaser, any and all records in the possession of such attorneys and agents relating to the prosecution of any applications, registrations and renewals of any Business Registered IP.

Section 5.18.    Termination of Overhead and Shared Services.

The Purchaser acknowledges and agrees that, except as otherwise expressly provided in the Transition Services Agreement, effective as of the Closing Date (i) all Overhead and Shared Services provided to the Business (except the Transferred Overhead and Shared Services) shall cease and (ii) the Sellers or their Affiliates shall have no further obligation to provide any Overhead and Shared Services to the Business.

Section 5.19.    Financing.

(a)     Notwithstanding anything to the contrary set forth herein, the Purchaser acknowledges and agrees that (i) its obligations to consummate the transactions contemplated by this Agreement are not conditioned or contingent in any way upon receipt of any financing from any other Person, and (ii) failure to consummate the transactions contemplated herein as a result of the failure to obtain financing shall constitute a breach of this Agreement by the Purchaser (including its obligations pursuant to Section 2.3).

Section 5.20.    Insurance Matters.

(a)     The Purchaser acknowledges and agrees that coverage of the Covered Assets and Persons under the Seller Insurance Policies shall cease as of the Closing Date (other than assets used in, and Persons engaged in, the provision of services under the Transition Services Agreement, except as otherwise set forth therein) and the Covered Assets and Persons will be deleted in all respects as insured (or additional insured, as the case may be) under all Seller Insurance Policies. Notwithstanding anything herein to the contrary, the Sellers shall retain any rights to, including any right to any proceeds received in respect of, any claim pending as of the date hereof or made after the date hereof under any Seller Insurance Policy.

(b)     If after the Closing Date the Purchaser or the Sellers (or any of their respective Affiliates) reasonably require any information regarding claim data or other information pertaining to a claim or an occurrence reasonably likely to give rise to a claim (including any pre-Closing claims under the Seller Insurance Policies that are to be covered under the retrospective component of the new insurance policy) in order to give notice to or

make filings with insurance carriers or claims adjustors or administrators or to adjust, administer or otherwise manage a claim, then the Sellers or the Purchaser, as the case may be, shall cause such information to be supplied to the other (or their designee), to the extent such information is in their possession and control or can be reasonably obtained by the Sellers or the Purchaser (or their respective Affiliates), as applicable, promptly upon a written request therefore.  If the Purchaser desires access to, and utilization of, claims data or information maintained by an insurance company or other Third Party in respect of any claim (including any pre-Closing claims under any Seller Insurance Policies that are covered under the retrospective component of the new insurance policies), the Purchaser shall be exclusively responsible for acquiring from such insurance company or Third Party, at the Purchaser's sole cost and expense, the rights necessary to permit them to obtain access to and utilization of such claims data or information, provided that Sellers and their Affiliates shall reasonably cooperate with Purchaser's efforts.  If any Third Party requires the consent of the Sellers or any of their Affiliates to the disclosure of such information, such consent shall not be unreasonably withheld.

Section 5.21.   Guarantees and Other Credit Support of the Business.

Following the Closing, the Purchaser shall, or shall cause the applicable Designated Purchasers to cooperate with the Sellers to procure the return and/or release by the applicable counterparty, as soon as reasonably practicable, of any security deposit, performance bond or surety posted by any Seller or any of its Affiliates in connection with Assigned Contracts (the "**Security Deposits**"), including where required by the applicable counterparty, offering to post such Security Deposits on terms and conditions no less favorable than offered to such Seller by such counterparty; provided, that neither the Purchaser nor any Designated Purchaser shall have any obligation under this Section 5.21 if any of the Sellers shall be in breach of the representations and warranties contained in Section 4.14(b) with respect to such Security Deposits or any portion thereof.  Purchaser shall in no event be required to provide any replacement financial security or any financial security or other deposits with respect to any premises leased pursuant to a Sublease or leased pursuant to a Direct Lease, all of which shall be the sole responsibility of the Sellers.

Section 5.22.   Use of Trademarks.

Except as expressly provided in the Trademark License Agreement, as of the Closing Date, neither the Purchaser nor any Designated Purchaser shall have the right to use the name "Nortel" or any other Trademarks owned by the Sellers or any of their Affiliates or any other Trademark employing the word "Nortel" or any confusingly similar Trademarks to any of the foregoing (collectively, the "**Sellers' Trademarks**").

Section 5.23.   Sellers' Accessible Information; Cooperation.After the Closing, the Purchaser shall have the right to reasonably request from the Main Sellers copies of all books, records, files, documentation and sales literature in the possession or under control of the Sellers and held or used in the Business (other than Employee Records where prohibited by applicable Law or Tax Records), to which the Purchaser in good faith determines it needs access for *bona fide* business or legal purposes.  The Sellers shall, or cause their Respective Affiliates to, provide such copies to the Purchaser (at the Purchaser's expense) as soon as reasonably practicable, provided that the Sellers shall be allowed to redact any such requested document in

order to delete any information and data relating to business segments of any such Seller and its Respective Affiliates not included in the Business; provided further, that nothing herein shall require the Sellers to disclose any information to the Purchaser if such disclosure would jeopardize any attorney-client or other legal privilege or contravene any applicable Law, fiduciary duty or agreement, it being understood that the Sellers shall cooperate in any reasonable efforts and requests for waivers that would enable otherwise required disclosure to the Purchaser to occur without so jeopardizing privilege or contravening such Law, duty or agreement.

(b)    Purchaser and the Sellers shall reasonably cooperate, and shall cause their respective Affiliates, officers, employees, agents, auditors and other Representatives to reasonably cooperate in preparing and auditing, as applicable, at Purchaser's expense, any financial statements that the Purchaser may request in connection with its future financing requirements, such financial statements to be compliant with any applicable regulations and stock exchange rules regarding financial statements of businesses acquired or to be acquired.

Section 5.24.  Maintenance of Books and Records.After the Closing, the Purchaser shall, and shall cause the Designated Purchasers to, preserve, until at least the greater of the third (3rd) anniversary of the Closing Date or as otherwise provided in Purchaser's applicable document retention policies, all pre-Closing Date records to the extent relating to the Business possessed or to be possessed by such Person.  After the Closing Date and up until at least the third (3rd) anniversary of the Closing Date, upon any reasonable advance notice and during regular business hours, the Purchaser shall, and/or shall cause the Person holding such records to, (a) provide to the Sellers or their Representatives reasonable access to such records during normal business hours and (b) permit the Sellers or their Representatives to make copies of such records; provided, however, that (A) any such access shall be conducted at Sellers' expense, in accordance with Law (including any applicable Antitrust Law and Bankruptcy Law), under the supervision of the Purchaser's personnel and in such a manner as to maintain confidentiality and not to interfere with the normal operations of the businesses of the Purchaser and its Affiliates, and (B) the Purchaser will not be required to provide to the Sellers access to or copies of any Tax Records or Employee Records where prohibited by applicable Laws.

(b)    Notwithstanding anything contained in this Agreement or any other agreement between the Purchaser and the Sellers executed on or prior to the date hereof, the Purchaser shall not have any obligation to make available to the Sellers or its Representatives, or provide the Sellers or its Representatives with (i) any income Tax Return or any combined or consolidated Tax Return filed by the Purchaser or any of its Affiliates or predecessors, or any related material, or (ii) more generally, any information if making such information available would (A) jeopardize any attorney-client or other legal privilege or (B) potentially cause the Purchaser to be found in contravention of any applicable Law or contravene any fiduciary duty or agreement (including any confidentiality agreement to which the Purchaser or any of its Affiliates is a party), it being understood that the Purchaser shall cooperate in any reasonable efforts and requests for waivers that would enable otherwise required disclosure to the Sellers to occur without so jeopardizing privilege or contravening such Law, duty or agreement.

(c)    In addition to the above, the Sellers shall have the right to retain, following the Closing, copies of any book, record, literature, list and any other written or

recorded information constituting Business Information or any Employee Records to which the Sellers in good faith determine they are reasonably likely to need access for bona fide Tax, financial or legal purposes.

      Section 5.25.  Sasken Agreements.

      Each of the Purchaser and the Sellers shall, and the Purchaser shall, and shall cause any relevant Designated Purchaser, as applicable, to use its reasonable efforts to, prior to the Closing Date, enter into arrangements (collectively, the "**Sasken Agreements**") with Sasken Communication Technologies (the "**Sasken Agreements**") with respect to the manufacturing and supply agreements between the Sellers, on the one hand, and Sasken, on the other hand, existing as of the date hereof in a manner so as to provide the Purchaser or the relevant Designated Purchaser, for a period of not less than three (3) months after the Closing, with the interest, benefits and rights under the Sasken Agreements as the applicable Seller had immediately prior to the Closing.

Section 5.26.   Finalization of Schedules to Transition Services Agreement;
Disputes.The Parties acknowledge that Schedule 1 attached to the form of Transition
Services Agreement contained in Exhibit **L** (the "**General Scope of Included Services**") reflects
the general scope of certain services anticipated by the Parties to be provided pursuant to the
Transition Services Agreement by the TSA Sellers, TSA EMEA Sellers and their respective
Affiliates (and may reflect greater detail as to some of such services), but may not be sufficiently
refined to define all such services in detail.  Accordingly, the Parties agree that, from and after
the execution of this Agreement, they will negotiate in good faith to refine the description of the
services included within the General Scope of Included Services so as to provide sufficient
operational detail (as mutually agreed or as determined by arbitration in accordance with clause
(d), the "**Included Services**").  The Parties agree that Included Services will be finally
determined by such negotiation or by arbitration in accordance with this Section 5.26, provided
that the Included Services will be consistent with, and will omit any services not reasonably
within the service description categories contained in, the General Scope of Included Services.
The Parties further agree that any such negotiation or arbitration will be subject to the following
general limitations and conditions (the "**Scope Guidelines**"): (i) the Included Services will not
include any portion of any service (A) related to the provision of space or real estate or (B) not
provided internally by the applicable Seller or the applicable EMEA Seller (or any Affiliate of
any of them) or provided or procured by the applicable Seller or the applicable EMEA Seller (or
any Affiliate of any of them) from a third party on the date hereof (the Sellers and the TSA
EMEA Sellers hereby represent to the Purchaser that no such internal services have heretofore
been discontinued with the intent of avoiding the provision thereof pursuant to this Section
(provided that, for the avoidance of doubt, discontinuance of such internal services by the EMEA
Sellers in the ordinary course of the Administration (but not with the intent of avoiding the
provision thereof pursuant to this Section) shall not breach this representation), (ii) the Included
Services will not include any service the provision of which, in the Seller's reasonable opinion,
would violate or would risk violating any Law, (iii) if and to the extent that employees of a Seller
or an EMEA Seller or a Subsidiary of a Seller or an EMEA Seller or Provider are Transferred
Employees under this Agreement or Transferring Employees under the EMEA Asset Sale
Agreement, then the Included Services will exclude human tasks formerly undertaken by such
Transferred Employees or Transferring Employees (but equipment, licenses and other resources
not transferred shall, in accordance with the terms of the Transition Services Agreement,
continue to be made available as necessary to perform such tasks under the Transition Services
Agreement as contemplated by this Section 5.26), and (iv) the Included Services will be limited
to those reasonably necessary to carry on the Business after the Closing in a manner consistent
with the operation of the Business during the nine month period prior to the Closing Date (and
will be limited to services provided internally by the applicable Seller or applicable EMEA Seller
(or any Affiliate of any of them), or sourced from a third party by the applicable Seller or
applicable EMEA Seller (or any Affiliate of any of them), during such period).

(b)     If, between the time of execution of this Agreement and Closing,
Purchaser identifies services not reasonably within the service description categories contained
in the General Scope of Included Services which are reasonably advisable in order to assist with
the orderly transition of the Business to Purchaser and which are consistent with the Scope
Guidelines, then the Parties agree that such additional services (defined in operational detail as
described herein) will be provided under the Transition Services Agreement, and the Parties will
negotiate in good faith and use reasonable efforts expeditiously to refine such additional services

in operational detail (failing which, such specification will be determined by arbitration in accordance with this Section 5.26). Further, if, between the time of the execution of this Agreement and Closing, Purchaser identifies services which are reasonably necessary to carry on the Business which are not described in the General Scope of Services and which are not consistent with the Scope Guidelines, other than the services related to the provision of space or real estate, but which can reasonably be provided by the applicable Seller or its Affiliate without violating any Law, or materially changing or burdening the operations of such Seller or EMEA Seller, then the Parties agree that such additional services will be provided under the Transition Services Agreement, and the Parties will negotiate in good faith and use reasonable efforts expeditiously to define such additional services in operational detail (failing which, such specification will be determined by arbitration in accordance with this Section 5.26; any services identified by Purchaser under this Section 5.26(b) are herein referred to as "**Extra Services**").

(c)     It is the expectation of the Parties that the Included Services, any Extra Services will be specified in operational detail, either by mutual agreement or by arbitration, prior to the Closing. However, notwithstanding anything to the contrary in this Agreement, finalization and mutual approval of the Included Services, the Extra Services and the Monetary Costs thereof shall not be a condition to, or delay, the Closing, or permit any Party to rescind or terminate this Agreement. In the event that the Included Services and any Extra Services have not been finalized and mutually approved by the Closing Date, then the following will apply: (i) at Closing, the applicable parties will execute and deliver the Transition Services Agreement in the form of Exhibit **L**, (ii) the Parties will continue to use good faith efforts after the Closing to finalize the Included Services and any Extra Services (subject to, and in accordance with, the terms of this Section 5.26), (iii) pending such finalization, the Sellers will (a) subject to Section 5.26(f) provide such Included Services (subject to the Scope Guidelines), and any Extra Services as are not in dispute and (b) act in good faith and use reasonable efforts, with the cooperation of Purchaser, to provide such other services, subject to the Scope Guidelines, as may be reasonably requested by Purchaser on an interim basis reasonably to support the Business in a manner materially consistent with the operation of the Business during the nine months prior to the Closing Date (any such services provided to be in accordance with the pricing and other provisions of this Section 5.26 and the Transition Services Agreement).

(d)     The Parties acknowledge that for purposes of providing the Included Services and Extra Services from and after the Closing, certain Segregation Projects will need to be undertaken and substantially completed between the date of this Agreement and the Closing Date (the "**Pre-Closing Segregation Projects**"). The Parties agree that, from and after the execution of this Agreement, they will promptly negotiate in good faith to identify the exact scope of the Pre-Closing Segregation Projects reasonably necessary, and the Sellers will cause such Pre-Closing Segregation Projects to be undertaken. The Parties will cooperate as to prioritizing necessary segregation services and assisting with an orderly transition at Closing. At Closing, Purchaser will pay to the Sellers, in addition to all other amounts then required to be paid by Purchaser under this Agreement, one half of the Monetary Cost incurred by the Sellers and their affiliates in providing such Pre-Closing Segregation Projects (the "**Pre-Closing Segregation Costs**"), provided that to the extent the aggregate Pre-Closing Segregation Costs exceeds US$5 million, the Sellers shall bear all of such excess. For the avoidance of doubt, any Pre-Closing Segregation Costs in respect of the Interdependencies (as defined in the Interdependencies Letter) shall be borne by Purchaser pursuant to the Interdependencies Letter.

Any disagreement among the Parties as to the Pre-Closing Segregation Costs will be resolved by arbitration in accordance with this Section 5.26.

(e)    If the Parties have not finalized the Included Services, the Extra Services or the Pre-Closing Segregation Projects forty-five (45) days after the Closing Date, then any affected Party shall have the right but not the obligation to submit the associated disagreements to binding arbitration for resolution, which arbitration proceeding will be initiated by notice delivered by such Party (the "**Complaining Party**") to the applicable counterparty, which notice shall specify the name of a person who shall serve as such Complaining Party's arbitrator. Within ten (10) business days of receipt of such notice, the applicable counterparty (the "**Responding Party**") shall notify the Complaining Party of such Responding Party's choice of a person to act as an arbitrator (if such Responding Party does not so notify the Complaining Party, then the arbitration shall be conducted by the Complaining Party's arbitrator alone). If two arbitrators are so selected, they will attempt to resolve the matter within thirty (30) days, failing which they shall jointly appoint a third arbitrator, who shall be unaffiliated with any of the Parties (a "**Qualified Arbitrator**"), to serve as arbitrator. (If the two arbitrators are unable jointly to appoint a third arbitrator, such third arbitrator, who must be a Qualified Arbitrator, shall be appointed either by the American Arbitration Association or upon application to the Supreme Court for the State of New York sitting in New York County). Any arbitration hereunder shall be conducted in the English language by such three arbitrators (except as expressly provided above), and shall take place in New York City in accordance with the Expedited Procedures of the Commercial Arbitration Rules of the American Arbitration Association. In rendering a decision, the arbitrators shall abide by the provisions of this Agreement and the Transition Services Agreement (and in particular, the arbitrators shall be engaged and directed by the Parties to define the Included Services and any Extra Services in operational detail in accordance with the requirements of Sections 5.26(a) and (b)). The decision of a majority of the arbitrators shall be in writing, shall be final and conclusive on the Parties, and counterpart copies thereof shall be delivered to all of the Parties not later than sixty (60) days of initiation of the date of the submission of the associated disagreements to binding arbitration for resolution. Judgment may be had on the decision of the arbitrators so rendered in any court of competent jurisdiction. The Purchaser shall bear the fees and expenses of the arbitrator it designates, the applicable Seller shall bear the fees and expenses of the arbitrator it designates, and the Purchaser and the applicable Seller shall equally share the fees and expenses of the third arbitrator.

(f)    The Sellers and Purchaser shall respectively use all commercially reasonable efforts, and take all reasonable steps, to obtain the consents and approvals that are required to enable the Providers to perform the Included Services in accordance with the Transition Services Agreement. The costs for obtaining such third-party consents will be shared equally by Purchaser and the applicable Seller; provided, that to the extent the aggregate of such costs exceeds US$2 million, the Sellers shall bear all of such excess. The Parties will reasonably cooperate to mitigate such costs.

(g)    Solely, for purposes of this Section 5.26, the term "Parties" shall also include the TSA EMEA Sellers.

Section 5.27.  Casualty.

At Closing the Sellers shall assign to the Purchaser or Designated Purchaser, as applicable, and the Purchaser or such Designated Purchaser shall be entitled to receive the benefits of, any and all claims and proceeds the Sellers may have with respect to any casualty insurance policies with respect to any Assets which related to a casualty occurring after the date of this Agreement but prior to the Closing, and the Purchaser shall have the right to proceed against any insurance company to recover any such items and will have the right prior to the Closing to participate in all negotiations and discussions regarding the adjustment and settlement of any insurance claims with respect to any property or group of properties having a value in excess of US$500,000.  The Sellers shall promptly after learning of same notify Purchaser in writing of the occurrence of any casualty or similar event with respect to any of the Assets.

Section 5.28.  Ancillary Agreements.

The Primary Parties shall, and shall cause their respective Affiliates to, promptly after the date hereof, negotiate, finalize and, prior to or simultaneously with the Closing, execute and deliver the Ancillary Agreements to which it is contemplated they (or such of their Affiliates) will be parties.  Without limiting the generality of the foregoing, and provided that the following would not diminish or otherwise affect the rights and obligations of the Purchaser, Designated Purchaser or any of the Sellers under this Agreement or any Ancillary Agreement, the Parties acknowledge that, (i) as of the date hereof, the Business entertains several bilateral relationships with other businesses, business segments or divisions (or former businesses, business segments or divisions) of certain Sellers for the supply of products and services (including certain Products and Services), and (ii) to the extent such relationships are required to be in place in order to fulfill customer commitments existing as of the Closing Date and which will continue thereafter (for the duration of any individual customer contract including frame contracts), the Primary Parties shall use their reasonable best efforts to negotiate, or to cause to be negotiated in good faith commercially reasonable terms in order to address such interdependencies among businesses, including through a Development and Support Agreement, a Dual Use Platform Agreement or other appropriate commercial arrangements, and taking into account options available to the Primary Parties; provided that the form of Dual Use Platform Agreement attached hereto as Exhibit M shall not apply to the "Enterprise" products and services used or required by the Business from and after such time that such products and services are no longer owned by the Sellers or their Affiliates.

Section 5.29.  Patents to be Reviewed.

The Sellers agree to review within thirty (30) days of the date hereof, the Patents listed in Section 5.29 of the Sellers Disclosure Schedule to determine whether such Patents shall be deemed "Transferred Patents" for purposes of this Agreement using the same standard and evaluation mechanism as applied to determine the assignability of the Transferred Patents (it being understood that such standard is a "predominantly used" in the Business standard).  The Sellers shall notify the Purchaser in writing not later than forty (40) days after the date hereof whether any of the Patents listed in Section 5.29 of the Sellers Disclosure Schedule were found by Sellers, based on the foregoing review, to be deemed "Transferred Patents" (such Patents, if any, the "New Transferred Patents").  The New Transferred Patents shall be added to Section

1.1(l) of the Sellers Disclosure Schedule and shall be licensed, as applicable, to the Sellers pursuant to the Intellectual Property License Agreement. This Section 5.29 shall not apply to any Patents other than those Patents listed in Section 5.29 of the Sellers Disclosure Schedule.

Section 5.30.  China Assets.

As promptly as practicable after the date hereof, the Sellers and the Purchaser shall negotiate in good faith and, no later than fifteen (15) Business Days prior to the Closing Date, enter into a definitive agreement (the **"China Purchase Agreement"**) pursuant to which the Sellers shall sell, transfer and assign to the Purchaser, and the Purchaser shall purchase and acquire, certain assets of the Sellers used or held for use predominantly in connection with the Business and held or located in China, including, without limitation, laboratory equipment and other research and development assets and properties and personal computers of Transferred Employees (collectively, the **"China Assets"**). The Purchase Price to be paid by the Purchaser for the Assets hereunder shall be reduced by US$230,000, the purchase price to be paid by the Purchaser for the China Assets (the **"China Purchase Amount"**), and (ii) Sellers shall be solely responsible for all customs duties, levies and other similar charges payable in connection with the sale of the China Assets.

Section 5.31.  Subleases.

For each Assumed and Subleased Real Estate Lease designated to be subleased pursuant to Section 2.1.5(b) or Non-365 Subleased Real Estate Lease designated to be subleased pursuant to Section 2.1.6(b) to the extent permitted by, and in accordance with, the terms of the related 365 Real Estate Lease or Non-365 Real Estate Lease (as applicable) and applicable Law and the Real Estate Agreements Term Sheet, the relevant Seller, as sublandlord, and Purchaser or a Designated Purchaser, as subtenant, will enter into a sublease in accordance with, and as provided by, the Real Estate Agreements Term Sheet (each such sublease, a **"Sublease"**) at Closing. Seller's obligation to assume an Assumed and Subleased Real Estate Lease or Non-365 Subleased Real Estate Lease shall be conditioned upon receipt of consent to the related Sublease from the master landlord to the extent required by the terms of the related 365 Real Estate Lease or Non-365 Real Estate Lease (as applicable). Subject to Section 2.1.7(e), any reasonable costs and expenses or fees imposed by the master landlord under the related 365 Real Estate Lease or Non-365 Real Estate Lease (as applicable) in connection with obtaining such Consent shall be borne by the Purchaser.

Section 5.32.  Direct Leases.

For each of the properties owned in fee by the Sellers identified on Section 5.32 of the Sellers Disclosure Schedule (collectively, the **"Direct Lease Real Estate"**) to the extent permitted by applicable Law, Purchaser agrees that the relevant Seller and Purchaser or a Designated Purchaser will enter into a lease in accordance with, and as provided by the Real Estate Agreements Term Sheet (each such lease, a **"Direct Lease"**) at Closing.

Section 5.33.  Licenses.

For each Licensed Real Estate Lease designated to be licensed pursuant to Section 2.1.5(c) or Non-365 Licensed Real Estate Lease designated to be licensed pursuant to

Section 2.1.6(c) to the extent permitted by, and in accordance with, the terms of the related 365 Real Estate Lease or Non-365 Real Estate Lease (as applicable) and applicable Law, the relevant Seller, as licensor, and Purchaser or a Designated Purchaser, as licensee, will enter into a license in accordance with, and as provided by, the Real Estate Agreements Term Sheet (each such license, a "**License**") at Closing. Seller's obligation to assume such Licensed Real Estate Lease shall be conditioned upon receipt of consent to the related License from the master landlord to the extent required by the terms of the related Licensed Real Estate Lease or Non-365 Licensed Real Estate Lease (as applicable). Subject to Section 2.1.7(e), any reasonable costs and expenses or fees imposed by the master landlord under the related Licensed Real Estate Lease or Non-365 Licensed Real Estate Lease (as applicable) in connection with obtaining such Consent shall be borne by the Purchaser.

Section 5.34.   Disclosure Schedules and Certain Information.

(a)     The Sellers shall submit to the Purchaser, every two weeks, written updates to Section 4.10(b) of the Sellers Disclosure Schedule; provided, however, that once employment offers have been made pursuant to Section 7.1.1, such updates shall be limited to those Employees receiving such offers or having the opportunity to continue employment, as applicable; and, provided further that, such updates shall not include Employees who terminate employment or reject such employment offer or continued employment. The Sellers shall use reasonable efforts to submit to the Purchaser, as promptly as reasonably practicable, written updates to the Sellers Disclosure Schedule in respect of ARTICLE IV disclosing any events or developments that occurred or any information learned between the date of this Agreement and the Closing Date that reflect any matters hereafter arising which, if existing, occurring or known to the Sellers at the date hereof, would have been required to be set forth or described in the Sellers Disclosure Schedule in relation to ARTICLE IV; provided, that such updates shall be disregarded for purposes of determining whether or not the condition contained in Section 8.3(a) has been fulfilled.

(b)     The Sellers shall give prompt notice to the Purchaser, and the Purchaser shall give prompt notice to the Sellers, upon obtaining knowledge of the occurrence or non-occurrence of any event that, individually or in the aggregate, would make the timely satisfaction of the conditions set forth in ARTICLE VIII impossible or unlikely.

(c)     The delivery of any update or notice pursuant to this Section 5.34 shall not cure any breach of any representation or warranty requiring disclosure of such matter or otherwise limit or affect the remedies available hereunder to any party receiving such notice. This Section 5.34 shall not constitute a covenant or agreement for purposes of ARTICLE VIII or ARTICLE IX.

Section 5.35.   Affiliates.

The Sellers shall cause their respective Affiliates that are not Parties to this Agreement to comply with the terms and conditions of this Agreement that impose obligations on such Affiliates as the context requires to carry out the provisions of this Agreement and give effect to the transactions contemplated herein.

# ARTICLE VI

# TAX MATTERS

Section 6.1.    <u>Transfer Taxes</u>.

(a)    The Parties agree that the Purchase Price is exclusive of any Transfer Taxes. Except as otherwise provided in Section 5.30 and the China Purchase Agreement, the Purchaser shall (on behalf of itself and the Designated Purchasers) promptly pay directly to the appropriate Tax Authority all applicable Transfer Taxes that may be imposed upon or payable or collectible or incurred in connection with this Agreement or the transactions contemplated herein, or that may be imposed upon or payable or collectible or incurred in connection with the execution of any other Transaction Document; provided, that if any such Transfer Taxes are required to be collected, remitted or paid by a Seller or any Subsidiary, Affiliate, Representative or agent thereof, such Transfer Taxes shall be paid by the Purchaser to such Seller, Subsidiary, Affiliate or agent, as applicable, at the Closing or thereafter, as requested of or by the applicable Seller. For the avoidance of doubt, except as otherwise provided in Section 5.30 and the China Purchase Agreement, Purchaser shall remain liable in respect of any Transfer Taxes regardless of the date that the Assets are removed from the premises of a Seller or any Seller's supplier. All other Closing expenses will be paid by the Party incurring such expenses. Upon request from a Seller, the Purchaser shall provide to such Seller an original receipt (or such other evidence as shall be reasonably satisfactory to such Seller) evidencing the payment of Transfer Taxes by the Purchaser to the applicable Tax Authority under this Section 6.1(a).

(b)    The Purchaser or any Designated Purchaser, as the case may be, shall provide the Sellers prior to Closing with an appropriate certificate of exemption, election and/or other document or evidence to support any reasonable exemption or reduction in respect of Transfer Taxes claimed by the Purchaser or such Designated Purchaser, as the case may be. All Parties shall make reasonable efforts to cooperate to the extent necessary to obtain any such exemption or reduction.

(c)    Provided that, in the opinion of the relevant Purchaser or Designated Purchaser, acting reasonably, the sale qualifies for such an election, the Purchaser and the relevant Designated Purchasers shall jointly execute with the applicable Seller(s) an election under section 167 of Part IX of the Excise Tax Act (Canada) and any equivalent election provided under provincial Laws, in the forms prescribed for such purposes, such that the sale of the Assets will take place without payment of any GST. The Purchaser or the relevant Designated Purchaser, as the case may be, shall file within the prescribed filing period all forms supporting such election with the relevant Tax Authority, together with its Tax Returns for the applicable reporting periods during which the sale of the Assets contemplated herein occurs and shall provide the Seller with a copy of such filed election. The Purchaser shall indemnify and hold the Sellers and their directors and officers harmless with respect to any Tax, interest or penalties assessed against the Sellers as a result of making such election or the Purchaser's or Designated Purchaser's failure to timely file such an election.

Section 6.2.    Withholding Taxes.

The Purchaser and the Designated Purchasers shall be entitled to deduct and withhold from the Purchase Price such amounts as the Purchaser or Designated Purchasers, as the case may be, are required to deduct and withhold under the Code, or any provision of federal, state, provincial, local or foreign Tax Law, with respect to the making of such payment and shall remit any amount so withheld to the appropriate Government Entity in accordance with applicable Law. To the extent such amounts are so withheld by the Purchaser or a Designated Purchaser, as the case may be, such withheld amounts shall be treated for all purposes of this Agreement and any other Transaction Document as having been paid to the relevant Seller in respect of whom such deduction and withholding was made by such Purchaser or Designated Purchaser. None of the Parties is aware of any obligation to deduct and withhold any amounts from the Purchase Price under the Code, or any provision of federal, state, provincial, local or foreign Tax Law, with respect to the making of such payment. If any of the Parties learns of any such obligation on or prior to the Closing Date, then (i) in the case of a Seller, such Seller shall promptly provide reasonable notice of such obligation to the Purchaser, and (ii) in the case of the Purchaser, the Purchaser shall promptly provide reasonable notice of such obligation to the Sellers. In the event that a Tax withholding obligation arises with respect to payment of the Purchase Price, the Parties shall cooperate in good faith to minimize the amounts that the Purchaser or Designated Purchasers, as the case may be, are required to deduct and withhold.

Section 6.3.    Tax Characterization of Payments Under This Agreement. The Sellers and the Purchaser agree to treat all payments made either to or for the benefit of the other Party under this Agreement (other than payment of the Estimated Purchase Price and any interest payments) as adjustments to the Purchase Price for Tax purposes and that such treatment shall govern for purposes hereof to the extent permitted under applicable Tax Law.

Section 6.4.    Apportionment of Taxes.

(a)    Except as otherwise provided in this ARTICLE VI, (i) the Sellers shall and shall cause the Other Sellers, as the case may be, to bear all Taxes of any kind relating to the Assets or the conduct or operation of the Business for all Tax periods or portions thereof ending on or before the Closing Date and (ii) the Purchaser shall and shall cause the Designated Purchasers to bear all Taxes relating to the Assets or the conduct or operation of the Business for all Tax periods or portions thereof beginning after the Closing Date.

(b)    For purposes of this Agreement, any Taxes (excluding, for the avoidance of doubt, any income or gross receipts Taxes) for a "**Straddle Period**" (a Tax period that includes, but does not end on, the Closing Date) shall be apportioned between the Sellers, on the one hand, and the Purchaser and the Designated Purchasers, on the other hand, based on the portion of the period ending on and including the Closing Date and the portion of the period beginning after the Closing Date, respectively. The amount of Taxes shall be allocated between portions of a Straddle Period in the following manner: (i) in the case of a Tax imposed in respect of property (excluding, for the avoidance of doubt, any income or gross receipts Tax) and that applies ratably to a Straddle Period, the amount of Tax allocable to a portion of the Straddle Period shall be the total amount of such Tax for the period in question multiplied by a fraction, the numerator of which is the total number of days in such portion of such Straddle Period and

the denominator of which is the total number of days in such Straddle Period, and (ii) in the case of sales, value-added and similar transaction-based Taxes (other than Transfer Taxes allocated under Section 6.1), such Taxes shall be allocated to the portion of the Straddle Period in which the relevant transaction occurred.

Section 6.5.    Records.Notwithstanding the provisions of Section 5.23 or Section 5.24, but subject to the provisions of Section 5.6, (i) after the Closing Date, the Purchaser and the Designated Purchasers, on the one hand, and the Sellers, on the other hand, will make available to the other, as reasonably requested, and to any Tax Authority, all information, records or documents relating to liability for Taxes with respect to the Assets, the Assumed Liabilities, or the Business for all periods prior to or including the Closing Date (including Straddle Periods), and will preserve such information, records or documents until the expiration of any applicable statute of limitations or extensions thereof, and (ii) in the event that one party needs access to records in the possession of a second party relating to any of the Assets, the Assumed Liabilities or the Business for purposes of preparing Tax Returns or complying with any Tax audit request, subpoena or other investigative demand by any Tax Authority, or for any other legitimate Tax-related purpose not injurious to the second party, the second party will allow representatives of the other party access to such records during regular business hours at the second party's place of business for the sole purpose of obtaining information for use as aforesaid and will permit such other party to make extracts and copies thereof as may be necessary or convenient. The obligation to cooperate pursuant to this Section 6.5 shall terminate at the time the relevant applicable statute of limitations expires (giving effect to any extension thereof).

(b)    At any time within the ten (10) years immediately following the Closing, the Sellers may cause copies of Restricted Technical Records to be placed into escrow with the Records Custodian, who shall hold such Restricted Technical Records for a term ending no later than ten (10) years after the Closing Date in accordance with an escrow agreement between the Purchaser (or the relevant Designated Purchaser, as applicable), the Sellers and the Records Custodian, in form satisfactory to the Purchaser (or the relevant Designated Purchaser) and the Main Sellers. The escrow agreement will provide for access to the copies of the Restricted Technical Records only by the relevant Canadian Tax Authority or by Tax advisors of any purchaser ("**Tax Credit Purchaser**") relating to the scientific research and experimental development tax credits of the Sellers under the Income Tax Act (Canada), and only if such advisors have executed an appropriate confidentiality agreement in form satisfactory to the Purchaser (or the relevant Designated Purchaser), acting reasonably. The access permitted by the escrow agreement shall be only for the limited purpose of defending any audit, claim or action by any Canadian Tax Authority in respect of the characterization of expenditures by NNL or NNTC as qualified expenditures on scientific research and experimental development for purposes of the applicable provisions of the Income Tax Act (Canada) ("**Qualified Expenditures**").

(c)    The Purchaser shall use reasonable efforts to make available to the relevant Tax Authority or Tax advisors of the Tax Credit Purchaser, those former employees of NNL or NNTC, as the case may be, with direct knowledge of the Qualified Expenditures who are then employed by the Purchaser and whose cooperation is necessary for the purpose of defending any audit, claim or action by any Tax Authority of the characterization of expenditures

by NNL or NNTC, as the case may be, as Qualified Expenditures, and provided such advisors have executed an appropriate confidentiality agreement satisfactory to the Purchaser.

(d)     The Purchaser shall have no obligation to provide any access under this provision unless the Seller (if there is no Tax Credit Purchaser in respect of the request for access) or the Tax Credit Purchaser pays all the Purchaser's reasonable expenses in connection with the foregoing provisions, including a reasonable per diem rate for access to former employees of NNL or NNTC, as the case may be (based on the total compensation of the employee at the time access is provided).

(e)     At the request of the Purchaser, the Sellers shall provide reasonable access to records and employees of the Sellers to assist the Purchaser in claiming any future scientific research and experimental development Tax credits for Qualified Expenditures.

(f)     The Sellers shall have no obligation to provide any access under this provision unless the Purchaser pays all of the Sellers' reasonable expenses in connection with the foregoing provisions, including a reasonable per diem rate for access to employees of the Sellers (based on the total compensation of the employee at the time access is provided).

Section 6.6.    Tax Returns.

(a)     The Sellers shall be responsible for the preparation and timely filing (taking into account any extensions received from the relevant Tax Authorities) of all Tax Returns in respect of the Assets or the Business, for all Pre-Closing Taxable Periods (other than any Tax Returns with respect to Transfer Taxes ("**Transfer Tax Returns**") described below in Section 6.6(b)). Such Tax Returns shall be true, correct and complete in all material respects. Except as otherwise provided in this Agreement, all Taxes indicated as due and payable on such Tax Returns shall be paid by (or shall be caused to be paid by) Sellers as and when required by Law.

(b)     Each Transfer Tax Return with respect to Transfer Taxes imposed in respect of this Agreement and the transactions contemplated herein or in respect of the execution of any other Transaction Document shall be prepared by the Party that customarily has primary responsibility for filing such Transfer Tax Return pursuant to the applicable Tax Laws. Any Transfer Tax Returns prepared by the Sellers pursuant to this Section 6.6(b) shall be made available to the Purchaser at least five (5) Business Days before such Tax Returns are due to be filed. The Purchaser shall pay to the Sellers any amount of Transfer Taxes payable in respect of Transfer Tax Returns to be filed by the Sellers pursuant to this Section 6.6(b) at least one (1) Business Day before such Transfer Tax becomes due and payable.

(c)     The Purchaser or a Designated Purchaser shall be responsible for the preparation and timely filing (taking into account any extensions received from the relevant Tax Authorities) of all Tax Returns with respect to the Assets or the Business for all Straddle Periods. Such Tax Returns shall be true, correct and complete in all material respects. All Taxes indicated as due and payable on such Tax Returns shall be paid by (or shall be caused to be paid by) the Purchaser or a Designated Purchaser as and when required by Law.

(d)     The Sellers shall be entitled to review and comment on any Tax Return (other than a Transfer Tax Return described in Section 6.6(b)) or any Tax Return relating to income or gross receipts Taxes of the Purchaser) prepared by the Purchaser or a Designated Purchaser for any Straddle Period before any such Tax Return is filed.  The Purchaser shall submit a draft of any such Tax Return to the Main Sellers at least thirty (30) days before the date such Tax Return is required to be filed with the relevant Tax Authority.  The Main Sellers shall have ten (10) days after the date of receipt thereof to submit to the Purchaser, in writing, the Main Sellers' written comments with respect to such Tax Return.  The Purchaser shall notify the Main Sellers within five (5) days after receipt of such comments of (a) the extent, if any, to which the Purchaser accepts such comments and will file such Tax Return in accordance therewith and (b) the extent, if any, to which the Purchaser rejects such comments.  To the extent the Purchaser rejects the comments of the Main Sellers, the Purchaser and the Main Sellers promptly shall negotiate in good faith to resolve their disagreements; if no agreement has been reached within five (5) days, the Parties immediately shall appoint an Independent Auditor to determine the correct manner for reporting the items that are in dispute and shall provide to the Independent Auditor all relevant information.  The Independent Auditor shall have ten (10) days to submit its determination, which shall be binding upon the Parties, and the Purchaser shall file such Tax Return in accordance therewith.  Notwithstanding the preceding sentence, if the Independent Auditor shall not have submitted its determination on or before the date such Tax Return is required to be filed with the relevant Tax Authority (giving effect to any valid extensions), the Purchaser shall file its original draft of such Tax Return and shall, upon receiving the Independent Auditor's later determination and to the extent permitted under applicable Law, promptly file an amended return in accordance therewith.  The fees and expenses of the Independent Auditor shall be paid by the Party whose position is deemed to be least correct by the Independent Auditor.

(e)     Notwithstanding any contrary provision in this ARTICLE VI, each Seller shall pay to the Purchaser the amount of its liability for Taxes shown to be due on any Tax Return for a Straddle Period at least three (3) Business Days prior to the due date thereof, giving effect to valid extensions; provided, however, that (i) if such Seller and the Purchaser are unable to agree as to the amount of such liability prior to such due date, such Seller shall pay to the Purchaser such amount as it in good faith believes that it owes, and (ii) to the extent the Independent Auditor determines that the amount of such liability is greater than the amount actually paid to the Purchaser prior to such due date, such Seller shall pay to the Purchaser such excess within three (3) Business Days after receiving the Independent Auditor's determination.

(f)     Notwithstanding any contrary provision in this ARTICLE VI, the Sellers shall not be entitled to any Tax-related information, including any Tax Return, that includes assets or operations of the Purchaser or any of its Affiliates in addition to the Assets; provided, however, that the Purchaser shall provide the Sellers with a copy of a pro forma Tax Return relating solely to the Assets for any Straddle Period.

Section 6.7.    Allocation of Purchase Price.

(a)     Except as otherwise required by applicable Law, the Parties shall (i) allocate to the tangible Assets a portion of the Purchase Price (and, to the extent properly taken into account under the applicable Tax Laws, the Assumed Liabilities) equal to the net book

value of such tangible Assets as of the Closing Date, and (ii) allocate to the intangible Assets the balance of the Purchase Price.

(b)     To the extent necessary to file Transfer Tax Returns, the Parties shall negotiate in good faith to determine an allocation of the Purchase Price (and, to the extent properly taken into account under the applicable Tax Laws, the Assumed Liabilities) among the Assets in accordance with the principles of Section 1060 of the Code and the Treasury Regulations promulgated thereunder and other applicable Tax Laws, which allocation shall be subject to the principles of Section 6.7(a) (such allocation, a "**Partial Allocation**"). If the Parties do not reach agreement on a Partial Allocation after negotiating in good faith, the Partial Allocation shall be submitted to the Independent Auditor, which shall prepare a final Partial Allocation; provided, however, that if a different Partial Allocation is required by a Government Entity (including as a result of the Bankruptcy Proceedings), then the Partial Allocation shall be modified as necessary to be consistent with the required allocation but in all cases shall be subject to the principles of Section 6.7(a). Notwithstanding the preceding sentence, if the Parties have not reached agreement on the Partial Allocation and the Independent Auditor has not submitted its determination on or before the date that a Transfer Tax Return is required to be filed with the relevant Tax Authority (giving effect to any valid extensions) pursuant to Section 6.6(b), then such Tax Return shall be timely filed in the manner that the Party with primary responsibility for filing such return reasonably determines and shall, upon receiving the Independent Auditor's later determination and to the extent permitted under applicable Law, promptly file an amended return in accordance therewith. The Parties agree (i) to be bound by the final Partial Allocation accepted by the Parties or prepared by the Independent Auditor (as modified to be consistent with the allocation required by a Government Entity, as described above), as applicable, and (ii) to act in accordance with the allocations contained in such final Partial Allocation for all purposes relating to Transfer Taxes, including the preparation, filing and audit of any Transfer Tax Returns.

Section 6.8.    Tax Elections.

(a)     Subsection 20(24) Election. Each of the Purchaser and each Designated Purchaser and the relevant Seller shall, if applicable, jointly execute and file an election under subsection 20(24) of the *Income Tax Act* (Canada) in the manner required by subsection 20(25) of the *Income Tax Act* (Canada) and under the equivalent or corresponding provisions of any other applicable provincial or territorial statute, in the prescribed forms and within the time period permitted under the *Income Tax Act* (Canada) and under any other applicable provincial or territorial statute, as to such amount paid by the Seller to the Purchaser or relevant Designated Purchaser, as the case may be, for assuming future obligations. In this regard, the Purchaser, the Designated Purchasers and the Seller acknowledge that a portion of the Assets transferred by the Seller pursuant to this Agreement and having a value equal to the amount elected under subsection 20(24) of the *Income Tax Act* (Canada) and the equivalent provisions of any applicable provincial or territorial statute, is being transferred by the Seller as a payment for the assumption of such future obligations by the Purchaser or Designated Purchaser, as the case may be.

(b)     Other Tax Elections. The Purchaser and the Seller shall also execute and deliver such other Tax elections and forms as they may mutually agree upon.

## ARTICLE VII

## EMPLOYMENT MATTERS

Section 7.1.    <u>Employment Obligations</u>

7.1.1.    <u>Employment Terms</u>.

(a)    Promptly following the granting of the later of the U.S. Sale Order and the Canadian Approval and Vesting Order, the Purchaser shall, or shall cause a Designated Purchaser to, extend a written offer of employment to the Employees as set forth on Section 7.1 of the Sellers Disclosure Schedule, such offer being contingent (x) in each case, in the discretion of the Purchaser, on such Employee passing a background check and, if such Employee is located in the United States, drug screening, in all cases, to the extent permitted and consistent with applicable Law and (y) in the case of Inactive Employees, upon their return to active status (other than Employees set forth on Section 7.1 of the Sellers Disclosure Schedule whose employment transfers automatically by operation of Law to the Purchaser or a Designated Purchaser). The Sellers shall have the right to review any offer of employment made pursuant to this Section 7.1 prior to it being sent to any Employee. Such offer of employment shall provide for an employee consideration period of at least one week, or such longer period as required by applicable Law. Such offers (and, with respect to Employees whose employment transfers by operation of Law, such continued employment) shall be consistent with the requirements of applicable Law and on terms and conditions no less favorable, in the aggregate, than those the Employees currently have, but subject to certain adjustments to conform to the Purchaser's standard employment policies where legally possible.

(b)    The Sellers shall provide the Purchaser or a Designated Purchaser with such additional information as the Purchaser may reasonably require in order to comply with its obligations under this ARTICLE VII. Notwithstanding anything to the contrary contained herein, as a condition to the transfer of employment (except as prohibited by applicable Law), the Purchaser or Designated Purchaser may require Employees to provide evidence that they are legally permitted to be employed by the Purchaser or a Designated Purchaser, as required by applicable Law.

(c)    Any Employee who accepts such offer of employment and commences employment with the Purchaser or a Designated Purchaser, and any Employee whose employment transfers by operation of Law, shall be deemed to be a Transferred Employee for all purposes of this Agreement. Inactive Employees who accept such offer shall remain employed by the relevant Seller until the first (1st) Business Day immediately following the date the Inactive Employee is released to return to active employment in accordance with Sellers' leave policies. The Purchaser or a Designated Purchaser shall use reasonable efforts from the date hereof until the Closing Date to obtain, at its cost, such visas or permits as are required for it to employ Visa Employees. Visa Employees shall remain employed by the relevant Seller following the Closing Date under the terms and conditions of the Loaned Employee Agreement. The Effective Hire Date for Employees is (a) the Employee Transfer Date for those Employees other than Inactive Employees and Visa Employees, (b) 12:01 a.m. on the first Business Day

following the release to return to active employment from leave for all Inactive Employees and (c) the date specified in the Loaned Employee Agreement with respect to Visa Employees.

(d)    For the twelve (12) month period following the Closing Date (or for such shorter period as a Transferred Employee remains employed by Purchaser or a Designated Purchaser), such Transferred Employee, subject to applicable Law, shall be employed on terms and conditions of employment not materially less favorable, in the aggregate, than the terms and conditions of employment provided to such Employees immediately prior to the Closing, subject, following the Effective Hire Date, to certain adjustments to conform to the Purchaser's standard employment policies where legally possible; provided, however, that, subject to the terms of the Loaned Employee Agreement, neither this Section 7.1 nor Section 7.2 restricts the right of the Sellers, the Purchaser or a Designated Purchaser to terminate the employment of any Transferred Employee after the Closing; provided, further, that, following the Effective Hire Date, except as provided in Section 7.4, nothing shall prohibit the Purchaser or any Designated Purchaser from amending or terminating, in whole or in part, any Purchaser Employee Plan or from making changes to such terms and conditions of employment that are generally applicable and broadly based across the Purchaser's or Designated Purchaser's employee population; and provided, further, that for purposes of clarity the Purchaser shall not be required to offer in any offer made pursuant to this ARTICLE VII any (i) equity, (ii) retiree medical or other retiree welfare arrangement or (iii) defined benefit pension plan, in each case, unless required by applicable Law.

### 7.1.2.    Employee Benefits.

(a)    The Purchaser or a Designated Purchaser shall, and shall cause its relevant Affiliates to, recognize the service date of each Transferred Employee as set out in the Employee Information for all purposes, including membership, vesting and entitlement to benefits under the relevant Purchaser Employee Plans, but not for purposes of benefit accrual under any Purchaser Employee Plan that is a defined benefit pension plan, except as otherwise provided herein, or to the extent that such crediting would result in duplication of benefits.

(b)    After the date hereof, the Sellers and the Purchaser shall cooperate promptly and in good faith in preparing the transition of the Transferred Employees, as applicable, from coverage under the Seller Employee Plans to coverage under the Purchaser Employee Plans effective as of the Transferred Employee's Effective Hire Date.

(c)    Without limiting the generality of the foregoing, the Purchaser shall, or shall cause its relevant Affiliates to, provide the following benefits to Transferred Employees:

(i)    The Sellers shall pay the amount of compensation with respect to the accrued and unused vacation hours that is due and owing to the Transferred Employees (other than those Transferred Employees specified in Section 7.1.2(c)(i) of the Sellers Disclosure Schedule (the "**Specified Transferred Employees**")), up to their Effective Hire Date, to such Transferred Employees by the date required under applicable Law. The Purchaser will, and will cause the relevant Designated Purchasers to, make reasonable efforts to accommodate requests for unpaid time off of such Transferred Employees until such time as they accrue sufficient paid time off under the Purchaser

94

Employee Plans to address their vacation plans. Section 7.1.2(c)(i) of the Sellers Disclosure Schedule sets forth the amount of accrued and unused vacation hours that are due and owing to the Specified Transferred Employees as of the date hereof and will be updated by Sellers as of the Closing Date with respect to Specified Transferred Employees who are employed as of that date and have not rejected the Purchaser's or Designated Purchaser's offer of employment or continued employment with the Purchaser or Designated Purchaser. The Purchaser shall, or shall cause its relevant Affiliates to, grant each such Transferred Employee paid time off in an amount equal to such accrued unused vacation hours for such Transferred Employee as set forth in Section 7.1.2(c)(i) of the Sellers Disclosure Schedule. If such Specified Transferred Employee terminates employment with the Purchaser or an Affiliate of Purchaser prior to receiving such paid time off, as described above, the Purchaser shall pay such Transferred Employee an amount equal to any such unused paid time off upon such employment termination.

(ii)    For the avoidance of doubt, such vacation accrual rate applicable to Specified Transferred Employees shall not be decreased by Purchaser or an Affiliate of Purchaser as a result of the obligation in Section 7.1.2(c)(i) that Purchaser or its Affiliates grant such Employees accrued and unused vacation hours as set forth in Section 7.1.2(c)(i) of the Sellers Disclosure Schedule.

(iii)    Each Transferred Employee (and their eligible dependents, as applicable), shall be eligible, effective as of the relevant Effective Hire Date, to participate in and accrue benefits under the Purchaser Employee Plans that the Purchaser (or, as applicable, a Designated Purchaser) extends to similarly situated employees of the Purchaser (or the applicable Designated Purchaser) subject to the terms of the Purchaser Employee Plans. With respect to each Transferred Employee (and their eligible dependents, as applicable), the Purchaser or the relevant Purchaser's Affiliates shall cause such plans to (i) waive any eligibility periods, evidence of insurability or pre-existing condition limitations to the extent such limitations no longer apply to such Transferred Employees under the comparable corresponding Seller Employee Plan and (ii) honor any deductibles, co-payments, co-insurance or out-of-pocket expenses paid or incurred by such employees, including with respect to their dependents, under comparable Seller Employee Plans during the Purchaser Employee Plan year in which the relevant Effective Hire Date occurs, provided that such employee provides an explanation of benefits or similar documentation of such expenses paid or incurred to the Purchaser or its Affiliates which is reasonably satisfactory to Purchaser.

(d)    The Sellers shall be solely responsible for any required notice under the WARN Act with respect to terminations of employment of Employees that occur on or prior to the Closing Date provided that the Purchaser or Designated Purchaser, as applicable, has satisfied its obligations as set out in this ARTICLE VII. Purchaser shall be solely responsible for any required notice under the WARN Act with respect to terminations of employment of Transferred Employees that occur after the Closing Date.

Section 7.2.    Other Employee Covenants.

(a)    After the date hereof, and subject to each Party's disclosure obligations imposed by Law or by Government Entities and each Party's obligations hereunder, neither the Purchaser, the Sellers nor any of their respective Affiliates shall issue any announcement or communication to their respective employees or the Employees, prior to consultation with, and the approval of, the other Party (not to be unreasonably withheld or delayed) with respect to this Agreement or any of the transactions contemplated hereby. If requested, the Parties shall reasonably cooperate in respect of the development and distribution of any announcement and communication to the employees of the Sellers, including Employees, with respect to this Agreement or any of the transactions contemplated hereby.

(b)    Prior to the Effective Hire Date (for Transferred Employees) and before and after the Closing Date for all other Employees, the Purchaser undertakes to keep the Employee Information in confidence including taking the following actions:

(i)    the Purchaser shall, and shall cause the Designated Purchasers to, restrict the disclosure of the Employee Information only to such of its employees, agents and advisors as is reasonably necessary for the purposes of complying with its obligations pursuant to this Agreement;

(ii)    the Employee Information shall not be disclosed to any Person other than those set forth in Section 7.2(b)(i) above (including, for the avoidance of doubt, any other employee of the Purchaser or any Designated Purchaser or other Affiliate of the Purchaser) without the consent of the Main Sellers, such consent not to be unreasonably withheld;

(iii)    the Employee Information shall not be used except for the purposes of complying with the obligations of the Purchaser and the Designated Purchasers pursuant to this Agreement and shall be returned to the Sellers or destroyed, at the Sellers' election, if this Agreement is terminated; and

(iv)    the Purchaser shall, and shall cause the Designated Purchasers to, comply with such additional obligations as may be reasonably required in any particular jurisdiction to comply with any applicable data privacy Laws.

(c)    As soon as practicable, but in no event later than thirty (30) days following the Closing Date, except to the extent prohibited by applicable data privacy Laws and subject to consent by such Employee in his or her written offer of employment, or as otherwise required by Law, the Sellers shall provide the Purchaser or the Designated Purchaser with (i) certain mutually agreed HR and Payroll SAP employee data as stored in Sellers SAP system with respect to each Transferred Employee and (ii) the Employee Records (or a copy thereof) of Transferred Employees in the province of Quebec in Canada and in other jurisdictions where required by applicable Law. The Purchaser and the Sellers shall cooperate with each other to provide for an orderly transition of the Transferred Employees from the Sellers to the Purchaser or the Designated Purchasers, as applicable, and to minimize the disruption to the respective businesses of the Parties resulting from the transactions contemplated hereby.

(d)    During the Non-Solicitation Period, the Sellers shall not, without the advance written consent of Purchaser, either directly or indirectly solicit for employment or hire any Transferred Employee unless the employment of such Transferred Employee is involuntarily terminated without cause by the Purchaser or Designated Purchaser prior to such action by the Sellers; provided, however, that nothing in this Section 7.2(d) shall prevent the Sellers from (i) conducting generalized employment searches, including placing *bona fide* public advertisements, that are not specifically targeted at such Transferred Employees or (ii) hiring such Transferred Employees identified through such employment searches.

(e)    During the Non-Solicitation Period, Purchaser and the Designated Purchasers shall not, without the Seller's advance written consent or as expressly permitted by this Agreement, either directly or indirectly solicit for employment or hire (i) any of the employees of the Sellers, unless the employment of such employee (excluding any employee described in (ii) or (iii) below) is involuntarily terminated without cause by the Sellers prior to such action by the Purchaser or the Designated Purchasers, (ii) any Employees who have rejected the employment offer of Purchaser or Designated Purchasers or objected to their transfer of employment to Purchaser or Designated Purchasers pursuant to this Agreement or (iii) any Employees to whom the Purchaser or any Designated Purchaser have not made an employment offer or provided the opportunity for continued employment; provided, however, that nothing in this Section 7.2(e) shall prevent the Purchaser or the Designated Purchasers from (x) conducting generalized employment searches, including placing bona fide public advertisements, that are not specifically targeted at such employees or former employees of the Sellers or (y) hiring such employees or former employees of the Sellers identified through such employment searches; and, provided further that with respect to any Employee described in (ii) or (iii) above who becomes employed with the Purchaser or a Designated Purchaser other than through operation of Law during the Non-Solicitation Period, the Purchaser or the Designated Purchaser, as applicable, shall be required to reimburse the Sellers, if applicable, for any notice of termination payment (including under the WARN Act) and/or severance payments, in either case, to the extent thereto timely paid, by Sellers to such Employee.

(f)    During the Non-Solicitation Period, neither Party shall, except as specifically set out in this Agreement or without the other Parties' written consent or as expressly permitted by this Agreement, either directly or indirectly solicit for employment or hire any of the employees with whom the Party has had personal contact, or who became known to the Party in the course of its negotiation of the transactions contemplated hereby; provided that nothing in this Section 7.2(f) shall restrict or preclude the Party, without such consent, from employing any employee Party who (x) contacts such Party directly at his or her own initiative without any direct or indirect solicitation by or encouragement from such party, (y) responds to a mass media solicitation or advertisement consistent with such Party's past practices, as applicable, that is not directed at  the employees, or (z) is contacted by a third party executive search firm or employment agency, so long the Party did not provide guidance as to such employee to the third party firm or agency.

Section 7.3.    Excluded Employee Liabilities.

Except for the Assumed Liabilities and except as otherwise specifically provided in the Loaned Employee Agreement, the Sellers shall retain, and none of the Purchaser or the

Designated Purchasers shall assume or be deemed to have assumed, any Liabilities of the Sellers or their Affiliates relating to Employees other than the Assumed Liabilities (the "**Excluded Employee Liabilities**").  The Excluded Employee Liabilities shall include, but not be limited to, the following:

        (a)     the Sellers' or any of their Affiliates' obligations to contribute to, make payments with respect to or provide benefits under any Seller Employee Plan (including, for the avoidance of doubt, any arrangement that provides severance-type benefits) except with respect to the Transferred Employee Plans;

        (b)     any Liability with respect to the KERP, the KEIP, the Calgary Retention Plan or any other Seller retention plan, program or arrangement in effect as of the Closing Date that provides benefits to any Transferred Employee;

        (c)     any obligation to provide continuation coverage pursuant to COBRA under any Seller Employee Plan that is a "group health plan" (as defined in Section 5000(b)(1) of the Code) to the Transferred Employees and/or their qualified beneficiaries with respect to a COBRA qualifying event that occurs prior to such Employees' Employee Transfer Date;

        (d)     Liabilities resulting from any Action (i) with respect to any Employee relating to his/her employment or termination of employment with any of the Sellers, or (ii) with respect to an applicant with respect to potential employment with any of the Sellers in the Business; and

        (e)     any Liabilities relating to the Employees or any former employees employed in the Business by the Sellers (with respect only to such employee's employment with the Sellers), including payments or entitlements that Sellers or any of their Affiliates may owe or have promised to pay to any current or former Employee (whether or not becoming a Transferred Employee prior to or in connection with the Closing, (including any Employee who does not accept an offer of employment with the Purchaser or a Designated Purchaser)), including wages, other remuneration, holiday, bonus, severance pay (statutory or otherwise), commission, post-employment medical or life obligations, pension contributions or benefits, Taxes, ERISA Affiliate Liability, any obligation, liability or expense relating to any employment agreement or contract, any former Collective Labor Agreement, the employment practices of Sellers or any of their Affiliates prior to the Closing Date and any other liability, payment or obligations related to current or former Employees, including any WARN Act Liabilities relating to actions of the Sellers arising on or prior to the Closing Date, any workers compensation, labor, social welfare or similar Law, if any, including any such Liabilities arising out of or resulting from the Closing and/or the consummation of the transactions contemplated by this Agreement, other than any Assumed Liabilities and other than with respect to liabilities incurred after the Closing Date under Purchaser Employee Plans by Transferred Employees who are terminated by Purchaser or a Designated Purchaser after the Closing Date.

        Section 7.4.   <u>Canadian Pension Plans</u>.

        As of the Closing Date, the Purchaser or the Designated Purchaser, as applicable, shall establish or otherwise provide a registered pension plan for Transferred Employees

employed in Canada and maintain such plan for a period of at least five (5) years following the Closing Date and each such Transferred Employee's participation shall commence on such Transferred Employee's Effective Hire Date.

Section 7.5.    Sole Benefit of Sellers and Purchaser.

The terms and provisions of this ARTICLE VII are for the sole benefit of the Sellers and the Purchaser. Nothing contained herein, express or implied (i) shall be construed to establish, amend, or modify any Seller Employee Plan, any Purchaser Employee Plan, or any other benefit plan, program, agreement or arrangement, (ii) shall alter or limit the ability of the Purchaser, the Sellers, or any of their respective Affiliates to amend, modify or terminate any Seller Employee Plan, any Purchaser Employee Plan (other than as provided in Section 7.4). or any other benefit or employment plan, program, agreement or arrangement after the Closing Date, (iii) is intended to confer or shall confer upon any current or former employee any right to employment or continued employment, or constitute or create an employment agreement with any Transferred Employees, or (iv) is intended to confer or shall confer upon any individual or any legal representative of any individual (including employees, retirees, or dependents or beneficiaries of employees or retirees and including collective bargaining agents or representatives) any right as a third-party beneficiary of this Agreement.

## ARTICLE VIII

## CONDITIONS TO THE CLOSING

Section 8.1.    Conditions to Each Party's Obligation.The Parties' obligation to effect, and, as to the Purchaser, to cause the relevant Designated Purchasers to effect, the Closing is subject to the satisfaction or the express written waiver of the Primary Parties, at or prior to the Closing, of the following conditions:

(a)    *Regulatory Approvals*.  All Regulatory Approvals shall have been obtained.

(b)    *No Injunctions or Restraints*.  There shall be in effect no Law, or order, injunction, decree or judgment of any court or other Government Entity in the U.S. or Canada prohibiting the consummation of any of the transactions contemplated hereby, and there shall not be any proceedings pending by any Government Entity in the U.S. or Canada seeking such prohibition.

(c)    *U.S. Sale Order and Canadian Approval and Vesting Order*.  The U.S. Sale Order and the Canadian Approval and Vesting Order (i) shall have been entered and not modified and (ii) shall have become Final Orders, provided, that, this condition under Section 8.1(c)(ii) may be waived by the Purchaser in its sole discretion.

(d)    *Satisfaction of Conditions under EMEA Asset Sale Agreement*.  The conditions to Closing (as that term is defined in the EMEA Asset Sale Agreement) set out in Clause 15.1 of the EMEA Asset Sale Agreement shall have been satisfied or waived in accordance with the terms of the EMEA Asset Sale Agreement.

(e)    *Consummation of Closing under EMEA Asset Sale Agreement.*  The transaction contemplated by the EMEA Asset Sale Agreement shall be completed contemporaneously with the Closing hereunder.

Section 8.2.    Conditions to Sellers' Obligation. The Sellers' obligation to effect the Closing shall be subject to the fulfillment (or express written waiver by the Main Sellers), at or prior to the Closing, of each of the following conditions:

(a)    *No Breach of Representations and Warranties.*

(i)    Each of the representations and warranties set forth in ARTICLE III (other than those referred to in clause (ii) below), disregarding all materiality and material adverse effect qualifications contained therein, shall be true and correct (x) as if restated on and as of the Closing Date or (y) if made as of a date specified therein, as of such date, except, in each case, for any failure to be true and correct that, individually or together with other such failures, has not had, and would not reasonably be expected to have, a material adverse effect on the ability of the Purchaser to consummate the transactions contemplated by this Agreement and the Ancillary Agreements.

(ii)    Each of the representations and warranties set forth in Sections 3.1, 3.2 and 3.3, disregarding all materiality and material adverse effect qualifications contained therein, shall be true and correct in all material respects (x) as if restated on and as of the Closing Date or (y) if made as of a date specified therein, as of such date.

(b)    *No Breach of Covenants.*  The covenants, obligations and agreements contained in this Agreement to be performed or complied with by the Purchaser or the Designated Purchasers on or before the Closing shall not have been breached in any material respect.

Section 8.3.    Conditions to Purchaser's Obligation. The Purchaser's obligation to effect, and to cause the relevant Designated Purchasers to effect, the Closing shall be subject to the fulfillment (or express written waiver by the Purchaser), at or prior to the Closing, of each of the following conditions:

(a)    *No Breach of Representations and Warranties.*

(i)    Each of the representations and warranties set forth in ARTICLE IV (other than those referred to in clause (ii) below), disregarding all materiality and Material Adverse Effect qualifications contained therein, shall be true and correct (x) as if restated on and as of the Closing Date or (y) if made as of a date specified therein, as of such date, except, in each case, for any failure to be true and correct that has not had, and would not reasonably be expected to have, a Material Adverse Effect.

(ii)    Each of the representations and warranties set forth in Sections 4.1, 4.2 and 4.3, disregarding all materiality and Material Adverse Effect qualifications contained therein, shall be true and correct in all material respects (x) as if

restated on and as of the Closing Date or (y) if made as of a date specified therein, as of such date.

(b)    *No Breach of Covenants.*  The covenants, obligations and agreements contained in this Agreement to be performed or complied with by the Sellers on or before the Closing shall not have been breached in any material respect.

(c)    *Unbundling and Assignment.*  With respect to Seller Contracts that accounted, in the aggregate, for at least 75% of the sales revenue related to the Business in fiscal year 2008 (the "**Specified Contracts**"), the Sellers shall have (or will prior to or at the Closing) (i) in the case of Assumed and Assigned Contracts, assumed and assigned such Specified Contracts to the Purchaser or a Designated Purchaser pursuant to Section 2.1.5, (ii) in the case of Designated Non-365 Contracts, obtained and delivered to the Purchaser all Consents of the other parties thereto or any Third Party (including a Government Entity) necessary or required for the assignment and assumption of such Designated Non-365 Contracts to the Purchaser or a Designated Purchaser pursuant to Section 2.1.6, and (iii) in the case of Bundled Contracts, other than the Contracts assumed and assigned as required by the foregoing clause (i), amended such Bundled Contracts and entered into new Contracts in accordance with Section 5.15 with the counterparties to such Specified Contracts so that such Contracts will be Assigned Contracts at the Closing.

(d)    *Certificates.*  The Sellers shall have delivered to the Purchaser duly executed certificates, as set forth in Section 2.3.2(b).

## ARTICLE IX

## TERMINATION

Section 9.1.    Termination.This Agreement may be terminated at any time prior to the Closing (except in the case of Section 9.1(e) where it shall be automatic):

(a)    by mutual written consent of the Primary Parties;

(b)    by either the Main Sellers or the Purchaser, upon written notice to the other:

(i)    if the U.S. Sale Order and the Canadian Approval and Vesting Order are not entered within thirty (30) days after the Auction (as defined in the U.S. Bidding Procedures Order);

(ii)    if the EMEA Asset Sale Agreement is terminated in accordance with its terms;

(iii)    if the NNSA Irrevocable Offer is terminated in accordance with its terms; or

(iv)    if the Closing does not take place within one-hundred and eighty (180) days from the date of the U.S. Sale Order.

(c)    (i) by the Main Sellers in the event of a material breach by the Purchaser of the Purchaser's representations, warranties, agreements or covenants set forth in this Agreement, which breach would result in a failure to satisfy the conditions to Closing set forth in Sections 8.1(a), 8.2(a), or 8.2(b) or (ii) by the Purchaser in the event of a material breach by the Sellers of the Sellers' representations, warranties, agreements or covenants set forth in this Agreement, which breach would result in a failure to satisfy the conditions to Closing set forth in Sections 8.1(a), 8.1(c) or 8.3, as applicable, and, in each case in respect of (i) and (ii) above, which, if capable of being cured, is not cured within forty-five (45) days from receipt of a written notice from the non-breaching Party;

(d)    by the Purchaser in the event the Sellers fail to consummate the Closing in breach of Section 2.3, within five (5) Business Days of written demand by the Purchaser to consummate the Closing; or

(e)    upon the breach by the Main Sellers of their obligations under Section 2 of the Termination Fee Side Agreement, which results in the Purchaser being entitled to the Termination Fee (as defined in the Termination Fee Side Agreement) pursuant to Section 3 thereof.

provided, however, that (x) the right to terminate this Agreement pursuant to Sections 9.1(b), 9.1(c) and 9.1(d) shall not be available to any Party whose breach hereof has been the cause of, or has resulted in, the event or condition purportedly giving rise to a right to terminate this Agreement under such clauses.

Section 9.2.    Effects of Termination.If this Agreement is terminated pursuant to Section 9.1:

(a)    all further obligations of the Parties under or pursuant to this Agreement shall terminate without further liability of any Party to the other except for the provisions of (i) Section 2.2.4 (Good Faith Deposit), (ii) Section 5.7 (Public Announcements), (iii) Section 5.10 (Transaction Expenses), (iv) Section 5.11 (Confidentiality), (v) Section 7.2(b)(iii) (Other Employee Covenants), (vi) Section 9.1 (Termination), (vii) Section 9.2 (Effects of Termination) and (viii) ARTICLE X (Miscellaneous); provided, that neither the termination of this Agreement nor anything in this Section 9.2 shall relieve any Party from liability for any breach of this Agreement occurring before the termination hereof and thereof;

(b)    except as required by applicable Law, the Purchaser shall promptly return to the Sellers or destroy all documents, work papers and other material of any of the Sellers relating to the transactions contemplated hereby, whether so obtained before or after the execution hereof; and

(c)    the provisions of the Confidentiality Agreement shall continue in full force and effect.

## ARTICLE X

## MISCELLANEOUS

Section 10.1.  No Survival of Representations and Warranties or Covenants. No representations or warranties, covenants or agreements in this Agreement or in any instrument delivered pursuant to this Agreement shall survive beyond the Closing Date, except for covenants and agreements that by their terms are to be satisfied after the Closing Date, which covenants and agreements shall survive until satisfied in accordance with their terms.

Section 10.2.  Remedies. No failure to exercise nor any delay in exercising, on the part of any Party, any right or remedy under this Agreement or the documents referred to in this Agreement shall operate as a waiver thereof, nor shall any single or partial exercise of any right or remedy prevent any further or other exercise thereof or the exercise of any other right or remedy.  To the maximum extent permitted by applicable Law: (i) no waiver that may be given by a Party hereto shall be applicable except in the specific instance for which it is given; and (ii) no notice to or demand on one Party shall be deemed to be a waiver of any right of the party giving such notice or demand to take further action without notice or demand.  The rights and remedies provided in this Agreement are cumulative and not exclusive of any rights or remedies provided by Law.

Section 10.3.  No Third Party Beneficiaries. The acknowledgements, rights, undertakings, representations or warranties contained in this Agreement and expressed to be for the benefit of the EMEA Sellers or the Joint Administrators (collectively, the "**Third Party Provisions**") shall inure to, are expressly intended to be for the benefit of, and shall be enforceable by, each of the EMEA Sellers and the Joint Administrators (and their applicable successors or representatives) (the "**Third Party Beneficiaries**"), as applicable, and shall be binding on the Purchaser and its successors and assigns.  Except as provided in this Section 10.3, this Agreement is for the sole benefit of the Parties and their permitted assigns and nothing herein, express or implied, is intended to or shall confer upon any other Person any legal or equitable right, benefit or remedy of any nature whatsoever under or by reason of this Agreement.

Section 10.4.  Consent to Amendments; Waivers. No Party shall be deemed to have waived any provision of this Agreement or any of the other Transaction Documents unless such waiver is in writing, and then such waiver shall be limited to the circumstances set forth in such written waiver.  This Agreement and the Ancillary Agreements shall not be amended, altered or qualified except by an instrument in writing signed by all the parties hereto or thereto, as the case may be.

Section 10.5.  Successors and Assigns. Except as otherwise expressly provided in this Agreement, all representations, warranties, covenants and agreements set forth in this Agreement or any of the Ancillary Agreements by or on behalf of the parties hereto or thereto will be binding upon and inure to the benefit of such parties and their respective successors and permitted assigns.  Neither this Agreement nor any of the rights, interests or obligations hereunder may be assigned by any Party without the prior written consent of the Main Sellers in case of an assignment by Purchaser or Purchaser in case of an assignment by any Seller, which

consent may be withheld in such party's sole discretion, except for the following assignment which shall not require consent (i) assignment to an Affiliate of a Party (provided (A) that except as otherwise provided in Section 2.4, such Party remains liable jointly and severally with its assignee Affiliate for the assigned obligations to the other Parties and (B) any such assignment by Purchaser complies with Section 2.4 if applicable), (ii) assignment by a U.S. Debtor to a succeeding entity following such U.S. Debtor's emergence from Chapter 11, and (iii) assignment by any of the Canadian Debtors pursuant to any plan of arrangement approved by the Canadian Court, which will not require the consent of the Purchaser.

Section 10.6.    Governing Law; Submission to Jurisdiction; Waiver of Jury Trial.

(a)    Any questions, claims, disputes, remedies or Actions arising from or related to this Agreement, and any relief or remedies sought by any Parties, shall be governed exclusively by the laws of the State of New York applicable to contracts made and to be performed in that State and without regard to the rules of conflict of laws of any other jurisdiction.

(b)    To the fullest extent permitted by applicable Law, each Party: (i) agrees that any claim, action, proceeding by such Party seeking any relief whatsoever arising out of, or in connection with, this Agreement, or the transactions contemplated hereby shall be brought only in (a) either the U.S. Bankruptcy Court, if brought prior to the entry of a final decree closing the Chapter 11 Cases, or the Canadian Court, if brought prior to the termination of the CCAA Cases, provided that if (X) a final decree closing the Chapter 11 Cases has not been entered and (Y) the CCAA Cases have not terminated, the U.S. Debtors or the Canadian Debtors may, in accordance with the Cross-Border Protocol, move the U.S. Bankruptcy Court or the Canadian Court, as case may be, to hold a joint hearing of the U.S. Bankruptcy Court and the Canadian Court to determine the appropriate jurisdiction for such claim, action or proceeding, and (b) in the Federal Courts in the Southern District of New York and the state courts of the State of New York, county of Manhattan (collectively, the "**New York Courts**") and the Canadian Court, if brought after entry of a final decree closing the Chapter 11 Cases and termination of the CCAA Cases, and shall not be brought, in each case, in any other court in the United States of America, Canada or any court in any other country; (ii) agrees to submit to the jurisdiction of the U.S. Bankruptcy Court, the Canadian Court, and the New York Courts, as applicable, pursuant to the preceding clauses (a) and (b) for purposes of all legal proceedings arising out of, or in connection with, this Agreement or the transactions contemplated hereby; (iii) waives and agrees not to assert any objection that it may now or hereafter have to the laying of the venue of such Action brought in any such court or any claim that any such Action brought in such court has been brought in an inconvenient forum; (iv) agrees that the mailing of process or other papers in connection with any such Action or proceeding in the manner provided in Section 10.7 or any other manner as may be permitted by Law shall be valid and sufficient service thereof; and (v) agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in any other jurisdictions by suit on the judgment or in any other manner provided by applicable Law.

(c)    Section 10.6(b) shall not limit the jurisdiction of (i) the Accounting Arbitrator set forth in Section 2.2.3.1(c) or (ii) any of the arbitrators set forth in Section 5.26,

although claims may be asserted in the courts referred to in Section 10.6(b) for purposes of enforcing the jurisdiction and judgments of the Accounting Arbitrator or arbitrator(s), as applicable.

        (d)      EACH PARTY HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION DIRECTLY OR INDIRECTLY ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS AGREEMENT, ANY ANCILLARY AGREEMENT OR ANY TRANSACTION CONTEMPLATED HEREBY OR THEREBY. EACH PARTY (I) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (II) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT AND THE ANCILLARY AGREEMENTS, AS APPLICABLE, BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION 10.6.

        Section 10.7.  Notices.All demands, notices, communications and reports provided for in this Agreement shall be in writing and shall be either sent by facsimile transmission with confirmation to the number specified below, or personally delivered or sent by reputable overnight courier service (delivery charges prepaid) to any Party at the address specified below, or at such address, to the attention of such other Person, and with such other copy, as the recipient Party has specified by prior written notice to the sending Party pursuant to the provisions of this Section 10.7.

        If to the Purchaser to:

            Telefonaktiebolaget L M Ericsson (PUBL)
            Torshamnsgatan 23
            Kista
            Stockholm
            Sweden
            Attention:  Per Oscarsson
            Attention:  Carl Olof Blomqvist
            Facsimile:  +46-8-18-4085

        With copies (that shall not constitute notice) to:

            Paul, Weiss, Rifkind, Wharton & Garrison LLP
            1285 Avenue of the Americas
            New York New York, USA 10019-6064
            Attention:  Stephen J. Shimshak
            Attention:  Marilyn Sobel
            Facsimile:  +1-212-373-3990

and

Blake, Cassels & Graydon LLP
199 Bay Street
Suite 2800, Commerce Court West
Toronto, Ontario, Canada  M5L 1A9
Attention:  Richard Corley
Attention:  Susan Grundy
Facsimile:  +1-416-863-2653

If to the Main Sellers or the Sellers, to:

Nortel Networks Corporation
195 The West Mall Mailstop:  T0503006
Toronto, Ontario, Canada  M9C 5K1
Attention:  Anna Ventresca
        Chief Legal Officer & Corporate Secretary
Facsimile:  +1-905-863-7386

Nortel Networks Limited
195 The West Mall Mailstop:  T0503006
Toronto, Ontario, Canada  M9C 5K1
Attention:  Anna Ventresca
        Chief Legal Officer & Corporate Secretary
Facsimile:  +1-905-863-7386

Nortel Networks Inc.
Legal Department
220 Athens Way, Suite 300
Nashville, Tennessee, USA  37228
Attention:  Anna Ventresca
        Chief Legal Officer & Corporate Secretary
Facsimile:  +1-615-432-4067

With copies (that shall not constitute notice) to:

Nortel Networks Corporation
195 The West Mall Mailstop:  T0503006
Toronto, Ontario, Canada  M9C 5K1
Attention:  Robert Fishman
Senior Counsel
Facsimile:  +1-347-427-3815 & +1-615-432-4067

Nortel Networks Limited
195 The West Mall Mailstop: T0503006
Toronto, Ontario, Canada  M9C 5K1
Attention:  Robert Fishman
Senior Counsel
Facsimile:  +1-347-427-3815 & +1-615-432-4067

and

Nortel Networks Inc.
Legal Department
220 Athens Way, Suite 300
Nashville, Tennessee, USA  37228
Attention:  Robert Fishman
Senior Counsel
Facsimile:  +1-347-427-3815 & +1-615-432-4067

and

Cleary Gottlieb Steen & Hamilton LLP
One Liberty Plaza
New York, New York, USA  10006
Attention:  Craig Brod
Attention:  Paul J. Shim
Facsimile:  +1-212-225-3999

Cleary Gottlieb Steen & Hamilton LLP
12, rue de Tilsitt
75008 Paris
France
Attention: Jean-Marie Ambrosi
Attention: Fabrice Baumgartner
Facsimile: +33 1 40 74 68 00

and

Ogilvy Renault LLP
200 Bay Street
Suite 3800, P.O. Box 84
Royal Bank Plaza, South Tower
Toronto, Ontario M5J 2Z4
Canada
Attention: Michael J. Lang
Facsimile: + 1-416-216-3930

Any such demand, notice, communication or report shall be deemed to have been given pursuant to this Agreement when delivered personally, when confirmed if by facsimile transmission, or on the second calendar day after deposit with a reputable overnight courier service, as applicable.

Section 10.8.    Exhibits; Sellers Disclosure Schedule. The Sellers Disclosure Schedule and the Exhibits attached hereto constitute a part of this Agreement and are incorporated into this Agreement for all purposes as if fully set forth herein.

(b)    For purposes of the representations and warranties of the Sellers contained in this Agreement, disclosure in any section of the Sellers Disclosure Schedule of any facts or circumstances shall be deemed to be adequate response and disclosure of such facts or circumstances with respect to all representations or warranties by the Sellers calling for disclosure of such information, whether or not such disclosure is specifically associated with or purports to respond to one or more of such representations or warranties, if it is reasonably apparent from the Sellers Disclosure Schedule that such disclosure is applicable.  The inclusion of any information in any section of the Sellers Disclosure Schedule or other document delivered by the Sellers pursuant to this Agreement shall not be deemed to be an admission or evidence of the materiality of such item, nor shall it establish a standard of materiality for any purpose whatsoever.

Section 10.9.  Counterparts.The Parties may execute this Agreement in two or more counterparts (no one of which need contain the signatures of all Parties), each of which will be an original and all of which together will constitute one and the same instrument.  Delivery of an executed counterpart of a signature page to this Agreement by facsimile or other electronic means shall be effective as delivery of a manually executed counterparty of this Agreement.

Section 10.10. No Presumption.The Parties agree that this Agreement was negotiated fairly between them at arm's length and that the final terms of this Agreement are the product of the Parties' negotiations.  Each Party represents and warrants that it has sought and received experienced legal counsel of its own choosing with regard to the contents of this Agreement and the rights and obligations affected hereby.  The Parties agree that this Agreement shall be deemed to have been jointly and equally drafted by them, and that the provisions of this Agreement therefore should not be construed against a Party on the grounds that such Party drafted or was more responsible for drafting the provisions.

Section 10.11. Severability.If any provision, clause, or part of this Agreement, or the application thereof under certain circumstances, is held invalid, illegal or incapable of being enforced in any jurisdiction, (i) as to such jurisdiction, the remainder of this Agreement or the application of such provision, clause or part under other circumstances, and (ii) as for any other jurisdiction, all provisions of this Agreement, shall not be affected and shall remain in full force and effect, unless, in each case, such invalidity, illegality or unenforceability in such jurisdiction materially impairs the ability of the Parties to consummate the transactions contemplated by this Agreement.  Upon such determination that any clause or other provision is invalid, illegal or incapable of being enforced in such jurisdiction, the Parties shall negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties as closely as possible in a mutually acceptable manner in order that the transactions contemplated hereby be consummated as originally contemplated to the greatest extent possible even in such jurisdiction.

Section 10.12. HeadingsThe headings used in this Agreement are for the purpose of reference only and shall not affect the meaning or interpretation of any provision of this Agreement.

Section 10.13. Entire Agreement.

(a)     This Agreement, the other Transaction Documents and the Confidentiality Agreement set forth the entire understanding of the Parties relating to the subject matter thereof, and all prior or contemporaneous understandings, agreements, representations and warranties, whether written or oral, are superseded by this Agreement, the other Transaction Documents and the Confidentiality Agreement, and all such prior or contemporaneous understandings, agreements, representations and warranties are hereby terminated.  In the event of any irreconcilable conflict between this Agreement and any of the other Transaction Documents or the Confidentiality Agreement, the provisions of this Agreement shall prevail, regardless of the fact that certain other Transaction Documents, such as the Local Sale Agreement, may be subject to different governing Laws.

(b)     For the sake of clarity, the provisions of the EMEA Asset Sale Agreement and the NNSA Irrevocable Offer have been drafted separately from the provisions in the body of

this Agreement to reflect differing market practices in the countries of jurisdiction of the EMEA Sellers and NNSA. Unless the context specifically requires, the provisions contained in the body of this Agreement and the provisions of the EMEA Asset Sale Agreement and the NNSA Irrevocable Offer shall be interpreted independently and without reference to each other.

Section 10.14. <u>Availability of Equitable Relief; Sole Remedy</u>.The Parties agree that irreparable damage would occur in the event that any of the provisions of this Agreement were not performed in accordance with their specific terms or were otherwise breached. Accordingly, subject to the limitations set forth in this Section 10.14, each of the Parties shall be entitled to equitable relief to prevent or remedy breaches of this Agreement, without the proof of actual damages, including in the form of an injunction or injunctions or orders for specific performance in respect of such breaches. Each Party agrees to waive any requirement for the security or posting of any bond in connection with any such equitable remedy. Each Party further agrees that the only permitted objection that it may raise in response to any action for equitable relief is that it contests the existence of a breach or threatened breach of the provisions of this Agreement. It is acknowledged and agreed that under no circumstances shall any Party be liable for punitive damages or indirect, special, incidental, or consequential damages arising out of or in connection with this Agreement or the transactions contemplated hereby or any breach or alleged breach of any of the terms hereof, including damages alleged as a result of tortious conduct.

Section 10.15. <u>Bulk Sales Laws</u>.Subject to the entry of the U.S. Sale Order and the Canadian Approval and Vesting Order, each Party waives compliance by the other Party with any applicable bulk sales Law.

Section 10.16. <u>Main Sellers as Representatives of Other Sellers</u>.

(a)    For all purposes of this Agreement:

(i)    each Other Seller listed in Section 10.16(a)(i) of the Sellers Disclosure Schedule hereby irrevocably appoints NNC as its representative;

(ii)    each Other Seller listed in Section 10.16(a)(ii) of the Sellers Disclosure Schedule hereby irrevocably appoints NNL as its representative; and

(iii)    each Other Seller listed in Section 10.16(a)(iii) of the Sellers Disclosure Schedule hereby irrevocably appoints NNI as its representative.

(b)    Pursuant to Section 10.16(a), each of NNC, NNL and NNI shall expressly have the power to, in the name and on behalf of each of its Respective Affiliates (as defined below), (i) take all decisions and carry out any actions required or desirable in connection with this Agreement, (ii) send and receive all notices and other communications required or permitted hereby, and (iii) consent to any amendment, waivers and modifications hereof.

(c)    For the purposes of this Agreement, **"Respective Affiliates"** means: (i) with respect to NNC, each Other Seller listed in Section 10.16(a)(i) of the Sellers Disclosure Schedule; (ii) with respect to NNL, each Other Seller listed in Section 10.16(a)(ii) of the Sellers

Disclosure Schedule, and (iii) with respect to NNI, all the other U.S. Debtors and each Other Seller listed in Section 10.16(a)(iii) of the Sellers Disclosure Schedule.

(d)    Each Respective Affiliate shall indemnify the Main Seller that acts as representative of such Respective Affiliate for, and hold it harmless against, any loss, liability or expense, including reasonable attorneys' fees, incurred by such Main Seller without gross negligence, bad faith or willful misconduct, for serving in the capacity of representative of such Respective Affiliate hereunder.

Section 10.17. Execution by Other Sellers.The Purchaser hereby acknowledges that the Other Sellers are not executing this Agreement as of the date hereof. This Agreement shall be binding on all parties that have executed this Agreement from the time of such execution, regardless of whether all Sellers have done so. Between the date hereof and the Closing Date, the Main Sellers hereby agree that they shall cause each Other Seller to execute a counterpart to this Agreement no later than the day prior to the Closing Date, agreeing to be bound as a Seller under this Agreement and authorizing NNC, NNL or NNI, as applicable, to act as its representative under Section 10.16 hereof.

Section 10.18. Obligations of the Sellers.When references are made in this Agreement to certain Sellers causing other Sellers or other Affiliate(s) to undertake (or to not undertake) certain actions, or agreements are being made on behalf of certain other Sellers or other Affiliates, "Sellers" for purposes of such clause shall be deemed to mean, respectively, NNI (in the case of a U.S. Debtor) and NNL (in the case of a Canadian Debtor – other than NNC – and a Non-Debtor Seller).

**[Remainder of this page intentionally left blank.  Signature page follows.]**

IN WITNESS WHEREOF, the Parties have duly executed this Asset Sale Agreement as of the date first written above.

Telefonaktiebolaget L M Ericsson (publ)

By: _____
    Name: Carl Olof Blomqvist
    Title: Senior Vice President & General Counsel

By: _____
    Name: Per Oscarsson
    Title: Global Head of Mergers & Acquisitions

Nortel Networks Corporation

By: _____
    Name:
    Title:

By: _____
    Name:
    Title:

Nortel Networks Limited

By: _____
    Name:
    Title:

By: _____
    Name:
    Title:

Nortel Networks Inc.

By: _____
    Name:
    Title:

Signature Page – Asset Sale Agreement

Nortel Networks Corporation

By: _____
    Name: Pavi Binning
    Title: EVP, Chief Financial Officer and CRO

By: _____
    Name: Anna Ventresca
    Title: General Counsel-Corporate and Corporate Secretary

Nortel Networks Limited

By: _____
    Name: Pavi Binning
    Title: EVP, Chief Financial Officer and CRO

By: _____
    Name: Anna Ventresca
    Title: General Counsel-Corporate and Corporate Secretary

Nortel Networks Inc.

By: _____
    Name: Anna Ventresca
    Title: Chief Legal Officer