74

Settlement and Release Agreement, NNI shall file a motion with the US Bankruptcy Court, which motion shall be in form and substance reasonably acceptable to Flextronics, seeking the approval of this Settlement and Release Agreement pursuant to §§ 101 and 363 of the Bankruptcy Code (the "US Approval Order") and any other applicable law, rules, orders or procedures, and shall use reasonable best efforts to pursue the same until the US Approval Order is entered and becomes Final. If the US Bankruptcy Court does not approve all terms and conditions contained in this Settlement and Release Agreement, and the Parties are unable to obtain court approval of this Settlement and Release Agreement, then this Settlement and Release Agreement shall be null and void.

11.    **Approval by the Canadian Court.** This Settlement and Release Agreement is subject in all respects to the entry of a final order by the Canadian Court approving all terms and conditions contained in this Settlement and Release Agreement. After NNL's receipt of an executed copy of this Settlement and Release Agreement, NNL shall file a motion with the Canadian Court in sufficient time to ensure such motion will be heard at a joint hearing with the US Bankruptcy Court, which motion shall be in form and substance reasonably acceptable to Flextronics, seeking the approval of this Settlement and Release Agreement pursuant to applicable law in the CCAA Proceedings (the "Canadian Approval Order") and any other applicable law, rules, orders or procedures, and shall use reasonable best efforts to pursue the same until the Canadian Approval Order is entered and becomes Final. If the Canadian Court does not approve all terms and conditions contained in this Settlement and Release Agreement, and the Parties are unable to obtain court approval of this Settlement and Release Agreement, then this Settlement and Release Agreement shall be null and void, and the Parties shall be restored to their respective positions.

**Execution Version**

12.   **Effective Date.** This Settlement and Release Agreement shall become effective on the first day after both the US Approval Order and the Canadian Approval Order (each an "Approval Order") become Final (the "Effective Date"). For purposes of this Settlement and Release Agreement, "Final" with respect to each Approval Order means the date on which the respective Approval Order is approved and entered by the respective court and is no longer subject to appeal, writ of certiorari, reargument or rehearing, or, in the event that a timely appeal has been noticed, or a timely writ of certiorari, reargument or rehearing has been sought with regard to the respective Approval Order, then such Approval Order shall become Final upon being affirmed by the highest court to which the Approval Order was appealed and the time to take any further appeal, to petition for writ of certiorari or to move for reargument or rehearing has expired. Notwithstanding the foregoing, the Parties shall have the right to waive the requirement that the Approval Orders become Final.

13.   **Execution of Documents.** The Parties agree to execute any and all documents, and to perform any acts, upon request by the other, reasonably necessary or proper to effectuate or further evidence the terms and provisions of this Settlement and Release Agreement.

14.   **Consultation and Review.** Each of the Parties hereby represents to the other that (i) it has had full and adequate opportunity to request and review any and all documents relevant to this Settlement and Release Agreement; (ii) it has negotiated this Settlement and Release Agreement at arm's length; (iii) it has read this Settlement and Release Agreement in its entirety and understands its terms and contents; (iv) it has had full and adequate opportunity to consult with and, in fact, has consulted with legal counsel on all matters related to this Settlement and Release Agreement; (v) it has provided any comments regarding this Settlement and Release

Execution Version

Agreement to its legal counsel; (vi) it has executed this Settlement and Release Agreement freely, voluntarily and without coercion; and (vii) it has not relied on any inducements, promises, statements, representations or warranties made by any person or entity not expressly set forth in this Settlement and Release Agreement.

15.    **Binding Effect.** This Settlement and Release Agreement constitutes a legal, valid and binding obligation, enforceable against each of the Parties and any successors or assigns of the Parties, in accordance with the terms hereof, subject to the approval of the US Bankruptcy Court and the Canadian Court. Each of the Parties represents and warrants that the execution, delivery and performance of this Settlement and Release Agreement has been approved, if necessary, by all requisite corporate actions on its part and is within the scope of its authority and powers, and shall not cause any default in or breach or violation of any applicable law, rule, regulation, contract or other instrument to which it is a party or by which any of its assets are bound or affected.

16.    **Objection to Settlement and Release Agreement.** In the event that an objection is filed to any motion for US Bankruptcy Court approval or Canadian Court approval of this Settlement and Release Agreement, the Parties shall in good faith support the approval of this Settlement and Release Agreement before the US Bankruptcy Court and/or the Canadian Court, and to defend any appeals of an Approval Order to the fullest extent reasonably practical.

17.    **Third-Party Rights.** Nothing in this Settlement and Release Agreement, whether express or implied, is intended to confer any rights or remedies under or by reason of this Settlement and Release Agreement on any persons other than the Parties and their respective successors and assigns, nor is anything in this Settlement and Release Agreement intended to relieve or discharge the obligation or liability of any third persons to the Parties, nor shall any

30

provision give any third persons any right of subrogation or action against any party to this

Settlement and Release Agreement; provided, however, that any Purchaser in a Divestiture that

has been authorized by the Courts shall be deemed a third party beneficiary of section 4 of this

Settlement and Release Agreement and shall be entitled to enforce and take advantage of the

benefits thereof to their fullest extent as if it were a signatory hereto.

18.    **No Admission of Liability.** It is understood by the Parties that this

Settlement and Release Agreement represents a compromise of disputed claims, and that this

Settlement and Release Agreement made hereunder is not to be construed as an admission of

liability on any claims, except as expressly stated herein. Neither the fact of this Settlement and

Release Agreement, nor any provision contained herein, nor any action taken hereunder, shall

constitute an admission with respect to any claims or facts alleged by any of the Parties hereto,

except as expressly stated herein. Without limiting the foregoing, Nortel does not admit the

validity of any objection Flextronics has asserted to date in the Proceedings, or that it could

assert with respect to any pending or future Divestiture, including without limitation to the

treatment of the MCMSAs in connection with any such Divestiture.

19.    **Interpretation.** Terms not defined herein shall have the meanings provided

in the Settlement Agreement and related Side Letter and if not provided therein, in the Amending

Agreement or the applicable MCMSA. To the extent of any conflict, inconsistency or ambiguity

between and among this Settlement and Release Agreement, the Settlement Agreement, the Side

Letter, the Amending Agreement and the MCMSAs, this Settlement and Release Agreement

shall control, followed by the Settlement Agreement and Side Letter, followed by the Amending

Agreement, followed by the applicable MCMSA. To the extent that the last date for any act or

action permitted or required to be taken under the Settlement and Release Agreement falls on a



day that is not a Business Day, that act or action may be taken on the next Business Day following. If any provisions of terms of this Settlement and Release Agreement are deemed unenforceable for any reason, then the parties agree that the rest of the Settlement and Release Agreement should be given full force and effect to the greatest extent permissible under applicable law, and that the court interpreting such provision is entitled to amend or substitute a provision that give effect to the original intent and meaning of the unenforceable provision to the greatest extent possible.

20.    **No Assumption, etc**. The Parties agree that this Settlement and Release Agreement is not intended to and shall not constitute or give rise to the assumption, rejection, novation or repudiation of any of the agreements referred to in this Settlement and Release Agreement or, except as expressly provided herein, otherwise affect the Parties' rights with respect to any such agreements, whether in connection with the Proceedings or otherwise, and, without limiting the foregoing, nothing in this Settlement and Release Agreement shall cause any of the EMEA Entities, the Joint Administrators or any other Nortel entity to assume any obligations under the MCMSAs or any other agreement to which such EMEA Entity or Joint Administrator is not a signatory prior to the date hereof.

21.    **No Transfer of Claims**. By executing this Settlement and Release Agreement, each Party represents and warrants to the other that it has not sold, assigned, transferred or otherwise conveyed any of its respective Released Claims to any other person or corporation or other entity that is not a Party to this Settlement and Release Agreement.    Any sale, assignment, transfer or other conveyance of claims in violation of this section 21 shall be null and void and of no force and effect.

**Execution Version**

22.   **Modification**.  This Settlement and Release Agreement may not be changed, modified or altered in any manner, except in a written instrument signed by each of the Parties (with the consent of the Monitor, the Official Committee of Unsecured Creditors appointed in the US Bankruptcy Cases and  the steering committee members of the ad hoc group of bondholders that have executed confidentiality or non-disclosure agreements with NNL) or approved by the Courts that refers specifically to this Settlement and Release Agreement.

23.   **Headings**.  The headings contained herein are set forth only as a matter of convenience and for reference and in no way define, limit or describe the scope of this Settlement and Release Agreement nor the intent of any provision thereof.

24.   **Consent to Jurisdiction**.  To the fullest extent and for the maximum time period permitted by applicable law, each Party (i) agrees to submit to the non-exclusive jurisdiction of the US Bankruptcy Court and the Canadian Court (if applicable, in a joint hearing conducted under the cross-border protocol adopted by such courts, as it may be in effect from time to time (the "Cross-Border Protocol")), for purposes of all legal proceedings to the extent relating to the matters agreed in this Settlement and Release Agreement, (ii) agrees that any claim, action or proceeding by such Party seeking any relief whatsoever to the extent relating to the matters agreed in this Settlement and Release Agreement must be commenced in the US Bankruptcy Court if such claim, action or proceeding would solely affect the US Debtors, the Canadian Court if such claim, action or proceeding would solely affect the Canadian Debtors, a joint hearing of both the Canadian Court and the US Court conducted under the Cross-Border Protocol if such claim, action or proceeding would affect the Canadian Debtors and the US Debtors and the English courts if such claim, action or proceeding would solely affect the EMEA Debtors, (iii) waives and agrees not to assert any objection that it may now or hereafter have to

33



the laying of the venue of any such action brought in such a court or any claim that any such action brought in such a court has been brought in an inconvenient forum, (iv) agrees that mailing of process or other papers in connection with any such action or proceeding or any other manner as may be permitted by law shall be valid and sufficient service thereof, and (v) agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by applicable law.

25.    **Injunctive Relief.**  Each of the Parties agrees that this Settlement and Release Agreement may be pled as a defense to any such claim or action in any court of competent jurisdiction. In connection with the foregoing, the Parties agree that monetary damages would not be sufficient to remedy any breach by a party of this Settlement and Release Agreement and that the non-breaching party would be entitled to equitable relief, including, without limitation, temporary injunctive relief preventing (or allowing, as the case may be) the unilateral termination of performance and specific performance in respect of any breach of the Settlement and Release Agreement.

26.    **Governing Law.**  This Settlement and Release Agreement shall be governed by the laws of the Province of Ontario and the federal laws of Canada applicable therein; provided, however, that any questions, claims, disputes, remedies or Actions arising from or related to Sections 29 – 32 and any questions, claims, disputes, remedies or actions arising from or related to  (i) the capacity of the Joint Administrators to act as agents of the EMEA Entities, (ii) the personal liability of the Joint Administrators, their firm, partners, employees, advisors, representatives or agents, (iii) their qualification to act as insolvency practitioners in accordance with Part XIII of the UK Insolvency Act, (iv) their appointment as joint administrators of the EMEA Entities and their status as such, or (v) the statutory duties of the Joint Administrators or

34

the legal obligations in relation to the exercise of their powers, duties or functions as administrators of the EMEA Entities under the UK Insolvency Act or any other applicable legislation or statutory instrument, shall be governed by English law and subject to the non-exclusive jurisdiction of the English courts.

27.    **Counterparts.** This Settlement and Release Agreement may be executed in multiple counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same complete agreement between the Parties.  A facsimile or a PDF signature shall be treated in all manners and respects as a binding and original signature.

28.    **Notices.** All notices and other communications under this Settlement and Release Agreement shall be in writing and shall be deemed to have been given when provided by e-mail in addition to one of the following: (a) when delivered personally by hand, (b) when sent by facsimile (with written confirmation of receipt) or (c) one (1) business day following the day sent by overnight courier (with written confirmation of receipt), in each case at the following e-mails, addresses and facsimile numbers:

> If to Nortel (if prior to November 20, 2009):
>
> Nortel Networks Limited
> 195 The West Mall
> Mailstop: T0503006
> Toronto, Ontario, Canada M9C 5K1
> Attention: Anna Ventresca
> Fax: (905) 863-2057
> E-Mail: annav@nortel.com:
>
> If to Nortel (if on or subsequent to November 20, 2009):
>
> Nortel Networks Limited
> 5945 Airport Road, Suite 360
> Mississauga, Ontario, Canada L4V 1R9
> Attention: Anna Ventresca

82

**Execution Version**

Fax:  (905) 863-2057
E-Mail:  annav@nortel.com

with copies (which shall not constitute notice) to:

Cleary Gottlieb Steen & Hamilton LLP
One Liberty Plaza
New York, New York 10006
Attn: James L. Bromley, Esq.
     Lisa M. Schweitzer, Esq.
Fax:  (212) 225-3999
E-Mail: jbromley@cgsh.com
     lschweitzer@cgsh.com

83

**Execution Version**

-and-

Ogilvy Renault LLP
Royal Bank Plaza
South Tower
200 Bay Street, Suite 3800
P.O. Box 84
Toronto, Ontario, Canada M5J 2Z4
Attn: Derrick C. Tay, Esq.
Fax: (416) 216-3930
E-Mail: dtay@ogilvyrenault.com

If to the Monitor:

Ernst & Young Inc.
Ernst & Young Tower
222 Bay Street, P. O. Box 251
Toronto, Ontario, Canada N M5K 1J7
Attn: Murray A. McDonald
Fax: (416) 943-3300
Murray.A.McDonald@ca.ey.com

with copies (which shall not constitute notice) to:

Goodmans L.L.P.
Attn: Joseph Pasquariello
Fax: (416) 979-1239
jpasquariello@goodmans.ca

If prior to or on December 22, 2009 at:

250 Yonge Street
Suite 2400
Toronto, Ontario, Canada M5B 2M6

If after December 22, 2009 at:

Bay Adelaide Centre
333 Bay Street, Suite 3400
Toronto, Ontario, Canada M5H 2S7

If to the Joint Administrators:

Ernst & Young LLP
One More  Place
London SE1 2AF

84

United Kingdom
Attn: Alan Bloom
Fax: +44 (0) 20 7951 1345
abloom@uk.ey.com

with copies (which shall not constitute notice) to:

Herbert Smith LLP
Exchange House
Primrose Street
London EC2A 2HS
United Kingdom
Attn:   Alan Montgomery, Esq.
        Ben Ward, Esq.
Fax: +44 (0) 20 7098 4878
        alan.montgomery@herbertsmith.com
        ben.ward@herbertsmith.com

If to Flextronics:

Flextronics Corporation
48 Gables Court
Beaconsfield, Quebec, Canada H9W 5H4
Attn: Simon Robins
Fax:  (514) 426-4262
E-Mail: simon.robins@ca.flextronics.com

-and-

Flextronics International
305 Interlocken Pkwy
Broomfield, Colorado 80021
Attn.: John Ritsick, Esq.
E-Mail: john.ritsick@flextronics.com

with copies (which shall not constitute notice) to

Curtis, Mallet-Prevost, Colt & Mosle LLP
101 Park Avenue
New York, New York 10178-0061
Attn:  Steven J. Reisman, Esq.
Fax:  (212) 697-1559
E-Mail: sreisman@curtis.com



Execution Version

-and-

ThorntonGroutFinnigan LLP
Suite 3200, Canadian Pacific Tower
100 Wellington St. West, Toronto-Dominion Centre
Toronto, Ontario, Canada M5K 1K7
Attention: Leanne M. Williams, Esq.
Fax: 416-304-1313
E-Mail: lwilliams@tgf.ca

29.    **Authorized Signatory.** Each person who executes this Settlement and

Release Agreement on behalf of (i) NNL and each of its Canadian affiliates that have filed an

application under the CCAA and (ii) NNI and its US debtor affiliates warrants and represents

that he or she has been duly authorized and empowered to execute and deliver this Settlement

and Release Agreement on behalf of each Nortel entity for which it signs.   The persons who

execute this Settlement and Release Agreement on behalf of (i) each of the EMEA Entities and

(ii) the Joint Administrators warrants and represents that he or she has been duly authorized and

empowered to execute and deliver this Settlement and Release Agreement on behalf of each

EMEA Entity or Joint Administrator for which it signs. The person who executes this Settlement

and Release Agreement on behalf of Flextronics warrants and represents that he or she has been

duly authorized and empowered to execute and deliver this Settlement and Release Agreement

on behalf of Flextronics and each of its Affiliates. Each of Flextronics' Affiliates shall be

entitled to enforce and take advantage of the benefits of this Settlement and Release Agreement

to its fullest extent as if they were signatories hereto.

30.    **NNSA Accession.** Nortel Networks S.A. ("NNSA") may, within 30 days of

the Effective Date, by notice in writing to the Parties hereto, accede to this Settlement and

Release Agreement as an EMEA Entity on the same terms and conditions as an EMEA Entity

(such accession conditioned, if applicable, on French Court approval), and the Parties shall



forthwith on receipt of such notice enter into an appropriate form of accession agreement with NNSA. The Parties agree that the provisions of this section 29 are for the benefit of NNSA and may be enforced by NNSA.

31.    Without limiting anything in this Settlement and Release Agreement or any other agreement between the Parties, each of the Parties agrees that it shall not do indirectly, through an affiliate, agent or otherwise, anything that it has agreed not to do under this Settlement and Release Agreement.

32.    The Parties acknowledge that the Joint Administrators are entering into this Settlement and Release Agreement as agents for the EMEA Entities and that none of the Joint Administrators or their firm, partners, employees, advisers, representatives or agents shall incur any personal liability whatsoever whether on their own part or in respect of any failure on the part of the EMEA Entities to observe, perform or comply with any of their obligations under this Settlement and Release Agreement or under or in relation to any associated arrangements or negotiations.

33.    The Parties acknowledge that the Joint Administrators have agreed to the terms of this Settlement and Release Agreement (i) as agents of the EMEA Entities of which they are administrators; and (ii) in their own capacity solely for taking the benefit of the statutory charges under Paragraph 99(3) of Schedule B1 of the UK Insolvency Act 1986 or any provisions of this Settlement and Release Agreement in their favor and enforcing obligations under this Settlement and Release Agreement.

34.    For the purposes of the acknowledgements or agreements to, or exclusions of, liability in favor of the Joint Administrators in this Settlement and Release Agreement, references to the Joint Administrators where the context so permits shall mean and include any

87

**Execution Version**

additional or successor administrator of the EMEA Entities and their respective firms or future

firms, employees, agents, members, partners and personal representatives.

[*Remainder of page intentionally left blank. Signatures follow.*]

IN WITNESS WHEREOF, each Party, by its respective duly-authorized representative identified below, acknowledges and agrees to the terms and conditions of this Settlement and Release Agreement.

81

**NORTEL NETWORKS CORPORATION**

By: _____

Name: Anne Ventresca

Title: General Counsel-Corporate
and Corporate Secretary

Dated:    November 20 2009

By: _____

Name: John Doolittle

Title: SVP, Finance & Corporate
Services

Dated:    November 20 2009


**NORTEL NETWORKS LIMITED**

By: _____

Name: Anne Ventresca

Title: General Counsel-Corporate
and Corporate Secretary

Dated:    November 20 2009

By: _____

Name: John Doolittle

Title: SVP, Finance & Corporate
Services

Dated:    November 20 2009


**NORTEL NETWORKS INC.**

By: _____

Name: Anne Ventresca

Title: Chief Legal Officer

Dated: November 20 2009


**NORTEL NETWORKS CAPITAL
CORPORATION**

By: _____

Name: John Doolittle

Title: President

Dated:    November 20 2009


**NORTEL ALTSYSTEMS INC.**

By: _____

Name: John Doolittle

Title: President

Dated:    November 20 2009

**SONOMA SYSTEMS**

By: _____

Name: _John Doolittle_

Title: _Pres. & Treasurer_

Dated:   November 20, 2009

**QTERA CORPORATION**

By: _____

Name: _John Doolittle_

Title: _President_

Dated:   November 20, 2009

**CORETEK, INC**

By: _____

Name: _John Doolittle_

Title: _President_

Dated:   November 20, 2009

**NORTEL NETWORKS
APPLICATIONS MANAGEMENT
SOLUTIONS INC.**

By: _____

Name: _John Doolittle_

Title: _President_

Dated:   November 20, 2009

**NORTEL NETWORKS OPTICAL
COMPONENTS INC.**

By: _____

Name: _John Doolittle._

Title: _President_

Dated:   November 20, 2009

**NORTEL NETWORKS HPOCS INC.**

By: _____

Name: _John Doolittle_

Title: _President_

Dated:   November 20, 2009

C91

**ARCHITEL SYSTEMS (U.S.)
CORPORATION**

By: _____

Name: _John Doolittle_____

Title: _President_____

Dated:   November 20, 2009

**NORTEL NETWORKS
INTERNATIONAL INC.**

By: _____

Name: _John Doolittle_____

Title: _President_____

Dated:   November 20, 2009

**NORTHERN TELECOM
INTERNATIONAL INC.**

By: _____

Name: _John Doolittle_____

Title: _President_____

Dated:   November 20, 2009

**NORTEL NETWORKS CABLE
SOLUTIONS INC.**

By: _____

Name: _John Doolittle_____

Title: _V-P_____

Dated:   November 20, 2009

**NORTEL NETWORKS (CALA) INC.**

By: _____

Name: _John Doolittle_____

Title: _Treasurer_____

Dated:   November 20, 2009

By: _____

Name: _Peter Look_____

Title: _President_____

Dated:   November 20, 2009

92

**NORTEL ALTSYSTEMS**
**INTERNATIONAL INC.**

By: _____

Name: _John Doolittle_

Title: _President_

Dated:   November 29 2009

**XROS, INC.**

By: _____

Name: _John Doolittle_

Title: _President_

Dated:   November 29 2009

93

Signed by CHRISTOPHER J.W.HILL as
joint administrator on behalf of the Joint
Administrators and the EMEA Entities
(except Nortel Networks (Ireland) Limited)
without personal liability and solely for the
purpose of obtaining the benefit of the
provisions of this Agreement expressed to be
conferred on or given to the Joint
Administrators

By _____
Name:  CHRISTOPHER HILL
Title:  JOINT ADMINISTRATOR

G4

Signed by David Hughes as joint
administrator on behalf of the Joint
Administrators and Nortel Networks
(Ireland) Limited without personal liability
and solely for the purpose of obtaining the
benefit of the provisions of this Agreement
expressed to be conferred on or given to the
Joint Administrators

By
Name:   DAVID   HUGHES
Title:   JOINT   ADMINISTRATOR

SIGNED for and on behalf of NORTEL        )
NETWORKS UK LIMITED (IN                   )    **CHRISTOPHER J.W. HILL**
ADMINISTRATION) by                        )
CHRISTOPHER J.W. HILL as Joint            )
Administrator (acting as agent and without
personal liability whatsoever) in the
presence of:

Witness: _____

Name: _JAN CORDELL_
Address: _1 HORE LONDON PLACE_
         _LONDON SE1 2AF_

SIGNED for and on behalf of NORTEL          )
NETWORKS (IRELAND) LIMITED                  )    **DAVID HUGHES**
(IN ADMINISTRATION)                         )
by DAVID HUGHES as Joint                    )
Administrator (acting as agent and without
personal liability whatsoever) in the
presence of:

Witness: _Eimear Ni Ghríofa_

Name: _EIMEAR NI GHRIOFA_
Address: _c/o ERNST & YOUNG, HARCOURT CENTRE, HARCOURT STREET, DUBLIN 2._

97

SIGNED for and on behalf of **NORTEL**  )
**NETWORKS BV (IN**  )          **CHRISTOPHER J.W. HILL**
**ADMINISTRATION)**  )
by **CHRISTOPHER J.W. HILL** as Joint  )
Administrator (acting as agent and without
personal liability whatsoever) in the
presence of:

Witness: _____

Name: _____
Address: _____
_____

SIGNED for and on behalf of **NORTEL**
**NETWORKS HISPANIA, S.A.**
by **CHRISTOPHER J.W. HILL** as Joint
Administrator (acting as agent and without
personal liability whatsoever) in the
presence of:

)
)
)
)

**CHRISTOPHER J.W. HILL**

Witness: _____

Name: _____
Address: _____

**FLEXTRONICS TELECOM SYSTEMS LTD**

By: _____

Name: Manny Marimuthu

Title: Director

Dated:   November ___, 2009

**FLEXTRONICS CORPORATION**

By: _____

Name: Michael Clarke

Title: President, Infrastructure

Dated:   November ___, 2009

**FLEXTRONICS AMERICA, LLC**

By: _____

Name: Michael Clarke

Title: President, Infrastructure

Dated:   November ___, 2009

**FLEXTRONICS EMS CANADA INC.**

By: _____

Name: Kieran Gunning

Title:  Vice President

Dated:   November ___, 2009

**FLEXTRONICS INTERNATIONAL EUROPE B.V.**

By: _____

Name: _____

Title: _____

Dated:          November ___, 2009

10

**FLEXTRONICS TELECOM SYSTEMS LTD**

By: _____

Name: Manny Marimuthu

Title: Director

Dated:   November ___, 2009

**FLEXTRONICS CORPORATION**

By: _____

Name: Michael Clarke

Title: President, Infrastructure

Dated:   November _10_, 2009

**FLEXTRONICS AMERICA, LLC**

By: _____

Name: Michael Clarke

Title: President, Infrastructure

Dated:   November _10_, 2009

**FLEXTRONICS EMS CANADA INC.**

By: _____

Name: Kieran Gunning

Title:  Vice President

Dated:   November ___, 2009

**FLEXTRONICS INTERNATIONAL EUROPE B.V.**

By: _____

Name: _____

Title: _____

Dated:              November ___, 2009

101

**FLEXTRONICS TELECOM SYSTEMS LTD**

By: _____

Name:  Manny Marimuthu

Title: Director

Dated:    November ___, 2009

**FLEXTRONICS CORPORATION**

By: _____

Name: Michael Clarke

Title: President, Infrastructure

Dated:    November ___, 2009

**FLEXTRONICS AMERICA, LLC**

By: _____

Name: Michael Clarke

Title: President, Infrastructure

Dated:    November ___, 2009

**FLEXTRONICS EMS CANADA INC.**

By: _____

Name: Kieran Gunning

Title:  Vice President

Dated:    November ___, 2009

**FLEXTRONICS INTERNATIONAL EUROPE B.V.**

By: _____

Name: _____

Title: _____

Dated:          November ___, 2009

102

**FLEXTRONICS TELECOM SYSTEMS LTD**

By: _____

Name:  Manny Marimuthu

Title: Director

Dated:   November ___, 2009

**FLEXTRONICS CORPORATION**

By: _____

Name: Michael Clarke

Title: President, Infrastructure

Dated:   November ___, 2009

**FLEXTRONICS AMERICA, LLC**

By: _____

Name: Michael Clarke

Title: President, Infrastructure

Dated:   November ___, 2009

**FLEXTRONICS EMS CANADA INC.**

By: _____

Name: Kieran Gunning

Title:  Vice President

Dated:  November ___, 2009

**FLEXTRONICS INTERNATIONAL EUROPE B.V.**

By: _____

Name: B.P.H.M van Loen

Title: Director

Dated: Venray November 7, 2009

103

**FLEXTRONICS INTERNATIONAL LATIN AMERICA (L) LTD.**

By: _____

Name: Manny Marimuthu

Title:  Director

Dated:   November __, 2009

**FLEXTRONICS INTERNATIONAL USA, INC.**

By: _____

Name: Michael Clarke

Title: President, Infrastructure

Dated:   November __, 2009

**FLEXTRONICS LOGISTICS USA, INC.**

By: _____

Name: Donald H. Standley

Title: Vice President

Dated:   November __, 2009

**FLEXTRONICS SALES & MARKETING NORTH ASIA (L) LTD.**

By: _____

Name: Manny Marimuthu

Title:  Director

Dated:   November __, 2009

**FLEXTRONICS FUNDING LLC**

By: _____

Name: Paul Read

Title: President

Dated:   November __, 2009

**FLEXTRONICS ELECTRONICS TECHNOLOGY (SUZHOU) CO. LTD.**

By: _____

Name: Manny Marimuthu

Title: Legal Representative

Dated:   November __, 2009

104

**FLEXTRONICS INTERNATIONAL LATIN AMERICA (L) LTD.**

By: _____

Name: Manny Marimuthu

Title:  Director

Dated:    November __, 2009

**FLEXTRONICS INTERNATIONAL USA, INC.**

By: _____

Name: Michael Clarke

Title: President, Infrastructure

Dated:   November 10, 2009

**FLEXTRONICS LOGISTICS USA, INC.**

By: _____

Name: Donald H. Standley

Title: Vice President

Dated:   November __, 2009

**FLEXTRONICS SALES & MARKETING NORTH ASIA (L) LTD.**

By: _____

Name: Manny Marimuthu

Title:  Director

Dated:    November __, 2009

**FLEXTRONICS FUNDING LLC**

By: _____

Name: Paul Read

Title: President

Dated:    November __, 2009

**FLEXTRONICS ELECTRONICS TECHNOLOGY (SUZHOU) CO. LTD.**

By: _____

Name: Manny Marimuthu

Title: Legal Representative

Dated:    November __, 2009

105

**FLEXTRONICS INTERNATIONAL LATIN AMERICA (L) LTD.**

By: _____

Name: Manny Marimuthu

Title:  Director

Dated:    November __, 2009

**FLEXTRONICS INTERNATIONAL USA, INC.**

By: _____

Name: Michael Clarke

Title: President, Infrastructure

Dated:    November __, 2009

**FLEXTRONICS LOGISTICS USA, INC.**

By: _____

Name: Donald H. Standley

Title: Vice President

Dated:    November __, 2009

**FLEXTRONICS SALES & MARKETING NORTH ASIA (L) LTD.**

By: _____

Name: Manny Marimuthu

Title:  Director

Dated:    November __, 2009

**FLEXTRONICS FUNDING LLC**

By: _____

Name: Paul Read

Title: President

Dated;    November __, 2009

**FLEXTRONICS ELECTRONICS TECHNOLOGY (SUZHOU) CO. LTD.**

By: _____

Name: Manny Marimuthu

Title: Legal Representative

Dated:    November __, 2009

**FLEXTRONICS INTERNATIONAL
LATIN AMERICA (L) LTD.**

By: _____

Name: Manny Marimuthu

Title:  Director

Dated:   November __, 2009

**FLEXTRONICS INTERNATIONAL USA,
INC.**

By: _____

Name: Michael Clarke

Title: President, Infrastructure

Dated:   November __, 2009

**FLEXTRONICS LOGISTICS USA, INC.**

By: _____

Name: Donald H. Standley

Title: Vice President

Dated:   November __, 2009

**FLEXTRONICS SALES & MARKETING
NORTH ASIA (L) LTD.**

By: _____

Name: Manny Marimuthu

Title:  Director

Dated:   November __, 2009

**FLEXTRONICS FUNDING LLC**

By: _____

Name: Paul Read

Title: President

Dated:   November __, 2009

**FLEXTRONICS ELECTRONICS
TECHNOLOGY (SUZHOU) CO. LTD.**

By: _____

Name: Manny Marimuthu

Title: Legal Representative

Dated:   November __, 2009

107

**FLEXTRONICS TECHNOLOGY
(PENANG) SDN. BHD.**

By: _____

Name: Manny Marimuthu

Title: Director

Dated:    November ___, 2009

**FLEXTRONICS DISTRIBUTION, INC.**

By: _Donald H. Standley_

Name: Donald H. Standley

Title: Vice President

Dated:    November __, 2009


**FLEXTRONICS (CANADA) INC.**

By: _____

Name: Kieren Gunning

Title:  Vice President

Dated:    November __, 2009


**FLEXTRONICS INTERNATIONAL POLAND AP, Z.O.O.**

By: _____

Name:_____

Title:_____

Dated:    November __, 2009


**FLEXTRONICS CANADA DESIGN SERVICES INC.**

By: _____

Name: Brent Serbin

Title:  Vice President

Dated:    November __, 2009

**FLEXTRONICS ENCLOSURE SYSTEMS (CHANGZHOU) LTD.**

By: _____

Name: Manny Marimuthu

Title: Director

Dated:    November __, 2009

**FLEXTRONICS DISTRIBUTION, INC.**

By: _____

Name: Donald H. Standley

Title: Vice President

Dated:   November ___, 2009


**FLEXTRONICS (CANADA) INC.**

By: _____

Name: Kieren Gunning

Title:  Vice President


Dated:   November ___, 2009


**FLEXTRONICS INTERNATIONAL POLAND AP. Z.O.O.**

By: _____

Name:_____

Title:_____


Dated:   November ___, 2009


**FLEXTRONICS CANADA DESIGN SERVICES INC.**

By: _____

Name: Brent Serbin

Title:  Vice President


Dated:   November _11_, 2009

**FLEXTRONICS ENCLOSURE SYSTEMS (CHANGZHOU) LTD.**


By: _____

Name: Manny Marimuthu

Title: Director


Dated:   November ___, 2009

**FLEXTRONICS DISTRIBUTION, INC.**

By: _____

Name: Donald H. Standley

Title: Vice President

Dated:   November __, 2009


**FLEXTRONICS (CANADA) INC.**

By: _Kian T. Gunning_

Name: Kieren Gunning

Title: Vice President

Dated:   November __, 2009


**FLEXTRONICS INTERNATIONAL POLAND AP, Z.O.O.**

By: _____

Name: _____

Title: _____

Dated:   November __, 2009


**FLEXTRONICS CANADA DESIGN SERVICES INC.**

By: _____

Name: Brent Serbin

Title:  Vice President

Dated:   November __, 2009

**FLEXTRONICS ENCLOSURE SYSTEMS (CHANGZHOU) LTD.**

By: _____

Name: Manny Marimuthu

Title: Director

Dated:   November __, 2009

**FLEXTRONICS DISTRIBUTION, INC.**

By: _____

Name: Donald H. Standley

Title: Vice President

Dated:    November ___, 2009


**FLEXTRONICS (CANADA) INC.**

By: _____

Name: Kieren Gunning

Title:  Vice President

Dated:    November ___, 2009


**FLEXTRONICS INTERNATIONAL POLAND AP. Z.O.O.**

By: _____

Name: _____

Title: _____

Dated:    November ___, 2009


**FLEXTRONICS CANADA DESIGN SERVICES INC.**

By: _____

Name: Brent Serbin

Title:  Vice President

Dated:    November ___, 2009


**FLEXTRONICS ENCLOSURE SYSTEMS (CHANGZHOU) LTD.**

By: _____

Name: Manny Marimuthu

Title: Director

Dated:    November ___, 2009

112

**FLEXTRONICS DISTRIBUTION, INC.**

By: _____

Name: Donald H. Standley

Title: Vice President

Dated:    November __, 2009


**FLEXTRONICS (CANADA) INC.**

By: _____

Name: Kieren Gunning

Title:  Vice President


Dated:    November __, 2009


**FLEXTRONICS INTERNATIONAL POLAND SP. Z.O.O.**

By: ___~~MMFK~~___ _Paul Clark_

Name: Justyna Wrzesien-Fic    Name: _Paul Bunn._

Title: Site Controller    Title: _General Manager_

Dated:    November 12ᵗʰ, 2009    _Dated: November 2009_

**FLEXTRONICS CANADA DESIGN SERVICES INC.**

By: _____

Name: Brent Serbin

Title:  Vice President


Dated:    November __, 2009

**FLEXTRONICS ENCLOSURE SYSTEMS (CHANGZHOU) LTD.**


By: _____

Name: Manny Marimuthu

Title: Director


Dated:    November __, 2009

113

**Execution Version**

## Schedule A - The EMEA Entities

1.      The EMEA Entities

Nortel Networks B.V (in administration)
Nortel Networks (Ireland) Limited (in administration)
Nortel Networks UK Limited (in administration)
Nortel Networks Hispania, S.A. (in administration)

2.      The Joint Administrators of Nortel Networks B.V. (in administration), Nortel Networks
UK Limited (in administration) and Nortel Networks Hispania, S.A. (in administration)

Alan Robert Bloom
Stephen John Harris
Alan Michael Hudson
Christopher John Wilkinson Hill
c/o Ernst & Young LLP
1 Moore Place
London SE1 2AF

3.      The Joint Administrators of Nortel Netwoks (Ireland) Limited (in administration)

David Hughes
c/o Ernst & Young Chartered Accountants
Harcourt Centre, Harcourt Street
Dublin 2, Ireland

Alan Robert Bloom
c/o Ernst & Young LLP
1 Moore Place
London SE1 2AF

\|ᴴ|

**Execution Version**

## Schedule B – The Payment Obligations of NNI

1. NNI shall pay to an account to be identified by Flextronics ▮▮▮▮▮▮▮ (such payment together with the Adjustment Amount (as defined below), the "Payment Obligation") in two equal installments. The first installment of ▮▮▮▮▮▮ shall be paid 10 days after the Effective Date (the "First Installment"). The second installment of ▮▮▮▮▮▮ shall be paid on or before May 31, 2010 (the "Second Installment").

2. The Parties agree to work in good faith to determine within 10 days of the execution of this Settlement and Release Agreement which, if any, of the open accounts receivable listed on Schedule J to this Settlement and Release Agreement are not valid obligations owed by Flextronics to Nortel.

3. With respect to open accounts receivable listed on Schedule J to this Settlement and Release Agreement where the only dispute between Flextronics and Nortel is Nortel's failure to provide an invoice and/or a proof of delivery ("POD") for such open accounts receivable, (i) Flextronics shall review its books and records to determine whether it has invoices and/or proofs of receipt related to such open accounts receivable and (ii) Nortel shall provide invoices and/or PODs for such open accounts receivable to Flextronics on or prior to December 15, 2009. For any such open accounts receivable for which Flextronics is unable to locate an invoice (to the extent missing) and a proof of receipt (to the extent missing) and Nortel does not provide a (i) an invoice (to the extent missing) and (ii) a POD (to the extent missing) ((i) and (ii) together the "Missing Invoice/POD") by that time, Nortel shall pay to an account identified by Flextronics the amount of such open accounts receivable (the "Missing Invoice/POD Amount") on or prior to December 24, 2009. In the event that Nortel subsequently provides, but not later than February 26, 2010, Flextronics with the Missing Invoice/POD for any open accounts receivable comprising the Missing Invoice/POD Amount, Flextronics shall pay to an account to be identified by Nortel the amount of such Missing Invoice/POD within ten (10) days of receipt of such Missing Invoice/POD.

4. With respect to all other open accounts receivable listed on Schedule J to this Settlement and Release Agreement, on or prior to December 15, 2009, Flextronics shall deliver to Nortel written notice itemizing the portions of the invoices relating to such accounts receivable that Flextronics agrees are valid obligations owing to Nortel. For any portion of such invoices that remain in dispute as of December 15, 2009, the Parties agree to continue to work in good faith to reconcile and resolve such disputes. NNI shall pay to Flextronics (i) the amount, if any, in respect of such remaining accounts receivable that the Parties subsequently agree do not constitute valid obligations owed by Flextronics to Nortel, or (ii) if the Parties are unable to agree on such amount on or prior to February 1, 2010, an amount in respect of such remaining accounts receivable determined by the Courts in a joint hearing upon notice to not constitute valid obligations owed by Flextronics to Nortel (the "Invalid Invoice Amount"). Nortel shall pay to an account to be identified by Flextronics the Invalid Invoice Amount on or prior to ten (10)

days from the date of written confirmation of an agreement between Flextronics and Nortel pursuant to (i) above or entry of the final determination by the Courts pursuant to (ii) above.

5. The Parties further agree that the Missing POD Amount plus the Invalid Invoice Amount (together the "Adjusted Amount") shall not exceed ▮▮▮▮▮▮▮▮.

Execution Version

## Schedule C – Post-Petition Ordinary Course Contractual Claims

| NT PO # | NT Legal Entity on PO | LOB | Inco-terms | Flex Site (MEP Code) | Flex Invoice # | Flex Invoice Date | Flex Legal Entity | Flex POD Number (Bill of Lading / Airway) | Delivery Date per Flex POD | Amount Invoiced Local Currency | Invoiced Currency | FX Rate | USD$ | Claims Description |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Nortel Networks Inc. | OPTICAL/PP/ CDMA | | PCBA Guadalajara North | 20002020-A | 24-Aug-09 | Flextronics International Latin America (L) Ltd | | | ▮ | USD | 1.0000 | ▮ | ROIC O4'09 (Jan'09-Mar'09) ET post-filing |
| | Nortel Networks Inc. | OPTICAL/PP/ CDMA | | PCBA Guadalajara North | 20002020-D | 24-Aug-09 | Flextronics International Latin America (L) Ltd | | | ▮ | USD | 1.0000 | ▮ | ROIC O1'10 (Apr'09-Jun'09) ET post-filing |
| 4320081568 | Nortel Networks Inc. | Carrier CVAS (Wireline) | | PCBA Creedmoor, North Carolina | J2410002732 | 26-Aug-09 | Flextronics America LLC | | | ▮ | USD | 1.0000 | ▮ | ROIC cost structure model Jan 14th, 2009 to Mar 31st |
| | Nortel Networks Inc. | Enterprise - Voice | | PCBA Calgary, Canada | 103/101 | 21-Aug-09 | Flextronics International Europe BV | | | ▮ | USD | 1.0000 | ▮ | Feb 2009 ROIC |
| | Nortel Networks Inc. | Enterprise - Voice | | PCBA Calgary, Canada | 103/101 | 21-Aug-09 | Flextronics International Europe BV | | | ▮ | USD | 1.0000 | ▮ | March 2009 ROIC |
| | Nortel Networks Inc. | Enterprise - Voice | | PCBA Calgary, Canada | 103/101 | 21-Aug-09 | Flextronics International Europe BV | | | ▮ | USD | 1.0000 | ▮ | April 2009 ROIC |
| | Nortel Networks Inc. | Enterprise - Voice | | PCBA Calgary, Canada | 103/101 | 21-Aug-09 | Flextronics International Europe BV | | | ▮ | USD | 1.0000 | ▮ | Jan 2009 ROIC (post-filing) |
| | Nortel Networks Inc. | Enterprise - Voice | | PCBA Calgary, Canada | 103/101 | 21-Aug-09 | Flextronics International Europe BV | | | ▮ | USD | 1.0000 | ▮ | May 2009 ROIC |
| | Nortel Networks Inc. | OPTICAL/PP/ CDMA | | PCBA Guadalajara North | 20002020-B | 24-Aug-09 | Flextronics International Latin America (L) Ltd | | | ▮ | USD | 1.0000 | ▮ | ROIC O4'09 (Jan'09-Mar'09) profiling |
| | Nortel Networks Inc. | Enterprise - Voice | | PCBA Calgary, Canada | 103/101 | 21-Aug-09 | Flextronics International Europe BV | | | ▮ | USD | 1.0000 | ▮ | Jun 2009 ROIC |
| | Nortel Networks Inc. | Enterprise - Voice | | PCBA Calgary, Canada | 104 | 24-Aug-09 | Flextronics International Europe BV | | | ▮ | USD | 1.0000 | ▮ | July 2009 ROIC |
| | Nortel Networks Inc. | Carrier CVAS (Wireline) | | PCBA Creedmoor, North Carolina | J2410002951 | 26-Aug-09 | Flextronics America LLC | | | ▮ | USD | 1.0000 | ▮ | Consumables |
| | Nortel Networks Inc. | Carrier CVAS (Wireline) | | PCBA Creedmoor, North Carolina | J2410002560 | 24-Aug-09 | Flextronics America LLC | | | ▮ | USD | 1.0000 | ▮ | Engineering Change Orders (ECO) |
| 20051215-184713 | Nortel Networks Inc. | Carrier - CDMA | | PCBA Penang, Malaysia Other | 2011285 | 30-Jan-09 | Flextronics Technology (Penang) Sdn. Bhd | | | ▮ | USD | 1.0000 | ▮ | Engineering Support to Customer (Jan'09) |
| 4320075906 | Nortel Networks Limited | Carrier - CDMA | | PCBA Guadalajara North | 10000591 | 19-May-09 | Flextronics International Latin America (L) Ltd | | | ▮ | USD | 1.0000 | ▮ | NPI for CMOS-2, CDMA |
| | Nortel Networks Inc. | Carrier CVAS (Wireline) | | PCBA Creedmoor, North Carolina | J2410002725 | 25-Aug-09 | Flextronics America LLC | | | ▮ | USD | 1.0000 | ▮ | Engineering Change Orders (ECO) |
| 4320075683 | Nortel Networks Limited | Carrier - CDMA | | PCBA Guadalajara North | 4152000140 | 15-May-09 | Flextronics International Latin America (L) Ltd | | | ▮ | USD | 1.0000 | ▮ | Consumables Crakts (Jan14-Feb28) |
| | Nortel Networks Inc. | Carrier CVAS (Wireline) | | PCBA Creedmoor, North Carolina | J2410003557 | 26-Aug-09 | Flextronics America LLC | | | ▮ | USD | 1.0000 | ▮ | Engineering General Support to Customer |
| | Nortel Networks Inc. | Carrier CVAS (Wireline) | | PCBA Creedmoor, North Carolina | J2410002398 | 26-Aug-09 | Flextronics America LLC | | | ▮ | USD | 1.0000 | ▮ | Freight & Duty - Inbound |
| | Nortel Networks Inc. | Carrier CVAS (Wireline) | | PCBA Creedmoor, North Carolina | J2410002724 | 26-Aug-09 | Flextronics America LLC | | | ▮ | USD | 1.0000 | ▮ | Rework / Upgrades |
| | Nortel Networks Inc. | Carrier CVAS (Wireline) | EXP INV | PCBA Creedmoor, North Carolina | J2410002296 | 26-Aug-09 | Flextronics America LLC | | | ▮ | USD | 1.0000 | ▮ | Engineering Change Orders (ECO) |
| | Nortel Networks Inc. | Carrier CVAS (Wireline) | | PCBA Creedmoor, North Carolina | J2410002404 | 26-Aug-09 | Flextronics America LLC | | | ▮ | USD | 1.0000 | ▮ | Engineering General Support to Customer |
| | Nortel Networks Inc. | Carrier CVAS (Wireline) | | PCBA Creedmoor, North Carolina | J2410002433 | 26-Aug-09 | Flextronics America LLC | | | ▮ | USD | 1.0000 | ▮ | Engineering Change Orders (ECO) |
| | Nortel Networks Inc. | Carrier CVAS (Wireline) | | PCBA Creedmoor, North Carolina | J2410002297 | 26-Aug-09 | Flextronics America LLC | | | ▮ | USD | 1.0000 | ▮ | Freight & Duty - Inbound |
| | Nortel Networks Inc. | Carrier CVAS (Wireline) | | PCBA Creedmoor, North Carolina | J2410002561 | 26-Aug-09 | Flextronics America LLC | | | ▮ | USD | 1.0000 | ▮ | Engineering Change Orders (ECO) |



**Execution Version**

### Schedule D – Pre-Petition Ordinary Course Contractual Claims

| Amount Invoiced Local Currency | Invoiced Currency | FX Rate | USD$ | Claims Description |
|---|---|---|---|---|
| ▓▓▓ | USD | 1.0000 | ▓▓▓ | ROIC Q2'08 Sept08 (BT) |
| ▓▓▓ | USD | 1.0000 | ▓▓▓ | Legacy E&O after BOP |
| ▓▓▓ | USD | 1 0000 | ▓▓▓ | ROIC Q3'08 (oct-nov-dec) |
| ▓▓▓ | USD | 1 0000 | ▓▓▓ | ROIC model cost structure model. Nov 2nd, 2008 to Dec 31st, 2008 |
| ▓▓▓ | USD | 1 0000 | ▓▓▓ | TRA - Retirement Benefit (Oct - Dec 2008) |
| ▓▓▓ | CDN | 1.2157 | ▓▓▓ | Q2-09 NN Portion of Pension Support MTL (Apr - Jun'09) |
| ▓▓▓ | CND | 1.2157 | ▓▓▓ | Q1-09 NN Portion of Pension Support MTL (15th Jan - 31st Mar) |
| ▓▓▓ | CDN | 1 2157 | ▓▓▓ | Q2-09 NN Portion of Pension Support CGY (Apr - Jun'09) |
| ▓▓▓ | USD | 1.0000 | ▓▓▓ | Jan 2009 ROIC (pre-filing) |
| ▓▓▓ | USD | 1.0000 | ▓▓▓ | Outbound freight (Jan 1 - Jan 14th) |
| ▓▓▓ | USD | 1 0000 | ▓▓▓ | Mind Ready claim (over a year old) |
| ▓▓▓ | USD | 1.0000 | ▓▓▓ | ROIC model cost structure model  Jan 1st to Jan 13th, 2009 |
| ▓▓▓ | CND | 1.2157 | ▓▓▓ | Q1-09 NN Portion of Pension Support MTL (1st-14th Jan) |
| ▓▓▓ | USD | 1.0000 | ▓▓▓ | TRA - Retirement Benefit (Oct - Dec 2008) |
| ▓▓▓ | USD | 1 0000 | ▓▓▓ | Stock Rotation # 142 Rework (December'08) |
| ▓▓▓ | USD | 1 0000 | ▓▓▓ | Monkstown Packaging Claim (Oct - Dec) |
| ▓▓▓ | USD | 1.0000 | ▓▓▓ | Expedited Air Freight (Dec'08) |
| ▓▓▓ | USD | 1.0000 | ▓▓▓ | Q1-09 NN Portion of Pension Support CGY (15th Jan - 31st Mar) |
| ▓▓▓ | USD | 1 0000 | ▓▓▓ | RTP Packaging Claim (Oct - Dec) |
| ▓▓▓ | USD | 1 0000 | ▓▓▓ | Calgary NPI (Nov'08) |
| ▓▓▓ | USD | 1.0000 | ▓▓▓ | Calgary NPI (Dec'08) |
| ▓▓▓ | USD | 1.0000 | ▓▓▓ | Calgary NPI (Aug'08) |
| ▓▓▓ | USD | 1.0000 | ▓▓▓ | Calgary NPI (Oct'08) |
| ▓▓▓ | USD | 1 0000 | ▓▓▓ | Calgary NPI (Sep'08) |
| ▓▓▓ | USD | 1 0000 | ▓▓▓ | Stock Rotation # 141 Rework (November'08) |
| ▓▓▓ | USD | 1.0000 | ▓▓▓ | Flextronics Q3 under consumption |
| ▓▓▓ | USD | 1.0000 | ▓▓▓ | NPI (Jan 1st - 14th) |
| ▓▓▓ | CND | 1 2157 | ▓▓▓ | Q1-09 NN Portion of Pension Support CGY (1st-14th Jan) |
| ▓▓▓ | USD | 1.0000 | ▓▓▓ | Flex's CSA invoices (2007-2008) |
| ▓▓▓ | USD | 1.0000 | ▓▓▓ | Engineering Related (nov'08) |
| ▓▓▓ | USD | 1.0000 | ▓▓▓ | Tooling, Fabrication Tooling (nov-08) |



Execution Version

## Schedule E – § 503(b)(9) Claims[3]

| Claim Register ID No. | U.S. Debtor | Creditor Name | Amount Claimed (USD) |
|---|---|---|---|
| 4858 | Nortel Altsystems Inc. | Flextronics Corporation | 24,795,601.00 |
| 4859 | Nortel Networks Inc. | Flextronics Corporation | 24,795,601.00 |
| 4862 | Nortel Networks Inc. | Flextronics Sales & Marketing North Asia (L) Ltd. | 331,437.00 |
| 4863 | Nortel Networks Inc. | Flextronics Technology (Penang) Sdn. Bhd. | 46,351.00 |
| 4864 | Nortel Networks Inc. | Flextronics International Latin America (L) Ltd. | 637,596.00 |
| 4865 | Nortel Networks (CALA), Inc. | Flextronics International Europe B.V. | 472.00 |
| 4866 | Nortel Networks Inc. | Flextronics International USA Inc. | 9,427.00 |
| 4867 | Nortel Networks (CALA), Inc. | Flextronics America LLC | 2,076.00 |
| 4868 | Nortel Networks Inc. | Flextronics International Europe B.V. | 10,663,45.00 |
| 4869 | Nortel Networks Inc. | Flextronics America LLC | 11,918,347.00 |
| 4870 | Nortel Altsystems Inc. | Flextronics Telecom Systems Ltd. | 24,795,601.00 |
| 4871 | Nortel Networks Inc. | Flextronics Telecom Systems Ltd. | 24,795,601.00 |
| 4875 | Nortel Networks Inc. | Flextronics Logistics USA Inc. | 1,195,872.00 |

---

[3] This Schedule E is provided for illustrative purposes only. To the extent that this Schedule E is inconsistent with the releases contained in section 7 of this Settlement and Release Agreement, the releases contained in section 7 of this Settlement and Release Agreement shall govern.

Execution Version

## Schedule F – US Proofs of Claim[4]

| Claim Register ID No. | U.S. Debtor | Creditor Name | Amount Claimed (USD) |
|---|---|---|---|
| | Nortel Altsystems Inc. | Flextronics Telecom Systems Ltd. | 608,200,466.00 |
| 4857 | Nortel Networks International Inc. | Flextronics Telecom Systems Ltd. | 608,200,466.00 |
| 4860 | Nortel Networks Inc. | Flextronics Telecom Systems Ltd. | 608,200,466.00 |
| 4861 | Nortel Networks Capital Corporation | Flextronics Telecom Systems Ltd. | 608,200,466.00 |
| 4872 | Nortel Networks Capital Corporation | Flextronics Corporation | 608,200,466.00 |
| 4873 | Nortel Networks Inc. | Flextronics Corporation | 608,200,466.00 |
| 4874 | Nortel Altsystems Inc. | Flextronics Corporation | 608,200,466.00 |
| 4876 | Nortel Networks Inc. | Flextronics Sales & Marketing North Asia (L) Ltd. | 303,738,362.00 |
| 4877 | Nortel Networks Inc. | Flextronics Logistics USA, Inc. | 305,640,281.00 |
| 4878 | Nortel Networks Inc. | Flextronics Technology (Penang) Sdn. Bhd. | 303,583,529.00 |
| 4879 | Nortel Networks (CALA), Inc. | Flextronics International Europe B.V. | 472.00 |
| 4880 | Nortel Networks Inc. | Flextronics International USA, Inc. | 302,779,326.00 |
| 4881 | Nortel Networks Inc. | Flextronics International Latin America (L) Ltd. | 312,698,697.00 |
| 4882 | Nortel Networks Inc. | Flextronics International Europe B.V. | 334,302,199.00 |
| 4883 | Nortel Networks Inc. | Flextronics America, LLC | 349,425,851.00 |
| 4884 | Nortel Networks (CALA), Inc. | Flextronics America, LLC | 2,076.00 |
| 4885 | Nortel Networks International Inc. | Flextronics Corporation | 608,200,466.00 |

---

[4] This Schedule F is provided for illustrative purposes only.  To the extent that this Schedule F is inconsistent with the releases contained in section 7 of this Settlement and Release Agreement, the releases contained in section 7 of this Settlement and Release Agreement shall govern.

**Execution Version**

| 4886 | Nortel Networks Inc. | Flextronics EMS Canada Inc. | 302,771,369.00 |

121

**Execution Version**

## Schedule G – Canadian Proofs of Claim[5]

| E&Y Claim ID Number | CCAA Applicant | Creditor Name | Amount Claimed (CAD) |
|---|---|---|---|
| 1840 | Nortel Networks Limited | Flextronics International Europe B.V. | 83,703,679.00 |
| 1841 | Nortel Networks Limited | Flextronics Electronics Technology (Suzhou) Co. Ltd. | 120,436.23 |
| 1842 | Nortel Networks Limited | Flextronics Distribution, Inc. | 72,219.28 |
| 1843 | Nortel Networks Technology Corporation | Flextronics America, LLC | 14,756.48 |
| 1844 | Nortel Networks Limited | Flextronics America, LLC | 529.59 |
| 1845 | Nortel Networks Technology Corporation | Flextronics Telecom Systems Ltd | 741,541,610.00 |
| 1846 | Nortel Networks Technology Corporation | Flextronics International Latin America (L) Ltd. | 38,808.83 |
| 1847 | Nortel Networks Limited | Flextronics International Latin America (L) Ltd. | 4,270,873.78 |
| 1850 | Nortel Networks Limited | Flextronics (Canada) Inc. | 33,679,301.00 |
| 1866 | Nortel Networks Limited | Flextronics Telecom Systems Ltd | 775,220,909.98 |
| 1870 | Nortel Networks International Corporation | Flextronics Telecom Systems Ltd | 741,541,610.20 |
| 1872 | Nortel Networks Global Corporation | Flextronics Telecom Systems Ltd | 741,541,610.20 |
| 1875 | Nortel Networks Corporation | Flextronics Telecom Systems Ltd | 741,541,610.20 |
| 1878 | Nortel Networks Technology Corporation | Flextronics Corporation | 741,541,608.98 |
| 1879 | Nortel Networks Limited | Flextronics Corporation | 741,541,608.98 |
| 1881 | Nortel Networks Global | Flextronics Corporation | 741,541,608.98 |

---

[5] This Schedule G is provided for illustrative purposes only. To the extent that this Schedule G is inconsistent with the releases contained in section 7 of this Settlement and Release Agreement, the releases contained in section 7 of this Settlement and Release Agreement shall govern.

Execution Version

| | | | |
|---|---|---|---|
| | Corporation | | |
| 1884 | Nortel Networks International Corporation | Flextronics Corporation | 741,541,608.98 |
| 1887 | Nortel Networks Corporation | Flextronics Corporation | 741,541,608.98 |
| 1894 | Nortel Networks Limited | Flextronics International Poland Sp. z.o.o. | 19,710.70 |
| 1898 | Nortel Networks Limited | Flextronics Sales & Marketing North Asia (L) Ltd | 20,046.27 |
| 1902 | Nortel Networks Technology Corporation | Flextronics Canada Design Services Inc. | 5,638,089.47 |
| 1903 | Nortel Networks Technology Corporation | Flextronics EMS Canada Inc. | 2,558,618.98 |
| 1904 | Nortel Networks Technology Corporation | Flextronics Enclosure Systems (Changzhou) Ltd. | 43,421.38 |

123

## Schedule H – Open Accounts Receivable

Confidential. Filed under seal pursuant to the Order Authorizing the Debtors to File Under Seal Certain Portions of (I) the Settlement and Release Agreement and (II) the Side Agreement, Attached as Exhibits to the Debtors' Motion Pursuant to 11 U.S.C. §§ 105 and 363 and Fed. R. Bankr. P. 9019 for Entry of an Order (I) Authorizing and Approving the Flextronics Settlement and Release Agreement, (II) Authorizing and Approving the Related Side Agreement and (III) Granting Related Relief [D.I. _____]. Copies of Schedule H will be provided to the United States Trustee and the Court.

## Schedule I – Preserved Open Accounts Receivable

Confidential. Filed under seal pursuant to the Order Authorizing the Debtors to File Under Seal Certain Portions of (I) the Settlement and Release Agreement and (II) the Side Agreement, Attached as Exhibits to the Debtors' Motion Pursuant to 11 U.S.C. §§ 105 and 363 and Fed. R. Bankr. P. 9019 for Entry of an Order (I) Authorizing and Approving the Flextronics Settlement and Release Agreement, (II) Authorizing and Approving the Related Side Agreement and (III) Granting Related Relief [D.I. _____]. Copies of Schedule I will be provided to the United States Trustee and the Court.

## Schedule J – Adjustment Amount Open Accounts Receivables

Confidential. Filed under seal pursuant to the Order Authorizing the Debtors to File Under Seal Certain Portions of (I) the Settlement and Release Agreement and (II) the Side Agreement, Attached as Exhibits to the Debtors' Motion Pursuant to 11 U.S.C. §§ 105 and 363 and Fed. R. Bankr. P. 9019 for Entry of an Order (I) Authorizing and Approving the Flextronics Settlement and Release Agreement, (II) Authorizing and Approving the Related Side Agreement and (III) Granting Related Relief [D.I. _____]. Copies of Schedule J will be provided to the United States Trustee and the Court.

ᗝᏞᏟ

**Execution Version**

**Exhibit 1 – Form ERS8K MA**

127

## ERS8K MANUFACTURING AGREEMENT

This Agreement is entered into between Nortel Networks Limited ("NNL") and Nortel Networks Inc. ("NNI") (NNL and NNI collectively "Nortel") on the one hand and on the other hand Flextronics Telecom Systems Ltd. ("FTS") and Flextronics Corporation (f/k/a Solectron Corporation, "FC") (FTS and FC, collectively, "Flextronics"), on the terms and conditions set forth below. This Agreement will become effective on _____, 2009 (the "Effective Date").

WHEREAS, Nortel is currently purchasing the contract manufacturing services related to certain of its products identified in Schedule A attached hereto as "SLR Enterprise Products," as produced in Flextronics's facility in Penang, Malaysia ("Penang"), Charlotte, North Carolina ("Charlotte"), Milpitas, California ("Milpitas") and distributed through Flextronics's facility in Columbia, South Carolina ("Columbia"). The purchase and sale of the SLR Enterprise Products is currently governed by that certain Master Contract Manufacturing Services Agreement between FC and Nortel, dated as of September 30, 2003 and as subsequently amended by the parties (the "SLR MCMSA");

AND WHEREAS, NNL and Flextronics have agreed, pursuant to that certain Settlement Agreement dated May 22, 2009 (the "Settlement Agreement"), that, *inter alia,* the business and operations conducted pursuant to the SLR MCMSA related to the SLR Enterprise Products would terminate in accordance with the terms of the SLR MCMSA as of December 12, 2009;

AND WHEREAS, the Parties have subsequently agreed that Flextronics will continue to provide the manufacturing services related to the SLR Enterprise Products under the terms and conditions set out herein;

NOW, THEREFORE, in consideration of the mutual promises hereinafter set forth (the receipt and sufficiency of which is hereby acknowledged), the Parties hereby agree as follows:

1.    The Parties agree that, with respect to the SLR Enterprise Products, Flextronics's continued production of such products shall be pursuant to the terms of that certain Amended and Restated Master Contract Manufacturing Services Agreement between FTS and Nortel, dated as of June 29, 2004 and as subsequently amended by the parties (the "Flex MCMSA"), and, further, that such production and services shall be continued until (a) December 31, 2010 with respect to the services currently provided in Penang, Charlotte and Milpitas and (b) March 31, 2010 with respect to the services currently provided in Columbia. With respect to such continuing support, the pricing will be fixed through December 31, 2009

2.    Except as set out herein, the terms and conditions governing the provision of the manufacturing services related to the SLR Enterprise Products shall be, in order of precedence (controlling documents listed first): (i) this Agreement, (ii) Settlement Agreement, (iii) the Amending Agreement by and between the parties dated January, 13, 2009, and (iv) the Flex MCMSA, as amended and as particularly amended by that certain Amending Agreement dated January 13, 2009 and the Settlement Agreement. The Parties have agreed that the terms of any applicable Virtual System House Agreements or other agreements currently governing the SLR

Enterprise Products business shall continue in their current forms, except to the extent such terms are superseded by the terms of the Flex MCMSA and this Agreement.

3.    The pricing for the SLR Enterprise Products will remain at the current rates through December 31, 2009.



January 1, 2010
April 1, 2010
July 1, 2010
October 1, 2010

As part of the closing of the sale to Avaya Inc. by Nortel of Nortel's Enterprise Solutions business ("Closing"), Flextronics consents to Nortel's assignment to Avaya of Nortel's obligation to pay all of the above described quarterly payments that will become due after the effective date of the Closing; provided, Avaya Inc. acknowledges its assumption of such payment obligation in writing with Flextronics in advance of the Closing. Upon Avaya Inc. and Flextronics entering into the written agreement acknowledging assumption of the described quarterly payments, Flextronics will release Nortel from all liability for such payments.

4.    Flextronics utilizes certain "gold boards" as part of the test processes for the SLR Enterprise Products (the "Gold Boards"), Nortel and FC will mutually agree on an appropriate Gold Board population and identify these quantities in Schedule B. Nortel shall submit a purchase order for the Gold Boards in the amount set forth in Schedule B, which Nortel shall pay to Flextronics on Payment terms consistent with the current AA process Flextronics shall retained possession of the Gold Boards as Loaned Assets under the Flex MCMSA.

5.    For the avoidance of doubt, Flextronics shall submit and Nortel shall be responsible for claims for Quarterly E&O generated by the SLR Enterprise Products in accordance with the terms of the Settlement Agreement and Amending Agreement.

[REST OF PAGE INTENTIONALLY LEFT BLANK – SIGNATURES FOLLOW]

IN WITNESS WHEREOF, the parties hereto have signed this Manufacturing Agreement, to be effective as of the Effective Date first above written, although actually signed by the parties on the dates shown below their respective signatures.

**NORTEL NETWORKS LIMITED**      **FLEXTRONICS TELECOM SYSTEMS, LTD.**

By:                              By:

Name:                            Name:
Title:                           Title:

Date:                            Date:

                                 **FLEXTRONICS CORPORATION**

                                 By:
                                 Name:
                                 Title:

                                 Date:

## Schedule A

### SLR Enterprise Products

As of the Effective Date, the SLR Enterprise Products consist of the following Products manufactured in Penang:

## Schedule B

## Gold Boards

13.2

**Execution Version**

### Exhibit 2 -- Form MEN MA

## MEN MANUFACTURING AGREEMENT

This Agreement is entered into between Nortel Networks Limited ("NNL") and Nortel Networks Inc. ("NNI") (NNL and NNI collectively "Nortel") on the one hand and on the other hand Flextronics Telecom Systems Ltd. ("FTS") and Flextronics Corporation (f/k/a Solectron Corporation, "FC") (FTS and FC, collectively, "Flextronics"), on the terms and conditions set forth below. This Agreement will become effective on October 15, 2009 (the "Effective Date").

WHEREAS, Nortel is currently purchasing the contract manufacturing services related to certain of its products identified in Schedule A attached hereto as SLR Metro Ethernet Networks (MEN) Products, as produced in Flextronics' facility in Guadalajara, Mexico. The purchase and sale of the SLR MEN Products is currently governed by that certain Master Contract Manufacturing Services Agreement between FC and Nortel, dated as of September 30, 2003 and as subsequently amended by the parties (the "SLR MCMSA");

AND WHEREAS, NNL and Flextronics have agreed, pursuant to that certain Settlement Agreement dated May 22, 2009 (the "Settlement Agreement"), that, *inter alia*, the business and operations conducted pursuant to the SLR MCMSA related to the SLR MEN Products would terminate in accordance with the terms of the SLR MCMSA as of December 12, 2009;

AND WHEREAS, the Parties have subsequently agreed that Flextronics will continue to provide the manufacturing services related to the SLR MEN Products under the terms and conditions set out herein;

NOW, THEREFORE, in consideration of the mutual promises hereinafter set forth (the receipt and sufficiency of which is hereby acknowledged), the Parties hereby agree as follows:

1.      The Parties agree that, with respect to the SLR MEN Products, Flextronics' continued production of such products shall be pursuant to the terms of that certain Amended and Restated Master Contract Manufacturing Services Agreement between FTS and Nortel, dated as of June 29, 2004 and as subsequently amended by the parties (the "Flex MCMSA"), and, further, that such production and services shall be continued until June 30, 2010 unless an extension to this agreement is mutually agreed prior to June 30, 2010.

2.      Except as set out herein, the terms and conditions governing the provision of the manufacturing services related to the SLR MEN Products shall be, in order of precedence (controlling documents listed first): (i) this Agreement, (ii) Settlement Agreement, (iii) the Amending Agreement by and between the parties dated January, 13, 2009, and (iv) the Flex MCMSA, as amended and as particularly amended by that certain Amending Agreement dated January 13, 2009 and the Settlement Agreement. The Parties have agreed that the terms of any applicable Virtual System House Agreements or other agreements currently governing the SLR MEN Products business shall continue in their current forms, except to the extent such terms are superseded by the terms of the Flex MCMSA and this Agreement.

3.    Pricing for the SLR MEN Products will remain at the current rates through December 31, 2009.



January 1, 2010
April 1, 2010

The January 1 payment is for the first quarter of calendar year 2010, whilst the April 1 payment is for the second quarter of calendar year 2010.

During the period for which ▮▮▮▮▮▮▮▮▮ Transformation cost for the Products will remain fixed at current levels, Material costs will continue to be agreed monthly in accordance with the MPLP process.

4.    For the avoidance of doubt, Flextronics shall submit and Nortel shall be responsible for claims for Quarterly E&O generated by the SLR MEN Products in accordance with the terms of the Settlement Agreement and Amending Agreement.

[REST OF PAGE INTENTIONALLY LEFT BLANK – SIGNATURES FOLLOW]

IN WITNESS WHEREOF, the parties hereto have signed this Wireline Manufacturing Agreement, to be effective as of the Effective Date first above written, although actually signed by the parties on the dates shown below their respective signatures.

**NORTEL NETWORKS LIMITED**          **FLEXTRONICS TELECOM SYSTEMS, LTD.**

By:                                                          By:

Name:                                                    Name:
Title:                                                      Title:

Date:                                                      Date:

                                                               **FLEXTRONICS CORPORATION**

                                                               By:
                                                               Name:
                                                               Title:

                                                               Date:


**[and other Nortel and Flex entities as required]**

136

## Schedule A

## SLR MEN Products

As of the Effective Date, the SLR MEN Products consist of the following Products manufactured in Guadalajara:

**OM3K:**

| | |
|---|---|
| NTN451BA | OM 3500 LIF Left Interface circuit pack |
| NTN451BH | OM3500 LIF Left Interface circuit pack Hardened |
| NTN451HA | OM3500: 20A Power Module |
| NTN451MA | OM 3500 LOAM left OAM circuit pack |
| NTN451MH | OM3500 LOAM left OAM circuit pack Hardened |
| NTN452AA | DS1 1-28 Top Front I/O Module |
| NTN452AH | DS1 1-28 Enhanced Front I/O Module |
| NTN452BA | DS1 1-28 Top Rear I/O Module |
| NTN452CA | DS1 29-56 Top Front I/O Module |
| NTN452CH | DS1 29-56 Top Front I/O Module |
| NTN452DA | DS1 29-56 Top Rear I/O Module |
| NTN452EA | DS1 29-84 Top Front I/O Module |
| NTN452EH | DS1 29-84 Top Front I/O Module |
| NTN452FA | DS1 29-84 Top Rear I/O Module |
| NTN452HB | 8 X - RJ45 Top Rear I/O Module |
| NTN452JA | BNC 12-port I/O Module |
| NTN452JH | BNC 12-port I/O Front Module |
| NTN452KA | BNC 12-port I/O Rear Module |
| NTN452NA | 8 X -RJ45 Top Front I/O Module |
| NTN452NH | 8 X - RJ45 Top Front I/O Module |
| NTN458HB | OM3500: FAN FRONT EXHAUST |
| NTN458HC | OM 3500 Fan Module- Front Exhaust |
| NTN458HH | OM 3500 Fan Module |
| NTN458MW | OM3500 Power Module & Cooling Unit Upgrade Kit |
| NTN458QA | Optical Metro 3500 Fan Kit |
| NTN458QH | Optical Metro 3500 Fan Kit |
| NTN476AH | Optical Metro 3500 Universal Shelf Assembly Hardened |

**Passport7/9K:**

| | |
|---|---|
| NT0489AG | MSS7K |
| NT0490AG | MSS7K |
| NTBP07AG | MSS7K |
| NTBP07BG | MSS7K |
| NTBP07CG | MSS7K |
| NTBP85AG | MSS7K |
| NTEP14BG | MSS7K |
| NTEP65BG | MSS7K |
| NTEP66DG | MSS7K |
| NTEP80AG | MSS7K |
| NTEP81AG | MSS7K |
| NTEP82AG | MSS7K |
| NTHQ19AG | MSS7K |
| NTJS20AG | MSS7K |
| NTJS52BG | MSS7K |
| NTJS53BG | MSS7K |
| NTJS56BG | MSS7K |
| NTJS62FG | MSS7K |
| NTJS63EG | MSS7K |
| NTJS64EG | MSS7K |
| NTJS65DG | MSS7K |
| NTJS66EG | MSS7K |
| NTJS67EG | MSS7K |
| NTJS74AG | MSS7K |
| NTJV24CG | MSS7K |
| NTJV32AG | MSS7K |
| NTPS20AG | MSS7K |
| NTPS20BG | MSS7K |
| NTPS22AG | MSS7K |
| NTNS40AA | MSS9K |
| NTNS41AA | MSS9K |



**Passport 15K:**

NTHR11EA
NTHR12EA
NTHR13EA
NTHR15EA
NTHW76EA
NTHR5071

# TAB B

DOCSTOR: 1680120\1

129

Execution Version

### SIDE AGREEMENT

This Side Agreement (the "Agreement") is dated as of November 20, 2009 (the "Effective Date"), among Nortel Networks Limited ("NNL") and its Canadian affiliates that have filed under the Companies' Creditors Arrangement Act (the "Canadian Entities"), (ii) Nortel Networks Inc. ("NNI") and its US debtor affiliates (the "US Entities") and (iii) the companies listed on Schedule A hereto (collectively the "EMEA Entities" and together with the Canadian Entities and the US Entities, the "Parties"), which in the case of the EMEA Entities are acting by their joint administrators Alan Robert Bloom, Stephen John Harris, Alan Michael Hudson and Christopher John Wilkinson Hill of Ernst & Young LLP of 1 More London Place, London SE1 2AF (other than Nortel Networks (Ireland) Limited, for which David Hughes of Ernst & Young Chartered Accountants of Harcourt Centre, Harcourt Street, Dublin 2, Ireland and Alan Robert Bloom serve as joint administrators) (collectively, the "Joint Administrators") who act as agents, for the EMEA Entities without any personal liability whatsoever.

### W I T N E S S E T H:

WHEREAS, the Canadian Entities, the US Entities and the EMEA Entities have entered into that certain Settlement and Release Agreement with Flextronics Corporation ("FC"), Flextronics Telecom Systems Ltd ("FTS") and certain of their affiliates, on behalf of themselves and their respective affiliates (collectively, "Flextronics"), for which the "Effective Date" shall be the first day after the Approval Orders (as defined therein) become final (the "Settlement and Release Agreement") attached hereto as Exhibit 1;

WHEREAS, solely for the purpose of facilitating the payments due to Flextronics under the Settlement and Release Agreement, and subject to the potential reallocation of the total liabilities due to Flextronics under the Settlement and Release Agreement among the Parties, the Parties have agreed to make the payments described in Schedule B hereto (the "Payment Obligations"); and

WHEREAS, the Parties expressly acknowledge and agree that the Payment Obligations do not necessarily reflect the appropriate allocation of liability for the Payment Obligations among the Parties and, as such, the Parties wish to settle the procedures for determining such liability and, if necessary, ultimately reallocating the Payment Obligations and the value of certain other claims compromised by certain of the Parties in connection with the Settlement and Release Agreement.

NOW, THEREFORE, in consideration of the respective covenants made herein, and of the mutual benefits to be derived hereby (the sufficiency of which are acknowledged), the Parties hereto agree as follows:

This is Exhibit..........*B*..........referred to in the
affidavit of ...*Donald M. Kilenz*...
sworn before me, this ...*24th*...
day of ...*November*... 20.*09*.

...*Susan Cumiskey*...
A COMMISSIONER FOR TAKING AFFIDAVITS

SUSAN CUMISKEY
Notary Public, State Of New York
No.01CU6086318
Qualified In Westchester County
Certificate Filed In New York County
Commission Expires January 21, *2011*

**Execution Version**

## ARTICLE I

## INTERPRETATION

SECTION 1.1. Definitions.

(a)    To the extent capitalized words used herein (including in the recitals hereof) are not defined in this Agreement, those words shall have the meanings given to them (i) in the Settlement and Release Agreement.

(b)    The following capitalized terms shall have the meanings set forth below:

(i)    "Allocation Rules" means the rules (expressed as percentages or otherwise) to be used to allocate the proceeds of the Relevant Sales (as defined herein) among the various Parties, as such rules shall be agreed upon among the relevant Parties, and pursuant to Section 12.d and 12.g of the IFSA or shall be otherwise determined in accordance with the binding procedures to be set forth in the Interim Sales Protocol pursuant to Section 12.c and 12.g of the IFSA.

(ii)    "IFSA" means the Interim Funding and Settlement Agreement dated June 9, 2009, to which each of the Canadian Entities, the US Entities and the EMEA Entities are a party.

(iii)    "Interim Sales Protocol" has the meaning ascribed to it in Section 12.c of the IFSA.

(iv)    "Party" means (w) each of the Canadian Entities, (x) each of the US Entities, (y) each of the EMEA Entities and (z) the Joint Administrators, as agents of the EMEA Entities and without any personal liability whatsoever.

SECTION 1.2. Interpretation.

1.2.1. Gender and Number. Any reference in this Agreement to gender includes all genders and words importing the singular include the plural and vice versa.

1.2.2. Certain Phrases and Calculation of Time. In this Agreement (i) the words "including" and "includes" mean "including (or includes) without limitation", (ii) the terms "hereof," "herein," and "herewith" and words of similar import shall, unless otherwise stated, be construed to refer to this Agreement and not to any particular provision of this Agreement, and Section and Schedule references are to the Sections and Schedules to this Agreement unless otherwise specified, and (iii) in the computation of periods of time from a specified date to a later specified date, unless otherwise expressly stated, the word "from" means "from and including" and the words "to" and "until" each mean "to but excluding". If the last day of any such period is not a business day, such period will end on the next business day.

When calculating the period of time "within" which, "prior to" or "following" which any act or event is required or permitted to be done, notice given or steps taken, the date

Execution Version

which is the reference date in calculating such period is excluded from the calculation. If the last day of any such period is not a business day, such period will end on the next business day.

 1.2.3. <u>Headings, etc</u>. The inclusion of a table of contents, the division of this Agreement into Articles and Sections and the insertion of headings are for convenient reference only and are not to affect or be used in the construction or interpretation of this Agreement.

ARTICLE II

COVENANTS

SECTION 2.1. <u>Efforts to Complete the Settlement and Release Agreement</u>.

 Subject to the requirements of any applicable law, each of the Parties shall use their reasonable best efforts to take, or cause to be taken, all actions and to do, or cause to be done, and cooperate with each other and Flextronics in good faith in order to do, all things necessary, proper or advisable under applicable law to perform their obligations under the Settlement and Release Agreement as soon as practicable in accordance with the provisions thereof and cause the fulfillment at the earliest practicable date of all of the conditions to Flextronics' obligations thereunder.

SECTION 2.2. <u>Segregated Account</u>.

 On or prior to the Effective Date of the Settlement and Release Agreement, (i) NNI shall establish a segregated account (the "<u>Segregated Account</u>") solely for the purpose of holding the Payment Obligations (including any "Adjustment Amount", as such term is defined in Schedule B to the Settlement and Release Agreement) until such amounts are distributed in accordance with Schedule B hereto, (ii) ███████████████████████████, and (iii) ████████████████████████████ into the Segregated Account (where (ii) and (iii) collectively constitute the "<u>Segregated Funds</u>"). NNI shall hold the Segregated Funds for the benefit of the Parties and solely for the purpose of satisfying the Payment Obligations set forth in Schedule B hereto. Without limiting the foregoing, the Parties shall deposit into the Segregated Account the Adjustment Amount, if any, in accordance with Schedule B hereto, which deposited amounts shall constitute additional Segregated Funds.

SECTION 2.3. <u>Payment to Flextronics</u>.

 The initial allocation of the Payment Obligations set forth in Schedule B hereto has been agreed to by the Parties solely as a means to fund the payments due to Flextronics under the Settlement and Release Agreement. Such allocation does not reflect an agreement of the Parties as to the appropriate allocation of liability with respect to the Payment Obligations or the claims being compromised by certain of the Parties in connection with the Settlement and Release Agreement, and such allocation of liability shall be determined in accordance with Section 2.4 hereof.

3

Ц42

**Execution Version**

SECTION 2.4.  Allocation of Settlement Cost.

(a)    *Allocation of Settlement Cost among the Regional Entities.*  The ultimate allocation of the Settlement Cost (as defined on Schedule C hereto) incurred by the Parties in each of the following three groups: (i) the Canadian Entities collectively, (ii) the US Entities collectively and (iii) the EMEA Entities collectively (each of (i), (ii) and (iii), a "Regional Entity" and together, the "Regional Entities") in connection with the Settlement and Release Agreement shall be allocated among the Regional Entities according to the weighted average of proceeds allocated to such Regional Entity (the "Weighted Average") from the sales of the Enterprise, Optical, CVAS and GSM businesses (the "Relevant Sales") in accordance with the Allocation Rules governing the Relevant Sales (each an "Allocation Decision"); provided that the Parties may agree to modify, with the consent of the official committee of unsecured creditors of Nortel Networks Inc., *et al.* (the "Committee"), the steering committee members of the ad hoc group of bondholders that have executed confidentiality or non-disclosure agreements with NNL (the "Bondholder Group") and Ernst & Young Inc. as "Monitor" in connection with the CCAA Proceedings (the "Monitor"), the sales included among the Relevant Sales.

(b)    *Determination of the US Avoidance Claim.*  The "US Avoidance Claim" shall consist of the value attributable to the claims released by the US Entities in the Settlement and Release Agreement under Chapter 5 of the Bankruptcy Code, which value each of the Parties shall negotiate in good faith to agree to through a representative designated by each of the Regional Entities (such representatives, collectively, the "Representatives"), with the consent of the Committee, the Bondholder Group and the Monitor, or if such agreement cannot be reached prior to the Allocation Decision for the first Relevant Sale, shall be promptly submitted to mediation among the Parties (through their Representatives) by a mediator appointed jointly by the United States Bankruptcy Court for the District of Delaware and the Ontario Superior Court of Justice (Commercial List) (collectively, the "Courts") following notice and a joint hearing. The costs of such mediation shall be shared equally among the Regional Entities participating in the mediation.  In the event that the mediation has not resulted in an agreement between the Parties (through their Representatives), with the consent of the Committee, the Bondholder Group and the Monitor (a "Mediation Agreement"), within 180 calendar days of the appointment of the mediator (unless the Representatives of the Parties, with the consent of the Committee, the Bondholder Group and the Monitor, agree to extend that period) the determination of the amount of the US Avoidance Claim shall be finally resolved by binding arbitration in accordance with the Rules of Arbitration of the International Chamber of Commerce ("ICC Arbitration Rules"). The arbitration shall be conducted in the English language in New York, New York, USA, by one disinterested arbitrator appointed in accordance with the ICC Arbitration Rules, who shall be a US trained lawyer experienced in United States bankruptcy matters.  The Parties agree that the decision of the arbitrator will be final and binding.  The EMEA Entities have the right to be a full participant to any mediation and/or arbitration proceeding, but in the event that the EMEA Entities elect not to participate in any mediation and/or arbitration proceeding they will not be obligated to do so and will not have any liability for any costs of such mediation and/or arbitration proceeding if they do not participate.  For the avoidance of doubt, (i) whether or not the EMEA Entities participate in the mediation, they shall be bound by any Mediation Agreement and (ii) whether or not the EMEA Entities participate in the arbitration, they shall be bound by any award rendered by the arbitrator and expressly waive any right to submit the US Avoidance Claim to any forum other than the arbitral forum specified herein.  The US Entities

4

agree that (x) any agreement by the US Entities (through their Representative) to the selection of a mediator and/or arbitrator in connection with the determination of the US Avoidance Claim and (y) any papers submitted in the mediation and/or arbitration by the US Entities shall be subject to the approval of the Committee. Further, if the Committee is not the designated Representative for the US Entities in connection with the negotiation and/or any necessary mediation or arbitration proceeding, the US Entities agree to directly involve the Committee in any discussions and negotiations that the US Entities (through their Representative) have with the other Regional Entities (through their Representatives) in connection with the determination of the US Avoidance Claim. Judgment on the award rendered by the arbitrator may be entered only in the state or federal courts sitting in the State of New York, which shall have exclusive jurisdiction to confirm or vacate the award. For the avoidance of doubt, the provisions of this Section 2.4(b) shall not limit the jurisdiction of the Courts as provided in Section 3.7(b) of this Agreement. The Parties covenant that they shall not disclose the information contained in Schedule C, including, but not limited to the Settlement Cost Cap and the Avoidance Claims Cap, to any mediator or arbitrator and the Parties agree that the mediator and/or arbitrator shall not consider any such information in determining the amount of the US Avoidance Claim. The Parties further agree to use their reasonable best efforts to ensure that the information contained in Schedule C, including, but not limited to the Settlement Cost Cap and the Avoidance Claims Cap, is not disclosed by any administrators of the arbitration proceeding provided for in this section 2.4(b).

(c)     *Escrow of True-up Amounts.* The Parties agree that at the time of disbursement of proceeds to the Regional Entities for a Relevant Sale, the Gross True-up Amount (as defined below) for each Regional Entity shall be transferred to an alternative escrow (the "True-up Escrow") established by the Parties, with the consent of the Committee, the Bondholder Group and the Monitor, for the purpose of holding funds to be used for the reallocation of the Settlement Cost among the Regional Entities under this Agreement. Following an Allocation Decision for a Relevant Sale, but prior to the disbursement of funds to the Parties from the proceeds escrow for a Relevant Sale, a "Gross True-up Amount" for each Regional Entity shall be calculated and the Parties shall direct the escrow agent for the relevant proceeds escrow to deposit into the True-up Escrow the Gross True-up Amounts, where such Gross True-up Amounts shall equal (i) the Settlement Cost multiplied by such Regional Entity's Weighted Average for all Relevant Sales for which an Allocation Decision has been made, less (ii) the sum of (w) such Regional Entity's share of the Released Accounts Payable (as defined in Schedule B hereto), (x) any Adjustment Amount (as defined in Schedule B hereto), (y) in respect of the US Entities only, the Interim Avoidance Cap as defined on Schedule C hereto. For the avoidance of doubt, if at any time prior to the termination of this Agreement, the amount that a Regional Entity has deposited into the True-up Escrow exceeds the aggregate Gross True-up Amount for such Regional Entity (any such amount, a "True-up Surplus") the Parties agree that any such True-up Surplus shall remain in the True-up Escrow on behalf of such Regional Entity until such time as the US Avoidance Claim is settled, and after which time, at the request of such Regional Entity, a new Gross True-up Amount will be calculated and the Parties will direct the escrow agent for the True-up Escrow to release from the True-up Escrow and pay to such Regional Entity any such True-up Surplus. The Parties expressly agree to direct the escrow agent for the True-up Escrow to hold and distribute proceeds from the Relevant Sales according to this paragraph.

(d)      *Payment Obligations Adjustment.*  After the Allocation Decision is made for the final Relevant Sale and the Regional Entities have deposited the final Gross True-up Amounts into the True-up Escrow in accordance with Section 2.4(c) above, the Parties shall direct the escrow agent for the True-up Escrow to disburse the funds contained in the True-up Escrow to any Regional Entity that has a negative Gross True-up Amount based on the final Weighted Average for each Regional Entity (as calculated for purposes of determining the final Gross True-up Amount), in the amount of such negative Gross True-up Amount (such disbursement, the "Payment Obligations Adjustment").  In connection with the foregoing, each Regional Entity agrees that the True-up Escrow is being used for administrative convenience and, in the event that sufficient sale proceeds are not received by a Regional Entity to satisfy its obligation to deposit funds into the True-up Escrow, such Regional Entity shall be liable for any portion of the Settlement Cost that such Regional Entity is determined to owe any other Regional Entity at the time that the Payment Obligations Adjustment becomes due, which liability shall not be capped by such Regional Entity's portion of the Gross True-up Amount on deposit in the True-up Escrow at such time.  Each of the Regional Entities shall be separately responsible for apportioning liability for the Settlement Cost among the Parties and their affiliates within such Regional Entity.

ARTICLE III

MISCELLANEOUS

SECTION 3.1.  Exclusion of Liability and Acknowledgments re Joint Administrators.

(a)      The Parties agree that the Joint Administrators are entering into this Agreement as agents for the EMEA Entities to which they are appointed and the Parties acknowledge that none of the Joint Administrators, their firm, partners, employees, advisers, representatives or agents shall incur any personal liability whatsoever whether on their own part or in respect of any failure on the part of any other Party to observe, perform or comply with any of its obligations under this Agreement or under or in relation to any associated arrangements or negotiations.

(b)      The Joint Administrators are a party to this Agreement: (i) as agents of each of the respective EMEA Entities of which they are administrators; and (ii) in their own capacities solely for (1) taking the benefit of the statutory charges under Paragraph 99(3) of Schedule B1 of the Insolvency Act, (2) obtaining the benefit of any provisions of this Agreement expressed to be conferred on them, (3) enforcing the obligations of the other Parties to this Agreement and (4) for the purposes of Section 3.1.

(c)      Notwithstanding anything in Section 3.6, any claim, action or proceeding against the Joint Administrators arising from or related to (i) the personal liability of the Joint Administrators, their firm or partners, (ii) their qualification to act as insolvency practitioners in accordance with Part XIII of the Insolvency Act or (iii) their appointment as joint administrators of the EMEA Entities and their remaining as current joint administrators thereof under this Agreement shall be governed exclusively by English law and subject to the exclusive jurisdiction of the English courts.

6

山\$

**Execution Version**

(d)    For the purposes of the acknowledgements or agreements to, or exclusions of, liability in favor of the Joint Administrators in this Agreement, references to the Joint Administrators where the context so permits shall mean and include any additional or successor administrator of the EMEA Entities and their respective firms or future firms, employees, agents, members, partners and personal representatives.

SECTION 3.2.  Remedies.  No failure to exercise, and no delay in exercising, any right, remedy, power or privilege under this Agreement by any Party will operate as a waiver of such right, remedy, power or privilege, nor will any single or partial exercise of any right, remedy, power or privilege under this Agreement preclude any other or further exercise of such right, remedy, power or privilege or the exercise of any other right, remedy, power or privilege.

SECTION 3.3.  Third-Party Beneficiaries.  Nothing in this Agreement, whether express or implied, is intended to confer any rights or remedies under or by reason of this Agreement on any persons other than the Parties and their respective successors and assigns, nor is anything in this Agreement intended to relieve or discharge the obligation or liability of any third persons to the Parties, nor shall any provision give any third persons any right of subrogation or action against any party to this Agreement; provided, however, that the Committee (as a statutory committee appointed in the US Bankruptcy Cases) shall be a third party beneficiary of Sections 2.1, 2.2, 2.3, 2.4, 3.5, 3.13 and 3.14 of this Agreement entitled to enforce and take advantage of the benefits of those sections of this Agreement to NNI only to their fullest extent as if it were a signatory hereto.

SECTION 3.4.  Accession by Nortel Networks, S.A.  Nortel Networks S.A. may, within 30 days of the Effective Date of the Settlement and Release Agreement, by notice in writing to the Parties hereto, accede to the Settlement and Release Agreement.  In the event it does so, and on the same date, Nortel Networks S.A. shall accede to this Agreement as an EMEA Entity on the same terms and conditions as an EMEA Entity (such accession conditioned, if applicable, on French court approval), and the Parties shall forthwith on receipt of such notice enter into an appropriate form of accession agreement with Nortel Networks S.A. The Parties agree that the provisions of this Section 3.4 are for the benefit of Nortel Networks S.A. and may be enforced by Nortel Networks S.A.

SECTION 3.5.Consent to Amendments; Waivers.  No Party shall be deemed to have waived any provision of this Agreement unless such waiver is in writing, and then such waiver shall be limited to the circumstances set forth in such written waiver.  This Agreement, or any provision hereof, may be waived or amended, on no less than 5 days' notice, only by means of a writing signed by all Parties, and approved by the Committee, Bondholder Group and the Monitor, which amendments, if material in the judgment of the Parties, must be approved by each of the Courts that initially approved this Agreement.

SECTION 3.6.  Successors.  Except as otherwise expressly provided in this Agreement, all covenants and agreements set forth in this Agreement or any of the Ancillary Agreements by or on behalf of the parties hereto or thereto will be binding upon and inure to the benefit of such parties and their respective successors.

SECTION 3.7.  Governing Law; Submission to Jurisdiction; Waiver of Jury Trial.

7

**Execution Version**

(a)    The Parties agree that this Agreement shall be governed exclusively by the laws of the State of New York without regard to the rules of conflict of laws of the State of New York or any other jurisdiction; provided, however, that Section 3.1 shall be governed exclusively by English law.

(b)    To the fullest extent permitted by applicable law, and except as provided for in Section 2.4(b), each Party (i) agrees to submit to the non-exclusive jurisdiction of the U.S. Bankruptcy Court and the Canadian Court (in a joint hearing conducted under the Cross-Border Protocol adopted by such courts, as it may be in effect from time to time), for purposes of all legal proceedings to the extent relating to the matters agreed in this Agreement, (ii) agrees that any claim, action or proceeding by such party seeking any relief whatsoever to the extent relating to the matters agreed in this Agreement must be brought in the U.S. Bankruptcy Court and the Canadian Court, (iii) waives and agrees not to assert any objection that it may now or hereafter have to the laying of the venue of any such action brought in such a court or any claim that any such action brought in such a court has been brought in an inconvenient forum, (iv) agrees that mailing of process or other papers in connection with any such action or proceeding or any other manner as may be permitted by law shall be valid and sufficient service thereof, and (v) agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by applicable Law; provided, however, that any claim, action or proceeding set forth in Section 3.1 shall be brought exclusively in the English courts.

(c)    EACH PARTY HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY ACTION DIRECTLY OR INDIRECTLY ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS AGREEMENT OR ANY TRANSACTION OR MATTER CONTEMPLATED HEREBY. EACH PARTY (I) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF ANY ACTION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (II) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION 3.7.

SECTION 3.8. Notices. All demands, notices, communications and reports provided for in this Agreement shall be in writing and shall be either sent by facsimile transmission with confirmation to the number specified below or personally delivered or sent by reputable overnight courier service (delivery charges prepaid) to any Party at the address specified below, or at such address, to the attention of such other Person, and with such other copy, as the recipient Party has specified by prior written notice to the sending Party pursuant to the provisions of this Section 3.8.

147

**Execution Version**

**If to the US Entities:**
c/o Nortel Networks Inc.
Attention: Anna Ventresca
        Chief Legal Officer
Address: 2221 Lakeside Boulevard
        Richardson, Texas 75082
        U.S.A.
Facsimile No.: (905) 863-8386

**With a copy to:**
Cleary Gottlieb Steen & Hamilton LLP
Attention: Lisa M. Schweitzer, Esq.
Address: One Liberty Plaza
        New York, New York 10006
        U.S.A.
Facsimile No.: (212) 225-3999

**If to the Canadian Entities (prior to December 1, 2009):**
c/o Nortel Networks Limited
Attention: Anna Ventresca
        Chief Legal Officer
Address: 195 The West Mall
Mailstop: T0503006
        Toronto, Ontario,
        Canada M9C 5K1
Facsimile No.: (905) 863-7386

**With a copy to:**

Ogilvy Renault LLP
Attention: Ian Ness, Esq.
Address: Suite 3800
        Royal Bank Plaza, South Tower
        200 Bay Street, P.O. Box 84
        Toronto, Ontario M5J 2Z4
        Canada
Facsimile No.: (416) 216-3930

**If to the Canadian Entities (after December 1, 2009):**

c/o Nortel Networks Limited
Attention: Anna Ventresca
        Chief Legal Officer
Address:  5945 Airport Road, Suite 360
        Mississauga, Ontario
        L4V 1R9
Facsimile No.: (905) 863-7386

**If to the EMEA Entities:**
c/o Ernst & Young LLP
Attention: Alan Bloom
Address: One More London Place
        London SE1 2AF
        United Kingdom
Facsimile No.: +44 (0) 20 7951 1345

**With a copy to:**
Herbert Smith LLP
Attention: Alan Montgomery and Ben Ward, Esq.
Address: Exchange House
        Primrose Street
        London EC2A 2HS
        United Kingdom
Facsimile No.: +44 (0) 20 7098 4878

**If to the Committee:**
Akin Gump Strauss Hauer & Feld LLP
Attention:  Fred S. Hodara, Esq. and David H. Botter, Esq.
Address:   One Bryant Park

**If to the Bondholder Group:**
Milbank, Tweed, Hadley & McCloy
Attention:  Gina Ciraldo, Esq. and David Clayton, Esq.
Address:   One Chase Manhattan Plaza

9

New York, New York 10036                New York, New York, 10006
Facsimile: (212) 872-1002               Facsimile: (212) 822-5537


**If to the Monitor:**                  **With a copy to:**
Murray A. McDonald                      Goodmans L.L.P.
Ernst & Young Inc.                      Attention: Joseph Pasquariello
Ernst & Young Tower                     Facsimilie: (416) 979-1239
Address: 222 Bay Street, P. O. Box 251
        Toronto, ON M5K 1J7               If prior to December 22, 2009:
        Canada
Facsimile: (416) 943-3300               Address:  250 Yonge Street
                           Suite 2400
                           Toronto, ON M5B 2M6
                           Canada

                    If after December 22, 2009:

                    Address:  Bay Adelaide Centre
                           333 Bay Street, Suite 3400
                           Toronto, ON M5H 2S7

Any such demand, notice, communication or report shall be deemed to have been given pursuant to this Agreement when delivered personally, when confirmed if by facsimile transmission, or on the calendar day after deposit with a reputable overnight courier service, as applicable.

        SECTION 3.9. <u>Counterparts</u>. The Parties may execute this Agreement in three or more counterparts (no one of which need contain the signatures of all Parties), each of which will be an original and all of which together will constitute one and the same instrument.

        SECTION 3.10. <u>Severability</u>. If any provision, section, or part of this Agreement, or the application thereof under certain circumstances, is held invalid, illegal or incapable of being enforced in any jurisdiction, (i) as to such jurisdiction, the remainder of this Agreement or the application of such provision, section or part under other circumstances, and (ii) as for any other jurisdiction, any provision of this Agreement, shall not be affected and shall remain in full force and effect, unless, in each case, such invalidity, illegality or unenforceability in such jurisdiction materially impairs the ability of the Parties to consummate the transactions contemplated by this Agreement. Upon such determination that any section or other provision is invalid, illegal or incapable of being enforced in such jurisdiction, the Parties shall negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties as closely as possible in a mutually acceptable manner, and approved by the Committee, the Bondholder Group and the Monitor, in order that the transactions contemplated hereby be consummated as originally contemplated to the greatest extent possible even in such jurisdiction.

        SECTION 3.11. <u>Termination</u>. This Agreement will automatically terminate upon the final distribution of any amounts owed by or to the Parties pursuant to Section 2.4 hereof.

**Execution Version**

SECTION 3.12. <u>Obligations of the Parties</u>. The liability of any Regional Entity shall be several (and not joint) with respect to the other Regional Entities, but the Parties included within a Regional Entity shall be jointly liable for all obligations of such Regional Entity.

SECTION 3.13.   <u>Effectiveness</u>.

(a)     No provision of this Agreement (other than as set forth in Section 3.13(d)) shall be effective until each of the US Court and the Canadian Court approves the entirety of this Agreement and all of the provisions hereof (the "<u>Court Approval Condition</u>").

(b)     All provisions of this Agreement shall be effective as of the date of the satisfaction of the Court Approval Condition.

(c)     Each Party hereto shall:

(i)     use commercially reasonable efforts to satisfy the Court Approval Condition as soon as possible, taking into account the availability of the respective Courts to address the matters set forth in this Agreement;

(ii)     keep all other Parties reasonably apprised of the progress of the satisfaction of the Court Approval Condition and provide such other information regarding the satisfaction of the Conditions as reasonably requested by other Parties; and

(iii)     use commercially reasonable efforts to allow any other Party, which so requests in writing reasonable participation in connection with any proceedings in any Court related to the satisfaction of the Court Approval Condition.

(d)     Notwithstanding any of the foregoing, the following provisions of the Agreement shall be effective as of the date hereof: Sections 3.1 through 3.12 and Section 3.13(b), (c) and (d).

SECTION 3.14.     <u>Limitations of Remedies</u>. Each of the Parties agrees that this Agreement may be pled as a defense to any claim or action in any court of competent jurisdiction. In connection with the foregoing, the Parties agree that monetary damages would not be sufficient to remedy any breach by a party of this Agreement and that the non-breaching party would be entitled to equitable relief, including, without limitation, temporary injunctive relief preventing (or allowing, as the case may be) the unilateral termination of performance and specific performance in respect of any breach of the Agreement.

SECTION 3.15.     <u>Reservation of Rights</u>. The Parties expressly agree that the allocation of the Payment Obligations pursuant to Schedule B hereto shall not be binding on the Parties in determining the ultimate allocation of the Settlement Cost of the Parties. Further, the Parties hereby agree that, except as otherwise provided herein, nothing in this Agreement shall or be deemed to determine, ratify, or adopt, or have any impact whatsoever on, the allocation or

distribution of proceeds from any Divestiture (as defined in the Settlement and Release Agreement).

**[Remainder of this page intentionally left blank.  Signature pages follow.]**

      IN WITNESS WHEREOF, each Party, by its respective duly-authorized representative identified below, acknowledges and agrees to the terms and conditions of this Agreement.

152

**NORTEL NETWORKS CORPORATION**

By: _____

Name: Anna Ventresca

Title: General Counsel-Corporate
and Corporate Secretary

Dated:  November 20 2009

By: _____

Name: John Doolittle

Title: SVP, Finance & Corporate
Services

Dated:  November 20, 2009

**NORTEL NETWORKS LIMITED**

By: _____

Name: Anna Ventresca

Title: General Counsel-Corporate
and Corporate Secretary

Dated:  November 20 2009

By: _____

Name: John Doolittle

Title: SVP, Finance & Corporate
Services

Dated:  November 20, 2009

**NORTEL NETWORKS INC.**

By: _____

Name: Anna Ventresca

Title: Chief Legal Officer

Dated: November 20 2009

**NORTEL NETWORKS CAPITAL
CORPORATION**

By: _____

Name: John Doolittle

Title: President

Dated:  November 20 2009

**NORTEL ALTSYSTEMS INC.**

By: _____

Name: John Doolittle

Title: President

Dated:  November 20, 2009