*Sierra Club of Canada v. Canada (Minister of Finance)*, [2002] 2 S.C.R. 522 has been satisfied and it is appropriate to grant the sealing order.

**18**    I have been satisfied that it is appropriate to approve the plans in question.

**19**    An order shall therefore issue approving:

> (i)      the KEIP except as it relates to the Applicants' employees whose are designated members of the SLT;
> (ii)     the KERP; and
> (iii)    the Calgary Retention Plan

**20**    An order shall issue sealing the Confidential Report pending further order of this court.

G.B. MORAWETZ J.

# TAB 4

*Case Name:*
## Shaw v. Shaw

**Between**
**Nicholas Shaw, also known as Nicholas Rodgers,**
**Plaintiff, and**
**Terena Anna Marie Shaw, also known as Terena Titus,**
**David Buchanan, Miller Thomson LLP, Cabarete Holding**
**BV, Arnold van der Heide, Cancaribe Limited, Orlaford**
**Limited, Sadu Blue Water Ltd., Light n' Strike Inc.,**
**Light n' Strike Corp., Turlough Mullen, Barry Butterly**
**and Grant Thornton, Defendants**
**And between**
**Terena Anna Marie Shaw, Cabarete Holding BV, and**
**Cancaribe Limited, Plaintiffs by Counterclaim, and**
**Nicholas Shaw also known as Nicholas Rodgers, James**
**Cheung and Chameleon, Inc., Defendants by Counterclaim**

[2007] O.J. No. 4999

162 A.C.W.S. (3d) 571

Court File No. 06-CV-303679 PD1

Ontario Superior Court of Justice

**F.J.C. Newbould J.**

Heard: December 19, 2007.
Judgment: December 20, 2007.

(16 paras.)

*Civil litigation -- Civil procedure -- Discovery -- Production and inspection of documents -- Confidentiality orders -- Motion by the defendants for a protective confidentiality order with respect to information to be produced in the litigation to the plaintiff and to the defendants by counterclaim -- Motion allowed -- Defendants sufficiently established that the documentation to be produced was confidential and commercially sensitive and that a competitor could obtain an unfair advantage if the information were released.*

*Motion by the defendants for a protective confidentiality order with respect to information to be produced in the litigation to the plaintiff and to the defendants by counterclaim -- Defendants asserted that the information sought to be protected was confidential, commercially sensitive and if disclosed would result in an unfair business advantage to competitors and particularly to the plain-*

*tiff and the defendants by counterclaim -- HELD: Motion allowed -- Defendants sufficiently established that the documentation to be produced by Cancaribe was confidential and commercially sensitive and that a competitor could obtain an unfair advantage if the information were released -- Plaintiff and the defendants by counterclaim had filed no affidavit material stating that they would suffer prejudice if the order was made.*

**Counsel:**

*Bryan Finlay, Q.C.,* and *Caroline E. Abela*, for Terena Anna Marie Shaw, Cabarete Holding BV and Cancaribe Ltd.

*Chris Dockrill*, for Nicholas Shaw, also known as Nicholas Rodgers, James Cheung and Chameleon Inc.

*Sara J. Erskine*, for Arnold van der Heide.

*Sandra Barton*, for David Buchanan and Miller Thomson LLP.

---

## ENDORSEMENT

**1    F.J.C. NEWBOULD J.:--** The defendants Terena Anna Maria Shaw, Cabarete Holding BV., and Cancaribe Limited ("the Shaw defendants") move for a protective confidentially order with respect to information to be produced in this litigation to the plaintiff and to the defendants by counterclaim. They assert that the information sought to be protected is confidential, commercially sensitive and if disclosed will result in an unfair business advantage to competitors and particularly to the plaintiff and the defendants by counterclaim.

**2**    In my view the Shaw defendants are entitled to the order sought with some changes.

**3**    There is little in this action that is not contested. Included in the orders that have been made in this litigation is a decision of Justice Cumming of April 20, 2006 enjoining the plaintiff from dealing with litigation in Bermuda and Florida without the consent of Cabarete Holding BV ("Cabarete") and providing related orders. There is also an order of Justice Jennings dated July 9, 2007 in which he made an order restraining the plaintiff and defendants by counterclaim from contravening a Licence Agreement made between the plaintiff and Cabarete, restraining them from continuing litigation in the United States against Brown Shoe Company and Elan Polo, Inc., and from commencing an action against any other client of Cabarete or Cancaribe Limited ("Cancaribe") or interfering in any way in their business in any foreign jurisdiction. The order also restrains them from interfering with the relationship between Walmart and Brown Shoe Company and from interfering with the relationship between Brown Shoe Company and Cancaribe. These orders of Cumming J. and Jennings J. are interlocutory orders.

**4**    The test for the making of a protective order is discussed by Master Beaudoin in *BASF Canada Inc. v. Max Auto Supply (1986) Inc.* (1999), 30 C.P.C. (4th) 23. In that case Master Beaudoin stated the following:

16.   As described by Cumming J. in the *CPC International Inc.* case, [1996] O.J. No. 2059 the making of a protective order is designed to strike a balance between the disclosure necessary for the conduct of an action and a party's bona fide right to protection of confidential and sensitive information. The courts have held that where the information at issue is such that the disclosure would allow a competitor to improve its competitive position, it is appropriate that a protective order be issued to guard against such effect. (*Zellers Inc. v. Venta Investments Ltd.* (May 25, 1998), [1998] O.J. No. 2118, Doc. 94-CR-55831 (Ont. Gen. Div.)

17.   In the present case, the court is satisfied that the information is confidential, that it is commercially sensitive, and that a competitor could obtain an unfair advantage through its release and, therefore, *prima facie*, the moving parties should be entitled to a protective order unless the defendants, plaintiffs by counterclaim, would be unduly prejudiced by this.

5    Mr. Dockrill contends in his factum that "trade secrets" may be protected by a protective order but that the information sought to be protected by the Shaw defendants cannot be characterized as "trade secrets". In this regard he points to the reference by Master Beaudoin to Cumming J. in the *CPC International* case. In that case, however, Cumming J. did not purport to limit the right to relief to "trade secrets" as opposed to "confidential information". He was dealing with both categories of information and for ease of reference referred to both of them collectively as "trade secrets". In *BASF Canada Inc.*, Master Beaudoin was not dealing with trade secrets such as food formula, but was dealing with the kind of information which concerns the Shaw defendants, namely, commercially sensitive information such as price lists, and he made a protective order in that case.

6    Terena Shaw lists in paragraph 11 of her affidavit the information that is to be produced. She states in paragraph 12 that the information is confidential and that it is not commonly known or readily assessable to her future competitors and to the plaintiffs and defendants by counterclaim.

7    In paragraph 14(g) Ms Shaw states that the information is commercially sensitive and it could cause loss, undue hardship or damage to the Shaw defendants' commercial interests. She states that once the shoe patent in question expires in March 2008, the plaintiff and defendants by counterclaim will likely compete with the Shaw defendants and further explains in paragraphs 15 to 18 as to how the information could be used to the disadvantage of the Shaw defendants if not protected. Ms. Shaw was not cross-examined on her affidavit and there is no responding affidavit material questioning her statements.

8    Ms. Shaw refers to prior competition that the Shaw defendants have had with the plaintiff and defendants by counterclaim and refers to that competition as unlawful. Whether that competition was unlawful is contested and presumably will be dealt with at the trial. I am in no position to, nor would I, make any finding as to whether past competition was unlawful. However, it appears clear from all of the evidence that there has been competition and there no doubt will be in the future once the patent expires.

9    Mr. Dockrill contends that the information is not confidential because the plaintiff has a right to the information by virtue of paragraph 4 of the Licence Agreement made as at December 31, 1996 between the plaintiff and Cabarete. That paragraph provides the licensor with the right to an independent audit of all records and books of account of the licensee necessary for the determination of royalty payments to be made and provides that the independent chartered accountants are entitled to

provide anything they obtain from the licensee to the licensor. Mr. Dockrill contends that because of this contractual right, the Shaw defendants are not entitled to any protective order as the information cannot be considered confidential between them. As to this contention:

> (i) Mr. Finlay advises that the documents that will be produced are documents of Cancaribe which is not a party to the Licence Agreement. Cancribe is a sub-licensee of the licence from Cabarete. I have been provided with the sub-licence agreements which were in effect at different times. These sub-licences do not obligate Cancribe to the plaintiff. They do provide for Can-caribe to pay the royalties to Cabarete that Carabete is to pay to the plain-tiff but do not make Cancaribe a party to the auditing provision in the Li-cence Agreement between the plaintiff and Cabarete.
>
> (ii) Whether the Licence Agreement made as of December 31, 1996 between the plaintiff and Cabarete is in force is a matter for determination at the trial. The plaintiff's position is that he lawfully terminated that licence ef-fective May 31, 2004. The Shaw defendants' position is that the agreement was not lawfully terminated and that they have complied with its terms.
>
> (iii) Even if the auditing provisions of the Licence Agreement applied to Can-caribe, which is not the case, I would hesitate to decide this motion on the basis of whether or not the Licence Agreement was in force. Moreover, it is clear that the relationship between the parties has substantially changed from the time the Licence Agreement was first made.

**10**  I conclude that the Shaw defendants have sufficiently established that the documentation to be produced by Cancaribe is confidential and commercially sensitive and that a competitor could ob-tain an unfair advantage if the information were released.

**11**  The issue then becomes whether the plaintiff and the defendants by counterclaim will be un-duly prejudiced by the order sought.

**12**  The plaintiff and the defendants by counterclaim have filed no affidavit material stating that they will suffer prejudice if the order is made. This is unlike the case of *GasTOPS Ltd. v. Forsyth* (2000), 15 C.P.C. (5th) 116 that was referred to by Mr. Dockrill. In that case Master Beaudoin acted on evidence that the defendant's solicitors would be unable to properly conduct the case without in-put from their clients. There is no such evidence on the motion before me.

**13**  Mr. Dockrill has stated that he will need his client to review the documentation produced in order to determine if the documentation that is produced is credible. That statement appears to be premature in that the documentation has not yet been produced and it cannot now be known whether what will be produced will be credible or not. Moreover, it may well be that the expert wit-nesses to be retained by Mr. Dockrill will be more than able to deal with any such issues. Without any compelling affidavit evidence on the point, I am not prepared to act on it to refuse the order sought. If there is any basis for the need to amend the order sought after the information has been produced, an appropriate motion could be brought.

**14**  In the U.S. litigation against Brown Shoes that was commenced by Chameleon, Inc. and Nicholas Rodgers, they requested and obtained a discovery confidentiality order binding on all par-ties that was said to be necessary to protect the confidentiality of non-public and competitively sen-sitive information that may need to be disclosed. It prevented the disclosure of "Highly Confiden-

tial" information except under conditions substantially the same as those sought by the Shaw defendants in the motion before me. The issues in the Brown Shoe litigation were not dissimilar to the present action in Ontario in that the action attacked the business relationship between Cancaribe and Brown Shoe and claimed damages based upon the shoes sold by Brown Shoes that had been acquired from Cancaribe. It would appear that Mr. Rodgers and Chameleon, Inc. were satisfied in the Brown Shoe litigation that they could conduct the litigation without themselves knowing the confidential information provided by Brown Shoes that would be looked at by their expert witnesses and lawyers. Without any affidavit evidence from them in this case, the fact that they entered into such a confidentiality arrangement in the U.S. litigation is somewhat telling against the assertion that they will be prejudiced in Ontario if the confidentiality order is made.

**15**    I recognize that making such an order is a discretionary matter. In this case based upon the foregoing, I exercise my discretion and I am prepared to make the order sought by the Shaw defendants in the form attached to the notice of motion with the following changes:

> (i)    Paragraph 7(c) allows for the provision of the information to any expert retained to assist any of the plaintiffs or defendants. I see no need for a reference to experts retained by the Shaw defendants as it is their documents that are being produced and I think that should be made clear. This would also apply to paragraph 8 of the proposed order.
>
> (ii)    Mr. Dockrill said that it may be that an expert retained by him may be someone the Shaw defendants do not want as it would be someone who is active in the marketplace and would have access to the information. In order to prevent that from occurring, I think the order should provide that before any of the confidential information is provided to an expert retained by the plaintiff or the defendants by counterclaim, the name of such expert with his or her curriculum vitae should be provided to counsel for the Shaw defendants who shall have 30 days to consider whether they object to any such expert.
>
> (iii)    The draft order provides in paragraph 21 that it is subject to further direction of the court. I think that should be broadened to ensure that the plaintiff and the defendants by counterclaim are not precluded from moving for some variation of the order once the confidential information has been delivered.

**16**    The Shaw defendants are entitled to their costs of the motion to be paid by the plaintiff and defendants by counterclaim. If these costs cannot be agreed, brief written submissions should be made by the Shaw defendants along with a bill of costs, and any brief responding submissions should be made within 10 days thereafter.

F.J.C. NEWBOULD J.

# TAB 5

*Case Name:*
# Sierra Club of Canada v. Canada (Minister of Finance)

**Atomic Energy of Canada Limited, appellant;**
**v.**
**Sierra Club of Canada, respondent, and**
**The Minister of Finance of Canada, the Minister of**
**Foreign Affairs of Canada, the Minister of International**
**Trade of Canada and the Attorney General of Canada,**
**respondents.**

[2002] S.C.J. No. 42

[2002] A.C.S. no 42

2002 SCC 41

2002 CSC 41

[2002] 2 S.C.R. 522

[2002] 2 R.C.S. 522

211 D.L.R. (4th) 193

287 N.R. 203

J.E. 2002-803

40 Admin. L.R. (3d) 1

44 C.E.L.R. (N.S.) 161

20 C.P.C. (5th) 1

18 C.P.R. (4th) 1

93 C.R.R. (2d) 219

113 A.C.W.S. (3d) 36

File No.: 28020.

Supreme Court of Canada

2001: November 6 / 2002: April 26.

**Present: McLachlin C.J. and Gonthier, Iacobucci,
Bastarache, Binnie, Arbour and LeBel JJ.**

ON APPEAL FROM THE FEDERAL COURT OF APPEAL (92 paras.)

*Practice -- Federal Court of Canada -- Filing of confidential material -- Environmental organiza-
tion seeking judicial review of federal government's decision to provide financial assistance to
Crown corporation for construction and sale of nuclear reactors -- Crown corporation requesting
confidentiality order in respect of certain documents -- Proper analytical approach to be applied to
exercise of judicial discretion where litigant seeks confidentiality order -- Whether confidentiality
order should be granted -- Federal Court Rules, 1998, SOR/98-106, r. 151.*

Sierra Club is an environmental organization seeking judicial review of the federal government's
decision to provide financial assistance to Atomic Energy of Canada Ltd. ("AECL"), a Crown cor-
poration, for the construction and sale to China of two CANDU reactors. The reactors are currently
under construction in China, where AECL is the main contractor and project manager. Sierra Club
maintains that the authorization of financial assistance by the government triggered s. 5(1)(b) of the
Canadian Environmental Assessment Act ("CEAA"), requiring an environmental assessment as a
condition of the financial assistance, and that the failure to comply compels a cancellation of the
financial arrangements. AECL filed an affidavit in the proceedings which summarized confidential
documents containing thousands of pages of technical information concerning the ongoing envi-
ronmental assessment of the construction site by the Chinese authorities. AECL resisted Sierra
Club's application for production of the confidential documents on the ground, inter alia, that the
documents were the property of the Chinese authorities and that it did not have the authority to dis-
close them. The Chinese authorities authorized disclosure of the documents on the condition that
they be protected by a confidentiality order, under which they would only be made available to the
parties and the court, but with no restriction on public access to the judicial proceedings. AECL's
application for a confidentiality order was rejected by the Federal Court, Trial Division. The Federal
Court of Appeal upheld that decision.

Held: The appeal should be allowed and the confidentiality order granted on the terms requested by
AECL.

In light of the established link between open courts and freedom of expression, the fundamental
question for a court to consider in an application for a confidentiality order is whether the right to
freedom of expression should be compromised in the circumstances. The court must ensure that the
discretion to grant the order is exercised in accordance with Charter principles because a confidenti-
ality order will have a negative effect on the s. 2(b) right to freedom of expression. A confidentiality
order should only be granted when (1) such an order is necessary to prevent a serious risk to an im-
portant interest, including a commercial interest, in the context of litigation because reasonably al-
ternative measures will not prevent the risk; and (2) the salutary effects of the confidentiality order,
including the effects on the right of civil litigants to a fair trial, outweigh its deleterious effects, in-
cluding the effects on the right to free expression, which in this context includes the public interest

in open and accessible court proceedings. Three important elements are subsumed under the first branch of the test. First, the risk must be real and substantial, well grounded in evidence, posing a serious threat to the commercial interest in question. Second, the important commercial interest must be one which can be expressed in terms of a public interest in confidentiality, where there is a general principle at stake. Finally, the judge is required to consider not only whether reasonable alternatives are available to such an order but also to restrict the order as much as is reasonably possible while preserving the commercial interest in question.

Applying the test to the present circumstances, the commercial interest at stake here relates to the objective of preserving contractual obligations of confidentiality, which is sufficiently important to pass the first branch of the test as long as certain criteria relating to the information are met. The information must have been treated as confidential at all relevant times; on a balance of probabilities, proprietary, commercial and scientific interests could reasonably be harmed by disclosure of the information; and the information must have been accumulated with a reasonable expectation of it being kept confidential. These requirements have been met in this case. Disclosure of the confidential documents would impose a serious risk on an important commercial interest of AECL, and there are no reasonably alternative measures to granting the order.

Under the second branch of the test, the confidentiality order would have significant salutary effects on AECL's right to a fair trial. Disclosure of the confidential documents would cause AECL to breach its contractual obligations and suffer a risk of harm to its competitive position. If a confidentiality order is denied, AECL will be forced to withhold the documents in order to protect its commercial interests, and since that information is relevant to defences available under the CEAA, the inability to present this information hinders AECL's capacity to make full answer and defence. Although in the context of a civil proceeding, this does not engage a Charter right, the right to a fair trial is a fundamental principle of justice. Further, the confidentiality order would allow all parties and the court access to the confidential documents, and permit cross-examination based on their contents, assisting in the search for truth, a core value underlying freedom of expression. Finally, given the technical nature of the information, there may be a substantial public security interest in maintaining the confidentiality of such information.

The deleterious effects of granting a confidentiality order include a negative effect on the open court principle, and therefore on the right to freedom of expression. The more detrimental the confidentiality order would be to the core values of (1) seeking the truth and the common good, (2) promoting self-fulfilment of individuals by allowing them to develop thoughts and ideas as they see fit, and (3) ensuring that participation in the political process is open to all persons, the harder it will be to justify the confidentiality order. In the hands of the parties and their experts, the confidential documents may be of great assistance in probing the truth of the Chinese environmental assessment process, which would assist the court in reaching accurate factual conclusions. Given the highly technical nature of the documents, the important value of the search for the truth which underlies both freedom of expression and open justice would be promoted to a greater extent by submitting the confidential documents under the order sought than it would by denying the order.

Under the terms of the order sought, the only restrictions relate to the public distribution of the documents, which is a fairly minimal intrusion into the open court rule. Although the confidentiality order would restrict individual access to certain information which may be of interest to that individual, the second core value of promoting individual self-fulfilment would not be significantly affected by the confidentiality order. The third core value figures prominently in this appeal as open

justice is a fundamental aspect of a democratic society. By their very nature, environmental matters carry significant public import, and openness in judicial proceedings involving environmental issues will generally attract a high degree of protection, so that the public interest is engaged here more than if this were an action between private parties involving private interests. However, the narrow scope of the order coupled with the highly technical nature of the confidential documents significantly temper the deleterious effects the confidentiality order would have on the public interest in open courts. The core freedom of expression values of seeking the truth and promoting an open political process are most closely linked to the principle of open courts, and most affected by an order restricting that openness. However, in the context of this case, the confidentiality order would only marginally impede, and in some respects would even promote, the pursuit of these values. The salutary effects of the order outweigh its deleterious effects and the order should be granted. A balancing of the various rights and obligations engaged indicates that the confidentiality order would have substantial salutary effects on AECL's right to a fair trial and freedom of expression, while the deleterious effects on the principle of open courts and freedom of expression would be minimal.

**Cases Cited**

Applied: Edmonton Journal v. Alberta (Attorney General), [1989] 2 S.C.R. 1326; Canadian Broadcasting Corp. v. New Brunswick (Attorney General), [1996] 3 S.C.R. 480; Dagenais v. Canadian Broadcasting Corp., [1994] 3 S.C.R. 835; R. v. Mentuck, [2001] 3 S.C.R. 442, 2001 SCC 76; M. (A.) v. Ryan, [1997] 1 S.C.R. 157; Irwin Toy Ltd. v. Quebec (Attorney General), [1989] 1 S.C.R. 927; R. v. Keegstra, [1990] 3 S.C.R. 697; referred to: AB Hassle v. Canada (Minister of National Health and Welfare), [2000] 3 F.C. 360, aff'g (1998), 83 C.P.R. (3d) 428; Ethyl Canada Inc. v. Canada (Attorney General) (1998), 17 C.P.C. (4th) 278; R. v. Oakes, [1986] 1 S.C.R. 103; R. v. O.N.E., [2001] 3 S.C.R. 478, 2001 SCC 77; F.N. (Re), [2000] 1 S.C.R. 880, 2000 SCC 35; Eli Lilly and Co. v. Novopharm Ltd. (1994), 56 C.P.R. (3d) 437.

**Statutes and Regulations Cited**

Canadian Charter of Rights and Freedoms, ss. 1, 2(b).
Canadian Environmental Assessment Act, S.C. 1992, c. 37, ss. 5(1)(b), 8, 54, 54(2)(b).
Federal Court Rules, 1998, SOR/98-106, rr. 151, 312.

APPEAL from a judgment of the Federal Court of Appeal, [2000] 4 F.C. 426, 187 D.L.R. (4th) 231, 256 N.R. 1, 24 Admin. L.R. (3d) 1, [2000] F.C.J. No. 732 (QL), affirming a decision of the Trial Division, [2000] 2 F.C. 400, 178 F.T.R. 283, [1999] F.C.J. No. 1633 (QL). Appeal allowed.

J. Brett Ledger and Peter Chapin, for the appellant.
Timothy J. Howard and Franklin S. Gertler, for the respondent Sierra Club of Canada.
Graham Garton, Q.C., and J. Sanderson Graham, for the respondents the Minister of Finance of Canada, the Minister of Foreign Affairs of Canada, the Minister of International Trade of Canada and the Attorney General of Canada.

[Quicklaw note: Please see complete list of solicitors appended at the end of the judgment.]

The judgment of the Court was delivered by

**IACOBUCCI J.**:--

I.    Introduction

**1**    In our country, courts are the institutions generally chosen to resolve legal disputes as best they can through the application of legal principles to the facts of the case involved. One of the underlying principles of the judicial process is public openness, both in the proceedings of the dispute, and in the material that is relevant to its resolution. However, some material can be made the subject of a confidentiality order. This appeal raises the important issues of when, and under what circumstances, a confidentiality order should be granted.

**2**    For the following reasons, I would issue the confidentiality order sought and accordingly would allow the appeal.

II.    Facts

**3**    The appellant, Atomic Energy of Canada Limited ("AECL") is a Crown corporation that owns and markets CANDU nuclear technology, and is an intervener with the rights of a party in the application for judicial review by the respondent, the Sierra Club of Canada ("Sierra Club"). Sierra Club is an environmental organization seeking judicial review of the federal government's decision to provide financial assistance in the form of a $1.5 billion guaranteed loan relating to the construction and sale of two CANDU nuclear reactors to China by the appellant. The reactors are currently under construction in China, where the appellant is the main contractor and project manager.

**4**    The respondent maintains that the authorization of financial assistance by the government triggered s. 5(1)(b) of the Canadian Environmental Assessment Act, S.C. 1992, c. 37 ("CEAA"), which requires that an environmental assessment be undertaken before a federal authority grants financial assistance to a project. Failure to undertake such an assessment compels cancellation of the financial arrangements.

**5**    The appellant and the respondent Ministers argue that the CEAA does not apply to the loan transaction, and that if it does, the statutory defences available under ss. 8 and 54 apply. Section 8 describes the circumstances where Crown corporations are required to conduct environmental assessments. Section 54(2)(b) recognizes the validity of an environmental assessment carried out by a foreign authority provided that it is consistent with the provisions of the CEAA.

**6**    In the course of the application by Sierra Club to set aside the funding arrangements, the appellant filed an affidavit of Dr. Simon Pang, a senior manager of the appellant. In the affidavit, Dr. Pang referred to and summarized certain documents (the "Confidential Documents"). The Confidential Documents are also referred to in an affidavit prepared by Mr. Feng, one of AECL's experts. Prior to cross-examining Dr. Pang on his affidavit, Sierra Club made an application for the production of the Confidential Documents, arguing that it could not test Dr. Pang's evidence without access to the underlying documents. The appellant resisted production on various grounds, including the fact that the documents were the property of the Chinese authorities and that it did not have authority to disclose them. After receiving authorization by the Chinese authorities to disclose the documents on the condition that they be protected by a confidentiality order, the appellant sought to introduce the Confidential Documents under Rule 312 of the Federal Court Rules, 1998, SOR/98-106, and requested a confidentiality order in respect of the documents.

**7**    Under the terms of the order requested, the Confidential Documents would only be made available to the parties and the court; however, there would be no restriction on public access to the proceedings. In essence, what is being sought is an order preventing the dissemination of the Confidential Documents to the public.

**8**    The Confidential Documents comprise two Environmental Impact Reports on Siting and Construction Design (the "EIRs"), a Preliminary Safety Analysis Report (the "PSAR"), and the supplementary affidavit of Dr. Pang which summarizes the contents of the EIRs and the PSAR. If admitted, the EIRs and the PSAR would be attached as exhibits to the supplementary affidavit of Dr. Pang. The EIRs were prepared by the Chinese authorities in the Chinese language, and the PSAR was prepared by the appellant with assistance from the Chinese participants in the project. The documents contain a mass of technical information and comprise thousands of pages. They describe the ongoing environmental assessment of the construction site by the Chinese authorities under Chinese law.

**9**    As noted, the appellant argues that it cannot introduce the Confidential Documents into evidence without a confidentiality order, otherwise it would be in breach of its obligations to the Chinese authorities. The respondent's position is that its right to cross-examine Dr. Pang and Mr. Feng on their affidavits would be effectively rendered nugatory in the absence of the supporting documents to which the affidavits referred. Sierra Club proposes to take the position that the affidavits should therefore be afforded very little weight by the judge hearing the application for judicial review.

**10**    The Federal Court of Canada, Trial Division refused to grant the confidentiality order and the majority of the Federal Court of Appeal dismissed the appeal. In his dissenting opinion, Robertson J.A. would have granted the confidentiality order.

III.    Relevant Statutory Provisions

**11**    Federal Court Rules, 1998, SOR/98-106

> 151. (1) On motion, the Court may order that material to be filed shall be treated as confidential.

> (2) Before making an order under subsection (1), the Court must be satisfied that the material should be treated as confidential, notwithstanding the public interest in open and accessible court proceedings.

IV.    Judgments Below

A. Federal Court, Trial Division, [2000] 2 F.C. 400

**12**    Pelletier J. first considered whether leave should be granted pursuant to Rule 312 to introduce the supplementary affidavit of Dr. Pang to which the Confidential Documents were filed as exhibits. In his view, the underlying question was that of relevance, and he concluded that the documents were relevant to the issue of the appropriate remedy. Thus, in the absence of prejudice to the respondent, the affidavit should be permitted to be served and filed. He noted that the respondent would be prejudiced by delay, but since both parties had brought interlocutory motions which had

contributed to the delay, the desirability of having the entire record before the court outweighed the prejudice arising from the delay associated with the introduction of the documents.

**13**    On the issue of confidentiality, Pelletier J. concluded that he must be satisfied that the need for confidentiality was greater than the public interest in open court proceedings, and observed that the argument for open proceedings in this case was significant given the public interest in Canada's role as a vendor of nuclear technology. As well, he noted that a confidentiality order was an exception to the rule of open access to the courts, and that such an order should be granted only where absolutely necessary.

**14**    Pelletier J. applied the same test as that used in patent litigation for the issue of a protective order, which is essentially a confidentiality order. The granting of such an order requires the appel-lant to show a subjective belief that the information is confidential and that its interests would be harmed by disclosure. In addition, if the order is challenged, then the person claiming the benefit of the order must demonstrate objectively that the order is required. This objective element requires the party to show that the information has been treated as confidential, and that it is reasonable to believe that its proprietary, commercial and scientific interests could be harmed by the disclosure of the information.

**15**    Concluding that both the subjective part and both elements of the objective part of the test had been satisfied, he nevertheless stated: "However, I am also of the view that in public law cases, the objective test has, or should have, a third component which is whether the public interest in disclo-sure exceeds the risk of harm to a party arising from disclosure" (para. 23).

**16**    A very significant factor, in his view, was the fact that mandatory production of documents was not in issue here. The fact that the application involved a voluntary tendering of documents to advance the appellant's own cause as opposed to mandatory production weighed against granting the confidentiality order.

**17**    In weighing the public interest in disclosure against the risk of harm to AECL arising from disclosure, Pelletier J. noted that the documents the appellant wished to put before the court were prepared by others for other purposes, and recognized that the appellant was bound to protect the confidentiality of the information. At this stage, he again considered the issue of materiality. If the documents were shown to be very material to a critical issue, "the requirements of justice militate in favour of a confidentiality order. If the documents are marginally relevant, then the voluntary nature of the production argues against a confidentiality order" (para. 29). He then decided that the docu-ments were material to a question of the appropriate remedy, a significant issue in the event that the appellant failed on the main issue.

**18**    Pelletier J. also considered the context of the case and held that since the issue of Canada's role as a vendor of nuclear technology was one of significant public interest, the burden of justify-ing a confidentiality order was very onerous. He found that AECL could expunge the sensitive ma-terial from the documents, or put the evidence before the court in some other form, and thus main-tain its full right of defence while preserving the open access to court proceedings.

**19**    Pelletier J. observed that his order was being made without having perused the Confidential Documents because they had not been put before him. Although he noted the line of cases which holds that a judge ought not to deal with the issue of a confidentiality order without reviewing the documents themselves, in his view, given their voluminous nature and technical content as well as

his lack of information as to what information was already in the public domain, he found that an examination of these documents would not have been useful.

**20**     Pelletier J. ordered that the appellant could file the documents in current form, or in an edited version if it chose to do so. He also granted leave to file material dealing with the Chinese regulatory process in general and as applied to this project, provided it did so within 60 days.

B. Federal Court of Appeal, [2000] 4 F.C. 426

(1)     Evans J.A. (Sharlow J.A. concurring)

**21**     At the Federal Court of Appeal, AECL appealed the ruling under Rule 151 of the Federal Court Rules, 1998, and Sierra Club cross-appealed the ruling under Rule 312.

**22**     With respect to Rule 312, Evans J.A. held that the documents were clearly relevant to a defence under s. 54(2)(b) which the appellant proposed to raise if s. 5(1)(b) of the CEAA was held to apply, and were also potentially relevant to the exercise of the court's discretion to refuse a remedy even if the Ministers were in breach of the CEAA. Evans J.A. agreed with Pelletier J. that the benefit to the appellant and the court of being granted leave to file the documents outweighed any prejudice to the respondent owing to delay and thus concluded that the motions judge was correct in granting leave under Rule 312.

**23**     On the issue of the confidentiality order, Evans J.A. considered Rule 151, and all the factors that the motions judge had weighed, including the commercial sensitivity of the documents, the fact that the appellant had received them in confidence from the Chinese authorities, and the appellant's argument that without the documents it could not mount a full answer and defence to the application. These factors had to be weighed against the principle of open access to court documents. Evans J.A. agreed with Pelletier J. that the weight to be attached to the public interest in open proceedings varied with context and held that, where a case raises issues of public significance, the principle of openness of judicial process carries greater weight as a factor in the balancing process. Evans J.A. noted the public interest in the subject matter of the litigation, as well as the considerable media attention it had attracted.

**24**     In support of his conclusion that the weight assigned to the principle of openness may vary with context, Evans J.A. relied upon the decisions in AB Hassle v. Canada (Minister of National Health and Welfare), [2000] 3 F.C. 360 (C.A.), where the court took into consideration the relatively small public interest at stake, and Ethyl Canada Inc. v. Canada (Attorney General) (1998), 17 C.P.C. (4th) 278 (Ont. Ct. (Gen. Div.)), at p. 283, where the court ordered disclosure after determining that the case was a significant constitutional case where it was important for the public to understand the issues at stake. Evans J.A. observed that openness and public participation in the assessment process are fundamental to the CEAA, and concluded that the motions judge could not be said to have given the principle of openness undue weight even though confidentiality was claimed for a relatively small number of highly technical documents.

**25**     Evans J.A. held that the motions judge had placed undue emphasis on the fact that the introduction of the documents was voluntary; however, it did not follow that his decision on the confidentiality order must therefore be set aside. Evans J.A. was of the view that this error did not affect the ultimate conclusion for three reasons. First, like the motions judge, he attached great weight to the principle of openness. Secondly, he held that the inclusion in the affidavits of a summary of the reports could go a long way to compensate for the absence of the originals, should the appellant

choose not to put them in without a confidentiality order. Finally, if AECL submitted the documents in an expunged fashion, the claim for confidentiality would rest upon a relatively unimportant factor, i.e., the appellant's claim that it would suffer a loss of business if it breached its undertaking with the Chinese authorities.

**26**     Evans J.A. rejected the argument that the motions judge had erred in deciding the motion without reference to the actual documents, stating that it was not necessary for him to inspect them, given that summaries were available and that the documents were highly technical and incompletely translated. Thus the appeal and cross-appeal were both dismissed.

(2)     Robertson J.A. (dissenting)

**27**     Robertson J.A. disagreed with the majority for three reasons. First, in his view, the level of public interest in the case, the degree of media coverage, and the identities of the parties should not be taken into consideration in assessing an application for a confidentiality order. Instead, he held that it was the nature of the evidence for which the order is sought that must be examined.

**28**     In addition, he found that without a confidentiality order, the appellant had to choose between two unacceptable options: either suffering irreparable financial harm if the confidential information was introduced into evidence, or being denied the right to a fair trial because it could not mount a full defence if the evidence was not introduced.

**29**     Finally, he stated that the analytical framework employed by the majority in reaching its decision was fundamentally flawed as it was based largely on the subjective views of the motions judge. He rejected the contextual approach to the question of whether a confidentiality order should issue, emphasizing the need for an objective framework to combat the perception that justice is a relative concept, and to promote consistency and certainty in the law.

**30**     To establish this more objective framework for regulating the issuance of confidentiality orders pertaining to commercial and scientific information, he turned to the legal rationale underlying the commitment to the principle of open justice, referring to Edmonton Journal v. Alberta (Attorney General), [1989] 2 S.C.R. 1326. There, the Supreme Court of Canada held that open proceedings foster the search for the truth, and reflect the importance of public scrutiny of the courts.

**31**     Robertson J.A. stated that although the principle of open justice is a reflection of the basic democratic value of accountability in the exercise of judicial power, in his view, the principle that justice itself must be secured is paramount. He concluded that justice as an overarching principle means that exceptions occasionally must be made to rules or principles.

**32**     He observed that, in the area of commercial law, when the information sought to be protected concerns "trade secrets", this information will not be disclosed during a trial if to do so would destroy the owner's proprietary rights and expose him or her to irreparable harm in the form of financial loss. Although the case before him did not involve a trade secret, he nevertheless held that the same treatment could be extended to commercial or scientific information which was acquired on a confidential basis and attached the following criteria as conditions precedent to the issuance of a confidentiality order (at para. 13):

> (1)     the information is of a confidential nature as opposed to facts which one would like to keep confidential; (2) the information for which confidentiality is sought is not already in the public domain; (3) on a balance of prob-

abilities the party seeking the confidentiality order would suffer irreparable harm if the information were made public; (4) the information is relevant to the legal issues raised in the case; (5) correlatively, the information is "necessary" to the resolution of those issues; (6) the granting of a confidentiality order does not unduly prejudice the opposing party; and (7) the public interest in open court proceedings does not override the private interests of the party seeking the confidentiality order. The onus in establishing that criteria one to six are met is on the party seeking the confidentiality order. Under the seventh criterion, it is for the opposing party to show that a prima facie right to a protective order has been overtaken by the need to preserve the openness of the court proceedings. In addressing these criteria one must bear in mind two of the threads woven into the fabric of the principle of open justice: the search for truth and the preservation of the rule of law. As stated at the outset, I do not believe that the perceived degree of public importance of a case is a relevant consideration.

**33**    In applying these criteria to the circumstances of the case, Robertson J.A. concluded that the confidentiality order should be granted. In his view, the public interest in open court proceedings did not override the interests of AECL in maintaining the confidentiality of these highly technical documents.

**34**    Robertson J.A. also considered the public interest in the need to ensure that site plans for nuclear installations were not, for example, posted on a Web site. He concluded that a confidentiality order would not undermine the two primary objectives underlying the principle of open justice: truth and the rule of law. As such, he would have allowed the appeal and dismissed the cross-appeal.

V.    Issues

**35**    A. What is the proper analytical approach to be applied to the exercise of judicial discretion where a litigant seeks a confidentiality order under Rule 151 of the Federal Court Rules, 1998?

B.    Should the confidentiality order be granted in this case?

VI.    Analysis

A.    The Analytical Approach to the Granting of a Confidentiality Order

(1)    The General Framework: Herein the Dagenais Principles

**36**    The link between openness in judicial proceedings and freedom of expression has been firmly established by this Court. In Canadian Broadcasting Corp. v. New Brunswick (Attorney General), [1996] 3 S.C.R. 480, at para. 23, La Forest J. expressed the relationship as follows:

The principle of open courts is inextricably tied to the rights guaranteed by s. 2(b). Openness permits public access to information about the courts, which in turn permits the public to discuss and put forward opinions and criticisms of

> court practices and proceedings. While the freedom to express ideas and opinions
> about the operation of the courts is clearly within the ambit of the freedom guar-
> anteed by s. 2(b), so too is the right of members of the public to obtain informa-
> tion about the courts in the first place.

Under the order sought, public access and public scrutiny of the Confidential Documents would be
restricted; this would clearly infringe the public's freedom of expression guarantee.

**37**   A discussion of the general approach to be taken in the exercise of judicial discretion to grant
a confidentiality order should begin with the principles set out by this Court in Dagenais v. Cana-
dian Broadcasting Corp., [1994] 3 S.C.R. 835. Although that case dealt with the common law juris-
diction of the court to order a publication ban in the criminal law context, there are strong similari-
ties between publication bans and confidentiality orders in the context of judicial proceedings. In
both cases a restriction on freedom of expression is sought in order to preserve or promote an inter-
est engaged by those proceedings. As such, the fundamental question for a court to consider in an
application for a publication ban or a confidentiality order is whether, in the circumstances, the right
to freedom of expression should be compromised.

**38**   Although in each case freedom of expression will be engaged in a different context, the
Dagenais framework utilizes overarching Canadian Charter of Rights and Freedoms principles in
order to balance freedom of expression with other rights and interests, and thus can be adapted and
applied to various circumstances. As a result, the analytical approach to the exercise of discretion
under Rule 151 should echo the underlying principles laid out in Dagenais, although it must be tai-
lored to the specific rights and interests engaged in this case.

**39**   Dagenais dealt with an application by four accused persons under the court's common law ju-
risdiction requesting an order prohibiting the broadcast of a television programme dealing with the
physical and sexual abuse of young boys at religious institutions. The applicants argued that be-
cause the factual circumstances of the programme were very similar to the facts at issue in their tri-
als, the ban was necessary to preserve the accuseds' right to a fair trial.

**40**   Lamer C.J. found that the common law discretion to order a publication ban must be exercised
within the boundaries set by the principles of the Charter. Since publication bans necessarily curtail
the freedom of expression of third parties, he adapted the pre-Charter common law rule such that it
balanced the right to freedom of expression with the right to a fair trial of the accused in a way
which reflected the substance of the test from R. v. Oakes, [1986] 1 S.C.R. 103. At p. 878 of
Dagenais, Lamer C.J. set out his reformulated test:

> A publication ban should only be ordered when:
>
> (a)   Such a ban is necessary in order to prevent a real and substantial risk to the
>       fairness of the trial, because reasonably available alternative measures will
>       not prevent the risk; and
> (b)   The salutary effects of the publication ban outweigh the deleterious effects
>       to the free expression of those affected by the ban. [Emphasis in original.]

**41**   In New Brunswick, supra, this Court modified the Dagenais test in the context of the related
issue of how the discretionary power under s. 486(1) of the Criminal Code, R.S.C. 1985, c. C-46, to
exclude the public from a trial should be exercised. That case dealt with an appeal from the trial

judge's order excluding the public from the portion of a sentencing proceeding for sexual assault and sexual interference dealing with the specific acts committed by the accused on the basis that it would avoid "undue hardship" to both the victims and the accused.

**42**   La Forest J. found that s. 486(1) was a restriction on the s. 2(b) right to freedom of expression in that it provided a "discretionary bar on public and media access to the courts": New Brunswick, at para. 33; however he found this infringement to be justified under s. 1 provided that the discretion was exercised in accordance with the Charter. Thus, the approach taken by La Forest J. at para. 69 to the exercise of discretion under s. 486(1) of the Criminal Code, closely mirrors the Dagenais common law test:

(a) the judge must consider the available options and consider whether there are any other reasonable and effective alternatives available;

(b) the judge must consider whether the order is limited as much as possible; and

(c) the judge must weigh the importance of the objectives of the particular order and its probable effects against the importance of openness and the particular expression that will be limited in order to ensure that the positive and negative effects of the order are proportionate.

In applying this test to the facts of the case, La Forest J. found that the evidence of the potential undue hardship consisted mainly in the Crown's submission that the evidence was of a "delicate nature" and that this was insufficient to override the infringement on freedom of expression.

**43**   This Court has recently revisited the granting of a publication ban under the court's common law jurisdiction in R. v. Mentuck, [2001] 3 S.C.R. 442, 2001 SCC 76, and its companion case R. v. O.N.E., [2001] 3 S.C.R. 478, 2001 SCC 77. In Mentuck, the Crown moved for a publication ban to protect the identity of undercover police officers and operational methods employed by the officers in their investigation of the accused. The accused opposed the motion as an infringement of his right to a fair and public hearing under s. 11(d) of the Charter. The order was also opposed by two intervening newspapers as an infringement of their right to freedom of expression.

**44**   The Court noted that, while Dagenais dealt with the balancing of freedom of expression on the one hand, and the right to a fair trial of the accused on the other, in the case before it, both the right of the accused to a fair and public hearing, and freedom of expression weighed in favour of denying the publication ban. These rights were balanced against interests relating to the proper administration of justice, in particular, protecting the safety of police officers and preserving the efficacy of undercover police operations.

**45**   In spite of this distinction, the Court noted that underlying the approach taken in both Dagenais and New Brunswick was the goal of ensuring that the judicial discretion to order publication bans is subject to no lower a standard of compliance with the Charter than legislative enactment. This goal is furthered by incorporating the essence of s. 1 of the Charter and the Oakes test into the publication ban test. Since this same goal applied in the case before it, the Court adopted a similar approach to that taken in Dagenais, but broadened the Dagenais test (which dealt specifically with the right of an accused to a fair trial) such that it could guide the exercise of judicial discretion where a publication ban is requested in order to preserve any important aspect of the proper administration of justice. At para. 32, the Court reformulated the test as follows:

A publication ban should only be ordered when:

(a)   such an order is necessary in order to prevent a serious risk to the proper administration of justice because reasonably alternative measures will not prevent the risk; and

(b)   the salutary effects of the publication ban outweigh the deleterious effects on the rights and interests of the parties and the public, including the effects on the right to free expression, the right of the accused to a fair and public trial, and the efficacy of the administration of justice.

**46**   The Court emphasized that under the first branch of the test, three important elements were subsumed under the "necessity" branch. First, the risk in question must be a serious risk well grounded in the evidence. Second, the phrase "proper administration of justice" must be carefully interpreted so as not to allow the concealment of an excessive amount of information. Third, the test requires the judge ordering the ban to consider not only whether reasonable alternatives are available, but also to restrict the ban as far as possible without sacrificing the prevention of the risk.

**47**   At para. 31, the Court also made the important observation that the proper administration of justice will not necessarily involve Charter rights, and that the ability to invoke the Charter is not a necessary condition for a publication ban to be granted:

> The [common law publication ban] rule can accommodate orders that must occasionally be made in the interests of the administration of justice, which encompass more than fair trial rights. As the test is intended to "reflec[t] the substance of the Oakes test", we cannot require that Charter rights be the only legitimate objective of such orders any more than we require that government action or legislation in violation of the Charter be justified exclusively by the pursuit of another Charter right. [Emphasis added.]

The Court also anticipated that, in appropriate circumstances, the Dagenais framework could be expanded even further in order to address requests for publication bans where interests other than the administration of justice were involved.

**48**   Mentuck is illustrative of the flexibility of the Dagenais approach. Since its basic purpose is to ensure that the judicial discretion to deny public access to the courts is exercised in accordance with Charter principles, in my view, the Dagenais model can and should be adapted to the situation in the case at bar where the central issue is whether judicial discretion should be exercised so as to exclude confidential information from a public proceeding. As in Dagenais, New Brunswick and Mentuck, granting the confidentiality order will have a negative effect on the Charter right to freedom of expression, as well as the principle of open and accessible court proceedings and, as in those cases, courts must ensure that the discretion to grant the order is exercised in accordance with Charter principles. However, in order to adapt the test to the context of this case, it is first necessary to determine the particular rights and interests engaged by this application.

(2)   The Rights and Interests of the Parties

**49**   The immediate purpose for AECL's confidentiality request relates to its commercial interests. The information in question is the property of the Chinese authorities. If the appellant were to disclose the Confidential Documents, it would be in breach of its contractual obligations and suffer a

risk of harm to its competitive position. This is clear from the findings of fact of the motions judge that AECL was bound by its commercial interests and its customer's property rights not to disclose the information (para. 27), and that such disclosure could harm the appellant's commercial interests (para. 23).

**50**    Aside from this direct commercial interest, if the confidentiality order is denied, then in order to protect its commercial interests, the appellant will have to withhold the documents. This raises the important matter of the litigation context in which the order is sought. As both the motions judge and the Federal Court of Appeal found that the information contained in the Confidential Documents was relevant to defences available under the CEAA, the inability to present this information hinders the appellant's capacity to make full answer and defence, or, expressed more generally, the appellant's right, as a civil litigant, to present its case. In that sense, preventing the appellant from disclosing these documents on a confidential basis infringes its right to a fair trial. Although in the context of a civil proceeding this does not engage a Charter right, the right to a fair trial generally can be viewed as a fundamental principle of justice: M. (A.) v. Ryan, [1997] 1 S.C.R. 157, at para. 84, per L'Heureux-Dubé J. (dissenting, but not on that point). Although this fair trial right is directly relevant to the appellant, there is also a general public interest in protecting the right to a fair trial. Indeed, as a general proposition, all disputes in the courts should be decided under a fair trial standard. The legitimacy of the judicial process alone demands as much. Similarly, courts have an interest in having all relevant evidence before them in order to ensure that justice is done.

**51**    Thus, the interests which would be promoted by a confidentiality order are the preservation of commercial and contractual relations, as well as the right of civil litigants to a fair trial. Related to the latter are the public and judicial interests in seeking the truth and achieving a just result in civil proceedings.

**52**    In opposition to the confidentiality order lies the fundamental principle of open and accessible court proceedings. This principle is inextricably tied to freedom of expression enshrined in s. 2(b) of the Charter: New Brunswick, supra, at para. 23. The importance of public and media access to the courts cannot be understated, as this access is the method by which the judicial process is scrutinized and criticized. Because it is essential to the administration of justice that justice is done and is seen to be done, such public scrutiny is fundamental. The open court principle has been described as "the very soul of justice", guaranteeing that justice is administered in a non-arbitrary manner: New Brunswick, at para. 22.

(3)    Adapting the Dagenais Test to the Rights and Interests of the Parties

**53**    Applying the rights and interests engaged in this case to the analytical framework of Dagenais and subsequent cases discussed above, the test for whether a confidentiality order ought to be granted in a case such as this one should be framed as follows:

A confidentiality order under Rule 151 should only be granted when:

(a)    such an order is necessary in order to prevent a serious risk to an important interest, including a commercial interest, in the context of litigation because reasonably alternative measures will not prevent the risk; and

(b)    the salutary effects of the confidentiality order, including the effects on the right of civil litigants to a fair trial, outweigh its deleterious effects, includ-

ing the effects on the right to free expression, which in this context in-
cludes the public interest in open and accessible court proceedings.

**54**    As in Mentuck, I would add that three important elements are subsumed under the first branch
of this test. First, the risk in question must be real and substantial, in that the risk is well grounded in
the evidence, and poses a serious threat to the commercial interest in question.

**55**    In addition, the phrase "important commercial interest" is in need of some clarification. In or-
der to qualify as an "important commercial interest", the interest in question cannot merely be spe-
cific to the party requesting the order; the interest must be one which can be expressed in terms of a
public interest in confidentiality. For example, a private company could not argue simply that the
existence of a particular contract should not be made public because to do so would cause the com-
pany to lose business, thus harming its commercial interests. However, if, as in this case, exposure
of information would cause a breach of a confidentiality agreement, then the commercial interest
affected can be characterized more broadly as the general commercial interest of preserving confi-
dential information. Simply put, if there is no general principle at stake, there can be no "important
commercial interest" for the purposes of this test. Or, in the words of Binnie J. in F.N. (Re), [2000]
1 S.C.R. 880, 2000 SCC 35, at para. 10, the open court rule only yields "where the public interest in
confidentiality outweighs the public interest in openness" (emphasis added).

**56**    In addition to the above requirement, courts must be cautious in determining what constitutes
an "important commercial interest". It must be remembered that a confidentiality order involves an
infringement on freedom of expression. Although the balancing of the commercial interest with
freedom of expression takes place under the second branch of the test, courts must be alive to the
fundamental importance of the open court rule. See generally Muldoon J. in Eli Lilly and Co. v.
Novopharm Ltd. (1994), 56 C.P.R. (3d) 437 (F.C.T.D.), at p. 439.

**57**    Finally, the phrase "reasonably alternative measures" requires the judge to consider not only
whether reasonable alternatives to a confidentiality order are available, but also to restrict the order
as much as is reasonably possible while preserving the commercial interest in question.

B. Application of the Test to this Appeal

(1)   Necessity

**58**    At this stage, it must be determined whether disclosure of the Confidential Documents would
impose a serious risk on an important commercial interest of the appellant, and whether there are
reasonable alternatives, either to the order itself, or to its terms.

**59**    The commercial interest at stake here relates to the objective of preserving contractual obliga-
tions of confidentiality. The appellant argues that it will suffer irreparable harm to its commercial
interests if the Confidential Documents are disclosed. In my view, the preservation of confidential
information constitutes a sufficiently important commercial interest to pass the first branch of the
test as long as certain criteria relating to the information are met.

**60**    Pelletier J. noted that the order sought in this case was similar in nature to an application for a
protective order which arises in the context of patent litigation. Such an order requires the applicant
to demonstrate that the information in question has been treated at all relevant times as confidential
and that on a balance of probabilities its proprietary, commercial and scientific interests could rea-
sonably be harmed by the disclosure of the information: AB Hassle v. Canada (Minister of National

Health and Welfare) (1998), 83 C.P.R. (3d) 428 (F.C.T.D.), at p. 434. To this I would add the requirement proposed by Robertson J.A. that the information in question must be of a "confidential nature" in that it has been "accumulated with a reasonable expectation of it being kept confidential" as opposed to "facts which a litigant would like to keep confidential by having the courtroom doors closed" (para. 14).

**61** Pelletier J. found as a fact that the AB Hassle test had been satisfied in that the information had clearly been treated as confidential both by the appellant and by the Chinese authorities, and that, on a balance of probabilities, disclosure of the information could harm the appellant's commercial interests (para. 23). As well, Robertson J.A. found that the information in question was clearly of a confidential nature as it was commercial information, consistently treated and regarded as confidential, that would be of interest to AECL's competitors (para. 16). Thus, the order is sought to prevent a serious risk to an important commercial interest.

**62** The first branch of the test also requires the consideration of alternative measures to the confidentiality order, as well as an examination of the scope of the order to ensure that it is not overly broad. Both courts below found that the information contained in the Confidential Documents was relevant to potential defences available to the appellant under the CEAA and this finding was not appealed at this Court. Further, I agree with the Court of Appeal's assertion (at para. 99) that, given the importance of the documents to the right to make full answer and defence, the appellant is, practically speaking, compelled to produce the documents. Given that the information is necessary to the appellant's case, it remains only to determine whether there are reasonably alternative means by which the necessary information can be adduced without disclosing the confidential information.

**63** Two alternatives to the confidentiality order were put forward by the courts below. The motions judge suggested that the Confidential Documents could be expunged of their commercially sensitive contents, and edited versions of the documents could be filed. As well, the majority of the Court of Appeal, in addition to accepting the possibility of expungement, was of the opinion that the summaries of the Confidential Documents included in the affidavits could go a long way to compensate for the absence of the originals. If either of these options is a reasonable alternative to submitting the Confidential Documents under a confidentiality order, then the order is not necessary, and the application does not pass the first branch of the test.

**64** There are two possible options with respect to expungement, and in my view, there are problems with both of these. The first option would be for AECL to expunge the confidential information without disclosing the expunged material to the parties and the court. However, in this situation the filed material would still differ from the material used by the affiants. It must not be forgotten that this motion arose as a result of Sierra Club's position that the summaries contained in the affidavits should be accorded little or no weight without the presence of the underlying documents. Even if the relevant information and the confidential information were mutually exclusive, which would allow for the disclosure of all the information relied on in the affidavits, this relevancy determination could not be tested on cross-examination because the expunged material would not be available. Thus, even in the best case scenario, where only irrelevant information needed to be expunged, the parties would be put in essentially the same position as that which initially generated this appeal, in the sense that, at least some of the material relied on to prepare the affidavits in question would not be available to Sierra Club.

**65** Further, I agree with Robertson J.A. that this best case scenario, where the relevant and the confidential information do not overlap, is an untested assumption (para. 28). Although the docu-

ments themselves were not put before the courts on this motion, given that they comprise thousands of pages of detailed information, this assumption is at best optimistic. The expungement alternative would be further complicated by the fact that the Chinese authorities require prior approval for any request by AECL to disclose information.

**66**   The second option is that the expunged material be made available to the court and the parties under a more narrowly drawn confidentiality order. Although this option would allow for slightly broader public access than the current confidentiality request, in my view, this minor restriction to the current confidentiality request is not a viable alternative given the difficulties associated with expungement in these circumstances. The test asks whether there are reasonably alternative measures; it does not require the adoption of the absolutely least restrictive option. With respect, in my view, expungement of the Confidential Documents would be a virtually unworkable and ineffective solution that is not reasonable in the circumstances.

**67**   A second alternative to a confidentiality order was Evans J.A.'s suggestion that the summaries of the Confidential Documents included in the affidavits "may well go a long way to compensate for the absence of the originals" (para. 103). However, he appeared to take this fact into account merely as a factor to be considered when balancing the various interests at stake. I would agree that at this threshold stage to rely on the summaries alone, in light of the intention of Sierra Club to argue that they should be accorded little or no weight, does not appear to be a "reasonably alternative measure" to having the underlying documents available to the parties.

**68**   With the above considerations in mind, I find the confidentiality order necessary in that disclosure of the Confidential Documents would impose a serious risk on an important commercial interest of the appellant, and that there are no reasonably alternative measures to granting the order.

### (2)   The Proportionality Stage

**69**   As stated above, at this stage, the salutary effects of the confidentiality order, including the effects on the appellant's right to a fair trial, must be weighed against the deleterious effects of the confidentiality order, including the effects on the right to free expression, which in turn is connected to the principle of open and accessible court proceedings. This balancing will ultimately determine whether the confidentiality order ought to be granted.

### (a)   Salutary Effects of the Confidentiality Order

**70**   As discussed above, the primary interest that would be promoted by the confidentiality order is the public interest in the right of a civil litigant to present its case, or, more generally, the fair trial right. Because the fair trial right is being invoked in this case in order to protect commercial, not liberty, interests of the appellant, the right to a fair trial in this context is not a Charter right; however, a fair trial for all litigants has been recognized as a fundamental principle of justice: Ryan, supra, at para. 84. It bears repeating that there are circumstances where, in the absence of an affected Charter right, the proper administration of justice calls for a confidentiality order: Mentuck, supra, at para. 31. In this case, the salutary effects that such an order would have on the administration of justice relate to the ability of the appellant to present its case, as encompassed by the broader fair trial right.

**71**   The Confidential Documents have been found to be relevant to defences that will be available to the appellant in the event that the CEAA is found to apply to the impugned transaction and, as

discussed above, the appellant cannot disclose the documents without putting its commercial interests at serious risk of harm. As such, there is a very real risk that, without the confidentiality order, the ability of the appellant to mount a successful defence will be seriously curtailed. I conclude, therefore, that the confidentiality order would have significant salutary effects on the appellant's right to a fair trial.

72   Aside from the salutary effects on the fair trial interest, the confidentiality order would also have a beneficial impact on other important rights and interests. First, as I discuss in more detail below, the confidentiality order would allow all parties and the court access to the Confidential Documents, and permit cross-examination based on their contents. By facilitating access to relevant documents in a judicial proceeding, the order sought would assist in the search for truth, a core value underlying freedom of expression.

73   Second, I agree with the observation of Robertson J.A. that, as the Confidential Documents contain detailed technical information pertaining to the construction and design of a nuclear installation, it may be in keeping with the public interest to prevent this information from entering the public domain (para. 44). Although the exact contents of the documents remain a mystery, it is apparent that they contain technical details of a nuclear installation, and there may well be a substantial public security interest in maintaining the confidentiality of such information.

(b) Deleterious Effects of the Confidentiality Order

74   Granting the confidentiality order would have a negative effect on the open court principle, as the public would be denied access to the contents of the Confidential Documents. As stated above, the principle of open courts is inextricably tied to the s. 2(b) Charter right to freedom of expression, and public scrutiny of the courts is a fundamental aspect of the administration of justice: New Brunswick, supra, at paras. 22-23. Although as a general principle, the importance of open courts cannot be overstated, it is necessary to examine, in the context of this case, the particular deleterious effects on freedom of expression that the confidentiality order would have.

75   Underlying freedom of expression are the core values of (1) seeking the truth and the common good; (2) promoting self-fulfilment of individuals by allowing them to develop thoughts and ideas as they see fit; and (3) ensuring that participation in the political process is open to all persons: Irwin Toy Ltd. v. Quebec (Attorney General), [1989] 1 S.C.R. 927, at p. 976; R. v. Keegstra, [1990] 3 S.C.R. 697, at pp. 762-64, per Dickson C.J. Charter jurisprudence has established that the closer the speech in question lies to these core values, the harder it will be to justify a s. 2(b) infringement of that speech under s. 1 of the Charter: Keegstra, at pp. 760-61. Since the main goal in this case is to exercise judicial discretion in a way which conforms to Charter principles, a discussion of the deleterious effects of the confidentiality order on freedom of expression should include an assessment of the effects such an order would have on the three core values. The more detrimental the order would be to these values, the more difficult it will be to justify the confidentiality order. Similarly, minor effects of the order on the core values will make the confidentiality order easier to justify.

76   Seeking the truth is not only at the core of freedom of expression, but it has also been recognized as a fundamental purpose behind the open court rule, as the open examination of witnesses promotes an effective evidentiary process: Edmonton Journal, supra, at pp. 1357-58, per Wilson J. Clearly the confidentiality order, by denying public and media access to documents relied on in the proceedings, would impede the search for truth to some extent. Although the order would not ex-

clude the public from the courtroom, the public and the media would be denied access to documents relevant to the evidentiary process.

77    However, as mentioned above, to some extent the search for truth may actually be promoted by the confidentiality order. This motion arises as a result of Sierra Club's argument that it must have access to the Confidential Documents in order to test the accuracy of Dr. Pang's evidence. If the order is denied, then the most likely scenario is that the appellant will not submit the documents with the unfortunate result that evidence which may be relevant to the proceedings will not be available to Sierra Club or the court. As a result, Sierra Club will not be able to fully test the accuracy of Dr. Pang's evidence on cross-examination. In addition, the court will not have the benefit of this cross-examination or documentary evidence, and will be required to draw conclusions based on an incomplete evidentiary record. This would clearly impede the search for truth in this case.

78    As well, it is important to remember that the confidentiality order would restrict access to a relatively small number of highly technical documents. The nature of these documents is such that the general public would be unlikely to understand their contents, and thus they would contribute little to the public interest in the search for truth in this case. However, in the hands of the parties and their respective experts, the documents may be of great assistance in probing the truth of the Chinese environmental assessment process, which would in turn assist the court in reaching accurate factual conclusions. Given the nature of the documents, in my view, the important value of the search for truth which underlies both freedom of expression and open justice would be promoted to a greater extent by submitting the Confidential Documents under the order sought than it would by denying the order, and thereby preventing the parties and the court from relying on the documents in the course of the litigation.

79    In addition, under the terms of the order sought, the only restrictions on these documents relate to their public distribution. The Confidential Documents would be available to the court and the parties, and public access to the proceedings would not be impeded. As such, the order represents a fairly minimal intrusion into the open court rule, and thus would not have significant deleterious effects on this principle.

80    The second core value underlying freedom of speech, namely, the promotion of individual self-fulfilment by allowing open development of thoughts and ideas, focusses on individual expression, and thus does not closely relate to the open court principle which involves institutional expression. Although the confidentiality order would restrict individual access to certain information which may be of interest to that individual, I find that this value would not be significantly affected by the confidentiality order.

81    The third core value, open participation in the political process, figures prominently in this appeal, as open justice is a fundamental aspect of a democratic society. This connection was pointed out by Cory J. in Edmonton Journal, supra, at p. 1339:

> It can be seen that freedom of expression is of fundamental importance to a democratic society. It is also essential to a democracy and crucial to the rule of law that the courts are seen to function openly. The press must be free to comment upon court proceedings to ensure that the courts are, in fact, seen by all to operate openly in the penetrating light of public scrutiny.

Although there is no doubt as to the importance of open judicial proceedings to a democratic society, there was disagreement in the courts below as to whether the weight to be assigned to the open court principle should vary depending on the nature of the proceeding.

**82**    On this issue, Robertson J.A. was of the view that the nature of the case and the level of media interest were irrelevant considerations. On the other hand, Evans J.A. held that the motions judge was correct in taking into account that this judicial review application was one of significant public and media interest. In my view, although the public nature of the case may be a factor which strengthens the importance of open justice in a particular case, the level of media interest should not be taken into account as an independent consideration.

**83**    Since cases involving public institutions will generally relate more closely to the core value of public participation in the political process, the public nature of a proceeding should be taken into consideration when assessing the merits of a confidentiality order. It is important to note that this core value will always be engaged where the open court principle is engaged owing to the importance of open justice to a democratic society. However, where the political process is also engaged by the substance of the proceedings, the connection between open proceedings and public participation in the political process will increase. As such, I agree with Evans J.A. in the court below where he stated, at para. 87:

> While all litigation is important to the parties, and there is a public interest in ensuring the fair and appropriate adjudication of all litigation that comes before the courts, some cases raise issues that transcend the immediate interests of the parties and the general public interest in the due administration of justice, and have a much wider public interest significance.

**84**    This motion relates to an application for judicial review of a decision by the government to fund a nuclear energy project. Such an application is clearly of a public nature, as it relates to the distribution of public funds in relation to an issue of demonstrated public interest. Moreover, as pointed out by Evans J.A., openness and public participation are of fundamental importance under the CEAA. Indeed, by their very nature, environmental matters carry significant public import, and openness in judicial proceedings involving environmental issues will generally attract a high degree of protection. In this regard, I agree with Evans J.A. that the public interest is engaged here more than it would be if this were an action between private parties relating to purely private interests.

**85**    However, with respect, to the extent that Evans J.A. relied on media interest as an indicium of public interest, this was an error. In my view, it is important to distinguish public interest, from media interest, and I agree with Robertson J.A. that media exposure cannot be viewed as an impartial measure of public interest. It is the public nature of the proceedings which increases the need for openness, and this public nature is not necessarily reflected by the media desire to probe the facts of the case. I reiterate the caution given by Dickson C.J. in Keegstra, supra, at p. 760, where he stated that, while the speech in question must be examined in light of its relation to the core values, "we must guard carefully against judging expression according to its popularity".

**86**    Although the public interest in open access to the judicial review application as a whole is substantial, in my view, it is also important to bear in mind the nature and scope of the information for which the order is sought in assigning weight to the public interest. With respect, the motions judge erred in failing to consider the narrow scope of the order when he considered the public inter-

est in disclosure, and consequently attached excessive weight to this factor. In this connection, I re-spectfully disagree with the following conclusion of Evans J.A., at para. 97:

> Thus, having considered the nature of this litigation, and having assessed the extent of public interest in the openness of the proceedings in the case before him, the Motions Judge cannot be said in all the circumstances to have given this factor undue weight, even though confidentiality is claimed for only three docu-ments among the small mountain of paper filed in this case, and their content is likely to be beyond the comprehension of all but those equipped with the neces-sary technical expertise.

Open justice is a fundamentally important principle, particularly when the substance of the proceed-ings is public in nature. However, this does not detract from the duty to attach weight to this princi-ple in accordance with the specific limitations on openness that the confidentiality order would have. As Wilson J. observed in Edmonton Journal, supra, at pp. 1353-54:

> One thing seems clear and that is that one should not balance one value at large and the conflicting value in its context. To do so could well be to pre-judge the issue by placing more weight on the value developed at large than is appro-priate in the context of the case.

**87**    In my view, it is important that, although there is significant public interest in these proceed-ings, open access to the judicial review application would be only slightly impeded by the order sought. The narrow scope of the order coupled with the highly technical nature of the Confidential Documents significantly temper the deleterious effects the confidentiality order would have on the public interest in open courts.

**88**    In addressing the effects that the confidentiality order would have on freedom of expression, it should also be borne in mind that the appellant may not have to raise defences under the CEAA, in which case the Confidential Documents would be irrelevant to the proceedings, with the result that freedom of expression would be unaffected by the order. However, since the necessity of the Confi-dential Documents will not be determined for some time, in the absence of a confidentiality order, the appellant would be left with the choice of either submitting the documents in breach of its obli-gations, or withholding the documents in the hopes that either it will not have to present a defence under the CEAA, or that it will be able to mount a successful defence in the absence of these rele-vant documents. If it chooses the former option, and the defences under the CEAA are later found not to apply, then the appellant will have suffered the prejudice of having its confidential and sensi-tive information released into the public domain, with no corresponding benefit to the public. Al-though this scenario is far from certain, the possibility of such an occurrence also weighs in favour of granting the order sought.

**89**    In coming to this conclusion, I note that if the appellant is not required to invoke the relevant defences under the CEAA, it is also true that the appellant's fair trial right will not be impeded, even if the confidentiality order is not granted. However, I do not take this into account as a factor which weighs in favour of denying the order because, if the order is granted and the Confidential Docu-ments are not required, there will be no deleterious effects on either the public interest in freedom of expression or the appellant's commercial interests or fair trial right. This neutral result is in contrast

with the scenario discussed above where the order is denied and the possibility arises that the appellant's commercial interests will be prejudiced with no corresponding public benefit. As a result, the fact that the Confidential Documents may not be required is a factor which weighs in favour of granting the confidentiality order.

90    In summary, the core freedom of expression values of seeking the truth and promoting an open political process are most closely linked to the principle of open courts, and most affected by an order restricting that openness. However, in the context of this case, the confidentiality order would only marginally impede, and in some respects would even promote, the pursuit of these values. As such, the order would not have significant deleterious effects on freedom of expression.

### VII.   Conclusion

91    In balancing the various rights and interests engaged, I note that the confidentiality order would have substantial salutary effects on the appellant's right to a fair trial, and freedom of expression. On the other hand, the deleterious effects of the confidentiality order on the principle of open courts and freedom of expression would be minimal. In addition, if the order is not granted and in the course of the judicial review application the appellant is not required to mount a defence under the CEAA, there is a possibility that the appellant will have suffered the harm of having disclosed confidential information in breach of its obligations with no corresponding benefit to the right of the public to freedom of expression. As a result, I find that the salutary effects of the order outweigh its deleterious effects, and the order should be granted.

92    Consequently, I would allow the appeal with costs throughout, set aside the judgment of the Federal Court of Appeal, and grant the confidentiality order on the terms requested by the appellant under Rule 151 of the Federal Court Rules, 1998.

Solicitors for the appellant: Osler, Hoskin & Harcourt, Toronto.
Solicitors for the respondent Sierra Club of Canada: Timothy J. Howard, Vancouver; Franklin S. Gertler, Montréal.
Solicitor for the respondents the Minister of Finance of Canada, the Minister of Foreign Affairs of Canada, the Minister of International Trade of Canada and the Attorney General of Canada: The Deputy Attorney General of Canada, Ottawa.

Court File No: 09-CL-7950

IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL
NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL NETWORKS
GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL CORPORATION AND
NORTEL NETWORKS TECHNOLOGY CORPORATION

*ONTARIO*
SUPERIOR COURT OF JUSTICE
(COMMERCIAL LIST)

Proceeding commenced at Toronto

**BRIEF OF AUTHORITIES OF THE
APPLICANTS**

Flextronics Settlement Approval Motion
(returnable December 2, 2009)

**OGILVY RENAULT LLP**
Suite 3800
Royal Bank Plaza, South Tower
200 Bay Street
P.O. Box 84
Toronto, Ontario M5J 2Z4

**Derrick Tay LSUC#: 21152A**
Tel: (416) 216-4832
Email: dtay@ogilvyrenault.com

**Mario Forte  LSUC#: 27293F**
Tel: (416) 216-4870
Email: mforte@ogilvyrenault.com

**Jennifer Stam LSUC #46735J**
Tel: (416) 216-2327
Fax: (416) 216-3930
Email: jstam@ogilvyrenault.com

Lawyers for the Applicants

DOCSTOR 1813012\1

Court File No.: 09-CL-7950

*ONTARIO*
**SUPERIOR COURT OF JUSTICE**
**(COMMERCIAL LIST)**

IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT,*
R.S.C. 1985, c. C-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF
NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL
NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL
CORPORATION and NORTEL NETWORKS TECHNOLOGY CORPORATION

APPLICATION UNDER THE *COMPANIES' CREDITORS ARRANGEMENT ACT,*
R.S.C. 1985, c. C-36, AS AMENDED

**FACTUM OF THE APPLICANTS**
Flextronics Settlement Approval Motion
(returnable December 2, 2009)

November 27, 2009

**OGILVY RENAULT LLP**
Suite 3800
Royal Bank Plaza, South Tower
200 Bay Street
P.O. Box 84
Toronto, Ontario  M5J 2Z4

**Derrick Tay LSUC#: 21152A**
Tel: (416) 216-4832
Email: dtay@ogilvyrenault.com

**Mario Forte LSUC#: 27293F**
Tel: (416) 216-4870
Email: mforte@ogilvyrenault.com

**Jennifer Stam LSUC#: 46735J**
Tel: (416) 216-2327
Email: jstam@ogilvyrenault.com
Fax: (416) 216-3930

Lawyers for the Applicants

Court File No.: 09-CL-7950

*ONTARIO*
**SUPERIOR COURT OF JUSTICE**
**(COMMERCIAL LIST)**

**IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,**
**R.S.C. 1985, c. C-36, AS AMENDED**

**AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF**
**NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL**
**NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL**
**CORPORATION and NORTEL NETWORKS TECHNOLOGY CORPORATION**
**(the "Applicants")**

**APPLICATION UNDER THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,**
**R.S.C. 1985, c. C-36, AS AMENDED ("CCAA")**

**FACTUM OF THE APPLICANTS**
(*re* Flextronics Settlement Motion returnable December 2, 2009)

**PART I  -  OVERVIEW**

1.     The Applicants bring this motion for an Order:

(a)     authorizing and approving the Settlement and Release Agreement (as hereinafter
defined) by and among Flextronics[1], (ii) the Applicants, (iii) the U.S. Debtors[2],
(iv) the EMEA Entities[3], and (v) the Joint Administrators acting on behalf of the
EMEA Entities, which agreement finally resolves a long-standing dispute
between Nortel and its most important supplier;

---

[1] Flextronics Corporation ("FC"), Flextronics Telecom Systems Ltd. ("FTS") and certain affiliates of FC and FTS
that are signatories to the Settlement and Release Agreement, on behalf of themselves and their respective affiliates
are collectively "**Flextronics**".
[2] Certain of Nortel Network Corporation's U.S. subsidiaries, including Nortel Networks Inc. ("NNI"), who made
voluntary filings under Chapter 11 of the United States Bankruptcy Code are collectively the "**U.S. Debtors**".
[3] Nortel Networks B.V., Nortel Networks (Ireland) Limited, Nortel Networks Hispania, S.A., and Nortel Networks
UK Ltd. are collectively the "**EMEA Debtors**".

- 2 -

(b)    authorizing and approving the related Side Agreement (as hereinafter defined), by and among Nortel[4] and the Joint Administrators;

(c)    permitting the Applicants to file under seal:

(i)    certain portions of the Settlement and Release Agreement; and
(ii)   certain portions of the Side Agreement;

as they appear in Exhibits "A" and "B" to the Affidavit of Donald McKenna sworn November 24, 2009 (the "**McKenna Affidavit**"), such that those portions shall not form part of the public record, subject to further Order of this Court;

(d)    authorizing and directing the Applicants to comply with their obligations under the Settlement and Release Agreement and the Side Agreement (the "**Settlement**").

2.    The Settlement is a good faith means to resolve the issues between Nortel and Flextronics and to fairly and efficiently allocate the costs thereof among the Nortel estates. Nortel will benefit from the finality of the resolution of the Flextronics Proofs and its ability to complete and pursue further Divestitures (all as hereinafter defined). The Settlement reflects sound business judgment and will further the interests of the Applicants and their stakeholders.

3.    The Settlement is the result of lengthy and vigorous negotiations between Nortel and Flextronics, including extensive discussions with the Monitor, the Committee and the Bondholder Group (both as hereinafter defined).

4.    The Committee and the Bondholder Group consent to the requested relief and no objections have been raised to the Settlement terms by any of the stakeholders with whom Nortel consulted.

5.    The U.S. Debtors intend to seek approval of the Settlement (with commercially sensitive portions under seal) by the U.S. Bankruptcy Court on the same day as the within motion.

---

[4] The Applicants, the U.S. Debtors and the EMEA debtors are collectively "**Nortel**".

- 3 -

## PART II  -  FACTS

### A.    Background to the CCAA

6.    The Applicants filed for and obtained protection under the Companies' Creditors Arrangement Act (the "**CCAA**") by order of this Honourable Court dated January 14, 2009 (such order, as amended and restated from time to time, the "**Initial Order**").[5]

7.    Also on January 14, 2009, the U.S. Debtors filed voluntary petitions for relief under Chapter 11 of the U.S. Bankruptcy Code (the "**Chapter 11 Proceedings**").[6]

8.    This Honourable Court has recognized the Chapter 11 Proceedings under section 18.6 of the CCAA; the U.S. Bankruptcy Court similarly entered an order recognizing these proceedings under Chapter 15 of the Bankruptcy Code on February 27, 2009.[7]

9.    On January 14, 2009, the High Court of Justice in England placed the EMEA Debtors into administration under the control of individuals from Ernst & Young LLC (collectively, the "**Joint Administrators**").[8]

10.    On May 28, 2009, at the request of the Joint Administrators, the Commercial Court of Versailles, France (the "**French Court**")[9] ordered the commencement of secondary proceedings in respect of Nortel Networks S.A. ("**NNSA**"), which consist of liquidation proceedings during which NNSA continued to operate as a going concern for an initial period of three months, which period was subsequently extended. On October 1, 2009, pursuant to a motion filed by the Joint Administrators, the French Court approved an order to: (i) suspend the liquidation operations relating to the sale of the assets and/or businesses of NNSA for a renewable period of two months; (ii) authorize the continuation of the business of NNSA so long as the liquidation operations are suspended; and (iii) maintain the powers of the French administrator and

---

[5] McKenna Affidavit, Motion Record, Tab 2, p. 31, para. 3.
[6] McKenna Affidavit, Motion Record, Tab 2, p 31, para. 4.
[7] McKenna Affidavit, Motion Record, Tab 2, p. 31, para. 5.
[8] McKenna Affidavit, Motion Record, Tab 2, p. 31, para. 6.
[9] (Docket No. 2009P00492).

- 4 -

liquidator during the suspension period, except with respect to the sale of assets and/or businesses of NNSA.[10]

11.    In accordance with the European Union's Council Regulation (EC) No. 1346/2000 on Insolvency Proceedings, the English law proceedings (the **"English Proceedings"**) remain the main proceedings in respect of NNSA.  On June 8, 2009, NNUK filed petitions in this Court for recognition of the English Proceedings as foreign main proceedings under chapter 15 of the Bankruptcy Code.  On June 26, 2009, the Court entered an order recognizing the English Proceedings as foreign main proceedings under chapter 15 of the Bankruptcy Code.[11]

12.    On January 18, 2009, certain Nortel affiliates, including Nortel Networks Israel (Sales and Marketing) Limited, filed an application with the Tel-Aviv-Jaffa District Court, pursuant to the Israeli Companies Law, 1999, and the regulations relating thereto for a stay of proceedings. On January 19, 2009, the Israeli Court appointed Yaron Har-Zvi and Avi D. Pelossof as joint administrators of the Israeli Company under the Israeli Companies Law.[12]

13.    On January 26, 2009, the Office of the United States Trustee for the District of Delaware appointed an Official Committee of Unsecured Creditors (the **"Committee"**) pursuant to section 1102(a)(1) of the Bankruptcy Code.  An *ad hoc* group of bondholders holding claims against certain of the U.S. Debtors and certain of the Applicants has also been organized (the **"Bondholder Group"**).  No trustee or examiner has been appointed in the U.S. Debtors' cases.[13]

14.    On July 14, 2009, Nortel Networks (CALA) Inc. (**"NN CALA"** and a Debtor with NNI and its affiliates), an affiliate of NNI, filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code.  On July 17, this Court entered orders approving the joint administration and consolidation of NN CALA's Chapter 11 case with the Chapter 11 Proceedings for procedural proposes, and applying to NN CALA certain previously entered orders in the Chapter 11 Proceedings.[14]

---

[10] McKenna Affidavit, Motion Record, Tab 2, p 32, para. 7.
[11] McKenna Affidavit, Motion Record, Tab 2, p. 32, para. 8.
[12] McKenna Affidavit, Motion Record, Tab 2, p. 32, para. 9.
[13] McKenna Affidavit, Motion Record, Tab 2, p. 32, para. 10.
[14] McKenna Affidavit, Motion Record, Tab 2, p. 33, para. 11.

- 5 -

15.    Nortel continues to manage its properties and operate its businesses under the supervision of this Honourable Court, which has appointed Ernst & Young Inc. as Monitor.[15]

16.    Nortel currently is in the process of divesting its assets through various pending and future sales of businesses or product lines or any other assets or shares of Nortel (each, a "**Business**") to one or more third parties (a "**Purchaser**") (any such sale, whether by asset sale, merger, operation of law or otherwise, a "**Divestiture**").

17.    Flextronics is by far Nortel's largest supplier, and its most critical. It is responsible for the supply of approximately 70% of Nortel's hardware products. In addition, it provides a significant portion of the logistics and repair services required in connection with those products.[16]

18.    Flextronics supplies several of the Businesses, including without limitation the Enterprise Solutions, MEN (Optical), CVAS, Passport and GSM Businesses. Due to the size of Nortel's supply relationship with Flextronics, Nortel expects it is likely that potential Purchasers will want to continue a supply relationship with Flextronics in connection with a Divestiture.[17]

19.    In September 2009, Flextronics filed a number of proofs of claim against Nortel in various jurisdictions asserting pre-filing amounts owed by Nortel to Flextronics.[18]

20.    Flextronics has also filed Objections in respect regarding the treatment of the MCMSAs in connection with some of the Divestitures.

**B.    Background to the Dispute between Nortel and Flextronics**

21.    In 2006, Nortel completed its plan to transition to an outsourcing model by transferring to third parties substantially all of its hardware manufacturing and related activities, including certain product integration, testing, repair operations, supply chain management, third party logistics and design assets. As part of this plan, in 2004 NNL entered into an asset purchase

---

[15] McKenna Affidavit, Motion Record, Tab 2, p. 33, para. 12.
[16] McKenna Affidavit, Motion Record, Tab 2, p. 34, para. 20.
[17] McKenna Affidavit, Motion Record, Tab 2, p. 9, para. 36.
[18] The "**Flextronics Proofs**" include the proofs of claim filed in: (a) these proceedings; (b) the Chapter 11 Proceedings; (c) any claims that have been or could be filed or otherwise asserted against the EMEA Entities; and (d) any claims that have been or could be filed or otherwise asserted in any other proceeding of a Nortel entity or otherwise in any other proceeding of a Nortel entity.

- 6 -

agreement with FTS for the sale of the bulk of Nortel's remaining manufacturing facilities and related inventory.[19]

22.    Since 2004, Nortel and Flextronics have engaged in a complex, wide-ranging contract manufacturing relationship whereby Flextronics, pursuant to specifications supplied by Nortel, purchases materials and components, assembles those materials and components into higher-level components and finished goods, and stores and delivers such finished components and goods to Nortel based on Nortel's forecasts and demands.[20]

23.    The contract manufacturing relationship between Flextronics and Nortel is governed by a number of agreements entered into by various Flextronics and Nortel entities. On September 30, 2003, NNL and Solectron Corporation entered into the Master Contract Manufacturing Services Agreement (including any ancillary agreements incorporated by reference thereunder, including without limitation certain VSHAs (as hereinafter defined) and purchase orders, and as amended by an amending agreement dated June 8, 2009, the "SLR MCMSA"). Subsequently, Flextronics acquired Solectron in 2007. Additionally, on June 29, 2004, in connection with FTS' purchase of the bulk of Nortel's manufacturing facilities, NNL and FTS entered into the Amended and Restated Master Contract Manufacturing Services Agreement (including any ancillary agreements incorporated by reference thereunder, including without limitation certain VSHAs (as hereinafter defined) and purchase orders as amended from time to time by the following agreements: (i) the first amending agreements, dated November 1, 2004; the second amending agreement, dated May 8, 2006; (iii) a memorandum of understanding, dated October 13. 2006; and (iv) a third amending agreement, dated March 31, 2008, the **"Flextronics MCMSA,"** and collectively with the SLR MCMSA, the **"MCMSAs"**).[21]

24.    Under the MCMSAs, NNL and certain of its subsidiaries, including NNI, also have entered into "Virtual Systems House Agreements" (the **"VSHAs"**) with Flextronics. The VSHAs authorize the Nortel entity party to the VSHA to issue purchase orders to Flextronics and outline the responsibilities of the VSHA parties with respect to individual Flextronics manufacturing sites and particular Nortel products. For example, each VSHA may contain terms

---

[19] McKenna Affidavit, Motion Record, Tab 2, p. 34, para. 18.
[20] McKenna Affidavit, Motion Record, Tab 2, p. 34, para. 19.
[21] McKenna Affidavit, Motion Record, Tab 2, p. 34, para. 21.

- 7 -

and conditions unique to each Flextronics manufacturing site, such as a list of products manufactured at the site, support teams and the specific reporting requirements for the site. Additionally, each Nortel entity and Flextronics entity that enters into a VSHA becomes a party to the MCMSA with regard to the products covered by the VSHA and the VSHAs are incorporated by reference into the relevant MCMSA.[22]

25.    To manage this process, Nortel provides to Flextronics non-binding rolling, forward-looking forecasts of their requirements for the products to be manufactured, assembled or supplied. In turn, Flextronics uses these forecasts to purchase and maintain the inventories necessary to meet Nortel's forecasted demand.[23]

26.    Based on the Nortel forecasts, Flextronics carries a substantial inventory of materials and components to be used to supply Nortel with the products it requires; and under the terms of the MCMSAs, Nortel has certain obligations to purchase obsolete and excess inventory from Flextronics.[24]

27.    Nortel allocates the cost of inventory purchases among the four Nortel entities that serve as transaction control centers ("TCCs"),[25] which are used to coordinate Nortel's global purchasing and supply chain. Under this system, Nortel determines the product line for which inventory will be used. Then, the cost of the inventory is allocated between Nortel entities based on the historical mix of purchases by product line that each TCC made in 2008. As a result of this purchasing system, costs related to the provision of goods and services are settled in the ordinary course through intercompany receivables and payables between the Nortel entities that serve as TCCs.[26]

## C.    Current Status of the Dispute with Flextronics

28.    On the eve of the filing under the CCAA and in recognition of the critical importance of Flextronics' continued performance during these proceedings, NNL entered into an agreement

---

[22] McKenna Affidavit, Motion Record, Tab 2, p. 35, para. 22.

[23] McKenna Affidavit, Motion Record, Tab 2, p. 35, para. 23.

[24] McKenna Affidavit, Motion Record, Tab 2, p. 35, para. 24.

[25] The four TCCs are NNL, NNI, Nortel Networks UK and Nortel Networks S.A.

[26] McKenna Affidavit, Motion Record, Tab 2, p. 35, para. 25.

- 8 -

with Flextronics that amended certain terms of their relationship (the "**Amending Agreement**").[27]

29.    The Amending Agreement was approved by this Honourable Court in the Initial Order which provided, at paragraph 48, that the Applicants were authorized and directed to comply with its obligations thereunder.[28]

30.    Subsequent to the Initial Order, the parties discovered certain disputes between them regarding the proper interpretation of the Amending Agreement and other matters. Recognizing the extreme importance of Flextronics' continued performance during Nortel's insolvency proceedings, Nortel engaged Flextronics in negotiations in order to maintain the relationship and resolve the disputes concerning the Amending Agreement.[29] The parties negotiated a settlement of those issues and entered into a Settlement Agreement on May 22, 2009 (the "**May Settlement Agreement**").[30]

31.    The terms of the May Settlement Agreement, which was filed under seal, were approved by the U.S. Bankruptcy Court on June 11, 2009 and by this Honourable Court on June 16, 2009.[31]

32.    Following the May Settlement Agreement, additional issues arose between the parties with regards to various pending and future sales of businesses or product lines and other assets of Nortel.[32]

**D.    The Settlement**

33.    In light of the several pending and potential Divestitures, the significance, size and complexity of the supply relationship with Flextronics, and Nortel's experience in prior Divestitures since its commencement of creditor protection proceedings, Nortel and Flextronics have determined that it is in their mutual best interests to enter into an agreement that:

---

[27] McKenna Affidavit, Motion Record, Tab 2, p. 36, para. 26, Exhibit "D" to the McKenna Affidavit, Motion Record Tab 2.
[28] McKenna Affidavit, Motion Record, Tab 2, p. 36, para. 28.
[29] McKenna Affidavit, Motion Record, Tab 2, p. 37, para. 29.
[30] McKenna Affidavit, Motion Record, Tab 2, p. 33, para. 14.
[31] McKenna Affidavit, Motion Record, Tab 2, p. 38, para. 35, Exhibit "C" to the McKenna Affidavit, Motion Record, Tab 2C.
[32] McKenna Affidavit, Motion Record, Tab 2, p. 33 para. 16.

- 9 -

    (a)    provides a mechanism for the transfer of the supply relationship to interested parties;

    (b)    resolves the settlement and payment of certain claims held by Nortel and Flextronics that would need to be resolved in connection with such Divestitures; and

    (c)    resolves pre-filing claims held by the Parties and certain other claims related to open accounts receivable and payable by Flextronics and Nortel. [33]

34.    Nortel does not admit the validity of: (a) any objection Flextronics has asserted to date in these proceedings or the Chapter 11 proceedings, or that it could assert with respect to any pending or future Divestiture, including without limitation to the treatment of the MCMSAs in connection with any such Divestiture; or (b) any claim asserted in the Flextronics Proofs. [34]

35.    However, Nortel believes it is in its best interests and those of its creditors to avoid the expense, delay and uncertainty associated with any possible litigation relating to such potential sale-related objections, the Flextronics Proofs, and the other matters addressed in the Settlement and Release Agreement. [35]

36.    To this end, the Parties have reached an agreement to:[36]

    (a)    ensure Flextronics' cooperation with regard to pending and future Divestitures;

    (b)    ensure the provision by Flextronics of a supply contract with the Purchaser in connection with any future Divestiture on the terms described in the Settlement and Release Agreement;

    (c)    satisfy the resolution of the existing objections with respect to the sale of the Nortel Enterprise business;

    (d)    fully and finally resolve the Flextronics Proofs, including certain post-filing ordinary course contractual claims, and all of the Parties' respective claims

---

[33] McKenna Affidavit, Motion Record, Tab 2, p. 39 para. 38.
[34] McKenna Affidavit, Motion Record, Tab 2, p. 39, para. 39.
[35] McKenna Affidavit, Motion Record, Tab 2, p. 39, para. 39.
[36] McKenna Affidavit, Motion Record, Tab 2, p. 40, para. 40.

- 10 -

arising prior to the Initial Order, except as otherwise expressly stated in the Settlement and Release Agreement; and

(e)    provide for the Parties' performance of their post-filing obligations under the MCMSAs in accordance with the Settlement and Release Agreement.

37.    The agreement is the result of lengthy and vigorous negotiations between Nortel and Flextronics, including extensive discussions with the Monitor, the Committee and the Bondholder Group.[37]

### E.    Settlement and Release Agreement

38.    The agreements between Nortel and Flextronics have been memorialized in a settlement and release agreement (the **"Settlement and Release Agreement"**) dated November 20, 2009. On that same date, Nortel also entered into a side agreement with the Joint Administrators (the **"Side Agreement"**, collectively, with the Settlement and Release Agreement, the **"Settlement Documents"**).[38]

#### (i)    Settlement and Release Agreement

39.    The main terms of the Settlement and Release Agreement include:[39]

(a)    a payment by Nortel in the amounts set forth in paragraph 1 of Schedule B to the Settlement and Release Agreement (such payment together with the Adjustment Amount (as hereinafter defined), the **"Payment Obligation"**), to be made in two equal instalments —10 days after the Effective Date (as hereinafter defined in the Settlement and Release Agreement), and on or before May 31, 2010 — in consideration for Flextronics' obligations under the Settlement and Release Agreement, and the full and final settlement of (i) the Flextronics Proofs, including certain post-filing ordinary course contractual claims, and (ii) all of the Parties' respective claims arising prior to the Initial Order, except as otherwise expressly stated in the Settlement and Release Agreement. The Settlement and

---

[37] McKenna Affidavit, Motion Record, Tab 2, p. 40, para 41.
[38] McKenna Affidavit, Motion Record, Tab 2, p. 40, para. 42.
[39] McKenna Affidavit, Motion Record, Tab 2, pp. 40-44 para. 43, and Exhibit "A" to the McKenna Affidavit.

- 11 -

Release Agreement provides that NNI shall pay the Payment Obligation to Flextronics on behalf of Nortel. The allocation within Nortel for the Payment Obligation is provided for under the Side Agreement.

(b)     the resolution of additional disputed accounts receivable (listed on Schedule J to the Settlement and Release Agreement) owed by Flextronics to Nortel. In the event the disputed invoices are determined to be invalid, Nortel shall not be entitled to setoff those amounts against amounts it otherwise would owe Flextronics, and accordingly would be required to pay to Flextronics such amounts (the "**Adjustment Amount**").

(c)     the Payment Obligation (including the Adjustment Amount) shall constitute an administrative expense claim pursuant to section 503(b) of the Bankruptcy Code against NNI in the Chapter 11 Proceedings.

(d)     Flextronics and Nortel agree that, except as may be specifically provided under the Settlement and Release Agreement, their post-filing accounts receivable and payable, including without limitation certain accounts receivable identified in Schedule C to the Settlement and Release Agreement (the "**Post-Filing Ordinary Contractual Claims**"), will be resolved and paid in the ordinary course of business.

(e)     Flextronics agrees to cooperate with Nortel and Purchasers in pending and future Divestitures, including by:

     (i)     Flextronics agrees not to assert any rights to adequate protection or similar rights related to the transfer of equipment owned by Nortel in connection with the sale of Nortel's Enterprise Solutions Business as authorized by this Court and the U.S. Bankruptcy Court on September 16 and 17, 2009, and to effect the orderly transfer of the equipment in Flextronics' possession owned by Nortel and proposed to be transferred to the Purchaser of the Enterprise Solutions Business.

     (ii)     in connection with any proposed future Divestiture,

- 12 -

(1)    Flextronics agrees that at the request of Nortel in connection with such Divestiture, it will conduct good faith negotiations with a proposed Purchaser for the purpose of entering into a direct agreement by and among Flextronics, such Purchaser and any of such Purchaser's designated Affiliates for the supply of products and services related to the applicable Business being acquired on market competitive terms and conditions.

(2)    Without limiting the foregoing obligation, if by the time periods set forth in the Settlement and Release Agreement, such direct agreement has not been reached, Flextronics will, at the request of Nortel, enter into and execute a new supply agreement with the Purchaser that contains terms and conditions identical (aside from non-material conforming changes) to the terms and conditions (including, but not limited to, payment and pricing terms) existing under the MCMSAs, as such terms and conditions relate to the Business subject to such Divestiture, as of January 12, 2009 (subject to certain terms as described in the Settlement and Release Agreement).

(3)    Nortel and Flextronics agree to conduct good faith negotiations with the Purchaser regarding a three-way inventory purchase agreement in connection with such Divestiture and to limit Nortel's liability for certain unconsumed portions of forecasts, as further described in the Settlement and Release Agreement.

(4)    Nortel and Flextronics further agree that Nortel will not place purchase orders for a Business following the closing of a Divestiture, except in an administrative role for a Purchaser.

(iii)    Flextronics agrees not to file any formal or informal objection or take any other action in opposition to or with the intention of frustrating any Divestiture, or to seek from Nortel or the Purchaser any remedy, payment or any modification of the MCMSAs as a result of any such Divestiture,

- 13 -

> including without limitation any claim or demand for adequate assurances, changes in payment terms, deposits or any other credit protection, cure costs, or any request or demand for the termination, assumption, rejection or repudiation of the MCMSAs or any part thereof. Flextronics further agrees that it shall not assert any claim or seek any payment or other remedy from a Purchaser in compensation for any right or claim released, waived or compromised by Flextronics pursuant to the Settlement and Release Agreement.

(iv)  The Settlement and Release Agreement provides further mechanics and terms to facilitate Divestitures.

(f)  Flextronics and Nortel further agree that (absent a material breach by the other Party) the Parties shall not seek to reject, repudiate or otherwise cancel or terminate the Flextronics MCMSA pursuant to the processes applicable in the Proceedings except upon 210 days notice to the other Party (or such shorter period as the Parties may agree), during which period the Parties shall continue to perform their obligations under the Flextronics MCMSA in the ordinary course of business.

(g)  Flextronics and Nortel agree to not exercise their respective rights to deliver a notice for termination for convenience under the Flextronics MCMSA for the period through December 31, 2010, and to enter into certain agreements related to the continuation of specific manufacturing agreements, following the termination of the SLR MCMSA.

(h)  Nortel and Flextronics each are releasing claims against each other for pre-filing amounts and as described and qualified in sections 6 and 7 of the Settlement and Release Agreement. The releases include a release by the U.S. Debtors of claims arising under chapter 5 of the Bankruptcy Code, subject to certain conditions set forth in the Settlement and Release Agreement.

- 14 -

### (ii)    The Side Agreement

40.    The Applicants, the U.S. Debtors and the EMEA Entities concluded it was in their best interests to further the Settlement and Release Agreement through the execution of a Side Agreement to govern allocation of responsibility for the Payment Obligation and the settlement of certain avoidance actions under the Settlement and Release Agreement.[40]

41.    On or about November 20, 2009, following lengthy negotiations, including negotiations with the Monitor, the Committee, the Bondholder Group and the Joint Administrators, the Applicants, the U.S. Debtors, the EMEA Entities and the Joint Administrators (collectively, the **"Side Agreement Parties"**) entered into the Side Agreement governing the initial funding of the Payment Obligation under the Settlement and Release Agreement and ultimate allocation of the Settlement Cost (as hereinafter defined in the Side Agreement) amongst them.[41]

42.    The Side Agreement provides for the initial funding of the Payment Obligation among the estates, the establishment of a segregated account by NNI to hold the funds pending payment, and a methodology for the ultimate allocation of the Settlement Cost incurred by the Side Agreement Parties in each of the following three groups: (i) the Applicants, (ii) the U.S. Debtors and (iii) the EMEA Entities (each of (i), (ii) and (iii), a **"Regional Entity"**) according to the weighted average of proceeds allocated to such Regional Entity from the sales of the Enterprise, MEN (Optical), CVAS and GSM businesses.[42]

43.    Nortel discussed the negotiations and settlement with the following parties, none of whom has raised any objections to the Settlement Documents:[43]

(a)    the Monitor;

(b)    the Committee;

(c)    the Bondholder Group; and

(d)    the Joint Administrators.

---

[40] McKenna Affidavit, Motion Record, Tab 2, p. 44, para. 44.
[41] McKenna Affidavit, Motion Record, Tab 2, p. 44, para. 45.
[42] McKenna Affidavit, Motion Record, Tab 2, p. 44, para. 46.
[43] McKenna Affidavit, Motion Record, Tab 2, pp. 44-45, para. 47.

- 15 -

## PART III  - THE ISSUES

44.    The issues to be determined are:

(a)    Should the Settlement be approved; and

(b)    Should certain portions of the Settlement Documents be filed under seal.

## PART IV  - LAW

### A.    The Approval of the Settlement

45.    Nortel seeks this Court's approval of the Settlement as it resolves claims and actual and potential disputes between the Parties regarding: (i) the Enterprise Objection; (ii) Flextronics' cooperation with regard to pending and future Divestitures; (iii) the provision by Flextronics of a supply contract with the Purchaser in connection with any future Divestiture on the terms described in the Settlement and Release Agreement; (iv) the Flextronics Proofs, including certain post-filing ordinary course contractual claims, and all of the Parties' respective claims arising prior to the Initial Order, except as otherwise expressly stated in the Settlement and Release Agreement; and (v) the Parties' performance of their post-filing obligations under the MCMSAs.

46.    Nortel will benefit from the Settlement and Release Agreement through its ability to further Divestitures, and the avoidance of the time, cost and expense of resolution of the other claims with Flextronics whether on a consensual basis or through litigation.    The Side Agreement provides for a fair and efficient method for allocating the costs of settlement among the Nortel estates.  The Agreements are consistent with sound business judgment and further the interests of the Applicants and the Applicants' stakeholders.

47.    Accordingly, the Applicants submit that the Agreements are in the best interests of the Applicants' estates, creditors and other stakeholders and should, therefore, be approved by this Honourable Court

### B.    The Sealing Order

48.    Section 137(2) of the *Courts of Justice Act* provides:

- 16 -

> A court may order that any document filed in a civil
> proceeding before it be treated as confidential, sealed and not
> form part of the public record.

49.     The Supreme Court of Canada set out the test for granting a confidentiality order under the corresponding Federal Court provision in *Sierra Club of Canada* v. *Canada (Minister of Finance):*

> A confidentiality order under Rule 151 should only be
> granted when:
>
> (a) such an order is necessary in order to prevent a serious
> risk to an important interest, including a commercial interest,
> in the context of litigation because reasonably alternative
> measures will not prevent the risk; and
>
> (b) the salutary effects of the confidentiality order, including
> the effects on the right of civil litigants to a fair trial,
> including the effects on the right of civil litigants to a fair
> trial, outweigh its deleterious effects, including the effects on
> the right to free expression, which in this context includes
> the public interest in open and accessible court
> proceedings.[44]

50.     The jurisprudence establishes that granting a confidentiality order is appropriate where the information to be sealed is confidential, commercially sensitive and its release would allow a competitor to improve its competitive position or obtain an unfair advantage.[45]

51.     This Court has granted sealing orders in the context of restructuring and insolvency proceedings where the documents requested for sealing contained sensitive commercial information.

52.     An unredacted copy of the Settlement Documents has been filed with this Honourable Court by the Monitor with its Thirty-First Report. Attached as Exhibits "A" and "B" to the

---

[44] *Sierra Club of Canada* v. *Canada (Minister of Finance),* [2002] S.C.J. No. 42, Brief of Authorities, Tab 5, para. 53.
[45] *Shaw* v. *Shaw,* [2007] O.J. No. 4999 (S.C.J.), Brief of Authorities, Tab 4, para 4 and *BASF Canada Inc.* v. *Max Auto Supply (1986) Inc.,* [1999] O.J. No. 515 (Gen. Div.), Brief of Authorities, Tab 1, paras. 16-17.

- 17 -

McKenna Affidavit are copies of the Settlement Documents with the redactions. It is essential that the redacted information not become publicly available.[46]

53.    Specifically, the Applicants request to file under seal the following information in the Settlement and Release Agreement:

(a)    the value of the Payment Obligation as set forth in Schedule B to the Settlement and Release Agreement; and

(b)    certain other Schedules and portions of Schedules and Exhibits to the Settlement and Release Agreement that contain pricing information.

54.    In the Side Agreement, the Applicants request to file under seal all values set forth therein that, if not filed under seal, would allow for the determination of the Payment Obligation and the total Settlement Cost of the Settlement and Release Agreement.

55.    The redacted portions of the Settlement Documents contain information which, if released, would disadvantage the Applicants.    The settlement with Flextronics is both necessitated by and reflective of Nortel's unique relationship with Flextronics. The disclosure of certain details of the settlement would severely impair the ability of the Applicants to successfully manage their relationships with other suppliers and creditors, and thereby place strain on the Applicants' operations during this critical period and potentially result in added expenses that would drain additional resources from the Applicants' estates and reduce the eventual recovery of creditors.

56.    The disclosure of certain economic details of the settlement contained in the redacted material would disrupt the Divestitures Nortel is undertaking in order to maximize value for its estates and creditors, and would also disrupt the necessary negotiations between the Applicants' suppliers and potential Purchasers to facilitate the transfer of supply arrangements until such Divestitures.

---

[46] Exhibits "A" and "B" to the McKenna Affidavit, Motion Record, Tabs 2A and 2B.

- 18 -

57.    Moreover, the information redacted in the Side Agreement relates to the Side Agreement Parties' payment obligations and agreements regarding the allocation methodology that, if disclosed, could compromise the process for allocation of the Settlement Cost.

58.    The salutary effects of the requested sealing order outweigh any deleterious effects.  The redactions sought are drawn as narrowly as possible to protect Nortel's commercial interests and no other party or entity is prejudiced or unfairly disadvantaged thereby.

### PART V  -  CONCLUSION

59.    Nortel therefore respectfully requests an order in the form attached at Tab 3 of its Motion Record.

**ALL OF WHICH IS RESPECTFULLY SUBMITTED**

November 27, 2009

*Ogilvy Renault LLP*

**OGILVY RENAULT LLP**
Counsel for the Applicants

## SCHEDULE "A"

### LIST OF AUTHORITIES

1.    *BASF Canada Inc.* v. *Max Auto Supply (1986) Inc.,* [1999] O.J. No. 515 (Gen. Div)

2.    *Muscletech Research and Development Inc. (Re),* [2006] O.J. No. 462 (S.C.J.)

3.    *Nortel Networks Corp. (Re),* [2009] O.J. No 1044 (S.C.J.)

4.    *Shaw* v. *Shaw,* [2007] O.J. No. 4999 (S.C.J.)

5.    *Sierra Club of Canada* v. *Canada (Minister of Finance),* [2002] S.C.J. No. 42

## SCHEDULE "B"

## RELEVANT STATUES

*Courts of Justice Act*
R.S.O. 1990, c. C.43, s. 137(2)

<u>Documents public</u>

137.(1)  On payment of the prescribed fee, a person is entitled to see any document filed in a civil proceeding in a court, unless an Act or an order of the court provides otherwise.

<u>Sealing documents</u>

(2)  A court may order that any document filed in a civil proceeding before it be treated as confidential, sealed and not form part of the public record.

Court File No: 09-CL-7950

IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL CORPORATION AND NORTEL NETWORKS TECHNOLOGY CORPORATION

*ONTARIO*
**SUPERIOR COURT OF JUSTICE**
**(COMMERCIAL LIST)**

Proceeding commenced at Toronto

**FACTUM OF THE APPLICANTS**
Flextronics Settlement Motion
(returnable December 2, 2009)

**OGILVY RENAULT LLP**
Suite 3800, P.O. Box 84
Royal Bank Plaza, South Tower
200 Bay Street
Toronto, Ontario  M5J 2Z4

**Derrick Tay LSUC#: 21152A**
Tel: (416) 216-4832
Email: dtay@ogilvyrenault.com

**Mario Forte LSUC#: 27293F**
Tel: (416) 216-4870
Email: mforte@ogilvyrenault.com

**Jennifer Stam LSUC #46735J**
Tel: (416) 216-2327
Fax: (416) 216-3930
Email: jstam@ogilvyrenault.com

Lawyers for the Applicants

DOCSTOR: 1818703