# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| *In re*: | Chapter 11 |
| Nortel Networks Inc., *et al.*,[1] | Case No. 09-10138 (KG) |
| Debtors. | Jointly Administered |

## NOTICE OF FILING OF TWENTY-SEVENTH REPORT OF THE MONITOR OF THE CANADIAN NORTEL COMPANIES <u>IN THE CANADIAN PROCEEDINGS</u>

---

[1] The Debtors in the Chapter 11 Cases, along with the last four digits of each Debtor's tax identification number, are: Nortel Networks Inc. (6332); Nortel Networks Capital Corporation (9620); Nortel Altsystems Inc. (9769); Nortel Altsystems International Inc. (5596); Xros, Inc. (4181); Sonoma Systems (2073); Qtera Corporation (0251); CoreTek, Inc. (5722); Nortel Networks Applications Management Solutions Inc. (2846); Nortel Networks Optical Components Inc. (3545); Nortel Networks HPOCS Inc. (3546); Architel Systems (U.S.) Corporation (3826); Nortel Networks International Inc. (0358); Northern Telecom International Inc. (6286); Nortel Networks Cable Solutions Inc. (0567) and Nortel Networks (CALA) Inc. (4226).

**PLEASE TAKE NOTICE** that on November 30, 2009, Ernst & Young Inc., the Monitor and foreign representative of Nortel Networks Corporation and certain of its direct and indirect subsidiaries, Nortel Networks Limited, Nortel Networks Technology Corporation, Nortel Networks Global Corporation, and Nortel Networks International Corporation, in proceedings under Canada's *Companies' Creditors Arrangement Act*, R.S.C. 1985, c. C-36, as amended, pending before the Ontario Superior Court of Justice (Commercial List), by its undersigned counsel, filed, in the above-captioned cases, a copy of the Twenty-Seventh Report of the Monitor (the "**Twenty-Seventh Report**"), dated November 27, 2009.  A copy of the Twenty-Seventh Report is annexed hereto as Exhibit A.

**PLEASE TAKE FURTHER NOTICE** that a copy of the Twenty-Seventh Report is also available on the Monitor's website, www.ey.com/ca/nortel or upon request to the Monitor's counsel.

Dated: Wilmington, Delaware
      November 30, 2009

ALLEN & OVERY LLP

Ken Coleman
Lisa Kraidin
1221 Avenue of the Americas
New York, New York  10020
Telephone (212) 610-6300
Facsimile (212) 610-6399
ken.coleman@allenovery.com
lisa.kraidin@allenovery.com

-and-

BUCHANAN INGERSOLL & ROONEY

By: /s/ Mary F. Caloway
Mary F. Caloway (No. 3059)
Peter J. Duhig (No. 4024)
The Brandywine Building
1000 West Street, Suite 1410
Wilmington, Delaware 19801
Telephone (302) 552-4200
Facsimile (302) 552-4295
mary.caloway@bipc.com

Attorneys for Ernst & Young Inc., as Monitor
and Foreign Representative of the Canadian Nortel
Group

## EXHIBIT A

Court File No. 09-CL-7950

***ONTARIO***
**SUPERIOR COURT OF JUSTICE**
**(COMMERCIAL LIST)**

**IN THE MATTER OF THE *COMPANIES' CREDITORS***
***ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED**

**AND IN THE MATTER OF A PLAN OF**
**COMPROMISE OR ARRANGEMENT OF**
**NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL**
**NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL**
**CORPORATION AND NORTEL NETWORKS TECHNOLOGY CORPORATION**
**(the "Applicants")**

**TWENTY-SEVENTH REPORT OF THE MONITOR**
**DATED NOVEMBER 16, 2009**

**INTRODUCTION**

1.     On January 14, 2009 (the "Filing Date"), Nortel Networks Corporation ("NNC" and
collectively with all its subsidiaries, "Nortel" or the "Company"), Nortel Networks
Limited ("NNL"), Nortel Networks Technology Corporation, Nortel Networks
International Corporation and Nortel Networks Global Corporation (collectively, the
"Applicants") filed for and obtained protection under the *Companies' Creditors
Arrangement Act* ("CCAA"). Pursuant to the Order of this Honourable Court dated
January 14, 2009, as amended and restated (the "Initial Order"), Ernst & Young Inc. was
appointed as the Monitor of the Applicants (the "Monitor") in the CCAA proceedings.
The stay of proceedings was extended to December 18, 2009, by this Honourable Court
in its Order dated October 28, 2009.

2.     Nortel Networks Inc. ("NNI") and certain of its U.S. subsidiaries concurrently filed
voluntary petitions under Chapter 11 of Title 11 of the U.S. Bankruptcy Code (the
"Code") in the United States Bankruptcy Court for the District of Delaware (the "U.S.
Court") on January 14, 2009 (the "Chapter 11 Proceedings"). As required by U.S. law,

- 2 -

an official unsecured creditors committee (the "Committee") was established in January, 2009.

3.    An ad hoc group of holders of bonds issued by NNL and NNC has been organized and is participating in these proceedings as well as the Chapter 11 Proceedings (the "Bondholder Group"). In addition, pursuant to Orders of this Honourable Court dated May 27, 2009, and July 22, 2009, respectively, representative counsel was appointed on behalf of the former employees of the Applicants (the "Former Employees") and on behalf of the continuing employees of the Applicants (the "Continuing Employees") and each of these groups is participating in the CCAA proceedings.

4.    Nortel Networks (CALA) Inc. (together with NNI and certain of its subsidiaries that filed on January 14, 2009, the "U.S. Debtors") filed a voluntary petition under Chapter 11 of Title 11 of the Code in the U.S. Court on July 14, 2009.

5.    Nortel Networks UK Limited and certain of its subsidiaries located in EMEA (together the "EMEA Debtors") were granted Administration orders (the "U.K. Administration Orders") by the English High Court on January 14, 2009.  The U.K. Administration Orders appointed Alan Bloom, Stephen Harris, Alan Hudson and Chris Hill of Ernst & Young LLP as Administrators of the various EMEA Debtors, except for Ireland, to which David Hughes (Ernst & Young LLP Ireland) and Alan Bloom were appointed (collectively the "UK Administrators"). On June 8, 2009, the Joint Administrators appointed in respect of NNUK filed a petition with the U.S. Court for the recognition of the Administration Proceedings as they relate to NNUK (the "English Proceedings") under Chapter 15 of the Code. On June 26, 2009, the U.S. Court entered an Order recognizing the English Proceedings as foreign main proceedings under Chapter 15 of the Code.

6.    On January 20, 2009, Nortel Networks Israel (Sales and Marketing) Limited and Nortel Communications Holdings (1997) Limited (together "NN Israel") were granted Administration orders by the court in Israel (the "Israeli Administration Orders").  The Israeli Administration Orders appointed representatives of Ernst & Young LLP in the U.K. and Israel as Administrators of NN Israel and provided a stay of NN Israel's

- 3 -

creditors which, subject to further orders of the Israeli Court, remains in effect during the Administration.

7.    Subsequent to the Filing Date, Nortel Networks SA commenced secondary insolvency proceedings within the meaning of Article 27 of the European Union's Council Regulation (EC) No 1346/2000 on Insolvency Proceedings in the Republic of France pursuant to which a liquidator and an administrator have been appointed by the Versailles Commercial Court.

**PURPOSE**

8.    The purpose of this Twenty-Seventh Report of the Monitor ("Twenty-Seventh Report") is to provide information regarding the Applicants' motion seeking approval of a sale of vacant lands in Ottawa, Ontario (the "Lands") pursuant to an agreement of purchase and sale dated October 8, 2009 (the "Agreement"), between NNL and 561121 Ontario Inc. (the "Purchaser"), an affiliate of The Regional Group of Companies Inc. ("Regional"), and to provide the Monitor's support for the proposed transaction.

**TERMS OF REFERENCE**

9.    In preparing this Twenty-Seventh Report, the Monitor has relied upon unaudited financial information, the Company's books and records, financial information prepared by the Company, discussions with management of Nortel, and various property and marketing reports produced by DTZ Barnicke ("DTZ") and Altus Group Limited ("Altus Group"), the real estate professionals retained by the Company to assist with the marketing and sales process. The Monitor has not audited, reviewed, or otherwise attempted to verify the accuracy or completeness of the information and, accordingly, the Monitor expresses no opinion or other form of assurance on the information contained in this Twenty-Seventh Report.

10.   Unless otherwise stated, all monetary amounts contained herein are expressed in Canadian dollars.

11.   Capitalized terms not defined in this Twenty-Seventh Report are as defined in the Agreement.

- 4 -

12.    The Monitor has made various materials relating to the CCAA proceedings available on its website at www.ey.com/ca/nortel. The Monitor's website also contains a dynamic link to Epiq Bankruptcy LLC's website where materials relating to the Chapter 11 Proceedings are posted.

## THE STRANDHERD LANDS

### Background

13.    The Lands are wholly-owned by NNL and comprise approximately 173 acres of vacant land located to the south-east of Highway 416 at the Strandherd Drive and Fallowfield Drive interchange in the Nepean region of Ottawa, Ontario.

14.    The Lands are not yet serviced and form part of an as yet undeveloped employment area known as the 416 Business Park.

15.    The Lands were purchased by NNL in 2000 to provide for a planned expansion of Nortel's existing campus on Carling Avenue in Ottawa.

16.    An appraisal of the Lands (the "Appraisal") was prepared by the Altus Group on April 15, 2009. A copy of the Appraisal has been attached as confidential Appendix "A" to this Twenty-Seventh Report. Given the sensitive nature of the information contained in the Appraisal and the impact the disclosure of such information would have on subsequent efforts to sell the Lands in the event the sale to the Purchaser does not close, the Applicants and the Monitor request that confidential Appendix "A" be sealed by this Honourable Court.

### Sales Process

17.    NNL and DTZ held informal discussions with a number of parties with respect to the potential sale of the Lands as early as March, 2006.

18.    In March, 2009, Nortel received an unsolicited expression of interest in the Lands from a local real estate developer, subject to completion of full due diligence.

19.    In April, 2009, NNL management decided to more actively pursue the sale of the Lands and engaged DTZ to market the property.

- 5 -

20.    DTZ conducted various pre-marketing activities during May and June, 2009 including sending preliminary property information to a target list of 107 potential purchasers, comprised of 35 national real estate companies and 72 regional developers and investors who are active participants in the Ottawa real estate market.

21.    These pre-marketing activities resulted in direct discussions with 31 interested parties. Nine of these parties received more detailed property information packages relating to the Lands following such discussions.

22.    One additional expression of interest in the Lands was received in June, 2009. It was subject to the completion of due diligence on the Lands.

23.    At the end of June, 2009 Nortel and DTZ, with the assistance of the Monitor, established a more formal offering process and bid submission guidelines. A memorandum outlining the sale process was sent to the target list of 107 potential purchasers noted above, and to an additional list of 53 potential purchasers identified by DTZ. In addition, advertisements offering the Lands for sale were published in the Globe and Mail on July 7 and July 9, 2009.

24.    The sale process was structured as follows:

- Interested parties were directed to contact DTZ for additional information;

- Those parties who signed a confidentiality agreement were given access to an electronic data room containing information necessary to perform due diligence on the Lands and provided with a form of an agreement of purchase and sale; and

- The deadline for submission of offers was set as August 20, 2009.

25.    Eight parties were provided with access to the data room, seven of which were from the target list of 107 potential purchasers and one of which responded to the Globe and Mail advertisement.

26.    Three of these parties ultimately submitted bids for the Lands.

- 6 -

27.     Offers were evaluated based on the submitted purchase price for the Lands, compliance with the form of the draft agreement of purchase and sale, the prospective purchaser's ability to complete the transaction and the timeliness and conditions of closing.

28.     Two of the offers, one of which was from the Purchaser, had substantially the same terms, including purchase price. Due diligence on both of these bids was limited to environmental matters.

29.     The third offer was higher in terms of monetary consideration; however, this offer was subject to more extensive due diligence requirements over a 90 day period and included a later closing date.

30.     Further discussions and negotiations were conducted with all three parties to solicit further improvements to the offers.  Ultimately, after considering the terms of the final offers submitted, the Applicants, in consultation with the Monitor and DTZ, elected to enter into the Agreement with the Purchaser. Attached as confidential Appendix "C" is a summary prepared by DTZ outlining the principal terms of the three offers and providing an analysis of same. Given the sensitive nature of the information contained in this analysis and the impact the disclosure of such information would have on subsequent efforts to sell the Lands in the event the sale to the Purchaser does not close, the Applicants and the Monitor request that confidential Appendix "C" be sealed by this Honourable Court.

**THE PURCHASER AND THE AGREEMENT OF PURCHASE AND SALE**

31.     Regional is a multi-disciplinary real estate firm based in the Ottawa area. It is active in the Ottawa area, as well as other centres throughout Canada. Regional invests and consults in the areas of residential and commercial real estate development, and also provides property management, valuation and consulting, and commercial brokerage services.

32.     The key terms of the Agreement are outlined in the paragraphs that follow.  Reference should be made directly to the Agreement, a copy of which is attached as Appendix "B"

- 7 -

to this Twenty-Seventh Report, for a complete understanding of the terms governing the transaction.

- <u>Purchase Price</u>: The Purchase Price is $8.85 million in cash, exclusive of any applicable taxes and subject to adjustments typical of this type of real estate transaction. NNL and DTZ believe the Purchase Price is reasonable given current market conditions and the time and expense required to service the Lands for development. Furthermore, NNL and DTZ are of the view that the market for this type of property in Ottawa will not materially improve in the next two years.

- <u>Deposit</u>: The Purchaser provided an initial deposit of $100,000 upon execution of the Agreement and a second deposit of $250,000 upon expiry of the Due Diligence Date (as discussed in greater detail below). If the transactions contemplated by the Agreement are not completed as a result of the default of the Purchaser, NNL shall be entitled to retain the deposit. The deposit is presently being held in Ogilvy Renault LLP's trust account.

- <u>Representations and Warranties</u>: The Lands are being sold substantially on an "as is, where is" basis. NNL has made certain representations and warranties based on knowledge, information and belief and save as disclosed to the Purchaser or obtained by the Purchaser in its investigations of the Lands that it has not received notices of any claim, expropriation notice or work orders in respect of the Lands, and as to certain environmental matters, all of which merge upon Closing.

- <u>Due Diligence Date</u>: The Agreement provided the Purchaser with a 30-day period in which to satisfy itself as to the condition of the Lands. This due diligence period expired on November 13, 2009, and, as noted above, a further deposit of $250,000 has been received from the Purchaser.

- <u>Closing</u>: The anticipated closing date is December 17, 2009.

- <u>Conditions to Closing</u>:

- 8 -

    o  The remaining conditions of the Purchaser's obligation to complete the Transaction are:

        ▪  NNL complying with all terms, covenants and conditions of the Agreement; and

        ▪  There not having been a material adverse change in the environmental condition of the Lands in the period from the Due Diligence Date to Closing.

    o  The obligation of NNL to complete the Transaction is subject to, amongst other things, obtaining the Approval and Vesting Order on or before 5:00 pm on November 20, 2009, provided that if NNL has not obtained the Approval and Vesting Order by such date it may, by written notice to the Purchaser, extend the date to December 15, 2009.

- **Assignment of Farm Lease**: A portion of the Lands is presently leased to Carleton Corner Farms Ltd. for use as farm land (the "Farm Lease"). The Monitor understands the Farm Lease will be assigned by NNL to the Purchaser at closing.

- **Direction of Title**: The Purchaser is entitled to assign or direct title to the Lands to a third party at Closing, provided it shall remain liable for the performance of its obligations under the Agreement. The Monitor understands the Purchaser intends to direct title to Strandherd Road Inc. at Closing.

## APPROVAL AND VESTING ORDER

33.    The Lands are to be transferred free and clear of all liens, claims and encumbrances of any kind, other than permitted encumbrances as identified in the Agreement. Accordingly, the Applicants are seeking an order of this Honourable Court vesting in the Purchaser's designee all of NNL's right, title and interest in the Lands free and clear of any encumbrances save for permitted encumbrances. The Monitor understands the permitted encumbrances include all easements, rights of way and restrictive covenants presently registered on title to the Lands and there are no registrations or encumbrances on title to the Lands to be vested out by order of this Honourable Court. The description

- 9 -

of the Lands has been updated by reference plans of survey prepared on behalf of the Purchaser, which updated descriptions are reflected in the transfer/deeds of land to be delivered to the Purchaser on the closing of the transaction.

- 10 -

**MONITOR'S ANALYSIS AND RECOMMENDATIONS**

34.     The Monitor has reviewed NNL's efforts to market and divest the Lands and is of the view it has acted in good faith to maximize value.    Accordingly, the Monitor recommends approval of the Agreement and supports NNL's motion for an Approval and Vesting Order in respect of same.

35.     As the Lands are solely owned by NNL, the proceeds of the sale will, upon closing, be available to NNL and have been incorporated into the cash flow attached to the Twenty-Fifth Report of the Monitor dated October 22, 2009.

36.     For the reasons described above at paragraphs 16 and 30, respectively, the Monitor requests that confidential Appendices "A" and "C" to this Twenty-Seventh Report be sealed by this Honourable Court.


All of which is respectfully submitted this 16th day of November, 2009.


**ERNST & YOUNG INC.**
**In its capacity as Monitor of the Applicants**

Per:


Murray A. McDonald
President

\5779999

**APPENDIX "A"**

**[CONFIDENTIAL]**

**APPENDIX "B"**

**[ATTACHED]**

## AGREEMENT OF PURCHASE AND SALE

This Agreement of Purchase and Sale made as of October 8, 2009, between,

### 561121 ONTARIO INC.
(hereinafter called the "**Purchaser**")

OF THE FIRST PART

-and-

### NORTEL NETWORKS LIMITED
(hereinafter called the "**Vendor**")

OF THE SECOND PART

**WITNESSES** that the Vendor and Purchaser have agreed to enter this Agreement to set forth the terms and conditions under which the Purchaser has agreed to purchase, and the Vendor has agreed to sell, the Lands;

**AND THEREFORE**, in consideration of the mutual covenants and agreements set forth in this agreement and the sum of Ten ($10.00) Dollars paid by each of the Vendor and the Purchaser to the other and for other good and valuable consideration (the receipt and sufficiency of which is hereby acknowledged), the parties hereby agree and declare as follows:

## ARTICLE I – INTERPRETATION

1.1     **Definitions**

The terms defined herein shall have for all purposes of this Agreement, unless the context expressly or by necessary implication otherwise requires, the following meanings:

"**Adjustments**" means the adjustments to the Purchase Price provided for and determined pursuant to Section 3.3.

"**Agreement**" means this Agreement of Purchase and Sale and the schedules attached hereto, as amended from time to time; "Article", "Section" and "Subsection" mean and refer to the specified article, section and subsection of this Agreement.

"**Approval and Vesting Order**" means the order of the Court substantially in the form attached hereto as Schedule "C" approving the transaction contemplated by this Agreement and vesting, on Closing, the Vendor's right, title and interest in the Lands in the Purchaser free and clear of liens, charges and encumbrances, save for the Permitted Encumbrances.

- 2 -

**"Balance"** has the meaning ascribed thereto in Section 3.2 (b).

**"Business Day"** means any day, other then a Saturday, Sunday and Jewish holidays or statutory holiday in the Province of Ontario.

**"CCAA Proceedings"** means the *Companies' Creditors Arrangement Act* (Canada) proceedings commenced by the Vendor on January 14, 2009.

**"Closing"** means the closing and consummation of the purchase and sale of the Lands on the Closing Date, including without limitation the payment of the Purchase Price and the delivery of the Closing Documents, at the offices of the Vendor's Solicitors.

**"Closing Date"** means 10:00 a.m. (Ottawa time) on December 17, 2009, provided that the Approval and Vesting Order has been obtained by November 20, 2009; if the Approval and Vesting Order is not obtained on or before November 20, 2009 and the Vendor has extended the condition date referred to in Section 4.1 (b) to December 15, 2009, the Closing Date shall be January 14, 2010.

**"Closing Documents"** means the agreements, instruments and other documents to be delivered by the Vendor to the Purchaser pursuant to Section 5.1 and the agreements, instruments and other documents to be delivered by the Purchaser to the Vendor pursuant to Section 5.2.

**"Confidential Information"** has the meaning ascribed thereto in Section 2.5.

**"Court"** means the Ontario Superior Court of Justice (Commercial List).

**"Deposit"** has the meaning ascribed thereto in Section 3.1.

**"Deliveries"** has the meaning ascribed thereto in Section 2.3.

**"Due Diligence Date"** means 5:00 p.m. (Ottawa time) on the day which is thirty (30) days following the date of this Agreement, and if such day does not fall on a Business Day, on the first Business Day after such thirty (30) day period.

**"GST Undertaking and Indemnity"** means the GST undertaking and indemnity to be delivered by the Purchaser on Closing in a form acceptable to the Vendor, acting reasonably, as defined in Section 5.3.

**"Initial Deposit"** has the meaning ascribed thereto in Section 3.1 (a).

**"Lands"** means the lands and premises legally described in Schedule "A" attached hereto having a total area of approx. 173 acres.

- 3 -

"**Monitor**" means the monitor appointed by the Court pursuant to the CCAA Proceedings.

"**Permitted Encumbrances**" means all encumbrances and instruments registered against the title to the Lands as of the date of this Agreement including, without limitation, the encumbrances listed in Schedule "B" attached hereto.

"**Purchase Price**" means Eight Million Eight Hundred and Fifty Thousand Dollars ($8,850,000.00), exclusive of any applicable taxes.

"**Purchaser's Solicitors**" means Merovitz-Potechin LLP or such other firm of solicitors as are retained by the Purchaser from time to time and written notice of which is provided to the Vendor.

"**Second Deposit**" has the meaning ascribed thereto in Section 3.1 (b).

"**Vendor's Solicitors**" means Ogilvy Renault LLP or such other firm or firms of solicitors as are retained by the Vendor from time to time and written notice of which is provided to the Purchaser.

1.2    **Extended Meanings**

The grammatical variations of any terms defined herein have similar meanings to such defined terms, words imparting number include the singular and plural, words imparting gender include the feminine, neuter and masculine genders.

1.3    **Headings**

The division of this Agreement into separate Articles, Sections and Schedules and the insertion of headings are for convenience of reference only and shall not affect the construction or interpretation of this Agreement.

1.4    **Currency**

All references to currency herein are references to lawful money of Canada.

1.5    **Construction**

The preparation of this Agreement has been a joint effort of the parties and the resulting document shall not, solely as a matter of judicial consideration, be construed more severely against one party than the other.

- 4 -

### 1.6    Obligations as Covenants

Each agreement and obligation of any of the parties hereto in this Agreement, even though not expressed as a covenant, is considered for all purposes to be a covenant.

### 1.7    Applicable Law

This Agreement shall be construed and enforced in accordance with the laws of the Province of Ontario and the laws of Canada applicable thereto and shall be treated in all respects as an Ontario contract.

### 1.8    Time of the Essence

Time shall be of the essence of this Agreement.

### 1.9    Schedules

Schedules "A", "B" and "C" attached hereto form an integral part of this Agreement.

## ARTICLE II – PURCHASE AND SALE

### 2.1    Purchase and Sale of Lands

Upon and subject to the terms and conditions of this Agreement, and in consideration of the payment of the Purchase Price, the Vendor will sell, and the Purchaser will purchase, the Lands.   This Agreement once executed and delivered by both parties constitutes a binding agreement of purchase and sale for the Lands in accordance with the provisions hereof.

### 2.2    Authorizations

The Vendor shall deliver to the Purchaser, within a reasonable time after request, authorizations prepared by the Purchaser's Solicitors to governmental authorities necessary to permit the Purchaser to obtain information from the files of such governmental authorities, provided said authorizations explicitly do not authorize or result in any physical inspections with respect to the Lands. The Purchaser covenants and agrees with the Vendor that it will not request, directly or indirectly, any such physical inspections.

### 2.3    Deliveries

The Purchaser acknowledges that the Vendor has made available to the Purchaser the following documents and files relating to the Lands in the Vendor's possession or under its control ("**Deliveries**"):

- 5 -

(a) copies of any leases or other occupancy agreements relating to the Lands;

(b) copies of any environmental, geotechnical, soils and survey records, reports, information and documents relating to the environmental or physical condition of the Lands;

(c) a copy of any existing plan of survey or surveyor's area certificates of the Lands;

(d) copies of current tax bills for the Lands; and

(e) copies (if any) of any existing work orders, notices, directives or letters of non-compliance received by the Vendor from any governmental authority affecting the Lands in respect of matters which have not been remedied or remain outstanding as of the date hereof.

## 2.4 Acknowledgment of Purchaser as to Condition of Lands

The Purchaser acknowledges and agrees that, subject to the Purchaser's right to terminate this Agreement as provided in Sections 2.6 and 4.2:

(a) on Closing, title to the Lands shall be free and clear from all encumbrances save for the Permitted Encumbrances;

(b) in entering into this Agreement, the Purchaser has relied and will continue to rely entirely and solely upon its own judgment, inspections and investigations with respect to the Lands, including without limitation, the physical and environmental condition of the Lands, and the Purchaser acknowledges it is not relying on any information, representation or documentation furnished by the Vendor or any other person or entities on behalf of or at the direction of the Vendor in connection therewith, except for those expressly set out in this Agreement; and

(c) the Lands are being purchased and assumed by the Purchaser on an "as is, where is" basis as of the date of this Agreement and without any express or implied agreement, representation or warranty of any kind whatsoever as to the condition, environmental condition, suitability for development, physical characteristics, profitability, use or zoning, the existence of latent defects, the quality thereof or as to the accuracy, currency or completeness of any information or documentation supplied in connection with the Lands.

The Vendor shall have no obligations or responsibility to the Purchaser after Closing with respect to any matter relating to the Lands or the condition thereof save as otherwise expressly provided in this Agreement and the Purchaser hereby releases and discharges the Vendor from all claims, demands and actions in that regard. The Purchaser shall indemnify and save the Vendor harmless against all liabilities, losses, costs, damages and

- 6 -

expenses (including legal expenses) which the Vendor may suffer as a result of any claim arising after Closing with respect to the condition of the Lands or the use and occupation thereof. The provisions of this Section 2.4 shall not merge on, but shall survive, Closing.

2.5     **Confidentiality**

Until Closing (and in the event this Agreement is terminated for any reason other than its completion, and also from, and after such termination), the Purchaser and its consultants, agents, advisors and solicitors shall keep confidential all information, documentation and records obtained from the Vendor or its consultants, agents, advisors or solicitors with respect to the Lands as well as any information arising out of the Purchaser's access to the Vendor's records and the Lands and its due diligence with respect thereto (collectively, the **"Confidential Information"**). The Purchaser shall not use any Confidential Information for any purposes not related to this transaction, or in any way detrimental to the interests of the Vendor other than in respect to the negotiations between the parties hereto. Nothing herein contained shall restrict or prohibit the Purchaser from disclosing the Confidential Information to its consultants, agents, advisors and solicitors provided such persons provide a letter addressed to the Vendor agreeing to keep such information confidential or the Vendor receives such other assurances as are acceptable to it. If this Agreement is terminated for any reason, the Purchaser shall promptly return to the Vendor all Confidential Information (other than the Purchaser's notes and due diligence materials) and similar material including all copies, and shall destroy all of the Purchaser's notes and due diligence materials containing Confidential Information related to this transaction.

2.6     **Searches and Examination**

(a)     The Vendor will permit the Purchaser, its agents and representatives, access to the Lands at reasonable times and upon reasonable prior written notice to carry out, at the Purchaser's sole expense and risk, such tests and investigations (including geotechnical, hydro-geological tests and investigations, soil tests and environmental tests) and inspections as the Purchaser may deem necessary, provided that:

(i)     any damage to the Lands caused by such tests and inspections will be promptly repaired by the Purchaser and the Purchaser will indemnify and save the Vendor harmless from all losses, costs, claims, third party actions, damages and expenses which the Vendor may suffer as a result of the said inspections;

(ii)    the Purchaser shall forthwith after receipt deliver to the Vendor copies of all soils reports, environmental reports and engineering studies conducted by or on behalf of the Purchaser, together with letters from the authors of the report, study or investigations permitting the Vendor to rely thereon; and

- 7 -

(iii)    the Vendor shall be entitled to deduct from the Deposit paid by the Purchaser hereunder the amount of any losses, costs, claims, third party actions, damages and expenses which the Vendor may suffer as a result of a breach of this Section 2.6.

(b)    If prior to the Due Diligence Date the Purchaser provides the Vendor with evidence of the existence of environmental contaminants in excess of the levels permitted under applicable environmental legislation applicable to the Lands for industrial/commercial uses and a request in writing that the Vendor remove or remediate such contaminants, and the Vendor is unwilling or unable to do so, the Purchaser may elect to cancel this Agreement by delivery of a written notice to the Vendor. Upon delivery of such notice, this Agreement shall be null and void, except for the clauses expressly intended to survive the termination of this Agreement, including the "Searches and Examination" and "Confidentiality" subsections, which shall remain in force and effect, the Deposit shall be returned to the Purchaser without interest, and the Vendor shall not be liable for any costs, claims or damages.

## 2.7    Vendor's Representations and Warranties

(a)    The Vendor covenants, represents and warrants that:

(i)    Subject to the terms and conditions and obtaining the approvals set out in this Agreement, the Vendor has full and absolute right and power to execute and deliver this Agreement, to perform the obligations of the Vendor hereunder, to obtain and cause the transfer of the Lands to the Purchaser and that all corporate actions necessary to authorize the sale of the Lands and the execution of the documents to effect the transfer of the Lands have been taken, or will have been, taken prior to the Closing Date;

(ii)    To the Vendor's knowledge, information and belief, and save as disclosed in any reports delivered by the Vendor to the Purchaser or obtained by the Purchaser in its investigations of the Lands:

(A)    no written notice of any claim or expropriation notice has been received by the Vendor and no claim or litigation is pending or threatened against the Vendor relating to the Lands or its occupancy or use thereof;

(B)    there are no outstanding work orders, orders to comply or other orders or notices of deficiency in effect with respect to the Lands from any municipal or other governmental authority whereby the Vendor is required to cure, repair or rectify any breach or non-compliance of the Lands or any use thereof; and

- 8 -

(C)     the Lands have never been used for the storage of "waste" or as a "waste disposal site" as such terms are defined in *the Environmental Protection Act* (Ontario) and the Vendor has never placed any noxious, dangerous or toxic substances or conditions on the Lands including, without limitation, hazardous or toxic substances, asbestos, PCBs, coal tar or any radioactive substances, and the Vendor has not received notice of any claims, actions, prosecutions, charges or proceedings of any kind in connection with any environmental matter affecting the Lands.

## ARTICLE III – PURCHASE PRICE

3.1     **Deposit**

(a)     Within one Business Day following the acceptance of this Agreement by both parties, the Purchaser shall pay the amount of $100,000.00 by certified cheque, negotiable bank draft or wire transfer to the Vendor's Solicitors to be held by the Vendor's Solicitors in trust in an interest bearing account as a deposit (the "**Initial Deposit**") pending completion or other termination of this Agreement.

(b)     On or before the expiry of the Due Diligence Date, the Purchaser shall pay an additional amount of $250,000.00 by certified cheque, negotiable bank draft or wire transfer to the Vendor's Solicitors to be held by the Vendor's Solicitors in trust in an interest bearing account as a deposit (the "**Second Deposit**", and together with the Initial Deposit, collectively, the "**Deposit**") pending completion or other termination of this Agreement

(c)     If the transactions contemplated by this Agreement are not completed for any reason except the default of the Purchaser, the Deposit (together with all interest accrued thereon) shall be thereupon returned to the Purchaser in full and final satisfaction of any claim which the Purchaser may have. If the transactions contemplated by this Agreement are not completed as a result of the default of the Purchaser, the Vendor shall be entitled to retain the Deposit together with interest accrued thereon in addition to any other rights or remedies that it may have pursuant to this Agreement or at law.

(d)     On Closing, the Deposit and accrued interest shall be credited against the Purchase Price due on Closing.

3.2     **Payment of Purchase Price**

The Purchase Price shall be satisfied by the Purchaser as follows:

(a)     by the crediting of the Deposit and any interest accrued thereon; and

(b)    by payment to the Vendor or as the Vendor may direct in writing by certified cheque, negotiable bank draft or wire transfer of the balance (the **"Balance"**) of the Purchase Price on Closing after deduction of the amounts described in Subsection 3.2(a), subject to the Adjustments.

### 3.3   General Adjustments

The adjustments between the parties in respect of the Lands (herein referred to as the **"Adjustments"**) shall include all operating costs, realty taxes, local improvement rates and charges, water and assessment rates, current rents, prepaid rents and interest thereon (if any), security deposits and interest thereon (if any), current expense and operation recoveries from any tenant, utility deposits (including replacement letters of credit or letters of guarantee therefor), and other adjustments established by usual practice in the City of Ottawa for the purchase and sale of a property similar in type to the Lands herein. In addition, the Adjustments shall include the other matters referred to in this Agreement which are stated to be the subject of adjustment and shall exclude the other matters in this Agreement which are stated not to be the subject of adjustment.

Adjustments shall be made as of the Closing Date. From and after the Closing Date, the Purchaser shall be responsible for all expenses and (except as otherwise provided herein) shall be entitled to all income from the Lands. The Vendor shall be responsible for all expenses and entitled to all income from the Lands for that period ending on the day prior to the Closing Date.

If any item subject to adjustment cannot be determined on Closing, an estimate shall be made by the Vendor for purposes of Closing and the final adjustment shall be made when the particular item can be determined. All claims for re-adjustments must be made within a six month period following Closing.

## ARTICLE IV – CONDITIONS PRECEDENT

### 4.1   Conditions Precedent for Vendor

The obligation of the Vendor to complete the agreement of purchase and sale constituted on the execution and delivery of this Agreement shall be subject to the following conditions precedent:

(a)    the Vendor shall have obtained all necessary corporate and Monitor approvals to this Agreement and the transactions contemplated herein on or before the end of the tenth (10th) day following the execution of this Agreement by both parties;

(b)    the Vendor has obtained and provided written notice to the Purchaser that the Vendor has obtained the Approval and Vesting Order on or before 5:00 pm on

November 20, 2009; provided that if the Vendor has not been successful in obtaining the Approval and Vesting Order on or before November 20, 2009, the Vendor may, by written notice to the Purchaser delivered on or before 5:00 pm on November 20, 2009, extend the said condition date to December 15, 2009; and

(c)     by Closing, all of the terms, covenants and conditions of this Agreement to be complied with or performed by the Purchaser shall have been complied with or performed in all material respects.

The conditions precedent set forth in Section 4.1 are for the sole benefit of the Vendor and satisfaction or waiver thereof may be given in whole or in part by the Vendor by written notice to the Purchaser on or before the applicable date set forth above.

### 4.2     Conditions Precedent for Purchaser

The obligation of the Purchaser to complete the purchase of the Lands under this Agreement shall be subject to the following conditions precedent:

(a)     by the Due Diligence Date, the Purchaser has not terminated this Agreement pursuant to Section 2.6(b) hereof;

(b)     by the Due Diligence Date, the Purchaser shall have examined the title to the Lands and be satisfied that no other encumbrances exist, save and except for the Permitted Encumbrances; and

(c)     by Closing, all of the terms, covenants and conditions of this Agreement to be complied with or performed by the Vendor shall have been complied with or performed in all material respects, and there shall not have been a material adverse change in the environmental condition of the Lands from the Due Diligence Date to the Closing Date.

The conditions precedent set forth in Section 4.2 are for the benefit of the Purchaser, and may be waived in whole or in put by the Purchaser by notice to the Vendor prior to the relevant date set forth above for the satisfaction of each condition.

### 4.3     Non-Satisfaction of Conditions Precedent

Subject to the provisions of Section 4.4, in the event each of the conditions precedent set forth in Section 4.1 and Section 4.2 is not satisfied or waived as therein provided on or before the applicable date referred to in Section 4.1 and Section 4.2, this Agreement shall be terminated, null and void and of no further force or effect whatsoever. If by the applicable time or date referred to in Section 4.1 and Section 4.2, the party having the benefit of the condition precedent has not given notice to the other that a condition

- 11 -

precedent has been satisfied, such condition precedent shall be deemed to have been waived.

4.4    **Title Requisitions**

The Vendor and Purchaser acknowledge and agree that if, by the Due Diligence Date, the Purchaser delivers to the Vendor in writing any valid and material objection or requisition as to the quality of the Vendor's title to the Lands which the Vendor is unable or unwilling to satisfy and which the Purchaser will not waive, then this Agreement shall be null and void, the Deposit and any accrued interest shall be repaid to the Purchaser, and the parties shall have no further obligations or liabilities hereunder save for those specified to survive termination. Notwithstanding the foregoing, the Purchaser acknowledges and agrees that title to the Lands will be subject to the Permitted Encumbrances and the Purchaser agrees to accept title to the Lands subject to Permitted Encumbrances.

## ARTICLE V – CLOSING DOCUMENTS

5.1    **Vendor's Closing Documents**

On or before Closing, subject to the provisions of this Agreement, the Vendor shall execute or cause to be executed and shall deliver or cause to be delivered to the Purchaser the following:

(a)    an acknowledgment and direction authorizing the electronic registration of the transfer/deed of land of the Vendor's interest in the Lands in favour of the Purchaser;

(b)    a direction as to the payee or payees of the Purchase Price;

(c)    an undertaking by the Vendor to re-adjust the Adjustments;

(d)    a statutory declaration or other evidence satisfactory to the Purchaser, acting reasonably, that the Purchase Price is not subject to withholding tax pursuant to the non-residency provisions of the *Income Tax Act* of Canada;

(e)    a certificate from an authorized signatory of the Vendor confirming that all of the Vendor's representations and warranties given in this Agreement are true as of the Closing Date, and that all Deliveries were made available to the Purchaser;

(f)    Court certified copy of the Approval and Vesting Order; and

(g)    the Monitor's Certificate contemplated by the Approval and Vesting Order (to be delivered on or shortly after Closing, as and when available).

- 12 -

All documentation shall be in form and substance acceptable to the Purchaser and the Vendor each acting reasonably and in good faith, provided that none of such documents shall contain covenants, representations or warranties which are in addition to or more onerous upon either the Vendor or the Purchaser than those expressly set forth in this Agreement.

5.2    **Purchaser's Closing Documents**

On or before Closing, subject to the provisions of this Agreement, the Purchaser shall execute or cause to be executed and shall deliver or cause to be delivered to the Vendor's Solicitors the following:

(a)    the Balance of the Purchase Price;

(b)    an undertaking by the Purchaser to re-adjust the Adjustments;

(c)    the GST Undertaking and Indemnity; and

(d)    all other documents which are required by this Agreement or which the Vendor has reasonably requested on or before the Closing Date to give effect to this transaction.

All documentation shall be in form and substance acceptable to the Purchaser and the Vendor each acting reasonably and in good faith, provided that none of such documents shall contain covenants, representations or warranties which are in addition to or more onerous upon either the Vendor or the Purchaser than those expressly set forth in this Agreement.

5.3    **Registration and Other Costs**

The Vendor shall be responsible for the costs of the Vendor's Solicitors in respect of this transaction. The Purchaser shall be responsible for the costs of the Purchaser's Solicitors in respect of this transaction. The Purchaser shall be responsible for and pay any land transfer taxes payable on the transfer of the Lands, all registration fees payable in respect of registration by it of any documents on Closing (other than discharges of encumbrances which are required to be made by the Vendor, which shall be the responsibility of the Vendor) and all federal and provincial sales and other taxes payable by a purchaser upon or in connection with the conveyance or transfer of the Lands, including provincial retail sales tax and goods and services tax.

The Purchaser shall indemnify and save harmless the Vendor and its shareholders, directors, officers, employees, advisers and agents from all claims, actions, causes of action, proceedings, losses, damages, costs, liabilities and expenses incurred, suffered or sustained as a result of a failure by the Purchaser:

- 13 -

(a)    to pay any federal, provincial or other taxes payable by the Purchaser in connection with the conveyance or transfer of the Lands whether arising from a reassessment or otherwise, including provincial retail sales tax and goods and services tax, if applicable; and/or

(b)    to file any returns, certificates, filings, elections, notices or other documents required to be filed by the Purchaser with any federal, provincial or other taxing authorities in connection with the conveyance or transfer of the Lands,

("**GST Undertaking and Indemnity**"). This Section shall survive, and shall not merge on Closing.

**5.4    Closing Arrangements**

The Vendor and Purchaser acknowledge and agree that this transaction will be completed by electronic registration pursuant to Part III of the Lands Registration Reform Act, R.S.O. 1990, c.L4, as amended.  The Vendor and Purchaser further acknowledge and agree that the delivery of documents and the release thereof to the Vendor and Purchaser shall be governed by a Document Registration Agreement to be entered into between the Purchaser's Solicitors and the Vendor's Solicitors substantially in the form currently prescribed by the Law Society of Upper Canada.

**ARTICLE VI – GENERAL**

**6.1    Invalidity**

If any immaterial covenant, obligation, agreement or part thereof set out herein or the application thereof to any person or circumstance, to any extent, shall be invalid or unenforceable, the remainder of this Agreement or the application of such covenant, obligation or agreement or part thereof to any person, party or circumstance other than those to which it is held invalid or unenforceable shall not be affected thereby. Each covenant, obligation and agreement in this Agreement shall be separately valid and enforceable to the fullest extent permitted by law.

**6.2    Amendment of Agreement**

No supplement modification, waiver or termination (other than a termination pursuant to Section 2.6 or Article 4) of this Agreement shall be binding unless executed in writing by the parties hereto in the same manner as the execution of this Agreement.

**6.3    Further Assurance**

Each of the parties hereto shall from time to time hereafter and upon any reasonable

- 14 -

request of the other, execute and deliver, make or cause to be made, all such further acts, deeds, assurances and things as may be required or necessary to more effectually implement and carry out the true intent and meaning of this Agreement.

### 6.4   Entire Agreement

This Agreement and any agreements, instruments and other documents herein contemplated to be entered into between, by or including the parties hereto constitute the entire agreement between the parties hereto pertaining to the purchase and sale of the Lands provided for herein and supersede all prior agreements, understandings, negotiations and discussions, whether oral or written, with respect thereto. There are no other warranties or representations and no other agreements, between the parties hereto in connection with the agreement of purchase and sale provided for herein except as specifically set forth in this Agreement or the Schedules attached hereto.

### 6.5   Waiver

No waiver of any of the provisions of this Agreement shall be deemed or shall constitute a waiver of any other provision (whether or not similar) nor shall any waiver constitute a continuing waiver unless otherwise expressed or provided.

### 6.6   Solicitors as Agents and Tender

Any notice, approval, waiver, agreement, instrument, document or communication permitted, required or contemplated in this Agreement may be given or delivered and accepted or received by the Purchaser's Solicitors on behalf of the Purchaser and by the Vendor's Solicitors on behalf of the Vendor, and any tender of Closing Documents and the Balance may be made upon the Vendor's Solicitors and the Purchaser's Solicitors, as the case may be.

### 6.7   Merger

Except as otherwise expressly set out herein, this Agreement shall merge with the closing of the transaction contemplated herein.

### 6.8   Successors and Assigns

All of the covenants and agreements in this Agreement shall be binding upon the parties hereto and their respective successors and assigns and shall enure to the benefit of and be enforceable by the parties hereto and their respective successors and their permitted assigns pursuant to the terms and conditions of this Agreement.

- 15 -

6.9    **Assignment**

The Purchaser may, at any time after the Due Diligence Date and payment of the Second Deposit, assign its rights and/or obligations hereunder with the prior written consent of the Vendor, which consent may **not** be unreasonably withheld, provided that the assignee enters into an assumption agreement acceptable to the Vendor, acting reasonably, or at Closing, the Purchser may direct title to a third party, and in either event the Purchaser shall remain liable for the performance of the Purchaser's obligations under this Agreement notwithstanding such assignment or direction.

6.10    **Notice**

Any notice, demand, approval, consent, information, agreement, offer, request or other communication (hereinafter referred to as a "Notice") to be given under or in connection with this Agreement shall be in writing and shall be given by personal delivery during regular business hours on any Business Day or by telecopier, facsimile transmission or other electronic communication which results in a written or printed notice being given, addressed or sent as set out below or to such other address or electronic number as may from time to time be the subject of a Notice:

(a)    Vendor:

Nortel Networks
2370 Performance Drive
Mailstop 087/05/A30
Richardson, TX  75082, USA

Attention:Property/Rent Administration
Fax:  (972) 684-3923
E-Mail :

With a copy to:

Nortel Networks
2221 Lakeside Boulevard
Mailstop 99115A40
Richardson, TX  75082-4399, USA

Attention: Charles Helm, Law Department
Fax:  (972) 684-3679
E-mail: chelm@nortel.com

(b)    Purchaser:

561121 Ontario Inc.
1737 Woodward Drive, 2nd Floor
Ottawa, ON   K2C 0P9

Attention: Steve Gordon
Facsimile: 613-230-2962
E-mail:    sgordon@regionalgroup.com

Merovitz-Potechin LLP
200 Catherine Street, 3rd Floor
Ottawa, ON   K2P 2K9

Attention:  Bram Potechin
Facsimile: 613-563-4577
E-mail:  bram@mpottawa.com

Any notice, if personally delivered, shall be deemed to have been validly and effectively given and received on the date of such delivery and if sent by telecopier, facsimile

- 16 -

transmission or other electronic communication with confirmation of transmission, shall be deemed to have been validly and effectively given and received on the Business Day next following the day it was received.

### 6.11   Planning Act of Ontario

This Agreement and the transactions reflected herein are subject to compliance with Section 50 of the *Planning Act* of Ontario. The Vendor shall undertake any application to comply with the provisions of the *Planning Act,* if necessary.

### 6.12   Effect of Termination of Agreement

Notwithstanding the termination of this Agreement for any reason, the confidentiality provisions contained in Section 2.6 of this Agreement and the indemnity and repair provisions contained in Section 2.6 shall survive Closing and shall remain in full force and effect.

### 6.13   No Registration of Agreement

The Purchaser shall not register this Agreement or any notice of this Agreement on the title to the Lands.

### 6.14   Commissions

The Purchaser represents and warrants to the Vendor that the Purchaser has not utilized the services of any real estate agent or broker or salesperson in connection with the purchase and sale of the Lands contemplated hereby, to whom any fees, commissions or compensation will be payable by the Vendor, save and except for the Vendor's agent. Subject to the foregoing, the Vendor acknowledges that the real estate commissions and fees payable by the Vendor to the Vendor's agent in respect of this Agreement shall be the sole responsibility of and payable by the Vendor.

### 6.15   Facsimile and Counterparts

All parties agree that this Agreement may be transmitted by facsimile or other electronic transmission and executed in counterparts (each such counterpart constituting one and the same instrument) and that the reproduction of signatures by way of facsimile or other electronic transmission will be treated as though such reproduction were executed originals, and each party undertakes to provide the other with a copy of this Agreement bearing original signatures within a reasonable time after the date of execution.

### 6.16   Acknowledgement of Disclosure

In accordance with the requirements of the *Real Estate and Business Brokers Act, 2002* of Ontario, the Purchaser discloses to the Vendor that The Regional Group of Companies Inc., it's brokers, officers and directors have an interest in the Purchaser and may ultimately have an

-17-

ownership or beneficial interest in the Lands. The Lands are being purchased for purposes of development and sale. The Vendor hereby acknowledges and accepts that the foregoing statements are full and satisfactory disclosure in compliance with the requirements of the *Real Estate and Business Brokers Act, 2002.*

6.17 **Irrevocable**

The offer to sell comprising this Agreement shall be irrevocable by the Vendor and open for acceptance by the Purchaser until 5:00 p.m. on the 13th day of October, 2009, after which time, if not accepted and notice of such acceptance communicated to the Vendor, then the said offer to sell shall be null and void and of no further force and effect.

**IN WITNESS WHEREOF** the Vendor has executed this Agreement as of the day and year first above written

NORTEL NETWORKS LIMITED

Per: _____
Name: Allan Lane
Title: Asset Manager Americas
I/we have the authority to bind the corporation

**IN WITNESS WHEREOF** the Purchaser has executed this Agreement at Ottawa on October 12, 2009

561121 ONTARIO INC.

Per: _____
Name: Steve Gordon
Title: President

I/we have the authority to bind the corporation

- 18 -

## SCHEDULE "A"
## DESCRIPTION OF LANDS

1.   PIN 04467-0016 (LT)

Part Lot 19, Con. 4, RF, Part 5 on Plan 5R-13501; Nepean.

2.   PIN 04467-0086 (LT)

East ½ of South ½ of Lot 19, Con. 4, RF, lying to the west of Part 13 on Plan 4R-8966; Nepean.

3.   PIN 04467-0557 (LT)

Part of Lot 17, Con. 4, RF, Nepean, Parts 1 and 2, Plan 4R-8623, except Part 1 Plan 4R-22422, lying west of Part 10 on Plan 4R-8966; Ottawa.

4.   PIN 04467-0089 (LT)

East ½ of Southerly ¾ of Lot 18, Con. 4, RF, lying to the west of Part 11 on Plan 4R-8966; Nepean.

5.   PIN 04467-0093 (LT)

Part of North ½ of North ½ of Lot 18, Con. 4, RF, lying to the west of Part 12 on Plan 4R-8966, and to the east of Expropriation Plan No. N568137; Nepean.

6.   PIN 04467-0070 (LT)

Part of Lot 20, Con. 4, RF, Part 1 4R-7681, lying west of Part 15 on Plan 4R-8966, and Parts 1 and 2 on 4R-8856; Nepean.

7.   PIN 04467-0084 (LT)

Part of Lots 19 and 20, Con. 4, RF, Part 1 on Plan 4R-8857, lying west of Part 14 on Plan 4R-8966; Nepean.



- 20 -

## SCHEDULE "B"
## PERMITTED ENCUMBRANCES

1.  The reservations, limitations, exceptions, provisos and conditions, if any, expressed in any original grant from the Crown including, without limitation, the reservation of any mines and minerals.

2.  Subdivision agreements, site plan control agreements, servicing or industrial agreements, utility agreements, airport zoning regulations and other similar agreements with government authorities or private or public utilities affecting the development or use of the Lands, provided same have been complied with to the Closing Date.

3.  Encumbrances respecting minor encroachments by the Lands over neighbouring lands and/or permitted under agreements with the owners of such other lands and minor encroachments over any of the Lands by improvements of abutting land owners.

4.  Title defects or irregularities which are of a minor nature and in the aggregate will not materially impair the use or marketability of the Lands for the purposes for which it is presently held.

5.  Restrictive covenants, private deed restrictions and other land use control agreements as set out in any documents registered on the title to the Lands.

6.  Any easements or rights-of-way in favour of any governmental authority or any private or public utility.

7.  The terms of any leases disclosure of which has been given to the Purchaser as part of the Deliveries.

### SPECIFIC PERMITTED ENCUMBRANCES

PIN 04467-0016 (LT)
n/a

PIN 04467-0557 (LT)

Instrument Number:  NS228212
Registration Date:   February 3, 1984
Instrument Type:     Agreement with City of Nepean
Instrument Number:  N639877
Registration Date:   November 3, 1992
Instrument Type:     Certificate – Application No. 91090-04

- 21 -

PIN 04467-0086 (LT)
n/a

PIN 04467-0089 (LT)
n/a

PIN 04467-0093 (LT)
n/a

PIN 04467-0070 (LT)

Instrument Number:    FAD794701
Registration Date:    June 27, 1991
Instrument Type:    Application General

Instrument Number:    LT1365199
Registration Date:    March 1, 2001
Instrument Type:    Application Annex Restrictive Covenants

Instrument Number:    OC565813
Registration Date:    February 22, 2006
Instrument Type:    Notice

PIN 04467-0084 (LT)
n/a

- 22 -

### SCHEDULE "C"
### FORM OF APPROVAL AND VESTING ORDER

Court File No.: 09-CL-7950

### *ONTARIO*
### SUPERIOR COURT OF JUSTICE
### COMMERCIAL LIST

| | | |
|---|---|---|
| THE HONOURABLE MR. | ) | ●, THE ● |
| | ) | |
| JUSTICE MORAWETZ | ) | DAY OF ●, 2009 |

IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,
R.S.C. 1985, c. C-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT
OF NORTEL NETWORKS CORPORATION, NORTEL NETWORKS
LIMITED,
NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS
INTERNATIONAL CORPORATION AND NORTEL NETWORKS
TECHNOLOGY
CORPORATION

APPLICATION UNDER THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,
R.S.C. 1985, c. C-36, AS AMENDED

### APPROVAL AND VESTING ORDER
### (Strandherd Lands)

THIS MOTION, made by Nortel Networks Corporation, Nortel Networks Limited ("NNL"), Nortel Networks Technology Corporation, Nortel Networks Global Corporation and Nortel Networks International Corporation (collectively, the "Applicants") for the relief set out in the Applicants' Notice of Motion dated )_____ including, the approval of a transaction (the "Transaction") pursuant to an agreement of

purchase and sale dated as of ●, 2009 (the "Sale Agreement) between NNL and 561121 Ontario Inc. (the "Purchaser") was heard this day at 330 University Avenue, Toronto, Ontario.

ON READING the affidavit of ● sworn ●, 2009 and the ● report of Ernst & Young Inc. in its capacity as monitor (the "Monitor") dated ●, 2009 (the "● Report") and on hearing the submissions of counsel for the Applicant, the Monitor and those other parties present, no one appearing for any other person on the service list, although properly served as appears from the affidavit of ● sworn ● filed:

1.      THIS COURT ORDERS that the time for the service of the Notice of Motion, the ● Report and the Motion Record is hereby abridged so that this Motion is properly returnable today and hereby dispenses with further service thereof

2.      THIS COURT ORDERS AND DECLARES that the Transaction is hereby approved. The execution of the Sale Agreement by NNL is hereby authorized and approved, and the Applicants are hereby authorized and directed to take such additional steps and execute such additional documents as may be necessary or desirable for the completion of the Transaction and for the conveyance of the Lands (as defined in the Sale Agreement) to the Purchaser.

3.      THIS COURT ORDERS AND DECLARES that upon the delivery of a Monitor's certificate to the Purchaser substantially in the form attached as Schedule A hereto (the "Monitor's Certificate"), all of NNL's right, title and interest in and to the Lands (including the real property set out on Schedule B hereto (the "Real Property") and as more particularly set out in the Sale Agreement) shall vest absolutely in the Purchaser, free and clear of and from any and all security interests (whether contractual, statutory, or otherwise), hypothecs, mortgages, trusts or deemed trusts (whether contractual, statutory, or otherwise), liens, executions, levies, charges, or other financial or monetary claims, whether or not they have attached or been perfected, registered or filed and whether secured, unsecured or otherwise (collectively, the "Claims") including, without limiting the generality of the foregoing: (i) any encumbrances or charges created by the Order of the Honourable Justice Morawetz dated January 14, 2009 (as amended and restated); (ii) all charges, security interests or claims evidenced by registrations pursuant to

- 24 -

the *Personal Property Security Act* (Ontario) or any other personal property registry system; and (iii) those Claims listed on Schedule C hereto (all of which are collectively referred to as the "Encumbrances"), which term shall not include the permitted encumbrances, easements and restrictive covenants listed on Schedule D and, for greater certainty, this Court orders that all of the Encumbrances affecting or relating to the Lands are hereby expunged and discharged as against the Lands.

4.      THIS COURT ORDERS that upon the registration in the Land Registry Office for the **[Land Titles Division of {LOCATION} of an Application for Vesting Order in the form prescribed by the *Land Titles Act* and/or the *Land Registration Reform Act*]** [NTD: Correct **description to be provided]**, the Land Registrar is hereby directed to enter the Purchaser as the owner of the Real Property in fee simple, and is hereby directed to delete and expunge from title to the Real Property all of the Claims listed in Schedule C hereto.

5.      THIS COURT ORDERS that for the purposes of determining the nature and priority of Claims, the net proceeds from the sale of the Lands shall stand in the place and stead of the Lands, and that from and after the delivery of the Monitor's Certificate all Claims and Encumbrances shall attach to the net proceeds from the sale of the Lands with the same priority as they had with respect to the Lands immediately prior to the sale, as if the Lands had not been sold and remained in the possession or control of the person having that possession or control immediately prior to the sale.

6.      THIS COURT ORDERS AND DIRECTS the Monitor to file with the Court a copy of the Monitor's Certificate, forthwith after delivery thereof.

7.      THIS COURT ORDERS that, notwithstanding:

(a)      the pendency of these proceedings;

(b)      any applications for a bankruptcy order now or hereafter issued pursuant to the *Bankruptcy and Insolvency Act* (Canada) in respect of any of the Applicants and any bankruptcy order issued pursuant to any such applications; and

- 25 -

(c)    any assignment in bankruptcy made in respect of any of the Applicants;

the vesting of the Lands in the Purchaser pursuant to this Order shall be binding on any trustee in bankruptcy that may be appointed in respect of the Applicants and shall not be void or voidable by creditors of the Applicants, nor shall it constitute nor be deemed to be a settlement, fraudulent preference, assignment, fraudulent conveyance, transfer at undervalue or other reviewable transaction under the *Bankruptcy and Insolvency Act* (Canada) or any other applicable federal or provincial legislation, nor shall it constitute oppressive or unfairly prejudicial conduct pursuant to any applicable federal or provincial legislation.

8.    THIS COURT HEREBY REQUESTS the aid and recognition of any court, tribunal, regulatory or administrative body having jurisdiction in Canada, the United States, the United Kingdom or elsewhere, to give effect to this Order and to assist the Applicants, the Monitor and their respective agents in carrying out the terms of this Order. All courts, tribunals, regulatory and administrative bodies are hereby respectfully requested to make such orders and to provide such assistance to the Applicants and to the Monitor, as an officer of this Court, as may be necessary or desirable to give effect to this Order, to grant representative status to the Monitor in any foreign proceeding, or to assist the Applicants and the Monitor and their respective agents in carrying out the terms of this Order.

9.    THIS COURT ORDERS that each of the Applicants and the Monitor be at liberty and is hereby authorized and empowered to apply to any court, tribunal, regulatory or administrative body, wherever located, for the recognition of this Order and for assistance in carrying out the terms of this Order.

Schedule A – Form of Monitor's Certificate

Court File No.: 09-CL-7950

*ONTARIO*
**SUPERIOR COURT OF JUSTICE**
**COMMERCIAL LIST**

IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,
R.S.C. 1985, c. C-36, AS AMENDED

**AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF**
**NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED,**
**NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS**
**INTERNATIONAL CORPORATION AND NORTEL NETWORKS TECHNOLOGY**
**CORPORATION**

APPLICATION UNDER THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,
R.S.C. 1985, c. C-36, AS AMENDED

**MONITOR'S CERTIFICATE**

**RECITALS**

A.      Pursuant to an Order of the Honourable Justice Morawetz of the Ontario Superior Court of Justice (the "Court") dated January 14, 2009 (as amended and restated), Nortel Networks Corporation, Nortel Networks Limited ("NNL"), Nortel Networks Global Corporation, Nortel Networks International Corporation and Nortel Networks Technology Corporation (collectively, the "Applicants") commenced proceedings pursuant to the *Companies' Creditors Arrangements Act* (Canada) and Ernst & Young Inc. was appointed as monitor (the "Monitor") in these proceedings.

B.      Pursuant to an Order of the Court dated ●, 2009, the Court approved a transaction (the "Transaction") pursuant to an agreement of purchase and sale dated as of August 20, 2009 (the "Sale Agreement") between NNL and _____ (the "Purchaser") and provided for the vesting in the Purchaser of NNL's right, title and interest in and to the Lands, which vesting is to be

effective with respect to the Lands upon the delivery by the Monitor to the Purchaser of a certificate confirming receipt of confirmation from NNL that (i) the payment by the Purchaser of the Purchase Price for the Lands; (ii) that the conditions to Closing as set out in sections 4.1 and 4.2 of the Sale Agreement have been satisfied or waived by NNL or the Purchaser, as applicable; and (iii) the Transaction has been completed to the satisfaction of NNL.

C.    Unless otherwise indicated herein, terms with initial capitals have the meanings set out in the Sale Agreement.

THE MONITOR CERTIFIES the following:

1.    NNL has advised the Monitor that the Purchaser has paid and NNL has received the Purchase Price for the Lands payable on the Closing Date pursuant to the Sale Agreement;

2.    NNL has advised the Monitor that the conditions to Closing as set out in sections 4.1 and 4.2 of the Sale Agreement have been satisfied or waived by NNL or the Purchaser, as applicable; and

3.    NNL has advised the Monitor that the Transaction has been completed to the satisfaction of NNL.

4.    This Certificate was delivered by the Monitor at _____ [TIME] on _____ 2009.

**ERNST & Young Inc. in its capacity as monitor  in the CCAA proceedings of Nortel Networks Corporation, et. al. and not in its personal capacity**

Name:
Title:

**Schedule B – Real Property – Legal Description of Lands**

**Schedule C – Claims to be deleted and expunged from title to Lands**

**Schedule D – Permitted Encumbrances, Easements and Restrictive Covenants related to the Lands**

**(unaffected by the Vesting Order)**

APPENDIX "C"

[CONFIDENTIAL]

Court File No: 09-CL-7950

IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL NETWORKS CORPORATION *et al.*

*ONTARIO*
**SUPERIOR COURT OF JUSTICE**
**(COMMERCIAL LIST)**

Proceeding commenced at Toronto

**TWENTY-SEVENTH REPORT**
**OF THE MONITOR**
**DATED NOVEMBER 16, 2009**

**GOODMANS LLP**
Barristers & Solicitors
250 Yonge Street, Suite 2400
Toronto, Canada M5B 2M6

Jay A. Carfagnini (LSUC#: 222936)
Joseph Pasquariello (LSUC# 37389C)
Christopher G. Armstrong (LSUC# 55148B)

Tel: 416.979.2211
Fax: 416.979.1234

Lawyers for the Monitor, Ernst & Young Inc.

\5781367