**EXHIBIT A**

Court File No. 09-CL-7950

*ONTARIO*
**SUPERIOR COURT OF JUSTICE**
**(COMMERCIAL LIST)**

**IN THE MATTER OF THE *COMPANIES' CREDITORS***
***ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED**

**AND IN THE MATTER OF A PLAN OF**
**COMPROMISE OR ARRANGEMENT OF**
**NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL**
**NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL**
**CORPORATION AND NORTEL NETWORKS TECHNOLOGY CORPORATION**

**TWENTY-EIGHTH REPORT OF THE MONITOR**
**DATED NOVEMBER 27, 2009**

**INTRODUCTION**

1.  On January 14, 2009 (the "Filing Date"), Nortel Networks Corporation ("NNC" and
    collectively with all its subsidiaries, "Nortel" or the "Company"), Nortel Networks Limited
    ("NNL"), Nortel Networks Technology Corporation, Nortel Networks International
    Corporation and Nortel Networks Global Corporation (collectively, the "Applicants") filed
    for and obtained protection under the *Companies' Creditors Arrangement Act* ("CCAA").
    Pursuant to the Order of this Honourable Court dated January 14, 2009, as amended and
    restated (the "Initial Order"), Ernst & Young Inc. ("EYI") was appointed as the Monitor of
    the Applicants (the "Monitor") in the CCAA proceedings.  The stay of proceedings was
    extended to December 18, 2009, by this Honourable Court in its Order dated October 28,
    2009.

2.  Nortel Networks Inc. ("NNI") and certain of its U.S. subsidiaries concurrently filed
    voluntary petitions under Chapter 11 of Title 11 of the U.S. Bankruptcy Code (the "Code")
    in the United States Bankruptcy Court for the District of Delaware (the "U.S. Court") on

January 14, 2009 (the "Chapter 11 Proceedings").  As required by U.S. law, an official unsecured creditors committee (the "UCC") was established in January, 2009.

3.    An ad hoc group of holders of bonds issued by NNL and NNC has been organized and is participating in these proceedings as well as the Chapter 11 Proceedings (the "Bondholder Group"). In addition, pursuant to Orders of this Honourable Court dated May 27, 2009, and July 22, 2009, respectively, representative counsel was appointed on behalf of the former employees of the Applicants and on behalf of the continuing employees of the Applicants and each of these groups is participating in the CCAA proceedings.

4.    Nortel Networks (CALA) Inc. (together with NNI and certain of its subsidiaries that filed on January 14, 2009, the "U.S. Debtors") filed a voluntary petition under Chapter 11 of Title 11 of the Code in the U.S. Court on July 14, 2009.

5.    Nortel Networks UK Limited ("NNUK") and certain of its subsidiaries located in EMEA (together the "EMEA Debtors") were granted Administration orders (the "U.K. Administration Orders") by the English High Court on January 14, 2009.  The U.K. Administration Orders appointed Alan Bloom, Stephen Harris, Alan Hudson and Chris Hill of Ernst & Young LLP as Administrators of the various EMEA Debtors, except for Ireland, to which David Hughes (Ernst & Young LLP Ireland) and Alan Bloom were appointed (collectively the "UK Administrators").  On June 8, 2009, the UK Administrators appointed in respect of NNUK filed a petition with the U.S. Court for the recognition of the Administration Proceedings as they relate to NNUK (the "English Proceedings") under Chapter 15 of the Code. On June 26, 2009, the U.S. Court entered an Order recognizing the English Proceedings as foreign main proceedings under Chapter 15 of the Code.

6.    On January 20, 2009, Nortel Networks Israel (Sales and Marketing) Limited and Nortel Communications Holdings (1997) Limited (together "NN Israel") were granted Administration orders by the court in Israel (the "Israeli Administration Orders").  The Israeli Administration Orders appointed representatives of Ernst & Young LLP in the U.K. and Israel as Administrators of NN Israel and provided a stay of NN Israel's creditors

which, subject to further orders of the Israeli Court, remains in effect during the Administration.

7.  Subsequent to the Filing Date, Nortel Networks SA commenced secondary insolvency proceedings within the meaning of Article 27 of the European Union's Council Regulation (EC) No 1346/2000 on Insolvency Proceedings in the Republic of France pursuant to which a liquidator and an administrator have been appointed by the Versailles Commercial Court.

**PURPOSE**

8.  The purpose of this Twenty-Eighth Report of the Monitor (the "Twenty-Eighth Report") is to provide information regarding the Applicants' motion seeking approval of a sale of substantially all of Nortel's Metro Ethernet Networks business (the "MEN Business") pursuant to an amended and restated asset sale agreement dated November 24, 2009 (the "Ciena Final Agreement"), amongst NNC, NNL and NNI (the "Main Sellers") and certain of their affiliates (the "Other Sellers" and, with the Main Sellers, the "Sellers"), and Ciena Corporation ("Ciena" or the "Purchaser") and to provide the Monitor's support thereof.

**TERMS OF REFERENCE**

9.  In preparing this Twenty-Eighth Report, EYI has relied upon unaudited financial information, the Company's books and records, financial information prepared by the Company, and discussions with management of Nortel. EYI has not audited, reviewed, or otherwise attempted to verify the accuracy or completeness of the information and, accordingly, EYI expresses no opinion or other form of assurance on the information contained in this Twenty-Eighth Report.

10. Unless otherwise stated, all monetary amounts contained herein are expressed in U.S. dollars.

11. Capitalized terms not defined in this Twenty-Eighth Report are as defined in the Affidavit of John Doolittle sworn on January 14, 2009 (the "Doolittle Affidavit"), the Pre-Filing Report, previous Reports of the Monitor, the Ciena Final Agreement or the Bidding Procedures (as defined below).

## GENERAL BACKGROUND

12. In the Twenty-Fourth Report, the Monitor noted that prior to commencing insolvency proceedings, Nortel management had determined that the Company should explore the possibility of divesting the MEN Business.  The Twenty-Fourth Report provided a description of the MEN Business and set out the process conducted by the Company both prior to and immediately after its CCAA filing to identify potential purchasers and to negotiate a definitive agreement for the sale of the MEN Business. As noted, the Monitor had extensive involvement in the post-filing sale process that resulted in the Sellers entering into an asset sale agreement dated October 7, 2009, as amended by an amendment no. 1 dated October 16, 2009 (the "Ciena Stalking Horse Agreement"), with the Purchaser. Concurrently, certain of the EMEA Debtors, NN Israel and certain affiliates of the EMEA Debtors (collectively, the "EMEA Sellers") entered into a separate asset sale agreement with Ciena dated October 7, 2009, as amended by a deed of amendment dated October 20, 2009 (the "EMEA ASA").  Collectively, the Ciena Stalking Horse Agreement and the EMEA ASA outlined the terms of the Sellers' and EMEA Sellers' sale of certain assets, shares and associated liabilities of the Business to Ciena.  The Ciena Stalking Horse Agreement is attached as Appendix "A" to the Twenty-Fourth Report.

13. The Twenty-Fourth Report also noted that as certain of the U.S. Debtors are parties to the Ciena Stalking Horse Agreement and given the desire to maximize value for the benefit of stakeholders in relation to the assets which are the subject of the Ciena Stalking Horse Agreement, Nortel determined and agreed with Ciena that the Ciena Stalking Horse Agreement would be subject to higher or better offers being obtained pursuant to a section 363 of the Code type sale process subject to the approval of both this Honourable Court and

4

the U.S. Court and that the Ciena Stalking Horse Agreement would serve as a stalking horse bid pursuant to that process.

14. The bidding procedures to be utilized in connection with the sale process (the "Bidding Procedures") were approved by this Honourable Court and the U.S. Court on October 15, 2009. A copy of the Bidding Procedures is attached at Appendix "A". The Bidding Procedures provided that all bids were to be received by the Sellers not later than November 9, 2009, at 4:00 p.m. ET. Such bids had to be accompanied by a Good Faith Deposit in an amount equal to 5% of the proposed purchase price. The Bidding Procedures also provided that the Auction would be held on November 13, 2009, at 9:30 a.m. ET.

**BIDDING PROCEDURES AND AUCTION PROCESS**

15. Subsequent to this Honourable Court's approval of the Bidding Procedures and prior to the bid deadline, Nortel and / or its financial advisor, Lazard Frères & Co. LLC ("Lazard") contacted fourteen potentially interested parties likely to be interested and able to acquire the MEN Business. Two potential buyers indicated their interest in participating in the sale process and submitted expressions of interest. After consultation with the Monitor, the UCC and the Bondholder Group, both of these potential buyers were deemed Qualified Bidders pursuant to the Bidding Procedures. Ciena was also deemed a Qualified Bidder. In addition, three other parties executed non-disclosure agreements during this period but did not submit expressions of interest.

16. In the period up to November 9, 2009, the two additional potential buyers: a) were given access to the confidential data room; b) accessed the data room; c) engaged legal counsel and other advisors; d) participated in meetings and other discussions with management of Nortel and Nortel's advisors; and e) met and / or held discussions with representatives of the Monitor, the UCC, the Bondholder Group and / or the UK Administrators.

17. During this period, the Monitor was kept apprised of all activity conducted between Nortel and the potential buyers. In addition, the Monitor participated in several conference calls with the potential buyers.

18. There were no bids submitted prior to November 9, 2009. Prior to that time, one of the potential buyers had notified the Company that it would not be submitting a bid. After further discussions with the other remaining potential buyer, Nortel, in consultation with the Monitor, the UCC, the Bondholder Group and the UK Administrators, determined that it should extend the bid deadline. Consequently, all of the Qualified Bidders were notified that the bid deadline was extended to November 12, 2009. Subsequently, the bid deadline was further extended to November 13, 2009, and then to November 17, 2009. All of the Qualified Bidders were promptly notified of all of these extensions.

19. In the period between November 9, 2009, and November 17, 2009, two additional potential buyers executed non-disclosure agreements, submitted expressions of interest and were granted access to diligence information.

20. On November 17, 2009, a bid was received from MEN Acquisition LLC ("MEN Acquisition"), an entity jointly owned by Nokia Siemens Networks B.V. ("Nokia") and One Equity Partners III, L.P. ("OEP"), offering to purchase the MEN Business for $548 million in cash on substantially similar terms as those contemplated by the Ciena Stalking Horse Agreement. Both Nokia and OEP had previously been deemed Qualified Bidders. In accordance with the Bidding Procedures, MEN Acquisition also submitted a Good Faith Deposit in the amount of $27.4 million. This Good Faith Deposit is currently being held in a sole purpose bank account with Citibank New York . There were no other bids received.

21. The MEN Acquisition bid was reviewed by the Sellers and the Monitor in detail. A copy of the MEN Acquisition bid was also provided to representatives of Lazard, the UCC, the Bondholder Group and the UK Administrators for their review. All of these parties concurred that the bid as submitted either conformed to the requirements of a Qualified Bid pursuant to the Bidding Procedures or, where it did not conform, should be deemed to be a

Qualified Bid pursuant to, and as permitted by, the Bidding Procedures. In accordance with the Bidding Procedures, the MEN Acquisition bid was deemed to be a Qualified Bid.

22. On November 18, 2009, in accordance with the Bidding Procedures, a copy of the MEN Acquisition bid was provided to Ciena.

23. After consultation with the Monitor and representatives of the UCC, the Bondholder Group and the UK Administrators, the Sellers determined that the highest or otherwise best offer was the bid represented by the MEN Acquisition bid. Accordingly, on November 19, 2009, MEN Acquisition and Ciena were informed that the MEN Acquisition bid had been selected as the Starting Bid pursuant to the Bidding Procedures.

24. The auction commenced on November 20, 2009, at the offices of Cleary Gottlieb Steen & Hamilton LLP in New York, New York. In attendance at the auction were representatives of the Sellers, the Monitor, the two Qualified Bidders, the UCC, the Bondholder Group and the UK Administrators. Also in attendance were representatives of certain creditors and other interested parties admitted at the discretion of the Sellers.

25. The MEN Acquisition bid was announced as the Starting Bid. The Sellers then adjourned the auction to allow Ciena time to prepare a written bid. Once a written bid was received from Ciena and the Sellers had consulted with the Monitor, the UCC, the Bondholder Group and the UK Administrators, the auction was re-convened and the Sellers announced the Ciena bid as the Leading Bid. The Sellers then asked for a second round of bidding. Once again, the auction was adjourned, this time to allow MEN Acquisition time to prepare a written bid.

26. The auction continued over the next several days in a similar fashion for a number of additional rounds of bidding. Initially, the incremental net value threshold was set at $5 million pursuant to the Bidding Procedures. In subsequent rounds of bidding, the Sellers exercised their discretion pursuant to the Bidding Procedures, following consultation with the Monitor and representatives of the UCC, the Bondholder Group, and the UK

Administrators, to revise the incremental net value threshold. Such revisions were communicated to the Qualified Bidders prior to or during each round of bidding.

27. In the eleventh round of bidding, a bid submitted by Ciena was declared to be the Leading Bid. The Sellers then called for a twelfth round of bidding. At that point, MEN Acquisition advised the Sellers that it would not be submitting an additional bid. Accordingly, the eleventh round bid submitted by Ciena was announced as the Successful Bid.

28. The auction was then adjourned again, solely to permit the completion of documentation between the Sellers and Ciena relating to the Successful Bid. On November 24, 2009, the documentation was finalized and signature pages were exchanged. At that point, the auction was concluded.

**THE SUCCESSFUL BID**

29. The Successful Bid includes the Ciena Final Agreement, a separate amendment agreement entered into by the EMEA Sellers (the "EMEA Final ASA") and various ancillary agreements. A copy of the Ciena Final Agreement is attached as Appendix "B". A copy of the Ciena Final Agreement blacklined against the Ciena Stalking Horse Agreement is attached as Appendix "C". A copy of the exhibits and schedules to the Ciena Final Agreement are attached as confidential Appendix "D" hereto. As these exhibits and schedules contain sensitive competitive information as well as personal information with respect to employees, the Monitor requests that confidential Appendix "D" to this Twenty-Eighth Report be sealed by this Honourable Court.

30. The terms and conditions of the Ciena Final Agreement are substantially the same as the Ciena Stalking Horse Agreement described in the Twenty-Fourth Report. The significant differences between the Ciena Stalking Horse Agreement and the Ciena Final Agreement are outlined below. Reference should be made directly to the Ciena Final Agreement for a complete understanding of the terms governing the transaction.

- <u>Purchase Price</u>.  The Purchase Price has been increased from $390 million cash, subject to certain adjustments as described in the Twenty-Fourth Report, plus 10 million shares of common stock of the Purchaser under the Ciena Stalking Horse Agreement, to $530 million cash plus $239 million principal amount of convertible notes due June 2017 under the Ciena Final Agreement plus, in both cases, the obligation of the Purchaser to pay, perform and discharge the Assumed Liabilities and the EMEA Assumed Liabilities.  The Ciena Final Agreement contains various amendments from the Ciena Stalking Horse Agreement to reflect the removal of the share consideration and the addition of the note consideration.

- <u>Convertible Notes.</u>  The Purchase Price now includes $239,000,000 aggregate principal amount (the "Aggregate Principal Amount") of 6.0% Senior Notes due June 15, 2017  (the "Convertible Notes") convertible at the holder's option into shares of the common stock of the Purchaser (the "Common Stock") at a conversion price equal to $16.4625 (the "Conversion Price"), subject to adjustments contemplated in the indenture providing for the issuance of the Convertible Notes, provided that: (i) the Purchaser may elect on or before the Closing Date to increase the cash consideration payable by up to the Aggregate Principal Amount in lieu of issuing the corresponding face amount of the Convertible Notes (such election, if exercised, the "Cash Replacement Election"); and (ii) if the Market Value of the Common Stock on the date of the notice of such election (or in the case the replacement is made with the proceeds of a simultaneous convertible security offering the most recent closing price per share of the Common Stock on the NASDAQ Global Select Market at the time such convertible security offering is priced) is equal to or greater than $17.00 per share of Common Stock, then in lieu of increasing the Cash Purchase Price by the Aggregate Principal Amount such increase will equal the Optional Redemption Price (as defined below) corresponding to such Aggregate Principal Amount. The other principal terms and features of the Convertible Notes are as follows:

o     The Convertible Notes shall be issued on terms substantially the same as the terms of the 0.875% Convertible Senior Notes due 2017 issued by the Purchaser that are presently outstanding, save for certain differences outlined in the Ciena Final Agreement, including that following the Closing but prior to the Liquidity Date (as defined below), the Purchaser may redeem the Convertible Notes at any time for cash at a redemption price per $1,000 principal amount of Convertible Notes equal to the greater of (a) $1,050.00 and (b) a price determined pursuant to a formula linked to the price per share of the Common Stock (the "Optional Redemption Price");

o     In the event that the Purchaser completes any capital raising transaction through the issuance and sale of debt or equity securities for cash during the period after the date of the Ciena Final Agreement through and including the Closing Date, the Purchaser shall be required to exercise the Cash Replacement Election to the extent of the net proceeds of such capital raising transaction. In the event that the Purchaser completes any capital raising transaction through the issuance and sale of debt or equity securities for cash during the period following the Closing Date but prior to the earlier of the date on which the Convertible Notes or any shares of Common Stock issued upon conversion thereof become freely tradeable (such date, the "Liquidity Date"), the Purchaser shall be required to offer to use the net proceeds therefrom to replace the Convertible Notes for an amount equal to the Optional Redemption Price.

o     Notwithstanding the provisions noted above, in the event that the Market Value of the Common Stock (rounded to the nearest whole cent) as of the Closing Date is less than $13.17, the interest rate on the Convertible Notes shall be increased as provided for in the chart in Section 2.2.1(d) of the Ciena Final Agreement.

- <u>Patents.</u> Approximately 84 patents have been excluded from the list of Transferred Patents to be sold to Ciena pursuant to the Ciena Final Agreement. These patents will be subject to the non-exclusive patent license pursuant to the Intellectual Property License Agreement.

31. The order of this Honourable Court dated October 15, 2009, approving the Bidding Procedures provided that if Ciena was determined to be the Successful Bidder at the Auction, Ciena shall provide a 5% deposit within two business days pursuant to a mutually acceptable escrow agreement. The Applicants and Ciena have executed such escrow agreement and the deposit was made on November 25, 2009.

**APPROVAL AND VESTING ORDER AND OTHER CLOSING CONDITIONS**

32. The assets to be transferred by the Applicants and the U.S. Debtors pursuant to the Ciena Final Agreement are to be transferred free and clear of all liens, claims and encumbrances of any kind other than permitted liens and those expressly assumed by Ciena pursuant to the Ciena Final Agreement. Accordingly, the Applicants are seeking an order of this Honourable Court vesting in Ciena all of the Applicants' right, title and interest in the Assets as defined in the Ciena Final Agreement. The Monitor understands that no leased assets are being conveyed as part of this transaction. Nevertheless, the Monitor understands that notice has been or will be provided by the Applicants to all personal property security registrants (save for one registrant the Applicants have previously attempted to serve where the materials have been returned as undeliverable) out of an abundance of caution.

33. The Monitor understands that a joint hearing has been scheduled before the U.S. Court and this Honourable Court on December 2, 2009, for approval of the Ciena Final Agreement. The Monitor understands that the Successful Bid is also subject to court approvals in France and Israel. Closing of the transaction is dependent on the timing of various regulatory approvals. Subject to the approval of the Courts and these regulatory approvals, Closing is currently anticipated to occur in the first quarter of 2010.

**THE ALTERNATE BID**

34.  The Bidding Procedures provide that the Sellers may, at their election, seek approval of the next highest or otherwise best offer (after the Successful Bid) as the Alternate Bid. If closing of the transactions contemplated by the Successful Bid fails to occur for any reason, the Sellers would be authorized, but not directed, to proceed to effect a sale pursuant to the terms of the Alternate Bid without further approval of the U.S. Court or this Honourable Court.

35.  The Sellers, in consultation with the Monitor, the UCC and the Bondholders, have determined that a bid submitted by MEN Acquisition in the sixth round of bidding with a Purchase Price of $710 million in cash should be designated the Alternate Bid. The Monitor notes that while MEN Acquisition submitted two additional bids subsequent to the submission of the $710 million bid that were deemed to be higher and better offers, MEN Acquisition takes the position that those bids contained conditions which prevent them from being designated as an Alternate Bid.

36.  The Alternate Bid is substantially in the same form as the Ciena Final Agreement, save for the Purchase Price and the absence of any non-cash consideration. Accordingly, the Company is seeking this Honourable Court's approval of the Alternate Bid pursuant to the Bidding Procedures. The Monitor notes that the Company is not seeking an approval and vesting order in connection with the Alternate Bid and therefore understands that, should closing of the transaction contemplated by the Successful Bid fail to occur, the Applicants would return before this Honourable Court prior to taking steps to close a transaction pursuant to the Alternate Bid.

**ALLOCATION OF SALES PROCEEDS**

37.  As noted in the Twenty-Fourth Report, the MEN Business is not operated through a dedicated legal entity or stand-alone division. Amongst other things, the Applicants have

an interest in intellectual property related to the MEN Business which, in turn, is subject to various intercompany licensing agreements with other Nortel legal entities around the world, in some cases on an exclusive basis and in other cases, on a non-exclusive basis. Therefore, the task of allocating the sale proceeds stemming from the Successful Bid amongst the various Nortel entities in the various jurisdictions is complex.

38.   As set out in the Fifteenth Report, the Applicants, U.S. Debtors, and certain of the EMEA entities, through the UK Administrators, entered into the Interim Funding and Settlement Agreement ("IFSA") which was approved by this Honourable Court on June 29, 2009. Pursuant to the IFSA, each of the Applicants, U.S. Debtors, and EMEA Debtors agreed that their execution of definitive documentation with a purchaser of any material Nortel assets shall not be conditional upon reaching an agreement regarding the allocation of the sale proceeds or binding procedures for the allocation of the sale proceeds. In addition, the parties agreed that in the absence of any agreement regarding the allocation of any sale proceeds, the proceeds shall be deposited in an escrow account and any distribution from the escrow account shall be contingent upon (i) the agreement of all of the Selling Debtors (as defined in the IFSA) or (ii) in the case where the Selling Debtors fail to reach an agreement, a determination of the allocation by the relevant dispute resolvers. The parties to the IFSA agreed to negotiate in good faith and attempt to reach an agreement on a protocol for resolving disputes concerning the allocation of sales proceeds, including binding procedures for the allocation of sales proceeds where the Selling Debtors have been unable to reach an agreement regarding such allocation.

39.   As of the current date, no agreement has been reached regarding the allocation of any sales proceeds and the terms of a protocol with respect to the resolution of disputes in connection with the allocation of sale proceeds are still under discussion. Accordingly, the Selling Debtors have determined that the proceeds shall be deposited in an escrow account. Once the terms of the escrow arrangements are finalized, the Applicants will bring a motion before this Honourable Court seeking approval of the escrow agreement.

**MONITOR'S ANALYSIS AND RECOMMENDATIONS**

40.    The Monitor is of the view that the Company's efforts to market the MEN Business were comprehensive and conducted in accordance with the Bidding Procedures and that the auction process provided a mechanism to fully determine the market value of the MEN Business.  The Monitor is satisfied that the Purchase Price for the Assets constitutes fair consideration for such assets.  As a result, the Monitor is of the view that the Ciena Final Agreement represents the best transaction for the sale of the MEN Business.  The Monitor therefore recommends that this Honourable Court grant the Order requested in the Applicants' motion authorizing the Applicants to complete the transaction contemplated by the Ciena Final Agreement and vesting all of the Applicants' right, title and interest in the Assets in Ciena or its designee.

41.    For the reasons described above at paragraph 29, the Monitor recommends that confidential Appendix "D" to this Twentieth Report be sealed by this Honourable Court.

All of which is respectfully submitted this 27th day of November, 2009.

**ERNST & YOUNG INC.**
**In its capacity as Monitor of the Applicants**

Per:

Murray A. McDonald
President

# APPENDIX "A"

**BIDDING PROCEDURES**

Set forth below are the bidding procedures (the "Bidding Procedures") to be employed with respect to the proposed sale of certain assets and assumption of certain liabilities as set forth in the Agreements (as defined below) with respect to the Purchaser, or, as set forth in the relevant sale agreement with respect to a Successful Bidder (as defined below). Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Agreements (as defined below).

On [●], 2009, Nortel Networks Inc. and certain of its U.S. subsidiaries that are debtors and debtors-in-possession (collectively, the "U.S. Debtors") as well as Nortel Networks Limited and certain other affiliates of the U.S. Debtors that have commenced proceedings under the Canadian Companies' Creditors Arrangement Act (the "Canadian Debtors"), and certain non-debtor affiliates of the U.S. Debtors and the Canadian Debtors (together with the U.S. Debtors and the Canadian Debtors, the "North American Sellers") executed that certain Asset Sale Agreement (the "North American Agreement") with [●] (together with any of its designees, the "Purchaser").

On [●], 2009, certain affiliates of the North American Sellers (the "EMEA Sellers" and together with the North American Sellers, the "Sellers"), certain of which are under the control of Alan Bloom, Stephen Harris, Chris Hill and Alan Hudson of Ernst & Young LLP, in their capacities as the joint administrators of certain EMEA Sellers' companies incorporated in the Europe, Middle East and Africa region appointed by the English High Court of Justice in connection with the proceedings (the "UK Proceedings") under the Insolvency Act 1986 (such individuals collectively, the "Administrators"), and the Administrators executed that certain Asset Sale Agreement Relating to the Sale and Purchase of the EMEA Assets with the Purchaser (the "EMEA Agreement" and together with the North American Agreement, the "Agreements").

The Sellers have determined that: (A) the transactions contemplated by the Agreements and the ancillary agreements discussed therein with respect to the Purchaser, or, as set forth in the relevant sale agreement and ancillary agreements with respect to a Successful Bidder (collectively, the "Transaction") should be subject to competitive bidding as set forth herein; (B) the transfer of the U.S. Debtors' rights, title and interests in and to the Assets (as defined below) should be subject to approval by the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") pursuant to sections 363 and 365 of title 11 of the United States Code, 11 U.S.C. §§ 101-1330, as amended (the "Bankruptcy Code"); (C) the transfer of the rights, title and interests of the Canadian Debtors (as such term is defined in the North American Agreement) in and to the Assets should be subject to approval by the Ontario Superior Court of Justice (the "Canadian Court"); and (D) the Transaction shall be submitted for approval by such other applicable court(s) as the Sellers, in consultation with the Committee (as defined below), the Bondholder Group (as defined below) and the Monitor (as defined below), may determine are necessary or appropriate and subject to such other closing conditions as are set forth in the Agreements.

On [●], 2009, the U.S. Debtors filed a Motion for Orders (I)(A) Authorizing Debtors' Entry into the Asset Sale Agreement, (B) Authorizing and Approving the Bidding Procedures, (C) Authorizing and Approving a Break-Up Fee and Expense Reimbursement, (D) Approving the Notice Procedures, (E) Approving the Assumption and Assignment Procedures, (F)

1

Authorizing the Filing of Certain Documents Under Seal and (G) Setting a Date for the Sale Hearing, and (II) Authorizing and Approving (A) the Sale of Certain Assets of Debtors' Metro Ethernet Networks Business Free and Clear of All Liens, Claims and Encumbrances, (B) The Assumption and Assignment of Certain Contracts and (C) the Assumption and Sublease of Certain Leases (the "Sale Motion").

On [●], 2009, the Bankruptcy Court entered an Order approving, among other things, the Bidding Procedures set forth herein and the payment, in certain circumstances, of the Break-Up Fee and Expense Reimbursement (the "Bidding Procedures Order").

On [●], 2009, the Canadian Debtors filed a motion with the Canadian Court seeking an order for approval of (I) execution and delivery of the North American Agreement by the Canadian Debtors, (II) payment of the Break-Up Fee and Expense Reimbursement in the circumstances provided for in the North American Agreement, and (III) a process for the Sale of the Canadian Debtors' rights, title and interests in and to the Assets (as defined below).

On [●], 2009, the Canadian Court entered an Order approving, among other things, the Bidding Procedures set forth herein and the payment, in certain circumstances, of the Break-Up Fee and Expense Reimbursement (the "Canadian Sales Process Order").

## Bidding Process

The Bidding Procedures set forth herein describe, among other things, the assets available for sale, the manner in which prospective bidders may gain access to or continue to have access to due diligence materials concerning the Assets, the manner in which bidders and bids become Qualified Bidders (as defined below) and Qualified Bids (as defined below), respectively, the receipt and negotiation of bids received, the conduct of any subsequent Auction (as defined below), the ultimate selection of the Successful Bidder (as defined below), and the Bankruptcy Court's and the Canadian Court's and, if required, such other applicable courts' approval thereof (collectively, the "Bidding Process"). The Sellers intend to consult with, among others, the Official Committee of Unsecured Creditors in connection with the chapter 11 cases of Nortel Networks Inc., et al. (jointly administered under Case No. 09-10138) involving the U.S. Debtors (the "Committee"), the ad hoc group of bondholders holding claims against certain of the U.S. Debtors and certain of the Canadian Debtors (the "Bondholder Group"), Ernst & Young Inc., in its capacity as the Canadian Court-appointed monitor in connection with the proceedings under the Companies' Creditors Arrangement Act (the "Monitor"), the Administrators in connection with the UK Proceedings, and their respective advisors throughout the Bidding Process. In the event that the Sellers and any party disagree as to the interpretation or application of these Bidding Procedures, the Canadian Court and the Bankruptcy Court will have jurisdiction to hear and resolve such dispute. [1]

## Assets To Be Sold

The Sellers are offering for sale, in one or more transactions, certain of the Sellers' assets pertaining to the business segment described in the Agreements (to the extent that such assets are

---

[1] For the avoidance of doubt, this Bidding Process shall not govern any disagreements among the Sellers.

not subsequently excluded from the sale in accordance with the terms of the Agreements) with respect to the Purchaser, or, as set forth in the relevant sale or restructuring agreement with respect to a Successful Bidder, and related schedules and in an information memorandum made available by the Sellers to the Purchaser and other potential bidders, which will also be made available to other potential bidders that have executed a confidentiality agreement with the Sellers (the "Assets").

## "As Is, Where Is"

The sale of the Assets will be on an "as is, where is" basis and without surviving representations or warranties of any kind, nature, or description by the Sellers, their agents, or estates, except, with respect to the Purchaser, to the extent set forth in the Agreements or, with respect to a Successful Bidder (as defined below), to the extent set forth in the relevant sale agreement of such Successful Bidder. In addition, in the case of the EMEA Sellers, the sale of whatever rights, title and interests that such EMEA Seller may have (if any) in and to the Assets will be without any representations or warranties (except as may be set forth in the EMEA Agreement).

## Free Of Any And All Claims And Interests

All of the rights, title and interests of the U.S. Debtors and the Canadian Debtors in and to the Assets, or any portion thereof, to be acquired will be sold free and clear of all pledges, liens, security interests, encumbrances, claims, charges, options, and interests thereon and there against (collectively, the "Claims and Interests") to the extent permitted by sections 363 and 365 of the Bankruptcy Code and other applicable law, such Claims and Interests to attach to the net proceeds of the sale of such Assets (without prejudice to any claims or causes of action regarding the priority, validity or enforceability thereof), except, with respect to the Purchaser, to the extent otherwise set forth in the North American Agreement or, with respect to a Successful Bidder, to the extent otherwise set forth in the relevant sale agreement of such Successful Bidder with the U.S. Debtors and the Canadian Debtors.

## Publication Notice

Within three (3) Business Days, or as soon thereafter as reasonably practicable after the entry of orders by the Bankruptcy Court and the Canadian Court approving these Bidding Procedures, the Sellers shall publish notice of these Bidding Procedures, the time and place of the Auction (as defined below), if required, the time and place of the Sale Hearing (as defined below), and the objection deadline for the Sale Hearing in The Financial Times (National Edition), The Wall Street Journal (National Edition) and The Globe & Mail (National Edition).

## Participation Requirements

Unless otherwise ordered by both the Bankruptcy Court and the Canadian Court and accepted by the Administrators, for cause shown, or as otherwise determined by the Sellers (in consultation with the Committee, the Bondholder Group and the Monitor), in order to participate in the Bidding Process, prior to the Bid Deadline (as defined below), each person other than the

Purchaser who wishes to participate in the Bidding Process (a "Potential Bidder") must deliver to the Notice Parties (as defined below) at the addresses provided below:

(a)   an executed confidentiality agreement (to be delivered prior to the distribution of any confidential information by the Sellers to a Potential Bidder) in substantially the same form as the confidentiality agreement executed by the Purchaser and otherwise in form and substance satisfactory to the Sellers, and which shall inure to the benefit of any purchaser of the Assets. In the event that the Potential Bidder has already entered into a confidentiality agreement with the Sellers, it must provide a statement agreeing that such agreement shall be deemed to be amended so as to be in substantially the same form as the confidentiality agreement executed by the Purchaser and that its obligations under such agreement shall inure to the benefit of any purchaser of the Assets;

(b)   current audited financial statements and latest unaudited financial statements of the Potential Bidder, or, if the Potential Bidder is an entity formed for the purpose of acquiring the Assets (or any portion thereof), current audited financial statements and latest unaudited financial statements of the equity holders of the Potential Bidder who will guarantee the obligations of the Potential Bidder, or such other form of financial disclosure and credit-quality support or enhancement that will allow the Sellers and their respective financial advisors, in consultation with the Committee, the Bondholder Group and the Monitor, to make a reasonable determination as to the Potential Bidder's financial and other capabilities to consummate the Transaction; and

(c)   a preliminary (non-binding) written proposal regarding: (i) the purchase price range (including liabilities to be assumed by the Potential Bidder); (ii) any Assets expected to be excluded or any additional assets desired to be included; (iii) the structure and financing of the Transaction (including, but not limited to, the sources of financing for the purchase price and all requisite financial assurance); (iv) any anticipated corporate, stockholder, internal or regulatory approvals required to close the Transaction, the anticipated time frame and any anticipated impediments for obtaining such approvals; (v) the proposed number of employees of the Sellers who will become employees of the Potential Bidder (save in jurisdictions where employees transfer by operation of law), and any proposed measures associated with the continued employment of all employees who will become employees of the Qualified Bidder; and (vi) any conditions to closing that the Potential Bidder may wish to impose in addition to those set forth in the Agreements.

A Potential Bidder that delivers the documents described above, whose financial information and credit quality support or enhancement demonstrate to the Sellers' satisfaction the financial capability of the Potential Bidder to consummate the Transaction, and who has submitted a reasonably competitive and realistic non-binding proposal, as described above, and who has executed a confidentiality agreement, as described above, and that the Sellers determine in their reasonable business judgment, after consultation with their counsel and financial advisors, the Committee, the Bondholder Group and the Monitor, is likely (based on availability

of financing, experience and other considerations) to be able to consummate the Transaction will be deemed a "Qualified Bidder".

As promptly as practicable after a Potential Bidder delivers all of the materials required above, the Sellers will determine, in consultation with the Committee, the Bondholder Group and the Monitor, and will notify the Potential Bidder, if such Potential Bidder is a Qualified Bidder. At the same time that the Sellers notify the Potential Bidder that it is a Qualified Bidder, the Sellers will allow the Qualified Bidder to begin or continue to conduct due diligence as provided in the following paragraph with respect to the Assets.

### Due Diligence

The Sellers may in their reasonable business judgment, and subject to competitive and other business considerations, afford each Qualified Bidder and any person seeking to become a Qualified Bidder that has executed a confidentiality agreement with the Sellers such due diligence access to materials and information relating to the Assets as the Sellers deem appropriate after consultation with the Committee, the Bondholder Group and the Monitor. Due diligence access may include management presentations as may be scheduled by the Sellers, access to electronic data rooms, on site inspections, and other matters which a Qualified Bidder may reasonably request and as to which the Sellers, in their reasonable business judgment, may agree. The Sellers will designate an employee or other representative to coordinate all reasonable requests for additional information and due diligence access from Qualified Bidders. No additional due diligence for any party other than a Qualified Bidder who has submitted a Qualified Bid will continue after the Bid Deadline (as defined below). The Sellers may, in their discretion, coordinate diligence efforts such that multiple Qualified Bidders have simultaneous access to due diligence materials and/or simultaneous attendance at management presentations or site inspections. In any event, the Purchaser shall be provided prompt access to all material due diligence materials, management presentations, on-site inspections and other information provided to Qualified Bidders that were not previously made available to the Purchaser. Neither the Sellers nor any of their affiliates (or any of their respective representatives) will be obligated to furnish any information relating to the Assets to any person other than to Qualified Bidders. The Sellers make no representation or warranty as to the information to be provided through this due diligence process or otherwise, except to the extent set forth in the Agreements or any other definitive sale agreement with any Successful Bidder executed and delivered by Sellers.

### Bid Deadline

A Qualified Bidder that desires to make a bid will deliver written copies of its bid to the following parties (collectively, the "Notice Parties"): (i) Nortel Networks Limited and Nortel Networks Inc., c/o Nortel Networks Limited, Attn: Anna Ventresca, Esq., (905) 863-2564, 195 The West Mall, Toronto, Ontario, Canada M9C 5K1, Facsimile: (905) 863-1984; (ii) U.S. Debtors' counsel: Cleary Gottlieb Steen & Hamilton LLP, Attn: James L. Bromley and Lisa M. Schweitzer, One Liberty Plaza, New York, New York 10006, Facsimile: (212) 225-3999; (iii) Canadian Debtors' counsel: Ogilvy Renault LLP, Attn: Derrick C. Tay and Jennifer Stam, Royal Bank Plaza, South Tower, Suite 3800, 200 Bay Street, Toronto, Ontario, Canada, Facsimile: (416) 216-3930; (iv) Sellers' financial advisors: Lazard Frères & Co., Attn: Frank A. (Terry) Savage, 30 Rockefeller Plaza, New York, NY 10020, Facsimile: (212) 332-1748; (v) counsel to the Committee: Akin Gump Strauss Hauer & Feld LLP, Attn: Fred S. Hodara, Stephen B. Kuhn,

David H. Botter and Kenneth A. Davis, One Bryant Park, New York, New York 10036, Facsimile: (212) 872-1002; (vi) financial advisor to the Committee: Jefferies & Company, Inc., Attn: General Counsel, Investment Banking, 520 Madison Avenue, New York, New York, Facsimile: (212) 284-2280; (vii) counsel to the Bondholder Group: Milbank, Tweed, Hadley & McCloy, Attn: Roland Hlawaty, One Chase Manhattan Plaza, New York, New York, 10006, Facsimile: (212) 822-5735; (viii) the Monitor: Murray A. McDonald, Ernst & Young Inc., Ernst & Young Tower, 222 Bay Street, P. O. Box 251, Toronto, ON M5K 1J7 Canada, Facsimile: (416) 943-3300; and (ix) the Administrators: Ernst & Young LLP, Attn: Stephen Harris, 1 More Place, London SE1 2AF, United Kingdom, Facsimile +44 20 7951 9002; and (x) counsel to the Administrators: Herbert Smith LLP, Attn: Stephen Gale, Exchange House, Primrose Street, London, EC2A 2HS, Facsimile: +44 20 7098 4878; so as to be received not later than November 9, 2009 at 4:00 p.m. (ET) by the Sellers (as may be extended as set out below, the "Bid Deadline"). The Sellers, after consultation with the Committee, the Bondholder Group and the Monitor, may extend the Bid Deadline once or successively, but they are not obligated to do so; provided, however, that for any such extension beyond five (5) Business Days, the Sellers shall have obtained the prior written consent of the Purchaser, the Committee, the Bondholder Group and the Monitor, in their respective sole discretion. If the Sellers extend the Bid Deadline, they will promptly notify all Qualified Bidders (including the Purchaser) and the parties listed above of such extension.

## Qualified Bid

A bid submitted will be considered a Qualified Bid only if the bid is submitted by a Qualified Bidder, pursuant to the previous paragraph and complies with all of the following (a "Qualified Bid"):

(a)     it states that the applicable Qualified Bidder offers to purchase the Assets upon the terms and conditions substantially as set forth in the Agreements, including, without limitation, with respect to certainty and timing of closing, or pursuant to an alternative structure (including without limitation, an offer conditioned upon confirmation of a plan of reorganization proposed by the U.S. Debtors either individually or in collaboration with such Qualified Bidder), or upon alternative terms and conditions that the Sellers reasonably determine, after consultation with the Committee, the Bondholders Committee and the Monitor, are no less favourable than the terms and conditions of the Agreements;

(b)     it includes a letter stating that the bidder's offer is irrevocable until the selection of the Successful Bidder and, if applicable, the Alternate Bidder (as defined below), provided that if such bidder is selected as the Successful Bidder or the Alternate Bidder, its offer shall remain irrevocable until the earlier of (i) closing of the Sale to the Successful Bidder or the Alternate Bidder, and (ii) (x) with respect to the Successful Bidder only, March 1, 2010, and (y) with respect to the Alternate Bidder only, the Alternate Bid Expiration Date (as defined below);

(c)     it includes duly authorized and executed Agreements, including the purchase price for the Assets expressed in U.S. Dollars (the "Purchase Price"), together with all exhibits and schedules thereto, including, to the extent required by the terms and conditions of such bid, Local Sale Agreements, the Real Estate

Agreements, the Intellectual Property License Agreement, the Transition Services Agreement, the Trademark License Agreement, the Loaned Employee Agreement the Subcontract Agreement, the Contract Manufacturing Inventory Agreements, the Carling Property Lease Agreements, the Patent Assignments, the Trademark Assignments, the Flextronics Back-to-Back Supply Agreement (if required) (each as defined in the Agreement), the other ancillary agreements, including other back-to-back supply agreements, as described in the Agreements and such additional ancillary agreements as may be required by the bidder with all exhibits and schedules thereto (or term sheets that describe the material terms and provisions of such agreements), as well as copies of such materials marked to show those amendments and modifications to the Agreements ("Marked Agreements") and such ancillary agreements (the "Marked Ancillary Agreements") and the proposed orders to approve the Sale by the Bankruptcy Court, the Canadian Court and any other applicable court(s) whose approval may be required, proposed by the bidder;

(d)     it includes written evidence of a firm, irrevocable commitment for financing, or other evidence of ability to consummate the proposed transaction, that will allow the Sellers, in consultation with the Committee, the Bondholder Group and the Monitor, to make a reasonable determination as to the Qualified Bidder's financial and other capabilities to consummate the transaction contemplated by the Marked Agreements;

(e)     it is not conditioned on (i) the outcome of unperformed due diligence by the bidder and/or (ii) obtaining financing;

(f)     it fully discloses the identity of each entity that will be bidding for the Assets or otherwise participating in connection with such bid, and the complete terms of any such participation;

(g)     it has a value to the Sellers, in the Sellers' reasonable business judgment, after consultation with their financial advisors, the Committee, the Bondholder Group and the Monitor, that either individually or, when evaluated in conjunction with any other Qualified Bid for the Assets, is greater than or equal to the sum of the value offered under the Agreements, plus (i) the amount of the Break-Up Fee and Expense Reimbursement (as defined below), plus (ii) U.S.$5,000,000.

(h)     it includes an acknowledgment and representation that the bidder will assume the Sellers' obligations under the executory contracts and unexpired leases proposed to be assigned pursuant to the Agreements (or identifies with particularity which of such contracts and leases the bidder wishes not to assume, or alternatively which additional executory contracts or unexpired leases the bidder wishes to assume), contains full details of the bidder's proposal for the treatment of related cure costs; and it identifies with particularity any executory contract or unexpired lease the assumption and assignment of which is a condition to closing;

(i)     it includes an acknowledgement and representation that the bidder: (A) has had an opportunity to conduct any and all required due diligence regarding the Assets prior to making its offer; (B) has relied solely upon its own independent review,

investigation and/or inspection of any documents and/or the Assets in making its bid; (C) did not rely upon any written or oral statements, representations, promises, warranties or guaranties whatsoever, whether express or implied (by operation of law or otherwise), regarding the Assets or the completeness of any information provided in connection therewith or the Auction, except as expressly stated in the Marked Agreements or the Marked Ancillary Agreements; and (D) is not entitled to any expense reimbursement or break-up fee in connection with its bid;

(j)     it includes evidence, in form and substance reasonably satisfactory to Sellers, of authorization and approval from the bidder's board of directors (or comparable governing body) with respect to the submission, execution, delivery and closing of the Marked Agreements and Marked Ancillary Agreements;

(k)     it is accompanied by a good faith deposit in the form of a wire transfer (to a bank account specified by the Sellers), certified check or such other form acceptable to the Sellers, payable to the order of the Sellers (or such other party as the Sellers may determine) in an amount equal to 5% of the Purchase Price to be dealt with as provided for under "Good Faith Deposit" herein;

(l)     it (a) contains full details of the proposed number of employees of the Sellers (apportioned by jurisdiction) who will become employees of the Qualified Bidder (save in jurisdictions where employees transfer by operation of law) and any proposed measures associated with the continued employment and associated with the employment of all employees who will become employees of the Qualified Bidder, and (b) identifies any pension liabilities and assets related to any employees currently covered under the Nortel Retirement Income Plan who will become employees of the Qualified Bidder that the Qualified Bidder intends to assume or purchase;

(m)     it includes evidence of the Potential Bidder's ability to comply with section 365 of the U.S. Bankruptcy Code (to the extent applicable), including providing adequate assurance of such Potential Bidder's ability to perform in the future the contracts and leases proposed in its bid to be assumed by the Sellers and assigned or subleased to the Potential Bidder, in a form that will permit the immediate dissemination of such evidence to the counterparties to such contracts and leases;

(n)     it contains other information reasonably requested by the Sellers; and

(o)     it is received by the Bid Deadline.

The Sellers will determine, in their reasonable business judgment, after consultation with the Committee, the Bondholder Group and the Monitor, whether to entertain bids for the Assets that do not conform to one or more of the requirements specified herein and deem such bids to be Qualified Bids, provided that the Sellers, in evaluating such bids, may not waive substantial compliance with any items in paragraphs (d), (e), (f), (i)(D), (j) and (o) without the consent of the Purchaser, the Committee, the Bondholder Group and the Monitor provided that, with respect to (e), such consent not to be unreasonably withheld in connection with any bid that would (1) otherwise fully satisfy the requirements of a Qualified Bid but for a de minimis failure to comply

with those criteria; and (2) such non compliance is cured within 24 hours of the Bid Deadline. The Sellers shall deliver copies of any bids deemed to be Qualified Bids to the Purchaser in accordance with Section 5.3(f) of the North American Agreement. Notwithstanding the foregoing, the Purchaser will be deemed a Qualified Bidder, and the Agreements will be deemed a Qualified Bid, for all purposes in connection with the Bidding Process, the Auction, and the Sale.

The Sellers shall notify the Purchaser and all Qualified Bidders in writing as to whether or not any bids constitute Qualified Bids (and, with respect to each Qualified Bidder that submitted a bid other than the Purchaser, whether such Qualified Bidder's bid constitutes a Qualified Bid) promptly after, and in any event on the same day as the notification to any Qualified Bidder that their bid constitutes a Qualified Bid; provided such notification shall not be given later than two (2) Business Days following the expiration of the Bid Deadline.

### Aggregate Bids

The Sellers may aggregate separate bids from unaffiliated persons to create one "Qualified Bid" from a "Qualified Bidder"; provided, that all bidders shall remain subject to the provisions of 11 U.S.C. § 363(n) regarding collusive bidding.

### Evaluation of Competing Bids

A Qualified Bid will be valued based upon several factors including, without limitation, items such as the purchase price and the net value (including assumed liabilities and the other obligations to be performed or assumed by the bidder, including any assumed pension liabilities) provided by such bid, the claims likely to be created by such bid in relation to other bids, the counterparties to such Transaction, the proposed revisions to the relevant Transaction documents, the effect of the Transaction on the value of the ongoing businesses of the Sellers (including ongoing relationships with customers and suppliers), other factors affecting the speed, certainty and value of the Transaction (including any regulatory approvals required to close the Transaction), the assets included or excluded from the bid, the estimated number of in-scope employees of the Sellers (apportioned by jurisdiction) to be offered post-closing employment by the Qualified Bidder and any proposed measures associated with their continued employment, the transition services required from the Sellers post-closing and any related restructuring costs, and the likelihood and timing of consummating such transaction, each as determined by the Sellers, in consultation with their advisors, the Committee, the Bondholder Group and the Monitor.

### No Qualified Bids

If the Sellers do not receive any Qualified Bids other than the Agreements received from the Purchaser, the Auction shall be cancelled and the U.S. Debtors shall report the same to the Bankruptcy Court, the Canadian Debtors shall report the same to the Canadian Court and the Monitor and subject to requiring and obtaining approvals of the Bankruptcy Court, the Canadian Court or any other applicable court and satisfaction of the conditions set forth in the Agreements, the Sellers shall promptly proceed to complete the transactions contemplated by the terms of the Agreements. In addition, if no Qualified Bid is received, the U.S. Debtors reserve the right to

request that the Bankruptcy Court advance the date of the Sale Hearing (as defined below) and provide notice of such new date to those parties in interest entitled to notice thereof and the Canadian Debtors reserve the right to file a motion with the Canadian Court seeking advancement of the date for approval of the sale of the Canadian Debtors' rights, title and interests in and to the Assets to the Purchaser. In addition, if approval of any other applicable court is required, the Sellers will as soon as practicable file an appropriate pleading with such court(s) seeking approval of the Transaction.

### Break-Up Fee and Expense Reimbursement

Recognizing the value and benefits that the Purchaser has provided to the U.S. Debtors and the other Sellers by entering into the Agreements, as well as the Purchaser's expenditure of time, energy and resources, the Sellers have agreed that if the Purchaser is not the Successful Bidder, the Sellers will, in the circumstances as set forth in the Agreements and Bidding Procedures Order, pay to the Purchaser (i) a break-up fee of $16,044,000 (the "Break-Up Fee"), and (ii) reimburse the Purchaser for certain expenses as set forth in the Agreements and Bidding Procedures Order up to $5,348,000 (the "Expense Reimbursement").

### Auction

If the Sellers receive one or more Qualified Bids in addition to the Agreements, the Sellers will conduct an auction (the "Auction") of the Assets, which shall be transcribed or recorded on video to the extent required under Delaware local practice, at **9:30 a.m. (ET) on Friday, November 13, 2009**, at the offices of Cleary Gottlieb Steen & Hamilton LLP located at One Liberty Plaza, New York, New York 10006 or such other location as shall be timely communicated to all entities entitled to attend the Auction. The commencement of the Auction may be cancelled or adjourned without the prior written consent of the Purchaser, subject to the terms of the Agreements. The Auction shall run in accordance with the following procedures:

(a)     Only the Sellers, the Purchaser, the Committee, the Bondholder Group, the Monitor and the Administrator (and the advisors to each of the foregoing), any creditor of the U.S. Debtors or the Canadian Debtors and any other Qualified Bidder that has timely submitted a Qualified Bid, shall attend the Auction in person, and only the Purchaser and such other Qualified Bidders will be entitled to make any subsequent bids at the Auction.

(b)     Each Qualified Bidder shall be required to confirm that it has not engaged in any collusion with respect to the bidding or the Sale.

(c)     At least one (1) Business Day prior to the Auction, each Qualified Bidder who has timely submitted a Qualified Bid must inform the Sellers whether it intends to attend the Auction; provided that in the event a Qualified Bidder elects not to attend the Auction, such Qualified Bidder's Qualified Bid shall nevertheless remain fully enforceable against such Qualified Bidder until (i) the date of the selection of the Successful Bidder at the conclusion of the Auction and (ii) if such bidder is selected as an Alternate Bidder (as defined below), the Alternate Bid Expiration Date. At least one (1) Business Day prior to the Auction, the Sellers will provide copies of the Qualified Bid or combination of Qualified Bids which

the Sellers believe, in their reasonable business judgment, after consultation with the Committee, the Bondholder Group and the Monitor, is the highest or otherwise best offer (the "Starting Bid") to the Purchaser and all other Qualified Bidders which have informed the Sellers of their intent to participate in the Auction.

(d)     All Qualified Bidders who have timely submitted Qualified Bids will be entitled to be present for all Subsequent Bids (as defined below) at the Auction with the understanding that the true identity of each Qualified Bidder at the Auction will be fully disclosed to all other Qualified Bidders at the Auction and that all material terms of each Subsequent Bid will be fully disclosed to all other bidders throughout the entire Auction; provided that all Qualified Bidders wishing to attend the Auction must have at least one individual representative with authority to bind such Qualified Bidder attending the Auction in person.

(e)     The Sellers, after consultation with their counsel and financial advisors, the Committee, the Bondholder Group and the Monitor, may employ and announce at the Auction additional procedural rules that are reasonable under the circumstances (e.g., the amount of time allotted to make Subsequent Bids) for conducting the Auction, provided that such rules are (i) not inconsistent with these Bidding Procedures, the Bankruptcy Code, or any order of the Bankruptcy Court, the Canadian Court or any other applicable court entered in connection herewith, and (ii) disclosed to each Qualified Bidder at the Auction.

(f)     Bidding at the Auction will begin with the Starting Bid and continue, in one or more rounds of bidding, so long as during each round at least one subsequent bid is submitted by a Qualified Bidder that (i) improves upon such Qualified Bidder's immediately prior Qualified Bid (a "Subsequent Bid") and (ii) the Sellers determine, in consultation with their advisors, the Committee, the Bondholder Group and the Monitor that such Subsequent Bid is (A) for the first round, a higher or otherwise better offer than the Starting Bid, and (B) for subsequent rounds, a higher or otherwise better offer than the Leading Bid (as defined below). Each incremental bid at the Auction shall provide net value to the estate of at least U.S.$5,000,000 over the Starting Bid or the Leading Bid (as defined below), as the case may be, provided that the Sellers, in consultation with the Committee, the Bondholder Group and the Monitor, shall retain the right to modify the increment requirements at the Auction. After the first round of bidding and between each subsequent round of bidding, the Sellers shall announce the bid or combination of bids (and the value of such bid(s)) that it believes to be the highest or otherwise better offer (the "Leading Bid"). A round of bidding will conclude after each participating Qualified Bidder has had the opportunity to submit a Subsequent Bid with full knowledge of the Leading Bid. Except as specifically set forth herein, for the purpose of evaluating the value of the consideration provided by Subsequent Bids (including any Subsequent Bid by the Purchaser), the Sellers will, at each round of bidding, give effect to the Break-Up Fee and Expense Reimbursement that may be payable to the Purchaser under the Agreements as well as any additional liabilities to be assumed by a Qualified Bidder and any additional costs which may be imposed on the Sellers.

**Selection Of Successful Bid**

Prior to the conclusion of the Auction, the Sellers, in consultation with their advisors, the Committee, the Bondholder Group and the Monitor will (a) review each Qualified Bid and evaluate each Qualified Bid as set forth in the section titled "Evaluation of Competing Bids" herein, (b) identify the highest or otherwise best offer or offers for the Assets received at the Auction (one or more such bids, collectively the "Successful Bid" and the bidder(s) making such bid, collectively, the "Successful Bidder"), and (c) communicate to the Purchaser and the other Qualified Bidders the identity of the Successful Bidder, the Alternate Bidder (as defined below), if any, and the details of the Successful Bid and Alternate Bid (as defined below), if any. The determination of the Successful Bid and Alternate Bid by the Sellers, after consultation with the Committee, the Bondholder Group and the Monitor, at the conclusion of the Auction, shall be final subject to approval by the Bankruptcy Court and the Canadian Court.

The Sellers will sell the Assets to the Successful Bidder pursuant to the terms of the Successful Bid (or, under certain circumstances described herein, the Alternate Bidder) upon the approval of such Successful Bid by the Bankruptcy Court at the Sale Hearing, the approval by the Canadian Court and any required approvals of any other applicable court(s) and approval and execution by the Administrators of the relevant purchase agreement with such Successful Bidder (or, under certain circumstances described herein, the Alternate Bid transaction documents with the Alternate Bidder).

**Sale Hearing**

The sale hearing to authorize certain of the Sellers to enter into agreements with respect to the Successful Bid (the "Sale Hearing") will be held, in respect of those Sellers that are U.S. Debtors, before the Honourable Judge Kevin Gross (or any substitute therefor) in the United States Bankruptcy Court for the District of Delaware, located in Wilmington, Delaware, on a date to be scheduled by the court and currently proposed as Thursday, November 19, 2009 at 1:00 p.m. (ET), and, in respect of those Sellers that are Canadian Debtors, before the Honourable Mr. Justice Geoffrey B. Morawetz (or any substitute therefor) in the Ontario Superior Court of Justice, in Toronto, Ontario, and in any other applicable court(s) whose approval is required, as soon as practicable following the date of the Sale Hearing (or, with respect to the Canadian Court, in a joint hearing with the Bankruptcy Court at the Sale Hearing). The Sale Hearing and any hearings of any other applicable court(s) to approve the entering into agreements with respect to the Successful Bid, may be adjourned or rescheduled by the Sellers without further notice by an announcement of the adjourned date at the Sale Hearing or, in the case of an adjournment of a relevant hearing of any other applicable court, at such hearing. If the Sellers do not receive any Qualified Bids (other than the Qualified Bid of the Purchaser), the Sellers shall proceed as set forth in the "No Qualified Bids" section above. If the Sellers receive one or more additional Qualified Bid(s), then, at the Sale Hearing and at any other hearings of any other applicable court(s) to approve the entering into agreements with respect to the Successful Bid, the Sellers will seek approval of the Successful Bid, and, at the Sellers' election, the next highest or best Qualified Bid (the "Alternate Bid" and, such bidder, the "Alternate Bidder"). The Sellers' presentation to the Bankruptcy Court, the Canadian Court and any other applicable court(s) whose approval is necessary or appropriate, of the Successful Bid, and, if applicable, the Alternate Bid will not constitute the Sellers' acceptance of either of such bids, which acceptance will only occur upon the latest approval of such bids to be delivered by the Bankruptcy Court at

the Sale Hearing, the Canadian Court and any other applicable court(s) whose approval is required. Following approval of the Sale to the Successful Bidder, if the Successful Bidder fails to consummate the Sale for any reason, then the Alternate Bid will be deemed to be the Successful Bid and the Sellers will be authorized, but not directed, to effectuate a Sale to the Alternate Bidder subject to the terms of the Alternate Bid of such Alternate Bidder without further order of the Bankruptcy Court, the Canadian Court or any other court. The Alternate Bid shall remain open until the earlier of (a) December 15, 2009 or (b) the consummation of the Sale to the Successful Bidder (the "Alternate Bid Expiration Date"). All Qualified Bids (other than the Successful Bid and the Alternate Bid) shall be deemed rejected by the Sellers on and as of the date of approval of the Successful Bid and the Alternate Bid by the Bankruptcy Court, the Canadian Court and any other applicable court(s) whose approval is required, as indicated above.

Notwithstanding the foregoing, under no circumstance will the Purchaser be deemed the Alternate Bidder.

### Good Faith Deposits

The Good Faith Deposit of any Alternate Bidder shall be retained by the Sellers until the Alternate Bid Expiration Date and returned to the Alternate Bidder within five (5) Business Days thereafter or, if the Alternate Bid becomes the Successful Bid, shall be applied to the purchase price to be paid by the Alternate Bidder in accordance with the terms of the Alternate Bid. The Good Faith Deposits of Qualified Bidders not selected as either the Successful Bidder or Alternate Bidder shall be returned to such bidders within five (5) Business Days of the date of the selection of the Successful Bidder and the Alternate Bidder. The Good Faith Deposit of the Successful Bidder will be applied in accordance with the terms of the Successful Bid, and will become nonrefundable upon the approval by the Bankruptcy Court and the Canadian Court of the Sale to the Successful Bidder.

### Reservation Of Rights

The Sellers, after consultation with their advisors, the Committee, the Bondholder Group and the Monitor, and their respective advisors, (a) after each round of bidding at the Auction may determine which Qualified Bid, if any, is the highest or otherwise best offer and the value thereof; (b) may reject, at any time, any bid (other than the Purchaser's initial bid) that is (i) inadequate or insufficient, (ii) not in conformity with the requirements of the Bankruptcy Code, the Bidding Procedures, any orders of the Canadian Court or any other orders applicable to one or more Sellers, or the terms and conditions of the Sale, (iii) contrary to the best interests of the Sellers, their estates, and stakeholders as determined by the Sellers in consultation with the Committee, the Bondholder Group and the Monitor; or (iv) contrary to the statutory duties or legal obligations of the Administrators in relation to the exercise of their duties or functions as administrators of certain EMEA Sellers and (c) except as otherwise specifically set forth herein, with respect to instances in which the consent of the Committee, the Bondholder Group and the Monitor is required, may modify the Bidding Procedures or impose, at or prior to the Auction, additional customary terms and conditions on the Sale of the Assets.

Other than as specifically provided for herein, the Sellers may not, without prior written consent of the Committee, the Bondholder Group the Monitor and the Purchaser in their respective sole discretion (i) adjourn the Auction for more than three (3) Business Days, or (ii)

subject to the availability of the Bankruptcy Court and the Canadian Court, adjourn the Sale Hearing for more than three (3) Business Days if the Auction has concluded.

Each of the foregoing actions shall be made by the Sellers in consultation with the Committee, the Bondholder Group and the Monitor, and their respective advisors.  For the purposes of these Bidding Procedures and all matters relating to them, the Administrators are acting only as agents for and on behalf of the EMEA Sellers that are controlled by the Administrators pursuant to the UK Proceedings and without personal liability.  Notwithstanding the foregoing, the Sellers may not, without the prior written consent of the Purchaser, impair or modify the Sellers' obligation to give effect to the Break-Up Fee and the Expense Reimbursement payable to the Purchaser under the Agreements by crediting those amounts to the Purchaser's Qualified Bid and any Subsequent Bid by the Purchaser.  For the avoidance of doubt, nothing herein shall be construed to impair or amend the Purchaser's rights and obligations under the Agreements.

# APPENDIX "B"

AMENDED AND RESTATED ASSET SALE AGREEMENT

BY AND AMONG

NORTEL NETWORKS CORPORATION

NORTEL NETWORKS LIMITED

NORTEL NETWORKS INC.

AND

THE OTHER ENTITIES IDENTIFIED HEREIN AS SELLERS

AND

CIENA CORPORATION

DATED AS OF NOVEMBER 24, 2009

**TABLE OF CONTENTS**

Page

**ARTICLE I INTERPRETATION** ....................................................................... **3**
SECTION 1.1. DEFINITIONS. ....................................................................... 3
SECTION 1.2. INTERPRETATION. ........................................................... 35

**ARTICLE II PURCHASE AND SALE OF ASSETS** ..................................... **36**
SECTION 2.1. PURCHASE AND SALE. .................................................... 36
SECTION 2.2. PURCHASE PRICE. ............................................................ 47
SECTION 2.3. CLOSING. ............................................................................ 56
SECTION 2.4. DESIGNATED PURCHASER(S). ..................................... 59

**ARTICLE III REPRESENTATIONS AND WARRANTIES OF THE PURCHASER ..... 60**
SECTION 3.1. ORGANIZATION AND CORPORATE POWER. ........................... 60
SECTION 3.2. AUTHORIZATION; BINDING EFFECT; NO BREACH. ............... 60
SECTION 3.3. AVAILABILITY OF FUNDS. ............................................ 61
SECTION 3.4. ADEQUATE ASSURANCE OF FUTURE PERFORMANCE. ........ 61
SECTION 3.5. PURCHASER'S ACKNOWLEDGMENTS; EXCLUSIVITY OF
        REPRESENTATIONS AND WARRANTIES. ........................ 61
SECTION 3.6. BROKERS. ............................................................................ 63
SECTION 3.7. REPRESENTATIONS AND WARRANTIES RELATING TO THE
        SHARES. ...................................................................... 63

**ARTICLE IV REPRESENTATIONS AND WARRANTIES OF THE SELLERS ........... 65**
SECTION 4.1. ORGANIZATION AND CORPORATE POWER. ........................... 65
SECTION 4.2. AUTHORIZATION; BINDING EFFECT; NO BREACH. ............... 66
SECTION 4.3. TITLE TO TANGIBLE ASSETS; SUFFICIENCY OF ASSETS ........ 66
SECTION 4.4. MATERIAL CONTRACTS. ................................................ 67
SECTION 4.5. INTELLECTUAL PROPERTY. .......................................... 69
SECTION 4.6. LITIGATION. ...................................................................... 72
SECTION 4.7. FINANCIAL STATEMENTS. ............................................ 72
SECTION 4.8. COMPLIANCE WITH LAWS; CONSENTS. .................... 73
SECTION 4.9. REAL PROPERTY. ............................................................. 73
SECTION 4.10. LABOR AND EMPLOYEE BENEFITS MATTERS. ................... 74
SECTION 4.11. BROKERS. .......................................................................... 76
SECTION 4.12. TAXES. ............................................................................... 76
SECTION 4.13. ENVIRONMENTAL MATTERS. .................................... 77
SECTION 4.14. UNDISCLOSED LIABILITIES. ...................................... 78
SECTION 4.15. RELIANCE ON EXEMPTION FROM REGISTRATION UNDER
        SECTION 4(2) OF THE SECURITIES ACT. ...................... 78
SECTION 4.16. REPRESENTATIONS AND WARRANTIES BY THE OTHER
        SELLERS. .................................................................... 80

**ARTICLE V COVENANTS AND OTHER AGREEMENTS** ........................ **81**
SECTION 5.1. U.S. BANKRUPTCY ACTIONS. ....................................... 81
SECTION 5.2. CANADIAN BANKRUPTCY ACTIONS. .......................... 82

i

**TABLE OF CONTENTS**

Page

SECTION 5.3. CONSULTATION; NOTIFICATION; COOPERATION;
    SOLICITATION. ................................................................. 83
SECTION 5.4. PRE-CLOSING COOPERATION. ................................. 84
SECTION 5.5. ANTITRUST AND OTHER REGULATORY APPROVALS. ........................ 85
SECTION 5.6. PRE-CLOSING ACCESS TO INFORMATION. ..................... 88
SECTION 5.7. PUBLIC ANNOUNCEMENTS. ................................... 90
SECTION 5.8. FURTHER ACTIONS. ........................................ 90
SECTION 5.9. CONDUCT OF BUSINESS. .................................... 91
SECTION 5.10. TRANSACTION EXPENSES. .................................. 93
SECTION 5.11. CONFIDENTIALITY. ....................................... 93
SECTION 5.12. DISCLOSURE SCHEDULES AND CERTAIN INFORMATION. ......... 95
SECTION 5.13. CERTAIN PAYMENTS OR INSTRUMENTS RECEIVED FROM
    THIRD PARTIES. ............................................................ 95
SECTION 5.14. NON-ASSIGNABLE CONTRACTS. ............................. 96
SECTION 5.15. BUNDLED CONTRACTS. .................................... 96
SECTION 5.16. POST-CLOSING ASSISTANCE FOR LITIGATION. .............. 98
SECTION 5.17. TANGIBLE ASSET REMOVAL. ............................... 99
SECTION 5.18. TERMINATION OF OVERHEAD AND SHARED SERVICES AND
    INTERCOMPANY LICENSING ARRANGEMENTS. ................................... 99
SECTION 5.19. FINANCING. ............................................. 100
SECTION 5.20. INSURANCE MATTERS. .................................... 100
SECTION 5.21. SELLERS DEPOSITS, GUARANTEES AND OTHER CREDIT
    SUPPORT OF THE BUSINESS. ................................................ 102
SECTION 5.22. USE OF SELLERS' TRADEMARKS. .......................... 103
SECTION 5.23. ACCESSIBLE INFORMATION. ............................... 103
SECTION 5.24. MAINTENANCE OF BOOKS AND RECORDS. .................... 103
SECTION 5.25. CERTAIN ANCILLARY AGREEMENTS. ........................ 104
SECTION 5.26. ADDITIONAL FINANCIAL STATEMENTS. ..................... 105
SECTION 5.27. SECURITIES COMPLIANCE. ................................ 106
SECTION 5.28. TRANSITION SERVICES. .................................. 106
SECTION 5.29. STANDSTILL PERIOD. .................................... 106
SECTION 5.30. HAZARDOUS MATERIALS AT THE CARLING PROPERTY. ........ 107
SECTION 5.31. MONTREAL PREMISES AND OTHER REAL ESTATE. ............ 108
SECTION 5.32. RIGHT TO EXCLUDE. ..................................... 108
SECTION 5.33. AUTHORIZATION OF SHARES. .............................. 109
SECTION 5.34. PATENT ASSIGNMENTS. ................................... 109
SECTION 5.35. INDIA. ................................................. 109
SECTION 5.36. NO VOTE. ............................................... 109
SECTION 5.37. DEPOSIT. ............................................... 110

**ARTICLE VI TAX MATTERS** ............................................ **110**
SECTION 6.1. TRANSFER TAXES. ........................................ 110
SECTION 6.2. WITHHOLDING TAXES. ..................................... 112
SECTION 6.3. TAX CHARACTERIZATION OF PAYMENTS UNDER THIS
    AGREEMENT. ................................................................ 112

ii

**TABLE OF CONTENTS**

Page

SECTION 6.4. APPORTIONMENT OF TAXES. ................................................... 113
SECTION 6.5. TAX RECORDS. ......................................................................... 115
SECTION 6.6. COOPERATION. ......................................................................... 116
SECTION 6.7. NORTH AMERICAN TAX ESCROW. ....................................... 116
SECTION 6.8. EMEA TAX ESCROW. ............................................................... 118
SECTION 6.9. ITALIAN TAX ESCROW. ........................................................... 119

**ARTICLE VII EMPLOYMENT MATTERS** ................................................. **122**
SECTION 7.1. EMPLOYMENT OBLIGATIONS WITH RESPECT TO NON-UNION
          EMPLOYEES. ................................................................................ 122
SECTION 7.2. EMPLOYMENT OBLIGATIONS WITH RESPECT TO UNION
          EMPLOYEES. ................................................................................ 127
SECTION 7.3. EXCLUDED EMPLOYEE LIABILITIES. ................................... 127
SECTION 7.4. OTHER EMPLOYEE COVENANTS. ......................................... 128
SECTION 7.5. CANADIAN PENSION PLANS. ................................................. 130
SECTION 7.6. SOLE BENEFIT OF SELLERS AND PURCHASER. ................... 132

**ARTICLE VIII REGISTRATION AND SALE OF CONVERTIBLE NOTES** ............. **132**
SECTION 8.1. SHELF REGISTRATION. ............................................................ 132
SECTION 8.2. OFFERINGS. .............................................................................. 134
SECTION 8.3. PIGGYBACK REGISTRATION. ................................................. 135
SECTION 8.4. NO INCONSISTENT AGREEMENTS. ....................................... 136
SECTION 8.5. REGISTRATION PROCEDURES. ............................................... 137
SECTION 8.6. COOPERATION BY MANAGEMENT. ..................................... 141
SECTION 8.7. REGISTRATION EXPENSES AND LEGAL COUNSEL. ............ 142
SECTION 8.8. INDEMNIFICATION. ................................................................. 142
SECTION 8.9. TRADING LIMITATION. ........................................................... 144
SECTION 8.10. AGENT OF SELLERS. .............................................................. 144
SECTION 8.11. LIQUIDATED DAMAGES. ........................................................ 144

**ARTICLE IX CONDITIONS TO THE CLOSING** ....................................... **145**
SECTION 9.1. CONDITIONS TO EACH PARTY'S OBLIGATION. ................... 145
SECTION 9.2. CONDITIONS TO SELLERS' OBLIGATION. ........................... 146
SECTION 9.3. CONDITIONS TO PURCHASER'S OBLIGATION. ................... 146

**ARTICLE X TERMINATION** ..................................................................... **147**
SECTION 10.1. TERMINATION. ....................................................................... 147
SECTION 10.2. TERMINATION PAYMENTS. ................................................... 148
SECTION 10.3. EFFECTS OF TERMINATION. ................................................ 149

**ARTICLE XI MISCELLANEOUS** ............................................................. **150**
SECTION 11.1. SURVIVAL OF REPRESENTATIONS AND WARRANTIES OR
          COVENANTS. ............................................................................... 150
SECTION 11.2. REMEDIES. .............................................................................. 150
SECTION 11.3. THIRD-PARTY BENEFICIARIES. ........................................... 150
SECTION 11.4. CONSENT TO AMENDMENTS; WAIVERS. ........................... 151
SECTION 11.5. SUCCESSORS AND ASSIGNS. ............................................... 151

iii

TABLE OF CONTENTS

Page

SECTION 11.6. GOVERNING LAW; SUBMISSION TO JURISDICTION; WAIVER
    OF JURY TRIAL. ................................................................................ 151
SECTION 11.7. NOTICES.......................................................................... 152
SECTION 11.8. EXHIBITS; SELLERS DISCLOSURE SCHEDULE.................. 155
SECTION 11.9. COUNTERPARTS................................................................ 155
SECTION 11.10. NO PRESUMPTION........................................................... 155
SECTION 11.11. SEVERABILITY................................................................. 155
SECTION 11.12. ENTIRE AGREEMENT........................................................ 156
SECTION 11.13. AVAILABILITY OF EQUITABLE RELIEF. ............................ 156
SECTION 11.14. BULK SALES LAWS. ......................................................... 157
SECTION 11.15. MAIN SELLERS AS REPRESENTATIVES OF OTHER SELLERS........ 157
SECTION 11.16. OBLIGATIONS OF SELLERS. .............................................. 157
SECTION 11.17. EXECUTION BY OTHER SELLERS........................................ 157

iv

# EXHIBITS

Exhibit A – Other Sellers

Exhibit B – EMEA Sellers

Exhibit C – Canadian Debtors; U.S. Debtors; Israeli Company; Non-Debtor Sellers; EMEA Debtors

Exhibit D – Original EMEA Asset Sale Agreement

Exhibit D-1 – Deed of Amendment

Exhibit E – EMEA Amendment Agreement

Exhibit F – Intellectual Property License Agreement

Exhibit G – Knowledge of the Purchaser

Exhibit H – Intentionally Omitted

Exhibit I – Loaned Employee Agreement

Exhibit J – Intentionally Omitted

Exhibit K – Intentionally Omitted

Exhibit L-1 – Lab 10 Lease Agreement

Exhibit L-2 – Carling Property Non-Disturbance Agreements

Exhibit M –Intentionally Omitted

Exhibit N – Intentionally Omitted

Exhibit O – Intentionally Omitted

Exhibit P – Trademark License Agreement

Exhibit Q – Transition Services Agreement

Exhibit R – Intentionally Omitted

Exhibit S – Intentionally Omitted

Exhibit T – Intentionally Omitted

Exhibit U – Intentionally Omitted

Exhibit V – Form of Assignment of Patent Rights

Exhibit W –Form of Assignment of Trademark Rights

Exhibit X  – Restricted Seller Revenue

Exhibit Y – Real Estate Terms and Conditions

Exhibit Z – Flextronics Back-to-Back Supply Agreement Term Sheet

Exhibit AA - Deposit Escrow Agreement

Exhibit 1.1 – Contract Manufacturing Inventory Agreements (Term Sheet)

Exhibit 2.1.1 – Sellers and Purchaser

Exhibit 2.2.1(b)(ii) – Related Share Adjustment Table

Exhibit 2.2.1(b)(iii) – Conversion Rate Table

Exhibit 5.1(a) – Forms of U.S. Bidding Procedures Order and U.S. Sale Order

Exhibit 5.2.1 – Form of Canadian Sales Process Order

Exhibit 5.2.2 – Form of Canadian Approval and Vesting Order

Exhibit 5.9 – Purchaser's Representatives for Interim Covenants Consents

Exhibit 5.12 – Purchaser's Representatives for Sellers Disclosure Schedule and Certain Information Updates

## SELLERS DISCLOSURE SCHEDULE

Section 1.1(a) – Contract Manufacturers

Section 1.1(b) – Persons Having Knowledge

Section 1.1(d) – Nortel Accounting Principles

Section 1.1(e) – Owned Equipment

Section 1.1(g) – Permitted Encumbrances

Section 1.1(h) – Products

Section 1.1(i) – Seller Contracts

Section 1.1(j) – Services

Section 1.1(k) – Patents

Section 1.1(l) – Trademarks

Section 1.1(m) – Seconded Employees

Section 2.1.1(g) – Seller Consents

Section 2.1.2(n) – Excluded Assets

Section 2.1.3(c) – Assumed Intellectual Property Liabilities

Section 2.1.3(i) – Assumed Specified Employee Liabilities

Section 2.1.4(n) – Other Excluded Liabilities

Section 2.1.5(a) – 365 Vendor Contracts

Section 2.1.5(b) – 365 Customer Contracts

Section 2.1.6(a) – Other Vendor Contracts

Section 2.1.6(b) – Non-Assignable Contracts with Suppliers

Section 2.1.6(c) – Designated Other Customer Contracts

Section 2.1.6(d) – Designated Non-Assignable Customer Contracts

Section 2.1.7(a) – Cure Costs

Section 2.1.7(b) – Payment of Cure Costs

Section 2.1.7(c) – Customer Contract Cure Costs

Section 2.2.3(d) – Manner for Exclusion of Sellers

Section 2.2.7(a) – Allocations for Shares

Section 4.3(c)(i) – Inbound License Agreements and Patent Cross Licenses

Section 4.3(c)(ii) – Other Assets and Rights

Section 4.4(a) – Material Customer and Supplier Contracts

Section 4.4(b) – Material Seller Contracts

Section 4.5(b) – Transferred Intellectual Property

Section 4.5(h) – Infringement

Section 4.5(j)(i) – Patent Cross Licenses

Section 4.5(j)(ii) – Inbound License Agreements

Section 4.5(j)(iii) – Outbound License Agreements

Section 4.5(k) – Open Source Software

Section 4.6 – Litigation

Section 4.7 – Financial Statements

Section 4.8 – Compliance with Laws

Section 4.9(a)(i) – Owned Real Property

Section 4.9(a)(ii) – Leased Real Property

Section 4.9(a)(iii) – 6-Month Locations

Section 4.9(a)(iv) – Short-Term Licensed Property

Section 4.9(a)(v) – Locations where Owned Assets Located

Section 4.10(a)(i) – Seller Employee Plans

Section 4.10(b) – Employee Information

Section 4.10(c) – Strike, Material Grievance, Work Stoppage

Section 4.10(d) – Collective Labor Agreements

Section 4.10(e) – Multiemployer Plans

Section 4.12(c) –Deficiency for Material Amount of Taxes

Section 5.9 – Conduct of Business in the Ordinary Course Exceptions

Section 5.15 – Bundled Contracts

Section 5.21(a) – Security Deposits

Section 5.28 – Covenants in respect of Transition Services

Section 5.35 - India

Section 7.1.1(a) – Employees Transferring by Operation of Law

Section 7.1.1(c) – Countries with Ten or More Employees

Section 7.1.2(b)(ii)(B) – Accrued Amounts Owing to Specified Transferred Employees

Section 7.1.2(b)(iv) – Australia Long Service Leave and Sick Leave

Section 11.15(a)(i) – Appointment of NNC as Representative

Section 11.15(a)(ii) – Appointment of NNL as Representative

Section 11.15(a)(iii) – Appointment of NNI as Representative

2

## AMENDED AND RESTATED ASSET SALE AGREEMENT

This Amended and Restated Asset Sale Agreement is dated as of November 24, 2009, among Nortel Networks Corporation, a corporation organized under the laws of Canada ("**NNC**"), Nortel Networks Limited, a corporation organized under the laws of Canada ("**NNL**"), Nortel Networks Inc., a corporation organized under the laws of Delaware ("**NNI**" and, together with NNC and NNL, the "**Main Sellers**"), the affiliates of the Main Sellers listed in Exhibit A hereto (the "**Other Sellers**" and, together with the Main Sellers, the "**Sellers**") and Ciena Corporation, a corporation organized under the laws of Delaware (the "**Purchaser**").

WHEREAS, the Sellers and the affiliates of the Main Sellers listed in Exhibit B hereto (the "**EMEA Sellers**") beneficially own and operate, respectively, the Business (as defined below);

WHEREAS, on the Petition Date (as defined herein), NNC, NNL and the Other Sellers listed in part 1 of Exhibit C hereto (together, the "**Canadian Debtors**") filed with the Canadian Court (as defined below) an application for protection under the Companies' Creditors Arrangement Act (the "**CCAA**") (the proceedings commenced by such application, the "**CCAA Cases**") and were granted certain initial creditor protection pursuant to an order issued by the Canadian Court on the same date, which also appointed Ernst & Young Inc. as "**Monitor**" in connection with the CCAA Cases and has been extended by further order of the Canadian Court from time to time, most recently on July 30, 2009, as the same may be amended and restated from time to time by the Canadian Court.

WHEREAS, NNI and the Other Sellers listed in part 2 of Exhibit C hereto (the "**U.S. Debtors**") are debtors-in-possession under the U.S. Bankruptcy Code (as defined below) which commenced cases under Chapter 11 of the U.S. Bankruptcy Code on the Petition Date by filing voluntary petitions for relief in the U.S. Bankruptcy Court for the District of Delaware (the "**Chapter 11 Cases**");

WHEREAS, the EMEA Debtors (as defined below) on the Petition Date filed applications with the English Court (as defined below), pursuant to the Insolvency Act of 1986, as amended (the "**Insolvency Act**") and the European Union's Council Regulation (EC) No. 1346/2000 on Insolvency Proceedings (the proceedings commenced by such applications, the "**EMEA Cases**") and the English Court appointed Alan Bloom, Stephen Harris, Christopher Hill and Alan Hudson of Ernst & Young LLP as joint administrators of all the EMEA Debtors (other than Nortel Networks (Ireland) Limited, for which David Hughes of Ernst & Young Chartered Accountants and Alan Bloom serve as joint administrators) (the "**Joint Administrators**") under the Insolvency Act;

WHEREAS, the entity listed under the heading "Israeli Company" in part 3 of Exhibit C hereto (the "**Israeli Company**") on January 18, 2009 filed an application with the Tel-Aviv-Jaffa District Court, pursuant to the Israeli Companies Law, 1999, and the regulations relating thereto (collectively, the "**Israeli Companies Law**") for a stay of proceedings, and the Israeli Court appointed Yaron Har-Zvi and Avi D. Pelossof (the "**Joint Israeli Administrators**") on January 19, 2009, as joint administrators of the Israeli Company under the Israeli Companies Law;

**WHEREAS**, on May 28, 2009, the Commercial Court of Versailles, France ordered the commencement of secondary proceedings and the appointment of a French administrator in respect of Nortel Networks S.A.;

**WHEREAS**, on July 14, 2009, Nortel Networks (CALA) Inc. commenced a case under Chapter 11 of the U.S. Bankruptcy Code by filing a voluntary petition for relief in the U.S. Bankruptcy Court for the District of Delaware;

**WHEREAS**, the Other Sellers listed in part 4 of Exhibit C hereto (the "**Non-Debtor Sellers**") are not subject to any Bankruptcy Proceedings (as defined below) as of the date hereof;

**WHEREAS**, the Sellers have agreed to transfer to the Purchaser and/or the Designated Purchasers (as defined below) and the Purchaser has agreed to purchase and assume, and cause the Designated Purchasers to purchase and assume, including, to the extent applicable, pursuant to Sections 363 and 365 of the U.S. Bankruptcy Code and pursuant to the Canadian Approval and Vesting Order, the Assets and the Assumed Liabilities (each as defined below) from the Sellers upon the terms and conditions set forth hereinafter;

**WHEREAS**, the Sellers and the Purchaser previously entered into that certain Asset Sale Agreement, dated as of October 7, 2009 (the "**Original Asset Sale Agreement**"), pursuant to which the Purchaser was selected as the stalking horse bidder for the purposes of the Auction (as defined below);

**WHEREAS**, simultaneously with the execution of the Original Asset Sale Agreement, the EMEA Sellers, the Joint Administrators, the Joint Israeli Administrators and the Purchaser entered into a separate agreement in the form set forth in Exhibit D hereto (the "**Original EMEA Asset Sale Agreement**") providing for the sale to the Purchaser (or the EMEA Designated Purchasers (as defined therein)) of the EMEA Assets (as defined below), the Original EMEA Asset Sale Agreement being amended by a Deed of Amendment dated October 20, 2009 in the form set forth in Exhibit D-1 hereto;

**WHEREAS**, on November 20-22, 2009, the Auction was held, during which time the Sellers and the Purchaser agreed to modify a number of terms in connection with the Sellers' selection of the Purchaser as the Successful Bidder (as defined below) at the Auction;

**WHEREAS**, the Purchaser and the Sellers desire to amend and restate the Original Asset Sale Agreement in its entirety to incorporate the terms agreed to in connection with the Sellers' selection of the Purchaser as the Successful Bidder at the Auction;

**WHEREAS**, simultaneously with the execution of this Agreement, the EMEA Sellers, the Joint Administrators, the Joint Israeli Administrators and the Purchaser are entering into an amendment agreement to amend further the Original EMEA Asset Sale Agreement to incorporate the terms agreed to in connection with the Sellers' selection of Purchaser as the Successful Bidder at the Auction (the "**EMEA Amendment Agreement**" a form of which is set forth in Exhibit E hereto);

2

**WHEREAS,** the Parties (as defined below) acknowledge and agree that the purchase by the Purchaser (and the Designated Purchasers, if any) of the Assets and the EMEA Assets, the license of Intellectual Property rights under the Intellectual Property License Agreement and the Trademark License Agreement (each as defined below), and the assumption by the Purchaser and the Designated Purchasers of the Assumed Liabilities and the EMEA Assumed Liabilities (as defined below) are being made at arm's length and in good faith and without intent to hinder, delay or defraud creditors of the Sellers and their Affiliates and each Seller acknowledges that the consideration to be paid is fair value and reasonably equivalent value for the acquisitions by the Purchaser and the Designated Purchasers of the Assets and the EMEA Assets, the license of Intellectual Property rights under the Intellectual Property License Agreement and the Trademark License Agreement and the assumption by the Purchaser and the Designated Purchasers of the Assumed Liabilities and the EMEA Assumed Liabilities, as set forth hereunder and in the EMEA Asset Sale Agreement; and

**WHEREAS,** in addition, at the Closing, the Purchaser, certain Sellers (or affiliates of the Sellers) and certain EMEA Sellers will enter into the following ancillary agreements (together, the **"Ancillary Agreements"**) (i) the Local Sale Agreements, (ii) the Real Estate Agreements, (iii) the Intellectual Property License Agreement, (iv) the Transition Services Agreement, (v) the Trademark License Agreement, (vi) the Loaned Employee Agreement; (vii) the Subcontract Agreement, (viii) the Contract Manufacturing Inventory Agreements, (ix) the Carling Property Lease Agreements, (x) the Patent Assignments, (xi) the Trademark Assignments, (xii) the Indenture (unless the Cash Election Option has been exercised in full), (xiii) if requested by the Purchaser in accordance with the terms hereof, the Flextronics Back-to-Back Supply Agreement and (xiv) such other back-to-back supply agreements as are requested by the Purchaser in accordance with the terms hereof, and, subject to the negotiation prior to Closing of each such agreement to the mutual satisfaction of each party thereto, in their sole and absolute discretion, will enter into the Mutual Development Agreement, the Seller Supply Agreement, the NETAS Distribution Agreement; the NGS Distribution Agreement, the EFA Development Agreement, and the LGN/Korea Distribution Agreement (each as defined below).

**NOW, THEREFORE,** in consideration of the respective covenants, representations and warranties made herein, and of the mutual benefits to be derived hereby (the sufficiency of which is acknowledged), the Parties agree as follows:

## ARTICLE I
## INTERPRETATION

**SECTION 1.1. Definitions.** Capitalized terms used but not otherwise defined herein shall have the meanings set forth below:

"**2008 Revenues**" has the meaning set forth in Section 2.2.3(b).

"**365 Contracts**" has the meaning set forth in Section 2.1.5(b).

"**365 Customer Contract List**" has the meaning set forth in Section 2.1.5(b).

"**365 Customer Contracts**" has the meaning set forth in Section 2.1.5(b).

3

"**365 Vendor Contract List**" has the meaning set forth in Section 2.1.5(a).

"**365 Vendor Contracts**" has the meaning set forth in Section 2.1.5(a).

"**6 Month Location**" has the meaning set forth in Section 4.9(a).

"**Accounting Arbitrator**" has the meaning set forth in Section 2.2.4.1(b).

"**Action**" means any litigation, action, audit, hearing, investigation, suit (whether civil, criminal, administrative or investigative), charge, binding arbitration, Tax audit or other legal, administrative or judicial proceeding.

"**Additional Adverse Bankruptcy Proceeding**" has the meaning set forth in Section 2.2.3(a).

"**Additional Premises Lease Agreement**" means the lease agreement between NNTC on the one hand and the Purchaser or Designated Purchaser on the other hand in respect of the leasing of those parts of the Lab 2 Building of the Carling Property as more particularly defined in the Real Estate Terms and Conditions.

"**Additional Statements**" has the meaning set forth in Section 8.1(a)(i).

"**Adjustment Amount**" has the meaning set forth in Section 2.2.4.2(a).

"**Adverse International Injunction**" has the meaning set forth in Section 2.2.3(a).

"**Affiliate**" means, as to any Person, any other Person that directly or indirectly through one or more intermediaries Controls, or is under common Control with, or is Controlled by, such Person; provided, however, that no EMEA Seller or Subsidiary of an EMEA Seller shall be deemed an Affiliate of any Seller.

"**Aggregate Principal Amount**" has the meaning set forth in Section 2.2.1(a).

"**Agreement**" means this Amended and Restated Asset Sale Agreement, the Sellers Disclosure Schedule and all Exhibits and Schedules attached hereto and thereto and all amendments hereto and thereto made in accordance with Section 11.4.

"**Alternative Arrangements**" has the meaning set forth in Section 5.15(b).

"**Alternative Transaction**" means the sale, transfer or other disposition, directly or indirectly, including through an asset sale, stock sale, merger, amalgamation, plan of arrangement or other similar transaction, of all or a substantial portion of the Business, or all or a substantial portion of the Assets and the EMEA Assets, in each case, in a transaction or a series of transactions with a Successful Bidder (as such term has been defined in Exhibit 5.1(a), which may include multiple bidders whose bids are combined) other than the Purchaser and/or its Affiliates; provided, however, that an "Alternative Transaction" shall not include: (i) the retention of the Business or all or any portion of the Assets and the EMEA Assets, by all or part of the Sellers and/or the EMEA Sellers (or their successor entities emerging from the Bankruptcy

Proceedings) pursuant to a stand-alone plan of reorganization or plan of arrangement approved by any Bankruptcy Court, or (ii) the sale, transfer or other disposition, directly or indirectly, of any portion of the Assets or the EMEA Assets (other than as a going concern) in connection with the closure, liquidation or winding-up of any of the Sellers.

"**Ancillary Agreements**" has the meaning set forth in the recitals to this Agreement.

"**Antitrust Approvals**" means the HSR Approval and the Competition Act Approval.

"**Antitrust Laws**" means the Competition Act, the HSR Act, the EC Merger Regulation, and any competition, merger control and anti-trust Law of the European Union, any applicable European Union member states and EFTA states, and any other applicable supranational, national, federal, state, provincial or local Law designed or intended to prohibit, restrict or regulate actions having the purpose or effect of monopolizing or restraining trade or lessening competition of any other country or jurisdiction, to the extent applicable to the transactions contemplated by this Agreement (and/or by the EMEA Asset Sale Agreement).

"**ARD Transferring Employee**" has the meaning attributed to that term in the EMEA Asset Sale Agreement.

"**Assets**" has the meaning set forth in Section 2.1.1.

"**Assigned Contracts**" means all Seller Contracts except: (i) the Excluded 365 Contracts, (ii) the Excluded Other Vendor Contracts, (iii) the Excluded Non-Assignable Supply Contracts, (iv) the Non-Assigned Contracts and (v) leases, subleases, licenses and other occupancy agreements in respect of any Real Property, unless an assignment of such contract is contemplated by the Real Estate Terms and Conditions.

"**Assumed and Assigned Contracts**" has the meaning set forth in Section 2.1.5(b).

"**Assumed Liabilities**" has the meaning set forth in Section 2.1.3.

"**Auction**" has the meaning set forth in the U.S. Bidding Procedures and Sale Motion.

"**Audited Financial Statements**" has the meaning set forth in Section 5.26.

"**Balance Sheet Date**" has the meaning set forth in Section 4.7.

"**Bankruptcy Consents**" has the meaning set forth in Section 4.1(a).

"**Bankruptcy Court**" means the U.S. Bankruptcy Court, the Canadian Court, the English Court and any other court before which Bankruptcy Proceedings are held.

5

"**Bankruptcy Laws**" means the U.S. Bankruptcy Code, the CCAA, the Insolvency Act and the other applicable bankruptcy, insolvency, administration or similar Laws of any jurisdiction where Bankruptcy Proceedings are held.

"**Bankruptcy Proceedings**" means the Chapter 11 Cases, the CCAA Cases, the EMEA Cases and, in each case, any proceedings thereunder, as well as any other voluntary or involuntary bankruptcy, insolvency, administration or similar judicial proceedings concerning any of the Sellers or the EMEA Sellers that are held from time to time.

"**Base Cash Purchase Price**" has the meaning set forth in Section 2.2.1(a).

"**Break-Up Fee**" has the meaning set forth in Section 10.2(a).

"**Bundled Contract**" has the meaning set forth in Section 5.15(a).

"**Business**" means the optical networking solutions and carrier ethernet switching segments of NNC's "Metro Ethernet Networks" business through which the Sellers and the EMEA Sellers, individually, jointly or in collaboration with, or pursuant to Contracts with, Third Parties: (a) design, develop and cause the manufacture, assembly and testing of the Products; (b) market, sell, distribute and supply the Products; and (c) provide the Services, all as conducted as at the date of this Agreement, but excludes:

 (i) any financial, information technology, legal, marketing, human resource operations (including supply management and technical and product support), real estate or other "corporate" or related functions supporting or utilized by such activities, unless such functions are exclusively dedicated to the support of the activities described in (a) through (c), in which event such functions are included;

 (ii) Overhead and Shared Services (other than Transferred Overhead and Shared Services); and

 (iii) any products and/or services provided by businesses or business segments of any of the Sellers or the EMEA Sellers, other than those specified in (a) through (c) above.

"**Business Day**" means a day on which the banks are opened for business (Saturdays, Sundays, statutory and civic holidays excluded) in (i) New York, New York, United States, (ii) Toronto, Ontario, Canada, and (iii) London, England, United Kingdom.

"**Business Information**" means, as of the Closing Date, all books, records, files, research and development log books, ledgers, documentation, sales literature or similar documents in the possession or under control of the Sellers and to the extent that such information relates to the Business, including policies and procedures, Owned Equipment manuals and materials and procurement documentation; provided, that, to the extent any of the foregoing is also used in any business or business segment of any Seller other than the Business, then such portion of the Business Information as used in such business or business segment of any Seller other than the Business shall be segregated and shall not form part of Business

Information, provided further that, where such segregation shall be impracticable, Business Information shall be limited to copies of the foregoing. Business Information shall not include any Employee Records or Tax records.

**"Canadian Approval and Vesting Order"** has the meaning set forth in Section 5.2.2.

**"Canadian Approval and Vesting Order Motion"** has the meaning set forth in Section 5.2.2.

**"Canadian Court"** means the Ontario Superior Court of Justice (Commercial List).

**"Canadian DB Replacement Plan"** has the meaning set forth in Section 7.5.3.

**"Canadian Debtors"** has the meaning set forth in the recitals to this Agreement.

**"Canadian Non-Union DC Replacement Plan"** has the meaning set forth in Section 7.5.1.

**"Canadian Sales Process Order"** has the meaning set forth in Section 5.2.1(a).

**"Canadian Sales Process Order Motion"** has the meaning set forth in Section 5.2.1(a).

**"Canadian Sellers"** means each of the Sellers that are organized under the laws of Canada (or any province of Canada).

**"Canadian Union DC Replacement Plan"** has the meaning set forth in Section 7.5.4.

**"Canadian Union Retiree"** means any individual who was employed by any of the Sellers or any of their Affiliates in Canada in respect of the Business and whose terms and conditions of employment were governed by a Collective Labor Agreement.

**"Carling Property"** means the "Premises" as defined in the Carling Property Lease Agreements.

**"Carling Property Escrow Amount"** means, pursuant to the Carling Property Lease Agreements, an initial amount in immediately available funds equal to $33,500,000 which amount shall secure exclusively the break-fee, if any, payable by the Sellers to the Purchaser in respect of the early termination of the Carling Property Lease Agreements by the Sellers in the exercise of the Sellers' early termination rights thereunder.

**"Carling Property Lease Agreements"** means, collectively, the Lab 10 Lease Agreement and the Additional Premises Lease Agreement, and non-disturbance agreements from any existing mortgagees registered on title to the Carling Property in the form attached as Exhibit L-2 hereto, each of the foregoing agreements to be entered into and delivered on or before Closing by each of the parties to such agreements substantially in the forms aforesaid.

7

"**Cash Purchase Price**" has the meaning set forth in Section 2.2.1(a).

"**Cash Replacement Election**" has the meaning set forth in Section 2.2.1(a).

"**CCAA**" has the meaning set forth in the recitals to this Agreement.

"**CCAA Cases**" has the meaning set forth in the recitals to this Agreement.

"**CCAA Service List**" means the Canadian Debtors' service list as posted on the Monitor's website (http://www.ey.com/ca/nortel) as the same may be updated from time to time in the context of the CCAA Cases.

"**CERCLA**" has the meaning set forth in Section 4.13(c).

"**Chapter 11 Cases**" has the meaning set forth in the recitals to this Agreement.

"**CIP Accounts Receivable**" means all uninvoiced accounts receivable relating to the Business with respect to Contracts in progress, but only to the extent that such accounts receivable have not been invoiced because of milestones, deliverables or other commitments arising pursuant to such Contracts which have not yet been satisfied or fulfilled and excluding all EMEA CIP Accounts Receivable.

"**Claim**" has the meaning set forth in Section 101(5) of the U.S. Bankruptcy Code.

"**Claim Notice**" has the meaning set forth in Section 6.7(b).

"**Closing**" has the meaning set forth in Section 2.3.1.

"**Closing Accrued Vacation and Service Award Amount**" means, as of the Closing Date, (i) the amount of compensation with respect to the accrued and unused vacation with respect to each Specified Transferred Employee and each EMEA Transferring Employee (including all Taxes required to be withheld on behalf of the applicable Specified Transferred Employee and EMEA Transferring Employee by his or her respective employer) calculated by taking, with respect to each such employee (A) an amount equal to the number (not less than zero) of such employee's accrued and unused vacation hours as of the Closing Date multiplied by such employee's hourly rate of pay (with such hourly rate of pay derived by dividing such employee's annual base salary by the number of standard work hours per year for such employee), and (ii) in respect of Transferred Employees in Australia with five (5) years or more of service as an employee of Sellers, the EMEA Sellers or their respective Affiliates as of the Closing Date, the amounts specified in Section 7.1.2(b)(iv) of the Sellers Disclosure Schedules in respect of long service leave multiplied by the applicable percentage as set forth in the Nortel Accounting Principles, plus, without duplication, the aggregate amount of employer Taxes required to be paid in connection with all such amounts.

"**Closing CIP Accounts Receivable Amount**" means, as of the Closing Date, the amount accrued for CIP Accounts Receivable and EMEA CIP Accounts Receivable as of the Closing Date in accordance with GAAP applied in a manner consistent with the Nortel Accounting Principles (to the extent consistent with GAAP).

8

"**Closing Date**" has the meaning set forth in Section 2.3.1.

"**Closing Date Net Working Capital Transferred**" has the meaning set forth in Section 2.2.4.1(a).

"**Closing Inventory Amount**" means, as of the Closing Date, the book value of the Owned Inventory and the EMEA Owned Inventory, net of applicable provisions, that would be required to be reflected on a balance sheet of the Business as of such date prepared in accordance with GAAP applied in a manner consistent with the Nortel Accounting Principles (to the extent consistent with GAAP).

"**Closing KPD Provision**" means, as of the Closing Date, the provision for Known Product Defects accrued by the Business in accordance with GAAP applied in a manner consistent with the Nortel Accounting Principles (to the extent consistent with GAAP).

"**Closing Net Deferred Revenues**" means, as of the Closing Date, (x) deferred revenues for services to be performed or products to be provided by the Business after the Closing Date but for which an account receivable has been recorded prior to the Closing Date minus (y) associated deferred costs to the extent incurred by the Business prior to the Closing Date in connection with such products or services, in each case, that would be required to be reflected on a balance sheet of the Business as of such date prepared in accordance with GAAP applied in a manner consistent with the Nortel Accounting Principles (to the extent consistent with GAAP).

"**Closing Other Accrued and Contractual Liabilities**" means, as of the Closing Date, (i) such current Assumed Liabilities and current EMEA Assumed Liabilities of a type accrued on the Business' historic Financial Statements under the heading "Other Accrued and Contractual Liabilities" (including "Accrued Known Project Losses", "Accrued Liquidated Damages", "Accrued Marketing Program Liabilities", "Accrued Product Credits" (including, for the avoidance of doubt, all credits for EMEA Products or EMEA Services to be assumed by the Purchaser pursuant to Section 2.4.2(B)(4) of the EMEA Asset Sale Agreement) and "Accrued Training Credits", but excluding "COS Accruals" and "Representative Fees"), that would be required to be reflected on a balance sheet of the Business as of such date prepared in accordance with GAAP applied in a manner consistent with the Nortel Accounting Principles (to the extent consistent with GAAP).

"**Closing Retirement Obligation Amount**" means, as of the Closing Date, the amount of the actual unfunded obligations accrued in any period preceding the Closing Date that will be assumed by the Purchaser, a Designated Purchaser or an EMEA Designated Purchaser at Closing (if any) whether pursuant to this Agreement or by operation of Law under a plan providing retirement or retiree welfare benefits of any Seller or EMEA Seller, and under any plan providing jubilee benefits (anniversary bonuses) of Nortel GmbH, in all cases determined in accordance with GAAP applied in a manner consistent with the Nortel Accounting Principles (to the extent consistent with GAAP), and using reasonable actuarial assumptions consistent with the assumptions most recently used for determining unfunded obligations for the applicable plan prior to the date hereof. For purposes of this definition, an unfunded obligation shall be deemed to be under (A) with respect to any Seller or EMEA Seller, a plan providing retirement or retiree welfare benefits to the extent it is required to be accounted for under FAS 87 (paragraphs 11, 72

9

and 73) or FAS 106 (paragraphs 16 and 85), as applicable, and (B) with respect to Nortel GmbH, a plan providing jubilee benefits (anniversary bonuses) to the extent it is required to be accounted for under FAS 112. Notwithstanding the foregoing, an unfunded obligation shall not be taken into account to the extent that it is a Liability in respect of which there is, and to the extent of, a separate Purchase Price adjustment that is expressly provided for, if any, under this Agreement or the EMEA Asset Sale Agreement.

"**Closing Statement**" has the meaning set forth in Section 2.2.4.1(a).

"**Closing Warranty Provision**" means, as of the Closing Date, the provision for potential claims by customers under the Warranty Obligations to be recognized and measured by the Business in accordance with GAAP applied in a manner consistent with the Nortel Accounting Principles (to the extent consistent with GAAP).

"**COBRA**" means the continuation coverage required by Section 4980B of the Code or any similar Law.

"**Code**" means the United States Internal Revenue Code of 1986, as amended.

"**Collective Labor Agreement**" means any written agreement that a Person has entered into with any union or collective bargaining agent with respect to terms and conditions of employment of such Person's employees.

"**Commissioner**" means the Commissioner of Competition appointed under the Competition Act or any person duly authorized to exercise the powers and perform the duties of the Commissioner of Competition.

"**Common Stock**" means shares of common stock, par value $0.01 per share, of the Purchaser.

"**Common Stock VWAP**" means, for any Trading Day, the per share volume-weighted average price as displayed under the heading "Bloomberg VWAP" on Bloomberg page "CIEN.Q <equity> AQR" (or any successor thereto) in respect of the period from the scheduled opening of trading until the scheduled close of trading of the primary trading session on such Trading Day (or if such volume-weighted average price is unavailable, the market value of one share of Common Stock on such Trading Day, determined using a volume-weighted average method, by a nationally recognized independent investment banking firm retained for such purpose that is mutually acceptable to Purchaser and Sellers). The Common Stock VWAP will be determined without regard to after hours trading or any other trading outside of the regular trading session trading hours.

"**Competing Transaction**" has the meaning set forth in Section 5.29(a).

"**Competition Act**" means the Competition Act (Canada), as amended, and the regulations promulgated in connection therewith.

"**Competition Act Approval**" means that: (a) the Commissioner shall have issued an advance ruling certificate pursuant to Section 102 of the Competition Act in respect of the transactions contemplated by this Agreement; or (b)(i) the applicable waiting period has

expired, been terminated pursuant to Section 123 of the Competition Act or compliance with Part IX of the Competition Act has been waived pursuant to Section 113(c) of the Competition Act, and (ii) the Commissioner or his/her authorized representative shall have advised the Purchaser in writing that the Commissioner does not intend to make an application under Section 92 of the Competition Act with respect to the transactions contemplated by this Agreement, and neither the Commissioner nor any of his/her authorized representatives shall have rescinded or amended such advice.

"**Confidentiality Agreement**" means collectively, the confidentiality agreement between the Purchaser, NNC and its subsidiaries and the Joint Administrators dated March 27, 2009, the clean team confidentiality agreement between the Purchaser and its subsidiaries and NNL and its subsidiaries, dated April 15, 2009, the second clean team confidentiality agreement between the Purchaser and its subsidiaries and NNL and its subsidiaries, dated May 8, 2009, and the third clean team confidentiality agreement between the Purchaser and its subsidiaries and NNL and its subsidiaries, dated June 19, 2009.

"**Consent**" means any approval, authorization, consent, order, license, permission, permit, qualification, exemption or waiver by, or notice to (including the expiry of any related notice or waiting period), any Government Entity or other Third Party.

"**Contract**" means any written binding contract, agreement, subcontract, purchase order, work order, sales order, indenture, note, bond, instrument, lease, mortgage, ground lease, commitment, covenant or undertaking.

"**Contract Manufacturing Inventory Agreements**" means the agreements between the Purchaser and/or any Designated Purchasers, on the one hand, the relevant Sellers, on the other hand, and the contract manufacturers of the Business listed in Section 1.1(a) of the Sellers Disclosure Schedule that the relevant Parties will use commercially reasonable efforts to execute on or before the Closing in the form that shall be negotiated in good faith pursuant to Section 5.25 and the term sheet attached as Exhibit 1.1.

"**Control**", including, with its correlative meanings, "**Controlled by**" and "**under common Control with**", means, in connection with a given Person, the possession, directly or indirectly, of the power to either (i) elect more than fifty percent (50%) of the directors of such Person or (ii) direct or cause the direction of the management and policies of such Person, whether through the ownership of securities, contract or otherwise.

"**Conversion Price**" has the meaning set forth in Section 2.2.1(a).

"**Convertible Note Recipient Sellers**" means each of the Canadian Sellers, the UK Sellers and the U.S. Sellers.

"**Convertible Notes**" has the meaning set forth in Section 2.2.1(a).

"**Convertible Securities**" has the meaning set forth in Section 8.2(d).

"**Covered Assets and Persons**" has the meaning set forth in Section 5.20(a).

"**Cure Cost**" has the meaning set forth in Section 2.1.7(b) of the Sellers Disclosure Schedule.

"**Customer Contract**" means any Seller Contract pursuant to which a Seller provides Products and/or Services to the counterparty.

"**Customer Contract Cure Cost**" has the meaning set forth in Section 2.1.7(c) of the Sellers Disclosure Schedule.

"**Daily Trading Limit**" as of any date shall mean the lesser of (i) 10% of the average reported daily trading volume of the shares of Common Stock on NASDAQ for the 20 consecutive Trading Days immediately preceding such date and (ii) 10% of the reported daily trading volume of the shares of Common Stock for the trading date immediately preceding such date.

"**Deficit Amount**" has the meaning set forth in Section 2.2.4.2(b)(ii).

"**Demand Note**" has the meaning set forth in Section 2.2.7(b).

"**Deposit Amount**" has the meaning set forth in Section 5.37.

"**Deposit Escrow Agent**" has the meaning set forth in Section 5.37.

"**Deposit Escrow Agreement**" has the meaning set forth in Section 5.37.

"**Designated Non-Assignable Contracts**" has the meaning set forth in Section 2.1.6(d).

"**Designated Non-Assignable Customer Contracts**" has the meaning set forth in Section 2.1.6(d).

"**Designated Non-Assignable Supply Contracts**" has the meaning set forth in Section 2.1.6(b).

"**Designated Other Customer Contracts**" has the meaning set forth in Section 2.1.6(c).

"**Designated Other Vendor Contracts**" has the meaning set forth in Section 2.1.6(a).

"**Designated Purchaser**" has the meaning set forth in Section 2.4.

"**Determination Date**" has the meaning set forth in Section 2.2.4.1(b).

"**Distribution Agent**" means the Person that will act as distribution agent for the Sellers and the EMEA Sellers hereunder, to be notified by the Main Sellers to the Purchaser and the Escrow Agent by and not later than January 25, 2010.

"**Domain Name**" means an alphanumeric name that identifies a specific computer or website on the Internet, and all rights in and to such domain name, including any registrations therefor with a domain name registrar.

"**DTC**" has the meaning set forth in Section 8.5(a)(x).

"**E&O Inventory**" has the meaning set forth in Section 5.9(a).

"**EC Merger Regulation**" means Council Regulation (EC) No. 139/2004 of January 20, 2004 on the control of concentrations between undertakings, as amended.

"**EFA Development Agreement**" means the agreement between the Purchaser and LG Nortel Co. Ltd. for development services related to ethernet fiber access (EFA) to be provided by the Purchaser to LG Nortel Co. Ltd., such agreement to be effective on Closing, that the relevant Parties will use commercially reasonable efforts to negotiate before the Closing pursuant to Section 5.25.

"**Effective Hire Date**" means the day on which the employment of an Employee commences or continues with the Purchaser or its Affiliates as provided in this Agreement.

"**Effective Period**" has the meaning set forth in Section 8.1(a).

"**EMEA Asset Sale Agreement**" means the Original EMEA Asset Sale Agreement as amended on October 20, 2009 and the date hereof.

"**EMEA Assets**" has the meaning attributed to that term in the EMEA Asset Sale Agreement.

"**EMEA Assumed Liabilities**" has the meaning attributed to that term in the EMEA Asset Sale Agreement.

"**EMEA Business**" has the meaning attributed to that term in the EMEA Asset Sale Agreement.

"**EMEA Cases**" has the meaning set forth in the recitals to this Agreement.

"**EMEA CIP Accounts Receivable**" has the meaning attributed to that term in the EMEA Asset Sale Agreement.

"**EMEA Debtors**" means those entities listed under the heading "EMEA Debtors" in part 5 of Exhibit C hereto.

"**EMEA Designated Purchaser**" has the meaning attributed to that term in the EMEA Asset Sale Agreement.

"**EMEA Employee**" means an employee of any of the EMEA Sellers engaged in the EMEA Business.

"**EMEA Excluded Liabilities**" has the meaning attributed to that term in the EMEA Asset Sale Agreement.

"**EMEA Excluded Taxes**" has the meaning set forth in Section 6.8(a).

"**EMEA Intellectual Property**" has the meaning set forth in Section 4.5(a).

"**EMEA Owned Inventory**" has the meaning attributed to that term in the EMEA Asset Sale Agreement.

"**EMEA Purchaser Party**" has the meaning set forth in Section 6.8(a).

"**EMEA Sellers**" has the meaning set forth in the recitals to this Agreement.

"**EMEA Tax Claim**" has the meaning set forth in Section 6.8(b).

"**EMEA Tax Claim Notice**" has the meaning set forth in Section 6.8(b).

"**EMEA Tax Escrow Amount**" means $2,500,000, which amount shall secure the EMEA Sellers' obligations under Section 6.8.

"**EMEA Transferring Employee**" has the meaning ascribed to the term "Transferring Employee" in the EMEA Asset Sale Agreement.

"**Employee**" means an employee of any of the Sellers or their Affiliates (excluding the EMEA Sellers) engaged in the Business (excluding the EMEA Business), in each instance as listed in Section 4.10(b) of the Sellers Disclosure Schedule.

"**Employee Data**" has the meaning set forth in Section 7.4(b).

"**Employee Information**" has the meaning set forth in Section 4.10(b).

"**Employee Records**" means books, records, files, or other documentation with respect to Employees.

"**Employee Transfer Date**" means with respect to each jurisdiction where Employees, other than Inactive Employees, Visa Employees and Seconded Employees, will become Transferred Employees in accordance with this Agreement, 12:01 a.m. local time in such jurisdiction immediately following the Closing.

"**English Court**" means the High Court of Justice of England and Wales.

"**Environment**" means soil, land, surface or subsurface strata, waters (including navigable ocean, stream, pond, reservoirs, drainage, basins, wetland, ground and drinking), sediments, ambient air (including indoor), noise, plant life, animal life and all other environmental media or natural resources.

"**Environmental Laws**" means any applicable Laws relating to pollution or protection of the Environment, human health and safety, including those relating to the presence,

14

use, manufacturing, refining, production, generation, handling, transportation, treatment, recycling, transfer, storage, disposal, distribution, importing, labeling, testing, processing, discharge, release, control, or other action or failure to act involving cleanup of any Hazardous Materials, including without limitation and by way of example only the following laws as in effect now and as of the Closing Date: (i) Clean Air Act (42 USC 7401, et seq.); (ii) Clean Water Act (33 USC 1251, et seq.); (iii) Resource Conservation and Recovery Act (42 USC 6901, et seq.); (iv) Comprehensive Environmental Response, Compensation and Liability Act (41 USC 9601, et seq.); (iv) Toxic Substances Control Act (15 USC 2601, et seq.).

"**ERISA**" means the Employee Retirement Income Security Act of 1974, as amended.

"**Escrow Agent**" has the meaning ascribed to such term in the Escrow Agreement.

"**Escrow Amount**" means the portion of the Cash Purchase Price to be paid to the Escrow Agent on the Closing Date in accordance with Section 2.3.2(b) and, subject to adjustment in accordance with Section 2.1.7(b) of the Sellers Disclosure Schedule, such amount will consist of (i) the Working Capital Escrow Amount, (ii) the Carling Property Escrow Amount, (iii) the Tax Escrow Amount, (iv) the EMEA Tax Escrow Amount and (v) the Italian Tax Escrow Amount.

"**Escrow Agreement**" means a "joint instruction" Escrow Agreement to be entered into on or prior to Closing with respect to the deposit, investment and disbursement of the Escrow Amount and the Transition Services Escrow Amount and requiring that any amounts to be distributed thereunder shall require the written instruction of one or more the Main Sellers and the Purchaser which shall be given in accordance with this Agreement or the applicable Transaction Document to which any portion of the Escrow Amount and the Transition Services Escrow Amount relates and otherwise on terms and conditions reasonably satisfactory to each of the Purchaser, the Sellers, the EMEA Sellers and the Escrow Agent.

"**Estimated Adjustment Amount**" has the meaning set forth in Section 2.2.2(b).

"**Estimated Closing Date Net Working Capital Transferred**" has the meaning set forth in Section 2.2.2(a).

"**Excess ARD Employees Amount**" has the meaning ascribed to such term in the EMEA Asset Sale Agreement.

"**Exchange Act**" means the Securities Exchange Act of 1934, as amended.

"**Excluded 365 Contract**" has the meaning set forth in Section 2.1.5(d).

"**Excluded Assets**" has the meaning set forth in Section 2.1.2.

"**Excluded Employee Liabilities**" has the meaning set forth in Section 7.3.

"**Excluded Liabilities**" has the meaning set forth in Section 2.1.4.

15

**"Excluded Non-Assignable Supply Contracts"** has the meaning set forth in 2.1.6(b).

**"Excluded Other Seller"** has the meaning set forth in Section 5.32(a).

**"Excluded Other Vendor Contracts"** has the meaning set forth in Section 2.1.6(a).

**"Excluded Taxes"** has the meaning set forth in Section 6.7(a).

**"Executory Contract"** means an 'executory contract' for the purposes of Section 365 of the U.S. Bankruptcy Code.

**"Existing 2017 Senior Notes"** means the 0.875% Convertible Senior Notes due 2017 issued by the Purchaser that are outstanding as of the date hereof.

**"Expense Reimbursement"** has the meaning set forth in Section 10.2(a).

**"Expense Reimbursement Notice"** has the meaning set forth in Section 10.2(a).

**"Extra Services"** has the meaning set forth in Section 5.28 of the Sellers Disclosure Schedule.

**"Filing Party"** has the meaning set forth in Section 6.4(b)(ii).

**"Final Order"** means an order of any Bankruptcy Court, any court of competent jurisdiction or other Government Entity (i) as to which no appeal, notice of appeal, motion to amend or make additional findings of fact, motion to alter or amend judgment, motion for rehearing or motion for new trial has been timely filed or, if any of the foregoing has been timely filed, it has been disposed of in a manner that upholds and affirms the subject order in all material respects without the possibility for further appeal or rehearing thereon; (ii) as to which the time for instituting or filing an appeal, motion for rehearing or motion for new trial shall have expired; and (iii) as to which no stay is in effect; provided, however, that, with respect to an order issued by the U.S. Bankruptcy Court, the filing or pendency of a motion under Federal Rule of Bankruptcy Procedure 9024 or Federal Rule of Civil Procedure 60 shall not cause an order not to be deemed a "Final Order" unless such motion shall be filed within ten (10) days of the entry of the order at issue.

**"Financial Statements"** has the meaning set forth in Section 4.7.

**"Flextronics Back-to-Back Supply Agreement"** means the agreement between the relevant Sellers and the Purchaser and/or any Designated Purchasers which may be executed, if required, on or before Closing on the terms set forth in the Flextronics Back-to-Back Supply Agreement Term Sheet attached as Exhibit Z hereto and such other terms as the Main Sellers and the Purchaser may reasonably agree.

**"Freely Tradeable"** means, with respect to a Convertible Note, a Convertible Note that at any time of determination (i) may be sold to the public in accordance with Rule 144 under the Securities Act by a holder of such Convertible Note where no conditions of Rule 144

under the Securities Act are then applicable (other than the holding period requirement of paragraph (d) of Rule 144 under the Securities Act so long as such holding period requirement is satisfied at such time of determination), including without limitation, the volume limitations set forth in Rule 144(e) under the Securities Act and (ii) does not bear any restrictive legends relating to the Securities Act.

"**GAAP**" means United States generally accepted accounting principles, consistently applied.

"**Government Entity**" means any U.S., Canadian, United Kingdom, foreign, domestic, supra-national, multi-national, federal, territorial, provincial, state, municipal or local governmental authority, quasi-governmental authority, instrumentality, court, government or self-regulatory organization, bureau, commission, tribunal or organization or any regulatory, administrative or other agency, or any political or other subdivision, department or branch of any of the foregoing, including the European Commission.

"**GST**" means goods and services tax payable under Part IX of the Excise Tax Act (Canada).

"**Hazardous Materials**" means (a) petroleum, petroleum products, asbestos in any form that is friable or polychlorinated biphenyls and (b) any chemical, waste, material, pollutant, contaminant or other substance, whether solid, liquid or gaseous, the presence of which is regulated by any Government Entity or which requires investigation or remediation under any Environmental Laws.

"**Handling of Hazardous Materials**" means the production, use, generation, Release, storage, treatment, formulation, processing, labeling, distribution, introduction into commerce, registration, transportation, reclamation, recycling, disposal, discharge, or other handling or disposition of Hazardous Materials.

"**HSR Act**" means the United States Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended, and any rules and regulations promulgated in connection therewith.

"**HSR Approval**" means expiration of all applicable waiting periods under the HSR Act (including any voluntary agreed extensions) or earlier termination thereof.

"**ICA Approval**" means that: (i) if required pursuant to Part IV of the Investment Canada Act, the Purchaser shall have received confirmation in writing from the responsible Minister under the Investment Canada Act that he/she is satisfied or is deemed to be satisfied that the transactions contemplated in this Agreement that are subject to the provisions of the Investment Canada Act are likely to be of net benefit to Canada, on terms and conditions satisfactory to the Purchaser, acting reasonably; and (ii) the responsible Minister shall not have issued a notice to the Purchaser pursuant to Section 25.2(1) of the Investment Canada Act or an order pursuant to Section 25.3(1) of the Investment Canada Act. If either a notice pursuant to Section 25.2(1) or an order pursuant to Section 25.3(1) has been issued, the Purchaser shall also have received (a) confirmation in writing from the responsible Minister either that no order will be made under Section 25.3(1) or that no further action will be taken or (b) a copy of an order

17

under Section 25.4(1)(b) authorizing the transaction, <u>provided</u> that order is on terms and conditions satisfactory to the Purchaser, acting reasonably.

"**Inactive Employees**" means Employees (other than Employees whose employment transfers to the Purchaser or a Designated Purchaser by operation of Law) who have accepted the Purchaser's or Designated Purchaser's offer of employment as provided in Section 7.1.1 and are on any Seller's approved leave of absence as of the Employee Transfer Date.

"**Identified Employees**" has the meaning set forth in Section 7.1.1(a).

"**IFSA**" means the Interim Funding and Settlement Agreement dated June 9, 2009 among NNL, NNL, the Joint Administrators and the other parties thereto.

"**Inbound License Agreements**" has the meaning set forth in Section 4.5(j)(ii).

"**Included Services**" has the meaning set forth in Section 5.28 of the Sellers Disclosure Schedule.

"**Increase Amount**" has the meaning set forth in Section 2.2.4.2(b)(i).

"**Indebtedness**" of any Person at any date means (a) indebtedness for borrowed money, (b) indebtedness evidenced by bonds, debentures, notes or similar instruments, (c) leases that are capitalized in accordance with GAAP under which such Person is the lessee, (d) reimbursement obligations of such Person with respect to letters of credit or performance bonds that are drawn prior to Closing, (e) obligations in respect of the deferred purchase price of property or services (other than current trade payables incurred on a basis consistent with past practices), (f) obligations (under conditional sale or other title retention agreements, (g) obligations (including without limitation, breakage costs) under interest rate cap agreements, interest rate swap agreements, foreign currency exchange contracts or other hedging contracts and (h) any guarantee of the obligations of another Person with respect to any of the foregoing.

"**Indenture**" means the indenture providing for the issuance of the Convertible Notes.

"**Independent Auditor**" means Deloitte & Touche LLP or, in the case such firm cannot carry-out its duties for whatever reason, such other auditing firm of international reputation that is (i) jointly selected by the Primary Parties, or (ii) in case the Primary Parties cannot agree on any such firm, selected by Deloitte & Touche LLP at the request of the first Primary Party to move.

"**Indemnitee**" has the meaning set forth in Section 8.8(b).

"**Indemnitor**" has the meaning set forth in Section 8.8(b).

"**Initial Shelf Registration Statement**" has the meaning set forth in Section 8.1(a).

"**Insolvency Act**" has the meaning set forth in the recitals to this Agreement.

18

"**Intellectual Property**" means any and all intellectual property, whether protected or arising under the laws of the United States, Canada or any other jurisdiction, including all intellectual property rights in respect of any of the following:  (a) Trademarks; (b) Patents; (c) copyrights and works of authorship (including any registrations therefor or applications for registration); (d) mask works; (e) trade secrets, know-how and confidential technical or business information; (f) industrial design or similar rights; and (g) any Software and technology.

"**Intellectual Property License Agreement**" means the agreement to be entered into between NNL, on the one hand, and the Purchaser (or the relevant Designated Purchasers), on the other hand, on or prior to the Closing in the form attached hereto as Exhibit F.

"**Investment Canada Act**" means the Investment Canada Act, as amended, and the regulations promulgated in connection therewith.

"**Israeli Companies Law**" has the meaning set forth in the recitals to this Agreement.

"**Israeli Company**" has the meaning set forth in the recitals to this Agreement.

"**Italian Excluded Taxes**" has the meaning set forth in Section 6.9(a).

"**Italian Purchaser Party**" has the meaning set forth in Section 6.9(a).

"**Italian Tax Claim**" has the meaning set forth in Section 6.9(b).

"**Italian Tax Claim Notice**" has the meaning set forth in Section 6.9(b).

"**Italian Tax Escrow Amount**" means $5,000,000, as such amount is adjusted in accordance with Section 6.9, which amount shall secure Nortel Italy's obligations under Section 6.9.

"**Joint Administrators**" has the meaning set forth in the recitals to this Agreement.

"**Joint Israeli Administrators**" has the meaning set forth in the recitals to this Agreement.

"**KEIP**" shall mean the Nortel Networks Corporation Key Executive Incentive Plan approved by the U.S. Bankruptcy Court in the District of Delaware on March 5, 2009, and approved by the Canadian Court on March 6, 2009 and March 20, 2009, with such further amendments and/or supplements as may be approved by the Canadian Court and/or the U.S. Bankruptcy Court from time to time.

"**KERP**" shall mean the Nortel Networks Corporation Key Employee Retention Plan approved by the U.S. Bankruptcy Court in the District of Delaware on March 5, 2009, and approved by the Canadian Court on March 6, 2009, with such further amendments and/or supplements as may be approved by the Canadian Court and/or U.S. Bankruptcy Court from time to time.

19

"**Knowledge**" or "**aware of**" or "**notice of**" or a similar phrase shall mean, with reference to the Sellers, the actual knowledge of those Persons listed on Section 1.1(b) of the Sellers Disclosure Schedule, and, with reference to the Purchaser, the actual knowledge of those Persons listed on Exhibit G.

"**Known Product Defects**" means those defects of Products and/or Services that have been sold by the Business and which are known by the Sellers as of the Closing Date.

"**Lab 10 Lease Agreement**" means the lease agreement between NNTC on the one hand and the Purchaser or Designated Purchaser on the other hand in respect of the leasing of the whole of the Lab 10 Building as more particularly defined in the Lab 10 Lease Agreement to be entered into on or before Closing in the form attached hereto as Exhibit L-1.

"**Law**" means any U.S., Canadian, United Kingdom, foreign, domestic, supra-national federal, territorial, state, provincial, local or municipal statute, law, common law, ordinance, rule, regulation, order, writ, injunction, directive, judgment, decree or policy or guideline having the force of law.

"**Leased Real Property**" has the meaning set forth in Section 4.9(a).

"**Leases**" has the meaning set forth in Section 4.9(a).

"**LGN Joint Venture**" means LG-Nortel Co. Ltd., which was established in November 2005 as a joint venture between NNL and LG Electronics Inc. for the purpose of jointly developing and marketing certain telecommunications equipment and network solutions.

"**LGN/Korea Distribution Agreement**" means the agreement to be entered into between the Purchaser and/or one or more Designated Purchasers designated by it and the LGN Joint Venture that the relevant Parties will use commercially reasonable efforts to negotiate before the Closing pursuant to Section 5.25.

"**Liabilities**" means debts, liabilities and obligations, whether accrued or fixed, direct or indirect, absolute or contingent, asserted or unasserted, liquidated or unliquidated, matured or unmatured, known or unknown or determined or undeterminable, including those arising under any Law or Action and those arising under any contract, agreement, arrangement, commitment or undertaking or otherwise, including any Tax liability.

"**Licensed Intellectual Property**" means the Intellectual Property being licensed to the Purchaser or the relevant Designated Purchasers under the Intellectual Property License Agreement and the Trademark License Agreement.

"**Lien**" means any lien (statutory or otherwise), mortgage, pledge or security interest, hypothecation, deed of trust, deemed trust, option, right of use, right of first offer or first refusal, servitude, encumbrance, easement, encroachment, right-of-way, restrictive covenant on real property, real property license, charge, prior claim, lease, conditional sale arrangement or other similar restriction of any kind, but does not include any prior Intellectual Property license granted by any of the Sellers.

"**Liquidity Date**" has the meaning set forth in Section 2.2.1(c).

20

"**Loaned Employee Agreement**" means the agreement between the relevant Sellers, on the one hand, and the Purchaser and/or any Designated Purchasers, on the other hand, to be executed on or before the Closing attached hereto as Exhibit I.

"**Local Sale Agreements**" has the meaning set forth in Section 2.1.8.

"**Losses**" means all losses, damages and reasonable and documented out-of-pocket costs and expenses.

"**Main Sellers**" has the meaning set forth in the preamble to this Agreement.

"**Market Value**" as of any date shall mean the arithmetic average of the Common Stock VWAP during the ten (10) Trading Days immediately prior to, but not including, such date.

"**Material Adverse Effect**" means any event, change or circumstance that, individually or in the aggregate, has had, or would reasonably be expected to have a material adverse effect on the assets, liabilities, operations, results of operations or condition (financial or otherwise) of the Business to be transferred hereunder and under the EMEA Asset Sale Agreement, taken as a whole, but in each case shall not include the effect of events, changes and circumstances to the extent arising from (a) changes in the industries and markets in which the Business operates, except to the extent such changes disproportionately affect the Business, (b) macroeconomic factors, interest rates, currency exchange rates, general financial market conditions, acts of God, war, terrorism or hostilities, (c) changes in Law, generally accepted accounting principles or official interpretations of the foregoing, (d) compliance with this Agreement, including any effect on the Business resulting from failure to take any action to which the Purchaser refused consent under this Agreement, (e) the transactions contemplated hereby or any announcement hereof or the identity of the Purchaser, (f) the attrition of customers or employees prior to the Closing Date, (g) the pendency of the Bankruptcy Proceedings and any action approved by the Bankruptcy Courts, or (h) the failure of the Business to achieve internal or external financial forecasts or projections, by itself; provided, however, that in the case of clauses (f) and (h), the reason for the customer attrition or the failure of the Business to achieve internal or external financial forecasts or projections shall not be excluded as a result of such clauses.

"**Material Contracts**" has the meaning set forth in Section 4.4(b).

"**Monitor**" means Ernst & Young Inc., in its capacity as the Canadian Court-appointed Monitor in connection with the CCAA Cases.

"**Montreal Landlord**" has the meaning set forth in the Real Estate Terms and Conditions.

"**Montreal Lease Termination Penalty**" has the meaning set forth in the Real Estate Terms and Conditions.

"**Montreal Premises**" means that portion of the third and fourth floors of the North Tower of the building municipally known as 2351 Alfred Nobel Blvd., St. Laurent,

Quebec that is used by the Business as of the date hereof or any alternate or additional premises in such building if contemplated by the Montreal Premises Restructured Lease or Montreal Premises Sublease, as the case may be.

"**Montreal Premises Amended Lease**" has the meaning set forth in the Real Estate Terms and Conditions.

"**Montreal Premises Lease**" means that certain lease dated June 27, 2007 in respect of the Montreal Premises by and between BREOF/Belmont Ban L.P., acting through its general partner BREOF/Belmont Ban G.P. Limited, as landlord, and NNL, as tenant, as amended by a first lease amending agreement dated October 8, 2008.

"**Montreal Premises Restructured Lease**" has the meaning set forth in the Real Estate Terms and Conditions.

"**Montreal Premises Sublease**" has the meaning set forth in the Real Estate Terms and Conditions.

"**Montreal Premises Sublease Consent**" has the meaning set forth in the Real Estate Terms and Conditions.

"**Mutual Development Agreement**" means the agreement between the Purchaser and/or any Designated Purchasers, on the one hand, and the relevant Sellers, on the other hand, relating to the development (i) by the Purchaser and/or any Designated Purchasers of new features of certain of products used by the Sellers and/or (ii) by the relevant Sellers of new features of certain of the Products that the relevant Parties will use commercially reasonable efforts to negotiate before the Closing pursuant to Section 5.25.

"**NETAS**" means Nortel Networks NETAS Telekomunikasyon A.S., a company incorporated in Turkey and having its principal place of business at Alemdag Caddesi, Umraniye 34768, Istanbul, Turkey.

"**NETAS Distribution Agreement**" means the agreement between the Purchaser and/or one or more Designated Purchasers and NETAS relating to the sale of Products by the Purchaser to NETAS for resale in Turkey that the relevant Parties will use commercially reasonable efforts to negotiate before the Closing pursuant to Section 5.25.

"**Net Working Capital Transferred**" has the meaning set forth in Section 2.2.4.1(a).

"**New York Courts**" has the meaning set forth in Section 11.6(b).

"**NGS**" means Nortel Government Solutions Incorporated, a corporation organized under the laws of Delaware with offices at 12730 Fair Lakes Circle, Fairfax, Virginia.

"**NGS Distribution Agreement**" means the agreement between the Purchaser and/or one or more Designated Purchasers and NGS relating to the sale of Products by the Purchaser to NGS that the relevant Parties will use commercially reasonable efforts to negotiate before the Closing pursuant to Section 5.25.

"**NNC**" has the meaning set forth in the preamble to this Agreement.

"**NNI**" has the meaning set forth in the preamble to this Agreement.

"**NNL**" has the meaning set forth in the preamble to this Agreement.

"**NNTC**" has the meaning set forth in Section 6.5(b).

"**Non-ARD Transferring Employee**" has the meaning attributed to that term in the EMEA Asset Sale Agreement.

"**Non-Assignable Contracts**" has the meaning set forth in Section 5.14(a).

"**Non-Assigned Contracts**" means the Non-Assignable Contracts, to the extent all applicable Consents to assignment thereof to the Purchaser or a Designated Purchaser have not been granted prior to the Closing Date, provided that if such Consents are granted within one (1) year after the Closing Date, such Non-Assignable Contracts will cease to be Non-Assignable Contracts as of the effective date of such Consents, and shall then be assigned by the relevant Seller to the Purchaser or a Designated Purchaser in accordance with this Agreement.

"**Non-Convertible Note Recipient Sellers**" means each of the Sellers and EMEA Sellers other than the Convertible Note Recipient Sellers.

"**Non-Debtor Sellers**" has the meaning set forth in the recitals to this Agreement.

"**Non-Exclusive Supply Contract**" means any supply Contract to which any Seller is a party that relates to the Business and also relates to one or more other businesses of the Sellers.

"**Non-Filing Party**" has the meaning set forth in Section 6.4(b)(ii).

"**Non-Solicitation Period**" means the twenty-four (24) month period immediately following the Closing Date.

"**Non-Union Employee**" means an Employee whose terms and conditions of employment are not governed by a Collective Labor Agreement.

"**Nortel Accounting Expenses**" has the meaning set forth in Section 8.7.

"**Nortel Accounting Principles**" means the accounting principles employed in the preparation of the Financial Statements, as set forth in Section 1.1(d) of the Sellers Disclosure Schedule.

"**Nortel Italy**" means Nortel Networks SpA (in administration).

"**Nortel Plan**" has the meaning set forth in Section 7.5.1.

"**Occupancy Agreement**" has the meaning set forth in the Real Estate Terms and Conditions.

"**Offer**" has the meaning set forth in Section 7.1.1(a).

"**Offer Consideration Period**" has the meaning set forth in Section 7.1.1(a).

"**Offering Limitation**" means that the underwriter selected by the Purchaser in an underwritten offering pursuant to a Piggyback Registration advises the Purchaser in writing that in its opinion the number of Shares or aggregate principal amount of Convertible Notes requested to be included in such offering by the Sellers and the EMEA Sellers exceeds the number of shares of Common Stock or aggregate principal amount of Convertible Securities (as applicable) which can be sold in such offering without adversely affecting the price, timing, distribution or marketability of the offering.

"**Omitted Patent Cross License**" has the meaning set forth in Section 4.5(j)(i).

"**Ontario Court**" has the meaning set forth in Section 11.6(b).

"**Open Source Software**" means Software that is made available under a license agreement that: (i) conditions use, modification or distribution of any Software program, or any Software integrated with or derived from such Software program, or into which such Software program is incorporated, on the disclosure, licensing or distribution of the source code of such Software program (or such Software); or (ii) otherwise materially limits the licensee's freedom of action with regard to seeking compensation in connection with sublicensing, licensing or distributing such Software program or Software.

"**Optional Redemption Price**" has the meaning set forth in Section 2.2.1(b).

"**Order**" means any award, writ, injunction, judgment, order or decree entered into, issued, made or rendered by any Government Entity.

"**Ordinary Course**" means the ordinary course of the Business (excluding the EMEA Business) through the date hereof consistent with past practice since the filing of the Bankruptcy Proceedings, as such practice may be modified from time to time to the extent necessary to reflect the Bankruptcy Proceedings.

"**Original Asset Sale Agreement**" has the meaning set forth in the recitals to this Agreement.

"**Original EMEA Asset Sale Agreement**" has the meaning set forth in the recitals to this Agreement.

"**Other Seller Contracts**" means Seller Contracts other than 365 Contracts.

"**Other Sellers**" has the meaning set forth in the preamble to this Agreement.

"**Other Vendor Contract**" means any Other Seller Contract that is not a Customer Contract.

"**Outbound License Agreements**" has the meaning set forth in Section 4.5(j)(iii).

"**Overhead and Shared Services**" means corporate or shared services provided to or in support of the Business that are general corporate or other overhead services and are provided to both (a) the Business and (b) other businesses or business segments of any Seller, including travel and entertainment services, temporary labor services, office supplies services (including copiers and faxes), personal telecommunications services, computer hardware and software services, fleet services, energy/utilities services, procurement and supply arrangements, treasury services, public relations, legal, compliance and risk management services (including workers' compensation), payroll services, sales and marketing support services, information technology and telecommunications services, accounting services, tax services, human resources and employee relations management services, employee benefits services, credit, collections and accounts payable services, logistics services, property management services, environmental support services and customs and excise services, in each case including services relating to the provision of access to information, operating and reporting systems and databases and including all hardware and software or other intellectual property necessary for or used in connection therewith.

"**Owned Equipment**" means (a) those items of tangible personal property owned by the Sellers that are held or used primarily in connection with the Business and that are located at the Carling Property, the Montreal Premises or any Real Property which is the subject of a Real Estate Agreement, (b) those items of tangible personal property owned by the Sellers that are personally assigned to, a Transferred Employee, (c) those other items of tangible personal property owned by the Sellers not included in clause (a) or (b) above that are held or used exclusively in the Business and (d) those other items of tangible personal property owned and paid for by the Sellers not included in clauses (a), (b) or (c) above and that are listed in Section 1.1(e) of the Sellers Disclosure Schedule excluding, in each case, any Owned Inventory and any Intellectual Property provided, however that the Owned Equipment shall not include any items of tangible personal property that are Excluded Assets described on Section 2.1.2(n) of the Sellers Disclosure Schedule.

"**Owned Inventory**" means any inventories of raw materials, manufactured and purchased parts, work-in-process, packaging, stores and supplies, unassigned finished goods inventories (which are finished goods not yet assigned to a specific customer order), "excess" or "obsolete" inventory, assets on loan, and merchandise in each case owned and paid for by the Sellers and held or used exclusively in connection with the Business, including any of the above items which is owned by the Sellers but remains in the possession or control of a contract manufacturer or another Third Party provided, however that the Owned Inventory shall not include any inventories that are Excluded Assets described on Section 2.1.2(n) of the Sellers Disclosure Schedule.

"**Owned Real Property**" has the meaning set forth in Section 4.9(a).

"**Partial Allocation**" has the meaning set forth in Section 2.2.6(b).

"**Party**" or "**Parties**" means individually or collectively, as the case may be, the Sellers and the Purchaser.

"**Patent Assignments**" means written assignments of the Patents included in the Transferred Intellectual Property, appropriate for filing with the patent office of the jurisdiction

25

in which each such Patent is registered. Such assignments shall be substantially in the form of Exhibit V, except for any such variations as are legally necessary or customary in patent assignments in the local jurisdiction where a Patent is registered.

      **"Patent Cross Licenses"** means all Contracts between the Sellers or their Affiliates and a Third Party under which the Sellers or such Affiliates, as applicable, both (i) grant a license under patents and/or patent applications owned by (or licensed to) them, and (ii) receive from the counter-party a license under patents and/or patent applications owned by (or licensed to) such counter-party (but other than inbound or outbound license agreements where the only grant back from the licensee is under improvements on the licensed Intellectual Property) in such case, to the extent the scope of such licenses include Patents licensed under the Intellectual Property License Agreement or assigned pursuant to the terms of this Agreement or that are otherwise used in the Business.

      **"Patents"** includes all national (including the United States and Canada) and multinational statutory invention registrations, patents, patent applications, provisional patent applications, industrial designs, industrial models, including all reissues, divisions, continuations, continuations-in-part, extensions and re-examinations, and all rights therein provided by multinational treaties or conventions.

      **"Permitted Encumbrances"** means (i) statutory Liens for Taxes or governmental assessments, charges or claims the payment of which is not yet due, or, if due, for Taxes the validity of which is being contested in good faith by appropriate proceedings, <u>provided</u> that in each case adequate reserves have been established to the extent required by GAAP, and which Tax Liens and the associated amount of Taxes (other than Real Property Tax Liens for assessments, charges or claims) are set forth in Section 1.1(g) of the Sellers Disclosure Schedule; (ii) mechanics', carriers', workers', repairers', landlords', warehouses and similar Liens arising or incurred in the Ordinary Course for sums not yet delinquent or overdue; (iii) any Liens imposed by any Bankruptcy Court in connection with the Bankruptcy Proceedings that are to be discharged at Closing pursuant to the terms of the Canadian Approval and Vesting Order and the U.S. Sale Order; (iv) any other Liens set forth in Section 1.1(g) of the Sellers Disclosure Schedule; and (v) present zoning, entitlement, building and land use regulations, covenants, minor defects of title, easements, rights of way, development agreements, restrictions and other similar charges or encumbrances which do not impair, individually or in the aggregate, in any material respect the use of the related assets in the Business as currently conducted.

      **"Person"** means an individual, a partnership, a corporation, an association, a limited or unlimited liability company, a joint stock company, a trust, a joint venture, an unincorporated organization or other legal entity or Government Entity.

      **"Petition Date"** means January 14, 2009, except with respect to Nortel Networks (CALA) Inc. in which case "Petition Date" shall mean July 14, 2009.

      **"Piggyback Notice"** has the meaning set forth in Section 8.3(a).

      **"Piggyback Registration"** has the meaning set forth in Section 8.3(a).

"**Plan of Record**" means the Products under development as included in Section 1.1(h) of the Sellers Disclosure Schedule.

"**Post-Closing Taxable Period**" means any Taxable period beginning after the Closing Date.

"**Pre-Closing Taxable Period**" means any Taxable period ending on or prior to the Closing Date.

"**Primary Party**" means each of (i) the Main Sellers and (ii) the Purchaser.

"**Prime Rate**" has the meaning set forth in Section 2.2.4.2(b)(i).

"**Products**" means those products that are (i) manufactured by or on behalf of and marketed by the Business, or (ii) in the Plan of Record, all as set forth in Section 1.1(h) of the Sellers Disclosure Schedule.

"**Provider**" has the meaning set forth in the Transition Services Agreement.

"**Purchase Price**" has the meaning set forth in Section 2.2.1(a).

"**Purchaser**" has the meaning set forth in the preamble to this Agreement.

"**Purchaser Employee Plan**" means any "employee benefit plan" within the meaning of Section 3(3) of ERISA, whether or not subject thereto, and any other employee benefit plan, agreement or arrangement, including any profit sharing plan, savings plan, bonus plan, performance awards plan, incentive compensation plan, deferred compensation plan, stock purchase plan, stock option plan, vacation plan, leave of absence plan, employee assistance plan, automobile leasing/subsidy/allowance plan, meal allowance plan, redundancy or severance plan, relocation plan, change in control plan, family support plan, pension plan, supplemental pension plan, retirement plan, retirement savings plan, post-retirement plan, medical, health, hospitalization or life insurance plan, disability plan, sick leave plan, retention plan, education assistance plan, expatriate assistance plan, compensation arrangement, including any base salary arrangement, overtime, on-call or call-in policy, death benefit plan, or any other similar plan, program, agreement, arrangement or policy that is maintained or otherwise contributed to, or required to be maintained or contributed to, by or on behalf of the Purchaser or any of its Subsidiaries or Affiliates with respect to their employees employed in those countries where they will employ Transferred Employees pursuant to this Agreement.

"**Purchaser Party**" has the meaning set forth in Section 6.7(a).

"**Qualified Expenditures**" has the meaning set forth in Section 6.5(b).

"**Real Estate Agreements**" means (i) the Carling Property Lease Agreements; (ii) as to the Montreal Premises, either the Montreal Premises Amended Lease, the Montreal Premises Restructured Lease (and any consent, assignment and assumption agreement in respect thereof, if applicable, between the Montreal Landlord, the Sellers, the Purchaser or any Designated Purchaser, as the case may be) or the Montreal Premises Sublease, as applicable in accordance with the Real Estate Terms and Conditions and the Montreal Premises Sublease

Consent, as applicable; (iii) the leases; subleases and license agreements between the relevant Sellers on the one hand, and the Purchaser or any Designated Purchasers, on the other hand, as provided by the Real Estate Terms and Conditions; and (v) any other ancillary agreements entered into in connection with, or to otherwise give effect to the occupancies contemplated by, the aforesaid agreements, in each such case to be executed and delivered on or prior to Closing, in accordance with and as provided by, the Real Estate Terms and Conditions.

**"Real Estate Terms and Conditions"** means the Real Estate Terms and Conditions attached hereto as Exhibit Y, the provisions of which are hereby incorporated into this Agreement by reference.

**"Real Property"** has the meaning set forth in Section 4.9(a).

**"Recognized Dealer"** has the meaning set forth in Section 8.9

**"Records Custodian"** means Deloitte & Touche LLP or in case such firm is unable to carry out its duties for whatever reason, such other auditing firm of international reputation that is acceptable to each of the Purchaser and the Main Sellers, each acting reasonably.

**"Registrable Securities"** has the meaning set forth in Section 8.1(a).

**"Registration Default"** has the meaning set forth in Section 8.11.

**"Registration Default Period"** has the meaning set forth in Section 8.11.

**"Registration Statement"** means each registration statement, including each Shelf Registration Statement, under the Securities Act, of the Purchaser that covers any of the Registrable Securities pursuant to this Agreement, including any information deemed to be part of and included in such registration statement pursuant to the rules of the SEC and all amendments and supplements to such registration statement and including all post-effective amendments to, all exhibits of, and all materials incorporated by reference or deemed to be incorporated by reference in, such registration statement, amendment or supplement.

**"Regulation D"** has the meaning set forth in Section 3.7(c).

**"Regulatory Approvals"** means the Antitrust Approvals and the ICA Approval.

**"Rejecting Employee"** has the meaning set forth in Section 7.1.1(h).

**"Rejecting Employees Liability Limit"** has the meaning set forth in Section 7.1.1(h).

**"Release"** means any release, spill, emission, leaking, pumping, injection, deposit, disposal, discharge, dispersal, leaching, or migration at, into or onto the Environment, including movement or migration through or in the Environment, whether sudden or non-sudden and whether accidental or non-accidental, or any release, emission or discharge as those terms are defined in any applicable Environmental Laws.

28

"**Respective Affiliates**" has the meaning set forth in Section 11.15(c).

"**Restricted Assets**" has the meaning set forth in Section 2.2.3(a).

"**Restricted Employee**" has the meaning set forth in Section 2.2.3(b).

"**Restricted Liabilities**" has the meaning set forth in Section 2.2.3(b).

"**Restricted Seller**" has the meaning set forth in Section 2.2.3(b).

"**Restricted Technical Records**" means the Livelink database or any other similar database containing all necessary documents with respect to the technical aspects of the Qualified Expenditures of NNTC or NNL in their 2007 and subsequent taxation years.

"**SEC**" has the meaning set forth in Section 3.7(g).

"**SEC Filings**" has the meaning set forth in Section 3.7(g).

"**Seconded Employee**" means Employees who are located in, or employed by the Sellers in any of the countries set forth in Section 1.1(m) of the Sellers Disclosure Schedule in which a Designated Purchaser is not ready to employ the Employees as of the Closing Date as determined in good faith by Purchaser and who having accepted an Offer or who transfer by operation of Law would otherwise be Transferred Employees on the Employee Transfer Date.

"**Securities Act**" means the Securities Act of 1933, as amended.

"**Security Deposits**" has the meaning set forth in Section 5.21(a).

"**Seller Consents**" has the meaning set forth in Section 2.1.1(g).

"**Seller Contracts**" means (i) those Contracts of a Seller that relate exclusively to the Business (excluding licenses of Intellectual Property) and (ii) the Contracts listed in Section 1.1(i) of the Sellers Disclosure Schedule.

"**Seller Employee Plan**" means any "employee benefit plan" within the meaning of Section 3(3) of ERISA, whether or not subject thereto, and any other employee benefit plan, agreement or arrangement, including any profit sharing plan, savings plan, bonus plan, performance awards plan, incentive compensation plan, deferred compensation plan, stock purchase plan, stock option plan, vacation plan, leave of absence plan, employee assistance plan, automobile leasing/subsidy/allowance plan, meal allowance plan, redundancy or severance plan, relocation plan, family support plan, pension plan, supplemental pension plan, retirement plan, retirement savings plan, post retirement plan, medical, health, hospitalization or life insurance plan, disability plan, sick leave plan, retention plan, education assistance plan, expatriate assistance plan, change in control plan, compensation arrangement, including any base salary arrangement, overtime, on-call or call-in policy, death benefit plan, or any other similar plan, program, agreement, arrangement or policy that is maintained or otherwise contributed to, or required to be maintained or contributed to, by or on behalf of the Sellers or any of their Subsidiaries or Affiliates (excluding any EMEA Sellers) with respect to Employees.

"**Seller Insurance Policies**" has the meaning set forth in Section 5.20(a).

"**Seller Supply Agreement**" means the agreement between the relevant Sellers or the purchaser of the Sellers' Enterprise business, on the one hand, and the Purchaser and/or any Designated Purchasers, on the other hand, relating to the purchase and sale of certain hardware and Software products related to the Sellers' Carrier Ethernet business, that the relevant Parties will use commercially reasonable efforts to negotiate before the Closing pursuant to Section 5.25.

"**Sellers**" has the meaning set forth in the preamble to this Agreement.

"**Sellers Disclosure Schedule**" means the disclosure schedule delivered by the Sellers to the Purchaser on the date hereof.

"**Sellers' Trademarks**" has the meaning set forth in Section 5.22.

"**Service Readiness Date**" has the meaning set forth in Section 5.28 of the Sellers Disclosure Schedule.

"**Services**" means those services that are provided by or on behalf of the Sellers in connection with the Business to customers as set forth in Section 1.1(j) of the Sellers Disclosure Schedule.

"**Shares**" means the shares of Common Stock issued or issuable upon conversion of the Convertible Notes.

"**Shelf Offering**" has the meaning set forth in Section 8.2(a).

"**Shelf Registration Statement**" has the meaning set forth in Section 8.1(a).

"**Shelf Take-Down Notice**" has the meaning set forth in Section 8.2(a).

"**Short-Term Licensed Property**" has the meaning set forth in Section 4.9(a).

"**Software**" means any and all (i) computer programs, whether in source code or object code, (ii) computerized databases and compilations, and (iii) all user manuals and architectural and design specifications, training materials and other documentation relating to any of the foregoing.

"**Solicitation Period**" has the meaning set forth in Section 5.3(f).

"**Specified Employee Liabilities**" has the meaning set forth in Section 2.1.3(i).

"**Specified Transferred Employees**" has the meaning set forth in Section 7.1.2(b)(ii)(A).

"**Sponsored Reorganization Plan**" means a plan of reorganization under Section 1129 of the Bankruptcy Code providing for the retention by all or part of the Sellers (or their successor entities emerging from the Bankruptcy Proceedings) of all or substantially all of the

Assets and the EMEA Assets taken as a whole, that is filed or otherwise sponsored by one or more of the Third Party creditors of the Sellers.

"**Straddle Period**" has the meaning set forth in Section 6.4(b)(i).

"**Subcontract Agreement**" means one or more agreements between the relevant Sellers, on the one hand, and the Purchaser and/or any Designated Purchasers, on the other hand, to be executed on or before the Closing in a form mutually agreed to by the Parties so as to pass through the benefits and burdens of the underlying Contract with customers as if the Purchaser or the applicable Designated Purchaser were party thereto.

"**Subsidiary**" of any Person means any Person Controlled by such first Person.

"**Substituted Convertible Notes**" has the meaning set forth in Section 2.2.7(b).

"**Successful Bidder**" has the meaning set forth in the U.S. Bidding Procedures Order.

"**Succession Tax Lien**" has the meaning given to that term in the EMEA Asset Sale Agreement.

"**Succession Tax Liabilities**" has the meaning given to that term in the EMEA Asset Sale Agreement.

"**Tax**" means (a) any domestic or foreign federal, state, local, provincial, territorial or municipal taxes or other impositions by or on behalf of any Government Entity, including the following taxes and impositions: net income, gross income, individual income, capital, value added, goods and services, gross receipts, sales, use, ad valorem, business rates, transfer, franchise, profits, business, environmental, real property, personal property, service, service use, withholding, payroll, employment, unemployment, severance, occupation, social security, excise, stamp, stamp duty reserve, customs, and all other taxes, fees, duties, assessments, deductions, withholdings or charges of the same or of a similar nature, however denominated, together with any interest and penalties, additions to tax or additional amounts imposed or assessed with respect thereto, whether or not disputed and (b) any obligation to pay Taxes of a Third Party or Affiliate, whether by contract, as a result of transferee or successor liability, as a result of being a member of an affiliated, consolidated, combined or unitary group for any period or otherwise.

"**Tax Authority**" means any local, municipal, governmental, state, provincial, territorial, federal, including any U.S., Canadian, U.K. or other fiscal, customs or excise authority, body or officials anywhere in the world with responsibility for, and competent to impose, collect or administer, any form of Tax.

"**Tax Claim**" has the meaning set forth in Section 6.7(b).

"**Tax Credit Purchaser**" has the meaning set forth in Section 6.5(b).

31

"**Tax Escrow Amount**" means $10,000,000, as such amount is adjusted in accordance with Section 6.7, which amount shall secure the Sellers' obligations under Section 6.7.

"**Tax Indemnitee**" has the meaning set forth in Section 2.2.7(c).

"**Tax Return**" means all returns, reports (including elections, declarations, schedules, estimates and information returns) and other information filed or required to be filed with any Tax Authority relating to Taxes, including any amendments thereto.

"**Third Party**" means any Person that is neither a Party nor an Affiliate of a Party, but for the purposes of Section 5.6(e)(ii)(B), includes an Affiliate that is a joint venture between such Person and a Person who is not an Affiliate of such Person.

"**Third Party Beneficiaries**" has the meaning set forth in Section 11.3.

"**Third Party Provisions**" has the meaning set forth in Section 11.3.

"**TIA**" has the meaning specified in Section 8.5(a)(xiv).

"**Trademark Assignments**" means written assignments of the Trademarks included in the Transferred Intellectual Property, in the case of registered Trademarks appropriate for filing with the trademark office of the jurisdiction in which each such Trademark is registered. Such assignments shall be substantially in the form of Exhibit W, except for any such variations as are legally necessary or customary in Trademark assignments in the local jurisdiction where a Trademark is registered.

"**Trademarks**" means, together with the goodwill associated therewith, all trademarks, service marks, trade dress, logos, distinguishing guises and indicia, trade names, corporate names, business names, domain names, whether or not registered, including all common law rights, and registrations, applications for registration and renewals thereof, including, but not limited to, all marks registered in the United States Patent and Trademark Office, the trademark offices of the states and territories of the United States of America, and the trademark offices of other nations throughout the world (including the Canadian Intellectual Property Office), and all rights therein provided by multinational treaties or conventions.

"**Trademark License Agreement**" means the trademark license agreement between the relevant Sellers, on the one hand, and the Purchaser and/or any Designated Purchasers, on the other hand, in respect of certain Trademarks used in respect of the Products and/or Services to be entered into on or before the Closing in the form attached hereto as Exhibit P.

"**Trading Day**" shall mean any scheduled trading day in New York City on which there is no material market disruption event, as determined by a nationally recognized independent investment banking firm retained for such purpose that is mutually acceptable to the Purchaser and the Sellers.

32

"**Transaction Documents**" means this Agreement, the EMEA Asset Sale Agreement, the Ancillary Agreements and all other ancillary agreements to be entered into, or documentation delivered by, any Party and/or any Designated Purchaser pursuant to this Agreement or any Local Sale Agreement.

"**Transfer**" means, directly or indirectly, to sell, transfer, assign, pledge, hedge, encumber, hypothecate or similarly dispose of, or to enter into any contract, option or other arrangement or understanding with respect to the sale, transfer, assignment, pledge, hedge, encumbrance, hypothecation or similar disposition.

"**Transfer Taxes**" means all goods and services, sales, excise, use, transfer, gross receipts, documentary, filing, recordation, value-added, stamp, stamp duty reserve, and all other similar taxes, duties or other like charges, however denominated (including any real property transfer taxes and conveyance and recording fees), together with interest, penalties and additional amounts imposed with respect thereto. For the avoidance of doubt, Transfer Taxes shall not include withholding Taxes.

"**Transfer Tax Determination**" has the meaning set forth in Section 2.2.6(b).

"**Transfer Tax Reduction Determination**" has the meaning set forth in Section 6.1(b).

"**Transfer Tax Return**" has the meaning set forth in Section 6.1(d).

"**Transferred Employee**" means (i) those Employees who accept an offer of employment by, and commence employment with, the Purchaser or a Designated Purchaser in accordance with the terms of Section 7.1 or Section 7.2, and (ii) those Employees whose employment transfers by operation of Law.

"**Transferred Employee Plans**" means those Seller Employee Plans that are (x) established or maintained in accordance with a Collective Labor Agreement that is transferred to the Purchaser or a Designated Purchaser under the terms of Section 7.2, and transferred (or the liabilities of which are transferred) to the Purchaser or Designated Purchaser pursuant to this Agreement or by operation of Law or (y) transferred (or the liabilities of which are transferred) to the Purchaser or Designated Purchaser pursuant to this Agreement or by operation of Law.

"**Transferred Intellectual Property**" means (i) the Patents listed in Section 1.1(k) of the Sellers Disclosure Schedule, which the Sellers will update to reflect any Patent applications filed between the date hereof and the Closing with respect to which the Sellers determine in good faith is used predominantly in the Business, (ii) the Trademarks set forth in Section 1.1(l) of the Sellers Disclosure Schedule, and (iii) the Intellectual Property (other than Patents and Trademarks) owned by any of the Sellers that is exclusively used in connection with the Business as of the Closing Date, including the Software (including previous versions being utilized or supported as of the date hereof and versions in development) exclusively used in the Business.

"**Transferred Overhead and Shared Services**" means Overhead and Shared Services to be provided to or in support of the Business post-Closing by Transferred Employees.

"**Transition Services Agreement**" means the agreement between the relevant Sellers, and the relevant EMEA Sellers on the one hand, and the Purchaser and/or any Designated Purchasers, on the other hand, to be executed on or prior to the Closing, in the form attached hereto as Exhibit Q.

"**Transition Services Escrow Amount**" has the meaning set forth in the Transition Services Agreement.

"**Trustee**" means the trustee under the Indenture.

"**TSA Arbitrator**" has the meaning set forth in Section 5.28 of the Sellers Disclosure Schedule.

"**TSA Sellers**" means the Main Sellers, Nortel Networks UK Limited, Nortel Networks (Ireland) Limited and the Other Sellers.

"**UK Sellers**" means Nortel Networks UK Limited (in administration).

"**Unaudited September 30, 2008 Financial Statements**" has the meaning set forth in Section 5.26.

"**Union Employee**" means an Employee whose terms and conditions of employment are covered by a Collective Labor Agreement as specified in Section 4.10(d) of the Sellers Disclosure Schedule.

"**U.S. Bankruptcy Code**" means Title 11 of the United States Code.

"**U.S. Bankruptcy Court**" means the United States Bankruptcy Court for the District of Delaware.

"**U.S. Bankruptcy Rules**" means the U.S. Federal Rules of Bankruptcy Procedure.

"**U.S. Bidding Procedures and Sale Motion**" has the meaning set forth in Section 5.1(a).

"**U.S. Bidding Procedures Order**" has the meaning set forth in Section 5.1(a).

"**U.S. Debtor Contract**" means any Seller Contract to which a U.S. Debtor is a party.

"**U.S. Debtors**" has the meaning set forth in the recitals to this Agreement.

"**U.S. Sale Hearing**" means the hearing before the U.S. Bankruptcy Court to consider approval of the relief set forth in the U.S. Sale Order.

"**U.S. Sale Order**" has the meaning set forth in Section 5.1(a).

34

"**U.S. Sellers**" means each of the Sellers that are organized under the laws of any state or commonwealth of the United States.

"**VAT**" has the meaning set forth in the EMEA Asset Sale Agreement.

"**Visa Employees**" means Employees (other than Employees whose employment transfers by operation of Law) who are identified as having and requiring a visa or permit in Section 4.10(b) of the Sellers Disclosure Schedule and whose employment with the Purchaser or a Designated Purchaser cannot commence or continue on the Employee Transfer Date solely due to the Purchaser's or a Designated Purchaser's inability to obtain the required visa or permit with respect to such Employee's employment on the Employee Transfer Date.

"**WARN Act**" means the Worker Adjustment and Retraining Notification Act of 1988, as amended, or any similar Law.

"**Warranty Obligations**" means the warranty obligations relating to Products and Services assumed by the Purchaser and/or a Designated Purchaser and/or an EMEA Designated Purchaser pursuant to Sections 2.1.3(b) and 2.1.3(e) of this Agreement and clause 2.4.2(B)(2) of the EMEA Asset Sale Agreement, excluding those warranty obligations that relate to Known Product Defects.

"**Working Capital Escrow Amount**" means an amount in immediately available funds equal to $5,000,000, which amount shall secure Sellers' and the EMEA Sellers' obligations hereunder to pay the Deficit Amount, if any.

### SECTION 1.2. Interpretation.

**1.2.1. Gender and Number.** Any reference in this Agreement to gender includes all genders and words importing the singular include the plural and *vice versa*.

**1.2.2. Certain Phrases and Calculation of Time.** In this Agreement (i) the words "including" and "includes" mean "including (or includes) without limitation", (ii) the terms "hereof," "herein," and "herewith" and words of similar import shall, unless otherwise stated, be construed to refer to this Agreement and not to any particular provision of this Agreement, and Article, Section, paragraph, Exhibit and Schedule references are to the Articles, Sections, paragraphs, Exhibits and Schedules to this Agreement unless otherwise specified, (iii) except as used in Section 11.17, the terms "the date hereof," "the date of this Agreement" and words of similar import shall, unless otherwise stated, be construed to refer to the date of the Original Asset Sale Agreement, and (iv) in the computation of periods of time from a specified date to a later specified date, unless otherwise expressly stated, the word "from" means "from and including" and the words "to" and "until" each mean "to but excluding". If the last day of any such period is not a Business Day, such period will end on the next Business Day.

When calculating the period of time "within" which, "prior to" or "following" which any act or event is required or permitted to be done, notice given or steps taken, the date which is the reference date in calculating such period is excluded from the calculation. If the last day of any such period is not a Business Day, such period will end on the next Business Day.

**1.2.3. Headings, etc.** The inclusion of a table of contents, the division of this Agreement into Articles and Sections and the insertion of headings are for convenient reference only and are not to affect or be used in the construction or interpretation of this Agreement.

**1.2.4. Currency.** All monetary amounts in this Agreement and the other Transaction Documents, unless otherwise specifically indicated, are stated in United States currency. All calculations and estimates to be performed or undertaken, unless otherwise specifically indicated, are to be expressed in United States currency. All payments required under this Agreement shall be paid in United States currency in immediately available funds, unless otherwise specifically indicated herein. Where another currency is to be converted into United States currency it shall be converted on the basis of the exchange rate published in the Wall Street Journal, Eastern Edition, for the day in question.

**1.2.5. EMEA.** The EMEA Sellers, the Joint Administrators, the Joint Israeli Administrators and the Purchaser will enter into the EMEA Asset Sale Agreement providing, *inter alia*, for the sale to the Purchaser (or the EMEA Designated Purchasers) of the EMEA Business. For greater certainty, (i) nothing in this Agreement shall be considered or construed in any manner as a sale or transfer of the EMEA Business, the EMEA Assets or the EMEA Employees (except to the extent that any of the Assets owned by the Sellers are used or held for use in the EMEA Business), and (ii) no reference to Sellers herein, including any reference to the Sellers in any representation in Article IV hereof shall include the EMEA Sellers (except to the extent that the EMEA Sellers are expressly included) in the applicable provision of this Agreement. By entering into both this Agreement and the EMEA Asset Sale Agreement the Purchaser would be purchasing the entire optical networking solutions and carrier ethernet switching division of the Sellers and the EMEA Sellers' "Metro Ethernet Networks" business.

**1.2.6. Recitals.** The recitals to this Agreement form an integral part of this Agreement for all purposes.

**1.2.7. Statutory References.** Unless otherwise specifically indicated, any reference to a statute in this Agreement refers to that statute and to the regulations made under that statute as in force from time to time.

**1.2.8. Amendment and Restatement of Original Asset Sale Agreement.** The Original Asset Sale Agreement is hereby amended and restated in accordance with the provisions of this Agreement and this Agreement replaces and supersedes the Original Asset Sale Agreement.

## ARTICLE II
## PURCHASE AND SALE OF ASSETS

### SECTION 2.1. Purchase and Sale.

**2.1.1. Assets.** Upon and subject to the terms and conditions of this Agreement, at the Closing, the Purchaser shall, and shall cause the relevant Designated Purchasers to, purchase or be assigned and assume from the relevant Sellers (as set forth in Exhibit 2.1.1), and each Seller shall transfer or assign to the Purchaser or the relevant Designated Purchasers (as set forth in Exhibit 2.1.1), all of its right, title and interest in and to the following assets other than

36

the Excluded Assets (such assets, excluding the Excluded Assets, the "**Assets**") (x) in the case of Assets that are transferred or assigned by U.S. Debtors, free and clear of all Liens and Claims (other than the Permitted Encumbrances of a type described in clause (v) of the definition thereof, Assumed Liabilities and Liens created by or through the Purchaser, the Designated Purchasers or any of their Affiliates or, with respect to the Transferred Intellectual Property, as expressly provided in Section 2.1.1(e) below) pursuant to Sections 363 and 365 of the U.S. Bankruptcy Code, (y) in the case of Assets that are transferred or assigned by the Canadian Debtors, free and clear of all Liens (other than the Permitted Encumbrances of a type described in clause (v) of the definition thereof, Assumed Liabilities and Liens created by or through the Purchaser, the Designated Purchasers or any of their Affiliates or, with respect to the Transferred Intellectual Property, as expressly provided in Section 2.1.1(e) below) pursuant to the Canadian Approval and Vesting Order, when granted, and (z) in the case of Assets that are transferred or assigned by the Other Sellers, free and clear of all Liens (other than the Permitted Encumbrances, Assumed Liabilities and Liens created by or through the Purchaser, the Designated Purchasers or any of their Affiliates or, with respect to the Transferred Intellectual Property, as expressly provided in Section 2.1.1(e) below):

>       (a)     the Owned Inventory as of the Closing Date;

>       (b)     the Owned Equipment as of the Closing Date;

>       (c)     the Assigned Contracts in force as at the Closing Date;

>       (d)     the Business Information existing as at the Closing Date, subject to, in the case of the Business Information used in connection with a service provided to the Purchaser under the Transition Services Agreement, a license to the Sellers to use such Business Information solely for the purpose of providing any services thereunder, for so long as such services are provided under the Transition Services Agreement, and thereafter, such Business Information will be delivered to the Purchaser subject to a mutually agreed plan to deliver electronic Business Information to the Purchaser, and further subject to Section 2.1.2(g);

>       (e)     the Transferred Intellectual Property as of the Closing Date, subject to the licenses granted under such Intellectual Property prior to the date hereof or coming into existence after the date hereof, but prior to the Closing Date, and not in violation of Section 5.9(c), together with all claims against Third Parties for infringement, misappropriation or other violation of Law with respect to any of the Transferred Intellectual Property, whether for any past, present or future infringement, misappropriation or other violation;

>       (f)     all rights as of the Closing under all warranties, representations and guarantees made by suppliers, manufacturers and contractors to the extent related to the Assets described above;

>       (g)     the Consents of Government Entities and pending applications therefor listed in Section 2.1.1(g) of the Sellers Disclosure Schedule (the "**Seller Consents**");

    (h) the Employee Records with respect to Employees whose employment transfers to the Purchaser or a Designated Purchaser by operation of Law;

    (i) any Tax records required by Law to be transferred to the Purchaser; and

    (j) the CIP Accounts Receivable.

   **2.1.2. Excluded Assets.**  Notwithstanding anything in this Section 2.1.2 or elsewhere in this Agreement or in any of the Transaction Documents to the contrary, the Sellers shall retain their respective right, title and interest in and to, and the Purchaser and the Designated Purchasers shall have no rights with respect to the right, title and interest of the Sellers in and to, the following assets (collectively, the **"Excluded Assets"**):

    (a) cash and cash equivalents, accounts receivable (including intercompany receivables but excluding CIP Accounts Receivable), bank account balances and all petty cash of the Sellers;

    (b) subject to Section 5.20, any refunds due from, or payments due on, claims with the insurers of any of the Sellers in respect of losses arising prior to the Closing Date;

    (c) all rights to Tax refunds, credits or similar benefits relating to the Assets or the Business allocable to a Pre-Closing Taxable Period or to the portion of a Straddle Period ending on and including the Closing Date, except to the extent expressly transferred by this Agreement to the Purchaser or a Designated Purchaser;

    (d) any Security Deposits of the Sellers (including those relating to Assigned Contracts) except to the extent such Security Deposits are assigned to the Purchaser or a Designated Purchaser in accordance with Section 5.21;

    (e) other than the Assigned Contracts, any rights of the Sellers under any contract, arrangement or agreement (including, for the avoidance of doubt, and without limiting any rights under, the Subcontract Agreement, the Excluded 365 Contracts, the Non-Assigned Contracts, the Bundled Contracts and the Excluded Other Vendor Contracts);

    (f) the minute books, stock ledgers and Tax records of the Sellers other than the Tax records included in Section 2.1.1(i);

    (g) (i) any books, records, files, documentation or sales literature other than the Business Information, (ii) any Employee Records other than those required to be delivered to the Purchaser pursuant to Article VII and other than those that constitute Assets pursuant to Section 2.1.1(h), and (iii) such portion of the Business Information that the Sellers are required by Law (including Laws relating to privilege or privacy) to retain (provided that copies of such information shall be provided to the Purchaser to the extent permitted by applicable Law or such agreement) and/or not to disclose;

    (h) except for the Transferred Intellectual Property and any rights transferred or licensed under the other Transaction Documents, Intellectual Property of any

Seller (including the Sellers' names) or any Affiliates of any Seller or Intellectual Property owned by a Third Party;

(i)     all rights of the Sellers under this Agreement and the Ancillary Agreements;

(j)     all of the rights and claims of the U.S. Debtors available to the U.S. Debtors under the U.S. Bankruptcy Code, of whatever kind or nature, as set forth in Sections 544 through 551, inclusive, 553, 558 and any other applicable provisions of the U.S. Bankruptcy Code, and any related claims and actions arising under such Sections by operation of Law or otherwise, including any and all proceeds of the foregoing;

(k)     all records prepared in connection with the sale of the Business, other than those records that relate exclusively to the sale of the Business to the Purchaser and the Designated Purchasers (other than those records containing personal communication or notes relating to same which shall be Excluded Assets). For greater certainty, any records relating to negotiations with Third Parties in connection with the sale of the Business shall be Excluded Assets other than any confidentiality agreements with Third Parties executed in connection with the sale of the Business which are otherwise being assigned to the Purchaser in accordance with the provisions of this Agreement;

(l)     all stock or other equity interests in any Person;

(m)     any business, asset, product or service run, owned, managed and/or provided by NETAS, the LGN Joint Venture or any other joint venture (or similar arrangement) of the Sellers and the EMEA Sellers unless expressly included in this Agreement;

(n)     any assets set forth on Section 2.1.2(n) of the Sellers Disclosure Schedule; and

(o)     any and all other assets and rights of the Sellers not specifically included in Section 2.1.1.

In addition to the above, the Sellers shall have the right to retain, following the Closing, copies of any book, record, literature, list and any other written or recorded information constituting Business Information to which the Sellers in good faith determine they are reasonably likely to need access for *bona fide* business or legal purposes, which retained Business Information shall be held in accordance with Section 5.11.

**2.1.3.  Assumed Liabilities.** Upon the terms and subject to the conditions set forth in this Agreement, at the Closing, the Purchaser shall, and shall cause the relevant Designated Purchasers to, assume and become responsible for, and perform, discharge and pay when due (in accordance with their respective terms and subject to the respective conditions thereof), the following Liabilities (the **"Assumed Liabilities"**) and no others:

(a)     all Liabilities arising after the Closing Date to the extent related to the operation of the Business (excluding the EMEA Business) by the Purchaser following the

39

Closing, including (i) all Liabilities incurred after the Closing Date with respect to the ownership and operation of the Assets, (ii) all Liabilities incurred after the Closing Date related to Actions or claims brought against the Business (excluding the EMEA Business), and (iii) all Liabilities arising after the Closing Date under any products liability Laws or similar Laws concerning defective products manufactured or sold by the Business (excluding the EMEA Business) following the Closing Date;

(b)    (i) all Liabilities arising from or in connection with the performance of the Assigned Contracts (or breach thereof) after the Closing Date and (ii) all Liabilities, whether arising before, on or after the Closing Date, with respect to (A) any Cure Costs payable by the Purchaser pursuant to Section 2.1.7(b) of the Sellers Disclosure Schedule, (B) any obligation to buy back from the relevant resellers the Products sold by the Business (excluding the EMEA Business) to its resellers under the Seller Contracts (to the extent such Contracts are Assigned Contracts), (C) any obligations under any warranty liabilities relating to the Products and Services which have been supplied under any Assigned Contract including warranties in respect of Known Product Defects and (D) all liabilities and obligations of a type accrued on the Business' historic Financial Statements under the heading "Other Accrued and Contractual Liabilities" to the extent reflected in the final calculation of Net Working Capital Transferred;

(c)    all Liabilities resulting from any licensing assurances, declarations, agreements or undertakings relating to the Transferred Intellectual Property that the Sellers may have granted or committed to Third Parties including standard-setting bodies, that are set forth on Section 2.1.3(c) of the Sellers Disclosure Schedule, it being understood that the Sellers or their Affiliates may have made other licensing assurances, declarations or undertakings to various standard-setting bodies concerning the Transferred Intellectual Property, the Liabilities for such other assurances, declarations or undertakings are not assumed hereunder but are being referenced merely to provide notice thereof;

(d)    all Liabilities for, or related to, any obligation for, any Tax that the Purchaser or any Designated Purchaser bears under Article VI;

(e)    all obligations under any warranty liabilities, including warranties with respect to Known Product Defects, relating to Products and Services which have been supplied under any Bundled Contract subcontracted to the Purchaser or any Designated Purchaser under the Subcontract Agreement;

(f)    except to the extent otherwise expressly set forth in Article VII, all Liabilities related to or arising from or in connection with: (i) the Purchaser's or any Designated Purchasers' (or any of their Affiliates') employment or termination of employment (whether or not arising under or in respect of any Purchaser Employee Plan) of Transferred Employees after Closing; (ii) Purchaser's or a Designated Purchaser's failure to offer employment to any Employee that constitutes a violation of applicable Law; (iii) the failure of the Purchaser or any Designated Purchaser to satisfy its obligations with respect to the Employees, including the Transferred Employees, as set out in Article VII;

(g)    all Liabilities that relate to or arise from or in connection with any Purchaser Employee Plan;

40

(h)      any obligation to provide continuation coverage pursuant to COBRA or any similar Laws under any Purchaser Employee Plan that is a "group health plan" (as defined in Section 5000(b)(1) of the Code) to Transferred Employees and/or their qualified beneficiaries with respect to a qualifying event occurring on or after such Transferred Employees' Effective Hire Date;

(i)      all Liabilities related to the Transferred Employees set forth on Section 2.1.3(i) of the Sellers Disclosure Schedule (the "**Specified Employee Liabilities**"); and

(j)      all Liabilities related to Transferred Employees expressly assumed by the Purchaser or a Designated Purchaser as set out in Article VII.

**2.1.4.  Excluded Liabilities.**  Notwithstanding any provision in this Agreement to the contrary, the Purchaser shall not assume and shall not be obligated to assume or be obliged to pay, perform or otherwise discharge any Liability of the Sellers, and the Sellers shall be solely and exclusively liable with respect to all Liabilities of the Sellers, other than the Assumed Liabilities (collectively, the "**Excluded Liabilities**").  For the purpose of clarity, and without limitation of the generality of the foregoing, the Excluded Liabilities shall include, without limitation, each of the following liabilities of the Sellers:

(a)      all Indebtedness of the Sellers and their Affiliates;

(b)      all guarantees of Third Party obligations by the Sellers and reimbursement obligations to guarantors of the Sellers' obligations or under letters of credit;

(c)      any Liability of the Sellers or their directors, officers, stockholders or agents (acting in such capacities), arising out of, or relating to, this Agreement or the transactions contemplated by this Agreement, whether incurred prior to, at or subsequent to the Closing Date, including, without limitation, other than as specifically set forth herein, including with respect to the Assumed Liabilities, all finder's or broker's fees and expenses and any and all fees and expenses of any representatives of the Sellers;

(d)      other than as specifically set forth herein, any Liability relating to events or conditions occurring or existing in connection with, or arising out of, the Business as operated prior to the Closing Date, or the ownership, possession, use, operation or sale or other disposition prior to the Closing Date of the Assets (or any other assets, properties, rights or interests associated, at any time prior to the Closing Date, with the Business) including, without limitation, any liability with respect to Customer Contract Cure Costs or any Cure Cost payable by the Sellers pursuant to Section 2.1.7(b) and Section 2.1.7(c) of the Sellers Disclosure Schedule;

(e)      other than as specifically set forth in Article VII, the Assumed Liabilities, or as specifically set forth in the Loaned Employee Agreement, any Liability to any Person at any time employed by the Sellers or to any such Person's spouse, children, other dependents or beneficiaries, with respect to incidents, events, exposures or circumstances occurring at any time during the period or periods of any such Person's employment by the Sellers and arising from or related to such Person's employment by the

41