Sellers whenever such claims mature or are asserted, including, without limitation (except as otherwise specifically set forth in Article VII, the Assumed Liabilities or the Loaned Employee Agreement), all Liabilities arising (i) under the Seller Employee Plans, (ii) under any employment, wage and hour restriction, equal opportunity, discrimination, plant closing or immigration and naturalization Laws, (iii) under any collective bargaining Laws, agreements or arrangements or (iv) in connection with any workers' compensation or any other employee health, accident, disability or safety claims;

(f)      any Liability relating to any real properties owned, operated or otherwise controlled by the Sellers or their Affiliates (including the Real Property) to the extent arising from events or conditions occurring or existing prior to the Closing Date, including, without limitation, where connected with, arising out of or relating to: (i) Releases, Handling of Hazardous Materials or violations of Environmental Laws or (ii) claims relating to employee health and safety, including claims for injury, sickness, disease or death of any Person;

(g)      any Liability of the Sellers under Title IV of ERISA;

(h)      any pension or retirement Liability of the Sellers;

(i)      all Liabilities for, or related to, any obligation for any Tax that the Sellers bear under Article VI, and, for the avoidance of doubt, the Parties intend that no Purchaser or Designated Purchaser shall have any transferee or successor liability for any Tax Sellers bear under Article VI;

(j)      all Actions pending against the Sellers on or before the Closing Date or to the extent relating to the Business or the Assets prior to the Closing Date even if instituted after the Closing Date;

(k)      any Liability incurred by the Sellers or their respective directors, officers, stockholders, agents or employees (acting in such capacities) after the Closing Date;

(l)      except as provided in Section 2.1.3(b), all liabilities for accounts payable;

(m)      any Liability relating to or arising out of the ownership or operation of an Excluded Asset or the operation by the Sellers of any business other than the Business, whether before, on or after the Closing Date; and

(n)      those Liabilities set forth on Section 2.1.4(n) of the Sellers Disclosure Schedule.

### 2.1.5. Assumption and/or Assignment or Rejection of 365 Contracts.

(a)      On or before the date of the U.S. Bidding Procedures Order hearing, the Sellers shall provide to the Purchaser Section 2.1.5(a) of the Sellers Disclosure Schedule which shall set forth a list of all U.S. Debtor Contracts (other than Customer Contracts) that are Executory Contracts or unexpired leases entered into before the Petition Date. On or

before three (3) days before the date of the Auction, the Purchaser will provide to the Main Sellers a list (the "**365 Vendor Contract List**") of those U.S. Debtor Contracts from Section 2.1.5(a) of the Sellers Disclosure Schedule, that the Purchaser has elected to have the relevant U.S. Debtor assume and assign to the Purchaser or a Designated Purchaser at Closing pursuant to Section 365 of the U.S. Bankruptcy Code (Contracts that may be included on the 365 Vendor Contract List, the "**365 Vendor Contracts**"). Any time prior to January 15, 2010, the Purchaser may, by written notice to the Sellers, remove any 365 Vendor Contract from the 365 Vendor Contract List, in which event such 365 Vendor Contract shall cease to be an Assumed and Assigned Contract and shall instead be an Excluded 365 Contract for all purposes hereunder.

(b)     On or before the date of the U.S. Bidding Procedures Order hearing, the Sellers shall provide to the Purchaser Section 2.1.5(b) of the Sellers Disclosure Schedule which shall set forth a list (the "**365 Customer Contract List**") of all Customer Contracts of a U.S. Debtor that are Executory Contracts and were entered into before the Petition Date and that the relevant U.S. Debtor will assume and assign to the Purchaser or a Designated Purchaser at Closing pursuant to Section 365 of the U.S. Bankruptcy Code (Contracts that may be included on the 365 Customer Contract List, the "**365 Customer Contracts**" and, together with the 365 Vendor Contracts, the "**Assumed and Assigned Contracts**" (as referred to herein from time to time as "**365 Contracts**")).

(c)     The U.S. Debtors shall seek the approval of the U.S. Bankruptcy Court to the assumption and/or assignment of the Assumed and Assigned Contracts as part of the U.S. Sale Order in accordance with Section 5.1.

(d)     Any U.S. Debtor Contracts that are Executory Contracts or unexpired leases that the Purchaser elects not to have assigned pursuant to Section 2.1.5(a) shall be referred to as an "**Excluded 365 Contract**" and shall not be an Assigned Contract hereunder.

2.1.6.  **Assignment of Other Vendor Contracts and Other Customer Contracts.**

(a)     On or before a date that is thirty (30) days from the date hereof, the Sellers shall provide to the Purchaser Section 2.1.6(a) of the Sellers Disclosure Schedule which shall set forth a list of Other Vendor Contracts (other than Non-Assignable Contracts). On or before December 31, 2009, the Purchaser shall notify the Sellers of (i) any Other Vendor Contracts (other than Non-Assignable Contracts) that the Purchaser wants the relevant Seller to assign to the Purchaser or a Designated Purchaser at the Closing (the "**Designated Other Vendor Contracts**") and (ii) any Other Vendor Contracts (other than Non-Assignable Contracts) that Purchaser does not want the relevant Seller to assign to the Purchaser or a Designated Purchaser at the Closing (the "**Excluded Other Vendor Contracts**"). On or before January 15, 2010 the Purchaser may by written notice to the Main Sellers, modify the lists of Designated Other Vendor Contracts and Excluded Other Vendor Contracts for all purposes hereunder.

(b)     On or before a date that is thirty (30) days from the date hereof, the Sellers shall provide to the Purchaser Section 2.1.6(b) of the Sellers Disclosure Schedule

which shall set forth a list of Non-Assignable Contracts with suppliers of products or services to the Business. On or before December 31, 2009, the Purchaser shall notify the Sellers of (i) any Non-Assignable Contracts with suppliers of products or services to the Business that the Purchaser wants the relevant Seller to attempt to assign to the Purchaser or a Designated Purchaser at the Closing (the "**Designated Non-Assignable Supply Contracts**") and (ii) any Non-Assignable Contracts with suppliers of products or services to the Business that the Purchaser does not want the relevant Seller to assign to the Purchaser or a Designated Purchaser at the Closing (the "**Excluded Non-Assignable Supply Contracts**"). On or before January 15, 2010, the Purchaser may by written notice to the Main Sellers, modify the lists of Designated Non-Assignable Contracts and Excluded Non-Assignable Contracts for all purposes hereunder.

(c)    On or before a date that is thirty (30) days from the date hereof, the Sellers shall provide to the Purchaser Section 2.1.6(c) of the Sellers Disclosure Schedule which shall set forth a list of those Customer Contracts other than 365 Customer Contracts and other than Non-Assignable Contracts to be assigned by the relevant Seller to the Purchaser or a Designated Purchaser at Closing (the "**Designated Other Customer Contracts**").

(d)    On or before a date that is thirty (30) days from the date hereof, the Sellers shall provide to the Purchaser Section 2.1.6(d) of the Sellers Disclosure Schedule which shall set forth a list of Non-Assignable Contracts (other than 365 Contracts) with customers of the Business which the relevant Seller will attempt to assign to the Purchaser or a Designated Purchaser at Closing (the "**Designated Non-Assignable Customer Contracts**" and together with the Designated Non-Assignable Supply Contracts, the "**Designated Non-Assignable Contracts**").

(e)    The Parties shall use commercially reasonable efforts to obtain all Consents required to permit the assignment to the Purchaser or a Designated Purchaser of the Designated Non-Assignable Contracts; provided, however, that the Sellers shall be under no obligation to compromise any right, asset or benefit or to expend any amount or incur any Liability in seeking such Consents and, for greater certainty, the failure to obtain any or all of such Consents shall not in itself entitle the Purchaser to terminate this Agreement or fail to complete the transactions contemplated hereby or entitle the Purchaser to any adjustment to the Purchase Price.

(f)    Subject to Section 2.1.10 and Section 5.14, all the Designated Other Vendor Contracts, Designated Other Customer Contracts and the Designated Non-Assignable Contracts in force at the Closing shall be assigned to the Purchaser or a Designated Purchaser at the Closing pursuant to Section 2.1.1(c).

(g)    For those Designated Non-Assignable Customer Contracts for which the Sellers are unable to obtain any required Consent on or before January 25, 2010, the relevant Sellers shall use commercially reasonable efforts to enter into one or more Subcontract Agreements between the Sellers and the Purchaser with respect to such Designated Non-Assignable Customer Contracts; provided that (x) the Sellers shall not renew any Designated Non-Assignable Customer Contract once it has expired unless both the relevant Seller and Purchaser agree, (y) the Sellers shall have the right, any time after the

date that is one year after the Closing Date, to exercise any right to terminate any Designated Non-Assignable Customer Contract, and (z) the Sellers shall be under no obligation to compromise any right, asset or benefit or to expend any amount or incur any Liabilities in order to comply with its obligations under this sentence.

### 2.1.7. Cure Costs; Adequate Assurance.

(a)     On or before the date of the U.S. Bidding Procedures Order hearing, the Sellers shall provide to the Purchaser Section 2.1.7(a) of the Sellers Disclosure Schedule which shall set forth a list of all of the following: (i) each 365 Vendor Contract and the aggregate amount of Cure Costs, in the Sellers' estimate, owed to each counterparty to such 365 Vendor Contract, (ii) each exclusive Other Vendor Contract that, in the Sellers' estimate, is subject to Cure Costs in excess of $100,000 and the aggregate amount of Cure Costs, in the Sellers' estimate, owed with respect to such Other Vendor Contract, and (iii) each supplier to the Business who supplies products or services pursuant to Non-Exclusive Supply Contracts who, in the Sellers' estimate, is owed Cure Costs thereunder in excess of $100,000 and the aggregate amount of Cure Costs, in the Sellers' estimate, owed to each such supplier.

(b)     Section 2.1.7(b) of the Sellers Disclosure Schedule sets forth the manner in which Cure Costs shall be paid under this Agreement and certain agreements of the Parties with respect thereto.

(c)     Section 2.1.7(c) of the Sellers Disclosure Schedule sets forth the manner in which Customer Contract Cure Costs shall be paid under this Agreement and certain agreements of the Parties with respect thereto.

(d)     This Agreement may be terminated by the Purchaser at any time prior to Closing in accordance with clause (C) of Section 2.1.7(b)(I) of the Sellers Disclosure Schedule, and in the event of such termination, the Purchaser shall be entitled to a termination payment of $21,392,000.

(e)     Prior to the U.S. Sale Hearing, the Purchaser shall provide adequate assurance of its and the relevant Designated Purchasers' future performance under each Assumed and Assigned Contract to the parties thereto (other than the U.S. Debtors) in satisfaction of Section 365(f)(2)(B) of the U.S. Bankruptcy Code.

### 2.1.8. Local Sale Agreements.
Subject to the terms and conditions hereof, if reasonably requested in writing by the Purchaser or the Sellers to effect the Closing on the terms hereof, the relevant Sellers shall, and the Purchaser shall, and shall cause the relevant Designated Purchasers to, enter into such agreements or instruments, including bills of sale and/or assignment and assumption agreements (the "**Local Sale Agreements**"), providing for (i) the sale, transfer, assignment or other conveyance to the Purchaser and relevant Designated Purchasers, in accordance with the requirements of applicable local Law, of any Assets located in the specified countries reasonably requested by the Sellers or the Purchaser, and (ii) the assumption by the Designated Purchasers of any Assumed Liability that the Purchaser intends to allocate to them. Such Local Sale Agreements shall promptly be negotiated in good faith

between the Main Sellers and the Purchaser. In the event of a conflict between this Agreement and the Local Sale Agreements, this Agreement shall prevail.

        **2.1.9.  EMEA Asset Sale Agreement.**  Notwithstanding anything to the contrary in this Agreement, except to the extent expressly incorporated by reference into the EMEA Asset Sale Agreement, none of the EMEA Sellers or the directors of any of them, the Joint Administrators or the Joint Israeli Administrators shall assume, or be deemed to assume, any obligation or liability whatsoever under this Agreement and nothing in this Agreement shall apply to, or govern, the sale, assignment, transfer, retention or assumption of assets, rights, properties or Liabilities of, or by, any EMEA Seller, the Joint Administrators or the Joint Israeli Administrators in any manner whatsoever. The only assets, rights, properties and Liabilities of the EMEA Sellers, the Joint Administrators or the Joint Israeli Administrators that are being sold, assigned or transferred to, and assumed by, the Purchaser or the EMEA Designated Purchasers, and the terms and conditions thereof, and except as expressly set forth in this Agreement as made by the Sellers, and not, for the avoidance of doubt, the EMEA Sellers, the representations with respect thereto are solely as expressly set forth in the EMEA Asset Sale Agreement. Except as provided in the EMEA Asset Sale Agreement, neither the Purchaser nor any Designated Purchaser shall be entitled to make any claim under this Agreement, or assert any right hereunder, against any Person other than the Sellers, their successors or assigns.

        **2.1.10.  Non-Assignable Assets.**  Notwithstanding anything in this Agreement to the contrary, if the requisite Consent has not been obtained on or prior to Closing, then, unless such Consent is subsequently obtained, this Agreement shall not constitute an agreement to sell, transfer or assign, directly or indirectly, any Asset, or any obligation or benefit arising thereunder if an attempted direct or indirect sale, transfer or assignment thereof, without the Consent of a Third Party, including a Government Entity, would constitute a breach, default, violation or other contravention of the rights of such Third Party or would be ineffective with respect to any party to a Contract concerning such Asset. For greater certainty, failure to obtain any such Consent shall not entitle the Purchaser to terminate this Agreement or fail to complete the transactions contemplated hereby or entitle the Purchaser to any adjustment of the Purchase Price. In the case of Consents, Contracts and other commitments included in the Assets (i) that cannot be transferred or assigned without the consent of Third Parties, which consent has not been obtained prior to the Closing, the Sellers shall, at the Purchaser's sole out-of-pocket cost, reasonably cooperate with the Purchaser in endeavoring to obtain such Consent and, if any such Consent is not obtained, the Sellers shall, following the Closing, at the Purchaser's sole out-of-pocket cost, cooperate with the Purchaser in all reasonable respects to provide to the Purchaser with the benefit of such Consent, Contract or other commitment, or (ii) that are otherwise not transferable or assignable, the Sellers shall, following the Closing, at the Purchaser's sole out-of-pocket cost, reasonably cooperate with the Purchaser to provide to the Purchaser with the benefit of such Consent, Contract or other commitment. The obligation of the Sellers to provide such reasonable cooperation under this Section 2.1.10 shall terminate on the date that is one (1) year following the Closing Date and after such time period, the Sellers shall have no further obligation to so cooperate nor shall the Sellers bear any liability for the failure to obtain such Consents within such one year period.

**SECTION 2.2.  Purchase Price.**

**2.2.1.  Purchase Price.**

(a)    Pursuant to the terms and subject to the conditions set forth in this Agreement, in consideration of the purchase, sale, assignment and conveyance of the Sellers' and EMEA Sellers' right, title and interest in, to and under the Assets and the EMEA Assets, respectively, pursuant to the terms hereof and pursuant to the terms of the EMEA Asset Sale Agreement, respectively, and of the rights granted by certain Sellers and the EMEA Sellers under the Intellectual Property License Agreement and the Trademark License Agreement, the Purchaser, on its own behalf and as agent for the relevant Designated Purchasers, shall (i) assume and become obligated to pay, perform and discharge, when due, the Assumed Liabilities and the EMEA Assumed Liabilities, (ii) subject to adjustment following the Closing in accordance with Section 2.2.4.2, pay to the Distribution Agent an amount of cash (the **"Cash Purchase Price"**) equal to Five Hundred Thirty Million dollars ($530,000,000) (the **"Base Cash Purchase Price"**) less the Escrow Amount and as adjusted pursuant to Sections 2.2.2 and 2.2.4 and Section 5.28 of the Sellers Disclosure Schedule or as otherwise expressly provided herein, in the Real Estate Terms and Conditions or in the EMEA Asset Sale Agreement, and (iii) subject to Section 2.2.7, issue to the Distribution Agent, as agent for the Sellers and the EMEA Sellers, $239,000,000 aggregate principal amount (the **"Aggregate Principal Amount"**) of 6.0% Senior Notes due June 15, 2017  (the **"Convertible Notes"**, and together with the Cash Purchase Price, as adjusted, the **"Purchase Price"**) convertible at the holder's option into Common Stock at a conversion price equal to $16.4625 (the **"Conversion Price"**), subject to adjustments contemplated in the Indenture; provided, however, that the Purchaser may, by written notice to the Sellers on or before the Closing Date, elect to increase the Cash Purchase Price and the Base Cash Purchase Price payable pursuant to clause (ii) above by up to the Aggregate Principal Amount in lieu of issuing the corresponding face amount of the Convertible Notes (such election, if exercised, the **"Cash Replacement Election"**); provided further, that if the Market Value of the Common Stock on the date of the notice of such election (or in the case the replacement is made with the proceeds of a simultaneous convertible security offering the most recent closing price per share of the Common Stock on the NASDAQ Global Select Market at the time such convertible security offering is priced) is equal to or greater than $17.00 per share of Common Stock, then in lieu of increasing the Cash Purchase Price by the Aggregate Principal Amount such increase will equal the Optional Redemption Price corresponding to such Aggregate Principal Amount.

(b)    Except as provided in Section 2.2.1(a), the Convertible Notes shall be issued on terms substantially the same as the terms of the Existing 2017 Senior Notes as set forth in the indenture with respect thereto except that (i) references to quotation on an automated over the counter trading market contained in the "Fundamental Change" definition of the 2017 Existing Senior Notes indenture will be omitted in the equivalent definition in the documentation for the Convertible Notes, (ii) the related share adjustment amount table (with conforming changes to minimum and maximum adjustment amounts described elsewhere) is replaced by the table attached hereto as Exhibit 2.2.1(b)(ii), (iii) following the Closing but prior to the Liquidity Date, the Purchaser may redeem the Convertible Notes at any time for cash at a redemption price per $1,000 principal amount of Convertible Notes equal to the greater of (a) $1,050.00 and (b) the product of (x) the closing

47

price per share of the Common Stock on the NASDAQ Global Select Market on the date of notice of such redemption (or in the case of redemption with the proceeds of a simultaneous convertible bond offering the most recent closing price per share of the Common Stock on the NASDAQ Global Select Market at the time such convertible bond offering is priced) multiplied by (y) the Conversion Rate (as defined in the Indenture) applicable to the Convertible Notes on such date, as increased by a number of additional shares determined by reference to the number of such additional Shares, the most recent closing price per share of the Common Stock on the NASDAQ Global Select Market at the time the simultaneous convertible security offering is priced and the time of such redemption as set forth in the table attached hereto as Exhibit 2.2.1(b)(iii) (using the date of notice of redemption or the date of pricing of such simultaneous convertible security offering as the referenced effective date and the closing price per share of the Common Stock on The NASDAQ Global Select Market), multiplied by (z) .95, plus, in each case, accrued and unpaid interest from the date of issuance (the "**Optional Redemption Price**"), and (iv) the indenture with respect to the Convertible Notes will reflect the post-Closing offer requirement set forth in Section 2.2.1(c) below.

(c)    In the event that the Purchaser completes any capital raising transaction through the issuance and sale of debt or equity securities for cash during the period after the date hereof through and including the Closing Date, the Purchaser shall be required to exercise the Cash Replacement Election to the extent of the net proceeds of such capital raising transaction. In the event that the Purchaser completes any capital raising transaction through the issuance and sale of debt or equity securities for cash during the period following the Closing Date but prior to the earlier of the date on which the Initial Shelf Registration Statement becomes effective or the date on which the Registrable Securities are otherwise Freely Tradeable (such date, the "**Liquidity Date**"), the Purchaser shall be required to offer to use the net proceeds therefrom to replace the Convertible Notes for an amount equal to the Optional Redemption Price.

(d)    Notwithstanding Sections 2.2.1(a), (b) and (c) above, in the event that the Market Value of the Common Stock (rounded to the nearest whole cent) as of the Closing Date is less than $13.17, the interest rate on the Convertible Notes shall be increased as follows:

| Market Value | Interest Rate |
| --- | --- |
| More than $13.16 | 6.00% |
| $13.00-$13.16 | 6.25% |
| $12.75-$12.99 | 6.50% |
| $12.50-$12.74 | 6.75% |
| $12.25-$12.49 | 7.00% |
| $12.00-$12.24 | 7.25% |
| $11.75-$11.99 | 7.50% |
| $11.50-$11.74 | 7.75% |
| Less than $11.49 | 8.00% |

### 2.2.2. Estimated Cash Purchase Price.

(a)    For purposes of determining the amount of cash to be paid as the Cash Purchase Price by the Purchaser to the Sellers at the Closing pursuant to Section 2.2.1, at least three (3) Business Days prior to the Closing Date but no more than ten (10) Business Days prior to the Closing Date, the Main Sellers shall deliver to the Purchaser their good faith estimate of the Closing Date Net Working Capital Transferred (the "**Estimated Closing Date Net Working Capital Transferred**") setting forth in reasonable detail the Main Sellers' calculation thereof. The Main Sellers' calculation of the Estimated Closing Date Net Working Capital shall be subject to the review and approval of the Purchaser, which approval shall not be unreasonably withheld. The Main Sellers shall cooperate with the Purchaser and shall provide such information as may be reasonably requested in connection with such review.

(b)    The "**Estimated Adjustment Amount**," which may be positive or negative, shall mean (i) the Estimated Closing Date Net Working Capital Transferred, minus (ii) $167,000,000. If the Estimated Adjustment Amount is a positive number, then the Cash Purchase Price shall be increased on the Closing Date by the Estimated Adjustment Amount, and if the Estimated Adjustment Amount is a negative number, then the Cash Purchase Price shall be decreased on the Closing Date by the absolute value of the Estimated Adjustment Amount.

(c)    The Parties agree that the Cash Purchase Price to be paid at Closing shall also be decreased in accordance with clause 3.5 and Schedule 8 of the EMEA Asset Sale Agreement.

### 2.2.3. Additional Adverse Bankruptcy Proceedings; Adverse International Injunctions; Excluded Entities.

(a)    Other than as set forth in Section 2.2.3(d), if at any time prior to the Closing Date, (i) any Seller that is a Non-Debtor Seller as of the date hereof shall have commenced voluntary or involuntary bankruptcy, insolvency, administration or judicial proceedings similar to the Bankruptcy Proceedings in any country or other jurisdiction (each such proceeding, an "**Additional Adverse Bankruptcy Proceeding**") or (ii) there shall be in effect any Law or Order of any court or other Government Entity in any country or other jurisdiction (other than the U.S., Canada or the United Kingdom) prohibiting in such jurisdiction the consummation of the transactions contemplated hereby or any pending proceeding by any such Government Entity seeking such prohibition (such Law, Order or proceeding, an "**Adverse International Injunction**"), then (A) the Main Sellers shall promptly notify the Purchaser of such Additional Adverse Bankruptcy Proceeding or such an Adverse International Injunction, as applicable, and, to the extent the Main Sellers are aware of the same, identify the Assets or assets of a Person that are subject to such Additional Adverse Bankruptcy Proceeding or Adverse International Injunction (the "**Restricted Assets**"), (B) the Parties shall, in respect of the Restricted Assets, use their commercially reasonable efforts to take, or cause to be taken, all actions and to do, or cause to be done, and cooperate with each other in order to do, all things necessary, proper or advisable under applicable Law to transfer, sell and assign all of the Sellers' right, title and interest in the Restricted Assets to the Purchaser or a Designated Purchaser, as applicable, as

49

contemplated hereby on the Closing Date on the terms and conditions set forth herein, notwithstanding the Additional Adverse Bankruptcy Proceeding or Adverse International Injunction, as applicable; provided, however, nothing contained herein shall require the Purchaser or any Designated Purchaser to take any action in violation of applicable Law or any Order or which would subject the Purchaser or any Designated Purchaser to any material liability other than the Assumed Liabilities or to incur any material out-of-pocket cost.

(b)     If, ten (10) Business Days prior to Closing, it has become apparent to the Parties that such Additional Adverse Bankruptcy Proceeding or Adverse International Injunction will or may prevent one or more Sellers (each a "**Restricted Seller**") from assigning the Restricted Assets to the Purchaser or a Designated Purchaser, as applicable, as of the Closing Date, then, as of the Closing Date, such Restricted Assets shall automatically be deemed Excluded Assets hereunder, the Sellers shall be excused from delivering the Restricted Assets and, without prejudice to all other obligations of the Purchaser and the other Sellers hereunder, the Purchaser shall be relieved from its rights and obligations to acquire such Restricted Assets, to assume any Assumed Liabilities in respect thereof (the "**Restricted Liabilities**") or to make offers to, or employ, any Employee who is employed by any Seller who is subject to such Additional Adverse Bankruptcy Proceeding or Adverse International Injunction or who devotes more than 50% of his or her working time to the business of any such Sellers (each a "**Restricted Employee**"). The Purchase Price, including the Cash Purchase Price paid to the Sellers at the Closing, shall be reduced, with respect to such Restricted Assets and Restricted Liabilities, by an amount equal to the product of (x) the sum of the revenues for the one year period ended on December 31, 2008 (the "**2008 Revenues**") for all Restricted Sellers as set forth on Exhibit X, times (y) 0.4088; provided, however, if the sum of the 2008 Revenues for all Restricted Sellers and all EMEA Sellers that are designated Restricted Sellers pursuant to the EMEA Asset Sale Agreement as set forth on Exhibit X exceeds $120,000,000, the Purchase Price, including the Cash Purchase Price paid to the Sellers at the Closing, shall be reduced, with respect to such Restricted Assets and Restricted Liabilities, by an amount equal to the product of (x) the sum of the 2008 Revenues for all Restricted Sellers as set forth on Exhibit X, times (y) 0.5314.

(c)     Subject to Section 5.4 and Section 5.5, for a period of thirty (30) days following the Closing, the Sellers and the Purchaser shall, in respect of the Restricted Assets, continue to use their commercially reasonable efforts to take, or cause to be taken, all actions and to do, or cause to be done, and cooperate with each other in order to do, all things necessary, proper or advisable under applicable Law to assign the Restricted Assets of the relevant Restricted Seller to the Purchaser or a Designated Purchaser, as promptly as reasonably practicable within such period; provided, however, nothing contained herein shall require the Purchaser or any Designated Purchaser to take any action in violation of applicable Law or any Order or which would subject the Purchaser or a Designated Purchaser to any material liability other than the Assumed Liabilities or to incur any material out-of-pocket cost. In the event that the Sellers are unable to cause the Adverse International Injunction to be terminated or to otherwise complete the transaction in accordance with the proviso above on or before the date that is 30 days after the Closing Date, neither the Purchaser nor any Designated Purchaser shall have any further obligation

with respect to the Restricted Assets, Restricted Liabilities or the Restricted Employees.  To the extent the Restricted Assets are assigned to the Purchaser or a Designated Purchaser, as applicable, the Purchaser or a Designated Purchaser shall assume the related Restricted Liabilities and make offers to and employ as provided in Article VII the Restricted Employees, then as of the transfer date: (i) the Restricted Assets, the Restricted Liabilities and the Restricted Employees shall be deemed respectively Assets, Assumed Liabilities and Transferred Employees hereunder; and (ii) the Purchaser shall pay to the Distribution Agent, as an adjustment to the Purchase Price hereunder, by wire transfer to the account designated by the Distribution Agent pursuant to Section 2.3.2(b) an amount in cash equal to the amount that the Purchase Price was reduced pursuant to subsection (b) above with respect to such Restricted Seller.

(d)     Section 2.2.3(d) of the Sellers Disclosure Schedule sets forth the manner in which certain Sellers or Affiliates of any Seller (and their Assets, and Liabilities) may be excluded from the transactions contemplated by this Agreement.

(e)     The Purchase Price, including the Cash Purchase Price, shall also be adjusted in accordance with clause 3.5 and Schedule 8 of the EMEA Asset Sale Agreement.

### 2.2.4.  Purchase Price Adjustment.    Closing Statement; Dispute Resolution

(a)     As promptly as practicable (and in any event within 90 days after the Closing), the Purchaser shall prepare and deliver to the Main Sellers and the EMEA Sellers an unaudited statement (the **"Closing Statement"**) setting forth in reasonable detail the Net Working Capital Transferred of the Business as of the Closing Date (the **"Closing Date Net Working Capital Transferred"**) and each component thereof.  Following the Closing, the Purchaser shall provide the Main Sellers and their representatives access to the records and employees of the Business to the extent relevant for the preparation of the Closing Statement and shall cause the employees of the Business to cooperate with the Main Sellers in connection with their review of the Closing Statement.  **"Net Working Capital Transferred"** as of the Closing Date shall mean an amount equal to (i) the Closing Inventory Amount, plus (ii) the Closing CIP Accounts Receivable Amount, minus (iii) the Closing Warranty Provision, minus (iv) the Closing KPD Provision, minus (v) the Closing Net Deferred Revenues, minus (vi) the Closing Other Accrued and Contractual Liabilities, minus (vii) the Closing Accrued Vacation and Service Award Amount, minus (viii) the Closing Retirement Obligation Amount, minus (ix) the Excess ARD Employees Amount.

(b)     If the Main Sellers disagree with the calculation of Closing Date Net Working Capital Transferred, they shall notify the Purchaser of such disagreement in writing, setting forth in reasonable detail the particulars of such disagreement, within thirty (30) days after their receipt of the Closing Statement.  In the event that the Main Sellers do not provide such a notice of disagreement within such thirty (30) day period, the Main Sellers shall be deemed to have accepted the Closing Statement and the calculation of the Closing Date Net Working Capital Transferred delivered by the Purchaser, which shall be final, binding and conclusive for all purposes hereunder.  In the event any such notice of disagreement is timely provided, the Purchaser and the Main Sellers shall use commercially reasonable efforts for a period of thirty (30) days (or such longer period as they may mutually agree) to resolve any disagreements with respect to the calculations of Closing

51

Date Net Working Capital Transferred. If, at the end of such period, they are unable to resolve such disagreements, then the Independent Auditor as arbitrator (or such other independent accounting firm of recognized national standing as may be mutually selected by the Purchaser and the Main Sellers) (the "**Accounting Arbitrator**") shall resolve any remaining disagreements. The Accounting Arbitrator shall determine as promptly as practicable, but in any event within thirty (30) days of the date on which such dispute is referred to the Accounting Arbitrator, whether the Closing Statement was prepared in accordance with the standards set forth in Section 2.2.4.1 and (only with respect to the remaining disagreements submitted to the Accounting Arbitrator) whether and to what extent (if any) Closing Date Net Working Capital Transferred require adjustment. The fees and expenses of the Accounting Arbitrator shall be paid inverse *pro rata* by the Primary Parties based on the final position of each of the Primary Parties as submitted to the Accounting Arbitrator relative to the Accounting Arbitrator's final determination. The determination of the Accounting Arbitrator shall be final, conclusive and binding on the Parties. The date on which Closing Date Net Working Capital Transferred is finally determined in accordance with this Section 2.2.4.1 is hereinafter referred as to the "**Determination Date**."

### 2.2.4.2. Purchase Price Adjustment

(a)     The "**Adjustment Amount**," which may be positive or negative, shall mean the Closing Date Net Working Capital Transferred, <u>minus</u> the Estimated Closing Date Net Working Capital Transferred. If the Adjustment Amount is a positive number, then the Base Cash Purchase Price shall be increased by the Adjustment Amount, and if the Adjustment Amount is a negative number, the Base Cash Purchase Price shall be decreased by the absolute value of the Adjustment Amount. The Adjustment Amount shall be paid in accordance with Section 2.2.4.2(b) below.

(b)     **Adjustment Payments.**

(i)     If the Adjustment Amount is a positive number (such amount, the "**Increase Amount**"), then, promptly following the Determination Date, and in any event within five (5) Business Days of the Determination Date:

(A)     the Purchaser shall pay to the Distribution Agent the Increase Amount, as finally determined, together with interest thereon from the Closing Date to the date of payment at the prime rate of interest published in the "Money Rates" column of the Eastern Edition of the Wall Street Journal (or the average of such rates if more than one rate is indicated) on the Closing Date (the "**Prime Rate**"); and

(B)     the Parties shall cause the Escrow Agent to pay to the Distribution Agent the full Working Capital Escrow Amount, together with interest thereon from the Closing Date to the date of payment at the Prime Rate.

Any cash payment of the Increase Amount shall be paid in cash by wire transfer of immediately available funds to the bank account(s) designated in writing by the Distribution Agent.

(ii)    If the Adjustment Amount is a negative number (the absolute value of such amount, the **"Deficit Amount"**), then, promptly following the Determination Date, and in any event within five (5) Business Days of the Determination Date:

(A)    the Parties shall cause the Escrow Agent to pay to the Purchaser, on its own behalf and in its capacity as agent for the Designated Purchasers and EMEA Designated Purchasers, the lesser of (x) the Deficit Amount, as finally determined, together with interest thereon from the Closing Date to the date of payment at the Prime Rate, and (y) the Working Capital Escrow Amount;

(B)    in the event that the Deficit Amount exceeds the Working Capital Escrow Amount, the Sellers shall cause the Distribution Agent to pay to the Purchaser, on its own behalf and in its capacity as agent for the Designated Purchasers and EMEA Designated Purchasers, an amount equal to the amount by which the Deficit Amount, as finally determined, together with the interest thereon from the Closing Date to the date of payment at the Prime Rate, exceeds the Working Capital Escrow Amount; and

(C)    to the extent that there is any Working Capital Escrow Amount remaining after payment of the Deficit Amount, such amount shall be returned to the Distribution Agent in accordance with the terms of the Escrow Agreement.

Any cash payment of the Deficit Amount shall be paid in cash by wire transfer of immediately available funds to the bank account(s) designated in writing by the Purchaser or the Distribution Agent, as applicable.

### 2.2.5. Escrows.

(a)    At the Closing, each of the Main Sellers, the EMEA Sellers or an authorized representative of the EMEA Sellers and the Purchaser shall enter into the Escrow Agreement with the Escrow Agent in respect of the Working Capital Escrow Amount, the Transition Services Escrow Amount, the Carling Property Escrow Amount, the Tax Escrow Amount, the EMEA Tax Escrow Amount, the Italian Tax Escrow Amount and the matters set forth on Section 2.1.7(b) of the Sellers Disclosure Schedule.

(b)    Each of the Main Sellers, the EMEA Sellers or an authorized representative of the EMEA Sellers and the Purchaser hereby undertake to promptly execute and deliver to the Escrow Agent, in accordance with the Escrow Agreement, instructions to pay to the Sellers or the Purchaser, as applicable, funds from the escrow account established pursuant to the Escrow Agreement any time that such Person becomes entitled to such payment from the escrow account pursuant to the terms of the Escrow Agreement and (i) Section 2.2.4.2 in respect of the Working Capital Escrow Amount, (ii) the terms of the Transition Services Agreement in respect of the Transition Services Escrow Amount, (iii) the terms of the Carling Property Lease Agreements in respect of the Carling Property Escrow Amount, (iv) Section 6.7 in respect of the Tax Escrow Amount, (v) Section 6.8 in respect of the EMEA Tax Escrow Amount, (vi) Section 6.9 in respect of the Italian Tax Escrow Amount and (vii) the terms of Section 2.1.7(b) of the Sellers Disclosure Schedule.

### 2.2.6. Purchase Price Allocation.

(a)     The Parties and the EMEA Sellers shall (i) first allocate to the tangible Assets, the tangible EMEA Assets, the CIP Accounts Receivable and the EMEA CIP Accounts Receivable, a portion of the Purchase Price as adjusted in accordance with the terms of this Agreement and the EMEA Asset Sale Agreement (and, to the extent properly taken into account under the applicable Tax Laws, the Assumed Liabilities and the EMEA Assumed Liabilities), if any, equal to the net book value of such tangible Assets, tangible EMEA Assets, the CIP Accounts Receivable and the EMEA CIP Accounts Receivable as of the Closing Date and (ii) then allocate the balance of the Purchase Price, as adjusted in clause (i) of this Section 2.2.6(a), to the intangible Assets and the intangible EMEA Assets.

(b)     To the extent necessary to file Transfer Tax Returns, the Parties and the EMEA Sellers shall negotiate in good faith to determine an allocation of the Purchase Price (and, to the extent properly taken into account under the applicable Tax Laws, the Assumed Liabilities), among the Assets and the EMEA Assets in accordance with the principles of Section 1060 of the Code and the Treasury regulations promulgated thereunder and other applicable Tax Laws, which allocation shall be subject to the principles of Section 2.2.6(a) (such allocation, a **"Partial Allocation"**).  If the Parties and the EMEA Sellers do not reach agreement on a Partial Allocation after negotiating in good faith, the Partial Allocation shall be submitted to the Accounting Arbitrator, which shall prepare a final Partial Allocation; provided, however, that if a different Partial Allocation is required by a Government Entity (including for this purpose an allocation required, approved or authorized pursuant to a Bankruptcy Proceeding), then the Partial Allocation shall be modified as necessary to be consistent with the required allocation (but in all cases shall be subject to the principles of Section 2.2.6(a)).  Notwithstanding the preceding sentence, if the Parties have not reached agreement on the Partial Allocation and the Accounting Arbitrator has not submitted its determination on or before the date that a Transfer Tax Return is required to be filed with the relevant Tax Authority (giving effect to any valid extensions), then such Transfer Tax Return shall be timely filed in the manner that the Party with primary responsibility for the payment of the Transfer Taxes under this Agreement reasonably determines (the **"Transfer Tax Determination"**), provided that such Transfer Tax Determination shall have a reasonable prospect of being sustained, and shall, upon receiving the Accounting Arbitrator's later determination and to the extent permitted under applicable Law, the filing Party shall promptly file, or cause to be filed, an amended return in accordance therewith.  The Purchaser agrees to indemnify and hold harmless the Sellers and their respective officers and directors from any Losses arising out of or resulting from the Transfer Tax Determination, including without limitation, any Tax, interest, penalty or sanction.  The Parties agree to be bound by the final Partial Allocation accepted by the Parties or prepared by the Accounting Arbitrator (as modified to be consistent with the allocation required by a Government Entity, described above), as applicable.  The Parties and the EMEA Sellers agree to act in accordance with the allocations contained in such final Partial Allocation for all purposes relating to Transfer Taxes (including the preparation, filing and audit of any Transfer Tax Returns).

### 2.2.7.  <u>Certain Payment Mechanics and Allocations for the Convertible Notes</u>.

(a)      Notwithstanding anything to the contrary in this Agreement, but subject to Section 2.2.7(b) unless, prior to the Closing, the Purchaser notifies the Sellers in writing that this Section 2.2.7 shall not apply or unless the Purchaser exercises the Cash Replacement Election in full, (i) a portion of the Purchase Price payable to the Distribution Agent, as agent for the U.S. Sellers, as consideration for the U.S. Sellers' right, title and interest in, to and under the Assets transferred by such U.S. Sellers to the Purchaser or a Designated Purchaser hereunder will include that portion of the Convertible Notes being delivered pursuant to Section 2.2.1 set forth on Section 2.2.7(a)(i) of the Sellers Disclosure Schedule and any remaining portion of the Purchase Price payable to the Distribution Agent as agent for the U.S. Sellers hereunder shall be paid to the Distribution Agent in cash as part of the Cash Purchase Price, (ii) a portion of the Purchase Price payable to the Distribution Agent, as agent for the UK Sellers, as consideration for the UK Sellers' right, title and interest in, to and under the EMEA Assets transferred by such UK Sellers to the Purchaser or an EMEA Designated Purchaser under the EMEA Asset Sale Agreement will include that portion of the Convertible Notes being delivered pursuant to Section 2.2.1 set forth on Section 2.2.7(a)(ii) of the Sellers Disclosure Schedule and any remaining portion of the Purchase Price payable to the Distribution Agent as agent for the UK Sellers hereunder shall be paid to the Distribution Agent in cash as part of the Cash Purchase Price, (iii) a portion of the Purchase Price payable to the Distribution Agent, as agent for the Canadian Sellers, as consideration for the Canadian Sellers' right, title and interest in, to and under the Assets transferred by such Canadian Sellers to the Purchaser or a Designated Purchaser hereunder will include that portion of the Convertible Notes being delivered pursuant to Section 2.2.1 set forth on Section 2.2.7(a)(iii) of the Sellers Disclosure Schedule and any remaining portion of the Purchase Price payable to the Distribution Agent as agent for the Canadian Sellers hereunder shall be paid to the Distribution Agent in cash as part of the Cash Purchase Price, and (iv) the Purchase Price payable as consideration for the right, title and interest in, to and under the Assets or EMEA Assets of any Non-Convertible Note Recipient Seller transferred to Purchaser, a Designated Purchaser or an EMEA Designated Purchaser will not include any Convertible Notes and shall consist entirely of cash paid to the Distribution Agent as part of the Cash Purchase Price.  Neither the initial allocation of Common Stock to the U.S. Sellers, UK Sellers and Canadian Sellers, nor the allocation of a portion of the Convertible Notes in accordance with this Section 2.2.7(a) is intended by the Sellers, the EMEA Sellers or the Purchaser to establish, or otherwise serve as evidence of, the absolute or relative value of the Assets or the EMEA Assets sold by, or the Assumed Liabilities or the EMEA Assumed Liabilities assumed by the Purchaser, a Designated Purchaser or an EMEA Designated Purchaser from, any such Seller or EMEA Seller hereunder or under the EMEA Asset Sale Agreement for any purpose.

(b)      In lieu of paying any portion of the Purchase Price payable to one or more of the Convertible Note Recipient Sellers in Convertible Notes in accordance with Section 2.2.7(a), the Purchaser may, or may cause the relevant Designated Purchaser or EMEA Designated Purchaser to, deliver to the Distribution Agent, as agent for such Convertible Note Recipient Seller, a non-interest bearing, redeemable promissory note in form and substance reasonably satisfactory to the Purchaser and such Convertible Note

Recipient Seller (each a "**Demand Note**") issued by the Purchaser, the relevant Designated Purchaser or EMEA Designated Purchaser to the Distribution Agent, as agent for such Convertible Note Recipient Seller, in an initial principal amount equal to the aggregate principal amount of the Convertible Notes otherwise deliverable to the Distribution Agent, as agent for such Convertible Note Recipient Seller, in accordance with Section 2.2.7(a) (the "**Substituted Convertible Notes**"). The Demand Note shall either be (i) redeemable upon demand by the Distribution Agent, the Convertible Note Recipient Seller or the Purchaser, by delivery by the Purchaser to the Distribution Agent, as agent for such Convertible Note Recipient Seller, Convertible Notes having an aggregate initial principal amount equal to the aggregate principal amount of the Substituted Convertible Notes or (ii) subject to put and call options allowing the Distribution Agent, the Convertible Note Recipient Seller or the Purchaser, as applicable, to exercise such option and exchange the Demand Note for Convertible Notes having an aggregate initial principal amount equal to the aggregate principal amount of the Substituted Convertible Notes; provided, that the delivery of such Demand Note shall be deemed to satisfy the Purchaser's obligations with respect to issuance of the Substituted Convertible Notes under this Agreement only if, immediately following the Closing and on the Closing Date, the Purchaser tenders to the Distribution Agent, as agent for the applicable Convertible Note Recipient Seller, in satisfaction of, or as consideration for the acquisition of, such Demand Note, Convertible Notes having an aggregate initial principal amount equal to the aggregate principal amount of the Substituted Convertible Notes.

(c)      Without limiting the obligations of the Purchaser to pay Transfer Taxes in accordance with Section 6.1 of this Agreement or clause 11 (Tax) of the EMEA Asset Sale Agreement, and without limiting any other remedy available to the Sellers, the EMEA Sellers, the Joint Administrators or the Joint Israeli Administrators (collectively, the "**Tax Indemnitees**" and individually, a "**Tax Indemnitee**") under this Agreement or the EMEA Asset Sale Agreement, but without duplication, the Purchaser shall indemnify the Tax Indemnitees for any Taxes imposed upon or payable by a Tax Indemnitee or for the fair value of any loss of Tax attributes arising in connection with the transactions contemplated or necessitated by this Section 2.2.7, including, without limitation, with respect to the delivery or redemption of a Demand Note, the issuance, delivery or receipt of Substituted Convertible Notes, the exercise of put or call options and any other transfer or disposition of the Convertible Notes, Demand Notes or Substituted Convertible Notes or rights in and to any of the foregoing, but not including any Taxes that would have been imposed upon or payable by a Tax Indemnitee on the assumption that Section 2.2.7 of this Agreement did not apply.

**SECTION 2.3.  Closing.**

**2.3.1.  Closing Date.** The completion of the purchase and sale of the Assets and the assumption of the Assumed Liabilities (the "**Closing**") shall occur simultaneously with closing of the transaction contemplated by the EMEA Asset Sale Agreement and shall take place at the offices of Ogilvy Renault LLP in Toronto, Canada commencing at 9:00 a.m. local time on the date which is the later of (i) February 1, 2010, (ii) the date that is the earlier of (x) ten (10) Business Days after the Service Readiness Date and (y) April 30, 2010, and (iii) five (5) Business Days after the day upon which all of the conditions set forth under Article IX (other than conditions to be satisfied at the Closing, but subject to the waiver or fulfillment of those

conditions) have been satisfied or, if permissible, waived by the Main Sellers and/or the Purchaser (as applicable), or on such other place, date and time as shall be mutually agreed upon in writing by the Purchaser and the Main Sellers (the day on which the Closing takes place being the "**Closing Date**").

Legal title, equitable title and risk of loss with respect to the Assets will transfer to the Purchaser or the relevant Designated Purchaser, and the Assumed Liabilities will be assumed by the Purchaser and the relevant Designated Purchasers, at the Closing.

### 2.3.2. <u>Closing Actions and Deliveries</u>. At the Closing:

(a)     the Sellers and the Purchaser shall, and the Purchaser shall cause the Designated Purchasers to, enter into the Ancillary Agreements to which it is contemplated that they will be parties, respectively, to the extent such agreements have not yet been entered into (except, with respect to Real Estate Agreements, as otherwise provided in the Real Estate Terms and Conditions) and subject to Section 5.25;

(b)     the Purchaser shall deliver or cause to be delivered (i) to the Distribution Agent, an amount in cash equal to the Base Cash Purchase Price (as adjusted in accordance with Sections 2.2.2 and 2.2.3) less the Escrow Amount by wire transfer in immediately available funds to an account or accounts designated at least two (2) Business Days prior to the Closing Date by the Distribution Agent in a written notice to the Purchaser, (ii) to the Escrow Agent, an amount equal to the Escrow Amount to be held and disbursed in accordance with the Escrow Agreement, this Agreement and the Carling Property Lease Agreements, (iii) as directed by the Sellers, the amount owing pursuant to Section 4(a)(ii) of the Transition Services Agreement, and (iv) subject to Section 2.2.7, to the Distribution Agent one or more stock certificates representing the Shares issued to the Distribution Agent;

(c)     immediately following delivery of the amount described in Section 2.3.2(b), at the Closing the Sellers shall deliver or cause to be delivered to the Escrow Agent by wire transfer of immediately available funds, an amount equal to the Transition Services Escrow Amount to be held and disbursed in accordance with the Escrow Agreement, this Agreement and the Transition Services Agreement; and

(d)     each Party shall deliver, or cause to be delivered, to the other any other documents reasonably requested by such other Party in order to effect, or evidence the consummation of, the transactions contemplated herein.

(e)     Purchaser's Deliveries. The Purchaser shall deliver or cause to be delivered to the Sellers:

(i)     an assumption agreement, in form mutually acceptable to the Primary Parties, pursuant to which the Purchaser shall assume the Assumed Liabilities, duly executed by the Purchaser;

(ii)     a certificate, in form reasonably acceptable to the Sellers, executed by a duly authorized senior officer of the Purchaser certifying that the conditions set forth in Section 9.2(a) and Section 9.2(b) have been satisfied;

(iii)     executed counterparts of each Ancillary Agreement to be entered into at Closing;

(iv)     such other assignments and other good and sufficient instruments of assumption and transfer, in form reasonably acceptable to the Sellers, as the Sellers may reasonably request to transfer and assign the Assumed Liabilities to the Purchaser;

(v)     in respect of the Montreal Premises, (X) such agreements or other instruments in respect of the Montreal Premises as are required to effect the transactions contemplated by Article I of the Real Estate Terms and Conditions consistent with the Purchaser's decision relating thereto, together with, if applicable based upon the decision not to receive an assignment of and assume the Montreal Premises Amended Lease, (Y) the Montreal Lease Termination Penalty payable to NNL, or if directed by NNL, to the Montreal Landlord in accordance with the Real Estate Terms and Conditions. For the avoidance of doubt, any such amount shall not be construed or deemed to constitute any portion of the Purchase Price; and

(vi)     an irrevocable notice dated as of the Closing Date, in a form reasonably acceptable to the Sellers, exercising the call option with respect to each Demand Note issued by the Purchaser, a Designated Purchaser or an EMEA Designated Purchaser.

(f)     Sellers' Deliveries.  The Sellers shall deliver or cause to be delivered to the Purchaser:

(i)     one or more bills of sale and/or deeds of transfer, in form reasonably acceptable to the Purchaser, duly executed by the applicable Sellers;

(ii)     executed counterparts of each Ancillary Agreement to be entered into at Closing;

(iii)     one or more instruments of assignment, in form reasonably acceptable to the Purchaser, duly executed by the applicable Sellers, with respect to assignment and transfer of the Assets, together with executed Consents from landlords in respect of Leases forming part of the Assigned Contracts, and such other documents relating to such Consents required from such landlords;

(iv)     a certificate, in form reasonably acceptable to the Purchaser, executed by a duly authorized senior officer of each Main Seller certifying that the conditions set forth in Section 9.3(a) and Section 9.3(b) have been satisfied;

(v)    copies of the U.S. Sale Order and the Canadian Approval and Vesting Order;

(vi)    the Sellers shall deliver an affidavit of NNI and Nortel Networks (CALA) Inc. certifying as to their non-foreign status, which affidavit complies with the requirements of Section 1445 of the Code;

(vii)    NNL and NNC shall each deliver, in form reasonably acceptable to the Purchaser, an original, valid, complete, correct and properly executed IRS Form W-8BEN with Part II completed claiming entitlement to the benefits under Article XII of the income tax treaty between the United States and Canada;

(viii)    such other bills of sale, deeds, endorsements, assignments and other good and sufficient instruments of conveyance and transfer, in form reasonably satisfactory to the Purchaser, as the Purchaser may reasonably request to vest in the Purchaser all the right, title and interest of the Sellers in, to or under any or all the Assets; and

(ix)    such agreements or other instruments in respect of the Montreal Premises as are required to effect the Purchaser's decision contemplated by the Real Estate Terms and Conditions with respect thereto.

**SECTION 2.4.  Designated Purchaser(s).**

(a)    The Purchaser shall be entitled to designate, in accordance with the terms and subject to the limitations set forth in this Section 2.4, one or more wholly-owned Subsidiaries to (i) purchase specified Assets (including specified Assigned Contracts), (ii) assume specified Assumed Liabilities, (iii) employ specified Transferred Employees on and after the Closing Date and/or (iv) to be made a party to any Real Estate Agreement (any Subsidiary of the Purchaser that shall be properly designated by the Purchaser in accordance with this clause, a "**Designated Purchaser**"); it being understood and agreed, however, that any such right of the Purchaser to designate a Designated Purchaser is conditioned upon (x) such Designated Purchaser being able to perform the covenants under Section 2.1.7 and Article VII and demonstrate satisfaction of the requirements of Section 365 of the U.S. Bankruptcy Code, including the provision of adequate assurance for future performance, with respect to the Assumed and Assigned Contracts and (y) any such designation not creating any net Liability (including any Liability relating to Taxes other than Taxes for which Purchaser is liable pursuant to Article VI and taking into account any savings of, or reduction in Taxes of any Seller or its Affiliates that would result from the use of such Designated Purchaser) for the Sellers or their Affiliates that would not have existed had the Purchaser purchased the Assets.  No such designation shall relieve the Purchaser of any of its obligations hereunder, and the Purchaser and each Designated Purchaser shall be jointly and severally liable for any obligations assumed by any of them hereunder.  For the avoidance of doubt, the Purchaser and each Designated Purchaser shall not be liable for any Excluded Liabilities, including any Excluded Liabilities for Taxes imposed on the Purchaser or a Designated Purchaser under applicable Law.

(b)      The above designation shall be made by the Purchaser by way of one or more written notices, together with corresponding updates to the list under the heading "Designated Purchasers" in Exhibit 2.1.1, to be delivered to the Sellers with respect to each jurisdiction, on or before the date necessary to comply with any regulatory requirements or the Purchaser's obligations under this Agreement, in each case without resulting in any material delay to the Closing (but in no event later than fifteen (15) Business Days before the Closing Date), which written notice shall contain the legal name of the Designated Purchaser, the jurisdiction of its incorporation or formation and the actual (and if there is any intention to change such residence on or prior to Closing, proposed) jurisdiction of Tax residence and shall indicate which Assets, Assumed Liabilities and Transferred Employees the Purchaser intends such Designated Purchaser(s) to purchase, assume and/or employ, as applicable, hereunder (to the extent such information necessary to comply with the obligation under this subsection (b) is actually available or has been made available to the Purchaser), and include a signed counterpart to this Agreement in a form acceptable to the Main Sellers, agreeing to be bound by the terms of this Agreement and authorizing the Purchaser to act as such Designated Purchaser(s)' agent for all purposes hereunder.

**ARTICLE III**
**REPRESENTATIONS AND WARRANTIES OF THE PURCHASER**

The Purchaser hereby represents and warrants to the Sellers as follows:

**SECTION 3.1.  Organization and Corporate Power.**

(a)      The Purchaser is a corporation duly organized, validly existing and in good standing under the Laws of the State of Delaware.  Each Designated Purchaser other than the Purchaser is duly organized, validly existing and in good standing under the Laws of the jurisdiction in which it is organized.  Each of the Purchaser and the Designated Purchasers has the requisite corporate or other organizational power and authority necessary to enter into, deliver and perform its obligations pursuant to each of the Transaction Documents to which it is or will become a party and to consummate the transactions contemplated thereby.

(b)      Each of the Designated Purchasers is duly qualified or licensed to do business and to own or lease and operate its properties and assets, including the Assets, and is in good standing as applicable in each jurisdiction in which the nature of its properties or the character of its business requires it to so qualify or be licensed, except to the extent that the failure to be so qualified or licensed would not materially hinder, delay or impair the Purchaser's or any such Designated Purchaser's ability to carry out its obligations under, and to consummate the transactions contemplated by, this Agreement and the Ancillary Agreements to which it is or will become a party.

**SECTION 3.2.  Authorization; Binding Effect; No Breach.**

(a)      The execution, delivery and performance of each Transaction Document to which the Purchaser or any of the Designated Purchasers is a party and the consummation of the transaction contemplated thereby have been duly and validly authorized by all corporate or other organizational action by the Purchaser and the relevant

Designated Purchasers, as applicable. This Agreement has been duly and validly executed and delivered by the Purchaser and each other Transaction Document required to be executed and delivered by the Purchaser or a Designated Purchaser at the Closing will be duly and validly executed and delivered by the Purchaser or such Designated Purchaser, as applicable, at the Closing. This Agreement and the other Transaction Documents constitute, with respect to the Purchaser or Designated Purchaser that is a party thereto, a legal, valid and binding obligation of the Purchaser or such Designated Purchaser, as applicable, enforceable against such Person in accordance with its respective terms.

(b)     The execution, delivery and performance by each of the Purchaser and the Designated Purchasers of the Transaction Documents to which the Purchaser or such Designated Purchaser is, or on the Closing Date will be, a party and the consummation of the transactions contemplated thereby do not and will not conflict with or result in a breach of the terms, conditions or provisions of, constitute a default under, result in a violation of, or require any Consent (other than the Regulatory Approvals and the Bankruptcy Consents) or other action by or declaration or notice to any Person pursuant to (i) the articles, charter, by-laws or other governing documents of the Purchaser or the relevant Designated Purchaser, (ii) any agreement, indenture or other instrument to which the Purchaser or the relevant Designated Purchaser is bound or (iii) any Laws to which the Purchaser, the Designated Purchaser, or any of their assets is subject, except in the case of (ii) and (iii) above to the extent that the failure to be so qualified or licensed would not, individually or in the aggregate, materially hinder, delay or impair the Purchaser's or any such Designated Purchaser's ability to carry out its obligations under, and to consummate the transactions contemplated by, this Agreement and the Ancillary Agreements to which it is or will become a party.

SECTION 3.3.  **Availability of Funds.**  The Purchaser has as of the date hereof, and will have as of the Closing, sufficient funds to enable the Purchaser to pay the Base Cash Purchase Price in full at Closing and all related fees and expenses.

SECTION 3.4.  **Adequate Assurance of Future Performance.**  To the extent required by any Bankruptcy Laws or other Laws, the Purchaser will be able to provide, at Closing or on such earlier date as is designated by the U.S. Bankruptcy Court, adequate assurance of its and/or the relevant Designated Purchasers' future performance under each Assumed and Assigned Contract to the parties thereto (other than the U.S. Debtors) in satisfaction of Section 365(f)(2)(B) of the U.S. Bankruptcy Code, and no other or further assurance will be necessary thereunder with respect to any Assumed and Assigned Contract.

SECTION 3.5.  **Purchaser's Acknowledgments; Exclusivity of Representations and Warranties.**  The Purchaser acknowledges and agrees that:

(a)     The Purchaser is experienced and sophisticated with respect to transactions of the type contemplated by this Agreement and the other Transaction Documents. In consultation with experienced counsel and advisors of its choice, the Purchaser has conducted its own independent review and analysis of the Business, the Assets, the EMEA Assets, the Assumed Liabilities, the EMEA Assumed Liabilities and the rights and obligations it is acquiring and assuming under this Agreement and the other Transaction Documents. The Purchaser acknowledges that it and its representatives have

61

been permitted such access to the books and records, facilities, equipment, contracts and other properties and assets of the Business as it has requested to complete its review, and that it and its representatives have had an opportunity to meet with the officers and other employees of the Sellers, the EMEA Sellers and the Business to discuss the Business.

(b)    The Purchaser acknowledges and agrees that:

(i)    except for the representations and warranties expressly set forth in this Agreement and the other Transaction Documents, the Purchaser has not relied on any representation or warranty from the Sellers, the EMEA Sellers or any Affiliate of any such Person or any employee, officer, director, accountant, financial, legal or other representative of the Sellers or the EMEA Sellers in determining whether to enter into this Agreement;

(ii)    except for the representations and warranties expressly set forth in this Agreement and the other Transaction Documents, none of the Sellers, the EMEA Sellers or any employee, officer, director, accountant, financial, legal or other representative of the Sellers, the EMEA Sellers or any Affiliate of any such Person has made any representation or warranty, express or implied, as to the Business (or the value or future thereof), the Assets or the EMEA Assets (including any implied representation or warranty as to the condition, merchantability, suitability or fitness for a particular purpose of any of the Assets or the EMEA Assets, including under the International Convention on Contracts for the Sale of Goods (Geneva Convention)) and any other applicable sale of goods Laws), the Assumed Liabilities, the EMEA Assumed Liabilities or any Affiliate of any such Person or the accuracy or completeness of any information regarding any of the foregoing that the Sellers, the EMEA Sellers or any other Person furnished or made available to the Purchaser and its representatives (including any projections, estimates, budgets, offering memoranda, management presentations or due diligence materials);

(iii)    except for the representations and warranties expressly set forth in this Agreement and the other Transaction Documents, and subject to the terms of the Bankruptcy Consents, the Purchaser or any Designated Purchaser takes the Assets on an "as is" and "where is" basis;

(iv)    the enforceability of this Agreement against the Sellers is subject to receipt of the Bankruptcy Consents; and

(v)    notwithstanding anything to the contrary contained herein, the Purchaser's obligations to consummate the transactions contemplated by this Agreement are not conditioned or contingent in any way upon the receipt of financing from any Person.

(c)    Except for the representations and warranties expressly set forth in this Agreement and the other Transaction Documents, THE PURCHASER ACKNOWLEDGES THAT THERE ARE NO EXPRESS OR IMPLIED WARRANTIES OF NONINFRINGEMENT OF THIRD PARTY INTELLECTUAL PROPERTY RIGHTS,

OR REGARDING THE SCOPE, VALIDITY OR ENFORCEABILITY OF ANY
TRANSFERRED INTELLECTUAL PROPERTY OR LICENSED INTELLECTUAL
PROPERTY RIGHTS.

**SECTION 3.6.  Brokers.**  Except for fees and commissions or other similar
payments that will be paid or otherwise settled or provided for by the Purchaser, no broker,
finder, agent or investment banker is entitled to any brokerage, finder's or other similar fee or
commission in connection with the transactions contemplated by this Agreement and the other
Transaction Documents based upon arrangements made by or on behalf of the Purchaser or any
of its Affiliates for which the Sellers are or will become liable, and the Purchaser shall indemnify
and hold harmless the Sellers from any claims with respect to any such fees and commissions.

**SECTION 3.7.  Representations and Warranties Relating to the Shares.**

(a)    As of October 31, 2009, the authorized capital stock of the Purchaser
consists of 290,000,000 shares of common stock, of which 92,038,360 shares are issued and
outstanding and 20,000,000 shares of preferred stock, of which no shares are issued and
outstanding. As of October 31, 2009, except for 5,538,342 shares issuable under
outstanding stock options, 3,716,169 restricted stock units outstanding, 3,469,262 shares
reserved for issuance under stock purchase plans and 20,647,130 shares reserved for
issuance in connection with convertible notes, there are no options, warrants or other
agreements obligating the Purchaser to issue or sell any shares of capital stock of, or other
equity interests in the Purchaser. Except as disclosed in the SEC Filings, there are no
outstanding obligations of the Purchaser to repurchase, redeem or otherwise acquire any
shares of its capital stock. All of the issued and outstanding shares of capital stock of the
Purchaser have been duly authorized and validly issued in accordance with applicable Laws
and are fully paid and non-assessable and not subject to preemptive rights. Except for (i) the
$500,000,000 principal amount of 0.875% convertible notes due June 15, 2017, (ii) the
$298,000,000 principal amount of 0.25% convertible senior notes due May 1, 2013, (iii)
other Indebtedness which does not exceed $50,000,000, individually or in the aggregate,
disclosed in the SEC Filings, and (iv) other Indebtedness incurred in the ordinary course of
business since July 31, 2009 which does not exceed $10,000,000, individually or in the
aggregate, as of the date hereof, the Purchaser has no outstanding Indebtedness that is senior
to, or *pari passu* with, the Convertible Notes.

(b)    The issued and outstanding shares of common stock of the Purchaser
are listed for trading solely on the NASDAQ Stock Market, and no order ceasing or
suspending trading in any securities of the Purchaser has been issued and, to the Knowledge
of the Purchaser, no proceedings for such purpose are threatened or pending.

(c)    All of the Shares will be, when issued, duly authorized, validly
issued, fully paid and non-assessable, free and clear of all Liens and not subject to any pre-
emptive rights or restrictions on transfer (other than restrictions arising under U.S. securities
Laws or the securities Laws of any state of the United States or any other jurisdiction), and
prior to the Closing Date the Purchaser shall have reserved for issuance such number of
shares of Common Stock as are issuable upon conversion of the Convertible Notes.  None of
the Purchaser or any of its affiliates (as defined in Rule 501(b) of Regulation D
(**"Regulation D"**) under the Securities Act) has, directly or through an agent, engaged in any

form of general solicitation or general advertising (as those terms are used in Regulation D) in connection with the offering of the Convertible Notes or the Shares under the Securities Act or in any manner involving a public offering within the meaning of Section 4(2) of the Securities Act; the Purchaser has not entered into any contractual arrangement with respect to the distribution of the Convertible Notes or the Shares except for this Agreement; and the Purchaser will not enter into any such arrangement, except in connection with a capital raising transaction to generate proceeds to exercise the Cash Replacement Election or otherwise as contemplated by Article VIII.

(d)    The Purchaser does not have a shareholder rights plan or "poison pill" or similar plan.

(e)    The Purchaser is a "well-known seasoned issuer" (as defined in Rule 405 under the Securities Act), including not being an "ineligible issuer" (as defined in Rule 405 under the Securities Act). The Purchaser is eligible to file an automatic shelf registration statement.

(f)    The Purchaser is not a "reporting issuer" as such term is defined in the Securities Act (Ontario) or the equivalent under securities legislation in any other province or territory of Canada and to the Knowledge of the Purchaser, after giving effect to the issue of the Shares, residents of Canada do not own directly or indirectly more than ten percent (10%) of the outstanding shares of Common Stock of the Purchaser and do not represent in number more than ten percent (10%) of the total number of owners directly or indirectly of the outstanding shares of Common Stock of the Purchaser.

(g)    The Purchaser has timely filed all reports, schedules, forms, statements and other documents required to be filed by it with the Securities and Exchange Commission (the "**SEC**") during the period since November 1, 2008 through and including the date hereof (such reports, schedules, forms, statements and other documents together with any documents furnished during such period by the Purchaser to the SEC on a voluntary basis on Current Reports on Form 8-K but excluding any exhibits required to be filed with any of the foregoing in accordance with Item 601 of Regulation S-K, the "**SEC Filings**"). As of its filing date, each SEC Filing (i) complied in all material respects with the applicable requirements of the Exchange Act, and (ii) did not, at the time they were filed, contain any untrue statements of a material fact or omit to state a material fact required to be stated therein or necessary in order to make the statements made therein, in light of the circumstances under which they were made, not misleading. As of the date hereof, there are no outstanding or unresolved comments from the staff of the SEC with respect to any of the SEC Filings. Each of the financial statements (including the related notes) of the Purchaser included or incorporated by reference in the SEC Filings were prepared in accordance with GAAP applied on a consistent basis throughout the periods indicated (except as may be indicated in the notes thereto or, in the case of unaudited statements, as permitted by Form 10-Q of the SEC and the requirements of Regulation S-X under the Securities Act) and each fairly presents, in all material respects, the consolidated financial position of the Purchaser and its consolidated Subsidiaries as of the respective dates thereof and their consolidated results of operations and cash flows for the periods then ended (subject, in the case of unaudited statements, to normal and recurring year-end audit adjustments and the absence of footnotes). To the extent required, each SEC Filing filed with the SEC by the Purchaser

during the twelve (12) month period prior to the date hereof, was accompanied by the certifications required to be filed or submitted by the Purchaser's chief executive officer and chief financial officer pursuant to the Sarbanes-Oxley Act of 2002.

(h)     The Purchaser maintains a system of internal control over financial reporting (within the meaning of Rules 13a-15(f) and 15d-15(f) of the Exchange Act) designed to provide reasonable assurances regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with GAAP.

(i)     The Purchaser shall not, and shall cause its affiliates (as defined in Rule 405 under the Securities Act) not to, purchase, resell or otherwise transfer any Convertible Notes unless and until the Convertible Notes are Freely Tradeable.

(j)     The issuance of the Convertible Notes and the Shares will not require the approval of shareholders or any securityholders of the Purchaser pursuant to NASDAQ Listing Rule 5635 or require any other action or consent pursuant to any applicable exchange rules, regulations, interpretations or Laws.

## ARTICLE IV
## REPRESENTATIONS AND WARRANTIES OF THE SELLERS

Except (a) for disclosure in any section of the Sellers Disclosure Schedule of any facts or circumstances, whether or not such disclosure is specifically associated with or purports to respond to one or more of such representations or warranties, if it is reasonably apparent on its face from the Sellers Disclosure Schedule that such disclosure is applicable, (b) as expressly contemplated by this Agreement or (c) other than with respect to Section 4.7, to the extent relating to the Excluded Assets or the Excluded Liabilities, each of the Main Sellers jointly and severally represents and warrants to the Purchaser as set forth in this Article IV:

**SECTION 4.1.  Organization and Corporate Power.**

(a)     Each Seller is duly organized, validly existing and in good standing under the Laws of the jurisdiction in which it is organized.  Subject to entry of the U.S. Bidding Procedures Order and the U.S. Sale Order in the case of the U.S. Debtors and the Canadian Sales Process Order and Canadian Approval and Vesting Order in the case of the Canadian Debtors and receipt of such other Consents from the U.S. Bankruptcy Court and the Canadian Court in connection with the transactions contemplated hereby and by the other Transaction Documents (collectively, the **"Bankruptcy Consents"**), each of the Sellers has the requisite corporate or other organizational power and authority necessary to enter into, deliver and perform its obligations pursuant to each of the Transaction Documents to which it is or will become a party and to consummate the transactions contemplated thereby.

(b)     Each of the Sellers is duly qualified or licensed to do business and to own or lease and operate its properties and assets, including the Assets, as applicable in each jurisdiction in which the nature of its properties or the character of its business relating to the Business (excluding the EMEA Business) requires it to so qualify or be licensed, except

65

to the extent that the failure to be so qualified would not have, or reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

### SECTION 4.2. Authorization; Binding Effect; No Breach.

(a)    Subject to the Bankruptcy Consents, the execution, delivery and performance of this Agreement and such other Transaction Documents by each Seller and the consummation by such Seller of the transactions contemplated herein and therein have been duly and validly authorized by all corporate or other organizational action by such Seller. This Agreement has been duly and validly executed and delivered by each Seller and each other Transaction Document required to be executed and delivered by a Seller at the Closing will be duly and validly executed and delivered by such Seller at the Closing. Subject to the Bankruptcy Consents, and assuming the due authorization, execution and delivery by the Purchaser, this Agreement and the other Transaction Documents constitute, with respect to each Seller that is party thereto, a legal, valid and binding obligation of such Seller enforceable against it in accordance with its terms.

(b)    The execution, delivery and performance by each Seller of the Transaction Documents to which such Seller is, or on the Closing Date will be, a party and the consummation of the transactions contemplated thereby do not and will not conflict with or result in a breach of the terms, conditions or provisions of, result in a loss of benefits or constitute a default under, result in a violation of, result in the creation or imposition of any Lien upon any of the Assets, cause any acceleration of or give any Person the right to accelerate any obligation of such Seller under, or require any Consent (other than the Regulatory Approvals and the Bankruptcy Consents) or other action by or declaration, filing or notice to any Person pursuant to (i) the articles, charter, by-laws or other governing documents of any Seller, (ii) any agreement, indenture, or other instrument to which any Seller is a party or to which any of its assets is subject or (iii) any Laws to which any of the Sellers or any of the Assets are subject, except, in the case of (ii) and (iii) above, for such defaults, violations, actions and notifications that would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

### SECTION 4.3. Title to Tangible Assets; Sufficiency of Assets.

(a)    Except for Permitted Encumbrances, the Owned Inventory and the Owned Equipment is owned beneficially by one or more of the Sellers, free and clear of all Liens, and those Sellers have good and marketable title thereto.

(b)    All tangible assets included in the Assets are in satisfactory operating condition for the uses to which they are being put, subject to ordinary wear and tear and ordinary maintenance requirements, except as would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

(c)    Assuming the assignment or novation of all Seller Contracts and all Non-Assignable Contracts to the Purchaser or a Designated Purchaser, the Assets, the EMEA Assets and the rights of, or to be acquired by, the Purchaser and/or the Designated Purchasers under this Agreement and the EMEA Asset Sale Agreement, together with the rights to be provided to the Purchaser and/or the Designated Purchasers under the other

66

Transaction Documents, considered together, include such material assets and material rights (other than Inbound License Agreements and Patent Cross Licenses set forth on Section 4.3(c)(i) of the Sellers Disclosure Schedule) as are necessary and sufficient to conduct the Business substantially in the manner conducted as of the date hereof other than (x) those assets and rights that are used to provide the Overhead and Shared Services and are not otherwise used in the Business and (y) those assets and rights disclosed on Section 4.3(c)(ii) of the Sellers Disclosure Schedule. For the avoidance of doubt, any effects arising from or out of the failure of the Purchaser to hire all of the Employees will not, or be deemed to, constitute a breach of this Section 4.3(c).

### SECTION 4.4. Material Contracts.

(a)    Section 4.4(a) of the Sellers Disclosure Schedule sets forth, as of the date hereof:

(i)    in respect of any customer of the Business which, in the most recent completed fiscal year of the Main Sellers resulted in, or is reasonably expected by the Main Sellers in 2009 to result in, the payment to or receipt by the Business of more than $10,000,000 per annum from such customer taken on an aggregate basis, a true and complete list of every written contract with such customer (other than purchase orders issued thereunder) that relates to the Business and to which a Seller is a party; and

(ii)    in respect of any supplier of the Business which, in the most recent completed fiscal year of the Main Sellers resulted in, or is reasonably expected by the Main Sellers in 2009 to result in, the payment by the Business of more than $10,000,000 per annum to such supplier, taken on an aggregate basis, a true and complete list of every written contract with such supplier (other than purchase orders issued thereunder) that relates to the Business and to which a Seller is a Party.

(b)    Section 4.4(b) of the Sellers Disclosure Schedule sets forth, as of the date hereof, a true and complete list of every Seller Contract, in each case other than purchase orders and invoices (which shall be deemed to be a part of the Seller Contract under which such purchase order or invoice is issued) that:

(i)    in respect of the Business, is (x) a non-competition agreement or other agreement which otherwise materially restricts the Seller party thereto from engaging in any business activity anywhere in the world or (y) an exclusive distribution agreement (whether such agreement is exclusive by geography, product type or otherwise);

(ii)    creates a material joint venture or partnership in respect of the Business or which otherwise involves the sharing of profits, losses, costs or liabilities in respect of the Business with any other Person;

(iii)    is a research and development Contract that, in respect of the Business, involves consideration or expenditures, in the most recent completed

67

fiscal year of the Main Sellers (or is reasonably expected by the Main Sellers under the terms of such Contract in 2009 to be) in excess of $2,000,000 or requiring such expenditures of more than $2,000,000 in the aggregate after the date hereof;

(iv)    is a distribution or reseller Contract that, in respect of the Business, involves the sale or distribution of Products, in the most recent completed fiscal year of the Main Sellers that is (or is reasonably expected by the Main Sellers under the terms of such Contract in 2009 to be) valued at more than $10,000,000;

(v)    is a distribution or reseller Contract that, in respect of the Business, contains any express inventory repurchase requirement (whether contingent or otherwise);

(vi)    is a Contract between the Business and the Sellers or any of their Affiliates (other than agreements related to Overhead and Shared Services or agreements which will be terminated prior to or at Closing);

(vii)    relates to Indebtedness (including personal property leases) in excess of $1,000,000 to be assumed by the Purchaser or a Designated Purchaser;

(viii)    has a "take or pay" or "requirements" provisions committing the Seller party thereto to purchase, in respect of the Business, goods or services in excess of $10,000,000 in 2009 or any calendar year thereafter;

(ix)    contains any material obligation secured by a Lien on any material Asset (other than a Permitted Encumbrance or any encumbrance that will be released prior to or at Closing); or

(x)    involves capital expenditures in respect of the Business in excess of $2,000,000 after the date hereof.

The Customer Contracts and the Seller Contracts set forth in Section 4.4(a) and Section 4.4(b), together with such Seller Contracts exclusive to the Business as are entered into, pursuant to Section 5.9, after the date hereof that would have been required to be set forth in Section 4.4(a) and Section 4.4(b) of the Sellers Disclosure Schedule had they been in effect as of the date hereof, are collectively referred to in this Agreement as the "**Material Contracts**".

(c)    The Seller Contracts listed on Section 1.1(i) of the Sellers Disclosure Schedule together with the Bundled Contracts listed in Section 5.15 of the Sellers Disclosure Schedule include all of the customer and supplier Contracts of the Sellers that in the most recent completed fiscal year of the Main Sellers resulted in, or is reasonably expected by the Main Sellers under its terms in 2009 to result in, the payment or receipt by the Business of more than $2,000,000 per annum in the aggregate.

(d)    Other than with respect to Bundled Contracts, the Sellers have made available to the Purchaser or its representatives pursuant to the clean team confidentiality agreement between the Purchaser and its subsidiaries and NNL and its subsidiaries, dated

April 15, 2009 and the second clean team confidentiality agreement between the Purchaser and its subsidiaries and NNL and its subsidiaries, dated May 8, 2009, copies of all of the Material Contracts in the Sellers' possession which the Purchaser has requested (as such copies exist in the Sellers' contract database(s)) and the Sellers have no specific Knowledge that the copies provided are incomplete in any material respect. With respect to Bundled Contracts, the Sellers have made available to the Purchaser copies of such Bundled Contracts to the extent that they relate to the Business which the Purchaser has requested (as such copies exist in the Sellers' contract database(s)) and the Sellers have no specific Knowledge that the copies provided are incomplete in any material respect. Each Material Contract is in full force and effect and is a legal, valid and binding obligation of each Seller party thereto and enforceable against the Seller party thereto, and to the Knowledge of the Sellers, the other parties thereto, in accordance with its terms and conditions, in each case except as such enforceability may be limited by bankruptcy, insolvency or other similar Laws affecting the enforcement of creditors' rights generally (and subject to general principles of equity, regardless of whether considered in a proceeding in equity or at Law).

(e)    To the Knowledge of the Sellers, neither any Seller nor any other party thereto, is in material violation, breach of or default under a Material Contract, and no event has occurred that with notice or lapse of time, or both, would constitute a material violation, breach of or default under a Material Contract by any Seller, or to the Sellers' Knowledge, any other party thereto. Except as disclosed in Section 4.4(a) or Section 4.4(b) of the Sellers Disclosure Schedule, the Sellers (or any Affiliate of the Sellers other than the EMEA Sellers) have not been notified in writing that any of them is in breach or default under any Material Contract, nor have the Sellers or any of their respective Affiliates (other than the EMEA Sellers) been notified in writing of such other party's intention to terminate any Seller Contract.

**SECTION 4.5.  Intellectual Property.**

(a)    The Transferred Intellectual Property, the Intellectual Property transferred by the EMEA Asset Sale Agreement (the **"EMEA Intellectual Property"**), the Licensed Intellectual Property and the Intellectual Property licensed to the Sellers and/or their Affiliates (other than any joint venture between any Seller or EMEA Seller or their Affiliates and any Third Party, whether or not such joint venture is controlled by the Sellers, the EMEA Sellers or their Affiliates), including the EMEA Sellers, under the Inbound License Agreements and the Patent Cross Licenses include all the material Intellectual Property owned or controlled by any of the Sellers or EMEA Sellers or their respective Affiliates (other than any joint venture between any Seller or EMEA Seller or their Affiliates and any Third Party, whether or not such joint venture is controlled by the Sellers, the EMEA Sellers or their Affiliates) that covers or is used in connection with the conduct and operation of the Business, except any Intellectual Property included in Overhead and Shared Services. No Seller or EMEA Seller licenses or uses any Intellectual Property that is owned or licensed by any joint venture between any Seller or EMEA Seller and any Third Party and that is material to the Business other than any Intellectual Property that will be licensed to Purchaser at the Closing pursuant to the Intellectual Property License Agreement. For the purposes of this Section 4.5, **"controlled"** has the meaning set forth in the Intellectual Property License Agreement.

(b)      An accurate, true and complete list of all the Transferred Intellectual Property registered in the name of the Sellers is set forth in Section 4.5(b) of the Sellers Disclosure Schedule.  To the Knowledge of the Sellers, the EMEA Sellers do not have any Patents or Trademarks or other Intellectual Property registered in their names that are included in either Transferred Intellectual Property or Licensed Intellectual Property.

(c)      The list identified in Section 4.5(b) of the Sellers Disclosure Schedule will include: (1) for each issued Patent and Patent application, the Patent number or application serial number for each jurisdiction in which such Patent is filed, and date issued and filed; (2) for each registered Trademark, the application serial number or registration number, by country, province and state; (3) for any Domain Names, the registration date and name of registry; and (4) for each copyright registration or application, the number and date of such registration or application by country, province and state.

(d)      To the Knowledge of the Sellers, the Transferred Intellectual Property and EMEA Intellectual Property that is material to the Business is subsisting and in full force and effect.  The foregoing will not be construed as a warranty that any Patent or Trademark will issue or be registered based on any application.

(e)      The Transferred Intellectual Property and EMEA Intellectual Property are not subject to any Liens other than Permitted Encumbrances.  The Sellers own all right, title, and interest in and to each item of Transferred Intellectual Property and the EMEA Sellers own all right, title, and interest in and to each item of EMEA Intellectual Property. To the Knowledge of the Sellers, none of the Transferred Intellectual Property or EMEA Intellectual Property is subject to any outstanding order, judgment or stipulation restricting the use, transfer or exploitation thereof by the Sellers and their Affiliates in any material respect.

(f)      To the Knowledge of the Sellers, the Sellers and their Affiliates and the EMEA Sellers hold sufficient rights in the Licensed Intellectual Property to grant the licenses of the Licensed Intellectual Property contemplated to be granted by the Sellers and their Affiliates and the EMEA Sellers in the Intellectual Property License Agreement.

(g)      The Sellers have no Knowledge that any Third Party infringes upon, misappropriates or violates the Transferred Intellectual Property.

(h)      To the Knowledge of the Sellers, except as set forth in Section 4.5(h) of the Sellers Disclosure Schedule, no Seller or EMEA Seller has received any written assertions since January 1, 2007 that (i) any Seller's or its Affiliates' (including any EMEA Seller or its Affiliates) operations of the Business, including such Seller's or its Affiliates' (including any EMEA Seller or its Affiliates) use, performance, licensing, copying, distribution, sale, offer for sale, lease, manufacture, having made, importation, or any other exploitation of the Products sold by the Business or of the Services rendered by the Business infringes, misappropriates or violates in any material respect any Intellectual Property right or moral right of any Third Party; or (ii) the use or exploitation of any of Transferred Intellectual Property or EMEA Intellectual Property infringes or violates in any material respect any Intellectual Property of or was misappropriated from a Third Party.

70

(i)     To the Knowledge of the Sellers, as of the date hereof, there has been no assertion or claim made in writing to the Sellers or their Affiliates or the EMEA Sellers or their Affiliates since January 1, 2007 asserting invalidity, misuse or unenforceability of any Transferred Intellectual Property or EMEA Intellectual Property or challenging the Sellers' or their Affiliates' (including any EMEA Seller or its Affiliates) right to use, right to transfer, or ownership of any Transferred Intellectual Property or EMEA Intellectual Property; in each case, excluding any such assertions or claims that would not reasonably be expected to result in any invalidity, unenforceability, loss or other material impairment of any rights or interest in the subject Intellectual Property.

(j)

(i)     To the Knowledge of the Sellers, Section 4.5(j)(i) of the Sellers Disclosure Schedule sets forth a complete and accurate list of all Patent Cross Licenses, indicating for each Patent Cross License, the title and the parties thereto, except to the extent a Patent Cross License prohibits disclosure of its existence without consent of the relevant Third Party, which consent the Sellers were unable to reasonably obtain, in which case such Patent Cross License has been omitted from Section 4.5(j)(i) of the Sellers Disclosure Schedule (an **"Omitted Patent Cross License"**). No royalties or other amounts are due or payable by or on behalf of Nortel under any such Omitted Patent Cross Licenses, nor will any such royalties or other amounts be due or payable by Purchaser under any Omitted Cross License in connection with entering into this Agreement.

(ii)     To the Knowledge of the Sellers, Section 4.5(j)(ii) of the Sellers Disclosure Schedule sets forth a complete and accurate list of all material Contracts (other than Patent Cross Licenses) granting to the Sellers or any of their Affiliates or the EMEA Sellers or their Affiliates any license under or to any Intellectual Property owned by a Third Party that is, as of the date hereof, incorporated in or used in connection with the design, development, testing, manufacturing, sale, distribution, support or servicing of any Products or the provision of Services (collectively, the **"Inbound License Agreements"**), indicating for each Inbound License Agreement whether such Contract is included in the definition of "Seller Contracts" hereunder, and the title and the parties thereto.

(iii)     To the Knowledge of the Sellers, Section 4.5(j)(iii) of the Sellers Disclosure Schedule sets forth a complete and accurate list of all Contracts in effect (other than (x) Patent Cross Licenses, (y) non-exclusive object code licenses granted to end users or other purchasers of Products or non-exclusive licenses granted by the Sellers or their Affiliates or the EMEA Sellers to customers, distributors or suppliers in connection with the manufacture or sale of products or Services and (z) any non-exclusive license granted to any purchaser of any subsidiary or assets of a business unit of the Sellers, the EMEA Sellers or their respective Affiliates the sale of which was consummated prior to January 1, 2007) under which the Sellers or their Affiliates or the EMEA Sellers or their Affiliates grant a license to a Third Party under Transferred Intellectual Property

71

(collectively, the **"Outbound License Agreements"**), indicating the title and the parties thereto.

(iv)　　To the Knowledge of the Sellers, there is no outstanding dispute or disagreement with respect to (1) any Inbound License Agreement, (2) any Outbound License Agreement or (3) any Patent Cross License, in each case, that materially affects any of the Intellectual Property rights granted to the Purchaser herein. To the Knowledge of the Sellers, the Sellers have made available to Purchaser or its counsel true and complete copies of each Inbound License Agreement, Outbound License Agreement and Patent Cross License (excluding Omitted Patent Cross Licenses).

(k)　　To the Knowledge of the Sellers, Section 4.5(k) of the Sellers Disclosure Schedule sets forth a true and complete list of any Open Source Software incorporated into any of the Products and describes (i) the specific Open Source Software used, (ii) the specific Open Source Software version, (iii) the licensor(s) of the specific Open Source Software, and (iv) the Products or portions thereof into which such Open Source Software is incorporated.

(l)　　To the Knowledge of the Sellers, the conduct of the Business, including the design, development, testing, manufacturing, sale, distribution, support or servicing of any Products or the use or exploitation of any Transferred Intellectual Property, EMEA Intellectual Property or Licensed Intellectual Property or the provision of any Services by any Seller or its Affiliates or the EMEA Sellers or their Affiliates in connection with any of the foregoing, does not infringe upon, misappropriate or otherwise violate in any material respect any Intellectual Property of any Third Party.

(m)　　Notwithstanding any provision herein to the contrary, this Section 4.5 consists of the sole representation and warranty in this Agreement regarding non-infringement, non-violation and non-misappropriation of Intellectual Property.

SECTION 4.6. **Litigation.** As of the date hereof, except for the Bankruptcy Proceedings and except as set forth in Section 4.6 of the Sellers Disclosure Schedule, there is no Action pending or, to the Knowledge of the Sellers, threatened before any Government Entity or arbitration tribunal against any Seller involving the Business (excluding the EMEA Business) or the Assets or that seeks to restrain or prohibit or otherwise challenge the consummation, legality or validity of the transactions contemplated hereby or that has had, or otherwise would reasonably be expected to have a Material Adverse Effect. To the Knowledge of the Sellers, except for the Bankruptcy Proceedings, there is no outstanding Order to which the Sellers are subject in respect of the Business (excluding the EMEA Business) or the Assets, nor are any of the Sellers in default with respect to any such Order.

SECTION 4.7. **Financial Statements.** Section 4.7 of the Sellers Disclosure Schedule sets forth the unaudited combined (i) balance sheet of the Business as of December 31, 2008 (the **"Balance Sheet Date"**) and December 31, 2007, (ii) statements of earnings and cash flows of the Business for each of the fiscal years ended December 31, 2008 and December 31, 2007, (iii) balance sheet of the Business as of June 30, 2009 and (iv) statements of earnings and cash flows of the Business for the six (6) months ended June 30, 2009 (collectively, the

"**Financial Statements**"). The Financial Statements were prepared in accordance with GAAP (subject to normal year-end adjustments, the effect of which are not material in nature, and except for the omission of certain footnotes and other presentation items required by GAAP with respect to audited financial statements) using the Nortel Accounting Principles, and fairly present in all material respects the combined financial position, results of operations and cash flows of the Business as of the date thereof and for the periods covered thereby.

### SECTION 4.8.  Compliance with Laws; Consents.

(a)     Except as set forth in Section 4.8 of the Sellers Disclosure Schedule, no Seller is in violation of any Law applicable to the operation of the Business or the Assets, except for such violations as would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, and none of the Sellers has received any written notice or written claims from any Government Entity within the twelve (12) months preceding the date hereof relating to any material non-compliance of the Business or the Assets with any applicable Law nor are there, to the Knowledge of the Sellers, any such notice or claims threatened or pending, except where such notices or claims would not, individually or in the aggregate, materially hinder, delay or impair the performance by the Sellers of any of their obligations under the Transaction Documents.

(b)     (i) All of the Consents of Government Entities necessary for, or otherwise material to, the conduct of the Business (excluding the EMEA Business) as conducted on the date hereof, have been duly obtained and are in full force and effect and (ii) the relevant Sellers are in compliance with the terms of each of such Consents, in each case except for such violations as would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect. None of the Sellers has received any notice or written claims from any Government Entity relating to any material non-compliance of the Business (excluding the EMEA Business) or the Assets with such Consents nor are there, to the Knowledge of the Sellers, any such notice or claims threatened or pending, except where such claims would not, individually or in the aggregate, materially hinder, delay or impair the performance by the Sellers of any of their obligations under the Transaction Documents.

### SECTION 4.9.  Real Property.

(a)     Section 4.9(a)(i) of the Sellers Disclosure Schedule lists, as of the date hereof, all real property which is owned by the Sellers in respect of which a real property lease or license between the applicable Seller and the Purchaser or one or more Designated Purchasers shall be entered into on Closing on terms set forth in the Real Estate Terms and Conditions  (collectively, the "**Owned Real Property**"). Section 4.9(a)(ii) of the Sellers Disclosure Schedule lists, as of the date hereof, all leases, subleases, space licenses or other occupancy agreements (collectively, "**Leases**") of real property (the "**Leased Real Property**") to be assigned to the Purchaser or one or more Designated Purchasers on Closing on the terms set forth in the Real Estate Terms and Conditions. Section 4.9(a)(iii) of the Sellers Disclosure Schedule lists, as of the date hereof, those Leases in respect of which an Occupancy Agreement is to be entered into on Closing on the terms set forth in the Real Estate Terms and Conditions (collectively, the "**6 Month Locations**"). Section 4.9(a)(iv) of the Sellers Disclosure Schedule lists, as of the date hereof, those Leases in respect of which a short-term license is to be entered into on Closing on the terms set forth

73

in the Real Estate Terms and Conditions (collectively, the "**Short-Term Licensed Property**" and together with the Owned Real Property, the Leased Real Property and the 6 Month Locations, the "**Real Property**"). Section 4.9(a)(v) of the Sellers Disclosure Schedule lists, as of the date hereof, those locations where any Owned Assets used in carrying the Business are located. The Sellers have provided true, complete and correct copies of the Leases with respect to the Real Property to the Purchaser, including any amendments thereto. There are no written or oral subleases, licenses, concessions, occupancy agreements or other contractual obligations granting to any other Person the right of use or occupancy of any part of the Real Property which is occupied for purposes of the Business, or which will be occupied for purposes of the Business on or after Closing in accordance with the segregation, consolidation and demising plans contemplated by the Real Estate Terms and Conditions, save and except with respect to such rights retained by the Sellers or granted to the purchasers of other Nortel business segments which are co-located at such premises, the effect of which would not have a material adverse effect on the lease, license or occupancy by the Purchaser or any Designated Purchaser of such part of the Real Property to be occupied for the purposes of the Business.

(b)     The Sellers have received all Consents that are necessary in connection with the Sellers' occupancy, ownership or leasing of the Real Property, and the present use of the Real Property by the Sellers does not violate the Consents applicable thereto, except where the (A) failure to receive or (B) violation of a Consent would not have a Material Adverse Effect.

(c)     Except to the extent that any Cure Cost is payable with respect to any Lease with respect to a breach of such Lease prior to the Petition Date, and except for the Bankruptcy Proceedings, (i) no Seller is in material breach or default of its obligations under any Lease, (ii) no condition exists that with notice or lapse of time or both would constitute a material default by any Seller under any Lease and (iii) to the Knowledge of the Sellers, no other party to any Lease is in breach or default thereunder, except in each case, as would not, individually or in the aggregate, reasonably be expected to result in the termination of such Lease or otherwise have a Material Adverse Effect.

(d)     The Sellers have not received written notice of any threatened (i) condemnation, eminent domain, expropriation or similar proceeding affecting the Real Property, (ii) proceeding to change the zoning classification of any portion of the Real Property or (iii) imposition of any special assessments for public betterments affecting the Real Property, which in each of clauses (i), (ii) and (iii) would materially and adversely impact the use of the Real Property for the purposes for which it is being used as of the date hereof.

**SECTION 4.10.  Labor and Employee Benefits Matters.**

(a)     Section 4.10(a)(i) of the Sellers Disclosure Schedule contains an accurate and complete list, by country, of (i) all material Seller Employee Plans and (ii) all employment agreements or other commitments for employment or engagement by the Sellers or their Affiliates with respect to Employees that deviate in any material respect from the standard form offer letter for the applicable jurisdiction or provide for retention, severance or change in control payments or benefits to the Employees, excluding in each

74

case Seller Employee Plans.  The Sellers have provided the Purchaser with a true and complete copy of the plan document or summary plan description of each material Seller Employee Plan or, if such plan document or summary plan description does not exist, an accurate written summary of such Seller Employee Plan.  The Sellers have provided the Purchaser or its Affiliate with a true and complete copy of the standard form (or where such individual plan document is materially different from the standard form, the individual written agreement) of such employment, retention, change in control or severance agreements between the Sellers (or any Affiliate of Sellers (excluding EMEA Sellers)) and any Employee.

(b)     The information contained in Section 4.10(b) of the Sellers Disclosure Schedule in respect of the Employees (the "**Employee Information**") is accurate in all material respects as of the date hereof, and sets forth with respect to each Employee (except where that is not permissible under applicable data privacy Laws): (i) unique identifier, (ii) service date, (iii) job title/position, (iv) annual base salary and annual incentive plan target amount, (v) work location, (vi) visa type, if any and expiry date, (vii) the applicable Collective Labor Agreement, works council or other applicable labor organization, if any, (viii) leave status, reason for the leave, the start date of the leave and expected return date, (ix) vacation accrual rate, (x) status as full-time or part-time, (xi) home country of residence, (xii) Job Complexity Indicator, (xiii) country of payroll, (xiv) sales indicator, (xv) Exempt/Non-Exempt status (U.S. only), (xvi) payment currency, (xvii) department/function, to the extent applicable,  (xviii) work schedule and (xix) whether such Employee has any individual written agreement that provides for length of notice or severance payment required to terminate his or her employment in excess of that required by applicable Law or pursuant to a Seller Employee Plan disclosed in Section 4.10(a)(i) of the Sellers Disclosure Schedule as a result of which there could be a payment to such employee in excess of $50,000 in addition to such payment required by applicable Law or such Seller Employee Plan.

(c)     Except as set forth in Section 4.10(c) of the Sellers Disclosure Schedule, there has not been for a period of twelve (12) consecutive months prior to the date hereof, nor is there existent or, to the Sellers' Knowledge, has there been threatened, any strike, material grievance, slowdown, lockout, picketing or work stoppage against the Sellers by or on behalf of the Employees.

(d)     Section 4.10(d) of the Sellers Disclosure Schedule identifies and lists all of the Collective Labor Agreements and works councils or similar labor organizations in effect with respect to the Employees and in the case of Collective Labor Agreements that have expired, whether notice to bargain has been given and the status of the bargaining process.  For a period of twelve (12) consecutive months prior to the date hereof, no petition has been filed or proceedings instituted by a union, works council, collective bargaining agent, employee or group of employees with any Government Entity seeking recognition of a collective bargaining agent with respect to any Employees, and, to the Sellers' Knowledge, no such organizational effort is currently being made or has been threatened by or on behalf of any union, works council, employee, group of employees or collective bargaining agent to organize any Employees.  The Sellers have provided the Purchaser with a true and complete copy of each Collective Labor Agreement listed in Section 4.10(d) of the Sellers Disclosure Schedule.

(e)    There are no Transferred Employee Plans and, except as set forth in Section 4.10(e) of the Sellers Disclosure Schedule, there are no Seller Employee Plans that are multiemployer plans within the meaning of Section 3(37) of ERISA, and none of the Sellers or any of their ERISA Affiliates has, within the past six (6) years, ever maintained, contributed to or participated in, any such multiemployer plans.

(f)    None of the Sellers or any of their Affiliates (excluding the EMEA Sellers) have, with respect to the Business, any Liability to provide retiree welfare benefits to any Person for any reason, except as may be required by COBRA, a Seller Employee Plan listed in Section 4.10(a)(i) of the Sellers Disclosure Schedule or applicable Law.

**SECTION 4.11. <u>Brokers</u>.** Except for fees and commissions or other similar payments that will be paid or otherwise settled or provided for by the Sellers, no broker, finder, agent or investment banker is entitled to any brokerage, finder's or other similar fee or commission in connection with the transactions contemplated by this Agreement and the other Transaction Documents based upon arrangements made by or on behalf of the Sellers or any of their Affiliates for which the Purchaser is or will become liable, and the Sellers shall indemnify and hold harmless the Purchaser from any claims with respect to any such fees and commissions.

**SECTION 4.12. <u>Taxes</u>.** Except as set forth in the corresponding sections of the Sellers Disclosure Schedules, if any, or with respect to any Taxes, Liens and Claims of the Sellers that will be discharged on the Closing Date as provided for in the U.S. Sales Order and the Canadian Approval and Vesting Orders;

(a)    There are no Liens for Taxes on any Asset (other than Permitted Encumbrances).

(b)    The Sellers have timely filed with the appropriate Tax Authorities all material Tax Returns required to be filed with respect to the Assets and the Business (excluding the EMEA Business) and all such Tax Returns are true, correct and complete in all material respects. All material Taxes due and payable with respect to the Assets and the Business (excluding the EMEA Business) have been timely paid.

(c)    No deficiency for any material amount of Taxes has been claimed, proposed or assessed by any Tax Authority against any Seller and there is no pending audit, examination or other proceeding involving any Seller in respect of any material amount of Taxes, (i), in the case of each Seller not listed on Section 4.12(c)(i) of the Sellers Disclosure Schedule, relating to any Asset or the Business (excluding the EMEA Business) and (ii) in the case of each Seller listed on Section 4.12(c)(ii) of the Sellers Disclosure Schedule, relating to each such Seller.

(d)    No Seller has entered into an agreement or waiver or been requested to enter into an agreement or waiver extending any statute of limitations relating to the assessment, payment or collection of material Taxes relating to any Asset or the Business (excluding the EMEA Business).

(e)    None of the Assets located within the United States or which is owned by a U.S. Debtor (i) is property required to be treated as being owned by another

76

person pursuant to the provisions of Section 168(f)(8) of the Internal Revenue Code of 1954, as amended and in effect immediately prior to the enactment of the Tax Reform Act of 1986, (ii) constitutes "tax-exempt use property" within the meaning of Section 168(h)(1) of the Code and (iii) is "tax-exempt bond financed property" within the meaning of Section 168(g) of the Code.

(f)     The Sellers have, in accordance with applicable Law, invoiced, collected, withheld, reported and remitted to the appropriate Government Entity (within the time prescribed) all material: (i) Transfer Taxes which are due and payable or collectible by the Sellers; (ii) withholding, payroll or employment taxes, and other deductions at source as required by applicable Law; and (iii) all non-resident withholding Taxes as required by applicable Law.

(g)     Any Seller that is selling any Asset that constitutes "taxable Canadian property" as defined under the Income Tax Act (Canada) is not a non-resident of Canada within the meaning of the Income Tax Act (Canada).

(h)     No Seller that is not a "United States person," as such term is defined in Section 7701(a)(30) of the Code, is transferring pursuant to this Agreement any "United States real property interest," as such term is defined in Section 897(c)(1) of the Code.

**SECTION 4.13. Environmental Matters.** Except as disclosed in the Sellers Disclosure Schedule, if any:

(a)     The Business (excluding the EMEA Business) is and since January 1, 2005, has been in material compliance with, all applicable Environmental Laws and all material licenses, permits and approvals issued under Environmental Laws.

(b)     All material licenses, permits and approvals required under Environmental Laws required to own or operate the Business (excluding the EMEA Business) have been obtained, and remain in full force and effect.

(c)     None of the Sellers has received any written request for information, or been notified in writing that it is a potentially responsible party, under the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended (**"CERCLA"**), or any similar state, local or foreign laws that relates in any respect to the Business (excluding the EMEA Business) or any facility used by the Business (excluding the EMEA Business) as of the date hereof.

(d)     There are no writs, injunctions, decrees, orders or judgments to which any of the Sellers is a party that are outstanding, and there are no material actions, suits, claims, orders, proceedings or investigations to which any of the Sellers is a party that are pending or, to the Knowledge of the Sellers, threatened, relating to the compliance of the Sellers with, or the liability of the Sellers under, any Environmental Laws in connection with the Business (excluding the EMEA Business) or any facility used by the Business (excluding the EMEA Business) as of the date hereof.

(e)     None of the real property currently owned, leased or operated by the Sellers in respect of the Business (excluding the EMEA Business), is listed or, to the Knowledge of the Sellers, proposed for listing on the "National Priorities List" under CERCLA, or on the Comprehensive Environmental Response, Compensation and Liability Information System maintained by the United States Environmental Protection Agency, as updated through the Closing Date, or any similar state or foreign list of sites requiring investigation or cleanup.

(f)     To the Knowledge of the Sellers, there has heretofore been no material Release of any Hazardous Material in connection with the Business (excluding the EMEA Business) or the operations of the Business (excluding the EMEA Business).

(g)     The Sellers have made available to, or provided the Purchaser with, true and correct copies of all material environmental assessment reports (including Phase I or Phase II reports) and any other material environmental studies in the possession of the Sellers relating to the Business (excluding the EMEA Business) or its operations.

**SECTION 4.14. Undisclosed Liabilities.**   There are no Assumed Liabilities or EMEA Assumed Liabilities of a type that would be required to be included on a balance sheet of the Business prepared in accordance with GAAP (or reflected in the notes thereto) except Liabilities that (i) in the aggregate are adequately provided for in the Financial Statements; (ii) have been incurred in the Ordinary Course since the date of the last balance sheet included in the Financial Statements; (iii) have been incurred in connection with this Agreement or the transactions contemplated hereby; or (iv) which (not including Liabilities referred to in clauses (i) through (iii) above) would not have a Material Adverse Effect.

**SECTION 4.15. Reliance On Exemption From Registration Under Section 4(2) of the Securities Act.**

(a)     The Distribution Agent is receiving the Convertible Notes (and, in the event of their conversion thereof, the Shares) in its capacity as agent for the Sellers and the EMEA Sellers, and does not exercise independent voting or investment power over the Convertible Notes (and, in the event of their conversion thereof, the Shares). The Convertible Notes and the Shares are being acquired by the Sellers and the EMEA Sellers for investment only and not with a view to distribution, except as contemplated by this Agreement. The Sellers and the EMEA Sellers have been advised and understand that the issuance of the Convertible Notes (and, in the event of their conversion thereof, the Shares) to the Distribution Agent has not been registered under the Securities Act or under the "blue sky" or similar Laws of any jurisdiction and that the Convertible Notes and the Shares may be resold only in a transaction registered under the Securities Act and in accordance with such "blue sky" or similar Laws as may be applicable, or, subject to the terms and conditions of this Agreement, if an exemption from registration is available. The Sellers and the EMEA Sellers have been advised and understand that the Purchaser, in issuing the Convertible Notes (and, in the event of their conversion thereof, the Shares), is relying upon, among other things, the representations and warranties of the Sellers herein in concluding that such issuance is not a "public offering" and is exempt from the registration requirements of the Securities Act.

78

(b)    Each of the Sellers and the EMEA Sellers is an "accredited investor" as that term is defined in Rule 501(a) of Regulation D under the Securities Act and is able to bear the risk of its investment in the Convertible Notes (and, in the event of their conversion thereof, the Shares). Each of the Sellers and the EMEA Sellers have such knowledge and experience in financial and business matters that it is capable of evaluating the merits and risks of acquiring the Convertible Notes (and, in the event of their conversion thereof, the Shares).

(c)    Each of the Sellers and the EMEA Sellers understand that no United States federal or state agency has passed on or made any recommendation or endorsement of the Convertible Notes and the Shares or the fairness or suitability of an investment in the Convertible Notes and the Shares nor have such authorities passed upon or endorsed the merits thereof.

(d)    Each of the Sellers and the EMEA Sellers understand that the Convertible Notes and the Shares are restricted securities and must be held until an exemption from registration under the Securities Act is available and all of the requirements of such exemption have been met or unless and until the resale of such Convertible Notes and the Shares is registered under the Securities Act or subject to the terms and conditions of this Agreement and the applicable U.S. securities Laws, an exemption from registration is available.

(e)    The Sellers and the EMEA Sellers have been furnished with all materials relating to the business, finances and operations of the Purchaser and its subsidiaries and materials relating to the offer and transfer of the Convertible Notes and the Shares which have been requested by them. The Sellers and the EMEA Sellers and their advisors, if any, have been afforded the opportunity to ask such questions of the Purchaser as they deem appropriate for purposes of the investment contemplated hereby. Each of the Sellers and the EMEA Sellers understands that beneficial ownership of the Convertible Notes and the Shares involves a high degree of risk and that each may lose its entire investment in the Convertible Notes and the Shares and that each can afford to do so without material adverse consequences to its financial condition. In choosing to acquire beneficial ownership over any Convertible Notes and the Shares, none of the Sellers or the EMEA Sellers is relying on any information provided by the Purchaser and its subsidiaries, except to the extent provided herein.

(f)    The Sellers, the EMEA Sellers and their respective "Ultimate Parent Entities" (including all entities under the control of such Ultimate Parent Entities) within the meaning of the HSR Act are acquiring, and will hold, the Convertible Notes and the Shares "solely for the purposes of investment" within the meaning of Section 18a(c)(9) of the HSR Act. As of the Closing, neither the Sellers and the EMEA Sellers nor their respective "Ultimate Parent Entities" (including all entities under the control of such Ultimate Parent Entities) within the meaning of the HSR Act, shall hold more than ten million (10,000,000) shares of Common Stock.

**SECTION 4.16.  Representations and Warranties by the Other Sellers.**

Except as set forth in the Sellers Disclosure Schedule, each Other Seller severally but not jointly will, as of the date such Other Seller will execute this Agreement pursuant to Section 11.17, represent and warrant to the Purchaser as follows:

### 4.16.1.  Organization and Corporate Power.

(a)    Such Other Seller is duly organized and validly existing under the Laws of the jurisdiction in which it is organized.  Subject to the receipt of the Bankruptcy Consents, at the time it executes this Agreement, such Other Seller will have the requisite corporate or other organizational power and authority necessary to enter into, deliver and perform its obligations pursuant to each of the Transaction Documents to which it is or, at the Closing Date, will become a party.

(b)    Such Other Seller is qualified to do business and to own, lease or operate its properties and assets, including the Assets, as applicable in each jurisdiction in which the nature of its properties or the character of its business relating to the Business (excluding the EMEA Business) requires it to so qualify, except to the extent that the failure to be so qualified would not have or would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

### 4.16.2.  Authorization; Binding Effect; No Breach.

(a)    Subject to the Bankruptcy Consents, the execution, delivery and performance by such Other Seller of the Transaction Documents to which such Other Seller will be a party will have been duly and validly authorized by all corporate or other organizational action by such Other Seller.  Subject to the Bankruptcy Consents, and assuming due authorization, execution and delivery by the Purchaser, the Transaction Documents to which such Other Seller will be a party will constitute a legal, valid and binding obligation of such Other Seller, enforceable against it in accordance with its terms, except to the extent that such enforceability may be limited by applicable principles of equity regarding the availability of remedies (whether in proceeding at law or in equity).

(b)    The execution, delivery and performance by such Other Seller of the Transaction Documents to which such Other Seller will be a party will not conflict with or result in a breach of the terms, conditions or provisions of, constitute a default under, result in a violation of, result in the creation or imposition of any Lien upon any of the Assets, or (subject to the receipt of Consents in connection with the Assigned Contracts and other Consents expressly provided for herein) require any Consent of any Person (other than the Regulatory Approvals and the Bankruptcy Consents) or other action by or declaration, filing or notice to any Person pursuant to (i) the articles, charter, by-laws or other governing documents of such Other Seller, (ii) any Material Contract to which the such Other Seller is a party or to which any of its assets is subject, (iii) any Laws to which such Other Seller, or any of the Assets owned by such Other Seller is subject, except, in the case of (ii) and (iii) above, for such defaults, violations, actions and notifications that would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

**ARTICLE V**
**COVENANTS AND OTHER AGREEMENTS**

**SECTION 5.1. U.S. Bankruptcy Actions.** On the timetables and subject to the terms set forth below, the Sellers who are U.S. Debtors shall (i) file with the U.S. Bankruptcy Court one or more motions and proposed orders as set forth below, (ii) notify, as required by the U.S. Bankruptcy Code, the U.S. Bankruptcy Rules, and any order of the U.S. Bankruptcy Court, all parties entitled to notice of such motions and orders, as modified by orders in respect of notice which may be issued at any time and from time to time by the U.S. Bankruptcy Court, and such additional parties as the Purchaser may reasonably request, and (iii) subject to the provisions of this Agreement, including the provisions of Section 10.1, and the U.S. Order, if entered, use commercially reasonable efforts to obtain U.S. Bankruptcy Court approval of such orders.

(a)     As promptly as practicable, but in no event later than the second (2nd) Business Day after the date hereof, the U.S. Debtors shall file with the U.S. Bankruptcy Court a motion (the **"U.S. Bidding Procedures and Sale Motion"**) and two (2) proposed orders substantially in the forms set forth in Exhibit 5.1(a) (as attached as exhibits to the U.S. Bidding Procedures and Sale Motion and as may be modified pursuant to Section 5.1(c) and Section 5.1(d), the **"U.S. Bidding Procedures Order"** and the **"U.S. Sale Order"**) seeking approval by the U.S. Bankruptcy Court of, respectively, (i) as for the U.S. Bidding Procedures Order, a process for the sale of the Business, the provision of the Solicitation Period as set forth in Section 5.3(f) and the provision of the Break-Up Fee and Expense Reimbursement as set forth in Section 10.2, and (ii) as for the U.S. Sale Order, pursuant to Sections 105, 363 and 365 of the U.S. Bankruptcy Code, the sale of the Assets to the Purchaser or a Designated Purchaser and the assumption by the U.S. Debtors and assignment to the Purchaser or a Designated Purchaser of the Assumed and Assigned Contracts.

(b)     The Sellers who are U.S. Debtors shall use their reasonable best efforts to cause the U.S. Bankruptcy Court to (i) schedule a hearing to consider the U.S. Bidding Procedures and Sale Motion and (ii) enter the U.S. Bidding Procedures Order within two (2) Business Days of the hearing referred to in clause (i) of this sentence.

(c)     The U.S. Bidding Procedures Order and the bidding procedures approved therein shall not be materially amended by the Sellers without the prior approval of the Purchaser in its reasonable discretion; provided, however, it shall not be deemed unreasonable for the Purchaser to withhold its consent to any change to the U.S. Bidding Procedures Order that conflict with any express provisions of this Agreement, including without limitation Section 5.1(g) below.

(d)     Material failure to adhere to the U.S. Bidding Procedures Order by the Sellers from and after the entry thereof shall constitute a breach of this Agreement and entitle the Purchaser to all rights and remedies set forth herein with respect to such breach, subject to the Sellers' cure right set out in Section 10.1(b)(ii).

(e)     The U.S. Sale Order shall contain the provisions (it being understood that certain of such provisions must constitute findings of fact or conclusions of Law to be

81