made by the U.S. Bankruptcy Court as part of the U.S. Sale Order) set forth in the form of Exhibit 5.1(a) attached hereto, without modification thereto unless the Purchaser expressly consents in writing to such modification in its reasonable discretion.

(f)     The Sellers shall request that the U.S. Bankruptcy Court schedule, subject to the availability of the U.S. Bankruptcy Court, a U.S. Sale Hearing on the fourth (4th) Business Day following the conclusion of the Auction and shall use their reasonable best efforts to cause the U.S. Bidding Procedures and Sale Motion to be heard on that date or the earliest date thereafter permitted by the Bankruptcy Court's schedule.

(g)     Notwithstanding anything to the contrary herein or in the U.S. Bidding Procedures Order, under no circumstances (i) will the Purchaser be required to remain obligated under this Agreement (as amended, at the Auction or otherwise) as the Alternate Bidder (as such term is defined in the U.S. Bidding Procedures Order) if any Alternative Transaction is selected by the Sellers at the Auction or (ii) will the Purchaser be required to pay any deposit as a condition of participating in the Auction or otherwise.

**SECTION 5.2.  Canadian Bankruptcy Actions.**

**5.2.1.  Canadian Sales Process Order.**

(a)     Within five (5) days of execution of this Agreement, the Canadian Debtors shall serve on the CCAA Service List and file with the Canadian Court a motion (the "**Canadian Sales Process Order Motion**") in form and substance acceptable to the Sellers and the Purchaser, each acting reasonably, seeking an order approving the execution, delivery and performance of this Agreement, including payment of the Break-Up Fee and Expense Reimbursement and a process for the sale of the Business. The Canadian Sales Process Order Motion, as served and filed, shall include a copy of the order in the form set forth in Exhibit 5.2.1 with such amendments as the Canadian Debtors and the Purchaser may agree (the "**Canadian Sales Process Order**"). Any amendment to the form of the Canadian Sales Process Order, after the Canadian Sales Process Order Motion has been served, shall be subject to the prior written approval of the Purchaser in its reasonable discretion.

(b)     The Canadian Debtors shall use their reasonable best efforts to cause the Canadian Court to (i) schedule and hear the Canadian Sales Process Order Motion within seven (7) days of filing the Canadian Sales Process Order Motion, and (ii) the Canadian Debtors shall enter the issued order forthwith after its issuance.

**5.2.2.  Canadian Approval and Vesting Order.**  As promptly as practicable, but in no event later than three (3) Business Days following completion of the Auction (although, provided that service shall take place at least one (1) Business Day prior to the Canadian Approval and Vesting Order Motion unless consented to by the Purchaser), the Canadian Debtors shall serve on the CCAA Service List with such reasonable additions as are requested by the Purchaser and file with the Canadian Court a motion (the "**Canadian Approval and Vesting Order Motion**") in form and substance acceptable to the Sellers and the Purchaser, each acting reasonably, seeking an order approving this Agreement and the transactions contemplated herein. The Canadian Approval and Vesting Order Motion, as served and filed, shall include a copy of the order in the form set forth in Exhibit 5.2.2 with

such amendments as the Canadian Debtors and the Purchaser may agree (the "**Canadian Approval and Vesting Order**").  Any amendment to the form of the Canadian Approval and Vesting Order, after the Canadian Approval and Vesting Order Motion has been served, shall be subject to the prior written approval of the Purchaser.

**SECTION 5.3.  Consultation; Notification; Cooperation; Solicitation.**

(a)    The Purchaser and the U.S. Debtors shall cooperate with filing and prosecuting the U.S. Bidding Procedures and Sale Motion, a draft of which shall be delivered by the Sellers to the Purchaser no later than one (1) day after the date hereof, and obtaining entry of the U.S. Bidding Procedures Order and the U.S. Sale Order, and the U.S. Debtors shall deliver to the Purchaser prior to filing, and as early in advance as is practicable to permit adequate and reasonable time for the Purchaser and its counsel to review and comment, copies of all proposed pleadings, motions, responses to objections, notices, statements, schedules, applications, reports and other material papers to be filed by the U.S. Debtors in connection with such motions and relief requested therein and any challenges thereto.

(b)    The Purchaser and the Canadian Debtors shall cooperate with filing and prosecuting the Canadian Sales Process Order Motion and the Canadian Approval and Vesting Order Motion, and obtaining issuance and entry of the Canadian Sales Process Order and the Canadian Approval and Vesting Order, and the Canadian Debtors shall deliver to the Purchaser prior to filing, and as early in advance as is practicable to permit adequate and reasonable time for the Purchaser and its counsel to review and comment, copies of all of the Canadian Debtors' proposed pleadings, motions, responses to objections, notices, statements schedules, applications, reports and other material papers to be filed by the Canadian Debtors in connection with such motions and relief requested therein and any challenges thereto.

(c)    If the U.S. Sale Order or any other order of the U.S. Bankruptcy Court relating to this Agreement shall be appealed by any Person (or a petition for certiorari or motion for rehearing, re-argument or stay shall be filed with respect thereto), the U.S. Debtors agree to, and to cause their Subsidiaries to, use their reasonable best efforts, to defend against such appeal, petition or motion, and the Purchaser agrees to cooperate in such efforts.  Each of the Parties hereby agrees to use its reasonable best efforts to obtain an expedited resolution of such appeal; provided, however, that, subject to the conditions set forth herein, nothing contained in this Section shall preclude the Parties from consummating, or permit the Parties not to consummate, the transactions contemplated hereby if the U.S. Sale Order shall have been entered and shall not have been stayed, modified, revised or amended, in which event the Purchaser and the relevant Designated Purchasers shall be able to assert the benefits of Section 363(m) of the U.S. Bankruptcy Code and, as a consequence of which, such appeal shall become moot.

(d)    If the Canadian Approval and Vesting Order or any other order of the Canadian Court relating to this Agreement shall be appealed by any Person (or a petition for certiorari or motion for rehearing, re-argument or stay shall be filed with respect thereto), the Canadian Debtors agree to, and to cause their Affiliates (other than the EMEA Sellers and their respective Subsidiaries) to, take all commercially reasonable steps, and use their

reasonable best efforts to defend against such appeal, petition or motion, and the Purchaser agrees to cooperate in such efforts. Each of the Parties hereby agrees to use its reasonable best efforts to obtain an expedited resolution of such appeal; provided, however, that, subject to the conditions set forth herein, nothing in this Section shall preclude the Parties from consummating, or permit the Parties not to consummate, the transactions contemplated hereby if the Canadian Approval and Vesting Order shall have been entered and shall not have been stayed, modified, revised or amended.

(e)     Prior to Closing, the Sellers shall, from time to time, at the request of the Purchaser, request such further Order or Orders from the Canadian Court or the U.S. Bankruptcy Court as the Sellers and the Purchaser both agree, each acting reasonably, are required in order to give effect to this Agreement and the transactions contemplated hereby. The terms of such requested Orders shall be satisfactory to the Sellers and the Purchaser, each acting reasonably. Upon any such request each of the Purchaser and the Sellers, acting reasonably, shall cooperate with each other, as necessary or as may be reasonably requested, in order to obtain such further Order or Orders.

(f)     From the date of the later of (i) the entry of the U.S. Bidding Procedures Order or (ii) the entry of the Canadian Sales Process Order, until the conclusion of the Auction (the "**Solicitation Period**"), the Sellers are permitted to cause their authorized representatives and Affiliates to initiate contact with, solicit or encourage submission of any inquiries, proposals or offers by, any Person (in addition to the Purchaser and its Affiliates, agents and authorized representatives) in connection with any Competing Transaction. In addition, during such Solicitation Period, the Sellers shall have the right to respond to any inquiries or offers to purchase all or any part of the Business and perform any and all other acts related thereto which are required under the Bankruptcy Code or other applicable Law, including supplying information relating to the Business and Assets to prospective buyers. The Sellers shall contemporaneously, or as soon as possible thereafter, provide the Purchaser with any information concerning the Business or Assets provided to any prospective purchasers not previously provided to the Purchaser. The Main Sellers shall provide the Purchaser with a copy of any Qualified Bid received by the Sellers on the day that the determination is made that such bid is a Qualified Bid but in no event later than 48 hours prior to the commencement of the Auction and otherwise in accordance with the U.S. Bidding Procedures Order. In the event that the time at which the final Qualified Bid to be delivered is less than 48 hours from the scheduled time for commencement of the Auction, either the Sellers or the Purchaser, may, by written notice, require that the scheduled commencement date and time of the Auction be delayed until such time the Purchaser has had possession of the Qualified Bids for 48 hours prior to commencement of the Auction. Nothing herein shall limit the Sellers' ability to consummate a Sponsored Reorganization Plan.

**SECTION 5.4.  Pre-Closing Cooperation.**

(a)     Prior to the Closing, upon the terms and subject to the conditions of this Agreement, each of the Parties shall use its reasonable best efforts to take, or cause to be taken, all actions and to do, or cause to be done, and cooperate with each other in order to do, all things necessary, proper or advisable under applicable Law to consummate the transactions contemplated by this Agreement as soon as practicable, including (i) the

preparation and filing of all forms, registrations and notices required to be filed to consummate the Closing and the taking of such actions as are necessary to obtain any requisite Consent, provided that the Sellers shall not be obligated to make any payment or deliver anything of value to any Third Party (other than filing and application fees to Government Entities, all of which shall be paid or reimbursed by the Purchaser) in order to obtain any Consent; (ii) taking reasonable actions to defend any Actions filed against such Party by or before any Government Entity challenging this Agreement or the consummation of the Closing (or to cooperate with the other Party in the case of any such Action filed against such other Party); and (iii) using reasonable efforts to cause to be lifted or rescinded any injunction, decree, ruling, order or other action of any Government Entity adversely affecting the ability of the Parties to consummate the Closing; provided, that such reasonable efforts described in clauses (ii) and (iii) above shall not require either Party to take, or agree to take any action, that would reasonably be expected to materially and adversely impact the Business or any other business of such Party.

(b)    Each Primary Party shall promptly notify the other Primary Party of the occurrence, to such party's knowledge, of any event or condition, or the existence, to such party's knowledge, of any fact, that would reasonably be expected to result in any of the conditions set forth in Article IX not being satisfied.

(c)    The Purchaser hereby covenants and agrees until the Closing Date or the earlier termination of this Agreement in accordance with Article X:

(i)    not to pay any dividend or make any cash distribution on or in respect of its outstanding common stock or take any other action that would trigger the adjustment of the Conversion Rate (as defined in the Indenture) pursuant to Section 6.5(a) of the Indenture; and

(ii)    that except with respect to any matter expressly contemplated by this Agreement, it will not acquire or agree to acquire by amalgamating, merging or consolidating with, purchasing a substantial equity interest in or a substantial portion of the assets of or otherwise, any business or Person which acquisition or other transaction would reasonably be expected to prevent or materially delay the transactions contemplated by this Agreement; provided, however, notwithstanding anything to the contrary herein, nothing in this clause (iii) shall prevent or otherwise restrict the Purchaser from being acquired or agreeing to be acquired (whether by merger, consolidation, tender offer or otherwise) by any other Person.

**SECTION 5.5. Antitrust and Other Regulatory Approvals.**

(a)    In furtherance and not in limitation of the provisions of Section 5.4, each of the Parties has prior to the date of this Agreement prepared and filed: (i) a request for an advance ruling certificate pursuant to Section 102 of the Competition Act, and if deemed advisable by the Purchaser, acting reasonably, a pre-merger notification filing under the Competition Act; (ii) an appropriate filing of a Notification and Report Form pursuant to the HSR Act; and (iii) all other necessary documents, registrations, statements, petitions,

filings and applications for ICA Approval and any other Consent of any other Government Entities required to satisfy the condition set forth in Section 9.1(a).

(b)     If a Party or any of its Affiliates receives a request for information or documentary material from any Government Entity with respect to this Agreement or any of the transactions contemplated by this Agreement (and/or by the EMEA Asset Sale Agreement), then such Party shall endeavor in good faith to make, or cause to be made, as soon as reasonably practicable and after consultation with the other Party, an appropriate response in compliance with such request.

(c)     The Parties shall keep each other apprised of the status of matters relating to the completion of the transactions contemplated by this Agreement (and/or by the EMEA Asset Sale Agreement) and work cooperatively in connection with obtaining the requisite Regulatory Approvals of each applicable Government Entity, including:

(i)     cooperating with each other in connection with filings required under the applicable Antitrust Laws or any Laws regulating foreign investment of any jurisdiction in connection with the transactions contemplated by this Agreement (and/or by the EMEA Asset Sale Agreement) and each Antitrust Approval, and liaising with each other in relation to each step of the procedure before the relevant Government Entities and as to the contents of all communications with such Government Entities. In particular, and except for any filings made pursuant to the Investment Canada Act, no Party will make any notification or other filing with or to any Government Entity in relation to the transactions contemplated hereunder without first providing the other Party or its outside counsel on an outside counsel only basis with a copy of such notification in draft form (except with respect to any documents relating to Item 4(c) of the notification form required by the HSR Act) and giving such other party or its outside counsel a reasonable opportunity to discuss its content before it is filed with the relevant Government Entities, and such first Party shall consider and take account of all reasonable comments timely made by the other Party or its outside counsel in this respect.  For the avoidance of doubt, draft filings, materials or information provided under this section or under any other provision of this Agreement to the other Party's counsel on an outside counsel only basis shall only be given to outside counsel of the recipient and will not be disclosed by such outside counsel to employees, officers or directors of the recipient without the advance written consent of the Party providing such draft filing or materials;

(ii)     furnishing to the other party or its outside counsel in a timely fashion all information within its possession that is required for any application or other filing to be made by the other party pursuant to the applicable Antitrust Laws or any Laws regulating foreign investment of any jurisdiction in connection with the transactions contemplated by this Agreement (and/or by the EMEA Asset Sale Agreement); provided, however, that no such information shall be required to be provided by a Party if it determines, acting reasonably, that the provision of such information would jeopardize any attorney-client or other legal privilege (it being understood, however, that the Parties shall cooperate in any reasonable

efforts and requests that would enable otherwise required disclosure to the other Party or its outside counsel to occur without so jeopardizing the privilege);

(iii)    promptly notifying each other of any communications from or with any Government Entity with respect to the transactions contemplated by this Agreement (and/or by the EMEA Asset Sale Agreement) and ensuring that each of the parties or its outside counsel (as determined by the Purchaser in its reasonable discretion in the case of meetings or appearances related to ICA Approval), where acceptable to the Government Entity, is represented at any meetings with or other appearances before any Government Entity with respect to the transactions contemplated by this Agreement (and/or by the EMEA Asset Sale Agreement); and

(iv)    consulting and cooperating with one another and the other Party's outside counsel in connection with all analyses, appearances, presentations, memoranda, briefs, arguments, opinions and proposals made or submitted by or on behalf of any party hereto in connection with proceedings under or relating to the Antitrust Laws or any Laws regulating foreign investment of any jurisdiction in connection with the transactions contemplated by this Agreement (and/or by the EMEA Asset Sale Agreement).

(d)    In addition, and subject to Section 5.5(e), the Purchaser shall, and shall cause each of the Designated Purchasers to, use its reasonable efforts to satisfy (or cause the satisfaction of) the conditions precedent to the Purchaser's obligations hereunder as set forth in Section 9.1(a) to the extent the same is within its control and to take, or cause to be taken, all other actions and to do, or cause to be done, all other things necessary, proper or advisable under all applicable Laws to consummate the transactions contemplated by this Agreement (and/or by the EMEA Asset Sale Agreement), including using its reasonable efforts to obtain all Regulatory Approvals, and any other Consent of a Government Entity required to be obtained in order for the Parties to consummate the transactions contemplated by this Agreement (and/or by the EMEA Asset Sale Agreement).

(e)    The obligations of the Purchaser pursuant to Section 5.5(d) shall include committing, and causing the Designated Purchasers to commit, to any and all undertakings, divestitures, licenses or hold separate or similar arrangements with respect to their respective assets and/or the Assets and/or the EMEA Assets and/or to any and all arrangements for the conduct of any business and/or to any termination of any and all existing relationships and contractual rights and obligations as a condition to obtaining any and all Consents from any Government Entity necessary to consummate the transactions contemplated by this Agreement (and/or by the EMEA Asset Sale Agreement), including taking, and causing the Designated Purchasers to take, any and all Consents from any Government Entity necessary to consummate the transactions contemplated hereby, including taking any and all actions necessary in order to ensure the receipt of the necessary Consents and Regulatory Approvals; provided, however, that nothing in this Agreement or the EMEA Asset Sale Agreement shall require or be construed to require the Purchaser, any Designated Purchaser, any EMEA Designated Purchaser or any of their respective Subsidiaries to commit to any undertaking, divestiture, license or hold separate or similar arrangement or conduct of business arrangement or to terminate any relationships, rights or

87

obligations or to do any other act, to the extent such commitment, termination or action would be reasonably likely to be materially adverse to the Business or the Purchaser, or financial condition or prospects of the Business or the Purchaser.

(f)     For the avoidance of doubt, the covenants under this Section 5.5 shall not apply to any action, effort, filing, Consent, proceedings, or other activity or matter relating to the Bankruptcy Courts, the Bankruptcy Proceedings and/or the Bankruptcy Consents, and the ICA Approval.

**SECTION 5.6.  Pre-Closing Access to Information.**

(a)     Prior to the Closing, the Sellers shall, and shall cause their Subsidiaries (other than the EMEA Sellers) to, (i) give the Purchaser and its authorized representatives, upon reasonable advance notice and during regular business hours, reasonable access to all books, records, personnel, officers and other facilities and properties of the Business (excluding the EMEA Business), (ii) permit the Purchaser to make such copies and inspections thereof, upon reasonable advance notice and during regular business hours, as the Purchaser may reasonably request, (iii) grant the Purchaser and its representatives reasonable access to each of the facilities of the Business where Assets are located for purposes of completing an updated inventory of the fixed assets of the Business for purposes of completing an appraisal of the value thereof, and (iv) cause the officers of the Sellers to (A) after each month-end promptly (and in any event within thirty (30) days thereafter) furnish the Purchaser with copies of the Sellers' standard Business review of orders and revenue as is regularly prepared in the Ordinary Course, and (B) after each quarter-end promptly (and in any event within thirty (30) days thereafter) furnish the Purchaser with an unaudited quarter-end balance sheet for the Business as of the end of such quarter, and unaudited combined statements of earnings and cash flows of the Business for the three (3) month period then ended; provided, however, that (1) any such access shall be conducted at the Purchaser's expense, in accordance with Law (including any applicable Antitrust Laws and Bankruptcy Laws), at a reasonable time, under the supervision of the Sellers' personnel and in such a manner as to maintain confidentiality and not to unreasonably interfere with the normal operations of the businesses of the Sellers and their Affiliates, and (2) the Sellers will not be required to provide to the Purchaser access to or copies of any Tax records except as otherwise provided herein.

(b)     In order to facilitate the Purchaser's entry into new supply arrangements effective as of the Closing, the Sellers shall make available to the Purchaser unredacted copies of all Contracts with suppliers of the Business, or in the case of any Non-Exclusive Supply Contracts, unredacted copies of any portion thereof that are applicable to the Business (other than pricing/cost information or other competitively sensitive information the sharing of which Sellers or their representatives reasonably determine may violate applicable Law), promptly following the date hereof (or in the event that any such Contract is subject to confidentiality restrictions promptly following the receipt of any required consent which the Sellers will cooperate with the Purchaser to obtain as promptly as practicable). So long as the Purchaser is the winning bidder in the Auction, the Sellers shall provide such information not provided in accordance with the preceding sentence upon the later of the entry of the U.S. Sale Order, the receipt of the HSR Approval and the receipt of the Competition Act Approval. Any such disclosures shall be made to any employees or

88

representatives of the Purchaser who are designated by the Purchaser, who reasonably require access to such information for any reasonable business purpose related to the acquisition of the Business by the Purchasers and who have executed the applicable "Clean Room Agreements," provided, however, that employees of the Purchaser shall not have access to such information unless they are not involved in making decisions regarding pricing or the other material competitive terms offered to any customer of a competing business to the Business, and if the transaction does not close, agree not to be employed in such a role for an agreed-upon minimum period of time.

(c)     In connection with the procedures set forth in Section 5.15 with respect to the Bundled Contracts, the Sellers will provide unredacted copies of any portion of any Bundled Contracts that relates to the Business (other than pricing information and other competitive sensitive information the sharing of which the Sellers or their representatives reasonably determine may violate applicable Law) promptly following the date hereof, and so long as the Purchaser is the winning bidder in the Auction, will provide such information upon the later of the entry of the U.S. Sale Order, the receipt of the HSR Approval and the receipt of the Competition Act Approval. Any such disclosures shall be made to any employees or representatives of the Purchaser who are designated by the Purchaser, who reasonably require access to such information for any reasonable business purpose related to the acquisition of the Business by the Purchasers and who have executed the applicable "Clean Room Agreements," provided, however, that employees of the Purchaser shall not have access to such information unless they are not involved in making decisions regarding pricing or the other material competitive terms offered to any customer of a competing business to the Business, and if the transaction does not close, agree not to be employed in such a role for an agreed-upon minimum period of time.

(d)     Promptly following the date hereof, the Sellers will provide to Purchaser a correct and complete list of table values from the Sellers' SAP HR system for the following fields: (i) job, (ii) organization/HR Department, and (iii) location. Within twenty (20) days following the date hereof, the Sellers will provide to the Purchaser a set of test files from the Sellers' SAP HR system, which shall include actual employee data (including at least one person per country), but excluding in such data any information revealing the identity of any Employees (including names, addresses, tax identification numbers and any other information that would allow the Purchaser to individually identify any Employee). Such test files shall be in the same format as the format that will be subsequently provided to the Purchaser by the Sellers when actual payroll data is transferred from the Sellers to the Purchaser. Within three (3) Business Days following the completion of the Auction, the Sellers will provide the following additional information with respect to each of the Employees whose information was provided in Section 4.10(b) of the Sellers Disclosure Schedule: (i) full name, (ii) work e-mail address, (iii) work telephone number, (iv) specific recurring allowances paid to employees (if applicable), (v) supervisor and (vi) pay schedule. Within three (3) Business Days following the notification from Purchaser to Sellers of any Identified Employee pursuant to Section 7.1.1, the Sellers will provide Purchaser with the Identified Employee's home address. Additionally, provided that Purchaser provides Seller with proof that an Identified Employee has consented to its release and, if applicable, transfer across boundaries, the Sellers will provide the Purchaser with the following additional information with respect to such Identified Employees as soon as

practicable following the receipt by Seller of such proof: (ix) tax identification number, (x) date of birth, and (xi) gender. In addition, upon Purchaser's reasonable request, the Sellers will promptly provide Purchaser with aggregate census data with respect to gender and age (using five-year bands) of the Identified Employees' employee population (without individually identifying any Identified Employee).

(e)    Notwithstanding anything contained in this Agreement or any other agreement between the Purchaser and the Sellers executed on or prior to the date hereof, the Sellers shall not have any obligation to make available to the Purchaser or its representatives, or provide the Purchaser or its representatives with, (i) any Tax Return filed by the Sellers or any of their Affiliates or predecessors or (ii) any other information, if in each case under subsection (i) and (ii), making such information available would (A) jeopardize any attorney-client or other legal privilege or (B) potentially cause the Sellers to be found in contravention of any applicable Law or contravene any fiduciary duty or agreement (including any confidentiality agreement with a Third Party to which the Sellers or any of their Affiliates are a party) between Sellers and a Third Party, it being understood that the Sellers shall cooperate in any reasonable efforts and requests for waivers that would enable otherwise required disclosure to the Purchaser to occur without so jeopardizing privilege or contravening such Law, duty or agreement.

(f)    Promptly following the date of the U.S. Sale Order, the Sellers agree to provide the Purchaser with access to such documentation, records and databases to the extent reasonably required to review and assess the Sellers' use of Open Source Software incorporated into any of the Products or Services.

SECTION 5.7. **Public Announcements.** The initial press release relating to this Agreement shall be a joint press release, the text of which shall be agreed to by the Purchaser and the Sellers acting reasonably. Unless otherwise required by applicable Law or by obligations of the Parties or their Affiliates pursuant to any listing agreement with or rules of any securities exchange, the Parties hereto shall consult with each other before issuing any other press release or otherwise making any public statement with respect to this Agreement, the transactions contemplated hereby or the activities and operations of the other Party and shall not issue any such release or make any such statement without the prior written consent of the other Party (such consent not to be unreasonably withheld or delayed).

SECTION 5.8. **Further Actions.** From and after the Closing Date, each of the Parties shall execute and deliver such documents and other papers and take such further actions as may reasonably be required to carry out the provisions of this Agreement and the other Transaction Documents to which they are a party and give effect to the transactions contemplated herein and therein, including the execution and delivery of such assignments, deeds and other documents as may be necessary to transfer any Assets as provided in this Agreement, including the assignment of any Assigned Contract; provided, that subject to Section 5.5, the Sellers shall not be obligated to make any payment or deliver anything of value to any Third Party (other than filing and application fees to Government Entities, all of which shall be paid or reimbursed by the party required to pay such fees under the Agreement) in order to obtain any Consent to the transfer of Assets or the assumption of Assumed Liabilities.

**SECTION 5.9.  Conduct of Business.**  The Sellers covenant that, subject to any limitation imposed as a result of being subject to the Bankruptcy Proceedings and except as (i) the Purchaser may approve otherwise in writing as set forth below (such approval not to be unreasonably withheld or delayed), (ii) set forth in Section 5.9 of the Sellers Disclosure Schedule, (iii) otherwise contemplated or permitted by this Agreement or another Transaction Document, (iv) required by Law (including any applicable Bankruptcy Laws or by any order of a Bankruptcy Court), or (v) relates solely to Excluded Assets or Excluded Liabilities, the Sellers shall and shall cause their Affiliates to (A) conduct the Business and maintain the Owned Equipment in the Ordinary Course, (B) use efforts that are commercially reasonable in the context of the Bankruptcy Proceedings and taking into account employee attrition to continue operating the Business (excluding the EMEA Business) as a going concern, and to maintain the business organizations of the Business (excluding the EMEA Business) intact and (C) abstain from any of the following actions:

(a)     sell or otherwise dispose of material Assets, other than sales of inventory (including, without limitation, inventory that has been designated as "excess" or "obsolete" (**"E&O Inventory"**)) on a basis consistent with past practice;

(b)     incur any Lien on any Assets, other than Liens that will be discharged at or prior to Closing and Permitted Encumbrances;

(c)     (i) grant any license or sublicense of any rights under or with respect to any Transferred Intellectual Property other than licenses to suppliers, resellers and customers in the Ordinary Course and licenses or sublicenses granted in accordance with the Intellectual Property License Agreement (if such agreement were in effect as of the date hereof), or (ii) enter into any exclusive license agreement that would restrict the Business or the Assets after the Closing in any material respect or which is in conflict with the provisions of this Agreement or that would be in conflict with the Intellectual Property License Agreement if it were in effect as of the date hereof;

(d)     increase the rate of cash compensation or other fringe, incentive, equity incentive, pension, welfare or other employee benefits payable to the Employees, other than normal periodic increases consistent with past practice or as required by applicable Law, Contracts or Seller Employee Plans in effect as of the date hereof, or pursuant to the KEIP or KERP (provided that the Sellers provide the Purchaser with notice of amendments, modifications, supplements or replacements to the KEIP as may be approved by the Canadian Court or to the KERP as may be approved by the Canadian Court or the U.S. Bankruptcy Court), or increases to welfare benefits that apply to substantially all similarly situated employees (including the Employees) of the Sellers or the applicable Affiliates of the Sellers, or (ii) except as otherwise expressly permitted under Section 5.9, enter into, or increase the benefits or any payments under, any employment, deferred compensation, severance or other similar agreement or arrangement with any Employee;

(e)     voluntarily terminate or waive any material right under, or materially amend any Material Contract or any Bundled Contract material to the Business (other than as necessary to effect the unbundling of any Bundled Contract required with respect to any other business or business segment of the Sellers), unless such Contract has become an

91

Excluded Other Vendor Contract, an Excluded 365 Vendor Contract or a Non-Assigned Contract;

(f)     waive, release, assign, settle or compromise any material claim, litigation or arbitration relating to the Business to the extent that such waiver, release, assignment, settlement or compromise imposes any binding obligation, whether contingent or realized, on the Business that will bind the Designated Purchasers after the Closing Date and is materially adverse to the Business;

(g)     fail to make any budgeted capital expenditures with respect to the Business (excluding the EMEA Business) or make any unbudgeted capital expenditure with respect to the Business (excluding the EMEA Business) in excess of $100,000 individually or $250,000 in the aggregate;

(h)     enter into any Material Contract for or relating to the Business that cannot be assigned to the Purchaser;

(i)     fail to maintain tangible property which, individually or in the aggregate, is material to the Business and which is included in the Assets, consistent with past practice since the filing of the Bankruptcy Proceedings;

(j)     enter into, or agree to enter into, any sale-leaseback transactions with respect to the Business;

(k)     take any action, other than actions that an employer in bankruptcy would take, to cause any employee of the Sellers who would otherwise be an Employee as of the Closing not to be such an employee (other than termination for cause or termination of Employees who failed to receive an offer of employment from the Purchaser or a Designated Purchaser pursuant to this Agreement provided the Sellers make a reasonable effort to provide notice to the Purchaser prior to such employment termination);

(l)     fail to maintain the material Consents with respect to the Business (excluding the EMEA Business);

(m)     on or before the Closing Date, make or rescind any material election in relation to Taxes that would materially and adversely impact the Purchaser after the Closing;

(n)     grant any lease, sublease, license, sublicense or other occupancy rights under or with respect to any portion of Real Property used in the Business (except with respect to such rights granted to the purchasers of other Nortel business segments which are co-located at such premises and the effect of which would not have a material adverse effect on the lease, license or occupancy by the Purchaser or any Designated Purchaser of such Real Property) or terminate or surrender or agree to release any Lease, in whole or in part, which is identified in the Real Estate Terms and Conditions except in accordance with the Real Estate Terms and Conditions;

(o)    construct, or permit to be constructed any capital improvements or major alterations at any portion of the Real Property used for the Business (excluding the EMEA Business, except with respect to any capital improvements or major alterations at any portion of the Real Property required in connection with the purchase by purchasers of other Nortel business segments), or as otherwise contemplated in the Real Estate Terms and Conditions;

(p)    enter into any Collective Labor Agreement affecting Transferred Employees except as required by applicable Law; or

(q)    · enter into any Contract not to compete in any line of business or geographic area that would reasonably be expected to bind the Purchaser or any of its Affiliates after the Closing in any material respect;

(r)    enter into any Contract granting an indemnity in respect of intellectual property infringement or misappropriation other than in the Ordinary Course that would bind the Purchaser or any of its Affiliates after the Closing in any material respect, except for those Contracts that will not be, or that the Purchaser may elect not to have, assigned to the Purchaser hereunder; or

(s)    authorize, or commit or agree to take, any of the foregoing actions.

If a Seller desires to take any action described in this Section 5.9, the Main Sellers may, prior to any such action being taken, request the Purchaser's consent via an electronic mail or facsimile sent to the individual(s) at the addresses listed on Exhibit 5.9. The Purchaser shall respond to such notice in writing by 11:59 p.m. (New York time) on the second Business Day after the day of delivery of such electronic mail or facsimile. The failure of the Purchaser to respond within such two (2) Business Days shall not be deemed to be consent to such action.

The Purchaser acknowledges and agrees that: (i) prior to the Closing Date, the Sellers shall exercise, consistent with the terms and conditions of this Agreement, control and supervision of the Business (excluding the EMEA Business) and the EMEA Sellers shall exercise, consistent with the terms and conditions of the EMEA Asset Sale Agreement, the EMEA Business and (ii) notwithstanding anything to the contrary set forth in this Agreement, no consent of the Purchaser shall be required with respect to any matter set forth in Section 5.9 or elsewhere in this Agreement to the extent the requirement of such consent would, upon advice of the Purchaser's counsel, violate any Law.

SECTION 5.10. **Transaction Expenses.** Except as otherwise provided in this Agreement or the Ancillary Agreements, each of the Purchaser and the Sellers shall bear its own costs and expenses (including brokerage commissions, finders' fees or similar compensation, and legal fees and expenses) incurred in connection with this Agreement, the other Transaction Documents and the transactions contemplated hereby and thereby.

SECTION 5.11. **Confidentiality.**

(a)    The Parties acknowledge that the Confidentiality Agreement remains in full force and effect in accordance with its terms, which are incorporated herein

93

by reference, and the Parties agree to be bound thereby in the same manner and to the same extent as if the terms had been set forth herein in full, except that the Sellers shall be at liberty to disclose the terms of this Agreement to any court or to any liquidator or in connection with any auction process with respect to the Business or the Assets approved by the Bankruptcy Court and show appropriate figures in their administration records, accounts and returns; provided, that after the completion of the transactions contemplated herein, the Purchaser's confidentiality obligations under this Section 5.11 and the confidentiality agreement between the Purchaser, NNC and its subsidiaries and Alan Bloom dated March 27, 2009, with respect to information and data relating to the Business and/or the Assets shall terminate. For greater certainty, the Purchaser's confidentiality obligations under the third clean team confidentiality agreement between the Purchaser and its subsidiaries and NNL and its subsidiaries, dated June 19, 2009, shall not terminate after the completion of the transactions contemplated herein.

(b)     Subject to the requirements of the Bankruptcy Laws or as may be imposed by the Bankruptcy Court or as otherwise required by applicable Law, from and after the Closing: (i) the Sellers shall, and shall cause their Affiliates to, hold in confidence all confidential information (including trade secrets, customer lists, marketing plans and pricing information) of the Sellers relating to the Business or the Assets; (ii) in the event that the Sellers or an Affiliate thereof shall be legally compelled to disclose any such information, the Sellers shall provide the Purchaser with prompt written notice of such requirement so that the Purchaser may seek a protective order or other remedy; and (iii) in the event that such protective order or other remedy is not obtained, the Sellers or their Affiliates shall furnish only such information as is legally required to be provided.

(c)     It is acknowledged by the Purchaser and the Sellers that in the course of attempting to sell the Assets, one or more of the Sellers has entered into several confidentiality agreements with Third Parties in respect of information relating to the Assets and has disclosed such information to certain of those Third Parties.

(d)     Each Seller shall assign to the Purchaser, at or prior to, and with effect from and after the Closing, all of its rights under any such confidentiality agreement made by such Seller with any Third Party but only as such confidentiality agreements relate to the Assets and the Business and only to the extent that such agreements permit such assignments without the consent of any Third Party. To the extent such agreements do not permit any assignment without the consent of any Third Party, at the Purchaser's request and the Purchaser's expense, provided that the Sellers receive an indemnity from the Purchaser in form and substance satisfactory to the Sellers, to the extent permitted by applicable Laws and the terms of such confidentiality agreements, shall appoint the Purchaser as such Sellers' representative and agent in respect of confidential information relating to the Business and Assets under such confidentiality agreements and any amounts recovered or expenses incurred in enforcing those confidentiality agreements in respect of the Sellers shall accrue to the benefit of or be for the account of the Purchaser.

(e)     Notwithstanding anything to the contrary contained in this Section 5.11, nothing contained in this Agreement shall be construed as precluding, prohibiting, restricting or otherwise limiting the ability of the Sellers, the Sellers' Affiliates or their respective representatives to: (i) make permitted disclosures under Section 5.7 or as

94

otherwise permitted under this Agreement; (ii) make any disclosures that are required by applicable Law; (iii) use or disclose information that is not exclusive to the Business to the extent necessary to operate the other business segments of the Sellers or their Affiliates or otherwise engage in any manner in any business activities unrelated to the Business; (iv) perform any retained Contracts, whether or not exclusively related to the Business; or (v) make customary disclosures, subject to customary confidentiality agreements, regarding information that is not exclusive to the Business and is primarily related to other business segments of the Sellers in connection with acquiring, merging or otherwise combining with, or being acquired by, or selling all or part of their assets to, any Person (whether in a single transaction or a series of related transactions or whether structured as an acquisition of assets, securities or otherwise).  Notwithstanding anything to the contrary contained in this Section 5.11, nothing contained in this Agreement shall be construed as precluding, prohibiting, restricting or otherwise limiting the ability of the Purchaser, the Purchaser's Affiliates or their respective representatives to: (i) make permitted disclosures under Section 5.7 or as otherwise permitted under this Agreement or (ii) make any disclosures that are required by applicable Law.

SECTION 5.12. **Disclosure Schedules and Certain Information.**

(a)     The Sellers shall submit to the Purchaser via electronic mail or facsimile sent to the individual(s) at the addresses listed in Exhibit 5.12, every two (2) weeks, written updates to Section 4.10(b) of the Sellers Disclosure Schedule with respect to additions, deletions or other status changes of Employees or, after finalization of the Identified Employees, only with respect to Identified Employees.  The Sellers shall submit to the Purchaser at least three (3) Business Days prior to the Closing Date, written updates to the Sellers Disclosure Schedules in respect of Article IV disclosing any events or developments that occurred or any information learned between the date of this Agreement and the Closing Date that reflect any matters hereafter arising which, if existing, occurring or known to the Sellers at the date hereof, would have been required to be set forth or described in the Sellers Disclosure Schedule in relation to Article IV.

(b)     The Sellers shall give prompt notice to the Purchaser, and the Purchaser shall give prompt notice to the Sellers, upon obtaining knowledge of the occurrence or nonoccurrence of any event that, individually or in the aggregate, would make the timely satisfaction of the conditions set forth in Article IX impossible or unlikely.

(c)     The delivery of any update or notice pursuant to this Section 5.12 shall not cure any breach of any representation or warranty requiring disclosure of such matter or otherwise limit or affect the remedies available hereunder to any party receiving such notice.

SECTION 5.13. **Certain Payments or Instruments Received from Third Parties.**
To the extent that, after the Closing Date, (a) the Purchaser or any Designated Purchaser receives any payment or instrument that is for the account of a Seller according to the terms of this Agreement or relates primarily to any business or business segment of the Sellers other than the Business, the Purchaser shall, and shall cause the Designated Purchasers to promptly deliver such amount or instrument to the relevant Seller, and (b) any of the Sellers receives any payment that is for the account of the Purchaser or any of the Designated Purchasers

95

according to the terms of this Agreement or relates primarily to the Business, the Main Sellers shall, and shall cause the Other Sellers to promptly deliver such amount or instrument to the Purchaser or the relevant Designated Purchasers. All amounts due and payable under this Section 5.13 shall be due and payable by the applicable Party in immediately available funds, by wire transfer to the account designated in writing by the relevant Party. Notwithstanding the foregoing, each Party hereby undertakes to use reasonable best efforts to direct or forward all bills, invoices or like instruments to the appropriate Party.

**SECTION 5.14. Non-Assignable Contracts.**

(a)    To the extent that any Seller Contract or any Seller Consent is not capable of being assigned under Section 365 of the U.S. Bankruptcy Code (or, if inapplicable, pursuant to other applicable Laws or the terms of such Contract or Consent) to the Purchaser or a Designated Purchaser at the Closing without the Consent of the issuer thereof or the other party thereto or any Third Party (including a Government Entity) (collectively, the **"Non-Assignable Contracts"**), this Agreement will not constitute an assignment thereof, or an attempted assignment, unless any such Consent is obtained.

(b)    For the purposes of this Agreement (including Section 5.14(a) and all representations and warranties of the Sellers contained herein), the relevant Sellers shall be deemed to have obtained all required Consents in respect of the assignment of any 365 Vendor Contract and 365 Customer Contract if, and to the extent that, pursuant to the U.S. Sale Order, the Sellers are authorized to assume and assign to the Purchaser or Designated Purchasers such Seller Contract pursuant to Section 365 of the U.S. Bankruptcy Code and any applicable Cure Cost has been, or will be, satisfied as provided in Section 2.1.7. In furtherance thereof, the U.S. Bidding Procedures Order shall contain procedures, in form and substance acceptable to the Purchaser, for obtaining U.S. Bankruptcy Court approval that all 365 Contracts other than the Non-Assignable Contracts can and shall be assigned to the Purchaser on the Closing Date.

**SECTION 5.15. Bundled Contracts.**

(a)    Section 5.15 of the Sellers Disclosure Schedule lists each Contract that the Sellers or their Affiliates have entered into prior to the date hereof providing for the sale or provision of Products and/or Services and the sale or provision of other products and services of the Sellers or their Affiliates (each, a **"Bundled Contract"**).

(b)    During the period from the date hereof until the Auction, the Sellers and their Affiliates shall cooperate (consistent with applicable Laws and any confidentiality restrictions requiring consent of Third Parties) with the Purchaser in developing a strategy with respect to transitioning each customer of the Business that is party to a Bundled Contract by, among other things, making available those employees who are responsible for managing the customer relationship with each such customer, by providing unredacted copies of all Contracts to which any Seller is a party (or in the case of Bundled Contracts, the portions of such Bundled Contracts as are applicable to the Business) with each of the top 40 customers of the Business by revenue for the year ended December 31, 2008 (other than pricing information and other competitive sensitive information the sharing of which Sellers or their representatives reasonably determine may violate applicable Law) and such

96

other information as the Purchaser may reasonably request, which disclosures shall be subject to the Confidentiality Agreement.  On or before the date that is five (5) Business Days after the date of the Auction, the Purchaser shall notify the Sellers of those counterparties to Bundled Contracts with which the Purchaser elects to attempt to negotiate alternative arrangements (effective as of and conditioned upon the Closing) ("**Alternative Arrangements**") directly with such counterparty to such Bundled Contract, including without limitation, such counterparty's purchase or sale of items under an existing Contract between such counterparty and the Purchaser or the entry into a new contract covering the Products and Services.  Promptly following the later of (x) the entry of the U.S. Sale Order and (y) the receipt of HSR Approval and Competition Act Approval, the Sellers and their Affiliates shall (i) provide such competitive sensitive information as was redacted pursuant to the first sentence of this subsection (b) in such a manner, and subject to, Section 5.6(c) so as not to violate any applicable Law and (ii) cooperate with the Purchaser with respect to the negotiation of any such Alternative Arrangements, including without limitation, by making introductions to customers with whom the Purchaser does not have an existing customer relationship, by, subject to applicable Law, participating in telephone calls and meetings with such customers and by providing such forecast and other information as is necessary to assist the Purchaser negotiate such Alternative Arrangements.  The Purchaser agrees that any Alternative Arrangements it reaches with counterparties shall, effective as of the occurrence of the Closing, expressly release each Seller that is a party to the affected Bundled Contract from any obligations and Liabilities under such Bundled Contract from and after the Closing Date as they relate to the Products and Services sold or provided after the Closing Date.

(c)      With respect to those Bundled Contracts other than those which the Purchaser has elected to negotiate Alternative Arrangements, promptly following the later of (i) the entry of the U.S. Sale Order and (ii) the receipt of HSR Approval and Competition Act Approval, the Purchaser and the Sellers shall cooperate to jointly contact each party thereto including without limitation, by making such contacts (by phone or in person) as may be reasonably requested by Purchaser and by sending a joint letter, in form and substance satisfactory to each of Sellers and Purchaser notifying the counterparty to each such Bundled Contract of the transactions and requesting the counterparty to agree to amend such Bundled Contract from and after the Closing Date so as to delete all obligations and Liabilities therefrom as they relate to the Products and the Services and enter into a new Contract (effective as of, and conditioned upon the occurrence of, the Closing) with the applicable customer and which only relates to Products and Services, in which event such new Contract shall be deemed to be a Seller Contract, provided, however, that the Sellers shall be under no obligation to compromise any right, asset or benefit or to expend any amount or incur any Liabilities in obtaining such arrangements, and the failure to enter into such arrangements shall not entitle the Purchaser to terminate this Agreement, fail to complete the transactions contemplated hereby or reduce the Purchase Price payable hereunder (except as otherwise provided in Section 2.2.1); provided, further, that without the express written consent of Purchaser, Sellers shall not agree to amend the material terms of any Bundled Contract as a condition of such counterparty agreeing to amend the Bundled Contract in the manner set forth in this subsection (c) and if so requested, Sellers shall notify Purchaser and, unless Purchaser consents to such amendment, Sellers shall not enter into a new Contract with such customer as set forth in this subsection (c) but shall instead enter

into a Subcontract Agreement with respect to such Bundled Contract as provided in subsection (d) below. Each of the Sellers and the Purchaser shall notify the other Party if any customer has contacted such Party with regard to the matters set forth in this Section 5.15 and shall keep such other Party reasonably informed regarding the content of any discussions with the customer.

(d)     For those Bundled Contracts for which the arrangements mentioned in Section 5.15 (a) – (c) have not been entered into by January 25, 2010 or such later date as the Parties may mutually agree, the Sellers and the Purchaser shall use commercially reasonable efforts to enter into one or more Subcontract Agreements between the Sellers and the Purchaser or the applicable Designated Purchaser with respect to such Bundled Contracts on such terms as are reasonably satisfactory to each of them; provided that (x) nothing in this Section 5.15 shall require the Sellers to renew any Bundled Contract once it has expired, (y) the Sellers shall have the right, any time after the date that is one (1) year after the Closing Date, to exercise any right to terminate any Bundled Contract, and (z) the Sellers shall be under no obligation to compromise any right, asset or benefit or to expend any amount or incur any Liabilities in order to comply with its obligations under this sentence.

**SECTION 5.16.  Post-Closing Assistance for Litigation.**

(a)     After the Closing, the Purchaser shall, upon the request of the Sellers and at the Sellers' cost (including reimbursement of reasonable out of pocket expenses of the Purchaser and the Designated Purchasers and payment of a reasonable *per diem* to the Purchaser or a Designated Purchaser which *per diem* shall be based on the total compensation of the affected Transferred Employees at the time), require the Transferred Employees to make themselves reasonably available at reasonable times and cooperate in all reasonable respects with the Sellers and their Affiliates in the preparation for, and defense of, any lawsuit, arbitration or other Action (whether disclosed or not disclosed in the Sellers Disclosure Schedule) filed or claimed against the Sellers or any of their Affiliates or any of the respective agents, directors, officers and employees of the Sellers and their Affiliates, whether currently pending or asserted in the future, concerning the operation or conduct of the Business prior to the Closing Date; provided, however, that the obligations of the Purchaser hereunder shall only extend to the Transferred Employees who remain employed by the Purchaser or a Designated Purchaser as of the date of the Sellers' request and shall not apply to former employees no longer employed by the Purchaser or a Designated Purchaser as of such date and shall not require the Purchaser or a Designated Purchaser to continue the employment of any such employee.

(b)     After the Closing, the Sellers shall, upon the request of the Purchaser, and at the Purchaser's cost (including reimbursement of reasonable out of pocket expenses of the Sellers and payment of a reasonable *per diem* to the Sellers which *per diem* shall be based on the total compensation of the affected employees at the time), require their employees that were not Transferred Employees to make themselves reasonably available and cooperate in all reasonable respects with the Purchaser and the Designated Purchasers and their Affiliates in the preparation for, and defense of, any lawsuit, arbitration or other Action filed or claimed against the Purchaser, any of the Designated Purchasers, any of their Affiliates or any of the respective agents, directors, officers and employees of any of the

98

foregoing, whether currently pending or asserted in the future, concerning the operation or conduct of the Business prior to the Closing Date; provided, that the obligations of the Sellers or their Affiliates under this Section 5.16(b) shall only extend to the employees of such Sellers or Sellers' Affiliates as of the date of the Purchaser's request and shall not apply to former employees no longer employed by such Sellers or Sellers' Affiliates as of such date and shall not require such Sellers or Sellers' Affiliates to continue the employment of any such employee.

SECTION 5.17. Tangible Asset Removal. Except as otherwise set forth in the Real Estate Terms and Conditions and the Real Estate Agreements, the Purchaser shall, and shall cause the relevant Designated Purchasers to remove all tangible Assets from all premises owned or leased by the Sellers or their Affiliates that are not being leased, subleased or licensed to the Purchaser or any Designated Purchaser in accordance with the Real Estate Terms and Conditions within sixty (60) days after the Closing Date; provided, however, that in the event that the Sellers notify the Purchaser in writing that the Sellers desire, or are required, to vacate earlier, (i) the Sellers shall have the right by written notice to the Purchaser to require the Purchaser to remove all tangible Assets from all premises owned or leased by the Sellers or their Affiliates prior to the date that is thirty (30) days after the Closing Date or (ii) the Sellers may remove and store all tangible Assets at the Sellers' sole cost and expense until the date that is sixty (60) days after the Closing Date. The Sellers shall cooperate with such efforts, including by providing access to such facilities during normal business hours or where necessary to minimize disruption to the Business and to the other businesses of the Sellers, to provide reasonable access during non-working hours for the purpose of facilitating such removal.

SECTION 5.18. Termination of Overhead and Shared Services and Intercompany Licensing Arrangements.

(a) The Purchaser acknowledges and agrees that, except as otherwise expressly provided in the Transition Services Agreement, effective as of the Closing Date (i) all Overhead and Shared Services provided to the Business (excluding the EMEA Business and except the Transferred Overhead and Shared Services) shall cease and (ii) the Sellers or their Affiliates shall have no further obligation to provide any Overhead and Shared Services to the Business (excluding the EMEA Business).

(b) The Sellers shall, on or before Closing, provide the Purchaser with reasonable evidence confirming that Nortel Networks S.A. has agreed:

(i) not to assert its Intellectual Property and exclusive license rights, if any, in a manner that could restrict or conflict with the ability of the Purchaser or its successors, assigns, licensees, sub-licensees or customers to operate in the field of the Business and its natural evolutions; and

(ii) to the fullest extent permitted under French Law, to relinquish, waive and terminate all its Intellectual Property and license rights (including any enforcement rights) to the extent (but only to the extent) that they relate to the Intellectual Property that is sold or licensed to the Purchaser in connection with the sale of the Business.

99

(c)     The Sellers (other than NNL) shall, on or before Closing, provide the Purchaser with Appropriate License Termination agreements (as defined in the IFSA) executed by each of them and shall use commercially reasonable efforts to obtain and provide the Purchaser with Appropriate License Termination agreements from each of their Affiliates who are not Sellers.

**SECTION 5.19.  Financing.**  Notwithstanding anything to the contrary set forth herein, the Purchaser acknowledges and agrees that (i) its obligations to consummate the transactions contemplated by this Agreement are not conditioned or contingent in any way upon receipt of any financing and the failure to consummate the transactions contemplated herein as a result of the failure to obtain financing shall constitute a breach of this Agreement by the Purchaser (including its obligations pursuant to Section 2.3).

**SECTION 5.20.  Insurance Matters.**

(a)     The Purchaser acknowledges and agrees that coverage of the assets, tangible or intangible property, Liabilities, ownership, activities, businesses, operations, current and former shareholders, and current and former directors, officers, employees and agents of, the Business (excluding the EMEA Business) (collectively, the **"Covered Assets and Persons"**) under all current or previous insurance policies of the Sellers and their Affiliates, including, without limitation, all environmental, directors' and officers' Liability, fiduciary Liability, employed lawyers, property and casualty flood, ocean marine, contaminated products and all other insurance policies or programs arranged or otherwise provided or made available by the Sellers or their Affiliates that cover (or covered) any of the Covered Assets and Persons at any time prior to the Closing (the **"Seller Insurance Policies"**) shall cease as of the Closing Date and the Covered Assets and Persons will be deleted in all respects as insured (or additional insured, as the case may be) under all Seller Insurance Policies.  Except as expressly provided herein, the Sellers shall retain any rights to, including any right to any proceeds received in respect of, any claim pending as of the date hereof or made after the date hereof under any Seller Insurance Policy, even if such claims relates to the capital assets or properties of the Business (excluding the EMEA Business).

(b)     If after the Closing Date the Purchaser or the Sellers (or any of their respective Affiliates) reasonably require any information regarding claim data or other information pertaining to a claim or an occurrence reasonably likely to give rise to a claim (including any pre-Closing claims under the Seller Insurance Policies that are to be covered under the retrospective component of the new insurance policy) in order to give notice to or make filings with insurance carriers or claims adjustors or administrators or to adjust, administer or otherwise manage a claim, then the Sellers or the Purchaser, as the case may be, shall cause such information to be supplied to the other (or their designee), to the extent such information is in their possession and control or can be reasonably obtained by the Sellers or the Purchaser (or their respective Affiliates), as applicable, promptly upon a written request therefore.  If the Purchaser desires access to, and utilization of, claims data or information maintained by an insurance company or other Third Party in respect of any claim (including any pre-Closing claims under any Seller Insurance Policies that are covered under the retrospective component of the new insurance policies), the Purchaser shall be exclusively responsible for acquiring from such insurance company or Third Party, at the

100

Purchaser's sole cost and expense, the rights necessary to permit them to obtain access to and utilization of such claims data or information.  If any Third Party requires the consent of the Sellers or any of their Affiliates to the disclosure of such information, such consent shall not be unreasonably withheld.

(c)    Prior to Closing, the Sellers shall maintain the Seller Insurance Policies, or in the event any such policies are cancelled or otherwise terminated, shall obtain other substantially comparable insurance policies that have the same coverage limits and deductibles or self-retention amounts.  In respect of insurance claims relating to the Owned Equipment (excluding for the purposes of this Section 5.20(c), any fixtures and improvements forming part of the Carling Property) or the premises subject to a Real Estate Agreement (except for the Carling Property) occurring prior to Closing, the following provisions shall apply:

(i)    The Sellers shall make and diligently pursue any applicable insurance claims related to damage or destruction to any Owned Equipment wherever located.

(ii)    If and to the extent that any Owned Equipment, wherever located, is destroyed or damaged prior to Closing, and is not replaced or repaired or restored to its condition prior to such damage or destruction, then at Closing, the Sellers shall pay to the Purchaser the amount of any net insurance proceeds received (or which would have been received had the Sellers maintained the Seller Insurance Policies) in respect of such Owned Equipment that have not been applied to repair, replacement or restoration, as applicable, and assign any such claim and the rights to receive the proceeds of any such claim that has not yet been finally adjusted.  In the event that insurance proceeds would have been available but for the Sellers' failure to maintain the Seller Insurance Policies, or due to the rights of any superior lender, then in such event, the Purchase Price shall be reduced by an amount equal to the cost of repair, or, if destroyed or damaged beyond repair, by an amount equal to the cost of replacing the Owned Equipment so damaged or destroyed with equipment of comparable age and condition.

(iii)    Except in respect of the Carling Property, if and to the extent that any leasehold improvements at any premises subject to a Real Estate Agreement are destroyed or damaged prior to Closing, then to the extent of the receipt of insurance proceeds relating to such damage or destruction by the Sellers or which would have been received had the Sellers complied with the Seller Insurance Policies, or tenant's insurance requirements under the applicable Lease, as applicable (but excluding any proceeds related to business interruption insurance or related to any part of any premises in the applicable building not forming part of the premises subject to a Real Estate Agreement) the Sellers shall be responsible to the extent required under the terms of the applicable Lease, to utilize such insurance proceeds received to restore the applicable improvements and leasehold improvements in accordance with the provisions of the applicable Lease.  To the extent that any Real Property which is the subject of a Real Estate Agreement is destroyed or damaged after Closing, the applicable terms of the

101

applicable Real Estate Agreement shall apply; and to the extent that the subject Real Estate Agreement provides that it is the responsibility of the landlord to repair or restore any destruction or damage to real or personal property, the Sellers shall make and diligently pursue any applicable claims against the landlord related to such damage or destruction.

(d)     If and to the extent that the Carling Property is destroyed or damaged prior to Closing and the Purchaser does not elect to terminate this Agreement pursuant to Section 10.1(f), hereof, then to the extent of the Sellers' receipt of insurance proceeds relating to such damage or destruction or which would have been received had the Seller maintained the Seller Insurance Policies, (but excluding any proceeds related to business interruption insurance), and subject to the rights of any superior landlord or mortgagee in respect of the Carling Property, the Sellers shall be responsible to the extent required under the terms of the Carling Property Lease Agreements (as if such Lease Agreements were in effect prior to Closing and as if the landlord were required to restore tenant improvements in the same manner as other improvements) to restore the applicable improvements and fixtures to a condition substantially comparable to the condition prior to such damage or destruction. In the event that (i) insurance proceeds are not immediately available to the Sellers on Closing for purposes of the repair and restoration of the Carling Property (including any fixtures and tenant improvements forming a part thereof); or (ii) insurance proceeds would have been available but for the Sellers' failure to maintain the Seller Insurance Policies, or due to the rights of any superior landlord or mortgagee, the Purchaser may withhold from the Purchase Price due on Closing and pay into the Escrow Account an amount equivalent to the aggregate cost of repairing such damage and restoring the Carling Property (including any fixtures and improvements forming a part thereof) to a condition substantially comparable to the condition prior to such damage or destruction (such cost to be determined by an independent and qualified architect or engineer mutually acceptable to the Sellers and Purchaser, each acting reasonably). The provisions of Article II.C of the Real Estate Terms and Conditions shall apply mutatis mutandis in respect of these escrow amounts and the completion of the repair and restoration works. To the extent that the Carling Property is destroyed or damaged after Closing, the terms of the Carling Property Lease Agreements shall apply.

**SECTION 5.21. <u>Sellers Deposits, Guarantees and Other Credit Support of the Business.</u>**

(a)     Following the Closing, the Purchaser shall, or shall cause the applicable Designated Purchaser to, cooperate with the Sellers to procure the return and/or release by the applicable counterparty, as soon as reasonably practicable, of any lease security deposits given by the Sellers under any Leases that are Assigned Contracts or any deposits, bonds or other security posted in connection with Assigned Contracts and that are set forth in Section 5.21(a) of the Sellers Disclosure Schedule (which such Section of the Sellers Disclosure Schedule may be updated by the Sellers upon notice to the Purchaser up until three (3) Business Days prior to the Closing Date) (the "**Security Deposits**"), including where required by the applicable counterparty, offering to post such Security Deposits on terms and conditions no less favorable than offered to such Seller by such counterparty. Except as required by the immediately preceding sentence, the Purchaser shall in no event be required to provide any replacement financial security or any financial security or other deposits with

102

respect to any premises leased pursuant to any lease or sublease arrangement with any Seller, all of which shall be the sole responsibility of the Seller.

(b)     The Purchaser shall, or shall cause the applicable Designated Purchaser to, hold the Sellers and their Affiliates harmless from and against any and all Losses suffered by the Sellers and their Affiliates resulting from, or relating to, the failure of the Purchaser or the applicable Designated Purchaser, as the case may be, to procure the return and/or release of the Security Deposits to the relevant Seller in accordance with Section 5.21(a); provided, however, that (i) the Purchaser shall have no liability to the Sellers and their Affiliates pursuant to this Section 5.21(b) unless the Sellers and their Affiliates assign to the Purchaser all of the Sellers' and their Affiliates' right, title and interest in the unreturned Security Deposits and (ii) the Purchaser's liability to the Sellers and their Affiliates shall be limited, in each case, to the amount of such Security Deposits.

SECTION 5.22.  **Use of Sellers' Trademarks.**  Except as expressly provided in the Trademark License Agreement, as of the Closing Date, the Purchaser shall not have the right to use the name "Nortel" or any Trademarks owned by the Sellers or any of their Affiliates or any other mark employing the word "Nortel" or any part or variation of any of the foregoing or any confusingly similar Trademarks to any of the foregoing (collectively, the **"Sellers' Trademarks"**).

SECTION 5.23.  **Accessible Information.**  After the Closing, the Purchaser shall have the right to reasonably request from the Main Sellers copies of all books, records, files, documentation and sales literature (other than Tax records and Employee Records, except as provided in Sections 5.6(d) and 7.4(d)) in the possession or under control of the Sellers and held or used in the Business (other than records to the extent prohibited by applicable Law), to which the Purchaser in good faith determines it needs access for *bona fide* business or legal purposes. The Sellers shall use commercially reasonable efforts to, or cause their Respective Affiliates to use commercially reasonable efforts to, provide such copies to the Purchaser (at the Purchaser's expense) as soon as reasonably practicable; provided, that the Sellers shall be allowed to redact any such requested document in order to delete any information and data relating to business segments of any such Seller and its Respective Affiliates not included in the Business; provided, further, that nothing herein shall require the Sellers to (i) disclose any information to the Purchaser if such information disclosure would jeopardize any attorney-client or legal privilege or (ii) contravene any applicable Law, fiduciary duty or agreement (including any confidentiality agreement to which the Sellers or any of their Affiliates is a party); it being understood, that the Sellers shall cooperate in any reasonable efforts and requests for waivers that would enable otherwise required disclosure to the Purchaser to occur without so jeopardizing privilege or contravening such Law, duty or agreement).

SECTION 5.24.  **Maintenance of Books and Records.**  After the Closing, each Primary Party shall, and shall cause its Affiliates to, preserve, until at least the third (3rd) anniversary of the Closing Date (or, in the case of Tax records (including VAT records), such later date as may be required by Law), all pre-Closing Date records to the extent relating to the Business possessed or to be possessed by such Person. After the Closing Date and up until at least the third (3rd) anniversary of the Closing Date, upon any reasonable request from any Primary Party or its representatives, the other Primary Party shall, and/or shall cause the Person holding such records to, (a) provide to the requesting Primary Party or its representatives

103

reasonable access to such records during normal business hours and (b) permit the requesting Primary Party or its representatives to make copies of such records, in each case at no cost to the requesting Primary Party or its representatives (other than for reasonable out-of-pocket expenses). In addition, in the event that the financial statements of the Business are audited for any period prior to the Closing Date, upon execution of a customary access letter if required, the requesting Primary Party and its representatives (including their outside accountants) shall be granted access to all relevant documents and information in connection with the requesting Primary Party completing the audit of its accounts for the 2009 fiscal year; provided, however, that nothing herein shall require the non-requesting Primary Party to disclose any information to the requesting Primary Party if such disclosure would jeopardize any attorney-client or other legal privilege or contravene any applicable Law, fiduciary duty or agreement (it being understood that the non-requesting Primary Party shall cooperate in any reasonable efforts and requests for waivers that would enable otherwise required disclosure to the requesting Primary Party to occur without so jeopardizing privilege or contravening such Law, duty or agreement). Such records may be sought under this Section 5.24 for any reasonable purpose, including to the extent reasonably required in connection with accounting, litigation, federal securities disclosure or other similar needs of the requesting Primary Party (other than claims between the Primary Parties or any of their respective Subsidiaries under this Agreement or any Ancillary Agreement). Notwithstanding the foregoing, any and all such records may be destroyed by the non-requesting Primary Party if the non-requesting Primary Party sends to the requesting Primary Party written notice of its intent to destroy such records, specifying in reasonable detail the contents of the records to be destroyed; (i) such records may then be destroyed after the 60th day following such notice unless the requesting Primary Party notify the destroying party that the requesting Primary Party desire to obtain possession of such records, in which event the non-requesting Primary Party shall transfer or cause to be transferred the records to the requesting Primary Party and the requesting Primary Party shall pay all reasonable expenses of the non-requesting Primary Party in connection therewith, and (ii) neither Primary Party shall be required to provide the other Party access to, or copies of any of its Tax records.

SECTION 5.25. **Certain Ancillary Agreements.** The Primary Parties shall use their commercially reasonable efforts to:

(a)     promptly negotiate in good faith with the relevant contract manufacturers and finalize the terms of the Contract Manufacturing Inventory Agreements based on the term sheet attached hereto as Exhibit 1.1;

(b)     promptly negotiate in good faith with the LGN Joint Venture with respect to the LGN/Korea Distribution Agreement;

(c)     promptly negotiate in good faith with NETAS with respect to the NETAS Distribution Agreement;

(d)     negotiate in good faith with the relevant counterparties with respect to the NGS Distribution Agreement and the EFA Development Agreement;

(e)     negotiate in good faith with respect to any Subcontract Agreement;

(f)    on or before the Closing and subject to the completion prior to Closing of the negotiation of each such agreement to the mutual satisfaction of each party thereto, enter into the Contract Manufacturing Inventory Agreements, the LGN/Korea Distribution Agreement and the NETAS Distribution Agreement, the Mutual Development Agreement, the Seller Supply Agreement, the NGS Distribution Agreement and the EFA Development Agreement, each as negotiated and finalized pursuant to this Section 5.25; and

(g)    negotiate, or to cause to be negotiated, in good faith on commercially reasonable terms and taking into account options available to the Primary Parties, appropriate commercial arrangements, including a potential Seller Supply Agreement and Mutual Development Agreement, in order to address interdependencies to the extent any bilateral relationships with other businesses, business segments or divisions (or former businesses, business segments or divisions) of certain Sellers for the supply of products are required to be in place in order to fulfill customer commitments existing as of the Closing Date and which will continue thereafter.

Notwithstanding the foregoing, the Primary Parties shall have no obligation to enter into any of the agreements described in this Section 5.25 unless each of them are satisfied, in their sole and absolute discretion with the terms thereof and it shall not be a breach of this Agreement to fail to enter into such agreements before, on or after the Closing Date; provided however, that the Parties acknowledge that the failure to enter into any such Agreement shall not be deemed a failure of any condition precedent to any Party's obligations hereunder.  In the event that the Purchaser is unable prior to the Closing to negotiate terms and conditions for the Seller Supply Agreement that are satisfactory to it in its sole discretion, the Purchaser may by written notice to the Sellers given by January 18, 2010 elect to require that the Sellers purchase such amount of the components and other products intended to be supplied under the Seller Supply Agreement and such components and other products shall be transferred to the Purchaser as part of the Owned Inventory hereunder.

**SECTION 5.26.  Additional Financial Statements.**  The Sellers shall use commercially reasonable efforts to cause KPMG (as their independent accountants) to complete the audit of the combined carve-out (A) balance sheets for the Business at December 31, 2007 and 2008, (B) related statements of earnings and cash flows of the Business for the fiscal years ended December 31, 2007 and 2008, and (C) balance sheet for the Business at September 30, 2009, and (D) the related statements of earnings and cash flows of the Business for the nine (9) month period ending on September 30, 2009 and (E) only if the Closing Date is February 12, 2010 or later, a balance sheet for the Business at December 31, 2009 and related statements of earnings and cash flows of the Business for the fiscal year ended December 31, 2009 (any such balance sheets and statements of earnings and cash flows, collectively, the "**Audited Financial Statements**") and to deliver to the Purchaser as promptly as practicable, and in any event within three (3) Business Days of receipt thereof the Audited Financial Statements.  The Sellers shall use commercially reasonable efforts to prepare and furnish the Purchaser with any other financial and other pertinent information regarding the Business as may be reasonably requested by the Purchaser, including all financial statements (including, to the extent required, unaudited combined carve-out financial statements of the Business as of the end of and for the nine (9) month period ended September 30, 2008, the "**Unaudited September 30, 2008 Financial Statements**") and financial data, in each case of the type required by Regulation S-X and Regulation S-K under the Securities Act or in order for the Purchaser to comply with its financial

105

reporting obligations as established by the SEC under the Exchange Act. The Sellers shall provide the Purchaser and its representatives with such cooperation and information as they shall reasonably request in connection with the Purchaser's compliance with its obligations under Section 8.1(a) hereof, or in order for the Purchaser to comply with its obligations as established by the SEC under the Securities Act and the Exchange Act.

SECTION 5.27. <u>Securities Compliance</u>. The Purchaser shall notify NASDAQ of the listing of the Shares as required by the NASDAQ listing rules prior to the Closing Date.

SECTION 5.28. <u>Transition Services</u>. Section 5.28 of the Sellers Disclosure Schedule addresses certain matters related to the Transition Services Agreement and the services to be performed by certain Affiliates of the Sellers for the Purchaser. The Parties agree that the terms and conditions set forth in Section 5.28 of the Sellers Disclosure Schedule are incorporated by reference herein and form a part of this Agreement.

SECTION 5.29. <u>Standstill Period</u>.

(a)    From the date of this Agreement until the entry of the U.S. Bidding Procedures Order, and from the date of the conclusion of the Auction until the Closing Date or termination of this Agreement, neither any Seller nor any Affiliate of any Seller shall, directly or indirectly through any of its authorized representatives, (i) solicit, initiate or encourage or engage in discussions or negotiations with respect to any proposal or offer from any Person (other than the Purchaser or its Affiliates) relating to in each case any acquisition, divestiture, recapitalization, business combination or reorganization of or involving all or a substantial part of the business and operations of the Business (a **"Competing Transaction"**), (ii) furnish any information with respect to, or participate in, or assist, any effort or attempt by any Person to do or seek a Competing Transaction, (iii) execute any letter of intent or agreement providing for a Competing Transaction, or (iv) seek or support Bankruptcy Court approval of a motion or Order inconsistent with the transactions contemplated herein, <u>provided</u>, <u>however</u>, that nothing contained herein shall prohibit the Sellers from providing any Person with the bidding procedures for the sale of the Business and related documents, answering questions about the bidding procedures for the sale of the Business, announcing the execution of this Agreement or the Auction or selecting an Alternate Bid (as such term is defined in the U.S. Bidding Procedures Order) at Auction and obtaining approval of such Alternate Bid as an alternate bid; and <u>provided</u> that nothing herein shall limit the Sellers' ability to negotiate, file, seek approval of or consummate a Sponsored Reorganization Plan prior to the completion of the Auction.

(b)    Notwithstanding the foregoing, the Sellers may provide continued access to written due diligence materials about the Business in an electronic data room (including written responses to requests for information made after the date hereof), to only such Person or Persons that (i) have access to such electronic data room as of the date hereof, and (ii) have satisfied the requirements of paragraph (a) of the "Participation Requirements" of the U.S. Bidding Procedures Order within ten (10) Business Days from the date hereof, it being understood that, during such ten (10) Business Day period, the Sellers will be allowed to (x) request such Persons to enter into amendments to their existing confidentiality agreements in order to render them compliant with the requirements of the bidding procedures for the sale of the Business, (y) discuss and negotiate such amendments

with those Persons, and (z) execute such amendments, and each such action shall not constitute a breach of this Section 5.29, provided, however, that the Sellers must provide the Purchaser at least equivalent access to all such written due diligence materials.

(c)     Without prejudice to any other methods or actions that may result in the cure of any breach of this Section 5.29, the Parties acknowledge and agree that in the event that any officer or other employee of any Seller acting alone (without the assistance of outside advisors) in violation of a corporate policy approved by the board of directors of NNC takes an action that constitutes a breach of Section 5.29(a)(i) but does not constitute a breach of any other clause of this Section 5.29, such breach shall be deemed cured in the event such action ceases and one or more of the Sellers notifies the counterparty or counterparties to the potential Competing Transaction in writing that the Sellers will not undertake such Competing Transaction, in each case no later than the fifth (5th) day after the Sellers become aware of such breach (for such purposes excluding the knowledge of the employee or officer whose action constitutes such breach), provided that such action that constituted the breach did not involve substantive negotiations regarding the terms of such Competing Transaction.

### SECTION 5.30.  Hazardous Materials at the Carling Property.

(a)     The Sellers acknowledge that the Purchaser and any Designated Purchaser did not cause or contribute to, and shall not be liable or responsible for, any currently or formerly existing Hazardous Materials contamination in, under, at, near or migrating from, to or through the Carling Property prior to or at the Closing Date.

(b)     The Sellers that own and lease the Carling Property and the Purchaser agree that the relevant Sellers and the Purchaser or a Designated Purchaser shall include in the Carling Property Lease Agreements: (i) an acknowledgement that the Purchaser or a Designated Purchaser did not cause or contribute to, and shall not be liable or responsible for, the currently or formerly existing Hazardous Materials contamination in, under, at, near or migrating from, to or through the Carling Property prior to or at the commencement of the Carling Property Lease Agreements; (ii) an indemnity by the relevant Sellers in favor of the Purchaser and any Designated Purchaser for (A) any Liabilities, including any Order, arising (directly or indirectly) out of or relating to any currently or formerly existing Hazardous Materials contamination in, under, at, near or migrating from, to or through the Carling Property prior to or at the commencement of the Carling Property Lease Agreements and (B) if and to the extent caused by Sellers, any Liabilities, including any Order, arising (directly or indirectly) out of or relating to any Hazardous Materials contamination in, under, at, near or migrating from, to or through the Carling Property; and (iii) an indemnity by the Purchaser or Designated Purchaser, as the case may be, in favor of the Sellers  for, if and to the extent caused by the Purchaser or Designated Purchaser, as the case may be, any Liabilities, if and to the extent caused by the Purchaser or Designated Purchaser, as the case may be, including any Order, arising (directly or indirectly) out of or relating to any Hazardous Materials contamination in, under, at, near or migrating from, to or through the Carling Property after the commencement of the Carling Property Lease Agreements.

107

**SECTION 5.31. Montreal Premises and Other Real Estate.** Before, on and after the Closing Date, the Parties shall take such actions as are contemplated by, and comply with, the Real Estate Terms and Conditions which shall be incorporated herein by reference. Without limiting the foregoing, at the Closing, the Purchaser and/or a Designated Purchaser and each applicable Seller shall enter into an Occupancy Agreement with respect to each Critical Location (identified in the Real Estate Terms and Conditions) and shall enter into a license agreement with respect to each Short-Term Licensed Property location which the Purchaser shall be licensed to occupy following the Closing Date, in each case on the terms and conditions specified in the Real Estate Terms and Conditions.

**SECTION 5.32. Right to Exclude.**

(a)     At any time prior to the date of the Auction, the Purchaser may elect, by written notice to the Main Sellers, but without any effect on the Purchase Price or the Purchaser's obligation to offer employment to at least the numbers of Employees set out in Section 7.1.1, to designate as Excluded Assets all of the assets, interests and rights of any Other Seller other than any Other Seller with respect to which it has previously made an election under Section 2.2.3 if it is the case that, absent such election, by consummating the transactions contemplated hereby, the Purchaser or a Designated Purchaser would be reasonably likely to succeed to Liabilities of such Other Seller that are not Assumed Liabilities hereunder, or Liabilities of such Other Seller would be reasonably likely to be transferred to, or assumed by, the Purchaser or a Designated Purchaser, whether by operation of Law or otherwise (including, without limitation, any Liability for Taxes) (any such Other Seller so designated by the Purchaser, an **"Excluded Other Seller"**. For the avoidance of doubt, if the Purchaser makes an election under this Section 5.32 with respect to any Excluded Other Seller, the provisions of Section 2.2.3 shall not apply to such Excluded Other Seller. Upon designation of any Excluded Other Seller, the assets, interests and rights of such Excluded Other Seller shall be Excluded Assets and any Liabilities of such Excluded Other Seller or otherwise relating to such Excluded Assets shall be Excluded Liabilities, and such Excluded Other Seller shall not be a Party to this Agreement, shall not be an Other Seller, and shall have no rights or obligations hereunder, provided that each Excluded Other Seller shall remain bound by the provisions of Article XI. In addition to the foregoing, following the designation of an Excluded Other Seller by the Purchaser, no sublease and no license or other arrangement pursuant to the Real Estate Terms and Conditions shall be required to be entered into with respect to any premises related to such Excluded Other Seller's operations prior to the date of the Purchaser's election. For the avoidance of doubt, the designation of assets, interests or rights in any country as Excluded Assets shall not in any way prevent the Purchaser or any of its Affiliates from engaging in the Business (defined as if such assets, interests or rights were not Excluded Assets) in such country either before or after the Closing. If a TSA Seller becomes an Excluded Other Seller pursuant to this Section 5.32, such entity shall not be required to be a party to the Transition Services Agreement. For the avoidance of doubt, the failure of any TSA Seller to become party to the Transition Services Agreement shall not in any way diminish the obligations of the remaining TSA Sellers to provide, or to cause one or more of the Providers to provide, all Services (as defined in the Transition Services Agreement). Notwithstanding anything herein to the contrary, the Parties agree that neither the Included Services nor the Extra Services shall include any service currently provided by an Excluded

108

Seller unless such service can reasonably be provided by the TSA Sellers without materially changing or burdening the operations of the TSA Sellers.

(b)    The Main Sellers agree that, as of the Closing, (i) neither any Seller nor any Seller's Affiliate will be a party to any Contract with any Excluded Seller that will restrict the Purchaser or a Designated Purchaser, in any material respect, from engaging after the Closing in any business activity relating to the Business in the country where such Excluded Seller is located or organized; and (ii) the Sellers and their Affiliates will cease to supply Products or Services or provide other assistance to an Excluded Seller with respect to the Business (except to the extent required in order to allow such Excluded Seller to continue to perform any obligations under (x) a contract with one of its customers existing as of the date hereof, or (y) a contract with one of its customers entered into after the date hereof but before Closing that was entered into in the Ordinary Course, in each case which such Excluded Seller is required by such contract to perform until the earliest of (A) the expiration of such contract (without giving effect to any extension of the term thereof other than at the option of the counterparty thereto), (B) the earliest date on which such Excluded Seller has the right to terminate such contract without penalty or (C) the date on which such contract is terminated by the counterparty thereto; provided that the Purchaser and its Affiliates shall be under no obligation to make Products or Services (or any other products or services) available to the Sellers or their Affiliates or provide other assistance in connection therewith) and the Purchaser and its Affiliates will have no obligation to supply Products or Services (or any other products or services) or provide other assistance to the Excluded Sellers; provided that, notwithstanding clauses (i) and (ii) above, the Purchaser or a Designated Purchaser will, if requested to do so, perform any Subcontract Agreement that it enters into pursuant to Section 5.15(c) at the request of an Excluded Seller and the Sellers may be a conduit through which the Purchaser supplies Products or Services to an Excluded Seller.

SECTION 5.33. **Authorization of Shares.** The Purchaser will, at all times, duly authorize and reserve for issuance the Shares.

SECTION 5.34. **Patent Assignments.** Prior to the Closing Date, the Purchaser shall notify the Sellers in writing of any defects in title affecting any of the transferred Patents and the Sellers shall take, as soon as reasonably practicable thereafter, all reasonable steps necessary to ensure that NNL is the assignee on record in the relevant government registry or patent office, as applicable, for all transferred Patents and to correct all material defects in title affecting any of the transferred Patents that are still in force in the relevant jurisdiction.

SECTION 5.35. **India.** Section 5.35 of the Sellers Disclosure Schedule addresses certain matters related to the transfer of assets that are used by Nortel Networks Singapore Pte. Limited, Nortel Networks India International Inc. and Nortel Networks (India) Private Limited in the Business in India. The Parties agree that the terms and conditions set forth in Section 5.35 of the Sellers Disclosure Schedule are incorporated by reference herein and form a part of this Agreement.

SECTION 5.36. **No Vote.** The Purchaser will not take any action that would result in a requirement for the approval of shareholders or any securityholders of the Purchaser pursuant to NASDAQ Listing Rule 5635 or require any other action or consent pursuant to any

109

applicable exchange rules, regulations, interpretations or Laws in connection with the issuance of the Convertible Notes or the Shares upon the conversion thereof.

SECTION 5.37. Deposit. On or before November 25, 2009, the Purchaser shall deposit Thirty-Eight Million Four Hundred Fifty Thousand dollars ($38,450,000) (the "**Deposit Amount**") with Citibank, N.A. (the "**Deposit Escrow Agent**") pursuant to the terms and conditions of the Deposit Escrow Agreement substantially in the form attached as Exhibit AA hereto (the "**Deposit Escrow Agreement**"). Notwithstanding anything to the contrary set forth herein or the Deposit Escrow Agreement, the Deposit Amount shall not become a part of the Sellers' or the EMEA Sellers' estate until such time as the Deposit Escrow Agent receives joint written instructions from the Parties and Nortel Networks UK Limited instructing the Deposit Escrow Agent to disburse the Deposit Amount to the Distribution Agent or the Main Sellers. At the Closing, the Purchaser shall be entitled to a credit for the amount of the Deposit Amount against the Base Cash Purchase Price and the Parties and Nortel Networks UK Limited shall jointly instruct the Deposit Escrow Agent to disburse the Deposit Amount to the Distribution Agent. The Deposit Amount shall be returned and/or disbursed in accordance with the U.S. Bidding Procedures Order, this Agreement and the Deposit Escrow Agreement. In the event that all of the conditions to the Purchaser's obligations to Closing are satisfied and Purchaser fails to consummate the transactions contemplated hereby and by the Deposit Escrow Agreement and the Main Sellers terminate this Agreement pursuant to, and in accordance with Section 10.1(b)(ii), the Main Sellers and the EMEA Sellers shall be entitled to the Deposit Amount (less any interest earned thereon which shall be disbursed to the Purchaser) and within two (2) Business Days of such termination, the Parties shall jointly instruct the Deposit Escrow Agent to disburse the Deposit Amount to the Distribution Agent.

ARTICLE VI
TAX MATTERS

SECTION 6.1. Transfer Taxes.

(a)     The Parties agree that the Purchase Price is exclusive of any Transfer Taxes. The Purchaser shall (on behalf of itself and the Designated Purchasers) promptly pay directly to the appropriate Tax Authority all applicable Transfer Taxes that are properly imposed upon or payable or collectible or incurred in connection with the purchase by the Purchaser (or a Designated Purchaser) of the Assets under this Agreement and in connection with the other Transaction Documents including, for greater certainty, any stamp, documentary, recording, filing and similar Taxes that may be imposed upon or payable or collectible or incurred in connection with the execution of this Agreement and any other Transaction Documents; provided that if any such Taxes are required to be collected, remitted, or paid by the Sellers or any Subsidiary of the Sellers or any agent thereof (as requested by the Sellers or any Subsidiary of the Sellers), they shall be paid by the Purchaser to the Sellers or any Subsidiary of the Sellers or any such agent, as applicable, at the Closing, as applicable, or thereafter as requested of or by the Sellers. For greater certainty, the Purchaser shall remain liable in respect of any Transfer Taxes for which it is liable under the terms hereof regardless of the date that the Assets purchased under this Agreement are removed by the Purchaser or its agents from the premises of the Sellers or any of the Sellers' suppliers. Upon request from a Seller, the Purchaser shall provide to such Seller an original receipt (or other such evidence as

110

shall be reasonably satisfactory to such Seller) evidencing the payment of Transfer Taxes by the Purchaser to the applicable Tax Authority under this Section 6.1(a).

(b)     If the Purchaser or any Designated Purchaser wishes to claim or elect any exemption relating to, or a reduced rate of, Transfer Taxes, in connection with this Agreement or the other Transaction Documents (other than the EMEA Asset Sale Agreement, with respect to which Transfer Taxes are separately addressed therein), the Purchaser or any Designated Purchaser, as the case may be, acting reasonably and in good faith, shall be solely responsible for determining that such exemption, reduction or election (a "**Transfer Tax Reduction Determination**") applies.  In such case, the Purchaser or the Designated Purchaser, as the case may be, shall provide the Sellers prior to Closing with its permit number, GST or other similar registration numbers and/or any appropriate certificate of exemption, election and/or other document or evidence to support the claimed entitlement to such exemption by the Purchaser or such Designated Purchaser, as the case may be, it being understood that Purchaser shall remain responsible for any Transfer Taxes whether or not shown due on such Tax Return and shall indemnify and hold harmless the Sellers and their respective officers and directors from any Losses arising out of or resulting from the Transfer Tax Reduction Determination, including without limitation, any Tax, interest, penalty or sanction.  The Sellers shall, if applicable, agree to make a joint election under Section 167 of the Excise Tax Act (Canada) and other similar Canadian provincial sales tax elections. If the Purchaser or any Designated Purchaser pays any Transfer Taxes pursuant to this Section 6.1 and a Seller thereafter becomes entitled to a refund for, or a reduction in Liability for, Transfer Taxes payable by such Seller in respect of such Transfer Taxes paid by the Purchaser or a Designated Purchaser, then such Seller shall promptly reimburse the Purchaser or Designated Purchaser for an amount equal to such refund or reduction (including any interest paid in connection with such refund or reduction and net of reasonable out of pocket expenses incurred in obtaining such refund or reduction).

(c)     Each of the Sellers shall cooperate with the Purchaser and its Affiliates in complying with the reporting requirements relating to any Transfer Taxes under applicable Law with respect to this Agreement and the Transaction Documents, and shall make reasonable efforts to cooperate to the extent necessary to obtain any exemption from, or any reduction in amount or rate of, Transfer Taxes sought by Purchaser or any Designated Purchaser.  For the avoidance of doubt, such cooperation shall include any applicable Seller using reasonable efforts to obtain and/or furnish to the Purchaser or any Designated Purchaser any applicable information that is reasonably requested by Purchaser or any Designated Purchaser in connection with its efforts to obtain any exemption or reduction in amount or rate of Transfer Taxes, including through the provision of invoices, receipts or other documentation requested by Purchaser or any Designated Purchaser to document the payment of or establish the entitlement to a recovery or refund of, such Transfer Taxes or the eligibility of the transactions to qualify as a "transfer of a going concern" under applicable Law.  Each Seller that is required by Law to collect VAT in connection with this Agreement and the Transaction Documents shall, prior to and on the Closing Date, be registered for VAT purposes in any jurisdiction applicable to such Seller.

(d)     Each Tax Return with respect to Transfer Taxes (a "**Transfer Tax Return**") imposed upon or payable or collectible or incurred in connection with the purchase by the Purchaser (or a Designated Purchaser) of the Assets under this Agreement

shall be prepared by the Party that customarily has primary responsibility for filing such Transfer Tax Return pursuant to applicable Law. Any Transfer Tax Returns prepared by the Sellers pursuant to this Section 6.1(d) shall be made available to the Purchaser at least five (5) Business Days before such Tax Returns are due to be filed. The Purchaser shall be entitled to review and comment on any Transfer Tax Return prepared by the Sellers prior to making any payment in respect thereof, and the Sellers shall incorporate any reasonable comments received from Purchaser at least three (3) Business Days before such Tax Returns are due to be filed, it being understood that the Purchaser shall remain responsible for any Transfer Taxes whether or not shown due on such Tax Return. Subject to Section 6.1(a), the Purchaser shall pay to the Sellers the amount of any Transfer Taxes payable in respect of Transfer Tax Returns to be filed by the Sellers pursuant to this Section 6.1(d) at least one (1) Business Day before such Transfer Tax becomes due and payable.

        (e)      With respect to any provision of this Article VI that by its terms applies to another Transaction Document, such provision shall not apply to the other Transaction Document to the extent that such other Transaction Document contains a contrary provision or contains a provision that is inconsistent with the relevant provision of this Article VI. A reference to a Transaction Document in this Article VI shall not include the EMEA Asset Sale Agreement or the schedules thereto.

        **SECTION 6.2. Withholding Taxes.** Subject to Section 2.4, the Purchasers and Designated Purchasers shall be entitled to deduct and withhold from the Purchase Price and other payments made under this Agreement and the Transaction Documents (other than the Transition Services Agreement, with respect to which withholding Taxes are separately addressed therein) such amounts as the Purchaser or Designated Purchasers, as the case may be, are required to deduct and withhold under the Code or under any provision of state, local or foreign Tax Law, with respect to the making of such payment. To the extent such amounts are so withheld by the Purchaser or a Designated Purchaser, as the case may be, such withheld amounts shall be treated for all purposes of this Agreement and the Transaction Documents as having been paid to the relevant Seller in respect of whom such deduction and withholding was made by such Purchaser or Designated Purchaser. If any of the Parties learns of any obligation to deduct and withhold from the Purchase Price and other payments made under this Agreement or the Transaction Documents (other than the Transition Services Agreement, with respect to which withholding Taxes are separately addressed therein) on or prior to the Closing Date, then (i) in the case of a Seller, such Seller shall promptly provide reasonable notice of such obligation to the Purchaser, and (ii) in the case of the Purchaser, the Purchaser shall promptly provide reasonable notice of such obligation to the Sellers. The Parties shall cooperate in good faith to minimize the amounts that the Purchaser or Designated Purchasers, as the case may be, are required to deduct and withhold. In connection therewith, the Parties shall cooperate to obtain any applicable forms, certificates, or other documentation or information that is reasonably requested by a Party to obtain any exemption from, or reduced rate of, withholding on any payments made pursuant to this Agreement and the other Transaction Documents.

        **SECTION 6.3. Tax Characterization of Payments Under This Agreement.** The Sellers and the Purchaser agree to treat all payments made either to or for the benefit of the other Party under this Agreement (other than any interest payments) as adjustments to the Purchase Price for Tax purposes and that such treatment shall govern for purposes hereof to the extent permitted under applicable Tax Law.

SECTION 6.4. **Apportionment of Taxes.**

(a)     Except as otherwise provided in this Article VI, (i) the Main Sellers shall and shall cause the Other Sellers, as the case may be, to bear all Taxes of any kind relating to the Assets or the conduct or operation of the Business (excluding the EMEA Business), in each case, for all Tax periods or portions thereof ending on or before the Closing Date and (ii) the Purchaser shall and shall cause the Designated Purchasers to bear all Taxes of any kind relating to the Assets or the conduct or operation of the Business (excluding the EMEA Business) for all Tax periods or portions thereof beginning after the Closing Date. The Sellers shall pay, when due, all Taxes apportioned to the Sellers under this Section 6.4(a) that could result in a liability of a Purchaser or Designated Purchaser as a successor or transferee or a Lien on any of the Assets in the hands of the Purchaser or Designated Purchaser. For purposes of the preceding sentence, a Tax shall be considered due when required to be paid after assessment (it being understood that Sellers shall have the right to pursue any action for reconsideration or appeal that under applicable law tolls the time for the payment of the disputed Tax and prevents the Tax Authority from availing itself of its collection remedies); provided that no Tax shall be considered due for purposes of this subsection to the extent payment thereof is excused under applicable Bankruptcy Law.

(b)

(i)     For purposes of this Agreement, any Taxes for a "**Straddle Period**" (a Tax period that includes, but does not end on, the Closing Date) shall be apportioned between the Sellers, on the one hand, and the Purchaser and the Designated Purchasers, on the other hand, based on the portion of the period ending on and including the Closing Date and the portion of the period beginning after the Closing Date, respectively. The amount of any Taxes based on or measured by income or receipts of the Business (excluding the EMEA Business) shall be allocated between the Pre-Closing Taxable Period and the Post-Closing Taxable Period on a closing-of-the-books basis. The amount of other Taxes shall be allocated between portions of a Straddle Period in the following manner: (a) in the case of a Tax imposed in respect of property (excluding, for the avoidance of doubt, any income Tax) and that applies rateably to a Straddle Period, the amount of Tax allocable to a portion of the Straddle Period shall be the total amount of such Tax for the period in question multiplied by a fraction, the numerator of which is the total number of days in such portion of such Straddle Period and the denominator of which is the total number of days in such Straddle Period, and (b) in the case of sales, value-added and similar transaction-based Taxes (other than Transfer Taxes allocated under Section 6.1), such Taxes shall be allocated to the portion of the Straddle Period in which the relevant transaction occurred.

(ii)     In the case where the parties do not file their own separate Tax Return for any Straddle Period under applicable Law, the party legally obligated to file any Tax Return for a Straddle Period (the "**Filing Party**") shall timely and accurately prepare and file such Tax Return and timely pay all Taxes due and payable on such Tax Return. Promptly upon the filing of any Tax Return for a Straddle Period, the party filing such Tax Return shall provide a copy of such Tax

113

Return to the Purchaser or Sellers, as the case may be, of the Assets to which such Tax Return relates, (the "**Non-Filing Party**") along with a calculation of the allocation of the Taxes shown to be due on such Tax Return between the Filing Party and the Non-Filing Party pursuant to this Section 6.4(b). Within ten (10) Business Days of the receipt of such Tax Return, the Non-Filing party shall, unless it timely objects to the calculation of the apportioned Tax based upon the principles set forth in this Section 6.4(b), pay to the Filing Party the amount shown in the calculation to be due by the Non-Filing Party. If the Non-Filing Party objects to the calculation of the apportioned Tax as prepared by the Filing Party in writing within ten (10) Business Days of the receipt of such Tax Return, the Filing Party and the Non-Filing Party shall negotiate in good faith a resolution of the calculation and the Non-Filing Party shall promptly pay to the Filing Party the amount of the apportioned Tax as finally resolved. If after five (5) Business Days of negotiation, the Parties cannot agree upon the apportioned Tax amount, they shall promptly submit the matter to the Accounting Arbitrator for final resolution as promptly as practical and the Accounting Arbitrator's decision shall be final and binding upon the Parties as to the amount of any disputed apportioned Tax, and the Non-Filing Party shall promptly pay to the Filing Party the amount of the disputed apportioned Tax as determined by the Accounting Arbitrator. The costs of the Accounting Arbitrator shall be borne by the Party whose position is less correct in the judgment of the Accounting Arbitrator.

(c)     Prior to, on and after the Closing Date, each of the Sellers shall reasonably cooperate with the Purchaser and its Affiliates (i) to obtain any applicable forms, certificates, or other information and (ii) to comply with clearance procedures established under applicable Law in the jurisdictions in which the Assets are being transferred hereunder to establish, quantify, reduce or eliminate the extent to which the Purchaser or any Designated Purchaser could be liable for any Taxes of the Sellers that are Excluded Liabilities, including by reason of a Lien being filed on the Assets or as a result of such Purchaser or Designated Purchaser having liability as a transferee or successor under applicable Law; provided that such cooperation shall not include a liquidation or restructuring of a Seller or any business of a Seller, and provided further that such cooperation would not: (i) in the Sellers' opinion, acting reasonably and in good faith, result in the imposition on the Sellers of any director's or officer's liability or Tax liability (other than any amount necessary to pay any Taxes of the Sellers that are Excluded Liabilities that Sellers are required to pay (as being due) under Section 6.4(a) at the time such cooperation is provided and any interest, penalties and additions to Tax thereon) that is not fully and promptly reimbursed by the Purchaser and its Affiliates; or (ii) cause any of the Sellers to bear any other out-of-pocket cost or expense that is not fully and promptly reimbursed by the Purchaser and its Affiliates; and provided further that such cooperation would not violate applicable Law, including Bankruptcy Laws as applied to the relevant Seller(s) and any order or other legal obligation of a Seller arising out of the Bankruptcy Proceedings. For the avoidance of doubt, such cooperation shall include taking actions necessary to comply with Tax clearance procedures established under applicable Law in Argentina and Hong Kong.

SECTION 6.5. <u>Tax Records</u>.

(a)    Notwithstanding the provisions of Section 5.6(a), Section 5.23 and Section 5.24, but subject to the provisions of Section 5.6(e) (i) after the date of the Auction, the Purchaser and the Designated Purchasers, on the one hand, and the Sellers, on the other hand, will make available to the other, as reasonably requested, and to any Tax Authority, all information, records or documents relating to Taxes with respect to the Assets, Assumed Liabilities or the Business (excluding the EMEA Business) for all periods prior to and including the Closing Date (including Straddle Periods), and will preserve such information, records or documents until the expiration of any applicable statute of limitations or extensions thereof, and (ii) in the event that one party reasonably needs access to the records in the possession of a second party relating to the Assets, Assumed Liabilities or the Business (excluding the EMEA Business) for purposes of preparing Tax Returns or complying with any Tax audit request, subpoena or any other investigative demand by any Tax Authority or for any other legitimate Tax-related purpose not injurious to the second party, the second party will allow Representatives of the other party access to such records during regular business hours and the second party's place of business for the sole purpose of obtaining information for use as aforesaid and will permit such other party to make extracts and copies thereof as may be necessary or convenient. The obligation to cooperate pursuant to this Section 6.5(a) shall terminate at the time the relevant applicable statute of limitations expires (giving effect to any extension thereof).

(b)    On or prior to Closing, the Sellers shall cause copies of Restricted Technical Records to be placed into escrow with the Records Custodian, who shall hold such Restricted Technical Records for ten (10) years in accordance with an escrow agreement between the Purchaser, the Sellers and the Records Custodian, in form satisfactory to the Purchaser and the Main Sellers. The escrow agreement will provide for access to the copies of the Restricted Technical Records only by the relevant Canadian Tax Authority or by Tax advisors of any purchaser ("**Tax Credit Purchaser**") of the scientific research and experimental development tax credits of the Sellers under the Income Tax Act (Canada), and only if such advisors have executed an appropriate confidentiality agreement in form satisfactory to the Purchaser. The access permitted by the escrow agreement shall be only for the limited purpose of defending any audit, claim or action by any Canadian Tax Authority in respect of the characterization of expenditures by NNL or Nortel Networks Technology Corporation ("**NNTC**") as qualified expenditures on scientific research and experimental development for purposes of the applicable provisions of the Income Tax Act (Canada) ("**Qualified Expenditures**").

(c)    The Purchaser shall use reasonable efforts to make available to the relevant Taxing Authority or Tax advisors of the Tax Credit Purchaser, those former employees of NNL or NNTC, as the case may be, with direct knowledge of the Qualified Expenditures who are then employed by the Purchaser and whose cooperation is necessary for the purpose of defending any audit, claim or action by any Taxing Authority of the characterization of expenditures by NNL or NNTC, as the case may be, as Qualified Expenditures, and provided such advisors have executed an appropriate confidentiality agreement satisfactory to the Purchaser.

115

(d)    The Purchaser shall have no obligation to provide any access under this provision unless the Seller (if there is no Tax Credit Purchaser in respect of the request for access) or the Tax Credit Purchaser pays all the Purchaser's reasonable expenses in connection with the foregoing provisions, including a reasonable per diem rate for access to former employees of NNL or NNTC, as the case may be (based on the total compensation of the employee at the time access is provided).

### SECTION 6.6. Cooperation.

(a)    The Sellers and the Purchaser shall reasonably cooperate with each other in connection with the conduct of any Tax audit, investigation, dispute, or appeal relating to any Pre-Closing Taxable Period.

(b)    Notwithstanding the provisions of Section 5.6, but subject to the provisions of Section 5.6(e) and, solely with respect to the subject matter addressed therein, subject to Section 6.5(a), from and after the date hereof through the Closing Date, (i) the Sellers shall reasonably cooperate with the Purchaser and its Affiliates to develop and provide such information as is reasonably requested and reasonably necessary to permit the Purchaser and its Affiliates to identify and timely comply with their respective obligations under applicable Tax Laws arising out of this Agreement and the other Transaction Documents and (ii) the Sellers shall reasonably cooperate with the Purchaser and its Affiliates to structure and carry out the transactions between the Sellers, on the one hand, and the Purchaser and its Affiliates, on the other hand, contemplated by this Agreement and the other Transaction Documents in a tax-efficient manner (including, without limitation, to limit withholding Taxes and irrecoverable VAT with respect to the transactions contemplated by this Agreement and the Transaction Documents); provided that any such cooperation to be provided in (i) and (ii) above would not include a liquidation or restructuring of a Seller or any business of a Seller, would not result in the imposition on any Seller of any additional Tax Liability or cause any Seller to bear any additional out-of-pocket cost or expense, in each case which is not fully and promptly reimbursed by the Purchaser and its Affiliates and such cooperation would not violate applicable law, including Bankruptcy Laws as applicable to the relevant Seller(s) and any order or other legal obligation of a Seller arising out of the Bankruptcy Proceedings

### SECTION 6.7. North American Tax Escrow.

(a)    In the event that any Tax Authority shall (A) make any claim against any Purchaser, Designated Purchaser, or any of their Affiliates (a "**Purchaser Party**") for any Taxes that are Excluded Liabilities of any Seller or (B) have in its favor a Lien on any of the Assets arising out of the non-payment of any Taxes that are Excluded Liabilities of a Seller (any Taxes described in (A) and (B) above hereby are referred to collectively as "**Excluded Taxes**"), such Purchaser Party shall be entitled to recover all Losses arising out of or in connection with such Excluded Taxes promptly (in accordance with the following provisions) by obtaining cash from the Tax Escrow Amount in an amount equal to the aggregate amount of such Losses, provided that (i) the aggregate amount to be recovered under this Section 6.7 in respect of such Losses shall not exceed the Tax Escrow Amount (plus any accrued interest on the Tax Escrow Amount); and (ii) the only Losses recoverable under this Section 6.7 shall be Losses incurred by a Purchaser Party after the earlier of the

116

date on which a Tax Authority has made a claim described in (A) above or registered or imposed a Lien described in (B) above, as applicable.

(b)     If a claim for Losses under Section 6.7(a) (a "**Tax Claim**") is to be made by a Purchaser Party, the Purchaser shall give written notice (a "**Claim Notice**") on behalf of such Purchaser Party to the Main Sellers promptly after such Purchaser Party becomes aware that a Tax Authority has made a claim against it for any Excluded Taxes or that such Taxes have given rise to a Lien described in clause (B) of subsection (a) above, as applicable, stating, with reasonable specificity, the basis for the Tax Claim, and including a copy of all relevant documents received from the relevant Tax Authority.  In the event that any Purchaser Party is entitled to recover the amount of any such Losses from the Tax Escrow Amount, the Purchaser and the Main Sellers shall issue joint written instructions to the Escrow Agent authorizing distribution of the amount of such Losses to such Purchaser Party and such Purchaser Party shall be responsible for paying over to the relevant Tax Authority the amount of Excluded Taxes distributed to it from the Tax Escrow Amount to the extent it has not already done so at the time of the distribution of such amount from such fund and shall provide Sellers with such written evidence as is reasonably requested in writing to confirm that payment to the relevant Tax Authority has been duly made.

(c)     Upon delivery by the Sellers to the Purchaser prior to Closing of a certificate or other documentation issued by the Hong Kong Inland Revenue Department reasonably satisfactory in form and content to the Purchaser confirming that Nortel Networks (Asia) Limited has no outstanding Tax Liabilities, the Tax Escrow Amount payable on Closing to the Escrow Agent shall be reduced by $5,000,000.

(d)     Upon delivery by the Sellers to the Purchaser after Closing of a certificate or other documentation issued by the Hong Kong Inland Revenue Department reasonably satisfactory in form and content to the Purchaser confirming that Nortel Networks (Asia) Limited has no outstanding tax liabilities, and provided that a Purchaser Party has not served a valid Claim Notice to the Main Sellers before that time in respect of a Tax Claim relating to Excluded Taxes of Nortel Networks (Asia) Limited, the Purchaser and the Main Sellers shall deliver to the Escrow Agent joint written instructions to release to the Distribution Agent, on behalf of the Sellers and the EMEA Sellers, $5,000,000 out of the Tax Escrow Amount (or such lesser amount remaining therein at that time).

(e)     On the date that is the first Business Day after the third anniversary of the Closing Date, the Purchaser and the Main Sellers shall deliver to the Escrow Agent joint written instructions to release to the Distribution Agent, on behalf of the Sellers and the EMEA Sellers, any remaining portion of the Tax Escrow Amount (including any accrued interest thereon) in excess of an amount equal to the aggregate of all Tax Claims which have been asserted prior to such date evidenced by one or more Claim Notices and which remain pending and unresolved on such date.  Thereafter, as soon as reasonably practicable after the final resolution of any such Tax Claims, the Purchaser and the Main Sellers shall issue joint written instructions to the Escrow Agent to release to the Distribution Agent, on behalf of the Sellers and the EMEA Sellers, any remaining portion of the Tax Escrow Amount (including any accrued interest thereon).

117

(f)     In the event that a Claim Notice is served, the Purchaser shall take such steps as are commercially reasonable to mitigate or otherwise defend the assessment(s) made by the relevant Tax Authority.  In the event that a payment is made to a Purchaser Party pursuant to this Section 6.7, and subsequently a Purchaser Party becomes entitled to and receives a refund of Excluded Taxes (in whole or in part), then the Purchaser shall, or shall cause the relevant Purchaser Party to, promptly pay to the Distribution Agent, on behalf of the Sellers and the EMEA Sellers, an amount equal to such refund (including any interest paid in connection with such refund), net of reasonable out-of-pocket expenses incurred by the Purchaser Party in obtaining such refund, unless (i) such refund is received prior to the third anniversary of the Closing Date or (ii) at the time the refund is received, the Tax Escrow Amount is less than the sum of the Tax Claims that are evidenced by one or more Claim Notices and which remain pending and unresolved on such date, then, in each case, the Purchaser Party shall pay the net amount of such refund to the Escrow Agent to be added to the Tax Escrow Amount.

(g)     Notwithstanding anything to the contrary in this Agreement (including, without limitation, the provisions of Section 11.1 of this Agreement as applied to provisions other than those contained in this Article VI), recourse to the Tax Escrow Amount under this Section 6.7 shall be the sole and exclusive remedy available to the Purchaser and any Designated Purchaser following the Closing in respect of any liability for Taxes that are Excluded Liabilities of a Seller or any liability for Taxes that give rise to any Lien on any Assets.

### SECTION 6.8.   EMEA Tax Escrow.

(a)     In the event that any Tax Authority shall make any claim against Purchaser or any EMEA Designated Purchaser or any of their Affiliates (an "**EMEA Purchaser Party**") for (A) any Taxes that are EMEA Excluded Liabilities of any EMEA Seller or (B) any Succession Tax Liabilities or (C) any Succession Tax Lien (any Taxes described in (A) and (B) and (C) above hereby are referred to collectively as "**EMEA Excluded Taxes**"), such EMEA Purchaser Party shall be entitled to recover all Losses arising out of or in connection with such EMEA Excluded Taxes promptly (in accordance with the following provisions) by obtaining cash from the EMEA Tax Escrow Amount in an amount equal to the aggregate amount of such Losses, provided that: (i) the aggregate amount to be recovered under this Section 6.8 in respect of such Losses shall not exceed the EMEA Tax Escrow Amount (plus any accrued interest on the EMEA Tax Escrow Amount); (ii) the only Losses recoverable under this Section 6.8 shall be Losses incurred by an EMEA Purchaser Party after a Tax Authority has made a claim described in (A), (B) or (C) above, as applicable; and (iii) no claim shall be allowed by any EMEA Purchaser Party in respect of Italian Excluded Taxes other than pursuant to Section 6.9 below.

(b)     If a claim for Losses under subsection (a) (an "**EMEA Tax Claim**") is to be made by an EMEA Purchaser Party, the Purchaser shall give written notice (an "**EMEA Tax Claim Notice**") on behalf of such EMEA Purchaser Party to the Joint Administrators promptly after such EMEA Purchaser Party becomes aware that a Tax Authority has made a claim against it for any EMEA Excluded Taxes or that such Taxes have given rise to any Succession Tax Lien for which recovery is sought under this Section 6.8, stating, with reasonable specificity, the basis for the EMEA Tax Claim and the amount

of EMEA Excluded Taxes claimed, and including a copy of all relevant documents received from the relevant Tax Authority. In the event that any EMEA Purchaser Party is entitled to recover the amount of any such Losses from the EMEA Tax Escrow Amount, the Purchaser and the Joint Administrators shall issue joint written instructions to the Escrow Agent authorizing distribution of the amount of such Loss to such EMEA Purchaser Party and such EMEA Purchaser Party shall be responsible for paying over to the relevant Tax Authority the amount of such EMEA Excluded Taxes distributed to it from the EMEA Tax Escrow Amount to the extent it has not already done so at the time of the distribution of such amount from such fund, and shall provide the Joint Administrators with such written evidence as is reasonably requested in writing to confirm that payment to the relevant Tax Authority has been duly made.

(c)     On the date that is the first Business Day after the third anniversary of the Closing Date, the Purchaser and the Joint Administrators shall deliver to the Escrow Agent joint written instructions to release to the Distribution Agent, on behalf of the Sellers and EMEA Sellers, any remaining portion of the EMEA Tax Escrow Amount (including any accrued interest thereon) in excess of an amount equal to the aggregate of all EMEA Tax Claims which have been asserted prior to such date evidenced by one or more EMEA Tax Claim Notices and which remain pending and unresolved on such date. Thereafter, as soon as reasonably practicable after the final resolution of all such EMEA Tax Claim(s), the Purchaser and the Joint Administrators shall issue joint written instructions to the Escrow Agent to release to the Distribution Agent, on behalf of the Sellers and EMEA Sellers, the remaining portion of the EMEA Tax Escrow Amount (including any accrued interest thereon).

(d)     In the event that an EMEA Claim Notice is served, the Purchaser shall take such steps as are commercially reasonable to mitigate or otherwise defend the assessment(s) made by the relevant Tax Authority. In the event that a payment is made to an EMEA Purchaser Party pursuant to this Section 6.8, and subsequently an EMEA Purchaser Party or any Affiliate becomes entitled to and receives a refund of amounts in respect of EMEA Excluded Taxes, then the Purchaser shall or shall procure that the relevant EMEA Purchaser Party shall promptly pay to Distribution Agent, on behalf of the Sellers and EMEA Sellers, an amount equal to such refund (including any interest paid in connection with such refund), net of reasonable out-of-pocket expenses incurred by the EMEA Purchaser Party in obtaining such refund, unless (i) such refund is received prior to the third anniversary of the Closing Date or (ii) at the time the refund is received, the EMEA Tax Escrow Amount is less than the sum of the EMEA Tax Claims that are evidenced by one or more EMEA Tax Claim Notices and which remain pending and unresolved on such date, then, in each case, the Purchaser Party shall pay the net amount of such refund to the Escrow Agent to be added to the EMEA Tax Escrow Amount.

**SECTION 6.9.  Italian Tax Escrow.**

(a)     In the event that any Tax Authority in Italy shall make any claim against the Purchaser or any EMEA Designated Purchaser or any of their Affiliates (an **"Italian Purchaser Party"**) for (A) any Taxes that are EMEA Excluded Liabilities of any EMEA Seller or (B) any Succession Tax Liabilities or (C) any Succession Tax Lien (any such Taxes are hereby are referred as **"Italian Excluded Taxes"**), such Italian Purchaser

119

Party shall be entitled to recover all Losses arising out of or in connection with such Italian Excluded Taxes promptly (in accordance with the following provisions) by obtaining cash from the Italian Tax Escrow Amount in an amount equal to the aggregate amount of such Losses, provided that: (i) the aggregate amount to be recovered under this Section 6.9 in respect of such Losses shall not exceed the Italian Tax Escrow Amount (plus any accrued interest on the Italian Tax Escrow Amount); and (ii) the only Losses recoverable under this Section 6.9 shall be Losses incurred by an Italian Purchaser Party after a Tax Authority in Italy has made a claim.

(b)     If a claim for Losses under subsection (a) (an "**Italian Tax Claim**") is to be made by an Italian Purchaser Party, the Purchaser shall give written notice (an "**Italian Tax Claim Notice**") on behalf of such Italian Purchaser Party to the Joint Administrators promptly after such Italian Purchaser Party becomes aware that a Tax Authority in Italy has made a claim against it for Italian Excluded Taxes  or that such Taxes have given rise to any Succession Tax Lien for which recovery is sought under this Section 6.9, stating, with reasonable specificity, the basis for the Italian Tax Claim and the amount of Italian Excluded Taxes claimed, and including a copy of all relevant documents received from the relevant Tax Authority.  In the event that any Italian Purchaser Party is entitled to recover the amount of any such Losses from the Italian Tax Escrow Amount, the Purchaser and the Joint Administrators  shall issue joint written instructions to the Escrow Agent authorizing distribution of the amount of such Loss to such Italian Purchaser Party and such Italian Purchaser Party shall be responsible for paying over to the relevant Tax Authority the amount of such Italian Excluded Taxes distributed to it from the Italian Tax Escrow Amount to the extent it has not already done so at the time of the distribution of such amount from such fund, and shall provide the Joint Administrators with such written evidence as is reasonably requested in writing to confirm that payment to the relevant Tax Authority has been duly made.

(c)     On the date that is the first Business Day after the third anniversary of the Closing Date, the Purchaser and the Joint Administrators shall deliver to the Escrow Agent joint written instructions to release to the Distribution Agent, on behalf of the Sellers and EMEA Sellers, any remaining portion of the Italian Tax Escrow Amount (including any accrued interest thereon) in excess of an amount equal to the aggregate of all Italian Tax Claims which have been asserted prior to such date evidenced by one or more Italian Tax Claim Notices and which remain pending and unresolved on such date.  Thereafter, as soon as reasonably practicable after the final resolution of all such Italian Tax Claim(s), the Purchaser and the Joint Administrators shall issue joint written instructions to the Escrow Agent to release to the Distribution Agent, on behalf of the Sellers and EMEA Sellers, the remaining portion of the Italian Tax Escrow Amount (including any accrued interest thereon).

(d)     In the event that an Italian Claim Notice is served, the Purchaser shall take such steps as are commercially reasonable to mitigate or otherwise defend the assessment(s) made by the relevant Tax Authority.  In the event that a payment is made to an Italian Purchaser Party pursuant to this Section 6.9, and subsequently an Italian Purchaser Party or any Affiliate becomes entitled to and receives a refund of amounts in respect of Italian Excluded Taxes, then the Purchaser shall or shall procure that the relevant Italian Purchaser Party shall promptly pay to Distribution Agent, on behalf of the Sellers and

120

EMEA Sellers, an amount equal to such refund (including any interest paid in connection with such refund), net of reasonable out-of-pocket expenses incurred by the Italian Purchaser Party in obtaining such refund, unless (i) such refund is received prior to the third anniversary of the Closing Date (other than where, prior to such refund being received, the provisions at Section 6.9(f) have applied) or (ii) at the time the refund is received, the Italian Tax Escrow Amount is less than the sum of the Italian Tax Claims that are evidenced by one or more Italian Tax Claim Notices and which remain pending and unresolved on such date, then, in each case, the Purchaser Party shall pay the net amount of such refund to the Escrow Agent to be added to the Italian Tax Escrow Amount.

(e)    Upon delivery by Nortel Italy to the Purchaser prior to Closing of a certificate, ruling or other documentation issued by the Tax Authorities in Italy (including but not limited to a response to the Interpellation addressed to the regional department of the Revenue Office of Lombardy as submitted by Nortel Italy on 4 August 2009) reasonably satisfactory in form and content to the Purchaser (acting in good faith), and, if such certificate, ruling or other documentation does not address Succession Tax Liens, such other written evidence as is reasonably satisfactory in form and content to the Purchaser (acting in good faith) addressing Succession Tax Liens, together confirming either:

(i)    that Nortel Italy does not have any liabilities for Tax that could become Succession Tax Liabilities or Succession Tax Liens; or

(ii)    that it is not possible (whether as a result of Bankruptcy Proceedings or otherwise) for liabilities for Tax of Nortel Italy to become Succession Tax Liabilities or Succession Tax Liens,

then the Italian Escrow Amount payable on Closing to the Escrow Agent shall be reduced to nil.

(f)    Upon delivery by Nortel Italy to the Purchaser after Closing of a certificate, ruling or other documentation issued by the Tax Authorities in Italy (including but not limited to a response to the Interpellation addressed to the regional department of the Revenue Office of Lombardy as submitted by Nortel Italy on 4 August 2009) reasonably satisfactory in form and content to the Purchaser (acting in good faith) and, if such certificate, ruling or other documentation does not address Succession Tax Liens, such other written evidence as is reasonably satisfactory in form and content to the Purchaser (acting in good faith) addressing Succession Tax Liens, together confirming either:

(i)    that Nortel Italy does not have any liabilities for Tax that could become Succession Tax Liabilities or Succession Tax Liens; or

(ii)    that it is not possible (whether as a result of Bankruptcy Proceedings or otherwise) for liabilities for Tax of Nortel Italy to become Succession Tax Liabilities or Succession Tax Liens,

then the Purchaser and Joint Administrators shall deliver to the Escrow Agent joint written instructions to release to the Distribution Agent, on behalf of the Sellers and the EMEA Sellers, any remaining portion of the Italian Tax Escrow Amount (including any accrued

interest thereon) in excess of an amount equal to the aggregate of all Italian Tax Claims which have been asserted prior to such date evidenced by one or more Italian Tax Claim Notices and which remain pending and unresolved on such date, provided that as soon as reasonably practicable after the final resolution of each such Italian Tax Claim, the Purchaser and the Joint Administrators shall issue joint written instructions to the Escrow Agent to release to the Distribution Agent, on behalf of the Sellers and EMEA Sellers, the remaining portion of the Italian Tax Escrow Amount referable to that Italian Tax Claim (including any accrued interest thereon).

**ARTICLE VII**
**EMPLOYMENT MATTERS**

**SECTION 7.1. <u>Employment Obligations with Respect to Non-Union Employees</u>.**

Except for the provisions of Section 7.1.1(a) and the first three (3) sentences of Section 7.1.2(b)(ii)(B), the provisions of this Section 7.1 shall apply only with respect to Non-Union Employees. Subject to the clarificatory wording in 7.1.1(a) and the provisions relating to the Closing Accrued Vacation and Service Award Amount, the Excess ARD Employees Amount and the Closing Retirement Obligation Amount, the provisions of this Agreement shall not apply to EMEA Employees.

**7.1.1. Employment Terms.**

(a)    Within thirty (30) days following the completion of the Auction, the Purchaser shall notify the Sellers of the identity of the Employees on Section 4.10(b) of the Sellers Disclosure Schedule by unique identifier (the **"Identified Employees"**) to whom the Purchaser or a Designated Purchaser intends to provide a written offer of employment or notice of continued employment in accordance with applicable Law (each an **"Offer"** and collectively, the **"Offers"**); <u>provided</u> that, promptly after the date hereof, the relevant Sellers have permitted the Purchaser with access to such information as the Purchaser reasonably requires in accordance with Section 5.6(d) and Section 7.4(c) in order to make such identifications (except as prohibited by Law). As soon as reasonably practicable following the latest of the granting of the U.S. Sale Order and the Canadian Approval and Vesting Order, but in any event no later than the time required to provide the Offer Consideration Period described below, the Purchaser shall, or shall cause a Designated Purchaser to, extend a minimum of Two Thousand (2,000) Offers, which number shall include all EMEA Transferring Employees, whose employment shall be governed by the EMEA Asset Sale Agreement (for the avoidance of doubt, no Offers will be required to be made to ARD Transferring Employees whose contracts of employment will transfer to the Purchaser by operation of Law, but the number of EMEA Transferring Employees will be included within the minimum number set forth above, and the terms of Offers made to Non-ARD Transferring Employees will be governed by the EMEA Asset Sale Agreement), plus a sufficient number of Employees equal to, in total, such minimum number, with employment of such Employee who is not an EMEA Employee to take effect as of the Effective Hire Date, as defined below. Such Offers to Employees (who are not EMEA Employees) shall be contingent (i) in the discretion of the Purchaser, on each such Employee passing a background check and, if such Employee is located in the United States, drug screening, in all cases, to the extent permitted and consistent with applicable Law and except with respect

122