to Union Employees, and (ii) in the case of Inactive Employees, upon their return to active status (other than Employees set forth on Section 7.1.1(a) of the Sellers Disclosure Schedule whose employment transfers automatically by operation of Law to the Purchaser or a Designated Purchaser) with the Purchaser or one of its Affiliates within two (2) years following the date of the commencement of the leave or such longer period as provided under applicable Law. The Offers shall be made prior to the Closing in compliance with Section 7.1.1 and shall provide each such Employee with a consideration period prior to the Closing that is no less than two (2) weeks with respect to Employees located in Japan and with respect to Employees located in other countries, one week, or such longer period as required by applicable Law (the "**Offer Consideration Period**"). The Sellers shall have the right to review any form Offer with respect to a particular jurisdiction (and any Offer that deviates in any material respect from the form Offer with respect to the relevant country) made pursuant to Section 7.1.1 prior to it being sent to any Employee. As soon as reasonably practicable following the Sellers' receipt from the Purchaser of the notice containing the Identified Employees (as required pursuant to the first sentence of this Section 7.1.1(a)) but in all events prior to Closing, the Sellers shall take any and all action permitted under applicable Law legally necessary to cause the termination of employment, effective prior to the Closing, of each Employee set forth on Section 4.10(b) who is not an Identified Employee but only to the extent such employment would otherwise transfer to the Purchaser or a Designated Purchaser by operation of Law.

(b)    For Employees employed in Canada and the United States, the Offers shall be in accordance with applicable Law and provide terms and conditions of employment as of such Employee's Effective Hire Date that will consist of (i) either the same annual base salary (whether on a salary, wage or hourly rate basis) and annual incentive plan target amount for such Employee as set out in the Employee Information or a substantially comparable overall compensation package (taking into account any equity-based compensation that may be offered by Purchaser or its Affiliates to such Employee) to such annual base salary and annual incentive plan target amount set out in the Employee Information, (ii) a location of employment reasonably close to such Employee's current location as set out in the Employee Information, and (iii) employee benefits that are substantially comparable in the aggregate to (A) employee benefits received by such Employee from the Sellers as of the date hereof or (B) employee benefits provided by the Purchaser (or any of its Affiliates) to its similarly situated employees.

(c)    For all Employees set forth in Section 4.10(b) of the Sellers Disclosure Schedule (other than Employees in Canada and the United States) in any country set forth on Section 7.1.1(c) of the Seller Disclosure Schedule where the number of Employees in such country is ten (10) or more, the Purchaser's Offer to Employees in such country shall be in accordance with applicable Law and on terms and conditions not less favorable in the aggregate than those terms and conditions received by the Employees as of the date hereof as disclosed in Section 4.10(a) and Section 4.10(b) of the Sellers Disclosure Schedule, subject to certain adjustments to conform to the Purchaser's (or its Affiliates') standard employment policies where legally possible; provided, that, following the Employee Transfer Date, nothing shall prohibit the Purchaser or any Designated Purchaser from making changes to such terms and conditions of employment that are generally applicable and broadly based across the Purchaser's or Designated Purchaser's employee

population in the particular country; provided, further that in no event other than as required by applicable Law, shall the Purchaser or a Designated Purchaser be required to (i) provide defined benefit pension plans, or (ii) take into account defined benefit pension benefits, post retirement health and welfare benefits, severance or retention, the KEIP or KERP, equity compensation, non-qualified deferred compensation plans, non-qualified retirement plans or retirement allowance plans of the Sellers or any of their Affiliates when determining whether terms and conditions of employment are no less favorable in the aggregate.

(d)    For Employees other than Employees referred to in Section 7.1.1(b) or Section 7.1.1(c), the Purchaser's Offer to such Employee shall be in accordance with applicable Law and on such terms and conditions of employment reasonably competitive with those received by similarly situated employees in the local market.

(e)    Employees whose employment transfers automatically by operation of Law to the Purchaser or a Designated Purchaser will have their terms and conditions of employment governed by such applicable Laws, but at a minimum shall receive terms and conditions of employment that are no less favorable than those employees in Section 7.1.1(c) or Section 7.1.1(d), as applicable, based on the number of the Sellers' Employees in the country where such Employees are employed, except with respect to Employees located in the Province of Quebec, Canada, as indicated in the Employee Information, who shall be treated in accordance with 7.1.1(b).

(f)    Any Employee who accepts an Offer and commences employment with the Purchaser or a Designated Purchaser pursuant to this Agreement, and any Employees whose employment transfers by operation of Law, shall each be deemed to be a Transferred Employee for all purposes of this Agreement. Inactive Employees shall remain employed by the relevant Seller until their release in the Ordinary Course to return to active status with the Purchaser or one of its Affiliates within two (2) years following the date of the commencement of the leave or such longer period as provided under applicable Law. Visa Employees and Seconded Employees shall remain employed by the relevant Seller under the terms and conditions of the Loaned Employee Agreement. The Purchaser or a Designated Purchaser shall use commercially reasonable efforts beginning immediately after the date of the Auction  to obtain, prior to the Closing Date, and beyond if necessary, at Purchaser's cost, such visas or permits as are required for Purchaser or a Designated Purchaser to employ any Visa Employee who accepts an Offer effective as of the Effective Hire Date. The Purchaser or Designated Purchaser shall use commercially reasonable efforts beginning promptly following the notification to Sellers of the Identified Employees (as provided for in Section 7.1.1(a)) to resolve, as soon as reasonably practicable following such notification, at the Purchaser's cost, any impediments to Purchaser's or Designated Purchaser's employment of Employees in countries set forth in Section 1.1(m) of the Sellers Disclosure Schedule.

(g)    The Effective Hire Date for Employees is (i) the Employee Transfer Date for those Employees other than Inactive Employees, Seconded Employees and Visa Employees, (ii) 12:01 a.m. on the first Business Day following the release to return to active employment from leave for all Inactive Employees and (iii) the date specified in the Loaned Employee Agreement with respect to Visa Employees and Seconded Employees, as applicable. As of the Effective Hire Date and, except as otherwise provided herein, for a

124

period of not less than twelve (12) months after the Closing Date, the employment of Non-Union Employees shall be, at a minimum, on the terms and conditions set forth in Section 7.1.

(h)      With respect to all Employees (other than EMEA Employees and Union Employees) to whom the Purchaser extends an Offer pursuant to Section 7.1.1 but who do not accept or who reject such an Offer (each, a "**Rejecting Employee**"), the Purchaser shall reimburse the Sellers for payments made by Sellers in an aggregate amount up to $2,000,000 in respect of pay in lieu of notice (including WARN Act notice) and/or severance liability relating to such Rejecting Employees (the "**Rejecting Employees Liability Limit**"); provided that any such payments shall have been made by the Sellers as required by applicable Law or the Seller Employee Plans listed in Section 4.10(a)(i) of the Sellers Disclosure Schedule or pursuant to a Contract in effect as of the date hereof, and a copy of which will be delivered to the Purchaser at the time such liability is incurred. Notwithstanding anything to the contrary in this Agreement, the Sellers shall retain, and neither the Purchaser nor any of its Affiliates shall assume any Liability whatsoever related to or arising from the Rejecting Employees in respect of pay in lieu of notice (including WARN Act notice) and/or severance liability, including without limitations, any Liability relating to or arising from Claims with respect to a change in the terms of employment made with respect to any Rejecting Employee in the Province of Quebec) to the extent such Liabilities exceed the Rejecting Employees Liability Limit.

### 7.1.2.  Employee Benefits.

(a)      The Purchaser or a Designated Purchaser shall, and shall cause its relevant Affiliates to, recognize the service date of each Transferred Employee as set out in the Employee Information for all purposes other than benefit accrual under any defined benefit pension plan, and except as would result in a duplication of benefits.

(b)      Without limiting the generality of the foregoing, the Purchaser shall, or shall cause its relevant Affiliates to, provide the following benefits to Transferred Employees:

(i)      For the period beginning on the Closing Date and ending on the date that is twelve (12) months from the Closing Date, the Purchaser shall, or shall cause its relevant Affiliates to, provide Transferred Employees with severance payments and severance benefits that are substantially similar to the severance payments and severance benefits provided to similarly situated employees of the Purchaser or the Designated Purchaser.

(ii)

(A)      The Sellers shall pay the amount of compensation with respect to the accrued and unused vacation hours that is due and owing to the Transferred Employees (other than Transferred Employees whose accrued and unused vacation is specified in Section 7.1.2(b)(ii)(B) of the Sellers Disclosure Schedule (the "**Specified Transferred Employees**")), up to their Effective Hire Date, to such Transferred Employees by the date required under applicable Law.  The

125

Purchaser will, and will cause the relevant Designated Purchasers to, make commercially reasonable efforts to accommodate time off requests of such Transferred Employees until such time as they accrue sufficient paid time off under the Purchaser Employee Plans to address their vacation plans.

(B)     Section 7.1.2(b)(ii)(B) of the Sellers Disclosure Schedule sets forth the amount of accrued and unused vacation hours that are due and owing to the Specified Transferred Employees as of the date hereof and updated by the Sellers as of the Closing Date. The Purchaser shall, or shall cause its relevant Affiliates to, grant each Specified Transferred Employee paid time off in an amount equal to such accrued unused vacation hours for such Specified Transferred Employee as set forth in Section 7.1.2(b)(ii)(B) of the Sellers Disclosure Schedule. If such Specified Transferred Employee terminates employment with the Purchaser or an Affiliate of the Purchaser prior to receiving such paid time off, as described above, the Purchaser shall pay such Specified Transferred Employee an amount equal to any such unused paid time off upon such employment termination. Under the vacation policy of the Purchaser or an Affiliate of the Purchaser, the vacation accrual rate of each Transferred Employee on and after the Effective Hire Date shall be equal to either, in the sole discretion of the Purchaser or its Affiliate, the Transferred Employee's vacation accrual rate (i) as reflected in the Employee Information or (ii) under the vacation policy of the Purchaser or its relevant Affiliate applicable to similarly situated employees after taking into account such Transferred Employee's service, if applicable, as provided in Section 7.1.2(a). For the avoidance of doubt, such vacation accrual rate applicable to Specified Transferred Employees shall not be decreased by the Purchaser or its Affiliates as a result of the obligation in this Section 7.1.2(b)(ii)(B) that the Purchaser or its Affiliates grant such Employees accrued and unused vacation hours due and owing as of the Closing Date.

(iii)

(A)     With respect to each Transferred Employee (and his or her eligible dependents, as applicable) in Canada and the United States, the Purchaser or the relevant Purchaser's Affiliates shall (x) waive any eligibility periods, evidence of insurability or pre-existing condition limitations and (y) honor any deductibles, co-payments, co-insurance or out-of-pocket expenses paid or incurred by such employee, including with respect to his or her dependents, under comparable Seller Employee Plans during the Purchaser Employee Plan year in which the relevant Effective Hire Date occurs, provided that such employee provides documentation of such expenses paid or incurred to the Purchaser or its Affiliates, and in each case to the extent waived or honored under the Seller Employee Plans in which such Transferred Employee participated immediately prior to the Closing and to the extent doing so will not result in the duplication of benefits.

(B)     With respect to each Transferred Employee (and his or her eligible dependents, as applicable) in all countries other than those described in Section 7.1.2(b)(iii)(A), the Purchaser or the relevant Purchaser's Affiliates shall use commercially reasonable efforts to cause the Purchaser Employee Plans to (x)

126

waive any eligibility periods, evidence of insurability or pre-existing condition limitations and (y) honor any deductibles, co-payments, co-insurance or out-of-pocket expenses paid or incurred by such employee, including with respect to his or her dependents, under comparable Seller Employee Plans during the Purchaser Employee Plan year in which the relevant Effective Hire Date occurs, provided that such employee provides documentation of such expenses paid or incurred to the Purchaser or its Affiliates, and in each case to the extent waived or honored under the Seller Employee Plans in which such Transferred Employee participated immediately prior to the Closing and to the extent doing so will not result in the duplication of benefits.

(iv)    The Purchaser or Designated Purchaser shall provide each Transferred Employee employed in Australia, with the benefit of the amount set forth in Section 7.1.2(b)(iv) of the Sellers Disclosure Schedule of long service leave and sick leave, at such time, if any, as payment of such amount is due and owing to each such Transferred Employee under applicable Law, taking into account in the calculation of such total payment due, the service of such Transferred Employee as set forth in the Employee Information together with such Transferred Employee's service with the Purchaser on and after the Closing Date. Section 7.1.2(b)(iv) of the Sellers Disclosure Schedule shall be updated no later than ten (10) Business Days prior to the Closing Date to reflect additions or deletions of Identified Employees or other status changes that are not prohibited under Section 5.9.

**SECTION 7.2.    Employment Obligations with Respect to Union Employees.** The provisions of this Section 7.2 shall apply to Union Employees. As of the Closing Date the Purchaser or its relevant Affiliate will be bound by the terms and obligations of the Collective Labor Agreements specified in the Employee Information with respect to the employment of the relevant Union Employees who are Transferred Employees as a successor, assign or purchaser of the relevant Seller. With respect to all Union Employees who are not Identified Employees, the Purchaser shall reimburse the Sellers for payments made by Sellers in respect of severance liability pursuant to the Collective Labor Agreement or as required by applicable Law relating to such Union Employees; provided, that, the Sellers agree to use commercially reasonable efforts to mitigate the Liabilities associated with the termination of such Union Employees by providing, upon notice from the Purchaser identifying any Union Employee who will not be an Identified Employee, working notice to such Union Employees and, in the case of Union Employees located in the province of Quebec, written notice, and the Minister of Employment and Social Solidarity in the case of a mass or group termination in all material respects in accordance with applicable Law.

**SECTION 7.3.    Excluded Employee Liabilities.** For purposes of clarity, the Sellers shall retain, and neither the Purchaser nor any of the Designated Purchasers or Purchaser Employee Plans shall assume, any of the following Liabilities of the Sellers or Seller Employee Plans (the "**Excluded Employee Liabilities**"):

(a)    Liabilities related to the Seller Employee Plans or any employee plans or arrangements related to former employees of the Business (excluding the EMEA Business), including the Sellers' or any of their Affiliates' (excluding the EMEA Sellers) or

Seller Employee Plans' obligations to make payments or provide benefit accrued under any Seller Employee Plan, except with respect to the Specified Employee Liabilities or as specified in the Loaned Employee Agreement;

      (b)     Any obligation to provide continuation coverage pursuant to COBRA under any Seller Employee Plan that is a "group health plan" (as defined in Section 5000(b)(1) of the Code) to the Employees and/or their qualified beneficiaries with respect to a COBRA qualifying event that occurs prior to such Employees' Effective Hire Date including, for avoidance of doubt, an Employee's termination of employment from the Sellers or their Affiliates;

      (c)     Liabilities related to the stock or other equity interests in the Seller or any of its Affiliates;

      (d)     Except with respect to the Assumed Liabilities and as provided for in Article VII, Liabilities relating to (i) any Employee's or a former employee's employment or termination of employment with any of the Sellers or their Affiliates, including any severance or similar obligations that may arise as a result of the transfer of an Employee's employment to the Purchaser or one of its Affiliates or as a result of the Employee's refusal of the Purchaser's Offer and any Liabilities that relate to the Inactive Employees', Visa Employees' and Seconded Employees' employment or termination of employment with any of the Sellers or their Affiliates, except as otherwise provided in the Loaned Employee Agreement, (ii) an applicant with respect to potential employment with any of the Sellers or their Affiliates, (iii) the purported class action filed in Ontario Superior Court of Justice under Court file number 08-CV41878CP, (iv) any Action arising on or prior to the Closing filed by any Person in connection with any Employee's employment or the termination thereof with the Sellers, or (v) any Action arising prior to, on or after the Closing relating to or filed by any of the Employees set forth in Section 4.10(b) who are not Identified Employees in connection with any such Employee's employment or termination of employment with the Sellers; and

      (e)     Any Liabilities with respect to Canadian Union Retirees.

**SECTION 7.4.  Other Employee Covenants.**

      (a)     After the date hereof, and subject to each Party's disclosure obligations imposed by Law or by Government Entities and each Party's obligations hereunder, the Purchaser shall not, and shall procure that the Designated Purchasers and any of the Purchaser's Affiliates shall not, issue any announcement or communication to their respective employees or the Employees, prior to consultation with, and the approval of, the Main Sellers (not to be unreasonably withheld or delayed) with respect to this Agreement or any of the transactions contemplated hereby.  If requested, the non-requesting Party shall cooperate with the requesting Party in respect of the development and distribution of any announcement and communication to the employees of the Sellers, including Employees, with respect to this Agreement or any of the transactions contemplated hereby.

      (b)     The Purchaser undertakes to keep the Employee Data and any additional information provided to the Purchaser by the Sellers with respect to individually

identifiable Employees (collectively, "**Employee Data**") in confidence and agrees that, until the relevant Employee Transfer Date with respect to those Employees who become Transferred Employees, and at all times with respect to those Employees who do not become Transferred Employees:

        (i)     the Purchaser shall, and shall cause the Designated Purchasers to, restrict the disclosure of the Employee Data only to such of its employees, agents and advisors as is reasonably necessary for the purposes of complying with its obligations pursuant to this Agreement;

        (ii)    the Employee Data shall not be used except for the purposes of complying with the obligations of the Purchaser and the Designated Purchasers pursuant to this Agreement and shall be returned to the Sellers or destroyed, at the Sellers' election, if this Agreement is terminated; and

        (iii)   the Purchaser shall, and shall cause the Designated Purchasers to, comply with such additional obligations as may be reasonably required in any particular jurisdiction to comply with any applicable data privacy Laws.

        (c)     The Purchaser and the Sellers shall cooperate with each other to provide for an orderly transition of the Transferred Employees from the Sellers to the Purchaser or the Designated Purchasers, as applicable (including the providing of any information by the Sellers to the Purchaser as may be reasonably requested by Purchaser for purposes of complying with its obligations pursuant to Article VII), subject to Section 5.6(d), and to minimize the disruption to the respective businesses of the Parties resulting from the transactions contemplated hereby.

        (d)     Within sixty (60) days following the relevant Effective Hire Date, except to the extent prohibited by applicable data privacy Laws and subject to consent by such employee to be obtained by the Purchaser or Designated Purchaser in his or her Offer (including any consent, if required, to transfer Employee Records across geographical boundaries), or as otherwise required by Law, the Sellers shall provide the Purchaser or the Designated Purchaser with the Employee Records (or a copy thereof) of Transferred Employees other than those Employee Records that constitute Assets pursuant to Section 2.1.1(h) hereof. Further, after the Effective Hire Date, the Purchaser may request in writing an individual Employee Record in relation to a reasonably contemplated employment termination by the Purchaser and, except to the extent prohibited by applicable data privacy Laws and subject to consent by such employee to be obtained by the Purchaser or Designated Purchaser in his or her Offer (including any consent, if required, to transfer Employee Records across geographical boundaries), the Seller shall provide such individual Employee Record within two (2) Business Days. With respect to such Employee Records provided by the Sellers to the Purchaser or Designated Purchasers, in the event that the Sellers reasonably need access to such records for purposes of complying with a subpoena or in connection with any pending or threatened Action, the Purchaser or Designated Purchaser will allow the Sellers reasonable access to such records for the sole purpose of obtaining information for use as aforesaid and will permit the Sellers to make copies thereof as may be necessary or convenient.

(e)     During the Non-Solicitation Period the Sellers shall not, without the advance written consent of the Purchaser, either directly or indirectly solicit for employment or hire any Transferred Employee unless the employment of such employee is involuntarily terminated by the Purchaser or Designated Purchaser prior to such action by the Sellers; provided, however, that nothing in this Section 7.4(e) shall prevent the Sellers from (i) conducting generalized employment searches, including placing bona fide public advertisements, that are not specifically targeted at such Transferred Employees, or (ii) hiring such Transferred Employees identified through such generalized employment searches.

(f)     During the Non-Solicitation Period, the Purchaser and the Designated Purchasers shall not, without the Sellers' advance written consent, either directly or indirectly solicit for employment (i) any of the employees of the Sellers who are not Employees, unless the employment of such employee is involuntarily terminated by the Sellers prior to such action by the Purchaser or the Designated Purchasers, (ii) any Employees who have rejected their Offer or objected to their transfer of employment to the Purchaser or Designated Purchasers pursuant to this Agreement, or (iii) any Employees to whom the Purchaser or any Designated Purchaser have not made an Offer; provided, however, that nothing in this Section 7.4(f) shall prevent the Purchaser or the Designated Purchasers from (A) conducting generalized employment searches, including placing *bona fide* public advertisements, that are not specifically targeted at such employees or former employees of the Sellers, or (B) hiring such employees or former employees identified through such generalized employment searches; provided, further, that, with respect to any Employee described in clauses (ii) and (iii) above who becomes employed with the Purchaser or a Designated Purchaser (other than by operation of Law) during the ninety-day period following the Closing Date, the Purchaser and the Designated Purchasers shall be required to reimburse the Sellers, if applicable, for any pay in lieu of notice (including WARN Act notice) and/or severance payments to the extent paid by the Sellers to such Employee.

(g)     Neither the Sellers nor any of their Affiliates shall enforce against any Transferred Employee any, non-compete, non-solicit or similar contractual obligations, or otherwise assert, with respect to any such Transferred Employee or the Purchaser or any of its Affiliates, claims that would otherwise prohibit or restrict such Transferred Employee's employment with the Purchaser or any of its Affiliates in the Business.

**SECTION 7.5. Canadian Pension Plans.**

**7.5.1. Non-Union Defined Benefit.** As of the relevant Effective Hire Date, each Non-Union Employee who has any entitlement to defined benefits under the Nortel Networks Limited Managerial and Non-Negotiated Pension Plan (the "**Nortel Plan**"), whether such Non-Union Employee was accruing such benefits as of such Effective Hire Date or whether accrual had ceased prior to such date, shall cease to participate actively in such Seller Employee Plan. The Purchaser shall cause all such Non-Union Employees who become Transferred Employees to participate in a defined contribution registered pension plan (the "**Canadian Non-Union DC Replacement Plan**") to be established by the relevant Designated Purchaser effective as of the day after the Closing Date. The Purchaser shall cause the Canadian Non-Union DC Replacement Plan to recognize the prior service of such Transferred Employees with the Seller

for the purposes of eligibility to participate, vesting and entitlement to benefits.  The Canadian Non-Union DC Replacement Plan shall contain an employer contribution formula of at least 1% of the salary of such Transferred Employees, subject to any applicable Tax Law.  The Designated Purchaser shall maintain the Canadian Non-Union DC Replacement Plan in respect of such Transferred Employees (A) for at least five (5) years after the Closing Date or their respective employment termination dates with the Designated Purchaser or (B) until the wind-up of the Nortel Plan, whichever is earlier, without any adverse amendment.  For greater certainty, there shall be no transfer of assets or liabilities from the Nortel Plan to the Canadian Non-Union DC Replacement Plan or any other Purchaser Employee Plan in respect of defined benefit accruals.

       **7.5.2.  Non-Union Defined Contribution.**  As of the relevant Effective Hire Date, each Non-Union Employee who participates only in the defined contribution component of the Nortel Plan shall cease to participate actively in, and accrue benefits under, such Seller Employee Plan.  The Purchaser shall cause all such Non-Union Employees to participate in the Canadian Non-Union DC Replacement Plan beginning as of the relevant Effective Hire Date.  The Purchaser shall cause the Canadian Non-Union DC Replacement Plan to recognize the prior service of such Transferred Employees with the Seller for the purposes of eligibility to participate, vesting and entitlement to benefits.  The Canadian Non-Union DC Replacement Plan shall contain an employer contribution formula of at least 1% of the salary of such Transferred Employees, subject to any applicable Tax Law.

       **7.5.3.  Union Defined Benefit.**  As of the relevant Effective Hire Date, each Union Employee who was accruing defined benefits under the Nortel Networks Negotiated Pension Plan shall cease to participate actively in, and accrue benefits under, such Seller Employee Plan.  The Purchaser shall cause all such Union Employees who become Transferred Employees to participate in a defined benefit registered pension plan (the "**Canadian DB Replacement Plan**") to be established by the relevant Designated Purchaser effective as of the day after the Closing Date and which shall contain a benefit formula which is no less favorable than the formula in the Nortel Networks Negotiated Pension Plan and which shall otherwise comply with the applicable Collective Labor Agreement.  The Purchaser shall cause the Canadian DB Replacement Plan to recognize the prior service of such Transferred Employees with the Seller for the purposes of eligibility to participate, vesting and entitlement to benefits, but not for the purpose of benefit accrual.  For greater certainty, there shall be no transfer of assets or liabilities from the Nortel Networks Negotiated Pension Plan to the Canadian DB Replacement Plan or any other Purchaser Employee Plan.

       **7.5.4.  Union Defined Contribution.**  As of the relevant Effective Hire Date, each Union Employee who participates in the defined contribution component of the Nortel Networks Negotiated Pension Plan shall cease to participate actively in, and accrue benefits under, such plan.  The Purchaser shall cause all such Union Employees who become Transferred Employees to participate in a defined contribution registered pension plan (the "**Canadian Union DC Replacement Plan**") to be established by the Purchaser effective as of the day after the Closing Date and which shall comply with the applicable Collective Labor Agreement.  The Purchaser shall cause the Canadian Union DC Replacement Plan to recognize the prior service of such Transferred Employees with the Seller for the purposes of eligibility to participate, vesting and entitlement to benefits.

SECTION 7.6.  **Sole Benefit of Sellers and Purchaser.**  The terms and provisions of this Article VII are for the sole benefit of the Parties.  Nothing contained herein, express or implied (i) shall be construed to establish, amend, or modify any Seller Employee Plan, any Purchaser Employee Plan, or any other benefit plan, program, agreement or arrangement, (ii) shall alter or limit the ability of the Purchaser, the Sellers, or any of their respective Affiliates to amend, modify or terminate any Seller Employee Plan, any Purchaser Employee Plan (other than as provided in Section 7.5), or any other benefit or employment plan, program, agreement or arrangement after the Closing Date, (iii) is intended to confer or shall confer upon any current or former employee any right to employment or continued employment, or constitute or create an employment agreement with any Transferred Employee, or (iv) is intended to confer or shall confer upon any individual or any legal representative of any individual (including employees, retirees, or dependents or beneficiaries of employees or retirees and including collective bargaining agents or representatives) any right as a third-party beneficiary of this Agreement.

## ARTICLE VIII
## REGISTRATION AND SALE OF CONVERTIBLE NOTES

### SECTION 8.1.  **Shelf Registration.**

(a)    In the event that, at issuance, the Convertible Notes and all Shares issuable upon conversion thereof (the **"Registrable Securities"**) are not freely transferable by the Distribution Agent without restrictions under the Securities Act, provided that the Sellers have complied with their obligations to deliver the information, including the Audited Financial Statements and Unaudited September 30, 2008 Financial Statements, as may be required by and within the time periods specified in Section 5.26, on or prior to the later of (x) the 30th calendar day following the Closing and (y) sixty (60) days following the receipt of such information and financial statements from the Sellers as are required by the rules and regulations promulgated under the Securities Act in connection with the filing and effectiveness of the Shelf Registration Statement referred to below, the Purchaser shall prepare and file an automatic shelf registration statement on Form S-3 (or other applicable form) (together with any amendments or supplements thereto, the **"Initial Shelf Registration Statement"**), to permit the immediate resale of the Registrable Securities under the Securities Act by the Sellers and shall use its commercially reasonable efforts to cause the Initial Shelf Registration Statement or any shelf registration statement filed to replace the Initial Registration Statement to permit the resale of the Registrable Securities should the Initial Shelf Registration Statement no longer be effective (together with any amendments or supplements thereto, and collectively with the Initial Shelf Registration Statement, the **"Shelf Registration Statement"**) to remain continuously effective until the later of (i) one year after the Closing and (ii) when the sale by the Sellers of the Registrable Securities are no longer subject to the volume limitations set forth in Rule 144(e) under the Securities Act (such period, the **"Effective Period"**); provided that the Purchaser may by written notice to the Distribution Agent immediately suspend the use of the Shelf Registration Statement for:

(i)    any period starting on the date on which additional financial statements for the Business with respect to any interim period that begins after the date of the latest period covered by the Audited Financial Statements but ends

prior to the Closing Date and that are not then included in the Shelf Registration Statement and any financial statements for the corresponding period of the preceding fiscal year that, in each case, are required by the rules and regulations promulgated under the Securities Act to be included or incorporated by reference in the Shelf Registration Statement (the **"Additional Statements"**) and ending three (3) Business Days after the date on which the Sellers have provided such Additional Statements to the Purchaser. The Purchaser shall provide the Main Sellers and their representatives reasonable access to the records and employees of the Business to the extent relevant for the preparation and delivery of any Additional Statements and shall cause the employees of the Business to provide the Main Sellers with such cooperation as they shall reasonably request in connection with their preparation and delivery of any Additional Statements;

(ii)   any period starting on the date that the Purchaser's board of directors (or a committee thereof) concludes that any previously issued financial statements included in, or incorporated by reference into, such Shelf Registration Statement should no longer be relied upon because of an error in such financial statements as addressed in Accounting Principles Board Opinion No. 20, as may be modified, supplemented or succeeded, and ending on the date on which the Purchaser takes corrective action necessary to permit sales under the Shelf Registration Statement to resume; and

(iii)   a period not to exceed twenty (20) consecutive days in any one instance and for a period not to exceed forty-five (45) days in any six (6) month period, without regard to any period of suspension pursuant to the immediately preceding clauses, at any time that the Purchaser becomes engaged in a material business activity or negotiation or any other event has occurred or is anticipated, which activity, negotiation or event is not disclosed in that prospectus and that the Purchaser's board of directors (or a committee thereof) reasonably believes after consultation with counsel should be disclosed therein under applicable Law and determines in good faith that such disclosure would be premature or would adversely affect the Purchaser or its business or prospects; provided, however, that the Purchaser may not suspend the use of the Shelf Registration Statement pursuant to this clause (iii) during the sixty (60) consecutive Trading Day period commencing on the effective date of the Shelf Registration Statement.

The Purchaser will use its reasonable best efforts to ensure that the use of the Shelf Registration Statement may be resumed immediately following any such period of suspension (including by taking such corrective actions as referred to in clause (ii) above).

(b)   At its expense, the Purchaser will use reasonable best efforts during the Effective Period to:

(i)   prepare and file with the SEC such amendments and supplements to the Shelf Registration Statement and the prospectus used in connection therewith as may be necessary to comply with the provisions of the Securities Act with respect to the disposition of the Registrable Securities covered by the Shelf Registration Statement;

133

(ii)    furnish such number of prospectuses and any amendments or supplements thereto, as the Distribution Agent, the Sellers or the EMEA Sellers from time to time may reasonably request;

(iii)    promptly amend the Shelf Registration Statement onto a form the Purchaser is then eligible to use or file a new registration statement on such form and to keep such registration statement effective in accordance with the requirements otherwise applicable under this Agreement if the Purchaser ceases to be a WKSI;

(iv)    make and keep adequate current public information with respect to the Purchaser available in accordance with Rule 144 under the Securities Act; and

(v)    file with the SEC in a timely manner all reports and other documents required of the Purchaser under the Securities Act and the Exchange Act.

**SECTION 8.2.  Offerings.**

(a)    At any time that a Shelf Registration Statement covering Registrable Securities pursuant to Section 8.1 is effective, if the Sellers and the EMEA Sellers deliver a notice to the Purchaser (a **"Shelf Take-Down Notice"**) stating that the Sellers and the EMEA Sellers intend to effect an offering of all or part of the Registrable Securities included by the Sellers and the EMEA Sellers on the Shelf Registration Statement (a **"Shelf Offering"**) and stating the number or dollar amount of the Registrable Securities to be included in such Shelf Offering, then the Purchaser shall amend or supplement the Shelf Registration Statement as may be necessary in order to enable such Registrable Securities to be distributed pursuant to the Shelf Offering as contemplated by the Shelf Take-Down Notice.

(b)    The Sellers and the EMEA Sellers may withdraw their Registrable Securities from a Shelf Offering at any time by providing the Purchaser with written notice. Upon receipt of such written notice, the Purchaser shall cease all efforts to secure registration.

(c)    In connection with an underwritten public Shelf Offering, the Sellers and the EMEA Sellers shall have the right to select an internationally recognized investment banking firm reasonably acceptable to the Purchaser as the lead or managing underwriter.

(d)    In connection with any underwritten public offering made pursuant to a Registration Statement, the Purchaser will not effect any public sale or distribution of any shares of its Common Stock (or securities convertible into or exchangeable or exercisable for its Common Stock (**"Convertible Securities"**)) for its own account (other than (x) a registration statement (i) on Form S-4, Form S-8 or any successor forms thereto or (ii) filed solely in connection with an exchange offer or any employee benefit or dividend reinvestment plan or (y) pursuant to such underwritten offering), during the period commencing on, and continuing for not more than 60 days (or such shorter period as the managing underwriter(s) may permit) after the effective date of such Registration Statement

134

pursuant to which such underwritten offering shall be made or, in the case of a Shelf Registration Statement, the period commencing on, and continuing for not more than 60 days (or such shorter period as the managing underwriter(s) may permit) after the Purchaser's notice of a distribution in connection with such offering, or, in either case, on such earlier date as the Sellers and the EMEA Sellers give notice to the Purchaser that they decline to proceed with any such offering, except (i) for the issuance of shares of Common Stock upon the conversion, exercise or exchange, by the holders thereof, of Convertible Securities pursuant to the terms of such Convertible Securities, (ii) pursuant to the terms of any other agreement to issue shares of Common Stock or any Convertible Securities in effect on the date of the notice of a proposed Transfer, including any such agreement in connection with any previously disclosed acquisition, merger, consolidation or other business combination, and (iii) in connection with Transfers to dividend reinvestment plans or to employee benefit plans in order to enable any such employee benefit plan to fulfill its funding obligations in the ordinary course, unless the managing underwriter(s) agree otherwise. Notwithstanding the foregoing, the provisions of this Section 8.2(d) shall be subject to the provisions of Section 8.1(a), and if the Purchaser exercises its rights of postponement pursuant to Section 8.1(a) with respect to any proposed underwritten public offering, the provisions of this Section 8.2(d) shall not apply unless and until such time as the Purchaser notifies the Sellers and the EMEA Sellers of the termination of such postponement and the Sellers and the EMEA Sellers notify the Purchaser of their intention to continue with such proposed offering.

### SECTION 8.3.  Piggyback Registration.

(a)    If at any time after the issuance of Convertible Notes, the Purchaser proposes or is required to file a registration statement under the Securities Act with respect to an offering of shares of Common Stock or Convertible Securities for its own account (other than (i) a registration statement filed pursuant to Section 8.1(a), (ii) a registration statement on Form S-4 or S-8 or any successors thereto, or (iii) a registration statement solely relating to an offering and sale to employees or directors of the Purchaser pursuant to any employee stock plan or other employee benefit plan arrangement), then the Purchaser shall give prompt written notice of such proposed filing at least ten (10) days before the anticipated filing date (the "**Piggyback Notice**") to the Distribution Agent. The Piggyback Notice shall offer the Sellers and the EMEA Sellers the opportunity to include in such registration statement the number of Shares (with respect to an offering of shares of Common Stock) or the aggregate principal amount of Convertible Notes (with respect to an offering of Convertible Securities) as they may request (a "**Piggyback Registration**"). Subject to Section 8.3(b), the Purchaser shall include in each such Piggyback Registration all Shares or Convertible Notes (as applicable) with respect to which the Purchaser has received a written request for inclusion therein within five (5) days after notice has been given to the Distribution Agent. The Sellers and the EMEA Sellers shall be permitted to withdraw all or part of any Registrable Securities from a Piggyback Registration at any time up to the pricing date.

(b)    If any of the shares of Common Stock or Convertible Securities to be registered pursuant to the registration giving rise to the Sellers' and the EMEA Sellers' rights under this Section 8.3 are to be sold in an underwritten public offering, the Sellers and the EMEA Sellers shall be permitted to include all Registrable Securities requested to be

135

included in such registration in such offering on the same terms and conditions as any other shares of Common Stock or Convertible Securities of the Purchaser included therein; provided, that if such offering is subject to an Offering Limitation, then there shall be included in such offering: (i) first, the number of shares of Common Stock or Convertible Securities the Purchaser proposes to sell, and (ii) second, the number of Registrable Securities requested to be included in such registration by the Sellers and the EMEA Sellers that in the opinion of the underwriter selected by the Purchaser can be sold without adversely affecting the price, timing, distribution or marketability of such offering.

(c)    The Purchaser may select the lead underwriter and co-manager or co-managers to administer any offering of Registrable Securities pursuant to a Piggyback Registration; provided, however, that if the Sellers and the EMEA Sellers' Registrable Securities that are expected to be included in any such offering constitute, in the Purchaser's reasonable judgment, at least 25% of the shares of Common Stock or aggregate principal amount of Convertible Securities expected to be transferred in such offering, the Sellers and the EMEA Sellers shall have the right to appoint one co-manager (reasonably acceptable to the Purchaser) for such offering, who shall participate in such offering on the same terms as the co-managers appointed by the Purchaser.

(d)    In the event that the Purchaser gives the Distribution Agent notice of its intention to effect an offering pursuant to a Piggyback Registration and subsequently declines to proceed with such offering, the Sellers and the EMEA Sellers shall have no rights in connection with such offering. The Sellers and the EMEA Sellers shall participate in any offering of Registrable Securities pursuant to a Piggyback Registration in accordance with the same plan of distribution for such Piggyback Registration as the Purchaser.

(e)    No registration of Shares effected pursuant to a request under this Section 8.3 shall relieve the Purchaser of its obligations under Section 8.1 or 8.2.

SECTION 8.4. **No Inconsistent Agreements.** Nothing herein shall restrict the authority of the Purchaser to grant to any Person the rights to obtain registration under the Securities Act of any equity securities of the Purchaser, or any securities convertible into or exchangeable or exercisable for such securities; provided, however, that the Purchaser shall not grant any such rights with respect to the Common Stock or Convertible Securities that conflicts with the rights of the Sellers or the EMEA Sellers under this Agreement; provided that in the event that Purchaser issues any Common Stock or Convertible Securities in connection with any acquisition of any other Person, the Purchaser may grant such other Person registration rights (including the rights in Section 8.3(b) which shall be deemed modified hereby) that are *pari passu* with the Sellers.

**SECTION 8.5.  Registration Procedures.**

(a)      The Purchaser is required to effect the registration of any Registrable Securities under the Securities Act as provided in Article VIII in a manner to permit the sale of such Registrable Securities in accordance with the intended method or methods of disposition thereof, and pursuant thereto the Purchaser shall cooperate in the sale of the securities and shall, as expeditiously as possible:

(i)      Before filing a Registration Statement or any prospectus (including any issuer free writing prospectus related thereto) or any amendments or supplements thereto, furnish or otherwise make available to the Sellers, the EMEA Sellers, their counsel and the managing underwriter(s), if any, copies of all such documents proposed to be filed, which documents will be subject to the reasonable review and comment of such counsel (provided that any comments made on behalf of the Sellers, the EMEA Sellers or the managing underwriter(s), if any, are provided to the Purchaser promptly upon receipt of the documents but in no event later than three (3) Business Days after receipt of such documents by the Sellers and the EMEA Sellers), and the managing underwriters, if any, and such other documents reasonably requested by such counsel, including any comment letter from the SEC, and, if requested by such counsel, provide such counsel reasonable opportunity to participate in the preparation of such Registration Statement and each prospectus included therein (including any issuer free writing prospectus related thereto) and such other opportunities to conduct a reasonable investigation within the meaning of the Securities Act, including reasonable access to the Purchaser's books and records, officers, accountants and other advisors. The Purchaser shall not file any such Registration Statement or prospectus (including any issuer free writing prospectus related thereto) or any amendments or supplements thereto with respect to any registration pursuant to which the Sellers, the EMEA Sellers, their counsel, or the managing underwriter(s), if any, shall reasonably object, in writing, on a timely basis, unless, in the opinion of the Purchaser, such filing is necessary to comply with applicable Law.

(ii)      Notify the Sellers, the EMEA Sellers and the managing underwriter(s), if any, promptly (A) when a prospectus or any prospectus supplement, issuer free writing prospectus or post-effective amendment has been filed, and, with respect to the Registration Statement or any post-effective amendment, when the same has become effective, (B) of any request by the SEC or any other Government Entity for amendments or supplements to the Registration Statement or related prospectus or issuer free writing prospectus or for additional information, (C) of the issuance by the SEC of any stop order suspending the effectiveness of any registration statement of the Purchaser or the initiation of any proceedings for that purpose, (D) if at any time the representations and warranties of the Purchaser contained in any agreement related to the Registrable Securities (including this Agreement and any underwriting agreement contemplated hereunder) cease to be true and correct, (E) of the receipt by the Purchaser of any notification with respect to the suspension of the qualification or exemption from qualification of any of the Registrable

137

Securities for sale in any jurisdiction, or the initiation or threatening of any proceeding for such purpose, and (F) of the happening of any event that makes any statement made in such Registration Statement or related prospectus or issuer free writing prospectus untrue in any material respect or that requires the making of any changes in such Registration Statement, prospectus, documents or issuer free writing prospectus so that, in the case of the Registration Statement, it will not contain any untrue statement of a material fact or omit to state any material fact required to be stated therein or necessary to make the statements therein not misleading, and that in the case of any prospectus or issuer free writing prospectus, it will not contain any untrue statement of a material fact or omit to state any material fact necessary in order to make the statements therein, in light of the circumstances under which they were made, not misleading.

(iii)     Use its reasonable best efforts to obtain the withdrawal of any order suspending the effectiveness of the Registration Statement, or the lifting of any suspension of the qualification (or exemption from qualification) of any of the Registrable Securities for sale in any jurisdiction at the reasonably earliest practical date.

(iv)     If requested by the managing underwriter(s), if any, or the Sellers and the EMEA Sellers, promptly include in a prospectus supplement, post-effective amendment or issuer free writing prospectus such information as the managing underwriter(s), if any, or the Sellers and the EMEA Sellers may reasonably request in order to permit the intended method of distribution of such securities and make all required filings of such prospectus supplement, such post-effective amendment or issuer free writing prospectus as soon as practicable after the Purchaser has received such request.

(v)     Furnish or make available to the Sellers, the EMEA Sellers and each managing underwriter, if any, without charge, such number of conformed copies of the Registration Statement and each post-effective amendment thereto, including financial statements (but excluding schedules, all documents incorporated or deemed to be incorporated therein by reference, and all exhibits, unless requested in writing by the Sellers, the EMEA Sellers, counsel or managing underwriter(s)), and such other documents, as the Sellers, the EMEA Sellers or such managing underwriter(s) may reasonably request, and upon request a copy of any and all transmittal letters or other correspondence to or received from the SEC or any other Government Entity relating to such offering.

(vi)     Deliver to the Sellers, the EMEA Sellers and the managing underwriter(s), if any, without charge, as many copies of the prospectus or prospectuses (including each form of prospectus and any issuer free writing prospectus related to any such prospectuses) and each amendment or supplement thereto as such Persons may reasonably request in connection with the distribution of the Registrable Securities; and the Purchaser, subject to Section 8.5(b), hereby consents to the use of such prospectus and each amendment or supplement thereto by each of the Sellers, the EMEA Sellers and the managing underwriter(s), if any, in connection with the offering and sale of the Registrable

Securities covered by such prospectus and any such amendment or supplement thereto.

(vii)    Prior to any public offering of Registrable Securities, use its commercially reasonable efforts to register or qualify or cooperate with the Sellers, the EMEA Sellers, the managing underwriter(s), if any, and their respective counsel in connection with the registration or qualification (or exemption from such registration or qualification) of such Registrable Securities for offer and sale under the securities or "blue sky" laws of such jurisdictions within the United States as any Seller, EMEA Seller or managing underwriter(s) reasonably requests in writing and to keep each such registration or qualification (or exemption therefrom) effective during the Effective Period and to take any other action that may be necessary or advisable to enable the Sellers and the EMEA Sellers to consummate the disposition of such Registrable Securities in such jurisdiction; provided, however, that the Purchaser will not be required to (i) qualify generally to do business in any jurisdiction where it is not then so qualified or (ii) take any action that would subject it to general service of process in any such jurisdiction where it is not then so subject.

(viii)    Cooperate with the Sellers, the EMEA Sellers and the managing underwriter(s), if any, to facilitate the timely preparation and delivery of certificates (not bearing any legends) representing Registrable Securities to be sold after receiving a written representation from the Sellers and the EMEA Sellers that the Registrable Securities represented by the certificates so delivered by the Sellers and the EMEA Sellers will be transferred in accordance with the Registration Statement, and enable such Registrable Securities to be in such denominations and registered in such names as the managing underwriter(s), if any, or the Sellers and the EMEA Sellers may request at least two (2) Business Days prior to any sale of Registrable Securities.

(ix)    Upon the occurrence of any event contemplated by Section 8.5(a)(ii)(B) through Section 8.5(a)(ii)(F), at the request of the Sellers and the EMEA Sellers, prepare and file with the SEC a supplement or post-effective amendment to such Registration Statement, prospectus or issuer free writing prospectus so that, as thereafter delivered to the purchasers of such Registrable Securities, such prospectus will not contain an untrue statement of a material fact or omit to state any material fact necessary to make the statements therein, in light of the circumstances in which they are made, not misleading.

(x)    Prior to the effective date of the Registration Statement, provide a CUSIP number for the Registrable Securities (if the Registrable Securities do not already have a CUSIP number) and make the Registrable Securities eligible for settlement and transfer through the facilities of The Depository Trust Company ("**DTC**").

(xi)    So long as the Common Stock is listed on any United States securities exchange, quotation system or market, use its commercially reasonable

efforts to cause all of the Shares to be listed on such exchange, quotation system or market.

(xii)    Provide and cause to be maintained a transfer agent or registrar, as applicable, for all Registrable Securities covered by such Registration Statement from and after a date not later than the effective date of such Registration Statement.

(xiii)    Enter into such agreements (including an underwriting agreement in form, scope and substance as is customary in underwritten offerings) and take all such other actions reasonably requested by the Sellers, the EMEA Sellers or by the managing underwriter(s), if any, to expedite or facilitate the disposition of such Registrable Securities, and in connection therewith, whether or not an underwriting agreement is entered into and whether or not the registration is an underwritten registration, (i) make such representations and warranties to the Sellers, the EMEA Sellers and the managing underwriter(s), if any, with respect to the business of the Purchaser and its Subsidiaries, and the Registration Statement, prospectus and documents, if any, incorporated or deemed to be incorporated by reference therein, in each case, in form, substance and scope as are customarily made by the Purchaser in its underwritten offerings, and, if true, confirm the same if and when requested, (ii) use its commercially reasonable efforts to furnish to the Sellers and the EMEA Sellers opinions of counsel to the Purchaser and updates thereof (which counsel and opinions (in form, scope and substance) shall be reasonably satisfactory to the managing underwriter(s), if any, and counsel to the Sellers and the EMEA Sellers), addressed to the Sellers, the EMEA Sellers and each of the managing underwriter(s), if any, covering the matters customarily covered in opinions provided by the Purchaser in its underwritten offerings and such other matters as may be reasonably requested by such counsel and managing underwriter(s), (iii) use its commercially reasonable efforts to obtain "cold comfort" letters and updates thereof from the independent registered public accounting firm of the Purchaser (and, if necessary, any other independent registered public accounting firm of any Subsidiary of the Purchaser or of any business acquired by the Purchaser for which financial statements and financial data are, or are required to be, included in the Registration Statement) who have certified the financial statements included in such Registration Statement, addressed to the Sellers and the EMEA Sellers (unless such accountants shall be prohibited from so addressing such letters by applicable standards of the accounting profession) and to each of the managing underwriter(s), if any, such letters to be in customary form and covering matters of the type customarily covered in "cold comfort" letters in connection with the Purchaser's underwritten offerings, (iv) if an underwriting agreement is entered into, the same shall contain indemnification provisions substantially to the effect set forth in Section 8.8 hereof with respect to all parties to be indemnified pursuant to said Section except as otherwise agreed by the Sellers, the EMEA Sellers and the managing underwriter(s) and (v) deliver such documents and certificates as may be reasonably requested by the Sellers, the EMEA Sellers, their counsel and the managing underwriter(s), if any, to evidence the continued

140

validity of the representations and warranties made pursuant to clause (i) above and to evidence compliance with any customary conditions contained in the underwriting agreement or other agreement entered into by the Purchaser. The above shall be done at each closing under such underwriting or similar agreement, or as and to the extent required thereunder.

(xiv)    Not later than the effective date of the Shelf Registration Statement, cause the Indenture to be qualified under the Trust Indenture Act of 1939 (as amended, the "**TIA**"); and, in connection therewith, cooperate with the Trustee to effect such changes to the Indenture as may be required for the Indenture to be so qualified in accordance with the terms of the TIA and execute, and use its reasonable best efforts to cause the Trustee to execute, all documents as may be required to effect such changes, and all other forms and documents required to be filed with the SEC to enable the Indenture to be so qualified in a timely manner.

(xv)    If requested by the lead manager for any underwritten offering of any Convertible Notes, the Purchaser shall at its own expense, use its best efforts to (a) if the Convertible Notes have been rated prior to such underwritten offering, confirm such ratings will apply to the Convertible Notes to be offered in such underwritten offering, or (b) if the Convertible Notes were not previously rated, cause the Convertible Notes to be offered in such offering to be rated by such rating agencies, as requested by the managing underwriters of such underwritten offering.

(b)    Each of the Parties will treat all notices of proposed transfers and registrations, and all information relating to any periods of suspension of the Shelf Registration Statement under Section 8.1(a) received from the other party with the strictest confidence (and in accordance with the provisions of Section 5.11) and will not disseminate such information. Nothing herein shall be construed to require the Purchaser or any of its Affiliates to make any public disclosure of information at any time. In the event the Purchaser has notified the Sellers and the EMEA Sellers of any occurrence of any event contemplated by Section 8.5(a)(ii)(B) through Section 8.5(a)(ii)(F) then the Sellers and the EMEA Sellers shall not deliver such prospectus or issuer free writing prospectus to any purchaser and will forthwith discontinue disposition of any Registrable Securities covered by such Registration Statement, prospectus or issuer free writing prospectus unless and until a supplement or post-effective amendment to such prospectus or issuer free writing prospectus has been prepared and filed as set forth in Section 8.5(a)(ix) or until the Purchaser advises the Sellers and the EMEA Sellers in writing that the use of such prospectus or issuer free writing prospectus may be resumed.

**SECTION 8.6.  Cooperation by Management.** The Purchaser shall make available members of the management of the Purchaser and its Affiliates for reasonable assistance in the selling efforts relating to any offering of the Registrable Securities, to the extent customary for such offering (including, without limitation, to the extent customary, senior management attendance at due diligence meetings with prospective investors or underwriters and their counsel and if requested by the lead underwriter with respect to any underwritten offering "road shows" at a time that does not unreasonably interfere with the operation of the business

141

either by conference call or, if in person, at a location acceptable to the Purchaser acting reasonably), and for such assistance as is reasonably requested by the Sellers, the EMEA Sellers and their counsel in the selling efforts relating to any such offering; provided, however, that management need only be made available for one offering in any 6-month period.

> SECTION 8.7.  Registration Expenses and Legal Counsel.  The Purchaser shall pay all reasonable fees and expenses incident to the performance of or compliance with its obligations under this Article VIII, including (i) all registration and filing fees (including fees and expenses (A) with respect to filings required to be made with all applicable securities exchanges and/or the Financial Industry Regulatory Authority, Inc., and (B) of compliance with securities or "blue sky" laws including any fees and disbursements of counsel for the underwriter(s) in connection with "blue sky" qualifications of the Registrable Securities pursuant to Section 8.5(a)(viii), (ii) printing expenses (including expenses of printing certificates for Registrable Securities in a form eligible for deposit with DTC and of printing prospectuses if the printing of prospectuses is requested by the managing underwriter(s), if any, or by the Sellers and the EMEA Sellers), (iii) messenger, telephone and delivery expenses of the Purchaser, (iv) fees and disbursements of counsel for the Purchaser, (v) expenses of the Purchaser incurred in connection with any "road show" and (vi) fees and disbursements of all independent registered public accounting firms (including, without limitation, the expenses of any special audit and "cold comfort" letters required by or incident to this Agreement) and any other persons, including special experts, retained by the Purchaser other than the fees and expenses of KPMG or any other accounting firm in connection with the preparation or audit of the Audited Financial Statements or the Additional Statements or any comfort given thereon ("**Nortel Accounting Expenses**").  For the avoidance of doubt, the Purchaser shall not be required to pay underwriting discounts and commissions and transfer taxes, if any, relating to the sale or disposition of Registrable Securities pursuant to any Registration Statement, the fees and expenses of counsel for the underwriter selected by the Sellers and the EMEA Sellers, the Nortel Accounting Expenses or any other expenses of the Sellers and the EMEA Sellers.  In addition, the Purchaser shall bear all of its internal expenses (including all salaries and expenses of its officers and employees performing legal or accounting duties), the expense of any annual audit, the fees and expenses incurred in connection with the listing of the Common Stock issuable upon conversion of Convertible Notes on any securities exchange or inter-dealer quotation system and the fees and expenses of any Person, including special experts, retained by the Purchaser.

> SECTION 8.8.  Indemnification.

>> (a)      As a condition to any Seller's or EMEA Seller's inclusion in a Registration Statement as a selling shareholder, such Seller or EMEA Seller shall, severally and not jointly, indemnify the Purchaser, each person, if any, who controls the Purchaser within the meaning of the Securities Act or the Exchange Act, and each officer or director of the Purchaser, against all losses, claims, damages or liabilities (including any loss, damage, claim or liability under the Securities Act, the Exchange Act, state securities laws or otherwise) arising out of or based upon any untrue statement or alleged untrue statement of any material fact contained in the Registration Statement, any preliminary prospectus or final prospectus contained therein, or any amendment or supplement thereof, or arising out of or based upon the omission or alleged omission to state therein a material fact required to be stated therein or necessary to make the statements therein not misleading and each agrees, severally and not jointly, to reimburse the Purchaser and each such officer, director

and controlling person for any legal or other expenses reasonably incurred by them in connection with investigating or defending such loss, claim, damage, liability or action, provided, however, that any Seller or EMEA Seller shall only be liable hereunder in any such case if and only to the extent that any such loss, claim, damage, liability arises out of or is based upon an untrue statement or alleged untrue statement or omission or alleged omission made in such Registration Statement, preliminary prospectus or final prospectus, or any such amendment or supplement, in reliance upon and in conformity with information pertaining to such Seller or EMEA Seller, as such, as furnished in writing to the Purchaser by or on behalf of the Sellers or the EMEA Sellers, respectively, specifically for use in the preparation thereof, provided, further, however, that the liability of each of the Sellers and the EMEA Sellers hereunder shall not in any event exceed the net proceeds received by such Seller or EMEA Seller from the sale of Registrable Securities covered by such Registration Statement. The Purchaser will indemnify and hold harmless each of the Sellers and the EMEA Sellers selling Registrable Securities registered on such Registration Statement and each other person, if any, who controls any of them within the meaning of the Securities Act or Exchange Act, and each officer, director or agent of any of them, against any losses, claims, damages or liabilities (including any loss, damage, claim or liability under the Securities Act, the Exchange Act or state securities Laws) or otherwise to the extent such losses, claims, damages or liabilities arise out of or based upon any untrue statement or alleged untrue statement of any material fact contained in such Registration Statement, any preliminary prospectus or final prospectus contained therein, or any amendment or supplement thereof, or arise out of or are based upon the omission or alleged omission to state therein a material fact required to be stated therein or necessary to make the statements therein not misleading and the Purchaser will reimburse each such Seller and EMEA Seller and each such officer, director, agent and controlling person for any legal or other expenses reasonably incurred by them in connection with investigating or defending any such loss, claim, damage, liability or action, provided, however, that the Purchaser will not be liable hereunder in any such case to the extent that any such loss, claim, damage or liability arises out of or is based upon an untrue statement or alleged untrue statement or omission or alleged omission made in such Registration Statement, preliminary prospectus or final prospectus or any such amendment or supplement, in reliance upon and in conformity with information pertaining to any of the Sellers or the EMEA Sellers, as such, as furnished in writing to the Purchaser by or on behalf of any of them specifically for use in the preparation thereof. The Purchaser shall bear all costs and expenses associated with the registration of the Registrable Securities as specified in Article VIII and the preparation and filing of such Registration Statement, the Purchaser's outside counsel, NASDAQ and "blue sky" registration and filing fees and transfer agents' and registrars' fees and legal fees and disbursements of counsel to the Sellers or the EMEA Sellers.

(b)     If the indemnification provided for in Section 8.8(a) is unavailable to a Person intended to be indemnified under Section 8.8(a) (an "**Indemnitee**") in respect of any losses, damages, claims or liabilities referred to herein, then, as a condition to any Seller's or EMEA Seller's inclusion in such Registration Statement as a selling shareholder, the Person who was to provide the indemnity under Section 8.8(a) (an "**Indemnitor**"), in lieu of indemnifying such Indemnitee hereunder, shall contribute to the amount paid or payable by such Indemnitee as a result of such losses, damages, claims or liabilities in such proportion as is appropriate to reflect the relative fault of the Indemnitor and the Indemnitee

143

and the Persons acting on behalf of or controlling the Indemnitor or the Indemnitee in connection with the statements or omissions or violations which resulted in such losses, damages, claims or liabilities, as well as any other relevant equitable considerations. If the indemnification described in Section 8.8(a) is unavailable to an Indemnitee, the relative fault of the Indemnitor and the Indemnitee and Persons acting on behalf of or controlling the Indemnitor or the Indemnitee shall be determined by reference to, among other things, whether the untrue or alleged untrue statement of a material fact or the omission or alleged omission to state a material fact relates to information supplied by the Indemnitor or the Indemnitee or the Persons acting on behalf of or controlling the Indemnitor or the Indemnitee and their relative intent, knowledge, access to information and opportunity to correct or prevent such statement or omission. The Indemnitor shall not be required to contribute pursuant to this Section 8.8(b) if there has been a settlement of any proceeding affected without its written consent. No claim against the assets of the Sellers or the EMEA Sellers shall be created by this Section 8.8(b), except as and to the extent permitted by applicable Law. Notwithstanding the foregoing, no Seller or EMEA Seller shall be required to make a contribution in excess of the net amount received by such Seller or EMEA Seller from the sale of the Registrable Securities in the offering giving rise to such liability.

    **SECTION 8.9.  Trading Limitation.** The Sellers and EMEA Sellers agree that (i) none of them will transfer any Convertible Notes or the right to receive the Convertible Notes other than (w) to the Sellers, the EMEA Sellers or their respective subsidiaries, (x) distributions to the Sellers' or the EMEA Sellers' creditors and other stakeholders, either directly or indirectly through a liquidating trust or other similar vehicle, whether pursuant to a plan of compromise and/or arrangement, plan of reorganization, plan of liquidation, scheme of arrangement, or otherwise, (y) through a "block trade" or a broadly marketed offering effected through an internationally recognized convertible bond dealer (**"Recognized Dealer"**) in accordance with Section 8.1 or (z) outside the context of clause (y), with the consent of the Purchaser, to a Recognized Dealer in accordance with applicable securities laws, which consent of the Purchaser shall not be unreasonably withheld or delayed (it being understood that such consent may be withheld unless such Recognized Dealer provides Purchaser with reasonable assurances that the Convertible Notes will not ultimately be placed in an unreasonably concentrated manner); and (ii) to the extent the Convertible Notes have been converted into Common Stock, the aggregate amount of Shares sold for the account of the Sellers and EMEA Sellers collectively, whether pursuant to a Registration Statement or otherwise, shall not exceed the Daily Trading Limit.

    **SECTION 8.10.  Agent of Sellers.** The Sellers, the EMEA Sellers or any of them may act through the Distribution Agent in connection with the exercise of any rights or the performance of any actions or obligations under this Article VIII.

    **SECTION 8.11.  Liquidated Damages.**

        In the event that (i) the Purchaser has not filed the Shelf Registration Statement on or before the date on which such registration statement is required to be filed pursuant to Section 8.1(a), or (ii) any Shelf Registration Statement required by Section 8.1(a) hereof is filed and declared effective but shall thereafter either be withdrawn by the Purchaser in violation of its obligations in Section 8.1 (a), or shall become subject to an effective stop order issued pursuant to Section 8(d) of the Securities Act suspending the effectiveness of such registration statement without being succeeded immediately by an additional registration statement filed and declared

effective (each such event referred to in clauses (i) and (ii), a "**Registration Default**" and each period during which a Registration Default has occurred and is continuing, a "**Registration Default Period**"), then, as liquidated damages for such Registration Default, subject to the provisions of Section 11.13, liquidated damages shall accrue on the Aggregate Principal Amount at a per annum rate of 0.25% for the first 90 days of the Registration Default Period, and at a per annum rate of 0.50% thereafter for the remaining portion of the Registration Default Period.

**ARTICLE IX**
**CONDITIONS TO THE CLOSING**

**SECTION 9.1.  Conditions to Each Party's Obligation.**  The Parties' obligation to effect, and, as to the Purchaser, to cause the relevant Designated Purchasers to effect, the Closing is subject to the satisfaction or the express written waiver of the Primary Parties, at or prior to the Closing, of the following conditions:

(a)    *Regulatory Approvals.*  All Regulatory Approvals shall have been obtained.

(b)    *No Injunctions or Restraints.*  There shall not be in effect any Law or Order of any court or other Government Entity in the U.S., Canada or the United Kingdom (in respect of the transactions contemplated under the EMEA Asset Sale Agreement) prohibiting the consummation of the transactions contemplated hereby and there shall not be any proceeding pending by any Government Entity in the U.S., Canada or the United Kingdom seeking such prohibition.

(c)    *Bidding Procedures Order and Canadian Sales Process Order.*  The U.S. Bidding Procedures Order and the Canadian Sales Process Order shall have been entered and shall not have been stayed as of the Closing Date and such orders shall have become Final Orders.

(d)    *U.S. Sale Order and Canadian Approval and Vesting Order.*  The U.S. Sale Order and the Canadian Approval and Vesting Order shall have been entered and shall not have been stayed and (x) such orders shall have become Final Orders, (y) following Closing any such appeal of either such Order shall become moot under applicable Law or (z) any ruling or order by the court in respect of the issue on appeal could not reasonably be expected to have a material adverse effect on the Purchaser or the Business taken as a whole.

(e)    *Satisfaction of Conditions under EMEA Asset Sale Agreement.*  The conditions to Closing of the EMEA Asset Sale Agreement set out in clauses 15.1, 15.2 and 15.3 thereof (other than the condition regarding the satisfaction of the conditions hereunder) shall have been satisfied or waived in accordance with the terms of the EMEA Asset Sale Agreement.

(f)    *Consummation of Closing under EMEA Asset Sale Agreement.*  The transaction contemplated by the EMEA Asset Sale Agreement shall be completed simultaneously with the Closing hereunder.

145

**SECTION 9.2.  Conditions to Sellers' Obligation.**  The Sellers' obligation to effect the Closing shall be subject to the fulfillment (or express written waiver by the Main Sellers), at or prior to the Closing, of each of the following conditions:

(a)    *No breach of Representations and Warranties*.  Each of the representations and warranties set forth in Article III (other than the representations and warranties set forth in Section 3.7 if the Purchaser exercises the Cash Replacement Election in full), disregarding all materiality and material adverse effect qualifications contained therein, shall be true and correct (i) as if restated on and as of the Closing Date or (ii) if made as of a date specified therein, as of such date, except, in each case, for any failure to be true and correct that has not had or would not reasonably be expected to have individually or in the aggregate (i) a material adverse effect on the Purchaser's ability to consummate the transactions contemplated hereby or (ii) a material adverse effect on the assets, liabilities, results of operations or condition (financial or otherwise) of the Purchaser and its subsidiaries taken as a whole.

(b)    *No breach of Covenants*.  The material covenants, obligations and agreements contained in this Agreement to be complied with by the Purchaser on or before the Closing shall not have been breached in any material respect.

(c)    *Notification of NASDAQ for Listing*.  The Purchaser has submitted a notification of listing of the Shares to NASDAQ, such listing to be effective as of the Closing Date, subject to the filing of required documentation, notice of issuance and/or other usual requirements at least fifteen (15) days prior to the Closing Date and has not received any notification of objection from NASDAQ with respect to such listing.

(d)    *Purchaser's Deliveries*.  Each of the deliveries required to be made by the Purchaser pursuant to Sections 2.3.2(b), and 2.3.2(e) shall have been so delivered.

**SECTION 9.3.  Conditions to Purchaser's Obligation.**  The Purchaser's obligation to effect, and to cause the relevant Designated Purchasers to effect, the Closing shall be subject to the fulfillment (or express written waiver by the Purchaser), at or prior to the Closing, of each of the following conditions:

(a)    *No breach of Representations and Warranties*.  Each of the representations and warranties set forth in Article IV, disregarding all materiality and Material Adverse Effect qualifications contained therein, shall be true and correct (i) as if restated on and as of the Closing Date or (ii) if made as of a date specified therein, as of such date, except in each case for any failure to be true and correct that has not had or would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

(b)    *No breach of Covenants*.  The material covenants, obligations and agreements contained in this Agreement to be complied with by the Sellers on or before the Closing shall not have been breached in any material respect, provided that a failure by the Sellers to achieve First Day Ready (as defined in Section 5.28 of the Sellers Disclosure Schedule) on or before April 30, 2010 shall not fall within the scope of this condition.

(c)    *Sellers' Deliveries.*  Each of the deliveries required to be made by the Sellers pursuant to Section 2.3.2(f) shall have been so delivered except if such deliverable is a Non-Assigned Contract in respect of which a Consent is outstanding.

(d)    *Financial Statements.*  The Sellers shall have delivered to the Purchaser at least five (5) days prior to the Closing Date, the Audited Financial Statements and Unaudited September 30, 2008 Financial Statements as required by and pursuant to Section 5.26 hereof and the Audited Financial Statements and Unaudited September 30, 2008 Financial Statements shall be consistent in all material respects with the Financial Statements for such periods that are included in the Financial Statements (other than to the extent such differences arise from the differences between the carve-out accounting guidelines promulgated by the SEC and the principals used to allocate corporate overhead used by the Sellers in preparing the Financial Statements).

(e)    *Carling Property.*  The premises in Lab 10 of the Carling Property to be leased to the Purchaser in accordance with the Carling Property Lease Agreements shall not have been destroyed or substantially damaged.

## ARTICLE X
## TERMINATION

**SECTION 10.1.** <u>Termination</u>.  This Agreement may be terminated at any time prior to the Closing:

(a)    by mutual written consent of the Primary Parties;

(b)    by either Primary Party, upon written notice to the other:

(i)    if the Closing does not take place on or before April 30, 2010.

(ii)    in the event of a material breach by such other Primary Party of such other Primary Party's representations, warranties, agreements or covenants set forth in this Agreement, which breach (x) would result in a failure of the conditions to Closing set forth in Section 9.1(a), Section 9.2(a), Section 9.2(b), Section 9.3(a) or Section 9.3(b), as applicable, and (y) is not cured within 30 days from receipt of a written notice from the non-breaching Primary Party;

(iii)    if the U.S. Bidding Procedures Order and the Canadian Sales Process Order are not entered by the respective courts by October 19, 2009 in the case of any termination pursuant to this clause (iii) by the Purchaser or October 30, 2009 in the case of any termination pursuant to this clause (iii) by the Main Sellers, <u>provided however</u>, that the Main Sellers shall only have the right to terminate pursuant to this Section 10.1(b)(iii) if they are not otherwise in breach of Section 5.1 or Section 5.2;

(iv)    if the U.S. Sale Order and Canadian Approval and Vesting Order are not entered into by December 17, 2009;

(v)     upon the entry of an order by the Bankruptcy Court authorizing an Alternative Transaction;

(vi)    if the EMEA Asset Sale Agreement is terminated in accordance with its terms;

(vii)   if a Government Entity in the U.S., Canada or the United Kingdom issues a ruling or Final Order prohibiting the transactions contemplated hereby; or

(viii)  if the Auction is not completed by December 11, 2009;

(c)     by the Purchaser in the event that the Sellers fail to consummate the Closing in breach of Section 2.3, within ten (10) Business Days of a written demand by the Purchaser to consummate the Closing;

(d)     by the Purchaser if any of the Sellers withdraw or seek authority to withdraw the Canadian Approval and Vesting Order Motion or the U.S. Bidding Procedures and Sale Motion, or publicly announce any stand-alone plan of reorganization or plan of arrangement in respect of the Business or liquidation or winding up of all or substantially all of the Assets or the EMEA Assets or any of the Sellers or the EMEA Sellers (or support any such plan filed by any other Person);

(e)     by the Main Sellers upon the entry of an order by the Bankruptcy Court authorizing a Sponsored Reorganization Plan; or

(f)     by the Purchaser if premises in Lab 10 of the Carling Property to be leased to the Purchaser in accordance with the Carling Property Lease Agreements is destroyed or substantially damaged,

provided, however, that the right to terminate this Agreement pursuant to Section 10.1(b)(i), Section 10.1(b)(ii), Section 10.1(b)(iii), Section 10.1(b)(iv), Section 10.1(b)(vi) and Section 10.1(b)(viii) shall not be available to any Party whose breach hereof has been the principal cause of, or has directly resulted in, the event or condition purportedly giving rise to a right to terminate this Agreement under such clauses; and further provided however, that a Party shall not be permitted to terminate under Section 10.1(b)(ii) if such Party is then itself in material breach of this Agreement.

### SECTION 10.2.  Termination Payments.

(a)     In the event that this Agreement is terminated by either Primary Party pursuant to Section 10.1(b)(v) or by the Purchaser pursuant to Section 10.1(b)(ii), Section 10.1(c) or Section 10.1(d) or by the Main Sellers pursuant to Section 10.1(b)(iii), Section 10.1(b)(iv), Section 10.1(b)(viii) or Section 10.1(e) or in the event that the EMEA Asset Sale Agreement is terminated by the Purchaser pursuant to clause 15.4.4 or clause 15.4.5 of the EMEA Asset Sale Agreement, then the Sellers shall pay to the Purchaser in immediately available funds, (i) within two (2) Business Days following such termination (other than with respect to any termination pursuant to Section 10.1(b)(v)) or (ii) within two (2) Business Days following the consummation of an Alternative Transaction that is

consummated at any time on or prior to the date that is twelve (12) months following any termination pursuant to Section 10.1(b)(v), a cash fee equal to $10,696,000 (the "**Break-Up Fee**"). Additionally, if this Agreement is terminated by either Party pursuant to Section 10.1 (other than Section 10.1(a) or by Sellers pursuant to Section 10.1(b)(ii) or pursuant to Section 10.1(b)(vi) to the extent that no EMEA Expense Reimbursement (as defined in the EMEA Asset Sale Agreement) is payable under the EMEA Asset Sale Agreement), the Sellers shall pay to the Purchaser an amount in cash equal to the total amount of all reasonable and documented fees, costs and expenses incurred by the Purchaser in connection with the preparation, execution and performance of this Agreement and the transactions contemplated hereby, including all filing and notification fees, and all fees and expenses of the Purchaser and its Affiliates in an amount not to exceed $3,565,333 (the "**Expense Reimbursement**"). The Sellers acknowledge and agree that the Expense Reimbursement is a reasonable amount given the size and complexity of the transactions contemplated by this Agreement. The Expense Reimbursement shall be paid by wire transfer or other means acceptable to the Purchaser not later than two (2) Business Days following the receipt by the Main Sellers of a written notice from the Purchaser describing the fees and expenses which constitute the Expense Reimbursement in reasonable detail (the "**Expense Reimbursement Notice**").

      (b)    Notwithstanding anything to the contrary in this Agreement, the payment of any fees payable pursuant to Section 10.2(a) shall be the sole and exclusive remedy of the Purchaser, whether at Law or in equity, under this Agreement in the event this Agreement is terminated in accordance with Article X and the Purchaser is paid such fees.

      (c)    The Sellers' obligation to pay the Expense Reimbursement and the Break-Up Fee pursuant to this Section 10.2 shall survive termination of this Agreement and shall, to the extent owed by the U.S. Debtors, constitute an administrative expense of the U.S. Debtors under Section 503(b) of the U.S. Bankruptcy Code.

      (d)    Notwithstanding anything to the contrary herein, the Sellers' obligation to pay the Break-Up Fee and Expense Reimbursement pursuant to this Section 10.2 is expressly subject to entry of the U.S. Bidding Procedures Order and the Canadian Sales Process Order.

    **SECTION 10.3.** **Effects of Termination.** If this Agreement is terminated pursuant to Section 10.1:

      (a)    all further obligations of the Parties under or pursuant to this Agreement shall terminate without further liability of any Party to the other except for the provisions of (i) Section 5.7 (Public Announcements), (ii) Section 5.10 (Transaction Expenses), (iii) Section 5.11 (Confidentiality), (iv) Section 7.4(b)(ii) (Other Employee Covenants), (v) Section 10.1 (Termination) (vi) Section 10.2 (Termination Payments), (vii) Section 10.3 (Effects of Termination) and (vii) Article XI (Miscellaneous); provided, that neither the termination or anything in this Section 10.3 shall relieve any Party hereto from liability for any breach of this Agreement occurring before the termination hereof and thereof;

(b) except as required by applicable Law, the Purchaser shall return to the Sellers or destroy all documents, work papers and other material of any of the Sellers relating to the transactions contemplated hereby, whether so obtained before or after the execution hereof; and

(c) the provisions of the Confidentiality Agreement will continue in full force and effect.

## ARTICLE XI
## MISCELLANEOUS

### SECTION 11.1. Survival of Representations and Warranties or Covenants.

(a) No representations or warranties, covenants or agreements of the Sellers or the Other Sellers in this Agreement shall survive beyond the Closing Date, except for covenants and agreements that by their terms are to be satisfied after the Closing Date, which shall survive until satisfied in accordance with their terms. For the avoidance of doubt, the covenants of the Sellers in Section 5.26, Article VI and Article VIII shall survive until fully discharged.

(b) No representations or warranties, covenants or agreements of the Purchaser in this Agreement shall survive beyond the Closing Date, except the representations and warranties, covenants and agreements of the Purchaser set forth in Section 3.1, Section 3.2, Section 3.5, Section 3.7 (unless the Purchaser exercises the Cash Replacement Election in full), Section 5.27 and Section 5.36 shall survive beyond the Closing Date, as shall any covenants and agreements set forth in Article VI and Article VIII and covenants and agreements of the Purchaser that by their terms are to be satisfied after the Closing Date, which shall survive until satisfied in accordance with their terms.

SECTION 11.2. Remedies. No failure to exercise, and no delay in exercising, any right, remedy, power or privilege under this Agreement or the documents referred to in this Agreement by any Party will operate as a waiver of such right, remedy, power or privilege, nor will any single or partial exercise of any right, remedy, power or privilege under this Agreement preclude any other or further exercise of such right, remedy, power or privilege or the exercise of any other right, remedy, power or privilege. To the maximum extent permitted by applicable Law, (a) no waiver that may be given by a Party shall be applicable except in the specific instance for which it is given and (b) no notice to or demand on one Party shall be deemed to be a waiver of any right of the Party giving such notice or demand to take further action without notice or demand.

SECTION 11.3. Third-Party Beneficiaries. The acknowledgements, rights, undertakings, representations or warranties contained in this Agreement and expressed to be for the benefit of the EMEA Sellers, the Joint Administrators or the Joint Israeli Administrators (including the provisions of Section 2.2, Section 3.7, Section 5.4(c), Section 5.27, Section 5.37, Section 6.8, Section 6.9, Section 5.28 of the Sellers Disclosure Schedule (other than subsection (k)) and Article VIII) (collectively, the "**Third Party Provisions**") shall inure to, are expressly intended to be for the benefit of, and shall be enforceable by, each of the EMEA Sellers, the Joint Administrators or the Joint Israeli Administrators (and their applicable successors or

150

representatives) (the "**Third Party Beneficiaries**"), as applicable, and shall be binding on the Purchaser and its successors and assigns. In the event that any Party or any of its successors or assigns (a) consolidates with or merges into any other Person and shall not be the continuing or surviving corporation or entity in such consolidation or merger, or (b) transfers all or a majority of its properties and assets to any Person, then, and in each such case, proper provision shall be made so that the successors and assigns of such Party, assumes the obligations thereof contained in the Third Party Provisions or otherwise in this Agreement. Except as provided in this Section 11.3, this Agreement is for the sole benefit of the Parties and their permitted assigns and nothing herein, express or implied, is intended to or shall confer upon any other Person any legal or equitable right, benefit or remedy of any nature whatsoever under or by reason of this Agreement.

SECTION 11.4.  **Consent to Amendments; Waivers.**  No Party shall be deemed to have waived any provision of this Agreement or any of the other Transaction Documents unless such waiver is in writing, and then such waiver shall be limited to the circumstances set forth in such written waiver. This Agreement and the Ancillary Documents shall not be amended, altered or qualified except by an instrument in writing signed by all the parties hereto or thereto, as the case may be. Notwithstanding the foregoing provisions of this Section 11.4, (a) no Third Party Beneficiary shall be deemed to have waived any Third Party Provision unless such waiver is in writing, and then such waiver shall be limited to the circumstances set forth in such written waiver and (b) no Third Party Provision shall be amended, altered or qualified except by an instrument in writing signed by all the parties hereto and the Third Party Beneficiaries affected by such amendment, alteration or qualification.

SECTION 11.5.  **Successors and Assigns.**  This Agreement shall inure to the benefit of and be binding upon the Parties and their respective successors and permitted assigns. Neither this Agreement nor any of the rights, interests or obligations hereunder may be assigned (whether directly or indirectly) by any Party without the prior written consent of the other Party, which consent may be withheld in such party's sole discretion, except for (i) direct assignment by any Seller to an Affiliate (provided that the applicable Seller remains liable jointly and severally with its assignee Affiliate for the assigned obligations), (ii) direct assignment by the Purchaser to a Designated Purchaser (provided that the Purchaser remains liable jointly and severally with its assignee Designated Purchaser for the assigned obligations), (iii) direct assignment by a U.S. Debtor to a succeeding entity following such U.S. Debtor's emergence from Chapter 11, and (iv) direct assignment by any of the Canadian Debtors pursuant to any plan of arrangement approved by the Canadian Court, which will not require the consent of the Purchaser.

SECTION 11.6.  **Governing Law; Submission to Jurisdiction; Waiver of Jury Trial.**

(a)    Any questions, claims, disputes, remedies or Actions arising from or related to this Agreement, and any relief or remedies sought by any Parties, shall be governed exclusively by the Laws of the State of New York without regard to the rules of conflict of laws of the State of New York or any other jurisdiction.

(b)    To the fullest extent permitted by applicable Law, each Party: (i) agrees that any claim, action or proceeding by such Party seeking any relief whatsoever

151

arising out of, or in connection with, this Agreement, or the transactions contemplated hereby shall be brought only in (a) either the U.S. Bankruptcy Court, if brought prior to the entry of a final decree closing the Chapter 11 Cases or the Canadian Court, if brought prior to the termination of the CCAA Cases and (b) in the United States District Court for the Southern District of New York or, if that court lacks subject matter jurisdiction, the Supreme Court of the State of New York, County of New York (collectively, the "**New York Courts**") or the *Superior Court of Justice* for the Province of Ontario ("**Ontario Court**"), if brought after entry of a final decree closing the Chapter 11 Cases and termination of the CCAA Cases, and shall not be brought in each case, in any other court in the United States of America, Canada or any court in any other country; (ii) agrees to submit to the jurisdiction of the U.S. Bankruptcy Court, the Canadian Court, the New York Courts and the Ontario Court, as applicable, pursuant to the preceding clauses (i)(a) and (b) for purposes of all legal proceedings arising out of, or in connection with, this Agreement or the transactions contemplated hereby; (iii) waives and agrees not to assert any objection that it may now or hereafter have to the laying of the venue of such action brought in any such court or any claim that any such action brought in such court has been brought in an inconvenient forum; (iv) agrees that the mailing of process or other papers in connection with any such action or proceeding in the manner provided in Section 11.7 or any other manner as may be permitted by Law should be valid and sufficient service thereof; and (v) agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in any other jurisdictions by suit on the judgment and in any other manner provided by applicable Law.

(c)     Section 11.6(b) shall not limit the jurisdiction of (i) the Accounting Arbitrator set forth in Section 2.2.4.1(b) with respect to all disputes hereunder which the Parties have agreed to be arbitrated by the Accounting Arbitrator, or (ii) the TSA Arbitrator set forth in Section 5.28(m)(i) of Section 5.28 of the Sellers Disclosure Schedule with respect to all disputes thereunder which the Parties have agreed to be arbitrated by the TSA Arbitrator, although claims described in the foregoing may be asserted in the courts referred to in Section 11.6(b) for purposes of enforcing the jurisdiction and judgments of the Accounting Arbitrator and the TSA Arbitrator.

(d)     EACH PARTY HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION DIRECTLY OR INDIRECTLY ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS AGREEMENT, ANY ANCILLARY AGREEMENT OR ANY TRANSACTION CONTEMPLATED HEREBY OR THEREBY. EACH PARTY (I) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (II) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT AND THE ANCILLARY AGREEMENTS, AS APPLICABLE, BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION 11.6.

**SECTION 11.7.  Notices.**  All demands, notices, communications and reports provided for in this Agreement shall be in writing and shall be either sent by facsimile transmission with confirmation to the number specified below or personally delivered or sent by

152

reputable overnight courier service (delivery charges prepaid) to any Party at the address specified below, or at such address, to the attention of such other Person, and with such other copy, as the recipient Party has specified by prior written notice to the sending Party pursuant to the provisions of this Section 11.7.

If to the **Purchaser** to:

**Ciena Corporation**
1201 Winterson Road
Linthicum, Maryland 21090
Attention: David Rothenstein,
            Senior Vice President and General Counsel
Facsimile: +1-410-865-8001

With copies (that shall not constitute notice) to:

**Latham & Watkins LLP**
555 Eleventh Street, NW
Suite 1000
Washington, DC 20004
Attention: David S. Dantzic
            Joseph A. Simei
Facsimile: +1-202-637-2201

and

**Stikeman Elliott LLP**
5300 Commerce Court West
199 Bay Street
Toronto, Ontario  M5L 1B9
Attention: Brian M. Pukier
Facsimile: +1-416-947-0866

If to the **Main Sellers** or the **Sellers**, to:

**Nortel Networks Corporation**
5945 Airport Road
Suite 360
Mississauga, ON  L4V 1R9
Attention: Anna Ventresca
            General Counsel – Corporate and Corporate Secretary
Facsimile: +1-905-863-7739

and

**Nortel Networks Limited**
5945 Airport Road

Suite 360
Mississauga, ON  L4V 1R9
Attention:  Anna Ventresca
       General Counsel – Corporate and Corporate Secretary
Facsimile:  +1-905-863-7739

and

**Nortel Networks Inc.**
Legal Department
220 Athens Way, Suite 300
Nashville, Tennessee  37228
Attention:  Lynn C. Egan
       Assistant Secretary
Facsimile:  +1-615-432-4067

With copies (that shall not constitute notice) to:

**Nortel Networks Inc.**
Legal Department
220 Athens Way, Suite 300
Nashville, Tennessee  37228
Attention:  Robert Fishman
       Senior Counsel
Facsimile:  +1-347-427-3815 & +1-615-432-4067

and

**Cleary Gottlieb Steen & Hamilton LLP**
One Liberty Plaza
New York, NY 10006
Attention:  Daniel S. Sternberg
Facsimile:  +1-212-225-3999

and

**Ogilvy Renault LLP**
200 Bay Street
Suite 3800, P.O. Box 84
Royal Bank Plaza, South Tower
Toronto, Ontario  M5J 2Z4
Attention:  Michael J. Lang
Facsimile:  +1-416-216-3930

and

**Baker, Donelson, Bearman, Caldwell & Berkowitz, PC**
211 Commerce Street
Nashville, Tennessee 37201
Attention: Robert J. Looney
Facsimile: +1-615-744-5647

Any such demand, notice, communication or report shall be deemed to have been given pursuant to this Agreement when delivered personally, when confirmed if by facsimile transmission, or on the calendar day after deposit with a reputable overnight courier service, as applicable.

**SECTION 11.8. Exhibits; Sellers Disclosure Schedule.**

(a)     The Sellers Disclosure Schedule and the Exhibits attached hereto constitute a part of this Agreement and are incorporated into this Agreement for all purposes as if fully set forth herein.

(b)     For purposes of the representations and warranties of the Sellers contained in this Agreement, disclosure in any Section of the Sellers Disclosure Schedule of any facts or circumstances shall be deemed to be adequate response and disclosure of such facts or circumstances with respect to all representations or warranties by the Sellers calling for disclosure of such information, whether or not such disclosure is specifically associated with or purports to respond to one or more of such representations or warranties, if it is reasonably apparent from the Sellers Disclosure Schedule that such disclosure is applicable. The inclusion of any information in any Section of the Sellers Disclosure Schedule or other document delivered by the Sellers pursuant to this Agreement shall not be deemed to be an admission or evidence of the materiality of such item, nor shall it establish a standard of materiality for any purpose whatsoever.

**SECTION 11.9. Counterparts.** The Parties may execute this Agreement in two or more counterparts (no one of which need contain the signatures of all Parties), each of which will be an original and all of which together will constitute one and the same instrument. Delivery of an executed counterpart of a signature page to this Agreement by telecopier or electronic mail attachment shall be effective as delivery of a manually executed counterpart of this Agreement.

**SECTION 11.10. No Presumption.** The Parties agree that this Agreement was negotiated fairly between them at arm's length and that the final terms of this Agreement are the product of the Parties' negotiations. Each Party represents and warrants that it has sought and received experienced legal counsel of its own choosing with regard to the contents of this Agreement and the rights and obligations affected hereby. The Parties agree that this Agreement shall be deemed to have been jointly and equally drafted by them, and that the provisions of this Agreement therefore should not be construed against a Party on the grounds that such Party drafted or was more responsible for drafting the provisions.

**SECTION 11.11. Severability.** If any provision, clause, or part of this Agreement, or the application thereof under certain circumstances, is held invalid, illegal or incapable of

155

being enforced in any jurisdiction, (i) as to such jurisdiction, the remainder of this Agreement or the application of such provision, clause or part under other circumstances, and (ii) as for any other jurisdiction, any provision of this Agreement, shall not be affected and shall remain in full force and effect, unless, in each case, such invalidity, illegality or unenforceability in such jurisdiction materially impairs the ability of the Parties to consummate the transactions contemplated by this Agreement. Upon such determination that any clause or other provision is invalid, illegal or incapable of being enforced in such jurisdiction, the Parties shall negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties as closely as possible in a mutually acceptable manner in order that the transactions contemplated hereby be consummated as originally contemplated to the greatest extent possible even in such jurisdiction.

**SECTION 11.12. Entire Agreement.**

(a)     This Agreement, the EMEA Asset Sale Agreement, the Ancillary Agreements and the Confidentiality Agreement set forth the entire understanding of the Parties relating to the subject matter thereof, and all prior or contemporaneous understandings, agreements, representations and warranties, whether written or oral, are superseded by this Agreement, the Ancillary Agreements and the Confidentiality Agreement, and all such prior or contemporaneous understandings, agreements, representations and warranties are hereby terminated. In the event of any irreconcilable conflict between this Agreement and any of the Ancillary Agreements or the Confidentiality Agreement, the provisions of this Agreement shall prevail, regardless of the fact that certain Ancillary Agreements, such as the Local Sale Agreement, may be subject to different governing Laws (unless the Ancillary Agreement expressly provides otherwise).

(b)     For the sake of clarity, the provisions of the EMEA Asset Sale Agreement have been drafted separately from the provisions in the body of this Agreement to reflect differing market practices in the countries of jurisdiction of the EMEA Sellers. Unless the context specifically requires, the provisions contained in the body of this Agreement and the provisions of the EMEA Asset Sale Agreement shall be interpreted independently and without reference to each other.

**SECTION 11.13. Availability of Equitable Relief.** Each Party agrees that irreparable damage would occur in the event that any of the provisions of this Agreement that it is required to perform were not performed in accordance with their specific terms or were otherwise breached. Accordingly, subject to the limitations set forth in this Section 11.13 and Section 10.2(a), each Party shall be entitled to equitable relief to prevent or remedy breaches of this Agreement prior to the Closing, and for any breach of Section 5.36, Section 8.1, Section 8.2, Section 8.3, Section 8.4, Section 8.5 and Section 8.6 following the Closing, without the proof of actual damages, including in the form of an injunction or injunctions or orders for specific performance in respect of such breaches. Each Party agrees to waive any requirement for the security or posting of any bond in connection with any such equitable remedy. Each Party further agrees that the only permitted objection that it may raise in response to any action for equitable relief is that it contests the existence of a breach or threatened breach of the provisions of this Agreement. For avoidance of doubt, under no circumstances shall the Sellers be liable for punitive damages or indirect, special, incidental, or consequential damages arising out of or in connection with this Agreement or the transactions contemplated hereby or any breach or alleged breach of any of the terms hereof, including damages alleged as a result of tortious conduct.

**SECTION 11.14.  Bulk Sales Laws.**  Each Party waives compliance by the other Party with any applicable bulk sales Law.

**SECTION 11.15.  Main Sellers as Representatives of Other Sellers.**

(a)     For all purposes of this Agreement:

(i)     each Other Seller listed in Section 11.15(a)(i) of the Sellers Disclosure Schedule hereby irrevocably appoints NNC as its representative;

(ii)     each Other Seller listed in Section 11.15(a)(ii) of the Sellers Disclosure Schedule hereby irrevocably appoints NNL as its representative; and

(iii)     each Other Seller listed in Section 11.15(a)(iii) of the Sellers Disclosure Schedule hereby irrevocably appoints NNI as its representative.

(b)     Pursuant to Section 11.15(a), each of NNC, NNL and NNI shall expressly have the power to, in the name and on behalf of each of its Respective Affiliates (as defined below), (i) make all decisions and carry out any actions required or desirable in connection with this Agreement, (ii) send and receive all notices and other communications required or permitted hereby, and (iii) consent to any amendment, waivers and modifications hereof.

(c)     For the purposes of this Agreement, **"Respective Affiliates"** means: (i) with respect to NNC, each Other Seller listed in Section 11.15(a)(i) of the Sellers Disclosure Schedule; (ii) with respect to NNL, each Other Seller listed in Section 11.15(a)(ii) of the Sellers Disclosure Schedule, and (iii) with respect to NNI, all the other U.S. Debtors and each Other Seller listed in Section 11.15(a)(iii) of the Sellers Disclosure Schedule.

(d)     Each Respective Affiliate shall indemnify the Main Seller that acts as representative of such Respective Affiliate pursuant to this Section for, and hold it harmless against, any loss, liability or expense, including reasonable attorneys' fees, incurred by such Main Seller without gross negligence, bad faith or willful misconduct, for serving in the capacity of representative of such Respective Affiliate hereunder.

**SECTION 11.16.  Obligations of Sellers.**  When references are made in this Agreement to certain Sellers causing Other Sellers or other Affiliate(s) to undertake (or to not undertake) certain actions, or agreements are being made on behalf of certain Other Sellers or other Affiliates, "Sellers" for purposes of such clause shall be deemed to mean, respectively, NNI (in the case of a U.S. Debtor) and NNL (in the case of a Canadian Debtor — other than NNC - and a Non-Debtor Seller).

**SECTION 11.17.  Execution by Other Sellers.**  The Purchaser hereby acknowledges that the Other Sellers are not executing this Agreement as of the date hereof.  This Agreement shall be binding on all parties that have executed this Agreement from the time of such execution, regardless of whether all Sellers have done so.  Between the date hereof and the Closing Date, the Main Sellers hereby agree that they shall cause each Other Seller to execute a

157

counterpart to this Agreement as promptly as practicable but in no event later than the day that is sixty (60) days after the date hereof, agreeing to be bound as a Seller under this Agreement and authorizing NNC, NNL or NNI, as applicable, to act as its representative under Section 11.15.

**[Remainder of this page intentionally left blank. Signature page follows.]**

158

**IN WITNESS WHEREOF**, the Parties have duly executed this Asset Sale Agreement as of the date first written above.

CIENA CORPORATION

Per: _____

Gary B. Smith

President and Chief Executive Officer

**NORTEL NETWORKS CORPORATION**

Per: _____

Pavi Binning

Executive Vice-President, Chief
Financial Officer and Chief Restructuring
Officer

Per: _____

Anna Ventresca

General Counsel – Corporate and
Corporate Secretary


**NORTEL NETWORKS LIMITED**

Per: _____

Pavi Binning

Executive Vice-President, Chief
Financial Officer and Chief Restructuring
Officer

Per: _____

Anna Ventresca

General Counsel – Corporate and
Corporate Secretary


**NORTEL NETWORKS INC.**

Per: _____

Anna Ventresca

Chief Legal Officer

**[OTHER SELLERS]**

Per: _____

 Name:

 Title:

Signature Page – Asset Sale Agreement

# APPENDIX "C"