Intellectual Property owned by a Third Party that is, as of the date hereof, incorporated in or used in connection with the design, development, testing, manufacturing, sale, distribution, support or servicing of any Products or the provision of Services (collectively, the "**Inbound License Agreements**"), indicating for each Inbound License Agreement whether such Contract is included in the definition of "Seller Contracts" hereunder, and the title and the parties thereto.

(iii)    To the Knowledge of the Sellers, Section 4.5(j)(iii) of the Sellers Disclosure Schedule sets forth a complete and accurate list of all Contracts in effect (other than (x) Patent Cross Licenses, (y) non-exclusive object code licenses granted to end users or other purchasers of Products or non-exclusive licenses granted by the Sellers or their Affiliates or the EMEA Sellers to customers, distributors or suppliers in connection with the manufacture or sale of products or Services and (z) any non-exclusive license granted to any purchaser of any subsidiary or assets of a business unit of the Sellers, the EMEA Sellers or their respective Affiliates the sale of which was consummated prior to January 1, 2007) under which the Sellers or their Affiliates or the EMEA Sellers or their Affiliates grant a license to a Third Party under Transferred Intellectual Property (collectively, the "**Outbound License Agreements**"), indicating the title and the parties thereto.

(iv)    To the Knowledge of the Sellers, there is no outstanding dispute or disagreement with respect to (1) any Inbound License Agreement, (2) any Outbound License Agreement or (3) any Patent Cross License, in each case, that materially affects any of the Intellectual Property rights granted to the Purchaser herein.  To the Knowledge of the Sellers, the Sellers have made available to Purchaser or its counsel true and complete copies of each Inbound License Agreement, Outbound License Agreement and Patent Cross License (excluding Omitted Patent Cross Licenses).

(k)    To the Knowledge of the Sellers, Section 4.5(k) of the Sellers Disclosure Schedule sets forth a true and complete list of any Open Source Software incorporated into any of the Products and describes (i) the specific Open Source Software used, (ii) the specific Open Source Software version, (iii) the licensor(s) of the specific Open Source Software, and (iv) the Products or portions thereof into which such Open Source Software is incorporated.

(l)    To the Knowledge of the Sellers, the conduct of the Business, including the design, development, testing, manufacturing, sale, distribution, support or servicing of any Products or the use or exploitation of any Transferred Intellectual Property, EMEA Intellectual Property or Licensed Intellectual Property or the provision of any Services by any Seller or its Affiliates or the EMEA Sellers or their Affiliates in connection with any of the foregoing, does not infringe upon, misappropriate or otherwise violate in any material respect any Intellectual Property of any Third Party.

(m)     Notwithstanding any provision herein to the contrary, this Section 4.5 consists of the sole representation and warranty in this Agreement regarding non-infringement, non-violation and non-misappropriation of Intellectual Property.

**SECTION 4.6.  Litigation.**  As of the date hereof, except for the Bankruptcy Proceedings and except as set forth in Section 4.6 of the Sellers Disclosure Schedule, there is no Action pending or, to the Knowledge of the Sellers, threatened before any Government Entity or arbitration tribunal against any Seller involving the Business (excluding the EMEA Business) or the Assets or that seeks to restrain or prohibit or otherwise challenge the consummation, legality or validity of the transactions contemplated hereby or that has had, or otherwise would reasonably be expected to have a Material Adverse Effect.  To the Knowledge of the Sellers, except for the Bankruptcy Proceedings, there is no outstanding Order to which the Sellers are subject in respect of the Business (excluding the EMEA Business) or the Assets, nor are any of the Sellers in default with respect to any such Order.

**SECTION 4.7.  Financial Statements.**  Section 4.7 of the Sellers Disclosure Schedule sets forth the unaudited combined (i) balance sheet of the Business as of December 31, 2008 (the "**Balance Sheet Date**") and December 31, 2007, (ii) statements of earnings and cash flows of the Business for each of the fiscal years ended December 31, 2008 and December 31, 2007, (iii) balance sheet of the Business as of June 30, 2009 and (iv) statements of earnings and cash flows of the Business for the six (6) months ended June 30, 2009 (collectively, the "**Financial Statements**").  The Financial Statements were prepared in accordance with GAAP (subject to normal year-end adjustments, the effect of which are not material in nature, and except for the omission of certain footnotes and other presentation items required by GAAP with respect to audited financial statements) using the Nortel Accounting Principles, and fairly present in all material respects the combined financial position, results of operations and cash flows of the Business as of the date thereof and for the periods covered thereby.

**SECTION 4.8.  Compliance with Laws; Consents.**

(a)     Except as set forth in Section 4.8 of the Sellers Disclosure Schedule, no Seller is in violation of any Law applicable to the operation of the Business or the Assets, except for such violations as would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, and none of the Sellers has received any written notice or written claims from any Government Entity within the twelve (12) months preceding the date hereof relating to any material non-compliance of the Business or the Assets with any applicable Law nor are there, to the Knowledge of the Sellers, any such notice or claims threatened or pending, except where such notices or claims would not, individually or in the aggregate, materially hinder, delay or impair the performance by the Sellers of any of their obligations under the Transaction Documents.

(b)     (i) All of the Consents of Government Entities necessary for, or otherwise material to, the conduct of the Business (excluding the EMEA Business) as conducted on the date hereof, have been duly obtained and are in full force and effect and (ii) the relevant Sellers are in compliance with the terms of each of such Consents, in each case except for such violations as would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.  None of the Sellers has received any notice or written claims from any Government Entity relating to any material non-compliance of the

73

Business (excluding the EMEA Business) or the Assets with such Consents nor are there, to the Knowledge of the Sellers, any such notice or claims threatened or pending, except where such claims would not, individually or in the aggregate, materially hinder, delay or impair the performance by the Sellers of any of their obligations under the Transaction Documents.

### SECTION 4.9. Real Property.

(a)      Section 4.9(a)(i) of the Sellers Disclosure Schedule lists, as of the date hereof, all real property which is owned by the Sellers in respect of which a real property lease or license between the applicable Seller and the Purchaser or one or more Designated Purchasers shall be entered into on Closing on terms set forth in the Real Estate Terms and Conditions  (collectively, the "**Owned Real Property**").  Section 4.9(a)(ii) of the Sellers Disclosure Schedule lists, as of the date hereof, all leases, subleases, space licenses or other occupancy agreements (collectively, "**Leases**") of real property (the "**Leased Real Property**") to be assigned to the Purchaser or one or more Designated Purchasers on Closing on the terms set forth in the Real Estate Terms and Conditions.  Section 4.9(a)(iii) of the Sellers Disclosure Schedule lists, as of the date hereof, those Leases in respect of which an Occupancy Agreement is to be entered into on Closing on the terms set forth in the Real Estate Terms and Conditions (collectively, the "**6 Month Locations**").  Section 4.9(a)(iv) of the Sellers Disclosure Schedule lists, as of the date hereof, those Leases in respect of which a short-term license is to be entered into on Closing on the terms set forth in the Real Estate Terms and Conditions (collectively, the "**Short-Term Licensed Property**" and together with the Owned Real Property, the Leased Real Property and the 6 Month Locations, the "**Real Property**").  Section 4.9(a)(v) of the Sellers Disclosure Schedule lists, as of the date hereof, those locations where any Owned Assets used in carrying the Business are located.  The Sellers have provided true, complete and correct copies of the Leases with respect to the Real Property to the Purchaser, including any amendments thereto.  There are no written or oral subleases, licenses, concessions, occupancy agreements or other contractual obligations granting to any other Person the right of use or occupancy of any part of the Real Property which is occupied for purposes of the Business, or which will be occupied for purposes of the Business on or after Closing in accordance with the segregation, consolidation and demising plans contemplated by the Real Estate Terms and Conditions, save and except with respect to such rights retained by the Sellers or granted to the purchasers of other Nortel business segments which are co-located at such premises, the effect of which would not have a material adverse effect on the lease, license or occupancy by the Purchaser or any Designated Purchaser of such part of the Real Property to be occupied for the purposes of the Business.

(b)      The Sellers have received all Consents that are necessary in connection with the Sellers' occupancy, ownership or leasing of the Real Property, and the present use of the Real Property by the Sellers does not violate the Consents applicable thereto, except where the (A) failure to receive or (B) violation of a Consent would not have a Material Adverse Effect.

(c)      Except to the extent that any Cure Cost is payable with respect to any Lease with respect to a breach of such Lease prior to the Petition Date, and except for the Bankruptcy Proceedings, (i) no Seller is in material breach or default of its obligations under any Lease, (ii) no condition exists that with notice or lapse of time or both would constitute a

74

material default by any Seller under any Lease and (iii) to the Knowledge of the Sellers, no other party to any Lease is in breach or default thereunder, except in each case, as would not, individually or in the aggregate, reasonably be expected to result in the termination of such Lease or otherwise have a Material Adverse Effect.

(d)      The Sellers have not received written notice of any threatened (i) condemnation, eminent domain, expropriation or similar proceeding affecting the Real Property, (ii) proceeding to change the zoning classification of any portion of the Real Property or (iii) imposition of any special assessments for public betterments affecting the Real Property, which in each of clauses (i), (ii) and (iii) would materially and adversely impact the use of the Real Property for the purposes for which it is being used as of the date hereof.

### SECTION 4.10.  Labor and Employee Benefits Matters.

(a)      Section 4.10(a)(i) of the Sellers Disclosure Schedule contains an accurate and complete list, by country, of (i) all material Seller Employee Plans and (ii) all employment agreements or other commitments for employment or engagement by the Sellers or their Affiliates with respect to Employees that deviate in any material respect from the standard form offer letter for the applicable jurisdiction or provide for retention, severance or change in control payments or benefits to the Employees, excluding in each case Seller Employee Plans.  The Sellers have provided the Purchaser with a true and complete copy of the plan document or summary plan description of each material Seller Employee Plan or, if such plan document or summary plan description does not exist, an accurate written summary of such Seller Employee Plan.  The Sellers have provided the Purchaser or its Affiliate with a true and complete copy of the standard form (or where such individual agreement is materially different from the standard form, the individual written agreement) of such employment, retention, change in control or severance agreements between the Sellers (or any Affiliate of Sellers (excluding EMEA Sellers)) and any Employee.

(b)      The information contained in Section 4.10(b) of the Sellers Disclosure Schedule in respect of the Employees (the "**Employee Information**") is accurate in all material respects as of the date hereof, and sets forth with respect to each Employee (except where that is not permissible under applicable data privacy Laws): (i) unique identifier, (ii) service date, (iii) job title/position, (iv) annual base salary and annual incentive plan target amount, (v) work location, (vi) visa type, if any and expiry date, (vii) the applicable Collective Labor Agreement, works council or other applicable labor organization, if any, (viii) leave status, reason for the leave, the start date of the leave and expected return date, (ix) vacation accrual rate, (x) status as full-time or part-time, (xi) home country of residence, (xii) Job Complexity Indicator, (xiii) country of payroll, (xiv) sales indicator, (xv) Exempt/Non-Exempt status (U.S. only), (xvi) payment currency, (xvii) department/function, to the extent applicable,  (xviii) work schedule and (xix) whether such Employee has any individual written agreement that provides for length of notice or severance payment required to terminate his or her employment in excess of that required by applicable Law or pursuant to a Seller Employee Plan disclosed in Section 4.10(a)(i) of the Sellers Disclosure Schedule as a result of which there could be a payment to such employee in excess of

75

$50,000 in addition to such payment required by applicable Law or such Seller Employee Plan.

(c)      Except as set forth in Section 4.10(c) of the Sellers Disclosure Schedule, there has not been for a period of twelve (12) consecutive months prior to the date hereof, nor is there existent or, to the Sellers' Knowledge, has there been threatened, any strike, material grievance, slowdown, lockout, picketing or work stoppage against the Sellers by or on behalf of the Employees.

(d)      Section 4.10(d) of the Sellers Disclosure Schedule identifies and lists all of the Collective Labor Agreements and works councils or similar labor organizations in effect with respect to the Employees and in the case of Collective Labor Agreements that have expired, whether notice to bargain has been given and the status of the bargaining process. For a period of twelve (12) consecutive months prior to the date hereof, no petition has been filed or proceedings instituted by a union, works council, collective bargaining agent, employee or group of employees with any Government Entity seeking recognition of a collective bargaining agent with respect to any Employees, and, to the Sellers' Knowledge, no such organizational effort is currently being made or has been threatened by or on behalf of any union, works council, employee, group of employees or collective bargaining agent to organize any Employees. The Sellers have provided the Purchaser with a true and complete copy of each Collective Labor Agreement listed in Section 4.10(d) of the Sellers Disclosure Schedule.

(e)      There are no Transferred Employee Plans and, except as set forth in Section 4.10(e) of the Sellers Disclosure Schedule, there are no Seller Employee Plans that are multiemployer plans within the meaning of Section 3(37) of ERISA, and none of the Sellers or any of their ERISA Affiliates has, within the past six (6) years, ever maintained, contributed to or participated in, any such multiemployer plans.

(f)      None of the Sellers or any of their Affiliates (excluding the EMEA Sellers) have, with respect to the Business, any Liability to provide retiree welfare benefits to any Person for any reason, except as may be required by COBRA, a Seller Employee Plan listed in Section 4.10(a)(i) of the Sellers Disclosure Schedule or applicable Law.

**SECTION 4.11. Brokers.** Except for fees and commissions or other similar payments that will be paid or otherwise settled or provided for by the Sellers, no broker, finder, agent or investment banker is entitled to any brokerage, finder's or other similar fee or commission in connection with the transactions contemplated by this Agreement and the other Transaction Documents based upon arrangements made by or on behalf of the Sellers or any of their Affiliates for which the Purchaser is or will become liable, and the Sellers shall indemnify and hold harmless the Purchaser from any claims with respect to any such fees and commissions.

**SECTION 4.12. Taxes.** Except as set forth in the corresponding sections of the Sellers Disclosure Schedules, if any, or with respect to any Taxes, Liens and Claims of the Sellers that will be discharged on the Closing Date as provided for in the U.S. Sales Order and the Canadian Approval and Vesting Orders;

(a)     There are no Liens for Taxes on any Asset (other than Permitted Encumbrances).

(b)     The Sellers have timely filed with the appropriate Tax Authorities all material Tax Returns required to be filed with respect to the Assets and the Business (excluding the EMEA Business) and all such Tax Returns are true, correct and complete in all material respects. All material Taxes due and payable with respect to the Assets and the Business (excluding the EMEA Business) have been timely paid.

(c)     No deficiency for any material amount of Taxes has been claimed, proposed or assessed by any Tax Authority against any Seller and there is no pending audit, examination or other proceeding involving any Seller in respect of any material amount of Taxes, (i), in the case of each Seller not listed on Section 4.12(c)(i) of the Sellers Disclosure Schedule, relating to any Asset or the Business (excluding the EMEA Business) and (ii) in the case of each Seller listed on Section 4.12(c)(ii) of the Sellers Disclosure Schedule, relating to each such Seller.

(d)     No Seller has entered into an agreement or waiver or been requested to enter into an agreement or waiver extending any statute of limitations relating to the assessment, payment or collection of material Taxes relating to any Asset or the Business (excluding the EMEA Business).

(e)     None of the Assets located within the United States or which is owned by a U.S. Debtor (i) is property required to be treated as being owned by another person pursuant to the provisions of Section 168(f)(8) of the Internal Revenue Code of 1954, as amended and in effect immediately prior to the enactment of the Tax Reform Act of 1986, (ii) constitutes "tax-exempt use property" within the meaning of Section 168(h)(1) of the Code and (iii) is "tax-exempt bond financed property" within the meaning of Section 168(g) of the Code.

(f)     The Sellers have, in accordance with applicable Law, invoiced, collected, withheld, reported and remitted to the appropriate Government Entity (within the time prescribed) all material: (i) Transfer Taxes which are due and payable or collectible by the Sellers; (ii) withholding, payroll or employment taxes, and other deductions at source as required by applicable Law; and (iii) all non-resident withholding Taxes as required by applicable Law.

(g)     Any Seller that is selling any Asset that constitutes "taxable Canadian property" as defined under the Income Tax Act (Canada) is not a non-resident of Canada within the meaning of the Income Tax Act (Canada).

(h)     No Seller that is not a "United States person," as such term is defined in Section 7701(a)(30) of the Code, is transferring pursuant to this Agreement any "United States real property interest," as such term is defined in Section 897(c)(1) of the Code.

**SECTION 4.13.  Environmental Matters.**  Except as disclosed in the Sellers Disclosure Schedule, if any:

(a)    The Business (excluding the EMEA Business) is and since January 1, 2005, has been in material compliance with, all applicable Environmental Laws and all material licenses, permits and approvals issued under Environmental Laws.

(b)    All material licenses, permits and approvals required under Environmental Laws required to own or operate the Business (excluding the EMEA Business) have been obtained, and remain in full force and effect.

(c)    None of the Sellers has received any written request for information, or been notified in writing that it is a potentially responsible party, under the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended ("CERCLA"), or any similar state, local or foreign laws that relates in any respect to the Business (excluding the EMEA Business) or any facility used by the Business (excluding the EMEA Business) as of the date hereof.

(d)    There are no writs, injunctions, decrees, orders or judgments to which any of the Sellers is a party that are outstanding, and there are no material actions, suits, claims, orders, proceedings or investigations to which any of the Sellers is a party that are pending or, to the Knowledge of the Sellers, threatened, relating to the compliance of the Sellers with, or the liability of the Sellers under, any Environmental Laws in connection with the Business (excluding the EMEA Business) or any facility used by the Business (excluding the EMEA Business) as of the date hereof.

(e)    None of the real property currently owned, leased or operated by the Sellers in respect of the Business (excluding the EMEA Business), is listed or, to the Knowledge of the Sellers, proposed for listing on the "National Priorities List" under CERCLA, or on the Comprehensive Environmental Response, Compensation and Liability Information System maintained by the United States Environmental Protection Agency, as updated through the Closing Date, or any similar state or foreign list of sites requiring investigation or cleanup.

(f)    To the Knowledge of the Sellers, there has heretofore been no material Release of any Hazardous Material in connection with the Business (excluding the EMEA Business) or the operations of the Business (excluding the EMEA Business).

(g)    The Sellers have made available to, or provided the Purchaser with, true and correct copies of all material environmental assessment reports (including Phase I or Phase II reports) and any other material environmental studies in the possession of the Sellers relating to the Business (excluding the EMEA Business) or its operations.

**SECTION 4.14. Undisclosed Liabilities.**    There are no Assumed Liabilities or EMEA Assumed Liabilities of a type that would be required to be included on a balance sheet of the Business prepared in accordance with GAAP (or reflected in the notes thereto) except Liabilities that (i) in the aggregate are adequately provided for in the Financial Statements; (ii) have been incurred in the Ordinary Course since the date of the last balance sheet included in the Financial Statements; (iii) have been incurred in connection with this Agreement or the transactions contemplated hereby; or (iv) which (not including Liabilities referred to in clauses (i) through (iii) above) would not have a Material Adverse Effect.

**SECTION 4.15.  Reliance On Exemption From Registration Under Section 4(2) of the Securities Act.**

(a)      The Distribution Agent is receiving the ~~Shares~~Convertible Notes (and, in the event of their conversion thereof, the Shares) in its capacity as agent for the Sellers and the EMEA Sellers, and does not exercise independent voting or investment power over the ~~Shares~~Convertible Notes (and, in the event of their conversion thereof, the Shares). The Convertible Notes and the Shares are being acquired by the Sellers and the EMEA Sellers for investment only and not with a view to distribution, except as contemplated by this Agreement. The Sellers and the EMEA Sellers have been advised and understand that the issuance of the ~~Shares~~Convertible Notes (and, in the event of their conversion thereof, the Shares) to the Distribution Agent has not been registered under the Securities Act or under the "blue sky" or similar Laws of any jurisdiction and that the Convertible Notes and the Shares may be resold only in a transaction registered under the Securities Act and in accordance with such "blue sky" or similar Laws as may be applicable, or, subject to the terms and conditions of this Agreement, if an exemption from registration is available. The Sellers and the EMEA Sellers have been advised and understand that the Purchaser, in issuing the ~~Shares~~Convertible Notes (and, in the event of their conversion thereof, the Shares), is relying upon, among other things, the representations and warranties of the Sellers herein in concluding that such issuance is not a "public offering" and is exempt from the registration requirements of the Securities Act.

(b)      Each of the Sellers and the EMEA Sellers is an "accredited investor" as that term is defined in Rule 501(a) of Regulation D under the Securities Act and is able to bear the risk of its investment in the ~~Shares~~Convertible Notes (and, in the event of their conversion thereof, the Shares). Each of the Sellers and the EMEA Sellers have such knowledge and experience in financial and business matters that it is capable of evaluating the merits and risks of acquiring the ~~Shares~~Convertible Notes (and, in the event of their conversion thereof, the Shares).

(c)      Each of the Sellers and the EMEA Sellers understand that no United States federal or state agency has passed on or made any recommendation or endorsement of the Convertible Notes and the Shares or the fairness or suitability of an investment in the Convertible Notes and the Shares nor have such authorities passed upon or endorsed the merits thereof.

(d)      Each of the Sellers and the EMEA Sellers understand that the Convertible Notes and the Shares are restricted securities and must be held until an exemption from registration under the Securities Act is available and all of the requirements of such exemption have been met or unless and until the resale of such Convertible Notes and the Shares is registered under the Securities Act or subject to the terms and conditions of this Agreement and the applicable U.S. securities Laws, an exemption from registration is available.

(e)      The Sellers and the EMEA Sellers have been furnished with all materials relating to the business, finances and operations of the Purchaser and its subsidiaries and materials relating to the offer and transfer of the Convertible Notes and the Shares which have been requested by them. The Sellers and the EMEA Sellers and their

advisors, if any, have been afforded the opportunity to ask such questions of the Purchaser as they deem appropriate for purposes of the investment contemplated hereby. Each of the Sellers and the EMEA Sellers understands that beneficial ownership of the Convertible Notes and the Shares involves a high degree of risk and that each may lose its entire investment in the Convertible Notes and the Shares and that each can afford to do so without material adverse consequences to its financial condition. In choosing to acquire beneficial ownership over any Convertible Notes and the Shares, none of the Sellers or the EMEA Sellers is relying on any information provided by the Purchaser and its subsidiaries, except to the extent provided herein.

(f)     The Sellers, the EMEA Sellers and their respective "Ultimate Parent Entities" (including all entities under the control of such Ultimate Parent Entities) within the meaning of the HSR Act are acquiring, and will hold, the Convertible Notes and the Shares "solely for the purposes of investment" within the meaning of Section 18a(c)(9) of the HSR Act. As of the Closing, neither the Sellers and the EMEA Sellers nor their respective "Ultimate Parent Entities" (including all entities under the control of such Ultimate Parent Entities) within the meaning of the HSR Act, shall hold more than ten million (10,000,000) shares of Common Stock.

**SECTION 4.16.  Representations and Warranties by the Other Sellers.**

Except as set forth in the Sellers Disclosure Schedule, each Other Seller severally but not jointly will, as of the date such Other Seller will execute this Agreement pursuant to Section 11.17, represent and warrant to the Purchaser as follows:

**4.16.1.      Organization and Corporate Power.**

(a)     Such Other Seller is duly organized and validly existing under the Laws of the jurisdiction in which it is organized. Subject to the receipt of the Bankruptcy Consents, at the time it executes this Agreement, such Other Seller will have the requisite corporate or other organizational power and authority necessary to enter into, deliver and perform its obligations pursuant to each of the Transaction Documents to which it is or, at the Closing Date, will become a party.

(b)     Such Other Seller is qualified to do business and to own, lease or operate its properties and assets, including the Assets, as applicable in each jurisdiction in which the nature of its properties or the character of its business relating to the Business (excluding the EMEA Business) requires it to so qualify, except to the extent that the failure to be so qualified would not have or would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

**4.16.2.      Authorization; Binding Effect; No Breach.**

(a)     Subject to the Bankruptcy Consents, the execution, delivery and performance by such Other Seller of the Transaction Documents to which such Other Seller will be a party will have been duly and validly authorized by all corporate or other organizational action by such Other Seller. Subject to the Bankruptcy Consents, and assuming due authorization, execution and delivery by the Purchaser, the Transaction

Documents to which such Other Seller will be a party will constitute a legal, valid and binding obligation of such Other Seller, enforceable against it in accordance with its terms, except to the extent that such enforceability may be limited by applicable principles of equity regarding the availability of remedies (whether in proceeding at law or in equity).

(b)     The execution, delivery and performance by such Other Seller of the Transaction Documents to which such Other Seller will be a party will not conflict with or result in a breach of the terms, conditions or provisions of, constitute a default under, result in a violation of, result in the creation or imposition of any Lien upon any of the Assets, or (subject to the receipt of Consents in connection with the Assigned Contracts and other Consents expressly provided for herein) require any Consent of any Person (other than the Regulatory Approvals and the Bankruptcy Consents) or other action by or declaration, filing or notice to any Person pursuant to (i) the articles, charter, by-laws or other governing documents of such Other Seller, (ii) any Material Contract to which the such Other Seller is a party or to which any of its assets is subject, (iii) any Laws to which such Other Seller, or any of the Assets owned by such Other Seller is subject, except, in the case of (ii) and (iii) above, for such defaults, violations, actions and notifications that would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

## ARTICLE V
## COVENANTS AND OTHER AGREEMENTS

**SECTION 5.1.    U.S. Bankruptcy Actions.**  On the timetables and subject to the terms set forth below, the Sellers who are U.S. Debtors shall (i) file with the U.S. Bankruptcy Court one or more motions and proposed orders as set forth below, (ii) notify, as required by the U.S. Bankruptcy Code, the U.S. Bankruptcy Rules, and any order of the U.S. Bankruptcy Court, all parties entitled to notice of such motions and orders, as modified by orders in respect of notice which may be issued at any time and from time to time by the U.S. Bankruptcy Court, and such additional parties as the Purchaser may reasonably request, and (iii) subject to the provisions of this Agreement, including the provisions of Section 10.1, and the U.S. Order, if entered, use commercially reasonable efforts to obtain U.S. Bankruptcy Court approval of such orders.

(a)     As promptly as practicable, but in no event later than the second (2nd) Business Day after the date hereof, the U.S. Debtors shall file with the U.S. Bankruptcy Court a motion (the "**U.S. Bidding Procedures and Sale Motion**") and two (2) proposed orders substantially in the forms set forth in Exhibit 5.1(a) (as attached as exhibits to the U.S. Bidding Procedures and Sale Motion and as may be modified pursuant to Section 5.1(c) and Section 5.1(d), the "**U.S. Bidding Procedures Order**" and the "**U.S. Sale Order**") seeking approval by the U.S. Bankruptcy Court of, respectively, (i) as for the U.S. Bidding Procedures Order, a process for the sale of the Business, the provision of the Solicitation Period as set forth in Section 5.3(f) and the provision of the Break-Up Fee and Expense Reimbursement as set forth in Section 10.2, and (ii) as for the U.S. Sale Order, pursuant to Sections 105, 363 and 365 of the U.S. Bankruptcy Code, the sale of the Assets to the Purchaser or a Designated Purchaser and the assumption by the U.S. Debtors and assignment to the Purchaser or a Designated Purchaser of the Assumed and Assigned Contracts.

(b)     The Sellers who are U.S. Debtors shall use their reasonable best efforts to cause the U.S. Bankruptcy Court to (i) schedule a hearing to consider the U.S. Bidding Procedures and Sale Motion and (ii) enter the U.S. Bidding Procedures Order within two (2) Business Days of the hearing referred to in clause (i) of this sentence.

(c)     The U.S. Bidding Procedures Order and the bidding procedures approved therein shall not be materially amended by the Sellers without the prior approval of the Purchaser in its reasonable discretion; provided, however, it shall not be deemed unreasonable for the Purchaser to withhold its consent to any change to the U.S. Bidding Procedures Order that conflict with any express provisions of this Agreement, including without limitation Section 5.1(g) below.

(d)     Material failure to adhere to the U.S. Bidding Procedures Order by the Sellers from and after the entry thereof shall constitute a breach of this Agreement and entitle the Purchaser to all rights and remedies set forth herein with respect to such breach, subject to the Sellers' cure right set out in Section 10.1(b)(ii).

(e)     The U.S. Sale Order shall contain the provisions (it being understood that certain of such provisions must constitute findings of fact or conclusions of Law to be made by the U.S. Bankruptcy Court as part of the U.S. Sale Order) set forth in the form of Exhibit 5.1(a) attached hereto, without modification thereto unless the Purchaser expressly consents in writing to such modification in its reasonable discretion.

(f)     The Sellers shall request that the U.S. Bankruptcy Court schedule, subject to the availability of the U.S. Bankruptcy Court, a U.S. Sale Hearing on the fourth (4th) Business Day following the conclusion of the Auction and shall use their reasonable best efforts to cause the U.S. Bidding Procedures and Sale Motion to be heard on that date or the earliest date thereafter permitted by the Bankruptcy Court's schedule.

(g)     Notwithstanding anything to the contrary herein or in the U.S. Bidding Procedures Order, under no circumstances (i) will the Purchaser be required to remain obligated under this Agreement (as amended, at the Auction or otherwise) as the Alternate Bidder (as such term is defined in the U.S. Bidding Procedures Order) if any Alternative Transaction is selected by the Sellers at the Auction or (ii) will the Purchaser be required to pay any deposit as a condition of participating in the Auction or otherwise.

**SECTION 5.2.  Canadian Bankruptcy Actions.**

**5.2.1.  Canadian Sales Process Order.**

(a)     Within five (5) days of execution of this Agreement, the Canadian Debtors shall serve on the CCAA Service List and file with the Canadian Court a motion (the "**Canadian Sales Process Order Motion**") in form and substance acceptable to the Sellers and the Purchaser, each acting reasonably, seeking an order approving the execution, delivery and performance of this Agreement, including payment of the Break-Up Fee and Expense Reimbursement and a process for the sale of the Business.  The Canadian Sales Process Order Motion, as served and filed, shall include a copy of the order in the form set forth in Exhibit 5.2.1 with such amendments as the Canadian Debtors and the Purchaser may

agree (the "**Canadian Sales Process Order**"). Any amendment to the form of the Canadian Sales Process Order, after the Canadian Sales Process Order Motion has been served, shall be subject to the prior written approval of the Purchaser in its reasonable discretion.

(b)    The Canadian Debtors shall use their reasonable best efforts to cause the Canadian Court to (i) schedule and hear the Canadian Sales Process Order Motion within seven (7) days of filing the Canadian Sales Process Order Motion, and (ii) the Canadian Debtors shall enter the issued order forthwith after its issuance.

**5.2.2. Canadian Approval and Vesting Order.** As promptly as practicable, but in no event later than three (3) Business Days following completion of the Auction (although, provided that service shall take place at least one (1) Business Day prior to the Canadian Approval and Vesting Order Motion unless consented to by the Purchaser), the Canadian Debtors shall serve on the CCAA Service List with such reasonable additions as are requested by the Purchaser and file with the Canadian Court a motion (the "**Canadian Approval and Vesting Order Motion**") in form and substance acceptable to the Sellers and the Purchaser, each acting reasonably, seeking an order approving this Agreement and the transactions contemplated herein. The Canadian Approval and Vesting Order Motion, as served and filed, shall include a copy of the order in the form set forth in Exhibit 5.2.2 with such amendments as the Canadian Debtors and the Purchaser may agree (the "**Canadian Approval and Vesting Order**"). Any amendment to the form of the Canadian Approval and Vesting Order, after the Canadian Approval and Vesting Order Motion has been served, shall be subject to the prior written approval of the Purchaser.

**SECTION 5.3.  Consultation; Notification; Cooperation; Solicitation.**

(a)    The Purchaser and the U.S. Debtors shall cooperate with filing and prosecuting the U.S. Bidding Procedures and Sale Motion, a draft of which shall be delivered by the Sellers to the Purchaser no later than one (1) day after the date hereof, and obtaining entry of the U.S. Bidding Procedures Order and the U.S. Sale Order, and the U.S. Debtors shall deliver to the Purchaser prior to filing, and as early in advance as is practicable to permit adequate and reasonable time for the Purchaser and its counsel to review and comment, copies of all proposed pleadings, motions, responses to objections, notices, statements, schedules, applications, reports and other material papers to be filed by the U.S. Debtors in connection with such motions and relief requested therein and any challenges thereto.

(b)    The Purchaser and the Canadian Debtors shall cooperate with filing and prosecuting the Canadian Sales Process Order Motion and the Canadian Approval and Vesting Order Motion, and obtaining issuance and entry of the Canadian Sales Process Order and the Canadian Approval and Vesting Order, and the Canadian Debtors shall deliver to the Purchaser prior to filing, and as early in advance as is practicable to permit adequate and reasonable time for the Purchaser and its counsel to review and comment, copies of all of the Canadian Debtors' proposed pleadings, motions, responses to objections, notices, statements schedules, applications, reports and other material papers to be filed by the Canadian Debtors in connection with such motions and relief requested therein and any challenges thereto.

83

(c)      If the U.S. Sale Order or any other order of the U.S. Bankruptcy Court relating to this Agreement shall be appealed by any Person (or a petition for certiorari or motion for rehearing, re-argument or stay shall be filed with respect thereto), the U.S. Debtors agree to, and to cause their Subsidiaries to, use their reasonable best efforts, to defend against such appeal, petition or motion, and the Purchaser agrees to cooperate in such efforts. Each of the Parties hereby agrees to use its reasonable best efforts to obtain an expedited resolution of such appeal; provided, however, that, subject to the conditions set forth herein, nothing contained in this Section shall preclude the Parties from consummating, or permit the Parties not to consummate, the transactions contemplated hereby if the U.S. Sale Order shall have been entered and shall not have been stayed, modified, revised or amended, in which event the Purchaser and the relevant Designated Purchasers shall be able to assert the benefits of Section 363(m) of the U.S. Bankruptcy Code and, as a consequence of which, such appeal shall become moot.

(d)      If the Canadian Approval and Vesting Order or any other order of the Canadian Court relating to this Agreement shall be appealed by any Person (or a petition for certiorari or motion for rehearing, re-argument or stay shall be filed with respect thereto), the Canadian Debtors agree to, and to cause their Affiliates (other than the EMEA Sellers and their respective Subsidiaries) to, take all commercially reasonable steps, and use their reasonable best efforts to defend against such appeal, petition or motion, and the Purchaser agrees to cooperate in such efforts. Each of the Parties hereby agrees to use its reasonable best efforts to obtain an expedited resolution of such appeal; provided, however, that, subject to the conditions set forth herein, nothing in this Section shall preclude the Parties from consummating, or permit the Parties not to consummate, the transactions contemplated hereby if the Canadian Approval and Vesting Order shall have been entered and shall not have been stayed, modified, revised or amended.

(e)      Prior to Closing, the Sellers shall, from time to time, at the request of the Purchaser, request such further Order or Orders from the Canadian Court or the U.S. Bankruptcy Court as the Sellers and the Purchaser both agree, each acting reasonably, are required in order to give effect to this Agreement and the transactions contemplated hereby. The terms of such requested Orders shall be satisfactory to the Sellers and the Purchaser, each acting reasonably. Upon any such request each of the Purchaser and the Sellers, acting reasonably, shall cooperate with each other, as necessary or as may be reasonably requested, in order to obtain such further Order or Orders.

(f)      From the date of the later of (i) the entry of the U.S. Bidding Procedures Order or (ii) the entry of the Canadian Sales Process Order, until the conclusion of the Auction (the "**Solicitation Period**"), the Sellers are permitted to cause their authorized representatives and Affiliates to initiate contact with, solicit or encourage submission of any inquiries, proposals or offers by, any Person (in addition to the Purchaser and its Affiliates, agents and authorized representatives) in connection with any Competing Transaction. In addition, during such Solicitation Period, the Sellers shall have the right to respond to any inquiries or offers to purchase all or any part of the Business and perform any and all other acts related thereto which are required under the Bankruptcy Code or other applicable Law, including supplying information relating to the Business and Assets to prospective buyers. The Sellers shall contemporaneously, or as soon as possible thereafter, provide the Purchaser with any information concerning the Business or Assets provided to

84

any prospective purchasers not previously provided to the Purchaser. The Main Sellers shall provide the Purchaser with a copy of any Qualified Bid received by the Sellers on the day that the determination is made that such bid is a Qualified Bid but in no event later than 48 hours prior to the commencement of the Auction and otherwise in accordance with the U.S. Bidding Procedures Order. In the event that the time at which the final Qualified Bid to be delivered is less than 48 hours from the scheduled time for commencement of the Auction, either the Sellers or the Purchaser, may, by written notice, require that the scheduled commencement date and time of the Auction be delayed until such time the Purchaser has had possession of the Qualified Bids for 48 hours prior to commencement of the Auction. Nothing herein shall limit the Sellers' ability to consummate a Sponsored Reorganization Plan.

**SECTION 5.4. <u>Pre-Closing Cooperation</u>.**

(a)     Prior to the Closing, upon the terms and subject to the conditions of this Agreement, each of the Parties shall use its reasonable best efforts to take, or cause to be taken, all actions and to do, or cause to be done, and cooperate with each other in order to do, all things necessary, proper or advisable under applicable Law to consummate the transactions contemplated by this Agreement as soon as practicable, including (i) the preparation and filing of all forms, registrations and notices required to be filed to consummate the Closing and the taking of such actions as are necessary to obtain any requisite Consent, <u>provided</u> that the Sellers shall not be obligated to make any payment or deliver anything of value to any Third Party (other than filing and application fees to Government Entities, all of which shall be paid or reimbursed by the Purchaser) in order to obtain any Consent; (ii) taking reasonable actions to defend any Actions filed against such Party by or before any Government Entity challenging this Agreement or the consummation of the Closing (or to cooperate with the other Party in the case of any such Action filed against such other Party); and (iii) using reasonable efforts to cause to be lifted or rescinded any injunction, decree, ruling, order or other action of any Government Entity adversely affecting the ability of the Parties to consummate the Closing; <u>provided</u>, that such reasonable efforts described in clauses (ii) and (iii) above shall not require either Party to take, or agree to take any action, that would reasonably be expected to materially and adversely impact the Business or any other business of such Party.

(b)     Each Primary Party shall promptly notify the other Primary Party of the occurrence, to such party's knowledge, of any event or condition, or the existence, to such party's knowledge, of any fact, that would reasonably be expected to result in any of the conditions set forth in Article IX not being satisfied.

(c)     The Purchaser hereby covenants and agrees until the Closing Date or the earlier termination of this Agreement in accordance with Article X:

(i)     ~~to reserve for issuance the Shares in connection with the transactions contemplated by this Agreement;~~

(i)     ~~(ii)~~ not to pay any dividend or make any cash distribution on or in respect of its outstanding common stock~~, other than normal and customary cash dividends, consistent with past practice~~ or take any other action that would trigger

85

the adjustment of the Conversion Rate (as defined in the Indenture) pursuant to Section 6.5(a) of the Indenture; and

(ii) ~~(iii)~~ that except with respect to any matter expressly contemplated by this Agreement, it will not acquire or agree to acquire by amalgamating, merging or consolidating with, purchasing a substantial equity interest in or a substantial portion of the assets of or otherwise, any business or Person which acquisition or other transaction would reasonably be expected to prevent or materially delay the transactions contemplated by this Agreement; provided, however, notwithstanding anything to the contrary herein, nothing in this clause (iii) shall prevent or otherwise restrict the Purchaser from being acquired or agreeing to be acquired (whether by merger, consolidation, tender offer or otherwise) by any other Person.

**SECTION 5.5. Antitrust and Other Regulatory Approvals.**

(a)      In furtherance and not in limitation of the provisions of Section 5.4, each of the Parties ~~agrees (so far as it is legally bound to do so) to prepare and file as promptly as practicable, or cause their ultimate parent entities (as that term is defined in the HSR Act) to prepare and file as promptly as practicable, and in any event by no later than ten (10) Business Days from~~has prior to the date of this Agreement ~~(or on such other subsequent day as the Parties mutually agree (or the earlier date required by the applicable Antitrust Laws))~~prepared and filed: (i) a request for an advance ruling certificate pursuant to Section 102 of the Competition Act, and if deemed advisable by the Purchaser, acting reasonably, a pre-merger notification filing under the Competition Act; (ii) an appropriate filing of a Notification and Report Form pursuant to the HSR Act; and (iii) all other necessary documents, registrations, statements, petitions, filings and applications for ICA Approval and any other Consent of any other Government Entities required to satisfy the condition set forth in Section 9.1(a).

(b)      If a Party or any of its Affiliates receives a request for information or documentary material from any Government Entity with respect to this Agreement or any of the transactions contemplated by this Agreement (and/or by the EMEA Asset Sale Agreement), then such Party shall endeavor in good faith to make, or cause to be made, as soon as reasonably practicable and after consultation with the other Party, an appropriate response in compliance with such request.

(c)      The Parties shall keep each other apprised of the status of matters relating to the completion of the transactions contemplated by this Agreement (and/or by the EMEA Asset Sale Agreement) and work cooperatively in connection with obtaining the requisite Regulatory Approvals of each applicable Government Entity, including:

(i)      cooperating with each other in connection with filings required under the applicable Antitrust Laws or any Laws regulating foreign investment of any jurisdiction in connection with the transactions contemplated by this Agreement (and/or by the EMEA Asset Sale Agreement) and each Antitrust Approval, and liaising with each other in relation to each step of the procedure before the relevant Government Entities and as to the contents of all

communications with such Government Entities. In particular, and except for any filings made pursuant to the Investment Canada Act, no Party will make any notification or other filing with or to any Government Entity in relation to the transactions contemplated hereunder without first providing the other Party or its outside counsel on an outside counsel only basis with a copy of such notification in draft form (except with respect to any documents relating to Item 4(c) of the notification form required by the HSR Act) and giving such other party or its outside counsel a reasonable opportunity to discuss its content before it is filed with the relevant Government Entities, and such first Party shall consider and take account of all reasonable comments timely made by the other Party or its outside counsel in this respect. For the avoidance of doubt, draft filings, materials or information provided under this section or under any other provision of this Agreement to the other Party's counsel on an outside counsel only basis shall only be given to outside counsel of the recipient and will not be disclosed by such outside counsel to employees, officers or directors of the recipient without the advance written consent of the Party providing such draft filing or materials;

(ii)    furnishing to the other party or its outside counsel in a timely fashion all information within its possession that is required for any application or other filing to be made by the other party pursuant to the applicable Antitrust Laws or any Laws regulating foreign investment of any jurisdiction in connection with the transactions contemplated by this Agreement (and/or by the EMEA Asset Sale Agreement); provided, however, that no such information shall be required to be provided by a Party if it determines, acting reasonably, that the provision of such information would jeopardize any attorney-client or other legal privilege (it being understood, however, that the Parties shall cooperate in any reasonable efforts and requests that would enable otherwise required disclosure to the other Party or its outside counsel to occur without so jeopardizing the privilege);

(iii)    promptly notifying each other of any communications from or with any Government Entity with respect to the transactions contemplated by this Agreement (and/or by the EMEA Asset Sale Agreement) and ensuring that each of the parties or its outside counsel (as determined by the Purchaser in its reasonable discretion in the case of meetings or appearances related to ICA Approval), where acceptable to the Government Entity, is represented at any meetings with or other appearances before any Government Entity with respect to the transactions contemplated by this Agreement (and/or by the EMEA Asset Sale Agreement); and

(iv)    consulting and cooperating with one another and the other Party's outside counsel in connection with all analyses, appearances, presentations, memoranda, briefs, arguments, opinions and proposals made or submitted by or on behalf of any party hereto in connection with proceedings under or relating to the Antitrust Laws or any Laws regulating foreign investment of any jurisdiction in connection with the transactions contemplated by this Agreement (and/or by the EMEA Asset Sale Agreement).

(d)     In addition, and subject to Section 5.5(e), the Purchaser shall, and shall cause each of the Designated Purchasers to, use its reasonable efforts to satisfy (or cause the satisfaction of) the conditions precedent to the Purchaser's obligations hereunder as set forth in Section 9.1(a) to the extent the same is within its control and to take, or cause to be taken, all other actions and to do, or cause to be done, all other things necessary, proper or advisable under all applicable Laws to consummate the transactions contemplated by this Agreement (and/or by the EMEA Asset Sale Agreement), including using its reasonable efforts to obtain all Regulatory Approvals, and any other Consent of a Government Entity required to be obtained in order for the Parties to consummate the transactions contemplated by this Agreement (and/or by the EMEA Asset Sale Agreement).

(e)     The obligations of the Purchaser pursuant to Section 5.5(d) shall include committing, and causing the Designated Purchasers to commit, to any and all undertakings, divestitures, licenses or hold separate or similar arrangements with respect to their respective assets and/or the Assets and/or the EMEA Assets and/or to any and all arrangements for the conduct of any business and/or to any termination of any and all existing relationships and contractual rights and obligations as a condition to obtaining any and all Consents from any Government Entity necessary to consummate the transactions contemplated by this Agreement (and/or by the EMEA Asset Sale Agreement), including taking, and causing the Designated Purchasers to take, any and all Consents from any Government Entity necessary to consummate the transactions contemplated hereby, including taking any and all actions necessary in order to ensure the receipt of the necessary Consents and Regulatory Approvals; provided, however, that nothing in this Agreement or the EMEA Asset Sale Agreement shall require or be construed to require the Purchaser, any Designated Purchaser, any EMEA Designated Purchaser or any of their respective Subsidiaries to commit to any undertaking, divestiture, license or hold separate or similar arrangement or conduct of business arrangement or to terminate any relationships, rights or obligations or to do any other act, to the extent such commitment, termination or action would be reasonably likely to be materially adverse to the Business or the Purchaser, or financial condition or prospects of the Business or the Purchaser.

(f)     For the avoidance of doubt, the covenants under this Section 5.5 shall not apply to any action, effort, filing, Consent, proceedings, or other activity or matter relating to the Bankruptcy Courts, the Bankruptcy Proceedings and/or the Bankruptcy Consents, and the ICA Approval.

### SECTION 5.6.  Pre-Closing Access to Information.

(a)     Prior to the Closing, the Sellers shall, and shall cause their Subsidiaries (other than the EMEA Sellers) to, (i) give the Purchaser and its authorized representatives, upon reasonable advance notice and during regular business hours, reasonable access to all books, records, personnel, officers and other facilities and properties of the Business (excluding the EMEA Business), (ii) permit the Purchaser to make such copies and inspections thereof, upon reasonable advance notice and during regular business hours, as the Purchaser may reasonably request, (iii) grant the Purchaser and its representatives reasonable access to each of the facilities of the Business where Assets are located for purposes of completing an updated inventory of the fixed assets of the Business for purposes of completing an appraisal of the value thereof, and (iv) cause the officers of

88

the Sellers to (A) after each month-end promptly (and in any event within thirty (30) days thereafter) furnish the Purchaser with copies of the Sellers' standard Business review of orders and revenue as is regularly prepared in the Ordinary Course, and (B) after each quarter-end promptly (and in any event within thirty (30) days thereafter) furnish the Purchaser with an unaudited quarter-end balance sheet for the Business as of the end of such quarter, and unaudited combined statements of earnings and cash flows of the Business for the three (3) month period then ended; provided, however, that (1) any such access shall be conducted at the Purchaser's expense, in accordance with Law (including any applicable Antitrust Laws and Bankruptcy Laws), at a reasonable time, under the supervision of the Sellers' personnel and in such a manner as to maintain confidentiality and not to unreasonably interfere with the normal operations of the businesses of the Sellers and their Affiliates, and (2) the Sellers will not be required to provide to the Purchaser access to or copies of any Tax records except as otherwise provided herein.

(b)     In order to facilitate the Purchaser's entry into new supply arrangements effective as of the Closing, the Sellers shall make available to the Purchaser unredacted copies of all Contracts with suppliers of the Business, or in the case of any Non-Exclusive Supply Contracts, unredacted copies of any portion thereof that are applicable to the Business (other than pricing/cost information or other competitively sensitive information the sharing of which Sellers or their representatives reasonably determine may violate applicable Law), promptly following the date hereof (or in the event that any such Contract is subject to confidentiality restrictions promptly following the receipt of any required consent which the Sellers will cooperate with the Purchaser to obtain as promptly as practicable). So long as the Purchaser is the winning bidder in the Auction, the Sellers shall provide such information not provided in accordance with the preceding sentence upon the later of the entry of the U.S. Sale Order, the receipt of the HSR Approval and the receipt of the Competition Act Approval. Any such disclosures shall be made to any employees or representatives of the Purchaser who are designated by the Purchaser, who reasonably require access to such information for any reasonable business purpose related to the acquisition of the Business by the Purchasers and who have executed the applicable "Clean Room Agreements," provided, however, that employees of the Purchaser shall not have access to such information unless they are not involved in making decisions regarding pricing or the other material competitive terms offered to any customer of a competing business to the Business, and if the transaction does not close, agree not to be employed in such a role for an agreed-upon minimum period of time.

(c)     In connection with the procedures set forth in Section 5.15 with respect to the Bundled Contracts, the Sellers will provide unredacted copies of any portion of any Bundled Contracts that relates to the Business (other than pricing information and other competitive sensitive information the sharing of which the Sellers or their representatives reasonably determine may violate applicable Law) promptly following the date hereof, and so long as the Purchaser is the winning bidder in the Auction, will provide such information upon the later of the entry of the U.S. Sale Order, the receipt of the HSR Approval and the receipt of the Competition Act Approval. Any such disclosures shall be made to any employees or representatives of the Purchaser who are designated by the Purchaser, who reasonably require access to such information for any reasonable business purpose related to the acquisition of the Business by the Purchasers and who have executed the applicable "Clean Room Agreements," provided, however, that employees of the

89

Purchaser shall not have access to such information unless they are not involved in making decisions regarding pricing or the other material competitive terms offered to any customer of a competing business to the Business, and if the transaction does not close, agree not to be employed in such a role for an agreed-upon minimum period of time.

(d)    Promptly following the date hereof, the Sellers will provide to Purchaser a correct and complete list of table values from the Sellers' SAP HR system for the following fields: (i) job, (ii) organization/HR Department, and (iii) location. Within twenty (20) days following the date hereof, the Sellers will provide to the Purchaser a set of test files from the Sellers' SAP HR system, which shall include actual employee data (including at least one person per country), but excluding in such data any information revealing the identity of any Employees (including names, addresses, tax identification numbers and any other information that would allow the Purchaser to individually identify any Employee). Such test files shall be in the same format as the format that will be subsequently provided to the Purchaser by the Sellers when actual payroll data is transferred from the Sellers to the Purchaser. Within three (3) Business Days following the completion of the Auction, the Sellers will provide the following additional information with respect to each of the Employees whose information was provided in Section 4.10(b) of the Sellers Disclosure Schedule: (i) full name, (ii) work e-mail address, (iii) work telephone number, (iv) specific recurring allowances paid to employees (if applicable), (v) supervisor and (vi) pay schedule. Within three (3) Business Days following the notification from Purchaser to Sellers of any Identified Employee pursuant to Section 7.1.1, the Sellers will provide Purchaser with the Identified Employee's home address. Additionally, provided that Purchaser provides Seller with proof that an Identified Employee has consented to its release and, if applicable, transfer across boundaries, the Sellers will provide the Purchaser with the following additional information with respect to such Identified Employees as soon as practicable following the receipt by Seller of such proof: (ix) tax identification number, (x) date of birth, and (xi) gender. In addition, upon Purchaser's reasonable request, the Sellers will promptly provide Purchaser with aggregate census data with respect to gender and age (using five-year bands) of the Identified Employees' employee population (without individually identifying any Identified Employee).

(e)    Notwithstanding anything contained in this Agreement or any other agreement between the Purchaser and the Sellers executed on or prior to the date hereof, the Sellers shall not have any obligation to make available to the Purchaser or its representatives, or provide the Purchaser or its representatives with, (i) any Tax Return filed by the Sellers or any of their Affiliates or predecessors or (ii) any other information, if in each case under subsection (i) and (ii), making such information available would (A) jeopardize any attorney-client or other legal privilege or (B) potentially cause the Sellers to be found in contravention of any applicable Law or contravene any fiduciary duty or agreement (including any confidentiality agreement with a Third Party to which the Sellers or any of their Affiliates are a party) between Sellers and a Third Party, it being understood that the Sellers shall cooperate in any reasonable efforts and requests for waivers that would enable otherwise required disclosure to the Purchaser to occur without so jeopardizing privilege or contravening such Law, duty or agreement.

(f)    Promptly following the date of the U.S. Sale Order, the Sellers agree to provide the Purchaser with access to such documentation, records and databases to the

extent reasonably required to review and assess the Sellers' use of Open Source Software incorporated into any of the Products or Services.

SECTION 5.7. **Public Announcements**. The initial press release relating to this Agreement shall be a joint press release, the text of which shall be agreed to by the Purchaser and the Sellers acting reasonably. Unless otherwise required by applicable Law or by obligations of the Parties or their Affiliates pursuant to any listing agreement with or rules of any securities exchange, the Parties hereto shall consult with each other before issuing any other press release or otherwise making any public statement with respect to this Agreement, the transactions contemplated hereby or the activities and operations of the other Party and shall not issue any such release or make any such statement without the prior written consent of the other Party (such consent not to be unreasonably withheld or delayed).

SECTION 5.8. **Further Actions**. From and after the Closing Date, each of the Parties shall execute and deliver such documents and other papers and take such further actions as may reasonably be required to carry out the provisions of this Agreement and the other Transaction Documents to which they are a party and give effect to the transactions contemplated herein and therein, including the execution and delivery of such assignments, deeds and other documents as may be necessary to transfer any Assets as provided in this Agreement, including the assignment of any Assigned Contract; provided, that subject to Section 5.5, the Sellers shall not be obligated to make any payment or deliver anything of value to any Third Party (other than filing and application fees to Government Entities, all of which shall be paid or reimbursed by the party required to pay such fees under the Agreement) in order to obtain any Consent to the transfer of Assets or the assumption of Assumed Liabilities.

SECTION 5.9. **Conduct of Business**.    The Sellers covenant that, subject to any limitation imposed as a result of being subject to the Bankruptcy Proceedings and except as (i) the Purchaser may approve otherwise in writing as set forth below (such approval not to be unreasonably withheld or delayed), (ii) set forth in Section 5.9 of the Sellers Disclosure Schedule, (iii) otherwise contemplated or permitted by this Agreement or another Transaction Document, (iv) required by Law (including any applicable Bankruptcy Laws or by any order of a Bankruptcy Court), or (v) relates solely to Excluded Assets or Excluded Liabilities, the Sellers shall and shall cause their Affiliates to (A) conduct the Business and maintain the Owned Equipment in the Ordinary Course, (B) use efforts that are commercially reasonable in the context of the Bankruptcy Proceedings and taking into account employee attrition to continue operating the Business (excluding the EMEA Business) as a going concern, and to maintain the business organizations of the Business (excluding the EMEA Business) intact and (C) abstain from any of the following actions:

(a)    sell or otherwise dispose of material Assets, other than sales of inventory (including, without limitation, inventory that has been designated as "excess" or "obsolete" ("**E&O Inventory**")) on a basis consistent with past practice;

(b)    incur any Lien on any Assets, other than Liens that will be discharged at or prior to Closing and Permitted Encumbrances;

(c)    (i) grant any license or sublicense of any rights under or with respect to any Transferred Intellectual Property other than licenses to suppliers, resellers and

customers in the Ordinary Course and licenses or sublicenses granted in accordance with the Intellectual Property License Agreement (if such agreement were in effect as of the date hereof), or (ii) enter into any exclusive license agreement that would restrict the Business or the Assets after the Closing in any material respect or which is in conflict with the provisions of this Agreement or that would be in conflict with the Intellectual Property License Agreement if it were in effect as of the date hereof;

(d)    increase the rate of cash compensation or other fringe, incentive, equity incentive, pension, welfare or other employee benefits payable to the Employees, other than normal periodic increases consistent with past practice or as required by applicable Law, Contracts or Seller Employee Plans in effect as of the date hereof, or pursuant to the KEIP or KERP (provided that the Sellers provide the Purchaser with notice of amendments, modifications, supplements or replacements to the KEIP as may be approved by the Canadian Court or to the KERP as may be approved by the Canadian Court or the U.S. Bankruptcy Court), or increases to welfare benefits that apply to substantially all similarly situated employees (including the Employees) of the Sellers or the applicable Affiliates of the Sellers, or (ii) except as otherwise expressly permitted under Section 5.9, enter into, or increase the benefits or any payments under, any employment, deferred compensation, severance or other similar agreement or arrangement with any Employee;

(e)    voluntarily terminate or waive any material right under, or materially amend any Material Contract or any Bundled Contract material to the Business (other than as necessary to effect the unbundling of any Bundled Contract required with respect to any other business or business segment of the Sellers), unless such Contract has become an Excluded Other Vendor Contract, an Excluded 365 Vendor Contract or a Non-Assigned Contract;

(f)    waive, release, assign, settle or compromise any material claim, litigation or arbitration relating to the Business to the extent that such waiver, release, assignment, settlement or compromise imposes any binding obligation, whether contingent or realized, on the Business that will bind the Designated Purchasers after the Closing Date and is materially adverse to the Business;

(g)    fail to make any budgeted capital expenditures with respect to the Business (excluding the EMEA Business) or make any unbudgeted capital expenditure with respect to the Business (excluding the EMEA Business) in excess of $100,000 individually or $250,000 in the aggregate;

(h)    enter into any Material Contract for or relating to the Business that cannot be assigned to the Purchaser;

(i)    fail to maintain tangible property which, individually or in the aggregate, is material to the Business and which is included in the Assets, consistent with past practice since the filing of the Bankruptcy Proceedings;

(j)    enter into, or agree to enter into, any sale-leaseback transactions with respect to the Business;

(k)    take any action, other than actions that an employer in bankruptcy would take, to cause any employee of the Sellers who would otherwise be an Employee as of the Closing not to be such an employee (other than termination for cause or termination of Employees who failed to receive an offer of employment from the Purchaser or a Designated Purchaser pursuant to this Agreement provided the Sellers make a reasonable effort to provide notice to the Purchaser prior to such employment termination);

(l)    fail to maintain the material Consents with respect to the Business (excluding the EMEA Business);

(m)    on or before the Closing Date, make or rescind any material election in relation to Taxes that would materially and adversely impact the Purchaser after the Closing;

(n)    grant any lease, sublease, license, sublicense or other occupancy rights under or with respect to any portion of Real Property used in the Business (except with respect to such rights granted to the purchasers of other Nortel business segments which are co-located at such premises and the effect of which would not have a material adverse effect on the lease, license or occupancy by the Purchaser or any Designated Purchaser of such Real Property) or terminate or surrender or agree to release any Lease, in whole or in part, which is identified in the Real Estate Terms and Conditions except in accordance with the Real Estate Terms and Conditions;

(o)    construct, or permit to be constructed any capital improvements or major alterations at any portion of the Real Property used for the Business (excluding the EMEA Business, except with respect to any capital improvements or major alterations at any portion of the Real Property required in connection with the purchase by purchasers of other Nortel business segments), or as otherwise contemplated in the Real Estate Terms and Conditions;

(p)    enter into any Collective Labor Agreement affecting Transferred Employees except as required by applicable Law; or

(q)    enter into any Contract not to compete in any line of business or geographic area that would reasonably be expected to bind the Purchaser or any of its Affiliates after the Closing in any material respect;

(r)    enter into any Contract granting an indemnity in respect of intellectual property infringement or misappropriation other than in the Ordinary Course that would bind the Purchaser or any of its Affiliates after the Closing in any material respect, except for those Contracts that will not be, or that the Purchaser may elect not to have, assigned to the Purchaser hereunder; or

(s)    authorize, or commit or agree to take, any of the foregoing actions.

If a Seller desires to take any action described in this Section 5.9, the Main Sellers may, prior to any such action being taken, request the Purchaser's consent via an electronic mail or facsimile sent to the individual(s) at the addresses listed on Exhibit 5.9. The Purchaser shall respond to such notice in writing by 11:59 p.m. (New York time) on the second Business Day after the day

93

of delivery of such electronic mail or facsimile. The failure of the Purchaser to respond within such two (2) Business Days shall not be deemed to be consent to such action.

The Purchaser acknowledges and agrees that: (i) prior to the Closing Date, the Sellers shall exercise, consistent with the terms and conditions of this Agreement, control and supervision of the Business (excluding the EMEA Business) and the EMEA Sellers shall exercise, consistent with the terms and conditions of the EMEA Asset Sale Agreement, the EMEA Business and (ii) notwithstanding anything to the contrary set forth in this Agreement, no consent of the Purchaser shall be required with respect to any matter set forth in Section 5.9 or elsewhere in this Agreement to the extent the requirement of such consent would, upon advice of the Purchaser's counsel, violate any Law.

SECTION 5.10.  **Transaction Expenses.**  Except as otherwise provided in this Agreement or the Ancillary Agreements, each of the Purchaser and the Sellers shall bear its own costs and expenses (including brokerage commissions, finders' fees or similar compensation, and legal fees and expenses) incurred in connection with this Agreement, the other Transaction Documents and the transactions contemplated hereby and thereby.

SECTION 5.11.  **Confidentiality.**

(a)    The Parties acknowledge that the Confidentiality Agreement remains in full force and effect in accordance with its terms, which are incorporated herein by reference, and the Parties agree to be bound thereby in the same manner and to the same extent as if the terms had been set forth herein in full, except that the Sellers shall be at liberty to disclose the terms of this Agreement to any court or to any liquidator or in connection with any auction process with respect to the Business or the Assets approved by the Bankruptcy Court and show appropriate figures in their administration records, accounts and returns; provided, that after the completion of the transactions contemplated herein, the Purchaser's confidentiality obligations under this Section 5.11 and the confidentiality agreement between the Purchaser, NNC and its subsidiaries and Alan Bloom dated March 27, 2009, with respect to information and data relating to the Business and/or the Assets shall terminate.  For greater certainty, the Purchaser's confidentiality obligations under the third clean team confidentiality agreement between the Purchaser and its subsidiaries and NNL and its subsidiaries, dated June 19, 2009, shall not terminate after the completion of the transactions contemplated herein.

(b)    Subject to the requirements of the Bankruptcy Laws or as may be imposed by the Bankruptcy Court or as otherwise required by applicable Law, from and after the Closing: (i) the Sellers shall, and shall cause their Affiliates to, hold in confidence all confidential information (including trade secrets, customer lists, marketing plans and pricing information) of the Sellers relating to the Business or the Assets; (ii) in the event that the Sellers or an Affiliate thereof shall be legally compelled to disclose any such information, the Sellers shall provide the Purchaser with prompt written notice of such requirement so that the Purchaser may seek a protective order or other remedy; and (iii) in the event that such protective order or other remedy is not obtained, the Sellers or their Affiliates shall furnish only such information as is legally required to be provided.

(c)     It is acknowledged by the Purchaser and the Sellers that in the course of attempting to sell the Assets, one or more of the Sellers has entered into several confidentiality agreements with Third Parties in respect of information relating to the Assets and has disclosed such information to certain of those Third Parties.

(d)     Each Seller shall assign to the Purchaser, at or prior to, and with effect from and after the·Closing, all of its rights under any such confidentiality agreement made by such Seller with any Third Party but only as such confidentiality agreements relate to the Assets and the Business and only to the extent that such agreements permit such assignments without the consent of any Third Party.  To the extent such agreements do not permit any assignment without the consent of any Third Party, at the Purchaser's request and the Purchaser's expense, provided that the Sellers receive an indemnity from the Purchaser in form and substance satisfactory to the Sellers, to the extent permitted by applicable Laws and the terms of such confidentiality agreements, shall appoint the Purchaser as such Sellers' representative and agent in respect of confidential information relating to the Business and Assets under such confidentiality agreements and any amounts recovered or expenses incurred in enforcing those confidentiality agreements in respect of the Sellers shall accrue to the benefit of or be for the account of the Purchaser.

(e)     Notwithstanding anything to the contrary contained in this Section 5.11, nothing contained in this Agreement shall be construed as precluding, prohibiting, restricting or otherwise limiting the ability of the Sellers, the Sellers' Affiliates or their respective representatives to: (i) make permitted disclosures under Section 5.7 or as otherwise permitted under this Agreement; (ii) make any disclosures that are required by applicable Law; (iii) use or disclose information that is not exclusive to the Business to the extent necessary to operate the other business segments of the Sellers or their Affiliates or otherwise engage in any manner in any business activities unrelated to the Business; (iv) perform any retained Contracts, whether or not exclusively related to the Business; or (v) make customary disclosures, subject to customary confidentiality agreements, regarding information that is not exclusive to the Business and is primarily related to other business segments of the Sellers in connection with acquiring, merging or otherwise combining with, or being acquired by, or selling all or part of their assets to, any Person (whether in a single transaction or a series of related transactions or whether structured as an acquisition of assets, securities or otherwise).  Notwithstanding anything to the contrary contained in this Section 5.11, nothing contained in this Agreement shall be construed as precluding, prohibiting, restricting or otherwise limiting the ability of the Purchaser, the Purchaser's Affiliates or their respective representatives to: (i) make permitted disclosures under Section 5.7 or as otherwise permitted under this Agreement or (ii) make any disclosures that are required by applicable Law.

**SECTION 5.12.  Disclosure Schedules and Certain Information.**

(a)     The Sellers shall submit to the Purchaser via electronic mail or facsimile sent to the individual(s) at the addresses listed in Exhibit 5.12, every two (2) weeks, written updates to Section 4.10(b) of the Sellers Disclosure Schedule with respect to additions, deletions or other status changes of Employees or, after finalization of the Identified Employees, only with respect to Identified Employees.  The Sellers shall submit to the Purchaser at least three (3) Business Days prior to the Closing Date, written updates to

the Sellers Disclosure Schedules in respect of Article IV disclosing any events or developments that occurred or any information learned between the date of this Agreement and the Closing Date that reflect any matters hereafter arising which, if existing, occurring or known to the Sellers at the date hereof, would have been required to be set forth or described in the Sellers Disclosure Schedule in relation to Article IV.

(b)     The Sellers shall give prompt notice to the Purchaser, and the Purchaser shall give prompt notice to the Sellers, upon obtaining knowledge of the occurrence or nonoccurrence of any event that, individually or in the aggregate, would make the timely satisfaction of the conditions set forth in Article IX impossible or unlikely.

(c)     The delivery of any update or notice pursuant to this Section 5.12 shall not cure any breach of any representation or warranty requiring disclosure of such matter or otherwise limit or affect the remedies available hereunder to any party receiving such notice.

**SECTION 5.13.  Certain Payments or Instruments Received from Third Parties.** To the extent that, after the Closing Date, (a) the Purchaser or any Designated Purchaser receives any payment or instrument that is for the account of a Seller according to the terms of this Agreement or relates primarily to any business or business segment of the Sellers other than the Business, the Purchaser shall, and shall cause the Designated Purchasers to promptly deliver such amount or instrument to the relevant Seller, and (b) any of the Sellers receives any payment that is for the account of the Purchaser or any of the Designated Purchasers according to the terms of this Agreement or relates primarily to the Business, the Main Sellers shall, and shall cause the Other Sellers to promptly deliver such amount or instrument to the Purchaser or the relevant Designated Purchasers. All amounts due and payable under this Section 5.13 shall be due and payable by the applicable Party in immediately available funds, by wire transfer to the account designated in writing by the relevant Party. Notwithstanding the foregoing, each Party hereby undertakes to use reasonable best efforts to direct or forward all bills, invoices or like instruments to the appropriate Party.

**SECTION 5.14.  Non-Assignable Contracts.**

(a)     To the extent that any Seller Contract or any Seller Consent is not capable of being assigned under Section 365 of the U.S. Bankruptcy Code (or, if inapplicable, pursuant to other applicable Laws or the terms of such Contract or Consent) to the Purchaser or a Designated Purchaser at the Closing without the Consent of the issuer thereof or the other party thereto or any Third Party (including a Government Entity) (collectively, the "**Non-Assignable Contracts**"), this Agreement will not constitute an assignment thereof, or an attempted assignment, unless any such Consent is obtained.

(b)     For the purposes of this Agreement (including Section 5.14(a) and all representations and warranties of the Sellers contained herein), the relevant Sellers shall be deemed to have obtained all required Consents in respect of the assignment of any 365 Vendor Contract and 365 Customer Contract if, and to the extent that, pursuant to the U.S. Sale Order, the Sellers are authorized to assume and assign to the Purchaser or Designated Purchasers such Seller Contract pursuant to Section 365 of the U.S. Bankruptcy Code and any applicable Cure Cost has been, or will be, satisfied as provided in Section 2.1.7. In

96

furtherance thereof, the U.S. Bidding Procedures Order shall contain procedures, in form and substance acceptable to the Purchaser, for obtaining U.S. Bankruptcy Court approval that all 365 Contracts other than the Non-Assignable Contracts can and shall be assigned to the Purchaser on the Closing Date.

**SECTION 5.15. Bundled Contracts.**

        (a)      Section 5.15 of the Sellers Disclosure Schedule lists each Contract that the Sellers or their Affiliates have entered into prior to the date hereof providing for the sale or provision of Products and/or Services and the sale or provision of other products and services of the Sellers or their Affiliates (each, a "**Bundled Contract**").

        (b)      During the period from the date hereof until the Auction, the Sellers and their Affiliates shall cooperate (consistent with applicable Laws and any confidentiality restrictions requiring consent of Third Parties) with the Purchaser in developing a strategy with respect to transitioning each customer of the Business that is party to a Bundled Contract by, among other things, making available those employees who are responsible for managing the customer relationship with each such customer, by providing unredacted copies of all Contracts to which any Seller is a party (or in the case of Bundled Contracts, the portions of such Bundled Contracts as are applicable to the Business) with each of the top 40 customers of the Business by revenue for the year ended December 31, 2008 (other than pricing information and other competitive sensitive information the sharing of which Sellers or their representatives reasonably determine may violate applicable Law) and such other information as the Purchaser may reasonably request, which disclosures shall be subject to the Confidentiality Agreement.  On or before the date that is five (5) Business Days after the date of the Auction, the Purchaser shall notify the Sellers of those counterparties to Bundled Contracts with which the Purchaser elects to attempt to negotiate alternative arrangements (effective as of and conditioned upon the Closing) ("**Alternative Arrangements**") directly with such counterparty to such Bundled Contract, including without limitation, such counterparty's purchase or sale of items under an existing Contract between such counterparty and the Purchaser or the entry into a new contract covering the Products and Services.  Promptly following the later of (x) the entry of the U.S. Sale Order and (y) the receipt of HSR Approval and Competition Act Approval, the Sellers and their Affiliates shall (i) provide such competitive sensitive information as was redacted pursuant to the first sentence of this subsection (b) in such a manner, and subject to, Section 5.6(c) so as not to violate any applicable Law and (ii) cooperate with the Purchaser with respect to the negotiation of any such Alternative Arrangements, including without limitation, by making introductions to customers with whom the Purchaser does not have an existing customer relationship, by, subject to applicable Law, participating in telephone calls and meetings with such customers and by providing such forecast and other information as is necessary to assist the Purchaser negotiate such Alternative Arrangements.  The Purchaser agrees that any Alternative Arrangements it reaches with counterparties shall, effective as of the occurrence of the Closing, expressly release each Seller that is a party to the affected Bundled Contract from any obligations and Liabilities under such Bundled Contract from and after the Closing Date as they relate to the Products and Services sold or provided after the Closing Date.

(c)     With respect to those Bundled Contracts other than those which the Purchaser has elected to negotiate Alternative Arrangements, promptly following the later of (i) the entry of the U.S. Sale Order and (ii) the receipt of HSR Approval and Competition Act Approval, the Purchaser and the Sellers shall cooperate to jointly contact each party thereto including without limitation, by making such contacts (by phone or in person) as may be reasonably requested by Purchaser and by sending a joint letter, in form and substance satisfactory to each of Sellers and Purchaser notifying the counterparty to each such Bundled Contract of the transactions and requesting the counterparty to agree to amend such Bundled Contract from and after the Closing Date so as to delete all obligations and Liabilities therefrom as they relate to the Products and the Services and enter into a new Contract (effective as of, and conditioned upon the occurrence of, the Closing) with the applicable customer and which only relates to Products and Services, in which event such new Contract shall be deemed to be a Seller Contract, provided, however, that the Sellers shall be under no obligation to compromise any right, asset or benefit or to expend any amount or incur any Liabilities in obtaining such arrangements, and the failure to enter into such arrangements shall not entitle the Purchaser to terminate this Agreement, fail to complete the transactions contemplated hereby or reduce the Purchase Price payable hereunder (except as otherwise provided in Section 2.2.1); provided, further, that without the express written consent of Purchaser, Sellers shall not agree to amend the material terms of any Bundled Contract as a condition of such counterparty agreeing to amend the Bundled Contract in the manner set forth in this subsection (c) and if so requested, Sellers shall notify Purchaser and, unless Purchaser consents to such amendment, Sellers shall not enter into a new Contract with such customer as set forth in this subsection (c) but shall instead enter into a Subcontract Agreement with respect to such Bundled Contract as provided in subsection (d) below. Each of the Sellers and the Purchaser shall notify the other Party if any customer has contacted such Party with regard to the matters set forth in this Section 5.15 and shall keep such other Party reasonably informed regarding the content of any discussions with the customer.

(d)     For those Bundled Contracts for which the arrangements mentioned in Section 5.15 (a) – (c) have not been entered into by January 25, 2010 or such later date as the Parties may mutually agree, the Sellers and the Purchaser shall use commercially reasonable efforts to enter into one or more Subcontract Agreements between the Sellers and the Purchaser or the applicable Designated Purchaser with respect to such Bundled Contracts on such terms as are reasonably satisfactory to each of them; provided that (x) nothing in this Section 5.15 shall require the Sellers to renew any Bundled Contract once it has expired, (y) the Sellers shall have the right, any time after the date that is one (1) year after the Closing Date, to exercise any right to terminate any Bundled Contract, and (z) the Sellers shall be under no obligation to compromise any right, asset or benefit or to expend any amount or incur any Liabilities in order to comply with its obligations under this sentence.

SECTION 5.16. Post-Closing Assistance for Litigation.

(a)     After the Closing, the Purchaser shall, upon the request of the Sellers and at the Sellers' cost (including reimbursement of reasonable out of pocket expenses of the Purchaser and the Designated Purchasers and payment of a reasonable *per diem* to the Purchaser or a Designated Purchaser which *per diem* shall be based on the total

98

compensation of the affected Transferred Employees at the time), require the Transferred Employees to make themselves reasonably available at reasonable times and cooperate in all reasonable respects with the Sellers and their Affiliates in the preparation for, and defense of, any lawsuit, arbitration or other Action (whether disclosed or not disclosed in the Sellers Disclosure Schedule) filed or claimed against the Sellers or any of their Affiliates or any of the respective agents, directors, officers and employees of the Sellers and their Affiliates, whether currently pending or asserted in the future, concerning the operation or conduct of the Business prior to the Closing Date; provided, however, that the obligations of the Purchaser hereunder shall only extend to the Transferred Employees who remain employed by the Purchaser or a Designated Purchaser as of the date of the Sellers' request and shall not apply to former employees no longer employed by the Purchaser or a Designated Purchaser as of such date and shall not require the Purchaser or a Designated Purchaser to continue the employment of any such employee.

(b)     After the Closing, the Sellers shall, upon the request of the Purchaser, and at the Purchaser's cost (including reimbursement of reasonable out of pocket expenses of the Sellers and payment of a reasonable *per diem* to the Sellers which *per diem* shall be based on the total compensation of the affected employees at the time), require their employees that were not Transferred Employees to make themselves reasonably available and cooperate in all reasonable respects with the Purchaser and the Designated Purchasers and their Affiliates in the preparation for, and defense of, any lawsuit, arbitration or other Action filed or claimed against the Purchaser, any of the Designated Purchasers, any of their Affiliates or any of the respective agents, directors, officers and employees of any of the foregoing, whether currently pending or asserted in the future, concerning the operation or conduct of the Business prior to the Closing Date; provided, that the obligations of the Sellers or their Affiliates under this Section 5.16(b) shall only extend to the employees of such Sellers or Sellers' Affiliates as of the date of the Purchaser's request and shall not apply to former employees no longer employed by such Sellers or Sellers' Affiliates as of such date and shall not require such Sellers or Sellers' Affiliates to continue the employment of any such employee.

SECTION 5.17.  Tangible Asset Removal.  Except as otherwise set forth in the Real Estate Terms and Conditions and the Real Estate Agreements, the Purchaser shall, and shall cause the relevant Designated Purchasers to remove all tangible Assets from all premises owned or leased by the Sellers or their Affiliates that are not being leased, subleased or licensed to the Purchaser or any Designated Purchaser in accordance with the Real Estate Terms and Conditions within sixty (60) days after the Closing Date; provided, however, that in the event that the Sellers notify the Purchaser in writing that the Sellers desire, or are required, to vacate earlier, (i) the Sellers shall have the right by written notice to the Purchaser to require the Purchaser to remove all tangible Assets from all premises owned or leased by the Sellers or their Affiliates prior to the date that is thirty (30) days after the Closing Date or (ii) the Sellers may remove and store all tangible Assets at the Sellers' sole cost and expense until the date that is sixty (60) days after the Closing Date.  The Sellers shall cooperate with such efforts, including by providing access to such facilities during normal business hours or where necessary to minimize disruption to the Business and to the other businesses of the Sellers, to provide reasonable access during non-working hours for the purpose of facilitating such removal.

**SECTION 5.18. <u>Termination of Overhead and Shared Services and</u> <u>Intercompany Licensing Arrangements</u>.**

(a)    The Purchaser acknowledges and agrees that, except as otherwise expressly provided in the Transition Services Agreement, effective as of the Closing Date (i) all Overhead and Shared Services provided to the Business (excluding the EMEA Business and except the Transferred Overhead and Shared Services) shall cease and (ii) the Sellers or their Affiliates shall have no further obligation to provide any Overhead and Shared Services to the Business (excluding the EMEA Business).

(b)    The Sellers shall, on or before Closing, provide the Purchaser with reasonable evidence confirming that Nortel Networks S.A. has agreed:

(i)    not to assert its Intellectual Property and exclusive license rights, if any, in a manner that could restrict or conflict with the ability of the Purchaser or its successors, assigns, licensees, sub-licensees or customers to operate in the field of the Business and its natural evolutions; and

(ii)    to the fullest extent permitted under French Law, to relinquish, waive and terminate all its Intellectual Property and license rights (including any enforcement rights) to the extent (but only to the extent) that they relate to the Intellectual Property that is sold or licensed to the Purchaser in connection with the sale of the Business.

(c)    The Sellers (other than NNL) shall, on or before Closing, provide the Purchaser with Appropriate License Termination agreements (as defined in the IFSA) executed by each of them and shall use commercially reasonable efforts to obtain and provide the Purchaser with Appropriate License Termination agreements from each of their Affiliates who are not Sellers.

**SECTION 5.19. <u>Financing</u>.** Notwithstanding anything to the contrary set forth herein, the Purchaser acknowledges and agrees that (i) its obligations to consummate the transactions contemplated by this Agreement are not conditioned or contingent in any way upon receipt of any financing and the failure to consummate the transactions contemplated herein as a result of the failure to obtain financing shall constitute a breach of this Agreement by the Purchaser (including its obligations pursuant to Section 2.3).

**SECTION 5.20. Insurance Matters.**

(a)     The Purchaser acknowledges and agrees that coverage of the assets, tangible or intangible property, Liabilities, ownership, activities, businesses, operations, current and former shareholders, and current and former directors, officers, employees and agents of, the Business (excluding the EMEA Business) (collectively, the "**Covered Assets and Persons**") under all current or previous insurance policies of the Sellers and their Affiliates, including, without limitation, all environmental, directors' and officers' Liability, fiduciary Liability, employed lawyers, property and casualty flood, ocean marine, contaminated products and all other insurance policies or programs arranged or otherwise provided or made available by the Sellers or their Affiliates that cover (or covered) any of the Covered Assets and Persons at any time prior to the Closing (the "**Seller Insurance Policies**") shall cease as of the Closing Date and the Covered Assets and Persons will be deleted in all respects as insured (or additional insured, as the case may be) under all Seller Insurance Policies. Except as expressly provided herein, the Sellers shall retain any rights to, including any right to any proceeds received in respect of, any claim pending as of the date hereof or made after the date hereof under any Seller Insurance Policy, even if such claims relates to the capital assets or properties of the Business (excluding the EMEA Business).

(b)     If after the Closing Date the Purchaser or the Sellers (or any of their respective Affiliates) reasonably require any information regarding claim data or other information pertaining to a claim or an occurrence reasonably likely to give rise to a claim (including any pre-Closing claims under the Seller Insurance Policies that are to be covered under the retrospective component of the new insurance policy) in order to give notice to or make filings with insurance carriers or claims adjustors or administrators or to adjust, administer or otherwise manage a claim, then the Sellers or the Purchaser, as the case may be, shall cause such information to be supplied to the other (or their designee), to the extent such information is in their possession and control or can be reasonably obtained by the Sellers or the Purchaser (or their respective Affiliates), as applicable, promptly upon a written request therefore. If the Purchaser desires access to, and utilization of, claims data or information maintained by an insurance company or other Third Party in respect of any claim (including any pre-Closing claims under any Seller Insurance Policies that are covered under the retrospective component of the new insurance policies), the Purchaser shall be exclusively responsible for acquiring from such insurance company or Third Party, at the Purchaser's sole cost and expense, the rights necessary to permit them to obtain access to and utilization of such claims data or information. If any Third Party requires the consent of the Sellers or any of their Affiliates to the disclosure of such information, such consent shall not be unreasonably withheld.

(c)     Prior to Closing, the Sellers shall maintain the Seller Insurance Policies, or in the event any such policies are cancelled or otherwise terminated, shall obtain other substantially comparable insurance policies that have the same coverage limits and deductibles or self-retention amounts. In respect of insurance claims relating to the Owned Equipment (excluding for the purposes of this Section 5.20(c), any fixtures and improvements forming part of the Carling Property) or the premises subject to a Real Estate Agreement (except for the Carling Property) occurring prior to Closing, the following provisions shall apply:

101

(i)     The Sellers shall make and diligently pursue any applicable insurance claims related to damage or destruction to any Owned Equipment wherever located.

(ii)    If and to the extent that any Owned Equipment, wherever located, is destroyed or damaged prior to Closing, and is not replaced or repaired or restored to its condition prior to such damage or destruction, then at Closing, the Sellers shall pay to the Purchaser the amount of any net insurance proceeds received (or which would have been received had the Sellers maintained the Seller Insurance Policies) in respect of such Owned Equipment that have not been applied to repair, replacement or restoration, as applicable, and assign any such claim and the rights to receive the proceeds of any such claim that has not yet been finally adjusted.  In the event that insurance proceeds would have been available but for the Sellers' failure to maintain the Seller Insurance Policies, or due to the rights of any superior lender, then in such event, the Purchase Price shall be reduced by an amount equal to the cost of repair, or, if destroyed or damaged beyond repair, by an amount equal to the cost of replacing the Owned Equipment so damaged or destroyed with equipment of comparable age and condition.

(iii)   Except in respect of the Carling Property, if and to the extent that any leasehold improvements at any premises subject to a Real Estate Agreement are destroyed or damaged prior to Closing, then to the extent of the receipt of insurance proceeds relating to such damage or destruction by the Sellers or which would have been received had the Sellers complied with the Seller Insurance Policies, or tenant's insurance requirements under the applicable Lease, as applicable (but excluding any proceeds related to business interruption insurance or related to any part of any premises in the applicable building not forming part of the premises subject to a Real Estate Agreement) the Sellers shall be responsible to the extent required under the terms of the applicable Lease, to utilize such insurance proceeds received to restore the applicable improvements and leasehold improvements in accordance with the provisions of the applicable Lease.  To the extent that any Real Property which is the subject of a Real Estate Agreement is destroyed or damaged after Closing, the applicable terms of the applicable Real Estate Agreement shall apply; and to the extent that the subject Real Estate Agreement provides that it is the responsibility of the landlord to repair or restore any destruction or damage to real or personal property, the Sellers shall make and diligently pursue any applicable claims against the landlord related to such damage or destruction.

(d)     If and to the extent that the Carling Property is destroyed or damaged prior to Closing and the Purchaser does not elect to terminate this Agreement pursuant to Section 10.1(f), hereof, then to the extent of the Sellers' receipt of insurance proceeds relating to such damage or destruction or which would have been received had the Seller maintained the Seller Insurance Policies, (but excluding any proceeds related to business interruption insurance), and subject to the rights of any superior landlord or mortgagee in respect of the Carling Property, the Sellers shall be responsible to the extent required under the terms of the Carling Property Lease Agreements (as if such Lease Agreements were in

102

effect prior to Closing and as if the landlord were required to restore tenant improvements in the same manner as other improvements) to restore the applicable improvements and fixtures to a condition substantially comparable to the condition prior to such damage or destruction. In the event that (i) insurance proceeds are not immediately available to the Sellers on Closing for purposes of the repair and restoration of the Carling Property (including any fixtures and tenant improvements forming a part thereof); or (ii) insurance proceeds would have been available but for the Sellers' failure to maintain the Seller Insurance Policies, or due to the rights of any superior landlord or mortgagee, the Purchaser may withhold from the Purchase Price due on Closing and pay into the Escrow Account an amount equivalent to the aggregate cost of repairing such damage and restoring the Carling Property (including any fixtures and improvements forming a part thereof) to a condition substantially comparable to the condition prior to such damage or destruction (such cost to be determined by an independent and qualified architect or engineer mutually acceptable to the Sellers and Purchaser, each acting reasonably). The provisions of Article II.C of the Real Estate Terms and Conditions shall apply mutatis mutandis in respect of these escrow amounts and the completion of the repair and restoration works. To the extent that the Carling Property is destroyed or damaged after Closing, the terms of the Carling Property Lease Agreements shall apply.

    **SECTION 5.21.  Sellers Deposits, Guarantees and Other Credit Support of the Business.**

        (a)    Following the Closing, the Purchaser shall, or shall cause the applicable Designated Purchaser to, cooperate with the Sellers to procure the return and/or release by the applicable counterparty, as soon as reasonably practicable, of any lease security deposits given by the Sellers under any Leases that are Assigned Contracts or any deposits, bonds or other security posted in connection with Assigned Contracts and that are set forth in Section 5.21(a) of the Sellers Disclosure Schedule (which such Section of the Sellers Disclosure Schedule may be updated by the Sellers upon notice to the Purchaser up until three (3) Business Days prior to the Closing Date) (the "**Security Deposits**"), including where required by the applicable counterparty, offering to post such Security Deposits on terms and conditions no less favorable than offered to such Seller by such counterparty. Except as required by the immediately preceding sentence, the Purchaser shall in no event be required to provide any replacement financial security or any financial security or other deposits with respect to any premises leased pursuant to any lease or sublease arrangement with any Seller, all of which shall be the sole responsibility of the Seller.

        (b)    The Purchaser shall, or shall cause the applicable Designated Purchaser to, hold the Sellers and their Affiliates harmless from and against any and all Losses suffered by the Sellers and their Affiliates resulting from, or relating to, the failure of the Purchaser or the applicable Designated Purchaser, as the case may be, to procure the return and/or release of the Security Deposits to the relevant Seller in accordance with Section 5.21(a); provided, however, that (i) the Purchaser shall have no liability to the Sellers and their Affiliates pursuant to this Section 5.21(b) unless the Sellers and their Affiliates assign to the Purchaser all of the Sellers' and their Affiliates' right, title and interest in the unreturned Security Deposits and (ii) the Purchaser's liability to the Sellers and their Affiliates shall be limited, in each case, to the amount of such Security Deposits.

      **SECTION 5.22.  Use of Sellers' Trademarks.**  Except as expressly provided in the Trademark License Agreement, as of the Closing Date, the Purchaser shall not have the right to use the name "Nortel" or any Trademarks owned by the Sellers or any of their Affiliates or any other mark employing the word "Nortel" or any part or variation of any of the foregoing or any confusingly similar Trademarks to any of the foregoing (collectively, the **"Sellers' Trademarks"**).

      **SECTION 5.23.  Accessible Information.**  After the Closing, the Purchaser shall have the right to reasonably request from the Main Sellers copies of all books, records, files, documentation and sales literature (other than Tax records and Employee Records, except as provided in Sections 5.6(d) and 7.4(d)) in the possession or under control of the Sellers and held or used in the Business (other than records to the extent prohibited by applicable Law), to which the Purchaser in good faith determines it needs access for *bona fide* business or legal purposes. The Sellers shall use commercially reasonable efforts to, or cause their Respective Affiliates to use commercially reasonable efforts to, provide such copies to the Purchaser (at the Purchaser's expense) as soon as reasonably practicable; provided, that the Sellers shall be allowed to redact any such requested document in order to delete any information and data relating to business segments of any such Seller and its Respective Affiliates not included in the Business; provided, further, that nothing herein shall require the Sellers to (i) disclose any information to the Purchaser if such information disclosure would jeopardize any attorney-client or legal privilege or (ii) contravene any applicable Law, fiduciary duty or agreement (including any confidentiality agreement to which the Sellers or any of their Affiliates is a party); it being understood, that the Sellers shall cooperate in any reasonable efforts and requests for waivers that would enable otherwise required disclosure to the Purchaser to occur without so jeopardizing privilege or contravening such Law, duty or agreement).

      **SECTION 5.24.  Maintenance of Books and Records.**  After the Closing, each Primary Party shall, and shall cause its Affiliates to, preserve, until at least the third (3rd) anniversary of the Closing Date (or, in the case of Tax records (including VAT records), such later date as may be required by Law), all pre-Closing Date records to the extent relating to the Business possessed or to be possessed by such Person. After the Closing Date and up until at least the third (3rd) anniversary of the Closing Date, upon any reasonable request from any Primary Party or its representatives, the other Primary Party shall, and/or shall cause the Person holding such records to, (a) provide to the requesting Primary Party or its representatives reasonable access to such records during normal business hours and (b) permit the requesting Primary Party or its representatives to make copies of such records, in each case at no cost to the requesting Primary Party or its representatives (other than for reasonable out-of-pocket expenses). In addition, in the event that the financial statements of the Business are audited for any period prior to the Closing Date, upon execution of a customary access letter if required, the requesting Primary Party and its representatives (including their outside accountants) shall be granted access to all relevant documents and information in connection with the requesting Primary Party completing the audit of its accounts for the 2009 fiscal year; provided, however, that nothing herein shall require the non-requesting Primary Party to disclose any information to the requesting Primary Party if such disclosure would jeopardize any attorney-client or other legal privilege or contravene any applicable Law, fiduciary duty or agreement (it being understood that the non-requesting Primary Party shall cooperate in any reasonable efforts and requests for waivers that would enable otherwise required disclosure to the requesting Primary Party to occur without so jeopardizing privilege or contravening such Law, duty or agreement).

Such records may be sought under this Section 5.24 for any reasonable purpose, including to the extent reasonably required in connection with accounting, litigation, federal securities disclosure or other similar needs of the requesting Primary Party (other than claims between the Primary Parties or any of their respective Subsidiaries under this Agreement or any Ancillary Agreement). Notwithstanding the foregoing, any and all such records may be destroyed by the non-requesting Primary Party if the non-requesting Primary Party sends to the requesting Primary Party written notice of its intent to destroy such records, specifying in reasonable detail the contents of the records to be destroyed; (i) such records may then be destroyed after the 60th day following such notice unless the requesting Primary Party notify the destroying party that the requesting Primary Party desire to obtain possession of such records, in which event the non-requesting Primary Party shall transfer or cause to be transferred the records to the requesting Primary Party and the requesting Primary Party shall pay all reasonable expenses of the non-requesting Primary Party in connection therewith, and (ii) neither Primary Party shall be required to provide the other Party access to, or copies of any of its Tax records.

> **SECTION 5.25. Certain Ancillary Agreements.** The Primary Parties shall use their commercially reasonable efforts to:

> > (a)    promptly negotiate in good faith with the relevant contract manufacturers and finalize the terms of the Contract Manufacturing Inventory Agreements based on the term sheet attached hereto as Exhibit 1.1;

> > (b)    promptly negotiate in good faith with the LGN Joint Venture with respect to the LGN/Korea Distribution Agreement;

> > (c)    promptly negotiate in good faith with NETAS with respect to the NETAS Distribution Agreement;

> > (d)    negotiate in good faith with the relevant counterparties with respect to the ~~Mutual Development Agreement, the Seller Supply Agreement, the~~ NGS Distribution Agreement and the EFA Development Agreement;

> > (e)    negotiate in good faith with respect to any Subcontract Agreement;

> > (f)    on or before the Closing and subject to the completion prior to Closing of the negotiation of each such agreement to the mutual satisfaction of each party thereto, enter into the Contract Manufacturing Inventory Agreements, the LGN/Korea Distribution Agreement and the NETAS Distribution Agreement, the Mutual Development Agreement, the Seller Supply Agreement, the NGS Distribution Agreement and the EFA Development Agreement, each as negotiated and finalized pursuant to this Section 5.25; and

> > _(g)    negotiate, or to cause to be negotiated, in good faith on commercially reasonable terms and taking into account options available to the Primary Parties, appropriate commercial arrangements, including a potential Seller Supply Agreement and Mutual Development Agreement, in order to address interdependencies to the extent any bilateral relationships with other businesses, business segments or divisions (or former businesses, business segments or divisions) of certain Sellers for the supply of products are_

required to be in place in order to fulfill customer commitments existing as of the Closing Date and which will continue thereafter.

Notwithstanding the foregoing, the Primary Parties shall have no obligation to enter into any of the agreements described in this Section 5.25 unless each of them are satisfied, in their sole and absolute discretion with the terms thereof and it shall not be a breach of this Agreement to fail to enter into such agreements before, on or after the Closing Date; provided however, that the Parties acknowledge that the failure to enter into any such Agreement shall not be deemed a failure of any condition precedent to any Party's obligations hereunder. In the event that the Purchaser is unable prior to the Closing to negotiate terms and conditions for the Seller Supply Agreement that are satisfactory to it in its sole discretion, the Purchaser may by written notice to the Sellers given by January 18, 2010 elect to require that the Sellers purchase such amount of the components and other products intended to be supplied under the Seller Supply Agreement and such components and other products shall be transferred to the Purchaser as part of the Owned Inventory hereunder.

**SECTION 5.26. Additional Financial Statements.** The Sellers shall use commercially reasonable efforts to cause KPMG (as their independent accountants) to complete the audit of the combined carve-out (A) balance sheets for the Business at December 31, 2007 and 2008, (B) related statements of earnings and cash flows of the Business for the fiscal years ended December 31, 2007 and 2008, and (C) balance sheet for the Business at September 30, 2009, and (D) the related statements of earnings and cash flows of the Business for the nine (9) month period ending on September 30, 2009 and (E) only if the Closing Date is February 12, 2010 or later, a balance sheet for the Business at December 31, 2009 and related statements of earnings and cash flows of the Business for the fiscal year ended December 31, 2009 (any such balance sheets and statements of earnings and cash flows, collectively, the **"Audited Financial Statements"**) and to deliver to the Purchaser as promptly as practicable, and in any event within three (3) Business Days of receipt thereof the Audited Financial Statements. The Sellers shall use commercially reasonable efforts to prepare and furnish the Purchaser with any other financial and other pertinent information regarding the Business as may be reasonably requested by the Purchaser, including all financial statements (including, to the extent required, unaudited combined carve-out financial statements of the Business as of the end of and for the nine (9) month period ended September 30, 2008, the **"Unaudited September 30, 2008 Financial Statements"**) and financial data, in each case of the type required by Regulation S-X and Regulation S-K under the Securities Act or in order for the Purchaser to comply with its financial reporting obligations as established by the SEC under the Exchange Act. The Sellers shall provide the Purchaser and its representatives with such cooperation and information as they shall reasonably request in connection with the Purchaser's compliance with its obligations under Section 8.1(a) hereof, or in order for the Purchaser to comply with its obligations as established by the SEC under the Securities Act and the Exchange Act.

**SECTION 5.27. Securities Compliance.** The Purchaser shall notify NASDAQ of the listing of the Shares as required by the NASDAQ listing rules prior to the Closing Date.

**SECTION 5.28. Transition Services.** Section 5.28 of the Sellers Disclosure Schedule addresses certain matters related to the Transition Services Agreement and the services to be performed by certain Affiliates of the Sellers for the Purchaser. The Parties agree that the

106

terms and conditions set forth in Section 5.28 of the Sellers Disclosure Schedule are incorporated by reference herein and form a part of this Agreement.

### SECTION 5.29. <u>Standstill Period.</u>

(a)      From the date of this Agreement until the entry of the U.S. Bidding Procedures Order, and from the date of the conclusion of the Auction until the Closing Date or termination of this Agreement, neither any Seller nor any Affiliate of any Seller shall, directly or indirectly through any of its authorized representatives, (i) solicit, initiate or encourage or engage in discussions or negotiations with respect to any proposal or offer from any Person (other than the Purchaser or its Affiliates) relating to in each case any acquisition, divestiture, recapitalization, business combination or reorganization of or involving all or a substantial part of the business and operations of the Business (a "**Competing Transaction**"), (ii) furnish any information with respect to, or participate in, or assist, any effort or attempt by any Person to do or seek a Competing Transaction, (iii) execute any letter of intent or agreement providing for a Competing Transaction, or (iv) seek or support Bankruptcy Court approval of a motion or Order inconsistent with the transactions contemplated herein, provided, however, that nothing contained herein shall prohibit the Sellers from providing any Person with the bidding procedures for the sale of the Business and related documents, answering questions about the bidding procedures for the sale of the Business, announcing the execution of this Agreement or the Auction or selecting an Alternate Bid (as such term is defined in the U.S. Bidding Procedures Order) at Auction and obtaining approval of such Alternate Bid as an alternate bid; and provided that nothing herein shall limit the Sellers' ability to negotiate, file, seek approval of or consummate a Sponsored Reorganization Plan prior to the completion of the Auction.

(b)      Notwithstanding the foregoing, the Sellers may provide continued access to written due diligence materials about the Business in an electronic data room (including written responses to requests for information made after the date hereof), to only such Person or Persons that (i) have access to such electronic data room as of the date hereof, and (ii) have satisfied the requirements of paragraph (a) of the "Participation Requirements" of the U.S. Bidding Procedures Order within ten (10) Business Days from the date hereof, it being understood that, during such ten (10) Business Day period, the Sellers will be allowed to (x) request such Persons to enter into amendments to their existing confidentiality agreements in order to render them compliant with the requirements of the bidding procedures for the sale of the Business, (y) discuss and negotiate such amendments with those Persons, and (z) execute such amendments, and each such action shall not constitute a breach of this Section 5.29, provided, however, that the Sellers must provide the Purchaser at least equivalent access to all such written due diligence materials.

(c)      Without prejudice to any other methods or actions that may result in the cure of any breach of this Section 5.29, the Parties acknowledge and agree that in the event that any officer or other employee of any Seller acting alone (without the assistance of outside advisors) in violation of a corporate policy approved by the board of directors of NNC takes an action that constitutes a breach of Section 5.29(a)(i) but does not constitute a breach of any other clause of this Section 5.29, such breach shall be deemed cured in the event such action ceases and one or more of the Sellers notifies the counterparty or counterparties to the potential Competing Transaction in writing that the Sellers will not

undertake such Competing Transaction, in each case no later than the fifth (5th) day after the Sellers become aware of such breach (for such purposes excluding the knowledge of the employee or officer whose action constitutes such breach), provided that such action that constituted the breach did not involve substantive negotiations regarding the terms of such Competing Transaction.

### SECTION 5.30. Hazardous Materials at the Carling Property.

(a)    The Sellers acknowledge that the Purchaser and any Designated Purchaser did not cause or contribute to, and shall not be liable or responsible for, any currently or formerly existing Hazardous Materials contamination in, under, at, near or migrating from, to or through the Carling Property prior to or at the Closing Date.

(b)    The Sellers that own and lease the Carling Property and the Purchaser agree that the relevant Sellers and the Purchaser or a Designated Purchaser shall include in the Carling Property Lease Agreements: (i) an acknowledgement that the Purchaser or a Designated Purchaser did not cause or contribute to, and shall not be liable or responsible for, the currently or formerly existing Hazardous Materials contamination in, under, at, near or migrating from, to or through the Carling Property prior to or at the commencement of the Carling Property Lease Agreements; (ii) an indemnity by the relevant Sellers in favor of the Purchaser and any Designated Purchaser for (A) any Liabilities, including any Order, arising (directly or indirectly) out of or relating to any currently or formerly existing Hazardous Materials contamination in, under, at, near or migrating from, to or through the Carling Property prior to or at the commencement of the Carling Property Lease Agreements and (B) if and to the extent caused by Sellers, any Liabilities, including any Order, arising (directly or indirectly) out of or relating to any Hazardous Materials contamination in, under, at, near or migrating from, to or through the Carling Property; and (iii) an indemnity by the Purchaser or Designated Purchaser, as the case may be, in favor of the Sellers  for, if and to the extent caused by the Purchaser or Designated Purchaser, as the case may be, any Liabilities, if and to the extent caused by the Purchaser or Designated Purchaser, as the case may be, including any Order, arising (directly or indirectly) out of or relating to any Hazardous Materials contamination in, under, at, near or migrating from, to or through the Carling Property after the commencement of the Carling Property Lease Agreements.

SECTION 5.31.  Montreal Premises and Other Real Estate.  Before, on and after the Closing Date, the Parties shall take such actions as are contemplated by, and comply with, the Real Estate Terms and Conditions which shall be incorporated herein by reference.  Without limiting the foregoing, at the Closing, the Purchaser and/or a Designated Purchaser and each applicable Seller shall enter into an Occupancy Agreement with respect to each Critical Location (identified in the Real Estate Terms and Conditions) and shall enter into a license agreement with respect to each Short-Term Licensed Property location which the Purchaser shall be licensed to occupy following the Closing Date, in each case on the terms and conditions specified in the Real Estate Terms and Conditions.

108

**SECTION 5.32.  Right to Exclude.**

(a)    At any time prior to the date of the Auction, the Purchaser may elect, by written notice to the Main Sellers, but without any effect on the Purchase Price or the Purchaser's obligation to offer employment to at least the numbers of Employees set out in Section 7.1.1, to designate as Excluded Assets all of the assets, interests and rights of any Other Seller other than any Other Seller with respect to which it has previously made an election under Section 2.2.3 if it is the case that, absent such election, by consummating the transactions contemplated hereby, the Purchaser or a Designated Purchaser would be reasonably likely to succeed to Liabilities of such Other Seller that are not Assumed Liabilities hereunder, or Liabilities of such Other Seller would be reasonably likely to be transferred to, or assumed by, the Purchaser or a Designated Purchaser, whether by operation of Law or otherwise (including, without limitation, any Liability for Taxes) (any such Other Seller so designated by the Purchaser, an **"Excluded Other Seller"**. For the avoidance of doubt, if the Purchaser makes an election under this Section 5.32 with respect to any Excluded Other Seller, the provisions of Section 2.2.3 shall not apply to such Excluded Other Seller. Upon designation of any Excluded Other Seller, the assets, interests and rights of such Excluded Other Seller shall be Excluded Assets and any Liabilities of such Excluded Other Seller or otherwise relating to such Excluded Assets shall be Excluded Liabilities, and such Excluded Other Seller shall not be a Party to this Agreement, shall not be an Other Seller, and shall have no rights or obligations hereunder, provided that each Excluded Other Seller shall remain bound by the provisions of Article XI. In addition to the foregoing, following the designation of an Excluded Other Seller by the Purchaser, no sublease and no license or other arrangement pursuant to the Real Estate Terms and Conditions shall be required to be entered into with respect to any premises related to such Excluded Other Seller's operations prior to the date of the Purchaser's election. For the avoidance of doubt, the designation of assets, interests or rights in any country as Excluded Assets shall not in any way prevent the Purchaser or any of its Affiliates from engaging in the Business (defined as if such assets, interests or rights were not Excluded Assets) in such country either before or after the Closing. If a TSA Seller becomes an Excluded Other Seller pursuant to this Section 5.32, such entity shall not be required to be a party to the Transition Services Agreement. For the avoidance of doubt, the failure of any TSA Seller to become party to the Transition Services Agreement shall not in any way diminish the obligations of the remaining TSA Sellers to provide, or to cause one or more of the Providers to provide, all Services (as defined in the Transition Services Agreement). Notwithstanding anything herein to the contrary, the Parties agree that neither the Included Services nor the Extra Services shall include any service currently provided by an Excluded Seller unless such service can reasonably be provided by the TSA Sellers without materially changing or burdening the operations of the TSA Sellers.

(b)    The Main Sellers agree that, as of the Closing, (i) neither any Seller nor any Seller's Affiliate will be a party to any Contract with any Excluded Seller that will restrict the Purchaser or a Designated Purchaser, in any material respect, from engaging after the Closing in any business activity relating to the Business in the country where such Excluded Seller is located or organized; and (ii) the Sellers and their Affiliates will cease to supply Products or Services or provide other assistance to an Excluded Seller with respect to the Business (except to the extent required in order to allow such Excluded Seller to continue to perform any obligations under (x) a contract with one of its customers existing

as of the date hereof, or (y) a contract with one of its customers entered into after the date hereof but before Closing that was entered into in the Ordinary Course, in each case which such Excluded Seller is required by such contract to perform until the earliest of (A) the expiration of such contract (without giving effect to any extension of the term thereof other than at the option of the counterparty thereto), (B) the earliest date on which such Excluded Seller has the right to terminate such contract without penalty or (C) the date on which such contract is terminated by the counterparty thereto; provided that the Purchaser and its Affiliates shall be under no obligation to make Products or Services (or any other products or services) available to the Sellers or their Affiliates or provide other assistance in connection therewith) and the Purchaser and its Affiliates will have no obligation to supply Products or Services (or any other products or services) or provide other assistance to the Excluded Sellers; provided that, notwithstanding clauses (i) and (ii) above, the Purchaser or a Designated Purchaser will, if requested to do so, perform any Subcontract Agreement that it enters into pursuant to Section 5.15(c) at the request of an Excluded Seller and the Sellers may be a conduit through which the Purchaser supplies Products or Services to an Excluded Seller.

SECTION 5.33. ~~Purchaser Management Presentation~~Authorization of Shares. ~~On or before October 31, 2009, the Chief Financial Officer, General Counsel and Vice-President of Business Development of the Purchaser will deliver a management presentation with respect to the Purchaser and its business to a reasonable number of representatives of the Sellers, *the EMEA Sellers, the Joint Administrators, the* Monitor and their financial advisors and such other Persons as the Sellers may notify the Purchaser for the sole purpose of permitting them to form an independent view of the value of the Shares. Each participant in such management presentation shall be required to execute a customary nondisclosure agreement with respect to all non-public information presented at such presentation. The scope of such management presentation will be agreed in advance between the Purchaser, the Sellers and the EMEA Sellers, each acting reasonably.~~The Purchaser will, at all times, duly authorize and reserve for issuance the Shares.

SECTION 5.34. Patent Assignments. Prior to the Closing Date, the Purchaser shall notify the Sellers in writing of any defects in title affecting any of the transferred Patents and the Sellers shall take, as soon as reasonably practicable thereafter, all reasonable steps necessary to ensure that NNL is the assignee on record in the relevant government registry or patent office, as applicable, for all transferred Patents and to correct all material defects in title affecting any of the transferred Patents that are still in force in the relevant jurisdiction.

SECTION 5.35. India. Section 5.35 of the Sellers Disclosure Schedule addresses certain matters related to the transfer of assets that are used by Nortel Networks Singapore Pte. Limited, Nortel Networks India International Inc. and Nortel Networks (India) Private Limited in the Business in India. The Parties agree that the terms and conditions set forth in Section 5.35 of the Sellers Disclosure Schedule are incorporated by reference herein and form a part of this Agreement.

SECTION 5.36. No Vote. The Purchaser will not take any action that would result in a requirement for the approval of shareholders or any securityholders of the Purchaser pursuant to NASDAQ Listing Rule 5635 or require any other action or consent pursuant to any

applicable exchange rules, regulations, interpretations or Laws in connection with the issuance of the Convertible Notes or the Shares upon the conversion thereof.

   **SECTION 5.37. Deposit.** On or before November 25, 2009, the Purchaser shall deposit Thirty-Eight Million Four Hundred Fifty Thousand dollars ($38,450,000) (the "**Deposit Amount**") with Citibank, N.A. (the "**Deposit Escrow Agent**") pursuant to the terms and conditions of the Deposit Escrow Agreement substantially in the form attached as Exhibit AA hereto (the "**Deposit Escrow Agreement**"). Notwithstanding anything to the contrary set forth herein or the Deposit Escrow Agreement, the Deposit Amount shall not become a part of the Sellers' or the EMEA Sellers' estate until such time as the Deposit Escrow Agent receives joint written instructions from the Parties and Nortel Networks UK Limited instructing the Deposit Escrow Agent to disburse the Deposit Amount to the Distribution Agent or the Main Sellers. At the Closing, the Purchaser shall be entitled to a credit for the amount of the Deposit Amount against the Base Cash Purchase Price and the Parties and Nortel Networks UK Limited shall jointly instruct the Deposit Escrow Agent to disburse the Deposit Amount to the Distribution Agent. The Deposit Amount shall be returned and/or disbursed in accordance with the U.S. Bidding Procedures Order, this Agreement and the Deposit Escrow Agreement. In the event that all of the conditions to the Purchaser's obligations to Closing are satisfied and Purchaser fails to consummate *the transactions contemplated* hereby and by the Deposit Escrow Agreement and the Main Sellers terminate this Agreement pursuant to, and in accordance with Section 10.1(b)(ii), the Main Sellers and the EMEA Sellers shall be entitled to the Deposit Amount (less any interest earned thereon which shall be disbursed to the Purchaser) and within two (2) Business Days of such termination, the Parties shall jointly instruct the Deposit Escrow Agent to disburse the Deposit Amount to the Distribution Agent.

## ARTICLE VI
## TAX MATTERS

### SECTION 6.1. Transfer Taxes.

   (a)   The Parties agree that the Purchase Price is exclusive of any Transfer Taxes. The Purchaser shall (on behalf of itself and the Designated Purchasers) promptly pay directly to the appropriate Tax Authority all applicable Transfer Taxes that are properly imposed upon or payable or collectible or incurred in connection with the purchase by the Purchaser (or a Designated Purchaser) of the Assets under this Agreement and in connection with the other Transaction Documents including, for greater certainty, any stamp, documentary, recording, filing and similar Taxes that may be imposed upon or payable or collectible or incurred in connection with the execution of this Agreement and any other Transaction Documents; provided that if any such Taxes are required to be collected, remitted, or paid by the Sellers or any Subsidiary of the Sellers or any agent thereof (as requested by the Sellers or any Subsidiary of the Sellers), they shall be paid by the Purchaser to the Sellers or any Subsidiary of the Sellers or any such agent, as applicable, at the Closing, as applicable, or thereafter as requested of or by the Sellers. For greater certainty, the Purchaser shall remain liable in respect of any Transfer Taxes for which it is liable under the terms hereof regardless of the date that the Assets purchased under this Agreement are removed by the Purchaser or its agents from the premises of the Sellers or any of the Sellers' suppliers. Upon request from a Seller, the Purchaser shall provide to such Seller an original receipt (or other such evidence as