**EXHIBIT A**

Court File No. 09-CL-7950

*ONTARIO*
**SUPERIOR COURT OF JUSTICE**
**(COMMERCIAL LIST)**

**IN THE MATTER OF THE *COMPANIES' CREDITORS***
***ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED**

**AND IN THE MATTER OF A PLAN OF**
**COMPROMISE OR ARRANGEMENT OF**
**NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL**
**NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL**
**CORPORATION AND NORTEL NETWORKS TECHNOLOGY CORPORATION**

**TWENTY-NINTH REPORT OF THE MONITOR**
**DATED NOVEMBER 27, 2009**

**INTRODUCTION**

1.  On January 14, 2009 (the "Filing Date"), Nortel Networks Corporation ("NNC" and collectively with all its subsidiaries, "Nortel" or the "Company"), Nortel Networks Limited ("NNL"), Nortel Networks Technology Corporation, Nortel Networks International Corporation and Nortel Networks Global Corporation (collectively, the "Applicants") filed for and obtained protection under the Companies' Creditors Arrangement Act ("CCAA"). Pursuant to the Order of this Honourable Court dated January 14, 2009, as amended and restated (the "Initial Order"), Ernst & Young Inc. ("EYI") was appointed as the Monitor of the Applicants (the "Monitor") in the CCAA proceedings. The stay of proceedings was extended to December 18, 2009, by this Honourable Court in its Order dated October 28, 2009.

2.  Nortel Networks Inc. ("NNI") and certain of its U.S. subsidiaries concurrently filed voluntary petitions under Chapter 11 of Title 11 of the U.S. Bankruptcy Code (the "Code") in the United States Bankruptcy Court for the District of Delaware (the "U.S. Court") on

January 14, 2009 (the "Chapter 11 Proceedings"). As required by U.S. law, an official unsecured creditors committee (the "UCC") was established in January, 2009.

3. An ad hoc group of holders of bonds issued by NNL and NNC has been organized and is participating in these proceedings as well as the Chapter 11 Proceedings (the "Bondholder Group"). In addition, pursuant to Orders of this Honourable Court dated May 27, 2009, and July 22, 2009, respectively, representative counsel was appointed on behalf of the former employees of the Applicants and on behalf of the continuing employees of the Applicants and each of these groups is participating in the CCAA proceedings.

4. Nortel Networks (CALA) Inc. (together with NNI and certain of its subsidiaries filed on January 14, 2009, the "U.S. Debtors") filed a voluntary petition under Chapter 11 of Title 11 of the Code in the U.S. Court on July 14, 2009.

5. Nortel Networks UK Limited ("NNUK") and certain of its subsidiaries located in EMEA (together the "EMEA Debtors") were granted Administration orders (the "U.K. Administration Orders") by the English High Court on January 14, 2009. The U.K. Administration Orders appointed Alan Bloom, Stephen Harris, Alan Hudson and Chris Hill of Ernst & Young LLP as Administrators (the "UK Administrators") of the various EMEA Debtors, except for Ireland, to which David Hughes (Ernst & Young LLP Ireland) and Alan Bloom were appointed (collectively the "UK Administrators"). On June 8, 2009, the UK Administrators appointed in respect of NNUK filed a petition with the U.S. Court for the recognition of the Administration Proceedings as they relate to NNUK (the "English Proceedings") under Chapter 15 of the Code. On June 26, 2009, the U.S. Court entered an Order recognizing the English Proceedings as foreign main proceedings under Chapter 15 of the Code.

6. On January 20, 2009, Nortel Networks Israel (Sales and Marketing) Limited and Nortel Communications Holdings (1997) Limited (together, "NN Israel") were granted Administration orders by the court in Israel (the "Israeli Administration Orders"). The Israeli Administration Orders appointed representatives of Ernst & Young LLP in the U.K. and Israel as Administrators of NN Israel and provided a stay of NN Israel's creditors

which, subject to further orders of the Israeli Court, remains in effect during the Administration.

7.    On May 28, 2009, Nortel Networks SA ("NNSA") commenced secondary insolvency proceedings within the meaning of Article 27 of the European Union's Council Regulation (EC) No 1346/2000 on Insolvency Proceedings in the Republic of France pursuant to which a liquidator (the "French Liquidator") and an administrator (the "French Administrator" and, collectively with the French Liquidator, the "French Office Holders") have been appointed by the Versailles Commercial Court (the "French Court").

## PURPOSE

8.    The purpose of this Twenty-Ninth Report of the Monitor (the "Twenty-Ninth Report") is to provide information regarding the Applicants' motion seeking approval of:

- the sale of certain assets associated with Nortel's North American GSM and GSM-R Business (the "North American GSM Business") pursuant to an asset sale agreement dated November 24, 2009 (the "Ericsson Agreement"), amongst NNC, NNI and NNL (the "Main Sellers") and certain of their affiliates (the "Sellers") and Telefoneaktiebolaget L M Ericsson Publ ("Ericsson" or the "Purchaser"); and

- a termination fee agreement dated November 24, 2009 (the "Termination Fee Agreement") between the Main Sellers and Ericsson;

and to provide the Monitor's support thereof.

3

**TERMS OF REFERENCE**

9.   In preparing this Twenty-Ninth Report, EYI has relied upon unaudited financial
     information, the Company's books and records, financial information prepared by the
     Company, and discussions with management of Nortel. EYI has not audited, reviewed, or
     otherwise attempted to verify the accuracy or completeness of the information and,
     accordingly, EYI expresses no opinion or other form of assurance on the information
     contained in this Twenty-Ninth Report.

10.  Unless otherwise stated, all monetary amounts contained herein are expressed in U.S.
     dollars.

11.  Capitalized terms not defined in this Twenty-Ninth Report are as defined in the Affidavit of
     John Doolittle sworn on January 14, 2009 (the "Doolittle Affidavit"), the Pre-Filing Report,
     the Twenty-Third Report of the Monitor dated October 8, 2009 (the "Twenty-Third
     Report"), other previous Reports of the Monitor, the Ericsson Agreement or the Bidding
     Procedures (as defined below).

**GENERAL BACKGROUND**

12.  In the Twenty-Third Report, the Monitor noted that as a result of its ongoing restructuring,
     Nortel management determined that the Company should divest its GSM Business in a
     relatively expedient manner in order to maximize the value of the assets of the GSM
     Business (the "GSM Assets") and reduce the continuing cost related to the support and
     development of the GSM Business. The Twenty-Third Report provided a description of the
     GSM Assets and set out the process conducted by the Company after its insolvency filings
     to identify potential purchasers and market the GSM Assets.

13.  The Twenty-Third Report also noted that given the pressure being exerted by existing and
     potential customers to provide a definitive timeline for the transfer of the GSM Business,

4

management determined that it should conduct an expedited court-approved sale process for the global GSM Business.

14. The bidding procedures (the "Bidding Procedures") to be employed in connection with the sale process were approved by both the U.S. Court and this Honourable Court on October 15, 2009. A copy of the Bidding Procedures is attached at Appendix "A". The Bidding Procedures provided that all bids were to be received by the Sellers not later than November 5, 2009, at 12:00 p.m. ET giving interested parties 21 days to conduct due diligence and submit a bid. Such bids had to be accompanied by a Good Faith Deposit in the amount of $10 million. The Bidding Procedures also provided that the Auction would be held on November 9, 2009, at 9:30 a.m. ET.

**BIDDING PROCEDURES AND AUCTION PROCESS**

15. Subsequent to this Honourable Court's approval of the Bidding Procedures, six potential buyers submitted non-binding letters of intent. After consultation with the Monitor, the UCC, the UK Administrators and the Bondholder Group, all of these parties were deemed Qualified Bidders pursuant to the Bidding Procedures.

16. In the period up to November 9, 2009, the Qualified Bidders: a) were given access to the confidential data room; b) accessed the data room; c) engaged legal counsel and other advisors; d) participated in meetings and other discussions with management of Nortel; e) met with representatives of the Monitor and the UK Administrators; and f) prepared marked up versions of the transaction documents as well as various ancillary agreements.

17. During this period, the Monitor was kept apprised of all activity conducted between Nortel and the potential buyers. In addition, the Monitor participated in several conference calls and meetings with the potential buyers.

18. On October 28, 2009, as a result of feedback from certain of the potential buyers and in consultation with the Monitor, the UCC, the UK Administrators and the Bondholder Group,

the Sellers agreed to extend the bid deadline to November 16, 2009, at 12:00 p.m. ET. All Qualified Bidders were promptly notified of the extension. Qualified Bidders were also notified that the auction would be conducted on November 20, 2009.

19.  On November 16, 2009, prior to the expiration of the revised bid deadline, three bids ("Single Bids") were received from potential buyers (the "Single Bidders") proposing stand-alone acquisitions of all or a portion of the GSM Assets. These parties were Huawei Technologies Co., Ltd. ("Huawei"), Nokia Siemens Networks, B.V. ("NSN") and one other potential buyer. In addition, a fourth proposal (a "Joint Bid") was received from two other potential buyers acting as a team (the "Joint Bidders") proposing to each acquire a portion of the GSM Assets. These parties were Ericsson and Kapsch CarrierCom AG ("Kapsch"). All of the parties that submitted bids had previously been deemed Qualified Bidders.

20.  In accordance with the Bidding Procedures, two of the three Single Bidders submitted Good Faith Deposits in the amount of $10 million. In addition, each of the Joint Bidders submitted a Good Faith Deposit of $5 million. The Good Faith Deposits are currently being held in a sole purpose bank account with Citibank N.A.

21.  The bids were reviewed by the Sellers, the UK Administrators and the Monitor in detail. Copies of the bids were also provided to representatives of the UCC and the Bondholder Group for their review.

22.  On November 17, 2009, the Single Bidders and the Joint Bidders (collectively, the "Bidders") were notified that a total of four bids had been received and that the Sellers would be seeking to engage in discussions with each of the Bidders with respect to certain key terms of their bids. The Bidders were also notified that the Sellers, in consultation with the Monitor, the UCC, the Bondholder Group and the UK Administrators, had decided to re-schedule the auction for November 23, 2009.

23.  On November 18, 2009, in accordance with Sections L. 642-1 *et seq.* and R. 642-1 *et seq.* of the French Commercial Code and the French Court's order of October 22, 2009, each of

Huawei and Kapsch filed with the French Office Holders an offer to acquire certain assets associated with NNSA's GSM and GSM-R business.

24.  Over the course of the next several days, the Sellers and the UK Administrators engaged in discussions with each of the Bidders with respect to the terms of their bids. The Monitor was present during the majority of these discussions.

25.  During the course of these discussions, certain of the Bidders agreed to revise certain terms of their bids and, accordingly, submitted revised bids.

26.  On November 20, 2009, the Sellers received a request from NSN for the Sellers to consent to NSN engaging in discussions with Huawei for purposes of preparing a joint bid. This consent was granted to both NSN and Huawei on the morning of November 21, 2009.

27.  On November 21, 2009, the Sellers received a written notice from the Single Bidder that had not submitted a Good Faith Deposit that such bidder was withdrawing its bid and would not participate in the auction.

28.  After reviewing the revised bids, the Sellers, in consultation with the Monitor, the UCC, the UK Administrators and the Bondholder Group, concurred that the bids received from Huawei, NSN and the Joint Bidders met the requirements of a Qualified Bid pursuant to the Bidding Procedures.

29.  On November 22, 2009, Huawei, NSN and the Joint Bidders were notified that their revised bids had been deemed Qualified Bids and that further details with respect to the timing of the auction would be provided as soon as possible.

30.  After further consultation with the Monitor and representatives of the UCC, the UK Administrators and the Bondholder Group, the Sellers determined that the highest or otherwise best offer amongst the three revised bids was the revised Joint Bid submitted by Ericsson and Kapsch in the amount of $81.5 million. Accordingly, on November 23, 2009, the Qualified Bidders were informed that the Ericsson and Kapsch Joint Bid had been selected as the Starting Bid pursuant to the Bidding Procedures and the Auction would be

held on November 24, 2009, at 8:00 a.m. ET. Copies of the Ericsson and Kapsch Joint Bid were provided to Huawei and NSN.

31. The Sellers were subsequently advised by NSN that it would not be participating in the Auction.

32. Prior to the commencement of the Auction, the Sellers received written requests from both Huawei and NSN to adjourn the auction to November 30, 2009, to allow Huawei and NSN to have additional time to structure and negotiate a joint bid. After considering the potential impact to the GSM Business from further delays in the process, including, as referenced above, the pressure being exerted by existing and potential customers to conclude a definitive transaction for the GSM Business, and after consulting with the Monitor, the UK Administrators, the UCC and the Bondholder Group, the Sellers informed Huawei and NSN that the auction would proceed on November 24, 2009.

33. The Auction commenced on November 24, 2009, at the offices of Cleary Gottlieb Steen & Hamilton LLP in New York, New York. In attendance at the auction were representatives of the Sellers, the Monitor, Ericsson, Kapsch, Huawei, the UCC, the UK Administrators, the French Administrator and the Bondholder Group. Also in attendance were representatives of other interested parties admitted at the discretion of the Sellers.

34. The Bidders were once again notified that the Joint Bid submitted by Ericsson and Kapsch had been designated as the Starting Bid. The Bidders were advised that there was no minimum incremental value threshold set for the first round of bidding and that all further bids were required to be submitted in writing. The Sellers then adjourned the auction to allow the Qualified Bidders time to prepare written bids.

35. During the adjournment, the Sellers engaged in discussions with Huawei and the Joint Bidders. In the course of these discussions, representatives of Huawei again requested that the Auction be adjourned for a period of time to allow Huawei additional time to formulate a joint bid with the Single Bidder referred to above. After further consultations with the

Monitor, the UK Administrators, the UCC and the Bondholder Group, the Sellers informed Huawei that such an adjournment would not be granted.

36. Also during the adjournment, the Sellers engaged in discussions with the Joint Bidders with respect to certain terms of their bid. As a result of these discussions, Ericsson and Kapsch submitted a revised written joint bid in the amount of $103 million with certain changes in contract terms relative to the Starting Bid.

37. After consultation with the Monitor, the UCC, the UK Administrators and the Bondholder Group, the Auction was re-convened. Prior to doing so, representatives of Huawei were informed that the Auction was to be re-convened but declined to attend. Accordingly, representatives of Huawei were not in attendance during the re-convened Auction. The Sellers announced the revised Ericsson and Kapsch Joint Bid as the Leading Bid and, as no other bids were submitted, the revised Ericsson and Kapsch Joint Bid was also announced as the Successful Bid.

38. The auction was then adjourned again, solely to permit the completion of documentation between the Sellers, the EMEA Debtors, Ericsson and Kapsch relating to the Successful Bid. At approximately 1:00 am ET on November 25, 2009, the documentation was finalized and signature pages were exchanged. At that point, the Auction was concluded.

## THE ERICSSON AGREEMENT

39. The Successful Bid includes the Ericsson Agreement pursuant to which Ericsson has agreed to purchase the North American GSM Assets and a separate asset sale agreement (the "Kapsch Agreement") between certain of the EMEA Debtors and their affiliates and Kapsch pursuant to which Kapsch has agreed to purchase the GSM Assets outside of North America. Kapsch provides voice and data communications solutions for fixed and mobile network providers with offices in 10 countries. Its headquarters are located in Vienna, Austria.

40. Ericsson, the Purchaser under the Ericsson Agreement, provides communications equipment and related professional services, and multimedia solutions to mobile and fixed network operators worldwide. Its headquarters are located in Stockholm, Sweden. As previously reported to this Honourable Court, Ericsson was also the purchaser of certain assets pertaining to Nortel's CDMA and LTE Access business.

41. A copy of the Ericsson Agreement is attached as Appendix "B". A copy of the exhibits and schedules to the Ericsson Agreement, including the Kapsch Agreement, are attached as confidential Appendix "C" hereto. As these exhibits and schedules contain sensitive competitive information as well as personal information with respect to employees, the Monitor requests that confidential Appendix "C" to this Twenty-Ninth Report be sealed by this Honourable Court.

42. The key provisions of the Ericsson Agreement are described in the paragraphs that follow. Reference should be made directly to the Ericsson Agreement for a complete understanding of the terms governing the transaction.

*Assets*

43. The assets being sold (the "Assets") are the GSM Assets of the Sellers relating to the North American GSM Business as well as certain GSM Assets associated with the Sellers' research and development ("R&D") activities in China. The Assets include:

- the Owned Inventory as of the Closing Date;

- the construction-in-process accounts receivable;

- the Owned Equipment as of the Closing Date;

- the Assigned Contracts in force as of the Closing Date;

- the North American GSM Business Information existing as of the Closing Date (subject to certain exceptions);

- the Transferred Intellectual Property as of the Closing Date, subject to license rights granted prior to the Closing Date, together with all claims against Third Parties for infringement, misappropriation or other violations of law with respect to the Transferred Intellectual Property;

- all rights as of the Closing Date under all warranties, representations and guarantees made by suppliers, manufacturers, and contractors to the extent related to the Assets;

- to the extent assignable, all consents of Government Entities exclusively pertaining to the North American GSM Business; and

- the China Assets, including certain laboratory equipment and other R&D assets and personal computers of Transferred Employees all as held or located in China, which shall be conveyed pursuant to a separate China Purchase Agreement.

44. The Assets to be acquired by the Purchaser exclude, among other things, certain cash and cash equivalents, accounts receivable (including intercompany receivables but excluding construction-in-process accounts receivable), bank account balances and petty cash of the Sellers, certain rights and refunds (including Tax refunds) relating to the pre-Closing period, security deposits provided by the Sellers to their contractual counterparties, any rights under any contracts (other than the Assigned Contracts), shares of any Person, and any assets owned by certain joint ventures of the Sellers.

***Purchase Price***

45. The Purchase Price is $70 million cash (the "Base Purchase Price"), as adjusted in the manner described below, plus the Purchaser's obligation to pay, perform and discharge the Assumed Liabilities and the EMEA Assumed Liabilities. The purchase price to be paid by Kapsch for the GSM Assets outside of North America pursuant to the Kapsch Agreement is $33 million.

46. On the Closing Date, the Purchaser will deliver to the Distribution Agent the Estimated Purchase Price, which is calculated as:

- the Base Purchase Price;

- plus: an amount, which may be positive or negative, equal to the Estimated Closing Date Net Working Capital plus $19.2 million;

- minus: the estimated Accrued Vacation Amount;

- minus the China Purchase Amount of $230,000 (The China Purchase Amount will be paid by the Purchaser separately pursuant to the China Purchase Agreement).

47. The Good Faith Deposit of $5 million delivered by Ericsson shall be applied to the Estimated Purchase Price to be paid by the Purchaser at Closing.

48. After the Closing, the Purchase Price will be further adjusted based on differences between the estimated and final amounts of the Adjusted Net Working Capital (as described below) and the Accrued Vacation Amount.

### *Post-Closing Purchase Price Working Capital Adjustment*

49. Within 30 days of Closing, the Purchaser shall deliver to the Sellers a Closing Statement which shall reflect the Purchaser's final calculation of the Purchase Price. The Sellers shall have 30 days from the date of receipt of such Closing Statement to notify the Purchaser of a disagreement with the Closing Statement. The Purchaser and the Sellers shall negotiate in good faith to resolve any disagreements for a period of 30 days thereafter, after which the Accounting Arbitrator will resolve any remaining disagreements. Upon determination of the Final Purchase Price, if the Final Purchase Price is less than the Estimated Purchase Price, then the Sellers shall cause the Distribution Agent to pay to the Purchaser the excess of the Estimated Purchase Price over the Final Purchase Price. If the Final Purchase Price

exceeds the Estimated Purchase Price, then the Purchaser shall pay to the Distribution Agent the amount by which the Final Purchase Price exceeds the Estimated Purchase Price.

### *Assumed Liabilities*

50.   The Purchaser will assume the following liabilities:

- all liabilities arising after the Closing Date to the extent related to the conduct, operation or ownership of the Assets;

- all liabilities arising from or in connection with the performance of the Assigned Contracts after the Closing Date and all liabilities with respect to Cure Costs payable by the Purchaser pursuant to the Ericsson Agreement;

- obligations under any warranty liabilities relating to the Products and Services supplied under any Assigned Contract or Bundled Contract subcontracted to the Purchaser;

- any obligations to post any deposits, bonds, or other security in replacement of any security posted under any Assigned Contract;

- all liabilities resulting from any licensing assurances, declarations, agreements or undertakings relating to the Transferred Intellectual Property which the Sellers may have granted or committed to third parties including standard setting bodies, that are listed in the Sellers Disclosure Schedule;

- all liabilities for, or related to any obligation for, any Tax that the Purchaser bears pursuant to the Ericsson Agreement;

- except to the extent otherwise set forth in the Ericsson Agreement, all liabilities related to any of the following: (i) the Purchaser's employment or termination of employment (whether or not arising under or in respect of any Purchaser Employee Plan) of Transferred Employees after Closing; and ii) the terms of

13

any offer of employment to any employee, including the Purchaser's failure to make an offer of employment to any employee that violates applicable law;

- all liabilities that arise under any Purchaser Employee Plan;

- all liabilities for the Accrued Vacation Amount as set out in the Sellers Disclosure Schedule;

- any obligation to provide continuation coverage pursuant to COBRA or any similar law under any Purchaser Employee Plan that is a "group health plan" (as defined in section 5000(b)(1) of the United States Internal Revenue Code of 1986, as amended) to Transferred Employees and/or their qualified beneficiaries who have a qualifying event on or after such Transferred Employees' Effective Hire Date;

- all liabilities related to Transferred Employees expressly assumed by the Purchaser as set out in the Ericsson Agreement; and

- all liabilities reflected in the computation of Adjusted Net Working Capital.

### *Employees*

51. The Purchaser has committed to offer employment to not less than 350 employees of the North American GSM Business. There are nine employees of the North American GSM Business located in Canada and 417 employees located in the United States. The Purchaser's employment offers shall provide terms and conditions that will be consistent with the requirements of applicable Law and on terms and conditions no less favourable, in the aggregate, than those the Transferred Employees currently have, but subject to adjustments to conform to the Purchaser's standard employment policies where legally possible.

52. The Purchaser shall establish or otherwise provide a registered pension plan for Transferred Employees employed in Canada and maintain such plan for a period of at least five years following the Closing Date.

53. Except for the Assumed Liabilities relating to Transferred Employees, the Purchaser shall not assume any other Liabilities relating to the Transferred Employees including but not limited to obligations to provide any benefits under any Seller Employee plan; any Liability with respect to KEIP, KERP, the Calgary Retention plan or any other Seller retention plan; any obligations under any group health plan; and any Liability relating to termination of employment of any Employee by the Sellers.

### *Assignment of Contracts*

54. The Purchaser will assume certain customer contracts associated with the North American GSM Business. The Purchaser may also assume selected supplier contracts and certain other contracts and real estate leases identified by the Purchaser within certain prescribed time periods.

### *Cure Costs*

55. The relevant Seller shall pay or provide for payment of all Cure Costs provided that i) with respect to Cure Costs relating to customer contracts that have been expressly designated for assignment to the Purchaser in a schedule to the Ericsson Agreement, the Purchaser shall pay for ½ of the first $5 million and ii) with respect to Cure Costs relating to contracts (which shall not be supplier contracts) the assignment of which is requested by the Purchaser after the signing of the Ericsson Agreement, the Purchaser shall pay for ½ of the first $5 million and any excess over the first $5 million.

### *Sale Free and Clear*

56. The Assets to be transferred by the Sellers will be transferred free and clear of all liens, claims and interests, other than those expressly assumed by the Purchaser or otherwise expressly permitted under the Ericsson Agreement.

***Representations and Warranties or Covenants***

57.    The Ericsson Agreement contains a number of representations, warranties and covenants by the Main Sellers with respect to various matters including title to assets, material contracts, intellectual property, preparation of financial statements, environmental matters, compliance with laws, taxes, employee matters, real property matters, regulatory matters and status of litigation. In addition, the Ericsson Agreement includes a number of covenants with respect to matters including pre-Closing cooperation and access to information, preparation and filings regarding antitrust and other Regulatory Approvals, pre-Closing conduct of the North American GSM Business, post-Closing assistance and maintenance of books and records, post-Closing arrangements with respect to Non Assignable Contracts, Inbound License Agreements and Bundled Contracts, post-Closing assistance for litigation, negotiation and completion of Ancillary Agreements, and insurance and real estate matters including the sub-lease of certain real property to the Purchaser.

***Survival of Representations and Warranties or Covenants***

58.    No representations or warranties, covenants, or agreements of the Sellers contained in the Ericsson Agreement shall survive beyond the Closing Date, except for covenants and agreements that by their terms are to be satisfied after the Closing Date, which covenants and agreements shall survive until satisfied in accordance with their terms.

***Termination Rights***

59. The Ericsson Agreement may be terminated prior to Closing in a number of instances including:

- by mutual consent of the Purchaser and the Main Sellers;

- by either the Purchaser or the Main Sellers:

o   if the Closing does not take place within 180 days of the date of the U.S. Sale Order;

o   in the event of a material breach by the other Primary Party of the Ericsson Agreement, which breach would result in a failure of certain specified conditions to Closing;

o   if the U.S. Sale Order and the Canadian Approval and Vesting Order are not entered within 30 days after the Auction;

o   if the Kapsch Agreement is terminated in accordance with its terms;

o   if the NNSA Irrevocable Offer, being an offer by Kapsch to purchase certain of NNSA's assets pertaining to the GSM Business that will be submitted for approval to the French Court, is terminated in accordance with its terms;

- by the Purchaser if the Sellers fail to consummate the Closing in breach of the Ericsson Agreement within five Business Days of a demand by the Purchaser to do so; or

- upon the breach by the Main Sellers of their obligations under Section 2 of the Termination Fee Agreement (as defined below), which results in the Purchaser being entitled to the Termination Fee, discussed in greater detail below.

***Termination Fee Agreement***

60.  In connection with the Ericsson Agreement, the Main Sellers and the Purchaser have entered into the Termination Fee Agreement, a copy of which is attached at Appendix "D". The Termination Fee Agreement provides that:

- NNI will file motions to approve the Ericsson Agreement, the Termination Fee Agreement and assumption and assignment procedures for Assigned Contracts

(the "Assignment Procedures Motion") with the U.S. Court within two business days of the date of the Termination Fee Agreement;

- NNL and NNC will file a motion with this Honourable Court seeking approval of the Ericsson Agreement and Termination Fee Agreement within two business days of the date of the Termination Fee Agreement;

- the Main Sellers shall not withdraw the motions described above;

- subject to the availability of the U.S. Court, NNI shall use reasonable best efforts to seek approval of the Ericsson Agreement, the Termination Fee Agreement and Assignment Procedures Motion by December 2, 2009. There is also a similar requirement for the Canadian Approval and Vesting Order Motion and motion for the Termination Fee; and

- in the event of a breach by the Main Sellers of their obligations under Section 2 of the Termination Fee Agreement that is not cured within one business day of receipt of notice by the Purchaser, the Main Sellers shall pay a Termination Fee to the Purchaser in the amount of $3.09 million (the "Termination Fee").

*Interdependencies*

61. As referenced in the Bidding Procedures, in order to divide the GSM Business the Joint Bidders may need to resolve certain interdependencies amongst the GSM Assets (the "Interdependencies"). As further provided in the Bidding Procedures, the Sellers and the EMEA Sellers indicated they would not undertake any obligation to resolve the Interdependencies. To this end, Ericsson has provided an Interdependencies Letter to the Main Sellers and Kapsch has provided an Interdependencies Letter to the UK Administrators (collectively, the "Interdependencies Letters"). Amongst other things, the Interdependencies Letters provide: (i) an acknowledgement by each of the Joint Bidders of the existence of the Interdependencies following closing of the transactions contemplated by the Ericsson Agreement and the Kapsch Agreement, respectively; (ii) that the

Interdependencies will be the sole responsibility of the Joint Bidders; (iii) that neither of the Joint Bidders will make any claims against Nortel parties in respect of Interdependencies; (iv) that no Nortel party will incur any liability to the extent such liability results from the Interdependencies; and (v) that the Nortel parties will be in the same position in respect of the Interdependencies as though the Joint Bidders were a single bidder, each of the foregoing being subject to the rights and obligations of Ericsson, Kapsch and the Nortel parties under the relevant transaction documents pertaining to the sale of the GSM Business.

### *Ancillary Agreements*

62.  On or before Closing, the Purchaser and the relevant Sellers and EMEA Sellers will enter into the following ancillary agreements, forms of which have been agreed to:

-  Intellectual Property License Agreement - an intellectual property license agreement between NNL and the Purchaser pursuant to which i) NNL and its affiliates will grant to the Purchaser a non-exclusive license to, among other things, make, use, distribute, sell, develop and service certain retained intellectual property assets; and ii) NNL and its affiliates will receive a license back to all intellectual property included for use in Nortel's other businesses.

-  Trademark License Agreement – an agreement between NNL and the Purchaser permitting the Purchaser and its affiliates to, among other things, use the "Nortel" trademark and logo and certain other Nortel marks in its sales of the Products and Services for a transitional period of 12 months after Closing.

-  Transition Services Agreement – an agreement between NNL, NNC, NNI, NNUK, NN Ireland, certain Other Sellers, the UK Administrators and the Purchaser pursuant to which the Sellers and their affiliates will agree to provide certain information technology, business transition and related services to the Purchaser for up to 18 months post-Closing. The final form of the Transition Services Agreement will set forth the fees to be paid by the Purchaser to the

Sellers for these services as well as certain other terms that will regulate the provision of services thereunder. The agreed form of Transition Services Agreement sets out the general scope of transition services to be provided and the parties have agreed to negotiate in good faith to refine the description of the transitional services to be provided in accordance with the terms and guidelines set forth in the Sellers Disclosure Schedule. The parties have agreed to an arbitration procedure to resolve any disputes regarding, among other things, the services to be provided or the amount to be billed for such services.

- <u>Kapsch Transition Service Agreement, Intellectual Property License Agreement and Trademark License Agreement</u> – agreements similar to the ones described above pursuant to which: i) the Sellers and their affiliates will agree to provide certain post-Closing transition services to Kapsch; ii) NNL and its affiliates will license certain intellectual property pertaining to the GSM Business to Kapsch on a non-exclusive basis; and (iii) NNL will permit Kapsch to use certain "Nortel" trademarks and logos for a transition period.

- <u>Loaned Employee Agreement</u> – an agreement between the relevant Sellers and the Purchaser pursuant to which certain employees of the Sellers that cannot be transferred to the Purchaser at Closing will be seconded to the Purchaser for a period of, in certain cases, up to 12 months. The Loaned Employees will remain on the payroll of the applicable Seller and will continue to participate in the Seller's pension and benefit plans. The Purchaser shall reimburse the Sellers for the cost of retaining the Loaned Employees, subject to certain exceptions.

- <u>Subcontract Agreement</u> – an agreement amongst NNC, NNL, NNI and the Purchaser to subcontract the rights and responsibilities of the Sellers under certain Bundled Contracts;

63.  In addition, the Main Sellers and the Purchaser will use their commercially reasonable efforts to negotiate between themselves and, when applicable, with the relevant third parties, the following ancillary agreements, among others, in good faith:

- <u>Real Estate Agreements</u> – agreements between the Sellers and the Purchaser for the lease, sublease or license of certain real property in the United States, Latin America and Asia.

- <u>Dual Use Platform Agreement</u> – an agreement between NNI and the Purchaser to provide appropriate product and service inputs after Closing.

- <u>Development and Supply Agreement</u> – an agreement between NNI and the Purchaser whereby each party may wish to engage the other to provide certain development and support.

- <u>GDNT Back-to-Back Agreement</u> – an agreement between the Sellers and the Purchaser for a back-to-back supply agreement for products and services with GDNT for a period of six months after Closing, plus the option for a three month extension upon mutual agreement, not to be unreasonably withheld.

- <u>Generic Back-to-Back Agreement</u> – an agreement between the Sellers and the Purchaser under which the Sellers will agree to pass through at no additional cost to the Purchaser its rights, remedies and other benefits as well as obligations and liabilities under the Master Contract Manufacturer Supply Agreement with respect to the manufacture and supply of products and provision of services for a period not exceeding 15 months after Closing.

- <u>Contract Manufacturing Inventory Agreements</u> – agreements between the Purchaser, the Sellers and certain Contract Manufacturers of the Sellers to sell Contract Manufacturer Inventories related to the GSM Business to the Purchaser after Closing.

21

*Closing*

64.   Closing shall occur simultaneously with the completion of the transactions contemplated by the Kapsch Agreement on the date which is five Business Days after the date upon which all Closing conditions have been satisfied or waived, or at such time as shall be mutually agreed upon by the Purchaser and the Main Sellers.

*Closing Conditions*

65.   The obligation of the Purchaser to close the sale is subject to satisfaction of the following conditions, among others:

- the U.S. Sale Order and the Canadian Approval and Vesting Order and any separate orders of the U.S. Court approving and authorizing the assumption and assignment of the Assumed and Assigned Contracts shall have been entered and not modified and such orders shall have become Final Orders;

- the receipt of all Regulatory Approvals;

- there shall be no law or order of any Court or other Governmental Entity in Canada or the U.S. prohibiting the consummation of any of the transactions contemplated by the Ericsson Agreement;

- the satisfaction of conditions to closing under the Kapsch Agreement and the simultaneous consummation of the transaction governed by the Kapsch Agreement;

- certain of the Sellers' representations and warranties being true and correct, except as would not reasonably be expected to result in a Material Adverse Effect;

- the Sellers' representation and warranties set forth in Sections 4.1, 4.2 and 4.3 being true and correct in all material respects;

- the Sellers' material pre-Closing covenants, obligations and agreements pursuant to the Ericsson Agreement shall not have been breached in any material respect; and    .

- with respect to customer contracts that accounted, in the aggregate, for at least 75% of the North American GSM Business sales revenue for fiscal 2008, the Sellers will have assigned such contracts, or, in the case of Bundled Contracts, entered into new contracts with the counterparties which will be Assigned Contracts on Closing.

**APPROVAL AND VESTING ORDER AND OTHER CLOSING CONDITIONS**

66. The Assets to be transferred by the Applicants and the U.S. Debtors pursuant to the Ericsson Agreement are to be transferred free and clear of all liens, claims and encumbrances of any kind other than permitted liens and those expressly assumed by Ericsson pursuant to the Ericsson Agreement. Accordingly, the Applicants are seeking an order of this Honourable Court vesting in Ericsson all of the Applicants' right, title and interest in the Assets as defined in the Ericsson Agreement. The Monitor understands that no leased assets are being conveyed as part of this transaction. Nevertheless, the Monitor understands that notice has been or will be provided by the Applicants to all personal property security registrants out of an abundance of caution, save for one registrant that the Applicants have previously been unable to effect service on.

67. The Monitor understands that a joint hearing has been scheduled before the U.S. Court and this Honourable Court on December 2, 2009, for approval of the Ericsson Agreement and that, subject to the approval of both Courts, Closing is anticipated to occur in March, 2010.

**ALLOCATION OF SALE PROCEEDS**

68. As noted in the Twenty-Third Report, the GSM Business is not operated through a dedicated legal entity or stand-alone division. The Applicants have an interest in intellectual property of the GSM Business which, in turn, is subject to various intercompany licensing agreements with other Nortel legal entities around the world, in some cases on an exclusive basis and in other cases, on a non-exclusive basis. Therefore, the task of allocating the sale proceeds stemming from the Successful Bid amongst the various Nortel entities in the various jurisdictions is complex.

69. As set out in the Fifteenth Report, the Applicants, the U.S. Debtors, and certain of the EMEA entities, through the UK Administrators, entered into the Interim Funding and Settlement Agreement ("IFSA") which was approved by this Honourable Court on June 29, 2009. Pursuant to the IFSA, each of the Applicants, U.S. Debtors, and EMEA Debtors agreed that their execution of definitive documentation with a purchaser of any material Nortel assets shall not be conditional upon reaching an agreement regarding the allocation of the sale proceeds or binding procedures for the allocation of the sale proceeds. In addition, the parties agreed that in the absence of any agreement regarding the allocation of any sale proceeds, the proceeds shall be deposited in an escrow account and any distribution from the escrow account shall be contingent upon (i) the agreement of all of the Selling Debtors (as defined in the IFSA) or (ii) in the case where the Selling Debtors fail to reach an agreement, a determination of the allocation by the relevant dispute resolvers. The parties agreed to negotiate in good faith and attempt to reach an agreement on a protocol for resolving disputes concerning the allocation of sale proceeds, including binding procedures for the allocation of sale proceeds where the Selling Debtors have been unable to reach an agreement regarding such allocation.

70. The Monitor notes that the aggregate purchase price payable in connection with the Successful Bid was negotiated by the Sellers and the UK Administrators and Ericsson and Kapsch on a global basis. The allocation of the overall $103 million purchase price as between the amount payable by Ericsson pursuant to the Ericsson Agreement and Kapsch

pursuant to the Kapsch Agreement was determined solely by Ericsson and Kapsch and not discussed with the Sellers. Accordingly, the Selling Debtors have agreed that the allocation as set forth in the two transaction agreements is not determinative or reflective of any allocation amongst the Selling Debtors.

71. As of the current date, no agreement has been reached regarding the allocation of any sale proceeds. Accordingly, the Selling Debtors have determined that the proceeds from both transactions shall be deposited in an escrow account. In addition, the terms of a protocol with respect to the resolution of disputes in connection with the allocation of proceeds are still under discussion between the Applicants, the U.S. Debtors, the UK Administrators, the Monitor, the UCC and the Bondholder Group. Accordingly, the Monitor expects that the Company will return before this Honourable Court prior to closing of the transactions contemplated by the Successful Bid to seek approval of the escrow agreement and a protocol for resolving disputes regarding the allocation of sale proceeds.

72. With respect to the provision of transition services to Ericsson and Kapsch, the Main Sellers and the EMEA Sellers providing transition services are negotiating a Term Sheet Regarding TSA Costs and Expenses that will form the conceptual basis for a definitive agreement to be entered into regarding, amongst other things, the allocation of unrecoverable costs and cost overruns relating to the provision of transition services. The basic premise of the term sheet is that such costs will be allocated amongst the Main Sellers and the relevant EMEA Sellers on a pro-rata basis based upon the ultimate allocation afforded to such Main Seller or EMEA Seller pursuant to the process described above at paragraph 69.

## MONITOR'S ANALYSIS AND RECOMMENDATIONS

73. The Monitor is of the view that the Company's efforts to market the GSM Business were comprehensive and conducted in accordance with the Bidding Procedures and that the auction process provided a mechanism to fully determine the market value of the Assets.

As such, the Monitor is satisfied that the Purchase Price for the Assets constitutes fair consideration for such assets and, therefore, that the Successful Bid represents the best transaction for the sale of these Assets. The Monitor therefore recommends that this Honourable Court grant the Order requested in the Applicants' motion authorizing the Applicants to complete the transaction contemplated by the Ericsson Agreement and vesting all of the Applicants' right, title and interest in the Assets in Ericsson.

74. The Monitor has also reviewed the terms of the Termination Fee Agreement and is of the view that the provisions are reasonable in the circumstances. Accordingly, the Monitor recommends approval of the Termination Fee Agreement.

75. For the reasons described in paragraph 41, the Monitor recommends that confidential Appendix "C" to this Twenty-Ninth Report be sealed by this Honourable Court.

All of which is respectfully submitted this 27th day of November, 2009.

**ERNST & YOUNG INC.**
**In its capacity as Monitor of the Applicants**

Per:

Murray A. McDonald
President

**APPENDIX A**

**[ATTACHED]**

## SCHEDULE "A"

## BIDDING PROCEDURES

Set forth below are the bidding procedures (the "Bidding Procedures") to be employed with respect to the proposed sale of certain assets and assumption of certain liabilities (the "Sale") pertaining to the global GSM/GSM-R business of Nortel (as defined below).

On January 14, 2009 (the "Filing Date"), Nortel Networks Corporation ("NNC"), Nortel Networks Limited ("NNL") and certain of NNC's other Canadian affiliates (collectively, the "Canadian Debtors," and NNC and its debtor and non-debtor affiliates are sometimes referred to herein as "Nortel"), commenced creditor protection proceedings before the Ontario Superior Court of Justice (Commercial List) (the "Canadian Court") under the Companies' Creditors Arrangement Act (Canada) (respectively, the "Canadian Proceedings" and "CCAA"), in connection with which Ernst & Young Inc. was appointed monitor (the "Monitor").

On the Filing Date and on July 14, 2009 (with respect to Nortel Networks (CALA) Inc.), Nortel Networks Inc. ("NNI") and certain of NNI's United States affiliates (collectively, the "US Debtors") filed petitions in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") under chapter 11 of title 11 of the United States Code (respectively, the "US Proceedings" and the "Bankruptcy Code").

On the Filing Date, Nortel Networks UK Limited ("NNUK"), Nortel Networks (Ireland) Limited ("NNIR"), Nortel Networks S.A. ("NNSA") and certain of NNUK's affiliates in the Europe, Middle East and Africa region (respectively, "EMEA Debtors" and "EMEA") commenced administration proceedings (the "UK Proceedings" and, together with the Canadian Proceedings and the US Proceedings, the "Proceedings") before the High Court of Justice in London, England (the "UK Court" and, together with the Canadian Court and the Bankruptcy Court, the "Courts"), and the UK Court appointed individuals from Ernst & Young LLP (the "UK Administrator"), and, in the case of NNIR only, Ernst & Young Chartered Accountants (the "NNIR Administrator"), as administrators in the UK Proceedings (the UK Administrator and the NNIR Administrator collectively, the "Administrators").

NNL, NNI and NNUK and certain of their affiliates (together, the "Sellers") have determined that: (A) the potential sale of the Assets (as defined below) contemplated by the Sale Motion (as defined below) should be subject to a competitive sale process as set forth herein and the supplement to these Bidding Procedures attached hereto as Schedule 1; (B) the eventual transfer of the U.S. Debtors' rights, title and interests in and to the Assets will be subject to approval by the Bankruptcy Court; (C) the eventual transfer of the rights, title and interests of the Canadian Debtors in and to the Assets will be subject to approval by the Canadian Court; and (D) the eventual transfer of the rights, title and interests of NNSA in and to the Assets will be subject to approval by the French Court (as defined in Schedule 1).

On September 30, 2009, the U.S. Debtors filed a Motion for Orders (I)(A) Authorizing and Approving the Bidding Procedures, (B) Approving the Notice Procedures, (C) Setting a Date

- 2 -

for the Sale Hearing, and (II) Authorizing and Approving the Sale of Certain Assets of Debtors' GSM/GSM-R Business (the "Sale Motion").

On [October 15], 2009 the Bankruptcy Court entered an Order approving, among other things, the Bidding Procedures set forth herein (the "Bidding Procedures Order").

On [October 6], 2009 the Canadian Debtors filed a motion with the Canadian Court seeking an order for approval of the Bidding Procedures set forth herein (the "Canadian Sales Process Order").

### Bidding Process

The Bidding Procedures set forth herein describe, among other things, the Assets available for sale, the manner in which prospective bidders may gain access to or continue to have access to due diligence materials concerning the Assets, the manner in which bidders and bids become Qualified Bidders (as defined below) and Qualified Bids (as defined below), respectively, the receipt and negotiation of bids received, the conduct of any subsequent Auction (as defined below), the ultimate selection of the Successful Bidder (as defined below), and the Bankruptcy Court's, the Canadian Court's and the French Court's and, if required, such other applicable courts' approval thereof (collectively, the "Bidding Process"). The Sellers intend to consult with, among others, the Official Committee of Unsecured Creditors in connection with the chapter 11 cases of Nortel Networks Inc., et al. (Case No. 09-10138) involving the U.S. Debtors (the "Committee"), the ad hoc group of bondholders holding claims against certain of the U.S. Debtors and certain of the Canadian Debtors (the "Bondholder Group"), Ernst & Young Inc., in its capacity as the Canadian Court-appointed monitor in connection with the proceedings under the CCAA, the Administrators in connection with the UK Proceedings, and their respective advisors throughout the Bidding Process. In the event that the Sellers and any party disagree as to the interpretation or application of these Bidding Procedures, the Bankruptcy Court and the Canadian Court will have jurisdiction to hear and resolve such dispute.[1]

### Assets To Be Sold

The Sellers are offering for sale certain of the Sellers' assets pertaining to the GSM/GSM-R business unit of Nortel (collectively, the "Transaction"), or, as set forth in the relevant sale agreements with respect to a Successful Bidder (as defined below), and related schedules and in an information memorandum made available by the Sellers to potential bidders that have executed a confidentiality agreement with the Sellers (the "Assets"). The Sellers will entertain bids to convey all or substantially all of the Assets to a single bidder or joint bids for all or substantially all of the Assets from a team of two or more bidders bidding jointly (each such bid, a "Joint Bid").

---

[1] For the avoidance of doubt, this Bidding Process shall not govern any disagreements among the Sellers.

- 3 -

### Joint Bids

The Sellers recognize that certain Potential Bidders may desire to acquire only a portion of the Assets. The Sellers do **NOT** intend to entertain bids that seek to exclude a material portion of the Assets in any significant jurisdiction.[2] As mentioned above, the Sellers will entertain a Joint Bid for all or substantially all of the Assets from a team of two or more bidders bidding jointly. PLEASE NOTE, HOWEVER, THAT A POTENTIAL OR QUALIFIED BIDDER MAY CONTACT ANOTHER POTENTIAL OR QUALIFIED BIDDER IN CONNECTION WITH A JOINT BID ONLY UPON THE PRIOR WRITTEN CONSENT OF NNL, NNI AND NNUK, WHICH CONSENT SHALL BE GRANTED AFTER CONSULTATION WITH THE COMMITTEE, THE BONDHOLDER GROUP AND THE MONITOR. Any unauthorized contacts between one or more Potential Bidders or Qualified Bidders are hereby strictly prohibited and may result in disqualification from participation in the Bidding Process and any Auction that may occur.

Upon consummation of the Sale, the participants in a Joint Bid may decide to divide the Assets amongst themselves and operate each portion of the Assets on a stand-alone basis. In order to operate such stand-alone businesses, the ultimate buyers of the Assets may need to resolve certain interdependencies among the various Assets (the "Interdependencies"), including, without limitation, certain issues relating to the use of intellectual property or the provision of transition services by and between joint bidders. Please note that the Sellers do not intend to, and shall not, undertake any obligation to resolve any Interdependencies among the various Assets.

### "As Is, Where Is"

The sale of the Assets will be on an "as is, where is" basis and without surviving representations or warranties of any kind, nature, or description by the Sellers, their agents, or estates. In addition, in the case of the EMEA Sellers (as defined below), the sale of whatever rights, title and interests that such EMEA Seller may have (if any) in and to the Assets will be on an "as-is" basis and will be without any representations or warranties. For the purposes of these Bidding Procedures, "EMEA Seller" means any Seller that is an EMEA Debtor or a wholly-owned subsidiary of an EMEA Debtor.

### Free Of Any And All Claims And Interests

All of the rights, title and interests of the U.S. Debtors and the Canadian Debtors in and to the Assets, or any portion thereof, to be acquired will be sold free and clear of all pledges, liens, security interests, encumbrances, claims, charges, options, and interests thereon and there against (collectively, the "Claims and Interests") as permitted by sections 105 (a), 363 and 365 of the Bankruptcy Code and the CCAA, such Claims and Interests to attach to the net proceeds of the sale of such Assets (without prejudice to any claims or causes of action regarding the priority, validity or enforceability thereof).

---

[2]   Without prejudice to the generality of this sentence, please note that the Sellers shall NOT entertain bids that exclude all or substantially all of the Assets that are located outside North America or vice versa.

Publication Notice

As soon as reasonably practicable after entry of the Bidding Procedures Order and the Canadian Bidding Procedures Order, but in any event no more than five (5) days after the entry of such orders, the Sellers shall publish notice of these Bidding Procedures, the time and place of the Auction (as defined below), if required, the time and place of the Sale Hearing (as defined below), and the objection deadline for the Sale Hearing in The Wall Street Journal (National Edition), The Globe & Mail (National Edition) and The Financial Times (International Edition) (such publication notice, the "Sale Notice").

Participation Requirements

Unless otherwise ordered by both the Bankruptcy Court and the Canadian Court and accepted by the Administrators, for cause shown or, as otherwise determined by the Sellers (in consultation with the Committee, the Bondholder Group and the Monitor), prior to the Bid Deadline (as defined below), in order to participate in the Bidding Process, each bidder (each such bidder, a "Potential Bidder") must deliver to the Notice Parties (as defined below) at the addresses provided below:

(a) an executed confidentiality agreement (to be delivered prior to the distribution of any confidential information by the Sellers to a Potential Bidder) in form and substance satisfactory to the Sellers, and which shall inure to the benefit of any purchaser of the Assets (in the event that the Potential Bidder has already entered into a confidentiality agreement with the Sellers, it must provide a statement agreeing that its obligations under such agreement shall inure to the benefit of any purchaser of the Assets and waiving any of its rights under such confidentiality agreement that are in conflict with the Bidding Procedures or that would otherwise prohibit disclosures regarding the Potential Bidder, or any Transaction it may enter into, to the Notice Parties (as defined below));

(b) current audited financial statements and latest unaudited financial statements of the Potential Bidder, or, if the Potential Bidder is an entity formed for the purpose of acquiring the Assets, current audited financial statements and latest unaudited financial statements of the equity holders or sponsors of the Potential Bidder who will guarantee the obligations of the Potential Bidder, or such other form of financial disclosure and credit-quality support or enhancement that will allow the Sellers and their respective financial advisors, in consultation with the Committee, the Bondholder Group and the Monitor, to make a reasonable determination as to the Potential Bidder's financial and other capabilities to consummate the Transaction; and

(c) a preliminary (non-binding) written proposal regarding: (i) the purchase price range (including liabilities to be assumed by the Potential Bidder); (ii) any portion of the assets expected to be excluded; (iii) the structure (including, without limitation, in the case of each potential Joint Bid, the structure of such Joint Bid) and financing of the Transaction (including, but not limited to, the sources of financing for the purchase price and all requisite financial assurance); (iv) any anticipated corporate, stockholder, internal or regulatory approvals required to close the Transaction, the anticipated time frame and

any anticipated impediments for obtaining such approvals; (v) the proposed number of employees of the Sellers who will become employees of the Potential Bidder (save in jurisdictions where employees transfer by operation of law), and any proposed measures associated with the continued employment of all employees who will become employees of the Potential Bidder; and (vi) any conditions to closing that the Potential Bidder may wish to impose in addition to those set forth in the Purchase Agreements, where for the purposes of these Bidding Procedures, "Purchase Agreements" means the sale agreements and other ancillary agreements provided by the Sellers to each Potential Bidder for the proposed Sale. The Sellers shall provide such Purchase Agreements in consultation with the Committee, the Bondholder Group and the Monitor.

A Potential Bidder, or in the case of a Joint Bid, all of the Potential Bidders participating in such Joint Bid, which shall be collectively considered a single bidder, that delivers the documents described above, whose financial information and credit quality support or enhancement demonstrate to the Sellers' satisfaction the financial capability of the Potential Bidder to consummate the Transaction, and who has submitted a reasonably competitive and realistic non-binding proposal, as described above, and who has executed a confidentiality agreement, as described above, and that the Sellers determine in their reasonable business judgment, after consultation with their counsel and financial advisors, the Committee, the Bondholder Group and the Monitor, is likely (based on availability of financing, experience and other considerations) to be able to consummate the Transaction will be deemed a "Qualified Bidder". For the avoidance of any doubt, in the case of a proposed Joint Bid, the Potential Bidders participating in such Joint Bid shall together constitute a single Qualified Bidder.

As promptly as practicable after a Potential Bidder delivers all of the materials required above, the Sellers will determine, in consultation with the Committee, the Bondholder Group and the Monitor, and will notify the Potential Bidder, if such Potential Bidder either by itself or, in the case of a proposed Joint Bid, in conjunction with other bidders participating in such Joint Bid, is a Qualified Bidder. At the same time that the Sellers notify the Potential Bidder that it is a Qualified Bidder, the Sellers will allow the Qualified Bidder to begin or continue to conduct due diligence as provided in the following paragraph with respect to the Assets.

<div align="center">Due Diligence</div>

The Sellers may in their reasonable business judgment, and subject to competitive and other business considerations, afford each Qualified Bidder and any person seeking to become a Qualified Bidder that has executed a confidentiality agreement (as described above) with the Sellers such due diligence access to materials and information relating to the Assets as the Sellers deem appropriate after consultation with the Committee, the Bondholder Group and the Monitor. Due diligence access may include management presentations as may be scheduled by the Sellers, access to electronic data rooms, on site inspections, and other matters which a Qualified Bidder or other person seeking to become a Qualified Bidder may reasonably request and as to which the Sellers, in their reasonable business judgment, may agree. The Sellers will designate an employee or other representative to coordinate all reasonable requests for additional information and due diligence access from such parties. The Sellers may, in their discretion, coordinate diligence efforts such that multiple parties have simultaneous access to due diligence materials and/or simultaneous attendance at management presentations or site inspections.

- 6 -

Neither the Sellers nor any of their affiliates (or any of their respective representatives) will be obligated to furnish any information relating to the Assets to any person other than to Qualified Bidders and any other person seeking to become a Qualified Bidder that has executed a confidentiality agreement with the Sellers. The Sellers make no representation or warranty as to the information to be provided through this due diligence process or otherwise, except to the extent set forth in the definitive sale agreements with any Successful Bidder executed and delivered by Sellers.

## Bid Deadline

A Qualified Bidder that desires to make a bid must deliver written copies of its bid to the following parties (collectively, the "Notice Parties"): (i) Nortel Networks Limited and Nortel Networks Inc., c/o Nortel Networks Limited, Attn: Anna Ventresca, General Counsel, 195 The West Mall, Toronto, Ontario, Canada M9C 5K1, Facsimile: (905) 863-2075; (ii) U.S. Debtors' counsel: Cleary Gottlieb Steen & Hamilton LLP, Attn: James L. Bromley and Lisa M. Schweitzer, One Liberty Plaza, New York, New York 10006, Facsimile: (212) 225-3999; (iii) Canadian Debtors' counsel: Ogilvy Renault LLP, Attn: Derrick C. Tay and Jennifer Stam, Royal Bank Plaza, South Tower, Suite 3800, 200 Bay Street, Toronto, Ontario, Canada, Facsimile: (416) 216-3930; (iv) Sellers' financial advisors: Lazard Frères & Co., Attn: Frank A. (Terry) Savage, 30 Rockefeller Plaza, New York, NY 10020, Facsimile: (212) 332-1748; (v) counsel to the Committee: Akin Gump Strauss Hauer & Feld LLP, Attn: Fred S. Hodara, Stephen B. Kuhn, David H. Botter and Kenneth A. Davis, One Bryant Park, New York, New York 10036, Facsimile: (212) 872-1002; (vi) financial advisor to the Committee: Jefferies & Company, Inc., Attn: General Counsel, Investment Banking, 520 Madison Avenue, New York, New York, Facsimile: (212) 284-2280; (vii) counsel to the Bondholder Group: Milbank, Tweed, Hadley & McCloy, Attn: Roland Hlawaty, One Chase Manhattan Plaza, New York, New York, 10006, Facsimile: (212) 822-5735; (viii) the Monitor: Murray A. McDonald, Ernst & Young Inc., Ernst & Young Tower, 222 Bay Street, P. O. Box 251, Toronto, ON M5K 1J7 Canada, Facsimile: (416) 943-3300; (ix) the Administrators: Ernst & Young LLP, Attn: Stephen Harris, 1 More Place, London SE1 2AF, United Kingdom, Facsimile +44 20 7951 9002; and (x) counsel to the Administrators: Herbert Smith LLP, Attn: Stephen Gale, Exchange House, Primrose Street, London, EC2A 2HS, Facsimile: +44 20 7098 4878; so as to be received not later than November 5, 2009 at 12:00 pm (Eastern) by the Sellers (the "Bid Deadline"). The Sellers, after consultation with the Committee, the Bondholder Group and the Monitor, may extend the Bid Deadline once or successively, but they are not obligated to do so. If the Sellers extend the Bid Deadline, they will promptly notify all Qualified Bidders and the other Notice Parties of such extension.

- 7 -

## Qualified Bid

A bid, including a Joint Bid, will be considered a Qualified Bid only if the bid is submitted by a Qualified Bidder, pursuant to the previous paragraph and complies with all of the following (a "Qualified Bid"):

(a)    it states that the applicable Qualified Bidder offers to purchase all or substantially all of the Assets upon the terms and conditions substantially as set forth in the Purchase Agreements, including, without limitation, with respect to certainty and timing of closing, or pursuant to an alternative structure (including, without limitation, an offer conditioned upon confirmation of a plan of reorganization proposed by the U.S. Debtors either individually or in collaboration with such Qualified Bidder) or upon alternative terms and conditions that the Sellers determine, after consultation with the Committee, the Bondholders Committee and the Monitor, are no less favorable than the terms and conditions of the Purchase Agreements;

(b)    it includes a letter stating that the Qualified Bidder's offer is irrevocable until the selection of the Successful Bidder and, if applicable, the Alternate Bidder (as defined below), provided that if such Qualified Bidder is selected as the Successful Bidder or the Alternate Bidder, its offer shall remain irrevocable until the earlier of (i) closing of the Sale to the Successful Bidder or the Alternate Bidder, and (ii) (x) with respect to the Successful Bidder only, 180 days from the entry of the Sale Order, and (y) with respect to the Alternate Bidder only, the Alternate Bid Expiration Date (as defined below);

(c)    it includes duly authorized and executed purchase agreements, including the purchase price for the Assets expressed in U.S. Dollars (the "Purchase Price"), together with all exhibits and schedules thereto, including the French Offer (as such term is defined in Schedule 1 attached hereto) and, to the extent required by the terms and conditions of such bid, any ancillary agreements as described in the Purchase Agreements with all exhibits and schedules thereto (or term sheets that describe the material terms and provisions of such agreements), as well as copies of such materials marked to show those amendments and ancillary modifications to the Purchase Agreements ("Marked Agreements"), the French Offer (the "Marked French Offer") and such ancillary agreements (the "Marked Ancillary Agreements") and the proposed orders to approve the Sale by the Bankruptcy Court, the Canadian Court and any other applicable court(s) whose approval may be required, proposed by the Qualified Bidder;

(d)    it includes written evidence of a firm, irrevocable commitment for financing, or other evidence of ability to consummate the proposed transaction, that will allow the Sellers, in consultation with the Committee, the Bondholder Group and the Monitor, to make a reasonable determination as to the Qualified Bidder's financial and other capabilities to consummate the transaction contemplated by the Marked Agreements, the Marked French Offer and the Marked Ancillary Agreements;

(e)    it is not conditioned on (i) the outcome of unperformed due diligence by the Qualified Bidder (and includes an acknowledgement and representation that the

- 8 -

Qualified Bidder has had an opportunity to conduct any and all required due diligence regarding the Assets prior to making its offer); (ii) obtaining financing and (iii) in the case of a Joint Bid, the resolution of any Interdependencies among the various Assets or entry of a cooperation agreement or similar agreement among the various participants in the Joint Bid;

(f)     it fully discloses the identity of each entity that will be bidding for the Assets or otherwise sponsoring or participating in connection with such bid, and the complete terms of any such participation;

(g)     it includes an acknowledgment and representation that the Qualified Bidder will assume the Sellers' obligations under the executory contracts and unexpired leases proposed to be assigned pursuant to the Purchase Agreements (or identifies with particularity which of such contracts and leases of the US and Canada Debtors that the Qualified Bidder wishes not to assume, or alternatively which additional executory contracts or unexpired leases of the US and Canada Debtors that the Qualified Bidder wishes to assume), contains full details of the Qualified Bidder's proposal for the treatment of related cure costs; and it identifies with particularity any executory contract or unexpired lease the assumption and assignment of which is a condition to closing;

(h)     it includes an acknowledgement and representation that the Qualified Bidder: (i) has relied solely upon its own independent review, investigation and/or inspection of any documents and/or the Assets in making its bid; (ii) did not rely upon any written or oral statements, representations, promises, warranties or guaranties whatsoever, whether express or implied (by operation of law or otherwise), regarding the Assets or the completeness of any information provided in connection therewith or the Auction, except as expressly stated in the Marked Agreements, the Marked French Offer or the Marked Ancillary Agreements; and (iii) is not entitled to any expense reimbursement or break-up fee in connection with its bid;

(i)     it includes evidence, in form and substance reasonably satisfactory to Sellers, of authorization and approval from the Qualified Bidder's board of directors (or comparable governing body) with respect to the submission, execution, delivery  and closing of the Marked Agreements, the Marked French Offer and Marked Ancillary Agreements;

(j)     it is accompanied by a good faith deposit ("Good Faith Deposit") in the form of a wire transfer (to a bank account specified by the Sellers), certified check or such other form acceptable to the Sellers, payable to the order of the Sellers (or such other party as the Sellers may determine) in an amount equal to US$10 million to be dealt with as provided for under "Good Faith Deposit" herein;

(k)     it (a) contains full details of the proposed number of employees of the Sellers, including, without limitation, NNSA (apportioned by jurisdiction(s)) who will become employees of the Qualified Bidder (save in jurisdictions where employees transfer by operation of law) and any proposed measures associated with the continued employment and associated with the employment of all employees who will become

- 9 -

employees of the Qualified Bidder, and (b) identifies any pension liabilities and assets related to any employees currently covered under any Nortel registered pension or retirement income plan who will become employees of the Qualified Bidder that the Qualified Bidder intends to assume or purchase;

(l)     it includes evidence of the Qualified Bidder's ability to comply with Section 365 of the U.S. Bankruptcy Code (to the extent applicable), including providing adequate assurance of such Qualified Bidder's ability to perform in the future the contracts and leases proposed in its bid to be assumed by the Sellers and assigned or subleased to the Qualified Bidder, in a form that will permit the immediate dissemination of such evidence to the counterparties to such contracts and leases;

(m)     it contains other information reasonably requested by the Sellers; and

(n)     it is received by the Bid Deadline.

The Sellers will determine, in their reasonable business judgment, after consultation with the Committee, the Bondholder Group and the Monitor, whether to entertain bids for the Assets that do not conform to one or more of the requirements specified herein and deem such bids to be Qualified Bids.

The Sellers shall notify any Qualified Bidders in writing as to whether or not their bid constitutes a Qualified Bid promptly following the expiration of the Bid Deadline.

### Evaluation of Competing Bids

A Qualified Bid will be valued based upon several factors including, without limitation, items such as the purchase price and the net value (including assumed liabilities and the other obligations to be performed or assumed by the bidder) provided by such bid, the claims likely to be created by such bid in relation to other bids, the counterparties to such Transaction, the proposed revisions to the relevant Transaction documents, the effect of the Transaction on the value of the ongoing businesses of the Sellers (including ongoing relationships with customers and suppliers), other factors affecting the speed, certainty and value of the Transaction (including any regulatory approvals required to close the Transaction), any assets excluded from the bid, the estimated number of in-scope employees of the Sellers (apportioned by jurisdiction(s)) to be offered post-closing employment by the Qualified Bidder (save in jurisdictions where employees transfer by operation of law) and any proposed measures associated with the continued employment of all employees who will become the employees of the Qualified Bidder, the transition services required from the Sellers post-closing and any related restructuring costs, and the likelihood and timing of consummating such transaction, each as determined by the Sellers, in consultation with their advisors, the Committee, the Bondholder Group and the Monitor. Following their review of the Qualified Bids and in consultation with their advisors, the Committee, the Bondholder Group and the Monitor, the Sellers reserve the right, in their sole discretion, to reject all Qualified Bids and/or withdraw from sale, in whole or in part, any Assets.

- 10 -

### No Qualified Bids

If the Sellers do not receive any Qualified Bids, the Sellers reserve the right, in consultation with their advisors, the Committee, the Bondholder Group and the Monitor, to (i) extend the deadlines set forth in the Bidding Procedures without further notice, and (ii) withdraw from sale, in whole or in part, any Assets at any time and to make subsequent attempts to market the same.

### Auction

If the Sellers receive two or more Qualified Bids, the Sellers will conduct an auction (the "Auction") of the Assets, which shall be transcribed or recorded on video to the extent required under Delaware local practice, at 9:30 a.m. on November 9, 2009, at the offices of Cleary Gottlieb Steen & Hamilton LLP located at One Liberty Plaza, New York, New York 10006 or such other location as shall be timely communicated to all entities entitled to attend the Auction, which Auction may be cancelled or adjourned without the prior written consent of any Qualified Bidder. Copies of all Qualified Bids shall be delivered to the Committee, the Bondholder Group, the Monitor and the Administrators at such time that such bid is deemed a Qualified Bid but no later than one (1) Business Day prior to the Auction. The Auction shall run in accordance with the following procedures:

(a)     Only the Qualified Bidders that have timely submitted Qualified Bids, the Sellers, the Committee, the Bondholder Group, the Monitor and the Administrators (and the advisors to each of the foregoing), and any creditor of the North American Debtors shall attend the Auction in person (and the advisors to such Qualified Bidder), and only such Qualified Bidders will be entitled to make any subsequent bids at the Auction.

(b)     Each Qualified Bidder shall be required to confirm that it has not engaged in any collusion with respect to the bidding or the Sale.

(c)     At least one (1) Business Day prior to the Auction, each Qualified Bidder who has timely submitted a Qualified Bid must inform the Sellers whether it intends to attend the Auction, provided that in the event a Qualified Bidder elects not to attend the Auction, such Qualified Bidder's Qualified Bid shall nevertheless remain fully enforceable against such Qualified Bidder until (i) the date of the selection of the Successful Bidder at the conclusion of the Auction and (ii) if such bidder is selected as an Alternate Bidder (as defined below), the Alternate Bid Expiration Date. At least one (1) Business Day prior to the Auction, the Sellers will provide copies of the Qualified Bid which the Sellers believe, in their reasonable business judgment, after consultation with the Committee, the Bondholder Group and the Monitor, is the highest or otherwise best offer (the "Starting Bid") to all Qualified Bidders that have timely submitted Qualified Bids and have informed the Sellers of their intent to attend the Auction.

(d)     All Qualified Bidders who have timely submitted Qualified Bids will be entitled to be present for all Subsequent Bids (as defined below) at the Auction with the understanding that the true identity of each Qualified Bidder at the Auction will be fully disclosed to all other Qualified Bidders at the Auction and that all material terms of each

- 11 -

Subsequent Bid will be fully disclosed to all other bidders throughout the entire Auction, provided that all Qualified Bidders wishing to attend the Auction must have at least one individual representative with authority to bind such Qualified Bidder attending the Auction in person.

(e)     The Sellers, after consultation with their counsel and financial advisors, the Committee, the Bondholder Group and the Monitor, may employ and announce at the Auction additional procedural rules that are reasonable under the circumstances (e.g., the amount of time allotted to make Subsequent Bids) for conducting the Auction, provided that such rules are (i) not inconsistent with these Bidding Procedures, the Bankruptcy Code, or any order of the Bankruptcy Court, the Canadian Court or any other applicable court entered in connection herewith, and (ii) disclosed to each Qualified Bidder at the Auction.

(f)     Bidding at the Auction will begin with the Starting Bid and continue, in one or more rounds of bidding, so long as during each round at least one subsequent bid is submitted by a Qualified Bidder that (i) improves upon such Qualified Bidder's immediately prior Qualified Bid (a "Subsequent Bid") and (ii) the Sellers determine, in consultation with their advisors, the Committee, the Bondholder Group and the Monitor that such Subsequent Bid is (A) for the first round, a higher or otherwise better offer than the Starting Bid, and (B) for subsequent rounds, a higher or otherwise better offer than the Leading Bid (as defined below). Each incremental bid at the Auction shall provide net value to the estate of at least US $3 million over the Starting Bid or the Leading Bid, as the case may be, provided that the Sellers, in consultation with the Committee, the Bondholder Group and the Monitor, shall retain the right to modify the increment requirements at the Auction, and provided, further that the Sellers in determining the net value of any incremental bid to the estate shall not be limited to evaluating the incremental dollar value of such bid and may consider other factors as identified in the "Selection of Successful Bid" section of these Bidding Procedures, including, without limitation, factors affecting speed and certainty of obtaining regulatory approvals required to close the Transaction. After the first round of bidding and between each subsequent round of bidding, the Sellers shall announce the bid (and the value of such bid(s)) that it believes to be the highest or otherwise better offer (the "Leading Bid"). A round of bidding will conclude after each participating Qualified Bidder has had the opportunity to submit a Subsequent Bid with full knowledge of the Leading Bid. Except as specifically set forth herein, for the purpose of evaluating the value of the consideration provided by Subsequent Bids, the Sellers will, at each round of bidding, give effect to any additional liabilities to be assumed by a Qualified Bidder and any additional costs which may be imposed on the Sellers.

<u>Selection Of Successful Bid</u>

Prior to the conclusion of the Auction, the Sellers, in consultation with their advisors, the Committee, the Bondholder Group and the Monitor will (a) review each Qualified Bid that is either the Leading Bid or submitted subsequent to and as an improvement to the submission of the Leading Bid on the basis of financial and contractual terms and the factors relevant to the sale process, including, among other things, the proposed revisions to the transaction documents,

the effect of the Sale on the value of the ongoing businesses of Sellers (including ongoing relationships with customers and suppliers), the counterparties to such transactions, the purchase price and the net value (including assumed liabilities and the other obligations to be performed or assumed by the bidder) provided by such bid, the claims likely to be created by such bid in relation to other bids, other factors affecting the speed, certainty and value of the Sale (including any regulatory approvals required to close the Transaction), any assets excluded from the bid, the estimated number of in-scope employees of the Sellers to be offered post-closing employment by the Qualified Bidder (save in jurisdictions where employees transfer by operation of law) and any proposed measures associated with the continued employment of all employees who will become employees of the Qualified Bidder, the transition services required from the Sellers post-closing and any related restructuring costs, and the likelihood and timing of consummating such transaction, each as determined by the Sellers, in consultation with their advisors, the Committee, the Bondholder Group and the Monitor; (b) identify the highest or otherwise best offer for the Assets received in accordance with the Bidding Procedures (such bid, the "Successful Bid" and the Qualified Bidder making such bid, collectively, the "Successful Bidder"); and (c) communicate to the Qualified Bidders the identity of the Successful Bidder, the Alternate Bidder (as defined below), if any, and the details of the Successful Bid and Alternate Bid (as defined below), if any. The determination of the Successful Bid and Alternate Bid by the Sellers, after consultation with the Committee, the Bondholder Group and the Monitor, at the conclusion of the Auction, shall be final subject to approval by the Bankruptcy Court and the Canadian Court.

The Sellers will sell the Assets to the Successful Bidder pursuant to the terms of the Successful Bid (or, under certain circumstances described herein, the Alternate Bidder) upon the approval of such Successful Bid by the Bankruptcy Court at the Sale Hearing, the approval by the Canadian Court and any required approvals of any other applicable court(s) with such Successful Bidder and approval and execution by the Administrators of the relevant Successful Bid transaction documents with such Successful Bidder (or, under certain circumstances described herein, the Alternate Bid transaction documents with the Alternate Bidder).

<u>Sale Hearing</u>

The sale hearing to authorize certain of the Sellers to enter into agreements with respect to the Successful Bid (the "Sale Hearing") will be held, in respect of those Sellers that are U.S. Debtors, before the Honorable Judge Kevin Gross (or any substitute therefor) in the United States Bankruptcy Court for the District of Delaware, located in Wilmington, Delaware, on a date to be scheduled by the court and currently proposed as November 19, 2009 at 1 p.m. (Eastern), and, in respect of those Sellers that are Canadian Debtors, before the Honourable Mr. Justice Geoffrey B. Morawetz (or any substitute therefor) in the Ontario Superior Court of Justice, in Toronto, Ontario, on a date to be scheduled by the court and currently proposed as November 19, 2009 at 1 p.m. (Eastern), and in any other applicable court(s) whose approval is required, as soon as practicable following the date of the Sale Hearing (or, with respect to the Canadian Court, in a joint hearing with the Bankruptcy Court at the Sale Hearing). The Sale Hearing and any hearings of any other applicable court(s) to approve the entering into agreements with respect to the Successful Bid, may be adjourned or rescheduled by the Sellers without further notice by an announcement of the adjourned date at the Sale Hearing or, in the case of an adjournment of a relevant hearing of any other applicable court, at such hearing. If the

- 13 -

Sellers do not receive any Qualified Bids, the Sellers shall proceed as set forth in the "No Qualified Bids" section above. If the Sellers receive one or more Qualified Bid(s), then, at the Sale Hearing and at any other hearings of any other applicable court(s) to approve the entering into agreements with respect to the Successful Bid, the Sellers will seek approval of the Successful Bid, and, at the Sellers' election, the next highest or best Qualified Bid (the "Alternate Bid" and, such bidder, the "Alternate Bidder"). The Sellers' presentation to the Bankruptcy Court, the Canadian Court and any other applicable court(s) whose approval is legally required, of the Successful Bid, and, if applicable, the Alternate Bid will not constitute the Sellers' acceptance of either of such bids, which acceptance will only occur upon the latest approval of such bids to be delivered by the Bankruptcy Court at the Sale Hearing, the Canadian Court and any other applicable court(s) whose approval is legally required. Following approval of the Sale to the Successful Bidder, if the Successful Bidder fails to consummate the Sale for any reason, then the Alternate Bid will be deemed to be the Successful Bid and the Sellers will be authorized, but not directed, to effectuate a Sale to the Alternate Bidder subject to the terms of the Alternate Bid of such Alternate Bidder without further order of the Bankruptcy Court, the Canadian Court or any other court. The Alternate Bid shall remain open until 45 days from the conclusion of the Auction (the "Alternate Bid Expiration Date"). All Qualified Bids (other than the Successful Bid and the Alternate Bid) shall be deemed rejected by the Sellers on and as of the date of approval of the Successful Bid and the Alternate Bid by the Bankruptcy Court, the Canadian Court and any other applicable court(s) whose approval is required, as indicated above.

### Good Faith Deposits

The Good Faith Deposit of any Alternate Bidder shall be retained by the Sellers until the Alternate Bid Expiration Date and returned to the Alternate Bidder within seven (7) days thereafter or, if the Alternate Bid becomes the Successful Bid, shall be applied to the purchase price to be paid by the Alternate Bidder in accordance with the terms of the Alternate Bid. The Good Faith Deposits of Qualified Bidders not selected as either the Successful Bidder or Alternate Bidder shall be returned to such bidders within five (5) Business Days of the date of the selection of the Successful Bidder and the Alternate Bidder. The Good Faith Deposit of the Successful Bidder will be applied in accordance with the terms of the Successful Bid.

### Reservation Of Rights

The Sellers, after consultation with their advisors, the Committee, the Bondholder Group and the Monitor, and their respective advisors, (a) after each round of bidding at the Auction may determine which Qualified Bid, if any, is the highest or otherwise best offer and the value thereof; (b) may reject, at any time, any bid that is (i) inadequate or insufficient, (ii) not in conformity with the requirements of the Bankruptcy Code, the Bidding Procedures, any orders of the Canadian Court or any other orders applicable to one or more Sellers, or the terms and conditions of the Sale, (iii) contrary to the best interests of the Sellers, their estates, and stakeholders as determined by the Sellers in consultation with the Committee, the Bondholder Group and the Monitor, or (iv) contrary to the statutory duties or legal obligations of the Administrators in relation to the exercise of their duties or functions as administrators of certain EMEA Sellers; (c) may impose additional terms and conditions and otherwise modify the Sale Procedures at any time; (d) withdraw from sale any Assets at any time and make subsequent attempts to market the same; and (e) reject all bids.

- 14 -

For the purposes of these Bidding Procedures and all matters relating to them, the Administrators are acting only as agents for and on behalf of the EMEA Sellers that are controlled by the Administrators pursuant to the UK Proceedings and without personal liability.

## SCHEDULE 1
### BIDDING PROCEDURES – FRENCH SUPPLEMENT

This document (the "French Supplement") supplements the Bidding Procedures to be employed with respect to the proposed sale of certain assets and assumption of certain liabilities pertaining to the global GSM/GSM-R business of Nortel.

Capitalized terms used but not defined herein have the meanings ascribed to them in the Bidding Procedures.

On May 28, 2009, at the request of the UK Administrator of NNSA and in accordance with Council Regulation (EC) No 1346/2000 of 29 May 2000 on insolvency proceedings (the "EC Regulation"), the Commercial Court of Versailles, France, (the "French Court") ordered the commencement of secondary proceedings (the "Secondary Proceedings") in respect of NNSA. In accordance with the EC Regulation and applicable French laws, the Secondary Proceedings consist of liquidation proceedings during which NNSA continued to operate as a going concern for an initial three-month period and, in accordance with a judgment of the French Court of August 20, 2009, will continue to operate as a going concern for another three-month period, provided that this second three-month period has been further extended as a result of the suspension of the liquidation process under the Secondary Proceedings in accordance with a judgment of the French Court of October 1, 2009 rendered at the request of the U.K. Administrator. In accordance with the EC Regulation, the U.K. administration proceedings remain the main proceedings in respect of NNSA. However, a French administrator (the "French Administrator") has been appointed and is in charge of the day-to-day affairs and continuing business of NNSA and a French liquidator (the "French Liquidator") has also been appointed and is in charge of the sale process of the business of NNSA. The French Administrator and the French Liquidator will remain in place during the suspension of the Secondary Proceedings.

### Publication Notice

The publication of the Sale Notice in The Wall Street Journal (National Edition), The Globe and Mail (National Edition) and The Financial Times (International Edition) contemplated by the "Publication Notice" section of the Bidding Procedures will be supplemented by the concurrent publication in each such newspapers of this French Supplement. In addition, the French Administrator and the French Liquidator will publish in Les Echos a French translation of the Sale Notice and of this French Supplement as soon as reasonably practicable after entry of orders by the Bankruptcy Court and the Canadian Court approving the Bidding Procedures, but in any event no more than fifteen (15) days after the entry of such orders.

- 2 -

### Bid Deadline

In addition to the delivery of its bid to the Notice Parties, a Qualified Bidder that desires to make a bid will deliver written copies of its bid to (i) the French administrator: Me. Franck Michel, AJAssociés, 10 allée Pierrede Coubertin 78000 Versailles, France , Facsimile: +33 1 39 50 87 52; (ii) the French Liquidator: Me Cosme Rogeau, 26 avenue Hoche 78000 Versailles, France, Facsimile: +33 1 39 49 44 63; and (iii) counsel to the French Administrator and the French Liquidator: Foucaud, Tchekhoff, Pochet et Associés, Attn: Antoine Tchekhoff and Edouard Fabre, 1bis avenue Foch 75116 Paris, France, Facsimile: +33 1 45 00 08 19.

Notwithstanding the Bid Deadline applicable to the making of bids in accordance with the Bidding Procedures, the Successful Bidder will be expected to file with the French Court in accordance with applicable French laws shortly after the conclusion of the Auction and prior to the U.S. Sale Hearing an offer for the acquisition of NNSA's GSM/GSM-R assets and business (the "French Offer"). The Purchase Agreements among the Sellers and the Successful Bidder shall contain a commitment from the Successful Bidder(s) to that effect.

The French Court will determine in due course the deadline for the filing of the French Offer with the French Court. The French Administrator and the French Liquidator will announce such deadline by way of a publication in Les Echos in French and in The Financial Times (International Edition) in English. Such publications will supplement the announcement published by the French Administrator in French in Les Echos on September 4, 2009, and in English in the Financial Times on September 3, 2009.

### Reservation Of Rights

The "Reservation of Rights" section of the Bidding Procedures is incorporated herein by reference.

For the purposes of this French Supplement and all matters relating to them, the French Administrator and the French Liquidator are acting solely as agents for and on behalf of NNSA and without personal liability.

**APPENDIX B**

**[ATTACHED]**

EXECUTION VERSION

## ASSET SALE AGREEMENT

BY AND AMONG

### NORTEL NETWORKS CORPORATION

### NORTEL NETWORKS LIMITED

### NORTEL NETWORKS INC.

AND

### THE OTHER ENTITIES IDENTIFIED HEREIN AS SELLERS

AND

### TELEFONAKTIEBOLAGET L M ERICSSON (PUBL)

### DATED AS OF NOVEMBER 24, 2009

## TABLE OF CONTENTS

**Page**

ARTICLE I INTERPRETATION ................................................................................................3
    Section 1.1.      Definitions. ..........................................................................................3
    Section 1.2.      Interpretation. ....................................................................................29
           1.2.1.      Gender and Number. ........................................................................29
           1.2.2.      Certain Phrases and Calculation of Time. .......................................29
           1.2.3.      Headings, etc. ...................................................................................30
           1.2.4.      Currency. ...........................................................................................30
           1.2.5.      Statutory References..........................................................................30

ARTICLE II PURCHASE AND SALE OF ASSETS ................................................................30
    Section 2.1.      Purchase and Sale. ............................................................................30
           2.1.1.      Assets.................................................................................................30
           2.1.2.      Excluded Assets.................................................................................31
           2.1.3.      Assumed Liabilities. .........................................................................33
           2.1.4.      Excluded Liabilities...........................................................................34
           2.1.5.      Assumption and Assignment of 365 Contracts. ...............................35
           2.1.6.      Assignment of Non-365 Contracts. ..................................................37
           2.1.7.      Cure Costs; Adequate Assurance; Efforts ......................................38
           2.1.8.      Local Sale Agreements......................................................................40
           2.1.9.      EMEA Asset Sale Agreement; NNSA Irrevocable Offer. ...............40
           2.1.10.    Non-Assignable Assets......................................................................40
    Section 2.2.      Purchase Price. ..................................................................................41
           2.2.1.      Purchase Price. ..................................................................................41
           2.2.2.      Estimated Purchase Price. .................................................................41
           2.2.3.      Purchase Price Adjustment.................................................................42
           2.2.4.      Good Faith Deposit............................................................................45
    Section 2.3.      Closing...............................................................................................45
           2.3.1.      Closing Date. .....................................................................................45
           2.3.2.      Closing Actions and Deliveries. ........................................................46
    Section 2.4.      Designated Purchaser(s). ...................................................................47

i

**TABLE OF CONTENTS**
**(Continued)**

Page

**ARTICLE III REPRESENTATIONS AND WARRANTIES OF THE PURCHASER** ...................................................................................... 48

Section 3.1.    Organization and Corporate Power. ........................................ 48

Section 3.2.    Authorization; Binding Effect; No Breach. .......................... 48

Section 3.3.    Financing. ............................................................................... 49

Section 3.4.    Adequate Assurance of Future Performance. ....................... 49

Section 3.5.    Purchaser's Acknowledgments; Exclusivity of Representations and Warranties. .................................................................. 49

Section 3.6.    Brokers. .................................................................................. 50

**ARTICLE IV REPRESENTATIONS AND WARRANTIES OF THE SELLERS** ............. 50

Section 4.1.    Organization and Corporate Power. ........................................ 50

Section 4.2.    Authorization; Binding Effect; No Breach. .......................... 51

Section 4.3.    Title to Tangible Assets. ....................................................... 52

Section 4.4.    Material Contracts. ................................................................ 52

Section 4.5.    Intellectual Property. ............................................................. 53

Section 4.6.    Litigation. .............................................................................. 54

Section 4.7.    Financial Statements. ............................................................ 55

Section 4.8.    Compliance with Laws; Consents. ........................................ 55

Section 4.9.    Environmental Matters. ......................................................... 56

Section 4.10.   Labor and Employee Benefits Matters. ................................. 56

Section 4.11.   Brokers. .................................................................................. 58

Section 4.12.   Tax. ........................................................................................ 58

Section 4.13.   Investment Canada Act. ......................................................... 58

Section 4.14.   Real Property. ........................................................................ 58

Section 4.15.   Trade Matters. ....................................................................... 60

Section 4.16.   Competition Act. ................................................................... 61

Section 4.17.   Representations and Warranties by the Other Sellers. .......... 61

4.17.1.   Organization and Corporate Power. ...................................... 61

4.17.2.   Authorization; Binding Effect; No Breach. .......................... 61

ii

## TABLE OF CONTENTS
### (Continued)

Page

**ARTICLE V COVENANTS AND OTHER AGREEMENTS** ................................................. 62

Section 5.1.    U.S. Bankruptcy Actions. ........................................................ 62

Section 5.2.    Canadian Bankruptcy Actions. ............................................... 62

Section 5.3.    Consultation; Notification. ..................................................... 63

Section 5.4.    Pre-Closing Cooperation. ....................................................... 64

Section 5.5.    Antitrust and Other Regulatory Approvals............................... 65

Section 5.6.    Pre-Closing Access to Information. ........................................ 68

Section 5.7.    Public Announcements............................................................ 69

Section 5.8.    Further Actions........................................................................ 69

Section 5.9.    Conduct of Business. .............................................................. 69

Section 5.10.   Transaction Expenses. ............................................................ 71

Section 5.11.   Confidentiality......................................................................... 71

Section 5.12.   Certain Payments or Instruments Received from Third Parties. ............. 72

Section 5.13.   Non-Assignable Contracts....................................................... 73

Section 5.14.   Inbound License Agreements. ................................................. 74

Section 5.15.   Bundled Contracts. ................................................................. 75

Section 5.16.   Post-Closing Assistance for Litigation. ................................... 76

Section 5.17.   Delivery of Assets. ................................................................. 76

Section 5.18.   Termination of Overhead and Shared Services. ...................... 77

Section 5.19.   Financing. ............................................................................... 77

Section 5.20.   Insurance Matters. .................................................................. 77

Section 5.21.   Guarantees and Other Credit Support of the Business. ........... 78

Section 5.22.   Use of Trademarks. ................................................................ 78

Section 5.23.   Sellers' Accessible Information; Cooperation.......................... 78

Section 5.24.   Maintenance of Books and Records. ....................................... 79

Section 5.25.   Sasken Agreements. ................................................................ 80

Section 5.26.   Finalization of Schedules to Transition Services Agreement; Disputes. ............. 81

Section 5.27.   Casualty. ................................................................................. 84

Section 5.28.   Ancillary Agreements.............................................................. 84

**TABLE OF CONTENTS**
**(Continued)**

Page

Section 5.29.  Patents to be Reviewed...................................................................... 84

Section 5.30.  China Assets. ...................................................................................... 85

Section 5.31.  Subleases. ............................................................................................ 85

Section 5.32.  Direct Leases. ...................................................................................... 85

Section 5.33.  Licenses. .............................................................................................. 85

Section 5.34.  Disclosure Schedules and Certain Information. ...................................86

Section 5.35.  Affiliates. .............................................................................................. 86

**ARTICLE VI TAX MATTERS** ........................................................................... 87

Section 6.1.  Transfer Taxes. ..................................................................................... 87

Section 6.2.  Withholding Taxes. ............................................................................... 88

Section 6.3.  Tax Characterization of Payments Under This Agreement.................... 88

Section 6.4.  Apportionment of Taxes........................................................................ 88

Section 6.5.  Records. ................................................................................................. 89

Section 6.6.  Tax Returns. .......................................................................................... 90

Section 6.7.  Allocation of Purchase Price. ............................................................... 91

Section 6.8.  Tax Elections. ........................................................................................ 92

**ARTICLE VII EMPLOYMENT MATTERS**........................................................ 93

Section 7.1.  Employment Obligations....................................................................... 93

7.1.1.  Employment Terms. .......................................................................... 93

7.1.2.  Employee Benefits............................................................................. 94

Section 7.2.  Other Employee Covenants.................................................................... 96

Section 7.3.  Excluded Employee Liabilities.............................................................. 97

Section 7.4.  Canadian Pension Plans......................................................................... 98

Section 7.5.  Sole Benefit of Sellers and Purchaser. .................................................. 99

**ARTICLE VIII CONDITIONS TO THE CLOSING** ........................................... 99

Section 8.1.  Conditions to Each Party's Obligation. ................................................. 99

Section 8.2.  Conditions to Sellers' Obligation. ....................................................... 100

Section 8.3.  Conditions to Purchaser's Obligation.................................................. 100

iv

**TABLE OF CONTENTS**
(Continued)

**Page**

**ARTICLE IX TERMINATION**.............................................................................................**101**

Section 9.1.    Termination. ...................................................................... 101

Section 9.2.    Effects of Termination....................................................... 102

**ARTICLE X MISCELLANEOUS**.....................................................................................**103**

Section 10.1.    No Survival of Representations and Warranties or Covenants. .......... 103

Section 10.2.    Remedies. .......................................................................... 103

Section 10.3.    No Third Party Beneficiaries............................................. 103

Section 10.4.    Consent to Amendments; Waivers. .................................... 103

Section 10.5.    Successors and Assigns. .................................................... 103

Section 10.6.    Governing Law; Submission to Jurisdiction; Waiver of Jury
                 Trial. ................................................................................ 104

Section 10.7.    Notices................................................................................ 105

Section 10.8.    Exhibits; Sellers Disclosure Schedule. .............................. 108

Section 10.9.    Counterparts. ..................................................................... 109

Section 10.10.    No Presumption. ............................................................... 109

Section 10.11.    Severability........................................................................ 109

Section 10.12.    Headings ............................................................................ 109

Section 10.13.    Entire Agreement............................................................... 109

Section 10.14.    Availability of Equitable Relief; Sole Remedy. .................. 110

Section 10.15.    Bulk Sales Laws. ............................................................... 110

Section 10.16.    Main Sellers as Representatives of Other Sellers................ 110

Section 10.17.    Execution by Other Sellers. ............................................... 111

Section 10.18.    Obligations of the Sellers. ................................................. 111