**TABLE OF CONTENTS**
(Continued)

**EXHIBITS**

Exhibit A – Other Sellers

Exhibit B – EMEA Sellers

Exhibit C – Canadian Debtors; U.S. Debtors; EMEA Debtors; Non-Debtor Sellers

Exhibit D – EMEA Asset Sale Agreement

Exhibit E – Contract Manufacturing Inventory Agreement Term Sheet

Exhibit F – Intellectual Property License Agreement

Exhibit G – Real Estate Agreements Term Sheet

Exhibit H – Loaned Employee Agreement

Exhibit I – Antitrust Approvals – Relevant Antitrust Jurisdictions/Authorities

Exhibit J – Subcontract Agreement

Exhibit K – Trademark License Agreement

Exhibit L – Transition Services Agreement

Exhibit M – Dual Use Platform Agreement

Exhibit N – Development and Supply Agreement

Exhibit O – Adjusted Net Working Capital Statement

Exhibit P – Contract Manufacturing Agreements Term Sheet

Exhibit Q – GDNT Back-to-Back Agreement Term Sheet

Exhibit R – Purchaser Supply Agreement

Exhibit 5.1 – Form of U.S. Sale Order

Exhibit 5.2 – Form of Canadian Approval and Vesting Order

Exhibit 5.9 – Purchaser's Representatives for Interim Covenants Consent

## ASSET SALE AGREEMENT

This Asset Sale Agreement is dated as of November 24, 2009, among Nortel Networks Corporation, a corporation organized under the laws of Canada ("**NNC**"), Nortel Networks Limited, a corporation organized under the laws of Canada ("**NNL**"), Nortel Networks Inc., a corporation organized under the laws of Delaware ("**NNI**" and, together with NNC and NNL, the "**Main Sellers**"), the Affiliates (as defined below) of the Main Sellers listed in Exhibit A hereto (the "**Other Sellers**" and, together with the Main Sellers, the "**Sellers**") and Telefonaktiebolaget L M Ericsson (publ), a corporation organized under the laws of Sweden (the "**Purchaser**").

## W I T N E S S E T H:

WHEREAS, the Sellers beneficially own and operate the Business (as defined below);

WHEREAS, on the Petition Date, NNC, NNL and the Other Sellers listed in part 1 of Exhibit C hereto (together, the "**Canadian Debtors**") filed with the Canadian Court (as defined below) an application for protection under the Companies' Creditors Arrangement Act (the "**CCAA**") (the proceedings commenced by such application, the "**CCAA Cases**") and were granted certain initial creditor protection pursuant to an order issued by the Canadian Court on the same date, which also appointed Ernst & Young Inc. as "**Monitor**" in connection with the CCAA Cases and was extended by further order of the Canadian Court on February 10, 2009, April 28, 2009, July 30, 2009 and October 28, 2009, as the same may be amended and restated from time to time by the Canadian Court;

WHEREAS, NNI and the Other Sellers listed in part 2 of Exhibit C hereto (the "**U.S. Debtors**") are debtors-in-possession under the U.S. Bankruptcy Code (as defined below) which commenced cases under Chapter 11 of the U.S. Bankruptcy Code on the Petition Date by filing voluntary petitions for relief in the U.S. Bankruptcy Court for the District of Delaware (the "**Chapter 11 Cases**");

WHEREAS, the entities listed under the heading "EMEA Debtors" in part 3 of Exhibit C hereto (the "**EMEA Debtors**") on the Petition Date filed applications with the English Court (as defined below), pursuant to the Insolvency Act of 1986, as amended (the "**Insolvency Act**") and the European Union's Council Regulation (EC) No 1346/2000 on Insolvency Proceedings (the proceedings commenced by such applications, the "**EMEA Cases**") and the English Court appointed Alan Bloom, Stephen Harris, Chris Hill and Alan Hudson of Ernst & Young LLP as joint administrators of all the EMEA Debtors (other than Nortel Networks (Ireland) Limited, for which David Hughes and Alan Bloom serve as joint administrators) (the "**Joint Administrators**") under the Insolvency Act;

WHEREAS, on May 28, 2009, liquidation proceedings with temporary continuation of the business have been commenced in France with respect to NNSA pursuant to the European Union's Council Regulation (EC) No 1346/2000 on Insolvency Proceedings and articles L. 640-1 *seq.* of the French Code of commerce, and the Commercial Court of Versailles,

France (the "**French Court**") appointed Cosme Rogeau as liquidator and Franck Michel as judicial administrator (together, the "**French Administrators**");

WHEREAS, the Other Sellers listed in part 4 of Exhibit C hereto (the "**Non-Debtor Sellers**") are not subject to any Bankruptcy Proceedings (as defined below) as of the date hereof;

WHEREAS, the Sellers have agreed to transfer to the Purchaser and/or the Designated Purchasers (as defined below), and the Purchaser has agreed to purchase and assume, and cause the Designated Purchasers to purchase and assume, including, to the extent applicable, pursuant to Sections 363 and 365 of the U.S. Bankruptcy Code and pursuant to the Canadian Approval and Vesting Order, the Assets and the Assumed Liabilities (each as defined below) from the Sellers, upon the terms and conditions set forth hereinafter;

WHEREAS, simultaneously with the execution of this Agreement, the EMEA Sellers (as defined below), the Joint Administrators, and Kapsch CarrierCom AG, a corporation organized under the laws of Austria (the "**EMEA Purchaser**"), are entering into a separate agreement in the form set forth in Exhibit D hereto (the "**EMEA Asset Sale Agreement**") providing for the sale to the EMEA Purchaser (and/or the EMEA Designated Purchasers (as defined therein)) of the assets of the EMEA Business (as defined in the EMEA Asset Sale Agreement) held by such EMEA Sellers;

WHEREAS, Schedule 6 to the EMEA Asset Sale Agreement contains the terms of an irrevocable offer (the "**NNSA Irrevocable Offer**") by the EMEA Purchaser to purchase the NNSA Assets (as defined in the EMEA Asset Sale Agreement), which will be submitted for approval to the French Court;

WHEREAS, the Parties (as defined below) acknowledge and agree that the purchase by the Purchaser (and the Designated Purchasers, if any) of the Assets, the license of Intellectual Property under the Intellectual Property License Agreement and the Trademark License Agreement (each as defined below), and the assumption by the Purchaser and the Designated Purchasers, as applicable, of the Assumed Liabilities (as defined below) are being made at arms' length and in good faith and without intent to hinder, delay or defraud creditors of the Sellers and their Affiliates;

WHEREAS, the Purchaser (and each of the Designated Purchasers, where applicable) intends to purchase only those Assets that relate to the Business;

WHEREAS, in accordance with the U.S. Bidding Procedures Order, the Purchaser has delivered to the Sellers and the EMEA Sellers the Good Faith Deposit (as defined below); and

WHEREAS, in addition, at the Closing, the Purchaser (or Affiliates of the Purchaser), and certain Sellers (or Affiliates of the Sellers) will enter into the following ancillary agreements ((i) through (xvii) together, the "**Ancillary Agreements**"): (i) the Local Sale Agreements, (ii) the Intellectual Property License Agreement, (iii) the Real Estate Agreements (each as defined below), (iv) certain Subcontract Agreements, if any, (v) the Transition Services Agreement, (vi) the Trademark License Agreement, (vii) the Loaned Employee Agreement,

(viii) the Dual Use Platform Agreement, (ix) the Development and Supply Agreement, (x) the GDNT Agreements, (xi) the China Purchase Agreement, (xii) the Sasken Agreements, (xiii) the Contract Manufacturing Inventory Agreements, (xiv) the Purchaser Supply Agreement and (xv) the Contract Manufacturing Agreements, and will use their reasonable efforts to enter into (xvi) any distribution agreements to be determined, and (xvii) any other agreements or arrangements to be entered into pursuant to the provisions of this Agreement.

NOW, THEREFORE, in consideration of the respective covenants, representations and warranties made herein, and of the mutual benefits to be derived hereby (the sufficiency of which is acknowledged), the Parties agree as follows:

## ARTICLE I

## INTERPRETATION

Section 1.1.    Definitions.Capitalized terms used but not otherwise defined herein shall have the meanings set forth below:

"**Accounting Arbitrator**" has the meaning set forth in Section 2.2.3.1(c).

"**Accrued Vacation Amount**" means, at any given time, the amount of compensation with respect to the accrued and unused vacation hours that is due and owing to the Specified Transferred Employees from their respective employer, to be calculated in accordance with the Calculation Principles.

"**Action**" means any litigation, action, suit, charge, binding arbitration, Tax audit or other legal, administrative, regulatory or judicial proceeding.

"**Acquired Actions**" means any avoidance or recovery actions as used under Section 542, 543, 544, 545, 546, 547, 548 or 550 of the Bankruptcy Code or the equivalent provisions or recovery under other applicable Laws that the Sellers have against any counterparty to an Assumed and Assigned Contract arising out of or relating to the Assigned Contracts that are actually assigned to the Purchaser or a Designated Purchaser hereunder.

"**Adjusted Net Working Capital**" has the meaning set forth in Section 2.2.2(c).

"**Adjusted Net Working Capital Statement**" means the statement of certain specified asset and liability accounts and certain accounting principles, methodologies and policies used in the determination of such accounts, consistent with the Calculation Principles, in the form provided in Exhibit O hereto.

"**Affiliate**" means, as to any Person, any other Person that directly or indirectly through one or more intermediaries Controls, or is under common Control with, or is Controlled by, such Person; provided, that neither any EMEA Seller or Subsidiary of an EMEA Seller (other than those Subsidiaries that are Sellers hereunder) nor NNSA shall be deemed an Affiliate of any Seller.

3

"**Agreement**" means this Asset Sale Agreement, the Sellers Disclosure Schedule and all Exhibits and Schedules attached hereto and thereto and all amendments hereto and thereto made in accordance with Section 10.4.

"**Ancillary Agreements**" has the meaning set forth in the recitals to this Agreement.

"**Antitrust Approvals**" means the HSR Approval, the MOFCOM Approval, and any other decision, in whatever form (including a declaration of lack of jurisdiction or a mere filing or notification, if the Closing can take place, pursuant to the applicable Antitrust Law, without a decision or the expiry of any waiting period), by any Government Entity under the Laws of any of the jurisdictions listed in Exhibit I or the expiry of the applicable waiting period, as applicable, under the Antitrust Laws of any of the jurisdictions listed in Exhibit I, authorizing or not objecting to the transactions contemplated by this Agreement, which includes any decision or consent by any such Government Entity setting forth conditions or obligations on the Purchaser or any of its Affiliates if such conditions have been or, pursuant to Section 5.5(e) are required, to be accepted by the Purchaser.

"**Antitrust Laws**" means the HSR Act, the Anti-monopoly Law of the People's Republic of China, and any competition, merger control and antitrust Law of any other applicable supranational, national, federal, state, provincial or local Law designed or intended to prohibit, restrict or regulate actions having the purpose or effect of monopolizing or restraining trade or lessening competition of any other country or jurisdiction, to the extent applicable to the transactions contemplated by this Agreement.

"**Assets**" has the meaning set forth in Section 2.1.1.

"**Assigned Contracts**" means, collectively, (i) the Assumed and Assigned Contracts, (ii) the Designated Non-365 Contracts (other than the Non-Assigned Contracts) and (iii) the Purchase Orders.

"**Assumed and Assigned Contracts**" has the meaning set forth in Section 2.1.5(e).

"**Assumed and Subleased Real Estate Leases**" has the meaning set forth in Section 2.1.5(b).

"**Assumed Liabilities**" has the meaning set forth in Section 2.1.3.

"**Balance Sheet Date**" has the meaning set forth in Section 4.7.

"**Bankruptcy Consents**" has the meaning set forth in Section 4.1(a).

"**Bankruptcy Court**" means the U.S. Bankruptcy Court, the Canadian Court, the English Court, the French Court or any other court before which Bankruptcy Proceedings are filed.

"**Bankruptcy Laws**" means the U.S. Bankruptcy Code, the CCAA, the Insolvency Act, Book VI of the French Code of commerce (*Code de commerce*) and the other applicable bankruptcy, insolvency, administration or similar Laws of any jurisdiction where Bankruptcy Proceedings are held.

"**Bankruptcy Proceedings**" means the Chapter 11 Cases, the CCAA Cases, the EMEA Cases and, in each case, any proceedings thereunder, as well as any other voluntary or involuntary bankruptcy, insolvency, administration, liquidation or similar judicial proceedings concerning any of the Sellers, the EMEA Sellers or NNSA from time to time.

"**Bidding Procedures**" means Exhibit I attached to the U.S. Bidding Procedures Order.

"**Bundled Contract**" has the meaning set forth in Section 5.15.

"**Business**" means the GSM infrastructure business of the Sellers consisting of:

(a)    researching, designing, developing and/or causing to design or develop the Products;

(b)    causing the manufacture, assembling and testing of the Products;

(c)    marketing, distributing, selling and supplying the Products and the support and warranties thereon; and

(d)    marketing, selling and supplying of the Services;

all as conducted by the Sellers in the United States and Canada or with respect to customers in the United States and Canada and, with respect to the research and development activities described above, in China, all as at the Closing Date, but excludes:

(i)    the Excluded Products and Services;

(ii)    Overhead and Shared Services (other than Transferred Overhead and Shared Services); and

(iii)    the GSM infrastructure business of the Sellers conducted by the Sellers in any territory other than the United States and Canada or with respect to customers in any territory other than the United States and Canada.

"**Business Day**" means a day on which the banks are opened for business (Saturdays, Sundays, statutory and civic holidays excluded) in (i) New York, New York, United States, (ii) Toronto, Ontario, Canada, (iii) London, England, United Kingdom, (iv) Paris, France and (v) Stockholm, Sweden.

"**Business Information**" means all books, records, files, research and development log books, ledgers, documentation, sales literature or similar documents in the possession or under control of the Sellers and to the extent that such information relates to the

Business, including policies and procedures, Owned Equipment manuals and materials and procurement documentation; provided, that, to the extent any of the foregoing is also used in any business or business segment of any Seller other than the Business, then such portion of the Business Information as used in such business or business segment of any Seller other than the Business shall be segregated and shall not form part of Business Information, provided further that, where such segregation shall be impracticable, Business Information shall be limited to copies of the foregoing. Business Information shall not include any Employee Records.

"**Business Registered IP**" has the meaning set forth in Section 4.5(b).

"**Calculation Principles**" means the Nortel Accounting Principles, applied in a manner consistent with historical practices, to the extent applicable to the determination of the Inventory Value, the CIP Receivables Amount, the Warranty Provision Amount, the Accrued Vacation Amount, the Adjusted Net Working Capital, the Contractual Liability Amount, the Deferred Revenue Liability Amount and the Royalty Liability Amount, and the other accounting principles, methodologies and policies for the determination of the Inventory Value, the CIP Receivables Amount, the Warranty Provision Amount, the Accrued Vacation Amount, the Adjusted Net Working Capital, the Contractual Liability Amount, the Deferred Revenue Liability Amount and the Royalty Liability Amount, as set forth in Section 1.1(a) of the Sellers Disclosure Schedule and in the Adjusted Net Working Capital Statement.

"**Canadian Approval and Vesting Order**" has the meaning set forth in Section 5.2.

"**Canadian Approval and Vesting Order Motion**" has the meaning set forth in Section 5.2.

"**Canadian Court**" means the Ontario Superior Court of Justice.

"**Canadian Debtors**" has the meaning set forth in the recitals to this Agreement.

"**Canadian Sales Process Order**" means that certain order (GSM/GSM-R Bidding Procedures Order), which was entered on October 15, 2009 by the Canadian Court.

"**CCAA**" has the meaning set forth in the recitals to this Agreement.

"**CCAA Cases**" has the meaning set forth in the recitals to this Agreement.

"**CFIUS**" means the Committee on Foreign Investment in the United States.

"**CFIUS Approval**" means that the Parties shall have received a written notification issued by CFIUS that it has concluded a review of any notification voluntarily provided pursuant to the Exon-Florio Amendment of the Defense Production Act of 1950, as amended and Section 5.5(f) hereof and determined not to conduct an investigation or, if an investigation is deemed to be required, notification that the U.S. government will not take action to prevent the transactions contemplated by this Agreement from being consummated.

"**Chapter 11 Cases**" has the meaning set forth in the recitals to this Agreement.

"**China Assets**" has the meaning set forth in Section 5.30.

"**China Purchase Agreement**" has the meaning set forth in Section 5.30.

"**China Purchase Amount**" has the meaning set forth in Section 5.30.

"**CIP Receivables**" means, as of a given date, amounts classified in construction-in-process accounts determined in accordance with the Calculation Principles.

"**CIP Receivables Amount**" means, as of any given date, the amount of CIP Receivables of the Business determined in accordance with the Calculation Principles.

"**Claim**" has the meaning set forth in Section 101(5) of the U.S. Bankruptcy Code.

"**Closing**" has the meaning set forth in Section 2.3.1.

"**Closing Accrued Vacation Amount**" has the meaning set forth in Section 2.2.3.1(a).

"**Closing Adjusted Net Working Capital**" has the meaning set forth in Section 2.2.3.1(a).

"**Closing CIP Receivables Amount**" has the meaning set forth in Section 2.2.3.1(a)

"**Closing Contractual Liability Amount**" has the meaning set forth in Section 2.2.3.1(a).

"**Closing Date**" has the meaning set forth in Section 2.3.1.

"**Closing Deferred Revenue Liability Amount**" has the meaning set forth in Section 2.2.3.1(a).

"**Closing Inventory Value**" has the meaning set forth in Section 2.2.3.1(a).

"**Closing Royalty Liability Amount**" has the meaning set forth in Section 2.2.3.1(a).

"**Closing Statement**" has the meaning set forth in Section 2.2.3.1(a).

"**Closing Warranty Provision Amount**" has the meaning set forth in Section 2.2.3.1(a).

"**COBRA**" means the continuation coverage required by Section 4980B of the Code or any similar Law.

7

"**Code**" means the United States Internal Revenue Code of 1986, as amended.

"**Collective Labor Agreement**" means any written agreement that a Seller or any of its Affiliates has entered into with any union, works council or collective bargaining agent with respect to terms and conditions of employment of the employees of such Seller or its Affiliates.

"**Competition Act**" means the Competition Act (Canada), as amended, and includes the regulations promulgated thereunder.

"**Complaining Party**" has the meaning set forth in Section 5.26(e).

"**Confidentiality Agreement**" means the confidentiality agreement between Purchaser and the other parties listed therein dated March 30, 2009, as amended or supplemented from time to time in accordance with its terms.

"**Confirmed Designated Purchaser**" has the meaning set forth in Section 2.4(a).

"**Consent**" means any approval, authorization, consent, order, license, permission, permit, qualification, exemption or waiver by any Government Entity or other Third Party.

"**Contract**" means any binding contract, agreement, subcontract, purchase order, work order, sales order, indenture, note, bond, instrument, lease, mortgage, ground lease, commitment, covenant or undertaking.

"**Contract Manufacturing Agreements**" means those agreements to be entered into by and between the Purchaser and/or any Designated Purchasers, the relevant Sellers, and the contract manufacturers of the Business parties thereto on or before the Closing based substantially on the Contract Manufacturing Agreements Term Sheet.

"**Contract Manufacturing Agreements Term Sheet**" means the term sheet attached hereto as Exhibit **P**.

"**Contract Manufacturing Inventory Agreements**" means the agreements between the Purchaser and/or any Designated Purchasers, the relevant Sellers, and the contract manufacturers of the Business listed in Section 1.1(b) of the Sellers Disclosure Schedule that the relevant Parties will use their reasonable efforts to execute on or before the Closing in the form that shall be negotiated in good faith on the basis of the term sheet attached hereto as Exhibit **E**.

"**Contractual Liability Amount**" means, as of any given date, the amount of liabilities of the Business under Assigned Contracts (other than Excluded Liabilities) determined in accordance with the Calculation Principles.

"**Control**", including, with its correlative meanings, "Controlled by" and "under common Control with", means, in connection with a given Person, the possession, directly or indirectly, or as trustee or executor, of the power to either (i) elect more than fifty percent (50%) of the directors of such Person or (ii) direct or cause the direction of the management and

8

policies of such Person, whether through the ownership of securities, contract, credit arrangement or otherwise.

"**Covered Assets and Persons**" means the Business and the assets (including the Assets), tangible or intangible property, Liabilities, ownership, activities, businesses, operations, current and former shareholders, and current and former directors, officers, employees and agents of, the Business.

"**Cross-Border Protocol**" means that certain Cross-Border Insolvency Protocol approved by the U.S. Bankruptcy Court pursuant to Section 105(a) of the U.S. Bankruptcy Code in an order dated January 15, 2009 and by the Canadian Court pursuant to an order, dated January 14, 2009, as the same may be amended from time to time.

"**Cure Cost**" means (i) any amounts required by Section 365(b)(1) of the U.S. Bankruptcy Code to cure any defaults by the relevant U.S. Debtor under a 365 Contract and to pay any actual pecuniary losses that have resulted from such defaults under such 365 Contract, and (ii) with respect to any Designated Non-365 Contract, any amounts required to cure any defaults and to pay any actual pecuniary losses under such Seller Contract in respect of the period prior to the Closing Date that are required by the counterparty thereto to be paid in order for such Designated Non-365 Contract to be assigned.

"**Designated Non-365 Contracts**" has the meaning set forth in Section 2.1.6(d).

"**Designated Non-365 Real Estate Leases**" has the meaning set forth in Section 2.1.6(a)(ii).

"**Deferred Revenue Liability Amount**" means, as of any given date, the amount of deferred revenue of the Business determined in accordance with the Calculation Principles.

"**Designated Purchaser**" has the meaning set forth in Section 2.4(a).

"**Development and Supply Agreement**" means the agreement to be entered into between the relevant Sellers, on the one hand, and the Purchaser (or the relevant Designated Purchasers), on the other hand, on or prior to the Closing in the form attached hereto as Exhibit N.

"**Direct Lease**" has the meaning set forth in Section 5.32.

"**Direct Lease Real Estate**" has the meaning set forth in Section 5.32.

"**Disagreement Notice**" has the meaning set forth in Section 2.2.3.1(b).

"**Distribution Agent**" means a distribution agent to be appointed by the Sellers and the EMEA Sellers prior to the Closing Date.

"**Dual Use Platform Agreement**" means the agreement to be entered into between the relevant Sellers, on the one hand, and the Purchaser (or the relevant Designated

Purchasers), on the other hand, on or prior to the Closing in the form attached hereto as Exhibit **M**.

"**Effective Hire Date**" means the day on which the employment of an Employee commences or continues with the Purchaser or its Affiliates as provided in this Agreement.

"**EMEA Asset Sale Agreement**" has the meaning set forth in the recitals to this Agreement.

"**EMEA Business**" has the meaning attributed to that term in the EMEA Asset Sale Agreement.

"**EMEA Cases**" has the meaning set forth in the recitals to this Agreement.

"**EMEA Debtors**" has the meaning set forth in the recitals to this Agreement.

"**EMEA Designated Purchaser**" has the meaning attributed to that term in the EMEA Asset Sale Agreement.

"**EMEA Purchaser**" has the meaning set forth in the recitals of this Agreement.

"**EMEA Sellers**" means the sellers under the EMEA Asset Sale Agreement as listed on Exhibit B.

"**Employee**" means any employee, as of the date hereof, of the Sellers or their Affiliates (other than the EMEA Sellers, NNSA or their respective Subsidiaries) who (i) for the twelve months prior to the date hereof (or such shorter time as such employee was employed by the Sellers or such Affiliates) performed services which were all or substantially all related to the Business or (ii) was hired into, transferred into, or assigned to the Business prior to the Closing in the Ordinary Course and whose services are all or substantially all related to the Business, or (iii) whose services are necessary to the operation of the Business, provided that if the employee is at a Job Complexity Indicator 6 or above, such hire, transfer or assignment is subject to Purchaser's consent and in each case is listed in Section 4.10(b) of the Sellers Disclosure Schedule.

"**Employee Information**" has the meaning set forth in Section 4.10(b).

"**Employee Records**" means books, records, files, or other documentation, whether in electronic or other form, with respect to Employees.

"**Employee Transfer Date**" means, with respect to each jurisdiction where Employees will become Transferred Employees in accordance with this Agreement, 12:01 a.m. local time in such jurisdiction on the day following the Closing Date.

"**English Court**" means the High Court of Justice of England and Wales.

"**Environmental Law**" means any applicable Law relating to or regulating (i) the handling, generation, management, Release or remediation of Hazardous Materials; (ii) the

10

exposure of persons to Hazardous Materials; (iii) occupational health and safety; or (iv) pollution or protection of human health, the environment or natural resources, including the United States Resource Conservation and Recovery Act, the Comprehensive Environmental Response Compensation and Liability Act, the Clean Air Act, the Federal Water Pollution Control Act, the Safe Drinking Water Act, the Occupational Safety and Health Act and the Toxic Substances Control Act, all as amended, and any requirements of a Government Entity promulgated pursuant to these applicable Laws or any analogous supranational, foreign, state, provincial, territorial, municipal or local Laws.

**"Environmental Permit"** means any Consent required under any Environmental Law for the Business as currently conducted.

**"Equipment"** means tangible property, including all trade fixtures and fixtures, furniture, furnishings, fittings, equipment, apparatus, appliances, test labs, trial equipment and other articles of personal property, which are owned by the Sellers and held or used predominantly in connection with the Business, including that located at the Direct Lease Real Estate or the demised premises which are (i) the subject of any real property lease included in the Assigned Contracts or (ii) the subject of any Sublease, provided, however that "Equipment" shall not include fixtures other than trade fixtures located at the Direct Lease Real Estate and shall not include any leasehold improvements owned by the head landlord and located at the demised premises which are the subject of any Sublease, any Inventory, items of tangible property personally assigned to Employees who are not (a) Transferred Employees as of the Employee Transfer Date or (b) Visa Employees, or any Intellectual Property covering, embodied in or connected to any Equipment.

**"ERISA"** means the Employee Retirement Income Security Act of 1974, as amended.

**"ERISA Affiliate Liability"** means any obligation, liability, or expense of any Seller which arises under or relates to any Seller Employee Plan that is subject to Title IV of ERISA, Section 302 of ERISA, Section 412 of the Code, COBRA or any other statute or regulation that imposes liability on a so-called "controlled group" basis with or without reference to any provision of Section 414 of the Code or Section 4001 of ERISA, including by reason of any Seller's affiliation with any of its ERISA Affiliates or the Purchaser being deemed a successor to any ERISA Affiliate of any Seller.

**"Escrow Agent"** means Citibank, N.A.

**"Estimated Accrued Vacation Amount"** has the meaning set forth in Section 2.2.2(a).

**"Estimated Adjusted Net Working Capital"** has the meaning set forth in Section 2.2.2(a).

**"Estimated CIP Receivables Amount"** has the meaning set forth in Section 2.2.2(a).

"**Estimated Contractual Liability Amount**" has the meaning set forth in Section 2.2.2(a).

"**Estimated Deferred Revenue Liability Amount**" has the meaning set forth in Section 2.2.2(a).

"**Estimated Inventory Value**" has the meaning set forth in Section 2.2.2(a).

"**Estimated Purchase Price**" has the meaning set forth in Section 2.2.2(b).

"**Estimated Royalty Liability Amount**" has the meaning set forth in Section 2.2.2(a).

"**Estimated Warranty Provision Amount**" has the meaning set forth in Section 2.2.2(a).

"**Excluded Assets**" has the meaning set forth in Section 2.1.2.

"**Excluded Contracts**" means any Contract that is not assigned to the Purchaser under this Agreement. For the avoidance of doubt, Excluded Contracts shall include (i) the Excluded 365 Contracts, (ii) the Excluded Non-365 Contracts, (iii) the Qualcomm Cross License, and (iv) Addendum No. 9 to the OEM iPlanet Software Products (Binary) Exhibit to the Global Account Agreement Master Terms between Sun Microsystems, Inc. and NNI, Binary License and Redistribution Agreement for Java 2 Standard Edition dated October 5, 2006.

"**Excluded Employee Liabilities**" has the meaning set forth in Section 7.3.

"**Excluded Liabilities**" has the meaning set forth in Section 2.1.4.

"**Excluded Non-365 Contract**" has the meaning set forth in Section 2.1.6(e).

"**Excluded Products and Services**" means (a) all products and services provided by businesses or business segments of any Seller other than the Products and Services, and including (b) the following products and all associated development and PLM resources: Evolved Packet Core (including the Access Gateway, MME, and next-generation GPRS support nodes), ATCA Core, LTE radio access products and services, WiMAX products and services, XACore Hardware and platform software and associated peripherals (LPP, MS/ENET, SPM, DTC, MTM, DRAM IWSPM), ERS8600, Passport (MSS), associated Software (PCR) and associated OAM MultiService Data Manager(MDM).

"**Excluded 365 Contract**" has the meaning set forth in Section 2.1.5(g).

"**Executory Contract**" means an "executory contract" for the purposes of Section 365 of the U.S. Bankruptcy Code.

"**Extra Services**" has the meaning set forth in Section 5.26(b).

"**Financial Statements**" has the meaning set forth in Section 4.7.

"**Final Order**" means an order of any Bankruptcy Court or other court of competent jurisdiction (i) as to which no appeal, notice of appeal, motion to amend or make additional findings of fact, motion to alter or amend judgment, motion for rehearing or motion for new trial has been timely filed by any party (other than the Purchaser) or, if any of the foregoing has been timely filed, it has been disposed of in a manner that upholds and affirms the subject order in all material respects without the possibility for further appeal or rehearing thereon; (ii) as to which the time for instituting or filing an appeal, motion for rehearing or motion for new trial shall have expired; and (iii) as to which no stay is in effect; provided, however, that, with respect to an order issued by the U.S. Bankruptcy Court, the filing or pendency of a motion under Federal Rule of Bankruptcy Procedure 9024 ("**Rule 9024**") or Federal Rule of Civil Procedure 60 ("**Rule 60**") shall not cause an order not to be deemed a "Final Order" unless such motion shall be filed within ten (10) days of the entry of the order at issue.

"**Final Purchase Price**" has the meaning set forth in Section 2.2.3.1(a).

"**French Administrators**" has the meaning set forth in the preamble to this Agreement.

"**French Court**" has the meaning set forth in the recitals to this Agreement.

"**GAAP**" means the United States generally accepted accounting principles.

"**GDNT Agreements**" means the agreements to be entered into between the relevant Sellers, the Purchaser (and/or any Designated Purchasers), and Guangdong-Nortel Telecommunications Equipment Co. Ltd., on or prior to the Closing based substantially on the GDNT Back-to-Back Agreement Term Sheet.

"**GDNT Back-to-Back Agreement Term Sheet**" means the term sheet attached hereto as Exhibit **Q**.

"**General Scope of Included Services**" has the meaning set forth in Section 5.26(a).

"**Good Faith Deposit**" has the meaning set forth in Section 2.2.4.

"**Government Entity**" means any U.S., Canadian, supranational, foreign, domestic, federal, territorial, provincial, state, municipal or local governmental authority, quasi-governmental authority, instrumentality, court, government or self-regulatory organization, commission, tribunal, arbitral body or organization or any regulatory, administrative or other agency, or any political or other subdivision, department or branch of any of the foregoing.

"**GSM**" means Global System for Mobile communications.

"**GST**" means goods and services tax payable under Part IX of the Excise Tax Act (Canada).

13

"**Hazardous Materials**" means any chemical, material, waste, heat, sound, radiation or substance defined by or regulated under any Environmental Law as a hazardous waste, hazardous material, hazardous substance, extremely hazardous waste, restricted hazardous waste, pollutant, contaminant, toxic substance or toxic waste, including without limitation petroleum, petroleum products, asbestos, lead or polychlorinated biphenyls.

"**Headcount Forecast**" has the meaning attributed to that term in the Transition Services Agreement.

"**HSR Act**" means the United States Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended.

"**HSR Approval**" means expiration of all applicable waiting periods under the HSR Act (including any voluntary agreed extensions) or earlier termination thereof.

"**ICA Approval**" means: (a) if subsection 448(1) of the *Budget Implementation Act, 2009* (Canada), comes into force on or before the Closing Date and as a result the transactions contemplated by this Agreement are subject to review under Part IV of the *Investment Canada Act*, the Purchaser shall have received notification from the responsible Minister under the *Investment Canada Act* that he is satisfied or is deemed to be satisfied that the transactions contemplated in this Agreement are likely to be of net benefit to Canada, on terms and conditions satisfactory to the Purchaser, in its reasonable discretion, and (b) the Purchaser shall not have received notice from the responsible Minister under either subsection 25.2(1) of the *Investment Canada Act* or subsection 25.3(2) of the *Investment Canada Act* within the period prescribed under the *Investment Canada Act* or, if the Purchaser has received such a notice, the Purchaser shall have subsequently received one of the following notices, as applicable: (i) under paragraph 25.2(4)(a) of the *Investment Canada Act* indicating that no order for the review of the transactions contemplated by this Agreement will be made under subsection 25.3(1) of the *Investment Canada Act*, (ii) under paragraph 25.3(6)(b) of the *Investment Canada Act* indicating that no further action will be taken in respect of the transactions contemplated by this Agreement, or (iii) under subsection 25.4(1) of the *Investment Canada Act* that the Governor in Council authorizes the completion of the transactions contemplated by this Agreement, on terms and conditions satisfactory to the Purchaser, in its reasonable discretion.

"**Inactive Employees**" means Employees on a Seller-approved leave of absence who are expected to return and actually return to work within the relevant time period set out below. An Employee shall be an Inactive Employee for purposes hereof only if such individual is absent as a result of military service, pregnancy or parental leave, disability leave, medical leave, jury duty or any leave provided under applicable Law and, in the case of leaves provided under applicable Law, is expected to return to work and actually returns to work in the time permitted for such leave under applicable Law and, for any other leave, is expected to return to work and actually returns to work in accordance with the terms of such leave but not longer than ninety (90) days (or, if such Employee is located in Canada, six (6) months) following the Closing Date.

"**Inbound License Agreements**" has the meaning set forth in Section 4.5(f).

"**Included Services**" has the meaning set forth in Section 5.26(a).

"**Indebtedness**" of any Person means at any date, without duplication, all obligations of such Person to the extent incurred for the Business (i) for indebtedness for borrowed money (including any unpaid principal, premium and accrued and unpaid interest or fees), (ii) for indebtedness evidenced by bonds, debentures, notes or similar instruments, (iii) in respect of leases whether or not capitalized in accordance with the Nortel Accounting Principles under which such Person is the lessee, (iv) in respect of letters of credit issued for the account of such Person (to the extent drawn), (v) in respect of guarantees of the obligations of other Persons of the type referred to in clauses (i) through (iv) above and (vi) any termination fees, prepayment penalties, "breakage" cost or similar payments associated with the repayment or default under any of the Indebtedness referred to in items (i) and (ii) above.

"**Independent Auditor**" means Grant Thornton LLP or, in the case such firm cannot carry-out its duties for whatever reason, such other auditing firm of international reputation that is jointly selected by the Primary Parties.

"**Intellectual Property**" means all intellectual and industrial property rights and any and all forms of protection having equivalent or similar effect anywhere in the world as recognized under the Laws of all countries and jurisdictions, whether registered or unregistered and including applications for the registration or grant of any such rights, including rights in or to any of the following: (a) Trademarks; (b) Patents; (c) works of authorship; (d) mask works; (e) trade secrets, know-how and confidential technical or business information; (f) Software; (g) databases; and (h) industrial designs.

"**Intellectual Property License Agreement**" means the agreement to be entered into between the relevant Sellers, on the one hand, and the Purchaser (or the relevant Designated Purchasers), on the other hand, on or prior to the Closing in the form attached hereto as Exhibit **F**.

"**Interdependencies Letter**" means that letter agreement, dated as of the date hereof, by and among the Purchaser and the Sellers, addressing certain matters relating to the interdependencies between the Business and the EMEA Business.

"**Inventory**" means any inventories of raw materials, manufactured and purchased parts, works in process, packaging, stores and supplies, unassigned finished goods inventories (which are finished goods not yet assigned to a specific customer order) and merchandise; provided, that inventory not located within the United States or Canada shall not be included in "Inventory", unless it (i) has been manufactured abroad; (ii) is, in the Ordinary Course, destined for shipment to the United States or Canada; (iii) is not older than ninety (90) days; (iv) is the current product release/revision; and (v) is saleable.

"**Inventory Value**" means, as of any given date, the book value of the Owned Inventory, net of applicable provisions, reflected on a balance sheet of the Business as of such date prepared consistent with the Calculation Principles.

"**Investment Canada Act**" means the Investment Canada Act, as amended.

15

"**IRS**" means the United States Internal Revenue Service.

"**Joint Administrators**" has the meaning set forth in the EMEA Asset Sale Agreement.

"**KEIP**" means the Nortel Networks Corporation Key Executive Incentive Plan approved by the U.S. Bankruptcy Court in the District of Delaware pursuant to orders entered on March 5, 2009 and on March 20, 2009, and approved by the Canadian Court pursuant to orders entered on March 6, 2009 and on March 20, 2009, as the same may be amended, modified, supplemented or replaced from time to time.

"**KERP**" means the Nortel Networks Corporation Key Employee Retention Plan approved by the U.S. Bankruptcy Court in the District of Delaware on March 5, 2009, and approved by the Canadian Court on March 6, 2009, as the same may be amended, modified, supplemented or replaced from time to time.

"**Knowledge**" or "**aware of**" or "**notice of**" or a similar phrase means, with reference to the Sellers, the actual knowledge of those Persons listed on Section 1.1(d) of the Sellers Disclosure Schedule.

"**KPD Provision**" means the provision for "Known Product Defects" to be recognized and measured by the Business pursuant to the Calculation Principles with respect to defects (other than defects covered by the Non-KPD Warranty Provision) of Products and/or Services that have been sold by the Sellers and the EMEA Sellers.

"**Latest Lease Rejection Date**" means the latest of (i) the date as set forth in Sections 2.1.5(a) and 2.1.6(a) of the Sellers Disclosure Schedule, if any, with respect to each parcel of Leased Real Property, or (ii) if Sellers (in their sole discretion) request and a landlord of a Leased Real Property agrees to an extension of the date by which the relevant Seller must elect to either assume or reject the related lease to a date later than that specified on Sections 2.1.5(a) and 2.1.6(a) of the Sellers Disclosure Schedule, then with respect to such lease, the date to which such deadline has been extended by agreement of Sellers and such landlord.

"**Law**" means any U.S., Canadian, and any other applicable foreign, supranational, domestic, federal, territorial, state, provincial, local or municipal statute, law, common law, ordinance, rule, regulation, judicial, administrative or other order, writ, injunction, directive, judgment, decree or policy or guideline having the force of law.

"**Lease(s)**" means all leases, subleases, real-property licenses and other agreements, including all amendments, extensions and renewals thereof, pursuant to which real property is held or occupied.

"**Leased Real Property**" means all real property subject to a Lease which is an Assigned Contract, an Assumed and Subleased Real Estate Lease, a Non-365 Subleased Real Estate Lease, a Licensed Real Estate Lease or a Non-365 Licensed Real Estate Lease.

16

"**LGN Joint Venture**" means LG-Nortel Co. Ltd., which was established in November 2005 as a joint venture between NNL and LG Electronics Inc. for the purpose of jointly developing and marketing certain telecommunications equipment and network solutions.

"**Liabilities**" means debts, liabilities and obligations, whether accrued or fixed, direct or indirect, liquidated or unliquidated, absolute or contingent, matured or unmatured or determined or undeterminable, known or unknown, including those arising under any Law or Action and those arising under any Contract or otherwise, including any Tax liability.

"**License**" has the meaning set forth in Section 5.33.

"**Licensed Intellectual Property**" means the Intellectual Property being licensed to the Purchaser or the relevant Designated Purchasers under the Intellectual Property License Agreement and the Trademark License Agreement.

"**Licensed Real Estate Lease**" has the meaning set forth in Section 2.1.5(c).

"**Lien**" means any lien (statutory or otherwise), mortgage, pledge, security interest, charge, right of first refusal, hypothecation, encumbrance, easement, encroachment, right-of-way, restrictive covenant on real property, real property license, prior claim, lease or conditional sale arrangement.

"**Loaded Devices**" has the meaning set forth in Section 2.1.1.

"**Loaned Employee Agreement**" means the agreement between the Main Sellers, on the one hand, and the Purchaser and/or any Designated Purchasers, on the other hand, to be executed on or before the Closing attached hereto as Exhibit **H**.

"**Local Sale Agreements**" has the meaning set forth in Section 2.1.8.

"**Losses**" means all losses, damages, Liabilities, deficiencies, interest, awards, judgments, fines, penalties and reasonable and documented out-of-pocket costs and expenses (including reasonable attorneys' fees and disbursements and the costs of litigation, including reasonable amount paid in investigation, defense or settlement of an Action).

"**Main Sellers**" has the meaning set forth in the preamble to this Agreement.

"**Mandatory Antitrust Filings**" means all notifications and filings which the Purchaser and/or the Sellers, in respect of the transactions contemplated by this Agreement, is required under the Laws of any jurisdiction to deliver, prior to Closing, to any Government Entity having jurisdiction over mergers and/or similar transactions under any Antitrust Laws applying to any of the parties or to the transactions contemplated by the Agreement.

"**Material Adverse Effect**" means any circumstance, state of fact, event, change or effect (each an "**Effect**") that, individually or in the aggregate with all other Effects, (a) is or could reasonably be materially adverse to the business, operations, assets, liabilities, results of operations or financial condition of the Business, taken as a whole, or (b) prevents or could reasonably be expected to prevent the ability of the Sellers to perform their material obligations

under this Agreement or the timely consummation of the transactions contemplated by this Agreement, but excluding, for purposes of clauses (a) and (b), (i) Effects resulting from changes in general economic conditions in the United States or Canada, (ii) Effects arising from the execution or delivery of this Agreement or the Transactions or the public announcement thereof, (iii) Effects that result from any action required to be taken pursuant to this Agreement or any action taken pursuant to the written request or with the prior written consent of the Purchaser, (iv) Effects relating to the industries and markets in which the Business operates, (v) Effects relating to changes in Law, generally accepted accounting principles or official interpretations of the foregoing, (vi) Effects relating to or including the attrition of customers prior to the Closing Date, or (vii) Effects relating to the pendency of the Bankruptcy Proceedings and any action approved by, or made before, the Bankruptcy Courts; it being understood that the failure of the Business to achieve internal or external financial forecasts or projections, by itself, will not constitute a Material Adverse Effect; provided, that, with respect to clauses (i), (iv), and (v), any such Effect shall be included to the extent such Effect has a materially disproportionate effect on the Business, taken as a whole, as compared to other industry participants.

"**Material Contracts**" has the meaning set forth in Section 4.4.

"**MOFCOM Approval**" means the Parties shall have received confirmation that the transaction contemplated by this Agreement has been cleared by the Anti-monopoly Bureau of the Ministry of Commerce of the People's Republic of China without any restrictions or conditions pursuant to the then applicable Anti-monopoly Law of the People's Republic of China.

"**Monetary Cost**" has the meaning attributed to that term in the Transition Services Agreement.

"**Monitor**" means Ernst & Young Inc., in its capacity as the Canadian Court-appointed Monitor in connection with the CCAA Cases.

"**New York Courts**" has the meaning set forth in Section 10.6(b)

"**NNC**" has the meaning set forth in the preamble to this Agreement.

"**NNI**" has the meaning set forth in the preamble to this Agreement.

"**NNL**" has the meaning set forth in the preamble to this Agreement.

"**NNSA**" means Nortel Networks S.A., a corporation incorporated under the laws of France.

"**NNSA Assets**" has the meaning attributed to that term in the EMEA Asset Sale Agreement.

"**NNSA Irrevocable Offer**" has the meaning set forth in the recitals to this Agreement.

"**NNTC**" means Nortel Networks Technology Corporation.

18

"**NN Turkey**" means Nortel Networks Netas Telekomunikasyon A.S., a joint stock corporation formed under the laws of Turkey.

"**NNUK**" means Nortel Networks UK Limited.

"**Non-Assignable Contracts**" has the meaning set forth in Section 5.13(a).

"**Non-Assigned Contract**" means a Non-Assignable Contract as to which all applicable Consents to assignment have not been granted prior to the Closing Date.

"**Non-Assignable Customer Contract**" has the meaning set forth in Section 5.13(c).

"**Non-Assignable Customer Contracts Indemnitees**" has the meaning set forth in Section 5.13(c).

"**Non-Assignable Customer Counterparty**" has the meaning set forth in Section 5.13(c).

"**Non-Assignable Customer Period**" has the meaning set forth in Section 5.13(c).

"**Non-Business Information**" has the meaning set forth in Section 5.11(b).

"**Non-Debtor Sellers**" has the meaning set forth in the recitals to this Agreement.

"**Non-KPD Warranty Provision**" means the provision to be recognized and measured by the Business pursuant to the Calculation Principles for potential claims by customers under the Warranty Obligations.

"**Non-Solicitation Period**" means the twenty-four (24) month period immediately following the Closing Date.

"**Non-365 Contracts**" has the meaning set forth in Section 2.1.6(a)(i).

"**Non-365 Contract List**" has the meaning set forth in Section 2.1.6(a)(i).

"**Non-365 Licensed Real Estate Leases**" has the meaning set forth in Section 2.1.6(c).

"**Non-365 Real Estate Leases**" has the meaning set forth in Section 2.1.6(a)(ii).

"**Non-365 Subleased Real Estate Leases**" has the meaning set forth in Section 2.1.6(b).

"**Nortel Accounting Principles**" means the accounting principles employed in the preparation of the Financial Statements, as set forth in Section 1.1(e) of the Sellers Disclosure Schedule.

"**Open Source Software**" means Software that is made available under a license agreement that (i) conditions use, modification or distribution of any Software program, or any Software integrated with or derived from such Software program, or into which such Software program is incorporated, on the disclosure, licensing or distribution of the source code of such Software program (or such Software) or (ii) otherwise materially limits the licensee's freedom of action with regard to seeking compensation in connection with sublicensing, licensing or distributing such Software program or Software.

"**Order**" means any decision, judgment, order, writ, injunction, decree, award or determination of any Government Entity.

"**Ordinary Course**" means the ordinary course of the Business consistent with recent past practice since the filing of the Bankruptcy Proceedings, as such practice may be modified from time to time to the extent necessary to reflect the Bankruptcy Proceedings and as such practice may be modified from time to time to reflect the separation of the Business from the other businesses of the Sellers in a manner consistent with the terms hereof.

"**Other Seller**" has the meaning set forth in the preamble of this Agreement.

"**Outbound License Agreements**" has the meaning set forth in Section 4.5(f).

"**Overhead and Shared Services**" means corporate or shared services provided to or in support of the Business that are general corporate or other overhead services or provided to both (i) the Business and (ii) other businesses or business segments of any Seller, including travel and entertainment services, temporary labor services, office supplies services (including copiers and faxes), personal telecommunications services, computer hardware and software services, fleet services, energy/utilities services, procurement and supply arrangements, research and development, treasury services, public relations, legal, compliance and risk management services (including workers' compensation), payroll services, sales and marketing support services, information technology and telecommunications services, accounting services, tax services, human resources and employee relations management services, employee benefits services, credit, collections and accounts payable services, logistics services, property management services, environmental support services and customs and excise services, in each case including services relating to the provision of access to information, operating and reporting systems and databases and including all hardware and software or other Intellectual Property necessary for or used in connection therewith.

"**Owned Equipment**" means (i) Equipment owned by any of the Sellers that is held or used predominantly in connection with the Business, and (ii) the other Equipment listed in Section 1.1(f) of the Sellers Disclosure Schedule, excluding, in each case, any Owned Inventory and any Intellectual Property.

"**Owned Inventory**" means (i) Inventory owned and paid for by any of the Sellers that is held or used predominantly in connection with the Business, including any such Inventory which is owned by the Sellers but remains in the possession or control of a contract manufacturer or another Third Party, and (ii) the other Inventory listed in Section 1.1(g) of the

Sellers Disclosure Schedule all as reflected on Sellers' general ledger as of the Closing Date an estimate of which will be provided to the Purchaser at least three days prior to Closing.

"**Partial Allocation**" has the meaning set forth in Section 6.7(b).

"**Party**" or "**Parties**" means individually or collectively, as the case may be, the Sellers and the Purchaser.

"**Patent Cross Licenses**" means all Contracts between the Sellers or their Affiliates and a Third Party under which the Sellers or such Affiliates, as applicable, both (i) grant a license under patents and patent applications owned by (or licensed to) them, and (ii) receive from the counter-party a license under patents and patent applications owned by (or licensed to) such counter-party (but other than inbound or outbound license agreements where the only grant back from the licensee is under improvements on the licensed Intellectual Property).

"**Patents**" means all national and multinational statutory invention registrations, invention disclosures, patents, utility models, patent applications, provisional patent applications, including all reissues, divisions, continuations, continuations-in-part, extensions and re-examinations thereof and all rights therein provided by multinational treaties or conventions.

"**Permitted Encumbrances**" means (i) statutory Liens for Taxes or governmental assessments, charges or claims the payment of which is not yet due, or if due, for Taxes the validity of which is being contested in good faith by appropriate proceedings and for which adequate reserves have been established to the extent required by GAAP, other than Liens that may be discharged at Closing pursuant to the terms of the Canadian Approval and Vesting Order and the U.S. Sale Order; (ii) mechanics', carriers', workers', repairers', landlords', warehouses and similar Liens arising or incurred in the Ordinary Course for sums not yet delinquent or overdue or which are being contested in good faith by appropriate proceedings and for which adequate reserves have been established to the extent required by GAAP; (iii) any Liens imposed by any Bankruptcy Court in connection with the Bankruptcy Proceedings that are to be discharged at Closing pursuant to the terms of the Canadian Approval and Vesting Order and the U.S. Sale Order; (iv) any other Liens set forth in Section 1.1(h) of the Sellers Disclosure Schedule; and (v) present or future zoning, entitlement, building and land use regulations, customary covenants, defects of title, easements, rights of way, restrictions and other similar charges or encumbrances which do not impair in any material respect the use or value of the related assets in the Business as currently conducted.

"**Person**" means an individual, a partnership, a corporation, an association, a limited or unlimited liability company, a joint stock company, a trust, a joint venture, an unincorporated organization or other legal entity or Government Entity.

"**Petition Date**" means January 14, 2009, except with respect to Nortel Networks (CALA) Inc. means July 14, 2009.

"**Pre-Closing Taxable Period**" means any Taxable period ending on or prior to the Closing Date.

"**Primary Party**" means (i) each of the Main Sellers, on the one hand, and (ii) the Purchaser, on the other hand.

"**Products**" means the prior, if currently supported, current versions and versions under development of all products set forth in Section 1.1(i) of the Sellers Disclosure Schedule.

"**Purchase Order**" means any purchase order, work order, statement of work or similar Contract pursuant to which a Third Party is providing products or services to Sellers exclusively for use in the Business, which products or services have been fully paid for by the Sellers and pursuant to which the Sellers have no remaining liability, that is not otherwise included in: (i) the Assumed and Assigned Contracts; (ii) the Designated Non-365 Contracts; or (iii) the Non-Assigned Contracts.

"**Purchase Price**" has the meaning set forth in Section 2.2.1.

"**Purchaser**" has the meaning set forth in the preamble to this Agreement..

"**Purchaser Employee Plan**" means any "employee benefit plan" within the meaning of Section 3(3) of ERISA and any other employee benefit plan or agreement, including any profit sharing plan, savings plan, bonus plan, performance awards plan, incentive compensation plan, deferred compensation plan, stock purchase plan, stock option plan, vacation plan, leave of absence plan, employee assistance plan, automobile leasing/subsidy/allowance plan, expense reimbursement plan, meal allowance plan, redundancy or severance plan or agreement, termination or retirement indemnity plan, relocation plan, family support plan, pension plan, supplemental pension plan, retirement plan, early or ill health retirement plan, retirement savings plan, post-retirement plan, medical, health, hospitalization or life insurance plan, disability plan, sick leave plan, retention plan, education assistance plan, expatriate assistance plan, compensation arrangement, including any base salary arrangement, overtime, on-call or call-in policy, death benefit plan, or any other similar plan, program, arrangement or policy that is maintained or otherwise contributed to, or required to be maintained or contributed to, by or on behalf of the Purchaser or any of its Subsidiaries or Affiliates with respect to their employees employed in those countries where they will employ Transferred Employees pursuant to this Agreement.

"**Purchaser Portion of Cure Costs**" has the meaning set forth in Section 2.1.7(f).

"**Purchaser Supply Agreement**" means the agreement to be entered into between the relevant Sellers, on the one hand, and the Purchaser (or the relevant Designated Purchasers), on the other hand, on or prior to the Closing in the form attached hereto as Exhibit **R**.

"**Qualcomm Cross-License**" means that certain Patent Cross-License Agreement, dated December 27, 2006, by and between Qualcomm Incorporated and NNL.

"**Qualified Arbitrator**" has the meaning set forth in Section 5.26(e).

"**Qualified Expenditures**" has the meaning set forth in Section 6.5(b).

"**Real Estate Agreements**" means the leases, sub-leases or license agreements between the relevant Sellers, on the one hand, and the Purchaser and/or any Designated Purchasers, on the other hand, to be executed on or prior to Closing in accordance with and as provided by the Real Estate Agreements Term Sheet.

"**Real Estate Agreements Term Sheet**" means the Real Estate Agreements Term Sheet attached hereto as Exhibit **G**.

"**Real Estate Lease**" means a Seller Contract that is a lease, sublease, license or other agreement for use and occupancy of real property including all amendments, extensions and renewals thereof and is an Assigned Contract, an Assumed and Subleased Real Estate Lease, a Non-365 Subleased Real Estate Lease, a Licensed Real Estate Lease or a Non-365 Licensed Real Estate Lease.

"**Records Custodian**" means Deloitte & Touche LLP or in case such firm is unable to carry out its duties for whatever reason, such other auditing firm of international reputation that is acceptable to each of the Purchaser and the Sellers, each acting reasonably.

"**Regulatory Approvals**" means the (i) Antitrust Approvals, (ii) the CFIUS Approval, (iii) the ICA Approval and (iv) the Trade Approvals.

"**Release**" when used in conjunction with Hazardous Materials, means any spilling, leaking, pumping, emitting, emptying, pouring, discharging, depositing, injecting, escaping, leaching, migrating, dumping, or disposing of Hazardous Materials (including the abandonment or discarding of barrels, containers or other receptacles containing Hazardous Materials) into the environment.

"**Representatives**" means as to any Person, the attorneys, accountants, consultants, financial advisors and other similar representatives and agents of such Person.

"**Respective Affiliates**" has the meaning set forth in Section 10.16(c).

"**Responding Party**" has the meaning set forth in Section 5.26(e).

"**Restricted Technical Records**" means the Livelink database or any other similar database containing only all necessary documents with respect to the technical aspects of the Qualified Expenditures of NNTC or NNL in their 2002 and subsequent taxation years.

"**Royalty Liability Amount**" means, as of any given date, the amount of the royalty liabilities determined in accordance with the Calculation Principles.

"**Sasken**" has the meaning set forth in Section 5.25.

"**Sasken Agreements**" has the meaning set forth in Section 5.25.

"**Scope Guidelines**" has the meaning set forth in Section 5.26(a).

"**Security Deposits**" has the meaning set forth in Section 5.21.

23

"**Seller(s)**" has the meaning set forth in the recitals to this Agreement.

"**Seller Consents**" has the meaning set forth in Section 2.1.1(h).

"**Seller Contracts**" means those Contracts of a Seller that (i) relate predominantly to the Business (including Inbound License Agreements that are used, as of the date hereof, predominantly in connection with the Business, but excluding any other licenses of Intellectual Property), or (ii) are otherwise material to the operation of the Business and not commercially available to the Purchaser.

"**Seller Employee Plan**" means (i) any "employee benefit plan" within the meaning of Section 3(3) of ERISA and any other employee benefit plan or agreement including any employee agreement other than immaterial employment agreements, profit sharing plan, savings plan, bonus plan, performance awards plan, incentive compensation plan, deferred compensation plan, stock purchase plan, stock option plan, vacation plan, leave of absence plan, employee assistance plan, automobile leasing/subsidy/allowance plan, expense reimbursement plan, meal allowance plan, redundancy or severance plan or agreement, relocation plan, family support plan, pension plan, supplemental pension plan, retirement plan, retirement savings plan, post retirement plan, medical, health, hospitalization or life insurance plan, disability plan, sick leave plan, retention plan, education assistance plan, expatriate assistance plan, compensation arrangement, including any base salary arrangement, overtime, on-call or call-in policy, death benefit plan, or any other similar plan, program, arrangement or policy under which the Sellers or any of their Subsidiaries or Affiliates (other than the EMEA Sellers or NNSA) have any Liabilities, or that is maintained or otherwise contributed to, or required to be maintained or contributed to, by or on behalf of the Sellers or any of their Subsidiaries or Affiliates (other than the EMEA Sellers or NNSA) with respect to Employees, or former employees of the Business, or pursuant to which payments are made, or benefits are provided to, or an entitlement to payments or benefits may arise with respect to any Employees or former employees of the Business (or any spouses, dependants or beneficiaries of any such individuals) and (ii) any other employee benefit plan with respect to which the Purchaser or any of its Affiliates could have any Liability as a result of the Sellers or any of their Subsidiaries or Affiliates (other than the EMEA Sellers or NNSA) maintaining such plan prior to the Closing Date.

"**Seller Insurance Policies**" means all current or previous insurance policies of the Sellers and their Affiliates, including all environmental, directors' and officers' Liability, fiduciary Liability, employed lawyers, property and casualty flood, ocean marine, contaminated products insurance policies and all other insurance policies or programs arranged or otherwise provided or made available by the Sellers or their Affiliates that cover (or covered) any of the Covered Assets and Persons at any time prior to the Closing.

"**Sellers Disclosure Schedule**" means the disclosure schedule delivered by the Sellers to the Purchaser on the date hereof.

"**Sellers' Trademarks**" has the meaning set forth in Section 5.22.

"**Services**" means the GSM network implementation services, the GSM network managed services and the GSM network support services associated with the Products provided

by the Sellers, individually, jointly or in collaboration or pursuant to contractual arrangements with Affiliates of Sellers or Third Parties, as of the Closing Date, including, without limitation, services associated with GSM extended service plans, extended warranty, maintenance, technical support, RF optimization, training and documentation.

"**Software**" means any and all (i) computer programs, whether in source code or object code, (ii) computerized databases and compilations, and (iii) documentation, compilation tools, development tools and support tools associated with (i) and/or (ii).

"**Specified Employee Liabilities**" has the meaning set forth in Section 2.1.3(k).

"**Specified Transferred Employees**" has the meaning set forth in Section 7.1.2(c)(i).

"**Straddle Period**" has the meaning set forth in Section 6.4(b).

"**Subcontract Agreement**" means one or more agreements between the relevant Seller(s), on the one hand, and the Purchaser and/or any Designated Purchasers, on the other hand, that such parties will use their reasonable effort to negotiate and execute on or prior to the Closing in the form attached hereto as Exhibit **J**.

"**Subleases**" has the meaning set forth in Section 5.31.

"**Subsidiary**" of any Person means any Person Controlled by such first Person; provided, that none of the EMEA Sellers shall be deemed a Subsidiary of any Seller.

"**Successful Bidder**" as defined in the Bidding Procedures.

"**Tax**" means (a) any domestic or foreign federal, state, local, provincial, territorial or municipal taxes or other impositions by or on behalf of any Government Entity, including the following taxes and impositions: net income, gross income, individual income, capital, value added, goods and services, gross receipts, sales, use, *ad valorem*, business rates, transfer, franchise, profits, business, environmental, real property, personal property, service, service use, withholding, payroll, employment, unemployment, severance, occupation, social security, excise, stamp, stamp duty reserve, customs, and all other taxes, fees, duties, assessments, deductions, withholdings or charges of the same or of a similar nature, however denominated, together with any interest and penalties, additions to tax or additional amounts imposed or assessed with respect thereto, and (b) any obligation to pay Taxes of a Third Party, whether by contract, as a result of transferee or successor liability, as a result of being a member of an affiliated, consolidated, combined or unitary group for any period or otherwise.

"**Tax Authority**" means any local, municipal, governmental, state, provincial, territorial, federal, including any U.S., Canadian or other fiscal, customs or excise authority, body or officials (or any entity or individual acting on behalf of such authority, body or officials) anywhere in the world with responsibility for, and competent to impose, collect or administer, any form of Tax.

"**Tax Credit Purchaser**" has the meaning set forth in Section 6.5(b).

"**Tax Records**" means books, records, files, or other documentation, whether in electronic or other form, with respect to Tax.

"**Tax Returns**" means all returns, reports (including elections, declarations, disclosures, schedules, estimates and information returns) and other information filed or required to be filed with any Tax Authority relating to Taxes, including any amendments thereto.

"**Termination Fee Side Agreement**" means that certain GSM Termination Fee Agreement, dated the date hereof, between the Main Sellers and the Purchaser.

"**Third Party**" means any Person that is neither a Party nor an Affiliate of a Party.

"**Third Party Beneficiaries**" has the meaning set forth in Section 10.3.

"**Third Party Provisions**" has the meaning set forth in Section 10.3.

"**365 Contract(s)**" has the meaning set forth in Section 2.1.5(a)(i).

"**365 Contract List**" has the meaning set forth in Section 2.1.5(a)(i).

"**365 Real Estate Lease**" has the meaning set forth in Section 2.1.5(a)(ii).

"**365 Real Estate Lease List**" has the meaning set forth in Section 2.1.5(a)(ii).

"**Trade Approvals**" means the timely submission by the Sellers of any and all necessary requests to the appropriate Governmental Authority for the assignment or issuance, which may be conditional on Closing, to Purchaser of all material Consents held by the Sellers which would be required under any Trade Law for Purchaser to continue to carry on, after Closing, the Business as currently conducted and the receipt and acceptance of such requests by the Governmental Authority without any objection.

"**Trade Laws**" means any applicable Law relating to, regulating, prohibiting or imposing requirements with respect to the import, export or transfer of goods, materials, technology or information, including the *Export Act, Export and Import Permits Act, Special Import Measures Act, Special Economic Measures Act, International Emergency Economic Powers Act and the Arms Export Control Act*, all as amended, and any requirements of a Government Entity promulgated pursuant to such Laws or any analogous supranational foreign, state, provincial, territorial, municipal or local Law.

"**Trade Permit**" means any Consent required under any Trade Law for the Business as currently conducted.

"**Trademarks**" means, together with the goodwill associated therewith, all trademarks, service marks, trade dress, logos, distinguishing guises and indicia, trade names, corporate names, business names, domain names, whether or not registered, and all common law rights, and registrations, applications for registration and renewals thereof, including without

26

limitation, all marks registered in the trademark offices of any nation throughout the world, and all rights therein provided by multinational treaties or conventions.

"**Trademark License Agreement**" means the trademark license agreement between the relevant Sellers, on the one hand, and the Purchaser and/or any Designated Purchasers, on the other hand, to be entered into on or before the Closing in the form attached hereto as Exhibit K.

"**Transaction Documents**" means this Agreement, the Ancillary Agreements, the Termination Fee Side Agreement and all other ancillary agreements to be entered into, or documentation delivered by, any Party and/or any Designated Purchaser pursuant to this Agreement or any Local Sale Agreement.

"**Transfer Tax Returns**" has the meaning set forth in Section 6.6(a).

"**Transfer Taxes**" means all goods and services, sales, excise, use, transfer, gross receipts, documentary, filing, recordation, value-added, stamp, stamp duty reserve, and all other similar Taxes, duties or other like charges, however denominated (including any real property transfer Taxes and conveyance and recording fees and notarial fees), together with interest, penalties and additional amounts imposed with respect thereto.

"**Transferred Employee**" means (i) Employees who accept an offer of employment by, and commence employment with, the Purchaser or a Designated Purchaser in accordance with the terms of Section 7.1 and (ii) those Employees whose employment transfers by operation of Law.

"**Transferred Employee Plan**" means any Seller Employee Plan that is transferred (or the Liabilities of which are transferred) to the Purchaser or Designated Purchaser by operation of Law, but excluding the Specified Employee Liabilities assumed by the Purchaser or the Designated Purchaser pursuant to Section 2.1.3(k).

"**Transferred Intellectual Property**" means (i) the Transferred Patents, (ii) the Transferred Trademarks, (iii) the Intellectual Property (other than Patents and Trademarks) in the Software used exclusively in the Products as of the date hereof as set forth in Section 1.1(j) of the Sellers Disclosure Schedule) and (iv) any other Intellectual Property (other than Patents, Trademarks and Software) owned by any of the Sellers that is used exclusively in connection with the Business as of the date hereof.

"**Transferred Overhead and Shared Services**" means Overhead and Shared Services to be provided to or in support of the Business post-Closing by Transferred Employees as set forth in Section 1.1(k) of the Sellers Disclosure Schedule.

"**Transferred Patents**" means the Patents listed in Section 1.1(l) of the Sellers Disclosure Schedule.

"**Transferred Trademarks**" means the Trademarks exclusively used in the Business as of Closing and owned as of the Closing Date by any of the Sellers or their Affiliates as set forth in Section 1.1(j) of the Sellers Disclosure Schedule.

27

"**Transition Services Agreement**" means an agreement between relevant Sellers and/or their Affiliates party thereto, on the one hand, and the Purchaser and/or any Designated Purchasers, on the other hand, to be executed on or prior to the Closing Date, in the form attached hereto as Exhibit L, except that the Schedules to such agreement shall be agreed between the Parties in accordance with Section 5.26 hereof.

"**TSA EMEA Sellers**" means NNUK and Nortel Networks (Ireland) Limited.

"**TSA Escrow Amount**" has the meaning set forth in the Transition Services Agreement.

"**TSA Sellers**" means the Main Sellers and those entities listed on Exhibit A attached to the form Transition Services Agreement attached hereto as Exhibit L.

"**Unexpired Leases**" means leases that constitute "unexpired leases" for the purposes of Section 365 of the U.S. Bankruptcy Code.

"**Uni-Nortel**" means Uni-Nortel Communication Technologies (Hellas), S.A., a company organized under the laws of Greece, which was established in July 2005 as a joint venture between Nortel Networks International Finance & Holding, B.V. and UniSystems, S.A. for the purposes of marketing and selling certain telecommunications equipment and systems in Greece and the Republic of Cyprus.

"**U.S. Bankruptcy Code**" means Title 11 of the United States Code.

"**U.S. Bankruptcy Court**" means the United States Bankruptcy Court for the District of Delaware.

"**U.S. Bankruptcy Rules**" means the U.S. Federal Rules of Bankruptcy Procedure.

"**U.S. Bidding Procedures Order**" means that certain Order Authorizing and Approving (I) Bidding Procedures, (II) Notice Procedures, and (III) Setting a Date for Sale Heating, for the Sale of Certain Assets of Debtors" GSM/GSM-R Business, which was entered on October 15, 2009 by the U.S. Bankruptcy Court [D.I. 1587].

"**U.S. Debtor Contract**" means any Seller Contract to which a U.S. Debtor is a party.

"**U.S. Debtors**" has the meaning set forth in the recitals to this Agreement.

"**U.S. Sale Order**" means the sale order of the U.S. Bankruptcy Court, substantially in the form attached hereto as Exhibit 5.1, approving the sale of the Assets to the Purchaser (or a Designated Purchaser) and the assignment by the U.S. Debtors to, and assumption thereof by, the Purchaser (or a Designated Purchaser) of the Assumed and Assigned Contracts and the Assumed Liabilities pursuant to Sections 105, 363 and 365 of the U.S. Bankruptcy Code.

"**Visa Employees**" means Employees (other than Employees whose employment transfers by operation of Law) who are identified as having a visa or permit in Section 4.10(b) of the Sellers Disclosure Schedule and whose employment with Purchaser or a Designated Purchaser cannot commence until the required visa or permit for a transfer of employment to Purchaser or a Designated Purchaser (with respect to such Employee) is obtained. An Employee shall be a Visa Employee for purposes hereof only if such Employee receives and accepts an employment offer from Purchaser as provided in Section 7.1 and has an Effective Hire Date that occurs within twelve (12) months following the Closing Date.

"**WARN Act**" means the Worker Adjustment and Retraining Notification Act of 1989, as amended, or any similar Law requiring notice to employees in the event of a plant closing or mass layoff.

"**Warranty Obligations**" means the warranty obligations relating to Products and Services assumed by the Purchaser and/or a Designated Purchaser pursuant to Section 2.1.3(b) and Section 2.1.3(g).

"**Warranty Provision Amount**" means the sum of (i) the KPD Provision and (ii) the Non-KPD Warranty Provision.

"**Wholly-Owned Subsidiary**" means any Subsidiary all of the capital stock or capital which is held directly or indirectly by the Purchaser, except for any capital stock which is held by a director of such Subsidiary as required by applicable Laws.

Section 1.2.    Interpretation.

1.2.1.    Gender and Number. Any reference in this Agreement to gender includes all genders and words importing the singular include the plural and vice versa.

1.2.2.    Certain Phrases and Calculation of Time. In this Agreement (i) the words "including" and "includes" mean "including (or includes) without limitation", (ii) the terms "hereof," "herein," and "herewith" and words of similar import shall, unless otherwise stated, be construed to refer to this Agreement and not to any particular provision of this Agreement, and Article, Section, paragraph, Exhibit and Schedule references are to the Articles, Sections, paragraphs, Exhibits and Schedules to this Agreement unless otherwise specified, and (iii) in the computation of periods of time from a specified date to a later specified date, unless otherwise expressly stated, the word "from" means "from and including" and the words "to" and "until" each mean "to but excluding", and (iv) in determining whether an asset is "exclusively" used in connection with the Business, incidental, *de minimis* or casual uses outside the Business shall not be considered. If the last day of any such period is not a Business Day, such period will end on the next Business Day.

When calculating the period of time "within" which, "prior to" or "following" which any act or event is required or permitted to be done, notice given or steps taken, the date which is the reference date in calculating such period is excluded from the calculation. If the last day of any such period is not a Business Day, such period will end on the next Business Day.

29

The reference to any "list" set forth in the Sellers Disclosure Schedule shall mean a list that is complete and accurate, taking into account that disclosure in one section of the Sellers Disclosure Schedule of any facts or circumstances shall be deemed an adequate response and disclosure of such facts and circumstances with respect to any other representations and warranties by Seller calling for disclosure of such information whether or not such disclosure is specifically associated with it or purports to respond to one or more of such other representations or warranties if it is reasonably apparent on the face of the Sellers Disclosure Schedule that such disclosure is applicable.

    1.2.3. Headings, etc.The inclusion of a table of contents, the division of this Agreement into Articles and Sections and the insertion of headings are for convenient reference only and are not to affect or be used in the construction or interpretation of this Agreement.

    1.2.4. Currency.All monetary amounts in this Agreement, unless otherwise specifically indicated, are stated in United States currency. All calculations and estimates to be performed or undertaken, unless otherwise specifically indicated, are to be expressed in United States currency. All payments required under this Agreement shall be paid in United States currency in immediately available funds, unless otherwise specifically indicated herein. Where another currency is to be converted into United States currency it shall be converted on the basis of the exchange rate published in the Wall Street Journal (Eastern Edition) for the day in question.

    1.2.5. Statutory References.Unless otherwise specifically indicated, any reference to a statute in this Agreement refers to that statute and to the regulations made under that statute as in force from time to time.

## ARTICLE II

## PURCHASE AND SALE OF ASSETS

   Section 2.1. Purchase and Sale.

    2.1.1. Assets.Subject to the terms and conditions of this Agreement, at the Closing, the Purchaser shall, and shall cause the relevant Designated Purchasers to, purchase or be assigned and assume from the relevant Sellers, and each Seller shall sell, transfer or assign to the Purchaser or the relevant Designated Purchasers, all of such Seller's right, title and interest in and to the assets predominantly (except in the case of the assets described in clauses (f) and (h), exclusively) used or held for use in the conduct of the Business, (such assets, excluding the Excluded Assets, the **"Assets"**) (x) in the case of Assets that are transferred or assigned by U.S. Debtors, free and clear of all Liens and Claims (other than Permitted Encumbrances and Liens created by or through the Purchaser, the Designated Purchasers or any of their Affiliates) pursuant to Sections 363 and 365 of the U.S. Bankruptcy Code, (y) in the case of Assets that are transferred or assigned by the Canadian Debtors, free and clear of all Liens (other than Permitted Encumbrances and Liens created by or through the Purchaser, the Designated Purchasers or any of their Affiliates) pursuant to the Canadian Approval and Vesting Order, when granted, and (z) in the case of Assets that are transferred or assigned by the Non-Debtor Sellers, free and clear

30

of all Liens (other than Permitted Encumbrances and Liens created by or through the Purchaser, the Designated Purchasers or any of their Affiliates). The Assets include:

      (a)    the Owned Inventory as of the Closing Date;

      (b)    the CIP Receivables as of the Closing Date;

      (c)    the Owned Equipment as of the Closing Date;

      (d)    the Assigned Contracts in force as of the Closing Date;

      (e)    the Business Information existing as of the Closing Date, subject to Section 2.1.2(h);

      (f)    the Transferred Intellectual Property as of the Closing Date, subject to any and all licenses granted prior to the Closing Date under such Intellectual Property, together with all claims against Third Parties for infringement, misappropriation or other violation of any Law with respect to any of the Transferred Intellectual Property, whether for any past, present or future infringement, misappropriation or other violation;

      (g)    all rights as of the Closing (i) under all warranties, representations and guarantees made by suppliers, manufacturers and contractors to the extent related to the Business or Assets, and (ii) with respect to Acquired Actions; and

      (h)    to the extent assignable under applicable Law, all Consents of Government Entities exclusively pertaining to the Business (the "**Seller Consents**").

      2.1.2.    Excluded Assets. Notwithstanding anything in this Section 2.1 or elsewhere in this Agreement or in any of the Transaction Documents to the contrary, nothing herein shall be deemed to sell, transfer, assign or convey (or require Sellers to do any of the foregoing as to) the following assets to the Purchaser or any Designated Purchaser, and the Sellers shall retain all of their respective rights, title and interests in and to, and the Purchaser and the Designated Purchasers shall have no rights with respect to, the rights, title and interests of the Sellers in and to any of the following assets (collectively, the "**Excluded Assets**"):

      (a)    cash and cash equivalents, accounts receivable (including intercompany receivables but excluding CIP Receivables), bank account balances and all petty cash of the Sellers;

      (b)    any refunds due from, or payments due on, claims with the insurers of any of the Sellers in respect of losses arising prior to the Closing Date (except as provided in Section 5.27);

      (c)    all rights to Tax refunds, credits or similar benefits relating to the Assets or the Business allocable to a Pre-Closing Taxable Period or to the portion of a Straddle Period ending on and including the Closing Date;

(d)     all claims, causes of action and rights of Sellers or any Subsidiary thereof to the extent relating to any Excluded Liabilities or to any Liabilities for which Sellers are responsible under this Agreement (including rights of set-off, rights to refunds and rights of recoupment from or against any Third Party but excluding any Acquired Actions);

(e)     any security deposits made by or on behalf of the Sellers (including those relating to Assigned Contracts);

(f)     any rights of the Sellers under any Non-Assigned Contract (except as provided for in Section 5.13);

(g)     the minute books, stock ledgers and Tax Records of the Sellers;

(h)     (i) any books, records, files, documentation or sales literature other than the Business Information (subject to clauses (ii) and (iii) below of this subsection and the last paragraph of this Section 2.1.2), (ii) the Employee Records other than those required to be delivered to the Purchaser pursuant to Article VII, and (iii) such portion of the Business Information that the Sellers are required by Law (including Laws relating to privilege or privacy but subject to any exemption from those Laws included in the Canadian Approval and Vesting Order or the U.S. Sale Order) or by any agreement with a Third Party to retain and/or not to disclose (provided that copies of such information shall be provided to the Purchaser and to the extent permitted by applicable Law or such agreement);

(i)     except for (i) the Transferred Intellectual Property and the rights described in Section 2.1.1(f) above, and (ii) Intellectual Property to the extent rights are granted thereto pursuant to the Intellectual Property License Agreement, the Trademark License Agreement or any other Transaction Documents, any rights to (A) any Intellectual Property of any of the Sellers (including Sellers' names) or any Affiliates of any of the Sellers or (B) Intellectual Property owned by a Third Party, except to the extent licensed under an Assigned Contract;

(j)     all rights of the Sellers under this Agreement and the Transaction Documents;

(k)     all of the rights and claims of the U.S. Debtors available to the U.S. Debtors under the U.S. Bankruptcy Code, of whatever kind or nature, as set forth in Sections 544 through 551, inclusive, 553, 558 and any other applicable provisions of the U.S. Bankruptcy Code, and any related claims and actions arising under such Sections by operation of Law or otherwise, including any and all proceeds of the foregoing but excluding the Acquired Actions;

(l)     all records containing personal communications or notes related to the negotiations in connection with the sale of the Assets to the Purchaser and the Designated Purchasers that were not shared with the Purchaser;

(m)     all stock or other equity interests in any Person;

(n)     any assets set forth on Section 2.1.2(n) of the Sellers Disclosure Schedule;

32

(o)    any business asset, product or service run, owned, managed and/or provided by NN Turkey, the LGN Joint Venture, Uni-Nortel and any other joint venture (or similar arrangement) of the Sellers unless expressly included in the Assets;

(p)    the Excluded Contracts;

(q)    all Seller Employee Plans, and any related assets or insurance policies;

(r)    any freehold or leasehold interest in any real estate other than the tenancy, subtenancy or occupancy interest, if any, if and to the extent created pursuant to a Sublease, Direct Lease or License in accordance with Section 5.31, Section 5.32 and Section 5.33, respectively; and

(s)    any rights of the Sellers under Assumed and Subleased Real Estate Leases, Excluded 365 Contracts, Bundled Contracts (except as provided for in Section 5.15), Excluded Non-365 Contracts and Seller Insurance Policies.

2.1.3.    Assumed Liabilities. On the terms and subject to the conditions set forth in this Agreement, at the Closing, the Purchaser shall, and shall cause the relevant Designated Purchasers to, assume and become responsible for, and perform, discharge and pay, when due, solely the following Liabilities (the "**Assumed Liabilities**"):

(a)    all Liabilities arising on or after the Closing Date to the extent related to the conduct, operation or ownership of the Assets after the Closing Date, including (i) all such Liabilities with respect to the ownership, exploitation and operation of the Assets incurred on or after the Closing Date and (ii) all such Liabilities related to Actions or claims brought against the Assets arising from events occurring after the Closing Date;

(b)    all Liabilities arising from or in connection with the performance of the Assigned Contracts after the Closing Date, the Purchaser Portion of Cure Costs pursuant to Sections 2.1.7(a) and 2.1.7(b), or any arrangements entered into pursuant to Section 5.15 after the Closing Date;

(c)    any obligations under any warranty liabilities relating to Products and Services which have been supplied under any Assigned Contract, but excluding any Cure Costs payable by Sellers pursuant to Section 2.1.7;

(d)    the obligation to post any deposits, bonds or other security in replacement of security posted under any Assigned Contract pursuant to Section 5.21 of this Agreement;

(e)    all Liabilities resulting from any licensing assurances, declarations, agreements or undertakings relating to the Transferred Intellectual Property which the Sellers may have granted or committed to Third Parties, including Liabilities resulting from the assurances, declarations and undertakings made to standard setting bodies that are listed in Section 2.1.3(e) of the Sellers Disclosure Schedule;

(f)    all Liabilities for, or related to any obligation for, any Tax that the Purchaser or any Designated Purchaser bears under ARTICLE VI;

33

(g)    all obligations of the Sellers under any warranty Liabilities relating to Products and Services which have been supplied by the Purchaser or any Designated Purchaser under any Bundled Contract subcontracted to the Purchaser or any Designated Purchaser under any Subcontract Agreement or the benefit and burden of which has otherwise been transferred in accordance with Section 5.15(b);

(h)    except to the extent otherwise expressly set forth in ARTICLE VII and the Loaned Employee Agreement, all Liabilities related to or arising from any of the following: (i) the Purchaser's or any Designated Purchaser's (or any of their Affiliates') employment or termination of employment (whether or not arising under or in respect of any Purchaser Employee Plan) of Transferred Employees arising after the Closing Date; (ii) the terms of any offer of employment or notice of continued employment, as applicable, to any Employee who is provided an offer pursuant to the terms of Section 7.1 (including the Purchaser's or any Designated Purchaser's failure to offer employment to any employee that constitutes a violation of applicable Law);

(i)    all Liabilities relating to or arising from or in connection with any Purchaser Employee Plan;

(j)    any obligation to provide continuation coverage pursuant to COBRA or any similar Law under any Purchaser Employee Plan that is a "group health plan" (as defined in Section 5000(b)(1) of the Code) to Transferred Employees and/or their qualified beneficiaries with respect to a qualifying event that occurs on or after such Transferred Employees' Effective Hire Date;

(k)    Accrued Vacation Amount as of the Closing Date set forth on Section 2.1.3(k) of the Sellers Disclosure Schedule (the "**Specified Employee Liabilities**");

(l)    all Liabilities related to Transferred Employees expressly assumed by Purchaser or a Designated Purchaser as set out in ARTICLE VII;

(m)    all Liabilities reflected in the computation of Adjusted Net Working Capital;

(n)    all other Liabilities listed in Section 2.1.3(n) of the Sellers Disclosure Schedule; and

(o)    with respect to any Products supplied under any Bundled Contract with a customer of a Seller prior to the Closing Date that is amended in accordance with Section 5.15, (i) any obligations under any warranty liabilities relating to such Products, but excluding any Cure Costs payable by the Sellers pursuant to Section 2.1.7; (ii) any Liabilities arising from or in connection with any non-cash incentives relating to Products supplied under such Bundled Contract; and (iii) Liabilities arising from the requirement to provide maintenance services in connection with such Products.

2.1.4.    Excluded Liabilities.Except as expressly provided in Section 2.1.3, neither the Purchaser nor any Designated Purchasers shall assume or be deemed to have assumed any Liabilities of the Sellers or their Affiliates other than the Assumed Liabilities

(collectively, the "**Excluded Liabilities**"). Without limiting the generality of the foregoing, Excluded Liabilities include:

        (a)     all Indebtedness of the Sellers and their Affiliates;

        (b)     all Liabilities arising out of the Contracts that are not Assigned Contracts (including Liabilities arising out of any Excluded Contracts and Liabilities arising out of that portion of any arrangement entered into pursuant to Section 5.15 for which Sellers are responsible by the terms thereof);

        (c)     all accounts payable and trade payables of the Sellers, including intercompany payables;

        (d)     all fees or commissions of any brokers, funds or investment banks in connection with the transactions contemplated by this Agreement and the other Transaction Documents based upon arrangements made by or on behalf of the Sellers or any of their Affiliates;

        (e)     any Cure Costs payable by the Sellers pursuant to Section 2.1.7;

        (f)     any Liabilities arising from or based on events or conditions occurring or existing prior to the Closing Date and connected with, arising out of or relating to (x) the Release or threatened Release of any Hazardous Materials at any location currently or formerly owned, operated or used by the Business or at any location to which Hazardous Materials generated, stored, handled or processed by the Business were sent, released or disposed of, or (y) compliance or the alleged non-compliance by the Business with any Environmental Law or Environmental Permit;

        (g)     all Liabilities for, or related to any obligation for, any Tax that is not expressly assumed by the Purchaser or any of the Designated Purchasers pursuant to ARTICLE VI (including, for the avoidance of doubt, any income or gross receipts Tax imposed on any of the Sellers);

        (h)     all Excluded Employee Liabilities;

        (i)     all Liabilities of the Sellers arising under this Agreement and the Ancillary Agreements; and

        (j)     all Liabilities of NN Turkey, the LGN Joint Venture, Uni-Nortel.

        2.1.5.     <u>Assumption and Assignment of 365 Contracts</u>.

        (a)     Section 2.1.5(a) of the Sellers Disclosure Schedule sets forth:

        (i)     a list (the "**365 Contract List**") of the U.S. Debtor Contracts (including Inbound License Agreements that are used, as of the date hereof, exclusively in connection with the Business, but excluding (a) other licenses of Intellectual Property and (b) Leases) that are (x) Executory Contracts, (y) were entered into prior to the

Petition Date and (z) are not Contracts with contract manufacturers or other suppliers to the Business (each such U.S. Debtor Contract, a **"365 Contract"**) that the Purchaser has elected to have the U.S. Debtors assume and assign to the Purchaser or a Designated Purchaser at Closing pursuant to Section 365 of the U.S. Bankruptcy Code; and

(ii)     a list (the **"365 Real Estate Lease List"**) of all Leases of a U.S. Debtor which were entered into prior to the Petition Date and are Unexpired Leases (each such Lease, a **"365 Real Estate Lease"**) that the Purchaser has elected to have the relevant U.S. Debtor pursuant to Section 365 of the U.S. Bankruptcy Code assume and assign to the Purchaser or a Designated Purchaser at Closing, in accordance with, and as provided by, the Real Estate Agreements Term Sheet; provided that, subject to the terms of the Real Estate Agreements Term Sheet, the applicable U.S. Debtor shall (i) not be required to assume a 365 Real Estate Lease prior to the Closing Date in connection with an assumption and assignment to Purchaser and (ii) have the right to reject any 365 Real Estate Lease designated for assumption and assignment in the event that the Closing shall not have occurred on or before the date that is three (3) Business Days prior to the Latest Lease Rejection Date.

(b)     Section 2.1.5(b) of the Sellers Disclosure Schedule sets forth a list of all 365 Real Estate Leases that the Purchaser has elected to have the relevant U.S. Debtor, pursuant to Section 365 of the U.S. Bankruptcy Code, assume and under which the Purchaser or a Designated Purchaser will enter into a Sublease, to the extent permitted by, and in accordance with, the terms of the related 365 Real Estate Lease and applicable Law (the **"Assumed and Subleased Real Estate Leases"**), at Closing, in accordance with, and as provided by, the Real Estate Agreements Term Sheet; provided that, subject to the terms of the Real Estate Agreements Term Sheet, the applicable U.S. Debtor shall (i) not be required to assume an Assumed and Subleased Real Estate Lease prior to the Closing Date in connection with a Sublease to Purchaser and (ii) have the right to reject any Assumed and Subleased Real Estate Lease designated for Sublease in the event that the Closing shall not have occurred on or before the date that is three (3) Business Days prior to the Latest Lease Rejection Date.

(c)     Section 2.1.5(c) of the Sellers Disclosure Schedule sets forth a list of 365 Real Estate Leases, certain of which may be available for the Purchaser to elect to have the relevant Seller enter into a License at Closing with the Purchaser or a Designated Purchaser to the extent permitted by, and in accordance with (i) the terms of the related 365 Real Estate Lease and applicable Law (each such 365 Real Estate Lease, the **"Licensed Real Estate Lease"**, such Schedule to be supplemented as expressly set forth in the Real Estate Agreements Term Sheet), and (ii) the Real Estate Agreements Term Sheet; provided, that, the applicable U.S. Debtor shall (i) not be required to assume a Licensed Real Estate Lease prior to the Closing Date in connection with a License to Purchaser and (ii) have the right to reject any Licensed Real Estate Lease designated for License in the event that the Closing shall not have occurred on or before the date that is three (3) Business Days prior to the Latest Lease Rejection Date.

(d)     Prior to the Closing Date, the Purchaser or the Sellers shall be entitled to add 365 Contracts or 365 Real Estate Leases to Sections 2.1.5(a), 2.1.5(b), or 2.1.5(c), respectively, of the Sellers Disclosure Schedule, provided that any such additions proposed by the Sellers shall only be added to such Sections of the Sellers Disclosure Schedules if the

Purchaser has agreed in writing prior to such addition that the U.S. Debtors should assume and assign to (or enter into a Sublease or License with) the Purchaser or a Designated Purchaser at Closing such additional 365 Contracts or 365 Real Estate Leases pursuant to Section 365 of the U.S. Bankruptcy Code (any such additional 365 Contracts added to Section 2.1.5(a) of the Sellers Disclosure Schedule, the "**Additional Assigned and Assumed Contracts**").

(e)     The Contracts listed on the 365 Contract List and the 365 Real Estate List, as updated pursuant to Section 2.1.5(d), are those 365 Contracts and 365 Real Estate Leases for assumption and assignment by the U.S. Debtors and are collectively referred to as the "**Assumed and Assigned Contracts**".

(f)     The U.S. Debtors shall seek the approval of the U.S. Bankruptcy Court to permit (i) the assumption and assignment of all the Assumed and Assigned Contracts and (ii) if and to the extent the landlord of the applicable Assumed and Subleased Real Estate Lease or Licensed Real Estate Lease has consented to the applicable Sublease or License, the assumption of the Assumed and Subleased Real Estate Leases and the entry into Subleases in connection therewith, and the assumption of Licensed Real Estate Leases and the entry into Licenses in connection therewith in accordance with Section 5.1.

(g)     Any (x) 365 Contract not listed on the 365 Contract List, or (y) any 365 Real Estate Lease not listed on the 365 Real Estate Lease List or under which the Purchaser has not elected to enter into a Sublease pursuant to Section 2.1.5(b) or a License pursuant to Section 2.1.5(c) are those that the Purchaser has elected not to have assumed and assigned (or Subleased or Licensed) pursuant to this Section 2.1.5 and shall be referred to as an "**Excluded 365 Contract**" and shall not be an Assigned Contract hereunder.

2.1.6.     Assignment of Non-365 Contracts.

(a)     Section 2.1.6(a) of the Sellers Disclosure Schedule sets forth:

(i)     a list (the "**Non-365 Contract List**") of all the Contracts (including Inbound License Agreements that are used, as of the date hereof, exclusively in connection with the Business, but excluding any (a) other licenses of Intellectual Property, (b) 365 Contracts and (c) Leases) that the Purchaser has elected to have the relevant Seller assign to the Purchaser or a Designated Purchaser at Closing (Contracts that may be included on the Non-365 Contract List, the "**Non-365 Contracts**"); and

(ii)     a list of all the Leases other than 365 Real Estate Leases ("**Non-365 Real Estate Leases**") relating to the Business that the Purchaser has elected to have the relevant Seller assign to the Purchaser or a Designated Purchaser at Closing, in accordance with, and as provided by, the Real Estate Agreements Term Sheet (the "**Designated Non-365 Real Estate Leases**"); provided that, subject to the terms of the Real Estate Agreements Term Sheet, the applicable Seller shall have the right to repudiate any Designated Non-365 Real Estate Lease designated for assignment in the event that the Closing shall not have occurred on or before the date that is three (3) Business Days prior to the Latest Lease Rejection Date.

37

(b)     Section 2.1.6(b) of the Sellers Disclosure Schedule sets forth a list of Non-365 Real Estate Leases (other than the Assumed and Subleased Real Estate Leases) under which the Purchaser has elected to have the relevant Seller enter into a Sublease at Closing with the Purchaser or a Designated Purchaser to the extent permitted by, and in accordance with, the terms of the related Non-365 Real Estate Lease and applicable Law (the **"Non-365 Subleased Real Estate Leases"**), in accordance with, and as provided by, the Real Estate Agreements Term Sheet; provided, that, subject to the terms of the Real Estate Agreements Term Sheet, the applicable Seller shall have the right to repudiate any Non-365 Subleased Real Estate Lease designated for Sublease in the event that the Closing shall not have occurred on or before the date that is three (3) Business Days prior to the Latest Lease Rejection Date.

(c)     Section 2.1.6(c) of the Sellers Disclosure Schedule sets forth a list of Real Estate Leases, certain of which may be available for the Purchaser to elect to have the relevant Seller enter into a License (as defined in Section 5.33) at Closing, with the Purchaser or a Designated Purchaser to the extent permitted by, and in accordance with, (i) the terms of the related Real Estate Lease and applicable Law (the Non-365 Real Estate Leases on such Schedule, the **"Non-365 Licensed Real Estate Leases"**, such Schedule to be supplemented as expressly set forth in the Real Estate Agreements Term Sheet), and (ii) the Real Estate Agreements Term Sheet; provided, that the applicable Seller shall have the right to repudiate any Non-365 Licensed Real Estate Lease designated for License in the event that the Closing shall not have occurred on or before the date that is three (3) Business Days prior to the Latest Lease Rejection Date.

(d)     The Contracts listed in the Non-365 Contract List and the Designated Non-365 Real Estate Leases are collectively referred to as the **"Designated Non-365 Contracts"**.

(e)     Any (x) Non-365 Contract that the Purchaser has not elected to have assigned, or (y) any Non-365 Real Estate Lease that the Purchaser has not elected to have assumed and assigned pursuant to Section 2.1.6(a)(ii) or under which the Purchaser has not elected to enter into a Sublease pursuant to Section 2.1.6(b) or a License pursuant to Section 2.1.6(c), shall be referred to as an **"Excluded Non-365 Contract"** and shall not be an Assigned Contract hereunder.

(f)     Subject to Section 2.1.7(e), Section 2.1.10, Section 5.13 and the receipt of any required Consents, all the Designated Non-365 Contracts in effect as of the Closing shall be assigned to the Purchaser or a Designated Purchaser at the Closing pursuant to Section 2.1.1(d).

2.1.7.     Cure Costs; Adequate Assurance; Efforts

(a)     To the extent that assumption and assignment of any Assumed and Assigned Contract entails the payment of any Cure Cost, NNI shall, or shall cause the relevant U.S. Debtor to, pay or otherwise provide for payment of such Cure Cost as required by the U.S. Bankruptcy Code and provided in the U.S. Sale Order or such separate orders of the U.S. Bankruptcy Court approving and authorizing the assumption and assignment of such Assumed and Assigned Contract; provided that, (x) subject to Section 2.1.7(f), with respect to Assumed and Assigned Contracts that are customer contracts (other than the Additional Assigned and

Assumed Contracts), the Purchaser shall pay one-half (1/2) of such Cure Costs (such amount to be paid by the Purchaser, the **"Purchaser's Portion of Existing 365 Cure Costs"**), and (y) with respect to the Additional Assigned and Assumed Contracts, the Purchaser shall pay one-half (1/2) of the first US$5,000,000 of such Cure Costs and all of such Cure Costs in excess of the first US$5,000,000.

(b)     To the extent that assignment to the Purchaser or a Designated Purchaser of any Designated Non-365 Contract entails the payment of any Cure Cost, the relevant Main Sellers shall, or shall cause the relevant Seller to, pay such amounts directly to such counterparty, on or prior to Closing, in a manner agreed between such Main Seller or such relevant Seller, as applicable, and such counterparty or ordered by a court of competent jurisdiction; provided that, subject to Section 2.1.7(f), with respect to such Designated Non-365 Contracts that are customer contracts, the Purchaser shall pay one-half (1/2) of such Cure Costs (the **"Purchaser's Portion of Non-365 Cure Costs"** and together with the Purchaser's Portion of Existing 365 Cure Costs, the **"Purchaser's Portion of Cure Costs"**).

(c)     To the extent that the assumption and sublease or license of any Assumed and Subleased Real Estate Leases or Licensed Real Estate Leases entails the payment of any Cure Cost, NNI shall, or shall cause the relevant U.S. Debtor to pay or otherwise provide for payment of such Cure Cost as required by the U.S. Bankruptcy Code. To the extent that the assignment, sublease or license to the Purchaser or a Designated Purchaser of any Non-365 Real Estate Leases or the Non-365 Subleased Real Estate Leases or Non-365 Licensed Real Estate Leases entails the payment of any amount to any party other than a Seller, the relevant Main Sellers shall, or shall cause the relevant Seller to, pay such amounts directly to such contracting party and shall offer to do so on or prior to Closing, in a manner agreed between such Main Seller or such relevant Seller, as applicable and such contracting party or ordered by a court of competent jurisdiction.

(d)     Prior to the hearing before the U.S. Bankruptcy Court to approve the assumption and assignment of the Assumed and Assigned Contracts, the Purchaser shall provide, as necessary, adequate assurance of its and the relevant Designated Purchasers' future performance under each Assumed and Assigned Contract to the parties thereto (other than the U.S. Debtors) in satisfaction of Section 365(f)(2)(B) of the U.S. Bankruptcy Code and to the extent required by the U.S. Sale Order or separate order of the U.S. Bankruptcy Court approving and authorizing the assumption and assignment of the Assumed and Assigned Contracts.

(e)     Sellers shall use reasonable best efforts, both before and after Closing, to obtain all Consents in form and substance reasonably satisfactory to the Purchaser required to permit the assignment, sublease or license, as applicable, to the Purchaser (or, if specified by the Purchaser, a Designated Purchaser) of the Assigned Contracts in force as of the Closing Date, and the entry into Subleases and Licenses, as applicable, and the Purchaser shall reasonably cooperate with Sellers to the extent necessary to obtain the same; provided, however, that the Sellers shall be under no obligation to compromise any right, asset or benefit or to expend any amount or incur any Liability in seeking such Consents (other than the payment of Cure Costs pursuant to this Section 2.1.7) and provided further that, except as set forth in Section 8.3(c), the failure to obtain any or all of such Consents shall not in itself entitle the Purchaser to terminate

39

this Agreement or fail to complete the transactions contemplated hereby or entitle the Purchaser to any adjustment to the Purchase Price.

(f)    Notwithstanding anything to the contrary contained in this Agreement or elsewhere, in no event shall the Purchaser's Portion of Cure Costs exceed an aggregate amount of US$2,500,000.

2.1.8.    Local Sale Agreements. Subject to the terms and conditions hereof, if reasonably requested in writing by the Purchaser to effect the Closing on the terms hereof, the relevant Sellers shall, and the Purchaser shall, and shall cause the relevant Designated Purchasers to, enter into such agreements or instruments, including bills of sale and/or assignment and assumption agreements (the "**Local Sale Agreements**"), providing for (i) the sale, transfer, assignment or other conveyance to the Purchaser and relevant Designated Purchasers, in accordance with the requirements of applicable local Law, of any Assets located in countries where such Local Sale Agreements are required or desirable, and (ii) the assumption by the Designated Purchasers of any Assumed Liability that the Purchaser intends to allocate to them. In the event of a conflict between this Agreement and the Local Sale Agreement, this Agreement shall prevail.

2.1.9.    EMEA Asset Sale Agreement; NNSA Irrevocable Offer. Except as otherwise set forth in Section 5.26, none of the EMEA Sellers, NNSA, the Joint Administrator, or the French Administrators shall assume, or be deemed to assume, any Liability whatsoever under this Agreement and nothing in this Agreement (except to the extent expressly incorporated into EMEA Asset Sale Agreement or the NNSA Irrevocable Offer) shall apply to, or govern, the sale, assignment, transfer, retention or assumption of assets, rights, properties or Liabilities of, or by, NNSA, the French Administrators, any EMEA Sellers or the Joint Administrators in any manner whatsoever. The only assets, rights, properties and Liabilities of NNSA or the French Administrators that are being sold, assigned or transferred to, and assumed by, the EMEA Purchaser or the EMEA Designated Purchaser(s), and the terms and conditions thereof, and representations with respect thereto, are solely as expressly set forth in the NNSA Irrevocable Offer. The only assets, rights, properties and Liabilities of the EMEA Sellers or Joint Administrators that are being sold, assigned or transferred to, and assumed by, the EMEA Purchaser or the EMEA Designated Purchasers, and the terms and conditions thereof, and representations with respect thereto, are solely as expressly set forth in the EMEA Asset Sale Agreement. Neither the Purchaser nor any Designated Purchaser shall be entitled to make any claim under this Agreement, or assert any right hereunder, against any Person other than the Sellers.

(b)    None of the Purchaser or any Designated Purchaser shall assume, or be deemed to assume, any Liability whatsoever under the EMEA Asset Sale Agreement or the NNSA Irrevocable Offer.

2.1.10.    Non-Assignable Assets. Notwithstanding anything in this Agreement to the contrary, if a Consent of a Third Party (including a Government Entity) has not been obtained on or prior to Closing, then, unless such Consent is subsequently obtained, this Agreement shall not constitute an agreement to sell, transfer, lease or sublease or assign, directly or indirectly, any Asset or any obligation or benefit arising thereunder if an attempted direct or

40

indirect sale, transfer, lease, sublease or assignment thereof, without such Consent, would constitute a breach, default, violation or other contravention of the rights of such Third Party or would be ineffective with respect to any party to a Contract concerning such Asset; provided, however, that the Sellers shall use their reasonable best efforts to cooperate with the Purchaser in connection with any commercially reasonable arrangement to provide the Purchaser the same interest, benefits and rights with respect to such Asset as the applicable Seller had immediately prior to the Closing. For greater certainty, except as set forth in Section 8.3(c), failure to obtain any such Consent shall not entitle the Purchaser to terminate or rescind this Agreement or fail to complete the transactions contemplated hereby or entitle the Purchaser to any adjustment of the Purchase Price.

Section 2.2.    Purchase Price.

2.2.1.    Purchase Price.Pursuant to the terms and subject to the conditions set forth in this Agreement, in consideration of the sale, transfer and assignment of the Assets pursuant to the terms hereof, and of the rights granted by certain Sellers under the Intellectual Property License Agreement and the Trademark License Agreement, the Purchaser, on its own behalf and as agent for the relevant Designated Purchasers, shall (x) assume and become obligated to pay, perform and discharge, when due, the Assumed Liabilities and (y) pay to the Distribution Agent an amount of cash (the **"Purchase Price"**) equal to Seventy Million dollars (US$70,000,000) to be adjusted pursuant to Section 2.2.3 of this Agreement.

2.2.2.    Estimated Purchase Price.

(a)    For purposes of determining the amount of cash to be paid as the Estimated Purchase Price by the Purchaser to the Sellers at the Closing pursuant to Section 2.3.2(c), at least three (3) Business Days prior to the Closing Date, the Main Sellers shall deliver to the Purchaser a statement prepared in good faith in accordance with the Calculation Principles (in all cases without double-counting of Cure Costs) and the terms hereof setting forth:

(i)    the estimated amount of the Inventory Value as of the Closing Date (the **"Estimated Inventory Value"**);

(ii)    the estimated amount of the CIP Receivables Amount as of the Closing Date (the **"Estimated CIP Receivables Amount"**);

(iii)    the estimated amount of the Warranty Provision Amount as of the Closing Date (the **"Estimated Warranty Provision Amount"**);

(iv)    the estimated amount of the Accrued Vacation Amount as of the Closing Date (the **"Estimated Accrued Vacation Amount"**);

(v)    the estimated amount of the Contractual Liability Amount as of the Closing Date (the **"Estimated Contractual Liability Amount"**);

(vi)    the estimated amount of the Deferred Revenue Liability Amount as of the Closing Date (the **"Estimated Deferred Revenue Liability Amount"**);

41

(vii)    the estimated amount of the Royalty Liability Amount as of the Closing Date (the **"Estimated Royalty Liability Amount"**);

(viii)    the estimated amount of the Adjusted Net Working Capital (the **"Estimated Adjusted Net Working Capital"**); and

(ix)    the Estimated Purchase Price.

(b)    As used in this Agreement, **"Estimated Purchase Price"** means an amount equal to:

(i)    the Purchase Price; <u>plus</u>

(ii)    an amount, which may be positive or negative, equal to the Estimated Adjusted Net Working Capital <u>plus</u> US$19,200,000; <u>minus</u>

(iii)    the Estimated Accrued Vacation Amount; <u>minus</u>

(iv)    the China Purchase Amount.

(c)    As used in this Agreement and shown in the attached Adjusted Net Working Capital Statement in Exhibit **O**, the **"Adjusted Net Working Capital"** means an amount equal to:

(i)    the Inventory Value; <u>plus</u>

(ii)    the CIP Receivables Amount; <u>minus</u>

(iii)    the Warranty Provision Amount; <u>minus</u>

(iv)    the Contractual Liability Amount; <u>minus</u>

(v)    the Deferred Revenue Liability Amount; <u>minus</u>

(vi)    the Royalty Liability Amount.

2.2.3.    <u>Purchase Price Adjustment</u>.

2.2.3.1    <u>Closing Statement; Dispute Resolution</u>.

(a)    As promptly as practicable after the Closing (and in any event within thirty (30) days after the Closing), the Purchaser shall deliver to the Main Sellers a written statement (the **"Closing Statement"**), which shall be prepared in accordance with the Calculation Principles and the terms hereof (in each case to the extent applicable) and contain the Purchaser's final calculation of:

(i)    the Inventory Value as of the Closing (the **"Closing Inventory Value"**);

42

   (ii) the CIP Receivables Amount as of the Closing (the "**Closing CIP Receivables Amount**");

   (iii) the Warranty Provision Amount as of the Closing (the "**Closing Warranty Provision Amount**");

   (iv) the Accrued Vacation Amount as of the Closing Date (the "**Closing Accrued Vacation Amount**");

   (v) the Contractual Liability Amount as of the Closing Date (the "**Closing Contractual Liability Amount**");

   (vi) the Deferred Revenue Liability Amount as of the Closing Date (the "**Closing Deferred Revenue Liability Amount**");

   (vii) the Royalty Liability Amount as of the Closing Date (the "**Closing Royalty Liability Amount**");

   (viii) the Adjusted Net Working Capital as of the Closing (the "**Closing Adjusted Net Working Capital**");

   (ix) the Accrued Vacation Amount as of the Closing Date; and

   (x) the final Purchase Price adjusted as provided in this Section and based on the foregoing (the "**Final Purchase Price**"), which shall be equal to:

    (A) the Purchase Price; plus

    (B) an amount, which may be positive or negative, equal to the Closing Adjusted Net Working Capital plus US$19,200,000; minus

    (C) the Closing Accrued Vacation Amount; minus

    (D) the China Purchase Amount.

  (b) If the Main Sellers disagree with the determination of the Closing Statement, the Main Sellers shall notify the Purchaser of such disagreement within thirty (30) days after delivery of the Closing Statement (such notice, the "**Disagreement Notice**"). The Disagreement Notice shall set forth, in reasonable detail, any disagreement with, and any requested adjustment to, the Closing Statement. If the Main Sellers fail to deliver the Disagreement Notice by the end of such thirty- (30-) day period, the Main Sellers shall be deemed to have accepted as final the Closing Statement delivered by the Purchaser. Matters included in the calculations in the Closing Statement to which the Main Sellers do not object in the Disagreement Notice shall be deemed accepted by the Main Sellers and shall not be subject to further dispute or review. Throughout the periods during which the Closing Statement is being prepared and any disputes that may arise under this Section 2.2.3 are being resolved, the Purchaser shall, promptly upon request, provide the Main Sellers and their accountants access to the books, records and personnel of the Business and all documents, schedules and workpapers

used by the Purchaser in the preparation of the Closing Statement or that are otherwise reasonably necessary for the Main Sellers and their accountants to review the Closing Statement (other than any such documents, schedules, workpapers and other information the disclosure of which could jeopardize any attorney-client or legal privilege or contravene any applicable Law, fiduciary duty or agreement; it being understood, however, that Purchaser and the Designated Purchasers shall cooperate in any reasonable efforts and requests for waivers that would enable otherwise required disclosure to the Main Sellers or their representatives to occur without so jeopardizing privilege or contravening such Law, duty or agreement). The Main Sellers and the Purchaser shall negotiate in good faith to resolve any disagreement with respect to the Closing Statement, and any resolution agreed to in writing by the Main Sellers and the Purchaser shall be final and binding upon the Parties.

(c)    If the Main Sellers and the Purchaser are unable to resolve any disagreement as contemplated by Section 2.2.3.1(b) within thirty (30) days after delivery of a Disagreement Notice by the Main Sellers, the Independent Auditor shall serve as arbitrator (the **"Accounting Arbitrator"**) to resolve such disagreement. The Primary Parties shall instruct the Accounting Arbitrator to consider only those items and amounts set forth in the Closing Statement as to which the Main Sellers and the Purchaser have not resolved their disagreement and to conduct such hearing as it considers necessary to resolve such disagreement. The Main Sellers and the Purchaser shall use their reasonable efforts to cause the Accounting Arbitrator to deliver to the Primary Parties, as promptly as practicable (and in no event later than fifteen (15) days after its appointment), a written report setting forth the resolution of any such disagreement determined in accordance with the terms of this Agreement. Such report and the Closing Statement, as adjusted thereby, shall be final and binding upon the Sellers and the Purchaser. In the event the Accounting Arbitrator concludes that the Purchaser was correct as to a majority (by dollar amount) of the disputed items, then the Sellers shall pay the Accounting Arbitrator's fees, costs and expenses. In the event the Accounting Arbitrator concludes that the Main Sellers were correct as to a majority (by dollar amount) of the disputed items, then the Purchaser shall pay the Accounting Arbitrator's fees, costs and expenses.

### 2.2.3.2    Calculation and Payment of the Purchase Price Adjustment.

(a)    If the Final Purchase Price, as finally determined in accordance with this Section 2.2.3, is less than the Estimated Purchase Price, then the Main Sellers shall cause the Distribution Agent to pay to the Purchaser, acting on its own behalf and as agent of the Designated Purchasers, the excess of the Estimated Purchase Price over the Final Purchase Price.

(b)    If the Final Purchase Price, as finally determined in accordance with this Section 2.2.3, exceeds the Estimated Purchase Price, the Purchaser, acting on its own behalf and as agent of the Designated Purchasers, shall pay to the Distribution Agent the amount by which the Final Purchase Price exceeds the Estimated Purchase Price.

(c)    Any payment to be made under this Section 2.2.3.2 shall include interest thereon calculated from the Closing Date to the date of payment at a rate per annum of three (3)%. Such interest shall accrue from day to day.

(d)     All amounts payable under this Section 2.2.3.2 to any Party shall be paid in cash by wire transfer of immediately available funds to the bank account(s) designated in writing by the Main Sellers in case of payment to the Distribution Agent or by the Purchaser in case of payment to the Purchaser within five (5) Business Days of the final determination of the Closing Statement in accordance with Section 2.2.3.1.

       2.2.4.    Good Faith Deposit.

(a)     The Purchaser has delivered to the Escrow Agent an amount in United States dollars equal to US$5,000,000 (the "**Good Faith Deposit**") in the form of wire transfer of immediately available funds to serve as earnest money under this Agreement.

(b)     The Good Faith Deposit shall:

(i)     be held by the Escrow Agent and shall not become property of the Sellers or the bankruptcy estates of the Sellers that have commenced Bankruptcy Proceedings;

(ii)     be applied to the Estimated Purchase Price to be paid by the Purchaser pursuant to Section 2.3.2(c) and therefore be paid by the Escrow Agent to the Distribution Agent (as agent of the Sellers) pursuant to Section 2.3.2(d) at Closing; or

(iii)     be returned to the Purchaser, within three (3) Business Days after the termination of this Agreement, free and clear of any claim, counterclaim, offset, recoupment Lien or encumbrance; <u>provided</u>, that in the case of (x) termination of this Agreement by the Sellers pursuant to Section 9.1(c)(i) or (y) termination by the EMEA Sellers of the EMEA Asset Sale Agreement pursuant to Clause 15.4.3 thereof (material breach thereof by the EMEA Purchaser that is not or could not be cured in accordance with the terms thereof), the Good Faith Deposit shall become the property of the Main Sellers.

Section 2.3.    Closing.

       2.3.1.    Closing Date. The completion of the purchase and sale of the Assets and the assumption of the Assumed Liabilities (the "**Closing**") shall occur simultaneously with the closing of the transaction contemplated by the EMEA Asset Sale Agreement, and shall take place at the offices of Cleary Gottlieb Steen & Hamilton LLP in New York, New York, commencing at 12:00 p.m. local time on the date which is five (5) Business Days after the day upon which all of the conditions set forth under ARTICLE VIII (other than conditions to be satisfied at the Closing, but subject to the waiver or fulfillment of those conditions) have been satisfied or, if permissible, waived by the Main Sellers and/or the Purchaser (as applicable), or on such other place, date and time as shall be mutually agreed upon in writing by the Purchaser and the Main Sellers (the day on which the Closing takes place being the "**Closing Date**").

Subject to the terms and conditions of this Agreement, legal title, equitable title and risk of Loss with respect to the Assets will transfer to the Purchaser or the relevant Designated Purchaser, and the Assumed Liabilities will be assumed by the Purchaser and the relevant Designated Purchasers, at the Closing.

2.3.2.    Closing Actions and Deliveries.At the Closing:

(a)    the Sellers and the Purchaser shall, and shall cause their respective Affiliates to, enter into (i) the Ancillary Agreements to which it is contemplated that they will be parties, to the extent such agreements have not yet been entered into (except as otherwise provided in the Real Estate Agreements Term Sheet) and subject to Section 5.26, and (ii) instruments of assignment and assumption effecting the transfer of the Assets and the Transferred Intellectual Property from the Sellers to the Purchaser or the Designated Purchaser(s), as applicable;

(b)    each Seller shall deliver to the Purchaser:

(i)    in the case of a Seller that is a "United States person" within the meaning of Section 7701 of the Code and applicable Treasury Regulations, a duly executed certificate of non-foreign status in accordance with Section 1445 of the Code and applicable Treasury Regulations; and

(ii)    (x) a duly executed certificate certifying that such Seller is not a non-resident of Canada for purposes of section 116 of the Income Tax Act (Canada), or (y) in the case of a Seller that is a non-resident of Canada for purposes of section 116 of the Income Tax Act (Canada), a duly executed certificate certifying that the Assets transferred or assigned to the Purchaser pursuant to this Agreement or any of the other Transaction Documents by such Seller do not include any taxable Canadian property as defined in the Income Tax Act (Canada), of such non-resident Seller;

(c)    the Purchaser shall deliver:

(i)    to the Distribution Agent, an amount equal to the Estimated Purchase Price, less the Good Faith Deposit, less the TSA Escrow Amount, by wire transfer in immediately available funds to an account or accounts designated at least two (2) Business Days prior to the Closing Date by the Main Sellers in a written notice to the Purchaser; and

(ii)    to the Main Sellers, a duly executed certificate of an executive officer of the Purchaser certifying the fulfillment of the conditions set forth in Section 8.2;

(d)    NNL, NNI and NNUK shall cause the Escrow Agent to deliver to the Distribution Agent (as agent for the Sellers) all amounts of cash held by the Escrow Agent by wire transfer in immediately available funds to an account or accounts designated at least two Business Days prior to the Closing Date by the Distribution Agent in a written notice to NNL, NNI and NNUK;

(e)    NNI shall deliver or cause to be delivered:

(i)    an updated Section 4.10(b) of the Sellers Disclosure Schedule (if applicable) with respect to those Employees who have accepted Purchaser's or the Designated Purchaser's offer of employment pursuant to Section 7.1.1 or whose

46

employment will transfer to the Purchaser or Designated Purchaser by operation of Law, dated as of a date no earlier than three (3) days prior to the Closing; and

(ii)    a duly executed certificate of an executive officer of NNI certifying the fulfillment of the conditions set forth in Section 8.3; and

(f)    each Party shall deliver, or cause to be delivered, to the other any other documents reasonably requested by such other Party in order to effect, or evidence the consummation of, the transactions contemplated herein.

Section 2.4.    Designated Purchaser(s).

(a)    The Purchaser shall be entitled to designate, in accordance with the terms and subject to the limitations set forth in this Section 2.4, one or more Affiliates of the Purchaser, the EMEA Purchaser or one or more Affiliates of the EMEA Purchaser to (i) purchase specified Assets (including specified Assigned Contracts), (ii) assume specified Assumed Liabilities, and/or (iii) employ Transferred Employees on and after the Closing Date (any Affiliate of the Purchaser that shall be properly designated by the Purchaser in accordance with this clause, a **"Designated Purchaser"**); it being understood and agreed, however, that any such right of the Purchaser to designate a Designated Purchaser is conditioned upon (x) such Designated Purchaser being able to perform the applicable covenants under Section 2.1.7 and ARTICLE VII and demonstrate satisfaction of the applicable requirements of Section 365 of the U.S. Bankruptcy Code (to the extent applicable), including the provision of adequate assurance for future performance, with respect to the Assumed and Assigned Contracts and (y) any such designation not creating any Liability (including any Liability relating to Taxes) for the Sellers or their Affiliates that would not have existed had the Purchaser purchased the relevant Assets, assumed the relevant Specified Employee Liabilities and/or employed the relevant Transferred Employees; provided, further, however, that the Sellers acknowledge and agree that each of Ericsson Inc., Ericsson Canada Inc., or Ericsson AB (each, a **"Confirmed Designated Purchaser"**) shall be deemed to satisfy the foregoing conditions and may be a Designated Purchaser. In addition, the EMEA Purchaser shall be a Confirmed Designated Purchaser; provided that, unless otherwise agreed by the Main Sellers, (i) the EMEA Purchaser shall not assume any Assumed Liabilities, and (ii) such designation shall not result in any material delay in the consummation of the transactions contemplated hereunder. If the designation of a Confirmed Designated Purchaser creates any Liability relating to Taxes for the Sellers or their Affiliates that would not have existed had the Purchaser purchased the relevant Assets, the Purchaser or the Designated Purchasers shall, notwithstanding anything to the contrary in Article VI, pay such additional amounts to the Sellers such that the total amount received by the applicable Sellers, after reducing such amount by the additional Liability relating to Taxes for the Sellers or their Affiliates created by the designation of such Confirmed Designated Purchaser, will equal the full amount such Seller would have received from the Purchaser had the designation not been made. No such designation shall relieve the Purchaser of any of its obligations hereunder and any breach hereof by a Designated Purchaser shall be deemed a breach by Purchaser. Except if the Designated Purchaser is a Confirmed Designated Purchaser, the Purchaser and each Designated Purchaser shall be jointly and severally liable for any obligations delegated or assigned to or assumed by any of them hereunder.

47

(b)     The above designation shall be made by the Purchaser by way of a written notice to be delivered to the Sellers as soon as reasonably practicable after the date hereof and in no event later than the fifteenth (15th) day prior to the Closing, which written notice shall (i) for any Designated Purchasers other than the Confirmed Designated Purchasers, contain appropriate information about the Designated Purchaser(s), (ii) indicate which Assets, Assumed Liabilities and Transferred Employees the Purchaser intends such Designated Purchaser(s) to purchase, assume and/or employ, as applicable, hereunder and (iii) include a signed counterpart to this Agreement in a form acceptable to the Main Sellers, agreeing to be bound by the terms of this Agreement as Designated Purchaser(s) and authorizing the Purchaser to act as such Designated Purchaser(s)' agent for all purposes hereunder.

## ARTICLE III

## REPRESENTATIONS AND WARRANTIES OF THE PURCHASER

The Purchaser hereby represents and warrants to the Sellers as follows:

Section 3.1.    Organization and Corporate Power.

(a)     The Purchaser is a corporation duly organized, validly existing and in good standing under the Laws of Sweden.  Each of the Purchaser and the Designated Purchasers has the requisite corporate power and authority to (i) enter into, deliver and perform its obligations pursuant to each of the Transaction Documents to which it is or will become a party and (ii) to own, lease and operate its assets and to carry on its business as it is now being conducted.

(b)     Each of Purchaser and the Designated Purchasers is duly qualified or licensed to own or lease and operate its properties and assets (including the Assets), and is in good standing, in each jurisdiction in which its ownership of assets or operation of business requires it to so qualify or to be so licensed, except to the extent that the failure to be so qualified or licensed would not materially hinder, delay or impair the Purchaser's or any such Designated Purchaser's ability to carry out its obligations under, and to consummate the transactions contemplated by, this Agreement and the Ancillary Agreements to which it is or will become a party.

Section 3.2.    Authorization; Binding Effect; No Breach.

(a)     The execution, delivery and performance of each Transaction Document to which the Purchaser or any of the Designated Purchasers is a party have been duly authorized by the Purchaser and the relevant Designated Purchasers, as applicable.  This Agreement has been duly executed and delivered by the Purchaser, and the other Transaction Documents to which the Purchaser or any Designated Purchaser is, or on the Closing Date will become, a party have been or will be duly executed and delivered by the Purchaser and each Designated Purchaser party thereto.  Assuming due authorization, execution and delivery by the relevant Sellers, each Transaction Document to which the Purchaser or any Designated Purchaser is a party constitutes, or upon execution thereof will constitute, a valid and binding obligation of the Purchaser or such Designated Purchaser, as applicable, enforceable against such Person in

48

accordance with its respective terms, except as such enforceability is limited by bankruptcy, insolvency, reorganization, moratorium or other Laws affecting creditors' rights generally and subject to general principles of equity, regardless of whether considered in a proceeding in equity or at Law.

(b)   The execution, delivery and performance by each of the Purchaser and the Designated Purchasers of the Transaction Documents to which the Purchaser or such Designated Purchaser is, or on the Closing Date will be, a party do not and will not conflict with or result in a breach of the terms, conditions or provisions of, constitute a default under, result in a violation of, give to any Person any right of termination, amendment, modification, acceleration or cancellation or any preemptive right or right to the payment of any penalty under, or require any Consent (other than the Regulatory Approvals) or other action by or declaration or notice to any Government Entity pursuant to (i) the articles, charter or by-laws of the Purchaser or the relevant Designated Purchaser, (ii) any material Contract to which the Purchaser or the relevant Designated Purchaser is a party or to which any of its assets is subject or (iii) any Laws to which the Purchaser, the relevant Designated Purchaser, or any of their assets is subject, except, in the case of (ii) and (iii) above, for such defaults, violations, actions and notifications that have not materially hindered, delayed or impaired, and would not reasonably be expected to, individually or in the aggregate, materially hinder, delay or impair, the performance by the Purchaser or the Designated Purchasers of any of their obligations under the Transaction Documents.

Section 3.3.   Financing.

The Purchaser has, as of the date hereof, and will have as of the Closing (i) sufficient funds available for purposes of funding the transactions contemplated herein and paying any other amount due hereunder or in respect hereof and (ii) the resources and capabilities (financial or otherwise) to perform its obligations hereunder. The Purchaser has not, as of the date hereof, and will not have as of the Closing, incurred any obligation, commitment, restriction or liability of any kind, which would materially impair or adversely affect such resources and capabilities. Notwithstanding anything to the contrary herein, the Purchaser's obligations to consummate the transactions contemplated by this Agreement are not conditioned or contingent in any way upon the receipt of financing from any Person.

Section 3.4.   Adequate Assurance of Future Performance.

To the extent required by any Bankruptcy Laws or other Laws, the Purchaser will be able to provide, at Closing or on such earlier date as is designated by the U.S. Bankruptcy Court, adequate assurance of its and/or the relevant Designated Purchasers' future performance under each Assumed and Assigned Contract to the parties thereto (other than the U.S. Debtors) in satisfaction of Section 365(f)(2)(B) of the U.S. Bankruptcy Code, and no other or further assurance will be necessary thereunder with respect to any Assumed and Assigned Contract.

Section 3.5.   Purchaser's Acknowledgments; Exclusivity of Representations and Warranties.

(a)   The Purchaser acknowledges and agrees that: