(i)       except for the representations and warranties expressly set forth herein or in any Ancillary Agreement, the Purchaser has not relied on any representation or warranty from the Sellers or any Affiliate of the Sellers or any employee, officer, director, accountant, financial, legal or other representative of the Sellers or their Affiliates in determining whether to enter into this Agreement;

(ii)      except for the representations and warranties expressly set forth herein or in any Ancillary Agreement, none of the Sellers, any Affiliates of the Sellers or any employee, officer, director, accountant, financial, legal or other representative of the Sellers or their Affiliates has made any representation or warranty, express or implied, as to the Business (or the value or future thereof), the Assets, (including any implied representation or warranty as to the condition, merchantability, suitability or fitness for a particular purpose of any of the Assets, including under the International Convention on Contracts for the Sale of Goods (Geneva Convention) and any other applicable sale of goods Laws), the Assumed Liabilities, or the accuracy or completeness of any information regarding any of the foregoing that the Sellers or any other Person furnished or made available to the Purchaser and its representatives (including any projections, estimates, budgets, offering memoranda, management presentations or due diligence materials); and

(iii)     the enforceability of this Agreement against the Sellers is subject to receipt of the Bankruptcy Consents.

Section 3.6.    Brokers.Except for fees and commissions that will be paid by the Purchaser, no broker, finder or investment banker is entitled to any brokerage, finder's or similar fee or commission in connection with the transactions contemplated by this Agreement and the other Transaction Documents based upon arrangements made by or on behalf of the Purchaser or any of its Affiliates.

## ARTICLE IV

## REPRESENTATIONS AND WARRANTIES OF THE SELLERS

Except (a) as set forth in the Sellers Disclosure Schedule, (b) as expressly contemplated by this Agreement or (c) to the extent relating to the Excluded Assets or the Excluded Liabilities, each of the Main Sellers jointly and severally represents and warrants to the Purchaser as set forth in this ARTICLE IV:

Section 4.1.    Organization and Corporate Power.

(a)       Each Seller is duly organized and validly existing and in good standing under the Laws of the jurisdiction in which it is organized.  Subject to entry of the U.S. Sale Order in the case of the U.S. Debtors and the Canadian Approval and Vesting Order in the case of the Canadian Debtors and receipt of other Consents from the U.S. Bankruptcy Court and the Canadian Court in connection with the transactions contemplated hereby and in the other Transaction Documents (collectively, the **"Bankruptcy Consents"**), each of the Sellers has the requisite corporate power and authority to (i) enter into, deliver and perform its obligations

pursuant to each of the Transaction Documents to which it is or will become a party and (ii) own, lease and operate its assets, including the Assets, as applicable, and to carry on the Business as it is now being conducted.

(b)    Each of the Sellers is duly qualified or licensed to do business and to own, lease and operate its assets, including the Assets, and to carry on the Business as it is currently being conducted, as applicable in each jurisdiction in which its ownership of property or conduct of business relating to the Business requires it to so qualify or to be so licensed and is in good standing in each jurisdiction in which its ownership of property or conduct of business relating to the Business requires it to so qualify or be licensed, except to the extent that the failure to be so qualified, licensed or in good standing would not have, or would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

Section 4.2.    Authorization; Binding Effect; No Breach.

(a)    Subject to the receipt of the Bankruptcy Consents (i) the execution, delivery and performance by each Main Seller of the Transaction Documents to which such Main Seller is, or at the Closing will be, a party have been duly authorized by such Main Seller and (ii) the execution, delivery and performance by each Other Seller of the Transaction Documents to which such Other Seller will be a party will have been duly authorized by such Other Seller by the time such Other Seller executes this Agreement. Subject to receipt of the Bankruptcy Consents, and assuming due authorization, execution and delivery by the Purchaser and the Designated Purchasers parties thereto, the Transaction Documents to which any Seller is or will be a party, will constitute, a legal, valid and binding obligation of such Seller, enforceable against it in accordance with its terms, subject to (in the case of Non-Debtor Sellers) applicable bankruptcy, insolvency, reorganization, moratorium or other Laws affecting creditors' rights generally and subject to general principles of equity, regardless of whether considered in a proceeding in equity or at Law.

(b)    Subject to receipt of the Bankruptcy Consents and the Regulatory Approvals, the execution, delivery and performance by each Seller of the Transaction Documents to which such Seller is, or on the Closing Date will be, a party do not and will not conflict with or result in a breach of the terms, conditions or provisions of, constitute a default under, result in a violation of, result in the creation or imposition of any Lien upon any of the Assets, or (subject to the receipt of Consents in connection with the Assigned Contracts and any other Consents expressly provided for herein) require any Consent (other than the Regulatory Approvals and the Bankruptcy Consents) or other action by or declaration or notice to any Government Entity pursuant to (i) the articles, charter or by-laws of the relevant Sellers, (ii) any Material Contract to which the relevant Seller is a party or to which any of its or their assets are subject, (iii) any order of any Government Entity applicable to any Seller or by which any of their respective properties or Assets are bound or (iv) any Laws to which any of the Sellers, or any of the Assets are subject, except, in the case of (ii), (iii) and (iv) above, for such defaults, violations, actions and notifications that would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

Section 4.3.    <u>Title to Tangible Assets</u>.

Except for Permitted Encumbrances, the Owned Inventory and the Owned Equipment is owned beneficially by one or more of the Sellers, free and clear of all Liens, and such Sellers have good and marketable title thereto.

Section 4.4.    <u>Material Contracts</u>.

(a)    Section 4.4(a) of the Sellers Disclosure Schedule sets forth, as of the date hereof, a list of every Seller Contract but excluding all licenses of Intellectual Property, all of which are addressed in Section 4.5 below, other than purchase orders and invoices and any third-party or intercompany agreements related to Overhead and Shared Services, that:

(i)    in the most recent fiscal year of the Main Sellers resulted in, or is reasonably expected by its terms in the future to result in, (A) the payment of more than US$7,500,000 per annum in the aggregate or (B) the receipt by the Business of more than US$7,500,000 per annum in the aggregate, except any Contracts referred to in any other subsection;

(ii)    materially restricts the Business from engaging in any business activity anywhere in the world;

(iii)    is a material joint venture, partnership or alliance Contract;

(iv)    is a research and development Contract involving consideration or expenditures in excess of US$7,500,000 per annum;

(v)    is a manufacturing or supply Contract involving the purchase of Products for the Business;

(vi)    contains (i) any non-competition, non-solicitation or similar agreements or arrangements or (ii) any "earn-out" or similar agreements or arrangements; or

(vii)    is a Contract with a Government Entity

(all the above, collectively, the **"Material Contracts"**).

(b)    The Sellers have made available to the Purchaser true, correct and complete copies of all of the Seller Contracts. Each Seller Contract is legal, valid, binding and enforceable against the Seller party thereto and, to the Knowledge of Seller, each other party thereto and is in full force and effect (in each case, subject to the Bankruptcy Proceedings and subject to applicable bankruptcy, insolvency, reorganization, moratorium or other Laws affecting creditors' rights generally and subject to general principles of equity, regardless of whether considered in a proceeding in equity or at Law).

(c)    As of the date hereof, except as disclosed in Section 4.4(c) of the Sellers Disclosure Schedule, the Sellers (or any Affiliate of the Sellers) have not been notified in writing

52

that any of them is in breach or default under any Material Contract (other than as a result of the Bankruptcy Proceedings), and, to the Knowledge of Seller, no other party to any Material Contract is in breach or default thereof, nor have the Sellers or any of their respective Affiliates been notified in writing of such other party's intention to terminate any Material Contract.

(d)    Since December 31, 2008, the Sellers (or any Affiliate of the Sellers) have not received written notification that any of the customers or suppliers party to the Material Contracts intends to materially reduce the level of Products it purchases from the Business subsequent to Closing or materially reduce the level of supplies it provides to the Business subsequent to Closing, as applicable.

Section 4.5.    Intellectual Property.

(a)    The Transferred Intellectual Property and the Licensed Intellectual Property and the Intellectual Property licensed to the Sellers and/or their Affiliates under the Inbound License Agreements and the Patent Cross Licenses include all the material Intellectual Property that, as of the date hereof, is used in connection with the conduct and operation of the Business, except with respect to any Intellectual Property included in Overhead and Shared Services.

(b)    A list of all the Transferred Intellectual Property registered in the name of the Sellers is set forth in Section 4.5(b) of the Sellers Disclosure Schedule (such listed Intellectual Property, the "**Business Registered IP**"). To the Knowledge of the Sellers, the Business Registered IP is subsisting and in full force and effect. The foregoing will not be construed as a warranty that any Patent or Trademark will issue or be registered based on any application.

(c)    The Transferred Intellectual Property is not subject to any Liens other than Permitted Encumbrances. The Sellers own all material rights, title and interest in and to each such item of Transferred Intellectual Property.

(d)    Except as set forth in Section 4.5(d) of the Sellers Disclosure Schedule, to the Knowledge of the Sellers, no Seller has received any written assertions during the two (2) years prior to the date hereof alleging that: (i) a Seller's operations of the Business, including such Seller's use, performance, licensing, copying, distribution, sale, offer for sale, lease, manufacture, having made, importation, or any other exploitation of the Products sold by the Business or of the Services rendered by the Business infringes, misappropriates or violates any Intellectual Property right of any Third Party; or (ii) the use or exploitation of any of the Transferred Intellectual Property infringes or violates any Intellectual Property of or was misappropriated from a Third Party.

(e)    To the Knowledge of the Sellers, as of the date hereof, there has been no assertion or claim made in writing to Sellers during the two (2) years prior to the date hereof asserting invalidity, misuse or unenforceability of any Transferred Intellectual Property or challenging the Sellers' right to use, right to transfer, or ownership of the Transferred Intellectual Property.

(f)    Section 4.5(f)(i) of the Sellers Disclosure Schedule sets forth a list of Patent Cross Licenses, indicating for each Patent Cross License, the title and the parties thereto, except to the extent a Patent Cross License prohibits disclosure of its existence without consent of the relevant Third Party, which consent the Sellers were unable to reasonably obtain, in which case such Patent Cross License has been omitted from Section 4.5(f)(i) of the Sellers Disclosure Schedule. Section 4.5(f)(ii) of the Sellers Disclosure Schedule sets forth a list of all material Contracts granting to the Sellers or any of their Affiliates any license under or to any Intellectual Property owned by a Third Party (other than Patent Cross Licenses) that is, as of the date hereof, incorporated in or used in connection with the design, development, testing, manufacturing, sale, distribution, support or servicing of any Products or the provision of Services (collectively, the "**Inbound License Agreements**"), indicating for each Inbound License Agreement, the title and the parties thereto, except to the extent an Inbound License Agreement prohibits disclosure of its existence without consent of the relevant Third Party, which consent the Sellers were unable to reasonably obtain, in which case such agreement has been omitted from Section 4.5(f)(ii) of the Sellers Disclosure Schedule, but the number of such Inbound License Agreements that have been omitted is set out in Section 4.5(f)(ii) of the Sellers Disclosure Schedule and the Sellers shall use reasonable efforts to provide such other information as reasonably requested by the Purchaser regarding such Inbound License Agreements, the disclosure of which does not breach such prohibition. Section 4.5(f)(iii) of the Sellers Disclosure Schedule sets forth a list of all material Contracts (other than Patent Cross Licenses) under which the Sellers grant a license to a Third Party under Transferred Patents where the predominant purpose of the Contract is the grant of a Patent license (collectively, the "**Outbound License Agreements**"), indicating for each Outbound License Agreement the title and the parties thereto, except to the extent an Outbound License Agreement prohibits disclosure of its existence without consent of the relevant Third Party, which consent the Sellers were unable to reasonably obtain, in which case such agreement has been omitted from Section 4.5(f)(iii) of the Sellers Disclosure Schedule, but the number of such Outbound License Agreements that have been omitted is set out in Section 4.5(f)(iii) of the Sellers Disclosure Schedule and the Sellers shall use reasonable efforts to provide such other information as reasonably requested by the Purchaser regarding such Outbound License Agreements, the disclosure of which does not breach such prohibition.

(g)    To the Knowledge of the Sellers, Section 4.5(g) of the Sellers Disclosure Schedule sets forth a list of any Open Source Software incorporated into any of the Products and, whenever possible, describes (i) the specific Open Source Software used; (ii) the specific Open Source Software version; (iii) the vendor of the specific Open Source Software; and (iv) the Products or portions thereof into which such Open Source Software is incorporated.

(h)    Notwithstanding any provision herein to the contrary, this Section 4.5 consists of the sole representation and warranty in this Agreement regarding non-infringement, non-violation and non-misappropriation of Intellectual Property.

Section 4.6.    Litigation.As of the date hereof, except for the Bankruptcy Proceedings, there is no Action pending or, to the Knowledge of the Sellers, threatened before any Government Entity against, involving or affecting the Business or the Assets, that would be reasonably expected to result in, individually or in the aggregate, a Material Adverse Effect. As of the date hereof, except for Orders and settlements entered in connection with the Bankruptcy Proceedings, there is no Order or settlement to which Sellers are subject that directly and

materially affects or restricts the ownership of the Assets, Assumed Liabilities or the Business, and no Action is pending or, to the Knowledge of Sellers, threatened against the Sellers that questions the validity of this Agreement or the Transaction Documents or any action taken or to be taken by the Sellers in connection with this Agreement or the Transaction Documents.

Section 4.7.   Financial Statements.Section 4.7 of the Sellers Disclosure Schedule sets forth the unaudited management statements of certain assets and liabilities of the Business and the other GSM and GSM-R infrastructure businesses conducted by the Sellers and the EMEA Sellers as of September 30, 2009 (the "**Balance Sheet Date**") and the related unaudited management statements of income of the Business and the other GSM and GSM-R infrastructure businesses conducted by the Sellers and the EMEA Sellers for the one- (1-) year period ended on the Balance Sheet Date (together, the "**Financial Statements**"). Except as set forth in the Financial Statements, such Financial Statements were prepared based on the financial books and records maintained by the Sellers and their Affiliates for the Business and the other GSM and GSM-R infrastructure businesses conducted by the Sellers and the EMEA Sellers on the basis of the Nortel Accounting Principles and represent Sellers' good faith estimate of the selected balance sheet accounts and income statements set forth therein for the Business and the other GSM and GSM-R infrastructure businesses conducted by the Sellers and the EMEA Sellers, in each case as of the dates and for the periods presented therein. The Financial Statements (a) have not been prepared in accordance with GAAP, (b) include estimated costs that do not necessarily represent the costs that were actually allocated to the Business for the relevant periods (or that the Business will incur after the Closing), (c) include assets that have not been tested for impairment or otherwise adjusted for fair value, (d) reflect the estimated historical operation of the Business and the other GSM and GSM-R infrastructure businesses conducted by the Sellers and the EMEA Sellers (including the Overhead and Shared Services and the Excluded Assets) for the periods specified therein and (e) do not represent the balance sheet accounts or the income statements that would have occurred if the Business had been operated by the Sellers as a "stand alone" entity.

Section 4.8.   Compliance with Laws; Consents.

(a)      To the Knowledge of the Sellers, no Seller is in violation of any applicable Law in connection with the Business, in each case except for such violations as would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect. None of the Sellers has received any written notice or written claims from any Government Entity within the twelve (12) months preceding the date hereof relating to any material non-compliance of the Business or the Assets with any applicable Law nor are there, any such notice or claims threatened or pending, except where such claims would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

(b)      To the Knowledge of the Sellers, (i) all the Consents of Government Entities necessary for, or otherwise material to, the conduct of the Business as conducted by the Seller on the date hereof, have been duly obtained and are in full force and effect and (ii) the relevant Sellers are in compliance with the terms of each of such Consents, in each case except for such violations as would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect. None of the Sellers has received any written notice or written claims from any Government Entity relating to any material non-compliance of the Business or the

Assets with such Consents nor are there, any such notice or claims threatened or pending, except where such claims would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

Section 4.9.    Environmental Matters.

(a)    To the Knowledge of the Sellers, the Business is in compliance with Environmental Laws and has obtained and is in compliance with all Environmental Permits, except where failure to comply with Environmental Laws, or to obtain or comply with Environmental Permits, would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

(b)    There are no Actions or Orders relating to the Business pending, or to the Knowledge of the Sellers threatened and the Sellers have not received any written notice, claim, subpoena or summons from any Person alleging: (i) any Liability under any Environmental Law relating to the Business or any property currently or formerly owned or operated in conjunction with the Business, or (ii) any violation by the Business of any Environmental Law, in each case except where such matters would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

(c)    No Hazardous Materials are present or have been Released at, on, or under, or migrated from, to or through, any real property currently or formerly owned or operated in conjunction with the Business that could reasonably be anticipated to result in liabilities or obligations pursuant to Environmental Laws, in each case except where such matters would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

(d)    Notwithstanding anything in this ARTICLE IV to the contrary, none of the representations and warranties in this ARTICLE IV other than this Section 4.9 shall relate to environmental matters.

Section 4.10.    Labor and Employee Benefits Matters.

(a)    Section 4.10(a) of the Sellers Disclosure Schedule contains a list of all material Seller Employee Plans. The Sellers have provided the Purchaser with a true and complete copy of the plan document or summary plan description of each material Seller Employee Plan or, if such plan document or summary plan description does not exist, an accurate written summary of such material Seller Employee Plan.

(b)    The information contained in Section 4.10(b) of the Sellers Disclosure Schedule in respect of the Employees (the **"Employee Information"**) is accurate in all material respects as of the date hereof, and sets forth with respect to each Employee (except where that is not permissible under applicable data privacy Laws): (i) unique identifier, (ii) service date, (iii) position, (iv) annual base salary and annual target incentive, (v) work location, (vi) visa type, if any, (vii) vacation accrual rate, (viii) status as full-time or part-time, (ix) telecommuter arrangement, if any, and (x) status as an Inactive Employee and expected date of return to work, if known.

56

(c)     There has not been for a period of twelve (12) consecutive months prior to the date hereof, nor is there existent or, to the Sellers' Knowledge, has been threatened in writing, any strike, slowdown, lockout, picketing or work stoppage against the Sellers by or on behalf of the Employees.

(d)     There are no Collective Labor Agreements in effect with respect to the Employees. For a period of twelve (12) consecutive months prior to the date hereof, no petition has been filed or proceedings instituted by a union, works council, collective bargaining agent, employee or group of employees with any Government Entity seeking recognition of a collective bargaining agent with respect to any Employees, no voluntary recognition has been given by the Sellers or any Affiliate, and, to the Sellers' Knowledge, no such organizational effort is currently being made or has been threatened in writing by or on behalf of any union, employee, group of employees or collective bargaining agent to organize any Employees.

(e)     Except as set forth in Section 4.10(e) of the Sellers Disclosure Schedule, with respect to the Employees, the Sellers and their Affiliates are in material compliance with all applicable Laws respecting employment and employment practices, including, without limitation, all Laws respecting terms and conditions of employment, health and safety, wages and hours, child labor, immigration, employment discrimination, disability rights or benefits, equal opportunity, plant closures and layoffs, affirmative action, workers' compensation, labor relations, employee leave issues and unemployment insurance.

(f)     To the Knowledge of the Sellers, the Sellers have not received written notice that any Employee is in any respect in violation of any term of any nondisclosure agreement, common law nondisclosure obligation, fiduciary duty, noncompetition agreement, or restrictive covenant of any such employee, or any similar employment arrangement relating (i) to the right of any such Employee to be employed by the Sellers or (ii) to the knowledge or use of trade secrets or proprietary information with respect to any such Employee's employment with the Sellers, in each case except for such violation as would not have, individually or in the aggregate, a Material Adverse Effect.

(g)     To the Knowledge of the Sellers, no Employee at the level of Job Complexity Indicator 55 has given written Notice of his or her intention to terminate his or her employment.

(h)     To the Knowledge of the Sellers, no event or circumstance exists that has affected or is likely to adversely affect the qualified status of any Seller Employee Plan intended to qualify under Section 401(a), 401(k) or 403(a) of the Code.

(i)     No liability under Title IV or section 302 of ERISA has been incurred by the Sellers or any trade or business, whether or not incorporated, that together with the Seller would be deemed a "single employer" within the meaning of Section 4001(b) of ERISA (including any entity that during the past six years was a Subsidiary of the Seller) (an "ERISA Affiliate") that has not been satisfied in full, and no condition exists that presents a material risk to the Sellers or any ERISA Affiliate of incurring any such liability, other than liability for premiums due the Pension Benefit Guaranty Corporation (which premiums have been paid when due). No "employee benefit plan" of the Sellers or any ERISA Affiliate that is subject to section

57

302 or Title IV of ERISA or section 412 of the Code (a "Title IV Plan") or any trust established thereunder has incurred any "accumulated funding deficiency" (as defined in section 302 of ERISA and section 412 of the Code), whether or not waived, as of the last day of the most recent fiscal year of each Title IV Plan ended prior to the Closing Date. Except as set forth in Section 4.10(i) of the Sellers Disclosure Schedule, all contributions required to be made with respect to any Title IV Plan on or prior to the Closing Date have been timely made. None of the Sellers nor any ERISA Affiliate has now or at any time contributed to, sponsored, or maintained a Multiemployer Plan (as defined in Section 3(37) of ERISA) that is subject to ERISA or a multi employer pension plan (as defined in applicable Federal and Provincial legislation in Canada) that is subject to such legislation.

(j)     The consummation of the transactions contemplated by this Agreement will not, either alone or in combination with another event, (i) entitle any Employee to severance pay or any other payment, except to the extent such severance pay is required under applicable Law or any Seller Employee Plan or (ii) accelerate the time of payment or vesting, or increase the amount of compensation due any such Employee.

(k)     There are no Transferred Employee Plans.

Section 4.11.    Brokers.Except for fees and commissions that will be paid or otherwise settled or provided for by the Sellers, no broker, finder or investment banker is entitled to any brokerage, finder's or other similar fee or commission in connection with the transactions contemplated by this Agreement and the other Transaction Documents based upon arrangements made by or on behalf of the Sellers or any of their Affiliates.

Section 4.12.    Tax. To the extent not covered by any of the other representations and warranties in this ARTICLE IV, no Liens for Taxes (other than Permitted Encumbrances) exist with respect to any of the Assets.

(b)     No Seller that is not a "United States person" as such term is defined in Section 7701(a)(30) of the Code, is transferring pursuant to this Agreement or any of the Transaction Documents any "United States real property interest," as such term is defined in Section 897(c)(1) of the Code and Treasury Regulations section 1.897-1(c).

Section 4.13.    Investment Canada Act.The aggregate value of the Assets in Canada, determined in accordance with, and for the purpose of, the *Investment Canada Act*, is less than Cdn.$312 million and the Business is not a cultural business within the meaning of the *Investment Canada Act*.

Section 4.14.    Real Property.

(a)     Section 4.14(a) of the Sellers Disclosure Schedule sets forth the address of each parcel of Leased Real Property, and a list of all Real Estate Leases, Licensed Real Estate Leases and Non-365 Licensed Real Estate Leases that will be leased, subleased or licensed for each such parcel of Leased Real Property, each of which Lease is legal, valid, binding, enforceable in accordance with its terms and in full force and effect. The Sellers have made available to Purchaser a true and complete copy of each such Real Estate Lease, Licensed Real Estate Lease and Non-365 Licensed Real Estate Lease. Each of the Real Estate Leases is a valid

and existing leasehold interest of the applicable Seller free of Liens created by Sellers (other than Permitted Encumbrances or as otherwise provided in the Real Estate Agreements Term Sheet) and is a binding obligation of the applicable Seller. To the Knowledge of the Sellers, no party is in material default under any Real Estate Lease, and no event has occurred and is continuing that constitutes or, with notice or the passage of time, or both, would constitute a material default under any such Real Estate Lease, Licensed Real Estate Lease or Non-365 Licensed Real Estate Lease. A schedule will be provided to Purchaser promptly after signing, but in no event later than fifteen (15) days after the date hereof, including with respect to the Real Estate Leases, other than the Licensed Real Estate Leases and the Non-365 Licensed Real Estate Leases, the date and name of the parties to such Lease or sublease document, the rent payable under such Lease and the date through which any such rent has been paid.

(b)     Section 4.14(b) of the Sellers Disclosure Schedule sets forth a list of (i) each Real Estate Lease (other than Licensed Real Estate Leases and Non-365 Licensed Real Estate Leases) for which the Sellers have made a security deposit and (ii) the amount of each such security deposit. To the Knowledge of the Sellers, no such security deposit or portion thereof deposited with respect to any Real Estate Lease (other than Licensed Real Estate Leases and Non-365 Licensed Real Estate Leases) has been applied in respect of a breach of, or default under, such Lease that has not been redeposited in full, and to the Knowledge of the Sellers, there has been no material breach or material default, and there exists no condition or circumstance, that would provide a basis for the application of any such security deposit or portion thereof.

(c)     Except as set forth in Section 4.14(c) of the Sellers Disclosure Schedule, with respect to each parcel of Leased Real Property: (i) the transactions contemplated by this Agreement do not require the consent of any other party to such Real Estate Lease (except for those landlord consents to be obtained by the Sellers pursuant to Section 2.1.7(e) of this Agreement and the Real Estate Agreements Term Sheet), will not result in a material breach of or material default under such Real Estate Lease, or otherwise cause such Real Estate Lease to cease to be legal, valid, binding, enforceable in accordance with its terms and in full force and effect on identical terms following the Closing; (ii) there are no material disputes with respect to such Leased Real Property; (iii) the Sellers do not owe, nor will they owe in the future, any brokerage commissions or finder's fees with respect to the transactions contemplated by this Agreement with respect to such Leased Real Property; (iv) the other party to such Real Estate Lease is not an affiliate of, and otherwise does not have any economic interest in, any of the Sellers; (v) except as otherwise provided by the Real Estate Agreements Term Sheet, the Sellers have not subleased, licensed or otherwise granted any Person the right to use or occupy such portion of the Leased Real Property that is used for the Business; and (vi) the Sellers have not collaterally assigned or granted any other security interest in such Leased Real Property or any interest therein. Sellers shall provide information regarding any landlord consent required for the Licenses upon finalization of the license schedules as set forth in the Real Estate Agreements Term Sheet.

(d)     With respect to each parcel of Direct Lease Real Estate, except as set forth in Section 4.14(d) of the Sellers Disclosure Schedule (i) the Sellers have good and marketable fee title to all Direct Lease Real Estate, free and clear of all Liens of any nature except for Liens set forth in Section 4.14(d) of the Sellers Disclosure Schedule and Seller Encumbrances; (ii) the

Sellers have not leased or otherwise granted to any person the right to use or occupy such portion of the Direct Lease Real Estate used for the Business and (iii) there are no outstanding options, rights of first offer, rights of reverter or rights of first refusal to purchase such Direct Lease Real Estate or any portion thereof or interest therein.

(e)    All requisite certificates of occupancy and other permits or approvals required with respect to the buildings, structures and improvements on any of the Direct Lease Real Estate and the occupancy and use thereof have been obtained and are currently in effect.

(f)    Each parcel of Direct Lease Real Estate has direct vehicular and pedestrian access to a public street adjoining such parcel or has vehicular and pedestrian access to a public street via an insurable, permanent, irrevocable and appurtenant easement benefiting such parcel, and such access is not dependent on any land or other real property interest which is not included in that parcel of Direct Lease Real Estate.

(g)    To the Knowledge of the Sellers, no Seller, as applicable, has received written notice from any Government Entity of any condemnation, expropriation or other proceeding in eminent domain, pending or threatened, affecting any parcel of Leased Real Property or Direct Lease Real Estate used for the Business or interest therein that, to the extent it relates to such Leased Real Property or Direct Lease Real Estate, could reasonably be expected to have a Material Adverse Effect on the use and operation of the Business at such Leased Real Property or Direct Lease Real Estate. The use and operation of the Leased Real Property and Direct Lease Real Estate in the conduct of business of the Sellers does not violate any instrument of record, agreement, occupancy restriction or Law affecting or applicable to the Leased Real Property or Direct Lease Real Estate, and the Sellers have not received any notice of violation thereof, except for violations that, individually or in the aggregate, would not reasonably be expected to have a Material Adverse Effect. The Sellers have no Knowledge of any proposed change to any such instrument of record, agreement, occupancy restriction or Law affecting or applicable to the Leased Real Property or Direct Lease Real Estate that would so affect any of the Leased Real Property or Direct Lease Real Estate or its use.

(h)    Neither the Main Sellers nor any of the Main Sellers' Affiliates has received any written notice of any currently pending or, to the Knowledge of the Sellers, threatened litigation, condemnation or expropriation proceedings.

Section 4.15.    Trade Matters.

(a)    The Business is in compliance with Trade Laws and has obtained and is in compliance with all Trade Permits, except where failure to comply with Trade Laws, or to obtain or comply with Trade Permits, would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

(b)    There are no Actions or Orders relating to the Business pending, or to the Knowledge of the Sellers threatened and the Sellers have not received any written notice, claim, subpoena or summons from any Person alleging: (i) any Liability under any Trade Law or Trade Permit relating to the Business or any property currently or formerly owned or operated in conjunction with the Business, or (ii) any violation by the Business of any Trade Law or Trade

Permit, in each case except where such matters would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

Section 4.16.  Competition Act.

For the purposes of the threshold set out at subsection 110(2) of the *Competition Act*, the aggregate value of the Assets in Canada does not exceed Cdn.$70 million, nor does the aggregate gross revenues from sales in or from Canada generated from those assets exceed Cdn.$70 million, all as determined in accordance with Part IX of the *Competition Act*.

Section 4.17.  Representations and Warranties by the Other Sellers. Except (a) as set forth in the Sellers Disclosure Schedule, (b) as expressly contemplated by this Agreement or (c) to the extent relating to the Excluded Assets or the Excluded Liabilities, each Other Seller will, as of the Closing Date, severally but not jointly represent and warrant to the Purchaser as follows:

4.17.1.  Organization and Corporate Power.

(a)    Such Other Seller is duly organized and validly existing and in good standing under the Laws of the jurisdiction in which it is organized. Subject to the receipt of the Bankruptcy Consents, such Other Seller has the requisite corporate power and authority to enter into, deliver and perform its obligations pursuant to each of the Transaction Documents to which it is a party.

(b)    Such Other Seller is duly qualified or licensed to do business and to own, lease and operate its assets, including the Assets, and to carry on the Business as it is currently conducted, as applicable in each jurisdiction in which its ownership of property or conduct of business relating to the Business requires it to so qualify or to be so licensed and is in good standing in each jurisdiction in which its ownership of property or conduct of business relating to the Business requires it to so qualify or to be so licensed, except to the extent that the failure to be so qualified, licensed or in good standing would not have, or would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

4.17.2.  Authorization; Binding Effect; No Breach.

(a)    Subject to the receipt of the Bankruptcy Consents, the execution, delivery and performance by such Other Seller of each Transaction Document to which such Other Seller is a party has been duly authorized by such Other Seller. This Agreement has been duly executed and delivered by such Other Seller, and the other Transaction Documents to which such Other Seller is a party have been duly executed and delivered by such Other Seller party thereto. Subject to the receipt of the Bankruptcy Consents, and assuming due authorization, execution and delivery by the Purchaser, each Transaction Document to which such Other Seller is a party constitute, a legal, valid and binding obligation of such Other Seller, enforceable against it in accordance with its terms, subject to (in the case of Non-Debtor Sellers) applicable bankruptcy, insolvency, reorganization, moratorium or other Laws affecting creditors' rights generally and subject to general principles of equity, regardless of whether considered in a proceeding in equity or at Law.

61

(b)     The execution, delivery and performance by such Other Seller of the Transaction Documents to which such Other Seller is a party do not conflict with or result in a breach of the terms, conditions or provisions of, constitute a default (or an event that, with notice or lapse of time or both, would become a default) under, result in a violation of, give to any Person any right of termination, amendment, modification, acceleration or cancellation or any preemptive right or right to the payment of any penalty under, result in the creation or imposition of any Lien upon any of the Assets owned by such Other Seller, or (subject to the receipt of Consents in connection with the Assigned Contracts and other Consents expressly provided for herein) require any Consent (other than the Regulatory Approvals and the Bankruptcy Consents) or other action by or declaration or notice to any Government Entity pursuant to (i) the articles, charter or by-laws of such Other Seller, (ii) any Material Contract to which such Other Seller is a party or to which any of the Assets or the Business is subject or (iii) any Laws to which such Other Seller, or any of the Assets owned by such Other Seller, is subject, except, in the case of (ii) and (iii), for such defaults, violations, actions and notifications that would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

## ARTICLE V

## COVENANTS AND OTHER AGREEMENTS

Section 5.1.    U.S. Bankruptcy Actions.    Within two (2) Business Days of the date hereof, the Sellers who are U.S. Debtors shall (x) file with the U.S. Bankruptcy Court one or more motions and proposed orders to seek approval of the (i) transactions contemplated by the Transaction Documents (to the extent necessary), and (ii) procedures for the assignment and assumption of the Assumed and Assigned Contracts, (y) file with the U.S. Bankruptcy Court a notice that the Purchaser has been designated by the Sellers as the Successful Bidder, and (z) notify, as required by the U.S. Bankruptcy Code, the U.S. Bankruptcy Rules and any order of the U.S. Bankruptcy Court, all parties entitled to notice of such motions and orders, as modified by orders in respect of notice which may be issued at any time and from time to time by the U.S. Bankruptcy Court, and such additional parties as the Purchaser may reasonably request. In addition, subject to the provisions of this Agreement, the U.S. Debtors shall use their reasonable best efforts to obtain U.S. Bankruptcy Court approval of such motions and orders, including, without limitation, the U.S. Sale Order, which shall be substantially in the form of Exhibit 5.1 (with such changes thereto as the Purchaser and the Sellers both approve in their reasonable discretion).

Section 5.2.    Canadian Bankruptcy Actions.

(a)     As promptly as practicable, but in no event later than the second (2nd) Business Day after the date hereof, the Canadian Debtors shall file with the Canadian Court one or more motions (the **"Canadian Approval and Vesting Order Motion"**) seeking to obtain entry of an order substantially in the form set forth in Exhibit 5.2 with such changes thereto as the Purchaser and the Sellers both shall approve in their respective reasonable discretion (such order as approved, the **"Canadian Approval and Vesting Order"**) of the Canadian Court approving this Agreement and the transactions contemplated herein and shall use their reasonable best efforts to obtain Canadian Court approval of the Canadian Approval and Vesting Order.

(b)     In connection with the foregoing, the Canadian Debtors shall seek in good faith in the Canadian Approval and Vesting Order Motion to (i) have the Canadian Approval and Vesting Order include a finding that, to the extent permitted by Law, neither the Purchaser nor any relevant Designated Purchaser is a successor to the Sellers or their bankruptcy estate by reason of any theory of Law or equity, and neither the Purchaser nor any Designated Purchaser shall assume or in any way be responsible for any Liability of any of the Sellers and/or their bankruptcy estates, except as otherwise expressly provided in this Agreement or the Transaction Documents; and (ii) have the endorsement of the Canadian Approval and Vesting Order or the order itself, include a finding that the consideration provided by the Purchaser and any Designated Purchaser pursuant to this Agreement constitutes reasonably equivalent value and fair consideration for the Assets. For greater certainty, nothing herein shall require the items in the preceding sentence to be included in the Canadian Approval and Vesting Order or any endorsement thereof, notwithstanding that such provisions may be included in the form set forth of the order set forth in Exhibit 5.2.

Section 5.3.    Consultation; Notification.

(a)     The Purchaser and the U.S. Debtors shall cooperate with filing and obtaining entry of the U.S. Sale Order, and the U.S. Debtors shall deliver to the Purchaser prior to filing, and as early in advance as is practicable to permit adequate and reasonable time for the Purchaser and its counsel to review and comment, copies of all proposed pleadings, motions, objections, responses to objections, notices, statements schedules, applications, reports and other material papers to be filed by the U.S. Debtors in connection with such motions and relief requested therein and any challenges thereto.

(b)     The Purchaser and the Canadian Debtors shall cooperate with filing and prosecuting the Canadian Approval and Vesting Order Motion and in obtaining entry of the Canadian Approval and Vesting Order, and the Canadian Debtors shall deliver to the Purchaser prior to filing, and as early in advance as is practicable to permit adequate and reasonable time for the Purchaser and its counsel to review and comment, copies of all proposed pleadings, motions, notices, statements, schedules, applications, reports (other than the draft Monitor's report) and other material papers to be filed by the Canadian Debtors in connection with such motions and relief requested therein and any challenges thereto.

(c)     If the U.S. Sale Order or any other order of the U.S. Bankruptcy Court relating to this Agreement shall be appealed by any Person (or a petition for certiorari or motion for rehearing, re-argument or stay shall be filed with respect thereto), the U.S. Debtors agree to take all reasonable steps, and use their reasonable best efforts, including incurring reasonable expenses, to defend against such appeal, petition or motion, and the Purchaser agrees to cooperate in such efforts. Each of the Parties hereby agrees to take all reasonably steps, and use its reasonable efforts, to obtain an expedited resolution of such appeal; provided, however, that, subject to the conditions set forth herein and assuming the Parties are not precluded pursuant to Section 5.3(d) from consummating the transactions contemplated by this Agreement, nothing contained in this Section shall preclude the Parties from consummating the transactions contemplated hereby if the U.S. Sale Order shall have been entered and shall not have been stayed, modified, revised or amended, in which event the Purchaser and the relevant Designated

Purchasers shall be able to assert the benefits of Section 363(m) of the U.S. Bankruptcy Code and, as a consequence of which, such appeal shall become moot.

(d)     If the Canadian Approval and Vesting Order or any other order of the Canadian Court relating to this Agreement shall be appealed by any Person (or a motion for rehearing, re-argument or stay shall be filed with respect thereto), the Canadian Debtors agree to, and to cause their Affiliates to, take all reasonable steps, and use their reasonable best efforts, including incurring reasonable expenses, to defend against such appeal or motion, and the Purchaser agrees to cooperate in such efforts. Each of the Parties hereby agrees to take all reasonable steps, and use its reasonable best efforts, to obtain an expedited resolution of such appeal; provided, however, that, subject to the conditions set forth herein and assuming the Parties are not precluded pursuant to Section 5.3(c) from consummating the transactions contemplated by this Agreement, nothing in this Section shall preclude the Parties from consummating the transactions contemplated hereby if the Canadian Approval and Vesting Order shall have been entered and shall not have been stayed, modified, revised or amended.

Section 5.4.   Pre-Closing Cooperation.

(a)     In addition to the efforts to obtain any requisite Consent in respect of Contracts, which are covered by Section 2.1.7, prior to the Closing, upon the terms and subject to the conditions of this Agreement, each of the Parties shall use its reasonable efforts to take, or cause to be taken, all actions and to do, or cause to be done, and cooperate with each other in order to do, all things necessary, proper or advisable under applicable Law to consummate the transactions contemplated by this Agreement as soon as practicable and cause the fulfillment at the earliest practicable date of all of the conditions to the other Parties' obligations to consummate the transactions contemplated by this Agreement, including using reasonable efforts in connection with: (i) the preparation and filing of all forms, registrations and notices required to be filed to consummate the Closing and the taking of such actions as are necessary to obtain any requisite Consent; provided, that the Sellers shall not be obligated to make any payment or deliver anything of value to any Government Entity in order to obtain any such Consent (other than filing and application fees to Government Entities all of which shall be paid or reimbursed by the Purchaser), (ii) taking all reasonable actions to defend all lawsuits and other proceedings by or before any Government Entity challenging this Agreement or the consummation of the Closing, (iii) using all reasonable efforts to cause to be lifted or rescinded any injunction, decree, ruling, order or other action of any Government Entity that would prohibit, prevent, restrict or materially delay the consummation of the transactions contemplated by this Agreement, and (iv) assisting the Purchaser in the offer process and facilitating the transactions contemplated hereby.

(b)     Each Primary Party shall promptly notify the other Primary Party of the occurrence, to such Party's Knowledge or knowledge, as applicable, of any event or condition, or the existence, to such Party's Knowledge or knowledge, as applicable, of any fact, that would reasonably be expected to result in any of the conditions set forth in ARTICLE VIII not being satisfied.

(c)     Seller and Purchaser agree to negotiate in good faith to agree on execution versions (on the terms and conditions contained in and otherwise in accordance with the Real

64

Estate Agreements Term Sheet) of (i) such License(s) as are reasonably required, before the Closing; and (ii) such other Real Estate Agreement(s) as are reasonably required, before the Closing Date, or as promptly as possible thereafter.

Section 5.5.    Antitrust and Other Regulatory Approvals.

(a)    In furtherance and not in limitation of the provisions of Section 5.4, each of the Parties, as applicable, agrees to (i) prepare and file as promptly as practicable, and in any event by no later than ten (10) Business Days from the date of this Agreement, an appropriate Notification and Report Form pursuant to the HSR Act; and (ii) prepare and file as promptly as practicable the Mandatory Antitrust Filings (with the exception of the filings required in (i) above) and all other necessary documents, registrations, statements, petitions, filings and applications for other Regulatory Approvals and any other Consent of any other Government Entities either required or that the Primary Parties mutually agree are advisable to satisfy the condition set forth in Section 8.1(a).

(b)    If a Party or any of its Affiliates receives a request for information or documentary material from any Government Entity with respect to this Agreement or any of the transactions contemplated by this Agreement, then such Party shall endeavor in good faith to make, or cause to be made, as soon as reasonably practicable and after consultation with the other Party, an appropriate response in compliance with such request.

(c)    The Parties shall keep each other apprised of the status of matters relating to the completion of the transactions contemplated by this Agreement and work cooperatively in connection with obtaining the Regulatory Approvals of each applicable Government Entity, including:

(i)    cooperating with each other in connection with the Mandatory Antitrust Filings, the Regulatory Approvals, and any other filings required to be made, or considered advisable to make, or information required to be provided by any Party under the applicable Antitrust Laws or any Laws regulating foreign investment of any jurisdiction in connection with the transactions contemplated by this Agreement including the Investment Canada Act (if applicable), and each Antitrust Approval, and liaising with each other in relation to each step of the procedure before the relevant Government Entities and as to the contents of all communications with such Government Entities. In particular, to the extent permitted by Law or Government Entity, no Party will make any notification or other submission in relation to the transactions contemplated hereunder without first providing the other Parties or their outside counsel with a copy of such notification or submission in draft form and giving such other party or counsel a reasonable opportunity to discuss its content before it is filed with the relevant Government Entities, and such first Party shall consider and take account of all reasonable comments timely made by the other Parties in this respect; provided, however, that no Party shall be required to provide the other Party with such portions of notifications or submissions that would jeopardize any attorney-client or other legal privilege (it being understood, however, that the Parties shall cooperate in any reasonable efforts and requests that would enable otherwise required disclosure to the other Parties to occur without so jeopardizing privilege); provided, further, that a Party may provide

65

such portions of notifications or submissions solely to the other Party's outside counsel pursuant to a common interest agreement and non-disclosure agreement, each to be negotiated by the Parties in good faith, if such Party determines, acting reasonably, that the provision to the other Party of such portions of notifications or submissions could reasonably be expected to have a material adverse effect upon it if the transactions contemplated by this Agreement are not consummated;

(ii)    furnishing to the other Primary Parties or their outside counsel all information within its possession that is required for the Mandatory Antitrust Filings, obtaining the Antitrust Approvals, and any application or other filing to be made or information required to be provided by the other Party pursuant to the applicable Antitrust Laws or any Laws regulating foreign investment of any jurisdiction, including the Investment Canada Act (if applicable), in connection with the transactions contemplated by this Agreement; provided, however, that (a) no such information shall be required to be provided by a Party if it determines, acting reasonably, that, such information is material and competitively sensitive or that the provision of such information could reasonably be expected to have a material adverse effect upon it if the transactions contemplated by this Agreement were not completed or that the provision of such information would jeopardize any attorney-client or other legal privilege (it being understood, however, that the parties shall cooperate in any reasonable efforts and requests that would enable otherwise required disclosure to the other parties to occur without so jeopardizing privilege), and (b) in any such case the Purchaser and the Main Sellers shall cooperate with a view to establishing a mutually satisfactory procedure for providing such information directly to the Government Entity requiring or requesting such information, and the relevant Main Seller or the Purchaser or the relevant Designated Purchaser required to provide such information shall provide it directly to such Government Entity requiring or requesting such information;

(iii)    promptly notifying each other of any communications from or with any Government Entity with respect to the transactions contemplated by this Agreement and ensuring to the extent permitted by Law or Government Entity that each of the Primary Parties is entitled to attend any meetings with or other appearances before any Government Entity with respect to the transactions contemplated by this Agreement;

(iv)    consulting and cooperating with one another in connection with all analyses, appearances, presentations, representations, memoranda, briefs, arguments, opinions and proposals made or submitted by or on behalf of any Party hereto in connection with proceedings under or relating to the Mandatory Antitrust Filings, the Antitrust Approvals, the applicable Antitrust Laws or any Laws regulating foreign investment of any jurisdiction (including the Investment Canada Act) in connection with the transactions contemplated by this Agreement; and

(v)    without prejudice to any rights of the Parties hereunder, consulting and cooperating in all respects with the other in defending all lawsuits and other proceedings by or before any Government Entity challenging this Agreement or the consummation of the transactions contemplated by this Agreement.

(d)    In addition, subject to any limitations set forth in Section 5.5(e), the Purchaser shall, and shall cause each of the Designated Purchasers to, use its reasonable efforts to satisfy (or cause the satisfaction of) the conditions precedent to the Purchaser's obligations hereunder as set forth in Section 8.1(a) to the extent the same is within its control and to take, or cause to be taken, all other actions and to do, or cause to be done, all other things necessary, proper or advisable under all applicable Laws to consummate the transactions contemplated by this Agreement, including using its reasonable efforts to make all required filings and obtain all Regulatory Approvals and any other Consent of a Government Entity required to be obtained, in order for the Parties to consummate the transactions contemplated by this Agreement.

(e)    Subject to the proviso below, the obligations of the Purchaser pursuant to Section 5.5(d) shall include an obligation to commit, and cause the Designated Purchasers to use their respective reasonable efforts to commit, to any and all undertakings, divestitures, licenses or hold separate or similar arrangements with respect to their respective assets and/or the Assets and/or to any and all arrangements for the conduct of any business and/or termination of any and all existing relationships and contractual rights and obligations as a condition to obtaining any and all Regulatory Approvals and other Consents from any Government Entity necessary to consummate the transactions contemplated by this Agreement, including without limitation an obligation to take any and all actions necessary in order to ensure the receipt of the necessary Consents, the obtaining of all Regulatory Approvals, or the termination, waiver or expiration of the necessary waiting periods, under the HSR Act, or any other applicable Antitrust Laws or investment or similar Law; provided, however, that nothing in this Agreement shall require or be construed to require Purchaser or the Designated Purchasers to commit to any undertaking, divestiture, license or hold separate or similar arrangement or conduct of business arrangement or to terminate any relationships, rights or obligations or to do any other act, to the extent such commitment, termination or action would be reasonably likely to be materially adverse to the business, financial condition, or prospects of the Business or the Purchaser or the Designated Purchasers. In addition, subject to the terms and conditions herein provided, the Purchaser shall not, and shall cause the Designated Purchasers not to, take or cause to be taken any action which would reasonably be expected to prevent or materially delay the consummation of the transactions contemplated by this Agreement. This Section 5.5(e) shall not apply to the Investment Canada Act or any related Regulatory Approvals.

(f)    Each of the Parties agrees to use reasonable efforts (i) to prepare and file, as promptly as practicable, a joint filing to be made with CFIUS with regard to the transactions contemplated herein for the purpose of securing the CFIUS Approval, and (ii) to timely respond to any inquiries from CFIUS or any other interested Government Entity.

(g)    Upon the Purchaser's request, the Sellers shall cooperate with the Purchaser in connection with any filings or submissions to be made by it under the Investment Canada Act with regard to the transactions contemplated. In furtherance thereof, the Purchaser shall be entitled to submit a notification to the Director of Investments under Part III of the *Investment Canada Act* in respect of the transactions contemplated by this Agreement before or within 30 days following Closing, at the Purchaser's discretion and the Sellers hereby agree to provide the Purchaser on a prompt basis all necessary information and otherwise render assistance to allow the Purchaser to reasonably promptly complete preparation and submission of any such filings or submissions and to respond to any enquiries from any Government Entity

responsible for or administering the Investment Canada Act, including at Purchaser's request attending or participating in meetings or writing in support of Purchaser's acquisition of the Business. The Purchaser shall keep the Sellers apprised of the status of matters related to obtaining the ICA Approval.

(h)     Upon the Purchaser's request, which may occur no later than the Closing Date, the Sellers shall cooperate with the Purchaser in connection with any filing required to be made with the Federal Communications Commission, or any other Government Entity with jurisdiction over authorization of telecommunications equipment, for any approvals or required notifications; provided that, the Purchaser shall take primary responsibility for preparation and submission of any such filing, and the Sellers hereby agree to provide the Purchaser on a reasonably prompt basis all necessary information and otherwise to render reasonable assistance to allow the Purchaser to reasonably promptly complete preparation and submission of the filing and to respond to any inquiries from the Federal Communications Commission or any such Government Entity.

(i)     For the avoidance of doubt, the covenants under this Section 5.5 shall not apply to any action, effort, filing, Consent, proceedings, or other activity or matter relating to the Bankruptcy Courts, the Bankruptcy Proceedings and/or the Bankruptcy Consents.

Section 5.6.     Pre-Closing Access to Information.

(a)     Prior to the Closing, the Main Sellers shall, and shall cause their Subsidiaries to, (i) give the Purchaser and its authorized Representatives, upon reasonable advance notice and during regular business hours, reasonable access to all books, records, personnel, officers, advisors, agents, bankers and other Representatives and other facilities and properties of the Business (including physical access to any Leased Real Property and/or Direct Lease Real Estate), (ii) permit the Purchaser and its Representatives to make such copies and inspections thereof, upon reasonable advance notice and during regular business hours, as the Purchaser may reasonably request and (iii) furnish the Purchaser with such unaudited financial and operating data and other information with respect to the Business as is regularly prepared in the Ordinary Course that the Purchaser may from time to time reasonably request; provided, however, that (A) any such access by the Purchaser shall be conducted at Purchaser's own expense, in accordance with Law (including any applicable Antitrust Law and Bankruptcy Law), at a reasonable time, under the supervision of the Sellers' personnel and in such a manner as to maintain confidentiality and not to interfere with the normal operations of the businesses of the Sellers and their Affiliates, and (B) the Sellers will not be required to provide to the Purchaser access to or copies of any Employee Records unless consented to by such Employee.

(b)     Notwithstanding anything contained in this Agreement or any other agreement between the Purchaser and the Sellers executed on or prior to the date hereof, the Sellers shall not have any obligation to make available to the Purchaser or its Representatives, or provide the Purchaser or its Representatives with, (i) any income Tax Return or any combined or consolidated Tax Return filed by the Sellers or any of their Affiliates or predecessors, or any related material, or (ii) more generally, any information if making such information available would (A) jeopardize any attorney-client or other legal privilege or (B) potentially cause the Sellers to be found in contravention of any applicable Law or contravene any fiduciary duty or

68

agreement (including any confidentiality agreement to which the Sellers or any of their Affiliates are a party), it being understood that the Sellers shall cooperate in any reasonable efforts and requests for waivers that would enable otherwise required disclosure to the Purchaser to occur without so jeopardizing privilege or contravening such Law, duty or agreement.

Section 5.7.    Public Announcements.Subject to (a) the provisions of ARTICLE VII with respect to communications and announcements to the Employees and the employees of the Purchaser and the Designated Purchasers and (b) each Party's disclosure obligations imposed by Law or stock exchange regulation (including any obligations under any Bankruptcy Laws), during the period from the date hereof until the Closing Date, the Purchaser and the Main Sellers shall, and shall cause their respective Affiliates to, (i) cooperate with the other Primary Party in the development and distribution of all news releases, other public information disclosures and announcements, including announcements and notices to customers, suppliers and Employees, with respect to this Agreement, or any of the transactions contemplated by this Agreement and the other Transaction Documents and (ii) not issue any such announcement or statement prior to consultation with, and the approval of, the other Primary Parties (such approval not to be unreasonably withheld or delayed); provided that approval shall not be required where the disclosing Primary Party determines, based on advice of counsel and after consultation with the other Primary Parties, that such disclosure is required by Law or stock exchange regulation.

Section 5.8.    Further Actions.Each of the Parties shall execute and deliver such documents and other papers and take such further actions as may reasonably be required to carry out the provisions of this Agreement and the Ancillary Agreements and give effect to the transactions contemplated herein and therein, including (i) the execution and delivery of such assignments, deeds and other documents as may be necessary to transfer any Assets as provided in this Agreement and (ii) the assumption and assignment of the Assumed and Assigned Contracts and the assignment of the Designated Non-365 Contracts, in each case, that were not previously elected by the Purchaser to have them assumed and assigned to the Purchaser, provided that the Sellers shall have no obligation to assume and assign any such contracts if they have already been rejected by the Sellers at the time of the request from the Purchaser to assume and assign such contract.

Section 5.9.    Conduct of Business.The Sellers covenant that, subject to any limitation imposed as a result of being subject to the Bankruptcy Proceedings and except as (i) the Purchaser may approve otherwise in writing as set forth below (such approval not to be unreasonably withheld or delayed), (ii) set forth in Section 5.9 of the Sellers Disclosure Schedule, (iii) otherwise expressly required by this Agreement or another Transaction Document, (iv) as permitted by the Real Estate Agreements Term Sheet, (v) required by Law (including any applicable Bankruptcy Law) or by any order of a Bankruptcy Court entered as of the date hereof, or (vi) relates solely to Excluded Assets or Excluded Liabilities, the Sellers shall and shall cause their Affiliates to (A) conduct the Business and maintain the level of operations and maintenance expenses at an adequate level, all in the Ordinary Course and (B) abstain from any of the following actions:

(a)    sell, lease or dispose of the Assets, in any single transaction or series of related transactions, other than sale of Inventory in the Ordinary Course, or enter into any

exclusive agreement that would restrict the Business or the Assets after the Closing in any material respect;

        (b)    incur any Lien on any Assets, other than Liens that will be discharged at or prior to Closing and Permitted Encumbrances;

        (c)    (x) grant any license or sublicense of any rights under or with respect to any Transferred Intellectual Property owned by the Sellers as of the date hereof intended to be included in the Assets, unless (i) such license or sublicense is to customers, contractors, distributors or suppliers in the Ordinary Course, or (ii) such license or sublicense would be permitted by the grant back license rights set forth in Section 2.06 of the Intellectual Property License Agreement (after the Intellectual Property License Agreement becomes effective), or (iii) such licenses or sublicenses granted pursuant to source code escrow arrangements listed in Section 5.9(c) of the Sellers Disclosure Schedule; (y) enter into any exclusive license agreement that would restrict the Business or the Assets after the Closing in any material respect or which is in conflict with the provisions of this Agreement or the Intellectual Property License Agreement; or (z) sell, transfer, or assign any Intellectual Property that is intended as of the date hereof to be (i) acquired by the Purchaser or Designated Purchaser at Closing, or (ii) licensed to Purchaser under the Intellectual Property License Agreement unless the relevant Sellers receive a written license from the buyer of such Licensed Intellectual Property sufficient for the Purchaser to retain all its rights in such Licensed Intellectual Property as set out in the Intellectual Property License Agreement;

        (d)    grant any lease, sublease, license, sublicense or other occupancy rights under or with respect to any portion of Leased Real Property or the Direct Lease Real Estate used in the Business or amend any Real Estate Leases in any material respect or in any manner which would impose on the assignee thereof any financial obligation thereunder that does not currently exist or terminate or surrender or agree to a release of any such Real Estate Lease, in whole or in part;

        (e)    construct, or permit to be constructed any capital improvements or major alterations at any portion of the Leased Real Property or Direct Lease Real Estate used for the Business;

        (f)    increase the rate of cash compensation or other fringe, incentive, equity incentive, pension, welfare or other employee benefits paid or payable to the Transferred Employees, other than increases required by applicable Law, Contracts or Seller Employee Plans in effect as of the date hereof (including pursuant to the KEIP or KERP, or any annual incentive plan), or as otherwise approved by the Bankruptcy Court from time to time, or increases in the Ordinary Course that apply to substantially all similarly situated employees (including the Transferred Employees) of the Sellers or the applicable Affiliates of the Sellers;

        (g)    enter into, adopt, amend or modify any Collective Labor Agreement affecting Employees, except as required by applicable Law;

(h)     voluntarily terminate, waive any right under, or amend in any material respect any Assigned Contract, Bundled Contract, Inbound License Agreement, Outbound License Agreement or Patent Cross License;

(i)     enter into any Contract that would be a Material Contract, other than any manufacturing or supply agreement with annual costs not to exceed US$1,000,000 individually or US$10,000,000 in the aggregate;

(j)     waive, release, assign, settle or compromise any material claim, litigation or arbitration relating to the Business to the extent that such waiver, release, assignment, settlement or compromise imposes any binding obligation, whether contingent or realized, on the Business that will bind the Purchaser and/or any of the Designated Purchasers after the Closing Date and is materially adverse to the Business;

(k)     solicit bids for the sale, transfer or other disposition, directly or indirectly, including through an asset sale, stock sale, merger, amalgamation, plan of arrangement or other similar transaction of any part of the Business;

(l)     manage the Adjusted Net Working Capital other than in the Ordinary Course;

(m)     take any action to cause any employee of the Sellers who would otherwise be an Employee as of the Closing not to be an Employee (other than termination for cause or termination of Employees who failed to receive an offer of employment from Purchaser or a Designated Purchaser pursuant to this Agreement provided Sellers make a reasonable effort to provide notice to Purchaser prior to such employment termination); or take any action to cause any employee of the Sellers who does not provide all or substantially all of his or her services to the Business as of the date of this Agreement, to become an Employee; or

(n)     authorize, or commit or agree to take, any of the foregoing actions.  If a Seller desires to take any action in this Section 5.9 requiring Purchaser's consent, the Main Sellers may, prior to any such action being taken, request the Purchaser's consent via an electronic mail or facsimile sent to the individual(s) at the addresses listed on Exhibit 5.9.  The Purchaser shall respond to such notice in writing by 11:59 p.m. (New York time) on the second Business Day after the day of delivery of such email or facsimile.  The failure of the Purchaser to respond within such two (2) Business Days shall not be deemed to be consent to such action.

Section 5.10.   Transaction Expenses.Except as otherwise provided in this Agreement or the Ancillary Agreements, each of the Purchaser and the Sellers shall bear its own costs and expenses (including brokerage commissions, finders' fees or similar compensation, and legal fees and expenses) incurred in connection with this Agreement, the other Transaction Documents and the transactions contemplated hereby and thereby.

Section 5.11.   Confidentiality.

(a)     The Parties acknowledge that the Confidentiality Agreement remains in full force and effect in accordance with its terms, which are incorporated herein by reference, and the Parties agree to be bound thereby in the same manner and to the same extent as if the

71

terms had been set forth herein in full, except that the Sellers shall be at liberty to disclose the terms of this Agreement to any court or to any liquidator or in connection with any auction process approved by the Bankruptcy Court and show appropriate figures in their administration records, accounts and returns and (ii) the Purchaser or the Designated Purchaser shall be at liberty to disclose the terms of this Agreement and other "Evaluation Materials" (as defined under the Confidentiality Agreement) to the EMEA Purchaser or any Designated EMEA Purchaser; provided, that after the Closing Date, the Purchaser's confidentiality obligations under this Section 5.11 and the Confidentiality Agreement with respect to information and data relating to the Business and/or the Assets shall terminate. Any Business Information or copies thereof retained by the Sellers pursuant to Section 5.24(c) shall be deemed to constitute "Evaluation Material" as such term is defined under the Confidentiality Agreement and, from and after the Closing Date, the Sellers shall treat such Business Information on the same terms and conditions applicable to the Purchaser's treatment of "Evaluation Material" as such term is defined under the Confidentiality Agreement.

(b)    To the extent a copy of any Bundled Contract is provided to Purchaser or a Designated Purchaser pursuant to Section 5.15 or otherwise, Purchaser or such Designated Purchaser shall not use or disclose any information therein that relates exclusively to a business of a Seller other than the Business (such information, **"Non-Business Information"**), including, without limitation, information related to product pricing, pricing strategy, production levels, production capacity or product inventories, current bids or potential bids for particular products or services, plans relating to the production, distribution, marketing, or introduction dates of specific products, including proposed territories and potential customers, matters relating to actual or potential suppliers or customers, current or project costs of procurement, development, manufacture or product research and development efforts of any specific product; provided, however, that Non-Business Information shall not include information that (i) was rightfully in Purchaser's or a Designated Purchaser's possession without a duty of confidentiality before receipt from Seller, (ii) is or has been disclosed publicly through no fault of Purchaser or a Designated Purchaser and without breach of any third parties' confidentiality obligations, (iii) is rightfully received by Purchaser or a Designated Purchaser without a duty of confidentiality, (iv) is independently developed by Purchaser or a Designated Purchaser without access to the Non-Business Information, as substantiated by written records or other documentation of Purchaser or such Designated Purchaser, or (v) is disclosed by Purchaser or a Designated Purchaser with a Seller's or its successors' or assigns' prior written approval; provided, further, that the Purchaser or the Designated Purchaser may disclose the Non-Business Information to the EMEA Purchaser or any Designated EMEA Purchaser. Furthermore, the rights of the Sellers under this Section 5.11(b) shall inure to the benefit of any buyer of a business of the Seller to which such Non-Business Information relates. Notwithstanding the foregoing, Purchaser or the relevant Designated Purchaser shall not be deemed in breach hereunder in the event that Purchaser or such Designated Purchaser is required by applicable law, regulation, legal process, or the regulations or rules of the stock exchange, or requested by a regulatory body, agency or stock exchange, to disclose any of the Non-Business Information.

Section 5.12.    Certain Payments or Instruments Received from Third Parties. To the extent that, after the Closing Date, (a) the Purchaser and/or any Designated Purchaser receives any payment or instrument that is for the account of a Seller according to the terms of any Transaction Document or relates primarily to any business or business segment of the Sellers

other than the Business, the Purchaser shall, and shall cause the Designated Purchasers to, promptly deliver such amount or instrument to the relevant Seller, and (b) any of the Sellers receives any payment that is for the account of the Purchaser, any of the Designated Purchasers according to the terms of any Transaction Document or relates primarily to the Business, the Sellers shall, and shall cause the other Sellers to, promptly deliver such amount or instrument to the Purchaser or the relevant Designated Purchaser, as applicable. All amounts due and payable under this Section 5.12 shall be due and payable by the applicable Party in immediately available funds, by wire transfer to the account designated in writing by the relevant Party. Notwithstanding the foregoing, each Party hereby undertakes to use its reasonable efforts to direct or forward all bills, invoices or like instruments to the appropriate Party.

Section 5.13. Non-Assignable Contracts.

(a) To the extent that any Assigned Contract or any Seller Consent is not capable of being assigned under Section 365 of the U.S. Bankruptcy Code (or, if inapplicable, pursuant to other applicable Laws or the terms of such Contract or Consent) to the Purchaser or a Designated Purchaser at the Closing (i) without the Consent of the issuer thereof or the other party thereto or any Third Party (including a Government Entity), and such Consent cannot be obtained pursuant to Section 2.1.7 or (ii) whether or not Consent is required, without Sellers' and their Affiliates' compromising any right, asset or benefit or expending any amount or incurring any Liability or providing any other consideration other than as provided in Section 2.1.7 (collectively, the **"Non-Assignable Contracts"**), this Agreement will not constitute an assignment thereof, or an attempted assignment, unless and until any such Consent is obtained; provided, however, that the Sellers will use their reasonable efforts to (i) cooperate with the Purchaser in connection with any commercially reasonable arrangement to provide the Purchaser the same interest, benefits and rights under any such Non-Assignable Contracts as the applicable Seller had immediately prior to the Closing, including entering into one or more mutually agreed commercially reasonable Subcontract Agreements, and (ii) facilitate Purchaser's negotiation with the other party to each Non-Assignable Contract that is a license of Intellectual Property to provide the Purchaser the same interest, benefits and rights under any such Non-Assignable Contracts as the applicable Seller had immediately prior to the Closing (including paying Cure Costs in order to obtain such Consent). If, and only for so long as, the arrangements described in clause (i) of the immediately preceding sentence are made such that Purchaser has obtained the same interest, benefits and rights under any such Non-Assignable Contracts, then, as between the Sellers and the Purchaser (or the relevant Designated Purchaser), such Non-Assignable Contracts shall be deemed to be assigned and the Purchaser (or the relevant Designated Purchaser) shall perform all obligations and covenants thereunder. Notwithstanding the foregoing sentences, (w) nothing in this Section 5.13 shall require any Seller to renew, modify or amend any Non-Assignable Contract once it has expired. The Parties acknowledge that the fact that any Contract constitutes a Non-Assignable Contract by itself shall not (i) constitute a breach of any covenant hereunder, (ii) except as otherwise provided in Section 8.3(c), entitle Purchaser to terminate this Agreement or (iii) result in any reduction of the Purchase Price payable hereunder. Any Non-Assignable Contract assigned pursuant to the terms of this Section 5.13 shall, when assigned, constitute an Assigned Contract hereunder from and after such date.

(b) For the purposes of this Agreement (including Section 5.13(a) and all representations and warranties of the Sellers contained herein), the relevant Sellers shall be

73

deemed to have obtained all required Consents in respect of the assignment of any Assumed and Assigned Contract if, and to the extent that, pursuant to the U.S. Sale Order or any separate order of the U.S. Bankruptcy Court approving and authorizing the assumption and assignment of the Assumed and Assigned Contracts, the Sellers are authorized to assume and assign to the Purchaser or a Designated Purchasers such Seller Contract pursuant to Section 365 of the U.S. Bankruptcy Code and any applicable Cure Cost has been satisfied as provided in Section 2.1.7.

      (c)    If, after the Closing, the Purchaser or the relevant Designated Purchaser receives a purchase order on account of any Non-Assignable Contract that is a contract between a Seller and a customer of such Seller (each, a **"Non-Assignable Customer Contract"** and the customer counterparty thereto a **"Non-Assignable Customer Counterparty"**), Purchaser or the relevant Designated Purchaser shall request that such Non-Assignable Customer Counterparty consent in writing to the assignment of such Non-Assignable Customer Contract to Purchaser or the relevant Designated Purchaser. For the period in which such consent is not forthcoming (the **"Non-Assignable Period"**), Purchaser or the relevant Designated Purchaser shall process such purchase order and Seller shall provide the Purchaser or the relevant Designated Purchaser with the interest, benefits and rights under such Non-Assignable Customer Contract in accordance with Section 5.13(a); provided, however, that Seller's obligation to provide Purchaser or the relevant Designated Purchaser with the interest, benefits and rights under such Non-Assignable Customer Contract will terminate upon the earliest of (i) the effective date of such consent, (ii) the effective date of any direct agreement between Purchaser (or the relevant Designated Purchaser) and such Non-Assignable Customer Counterparty or (iii) in accordance with Section 5.13(a); provided further, however, that Purchaser and the relevant Designated Purchaser agree to indemnify, defend and hold Sellers and each Seller's respective directors, officers and personnel (collectively, the **"Non-Assignable Customer Contracts Indemnitees"**) harmless from and against any and all losses, costs, damages, expenses and liabilities whatsoever (including reasonable legal fees) which may be suffered or incurred by any Non-Assignable Customer Contracts Indemnitee arising out of claims made by a Non-Assignable Customer Counterparty relating to Seller's providing Purchaser and/or the relevant Designated Purchaser with the interests, benefits and rights under the relevant Non-Assignable Customer Contract during the Non-Assignable Period.

      Section 5.14.  Inbound License Agreements.

      Each of the Purchaser and the Sellers shall, and the Purchaser shall cause any relevant Designated Purchaser and the Sellers shall cause any Affiliate to, use reasonable efforts and work cooperatively in good faith to facilitate the Purchaser's negotiation with the licensor under any Inbound License Agreement that is not assigned to the Purchaser or a Designated Purchaser to obtain rights for the Purchaser or a Designated Purchaser to use the Intellectual Property that is licensed under that Inbound License Agreement, or, if that negotiation is unsuccessful, the Sellers shall use reasonable efforts to provide the same interests, benefits and rights under such Inbound License Agreement, in each case, as reasonably necessary to effectively operate the Business from and after Closing, including in the case of the Sellers requesting Consent to the grant of these rights from the relevant third party; provided, however, that the Sellers shall be under no obligation to compromise any right, asset or benefit (including relinquishment of rights in the Retained Field of Use, as defined in the Intellectual Property

License Agreement) or to expend any amount or incur any Liability or provide any other consideration in complying with their obligations under this Section 5.14.

Section 5.15.  Bundled Contracts.

(a)    Each of the Purchaser and the Sellers shall, and the Purchaser shall, and shall cause any relevant Designated Purchaser, as applicable, to use its reasonable efforts to, prior to the Closing Date, enter into arrangements with the counterparty to each Contract of a Seller that involves the sale or provision of Products and/or Services to a customer of the Business and the sale or provision of other products and/or services of the Sellers or their Affiliates and is listed in Section 5.15 of the Sellers Disclosure Schedule (a "**Bundled Contract**"), to amend such Bundled Contract so as to delete all obligations and Liabilities therefrom as they relate to the Products and the Services and enter into a new Contract (effective as of, and conditioned upon the occurrence of, the Closing) with the applicable counterparty and which only relates to Products and Services, on substantially the same terms and conditions as are in effect for the sale or provision of Products and/or Services under the Bundled Contract or as otherwise acceptable to Purchaser, in which event such new Contract shall be deemed to be an Assigned Contract, and such Bundled Contract shall cease to be a Bundled Contract.  Seller shall generally be responsible for all administrative costs, fees and expenses connected with the amendment of a Bundled Contract and entry into a new Contract to replace a Bundled Contract as provided in the preceding sentence (other than the costs, fees and expenses of Purchaser or any counsel to Purchaser); provided, however, that the Sellers shall be under no obligation to compromise any right, asset or benefit in obtaining such arrangements and the failure to enter into such arrangements with respect to any Bundled Contract shall not, except as otherwise provided in Section 8.3(c), entitle the Purchaser to terminate this Agreement, not to complete the transactions contemplated hereby or reduce the Purchase Price payable hereunder.  In the event Sellers' efforts do not result in the separation of a Bundled Contract, then Purchaser and Sellers shall cooperate in good faith to enter into reasonable arrangements to provide the Purchaser or Designated Purchaser, as applicable, the same interest, benefits, rights and obligations under such Bundled Contract, only to the extent relating to the Business.

(b)    For those Bundled Contracts for which the arrangements mentioned in Section 5.15(a) could not be entered into prior to the Closing Date, the relevant Sellers shall either: (i) continue to use their reasonable efforts to facilitate the entry by the Purchaser or the relevant Designated Purchaser and the other party to each such Bundled Contract into a new Contract that only relates to Products and/or Services on substantially the same terms and conditions as are in effect for the sale or provision of Products and/or Services under the Bundled Contracts or as otherwise acceptable to the Purchaser and/or (ii) use their reasonable best efforts to cooperate with the Purchaser in any commercially reasonable arrangement to provide the Purchaser or Designated Purchaser, as applicable, the same interest, benefits and rights under any such Bundled Contract only to the extent relating to Products and/or Services as the applicable Seller had immediately prior to the Closing, including using its reasonable efforts to enter into one or more mutually agreed commercially reasonable Subcontract Agreements with respect to such Bundled Contracts; provided that (A) nothing in this Section 5.15 shall require the Sellers to renew any Bundled Contract once it has expired, (B) the Sellers shall have the right, any time after December 31, 2010, to exercise any right to terminate any Bundled Contract, and (C) the Sellers shall be under no obligation to compromise any right, asset or benefit or to incur any

75

Liability in order to comply with its obligations under this sentence. Notwithstanding the foregoing, the Sellers shall not take any action to terminate or reject any Bundled Contract, or take any action or fail to take any action that would permit the other party to any Bundled Contract to terminate such Bundled Contract, in each case, prior to December 31, 2010.

Section 5.16.  Post-Closing Assistance for Litigation.

(a)     After the Closing, the Purchaser shall, upon the request of the Sellers, and at the Sellers' cost (including reimbursement of out of pocket expenses of the Purchaser and the Designated Purchasers and payment of a reasonable *per diem* to the Purchaser or a Designated Purchaser which per diem shall be based on the total compensation of the affected Transferred Employees at the time), require the Transferred Employees to make themselves reasonably available at reasonable times and cooperate in all reasonable respects with the Sellers and their Affiliates in the preparation for, and defense of, any lawsuit, arbitration or other Action (whether disclosed or not disclosed in the Sellers Disclosure Schedule) filed or claimed against the Sellers or any of their Affiliates or any of the respective agents, directors, officers and employees of the Sellers and their Affiliates, whether currently pending or asserted in the future, concerning the operation or conduct of the Business prior to the Closing Date; provided, however, that the obligations of the Purchaser hereunder shall only extend to the Transferred Employees who remain employed by the Purchaser or a Designated Purchaser as of the date of the Seller's request and shall not apply to former employees no longer employed by the Purchaser or a Designated Purchaser as of such date and shall not require the Purchaser or a Designated Purchaser to continue the employment of any such employee.

(b)     After the Closing, the Sellers shall, upon the request of the Purchaser, and at the Purchaser's cost (including reimbursement of out of pocket expenses of the Sellers and payment of a reasonable *per diem* to the Sellers which *per diem* shall be based on the total compensation of the affected employees of the Sellers at the time), require their employees that were not Transferred Employees to make themselves reasonably available and cooperate in all reasonable respects with the Purchaser and the Designated Purchasers and their Affiliates in the preparation for, and defense of, any lawsuit, arbitration or other Action filed or claimed against the Purchaser, any of the Designated Purchasers, any of their Affiliates or any of the respective agents, directors, officers and employees of any of the foregoing, whether currently pending or asserted in the future, concerning the operation or conduct of the Business; provided, that the obligations of the Sellers or their Affiliates under this Section 5.16(b) shall only extend to the employees of such Sellers or Sellers' Affiliates as of the date of Purchaser's request and shall not apply to former employees no longer employed by such Sellers or Seller's Affiliates as of such date and shall not require Sellers or Seller's Affiliates to continue the employment of any such employee.

Section 5.17.  Delivery of Assets.

(a)     To the extent not provided for in the Transition Services Agreement or the Real Estate Agreements Term Sheet, the Purchaser shall, and shall cause the relevant Designated Purchasers to, within ninety (90) days after the Closing Date, relocate all tangible Assets and Purchaser's activities from all premises owned or leased by the Sellers or their Affiliates after the Closing other than those premises to be occupied by the Purchaser or any Designated Purchasers

76

after the Closing Date pursuant to the provisions of the Real Estate Agreements, the Direct Leases or the Assumed and Assigned Contracts.

(b)    As promptly as reasonably practicable, and in no event more than thirty (30) days, after the Closing Date, the Sellers shall deliver to the Purchaser copies of correspondence, notices, filings, prosecution files, dockets, certifications and other documents relating to the filing, prosecution, issuance, renewal and enforcement of the Business Registered IP, provided that all items to be delivered hereunder shall be delivered solely by remote telecommunication to the extent the Purchaser may so request. Without limiting the generality of the foregoing, within thirty (30) days of Closing, the Sellers shall and shall cause their Affiliates to, instruct their current attorneys and agents to deliver to the Purchaser, or attorneys designated by Purchaser, any and all records in the possession of such attorneys and agents relating to the prosecution of any applications, registrations and renewals of any Business Registered IP.

Section 5.18.    Termination of Overhead and Shared Services.

The Purchaser acknowledges and agrees that, except as otherwise expressly provided in the Transition Services Agreement, effective as of the Closing Date (i) all Overhead and Shared Services provided to the Business (except the Transferred Overhead and Shared Services) shall cease and (ii) the Sellers or their Affiliates shall have no further obligation to provide any Overhead and Shared Services to the Business.

Section 5.19.    Financing.

(a)    Notwithstanding anything to the contrary set forth herein, the Purchaser acknowledges and agrees that (i) its obligations to consummate the transactions contemplated by this Agreement are not conditioned or contingent in any way upon receipt of any financing from any other Person, and (ii) failure to consummate the transactions contemplated herein as a result of the failure to obtain financing shall constitute a breach of this Agreement by the Purchaser (including its obligations pursuant to Section 2.3).

Section 5.20.    Insurance Matters.

(a)    The Purchaser acknowledges and agrees that coverage of the Covered Assets and Persons under the Seller Insurance Policies shall cease as of the Closing Date (other than assets used in, and Persons engaged in, the provision of services under the Transition Services Agreement, except as otherwise set forth therein) and the Covered Assets and Persons will be deleted in all respects as insured (or additional insured, as the case may be) under all Seller Insurance Policies. Notwithstanding anything herein to the contrary, the Sellers shall retain any rights to, including any right to any proceeds received in respect of, any claim pending as of the date hereof or made after the date hereof under any Seller Insurance Policy.

(b)    If after the Closing Date the Purchaser or the Sellers (or any of their respective Affiliates) reasonably require any information regarding claim data or other information pertaining to a claim or an occurrence reasonably likely to give rise to a claim (including any pre-Closing claims under the Seller Insurance Policies that are to be covered under the retrospective component of the new insurance policy) in order to give notice to or

make filings with insurance carriers or claims adjustors or administrators or to adjust, administer or otherwise manage a claim, then the Sellers or the Purchaser, as the case may be, shall cause such information to be supplied to the other (or their designee), to the extent such information is in their possession and control or can be reasonably obtained by the Sellers or the Purchaser (or their respective Affiliates), as applicable, promptly upon a written request therefore. If the Purchaser desires access to, and utilization of, claims data or information maintained by an insurance company or other Third Party in respect of any claim (including any pre-Closing claims under any Seller Insurance Policies that are covered under the retrospective component of the new insurance policies), the Purchaser shall be exclusively responsible for acquiring from such insurance company or Third Party, at the Purchaser's sole cost and expense, the rights necessary to permit them to obtain access to and utilization of such claims data or information, provided that Sellers and their Affiliates shall reasonably cooperate with Purchaser's efforts. If any Third Party requires the consent of the Sellers or any of their Affiliates to the disclosure of such information, such consent shall not be unreasonably withheld.

Section 5.21.   Guarantees and Other Credit Support of the Business.

Following the Closing, the Purchaser shall, or shall cause the applicable Designated Purchasers to cooperate with the Sellers to procure the return and/or release by the applicable counterparty, as soon as reasonably practicable, of any security deposit, performance bond or surety posted by any Seller or any of its Affiliates in connection with Assigned Contracts (the "Security Deposits"), including where required by the applicable counterparty, offering to post such Security Deposits on terms and conditions no less favorable than offered to such Seller by such counterparty; provided, that neither the Purchaser nor any Designated Purchaser shall have any obligation under this Section 5.21 if any of the Sellers shall be in breach of the representations and warranties contained in Section 4.14(b) with respect to such Security Deposits or any portion thereof. Purchaser shall in no event be required to provide any replacement financial security or any financial security or other deposits with respect to any premises leased pursuant to a Sublease or leased pursuant to a Direct Lease, all of which shall be the sole responsibility of the Sellers.

Section 5.22.   Use of Trademarks.

Except as expressly provided in the Trademark License Agreement, as of the Closing Date, neither the Purchaser nor any Designated Purchaser shall have the right to use the name "Nortel" or any other Trademarks owned by the Sellers or any of their Affiliates or any other Trademark employing the word "Nortel" or any confusingly similar Trademarks to any of the foregoing (collectively, the "Sellers' Trademarks").

Section 5.23.   Sellers' Accessible Information; Cooperation.After the Closing, the Purchaser shall have the right to reasonably request from the Main Sellers copies of all books, records, files, documentation and sales literature in the possession or under control of the Sellers and held or used in the Business (other than Employee Records where prohibited by applicable Law or Tax Records), to which the Purchaser in good faith determines it needs access for *bona fide* business or legal purposes. The Sellers shall, or cause their Respective Affiliates to, provide such copies to the Purchaser (at the Purchaser's expense) as soon as reasonably practicable, provided that the Sellers shall be allowed to redact any such requested document in

order to delete any information and data relating to business segments of any such Seller and its Respective Affiliates not included in the Business; provided further, that nothing herein shall require the Sellers to disclose any information to the Purchaser if such disclosure would jeopardize any attorney-client or other legal privilege or contravene any applicable Law, fiduciary duty or agreement, it being understood that the Sellers shall cooperate in any reasonable efforts and requests for waivers that would enable otherwise required disclosure to the Purchaser to occur without so jeopardizing privilege or contravening such Law, duty or agreement.

(b)     Purchaser and the Sellers shall reasonably cooperate, and shall cause their respective Affiliates, officers, employees, agents, auditors and other Representatives to reasonably cooperate in preparing and auditing, as applicable, at Purchaser's expense, any financial statements that the Purchaser may request in connection with its future financing requirements, such financial statements to be compliant with any applicable regulations and stock exchange rules regarding financial statements of businesses acquired or to be acquired.

Section 5.24.   Maintenance of Books and Records.After the Closing, the Purchaser shall, and shall cause the Designated Purchasers to, preserve, until at least the greater of the third (3rd) anniversary of the Closing Date or as otherwise provided in Purchaser's applicable document retention policies, all pre-Closing Date records to the extent relating to the Business possessed or to be possessed by such Person. After the Closing Date and up until at least the third (3rd) anniversary of the Closing Date, upon any reasonable advance notice and during regular business hours, the Purchaser shall, and/or shall cause the Person holding such records to, (a) provide to the Sellers or their Representatives reasonable access to such records during normal business hours and (b) permit the Sellers or their Representatives to make copies of such records; provided, however, that (A) any such access shall be conducted at Sellers' expense, in accordance with Law (including any applicable Antitrust Law and Bankruptcy Law), under the supervision of the Purchaser's personnel and in such manner as to maintain confidentiality and not to interfere with the normal operations of the businesses of the Purchaser and its Affiliates, and (B) the Purchaser will not be required to provide to the Sellers access to or copies of any Tax Records or Employee Records where prohibited by applicable Laws.

(b)     Notwithstanding anything contained in this Agreement or any other agreement between the Purchaser and the Sellers executed on or prior to the date hereof, the Purchaser shall not have any obligation to make available to the Sellers or its Representatives, or provide the Sellers or its Representatives with (i) any income Tax Return or any combined or consolidated Tax Return filed by the Purchaser or any of its Affiliates or predecessors, or any related material, or (ii) more generally, any information if making such information available would (A) jeopardize any attorney-client or other legal privilege or (B) potentially cause the Purchaser to be found in contravention of any applicable Law or contravene any fiduciary duty or agreement (including any confidentiality agreement to which the Purchaser or any of its Affiliates is a party), it being understood that the Purchaser shall cooperate in any reasonable efforts and requests for waivers that would enable otherwise required disclosure to the Sellers to occur without so jeopardizing privilege or contravening such Law, duty or agreement.

(c)     In addition to the above, the Sellers shall have the right to retain, following the Closing, copies of any book, record, literature, list and any other written or

79

recorded information constituting Business Information or any Employee Records to which the Sellers in good faith determine they are reasonably likely to need access for bona fide Tax, financial or legal purposes.

        Section 5.25.  Sasken Agreements.

        Each of the Purchaser and the Sellers shall, and the Purchaser shall, and shall cause any relevant Designated Purchaser, as applicable, to use its reasonable efforts to, prior to the Closing Date, enter into arrangements (collectively, the **"Sasken Agreements"**) with Sasken Communication Technologies (the **"Sasken Agreements"**) with respect to the manufacturing and supply agreements between the Sellers, on the one hand, and Sasken, on the other hand, existing as of the date hereof in a manner so as to provide the Purchaser or the relevant Designated Purchaser, for a period of not less than three (3) months after the Closing, with the interest, benefits and rights under the Sasken Agreements as the applicable Seller had immediately prior to the Closing.

Section 5.26.   Finalization of Schedules to Transition Services Agreement;
Disputes.The Parties acknowledge that Schedule 1 attached to the form of Transition
Services Agreement contained in Exhibit L (the **"General Scope of Included Services"**) reflects
the general scope of certain services anticipated by the Parties to be provided pursuant to the
Transition Services Agreement by the TSA Sellers, TSA EMEA Sellers and their respective
Affiliates (and may reflect greater detail as to some of such services), but may not be sufficiently
refined to define all such services in detail. Accordingly, the Parties agree that, from and after
the execution of this Agreement, they will negotiate in good faith to refine the description of the
services included within the General Scope of Included Services so as to provide sufficient
operational detail (as mutually agreed or as determined by arbitration in accordance with clause
(d), the **"Included Services"**). The Parties agree that Included Services will be finally
determined by such negotiation or by arbitration in accordance with this Section 5.26, provided
that the Included Services will be consistent with, and will omit any services not reasonably
within the service description categories contained in, the General Scope of Included Services.
The Parties further agree that any such negotiation or arbitration will be subject to the following
general limitations and conditions (the **"Scope Guidelines"**):  (i) the Included Services will not
include any portion of any service (A) related to the provision of space or real estate or (B) not
provided internally by the applicable Seller or the applicable EMEA Seller (or any Affiliate of
any of them) or provided or procured by the applicable Seller or the applicable EMEA Seller (or
any Affiliate of any of them) from a third party on the date hereof (the Sellers and the TSA
EMEA Sellers hereby represent to the Purchaser that no such internal services have heretofore
been discontinued with the intent of avoiding the provision thereof pursuant to this Section
(provided that, for the avoidance of doubt, discontinuance of such internal services by the EMEA
Sellers in the ordinary course of the Administration (but not with the intent of avoiding the
provision thereof pursuant to this Section) shall not breach this representation), (ii) the Included
Services will not include any service the provision of which, in the Seller's reasonable opinion,
would violate or would risk violating any Law, (iii) if and to the extent that employees of a Seller
or an EMEA Seller or a Subsidiary of a Seller or an EMEA Seller or Provider are Transferred
Employees under this Agreement or Transferring Employees under the EMEA Asset Sale
Agreement, then the Included Services will exclude human tasks formerly undertaken by such
Transferred Employees or Transferring Employees (but equipment, licenses and other resources
not transferred shall, in accordance with the terms of the Transition Services Agreement,
continue to be made available as necessary to perform such tasks under the Transition Services
Agreement as contemplated by this Section 5.26), and (iv) the Included Services will be limited
to those reasonably necessary to carry on the Business after the Closing in a manner consistent
with the operation of the Business during the nine month period prior to the Closing Date (and
will be limited to services provided internally by the applicable Seller or applicable EMEA Seller
(or any Affiliate of any of them), or sourced from a third party by the applicable Seller or
applicable EMEA Seller (or any Affiliate of any of them), during such period).

(b)     If, between the time of execution of this Agreement and Closing,
Purchaser identifies services not reasonably within the service description categories contained
in the General Scope of Included Services which are reasonably advisable in order to assist with
the orderly transition of the Business to Purchaser and which are consistent with the Scope
Guidelines, then the Parties agree that such additional services (defined in operational detail as
described herein) will be provided under the Transition Services Agreement, and the Parties will
negotiate in good faith and use reasonable efforts expeditiously to refine such additional services

in operational detail (failing which, such specification will be determined by arbitration in accordance with this Section 5.26). Further, if, between the time of the execution of this Agreement and Closing, Purchaser identifies services which are reasonably necessary to carry on the Business which are not described in the General Scope of Services and which are not consistent with the Scope Guidelines, other than the services related to the provision of space or real estate, but which can reasonably be provided by the applicable Seller or its Affiliate without violating any Law, or materially changing or burdening the operations of such Seller or EMEA Seller, then the Parties agree that such additional services will be provided under the Transition Services Agreement, and the Parties will negotiate in good faith and use reasonable efforts expeditiously to define such additional services in operational detail (failing which, such specification will be determined by arbitration in accordance with this Section 5.26; any services identified by Purchaser under this Section 5.26(b) are herein referred to as "**Extra Services**").

(c)    It is the expectation of the Parties that the Included Services, any Extra Services will be specified in operational detail, either by mutual agreement or by arbitration, prior to the Closing. However, notwithstanding anything to the contrary in this Agreement, finalization and mutual approval of the Included Services, the Extra Services and the Monetary Costs thereof shall not be a condition to, or delay, the Closing, or permit any Party to rescind or terminate this Agreement. In the event that the Included Services and any Extra Services have not been finalized and mutually approved by the Closing Date, then the following will apply: (i) at Closing, the applicable parties will execute and deliver the Transition Services Agreement in the form of Exhibit L, (ii) the Parties will continue to use good faith efforts after the Closing to finalize the Included Services and any Extra Services (subject to, and in accordance with, the terms of this Section 5.26), (iii) pending such finalization, the Sellers will (a) subject to Section 5.26(f) provide such Included Services (subject to the Scope Guidelines), and any Extra Services as are not in dispute and (b) act in good faith and use reasonable efforts, with the cooperation of Purchaser, to provide such other services, subject to the Scope Guidelines, as may be reasonably requested by Purchaser on an interim basis reasonably to support the Business in a manner materially consistent with the operation of the Business during the nine months prior to the Closing Date (any such services provided to be in accordance with the pricing and other provisions of this Section 5.26 and the Transition Services Agreement).

(d)    The Parties acknowledge that for purposes of providing the Included Services and Extra Services from and after the Closing, certain Segregation Projects will need to be undertaken and substantially completed between the date of this Agreement and the Closing Date (the "**Pre-Closing Segregation Projects**"). The Parties agree that, from and after the execution of this Agreement, they will promptly negotiate in good faith to identify the exact scope of the Pre-Closing Segregation Projects reasonably necessary, and the Sellers will cause such Pre-Closing Segregation Projects to be undertaken. The Parties will cooperate as to prioritizing necessary segregation services and assisting with an orderly transition at Closing. At Closing, Purchaser will pay to the Sellers, in addition to all other amounts then required to be paid by Purchaser under this Agreement, one half of the Monetary Cost incurred by the Sellers and their affiliates in providing such Pre-Closing Segregation Projects (the "**Pre-Closing Segregation Costs**"), provided that to the extent the aggregate Pre-Closing Segregation Costs exceeds US$5 million, the Sellers shall bear all of such excess. For the avoidance of doubt, any Pre-Closing Segregation Costs in respect of the Interdependencies (as defined in the Interdependencies Letter) shall be borne by Purchaser pursuant to the Interdependencies Letter.

Any disagreement among the Parties as to the Pre-Closing Segregation Costs will be resolved by arbitration in accordance with this Section 5.26.

          (e)     If the Parties have not finalized the Included Services, the Extra Services or the Pre-Closing Segregation Projects forty-five (45) days after the Closing Date, then any affected Party shall have the right but not the obligation to submit the associated disagreements to binding arbitration for resolution, which arbitration proceeding will be initiated by notice delivered by such Party (the "**Complaining Party**") to the applicable counterparty, which notice shall specify the name of a person who shall serve as such Complaining Party's arbitrator. Within ten (10) business days of receipt of such notice, the applicable counterparty (the "**Responding Party**") shall notify the Complaining Party of such Responding Party's choice of a person to act as an arbitrator (if such Responding Party does not so notify the Complaining Party, then the arbitration shall be conducted by the Complaining Party's arbitrator alone). If two arbitrators are so selected, they will attempt to resolve the matter within thirty (30) days, failing which they shall jointly appoint a third arbitrator, who shall be unaffiliated with any of the Parties (a "**Qualified Arbitrator**"), to serve as arbitrator. (If the two arbitrators are unable jointly to appoint a third arbitrator, such third arbitrator, who must be a Qualified Arbitrator, shall be appointed either by the American Arbitration Association or upon application to the Supreme Court for the State of New York sitting in New York County). Any arbitration hereunder shall be conducted in the English language by such three arbitrators (except as expressly provided above), and shall take place in New York City in accordance with the Expedited Procedures of the Commercial Arbitration Rules of the American Arbitration Association. In rendering a decision, the arbitrators shall abide by the provisions of this Agreement and the Transition Services Agreement (and in particular, the arbitrators shall be engaged and directed by the Parties to define the Included Services and any Extra Services in operational detail in accordance with the requirements of Sections 5.26(a) and (b)). The decision of a majority of the arbitrators shall be in writing, shall be final and conclusive on the Parties, and counterpart copies thereof shall be delivered to all of the Parties not later than sixty (60) days of initiation of the date of the submission of the associated disagreements to binding arbitration for resolution. Judgment may be had on the decision of the arbitrators so rendered in any court of competent jurisdiction. The Purchaser shall bear the fees and expenses of the arbitrator it designates, the applicable Seller shall bear the fees and expenses of the arbitrator it designates, and the Purchaser and the applicable Seller shall equally share the fees and expenses of the third arbitrator.

          (f)     The Sellers and Purchaser shall respectively use all commercially reasonable efforts, and take all reasonable steps, to obtain the consents and approvals that are required to enable the Providers to perform the Included Services in accordance with the Transition Services Agreement. The costs for obtaining such third-party consents will be shared equally by Purchaser and the applicable Seller; provided, that to the extent the aggregate of such costs exceeds US$2 million, the Sellers shall bear all of such excess. The Parties will reasonably cooperate to mitigate such costs.

          (g)     Solely, for purposes of this Section 5.26, the term "Parties" shall also include the TSA EMEA Sellers.

Section 5.27.  Casualty.

    At Closing the Sellers shall assign to the Purchaser or Designated Purchaser, as applicable, and the Purchaser or such Designated Purchaser shall be entitled to receive the benefits of, any and all claims and proceeds the Sellers may have with respect to any casualty insurance policies with respect to any Assets which related to a casualty occurring after the date of this Agreement but prior to the Closing, and the Purchaser shall have the right to proceed against any insurance company to recover any such items and will have the right prior to the Closing to participate in all negotiations and discussions regarding the adjustment and settlement of any insurance claims with respect to any property or group of properties having a value in excess of US$500,000.  The Sellers shall promptly after learning of same notify Purchaser in writing of the occurrence of any casualty or similar event with respect to any of the Assets.

Section 5.28.  Ancillary Agreements.

    The Primary Parties shall, and shall cause their respective Affiliates to, promptly after the date hereof, negotiate, finalize and, prior to or simultaneously with the Closing, execute and deliver the Ancillary Agreements to which it is contemplated they (or such of their Affiliates) will be parties.  Without limiting the generality of the foregoing, and provided that the following would not diminish or otherwise affect the rights and obligations of the Purchaser, Designated Purchaser or any of the Sellers under this Agreement or any Ancillary Agreement, the Parties acknowledge that, (i) as of the date hereof, the Business entertains several bilateral relationships with other businesses, business segments or divisions (or former businesses, business segments or divisions) of certain Sellers for the supply of products and services (including certain Products and Services), and (ii) to the extent such relationships are required to be in place in order to fulfill customer commitments existing as of the Closing Date and which will continue thereafter (for the duration of any individual customer contract including frame contracts), the Primary Parties shall use their reasonable best efforts to negotiate, or to cause to be negotiated in good faith commercially reasonable terms in order to address such interdependencies among businesses, including through a Development and Support Agreement, a Dual Use Platform Agreement or other appropriate commercial arrangements, and taking into account options available to the Primary Parties; provided that the form of Dual Use Platform Agreement attached hereto as Exhibit M shall not apply to the "Enterprise" products and services used or required by the Business from and after such time that such products and services are no longer owned by the Sellers or their Affiliates.

Section 5.29.  Patents to be Reviewed.

    The Sellers agree to review within thirty (30) days of the date hereof, the Patents listed in Section 5.29 of the Sellers Disclosure Schedule to determine whether such Patents shall be deemed "Transferred Patents" for purposes of this Agreement using the same standard and evaluation mechanism as applied to determine the assignability of the Transferred Patents (it being understood that such standard is a "predominantly used" in the Business standard).  The Sellers shall notify the Purchaser in writing not later than forty (40) days after the date hereof whether any of the Patents listed in Section 5.29 of the Sellers Disclosure Schedule were found by Sellers, based on the foregoing review, to be deemed "Transferred Patents" (such Patents, if any, the "New Transferred Patents").  The New Transferred Patents shall be added to Section

84