1.1(l) of the Sellers Disclosure Schedule and shall be licensed, as applicable, to the Sellers pursuant to the Intellectual Property License Agreement. This Section 5.29 shall not apply to any Patents other than those Patents listed in Section 5.29 of the Sellers Disclosure Schedule.

Section 5.30.   China Assets.

As promptly as practicable after the date hereof, the Sellers and the Purchaser shall negotiate in good faith and, no later than fifteen (15) Business Days prior to the Closing Date, enter into a definitive agreement (the **"China Purchase Agreement"**) pursuant to which the Sellers shall sell, transfer and assign to the Purchaser, and the Purchaser shall purchase and acquire, certain assets of the Sellers used or held for use predominantly in connection with the Business and held or located in China, including, without limitation, laboratory equipment and other research and development assets and properties and personal computers of Transferred Employees (collectively, the **"China Assets"**). The Purchase Price to be paid by the Purchaser for the Assets hereunder shall be reduced by US$230,000, the purchase price to be paid by the Purchaser for the China Assets (the **"China Purchase Amount"**), and (ii) Sellers shall be solely responsible for all customs duties, levies and other similar charges payable in connection with the sale of the China Assets.

Section 5.31.   Subleases.

For each Assumed and Subleased Real Estate Lease designated to be subleased pursuant to Section 2.1.5(b) or Non-365 Subleased Real Estate Lease designated to be subleased pursuant to Section 2.1.6(b) to the extent permitted by, and in accordance with, the terms of the related 365 Real Estate Lease or Non-365 Real Estate Lease (as applicable) and applicable Law and the Real Estate Agreements Term Sheet, the relevant Seller, as sublandlord, and Purchaser or a Designated Purchaser, as subtenant, will enter into a sublease in accordance with, and as provided by, the Real Estate Agreements Term Sheet (each such sublease, a **"Sublease"**) at Closing. Seller's obligation to assume an Assumed and Subleased Real Estate Lease or Non-365 Subleased Real Estate Lease shall be conditioned upon receipt of consent to the related Sublease from the master landlord to the extent required by the terms of the related 365 Real Estate Lease or Non-365 Real Estate Lease (as applicable). Subject to Section 2.1.7(e), any reasonable costs and expenses or fees imposed by the master landlord under the related 365 Real Estate Lease or Non-365 Real Estate Lease (as applicable) in connection with obtaining such Consent shall be borne by the Purchaser.

Section 5.32.   Direct Leases.

For each of the properties owned in fee by the Sellers identified on Section 5.32 of the Sellers Disclosure Schedule (collectively, the **"Direct Lease Real Estate"**) to the extent permitted by applicable Law, Purchaser agrees that the relevant Seller and Purchaser or a Designated Purchaser will enter into a lease in accordance with, and as provided by the Real Estate Agreements Term Sheet (each such lease, a **"Direct Lease"**) at Closing.

Section 5.33.   Licenses.

For each Licensed Real Estate Lease designated to be licensed pursuant to Section 2.1.5(c) or Non-365 Licensed Real Estate Lease designated to be licensed pursuant to

Section 2.1.6(c) to the extent permitted by, and in accordance with, the terms of the related 365 Real Estate Lease or Non-365 Real Estate Lease (as applicable) and applicable Law, the relevant Seller, as licensor, and Purchaser or a Designated Purchaser, as licensee, will enter into a license in accordance with, and as provided by, the Real Estate Agreements Term Sheet (each such license, a "**License**") at Closing. Seller's obligation to assume such Licensed Real Estate Lease shall be conditioned upon receipt of consent to the related License from the master landlord to the extent required by the terms of the related Licensed Real Estate Lease or Non-365 Licensed Real Estate Lease (as applicable). Subject to Section 2.1.7(e), any reasonable costs and expenses or fees imposed by the master landlord under the related Licensed Real Estate Lease or Non-365 Licensed Real Estate Lease (as applicable) in connection with obtaining such Consent shall be borne by the Purchaser.

Section 5.34.   Disclosure Schedules and Certain Information.

(a)     The Sellers shall submit to the Purchaser, every two weeks, written updates to Section 4.10(b) of the Sellers Disclosure Schedule; provided, however, that once employment offers have been made pursuant to Section 7.1.1, such updates shall be limited to those Employees receiving such offers or having the opportunity to continue employment, as applicable; and, provided further that, such updates shall not include Employees who terminate employment or reject such employment offer or continued employment. The Sellers shall use reasonable efforts to submit to the Purchaser, as promptly as reasonably practicable, written updates to the Sellers Disclosure Schedule in respect of ARTICLE IV disclosing any events or developments that occurred or any information learned between the date of this Agreement and the Closing Date that reflect any matters hereafter arising which, if existing, occurring or known to the Sellers at the date hereof, would have been required to be set forth or described in the Sellers Disclosure Schedule in relation to ARTICLE IV; provided, that such updates shall be disregarded for purposes of determining whether or not the condition contained in Section 8.3(a) has been fulfilled.

(b)     The Sellers shall give prompt notice to the Purchaser, and the Purchaser shall give prompt notice to the Sellers, upon obtaining knowledge of the occurrence or non-occurrence of any event that, individually or in the aggregate, would make the timely satisfaction of the conditions set forth in ARTICLE VIII impossible or unlikely.

(c)     The delivery of any update or notice pursuant to this Section 5.34 shall not cure any breach of any representation or warranty requiring disclosure of such matter or otherwise limit or affect the remedies available hereunder to any party receiving such notice. This Section 5.34 shall not constitute a covenant or agreement for purposes of ARTICLE VIII or ARTICLE IX.

Section 5.35.   Affiliates.

The Sellers shall cause their respective Affiliates that are not Parties to this Agreement to comply with the terms and conditions of this Agreement that impose obligations on such Affiliates as the context requires to carry out the provisions of this Agreement and give effect to the transactions contemplated herein.

# ARTICLE VI

# TAX MATTERS

Section 6.1.    Transfer Taxes.

(a)    The Parties agree that the Purchase Price is exclusive of any Transfer Taxes. Except as otherwise provided in Section 5.30 and the China Purchase Agreement, the Purchaser shall (on behalf of itself and the Designated Purchasers) promptly pay directly to the appropriate Tax Authority all applicable Transfer Taxes that may be imposed upon or payable or collectible or incurred in connection with this Agreement or the transactions contemplated herein, or that may be imposed upon or payable or collectible or incurred in connection with the execution of any other Transaction Document; provided, that if any such Transfer Taxes are required to be collected, remitted or paid by a Seller or any Subsidiary, Affiliate, Representative or agent thereof, such Transfer Taxes shall be paid by the Purchaser to such Seller, Subsidiary, Affiliate or agent, as applicable, at the Closing or thereafter, as requested of or by the applicable Seller. For the avoidance of doubt, except as otherwise provided in Section 5.30 and the China Purchase Agreement, Purchaser shall remain liable in respect of any Transfer Taxes regardless of the date that the Assets are removed from the premises of a Seller or any Seller's supplier. All other Closing expenses will be paid by the Party incurring such expenses. Upon request from a Seller, the Purchaser shall provide to such Seller an original receipt (or such other evidence as shall be reasonably satisfactory to such Seller) evidencing the payment of Transfer Taxes by the Purchaser to the applicable Tax Authority under this Section 6.1(a).

(b)    The Purchaser or any Designated Purchaser, as the case may be, shall provide the Sellers prior to Closing with an appropriate certificate of exemption, election and/or other document or evidence to support any reasonable exemption or reduction in respect of Transfer Taxes claimed by the Purchaser or such Designated Purchaser, as the case may be. All Parties shall make reasonable efforts to cooperate to the extent necessary to obtain any such exemption or reduction.

(c)    Provided that, in the opinion of the relevant Purchaser or Designated Purchaser, acting reasonably, the sale qualifies for such an election, the Purchaser and the relevant Designated Purchasers shall jointly execute with the applicable Seller(s) an election under section 167 of Part IX of the Excise Tax Act (Canada) and any equivalent election provided under provincial Laws, in the forms prescribed for such purposes, such that the sale of the Assets will take place without payment of any GST. The Purchaser or the relevant Designated Purchaser, as the case may be, shall file within the prescribed filing period all forms supporting such election with the relevant Tax Authority, together with its Tax Returns for the applicable reporting periods during which the sale of the Assets contemplated herein occurs and shall provide the Seller with a copy of such filed election. The Purchaser shall indemnify and hold the Sellers and their directors and officers harmless with respect to any Tax, interest or penalties assessed against the Sellers as a result of making such election or the Purchaser's or Designated Purchaser's failure to timely file such an election.

Section 6.2.    Withholding Taxes.

The Purchaser and the Designated Purchasers shall be entitled to deduct and withhold from the Purchase Price such amounts as the Purchaser or Designated Purchasers, as the case may be, are required to deduct and withhold under the Code, or any provision of federal, state, provincial, local or foreign Tax Law, with respect to the making of such payment and shall remit any amount so withheld to the appropriate Government Entity in accordance with applicable Law. To the extent such amounts are so withheld by the Purchaser or a Designated Purchaser, as the case may be, such withheld amounts shall be treated for all purposes of this Agreement and any other Transaction Document as having been paid to the relevant Seller in respect of whom such deduction and withholding was made by such Purchaser or Designated Purchaser. None of the Parties is aware of any obligation to deduct and withhold any amounts from the Purchase Price under the Code, or any provision of federal, state, provincial, local or foreign Tax Law, with respect to the making of such payment. If any of the Parties learns of any such obligation on or prior to the Closing Date, then (i) in the case of a Seller, such Seller shall promptly provide reasonable notice of such obligation to the Purchaser, and (ii) in the case of the Purchaser, the Purchaser shall promptly provide reasonable notice of such obligation to the Sellers. In the event that a Tax withholding obligation arises with respect to payment of the Purchase Price, the Parties shall cooperate in good faith to minimize the amounts that the Purchaser or Designated Purchasers, as the case may be, are required to deduct and withhold.

Section 6.3.    Tax Characterization of Payments Under This Agreement.The Sellers and the Purchaser agree to treat all payments made either to or for the benefit of the other Party under this Agreement (other than payment of the Estimated Purchase Price and any interest payments) as adjustments to the Purchase Price for Tax purposes and that such treatment shall govern for purposes hereof to the extent permitted under applicable Tax Law.

Section 6.4.    Apportionment of Taxes.

(a)    Except as otherwise provided in this ARTICLE VI, (i) the Sellers shall and shall cause the Other Sellers, as the case may be, to bear all Taxes of any kind relating to the Assets or the conduct or operation of the Business for all Tax periods or portions thereof ending on or before the Closing Date and (ii) the Purchaser shall and shall cause the Designated Purchasers to bear all Taxes relating to the Assets or the conduct or operation of the Business for all Tax periods or portions thereof beginning after the Closing Date.

(b)    For purposes of this Agreement, any Taxes (excluding, for the avoidance of doubt, any income or gross receipts Taxes) for a **"Straddle Period"** (a Tax period that includes, but does not end on, the Closing Date) shall be apportioned between the Sellers, on the one hand, and the Purchaser and the Designated Purchasers, on the other hand, based on the portion of the period ending on and including the Closing Date and the portion of the period beginning after the Closing Date, respectively. The amount of Taxes shall be allocated between portions of a Straddle Period in the following manner: (i) in the case of a Tax imposed in respect of property (excluding, for the avoidance of doubt, any income or gross receipts Tax) and that applies ratably to a Straddle Period, the amount of Tax allocable to a portion of the Straddle Period shall be the total amount of such Tax for the period in question multiplied by a fraction, the numerator of which is the total number of days in such portion of such Straddle Period and

the denominator of which is the total number of days in such Straddle Period, and (ii) in the case of sales, value-added and similar transaction-based Taxes (other than Transfer Taxes allocated under Section 6.1), such Taxes shall be allocated to the portion of the Straddle Period in which the relevant transaction occurred.

Section 6.5.    Records.Notwithstanding the provisions of Section 5.23 or Section 5.24, but subject to the provisions of Section 5.6, (i) after the Closing Date, the Purchaser and the Designated Purchasers, on the one hand, and the Sellers, on the other hand, will make available to the other, as reasonably requested, and to any Tax Authority, all information, records or documents relating to liability for Taxes with respect to the Assets, the Assumed Liabilities, or the Business for all periods prior to or including the Closing Date (including Straddle Periods), and will preserve such information, records or documents until the expiration of any applicable statute of limitations or extensions thereof, and (ii) in the event that one party needs access to records in the possession of a second party relating to any of the Assets, the Assumed Liabilities or the Business for purposes of preparing Tax Returns or complying with any Tax audit request, subpoena or other investigative demand by any Tax Authority, or for any other legitimate Tax-related purpose not injurious to the second party, the second party will allow representatives of the other party access to such records during regular business hours at the second party's place of business for the sole purpose of obtaining information for use as aforesaid and will permit such other party to make extracts and copies thereof as may be necessary or convenient. The obligation to cooperate pursuant to this Section 6.5 shall terminate at the time the relevant applicable statute of limitations expires (giving effect to any extension thereof).

(b)    At any time within the ten (10) years immediately following the Closing, the Sellers may cause copies of Restricted Technical Records to be placed into escrow with the Records Custodian, who shall hold such Restricted Technical Records for a term ending no later than ten (10) years after the Closing Date in accordance with an escrow agreement between the Purchaser (or the relevant Designated Purchaser, as applicable), the Sellers and the Records Custodian, in form satisfactory to the Purchaser (or the relevant Designated Purchaser) and the Main Sellers. The escrow agreement will provide for access to the copies of the Restricted Technical Records only by the relevant Canadian Tax Authority or by Tax advisors of any purchaser ("**Tax Credit Purchaser**") relating to the scientific research and experimental development tax credits of the Sellers under the Income Tax Act (Canada), and only if such advisors have executed an appropriate confidentiality agreement in form satisfactory to the Purchaser (or the relevant Designated Purchaser), acting reasonably. The access permitted by the escrow agreement shall be only for the limited purpose of defending any audit, claim or action by any Canadian Tax Authority in respect of the characterization of expenditures by NNL or NNTC as qualified expenditures on scientific research and experimental development for purposes of the applicable provisions of the Income Tax Act (Canada) ("**Qualified Expenditures**").

(c)    The Purchaser shall use reasonable efforts to make available to the relevant Tax Authority or Tax advisors of the Tax Credit Purchaser, those former employees of NNL or NNTC, as the case may be, with direct knowledge of the Qualified Expenditures who are then employed by the Purchaser and whose cooperation is necessary for the purpose of defending any audit, claim or action by any Tax Authority of the characterization of expenditures

by NNL or NNTC, as the case may be, as Qualified Expenditures, and provided such advisors have executed an appropriate confidentiality agreement satisfactory to the Purchaser.

(d)    The Purchaser shall have no obligation to provide any access under this provision unless the Seller (if there is no Tax Credit Purchaser in respect of the request for access) or the Tax Credit Purchaser pays all the Purchaser's reasonable expenses in connection with the foregoing provisions, including a reasonable per diem rate for access to former employees of NNL or NNTC, as the case may be (based on the total compensation of the employee at the time access is provided).

(e)    At the request of the Purchaser, the Sellers shall provide reasonable access to records and employees of the Sellers to assist the Purchaser in claiming any future scientific research and experimental development Tax credits for Qualified Expenditures.

(f)    The Sellers shall have no obligation to provide any access under this provision unless the Purchaser pays all of the Sellers' reasonable expenses in connection with the foregoing provisions, including a reasonable per diem rate for access to employees of the Sellers (based on the total compensation of the employee at the time access is provided).

Section 6.6.    Tax Returns.

(a)    The Sellers shall be responsible for the preparation and timely filing (taking into account any extensions received from the relevant Tax Authorities) of all Tax Returns in respect of the Assets or the Business, for all Pre-Closing Taxable Periods (other than any Tax Returns with respect to Transfer Taxes ("**Transfer Tax Returns**") described below in Section 6.6(b)). Such Tax Returns shall be true, correct and complete in all material respects. Except as otherwise provided in this Agreement, all Taxes indicated as due and payable on such Tax Returns shall be paid by (or shall be caused to be paid by) Sellers as and when required by Law.

(b)    Each Transfer Tax Return with respect to Transfer Taxes imposed in respect of this Agreement and the transactions contemplated herein or in respect of the execution of any other Transaction Document shall be prepared by the Party that customarily has primary responsibility for filing such Transfer Tax Return pursuant to the applicable Tax Laws. Any Transfer Tax Returns prepared by the Sellers pursuant to this Section 6.6(b) shall be made available to the Purchaser at least five (5) Business Days before such Tax Returns are due to be filed. The Purchaser shall pay to the Sellers any amount of Transfer Taxes payable in respect of Transfer Tax Returns to be filed by the Sellers pursuant to this Section 6.6(b) at least one (1) Business Day before such Transfer Tax becomes due and payable.

(c)    The Purchaser or a Designated Purchaser shall be responsible for the preparation and timely filing (taking into account any extensions received from the relevant Tax Authorities) of all Tax Returns with respect to the Assets or the Business for all Straddle Periods. Such Tax Returns shall be true, correct and complete in all material respects. All Taxes indicated as due and payable on such Tax Returns shall be paid by (or shall be caused to be paid by) the Purchaser or a Designated Purchaser as and when required by Law.

(d)     The Sellers shall be entitled to review and comment on any Tax Return (other than a Transfer Tax Return described in Section 6.6(b)) or any Tax Return relating to income or gross receipts Taxes of the Purchaser) prepared by the Purchaser or a Designated Purchaser for any Straddle Period before any such Tax Return is filed. The Purchaser shall submit a draft of any such Tax Return to the Main Sellers at least thirty (30) days before the date such Tax Return is required to be filed with the relevant Tax Authority. The Main Sellers shall have ten (10) days after the date of receipt thereof to submit to the Purchaser, in writing, the Main Sellers' written comments with respect to such Tax Return. The Purchaser shall notify the Main Sellers within five (5) days after receipt of such comments of (a) the extent, if any, to which the Purchaser accepts such comments and will file such Tax Return in accordance therewith and (b) the extent, if any, to which the Purchaser rejects such comments. To the extent the Purchaser rejects the comments of the Main Sellers, the Purchaser and the Main Sellers promptly shall negotiate in good faith to resolve their disagreements; if no agreement has been reached within five (5) days, the Parties immediately shall appoint an Independent Auditor to determine the correct manner for reporting the items that are in dispute and shall provide to the Independent Auditor all relevant information. The Independent Auditor shall have ten (10) days to submit its determination, which shall be binding upon the Parties, and the Purchaser shall file such Tax Return in accordance therewith. Notwithstanding the preceding sentence, if the Independent Auditor shall not have submitted its determination on or before the date such Tax Return is required to be filed with the relevant Tax Authority (giving effect to any valid extensions), the Purchaser shall file its original draft of such Tax Return and shall, upon receiving the Independent Auditor's later determination and to the extent permitted under applicable Law, promptly file an amended return in accordance therewith. The fees and expenses of the Independent Auditor shall be paid by the Party whose position is deemed to be least correct by the Independent Auditor.

(e)     Notwithstanding any contrary provision in this ARTICLE VI, each Seller shall pay to the Purchaser the amount of its liability for Taxes shown to be due on any Tax Return for a Straddle Period at least three (3) Business Days prior to the due date thereof, giving effect to valid extensions; provided, however, that (i) if such Seller and the Purchaser are unable to agree as to the amount of such liability prior to such due date, such Seller shall pay to the Purchaser such amount as it in good faith believes that it owes, and (ii) to the extent the Independent Auditor determines that the amount of such liability is greater than the amount actually paid to the Purchaser prior to such due date, such Seller shall pay to the Purchaser such excess within three (3) Business Days after receiving the Independent Auditor's determination.

(f)     Notwithstanding any contrary provision in this ARTICLE VI, the Sellers shall not be entitled to any Tax-related information, including any Tax Return, that includes assets or operations of the Purchaser or any of its Affiliates in addition to the Assets; provided, however, that the Purchaser shall provide the Sellers with a copy of a pro forma Tax Return relating solely to the Assets for any Straddle Period.

Section 6.7.    Allocation of Purchase Price.

(a)     Except as otherwise required by applicable Law, the Parties shall (i) allocate to the tangible Assets a portion of the Purchase Price (and, to the extent properly taken into account under the applicable Tax Laws, the Assumed Liabilities) equal to the net book

value of such tangible Assets as of the Closing Date, and (ii) allocate to the intangible Assets the balance of the Purchase Price.

        (b)     To the extent necessary to file Transfer Tax Returns, the Parties shall negotiate in good faith to determine an allocation of the Purchase Price (and, to the extent properly taken into account under the applicable Tax Laws, the Assumed Liabilities) among the Assets in accordance with the principles of Section 1060 of the Code and the Treasury Regulations promulgated thereunder and other applicable Tax Laws, which allocation shall be subject to the principles of Section 6.7(a) (such allocation, a **"Partial Allocation"**). If the Parties do not reach agreement on a Partial Allocation after negotiating in good faith, the Partial Allocation shall be submitted to the Independent Auditor, which shall prepare a final Partial Allocation; provided, however, that if a different Partial Allocation is required by a Government Entity (including as a result of the Bankruptcy Proceedings), then the Partial Allocation shall be modified as necessary to be consistent with the required allocation but in all cases shall be subject to the principles of Section 6.7(a). Notwithstanding the preceding sentence, if the Parties have not reached agreement on the Partial Allocation and the Independent Auditor has not submitted its determination on or before the date that a Transfer Tax Return is required to be filed with the relevant Tax Authority (giving effect to any valid extensions) pursuant to Section 6.6(b), then such Tax Return shall be timely filed in the manner that the Party with primary responsibility for filing such return reasonably determines and shall, upon receiving the Independent Auditor's later determination and to the extent permitted under applicable Law, promptly file an amended return in accordance therewith. The Parties agree (i) to be bound by the final Partial Allocation accepted by the Parties or prepared by the Independent Auditor (as modified to be consistent with the allocation required by a Government Entity, as described above), as applicable, and (ii) to act in accordance with the allocations contained in such final Partial Allocation for all purposes relating to Transfer Taxes, including the preparation, filing and audit of any Transfer Tax Returns.

        Section 6.8.    Tax Elections.

        (a)     Subsection 20(24) Election. Each of the Purchaser and each Designated Purchaser and the relevant Seller shall, if applicable, jointly execute and file an election under subsection 20(24) of the *Income Tax Act* (Canada) in the manner required by subsection 20(25) of the *Income Tax Act* (Canada) and under the equivalent or corresponding provisions of any other applicable provincial or territorial statute, in the prescribed forms and within the time period permitted under the *Income Tax Act* (Canada) and under any other applicable provincial or territorial statute, as to such amount paid by the Seller to the Purchaser or relevant Designated Purchaser, as the case may be, for assuming future obligations. In this regard, the Purchaser, the Designated Purchasers and the Seller acknowledge that a portion of the Assets transferred by the Seller pursuant to this Agreement and having a value equal to the amount elected under subsection 20(24) of the *Income Tax Act* (Canada) and the equivalent provisions of any applicable provincial or territorial statute, is being transferred by the Seller as a payment for the assumption of such future obligations by the Purchaser or Designated Purchaser, as the case may be.

        (b)     Other Tax Elections. The Purchaser and the Seller shall also execute and deliver such other Tax elections and forms as they may mutually agree upon.

92

## ARTICLE VII

## EMPLOYMENT MATTERS

Section 7.1.    Employment Obligations

7.1.1.    Employment Terms.

(a)    Promptly following the granting of the later of the U.S. Sale Order and the Canadian Approval and Vesting Order, the Purchaser shall, or shall cause a Designated Purchaser to, extend a written offer of employment to the Employees as set forth on Section 7.1 of the Sellers Disclosure Schedule, such offer being contingent (x) in each case, in the discretion of the Purchaser, on such Employee passing a background check and, if such Employee is located in the United States, drug screening, in all cases, to the extent permitted and consistent with applicable Law and (y) in the case of Inactive Employees, upon their return to active status (other than Employees set forth on Section 7.1 of the Sellers Disclosure Schedule whose employment transfers automatically by operation of Law to the Purchaser or a Designated Purchaser). The Sellers shall have the right to review any offer of employment made pursuant to this Section 7.1 prior to it being sent to any Employee. Such offer of employment shall provide for an employee consideration period of at least one week, or such longer period as required by applicable Law. Such offers (and, with respect to Employees whose employment transfers by operation of Law, such continued employment) shall be consistent with the requirements of applicable Law and on terms and conditions no less favorable, in the aggregate, than those the Employees currently have, but subject to certain adjustments to conform to the Purchaser's standard employment policies where legally possible.

(b)    The Sellers shall provide the Purchaser or a Designated Purchaser with such additional information as the Purchaser may reasonably require in order to comply with its obligations under this ARTICLE VII. Notwithstanding anything to the contrary contained herein, as a condition to the transfer of employment (except as prohibited by applicable Law), the Purchaser or Designated Purchaser may require Employees to provide evidence that they are legally permitted to be employed by the Purchaser or a Designated Purchaser, as required by applicable Law.

(c)    Any Employee who accepts such offer of employment and commences employment with the Purchaser or a Designated Purchaser, and any Employee whose employment transfers by operation of Law, shall be deemed to be a Transferred Employee for all purposes of this Agreement. Inactive Employees who accept such offer shall remain employed by the relevant Seller until the first (1st) Business Day immediately following the date the Inactive Employee is released to return to active employment in accordance with Sellers' leave policies. The Purchaser or a Designated Purchaser shall use reasonable efforts from the date hereof until the Closing Date to obtain, at its cost, such visas or permits as are required for it to employ Visa Employees. Visa Employees shall remain employed by the relevant Seller following the Closing Date under the terms and conditions of the Loaned Employee Agreement. The Effective Hire Date for Employees is (a) the Employee Transfer Date for those Employees other than Inactive Employees and Visa Employees, (b) 12:01 a.m. on the first Business Day

following the release to return to active employment from leave for all Inactive Employees and (c) the date specified in the Loaned Employee Agreement with respect to Visa Employees.

(d)    For the twelve (12) month period following the Closing Date (or for such shorter period as a Transferred Employee remains employed by Purchaser or a Designated Purchaser), such Transferred Employee, subject to applicable Law, shall be employed on terms and conditions of employment not materially less favorable, in the aggregate, than the terms and conditions of employment provided to such Employees immediately prior to the Closing, subject, following the Effective Hire Date, to certain adjustments to conform to the Purchaser's standard employment policies where legally possible; provided, however, that, subject to the terms of the Loaned Employee Agreement, neither this Section 7.1 nor Section 7.2 restricts the right of the Sellers, the Purchaser or a Designated Purchaser to terminate the employment of any Transferred Employee after the Closing; provided, further, that, following the Effective Hire Date, except as provided in Section 7.4, nothing shall prohibit the Purchaser or any Designated Purchaser from amending or terminating, in whole or in part, any Purchaser Employee Plan or from making changes to such terms and conditions of employment that are generally applicable and broadly based across the Purchaser's or Designated Purchaser's employee population; and provided, further, that for purposes of clarity the Purchaser shall not be required to offer in any offer made pursuant to this ARTICLE VII any (i) equity, (ii) retiree medical or other retiree welfare arrangement or (iii) defined benefit pension plan, in each case, unless required by applicable Law.

7.1.2.    Employee Benefits.

(a)    The Purchaser or a Designated Purchaser shall, and shall cause its relevant Affiliates to, recognize the service date of each Transferred Employee as set out in the Employee Information for all purposes, including membership, vesting and entitlement to benefits under the relevant Purchaser Employee Plans, but not for purposes of benefit accrual under any Purchaser Employee Plan that is a defined benefit pension plan, except as otherwise provided herein, or to the extent that such crediting would result in duplication of benefits.

(b)    After the date hereof, the Sellers and the Purchaser shall cooperate promptly and in good faith in preparing the transition of the Transferred Employees, as applicable, from coverage under the Seller Employee Plans to coverage under the Purchaser Employee Plans effective as of the Transferred Employee's Effective Hire Date.

(c)    Without limiting the generality of the foregoing, the Purchaser shall, or shall cause its relevant Affiliates to, provide the following benefits to Transferred Employees:

(i)    The Sellers shall pay the amount of compensation with respect to the accrued and unused vacation hours that is due and owing to the Transferred Employees (other than those Transferred Employees specified in Section 7.1.2(c)(i) of the Sellers Disclosure Schedule (the "**Specified Transferred Employees**")), up to their Effective Hire Date, to such Transferred Employees by the date required under applicable Law. The Purchaser will, and will cause the relevant Designated Purchasers to, make reasonable efforts to accommodate requests for unpaid time off of such Transferred Employees until such time as they accrue sufficient paid time off under the Purchaser

94

Employee Plans to address their vacation plans. Section 7.1.2(c)(i) of the Sellers Disclosure Schedule sets forth the amount of accrued and unused vacation hours that are due and owing to the Specified Transferred Employees as of the date hereof and will be updated by Sellers as of the Closing Date with respect to Specified Transferred Employees who are employed as of that date and have not rejected the Purchaser's or Designated Purchaser's offer of employment or continued employment with the Purchaser or Designated Purchaser. The Purchaser shall, or shall cause its relevant Affiliates to, grant each such Transferred Employee paid time off in an amount equal to such accrued unused vacation hours for such Transferred Employee as set forth in Section 7.1.2(c)(i) of the Sellers Disclosure Schedule. If such Specified Transferred Employee terminates employment with the Purchaser or an Affiliate of Purchaser prior to receiving such paid time off, as described above, the Purchaser shall pay such Transferred Employee an amount equal to any such unused paid time off upon such employment termination.

(ii)     For the avoidance of doubt, such vacation accrual rate applicable to Specified Transferred Employees shall not be decreased by Purchaser or an Affiliate of Purchaser as a result of the obligation in Section 7.1.2(c)(i) that Purchaser or its Affiliates grant such Employees accrued and unused vacation hours as set forth in Section 7.1.2(c)(i) of the Sellers Disclosure Schedule.

(iii)     Each Transferred Employee (and their eligible dependents, as applicable), shall be eligible, effective as of the relevant Effective Hire Date, to participate in and accrue benefits under the Purchaser Employee Plans that the Purchaser (or, as applicable, a Designated Purchaser) extends to similarly situated employees of the Purchaser (or the applicable Designated Purchaser) subject to the terms of the Purchaser Employee Plans. With respect to each Transferred Employee (and their eligible dependents, as applicable), the Purchaser or the relevant Purchaser's Affiliates shall cause such plans to (i) waive any eligibility periods, evidence of insurability or pre-existing condition limitations to the extent such limitations no longer apply to such Transferred Employees under the comparable corresponding Seller Employee Plan and (ii) honor any deductibles, co-payments, co-insurance or out-of-pocket expenses paid or incurred by such employees, including with respect to their dependents, under comparable Seller Employee Plans during the Purchaser Employee Plan year in which the relevant Effective Hire Date occurs, provided that such employee provides an explanation of benefits or similar documentation of such expenses paid or incurred to the Purchaser or its Affiliates which is reasonably satisfactory to Purchaser.

(d)     The Sellers shall be solely responsible for any required notice under the WARN Act with respect to terminations of employment of Employees that occur on or prior to the Closing Date provided that the Purchaser or Designated Purchaser, as applicable, has satisfied its obligations as set out in this ARTICLE VII. Purchaser shall be solely responsible for any required notice under the WARN Act with respect to terminations of employment of Transferred Employees that occur after the Closing Date.

95

Section 7.2.    <u>Other Employee Covenants</u>.

(a)    After the date hereof, and subject to each Party's disclosure obligations imposed by Law or by Government Entities and each Party's obligations hereunder, neither the Purchaser, the Sellers nor any of their respective Affiliates shall issue any announcement or communication to their respective employees or the Employees, prior to consultation with, and the approval of, the other Party (not to be unreasonably withheld or delayed) with respect to this Agreement or any of the transactions contemplated hereby. If requested, the Parties shall reasonably cooperate in respect of the development and distribution of any announcement and communication to the employees of the Sellers, including Employees, with respect to this Agreement or any of the transactions contemplated hereby.

(b)    Prior to the Effective Hire Date (for Transferred Employees) and before and after the Closing Date for all other Employees, the Purchaser undertakes to keep the Employee Information in confidence including taking the following actions:

(i)    the Purchaser shall, and shall cause the Designated Purchasers to, restrict the disclosure of the Employee Information only to such of its employees, agents and advisors as is reasonably necessary for the purposes of complying with its obligations pursuant to this Agreement;

(ii)    the Employee Information shall not be disclosed to any Person other than those set forth in Section 7.2(b)(i) above (including, for the avoidance of doubt, any other employee of the Purchaser or any Designated Purchaser or other Affiliate of the Purchaser) without the consent of the Main Sellers, such consent not to be unreasonably withheld;

(iii)    the Employee Information shall not be used except for the purposes of complying with the obligations of the Purchaser and the Designated Purchasers pursuant to this Agreement and shall be returned to the Sellers or destroyed, at the Sellers' election, if this Agreement is terminated; and

(iv)    the Purchaser shall, and shall cause the Designated Purchasers to, comply with such additional obligations as may be reasonably required in any particular jurisdiction to comply with any applicable data privacy Laws.

(c)    As soon as practicable, but in no event later than thirty (30) days following the Closing Date, except to the extent prohibited by applicable data privacy Laws and subject to consent by such Employee in his or her written offer of employment, or as otherwise required by Law, the Sellers shall provide the Purchaser or the Designated Purchaser with (i) certain mutually agreed HR and Payroll SAP employee data as stored in Sellers SAP system with respect to each Transferred Employee and (ii) the Employee Records (or a copy thereof) of Transferred Employees in the province of Quebec in Canada and in other jurisdictions where required by applicable Law. The Purchaser and the Sellers shall cooperate with each other to provide for an orderly transition of the Transferred Employees from the Sellers to the Purchaser or the Designated Purchasers, as applicable, and to minimize the disruption to the respective businesses of the Parties resulting from the transactions contemplated hereby.

(d)    During the Non-Solicitation Period, the Sellers shall not, without the advance written consent of Purchaser, either directly or indirectly solicit for employment or hire any Transferred Employee unless the employment of such Transferred Employee is involuntarily terminated without cause by the Purchaser or Designated Purchaser prior to such action by the Sellers; provided, however, that nothing in this Section 7.2(d) shall prevent the Sellers from (i) conducting generalized employment searches, including placing *bona fide* public advertisements, that are not specifically targeted at such Transferred Employees or (ii) hiring such Transferred Employees identified through such employment searches.

(e)    During the Non-Solicitation Period, Purchaser and the Designated Purchasers shall not, without the Seller's advance written consent or as expressly permitted by this Agreement, either directly or indirectly solicit for employment or hire (i) any of the employees of the Sellers, unless the employment of such employee (excluding any employee described in (ii) or (iii) below) is involuntarily terminated without cause by the Sellers prior to such action by the Purchaser or the Designated Purchasers, (ii) any Employees who have rejected the employment offer of Purchaser or Designated Purchasers or objected to their transfer of employment to Purchaser or Designated Purchasers pursuant to this Agreement or (iii) any Employees to whom the Purchaser or any Designated Purchaser have not made an employment offer or provided the opportunity for continued employment; provided, however, that nothing in this Section 7.2(e) shall prevent the Purchaser or the Designated Purchasers from (x) conducting generalized employment searches, including placing bona fide public advertisements, that are not specifically targeted at such employees or former employees of the Sellers or (y) hiring such employees or former employees of the Sellers identified through such employment searches; and, provided further that with respect to any Employee described in (ii) or (iii) above who becomes employed with the Purchaser or a Designated Purchaser other than through operation of Law during the Non-Solicitation Period, the Purchaser or the Designated Purchaser, as applicable, shall be required to reimburse the Sellers, if applicable, for any notice of termination payment (including under the WARN Act) and/or severance payments, in either case, to the extent thereto timely paid, by Sellers to such Employee.

(f)    During the Non-Solicitation Period, neither Party shall, except as specifically set out in this Agreement or without the other Parties' written consent or as expressly permitted by this Agreement, either directly or indirectly solicit for employment or hire any of the employees with whom the Party has had personal contact, or who became known to the Party in the course of its negotiation of the transactions contemplated hereby; provided that nothing in this Section 7.2(f) shall restrict or preclude the Party, without such consent, from employing any employee Party who (x) contacts such Party directly at his or her own initiative without any direct or indirect solicitation by or encouragement from such party, (y) responds to a mass media solicitation or advertisement consistent with such Party's past practices, as applicable, that is not directed at  the employees, or (z) is contacted by a third party executive search firm or employment agency, so long the Party did not provide guidance as to such employee to the third party firm or agency.

Section 7.3.    Excluded Employee Liabilities.

Except for the Assumed Liabilities and except as otherwise specifically provided in the Loaned Employee Agreement, the Sellers shall retain, and none of the Purchaser or the

Designated Purchasers shall assume or be deemed to have assumed, any Liabilities of the Sellers or their Affiliates relating to Employees other than the Assumed Liabilities (the "**Excluded Employee Liabilities**"). The Excluded Employee Liabilities shall include, but not be limited to, the following:

(a)    the Sellers' or any of their Affiliates' obligations to contribute to, make payments with respect to or provide benefits under any Seller Employee Plan (including, for the avoidance of doubt, any arrangement that provides severance-type benefits) except with respect to the Transferred Employee Plans;

(b)    any Liability with respect to the KERP, the KEIP, the Calgary Retention Plan or any other Seller retention plan, program or arrangement in effect as of the Closing Date that provides benefits to any Transferred Employee;

(c)    any obligation to provide continuation coverage pursuant to COBRA under any Seller Employee Plan that is a "group health plan" (as defined in Section 5000(b)(1) of the Code) to the Transferred Employees and/or their qualified beneficiaries with respect to a COBRA qualifying event that occurs prior to such Employees' Employee Transfer Date;

(d)    Liabilities resulting from any Action (i) with respect to any Employee relating to his/her employment or termination of employment with any of the Sellers, or (ii) with respect to an applicant with respect to potential employment with any of the Sellers in the Business; and

(e)    any Liabilities relating to the Employees or any former employees employed in the Business by the Sellers (with respect only to such employee's employment with the Sellers), including payments or entitlements that Sellers or any of their Affiliates may owe or have promised to pay to any current or former Employee (whether or not becoming a Transferred Employee prior to or in connection with the Closing, (including any Employee who does not accept an offer of employment with the Purchaser or a Designated Purchaser)), including wages, other remuneration, holiday, bonus, severance pay (statutory or otherwise), commission, post-employment medical or life obligations, pension contributions or benefits, Taxes, ERISA Affiliate Liability, any obligation, liability or expense relating to any employment agreement or contract, any former Collective Labor Agreement, the employment practices of Sellers or any of their Affiliates prior to the Closing Date and any other liability, payment or obligations related to current or former Employees, including any WARN Act Liabilities relating to actions of the Sellers arising on or prior to the Closing Date, any workers compensation, labor, social welfare or similar Law, if any, including any such Liabilities arising out of or resulting from the Closing and/or the consummation of the transactions contemplated by this Agreement, other than any Assumed Liabilities and other than with respect to liabilities incurred after the Closing Date under Purchaser Employee Plans by Transferred Employees who are terminated by Purchaser or a Designated Purchaser after the Closing Date.

Section 7.4.    Canadian Pension Plans.

As of the Closing Date, the Purchaser or the Designated Purchaser, as applicable, shall establish or otherwise provide a registered pension plan for Transferred Employees

employed in Canada and maintain such plan for a period of at least five (5) years following the Closing Date and each such Transferred Employee's participation shall commence on such Transferred Employee's Effective Hire Date.

Section 7.5.    Sole Benefit of Sellers and Purchaser.

The terms and provisions of this ARTICLE VII are for the sole benefit of the Sellers and the Purchaser. Nothing contained herein, express or implied (i) shall be construed to establish, amend, or modify any Seller Employee Plan, any Purchaser Employee Plan, or any other benefit plan, program, agreement or arrangement, (ii) shall alter or limit the ability of the Purchaser, the Sellers, or any of their respective Affiliates to amend, modify or terminate any Seller Employee Plan, any Purchaser Employee Plan (other than as provided in Section 7.4). or any other benefit or employment plan, program, agreement or arrangement after the Closing Date, (iii) is intended to confer or shall confer upon any current or former employee any right to employment or continued employment, or constitute or create an employment agreement with any Transferred Employees, or (iv) is intended to confer or shall confer upon any individual or any legal representative of any individual (including employees, retirees, or dependents or beneficiaries of employees or retirees and including collective bargaining agents or representatives) any right as a third-party beneficiary of this Agreement.

## ARTICLE VIII

## CONDITIONS TO THE CLOSING

Section 8.1.    Conditions to Each Party's Obligation.The Parties' obligation to effect, and, as to the Purchaser, to cause the relevant Designated Purchasers to effect, the Closing is subject to the satisfaction or the express written waiver of the Primary Parties, at or prior to the Closing, of the following conditions:

(a)    *Regulatory Approvals.* All Regulatory Approvals shall have been obtained.

(b)    *No Injunctions or Restraints.* There shall be in effect no Law, or order, injunction, decree or judgment of any court or other Government Entity in the U.S. or Canada prohibiting the consummation of any of the transactions contemplated hereby, and there shall not be any proceedings pending by any Government Entity in the U.S. or Canada seeking such prohibition.

(c)    *U.S. Sale Order and Canadian Approval and Vesting Order.* The U.S. Sale Order and the Canadian Approval and Vesting Order (i) shall have been entered and not modified and (ii) shall have become Final Orders, provided, that, this condition under Section 8.1(c)(ii) may be waived by the Purchaser in its sole discretion.

(d)    *Satisfaction of Conditions under EMEA Asset Sale Agreement.* The conditions to Closing (as that term is defined in the EMEA Asset Sale Agreement) set out in Clause 15.1 of the EMEA Asset Sale Agreement shall have been satisfied or waived in accordance with the terms of the EMEA Asset Sale Agreement.

      (e)     *Consummation of Closing under EMEA Asset Sale Agreement.* The transaction contemplated by the EMEA Asset Sale Agreement shall be completed contemporaneously with the Closing hereunder.

     Section 8.2.   Conditions to Sellers' Obligation.The Sellers' obligation to effect the Closing shall be subject to the fulfillment (or express written waiver by the Main Sellers), at or prior to the Closing, of each of the following conditions:

      (a)     *No Breach of Representations and Warranties.*

         (i)     Each of the representations and warranties set forth in ARTICLE III (other than those referred to in clause (ii) below), disregarding all materiality and material adverse effect qualifications contained therein, shall be true and correct (x) as if restated on and as of the Closing Date or (y) if made as of a date specified therein, as of such date, except, in each case, for any failure to be true and correct that, individually or together with other such failures, has not had, and would not reasonably be expected to have, a material adverse effect on the ability of the Purchaser to consummate the transactions contemplated by this Agreement and the Ancillary Agreements.

         (ii)     Each of the representations and warranties set forth in Sections 3.1, 3.2 and 3.3, disregarding all materiality and material adverse effect qualifications contained therein, shall be true and correct in all material respects (x) as if restated on and as of the Closing Date or (y) if made as of a date specified therein, as of such date.

      (b)     *No Breach of Covenants.* The covenants, obligations and agreements contained in this Agreement to be performed or complied with by the Purchaser or the Designated Purchasers on or before the Closing shall not have been breached in any material respect.

     Section 8.3.   Conditions to Purchaser's Obligation.The Purchaser's obligation to effect, and to cause the relevant Designated Purchasers to effect, the Closing shall be subject to the fulfillment (or express written waiver by the Purchaser), at or prior to the Closing, of each of the following conditions:

      (a)     *No Breach of Representations and Warranties.*

         (i)     Each of the representations and warranties set forth in ARTICLE IV (other than those referred to in clause (ii) below), disregarding all materiality and Material Adverse Effect qualifications contained therein, shall be true and correct (x) as if restated on and as of the Closing Date or (y) if made as of a date specified therein, as of such date, except, in each case, for any failure to be true and correct that has not had, and would not reasonably be expected to have, a Material Adverse Effect.

         (ii)     Each of the representations and warranties set forth in Sections 4.1, 4.2 and 4.3, disregarding all materiality and Material Adverse Effect qualifications contained therein, shall be true and correct in all material respects (x) as if

restated on and as of the Closing Date or (y) if made as of a date specified therein, as of such date.

(b)     *No Breach of Covenants.* The covenants, obligations and agreements contained in this Agreement to be performed or complied with by the Sellers on or before the Closing shall not have been breached in any material respect.

(c)     *Unbundling and Assignment.* With respect to Seller Contracts that accounted, in the aggregate, for at least 75% of the sales revenue related to the Business in fiscal year 2008 (the **"Specified Contracts"**), the Sellers shall have (or will prior to or at the Closing) (i) in the case of Assumed and Assigned Contracts, assumed and assigned such Specified Contracts to the Purchaser or a Designated Purchaser pursuant to Section 2.1.5, (ii) in the case of Designated Non-365 Contracts, obtained and delivered to the Purchaser all Consents of the other parties thereto or any Third Party (including a Government Entity) necessary or required for the assignment and assumption of such Designated Non-365 Contracts to the Purchaser or a Designated Purchaser pursuant to Section 2.1.6, and (iii) in the case of Bundled Contracts, other than the Contracts assumed and assigned as required by the foregoing clause (i), amended such Bundled Contracts and entered into new Contracts in accordance with Section 5.15 with the counterparties to such Specified Contracts so that such Contracts will be Assigned Contracts at the Closing.

(d)     *Certificates.* The Sellers shall have delivered to the Purchaser duly executed certificates, as set forth in Section 2.3.2(b).

## ARTICLE IX

## TERMINATION

Section 9.1.     Termination.This Agreement may be terminated at any time prior to the Closing (except in the case of Section 9.1(e) where it shall be automatic):

(a)     by mutual written consent of the Primary Parties;

(b)     by either the Main Sellers or the Purchaser, upon written notice to the other:

(i)     if the U.S. Sale Order and the Canadian Approval and Vesting Order are not entered within thirty (30) days after the Auction (as defined in the U.S. Bidding Procedures Order);

(ii)     if the EMEA Asset Sale Agreement is terminated in accordance with its terms;

(iii)     if the NNSA Irrevocable Offer is terminated in accordance with its terms; or

(iv)     if the Closing does not take place within one-hundred and eighty (180) days from the date of the U.S. Sale Order.

101

(c)    (i) by the Main Sellers in the event of a material breach by the Purchaser of the Purchaser's representations, warranties, agreements or covenants set forth in this Agreement, which breach would result in a failure to satisfy the conditions to Closing set forth in Sections 8.1(a), 8.2(a), or 8.2(b) or (ii) by the Purchaser in the event of a material breach by the Sellers of the Sellers' representations, warranties, agreements or covenants set forth in this Agreement, which breach would result in a failure to satisfy the conditions to Closing set forth in Sections 8.1(a), 8.1(c) or 8.3, as applicable, and, in each case in respect of (i) and (ii) above, which, if capable of being cured, is not cured within forty-five (45) days from receipt of a written notice from the non-breaching Party;

(d)    by the Purchaser in the event the Sellers fail to consummate the Closing in breach of Section 2.3, within five (5) Business Days of written demand by the Purchaser to consummate the Closing; or

(e)    upon the breach by the Main Sellers of their obligations under Section 2 of the Termination Fee Side Agreement, which results in the Purchaser being entitled to the Termination Fee (as defined in the Termination Fee Side Agreement) pursuant to Section 3 thereof.

provided, however, that (x) the right to terminate this Agreement pursuant to Sections 9.1(b), 9.1(c) and 9.1(d) shall not be available to any Party whose breach hereof has been the cause of, or has resulted in, the event or condition purportedly giving rise to a right to terminate this Agreement under such clauses.

Section 9.2.    Effects of Termination. If this Agreement is terminated pursuant to Section 9.1:

(a)    all further obligations of the Parties under or pursuant to this Agreement shall terminate without further liability of any Party to the other except for the provisions of (i) Section 2.2.4 (Good Faith Deposit), (ii) Section 5.7 (Public Announcements), (iii) Section 5.10 (Transaction Expenses), (iv) Section 5.11 (Confidentiality), (v) Section 7.2(b)(iii) (Other Employee Covenants), (vi) Section 9.1 (Termination), (vii) Section 9.2 (Effects of Termination) and (viii) ARTICLE X (Miscellaneous); provided, that neither the termination of this Agreement nor anything in this Section 9.2 shall relieve any Party from liability for any breach of this Agreement occurring before the termination hereof and thereof;

(b)    except as required by applicable Law, the Purchaser shall promptly return to the Sellers or destroy all documents, work papers and other material of any of the Sellers relating to the transactions contemplated hereby, whether so obtained before or after the execution hereof; and

(c)    the provisions of the Confidentiality Agreement shall continue in full force and effect.

# ARTICLE X

## MISCELLANEOUS

Section 10.1.  No Survival of Representations and Warranties or Covenants.No representations or warranties, covenants or agreements in this Agreement or in any instrument delivered pursuant to this Agreement shall survive beyond the Closing Date, except for covenants and agreements that by their terms are to be satisfied after the Closing Date, which covenants and agreements shall survive until satisfied in accordance with their terms.

Section 10.2.  Remedies.No failure to exercise nor any delay in exercising, on the part of any Party, any right or remedy under this Agreement or the documents referred to in this Agreement shall operate as a waiver thereof, nor shall any single or partial exercise of any right or remedy prevent any further or other exercise thereof or the exercise of any other right or remedy.  To the maximum extent permitted by applicable Law: (i) no waiver that may be given by a Party hereto shall be applicable except in the specific instance for which it is given; and (ii) no notice to or demand on one Party shall be deemed to be a waiver of any right of the party giving such notice or demand to take further action without notice or demand.  The rights and remedies provided in this Agreement are cumulative and not exclusive of any rights or remedies provided by Law.

Section 10.3.  No Third Party Beneficiaries.The acknowledgements, rights, undertakings, representations or warranties contained in this Agreement and expressed to be for the benefit of the EMEA Sellers or the Joint Administrators (collectively, the **"Third Party Provisions"**) shall inure to, are expressly intended to be for the benefit of, and shall be enforceable by, each of the EMEA Sellers and the Joint Administrators (and their applicable successors or representatives) (the **"Third Party Beneficiaries"**), as applicable, and shall be binding on the Purchaser and its successors and assigns.  Except as provided in this Section 10.3, this Agreement is for the sole benefit of the Parties and their permitted assigns and nothing herein, express or implied, is intended to or shall confer upon any other Person any legal or equitable right, benefit or remedy of any nature whatsoever under or by reason of this Agreement.

Section 10.4.  Consent to Amendments; Waivers.No Party shall be deemed to have waived any provision of this Agreement or any of the other Transaction Documents unless such waiver is in writing, and then such waiver shall be limited to the circumstances set forth in such written waiver.  This Agreement and the Ancillary Agreements shall not be amended, altered or qualified except by an instrument in writing signed by all the parties hereto or thereto, as the case may be.

Section 10.5.  Successors and Assigns.Except as otherwise expressly provided in this Agreement, all representations, warranties, covenants and agreements set forth in this Agreement or any of the Ancillary Agreements by or on behalf of the parties hereto or thereto will be binding upon and inure to the benefit of such parties and their respective successors and permitted assigns.  Neither this Agreement nor any of the rights, interests or obligations hereunder may be assigned by any Party without the prior written consent of the Main Sellers in case of an assignment by Purchaser or Purchaser in case of an assignment by any Seller, which

103

consent may be withheld in such party's sole discretion, except for the following assignment which shall not require consent (i) assignment to an Affiliate of a Party (provided (A) that except as otherwise provided in Section 2.4, such Party remains liable jointly and severally with its assignee Affiliate for the assigned obligations to the other Parties and (B) any such assignment by Purchaser complies with Section 2.4 if applicable), (ii) assignment by a U.S. Debtor to a succeeding entity following such U.S. Debtor's emergence from Chapter 11, and (iii) assignment by any of the Canadian Debtors pursuant to any plan of arrangement approved by the Canadian Court, which will not require the consent of the Purchaser.

Section 10.6.   Governing Law; Submission to Jurisdiction; Waiver of Jury Trial.

(a)      Any questions, claims, disputes, remedies or Actions arising from or related to this Agreement, and any relief or remedies sought by any Parties, shall be governed exclusively by the laws of the State of New York applicable to contracts made and to be performed in that State and without regard to the rules of conflict of laws of any other jurisdiction.

(b)      To the fullest extent permitted by applicable Law, each Party: (i) agrees that any claim, action, proceeding by such Party seeking any relief whatsoever arising out of, or in connection with, this Agreement, or the transactions contemplated hereby shall be brought only in (a) either the U.S. Bankruptcy Court, if brought prior to the entry of a final decree closing the Chapter 11 Cases, or the Canadian Court, if brought prior to the termination of the CCAA Cases, provided that if (X) a final decree closing the Chapter 11 Cases has not been entered and (Y) the CCAA Cases have not terminated, the U.S. Debtors or the Canadian Debtors may, in accordance with the Cross-Border Protocol, move the U.S. Bankruptcy Court or the Canadian Court, as case may be, to hold a joint hearing of the U.S. Bankruptcy Court and the Canadian Court to determine the appropriate jurisdiction for such claim, action or proceeding, and (b) in the Federal Courts in the Southern District of New York and the state courts of the State of New York, county of Manhattan (collectively, the "**New York Courts**") and the Canadian Court, if brought after entry of a final decree closing the Chapter 11 Cases and termination of the CCAA Cases, and shall not be brought, in each case, in any other court in the United States of America, Canada or any court in any other country; (ii) agrees to submit to the jurisdiction of the U.S. Bankruptcy Court, the Canadian Court, and the New York Courts, as applicable, pursuant to the preceding clauses (a) and (b) for purposes of all legal proceedings arising out of, or in connection with, this Agreement or the transactions contemplated hereby; (iii) waives and agrees not to assert any objection that it may now or hereafter have to the laying of the venue of such Action brought in any such court or any claim that any such Action brought in such court has been brought in an inconvenient forum; (iv) agrees that the mailing of process or other papers in connection with any such Action or proceeding in the manner provided in Section 10.7 or any other manner as may be permitted by Law shall be valid and sufficient service thereof; and (v) agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in any other jurisdictions by suit on the judgment or in any other manner provided by applicable Law.

(c)      Section 10.6(b) shall not limit the jurisdiction of (i) the Accounting Arbitrator set forth in Section 2.2.3.1(c) or (ii) any of the arbitrators set forth in Section 5.26,

although claims may be asserted in the courts referred to in Section 10.6(b) for purposes of enforcing the jurisdiction and judgments of the Accounting Arbitrator or arbitrator(s), as applicable.

(d)     EACH PARTY HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION DIRECTLY OR INDIRECTLY ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS AGREEMENT, ANY ANCILLARY AGREEMENT OR ANY TRANSACTION CONTEMPLATED HEREBY OR THEREBY. EACH PARTY (I) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (II) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT AND THE ANCILLARY AGREEMENTS, AS APPLICABLE, BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION 10.6.

Section 10.7.  Notices. All demands, notices, communications and reports provided for in this Agreement shall be in writing and shall be either sent by facsimile transmission with confirmation to the number specified below, or personally delivered or sent by reputable overnight courier service (delivery charges prepaid) to any Party at the address specified below, or at such address, to the attention of such other Person, and with such other copy, as the recipient Party has specified by prior written notice to the sending Party pursuant to the provisions of this Section 10.7.

If to the Purchaser to:

Telefonaktiebolaget L M Ericsson (PUBL)
Torshamnsgatan 23
Kista
Stockholm
Sweden
Attention:  Per Oscarsson
Attention:  Carl Olof Blomqvist
Facsimile:  +46-8-18-4085

With copies (that shall not constitute notice) to:

Paul, Weiss, Rifkind, Wharton & Garrison LLP
1285 Avenue of the Americas
New York New York, USA 10019-6064
Attention:  Stephen J. Shimshak
Attention:  Marilyn Sobel
Facsimile:  +1-212-373-3990

and

Blake, Cassels & Graydon LLP
199 Bay Street
Suite 2800, Commerce Court West
Toronto, Ontario, Canada M5L 1A9
Attention: Richard Corley
Attention: Susan Grundy
Facsimile: +1-416-863-2653

If to the Main Sellers or the Sellers, to:

Nortel Networks Corporation
195 The West Mall Mailstop: T0503006
Toronto, Ontario, Canada M9C 5K1
Attention: Anna Ventresca
          Chief Legal Officer & Corporate Secretary
Facsimile: +1-905-863-7386

Nortel Networks Limited
195 The West Mall Mailstop: T0503006
Toronto, Ontario, Canada M9C 5K1
Attention: Anna Ventresca
          Chief Legal Officer & Corporate Secretary
Facsimile: +1-905-863-7386

Nortel Networks Inc.
Legal Department
220 Athens Way, Suite 300
Nashville, Tennessee, USA 37228
Attention: Anna Ventresca
          Chief Legal Officer & Corporate Secretary
Facsimile: +1-615-432-4067

With copies (that shall not constitute notice) to:

Nortel Networks Corporation
195 The West Mall Mailstop: T0503006
Toronto, Ontario, Canada M9C 5K1
Attention: Robert Fishman
Senior Counsel
Facsimile: +1-347-427-3815 & +1-615-432-4067

106

Nortel Networks Limited
195 The West Mall Mailstop: T0503006
Toronto, Ontario, Canada  M9C 5K1
Attention:  Robert Fishman
Senior Counsel
Facsimile:  +1-347-427-3815 & +1-615-432-4067

and

Nortel Networks Inc.
Legal Department
220 Athens Way, Suite 300
Nashville, Tennessee, USA  37228
Attention:  Robert Fishman
Senior Counsel
Facsimile:  +1-347-427-3815 & +1-615-432-4067

and

Cleary Gottlieb Steen & Hamilton LLP
One Liberty Plaza
New York, New York, USA  10006
Attention:  Craig Brod
Attention:  Paul J. Shim
Facsimile:  +1-212-225-3999

Cleary Gottlieb Steen & Hamilton LLP
12, rue de Tilsitt
75008 Paris
France
Attention: Jean-Marie Ambrosi
Attention: Fabrice Baumgartner
Facsimile: +33 1 40 74 68 00

and

Ogilvy Renault LLP
200 Bay Street
Suite 3800, P.O. Box 84
Royal Bank Plaza, South Tower
Toronto, Ontario M5J 2Z4
Canada
Attention: Michael J. Lang
Facsimile: + 1-416-216-3930

107

Any such demand, notice, communication or report shall be deemed to have been given pursuant to this Agreement when delivered personally, when confirmed if by facsimile transmission, or on the second calendar day after deposit with a reputable overnight courier service, as applicable.

Section 10.8.   Exhibits; Sellers Disclosure Schedule. The Sellers Disclosure Schedule and the Exhibits attached hereto constitute a part of this Agreement and are incorporated into this Agreement for all purposes as if fully set forth herein.

(b)   For purposes of the representations and warranties of the Sellers contained in this Agreement, disclosure in any section of the Sellers Disclosure Schedule of any facts or circumstances shall be deemed to be adequate response and disclosure of such facts or circumstances with respect to all representations or warranties by the Sellers calling for disclosure of such information, whether or not such disclosure is specifically associated with or purports to respond to one or more of such representations or warranties, if it is reasonably apparent from the Sellers Disclosure Schedule that such disclosure is applicable.  The inclusion of any information in any section of the Sellers Disclosure Schedule or other document delivered by the Sellers pursuant to this Agreement shall not be deemed to be an admission or evidence of the materiality of such item, nor shall it establish a standard of materiality for any purpose whatsoever.

Section 10.9.   Counterparts.The Parties may execute this Agreement in two or more counterparts (no one of which need contain the signatures of all Parties), each of which will be an original and all of which together will constitute one and the same instrument.  Delivery of an executed counterpart of a signature page to this Agreement by facsimile or other electronic means shall be effective as delivery of a manually executed counterparty of this Agreement.

Section 10.10. No Presumption.The Parties agree that this Agreement was negotiated fairly between them at arm's length and that the final terms of this Agreement are the product of the Parties' negotiations.  Each Party represents and warrants that it has sought and received experienced legal counsel of its own choosing with regard to the contents of this Agreement and the rights and obligations affected hereby.  The Parties agree that this Agreement shall be deemed to have been jointly and equally drafted by them, and that the provisions of this Agreement therefore should not be construed against a Party on the grounds that such Party drafted or was more responsible for drafting the provisions.

Section 10.11. Severability.If any provision, clause, or part of this Agreement, or the application thereof under certain circumstances, is held invalid, illegal or incapable of being enforced in any jurisdiction, (i) as to such jurisdiction, the remainder of this Agreement or the application of such provision, clause or part under other circumstances, and (ii) as for any other jurisdiction, all provisions of this Agreement, shall not be affected and shall remain in full force and effect, unless, in each case, such invalidity, illegality or unenforceability in such jurisdiction materially impairs the ability of the Parties to consummate the transactions contemplated by this Agreement.  Upon such determination that any clause or other provision is invalid, illegal or incapable of being enforced in such jurisdiction, the Parties shall negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties as closely as possible in a mutually acceptable manner in order that the transactions contemplated hereby be consummated as originally contemplated to the greatest extent possible even in such jurisdiction.

Section 10.12. HeadingsThe headings used in this Agreement are for the purpose of reference only and shall not affect the meaning or interpretation of any provision of this Agreement.

Section 10.13. Entire Agreement.

(a)     This Agreement, the other Transaction Documents and the Confidentiality Agreement set forth the entire understanding of the Parties relating to the subject matter thereof, and all prior or contemporaneous understandings, agreements, representations and warranties, whether written or oral, are superseded by this Agreement, the other Transaction Documents and the Confidentiality Agreement, and all such prior or contemporaneous understandings, agreements, representations and warranties are hereby terminated.  In the event of any irreconcilable conflict between this Agreement and any of the other Transaction Documents or the Confidentiality Agreement, the provisions of this Agreement shall prevail, regardless of the fact that certain other Transaction Documents, such as the Local Sale Agreement, may be subject to different governing Laws.

(b)     For the sake of clarity, the provisions of the EMEA Asset Sale Agreement and the NNSA Irrevocable Offer have been drafted separately from the provisions in the body of

this Agreement to reflect differing market practices in the countries of jurisdiction of the EMEA Sellers and NNSA. Unless the context specifically requires, the provisions contained in the body of this Agreement and the provisions of the EMEA Asset Sale Agreement and the NNSA Irrevocable Offer shall be interpreted independently and without reference to each other.

Section 10.14. Availability of Equitable Relief; Sole Remedy.The Parties agree that irreparable damage would occur in the event that any of the provisions of this Agreement were not performed in accordance with their specific terms or were otherwise breached. Accordingly, subject to the limitations set forth in this Section 10.14, each of the Parties shall be entitled to equitable relief to prevent or remedy breaches of this Agreement, without the proof of actual damages, including in the form of an injunction or injunctions or orders for specific performance in respect of such breaches. Each Party agrees to waive any requirement for the security or posting of any bond in connection with any such equitable remedy. Each Party further agrees that the only permitted objection that it may raise in response to any action for equitable relief is that it contests the existence of a breach or threatened breach of the provisions of this Agreement. It is acknowledged and agreed that under no circumstances shall any Party be liable for punitive damages or indirect, special, incidental, or consequential damages arising out of or in connection with this Agreement or the transactions contemplated hereby or any breach or alleged breach of any of the terms hereof, including damages alleged as a result of tortious conduct.

Section 10.15. Bulk Sales Laws.Subject to the entry of the U.S. Sale Order and the Canadian Approval and Vesting Order, each Party waives compliance by the other Party with any applicable bulk sales Law.

Section 10.16. Main Sellers as Representatives of Other Sellers.

(a)    For all purposes of this Agreement:

(i)    each Other Seller listed in Section 10.16(a)(i) of the Sellers Disclosure Schedule hereby irrevocably appoints NNC as its representative;

(ii)    each Other Seller listed in Section 10.16(a)(ii) of the Sellers Disclosure Schedule hereby irrevocably appoints NNL as its representative; and

(iii)    each Other Seller listed in Section 10.16(a)(iii) of the Sellers Disclosure Schedule hereby irrevocably appoints NNI as its representative.

(b)    Pursuant to Section 10.16(a), each of NNC, NNL and NNI shall expressly have the power to, in the name and on behalf of each of its Respective Affiliates (as defined below), (i) take all decisions and carry out any actions required or desirable in connection with this Agreement, (ii) send and receive all notices and other communications required or permitted hereby, and (iii) consent to any amendment, waivers and modifications hereof.

(c)    For the purposes of this Agreement, **"Respective Affiliates"** means: (i) with respect to NNC, each Other Seller listed in Section 10.16(a)(i) of the Sellers Disclosure Schedule; (ii) with respect to NNL, each Other Seller listed in Section 10.16(a)(ii) of the Sellers

Disclosure Schedule, and (iii) with respect to NNI, all the other U.S. Debtors and each Other Seller listed in Section 10.16(a)(iii) of the Sellers Disclosure Schedule.

(d)     Each Respective Affiliate shall indemnify the Main Seller that acts as representative of such Respective Affiliate for, and hold it harmless against, any loss, liability or expense, including reasonable attorneys' fees, incurred by such Main Seller without gross negligence, bad faith or willful misconduct, for serving in the capacity of representative of such Respective Affiliate hereunder.

Section 10.17. Execution by Other Sellers.The Purchaser hereby acknowledges that the Other Sellers are not executing this Agreement as of the date hereof. This Agreement shall be binding on all parties that have executed this Agreement from the time of such execution, regardless of whether all Sellers have done so.  Between the date hereof and the Closing Date, the Main Sellers hereby agree that they shall cause each Other Seller to execute a counterpart to this Agreement no later than the day prior to the Closing Date, agreeing to be bound as a Seller under this Agreement and authorizing NNC, NNL or NNI, as applicable, to act as its representative under Section 10.16 hereof.

Section 10.18. Obligations of the Sellers.When references are made in this Agreement to certain Sellers causing other Sellers or other Affiliate(s) to undertake (or to not undertake) certain actions, or agreements are being made on behalf of certain other Sellers or other Affiliates, "Sellers" for purposes of such clause shall be deemed to mean, respectively, NNI (in the case of a U.S. Debtor) and NNL (in the case of a Canadian Debtor – other than NNC – and a Non-Debtor Seller).

**[Remainder of this page intentionally left blank.  Signature page follows.]**

111

IN WITNESS WHEREOF, the Parties have duly executed this Asset Sale Agreement as of the date first written above.

Telefonaktiebolaget L M Ericsson (publ)

By:_____
    Name: Carl Olof Blomqvist
    Title: Senior Vice President & General Counsel

By:_____
    Name: Per Oscarsson
    Title: Global Head of Mergers & Acquisitions

Nortel Networks Corporation

By:_____
    Name:
    Title:

By:_____
    Name:
    Title:

Nortel Networks Limited

By:_____
    Name:
    Title:

By:_____
    Name:
    Title:

Nortel Networks Inc.

By:_____
    Name:
    Title:

Signature Page – Asset Sale Agreement

Nortel Networks Corporation

By: _____
    Name: Pavi Binning
    Title: EVP, Chief Financial Officer and CRO

By: _____
    Name: Anna Ventresca
    Title: General Counsel-Corporate and Corporate Secretary


Nortel Networks Limited

By: _____
    Name: Pavi Binning
    Title: EVP, Chief Financial Officer and CRO

By: _____
    Name: Anna Ventresca
    Title: General Counsel-Corporate and Corporate Secretary


Nortel Networks Inc.

By: _____
    Name: Anna Ventresca
    Title: Chief Legal Officer

**APPENDIX "C"**

**[CONFIDENTIAL]**

**APPENDIX D**

[ATTACHED]

EXECUTION VERSION

## GSM TERMINATION FEE AGREEMENT

This GSM TERMINATION FEE AGREEMENT (the "Agreement") is dated as of November 24, 2009, among Nortel Networks Corporation, a corporation organized under the laws of Canada ("NNC"), Nortel Networks Limited, a corporation organized under the laws of Canada ("NNL"), Nortel Networks Inc., a corporation organized under the laws of Delaware ("NNI" and, together with NNC and NNL, the "Main Sellers"), and Telefonaktiebolaget LM Ericsson (publ), a corporation organized under the laws of Sweden (the "Purchaser").

### RECITALS

WHEREAS, on November 24, 2009, following an auction (the "Auction"), the Main Sellers entered into an asset sale agreement with the Purchaser relating to the sale of the GSM business of the Main Sellers and certain of their affiliates (respectively, the "Asset Sale Agreement" and the "Sale"); and

WHEREAS, for the purpose of facilitating the completion of the Sale and maximizing the value arising from the Sale for their respective stakeholders, the parties hereby agree to certain covenants relating to the pursuit and completion of the Sale.

NOW, THEREFORE, in consideration of the promises and mutual covenants made herein, and of the mutual benefits to be derived hereby (the sufficiency of which are acknowledged), the parties hereto agree as follows:

1. Definitions. To the extent capitalized words used herein (including in the recitals hereof) are not defined in this Agreement, those words shall have the meanings given to them in the Asset Sale Agreement.

2. Certain Covenants.

   a. Within two (2) Business Days of the date hereof, NNI shall file (a) a notice with the U.S. Bankruptcy Court to inform all parties in interest that upon completion of the Auction, the Purchaser has been designated by the Sellers as the Successful Bidder, (b) a motion with the U.S. Bankruptcy Court seeking approval of the assumption and assignment procedures for the Assumed and Assigned Contracts of the U.S. Debtors (the "Assignment Procedures Motion"), (c) a notice of a proposed final sale order approving and authorizing the Sale, which shall be substantially in the form of Exhibit 5.1 of the Asset Sale Agreement (with such changes thereto as the Purchaser and the Sellers both approve in their respective reasonable discretion) and (d) a motion with the U.S. Bankruptcy Court seeking approval of this Agreement (the "Termination Fee Motion").

   b. Within two (2) Business Days of the date hereof, NNL and NNC shall file (a) a motion with the Canadian Court seeking approval of the Canadian Approval and Vesting Order Motion with respect to the Sale and (b) a motion with the Canadian Court seeking approval of this Agreement.

c.  The Main Sellers shall not withdraw the U.S. Sale Motion or the Canadian Approval and Vesting Order Motion with respect to the Sale. For purposes hereof, the "U.S. Sale Motion" means that certain Debtors' Motion For Orders (I)(A) Authorizing And Approving The Bidding Procedures, (B) Approving The Notice Procedures, And (C) Setting A Date For The Sale Hearing, And (II) Authorizing And Approving The Sale Of Certain Assets Of Debtors' GSM/GSM-R Business, which was filed on September 30, 2009 with the U.S. Bankruptcy Court.

d.  Subject to the availability of the U.S. Bankruptcy Court, NNI shall use reasonable best efforts to prosecute and seek approval of each of the Assignment Procedures Motion, the Termination Fee Motion and the U.S. Sale Motion with respect to the Sale by December 2, 2009, provided that if the U.S. Bankruptcy Court approves the Sale and grants the relief sought by U.S. Sale Motion and the Canadian Court approves the Sale and grants the relief sought in the Canadian Approval and Vesting Motion prior to the approval of the Termination Fee Motion, the parties hereby agree that NNI may withdraw the Termination Fee Motion without incurring any obligation to pay the Termination Fee (as defined below).

3.  Termination Payment. In the event of a breach by the Main Sellers of their obligations under Section 2 hereof, the Purchaser shall provide written notice to the Main Sellers of such breach ("Breach Notice"). If the Main Sellers fails to cure the breach set forth in the Breach Notice within one (1) Business Day of actual receipt of the Breach Notice, the Main Sellers shall pay to the Purchaser, as the sole and exclusive remedy of the Purchaser, in immediately available funds within two (2) Business Days following such event, a cash fee of $3.09 million (the "Termination Fee"). The Sellers acknowledge and agree that the Termination Fee is a reasonable amount given the size and complexity of the transactions contemplated by this Agreement. The Main Sellers' obligation to pay the Termination Fee shall, to the extent owed by the U.S. Debtors, constitute allowed administrative expense claims against the U.S. Debtors under Section 503(b) of the U.S. Bankruptcy Code and shall be entitled to a first priority Lien on the proceeds of an Alternative Transaction, if any. For purposes hereof, "Alternative Transaction" means the sale, transfer or other disposition, directly or indirectly, including through an asset sale, stock sale, merger, amalgamation or other similar transaction, of all or a material portion of the Business or all or a material portion of the Assets (or a material portion of the EMEA Assets and the NNSA Assets, taken together as a whole) in a transaction or a series of transactions with one or more Persons other than the Purchaser, Kapsch Carriercom AG and/or their respective Affiliates.

4.  Incorporation by Reference. The parties hereby incorporate the following sections of the Asset Sale Agreement by reference: Sections 10.3 (No Third Party Beneficiaries), 10.4 (Consent to Amendments; Waivers), 10.5 (Successors and Assigns), 10.6 (Governing Law; Submission to Jurisdiction; Waiver of Jury Trial), 10.7 (Notices), 10.9 (Counterparts), 10.10 (No Presumption), 10.11 (Severability), 10.12 (Headings) and 10.13 (Entire Agreement).

2

IN WITNESS WHEREOF, the parties hereto have duly executed this Agreement as of the date first written above.

Telefonaktiebolaget L M Ericsson (publ)

By: _____
    Name:  Per Oscarsson
    Title:  Global Head of Mergers & Acquisitions

By: _____
    Name:
    Title:

Nortel Networks Corporation

By: _____
    Name:
    Title:

By: _____
    Name:
    Title:

Nortel Networks Limited

By: _____
    Name:
    Title:

By: _____
    Name:
    Title:

Nortel Networks Inc.

By: _____
    Name:
    Title:

Signature Page – GSM/GSM-R Termination Fee
Agreement

IN WITNESS WHEREOF, the parties hereto have duly executed this Agreement as of the date first written above.

Telefonaktiebolaget L M Ericsson (publ)

By: _____
       Name:
       Title:

By: _____
       Name:
       Title:

Nortel Networks Corporation

By: _____
       Name: Pavi Binning
       Title: EVP, Chief Financial Officer and CRO

By: _____
       Name:
       Title:

Nortel Networks Limited

By: _____
       Name: Pavi Binning
       Title: EVP, Chief Financial Officer and CRO

By: _____
       Name:
       Title:

Nortel Networks Inc.

By: _____
       Name:
       Title:

Signature Page -- GSM/GSM-R Termination Fee Agreement

Court File No: 09-CL-7950

IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL NETWORKS CORPORATION *et al.*

*ONTARIO*
**SUPERIOR COURT OF JUSTICE**
**(COMMERCIAL LIST)**

Proceeding commenced at Toronto

**TWENTY-NINTH REPORT**
**OF THE MONITOR**
**DATED NOVEMBER 27, 2009**

**GOODMANS LLP**
Barristers & Solicitors
250 Yonge Street, Suite 2400
Toronto, Canada  M5B 2M6

Jay A. Carfagnini (LSUC#: 222936)
Joseph Pasquariello (LSUC# 37389C)
Christopher G. Armstrong (LSUC# 55148B)

Tel: 416.979.2211
Fax: 416.979.1234

Lawyers for the Monitor, Ernst & Young Inc.

5787089