# EXHIBIT A

Court File No. 09-CL-7950

## ONTARIO
## SUPERIOR COURT OF JUSTICE
## (COMMERCIAL LIST)

IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL CORPORATION AND NORTEL NETWORKS TECHNOLOGY CORPORATION

## THIRTIETH REPORT OF THE MONITOR
## DATED NOVEMBER 27, 2009

## INTRODUCTION

1.  On January 14, 2009 (the "Filing Date") Nortel Networks Corporation ("NNC" and collectively with all its subsidiaries, "Nortel" or the "Company"), Nortel Networks Limited ("NNL"), Nortel Networks Technology Corporation, Nortel Networks International Corporation and Nortel Networks Global Corporation (collectively the "Applicants") filed for and obtained protection under the *Companies' Creditors Arrangement Act* ("CCAA"). Pursuant to the Order of this Honourable Court dated January 14, 2009, as amended and restated (the "Initial Order"). Ernst & Young Inc. ("EYI") was appointed as the Monitor of the Applicants (the "Monitor") in the CCAA proceedings. The stay of proceedings was extended to December 18, 2009, by this Honourable Court in its Order dated October 28, 2009.

2.  Nortel Networks Inc. ("NNI") and certain of its U.S. subsidiaries concurrently filed voluntary petitions under Chapter 11 of Title 11 of the U.S. Bankruptcy Code (the "Code") in the United States Bankruptcy Court for the District of Delaware (the "U.S. Court") on January 14, 2009 (the "Chapter 11 Proceedings"). As required by U.S. law, an official unsecured creditors committee (the "Committee") was established in January, 2009.

1

3.    An ad hoc group of holders of bonds issued by NNL and NNC has been organized and is participating in these proceedings as well as the Chapter 11 Proceedings (the "Bondholder Group"). In addition, pursuant to Orders of this Honourable Court dated May 27, 2009, and July 22, 2009, respectively, representative counsel was appointed on behalf of the former employees of the Applicants and on behalf of the continuing employees of the Applicants and each of these groups is participating in the CCAA proceedings.

4.    Nortel Networks (CALA) Inc. (together with NNI and those of its US subsidiaries that filed on January 14, 2009, the "U.S. Debtors") filed a voluntary petition under Chapter 11 of Title 11 of the Code in the U.S. Court on July 14, 2009.

5.    Nortel Networks UK Limited ("NNUK") and certain of its subsidiaries located in EMEA (together the "EMEA Debtors") were granted Administration orders (the "U.K. Administration Orders") by the English High Court on January 14, 2009. The U.K. Administration Orders appointed Alan Bloom, Stephen Harris, Alan Hudson and Chris Hill of Ernst & Young LLP as Administrators of the various EMEA Debtors, except for Ireland, to which David Hughes (Ernst & Young LLP Ireland) and Alan Bloom were appointed (collectively the "UK Administrators"). On June 8, 2009, the UK Administrators appointed in respect of NNUK filed a petition with the U.S. Court for the recognition of the Administration Proceedings as they relate to NNUK (the "English Proceedings") under Chapter 15 of the Code. On June 26, 2009, the U.S. Court entered an Order recognizing the English Proceedings as foreign main proceedings under Chapter 15 of the Code.

6.    On January 20, 2009, Nortel Networks Israel (Sales and Marketing) Limited and Nortel Communications Holdings (1997) Limited (together "NN Israel") were granted Administration orders by the court in Israel (the "Israeli Administration Orders"). The Israeli Administration Orders appointed representatives of Ernst & Young LLP in the U.K. and Israel as Administrators of NN Israel and provided a stay of NN Israel's creditors which, subject to further orders of the Israeli Court, remains in effect during the Administration.

7.    Subsequent to the Filing Date, Nortel Networks SA commenced secondary insolvency proceedings within the meaning of Article 27 of the European Union's Council Regulation (EC) No 1346/2000 on

Insolvency Proceedings in the Republic of France pursuant to which a liquidator and an administrator have been appointed by the Versailles Commercial Court.

**PURPOSE**

8.  The purpose of this Thirtieth Report of the Monitor (the "Thirtieth Report") is to seek the approval of this Honourable Court of the Asia Restructuring Agreement dated as of November 5, 2009 amongst the US Debtors, the Applicants, the EMEA Debtors and the APAC Entities (as defined below) (the "APAC Agreement"). The APAC Agreement is also subject to approval by the U.S. Court at a joint hearing that has been scheduled for December 2, 2009. A copy of the APAC Agreement is attached as Appendix "A" to this Thirtieth Report. Those entities from the Asian-Pacific ("APAC") region participating in the APAC Agreement are listed in Schedule 4 to the APAC Agreement (the "APAC Entities").

**TERMS OF REFERENCE**

9.  In preparing this Thirtieth Report, the Monitor has relied upon unaudited financial information, the Company's books and records, financial information prepared by the Company and discussions with management of Nortel. The Monitor has not audited, reviewed or otherwise attempted to verify the accuracy or completeness of the information and accordingly, the Monitor expresses no opinion or other form of assurance on the information contained in this Thirtieth Report.

10. Unless otherwise stated, all monetary amounts contained herein are expressed in U.S. dollars.

11. Capitalized terms not defined in this Report are as defined in the Affidavit of John Doolittle sworn on January 14, 2009 (the "Doolittle Affidavit"), the Pre-Filing Report, and previous reports of the Monitor or the APAC Agreement.

12. The Monitor has made various materials relating to the CCAA proceedings available on its website at www.ey.com/ca/nortel. The Monitor's website also contains a dynamic link to Epiq Bankruptcy LLC's website where materials relating to the voluntary proceedings under Chapter 11 of the Code are posted.

**BACKGROUND AND CURRENT STATUS OF APAC REGION AND APAC ENTITY INTERCOMPANY TRANSACTIONS**

13. Since September 30, 2009, Nortel has conducted its global business through four reportable business unit segments, Wireline and Wireless Network ("WN"), Metro Ethernet Networks ("MEN"), Carrier Voice Application Solutions ("CVAS"), and LG Nortel Co. Ltd. ("LGN"). The revenue and assets of each of the business units, except for LGN, is distributed among the multiple Nortel legal entities and joint ventures around the world.

14. Nortel's structure of operating global business units creates a high degree of interdependence among the various legal entities in different countries around the world.

15. As a result of the insolvency proceedings of the Applicants, the US Debtors and the EMEA Debtors (collectively the "Filed Debtors"), payment of pre-filing amounts owing by the Filed Debtors to certain of Nortel's Asian-Pacific entities were stayed. This resulted in certain of the APAC Entities having liquidity and/or balance sheet constraints even though they continue to generate cash flow from continuing operations.

16. As discussed in the Monitor's Fifteenth Report, a significant factor creating the global interdependence among Nortel entities is the transfer pricing methodology employed by Nortel (the "TPA").

17. As part of the Interim Funding and Settlement Agreement, which was discussed in the Monitor's Fifteenth Report and approved by this Honourable Court on June 29, 2009, certain rights related to TPA were settled (i) between NNL and NNI for the period ending September 30, 2009; and (ii) between the Applicants and the U.S. Debtors on the one hand and the EMEA Debtors on the other, for the period ending December 31, 2009.

18. As part of the consideration for entering into the APAC Agreement, TPA payments owing between any of the APAC Entities and the Applicants from the Filing Date to December 31, 2009 (which, based on an estimated forecast, would have likely resulted in the Applicants being a net payer to the APAC Entities) will be settled in full for no additional cash cost.

4

**SALES TRANSACTIONS**

19. As previously reported in the Monitor's Twentieth Report, Nortel has entered into an agreement to sell the North American, Latin America, EMEA and Asian assets of the Enterprise Solutions business to Avaya Inc. and is actively pursuing the divestiture of its remaining global business units.

20. Nortel recently announced it has concluded successful auctions of substantially all of the assets of its:

    a) Metro Ethernet Networks businesses to Ciena Corporation for a purchase price of $530 million in cash plus $239 million principal amount of convertible notes due June 2017 plus the assumption of certain liabilities; and

    b) GSM/GSM-R business to the joint bidders Telefonaktiebolaget LM Ericsson and Kapsch CarrierCom AG for a purchase price of $103 million in cash plus the assumption of certain liabilities.

    Both transactions are subject to approval by this Honourable Court and the U.S. Court and the Monitor will prepare separate reports on these transactions.

21. It is a condition of closing pursuant to the Avaya Final ASSA that various APAC Entities are party to the Avaya Final ASSA and convey their applicable assets.

**APAC AGREEMENT**

22. To enable the APAC Entities to address their liquidity and/or balance sheet constraints, and to allow them to continue their respective business operations and facilitate and participate in the global divestiture transactions, a restructuring plan relating to the APAC intercompany debt has been negotiated.

23. The Monitor has participated extensively in the analysis and negotiations of the APAC Agreement. The APAC Agreement addresses a number of critical issues facing the Applicants and the APAC Entities, including:

a) strengthening the financial position of the APAC Entities by stabilizing their liquidity position and balance sheet requirements to enable continuing operations, for the payment of post-filing intercompany obligations to the Filed Debtors, and the divestiture of global business units;

b) providing a mechanism whereby the APAC Entities will be able to settle pre-filing intercompany amounts owing to the Filed Debtors;

c) providing a mechanism for the Applicants to settle TPA payments with the APAC Entities, whether payable or anticipated to become payable, for the period from the Filing Date to December 31, 2009;

d) termination of non-exclusive intellectual property licenses and rights granted by NNL to the APAC Entities pursuant to the provisions of the Master R&D Agreement for purposes of facilitating existing and potential future global business and asset sales; and

e) ensuring that the execution of definitive documentation with a purchaser by Nortel shall not be conditioned upon reaching an agreement with respect to the allocation of the proceeds from such a sale.

24. The APAC Entities are currently and will continue to pay their respective third party liabilities and post-filing intercompany debts, on a pro rata basis, if necessary.

25. A summary of the significant terms of the APAC Agreement is provided in the paragraphs that follow. Reference should be made directly to the APAC Agreement for a complete understanding of its terms.

a) The net pre-filing intercompany debt owing by certain APAC Entities to the Filed Debtors and other APAC Entities will be stratified into three categories and payments against each category will be made as follows:

i. Initial Payments (Category I) – payment of a portion of the net pre-filing intercompany debt which will comprise a series of three instalments each 14 days apart;

    ii. Subsequent Payments (Category II) – to the extent the individual APAC Entity has a positive Net Cash Balance (after reserving for working capital, taxes and other costs and expenses) monthly payments will be made to its intercompany creditors on a pro-rata basis; and

    iii. Subordination (Category III) – this portion will be subordinated to (i) all third party liabilities, (ii) post-filing intercompany debt, (iii) Category I pre-filing intercompany debt; and (iv) Category II pre-filing intercompany debt of the individual APAC Entity. Payment will be made only if the debts listed in (i) to (iv) are fully repaid and if the APAC Entity in question has a positive Net Cash Balance;

b) Any post-filing 2009 TPA payments that may be or could become owing between any of the APAC Entities and NNL are settled in full; and

c) The APAC Entities have agreed to participate in current and future global business and asset sale transactions including entering into agreements to terminate intellectual property licences, and such participation shall not be conditioned on reaching an agreement with the APAC Entities on the allocation of the sales proceeds. .

26. The APAC Entities have agreed to appoint Ernst & Young Solutions LLP (EY Singapore) as the restructuring manager to provide financial consulting and advisory services to the APAC Entities as set forth in Annex G to the APAC Agreement.

27. It is anticipated the Applicants will receive approximately $15 million as proceeds from the collection of monies from the APAC Entities pursuant to the Initial Payments. The Initial Payment represents approximately 17% of the total net-pre-filing intercompany debt owing by the various APAC Entities to the Applicants.

**MONITOR'S ANALYSIS AND RECOMMENDATIONS**

28. The Monitor is of the view that entering into the APAC Agreement provides significant incremental value to the Applicants, including:

a) the expected initial realizations to the Applicants of approximately $15 million;

b) the full and final settlement of post-filing 2009 TPA amounts owing by NNL for no additional cash cost; and

c) the agreement of the APAC Entities to participate in future global business and assets sales transactions.

29. Accordingly, the Monitor recommends this Honourable Court grant the relief requested in the Applicants' motion for approval of the APAC Agreement.

All of which is respectfully submitted this 27th day of November, 2009.

**ERNST & YOUNG INC.**
**In its capacity as Monitor of the Applicants**

Per:

Murray A. McDonald
President

**APPENDIX "A"**

*This is Exhibit .........A............ referred to in the
affidavit of .....S.M.LL.DOO.L.H.LE.......
sworn before me, this ,.......................................
day of .....NO.V.L.M.B.R.V................. 20.09.*

~~A COMMISSIONER FOR TAKING AFFIDAVITS~~

EXECUTION VERSION

## ASIA RESTRUCTURING AGREEMENT

This agreement (including the Schedules and Annexes attached hereto and as amended or supplemented from time to time, this "<u>Agreement</u>") is entered into by and among Nortel Networks Limited ("<u>NNL</u>") and the other entities set forth in <u>Schedule 1</u> attached hereto, Nortel Networks Inc. ("<u>NNI</u>") and the other entities set forth in <u>Schedule 2</u> attached hereto, the Joint Administrators (as defined below) and the entities set forth in <u>Schedule 3</u> attached hereto (each, an "<u>EMEA Debtor</u>" and collectively, the "<u>EMEA Debtors</u>") and the entities set forth in <u>Schedule 4</u> attached hereto (each, an "<u>APAC Debtor</u>" and collectively, the "<u>APAC Debtors</u>"), dated as of November 5, 2009. The Canadian Debtors (as defined below), the US Debtors (as defined below), the EMEA Debtors and the APAC Debtors are sometimes referred to herein individually as a "<u>Party</u>" and collectively as the "<u>Parties</u>". The Joint Administrators, in their personal capacity, shall be party to this Agreement as provided in Section 16 and solely for the purpose of obtaining the benefit of the provisions of this Agreement expressed to be conferred on or given to the Joint Administrators and references to the Parties shall be construed accordingly.

### RECITALS

1.      WHEREAS, on January 14, 2009 (the "<u>Filing Date</u>"), Nortel Networks Corporation ("<u>NNC</u>"), NNL and certain of NNC's other Canadian affiliates included in <u>Schedule 1</u> (collectively, the "<u>Canadian Debtors</u>," and NNC and its debtor and non-debtor affiliates are sometimes referred to herein as the "<u>Nortel Group</u>"), commenced creditor protection proceedings before the Ontario Superior Court of Justice (Commercial List) (the "<u>Canadian Court</u>") under the Companies' Creditors Arrangement Act (Canada) (the "<u>Canadian Proceedings</u>"), in connection with which Ernst & Young Inc. was appointed monitor (the "<u>Monitor</u>"); and

2.      WHEREAS, on the Filing Date and on July 14, 2009 (with respect to Nortel Networks (CALA) Inc.), NNI and certain of NNI's United States affiliates included in <u>Schedule 2</u> (collectively, the "<u>US Debtors</u>" and, together with the Canadian Debtors and the EMEA Debtors, the "<u>Filed Debtors</u>" and, together with the Canadian Debtors, the EMEA Debtors and the APAC Debtors, the "<u>Debtors</u>") filed petitions in the United States Bankruptcy Court for the District of Delaware (the "<u>US Court</u>") under chapter 11 of title 11 of the United States Code (the "<u>US Proceedings</u>"); and

3.      WHEREAS, on the Filing Date, Nortel Networks UK Limited ("<u>NNUK</u>"), Nortel Networks (Ireland) Limited ("<u>NNIR</u>"), Nortel Networks S.A. ("<u>NNSA</u>") and certain of NNUK's affiliates in the Europe, Middle East and Africa ("<u>EMEA</u>") region, including those in <u>Schedule 3</u> attached hereto, commenced administration proceedings (the "<u>UK Proceedings</u>" and, together with the Canadian Proceedings and the US Proceedings, the "<u>Proceedings</u>") before the High Court of Justice in London, England (the "<u>UK Court</u>" and, together with the Canadian Court and the US Court, the "<u>Courts</u>"), and the UK Court appointed individuals from Ernst & Young LLP (the "<u>UK Administrator</u>"), and, in the case of NNIR only, Ernst & Young Chartered Accountants (the "<u>NNIR Administrator</u>"), as administrators in the UK Proceedings (the UK Administrator and the NNIR Administrator collectively, and including their respective successors, replacements and any subsequent office holders appointed to the relevant EMEA Debtors, the "<u>Joint Administrators</u>"); and

1

4.    WHEREAS, subsequent to the Filing Date, NNSA commenced secondary insolvency proceedings within the meaning of Article 27 of the European Union's Council Regulation (EC) No 1346/2000 on Insolvency Proceedings in the Republic of France pursuant to which a liquidator (the "NNSA Liquidator") and an administrator (the "NNSA Administrator") have been appointed by the Versailles Commercial Court (Docket No. 2009P00492) for NNSA; and

5.    WHEREAS, prior to the Filing Date, certain members of the Nortel Group made quarterly payments (the "Transfer Pricing Payments") to other Nortel Group entities pursuant to a transfer pricing methodology ("Transfer Pricing") provided for in the Transfer Pricing Agreements, where "Transfer Pricing Agreements" means (i) the Master Research and Development Agreement dated as of December 22, 2004 (as amended by, and together with the related understandings contained in, the documents listed in Annex A hereto, the "Master R&D Agreement") and (ii) certain distribution agreements, whether written or oral, between one or more Nortel Group entities, including without limitation the agreements listed in Annex B and Annex H hereto and any other agreements similar to the agreements listed in Annex B and Annex H hereto (as amended, supplemented or otherwise modified, the "Distribution Agreements"); and

6.    WHEREAS, subsequent to the Filing Date, NNL, NNI and the Joint Administrators have accepted that, subject to this Agreement, the APAC Debtors will pay their respective third party and intercompany debts on the following basis: (i) firstly, payment of all Third Party Liabilities (as defined below) and the Post-Filing Intercompany Debt (as defined below) on a pro rata basis, and (ii) secondly, payment of the Pre-Filing Intercompany Debt (as defined below) on a pro rata basis; and

7.    WHEREAS, the Parties intend to continue to meet their respective obligations to make the monthly payments in respect of the intercompany trading of goods and services supplied by Nortel Group entities subsequent to the Filing Date, pursuant to the arrangements existing prior to or entered into subsequent to the Filing Date; and

8.    WHEREAS, as a consequence of the Proceedings, certain amounts or balances of intercompany payables owing by the Filed Debtors to the APAC Debtors as of the Filing Date became impaired, and certain members of the APAC Debtors, although generating cash flow from continuing operations, have liquidity and/or balance sheet constraints after conducting a proper pre-filing setoff of the corresponding intercompany debt as of the Filing Date; and

9.    WHEREAS, on July 25, 2009, NNC announced that NNL and certain of NNL's subsidiaries, including NNI, had concluded a successful auction of substantially all of their CDMA business and LTE Access assets whereby Telefonaktiebolaget LM Ericsson emerged as the winning bidder for such assets, which bid was approved by the Canadian Court and the US Court on July 28, 2009, and on September 14, 2009, NNC announced that NNL and certain of NNL's subsidiaries, including NNI, had concluded a successful auction of their North American, Caribbean, Latin America and Asia Enterprise Solutions business and the EMEA portion of their Enterprise Solutions business whereby Avaya Inc. ("Avaya") emerged as the winning bidder for such assets, which bid was approved by the Canadian Court and the US Court on September 16, 2009; and

2

10. WHEREAS, NNC has also announced that it is actively engaged in discussions with external parties to sell its other businesses and that it has determined that the sale of its businesses maximizes value while preserving innovation platforms, customer relationships and jobs to the greatest extent possible; and

11. WHEREAS, to enable the APAC Debtors to address applicable solvency issues so as to continue their respective business operations and to preserve their assets and businesses in order to facilitate and participate in any potential sale of the assets, undertakings or businesses of the Nortel Group entities, an Asia-Pacific restructuring plan has been discussed and developed with the Filed Debtors, the Monitor, the Joint Administrators together with the Creditors' Committee (as defined below) and the Bondholders' Committee (as defined below), and this Agreement represents the outcome of those discussions.

NOW THEREFORE, THE PARTIES HEREBY AGREE THAT:

## PART A – DEFINITIONS

| Term | Defined in Section |
|---|---|
| Adjustment Payments | 8 |
| Agreement | Preamble |
| Allocation Protocol | 11.c. |
| APAC Debtors | Preamble |
| APAC Debtor Person | 17.a. |
| APAC Distribution Agreements | 8 |
| APAC Selling Debtor | 11.a. |
| Asset Sale | 10.a. |
| Avaya | Recital 9 |
| Bondholders' Committee | 3.a. |
| BOT Condition | 12.a.iv. |
| Business Day | 14 |
| Canadian Court | Recital 1 |
| Canadian Debtors | Recital 1 |
| Canadian Proceedings | Recital 1 |
| Cash and Cash Equivalents | 2.a.i.(A) |
| Category I Pre-Filing Intercompany Debt | 1.a.i. |
| Category II Pre-Filing Intercompany Debt | 1.a.ii. |
| Category III Pre-Filing Intercompany Debt | 1.a.iii. |
| Collateral | 13.c. |
| Conditions | 12.a.iv. |
| Courts | Recital 3 |
| Covenant Event of Default | 13.a. |
| Creditors' Committee | 3.a. |
| Cross-Border Protocol | 15.b. |
| Debtors | Recital 2 |
| Determination Date | 3.b. |

| Term | Defined in Section |
|------|--------------------|
| Distribution Agreements | Recital 5 |
| D&O Insurance | 18 |
| EMEA | Recital 3 |
| EMEA Debtors | Preamble |
| Escrow Account | 11.b. |
| Estimated Premise Reinstatement Costs | 2.a.ii.(y) |
| Estimated Restructuring Costs | 2.a.ii.(x) |
| Estimated Taxes | 2.a.ii.(z) |
| Estimated Working Capital Requirements | 2.a.ii.(w) |
| Excluded Affiliates | 2.a.ii.(v) |
| Excluded Affiliate Liabilities | 5 |
| Excluded Affiliate Pre-Filing Intercompany Debt | 2.a.ii.(v) |
| Excluded Affiliate Restructuring Agreement | 5 |
| Filed Debtors | Recital 2 |
| Filing Date | Recital 1 |
| Final Effective Date | 12.b. |
| Final Effective Date Payment Amount | 2.c. |
| Indemnified Liabilities | 17.b. |
| Identified Debtors | 4.a. |
| Indebtedness | 6.d.iii. |
| Initial Conditions | 12.a.ii. |
| Initial Determination Date | 2.a. |
| Initial Effective Date | 12.b. |
| Initial Effective Date Payment Amount | 2.b. |
| Initial Payment Amount | 2.c. |
| Intercompany Creditors | 1.a. |
| Joint Administrators | Recital 3 |
| License Termination Agreement | 10.b. |
| Master R&D Agreement | Recital 5 |
| Matured Indemnity Obligation | 2.a. |
| Monitor | Recital 1 |
| NCB Determination Procedure | 2.a. |
| NCB Items | 2.a. |
| Net Cash Balance | 2.a. |
| NN Asia Group | Schedule 4 |
| NN Australia | Schedule 4 |
| NN Australia Note Facility | 6.d.iii. |
| NN India (Private) | Schedule 4 |
| NN Indonesia | Schedule 4 |
| NN Japan | Schedule 4 |
| NN Korea | Schedule 4 |
| NN Malaysia | Schedule 4 |
| NN New Zealand | Schedule 4 |
| NN Singapore Group | Schedule 4 |

4

41

| Term | Defined in Section |
|------|-------------------|
| NN Thailand | Schedule 4 |
| NN Vietnam | Schedule 4 |
| NNC | Recital 1 |
| NNI | Preamble |
| NNIR | Recital 3 |
| NNIR Administrator | Recital 3 |
| NNL | Preamble |
| NNSA | Recital 3 |
| NNSA Administrator | Recital 4 |
| NNSA Liquidator | Recital 4 |
| NNUK | Recital 3 |
| Non-Filed Affiliates | 11.c.i. |
| Nortel Group | Recital 1 |
| North American Court Condition | 12.a.i. |
| Ordinary Course Cash Collateral | 6.d.iii. |
| Parties | Preamble |
| Payment Event of Default | 13.a. |
| Permitted Severance Payments | 2.a.ii.(x) |
| Post-Filing Intercompany Debt | 4.a.ii. |
| Pre-Filing Intercompany Debt | 1.a. |
| Professional Advice | 2.a. |
| Proceedings | Recital 3 |
| Purchaser | 11.a. |
| RBI Condition | 12.a.iii. |
| Relevant Parties | 3.a. |
| Restructuring Manager | 7 |
| Reversion Date | 4.d. |
| Reverted Subordinated Debt | 4.d. |
| Sale Proceeds | 11.a. |
| Sale Transaction | 11.a. |
| Secured Obligations | 13.c. |
| Selling Debtor | 11.a. |
| Senior Indebtedness | 4.a. |
| Subordinated Debt | 4.a. |
| Subsequent Determination Date | 3.b. |
| Subsequent Payment Amount | 3.c. |
| Suspended Subordinated Debt | 4.d. |
| Suspension Date | 4.d. |
| Suspension Period | 4.d. |
| Third Party Liabilities | 4.a.i. |
| Transfer Pricing | Recital 5 |
| Transfer Pricing Agreements | Recital 5 |
| Transfer Pricing Payments | Recital 5 |
| UK Administrator | Recital 3 |

42

| Term | Defined in Section |
|---|---|
| UK Court | Recital 3 |
| UK Court Condition | 12.a.ii. |
| UK Court's Directions | 12.a.ii. |
| UK Proceedings | Recital 3 |
| US Court | Recital 2 |
| US Debtors | Recital 2 |
| US Proceedings | Recital 2 |

## PART B – PRE-FILING INTERCOMPANY DEBT RESTRUCTURING

1. Pre-Filing Intercompany Debt.

   a. Each APAC Debtor acknowledges and confirms, and each Intercompany Creditor (as defined below) of such APAC Debtor acknowledges and confirms that Annex C-1 sets out the unpaid amount of loans, credits and obligations owing by such APAC Debtor to such Intercompany Creditor as of the Filing Date (after setting off against any receivables owing to such APAC Debtor by such Intercompany Creditor as of the Filing Date to the extent not prohibited or restricted under applicable laws and regulations) (the "Pre-Filing Intercompany Debt") and further sets out, as of the Initial Effective Date (as defined below):

      i. the amount of such Pre-Filing Intercompany Debt to be repaid with the aggregate Initial Payment Amount (as defined below) in accordance with Section 2 (the "Category I Pre-Filing Intercompany Debt"),

      ii. the amount of such Pre-Filing Intercompany Debt to be repaid with the aggregate Subsequent Payment Amount (as defined below) in accordance with Section 3 (the "Category II Pre-Filing Intercompany Debt"), and

      iii. the amount of such Pre-Filing Intercompany Debt to be subordinated in accordance with Section 4 (the "Category III Pre-Filing Intercompany Debt").

      For the purposes of this Agreement, with respect to each APAC Debtor, the Parties to whom such APAC Debtor owes any Pre-Filing Intercompany Debt shall be referred to individually as an "Intercompany Creditor" and collectively, as the "Intercompany Creditors".

   b. The Parties hereby agree that, effective as of the Final Effective Date (as defined below), the amounts of the Category I Pre-Filing Intercompany Debt, the Category II Pre-Filing Intercompany Debt and the Category III

6

43

Pre-Filing Intercompany Debt set out in Annex C-1 shall be automatically revised to the corresponding amounts set forth in Annex C-2.

c.    The Parties hereby agree, that to the extent any APAC Debtor makes a Subsequent Payment Amount to its Intercompany Creditors between the Initial Effective Date and the Final Effective Date, Annex C-2 shall be further revised on or prior to the Final Effective Date to give effect to the payment of such Subsequent Payment Amount.

d.    The Parties hereby agree, that to the extent NNSA does not become a Party to this Agreement in accordance with Section 6.a., the amounts set forth in the Annexes C-1, C-2, D, E-1 and E-2 hereto (which have been calculated based on the assumption that NNSA shall be a party to this Agreement), shall be further revised, in a manner consistent with the methodology and standards initially employed to calculate such amounts, on or prior to the Initial Effective Date to give effect to the exclusion of NNSA from the scope of this Agreement.

2.    Initial Payments.

a.    Each APAC Debtor having Category I Pre-Filing Intercompany Debt represents and warrants that as of July 10, 2009 (the "Initial Determination Date"), it has complied with the NCB Determination Procedure (as defined below) and determined its Net Cash Balance (as defined below) to be as set forth in Annex D. For the purposes of this Agreement, the "Net Cash Balance" means, as of each Determination Date (as defined below) and with respect to each APAC Debtor, without duplication:

i.    the sum of:

(A)    its (1) cash in U.S. dollars or other local currencies held by such APAC Debtor and (2) readily marketable government securities, certificates of deposit, time deposits and other readily marketable fixed income instruments, in each case, that are immediately available and freely remittable (the "Cash and Cash Equivalents") (for the avoidance of doubt, such Cash and Cash Equivalents shall not include any cash or cash equivalents that are considered to be restricted by reason of having been posted by such APAC Debtor as collateral to a third party), plus

(B)    (with respect to the calculation of the Net Cash Balance on each Subsequent Determination Date (as defined below) pursuant to Section 3 only) the net cash proceeds received by such APAC Debtor from a Sale Transaction (as defined below);

minus

ii.    the sum of:

7

44

(v)    the amount of loans, credits and obligations owing by such APAC Debtor to the entities set forth in <u>Schedule 6</u> as of the Filing Date (respectively, the "<u>Excluded Affiliate Pre-Filing Intercompany Debt</u>" and the "<u>Excluded Affiliates</u>"), <u>plus</u>

(w)    its estimated working capital required for the four (4) weeks immediately following such Determination Date to carry on its business and to satisfy its liabilities as they fall due, together with appropriate provision for any contingent liabilities and anticipated future liabilities, including, without limitation, the Third Party Liabilities, the Post-Filing Intercompany Debt and the Matured Indemnity Obligation (as defined below) of such APAC Debtor (the "<u>Estimated Working Capital Requirements</u>"), <u>plus</u>

(x)    its estimated costs and expenses arising from or in connection with the restructuring of its indebtedness and its business or potential eventual liquidation or winding down of the business of such APAC Debtor, including, but not limited to:

     (1)    potential statutory severance and redundancy payments,

     (2)    potential severance and redundancy payments pursuant to binding contractual commitments existing as of the Filing Date and

     (3)    other potential severance and redundancy payments disclosed to the Relevant Parties (as defined below) as of the date hereof or in such greater aggregate amount approved by the Relevant Parties from time to time

     (collectively, the "<u>Permitted Severance Payments</u>") (the "<u>Estimated Restructuring Costs</u>"; *provided, however,* any potential severance or redundancy payments in excess of the Permitted Severance Payments based on past or existing practices and/or policies of the Debtors or otherwise shall not be included in the calculation of the Estimated Restructuring Costs), <u>plus</u>

(y)    its estimated costs of reinstatement of premises under the leases to which such APAC Debtor is a party (the "<u>Estimated Premise Reinstatement Costs</u>"), <u>plus</u>

8

(z)    its estimated provision for all taxes, levies, duties, deductions, charges or withholdings and all penalties, costs and interest relating thereto, whether actual, contingent, present or future, imposed or which may be imposed by any governmental or regulatory authority, central bank or court of competent jurisdiction (the "Estimated Taxes").

For the purposes of determining the Net Cash Balance of any APAC Debtor, the amounts of the Excluded Affiliate Pre-Filing Intercompany Debt (subject to Section 5), the Matured Indemnity Obligation, the Estimated Working Capital Requirements, the Permitted Severance Payments, the Estimated Restructuring Costs, the Estimated Premise Reinstatement Costs and the Estimated Taxes (each, an "NCB Item" and collectively, the "NCB Items") have been and shall be determined by the board of directors of such APAC Debtor acting reasonably and in good faith after consultation with the Restructuring Manager (as defined below) and after taking into account any written opinions obtained from its legal, financial, tax or other professional advisors (such determination procedure, the "NCB Determination Procedure" and such opinions, the "Professional Advice"). Each APAC Debtor hereby agrees and covenants that the Net Cash Balance and the NCB Items to be determined on any Subsequent Determination Date shall be calculated using the same methodology and standards employed to calculate such amounts on the Initial Determination Date. In addition, in calculating its Net Cash Balance as of any Subsequent Determination Date, each APAC Debtor shall give effect to any material amount of cash received by such APAC Debtor during the period after such Subsequent Determination Date but prior to the delivery of its Net Cash Balance calculation to the Relevant Parties in accordance with Section 3.b. Furthermore, each APAC Debtor hereby agrees and covenants that, with respect to any indemnity obligations of such APAC Debtor pursuant to Section 17.b., the Net Cash Balance and the NCB Items shall only take into account (or otherwise hold amounts in reserve to provide for) solely bona fide claims for indemnity that have been made by any APAC Debtor Person (as defined below) of such APAC Debtor against such APAC Debtor in accordance with Section 17.b. and after taking into account the availability of any liability insurance as contemplated by Section 18 or otherwise available to cover such claims for indemnity and consistent with the applicable accounting standards (such amount, the "Matured Indemnity Obligation").

b.    Effective upon the Initial Effective Date, each APAC Debtor having Category 1 Pre-Filing Intercompany Debt as set forth in Annex C-1 shall make the cash payment (the amount of such cash payment, an "Initial Effective Date Payment Amount") to each of its Intercompany Creditors of its Category 1 Pre-Filing Intercompany Debt owing to such Intercompany Creditor utilizing its Net Cash Balance as of the Initial Determination Date on a pro rata basis according to the proportion in

9

which the Category I Pre-Filing Intercompany Debt of such APAC Debtor owing to each of its Intercompany Creditors bears to the aggregate amount of all Category I Pre-Filing Intercompany Debt of such APAC Debtor owing to all of its Intercompany Creditors, as set forth in Annex E-1. Annex E-1 sets forth the payment tranches for the Initial Effective Date Payment Amount to be paid by each APAC Debtor to each of its Intercompany Creditors and the respective deadlines by which payment of each tranche must be made.

c.   Effective upon the Final Effective Date, each APAC Debtor having any remaining Category I Pre-Filing Intercompany Debt as set forth in Annex C-2 shall make the cash payment (the amount of such cash payment, a "Final Effective Date Payment Amount" and, together with an Initial Effective Date Payment Amount, an "Initial Payment Amount") to each of its Intercompany Creditors of its remaining Category I Pre-Filing Intercompany Debt owing to such Intercompany Creditor utilizing its Net Cash Balance as of the Initial Determination Date on a pro rata basis according to the proportion in which the remaining Category I Pre-Filing Intercompany Debt of such APAC Debtor owing to each of its Intercompany Creditors bears to the aggregate amount of all remaining Category I Pre-Filing Intercompany Debt of such APAC Debtor owing to all of its Intercompany Creditors, as set forth in Annex E-2. Annex E-2 sets forth the payment tranches for the Final Effective Date Payment Amount to be paid by each APAC Debtor to each of its Intercompany Creditors and the respective deadlines by which payment of each tranche must be made.

3.   Subsequent Payments.

a.   Following the date of this Agreement, each APAC Debtor shall provide to the Relevant Parties, once every week and substantially in the form provided by such APAC Debtor to NNL as of the date hereof, (i) rolling 13-week cash flow forecasts and (ii) reports on actual weekly cash flow results. Each APAC Debtor shall hold conference calls from time to time with the Relevant Parties to discuss such financial information at the request of any of the Relevant Parties. For the purposes of this Agreement, the "Relevant Parties" means (1) NNL (on behalf of the Canadian Debtors), (2) the Monitor, (3) NNI (on behalf of the US Debtors), (4) the Official Committee of Unsecured Creditors appointed in the US Proceedings (the "Creditors' Committee"), (5) the steering committee members of the ad hoc group of bondholders that have executed confidentiality or non-disclosure agreements with NNL (the "Bondholders' Committee"), (6) the Joint Administrators (on behalf of the EMEA Debtors) and (7) the Restructuring Manager (on behalf of the APAC Debtors).

10

47

b.  Each APAC Debtor shall, on a monthly basis, commencing on October 30,
    2009 and on the last day of each month thereafter (each such date, a
    "Subsequent Determination Date," and each of the Initial Determination
    Dates and a Subsequent Determination Date, a "Determination Date"),
    calculate the amount of its Net Cash Balance and shall provide, no later
    than 14th calendar day following each Subsequent Determination Date, its
    calculation of its Net Cash Balance as of such Subsequent Determination
    Date to the Relevant Parties in reasonable detail, together with (A) a report
    by the Restructuring Manager which report shall provide its commentary
    regarding the basis for such APAC Debtor's calculation of its Net Cash
    Balance and such APAC Debtor's compliance with the NCB
    Determination Procedure and (B) any reasonably available supporting
    documents, including, without limitation, any material Professional
    Advice; *provided, however,* that if in the reasonable opinion of such
    APAC Debtor's counsel, the provision of any such Professional Advice
    would result in the loss or waiver of any lawful privilege that may be
    asserted with respect thereto, such APAC Debtor may provide, in lieu
    thereof, a summary of the conclusions set forth in such Professional
    Advice in a manner designed to preserve such lawful privilege.  During
    the seven (7) calendar days following the delivery of its calculation of its
    Net Cash Balance as of each Subsequent Determination Date, each APAC
    Debtor shall consult, acting reasonably and in good faith, with the
    Relevant Parties in respect of its calculation of its Net Cash Balance.  The
    determination by the board of directors of each APAC Debtor of its Net
    Cash Balance, if made in accordance with the NCB Determination
    Procedure and following such consultation process with the Relevant
    Parties, shall be final and binding on all Parties, absent manifest error.

c.  Each APAC Debtor shall, no later than the deadlines set forth in Annex F,
    make the cash payment (the amount of any such payment, a "Subsequent
    Payment Amount") to each of its Intercompany Creditors of a portion of
    its Category II Pre-Filing Intercompany Debt owing to such Intercompany
    Creditor utilizing its Net Cash Balance as of a Subsequent Determination
    Date on a pro rata basis according to the proportion in which the Category
    II Pre-Filing Intercompany Debt of such APAC Debtor owing to each of
    its Intercompany Creditors bears to the aggregate amount of all Category
    II Pre-Filing Intercompany Debt of such APAC Debtor owing to all of its
    Intercompany Creditors.

d.  Subject to Section 4, once all of its Senior Indebtedness (as defined below)
    has been paid or satisfied in full, each APAC Debtor shall, no later than
    the deadlines set forth in Annex F, make a Subsequent Payment Amount
    to each of its Intercompany Creditors of a portion of its Category III Pre-
    Filing Intercompany Debt owing to such Intercompany Creditor utilizing,
    and only to the extent of, its Net Cash Balance as of a Subsequent
    Determination Date on a pro rata basis according to the proportion in
    which the Category III Pre-Filing Intercompany Debt of such APAC

11

48

Debtor owing to each of its Intercompany Creditors bears to the aggregate amount of all Category III Pre-Filing Intercompany Debt of such APAC Debtor owing to all of its Intercompany Creditors.

e.    The obligations set forth in this Section 3 shall apply only to the APAC Debtors having Category II Pre-Filing Intercompany Debt or Category III Pre-Filing Intercompany Debt and shall cease to apply to such APAC Debtors once all of their respective Category II Pre-Filing Intercompany Debt and Category III Pre-Filing Intercompany Debt have been paid or satisfied in full.

4.    Subordination.

a.    Subject to Sections 4.d. and 12, the Category III Pre-Filing Intercompany Debt owing by each of NN Asia Group, NN Australia, NN Malaysia, NN India (Private), NN Singapore Group, NN Korea, NN Thailand and NN Vietnam (each, an "Identified Debtor," and collectively, the "Identified Debtors") to its Intercompany Creditors (the "Subordinated Debt") shall be subordinated and junior in right of payment to the prior payment in full of the following debts of such Identified Debtor (the "Senior Indebtedness"), and each Intercompany Creditor agrees not to enforce the Subordinated Debt prior to such payment of the Senior Indebtedness:

i.    subject to Section 5, all liabilities and obligations of such Identified Debtor, whether actual, contingent, present or future, to the Excluded Affiliates or non-affiliated third parties, in each case, whether incurred before or after the Filing Date (the "Third Party Liabilities");

ii.    subject to Section 8, all intercompany loans, credits and obligations owing by such Identified Debtor to its Intercompany Creditors incurred after the Filing Date after setting off against the receivables owing to it by the relevant Intercompany Creditors after the Filing Date to the extent not prohibited or restricted under applicable laws and regulations (the "Post-Filing Intercompany Debt");

iii.    all Category I Pre-Filing Intercompany Debt owing by such Identified Debtor to its Intercompany Creditors and to be repaid pursuant to Section 2; and

iv.    all Category II Pre-Filing Intercompany Debt owing by such Identified Debtor to its Intercompany Creditors and to be repaid pursuant to Section 3.

b.    Each of the Identified Debtors shall only be obligated to make payment of the Subordinated Debt (i) only if no Senior Indebtedness remains outstanding and (ii) subject to Section 4.c., only to the extent of its Net

12

Cash Balance (after full payment or satisfaction of all of its Senior Indebtedness) as of the applicable Subsequent Determination Date. Any such payment of the Subordinated Debt shall be made on a pro rata basis according to the proportion in which the Subordinated Debt of such Identified Debtor owing to each of its Intercompany Creditors bears to the aggregate amount of all Subordinated Debt of such Identified Debtor owing to all of its Intercompany Creditors.

c.  Upon any distribution of assets of an Identified Debtor in any dissolution, winding up, liquidation or reorganization of such Identified Debtor (whether in bankruptcy, insolvency or receivership proceedings or upon an assignment for the benefit of creditors or otherwise):

    i.  the holders of all Senior Indebtedness of such Identified Debtor shall first be entitled to receive payment in full in cash of all Senior Indebtedness of such Identified Debtor before any Intercompany Creditor of the Subordinated Debt of such Identified Debtor is entitled to receive any payment of any kind or character on account of the principal of or interest on or any other amount owing in respect of such Subordinated Debt;

    ii.  any payment or distribution of assets of such Identified Debtor of any kind or character, whether in cash, property or securities, to which any Intercompany Creditor of the Subordinated Debt of such Identified Debtor would be entitled except for the provisions of this Section 4, shall be paid by the liquidating trustee or agent making such payment or distribution, whether a trustee in bankruptcy, a receiver or liquidating trustee or other trustee or agent, directly to the holders of Senior Indebtedness of such Identified Debtor to the extent necessary to make payment in full in cash of all Senior Indebtedness of such Identified Debtor remaining unpaid after giving effect to any concurrent payment or distribution to the holders of such Senior Indebtedness; and

    iii.  in the event that, notwithstanding the foregoing provisions of this Section 4.c., any payment or distribution of assets of such Identified Debtor of any kind or character, whether in cash, property or securities, shall be received by any Intercompany Creditor of the Subordinated Debt of such Identified Debtor on account of the Subordinated Debt of such Identified Debtor before all Senior Indebtedness of such Identified Debtor is paid in full in cash, such payment or distribution shall be received and held by such Intercompany Creditor for the sole benefit of, and shall forthwith be paid over to, the holders of the Senior Indebtedness of such Identified Debtor remaining unpaid for application to the payment of such Senior Indebtedness until all such Senior Indebtedness shall have been paid in full in cash, after giving effect

13



to any concurrent payment or distribution to the holders of such Senior Indebtedness.

The applicable Identified Debtor shall give prompt written notice to each Intercompany Creditor of the Subordinated Debt of such Identified Debtor and the other Relevant Parties of any dissolution, winding up, liquidation or reorganization of such Identified Debtor (whether in bankruptcy, insolvency or receivership proceedings or upon assignment for the benefit of creditors or otherwise); *provided, however,* that failure to give such notice shall not affect the subordination effected hereby or in any way modify the provisions of this Section 4.

d.    Notwithstanding anything herein to the contrary, with respect to any Identified Debtor, during any period of time that a Payment Event of Default (as defined below) has occurred and is continuing under this Agreement (the date of the occurrence of such Payment Event of Default, the "Suspension Date"), the provisions of this Section 4 shall be suspended and not be applicable to the portion of Subordinated Debt of such Identified Debtor equal to the amount relating to such Payment Event of Default (the "Suspended Subordinated Debt") to the effect that the Suspended Subordinated Debt shall not be deemed to be Subordinated Debt during the Suspension Period (as defined below). In the event that on any subsequent date (the "Reversion Date"), such Identified Debtor cures such Payment Event of Default, the provisions of this Section 4 shall again be applicable to the Suspended Subordinated Debt equal to the amount so cured (the "Reverted Subordinated Debt") and the Reverted Subordinated Debt shall thereafter again be deemed to be Subordinated Debt. For the purposes of this Agreement, the period of time between the Suspension Date and the Reversion Date is referred to as the "Suspension Period". The applicable Identified Debtor shall deliver written notice promptly to the Relevant Parties notifying of any event set forth in this Section 4.d.

5.    Excluded Affiliate Liabilities. Notwithstanding anything herein to the contrary, if any Excluded Affiliate enters into an agreement with any APAC Debtor subsequent to the date of this Agreement (an "Excluded Affiliate Restructuring Agreement") which provides for a less favorable treatment with respect to such APAC Debtor's Third Party Liabilities owed to such Excluded Affiliate (the "Excluded Affiliate Liabilities") than the treatment thereof provided herein, then the treatment of such Excluded Affiliate Liabilities hereunder shall be in accordance with the terms of such Excluded Affiliate Restructuring Agreement from the effective date thereof and subsequent calculations of such APAC Debtor's Net Cash Balance shall give effect to such Excluded Affiliate Restructuring Agreement.

6.    Covenants.

a.    NNSA may, prior to the Initial Effective Date, by notice in writing to the Parties hereto, accede to this Agreement as an EMEA Debtor on the same

14

terms and conditions as an EMEA Debtor (such accession conditioned, if applicable, on French court approval), and the Parties shall forthwith on receipt of such notice enter into an appropriate form of accession agreement with NNSA. The Parties agree that the provisions of this Section 6.a. are for the benefit of NNSA and may be enforced by NNSA.

b.    Without limiting the generality of Section 11, each APAC Debtor hereby agrees, upon receipt of a written request from NNL, to enter into one or more asset sale agreements to transfer such APAC Debtor's assets relating to the Enterprise Solutions and Metro Ethernet Networks business units of the Nortel Group and any and all agreements and documents contemplated thereby and/or agreements between the Selling Debtors (as defined below) entered into in relation thereto.

c.    To the extent any APAC Debtor is restricted from remitting cash or making the Initial Payment or any Subsequent Payment by any applicable law or regulation, such APAC Debtor covenants to use its reasonable best efforts to undertake all necessary or desirable actions in order for such APAC Debtor to be able to freely remit cash and/or make the Initial Payment or the Subsequent Payment as soon as practicable.

d.    Each APAC Debtor hereby covenants that until such APAC Debtor's Pre-Filing Intercompany Debt has been paid or satisfied in full, such APAC Debtor shall not take any of the following actions without the prior written consent of the Monitor, the Creditors' Committee, the Bondholders' Committee and the Joint Administrators (which consent shall not be unreasonably withheld or delayed):

i.    The distribution of profits among the shareholders of such APAC Debtor by way of dividend, return of capital or otherwise;

ii.    The adoption or modification of any significant accounting policies of such APAC Debtor, except as required under any applicable laws, regulations or accounting standards;

iii.    Except as contemplated by this Agreement, the entry into any material agreements, including, without limitation, any contractual agreements to make any severance or redundancy payments, to incur any obligation for the payment or repayment of money borrowed (such obligation, the "Indebtedness"), or any financing or lease agreement, or by mortgaging or creating a security interest or other encumbrance over the assets of such APAC Debtor, in each case, other than (A) in relation to the standby note facility among NN Australia, NN Japan and NN New Zealand in the aggregate amount not exceeding US$7.0 million (the "NN Australia Note Facility") and the related security interest to be provided by NN Australia to secure its obligations thereunder, (B)

15

52

in relation to (1) any existing or future posting of any cash or cash equivalents by such APAC Debtor to banks or other third parties as collateral or (2) any escrow arrangements entered into or to be entered into between such APAC Debtor, its customers or vendors and any financial institutions, in each case, in connection with the provision or issuance of performance, advance payment, warranty, tax, customs duty or other types of bonds, guarantees or security in the ordinary course of business and/or in the fulfillment of any contractual obligation to provide the same ("Ordinary Course Cash Collateral") and (C) in the ordinary course of such APAC Debtor's business consistent with past practice and applicable corporate policies and procedures, as such practice and corporate policies and procedures may be modified from time to time to the extent necessary to enter or consummate any Sale Transaction or the Proceedings of the shareholders of such APAC Debtor; or

iv.    The payment of any Indebtedness of such APAC Debtor other than as specifically permitted by this Agreement.

e.    Each APAC Debtor hereby covenants that until such APAC Debtor's Pre-Filing Intercompany Debt has been paid or satisfied in full, such APAC Debtor shall use its reasonable best efforts to provide written notice to and to consult with the Monitor, the Creditors' Committee, the Bondholders' Committee and the Joint Administrators prior to taking any of the following actions: liquidate, commence bankruptcy proceedings, suspend payments, assign to or make any other arrangement with such APAC Debtor's creditors or put such APAC Debtor into judicial management or administration and/or consolidation, or merge or amalgamate such APAC Debtor with any other company and/or cease to conduct or carry on such APAC Debtor's business or any part thereof other than as a result of a Sale Transaction where such APAC Debtor is a Selling Debtor.

f.    Each Party which is a shareholder of any APAC Debtor hereby agrees that to the extent required or desirable and upon receipt of a written request from such APAC Debtor, such Party shall execute shareholder(s)' resolutions (solely in its capacity as a shareholder of such APAC Debtor) approving and/or ratifying the entry of this Agreement by such APAC Debtor and the consummation of the transactions contemplated by this Agreement.

7.    Appointment of Restructuring Manager. The APAC Debtors shall appoint, with effect from the date hereof, Ernst & Young Solutions LLP as the restructuring manager (the "Restructuring Manager") to carry out the duties set out in Annex G. The fees, costs and expenses of the Restructuring Manager shall be borne jointly and severally by NN Japan, NN India (Private), NN Australia, NN Singapore Group and NN Asia Group. If the Restructuring Manager resigns or is removed or a vacancy exists in the office of the Restructuring Manager for

16

any reason, then the APAC Debtors shall promptly appoint a successor Restructuring Manager in consultation with the other Relevant Parties.

       8.     Full and Final Settlement. In consideration of the obligations, covenants and rights of the Parties set forth in this Agreement, including without limitation the APAC Debtor's agreement to enter into the relevant sale agreements under Section 6.b. and to cooperate fully and participate in one or more Sale Transactions under Section 11, the Parties hereby agree that this Agreement shall constitute a full and final settlement of any and all Adjustment Payments (as defined below) owing and that may, or could be owing between (a) the APAC Debtors *inter se* and (b) an APAC Debtor, on the one hand, and a Canadian Debtor, on the other hand, under the APAC Distribution Agreements (as defined below) for all calculation periods or parts thereof during, or with respect to, the period from and including the Filing Date through and including December 31, 2009. For the purposes of this Section 8, "Adjustment Payments" means the quarterly and/or annual adjustment payments payable pursuant to the APAC Distribution Agreements; and "APAC Distribution Agreements" means certain distribution agreements, whether written or oral, in effect between two or more APAC Debtors or between one or more APAC Debtors, on the one hand, and a Canadian Debtor, on the other hand, including without limitation, the agreements listed in Annex H (as amended, supplemented or otherwise modified from time to time).

## PART C – PROVISIONS OF GENERAL APPLICATION

       9.     Scope of this Agreement. The Parties hereto agree that:

           a.     this Agreement is not, and shall not be deemed to be, an acknowledgement by any Party of the assumption, ratification, adoption or rejection of the Transfer Pricing Agreements or any other Transfer Pricing methodology employed by the Nortel Group or its individual members for any purpose nor shall it be determinative of, or have any impact whatsoever on, the allocation of proceeds to any Debtor from any sale of assets, undertakings or businesses of Nortel Group entities;

           b.     except as specifically provided herein, that payments required hereunder shall be made in accordance with the terms hereof regardless of any actual or purported right of offset or other defense;

           c.     this Agreement shall not serve as the basis for any claim by any Party against any other Party in respect of Transfer Pricing or any other theory of cost reimbursement or allocation of any sale proceeds, or any ownership of intellectual property;

           d.     each Party approves all payments to be made in accordance with this Agreement and all other matters contemplated hereby, to the extent that such Party is a creditor of the Party making such payment; and

           e.     this Agreement shall not, and is not intended to, have any impact whatsoever on the rights and obligations of the various parties to the certain Interim Funding and Settlement Agreement dated June 9, 2009.



10. <u>Relinquishment of Intellectual Property Licenses.</u>

    a.    Upon the written request of NNL, each of the APAC Debtors hereby agrees to enter into a License Termination Agreement (as defined below) with respect to the licenses and rights granted by NNL to such APAC Debtors for the purposes of facilitating, and in consideration of a right to an allocation, to be determined in accordance with Section 11, to such APAC Debtors of a portion of the sale proceeds from, the sale of any material assets of any of the Canadian Debtors and/or the US Debtors to a third party (an "<u>Asset Sale</u>"); *provided, however,* such APAC Debtor shall not be required to enter into any License Termination Agreement if a License Agreement (as defined in the License Termination Agreement) contains terms that are materially inconsistent with the terms of the License Termination Agreement.

    b.    For the purposes of this Agreement, the term "<u>License Termination Agreement</u>" means an agreement substantially in the form attached hereto as <u>Annex I</u>.

    c.    Where any APAC Debtor enters into any License Termination Agreement in accordance with the provisions of this Section 10, such APAC Debtor shall be deemed to be a Selling Debtor (as defined below), and the proceeds of such Asset Sale shall be deemed to be Sale Proceeds (as defined below), for the purposes of Sections 11.b., 11.c. and 11.d., and Sections 11.b., 11.c. and 11.d. shall apply accordingly.

11. <u>Entry into Sale Transactions.</u>

    a.    Subject to (i) compliance with applicable laws and regulations and (ii) the determination by the board of directors of each APAC Debtor, acting reasonably and in good faith and after consultation with the Relevant Parties, that the applicable Sale Transaction is in the best economic interests of such APAC Debtor's relevant stakeholders generally, each APAC Debtor hereby agrees to cooperate fully and participate in one or more Sale Transactions. Such cooperation shall include implementation of any reasonable operational or corporate structure changes required by the Filed Debtors or any purchaser (or, in the case of any auction, the successful bidder in any such auction) (a "<u>Purchaser</u>") and the execution of definitive documentation, including any ancillary or related documents necessary or reasonably desirable to participate in the Sale Transactions, with the Purchaser in accordance with the terms of such definitive documentation. Each APAC Debtor hereby agrees that its execution of definitive documentation with a Purchaser of, or closing of any sale of, material assets, undertakings or businesses of any of the APAC Debtors to which such APAC Debtor (an "<u>APAC Selling Debtor</u>") is proposed to be a party, together with each of the other Parties hereto that is proposed to be a party thereto (together with the APAC Selling Debtors, the "<u>Selling</u>



Debtors") (each, a "Sale Transaction") shall not be conditioned upon such APAC Selling Debtor reaching agreement with the other Selling Debtors regarding (i) allocation of the sale proceeds (the "Sale Proceeds") from the relevant Sale Transaction or (ii) the Allocation Protocol (as defined below).

b.    Pending the distribution of the Sale Proceeds as described in the second sentence of this Section 11.b., the entire amount of the Sale Proceeds from a Sale Transaction (less applicable transfer or value-added taxes and, to the extent agreed by the Selling Debtors, transaction costs (including any applicable break fee or expense reimbursement) and other agreed amounts) shall be deposited in an escrow account (the "Escrow Account"). In no case shall there be any distribution from the Escrow Account in advance of either (i) agreement of all of the Selling Debtors or (ii) in the case where the Selling Debtors fail to reach agreement, determination by the relevant dispute resolver(s) under the terms of the Allocation Protocol applicable to the Sale Proceeds, and subject in each case to payment of the agreed or determined amount of allocation of Sale Proceeds to all Selling Debtors.

c.    Without derogating from the obligations provided in Section 11.a., each APAC Debtor shall, as soon as reasonably practicable following the execution of the Allocation Protocol by the Filed Debtors, accede to a common protocol for resolving disputes concerning the allocation of Sale Proceeds from Sale Transactions, which shall provide in substance the following general principles, among others (the "Allocation Protocol"):

    i.    APAC Debtors, along with one or more affiliates of the Filed Debtors that have not commenced any bankruptcy or other creditor protection proceedings and so elect, (such affiliates together with the APAC Debtors, the "Non-Filed Affiliates"), shall be collectively represented in the procedures under the Allocation Protocol by an independent counsel and financial advisor, and the fees and expenses of such counsel and financial advisor shall be paid from the Sale Proceeds allocated to the Non-Filed Affiliates;

    ii.    Subject to Section 11.c.iv. of this Agreement, the representatives of the Non-Filed Affiliates shall have the right to participate and present the claims of the Non-Filed Affiliates to the relevant Sale Proceeds in the proceedings under the Allocation Protocol; the manner and terms of such participation and presentation shall be determined by the dispute resolver(s);

    iii.    In the event the Selling Debtors fail to reach agreement regarding the allocation of Sale Proceeds under the Allocation Protocol, such dispute shall be automatically referred to the dispute resolver(s) pursuant to the Allocation Protocol;

19

iv.     It is the intention of the Parties that the procedures under the Allocation Protocol shall be designed to avoid unnecessary delay or expense, so as to provide a fair and efficient means for the final resolution of the relevant dispute among the Selling Debtors. The rights of the Non-Filed Affiliates to participate and present as contemplated by Section 11.c.ii, as determined by the dispute resolver(s), shall reflect, to the extent reasonably practicable and determinable under the circumstances, the relative contribution, if any, of the assets (tangible and intangible) and the rights transferred or relinquished by and liabilities assumed from the Non-Filed Entities in comparison to other Selling Debtors in such Sale Transaction; and

v.      The written decision of the dispute resolver(s) allocating the Sale Proceeds among the Selling Debtors shall be conclusive, final and binding upon each of the parties as may be provided in the Allocation Protocol, including, without limitation, the Non-Filed Affiliates, subject to the terms of the Allocation Protocol.

d.      All Selling Debtors shall, immediately following entry into any Sale Transaction, negotiate in good faith and on a timely basis to attempt to reach agreement regarding the allocation of the Sale Proceeds from such Sale Transaction within a reasonable period of time or as may be otherwise provided in the Allocation Protocol, failing which the Allocation Protocol shall apply to determine the allocation of the relevant Sale Proceeds.

e.      For the purposes of Sections 11.a. through 11.d. (inclusive):

i.      the US Debtors hereby agree that with respect to any of the matters referred to in such Sections as to which the agreement or determination of any of the US Debtors is required, the US Debtors shall include the Creditors' Committee and the Bondholders' Committee in any negotiations on such issues with the other Debtors or any related proceedings and any agreement or determination by the US Debtors shall require the prior consent of the Creditors' Committee and the Bondholders' Committee acting in good faith; and

ii.     the Canadian Debtors hereby agree that with respect to any of the matters referred to in such Sections as to which the agreement or determination of any of the Canadian Debtors is required, the Canadian Debtors shall include the Monitor and the Bondholders' Committee in any negotiations on such issues with the other Debtors or any related proceedings and any agreement or determination by the Canadian Debtors shall require the prior

consent of the Monitor and the Bondholders' Committee acting in good faith.

12.   Effectiveness.

a.   Subject to Sections 12.b. and 12.f., the effectiveness of the provisions of this Agreement shall be subject to the satisfaction of the following conditions:

   i.   each of the US Court and the Canadian Court approving the entirety of this Agreement and all of the provisions hereof (the "North American Court Condition");

   ii.   the UK Court giving a direction (the "UK Court's Directions") that, if so sought, the Joint Administrators be at liberty to enter into this Agreement (the "UK Court Condition" and, together with the North American Court Condition, the "Initial Conditions," and each, an "Initial Condition"), *provided, however,* the Joint Administrators may at their election waive the UK Court Condition;

   iii.   (A) the Reserve Bank of India approving (1) the setting-off of the unpaid amount of loans, credits and obligations owing by NN India (Private) to each of its Intercompany Creditors as of the Filing Date against any receivables owing to NN India (Private) by such Intercompany Creditors as of the Filing Date, as contemplated under Section 1.a., (2) the setting-off of the unpaid amount of loans, credits and obligations owing by NN India (Private) to its Intercompany Creditors incurred after the Filing Date against any receivables owing to NN India (Private) by the relevant Intercompany Creditors as contemplated under Section 4.a.ii and (3) Section 4 and 8 of this Agreement and (B) the satisfaction of all conditions, if any, which the Reserve Bank of India may attach or impose on such approvals (collectively, the "RBI Condition"); and

   iv.   (A) the Bank of Thailand or any commercial bank that is an authorized agent of the Bank of Thailand approving the setting-off of the unpaid amount of loans, credits and obligations owing by NN Thailand to each of its Intercompany Creditors as of the Filing Date against any receivables owing to NN Thailand by such Intercompany Creditors as of the Filing Date, as contemplated under Section 1.a. and (B) the satisfaction of all conditions, if any, which the Bank of Thailand or an authorized agent of the Bank of Thailand may attach or impose on such approvals (collectively, the "BOT Condition" and, together with the Initial Conditions and the RBI Condition, the "Conditions," and each, a "Condition").

21



b.   Upon the satisfaction of each of the Initial Conditions, (i) all provisions of this Agreement shall be effective with respect to all the Parties (other than NN India (Private) and NN Thailand), (ii) all provisions of this Agreement other than Sections 1-4 and 8 shall be effective with respect to NN India (Private) and (iii) all provisions of this Agreement other than Sections 1-4 shall be effective with respect to NN Thailand, in each case, as of the date of the satisfaction of the last Initial Condition (the "<u>Initial Effective Date</u>"). Upon the satisfaction of the RBI Condition, Sections 1-4 and 8 shall be effective with respect to NN India (Private) as of the date of the satisfaction of the RBI Condition. Upon the satisfaction of the BOT Condition, Sections 1-4 shall be effective with respect to NN Thailand. The last date of the satisfaction of the RBI Condition and the BOT Condition is referred to in this Agreement as the "<u>Final Effective Date</u>."

c.   Each Party hereto (including NN India (Private) and NN Thailand but excluding the other APAC Debtors) shall:

    i.    use commercially reasonable efforts to satisfy the Conditions as soon as possible, taking into account the availability of the respective Courts to address the matters set forth in this Agreement;

    ii.   keep all other Parties, the Monitor, the Creditors' Committee and the Bondholders' Committee reasonably apprised of the progress of the satisfaction of the Conditions and provide such other information regarding the satisfaction of the Conditions as reasonably requested by other Parties; and

    iii.  use commercially reasonable efforts to allow any other Party, the Monitor, the Creditors' Committee or the Bondholders' Committee which so requests in writing reasonable participation in connection with any proceedings in any Court related to the satisfaction of the Conditions.

d.   Each APAC Debtor hereto shall use commercially reasonable efforts to make or obtain all applicable governmental notifications, consents, authorizations and approvals required for such APAC Debtor to enter into this Agreement and/or to consummate the transactions contemplated herein and set forth in <u>Schedule 5</u> as soon as practicable.

e.   If the Joint Administrators elect to seek the UK Court's Directions, then the EMEA Debtors shall (i) use commercially reasonable efforts to obtain the UK Court's Directions as soon as possible, taking into account the availability of the UK Court, (ii) keep all other Parties, the Monitor, the Creditors' Committee and the Bondholders' Committee reasonably apprised of the progress of the efforts to obtain UK Court's Directions and provide such other information regarding the efforts to obtain UK Court's

22

Directions as reasonably requested by other Parties, and (iii) use commercially reasonable efforts to allow any other Party, the Monitor, the Creditors' Committee or the Bondholders' Committee which so requests in writing reasonable participation in connection with any proceedings in the UK Court related to the UK Court's Directions.

f.    Notwithstanding any of the foregoing but subject to Section 12.b., the following provisions of the Agreement shall be effective as of the date hereof: Sections 3.a., 3.b., 5, 6, 7, 8, 10, 11, 12, 13.c. and 14-27.

13.    Events of Default; Remedies.

a.    For the purposes of this Agreement, (i) a "Payment Event of Default" shall mean, with respect to an APAC Debtor, a default for ten (10) or more calendar days in the payment of any Initial Payment Amount or any Subsequent Payment Amount of such APAC Debtor when due (whatever the reason for such Payment Event of Default and whether it shall be voluntary or involuntary or be effected by operation of law or pursuant to any judgment, decree or order of any court or any order, rule or regulation of any administrative or governmental body) and (ii) a "Covenant Event of Default" shall mean, with respect to an APAC Debtor, a failure for ten (10) or more calendar days after receipt by such APAC Debtor of written notice given by NNL or NNI to comply with its agreements set forth in Sections 10 and 11.

b.    Subject to Section 4.d. and without derogating from the obligations provided in Sections 2.b. and 3.c., upon the occurrence of a Payment Event of Default by an APAC Debtor, to the extent that such APAC Debtor has a Net Cash Balance as of the applicable Determination Date, such APAC Debtor shall make payment of a portion of the Initial Payment Amount or the Subsequent Payment Amount (as the case may be) to each of its Intercompany Creditors of its Category I Pre-Filing Intercompany Debt (in the case of an Initial Payment Amount) or its Category II Pre-Filing Intercompany Debt (in the case of a Subsequent Payment Amount) owing to such Intercompany Creditor utilizing its Net Cash Balance as of the applicable Determination Date on a pro rata basis according to the proportion in which the Category I Pre-Filing Intercompany Debt (in the case of an Initial Payment Amount) or the Category II Pre-Filing Intercompany Debt (in the case of a Subsequent Payment Amount) of such APAC Debtor owing to each of its Intercompany Creditors bears to the aggregate amount of all Category I Pre-Filing Intercompany Debt (in the case of an Initial Payment Amount) or the aggregate amount of all Category II Pre-Filing Intercompany Debt (in the case of a Subsequent Payment Amount) of such APAC Debtor owing to all of its Intercompany Creditors.

23



        c.       Subject to compliance with all applicable laws and regulations, each APAC Debtor's obligation to comply with its agreements set forth in Sections 10 and 11, and the expenses, costs, losses, liabilities and damages that may be incurred by the other Selling Debtors by reason of such APAC Debtor's non-compliance with such agreements (the "<u>Secured Obligations</u>"), shall be secured by the following assets of such APAC Debtor (collectively, the "<u>Collateral</u>"): perfected first-priority security interests in all present and future tangible and intangible assets, properties and undertakings (including, without limitation, bank accounts, investment property, intercompany receivables and any other receivables, equipment, contractual rights, intellectual property and other general intangibles) but in each case excluding those assets over which granting of a security interest in such assets would be prohibited or limited (but if limited, only excluded to the extent of such limitation and for so long as such limitation is in force) by law and/or contract; *provided, however*, that with respect to any Collateral that also secures the obligations of NN Australia under the NN Australia Note Facility, the Secured Obligations shall be secured by second-priority security interest that shall be junior to the security interests of the secured parties under the NN Australia Note Facility, and the lien priority and the relative rights issues in respect thereof will be set forth in a customary intercreditor agreement, which shall be reasonably acceptable to the secured parties under the NN Australia Note Facility, and *provided, further*, that such security interests shall not prevent any APAC Debtor from posting Ordinary Course Cash Collateral. Subject to compliance with all applicable laws and regulations, all of the above-described security interests with respect to NN Japan, NN Asia Group and NN Singapore Group shall be created for the benefit of the other Selling Debtors on or prior to the Initial Effective Date (or with respect to the other APAC Debtors within 45 days from the date hereof) on terms, and pursuant to documentation reasonably satisfactory to the Relevant Parties, and shall provide for the ability of the secured parties thereof to enforce such security interests upon the occurrence of a Covenant Event of Default. Notwithstanding the foregoing, assets may be excluded from the Collateral in circumstances where such APAC Debtor and the Relevant Parties agree that the cost of obtaining a security interest in such assets are excessive in relation to the value afforded thereby. Each APAC Debtor shall bear all reasonable costs and expenses that may be incurred by the Parties in creating the security interests relating to such APAC Debtor in accordance with this Section 13.c.

    14.    <u>Amendments</u>. This Agreement may be amended or any rights under the Agreement may be waived, on no less than 5 Business Days' notice, only in writing signed by all Parties, and approved by the Monitor, Creditors' Committee and the Bondholders' Committee, which amendments or waivers, if material in the judgment of the Parties, must be approved by all of the Courts that initially approved this Agreement or gave directions in respect of this Agreement (in the case of the UK Court). For the purposes of this Section 14, "<u>Business Day</u>"

shall mean a day that is not a Saturday, Sunday or national public holiday in Canada, the United States or the United Kingdom.

15.    Governing Law and Jurisdiction.

    a.    This Agreement shall be governed exclusively by the laws of the State of New York without regard to the rules of conflict of the laws of the State of New York; *provided, however,* that Sections 1-5, 6.c., 6.d., 6.e., 7, 12.d., 13.a., 13.b., 16 and 26 shall be governed exclusively by English law and Section 8 shall be governed by Ontario law.

    b.    To the fullest extent permitted by applicable law, each Party (i) agrees to submit to the non-exclusive jurisdiction of the US and Canadian Courts (in a joint hearing conducted under the cross-border protocol previously approved by the US Court and the Canadian Court, as it may be in effect from time to time (the "Cross-Border Protocol"), for purposes of all legal proceedings to the extent relating to the matters agreed in this Agreement (but not, for the avoidance of doubt, any Transfer Pricing Agreement matter generally), (ii) agrees that any claim, action or proceeding by such Party seeking any relief whatsoever to the extent relating to the matters agreed in this Agreement must be commenced in (A) the US Court if such claim, action or proceeding would solely involve the US Debtors, (B) the Canadian Court if such claim, action or proceeding would solely involve the Canadian Debtors, (C) a joint hearing of both the US and Canadian Courts conducted under the Cross-Border Protocol if such claim, action or proceeding would involve the Canadian Debtors and the US Debtors, (D) the English courts if such claim, action or proceeding would solely involve the EMEA Debtors and (E) the English courts if such claim, action or proceeding would solely involve the APAC Debtors, (iii) waives and agrees not to assert any objection that it may now or hereafter have to the laying of the venue of any such action brought in such a Court or any claim that any such action brought in such a Court has been brought in an inconvenient forum, (iv) agrees that mailing of process or other papers in connection with any such action or proceeding or any other manner as may be permitted by law shall be valid and sufficient service thereof, and (v) agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by applicable law; *provided, however,* that (1) any claim, action or proceeding brought against the Joint Administrators in relation to any potential liability or their capacity be it personal or otherwise under this Agreement shall be brought exclusively in the English courts, (2) any claim, suit, action or proceeding against any APAC Debtor Person shall be brought exclusively in the courts of the place of incorporation of the relevant APAC Debtor in which such APAC Debtor Person is a director, officer or employee (as the case may be) and (3) any claim, suit, action or proceeding relating to the matters set forth in Section 8 shall be brought exclusively in the Canadian Court.

16.    No Personal Liability of the Joint Administrators.

   a.    The Parties agree that the Joint Administrators have negotiated and are
         entering into this Agreement as agents for the EMEA Debtors to which
         they are appointed and that none of the Joint Administrators, their firm,
         partners, employees, advisers, representatives or agents shall incur any
         personal liability whatsoever whether on their own part or in respect of
         any failure on the part of any Nortel Group company to observe, perform
         or comply with any of its obligations under this Agreement or under or in
         relation to any associated arrangements or negotiations.

   b.    The Joint Administrators are a Party to this Agreement: (i) as agents of the
         respective EMEA Debtors of which they are administrators; and (ii) in
         their own capacities solely for taking the benefit of the statutory charges
         under Paragraph 99(3) of Schedule B1 of the United Kingdom Insolvency
         Act 1986 and for the purposes of obtaining the benefit of the provisions of
         this Agreement expressed to be conferred on or given to the Joint
         Administrators and enforcing the obligations of certain other Parties to this
         Agreement.

17.    No Personal Liability of the APAC Debtor Persons.

   a.    To the fullest extent permitted by applicable law, each of the Parties (other
         than the relevant APAC Debtor) agrees that it shall have no claim against
         any director, officer or employee of each APAC Debtor (each, an "APAC
         Debtor Person" and collectively, the "APAC Debtor Persons") and none
         of the APAC Debtor Persons shall have any personal liability to any Party
         (other than the relevant APAC Debtor) whatsoever based upon him being
         or having been or having done any act or omitting anything to be done as a
         director, officer or employee (as the case may be) of the relevant APAC
         Debtor, or in respect of any failure on the part of the relevant APAC
         Debtor to observe, perform or comply with any of its obligations under
         this Agreement or under or in relation to any associated arrangements or
         negotiations and each of such Parties, to the fullest extent permitted by
         applicable law, waives and releases and agrees and undertakes not to
         allege any such liability or assert, promote or support any such claim,
         except to the extent a liability arises out of fraud, willful misconduct or
         gross negligence on the part of such APAC Debtor Person.

   b.    Each APAC Debtor hereby unconditionally and irrevocably and to the
         fullest extent permitted by applicable law, agrees and undertakes to fully
         and effectively indemnify and keep indemnified and hold harmless each
         APAC Debtor Person of such APAC Debtor from and against all and any
         actions, suits, proceedings, claims, liabilities, demands, losses, charges,
         costs and expenses (including, without limitation, all reasonable costs and
         expenses incurred in disputing or defending or the settlement of any
         claims or actions or other proceedings as such APAC Debtor Person may

26

in his reasonable discretion decide to dispute, defend or settle, on a full indemnity basis) (collectively, the "Indemnified Liabilities") which may be made or brought, or threatened to be made or brought by any party (including by that APAC Debtor) against such APAC Debtor Person, or which such APAC Debtor Person may sustain, suffer or incur, based upon him being or having been or having done any act or omitting anything to be done as a director, officer or employee (as the case may be) of such APAC Debtor, or the failure on the part of such APAC Debtor to observe, perform or comply with any of its obligations under this Agreement or under or in relation to any associated arrangements or negotiations; provided, however, that nothing in this Section 17.b. shall exclude liability of any APAC Debtor Person of such APAC Debtor to such APAC Debtor for fraud, wilful misconduct or gross negligence. Without prejudice to the generality of the foregoing, each APAC Debtor shall forthwith upon the written demand(s) of any APAC Debtor Person of such APAC Debtor from time to time, pay to such APAC Debtor Person any Indemnified Liabilities which may be payable by such APAC Debtor Person. Notwithstanding any of the foregoing, NN Japan shall not indemnify, keep indemnified or hold harmless any director of NN Japan from and against any Indemnified Liabilities which may be made or brought by, or threatened to be made or brought by, NN Japan or the shareholders of NN Japan on behalf of NN Japan pursuant a derivative shareholders' suit against such director.

c.  Notwithstanding anything in Section 15, any claim, suit, action or proceeding against any APAC Debtor Person shall be governed exclusively by the laws of, and shall be subject to the exclusive jurisdiction of the courts of, the place of incorporation of the relevant APAC Debtor in which such APAC Debtor Person is a director, officer or employee (as the case may be), provided that in the case of a director, officer or employee of NN Australia, any claim, suit, action or proceeding against such APAC Debtor Person shall be governed exclusively by the laws of New York and shall be subject to exclusive jurisdiction of the courts of the State of New York and of the United States sitting in the Borough of Manhattan.

d.  The Parties agree that the provisions of this Section 17 are for the benefit of each APAC Debtor Person and may be enforced by each APAC Debtor Person.

18.  **D&O Insurance.** In consultation with the Relevant Parties and to the fullest extent permitted by applicable law, the APAC Debtors may obtain and maintain liability insurance, or procure that liability insurance be obtained and maintained, for their directors and officers ("D&O Insurance") so long as (a) such insurance covers all directors and officers of all of the APAC Debtors and (b) the total cost of such insurance shall not exceed US$1 million per annum. The APAC Debtors hereby agree that if the cost of D&O Insurance would exceed US$1 million

27

per annum, then no such insurance shall be obtained by the APAC Debtors without the prior written consent of the Relevant Parties.

19.     Representations and Warranties.  Subject to the satisfaction of the Conditions and the execution of the shareholder(s)' resolutions described in Section 6.f., each Party (but, for the avoidance of doubt, not the Joint Administrators in their personal capacities) hereby severally represents and warrants to each other that, as of the date hereof:

> a.     it has the power and authority to enter into this Agreement and to carry out its obligations hereunder;
>
> b.     the execution of this Agreement, and the consummation of the transactions contemplated herein, have been authorized by all necessary corporate approvals, and no other act or proceeding on its part is necessary to authorize the execution of this Agreement; and
>
> c.     this Agreement has been duly executed by it and constitutes its legal, valid and binding obligations.

20.     Reservation of Rights.  Except as set forth in Section 8 of this Agreement, nothing in this Agreement shall constitute an amendment, modification or waiver of rights of any Party (a) under any other agreement, including, without limitation, group supplier protocol agreements approved in the applicable Proceedings from time to time and the Transfer Pricing Agreements, applicable law or otherwise, including, without limitation, the right to object to the propriety of any payments made under or in connection with the Transfer Pricing Agreements or any offset arising therefrom or otherwise or (b) with respect to any potential tax contingencies, assessments, rulings or agreements arising from Transfer Pricing Payments pursuant to the Transfer Pricing Agreements or any offset arising therefrom or otherwise.  The use of the term Transfer Pricing Payment (or any similar term) or reference to the Transfer Pricing Agreements (or similar agreement) in this Agreement is for convenience only and shall have no evidentiary effect or be used by any of the Parties hereto in any proceeding to determine the pre-petition or post-petition validity, applicability, assumption, affirmation or ratification by any Party of the Transfer Pricing Agreements or any transfer pricing methodology provided in the Transfer Pricing Agreements.

21.     Counterparts.  This Agreement may be executed in separate counterparts (which may include counterparts delivered by facsimile transmission) and all of said counterparts taken together shall be deemed to be an original and shall be binding on the Party who signed the counterpart and all of which together shall constitute a single agreement.

22.     Entire Agreement. This Agreement embodies all the terms and conditions agreed upon between the Parties as to the subject matter of this Agreement and supersedes and cancels in all respects all previous term sheets, agreements and undertakings, if any, between the Parties with respect to the subject matter hereof, whether such be written or oral.

23.     Costs and Expenses.  Each Party shall bear its own costs and expenses incurred in connection with the preparation, negotiation and execution of this Agreement.



24.    Specific Performance.  Each Party hereby agrees and acknowledges that it will be impossible to measure in money the damages that would be suffered if such Party fails to comply with any of its obligations in this Agreement and that, in the event of any such failure, an aggrieved party will be irreparably damaged and will not have an adequate remedy at law.  Any such party shall, therefore, be entitled (in addition to any other remedy to which such party may be entitled at law or in equity) to seek injunctive relief, including specific performance, to enforce such obligations.

25.    Severability.  In the event that any provision of this Agreement shall be illegal, invalid or unenforceable, such provision shall be construed by limiting it in such a way so as to render it legal, valid and enforceable to the maximum extent provided by applicable law, and the legality, validity and enforceability of the remaining provisions shall not in any way be affected or impaired by any illegality, invalidity or unenforceability of any provision.  The Parties shall negotiate in good faith with respect to any provision of this Agreement found to be illegal, invalid or unenforceable, in order to agree on a substitute provision giving effect, to the maximum extent possible, to the original intent of such provision.

26.    Contracts (Rights of Third Parties) Act 1999.  Except as specifically set forth in this Agreement, no rights are conferred on any person who is not a party to this Agreement under the Contracts (Rights of Third Parties) Act 1999 of the United Kingdom to enforce any term of this Agreement, but this does not affect any right or remedy which exists or is available apart from that Act.

27.    NN Korea.  NN Korea hereby represents and warrants that (except for accounts receivable owing by certain of the APAC Debtors and Filed Debtors, and a small cash balance) it has no material tangible or intangible assets, including, without limitation, any intellectual property rights that are contemplated to be included in any Asset Sale or Sale Transaction.  In consideration of this representation, the Parties hereby agree that, notwithstanding anything to the contrary in this Agreement, Sections 6.b., 10, 11 and 13.c. of this Agreement shall not apply to NN Korea.

28.    Several Obligations.  Except as specifically set forth in this Agreement, the obligations of each Party hereunder are several, and not joint and several.

29

IN WITNESS WHEREOF, the Parties hereto have caused this Agreement to be duly executed and delivered as of the date hereof.

NORTEL NETWORKS CORPORATION

By: _____
Name: John Doolittle
Title: SVP, Finance and
       Corporate Finance

NORTEL NETWORKS LIMITED

By: _____
Name: John Doolittle
Title: SVP, Finance and
       Corporate Finance

NORTEL NETWORKS GLOBAL
CORPORATION

By: _____
Name: John Doolittle
Title: President

NORTEL NETWORKS INTERNATIONAL
CORPORATION

By: _____
Name: John Doolittle
Title: President

NORTEL NETWORKS CORPORATION

By _____
Name: Anna Ventresca
Title: General Counsel-Corporate and
       Corporate Secretary

NORTEL NETWORKS LIMITED

By _____
Name: Anna Ventresca
Title: General Counsel-Corporate and
       Corporate Secretary

NORTEL NETWORKS GLOBAL
CORPORATION

By _____
Name: Anna Ventresca
Title: Secretary

NORTEL NETWORKS INTERNATIONAL
CORPORATION

By _____
Name: Anna Ventresca
Title: Secretary

NORTEL NETWORKS TECHNOLOGY
CORPORATION

By _____
Name: Anna Ventresca
Title: Secretary

NORTEL NETWORKS INC.

By _____
    Name: Anna Ventresca
    Title: Chief Legal Officer


ARCHITEL SYSTEMS (U.S.)
CORPORATION

By _____
    Name: John Doolittle
    Title: President


CORETEK, INC.

By _____
    Name: John Doolittle
    Title: President


NORTEL ALTSYSTEMS, INC.

By _____
    Name: John Doolittle
    Title: President


NORTEL ALTSYSTEMS
INTERNATIONAL INC.

By _____
    Name: John Doolittle
    Title: President


NORTEL NETWORKS APPLICATIONS
MANAGEMENT SOLUTIONS INC.

By _____
    Name: John Doolittle
    Title: President

NORTEL NETWORKS CABLE
SOLUTIONS INC.

By _____
   Name:  Anna Ventresca
   Title:   Chief Legal Officer

NORTEL NETWORKS CAPITAL
CORPORATION

By _____
   Name:  John Doolittle
   Title:  President

NORTEL NETWORKS (CALA) INC.

By: _____
   Name:  John Doolittle
   Title:  Treasurer

NORTEL NETWORKS (CALA) INC.

By _____
   Name:  Peter Look
   Title:  President

NORTEL NETWORKS HPOCS INC.

By _____
   Name:  John Doolittle
   Title:  President

NORTEL NETWORKS INTERNATIONAL
INC.

By _____
   Name:  John Doolittle
   Title:  President

NORTEL NETWORKS OPTICAL
COMPONENTS INC.

By _____
   Name:  John Doolittle
   Title:  President

2

69

NORTHERN TELECOM
INTERNATIONAL INC.

By _____
    Name: John Doolittle
    Title:  President

QTERA CORPORATION

By _____
    Name:  John Doolittle
    Title:  President

SONOMA SYSTEMS

By _____
    Name:  John Doolittle
    Title:  President and Treasurer

XROS, INC.

By _____
    Name:  John Doolittle
    Title:  President

3

NORTHERN TELECOM
INTERNATIONAL INC.

By _____
   Name:
   Title:


QTERA CORPORATION

By _____
   Name:
   Title:


SONOMA SYSTEMS

By _____
   Name:
   Title:


XROS, INC.

By _____
   Name:
   Title:


NORTEL NETWORKS (ASIA) LIMITED

By _____
   Name: ALAIN FOSTER
   Title:


NORTEL NETWORKS AUSTRALIA PTY.
LIMITED

By _____
   Name: ALAIN FOSTER
   Title:


Signature page to Asia Restructuring
Agreement

71

NORTEL NETWORKS (INDIA) PRIVATE
LIMITED

By _____
    Name:  ALAIN FOSTER
    Title:

PT NORTEL NETWORKS INDONESIA

By _____
    Name:  JAMES DEMERS
    Title:

NORTEL NETWORKS KABUSHIKI
KAISHA
               See attached

By _____
    Name: RAYMOND TESKE
    Title:

NORTEL NETWORKS KOREA LIMITED

By _____
    Name:  ANDREW GRANT
    Title:

NORTEL NETWORKS MALAYSIA SDN.
BHD. (COMPANY NO: 54799-M)

By _____
    Name: ALAIN FOSTER
    Title:

NORTEL NETWORKS NEW ZEALAND
LIMITED

By _____
    Name: ALAIN FOSTER
    Title:

72

NORTEL NETWORKS (INDIA) PRIVATE
LIMITED

By _____
   Name: ALAIN FOSTER
   Title:

PT NORTEL NETWORKS INDONESIA

By _____
   Name: JAMES DEMERS
   Title:

NORTEL NETWORKS KABUSHIKI
KAISHA

By _____   original
   Name: RAYMOND TESKE
   Title: REPRESENTATIVE DIRECTOR

NORTEL NETWORKS KOREA LIMITED

By _____
   Name: ANDREW GRANT
   Title:

NORTEL NETWORKS MALAYSIA SDN.
BHD. (COMPANY NO: 54799-M)

By _____
   Name: ALAIN FOSTER
   Title:

NORTEL NETWORKS NEW ZEALAND
LIMITED

By _____
   Name: ALAIN FOSTER
   Title:

Signature page to Asia Restructuring
Agreement

NORTEL NETWORKS SINGAPORE PTE
LTD

By _____
    Name: ANDREW GRANT
    Title:


NORTEL NETWORKS (THAILAND)
LIMITED

By _____
    Name: JAMES DEMERS
    Title:


NORTEL VIETNAM LIMITED

By _____ See attached _____
    Name:  NICHOLAS VREUGDENHIL
    Title:

NORTEL NETWORKS SINGAPORE PTE
LTD

By _____
    Name: ANDREW GRANT
    Title:


NORTEL NETWORKS (THAILAND)
LIMITED

By _____
    Name: JAMES DEMERS
    Title:


NORTEL VIETNAM LIMITED

By _____ original
    Name: NICHOLAS VREUGDENHIL
    Title:

Signed by **ALAN BLOOM** as Joint
Administrator on behalf of the Joint
Administrators of each of the EMEA Debtors
without personal liability as provided in
Section 16 of this Agreement and solely for
the purpose of obtaining the benefit of the
provisions of this Agreement expressed to be
conferred on or given to each of the Joint
Administrators

By _____
    Name:
    Title:


**SIGNED** for and on behalf of **NORTEL**    )
**NETWORKS UK LIMITED (IN**    )    **ALAN BLOOM**
**ADMINISTRATION)**    )
by **ALAN BLOOM** as Joint Administrator    )
(acting as agent and without personal
liability) in the presence of:

Witness signature

Name:    WILMA GRAHAM
Address: NO 1 MORE LONDON PLACE
    LONDON SE1 2AF

**SIGNED** for and on behalf of **NORTEL**    )
**NETWORKS (IRELAND) LIMITED**    )    **ALAN BLOOM**
**(IN ADMINISTRATION)**    )
by **ALAN BLOOM** as Joint Administrator    )
(acting as agent and without personal
liability) in the presence of:

Witness signature

Name:    WILMA GRAHAM
Address: NO 1 MORE LONDON PLACE
    LONDON SE1 2AF


Signature page to Asia Restructuring
Agreement

**SIGNED** for and on behalf of **NORTEL**
**NETWORKS NV (IN**
**ADMINISTRATION)**
by ~~ALAN BLOOM~~ CHRISTOPHER HILL as Joint Administrator
(acting as agent and without ~~personal~~
liability) in the presence of:

)
)
)
)

~~ALAN BLOOM~~ CHRISTOPHER HILL



Witness signature

Name:      B. DANDRIDGE
Address:  C/o NORTEL NETWORKS
              MAIDENHEAD UK

**SIGNED** for and on behalf of **NORTEL**
**NETWORKS SPA (IN**
**ADMINISTRATION)**
by ~~ALAN BLOOM~~ CHRISTOPHER HILL as Joint Administrator
(acting as agent and without personal
liability) in the presence of:

)
)
)
)

~~ALAN BLOOM~~ CHRISTOPHER HILL



Witness signature

Name:      B DANDRIDGE
Address:  C/o NORTEL NETWORKS
              MAIDENHEAD UK

**SIGNED** for and on behalf of **NORTEL**
**NETWORKS BV (IN**
**ADMINISTRATION)**
by ~~ALAN BLOOM~~ CHRISTOPHER HILL as Joint Administrator
(acting as agent and without personal
liability) in the presence of:

)
)
)
)

~~ALAN BLOOM~~ CHRISTOPHER HILL



Witness signature

Name:      B. DANDRIDGE
Address:  C/o NORTEL NETWORKS
              MAIDENHEAD UK

**SIGNED** for and on behalf of **NORTEL**          )

Signature page to Asia Restructuring
Agreement

77

NETWORKS POLSKA SP Z.O.O. (IN ADMINISTRATION) by **ALAN BLOOM** as Joint Administrator (acting as agent and without personal liability) in the presence of:

)
)
)

ALAN BLOOM  CHRISTOPHER  HILL



Witness signature

Name:
Address:    B·DANDRIDGE
C/O NORTEL NETWORKS
MAIDENHEAD UK

SIGNED for and on behalf of **NORTEL NETWORKS HISPANIA SA** (IN ADMINISTRATION) by **ALAN BLOOM** as Joint Administrator (acting as agent and without personal liability) in the presence of:

)
)
)
)

ALAN BLOOM  CHRISTOPHER  HILL



Witness signature

Name:
Address:    B·DANDRIDGE
C/O NORTEL NETWORKS
MAIDENHEAD  UK

SIGNED for and on behalf of **NORTEL NETWORKS (AUSTRIA) GMBH** (IN ADMINISTRATION) by **ALAN BLOOM** as Joint Administrator (acting as agent and without personal liability) in the presence of:

)
)
)
)

ALAN BLOOM  CHRISTOPHER  HILL



Witness signature

Name:
Address:    B DANDRIDGE
C/O NORTEL NETWORKS
MAIDENHEAD  UK

Signature page to Asia Restructuring Agreement

*78*

**SIGNED** for and on behalf of **NORTEL** )
**NETWORKS SRO (IN** )
**ADMINISTRATION)** )
~~CHRISTOPHER HILL~~
by ~~**ALAN BLOOM**~~ as Joint Administrator )
(acting as agent and without personal
liability) in the presence of:

~~ALAN BLOOM~~ CHRISTOPHER HILL



Witness signature

Name:      B. DANDRIDGE
Address:   C/o NORTEL NETWORKS
           MAIDENHEAD UK

**SIGNED** for and on behalf of **NORTEL** )
**NETWORKS ENGINEERING** )
**SERVICES KFT (IN** )
**ADMINISTRATION)** )
~~CHRISTOPHER HILL~~
by ~~**ALAN BLOOM**~~ as Joint Administrator
(acting as agent and without personal
liability) in the presence of:

~~ALAN BLOOM~~ CHRISTOPHER HILL

Witness signature

Name:      B. DANDRIDGE
Address:   C/o NORTEL NETWORKS
           MAIDENHEAD UK

**SIGNED** for and on behalf of **NORTEL** )
**NETWORKS PORTUGAL SA (IN** )
**ADMINISTRATION)** )
~~CHRISTOPHER HILL~~
by ~~**ALAN BLOOM**~~ as Joint Administrator )
(acting as agent and without personal
liability) in the presence of:

~~ALAN BLOOM~~ CHRISTOPHER HILL



Witness signature

Name:      B. DANDRIDGE
Address:   C/o NORTEL NETWORKS
           MAIDENHEAD UK

Signature page to Asia Restructuring
Agreement

71

SIGNED for and on behalf of NORTEL    )
NETWORKS SLOVENSKO SRO (IN    )
ADMINISTRATION)    )
CHRISTOPHER HILL    )
by ALAN BLOOM as Joint Administrator
(acting as agent and without personal
liability) in the presence of:

Witness signature 

Name:    B. DANDRIDGE
Address:    C/o NORTEL NETWORKS
    MAIDENHEAD UK

ALAN BLOOM CHRISTOPHER HILL



SIGNED for and on behalf of NORTEL    )
NETWORKS ROMANIA SRL (IN    )
ADMINISTRATION)    )
CHRISTOPHER HILL    )
by ALAN BLOOM as Joint Administrator
(acting as agent and without personal
liability) in the presence of:

Witness signature

Name:    B. DANDRIDGE
Address:    C/o NORTEL NETWORKS
    MAIDENHEAD UK

ALAN BLOOM CHRISTOPHER HILL



SIGNED for and on behalf of NORTEL    )
NETWORKS FRANCE S.A.S. (IN    )
ADMINISTRATION)    )
CHRISTOPHER HILL    )
by ALAN BLOOM as Joint Administrator
(acting as agent and without personal
liability) in the presence of:

Witness signature

Name:    B. DANDRIDGE
Address:    C/o NORTEL NETWORKS
    MAIDENHEAD UK

ALAN BLOOM CHRISTOPHER HILL



SIGNED for and on behalf of NORTEL        )
GMBH (IN ADMINISTRATION)                  )       ALAN BLOOM CHRISTOPHER HILL
CHRISTOPHER HILL                          )
by ALAN BLOOM as Joint Administrator      )
(acting as agent and without personal
liability) in the presence of:

Witness signature

Name:        B DANDRIDGE
Address:     C/O NORTEL NETWORKS
             MAIDENHEAD UK



SIGNED for and on behalf of NORTEL        )
NETWORKS OY (IN                           )       ALAN BLOOM CHRISTOPHER HILL
ADMINISTRATION)                           )
CHRISTOPHER HILL                          )
by ALAN BLOOM as Joint Administrator
(acting as agent and without personal
liability) in the presence of:

Witness signature

Name:        B.DANDRIDGE
Address:     C/o NORTEL NETWORKS
             MAIDENHEAD UK

SIGNED for and on behalf of NORTEL        )
NETWORKS INTERNATIONAL                    )       ALAN BLOOM CHRISTOPHER HILL
FINANCE & HOLDING BV (IN                  )
ADMINISTRATION)                           )
CHRISTOPHER HILL
by ALAN BLOOM as Joint Administrator
(acting as agent and without personal
liability) in the presence of:

Witness signature

Name:        B.DANDRIDGE
Address:     C/O NORTEL NETWORKS
             MAIDENHEAD UK



Signature page to Asia Restructuring
Agreement

SIGNED for and on behalf of NORTEL )
NETWORKS AB (IN )      ~~ALAN BLOOM~~  CHRISTOPHER HILL
ADMINISTRATION) )
CHRISTOPHER HILL
by ~~ALAN BLOOM~~ as Joint Administrator )
(acting as agent and without personal
liability) in the presence of:

Witness signature

Name:        B .DANDRIDGE
Address:     C/O NORTEL NETWORKS
             MAIDENHEAD UK

Signature page to Asia Restructuring
Agreement

Court File No: 09-CL-7950

IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL NETWORKS CORPORATION *et al.*

---

*ONTARIO*
**SUPERIOR COURT OF JUSTICE**
**(COMMERCIAL LIST)**

Proceeding commenced at Toronto

---

**THIRTIETH REPORT OF THE MONITOR**
**DATED NOVEMBER 27, 2009**

---

**GOODMANS LLP**
Barristers & Solicitors
250 Yonge Street, Suite 2400
Toronto, Canada  M5B 2M6

Jay A. Carfagnini  (LSUC#: 222936)
Joseph Pasquariello (LSUC# 37389C)
Christopher G. Armstrong (LSUC# 55148B)

Tel: 416.979.2211
Fax: 416.979.1234

Lawyers for the Monitor, Ernst & Young Inc.

\5787020