**EXHIBIT A**

Court File No. 09-CL-7950

ONTARIO
SUPERIOR COURT OF JUSTICE
(COMMERCIAL LIST)

IN THE MATTER OF THE *COMPANIES' CREDITORS
ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF
COMPROMISE OR ARRANGEMENT OF
NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL
NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL
CORPORATION AND NORTEL NETWORKS TECHNOLOGY CORPORATION

THIRTY- FIRST REPORT OF THE MONITOR
DATED NOVEMBER 27, 2009

## INTRODUCTION

1.  On January 14, 2009 (the "Filing Date") Nortel Networks Corporation ("NNC" and
    collectively with all its subsidiaries "Nortel or the "Company"), Nortel Networks Limited
    ("NNL"), Nortel Networks Technology Corporation, Nortel Networks International
    Corporation and Nortel Networks Global Corporation (collectively the "Applicants") filed
    for and obtained protection under the *Companies' Creditors Arrangement Act* ("CCAA").
    Pursuant to the Order of this Honourable Court dated January 14, 2009, as amended and
    restated (the "Initial Order").  Ernst & Young Inc. was appointed as the Monitor of the
    Applicants (the "Monitor") in the CCAA proceedings.  The stay of proceedings was
    extended to December 18, 2009 by this Honourable Court in its Order dated October
    28, 2009.

2.  Nortel Networks Inc. ("NNI") and certain of its U.S. subsidiaries that concurrently filed
    voluntary petitions under Chapter 11 of Title 11 of the U.S. Bankruptcy Code (the "Code")
    in the United States Bankruptcy Court on January 14, 2009 (the "Chapter 11 Proceedings")

(collectively the "U.S. Debtors"). As required by U.S. law, an official unsecured creditors committee (the "Committee") was established in January, 2009.

3.  An ad hoc group of holders of bonds issued by NNL and NNC has been organized and is participating in these proceedings as well as the Chapter 11 Proceedings (the "Bondholder Group"). In addition, pursuant to Orders of this Honourable Court dated May 27, 2009, and July 22, 2009, respectively, representative counsel was appointed on behalf of the former employees of the Applicants and on behalf of the continuing employees of the Applicants and each of these groups is participating in the CCAA proceedings.

4.  Nortel Networks (CALA) Inc. (together with NNI and certain of its subsidiaries that filed on January 14, 2009, the "U.S. Debtors") filed a voluntary petition under Chapter 11 of Title 11 of the Code in the U.S. Court on July 14, 2009.

5.  Nortel Networks UK Limited ("NNUK") and certain of its subsidiaries located in EMEA were granted Administration orders (the "UK Administration Orders") by the English High Court on January 14, 2009 (collectively the "EMEA Debtors"). The UK Administration Orders appointed Alan Bloom, Stephen Harris, Alan Hudson and Chris Hill of Ernst & Young LLP as Administrators of the various EMEA Debtors, except for Ireland, to which David Hughes (Ernst & Young LLP Ireland) and Alan Bloom were appointed (collectively the "Joint Administrators"). On June 8, 2009, the Joint Administrators appointed in respect of NNUK filed a petition with the U.S. Court for the recognition of the Administration Proceedings as they relate to NNUK (the "English Proceedings") under Chapter 15 of the Code. On June 26, 2009, the U.S. Court entered an order recognizing the English Proceedings as foreign main proceedings under Chapter 15 of the Code.

6.  On January 20, 2009, Nortel Networks Israel (Sales and Marketing) Limited and Nortel Communications Holdings (1997) Limited (together "NN Israel") were granted Administration orders by the court in Israel (the "Israeli Administration Orders"). The Israeli Administration Orders appointed representatives of Ernst & Young LLP in the UK and Israel as Administrators of NN Israel and provided a stay of NN Israel's creditors which, subject to further orders of the Israeli Court, remains in effect during the Administration.

2

7.   Subsequent to the Filing Date, Nortel Networks SA commenced secondary insolvency proceedings within the meaning of Article 27 of the European Union's Council Regulation (EC) No 1346/2000 on Insolvency Proceedings in the Republic of France pursuant to which a liquidator and an administrator have been appointed by the Versailles Commercial Court.

**PURPOSE**

8.   The purpose of this thirty first report of the Monitor (the "Thirty-First  Report") is to seek the approval of this Honourable Court with respect to:

   a)   a settlement and release agreement dated November 20, 2009 entered into between the Applicants, U.S. Debtors and Nortel Networks B.V., Nortel Networks (Ireland) Limited, Nortel Networks Hispania, Nortel Networks S.A. and NNUK (collectively the "EMEA Entities") and the Joint Administrators, acting on behalf of the EMEA Entities (the Applicants, U.S. Debtors, and EMEA Entities are collectively referred to herein as "Nortel Entities") with Flextronics Corporation ("FC"), Flextronics Telecom Systems Ltd. ("FTS") and certain affiliates of FC and FTS that are signatories thereto (collectively "Flextronics") (the "Settlement and Release Agreement") (the Nortel Entities, Flextronics and the Joint Administrators are collectively referred to herein as the "Parties");

   b)   a side agreement dated November 20, 2009 entered into between the Nortel Entities and the Joint Administrators (the "Side Agreement "and together with the Settlement and Release Agreement the "Settlement Documents"); and

   c)   filing of certain portions of the Settlement Documents under seal.

9.   A redacted copy of the Side Agreement is attached as Appendix "A" to this Thirty-First Report and a redacted copy of the Settlement and Release Agreement is attached as Exhibit 1 to the Side Agreement.  The Applicants are requesting the redacted portions of the Settlement Documents be filed under seal.

## TERMS OF REFERENCE

10. In preparing this Thirty-First Report, the Monitor has relied upon unaudited financial information, the Company's books and records, financial information prepared by the Company and discussions with management of Nortel. The Monitor has not audited, reviewed or otherwise attempted to verify the accuracy or completeness of the information and accordingly, the Monitor expresses no opinion or other form of assurance on the information contained in this Thirty-First Report.

11. Unless otherwise stated, all monetary amounts contained herein are expressed in U.S. dollars.

12. Capitalized terms not defined in this Report are as defined in the Affidavit of John Doolittle sworn on January 14, 2009 (the "Doolittle Affidavit"), the Pre-Filing Report or previous reports of the Monitor.

13. The Monitor has made various materials relating to the CCAA proceedings available on its website at www.ey.com/ca/nortel. The Monitor's website also contains a dynamic link to Epiq Bankruptcy LLC's website where materials relating to the voluntary proceedings under Chapter 11 of the Code are posted.

## GENERAL BACKGROUND

14. Since September 30, 2009, Nortel has conducted its global business through four reportable business unit segments, Wireline and Wireless Networks ("WN"), Enterprise Solutions ("ES"), Metro Ethernet Networks ("MEN"), Carrier Voice Application Solutions ("CVAS"), and LG Nortel Co. Ltd. ("LGN"). The revenue and assets of each of the business units, except for LGN, is distributed among the multiple Nortel legal entities and joint ventures around the world.

15. As detailed in the Pre-Filing Report, Flextronics and various other contract manufacturers purchased substantially all of Nortel's inventory and manufacturing facilities in 2004. The manufacturing relationship between Flextronics and Nortel is governed by a number of

agreements, including the following Master Contract Manufacturing Services Agreements ("MCMSAs"):

    a) The MCMSA entered into between Nortel Networks Limited ("NNL") and Solectron Corporation (as FC was then known) on September 30, 2003 ("2003 MCMSA"); and

    b) The Amended and Restated MCMSA entered into between NNL and FTS on June 29, 2004.

16. Flextronics currently provides approximately 70% of Nortel's hardware products on a global basis and a significant portion of logistics and repair services required in connection with those products.

17. In recognition of the strategic importance of Flextronics' cooperation to ensure ongoing manufacturing support during the proceedings, NNL entered into an agreement with Flextronics dated January 13, 2009 (the "Amending Agreement") which among other things amended the MCMSAs to provide minimal disruptions to Nortel's supply chain and a corresponding degree of stability for Nortel's customer base during the post-filing period. The terms of the Amending Agreement provided, among other things, for the payment to Flextronics of $120 million towards the purchase of certain inventories and addressed the ongoing credit terms Flextronics would provide for delivery to Nortel of post-filing goods and services.

18. The Amending Agreement was approved by this Honourable Court on January 14, 2009.

19. Subsequent to the execution of the Amending Agreement, disputes developed between Nortel and Flextronics with respect to interpretations of certain terms contained therein and certain other matters.

20. In recognition of the continuing importance of the Flextronics relationship with Nortel and the material negative effect any disruption to the supply of product and services would have on Nortel's operations, a settlement agreement and side letter (collectively the "May 2009 Settlement Documents") were entered into between Nortel and Flextronics on May 22, 2009

to resolve these disputed matters. As a result of the confidential and sensitive information of a commercial nature with respect to Nortel's supply chain and its business relationship with its most significant supplier contained in the May 2009 Settlement Documents certain sections of the May 2009 Settlement Documents were redacted.

21. The May 2009 Settlement Documents and the sealing of the redacted portions thereof were approved by this Honourable Court at a hearing on June 16, 2009 and by the United States Bankruptcy Court for the District of Delaware at a hearing on June 11, 2009.

**CURRENT SITUATION**

22. Nortel is currently working toward divesting itself of certain assets through various pending and future sales transactions (any such transaction, a "Divestiture") with third parties (each third party, a "Purchaser").

23. As previously reported, Flextronics supplies the vast majority of Nortel's manufacturing requirements. The nature and complexity of the services provided by Flextronics is such that resourcing this manufacturing capability would be both expensive and incapable of being accomplished within a relative short period of time. As a result, Nortel expects it will be necessary for any Purchaser to retain Flextronics as a supplier in any Divestiture for some period of time.

24. It is a requirement of the various pending and potential Divestitures, for transition services to be provided for up to two years in order to transition the business operations and other administrative functions to the Purchaser. Accordingly, Nortel and any Purchaser will need to work cooperatively with Flextronics to ensure a cost effective and efficient transition of the businesses.

25. To facilitate the provision of transition services to a Purchaser, the Purchaser will have to either enter into a direct supply contract with Flextronics or Nortel will have to operate during the transition period pursuant to "back to back" contract arrangements with Flextronics and the Purchaser.

26. The option of a Purchaser entering into a direct supply contract with Flextronics may bring with it the issue of additional monetary demands from Flextronics. Such demands would result in either a reduction in the net purchase price realized or an increase in costs to Nortel.

27. Flextronics has previously filed objections with respect to pending Divestitures challenging the ability of Nortel, among other things, to operate under "back to back" contract arrangements. Flextronics also indicated it would file similar objections to future Divestitures.

28. If successful in its objection, Flextronics could very well be in an advantageous position with respect to demanding contractual concessions or incentive payments as consideration to entering into a new supply contract with a Purchaser. This ultimately would reduce the net proceeds from the Divestiture. If Flextronics is unsuccessful in its objection, the relationship between Nortel, the Purchaser and Flextronics would be significantly strained which could lead to inefficiency and unreliability in the functioning of the supply chain with a corresponding detrimental impact on the financial results of both Nortel and a Purchaser.

29. Entering into "back to back" contracts in themselves create significant financial and administrative drawbacks from an operational perspective including, but not limited to, the creation of potential working capital issues whereby Nortel would independently be required to pay for goods and services in advance of receiving payment from a purchaser and Nortel would likely find itself in the middle of disputes between a Purchaser and Flextronics over a variety of operational issues. These situations could also lead to inefficient and unreliable functioning of the supply chain.

30. There is an ongoing disagreement between Nortel and Flextronics with respect to amounts Flextronics owes to Nortel (both pre-filing and post-filing) and Flextronics has continued to set off as against pre-filing amounts Nortel owes to Flextronics. For a majority of these amounts, NNL disputes Flextronics right to apply such set off. Undertaking litigation to resolve such disputes would, in addition to the risk of being unsuccessful, involve the incurring of additional costs and commanding management, Monitor and other advisor time and resources which could otherwise be directed to other restructuring endeavours. In addition, such litigation would potentially strain ongoing relations with Flextronics during

7

the transitional services period, thereby risking negative operational and financial consequences.

31. The transactions underlying the amounts being set off relate primarily to the repurchase by Flextronics of excess and obsolete inventories from NNL as revised forecasts require such goods. These repurchases are required pursuant to the provisions of the MCMSA's, as amended by the Amending Agreement and Settlement Documents. It is anticipated Flextronics will continue to set off these amounts on a go forward basis, thereby negatively impacting the future cash flows of NNL. Alternative markets for this inventory are very limited or do not exist; therefore, if NNL was to discontinue reselling these inventories to Flextronics, it would incur a cash loss of a similar magnitude to the set off amounts by way of lower inventory realization proceeds.

32. On September 30, 2009, 13 Flextronics entities filed a total of 23 individual proofs of claim against the Applicants consisting of total pre-filing and post-filing claims in excess of CDN $7.6 billion ( the "Canadian Proofs of Claim" and the Canadian Proofs of Claim, together with the claims filed in the Chapter 11 Proceedings, any claims that have been or could be filed or otherwise asserted against the EMEA Entities and any claims that have been or could be filed or otherwise asserted in any other proceeding of a Nortel entity or otherwise in any other proceeding of a Nortel entity (the "Flextronics Proofs"). The majority of the Canadian Proofs of Claim are duplicative; however, they include discrete claims in excess of CDN. $775 million.

**SETTLEMENT AND RELEASE AGREEMENT**

33. In order to address the issues identified above, including the desire to maintain a sound, co-operative working relationship with Flextronics to ensure maximization of net proceeds realized from pending and future Divestitures, management of Nortel entered into extensive negotiations with Flextronics to address these issues.

34. During the currency of these negotiations, representatives of the Monitor, the Joint Administrators, the Committee and the Bondholders Group have been kept apprised of and have provided significant input into the progress and content of the negotiations.

8

35. These negotiations proved successful and the Nortel Entities and Flextronics have entered into the Settlement and Release Agreement subject to approval of this Honourable Court and the US Bankruptcy Court.

36. The Nortel Entities and Flextronics have entered into the Settlement and Release Agreement to avoid the expense, delay and uncertainty associated with litigation relating to any objection filed by Flextronics with respect to any pending or potential Divestiture, the Flextronics Proofs and in order to resolve certain other claims and matters outstanding between the Parties. A summary of the key provisions of the Settlement and Release Agreement is provided in the paragraphs which follow. Reference should also be made directly to the Settlement and Release Agreement for a complete understanding of the terms governing the agreement.

   a) Payment by the Nortel Entities to Flextronics in an amount as set forth in paragraph 1 of Schedule B to the Settlement and Release Agreement (such payment together with the Adjustment Amount (as defined below), the "Payment Obligation"), to be made in two equal instalments 10 days after the Effective Date (as defined in the Settlement and Release Agreement) and on or before May 31, 2010) in consideration for Flextronics' obligations under the Settlement and Release Agreement, and the full and final settlement of (i) the Flextronics Proofs, including certain post-filing ordinary course contractual claims, and (ii) all of the Parties' respective claims arising prior to the Initial Order, except as otherwise expressly stated in the Settlement and Release Agreement. The Settlement and Release Agreement provides that NNI shall pay the Payment Obligation to Flextronics on behalf of Nortel. The allocation within Nortel for the Payment Obligation is provided for under the Side Agreement.

   b) The resolution of additional disputed accounts receivable (listed on Schedule J to the Settlement and Release Agreement) owed by Flextronics to the Nortel Entities. In the event the disputed invoices are determined to be invalid, Nortel shall not be entitled to set off those amounts against amounts it otherwise would owe

9

Flextronics, and accordingly would be required to pay to Flextronics such amounts (the "Adjustment Amount").

c) The Payment Obligation (including the Adjustment Amount) shall constitute an administrative expense claim pursuant to section 503(b) of the Bankruptcy Code against NNI in the Chapter 11 Proceedings.

d) Flextronics and the Nortel Entities agree that, except as may be specifically provided under the Settlement and Release Agreement, their post-filing accounts receivable and payable, including without limitation certain accounts receivable identified in Schedule C to the Settlement and Release Agreement (the "Post-Filing Ordinary Contractual Claims"), will be resolved and paid in the ordinary course of business;

e) Flextronics agrees to cooperate with the Nortel Entities and Purchasers in pending and future Divestitures, including:

    (i) Flextronics agreeing not to assert any rights to adequate protection or similar rights related to the transfer of equipment owned by Nortel in connection with the sale of Nortel's Enterprise Solutions Business as authorized by this Court and the U.S. Bankruptcy Court on September 16 and 17, 2009, and to effect the orderly transfer of the equipment in Flextronics' possession owned by Nortel and proposed to be transferred to the Purchaser of the Enterprise Solutions Business;

    (ii) in connection with any proposed future Divestiture

        (1) Flextronics agreeing that at the request of Nortel in connection with such Divestiture, it will conduct good faith negotiations with a proposed Purchaser for the purpose of entering into a direct agreement by and among Flextronics, such Purchaser and any of such Purchaser's designated Affiliates for the supply of products and services related to the applicable Business being acquired on market competitive terms and conditions;

(2)    Without limiting the foregoing obligation, if by the time periods set forth in the Settlement and Release Agreement, such direct agreement has not been reached, Flextronics will, at the request of Nortel, enter into and execute a new supply agreement with the Purchaser that contains terms and conditions identical (aside from nonmaterial conforming changes) to the terms and conditions (including, but not limited to, payment and pricing terms) existing under the MCMSAs, as such terms and conditions relate to the Business subject to such Divestiture, as of January 12, 2009 (subject to certain terms as described in the Settlement and Release Agreement);

(3)    Nortel and Flextronics agreeing to conduct good faith negotiations with the Purchaser regarding a three-way inventory purchase agreement in connection with such Divestiture and to limit Nortel's liability for certain unconsumed portions of forecasts, as further described in the Settlement and Release Agreement;

(4)    Nortel and Flextronics further agreeing that Nortel will not place purchase orders for a Business following the closing of a Divestiture, except in an administrative role for a Purchaser;

(5)    Flextronics agreeing not to file any formal or informal objection or take any other action in opposition to or with the intention of frustrating any Divestiture, or to seek from Nortel or the Purchaser any remedy, payment or any modification of the MCMSAs as a result of any such Divestiture, including without limitation any claim or demand for adequate assurances, changes in payment terms, deposits or any other credit protection, cure costs, or any request or demand for the termination, assumption, rejection or repudiation of the MCMSAs or any part thereof. Flextronics further agrees that it shall not assert any claim or seek any payment or other remedy from a Purchaser in compensation for any right or

11

claim released, waived or compromised by Flextronics pursuant to the Settlement and Release Agreement; and

(6)    The Settlement and Release Agreement provides further mechanics and terms to facilitate Divestitures.

f) Flextronics and Nortel further agree that (absent a material breach by the other Party) the Parties shall not seek to reject, repudiate or otherwise cancel or terminate the Flextronics MCMSA pursuant to the processes applicable in the Proceedings except upon 210 days notice to the other Party (or such shorter period as the Parties may agree), during which period the Parties shall continue to perform their obligations under the Flextronics MCMSA in the ordinary course of business.

g) Flextronics and Nortel agree to not exercise their respective rights to deliver a notice for termination for convenience under the Flextronics MCMSA for the period through December 31, 2010, and to enter into certain agreements related to the continuation of specific manufacturing agreements, following the termination of the SLR MCMSA.

h) Nortel and Flextronics each are releasing claims against each other for pre-filing amounts and as described and qualified in sections 6 and 7 of the Settlement and Release Agreement. The releases include a release by the U.S. Debtors of claims arising under chapter 5 of the Bankruptcy Code (avoidance claims), subject to certain conditions set forth in the Settlement and Release Agreement.

37. The Settlement and Release Agreement should foster a more cooperative and efficient environment as between the Nortel Entities, Flextronics and any Purchasers. This should help to facilitate the closing and transitional periods of any pending and potential Divestitures of Nortel's remaining assets. Specific benefits relating to the Settlement and Release Agreement to be realized by Nortel generally and the Applicants specifically include:

a) the payment to Flextronics of significant cure costs or other incentive type payments to ensure cooperation in closing specific Divestitures are avoided;

b) the net proceeds realized from Nortel's Divestitures and the ultimate share of those net proceeds attributable to the Applicants should be maximized by:

   i. withdrawal of any Flextronics objections to any pending or future Divestitures;

   ii. ensuring Purchasers that Flextronics will be cooperative in facilitating any Divestitures and during the transitional period after closing;

   iii. promoting an improved relationship with Flextronics thereby minimizing potential operational inefficiencies and the resulting financial ramifications thereof;

   iv. avoiding the operational, administrative and financial challenges of entering into "back to back" supply contract arrangements with Purchasers;

   v. providing full value to Nortel generally and the Applicants in particular for any set off claims exercised by Flextronics to date and avoiding the cost and related distraction of management attention pursuing litigation to recover improperly set off amounts;

   vi. avoiding either the future negative cash flow consequences to the Applicants of Flextronics continuing to set off future amounts and/or the impairment of inventory realizations should NNL stop selling inventory back to Flextronics, which in either case could potentially amount to as much as $33 million;

   vii. providing an immediate positive cash flow impact to NNL, by way of payment from the US Debtors and EMEA Entities as provided for in the Side Agreement, which otherwise would not have been available as a result of the set off dispute with Flextronics;

viii. the withdrawal of the Flextronics Proofs with the exception of the Pension Claims (as defined in the Settlement and Release Agreement) against NNL and Flextronics claim against the Nortel Health and Welfare Trust, if any, thereby eliminating the time and costs that otherwise would be incurred in dealing with these claims; and

ix. the elimination of post filing claims alleged by Flextronics in the Flextronics Proofs thereby avoiding the time and costs that would otherwise be incurred in settling these claims.

**SIDE AGREEMENT**

38. On November 20, 2009, the Side Agreement was entered into between Nortel and the Joint Administrator (collectively referred to as the "Side Agreement Entities") contemporaneously with entering into the Settlement and Release Agreement with Flextronics. The Side Agreement was the culmination of extensive negotiations between the Side Agreement Entities, the Monitor, the Committee and the Bondholder Group.

39. The purpose of the Side Agreement is to:

a) facilitate payments due to Flextronics pursuant to the provisions of the Settlement and Release Agreement;

b) determine the value of the total cost of settlement ("Settlement Cost") with Flextronics pursuant to the Settlement and Release Agreement;

c) agree on the appropriate allocation of the Settlement Cost amongst Nortel; and

d) establish a process to determine the value of certain avoidance actions released by the US Debtors (the "US Avoidance Claim"), calculate the total consideration each of the Entities have made toward the Settlement Cost and provide a mechanism to allow for a true up of such total consideration.

14

40. A summary of the key provisions of the Side Agreement is provided in the paragraphs which follow. Reference should also be made directly to the Side Agreement for a complete understanding of the terms governing the agreement.

a) Prior to the Effective Date of the Settlement and Release Agreement, NNI is to establish a segregated account (the "Segregated Account") solely for the purpose of holding the Payment Obligations (as defined in Schedule B to the Settlement and Release Agreement) and the EMEA Entities and NNI shall deposit sufficient funds into the Segregated Account to satisfy the Payment Obligations. In addition, following the reconciliation of the Adjustment Amount, the Side Agreement Entities will deposit their share of the Adjustment Amount into the Segregated Account;

b) NNI will make payments to Flextronics and NNL from the Segregated Account as required by Schedule B to the Side Agreement;

c) The Settlement Cost will be determined as described in Schedule C to the Side Agreement and will be allocated amongst the Side Agreement Parties on the basis of the weighted average of proceeds ultimately allocated to the Applicants, U.S. Debtors and the EMEA Entities (the "Regional Entities" and each individually a "Regional Entity") from the sale of the ES, MEN, CVAS and GSM businesses (the "Relevant Sales" and each individually a "Relevant Sale");

d) The value of the US Avoidance Claim shall be determined by way of negotiation amongst the Side Agreement Parties and failing a negotiated agreement, the value will be determined by way of mediation and failing that binding arbitration; and

e) The Side Agreement requires that upon distribution of proceeds of sale of each of the Relevant Sales, an amount (the "Gross True-up Amount") will be paid into an escrow account ("True-up Escrow") for the purpose of holding funds to be used for the reallocation of the Settlement Cost among the Regional Entities. The Gross True-up Amount will be equal to the Settlement Cost attributed to each Regional Entity multiplied by its cumulative weighted average of proceeds from Relevant

15

Sales less the sum of each Regional Entity's share of Released Accounts Payable (as defined in Schedule B to the Side Agreement), any Adjustment Amount and the Interim Avoidance Cap (as defined in Schedule C to the Side Agreement).

41. The Applicants are requesting certain information contained in the Settlement Documentation, including the value of the Payment Obligations, any values set forth therein that would allow for the calculation of the Payment Obligation and Settlement Cost and certain other Schedules and portions of Schedules and Exhibits to the Settlement and Release Agreement containing pricing information, be filed under seal.

42. This information is of a sensitive and confidential nature with respect to Nortel's supply chain and business relationship with its most significant supplier. If disclosed, this information could severely impair the ability of the Applicants to successfully manage their relationship with other competitors, suppliers and creditors thereby potentially disrupting ongoing operations and affect the transfer of supply arrangements in connection with other possible Divestitures. Furthermore, information redacted within the Side Agreement relates to the Side Agreement Parties' payment obligations and agreements regarding the allocation methodology that could compromise the process for allocation of the Settlement Cost.

43. The Monitor is aware the Committee, the Bondholder Group and the Joint Administrators are fully apprised of the terms contained in the Settlement Documents and none of these parties have raised any objection to such terms.

44. The Monitor is also aware the legal and financial advisors to the Ontario Superintendent of Financial Services as Administrator of the Pension Benefits Guarantee Fund and Former Employees are fully apprised of the terms contained in the Settlement Documents. While their clients are still in the process of reviewing the Settlement Documents; as of the time of the preparation of this Thirty-First Report, no objection has been raised to the terms set forth therein.

45. The U.S. Debtors have filed a motion with the U.S. Bankruptcy Court seeking approval of the Settlement Documents at a joint hearing which is scheduled to be heard on December 2, 2009.

**MONITOR'S ANALYSIS AND RECOMMENDATION**

46. One of Nortel's goals is to maximize recovery for the benefit of its stakeholders. This goal can best be accomplished through maximization of net proceeds from pending and future Divestitures and minimizing operational and administrative costs.

47. As a result of the magnitude, complexity and uniqueness of the relationship between Nortel and Flextronics, it is essential a solid, workable relationship exist between them in order to achieve the above stated goal. Furthermore, a settlement between Nortel and Flextronics will provide market confidence with respect to their ability to deliver a seamless and efficient transition of a Divestiture to a Purchaser. This will assist in maximizing net proceeds from a Divestiture and minimizing the costs involved in transitioning the businesses.

48. Accordingly, for the reasons outlined in this Thirty-First Report, the Monitor recommends the Settlement Documents be approved by this Honourable Court and that the redacted portions of the Settlement Documents be sealed. The Monitor will file a non-redacted version of the Settlement Documents with this Honourable Court on a confidential basis.

All of which is respectfully submitted this 27th day of November, 2009.

**Ernst & Young Inc.**
In its capacity as Monitor of the Applicants

Per:

Murray A. McDonald
President

17

# APPENDIX "A"

**Execution Version**

## SIDE AGREEMENT

This Side Agreement (the "<u>Agreement</u>") is dated as of November 20, 2009 (the "<u>Effective Date</u>"), among Nortel Networks Limited ("<u>NNL</u>") and its Canadian affiliates that have filed under the Companies' Creditors Arrangement Act (the "<u>Canadian Entities</u>"), (ii) Nortel Networks Inc. ("<u>NNI</u>") and its US debtor affiliates (the "<u>US Entities</u>") and (iii) the companies listed on Schedule A hereto (collectively the "<u>EMEA Entities</u>" and together with the Canadian Entities and the US Entities, the "<u>Parties</u>"), which in the case of the EMEA Entities are acting by their joint administrators Alan Robert Bloom, Stephen John Harris, Alan Michael Hudson and Christopher John Wilkinson Hill of Ernst & Young LLP of 1 More London Place, London SE1 2AF (other than Nortel Networks (Ireland) Limited, for which David Hughes of Ernst & Young Chartered Accountants of Harcourt Centre, Harcourt Street, Dublin 2, Ireland and Alan Robert Bloom serve as joint administrators) (collectively, the "<u>Joint Administrators</u>") who act as agents, for the EMEA Entities without any personal liability whatsoever.

### W I T N E S S E T H:

WHEREAS, the Canadian Entities, the US Entities and the EMEA Entities have entered into that certain Settlement and Release Agreement with Flextronics Corporation ("<u>FC</u>"), Flextronics Telecom Systems Ltd ("<u>FTS</u>") and certain of their affiliates, on behalf of themselves and their respective affiliates (collectively, "<u>Flextronics</u>"), for which the "<u>Effective Date</u>" shall be the first day after the Approval Orders (as defined therein) become final (the "<u>Settlement and Release Agreement</u>") attached hereto as Exhibit 1;

WHEREAS, solely for the purpose of facilitating the payments due to Flextronics under the Settlement and Release Agreement, and subject to the potential reallocation of the total liabilities due to Flextronics under the Settlement and Release Agreement among the Parties, the Parties have agreed to make the payments described in Schedule B hereto (the "<u>Payment Obligations</u>"); and

WHEREAS, the Parties expressly acknowledge and agree that the Payment Obligations do not necessarily reflect the appropriate allocation of liability for the Payment Obligations among the Parties and, as such, the Parties wish to settle the procedures for determining such liability and, if necessary, ultimately reallocating the Payment Obligations and the value of certain other claims compromised by certain of the Parties in connection with the Settlement and Release Agreement.

NOW, THEREFORE, in consideration of the respective covenants made herein, and of the mutual benefits to be derived hereby (the sufficiency of which are acknowledged), the Parties hereto agree as follows:

**Execution Version**

ARTICLE I

INTERPRETATION

SECTION 1.1. Definitions.

(a)     To the extent capitalized words used herein (including in the recitals hereof) are not defined in this Agreement, those words shall have the meanings given to them (i) in the Settlement and Release Agreement.

(b)     The following capitalized terms shall have the meanings set forth below:

(i)     "Allocation Rules" means the rules (expressed as percentages or otherwise) to be used to allocate the proceeds of the Relevant Sales (as defined herein) among the various Parties, as such rules shall be agreed upon among the relevant Parties, and pursuant to Section 12.d and 12.g of the IFSA or shall be otherwise determined in accordance with the binding procedures to be set forth in the Interim Sales Protocol pursuant to Section 12.c and 12.g of the IFSA.

(ii)     "IFSA" means the Interim Funding and Settlement Agreement dated June 9, 2009, to which each of the Canadian Entities, the US Entities and the EMEA Entities are a party.

(iii)     "Interim Sales Protocol" has the meaning ascribed to it in Section 12.c of the IFSA.

(iv)     "Party" means (w) each of the Canadian Entities, (x) each of the US Entities, (y) each of the EMEA Entities and (z) the Joint Administrators, as agents of the EMEA Entities and without any personal liability whatsoever.

SECTION 1.2. Interpretation.

1.2.1.  Gender and Number. Any reference in this Agreement to gender includes all genders and words importing the singular include the plural and vice versa.

1.2.2.  Certain Phrases and Calculation of Time. In this Agreement (i) the words "including" and "includes" mean "including (or includes) without limitation", (ii) the terms "hereof," "herein," and "herewith" and words of similar import shall, unless otherwise stated, be construed to refer to this Agreement and not to any particular provision of this Agreement, and Section and Schedule references are to the Sections and Schedules to this Agreement unless otherwise specified, and (iii) in the computation of periods of time from a specified date to a later specified date, unless otherwise expressly stated, the word "from" means "from and including" and the words "to" and "until" each mean "to but excluding". If the last day of any such period is not a business day, such period will end on the next business day.

When calculating the period of time "within" which, "prior to" or "following" which any act or event is required or permitted to be done, notice given or steps taken, the date

2

**Execution Version**

which is the reference date in calculating such period is excluded from the calculation. If the last day of any such period is not a business day, such period will end on the next business day.

      1.2.3. Headings, etc. The inclusion of a table of contents, the division of this Agreement into Articles and Sections and the insertion of headings are for convenient reference only and are not to affect or be used in the construction or interpretation of this Agreement.

## ARTICLE II

## COVENANTS

SECTION 2.1. Efforts to Complete the Settlement and Release Agreement.

      Subject to the requirements of any applicable law, each of the Parties shall use their reasonable best efforts to take, or cause to be taken, all actions and to do, or cause to be done, and cooperate with each other and Flextronics in good faith in order to do, all things necessary, proper or advisable under applicable law to perform their obligations under the Settlement and Release Agreement as soon as practicable in accordance with the provisions thereof and cause the fulfillment at the earliest practicable date of all of the conditions to Flextronics' obligations thereunder.

SECTION 2.2. Segregated Account.

      On or prior to the Effective Date of the Settlement and Release Agreement, (i) NNI shall establish a segregated account (the "Segregated Account") solely for the purpose of holding the Payment Obligations (including any "Adjustment Amount", as such term is defined in Schedule B to the Settlement and Release Agreement) until such amounts are distributed in accordance with Schedule B hereto, (ii) ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓, and (iii) ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ ▓▓▓▓▓▓▓▓▓▓ into the Segregated Account (where (ii) and (iii) collectively constitute the "Segregated Funds"). NNI shall hold the Segregated Funds for the benefit of the Parties and solely for the purpose of satisfying the Payment Obligations set forth in Schedule B hereto. Without limiting the foregoing, the Parties shall deposit into the Segregated Account the Adjustment Amount, if any, in accordance with Schedule B hereto, which deposited amounts shall constitute additional Segregated Funds.

SECTION 2.3. Payment to Flextronics.

      The initial allocation of the Payment Obligations set forth in Schedule B hereto has been agreed to by the Parties solely as a means to fund the payments due to Flextronics under the Settlement and Release Agreement. Such allocation does not reflect an agreement of the Parties as to the appropriate allocation of liability with respect to the Payment Obligations or the claims being compromised by certain of the Parties in connection with the Settlement and Release Agreement, and such allocation of liability shall be determined in accordance with Section 2.4 hereof.

SECTION 2.4.  Allocation of Settlement Cost.

(a)     *Allocation of Settlement Cost among the Regional Entities.*  The ultimate allocation of the Settlement Cost (as defined on Schedule C hereto) incurred by the Parties in each of the following three groups: (i) the Canadian Entities collectively, (ii) the US Entities collectively and (iii) the EMEA Entities collectively (each of (i), (ii) and (iii), a "Regional Entity" and together, the "Regional Entities") in connection with the Settlement and Release Agreement shall be allocated among the Regional Entities according to the weighted average of proceeds allocated to such Regional Entity (the "Weighted Average") from the sales of the Enterprise, Optical, CVAS and GSM businesses (the "Relevant Sales") in accordance with the Allocation Rules governing the Relevant Sales (each an "Allocation Decision"); provided that the Parties may agree to modify, with the consent of the official committee of unsecured creditors of Nortel Networks Inc., *et al.* (the "Committee"), the steering committee members of the ad hoc group of bondholders that have executed confidentiality or non-disclosure agreements with NNL (the "Bondholder Group") and Ernst & Young Inc. as "Monitor" in connection with the CCAA Proceedings (the "Monitor"), the sales included among the Relevant Sales.

(b)     *Determination of the US Avoidance Claim.*  The "US Avoidance Claim" shall consist of the value attributable to the claims released by the US Entities in the Settlement and Release Agreement under Chapter 5 of the Bankruptcy Code, which value each of the Parties shall negotiate in good faith to agree to through a representative designated by each of the Regional Entities (such representatives, collectively, the "Representatives"), with the consent of the Committee, the Bondholder Group and the Monitor, or if such agreement cannot be reached prior to the Allocation Decision for the first Relevant Sale, shall be promptly submitted to mediation among the Parties (through their Representatives) by a mediator appointed jointly by the United States Bankruptcy Court for the District of Delaware and the Ontario Superior Court of Justice (Commercial List) (collectively, the "Courts") following notice and a joint hearing. The costs of such mediation shall be shared equally among the Regional Entities participating in the mediation.  In the event that the mediation has not resulted in an agreement between the Parties (through their Representatives), with the consent of the Committee, the Bondholder Group and the Monitor (a "Mediation Agreement"), within 180 calendar days of the appointment of the mediator (unless the Representatives of the Parties, with the consent of the Committee, the Bondholder Group and the Monitor, agree to extend that period) the determination of the amount of the US Avoidance Claim shall be finally resolved by binding arbitration in accordance with the Rules of Arbitration of the International Chamber of Commerce ("ICC Arbitration Rules"). The arbitration shall be conducted in the English language in New York, New York, USA, by one disinterested arbitrator appointed in accordance with the ICC Arbitration Rules, who shall be a US trained lawyer experienced in United States bankruptcy matters.  The Parties agree that the decision of the arbitrator will be final and binding.  The EMEA Entities have the right to be a full participant to any mediation and/or arbitration proceeding, but in the event that the EMEA Entities elect not to participate in any mediation and/or arbitration proceeding they will not be obligated to do so and will not have any liability for any costs of such mediation and/or arbitration proceeding if they do not participate.  For the avoidance of doubt, (i) whether or not the EMEA Entities participate in the mediation, they shall be bound by any Mediation Agreement and (ii) whether or not the EMEA Entities participate in the arbitration, they shall be bound by any award rendered by the arbitrator and expressly waive any right to submit the US Avoidance Claim to any forum other than the arbitral forum specified herein.  The US Entities

4

agree that (x) any agreement by the US Entities (through their Representative) to the selection of a mediator and/or arbitrator in connection with the determination of the US Avoidance Claim and (y) any papers submitted in the mediation and/or arbitration by the US Entities shall be subject to the approval of the Committee. Further, if the Committee is not the designated Representative for the US Entities in connection with the negotiation and/or any necessary mediation or arbitration proceeding, the US Entities agree to directly involve the Committee in any discussions and negotiations that the US Entities (through their Representative) have with the other Regional Entities (through their Representatives) in connection with the determination of the US Avoidance Claim. Judgment on the award rendered by the arbitrator may be entered only in the state or federal courts sitting in the State of New York, which shall have exclusive jurisdiction to confirm or vacate the award. For the avoidance of doubt, the provisions of this Section 2.4(b) shall not limit the jurisdiction of the Courts as provided in Section 3.7(b) of this Agreement. The Parties covenant that they shall not disclose the information contained in Schedule C, including, but not limited to the Settlement Cost Cap and the Avoidance Claims Cap, to any mediator or arbitrator and the Parties agree that the mediator and/or arbitrator shall not consider any such information in determining the amount of the US Avoidance Claim. The Parties further agree to use their reasonable best efforts to ensure that the information contained in Schedule C, including, but not limited to the Settlement Cost Cap and the Avoidance Claims Cap, is not disclosed by any administrators of the arbitration proceeding provided for in this section 2.4(b).

(c)     *Escrow of True-up Amounts.*  The Parties agree that at the time of disbursement of proceeds to the Regional Entities for a Relevant Sale, the Gross True-up Amount (as defined below) for each Regional Entity shall be transferred to an alternative escrow (the "True-up Escrow") established by the Parties, with the consent of the Committee, the Bondholder Group and the Monitor, for the purpose of holding funds to be used for the reallocation of the Settlement Cost among the Regional Entities under this Agreement. Following an Allocation Decision for a Relevant Sale, but prior to the disbursement of funds to the Parties from the proceeds escrow for a Relevant Sale, a "Gross True-up Amount" for each Regional Entity shall be calculated and the Parties shall direct the escrow agent for the relevant proceeds escrow to deposit into the True-up Escrow the Gross True-up Amounts, where such Gross True-up Amounts shall equal (i) the Settlement Cost multiplied by such Regional Entity's Weighted Average for all Relevant Sales for which an Allocation Decision has been made, less (ii) the sum of (w) such Regional Entity's share of the Released Accounts Payable (as defined in Schedule B hereto), (x) any Adjustment Amount (as defined in Schedule B hereto), (y) in respect of the US Entities only, the Interim Avoidance Cap as defined on Schedule C hereto. For the avoidance of doubt, if at any time prior to the termination of this Agreement, the amount that a Regional Entity has deposited into the True-up Escrow exceeds the aggregate Gross True-up Amount for such Regional Entity (any such amount, a "True-up Surplus") the Parties agree that any such True-up Surplus shall remain in the True-up Escrow on behalf of such Regional Entity until such time as the US Avoidance Claim is settled, and after which time, at the request of such Regional Entity, a new Gross True-up Amount will be calculated and the Parties will direct the escrow agent for the True-up Escrow to release from the True-up Escrow and pay to such Regional Entity any such True-up Surplus. The Parties expressly agree to direct the escrow agent for the True-up Escrow to hold and distribute proceeds from the Relevant Sales according to this paragraph.

(d)    *Payment Obligations Adjustment.* After the Allocation Decision is made for the final Relevant Sale and the Regional Entities have deposited the final Gross True-up Amounts into the True-up Escrow in accordance with Section 2.4(c) above, the Parties shall direct the escrow agent for the True-up Escrow to disburse the funds contained in the True-up Escrow to any Regional Entity that has a negative Gross True-up Amount based on the final Weighted Average for each Regional Entity (as calculated for purposes of determining the final Gross True-up Amount), in the amount of such negative Gross True-up Amount (such disbursement, the "Payment Obligations Adjustment"). In connection with the foregoing, each Regional Entity agrees that the True-up Escrow is being used for administrative convenience and, in the event that sufficient sale proceeds are not received by a Regional Entity to satisfy its obligation to deposit funds into the True-up Escrow, such Regional Entity shall be liable for any portion of the Settlement Cost that such Regional Entity is determined to owe any other Regional Entity at the time that the Payment Obligations Adjustment becomes due, which liability shall not be capped by such Regional Entity's portion of the Gross True-up Amount on deposit in the True-up Escrow at such time. Each of the Regional Entities shall be separately responsible for apportioning liability for the Settlement Cost among the Parties and their affiliates within such Regional Entity.

## ARTICLE III

## MISCELLANEOUS

SECTION 3.1. <u>Exclusion of Liability and Acknowledgments re Joint Administrators</u>.

(a)    The Parties agree that the Joint Administrators are entering into this Agreement as agents for the EMEA Entities to which they are appointed and the Parties acknowledge that none of the Joint Administrators, their firm, partners, employees, advisers, representatives or agents shall incur any personal liability whatsoever whether on their own part or in respect of any failure on the part of any other Party to observe, perform or comply with any of its obligations under this Agreement or under or in relation to any associated arrangements or negotiations.

(b)    The Joint Administrators are a party to this Agreement: (i) as agents of each of the respective EMEA Entities of which they are administrators; and (ii) in their own capacities solely for (1) taking the benefit of the statutory charges under Paragraph 99(3) of Schedule B1 of the Insolvency Act, (2) obtaining the benefit of any provisions of this Agreement expressed to be conferred on them, (3) enforcing the obligations of the other Parties to this Agreement and (4) for the purposes of Section 3.1.

(c)    Notwithstanding anything in Section 3.6, any claim, action or proceeding against the Joint Administrators arising from or related to (i) the personal liability of the Joint Administrators, their firm or partners, (ii) their qualification to act as insolvency practitioners in accordance with Part XIII of the Insolvency Act or (iii) their appointment as joint administrators of the EMEA Entities and their remaining as current joint administrators thereof under this Agreement shall be governed exclusively by English law and subject to the exclusive jurisdiction of the English courts.

6

**Execution Version**

(d)    For the purposes of the acknowledgements or agreements to, or exclusions of, liability in favor of the Joint Administrators in this Agreement, references to the Joint Administrators where the context so permits shall mean and include any additional or successor administrator of the EMEA Entities and their respective firms or future firms, employees, agents, members, partners and personal representatives.

SECTION 3.2.  Remedies.  No failure to exercise, and no delay in exercising, any right, remedy, power or privilege under this Agreement by any Party will operate as a waiver of such right, remedy, power or privilege, nor will any single or partial exercise of any right, remedy, power or privilege under this Agreement preclude any other or further exercise of such right, remedy, power or privilege or the exercise of any other right, remedy, power or privilege.

SECTION 3.3.  Third-Party Beneficiaries.  Nothing in this Agreement, whether express or implied, is intended to confer any rights or remedies under or by reason of this Agreement on any persons other than the Parties and their respective successors and assigns, nor is anything in this Agreement intended to relieve or discharge the obligation or liability of any third persons to the Parties, nor shall any provision give any third persons any right of subrogation or action against any party to this Agreement; provided, however, that the Committee (as a statutory committee appointed in the US Bankruptcy Cases) shall be a third party beneficiary of Sections 2.1, 2.2, 2.3, 2.4, 3.5, 3.13 and 3.14 of this Agreement entitled to enforce and take advantage of the benefits of those sections of this Agreement to NNI only to their fullest extent as if it were a signatory hereto.

SECTION 3.4.  Accession by Nortel Networks, S.A.  Nortel Networks S.A. may, within 30 days of the Effective Date of the Settlement and Release Agreement, by notice in writing to the Parties hereto, accede to the Settlement and Release Agreement.  In the event it does so, and on the same date, Nortel Networks S.A. shall accede to this Agreement as an EMEA Entity on the same terms and conditions as an EMEA Entity (such accession conditioned, if applicable, on French court approval), and the Parties shall forthwith on receipt of such notice enter into an appropriate form of accession agreement with Nortel Networks S.A. The Parties agree that the provisions of this Section 3.4 are for the benefit of Nortel Networks S.A. and may be enforced by Nortel Networks S.A.

SECTION 3.5.Consent to Amendments; Waivers.  No Party shall be deemed to have waived any provision of this Agreement unless such waiver is in writing, and then such waiver shall be limited to the circumstances set forth in such written waiver.  This Agreement, or any provision hereof, may be waived or amended, on no less than 5 days' notice, only by means of a writing signed by all Parties, and approved by the Committee, Bondholder Group and the Monitor, which amendments, if material in the judgment of the Parties, must be approved by each of the Courts that initially approved this Agreement.

SECTION 3.6.  Successors.  Except as otherwise expressly provided in this Agreement, all covenants and agreements set forth in this Agreement or any of the Ancillary Agreements by or on behalf of the parties hereto or thereto will be binding upon and inure to the benefit of such parties and their respective successors.

SECTION 3.7.  Governing Law; Submission to Jurisdiction; Waiver of Jury Trial.

(a)    The Parties agree that this Agreement shall be governed exclusively by the laws of the State of New York without regard to the rules of conflict of laws of the State of New York or any other jurisdiction; provided, however, that Section 3.1 shall be governed exclusively by English law.

(b)    To the fullest extent permitted by applicable law, and except as provided for in Section 2.4(b), each Party (i) agrees to submit to the non-exclusive jurisdiction of the U.S. Bankruptcy Court and the Canadian Court (in a joint hearing conducted under the Cross-Border Protocol adopted by such courts, as it may be in effect from time to time), for purposes of all legal proceedings to the extent relating to the matters agreed in this Agreement, (ii) agrees that any claim, action or proceeding by such party seeking any relief whatsoever to the extent relating to the matters agreed in this Agreement must be brought in the U.S. Bankruptcy Court and the Canadian Court, (iii) waives and agrees not to assert any objection that it may now or hereafter have to the laying of the venue of any such action brought in such a court or any claim that any such action brought in such a court has been brought in an inconvenient forum, (iv) agrees that mailing of process or other papers in connection with any such action or proceeding or any other manner as may be permitted by law shall be valid and sufficient service thereof, and (v) agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by applicable Law; provided, however, that any claim, action or proceeding set forth in Section 3.1 shall be brought exclusively in the English courts.

(c)    EACH PARTY HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY ACTION DIRECTLY OR INDIRECTLY ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS AGREEMENT OR ANY TRANSACTION OR MATTER CONTEMPLATED HEREBY. EACH PARTY (I) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF ANY ACTION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (II) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION 3.7.

SECTION 3.8. Notices. All demands, notices, communications and reports provided for in this Agreement shall be in writing and shall be either sent by facsimile transmission with confirmation to the number specified below or personally delivered or sent by reputable overnight courier service (delivery charges prepaid) to any Party at the address specified below, or at such address, to the attention of such other Person, and with such other copy, as the recipient Party has specified by prior written notice to the sending Party pursuant to the provisions of this Section 3.8.

**Execution Version**

**If to the US Entities:**
c/o Nortel Networks Inc.
Attention:  Anna Ventresca
         Chief Legal Officer
Address: 2221 Lakeside Boulevard
         Richardson, Texas 75082
         U.S.A.
Facsimile No.: (905) 863-8386

**With a copy to:**
Cleary Gottlieb Steen & Hamilton LLP
Attention: Lisa M. Schweitzer, Esq.
Address: One Liberty Plaza
         New York, New York 10006
         U.S.A.
Facsimile No.:  (212) 225-3999

**If to the Canadian Entities (prior to December 1, 2009):**
c/o Nortel Networks Limited
Attention: Anna Ventresca
         Chief Legal Officer
Address: 195 The West Mall
Mailstop: T0503006
         Toronto, Ontario,
         Canada M9C 5K1
Facsimile No.: (905) 863-7386

**With a copy to:**

Ogilvy Renault LLP
Attention: Ian Ness, Esq.
Address: Suite 3800
         Royal Bank Plaza, South Tower
         200 Bay Street, P.O. Box 84
         Toronto, Ontario M5J 2Z4
         Canada
Facsimile No.: (416) 216-3930

**If to the Canadian Entities (after December 1, 2009):**

c/o Nortel Networks Limited
Attention: Anna Ventresca
         Chief Legal Officer
Address:   5945 Airport Road, Suite 360
         Mississauga, Ontario
         L4V 1R9
Facsimile No.: (905) 863-7386

**If to the EMEA Entities:**
c/o Ernst & Young LLP
Attention: Alan Bloom
Address: One More London Place
         London SE1 2AF
         United Kingdom
Facsimile No.: +44 (0) 20 7951 1345

**With a copy to:**
Herbert Smith LLP
Attention: Alan Montgomery and Ben Ward, Esq.
Address: Exchange House
         Primrose Street
         London EC2A 2HS
         United Kingdom
Facsimile No.: +44 (0) 20 7098 4878

**If to the Committee:**
Akin Gump Strauss Hauer & Feld LLP
Attention:  Fred S. Hodara, Esq. and David H. Botter, Esq.
Address:   One Bryant Park

**If to the Bondholder Group:**
Milbank, Tweed, Hadley & McCloy
Attention:  Gina Ciraldo, Esq. and David Clayton, Esq.
Address:   One Chase Manhattan Plaza

9

Execution Version

New York, New York 10036                    New York, New York, 10006
Facsimile:  (212) 872-1002                  Facsimile:  (212) 822-5537

**If to the Monitor:**                      **With a copy to:**
Murray A. McDonald                          Goodmans L.L.P.
Ernst & Young Inc.                          Attention: Joseph Pasquariello
Ernst & Young Tower                         Facsimilie: (416) 979-1239
Address: 222 Bay Street, P. O. Box 251
       Toronto, ON M5K 1J7           If prior to December 22, 2009:
       Canada
Facsimile:  (416) 943-3300                  Address:   250 Yonge Street
                 Suite 2400
                 Toronto, ON M5B 2M6
                 Canada

                If after December 22, 2009:

                Address:   Bay Adelaide Centre
                       333 Bay Street, Suite 3400
                       Toronto, ON M5H 2S7

Any such demand, notice, communication or report shall be deemed to have been given pursuant to this Agreement when delivered personally, when confirmed if by facsimile transmission, or on the calendar day after deposit with a reputable overnight courier service, as applicable.

      SECTION 3.9.  Counterparts.  The Parties may execute this Agreement in three or more counterparts (no one of which need contain the signatures of all Parties), each of which will be an original and all of which together will constitute one and the same instrument.

      SECTION 3.10.  Severability.  If any provision, section, or part of this Agreement, or the application thereof under certain circumstances, is held invalid, illegal or incapable of being enforced in any jurisdiction, (i) as to such jurisdiction, the remainder of this Agreement or the application of such provision, section or part under other circumstances, and (ii) as for any other jurisdiction, any provision of this Agreement, shall not be affected and shall remain in full force and effect, unless, in each case, such invalidity, illegality or unenforceability in such jurisdiction materially impairs the ability of the Parties to consummate the transactions contemplated by this Agreement.  Upon such determination that any section or other provision is invalid, illegal or incapable of being enforced in such jurisdiction, the Parties shall negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties as closely as possible in a mutually acceptable manner, and approved by the Committee, the Bondholder Group and the Monitor, in order that the transactions contemplated hereby be consummated as originally contemplated to the greatest extent possible even in such jurisdiction.

      SECTION 3.11.  Termination.  This Agreement will automatically terminate upon the final distribution of any amounts owed by or to the Parties pursuant to Section 2.4 hereof.

SECTION 3.12.  Obligations of the Parties.  The liability of any Regional Entity shall be several (and not joint) with respect to the other Regional Entities, but the Parties included within a Regional Entity shall be jointly liable for all obligations of such Regional Entity.

SECTION 3.13.  Effectiveness.

(a)    No provision of this Agreement (other than as set forth in Section 3.13(d)) shall be effective until each of the US Court and the Canadian Court approves the entirety of this Agreement and all of the provisions hereof (the "Court Approval Condition").

(b)    All provisions of this Agreement shall be effective as of the date of the satisfaction of the Court Approval Condition.

(c)    Each Party hereto shall:

(i)    use commercially reasonable efforts to satisfy the Court Approval Condition as soon as possible, taking into account the availability of the respective Courts to address the matters set forth in this Agreement;

(ii)    keep all other Parties reasonably apprised of the progress of the satisfaction of the Court Approval Condition and provide such other information regarding the satisfaction of the Conditions as reasonably requested by other Parties; and

(iii)    use commercially reasonable efforts to allow any other Party, which so requests in writing reasonable participation in connection with any proceedings in any Court related to the satisfaction of the Court Approval Condition.

(d)    Notwithstanding any of the foregoing, the following provisions of the Agreement shall be effective as of the date hereof: Sections 3.1 through 3.12 and Section 3.13(b), (c) and (d).

SECTION 3.14.    Limitations of Remedies.  Each of the Parties agrees that this Agreement may be pled as a defense to any claim or action in any court of competent jurisdiction.  In connection with the foregoing, the Parties agree that monetary damages would not be sufficient to remedy any breach by a party of this Agreement and that the non-breaching party would be entitled to equitable relief, including, without limitation, temporary injunctive relief preventing (or allowing, as the case may be) the unilateral termination of performance and specific performance in respect of any breach of the Agreement.

SECTION 3.15.    Reservation of Rights.  The Parties expressly agree that the allocation of the Payment Obligations pursuant to Schedule B hereto shall not be binding on the Parties in determining the ultimate allocation of the Settlement Cost of the Parties.  Further, the Parties hereby agree that, except as otherwise provided herein, nothing in this Agreement shall or be deemed to determine, ratify, or adopt, or have any impact whatsoever on, the allocation or

**Execution Version**

distribution of proceeds from any Divestiture (as defined in the Settlement and Release Agreement).

**[Remainder of this page intentionally left blank. Signature pages follow.]**

**Execution Version**

IN WITNESS WHEREOF, each Party, by its respective duly-authorized representative identified below, acknowledges and agrees to the terms and conditions of this Agreement.

**NORTEL NETWORKS CORPORATION**

By: _____

Name: _Anna Ventresca_

Title: _General Counsel - Corporate and Corporate Secretary_

Dated:  November 20 2009

By: _____

Name: _John Doolittle_

Title: _SVP, Finance & Corporate Services_

Dated:  November 20 2009


**NORTEL NETWORKS LIMITED**

By: _____

Name: _Anna Ventresca_

Title: _General Counsel - Corporate and Corporate Secretary_

Dated:  November 20 2009

By: _____

Name: _John Doolittle_

Title: _SVP, Finance & Corporate Services_

Dated:  November 20 2009


**NORTEL NETWORKS INC.**

By: _____

Name: _Anna Ventresca_

Title: _Chief Legal Officer_

Dated: November 20 2009


**NORTEL NETWORKS CAPITAL CORPORATION**

By: _____

Name: _John Doolittle_

Title: _President_

Dated:  November 20 2009


**NORTEL ALTSYSTEMS INC.**

By: _____

Name: _John Doolittle_

Title: _President_

Dated:  November 20 2009

**SONOMA SYSTEMS**

By: _____

Name: _John Doolittle_

Title: _Pres. & Treasurer_

Dated:   November 20, 2009

**OTERA CORPORATION**

By: _____

Name: _John Doolittle_

Title: _President_

Dated:   November 20, 2009

**CORETEK, INC**

By: _____

Name: _John Doolittle_

Title: _President_

Dated:   November 20, 2009

**NORTEL NETWORKS**
**APPLICATIONS MANAGEMENT**
**SOLUTIONS INC.**

By: _____

Name: _John Doolittle_

Title: _President_

Dated:   November 20, 2009

**NORTEL NETWORKS OPTICAL**
**COMPONENTS INC.**

By: _____

Name: _John Doolittle_

Title: _President_

Dated:   November 20, 2009

**NORTEL NETWORKS HPOCS INC.**

By: _____

Name: _John Doolittle_

Title: _President_

Dated:   November 20, 2009

**ARCHITEL SYSTEMS (U.S.) CORPORATION**

By: _____

Name: _____ John Doolittle _____

Title: ___ President ___

Dated:   November 20, 2009

**NORTEL NETWORKS INTERNATIONAL INC.**

By: _____

Name: _____ John Doolittle _____

Title: ___ President ___

Dated:   November 20, 2009

**NORTHERN TELECOM INTERNATIONAL INC.**

By: _____

Name: _____ John Doolittle _____

Title: ___ President ___

Dated:   November 20, 2009

**NORTEL NETWORKS CABLE SOLUTIONS INC.**

By: _____

Name: _____ John Doolittle _____

Title: ___ V-P ___

Dated:   November 20, 2009

**NORTEL NETWORKS (CALA) INC.**

By: _____

Name: _____ John Doolittle _____

Title: ___ Treasurer ___

Dated:   November 20, 2009

By: _____

Name: _____ Peter Look _____

Title: ___ President ___

Dated:   November 20, 2009

**NORTEL ALTSYSTEMS**
**INTERNATIONAL INC.**

By: _____

Name: _____John Doolittle_____

Title: _____President_____

Dated:    November 20 2009

**XROS, INC.**

By: _____

Name: _____John Doolittle_____

Title: _____President_____

Dated:    November 20 2009

Signed by CHRISTOPHER J.W.HILL as
joint administrator on behalf of the Joint
Administrators and the EMEA Entities
(except Nortel Networks (Ireland) Limited)
without personal liability and solely for the
purpose of obtaining the benefit of the
provisions of this Agreement expressed to be
conferred on or given to the Joint
Administrators

By _____

Name: CHRISTOPHER HILL

Title: JOINT ADMINISTRATOR

Signed by David Hughes as joint
administrator on behalf of the Joint
Administrators and Nortel Networks
(Ireland) Limited without personal liability
and solely for the purpose of obtaining the
benefit of the provisions of this Agreement
expressed to be conferred on or given to the
Joint Administrators

By _____

Name: _DAVID    HUGHES_

Title: _JOINT    ADMINISTRATOR_

**SIGNED** for and on behalf of **NORTEL NETWORKS UK LIMITED (IN ADMINISTRATION)** by **CHRISTOPHER J.W. HILL** as Joint Administrator (acting as agent and without personal liability whatsoever) in the presence of:

)
)
)
)

**CHRISTOPHER J.W. HILL**

Witness: _____ 

Name: JAN CORDELL
Address: 1 HORE LONDON PLACE
LONDON SE1 2AF

SIGNED for and on behalf of NORTEL    )
NETWORKS (IRELAND) LIMITED    )   **DAVID HUGHES**
(IN ADMINISTRATION)    )
by DAVID HUGHES as Joint    )
Administrator (acting as agent and without
personal liability whatsoever) in the
presence of:

Witness: _Eimear Ni Ghríofa_

Name: _EIMEAR NI GHRIOFA_
Address: _C/O ERNST & YOUNG, HARCOURT CENTRE, HARCOURT STREET, DUBLIN 2._

SIGNED for and on behalf of **NORTEL**　　)
**NETWORKS BV (IN**　　　　　　　　　　)　　**CHRISTOPHER J.W. HILL**
**ADMINISTRATION)**　　　　　　　　　　)
by **CHRISTOPHER J.W. HILL** as Joint　　)
Administrator (acting as agent and without
personal liability whatsoever) in the
presence of:

Witness: _____

Name: _JAN CORDELL____
Address: _1 HORE LONDON PLACE_
　　　　　LONDON SE1 2AF

SIGNED for and on behalf of NORTEL )  CHRISTOPHER J.W. HILL
NETWORKS HISPANIA, S.A. )
by CHRISTOPHER J.W. HILL as Joint )
Administrator (acting as agent and without
personal liability whatsoever) in the
presence of:

Witness:  _____

Name:  _____JAN CORDELL_____
Address:  _I MORE LONDON PLACE_
          LONDON  SE1 2AF

## Schedule A – EMEA Entities

Nortel Networks UK Limited (in administration)

Nortel Networks (Ireland) Limited (in administration)

Nortel Networks B.V. (in administration)

Nortel Networks Hispania SA (in administration)

If Nortel Networks S.A. accedes to this Agreement pursuant to Section 3.4, it shall be considered an EMEA Entity.

## Schedule B – The Payment Obligations

1.    Initial Payment to Flextronics

NNI shall, on behalf of all of the Parties and following the receipt of payment of ▓▓▓ ▓▓▓▓▓▓▓▓▓ from the EMEA Entities as Segregated Funds as contemplated in Section 2.2 of this Agreement (the "EMEA Payment"), pay Flextronics from the Segregated Account ▓▓▓▓▓▓▓▓▓▓ within 10 days after the Effective Date of the Settlement and Release Agreement.

2.    Final Payment to Flextronics

NNI shall, on behalf of all of the Parties and following the receipt of the EMEA Payment, pay Flextronics from the Segregated Account ▓▓▓▓▓▓▓▓▓ on or before May 31, 2010.

3.    Payment to NNL

NNI shall, on behalf of all of the Parties and following the receipt of the EMEA Payment, pay NNL from the Segregated Account ▓▓▓▓▓▓▓▓▓ within 10 days after the Effective Date of the Settlement and Release Agreement.

4.    Released Accounts Payable

Immediately following the payment described in item 3 above, the "Released Accounts Payable" for the Regional Entities shall equal ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

5.    Adjustment Amount

(a)    Promptly, but in no case more than 5 days, following the determination of the Adjustment Amount (or any portion thereof) in accordance with Schedule B to the Settlement and Release Agreement, each Regional Entity shall pay to NNI for deposit into the Segregated Account the actual amount of the Adjustment Amount attributable to each Regional Entity (which shall be determined according to the Nortel legal entities listed for the accounts payable agreed not to be valid obligations in accordance with Schedule B to the Settlement and Release Agreement).

(b)    NNI shall, on behalf of all of the Parties and following the receipt of the payments from the Canadian Entities and EMEA Entities required in 4(a) above, pay to Flextronics the Adjustment Amount from the Segregated Account in accordance with Schedule B to the Settlement and Release Agreement.

Schedule B

## Schedule C – Settlement Cost

This schedule is confidential and has not been attached as the Applicants have requested it be sealed by this Honourable Court.

# EXHIBIT 1

**Execution Version**

## SETTLEMENT AND RELEASE AGREEMENT

Flextronics Corporation ("FC"), Flextronics Telecom Systems Ltd ("FTS") and the affiliates of FC and FTS that are signatories hereto, on behalf of themselves and their respective Affiliates (as defined below) (collectively, "Flextronics"), and (i) Nortel Networks Limited ("NNL") and its Canadian affiliates that have filed an application under the Companies' Creditors Arrangement Act (the "CCAA"), (ii) Nortel Networks Inc. ("NNI") and its US debtor affiliates, (iii) the companies listed on Schedule A hereto (collectively the "EMEA Entities"; and (i), (ii) and (iii) collectively, "Nortel")), and (iv) the joint administrators acting on behalf of the EMEA Entities also listed on Schedule A hereto (the "Joint Administrators") (Flextronics, Nortel and the Joint Administrators are collectively referred to herein as the "Parties") hereby enter into this agreement (the "Settlement and Release Agreement"), on the terms and conditions set forth below:

**WHEREAS**, NNL and Flextronics are parties to a Master Contract Manufacturing Services Agreement, dated as of September 30, 2003, between NNL and Flextronics Corporation (f/k/a Solectron Corporation) (including any ancillary agreements incorporated by reference thereunder, including without limitation certain Virtual Systems House Agreements ("VSHAs") and purchase orders, and as amended by an amending agreement, dated June 18, 2004; the "SLR MCMSA"), and an Amended and Restated Master Contract Manufacturing Services Agreement, dated as of June 29, 2004, between NNL and Flextronics Telecom Systems Ltd. (including any ancillary agreements incorporated by reference thereunder, including without limitation certain VSHAs and purchase orders, as amended from time to time by the following agreements: (i) the first amending agreement, dated November 1, 2004; (ii) the second amending agreement, dated May 8, 2006; (iii) a memorandum of understanding, dated

1

Execution Version

October 13, 2006; and (iv) the third amending agreement, dated March 31, 2008, the "Flextronics MCMSA," and together with the SLR MCMSA, as amended, the "MCMSAs").

WHEREAS, on January 13, 2009, NNL and Flextronics entered into an agreement (the "Amending Agreement") which, among other things, amended the contractual relationship, as set forth in the MCMSAs, in a variety of ways, including: (i) NNL agreed to purchase from Flextronics US$120,000,000 of inventory, as identified in Schedule A of the Amending Agreement, via four payments over an approximately six-month period; (ii) NNL agreed to issue, on a quarterly basis, purchase orders to Flextronics for certain inventory defined therein as Quarterly E&O; (iii) NNL and Flextronics agreed to treatment of certain existing plans of record for transfers of operations; and (iv) NNL and Flextronics modified NNL's credit terms to provide for payments on a weekly basis;

WHEREAS, on or about January 14, 2009 (the "Petition Date")[1], (i) NNL and certain of its Canadian Affiliates filed an application under and were granted certain initial creditor protection pursuant to the CCAA in Canada to facilitate a comprehensive business and financial restructuring (the "CCAA Proceedings") pursuant to the terms of an initial order of the Ontario Superior Court of Justice (Commercial List) (the "Canadian Court"), as the same has been and may be amended and restated from time to time, (ii) NNI and certain of its U.S. subsidiaries (the "Debtors")[2] commenced bankruptcy cases (the "US Bankruptcy Cases") by filing voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Delaware (the "US Bankruptcy Court" and together with the Canadian Court, the "Courts"), and (iii) the High Court

---

[1] The Petition Date shall also refer, only in the case of Nortel Networks (CALA) Inc., to July 14, 2009.
[2] The Debtors also include Nortel Networks (CALA) Inc., which subsequently filed a voluntary chapter 11 petition in the US Bankruptcy Court on July 14, 2009, and the US Bankruptcy Cases include the Chapter 11 case of Nortel Networks (CALA) Inc.

2

of Justice in England placed nineteen of Nortel's European affiliates, including the EMEA

Entities, into administration under the control of individuals from Ernst & Young LLC (the

"EMEA Proceedings", and together with the CCAA Proceedings and the US Bankruptcy Cases,

the "Proceedings");

            **WHEREAS,** Flextronics' business relationship with Nortel is primarily governed

by the MCMSAs;

            **WHEREAS,** subsequent to the commencement of the Proceedings, certain

disputes emerged between Flextronics and Nortel regarding the proper interpretation of the

Amending Agreement and certain other matters, and the resolution of such disputes was

memorialized in a Settlement Agreement (the "Settlement Agreement") and related Side Letter

(the "Side Letter"), each dated as of May 22, 2009;

            **WHEREAS,** the Amending Agreement, the Settlement Agreement and the Side

Letter have been approved by the Canadian Court in the CCAA Proceedings, and the Settlement

Agreement and Side Letter have been approved by the US Bankruptcy Court in the US

Bankruptcy Cases;

            **WHEREAS,** the Settlement Agreement provides, among other things, that "the

termination of the SLR MCMSA, pursuant to the termination notice delivered by Flextronics

dated January 12, 2009, shall be effective on December 12, 2009";

            **WHEREAS,** the Flextronics MCMSA remains in effect and no termination

notices have been given thereunder;

            **WHEREAS,** Nortel has not repudiated or moved to assume or reject either of the

MCMSAs to date;

3

**Execution Version**

WHEREAS, the MCMSAs establish a complex manufacturing relationship by which, in essence, Nortel has "outsourced" its hardware design, manufacturing and supply functions to Flextronics;

WHEREAS, in general terms (subject to the actual terms of the MCMSAs), pursuant to this complex relationship, NNL and certain Nortel entities issue 12-month nonbinding "forecasts" of orders for goods and services expected to be placed by NNL and such other Nortel entities in the coming year, which forecasts Flextronics uses as a basis to place orders for materials from third parties and to otherwise manage its manufacturing process to meet Nortel's expected demand ("Forecasts");

WHEREAS, certain Nortel entities place monthly orders for finished goods to Flextronics, which, following acceptance by Flextronics, obligate Flextronics to ship goods in accordance with the accepted purchase orders;

WHEREAS, on July 20, 2009, the Debtors filed the Debtors' Motion For Orders (I) (A) Authorizing Entry Into the Asset and Share Sale Agreement, (B) Authorizing and Approving the Bidding Procedures, (C) Authorizing and Approving a Break-Up Fee and Expense Reimbursement, (D) Approving the Notice Procedures, (E) Approving the Assumption and Assignment Procedures, (F) Authorizing the Filing of Certain Documents Under Seal and (G) Setting a Date For the Sale Hearing, and (II) Authorizing and Approving (A) the Sale of Certain Assets of, and Equity Interests In, Debtors' Enterprise Solutions Business, (B) the Assumption and Assignment of Certain Contracts and Leases and (C) the Assumption and Sublease of Certain Leases [Docket No. 1131] (the "US Enterprise Sale Motion") in the US Bankruptcy Court;

4

**WHEREAS,** on September 4, 2009, Flextronics filed a timely limited objection and reservation of rights with respect to the US Enterprise Sale Motion  (the "Enterprise Objection");

**WHEREAS,** on September 15, 2009, Nortel Networks Corporation, NNL, Nortel Networks Technology Corporation, Nortel Networks Global Corporation, and Nortel Networks International Corporation (collectively, the "Applicants") filed a motion for the relief set forth in the Applicants' Notice of Motion, including approval to sell assets and shares in Nortel's Enterprise Solutions Business pursuant to an amended and restated asset and share sale agreement, dated as of September 14, 2009 (the "Canadian Enterprise Sale Motion") in the Canadian Court;

**WHEREAS,** on September 16, 2009, the US Bankruptcy Court entered the Order Authorizing and Approving (A) the Sale of Certain Assets of, and Equity Interests in, Debtors' Enterprise Solutions Business, (B) the Assumption and Assignment of Certain Contracts and Leases and (C) the Assumption and Sublease of Certain Leases (the "US Enterprise Sale Order") which, *inter alia*, granted the relief sought in the US Enterprise Sale Motion and contained in paragraph 28 thereof a resolution of the Enterprise Objection;

**WHEREAS,** on September 17, 2009, the Canadian Court entered the Approval and Vesting Order (Enterprise Solutions Business) (the "Canadian Enterprise Sale Order," together with the US Enterprise Sale Order, the "Enterprise Sale Orders"), which, *inter alia*, granted the relief sought in the Canadian Enterprise Sale Motion and contained in paragraph 11 thereof a resolution of the Enterprise Objection;

**WHEREAS,** Flextronics and certain of the Nortel entities have certain outstanding amounts owing between them and their various Affiliates, where "Affiliates" means

**Execution Version**

any entity that controls, is controlled by or is under common control with any of the Parties, where "control" means ownership of more than 10% of the voting equity of an entity or the ability to otherwise direct the management of an entity;

       **WHEREAS**, while Nortel does not admit the validity of any objection Flextronics has asserted to date in the Proceedings, or that it could assert with respect to any prior, pending or future sale of a business or product line or any other assets or shares of Nortel (a "Business") to one or more third parties (a "Purchaser") (any such sale, whether by asset sale, merger, operation of law or otherwise, a "Divestiture"), including without limitation to the treatment of the MCMSAs in connection with any such Divestiture, the Parties wish to resolve certain matters as set forth in this Settlement and Release Agreement, including to (i) resolve the Enterprise Objection, (ii) fully and finally resolve the proofs of claim filed by Flextronics against Nortel and the Released Claims (as defined in Section 7 of this Settlement and Release Agreement), including the Post-Petition Ordinary Course Contractual Claims (as defined in Section 1 of this Settlement and Release Agreement), except as otherwise expressly stated herein, (iii) ensure Flextronics' cooperation with regard to pending and future Divestitures, (iv) ensure the provision by Flextronics of a supply contract with the Purchaser in connection with any future Divestiture on the terms described herein and (v) provide for the Parties' performance of their postpetition obligations under the MCMSAs until termination in accordance with this Settlement and Release Agreement;

       **WHEREAS**, nothing in this Settlement and Release Agreement shall cause any of the EMEA Entities, the Joint Administrators or any other Nortel entity to assume any obligations under the MCMSAs or any other agreement to which such EMEA Entity, Joint Administrator or other Nortel entity is not a signatory prior to the date hereof; and

**WHEREAS**, the Parties have been and are currently represented by counsel at all times during the course of the settlement negotiations culminating in this Settlement and Release Agreement.

**NOW THEREFORE**, in consideration of the foregoing and in consideration of the terms, conditions, mutual agreements and covenants set forth herein, and other good and valuable consideration, the receipt and sufficiency of which the Parties acknowledge, and in order to avoid the expense, delay and uncertainty associated with further litigation relating to the Enterprise Objection or any prior, pending or future Divestiture and in order to resolve certain claims and the other matters addressed herein, it is hereby:

**AGREED**, by and between the Parties hereto, as follows:

1.    **Payment Obligations**.  In full and final settlement of the Released Claims, subject to the terms and conditions set forth below, NNI shall pay to Flextronics on behalf of Nortel (in accordance with a side agreement among the Nortel parties hereto to which Flextronics is not a party) the Payment Obligation (as defined in Schedule B of this Settlement and Release Agreement) set out in Schedule B of this Settlement and Release Agreement, at the times set forth in Schedule B to this Settlement and Release Agreement. The Payment Obligation shall constitute an administrative expense pursuant to Section 503(b) of the Bankruptcy Code against NNI in its US Bankruptcy Case which must be paid in accordance with the terms set forth in Schedule B of this Settlement and Release Agreement. In addition, in full and final settlement of the portion of the claims included in the US Proofs of Claim and the Canadian Proofs of Claim (as such terms are defined in section 7 herein) that the Parties hereby agree are valid obligations arising after the Petition Date owed by Nortel to Flextronics, and which claims are identified in Schedule C to this Settlement and Release Agreement (the "Post-

7

Petition Ordinary Contractual Claims"), subject to the terms and conditions set forth below,

certain Nortel entities shall pay to Flextronics the amounts set out in Schedule C of this

Settlement and Release Agreement in the ordinary course of business, which amounts the Parties

acknowledge are undisputed and shall be paid not later than December 15, 2009.

Notwithstanding any other provision of this Settlement and Release Agreement or any other

agreement among the parties, the obligation of each Nortel entity to make the payment next to its

name in Schedule C of this Settlement and Release Agreement is a several obligation of such

entity and nothing in this Settlement and Release Agreement or any other agreement among the

parties shall be construed to cause the obligations set out in Schedule C to be a joint obligation of

any Nortel entity, and Flextronics expressly agrees hereby that the liability of each of the Nortel

entities to make the payments set out next to its name is limited to the amount of such payment

for such entity and that no other Nortel entity has any liability to make any of the payments set

out therein.

        2.    **Post-Filing Performance.**

        (a) The Parties hereby acknowledge and agree that, except as otherwise expressly

set forth in section 4(a)(iv) of this Settlement and Release Agreement, the Parties shall perform

in good faith in the ordinary course of business in accordance with the terms of the MCMSAs, as

amended by the Amending Agreement, the Settlement Agreement or the Side Letter (including

without limitation Nortel's obligations to provide reasonable Forecasts of expected orders

consistent with historical business practices between the Parties, to issue purchase orders

consistent with historical business practices and to make timely payment of invoices with respect

to deliveries made in accordance with such purchase orders, and Flextronics' obligations to

purchase inventory and to fulfill purchase orders), without any claim or demand for adequate

Execution Version

assurances, changes in payment terms or deposits or any other credit protection, until termination pursuant to section 5 of this Settlement and Release Agreement.

(b) With respect to inventory that Flextronics identifies as subject to a post-petition purchase obligation by Nortel, Flextronics hereby agrees that (i) Nortel may reasonably request information regarding any such inventory, (ii) Flextronics shall supply information pursuant to and shall reasonably cooperate with such request and (iii) Nortel will be afforded reasonable access to inspect such inventory, in order for Nortel to determine (which determination shall be made in writing to Flextronics within 30 days of the date Flextronics identifies such inventory as subject to a post-petition purchase obligation by Nortel) whether such inventory is defective or does not comply with the applicable specifications in accordance with the MCMSAs, was not acquired using prudent purchasing practices in accordance with the MCMSAs or was previously paid for by Nortel under the Amending Agreement or the Settlement Agreement or otherwise, for which the obligation to pay has become an obligation of a Purchaser in connection with a Divestiture, or for any other reason is not an unsatisifed post-petition purchase obligation. For the avoidance of doubt, this section shall not apply to any obligations released under this Settlement and Release Agreement.

(c) With respect to inventory owned by Nortel that Flextronics or a third-party warehousing provider holds on consignment as of the Effective Date (the "Consigned Inventory"), Flextronics agrees to buy from such Consigned Inventory, at the lesser of (i) the price paid by Nortel to Flextronics for such Consigned Inventory or (ii) the then-prevailing market price at the time Flextronics purchases the Consigned Inventory, any inventory that Flextronics needs in order to fulfill a purchase order that Flextronics receives from any third party (including, but not limited to, a Purchaser in connection with any of the Divestitures) prior

9

to Flextronics purchasing any such inventory from any of its suppliers, provided, however, that Flextronics shall be permitted to consume inventory purchased pursuant to an existing non-cancelable purchase order with a third party prior to purchasing Consigned Inventory. For the avoidance of doubt, the foregoing sentence does not limit the ability of Flextronics to sell any inventory that Flextronics owns as of the Effective Date.

(d) The Parties hereby acknowledge and agree that, notwithstanding Section 8 of the Side Letter, and except as otherwise expressly set forth in this Settlement and Release Agreement or as agreed to in advance and in writing by the Parties in the ordinary course of business, the Parties shall not hold or offset any past, present or future payables, claims or other amounts that they or any of their Affiliates now owe or in the future may owe the other Party or any of its Affiliates (including, without limitation, any amounts owed by the Parties or any of their Affiliates under the MCMSAs or any other agreement among any of the Parties that are not part of the Released Claims) against any past, present or future payables, claims or other amounts that are now owed or may in the future be owed to them or their Affiliates by the other Party or any of its Affiliates, and the Parties agree that all such amounts shall be paid in accordance with the terms of the relevant agreement. For the avoidance of doubt and without limiting the foregoing, the Parties agree that (i) the Parties will not hold or offset any past, present or future payables, claims or other amounts that they or any of their Affiliates may now owe or in the future may owe to the other Party or any of its Affiliates or have a past, present or future right of set-off with respect to the Pension Claims (as defined in section 6 below) and (ii) any right of recovery from Nortel with respect to the Pension Claims is restricted to any distribution to unsecured creditors under any Plan of Arrangement in the CCAA Proceedings, or

10

such rights as Flextronics may have, if any, as against the Nortel Networks Health & Welfare Trust.

     3.    **The Enterprise Sale Orders.**

     (a)  The Enterprise Sale Orders as they relate to the resolution of the Enterprise Objection (paragraph 28 of the US Enterprise Sale Order and paragraph 11 of the Canadian Enterprise Sale Order) shall remain effective as set forth therein; provided that Flextronics and Nortel agree that the obligations under section (vi) of paragraph 28 of the US Enterprise Sale Order and paragraph 11 of the Canadian Enterprise Sale Order are satisfied as follows:

     (i)    Flextronics shall not assert, or shall be deemed to have withdrawn, any rights to adequate protection or similar rights related to the transfer of equipment owned by Nortel in connection with the sale of Nortel's Enterprise Solutions Business as authorized by the Courts on September 16 and 17, 2009;

     (ii)    Flextronics and Nortel agree to effect the orderly transfer of the equipment in Flextronics' possession owned by Nortel and proposed to be transferred to the Purchaser of the Enterprise Solutions Business, which equipment has been identified in writing and agreed to between the Parties as of November 5, 2009. Nortel or the Purchaser shall provide Flextronics with written notification of its intent to transfer such equipment. Within 30 days of such written notification, Flextronics shall provide Nortel or the Purchaser, as appropriate, in writing, the estimated documented costs directly related to such transfer. For the avoidance of doubt, Nortel or the Purchaser, as appropriate and as agreed to between Nortel and Flextronics (in advance of any such transfer), shall bear the reasonable, documented costs directly related to any such transfer, including costs of storage, insurance and transportation directly related to any such transfer, any depreciation charge-backs and any taxes including sales, use, VAT and

transfer taxes or any levies, customs duties or similar governmental charges of any kind, each of
which costs shall be excluded from the Flextronics Released Claims (defined below), but shall
not include any formal or informal requests or demands for adequate protection payments or any
similar payments or protections.

(b) Nothing herein shall be construed as an amendment or restatement of the
Enterprise Sale Orders. Flextronics further agrees that it shall not and will not file or assert any
formal or informal objection or take any other action in opposition to any motion or other request
by Nortel for relief to effect the sale of the Enterprise Solutions Business provided such relief is
not inconsistent with section 3 of this Settlement and Release Agreement.

4.    **Future Divestitures**.

(a) In connection with any proposed future Divestiture, which for the purposes of
this section 4(a) excludes (x) the sale of Nortel's Enterprise Solutions Business pursuant to the
agreement approved by the Enterprise Sale Orders, (y) the sale of Nortel's CDMA and LTE
Access Business pursuant to the sale agreement approved in the Proceedings on July 28, 2009,
provided that each of (x) and (y) shall not be excluded if such sale is not consummated in
accordance with the approved applicable sale agreement, or in accordance with such applicable
sale agreement as modified or amended, and (z) the sale of Nortel's Layer 4-7 business pursuant
to the sale agreement approved in the U.S. Proceedings on March 26, 2009 and Canadian
Proceedings on April 7, 2009:

(i)    Flextronics agrees that at the request of Nortel in connection with such
Divestiture, it will conduct good faith negotiations with a proposed Purchaser for the purpose of
entering into a direct agreement by and among Flextronics, such Purchaser and any of such

12

Purchaser's designated Affiliates for the supply of products and services related to the applicable Business being acquired on market competitive terms and conditions; and

        (ii)     Without limiting Flextronics' obligation in section 4(a)(i) of this Settlement and Release Agreement, if by the earliest of (x) 45 days after the conclusion of the auction of the Business pursuant to bidding procedures approved by the Courts, (y) 10 days after the entry of orders approving such Divestiture by the Courts (or if such orders are not entered on the same day, 10 days after the entry of the earlier order) and (z) 30 days prior to the closing of such Divestiture (as determined by Nortel), Flextronics and the Purchaser have not reached a direct agreement as described in section 4(a)(i) of this Settlement and Release Agreement, Flextronics hereby consents to, at the request of Nortel, enter into and execute an agreement with the Purchaser, which agreement shall be effective upon the closing of such Divestiture, that contains terms and conditions identical (aside from nonmaterial conforming changes) to the terms and conditions (including, but not limited to, payment and pricing terms) existing under the MCMSAs, as such terms and conditions relate to the Business subject to such Divestiture, as of January 12, 2009, provided that (A) for the avoidance of doubt, such agreement shall not include the terms of the Amending Agreement except as set forth in section 4(a)(ii)(B) of this Settlement and Release Agreement, (B) such agreement shall include the Quarterly E&O obligations set forth in section 4 of the Amending Agreement and section 5 of the Settlement Agreement, (C) at Purchaser's option, such agreement shall provide that Purchaser and Flextronics shall agree not to exercise their respective rights to deliver a notice for termination for convenience (as provided for in section 1.5 of the Flextronics MCMSA) for a period of three (3) months after the closing of such Divestiture; and (D) if Flextronics determines in good faith that the Purchaser's creditworthiness is insufficient to support such pre-Amending Agreement

13

**Execution Version**

payment terms, Flextronics shall be permitted to modify such payment terms (but not the pricing terms), provided that such modified payment terms shall be no worse than the payment terms received by any Flextronics customer whose creditworthiness is substantially similar to the Purchaser and shall not include demands for letters of credit, deposits or other similar creditor protections. In connection with the foregoing, upon the request of Nortel, Flextronics shall assess any potential Purchaser's creditworthiness and provide Nortel with the payment terms that Flextronics deems acceptable for such Purchaser in writing within two (2) business days of Nortel's request for such information, provided that (1) Nortel provides Flextronics, contemporaneously with such request for payment terms, all material nonpublic information provided by Purchaser to Nortel related to such Purchaser's creditworthiness, to the extent authorized by Purchaser, and (2) Nortel reasonably cooperates with Flextronics in connection with any of Flextronics' requests for further information regarding the Purchaser; and

        (iii)     Nortel agrees, except to the extent provided above in this section 4, that the MCMSAs and any of Nortel's contractual rights thereunder as they relate to such Divestiture shall not be assigned to the Purchaser in connection with such Divestiture;

        (iv)     Without limiting the obligation of Flextronics described in section 2(c) of this Settlement and Release Agreement, Nortel and Flextronics agree to conduct good faith negotiations with the Purchaser regarding a three-way inventory purchase agreement in connection with such Divestiture as set forth in section 3 of the Settlement Agreement (notwithstanding the limitation therein with respect to Divestitures where the gross proceeds are less than $100 million); provided that notwithstanding the foregoing and section 3(c) of the Settlement Agreement, in connection with such Divestiture, Nortel shall not be responsible or otherwise required to pay for any unconsumed portion of such Purchaser's Forecast (as defined

in the Settlement Agreement) or any other Quarterly E&O liability arising after the date of closing related to the Business subject to such Divestiture and Flextronics waives its right to seek payment from Nortel for such amounts; and

(v)     At Nortel's request, within 30 days of execution of a Divestiture agreement, or a later date determined by Nortel, Flextronics and Nortel shall identify, in writing, any equipment in Flextronics' possession owned by or reserved for Nortel and proposed to be transferred to the Purchaser in such Divestiture, and shall promptly meet and confer to reconcile any potential discrepancies. Flextronics and Nortel agree to effect the orderly transfer of such equipment in accordance with the procedures set forth under the MCMSAs, as modified by the provisions of this section 4(a)(v). Nortel or the Purchaser shall provide Flextronics with written notification of its intent to transfer such equipment. Within 30 days of such written notification, Flextronics shall provide Nortel or the Purchaser, as appropriate, in writing, the estimated documented costs directly related to such transfer. For the avoidance of doubt, Nortel or the Purchaser, as appropriate and as agreed to between Nortel and Flextronics (in advance of any such transfer), shall bear the reasonable, documented costs directly related to any such transfer, including costs of storage, insurance and transportation directly related to any such transfer, any depreciation charge-backs and any taxes including sales, use, VAT and transfer taxes or any levies, customs duties or similar governmental charges of any kind, each of which costs shall be excluded from the Flextronics Released Claims (defined below). Flextronics further agrees that it shall not make any formal or informal requests or demands for adequate protection payments or any similar payments or protections in connection with equipment proposed to be transferred to the Purchaser in such Divestiture; and

(vi)    Upon closing of such Divestiture, Nortel shall cease placing Forecasts or purchase orders under the MCMSAs for products or services exclusively used in the Business subject to such Divestiture, provided that Nortel, in its capacity as transition service provider to the Purchaser, shall not be prohibited from providing administrative services to the Purchaser, including, but not limited to placing Forecasts or purchase orders on behalf of the Purchaser, and Nortel shall not be (A) restricted from placing Forecasts or purchase orders for any portion of the business not subject to such Divestiture or (B) released from any liability for such Forecasts or purchase orders referred to in (A) above.

(b) Except as otherwise provided in section 3(b) herein, Flextronics agrees that it shall not file with any court or assert in any proceeding or otherwise any formal or informal objection or take any other action in opposition to or with the intention of frustrating any Divestiture.  Flextronics further agrees that it shall not seek from Nortel or the Purchaser any remedy, payment, or any modification of the MCMSAs as a result of any such Divestiture, including without limitation any claim or demand for adequate assurances, changes in payment terms, deposits or any other credit protection, cure costs, or any request or demand for the termination, assumption, rejection or repudiation of the MCMSAs or any part thereof. Flextronics further agrees that it shall not assert any claim or seek any payment or other remedy from a Purchaser in compensation for the Released Claims or any other right or claim waived or compromised by Flextronics pursuant to this Settlement and Release Agreement.

5.    **Termination of MCMSAs.**  The Parties acknowledge and agree that unless otherwise agreed between the Parties: (i) without limiting any of Flextronics' or Nortel's respective rights to terminate the Flextronics MCMSA upon a material breach by the other Party, the Parties shall not seek to reject, repudiate or otherwise cancel or terminate the Flextronics

MCMSA pursuant to the processes applicable in the Proceedings except upon 210 days notice to

the other Party (or such shorter period as the Parties may agree), during which period the Parties

shall continue to perform their obligations under the Flextronics MCMSA in the ordinary course

of business, and the Parties agree that if such notice is provided they will not deliver a notice for

termination for convenience that would become effective prior to such planned rejection,

repudiation, cancellation or termination date; and (ii) Flextronics and Nortel agree to not exercise

their respective rights to deliver a notice for termination for convenience pursuant to section 1.5

of the Flextronics MCMSA for the period through December 31, 2010, which for the avoidance

of doubt shall govern (y) the production of the SLR Enterprise Products (as defined in the

ERS8K Manufacturing Agreement, defined below) pursuant to the ERS8K Manufacturing

Agreement between and among NNL, NNI, FC and FTS (the "ERS8K MA"), provided that the

Parties shall not be bound by this Section 5(ii)(y) until each of the parties to the ERS8K MA

execute the agreed form ERS8K MA attached hereto as Exhibit 1, and provided further that any

modifications to the agreed form ERS8K MA requested prior to the execution of such agreed

form ERS8K MA shall be subject to the reasonable approval of the parties to the ERS8K MA,

and (z) the production of the SLR MEN Products (as defined in the MEN Manufacturing

Agreement, defined below) pursuant to the MEN Manufacturing Agreement between and among

NNL, NNI, FC and FTS (the "MEN MA"), provided that the Parties shall not be bound by this

Section 5(ii)(y) until each of the parties to the MEN MA execute the agreed form MEN MA

attached hereto as Exhibit 2, and provided further that any modifications to the agreed form

MEN MA requested prior to the execution of such agreed form MEN MA shall be subject to the

reasonable approval of the parties to the MEN MA, and (iii) the SLR MCMSA shall terminate as

currently scheduled effective as of December 12, 2009 pursuant to and subject to the contractual

**Execution Version**

terms and conditions that apply to a termination made in accordance with its terms; provided, however, that notwithstanding the termination of the SLR MCMSA and section 4 of the Settlement Agreement, the Parties agree that Flextronics and Nortel shall continue to perform in accordance with the terms and conditions of the SLR MCMSA all operations (A) under the present VSHAs applicable to the CDMA business, and (B) under the Wireline Manufacturing Agreement between and among NNL, NNI, FC and FTS, effective on June 23, 2009 (the "Wireline Manufacturing Agreement") applicable to the Wireline Products business (as defined in the Wireline Manufacturing Agreement).  Flextronics further agrees that it shall grant a Purchaser terms and conditions identical (aside from nonmaterial conforming changes) to the terms and conditions under the then-existing ERS8K MA, MEN MA and  Wireline Manufacturing Agreement, respectively, as such terms and conditions relate to a Business subject to a future Divestiture, all on such terms, and subject to the provisions, as set forth in section 4(a)(ii) of this Settlement and Release Agreement.

6.    **Nortel Release.**  Upon the Effective Date, Nortel (including the Debtors and their estates) (the foregoing collectively referred to as the "Nortel Releasors"), do hereby release, waive, and discharge (i) the claims for open accounts receivable owed by Flextronics to Nortel as of October 29, 2009 listed on Schedule H to this Settlement and Release Agreement, and (ii) any and all rights, rights of set-off, causes of action, liabilities, remedies and claims of any kind or nature whatsoever which the Nortel Releasors have, may have or could have asserted against Flextronics or its former, present or future officers, directors, employees or agents (the "Flextronics Released Parties"), which arise directly from or relate to transactions or events occurring or deemed to occur prior to the Petition Date in law or in equity, whether known or unknown, foreseen or unforeseen, matured or unmatured, contingent or not contingent, whether

or not hidden or concealed, whether based on tort, fraud, contract or otherwise, and/or any other

obligations, claims, interests, or debts of any kind, which the Nortel Releasors, from the

beginning of time, heretofore possessed or may possess against the Flextronics Released Parties,

which include, without limitation, causes of action included in Chapter 5 of the Bankruptcy Code

(and any similar causes of action under applicable state law) (collectively, the "Chapter 5

Claims"), all claims arising under or relating to the MCMSAs, including without limitation

claims for guaranty, warranty and indemnity arising thereunder, claims arising under purchase

orders issued pursuant to the MCMSAs, claims of set-off and claims for cure under the

MCMSAs (collectively, the "Nortel Released Claims"). Without limiting section 2(d) of this

Settlement and Release Agreement, the Nortel Released Claims shall not include any rights,

causes of action, liabilities, remedies and claims or defenses of any kind or nature the Nortel

Releasors have, may have or could have against Flextronics arising pursuant to a Pension and

Retirement Benefits Agreement (the "PRBA") in connection with the transfer of facilities and

employees from Nortel to Flextronics in 2004, including any rights, causes of action, liabilities,

remedies and claims of any kind or nature or defenses arising from obligations under the PRBA

for certain post-retirement benefits (PRBs), transition retirement allowances (TRAs) and

retirement allowance payments (RAPs) (the "Pension Claims"). Notwithstanding the foregoing,

the Parties acknowledge and agree that, unless Flextronics is shown, following notice to

Flextronics provided within nine (9) months after the Effective Date, to have breached any of its

material obligations set forth in section 4 of this Settlement and Release Agreement, and unless

Flextronics does not cure such breach within five (5) business days following receipt of such

notice, the release by the Nortel Releasors of Chapter 5 Claims shall become effective upon the

earlier of (i) nine (9) months after the Effective Date and (ii) closing of Nortel's Divestitures

19

with respect to the CDMA/LTE, Enterprise, Optical, CVAS, Passport, GSM and Repair

Operations business lines (and upon closing of each of these identified Divestitures Flextronics

shall be released from Chapter 5 Claims relating to transactions in connection with such specific

business lines). The Nortel Releasors shall not assert any Chapter 5 Claims against Flextronics

unless and until, after giving notice of material breach, such breach not timely cured, as set forth

in the immediately preceding sentence. In the event that a Chapter 5 Claim is asserted by one or

more of the Nortel Releasors against Flextronics, the Parties agree that Flextronics shall be

entitled to assert any defenses related to such Chapter 5 Claims provided for under the

Bankruptcy Code or state law that Flextronics would have been able to assert if the Released

Claims had not been released pursuant to this Settlement and Release Agreement. For the

avoidance of doubt and without limiting the foregoing or other claims that may not be released

under this Settlement and Release Agreement, the Nortel Released Claims do not include (i) any

obligations, rights, causes of action, liabilities, remedies or claims of any kind or nature arising

under this Settlement and Release Agreement, or (ii) claims and defenses to those open accounts

receivable on Schedule I to this Settlement and Release Agreement, which remain subject to

reconciliation by the Parties in the ordinary course of business. For purposes of this section 6,

the Parties acknowledge and agree that (i) any guaranty, warranty, indemnity or similar

obligation shall be deemed to arise on the earliest date that the relevant goods are "delivered" by

Flextronics to Nortel or its designee or vice versa and (ii) "delivered" shall have the meaning

agreed to in section 6(a) of the Settlement Agreement. It is further agreed that to the extent that

the Nortel Releasors make any claim or commence or maintain any action or proceeding on

behalf of themselves or on behalf of any other person or causes any other person to make any

claim or commence or maintain any action or proceeding against any person or corporation or

20

other entity in which any claim could arise against the Flextronics Released Parties, or any of them, for contribution or indemnity or any other similar relief arising from or relating to the Nortel Released Claims (each such action a "Nortel Third Party Action"), the Nortel Releasors shall indemnify and hold harmless the Flextronics Released Parties for any reasonable and actual costs, fees (including reasonable attorneys' fees) or damages directly attributable to such Nortel Third Party Actions (such indemnity obligation the "Nortel Third Party Indemnity Obligations"). The Nortel Releasors hereby agree that the Flextronics Released Parties may require the Nortel Releasors to escrow any funds actually received on account of such Nortel Third Party Actions in an account to secure such Nortel Third Party Indemnity Obligations.

7.    **Flextronics Release.**  Upon the Effective Date, Flextronics (the foregoing referred to as the "Flextronics Releasors"), do hereby release, waive, and discharge any and all rights, rights of set-off, causes of action, liabilities, remedies and claims of any kind or nature whatsoever which the Flextronics Releasors have, may have or could have asserted against Nortel or its former, present or future administrators, trustees, officers, and Ernst & Young Inc. as "Monitor" in connection with the CCAA Proceedings (the "Monitor"), directors, employees or agents (the "Nortel Released Parties"), which arise directly from or relate to transactions or events occurring or deemed to occur prior to the Petition Date, in law or in equity, whether known or unknown, foreseen or unforeseen, matured or unmatured, contingent or not contingent, whether or not hidden or concealed, whether based on tort, fraud, contract or otherwise, and/or any other obligations, claims, interests, or debts of any kind, which the Flextronics Releasors, from the beginning of time, heretofore possessed or may possess against the Nortel Released Parties, which include, without limitation: any and all claims for Pre-Filing Inventory (as defined in the Settlement Agreement) provided however that Nortel shall not be entitled to ownership of

such Pre-Filing Inventory unless payment is made in accordance with the MCMSAs; claims

arising under § 503(b)(9) of the Bankruptcy Code, including the claims pursuant to § 503(b)(9)

of the Bankruptcy Code filed or otherwise asserted by FC, FTS, Flextronics America, LLC

("Flextronics America"), Flextronics International Europe B.V. ("Flextronics Int'l Europe"),

Flextronics Logistics USA, Inc. ("Flextronics Logistics USA"), Flextronics Sales & Marketing

North Asia (L) Ltd ("Flextronics Sales & Marketing North Asia"), Flextronics Technology

(Penang) Sdn. Bhd. ("Flextronics Technology (Penang)"), Flextronics International Latin

America (L) Ltd. ("Flextronics Int'l Latin America") and Flextronics International USA, Inc.

("Flextronics Int'l USA"), against NNI, Nortel Altsystems, Inc. ("Nortel Altsystems") and Nortel

Networks (CALA), Inc. ("Nortel Networks (CALA)") (as detailed in Schedule E of this

Settlement and Release Agreement) and any other claims arising under § 503(b)(9) of the

Bankruptcy Code that have been or could be filed or otherwise asserted in the US Bankruptcy

Cases (such claims, "§ 503(b)(9) Claims"); all claims included in the proofs of claim filed or

otherwise asserted by FC, FTS, Flextronics America, Flextronics EMS Canada Inc. ("Flextronics

EMS Canada"), Flextronics Int'l Europe, Flextronics Int'l Latin America, Flextronics Int'l USA,

Flextronics Logistics USA, Flextronics Sales & Marketing North Asia and Flextronics

Technology (Penang) against NNI, Nortel Networks Capital Corporation, Inc., Nortel

Altsystems, Nortel Networks International Inc. and Nortel Networks (CALA) (as detailed in

Schedule F of this Settlement and Release Agreement) and any other such proofs of claim that

have been or could be filed or otherwise asserted in the US Bankruptcy Cases (such claims, "US

Proofs of Claim"); all claims included in the proofs of claim filed or otherwise asserted by FC,

FTS, Flextronics Int'l Europe, Flextronics Electronics Technology (Suzhou) Co. Ltd.,

Flextronics Distribution, Inc., Flextronics America, Flextronics International Europe B.V.,

22

**Execution Version**

Flextronics Int'l Latin America, Flextronics (Canada) Inc., Flextronics International Poland sp.

z.o.o., Flextronics Sales & Marketing North Asia, Flextronics Canada Design Services Inc.,

Flextronics EMS Canada and Flextronics Enclosure Systems (Chongzhou) Ltd. against NNL,

Nortel Networks Technology Corporation, Nortel Networks International Corporation, Nortel

Networks Global Corporation and Nortel Networks Corporation (as detailed in Schedule G of

this Settlement and Release Agreement) and any other such proofs of claim that have been or

could be filed or otherwise asserted in the CCAA Proceedings (such claims, "Canadian Proofs of

Claim"); any other claims that have been or could be filed or otherwise asserted in the EMEA

Proceedings (the "EMEA Proofs of Claim"); any claims that have been or could be filed or

otherwise asserted in any other proceeding of a Nortel entity or otherwise (such claims together

with the EMEA Proofs of Claim, the § 503(b)(9) Claims, the US Proofs of Claim and the

Canadian Proofs of Claim, the "Flextronics Proofs"); reclamation claims arising under § 546 of

the Bankruptcy Code or otherwise; any potential obligation owed by the Nortel Released Parties

to the Flextronics Releasors related to or arising under the Montreal closing as set forth and

contemplated in section 5 of the Side Letter, and all claims arising under or relating to the

MCMSAs, including without limitation claims for guaranty, warranty and indemnity arising

thereunder, claims arising under purchase orders issued pursuant to the MCMSAs, claims of set-

off and claims for cure under the MCMSAs (all of the foregoing collectively, the "Flextronics

Released Claims" and together with the Nortel Released Claims, the "Released Claims").

Without limiting section 2(d) of this Settlement and Release Agreement, the Flextronics

Released Claims shall not include any rights, causes of action, liabilities, remedies and claims or

defenses of any kind or nature the Flextronics Releasors have, may have or could have against

NNL or the Nortel Networks Health & Welfare Trust arising in connection with the Pension

**Execution Version**

Claims or against any party with respect to Chapter 5 Claims. For the avoidance of doubt, the

following claims, inter alia, are included in the Flextronics Released Claims: (i) the

US$180,896,868 of claims for unpaid accounts receivable as of the Petition Date asserted in the

Flextronics Proofs against the Nortel Released Parties at, inter alia, paragraphs 19-21 of the proof

of claim asserted by FC against NNI [Claim No. 4873] (the "NNI Proof of Claim"), (ii) any and

all claims by Flextronics against the Nortel Released Parties for unpaid accounts receivable as of

the Petition Date arising from Nortel's CDMA and LTE Access Business, (iii) any and all claims

by Flextronics against the Nortel Released Parties for unpaid accounts receivable on account of

goods or services delivered to the Nortel Released Parties or any of their customers or invoiced

to the Nortel Released Parties or any of their customers prior to the Petition Date, (iv) the

ordinary course contractual claims asserted in the Flextronics Proofs at, inter alia, paragraphs 22-

24 of the NNI Proof of Claim listed on Schedule D of this Settlement and Release Agreement,

(v) the Post-Petition Ordinary Course Contractual Claims asserted in the Flextronics Proofs at,

inter alia, paragraphs 22-24 of the NNI Proof of Claim listed on Schedule C of this Settlement

and Release Agreement, (vi) all claims related to Pre-Filing Inventory specifically including the

$98,757,797 for inventory on hand and the 3% cost of acquisition related to such inventory

asserted in the Flextronics Proofs at, inter alia, paragraphs 25-28 of the NNI Proof of Claim and

in the "Summary Tab" of the spreadsheets contained on the disk attached to the NNI Proof of

Claim as Exhibit C, and (vii) any and all other breach of contract claims asserted in the

Flextronics Proofs at, inter alia, paragraphs 29-30 of the NNI Proof of Claim, including

contingent, unliquidated and unmatured claims and claims for continuing breach. For the

avoidance of doubt and without limiting the foregoing or other claims that may not be released

under this Settlement and Release Agreement, the Flextronics Released Claims do not include (i)

any obligations, rights, causes of action, liabilities, remedies or claims of any kind or nature

arising under this Settlement and Release Agreement, or (ii) claims and defenses related to those

open accounts receivable on Schedule I to this Settlement and Release Agreement, which remain

subject to reconciliation by the Parties in the ordinary course of business. For purposes of this

section 7, the Parties acknowledge and agree that (i) any guaranty, warranty, indemnity or

similar obligation shall be deemed to arise on the earliest date that the relevant goods are

"delivered" by Flextronics to Nortel or its designee or vice versa and (ii) "delivered" shall have

the meaning agreed to in section 6(a) of the Settlement Agreement. It is further agreed that to

the extent that the Flextronics Releasors make any claim or commence or maintain any action or

proceeding on behalf of themselves or on behalf of any other person or causes any other person

to make any claim or commence or maintain any action or proceeding against any person or

corporation or other entity in which any claim could arise against the Nortel Released Parties, or

any of them, for contribution or indemnity or any other similar relief arising from or relating to

the Flextronics Released Claims (each such action a "Flextronics Third Party Action"), the

Flextronics Releasors shall indemnify and hold harmless the Nortel Released Parties for any

reasonable and actual costs, fees (including reasonable attorneys' fees) or damages directly

attributable to such Flextronics Third Party Actions (such indemnity obligation the "Flextronics

Third Party Indemnity Obligations"). The Flextronics Releasors hereby agree that the Nortel

Released Parties may require the Flextronics Releasors to escrow any funds actually received on

account of such Flextronics Third Party Actions in an  account to secure such Flextronics Third

Party Indemnity Obligations.

       8.   **No Claims or Defenses Asserted.**  For the avoidance of doubt, except as

expressly permitted under this Settlement and Release Agreement, Flextronics and Nortel hereby

acknowledge and agree that they (i) shall not assert any further claim, demand payment or seek further court relief or resolution, in either the Courts or any other court, with respect to all or any portion of the Pre-Filing Inventory or any other Released Claims, (ii) promptly following the Effective Date, shall reduce the related accounts receivable and accounts payable to zero balances in their respective books and records and accounting systems and shall close all invoices relating to the Pre-Filing Inventory in their respective books and records and accounting systems, and (iii) shall not seek or be entitled to any remedy, cure or any other payment or consideration or accommodation from a Purchaser or any other party in a Divestiture in respect of any portion of the Pre-Filing Inventory or any other Released Claim. Notwithstanding the foregoing or any other provision of this Settlement and Release Agreement, Pre-Filing Inventory shall continue to be used in the calculation of Quarterly E&O pursuant to section 5 of the Settlement Agreement. Flextronics further hereby acknowledges and agrees that the Flextronics Proofs shall be deemed withdrawn in the applicable proceedings with prejudice, provided, however, that Flextronics shall be permitted to file one or more amended proofs of claim against NNL solely with regard to the Pension Claims that Flextronics alleges are owed by NNL. With respect to such Pension Claims, Flextronics and NNL hereby agree that such claims will be evaluated, adjudicated and resolved in accordance with the claims procedures to be established by one or more claims procedure orders to be issued in the CCAA Proceedings. For the avoidance of doubt, nothing in this Settlement and Release Agreement releases or constitutes a waiver of Nortel's defenses to any proofs of claim filed by Flextronics with respect to the Pension Claims.

9.   **Resolution of Pension Claims.** NNL shall not remove Flextronics from the service list maintained in the CCAA Proceedings, and in the event that any distributions to

26

creditors are proposed in a plan of reorganization, arrangement or compromise under the CCAA

(a "CCAA Plan") prior to the final resolution of the Pension Claims in accordance with the

claims resolution process, NNL shall provide to Flextronics a copy of the proposed CCAA Plan

and shall provide notice of the hearing to approve the CCAA Plan, the proposed distribution and

the manner of addressing the claims including, without limitation, the establishment of a reserve

for the unresolved claims of all creditors that have timely filed claims (which notice may be

effected by service upon the service list maintained in the CCAA Proceedings or by distribution

to creditors generally in accordance with such procedures as may be approved by the Canadian

Court). NNL shall, if requested by Flextronics, consult with Flextronics regarding the proposed

treatment of the unresolved claims, including, without limitation, the amount of the proposed

reserve in respect of the unresolved claims, if the Pension Claims are then unresolved, prior to

any vote on the CCAA Plan by affected creditors. NNL shall further use reasonable best efforts,

subject to and consistent with its duties and obligations under applicable law and in accordance

with the terms of the PRBA, to (i) preserve documents related to the Pension Claims and make

such documents available to Flextronics upon request and (ii) reasonably cooperate with

Flextronics in connection with any litigation or other disputes with third parties relating to the

Pension Claims. Nothing contained in this Settlement and Release Agreement shall affect the

rights Flextronics may have, if any, as against the Nortel Networks Health & Welfare Trust in

respect of the Pension Claims.

> 10.    **Approval by the US Bankruptcy Court.** This Settlement and Release
Agreement is subject in all respects to the entry of a final (as defined below) order by the US

Bankruptcy Court approving all terms and conditions contained in this Settlement and Release

Agreement. Within three (3) business days after NNI's receipt of an executed copy of this

**Execution Version**

Settlement and Release Agreement, NNI shall file a motion with the US Bankruptcy Court, which motion shall be in form and substance reasonably acceptable to Flextronics, seeking the approval of this Settlement and Release Agreement pursuant to §§ 101 and 363 of the Bankruptcy Code (the "US Approval Order") and any other applicable law, rules, orders or procedures, and shall use reasonable best efforts to pursue the same until the US Approval Order is entered and becomes Final. If the US Bankruptcy Court does not approve all terms and conditions contained in this Settlement and Release Agreement, and the Parties are unable to obtain court approval of this Settlement and Release Agreement, then this Settlement and Release Agreement shall be null and void.

      11.    **Approval by the Canadian Court.** This Settlement and Release Agreement is subject in all respects to the entry of a final order by the Canadian Court approving all terms and conditions contained in this Settlement and Release Agreement. After NNL's receipt of an executed copy of this Settlement and Release Agreement, NNL shall file a motion with the Canadian Court in sufficient time to ensure such motion will be heard at a joint hearing with the US Bankruptcy Court, which motion shall be in form and substance reasonably acceptable to Flextronics, seeking the approval of this Settlement and Release Agreement pursuant to applicable law in the CCAA Proceedings (the "Canadian Approval Order") and any other applicable law, rules, orders or procedures, and shall use reasonable best efforts to pursue the same until the Canadian Approval Order is entered and becomes Final. If the Canadian Court does not approve all terms and conditions contained in this Settlement and Release Agreement, and the Parties are unable to obtain court approval of this Settlement and Release Agreement, then this Settlement and Release Agreement shall be null and void, and the Parties shall be restored to their respective positions.

28

**Execution Version**

12.     **Effective Date.** This Settlement and Release Agreement shall become effective on the first day after both the US Approval Order and the Canadian Approval Order (each an "Approval Order") become Final (the "Effective Date"). For purposes of this Settlement and Release Agreement, "Final" with respect to each Approval Order means the date on which the respective Approval Order is approved and entered by the respective court and is no longer subject to appeal, writ of certiorari, reargument or rehearing, or, in the event that a timely appeal has been noticed, or a timely writ of certiorari, reargument or rehearing has been sought with regard to the respective Approval Order, then such Approval Order shall become Final upon being affirmed by the highest court to which the Approval Order was appealed and the time to take any further appeal, to petition for writ of certiorari or to move for reargument or rehearing has expired. Notwithstanding the foregoing, the Parties shall have the right to waive the requirement that the Approval Orders become Final.

13.     **Execution of Documents.** The Parties agree to execute any and all documents, and to perform any acts, upon request by the other, reasonably necessary or proper to effectuate or further evidence the terms and provisions of this Settlement and Release Agreement.

14.     **Consultation and Review.** Each of the Parties hereby represents to the other that (i) it has had full and adequate opportunity to request and review any and all documents relevant to this Settlement and Release Agreement; (ii) it has negotiated this Settlement and Release Agreement at arm's length; (iii) it has read this Settlement and Release Agreement in its entirety and understands its terms and contents; (iv) it has had full and adequate opportunity to consult with and, in fact, has consulted with legal counsel on all matters related to this Settlement and Release Agreement; (v) it has provided any comments regarding this Settlement and Release

Agreement to its legal counsel; (vi) it has executed this Settlement and Release Agreement freely, voluntarily and without coercion; and (vii) it has not relied on any inducements, promises, statements, representations or warranties made by any person or entity not expressly set forth in this Settlement and Release Agreement.

15.    **Binding Effect.**  This Settlement and Release Agreement constitutes a legal, valid and binding obligation, enforceable against each of the Parties and any successors or assigns of the Parties, in accordance with the terms hereof, subject to the approval of the US Bankruptcy Court and the Canadian Court. Each of the Parties represents and warrants that the execution, delivery and performance of this Settlement and Release Agreement has been approved, if necessary, by all requisite corporate actions on its part and is within the scope of its authority and powers, and shall not cause any default in or breach or violation of any applicable law, rule, regulation, contract or other instrument to which it is a party or by which any of its assets are bound or affected.

16.    **Objection to Settlement and Release Agreement.**  In the event that an objection is filed to any motion for US Bankruptcy Court approval or Canadian Court approval of this Settlement and Release Agreement, the Parties shall in good faith support the approval of this Settlement and Release Agreement before the US Bankruptcy Court and/or the Canadian Court, and to defend any appeals of an Approval Order to the fullest extent reasonably practical.

17.    **Third-Party Rights.**  Nothing in this Settlement and Release Agreement, whether express or implied, is intended to confer any rights or remedies under or by reason of this Settlement and Release Agreement on any persons other than the Parties and their respective successors and assigns, nor is anything in this Settlement and Release Agreement intended to relieve or discharge the obligation or liability of any third persons to the Parties, nor shall any

30

provision give any third persons any right of subrogation or action against any party to this Settlement and Release Agreement; provided, however, that any Purchaser in a Divestiture that has been authorized by the Courts shall be deemed a third party beneficiary of section 4 of this Settlement and Release Agreement and shall be entitled to enforce and take advantage of the benefits thereof to their fullest extent as if it were a signatory hereto.

18.   **No Admission of Liability.**   It is understood by the Parties that this Settlement and Release Agreement represents a compromise of disputed claims, and that this Settlement and Release Agreement made hereunder is not to be construed as an admission of liability on any claims, except as expressly stated herein.  Neither the fact of this Settlement and Release Agreement, nor any provision contained herein, nor any action taken hereunder, shall constitute an admission with respect to any claims or facts alleged by any of the Parties hereto, except as expressly stated herein.  Without limiting the foregoing, Nortel does not admit the validity of any objection Flextronics has asserted to date in the Proceedings, or that it could assert with respect to any pending or future Divestiture, including without limitation to the treatment of the MCMSAs in connection with any such Divestiture.

19.   **Interpretation.**   Terms not defined herein shall have the meanings provided in the Settlement Agreement and related Side Letter and if not provided therein, in the Amending Agreement or the applicable MCMSA.  To the extent of any conflict, inconsistency or ambiguity between and among this Settlement and Release Agreement, the Settlement Agreement, the Side Letter, the Amending Agreement and the MCMSAs, this Settlement and Release Agreement shall control, followed by the Settlement Agreement and Side Letter, followed by the Amending Agreement, followed by the applicable MCMSA.  To the extent that the last date for any act or action permitted or required to be taken under the Settlement and Release Agreement falls on a

31