**EXHIBIT B**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

--------------------------------------------------------X
                       :
                       :        Chapter 11
*In re*                   :
                       :        Case No. 09-10138 (KG)
Nortel Networks Inc., *et al.*,[1]   :
                       :        Jointly Administered
                Debtors.   :
                       :        **RE: D.I. ‒‒‒‒‒1627**
--------------------------------------------------------X

**ORDER AUTHORIZING AND APPROVING (A) SALE OF
CERTAIN ASSETS OF THE DEBTORS' METRO ETHERNET
NETWORKS BUSINESS FREE AND CLEAR OF ALL LIENS,
CLAIMS AND ENCUMBRANCES AND (B) ASSUMPTION
AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS**

Upon the motion [D.I. •1627] (the "Motion")[2] of Nortel Networks Inc. ("NNI") and its

affiliated debtors, as debtors and debtors in possession (collectively, the "Debtors"), for entry of

orders under Bankruptcy Code sections 105, 107(b)(1), 363 and 365, Bankruptcy Rules 2002,

6004, 6006, 9014 and 9018 and Local Rules 6004-1 and 9018-1 (I)(A) authorizing Debtors'

entry into that certain asset sale agreement dated as of October 7, 2009, among Nortel Networks

Corporation ("NNC"), Nortel Networks Limited ("NNL"), NNI and certain other entities

identified therein as Sellers (the "Sellers") and Ciena Corporation as purchaser ("Ciena," or the

---

[1]     The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's tax identification number, are:  Nortel Networks Inc. (6332), Nortel Networks Capital Corporation (9620), Nortel Altsystems Inc. (9769), Nortel Altsystems International Inc. (5596), Xros, Inc. (4181), Sonoma Systems (2073), Qtera Corporation (0251), CoreTek, Inc. (5722), Nortel Networks Applications Management Solutions Inc. (2846), Nortel Networks Optical Components Inc. (3545), Nortel Networks HPOCS Inc. (3546), Architel Systems (U.S.) Corporation (3826), Nortel Networks International Inc. (0358), Northern Telecom International Inc. (6286), Nortel Networks Cable Solutions Inc. (0567) and Nortel Networks (CALA) Inc. (4226).  Addresses for the Debtors can be found in the Debtors' petitions, which are available at http://chapter11.epiqsystems.com/nortel.

[2]     Capitalized terms not otherwise defined herein shall have the meanings ascribed to such terms in the Motion, or if not defined in the Motion, shall have the meanings ascribed to such terms in the Sale Agreement (as defined herein).

"Stalking Horse Purchaser") for the sale of certain assets of the Sellers' Metro Ethernet

Networks Business as described therein (the "Purchased Assets") as a "stalking-horse" purchase

agreement (as appended to the Motion as Exhibit A, the "Stalking Horse Agreement"), (B)

authorizing and approving the bidding procedures (as appended to the Bidding Procedures Order

(as defined below), the "Bidding Procedures"), (C) authorizing and approving the terms and

conditions of the Break-Up Fee and Expense Reimbursement (as each is defined in the Stalking

Horse Agreement), (D) approving the form and manner of sale and publication notices (the

"Notice Procedures"), (E) approving the Assumption and Assignment Procedures as set forth in

the Motion for the assumption and assignment of certain executory contracts (the "Assumed and

Assigned Contracts," and together with the "Purchased Assets", the "Assets"), (F) authorizing

the Debtors to file certain documents under seal, and (G) setting the time, date and place for a

hearing to consider the sale of the Purchased Assets and the assumption and assignment of the

Assumed and Assigned Contracts (the "Sale Hearing"); (II) authorizing and approving (A) the

sale of the Assets free and clear of all liens, claims and encumbrances, and (B) the assumption

and assignment of the Assumed and Assigned Contracts; and (III) granting such other and further

relief as the Court deems just and proper; and the Court having entered an order approving,

among other things, the Bidding Procedures (the "Bidding Procedures Order") [D.I. ●**1685**]

based upon the evidence presented at the hearing held on October 15, 2009 (the "Bidding

Procedures Hearing"); and the Auction (as defined below) having been held in accordance with

the Bidding Procedures Order; and at the conclusion of said Auction [●]**Ciena** having been

chosen as the Successful Bidder in accordance with the Bidding Procedures (the "Purchaser");

and the Court having conducted the Sale Hearing on ~~November 19,~~**December 2,** 2009; and all

parties in interest having been heard or having had the opportunity to be heard regarding the

2

asset sale agreement attached hereto as Exhibit A (the "Sale Agreement"), by and among the

Sellers and the Purchaser; and the Court having reviewed and considered the Motion, and the

arguments of counsel made and the evidence adduced at the Bidding Procedures Hearing and the

Sale Hearing; and upon the record of the Bidding Procedures Hearing and the Sale Hearing and

these chapter 11 cases, and after due deliberation thereon, and good cause appearing therefor, it

is hereby

### FOUND AND DETERMINED THAT:[3]

A.    Jurisdiction.  The Court has jurisdiction to hear and determine the Motion and to

grant the relief requested in the Motion pursuant to 28 U.S.C. § 157(b)(1) and 1334(b).

B.    Venue.  Venue of these cases and the Motion in this district is proper under 28

U.S.C. §§ 1408 and 1409.  This is a core proceeding within the meaning of 28 U.S.C. §

157(b)(2).

C.    Statutory Predicates.  The statutory and legal predicates for the relief requested in

the Motion are Bankruptcy Code sections 105, 107(b)(1), 363 and 365, Bankruptcy Rules 2002,

6004, 6006, 9014 and 9018, and Local Rules 6004-1 and 9018-1.

D.    Notice.  Notice of the Motion and the Sale Hearing has been provided to (A) (i)

all entities reasonably known to have expressed an interest in a transaction with respect to the

Assets during the past nine (9) months, (ii) all entities reasonably known to have asserted any

claim, lien, interest or encumbrance against the Debtors' right, title and interest in the Assets,

(iii) the attorneys general for all states in which Purchased Assets owned by the Debtors are

located, all federal and state taxing authorities including, without limitation, the SEC, the EPA,

state environmental protection agencies, the IRS, and the Department of Labor and similar state

---

[3]    Findings of fact shall be construed as conclusions of law and conclusions of law shall be construed as
findings of fact to the fullest extent of the law.  See Fed. R. Bankr. P. 7052.

labor or employment agencies, (iv) all counterparties to the Assumed and Assigned Contracts,

(v) all known or potential creditors of the Debtors, and (vi) the general service list established in

these chapter 11 cases pursuant to Bankruptcy Rule 2002 and Local Rule 2002-1, including, but

not limited to, the Official Committee of Unsecured Creditors (the "Committee"); and (B) other

parties through publication of the Publication Notice (as defined in the Motion), all in

accordance with and as provided by the Bidding Procedures Order.  As evidenced by

affidavit**affidavits** of publication filed with the Court [D.I. ●**'s 1774, 1775, 1777**], the

Publication Notice was published in The Wall Street Journal (National Edition), The Globe and

Mail (National Edition), and The Financial Times (International Edition) on [●],**October 29,**

2009.

      E.    Notice Sufficient.  Based upon the affidavits of service and publication filed with

the Court [D.I. ●**1747, 1774, 1775, 1777**]:  (a) notice of the Motion and the Sale Hearing was

adequate and sufficient under the circumstances of these chapter 11 cases and these proceedings

and complied with the various applicable requirements of the Bankruptcy Code, the Bankruptcy

Rules and the Bidding Procedures Order; and (b) a reasonable opportunity to object and be heard

with respect to the Motion and the relief requested therein was afforded to all interested persons

and entities.

      F.    Assets Property of the Estates.  The Assets sought to be transferred and/or

assigned by the Debtors to the Purchaser pursuant to the Sale Agreement are property of the

Debtors' estates and title thereto is vested in the Debtors' estates.

      G.    Sufficiency of Marketing.  The Debtors and their professionals marketed the

Assets and conducted the marketing and sale process as set forth in and in accordance with the

Motion.  Based upon the record of these proceedings, all creditors and other parties in interest

and all prospective purchasers have been afforded a reasonable and fair opportunity to bid for the Assets.

H.    <u>Stalking Horse Agreement</u>.  On October 7, 2009, the Debtors entered into the Stalking Horse Agreement subject to higher and better offers.  Simultaneously with the execution of the Stalking Horse Agreement, the EMEA Sellers, the Joint Administrators, the Joint Israeli Administrators and the Purchaser entered into a separate agreement (the "<u>EMEA Asset Sale Agreement</u>") providing for the sale to the Purchaser of the EMEA Assets (as defined in the EMEA Asset Sale Agreement).

I.    <u>Bidding Procedures</u>.  The Bidding Procedures were substantively and procedurally fair to all parties and all potential bidders.  The Debtors conducted the sale process (including the Auction, as defined below) without collusion and in accordance with the Bidding Procedures.

J.    <u>Auction</u>.  After the conclusion of the auction held ~~on~~**from** November ~~13,~~**20, 2009 until November 24,** 2009 (the "<u>Auction</u>"), the Debtors determined in a valid and sound exercise of their business judgment that the highest and best Qualified Bid (as defined in the Bidding Procedures Order) was that of the Purchaser **and the next highest and best Qualified Bid (the "Alternate Bid") was that of MEN Acquisition LLC (the "Alternate Bidder")**.

K.    <u>Corporate Authority</u>.  Subject to the entry of this Order, each Debtor that is a Seller (i) has full power and authority to execute the Sale Agreement, the Ancillary Agreements (as defined in the Sale Agreement) and all other documents contemplated thereby, (ii) has all of the power and authority necessary to consummate the transactions contemplated by the Sale Agreement, and (iii) has taken all company action necessary to authorize and approve the Sale Agreement, the Ancillary Agreements, the sale of the Assets (the "<u>Sale</u>"), and any actions

5

required to be performed by the Debtors in order to consummate the transactions contemplated in the Sale Agreement.  No consents or approvals, other than those expressly provided for in the Sale Agreement or this Order, are required for the Debtors to consummate the Sale.

L.     Arms'-Length Sale.  The Sale Agreement and the Ancillary Agreements were negotiated and have been and are undertaken by the Debtors and the Purchaser at arms' length without collusion or fraud, and in good faith within the meaning of Bankruptcy Code section 363(m).  As a result of the foregoing, the Debtors and the Purchaser are entitled to the protections of section 363(m) of the Bankruptcy Code.

M.     Sale Highest and Best Offer.  The total consideration provided by the Purchaser for the Assets and the EMEA Assets is the highest and best offer received by the Sellers, and the Purchase Price (as defined in the Sale Agreement) constitutes reasonably equivalent value under the Bankruptcy Code, the Uniform Fraudulent Transfer Act, the Uniform Fraudulent Conveyance Act and any other applicable laws, and may not be avoided under section 363(n) of the Bankruptcy Code.  Other than the Purchaser, no other person or entity or group of persons or entities has offered to purchase the Assets for an amount that would provide greater value to the Debtors.  The Court's approval of the Motion, the Sale Agreement and the Ancillary Agreements is in the best interests of the Debtors, their estates, their creditors and all other parties in interest.

N.     Free and Clear Findings Required by Purchaser.  The Purchaser would not have entered into the Sale Agreement and would not consummate the Sale if the sale of the Assets to the Purchaser were not free and clear of all liens, claims and interests pursuant to Bankruptcy Code section 363(f), including all Claims and Interests (each as defined below), or if the Purchaser would, or in the future could, be liable for any of such Claims and Interests.  A sale of the Assets other than one free and clear of all Claims and Interests would yield substantially less

value for the Debtors' estates, with less certainty, than the Sale as contemplated.  Therefore, the

Sale contemplated by the Sale Agreement is in the best interests of the Debtors, their estates and

creditors, and all other parties in interest.

O.     Satisfaction of Section 363(f) Standards.  The Debtors may sell the Assets free

and clear of all Claims and Interests because, with respect to each creditor asserting a Claim or

Interest, one or more of the standards set forth in Bankruptcy Code § 363(f)(1)-(5) has been

satisfied.  Those holders of Claims and Interests who did not object or who withdrew their

objections to the Sale or the Motion are deemed to have consented to the Motion and Sale

pursuant to Bankruptcy Code § 363(f)(2).  Those holders of Claims and Interests who did object

fall within one or more of the other subsections of Bankruptcy Code section 363(f).

P.     No Liability under Section 363(n).  Neither the Debtors nor the Purchaser

engaged in any conduct that would cause or permit the Sale Agreement or the consummation of

the Sale to be avoided, or costs or damages to be imposed, under section 363(n) of the

Bankruptcy Code.

Q.     No Fraudulent Transfer.  The Sale Agreement and Ancillary Agreements were not

entered into, and the Sale is not consummated, for the purpose of hindering, delaying or

defrauding creditors of the Debtors under the Bankruptcy Code or under the laws of the United

States, any state, territory, possession thereof, or the District of Columbia, or any other

applicable law.  Neither the Debtors nor the Purchaser has entered into the Sale Agreement or the

Ancillary Agreements or is consummating the Sale with any fraudulent or otherwise improper

purpose.

R.     No Successor Liability.  The Purchaser is not holding itself out to the public as a

continuation of the Debtors and is not an "insider" or "affiliate" of any of the Debtors, as those

terms are defined in the Bankruptcy Code, and no common identity of incorporators, directors or stockholders existed between the Purchaser and any of the Debtors.  Pursuant to the Sale Agreement, the Purchaser is not purchasing all of the Debtors' assets in that the Purchaser is not purchasing any of the Excluded Assets (as defined in the Sale Agreement), and the Purchaser is not holding itself out to the public as a continuation of the Debtors.  The conveyance of the Assets does not amount to a consolidation, merger or *de facto* merger of the Purchaser and the Debtors and/or Debtors' estates, there is not substantial continuity between the Purchaser and the Debtors, there is no continuity of enterprise between the Debtors and the Purchaser, the Purchaser is not a mere continuation of the Debtors or the Debtors' estates, and the Purchaser does not constitute a successor to the Debtors or the Debtors' estates.  Upon the Closing (as defined in the Sale Agreement), the Purchaser shall be deemed to have assumed only the Assumed Liabilities (as defined in the Sale Agreement).  Except for the Assumed Liabilities, the Purchaser's acquisition of the Assets shall be free and clear of any "successor liability" claims of any nature whatsoever, whether known or unknown and whether asserted or unasserted as of the Closing.  The Purchaser's operations shall not be deemed a continuation of the Debtors' business as a result of the acquisition of the Assets purchased.  The Court finds that the Purchaser would not have acquired the Assets but for the foregoing protections against potential claims based upon "successor liability" theories.

　　　　S.　　Sale as Exercise of Business Judgment.  Entry into the Sale Agreement and Ancillary Agreements constitute the exercise by the Debtors of sound business judgment, and such acts are in the best interests of the Debtors, their estates and creditors, and all parties in interest.  The Court finds that the Debtors have articulated good and sufficient business reasons justifying the Sale of the Assets to the Purchaser.  Additionally, (i) the Sale Agreement

constitutes the highest and best offer for the Assets; (ii) the Sale Agreement and the closing thereon will present the best opportunity to realize the value of the Assets and avoid further decline and devaluation of the Assets; (iii) there is risk of deterioration of the value of the Assets if the Sale is not consummated promptly; and (iv) the Sale Agreement and the closing thereon will provide a greater recovery for the Debtors' creditors than would be provided by any other presently available alternative.

T.    <u>Assumption and Assignment as Exercise of Business Judgment</u>.  The Debtors have demonstrated that it is an exercise of their sound business judgment to assume and assign the Assumed and Assigned Contracts to the Purchaser in connection with the consummation of the Sale, and the assumption, assignment, and sale of the Assumed and Assigned Contracts to the Purchaser is in the best interests of the Debtors, their estates, their creditors, and all parties in interest.  The Assumed and Assigned Contracts being assigned to the Purchaser are an integral part of the Assets being purchased by the Purchaser, and accordingly, such assumption, assignment, and sale of the Assumed and Assigned Contracts are reasonable and enhance the value of the Debtors' estates.  The cure amounts required to be paid pursuant to Bankruptcy Code section 365(b), whether agreed or judicially resolved (the "<u>Cure Amounts</u>"), are deemed to be the entire cure obligation due and owing under the Assumed and Assigned Contracts under Bankruptcy Code section 365(b).

U.    <u>Contracts Assignable</u>.  Each and every provision of the Assumed and Assigned Contracts or applicable non-bankruptcy law that purport to prohibit, restrict, or condition, or could be construed as prohibiting, restricting, or conditioning assignment of any Assumed and Assigned Contract have been satisfied or are otherwise unenforceable under Bankruptcy Code section 365.

V.     Cure Amounts Sufficient.  Upon the payment of the Cure Amount to the relevant Counterparty, there are no outstanding defaults of the Debtors and their estates under the Assumed and Assigned Contracts.

W.     Adequate Assurance.  The Purchaser has demonstrated adequate assurance of future performance of all Assumed and Assigned Contracts within the meaning of Bankruptcy Code section 365.

X.     Contracts Binding upon Purchaser.  Upon the assignment and sale to the Purchaser, the Assumed and Assigned Contracts shall be deemed valid and binding, in full force and effect in accordance with their terms, subject to the provisions of this Order.

Y.     No *Sub Rosa* Plan.  The Sale does not constitute a *sub rosa* chapter 11 plan.

**ORDERED, ADJUDGED AND DECREED THAT:**

1.     Motion is Granted.  The relief requested in the Motion is GRANTED.

2.     Objections Overruled.  All objections with regard to the relief sought in the Motion that have not been withdrawn, waived, settled or otherwise dealt with as expressly provided herein or on the record at the Sale Hearing, are hereby overruled on the merits, with prejudice.

3.     Approval.  Pursuant to Bankruptcy Code sections 105 and 363, the Sale Agreement, the Ancillary Agreements, and the Sale of the Assets are hereby approved and the Debtors are authorized to comply with the Sale Agreement and the Ancillary Agreements**, and the Alternate Bid submitted by the Alternate Bidder with a cash purchase price of $710,000,000 pursuant to the terms submitted therewith, is hereby approved and authorized as an Alternate Bid and shall remain binding as an Alternate Bid pursuant to the terms of the Bidding Procedures Order and the bid terms submitted at the Auction**.

Pursuant to sections 105 and 363 of the Bankruptcy Code, the Debtors and the Purchaser are each hereby authorized to take any and all actions necessary or appropriate to: (i) consummate the Sale of the Assets to the Purchaser and the Closing of the Sale in accordance with the Motion, the Sale Agreement and this Order; (ii) assume and assign the Assumed and Assigned Contracts; and (iii) perform, consummate, implement and close fully the Sale Agreement together with all additional instruments and documents that may be reasonably necessary or desirable to implement the Sale Agreement. The Debtors are hereby authorized to perform each of their covenants and undertakings as provided in the Sale Agreement and the Ancillary Agreements prior to or after closing without further order of the Court. **In the event that the Sale contemplated by the Sale Agreement cannot be consummated, the Alternate Bid shall be and is hereby approved, the execution of the asset sale agreement pursuant to the Alternate Bid by the Debtors is approved and the Debtors are authorized to take such additional steps and execute such additional documents, including without limitation the ancillary agreements contemplated by the Alternate Bid, as may be necessary or desirable for the completion of the Sale and for the conveyance of the Debtors' right, title and interest in and to the Assets to the Alternative Bidder.**

**4.      Authority to Effectuate Section 2.2.1(a) of the Sale Agreement.  The Debtors are hereby authorized to execute any agreements, instruments, applications, consents, or other documents, including without limitation an indenture or any amendment thereto, an underwriting agreement, purchase agreement, sale agreement, or similar agreement, which may include provisions with respect to the payment of underwriting discounts, sales commissions, or brokerage fees, and provisions relating to indemnification and contribution, that may be necessary or appropriate to effectuate Section 2.2.1(a) of the Sale**

**Agreement, subject in each case to the consent of the Committee and Bondholder Group acting in good faith. The Debtors are further authorized to take any action the Sellers may deem necessary or advisable in order to sell, replace or redeem the Convertible Notes (as defined in the Sale Agreement) at any time for cash pursuant to the Sale Agreement, in each case without further order of this Court, subject in each case to the consent of the Committee and Bondholder Group acting in good faith.**

**5.** 4. Authorization to Assume and Assign.  Pursuant to section 365(f) of the Bankruptcy Code, notwithstanding any provision of any Assumed and Assigned Contract or applicable non-bankruptcy law that prohibits, restricts, or conditions the assignment of the Assumed and Assigned Contracts, the Debtors are authorized to assume the Assumed and Assigned Contracts and to assign the Assumed and Assigned Contracts to the Purchaser, which assignment shall take place on and be effective as of the Closing or as otherwise provided by order of this Court.

**6.** 5. Assumption Conditioned upon Closing.  The Debtors' assumption of the Assumed and Assigned Contracts is subject to the consummation of the Sale of the Assets to the Purchaser.  To the extent that an objection by a Counterparty to any Assumed and Assigned Contract, including all objections related to Cure Amounts, is not resolved prior to the Closing Date (as defined in the Sale Agreement), the Debtors, in consultation with the Purchaser, may elect to (i) not assume such Assumed and Assigned Contract or (ii) postpone the assumption of such Assumed and Assigned Contract until the resolution of such objection.  Any Cure Amounts outstanding on the Closing Date shall be paid to the appropriate Counterparty as a condition subsequent to such assumption and assignment of the relevant Assumed and Assigned Contract.

**7.**    6. Transfer Free and Clear.  Upon the Closing, (a) the Debtors are hereby authorized and directed to consummate, and shall be deemed for all purposes to have consummated, the sale, transfer and assignment of all of the Debtors' right, title and interest in the Assets to the Purchaser free and clear of (i) any and all interests pursuant to section 363 of the Bankruptcy Code, including (without limitation) all liens, including any lien (statutory or otherwise), mortgage, pledge, security interest, charge, deed of trust, deemed trust, option, right of use, right of first offer or first refusal, right of setoff, hypothecation, servitude, encumbrance on real property, easement, encroachment, right-of-way, restrictive covenant on real property, real property license, prior claim, lease, conditional sale arrangement or other similar restriction of any kind (collectively, including "Liens" as defined in the Sale Agreement, the "Liens"), (ii) any and all debts, guarantees, options, contractual commitments, liabilities and obligations, whether accrued or fixed, direct or indirect, liquidated or unliquidated, absolute or contingent, matured or unmatured or determined or undeterminable, known or unknown, including any tax liability (other than Assumed Liabilities and the Permitted Encumbrances[4]) (collectively, the "Liabilities" and together with the Liens, the "Interests"), with such Claims and Interests to attach to the sale proceeds in the same validity, extent and priority as immediately prior to the Sale, subject to any rights, claims and defenses of the Debtors and other parties in interest, and (iii) any and all claims as defined in 11 U.S.C. § 101(5), rights or causes of action (whether in law or in equity), obligations, demands, restrictions, interests and matters of any kind or nature whatsoever, whether arising prior to or subsequent to the commencement of these cases, and whether imposed by agreement, understanding, law, equity or otherwise, including any "Claims" as defined in the Sale Agreement (collectively, the "Claims"), in each case other than Assumed

---

[4]    For purposes of this Order, "Permitted Encumbrances" shall have the same meaning as set forth in the Stalking Horse Agreement, but excluding clauses (i) through (iv) of such definition.

Liabilities and the Permitted Encumbrances**, with such Claims and Interests to attach to the sale proceeds in the same validity, extent and priority as immediately prior to the Sale, subject to any rights, claims and defenses of the Debtors and other parties in interest**, and (b) except as otherwise expressly provided in the Sale Agreement, all such Claims and Interests (other than Assumed Liabilities and the Permitted Encumbrances) shall not be enforceable as against the Purchaser or the Assets.

**8.**    ~~7.~~ Valid Transfer; Attachment to Sale Proceeds.  The transfer to the Purchaser of the Debtors' right, title and interest in the Assets pursuant to the Sale Agreement shall be, and hereby is deemed to be, a legal, valid and effective transfer of the Debtors' right, title and interest in the Assets, and vests with or will vest in the Purchaser all right, title and interest of the Debtors in the Assets, free and clear of all Claims and Interests of any kind or nature whatsoever (other than the Permitted Encumbrances and the Assumed Liabilities), with such Claims and Interests attaching to the sale proceeds in the same validity, extent and priority as immediately prior to the Sale, subject to any rights, claims and defenses of the Debtors and other parties in interest.

**9.**    ~~8.~~ Exculpation and Release.  None of the Purchaser or their affiliates, successors and assigns (collectively, the "Purchaser Releasees") shall have or incur any liability to, or be subject to any action by any Debtor or any of their predecessors, successors or assigns, arising out of the negotiation, investigation, preparation, execution, delivery of the Sale Agreement and the Ancillary Agreements and the entry into and consummation of the Sale, except as expressly provided in the Sale Agreement, the Ancillary Agreements, and this Order.

**10.**    ~~9.~~ Injunction.  Except as expressly provided in the Sale Agreement or by this Order, all persons and entities, including, but not limited to, all debt security holders, equity

security holders, governmental, tax and regulatory authorities, lenders, vendors, suppliers, employees, trade creditors, litigation claimants and other persons, holding Claims and Interests of any kind or nature whatsoever against or in the Debtors or the Debtors' interests in the Assets (whether known or unknown, legal or equitable, matured or unmatured, contingent or noncontingent, liquidated or unliquidated, asserted or unasserted, whether arising prior to or subsequent to the commencement of these chapter 11 cases, whether imposed by agreement, understanding, law, equity or otherwise), including, without limitation, the nondebtor party or parties to each Assumed and Assigned Contract, arising under or out of, in connection with, or in any way relating to, the Debtors, the Assets, the operation of the Debtors' businesses before the Closing, before or after the Closing regarding the operation of the Debtors' businesses not subject to the Sale, or the transfer of the Debtors' interests in the Assets to the Purchaser, including, without limitation, any default existing as of the Closing Date and any objection to the assumption and assignment of the Assumed and Assigned Contracts, shall be and hereby are forever barred, estopped and permanently enjoined from asserting, prosecuting or otherwise pursuing Claims and Interests against the Purchaser or their affiliates, successors and assigns, the Assets, or the interests of the Debtors in such Assets.  Following the Closing, no holder of an Interest against the Debtors shall interfere with the Purchaser's title to or use and enjoyment of the Debtors' interests in the Assets based on or related to such Claims and Interests, and all such Claims and Interests, if any, shall be, and hereby are transferred and attached to the proceeds from the Sale in the order of their priority, with the same validity, force and effect which they have against such Assets as of the Closing, subject to any rights, claims and defenses that the Debtors' estates and Debtors, as applicable, may possess with respect thereto.

**11.**    ~~10.~~ Obligations for Assumed and Assigned Contracts.  Upon assumption of the Assumed and Assigned Contracts by the Debtors and assignment to the Purchaser, the Assumed and Assigned Contracts shall be deemed valid and binding, in full force and effect in accordance with their terms, subject to the provisions of this Order.  As of the Closing, subject to the provisions of this Order, the Purchaser shall succeed to the entirety of Debtors' rights and obligations in the Assumed and Assigned Contracts first arising and attributable to the time period occurring on or after the Closing and shall have all rights thereunder.

**12.**    ~~11.~~ Cure Amounts for Assumed and Assigned Contracts.  Upon the ~~entry of this Order~~**Closing**, (i) all defaults (monetary and non-monetary) under the Assumed and Assigned Contracts through the Closing shall be deemed cured and satisfied through the payment of the Cure Amounts, (ii) no other amounts will be owed by the Debtors, their estates or the Purchaser with respect to amounts first arising or accruing during, or attributable or related to, the period before Closing with respect to the Assumed and Assigned Contracts, (iii) any and all persons or entities shall be forever barred and estopped from asserting a claim against the Debtors, their estates, or the Purchaser that any additional amounts are due or defaults exist under the Assumed and Assigned Contracts that arose or accrued, or relate to or are attributable to the period before the Closing.

**13.**    ~~12.~~ Good Faith Purchaser.  The Sale Agreement and Ancillary Agreements have been entered into by the Purchaser in good faith and the Purchaser is a good faith purchaser of the Assets as that term is used in Bankruptcy Code section 363(m). The Purchaser is entitled to all of the protections afforded by section 363(m) of the Bankruptcy Code.

**14.**    ~~13.~~ No Bulk Sales.  No bulk sales law or any similar law of any state or other jurisdiction shall apply in any way to the Sale.  Except as provided in the Sale Agreement, no

16

brokers were involved in consummation of the Sale, and no brokers' commissions are due to any Person in connection with the Sale.

**15.** 14. Fair and Equivalent Value.  The consideration provided by the Purchaser for the Assets under the Sale Agreement and the EMEA Assets under the EMEA Asset Sale Agreement shall be deemed for all purposes to constitute reasonably equivalent value and fair consideration under the Bankruptcy Code and any other applicable law, and the Sale may not be avoided, or costs or damages imposed or awarded under section 363(n) or any other provision of the Bankruptcy Code, the Uniform Fraudulent Transfer Act, the Uniform Fraudulent Conveyance Act or any other similar state laws.

**16.** 15. Transfer of Marketable Title.  On the Closing Date, this Order shall be construed and shall constitute for any and all purposes a full and complete general assignment, conveyance and transfer of all of the Debtors' right, title and interest in the Assets or a bill of sale transferring good and marketable title in such Assets to the Purchaser on the Closing Date pursuant to the terms of the Sale Agreement, free and clear of all Claims and Interests (other than Assumed Liabilities).

**17.** 16. Transfer Free and Clear.  Except as otherwise provided in the Sale Agreement, any and all Assets in the possession or control of any person or entity, including, without limitation, any vendor, supplier or employee of the Debtors shall be transferred to the Purchaser free and clear of all Claims and Interests (other than Assumed Liabilities) and shall be delivered at the time of Closing to the Purchaser.

**18.** 17. No Successor Liability.  The consummation of the Sale does not amount to a consolidation, merger or *de facto* merger of the Purchaser and the Debtors and/or the Debtors' estates, there is not substantial continuity between the Purchaser and the Debtors, there is no

17

continuity of enterprise between the Debtors and the Purchaser, the Purchaser is not a mere continuation of the Debtors or the Debtors' estates, and the Purchaser does not constitute a successor to the Debtor or the Debtors' estates.  Upon the Closing, the Purchaser shall be deemed to have assumed only the Assumed Liabilities.  Except for the Assumed Liabilities and Permitted Encumbrances, the Purchaser's acquisition of the Assets shall be free and clear of any "successor liability" claims of any nature whatsoever, whether known or unknown and whether asserted or unasserted as of the time of Closing.  The Purchaser's operations shall not be deemed a continuation of the Debtors' business as a result of the acquisition of the Assets purchased.

**19.**    ~~18.~~ Examples of No Successor Liability.  Upon the Closing, and except as otherwise expressly provided in the Sale Agreement, the Purchaser shall not be liable for any Claims against, and Liabilities and obligations of, the Debtors or any of the Debtors' predecessors or affiliates.  Without limiting the generality of the foregoing, and except as otherwise provided in the Sale Agreement, the Ancillary Agreements or this Order, (a) the Purchaser shall have no liability or obligation to pay wages, bonuses, severance pay, benefits (including, without limitation, contributions or payments on account of any under-funding with respect to any pension plans) or make any other payment to employees of the Debtors, (b) the Purchaser, shall have no liability or obligation in respect of any employee pension plan, employee health plan, employee retention program, employee incentive program or any other similar agreement, plan or program to which any Debtors are a party (including, without limitation, liabilities or obligations arising from or related to the rejection or other termination of any such plan, program agreement or benefit), (c) the Purchaser shall in no way be deemed a party to or assignee of any such employee benefit, agreement, plan or program, and (d) all parties to any such employee benefit, agreement, plan or program are enjoined from asserting against

the Purchaser any Claims or Interests arising from or relating to such employee benefit, agreement, plan or program.

**20.**    ~~19.~~ Release of Claims and Interests.  This Order (a) is and shall be effective as a determination that other than Permitted Encumbrances and Assumed Liabilities, all Claims and Interests of any kind or nature whatsoever existing as to the Assets prior to the Closing have been unconditionally released, discharged and terminated, and that the conveyances described herein have been effected, and (b) is and shall be binding upon and shall authorize all entities, including, all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, administrative agencies or units, governmental departments or units, secretaries of state, federal, state and local officials and all other persons and entities who may be required by operation of law, the duties of their office, or contract, to accept, file, register or otherwise record or release any documents or instruments, or who may be required to report or insure any title or state of title in or to the Assets conveyed to the Purchaser. All recorded Claims and Interests against the Assets from their records, official and otherwise shall ~~me~~**be** deemed stricken.

**21.**    ~~20.~~ Approval to Release Claims and Interests.  If any person or entity which has filed statements or other documents or agreements evidencing Liens on, or Claims or Interests in, the Assets shall not have delivered to the Debtors before the Closing, in proper form for filing and executed by the appropriate parties, termination statements, instruments of satisfaction, releases of liens and easements, and any other documents necessary for the purpose of documenting the release of all Liens which the person or entity has or may assert with respect to the Assets, the Debtors and the Purchaser are hereby authorized to execute and file such

19

statements, instruments, releases and other documents on behalf of such person or entity with respect to the Assets.

**22.** ~~21.~~ Cooperation from Counterparties.  All Counterparties to the Assumed and Assigned Contracts shall cooperate and expeditiously execute and deliver, upon the reasonable requests of the Purchaser, and shall not charge the Debtor or the Purchaser for, any instruments, applications, consents, or other documents which may be required or requested by any public or quasi-public authority or other party or entity to effectuate the applicable transfers in connection with the Sale.

**23.** ~~22.~~ Governmental Authorization to Effectuate Sale and Assignments.  Each and every federal, state and governmental agency or department, and any other person or entity, is hereby authorized to accept any and all documents and instruments in connection with or necessary to consummate the Transactions contemplated by the Sale Agreement.

**24.** ~~23.~~ No Suspension by Governmental Units.  No governmental unit may revoke or suspend any right, license, trademark or other permission relating to the use of the Assets sold, transferred or conveyed to the Purchaser on account of the filing or pendency of these chapter 11 cases or the consummation of the Sale.

**25.     Resolution of SNMP Objection.  Nothing in this Order or in the Sale Agreement or Ancillary Agreements provides for the assumption and/or assignment, whether under section 365 of the Bankruptcy Code or otherwise, by the Debtors, of any contract with SNMP Research International, Inc. ("SNMP"), and no intellectual property rights or intellectual property licensed via contracts with SNMP and Nortel are being conveyed or otherwise transferred by the Debtors pursuant to the Order, Sale Agreement or Ancillary Agreements. To the extent that the Purchaser elects to have the Debtors assign**

**to the Purchaser any contract with or intellectual property right of SNMP relating to the Assets, the Debtors and Purchaser will do so in accordance with the terms of such contract or applicable license.**

**26.    Resolution of Qwest Objection.  Notwithstanding anything in this Order or the Sale Agreement to the contrary, Purchaser shall remain liable for any and all obligations that fall due after the Closing under the Assumed and Assigned Contracts to which Qwest Communications Company, LLC or its predecessor(s) in interest or affiliate(s) (collectively, "Qwest") is a counterparty, regardless of whether such obligations accrued, relate to, or are attributable to the period prior to the Closing.  Nothing in this Order or the Sale Agreement shall enjoin or restrict Qwest from enforcing its rights under such Assumed and Assigned Contracts against Purchaser after the Closing.  In addition, nothing in this Order or the Sale Agreement shall relieve the Debtor from its obligations arising under the Assumed and Assigned Contracts to which Qwest is a counterparty through the Closing and any defaults shall be cured by the Debtor prior to Closing.**

**27.    Resolution of Verizon Objection.  For the avoidance of doubt, and notwithstanding anything to the contrary in this Order, the Purchaser has agreed to be, and shall be, responsible for obligations arising after the Closing with respect to any Assumed and Assigned Contracts (as defined in the Sale Agreement) between Nortel and the affiliates of Verizon Communications Inc. (collectively, "Verizon") to which Verizon is a Counterparty (together, the "Verizon Contracts"), and shall have the same rights after Closing with respect to the Verizon Contracts that Nortel had with respect to the Verizon Contracts prior to Closing.   In addition, for the avoidance of doubt, the Purchaser has agreed to be, and shall be, responsible for any warranties, non-cash incentives, credits,**

21

indemnifications (including for third-party intellectual property infringement claims), requirements to provide product support and maintenance services and other liabilities, in each case either arising under or relating to the Verizon Contracts, whether such duties, obligations or liabilities arose prior to, contemporaneous with or after the Closing. Furthermore, nothing in this Order shall be deemed to waive, release or extinguish any valid claim with respect to setoff that Verizon may have against the Debtors.

28.    **Resolution of Motorola Objection.** Nothing in this Order authorizes or otherwise provides for the assumption, assignment or rejection, in whole or in part, of any Objecting Party Agreement. Other than the rights and obligations between the parties to the Agreement, nothing herein or in the Agreement shall affect the rights of any party regarding an Objecting Party Agreement, all of which such rights of the Objecting Parties are hereby preserved, including without limitation the right to seek, oppose or support (a) any assumption, assignment or rejection of any Objecting Party Agreement on any legal or factual basis, (b) adequate assurance of future performance, (c) the estimation or assertion of any proposed cure amount, (d) the assumption by the Purchaser of all obligations and liabilities under any Objecting Party Agreement by virtue of the assumption and assignment of the Objecting Party Agreement under Section 365 and other applicable law, including contingent, unmatured, or unliquidated claims and whether such claims arise or arose pre- or post-closing, and (e) adequate assurance for payment of such contingent, unmatured, or unliquidated claims. For the purposes of this Order, "Objecting Party Agreement" means any written contract, agreement, license or any other document that creates binding contractual obligations between an Objecting Party and one or more Debtors; "Objecting Party" means Motorola, Inc. ("Motorola"). Nothing in this Order or

the Agreement shall prejudice, estop, bar, impair or otherwise limit in any respect any party's rights under Section 365 of the Bankruptcy Code with respect to the Objecting Party. Agreements, including, without limitation, the rights set forth above in subparts (a) through (e).

29.    **Resolution of AT&T Objection.**  For the avoidance of doubt, and notwithstanding anything to the contrary in this Order, the Purchaser has agreed to be, and shall be, responsible for obligations arising after the Closing with respect to any Assumed and Assigned Contracts (as defined in the Sale Agreement) between Nortel and AT&T Corp. and its affiliates and subsidiaries (collectively, "AT&T") to which AT&T is a Counterparty (together, the "AT&T Contracts"), and shall have the same rights after Closing with respect to the AT&T Contracts that the Debtors had with respect to the AT&T Contracts prior to Closing.   In addition, for the avoidance of doubt, the Purchaser has agreed to be, and shall be, responsible for any warranties, non-cash incentives, credits, indemnifications (including for third-party intellectual property infringement claims), requirements to provide product support and maintenance services and other liabilities, in each case either arising under or relating to the AT&T Contracts, whether such duties, obligations or liabilities arose prior to, contemporaneous with or after the Closing.

30.    **Resolution of HP Objection.**  Nothing in this Order provides for the assumption and assignment of any contract or license with Hewlett Packard, Inc. ("HP") pursuant to section 365 of the Bankruptcy Code. To the extent that the Purchaser elects to have the Debtors assume and assign to the Purchaser any contract with HP relating to the Assets, in whole or in part, the Debtors and Purchaser will do so in accordance with the

terms of such contract or license or in any manner otherwise in accordance with applicable law, including section 365 of the Bankruptcy Code.

31.      Resolution of Concerns Expressed by OSS.  Nothing in this Order provides for the assumption and assignment of any contract or license with Open Systems Solutions, Inc. ("OSS") pursuant to section 365 of the Bankruptcy Code.  To the extent that the Purchaser elects to have the Debtors assign to the Purchaser any contract with OSS relating to the Purchased Assets, in whole or in part, the Debtors and Purchaser will do so in accordance with the terms of such contract or license, which terms include, inter alia, the written consent of OSS.  In addition, nothing in this Order permits or may be construed to permit Purchaser any right to access or to use or to have the right to use OSS' license and/or software in connection with the Purchased Assets.

32.      Resolution of the MatlinPatterson Objection.  The Sellers and the Purchaser have agreed to amend and restate Section 2.2.1(a) of the Sale Agreement as follows:

(a) Pursuant to the terms and subject to the conditions set forth in this Agreement, in consideration of the purchase, sale, assignment and conveyance of the Sellers' and EMEA Sellers' right, title and interest in, to and under the Assets and the EMEA Assets, respectively, pursuant to the terms hereof and pursuant to the terms of the EMEA Asset Sale Agreement, respectively, and of the rights granted by certain Sellers and the EMEA Sellers under the Intellectual Property License Agreement and the Trademark License Agreement, the Purchaser, on its own behalf and as agent for the relevant Designated Purchasers, shall (i) assume and become obligated to pay, perform and discharge, when due, the Assumed Liabilities and the EMEA Assumed Liabilities, (ii) subject to adjustment following the Closing in accordance with Section 2.2.4.2, pay to the Distribution Agent an amount of cash (the "Cash Purchase Price") equal to Five Hundred Thirty Million dollars ($530,000,000) (the "Base Cash Purchase Price") less the Escrow Amount and as adjusted pursuant to Sections 2.2.2 and 2.2.4 and Section 5.28 of the Sellers Disclosure Schedule or as otherwise expressly provided herein, in the Real Estate Terms and Conditions or in the EMEA Asset Sale Agreement, and (iii) subject to Section 2.2.7, issue to the Distribution Agent, as agent for the Sellers and the EMEA Sellers, $239,000,000 aggregate principal amount (the "Aggregate Principal

**Amount") of 6.0% Senior Notes due June 15, 2017 (the "Convertible Notes", and together with the Cash Purchase Price, as adjusted, the "Purchase Price") convertible at the holder's option into Common Stock at a conversion price equal to $16.4625 (the "Conversion Price"), subject to adjustments contemplated in the Indenture; provided, however, that the Purchaser may, by written notice to the Sellers on or before the Closing Date, elect to increase the Cash Purchase Price and the Base Cash Purchase Price payable pursuant to clause (ii) above by ~~up to the Aggregate Principal Amount~~an amount equal to $1,020.00 in cash in lieu of issuing ~~the~~each corresponding ~~face~~$1,000.00 in principal amount of the Convertible Notes (such election, if exercised, the "Cash Replacement Election"); provided further, that if the Market Value of the Common Stock on the date of the notice of such election (or in the case the replacement is made with the proceeds of a simultaneous convertible security offering the most recent closing price per share of the Common Stock on the NASDAQ Global Select Market at the time such convertible security offering is priced) is equal to or greater than $17.00 per share of Common Stock, then in lieu of increasing the Cash Purchase Price by the Aggregate Principal Amount~~as provided above such increase will equal the Optional Redemption Price corresponding to such Aggregate Principal Amount.**

**33.** ~~24.~~ Inconsistencies with Prior Orders, Pleadings or Agreements. To the extent this Order is inconsistent with any prior order or pleading with respect to the Motion in these chapter 11 cases, the terms of this Order shall govern. To the extent there is any inconsistency between the terms of this Order and the terms of the Sale Agreement (including all ancillary documents executed in connection therewith), the terms of this Order shall govern.

**34.** ~~25.~~ Assets of Non-Debtors. This Order applies only to Assets owned by the Debtors. Consequently, notwithstanding any other provision of this Order or the Sale Agreement to the contrary, the portions of this Order that approve the transfer of Assets to the Purchaser free and clear of all liens and other encumbrances, or that modify, enjoin, release or otherwise limit the rights of creditors of entities transferring Assets, apply only to Assets owned by the Debtors and do not apply to any Assets owned by non-debtor entities.

**35.** ~~26.~~ Effect upon Property of the Estates other than Assets. Except as expressly provided in the Sale Agreement or the Ancillary Agreements, nothing in this Order shall be

deemed to waive, release, extinguish or estop the Debtors or their estates from asserting or

otherwise impair or diminish any right (including without limitation any right of recoupment),

claim, cause of action, defense, offset or counterclaim in respect of any asset that is not a

Purchased Asset.

**36.**    27. Fees, Expenses, and other Obligations.  Any amounts that become payable by

the Debtors to the Purchaser pursuant to the Sale Agreement or any of the documents delivered

by the Debtors pursuant to or in connection with the Sale Agreement, including any indemnity

obligations under the Sale Agreement shall (a) constitute administrative expenses of the Debtors'

estates within the meaning of section 503(b) of the Bankruptcy Code, and (b) be paid by the

Debtors in the time and manner as provided in the Sale Agreement without further order of this

Court.

**37.**    28. Subsequent Orders and Plan Provisions.  This Order shall not be modified by

any chapter 11 plan confirmed in these chapter 11 cases or subsequent order of this Court unless

expressly consented to in writing by the Purchaser.

**38.**    29. Binding Effect of Order.  This Order and the Sale Agreement shall be binding

in all respects upon all creditors and interest holders of any of the Debtors, all non-debtor parties

to the Assumed and Assigned Contracts, the Committee, all successors and assigns of the

Debtors and their affiliates and subsidiaries, and any trustees, examiners, "responsible persons"

or other fiduciaries appointed in the Debtors' bankruptcy chapter 11 cases or upon a conversion

to chapter 7 under the Bankruptcy Code, and the Sale Agreement shall not be subject to rejection

or avoidance under any circumstances.

**39.**    30. Failure to Specify Provisions.  The failure specifically to include or make

reference to any particular provisions of the Sale Agreement or any Ancillary Agreement in this

Order shall not diminish or impair the effectiveness of such provision, it being the intent of the

Court that the Sale Agreement and the Ancillary Agreements are authorized and approved in

their entirety.

**40.**    ~~31.~~ Retention of Jurisdiction.  The Court retains jurisdiction with respect to all

matters arising from or related to the implementation of this Order, including, without limitation,

the authority to:  (i) interpret, implement and enforce the terms and provisions of this Order

(including the injunctive relief provided in this Order) and the terms of the Sale Agreement, the

Ancillary Agreements, all amendments thereto and any waivers and consents thereunder; (ii)

protect the Purchaser, or the Assets, from and against any of the Claims or Interests; (iii) compel

delivery of all Assets to the Purchaser; (iv) compel the Purchaser to perform all of its obligations

under the Sale Agreement; and (v) resolve any disputes arising under or related to the Sale

Agreement, the Ancillary Agreements, or the Sale.

**41.**    ~~32.~~ No Material Modifications.  The Sale Agreement, the Ancillary Agreements

and any related agreements, documents or other instruments may be modified, amended, or

supplemented through a written document signed by the parties thereto in accordance with the

terms thereof without further order of the Court; provided, however, that any such modification,

amendment or supplement is neither material nor materially changes the economic substance of

the transactions contemplated hereby (it being understood, for the sake of clarity, that no such

modification, amendment or supplement shall be deemed to be material or shall be deemed to

materially change the economic substance of the transactions to the extent that the impact does

not exceed two percent of the Purchase Price (as defined in the Sale Agreement)); and provided

further that no such modifications, amendments, or supplements may be made except following

two (2) days written notice to, or with the prior consent of, the Committee, c/o Akin Gump

Strauss Hauer & Feld LLP, One Bryant Park, New York, NY 10036 (Attention:  Fred Hodara,

Stephen Kuhn, and Kenneth Davis).

**42.**    ~~33.~~ Immediate Effect.  Notwithstanding any provision in the Bankruptcy Rules to

the contrary, (i) the terms of this Order shall be immediately effective and enforceable upon its

entry, (ii) the Debtors are not subject to any stay in the implementation, enforcement or

realization of the relief granted in this Order, and (iii) the Debtors may, in their discretion and

without further delay, take any action and perform any act authorized under this Order.

**43.**    ~~34.~~ Provisions Non-Severable.  The provisions of this order are nonseverable and

mutually dependent.

**44.    Allocation of Risks and Costs of Providing Transition Services.  The U.S.**

**Debtors and the Canadian Debtors (together, the "North American Debtors") recognize**

**that the provision of transition services by each of the North American Debtors under the**

**transition services agreements related to the Sale of the MEN Business and the sales of the**

**other principal lines of Nortel's business are and will be provided by a business**

**organization that operates on a cross-jurisdictional basis using personnel and assets of**

**several of the North American Debtors, including, without limitation NNI and NNL.  In**

**light of the foregoing and in order to address certain concerns raised by the Committee and**

**the Monitor, the North American Debtors have agreed to allocate certain risks and costs of**

**providing such transition services, acting reasonably, including, without limitation, consent**

**fees and segregation costs, sunset costs, indemnification claims and under-recoveries from**

**the respective purchasers, in the same proportion as the "Sales Proceeds" of such sales to**

**each of the North American Debtors are allocated  (as determined in accordance with the**

**"Interim Sale Protocol" contemplated by the Interim Funding and Settlement Agreement**

28

**or mutual agreement of the relevant "Selling Debtors" (as such terms are defined in the Interim Funding and Settlement Agreement)), and that the side agreement reflecting the foregoing shall be on such terms and conditions as the North American Debtors may agree not inconsistent with the foregoing, acting promptly and in good faith and subject to the consent of the Committee, the Bondholder Group and the Monitor.**

**45.** ~~35.~~ Allocation.  The Purchaser shall deposit proceeds of the Sale, subject to the price adjustments and Purchaser's rights under the Sale Agreement and less applicable transfer or value-added taxes incurred by the Sellers and the EMEA Sellers, and, to the extent agreed by the Sellers and the EMEA Sellers, any transaction costs, into an Escrow Account (as **such term is** defined in the Interim Funding and Settlement Agreement, dated June 9, 2009 (the "IFSA")). In accordance with this Court's order approving and authorizing the transactions contemplated by the IFSA, the proceeds in the Escrow Account shall not be distributed in advance of either (a) agreement of all of the ~~Sellers and the EMEA Sellers~~**Selling Debtors (as defined in the IFSA)** as to the distribution of such proceeds (subject to the prior consent of the Committee and the Bondholder Group acting in good faith in accordance with **the IFSA and subject to the requirements of** Section 12.g~~.~~ of the IFSA) or (b) in the case where the ~~Sellers and the EMEA Sellers~~**Selling Debtors** fail to reach agreement, determination by the relevant dispute resolver(s) in accordance with the terms of the Interim Sales Protocol (as such term is defined in the IFSA and subject to the requirements of Section 12.g of the IFSA), which Interim Sales Protocol shall be approved by the Court.  **The Debtors are hereby authorized to negotiate and enter into an escrow agreement, on terms and conditions reasonably satisfactory to the Committee and the Monitor acting in good faith, with an escrow agent to establish an Escrow Account without further order of this Court.**

Dated: _____, 2009
      Wilmington, Delaware

_____
THE HONORABLE KEVIN GROSS
UNITED STATES BANKRUPTCY JUDGE