**<u>Exhibit A</u>**

**Amended and Restated Asset Sale Agreement**

AMENDED AND RESTATED ASSET SALE AGREEMENT

BY AND AMONG

NORTEL NETWORKS CORPORATION

NORTEL NETWORKS LIMITED

NORTEL NETWORKS INC.

AND

THE OTHER ENTITIES IDENTIFIED HEREIN AS SELLERS

AND

CIENA CORPORATION

DATED AS OF NOVEMBER 24, 2009

**TABLE OF CONTENTS**

Page

**ARTICLE I INTERPRETATION** ................................................................................ 3
SECTION 1.1. DEFINITIONS. ..................................................................................... 3
SECTION 1.2. INTERPRETATION. ........................................................................... 35
**ARTICLE II PURCHASE AND SALE OF ASSETS** ..................................................... 36
SECTION 2.1. PURCHASE AND SALE. ..................................................................... 36
SECTION 2.2. PURCHASE PRICE. ............................................................................ 47
SECTION 2.3. CLOSING. ............................................................................................ 56
SECTION 2.4. DESIGNATED PURCHASER(S). ....................................................... 59
**ARTICLE III REPRESENTATIONS AND WARRANTIES OF THE PURCHASER** ..... 60
SECTION 3.1. ORGANIZATION AND CORPORATE POWER. ................................ 60
SECTION 3.2. AUTHORIZATION; BINDING EFFECT; NO BREACH. ................... 60
SECTION 3.3. AVAILABILITY OF FUNDS. .............................................................. 61
SECTION 3.4. ADEQUATE ASSURANCE OF FUTURE PERFORMANCE. ............ 61
SECTION 3.5. PURCHASER'S ACKNOWLEDGMENTS; EXCLUSIVITY OF
               REPRESENTATIONS AND WARRANTIES. ..................................... 61
SECTION 3.6. BROKERS. ............................................................................................ 63
SECTION 3.7. REPRESENTATIONS AND WARRANTIES RELATING TO THE
               SHARES. ........................................................................................... 63
**ARTICLE IV REPRESENTATIONS AND WARRANTIES OF THE SELLERS** ............ 65
SECTION 4.1. ORGANIZATION AND CORPORATE POWER. ................................ 65
SECTION 4.2. AUTHORIZATION; BINDING EFFECT; NO BREACH. ................... 66
SECTION 4.3. TITLE TO TANGIBLE ASSETS; SUFFICIENCY OF ASSETS. ......... 66
SECTION 4.4. MATERIAL CONTRACTS. .................................................................. 67
SECTION 4.5. INTELLECTUAL PROPERTY ............................................................ 69
SECTION 4.6. LITIGATION. ....................................................................................... 72
SECTION 4.7. FINANCIAL STATEMENTS. ............................................................... 72
SECTION 4.8. COMPLIANCE WITH LAWS; CONSENTS. ....................................... 73
SECTION 4.9. REAL PROPERTY. ............................................................................... 73
SECTION 4.10. LABOR AND EMPLOYEE BENEFITS MATTERS. .......................... 74
SECTION 4.11. BROKERS. ........................................................................................... 76
SECTION 4.12. TAXES. ................................................................................................ 76
SECTION 4.13. ENVIRONMENTAL MATTERS. ........................................................ 77
SECTION 4.14. UNDISCLOSED LIABILITIES. ......................................................... 78
SECTION 4.15. RELIANCE ON EXEMPTION FROM REGISTRATION UNDER
                SECTION 4(2) OF THE SECURITIES ACT. .................................... 78
SECTION 4.16. REPRESENTATIONS AND WARRANTIES BY THE OTHER
                SELLERS. ........................................................................................ 80
**ARTICLE V COVENANTS AND OTHER AGREEMENTS** .......................................... 81
SECTION 5.1. U.S. BANKRUPTCY ACTIONS. .......................................................... 81
SECTION 5.2. CANADIAN BANKRUPTCY ACTIONS. ............................................ 82

i

**TABLE OF CONTENTS**

Page

SECTION 5.3. CONSULTATION; NOTIFICATION; COOPERATION; SOLICITATION. ........................................................................... 83
SECTION 5.4. PRE-CLOSING COOPERATION. ................................................ 84
SECTION 5.5. ANTITRUST AND OTHER REGULATORY APPROVALS. ......... 85
SECTION 5.6. PRE-CLOSING ACCESS TO INFORMATION. ........................... 88
SECTION 5.7. PUBLIC ANNOUNCEMENTS. ................................................... 90
SECTION 5.8. FURTHER ACTIONS. ................................................................. 90
SECTION 5.9. CONDUCT OF BUSINESS. ........................................................ 91
SECTION 5.10. TRANSACTION EXPENSES. ..................................................... 93
SECTION 5.11. CONFIDENTIALITY. ................................................................. 93
SECTION 5.12. DISCLOSURE SCHEDULES AND CERTAIN INFORMATION. .............. 95
SECTION 5.13. CERTAIN PAYMENTS OR INSTRUMENTS RECEIVED FROM THIRD PARTIES. .......................................................................... 95
SECTION 5.14. NON-ASSIGNABLE CONTRACTS. ........................................... 96
SECTION 5.15. BUNDLED CONTRACTS. .......................................................... 96
SECTION 5.16. POST-CLOSING ASSISTANCE FOR LITIGATION. .................... 98
SECTION 5.17. TANGIBLE ASSET REMOVAL. ................................................. 99
SECTION 5.18. TERMINATION OF OVERHEAD AND SHARED SERVICES AND INTERCOMPANY LICENSING ARRANGEMENTS. .................................. 99
SECTION 5.19. FINANCING. ............................................................................. 100
SECTION 5.20. INSURANCE MATTERS. ........................................................... 100
SECTION 5.21. SELLERS DEPOSITS, GUARANTEES AND OTHER CREDIT SUPPORT OF THE BUSINESS. .................................................... 102
SECTION 5.22. USE OF SELLERS' TRADEMARKS. ......................................... 103
SECTION 5.23. ACCESSIBLE INFORMATION. ................................................. 103
SECTION 5.24. MAINTENANCE OF BOOKS AND RECORDS. .......................... 103
SECTION 5.25. CERTAIN ANCILLARY AGREEMENTS. .................................. 104
SECTION 5.26. ADDITIONAL FINANCIAL STATEMENTS. .............................. 105
SECTION 5.27. SECURITIES COMPLIANCE. ................................................... 106
SECTION 5.28. TRANSITION SERVICES. ......................................................... 106
SECTION 5.29. STANDSTILL PERIOD. ............................................................. 106
SECTION 5.30. HAZARDOUS MATERIALS AT THE CARLING PROPERTY. ............... 107
SECTION 5.31. MONTREAL PREMISES AND OTHER REAL ESTATE. .............. 108
SECTION 5.32. RIGHT TO EXCLUDE. ............................................................. 108
SECTION 5.33. AUTHORIZATION OF SHARES. ............................................... 109
SECTION 5.34. PATENT ASSIGNMENTS. ......................................................... 109
SECTION 5.35. INDIA. ..................................................................................... 109
SECTION 5.36. NO VOTE. ................................................................................ 109
SECTION 5.37. DEPOSIT. ................................................................................. 110

**ARTICLE VI TAX MATTERS** .......................................................................... **110**
SECTION 6.1. TRANSFER TAXES. ................................................................... 110
SECTION 6.2. WITHHOLDING TAXES. ............................................................ 112
SECTION 6.3. TAX CHARACTERIZATION OF PAYMENTS UNDER THIS AGREEMENT. ....................................................................... 112

ii

**TABLE OF CONTENTS**

Page

SECTION 6.4. APPORTIONMENT OF TAXES. ................................................. 113
SECTION 6.5. TAX RECORDS. ..................................................................... 115
SECTION 6.6. COOPERATION. ..................................................................... 116
SECTION 6.7. NORTH AMERICAN TAX ESCROW. ........................................ 116
SECTION 6.8. EMEA TAX ESCROW. ............................................................ 118
SECTION 6.9. ITALIAN TAX ESCROW........................................................... 119
**ARTICLE VII EMPLOYMENT MATTERS ..................................................... 122**
SECTION 7.1. EMPLOYMENT OBLIGATIONS WITH RESPECT TO NON-UNION
                        EMPLOYEES. ............................................................... 122
SECTION 7.2. EMPLOYMENT OBLIGATIONS WITH RESPECT TO UNION
                        EMPLOYEES. ............................................................... 127
SECTION 7.3. EXCLUDED EMPLOYEE LIABILITIES........................................ 127
SECTION 7.4. OTHER EMPLOYEE COVENANTS. ........................................... 128
SECTION 7.5. CANADIAN PENSION PLANS. ................................................. 130
SECTION 7.6. SOLE BENEFIT OF SELLERS AND PURCHASER................................ 132
**ARTICLE VIII REGISTRATION AND SALE OF CONVERTIBLE NOTES ............. 132**
SECTION 8.1. SHELF REGISTRATION. ......................................................... 132
SECTION 8.2. OFFERINGS. ........................................................................ 134
SECTION 8.3. PIGGYBACK REGISTRATION................................................... 135
SECTION 8.4. NO INCONSISTENT AGREEMENTS. ......................................... 136
SECTION 8.5. REGISTRATION PROCEDURES. ............................................... 137
SECTION 8.6. COOPERATION BY MANAGEMENT........................................... 141
SECTION 8.7. REGISTRATION EXPENSES AND LEGAL COUNSEL. ................... 142
SECTION 8.8. INDEMNIFICATION. .............................................................. 142
SECTION 8.9. TRADING LIMITATION. ......................................................... 144
SECTION 8.10. AGENT OF SELLERS............................................................. 144
SECTION 8.11. LIQUIDATED DAMAGES........................................................ 144
**ARTICLE IX CONDITIONS TO THE CLOSING .............................................. 145**
SECTION 9.1. CONDITIONS TO EACH PARTY'S OBLIGATION. ....................... 145
SECTION 9.2. CONDITIONS TO SELLERS' OBLIGATION. ............................... 146
SECTION 9.3. CONDITIONS TO PURCHASER'S OBLIGATION........................... 146
**ARTICLE X TERMINATION ...................................................................... 147**
SECTION 10.1. TERMINATION. ................................................................... 147
SECTION 10.2. TERMINATION PAYMENTS..................................................... 148
SECTION 10.3. EFFECTS OF TERMINATION. ................................................. 149
**ARTICLE XI MISCELLANEOUS .................................................................. 150**
SECTION 11.1. SURVIVAL OF REPRESENTATIONS AND WARRANTIES OR
                        COVENANTS................................................................ 150
SECTION 11.2. REMEDIES........................................................................... 150
SECTION 11.3. THIRD-PARTY BENEFICIARIES. ............................................ 150
SECTION 11.4. CONSENT TO AMENDMENTS; WAIVERS................................. 151
SECTION 11.5. SUCCESSORS AND ASSIGNS.................................................. 151

iii

**TABLE OF CONTENTS**

SECTION 11.6. GOVERNING LAW; SUBMISSION TO JURISDICTION; WAIVER
     OF JURY TRIAL. ....................................................................................... 151
SECTION 11.7. NOTICES................................................................................... 152
SECTION 11.8. EXHIBITS; SELLERS DISCLOSURE SCHEDULE................................... 155
SECTION 11.9. COUNTERPARTS........................................................................... 155
SECTION 11.10. NO PRESUMPTION........................................................................ 155
SECTION 11.11. SEVERABILITY............................................................................ 155
SECTION 11.12. ENTIRE AGREEMENT.................................................................... 156
SECTION 11.13. AVAILABILITY OF EQUITABLE RELIEF. ......................................... 156
SECTION 11.14. BULK SALES LAWS. .................................................................... 157
SECTION 11.15. MAIN SELLERS AS REPRESENTATIVES OF OTHER SELLERS........ 157
SECTION 11.16. OBLIGATIONS OF SELLERS. .......................................................... 157
SECTION 11.17. EXECUTION BY OTHER SELLERS..................................................... 157

## EXHIBITS

Exhibit A – Other Sellers

Exhibit B – EMEA Sellers

Exhibit C – Canadian Debtors; U.S. Debtors; Israeli Company; Non-Debtor Sellers; EMEA Debtors

Exhibit D – Original EMEA Asset Sale Agreement

Exhibit D-1 -- Deed of Amendment

Exhibit E – EMEA Amendment Agreement

Exhibit F – Intellectual Property License Agreement

Exhibit G – Knowledge of the Purchaser

Exhibit H – Intentionally Omitted

Exhibit I – Loaned Employee Agreement

Exhibit J – Intentionally Omitted

Exhibit K – Intentionally Omitted

Exhibit L-1 – Lab 10 Lease Agreement

Exhibit L-2 – Carling Property Non-Disturbance Agreements

Exhibit M –Intentionally Omitted

Exhibit N – Intentionally Omitted

Exhibit O – Intentionally Omitted

Exhibit P – Trademark License Agreement

Exhibit Q – Transition Services Agreement

Exhibit R – Intentionally Omitted

Exhibit S – Intentionally Omitted

Exhibit T – Intentionally Omitted

Exhibit U – Intentionally Omitted

Exhibit V – Form of Assignment of Patent Rights

Exhibit W –Form of Assignment of Trademark Rights

Exhibit X  – Restricted Seller Revenue

Exhibit Y – Real Estate Terms and Conditions

Exhibit Z – Flextronics Back-to-Back Supply Agreement Term Sheet

Exhibit AA - Deposit Escrow Agreement

Exhibit 1.1 – Contract Manufacturing Inventory Agreements (Term Sheet)

Exhibit 2.1.1 – Sellers and Purchaser

Exhibit 2.2.1(b)(ii) – Related Share Adjustment Table

Exhibit 2.2.1(b)(iii) – Conversion Rate Table

Exhibit 5.1(a) – Forms of U.S. Bidding Procedures Order and U.S. Sale Order

Exhibit 5.2.1 – Form of Canadian Sales Process Order

Exhibit 5.2.2 – Form of Canadian Approval and Vesting Order

Exhibit 5.9 – Purchaser's Representatives for Interim Covenants Consents

Exhibit 5.12 – Purchaser's Representatives for Sellers Disclosure Schedule and Certain Information Updates

## SELLERS DISCLOSURE SCHEDULE

Section 1.1(a) – Contract Manufacturers

Section 1.1(b) – Persons Having Knowledge

Section 1.1(d) – Nortel Accounting Principles

Section 1.1(e) – Owned Equipment

Section 1.1(g) – Permitted Encumbrances

Section 1.1(h) – Products

Section 1.1(i) – Seller Contracts

Section 1.1(j) – Services

Section 1.1(k) – Patents

Section 1.1(l) – Trademarks

Section 1.1(m) – Seconded Employees

Section 2.1.1(g) – Seller Consents

Section 2.1.2(n) – Excluded Assets

Section 2.1.3(c) – Assumed Intellectual Property Liabilities

Section 2.1.3(i) – Assumed Specified Employee Liabilities

Section 2.1.4(n) – Other Excluded Liabilities

Section 2.1.5(a) – 365 Vendor Contracts

Section 2.1.5(b) – 365 Customer Contracts

Section 2.1.6(a) – Other Vendor Contracts

Section 2.1.6(b) – Non-Assignable Contracts with Suppliers

Section 2.1.6(c) – Designated Other Customer Contracts

Section 2.1.6(d) – Designated Non-Assignable Customer Contracts

Section 2.1.7(a) – Cure Costs

Section 2.1.7(b) – Payment of Cure Costs

Section 2.1.7(c) – Customer Contract Cure Costs

Section 2.2.3(d) – Manner for Exclusion of Sellers

Section 2.2.7(a) – Allocations for Shares

Section 4.3(c)(i) – Inbound License Agreements and Patent Cross Licenses

Section 4.3(c)(ii) – Other Assets and Rights

Section 4.4(a) – Material Customer and Supplier Contracts

Section 4.4(b) – Material Seller Contracts

Section 4.5(b) – Transferred Intellectual Property

Section 4.5(h) – Infringement

Section 4.5(j)(i) – Patent Cross Licenses

Section 4.5(j)(ii) – Inbound License Agreements

Section 4.5(j)(iii) – Outbound License Agreements

Section 4.5(k) – Open Source Software

Section 4.6 – Litigation

Section 4.7 – Financial Statements

Section 4.8 – Compliance with Laws

Section 4.9(a)(i) – Owned Real Property

Section 4.9(a)(ii) – Leased Real Property

Section 4.9(a)(iii) – 6-Month Locations

Section 4.9(a)(iv) – Short-Term Licensed Property

Section 4.9(a)(v) – Locations where Owned Assets Located

Section 4.10(a)(i) – Seller Employee Plans

Section 4.10(b) – Employee Information

Section 4.10(c) – Strike, Material Grievance, Work Stoppage

Section 4.10(d) – Collective Labor Agreements

Section 4.10(e) – Multiemployer Plans

Section 4.12(c) –Deficiency for Material Amount of Taxes

Section 5.9 – Conduct of Business in the Ordinary Course Exceptions

Section 5.15 – Bundled Contracts

Section 5.21(a) – Security Deposits

Section 5.28 – Covenants in respect of Transition Services

Section 5.35 - India

Section 7.1.1(a) – Employees Transferring by Operation of Law

Section 7.1.1(c) – Countries with Ten or More Employees

Section 7.1.2(b)(ii)(B) – Accrued Amounts Owing to Specified Transferred Employees

Section 7.1.2(b)(iv) – Australia Long Service Leave and Sick Leave

Section 11.15(a)(i) – Appointment of NNC as Representative

Section 11.15(a)(ii) – Appointment of NNL as Representative

Section 11.15(a)(iii) – Appointment of NNI as Representative

## AMENDED AND RESTATED ASSET SALE AGREEMENT

This Amended and Restated Asset Sale Agreement is dated as of November 24, 2009, among Nortel Networks Corporation, a corporation organized under the laws of Canada ("**NNC**"), Nortel Networks Limited, a corporation organized under the laws of Canada ("**NNL**"), Nortel Networks Inc., a corporation organized under the laws of Delaware ("**NNI**" and, together with NNC and NNL, the "**Main Sellers**"), the affiliates of the Main Sellers listed in Exhibit A hereto (the "**Other Sellers**" and, together with the Main Sellers, the "**Sellers**") and Ciena Corporation, a corporation organized under the laws of Delaware (the "**Purchaser**").

**WHEREAS**, the Sellers and the affiliates of the Main Sellers listed in Exhibit B hereto (the "**EMEA Sellers**") beneficially own and operate, respectively, the Business (as defined below);

**WHEREAS**, on the Petition Date (as defined herein), NNC, NNL and the Other Sellers listed in part 1 of Exhibit C hereto (together, the "**Canadian Debtors**") filed with the Canadian Court (as defined below) an application for protection under the Companies' Creditors Arrangement Act (the "**CCAA**") (the proceedings commenced by such application, the "**CCAA Cases**") and were granted certain initial creditor protection pursuant to an order issued by the Canadian Court on the same date, which also appointed Ernst & Young Inc. as "**Monitor**" in connection with the CCAA Cases and has been extended by further order of the Canadian Court from time to time, most recently on July 30, 2009, as the same may be amended and restated from time to time by the Canadian Court.

**WHEREAS**, NNI and the Other Sellers listed in part 2 of Exhibit C hereto (the "**U.S. Debtors**") are debtors-in-possession under the U.S. Bankruptcy Code (as defined below) which commenced cases under Chapter 11 of the U.S. Bankruptcy Code on the Petition Date by filing voluntary petitions for relief in the U.S. Bankruptcy Court for the District of Delaware (the "**Chapter 11 Cases**");

**WHEREAS**, the EMEA Debtors (as defined below) on the Petition Date filed applications with the English Court (as defined below), pursuant to the Insolvency Act of 1986, as amended (the "**Insolvency Act**") and the European Union's Council Regulation (EC) No. 1346/2000 on Insolvency Proceedings (the proceedings commenced by such applications, the "**EMEA Cases**") and the English Court appointed Alan Bloom, Stephen Harris, Christopher Hill and Alan Hudson of Ernst & Young LLP as joint administrators of all the EMEA Debtors (other than Nortel Networks (Ireland) Limited, for which David Hughes of Ernst & Young Chartered Accountants and Alan Bloom serve as joint administrators) (the "**Joint Administrators**") under the Insolvency Act;

**WHEREAS**, the entity listed under the heading "Israeli Company" in part 3 of Exhibit C hereto (the "**Israeli Company**") on January 18, 2009 filed an application with the Tel-Aviv-Jaffa District Court, pursuant to the Israeli Companies Law, 1999, and the regulations relating thereto (collectively, the "**Israeli Companies Law**") for a stay of proceedings, and the Israeli Court appointed Yaron Har-Zvi and Avi D. Pelossof (the "**Joint Israeli Administrators**") on January 19, 2009, as joint administrators of the Israeli Company under the Israeli Companies Law;

WHEREAS, on May 28, 2009, the Commercial Court of Versailles, France ordered the commencement of secondary proceedings and the appointment of a French administrator in respect of Nortel Networks S.A.;

WHEREAS, on July 14, 2009, Nortel Networks (CALA) Inc. commenced a case under Chapter 11 of the U.S. Bankruptcy Code by filing a voluntary petition for relief in the U.S. Bankruptcy Court for the District of Delaware;

WHEREAS, the Other Sellers listed in part 4 of Exhibit C hereto (the "Non-Debtor Sellers") are not subject to any Bankruptcy Proceedings (as defined below) as of the date hereof;

WHEREAS, the Sellers have agreed to transfer to the Purchaser and/or the Designated Purchasers (as defined below) and the Purchaser has agreed to purchase and assume, and cause the Designated Purchasers to purchase and assume, including, to the extent applicable, pursuant to Sections 363 and 365 of the U.S. Bankruptcy Code and pursuant to the Canadian Approval and Vesting Order, the Assets and the Assumed Liabilities (each as defined below) from the Sellers upon the terms and conditions set forth hereinafter;

WHEREAS, the Sellers and the Purchaser previously entered into that certain Asset Sale Agreement, dated as of October 7, 2009 (the "Original Asset Sale Agreement"), pursuant to which the Purchaser was selected as the stalking horse bidder for the purposes of the Auction (as defined below);

WHEREAS, simultaneously with the execution of the Original Asset Sale Agreement, the EMEA Sellers, the Joint Administrators, the Joint Israeli Administrators and the Purchaser entered into a separate agreement in the form set forth in Exhibit D hereto (the "Original EMEA Asset Sale Agreement") providing for the sale to the Purchaser (or the EMEA Designated Purchasers (as defined therein)) of the EMEA Assets (as defined below), the Original EMEA Asset Sale Agreement being amended by a Deed of Amendment dated October 20, 2009 in the form set forth in Exhibit D-1 hereto;

WHEREAS, on November 20-22, 2009, the Auction was held, during which time the Sellers and the Purchaser agreed to modify a number of terms in connection with the Sellers' selection of the Purchaser as the Successful Bidder (as defined below) at the Auction;

WHEREAS, the Purchaser and the Sellers desire to amend and restate the Original Asset Sale Agreement in its entirety to incorporate the terms agreed to in connection with the Sellers' selection of the Purchaser as the Successful Bidder at the Auction;

WHEREAS, simultaneously with the execution of this Agreement, the EMEA Sellers, the Joint Administrators, the Joint Israeli Administrators and the Purchaser are entering into an amendment agreement to amend further the Original EMEA Asset Sale Agreement to incorporate the terms agreed to in connection with the Sellers' selection of Purchaser as the Successful Bidder at the Auction (the "EMEA Amendment Agreement" a form of which is set forth in Exhibit E hereto);

2

**WHEREAS**, the Parties (as defined below) acknowledge and agree that the purchase by the Purchaser (and the Designated Purchasers, if any) of the Assets and the EMEA Assets, the license of Intellectual Property rights under the Intellectual Property License Agreement and the Trademark License Agreement (each as defined below), and the assumption by the Purchaser and the Designated Purchasers of the Assumed Liabilities and the EMEA Assumed Liabilities (as defined below) are being made at arm's length and in good faith and without intent to hinder, delay or defraud creditors of the Sellers and their Affiliates and each Seller acknowledges that the consideration to be paid is fair value and reasonably equivalent value for the acquisitions by the Purchaser and the Designated Purchasers of the Assets and the EMEA Assets, the license of Intellectual Property rights under the Intellectual Property License Agreement and the Trademark License Agreement and the assumption by the Purchaser and the Designated Purchasers of the Assumed Liabilities and the EMEA Assumed Liabilities, as set forth hereunder and in the EMEA Asset Sale Agreement; and

**WHEREAS**, in addition, at the Closing, the Purchaser, certain Sellers (or affiliates of the Sellers) and certain EMEA Sellers will enter into the following ancillary agreements (together, the "**Ancillary Agreements**") (i) the Local Sale Agreements, (ii) the Real Estate Agreements, (iii) the Intellectual Property License Agreement, (iv) the Transition Services Agreement, (v) the Trademark License Agreement, (vi) the Loaned Employee Agreement; (vii) the Subcontract Agreement, (viii) the Contract Manufacturing Inventory Agreements, (ix) the Carling Property Lease Agreements, (x) the Patent Assignments, (xi) the Trademark Assignments, (xii) the Indenture (unless the Cash Election Option has been exercised in full), (xiii) if requested by the Purchaser in accordance with the terms hereof, the Flextronics Back-to-Back Supply Agreement and (xiv) such other back-to-back supply agreements as are requested by the Purchaser in accordance with the terms hereof, and, subject to the negotiation prior to Closing of each such agreement to the mutual satisfaction of each party thereto, in their sole and absolute discretion, will enter into the Mutual Development Agreement, the Seller Supply Agreement, the NETAS Distribution Agreement; the NGS Distribution Agreement, the EFA Development Agreement, and the LGN/Korea Distribution Agreement (each as defined below).

**NOW, THEREFORE**, in consideration of the respective covenants, representations and warranties made herein, and of the mutual benefits to be derived hereby (the sufficiency of which is acknowledged), the Parties agree as follows:

# ARTICLE I
# INTERPRETATION

**SECTION 1.1.** **Definitions.** Capitalized terms used but not otherwise defined herein shall have the meanings set forth below:

"**2008 Revenues**" has the meaning set forth in Section 2.2.3(b).

"**365 Contracts**" has the meaning set forth in Section 2.1.5(b).

"**365 Customer Contract List**" has the meaning set forth in Section 2.1.5(b).

"**365 Customer Contracts**" has the meaning set forth in Section 2.1.5(b).

3

"**365 Vendor Contract List**" has the meaning set forth in Section 2.1.5(a).

"**365 Vendor Contracts**" has the meaning set forth in Section 2.1.5(a).

"**6 Month Location**" has the meaning set forth in Section 4.9(a).

"**Accounting Arbitrator**" has the meaning set forth in Section 2.2.4.1(b).

"**Action**" means any litigation, action, audit, hearing, investigation, suit (whether civil, criminal, administrative or investigative), charge, binding arbitration, Tax audit or other legal, administrative or judicial proceeding.

"**Additional Adverse Bankruptcy Proceeding**" has the meaning set forth in Section 2.2.3(a).

"**Additional Premises Lease Agreement**" means the lease agreement between NNTC on the one hand and the Purchaser or Designated Purchaser on the other hand in respect of the leasing of those parts of the Lab 2 Building of the Carling Property as more particularly defined in the Real Estate Terms and Conditions.

"**Additional Statements**" has the meaning set forth in Section 8.1(a)(i).

"**Adjustment Amount**" has the meaning set forth in Section 2.2.4.2(a).

"**Adverse International Injunction**" has the meaning set forth in Section 2.2.3(a).

"**Affiliate**" means, as to any Person, any other Person that directly or indirectly through one or more intermediaries Controls, or is under common Control with, or is Controlled by, such Person; provided, however, that no EMEA Seller or Subsidiary of an EMEA Seller shall be deemed an Affiliate of any Seller.

"**Aggregate Principal Amount**" has the meaning set forth in Section 2.2.1(a).

"**Agreement**" means this Amended and Restated Asset Sale Agreement, the Sellers Disclosure Schedule and all Exhibits and Schedules attached hereto and thereto and all amendments hereto and thereto made in accordance with Section 11.4.

"**Alternative Arrangements**" has the meaning set forth in Section 5.15(b).

"**Alternative Transaction**" means the sale, transfer or other disposition, directly or indirectly, including through an asset sale, stock sale, merger, amalgamation, plan of arrangement or other similar transaction, of all or a substantial portion of the Business, or all or a substantial portion of the Assets and the EMEA Assets, in each case, in a transaction or a series of transactions with a Successful Bidder (as such term has been defined in Exhibit 5.1(a), which may include multiple bidders whose bids are combined) other than the Purchaser and/or its Affiliates; provided, however, that an "Alternative Transaction" shall not include: (i) the retention of the Business or all or any portion of the Assets and the EMEA Assets, by all or part of the Sellers and/or the EMEA Sellers (or their successor entities emerging from the Bankruptcy

Proceedings) pursuant to a stand-alone plan of reorganization or plan of arrangement approved by any Bankruptcy Court, or (ii) the sale, transfer or other disposition, directly or indirectly, of any portion of the Assets or the EMEA Assets (other than as a going concern) in connection with the closure, liquidation or winding-up of any of the Sellers.

"**Ancillary Agreements**" has the meaning set forth in the recitals to this Agreement.

"**Antitrust Approvals**" means the HSR Approval and the Competition Act Approval.

"**Antitrust Laws**" means the Competition Act, the HSR Act, the EC Merger Regulation, and any competition, merger control and anti-trust Law of the European Union, any applicable European Union member states and EFTA states, and any other applicable supranational, national, federal, state, provincial or local Law designed or intended to prohibit, restrict or regulate actions having the purpose or effect of monopolizing or restraining trade or lessening competition of any other country or jurisdiction, to the extent applicable to the transactions contemplated by this Agreement (and/or by the EMEA Asset Sale Agreement).

"**ARD Transferring Employee**" has the meaning attributed to that term in the EMEA Asset Sale Agreement.

"**Assets**" has the meaning set forth in Section 2.1.1.

"**Assigned Contracts**" means all Seller Contracts except: (i) the Excluded 365 Contracts, (ii) the Excluded Other Vendor Contracts, (iii) the Excluded Non-Assignable Supply Contracts, (iv) the Non-Assigned Contracts and (v) leases, subleases, licenses and other occupancy agreements in respect of any Real Property, unless an assignment of such contract is contemplated by the Real Estate Terms and Conditions.

"**Assumed and Assigned Contracts**" has the meaning set forth in Section 2.1.5(b).

"**Assumed Liabilities**" has the meaning set forth in Section 2.1.3.

"**Auction**" has the meaning set forth in the U.S. Bidding Procedures and Sale Motion.

"**Audited Financial Statements**" has the meaning set forth in Section 5.26.

"**Balance Sheet Date**" has the meaning set forth in Section 4.7.

"**Bankruptcy Consents**" has the meaning set forth in Section 4.1(a).

"**Bankruptcy Court**" means the U.S. Bankruptcy Court, the Canadian Court, the English Court and any other court before which Bankruptcy Proceedings are held.

"**Bankruptcy Laws**" means the U.S. Bankruptcy Code, the CCAA, the Insolvency Act and the other applicable bankruptcy, insolvency, administration or similar Laws of any jurisdiction where Bankruptcy Proceedings are held.

"**Bankruptcy Proceedings**" means the Chapter 11 Cases, the CCAA Cases, the EMEA Cases and, in each case, any proceedings thereunder, as well as any other voluntary or involuntary bankruptcy, insolvency, administration or similar judicial proceedings concerning any of the Sellers or the EMEA Sellers that are held from time to time.

"**Base Cash Purchase Price**" has the meaning set forth in Section 2.2.1(a).

"**Break-Up Fee**" has the meaning set forth in Section 10.2(a).

"**Bundled Contract**" has the meaning set forth in Section 5.15(a).

"**Business**" means the optical networking solutions and carrier ethernet switching segments of NNC's "Metro Ethernet Networks" business through which the Sellers and the EMEA Sellers, individually, jointly or in collaboration with, or pursuant to Contracts with, Third Parties: (a) design, develop and cause the manufacture, assembly and testing of the Products; (b) market, sell, distribute and supply the Products; and (c) provide the Services, all as conducted as at the date of this Agreement, but excludes:

    (i)    any financial, information technology, legal, marketing, human resource operations (including supply management and technical and product support), real estate or other "corporate" or related functions supporting or utilized by such activities, unless such functions are exclusively dedicated to the support of the activities described in (a) through (c), in which event such functions are included;

    (ii)    Overhead and Shared Services (other than Transferred Overhead and Shared Services); and

    (iii)    any products and/or services provided by businesses or business segments of any of the Sellers or the EMEA Sellers, other than those specified in (a) through (c) above.

"**Business Day**" means a day on which the banks are opened for business (Saturdays, Sundays, statutory and civic holidays excluded) in (i) New York, New York, United States, (ii) Toronto, Ontario, Canada, and (iii) London, England, United Kingdom.

"**Business Information**" means, as of the Closing Date, all books, records, files, research and development log books, ledgers, documentation, sales literature or similar documents in the possession or under control of the Sellers and to the extent that such information relates to the Business, including policies and procedures, Owned Equipment manuals and materials and procurement documentation; provided, that, to the extent any of the foregoing is also used in any business or business segment of any Seller other than the Business, then such portion of the Business Information as used in such business or business segment of any Seller other than the Business shall be segregated and shall not form part of Business

Information, <u>provided</u> <u>further</u> that, where such segregation shall be impracticable, Business Information shall be limited to copies of the foregoing. Business Information shall not include any Employee Records or Tax records.

"**Canadian Approval and Vesting Order**" has the meaning set forth in Section 5.2.2.

"**Canadian Approval and Vesting Order Motion**" has the meaning set forth in Section 5.2.2.

"**Canadian Court**" means the Ontario Superior Court of Justice (Commercial List).

"**Canadian DB Replacement Plan**" has the meaning set forth in Section 7.5.3.

"**Canadian Debtors**" has the meaning set forth in the recitals to this Agreement.

"**Canadian Non-Union DC Replacement Plan**" has the meaning set forth in Section 7.5.1.

"**Canadian Sales Process Order**" has the meaning set forth in Section 5.2.1(a).

"**Canadian Sales Process Order Motion**" has the meaning set forth in Section 5.2.1(a).

"**Canadian Sellers**" means each of the Sellers that are organized under the laws of Canada (or any province of Canada).

"**Canadian Union DC Replacement Plan**" has the meaning set forth in Section 7.5.4.

"**Canadian Union Retiree**" means any individual who was employed by any of the Sellers or any of their Affiliates in Canada in respect of the Business and whose terms and conditions of employment were governed by a Collective Labor Agreement.

"**Carling Property**" means the "Premises" as defined in the Carling Property Lease Agreements.

"**Carling Property Escrow Amount**" means, pursuant to the Carling Property Lease Agreements, an initial amount in immediately available funds equal to $33,500,000 which amount shall secure exclusively the break-fee, if any, payable by the Sellers to the Purchaser in respect of the early termination of the Carling Property Lease Agreements by the Sellers in the exercise of the Sellers' early termination rights thereunder.

"**Carling Property Lease Agreements**" means, collectively, the Lab 10 Lease Agreement and the Additional Premises Lease Agreement, and non-disturbance agreements from any existing mortgagees registered on title to the Carling Property in the form attached as Exhibit L-2 hereto, each of the foregoing agreements to be entered into and delivered on or before Closing by each of the parties to such agreements substantially in the forms aforesaid.

7

"**Cash Purchase Price**" has the meaning set forth in Section 2.2.1(a).

"**Cash Replacement Election**" has the meaning set forth in Section 2.2.1(a).

"**CCAA**" has the meaning set forth in the recitals to this Agreement.

"**CCAA Cases**" has the meaning set forth in the recitals to this Agreement.

"**CCAA Service List**" means the Canadian Debtors' service list as posted on the Monitor's website (http://www.ey.com/ca/nortel) as the same may be updated from time to time in the context of the CCAA Cases.

"**CERCLA**" has the meaning set forth in Section 4.13(c).

"**Chapter 11 Cases**" has the meaning set forth in the recitals to this Agreement.

"**CIP Accounts Receivable**" means all uninvoiced accounts receivable relating to the Business with respect to Contracts in progress, but only to the extent that such accounts receivable have not been invoiced because of milestones, deliverables or other commitments arising pursuant to such Contracts which have not yet been satisfied or fulfilled and excluding all EMEA CIP Accounts Receivable.

"**Claim**" has the meaning set forth in Section 101(5) of the U.S. Bankruptcy Code.

"**Claim Notice**" has the meaning set forth in Section 6.7(b).

"**Closing**" has the meaning set forth in Section 2.3.1.

"**Closing Accrued Vacation and Service Award Amount**" means, as of the Closing Date, (i) the amount of compensation with respect to the accrued and unused vacation with respect to each Specified Transferred Employee and each EMEA Transferring Employee (including all Taxes required to be withheld on behalf of the applicable Specified Transferred Employee and EMEA Transferring Employee by his or her respective employer) calculated by taking, with respect to each such employee (A) an amount equal to the number (not less than zero) of such employee's accrued and unused vacation hours as of the Closing Date multiplied by such employee's hourly rate of pay (with such hourly rate of pay derived by dividing such employee's annual base salary by the number of standard work hours per year for such employee), and (ii) in respect of Transferred Employees in Australia with five (5) years or more of service as an employee of Sellers, the EMEA Sellers or their respective Affiliates as of the Closing Date, the amounts specified in Section 7.1.2(b)(iv) of the Sellers Disclosure Schedules in respect of long service leave multiplied by the applicable percentage as set forth in the Nortel Accounting Principles, plus, without duplication, the aggregate amount of employer Taxes required to be paid in connection with all such amounts.

"**Closing CIP Accounts Receivable Amount**" means, as of the Closing Date, the amount accrued for CIP Accounts Receivable and EMEA CIP Accounts Receivable as of the Closing Date in accordance with GAAP applied in a manner consistent with the Nortel Accounting Principles (to the extent consistent with GAAP).

"**Closing Date**" has the meaning set forth in Section 2.3.1.

"**Closing Date Net Working Capital Transferred**" has the meaning set forth in Section 2.2.4.1(a).

"**Closing Inventory Amount**" means, as of the Closing Date, the book value of the Owned Inventory and the EMEA Owned Inventory, net of applicable provisions, that would be required to be reflected on a balance sheet of the Business as of such date prepared in accordance with GAAP applied in a manner consistent with the Nortel Accounting Principles (to the extent consistent with GAAP).

"**Closing KPD Provision**" means, as of the Closing Date, the provision for Known Product Defects accrued by the Business in accordance with GAAP applied in a manner consistent with the Nortel Accounting Principles (to the extent consistent with GAAP).

"**Closing Net Deferred Revenues**" means, as of the Closing Date, (x) deferred revenues for services to be performed or products to be provided by the Business after the Closing Date but for which an account receivable has been recorded prior to the Closing Date minus (y) associated deferred costs to the extent incurred by the Business prior to the Closing Date in connection with such products or services, in each case, that would be required to be reflected on a balance sheet of the Business as of such date prepared in accordance with GAAP applied in a manner consistent with the Nortel Accounting Principles (to the extent consistent with GAAP).

"**Closing Other Accrued and Contractual Liabilities**" means, as of the Closing Date, (i) such current Assumed Liabilities and current EMEA Assumed Liabilities of a type accrued on the Business' historic Financial Statements under the heading "Other Accrued and Contractual Liabilities" (including "Accrued Known Project Losses", "Accrued Liquidated Damages", "Accrued Marketing Program Liabilities", "Accrued Product Credits" (including, for the avoidance of doubt, all credits for EMEA Products or EMEA Services to be assumed by the Purchaser pursuant to Section 2.4.2(B)(4) of the EMEA Asset Sale Agreement) and "Accrued Training Credits", but excluding "COS Accruals" and "Representative Fees"), that would be required to be reflected on a balance sheet of the Business as of such date prepared in accordance with GAAP applied in a manner consistent with the Nortel Accounting Principles (to the extent consistent with GAAP).

"**Closing Retirement Obligation Amount**" means, as of the Closing Date, the amount of the actual unfunded obligations accrued in any period preceding the Closing Date that will be assumed by the Purchaser, a Designated Purchaser or an EMEA Designated Purchaser at Closing (if any) whether pursuant to this Agreement or by operation of Law under a plan providing retirement or retiree welfare benefits of any Seller or EMEA Seller, and under any plan providing jubilee benefits (anniversary bonuses) of Nortel GmbH, in all cases determined in accordance with GAAP applied in a manner consistent with the Nortel Accounting Principles (to the extent consistent with GAAP), and using reasonable actuarial assumptions consistent with the assumptions most recently used for determining unfunded obligations for the applicable plan prior to the date hereof. For purposes of this definition, an unfunded obligation shall be deemed to be under (A) with respect to any Seller or EMEA Seller, a plan providing retirement or retiree welfare benefits to the extent it is required to be accounted for under FAS 87 (paragraphs 11, 72

9

and 73) or FAS 106 (paragraphs 16 and 85), as applicable, and (B) with respect to Nortel GmbH, a plan providing jubilee benefits (anniversary bonuses) to the extent it is required to be accounted for under FAS 112.  Notwithstanding the foregoing, an unfunded obligation shall not be taken into account to the extent that it is a Liability in respect of which there is, and to the extent of, a separate Purchase Price adjustment that is expressly provided for, if any, under this Agreement or the EMEA Asset Sale Agreement.

"**Closing Statement**" has the meaning set forth in Section 2.2.4.1(a).

"**Closing Warranty Provision**" means, as of the Closing Date, the provision for potential claims by customers under the Warranty Obligations to be recognized and measured by the Business in accordance with GAAP applied in a manner consistent with the Nortel Accounting Principles (to the extent consistent with GAAP).

"**COBRA**" means the continuation coverage required by Section 4980B of the Code or any similar Law.

"**Code**" means the United States Internal Revenue Code of 1986, as amended.

"**Collective Labor Agreement**" means any written agreement that a Person has entered into with any union or collective bargaining agent with respect to terms and conditions of employment of such Person's employees.

"**Commissioner**" means the Commissioner of Competition appointed under the Competition Act or any person duly authorized to exercise the powers and perform the duties of the Commissioner of Competition.

"**Common Stock**" means shares of common stock, par value $0.01 per share, of the Purchaser.

"**Common Stock VWAP**" means, for any Trading Day, the per share volume-weighted average price as displayed under the heading "Bloomberg VWAP" on Bloomberg page "CIEN.Q <equity> AQR" (or any successor thereto) in respect of the period from the scheduled opening of trading until the scheduled close of trading of the primary trading session on such Trading Day (or if such volume-weighted average price is unavailable, the market value of one share of Common Stock on such Trading Day, determined using a volume-weighted average method, by a nationally recognized independent investment banking firm retained for such purpose that is mutually acceptable to Purchaser and Sellers).  The Common Stock VWAP will be determined without regard to after hours trading or any other trading outside of the regular trading session trading hours.

"**Competing Transaction**" has the meaning set forth in Section 5.29(a).

"**Competition Act**" means the Competition Act (Canada), as amended, and the regulations promulgated in connection therewith.

"**Competition Act Approval**" means that: (a) the Commissioner shall have issued an advance ruling certificate pursuant to Section 102 of the Competition Act in respect of the transactions contemplated by this Agreement; or (b)(i) the applicable waiting period has

expired, been terminated pursuant to Section 123 of the Competition Act or compliance with Part IX of the Competition Act has been waived pursuant to Section 113(c) of the Competition Act, and (ii) the Commissioner or his/her authorized representative shall have advised the Purchaser in writing that the Commissioner does not intend to make an application under Section 92 of the Competition Act with respect to the transactions contemplated by this Agreement, and neither the Commissioner nor any of his/her authorized representatives shall have rescinded or amended such advice.

"**Confidentiality Agreement**" means collectively, the confidentiality agreement between the Purchaser, NNC and its subsidiaries and the Joint Administrators dated March 27, 2009, the clean team confidentiality agreement between the Purchaser and its subsidiaries and NNL and its subsidiaries, dated April 15, 2009, the second clean team confidentiality agreement between the Purchaser and its subsidiaries and NNL and its subsidiaries, dated May 8, 2009, and the third clean team confidentiality agreement between the Purchaser and its subsidiaries and NNL and its subsidiaries, dated June 19, 2009.

"**Consent**" means any approval, authorization, consent, order, license, permission, permit, qualification, exemption or waiver by, or notice to (including the expiry of any related notice or waiting period), any Government Entity or other Third Party.

"**Contract**" means any written binding contract, agreement, subcontract, purchase order, work order, sales order, indenture, note, bond, instrument, lease, mortgage, ground lease, commitment, covenant or undertaking.

"**Contract Manufacturing Inventory Agreements**" means the agreements between the Purchaser and/or any Designated Purchasers, on the one hand, the relevant Sellers, on the other hand, and the contract manufacturers of the Business listed in Section 1.1(a) of the Sellers Disclosure Schedule that the relevant Parties will use commercially reasonable efforts to execute on or before the Closing in the form that shall be negotiated in good faith pursuant to Section 5.25 and the term sheet attached as Exhibit 1.1.

"**Control**", including, with its correlative meanings, "**Controlled by**" and "**under common Control with**", means, in connection with a given Person, the possession, directly or indirectly, of the power to either (i) elect more than fifty percent (50%) of the directors of such Person or (ii) direct or cause the direction of the management and policies of such Person, whether through the ownership of securities, contract or otherwise.

"**Conversion Price**" has the meaning set forth in Section 2.2.1(a).

"**Convertible Note Recipient Sellers**" means each of the Canadian Sellers, the UK Sellers and the U.S. Sellers.

"**Convertible Notes**" has the meaning set forth in Section 2.2.1(a).

"**Convertible Securities**" has the meaning set forth in Section 8.2(d).

"**Covered Assets and Persons**" has the meaning set forth in Section 5.20(a).

"**Cure Cost**" has the meaning set forth in Section 2.1.7(b) of the Sellers Disclosure Schedule.

"**Customer Contract**" means any Seller Contract pursuant to which a Seller provides Products and/or Services to the counterparty.

"**Customer Contract Cure Cost**" has the meaning set forth in Section 2.1.7(c) of the Sellers Disclosure Schedule.

"**Daily Trading Limit**" as of any date shall mean the lesser of (i) 10% of the average reported daily trading volume of the shares of Common Stock on NASDAQ for the 20 consecutive Trading Days immediately preceding such date and (ii) 10% of the reported daily trading volume of the shares of Common Stock for the trading date immediately preceding such date.

"**Deficit Amount**" has the meaning set forth in Section 2.2.4.2(b)(ii).

"**Demand Note**" has the meaning set forth in Section 2.2.7(b).

"**Deposit Amount**" has the meaning set forth in Section 5.37.

"**Deposit Escrow Agent**" has the meaning set forth in Section 5.37.

"**Deposit Escrow Agreement**" has the meaning set forth in Section 5.37.

"**Designated Non-Assignable Contracts**" has the meaning set forth in Section 2.1.6(d).

"**Designated Non-Assignable Customer Contracts**" has the meaning set forth in Section 2.1.6(d).

"**Designated Non-Assignable Supply Contracts**" has the meaning set forth in Section 2.1.6(b).

"**Designated Other Customer Contracts**" has the meaning set forth in Section 2.1.6(c).

"**Designated Other Vendor Contracts**" has the meaning set forth in Section 2.1.6(a).

"**Designated Purchaser**" has the meaning set forth in Section 2.4.

"**Determination Date**" has the meaning set forth in Section 2.2.4.1(b).

"**Distribution Agent**" means the Person that will act as distribution agent for the Sellers and the EMEA Sellers hereunder, to be notified by the Main Sellers to the Purchaser and the Escrow Agent by and not later than January 25, 2010.

"**Domain Name**" means an alphanumeric name that identifies a specific computer or website on the Internet, and all rights in and to such domain name, including any registrations therefor with a domain name registrar.

"**DTC**" has the meaning set forth in Section 8.5(a)(x).

"**E&O Inventory**" has the meaning set forth in Section 5.9(a).

"**EC Merger Regulation**" means Council Regulation (EC) No. 139/2004 of January 20, 2004 on the control of concentrations between undertakings, as amended.

"**EFA Development Agreement**" means the agreement between the Purchaser and LG Nortel Co. Ltd. for development services related to ethernet fiber access (EFA) to be provided by the Purchaser to LG Nortel Co. Ltd., such agreement to be effective on Closing, that the relevant Parties will use commercially reasonable efforts to negotiate before the Closing pursuant to Section 5.25.

"**Effective Hire Date**" means the day on which the employment of an Employee commences or continues with the Purchaser or its Affiliates as provided in this Agreement.

"**Effective Period**" has the meaning set forth in Section 8.1(a).

"**EMEA Asset Sale Agreement**" means the Original EMEA Asset Sale Agreement as amended on October 20, 2009 and the date hereof.

"**EMEA Assets**" has the meaning attributed to that term in the EMEA Asset Sale Agreement.

"**EMEA Assumed Liabilities**" has the meaning attributed to that term in the EMEA Asset Sale Agreement.

"**EMEA Business**" has the meaning attributed to that term in the EMEA Asset Sale Agreement.

"**EMEA Cases**" has the meaning set forth in the recitals to this Agreement.

"**EMEA CIP Accounts Receivable**" has the meaning attributed to that term in the EMEA Asset Sale Agreement.

"**EMEA Debtors**" means those entities listed under the heading "EMEA Debtors" in part 5 of Exhibit C hereto.

"**EMEA Designated Purchaser**" has the meaning attributed to that term in the EMEA Asset Sale Agreement.

"**EMEA Employee**" means an employee of any of the EMEA Sellers engaged in the EMEA Business.

"**EMEA Excluded Liabilities**" has the meaning attributed to that term in the EMEA Asset Sale Agreement.

"**EMEA Excluded Taxes**" has the meaning set forth in Section 6.8(a).

"**EMEA Intellectual Property**" has the meaning set forth in Section 4.5(a).

"**EMEA Owned Inventory**" has the meaning attributed to that term in the EMEA Asset Sale Agreement.

"**EMEA Purchaser Party**" has the meaning set forth in Section 6.8(a).

"**EMEA Sellers**" has the meaning set forth in the recitals to this Agreement.

"**EMEA Tax Claim**" has the meaning set forth in Section 6.8(b).

"**EMEA Tax Claim Notice**" has the meaning set forth in Section 6.8(b).

"**EMEA Tax Escrow Amount**" means $2,500,000, which amount shall secure the EMEA Sellers' obligations under Section 6.8.

"**EMEA Transferring Employee**" has the meaning ascribed to the term "Transferring Employee" in the EMEA Asset Sale Agreement.

"**Employee**" means an employee of any of the Sellers or their Affiliates (excluding the EMEA Sellers) engaged in the Business (excluding the EMEA Business), in each instance as listed in Section 4.10(b) of the Sellers Disclosure Schedule.

"**Employee Data**" has the meaning set forth in Section 7.4(b).

"**Employee Information**" has the meaning set forth in Section 4.10(b).

"**Employee Records**" means books, records, files, or other documentation with respect to Employees.

"**Employee Transfer Date**" means with respect to each jurisdiction where Employees, other than Inactive Employees, Visa Employees and Seconded Employees, will become Transferred Employees in accordance with this Agreement, 12:01 a.m. local time in such jurisdiction immediately following the Closing.

"**English Court**" means the High Court of Justice of England and Wales.

"**Environment**" means soil, land, surface or subsurface strata, waters (including navigable ocean, stream, pond, reservoirs, drainage, basins, wetland, ground and drinking), sediments, ambient air (including indoor), noise, plant life, animal life and all other environmental media or natural resources.

"**Environmental Laws**" means any applicable Laws relating to pollution or protection of the Environment, human health and safety, including those relating to the presence,

use, manufacturing, refining, production, generation, handling, transportation, treatment, recycling, transfer, storage, disposal, distribution, importing, labeling, testing, processing, discharge, release, control, or other action or failure to act involving cleanup of any Hazardous Materials, including without limitation and by way of example only the following laws as in effect now and as of the Closing Date: (i) Clean Air Act (42 USC 7401, et seq.); (ii) Clean Water Act (33 USC 1251, et seq.); (iii) Resource Conservation and Recovery Act (42 USC 6901, et seq.); (iv) Comprehensive Environmental Response, Compensation and Liability Act (41 USC 9601, et seq.); (iv) Toxic Substances Control Act (15 USC 2601, et seq.).

"**ERISA**" means the Employee Retirement Income Security Act of 1974, as amended.

"**Escrow Agent**" has the meaning ascribed to such term in the Escrow Agreement.

"**Escrow Amount**" means the portion of the Cash Purchase Price to be paid to the Escrow Agent on the Closing Date in accordance with Section 2.3.2(b) and, subject to adjustment in accordance with Section 2.1.7(b) of the Sellers Disclosure Schedule, such amount will consist of (i) the Working Capital Escrow Amount, (ii) the Carling Property Escrow Amount, (iii) the Tax Escrow Amount, (iv) the EMEA Tax Escrow Amount and (v) the Italian Tax Escrow Amount.

"**Escrow Agreement**" means a "joint instruction" Escrow Agreement to be entered into on or prior to Closing with respect to the deposit, investment and disbursement of the Escrow Amount and the Transition Services Escrow Amount and requiring that any amounts to be distributed thereunder shall require the written instruction of one or more the Main Sellers and the Purchaser which shall be given in accordance with this Agreement or the applicable Transaction Document to which any portion of the Escrow Amount and the Transition Services Escrow Amount relates and otherwise on terms and conditions reasonably satisfactory to each of the Purchaser, the Sellers, the EMEA Sellers and the Escrow Agent.

"**Estimated Adjustment Amount**" has the meaning set forth in Section 2.2.2(b).

"**Estimated Closing Date Net Working Capital Transferred**" has the meaning set forth in Section 2.2.2(a).

"**Excess ARD Employees Amount**" has the meaning ascribed to such term in the EMEA Asset Sale Agreement.

"**Exchange Act**" means the Securities Exchange Act of 1934, as amended.

"**Excluded 365 Contract**" has the meaning set forth in Section 2.1.5(d).

"**Excluded Assets**" has the meaning set forth in Section 2.1.2.

"**Excluded Employee Liabilities**" has the meaning set forth in Section 7.3.

"**Excluded Liabilities**" has the meaning set forth in Section 2.1.4.

"**Excluded Non-Assignable Supply Contracts**" has the meaning set forth in 2.1.6(b).

"**Excluded Other Seller**" has the meaning set forth in Section 5.32(a).

"**Excluded Other Vendor Contracts**" has the meaning set forth in Section 2.1.6(a).

"**Excluded Taxes**" has the meaning set forth in Section 6.7(a).

"**Executory Contract**" means an 'executory contract' for the purposes of Section 365 of the U.S. Bankruptcy Code.

"**Existing 2017 Senior Notes**" means the 0.875% Convertible Senior Notes due 2017 issued by the Purchaser that are outstanding as of the date hereof.

"**Expense Reimbursement**" has the meaning set forth in Section 10.2(a).

"**Expense Reimbursement Notice**" has the meaning set forth in Section 10.2(a).

"**Extra Services**" has the meaning set forth in Section 5.28 of the Sellers Disclosure Schedule.

"**Filing Party**" has the meaning set forth in Section 6.4(b)(ii).

"**Final Order**" means an order of any Bankruptcy Court, any court of competent jurisdiction or other Government Entity (i) as to which no appeal, notice of appeal, motion to amend or make additional findings of fact, motion to alter or amend judgment, motion for rehearing or motion for new trial has been timely filed or, if any of the foregoing has been timely filed, it has been disposed of in a manner that upholds and affirms the subject order in all material respects without the possibility for further appeal or rehearing thereon; (ii) as to which the time for instituting or filing an appeal, motion for rehearing or motion for new trial shall have expired; and (iii) as to which no stay is in effect; provided, however, that, with respect to an order issued by the U.S. Bankruptcy Court, the filing or pendency of a motion under Federal Rule of Bankruptcy Procedure 9024 or Federal Rule of Civil Procedure 60 shall not cause an order not to be deemed a "Final Order" unless such motion shall be filed within ten (10) days of the entry of the order at issue.

"**Financial Statements**" has the meaning set forth in Section 4.7.

"**Flextronics Back-to-Back Supply Agreement**" means the agreement between the relevant Sellers and the Purchaser and/or any Designated Purchasers which may be executed, if required, on or before Closing on the terms set forth in the Flextronics Back-to-Back Supply Agreement Term Sheet attached as Exhibit Z hereto and such other terms as the Main Sellers and the Purchaser may reasonably agree.

"**Freely Tradeable**" means, with respect to a Convertible Note, a Convertible Note that at any time of determination (i) may be sold to the public in accordance with Rule 144 under the Securities Act by a holder of such Convertible Note where no conditions of Rule 144

16

under the Securities Act are then applicable (other than the holding period requirement of paragraph (d) of Rule 144 under the Securities Act so long as such holding period requirement is satisfied at such time of determination), including without limitation, the volume limitations set forth in Rule 144(e) under the Securities Act and (ii) does not bear any restrictive legends relating to the Securities Act.

"**GAAP**" means United States generally accepted accounting principles, consistently applied.

"**Government Entity**" means any U.S., Canadian, United Kingdom, foreign, domestic, supra-national, multi-national, federal, territorial, provincial, state, municipal or local governmental authority, quasi-governmental authority, instrumentality, court, government or self-regulatory organization, bureau, commission, tribunal or organization or any regulatory, administrative or other agency, or any political or other subdivision, department or branch of any of the foregoing, including the European Commission.

"**GST**" means goods and services tax payable under Part IX of the Excise Tax Act (Canada).

"**Hazardous Materials**" means (a) petroleum, petroleum products, asbestos in any form that is friable or polychlorinated biphenyls and (b) any chemical, waste, material, pollutant, contaminant or other substance, whether solid, liquid or gaseous, the presence of which is regulated by any Government Entity or which requires investigation or remediation under any Environmental Laws.

"**Handling of Hazardous Materials**" means the production, use, generation, Release, storage, treatment, formulation, processing, labeling, distribution, introduction into commerce, registration, transportation, reclamation, recycling, disposal, discharge, or other handling or disposition of Hazardous Materials.

"**HSR Act**" means the United States Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended, and any rules and regulations promulgated in connection therewith.

"**HSR Approval**" means expiration of all applicable waiting periods under the HSR Act (including any voluntary agreed extensions) or earlier termination thereof.

"**ICA Approval**" means that: (i) if required pursuant to Part IV of the Investment Canada Act, the Purchaser shall have received confirmation in writing from the responsible Minister under the Investment Canada Act that he/she is satisfied or is deemed to be satisfied that the transactions contemplated in this Agreement that are subject to the provisions of the Investment Canada Act are likely to be of net benefit to Canada, on terms and conditions satisfactory to the Purchaser, acting reasonably; and (ii) the responsible Minister shall not have issued a notice to the Purchaser pursuant to Section 25.2(1) of the Investment Canada Act or an order pursuant to Section 25.3(1) of the Investment Canada Act.  If either a notice pursuant to Section 25.2(1) or an order pursuant to Section 25.3(1) has been issued, the Purchaser shall also have received (a) confirmation in writing from the responsible Minister either that no order will be made under Section 25.3(1) or that no further action will be taken or (b) a copy of an order

under Section 25.4(1)(b) authorizing the transaction, <u>provided</u> that order is on terms and conditions satisfactory to the Purchaser, acting reasonably.

"**Inactive Employees**" means Employees (other than Employees whose employment transfers to the Purchaser or a Designated Purchaser by operation of Law) who have accepted the Purchaser's or Designated Purchaser's offer of employment as provided in Section 7.1.1 and are on any Seller's approved leave of absence as of the Employee Transfer Date.

"**Identified Employees**" has the meaning set forth in Section 7.1.1(a).

"**IFSA**" means the Interim Funding and Settlement Agreement dated June 9, 2009 among NNL, NNL, the Joint Administrators and the other parties thereto.

"**Inbound License Agreements**" has the meaning set forth in Section 4.5(j)(ii).

"**Included Services**" has the meaning set forth in Section 5.28 of the Sellers Disclosure Schedule.

"**Increase Amount**" has the meaning set forth in Section 2.2.4.2(b)(i).

"**Indebtedness**" of any Person at any date means (a) indebtedness for borrowed money, (b) indebtedness evidenced by bonds, debentures, notes or similar instruments, (c) leases that are capitalized in accordance with GAAP under which such Person is the lessee, (d) reimbursement obligations of such Person with respect to letters of credit or performance bonds that are drawn prior to Closing, (e) obligations in respect of the deferred purchase price of property or services (other than current trade payables incurred on a basis consistent with past practices), (f) obligations (under conditional sale or other title retention agreements, (g) obligations (including without limitation, breakage costs) under interest rate cap agreements, interest rate swap agreements, foreign currency exchange contracts or other hedging contracts and (h) any guarantee of the obligations of another Person with respect to any of the foregoing.

"**Indenture**" means the indenture providing for the issuance of the Convertible Notes.

"**Independent Auditor**" means Deloitte & Touche LLP or, in the case such firm cannot carry-out its duties for whatever reason, such other auditing firm of international reputation that is (i) jointly selected by the Primary Parties, or (ii) in case the Primary Parties cannot agree on any such firm, selected by Deloitte & Touche LLP at the request of the first Primary Party to move.

"**Indemnitee**" has the meaning set forth in Section 8.8(b).

"**Indemnitor**" has the meaning set forth in Section 8.8(b).

"**Initial Shelf Registration Statement**" has the meaning set forth in Section 8.1(a).

"**Insolvency Act**" has the meaning set forth in the recitals to this Agreement.

18

"**Intellectual Property**" means any and all intellectual property, whether protected or arising under the laws of the United States, Canada or any other jurisdiction, including all intellectual property rights in respect of any of the following: (a) Trademarks; (b) Patents; (c) copyrights and works of authorship (including any registrations therefor or applications for registration); (d) mask works; (e) trade secrets, know-how and confidential technical or business information; (f) industrial design or similar rights; and (g) any Software and technology.

"**Intellectual Property License Agreement**" means the agreement to be entered into between NNL, on the one hand, and the Purchaser (or the relevant Designated Purchasers), on the other hand, on or prior to the Closing in the form attached hereto as Exhibit F.

"**Investment Canada Act**" means the Investment Canada Act, as amended, and the regulations promulgated in connection therewith.

"**Israeli Companies Law**" has the meaning set forth in the recitals to this Agreement.

"**Israeli Company**" has the meaning set forth in the recitals to this Agreement.

"**Italian Excluded Taxes**" has the meaning set forth in Section 6.9(a).

"**Italian Purchaser Party**" has the meaning set forth in Section 6.9(a).

"**Italian Tax Claim**" has the meaning set forth in Section 6.9(b).

"**Italian Tax Claim Notice**" has the meaning set forth in Section 6.9(b).

"**Italian Tax Escrow Amount**" means $5,000,000, as such amount is adjusted in accordance with Section 6.9, which amount shall secure Nortel Italy's obligations under Section 6.9.

"**Joint Administrators**" has the meaning set forth in the recitals to this Agreement.

"**Joint Israeli Administrators**" has the meaning set forth in the recitals to this Agreement.

"**KEIP**" shall mean the Nortel Networks Corporation Key Executive Incentive Plan approved by the U.S. Bankruptcy Court in the District of Delaware on March 5, 2009, and approved by the Canadian Court on March 6, 2009 and March 20, 2009, with such further amendments and/or supplements as may be approved by the Canadian Court and/or the U.S. Bankruptcy Court from time to time.

"**KERP**" shall mean the Nortel Networks Corporation Key Employee Retention Plan approved by the U.S. Bankruptcy Court in the District of Delaware on March 5, 2009, and approved by the Canadian Court on March 6, 2009, with such further amendments and/or supplements as may be approved by the Canadian Court and/or U.S. Bankruptcy Court from time to time.

19

"**Knowledge**" or "**aware of**" or "**notice of**" or a similar phrase shall mean, with reference to the Sellers, the actual knowledge of those Persons listed on Section 1.1(b) of the Sellers Disclosure Schedule, and, with reference to the Purchaser, the actual knowledge of those Persons listed on Exhibit G.

"**Known Product Defects**" means those defects of Products and/or Services that have been sold by the Business and which are known by the Sellers as of the Closing Date.

"**Lab 10 Lease Agreement**" means the lease agreement between NNTC on the one hand and the Purchaser or Designated Purchaser on the other hand in respect of the leasing of the whole of the Lab 10 Building as more particularly defined in the Lab 10 Lease Agreement to be entered into on or before Closing in the form attached hereto as Exhibit L-1.

"**Law**" means any U.S., Canadian, United Kingdom, foreign, domestic, supra-national federal, territorial, state, provincial, local or municipal statute, law, common law, ordinance, rule, regulation, order, writ, injunction, directive, judgment, decree or policy or guideline having the force of law.

"**Leased Real Property**" has the meaning set forth in Section 4.9(a).

"**Leases**" has the meaning set forth in Section 4.9(a).

"**LGN Joint Venture**" means LG-Nortel Co. Ltd., which was established in November 2005 as a joint venture between NNL and LG Electronics Inc. for the purpose of jointly developing and marketing certain telecommunications equipment and network solutions.

"**LGN/Korea Distribution Agreement**" means the agreement to be entered into between the Purchaser and/or one or more Designated Purchasers designated by it and the LGN Joint Venture that the relevant Parties will use commercially reasonable efforts to negotiate before the Closing pursuant to Section 5.25.

"**Liabilities**" means debts, liabilities and obligations, whether accrued or fixed, direct or indirect, absolute or contingent, asserted or unasserted, liquidated or unliquidated, matured or unmatured, known or unknown or determined or undeterminable, including those arising under any Law or Action and those arising under any contract, agreement, arrangement, commitment or undertaking or otherwise, including any Tax liability.

"**Licensed Intellectual Property**" means the Intellectual Property being licensed to the Purchaser or the relevant Designated Purchasers under the Intellectual Property License Agreement and the Trademark License Agreement.

"**Lien**" means any lien (statutory or otherwise), mortgage, pledge or security interest, hypothecation, deed of trust, deemed trust, option, right of use, right of first offer or first refusal, servitude, encumbrance, easement, encroachment, right-of-way, restrictive covenant on real property, real property license, charge, prior claim, lease, conditional sale arrangement or other similar restriction of any kind, but does not include any prior Intellectual Property license granted by any of the Sellers.

"**Liquidity Date**" has the meaning set forth in Section 2.2.1(c).

20

"**Loaned Employee Agreement**" means the agreement between the relevant Sellers, on the one hand, and the Purchaser and/or any Designated Purchasers, on the other hand, to be executed on or before the Closing attached hereto as Exhibit I.

"**Local Sale Agreements**" has the meaning set forth in Section 2.1.8.

"**Losses**" means all losses, damages and reasonable and documented out-of-pocket costs and expenses.

"**Main Sellers**" has the meaning set forth in the preamble to this Agreement.

"**Market Value**" as of any date shall mean the arithmetic average of the Common Stock VWAP during the ten (10) Trading Days immediately prior to, but not including, such date.

"**Material Adverse Effect**" means any event, change or circumstance that, individually or in the aggregate, has had, or would reasonably be expected to have a material adverse effect on the assets, liabilities, operations, results of operations or condition (financial or otherwise) of the Business to be transferred hereunder and under the EMEA Asset Sale Agreement, taken as a whole, but in each case shall not include the effect of events, changes and circumstances to the extent arising from (a) changes in the industries and markets in which the Business operates, except to the extent such changes disproportionately affect the Business, (b) macroeconomic factors, interest rates, currency exchange rates, general financial market conditions, acts of God, war, terrorism or hostilities, (c) changes in Law, generally accepted accounting principles or official interpretations of the foregoing, (d) compliance with this Agreement, including any effect on the Business resulting from failure to take any action to which the Purchaser refused consent under this Agreement, (e) the transactions contemplated hereby or any announcement hereof or the identity of the Purchaser, (f) the attrition of customers or employees prior to the Closing Date, (g) the pendency of the Bankruptcy Proceedings and any action approved by the Bankruptcy Courts, or (h) the failure of the Business to achieve internal or external financial forecasts or projections, by itself; provided, however, that in the case of clauses (f) and (h), the reason for the customer attrition or the failure of the Business to achieve internal or external financial forecasts or projections shall not be excluded as a result of such clauses.

"**Material Contracts**" has the meaning set forth in Section 4.4(b).

"**Monitor**" means Ernst & Young Inc., in its capacity as the Canadian Court-appointed Monitor in connection with the CCAA Cases.

"**Montreal Landlord**" has the meaning set forth in the Real Estate Terms and Conditions.

"**Montreal Lease Termination Penalty**" has the meaning set forth in the Real Estate Terms and Conditions.

"**Montreal Premises**" means that portion of the third and fourth floors of the North Tower of the building municipally known as 2351 Alfred Nobel Blvd., St. Laurent,

Quebec that is used by the Business as of the date hereof or any alternate or additional premises in such building if contemplated by the Montreal Premises Restructured Lease or Montreal Premises Sublease, as the case may be.

"**Montreal Premises Amended Lease**" has the meaning set forth in the Real Estate Terms and Conditions.

"**Montreal Premises Lease**" means that certain lease dated June 27, 2007 in respect of the Montreal Premises by and between BREOF/Belmont Ban L.P., acting through its general partner BREOF/Belmont Ban G.P. Limited, as landlord, and NNL, as tenant, as amended by a first lease amending agreement dated October 8, 2008.

"**Montreal Premises Restructured Lease**" has the meaning set forth in the Real Estate Terms and Conditions.

"**Montreal Premises Sublease**" has the meaning set forth in the Real Estate Terms and Conditions.

"**Montreal Premises Sublease Consent**" has the meaning set forth in the Real Estate Terms and Conditions.

"**Mutual Development Agreement**" means the agreement between the Purchaser and/or any Designated Purchasers, on the one hand, and the relevant Sellers, on the other hand, relating to the development (i) by the Purchaser and/or any Designated Purchasers of new features of certain of products used by the Sellers and/or (ii) by the relevant Sellers of new features of certain of the Products that the relevant Parties will use commercially reasonable efforts to negotiate before the Closing pursuant to Section 5.25.

"**NETAS**" means Nortel Networks NETAS Telekomunikasyon A.S., a company incorporated in Turkey and having its principal place of business at Alemdag Caddesi, Umraniye 34768, Istanbul, Turkey.

"**NETAS Distribution Agreement**" means the agreement between the Purchaser and/or one or more Designated Purchasers and NETAS relating to the sale of Products by the Purchaser to NETAS for resale in Turkey that the relevant Parties will use commercially reasonable efforts to negotiate before the Closing pursuant to Section 5.25.

"**Net Working Capital Transferred**" has the meaning set forth in Section 2.2.4.1(a).

"**New York Courts**" has the meaning set forth in Section 11.6(b).

"**NGS**" means Nortel Government Solutions Incorporated, a corporation organized under the laws of Delaware with offices at 12730 Fair Lakes Circle, Fairfax, Virginia.

"**NGS Distribution Agreement**" means the agreement between the Purchaser and/or one or more Designated Purchasers and NGS relating to the sale of Products by the Purchaser to NGS that the relevant Parties will use commercially reasonable efforts to negotiate before the Closing pursuant to Section 5.25.

"**NNC**" has the meaning set forth in the preamble to this Agreement.

"**NNI**" has the meaning set forth in the preamble to this Agreement.

"**NNL**" has the meaning set forth in the preamble to this Agreement.

"**NNTC**" has the meaning set forth in Section 6.5(b).

"**Non-ARD Transferring Employee**" has the meaning attributed to that term in the EMEA Asset Sale Agreement.

"**Non-Assignable Contracts**" has the meaning set forth in Section 5.14(a).

"**Non-Assigned Contracts**" means the Non-Assignable Contracts, to the extent all applicable Consents to assignment thereof to the Purchaser or a Designated Purchaser have not been granted prior to the Closing Date, provided that if such Consents are granted within one (1) year after the Closing Date, such Non-Assignable Contracts will cease to be Non-Assignable Contracts as of the effective date of such Consents, and shall then be assigned by the relevant Seller to the Purchaser or a Designated Purchaser in accordance with this Agreement.

"**Non-Convertible Note Recipient Sellers**" means each of the Sellers and EMEA Sellers other than the Convertible Note Recipient Sellers.

"**Non-Debtor Sellers**" has the meaning set forth in the recitals to this Agreement.

"**Non-Exclusive Supply Contract**" means any supply Contract to which any Seller is a party that relates to the Business and also relates to one or more other businesses of the Sellers.

"**Non-Filing Party**" has the meaning set forth in Section 6.4(b)(ii).

"**Non-Solicitation Period**" means the twenty-four (24) month period immediately following the Closing Date.

"**Non-Union Employee**" means an Employee whose terms and conditions of employment are not governed by a Collective Labor Agreement.

"**Nortel Accounting Expenses**" has the meaning set forth in Section 8.7.

"**Nortel Accounting Principles**" means the accounting principles employed in the preparation of the Financial Statements, as set forth in Section 1.1(d) of the Sellers Disclosure Schedule.

"**Nortel Italy**" means Nortel Networks SpA (in administration).

"**Nortel Plan**" has the meaning set forth in Section 7.5.1.

"**Occupancy Agreement**" has the meaning set forth in the Real Estate Terms and Conditions.

23

"**Offer**" has the meaning set forth in Section 7.1.1(a).

"**Offer Consideration Period**" has the meaning set forth in Section 7.1.1(a).

"**Offering Limitation**" means that the underwriter selected by the Purchaser in an underwritten offering pursuant to a Piggyback Registration advises the Purchaser in writing that in its opinion the number of Shares or aggregate principal amount of Convertible Notes requested to be included in such offering by the Sellers and the EMEA Sellers exceeds the number of shares of Common Stock or aggregate principal amount of Convertible Securities (as applicable) which can be sold in such offering without adversely affecting the price, timing, distribution or marketability of the offering.

"**Omitted Patent Cross License**" has the meaning set forth in Section 4.5(j)(i).

"**Ontario Court**" has the meaning set forth in Section 11.6(b).

"**Open Source Software**" means Software that is made available under a license agreement that: (i) conditions use, modification or distribution of any Software program, or any Software integrated with or derived from such Software program, or into which such Software program is incorporated, on the disclosure, licensing or distribution of the source code of such Software program (or such Software); or (ii) otherwise materially limits the licensee's freedom of action with regard to seeking compensation in connection with sublicensing, licensing or distributing such Software program or Software.

"**Optional Redemption Price**" has the meaning set forth in Section 2.2.1(b).

"**Order**" means any award, writ, injunction, judgment, order or decree entered into, issued, made or rendered by any Government Entity.

"**Ordinary Course**" means the ordinary course of the Business (excluding the EMEA Business) through the date hereof consistent with past practice since the filing of the Bankruptcy Proceedings, as such practice may be modified from time to time to the extent necessary to reflect the Bankruptcy Proceedings.

"**Original Asset Sale Agreement**" has the meaning set forth in the recitals to this Agreement.

"**Original EMEA Asset Sale Agreement**" has the meaning set forth in the recitals to this Agreement.

"**Other Seller Contracts**" means Seller Contracts other than 365 Contracts.

"**Other Sellers**" has the meaning set forth in the preamble to this Agreement.

"**Other Vendor Contract**" means any Other Seller Contract that is not a Customer Contract.

"**Outbound License Agreements**" has the meaning set forth in Section 4.5(j)(iii).

**"Overhead and Shared Services"** means corporate or shared services provided to or in support of the Business that are general corporate or other overhead services and are provided to both (a) the Business and (b) other businesses or business segments of any Seller, including travel and entertainment services, temporary labor services, office supplies services (including copiers and faxes), personal telecommunications services, computer hardware and software services, fleet services, energy/utilities services, procurement and supply arrangements, treasury services, public relations, legal, compliance and risk management services (including workers' compensation), payroll services, sales and marketing support services, information technology and telecommunications services, accounting services, tax services, human resources and employee relations management services, employee benefits services, credit, collections and accounts payable services, logistics services, property management services, environmental support services and customs and excise services, in each case including services relating to the provision of access to information, operating and reporting systems and databases and including all hardware and software or other intellectual property necessary for or used in connection therewith.

**"Owned Equipment"** means (a) those items of tangible personal property owned by the Sellers that are held or used primarily in connection with the Business and that are located at the Carling Property, the Montreal Premises or any Real Property which is the subject of a Real Estate Agreement, (b) those items of tangible personal property owned by the Sellers that are personally assigned to, a Transferred Employee, (c) those other items of tangible personal property owned by the Sellers not included in clause (a) or (b) above that are held or used exclusively in the Business and (d) those other items of tangible personal property owned and paid for by the Sellers not included in clauses (a), (b) or (c) above and that are listed in Section 1.1(e) of the Sellers Disclosure Schedule excluding, in each case, any Owned Inventory and any Intellectual Property provided, however that the Owned Equipment shall not include any items of tangible personal property that are Excluded Assets described on Section 2.1.2(n) of the Sellers Disclosure Schedule.

**"Owned Inventory"** means any inventories of raw materials, manufactured and purchased parts, work-in-process, packaging, stores and supplies, unassigned finished goods inventories (which are finished goods not yet assigned to a specific customer order), "excess" or "obsolete" inventory, assets on loan, and merchandise in each case owned and paid for by the Sellers and held or used exclusively in connection with the Business, including any of the above items which is owned by the Sellers but remains in the possession or control of a contract manufacturer or another Third Party provided, however that the Owned Inventory shall not include any inventories that are Excluded Assets described on Section 2.1.2(n) of the Sellers Disclosure Schedule.

**"Owned Real Property"** has the meaning set forth in Section 4.9(a).

**"Partial Allocation"** has the meaning set forth in Section 2.2.6(b).

**"Party"** or **"Parties"** means individually or collectively, as the case may be, the Sellers and the Purchaser.

**"Patent Assignments"** means written assignments of the Patents included in the Transferred Intellectual Property, appropriate for filing with the patent office of the jurisdiction

25

in which each such Patent is registered.  Such assignments shall be substantially in the form of Exhibit V, except for any such variations as are legally necessary or customary in patent assignments in the local jurisdiction where a Patent is registered.

"**Patent Cross Licenses**" means all Contracts between the Sellers or their Affiliates and a Third Party under which the Sellers or such Affiliates, as applicable, both (i) grant a license under patents and/or patent applications owned by (or licensed to) them, and (ii) receive from the counter-party a license under patents and/or patent applications owned by (or licensed to) such counter-party (but other than inbound or outbound license agreements where the only grant back from the licensee is under improvements on the licensed Intellectual Property) in such case, to the extent the scope of such licenses include Patents licensed under the Intellectual Property License Agreement or assigned pursuant to the terms of this Agreement or that are otherwise used in the Business.

"**Patents**" includes all national (including the United States and Canada) and multinational statutory invention registrations, patents, patent applications, provisional patent applications, industrial designs, industrial models, including all reissues, divisions, continuations, continuations-in-part, extensions and re-examinations, and all rights therein provided by multinational treaties or conventions.

"**Permitted Encumbrances**" means (i) statutory Liens for Taxes or governmental assessments, charges or claims the payment of which is not yet due, or, if due, for Taxes the validity of which is being contested in good faith by appropriate proceedings, provided that in each case adequate reserves have been established to the extent required by GAAP, and which Tax Liens and the associated amount of Taxes (other than Real Property Tax Liens for assessments, charges or claims) are set forth in Section 1.1(g) of the Sellers Disclosure Schedule; (ii) mechanics', carriers', workers', repairers', landlords', warehouses and similar Liens arising or incurred in the Ordinary Course for sums not yet delinquent or overdue; (iii) any Liens imposed by any Bankruptcy Court in connection with the Bankruptcy Proceedings that are to be discharged at Closing pursuant to the terms of the Canadian Approval and Vesting Order and the U.S. Sale Order; (iv) any other Liens set forth in Section 1.1(g) of the Sellers Disclosure Schedule; and (v) present zoning, entitlement, building and land use regulations, covenants, minor defects of title, easements, rights of way, development agreements, restrictions and other similar charges or encumbrances which do not impair, individually or in the aggregate, in any material respect the use of the related assets in the Business as currently conducted.

"**Person**" means an individual, a partnership, a corporation, an association, a limited or unlimited liability company, a joint stock company, a trust, a joint venture, an unincorporated organization or other legal entity or Government Entity.

"**Petition Date**" means January 14, 2009, except with respect to Nortel Networks (CALA) Inc. in which case "Petition Date" shall mean July 14, 2009.

"**Piggyback Notice**" has the meaning set forth in Section 8.3(a).

"**Piggyback Registration**" has the meaning set forth in Section 8.3(a).

26

**"Plan of Record"** means the Products under development as included in Section 1.1(h) of the Sellers Disclosure Schedule.

**"Post-Closing Taxable Period"** means any Taxable period beginning after the Closing Date.

**"Pre-Closing Taxable Period"** means any Taxable period ending on or prior to the Closing Date.

**"Primary Party"** means each of (i) the Main Sellers and (ii) the Purchaser.

**"Prime Rate"** has the meaning set forth in Section 2.2.4.2(b)(i).

**"Products"** means those products that are (i) manufactured by or on behalf of and marketed by the Business, or (ii) in the Plan of Record, all as set forth in Section 1.1(h) of the Sellers Disclosure Schedule.

**"Provider"** has the meaning set forth in the Transition Services Agreement.

**"Purchase Price"** has the meaning set forth in Section 2.2.1(a).

**"Purchaser"** has the meaning set forth in the preamble to this Agreement.

**"Purchaser Employee Plan"** means any "employee benefit plan" within the meaning of Section 3(3) of ERISA, whether or not subject thereto, and any other employee benefit plan, agreement or arrangement, including any profit sharing plan, savings plan, bonus plan, performance awards plan, incentive compensation plan, deferred compensation plan, stock purchase plan, stock option plan, vacation plan, leave of absence plan, employee assistance plan, automobile leasing/subsidy/allowance plan, meal allowance plan, redundancy or severance plan, relocation plan, change in control plan, family support plan, pension plan, supplemental pension plan, retirement plan, retirement savings plan, post-retirement plan, medical, health, hospitalization or life insurance plan, disability plan, sick leave plan, retention plan, education assistance plan, expatriate assistance plan, compensation arrangement, including any base salary arrangement, overtime, on-call or call-in policy, death benefit plan, or any other similar plan, program, agreement, arrangement or policy that is maintained or otherwise contributed to, or required to be maintained or contributed to, by or on behalf of the Purchaser or any of its Subsidiaries or Affiliates with respect to their employees employed in those countries where they will employ Transferred Employees pursuant to this Agreement.

**"Purchaser Party"** has the meaning set forth in Section 6.7(a).

**"Qualified Expenditures"** has the meaning set forth in Section 6.5(b).

**"Real Estate Agreements"** means (i) the Carling Property Lease Agreements; (ii) as to the Montreal Premises, either the Montreal Premises Amended Lease, the Montreal Premises Restructured Lease (and any consent, assignment and assumption agreement in respect thereof, if applicable, between the Montreal Landlord, the Sellers, the Purchaser or any Designated Purchaser, as the case may be) or the Montreal Premises Sublease, as applicable in accordance with the Real Estate Terms and Conditions and the Montreal Premises Sublease

Consent, as applicable; (iii) the leases; subleases and license agreements between the relevant Sellers on the one hand, and the Purchaser or any Designated Purchasers, on the other hand, as provided by the Real Estate Terms and Conditions; and (v) any other ancillary agreements entered into in connection with, or to otherwise give effect to the occupancies contemplated by, the aforesaid agreements, in each such case to be executed and delivered on or prior to Closing, in accordance with and as provided by, the Real Estate Terms and Conditions.

"**Real Estate Terms and Conditions**" means the Real Estate Terms and Conditions attached hereto as Exhibit Y, the provisions of which are hereby incorporated into this Agreement by reference.

"**Real Property**" has the meaning set forth in Section 4.9(a).

"**Recognized Dealer**" has the meaning set forth in Section 8.9

"**Records Custodian**" means Deloitte & Touche LLP or in case such firm is unable to carry out its duties for whatever reason, such other auditing firm of international reputation that is acceptable to each of the Purchaser and the Main Sellers, each acting reasonably.

"**Registrable Securities**" has the meaning set forth in Section 8.1(a).

"**Registration Default**" has the meaning set forth in Section 8.11.

"**Registration Default Period**" has the meaning set forth in Section 8.11.

"**Registration Statement**" means each registration statement, including each Shelf Registration Statement, under the Securities Act, of the Purchaser that covers any of the Registrable Securities pursuant to this Agreement, including any information deemed to be part of and included in such registration statement pursuant to the rules of the SEC and all amendments and supplements to such registration statement and including all post-effective amendments to, all exhibits of, and all materials incorporated by reference or deemed to be incorporated by reference in, such registration statement, amendment or supplement.

"**Regulation D**" has the meaning set forth in Section 3.7(c).

"**Regulatory Approvals**" means the Antitrust Approvals and the ICA Approval.

"**Rejecting Employee**" has the meaning set forth in Section 7.1.1(h).

"**Rejecting Employees Liability Limit**" has the meaning set forth in Section 7.1.1(h).

"**Release**" means any release, spill, emission, leaking, pumping, injection, deposit, disposal, discharge, dispersal, leaching, or migration at, into or onto the Environment, including movement or migration through or in the Environment, whether sudden or non-sudden and whether accidental or non-accidental, or any release, emission or discharge as those terms are defined in any applicable Environmental Laws.

**"Respective Affiliates"** has the meaning set forth in Section 11.15(c).

**"Restricted Assets"** has the meaning set forth in Section 2.2.3(a).

**"Restricted Employee"** has the meaning set forth in Section 2.2.3(b).

**"Restricted Liabilities"** has the meaning set forth in Section 2.2.3(b).

**"Restricted Seller"** has the meaning set forth in Section 2.2.3(b).

**"Restricted Technical Records"** means the Livelink database or any other similar database containing all necessary documents with respect to the technical aspects of the Qualified Expenditures of NNTC or NNL in their 2007 and subsequent taxation years.

**"SEC"** has the meaning set forth in Section 3.7(g).

**"SEC Filings"** has the meaning set forth in Section 3.7(g).

**"Seconded Employee"** means Employees who are located in, or employed by the Sellers in any of the countries set forth in Section 1.1(m) of the Sellers Disclosure Schedule in which a Designated Purchaser is not ready to employ the Employees as of the Closing Date as determined in good faith by Purchaser and who having accepted an Offer or who transfer by operation of Law would otherwise be Transferred Employees on the Employee Transfer Date.

**"Securities Act"** means the Securities Act of 1933, as amended.

**"Security Deposits"** has the meaning set forth in Section 5.21(a).

**"Seller Consents"** has the meaning set forth in Section 2.1.1(g).

**"Seller Contracts"** means (i) those Contracts of a Seller that relate exclusively to the Business (excluding licenses of Intellectual Property) and (ii) the Contracts listed in Section 1.1(i) of the Sellers Disclosure Schedule.

**"Seller Employee Plan"** means any "employee benefit plan" within the meaning of Section 3(3) of ERISA, whether or not subject thereto, and any other employee benefit plan, agreement or arrangement, including any profit sharing plan, savings plan, bonus plan, performance awards plan, incentive compensation plan, deferred compensation plan, stock purchase plan, stock option plan, vacation plan, leave of absence plan, employee assistance plan, automobile leasing/subsidy/allowance plan, meal allowance plan, redundancy or severance plan, relocation plan, family support plan, pension plan, supplemental pension plan, retirement plan, retirement savings plan, post retirement plan, medical, health, hospitalization or life insurance plan, disability plan, sick leave plan, retention plan, education assistance plan, expatriate assistance plan, change in control plan, compensation arrangement, including any base salary arrangement, overtime, on-call or call-in policy, death benefit plan, or any other similar plan, program, agreement, arrangement or policy that is maintained or otherwise contributed to, or required to be maintained or contributed to, by or on behalf of the Sellers or any of their Subsidiaries or Affiliates (excluding any EMEA Sellers) with respect to Employees.

29

"**Seller Insurance Policies**" has the meaning set forth in Section 5.20(a).

"**Seller Supply Agreement**" means the agreement between the relevant Sellers or the purchaser of the Sellers' Enterprise business, on the one hand, and the Purchaser and/or any Designated Purchasers, on the other hand, relating to the purchase and sale of certain hardware and Software products related to the Sellers' Carrier Ethernet business, that the relevant Parties will use commercially reasonable efforts to negotiate before the Closing pursuant to Section 5.25.

"**Sellers**" has the meaning set forth in the preamble to this Agreement.

"**Sellers Disclosure Schedule**" means the disclosure schedule delivered by the Sellers to the Purchaser on the date hereof.

"**Sellers' Trademarks**" has the meaning set forth in Section 5.22.

"**Service Readiness Date**" has the meaning set forth in Section 5.28 of the Sellers Disclosure Schedule.

"**Services**" means those services that are provided by or on behalf of the Sellers in connection with the Business to customers as set forth in Section 1.1(j) of the Sellers Disclosure Schedule.

"**Shares**" means the shares of Common Stock issued or issuable upon conversion of the Convertible Notes.

"**Shelf Offering**" has the meaning set forth in Section 8.2(a).

"**Shelf Registration Statement**" has the meaning set forth in Section 8.1(a).

"**Shelf Take-Down Notice**" has the meaning set forth in Section 8.2(a).

"**Short-Term Licensed Property**" has the meaning set forth in Section 4.9(a).

"**Software**" means any and all (i) computer programs, whether in source code or object code, (ii) computerized databases and compilations, and (iii) all user manuals and architectural and design specifications, training materials and other documentation relating to any of the foregoing.

"**Solicitation Period**" has the meaning set forth in Section 5.3(f).

"**Specified Employee Liabilities**" has the meaning set forth in Section 2.1.3(i).

"**Specified Transferred Employees**" has the meaning set forth in Section 7.1.2(b)(ii)(A).

"**Sponsored Reorganization Plan**" means a plan of reorganization under Section 1129 of the Bankruptcy Code providing for the retention by all or part of the Sellers (or their successor entities emerging from the Bankruptcy Proceedings) of all or substantially all of the

Assets and the EMEA Assets taken as a whole, that is filed or otherwise sponsored by one or more of the Third Party creditors of the Sellers.

"**Straddle Period**" has the meaning set forth in Section 6.4(b)(i).

"**Subcontract Agreement**" means one or more agreements between the relevant Sellers, on the one hand, and the Purchaser and/or any Designated Purchasers, on the other hand, to be executed on or before the Closing in a form mutually agreed to by the Parties so as to pass through the benefits and burdens of the underlying Contract with customers as if the Purchaser or the applicable Designated Purchaser were party thereto.

"**Subsidiary**" of any Person means any Person Controlled by such first Person.

"**Substituted Convertible Notes**" has the meaning set forth in Section 2.2.7(b).

"**Successful Bidder**" has the meaning set forth in the U.S. Bidding Procedures Order.

"**Succession Tax Lien**" has the meaning given to that term in the EMEA Asset Sale Agreement.

"**Succession Tax Liabilities**" has the meaning given to that term in the EMEA Asset Sale Agreement.

"**Tax**" means (a) any domestic or foreign federal, state, local, provincial, territorial or municipal taxes or other impositions by or on behalf of any Government Entity, including the following taxes and impositions: net income, gross income, individual income, capital, value added, goods and services, gross receipts, sales, use, ad valorem, business rates, transfer, franchise, profits, business, environmental, real property, personal property, service, service use, withholding, payroll, employment, unemployment, severance, occupation, social security, excise, stamp, stamp duty reserve, customs, and all other taxes, fees, duties, assessments, deductions, withholdings or charges of the same or of a similar nature, however denominated, together with any interest and penalties, additions to tax or additional amounts imposed or assessed with respect thereto, whether or not disputed and (b) any obligation to pay Taxes of a Third Party or Affiliate, whether by contract, as a result of transferee or successor liability, as a result of being a member of an affiliated, consolidated, combined or unitary group for any period or otherwise.

"**Tax Authority**" means any local, municipal, governmental, state, provincial, territorial, federal, including any U.S., Canadian, U.K. or other fiscal, customs or excise authority, body or officials anywhere in the world with responsibility for, and competent to impose, collect or administer, any form of Tax.

"**Tax Claim**" has the meaning set forth in Section 6.7(b).

"**Tax Credit Purchaser**" has the meaning set forth in Section 6.5(b).