# EXHIBIT B

**[Settlement Agreement]**

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| *In re* | : | Chapter 11 |
| Nortel Networks Inc., *et al.*,[1] | : | Case No. 09-10138 (KG) |
| Debtors. | : | Jointly Administered |

## CONFIDENTIAL SETTLEMENT AGREEMENT

This Confidential Settlement Agreement (the "Settlement Agreement"), effective upon entry of the Final Order (as defined below), is entered into by and between Nortel Networks Inc. ("NNI"), a corporation established under the laws of the State of Delaware with its principal place of business located at 2221 Lakeside Blvd., Richardson, Texas 75082 U.S.A. and International Business Machines Corporation ("IBM"), a corporation established under the laws of the State of New York, with its principal place of business located at Route 100, Salmers, New York 10589 (NNI and IBM each a "Party", and together, the "Parties"). The Parties hereby stipulate and agree to the following terms and conditions:

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's tax identification number, are: Nortel Networks Inc. (6332), Nortel Networks Capital Corporation (9620), Nortel Altsystems Inc. (9769), Nortel Altsystems International Inc. (5596), Xros, Inc. (4181), Sonoma Systems (2073), Qtera Corporation (0251), CoreTek, Inc. (5722), Nortel Networks Applications Management Solutions Inc. (2846), Nortel Networks Optical Components Inc. (3545), Nortel Networks HPOCS Inc. (3546), Architel Systems (U.S.) Corporation (3826), Nortel Networks International Inc. (0358), Northern Telecom International Inc. (6286) and Nortel Networks Cable Solutions Inc. (0567) and Nortel Networks (CALA) Inc. (4226). Addresses for the Debtors can be found in the Debtors' petitions, which are available at http://chapter11.epiqsystems.com/nortel.

## RECITALS

**WHEREAS**, on March 30, 2007, Nortel Networks Limited ("NNL"), on behalf of itself, its parent Nortel Networks Corporation ("NNC"), and Subsidiaries[2] and IBM executed that certain Master Services Agreement (the "HLR/HSS Agreement")[3];

**WHEREAS**, on March 31, 2008, NNL, on behalf of itself, its parent NNC, and NNI and IBM executed that certain Master Services Agreement (the "PV&T Agreement", and together with the HLR/HSS Agreement, the "Agreements")[4];

**WHEREAS**, on or about January 14, 2009 (the "Petition Date")[5], (i) NNL and certain of its Canadian affiliates (collectively, the "Canadian Debtors")[6] filed an application under and were granted certain initial creditor protection pursuant to the Companies' Creditors Arrangement Act (Canada) (the "CCAA") to facilitate a comprehensive business and financial restructuring (the "CCAA Proceedings") pursuant to the terms of an initial order of the Ontario Superior Court of Justice (Commercial List) (the "Canadian Court"), as the same has been and may be amended and restated from time to time (the "Initial Order"); (ii) NNI and certain of its

---

2 As defined in the HLS/HSS Agreement. Capitalized terms used but not defined herein shall have the meaning ascribed to them in the HLR/HSS Agreement or the PV&T Agreement, as applicable.

3 The term, HLR/HSS Agreement, as used in this Settlement Agreement, includes: (i) all related Statements of Work and Project Change Requests and all other documents or work requests executed or issued by any party or parties pursuant to the HLR/HSS Agreement; and (ii) any portion of the HLR/HSS Agreement, and the rights and obligations thereunder, that were assigned by IBM to any other party.

4 The term, PV&T Agreement, as use in this Settlement Agreement, includes (i) all Schedules, Appendices, Requests for Change, Contract Change Requests, requests for new Project Services, and all other documents or work orders executed or issued by any party or parties pursuant to the PV&T Agreement; (ii) that portion of the PV&T Agreement, and the rights and obligations thereunder, that were assigned by IBM to IBM Canada Limited ("IBM Canada") by Notice of Assignment between IBM, IBM Canada and NNL, deemed to be effective June 9, 2008; (iii) that portion of the PV&T Agreement, and the rights and obligations thereunder, that were assigned to IBM Global Services (China) Co., Ltd. ("IGSC") by Notice of Assignment between IBM, IGSC and NNL dated September 22, 2008; and (iv) any portion of the PV&T Agreement, and the rights and obligations thereunder, that were assigned by IBM to any other party.

5 The Petition Date shall also refer, only in the case of Nortel Networks (CALA) Inc., to July 14, 2009.

6 The Canadian Debtors include the following entities: NNC, NNL, Nortel Networks Technology Corporation, Nortel Networks Global Corporation and Nortel Networks International Corporation.

U.S. subsidiaries (the "U.S. Debtors")[7] filed voluntary petitions for relief (the "U.S. Bankruptcy Cases") under Title 11 of the United States Code, 11 U.S.C. et seq. 101 (as amended, the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Delaware (the "U.S. Bankruptcy Court", and together with the Canadian Court, the "Courts"); and (iii) the High Court of Justice in England placed nineteen of the EMEA entities (the "EMEA Debtors" [8], and together with the Canadian Debtors and the U.S. Debtors, the "Debtors") into administration under the control of individuals from Ernst & Young LLC (the "EMEA Proceedings", and together with the CCAA Proceedings and the U.S. Bankruptcy Cases, the "Proceedings");

**WHEREAS**, on January 15, 2009, the U.S. Bankruptcy Court entered the *Order Pursuant to 11 U.S.C. § 105, Bankruptcy Rule 1015 and Local Rule 1015-1 (I) Directing Joint Administration of the Debtors' Related Chapter 11 Cases and (II) Granting Related Relief* [D.I. 36], which provided for the joint administration of the U.S. Bankruptcy Cases and for consolidation for procedural purposes only;

**WHEREAS**, on January 26, 2009, the Office of the United States Trustee for the District of Delaware (the "U.S. Trustee") appointed an Official Committee of Unsecured

---

7 The U.S. Debtors include the following entities: Nortel Networks Inc., Nortel Networks Capital Corporation, Nortel Altsystems Inc., Nortel Altsystems International Inc., Xros, Inc., Sonoma Systems, Qtera Corporation, CoreTek, Inc., Nortel Networks Applications Management Solutions Inc., Nortel Networks Optical Components Inc., Nortel Networks HPOCS Inc., Architel Systems (U.S.) Corporation, Nortel Networks International Inc., Northern Telecom International Inc. and Nortel Networks Cable Solutions Inc. The U.S. Debtors also include Nortel Networks (CALA) Inc., which subsequently filed a voluntary chapter 11 petition in the U.S. Bankruptcy Court on July 14, 2009, and the U.S. Bankruptcy Cases include the chapter 11 case of Nortel Networks (CALA) Inc.

8 The EMEA Debtors include the following entities: Nortel Networks UK Limited, Nortel Networks S.A., Nortel Networks (Ireland) Limited, Nortel GmbH, Nortel Networks France S.A.S., Nortel Networks Oy, Nortel Networks Romania SRL, Nortel Networks AB, Nortel Networks N.V., Nortel Networks S.p.A., Nortel Networks B.V., Nortel Nortel Networks Polska Sp. z.o.o., Nortel Networks Hispania, S.A., Nortel Networks (Austria) GmbH, Nortel Networks, s.r.o., Nortel Networks Engineering Service Kft, Nortel Networks Portugal S.A., Nortel Networks Slovensko, s.r.o. and Nortel Networks International Finance & Holding B.V.

Creditors (the "Committee") pursuant to section 1102(a)(1) of the Bankruptcy Code [D.I.s 141, 142]. No trustee or examiner has been appointed in the U.S. Debtors' cases;

**WHEREAS**, on July 14, 2009, Nortel Networks (CALA) Inc. ("NN CALA" and a U.S. Debtor with NNI and its affiliates), an affiliate of NNI, filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. On July 17, the U.S. Bankruptcy Court entered orders approving the joint administration and consolidation of NN CALA's chapter 11 case with the other U.S. Debtors' chapter 11 cases for procedural proposes [D.I. 1098], and applying to NN CALA certain previously entered orders in the U.S. Debtors' chapter 11 cases [D.I. 1099];

**WHEREAS**, on March 20, 2009, the U.S. Bankruptcy Court entered the *Order Approving Procedures for the Rejection of Executory Contracts and Unexpired Leases and the Abandonment of Certain Assets Related Thereto* [D.I. 510] (the "Rejection Procedures Order");

**WHEREAS,** on May 28, 2009, in accordance with the Rejection Procedures Order, the U.S. Debtors filed the *Fifth Notice of Rejection of Executory Contract(s) and/or Personal Property Lease(s) by Debtors and Debtors in Possession* [D.I. 794] (the "PV&T Agreement Rejection Notice"). Following the expiration of the Rejection Notice Period applicable to the PV&T Rejection Notice[9] without objection to the PV&T Agreement Rejection Notice, the PV&T Agreement was deemed rejected on May 28, 2009;

**WHEREAS**, by letter dated May 28, 2009 (the "PV&T Agreement Repudiation Letter"), pursuant to paragraph 11(d) of the Initial Order, NNL and NNC repudiated the PV&T Agreement;

**WHEREAS,** on September 29, 2009, in accordance with the Rejection Procedures Order, the U.S. Debtors filed the *Sixteenth Notice of Rejection of Executory*

---

9 As defined by the Rejection Procedures Order.

*Contract(s) and/or Personal Property Lease(s) by Debtors and Debtors in Possession* [D.I. 1572] (the "HLR/HSS Agreement Rejection Notice"). Following the expiration of the Rejection Notice Period applicable to the HLR/HSS Agreement Rejection Notice[10] without objection to the HLR/HSS Agreement Rejection Notice, the HLR/HSS Agreement was deemed rejected on September 30, 2009;

**WHEREAS**, by letter dated September 29, 2009 (the "HLR/HSS Agreement Repudiation Letter"), pursuant to paragraph 11(d) of the Initial Order, NNL and NNC repudiated the HLR/HSS Agreement.

**WHEREAS**, on August 4, 2009, the U.S. Bankruptcy Court entered the *Order Establishing Deadlines for Filing Proofs of Claim and Approving Form and Manner of Notice Thereof* [D.I. 1280] (the "U.S. Bar Date Order") establishing September 30, 2009 at 4:00 p.m. (prevailing Eastern Time) as the last date for persons or entities to file proofs of claim based upon prepetition obligations of the U.S. Debtors;

**WHEREAS**, on February 2, 2009, IBM filed claim number 192 (the "Initial IBM Claim") against the U.S. Debtors. On September 30, 2009, IBM filed claim numbers 5418, 5419, and 5420 against the U.S. Debtors (collectively, the "Additional IBM Claims", and together with the Initial IBM Claim, the "IBM U.S. Claim");

**WHEREAS**, on July 30, 2009, the Canadian Court entered the Claims Procedure Order (the "Canadian Bar Date Order", and together with the U.S. Bar Date Order, the "Bar Date Order") establishing September 30, 2009 at 4:00 p.m. (prevailing Eastern Time) as the last date for persons or entities to file proofs of claim based on prefiling obligations of the Canadian Debtors;

---

[10] As defined by the Rejection Procedures Order.

**WHEREAS**, on September 30, 2009, IBM filed a claim against both of NNC and NNL each of which claim consisted of a US $22,299,106.76 unsecured claim and a US $29,310,274.38 restructuring claim; IBM Global Services (China) Co. Ltd. filed a claim against both of NNC and NNL each of which claim consisted of a US $485,750.96 unsecured claim and a US $493,509.95 restructuring claim; and IBM Canada Limited filed a claim against NNC which consisted of a US $576,343.04 unsecured claim, a CAN $2,308,982.81 unsecured claim and a CAN $13,384,621.97 restructuring claim (collectively, the "IBM Canada Claim", and together with the IBM U.S. Claim, the "IBM Claim");

**WHEREAS**, IBM asserts, through, among other things, the IBM Claim, a claim against the Debtors for (i) amounts due and owing, directly or indirectly relating to, or arising from, the HLR/HSS Agreement arising prior to the Petition Date (all such claims whether asserted or assertable, the "Pre-Petition HLR/HSS Agreement Claim"); (ii) amounts due and owing, directly or indirectly relating to, or arising from, the PV&T Agreement arising prior to the Petition Date (all such claims whether asserted or assertable, the "Pre-Petition PV&T Agreement Claim", and together with the Pre-Petition HLR/HSS Agreement Claim, the "Pre-Petition Claim"); (iii) amounts due and owing, directly or indirectly relating to, or arising from, the HLR/HSS Agreement arising on or after the Petition Date (all such claims whether asserted or assertable, the "Post-Petition HLR/HSS Agreement Claim"); and (iv) amounts due and owing, directly or indirectly relating to, or arising from, the PV&T Agreement arising on or after the Petition Date (all such claims whether asserted or assertable, the "Post-Petition PV&T Agreement Claim", and together with the Post-Petition HLR/HSS Agreement Claim, the "Post-Petition Claim"). The Post-Petition Claim specifically includes, without limitation, all amounts listed on the attached **Exhibit A**.

**WHEREAS**, IBM asserts, through, among other things, the IBM Claim, a claim against the Debtors for (i) Wind Down Costs, Termination Charges, Termination for Convenience Charges, and including all other similar charges and amounts, in regard to the PV&T Agreement (collectively, the "PV&T Wind Down and Termination Charges"); and (ii) Early Termination, and including all other similar charges and amounts, in regard to the HLR\HSS Agreement (collectively, the "HLR\HSS Early Termination", and together with the PV&T Wind Down and Termination Charges, the "Wind Down and Termination Charges[11]"). IBM asserts that the Termination and Wind Down Charges are a claim against the Debtors which arises on or after the Petition Date.

**WHEREAS**, IBM asserts, through, among other things, the IBM Claim, a claim against the Debtors for Lab Start Up Costs, and including all other similar charges and amounts, under the PV&T Agreement (the "Lab Start Up Costs").

**WHEREAS**, the Parties acknowledge that (i) establishing the character, validity and amount of the IBM Claim is likely to require time-consuming and costly litigation and (ii) the outcome of any objection to the IBM Claim is uncertain;

**WHEREAS**, the Parties desire to avoid such expense and resolve certain of the differences between them by agreement as set forth below; and

**WHEREAS**, the Parties have been and are currently represented by counsel at all times during the course of the settlement negotiations culminating in this Settlement Agreement.

**NOW, THEREFORE**, in consideration of the foregoing and in consideration of the terms, conditions, mutual agreements and covenants set forth herein, and other good and

---

[11] The term Wind Down and Termination Charges includes any and all Capital Account recovery charges, Capital Account amounts, and all other similar charges and amounts owing under the PV&T Agreement, the HLR\HSS Agreement, or both.

valuable consideration, the receipt and sufficiency of which the Parties acknowledge, and in order to avoid the expense, delay and uncertainty associated with further litigation or objection relating to the IBM Claim, and the other matters addressed herein, it is hereby:

**AGREED**, by and between the Parties hereto, as follows:

1. In full and final settlement of the Post-Petition Claim, NNI agrees to pay US$ 2,500,000 directly to IBM (the "Payment[12]"), within three (3) business days of the date of entry of the Final Order (as defined below). The Payment shall be made by wire transfer of immediately available funds to an account as provided by IBM's instructions.

2. Upon entry of the Final Order (as defined below), and except as otherwise expressly set forth herein, IBM and its affiliates, specifically including, but without limitation, IBM Canada Limited and IBM Global Services (China) Co. Ltd., and its and their successors and assigns (collectively the "IBM Releasors"), (i) do hereby finally and irrevocably release, waive, and discharge any and all rights, rights of set-off, causes of action, liabilities, remedies and claims of any kind or nature whatsoever arising under or relating to the PV&T Agreement, the HLR/HSS Agreement, or both, including, without limitation, the amounts listed on **Exhibit A**, which the IBM Releasors have, may have or could have asserted against the Debtors, including specifically all of the Debtors subsidiaries and affiliates, or their former, present or future administrators, trustees, officers, Monitor, directors, employees or agents (the "Nortel Released Parties"), which arise directly from or relate to transactions or events occurring or deemed to occur on or after the Petition Date, whether known or unknown, foreseen or unforeseen, matured or unmatured, contingent or not contingent, whether or not hidden or concealed, whether based on tort, fraud, contract or otherwise, and/or any other obligations, claims, interests, or debts of

[12] A portion of the Payment will be contributed by NNL\NNC.

any kind, directly or indirectly relating to, or arising from, which the IBM Releasors, from the beginning of time, heretofore possessed or may possess against the Nortel Released Parties (individually and collectively, and including without limitation the Post-Petition Claim, the "Released Post-Petition Claims"); and (ii) the IBM Releasors forever release, waive, and discharge any and all rights to assert that the Released Post-Petition Claims are entitled to administrative priority under section 503 of the Bankruptcy Code or otherwise, or are entitled to any treatment other than as consequences of repudiation and corresponding damages to be dealt with as Pre-Petition Claims in the Plan, pursuant to paragraph 11(d) of the Initial Order.

3. The foregoing notwithstanding, IBM does not release, waive, and discharge its Pre-Petition Claim, including without limitation, its claim for the Termination and Wind Down Charges and Lab Start Up Costs, provided, however, (i) the IBM Releasors agree and stipulate that the Termination and Wind Down Charges and Lab Start Up Costs arise directly from or relate to transactions or events occurring or deemed to occur prior to the Petition Date; and (ii) the IBM Releasors agree and stipulate that any claim for the Termination and Wind Down Charges and Lab Start Up Costs shall be treated solely as a claim that arises directly from or relates to transactions or events occurring or deemed to occur before the Petition Date and shall not be entitled to administrative priority under section 503 of the Bankruptcy Code or otherwise, or entitled to any treatment other than as consequences of repudiation and corresponding damages to be dealt with as Pre-Petition Claims in the Plan, pursuant to paragraph 11(d) of the Initial Order; (iii) the IBM Releasors forever release, waive, and discharge any and all rights to assert that the Termination and Wind Down Charges and Lab Start Up Costs arise directly from or relate to transactions or events occurring or deemed to occur on or after the Petition Date; and (iv) the IBM Releasors forever release, waive, and discharge any and all rights

to assert that the Termination and Wind Down Charges and Lab Start Up Costs are entitled to administrative priority under section 503 of the Bankruptcy Code or otherwise, or entitled to any treatment other than as consequences of repudiation and corresponding damages to be dealt with as Pre-Petition Claims in the Plan, pursuant to paragraph 11(d) of the Initial Order.

4. The IBM Releasors agree and stipulate that the Pre-Petition Claim, IBM's claim for the Termination and Wind Down Charges, and IBM's claim for the Lab Start Up Costs shall not be allowed against the estate of more than one Debtor.

5. The Parties understand and acknowledge that this Settlement Agreement is subject to approval by the U.S. Bankruptcy Court and that this Settlement Agreement shall not become final and binding upon the Parties until the entry by the U.S. Bankruptcy Court or of an appellate court, where applicable, of an order approving the Settlement Agreement (the "Final Order"). For purposes of this Settlement Agreement, a "Final Order" means an order, the operation or effect of which has not been stayed, reversed or amended and as to which the time to appeal or such review or rehearing has expired and as to which no appeal or petition for review or rehearing was filed or, if filed, remains pending. Upon receipt of a fully executed Settlement Agreement, the U.S. Debtors agree to promptly seek approval of this Settlement Agreement by the U.S. Bankruptcy Court and the Parties agree to take all reasonable actions necessary to secure entry of such an order. In the event that the Settlement Agreement is not approved by the U.S. Bankruptcy Court for any reason, no part of this Settlement Agreement shall be admissible in evidence for any purpose.

6. In the event a Final Order is not entered, or NNI does not transfer the Payment to IBM, before December 31, 2009, or such later date as the parties mutually agree, IBM shall have the right to terminate this Settlement Agreement.

7. The Parties agree and acknowledge that this Settlement Agreement is for the compromise of disputed claims and nothing contained in this Settlement Agreement nor any of the negotiations in connection herewith constitute or shall be construed as an admission by either Party of any wrongdoing, breach of contract or liability pursuant to the Agreements.

8. Each Party covenants that (i) it has the full power and authority to make, execute, deliver and perform this Settlement Agreement and its terms, and has taken such corporate and other action as is necessary or appropriate to enable it to perform its obligations hereunder, (ii) that no additional consent, approval, authorization, or other of any court, governmental agency or other body is required for its execution of this Settlement Agreement or its performance of any obligation hereunder except for the entry of the Final Order of the U.S. Bankruptcy Court approving the NNI's entry into this Settlement Agreement, (iii) this Settlement Agreement has been duly executed and delivered by it and constitutes its legal and valid binding obligation, enforceable in accordance with its terms, and (iv) that its respective undersigned representatives have full authority to make, execute and deliver this Settlement Agreement on behalf of the Party for which he or she has executed.

9. Each Party to this Settlement Agreement will bear its own costs, expenses, and claims to interest and attorneys' fees, whether taxable or otherwise, incurred in or arising out of, or in any way connected with the matters which are referenced or covered in the mutual releases referenced above or which were otherwise related to the subject of this Settlement Agreement. In the event any action is necessary to enforce a provision or provisions of this Settlement Agreement, all costs, expenses and attorneys' fees incurred in taking such action, whether taxable or not, shall be paid by the non-prevailing Party to the prevailing Party.

10. This Settlement Agreement represents and contains the entire agreement and understanding between the Parties hereto with respect to the subject matter of this Settlement Agreement, and supersedes any and all prior oral and written agreements and understandings. No representation, warranty, condition, understanding or agreement of any kind with respect to the subject matter hereof shall be relied upon by the Parties except those contained herein. This Settlement Agreement may not be amended or modified except by an agreement signed by the Party against whom enforcement of any modification or amendment is sought.

11. All Parties agree to cooperate fully and execute any and all supplementary documents and to take all additional actions which may be necessary or appropriate to give full force and effect to the basic terms and intent of this Settlement Agreement.

12. In entering into this Settlement Agreement, the Parties each acknowledge and represent that they have had the opportunity to seek and obtain the legal advice of their attorneys, who are the attorneys of their own choice. They further represent that they have made a full investigation into the facts surrounding the Agreements. Each Party acknowledges that it has completely read, understands and voluntarily accepts the terms of this Settlement Agreement.

13. This Settlement Agreement may be executed by facsimile in any number of counterparts, each of which shall be deemed an original, and all of which together shall be deemed one and the same instrument.

14. This Settlement Agreement shall be binding upon and inure to the benefit of the Parties' respective executors, administrators, personal representatives, legal heirs, successors, assigns, and insolvency representatives, including, but not limited to, any chapter 11 or chapter 7 trustee subsequently appointed in the U.S. Debtors' bankruptcy cases.

15. This Settlement Agreement shall be governed by, construed and interpreted in accordance with the laws of the State of Delaware, without giving effect to the choice of law provisions thereof.

16. The language of this Settlement Agreement shall be construed as a whole, according to its fair meaning and intent and not strictly for or against any party. In the event an ambiguity or question of intent or interpretation arises, this Settlement Agreement shall be construed as if drafted jointly by the Parties and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of the authorship of any of the provisions of this Settlement Agreement.

IN WITNESS WHEREOF, the Parties hereto have duly executed this Settlement Agreement as of the 7th day of December, 2009.

3264367

SIGNED for and on behalf of International Business Machines Corporation and its successors and assigns: )

By:
Print Name: MATT PORTA
Date: December 7, 2009
Address: 425 Market Street, San Francisco CA
Witness:

SIGNED for and on behalf of of IBM (China) Company Limited, formerly known as IBM Global Services (China) Co. Ltd, and its successors and assigns: )

By: MARC. A. CHAPMAN (GM)
Print Name:
Date: DECEMBER 7, 2009
Address: PCP IBM OFFICE, BEIJING
Witness: Janice Lin (GBS CFO)

SIGNED for and on behalf of of IBM Canada Limited, and its successors and assigns: )

By: MORAG PARKINSON
Print Name:
Date: DECEMBER 7, 2009
Address: 3600, STEELES AVE E, MARKHAM. ONT. CANADA
Witness:

SIGNED for and on behalf of Nortel Networks Inc. and its affiliates and its and their successors and assigns: )

By:
Print Name: John M. Doolittle, President
Date: December 7, 2009
Address: 5945 Airport Road, Mississauga, Ontario L4V 1R9
Witness: Yolanda Lopez-Gomez

**EXHIBIT A**

**EXHIBIT A - Summary of IBM Total PV&T and HLR/HSS** — **Outstanding Unpaid Post Petition**

| **Services Charges Summary (per IBM invoice detail)** | **Delivered in Services** | **Invoices Issued to Nortel Amortized Payment Due at the time** | **Nortel Amortized Payment already applied** | **Balance Due** |
|---|---|---|---|---|
| IBM China Claim (against NNI, in U.S. $s) | $ 500,224.08 | $ 16,945.74 | $ (6,834.12) | $493,389.96 |
| IBM US Claim (U.S. $) | $ 3,378,621.94 | $ 126,436.44 | $ (65,074.23) | $3,313,547.71 |
| IBM Canada Claim (Canadian $) | $ 783,012.75 | $ 118,733.43 | $ (2,148.96) | $780,863.79 |
| IBM Canada Claim (converted to U.S. $, Nov 25, 2009) | | | | $739,090.00 |
| **Additional Charges** | | | | |
| 2009 Pass Thru Charges | $ 114,092.67 | | | $114,092.67 |
| 2009 Knowledge Transfer (Milestone) Billing | $ 31,900.96 | | | $31,900.96 |
| | | | **(U.S. $)** | |
| | | | **Total IBM Post Petition Invoices (U.S. $)** | **$4,692,021.30** |
| **Note: Parties Agree Lab Start up costs shall be a Pre Petition Claim** | | | **Less Lab Startup Costs** | **$1,340,482.00** |
| | | | **Settlement Value** | **$2,500,000.00** |

**IBM INVOICED WORK HOURS SUMMARY (U.S., CANADA, CHINA) Jan 14, 2009 - May 28, 2009**

| **Worked** | Jan | Feb | Mar | Apr | May | Total Jan-Jun |
|---|---|---|---|---|---|---|
| US Tranition Hours | 6,488 | 20,490 | 23,589 | 10,712 | 7,784 | |
| China Transition Hours | 1,272 | 2,336 | 3,576 | 1,224 | 0 | |
| Canada Transition Hours | 1,503 | 2,795 | 2,230 | 1,696 | 756 | |
| Total Transition Hours | 9,263 | 25,621 | 29,395 | 13,632 | 8,540 | 86,451 |

**U.S. Invoices Shows a substantial outstanding fee is for Lab Start Up Costs ($1,340,482)**

**IBM U.S. INVOICES SUMMARY Jan 14, 2009 - May 28, 2009**

| | Jan | Feb | Mar | Apr | May | Total Jan-May |
|---|---|---|---|---|---|---|
| Actually Billed on the US Invoices | $421,366 | $933,300 | $933,300 | $639,689 | $468,699 | $3,396,353 |
| Total IBM KT Hours on U.S. invoices | 6488 | 20490 | 23589 | 10712 | 7784 | 69,063 |
| Collaboration Center | $24,125 | $41,594 | $41,594 | $41,594 | $34,477 | $183,384 |
| Lab Startup Costs | $179,153 | $303,306 | $303,306 | $303,306 | $251,411 | $1,340,482 |