**EXHIBIT C**

December 7, 2009

Board of Directors
Nortel Networks Inc.
2221 Lakeside Boulevard
Richardson, Texas 75082-4399

Re: Principal Officer of Nortel Networks Inc. ("NNI")

1. **Introduction**

    Subject to the approval of the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"), by this letter NNI hereby retains John Ray, Senior Managing Director of Avidity Partners, LLC ("Ray"), to act as the Principal Officer of NNI and its affiliates that are chapter 11 debtors (collectively, the "US Debtors" and, together, with their non-US Debtor affiliates and subsidiaries, "Nortel") in proceedings pending before the Bankruptcy Court, effective as of the date of execution hereof. In his role as Principal Officer, Ray will provide certain Services (as defined herein) to the US Debtors as set forth below. This letter of engagement (the "Engagement") and the related Standard Terms and Conditions together constitute the engagement contract (the "Engagement Contract") pursuant to which the Services will be provided.

2. **Scope of Services**

    Ray shall become the Principal Officer of NNI and each of the US Debtors and in such officer capacity shall have the principal, but not sole, responsibility for overseeing and directing the wind down of the estates of NNI and the other US Debtors with the goal of promptly maximizing the value to be distributed to creditors. Ray's responsibilities as Principal Officer shall include, but not be limited to,: (1) directing, and overseeing the winding up of the businesses of the US Debtors, and reviewing and guiding their interaction with other Nortel entities and businesses, (2) supporting and defending the interests of the US Debtors' estates and their creditors on issues including, without limitation, purchase price and cost allocation, repatriation of cash, cost reductions, transition services and related pricing, claims resolution, inter-estate disputes between the US Debtors or among the US Debtors and the various Nortel entities, compensation, auditing and other administrative functions, and any other issues that may affect recoveries to creditors of the US Debtors' estates, (3) receiving periodic reports from operational management on the provision of transition services and the winding down of the Nortel businesses, (4) working with all constituents to develop and implement plans to monetize remaining assets, developing and implementing strategies for winding down Nortel businesses or creating plans of liquidation or reorganization, (5) in furtherance of the foregoing, interacting and consulting as appropriate with Nortel employees, the Monitor appointed in Nortel's Canadian

1

insolvency proceedings, the Joint Administrators appointed in Nortel's UK administrative proceedings, the official committee of unsecured creditors appointed in the US Debtors' chapter 11 proceedings (the "Creditors' Committee), the ad hoc committee of bondholders (the "Bondholders' Group") and each of their various retained advisors, (6) meeting with and providing periodic reports to the Board of Directors of NNI (the "Board"), the Creditors' Committee, the steering committee of the Bondholders' Group and, to the extent necessary, the Bankruptcy Court, which, with respect to the Creditors' Committee and the steering committee of the Bondholders' Group, shall include, if requested, one in-person meeting approximately every 60 days from and after December 7, 2009, and (7) such other services as may be mutually agreed upon by Ray and NNI (all of the foregoing collectively, the "Services"), provided, however, that it is acknowledged and agreed that the Services do not include day-to-day operational management of the US Debtors' businesses.

In his performance of the Services, Ray may seek advice and/or analyses from the advisors to the Creditors' Committee or the Bondholders' Group, and Ray shall be permitted to receive such advice and/or analyses on the condition that the parties hereto acknowledge and agree that any such advice or analyses will be provided to Ray by the advisors solely in their capacity as representatives for the Creditors' Committee and/or Bondholders' Group, as applicable, and that all appropriate steps shall be taken to protect the confidentiality and common-interest privilege, if any, of such communications.

3. **Fees**

In consideration for the Services, Ray will charge NNI $450 per hour (the "Fees"). Such Fees shall be payable monthly, subject to Bankruptcy Court approval of fee applications filed by Ray in accordance with the interim compensation procedures order approved by the Bankruptcy Court in the US Debtors' chapter 11 cases (the "ICP Order"); provided, however, that, except as provided in Section 5.1 of the attached Standard Terms and Conditions, 50% of the Fees (the "Deferred Fees") earned by Ray (which holdback shall be inclusive of any monthly holdback for professional fees prescribed by the ICP Order) in calendar years 2009 and 2010 shall be deferred and paid to Ray in a single lump sum payment on the later of (i) January 1, 2011 and (ii) the date that the US Debtors make a distribution or distributions equal to or exceeding 35% of the amount estimated in an approved disclosure statement for distribution to general unsecured creditors under a Bankruptcy Court approved plan (the "Distribution"), provided, further, that whether or not the Distribution occurs, such payment will be made in no event later than December 31, 2011. For the avoidance of doubt, there shall be no deferral of Fees payable to Ray in calendar year 2011. Hourly rates are generally revised periodically, provided that annual increases shall not exceed 5%.

In addition to the Fees, Ray shall bill NNI for reasonable expenses incurred on behalf of the US Debtors during this Engagement, including, but not limited to airfare, meals, hotel accommodations, telephone, research, duplicating and printing.

2

4. **Terms and Conditions**

The attached Standard Terms and Conditions set forth the duties of each party with respect to the Services. Further, this letter and the Standard Terms and Conditions attached comprise the entire Engagement Contract for the provision of the Services to the exclusion of any other express or implied terms, whether expressed orally or in writing, including any conditions, warranties and representations, and shall supersede all previous proposals, letters of engagement, undertakings, agreements, understandings, correspondence and other communications, whether written or oral, regarding the Services.

The parties intend that Ray shall render the Services hereunder as an independent contractor, and nothing in this Engagement Contract shall be construed to be inconsistent with this relationship or status. Ray shall not be entitled to any benefits paid by the US Debtors to their employees. Ray shall be solely responsible for any tax consequences applicable to Ray by reason of this Engagement Contract and the relationship established hereunder, and the US Debtors shall not be responsible for the payment of any federal, state or local taxes or contributions imposed under any employment insurance, social security, income tax or other tax law or regulation with respect to Ray's performance of services hereunder. The parties agree that, subject to the terms and provisions of this Engagement Contract, Ray may perform any duties hereunder and set his own work schedule without day-to-day supervision by the US Debtors, but subject always to appropriate direction of the Board of Directors of the US Debtors.

5.  **Acknowledgement and Acceptance**

    Please acknowledge acceptance of the terms of this Engagement Contract by signing both the confirmation below and the attached Standard Terms and Conditions and returning a copy of each to us at the above address.

If you have any questions regarding this letter or the attached Standard Terms and Conditions, please do not hesitate to contact John Ray at (630) 613-7300.

Yours faithfully,

_____
John J. Ray III

4

**Confirmation of Terms of Engagement**

We agree to engage John Ray upon the terms set forth herein and in the attached Standard Terms and Conditions.

Nortel Networks Inc.

By: _____
    John Doolittle
    Vice-President

Date: December 7, 2009

## STANDARD TERMS AND CONDITIONS

The following are the Standard Terms and Conditions on which Ray will provide the Services to the US Debtors set forth within the attached letter of engagement dated December 7, 2009. The Engagement letter and the Standard Terms and Conditions (collectively the "Engagement Contract") form the entire agreement between Ray and NNI relating to the Services and replace and supersede any previous proposals, letters of engagement, undertakings, agreements, understandings, correspondence and other communications, whether written or oral, regarding the Services. The headings and titles in the Engagement Contract are included to make it easier to read but do not form part of the Engagement Contract.

### 1.    Reports and Advice

1.1    **Use and purpose of advice and reports** – Any advice given or report issued by Ray is provided for NNI's use and benefit and only in connection with the purpose in respect of which the Services are provided; provided, however, that any such advice or reporting may, if not inconsistent with the interests of the US Debtors, be provided to the Creditors' Committee, the Steering Committee of the Bondholders Group (the "Steering Committee") and their respective advisors. Unless required by law or as provided in the preceding sentence, NNI shall not provide any advice given or report issued by Ray to any third party, without Ray's prior written consent. In no event, regardless of whether consent has been provided, shall Ray assume any responsibility to any third party to which any advice or report is disclosed or otherwise made available.

### 2.    Information and Assistance

2.1    **Provision of information and assistance** – Ray's performance of the Services is dependent upon timely and complete access to such information and assistance as Ray may reasonably require from time to time.

2.2    **No assurance on financial data** – While Ray's work may include an analysis of financial and accounting data, the Services will not include an audit, compilation or review of any kind of any financial statements or components thereof. NNI will be responsible for any and all financial information provided to Ray during the course of this Engagement, and Ray will not examine or compile or verify any such financial information. Moreover, the circumstances of the Engagement may cause Ray's advice to be limited in certain respects based upon, among other matters, the extent of sufficient and available data and the opportunity for supporting investigations in the time period. Accordingly, as part of this Engagement, Ray will not express any opinion or other form of assurance on financial information provided by NNI.

2.3    **Prospective financial information** - In the event the Services involve prospective financial information, Ray's work will not constitute an examination or compilation, or apply

agreed-upon procedures, in accordance with standards established by the American Institute of Certified Public Accountants or otherwise, and Ray will express no assurance of any kind on such information. There will usually be differences between estimated and actual results, because events and circumstances frequently do not occur as expected, and those differences may be material. Ray will take no responsibility for the achievability of results or events projected or anticipated by NNI's management.

**3.    Additional Services**

3.1    **Responsibility for other parties** – Ray is not responsible for the work and fees of any other party engaged by, or affiliated with, NNI to provide services in connection with the Engagement. Except as provided in this Engagement Contract, Ray shall not be responsible for providing or reviewing the advice or services of any such third party, including advice as to legal, regulatory, accounting or taxation matters.

**4.    Confidentiality**

4.1    **Restrictions on confidential information** – Both parties agree that any confidential information received from the other party shall only be used for the purposes of providing or receiving Services under this or any other contract between us. Except as provided below, neither party will disclose the other party's confidential information to any third party without the other party's consent. Confidential information shall not include information that is or becomes generally available to the public other than as a result of a breach of an obligation under this Clause 4.1; or is acquired from a third party who, to the recipient party's knowledge, owes no obligation of confidence in respect of the information; or is or has been independently developed by the recipient.

4.2    **Disclosing confidential information** – Notwithstanding the above, either party will be entitled to disclose confidential information of the other to a third party (including without limitation the Creditors' Committee and Steering Committee and their respective advisors) to the extent that such third party is subject to a confidentiality agreement (or such other acceptable arrangement) with NNI to protect confidential information, or such disclosure is required by valid legal process, provided that (and without breaching any legal or regulatory requirement) where reasonably practicable not less than 2 business days' notice in writing is first given to the other party.

**5.    Termination**

5.1    **Termination of Engagement with notice** – Either party may terminate the Engagement Contract for "Cause", defined as intentional, reckless or willful misconduct or fraud, upon written notice. Upon receipt of notice of termination, Ray will stop all work immediately. Except as provided herein, NNI will be responsible for all accrued but unpaid Fees and expenses incurred by Ray through the date termination notice is received by the non-terminating party. In addition, each party may terminate the Engagement Contract upon sixty days' written notice (the "Notice Period") for any reason other than Cause. On the last day of the Notice Period resulting from termination of the Engagement Contract by NNI other than for Cause or by Ray for Cause, NNI shall pay Ray a lump sum in cash equal to any accrued

7

but unpaid Deferred Fees (as defined in paragraph 3 of the Engagement letter). Notwithstanding the foregoing, NNI may not terminate Ray's Engagement for any reason without prior consultation with, and five days' written notice to, the Creditors' Committee and Steering Committee and their respective advisors. Any termination of the Engagement Contract by Ray other than for Cause or by NNI for Cause shall result in Ray's forfeiture of the Deferred Fees (as defined in paragraph 3 of the Engagement letter).

5.2    **Continuation of terms** – The terms of the Engagement that by their context are intended to be performed after termination or expiration of this Engagement Contract and are intended to survive such termination or expiration and shall continue to bind all parties.

6.    **Limitation of liability; Indemnification** - NNI agrees that Ray shall receive the same post petition limitations of liabilities, indemnities and other protections provided to the Officers of NNI pursuant to the terms of the certificate of incorporation and by-laws of NNI as in effect on the date hereof (which shall not be changed with respect to Ray from the date hereof without Ray's consent and which shall survive any corporate reorganization or dissolution or other corporate transaction or event). NNI shall provide Officers' insurance, with an inception date after the petition date, to Ray for the period in which Ray serves as an officer of NNI with zero individual insured retention costs and unimpaired coverage limits of not less than $25 million annually.

7.    **Governing Law and Jurisdiction** -The Engagement Contract shall be governed by and interpreted in accordance with the laws of the State of Delaware, without giving effect to the choice of law provisions thereof. The parties agree to the jurisdiction of the Bankruptcy Court to hear and resolve any dispute under this Engagement Contract. If the Bankruptcy Court declines or otherwise does not exercise jurisdiction over any such dispute, then the parties agree that any such dispute shall be heard and resolved in a state or federal court or competent jurisdiction located in Delaware.

3247941.7