1

UNITED STATES BANKRUPTCY COURT

DELAWARE DISTRICT OF DELAWARE

Case No. 09-10138 (KG)

- - - - - - - - - - - - - - - - - - - -x

In the Matter of:


NORTEL NETWORKS, INC., et. al.


        Debtors.


- - - - - - - - - - - - - - - - - - - -x


                U.S. Bankruptcy Court

                824 North Market Street

                Wilmington, Delaware


                December 2, 2009

                11:14 AM


B E F O R E:

HON. KEVIN GROSS

U.S. BANKRUPTCY JUDGE


ECR OPERATOR:  JENNIFER PASIERB

2

1    Omnibus Hearing.

2

3    HEARING re Debtors' Motion Pursuant to Sections 501, 502 and

4    1111(a) of the Bankruptcy Code, Bankruptcy Rules 2002 and

5    3003(c)(3) and Local Rule 2002-1(e) for an Order Establishing

6    Deadlines to File Proofs of Claim Against Nortel Networks

7    (CALA) Inc. and Approving Form and Manner of Notice Thereof

8

9    HEARING re Motion Pursuant to 11 U.S.C. Section 105(a), Section

10   363 and Fed. R. Bankr. P. 9019 for an Order (A) Approving The

11   Asia Restructuring Agreement, And (B) Granting Related Relief

12

13   HEARING re Debtors' Motion Pursuant to 11 U.S.C. Section

14   105(a), Section 363(b) to for an Order (A) Approving Debtors'

15   Entry Into The Next Generation Packet Core Network Components

16   Escrow Agreement And (B) Granting Related Relief

17

18   HEARING re Motion to Approve Debtors' Motion Pursuant To 11

19   U.S.C. Section 105 And Section 363 And Fed. R. Bankr. P. 9019

20   For Entry Of An Order (I) Authorizing And Approving The

21   Flextronics Settlement And Release Agreement, (II) Authorizing

22   And Approving The Related Side Agreement And (III) Granting

23   Related Relief

24

25

1

2    HEARING re Debtors' Motion Pursuant To 11 U.S.C. Sections 105

3    363 and Fed. R. Bankr. P. 9019 for Entry of an Order (I)

4    Authorizing And Approving The Flextronics Settlement And

5    Release Agreement, (II)Authorizing And Approving The Related

6    Side Agreement And (III) Granting Related Relief

7

8    HEARING re Debtors' Motion for Entry of an Order Authorizing

9    the Debtors to File Under Seal Certain Portions Of (I) The

10   Settlement And Release Agreement And (II) The Side Agreement,

11   Attached As Exhibits To The Debtors' Motion Pursuant To 11

12   U.S.C. Sections 105 And 363 And Fed. R. Bankr. P. 9019 For The

13   Entry Of An Order (I) Authorizing And Approving The Flextronics

14   Settlement And Release Agreement, (II) Authorizing And

15   Approving The Related Side Agreement And (III) Granting Related

16   Relief

17

18   HEARING re Debtors' Motion to (I)(A) Authorizing And Approving

19   The Bidding Procedures, (B) Approving The Notice Procedures,

20   And (C) Setting A Date For The Sale Hearing, And (II)

21   Authorizing And Approving Sale Of Certain Assets Of Debtors'

22   GSM/GSM-R Business

23

24

25

4

1

2   HEARING re Debtors' Motion For Orders (I)(A) Authorizing

3   Debtors' Entry Into The Stalking Horse Asset Sale Agreement,

4   (B) Authorizing And Approving The Bidding Procedures And Bid

5   Protections, (C) Approving The Notice Procedures And The

6   Assumption And Assignment Procedures, (D) Authorizing The

7   Filing Of Certain Documents Under Seal And (E) Setting A Date

8   For The Sale Hearing, And (II) Authorizing And Approving (A)

9   The Sale Of Certain Assets Of Debtors' Metro Ethernet Networks

10   Business Free And Clear Of All Liens, Claims And Encumbrances

11   And (B) The Assumption And Assignment Of Certain Executory

12   Contracts

13

14   HEARING re Motion to File Under Seal The Sellers Disclosure

15   Schedule And Exhibits And Other Schedules Related To The Sale

16   Of Certain Assets Of The Metro Ethernet Networks Business

17

18   HEARING re Debtors' Motion for an Order authorizing the Debtors

19   to File Under Seal The Sellers Disclosure Schedules And All

20   Exhibits And Schedules To The Sale of Certain Assets of the

21   Metro Ethernet Networks Business

22

23   HEARING re Debtors' Motion Pursuant to 11 U.S.C. Section 105(a)

24   and Section 363 for an Oz (A)Authorizing And Approving The GSM

25   Termination Fee Agreement And (B) Granting Related Relief

5

1

2    HEARING re Debtors' Motion For an Order  (A) Approval Of The

3    Assumption And Assignment Procedures In Connection With The

4    Sale Of Nortel's GSM/GSM-R Business And (B) Authorizing The

5    Filing Of Certain Documents Under Seal

6

7    HEARING re Debtors' Motion for an Order Authorizing the Debtors

8    to File Under Seal the Seller's Disclosure Schedules And All

9    Exhibits And Schedules To The GSM Asset Sale Agreement

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25    Transcribed by:  Sharona Shapiro

6

1

2    A P P E A R A N C E S :

3    MORRIS, NICHOLS, ARSHT & TUNNELL LLP

4          Attorneys for Debtors

5          1201 North Market Street

6          18th Floor

7          Wilmington, DE 19899

8

9    BY:   DEREK ABBOTT, ESQ.

10          ANNIE C. CORDO, ESQ.

11

12    CLEARY GOTTLIEB STEEN & HAMILTON, LLP

13          Attorneys for Debtors

14          One Liberty Plaza

15          New York, NY 10006

16

17    BY:   LISA M. SCHWEITZER, ESQ.

18          JAMES L. BROMLEY, ESQ.

19

20    AKIN GUMP STRAUSS HAUER & FELD LLP

21          Attorneys for Official Committee of Unsecured Creditors

22          One Bryant Park

23          New York, NY  10036

24

25    BY:   FRED S. HODARA, ESQ.

7

```
1    U.S. DEPARTMENT OF JUSTICE

2         Office of the United States Trustee

3         844 King Street

4         Suite 2207

5         Wilmington, DE 19801

6

7    BY:   JANE M. LEAMY, ESQ.

8

9    ARNALL GOLDEN GREGORY LLP

10        Attorneys for Verizon Communications, Inc.

11        171 17th Street NOTEHOLDER,  Suite 2100

12        Atlanta, GA 30363

13

14   BY:   DARRYL S. LADDIN, ESQ. (TELEPHONICALLY)

15         FRANK WHITE, ESQ. (TELEPHONICALLY)

16

17   ASHBY & GEDDES

18   Attorneys for ATT and Flextronics

19   BY:   AMANDA M. WINFREE, ESQ.

20         RICHARD JOSEPH SLIVINSKI, ESQ.

21

22   LANDIS RATH & COBB LLP

23   Attorneys for Linex Technologies

24   BY:   KERRI MUMFORD, ESQ.

25
```

8

1    REED SMITH LLP

2    Attorneys for Qwest

3    BY:   J. CORY FALGOWSKI, ESQ.

4

5    POLSINELLI SHUGHART PC

6    Attorneys for OSS Nokalva, Inc.

7    BY:   SHANTI M. KATONA, ESQ.

8

9    SULLIVAN HAZELTINE ALLINSON LLC

10   Attorneys for Motorola, Inc.

11   BY:   ELIHU EZEKIEL (ZEKE) ALLINSON, III, ESQ.

12

13   LATHAM & WATKINS

14   Attorneys for Ciena Corporation

15   BY:   WITOLD BALABAN, ESQ.

16         J. DOUGLAS BACON, ESQ.

17

18   BRACEWELL & GIULIANI LLP

19   Attorneys for Matlin Paterson

20   BY:   JENNIFER FELDSHER, ESQ.

21

22   MILBANK TWEED HADLEY MCCLOY LLP

23   Attorneys for the Ad Hoc Bondholders

24   BY:   THOMAS R. KRELLER, ESQ.

25         DAVID CLAYTON, ESQ. (TELEPHONICALLY)

1    CURTIS, MALLET-PREVOST, COLT & MOSLE, LLP

2    Attorneys for Flextronics

3    BY:   TURNER P. SMITH, ESQ.

4          JAMES V. DREW, ESQ.

5          STEVEN J. REISMAN, ESQ. (TELEPHONICALLY)

6

7    SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

8    Attorneys for MEN Acquisition LLC

9    BY:   GREGG M. GALARDI, ESQ.

10

11   LATHAM & WATKINS

12   Attorneys for MEN Acquisition LLC

13   BY:   DAVID S. ALLINSON, ESQ.

14

15   ANDREWS KURTH LLP

16   Attorneys for Hewlett-Packard

17   CASSANDRA PORSCH, ESQ.

18

19   RICHARDS, LAYTON & FINGER, P.A.

20   CHRIS M. SAMIS, ESQ.

21

22

23

24

25

1                TELEPHONIC APPEARANCES:

2

3   TAD DAVIDSON, ESQ., ANDREWS & KURTH LLP for Hewlett-Packard

4   AMISH R. DOSHI, ESQ., DAY PITNEY, LLP for Oracle USA, Inc.

5   OLIVER DUNN, ESQ., ERNST & YOUNG, LLP for UK Administrator

6   SIMON EDEL, ESQ., ERNST & YOUNG, LLP for UK Administrator

7   ROBIN JOWITT, ESQ., ERNST & YOUNG, LLP for UK Administrator

8   DAVID FIDLER KLEE, ESQ. TUCHIN, BOGDANOFF & STERN for Sanmina

9   IRA M. LEVEE, ESQ., LOWENSTEIN SANDLER for Lead Plaintiffs

10        in Security Litigation

11  ANNE H. PAK, ESQ., ROPES & GRAY for Silver Lake Capital

12  GREGORY G. PLOTKO, ESQ., KRAMER LEVIN NAFTALIS & FRANKEL LLP

13        for ZSF/Research Trust

14  HONDO SEN, Pro Se, creditor

15  THOMAS WALSH, ESQ., HERBERT SMITH LLP for Nortel UK

16  JACOB ZAND, Pro Se

17  VINCENT MURRELL, ESQ.

18

19

20                CANADIAN COUNSEL:

21

22  SCOTT BOMHOF, ESQ., TORYS LLP for MEN Acquisition LLP

23  S. RICHARD ORZY, ESQ., BENNETT JONES LLP for The Informal

24        Nortel Noteholder Group

25

1   DERRICK C. TAY, ESQ., OGILVY RENAULT for Nortel Network

2        Corporation

3   JENNIFER STAM, ESQ., OGILVY RENAULT for Nortel Networks

4        Corporation

5   MARK ZIGLER, ESQ., KOSKIE MINSKY LLP for former Nortel

6        Employees

7   JAY CARFAGNINI, ESQ., GOODMANS LLP for proposed monitor,

8        Ernst & Young

9   JOSEPH PASQUARIELLO, ESQ., GOODMANS LLP for proposed

10        monitor, Ernst & Young

11   CHRIS ARMSTRONG, ESQ., GOODMANS LLP for proposed

12        monitor, Ernst & Young

13   KYLA MAHAR, ESQ., THORNTONGROUTFINNIGAN LLP for Flextronics

14   LEANNE WILLIAMS ESQ., THORNTONGROUTFINNIGAN LLP for Flextronics

15   ROBIN B. SCHWILL, ESQ., DAVIES WARD PHILLIPS & VINEBERG LLP for

16        Nortel Networks UK Limited

17   KATHERINE MCEACHERN, ESQ., BLAKE, CASSELS & GRAYDON LLP for

18        Ericsson

19   LILY HARMER, ESQ., PALIARE ROLAND ROSENBERG ROTHSTEIN LLP for

20        Superintendent of Financial Services of Ontario

21   ASHLEY TAYLOR, ESQ. STIKEMAN ELLIOTT LLP for Ciena Corporation

22   BARRY W. WADSWORTH, ESQ., CAW-CANADA

23   ALEX L. MACFARLANE, ESQ., FRASER MILNER CASGRAIN LLP

24

25

1                   P R O C E E D I N G S

2           THE CLERK:  Please rise.

3           THE COURT:  Good morning and please be seated.  Thank

4    you.  Good morning.

5           MR. ABBOTT:  Good morning.

6           THE COURT:  Mr. Abbott, how are you, sir?

7           MR. ABBOTT:  I'm well, Your Honor; I hope you are.

8           THE COURT:  Very well, thank you.

9           MR. ABBOTT:  Judge Gross, Mr. Justice Morawetz, Derek

10   Abbott here for the Nortel debtors.

11          Your Honor, we have submitted, at least to the U.S.

12   court, an agenda letter.  And I note that the front end of

13   that, Your Honor, contains four items that have been adjourned.

14   We won't be dealing with those today.

15          THE COURT:  Right.

16          MR. ABBOTT:  The balance of the agenda, Your Honor, at

17   least in the U.S. court, includes both joint matters and

18   nonjoint matters.  And what I'm going to do, Your Honor, is ask

19   Mr. Bromley to take over.  But we're going to have to, I think,

20   in the interest of convenience and moving things along, given

21   we've got a lot on the plate today --

22          THE COURT:  Yes.

23          MR. ABBOTT:  -- to try to take these a little bit out

24   of order, at least that would be our suggestion.  And so at

25   this point I'll ask Mr. Bromley to address the balance of the

1    agenda starting at number 5, Your Honor.

2            THE COURT:  Thank you, Mr. Abbott.

3            Good morning, Mr. Bromley.

4            MR. BROMLEY:  Good morning, Judge Gross.  James

5    Bromley of Cleary Gottlieb on behalf of Nortel Networks, Inc.

6    and the Nortel U.S. debtors.

7            Good morning, Mr. Justice Morawetz.  It's a pleasure

8    to be before both of you again, and we thank you for your

9    indulgence yet again.  And as you can see, today we have a

10   little bit more action --

11           THE COURT:  Yes.

12           MR. BROMLEY:  -- than we've had in other hearings, but

13   we're happy to move forward.  I wanted to just set the stage

14   very briefly and then hand things over to Mr. Tay in Canada.

15           But I think that it's worthwhile to start with a

16   headline.  There's a full agenda today.  We have two sales --

17   our fifth and sixth major sales -- up for approval today.  We

18   have a major settlement for approval with our largest

19   manufacturer of our product, Flextronics.  We have a number of

20   miscellaneous smaller matters.  And frankly, hovering over all

21   of it is a major philosophical question about the way our

22   auction processes have been run and the price that we've

23   obtained as it relates to one of them.

24           The main event, Your Honor, is the motion to approve

25   the sale of the Metro Ethernet Networks business.  We were

1    before you filing a motion before both courts on October 7th,

2    the motion to approve a stalking horse transaction with Ciena

3    Corporation.  We were before you again on the 16th of October,

4    again in joint hearing, to approve the bidding procedures.

5    Orders were entered in both courts.  The bidding procedures

6    were approved.  Oddly enough, the bidding procedures were

7    drafted in large part by one of the objectors.  So there is a

8    bit of irony here because, as you will recall, Your Honor, that

9    Nokia Siemens Networks was our first stalking horse bidder in

10   the CDMA transaction.

11        We did have an auction, another long weekend away from

12   families, from the 20th to the 22nd of November, at which the

13   value of the transaction that was on the table was increased by

14   another quarter of a billion dollars.  It is our third major

15   success in the auction process.  And when you count all six of

16   the transactions that we have brought before both courts for

17   approval, we are now at 2.9 billion dollars, nearly 3 billion

18   dollars.  We believe that that, in and of itself, is evidence

19   that what we do works and what we do works well.

20        But Your Honor, what we're talking about here -- and

21   Mr. Justice Morawetz -- is a fundamental question.  Do we stand

22   here today in both courts in Toronto and Wilmington and do we

23   support the process that has worked and worked well in six

24   separate transactions that has generated nearly three billion

25   dollars worth of proceeds with more to come?  Do we sit here

1    and say that the process that has been done in an open and

2    transparent fashion before hundreds of people in our offices in

3    New York on three separate occasions should stand?  And we

4    certainly believe very strongly that it should.  We believe not

5    only should the process stand, but that the sour grapes of

6    frustrated bidders who ten days after the fact have come out of

7    the woodwork and said "I'd like to turn the clock back to 9:45

8    p.m. on Sunday night the 22nd of November" can't do that.

9           So with that as the overview, Your Honor, I would like

10   to pass the podium to Mr. Tay in Toronto and then come back

11   after that with further comments from the U.S. perspective.

12          THE COURT:  All right.  Thank you, Mr. Bromley.

13          MR. TAY:  Good morning, Your Honors, Derrick Tay for

14   the Canadian debtors.  And by way of putting this in context,

15   Your Honors, I think it's important that we recognize that this

16   is a process that involves not just the U.S. estate, not just

17   the U.S. bankruptcy process, but also the U.K. administrators

18   who are not subject to the same type of court supervision but

19   they have their own fiduciary obligations but also it's subject

20   to the jurisdiction of the Canadian court.  And I think it's

21   important to realize that just because we're doing the a cross

22   border sale, that just because we're doing a cross border joint

23   hearing doesn't in any way vitiate the application of Canadian

24   laws to the approval that's been requested.

25          I think it's also important to recognize that the only

1    way we're going to get a useful outcome here is if both courts

2    can come to an agreement because if both courts do not, you

3    will end up with neither an auction nor the approval of a sale.

4    And so I think it's important that all of us be aware of the

5    constraints and the practices on the Canadian court that

6    continue to be extremely relevant to this case, notwithstanding

7    the fact that it is a cross border case and involves other

8    jurisdictions.

9          I draw your attention first to the fact that no

10    objection has been filed in Canada.  So I'm not sure that this

11    issue is even properly before the Canadian court.  And while

12    that may be seen to be an oversight or, you know, just an

13    inconvenience, I don't think it's the proper thing to do that

14    if there is an objection to the process being -- to the

15    approval being sought from the Canadian court that the

16    objection be properly brought before this Court.

17          And even if the objection had been properly brought

18    before this Court, Canadian law is very clear about the right

19    of standing for an unsuccessful bidder.  But say we get around

20    all of that and then get beyond the technicalities of whether

21    they filed the right papers or not, what we're faced with here

22    is on the one hand we have a higher unsolicited offer that

23    looks good on the surface.  We all want more money for the

24    estates; we can agree to that.  But behind all of that this is

25    a very complex situation where you need to take into account

17

1    not just the potential of greater money but also you have to

2    balance the risks involved, the risks to the business, the

3    risks of litigation, and all these other issues that have to

4    come into the equation.

5         Now, in the Canadian process we have a very special

6    tool that's meant to help the Court and that is the court

7    officer who is the monitor.  The monitor is in this process for

8    a specific reason.  It is the eyes and ears of the Court and it

9    is mandated to provide the Court, especially in these complex

10   situations, with a specific recommendation as to the right

11   thing to do for all concerned.  Creditors may agree, creditors

12   may disagree.  It doesn't change the fact that the monitor has

13   an overriding obligation to provide this Court with an even-

14   handed, unbiased view and recommendation, and that you have

15   before you today.

16        And when the monitor does put recommendation before

17   the Court, the Court of Appeal of this province has laid down

18   in the leading case of Soundair, which I know Your Honor is

19   very familiar with, and I'm not going to take you to the case

20   at this stage, and I'm happy to do so at a later stage in my

21   main submissions here if necessary.  But I would suggest to you

22   that a Court of Appeal has laid out four important principals

23   in Soundair, that unless you think the monitor has acted

24   improvidently in this case -- and there's no suggestion of

25   that -- there are four important principles.

1           The first principle is that this Court should not

2    second guess the business judgment of the monitor.  That this

3    Court should not reject the recommendation of the monitor

4    except, and I quote, "in the most exceptional circumstances".

5           The second principle is that the monitor's

6    recommendation should not be set aside simply because a later

7    and higher bid is made.  And in fact the Court of Appeal went

8    out of its way to say that the only relevance of the higher bid

9    is on the question of whether because it's so

10   disproportionately larger that it's evidence of improvidence on

11   the part of the monitor in its considerations.  Other than

12   that, it has no relevance.  That's what the Court of Appeal

13   says.

14          The third fundamental principle from Soundair is that

15   this Court should not sit on appeal from a decision of the

16   monitor nor should it go into the minutiae of the process of

17   the selling strategy.  I think it's not a large extension to

18   say that this Court should also not go into second guessing the

19   monitor's recommendation as to whether reopening the option is

20   a good or a bad thing for the estate.

21          Fourthly, the opinion of creditors should be taken

22   into account but the Court of Appeal was very clear in saying

23   that the views of the creditors are not determinative and

24   should not override the considered judgment of the monitor.

25          So those are the four fundamental principles that a

1   Court of Appeal has set out in respect of how the Court should

2   treat the recommendations of the monitor.  Soundair also put

3   out three more principles that are very relevant to what's

4   before this Court today.  And those principles are this:

5           Number one, prospective purchasers must be discouraged

6   from waiting until the sale approval is before the Court before

7   submitting the final offer.  The Court of Appeal went into

8   great particularity in saying that we want to discourage in

9   Canada auctions that happen before the Court.  And so sending

10  any kind of signal that it's open season and people can just

11  sit in the bushes and wait until the last minute is absolutely

12  flatly contrary to what the Court of Appeal has set out as a

13  principle objective.

14          The second principle is that the Court should take

15  into account the interests of the successful bidder who,

16  especially in this case, has spent a lot of time and a lot of

17  money in playing by the rules that were blessed by this Court

18  and the U.S. Court and is therefore entitled to expect that

19  when they are successful at the end of that process that they

20  should be able to get the support of the Court in approving its

21  bid.

22          The third principle is that while the primary concern

23  is in protecting the interests of the creditors, there is a

24  secondary but very important consideration, which is the

25  integrity of the process by which the sale is affected.

1          And you see these three principles are all sort of

2     interlinked and it reflects the Court of Appeal's view that we

3     do not want to encourage people to wait in the bushes until we

4     have an option before the Court and we do not want people to

5     lose confidence in the integrity of a process once the Court

6     has set out a process.  People who abide by that process should

7     be entitled to rely that the Court will support them in the end

8     of that process.

9          So where are we now?  Here we have a situation where

10    the monitor has been fully involved in the auction process,

11    fully satisfied that anyone who wanted to make their best bid

12    was given the option indeed to make the best bid and has given

13    recommendation to this Court that a Ciena bid be approved.  And

14    it was made based on the information available to the monitor

15    at that time.

16         Since then this higher bid has come to our attention,

17    and the monitor has again had a chance to consider its

18    recommendation in the light of this higher bid and balance

19    against that all of the practical timing and closing risks

20    associated with reopening this process.  And I think at this

21    stage I would ask the monitor's counsel to confirm that even

22    after considering this high bid, the monitor is still of the

23    view that the Ciena bid that was the successful bid in the

24    process should be approved by this Court.

25         JUSTICE MORAWETZ:  Mr. Carfagnini?

1      MR. CARFAGNINI:  Thank you, Your Honor, Jay Carfagnini

2   from Goodmans here with Mr. Pasquariello and Mr. Armstrong

3   representing the Canadian monitor.  As Your Honor in Canada is

4   aware, Mr. McDonald, the president of Ernst & Young, and Ms.

5   Hamilton are here in court.

6      Mr. Tay is correct, a monitor's report has been filed

7   and the recommendation support for the Ciena transaction are

8   clearly set forth in paragraph 40 of the order -- of the

9   report, sorry.  As for the "new offer", the monitor has

10  considered it, the monitor has consulted with the company and

11  management and many of the stakeholders.  The monitor has

12  weighed the benefits and risks of proceeding with a "new

13  offer", assuming it is even open for consideration in Canada.

14  And the monitor -- and I can confirm to the Court the monitor

15  is firmly of the view that its recommendation stands and that

16  this Court should proceed with the approval of the Ciena

17  transaction.

18      Subject to any questions at this time and further

19  submissions and the main submissions, those are my brief

20  opening statements.

21      JUSTICE MORAWETZ:  I do take it, Mr. Carfagnini, that

22  the only document that's been filed is the MEN Acquisition, LLC

23  limited objection in Delaware.  There's no paper, no dockets

24  that have been filed here?

25      MR. CARFAGNINI:  Correct.

1          JUSTICE MORAWETZ:  Okay, thank you.

2          Mr. Bomhof?

3          If the registrar could have Mr. Bomhof sign?

4          MR. BOMHOF:  Your Honor, I firstly am here for MEN,

5     and I apologize.  There was a --

6          JUSTICE MORAWETZ:  I didn't quite hear that.

7          MR. BOMHOF:  I'm here for MEN in Canada, Your Honor.

8     And firstly I made an apology.  Mr. Tay asked if it was

9     inadvertence that there was nothing filed and it surely was

10    inadvertence.  In terms of the filing there was a

11    misunderstanding that what was filed with the U.S. would be

12    available to the Canadian court.  When I found out that nothing

13    had been filed I contacted Ms. Stam last night, asked that the

14    copy be available, but unfortunately have only come up -- found

15    it to come up today and brought a copy of it with me.  So I do

16    have a copy --

17         JUSTICE MORAWETZ:  I do have a copy of what has been

18    filed in Delaware.

19         MR. BOMHOF:  Thank you, Your Honor.

20         JUSTICE MORAWETZ:  Okay.

21         MR. BOMHOF:  I apologize that it wasn't served on the

22    committee and server's list.  If I had known in the past I

23    would have served as -- well, as you know.

24         JUSTICE MORAWETZ:  I take it your client was aware of

25    the proceedings both here and in Delaware?  So I take it -- I

1    have the document from the U.S., what am I to do with it?

2           MR. BOMHOF:  Your Honor, I would ask you, given the

3    protocol in place and the fact that the objection is known to

4    the Court that it at least be taken into consideration, given

5    this is a joint hearing and it will be considered by the U.S.

6    Court that the same terms of the objection can be raised here

7    in Canada.

8           JUSTICE MORAWETZ:  All right.  And you'll be prepared

9    at some point to address the standing issue?

10          MR. BOMHOF:  I will, Your Honor.

11          JUSTICE MORAWETZ:  Okay.  Thank you, sir.

12          Mr. Tay, is there anything further at this point?

13          MR. TAY:  No, Your Honor.  I think that the intention

14   was simply to set the stage so that our friends in the U.S.

15   would be aware of the different rules that we have here in

16   regard to this issue.  And then I think Mr. Bromley was going

17   to come back to the podium and maybe ask for directions as to

18   how we proceed.

19          JUSTICE MORAWETZ:  I think that would be most helpful.

20          And Judge Gross, let's hand it back to you, but with

21   the specific request that Mr. Bromley and Mr. Tay sort of lay

22   out for us how the parties wish to proceed with which motion in

23   the appropriate order that they think is going to be the best

24   use of the Court's time to get through the docket today.

25          THE COURT:  Yes.  Mr. Bromley?

24

1          MR. BROMLEY:  Thank you, Judge Gross, Mr. Justice

2   Morawetz.  The suggestion that we have for proceeding at this

3   point is as follows.  I would note that in the past we have had

4   the evidence presented here in the United States given the

5   differences in the systems, and we would anticipate doing that

6   today as well.

7          We have three witnesses here and available and we

8   anticipate a need to put on live testimony.  There may be an

9   opportunity to proffer certain of the precatory information but

10  we think, in large part, we will have to put on the testimony

11  of the witnesses.

12         THE COURT:  Yes.

13         MR. BROMLEY:  We also have a binder that we would like

14  to hand up here, Your Honor, that contains documents that we

15  may use.  Rather than continuing to approach the bench, what we

16  would propose to do is hand it to you and also to counsel to

17  the counsel to the committee and the bonds and the objectors so

18  that we are all looking at the same binder.  And it is a fairly

19  short group of documents but we do anticipate a need to refer

20  back to it at times.  If it turns out that we do not need to

21  introduce every one of these into evidence then we would ask to

22  take the pieces back from you, but rather than have too much

23  back and forth during the process we thought a binder might be

24  best.

25         Then once we do that, Your Honor, I would propose to

1   give, in a sense, an opening statement as to what we believe

2   the evidence and the law here in the United States shows.  I

3   think that Mr. Tay has set forth in very clear terms the issues

4   under Canadian law, but I do believe that it's appropriate for

5   both Courts to hear, from the U.S. perspective, the law and the

6   evidence that we believe that we're going to put on the record.

7   At that point it might be appropriate, Your Honors, for the two

8   of you to consult as is appropriate under the cross border

9   protocol and help us guide the process from there.  But I would

10  then propose to come back on the record and go directly into

11  the evidence --

12          THE COURT:  All right.

13          MR. BROMLEY:  -- if that is acceptable to both Courts.

14          THE COURT:  Justice Morawetz?

15          JUSTICE MORAWETZ:  I have no problem with the way in

16  which Mr. Bromley has indicated he wishes to proceed.

17          Is there any party in Canada who wishes to respond and

18  suggest an alternative process?

19          I can report to you, Judge Gross, that everybody had

20  their heads down.

21          THE COURT:  Well, I'll ask somewhat reluctantly if

22  there's anyone in the courtroom who wishes to be heard with

23  respect to the proposed proceeding.  All right.

24          MR. BROMLEY:  May I approach, Your Honor?

25          THE COURT:  You may.  Thank you, sir.

1          (Pause)

2              MR. BROMLEY:  Your Honor and Mr. Justice Morawetz, if

3      I may, I would like to start out with two observations.  First,

4      while we are extraordinarily proud of the results that we have

5      accomplished thus far -- and I will note that Mr. Reidl will

6      testify as to where we stand on our various transactions, but I

7      am pleased to notify the Courts that we have closed the CDMA

8      transaction; the Nortel estates have received 1.13 billion

9      dollars; the transition services agreement is up and running;

10     employees have been transferred in multiple jurisdictions

11     around the world; and we've successfully carved out this major

12     business from the Nortel universe and transferred it

13     successfully to Ericsson.  We are on course to close the

14     enterprise transaction, the sale to Avaya, this month as well,

15     and Mr. Reidl will mention that in his testimony.

16             But I should note, Your Honors, it is harder than it

17     looks.  And I think that we are at severe risk of taking a few

18     things for granted.  We are standing here with an international

19     organization.  A year ago it was one of the largest

20     manufacturers and designers and inventors of telecom equipment

21     in the world.  It operated on a consolidated basis in over 100

22     jurisdictions.  Its businesses were integrated in an amazing

23     fashion.  They were integrated in every jurisdiction around the

24     world.

25             And when we came to these courts on June 19th with the

1    proposal to carve out the CDMA business and to sell it, we did

2    it with a great deal of trepidation because what we were

3    attempting to do at that point in time had never been done

4    before.  We were attempting to manage three bankruptcy

5    processes, insolvency processes in three major jurisdictions,

6    all of which spoke a common language, and yet all of which had

7    different approaches to how to maximize value and how to

8    respond to the pressures and concerns presented by the

9    statutory regimes.

10          After a series of meetings and consultations that took

11    place over a period of months, Nortel management and its

12    advisors were able to convince the official committee in the

13    U.S, the monitor, the bondholder group whose claims are in both

14    the U.S. and Canada, and the U.K. administrator that there was

15    one path forward to maximize value, and only one.  And that

16    path forward was to sell these businesses as wholes, worldwide

17    businesses, that you could not have any expectation to maximize

18    value if you sold the little bit that was in the U.S. and the

19    little bit that was in Canada and the little bit that was in

20    Argentina and the little bit that was in Israel and think --

21    and I can repeat that for another thirty different countries at

22    least -- and think that there would be anywhere near maximizing

23    value.

24          You heard that in Canada Nortel Networks Ltd. operated

25    all of the businesses.  You heard in the United States that

28

1    Nortel Networks Incorporated operated all of the businesses.

2    You heard in the U.K. that Nortel Networks U.K. operated all of

3    the businesses.  We did not have the luxury to sell stock.  We

4    did not even have the luxury to sell buildings.  We didn't have

5    the luxury to transfer employees who were 100 percent occupied

6    with the businesses that we were selling.  So we were faced

7    with a monumental task in multiple jurisdictions.  And we all

8    swallowed hard and we decided to do it.

9         And so on June 19th we came to this Court and to the

10   Court in Canada with a proposal, a proposal that had been

11   negotiated with Nokia Siemens Networks with bidding procedures

12   that they had largely dictated to us and said "Please approve

13   this".

14        And then in July we had an auction and Ericsson took

15   that business.  And we have proceeded irrevocably marching down

16   that path, and last month we closed that transaction.  We

17   accomplished that by getting regulatory approval around the

18   world:  in China, in Brussels, in the United States.  We've

19   gotten approvals from the Department of Defense, the Department

20   of State.  We have gotten approvals everywhere around the world

21   to make sure that we would be able to maximize value for these

22   estates for all of these creditors around the world, for the

23   employees that remain and can be transferred, and for the

24   retirees and those who have been severed.  We have done this

25   all to make sure that we were going to get the highest dollar

29

1    amount in transaction after transaction after transaction.  And

2    we've done that.  But it is harder than it looks.

3           And one look no further than Bloomberg yesterday when

4    the CEO of General Motors was unceremoniously fired a week

5    after the transaction with Saab collapsed, a month after the

6    transaction to sell Saturn collapsed, two months after the

7    transaction to sell Opel collapsed.  This isn't idle

8    speculation; these are facts.  It is difficult to do these

9    things.  And the transaction relating to MEN is no different.

10          So before we sit here and say cavalierly, for an extra

11   twenty or thirty million dollars maybe that we might get later

12   on we should upset the apple cart, we have to think about what

13   that apple cart holds and the implications of upsetting that

14   apple cart.

15          And it's funny, when you go and look at the law here

16   in the Third Circuit, the issue of standing comes up.  And we

17   have two objections, right?  We have an objection from a

18   creditor, and they have standing, God bless them.  And we have

19   an objection from someone who has not standing, and God bless

20   them too.  It is that season.

21          THE COURT:  Yes.

22          MR. BROMLEY:  But you have to look at the cases,

23   right, that talk about who has the right to complain and what

24   they have the right to complain about.  So the O'Brien case is

25   a case that we often talk about when we're talking about

1    breakup fees.  But it also is a case that we need to talk about

2    when we're looking at who has the right to object and about

3    what.

4         Now, admittedly, O'Brien is an appellate case and it

5    talks about aggrieved persons and who is affected by the

6    decision below.  But it really applies as well in the same

7    effect with respect to who has the ability to object to the

8    results of an auction.  And so while certain of the case law

9    and how it's cited and how it's written in Canada might feel a

10   little bit alien to those of us in Delaware, in fact it's very

11   consistent.

12        O'Brien says that you need to have standing to object.

13   You need to have been an aggrieved person.  You need to be

14   someone who has had the decision of the auction impact them in

15   a negative way.  But they also have to be someone within the

16   realm of protected persons that the statute was intended to

17   protect.  So at one level you could look at MEN Acquisition Co.

18   or LLC, which is a shell corporation created solely for the

19   purpose of purchasing these assets, and say well, they're

20   not -- they're not allowed to be here.  But they're here, they

21   filed their objection and it's a joinder.  I like the joinder

22   because there's nothing like bootstrapping to actually -- to

23   actually put a fine pin on what bankruptcy practice often is in

24   the United States.

25        But if you look at the Colony case that's cited in

31

 1   O'Brien, it's a Second Circuit decision.  And it talks even

 2   more precisely about well, even if you're not someone who has

 3   standing you still have the right to object in certain

 4   circumstances if something was fundamentally wrong with the

 5   process, if there wasn't good faith, if there wasn't collusion.

 6   In those situations, someone in MEN's position might have an

 7   argument that they should be able to be heard.

 8         And as we're standing here today, one of the things

 9   that is stated in both cases is the term "intrinsic fairness",

10   is there something about the process, about the intrinsic

11   fairness or unfairness of the process that raises this to the

12   point that we should review what happened.

13         And Your Honor, I think that the evidence will show

14   and Mr. Reidl and Mr. Murray will testify that what we are

15   not -- we're not talking about unfairness, we're talking about

16   the absolute definition of intrinsic fairness.  Indeed, we went

17   out of our way to accommodate these bidders.  We went out of

18   our way to make sure that they would have an opportunity to

19   participate.  We went out of our way at their specific request

20   to extend the bid deadline three times.  The original bid

21   deadline here was the 9th of November.  Mr. Reidl will testify

22   that he was contacted by someone at NSN and said "Please,

23   please extend the bid deadline.  We have not gotten the

24   authority that we need to bid.  We need to go find a partner.

25   Please give us more time."  And we did that.  We extended it

1    from the 9th to the 12th to the 13th and finally to the 17th.

2    And we received a bid.

3         So the idea that we're sitting here today arguing

4    about process has to be viewed first and foremost in light of

5    the fact that this process has been changed consciously and

6    deliberately to benefit these bidders.  We extended this for a

7    week at their specific request in order to allow them to bid,

8    and they did.

9         You will hear from Mr. Reidl that NSN and OEP, the two

10   partners who own MEN, have been hovering around Nortel Assets

11   for well over a year.  They've been looking at everything that

12   Nortel has to sell.  They are very familiar with the process.

13   NSN, indeed, was the stalking horse bidder, as I've mentioned,

14   in the CDMA transaction.  There are no surprises here.  There's

15   nothing about this process here that's any different than the

16   processes we've run.  So the idea that something should come as

17   a surprise or they shouldn't have been ready to react or they

18   shouldn't have been prepared to bid or they should not have

19   been able to react to anything that was thrown at them is just

20   ridiculous.

21        And you know what?  We got a bid from them on the 17th

22   and we declared it the starting bid and the best bid on the

23   19th.  And we started an auction on the 20th with this bid as

24   the starting bid.  We went through eleven, twelve rounds of

25   auctions, sixty hours.  We started on Friday the 20th, we

1   continued to after midnight on the 20th, started again on the

2   21st at noon, continued again nearly to midnight, came back on

3   the 22nd, started early in the morning and finished at 9:30 at

4   night.

5       You'll hear from Mr. Reidl and Mr. Murray that that

6   process took place in our offices, Cleary Gottlieb's offices in

7   New York on the 39th floor, a floor that's as big as a football

8   field, with fifteen separate conference rooms, every single one

9   of them filled with people who were participating in this

10  process, professionals, principals, lawyers, accountants,

11  financial advisors, everyone of them fully prepared, fully

12  briefed, fully consulted with at every stage, every single hour

13  of the day.  They had complete and total access.  Our cafeteria

14  served over 150 people food throughout the weekend to make sure

15  that everyone was fully briefed and able -- because an army

16  marches on its stomach -- to make the bids that they needed to,

17  to have the full support that they needed to.

18      You will hear that on Sunday night at ten minutes of 9

19  MEN Acquisition gave us a bid for 770 million dollars cash.

20  You'll hear that that bid had a ten minute fuse, that it was

21  subject to being revoked in ten minutes.  We were in the

22  auction room and literally had to scream for everybody to get

23  out of the room so that we could consider this bid, and people

24  had to stand on tables in order to be heard to figure out what

25  was being proposed.  Now, I admit that when we asked for more

1    time they gave us another half hour.

2         And at 9:30 when we got a bid -- at 9:35 from Ciena,

3    the bid that won, the winning bid, we announced that they were

4    the leading bid, not the winning bid.  And on the record in

5    full view of everyone in the process, the principals of NSN and

6    OEP said they were done, they would not bid, it was over.  It's

7    true that throughout that weekend they were angry at times and

8    unhappy with the fact that Ciena was bidding with what we term

9    in the vernacular "paper".  And you'll hear about that today.

10        But the fact of the matter is, is that on Sunday night

11   at 9:35 p.m., the 22nd of November, the bidder that's here

12   today that says they want to reopen the process, stood up and

13   walked out.  They were asked directly on the record whether

14   they had anything more to add; they said nothing.  They were

15   asked whether they wanted to bid more; they said no.  And

16   there's no statement on the record saying that they were

17   unhappy during the process.

18        Never once during that weekend did they ever ask us to

19   ask for the intercession of either court.  They asked over and

20   over again for us to provide them access to financial advisors

21   so they could convince us that we were wrong about the paper.

22   And you will hear from our witnesses that that access was

23   provided, and provided over and over again.  And after a

24   twenty-one hour break in the bidding they came back with a bid

25   that was five million dollars higher.

1          So when we talk about the process and the intrinsic

2     fairness of the process and whether or not things worked

3     right -- correctly, I think that the evidence is

4     overwhelming -- overwhelming that this auction was run

5     correctly, appropriately, effectively, and every opportunity

6     was provided to this frustrated bidder who wasn't frustrated

7     then but is frustrated now.

8          And then on the early morning hours of Monday the 23rd

9     of November, NSN issued a press release.  They said, "We lost.

10    And we don't think the value is there to justify further

11    bidding."  So on Monday morning the 23rd of November, not only

12    had we run a sixty-hour, three-day process where the bidders

13    stood up and left and said they had nothing left and they would

14    no longer participate and they did not want to bid, we also had

15    a press release issued in the early morning of the hours of the

16    23rd saying it was over.

17         So what are we to think?  Well, I think what we're to

18    think here is that the process was appropriate and that

19    decisions were made and people moved on.  Now, what is

20    different today on the 2nd of December than it was on the

21    evening of November 22nd?  Nothing, from the perspective of the

22    bidder, the frustrated bidder.  They've put a little more cash

23    on the table through a letter that was changed twice

24    yesterday -- or sent twice, I'm sorry, changed once.  There's

25    nothing new from the 23rd or the 24th or the 25th or the 26th

1    or the 27th -- they were holidays here in the U.S. but not in

2    Canada -- the 28th, the 29th, the 30th, nothing changed.

3         What our frustrated bidder would like to do is turn

4    back the clock.  They want to be able to be back at our table

5    at 9:45 p.m. on Sunday the 22nd and pretend nothing happened in

6    the interim.  And the fact is, we can't do that.  We can't do

7    that because it's not fair.  It's not fair to the employees.

8    It's not fair to the customers.  It's not fair to the company.

9    And it's not fair to the people and the counterparties who have

10   depended on the process that has been approved in this court

11   and in Mr. Justice Morawetz's court over and over and over

12   again.

13        We have other things to sell, Your Honor.  This is not

14   a happy case.  Nortel is not happy to be in the mode of selling

15   all of its businesses, but it must do that and it must be able

16   to do that with confidence that when it sits down with a

17   counterparty that counterparty is going to put the best offer

18   it can on the table.  It has to do that with confidence that

19   the highest bid is going to come out.  And if our bidders sit

20   here and think that they are never going to be able to have any

21   comfort until the last signature is placed by the two courts, I

22   think we're in trouble.  And that's because, again, it's harder

23   than it looks.  We are balancing interests in multiple

24   jurisdictions.  And when you talk about the standard in the

25   United States, the standard is the highest or best.  It's "or",

1    it's not "and".  And "best" in this circumstance has to take

2    into account, for the United States debtors, a lot of different

3    things.

4          We can sit here and look at the proceeds that are the

5    headline number, 769 million dollars.  That's not all coming to

6    the United States debtors.  It's going to have to be split up

7    and divided amongst all the sellers.  It's going to have to be

8    subject to a process that's still under negotiation.  As we've

9    made up some of this stuff so far, we have to make up some more

10   stuff, Your Honor.

11         We have to recognize that we're also selling assets

12   in, as I calculate it, up to thirty jurisdictions.  And we need

13   to be able to make sure that when we walk into the court in

14   Versailles in France or in Tel Aviv or in London that those

15   judges can feel confident that the process that's been employed

16   is going to stand up.

17         We have risks as well, Your Honor.  We're not sitting

18   here talking about trading another ten or twenty million

19   dollars because we do have to take into account a break fee.  I

20   think everybody would like another ten or twenty million

21   dollars.  We'd like another 100 or 200 or 300 or a billion

22   dollars.  But we have to recognize what's before us.  We have

23   to recognize that the best transaction is the transaction

24   that's going to bring as much money with as much certainty in a

25   short time frame as possible.  We have to recognize that these

38

1    businesses are losing money as they continue to be operated in

2    Nortel's hands.

3         You'll hear from Mr. Reidl that these businesses in

4    Canada alone lose up to ten million dollars a month and that

5    the transaction that we're talking about here with MEN

6    Acquisition is likely to take at least thirty and most probably

7    sixty days more to close.  And by delaying the ten or eleven

8    days that we've delayed here, even if we were able to snap our

9    fingers and say there was another deal that we could step into,

10   those ten or eleven days mean that we're smack dab in the

11   middle of the holiday season and the likelihood that anything

12   gets done before January 10th -- particularly when you have to

13   do these things in European jurisdictions and everyone goes on

14   vacation for two or three weeks -- is fantasy.  So those ten

15   days meant a lot.  Those ten days meant probably another thirty

16   days because of the timeline and the calendar that we're

17   facing.

18        We also run the risk that if we take this transaction

19   and say let's reopen it, that we're not going to get a backup

20   bid, that we're not going to have a Ciena.  I think you'll hear

21   from Ciena's counsel and they'll make their point, but I was

22   informed before we stood up here today that Ciena has no

23   intention, if this auction is reopened, to participate.  So we

24   have to be darn sure that the two in the bush are worth the

25   bird in the hand.

1          And I think as you've heard, the decision of the

2   monitor, based on the information before us today, is very

3   clear.  And I don't think that the business judgment of the

4   debtors or the monitor is subject to dispute here.  We have

5   other businesses to sell, as I said, other businesses with

6   about a billion dollars worth of revenue.  We have hundreds of

7   patents that need to be sold.

8          We have a process that has worked.  And who's saying

9   that we should abandon that process?  A party that slept on its

10  rights.  A party that has not reserved its rights, did not come

11  to the Court with the complaints that it said it had.  A party

12  that the strategic party of the duo issued a press release

13  saying that they wouldn't pay any more because it wasn't worth

14  it.  Are we supposed to walk away from the transaction that we

15  have for that?  Based on the information before us and the

16  proposal that's been put on the table, I think the answer has

17  to be a definitive no.

18         The other P that is part of this process is price

19  because I think that there's ample evidence that will be put on

20  that the process was appropriate and the process was fair, and

21  if anything it was more fair to NSN and OEP than it was to

22  Ciena, if that's possible.  Because again, we delayed things

23  for a week, we waited while they tried to put together a

24  partnership on the fly, we accommodated them to allow them to

25  be part of this process, and they then walked away.

40

1        But the other issue we have is price.  And it goes

2    back to the term "paper".  You know, one of my partners said

3    before we went in, you know, Yogi Berra once said that cash is

4    almost as good as money.  And that's kind of what we're talking

5    about here.  We walked into these courts in October asking for

6    approval of a stalking horse transaction where there were ten

7    million pieces of paper, ten million shares of Ciena stock.

8    Now why was that a transaction that all of the constituents

9    were willing to take to these courts?  Well, you'll hear Mr.

10   Reidl say, well, because Ciena's a publicly traded company,

11   it's listed on NASDAQ, it's got a history, it has a reason to

12   buy this business, it's known to the customers, there is a

13   business plan.  And indeed, the stock, the common equity that

14   was part of the original transaction, was valuable paper.

15   Indeed, it almost was as good as money.

16        And then you'll hear how the process changed once we

17   got into the auction and we took stock off the table and

18   replaced it with convertible debt.  That's another type of

19   paper but you'll hear Mr. Reidl, Mr. Murray, Mr. Dyson talk

20   about what convertible debt is.  Convertible debt is better

21   than stock.  Convertible debt gives you the upside of stock and

22   the downside protection or the insurance of debt.

23        I think you'll hear complaints about that.  As a

24   matter of fact, I know you will.  But again, this isn't

25   something that has never happened before.  Ciena has

41

1    convertible debt.  It trades in the marketplace.  There are

2    prices for it.  The convertible debt that was crafted was

3    crafted very specifically to make sure that the value that

4    would be able to be ascribed in the process was par value.

5         We told that to our competing bidder over and over and

6    over and over.  It is hard to describe how many meetings we

7    told them that this paper was being valued by the financial

8    advisors of the debtors and the committee and the bondholders,

9    that this was par paper.  They didn't like that answer, they

10   disagreed with that answer, they argued endlessly about it, but

11   ultimately we didn't hide it from them.  We told them what it

12   was, and we were telling them exactly what our advisors

13   believed to be the case.  And you will hear that today, and

14   that view hasn't changed.

15        So the frustration that this bidder has at saying "I'm

16   bidding against something that I don't think is worth what you

17   think it's worth" is a disagreement; it's not a flaw in the

18   process.  And it's a disagreement where if we were going to add

19   up the numbers of people who disagreed we'd have had a hell of

20   a lot more that agreed with us, and agreed notwithstanding the

21   ability to have presentations and arguments and discussions and

22   sidebars endlessly throughout that weekend.

23        And even as late as yesterday when we got a letter

24   saying "here's a bid for 810 million dollars", what did it say?

25   It said "Open this auction up again, but if you do we will not

1    bid again unless you discount this paper.  And if you don't

2    discount it, I want the bankruptcy court in the District of

3    Delaware to decide what it's worth".  Now we got a revised

4    letter; that's not there anymore.  But it was there yesterday,

5    and my suspicion is it's still there.

6          The suggestion that we received yesterday morning was

7    that this frustrated bidder wants the business judgment of not

8    just the U.S. debtors, not just the Canadian debtors, but also

9    the U.K. administrator to be replaced by your decision, Your

10   Honor, and not Justice Morawetz, with all due respect, sir.

11   Only you, Judge Gross, if they don't agree with our value.  And

12   I can guarantee you that they will not.

13         So the suggestion that we received yesterday around

14   noon was that they were willing to put 810 million dollars in

15   cash on the table, they were willing to reopen the auction on

16   the condition that you be the arbiter of value.  Now, Your

17   Honor, I'd love to invite you up to our offices for a weekend

18   because the views are spectacular, particularly at this time of

19   year.  But that is not your job and I suspect you have other

20   things to do, although I think the Eagles and the Giants might

21   be playing this weekend.

22         THE COURT:  I'm good.

23         MR. BROMLEY:  The fact of the matter is, Your Honor,

24   that claw in the beak of our frustrated bidder has been there

25   and been there at large every step of the way.  And it was

43

1    there as late as yesterday, and I guarantee you that if we

2    reopen this process it's going to be there again.

3          Your going to hear testimony, Your Honor, from our

4    witnesses that the value that was ascribed was appropriate,

5    appropriate and appropriate in terms of the exercise of the

6    business judgment of the U.S. debtors, the Canadian debtors,

7    the monitor, and the U.K. administrator.  A frustrated bidder

8    who cannot point to collusion, cannot point to lack of good

9    faith, cannot point to any flaw in the process other than they

10   disagree with value, should not be able to demand that this

11   court replace the business judgment of all of those parties --

12   including several material ones who are not subject to your

13   jurisdiction, Your Honor -- and demand that the process be

14   reopened for their benefit.  It simply can't be done.

15         So where we stand, Your Honor, is we have a

16   transaction with Ciena.  It's a transaction that we believe in.

17   It's a transaction that we believe should go forward.  And

18   based on what has been put on the table by this frustrated

19   bidder, there is no reason under U.S. law or Canadian law to

20   upset that.  And we are prepared, Your Honor, to put on our

21   evidence to prove that point.

22         THE COURT:  All right, you may proceed with the

23   evidence.

24         MR. BROMLEY:  Would you like us to go directly into

25   the evidence, Your Honor, or would you like an ability to break

44

1    with Justice Morawetz?  We're happy to do it either way.

2         THE COURT:  Justice Morawetz, shall we break for a

3    moment?

4         JUSTICE MORAWETZ:  I think that would be an excellent

5    suggestion.

6         THE COURT:  All right.  We will take a break and we'll

7    advise you when we're ready to return.

8         MR. BROMLEY:  Thank you, Your Honor.

9         THE COURT:  Thank you.

10        (Recess from 12:08 p.m. until 12:23 p.m.)

11        THE CLERK:  Please rise.

12        THE COURT:  Please be seated.  Thank you.  We'll wait

13   for Justice Marowetz to return before we begin again.  The

14   sound difficulties, by the way, are at the Canadian end,

15   they're not here, and Justice Marowetz recognizes.  He's even

16   having trouble hearing them, so -- in his own courtroom, so

17   we'll do the best we can.  But they're hearing us fine.

18        (Pause)

19        THE CLERK:  Order.  All rise.

20        JUSTICE MAROWETZ:  Judge Gross, if I may just make a

21   few remarks?

22        THE COURT:  Yes, sir.

23        JUSTICE MAROWETZ:  Okay, first of all, Judge Gross has

24   informed me that the audio transmission is not that clear in

25   Delaware, and I don't know whether it will be of any assistance

45

1   if counsel are able to bring a microphone closer to them.  That

2   may increase the feedback, because we are getting feedback,

3   obviously, in this room such that some of the counsel -- I'm

4   even having difficulty hearing what you're saying.  Is it

5   difficult to try to fiddle around and ask the technical people

6   to do what they can.

7        Judge Gross and I had the discussion regarding

8   procedure, and we'll start with the evidence being presented in

9   the Delaware Court.  But prior to that, I do have one point

10   that I would like to clarify, and it's regarding the objection

11   of Matlin.  And I take it that there is no paper that has been

12   filed in the Canadian proceeding from MatlinPatterson, is that

13   correct?

14        (No response.)

15        JUSTICE MAROWETZ:  And second, is 4even counsel here

16   for Matlin?  I know that they have been represented in previous

17   hearings, but nobody has signed in on the record today.

18        MS. FELDSHER:  Good morning -- good afternoon now, Mr.

19   Justice Marowetz.

20        JUSTICE MAROWETZ:  Hi.

21        MS. FELDSHER:  This is Jennifer Feldsher from

22   Bracewell & Giuliani, on behalf of MatlinPatterson.  Mr.

23   Justice Marowetz, you are correct that we did not file anything

24   with the Canadian Court.  The reason for that, and as you may

25   have seen from the papers that we did file in the U.S. Court,

1    was that, at least on an initial basis, by the objection

2    deadline we as a creditor in this case did not have sufficient

3    information in order to determine the basis for an objection,

4    because the debtors at that point had not yet filed the

5    material terms of the paper or security that is being proposed

6    here by Ciena, the winning bidder.  But we are present in the

7    courtroom today and are prepared to move forward with our

8    objection.  The debtors and other parties-in-interest and the

9    committees are well aware of what our objections are and,

10   certainly as a creditor in these cases, we do have standing to

11   object to the relief being sought here.

12           JUSTICE MAROWETZ:  Okay.  Thank you.

13           MS. FELDSHER:  Thank you.

14           JUSTICE MAROWETZ:  Over to you, Judge Gross.

15           MR. HODARA:  Your Honor?

16           THE COURT:  Yes.  Yes, Mr. -- please.

17           MR. HODARA:  Thank you.  Would it not make sense for

18   the Courts to take brief opening statements from the other

19   parties, particularly the official creditors' committee,

20   perhaps the ad hoc committee in view of the recent developments

21   and to put things in context before we move into the lengthy

22   evidence.

23           THE COURT:  Let me just confer briefly with my

24   colleague.

25           Mr. Justice Marowetz, is that acceptable to you?

1        JUSTICE MAROWETZ:  It is certainly acceptable.  Are

2  there any objections being raised to that suggestion of Mr.

3  Hodara?  There are none, no objections here.

4        THE COURT:  All right, that would be a fine

5  suggestions, Mr. Hodara.

6        MR. HODARA:  Thank you.  Appreciate that.

7        Mr. Justice Marowetz, Judge Gross, Fred Hodara, for

8  the record, Akin Gump Strauss Hauer & Feld for the official

9  committee of unsecured creditors, a party which, along with the

10  ad hoc bondholder committee and the monitor and the two debtors

11  and the other debtor entities from around the world, did have

12  the pleasure of taking part in the lengthy auction process, and

13  I don't say that facetiously.  The auction, once again, was

14  quite a process and has resulted in a favorable result up to

15  the point it was when it was presented to this Court.  But

16  since that time, there has in fact been a development.  And in

17  over an hour discussion from the various counsels this morning,

18  there's been precious little said about the simple fact that it

19  appears that on a net cash basis there's an additional twenty

20  million dollars available to the estates in the auction process

21  if the auction is reopened.

22        And so we as a committee have spent quite a bit of

23  time since receiving the bid letter of MEN Acquisition

24  considering all of the various arguments that Mr. Bromley and

25  Mr. Tay and Mr. Carfagnini have stated today.  We had yet

48

1   another call at 8 a.m./8:30 a.m. Eastern Time this morning of

2   the entire creditors' committee, and I believe the ad hoc

3   committee participated as well, to hear further observations of

4   the debtors with respect to the auction process and the new bid

5   that has come.  And all of that information has been taken into

6   account by the creditors' committee, leading us to the

7   conclusion that, subject to one issue, the issue that Mr.

8   Bromley referenced concerning valuation, this auction should be

9   reopened to enable the estates to achieve and receive the

10   highest value possible for these assets.

11       Let me make a few points with respect to the

12   conclusion that the creditors' committee has reached.  One of

13   the first things we went back to look at were the bid

14   procedures themselves.  What do these bid procedures say with

15   respect to the ability of parties to submit bids at various

16   times, and what do they not say?  And ultimately the critical

17   provision that we find is in -- on page 12 of the bid

18   procedures, entitled, or the heading of that section being

19   "Selection of Successful Bid".  What that section says is that

20   the determination of the successful bid and the alternate bid

21   by the sellers, after consultation with the committee, the

22   bondholder group and the monitor at the conclusion of the

23   auction, shall be final, subject to approval by the Bankruptcy

24   Court and the Canadian Court.

25       So we find that, consistent with the case law, and

49

1    I'll talk just briefly about the case law, that these bid

2    procedures do leave open the opportunity to come before this

3    Court with the auction results and whatever else is deemed

4    appropriate to put in front of the Court to seek the approval

5    or the disapproval of the Bankruptcy Court and the Canadian

6    Court of the auction process itself.

7         And so on a timely basis, prior to this hearing, the

8    new bid, the new higher bid, was submitted to the parties, and

9    it was submitted in time that the creditors' committee not only

10   had an opportunity to review it but had an opportunity, after

11   careful consideration, to go back to MEN Acquisition and state

12   four specific problems that we saw with the bid, because, as

13   Mr. Bromley said, and said appropriately, it can't only be

14   about the dollars, even when the dollars are in the form of all

15   cash and are, on their face, superior by twenty million.

16        But you also have to take into account other factors.

17   And so we felt that there were four items left open to resolve,

18   and those four items, subject to the one on valuation, were

19   immediately dealt with by MEN Acquisition and resolved to our

20   satisfaction.  And specifically -- and by the way, that's why

21   there then was a subsequent letter yesterday clarifying these

22   points; that's the letter Mr. Bromley referred to as the second

23   letter.

24        So the first point was that we felt that at this stage

25   the good faith deposit, a defined time, under the bid

50

1    procedures should in the end of the day equal five percent of

2    the ultimate offer price, rather than the five percent of the

3    far inferior initial bid, which is where it had stood up until

4    now, and that point was quickly agreed.

5         Second, we said that we needed to see updated equity

6    commitment letters from NSN and OEP, the two significant

7    parties that make up MEN Acquisition, so that we could be

8    assured that this entity in fact has the wherewithal to

9    consummate the transaction so we can realize this very

10   significant additional cash value.  And they quickly agreed to

11   that.

12        Third, we asked that MEN Acquisition be in a position

13   to state clearly on the record in court today the binding and

14   irrevocable nature of this higher and better bid, and they said

15   that, given the opportunity, they certainly would do that on

16   the record in court.

17        Finally, we asked that they delete the provision that

18   Mr. Bromley identified concerning the participation, if you

19   will, of MEN Acquisitions in the valuation of the note, or that

20   the Court determine what the value is, conceivably in the midst

21   of the renewed auction.  And that's something that we did find

22   offensive.  To be clear, the creditors' committee completely

23   agrees with the debtor and the other parties that the noncash

24   consideration offered Ciena, at least in the form of the

25   current bid at the end of the auction, should in fact be valued

1    at par, frankly if not more than par.

2         So we have no qualms at all seeing it valued at that

3    level.  However, cash is cash, and we know how to value that.

4    What we don't think is appropriate is for this Court to be

5    asked to step in in the auction and value it.  And more

6    importantly, if this Court agrees with the creditors that in

7    the interest of creditors the auction should be open to permit

8    this additional twenty million cash and potentially then more

9    to come into the estates, we do believe firmly that we can't

10   have a situation where we then come back to the final hearing

11   and have the auction process again collaterally attacked on the

12   exact same basis, meaning that if Ciena chooses to then rebid,

13   whether it's now said it won't bid or not -- we've heard that

14   from MEN Acquisition, frankly, in the past as well -- if we're

15   lucky enough to have further bids and Ciena is the winning

16   bidder and there's a noncash component to its bid, it can't be

17   that after having succeeded in opening up the auction that MEN

18   Acquisition then comes in again and attacks the apparent

19   winning bid.

20        So, as much as we want to see the auction reopened and

21   have the additional value come in, our position is that we

22   would need to see that point of MEN Acquisition dropped so that

23   we don't have uncertainty at the final hearing on that point.

24        THE COURT:  And I take it that they have not agreed to

25   that provision, or that --

52

1        MR. HODARA:  They -- as far as --

2        THE COURT:  -- that issue.

3        MR. HODARA:  -- we've been told, and we conferred with

4    them again at the start of this session, they have not agreed.

5        THE COURT:  Okay.

6        MR. HODARA:  So after hearing from the debtor this

7    morning, the committee reconfirmed its view that I've

8    articulated that the auction had not ended in accordance with

9    the terms of the bid procedure, because there was still the

10   important step of the Canadian Court and the U.S. Court

11   reviewing the process and determining what is highest and best.

12   Second, a higher and better all-cash bid has in fact been

13   received, and we've gotten the comfort we needed to know that

14   this is a real bid.  And third, permitting this bid to come in

15   at the auction as the lead bid, we think, would be essential to

16   maximizing the value of these estates.  And we think

17   particularly where what we're dealing with are liquidating

18   estates that maximizing the value is the paramount goal of the

19   parties.  And surely, and at least under United States

20   bankruptcy jurisprudence, the views of creditors are typically

21   given more weight when we're dealing in a liquidation

22   circumstance.  And that's one of the reasons that I want to be

23   clear on the view of the creditors' committee on this point.

24       Now, let me just very briefly refer to what I'll call

25   the three F cases, the -- what I think are the leading cases on

53

1    the issue of finality of an auction and the propriety of

2    reopening the bidding, and then a fourth case which didn't

3    happen to start with the letter F, and that's the Polaroid

4    recent bankruptcy proceeding, Polaroid II, not the one that Mr.

5    Galardi and I had the pleasure of dealing with in Delaware a

6    few years back, but the proceeding in Minnesota.  All four of

7    those Courts came to the conclusion that a higher and better

8    bid should be permitted even after the close of the formal

9    auction if the Court has not yet signed an order finalizing the

10   auction process.

11          Here in Delaware very recently, Judge Carey had an

12   opportunity to consider that question in the Foamex

13   proceedings.

14          THE COURT:  Yes.

15          MR. HODARA:  Our firm happened to be representing the

16   debtor and ended up on the side of the argument that lost,

17   saying that the auction was done, shouldn't we move forward.

18   And the creditors argued strongly that no, there was a credit

19   bid that had not been permitted at the auction.  They had made

20   the point at the auction itself, and Judge Carrie pretty

21   quickly found that it was required to open the auction again,

22   let that bid come in, and ultimately considerable additional

23   value was realized by the Foamex estate.

24          Some years back in the Financial News Network, FNN,

25   case in the Southern District of New York, in a fairly

54

1    complicated series of proceedings, a bid by the Dow Company was

2    changed and improved after the district court ruled that the

3    auction should be permitted to be reopened.  The competing

4    bidder, CNBC, unhappily improved its bid beyond the new Dow

5    bid; it was accepted.  And then CNBC, after winning the auction

6    and being approved by the Bankruptcy Court, appealed the

7    Bankruptcy Court's order and argued to the District Court that

8    Dow should not have been allowed to change its bid after the

9    formal auction had closed and before the Bankruptcy Court had

10   entered its order.  But the District Court disagreed because,

11   specifically, the Bankruptcy Court had not yet ruled when the

12   improved Dow offer was submitted.  So, again, there, with the

13   bid coming in before the Court ruling, the auction was reopened

14   and the District Court affirmed that.

15       An Eighth Circuit decision, 1997, Four B. Corp. v.

16   Food Barn Stores, there, in determining whether an auction

17   should be reopened, the Eighth Circuit held that, up to the

18   point where the Court actually enters an order confirming the

19   sale, a bankruptcy court has broad discretion to accept or

20   reject bids and to conduct sales or auctions in the manner

21   deemed most appropriate by the Court.  And the Court there

22   adopted what it referred to as a sliding scale approach

23   balancing the estate enhancement with an auction participant's

24   reasonable expectations, a factor that I think is relevant here

25   and I'll come to presently.  The Polaroid decision I alluded

1    to, also in that circuit, at the bankruptcy court level, exact

2    same conclusion following that sliding scale approach.

3         Now, on that very point of expectations of the

4    bidders, as Mr. Bromley said, the bidder here, the disgruntled

5    bidder, MEN Acquisition, expressed for most of those sixty

6    hours, probably about fifty-nine and a half of them, its

7    disquiet with the issue of valuation of the noncash

8    consideration.  A lot of the sixty hours were spent in

9    consultation with their investment banker, with their

10   principles, discussing that issue, and they made clear at every

11   step of the way that in fact they felt that the parties were

12   valuing the noncash consideration incorrectly.

13        Now, as I said, we don't agree with them.  We didn't

14   agree then, we don't agree today.  We think that the

15   convertible note that was fashioned is a very strong piece of

16   paper and was a very positive development over the course of

17   the auction.  But the point that I'm making is that nobody here

18   today should be surprised that MEN Acquisition has come in with

19   a higher and better bid or is asking the Court to reopen the

20   auction.  In fact, what Mr. Bromley didn't specifically

21   reference from the transcript of the proceedings, at the very

22   end of the auction proceedings was the statement of MEN's

23   counsel, MEN Acquisition's counsel, where they said "We believe

24   that the offer you just announced", they're referring to that

25   final bid of Ciena, "as the lead bid, is not the highest and

1   best offer.  And we believe that because the convertible debt

2   is not being discounted at all, and we believe it is way below

3   par in real value."

4        So it just wasn't a surprise to anyone.  It wasn't a

5   secret.  They didn't launch this after the fact that they had

6   an issue with how the auction was conducted.  We disagree.  If

7   this thing is reopened, we feel firmly that that issue's got to

8   be put behind us, but we do think that, given the precedents,

9   given the paramount interests of creditors, given twenty

10  million dollars of real cash value already within sight, within

11  grasp, and the opportunity potentially for more, which is what

12  these auctions are all about, that we should reopen this

13  process and permit the bidding to conclude in an appropriate

14  manner.

15       THE COURT:  Thank you, Mr. Hodara.

16       MR. HODARA:  Thank you, Your Honor.

17       THE COURT:  I do appreciate it.  And I am -- I don't

18  want to -- anyone to misunderstand.  I'm remaining purposely

19  quiet because I want to hear the various parties' positions

20  without sort of tipping my hand as to what I'm thinking and

21  which might in some way jeopardize the -- this sort of ongoing

22  process.

23       MR. HODARA:  Understood, Your Honor.  Of course, if

24  you or Mr. Justice Marowetz has any specific questions, for us,

25  we'd be happy to answer them.

1        THE COURT:  Thank you.

2        JUSTICE MAROWETZ:  Mr. Hodara, I will be calling upon

3   Mr. McFarland, I think it might be appropriate for him to make

4   whatever remarks he has to address the Canadian aspects of your

5   submission.  And Judge Gross -- I see another counsel in the

6   background to Mr. Hodara is ready to go, but perhaps I would

7   like to at least get the brief remarks of -- what I anticipate,

8   the brief remarks of Mr. McFarland.

9        THE COURT:  That would be -- yes.

10       MR. HODARA:  Thank you.

11       THE COURT:  Thank you, Mr. Hodara.

12       JUSTICE MAROWETZ:  Okay, Mr. McFarland?

13       MR. MCFARLAND:  Thank you, Judge Marowetz, Judge

14   Gross.  I am Canadian counsel for the U.S. creditors'

15   committee.

16       JUSTICE MAROWETZ:  What I specifically wish you to

17   address is, Mr. Hodara has laid out some of the case law in the

18   U.S. that he has directed Judge Gross.  I would like you to do

19   the same here as well, to elaborate on anything else that you

20   think is appropriate at this time.

21       MR. MCFARLAND:  Your Honor and Judge Gross, in

22   respect -- the Canadian case law is well-known in Canada, and I

23   can't specifically point to any Canadian case law that would

24   necessarily be of assistance to my argument today.  But what I

25   was prepared to make argument on is more of a high-level look

58

1    at these two proceedings as being very unique in respect of

2    insolvency restructuring cross-border proceedings.  And, in

3    fact, each time we've come before the Courts in Delaware and in

4    Ontario, we are confronted from time to time with the

5    uniqueness of these proceedings.

6         And what we have here today is a uniqueness that I'd

7    like to point out to both Courts, Judge Gross and Justice

8    Marowetz, is that much is said about the business judgment of

9    the monitor in these proceedings.  And no one in this Court

10   will necessarily dispute that the monitor has always been given

11   a high deference by the Court to its business judgment.

12        But what we have here today is really effectively the

13   clash of two systems, between the U.S. bankruptcy system and

14   the Canadian CCAA proceedings.  We have a court officer, the

15   monitor, who has participated in the auction process, has made

16   a report to the Court and made recommendations that the sale

17   proceeding should be accepted by both Courts.  We have another

18   fiduciary body in the United States, which is the U.S.

19   creditors' committee appointed by statute to represent all

20   unsecured creditors in those proceedings, by statute, has a

21   fiduciary duty, as my co-counsel Mr. Hodara pointed out, to

22   maximize realizations for the unsecured creditors and those

23   committees and in those proceedings.  Its sole responsibility

24   is to the unsecured creditors and those committees.  Its sole

25   responsibility is to maximize a realization for those

59

1    creditors.

2         As Mr. Hodara pointed out, this is a liquidating CCAA,

3    it's a liquidating Chapter 11, and in a liquidating proceeding

4    the rights and the judgment of the creditors are given higher

5    regard than in the usual case of a restructuring.

6         In this case it's incumbent upon the committee, upon

7    looking at the offers and the late offer from MEN, to make an

8    assessment that twenty million dollars cash in hand is a higher

9    and better offer.  They're not -- Mr. Hodara did not raise any

10   material disputes with respect to the auction.  The auction was

11   run in a fair process.  He did point out it was not unexpected

12   that MEN might come in with a late bid.  And in fact, in the

13   U.S. proceedings, contrary to the Canadian proceedings, it

14   appears to be the case that in many proceedings, until the

15   judge has actually signed the order closing the auction,

16   closing the bids, there has been a number of cases where the

17   auction has been opened and in order to allow another bid to

18   come in.

19        And this case is no different than those other cases,

20   and I would urge the Courts in this case to make note of the

21   fact that these are both liquidating cases, the U.S. creditors'

22   committee has a fiduciary statutory duty and its counsel has

23   come forth representing that committee, and all the unsecured

24   creditors and now the estate to reopen the auction to try to

25   maximize that value by allowing the MEN to go forward.

1        Those effectively are my submissions, Your Honor.

2        JUSTICE MAROWETZ:  Okay.  And, again, I'm not going to

3   repeat what Judge Gross has already articulated, but the

4   silence that you get from me may be unusual, but it's also

5   going to be perhaps brought up later in the proceedings.  If I

6   have any questions, I'll direct them at that time.

7        MR. MCFARLAND:  I just had a hard time hearing Your

8   Honor.

9        JUSTICE MAROWETZ:  I'm not going to question you or

10  interrupt you or ask for any further submissions now, but you

11  may get --

12       MR. MCFARLAND:  And for that I'm grateful, as you can

13  appreciate.  Thank you, Your Honor.

14       JUSTICE MAROWETZ:  Thank you.

15       THE COURT:  And I think an additional factor --

16       JUSTICE MAROWETZ:  All right, Judge Gross, sorry --

17       THE COURT:  -- in our silence --

18       JUSTICE MAROWETZ:  -- for that interruption.  I think

19  there was another counsel --

20       THE COURT:  Yes, and I do think an additional factor

21  in our silence is, frankly, the fact that Justice Marowetz and

22  I have to confer from time to time on issues, and I don't think

23  we want to be acting, to the extent possible, at cross-

24  purposes.

25       Good afternoon.

1           MR. KRELLER:  Good afternoon, Judge Gross.  Good

2    afternoon, Mr. Justice Marowetz.  Thomas Kreller of Milbank

3    Tweed Hadley & McCloy, appearing on behalf of the ad hoc

4    bondholder group, bondholders whom -- that are creditors in

5    both the U.S. cases and the Canadian cases, and I think that's

6    important to note.

7           Your Honor, I'd like to start, kind of before we jump

8    into the fray on this, I'd be remiss if I didn't commend the

9    debtors, the company, their deal teams on another job well done

10   in terms of this auction and the results we've seen thus far.

11   And so I wanted to make sure I didn't forget that as we get

12   into the mix here today.

13          The ad hoc bondholder group did not file an objection.

14   The statements today really are in reaction to the recent

15   developments that are the MEN Acquisition bid.  And we think

16   these statements are important, Your Honors, for all the

17   reasons that Mr. Hodara's articulated with respect to the

18   deference given to creditor views, particular in these types of

19   liquidation scenarios.  And so I wanted to make clear our

20   views.

21          I'll try and be brief, because I think in many

22   respects the views of the ad hoc bondholders really mirror the

23   unsecured creditors' committee views, and I won't bore the

24   Court with repeating what Mr. Hodara's articulated so well.

25          I do want to make a few points, though.  I think,

62

1    first, Your Honor, I'd like to make clear, I think you have two

2    very different issues before you today.  On the one hand, I

3    think you have an objection which is really a challenge to the

4    auction process, to the valuation component of that process,

5    and that challenge is being brought by a disappointed bidder

6    who, as Mr. Bromley noted, has some, probably, significant

7    standing issues to deal with.

8         We don't share in that challenge at all, Your Honor.

9    To the contrary, the ad hoc bondholder group was an active

10   participant in this auction.  It's been an active participant

11   in prior auctions.  We believe that the auction was conducted

12   entirely in conformity with the procedures approved by both

13   Courts, and we believe the results of that auction speak for

14   themselves.  So we do not share any concerns about the process

15   to date.

16        The second issue, Your Honor, though, that you're

17   faced with, and that we're all faced with, frankly, is the

18   question of, as we stand here today, what is the highest and

19   best bid available to these estates.  And this is the question

20   that brings the ad hoc bondholder group to the table because,

21   as it appears to us, subject to some of the same issues that

22   you've heard from Mr. Hodara, there is a very high possibility

23   that we have a higher and better bid on the table today, in

24   comparison to the Ciena bid that was -- that's otherwise being

25   presented to you.

63

1            THE COURT:  Higher or better, I think, is --

2            MR. KRELLER:  Higher or better, Your Honor.  We think

3    this may be higher and better; this may satisfy both of those

4    prongs --

5            THE COURT:  Okay.

6            MR. KRELLER:  -- subject to some things I'll touch on

7    in a moment.

8            So on process, Your Honor, we fully respect the

9    process.  The process has served us well.  We've been active

10   participants, and ultimately the ad hoc bondholder group will

11   be the ultimate beneficiaries of some of the successes that

12   have been achieved here.

13           That being said, for all the reasons articulated by

14   Mr. Hodara, we do not believe that a reopening of the auction

15   under appropriate circumstances would at all be contrary.  In

16   fact, we believe it could be done in complete compliance with

17   the auction procedures.

18           But I think it's important that when we talk about

19   process, we need to think about what that process is set up to

20   achieve.  And I believe that under Section 363 sales and these

21   types of sale procedures that we establish on such a regular

22   basis in these cases, the purpose really is twofold:  One is to

23   allow the debtors to realize and generate the highest and best

24   bids to maximize value from their assets; and the other purpose

25   of these processes is so that when we come before you on these

64

1    kind of occasions, you are put in a position where you can make

2    the determination that the transaction being proposed for your

3    approval is in the best interest of the estate for the very

4    reason that it's the pursuit of the highest and best value, or

5    highest or best value, for the assets.

6         And that really is the paramount concern of the ad hoc

7    bondholder group here, Your Honor.  And this is where, frankly,

8    it gets a little tricky.  Coming out of the auction process ten

9    or eleven days ago, the Ciena bid was the leading bid, and I

10   think the debtors, I think the official committee and I think

11   the ad hoc bondholder group had no doubt among them that that

12   was the then-leading bid.

13        We've received, as has been reported to you, as

14   recently as about an hour or so prior to the hearing, the most

15   recent version of a revised bid from MEN Acquisition.  That

16   bid -- the basics of that bid lead the ad hoc bondholder group

17   to the view that an 810 million dollar all-cash bid, after

18   netting out breakup fees and dealing with other -- clearing out

19   other underbrush, would yield potentially as much as 20 million

20   dollars of additional net value to the estates.

21        Now, there are issues around that bid and what it

22   means; some of those issues have been clarified and cleared up.

23   If what that bid is is an 810 million dollar all-cash bid that

24   would serve as the floor for a reopening of an auction, and the

25   auction, as reopened, would continue in accordance with the

65

1    auction procedures as it was run prior thereto, without any

2    conditions about how noncash currency gets valued, or any of

3    the other -- any of those other modifications, then I think we

4    would stand here before you today and say we believe that 810

5    million dollars straight-up cash bid is a higher and better

6    bid.  We're not there yet, and that, frankly, is a bit of my

7    problem as my stand here in front of you, because we have a bid

8    that I think is potentially higher or better, subject to some

9    clarifications, and we haven't heard the clarifications that we

10   need.  And the real clarification that we're talking about is

11   the same one that you heard from Mr. Bromley and from Mr.

12   Hodara, and it relates to an attempt by MEN Acquisition to

13   exert some level of control or put in your hands some level of

14   control over the determination of the value of components of

15   the Ciena bid.  And that, we believe, is in fact outside the

16   bounds of what the auction procedures contemplate and would be

17   a variance from those procedures and therefore is

18   inappropriate.

19         Your Honor, if that issue were to go away, I think I

20   would be able to stand here and say we endorse that bid, we

21   endorse that MEN Acquisition bid as the highest and bid and

22   that the bid that the debtors should accept as the lead bid and

23   reopen the auction.

24         If we find ourselves with that kind of a bid in front

25   of you, I will make those statements.  At the moment, we have

1   to reserve and see where this hearing takes us.  But to be

2   clear, our challenge is not to the prior process.  Our question

3   is do we have a higher and better bid in front of that we all

4   need to consider as the way to maximize value for the creditors

5   here.

6         THE COURT:  Thank you.  I do have a question for you,

7   though, and perhaps, Mr. Hodara, if you would like to be heard

8   to for retracting my prior comment, but to what extent should I

9   and can I consider the fact that there are future sales and

10  what impact the reopening of an auction might have upon future

11  negotiations, future sales, on the debtors' estate.

12        MR. KRELLER:  Your Honor, I'll go first and let Mr.

13  Hodara catch what I miss.  But I believe you can reopen, I

14  think, for the reasons -- for the case authority Mr. Hodara

15  cited, for the -- given the provision in the auction procedures

16  that provides that this is -- the highest and best bid is all

17  subject to Court approval.  I believe you've got ample

18  authority to do it.

19        I also think that, for those of us who practice in the

20  arena, while it can be unpleasant when you represent a winning

21  bidder emerging from an auction, and while it can be difficult

22  when you represent a debtor who is the seller, the reality is

23  that there is always this kind of possibility.  And I've sat in

24  Judge Walsh's courtroom on more than one occasion and had him

25  look at me and say but if Bill Gates shows up with his

1    checkbook --

2         THE COURT:  Yes.

3         MR. KRELLER:  -- today, I will listen to him.

4         THE COURT:  Yes.

5         MR. KRELLER:  And so, Your Honor, I do think the

6    authority is there, and I do think that the auction procedures

7    contemplate that as well.

8         THE COURT:  All right, thank you, Mr. Kreller.

9         MR. BACON:  Your Honor, may the successful bidder be

10   heard from?

11        THE COURT:  Yes.

12        MR. BACON:  Thank you.

13        THE COURT:  I will hear from you.

14        MR. BACON:  My name is Doug Bacon.

15        JUSTICE MAROWETZ:  Judge Gross --

16        MR. BACON:  I'm with Latham & Watkins.

17        JUSTICE MAROWETZ:  Judge Gross?

18        THE COURT:  Yes?

19        JUSTICE MAROWETZ:  If I just may interrupt for a

20   moment to see whether Mr. Orzy, as the Canadian counsel to

21   bondholders, has anything to --

22        MR. BACON:  I beg your pardon.

23        THE COURT:  You may.

24        JUSTICE MAROWETZ:  -- add at this point.

25        THE COURT:  Yes, certainly --

1          JUSTICE MAROWETZ:  Thank you.

2          THE COURT:  -- Mr. Justice Marowetz.

3          You will be heard, Mr. Bacon.

4          MR. BACON:  Thank you.

5          MR. ORZY:  Thank you, Your Honor.  My submissions are

6     very brief because I'm just going to try to answer the question

7     you asked Mr. McFarland and not add to Mr. Kreller's

8     submissions, although we do adopt Mr. Kreller's submissions of

9     course, and, again, both as to process and as to the best

10    interest of the estate.  But I want to address the Canadian

11    issue that you asked on, and therefore this submission is

12    primarily directed at you, Justice Marowetz.

13         In terms of the Canadian case law, it seems that it is

14    largely directed at process and protecting the efficacy of the

15    process, or ensuring the efficacy of the process, and not

16    undermining the credibility of the process by retroactively

17    changing the rules, and that's, I think -- that would be my

18    summary of what I think the case says and the cases that there

19    are in our courts about this issue.

20         But there is not a lot of, or maybe even any, Canadian

21    case law that deals with this particular auction, this

22    particular type of auction.  This is an auction that's very

23    typical in the U.S.  It's very -- found very often in the U.S.

24    We have some of them here, but, you know, our sale processes

25    are usually different.  And this is a process that we all

1    agreed would be utilized for various reasons, because it made

2    sense, not just because it happened to be according to U.S.

3    laws.  But if it's done according to rules and guidelines,

4    they're regularly used and applied, Chapter 11 cases in

5    particular, and much less so here.

6            And so my submission would be that if it is the case

7    under the -- in the place -- of course there are a lot of cases

8    involving this type of auction where these rules and guidelines

9    are applied regularly.  If it is in fact proper to open it up,

10   then it would not bring this Court's process into disrepute if

11   this joint hearing were to reopen the auction.  And by saying

12   that, I want to be clear; I am not suggesting that Your Honor

13   defer to the U.S. law or as you certainly resile from your rule

14   in making a decision in this; that's not what I'm saying.  I'm

15   just saying that our case law is really so geared towards

16   protecting the efficacy of the process that if in fact when you

17   confer with your counterpart in the U.S, that if you were to

18   determine that it was otherwise appropriate, I do not think you

19   would be going against the existing case law because -- and

20   then it would not bring the process into, if you will,

21   disrepute or in any way destroy the efficacy of the process,

22   because you would be patterning that decision on the basis of a

23   process and rules and applications that have been applied many

24   times to this particular type of auction.

25            So what I'm saying here is that, effectively, we

1    don't -- we would take the position that if it is determined,

2    and, again, Mr. Kreller's comments have to be taken in context,

3    at this point our committee is not absolutely satisfied that

4    the other bid is in fact in the shape that it needs to be for

5    that.  But if it is taken that it is appropriate otherwise to

6    reopen the auction, I do not believe that Canadian case law

7    would stand in your way to do so.

8            That's -- those are my submissions.

9            JUSTICE MAROWETZ:  Okay.

10           MS. FELDSHER:  Your Honor, if I may.  I don't mean

11   to --

12           JUSTICE MAROWETZ:  Thank you.  Back to you, Judge

13   Gross.

14           MS. FELDSHER:  -- to jump ahead, but --

15           THE COURT:  Thank you.

16           MS. FELDSHER:  -- I did think, as far as process, you

17   were taking submissions from the creditors.  And given that we

18   represent one of the --

19           THE COURT:  All right.

20           MS. FELDSHER:  -- significant creditors --

21           MR. BACON:  That's fine, Your Honor.

22           THE COURT:  Thank you.

23           MS. FELDSHER:  -- would it make sense --

24           THE COURT:  Yes, Ms. Feldsher.

25           MS. FELDSHER:  Thank you very much.  Good afternoon

1    again, Your Honor and Mr. Justice Marowetz.  Jennifer Feldsher

2    from Bracewell & Giuliani, on behalf of MatlinPatterson Global

3    Advisors.

4           As the two Courts are aware, MatlinPatterson is a

5    significant stakeholder in these cases, holding a large

6    percentage of the bonds both in the U.S. and Canada, which are

7    outstanding in these cases, and have participated in one of the

8    prior auctions that the debtors undertook.  So we are very well

9    familiar, having been tried and tested through that fire, with

10   the debtors' auction procedures.

11          We did not participate in this auction, and therefore

12   we stand before both Courts as purely a creditor.  But by

13   "purely", I don't mean to discount our view, because it is my

14   clients, who are actually here today as well, it is their apple

15   cart.  They and other creditors in these cases own the apple

16   cart, and sometimes that gets lost.  For those of us who

17   practice and are attorneys, you know, to us it's another day at

18   the office; to them it's, you know, their livelihood.  So not

19   to overstate there.

20          There's much that's been said by my colleagues, who

21   represent the creditors' committee and the bondholders'

22   committee, about the increased value of the MEN Acquisition

23   bid.  And I think that is absolutely true.  I think twenty

24   million dollars is not an insignificant amount of money, and

25   certainly for a small delay that would be caused in reopening

1  the auction it would serve the creditors well and would be well

2  worth it.

3       But I stand before you to say that I take issue with

4  even the twenty million dollar number, and the reason for that

5  is that the debtors, and the committees as well, posit a

6  situation under which the creditors here are being offered, by

7  Ciena, cash and notes.  And there is a lot of discussion about

8  how you value the notes and whether the notes should have been

9  valued at par or should not be valued at par, how you value

10  them going forward if we reopen the auction.  But, Your Honor,

11  standing here representing a creditor, I can tell you that my

12  clients don't believe they have notes, and they don't believe

13  that those notes are what they hold in their hands.

14       So the choice is not between an all-cash bid and a bid

15  that is composed of cash and notes, but it is currently, as it

16  stands today, and all-cash bid and a bid that has a portion in

17  cash and a portion which is a naked put, and I'll explain what

18  I mean by that, and I'll try to do my best.  I'm -- I am an

19  attorney, so I just hedge this by saying, you know, that I'm

20  going to try to put it out there in layman's terms.

21       What Ciena negotiated -- let me back up and say I'm --

22       MR. BACON:  Your Honor?

23       THE COURT:  Yes?

24       MR. BACON:  May I raise a point?

25       THE COURT:  Yeah, I'm starting to become a little bit

73

1  concerned with the direction of the argument, Ms. Feldsher,

2  because at this point this is an evaluation hearing at this

3  point, and I don't want to turn it into that.  I understand

4  your position that you think that the auction -- or may you

5  don't, I don't know -- should or shouldn't be reopened; that

6  really is what I'd like to hear from you.  I'm beginning to

7  hear that perhaps you don't think the auction should be

8  reopened, that --

9          MS. FELDSHER:  The -- actually, the opposite, Your

10 Honor.  What I was arguing for was that the auction should

11 absolutely be reopened, and the reason for that is that the

12 value that can be achieved from reopening the auction, and the

13 short delay attendant thereto, is well in excess of even the

14 twenty million dollar number that has been thrown around.  And,

15 Your Honor, I was not asking the Court, and my apologies if it

16 sounded like that, to entertain or to engage in a valuation

17 analysis.  I was just -- merely wanted to point out to the

18 Court that when you're talking about what is on the table and

19 why I say that the increased value can be much more than twenty

20 million dollars to the creditors is that, currently as it

21 stands, Ciena can choose to either pay cash or give creditors

22 notes at sometime in the future when the closing date will

23 occur, and that can occur in thirty days, sixty days, ninety

24 days, six months, four months; nobody really knows.  And the

25 reason that that's important from a creditor perspective, and

74

1    the reason that we stand before you asking that this auction be

2    reopened, is that, were the auction closed today, the creditors

3    of this estate would be stuck holding all of the risk of the

4    next X time until the closing date when Ciena gets to decide

5    oh, interest rates have gone up; or, you know, there's been

6    market fluctuations and the NASDAQ has now dropped twenty

7    percent; here's notes, I'm not giving you cash, here are my

8    notes; and those notes would put the -- I submit, would put

9    creditors, the actual stakeholders here, in a much worse

10   position.  So that is why it is imperative, and the value that

11   can be achieved from opening the auction can well exceed the

12   mere highline numbers that Your Honor sees before you and the

13   twenty million dollars that's been thrown around.

14         Your Honor, Mr. Bromley talks a lot about the prior

15   successes he's had, and I stand before you with all the respect

16   I can muster to say that is very true, but there's an adage:

17   History is not destiny, and what worked in one auction might

18   not have worked in another auction.  And here it is very clear,

19   as in all auctions, and many of us have been part of this, when

20   you have a bidder that is hopping up and down at the end of the

21   auction saying I want to participate but I can't on these terms

22   but I have a better bid to make, and is calling everybody, you

23   know, from the minute the auction ended saying I want to bid I

24   have more value, all of us who practice in this arena need to

25   take a step back and say perhaps the process in this case, with

75

1   these two bidders, okay, didn't work the way that it was

2   supposed to, because all of the creditors stand before you now

3   saying this is -- we definitely know we have a higher and

4   better bid, and that bid can only be achieved from reopening

5   the auction.  And as I said, future bids, if they come in, will

6   only serve to enhance the value that can be achieved from these

7   estates.

8        And therefore I submit that while history is a guide,

9   it should certainly not serve as a bar to getting a better

10  value here, and certainly neither should egos and neither

11  should, you know, a process that may have worked in prior

12  instances but didn't work here.

13       Your Honor, what are we asking the Court to do now?

14  We are standing before you asking for the Court to reopen the

15  auction.  We are standing here because, unlike what Mr. Bromley

16  said, the creditors, the ultimate stakeholders here, have not

17  moved on.  If you look around you in the courtroom today, I

18  think Your Honor can see -- and I apologize, Mr. Justice

19  Marowetz, but this is a packed courtroom here so I'm just

20  giving you the visual -- nobody has moved on.  Creditors here

21  have not moved on.  My client sits here today because they have

22  not moved on, because what they have from this process is only

23  the benefit that they get from these sales; that's all they can

24  ever get; they can't get anything better.  And as Your Honor

25  knows, we at one point stood before you and said this should be

1    a plan, we should reorganize, this is a company that was --

2    once had a market share of 250 billion or more.  Great, we've

3    achieved three billion dollars in sales now; that's a small

4    fraction of what's owed to creditors in these cases.  So, Your

5    Honor, I just ask that you keep that in mind.

6        And in terms of your question about the slippery slope

7    opening this, how this affects further auctions, Your Honor, I

8    would merely submit, and I second the comments of counsel that

9    came before me, that, one, this is an inherent risk with the

10   bankruptcy process.  The Court is not, as may have been posited

11   by the debtors here, a rubber stamp as to what the debtors did

12   in their process, and the Court does have discretion.  I was

13   before Judge Carey arguing for a reopening of the auction in

14   the Foamex case, and there we were successful in reopening the

15   auction, and achieved a lot of value.  But I also submit that

16   let's look at history.  We've had several auctions.  There have

17   been bidders that have gone away that haven't won; my client

18   was one of them.  We didn't hop up and down; we knew we were --

19   we got outbid, and we walked away, we took our, you know, our

20   ball home, and nobody came in here and objected.

21       Just because in this case the process didn't work the

22   way it should have and the best -- highest and best bid wasn't

23   elicited at the actual auction because of a procedural glitch

24   does not mean that every bidder who loses is going to be coming

25   into this court and arguing to this Court that they should

1    reopen the auction.  The fact is that's not the way it usually

2    happens, but there are instances where it does happen, and in

3    those instances Courts in this district and in other districts

4    have been willing to say there's more value here and I'm not

5    going to prejudice creditors because the debtors had a process

6    that was a great process.  I'm not standing before you arguing

7    with the process, but for whatever reason, whatever happened in

8    those twenty-one hours didn't get the highest and best bid, and

9    Your Honor sits in a position where it can reopen the auction.

10   I think MEN Acquisition's letter to the -- which was submitted

11   to the Court, is clear.  They are putting their first bid, the

12   810 million dollar bid, on the record with no conditions.  They

13   do have conditions to further bids, but that is MEN

14   Acquisition's choice.  Should they choose not to continue to

15   bid, if Ciena overbids them, that's their choice.  I'm not

16   suggesting that the debtors need to change their process in

17   order to reopen the auction, because MEN's bid -- MEN

18   Acquisition's bid is 810 million, no conditions, as we read it.

19          So unless the Court has any other questions --

20          THE COURT:  No.  Thank you, Ms. Feldsher.

21          MS. FELDSHER:  Thank you, Your Honor.  And I apologize

22   again for jumping in here.

23          THE COURT:  Mr. Bacon?

24          MR. BACON:  I don't think there's a Canadian

25   counterpart to that objection.

1           THE COURT:  No, I don't believe so.

2           MR. BACON:  Thank you, Judge.  Again, Your Honor, Doug

3    Bacon with Latham & Watkins, for Ciena Corporation.

4           THE COURT:  Yes.

5           MR. BACON:  We were here in October for the

6    procedures -- the bid procedures hearing.  And I've listened

7    carefully this morning.  I think your day got a lot easier in

8    the last couple hours, and I'll tell you why.  I know my day

9    got a lot easier, because I'm not going to repeat everything

10   Mr. Bromley said and Mr. Tay said so eloquently in Canada.

11          I don't think there's a clash or conflict of laws that

12   you're going to have to sort out today.  I think every case --

13   every reported case I've seen in the U.S. on reopening of

14   auctions talks a lot about integrity and finality.  And I think

15   Your Honor's -- that Justice Marowetz and your decisions and

16   whatever ruling comes out today will speak to integrity and

17   finality, and those are the watchwords, and they're sort of

18   amorphous concepts, but I think this Court and Justice Marowetz

19   know integrity when they see it.  And you get to set the

20   boundaries in this court; you get to define what integrity and

21   finality means in this court.  And of course you sit in a very

22   special court in the U.S.; you sit in something of a spotlight.

23   When any judge in this district makes a substantive decision,

24   you don't have to publish an opinion, the transcript's printed

25   and it gets e-mailed all around the United States to all around

1    the bankruptcy bar.  So your decision today is impactful and

2    you're going to decide what the boundaries are around finality

3    and integrity.  And I don't think you have to -- I don't think

4    the case law in the U.S. tells you exactly where those

5    boundaries lie, and I don't think you have to decide today

6    exactly where those boundaries lie in every circumstance, but I

7    think you can, Your Honor, and respectfully should, easily

8    decide that we're outside any kind of boundary of fair play,

9    good faith, finality and integrity.  And I think it's easy and

10   I think there's going to be a lot of evidence put on if Your

11   Honor needs to hear a lot of evidence.  But there's a couple of

12   key things that I think make -- will make your decision easy.

13         I want to give you -- I'd like to hand up one

14   demonstrative exhibit, which I think most of the folks in here

15   that are the front of the room have, and it's -- if I may

16   approach?

17         THE COURT:  Yes.  Thank you, Mr. Bacon.

18         MR. BACON:  Justice Marowetz, I don't know the

19   procedure in Canada, I apologize.  Mr. Taylor, our co-counsel,

20   has this same -- this is the bid, the one-page summary of bids

21   that I think Mr. Taylor has there in the courtroom in Canada.

22         JUSTICE MAROWETZ:  Mr. Bacon, I have been provided

23   with a copy.

24         MR. BACON:  Thank you, Your Honor.

25         And I'll come back and forth to this, but I think you

80

1   will find this handy as you listen to the testimony today about

2   this auction.  And I think -- honestly, I think this has been a

3   much cleaner hearing than I expected, and I'm really impressed

4   at some of the admissions the committee made.  I thought,

5   frankly, Matlin's counsel took a little bit of a cheap shot

6   with the ego comment.  I think that was aimed at Mr. Bromley,

7   but I'll tell you, I was going to talk about -- my only

8   criticism of Mr. Bromley is he was too modest.  The auction

9   that was run in his offices was amazing.  And I wish you could

10  have been there.  The monitor was there; the creditors'

11  committee was there.  I don't know why Matlin wasn't there, but

12  they weren't there.  And it was amazing.  I don't think it was

13  sixty hours, Your Honor; I think it was fifty-nine hours.  But

14  it was fifty-nine substantive, beautifully orchestrated hours,

15  and it was formal, and the record of the actual auction, which

16  took place in an enormous conference room after periodic

17  breaks, is short; I think it's only thirty-five pages, and it's

18  in the binder --

19          THE COURT:  Yes.

20          MR. BACON:  -- before you.  And it's clear, there's

21  not -- there's just a little bit of back-and-forth, but there's

22  not a lot of showboating or acrimony or umbrage.  It's a

23  pristine record.  And that -- as Mr. Bromley says, that may

24  look easy, but that wasn't easy, and I -- the record -- what I

25  think's interesting about the exhibit I just handed you, and

1   there's a summary in the notebook too, but it doesn't have the

2   times.  And as you're hearing the evidence today, look at how

3   this auction unfolded and look at how complicated it was.

4   There were -- I counted 150 attendees on one sign-up sheet and

5   somebody said 200; there were at least 150 folks there, mostly

6   very highly paid professionals, and that process worked

7   magically.  But look at the -- look at how the bidding

8   unfolded, and look, as we go through the -- I won't take you

9   through it all right now, but watch -- look at the time gaps.

10  The round -- at round 5 at 7: -- about 7:13 on Saturday night,

11  you see the emergence of these convertible notes, which there's

12  been a lot of discussion about the convertible notes; Mr.

13  Bromley described those.  That was a material improvement in my

14  client's bid, and it was a terrific accomplishment by the

15  investment bankers.  Everybody always looks at investment

16  bankers after the fact and says they were overpaid.  Well,

17  these guys collectively really earned their keep that day

18  because in the midst of this they spent from Friday night --

19  you see this long gap from Friday night on the 20th at 10:30

20  when the last official appearance -- not when everybody went

21  home, but it was the last time we were in that big conference

22  room, until 7 o'clock last night, the next night, the

23  investment bankers collectively, and I don't just mean my

24  clients and the debtors, but also the creditors' committee;

25  they were all involved in negotiating taking our shares, which

1  had always been part of the currency from the very beginning;

2  everybody knew that a material component of our bid was

3  stock --

4         THE COURT:  Yes.

5         MR. BACON:  -- in this public -- in my client, which

6  is a publicly traded company.  And they created in real time,

7  and probably record time, a more sophisticated instrument that

8  was better for the estate and that everybody agreed was better

9  for the estate.

10        And one of the things that I think made your day a lot

11 easier, and I commend Mr. Hodara for it, is that the

12 committee's not playing any games today about yeah, maybe that

13 currency's not so good.  You know, when -- and I know the Court

14 knows this, but I want to make sure everybody knows that people

15 stand up here and say they agreed it should be valued at par,

16 that's a bunch of very sophisticated experts getting together

17 and agreeing that that paper is worth the face amount of that

18 paper --

19        THE COURT:  Right.

20        MR. BACON:  -- that it is -- you can't say it's valued

21 at par but it's not as good as cash; that's an oxymoron.

22        So that was a big deal.  And this exhibit also shows

23 you how elaborate this auction was. There were huge gaps.  You

24 don't see people, as you do in some auctions, coming back on

25 the record that's before you and raising Cain about why would

83

1   we have to sit in this conference room.  You know, we were well

2   fed and we were well communicated with, and positive things

3   were happening, but this is not, as I know you know, an auction

4   of a truck or a farm; this is a very complicated auction.  And

5   the timeline shows you what would happen if you reopen the

6   auction.

7           So the committee's come in and said the paper was

8   properly valued.  Matlin has some comments about the paper, but

9   they didn't come to the auction, they didn't elect to

10  participate in the process where the investment bankers came up

11  with that paper and collectively agreed it would be valued at

12  par.  Some of them will tell you it would be valued at

13  substantially above par.  And maybe you're going to get into

14  that today.  I think you're going to hear some evidence on

15  that.

16          If you want to get into a valuation hearing, which

17  none of the constituents want, and we certainly don't want,

18  and, you know, Judge, I think you've got reporters sitting in

19  this courtroom, and ironically as you get into that valuation

20  the valuation may shift around, because before we get out of

21  this building, comments you make you make about that paper and

22  testimony, and comments I make about the paper, can end up on

23  the wire service; that happened at the procedures hearing,

24  literally.  Remember we had --

25          THE COURT:  Yes.

84

1          MR. BACON:  -- and interruption?

2          THE COURT:  Yes.

3          MR. BACON:  It was on the wire before we were back in

4    here to solve the problem Your Honor had, and that's a real

5    problem when you've got a public company like my client which

6    you -- I think everybody's delighted was attracted to this

7    process, and everybody's delighted in my client's participation

8    in this process.  But you talk about sending messages to the

9    next public company that wants to get involved in this process,

10   and you're going to send -- if Your Honor opens this up again,

11   you're going to send a very loud message, and the message will

12   be no boundaries, there are no boundaries, because the other

13   things that should make your decision easy, Your Honor, are

14   that press release that Nokia put out Monday morning after this

15   long auction, and it's short, Judge, and it's in the binder in

16   front of you, it's tab 11 --

17         THE COURT:  Yes, I saw that.

18         MR. BACON:  -- and it's short and to the point.  And I

19   don't know what they were thinking, I -- if that's a

20   machination to lull us into complacency.  I suppose it's --

21   well, you could attach a lot of character -- I won't ascribe to

22   what they were say -- what they were thinking, but I know what

23   they said, and they said, and I'm quoting from the last

24   sentence of that short press release, "Nokia Siemens Networks

25   believes that its final offer represented fair value for the

85

1    assets and further bidding could not be financially justified."

2    That's Monday morning; that's nine days ago.  They went to the

3    trouble to issue a press release -- I mean, this thing has been

4    very closely watched in the press -- to tell everybody they

5    were done.  And I think it was Mr. Hodara a few minutes ago

6    quoted -- somebody quoted from the transcript that's also in

7    the binder --

8              THE COURT:  Yes.

9              MR. BACON:  -- in front of Your Honor --

10             THE COURT:  Yes.

11             MR. BACON:  -- and it -- I think the quote was from

12   page 38 -- or 35, excuse me, from Mr. Allinson, who sort of

13   spent a very short period of time griping about the currency

14   that the committee has agreed is good currency.  And what he

15   didn't quote is Ms. Highstand, who I believe is counsel for

16   NSN, who was sitting right next to him, who then went to the

17   trouble to interject after he finished at line 20, "But we will

18   not be submitting another bid."  That, to me, Your Honor, makes

19   Your -- makes this easy, because I don't know where the

20   boundaries are.  I know you can reopen auctions, I know Courts

21   do it under some circumstances, but in the wake of an auction

22   of this sophistication and complexity, fifty-nine hours of

23   active participation by this bidder -- and note again, Your

24   Honor, in the demonstrative exhibit I handed you, the new

25   currency, the convertible notes that formally went on the

1   record at 7 o'clock on Saturday night, that sparked another

2   several rounds of bidding.  This disgruntled bidder had no

3   problem bidding against that currency until 9:37 that night

4   when they said, well, we're not going to bid anymore, and then

5   the press release the next day.

6          So is that -- I don't know where the boundaries are,

7   Your Honor, but if you can put out -- if you can put that on

8   the official record -- and that was not a cocktail -- there

9   were no -- I think there were cocktails at one point on another

10  floor, I never got invited to that part, but there weren't any

11  cocktails in that conference room; that was not a chit-chat

12  room; that's why fifty-nine hours boils down to thirty-five

13  pages.  People knew they were on the record in that setting,

14  and they officially said at the end of the -- at the auction,

15  we're not going to be submitting another bid, and followed that

16  up with a press release.  And then they waited nine days.  I

17  don't think they could have waited two days.  I think they'd be

18  outside the boundaries if they'd waited two days.  But they

19  waited nine days.  They waited until after last Wednesday's

20  objection deadline, and they came in less than twenty-four

21  hours ago.

22          And, Judge, if that's within the boundaries of equity

23  and integrity and finality, I suggest, Your Honor, I don't

24  know -- I don't think there are any boundaries left, and I hope

25  Your Honor will sound that loud and clear.

1            I'm almost finished, Your Honor.  I told you last time

2    I was here that I didn't want to negotiate with Your Honor.

3    And you took me to school; you just came out and ruled against

4    me and I had to come in and change my position.  But I don't

5    want to -- I -- and I've reminded my client of that, and I told

6    my client parties were going to be interested in knowing

7    whether we'd come to another auction if we've reopened it, and

8    we're not going to, Judge.  We will not participate in a

9    reopened auction.  We've told the key parties here that that's

10   our position, and we've told them that we would so inform the

11   Court, and we wouldn't do that lightly with either this Court

12   or Justice Morawetz, we're not going to, because if this is a

13   fair process at this stage, if Your Honors think it's fair to

14   reopen it at this stage, that's just not something we as a

15   public company who is going to get buffeted, and has been

16   buffeted, in this process, and a public company that has had a

17   reasonable expectation of finality, which is the other thing

18   that U.S. cases talk about, reasonable expectation of finality,

19   Judge, in the wake of an official statement on an official

20   record in a press release, and then radio silence for nine

21   days, shame on us, but we really expected finality and we have

22   behaved accordingly, and you'll hear testimony about that.  And

23   the press has reflected that, and the actions of the parties

24   have reflected that.  And there's been a lot of work done to

25   begin the massive project of integrating these companies, and

88

1    you'll hear evidence on that.  And I think we did that in good

2    faith and for good reasons.

3            Judge, I don't know -- I'm almost through here.  I've

4    got the term "laches".  I couldn't get hold of a thesaurus this

5    morning, and I know I can't use the word "outrageous", so I've

6    crossed out "outrageous", but I do have "laches" and I have --

7    you've been doing this a long time, and I have too, and I won't

8    plea -- you know, I know you know what a court of equity is and

9    what good faith and clean hands made.  And you're going to get

10   to decide, and you're going to get to tell everybody --

11   because, you know, sort of, the world's watching in a case of

12   this size -- what the boundaries are, or at least what they are

13   not, in the United States in this court.

14           I think, Judge, my last point, is whether you -- how

15   much time you want to spend trying to value the currency, that

16   is, try to value the convertible notes.  I think we had

17   unanimity -- I'm not sure about Matlin; I lost track -- but

18   everybody else that did participate in the fifty-nine hour

19   auction doesn't want you to get into -- excuse me --

20           THE COURT:  Take your time, Mr. Bacon.

21           MR. BACON:  -- doesn't want you -- thank you --

22   doesn't want you to get into valuation of the notes.  If you do

23   it, you ought to ask the experts on convertible notes to stand

24   up in this courtroom.  I bet there's only four of them.

25   They're easy to spot; the intelligence sort of radiates off of

89

1    them.  They're the smartest people in the room on this side of

2    the bench.  It's very sophisticated stuff.  And if -- I think

3    there's at least three experts from three different

4    constituents.  I'm delighted in terms of fair play.  I think

5    the committee played very fair by acknowledging this isn't

6    about the value of the paper, and they're -- I don't know if

7    their expert's here, but I know their expert was at the fifty-

8    nine hour auction.  And I'm delighted that they acknowledge

9    that maybe the second loudest voice in this courtroom, the

10   debtor I think maybe being the loudest, after Your Honor of

11   course, that the committee doesn't -- that there's no

12   indictment or cloud around that paper.  And that -- Judge,

13   that's a sprankly -- I think that's a subterfuge.  I think

14   that's a subterfuge, and I don't use that word lightly.  I

15   think that's a subterfuge on the part of the disgruntled

16   bidder.  I don't know what they've been doing for the last nine

17   days; I may ask you to let me find out under some

18   circumstances, but I don't want to go there and I don't think

19   we need to go there.

20        THE COURT:  No.

21        MR. BACON:  But we're not going to participate in a

22   second auction; I don't think anybody would fault that -- us

23   for that under the circumstance.  You know, we have -- we

24   understood we were a stalking horse, we understand what a

25   stalking horse is, and we behaved accordingly with our

90

1    customers and our employees and our stakeholders.   We

2    understood we weren't going to be the successful bidder until

3    there was an auction concluded, and we know we have to come

4    before this Court too, but when we finished that auction, that

5    really beautifully orchestrated auction, and the champagne

6    literally came out, so I guess I lied, I did have a cocktail,

7    because the next you knew, you turn around, there was champagne

8    everywhere, and everywhere was shaking hands.   And frankly, I

9    thought the disgruntled bidder had done a classy thing by

10   making a point -- one of the last sentences on the record -- by

11   making the point that we -- "but we will not be submitting

12   another bid".   That led us to sit back and have a little

13   champagne.   And since then, in a very long nine days, we have

14   behaved like a successful bidder; we've behaved that way in our

15   communications with our stakeholders, we've behaved that way in

16   the communications with our customers, and we've behaved that

17   way in our communications with our employees and with the

18   thousands of employees at Nortel that have a reasonable

19   expectation they're going to be coming to work with us

20   eventually.   And I don't think we can be faulted for that on

21   this record, and I think you -- if this goes on and this gets

22   reopened, I think the Courts -- I just -- I don't think the

23   Court's going to do it, and I don't think the Court should do

24   it.   And I'm glad the strictures are what they are in Canada,

25   but I don't think this Court needs to feel -- I know this

1    Court's going to work with Canada.  I don't -- I hope it's not

2    the Canadian constraint that keeps this Court from reopening

3    this auction.  And I appreciate your hearing me out.

4         THE COURT:  All right, Mr. Bacon.  Thank you, sir.

5         MR. BACON:  Oh, and Justice Marowetz, Mr. Taylor, as

6    you know, is in the courtroom; I don't know if he wants to be

7    heard from in Canada.

8         Thank you, Judge.

9         THE COURT:  Thank you, sir.

10        JUSTICE MAROWETZ:  Thank you.  Mr. Taylor, do you have

11   anything to add to what Mr. Bacon had to say?

12        MS. TAYLOR:  Your Honor, I do have submissions I do

13   want to make.  I was going to wait until the debtor had been

14   able to finish all of its submissions before standing up to

15   make them.  I'm in your hands as to whether or not you want to

16   hear all of my submissions now or wait for Mr. Tay.  I suspect

17   that I will be duplicating much of what he has to say.

18        JUSTICE MAROWETZ:  I just really want to know at this

19   point whether you have anything to add by way of clarification

20   to what Mr. Bacon has submitted.  We're still at the point of

21   preliminary statements, there's been no evidence put forward,

22   and that will be forthcoming in the U.S. court.  So it's just

23   really by way of opening statement whether you have anything to

24   add.

25        MS. TAYLOR:  No, nothing at the moment, Your Honor.

92

1    JUSTICE MAROWETZ:  Thank you.

2    THE COURT:  Mr. Galardi, good afternoon.

3    MR. GALARDI:  Good afternoon, Your Honor, and good

4    afternoon, Justice Marowetz.

5    Your Honor, going last, I think I will try to fill in

6    some holes, and if Your Honors have issues with standing, I

7    think it's worth now doing it before putting the Court through

8    an evidentiary hearing.

9    THE COURT:  I do have a concern about standing.

10   MR. GALARDI:  And I will address all of those, Your

11   Honor.  First, Your Honor, I think Mr. Hodara started at the

12   right place.  The selection of the -- the determination of the

13   successful bid and the alternative bid by the sellers, after

14   consultation with the committee, the bondholder group and the

15   monitor, at the conclusion of the auction -- I want to

16   underling those words -- shall be final subject to approval of

17   the Bankruptcy Court and the Canadian Court.

18   Mr. Hodara's already given you the case law about,

19   once the auction's been concluded, coming into court and still

20   proceeding.

21   Your Honor, the first question --

22   THE COURT:  Well, I assume there are at least as many,

23   if not far more, cases going the other way from the cases that

24   Mr. Hodara cited to me.

25   MR. GALARDI:  Your Honor, I have been on both sides of

1     that, as Your Honor well knows.  I've been before Judge Walsh

2     on this issue, been before -- you're probably right.  There are

3     many times, quote, the disgruntled bidder comes in after this

4     process and the integrity of the process is raised to close

5     them out.  And for all the reasons that I heard from the

6     Canadian counsel, this Court should not be simply reopening an

7     auction for disgruntled bidders playing games with the process.

8              Your Honor, but I want to point out an important

9     statement by Mr. Bromley at the end of the auction.  And I'm --

10    the real -- there is an issue here:  Are you really being asked

11    to reopen, or has that auction ever closed?  I quote from page

12    36, right before the end and right after all of the remarks by

13    counsel regarding we believe we have the highest offer.  It

14    says:  "So until such time as the documents are executed, the

15    auction will remain open."  Today we do not have the

16    convertible note debenture executed.  We do have the asset

17    purchase agreement; we do not have the ancillary documents.

18    There is no closed auction, Your Honor.  And the first issue I

19    think you'll have to take up as a factual matter is, is the

20    auction even closed as we sit here, or stand here, today?  The

21    documents may be -- may, but I have not seen, and I don't think

22    the parties have seen, an executed indenture that governs this

23    convertible note.

24              So let's start with one issue that I think the Court

25    has to frame.  But let's assume now, Your Honor, that the

1    auction was closed, that this is just a misstatement, that the

2    amended and restated document, which was in fact filed on

3    November 25th, served to close the auction.  If we go that

4    argument, Your Honor, and, again, I've heard Canadian counsel,

5    and, as a debtor's counsel often, I do believe in the integrity

6    of the process.  I do believe that it would be inappropriate

7    for a bidder to simply wait to the last minute to raise an

8    auction, raise a higher bid at the last minute.  What we've

9    essentially done is alternative pleading, Your Honor, and I

10   want to understand it because it goes to the four points

11   before.

12        Your Honor, first I'm going to confirm on the record,

13   because Mr. Hodara and other people have confir -- wanted me to

14   confirm on the record, one, our bid is irrevocable.  Our bid is

15   110 million dollars, with all of the same provisions that were

16   in our last 770 million bid.

17        UNIDENTIFIED SPEAKER:  810.

18        THE COURT:  810 million dollars.

19        MR. GALARDI:  810.

20        THE COURT:  Yes.

21        MR. GALARDI:  I'm sorry.  People are very quick.

22   You're absolutely right, it's 810 million dollars with all of

23   the provisions that we put before at the auction; all of those

24   are good.  We have agreed to refresh the equity commitments

25   that were required.

1    We've come to, I think, the fourth condition which has

2  taken on a life of its own, inartfully drawn.  Your Honor, I

3  have been before Judge Walsh, and as have you.  And Justice

4  Morawetz, you are probably pleased that you have not been

5  before Judge Walsh only if you're on the losing side.  The

6  point here is who is the final arbiter of the highest or

7  otherwise best bid?  Your Honor, not one party here -- this is

8  not an auction where we're bidding on apples and oranges.

9        THE COURT:  Mr. --

10        MR. GALARDI:  And we have --

11        THE COURT:  Let me -- Mr. Bromley?

12        MR. BROMLEY:  I thought we were going to start with

13  the standing point.

14        MR. GALARDI:  Oh, do you want to go to the standing

15  point?

16        MR. BROMLEY:  Well, that --

17        THE COURT:  That's --

18        MR. GALARDI:  That's fine.

19        MR. BROMLEY:  -- that'd be helpful.  Thank you.

20        THE COURT:  Yes, that's what I had understood as well.

21        MR. GALARDI:  Your Honor, let me give you three

22  reasons -- or two reasons why we think we have standing.  First

23  of all, as is admitted under the O'Brien standard, the question

24  is the intrinsic fairness of the process.  Your Honor, our view

25  is that the process, though admirable, though successful to

1   increase the bid, had a flaw.  And here is the flaw, and, Your

2   Honor, we will bring this out on evidence:  First, Your Honor,

3   it is not adequate to go to an auction, have a piece of

4   paper -- they gave us a value, correct; that doesn't mean we

5   can't come back into court and argue that they misvalued it.

6   Your Honor, think of it this way:  You have cash collateral

7   fights, you do the valuation of the value of the collateral,

8   you could have four experts, and the four experts could agree,

9   but Your Honor still makes an independent determination.  Your

10  Honor, if these assets were sold under a plan and they were a

11  creditor objecting to the value on a liquidation analysis or a

12  reorganization value, it's not absurd for the Court to say I'm

13  the final person to determine that value.

14          Your Honor, what you have heard, and why I think there

15  is not an inconsistency at all between the Canadian principles

16  that the monitor must follow, and what we are -- we have asked

17  the Court to do an why we've made the objection is we do

18  challenge the intrinsic fairness of this process.  We challenge

19  that valuation and the valuation that was used to say our 770

20  million dollar bid was not the highest or otherwise best bid.

21  That is a challenge to the process.  They refused to provide a

22  valuation, and they said it was par.  When they said it was

23  par, we said we didn't agree, and we said we would not bid

24  anymore, because we did -- as the press release said, I think

25  we offered the fair value.  Why would we bid against ourselves?

1       So, Your Honor, the question then comes down:  Is

2  valuation -- what I think you've heard, or what is being

3  suggested, but what I think is the unexamined legal principle

4  Your Honors have to decide, both of you, is if the debtor says

5  it's par and we're going to accept this value as par, is that a

6  matter of business judgment at all?  Our position is not.  And

7  the Courts in the Third Circuit go to Judge Sontchi's opinion

8  in Nutraceutical, and it's a mixed question of law and fact.

9  Your Honor is the final -- and Your Honor in Canada, is the

10  final determiner of whether or not this is the highest or

11  otherwise best bid.  That's not to say that the debtors didn't

12  use their business judgment.  It's not to challenge their

13  business judgment.  A much different standard is instead to ask

14  the question whether that value is appropriate, or was our 770

15  million dollar bid actually the highest or otherwise best bid

16  if Your Honor concludes that that auction was concluded.

17       Now, Your Honor, we didn't want to get into a

18  valuation fight today.  We didn't want to argue that issue

19  because it would delay this process, it would put Your Honors

20  to a battle of experts, and instead, in the alternative, if

21  you're not interested in having that valuation fight, and,

22  again, after discussions with the committee, we said fine, we

23  will bid the 810 million dollars; that entirely avoids putting

24  on the experts from the debtor, the experts from the committee.

25  Mr. Hodara has over and over again said they'll stand by the

1    par value.  We may still disagree, Your Honor, but we're

2    prepared to put that aside.  We're prepared to put aside our

3    objections to the process.  If Your Honor wants to proceed

4    rapidly, quickly, we're prepared to do the auction today, we

5    are prepared to do an irrevocable auction bid today, which

6    we've offered, with the deposit, and be done with this today or

7    tomorrow.  We're not seeking delay, we're not playing games;

8    we're prepared to do that.  We have dropped the two provisions.

9    We're not saying that we have to participate in the value.  We

10   are not even saying on a day-by-day basis or bid-by-bid basis

11   Your Honor has to prepare.  We've dropped that.  But the

12   question is, Your Honor, can you drop your final decision as to

13   whether that's the highest or otherwise best bid.  I leave that

14   to Your Honors.  We think you always have that.  There's always

15   that available.  And certainly I don't think anyone is asking

16   us to simply waive all legal rights for all times to be a

17   dispute on that.  And if they are, Your Honor can say you

18   should waive your legal rights if I'm opening the auction; I

19   give you that opportunity, Your Honor.  But if I waive it,

20   you're certainly waiving your rights, you know the issue.

21   We've tried to avoid that issue in its entirety.

22          So, Your Honor, we challenge the fairness of the

23   process.  Two, what is Your Honor also being asked to approve

24   today?  "Us" is the second bidder.  You are trying to bind us

25   with this order to the second bid.  If that doesn't give us an

1    opportunity to object and have standing, to stand behind the

2    first bidder in case that first bidder doesn't close, then what

3    else could grant us standing?  You're subjecting us to the

4    jurisdiction; you're saying, as O'Brien says, that that asset

5    purchase agreement you put in is actually being approved, you

6    are being directed to close if the first bidder doesn't close.

7    This is an animal of Delaware bankruptcy court.  This is not

8    like any other case.  We did this for convenience.  Again, a

9    concession to the shortness of life; if the first bidder

10   doesn't close, let's stand ready, it's good business.  We

11   created it.  I think you've created for the second bidder,

12   whether they're a creditor or not, standing in each and every

13   instance.  The debtors can't stand here and tell you I'm going

14   to bind this party to that 710 million dollar bid, but, oh, by

15   the way, they have no right to object to the first bid.  They

16   have no standing to object, just because they're the second

17   bidder.  Well, if that's it, then why can you bind me to my

18   second bid?  We're prepared to be bound by that bid, Your

19   Honor, but we think that grants standing as well.  It's not

20   just a disgruntled bidder; you're asking us to stand in the

21   shoes in case it doesn't close.

22        So there's two challenges, both of which come straight

23   out of O'Brien:  One is we do challenge the intrinsic process;

24   we will get into evidence, if necessary, that they discounted

25   the stock and now they don't want to discount the stock that is

1    the basis for the value of the convertible debt, that they

2    discounted below the value that's being put into the agreement.

3    We can have those fights.  We prefer not to; we prefer to move

4    expeditiously forward.

5           Again, I think that doesn't go now to the business

6    judgment standard, so I wanted to go back, although I have

7    counsel in Canada, I will just simply comment.  One, there is

8    no attempt to second-guess the business judgment of the

9    monitor.  We respect the judgment of the business -- the

10   business judgment of the monitor.  They can come, as the

11   debtors have come, to say this is the highest or best bid.

12   There may be exceptional circumstances, but that's their

13   business judgment; we respect that.  They've done that before;

14   we happen to have been losing bidders before, and this is the

15   first time we're in here making another bid.

16          We don't think that the Court can simply set aside the

17   bid, because there is a later or higher bid; that's why we're

18   challenging the process.  We are -- in fact, believe that there

19   is a flaw in the process.  We don't believe, Your Honor, that

20   you can stand in an auction, tell us you value a piece of

21   paper, tell us that you won't value it directly, and so I have

22   to go dollar by dollar until you say yes, oh, but now it's

23   higher or better.

24          Now, they said par but they didn't say it that

25   clearly, Your Honor, par or some discount, and today I heard

1    par or some premium.  Well, we've all been in auctions over

2    sixty hours over a weekend when a judge may not be available.

3    How is it that you challenge that?  How is it that you nail

4    down that value?  That's not intrinsically fair, especially

5    when the second or first bid in this process already devalued

6    the equity to get us a bid.  And we'll put that onto the

7    transcript, Your Honor.  That's in the transcript.

8         Your Honor, we're not getting into minutiae regarding

9    the monitor's recommendation; it's a fundamental issue that I

10   think both Courts have jurisdiction to decide:  Is the bid

11   they've put before you the highest or otherwise best?  You can

12   decide that.  You could look at our 770 bid, have a valuation

13   fight and say, you know, I think there is a discount to this

14   piece of paper, and therefore it's not your business judgment

15   because it's my valuation of the bid.  And we can have a battle

16   of the experts, or Your Honor can say there's no closing, I

17   didn't approve this, Bill Gates has now shown up with twenty

18   million dollars more, I don't even know if the documentation is

19   done.  And, again, this is a liquidating case and discharging

20   fiduciary obligations of creditors -- to creditors to the

21   greatest value.  So I don't think there is a simple look at the

22   minutiae.

23        We're not asking that the considered judgment be

24   overridden in the sense of the business judgment.  We're asking

25   that the valuation be looked at carefully and determined

1   whether par -- and I want to show Your Honor, as close as it

2   is, if it's only ninety-five cents on the dollar, our bid was a

3   higher or otherwise better bid.  So it's not a whole lot margin

4   for error.

5          Your Honor, we are not encouraging prospective

6   purchasers.  We were discouraged by delaying to submit.  We

7   didn't want to submit.  But, again, to be a proper lawyer and

8   to give alternatives to the constituencies, we'll go away on

9   our fight on this valuation if the auction's open.  If the

10  auction's not open, we're here to say and we'll have the

11  valuation fight and Your Honor can say valuation is business

12  judgment.  We're not going to challenge the business judgment,

13  Your Honor; I know that.  But if valuation is this Court's

14  determination, we have every right to challenge it and do it

15  today.

16         It is in the interest of the successful bidder to

17  support, and I am glad that Mr. Bacon got a little taste of

18  champagne.  At the same time, Your Honor, it is still

19  everyone's knowledge, public company, private, that an auction

20  is not over.  And strange things happen in bankruptcy court,

21  and it is not uncommon for bidders to show up and committees to

22  have objections and for things to be reconsidered while Your

23  Honor is correct, while Your Honors are probably both correct.

24  In this case we have many times people come in as disgruntled

25  bidders, and many times they overbid, and most times the

1  "integrity of the process" is to say no, too little, too late,

2  or just simply "too late"; it almost doesn't matter, although I

3  always hear Judge Walsh say if Bill Gates shows up, there is a

4  price where this process gets opened, Your Honor.  And I don't

5  want to get into a debate if it's twenty million or ten

6  million, nor do I think Your Honor, so I'm trying to give you

7  avenues that I don't think this is a process that was fair.

8         And finally, Your Honor, we're not -- we are

9  challenging, and this is what gives us the standing, the

10  integrity of the process and how it was run.  We don't doubt

11  that people worked hard; we've worked with them in many

12  auctions.  We don't doubt that they sincerely and truly believe

13  that they valued the security properly.  We simply say there is

14  an inconsistency in the process, which we believe we can point

15  out through the transcript, and I can use Mr. Bacon's sheet to

16  highlight where that came up.  And it didn't comply with the

17  overbid, unless you discounted the security, the equity, to a

18  number around 11.8 or .4, depending on how you calculate it.

19  And that happens to be the lower number in the asset purchase

20  agreement whereby there is not downside protection.

21         So we do think that there is an issue, and we were

22  entitled to be confused about the value, and we were entitled

23  to say no more.

24         So, Your Honor, I don't challenge any of the

25  individuals' integrity, I don't challenge their good faith.  I

1    don't believe Mr. Bacon's client did anything inappropriate.

2    And for the record, we're not challenging their good faith.  We

3    are simply saying there was an error in the process that made

4    fair bidding on a level playing field, given breakup fees and

5    professional fees, an improper -- was not consistently applied

6    throughout the process and made it no feasible for us to make

7    the next bid.  But we're prepared to make that bid if Your

8    Honor is prepared to, whether you call it, reopen that auction,

9    or simply proceed with the auction that we don't believe yet

10   has really been closed, or because Your Honor has determined no

11   bid has actually been accepted by this Court.

12          I think there are three avenues for Your Honor.

13          THE COURT:  Thank you, Mr. Galardi.

14          MR. GALARDI:  Do Your Honors have any questions about

15   standing?

16          THE COURT:  I do not.

17          MR. GALARDI:  Justice Marowetz?

18          JUSTICE MAROWETZ:  They will be addressed by Mr.

19   Bomhof, I suspect, Mr. Galardi.

20          MR. GALARDI:  Thank you, Your Honor.

21          THE COURT:  Thank you, Mr. Galardi.

22          I think counsel for --

23          JUSTICE MAROWETZ:  Mr. Bomhof --

24          MR. BOMHOF:  Right.

25          THE COURT:  -- MAN Acquisition is going to now argue.

105

1          JUSTICE MAROWETZ:  Okay, Mr. Bomhof?

2          MR. BOMHOF:  Good morning, Your Honor.  Your Honor,

3    you've already asked is there any case law completely

4    applicable to this, and the answer is no.  But the stalking

5    horse process is fairly unique in Canada, and it's much more

6    common in cross-border proceedings.  But the cases out there

7    are very different than the process we're looking at.  Hyal

8    Pharmaceuticals and others all dealt with sealed bidding

9    processes.  In-courtroom bidding is very much a --

10   disencouraged by the Court in those proceedings.

11          What we have here --

12          JUSTICE MAROWETZ:  Mr. Bomhof, I'll ask you to

13   interrupt (sic).  I can hardly hear you.

14          MR. BOMHOF:  Okay.  Sorry, Your Honor.

15          JUSTICE MAROWETZ:  The feedback is such that I'm

16   having a lot of problems.

17          MR. BOMHOF:  The difference with the proceeding we

18   have in front of us now --

19          Little better?  I will speak away from the microphone

20   maybe.

21          The difference that we have in the proceeding before

22   us now, Your Honor, is simply we have an open process approved

23   by two Courts where the bids, the process, the requirements for

24   proceeding were all known to the parties.  In Highland and in

25   other cases, and the Court of Appeals talks about this in

106

1   paragraph 25 of Hyal, is a completely discretionary process

2   and, in fact, there's the ability for the receiver -- it was a

3   receiver's case -- to completely walk away, accept no offers

4   and just wrap up the process.

5         We don't -- that is not part of what we're doing here.

6   In fact, there's a court mandated sale already approved if the

7   process isn't successful.

8         So, Your Honor, there's -- even though the process is

9   different, I submit there's two points in Hyal that are

10  completely relevant to the standard argument.  The first one is

11  found in paragraph 27.  Mr. Galardi went through this is in

12  great detail, Your Honor, the integrity of the process.

13        JUSTICE MAROWETZ:  Well, let's ascend to maybe 40,000

14  feet, Mr. Bomhof, and just to try to get me over one issue,

15  which is, this Court has consistently discouraged courtroom

16  auctions, okay?  Now, take it through that in the context of

17  the parallel proceedings and give me your views on that issue.

18        MR. BOMHOF:  Yes, Your Honor.  The underlying

19  objection, the objection that is before the Court, and

20  unfortunately is late before you, is based on the integrity of

21  the process, Your Honor.  MEN is not here today -- we're not

22  here asking you at this point in time, on the standing point at

23  least, to consider other offers.  What we're saying is that

24  there was a problem with the process.  The process before you,

25  Your Honor, involved an option with bidding.  And there's

1    actually -- the summary's a very interesting summary that was

2    handed around.  As you see, the bids increased each time my

3    client increased their cash bid.  Ciena increased their

4    convertible note bid.  And that went on for quite a while, Your

5    Honor, round after round after round.

6         Now, the problem in sight of the objection that my

7    client with that had with that process is, at no time were the

8    terms of that note disclosed, and when they asked how it was

9    valued they were told that they weren't going to be told that

10   information.  So bid after bid after bid, they put more cash

11   on, and time after time this, I'll call it, unknown note, and

12   people may object to that, whatever they want to call it, but

13   the terms of this note were not disclosed at the auction; they

14   were bidding against something that they could not themselves

15   value or determine the worth of.

16        So, Your Honor, today's motion is about whether that

17   auction process resulted in a fair result.  And that is what

18   Hyal Pharmaceutical, and even if we get to the approval motion,

19   if we're allowed to speak to it, Soundair speaks to:  Was this

20   process conducted in accordance with this Court's ruling, the

21   U.S. Court's ruling in fairness to the parties?

22        This isn't about the courtroom bidding or courtstep

23   bidding so much, Your Honor, as ensuring there was a fair

24   process.  And that's what we're here to speak to today.

25        Your Honor, can I also refer you to paragraph 29 in

1    the Hyal decision?

2           JUSTICE MAROWETZ:  Cassandra (ph.), you have a copy

3    for me?  Thank you.

4           MR. BOMHOF:  This is found on page 242 of the OR

5    decision, Your Honor.

6           JUSTICE MAROWETZ:  Okay, thank you.

7           MR. BOMHOF:  Your Honor, in -- even in Hyal, the Court

8    of Appeal recognize that in limited circumstances a prospective

9    purchaser may become entitled to participate, and it must be

10   shown that the prospective purchaser acquired a legal right or

11   interest from the circumstances of a particular sale process.

12   And the nature of this right is not -- is one that could be

13   adversely affected by the approval order.

14          So here we are today, Your Honor, participating in a

15   process approved by this Court wherein a set of bid procedures

16   in the monitor's report -- we're not just a bidder; in fact, we

17   move beyond the bidder stage to the qualified bidder stage.  We

18   were recognized as a qualified bidder.  We were then recognized

19   as the opening bid.  And as Mr. Galardi pointed out, under the

20   court-approved process, and as set out in paragraph 35 of the

21   monitor's report, my clients now are the alternative bidder,

22   meaning that they are affected by today's order, and in fact

23   will be bound by today's order, to proceed with a transaction

24   which, from the beginning point, they're saying resulted from a

25   process that wasn't in accordance with this Court's order.

1      So, Your Honor, I respectfully submit that even under

2   Hyal and the unique circumstances of this case, my client does

3   have an interest in this order and should be entitled to speak

4   to the motion today.  And, Your Honor, I could make the

5   arguments on fairness of process; I don't think it's necessary

6   for either Court to hear it again.  Subject to any questions

7   you have, Your Honor, those are my submissions.

8      JUSTICE MAROWETZ:  Thank you.

9      THE COURT:  Well, I think this might be an appropriate

10  time for a brief recess.  Mr. Bromley, is there something -- I

11  have one question for Mr. Bromley, and that is, the argument

12  has been made that this auction was not closed.  And what is

13  your response to that issue?

14     MR. BROMLEY:  It's a bad argument, Your Honor.  We

15  filed a notice of filing of successful bid, and we signed an

16  amended asset purchase agreement.  There are literally dozens

17  of documents that relate to the closing of any transaction.

18  And the fact that the indenture has not yet been executed is

19  not an issue there.

20     THE COURT:  Okay.

21     MR. BROMLEY:  So we worked all through the night and

22  into the next day and into the next night to make sure that the

23  amended ASA would be signed.  It was signed and the notice was

24  filed immediately.

25     So it is our very strongly held view that the auction

110

1    was concluded upon the execution of the amended ASA and the

2    notice of the filing of successful bid, a notice which was made

3    prior to the expiration of the objection deadline --

4              THE COURT:  Yes.

5              MR. BROMLEY:  -- which was not met by the disgruntled

6    bidder.

7              Your Honor, in terms of moving forward, there's

8    clearly a lot that's been said since I last stood up, and I'd

9    be happy to respond to some of that.  And we also have witness

10   that we'd like to put on to move things forward.

11             I also take note that there has been a lot about

12   eating.

13             THE COURT:  Yes.  Yes.

14             MR. BROMLEY:  And none of that has been happening

15   here.

16             THE COURT:  That's right, and --

17             MR. BROMLEY:  And it is about --

18             THE COURT:  -- and with all of these people, the sound

19   is very loud.

20             MR. BROMLEY:  Yes.  So maybe it makes sense for us to

21   break for an hour and try to find someplace to get some

22   nourishment and then come back.  I would, however, like to

23   respond to a couple of the points before we put our witnesses

24   on, because I do think it will inform how we should proceed on

25   that basis.

1          THE COURT:  All right, well, Justice Marowetz, is an

2     hour's recess satisfactory?

3          JUSTICE MAROWETZ:  That is satisfactory.  I'd also add

4     that Mr. Tay has indicated that he would also like to respond

5     when we convene at 3 p.m.

6          THE COURT:  Yes.  So we will adjourn until 3.

7          MR. BROMLEY:  Thank you, Your Honor.

8          THE COURT:  And I thank counsel, and we'll stand in

9     recess.

10        (Recess from 2:01 p.m. until 3:10 p.m.)

11         JUSTICE MORAWETZ:  While we're waiting, I understand

12    that I've endorsed that record hardship motion granted, ordered

13    to go and form submit.

14         UNIDENTIFIED ATTORNEY:  Thank you, Your Honor.

15        (Pause)

16         THE CLERK:  Please rise.

17         THE COURT:  Thank you.  Please be seated everyone.

18    Well, hopefully lunch helped a little bit and Justice Morawetz?

19         JUSTICE MORAWETZ:  Good afternoon, Judge Gross.

20         THE COURT:  Good afternoon.  Mr. Bromley I think we

21    can start with your comments which will be endorsed by me

22    regarding the standing issue.  Mr. Bromley?

23         MR. BROMLEY:  Your Honor, Mr. Tay and I had a phone

24    call during the break and he's going to go first and then I'm

25    going after.

1          THE COURT:  Oh, thank you.  I'm sorry.  Thank you, Mr.

2    Bromley.  It's in your court, Justice Morawetz.

3          JUSTICE MORAWETZ:  Okay.  Judge Gross, from our

4    consultation prior to lunch, we did indicate that arguments

5    would be heard from the "disgruntled" bidder with both courts

6    preserving any decision regarding standing until a later time.

7          THE COURT:  Yes.

8          JUSTICE MORAWETZ:  Okay, Mr. Tay.

9          MR. TAY:  Thank you, Your Honor.  I thought I'd -- in

10   my initial reply I deal with a couple of things.  I think what

11   you're hearing is that there are two separate arguments that

12   are being put to the Court.

13         The argument that they're hearing solely from the

14   disgruntled bidder is an argument about the fairness of the

15   process.  You're not hearing that from the UCC, you're not

16   hearing that from the ad hoc bond committee.  And in fact what

17   you're hearing from them is that they are completely satisfied

18   with the integrity of the process.  You also, obviously, have

19   the evidence before you that the monitor is completely

20   satisfied with the integrity of the process.

21         And there's no evidence before the Canadian Court,

22   whatsoever, because there's no evidence that's been put before

23   the Canadian Court by the opposing parties.  But there's no

24   evidence before the Court that in fact there was unfairness in

25   the process.  And that I would suggest to the Court that it

1  might be useful to look at the case of SkyePharma because it

2  deals with these issues directly on point.  And Judge Gross, I

3  believe, a copy of the case has been handed up to you or will

4  be handed up to you.  That's a case called SkyePharma, it was a

5  pharmaceutical corporation.  Do you have a copy of it, Judge

6  Gross?

7       THE COURT:  Not yet.  I do not yet.

8       MR. BROMLEY:  Your Honor, you can find it under tab 10

9  in the binder that we gave you.

10      THE COURT:  I'm sorry.  Thank you.  I'm sorry, Mr.

11  Bromley.  Thank you, Mr. Tay.

12    (Pause)

13      MR. TAY:  If I can take both Your Honors to page 241,

14  paragraph 25.

15    (Pause)

16      MR. TAY:  Where the Court summarizes, and this is from

17  the Ontario Court of Appeal.  And the Court says, the two main

18  reasons why an unsuccessful prospective purchaser does not have

19  a right or interest that is affected by a sale approval order.

20  First, the prospective purchaser has no legal or proprietary

21  right in the property being sold.  There is no right in the

22  party -- I'm just skipping down to the bottom, last line of

23  that paragraph.  There is no right to a party who submits an

24  offer to have the offer, even if the highest accepted by either

25  the receiver or the Court.

1        So what the law is in on Ontario, according to the

2    Court of Appeal, is that just by putting in an offer to

3    purchase you do not acquire standing or legal right that is

4    affected by the sales approval order.

5        You've also heard the counsel in the U.S. for the

6    disgruntled bidder saying that well, you know, if you had

7    discounted it like I told you it should be discounted, then

8    ours was actually the highest offer.  The law is, again, clear.

9    There is no right to a party who submits an offer to have the

10   offer, even if the highest accepted by either the receiver or

11   the Court.

12       You then heard about allegations of unfairness of the

13   process because of the no discounting issue.  This is addressed

14   in paragraph 27 of the same case where the Court says, "I

15   recognize that a Court conducting a sale approval motion is

16   required to consider the integrity of the process by which the

17   offers have been obtained and to consider whether there's

18   unfairness in the working out of that process."  And that is

19   the allegation that's being made in court today.  I submit with

20   no evidence, be that as it may.

21       The Court goes on to say, "The examination of the

22   sales process will, in the normal circumstances, be focused on

23   the integrity of that process from the perspective of those for

24   whose benefit it has been conducted."  And that's key.  It's

25   there for the benefit of the stakeholders of these proceedings.

115

1    And you have heard, very clearly, from the representatives of

2    the stakeholders who say they are perfectly content with the

3    fairness of the process.

4         The Court goes on to say, "The inquiry into the

5    integrity of the process may incidentally address the fairness

6    of the process of perspective purchasers.  But that, in itself,

7    does not create a right or interest in a perspective purchaser

8    that is affected by a sales approval order."  So I think that

9    answers those allegations.

10        And here's the reason why the Canadian Courts have

11   taken a very strong stand in this regard, about not allowing

12   disgruntled purchasers to participate in the sales approval

13   process.  And the answer is in paragraph 30 on page 242.  Where

14   the Court said, "There's a sound policy reason for restricting,

15   to the extent possible, the involvement of perspective

16   purchasers in sale approval motions.  There is often a measure

17   of urgency to complete court approval for sales.  This case is

18   a good example.  When unsuccessful purchasers become involved

19   there's a potential for greater delay and additional

20   uncertainty.  This potential may, in some situations, create

21   commercial leverage in the hands of a disappointed would-be

22   purchaser which could be counterproductive to the best

23   interests of those whose benefit the sale is intended."

24        So I believe that the SkyePharma  case answers

25   completely the question of standing and why standing is denied

1   for disgruntled purchasers and why the arguments that were

2   raised by the U.S. counsel of similar arguments that had been

3   raised in that case and have been discounted and not given heed

4   by the Court of Appeal.

5          So that's one issue.  That's the issue of was the

6   process fair.  And I submit to you that on the record, at least

7   in Canada, there's no evidence that the process has been

8   anything other than fair and that the question about whether

9   the process is fair and the integrity of the process it is the

10   views of the real creditors and the stakeholders, and I would

11   suggest in Canada the court officer that are the views that the

12   Court should take into consideration, not the view of the

13   disgruntled purchaser.

14          So now looking to the second question, and the second

15   question is, should we reopen the auction process?  And despite

16   all the comments made by my friends in the U.S. to show that

17   the law is the same in Canada as it is in the U.S., I have to

18   submit it's just not true.  The law in Canada is different.

19   It's as simple as that; the law in Canada is different.

20          Now Mr. Hodara and others jumped on the fact that well

21   this is a liquidation scenario and therefore, you know, those

22   principals shouldn't apply.  The two cases that I'm relying on,

23   which summarizes a whole bunch of cases which summarize a very

24   consistent position in Canadian law, are both receivership

25   instances.  You don't get any more liquidation like than in a

1    receivership.  So these are not cases of principles that have

2    been enunciated in the context of the CCAA on the context where

3    there's going to be a restructured company.  These are

4    principles that were laid down in respect of receiverships,

5    liquidations and the trust in Canada.

6         And I'd like to take you now to the Soundair decision,

7    and Judge Gross, I believe you have that in your binder as

8    well.

9         (Pause)

10        MR. TAY:  The real question here, and before I

11   actually go into any -- let me do the 50,000 foot overview

12   because I think that's really all that we need here.  The issue

13   in Canada, the fundamental threshold issue is was the process

14   unfair or was it improvident.  The moment you cross that

15   threshold we have no rule in Canada that says well you still --

16   you know, if Bill Gates walks in with a check -- we have to get

17   as much money as we can for the estate.

18        The rule is that once you clear the initial hurdle and

19   come to the conclusion that the process is fair, then certain

20   things kick in, and those are the principles that I had talked

21   about earlier.  And the principle is, this is why you have the

22   monitor in Canada.  Because the Court should not -- and the

23   Court of Appeal has said should not get involved in the nitty

24   gritty of trying to assess whether or not something as complex

25   as this is good for the estate.  It is just not -- a Court is

118

1    not equipped, in Canada's law, to do that.  And that's why we

2    have a special creature created called the monitor or in the

3    case of receiverships, a receiver.  So that the monitor can

4    make those acts of judgments not after hearing just a few hours

5    of testimony but having lived with this issue for weeks and

6    months and understanding the issues inside out, including the

7    issues of risk, the issues of loss of value, the issues

8    respecting what Mr. Bromley had touched on which is the cash

9    flow loss that Canada suffers at the rate of about ten million

10   dollars a month by keeping this business ongoing.  These are

11   all the complex issues that a Court could not possibly hope to

12   grapple with or understand fully in the course of a hearing.

13   And that's why the Canadian law and the Canadian rule and the

14   Canadian process is that the Court looks to the monitor for its

15   recommendation.  And that's why you have the Soundair case

16   saying the Court should not second guess the business judgment

17   of the monitor.  And that the Court should not reject the

18   recommendation of the monitor except in the most exceptional

19   cases.

20        You have a situation here where the monitor has looked

21   at this, as I've said, weeks if not months, has looked at the

22   revised offer.  And, you know, we all get caught up in the

23   frenzy if we can get fifty million now who knows what we could

24   get in an auction.  But the law says that the receiver's

25   decision or the monitor's decision has to be made based on the

1    facts available to the court officer at any particular point in

2    time.

3           The monitor makes the decision, after being party to

4    the whole auction process or as Mr. McDonald called it the pre-

5    sunset auction, which it was.  He was intimately involved in

6    that process and intimately involved in the arguments about the

7    notes and the value of the notes and everything else and came

8    to a conclusion and gave a written monitor's report that says I

9    recommend that you bless the Ciena sale.  Since then we've had

10   two versions of these offers and so we've put it to the monitor

11   again.  And what can the monitor look at?  What the law says is

12   the monitor needs to look at the facts as they stand at the

13   time that he makes his decision.  What are the facts?

14          The facts are that we have, on the table, an offer

15   that is twenty million dollars higher.  We accept that.  It's

16   good.  It's nice.  It's great.  The fact is there's no

17   assurance that there will be an auction if you reopen it

18   because what you have heard, and the only evidence before the

19   Court today, is the representation by Ciena that they will not

20   participate in any auction if you reopen this process.  That is

21   the fact that we are faced with.  People can discount the fact,

22   people can argue about well, you know, they can always change

23   their mind because we all know that NSN said they weren't going

24   to bid and they did.  But that is not a fact.  The only fact

25   before the Court is we have an offer that's twenty million

120

1    dollars more.  We have the only other bidder that says I will

2    not play.

3         The monitor has taken into account this additional

4    twenty million dollars.  Has taken into account all these other

5    risks that we've talked about and all the other concerns that

6    it is aware of by talking to the company and by being

7    intimately involved with the company.  And when asked again,

8    given the new facts, the monitor's recommendation to you was

9    unequivocal.  They still recommend that the Ciena deal be

10   approved.

11        So the law is different.  The Soundair case, as Your

12   Honor well knows, shows a clear public policy that's set out by

13   the Court of the Appeal that says we don't want this kind of

14   confusion that we have witnessed today.  The Canadian Courts do

15   not want to be party to this kind of confusion, lack of

16   clarity, lack of integrity of the process from its perspective

17   of people not being able to rely on a Court approved process.

18        Mr. Hodara said, well you know the bid process itself

19   is subject to the approval of the Canadian and the U.S. court

20   and therefore that means it's open season, you can do anything

21   you want up to that point.  That is not the law in Canada.  All

22   these things are subject to court approval.  And these rules

23   that the Soundair case, and I won't go through them again

24   because I know you took notice when I said them the first time,

25   but these rules that were set out in the Soundair case were

1   done in the exact same context.  Where the receiver in that

2   case had selected the deal but it's subject to Court approval.

3        So it doesn't mean that just because the process is

4   subject to Court approval that that means there are no rules.

5   It is exactly in that context that Soundair and the Court of

6   Appeal has set out these rules.

7        And the reason my friends in Canada were having

8   difficulty in answering your questions about how do you

9   reconcile what we're trying to do with the Canadian law is

10  because there is no reconciliation.  There is no case that says

11  that you can do this.  There is no case that says that we

12  encourage getting a higher price at any cost.  There is no case

13  that says, you know, we encourage a courthouse auction.  In

14  fact, what you have is the opposite of that.  You have clearly

15  laid down principle in Soundair that we do not encourage that,

16  that that is not what we want to see.  And it's pretty strong

17  language in Soundair when the Courts say that.  So the case

18  deals with the exact situation of where a higher bid is made.

19  And the Court says that the only relevance of a higher bid is

20  to the question of the integrity of the process.  That is the

21  only relevance of a higher bid.  There's no Bill Gates

22  exception in Canadian law.  And that's why the Court of Appeals

23  says the Court should not interfere with or second guess or

24  reject the recommendation of the monitor in circumstances like

25  this.

122

1          So basically the law is different.  And this is no

2     different then when we were together last, actually approving

3     the Ciena stalking horse bid.  There was an issue that was

4     raised in the U.S. that said certain provisions of the bid were

5     just not in accordance with U.S. law.  And it was ruled that it

6     was not in accordance with U.S. law, it had to be changed.

7          So the big point here is that just because you have a

8     cross-border hearing, just because you have a joint hearing,

9     just because you have a joint sale doesn't mean that either

10    jurisdiction loses the integrity of its own court process or

11    loses the integrity of it's own laws and processes.  And I

12    submit to you, Your Honor, that in Canada not only is there no

13    precedent in a circumstance like this for the Court overruling

14    the recommendation of the monitor in such a complex situation

15    like this and such a sensitive situation like this, I would

16    suggest to you that this Court has no jurisdiction to do that.

17    Because there's no evidence before the Court but even with all

18    the evidence that we are hearing from the U.S. there is no

19    evidence, I submit to you, that is so heavy that the Court

20    should feel that it has to override the judgment, the

21    considered judgment, of the court officer and its

22    recommendations.

23          Those are my submissions.

24          JUSTICE MORAWETZ:  Thank you.

25          THE COURT:  Mr. Bromley?

1      MR. BROMLEY:  Your Honors, I'll try to be brief and

2  then we can move quickly into the evidence.

3      I'd like to go back to Mr. Hodara's statements and

4  then talk to Mr. Galardi's statements because I think there are

5  two questions that have been raised in the comments that we've

6  heard.

7      First, is the auction still open?  Can it still be

8  open?  And Mr. Hodara cited four cases for that proposition,

9  3Fs and a P.  And I would say that the thing that is

10  distinguishing about every one of them is that it makes it very

11  clear that it's in the discretion of the Court to make these

12  decisions, right?  It doesn't say it's compelled if there's a

13  higher bid.  It doesn't have any rule that requires that a late

14  bid be accepted or considered.

15      So we should actually, then, look at what the facts

16  are, right?  I did not start off this hearing describing

17  everything that has been accomplished to win any applause.  I

18  described it all to actually draw a very clear distinction

19  between the cases that allow this type of last-minute

20  intermeddling and the case we have before us today.

21      In the Polaroid II case I like the fact that we have

22  two Chapter 22s among this, Polaroid II and Foamex II.

23  Polaroid II was a transaction to sell substantially all of the

24  assets of a company that had already sold substantially all of

25  its assets and failed twice.  And the numbers we were talking

124

1   about were tens of millions of dollars.  It is, what I would

2   call, a won and done case.  You can sell substantially all of

3   the assets under 363 once but you can't sell them again and

4   you're not going to have to maintain an integrity -- the

5   integrity of the process or multiple processes.

6        So the idea that multiple transactions, which are

7   yielding billions of dollars, and yes I agree with Ms. Feldsher

8   that it's a shame it's not more.  But believe me it's a lot

9   more than many people had thought not too long ago.  That is

10  not anywhere near as complicated a situation.  And when there's

11  only one transaction that comprises the entirety of the case

12  maybe there's a little more leeway, particularly in that one

13  transaction is controlled by one court in one jurisdiction and

14  one set of assets.

15       Foamex II, it's a subject near and dear to my heart

16  because I have a deal toy (ph.) for Foamex I on my shelf.  And

17  so my clients are the ones that lost all the money on Foamex I.

18  And I believe I was in front of you, Your Honor, at the end of

19  that case.

20       THE COURT:  I think so.

21       MR. BROMLEY:  That was interesting as well, because it

22  was substantially all of the assets yet again, right?

23       THE COURT:  Yes.

24       MR. BROMLEY:  So that is a consistent theme.  But also

25  recall what happened there.  Judge Carey was not happy that the

1    auction process had led to the rejection in the auction process

2    of a credit bid.  There's no disgruntled bidder here whose bid

3    has been rejected.  There's a disgruntled bidder whose point of

4    view has been rejected by everyone that it raised it to.  So --

5    but no bid was rejected by MEN at all.  And so Foamex II is

6    completely inapplicable.  And again, it was substantially all

7    of the assets and, you know, much to my chagrin, you know, not

8    many dollars going for those assets.

9         And then there's 4B Corp.  4B Corp, an Eighth Circuit

10   case.  That sliding scale, as Mr. Hodara referenced, that

11   related to a supermarket lease of 2.1 million dollars.  I think

12   that the sale of 2.1 million dollar supermarket lease in

13   Minnesota is not quite a road map for how this auction should

14   be conducted and whether a late bid should be considered.

15        And then finally, there's Financial News Network.

16   There's a bankruptcy court case with Judge Conrad.  There's a

17   Second Circuit decision as well.  But the first paragraph of

18   Judge Conrad' opinion says this is an open auction.  It was an

19   open auction conducted by Judge Conrad in his courtroom.  All

20   you have to do is read it and it is a three-ring circus.  And

21   that is exactly what, I think; our frustrated bidder would like

22   this courtroom to turn into.  But that was set up as a three-

23   ring circus.  And when you look at 4B Corp and it talks about

24   Financial News Network, it talks about the expectations, the

25   reasonable expectations, of the bidders, all bidders, that

126

1    includes the winning bidder.  And basically the Eighth Circuit

2    said well, you know, they knew what they were getting

3    themselves into because it was an open auction process.  So the

4    fact that FNN and CNBC and Dow and all of those spun themselves

5    up in the Southern District of New York was to be totally

6    expected, because there was no stalking horse bid and Judge

7    Conrad wanted everybody in his courtroom as the ring master, so

8    to speak.

9         And so the four cases that have been cited as examples

10   of why late bids should be taken into account and accepted, not

11   one of them has any application whatsoever to the facts before

12   us today.  And so that plays into the discretion of this Court

13   in terms of taking into account the fact that we have multiple

14   jurisdiction, not just Canada and not just the United States

15   but also the United Kingdom and as I mentioned, dozens of other

16   jurisdictions around the world.

17        So when taking into account whether this auction

18   should be still open and whether this late bid should be

19   considered, I think that the case law in the United States

20   provides this Court with a clear roadmap for determining

21   whether or not it should be.  And the answer, in my mind, is

22   very clear; the auction should not still be open.

23        But we also did, as Mr. Tay mentioned, get some

24   interesting information.  Because on the one hand folks would

25   say let's reopen the auction but Ciena's counsel has come up

1   and said there is no auction.  We are not going to bid if the

2   auction is "reopened" which then, I guess, would reduce us to

3   determining is an 810 million dollar cash bid superior to the

4   Ciena transaction.  And if that is the decision that we need to

5   make, well the bidding procedures require us to adjourn from

6   this court and go and sit in rooms with our constituents and

7   discuss it with them and consult with them as to whether or not

8   that decision, not the decision as to reopening the auction and

9   the decision as to whether or not maybe Ciena comes up with

10  some more money is on the table.  If that is not on the table,

11  we have to go off and talk about whether or not the Ciena

12  proposal is better than the 810 cash proposal.  And I would

13  tell you, it is the considered view of the estates that the

14  Ciena offer and transaction is better, without a doubt.

15          There's also the question of standing, right?  Mr.

16  Galardi reminded me a bit of when I first went to a basketball

17  game and my father bought me cotton candy.  You look in the bin

18  and there's nothing there and a guy takes a stick and he spins

19  it around a little bit and poof, there's something really big

20  at the end of that stick.  But then you eat it and your teeth

21  rot and you realize it was a mistake.

22          So what exactly do we have?  Well, what we have is a

23  failure to file an objection in Canada.  A complete and total

24  failure to file an objection in Canada.  Very clear from the

25  bidding procedures that the Canadian Court needs to approve

128

1    this transaction.  There's no objection in Canada.  So I don't

2    even know that we can have an argument or a discussion about

3    standing.  You need to walk into the courtroom to stand, they

4    haven't walked in.  So there's no issue, it seems to me, as to

5    whether or not somebody is present in Canada making this

6    process.  There's no objection filed.

7           Then we have to look in the United States.  There's an

8    objection deadline.  That objection deadline was known and was

9    missed.  There was no objection filed by the objection

10   deadline.  There was no phone call saying we need more time.

11   There was no indication that there might be another bid.  There

12   was no contact whatsoever.  The only thing that we had, after

13   the conclusion of the auction, was a press release saying that

14   we're done and we don't think it's worth any more.

15          So when we're talking about access to this Court, we

16   can't lose sight of the fact that the rules require that you

17   show up and say things on a timely basis.  Now why is that

18   important?  Why is that objection deadline important to me and

19   why should it be important to you, Your Honor?  Well, it's

20   because there's a hearing scheduled for today.  And the filing

21   of an objection by the objection deadline is designed to give

22   the Court and the parties' notice of issues, the ability to

23   prepare for them and consider them.

24          So the blatant flaunting of the objection deadline is

25   an ambush, pure and simple.  There's no reason, whatsoever, for

129

1    the objection, regardless of whether there's standing to file

2    that objection and pursue that objection.  There's no

3    explanation, not a bit, as to why it wasn't filed in Canada and

4    why it wasn't filed on a timely basis here.

5          So when we talk about integrity of process and

6    fairness, it seems to me that the only place that integrity and

7    fairness have a place in this courtroom is on my podium when

8    I'm speaking.  Because if this was going to be taken up today,

9    we had a right to know about it last Wednesday at 5 o'clock.

10   And that right is ignored by even allowing Mr. Galardi to stand

11   up and talk.

12         So then we talk about standing.  Assume that we can

13   ignore -- the time/space continuum that exists on our

14   frustrated bidder's part is interesting, right?  Because you

15   will see in the evidence that they did not file a bid by the

16   bid deadline.  They had to be called up and said what's going

17   on and they said we need more time.  Even when the bid deadline

18   was extended they filed it late.

19         When they decided at the auction that they wanted

20   their bid to be taken, they gave us ten minutes to take it.

21   Yes, they extended it by another half hour but what we're

22   talking about here is a history of playing games with time,

23   playing games with the right to participate.  And the idea that

24   O'Brien and Colony can be cited in support of their standing

25   when they have ignored the objection deadline and imposed

130

1    extreme unfairness on the debtors is, frankly, astonishing to

2    me.

3         So when you look at Colony and O'Brien and you talk

4    about intrinsic fairness, right, you say a frustrated bidder,

5    assuming it filed on time or assuming it doesn't matter that

6    it's not filed on time, the question of whether a frustrated

7    bidder, per se, has standing boils down to a question of

8    intrinsic fairness.

9         And when you go to the Colony case, it's talking about

10   things like collusion and bad faith and fraud.  So let's talk

11   about the unfairness of the process that was cited, the

12   challenge to the auction process.  You heard Mr. Hodara stand

13   up and say we believe that the highest and best bid at the

14   conclusion of the auction on that Sunday night was the bid of

15   Ciena.  And we believe, and we told the competing bidder that

16   the paper was valued at par.

17        You heard Mr. Kreller stand up and say the exact same

18   thing.  You heard the debtors stand up and say that and we'll

19   put evidence on to say that we told it to them.  And you heard

20   the monitor say the same thing.

21        So where's the intrinsic unfairness?  Where's the

22   fraud?  Where's the collusion?  Where's the bad faith?  You're

23   talking about everyone who is participating in that process,

24   except for the frustrated bidder, believing that the highest

25   offer at the time, at the final -- 9:30 on Sunday night, the

131

1   22nd, was the Ciena bid.  And the intrinsic unfairness of that

2   decision that allows this frustrated bidder to stand up is that

3   they disagree with that point of view.  This agreement is not

4   collusion.  This agreement is not bad faith.  Dissolution is

5   not a perversion of this process.  Disagreement is

6   disagreement.

7        So when we're talking about giving somebody whose not

8   supposed to have standing, standing only in extreme

9   circumstances and the only thing that that person can point to

10  is that I don't agree with your point of view and I've had full

11  access to the process, indeed you gave me an extra week to get

12  involved in the process, I find it hard to believe that we can

13  talk about standing here.

14       And then we talk about backup bidding.  Well, you

15  know, it's interesting.  There's been a little bit of, you

16  know, shell game here too.  The last bid that was put on the

17  table by the disgruntled bidder was 770 million dollars in

18  cash.  Your Honor, that is not the backup bid.  The backup bid

19  is a bid for 710 million dollars that also included twenty-five

20  million dollars of patents.  So if you used the twenty-five

21  million dollars of value, the backup bid is 685 million, it's

22  not 770.  So why is that?  Well, that's because the last two

23  bids that our disgruntled bidder put on the table specifically

24  said I will not stand on the bid I'm putting on the table.  My

25  backup bid is going to be the one behind it.  We're not arguing

132

1    with that.  The price of admission to this process was to be a

2    backup bidder.  And if they have standing on anything, it is

3    only to talk about the backup bid, a 685 million dollar bid.

4         So let's think about that, Your Honor.  The only

5    standing they have is if Ciena doesn't perform within the

6    timeline, and it's a very strict timeline, and it turns into

7    their backup bid, they get these assets for 685 million dollars

8    not 810.  And that standing -- that is going to be the reason

9    for the standing for them to stand here and to disrupt this

10   auction?  That's ridiculous.

11        So Your Honor, we feel it's absolutely clear this

12   bidder is late -- this bidder is late, doesn't have standing.

13   It is putting these debtors in multiple jurisdictions at risk.

14   It's putting this transaction at risk.  We don't believe that

15   they have a right to stand here and disrupt this auction.

16        So Your Honor, I didn't quite hear what Justice

17   Morawetz said when he came on the stand, we certainly -- and if

18   the answer was you're going to reserve on deciding the standing

19   point, that's fine.

20        THE COURT:  Yes.

21        MR. BROMLEY:  But it also does, in fact, deal with how

22   we're going to proceed from an evidentiary perspective.

23        THE COURT:  And it may be that Mr. Justice Morawetz

24   and I have to retire, at some point, to discuss that issue and

25   making a ruling, I recognize that.

133

1       MR. BROMLEY:  Okay, Your Honor.  So on that basis,

2   we're ready to go into our evidence.

3       THE COURT:  Okay.  Justice Morawetz, are you prepared

4   to take evidence, sir?

5       JUSTICE MORAWETZ:  We are.

6       THE COURT:  Okay.  You may proceed then, Mr. Bromley.

7       MR. BROMLEY:  The debtors would call Mr. George Riedel

8   to the stand, please.

9       THE COURT:  Mr. Riedel.

10      MR. HODARA:  Your Honor.

11      THE COURT:  Yes, Mr. Hodara?

12      MR. HODARA:  Again, procedure.

13      THE COURT:  Yes.

14      MR. HODARA:  Given the issues that are pending, is the

15  evidence that's being proffered now with respect to the issue

16  of reopening --

17      JUSTICE MORAWETZ:  Judge Gross, we're not able to hear

18  Mr. Hodara unless he's at a microphone.

19      MR. HODARA:  -- with respect to the issue of reopening

20  the auction exclusively or also with respect to having the

21  Court authorize the currently leading bid?

22      THE COURT:  Well, it's my understanding that the

23  evidence that we're about to hear goes to the auction process.

24  Is that correct, Mr. Bromley, the fairness and the integrity of

25  that process?

1          MR. BROMLEY:  Yes it is, Your Honor.

2          THE COURT:  All right.

3          MR. BROMLEY:  And at this point we would not propose

4     to be putting on valuation testimony.

5          THE COURT:  Right.

6          MR. BROMLEY:  We believe that, at least as we've been

7     hearing things so far, the consensus is that the view at the

8     conclusion of the auction was we had the highest and best offer

9     on the table.  Now, we're going to talk about the process that

10    we, you know, had to get to that point.

11         THE COURT:  Yes.

12         MR. HODARA:  So it's basically with respect to

13    everything then?

14         THE COURT:  Yes.

15         MR. HODARA:  Okay.  Understood.  And just one point of

16    clarity --

17         THE COURT:  And of course that testimony, that

18    evidence, and Justice Morawetz will certainly speak up himself,

19    that evidence will go to the issue, it seems to me, as to

20    whether or not there should be a reopening of the auction.

21         MR. HOADAR:  Understood.  Just one point of

22    clarification of an issue that was raised during my

23    presentation and others commented on the same point, it was

24    confirmed to us during the lunch break, by Mr. Galardi on

25    behalf of MEN Acquisition and its affiliates, that they would

135

1    agree that if the auction is reopened none of them would raise

2    the issue of valuation in any MEN proceeding or hearing.

3    Obviously the Court, and any other party that has a position or

4    rights with respect to valuation, particularly with respect to

5    non-cash consideration, would have the ability to raise those

6    issues.  But MEN Acquisition and its affiliates has agreed that

7    they would not, in any context relating to the MEN processes,

8    raise that issue.

9         THE COURT:  Okay.  Thank you, Mr. Hodara, for the

10   clarification.

11        MS. FELDSHER:  Your Honor, just a point of

12   clarification before we begin the testimony, because I think

13   this point was a little bit fudged and confused when Mr. Bacon

14   (ph.) got up earlier during my presentation.

15        My client's position, and I think I made this clear

16   but I'd just like to say so before the questioning begins

17   because I may be getting up to cross examine some of Mr.

18   Bromley's witnesses.  My client's view here about the auction

19   is that the process had to have been flawed at some point.

20   Because what the estate ended up with was a security that had a

21   massive amount of risk.

22        So while I'm not getting into valuation in the strict

23   sense of should it have been valued, if you looked at the notes

24   on the day of the auction, at par, a hundred cents, ninety-four

25   cents, ninety-two cents, ninety-one cents, I'm not going to be

136

1    getting into that issue.  I certainly will want to ask the

2    witnesses, and I just want to make sure that Your Honor knows

3    in advance where I'll be going with that, I would certainly

4    want to ask the witnesses because this security is not being

5    issued for four months, five months, six months, about risk

6    factors that go into the aggregate value of this bundle that

7    creditors are being handed at the end of the sale.

8            So I just wanted to make that clarification early so

9    that when Mr. Bromley talks about not putting in valuation, we

10   absolutely want to talk about the risk because we don't believe

11   that a process that wasn't flawed along the way would have

12   resulted in an instrument that it didn't start out with that

13   has a lot more risk than the instrument it started out with,

14   which was stock in a public company.

15           So I don't know if that clarifies things for Mr.

16   Bromley or not.

17           MR. BROMLEY:  I don't think I understood a word Ms.

18   Feldsher said, frankly Your Honor.

19           THE COURT:  Well, I think we'll do this.  I think,

20   just to move things along Ms. Feldsher, when you're prepared to

21   proceed with cross examination, I'll hear an objection if

22   appropriate, if they believe it appropriate, from the debtors

23   or from anyone else and I'll then take up that objection.

24           MS. FELDSHER:  That's fine, Your Honor.  I just wanted

25   to make -- Mr. Bromley should put on the witnesses as he sees

1   fit.  But I don't want him later saying he didn't put somebody

2   on because my issue was what he considers valuation, because he

3   clearly has a hard time understanding what I mean by valuation.

4         THE COURT:  All right.  Mr. Galardi?

5         MR. GALARDI:  As the outrageous, disgruntled person

6   here, Your Honor, and hoping that I am granted standing and

7   should I get to the podium to ask my questions, Your Honor, I

8   guess I'll ask for just a legal clarification because I think

9   your comment about not putting on valuation testimony it goes

10  really to the threshold issue that I raised before.

11        It's my view, at least, and if you say I don't have

12  standing I'll just still make the legal argument that it is the

13  debtors' burden to show that this is the highest or otherwise

14  best bid at the auction.  I don't know how you do that without

15  valuation testimony.  So I will say they proceed at their own

16  risk but my intention would be to ask how they came to that

17  conclusion of highest or otherwise best.  So I just put that on

18  the record, Your Honor.

19        THE COURT:  All right.  Thank you, Mr. Galardi.  Mr.

20  Bromley?

21        MR. BROMLEY:  Well it may be, Your Honor, that once we

22  get to actual testimony we may have to have a little --

23        THE COURT:  Argument.

24        MR. BROMLEY:  -- argument on certain points.

25        THE COURT:  Yes.  Understood.

1    MR. BROMLEY:  And it may be that we do think we need

2  to come to the threshold question of whether there is standing.

3    THE COURT:  Standing.  I understand.

4    MR. BROMLEY:  And so, with that --

5    THE COURT:  But I think we can probably proceed more

6  smoothly at this point is if we have your witness and then it

7  probably will take us to a break, at which point Justice

8  Morawetz and I can confer.

9    MR. BROMLEY:  Thank you, Your Honor.  We'll proceed in

10  that fashion.

11    THE COURT:  Okay.

12    MR. BROMLEY:  Your Honor, as a housekeeping matter --

13  oh, if we could swear the witness.

14    THE COURT:  Yes.  Mr. Riedel, if you would please rise

15  and we'll have you sworn, sir.

16    THE CLERK:  Please place your left hand on the Bible.

17  State your full name and spell your last name for the record.

18    MR. RIEDEL:  George Riedel, R-I-E-D-E-L.

19    (Witness duly sworn)

20    THE CLERK:  Please be seated.

21    THE COURT:  Thank you, Mr. Riedel.

22    MR. BROMLEY:  As a housekeeping matter, Your Honor,

23  before we get to the testimony.  We did have -- Mr. Bacon had

24  handed up a demonstrative.

25    THE COURT:  Yes.

1      MR. BROMLEY:  And just from a numbering perspective,

2  we understand it's being offered as a demonstrative exhibit but

3  maybe if we could call that Exhibit 1.

4      THE COURT:  That is fine.  And that is the summary of

5  bids, is that correct?

6      MR. BROMLEY:  This is the summary of the bids, Your

7  Honor.  Yes.  And also the first tab in the binder is the

8  transcript of the auction.  I don't think that anyone has any

9  objection to that coming in, so we would offer that into

10  evidence without -- hopefully on a stipulated basis.

11      THE COURT:  Any objection?

12    (No response)

13      THE COURT:  All right.  They are admitted.

14  (Summary of Bids was hereby received into evidence as Debtors'

15  Exhibit 1, as of this date.)

16  (Transcript of Auction was hereby received into evidence as

17  Debtors' Exhibit 2, as of this date.)

18      MR. BROMLEY:  Okay.  Thank you, Your Honor.  And that

19  will be Exhibit 2.  And on a similar vein, Your Honor, we have

20  in tab 4, redacted copies of all the bid submissions that were

21  submitted throughout the course of the auction.  And we propose

22  to simply submit that as well, hopefully on a stipulated basis.

23      THE COURT:  Again, any objection?

24    (No response)

25      THE COURT:  All right.  That is admitted as well, as

140

1   Exhibit 4.

2   (Redacted Copies of Bid Submissions was hereby received into

3   evidence as Debtors' Exhibit 3, as of this date.)

4           MR. BROMLEY:  Actually, it's Exhibit 3.

5           THE COURT:  Exhibit 3.

6           MR. BROMLEY:  It's 3, Your Honor.

7           THE COURT:  I'm sorry.

8           MR. BROMLEY:  Okay.  Thank you very much.

9   DIRECT EXAMINATION

10  BY MR. BROMLEY:

11  Q.   Mr. Riedel, could you please state your name, again, for

12  the record?

13  A.   George Riedel.

14  Q.   And what is your current position?

15  A.   Chief strategy officer for Nortel.

16  Q.   Could you give me a brief background of your

17  responsibilities as chief strategy officer?

18  A.   Sure.  There are five different areas of responsibility.

19  I look after M&A, corporate strategy, business development,

20  strategic partnerships and there used to be a small incubation

21  fund for new investments.

22  Q.   Now prior to taking your position at Nortel, what was your

23  prior employment?

24  A.   It was with Juniper Networks for three years in a similar

25  role.  I was VP of strategy and M&A.

141

1   Q.   Now, when did you join Nortel?

2   A.   March of '06.

3   Q.   Now, have you previously testified in this court?

4   A.   I have.

5   Q.   And was that in respect of the CDMA sale?

6   A.   That's correct.

7   Q.   And also in connection with the Enterprise sale?

8   A.   Also true.

9   Q.   And the Seville (ph.) sale?

10  A.   Correct.

11  Q.   And you've been here in connection with the stalking horse

12  transaction with Ciena, is that correct?

13  A.   That's also correct.

14  Q.   Mr. Riedel, is it fair to say that you've participated in

15  the sale and auction processes that have taken place since the

16  bankruptcy filing?

17  A.   Yes, it is.

18  Q.   And is that true with respect to the CDMA deal?

19  A.   Yes.

20  Q.   And in connection with that, did you deal with NSN?

21  A.   I did.

22  Q.   Could you please describe those dealings?

23  A.   We had a number of dialogues around getting to a stalking

24  horse bid with NSN for the CDMA transaction.  They originally

25  began in prefiling days, in late '08 and the postfiling, in the

1    early part of this year, in '09, that we reengaged in those

2    discussions around their interest in acquiring the CDMA and

3    certain LTE assets.

4    Q.    So over the course of the past twelve months, how many

5    times do you think you've had business meetings with

6    representatives of NSN?

7    A.    Oh, gosh.  Twenty, thirty times.

8    Q.    On multiple transactions?

9    A.    Yes.

10   Q.    So not just CDMA but also MEN, for instance?

11   A.    Correct.

12   Q.    And are you familiar with the One Equity Partners entity?

13   A.    Yes, I am.

14   Q.    And could you tell me how you came to become familiar with

15   them?

16   A.    Similar journey.  In the fall of '08 when we announced

17   publicly that we were selling the MEN business, they were

18   involved with another party, to pursue an acquisition of that

19   asset and then again subsequently post filing, when we put the

20   business back up for sale, they too came back looking, on a

21   standalone basis, to perhaps acquire that asset.

22   Q.    And how about Ciena Corporation, have you been dealing

23   with them since the filing of these bankruptcies?

24   A.    Yes, I have.

25   Q.    And could you describe that generally?

1   A.   Again, similar kind of engagement, both prefiling and post

2   filing.  A range of management meetings, dialogue about

3   negotiations, involvement in discussions of diligence and the

4   like.

5   Q.   So how many times do you think you've met with

6   representatives of Ciena over the past year?

7   A.   Oh, probably fifteen to twenty.

8   Q.   And how about meetings with the folks from One Equity

9   Partners, how many meetings?

10  A.   Eight to ten, maybe twelve.

11  Q.   So is it fair to say with these three entities, maybe

12  about fifty meetings?

13  A.   That's about right.

14  Q.   And that would be over the past twelve months, you think?

15  A.   Correct.

16  Q.   In connection with the CDMA auction --

17  A.   Yes, sir.

18  Q.   -- and sale process, were you present at the actual

19  auction?

20  A.   Yes, I was.

21  Q.   And were you a participant in all facets of that auction?

22  A.   I was.

23  Q.   The Enterprise business, that business had an auction as

24  well, is that correct?

25  A.   Yes, it did.

144

1    Q.    And were you a participant in that auction process?

2    A.    Yes, I was.

3    Q.    And what was the result of that auction?

4    A.    A very successful outcome for the estate.  We sold the

5    business to Avaya for 900 and change million dollars.

6    Q.    And you were -- so you said you were part of that auction

7    process as well?

8    A.    Yes.

9    Q.    How long did that last?

10   A.    It was both exhausting and exhaustive.  It was four days,

11   began Friday morning and ended 2:30 Monday morning.

12   Q.    Uh-huh.  Do you think that, in your view, the conduct of

13   the CDMA auction and the Enterprise auction were roughly

14   similar?

15   A.    I do.

16   Q.    Were you -- let me focus now a little bit on the MEN

17   business.

18   A.    Okay.

19   Q.    Could you tell us what MEN stands for?

20   A.    It's Metro Ethernet Networks.  It's a collection of both

21   optical transport technologies and Ethernet transport

22   technologies that we combined three and a half, four years ago.

23   They are used in a range of applications, principally in either

24   core or metro networks or in some cases submarine -- long haul

25   networks to carry high volume traffic, Internet traffic, voice

1  traffic and the like.

2  Q.   And can you generally describe the scope of Nortel's MEN

3  business?  Where is it located geographically?

4  A.   Sure.  Large set of development resources in Canada.  We

5  have roughly 1,000 R&D engineers in Ottawa.  There's about 350

6  people in management and product management in Montreal.  It is

7  global in nature.  Total business has got about 2,400 and

8  change headcount around the world, sales, R&D and the like.

9  We operate a large part of the business in North America,

10 sizeable business in Europe; meaningful business in Latin

11 American and as well in Asia.

12 Q.   Did there come a time that Nortel decided that it should

13 try to sell its MEN business?

14 A.   It did.  We announced publicly, in September of last year,

15 2008, that we would initiate a process with the intent of

16 selling the MEN business.

17 Q.   So that's September of 2008, that's prior to the petition

18 date?

19 A.   That's correct.

20 Q.   Was that a public announcement about that?

21 A.   It was.

22 Q.   And can you describe the process that went into deciding

23 to try to sell the MEN business?

24 A.   We were staring at a number of challenges for the company,

25 ability to fund sufficiently all the relevant business.  We had

1   scale challenges in the competitive landscape we were dealing

2   with.  It became clear that we couldn't be the, sort of, broad-

3   based player that we had hoped we could be and therefore we had

4   to make a difficult decision about which asset we could

5   monetize for what value.  The business was investing heavily in

6   40 gig and 100 gig technologies and doing quite well.  But the

7   ongoing investment and the long-term returns to that investment

8   would be challenging on a standalone basis.  And so we

9   initiated a sales process in September of '08.

10  Q.   Can you tell me a little bit about the sales process that

11  went on prior to the petition date?

12  A.   Sure.  We reached out to with, then Credit Suisse, for a

13  banker about thirty-five different people.  We had

14  conversations which translated into NDAs and information

15  memorandum being sent to, I believe it was, near twenty or

16  twenty-one.  That translated into a series of management

17  engagements, discussions, access to electronic data rooms.  We

18  got down to about seven people in earnest.

19       And then, as we went into January, we were in the deep

20  parts of negotiations with three or four different parties to

21  see if we could conclude a transaction.  We ultimately ended up

22  filing in the middle of the month and therefore put the process

23  on hold.

24  Q.   Was Ciena one of those parties that you were talking to?

25  A.   They were.

1   Q.   And was Nokia Siemens Networks one of them?

2   A.   They were originally in and then out.  They had, sort of,

3   back and forth debated whether they wanted to participate.  At

4   one stage they had signed the NDA, were in the process.  But in

5   terms of where they were in January, they were not.

6   Q.   And what about One Equity Partners?

7   A.   They were in with another party.  And my recollection is

8   that they were engaged through January, actively, to look at

9   the business.

10  Q.   Who are the major competitors of Nortel in the MEN

11  business?

12  A.   You would see Alcatel Lucent.  You would see Waway (ph.),

13  Cisco, Ciena, NSN, Tellabs, would be probably the top five or

14  six.

15  Q.   And was there a decision taken that Nortel didn't have the

16  wherewithal to compete in that business?

17  A.   It's a very high investment business.  You need global

18  footprint to justify the R&D.  We had strong footprint in North

19  America but less so in Europe and certainly much less in Asia.

20  So yes, we were at a scale disadvantage in the business.

21  Q.   Now, is the MEN business contained within a separate

22  standalone corporate entity?

23  A.   At the time we had not yet carved out the business.  It

24  was part of the integrated Nortel.  And part of the journey

25  was, it started in the fall of '08, was to create a separate

148

1    P&L, to create the ability to provide a separate balance sheet,

2    to create a separate organization and move towards a more

3    standalone business unit.

4    Q.    And what was the status of those carve out efforts at the

5    time of the bankruptcy filings?

6    A.    It was just getting underway with MEN.  The other business

7    units hadn't begun. So we were probably halfway done with MEN

8    in terms of the carve out.

9    Q.    And why is a carve out necessary in order to sell the

10   business?

11   A.    A combination of reasons.  You've got to prescribe the

12   assets that are going with the business; contracts, customers,

13   product, IP, etcetera, etcetera.  Obviously the balance sheet

14   and the P&L to determine cash flow and the liabilities that

15   would transfer or not as part of that.

16   Q.    And is the carve out a complicated exercise?

17   A.    Extraordinarily.  Extraordinarily complicated.  For us

18   it's a very complicated process.  We have a series of

19   challenges, given the complexity of the organization, the

20   complexity of the business model we operate, the financial

21   systems.  It's a very -- extraordinarily difficult process.

22   Q.    Is the MEN business organized on a geographical basis?  Is

23   there an MEN France and an MEN U.S. and an MEN Asia?

24   A.    No.  It's operating in those various geographies of

25   theaters but there isn't a standalone business unit in each of

1    those theaters.

2    Q.    So you have to do carve outs everywhere, is that fair?

3    A.    Correct.  Correct.

4    Q.    Does that make it even more difficult?

5    A.    It does.

6    Q.    After the commencement of these proceedings the CCAA in

7    Canada and the Chapter 11 here and the administration

8    proceedings in Europe, was consideration given to reorganizing

9    around the MEN business?

10    A.    Part of our challenge was the scale and the profitability

11    of that business and what the future requirement would be

12    necessary to support that investment.  And on a standalone

13    basis, we concluded that that was not something that was

14    viable.

15    Q.    When you say not viable, is it that, in simple terms,

16    Nortel needed more money to invest in it?

17    A.    Correct.

18    Q.    And you didn't have access to that investment money?

19    A.    Correct.

20    Q.    Was there a point in time after the filings that a

21    decision was made to sell the MEN business?

22    A.    There was.  We went through a series of reviews of

23    different plans.  The filing had, as you would expect, a fairly

24    dramatic impact on the revenue run rate for all the various

25    businesses, some more than others.

1    In the spring of this year we reviewed the potential for

2    selling the assets versus the potential for running it on a

3    standalone basis and concluded that we were better off, given

4    the structural challenges of the business, the funding

5    requirements of the business and the likely cash flows that we

6    would generate, that we were better off monetizing the

7    business.

8    Q.    Were you involved in making any presentations about that

9    program to creditors or the monitor or bondholders?

10   A.    Extensively.

11   Q.    And how many presentations do you think you made in

12   connection with that?

13   A.    A dozen

14   Q.    And would that be with advisors, financial advisors?

15   A.    It was.  It was with advisors, it was with various

16   creditor committees, the monitor, the ad hoc bondholder

17   committee, etcetera.

18   Q.    When the decision was made to sell the business, what did

19   Nortel do in terms of engaging financial advisors and

20   commencing a process?

21   A.    Right.  We had hired Lazard at that time and created a

22   mechanism to contact and expand the contact of the original

23   group of; I think it was thirty-some odd folks we reached out

24   it.  It got to almost forty that we reached out to, both

25   strategic buyers and financial buyers.  Built an information

1    memorandum and an EDR, got NDAs, sent out to interested

2    parties, selected folks who had credible interest to

3    participate in management presentations, work through the

4    normal funnel to provide diligence information so that they

5    could, in fact, provide necessary information to bid in order

6    to ultimately determine who could be a stalking horse.

7    Q.   And were you in charge of that process with Nortel?

8    A.   I was.

9    Q.   And who at Lazard was in charge of the process for Lazard?

10   A.   Mike Murray was the principal partner involved.

11   Q.   And did you consult with Mr. Murray on a frequent basis?

12   A.   Yes, I think that's a fair statement.

13   Q.   You mentioned strategic and financial buyers, if I could

14   ask you just to clarify for the record, what do you mean by a

15   strategic buyer?

16   A.   If you look from the eyes of our customers, people like

17   AT&T, Verizon and the like, they would sit there and say these

18   are folks who are in the global business of providing telecom

19   equipment, have customers, have intellectual property,

20   products, supply chain, capabilities, etcetera, etcetera, have

21   sizeable market share and a global sense of the business and

22   therefore are looked upon as viable vendors over the multi-year

23   deployment periods that these folks have to think about making

24   decisions versus financial buyers which would be sponsors,

25   private equity, hedge funds and others who are looking to

1    acquire the business and then ultimately sell it on for some

2    liquidity event later for a greater return.

3    Q.    Okay.  So maybe in simplistic terms, the strategic buyer,

4    they're already in the business in some way?

5    A.    They're in the business.  They would have synergies; they

6    would have credentials that the customers, the end users, would

7    see as valuable.  They would have longevity experience in

8    operating.

9    Q.    And in terms of looking at strategic and financial

10    investors, do you feel that Nortel and Lazard canvas the

11    landscape?

12    A.    I do.

13    Q.    Do you think you missed anyone?

14    A.    Not to my knowledge.

15    Q.    Now, having looked at these thirty or forty potential

16    interested parties, what else did you have going on?  Was there

17    an electronic data room or anything like that?

18    A.    There was.  There was an electronic data room.  There was

19    various management presentations.  There were diligence

20    sessions.  There was contract discussions on either the main

21    ASA, share agreement, or ancillary agreements as well.

22    Q.    Now, were any of these interested parties willing to

23    execute confidentiality agreements?

24    A.    They were.

25    Q.    And do you know approximately how many?

153

1    A.   I have to go back and check my records.  I think it was in

2    the neighborhood of twelve to thirteen.

3    Q.   Do you know if all of those who signed the confidentiality

4    agreements accessed the electronic data room?

5    A.   I believe most of them did.

6    Q.   And how about management presentations, do you recall how

7    many separate entities received management presentations?

8    A.   I'd have to double check my records but I think it's at

9    least ten, perhaps twelve.

10   Q.   Were there any requests for management presentations that

11   were rejected?

12   A.   Not for folks who had signed the NDAs and we viewed as

13   credible.

14   Q.   Now, let's focus a little bit on the stalking horse

15   transaction. Ciena Corporation, could you tell me a little bit

16   about Ciena?

17   A.   Ciena is a player in the optical space as well, based in

18   Baltimore, Maryland.  They're big in North America; operate a

19   little bit in Europe, less so in Latin America and Asia.  Have

20   strong positions in some of the larger tier one customers in

21   North America like AT&T.

22   Q.   And were you familiar with Ciena prior to the MEN sale

23   process?

24   A.   I knew a bit about them, yes.

25   Q.   And would you call them a financial or strategic --

154

1    A.    Strategic.

2    Q.    Strategic.  And do you think that there are particular

3    strengths that Ciena brings to a transaction?

4    A.    They do.  They operate a focused business.  They're a

5    successful player in multi-generational product development.

6    They've got good operations and supply chain management.

7    They're seen as credible suppliers in the eyes of major

8    customers.

9    Q.    And how about NSN in this area?

10   A.    NSN is also seen as a strategic, global player.  I don't

11   know what their current market share is.  It used to be, sort

12   of, in the top five, it may have dropped a bit.  But they're

13   also well regarded by the customers, acknowledged as a global

14   player, seen as important in the eyes of the industry.

15   Q.    So they have a credible strategic footprint as well?

16   A.    They do.

17   Q.    What about One Equity, are they a strategic or financial

18   player?

19   A.    They're a financial player.

20   Q.    And were you engaged in any post filing conversations with

21   One Equity?

22   A.    We were.  We had a number of dialogues with them.  They

23   had put forward a number of different, creative proposals to

24   acquire the business.  Some included cash, some included cash

25   and equity.  There are a range of different creative solutions

155

1   that they were exploring with us and our creditors.

2   Q.   How did Nortel narrow its focus in terms of reaching a

3   stalking horse deal with Ciena?

4   A.   Three things mattered, one was value and the gaps between

5   what the indicative bids were from the various other bidders

6   versus, say, one equity.  There was substantial valuation gaps.

7        Two was credibility and acceptance with our customers.  I

8   mentioned, you know, the conveyance of these contracts, the

9   large multi-year, very important tier one customers do look

10  heavily on value of a strategic buyer and that was comforting

11  to us in the context of that.  And third is where we were on

12  draft documents.  You know, can we see a path forward to

13  getting something executed.  And for those three reasons,

14  ultimately we ended up picking Ciena.

15  Q.   Stepping aside for a moment to the customer.  I think you

16  talked about tier one customers, what do you mean by that?

17  A.   So the big telecom operators in the U.S., Verizon and

18  AT&T.  In Canada it would be Bell Canada, Rogers.  U.K. would

19  be DT, Deutsch Telekom, Franz Telecom, folks like that.

20  Q.   So when you were here testifying about the Enterprise

21  transaction, you talked about smaller contracts and lots of

22  them.

23  A.   Right.

24  Q.   Is that the type of model that MEN has?

25  A.   No, this is -- increasing the industry has consolidated

156

1    around bigger and bigger carriers buying from fewer and fewer

2    players.  And so these would be large, multi-year commitments

3    to deploy core technology in very critical parts of the

4    network.

5    Q.    And these contracts, are they in the tens of millions of

6    dollars, hundreds, what?

7    A.    On an annual basis they're in the hundreds.

8    Q.    And who are the biggest customers?

9    A.    AT&T in North America is our biggest customer.

10   Q.    When you were sitting down and talking with Ciena about a

11   stalking horse agreement the issue of Ciena stock came up, is

12   that correct?

13   A.    That's correct.

14   Q.    And what was the ultimate stalking horse agreement in

15   terms of a consideration about cash and not cash?

16   A.    A portion in cash, a portion in shares.  It was 390

17   million in cash; it was ten million in shares.  The view on

18   shares, from ourselves and in concert -- in consultation with

19   our creditors and the like was, it's a publicly traded company,

20   it's a very liquid security, we had an ability to value, with

21   some reverse diligence, the risk associated with the business

22   and we concluded that for the range of shares in consideration

23   at this stage, that treating them at or near par was a

24   reasonable approach at this stage.

25   Q.    In your experience in the M&A transactions, is stock a

1    common form of consideration?

2    A.   It varies widely but yes, it's a common form.

3    Q.   So when you were talking about accepting stock from Ciena

4    in the stalking horse transaction, did Nortel discuss that with

5    its creditor constituencies?

6    A.   We did.

7    Q.   Did it discuss it with the administrators in the U.K.?

8    A.   We did.  With the monitor, with the administrator, with

9    creditor constituents, we offered them opportunities to perform

10   reverse diligence on Ciena's stock as well.

11   Q.   When you say reverse diligence, what do you mean by that?

12   A.   Having them have a chance to chat with the executives at

13   Ciena about the financials, the balance sheet, the risk

14   associated with taking that kind of currency, the consideration

15   concerns that they might have.

16   Q.   So when Ciena offered to provide its stock as currency, it

17   also offered to provide, in a sense, diligence --

18   A.   Correct.

19   Q.   -- for Nortel and its constituents?

20   A.   That's correct.

21   Q.   And did you participate in that?

22   A.   I did not participate in that.

23   Q.   Did Lazard handle that?

24   A.   Yes, they did.

25   Q.   And did you understand that the constituents also had the

1   opportunity to do that?

2   A.   They had the opportunity and they took advantage of that.

3   Q.   So how long were the negotiations between Nortel and Ciena

4   in order to reach this stalking horse bid?

5   A.   Extraordinarily long.  I think our other side would say it

6   was much longer than it probably -- we all thought it should

7   have been.  It lasted probably three and a half, four months.

8   Q.   And that's from the first meetings to execution of the

9   stalking horse documents?

10  A.   Yeah.

11  Q.   Now, during these negotiations with Ciena was there ever a

12  conversation about saying well you just buy the U.S. MEN

13  business or just the Canadian MEN business?

14  A.   Doesn't work for us.  It's a global business.  The way the

15  company's organized, where the products and intellectual

16  property is sold in terms of packages of goods and services,

17  there isn't a discrete U.S. or Canada or French business.

18  Q.   Are you familiar with the stalking horse agreement?

19  A.   Yes.

20  Q.   Would it be possible just to sell, you know, the U.S. MEN

21  business to them and still have a transaction?

22  A.   Not really.

23  Q.   Do you recall when the stalking horse agreement was

24  signed?

25  A.   It was November 7th -- no, no.  Sorry.  It was October --

1    October 7th.

2    Q.    October 7th.  Was it always part of the proposed

3    transaction with Ciena that there would be approval of the

4    courts in the U.S. and Canada?

5    A.    Absolutely.

6    Q.    And is there also another agreement that's between Ciena

7    and the European debtors?

8    A.    Correct.  There's a separate asset, sale and purchase

9    agreement.

10    Q.    Are they interdependent with each other?

11    A.    They are in a range of areas.  The intellectual property

12    is interdependent, transition services that flow across the

13    different geographies is interdependent, supply chain, product,

14    customer support.  There's a range of interdependencies.

15    Q.    So when you talk about transition services, what do you

16    mean by that?

17    A.    As you move from carving out the business within Nortel to

18    selling it to a new entity there's a set of services, IT, HR,

19    supply chain, product support that are required to facilitate

20    that transition because the new buyer has to have his or her

21    systems up in place and ready to accept that.  That period of

22    time is negotiated by joint parties and you come to review

23    about the cost and the service level agreements to deliver

24    those services.

25    Q.    So you -- I think you referenced earlier, you were

1    actually here and testified in this court in support of the

2    bidding procedures, do you recall that?

3    A.   That's correct.

4    Q.   And after those bidding procedures were approved, do you

5    recall whether you went out or authorized your advisors to go

6    out and contact additional parties?

7    A.   We did.

8    Q.   And is that known as the go-shop theory?

9    A.   It is.

10   Q.   And so what did you do during that period with respect to

11   the MEN assets?

12   A.   Again, reached out to a number of the prospective buyers,

13   encouraged them to take a hard look at the asset, participated

14   in management presentations, in diligence sessions, in

15   negotiations with them on contract issues.

16   Q.   And how many parties did you contact?

17   A.   We originally reached out to, gosh; it would have probably

18   been a dozen, again.  A number had said thank you we've looked

19   at the asset and aren't interested in going forward.  Got down

20   to about seven who were serious.  Got about five into very

21   serious diligence, management presentations, EDR access, follow

22   up, meetings, etcetera, etcetera.

23   Q.   Do you recall the bidding procedures that set a deadline

24   for the submission of bids?

25   A.   I do.

1   Q.   And do you recall what that date was?

2   A.   November 9th.

3   Q.   Did you have conversations with representatives of OEP or

4   NSN prior to November 9th about submitting a bid?

5   A.   NSN, yes.  OEP, no.

6   Q.   And were you expecting to receive a bid from NSN on the

7   9th?

8   A.   We were.

9   Q.   And did you?

10  A.   No, we did not.

11  Q.   What happened after you did not receive a bid?

12  A.   Bid procedures expired at 4 p.m. eastern on the 9th.  We

13  hadn't heard.  About 6:30 that evening I called Michael

14  Matthews, who's my counterpart at NSN, he was in Munich, it was

15  early in the morning.  We asked what was going on, we had been

16  led, over the weekend, to expect to get something from them

17  before the bid deadline.

18       He indicated they'd had a change of heart at the board, in

19  terms of their ability to fund this on their own.  They wanted

20  to explore working a partnership model; they had already had

21  some dialogue with OEP about the possibility of doing something

22  together.  Recognizing that that was going to be a heroic

23  effort they asked for more time.

24  Q.   And what was Nortel's view when they asked for more time?

25  A.   We had a subsequent conversation Tuesday morning with them

162

1    on it to better understand where they really were.  We

2    indicated at that time we'd need to see some real momentum and

3    real traction, offered to help, gave them seventy-two hours to

4    come back with some evidence of momentum.

5         Ultimately, we ended up extending that again and then a

6    third time to the following Tuesday, the 17th. So a total of --

7    from Monday the 9th to Tuesday the 17th.

8    Q.   Would it be fair to say that Nortel aggressively pursued

9    NSN as a bidder?

10   A.   Very much so.  We had our key management down in New York

11   working with OEP and NSN.  We had a range of things, we had

12   dialogues with bankers and counsel and the like.  It was a very

13   intense week to try and see if we could help them put something

14   together.

15   Q.   And why did you do that?

16   A.   Simply put, we had -- we had a view that that was

17   important to create the auction and to create tension in terms

18   of the value we would get for this asset.

19   Q.   And was a bid ultimately submitted?

20   A.   It was ultimately submitted.

21   Q.   And do you recall what that bid was?

22   A.   It was a leading bid, cash was five -- five-something,

23   I'll have to check my notes.

24   Q.   Would 548 sound right?

25   A.   548, yes.  Thank you.

163

1    Q.    Now, you said the leading bid, was that bid determined,

2    ultimately, to be the --

3    A.    Sorry.  It was first determined as a qualified bid and

4    then we ultimately determined it was a leading bid in order to

5    start the auction.

6    Q.    When you say we, do you mean just Nortel or is -- others

7    involved?

8    A.    No, no.  It was extensive consultations with the monitor,

9    with the U.K. administrator, with the creditors, the

10   bondholders, the management team, etcetera.

11   Q.    And so -- so the bid that was submitted by MEN Acquisition

12   --

13   A.    Correct.

14   Q.    -- was selected after all these consultations to be the

15   starting bid for the auction?

16   A.    That's correct.

17   Q.    Now, can you tell me a little bit about the entity that

18   made the bid?  Was it NSN itself?

19   A.    No, it was a partnership that had come together between

20   OEP and NSN.  It was a fifty/fifty, sort of, partnership

21   between the private equity player and NSN the strategic player.

22   Q.    So let's fast forward a little bit to November 20th.  Do

23   you recall that being the day that the auction commenced?

24   A.    I do.

25   Q.    And where were you?

164

1    A.    Cleary Gottlieb, 3901.

2    Q.    Can you tell me just a little bit about what happened on

3    that Friday?

4    A.    So, we opened up the auction, declared the leading bid,

5    gave the various parties time to respond, to prepare their bid.

6    There were a subsequent set of rounds that occurred that day,

7    back and forth in terms of bids.  Late in the day we ended up

8    sitting down to take stock of where we were and work with, at

9    Ciena's request, overnight to help put together an

10   understanding in terms of a consideration that they thought was

11   important in terms of a new security moving away from the

12   equity based consideration they had in their earlier bids to

13   the convertible debt instrument that ultimately came on the

14   table Saturday evening.

15   Q.    So during the course of the day on Friday, conversations

16   with Ciena moved away from stock as part of the consideration

17   toward convertible debt?

18   A.    It wasn't until late in the day that that actually

19   happened.  There was a lot of discussion on the first round or

20   two in terms of their bid and then counterbids and the like.

21   But it wasn't until late in the day that that became a topic of

22   discussion.

23   Q.    When MEN Acquisition put in the bid that became the

24   starting bid, had you had conversations prior to the submission

25   of that bid with anyone from OEP or NSN?

1   A.   I'm sorry; could you repeat that again?

2   Q.   Prior to the submission of the bid that became the

3   starting bid, the 548 million --

4   A.   Right.

5   Q.   -- had you had conversations about that bid with NSN and

6   OEP?

7   A.   Yes, we did.  There were a number of conversations.  We

8   were looking for a range of things, clarity or clarifications

9   on different things, equity commitment letters, a better

10   understanding of where the funding was coming from, how they

11   were going to structure this, which ultimately was going to be

12   a carve out of the NSN optical business from the parent and

13   ultimately contribute into this new co.

14   Q.   Okay.  So a couple things, you mentioned the equity

15   commitment letters, what's an equity commitment letter?

16   A.   We have two parties, effectively, providing a written

17   guarantee that yes I'm good for the money, is effectively what

18   they had.

19   Q.   Good for the money that this acquisition vehicle would

20   have to pay?

21   A.   Correct.

22   Q.   And so -- and then you talked about a contribution of a

23   carve out?

24   A.   Right.

25   Q.   Well, could you describe that a little bit for me?

1    A.    So NSN, like Nortel used to be, operates as a global

2    integrated company.  In order for this new capital to come in

3    what they, I think, got to was a model that says let us carve

4    out our optical business out of the parent company, contribute

5    it into this new co in kind and also add some cash to the mix

6    to help fund the acquisition.  You get synergies; you get an

7    ability to have a vehicle that ultimately could see a liquidity

8    event.  There's a range of attractive aspects of that.

9         There are also are complications that come with that, you

10   have to deal with how do I transfer the intellectual property,

11   who gets to consolidate the revenues, a range of things around

12   that.

13   Q.    So earlier you were talking about carving out the Nortel

14   MEN business and then you mentioned NSN having to carve out

15   their optical business.

16   A.    Correct.

17   Q.    Is the term carve out roughly synonymous in both of those?

18   A.    It is.  It is.

19   Q.    So that's not necessarily an easy exercise --

20   A.    Not at all.

21   Q.    -- on NSN's part, is that fair?

22   A.    No.

23   Q.    So -- okay, back to the auction.  Were you there the

24   entire auction?

25   A.    I was.

1   Q.   And that was the same way that you had been there

2   throughout the CDMA and Enterprise auction, is that right?

3   A.   Correct.

4   Q.   Do you think the auction was run in roughly the same way?

5   A.   I do.

6   Q.   During the course of that Friday, were you -- did you have

7   conversations and meetings with representatives of OEP?

8   A.   Yes, I did.

9   Q.   And NSN?

10  A.   I did.

11  Q.   And Ciena?

12  A.   Correct.

13  Q.   And during the course of those meetings and negotiations,

14  were all of them conducted on an arm's length basis?

15  A.   They were.

16  Q.   Do you believe, at any point in time, that there was any

17  favoritism shown to any of the parties?

18  A.   I do not.

19  Q.   Would you characterize the discussions and negotiations as

20  arms length and vigorous?

21  A.   Vigorous and robust at times.

22  Q.   Were there any -- were any of these people represented by

23  anyone in those meetings?

24  A.   Yes, there were.  There were advisors from all the

25  parties, whether it was financial advisors, investment banks or

1    legal advisors.

2    Q.    So it's fair to say everyone was lawyered up, as they say?

3    A.    They were lawyered up.

4    Q.    So let's go through that.  So this is Friday, right?

5    A.    Okay.

6    Q.    So you mentioned that there was conversations moving from

7    stock to convertible debt, what -- why was that?

8    A.    There were -- one of the concerns or perspectives we had

9    about how much stock could we take was that we didn't need or

10    want to have a shareholder vote with Ciena, i.e., for them to

11    have to go to their shareholder to get public approval.

12    There's a limitation as to how much stock you could use and not

13    exceed that threshold, which we had transparently communicated

14    to them and they understood.

15        As and when the bid increments got higher, they came to us

16    and said look we're at a point where we would like to explore

17    putting something else different on the table, besides that

18    stock, in order to give us more head room to bid.  And they

19    said can we spend some time with you and your advisors

20    constructing that something else, which became this convertible

21    debt instrument.

22    Q.    Uh-huh.  So was it Nortel's idea to get convertible debt?

23    A.    It was not.

24    Q.    Was it your idea?

25    A.    Nope.

1  Q.   Are you an expert in convertible debt?

2  A.   Not at all.

3  Q.   In connection with those conversations on creating this

4  vehicle, were you involved in those negotiations?

5  A.   We relied heavily on our financial advisors for the

6  company, that is Lazard, and the financial advice that the

7  creditors also had from their financial advisors.

8  Q.   So when you say the financial advisors to the creditors,

9  would that be Jeffries for the --

10  A.   Jeffries for the unsecured creditor committee, FTI for the

11  bondholders, in particular.

12  Q.   Were there also financial advisors for the U.K.

13  administrators?

14  A.   There were.

15  Q.   And was the monitor present?

16  A.   He was.

17  Q.   Would you say that all of those constituents were

18  participating in these conversations?

19  A.   Actively.

20  Q.   But you were not leading those conversations?

21  A.   I was not.

22  Q.   And did there come a time when convertible debt was put on

23  as a proposal from --

24  A.   It was, yes.

25  Q.   And during the course -- once the convertible debt was put

1    on, was it Nortel's view that that convertible debt should be

2    valued in a particular way?

3    A.    It was.

4    Q.    And how was that?

5    A.    We ultimately had looked at a range of different analysis

6    conducted by our advisors and came to view that that

7    instrument, given the various features of that instrument,

8    should be valued at or near par.

9    Q.    And was that point of view conveyed to the bidders?

10    A.    It was.

11    Q.    Did you convey that specifically to OEP and NSN?

12    A.    I didn't personally but our advisors did.

13    Q.    Uh-huh.  And are you an expert in convertible debt to be

14    able to determine --

15    A.    I am not.

16    Q.    -- how to value it?

17    A.    I am not.

18    Q.    Was there a point in time during this auction where you

19    became aware that MEN Acquisition was not happy the convertible

20    debt was being put on the table?

21    A.    There was.  It wasn't so much the putting it on the table,

22    it was a difference of view about how to value it and what the

23    appropriate discount was.  That became reasonably well known

24    starting late Saturday but in earnest on Sunday.

25    Q.    And do you -- was it your understanding that opportunities

1    were given to MEN acquisition and OEP and NSN to have

2    conversations about that issue with the various advisors?

3    A.   They did.  They had a lot of conversations with our varied

4    advisors.  They had asked me to orchestrate a meeting with the

5    creditors' committee as well, to have them be able to explain

6    their point of view on this, which we did.

7    Q.   So you did help arrange that meeting?

8    A.   We did.

9    Q.   Did you participate in that meeting?

10   A.   I did not.

11   Q.   Do you know how many rounds of bidding took place?

12   A.   Eleven.

13   Q.   And was there any point in time in which the MEN

14   Acquisition wasn't bidding cash?

15   A.   Not to my knowledge.

16   Q.   Now, were you present at the end of the auction?

17   A.   I was.

18   Q.   Were you present when there was a proposal put on the

19   table by Ciena that had a fuse, a time on it?

20   A.   Correct.

21   Q.   And can you tell me a little bit about that?

22   A.   It was Sunday afternoon, let's see, it would have been

23   around 9, I think it was.  They basically put in a bid and said

24   you have two hours on this bid and then it expires.

25   Q.   And that was -- Ciena said that?

172

1   A.    That was Ciena, yes.

2   Q.    And do you recall if after that bid was put on the table

3   did MEN Acquisition put a bid on the table?

4   A.    They did put a bid on the table and their first bid they

5   responded in that timeframe and the Ciena bid again.  And then

6   the third bid NSN gave a -- just before 9 o'clock they gave us

7   a bid which expired in roughly twelve minutes.

8   Q.    Were you --

9   A.    We ultimately were able to convince them we needed another

10  half hour of time to review.

11  Q.    And were you involved in the conversations about whether

12  or not to accept that bid?

13  A.    I was.

14  Q.    And was the bid that had the twelve minute fuse on it

15  actually accepted as a leading bid?

16  A.    It was in the context of we had one more bid from Ciena

17  later.  They had originally given us a two hour fuse, then MEN

18  Acquisition gave us a twelve minute fuse and in the context

19  Ciena had an hour long bid -- fuse after that.

20  Q.    Do you know why there were these fuses put on these bids?

21  A.    I think there was a couple of concerns.  One was it had

22  been a long weekend already, folks wanted to see closure.  Two,

23  that the market was opening the next morning.  There had been a

24  leak, throughout the weekend, on information.  There was

25  concern about the impact on the security of Ciena in particular

173

1    and how that would affect things.  I think it was also a sense

2    of we had -- there were no more contractual issues we were

3    debating.  It was generally down to financial consideration.

4    Q.   Were you present at the auction room at the end when the

5    final bid of 530 cash and 239 of notes was put on the table as

6    the leading bid?

7    A.   I was.

8    Q.   And what did the folks from MEN acquisition say?

9    A.   They basically said we are not prepared to bid further.

10   Q.   Now, did you feel that there was any equivocation in that

11   statement?

12   A.   Not at all.  Michael Matthews came up to me and said good

13   luck and then said the same thing to Philippe and others and

14   then they departed.

15   Q.   So did anyone from either NSN or OEP indicate to you that

16   evening, after that final bid, that they were still interested

17   in bidding?

18   A.   Not to my knowledge, no.

19   Q.   So -- okay, so we're at the end of the auction.  Did you

20   become aware of a press release being issued by NSN?

21   A.   I did.

22        MR. BROMLEY:  If I may approach the witness, Your

23   Honor?

24        THE COURT:  Yes.

25        MR. BROMLEY:  This is in debtors tab 11.

174

1    Q.    Mr. Riedel, is that document familiar to you?

2    A.    It is.

3    Q.    And did you -- did you see this document on or about

4    November 23rd?

5    A.    I did, on Reuters.

6    Q.    On Reuters.  And did you see this in connection with your

7    responsibilities as the chief strategy officer of Nortel?

8    A.    I did.

9         MR. BROMLEY:  I'll read it into the record, if you

10   will permit me to, Your Honor.

11        THE COURT:  Yes, you may Mr. Bromley.  Certainly.

12        MR. BROMLEY:  "Nokia Siemens Network's statement on

13   Nortel auction outcome.  Nokia Siemens Networks confirms that

14   with its financial partner it did not submit the highest bid

15   for Nortel's optical networking and carrier Ethernet assets in

16   the bankruptcy court sanctioned auction that began on Friday

17   morning and extended through the weekend.

18        "Nokia Siemens Networks believes that its final offer

19   represented fair value for the assets and further bidding could

20   not be financially justified."

21   Q.    Do you recall seeing that?

22   A.    I do.

23   Q.    At any point in time did anyone from NSN or OEP contact

24   you to retract this statement?

25   A.    They did not.

175

1    Q.   And did you -- did you -- do you believe that this was an

2    actual press release from NSN?

3    A.   I did.  I had also received a subsequent e-mail from

4    Michael Matthews saying more or less the same, that they felt

5    like they had done their part for our shareholders and

6    creditors and they weren't going to bid any more.

7    Q.   So when did you first become aware of the fact that MEN

8    was interested in submitting another bid?

9    A.   Would have been -- there was an objection question that

10   came across right before Thanksgiving, where they were

11   concerned about things.  But in terms of actually seeing the

12   bid, it wasn't until early this week.

13   Q.   So did -- at the end of the auction was it your view that

14   there was consensus among the constituents --

15   A.   Absolutely.

16   Q.   -- that the bid that Ciena had put on the table was the

17   highest and best offer?

18   A.   We had a vigorous discussion on it.  We went around the

19   room, asked everybody is this the highest and best bid and the

20   answer was yes.

21   Q.   And you didn't hear any nay sayers?

22   A.   Correct.

23   Q.   And that would have been true from the official committee?

24   A.   The official committee, the ad hoc monitor, the U.K.

25   administrator.

176

1    Q.   Do you have any doubt that the Ciena bid was the highest

2    bid made at the auction?

3    A.   I do not.

4    Q.   Do you feel, based on your understanding and experience,

5    that the auction was conducted in a fair manner?

6    A.   I do.

7    Q.   Believe that there was any benefit that was given to Ciena

8    throughout the auction?

9    A.   I'm sorry; any benefit?

10   Q.   Any particular additional benefit?

11   A.   No.

12   Q.   There was no special treatment of Ciena?

13   A.   No, I think they were treated equally and fairly as the

14   NSN OEP folks.

15   Q.   And are you aware whether anyone at Ciena or Ciena itself

16   is an insider of Nortel?

17   A.   I'm not aware of anyone there.

18   Q.   Now in connection with the asset purchase agreement or the

19   asset sale agreement, there are a number of schedules and

20   exhibits that have been filed under seal, do you know why we've

21   asked to have them filed under seal?

22   A.   Generally speaking there's a number of themes, it's either

23   very sensitive, competitive information, pricing, terms, facts

24   that would be difficult for the broader community -- difficult

25   for the business if the broader community were to learn of

177

1   those and therefore put the business at harm.

2   Q.   And do you think it's appropriate that that information be

3   kept confidential?

4   A.   I do.

5   Q.   And do you believe it's commercially sensitive

6   information?

7   A.   Very sensitive.

8   Q.   Are you familiar with the terms and conditions of the

9   amended and restate asset sale agreement?

10  A.   I am.

11  Q.   And do you believe that they -- the terms of that

12  agreement were negotiated on an arms length basis?

13  A.   Absolutely.

14  Q.   Do you believe there was any evidence of which you were

15  aware, that the sale price was controlled by an agreement among

16  potential bidders at the auction?

17  A.   No.

18  Q.   Do you believe that it's in the best interest of Nortel,

19  Nortel U.S., Nortel Canada, Nortel U.K. to approve and

20  consummate this asset sale agreement?

21  A.   I do.

22  Q.   Certain questions have been raised today about reopening

23  the auction process.  I'd like to focus you a bit on your

24  experience to date.  Has it been your experience that having

25  bidding procedures and a stalking horse have been helpful in

178

1    attaining the highest and best value for the assets?

2    A.    Absolutely.  We have evidence both in several of the

3    transactions where that has been the case and one where we have

4    not been able to put a stalking horse together, the DSM

5    business we ended up doing what was called a naked auction

6    where, for competitive and other reasons, we weren't able to

7    get a stalking horse.  And the ability for the estates to get

8    term concessions, to get value out of the asset, I

9    fundamentally believe is hampered as a result.

10    Q.    Do you think having this auction process upset would make

11    it more difficult in the future to obtain stalking horse deals?

12    A.    I think without a doubt.  I think credibility,

13    transparency, integrity are the hallmarks of what we've tried

14    to do in this process.  And while folks sometimes complain

15    about the length of the journey, I think they can say they've

16    been fairly treated.

17        We have three other businesses still to sell, with a total

18    revenue of more than a billion dollars in current '09 revenue

19    run rate.  We have 3,900 patents to figure out how to monetize

20    as well.  We have a lot of work still to do in terms of

21    remaining transactions.  And for both the company's

22    credibility, for my own credibility in having an integral

23    process that is beyond reproach is key to getting the right

24    value, the right terms and the right outcome for that process.

25    Q.    But you do want to get the highest price possible for the

179

1    assets, right?

2    A.    Absolutely.

3    Q.    And do you believe that sticking to a process is the way

4    to get the highest and best value, generally speaking?

5    A.    I do.  And I'd only add to that the best net price.

6    Because as we've seen in this journey, it's not just the

7    headline it's the net after deducts and other risk factors that

8    we have to consider.

9    Q.    So with respect to this particular business, right now

10   there's a transaction with Ciena.  It's fully documented and

11   signed, is that correct?

12   A.    It is.

13   Q.    So you have a -- do you have a closing date in mind?

14   A.    We do.  Targeted closing date for the transaction is first

15   week of February 2010.

16   Q.    And as you sit here today, do you think that date is

17   achievable?

18   A.    I do.  We've demonstrated with CDMA, we had a target date

19   for when we expected to close that.  We hit that within a week.

20   We're hitting a targeted enterprise close date in a similar

21   fashion.  There's a lot of work to do, but I believe we can get

22   to the first week of February close.

23   Q.    And have there been regulatory approvals that have been

24   sought?

25   A.    In the U.S. Ciena has received regulatory or anti-trust

1    accruals.  I believe it's still pending in Canada.

2    Q.   Is this business on a cash basis right now making money?

3    A.   In the aggregate, the business is a break even.  But I

4    think you have to look at the different estates to answer that

5    question.  In Canada this business loses about fifteen million

6    dollars a month, in the fourth quarter of this year.  We expect

7    it to lose about ten million dollars a month in the first

8    quarter of next year.

9         In the U.S. we actually do generate positive cash.  The

10   disparity is easily explained by the fact that Canada has a

11   large cost base, a lot of R&D, a lot of people but a relatively

12   modest revenue base.  And so they bear the burden for the

13   global business of roughly 1,000 engineers and therefore it's a

14   very costly business to continue to operate for Canada.

15   Q.   So when you say loses money, do you mean cash loss?

16   A.   Cash.  Correct.

17   Q.   So cash goes down by ten million dollars a month?

18   A.   Correct.

19   Q.   In the first quarter, per month?

20   A.   That's correct.

21   Q.   If this transaction shifted from a Ciena transaction to an

22   MEN transaction and it shifted right now, would -- do you think

23   that the MEN Acquisition transaction would close on February 1?

24   A.   I do not.

25   Q.   When do you think it would close?

181

1    A.    I think -- it takes a couple of things.  You've got to get

2    regulatory approval for that.  You've got to get the financials

3    in order.  There's a series of TSA discussions that have to

4    take place.  I think you're talking roughly another thirty-five

5    to sixty days post the first week of February.

6         So in the contract that they -- Ciena wrote with us, we

7    have an April 30, 2010 termination date.  I think we could

8    close by then but it would probably be mid to late April before

9    we close.

10   Q.    So you mean by then with MEN?

11   A.    With MEN, correct.

12   Q.    So --

13   A.    So roughly a month and a half to two months later.

14   Q.    And that, at least, in Canada would amount to an

15   additional cash burn of twenty-five --

16   A.    Twenty, twenty-five million dollars.

17   Q.    -- million dollars?

18   A.    Correct.

19   Q.    And is that assuming that the carve out of the optical

20   business at NSN goes smoothly and takes place on time?

21   A.    The way the contract is written it's not conditioned on

22   them having the carve out done in that time.  I think that's a

23   subsequent event that would occur.

24   Q.    Uh-huh.  What is your view about the potential impact on

25   the business of shifting gears?

1   A.   Let's talk about three things; revenue for major

2   customers, retention for people and then cash.  It's a very

3   fragile business that's been out on the market for sale for

4   over a year.  Go back to September of '08; we've been trying to

5   sell this business for quite some time.

6        Orders and revenue softened in Q3; there was a lot of

7   anticipation on when would we get a stalking horse announced.

8   They have been improved since the announcement of the Ciena

9   stalking horse, orders have picked up.

10        Our concern would be, if we went into an extended period

11  of limbo, that revenue softness or that order softness would

12  return.  That's particularly important for some of our large

13  customers.  AT&T, I mentioned, is our largest North American

14  customer.  They have, in subsequent conversation post the

15  stalking horse, acknowledged they're very comfortable with the

16  Ciena combination.  I think they've also raised concerns about

17  the other party, if they were to win, being a, in part, private

18  equity funded player and what would that mean for the long-term

19  viability or trajectory of the company.

20        So while I don't think that's a fatal flaw, I think it's

21  just another hurdle we'd have to get over in terms of getting

22  them comfortable around that contract.

23  Q.   But look, it's December 2nd.

24  A.   Right.

25  Q.   Ten or eleven days, is there a difference as to -- you

1    were willing to take a proposal from them on that Sunday night.

2    A.   Sure.

3    Q.   And is there anything that's happened in the ten or eleven

4    days since then?

5    A.   So there's roughly a hundred people in Baltimore, Maryland

6    today working on six or seven different work streams on

7    integration.  There are a handful of employee communications

8    that have already gone out.  Remember, people have been

9    thinking where's my safe home, where's my job.  They're

10   starting to begin to anticipate when do I get employment

11   offers, etcetera, etcetera.  So you've got a lot of energy

12   already invested on producing a closeable transaction on the

13   early part of February 2010.

14        Obviously as a stalking horse, that's part of the benefit.

15   You know, anybody who would step into this role would have a

16   time lag relative to closing.  But I think yeah, you've got a

17   lot of integration work, a lot of good customer feedback and a

18   lot of employees starting to get comfortable with this notion.

19   Q.   Now stepping back a bit, when you're talking with other

20   potential bidders about transactions, do they look back at the

21   other precedents?

22   A.   They don't look back; a lot of them sit in these auctions.

23   If you go back to the CDMA auction, if you go back to the MEN

24   auction, in most cases it was subsequent bidders who were going

25   to be involved in other auctions who were there.  So they're

184

1    very attuned to the process, the contracts, the public aspect

2    of this.

3    Q.    Is it fair to say that what is done in one deal is

4    revisited in the next one?

5    A.    Very much so.

6    Q.    There are a number of ancillary agreements, do you know

7    that term?

8    A.    I do.

9    Q.    And the forms of those agreements have not been filed with

10   the documents filed with the Court, do you know why?

11   A.    Well, there's a number of things in them.  The ancillary

12   agreements tend to deal with things like intellectual property,

13   transition services, contract manufacturing terms.  Again, some

14   of them have sensitive competitive information and sensitive

15   commercial information that both for the benefit of the buyer

16   and the company are probably not prudent to have widely shared.

17   Q.    Uh-huh.  But is that information in the form of those

18   agreements available to the committee and to the bondholders

19   and to the administrator?

20   A.    It is.

21   Q.    But from a commercially sensitive standpoint, you believe

22   it shouldn't be filed with the Court?

23   A.    Correct.

24   Q.    So you would support filing those under seal, is that

25   fair?

185

1    A.    Yes, I would.

2    Q.    You're aware, by this time, of the concept of assuming and

3    assigning contracts?

4    A.    I am.

5    Q.    Are you aware that there's certain contracts relating to

6    U.S. contracts relating to this business that would have to be

7    assumed and assigned?

8    A.    I do.

9    Q.    Now, the -- there are certain procedures that have been

10   put in place as part of this transaction about notifying those

11   counterparties, customers and suppliers and the information

12   about who they are has been filed under seal as well.  Are you

13   -- do you believe that that's necessary from a commercial

14   sensitivity standpoint?

15   A.    I do.

16   Q.    And why is that?

17   A.    Again, you've got terms, you've got pricing information.

18   You've got a range of things that if broadly disseminated would

19   be injurious to the business.

20   Q.    But is it your understanding that counterparties to these

21   agreements will get information necessary for them to

22   understand what's happening to their particular contract?

23   A.    Correct.  Correct.

24   Q.    And are you aware if this process has been used in other

25   transactions?

1    A.    It has been.

2    Q.    So Mr. Riedel, before you started in 2009 with Nortel and

3    this process, had you been involved in bankruptcy auctions?

4    A.    I had not.

5    Q.    And in terms of the process that you've seen that has

6    taken place over the course of the year on these multiple

7    transactions, do you believe that they generate the highest and

8    best offer for the various constituents here?

9    A.    I do.  I think if you look at the half a dozen or so

10   transactions we've gone through this year and look at the

11   outcome, both in terms of value, improved terms for the

12   estates, they've been very effective.

13          MR. BROMLEY:  Your Honor, at this point I think we

14   would rest with respect to Mr. Riedel.  We of course reserve

15   our right on redirect.  And offer him up for cross-examination.

16          THE COURT:  All right.  Thank you, Mr. Bromley.  Mr.

17   Hodara?

18          MR. HODARA:  Thank you, Your Honor.  I just have a

19   very brief cross examination.

20          JUSTICE MORAWETZ:  Mr. Hodara, if I may just interrupt

21   you for a second.  There are some parties here who may benefit

22   from a five to ten minute comfort break.

23          MR. HODARA:  Yes, understood.  Although I have what's

24   probably just one or two questions so we can be done with it.

25   Or, obviously, if you think better we can break now.

187

1          JUSTICE MORAWETZ:  Is that a promise?

2          THE COURT:  Do you want to hold yourself to that, Mr.

3   Hodara.

4          MR. HODARA:  Okay.  Okay, it's a promise.

5          THE COURT:  All right.

6          JUSTICE MORAWETZ:  Carry on, please.

7          MS. FELDSHER:  Your Honor, I will also have a couple

8   of brief questions.  So I don't know how you want to --

9          THE COURT:  Why don't we hear from Mr. Hodara and his

10   questions first and then we'll take a recess.

11          MS. FELDSHER:  Okay.

12   CROSS EXAMINATION

13   BY MR. HODARA:

14   **Q.   Mr. Riedel, just one area and perhaps just one question.**

15   **At the auction was any discount placed on any bid by MEN**

16   **Acquisition due to risk of closing, time to close, ability to**

17   **get regulatory approvals, customer confidence in the new joint**

18   **venture or any other such factor?**

19   **A.   No.**

20   **Q.   Thank you.**

21          THE COURT:  All right.

22          MR. HODARA:  I was good to my promise.

23          THE COURT:  You certainly were, even better.  All

24   right.  Shall we take that recess, Justice Morawetz?

25          JUSTICE MORAWETZ:  Certainly, would you like five or

188

1   ten minutes?

2         THE COURT:  Well, given the number of people I would

3   say ten minutes.

4         JUSTICE MORAWETZ:  Okay.  Thank you.

5         THE COURT:  All right.  Ten minutes.  Thank you.

6         (Recess from 4:56 p.m. until 5:10 p.m.)

7         THE CLERK:  Please rise.

8         THE COURT:  Please be seated, everyone.  Thank you.

9         Your may proceed, Ms. Feldsher.

10        MS. FELDSHER:  Thank you, Your Honor.

11        THE COURT:  I know people will be straggling in a

12  little bit.  But that's okay.  We have Mr. Bromley here.

13        MS. FELDSHER:  Boy am I excited now.

14        MR. BROMLEY:  I'm going to listen real carefully.

15        MS. FELDSHER:  I apologize, Your Honor.

16        THE COURT:  It's quite all right.  It's been a long

17  day.

18  CROSS-EXAMINATION

19  BY MS. FELDSHER:

20  Q.   Mr. Reidl, we're familiar, but I'll reintroduce myself to

21  you.

22  A.   Good to see you.

23  Q.   I'm Jennifer Feldsher from Bracewell & Giuliani, and I

24  represent MatlinPatterson, which is one of Nortel's significant

25  creditors.

1    A.    Correct.

2    Q.    I just had a couple of questions regarding your testimony.

3    Mr. Reidl, you testified that there are only several

4    dispositions left to be done by the Nortel estate.  Is that

5    correct?

6    A.    That's correct.

7    Q.    And I believe that you said that there were three more

8    sales that you anticipate of business units of Nortel.  Is that

9    correct?

10   A.    That's correct.

11   Q.    And can you tell me in terms of size of those business

12   units as compared to what's already been sold, is it fair to

13   say that what remains is a fraction of the assets that have

14   already been sold by the Nortel estates?

15   A.    That's a fair statement.

16   Q.    So these will be a couple of smaller sales of smaller

17   divisions?

18   A.    Well, you've got -- one is about three quarters of a

19   billion in revenue.  One's about 200 million in revenue.  And

20   the other is a joint venture interest, which is a sizeable

21   revenue.  So I wouldn't characterize them as small.

22   Q.    But just by way of comparison, what was the revenue of the

23   units that you've already sold?

24   A.    The MEN business was a billion-one.  The enterprise

25   business was two billion and change.  The CMA business was two

1   billion and change.

2   Q.   So let's say, out of five or six billion that you've

3   already sold, this is another billion to two billion?

4   A.   Correct.

5   Q.   Probably about a billion, I think you said.  So, in

6   speaking about the auction at hand, you testified that it was

7   Nortel's view -- your view at the time, as a representative of

8   Nortel -- that the Ciena notes should be valued at or near par?

9   A.   Correct.

10  Q.   Is that correct?  Are you aware that the Ciena notes have

11  what we call the put option?

12  A.   I've heard that a few times, yes.

13  Q.   Do you know what that means?

14  A.   I do.

15  Q.   Could you describe it -- I'm not trying to be obtuse here,

16  but it's easier for me to listen to the answers I want if you

17  tell me what you think the put option means?

18  A.   Well, first let me acknowledge, I'm not the convertible

19  bond expert here.  But basically, it's a right of one party to

20  put the instrument to the other party at some point in time, at

21  a certain price.

22  Q.   How will that -- how will it work specifically in the

23  Ciena example?  Are you aware?

24  A.   I would yield to our financial advisors who are much

25  closer to the details on how the mechanics of that would

1    actually work.

2    Q.    I too am not a convertible bond expert, I will concede

3    right off the bat.

4    A.    Okay.

5    Q.    But let me try to summarize it, and then you tell me if

6    you agree or if that sounds vaguely like what you've heard.

7           MR. BACON:    Excuse me.

8           THE COURT:    Mr. Bacon?

9           MR. BACON:    Your Honor, Doug Bacon for Ciena.    I

10   object to getting into the testimony about the specifics of the

11   bond with a witness who says he's not familiar with the

12   specifics of the bond.    As we do things in this courtroom, last

13   time I rose I said they show right up on the wire service.

14   That happened.    Within thirty minutes of my statements they

15   were on the wires.    And this is really counsel's statements

16   about an instrument.    There'll be evidence about this if the

17   Court deems it appropriate, but this isn't the guy to elicit it

18   from, and I don't think it's fair for counsel to fill the

19   record with that stuff.

20          THE COURT:    Ms. Feldsher?

21          MS. FELDSHER:    You Honor, Mr. Reidl testified that it

22   was Nortel's view, not just the view of his financial advisors,

23   but Nortel's view that the instrument should be -- was valued

24   and should have been valued at or near par.    He put that

25   testimony into evidence, Your Honor.    I'm just questioning him

192

1    about when he was considering and when Nortel came up with that

2    view, what they thought of the put option, which I think is a

3    material component of the notes.  I haven't heard anybody tell

4    me to the contrary.

5              THE COURT:  It's --

6              MR. BACON:  If he were the only witness on the -- in

7    the courtroom that's going to testify today, I'd say give her

8    the latitude, Your Honor.  But I think he's not.  And it's

9    appropriate -- it's inappropriate for the counsel who says

10   she's not an expert to be asking the guy who says he's the not

11   the one most familiar with it.  It's just -- this kind of thing

12   has market implications, ironically, that deal with the very

13   instrument that we're talking about.

14             THE COURT:  Well, I --

15             MR. BACON:  So that's all I --

16             THE COURT:  -- I assume it wasn't Mr. Reidl who

17   determined that it should be valued at or under par, that you

18   were relying upon --

19             THE WITNESS:  That's correct, Judge Gross.

20             THE COURT:  -- others?

21             THE WITNESS:  We relied heavily on the financial

22   advisors from Lazard and also the financial advisors who

23   supported the creditors' committee and the ad hoc bondholders.

24             MS. FELDSHER:  Your Honor, but the estate here has to

25   have a view on the value that they're delivering to creditors.

1    Otherwise, I'm not really sure what we're doing here.  I mean,

2    the estate -- Mr. Reidl's testifying that he got the highest

3    and best offer.  How can he know if he doesn't know the

4    consideration that he got.

5         THE COURT:  By relying upon his experts, which is

6    certainly appropriate under Delaware law and under bankruptcy

7    law, and any other law that I'm aware of.

8         I'm going to sustain the objection.

9         MS. FELDSHER:  Okay.

10   BY MS. FELDSHER:

11   **Q.   Mr. Reidl, you testified that there were no more**

12   **contractual issues with the bid -- I apologize, the OEP NSN**

13   **bid, by the time they got to the last round of bidding.  Is**

14   **that correct?**

15   **A.   That's correct.**

16   **Q.   So is it fair to say that if the judge were -- the judges**

17   **were to reopen or continue the auction and permit OEP and NSN**

18   **to bid their 810 million dollars, what we're talking about is**

19   **just changing the cash consideration portion of their bid?**

20   **A.   In terms of the contract?**

21   **Q.   Yes.**

22   **A.   Yeah, I think that's fair.**

23   **Q.   So that contract could be signed today?**

24   **A.   It could.**

25   **Q.   If the auctions were reopened.  Now, Mr. Reidl, you**

194

1    testified regarding potential delay of anywhere from thirty to

2    sixty days if OEP and NSN become the successful bidder through

3    a continuation of the auction or reopening of the auction.  Is

4    that correct?

5    A.    Correct.

6    Q.    And you said that overall, though, this business, in the

7    aggregate, is cash neutral?

8    A.    Correct.

9    Q.    So if we were to assume that the OEP NSN bid is twenty

10   million dollars more on its face and potentially more by

11   derisking the security, that deal would be a significantly

12   better deal for creditors.  Is that correct?

13   A.    Well, I think we also said a couple things about the cash

14   that would ultimately flow to those creditors.  If it takes

15   thirty to sixty days more to close, given where we start the

16   process, you will burn more cash in certain estates, Canada in

17   particular.  You also have other downstream risk that we in

18   effect have to concern ourselves about selling the other

19   businesses.  You've also got the combination of regulatory

20   approvals required and uncertainty of closing all the other Ts

21   and Cs on TSA.  There's a lot of work still to bring that to

22   fruition.

23   Q.    Right.  As there is with the current successor --

24   A.    Correct.

25   Q.    -- that there are still outstanding issues.  And with

1    respect to the Canadian estates, again, you testified that

2    total time, assuming this transaction closed in April, they

3    might lose twenty to twenty-five million dollars, which is

4    coincidentally, the same value, at least in the headline price,

5    that's being offered by OEP and NSN?

6    A.   Correct.

7    Q.   So -- and then you testified, as you just did, about other

8    bidders and other auctions and your concern about other

9    bidders.  But you also testified that you're starting to see

10   the same bidders in every auction.  Isn't that correct?

11   A.   Actually, it varies widely.  You know, the Enterprise

12   auction bidders were not the same bidders.  The LG joint

13   venture, which we have to sell in front of us, there's one

14   common bidder, but the other two are not.  It varies, I guess,

15   is the short answer.

16   Q.   I understand.  But you testified, I believe, maybe I got

17   your quote wrong, but I think you testified that even in the

18   auctions, you have some of the same bidders who are sitting in

19   on these auctions?

20   A.   What I said was you have bidders who are sitting in for

21   subsequent auctions who want to observe the process.  It may

22   not be the same bidders.

23   Q.   Correct.  And in this auction there were just two bidders?

24   A.   Correct.

25   Q.   And one of the two bidders has expressed extreme

196

1    displeasure over the process.  Isn't that correct?

2    A.    That's correct.

3    Q.    And that bidder could be involved in the subsequent

4    auctions, correct?

5    A.    In fact they very well are involved in subsequent

6    auctions.

7    Q.    Okay.  So --

8    A.    Or at least one part of that bidder.  I'm sorry, let me be

9    very explicit.

10   Q.    Correct.  That's a fair statement, and I just don't want

11   that to go unmissed.  So it's fair to say that were that part

12   disgruntled at this auction, they could very well choose not to

13   bid at subsequent auctions, causing this estate even more

14   damage than the --

15   A.    That's possible.

16   Q.    Thank you, Mr. Reidl.

17            THE COURT:  Thank you, Ms. Feldsher.

18            MS. FELDSHER:  Thank you, Your Honor.

19            THE COURT:  Mr. Galardi, I guess --

20            MR. GALARDI:  I guess --

21            THE COURT:  -- your rising means we have to address

22   the standing issue at this point?

23            MR. GALARDI:  Your Honor, I think that's true.  Again,

24   many of my questions may actually go to the fairness of the

25   process.  So you may want to decide the standing issue after

1   you hear some of my questions.  Or you can say, I have no right

2   to ask questions in the first instance.  I defer to you.

3          THE COURT:  Well, it is my view -- and I'm always

4   delighted to see you in the courtroom.

5          MR. GALARDI:  I know you are, Your Honor.

6          THE COURT:  But I think on this occasion, I'll have to

7   see you as a spectator, because it's my ruling that MEN

8   Acquisition does not have standing in this case.  It is an

9   unhappy bidder, which the case has made clear.  It does not

10  provide standing.  As far as the argument that you made earlier

11  relating to being a backup bidder, your objection does not go

12  to your backup bid.  It's not an issue before me.  And I think

13  that under the circumstances, I'm going to find that MEN

14  Acquisition does not have standing for purposes of this

15  hearing.

16         MR. GALARDI:  And as I -- that's the warmest way I've

17  been told to leave before, Your Honor.  So I do appreciate

18  that.  Some people have been more callous.

19         I will ask for a couple quest --

20         THE COURT:  Yes.

21         MR. GALARDI:  Just for follow-up, Your Honor?

22         THE COURT:  Yes.

23         MR. GALARDI:  With your --

24         JUSTICE MORAWETZ:  Prior to your -- Mr. Galardi?

25         MR. GALARDI:  Yes.

1          JUSTICE MORAWETZ:  Just prior to your asking those

2    questions, I'd also like to make the following ruling from the

3    Ontario part, so that Mr. Bomhof has the same news.  That for

4    similar reasons just expressed by Judge Gross, in addition to

5    reliance on the SkyePharma and Hyal Pharmaceutical Corporation

6    case that has been submitted by Mr. Tay, standing is also being

7    denied in this court to MEN Acquisition.  I will be providing

8    further and more elaborate reasons on this in the due course.

9    Thank you.

10         MR. GALARDI:  Thank you, Your Honor -- or not thank

11   you for dismissing it, but I do appreciate your getting to the

12   issue.

13         Your Honor, a few things that I would just like.  One

14   that -- I would ask, then while I am still at the podium, one

15   that the sale order actually provide a specific finding by this

16   Court that we do not have standing.  Two, Your Honor, I would

17   ask Your Honor then, may we be removed as the backup bidder,

18   because that order clearly does have an implication for us.

19   And we would ask that we no longer be compelled under the

20   process to remain as the backup bidder in this process.

21         Three, Your Honor, and again, only because this is a

22   ruling, and I have not read the order, and I apologize since

23   this is one of those things that came upon me yesterday -- to

24   the extent that there is a ten-day waiver of the stay period, I

25   think the evidence in the record is such that this isn't going

1    to close till February 1st, and we would ask for no waiver of

2    any appeal stay -- automatic stay of the order so as my client

3    can in fact preserve its rights.

4         And I guess, Your Honor, I would ask then, for also a

5    finding by this Court that the auction was in fact closed and

6    the date on which Your Honor concludes that it was closed; to

7    make the ruling that I no longer have standing.  And Your

8    Honor, I guess, in that respect -- and I'm going to push my

9    luck, but you know me to do that anyway --

10        THE COURT:  Yes, of course.

11        MR. GALARDI:  -- so, and Judge Morawetz, I think you

12   probably know I'd push my luck anyway, so I will do it.

13        Your Honor, I would only ask -- and maybe there will

14   be evidence -- but my understanding from the testimony so far,

15   and I would just draw your attention so that we can have a

16   clear record for any actions that my client might want to take,

17   is that when -- we understand that certain documents have been

18   redacted.

19        THE COURT:  Yes.

20        MR. GALARDI:  I have not understood, nor I've heard,

21   for two in particular documents, one referenced in the asset

22   purchase agreement and one referenced in the actual

23   determination of the higher and better bid, one, whether the

24   indenture has been executed.  I think I have been told that

25   it's not been executed, so I think Your Honor may want to make

200

1    a finding -- but I'll leave it to you -- that it's not

2    material, therefore the auction could be closed.

3         And two, Your Honor, whether the transition services

4    agreement has been executed, which is specifically referenced

5    in the bid procedures order.  And if not executed, I would only

6    note that I think that that is a failure in the record, and

7    preserving again, my options with respect to whether this

8    auction has been closed.

9         THE COURT:  All right.  Thank you --

10        MR. GALARDI:  Thank you, Your Honor.

11        THE COURT:  -- all right, Mr. Galardi.  Let me hear

12   from debtors' counsel as to a number of the issues.  Let me say

13   this.  The stay waiver, I think that we can hear later.  I

14   think that's putting the cart before the horse.  As far as

15   removing MEN Acquisition as a backup bidder, I don't know what

16   the debtors' position is on that, and I would like to know it

17   before, obviously, I make a ruling.  The date that the auction

18   was closed, your views on that.  And the document questions

19   that Mr. Galardi has raised, namely the indenture, whether it's

20   been executed or not, as well as the transition services

21   agreement.

22        JUSTICE MORAWETZ:  I guess, before we get to that, I

23   think, Judge Gross, Mr. Bomhof has indicated he may wish to add

24   something.

25        THE COURT:  Yes.

201

1    MR. BOMHOF:  All I that I was going to say, Your

2    Honor, is we would obviously seek the same relief.  I do not

3    believe the stay waiver is an issue in the form of order as

4    I've seen it.  But other than the stay waiver, I will look for

5    the same findings if they are available --

6    THE COURT:  I didn't hear that at all, Justice

7    Morawetz, I'm sorry.

8    MR. BOMHOF:  -- a copy of the objection with an

9    affidavit, if you'd like it, just for the power, Your Honor.

10   JUSTICE MORAWETZ:  Thank you.  Over to you, Judge

11   Gross.

12   THE COURT:  Mr. Bromley.

13   MR. BROMLEY:  Your Honor, I was writing as fast as Mr.

14   Galardi was speaking.  But I'm afraid I don't have answers to

15   all of these questions.  So what I would ask is that we have an

16   opportunity to have somebody on our team check into a number of

17   these, and then we can, at another break, try to address your

18   questions.  I just --

19   THE COURT:  That's fair.

20   MR. BROMLEY:  -- don't have all of that information

21   with me, right now.

22   THE COURT:  All right.

23   MR. BROMLEY:  But we will get it immediately.

24   THE COURT:  Very well.

25   MR. BROMLEY:  I don't know if there's anyone else who

202

1    has standing that would like to cross examine.

2            THE COURT:  Mr. Bacon?

3            MR. BACON:  Judge, Doug Bacon, again, for Ciena.  I've

4    got a couple of questions.  I don't know whether they're cross

5    examination or -- we're sort of the monkey in the middle here,

6    but I don't think it matters with the nature of my questions.

7            THE COURT:  Very well.  You certainly may --

8            MR. BACON:  I don't think it will present --

9            THE COURT:  -- proceed.

10           MR. BACON:  -- an issue.

11           THE COURT:  Of course.

12   CROSS-EXAMINATION

13   BY MR. BACON:

14   Q.    I just wanted to clear up a couple of things that I think

15   weren't clear.  You made a couple of references to Michael

16   Matthews.  I think you testified that Michael Matthews e-mailed

17   you that something consistent with the press for the Monday

18   morning disgruntled bidder press release that there wasn't

19   going to be any more bidding.  And I wasn't sure who Michael

20   Matthews was, and I don't think the record reflects it.

21   A.    Michael Matthews is an executive at NSN who is effectively

22   my counterpart on the negotiations.  So he's a vice president

23   of business development and M&A, I think is his title.

24   Q.    Is Mr. Matthews in court today?

25   A.    He is not.

203

1    Q.   He's not?

2    A.   He is not.

3    Q.   And who was your counterpart at One Equity Partners?

4    A.   There were two principals we spoke with, David Walsh and

5    Jamie Koven.

6    Q.   Are they here today?

7    A.   They are.

8    Q.   And now I'm going to ask you the ultimate question that

9    Mr. Bromley didn't ask you, which is whether from your

10   perspective, just as a businessman, has my client, Ciena, dealt

11   with Nortel in good faith throughout the duration of this

12   process, in your opinion?

13   A.   They have.  They've been very straight up and down.

14   Q.   Thank you.

15        MR. BACON:  No further questions.

16        THE COURT:  Thank you, Mr. Bacon.

17        Anyone else?  All right --

18        MR. BROMLEY:  I just have --

19        THE COURT:  Oh, I'm sorry, Mr. Bromley.

20        MR. BROMLEY:  -- two or three -- I apologize.

21        THE COURT:  Of course, you're entitled.

22   REDIRECT EXAMINATION

23   BY MR. BROMLEY:

24   Q.   Just to go back to Ms. Feldsher's cross-exam.  When you

25   were discussing the remaining transactions --

204

1    A.    Correct.

2    Q.    -- I don't think you mentioned the sale of the

3    intellectual property assets?

4    A.    That's correct.  I spoke of three principal businesses.

5    There's roughly 3,900 patents that we are in the process of

6    developing a plan to figure out how to monetize.

7    Q.    And that monetization could include auctions in the

8    future.  Is that correct?

9    A.    It could very well include auctions, yes.

10   Q.    And the values there could be substantial.  Is that fair?

11   A.    Very substantial.

12   Q.    Okay, thank you.  And --

13            MR. BROMLEY:  I think that's it, Your Honor.

14            THE COURT:  All right.  Thank you, Mr. Bromley.

15            I think you may step down, sir.

16            THE WITNESS:  Thank you, Judge Gross.

17            THE COURT:  Thank you.

18            THE WITNESS:  Thank you Justice Morawetz.

19       (Pause)

20            THE COURT:  Ms. Schweitzer.

21            MS. SCHWEITZER:  Two very technical housekeeping

22   things.

23            THE COURT:  Yes.

24            MS. SCHWEITZER:  The first being Exhibit 4 that was

25   marked for the witness, which was the NSN press release --

1          THE COURT:  Right.

2          MS. SCHWEITZER:  -- was not offered into evidence, and

3     therefore not admitted into evidence.  So --

4          THE COURT:  I thought it was.  But to the extent it

5     wasn't, does anyone have any objection?  All right, it is

6     admitted now?

7          MS. SCHWEITZER:  Okay.

8          THE COURT:  Oh, Mr. Galardi?

9          MR. GALARDI:  Can the parties without standing ask for

10    an evidentiary basis for it?

11         THE COURT:  Yes.

12         MR. GALARDI:  Thank you.

13         THE COURT:  Through me, at least.

14         MS. SCHWEITZER:  Well, it's a matter -- it's available

15    in the newspapers.  It was released publicly, and it was being

16    offered for the witness having knowledge of the fact of the

17    statements being made by them.  And certainly here, if they're

18    objecting it's opponent's admission, so.

19         MR. BACON:  Your Honor, I'd like to be heard on that

20    too.  May I?

21         THE COURT:  Yes, let me hear from your first.

22         MR. BACON:  Doug Bacon for Ciena.

23         THE COURT:  Yes.

24         MR. BACON:  You know, we're all responding in real

25    time to an objection that was filed, I think, at 2 o'clock

1    yesterday.

2           THE COURT:  Yes.

3           MR. BACON:  The -- I represent -- one of the things

4    that the Court can do with hearsay testimony, to the extent

5    it's hearsay, and it's not necessarily being offered for the

6    truth of what it asserts, but you can let in testimony that's

7    reliable.  I'll represent to Your Honor, as an officer of the

8    Court, that we retrieved that press released from the Nortel

9    web site, presumably it's still on there.  I think that

10   authenticates it.

11          THE COURT:  From the Nortel web site or --

12          MR. BACON:  Oh, I'm sorry.  Excuse me.  Excuse me.

13   From the NSN web site.

14          THE COURT:  I assumed that, Mr. Bacon.  But yes, thank

15   you.

16          MR. GALARDI:  Your Honor, as usual, I'll make a

17   distinction.  One, we're not going to dispute that it was a

18   press release.  Two, I will object to it for the truth of the

19   matter asserted herein.  That this individual may have relied

20   on that, that's his own testimony.  As to the truth of the

21   matters asserted, I don't think there's a hearsay exception.

22   And since we're not a party and no standing, I don't think you

23   can admit it as to hearsay.

24          MR. BACON:  Judge, it's not offered --

25          MR. GALARDI:  You can --

1      MR. BACON:  -- for the truth.  In fact, it's not true.

2    The whole point is it wasn't true.

3      MR. GALARDI:  That's fine.  Your Honor, if it's simply

4    for the fact that a press release with these words were in it,

5    I have no objection.

6      THE COURT:  And that it was relied upon by the

7    witness.

8      MR. GALARDI:  Did he testify to that, Your Honor?

9      THE COURT:  Yes.

10      MR. GALARDI:  And I was not given the opportunity to

11   cross examine it.

12      THE COURT:  All right.  Well, I will admit the

13   document into evidence.

14   (NSN press release was hereby received into evidence as

15   Debtors' Exhibit 4, as of this date.)

16      MS. SCHWEITZER:  Thank you, Your Honor.  I have a

17   second easier housekeeping thing --

18      THE COURT:  Yes.

19      MS. SCHWEITZER:  -- which is that we actually do have

20   the Canadian cases --

21      THE COURT:  Oh, thank you.

22      MS. SCHWEITZER:  -- which I realize are chasing you.

23   But you probably, for sense of completeness want them.

24      THE COURT:  Thank you.

25      MS. SCHWEITZER:  May I approach?

208

1          MS. SCHWEITZER:  Please, please, Ms. Schweitzer.

2    Thank you.  Very well, thank you.  All right.

3          MS. SCHWEITZER:  So to continue with the theme of

4    anxious bidders and passage of time and all that, we do have

5    another witness --

6          THE COURT:  Yes.

7          MS. SCHWEITZER:  -- on behalf of the debtors.  We have

8    Mr. Murray from Lazard.

9          THE COURT:  All right.

10          MS. SCHWEITZER:  We also have very patient

11    counterparties to other motions pending who are asking for

12    guidance.  And we've informed them that the Courts in both

13    jurisdictions are trying to be as patient and stay as long as

14    possible.  But we wanted to ask both you and Mr. Justice

15    Morawetz for guidance if would you prefer for us to continue

16    with this or at some point, whether now or later, to take a

17    break.  We've a GSM sale motion that right now there are no

18    objections to, but we still have to lay a proffer -- at least a

19    proffer, testimony basis for that sale.

20          And then we have a couple -- we have the Flextronics

21    settlement motion, which again, we're not aware of any -- no

22    objections were filed in the U.S.  We're not aware of

23    objections in Canada.  But we would want to at least lay some

24    minimal foundation for that.  And then we have a couple other

25    U.S. motions which are also uncontested, but we can do those,

1   certainly, at the end.  We don't have people waiting for those.

2        THE COURT:  Well, let me just get a sense -- and then

3   I'll let Mr. Justice Morawetz speak -- how much longer do you

4   think we have on the MEN sale?  If you have a sense?

5        MS. SCHWEITZER:  Am I allowed to answer that with a

6   nonanswer?  I'd prefer to tell you how much time I think

7   everything else will take.

8        THE COURT:  Okay.

9        MS. SCHWEITZER:  I think everything else can be done

10  in a half hour, forty-five minutes.  On this, I think -- I

11  don't know.

12       THE COURT:  I'm just trying to -- and I'm --

13       MS. SCHWEITZER:  I think -- I guess we have one more

14  witness and another potential witness depending on what the

15  level -- what we need to show to you --

16       THE COURT:  Yes.

17       MS. SCHWEITZER:  -- and what people are asking for us

18  to show you, and how far we go.  I know there are other

19  potential witnesses in the courtroom.  I don't know if people

20  intend to offer them as rebuttal witnesses on valuation points,

21  even though valuation isn't being litigated.  But I -- things

22  are fluid.  And then I assume people want argument at the end

23  of that.

24       THE COURT:  I'm sure.

25       MS. SCHWEITZER:  So it would be optimistic to say

1    another hour.  But -- two hours?

2         THE COURT:  Let's say three hours, just to be on the

3    safe side.  And these other matters will take roughly another

4    hour.

5         MS. SCHWEITZER:  The way it call it is two hours

6    Cleary auction time.

7         THE COURT:  Yes.

8         UNIDENTIFIED SPEAKER:  We can't afford that.

9         THE COURT:  We don't serve the food that you do.

10        MS. SCHWEITZER:  Next time.  So I'm sorry, because I,

11   in all that, missed what your preference is.  And I assume

12   you'd want to consult.  But --

13        THE COURT:  Yes.  And I'd like to -- Mr. Hodara, do

14   you have a view you'd like to be heard?

15        MR. HODARA:  Your Honor, the committee has no

16   witnesses that it intends to proffer.

17        THE COURT:  Okay.  That's helpful.

18        Justice Morawetz, any thoughts at your end, sir?

19        JUSTICE MORAWETZ:  Well, I think at this stage, I

20   would hope this doesn't turn into a two sunrise hearing,

21   quoting Mr. McDonald.  But the good news is, with respect to

22   the remaining motions, the evidentiary record in the Ontario

23   court is complete.  So it would just be argument.  So that

24   should significantly reduce the amount of time.  And so

25   essentially, counsel here have no opinion as to whether you

211

1    wish to continue with this one or go to the other hearings.

2         THE COURT:  Well, we could certainly consider these

3    other matters, perhaps on a break, and allow other people who

4    are not particularly interested in them to adjourn and get some

5    dinner or whatever.  But I might also tell you that I do have

6    some time tomorrow.  I don't know how anxious you are to

7    complete those matters sooner than later or -- it's --

8         JUSTICE MORAWETZ:  The view from this Court is to try

9    to complete it today, Judge Gross.

10        THE COURT:  Okay.  That's fine.

11        MS. SCHWEITZER:  And I think also, as far as doing the

12   GSM hearing, which is a sale hearing --

13        THE COURT:  Yes.

14        MS. SCHWEITZER:  -- and the Flex, are both scheduled

15   for a joint hearing.  Like forty-five minutes, a half hour, if

16   you let me talk quickly.

17        THE COURT:  Would you like to do that right now, then?

18        MS. SCHWEITZER:  I'm --

19        THE COURT:  Is that your suggestion?

20        MS. SCHWEITZER:  -- I'm happy to do it now, I'm happy

21   to continue the witnesses or do it in the future.  I think

22   people are just asking for guidance --

23        THE COURT:  All right.

24        MS. SCHWEITZER:  -- so that they can --

25        THE COURT:  Well, why don't we take those -- Justice

212

1    Morawetz, shall we take those up right now?  The additional

2    matters?  Or is it your preference to continue with the issue

3    at hand?

4              JUSTICE MORAWETZ:  Well, judging by some of the

5    counsel in my courtroom, they are ecstatic at the possibility

6    of jumping the queue so they don't have to wait here all night.

7              THE COURT:  Yes.

8              JUSTICE MORAWETZ:  So could perhaps go with those

9    other very short motions.

10             UNIDENTIFIED SPEAKER (CANADA):  Your Honor, one small

11   matter.  If we could at all deal with the Flextronics motion

12   before the GSM motion to accommodate Ericsson's Canadian

13   counsel, that would be much appreciated.

14             JUSTICE MORAWETZ:  I don't know if you got that

15   clearly, Judge Gross.  There was a request to do the

16   Flextronics before the GSM motion.

17             THE COURT:  All right.  Then why don't we take a

18   recess from our present matter and I'll hear you on the other

19   motions.

20             MS. SCHWEITZER:  Sure.

21             THE COURT:  Flextronics first.

22             MS. SCHWEITZER:  Okay.  Let me grab my notes and we'll

23   get right on it.

24             THE COURT:  All right.  And counsel, you --

25             MR. BACON:  Can we say we could be gone for thirty

1    minutes, Your Honor.

2            THE COURT:  Yes.

3            MR. BACON:   Thank you, Judge.

4            THE COURT:  Thirty minutes.

5            JUSTICE MORAWETZ:  Let me just -- a housekeeping

6    matter while we're waiting.  Obviously the air conditioning

7    system in this courtroom is not operating.  And those in the

8    gallery, feel free to make yourselves more comfortable in your

9    attire.  Counsel, if I cannot make myself more comfortable,

10   you're not to make yourselves more comfortable, so you'll have

11   to suffer through.

12       (Pause)

13           THE COURT:  All right, Ms. Schweitzer, when you're

14   ready.

15           MS. SCHWEITZER:  Sure.

16           THE COURT:  And we'll start with the Flextronics

17   settlement motion.

18           MS. SCHWEITZER:  Yes, absolutely.  Thanks, Your Honor.

19   We do appreciate both Your Honors' indulgence in the process

20   today.  There's a lot on the table, but good things today.

21           So we're starting with the motion to approve an

22   agreement -- a settlement and release agreement between the

23   U.S. debtors and Flextronics and its affiliates in the U.S.

24   And it's also signed -- relief is being sought for the Canadian

25   debtors, who are also a party.  There are also certain EMEA

214

1    debtors, the European debtors, that are a party as well.

2         The settlement itself is summarized pretty thoroughly

3    in the motion.  It's -- as people have said earlier today,

4    Flextronics is a major supplier to the debtors.  And there have

5    been prior settlements and agreements entered into along the

6    way in this case early on.  And this agreement is basically

7    intended to address a couple different things.  It's a timely

8    agreement to put up today, because it facilitates sales in

9    enabling us to have a path forward to deliver to buyers, an

10   agreement where Flex will offer the buyers a supplier

11   agreement.  It's either a new agreement, or what we would call

12   a split and clone or a broken-off agreement from the existing

13   agreements.

14        There's also a settlement of certain claims and

15   agreements to continue working in a business relationship under

16   the existing agreements for the next several months or year, in

17   order to ensure that we have a supply chain while these sales

18   are pending closing and the business is otherwise being wound

19   down.

20        There are various other details that are set forth in

21   the settlement agreement and the motion.  I'm happy to go

22   through them in more detail, although I think they're in there.

23   There are two technical typographical errors that we'd just --

24   rather than re-execute, we just wanted to put them on the

25   record.

1        THE COURT:  Those appear in where, Ms. Schweitzer?

2        MS. SCHWEITZER:  They're in the settlement and release

3    agreement itself.

4        THE COURT:  Okay.

5        MS. SCHWEITZER:  And then one's in the side agreement

6    on the schedule to the side agreement.  And they are truly

7    typographical errors.  In the settlement and release agreement,

8    Section 5(ii) in subsection (z) as in zebra, it makes a

9    reference to -- at the end it says that "the parties shall not

10   be bound by this Section 5(ii)(y)", and that should be a (z).

11   Obviously, it's an internal cite, so it's a true typo.

12       THE COURT:  Good.

13       MS. SCHWEITZER:  The second one is of the same ilk,

14   which is in the side agreement, Schedule B, Item 5(b) makes a

15   line item reference to an obligation that is in "paragraph 4(a)

16   above", which should be "5(a) above."  It's again, just an

17   internal conforming typographical error.  So rather than re-

18   execute things, we just wanted to state everyone's agreement on

19   the record.

20       THE COURT:  Very well.

21       MS. SCHWEITZER:  Beyond that, we also do, in the U.S.

22   courtroom today, have present with us Robert Baritheras (ph.),

23   who is a manufacturing services leader at Nortel Business

24   Services, which is a business division in charge of the

25   transition services at Nortel.  He's available, willing to

216

1    testify to the facts set forth in the motion, the basis for the

2    settlement, the terms of the settlement, the need for the

3    settlement.

4         And also, there's an accompanying motion on the

5    agenda, which is to seal certain parts of the settlement

6    agreement, including the dollar consideration and certain

7    allocation issues.  And the debtors believe, as set forth in

8    the motion, that those are sensitive commercial terms.  There's

9    a basis provided in the motion, but Mr. Baritheras is present

10   here today, if anyone in the courtroom would like him to

11   testify.  And if you would like I can proffer further, or I can

12   offer the facts in the motion set forth as a proffer on his

13   behalf.

14        THE COURT:  That would be fine.

15        MS. SCHWEITZER:  Okay.  So we'll stick with that.  And

16   then I will -- unless there's anything anyone wants to respond

17   to in the U.S., I'm happy to turn it over to our Canadian

18   colleagues to address it from the Canadian side.

19        THE COURT:  All right.

20        JUSTICE MORAWETZ:  Mr. Tay?

21        MR. TAY:  Thank you very much, Your Honor.

22        JUSTICE MORAWETZ:  You can take -- but I have your

23   motion record, with your very comprehensive and informative

24   facts on this issue.

25        MR. TAY:  Thank you.  And you will be happy to hear

1    that I won't be referring to any of those.  I think all you

2    need to --

3              JUSTICE MORAWETZ:  That's a surprise.

4              MR. TAY:  -- see is on -- if you go to the affidavit

5    that is supporting this motion, the affidavit of Donna McKenna,

6    this is page 40 of the motion record, paragraph 40, and that

7    will show you things that we entered into this agreement for

8    and the benefits that the estates believe that they are getting

9    from this agreement.  We certainly hope by all the powers that

10   been that this is the last agreement we have to enter into with

11   Flextronics.  We have hoped that before, but have reason to

12   believe that this will be the last.

13             And so what we're asking for today, three things.  One

14   is approval of the Flextronics settlement agreement.  Secondly,

15   a side agreement that the various estates have entered into as

16   to the how the cost of the Flextronic settlement is going to be

17   shared.  And thirdly, you will have, I believe the confidential

18   thirty-first report of the monitor, that we ask that that be

19   sealed.  And we've been through Sierra Club enough, and I think

20   we can take it that my submission is that we satisfy the test

21   for such sealing.  Thank you.

22             JUSTICE MORAWETZ:  Thank you.

23             MR. TAY:  Let me just hand up copies to the Court.

24             JUSTICE MORAWETZ:  Mr. Pasquariello?

25             MR. PASQUARIELLO:  Your Honor, on behalf of the

218

1   monitor, the monitor has filed his thirty-first report in

2   support of the motion.  If I may just -- Ms. Schweitzer

3   referred to a couple of typographical errors.  If I can ask

4   Your Honor to turn to the pages to make the same revisions in

5   our record.  Under tab A, which is Appendix A, this is the

6   public filing, not the confidential filing, following the

7   agreement, there's a Schedule B to that first agreement

8   entitled "Payment Obligations."  Do you have it, Your Honor?

9           JUSTICE MORAWETZ:  I'm looking for it.

10          MR. PASQUARIELLO:  Behind tab A, you'll have what's in

11  the top right-hand corner "Execution Version" of the agreement.

12  There are a number of signature pages.  I apologize that the

13  record's not numbered.

14          JUSTICE MORAWETZ:  Yes, I have them.

15          MR. PASQUARIELLO:  There's Schedule A and then there's

16  Schedule B which has redacted portions to it.

17          JUSTICE MORAWETZ:  Schedule B?

18          MR. PASQUARIELLO:  Yes.  In paragraph 5(b) --

19          JUSTICE MORAWETZ:  Yes.

20          MR. PASQUARIELLO:  -- the second line, the reference

21  is to "4(a) above."  That should read "5(a)".

22          JUSTICE MORAWETZ:  Right.

23          MR. PASQUARIELLO:  And then under tab 1, page 17 of

24  that agreement.

25          JUSTICE MORAWETZ:  17?

1      MR. PASQUARIELLO:  Yes.  Five lines up from the

2  bottom, Your Honor.

3      JUSTICE MORAWETZ:  Yes.

4      MR. PASQUARIELLO:  It references Section 5(ii)(y).

5      JUSTICE MORAWETZ:  Yes.

6      MR. PASQUARIELLO:  That should be "zed" or "zee".

7      JUSTICE MORAWETZ:  Zed today.

8      MR. PASQUARIELLO:  And every day.  But those are the

9  only typographical errors, Your Honor, and if you've read the

10  report and are satisfied, and the monitor has recommended

11  Flextronics' agreement.  But it's really all in the

12  negotiations.

13      JUSTICE MORAWETZ:  Thank you.

14      MR. PASQUARIELLO:  Thank you.

15      MS. SCHWEITZER:  Your Honor, I --

16      JUSTICE MORAWETZ:  Any other party that wishes to make

17  submissions on the Flextronics motion?  Judge Gross, I'm ready

18  to rule on this if you are.

19      THE COURT:  I will be ready as well, Your Honor.

20      JUSTICE MORAWETZ:  From my standpoint, the court

21  reporter is on a break right now, so we'll be very brief,

22  reasons to be issued shortly, the motion is granted, the order

23  has been signed.

24      MS. SCHWEITZER:  Your Honor, from the U.S. side, I can

25  hand up the orders which --

220

1       THE COURT:  Please, yes.

2       MS. SCHWEITZER:  -- are unchanged for the --

3       THE COURT:  All right.

4       MS. SCHWEITZER:  -- settlement order and the sealing

5   order.  And it does bear repeating that we do emphasize Mr.

6   Tay's point, which is that we believe we've bought global

7   peace, and we really expect -- and Flex's counsel should hear

8   how we expect that we will not be revisiting this Court

9   sometime soon with a motion number four or five or whatever

10  we're up to.

11      THE COURT:  Okay.

12      MS. SCHWEITZER:  But if I may approach?

13      THE COURT:  Please.  Does anyone else wish to be heard

14  with respect to the motion?  Thank you.  All right.  Well, I

15  certainly am prepared to find that the terms of the settlement

16  agreement and release, the side letter agreement, are fair and

17  reasonable; certainly fulfill Rule 9019 of the Bankruptcy Code;

18  are in the best interests of the debtors' estate; and I

19  certainly recognize the importance of the settlement and

20  achieving resolution with such an important customer.  Having

21  said that, I am also prepared, without any objection, to grant

22  the order sealing the documents.

23      MS. SCHWEITZER:  Thank you, Your Honor.  So that was

24  agenda number 8 and 9.

25      THE COURT:  Yes.

221

1        MS. SCHWEITZER:  Whipping through them as promised,

2    right?

3        THE COURT:  Oh, you're much faster than Mr. Bromley.

4        MS. SCHWEITZER:  It's all his fault.

5        THE COURT:  I'm telling you.

6        MS. SCHWEITZER:  And better, too, but you know.

7        We're on to number 10 on the hearing, which is the

8    motion for an order approving the sale of the GSM and GSM-R

9    businesses.  And there's two accompanying motions.  In the U.S.

10    there's the approval of assumption and assignment procedures

11    and a sealing motion as well.  I would start with just the sale

12    motion.  And the good teaser line is that I actually think we

13    have global peace on all of the objections that had been filed.

14        THE COURT:  Okay.

15        MS. SCHWEITZER:  You might have to indulge me for a

16    minute or two when we go through those, because people have

17    asked for representations on the record, and people have been

18    working all through the night to settle things, so.

19        THE COURT:  I certainly understand.  And I somewhere

20    here have a list of all those -- oh, here they are.

21        MS. SCHWEITZER:  Yes.  There's --

22        THE COURT:  And a little synopsis.

23        MS. SCHWEITZER:  -- yes, exactly.  I would share you

24    mine, but it's got all the privilege and confidential nonsense

25    all of it.

1          THE COURT:  Right.  Right.

2          MS. SCHWEITZER:  Well, in the deja vu all over again,

3    we have a motion to approve a sale to Ericsson, who is the

4    winner of our CDMA auction.  And in a true moment of irony,

5    that when they had won the CDMA auction one of their people

6    that works at Ericsson had said, you know, we came to win, we

7    won, and it sure took a long time.  At that time, that was a

8    one-day auction.  This auction was completed in half a day.  It

9    probably would have gotten the same speech over the different

10   champagne.  And in true form, we have to convince them that no

11   sale hearing will take any less time.  But they hopefully still

12   get to win at the end of the process, so.

13         THE COURT:  Yes.

14         MS. SCHWEITZER:  Here we are.  So in another moment of

15   deja vu all over again, for people who don't know, the GSM

16   business is effectively a competitor technology to the CDMA

17   business.  So you'll remember, this is the things that make

18   your BlackBerries work and --

19         THE COURT:  Right.

20         MS. SCHWEITZER:  -- and phone technology and all that

21   sorts of stuff.  GSM technology is more European, and here

22   there is a large European component to the sale.  In fact, it's

23   not just Ericsson as the bidder, it's Ericsson entering into a

24   North American agreement with the U.S. and Canadian debtors.

25   And Kapsch is a counterparty entering into an agreement with

223

1    the EMEA sellers.  And they are -- it's put in as a joint bid

2    that's linked together.  But they actually are two different

3    sale agreements, each executed with the one buyer.  So before

4    us today, we're seeking approval of the Ericsson deal,

5    recognizing it's all meshed together.

6         The sale motion, obviously we've come before you

7    having sought approval of procedures in the past.  And there is

8    a lengthy proffer put forward in there as to the prior efforts

9    to sell the business at that time.  This is one of the sales

10   that came up without a stalking-horse bidder, so we have no

11   fights over breakup fees and the like now.  But we actually did

12   have a healthy process, in which case we had several bidders

13   come to the process and an actual auction which there was two

14   rounds of bidding and a bidder -- the stalking horse, the

15   starting bidder, bidding against itself ultimately, in

16   improvement of the price from, I think, 40 million to 103

17   million, as our final sale price.

18        And again, that this was while the U.S. was part of

19   this, a thing that's factually noteworthy in this deal is that

20   the U.S. is providing substantial transition services, in other

21   words, post-sale services to the buyer --

22        THE COURT:  Right.

23        MS. SCHWEITZER:  -- and it's getting its share of the

24   proceeds.  But there are related inter-estate agreements that

25   have been negotiated to term sheet form, dealing with the

224

1    allocation of those costs and any -- if there are losses or

2    costs borne as a result of its sustaining -- or engaging in

3    transition services for the good of the deal, that there is an

4    effort to document those in final form, but an agreement --

5    term sheet has been reached to allocate those consistent with

6    the recoveries that will be received in the deals.

7          Just to run through the chronology of where we're at,

8    that -- given that there's no objections, I can say, I again

9    have Mr. Reidl in the courtroom to testify, and Mr. Dakota

10   from -- who's a managing director at Lazard, who was a

11   participant and observer at the auction, as the financial

12   advisor to the debtors.  They're both in the courtroom to

13   testify.  What I would propose to do, in the interest of

14   expedition, is sort of combine -- instead of going through a

15   recitation of facts, a proffer and then putting them up, there

16   is no one that I know that's objecting.  I would prefer just to

17   go right into a proffer and tell the story that way, quickly

18   and concisely, if that's okay with you?

19         THE COURT:  That is fine.  Yes, Ms. Schweitzer.

20         MS. SCHWEITZER:  So we'll start off with Mr. Reidl's

21   testimony.  Again, as he previously -- he is the chief strategy

22   officer of Nortel, and his credentials were put on the record

23   earlier today.

24         THE COURT:  Yes.

25         MS. SCHWEITZER:  He was involved in the entire process

225

1    of selling the GSM assets during the bankruptcy, and that it is

2    a worldwide business.  That they have been -- Nortel has made

3    efforts since April 2009, or early last year, to find third-

4    party interest.  This has proven to be one of the more

5    complicated sales to do, given the worldwide nature of it.

6    Again, the same testimony we had heard before about the ability

7    to break it apart regionally or to break it apart from other

8    businesses and the overlap across jurisdictions is complicated

9    here.  And trying to match buyers who want to buy a worldwide

10   business with sellers who want to convey it in a worldwide

11   manner, has proven to be complicated.  But in a true test of

12   perseverance, Mr. Reidl would testify as to their reaching out

13   to twenty-six potential bidders.

14        They got expressions of interest from eleven potential

15   bidders. They've been working throughout the summer and fall to

16   get further.  That did not lead to a stalking-horse bidder.

17   And there were pressures from customers, pressures from the

18   French affiliate, and it all led to the decision that the most

19   expeditious way of realizing value and locking in the bidders

20   who had expressed interest, was to go to a naked auction

21   process.  And the bid deadline was set on November 5th of 2009.

22   Six entities submitted material to become qualified bidders.

23        As a result of that, there wound up ultimately being

24   four bids put in, including one joint bid, with Ericsson being

25   the joint bid.  And though the bid deadline, between the

226

1    original bid deadline had been moved out in order to continue

2    to facilitate discussions with these parties and improve the

3    bids, the bid deadline of November 16th was the ultimate one

4    where bids came in.  And there was again, since you'll note the

5    timing was aligning straight with the MEN auction --

6              THE COURT:  Yes.

7              MS. SCHWEITZER:  -- there was adjournment, not only of

8    the bid deadlines, but the auction deadlines as well.  So the

9    auction was set, ultimately for November 24th, again, in

10   Cleary's offices.  But we did have Monday off, so that was

11   good.  We had to clean up the conference rooms to make room for

12   more auction fun.

13             So, Mr. Reidl would also testify that as a result of

14   having reviewed those bids, looked at them and consulted with

15   all the major constituents, being the committee, bondholder

16   groups, monitor, administrators, and the like, that the

17   Ericsson-Kapsch bid, at 81.5 million, which was itself an

18   improved bid from earlier expressions of interest, was selected

19   as the starting bid.  There were other bidders present at the

20   auction or potential bidders that came to the auction.  The

21   auction commenced -- this was announced as the round one bid,

22   and Ericsson, before a competing bid had been put in, put in --

23   topped itself, effectively, at 103.  And in another theme of

24   deja vu over again, put in an exploding offer, where they gave

25   us a little more than fifteen minutes -- I think we didn't have

227

1    to run out of one conference room, maybe down the hall, but it

2    exploded with a deadline of 12:30 p.m.

3         And they had expressed repeatedly, prior to the

4    auction that they understood we were adjourning the auction,

5    they understood we were trying to get competitive bidding

6    going, but they weren't going to sit around forever.  And the

7    debtors, while of course wanting to pursue other alternative

8    bids, recognized that there is as bird in the hand issue here,

9    and certainly an improved bid that went up to over a hundred

10   million dollars, was something worth locking in and closing the

11   auction.  There were slight contract improvements as well in

12   that revised bid.

13        It was announced to be the successful bid.  There was

14   an opportunity for the other bidder to put in a bid.  It did

15   not happen, so that the auction closed in record time, which is

16   good.  And then we came here and are seeking our relief.

17        Mr. Reidl would further testify that this was selected

18   as the highest and best bid, obviously, because of the purchase

19   price being substantially greater than the other expressions of

20   interest received, but then also, obviously, because of the

21   terms of the transaction documents, that it's a known bid.

22   They've proven successful ability to close one sale

23   transaction, namely the CDMA transaction.  And there was a

24   speed and certainty of closure, a good relationship with

25   customers and suppliers and the like, that made this the

228

1    highest and best bid that was available to the debtors and

2    Nortel generally.

3         And obviously, we have experience with Ericsson on the

4    U.S. side, and consistent with prior experience with them, Mr.

5    Reidl would testify that this was an arm's-length, vigorous

6    negotiation, hard-fought, and obviously improved value as a

7    result of the negotiation and bidding process; that there was

8    not any evidence of collusion; that they're not insiders to

9    Nortel as buyers.  They didn't ask anyone else not to bid, and

10   certainly they had represented to Mr. Reidl that there were no

11   undisclosed bidders or anything else that would call into

12   question a good-faith finding or a no-collusion finding by the

13   Court.

14        And as a result of all these facts and the need to

15   close the deal, Mr. Reidl would testify that this is the

16   highest and best opportunity for the debtors to realize value

17   off these assets, and the sale should go forward and be

18   approved.

19        There's also Mr. Reidl, who will be available to

20   provide testimony consistent with testimony he's provided for

21   the MEN auction, regarding the need to seal the exhibits and

22   schedules.  Again, they're very similar in kind in the relief

23   being sought.  It's a motion to seal the exhibits and schedules

24   because of the confidential nature of the commercial

25   information in there, and the business sensitivities,

229

1   particularly with the repetitive bids and the customer and

2   supplier relationships.  But he would be able to support that

3   request as well.

4        The second person available in the courtroom is Mr.

5   Dakota of Lazard.  This project or this asset sale was actually

6   conducted through Lazard's French offices as a lead.  But the

7   auction itself was taking place in the New York office, and Mr.

8   Dakota was present for the auction process, and obviously

9   familiar with the entire process.  I would again, offer to just

10  proffer a very short testimony from him in lieu of live

11  testimony.

12       THE COURT:  Yes, please.

13       MS. SCHWEITZER:  So, Mr. Dakota, just to cut to the

14  chase would -- he's a managing director at Lazard in their

15  restructuring group.  He's worked at Lazard since 1999.  His

16  prior M&A experience before that, he has his M.B.A from the

17  University of Chicago.  He has been actively involved with

18  advising Nortel since the beginning of its case and the various

19  M&A transactions, and he's familiar with the business being

20  sold here.

21       He could testify regarding Lazard's participation in

22  the auction process, its efforts to solicit higher bids

23  throughout the process.  And some of the evidence was put on,

24  as I said, at the prior bidding procedure hearing.  He would

25  testify that he felt that the market had been adequately

230

1    canvassed for opportunities, and would support Mr. Reidl's

2    testimony regarding the complexity of the assets being

3    conveyed, the need for a prompt closure, and the value that

4    Ericsson is bringing as the buyer in this joint sale process.

5         Mr. Dakota could also testify that he was present at

6    the auction.  He was comfortable with the way the auction was

7    handled; that it, again, was an arm's-length process before and

8    at the auction; there's no evidence of collusion or any

9    improper behavior at the auction; and that he would recommend,

10   as the advisor, he would support the company's recommendations

11   as the advisor, to enter into the 103 million dollar sale

12   agreement and take the money and close.

13        And obviously, Mr. Dakota could testify, consistent

14   with behavior so far in the case, that all the decisions made

15   here were made in consultation with Nortel's other advisors,

16   the committee, bondholder group, monitor, the administrators,

17   which are our favorite friends when it comes to these auctions.

18   And he would support Mr. Reidl's basis for why he would pursue

19   this particular deal.

20        And that would be Mr. Dakota's testimony if he was

21   called upon.  I will pause to confirm no one wants to cross

22   examine or have anyone come on the stand.

23        THE COURT:  Does anyone object to the admission into

24   evidence of both of these proffers or wish to cross examine the

25   witnesses?  All right, hearing no one, they are both admitted

1    into evidence in support of the motions.

2         MS. SCHWEITZER:  Thank you, Your Honor.  So as far

3    as -- with that, the U.S. side -- obviously we're going to turn

4    to the Canadian colleagues in a minute -- but from the U.S.

5    side, I think that there are substantial motion papers before

6    the Court on the basis for the relief, the 363 basis, and the

7    relief being sought.  There's a comprehensive sale order --

8         THE COURT:  Yes.

9         MS. SCHWEITZER:  -- that's been presented to the

10   Court.  So I'll rely on the papers for the arguments in support

11   of the relief being sought.  While we're on the relief, I'll

12   couple it with the procedures we're seeking approval for for

13   the assumption and assignment of contracts.

14        THE COURT:  Yes.

15        MS. SCHWEITZER:  Here, because there was not stalking-

16   horse bidder, we don't have notices pending of 365 sales.  So

17   it's a very plain vanilla procedure for the assumption and

18   assignment of contracts, whereby we propose that we have an

19   opportunity to mail out notices to counterparties within, I

20   believe thirty days of the closing, that we can mail out

21   notices to the counterparties of the intended assumption and

22   assignment, pursuant to 365.  If they don't object, that's

23   fine, the assumptions and assignments go forward at the

24   closing.  If they do object, they would either be resolved

25   consensually, it would come back to your Court, or the sellers

1   have the right to pull the contract off of the list in their

2   discretion, consistent with the way it's described in the

3   motion.

4         THE COURT:  Yes.

5         MS. SCHWEITZER:  So in other words, to get it done

6   quickly, don't bother you unless we have to.  A lot of the

7   counterparties are already in the room reserving their rights.

8   So I think -- certainly not everyone, but we have all the right

9   people paying attention to it.

10         There's a bunch of objections that go to the U.S. sale

11   motion.  In the interest of sort of taking a breath and making

12   sure I have the right people lined up and can do this

13   efficiently, I propose to defer to Canada to do their primary

14   case, and then I can run through the objections quickly.

15         THE COURT:  That would be fine.

16         MS. SCHWEITZER:  And hand up the order?

17         THE COURT:  Okay.

18         JUSTICE MORAWETZ:  Mr. Tay?

19         MR. TAY:  Thank you, Your Honors.  As Ms. Schweitzer

20   has mentioned several times, this is the process as we call it,

21   the naked auction.  Unfortunately one of my lawyers wasn't sure

22   what that meant and decided to Google the term naked auction

23   and came out with something related and perhaps inappropriate

24   results.  So I prefer to refer to this as the phantom course

25   auction.

233

1      You have our motion material, and the monitor's

2    report, twenty-ninth, and also the confidential appendices.

3    You will see that this motion was stated to be in the

4    alternative.  It was either the approval of a termination fee

5    agreement if we had not met certain time limits, or going ahead

6    with this approval.  So since we're moving ahead with this

7    approval, we will not be proceeding with respect to the

8    termination fee agreement.

9          JUSTICE MORAWETZ:  Thank you.  So you're straight

10   through to the alternative set up in sub (c) of your motion?

11         MR. TAY:  So I think, without going through any of the

12   evidence again, this is clearly a good result, and we would ask

13   that the Court approve it.  And again, I would submit the

14   Sierra Club principles apply to the confidential appendices.

15   Thank you.

16         JUSTICE MORAWETZ:  Thank you, Mr. Tay.  I found the

17   affidavit from Mr. Reidl from November 27th as well as the

18   report to be very comprehensive.  Thank you.

19   Mr. Pasquariello, anything to add?

20         MR. PASQUARIELLO:  Only that the twenty-ninth report

21   was filed in support, Your Honor, which you have and --

22         JUSTICE MORAWETZ:  And two volumes for the

23   confidential appendices.

24         MR. PASQUARIELLO:  Correct, which Mr. Tay has referred

25   to as being sealed.  The monitor obviously supports the motion.

234

1    Thank you.

2         JUSTICE MORAWETZ:  Thank you.  Any other party wishing

3    to make submissions on the GSM motion?  Ms. McEachern?

4         MS. MCEACHERN:  Yes, Your Honor.  I appear for

5    Ericsson.  I'm here to say that we obviously would like to see

6    this approved.  And we have no issues with the form of sale

7    approval and vesting order that's been submitted.

8         JUSTICE MORAWETZ:  Okay.  Thank you.  Mr. Zigler?

9         MR. ZIGLER:  Good evening, Your Honor.  My clients

10   don't object to the transaction.  The issue which is coming up

11   here and may come up in the other transaction involving the MEN

12   business is the business of the escrow account.  Our clients

13   are concerned that given the concerns to the integrity of the

14   process, some of the symmetry that the escrow account be with a

15   Canadian bank.  That is not a requirement of the documentation.

16   It has not been the intention, as I understand it, of either

17   the debtors nor the other parties to do so, that is to consider

18   a Canadian bank for these escrow accounts.

19        It's a matter that I think was also raised by the

20   Financial Services Commission at one point.  And we would ask

21   the endorsement from both Courts to permit that to occur,

22   simply because the integrity of the process and the many assets

23   in Canada involved would require it.  Those are my submissions.

24        JUSTICE MORAWETZ:  So let me just be clear.  You're

25   looking for something in the endorsement that leaves it open as

1    to whether the money's being placed into escrow in a Canadian

2    bank as opposed to the escrow agent?

3            MR. ZIGLER:  Or that at least requires that it leaves

4    it open to a pin process.  Either would be fine.

5            JUSTICE MORAWETZ:  Mr. Tay?

6            MR. TAY:  Yes, Your Honor.  If I can just respond to

7    that.  Just as we have said numerous times when this point has

8    been raised, that this is a complex negotiation and a sale

9    involving all different states, U.S., Canada, EMEA, and the

10   rest of the world.  And that any monies put into the escrow

11   account are subject to this Court's jurisdiction.

12           JUSTICE MORAWETZ:  They're subject -- as I understand

13   it, it's subject to approvals, release issues --

14           MR. TAY:  Exactly.

15           THE COURT:  -- that has to come from both the U.S. and

16   this Court.

17           MR. TAY:  Exactly right, Your Honor.  And it's as

18   contemplated by the funding agreement.  So the reality is that

19   it almost doesn't matter where you put the money, the money

20   isn't leaving the escrow without the approval of this Court or

21   without the approval of the U.S. Court.  And I think people

22   should take comfort in that.

23           So, if there are no more comments, I'll just hand you

24   up --

25           JUSTICE MORAWETZ:  Mr. Schwill, something to add, and

1    then Mr. Pasquariello.

2         MR. PASQUARIELLO:  Your Honor, just by way of

3    clarification, there presently is no escrow agreement being put

4    before the Court in respect of the GSM and GSM-R transaction.

5    It is contemplated as --

6         JUSTICE MORAWETZ:  As well as having it set -- I saw

7    via the motion, it should be deposited into an escrow account,

8    subject to an escrow agreement to be negotiated and agreed to

9    by all of the sellers.

10        MR. PASQUARIELLO:  Right.  In due course, we will be

11   before you likely seeking approval.  So in any event, I believe

12   Mr. Zigler's comments are at least premature as it relates to

13   the specific motion.  We will be seeking approval of another

14   escrow agreement later on, which perhaps Mr. Zigler's comments

15   will be applicable to that, but we'll speak to that at that

16   time.

17        JUSTICE MORAWETZ:  Well, I think you can take it, Mr.

18   Pasquariello, that whatever I do not have to deal with today, I

19   will not deal with today.

20        MR. PASQUARIELLO:  Hence my submissions, Your Honor.

21        JUSTICE MORAWETZ:  Thank you.  Mr. Zigler, did you

22   have something or did you want to follow Mr. Schwill?  Okay,

23   Mr. Schwill.

24        MR. SCHWILL:  Your Honor, just brief submissions.

25   You'll see in paragraph 8 of the order that Mr. Tay and Ms.

1  Stam will hand up, the deal as been explained to you is sort of

2  bifurcated by the attached.  As you know, counsel for the EMEA

3  entities on the Canadian side of things.  So while there was

4  one deal for the North Americans and one deal for the EMEA

5  entities, it was always done on the basis that the proceeds

6  would be pooled into an escrow account and dealt with in

7  accordance with the IFSA.  And so you'll see a reference in

8  paragraph 8 which is different from some of the previous

9  references that just simply refers to TSA or transition

10  services term sheet, that deals with effectively the pooling.

11  That's why that's there.  I just wanted to bring that to your

12  attention, because it is different from -- whereby the other

13  orders would have just said the proceeds get dumped into an

14  escrow account, this is a bit of a preamble that deals with the

15  term sheet.  Well, that's dealt with, or that is to speak to

16  the parties' understanding that the funds in the two sales will

17  be pooled and dealt with in accordance with the escrow account

18  in the interim funding.

19       JUSTICE MORAWETZ:  I am proceeding on the assumption

20  that all parties affected by paragraph 8 and others are in

21  agreement with the form of order.

22       MR. SCHWILL:  We are now.  Yes, Your Honor.  Thank

23  you.

24       JUSTICE MORAWETZ:  Okay.

25       MR. ZIGLER:  And, Your Honor, my only brief points in

1    reply are as follows.  It is not premature.  In fact, when the

2    escrow agreement comes before you for approval it's too late at

3    that point.  And I'm greeted with that argument.  It is

4    something that should be dealt with at this point, in my

5    submission and your endorsement.  Although it doesn't determine

6    the ultimate allocation of assets and these are complex

7    transactions, we have some very capable and competent banks,

8    and it would add to the integrity of the process in Canada that

9    the escrow agent would be a Canadian bank for these

10   transactions, having had other escrow agents in the United

11   States for the first two major transactions involving the sale

12   to Ericsson and the sale to Avaya.

13          JUSTICE MORAWETZ:  Thank you.

14          MR. MACFARLANE:  Your Honor, just to complete the

15   submissions, Judge Gross --

16          THE COURT:  Mr. MacFarlane.

17          MR. MACFARLANE:  Just once more, the committee

18   supports the county's position on this and believes that this

19   issue can be fairly dealt with and it has been in the past and

20   previous auctions and escrow agreements on the motion to

21   approve the escrow agreement at such a point in time.  And as

22   correctly pointed out by Mr. Tay, the approval process and the

23   negotiation process with the escrow agreement and the choosing

24   of the escrow agent is set out in detail in the interim funding

25   settlement agreement, which has been approved by both Courts.

1  So I think that everyone's covered, and that this is a matter

2  that's not necessary to address on today's docket.  Thank you.

3       JUSTICE MORAWETZ:  Okay.  Mr. Pasquariello, can you

4  provide any clarification on Mr. Zigler's comment that it is

5  not premature to deal with this?

6       MR. PASQUARIELLO:  Your Honor, there's no specific

7  relief being requested in that regarding the order.  So I find

8  it hard to understand how it cannot be premature.  I think Mr.

9  Zigler's put forward sort of a preemptive strike.  If he wants

10  to take the lead from Mr. MacFarlane, I'm happy for him to

11  reserve his rights in respect of making submissions with

12  respect of the escrow agreement.  But we don't feel that it's

13  as matter to be dealt with today.

14       JUSTICE MORAWETZ:  One think I can guarantee you, is

15  that my endorsement will not contain the words "reservation of

16  rights."

17       MR. PASQUARIELLO:  Those are my submissions.  Unless

18  you have further questions.

19       JUSTICE MORAWETZ:  Thank you.  Mr. Tay, do you have

20  form of order?

21       MR. TAY:  Yes.

22       JUSTICE MORAWETZ:  Those changes are fine as far as

23  I'm concerned.  Ms. Schweitzer, are you ready to continue at

24  your end?

25       MS. SCHWEITZER:  Absolutely, Your Honor.  The good

240

1    news is --

2         JUSTICE MORAWETZ:  Then I'll turn it back towards you,

3    Judge Gross.

4         MS. SCHWEITZER:  -- taking a break gets you more

5    organized and I realized that I had seven copies of one list of

6    objections plus the seven pages of objections we had to put on

7    the record.  So life is good again.

8         I unfortunately do have to read a couple statements on

9    the record, but the good news is that we don't have any pending

10   objections that we know of, and this is how we make them go

11   away.  There are, I think, seven objecting -- misnumbered --

12   seven objecting parties that we're aware of.

13        The securities class action plaintiffs had made a

14   motion regarding the protection of their documents, consistent

15   with ones we've seen before --

16        THE COURT:  Right.

17        MS. SCHWEITZER:  -- and it's resolved through a

18   statement on the record, consistent with what we've done in

19   other cases that there are no original records, as the term is

20   used in the ASA, that will be transferred to the purchaser.

21   And to the extent that any such records are requested by the

22   purchaser, only copies will be provided.  And that, I think,

23   resolves the securities class action plaintiffs' objection.

24        THE COURT:  All right.

25        MS. SCHWEITZER:  I'll pause if anyone wants to speak.

1        MR. LEVEE:  Your Honor, this is Ira Levee from

2    Lowenstein Sandler.  That representation resolves our

3    objection, thank you.

4        THE COURT:  All right.  Thank you.

5        MS. SCHWEITZER:  The next one is ZSF Research Gateway

6    Trust.  Again, I believe this is resolved through a statement

7    on the record to the effect that this was a question -- it's a

8    landlord, and they were concerned about the assumption of their

9    leases.  And we resolved it with the following statement that

10   Nortel's not planning to assume and assign any leases between

11   Nortel and ZSF Research Network Trust or ZSF Research Gateway

12   Trust in connection with the sale of its GSM/GSM-R business.

13   To the extent that any leases are already assumed or otherwise

14   implicated by the sale, any changes to those leases will be

15   made in accordance with the terms of such lease, and that

16   nothing in the order prejudices ZSF's rights as no approval of

17   any assumptions are being sought at this hearing.

18       THE COURT:  Okay.

19       MS. SCHWEITZER:  I believe that resolves that

20   objection.

21       THE COURT:  Anyone wish to be heard?  All right.

22       MS. SCHWEITZER:  Third one is OSS Nokalva, who is

23   again, a person we've resolved things in the past.  It looks

24   like we're doing something similar.  There's a couple

25   objections that I'll actually refer you -- well, if I may

242

1    approach, I can hand up a black-line of the order, and --

2         THE COURT:  Yes.

3         MS. SCHWEITZER:  -- show you that?

4         THE COURT:  Thank you.  Thank you, Ms. Schweitzer.

5    Okay, thank you.

6         MS. SCHWEITZER:  So, I've just handed you the clean

7    and the black-line of the order.  If you turn to paragraph 39,

8    either one, there's -- rather than put individual reservation

9    of rights that are identical, what we've done is provided,

10   general reservation of rights is being provided to certain

11   objecting parties, or reference to objecting party agreements,

12   and different objectors are effectively opting in to this

13   objecting party agreement.  So we've added this language in the

14   sale order that, again, deals with the fact that we're not

15   seeking assumption and assignment or rejection of certain

16   contracts, and if we do, this is our reservation of rights or

17   procedure which we will follow.

18        And the statement on the record that OSS had asked us

19   to make is that to the extent that an OSS license is a

20   nonexclusive license, any such license would not be assigned

21   without OSS's consent in connection with the sale.  And I

22   believe the addition of the language into the paragraph and

23   that representation on the record resolves OSS's objection.

24   I'll pause if they want to speak.

25        THE COURT:  Anyone?  All right.

243

1    MS. SCHWEITZER:  Next one is SNMP Research

2    International Inc.  Again, they are -- the inclusion of them as

3    an objecting party in paragraph 39, I believe resolves their

4    objection, as it does for Oracle, who is also included as an

5    objecting party.

6    THE COURT:  Okay.

7    MS. SCHWEITZER:  And I will pause for SNMP and Oracle,

8    if anyone wants to speak.

9    THE COURT:  All right.

10    MS. SCHWEITZER:  And Motorola, again, is being added

11    into -- as an objecting party in paragraph 39 and also

12    additional language is added in paragraph 40 addressing

13    Motorola's concerns and the timeliness of their objection here.

14    So with the addition of paragraph 39 and paragraph 40, their

15    objection, I understand, is resolved.

16    THE COURT:  Anyone from Motorola wishing to be heard?

17    MR. ALLINSON:  That's correct, Your Honor.

18    THE COURT:  Thank you.

19    MS. SCHWEITZER:  Last but not least, AT&T Services

20    Inc., again, is included as an objecting party in paragraph 39,

21    and I believe that resolves their objection.

22    THE COURT:  All right.  Anyone for AT&T?  Hearing no

23    one, that's resolved.

24    MS. SCHWEITZER:  There's one other change.  As you'll

25    see, the black-line has other changes.  They're mostly cleanup

244

1    on defined terms, just to conform them with other documents

2    floating around.

3            THE COURT:  Yes.

4            MS. SCHWEITZER:  The only paragraph I'll point to you

5    in addition to that is at the end, this paragraph 44, I

6    believe.  This added -- which the folks in Canada were just

7    addressing as well, which is that, as they've said, in prior

8    deals we've agreed to put money, the sale proceeds, into

9    escrow --

10           THE COURT:  Right.

11           MS. SCHWEITZER:  -- to be dealt with with the IFSA in

12   the future in our allocation protocols.  Here, we again have

13   that arrangement, subject to the entry into definitive

14   documentation of this TSA, cost sharing agreement, which I

15   described for you earlier today.  So that it's just that

16   qualification is put into there as the condition to agreeing to

17   put the money into escrow.  And as pointed out in Canada, it's

18   slightly different in that regard compared to prior orders, but

19   otherwise it's similar in kind and intent.

20           And the other thing is that at the end of that

21   paragraph, that we're asking for authority to enter into the

22   escrow agreement.  These are standard form agreements, which

23   was an original motion.  But we're asking to enter into

24   standard form escrow agreements with the depositor who's going

25   to hold the proceeds.  And the committee just asked that we

245

1   clarify that the terms of that escrow agreement will be

2   reasonably satisfactory to the committee and the monitor acting

3   in good faith, which is obviously nonobjectionable.

4         THE COURT:  All right.

5         MS. SCHWEITZER:  And with that, I believe we are good

6   on our proof, and we have resolved all of our objections, which

7   makes it a good day.  And with that, I would offer the motion

8   up for approval by the Court.

9         THE COURT:  Let me just ask first if anyone else

10   wishes to be heard?  Well, there are no objections.  And I

11   suspect for good reasons.  Clearly the sale is in good faith

12   and at arm's length and fulfils the statutory requirements of

13   Section 363.  And I'm prepared to approve it as in the best

14   interest of the debtors' estate and as well to approve the

15   request that documents be filed under seal.

16         MS. SCHWEITZER:  Thank you, Your Honor.  And I can

17   approach with order on the assignment procedures and the

18   sealing motion as well?

19         THE COURT:  Very well, thank you.

20         MS. SCHWEITZER:  Having successfully obtained those

21   orders, we have the further pleasure of withdrawing one other

22   related motion which was seeking approval of a termination --

23         JUSTICE MORAWETZ:  Ms. Schweitzer --

24         MS. SCHWEITZER:  -- fee in connection with a sale.

25   That the winning bidders had asked for protections --

1      JUSTICE MORAWETZ:  -- Ms. Schweitzer --

2      MS. SCHWEITZER:  -- prior to the time of this hearing

3  that they wanted us to perform and get to this hearing.  And

4  there was a certain termination fee that was supposed to be

5  approved at this hearing if we didn't get here and get to this

6  point.

7      THE COURT:  We have to --

8      MS. SCHWEITZER:  Oh, I'm sorry.

9      THE COURT:  -- yes, he's got to rule.  Justice

10  Morawetz, forgive me.  I should have delayed and given you time

11  to make your ruling as well.

12      JUSTICE MORAWETZ:  I gather that Ms. Schweitzer just

13  proceeded with one other aspect of GSM.  Is that correct?

14      MS. SCHWEITZER:  Yes, this is just a cleanup thing.

15  There was another motion in the U.S. on the termination fee --

16  approval of the termination fee that would only be sought if

17  this motion and order were not entered.

18      THE COURT:  Right.

19      MS. SCHWEITZER:  So the purchaser has agreed that we

20  would be withdrawing that as moot in light of the entry of

21  these orders.  So I can just do that on the record.

22      I'm sorry, Mr. Justice Morawetz.

23      JUSTICE MORAWETZ:  Well, if you're finished now with

24  GSM, I'll give you a ruling from the Canadian aspect of that

25  motion.

247

1          MS. SCHWEITZER:  I'm finished, but I'm sorry, the

2     sound's breaking up on our end.

3          JUSTICE MORAWETZ:  Okay.  Have you finished now with

4     GSM?

5          THE COURT:  Yes.

6          MS. SCHWEITZER:  Yes, we have.  And happy to take

7     guidance from the Courts.  I was corrected that there are two

8     other motions that were noticed for the joint hearing, which

9     was the approval of the APAC settlement.  And then there's the

10    Seville (ph.) escrow motion that also was up for approval

11    today.  We can, again, do that now, later, whenever people want

12    to.  But I apologize, I hadn't flagged those earlier.

13         JUSTICE MORAWETZ:  Okay, well, I think, Judge Gross,

14    with your indulgence, I'll do the ruling on GSM so we can close

15    the book on that.

16         THE COURT:  Yes.

17         MS. SCHWEITZER:  Yes.

18         JUSTICE MORAWETZ:  Okay, madam reporter are you ready?

19         This hearing was effected by way of video conference

20    with a parallel motion being heard in the United States

21    Bankruptcy Court with His Honor Judge Gross presiding over the

22    hearing in the U.S. court.  This joint hearing was conducted in

23    accordance with the provisions of the cross-border protocol

24    which has previously been approved by both the U.S. Court and

25    by this Court.

1       The applicants move for the authorization and approval

2   of the transaction contemplated in the asset sale agreement as

3   of November 24, 2009, among Nortel Networks Inc., Nortel

4   Networks Corporation, Nortel Networks Ltd., as the main sellers

5   in the transaction involving certain assets relating to

6   Nortel's GSM infrastructure business.  The applicants also

7   sought the appropriately related vested order and the

8   declaration that all proceeds of sale, less applicable taxes,

9   be deposited into an escrow agreement to be negotiated and

10  agreed to by the sellers, in accordance with the IFSA entered

11  into on June 9, 2009.

12      On October 15, 2009, this Court made an order

13  approving certain bidding procedures in connection with the

14  bidding process of the GSM/GSM-R business, which is defined as

15  the business and related assets.  The U.S. Court made an order

16  approving the bidding procedures on the same date.

17      The background with respect to the sales process is

18  covered in the comprehensive affidavit of Mr. Reidl, sworn

19  November 27th, as well as in the twenty-ninth report of the

20  monitor.  There is no opposition to the sales transaction,

21  hence I accept the evidence as set forth in the affidavit and

22  in the twenty-ninth report as establishing that the transaction

23  is fair and reasonable, and I am satisfied that the transaction

24  is in accordance with and adheres to the Soundair principles

25  and should be approved.

249

1          Parties have also requested a sealing order in respect

2     of Confidential Appendix C, which consists of two volumes to

3     the monitor's report.  I'm satisfied that these documents

4     contain commercially sensitive information, the disclosure of

5     which could be harmful to the parties.  I have considered the

6     Sierra Club test, and I am in agreement with the submissions of

7     counsel that the documents should be sealed.

8          There have been seven objections that were raised in

9     the U.S. proceedings, all of which have been resolved, and no

10    further comment is required in connection with these

11    objections.

12         Counsel to the former employees has raised an issue

13    with respect to the escrow agreement, which, as indicated

14    previously in these reasons, remains to be negotiated, and in

15    my view, it is not necessary to deal with this issue today.

16    The only comment that I will offer is that I accept the

17    submissions of counsels to Nortel to the effect that any monies

18    deposited into the escrow account remain under the control and

19    will require further orders of both the U.S. Court and this

20    Court, prior to any disbursal.

21         The order shall issue to give effect to the foregoing.

22    And that concludes my reasons in respect of this motion.  Thank

23    you.

24         THE COURT:  All right.  Ms. Schweitzer, it might help

25    if we just went over what remains on the agenda here.

1           MS. SCHWEITZER:  Absolutely.

2           THE COURT:  I think, as I was just reviewing our

3    agenda --

4           MS. SCHWEITZER:  Hold on one second --

5           THE COURT:  -- here --

6           MS. SCHWEITZER:  -- I apologize.

7           THE COURT:  Take your time.

8           MS. SCHWEITZER:  I got it.

9           THE COURT:  All right.  I have -- it looks like

10   besides the matter, obviously, that we're attending to now, 5,

11   6, and 7?

12          MS. SCHWEITZER:  Yes.

13          THE COURT:  All right.  Now, are any of those matters

14   to be jointly resolved with the Canadian Court?

15          MS. SCHWEITZER:  Well, number 5 is just the

16   establishment of the CALA bar date, which is a supplemental bar

17   date.  The general bar date was set by September 3th --

18          THE COURT:  Right.

19          MS. SCHWEITZER:  -- for all other debtors.  No

20   objections to that.  It sets a January 25th bar date.  So I

21   don't know if you want to take that one on submission --

22          THE COURT:  Yes.

23          MS. SCHWEITZER:  -- it's not joint.

24          THE COURT:  I think we can do that on submission.

25          MS. SCHWEITZER:  Okay.  So we'll hand up an order on

1    that.  And then number 6 and number 7.  Number 6 is this

2    settlement of the -- this Asia restructuring agreement.  And

3    number 7 is what I was calling the Seville escrow agreement.

4    It's an escrow agreement to a sale that was approved last

5    hearing.

6                THE COURT:  Right.

7                MS. SCHWEITZER:  So those two are set for joint

8    hearing.  From the U.S. side, I don't want to prejudge, but

9    they're uncontested, and they're -- certainly the escrow

10   agreement is a relatively pro forma motion.

11               THE COURT:  Absolutely.

12               MS. SCHWEITZER:  We're happy to do those now or later.

13   I think people would be interested in trying to get those done

14   tonight, while everyone's hooked up.  If you want to keep

15   marching through, we can revisit those.

16               THE COURT:  Well, they are matters that normally I

17   would just consider, actually on a certificate of counsel,

18   frankly.

19               MS. SCHWEITZER:  Okay.

20               THE COURT:  I don't know about Mr. Justice Morawetz's

21   preference on those remaining items.

22               MS. SCHWEITZER:  Right.  I don't -- if you want, I'm

23   sure there will be another opportunity for break, if you want

24   to consult before you --

25               THE COURT:  Okay.  Let's do that.

252

1       MS. SCHWEITZER:  Does it make sense?  And then you can

2   either take out a submission or if they want to make a showing,

3   that's fine.

4       THE COURT:  Very well.

5       MS. SCHWEITZER:  And then number 8 and 9 we just did,

6   which were the Flex settlement.

7       THE COURT:  Right.

8       MS. SCHWEITZER:  And number 10 is the sale hearing for

9   GSM, so we just accomplished that.  11 is the -- which one is

10  this?

11      THE COURT:  It's Mr. Bromley's matter.

12      MS. SCHWEITZER:  That's the big one.  Well, we're

13  sharing, but that's the big one.

14      THE COURT:  And I think we've done 13 and --

15      MS. SCHWEITZER:  Yes, 13 is the -- right.  This is the

16  GSM sale.  And then 14 is the procedures; 15 is the sealing for

17  the GSM sale; and then that's it.  So I think we're left with

18  those two that if you want to consult, and then we'll return

19  back to MEN?

20      THE COURT:  Very well.  Okay.  Thank you, Ms.

21  Schweitzer.

22      MS. SCHWEITZER:  Sure, of course.  Do you want me to

23  hand up the CALA motion?

24      THE COURT:  Yes, please.

25      JUSTICE MORAWETZ:  Mr. Tay, could you give an update

253

1   as to whether you think there's any opposition or whether you

2   have draft orders with respect to the two motions?

3            MR. TAY:  No, there are no objections to the -- either

4   of the two motions.  I believe that -- I don't know whether she

5   wants to do it.  There was a threat that they were going to

6   make the same argument about the escrow account being in

7   Canada.  But I would simply say I repeat my -- to save some

8   time -- you've heard my response, if that were to come up.  But

9   there's no objection to the --

10           JUSTICE MORAWETZ:  Ms. Harmer was indicating that she

11  is not going to --

12           MR. TAY:  Okay.  Then that solves that.

13           JUSTICE MORAWETZ:  -- that she has perhaps anticipated

14  your response.  Do you have draft orders in connection with

15  this?

16           MR. TAY:  Yes.

17           MS. SCHWEITZER:  Your Honor, may I approach for the

18  APAC and --

19           JUSTICE MORAWETZ:  These are going to be the subject

20  of discussion in a recess with Judge Gross, I just wish to have

21  the draft orders.

22           MR. TAY:  And these are the orders --

23           MS. SCHWEITZER:  Let me approach with the orders, and

24  then you can decide --

25           THE COURT:  That would be well.

254

1          MS. SCHWEITZER:  -- if you're recessing.

2          THE COURT:  Thank you.  Thank you, Ms. Schweitzer.

3          MR. TAY:  And this is just an amended --

4          JUSTICE MORAWETZ:  Yes.  So have both sides received

5     all of the materials in respect of those unopposed and

6     housekeeping motions?

7          THE COURT:  Yes.  I have received the materials as

8     well.

9          JUSTICE MORAWETZ:  Shall we take five minutes and deal

10    with those?

11         THE COURT:  I didn't -- I'm sorry, sir, I didn't hear

12    that.

13         JUSTICE MORAWETZ:  Should we take a five-minute break

14    and consult with respect to those outstanding motions so we

15    can --

16         THE COURT:  Yes.

17         JUSTICE MORAWETZ:  -- deal with that?

18         THE COURT:  And then we'll resume the hearing on the

19    MEN sale as well.

20         MS. SCHWEITZER:  May I ask for ten minutes, in the

21    hope that we can clean off our desks in the meantime.

22         THE COURT:  In fact, why don't we give you fifteen

23    minutes, all right?

24         MS. SCHWEITZER:  We appreciate it.

25         THE COURT:  And we'll stand in recess for fifteen --

255

1           MS. SCHWEITZER:  A prompt fifteen, we'll try on our

2     side.

3           THE COURT:  Very well.  Thank you.

4           MS. SCHWEITZER:  Thank you.

5           JUSTICE MORAWETZ:  If you want we can give twenty

6     minutes and everyone can have a gourmet meal also.

7       (Recess from 6:38 p.m. until 7:13 p.m.)

8           THE CLERK:  Please rise.

9           THE COURT:  You may be seated.  Thank you.  Good

10    evening.

11          JUSTICE MORAWITZ:  Good evening, sir.

12          THE COURT:  Mr. Bromley.

13          MR. BROMLEY:  Your Honor, thank you both for

14    continuing to accommodate us, and we certainly hope that we're

15    going to be able to move expeditiously at this point.  Before

16    we put Mr. Murray on the stand, I did want to bring both Courts

17    up to speed on something we just discussed in the hallway,

18    which is we believe that we have resolved the concerns that

19    MatlinPatterson has, such that their limited objection would be

20    withdrawn.  And our hope would, then, allow Mr. Murray to

21    proceed by proffer, rather than by direct testimony.  And that

22    would, in particular, deal with adding certain language to

23    Section 2.2.1 of the amended asset sale agreement relating to

24    the so-called put that has been discussed.

25          THE COURT:  Yes.

1        MR. BROMLEY:  And so we view these as clean up

2    matters, but we are -- and we have agreed on the language.  We

3    have not yet, by virtue of the dealing with this in real time,

4    shared it with the monitor, because, literally, we just walked

5    out of the room with it.  But we do believe that it is going to

6    be satisfactory, both to -- satisfactory to Nortel, here, in

7    the room, in Wilmington.  So what we propose to do is to take

8    this language which has been agreed by MatlinPatterson and

9    Ciena, put it into an e-mail, send it up to Canada while we're

10   talking with Mr. Murray, through Mr. Murray's testimony.  But

11   on the basis of this language, we believe that the objection is

12   resolved and withdrawn by Matlin.

13        THE COURT:  All right.

14        MR. BROMLEY:  And Ms. Feldsher can speak to that as

15   well.

16        THE COURT:  Thank you.  Ms. Feldsher.

17        MS. FELDSHER:  Good evening, Your Honor.

18        THE COURT:  Good evening.

19        MS. FELDSHER:  It's been a long day.

20        THE COURT:  Yes.

21        MS. FELDSHER:  But I am pleased to stand here and say

22   that Mr. Bromley is correct, and we do believe that we have an

23   agreement with the debtors and Ciena, the successful -- if

24   approved, the successful bidder here.  And just to give the

25   Courts a brief glimpse of what that settlement will be, you

257

1    know, as we've highlighted to the Court throughout the day,

2    there is a provision in the ASA which permits Ciena to,

3    essentially, elect to not issue notes in whatever denomination

4    it chooses not to issue them, and instead, pay -- the old way

5    said that they would just pay par, pay dollar-for-dollar cash

6    in lieu of the notes.  What we've agreed with Ciena is that if

7    they choose to take that election, exercise that election, and

8    they choose to not issue a portion or all of the notes prior to

9    the closing date, they would do that at 102 percent, rather

10   than at par, at a hundred percent, unless -- now we're going to

11   get into lots of technicalities which I won't get into -- there

12   are provisions by which they would need to take it out at

13   higher amounts than that if they fall under what's referred to

14   in the ASA as the optional redemption provision.  But assuming

15   they do not, if they were previously permitted to, essentially,

16   take out the notes at par, they would not pay 102 percent.  We

17   believe that this brings value to the estate, and on that

18   basis, we are happy to withdraw any further objections we have

19   to the debtors' efforts to have Ciena's bid declared the

20   successful bid.

21           THE COURT:  All right, thank you.

22           MS. FELDSHER:  Thank you, Your Honor.

23           THE COURT:  Thank you, Ms. Feldsher.  Mr. Galardi.

24           MR. GALARDI:  Your Honor, for a party that has no

25   standing --

258

1      THE COURT:  I know.  I was about to say it, and I'm

2  glad you did.

3      MR. GALARDI:  Your Honor, just, again, I don't mean to

4  criticize the estate.  It's great that it's getting more value.

5  It sounds like there is a material change to the bid.  I just

6  simply want to note that on the record, whether it's more value

7  or not, to change the bid on a provision that we have been

8  objecting to, to understand, to improve the estate, to me, if

9  that doesn't reopen an auction, I'm not sure what does.  So I

10  will just say that on the record.  We still stand by our 810

11  million dollar bid, and we stand by that, and I understand I

12  have no standing to say anything other than that.

13      THE COURT:  Thank you, Mr. Galardi.  Mr. Bacon.

14      MR. BACON:  Your Honor, Doug Bacon for Ciena.  Every

15  time Mr. Galardi steps up, I have this recurring fantasy of

16  coming in here representing Bill Gates.  I don't think that's

17  going to happen, though.  Judge, what took so long to deal with

18  a very simple modification that went straight to the heart of

19  MatlinPatterson's objection was the concern that exactly that

20  kind of argument could be raised.  And I'm comfortable, and

21  I've ensured my client, that the kind of hallway modification

22  that was just described to you is exactly the kind of thing

23  Courts encourage to bring proceedings to a quicker end.  And

24  it's worth something to my client not to have a lot of

25  misinformation spread, which has been happening since the

259

1    Sunday leaks which were testified about.  It's worth something

2    to my client to have a clean record, ideally tonight, for when

3    the markets open around our public company tomorrow.  So I hope

4    Your Honor will take it in that spirit.

5            THE COURT:  Thank you.  I understand, Mr. Bacon, and

6    thank you.

7            MR. BACON:  Thank you.

8            THE COURT:  Mr. Bromley.

9            MR. BROMLEY:  One of my senior partners once told me

10   when you get good news you say thank you, so I thank the

11   parties for resolving that issue.

12           THE COURT:  Yes.

13           MR. BROMLEY:  An objector with standing has talked to

14   our purchaser, and they've resolved a concern that they both

15   had.  I don't think that reopens anything, Your Honor.  And,

16   now we're ready to move forward, and we have our next witness,

17   Mr. Michael Murray, from Lazard.  My partner, Lisa Schweitzer,

18   will be handling that testimony.

19           THE COURT:  All right.

20           MR. BROMLEY:  So we would call Michael Murray to the

21   stand.

22           THE COURT:  Mr. Murray.  Mr. Murray, if you'll just

23   remain standing while you're sworn, sir.  Thank you.

24           THE CLERK:  Could you please state your full name for

25   the record, and spell your last name?

260

1          MR. MURRAY:  Michael Murray, M-U-R-R-A-Y.

2      (Witness duly sworn)

3          THE CLERK:  You may be seated.

4          THE COURT:  Ms. Schweitzer, whenever you're ready.

5          MS. SCHWEITZER:  Sure.  Good evening, Your Honor.

6   DIRECT EXAMINATION

7   BY MS. SCHWEITZER:

8   Q.   Mr. Murray, can you, for the record, state your position

9   at Lazard?

10  A.   I'm managing director.

11  Q.   How long have you worked there?

12  A.   Just over two years.  I joined in September of 2007.

13  Q.   Where did you work before that?

14  A.   Deutsche Bank.

15  Q.   Can you, generally, describe your area of expertise and

16  responsibilities at Lazard?

17  A.   M&A banker for the technology industry.

18  Q.   And you have an MBA, as well?

19  A.   I do, from Harvard.

20  Q.   You've given prior testimony in this court regarding

21  different asset sales undertaken by Nortel?

22  A.   Yes.

23  Q.   Including CDMA sale, among others?

24  A.   Yes.

25  Q.   And you, personally, have been involved in a leading role

1    from Lazard on many, if not all, of the asset sales conducted?

2    A.   I've spent the majority of my year on Nortel issues.

3    Q.   And no one could ask for anything more, right?  And

4    Nortel -- I mean, I'm sorry, Lazard, in fact, was retained by

5    Nortel in January 2009 or at the end of 2008 to provide advice

6    with different restructuring opportunities, including the asset

7    sales --

8    A.   We were.

9    Q.   -- that it's now pursuing.  And based on your year of

10   experience with the company, you're also familiar with the

11   different businesses of Nortel --

12   A.   I am.

13   Q.   -- the nature of the businesses, their customer

14   relationships and the like?

15   A.   Yes.

16   Q.   And you also, as part of your responsibilities,

17   participated in different viability analyses early on in the

18   process in determining whether to pursue asset sales or stay on

19   the loan plans and different reorganization options, is that

20   correct?

21   A.   That is correct.

22   Q.   And it was ultimately determined by the estate to pursue

23   these various asset sales in an orderly manner --

24   A.   Yes.

25   Q.   -- and the sale is just one of the several that we all

1   know have occurred --

2   A.   Yes.

3   Q.   -- over the last year.  You were in the courtroom before

4   for Mr. Riedel's testimony, were you not?

5   A.   I was.

6   Q.   And you heard his description of the history of the MEN

7   asset sales strategies, the exploration of the sales starting

8   in September 2008, right?

9   A.   I'm aware of that background; I was not involved in the

10   prefiling --

11   Q.   Right.

12   A.   -- part of the process.

13   Q.   And when did you specifically become involved in the MEN

14   auction process or sale process?

15   A.   Some time after the filing, I think in the February/March

16   time frame.

17   Q.   Right.  And Mr. Riedel had testified, also, that there was

18   a prebankruptcy effort to market the MEN assets, and then that

19   quieted down during the bankruptcy --

20   A.   Right.

21   Q.   -- was restarted after the filing.

22   A.   Exactly.

23   Q.   And that's consistent with your understanding --

24   A.   Yes.

25   Q.   -- of the history?  And when you became involved, what was

1    your role and duties in connection with the MEN sale?

2    A.   It would primarily focus around targeting potential

3    buyers, structuring a process.

4    Q.   Okay.

5    A.   Work on valuation and structuring of the assets.

6    Q.   Right.

7    A.   Much of that work had been done.

8    Q.   I believe Mr. Riedel testified that they had approached

9    approximately forty or fifty potential bidders and

10   counterparties looking for potential buyers.  Is that

11   consistent with your recollection?

12   A.   yes, it is.

13   Q.   And then about thirteen, or so, of those counterparties

14   ultimately signed nondisclosure agreements with the company?

15   A.   That's right.

16   Q.   Is that correct?  And management presentations were done

17   to a subset of those thirteen?

18   A.   That's right.

19   Q.   And what other efforts did you make to identify potential

20   buyers for the assets?

21   A.   We reached out, in my opinion, to everyone that would have

22   potential interest in the asset, just through our knowledge of

23   the industry and our contacts throughout the world in the

24   industry.

25   Q.   Okay.  And you're aware, also, based on your involvement,

264

1    that Ciena was ultimately, at the end of that process, selected

2    as the stalking horse bidder for the original bid?

3    A.    Yes.

4    Q.    And what was your role in working with the company to

5    decide on the stalking horse bidder and the selection of the

6    right counterparty?

7    A.    I was very involved with the negotiations with the

8    counterparty, quite involved with discussions with the various

9    committees on our side, relative to the decisions we were

10   taking, and also involved with the analysis of the value of the

11   bid.

12   Q.    And what was your view of the company's decision to select

13   Ciena as the stalking horse bidder?

14   A.    I was very much in support of it.

15   Q.    And what did you --

16   A.    I regarded it as a superior bid at the time.

17   Q.    And what was your opinion of Ciena as a bidder and a

18   potential counterparty?

19   A.    I had a lot of comfort in their ability to execute on and

20   close on a transaction.

21   Q.    What did you base the conclusion on?

22   A.    Ability to pay, and my analysis was their familiarity with

23   the industry, their track record of acquisitions, which is --

24   they haven't closed one as large as this, but they've been very

25   active --

265

1    Q.    Right.

2    A.    -- acquirers over the years.

3    Q.    Right.  Mr. Riedel also testified earlier, and it's

4    contained right in the Ciena stalking horse asset sale

5    agreement that Ciena would provide certain diligence that --

6    well, first, that the asset sale agreement had a stock

7    component to it --

8    A.    Yes.

9    Q.    -- and that Ciena would provide certain diligence to

10   Nortel and its creditor constituencies regarding the company

11   itself.  Did you participate in that?  Well, first of all, did

12   such a meeting occur?

13   A.    It did.

14   Q.    And did you participate in that?

15   A.    Yes.

16   Q.    And what was your opinion of the information that was

17   shared with you?

18   A.    It was shared with a broad audience on our side, and I

19   felt that it was sufficient with regard to our ability to

20   assess the value of the stock which, as we all know, trades

21   every day in the market.

22   Q.    How did it affect your decision, or the company's decision

23   to select Ciena as the stalking horse bidder and to seek

24   approval of that sale agreement?

25   A.    The stock was a component of the overall value, and we

266

1    took comfort in that discussion.

2    Q.   Okay.  And were you actually involved in the negotiation

3    of the stalking horse agreement with Ciena?

4    A.   Yes.

5    Q.   In what capacity?

6    A.   I was a primary advisor to Nortel with regard to terms of

7    the agreement and the negotiation.

8    Q.   Could you describe the nature and duration of those

9    negotiations, generally?

10   A.   It went on for quite an extended period of time.  It was

11   certainly arm's length, vigorous, at times contentious over

12   multiple months and dozens of meetings.

13   Q.   All right.  And this ultimately culminated in the signing

14   of the --

15            MS. SCHWEITZER:  Sorry.  Withdraw that.

16   Q.   And following the selection of Ciena as the stalking horse

17   bidder, the Court -- we came to the Court and got approval of

18   bidding procedures that you're familiar with as well?

19   A.   Yes.

20   Q.   I believe you actually probably testified at that hearing?

21   A.   I did.

22   Q.   The one that I missed.  And as a result, following that,

23   the debtors, in fact, conducted a further solicitation process

24   and auction, that's correct?

25   A.   That is correct.

267

1    Q.   And what was your involvement in that subsequent

2    solicitation process?

3    A.   I was, again, involved in targeting and contacting

4    potential buyers to solicit their potential participation in

5    the auction.

6    Q.   Right.  Did those contacts include contacts with NSN?

7    A.   Yes.

8    Q.   And what were the nature of your discussions prior to the

9    bid deadline with NSN?

10   A.   I had a number of discussions with their bankers at Credit

11   Suisse.

12   Q.   And based on those discussions, did you have a sense or a

13   conclusion as to whether NSN was intending to bid in the

14   process?

15   A.   I believe very strongly that they intended to bid right up

16   until the bid deadline.

17   Q.   Did you talk to them after they failed to submit a bid at

18   the bid deadline?

19   A.   I spoke with their banker the following day.

20   Q.   And what did you discuss?

21   A.   Why they didn't submit a bid.

22   Q.   Right, and did they continue to express interest in

23   pursuing a bid in the process?

24   A.   I first learned of their potential interest in pursuing

25   another bid, I'd say, about two days after the bid deadline.

268

1  Q.   And at that time, had they -- were they talking about

2  doing a sole bid or a bid in connection with another partner?

3  A.   It would be in connection with another partner.

4  Q.   And why was that?

5  A.   My understanding was that they had been denied, at the

6  board, the authority to pursue the transaction on a stand-alone

7  basis.

8  Q.   Where did you get that understanding from?

9  A.   From their banker.

10  Q.   Did they identify for you the counterparty that they were

11  having conversations with?

12  A.   Yes.

13  Q.   And was it OEP?

14  A.   It was.

15  Q.   And that ultimately resulted in a bid being submitted by

16  NSN and OEP?

17  A.   Yes.

18  Q.   Prior to the original bid deadline, had you had any

19  conversations with OEP regarding their desire to submit a bid I

20  the process?

21  A.   They were quite involved in the process, actually, prior

22  to the stalking horse bid.  So we had had many, many

23  conversations with OEP over many months.

24  Q.   And was there a reason they weren't selected, or didn't

25  proceed to become the original stalking horse bidder?

269

1    A.   From a value perspective, they were, in my opinion, quite

2    short of where Ciena was.  Ciena was also, in my opinion, much

3    more focused and organized around getting to closure on the

4    documentation.  But the primary delta, in my view, was value.

5    Q.   And you've had conversations with OEP in order to

6    encourage them to raise the value --

7    A.   Yes, we did.

8    Q.   -- of their offering?

9    A.   We also had them present to the creditors' committees with

10   regard to their bid, and we were able to get feedback from

11   those bodies on that topic, as well.

12   Q.   And that ultimately did not lead them to submitting a bid

13   that was satisfactory to become a stalking horse bid?

14   A.   Correct.

15   Q.   And they also did not submit a bid prior to the original

16   bid deadline?

17   A.   They did not.

18   Q.   But then you're aware that they ultimately, the joint bid

19   was put in --

20   A.   Yes.

21   Q.   -- at the time of the extended bid deadline --

22   A.   I am.

23   Q.   -- in November.  And that, in fact, was announced to be

24   the starting bid at auctions, that's correct?

25   A.   Exactly.

270

1    Q.    And were you involved in the valuation of that bid as a

2    starting bid at auction?

3    A.    I was.

4    Q.    And what was the reason that was selected as a starting

5    bid?

6    A.    It was a superior bid and all cash.

7    Q.    And what was your -- did you, first of all, did you attend

8    the auction that was held at Cleary's offices?

9    A.    I did.

10    Q.    What was your role at the auction?

11    A.    Again, advising my client, Nortel, on all the parameters

12    of the two bids with regard to value and structure and issues

13    with regard to the contract, et cetera.

14    Q.    And you reviewed the bids as they came in?

15    A.    I did.

16    Q.    And you're aware that there were eleven rounds of bidding?

17    A.    I am.  Very much so.

18    Q.    Painfully aware?  And, in fact, did Nortel employees,

19    officers that were present consult with you and other folks at

20    Lazard in forming their opinions regarding the value that's

21    ascribed to the different bids that came in?

22    A.    Often and actively.

23    Q.    And what other constituencies and professionals were

24    involved in making those determinations or consulted with

25    before the determinations were --

271

1    A.    Yeah, financial advisors to the ad hoc bond committee, as

2    well as to the UCC were also involved.  There were, as we've

3    heard today, hundreds of people around the floor that day, and

4    on our side, dozens that were involved in discussions related

5    to each and every bid.

6    Q.    Right, without going into details, how would you generally

7    describe the nature of that consultation and evaluation of the

8    bids?

9    A.    It was an active, interactive dialogue between all of the

10   constituents.  I think that it resulted in consensus at each

11   and every round.  But it was -- it was a full debate.

12   Q.    And you agreed -- you agreed with the positions taken of

13   the selection of the leading bid at the different rounds?

14   A.    I did.

15   Q.    And you ultimately agreed with the decision of the debtors

16   to select the Ciena bid for which we're seeking approval today

17   as the successful bid at auction?

18   A.    I did.

19   Q.    And what did you base that conclusion on?

20   A.    I deemed it to be the highest and best value received at

21   the end of the auction.

22   Q.    Okay.  And what did you base that opinion on, your highest

23   and best value.

24   A.    My view of the valuation of the cash and the notes and the

25   combination, and also with regard to the break fee, all of that

272

1   weighed into the mix with regard to that assessment.

2   Q.   You've, obviously, been in the courtroom today and heard a

3   lot of discussion about the valuation of notes --

4   A.   Yes.

5   Q.   -- and that certain people's not -- that are not the

6   debtors or creditor constituency disagree with the debtors'

7   valuation or at least cause some question to be cached --

8   A.   Right.

9   Q.   -- on the debtors' valuation of the notes.  Can you speak

10  a little bit -- and I guess Mr. Riedel had previously testified

11  that in the company determining the value of the notes and to

12  mark them at par --

13  A.   Um-hum.

14  Q.   -- for the purposes of bidding increments, that they had

15  turned to their advisors, including Lazard?

16  A.   Yes.

17  Q.   Can you give us some color on who, at Lazard --

18  A.   Sure.

19  Q.   -- worked on that?

20  A.   I was involved.  I'm not a convertible bond expert, but

21  I'm quite familiar with the product.  I involved my partner,

22  Brendan Dyson, who is our convertible -- head of our

23  convertible advisory group.  He has twenty-five years

24  experience with the product.  We also consulted with Jefferies,

25  who are advisors to the UCC.

273

1    Q.    Okay, and the convertible debt was not an original

2    component of Ciena's bids in the early rounds, is that correct?

3    A.    That's correct.

4    Q.    And that, in fact, came in at about the middle of the

5    auction on Saturday, the second day of auction -- or, I

6    apologize -- they came in the first night of auction, the idea

7    of a convertible note?

8    A.    It was introduced as an idea by Ciena on Friday night.

9    Q.    Can you talk a little bit about how that unfolded?

10   A.    Sure.  There were -- if memory serves me right, there were

11   two rounds of bidding prior to that where the ten million

12   shares were still part of the mix.  Ciena approached us late on

13   Friday and, basically, said that we would like to take some

14   time to craft a convertible that we could use for continued

15   bidding.  And we said that we were open to that discussion.

16   Q.    That evening, did Ciena give you any more context as to

17   the terms that they were considering for the convertible notes?

18   A.    I don't recall if the original terms that were proposed

19   were that evening or later in the morning or when it happened.

20   But they did propose an initial set of terms that we reacted

21   to.

22   Q.    And what did you do when you received those initial --

23   well, first of all, do you recall the initial set of terms they

24   proposed for the convertible notes?

25   A.    I believe they were four percent up thirty.

274

1    Q.    What does that mean, for those of us that don't talk

2    banker?

3    A.    The coupon is four percent; the conversion premium is

4    thirty percent.

5    Q.    And to step back, what is a convertible note, generally?

6    A.    It's a hybrid security that combines the features of a

7    bond with the features of an option on the stock price.

8    Q.    And they had provided you with the basic economic terms of

9    what that convertible note would look like?

10   A.    Of a convertible note that they valued at par.

11   Q.    Ciena actually told Nortel that they valued that note at

12   par?

13   A.    Yes.

14   Q.    And what did Nortel do in assessing the value of the note

15   or moving forward with that proposal?

16   A.    We began to consult without experts as well as our

17   constituents with regard to our reaction to that proposal.

18   Q.    Okay, and when you say your experts, who do you

19   specifically have in mind?

20   A.    Again, on my side, it was Brendan Dyson, my partner, along

21   with Jefferies.

22   Q.    And was an action plan created on the Nortel side in

23   reaction to that informal dialogue with Ciena?

24   A.    We just had a series of conversations with regard to our

25   reaction, and we did counterpropose.

275

1   Q.   Okay, when you say you counterproposed, what was your

2   counterproposal?

3   A.   I'm not going to remember the exact sequence, but we

4   proposed something closer to, if I'm not mistaken, seven

5   percent up -- up forty.

6   Q.   Right, and again, for those of us that don't speak banker,

7   what are you saying?

8   A.   Seven percent coupon, forty percent conversion premium.

9   Q.   Thanks.  And how did you come up with -- or, how did

10  Nortel come up with that counterproposal?

11  A.   It as our view that to -- I guess I'd say it this way.

12  The direction from the committees, or the view of the creditors

13  is that cash -- the bond needed to look as much like cash as

14  possible.  So we worked hard to craft terms that we thought

15  would be, actually, at a premium to par and provide us with a

16  cushion, to the extent things changed, that would maintain par.

17  Q.   And you said Brendan Dyson of Lazard was involved in that?

18  A.   Yes, very much so.

19  Q.   And as a res -- did you actually form an opinion when you

20  went back to Ciena with a counterproposal as to the value of

21  the paper that you were proposing to -- that they should offer?

22  A.   We believed that it was at a premium to par.

23  Q.   Okay, and where did that lead in the next round of

24  bidding?

25  A.   We had one or two more discussions.  We arrived at the

1    terms that are now seen and then worked to, essentially,

2    document them.

3    Q.    And when you say that you were looking at your note and

4    working through them and that you came to the conclusion that

5    the notes were value -- you could value the notes at a premium

6    to par, the value of the notes -- or, the face amount of the

7    notes went up over the course of the auction.

8    A.    That's right.

9    Q.    Did you, when you came to the conclusion the notes could

10   be valued at par, have an idea of the dollar range of the notes

11   that would be subject to a par valuation or a premium to par

12   valuation?

13   A.    I think Mr. Riedel alluded to the cap that we perceived

14   which was related to the shareholder vote threshold.  We were

15   comfortable, as a group of constituents, that we could get to

16   that level and maintain par with these terms.

17   Q.    Okay.  And when Ciena counterproposed with their notes,

18   did Nortel consult with you and other advisors and other

19   constituencies about the value of the note that Ciena was

20   proposing?

21   A.    Absolutely.

22   Q.    And what was the conclusion reached on the value of that

23   note, not just for bidding purposes, but, generally, of the

24   value of that note?

25   A.    We were very comfortable utilizing at par value in the

277

1    context of bidding.  That was also communicated to the other

2    bidder.

3    Q.   Okay, and you testified earlier that you're not a

4    convertible debt expert, but you have some familiarity --

5    A.   Yes.

6    Q.   -- with the notes.  Do you have enough familiarity to be

7    able to give your own evaluation of the notes or, you know,

8    what you learned in connection with consulting with your own

9    experts?

10   A.   I'm smart enough to know that I will always consult with

11   somebody who's more comfortable with the product than I am.

12   Q.   Right.

13   A.   But given the dialogue I've had about the product, yes,

14   I'm comfortable opining that -- and I have -- that the notes

15   are valued at at least par.

16   Q.   Right.  And you formed your own internal opinion to that,

17   not just hearing it --

18   A.   I did.

19   Q.   -- and passing it through.

20   A.   Yes, I did.

21   Q.   Okay.  And after that note -- after that determination the

22   notes were at par was made, that round of bidding, ultimately,

23   the debtors designated the Ciena proposal, including the notes

24   and some cash, as the leading bid for that round.

25   A.   That's correct.

278

1    Q.    Is that right?

2    A.    Yup.

3    Q.    And then, did the MEN Acquisition Corp. bid again after

4    that?

5    A.    They did.

6    Q.    And what was their bid?

7    A.    It was, if I remember correctly, exactly at the bid

8    increment required to be deemed a topping bid, with the par --

9    with the bonds at par.

10   Q.    I believe it was 7 -- 10 million.  Does that sound

11   correct?

12   A.    That sounds right.

13   Q.    And did MEN Acquisition tie any conditions or

14   contingencies to that -- the acceptance of that bid in that

15   first round after the notes came in?

16   A.    I don't think they did in the first round after the notes

17   were introduced.

18   Q.    But there were subsequent rounds of bidding?

19   A.    Yes.

20   Q.    And then, after that initial round of bidding, did MEN

21   Acquisition express their view as to whether they valued the

22   notes at par?

23   A.    They did.

24   Q.    And what was their view?

25   A.    They did not deem them to be at par.  They challenged our

279

1   view on that.

2   Q.   Did they, at any point, give you their valuation of the

3   notes?

4   A.   No.

5   Q.   Did we ask them?

6   A.   Yes.

7   Q.   And who specifically asked, if you remember, for the value

8   of the notes?

9   A.   I asked.  My partner, David Descoteaux, asked the

10   question.  Their response was that we don't feel that their

11   par.  But we never got into a discussion about their view of

12   the actual value.

13   Q.   Did they ask to have -- did MEN Acquisitions

14   representatives ask to have any conversations with the company

15   or the creditors regarding their views of the notes?

16   A.   Yes, they did.

17   Q.   And what did they ask for, and what did they get?

18   A.   They asked for an audience with the creditors and the FAs

19   to the creditors, which they did receive.

20   Q.   Did they speak to anyone else?

21   A.   Certainly to us, quite a bit, to the company.  To just

22   about everyone who was on the floor that day.

23   Q.   Did they give you any information or opinions that changed

24   your view of the valuation of the notes?

25   A.   No.

280

1    Q.   Are you aware that their conversations changed any other

2    creditor constituencies' valuation of the notes for bidding

3    purposes?

4    A.   Not that I'm aware of.

5    Q.   Now, I understand you're not a convertible debt expert,

6    but you have some knowledge about the convertible debt.

7    There's sometimes been a theme or conversation of just how

8    could paper ever be --

9    A.   Sure.

10   Q.   -- as good as cash, right?

11   A.   Right.

12   Q.   Cash is cash, and you can never have paper as good as

13   cash, so you certainly couldn't have a note or an IOU as good

14   as cash.  Can you explain in simple English of how you get to

15   the position that you're able to valuate a note which is an IOU

16   at a --

17   A.   Sure.

18   Q.   -- price above cash?

19   A.   Yeah.  There are certainly pieces of paper given certain

20   terms that are valued above cash.  IBM, if you had a choice

21   between ten dollars from IBM in cash or ten dollars in bonds

22   that pay way above market rate, I'd take the bonds.

23   Q.   Right.

24   A.   It's worth more than cash.

25   Q.   And in this case, the notes were not going to be issued

281

1    until closing, that's correct?

2    A.   That's right.

3    Q.   And prior to closing, Ciena had the right to offer cash

4    instead of notes --

5    A.   At par.

6    Q.   -- at par.

7    A.   That's right.

8    Q.   And how did that -- how did those, both the delay and the

9    issuance of the notes and the right to take them out at par

10   affect your valuation, if at all?

11   A.   So, the probability of where the stock price and credit

12   spread might be, say, four months out at close was factored

13   into our assessment of the value of the bonds.

14   Q.   Okay, and the fact that they said they had the right to

15   take you out -- or take Nortel out at par prior to the closing,

16   did that, in itself, did not cause you to say that the notes

17   had to be valued at less than par?

18   A.   I'd say even more effectively, we have an incentive

19   structure built into the bond that, in our opinion, would

20   probably cause them to want to take the note down to par, which

21   is equivalent to cash.

22   Q.   And was that opinion and conclusion shared by Brendan

23   Dyson and other folks at Lazard?

24   A.   Yes.

25   Q.   And was it also shared by the advisors to the other

282

1   creditor constituencies that were consulted along the way?

2   A.   Yes.

3   Q.   After the auction closed -- a week or ten days have now

4   passed, and obviously the market has had time to know Ciena won

5   the auction --

6   A.   Right.

7   Q.   -- that was closed and to see the terms of the notes.  And

8   there's obviously been trading in the existing Ciena notes and

9   bonds --

10   A.   Every day.

11   Q.   -- and stock.  And the market reaction, has that affected

12   your conclusion or your valuations at auction in any way?

13   A.   It hasn't.  And I think the fact that the way the stock's

14   traded relative to the existing bond is indicative of one of

15   the reasons we moved to a convertible security.  The day after

16   the auction, Ciena's stock was down nine percent.  Their

17   existing bond, which has the exact same maturity as this bond,

18   was down about four percent.

19   Q.   What does that lead you to conclude, that piece of

20   information?

21   A.   We have downside protection in a convertible security,

22   relative to the stock price.

23   Q.   And you're referencing an existing convertible debt --

24   A.   Yes.

25   Q.   -- issuance.  Can you explain the relationship or

1   similarity of that to the piece of paper that was offered by

2   Ciena?

3   A.   Sure.  The existing convertible has a maturity on the

4   exact same day as this structure.  It trades in the marketplace

5   every day.  It has a current yield of 8.2 percent, and it has

6   an option or strike price of thirty-eight dollars, versus a

7   stock price of thirteen.  So the option value in that

8   convertible is quite low.  So it's actually a very good

9   indicator of where the market prices Ciena credit.  And we use

10  that as a proxy for pricing this bond.

11  Q.   Now that the -- we're seeking approval of this Ciena bid,

12  as well, the suggestion has been made by certain folks that

13  there'd be no harm to reopening the auction, the auction could

14  be done quickly, that we're only fighting about cash, and that

15  it's important for the debtors to realize the highest value.

16  Do you, as the advisor to the debtor, have an opinion as to the

17  value of seeking approval of the Ciena current proposal now

18  versus pursuing a higher and better -- potentially higher offer

19  in terms of getting more cash into the estate?

20  A.   I am very much persuaded by two arguments.  One is, I

21  think process integrity is important, particularly relative to

22  our plans for further asset sales.  I think that's a very

23  important factor.  Secondly, I think that any delay that may be

24  caused by a reopening of the auction and a potential change of

25  bidders is potentially detrimental to this asset.

284

1   Q.   And do you have an opinion based on -- I think at the end,

2   someone had said, you know, because we're bidding these notes

3   at par, we're valuing these notes at par, there was -- the bids

4   were viewed exactly the same, quantitatively.

5   A.   Um-hum.

6   Q.   Do you have any qualitative views on the bidders where you

7   have on one side a strategic financial bidder, on the other

8   side, you have a strategic bidder in Ciena, just in terms of

9   the highest and best offer, or highest or best offer?  Are

10  there other factors that were considered along the way?

11  A.   I would say considered, in the context of discussions, not

12  factored in in a quantitative way.  I put a lot of comfort on

13  Ciena's ability to close this transaction at the terms as

14  negotiated.

15  Q.   I thank you.  I think that's it from our end.

16  A.   Thank you.

17          THE COURT:  Thank you, Ms. Schweitzer.

18          MS. SCHWEITZER:  Um-hum.

19          THE COURT:  Mr. Hodara?  Anyone else?  Yes, Mr. Bacon.

20          MR. BACON:  I just have one question, Your Honor.

21  Doug Bacon for Ciena.

22  CROSS-EXAMINATION

23  BY MR. BACON:

24  Q.   Mr. Murray, is it your view -- or, do you have -- it's

25  actually two questions.  Do you have a view on whether,

285

1    throughout this process, Ciena has comported itself in good

2    faith?

3    A.    I feel that they have.

4    Q.    Thank you.  And it's just one question.

5            MR. BACON:  Thank you, Judge.

6            THE COURT:  Thank you, Mr. Bacon.  Anyone else?

7            Mr. Murray, you may step down, sir.

8            THE WITNESS:  Thank you.

9            THE COURT:  Thank you.  Mr. Bromley?

10           MR. BROMLEY:  Your Honor, now, maybe we could ask for

11   a bit of guidance.  We believe that there's a sufficient

12   evidentiary record to support the approval of the transactions.

13   We are -- we also have a number of, sort of, the more run-of-

14   the-mill objections where we're going through the objecting

15   party paragraph type of thing that we did with respect to the

16   Isis (ph.) transaction.

17           THE COURT:  Right.

18           MR. BROMLEY:  We could do that now.  We could, also,

19   go directly into what would be closing argument.  We think that

20   both have to be done, and we're happy to go in either order.

21   Obviously, there are certain issues that have been raised with

22   respect to the threshold questions.  It would be helpful for

23   us, I think, as well, to know what the Courts would like us to

24   do.

25           THE COURT:  Justice Morawitz, it's my view that we

1    should take argument on what I'll call the larger issues before

2    we go into some of the more specific objections.

3            JUSTICE MORAWITZ:  I concur.

4            THE COURT:  I believe Mr. Justice Morawitz said he

5    concurred.

6            MR. BROMLEY:  Well, with that, Your Honor, I would,

7    again, cede the podium to my colleague, Mr. Tay, in Toronto.

8            THE COURT:  Okay.

9            MR. TAY:  Thank you, Your Honors.  I will take no more

10   than ten or fifteen minutes.  Hopefully, Judge Gross, you can

11   hear me.  The sound is pretty bad, here, but I'm hoping you can

12   hear us.  And I'm told you also have before you now a copy of

13   the Soundair case --

14           THE COURT:  Yes.

15           MR. TAY:  -- the Royal Bank v. Soundair case.  What I

16   propose to do is, when I stood up for you, you heard the words

17   of an advocate.  And I think it's instructive that I take you

18   to the excellent words of the Court of Appeal.  And so I will

19   just take you through paragraphs of this case that I think are

20   relevant.  I will go in chronological order, and you will find

21   that a lot of the paragraphs that I'm going to take you to will

22   sound very familiar because in making my submissions, earlier,

23   I tried to stick as closely as possible to the words of the

24   case because I think it's instructive for me to do this.  And

25   then I will add a few arguments, based on the evidence that we

1    have just heard.  And that will be what I plan to do.

2         So if I can take you, first, to page 7, and to the

3    paragraph that's quoted, the indented portion, where -- sorry,

4    it's paragraph F.  The numbering, here, is very weird.  I don't

5    know -- do you have --

6         THE COURT:  Yes, yes I do, Mr. Tay.  Thank you.

7         MR. TAY:  Yes, the reference to Crown Trust Co. v.

8    Rosenberg.  Okay, so we're on the same page.  So it's talking

9    about the decision of the receiver's account.  And it says,

10   "Its decision was made as a matter of business judgment on the

11   elements then available to it.  It is the very essence of a

12   receiver's function to make such judgments and in the making of

13   them to act seriously and responsibly so as to be prepared to

14   stand behind them."  And it's also tried on Canada that these

15   references apply equally to the monitor.  So I'm just going to

16   read receiver, but please keep in mind that it applies equally

17   to monitors.

18        Next paragraph, "If the Court were to reject the

19   recommendation of the receiver in any but the most exceptional

20   circumstances, it would materially diminish and weaken the role

21   and function of the receiver, both in the perception of

22   receivers and in the perception of any others who might have

23   occasion to deal with them.  It would lead to the conclusion

24   that the decision of the receiver was of little weight and that

25   the real decision was always made upon the motion for approval.

288

1    That would be a consequence susceptible of immensely damaging

2    result to the disposition of assets by court-appointed

3    receivers."  And I would submit in the CCAA process and the

4    role of the monitor, that it equates in the CCAA process.

5         I'll take you to the next page, then, at the top of

6    the page.  "In my opinion, if the decision of the receiver

7    entered into an agreement of sale subject to court approval,"

8    and we've already talked about that, "with respect to certain

9    assets, it's reasonable and sound under the circumstances at

10   the time existing, it should not be satisfied simply because a

11   later and higher bid is made.  To do so would literally create

12   chaos on the commercial world and receivers and purchasers

13   would never be sure they had a binding agreement."  So there is

14   a policies in Canada to not have the never-ending auction, but

15   rather to create certainty and reliability in the process the

16   court approves.

17        If I can take you to page 9, now, the start of the

18   first paragraph, "It is my opinion that the price contained in

19   the" what he calls the ninth to offer, so in other words, the

20   higher offer, "is relevant only if it shows that the price

21   obtained by the receiver in the lower offer was not the

22   reasonable one."  It then discusses several cases and comes to

23   the conclusion at the bottom of the page where it says, "What

24   those cases show is that the prices in other offers have

25   relevance only if they showed the prices contained in the offer

289

1    accepted by the receiver was so unreasonably low as to

2    demonstrate that the receiver was improvident in accepting it.

3    I'm of the opinion, therefore, that if they do not attempt to

4    show that the receiver was improvident, they should not be

5    considered upon a motion to confirm a sale recommended by a

6    court-appointed receiver.  If they were, the process would be

7    changed from a sale by receiver subject to court approval into

8    an auction inducted by the Court at the time the approval is

9    sought.  In my opinion, the latter course is unfair to the

10   person who has entered bona fide into an agreement with the

11   receiver, can only lead to chaos, and must be discouraged."

12        There's an exception in the next paragraph.  It says,

13   "If, however, the subsequent offer is so substantially higher

14   than the sale recommended by the receiver, then it may be that

15   the receiver has not conducted the sale properly.  In such

16   circumstances, the Court would be justified, itself, in

17   entering into the sale process by considering better bids.

18   However, I think that process should be entered into only if

19   the Court is satisfied that the receiver has not properly

20   conducted the sale which it has recommended to the Court."  I

21   submit to you, that exception does not apply here.

22        I will then take you to page 12, where the top of the

23   page says, "It's well established that the primary interest is

24   that of the creditors of the debtor."  Next sentence:

25   "However, it is not the only or overriding consideration.  In

290

1    my opinion, there are other persons whose interests require

2    consideration.  In the appropriate case, the interests of the

3    debtor must be taken into account."  And I would ask you to

4    just keep that in the back of your mind, because I'll come back

5    to the letter, here, and especially the Canadian letter, and

6    I'll be making submissions in that respect.  And it goes on to

7    say, "Also in a case like this where the purchaser has

8    bargained at some length and dealt with, at a considerable

9    expense, with the receiver, the interests of the purchaser

10   ought to be taken into account."  And at the very bottom of

11   that paragraph, he says, "I think it's clearly implied that the

12   interests of a person who has negotiated an agreement with a

13   court-appointed receiver are very important."

14          If you go down to the next paragraph, and this is an

15   important policy point from the Canadian law perspective, it

16   says, "While it is accepted that the primary concern of the

17   receiver is the protection of the interest of the creditors,

18   there is a secondary but very important consideration, and that

19   is the integrity of the process by which the sale is effected."

20          Now, if you go down to the bottom of that page,

21   starting with the last two sentences, you'll see that I read

22   that paragraph earlier on.  But if you go to the next page,

23   there's an additional sentence that's quoted here.  It says,

24   "On the contrary," -- sorry, let me -- just for context, I'll

25   read the sentence before that.  It says, "To do so, would

291

1   literally create chaos on the commercial world and receivers

2   and purchasers would never be sure they had a binding

3   agreement.  On the contrary, they would know that other bids

4   could be received and considered up until the applications for

5   court approval is heard.  This would be an intolerable

6   situation."  This was my point about Canada doesn't have Bill

7   Gates exception.  It's about the integrity of the process, it's

8   about the certainty of the process, it's about needing a

9   termination of the process and people being able to rely on

10  that.

11       If I then take you down to a few paragraphs down that

12  starts, "It is my opinion that the Court must exercise extreme

13  caution before it interferes with the process adopted by

14  receiver to sell an unusual asset.  It is important that

15  prospective purchasers know that if they're acting in good

16  faith, bargain seriously with the receiver, and enter into an

17  agreement with it, the Court will not likely interfere with the

18  commercial judgment of the receiver to sell the asset to them."

19       If I take you to the last line of that page, "The

20  Court ought not to sit as on appeal from the decision of the

21  receiver, reviewing in minute detail every element of the

22  process by which the decision is reached.  To do so would be a

23  futile and duplicitous exercise."  It would be a futile and

24  duplicitous exercise for this Court to examine in minute detail

25  all of the circumstances leading up to the acceptance of, in

292

1    our case, the Ciena offer.

2          And if you look at a few lines down, again, stated,

3    "As a general rule, I do not think it's appropriate for the

4    Court to go into the minutiae of the process or the selling

5    strategy adopted by the receiver."

6          I'll now take you to my final quote that I want to

7    read, and that's on page 17.  And this talks about the point

8    that I raised earlier, about the interest of the creditors and

9    the views of the creditors and how the Court should treat them.

10   And this is the penultimate paragraph of page 17.  "There can

11   be no doubt that the interests of the creditors are an

12   important consideration in determining whether the receiver has

13   properly conducted the sale.  The opinion of the creditors as

14   to which offer ought to be accepted is something to be taken

15   into account.  But if the Court decides the receiver has acted

16   properly and providently, those views are not necessarily

17   determinative.  Because in this case, the receiver acted

18   properly and providently, I do not think that the views of the

19   creditors should override the considered judgment of the

20   receiver."

21         Now, from there, let me just go to the uncontroverted

22   facts that we have all heard from the testimony of Mr. Riedel.

23   And here, we have to be careful about sweeping statements. So

24   when people say we should reopen the auction because it's of

25   benefit to the estate, well, there's more than one estate,

1    here.  There's a Canadian estate, there's a U.S. estate,

2    there's EMEA estates, there's estates of the people who are not

3    even filing, APAC companies, for example.  And so when we say

4    let's increase the value that would potentially be available to

5    the estates, let's look at the facts before us today.  We have

6    the Ciena bid.  And we have the MEN Acquisition bid, which is

7    some 20 million dollars higher.  You have heard from Mr. Riedel

8    that taken as a whole, the MEN is the same, more or less,

9    receiver.  You've also heard that if you look at the U.S.

10   estate, a delay is actually good for the U.S. estate.  It

11   continues to make money because it's profitable, if you look

12   simply at the U.S. estate.  And who's paying for that?  Again,

13   it's the Canadian estate.  You've heard evidence,

14   uncontroverted evidence that this will cost, any delay in the

15   closing of this deal, will cost the Canadian estate 10 to 15

16   million dollars a month.  You've heard uncontroverted evidence

17   that because of the differences in the case, it will take at

18   least thirty to sixty days more to do the Ciena deal.  So

19   basically, even under the most hopeful, optimistic

20   circumstances, so maybe the estate will get, because we've

21   heard, and Ciena's a public company, and Ciena has publicly

22   stated it will not participate in an auction, I don't see how a

23   public company can go back on that statement.  So the facts

24   that are facing us today is that at best, we will get the deal

25   that is on the table, that will give us, maybe 20 million

294

1    dollars more.  We've heard the evidence it will cost Canada

2    more than the 20 to 25 million dollars, depending on how long

3    the closing is delayed.

4         So when we say let's reopen this auction so that the

5    estate can benefit, what estate are we talking about, here.

6    And you know that, from what you've seen in the past, Your

7    Honors, that when it comes to the question of allocation, we've

8    been arguing about this for months.  When it comes to the issue

9    of funding, we've been arguing about it for months.  Because

10   when it comes to contributing or letting go of money for the

11   particular estate, everyone's got their arms around and ring

12   fences around their own estate in their jurisdiction.

13        So while I don't fault the UCC whatsoever for saying

14   as a fiduciary of the U.S. estate, they're completely in favor

15   of you reopening this option, because there's no risk to the

16   U.S. estate.  In fact, with a delay, the U.S. estate actually

17   makes money.  But that's why you hear the receiver, who is

18   speaking on behalf of the Canadian estate saying no.  It is the

19   Ciena deal that provides the best value for the Canadian

20   estate.  Now, we also happen to think that it provides the best

21   value for all the estates because of the lack -- the lesser

22   risk and uncertainty and impact on customers, et cetera.  But,

23   Mr. Justice Morawitz, from the Canadian perspective, the

24   evidence before you, quite apart from any of these intangible

25   things and qualitative things that we can talk, the

295

1    uncontroverted evidence before you is that if you reopen this

2    auction, the Canadian estate will lose anywhere from 10 to 20

3    to 30 million dollars, depending on the delay.  And so even if

4    we were to be allocated a hundred percent of their additional

5    proceeds that would come from the MEN Acquisition deal

6    that's -- offer on the table -- and we all know we're not going

7    to get a hundred percent in Canada for the proceeds -- we would

8    still lose money.  How can that make sense?

9         Those are my submissions.

10    JUSTICE MORAWITZ:  Thank you, Mr. Tay.  Mr. Taylor?

11    MR. TAYLOR:  Thank you, Your Honor.  I'm here on

12    behalf of Ciena.  I don't propose to take very long, and I'll

13    actually take even less than I thought because when Mr. Tay

14    took you through the high level of Soundair, I thought there

15    were some sections I could point you to.  Now that he's taken

16    you through the case more specifically, I only have a couple of

17    references I would like to take Your Honor to.  I will not read

18    them to you, but I would just like to have you mark them in

19    your copy.

20         If you have the Soundair in front if you, on page 13,

21    at the top, Mr. Tay read that quote starting on the previous

22    page, down to the end of that first paragraph.  I would just

23    like to refer the Court to the next line of the following

24    paragraph where the judge says, "While those remarks may have

25    been made in the context of a bidding situation," you don't

1    need to go any further.  The only reason I take you there is

2    that someone has suggested today that there's nothing in the

3    Canadian cases dealing with this type of process.  Well, in

4    fact, this case is dealing with a situation where there are

5    bidders, and so it is very close to our own situation.

6         Secondly, if you turn to page 19.

7         JUSTICE MORAWITZ:  19?

8         MR. TAYLOR:  Page 19, starting on the fifth line, over

9    on the right hand side with, "I have decided with this appeal"

10   just to the end of the paragraph.  And again, I won't take the

11   time of both Courts to read through it.  I recommend that Your

12   Honor has a summary of the basis on which the court of appeal

13   made their decisions.  It's a good summary.

14        Second point, out of everyone who has spoken today,

15   only two parties have suggested that anything happened at this

16   auction which was at all improper.  One of those parties was

17   the unsuccessful bidder, and the second was a creditor who did

18   not participate in the auction and has now withdrawn their

19   objection.  Everybody else who has spoken today has indicated

20   that they believe this process, this auction, was conducted

21   properly and in accordance with the court-approved bidding

22   procedures.

23        Third issue I'd like to address is valuation.  I have

24   four points.  First one, I don't know if this was part of the

25   package which was handed up to you.  I have a list of the

297

1    attendees for the auction.

2            JUSTICE MORAWITZ:  Thank you.

3            MR. TAYLOR:  And I hand it up only to demonstrate to

4    the Court, which you can see, just by flipping through the list

5    of attendees, the number of professionals that all of the

6    parties had to rely upon.  And specifically, for Nortel, we had

7    the benefit of advice from Ogilvy's, Cleary's, Morris, Nichols,

8    and the investment banking firm of Lazard's.  The bondholders

9    had the benefit of their counsel and FTI Consulting.  The UCC

10   had the benefit of their counsel, Jefferies, and Capstone.  And

11   the -- Mr. Riedel and Mr. Murray who testified today, have both

12   referred to the fact that they relied upon those experts, and

13   specifically, Mr. Murray referred to the fact that he had

14   access to other advisors who were experts in the specific

15   fields that were required for the benefit -- sorry, were

16   required for particular parts of the analysis of the note which

17   were an important part of the auction.

18           The second point with respect to valuation is that

19   these parties reviewed the price and reviewed the bid at the

20   time, and they were happy with the bid at that time.  That has

21   been confirmed through the testimony.  And, it's important to

22   note that the UCC, today, addressed that point and is standing

23   by their valuation of the note and their valuation of the bid.

24           The third point, I'd just like to bring the Courts'

25   attention to the bidding procedures which were approved by the

1   Court, and specifically, the paragraph dealing with -- sorry,

2   I'm looking at the wrong thing -- the section dealing with the

3   reservation of rights, which is on the thirteenth or fourteenth

4   page.  The pages aren't number.  And specifically, at the

5   beginning of that paragraph where it says that "the sellers,

6   after consultation with their advisors, the committee, the

7   bondholder group, and the monitor, and their respective

8   advisors, after each round of bidding at the auction, may

9   determine which qualified bid, if any, is the highest or

10   otherwise best offer, and the value thereof."  And so it

11   specifically provided for in the bidding procedures, that it

12   was up to the sellers to determine that value, and that's what

13   the sellers did at the auction.

14         And the last point I would make with respect to

15   valuation, Your Honor, is that it is the role of the seller to

16   make that determination with the assistance of its advisors; it

17   is not the role of the Court to second-guess that valuation.

18         This point has been made several times, so I won't

19   spend a lot of time on it, Your Honor, but suffice it to say

20   that to go in a different direction than Soundair would be a

21   seismic shift in the Canadian law, a 180-degree turn, and would

22   open up, not only at this proceeding, but all future

23   proceedings involving not only a stalking horse but any sort of

24   bidding process to uncertainty which should be avoided at all

25   costs.

299

1          And last, Your Honor, I would like to draw this

2     Court's attention to the cross-border protocol.  And

3     specifically, while the protocol does encourage both Courts to

4     consult and give effect to the doctrines of the comity, the

5     protocol specifically preserves both Courts, their exclusive

6     jurisdiction, and power over the conduct of the proceedings

7     within its court.  And specifically, in paragraph 9 of the

8     protocol, Your Honor, it states, "In accordance with the

9     principles of comity and independence recognized herein,

10    nothing contained herein shall be construed to" -- and in

11    subparagraph C, "require the Canadian Court to take any action

12    that is inconsistent with its obligations under the law of

13    Canada."

14          Subject to any questions, Your Honor, those are my

15    submissions.

16          JUSTICE MORAWITZ:  Thank you.  Mr. MacFarlane?

17          MR. MACFARLANE:  Yes, sir.  First of all, Your Honor,

18    you asked a question with respect to if I had any law to

19    support our position and over the break, and not through my own

20    due diligence but Mr. Bomhof, as counsel for the spurned

21    bidder, was good enough to pass me up a case that he was going

22    to argue, had he had standing, and asked that I present that

23    case to Your Honor.  So, at the risk, I'm passing that case to

24    Your Honor.

25          JUSTICE MORAWITZ:  You may walk it up.

1          MR. MACFARLANE:  It's a short case.

2          JUSTICE MORAWITZ:  It's welcome.

3          MR. MACFARLANE:  It's a case of your brethren Justice

4     Campbell of this court.  I apologize to Judge Gross.  I don't

5     have a copy for you, but I think the court staff said he'll get

6     you a copy at the conclusion of the hearing.  It simply deals

7     with the Canadian issue with respect to opening the bid process

8     in a manner of circumstances.

9          First, Your Honor, we've heard a lot -- as you know,

10    we act for the committee, the U.S. creditors' committee.  Much

11    has been said about the U.S. creditors' committee having an

12    interest, of course, in U.S. proceedings and having a fiduciary

13    duty to maximize realization on behalf of all unsecured

14    creditors in those proceedings.  However, it can also be said

15    with respect to these particular proceedings, the interests of

16    the unsecured creditors in Canada should be of the same level

17    of the interests of the unsecured creditors of the U.S.

18    Because these are liquidating cases, there should be a priority

19    given to all parties that maximizing realizations for the

20    creditors in both estates.  And as it turns out, this case,

21    albeit unusual circumstances, the U.S. creditors, via NNI, are

22    also significant creditors in these proceedings, and in fact,

23    may very well be one of the largest unsecured creditors in

24    these proceedings, and have as much interest in these

25    proceedings and maximizing realizations as any other unsecured

301

1   creditors.

2           Other than the case that I passed to Your Honor with

3   respect to the sale process being continued to reopen, I

4   haven't been able to get my hands on any other cases.  But my

5   counsel in the U.S., Mr. Hodara, has brought to the Court's

6   attention the fact that there is a well-established body of

7   case law where any process is having to open the appropriate

8   cases, and in my respectful submission, this is one of those

9   cases in which the bidding process or procedure should be

10  reopened to allow the highest bid as offered late in the day by

11  MEN Acquisition to go forward.

12          For support in that proposition in Canada, and I know

13  that Your Honor is probably way ahead of me on the cases, so I

14  won't take much time going through the case with you, Your

15  Honor, and I apologize, again, just to Judge Gross for not

16  having it, but the facts are fairly well set out in the head

17  notes of the case, and it's basically, it was a situation where

18  the debtors, CCAA case, the debtors, in conjunction with the

19  monitor for the plan, they contemplated the sale of a hotel

20  property.  After the sale process was concluded, though it

21  wasn't a stalking horse bidding process as we got here, late in

22  the day, a higher, better offer was brought forth by one of the

23  previous participants in that sale process.  Starting on page

24  3, Justice Campbell sets out that in very similar circumstances

25  which are before Your Honor today, and Judge Gross, that

1  paragraph 7 sets out that counsel for one of the bidders

2  brought forth a new and improved offer in the form of a letter,

3  and that was put before the Court.  In the offer paragraphs, in

4  paragraphs 11 through 13, Justice Campbell reviews the

5  recommendation as it was made by the monitor as what the Court

6  would do in these circumstances, which essentially came down to

7  three options, which was accept the offer that had been brought

8  forth by the debtor and the monitor, it could also,

9  effectively, run a further auction as a second option, or it

10  could reopen the process to allow any party to bring forth a

11  third -- another offering, including the original successful

12  bidder and the bidder that brought the higher offer.  Of

13  course, counsel for the company, in paragraph 17, urged the

14  Court to accept the offer at hand.  That was before the Court.

15  However, Justice Campbell goes over to conclude on page 4,

16  paragraph 19, and states, "It is with some reluctance that I

17  have concluded that in the circumstances, option 3," which is

18  reopening the sale process "is the most appropriate at this

19  time.  I am mindful that this is a CCAA proceeding, not an

20  auction process.  Both sides have pointed to the decision of

21  the Court of Appeal and Soundair" which has been referred to in

22  this court, "as setting of the guiding principles.  The factual

23  distinction between this case and the facts of Soundair is,

24  here, at least the potential for a much-improved return for

25  unsecured creditors."  That's the very factual situation that

1  we have here, today, Your Honor.  Just on the cash basis and

2  the cash offered from MEN is 20 million dollars more for the

3  unsecured creditors of both estates.

4      JUSTICE MORAWITZ:  How do I deal with Mr. Tay's

5  submission that, when considering -- trying recapsize (sic)

6  what he said -- is that I sit here as a judge presiding over

7  CCAA proceedings and the -- to use Mr. Tay's phrase -- the

8  uncontroverted evidence from Mr. Riedel that there is going to

9  be, based on a projected delay in closing, a net loss for the

10  Canadian estate.  How do I square that up with Justice

11  Campbell's remarks where he adopts option 3 on the basis that

12  it is a much-improved return for unsecured creditors?

13      MR. MACFARLANE:  Well, it's a much-improved return for

14  unsecured creditors on a global basis on the part of the North

15  American estate.

16      JUSTICE MORAWITZ:  So if they project a decline of 20

17  or 25 million based on the time estimates, and projected

18  increase in the bid of about 20 million, where do I get to a

19  much-improved return for unsecured creditors?

20      MR. MACFARLANE:  Well, you're also taking away the

21  risk that's on account of -- that's associated with the notes.

22  You're taking an all-cash bid, and that's part of the

23  recommendations of the creditors' committee, is urging that

24  cash is king, and cash is better than having convertible notes.

25  So it's not just the fact that the bid is, in fact, higher.

304

1    There's certainty that there's cash at hand that they can use

2    now.

3            JUSTICE MORAWITZ:  And that's from the creditors'

4    committee?

5            MR. MACFARLANE:  That's correct.

6            JUSTICE MORAWITZ:  Okay, but I thought Mr. Hodara made

7    the submission earlier today that, in essence -- give me a

8    moment -- UCC agrees that the noncash consideration should be

9    valued at par or, indeed, more than par.

10           MR. MACFARLANE:  That's correct.  But there still is,

11   from the perspective of the committee, even though you're

12   valuing the notes at par, cash is preferable to notes.  And in

13   this instance, it's not just cash that's at equal value to the

14   notes and the cash of the Ciena bid.  It's all cash, it's all

15   up front, and the offer's been improved with a higher deposit.

16           JUSTICE MORAWITZ:  Okay.

17           MR. MACFARLANE:  The other operative paragraphs in

18   that judgment -- I won't belabor it, Your Honor -- are

19   paragraphs 20, 25, and 26.  And paragraph 25, where the --

20   Justice Campbell was on this date -- the unsecured creditors

21   are not deprived of the possibility of the Court considering of

22   an improved offer from the original purchaser, as well.  Now,

23   Ciena has said they're not going to bid, but who knows.

24           Mr. Tay, in his submissions, has gone on at length

25   on -- there are two counts -- he's really taken us through a

305

1    detailed analysis of the Soundair case, which is the guiding

2    principles of this Court and it's your jurisdiction.  It also

3    has emphasized the deference that is given by the Court to the

4    business judgment of the monitor/receiver.  The distinguishing

5    factor in this case, however, Your Honor, is that the record

6    that has been put before this Court, the twenty-eighth report

7    paints a different story.  It paints a different story because

8    first of all, if you look at the agreement of sale which is

9    found at Tab B and the improved offer at Tab C, the monitor is

10   not a signatory to this agreement.  The company is a signatory

11   to this agreement.  There is no evidence before this Court that

12   the monitor was acting as qua seller, unlike Soundair, where it

13   was the receiver that was selling, where it was the officer of

14   the court that was selling.  Not the case here, Your Honor.  In

15   fact, if you go through the report of the monitor, the twenty-

16   eighth report, and I'll pick out a few select paragraphs,

17   starting with paragraph 17, the monitor described under the

18   heading bidding procedures and auction process, the monitor

19   states at paragraph 17 in the twenty-eighth report, page 6, at

20   the top of the page, "During this period, the monitor was kept

21   apprised of all activity between Nortel and the potential

22   buyers.  In addition, the monitor participated in several

23   conference calls with potential buyers."  The monitor wasn't in

24   control of the process.  He was acting qua advisor, as was

25   Lazard to the company, as was FTI to the bondholders, as was

1    Jefferies to the committee.

2          Furthermore, paragraph 18 is a representative

3    paragraph, "There were no bids submitted prior to November 9th.

4    Prior to that time, one of the potential buyers had notified

5    the company that it would not be submitting a bid.  Through

6    discussions with other remaining potential buyers, Nortel, in

7    consultation with the monitor, the UCC, the bondholder group,

8    and the U.K. administrators, determined they should extend the

9    bid lineup."

10          Paragraph 21, "The MEN Acquisition bid was reviewed by

11    the sellers and the monitor in detail."

12          Paragraph 23, "After consultation with the monitor and

13    representatives of the UCC and the bondholding group and the

14    U.K. administrators, the sellers determined that the highest,

15    otherwise best offer was the bid represented by MEN

16    Acquisitions."

17          Paragraph 24, "The auction commenced November 20th,

18    2009 at the offices of Cleary Gottlieb.  In attendance at the

19    auction were the various representatives, including the

20    monitor."

21          Paragraph 25, last line, "The sellers asked their

22    second round of bidding.  Once again, the auction was adjourned

23    to allow the MEN Acquisition to provide a written bid."

24          Paragraph 26, "The auction proceeded on the next

25    several days in a similar fashion for a number of additional

1    rounds of bidding.  An issue, the incremental net value

2    threshold was 5 million, pursuant to the bidding procedures.

3    In subsequent rounds of bidding, the sellers exercised their

4    discretion in the bidding procedures, following consultation

5    with the monitor, representatives of the UCC, the bondholder

6    group, and the U.K. administrators to revise the incremental

7    amount."

8              The same is reflected in paragraphs 27, 32, and 40.

9              JUSTICE MORAWITZ:  Okay.

10             MR. MACFARLANE:  The monitor, as is often the case,

11   was involved in a process.  It was not qua receiver as in

12   Soundair.  Ciena didn't sign a deal with the monitor.  Ciena

13   signed a deal with the debtors.  The monitor happened to

14   approve that deal.

15             JUSTICE MORAWITZ:  So am I to reject or discount or

16   ignore what this monitor is saying?

17             MR. MACFARLANE:  No, no.  I just --

18             JUSTICE MORAWITZ:  So what do I take from that?

19             MR. MACFARLANE:  I think that Soundair can be

20   distinguished, because, certainly, in that case, it's a court

21   officer that has contracted with a party and brought that offer

22   to court.  In this case, the debtor has brought it forward in

23   conjunction with a number of other advisors.  And what I'll

24   take --

25             JUSTICE MORAWITZ:  In previous approval motions, I

308

1    have made reference in the endorsements to Tiger Brand and the

2    adoption in CCAA cases of the Soundair principles, based on

3    where a monitor is traditionally reporting.

4         MR. MACFARLANE:  That's right, but I think, if I'm not

5    mistaken, the Tiger Brand monitor may have actually been a

6    signatory to the agreement.  In this case, the monitor's not.

7    And furthermore, the issue that has come up, certainly from all

8    the stakeholders' perspective, save except for MatlinPatterson,

9    save except for the spurned bidder, is that no one's taking

10   issue with the monitor's report.  No one's taking issue with

11   the auction process.  The monitor's report is a well-written

12   document and details what happens at the auction up until

13   November 27th, 2009.  The issue for this Court, and for the

14   U.S. Bankruptcy Court, is the new bid that came forth on

15   December 1st, 2009.  This report does not address that.

16        There's no evidence before the Court that the monitor

17   has considered the new bid and compared it to the Ciena bid and

18   made a recommendation to this Court.  And in fact, it may have

19   been that the monitor should have filed a supplemental report,

20   put evidence before the Court, or sought a motion for advice

21   and direction to put a report before the Court recommending

22   this to go with the Ciena --

23        JUSTICE MORAWITZ:  Well, we have a reporter here, and

24   Mr. McDonald and Ms. Hamilton are here.  Perhaps we'll address

25   it in that manner.

1          MR. MACFARLANE:  We can.  I just, I mean, I don't want

2     to take up more of the Court's time.  I just want to point

3     out --

4          JUSTICE MORAWITZ:  If you're raising an evidentiary

5     point, Mr. MacFarlane --

6          MR. MACFARLANE:  I'm raising it simply as weight.  Is

7     that the weight is that there's been a high regard to deference

8     to the monitor, and we all agree with that.  And we agree that

9     the report is well-constructed and documents --

10          JUSTICE MORAWITZ:  I took the last submission -- I'm

11     sorry to be somewhat short with you, but I think time is

12     working against the parties.  I took your last submission to be

13     that there was no evidence that the monitor has considered

14     events after the auction -- I guess I don't want to get into

15     whether the auction was closed, terminated, completed, or

16     whatever, but after round eleven on November 22nd, and we did

17     hear oral submissions this morning.  And if it's a question of

18     a lack of proper evidence, there are two representatives of the

19     monitor here, and if that's the direction that you wish this

20     submission to go, I think it may be appropriate to have them

21     provide some in voce evidence.

22          MR. MACFARLANE:  Before we go down that path, because

23     I was not ex -- necessarily recommending that, I was simply

24     pointing out that the deference -- I'd like a break and take

25     some instructions on that before we reconvene.  But my point in

1   the pointing out that there's no report that deals with this,

2   that's an evidentiary issue, yes, is that in the normal case,

3   the Court's deference to the monitor/receiver is predicated on

4   a report being before the Court that the judge of the case has

5   been able to review and make a determination on.  In this case,

6   we don't have that because of the way events occurred, and the

7   monitor, for whatever reason, chose not to put in a

8   supplemental report.

9        JUSTICE MORAWITZ:  Well, I will grant leave to the

10   counsel to the monitor to call evidence on this point.

11        MR. MACFARLANE:  Can we break for five minutes, and

12   I --

13        JUSTICE MORAWITZ:  Yes.

14        MR. MACFARLANE:  Thank you.

15        JUSTICE MORAWITZ:  Judge Gross, I have granted Mr.

16   MacFarlane an indulgence for five minutes.

17        THE COURT:  All right, we will stand in recess for

18   five minutes, then.  Thank you.

19     (Recess from 8:32 p.m. until 8:45 p.m.)

20        THE COURT:  Please be seated.  Justice Morawetz, I

21   believe it's still in your court.

22        JUSTICE MORAWETZ:  Thank you, Judge Gross,

23   Mr. MacFarlane.

24        MR. MACFARLANE:  Thank you for the break, Your Honor

25   and Judge Gross.  The instructions on the point of having the

1    monitor go into the box we are satisfied with the record that's

2    before the Court.

3          JUSTICE MORAWETZ:  Unfortunately, I'm not.

4          MR. MACFARLANE:  No.

5          JUSTICE MORAWETZ:  So I will be requiring evidence on

6    it from the monitor.

7          MR. MACFARLANE:  Okay.  Your Honor, I have a second

8    point if could go on?

9          JUSTICE MORAWETZ:  Certainly.

10          MR. MACFARLANE:  It's the point dealing with the

11    cash -- all cash bid versus notes.  Your Honor correctly

12    pointed out with respect to Mr. Hodara's submissions with

13    respect to the note portion of the Ciena bid.  The committee's

14    position is that the enhanced cash portion of the MEN bid is

15    the inducement to reopen the auction.  That the note,

16    convertible notes, in the committee view are as good as cash to

17    the extent that they're convertible.

18          And if Your Honor is going to ask the monitor to

19    provide evidence then I will save my final point because my

20    final point was that based upon the record that's before the

21    Court there would be no higher deference given to the monitor

22    to the business judgment of the committee and its members if

23    asking for the auction to be reopened because the committee has

24    a fiduciary duty to maximize utilizations.  Those are my three

25    submissions.

1          JUSTICE MORAWETZ:  Thank you.  The reason why I

2     believe it is appropriate and necessary for the monitor to

3     provide evidence is that Mr. MacFarlane you did quite correctly

4     point out that there is nothing on the record.  And submissions

5     were made and for the -- for the benefit to have a complete

6     record I am going to require evidence on that point.

7          MR. MACFARLANE:  Thank you, Your Honor.

8          JUSTICE MORAWETZ:  Thank you.  Mr. Orzy?

9          MR. ORZY:  Your Honor, in all honesty, I was not going

10    to admit any submissions at all but I just say one word after

11    the previous one.

12         From the bondholder committee's perspective, this has

13    always been about getting the best value for the creditors.

14    And I rose at the outset of these proceedings today to tell you

15    how I thought in law Your Honor could reopen the auction if

16    that were in fact the best way to get that value.

17         The bondholder committee remains dedicated to

18    maximizing creditor value.  The debtor and the monitor have

19    clearly expressed their view, maybe not clearly yet, but we'll

20    understand it clearly their views as to the proper choice in

21    this case for purposes of value and of course the UCC has

22    expressed its view in the form you heard a few moments ago.

23         Our committee is specifically not adopting the

24    submissions that were just made by the UCC.  I just want to be

25    clear.  My colleague, Mr. Kreller, when we get to the U.S. side

1    of this will have some comments I'm sure.  But I just wanted to

2    say that we remain of the view that this is of course a proper

3    determination for both Courts to make and we make in Canada, at

4    least, no further submission in that regard other than the

5    comments we've made already.  Thank you.

6         JUSTICE MORAWETZ:  Thank you.  Mr. Zigler.

7         MR. ZIGLER:  I'll be very brief, Your Honor.  My

8    clients, obviously, would like to maximize the value as well.

9    But the point made by Mr. Tay is very important.

10        As the primary uniquely Canadian creditors, if the net

11   effect of all this is to create a loss to the Canadian estate

12   so that other estates may benefit or we end up in a wash that

13   is of no benefit to the former employees in Canada whatsoever.

14   To the extent that the Soundair case mentions the interest of

15   the creditors, I would submit that the UCC has a conflict here.

16   Their creditors are in another estate.  Those creditors who are

17   unique to your -- to the estate for you do not benefit from the

18   proposal from rejecting the Ciena offer.  If anything, I go

19   back to where I was earlier today.  The integrity of the

20   system's important.  Close the deal in Canada and have it at

21   the Canadian bank.  Those are my suggestions.

22        JUSTICE MORAWETZ:  Thank you.  Mr. Carfagnini.

23        MR. CARFAGNINI:  Your Honor, Jay Carfagnini on behalf

24   of the Canadian monitor.  There are two issues raised --

25        JUSTICE MORAWETZ:  I didn't know there was any other.

314

1    MR. CARFAGNINI:  Yes.  Sorry.  Two issues raised.  In

2    connection with the monitor's authority and a company's

3    authority to sign that agreement, well that has been withdrawn,

4    that submission has been withdrawn.  I just wanted to point out

5    to Your Honor and for the record that under the amended initial

6    order, of course, we'll find the monitor and granting its

7    authority we have the super monitor role.  And this debtor, as

8    Your Lordship is aware, cannot approve any agreement and not

9    sign anything without the monitor's consent.  So I think that

10   answers that question.

11       In terms of the evidence before the Court, we are

12   prepared to put Mr. McDonald on the stand.  This offer -- new

13   offer only came in yesterday and we weren't quite sure how to

14   deal with it but we are prepared and Mr. McDonald is prepared

15   to answer any questions that this Court or anybody else has

16   about the new offer and his consideration of that.

17       JUSTICE MORAWETZ:  All right.

18       MR. CARFAGNINI:  Would it be appropriate now to

19   proceed that way?

20       JUSTICE MORAWETZ:  Yes.

21    (Pause)

22       JUSTICE MORAWETZ:  Just before you start your

23   questioning, Mr. Carfagnini, I think if, Mr. Registrar, if you

24   could take a moment to be sure that Mr. McDonald has some water

25   over there given that it's now 95 degrees in here.  Thank you.

1     This is a precaution in case you're here for the next

2   hour and a half.

3                    MURRAY MCDONALD, WITNESS

4   DIRECT EXAMINATION

5   BY MR. CARFAGNINI:

6   Q.   Mr. McDonald, for the record, could you please advise the

7   Court of your position at Ernst & Young, Inc.

8   A.   I am the president of our restructuring group, Ernst &

9   Young, Inc.

10  Q.   And you have been involved in these -- in this

11  restructuring since its beginning?

12  A.   Correct.

13  Q.   And you participated in the discussions and negotiations

14  that led up to the acceptance of the stalking horse bid?

15  A.   Yes.

16  Q.   And you first participated in the discussions and

17  negotiations at the -- what you described is the famous three

18  sunset auction?

19  A.   I did, yes.

20  Q.   And would you advise the Court of your views formed about

21  the Ciena transaction at that time.

22  A.   We were very supportive of the Ciena transaction at Ernst.

23  Q.   And the recommendations continued in the monitor's report

24  you're familiar with?

25  A.   Correct.

1    Q.    You've seen the new offer that came in yesterday and have

2    you had an opportunity to consider it?

3    A.    Yes.

4    Q.    Would you please state for the Court your views on that

5    offer, the benefits and risks that you assessed in forming a

6    recommendation to this Court?

7    A.    Well, we looked at the offer and in conjunction with

8    looking at that offer we've had discussions with the management

9    of the company.  We've taken into account the issues that come

10    into play if there is a delay in closing this transaction.  The

11    monitor has made it clear to all of the stakeholders that these

12    businesses need to get into safe hands, get into safe hands

13    quickly.  And that's where there will be stability.

14        The delay that comes with this is prejudicial to the

15    Canadian estate.  This is an estate that's funded through the

16    stay area through December 15th and it is going to be an issue

17    that has to be worked at as to how this estate is going to be

18    funded after that date.  So when we come back and looking at

19    getting these businesses sold and getting them sold quickly, we

20    are continued to recommend the Ciena offer.

21        MR. CARFAGNINI:  Your Honor, unless you have any

22    further questions, those are the questions that I have.

23        JUSTICE MORAWETZ:  Thank you.  Does any party wish to

24    have questions of Mr. McDonald respecting the Bakemates

25    authority with respect to how to question or cross-examine or

317

1    lack thereof of the monitor?

2        I see nobody rising.  Mr. McDonald, thank you very

3    much.  You may step down.

4        MR. MCDONALD:  Thank you.

5        JUSTICE MORAWETZ:  Mr. Tay?  A brief reply.

6        MR. TAY:  A very brief reply just so that it doesn't

7    get unchallenged.  The case that Mr. MacFarlane raised before

8    you, the 15879301 Ontario Limited, otherwise known as the

9    Constellation Hotel case and I could make a cheap remark on how

10   this involves a deserted hotel that's been in solvency

11   proceedings twice has no business --

12       JUSTICE MORAWETZ:  Three times I believe.

13       MR. TAY:  -- three times and, therefore, you know,

14   it's somewhat different from the case at hand.  But Mr.

15   MacFarlane drew your attention in passing to paragraph 20 and

16   he said he wouldn't belabor you with paragraph 20 but I will

17   belabor you with paragraph 20 because paragraph 20 is the main

18   reason that the judge there used as the basis for making this

19   decision.  And it says, "In proof return is a fact which while

20   not necessarily the only consideration it is a significant one.

21   While I'm concerned with the risk to the estate of the company,

22   of the costs of the further time involved, I concluded that is

23   a risk worth taking since the unsecured creditors who will bear

24   the risks are prepared to do so."

25       Who are the people bearing the risks here?  The rest

1   of the estates are gambling on Canada's dime.  Albeit our

2   dollar is getting stronger but they're still gambling on

3   Canada's dime.  So when you look at this principle that

4   underlies this case, it's about people who are bearing the

5   risk, being prepared to bear the risk.  There is nobody else

6   bearing this risk except Canada and we are not prepared to bear

7   this risk.  Thank you.

8        JUSTICE MORAWETZ:  Thank you.  I believe that

9   concludes the submissions.  Judge Gross, back to you.

10        THE COURT:  All right.  Thank you, Justice Morawetz.

11   Before I hear from the parties, I just would like to set the

12   stage so that I am clear what we're addressing right now.

13        We had an objection from MatlinPatterson and that

14   objection has been withdrawn.  We have MEN Acquisition which

15   filed a joinder.  It is my understanding under the practice in

16   this court that when a party files a joinder they take a risk

17   that the objection to which they are joining will be withdrawn

18   and, therefore, they will themselves be without an objection.

19   I think that's the case that we have here at this point.

20        As far as the ad hoc committee and the committee is

21   concerned, they did not file an objection to the sale motion.

22   As I understand it, I do not have an objection pending to the

23   sale motion at this point.  I have a motion to reopen the

24   auction.  Is that correct?  Mr. Hodara and Mr. Kreller, I'll --

25        MR. HODARA:  Your Honor, Fred Hodara for the

1    committee.  I believe procedurally that's correct.  The

2    committee has not stated an objection to the auction.  And, in

3    fact, as we've said and as other parties have noted, we had no

4    problem whatsoever with the auction but we do continue to seek

5    to have the auction itself reopened to permit the new and

6    higher bid to come in.

7          THE COURT:  Yes.  Okay.  I certainly understand that

8    and I assume Mr. Kreller you're position is likewise?

9          MR. KRELLER:  That's correct, Your Honor.

10         THE COURT:  Oh, I'm sorry.  Thank you, Mr. Kreller.

11   Thank you.  All right.

12         Well, I suppose to some extent we have consensus to

13   the sale motion.  I understand there is a motion to reopen the

14   auction but --

15         MR. GALARDI:  Your Honor, may I take just one minute?

16         THE COURT:  Yes.

17         MR. GALARDI:  I just wanted to see the binder that --

18   I gave mine away.

19      (Off the record)

20         MR. GALARDI:  I don't even have standing to touch that

21   in front of the Court.

22         MR. BROMLEY:  I'm beginning to agree with Mr. Galardi

23   quite a bit.

24         THE COURT:  Mr. Bromley?

25         MR. GALARDI:  Your Honor, just --

1          THE COURT:  Yes.

2          MR. GALARDI:-- for the record --

3          THE COURT:  Yes.  Mr. Galardi.

4          MR. GALARDI:   -- because I have a feeling I know

5    where this is going, if we read the title to our -- it says it

6    is a joinder and an objection so you're not going to get me on

7    the standing and out of here that quickly.

8          THE COURT:  Okay.

9          MR. GALARDI:  And it also says in the first line it

10   "Hereby joints and files this objection."  You can say that my

11   objection is untimely, Your Honor, but I think I didn't allow

12   you to do what you're trying to do.

13         THE COURT:  Okay.  All right.  Thank you, Mr. Galardi.

14         MR. GALARDI:  Thank you.  Sorry.

15         THE COURT:  No apology necessary.  Mr. Bromley.

16         MR. GALARDI:  I learned that one myself.

17         THE COURT:  Okay.

18         MR. BROMLEY:  Your Honor, if I could just be heard on

19   a couple of points --

20         THE COURT:  Please.

21         MR. BROMLEY:  --- and then -- and I don't intend to go

22   into a long drawn out closing unless it's necessary.

23         THE COURT:  It should not be necessary here.

24         MR. BROMLEY:  I think that there are a couple points.

25   One is I think I disagree that there's actually a motion that's

1    been made to reopen the auction.  I think that the question

2    that is out there is there is an unsolicited proposal that's

3    been received and the question that the Court needs to consider

4    is whether or not there's any opportunity to reopen the

5    auction.  I don't think there's been a request to reopen the

6    auction per se.  Because as Mr. Hodara and Mr. Kreller have

7    both said and said repeatedly, they believe in the auction

8    process and what has gone on.

9         Mr. Hodara did state earlier a number of cases which I

10   distinguished earlier that went to the point of whether or not

11   an auction in a U.S. Bankruptcy Court is ever really once and

12   for all finally done.  And I think the cases were all

13   distinguished and continue to be distinguishable.

14        You know, there continue to be -- there are also cases

15   in many jurisdictions including in the Third Circuit that talk

16   about the sanctity of the process, that talk about the need for

17   certainty and that the standard for upsetting these

18   standards -- for upsetting these processes are very high.  And

19   so where we stand today, Your Honor, is a question it seems to

20   me we have a joinder that's, I think, gone, an objection which

21   is untimely, an objection which has been resolved.  We have a

22   proposal from a disgruntled bidder that is come in at a late

23   hour.  And while we've heard quite a bit over the past hour

24   from our Canadian friends about the issues relating to how

25   there's a negative impact on the Canadian estates, I go back to

322

1    something I said in the very beginning.  The standard in the

2    United States is the highest or best, right.

3            THE COURT:  Correct.

4            MR. BROMLEY:  And this is an integrated transaction.

5    It's an integrated transaction from the beginning.  Mr. Reidl

6    testified very clearly that this and all the other transactions

7    sit across multiple jurisdictions and the transactions have to

8    be viewed in the way that they affect all of those

9    jurisdictions.  So the fact that there is a negative impact on

10   Canada is not irrelevant to the United States if the United

11   States transaction cannot go forward.  Mr. Reidl was very

12   clear; there is no United States transaction.  There's no

13   Canadian transaction.  There's no U.K. transaction.  There is

14   one MEN transaction.  And the question is should this one MEN

15   transaction, which we are seeking to have approved here today

16   in Canada and in the United States be challenged at the last

17   minute with an untimely bid?  And I think the answer under U.S.

18   law is very clearly, no.  It's in the discretion of this Court

19   to decide that that bid is untimely and that it shouldn't be

20   considered.  It's also in the discretion of this Court to

21   determine that even if it was timely, the bid that we have on

22   the table is the better bid.  It's the bid that's more likely

23   to have closed.  It's the bid that's more likely to deliver

24   value across all of the estates.  It's the bid that's more

25   likely to result in the result -- to give us the result we want

1    across all of the jurisdictions without there being any

2    interstate concerns or issues.

3              So I think there is really little debate here.  There

4    was one transaction that works for everyone.  There's another

5    transaction that is late, flawed and inappropriate that doesn't

6    work.  It doesn't seem to me that there's much debate as to

7    which one should be approved.

8              We've had an awful lot of discussion during the course

9    of the day today and in some respects our opening arguments

10   turned into closing arguments but I think under U.S. law, under

11   the Abbott's case, under Lionel, we are in full square within

12   the business judgment of the U.S. debtors in terms of making

13   this transaction the transaction that should be approved.

14             The process was full.  It was fair.  It was

15   comprehensive.  It was transparent.  And you've heard nothing

16   from anyone in either jurisdiction other than the disgruntled

17   bidder who said that they still disagree with valuation to

18   contradict that.

19             And so based on the evidence, based on the papers that

20   we've submitted here, based on the arguments that we've had

21   earlier, I don't think there's really any choice here.  I think

22   what we have is one transaction that works.  And that

23   transaction, let's not lose sight of it, is a transaction that

24   is still a quarter of billion dollars higher than the

25   transaction we started out with.

1          So there's been a lot of toing-and-froing today but

2     the fact is we're still up 250 million dollars.  That's a good

3     day.  That's a good day's work.  It was a good weekend's work.

4     And so where we are, we can all walk out of here very happy

5     that we have a business that's going into safe hands, going

6     into safe hands quickly, going into safe hands for a premium

7     over the stalking horse bid of a quarter of a billion dollars.

8          So that's what I wanted to say and I'm happy to

9     continue on if there's any need for that.  But from the U.S.

10    debtors' prospective I think that really sums it up, Your

11    Honor.

12         THE COURT:  Thank you.  Mr. Bromley, if I made a

13    finding that the auction closed on November 22nd, having

14    reviewed the transcript, would the debtors take exception to

15    that finding?

16         MR. BROMLEY:  On the 22nd --

17         THE COURT:  That was the --

18         MR. BROMLEY:  I'm sorry, when was it?

19         THE COURT:  -- that was the Sunday night.

20         MR. BROMLEY:  -- Sunday night.

21         THE COURT:  Yes.

22         MR. BROMLEY:  I don't think so, Your Honor.

23         THE COURT:  Thank you.

24         UNIDENTIFIED SPEAKER:  In other words, you agree.  It

25    sounds like it's --

1          MR. BROMLEY:  I'm sorry.  I mean what we said on the

2    record, Your Honor, was obviously subject to documentation.  It

3    was signed.

4          THE COURT:  Correct.

5          MR. BROMLEY:  We did file a notice of successful

6    bidder.  So, you know, the --

7          THE COURT:  Well, there were no further bids.

8          MR. BROMLEY:  There were no further bids.

9          THE COURT:  The bids had closed.

10         MR. BROMLEY:  Um-hum.

11         JUSTICE MORAWETZ:  Question.  Your question, Judge

12   Gross and the answer to Mr. Bromley did not transmit here.  You

13   asked the question of Mr. Bromley "Did the auction close?"  We

14   did not hear his response.

15         THE COURT:  I'm sorry.  Mr. Bromley answered that it

16   did close on the evening of November 22nd.

17         MR. BROMLEY:  That's correct, Your Honor.

18         THE COURT:  But it was subject to further

19   documentation but that there were no further bids.

20   Mr. Galardi?

21         MR. GALARDI:  Your Honor and Justice Morawetz, I do

22   appreciate giving a party with no standing the right to stand

23   one more time and I will make this the last.

24         Your Honor, I have sat here and I understand where

25   this hearing is going and where Your Honors will rule, I just

326

1   do want to note, one, we've made a lot of comments have been

2   made that there is no evidentiary record to the contrary.  We

3   have not been given that opportunity to cross-examine or put

4   our witnesses in because of Your Honor's standing ruling.  And

5   that is important because never before today was the twenty to

6   twenty-five million dollar Canadian issue ever brought out on

7   the record or ever brought out on the transcript of any

8   auction.

9        Your Honor, there has also been no opportunity for an

10  evidentiary record to be made about the intrinsic fairness of

11  the process.  I would submit, if Your Honors review the auction

12  transcript itself, there are issues which I have been precluded

13  from providing evidence and testimony on today.

14       So, Your Honor, I just don't want the record to close

15  by denying us the standing.  I think we've been not even

16  permitted to make our argument that there is an intrinsic

17  fairness process and I simply wanted to say that as this record

18  may be available for appeal.

19       THE COURT:  Understood.

20       MR. BROMLEY:  The choices that the disgruntled bidder

21  made over and over and over again were obviously the

22  disgruntled bidder's choices including failing to file anything

23  in Canada, including failing to file an objection by the

24  objection deadline, including failing to notice that one of the

25  participants had filed a -- issued a press release saying that

327

1    not only were they out of it but that they didn't feel there's

2    any more reason to bid any more value here.

3         So the idea that Mr. Galardi's clients have been

4    precluded from anything, we, obviously, take issue.  They have

5    made very conscious choices.  Maybe they regret those choices.

6    And I go back to maybe the first thing I said; they do wish it

7    was 9:45 p.m. on Sunday night the 22nd.

8         THE COURT:  I intended to address Mr. Galardi's

9    umbrage in my ruling.

10        MR. BROMLEY:  Thank you, Your Honor.

11        MS. FELDSHER:  Your Honor?

12        THE COURT:  Yes.

13        MS. FELDSHER:  May I just be heard briefly?

14        THE COURT:  Ms. Feldsher, yes.

15        MS. FELDSHER:  As you know, I stand here today

16   somewhat happier than I was at the start of this day and on

17   that basis this Court has taken notice and we can affirm that

18   we have removed our objection to the sales process going

19   forward.  But I'd like to make the record clear on behalf of my

20   client who is a creditor here and one of the ultimate

21   stakeholders and that record is -- should reflect as follows.

22        I don't think anybody in this --

23        MR. BACON:  Your Honor, excuse me, I'm sorry.

24        THE COURT:  An objection's been withdrawn, yes.

25        MR. BACON:  It -- I object.  If this counsel --

1          MS. FELDSHER:  It is, but I --

2          MR. BACON:  -- then I want one minute with my client

3    to revisit whether we want to take that hallway settlement back

4    because one of the things we did in the hallway was truncate

5    whatever is --

6          MS. FELDSHER:  I'm not objecting to the sale.  I just

7    want to make mention --

8          THE COURT:  Well, let's talk to the Court.

9          MS. FELDSHER:  I apologize, Your Honor.

10         THE COURT:  I understand your objection, Mr. Bacon,

11   and if appropriate at the conclusion of the comments I will

12   strike them.

13         MS. FELDSHER:  Your Honor, I'm not speaking out

14   against the deal that was struck nor am I speaking out against

15   the deal that is going forward here.  In fact, as I started

16   this process I say very clearly that we've withdrawn our

17   objection.  I do only stand to note that this -- the process

18   that went into effect with this sale did lead to a disgruntled

19   bidder but that bidder is involved in other sales here and we

20   just want the record to be clear that we hope in the future

21   that given all of the concerns of the parties that those are

22   taken into account in future auctions by the debtors, by the

23   other -- the creditors' committees because my client, which is

24   a creditor here, would like to not see this happen again.  We'd

25   like to see the auctions that happened before this auction

1    where there were other bidders that did not succeed but yet

2    left knowing that they did what they needed to do and lost fair

3    and square.  And that was the only thing that I wanted to make

4    mention in the record.  Thank you, Your Honor.

5           THE COURT:  Thank you.

6           MR. BROMLEY:  There's a -- as long as MatlinPatterson

7    owns bonds and is a creditor, they are more than welcome to

8    come to One Liberty Plaza when we have our auction and we will

9    actually give them a room and feed them which we've done in the

10   past and we'll do so happily again.  But we also would note

11   that a choice not to attend and participate also brings with it

12   certain burdens and those burdens are not having any knowledge

13   of actually what went on.

14          So the -- we suggest there's an easy way to cure that.

15   There's also an easy way to pay attention to the dates that all

16   these documents have and require responses by and where things

17   need to be filed.  We feel all of those are pretty apparent and

18   if you can figure that out then you have the right to stand up

19   and say certain things.  If you can, you don't.  Thank you,

20   Your Honor.

21          THE COURT:  Thank you.  I'll reserve my comment.  Yes,

22   Mr. Hodara.

23          MR. HODARA:  Thank you, Your Honor.  I want to thank

24   my cocounsel, Mr. MacFarlane, of the Fraser firm who today as

25   he has and his firm has throughout this case coordinated with

1   ourselves and so that enables us to share one another's

2   comments and as he did earlier in the day in the opening

3   statements acknowledging our comments for purposes in the

4   Canadian court, I will simply do that at this time and make

5   just one further observation.  Before I do that, I also want to

6   thank yourself and Mr. Justice Morawetz and particularly all

7   the clerks and all the staff in the courthouse for helping us

8   get this long hearing done.  No matter what the outcome of this

9   hearing, it is very important to the estates and obviously then

10  to the creditors of the estates that we have a conclusion and a

11  way forward.  This sale, no matter which of the parties is the

12  ultimate successful bidder and purchaser is a good thing for

13  these estates.  So I thank all of you for enabling us to get

14  this done tonight.  I assume we will get it done tonight.

15          THE COURT:  I assume so too.

16          MR. HODARA:  And on the subject of time, to us, I

17  think, having gone through ten hours of testimony and argument

18  that it still all boils down in the eyes of creditors, those

19  that we represent in this estate, to a matter of twenty million

20  dollars hard cash from an appropriate party on the table within

21  grasp of the parties.  And the arguments that we heard today,

22  both at the very and belatedly from the monitor, earlier in the

23  day in the U.S. estate from Mr. Reidl to the effect that

24  there's this parade of horribles or at least some not so good

25  things that would transpire from a loss of time and so on, I

331

1    believe is belied by the actions of the parties at the auction

2    itself.  Whereas, in my extensive cross-examination of Mr.

3    Reidl we heard that there was never, during the auction, any

4    discount placed on the bid of MEN Acquisition for any of those

5    kinds of things that we suddenly heard about today.

6         So in closing, Your Honor, the creditors' committee

7    would like to see the auction reopened and additional value

8    brought into these estates.  Thank you.

9         THE COURT:  Thank you.  Thank you, Mr. Hodara.  Mr.

10   Kreller.

11        MR. KRELLER:  Thank you, Your Honor, and I'll be

12   brief.  Mr. Justice Morawetz.

13        Your Honor, I opened today indicating that the

14   paramount interest of the ad hoc bondholder group here would --

15   was to see that the highest and best -- highest or best bid was

16   realized by the estate here.  And that's really what the

17   process is designed to generate and yield.  It's an easy thing

18   to say.  In practice as we've learned today and at other times,

19   it's quite difficult to figure out when you're actually at that

20   point and when the music stops and you've arrived at the

21   highest or best bid.

22        The debtors have clearly today and I think

23   unequivocally advised you and argued compellingly that they've

24   reached their conclusion on that point.  From our viewpoint,

25   we're still not quite there.  We're not quite convinced of

1    that.  And in part it's because there have been a number of

2    moving parts including the most recent modification to the

3    Ciena bid which we view as a welcome improvement to that bid.

4         At the end of the day though, Your Honor, the debtors

5    don't need to convince me of that.  They may need to listen to

6    me in accordance with the bid procedures and you may need to

7    give deference to our views as creditors, but ultimately they

8    don't need to convince me that it's the higher or best -- the

9    highest or best bid.  They need to convince you of that.  And

10   given the proceedings we've had here today and where we find

11   ourselves, I think probably the smartest the thing that I could

12   do is to sit down and let you tell us whether they've carried

13   that burden or not.  Thank you, Your Honor.

14        THE COURT:  Thank you, Mr. Kreller.  Thank you very

15   much.  Mr. Bacon.

16        MR. BACON:  Your Honor, I think the best way to show

17   Ciena's appreciation for the full and fair hearing we've gotten

18   from both your courts tonight and today is to really stand by

19   my opening statement, which I will; you gave me a lot of

20   latitude there.  I would just add, though, that when -- as the

21   Court considers this, I hope this goes the way I indicated in

22   my opening statement.  And if it does, I hope that Your Honor

23   will consider the good faith finding relative to my client.

24   There's been no contest whatsoever that my client's a good

25   faith purchaser.  And I know that if the Court approves this

1    transaction that will find its way into the order.  But I think

2    my client would appreciate the recognition that that's more

3    than just boilerplate in this case.  We stood through a long

4    process.  We spent an incremental 248 million dollars.  And if

5    you look at that tight record of the transcript, you won't see

6    us complaining or resulting to -- resorting to anything that

7    smacks of any kind of gamesmanship and I just like to have that

8    recognized if the Court is so inclined.  Thank you for your

9    time.

10            THE COURT:  Thank you, Mr. Bacon.

11            Justice Morawetz, should we retire for a few moments

12    or --

13            JUSTICE MORAWETZ:  Judge Gross, I just have one thing

14    to add just so there's no confusion from Mr. Bromley with

15    respect to the status of MEN Acquisition.

16            Very late in the proceedings today I was provided with

17    the affidavit of Mr. Bomhof who was earlier here as counsel.

18    It's just a two paragraph affidavit which attaches the limited

19    objection filed by MEN Acquisition, LLC in the Delaware court.

20            THE COURT:  Very well.

21            JUSTICE MORAWETZ:  Shall we recess for a few minutes,

22    Judge Gross?

23            THE COURT:  Yes.  We will recess for a few moments and

24    we will alert you when we're ready to return to rule.

25            (Recess from 9:19 p.m. to 9:36 p.m.)

334

1          THE COURT:  Everyone may be seated.  Thank you.

2     Before we begin, Justice Morawetz reminded me that I have not

3     yet obtained an answer from you, Mr. Bromley, or from the

4     debtors regarding the backup bid issue that MEN Acquisition

5     raised.  And I think it's really just an answer that we're

6     looking for.

7          MR. BROMLEY:  Okay.  I think the answer is at this

8     point, Your Honor, we're not prepared to remove them as the

9     backup bidder.

10          THE COURT:  All right.  Thank you.  It's been agreed

11     upon that I will rule first and Justice Morawetz will then

12     follow.  And first I'd like to commend counsel for a very well

13     presented hearing today.  I know it's been difficult, and there

14     have been high emotions at times, but the parties have really,

15     and counsel have all conducted yourselves, I think, and receive

16     high marks.

17          You know, I don't have the benefit of a monitor, but I

18     must say that the integrity and professionalism that has been

19     shown throughout this case by debtors' counsel is something

20     that the Court must take note of, and it gives the Court

21     comfort when it's faced with a difficult issue such as is being

22     addressed here today.  And that integrity and thoroughness has

23     carried over to the sale process of the MEN assets.  And while

24     I'll add on to something Ms. Feldsher said earlier, while

25     history is not destiny, I do think that it is a pretty clear

1    window into the present.  And the history of these proceedings,

2    I think, is a very high commentary for debtors' counsel and the

3    way they've conducted themselves.

4         The Court finds, as has been conceded by all

5    interested parties, that the auction was conducted in good

6    faith and in accordance with the bidding procedures.  It was an

7    exhaustive and tireless effort by debtors to achieve the

8    highest or best terms for the sale of the assets, the MEN

9    assets.  Ciena was awarded the auction, which closed on

10   November 22nd, because it made the highest or best offer, and

11   because its good faith and willingness to play fair and to go

12   the extra mile put it in that position.

13        As to the finding that Ciena's bid was the highest or

14   best, the evidence clearly establishes the debtors performed a

15   thorough and appropriate analysis upon which the Court is

16   entitled to rely.  The evidence presented by Mr. Murray clearly

17   establishes that in the professional's view, the financial

18   advisors for the debtors who consulted with the financial

19   advisors for the committee, that the terms that are being

20   presented today for the sale are the highest or best.

21        Now, the Court is not required to perform its own

22   separate valuation, particularly given the fairness of the

23   process and the careful analysis of the debtors' financial

24   advisors and the committee's professional advisors in

25   determining that Ciena's bid was the highest or best.  And it

336

1    is a highest or best analysis.  Not just the highest, which the

2    Court believes has been achieved but, in fact, the best.

3    Again, the conduct by Ciena throughout these proceedings,

4    including going back to the bidding procedures when Ciena made

5    important concessions that the Court requested, did not have to

6    do so but did, and, at the time, it was critical to the process

7    moving forward, that good faith and fair play is in contrast to

8    MEN Acquisition, which came close at every turn to not

9    proceeding, and even at the last moment has come in as somewhat

10   of an upset, as opposed to a party that was acting within the

11   bidding procedures and the process that was available to them

12   in the auction, an auction that lasted over three days.  Those

13   are important factors for the Court's consideration and

14   determination that the bid of Ciena is the best bid as well.

15        Let me just, now, address the committee's and the

16   bondholders request to reopen the auction.  I appreciate their

17   position.  They're trying to obtain the highest, or, I should

18   say, the last dollar.  But the last dollar isn't always the

19   best dollar, and I don't think that is the case here.  Again,

20   there are a number of factors, including the complexity of this

21   entire transaction, the number of jurisdictions involved, the

22   work that has already gone into this auction and the work that

23   has begun to close the transaction, which convinces the Court

24   that it would be inappropriate to exercise discretion in favor

25   of reopening the auction.  That would be, I think, a mistake

1    for all concerned.  It would be, perhaps, pennywise but pound

2    foolish in this circumstance.

3           And the Court appreciates the debtors distinguishing

4    the cases that were cited.  Those are not complex cases.

5    Certainly not complex in the nature of this case, and,

6    accordingly, the Court will not reopen the auction.

7           I'm trying to think if there's anything else that

8    requires a ruling.  I am certainly prepared to find, under

9    Section 363(m), that Ciena has acted in good faith and is

10   entitled to a good faith finding.  I am not going to release

11   MEN Acquisition from its backup bid.  I did not have an

12   objection to continuing as a backup bidder, and the fact that

13   MEN Acquisition was prepared even to increase its bid satisfies

14   me that it should remain, and will remain, obligated under the

15   auction procedures.

16          Mr. Bromley, is there anything further?

17          MR. BROMLEY:  No, Your Honor, thank you.  We do have,

18   after we hear from Justice Morawetz, certain minor objections,

19   as well, that we --

20          THE COURT:  Yes.

21          MR. BROMLEY:  -- resolving, but --

22          THE COURT:  And I think those are particular to the

23   United States, are they not?

24          MR. BROMLEY:  Yes, they are.  I'm sorry.  I should

25   have spoken into the microphone.  Yes.  We do have some U.S.

338

1    specific objections that are to be resolved through language in

2    the sale order.  But we --

3            THE COURT:  Okay.

4            MR. BROMLEY: -- need not keep our Canadian colleagues

5    occupied with that.

6            THE COURT:  Okay.  Thank you.  I might just add that

7    on the standing issue I will not require that to be included in

8    the order, in the sale order, but I will issue a separate order

9    on that issue.  Justice Morawetz?

10           JUSTICE MORAWETZ:  Thank you, Judge Gross.  As I

11   indicated earlier, I will be providing further reasons with

12   respect to the standing issue at a later date.  The following

13   is my endorsements in respect of this motion.

14           The applicant's move for approval of the sale

15   agreement dated as of November 24, 2009 among Ciena Corporation

16   as purchaser and the various Nortel entities as sellers with

17   respect of certain aspects relating to Nortel's Metro Ethernet

18   Network business in the form attached to the twenty-eighth

19   report, the monitor.  The applicants have also sought a related

20   vesting order and approval of the bid submitted by MEN

21   Acquisition as the alternate bid.  The applicants have also

22   requested a sealing order in respect to the confidential

23   appendices to the twenty-eighth report, the monitor.

24           On October 15, 2009 a joint hearing was held between

25   this Court and the U.S. Court.  As part of that joint hearing

339

1    the Asset Sale Agreement dated as of October 7, 2009 among the

2    purchaser and the sellers and the bidding procedures was

3    approved.  Factual developments subsequent to the approval of

4    the bidding procedures are described in the affidavit of Mr.

5    Reidl, sworn November 25, 2009, and in the twenty-eighth report

6    of the monitor and is supplemented by live evidence provided by

7    Mr. McDonald at today's hearing.

8           Suffice to say, in the eleventh round of a very

9    lengthy auction, Ciena made a bid, defined as the final bid,

10   contemplating a purchase price of U.S. 530 million dollars in

11   cash plus U.S. 239 million convertible notes, all as defined in

12   the sale agreement.  The final bid was selected as the winning

13   bid, and then an acquisition bid offered at around eight of the

14   auction was declared the alternative bid.

15          This motion for approval of the sale agreement was

16   opposed by a variety of parties, including MEN Acquisition LLC

17   as well as MatlinPatterson Global Advisors LLC, although this

18   objection was subsequently withdrawn.  There are a number of

19   other objections that were filed in respect to the U.S.

20   proceedings that are -- be dealt with in a ruling by Judge

21   Gross.

22          Opposition was also voiced by counsel on behalf of the

23   official committee of unsecured creditors and by the

24   bondholders.  I have considered, and declined to give effect,

25   to the various objections.  Further details in respect of my

340

1    decision to reject these objections will be provided in

2    supplementary reasons, which, when released, are to be

3    considered in conjunction with this endorsement.

4         I am satisfied that in bringing this motion the

5    applicants have complied with the requirements and principles

6    as set out by the Court of Appeal in Ontario in Royal Bank and

7    Soundair, which, in turn, accepts certain standards set out by

8    this Court in Crown Trust and Rosenberg.  Although the Soundair

9    and Crown Trust tests were established for the sale of assets

10   by a receiver, the principles have been considered to be

11   appropriate for the sale of assets as part of a Court

12   supervised sale process in a CCAA proceeding.  For authority on

13   this point see Tiger Brand Knitting Company.

14        The duties of the Court in reviewing proposed sale of

15   assets are as follows.  One, it should consider whether

16   sufficient effort has been made to obtain the best price and

17   that the debtor has not acted improvidently.  Two, it should

18   consider the interests of all parties.  Three, it should

19   consider the efficacy and integrity of the process by which the

20   offers have been obtained.  And, four, it should consider

21   whether there has been unfairness in the working out of the

22   process.

23        I am satisfied that the sales process has been

24   conducted in good faith, in accordance with the bidding

25   procedures, and with the principles as set out both Soundair

341

1   and Crown Trust.  I am also satisfied that the consideration

2   being provided by Ciena constitutes fair consideration for the

3   assets involved in the sale transaction.  In the circumstances

4   I am also of the view that the applicants have established that

5   the Ciena bid is the best bid.  The sale agreement as between

6   Ciena and Nortel is accordingly approved.  With respect to the

7   request for the sealing order, I am satisfied that the

8   confidential appendices do contain confidential and sensitive

9   commercial information, the disclosure of which could be

10  harmful to the stakeholders, and, accordingly, based on the

11  principle setup of the Sierra Club case I am encouraged to

12  grant the sealing order.  An order shall issue in the form to

13  be presented, which will be considered.  We will, perhaps, deal

14  with that after the closing of this hearing, Mr. Tay.

15          In closing, I would like to thank all counsel, both in

16  this court and in the proceedings before Judge Gross, for the

17  quality of their presentations throughout this very lengthy

18  hearing.  I would also like to thank the court staff in both

19  courts for long and diligent service beyond the call of duty

20  today.

21          That concludes my reasons.  Thank you.

22          THE COURT:  Thank you, Justice Morawetz.  I believe

23  that the remaining matters are not joint issues.

24          JUSTICE MORAWETZ:  I am of the same with you, Judge

25  Gross, and have a nice evening.

342

1          THE COURT:  Thank you, sir.

2          MS. SCHWEITZER:  Your Honor?

3          THE COURT:  Yes?  Pardon me.  Is there a joint issue?

4          MS. SCHWEITZER:  The APAC and Hitachi motions.  Were

5     those entered?  Do you --

6          THE COURT:  Yes.

7          MS. SCHWEITZER: -- a caucus of that?

8          THE COURT:  Yes.  Yes.  I'm sorry.  I'm sorry.  Yes.

9     Those have been signed and will be docketed.

10          MS. SCHWEITZER:  Thank you.

11          THE COURT:  As well as in Canada.

12          JUSTICE MORAWETZ:  Yes, I will be considering the form

13     of order, and it will be addressed with counsel here, and an

14     order, I doubt very much whether you'll find an issue and enter

15     it tonight and to --

16          Thank you, Judge Gross.  Unless there's anything

17     further we propose to terminate the appealing.

18          THE COURT:  Thank you, sir.  And good evening to all.

19          JUSTICE MORAWETZ:  Thank you.  Mr. Tay?

20          MR. TAY:  Thank goodness.

21          THE COURT:  All right.  I guess I should have also

22     addressed the motion to file under seal, which was a separate

23     motion, of course, but I fully agree with Justice Morawetz that

24     the matters involved are of a very sensitive commercial nature,

25     proprietary nature, and I will grant that motion.

343

1          MR. BROMLEY:  Thank you very much, Your Honor.  We

2     have a number of, you know, the parade of specific objections

3     that --

4          THE COURT:  Understood.

5          MR. BROMLEY: -- we are attempting to deal with.  Mr.

6     Abbott is going to start off with a couple from, I think, IBM

7     and Hewlett-Packard.

8          MS. FELDSHER:  Your Honor, just, if I might?

9          THE COURT:  Ms. Feldsher?

10         MS. FELDSHER:  For those of us who, as much as we have

11    enjoyed being here and enjoyed your company, I know some of us

12    are trying to catch a train and just are not involved in these

13    matters.

14         THE COURT:  Yes.

15         MS. FELDSHER:  And, as I've been told by the

16    successful bidder, you know, my silence has already been

17    purchased, so may we be excused?

18         THE COURT:  You may.  Anyone may be excused who wishes

19    to be excused.

20         MS. FELDSHER:  Thank you, Your Honor.

21         THE COURT:  And thank you very much and good evening

22    and a safe trip home.

23         MS. FELDSHER:  Thank you, Your Honor.

24         MR. GALARDI:  Thank you for indulging us.

25         THE COURT:  Thank you very, very much.

1          (Pause)

2          MR. ABBOTT:  Good afternoon, Your Honor.  Derek

3     Abbott.

4          MR. SPEAKER:  If it weren't for that green tie we'd

5     all be asleep.

6          MR. SPEAKER:  Yes.

7          MR. SPEAKER:  Maybe we should give them a couple of

8     minutes, Your Honor.

9          THE COURT:  I think so.

10         MR. SPEAKER:  It might be easier to hear.

11         THE COURT:  I think so.  Mr. Kreller?  Mr. Hodara?

12     Thank you.

13         MR. HODARA:  Thank you, Your Honor.

14         MR. KRELLER:  Thank you, Your Honor.

15         MR. HODARA:  Mr. Samis will stay and finish up for the

16     creditors' committee, if that's okay with you.

17         THE COURT:  All right, Mr. Samis.  Absolutely.  I

18     certainly understand, and a safe trip home all.

19         MR. HODARA:  Thank you.

20         MR. MURRELL:  Your Honor?

21         THE COURT:  Yes.

22         MR. MURRELL:  Yes, Your Honor, it's --

23         THE COURT:  If you will, we're just taking a few

24     minutes to allow parties to leave the courtroom.

25         MR. MURRELL:  Yes, Your Honor.  I was asked --

345

1      (Pause)

2          THE COURT:  We can wait a few minutes.

3      (Pause)

4          THE COURT:  I think we missed rush hour.

5          MR. ABBOTT:  Fair enough.  Your Honor, Derek Abbott,

6  Morris Nichols, on behalf of the debtors.  Your Honor, we've

7  also served as conflict counsel with respect to a couple of

8  these objectors.  IBM --

9          THE COURT:  Yes.

10          MR. ABBOTT:  The easy one, Your Honor.

11          THE COURT:  Yes.

12          MR. ABBOTT:  We had issued a notice of potential

13  assumption and assignment.  That was subsequently withdrawn by

14  us, which resolved the IBM objection.

15          THE COURT:  Okay.

16          MR. ABBOTT:  So that goes away.  The other matter

17  we're handling, Your Honor, is -- Your Honor, may I approach?

18          THE COURT:  Yes.  Thank you, Mr. Abbott.  Oh, good.

19          MR. ABBOTT:  Your Honor, that is a blackline showing,

20  I believe, cumulative changes to date against what was filed.

21  It is not the final form of order, but it's pretty close and I

22  think will serve as a good tool to get us through most of us

23  and certainly get us through my piece.

24          THE COURT:  Okay.

25          MR. ABBOTT:  Your Honor, Hewlett-Packard objected,

1    raising issues regarding certain contracts.  We discussed

2    matter with them generally.  We agreed to add language that

3    you'll see in the new paragraph 30, Your Honor.  It essentially

4    indicates that nothing in this order provides for the

5    assumption and assignment of any contracts with HP, and that if

6    we later seek to assume and assign any contracts with HP that

7    we would do it either in accordance with the terms of the

8    contract or as otherwise permitted by applicable law, including

9    Section 365 of the Bankruptcy Code.

10          We had a number of discussions with HP.  Candidly,

11    Your Honor, they wanted more than this language.  We were not

12    willing to give more than this language.  They continue to be

13    concerned about a number of their contracts with the debtors'

14    estates and how those are going to be treated as a result of

15    this case and their entitlement to get paid for services that

16    they render.  And we continue to talk, Your Honor.  We haven't

17    been able to reach agreement.  We have agreed, however, that we

18    would sit down and meet with them to discuss these matters, and

19    I think, with that, the HP objection is resolved, although I

20    know that their counsel would like to address the Court.

21          THE COURT:  All right.  Thank you.

22          MR. ABBOTT:  Thank you, Your Honor.

23          THE COURT:  It's Ms. Porsch?

24          MS. PORSCH:  Yes.

25          THE COURT:  You've sat a long time.

347

1          MS. PORSCH:  Yes.

2          THE COURT:  You're entitled to be heard.

3          MS. PORSCH:  Thank you.  Just, very quickly, we

4     appreciate the debtors' willingness to add that language to the

5     order, and we appreciate their willingness to sit down with us

6     and further discuss the payment issues.  So, because we still

7     do have concerns with the payment issues under the various HP

8     agreements addressed in our objection, we would just like to

9     reserve our rights with respect to these issues.  And that's

10    all I have to add.

11         THE COURT:  All right.

12         MS. PORSCH:  Thank you.

13         THE COURT:  Ms. Porsch, thank you for your patience.

14         MR. ABBOTT:  Your Honor, that's all I have on the

15    order.  I know that there are a number of other issues on the

16    order.

17         THE COURT:  Yes.

18         MR. ABBOTT:  I believe my friends from Cleary -- I

19    think Ms. Schweitzer, who is probably working on one of them

20    right now, is going to address the rest.  If we could have just

21    a moment, Your Honor?

22         THE COURT:  You bet.

23         MR. ABBOTT:  Thank you, Your Honor.

24       (Pause)

25         MS. SCHWEITZER:  Sorry, Your Honor.

348

1          THE COURT:  It's fine.  It's quite all right.

2          MS. SCHWEITZER:  Okay.  Here we go.  Qwest.

3          THE COURT:  Yes.

4          MS. SCHWEITZER:  I'll just go through in order.  Most,

5     not all of them, are resolved now.  Qwest had an objection

6     regarding certain contracts, whether they're being assumed,

7     assigned and treatment to them.  There's language added in

8     paragraph 26 of the order, and I apologize.  I'm working real

9     time.  I think these sites are still pulled up.  So paragraph

10    26, again, makes clear about allocation of liabilities for

11    assumed and assigned contracts and who has to pay what, when

12    and whose rights are preserved.  You'll notice a little theme

13    here.  And I believe the additional of that language resolves

14    Qwest's objection.  I don't know if they're on the phones or

15    present.

16         THE COURT:  Does anyone for Qwest wish to be heard?

17    Yes.  Good evening.

18         MR. FALGOWSKI:  Good evening, Your Honor.  Cory

19    Falgowski from Reed Smith.  I can confirm that Qwest's

20    objection is resolved by the additional language.  Thank you.

21         THE COURT:  Thank you, Mr. Falgowski.

22         MS. SCHWEITZER:  The next one is Motorola.  And,

23    again, there was a certain clarification about whether

24    contracts are being taken in this sale.

25         THE COURT:  Yes.

1          MS. SCHWEITZER:  There's language in paragraph 28 of

2     the order --

3          THE COURT:  Yes.

4          MS. SCHWEITZER: -- that, again, makes clear that we're

5     not, through this order, assigning the contracts and their

6     rights are preserved if we try to later.  And so that's

7     paragraph 28.  Again, I think it resolves Motorola's objection.

8          THE COURT:  Mr. Allinson?

9          MS. SPEAKER:  Look at the majority of people that

10    struck around.

11         THE COURT:  Isn't that amazing?  Mr. Allinson does not

12    go home.

13         MR. ALLINSON:  Good evening, Your Honor.

14         THE COURT:  Good evening.

15         MR. ALLINSON:  Paragraph 28 does resolve Motorola's

16    objection.

17         THE COURT:  All right.  Thank you, sir.

18         MS. SCHWEITZER:  Next is SNMP Research.

19         THE COURT:  Yes.

20         MS. SCHWEITZER:  Again, same issue, clarification

21    regarding contracts being taken or not.  There's language in

22    paragraph 25 of the sale order.  Sorry to make you jump around

23    like this, but 25 of the sale order addresses their concerns.

24    It's more of the same.

25         THE COURT:  Anyone here for SNMP?  All right.  Thank

350

1    you.

2            MS. SCHWEITZER:  Someone's sleeping.  That's good

3            THE COURT:  Good.

4            MS. SCHWEITZER:  Hewlett-Packard was addressed by Mr.

5    Abbott.  AT&T is the next one.

6            THE COURT:  Yes.

7            MS. SCHWEITZER:  Paragraph 29 of the sale order.  More

8    of the same of questions regarding assumption and assignment of

9    contracts and treatment of contracts pursuant to the order.

10   And 29, I believe, resolves their objection.

11           THE COURT:  All right.  Hearing no one it's resolved.

12           MS. SCHWEITZER:  They were here before, so I'm sure it

13   is resolved.  And then number 7, Linex Technologies, they

14   basically want preserved their right to serve patent

15   infringement claims against the purchaser on the theory of, I

16   guess, I don't, you know, I don't know who's taking what, but I

17   want language in the order, that's explicit in the sale order,

18   that says I have the right to go after the purchaser for my

19   patent infringement claims if there's such a claim, and Section

20   363(f) of the Bankruptcy Code wouldn't trump that right.

21           THE COURT:  That's right.

22           MS. SCHWEITZER:  I think that might be true as a

23   matter of law.  I think we've crossed this bridge with prior

24   counterparties in other sales, and I think the purchaser is not

25   going to consent to that language being put in voluntarily.

1  And I think, as you see, the, sort of, the lowest common

2  denominator in repeating patterns here is our problem -- is

3  that the more reservation of rights we give to people, the

4  laundry list just never seems to end.  So I think that in our

5  view, and what we've told the counterparty, is that your

6  rights, kind of, are what they are.  The order says we're

7  getting an order that's, for the purchaser is free and clear of

8  liens, claims pursuant to 363(f).  And they've got their 363(f)

9  protections, and if you have a claim, you do, and if you don't,

10  you don't, but you don't need special treatment reservations of

11  rights or protections in the sale order.  I know Linex's

12  counsel is in the courtroom and wanted to speak on the record.

13       THE COURT:  Oh.  Yes.

14       MS. MUMFORD:  Good evening, Your Honor.

15       THE COURT:  Good evening.

16       MS. MUMFORD:  Is it still evening or is it good night?

17       THE COURT:  I think we call it night at this point.

18       MS. MUMFORD:  Your Honor, Kerri Mumford from Landis

19  Rath & Cobb on behalf of Linex.

20       THE COURT:  Ms. Mumford.

21       MS. MUMFORD:  Your Honor, obviously there was a lot

22  going on today, and there is what I would even view as a pretty

23  small minor matter.  I don't know if Your Honor had a chance to

24  review our objection.

25       THE COURT:  I did.

1          MS. MUMFORD:  But, essentially, Your Honor, we do have

2     current pending patent litigation against the debtors.  As we

3     stand here today we still don't know what assets are being sold

4     to the purchaser, whether they include the assets that we

5     believe are infringing on our patents now, or whether they may

6     include equipment that we don't even know about yet that will

7     infringe in the future.  I think I heard Your Honor say that is

8     correct when counsel said whatever our claims are, our claims

9     are, and if they infringe on our patents post-closing then the

10    363 would not be a protection from us asserting those claims.

11         Your Honor, we've tried multiple times to resolve this

12    objection.  We think that the request of our language was

13    fairly simple.  And although I can appreciate that we don't

14    want our sale orders to become longer and longer, we've already

15    gone through several reservations of rights that have already

16    been put on the record.  The refusal to put this one on does

17    cause me some concern that the purchaser may use the sale order

18    as a defense.

19         Your Honor, in the interest of time we're simply fine

20    with them putting on the record that they agree with Your

21    Honor's conclusion that 363 does not protect any post-closing

22    patent infringement claims that we may have against them.

23         MS. SCHWEITZER:  Your Honor, I'm sure that Ciena's

24    counsel wants to talk.  One point they forgot to mention.

25         THE COURT:  Or he may not.

1          MS. SCHWEITZER:  Or he may not.

2          MR. BACON:  I'm sort of mindful of Mr. Bromely's

3    advice that the burden of not showing up is you don't know what

4    people are talking about --

5          MS. SCHWEITZER:  Right.

6          THE COURT:  That's right.

7          MR. BACON:  And I don't --

8          MS. SCHWEITZER:  Right.

9          MR. BACON:  -- Your Honor, and I think the law is what

10   the law is and the Court's ruling and observations are what

11   they are and I don't want to make some casual comment about

12   patent litigation I don't know anything about.

13         MS. SCHWEITZER:  Right.

14         THE COURT:  Okay.

15         MS. SCHWEITZER:  The one fact that I will point out is

16   that there is pending litigation and we have asked the

17   plaintiffs to tell us what patents we're talking about and

18   technology we're talking about and we'll tell you if it's

19   subject to the sale.  And they've kind of given us these

20   including without limitation type list.  Every IP right they've

21   given us is not subject to the sale, and we've told them that

22   and we've confirmed that for them.  So we do view this as no

23   one knows.  You know, they say well, I don't know.  Well, the

24   fact is is they should know what their rights are.  We're happy

25   to look it up.  We're happy to, you know, if they tell us a

354

1   product they think is at risk we'll look it up and say that

2   product is moving over with this sale.  But we're concerned

3   with, in the same way they're concerned, someone having a

4   363(f) finding and saying that hurts them, and she cuts off

5   litigation for there to be an equally unqualified statement on

6   the record that their rights survive.  Maybe they do, maybe

7   they don't.  They are what they are, is what I think I'm

8   saying.  So that's my position, but, obviously this is Your

9   Honor's ruling at this point, because I don't think there's

10  consensus between the parties.

11           THE COURT:  Well, I think it should be sufficient here

12  to just indicate, really, what the law is, and that is whatever

13  rights you have are reserved.  The Court isn't in a position to

14  make a determination, as you are not in a position to make a

15  request, as to what those rights are and what the particular

16  assets are, but, clearly, the order that I will enter does not

17  cut off, the order in and of itself does not cut off your

18  client's rights.  And I think that that should be sufficient

19  for purposes of this evening.

20           MS. MUMFORD:  Thank you, Your Honor.

21           THE COURT:  Thank you, Ms. Mumford.

22           MS. SCHWEITZER:  Next one, Verizon.  Verizon filed an

23  objection, again, relating to counterparty to contracts, wanted

24  clarify on what contracts were moving over and the

25  apportionment of liabilities and rights under the contracts.

355

1      There's two different parts to the objection.  They had a

2      specific request regarding a MERS, M-E-R-S, agreement and

3      whether that was subject to the process.  The parties have

4      reached agreement on that, how that contract is being treated,

5      and my understanding is they're withdrawing that portion of

6      their objection and aren't pressing it.  And then the second

7      part of their objection was, again, this treatment of certain

8      contracts, and paragraph 27 of the order is added to provide

9      language that was agreed on between Ciena and Verizon

10     addressing the treatment of their contracts in connection with

11     the sale.

12             THE COURT:  All right.  Does anyone for Verizon wish

13     to be heard?

14             MR. WHITE:  Your Honor, on the telephone, Frank White

15     of Arnall Golden Gregory for Verizon.

16             THE COURT:  Yes, Mr. White?

17             MR. WHITE:  My client wanted me to just -- just a

18     brief bit of background on the record, and after eleven hours

19     I'm afraid that I would never be able to say stuff again if I

20     didn't do that.

21             THE COURT:  You bet.

22             MR. WHITE:  Your Honor, the debtors initially served

23     to file separate notices of assumption on executory contracts

24     on Verizon in connection with the MEN sale.  Discussions

25     between the parties thereafter resulted in the withdrawal by

1     the debtors of three of those assumption notices, leaving two

2     assumption notices that referenced contracts between the

3     debtors and Verizon.  One is the MERS agreement that Ms.

4     Schweitzer just referred to, and the other a contract known as

5     the NGADM agreement.

6          Nortel further agreed, in discussions with Verizon,

7     that the NGADM agreement was required and intended to be

8     assumed to Ciena in its entirety, including all of its

9     associated amendments and statements of work and other parts.

10    That left Verizon with only one very limited objection relating

11    to the temporal scope of certain indemnity warranty and other

12    obligations that were being undertaken by Ciena in connection

13    with the sale.  And the language added to the sale order that

14    Ms. Schweitzer just referred to does resolve those remaining

15    objections in full.  Thank you.

16          THE COURT:  All right, Mr. White.  Thank you, sir.

17    And good evening to you.

18          MR. WHITE:  Good evening to you, Your Honor.  Thank

19    you.

20          MS. SCHWEITZER:  I'm just checking with the people who

21    actually know all the facts, and they're --

22          THE COURT:  Okay.

23          MS. SCHWEITZER: -- telling me that's correct.  So I

24    think we're done with Verizon, which is great news.

25    ZSF/Research Gateway Trust is the next one.

1          THE COURT:  All right.

2          MS. SCHWEITZER:  They had initially made a request for

3     adequate assurance information.  It might not have gotten sent

4     to them or they had some question about it, but we agreed

5     either way.  It's a landlord and we agreed to make a statement

6     on the record that Nortel is not planning to assume any leases

7     between Nortel and ZSF/Research Network Trust or ZSF/Research

8     Gateway Trust in connection with the sale of MEN Business.  And

9     I think with that comfort and representation they are not

10    pressing the objection or it's rendered moot.

11         MatlinPatterson, we have crossed that bridge.  MEN

12    Acquisition, we've crossed that bridge.  And then there was two

13    other, three other provisions statements we've agreed to add

14    into the sale order.  First, on paragraph 30 of the sale

15    order --

16         THE COURT:  Yes.

17         MS. SCHWEITZER:  There is language added in with Open

18    Systems Solutions or OSS, you'll recall.  They're starting to

19    sound familiar.  Again, giving comfort to them on the

20    assumption and assignment of their contracts.  There's a second

21    thing which bears a moment of explanation, which is paragraph

22    42 of the sale.  You've heard, this is an agreement between the

23    U.S. debtors and the Canadian debtors regarding allocation of

24    certain TSA costs --

25         THE COURT:  Oh, yes.

1      MS. SCHWEITZER: -- in allocation of sale related costs

2  and how that would be done.  The parties, the U.S. debtors on

3  the one side and the Canadian debtors on the other side, have

4  been working to have a consensual arrangement relating to cost

5  sharing, and I think that they're close, that there's language

6  in here describing what the nature of the agreement is, and it

7  would be subject to further document, but we've agreed to put

8  forth paragraph 42 into the seller describing the agreements

9  that have been reached and how we would proceed with those

10  agreements.  So it goes to all these questions regarding which

11  estates are benefitting and which estates are paying, and it's

12  language that got everyone comfortable proceeding with the sale

13  today.

14      THE COURT:  Okay.

15      MS. SCHWEITZER:  So that's added in.  I don't know

16  if -- the committee looks like they're all on a train, so

17  they've signed off on the language.

18      THE COURT:  Mr. Samis is here. Just to confirm for the

19  record, Mr. Samis.

20      MR. SAMIS:  Yes.  Just to confirm for the record the

21  committee is fine with that language.

22      THE COURT:  Thank you, sir.  Thank you.

23      MS. SCHWEITZER:  And then there was one last statement

24  on the record, again for the plaintiff Lusescu, L-U-S-E-S-C-U,

25  who is a plaintiff in a securities litigation brought against

1    Nortel directors, who had the concern about document retention.

2    And we agreed that we'll state on the record simply what the

3    ASA says about document retention, which is that we keep the

4    originals and Ciena gets copies.

5         THE COURT:  Right.

6         MS. SCHWEITZER:  And, with that, I think all of the

7    objections have now been addressed.  There was just, the reason

8    the order is not final is we're just trying to work into the

9    language of the order this one agreement with Ciena on the

10   change of the --

11        THE COURT:  Yes.

12        MS. SCHWEITZER:  -- move into 102.  So I think we're

13   just going to add one paragraph at the end of the order.  We

14   certainly aren't going to ask Your Honor to stay a moment

15   longer to wait for us to hand that in.  So it probably makes

16   sense if we just submit it under certification of counsel in

17   the morning, if that's all right with you.

18        THE COURT:  That's perfectly fine with me.  I just

19   have one issue or one question, and that has to do with the

20   stay waiver, if we can just address that.  And I'm looking for

21   it.

22        MS. SCHWEITZER:  It's the, I think the next to last

23   paragraph.

24        THE COURT:  Good.

25        MR. ABBOTT:  Paragraph 41, I believe.

360

1          MS. SCHWEITZER:  Is it paragraph 41?  I gave away my

2     copy.

3          THE COURT:  Let me just -- I just want to make sure at

4     least I look at it.  Immediate effect --

5          MS. SCHWEITZER:  Absolutely.  I mean, I'm happy to

6     address the substance of it and that Mr. Reidl had provided

7     testimony and certainly Mr. Murray had provided testimony on

8     the need for moving forward in certainty and closure to the

9     process.

10         THE COURT:  Right.

11         MS. SCHWEITZER:  And we think that the record has been

12    made, but the language itself is in paragraph 41 on page 5.

13    I'm working off a blackline.

14         THE COURT:  We don't know what page anymore, but --

15         MS. SCHWEITZER:  Right.

16         THE COURT: -- I am prepared to authorize that, yes.

17         MS. SCHWEITZER:  Thank you, Your Honor.  I think

18    that's it.  Let me just take one little click and flip through

19    on this, but I think we've got them all.  So we can hand in the

20    order in the morning, and then the only motion that we had

21    pending in connection with this is the sealing motion.

22         THE COURT:  Right.

23         MS. SCHWEITZER:  And I think the record was made along

24    the way, but I have the order that has not been handed up.

25         THE COURT:  Yes.  And I think I indicated I was

1    approving that motion, but, yes, I will sign it now.

2            MS. SCHWEITZER:  I can hand it up.

3            THE COURT:  Please.  Thank you, Ms. Schweitzer.

4            MS. SCHWEITZER:  With that, Your Honor, I think we're

5    reaching a twelve hour hearing here, so we want to bring you

6    some of the pleasure of what auctions Cleary style feel like,

7    and we promise to keep them limited, and we sincerely do

8    appreciate your indulgence in staying and accommodating us,

9    because it's made a big difference to a lot of people in the

10   room.

11           THE COURT:  I appreciate that.  And thank you, and I

12   appreciate counsel's hard work as well.  I recognize that

13   you've been really working tirelessly on this case, and, for

14   the most part, you've made it relatively easy for the Court.

15   You haven't brought a lot of these fights to me, but when they

16   arise, obviously, I'm here to address them.

17           MS. SCHWEITZER:  Right.  We appreciate that.

18           MR. SPEAKER:  Thank you very much, Your Honor.

19           THE COURT:  I wish you all a good evening.  I

20   congratulate Ciena --

21           MR. BACON:  Thank you, Judge.

22           THE COURT:  -- and good luck to you.

23           MR. BACON:  Thank you.  And I want to thank the Court

24   and your personnel, because you guys aren't on the meter like

25   most of the people out here, and we really appreciate it.  It

1    does make a different to finish this today.

2         THE COURT:  Of course it does.  It's necessary.  Was

3    someone starting to speak?

4         MR. MURRELL:  Yes.  Good night, Your Honor.  Vicente

5    Matias Murrell on behalf of Pension Benefit Guaranty

6    Corporation.  Your Honor, there are times that because we've

7    had technical difficulties it's been really hard to hear, but I

8    am assuming, Your Honor, that there's been no -- we did not

9    file the objection.  The debtor graciously accepted, provided

10   us with language that says that the order would not apply to

11   non-debtor assets, and I'm assuming that nothing like that,

12   that nothing has changed and I didn't miss anything.

13        MS. SCHWEITZER:  Your Honor, it's Lisa Schweitzer for

14   the debtors.  I can say nothing has changed with respect to the

15   PBGC's rights and our protective language for them.

16        THE COURT:  All right.

17        MR. MURRELL:  Your Honor, I thank the Court and I

18   thank Ms. Schweitzer very much.

19        THE COURT:  And thank you for your long day too, sir.

20   And we'll stand in recess.  And everyone have a good evening

21   and a good trip home.

22        MS. SCHWEITZER:  Thank you, Your Honor.

23        THE COURT:  Thank you.

24      (Proceedings concluded at 10:16 PM)

25

363

1                      I N D E X

2

3    WITNESS              EXAMINATION BY      PAGE

4    George Reidl         Mr. Bromley         140

5    George Riedel        Mr. Hodara          187

6    George Reidl         Ms. Feldsher        188

7    George Reidl         Mr. Bacon           202

8    George Riedel        Mr. Bromley         203

9    Mike Murray          Ms. Schweitzer      260

10   Mike Murray          Mr. Bacon           284

11   Murray McDonald      Mr. Carfagnini      315

12

13                    E X H I B I T S

14   DEBTORS'             DESCRIPTION         PAGE

15   1                    Summary of Bids     139

16   2                    Transcript of       139

17                        Auction

18   3                    Redacted Copies of  140

19                        Bid Submissions

20   4                    NSN press release   207

21

22   (Continued on next page)

23

24

25

364

I N D E X (Contd.)


JUDGE GROSS RULINGS

|  | Page | Line |
|---|---|---|
| MEN Acquisitions has no standing | 197 | 8 |
| in the present hearing | | |
| Debtors' motion for entry of an order | 219 | 22 |
| (i) authorizing and approving the | | |
| Flextronics settlement and release | | |
| agreement,(ii) authorizing and | | |
| approving the related side agreement and | | |
| (iii)granting related relief - Granted | | |
| Debtors' motion for entry of an order | 220 | 21 |
| authorizing the debtors to file under | | |
| seal certain portions of the settlement | | |
| and release agreement and the side | | |
| agreement - Granted | | |
| GSM/GSM-R sale motion approved | 245 | 13 |
| GSM sale order request for filing | 245 | 14 |
| Documents under seal approved | | |
| Approval of sale of Metro Ethernet | 335 | 14 |
| Networks to Ciena Corporation | | |
| Granting of motion to file sale | 342 | 25 |
| to Ciena under seal | | |

365

I N D E X (Contd.)


JUSTICE MORAWETZ RULINGS

|  | Page | Line |
|---|---|---|
| Record hardship motion granted | 111 | 12 |
| Standing denied to MEN Acquisition | 198 | 7 |
| Flextronic's motion granted | 219 | 22 |
| GSM sale agreement approved | 248 | 25 |
| Confidential appendix to monitor's | 249 | 7 |
| 29th report will be sealed |  |  |

366

C E R T I F I C A T I O N

I, Sharona Shapiro, certify that the foregoing transcript is a
true and accurate record of the proceedings.

_____

SHARONA SHAPIRO (CET**D-492)


AAERT Certified Electronic Transcriber


Also transcribed by:    Clara Rubin (CET**D-491)



Veritext

200 Old Country Road

Suite 580

Mineola, New York 11501


Date:  December 11, 2009