## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

-------------------------------------------------------X

| | |
|---|---|
| *In re* | Chapter 11 |
| Nortel Networks Inc., *et al.*,[1] | Case No. 09-10138 (KG) |
| Debtors. | Jointly Administered |
| | **Hearing date:** December 15, 2009 at 10:00 AM (ET) [PROPOSED] |
| | **Objections due:** December 15, 2009 at 10:00 AM (ET) [PROPOSED] |

-------------------------------------------------------X

### DEBTORS' MOTION FOR AN ORDER (A) APPROVING THE ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS PURSUANT TO THE SALE OF THE DEBTORS' ENTERPRISE SOLUTIONS BUSINESS AND (B) APPROVING A COMPROMISE OF CONTROVERSY BETWEEN THE DEBTORS, AVAYA INC. AND AT&T SERVICES, INC.

Nortel Networks Inc. ("NNI") and certain of its affiliates, as debtors and debtors in possession (collectively, the "Debtors"), hereby move this Court (the "Motion") for the entry of an order (attached hereto as Exhibit A) pursuant to sections 105, 363 and 365 of title 11 of the United States Code (the "Bankruptcy Code"), Rules 2002, 6004, 6006, and 9019 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") (a) approving the assumption and assignment of the AT&T Customer Contracts (as defined in the Stipulation Among Nortel Networks Inc., AT&T Services, Inc. and Avaya Inc. ("Avaya"), attached hereto as Exhibit B, the "Stipulation")) in connection with the sale of the Debtors' Enterprise Solutions business to

---

[1]     The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's tax identification number, are:  Nortel Networks Inc. (6332), Nortel Networks Capital Corporation (9620), Nortel Altsystems Inc. (9769), Nortel Altsystems International Inc. (5596), Xros, Inc. (4181), Sonoma Systems (2073), Qtera Corporation (0251), CoreTek, Inc. (5722), Nortel Networks Applications Management Solutions Inc. (2846), Nortel Networks Optical Components Inc. (3545), Nortel Networks HPOCS Inc. (3546), Architel Systems (U.S.) Corporation (3826), Nortel Networks International Inc. (0358), Northern Telecom International Inc. (6286) and Nortel Networks Cable Solutions Inc. (0567) and Nortel Networks (CALA) Inc. (4226).  Addresses for the Debtors can be found in the Debtors' petitions, which are available at http://chapter11.epiqsystems.com/nortel.

Avaya as purchaser (together with its designees, the "Purchaser") in accordance with the terms

and conditions of the Amended and Restated Asset and Share Sale Agreement entered into by

the Debtors, certain of their affiliates and the Purchaser dated September 14, 2009, as may be

subsequently amended (the "Sale Agreement"); (b) authorizing the Debtors to compromise a

controversy among (i) NNI; (ii) AT&T Services, Inc., on its own behalf and as agent on behalf of

AT&T Corp. and its subsidiaries and affiliates (collectively, "AT&T"); and (iii) Avaya (together

with NNI and AT&T, the "Parties") as more fully described below and as set forth in the agreed

terms of the Stipulation; and (c) granting them such other and further relief as the Court deems

just and proper.  In support of this Motion, the Debtors respectfully represent as follows:

## Jurisdiction

1.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and

1334.  This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).  Venue is

proper pursuant to 28 U.S.C. §§ 1408 and 1409.

2.      The statutory bases for the relief requested herein are sections 105, 363 and 365

of the Bankruptcy Code, Rules 2002, 6004, 6006, and 9019 of the Bankruptcy Rules.

## Background

**B.      Introduction**

3.      On January 14, 2009 (the "Petition Date"), the Debtors, other than NN CALA (as

defined below) filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code.

4.      The Debtors continue to operate their businesses and manage their properties as

debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

5.      On January 15, 2009, this Court entered an order of joint administration pursuant

to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") that

provided for the joint administration of these cases and for consolidation for procedural purposes

only [D.I. 36].

6.       Also on the Petition Date, the Debtors' ultimate corporate parent NNC, NNI's direct corporate parent NNL (together with NNC and their affiliates, including the Debtors, "Nortel"), and certain of their Canadian affiliates (collectively, the "Canadian Debtors")[2] filed an application with the Ontario Superior Court of Justice (the "Canadian Court") under the Companies' Creditors Arrangement Act (Canada) (the "CCAA"), seeking relief from their creditors (collectively, the "Canadian Proceedings").  The Canadian Debtors continue to manage their properties and operate their businesses under the supervision of the Canadian Court.

7.       Ernst & Young Inc., as court-appointed Monitor in the Canadian Proceedings and as foreign representative for the Canadian Debtors (the "Monitor"), has filed petitions in this Court for recognition of the Canadian Proceedings as foreign main proceedings under chapter 15 of the Bankruptcy Code.  On January 14, 2009, the Canadian Court entered an order recognizing these chapter 11 proceedings as a foreign proceeding under section 18.6 of the CCAA.  On February 27, 2009, this Court entered an order recognizing the Canadian Proceedings as foreign main proceedings under chapter 15 of the Bankruptcy Code.

8.       On January 14, 2009, the High Court of Justice in England placed nineteen of Nortel's European affiliates (collectively, the "EMEA Debtors")[3] into administration under the control of individuals from Ernst & Young LLC (collectively, the "Joint Administrators"). On May 28, 2009, at the request of the Joint Administrators, the Commercial Court of Versailles,

---

[2]       The Canadian Debtors include the following entities:  NNC, NNL, Nortel Networks Technology Corporation, Nortel Networks Global Corporation and Nortel Networks International Corporation.

[3]       The EMEA Debtors include the following entities:  Nortel Networks UK Limited, Nortel Networks S.A., Nortel Networks (Ireland) Limited, Nortel GmbH, Nortel Networks France S.A.S., Nortel Networks Oy, Nortel Networks Romania SRL, Nortel Networks AB, Nortel Networks N.V., Nortel Networks S.p.A., Nortel Networks B.V., Nortel Nortel Networks Polska Sp. z.o.o., Nortel Networks Hispania, S.A., Nortel Networks (Austria) GmbH, Nortel Networks, s.r.o., Nortel Networks Engineering Service Kft, Nortel Networks Portugal S.A., Nortel Networks Slovensko, s.r.o. and Nortel Networks International Finance & Holding B.V.

France (Docket No. 2009P00492) ordered the commencement of secondary proceedings in respect of Nortel Networks S.A. ("NNSA"), which consist of liquidation proceedings during which NNSA continued to operate as a going concern for an initial period of three months, which period was subsequently extended.  On October 1, 2009, pursuant to a motion filed by the Joint Administrators, the French Court approved an order to:  (i) suspend the liquidation operations relating to the sale of the assets and/or businesses of NNSA for a renewable period of two months; (ii) authorize the continuation of the business of NNSA so long as the liquidation operations are suspended; and (iii) maintain the powers of the French Administrator and Liquidator during the suspension period, except with respect to the sale of assets and/or businesses of NNSA.  In accordance with the European Union's Council Regulation (EC) No. 1346/2000 on Insolvency Proceedings, the English law proceedings (the "English Proceedings") remain the main proceedings in respect of NNSA.  On June 8, 2009, Nortel Networks UK Limited ("NNUK") filed petitions in this Court for recognition of the English Proceedings as foreign main proceedings under chapter 15 of the Bankruptcy Code.  On June 26, 2009, the Court entered an order recognizing the English Proceedings as foreign main proceedings under chapter 15 of the Bankruptcy Code.

9.        On January 18, 2009, certain Nortel affiliates, including Nortel Networks Israel (Sales and Marketing) Limited, filed an application with the Tel-Aviv-Jaffa District Court, pursuant to the Israeli Companies Law, 1999, and the regulations relating thereto for a stay of proceedings.  On January 19, 2009, the Israeli Court appointed Yaron Har-Zvi and Avi D. Pelossof as joint administrators of the Israeli Company under the Israeli Companies Law (the "Joint Israeli Administrators").

10.        On January 26, 2009, the Office of the United States Trustee for the District of

4

Delaware (the "U.S. Trustee") appointed an Official Committee of Unsecured Creditors (the "Committee") pursuant to section 1102(a)(1) of the Bankruptcy Code [D.I.s 141, 142]. An ad hoc group of bondholders holding claims against certain of the Debtors and certain of the Canadian Debtors has also been organized (the "Bondholder Group"). No trustee or examiner has been appointed in the Debtors' cases.

11.     On July 14, 2009 (the "CALA Petition Date"), Nortel Networks (CALA) Inc. ("NN CALA" and a Debtor with NNI and its affiliates), an affiliate of NNI, filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. On July 17, this Court entered orders approving the joint administration and consolidation of NN CALA's chapter 11 case with the other Debtors' chapter 11 cases for procedural proposes [D.I. 1098], and applying to NN CALA certain previously entered orders in the Debtors' chapter 11 cases [D.I. 1099].

C.     **Debtors' Corporate Structure and Business**

12.     A description of the Debtors' corporate structure and business and the events leading to the chapter 11 cases is set forth in the Declaration of John Doolittle in Support of First Day Motions and Applications [D.I. 3].

D.     **The Enterprise Business Solutions Sale**

13.     Nortel's Enterprise Solutions business unit provides solutions for addressing the communication needs of large and small businesses globally across a wide variety of industries by building new networks and transforming existing networks into more cost-effective, packet-based networks supporting data, voice and multimedia communications (the "Enterprise Solutions Business"). In particular, the Enterprise Solutions Business specializes in providing solutions that allow its customers to integrate and remove barriers between voice, email, conferencing, video and instant messaging technologies. Nortel's Enterprise Solutions Business has a global presence with operations and customers in the United States, Canada, Central and

Latin America, Europe, the Middle East, Africa, and Asia.

14.     On July 20, 2009, the Debtors filed a Motion for Orders (I)(A) Authorizing

Debtors' Entry into the Asset and Share Sale Agreement, (B) Authorizing and Approving the

Bidding Procedures, (C) Authorizing and Approving a Break-Up Fee and Expense

Reimbursement, (D) Approving the Notice Procedures, (E) Approving the Assumption and

Assignment Procedures, (F) Authorizing the Filing of Certain Documents under Seal and (G)

Setting a Date for the Sale Hearing, and (II) Authorizing and Approving (A) the Sale of Certain

Assets of, and Equity Interests In, Debtors' Enterprise Solutions Business, (B) the Assumption

and Assignment of Certain Contracts and Leases and (C) the Assumption and Sublease of

Certain Leases [D.I. 1131] (the "Sale Motion").[4]  The Sale Motion sought approval of the sale of

certain of the Debtors' assets relating to the Debtors' Enterprise Solutions Business (the

"Assets"), including the assumption and assignment of certain executory contracts to the

Successful Bidder at an auction, and the approval of certain bidding procedures (the "Bidding

Procedures") in connection with the proposed sale.  Following a hearing on the Bidding

Procedures, this Court entered an order on August 4, 2009 [D.I. 1278] (the "Sale Procedures

Order"), approving the Bidding Procedures to govern the sale by NNI and certain of its affiliates

(collectively, the "Sellers") of the Assets.

15.     In accordance with the Bidding Procedures, the Sellers conducted an auction that

commenced on September 11, 2009 (the "Auction").  The Successful Bid (as defined in the

Bidding Procedures) resulting from the Auction was the Sale Agreement, dated as of

September 14, 2009 with Avaya as the Purchaser (the "Successful Bid").

16.     On September 16, 2009, this Court entered an order approving the sale of the

---

[4]     Capitalized terms used but not defined herein shall have the meaning ascribed to them in the Sale Motion.

Assets to the Purchaser pursuant to the Successful Bid [D.I. 1514] (the "Sale Order").  The

Canadian Court entered a corresponding order approving the sale in the Canadian Proceedings

on the same day.

## Relief Requested

17.     By this Motion, the Debtors seek an order (a) approving the assumption and

assignment of the AT&T Customer Contracts to the Purchaser pursuant to section 365 of the

Bankruptcy Code; (b) authorizing the Debtors to compromise a controversy between the Parties;

and (c) granting such other relief as the Court deems just and proper.

## Facts Relevant to the Motion

18.     As part of the Sale Order, the Court authorized the Debtors under Bankruptcy

Code section 365 to assume and assign the Assumed and Assigned Contracts to the Purchaser,

which assignment shall take place on and be effective as of the Closing or such later date as

contemplated by the Sale Agreement.  The Assumed and Assigned Contracts were defined in the

Sale Agreement to include certain executory contracts (including supplier and customer

contracts) to which the Debtors were a party prior to the sale.

19.     AT&T filed a limited objection to the Sale Motion concerning the AT&T

Customer Contracts and the potential assumption and assignment of the contracts [D.I. 1432]

(the "AT&T Objection").  As a result, the Sale Order reserved the rights of all Parties with

respect to the AT&T Customer Contracts and the AT&T Objection.  The Debtors, AT&T and

Avaya, as described below, have agreed to the Stipulation as a proposed resolution of the AT&T

Objection.

*The Proposed Stipulation*[5]

20.    <u>Assumption and Assignment</u>.  Since the entry of the Sale Order, the Parties have engaged in arms-length negotiations to resolve the AT&T Objection and any disputes relating to the assumption and assignment of the AT&T Customer Contracts.  The Debtors now wish, pursuant to the terms of the Stipulation, to assume and assign the AT&T Customer Contracts to the Purchaser in connection with the sale of the Assets (the "<u>Additional Contracts</u>") effective as of the Closing Date (as defined in the Sale Agreement, and presently anticipated to occur as early as December 18, 2009).  On the Closing Date, the Additional Contracts shall be assumed and assigned to Avaya under section 365 of the Bankruptcy Code, free and clear of all Interests (as defined in paragraph L of the Sale Order) of any kind or nature whatsoever, other than the Assumed Liabilities (as defined in the Sale Agreement) on the terms set forth in the Sale Agreement.  Avaya shall be deemed to have assumed the Assumed Liabilities related to the AT&T Customer Contracts.

21.    <u>Reservation of Rights</u>.  Notwithstanding the assumption and assignment of the AT&T Customer Contracts to Avaya on the terms set forth above, nothing in the Stipulation, the Sale Agreement or in the Enterprise Sale Order shall affect, prejudice, estop, bar, impair or otherwise limit in any respect, the rights of AT&T or Avaya at a date subsequent to the date of the Stipulation to oppose or support the position that by virtue of the assumption and assignment of the AT&T Customer Contracts to Avaya on the terms set forth above that Avaya has assumed, whether under the Bankruptcy Code or other applicable law, all obligations and liabilities

---

[5]    The summaries and descriptions of the terms and conditions of the Stipulation set forth in the Motion are intended solely for informational purposes to provide the Court and parties in interest with an overview of significant terms thereof and should only be relied upon as such. The summaries and descriptions are qualified in their entirety by the Stipulation. In the event there is a conflict between the Motion and the Stipulation, the Stipulation shall control in all respects.

associated with the AT&T Customer Contracts relating to the conduct or operation of the

Enterprise Solutions Business by NNI and the Debtors before the Closing Date that do not

constitute Assumed Liabilities under the Sale Agreement, including without limitation, any

indemnification obligations or liabilities (collectively, the "Pre-Closing Obligations").  For the

avoidance of doubt, none of the provisions or terms in the Sale Agreement or the Enterprise Sale

Order shall bar, estop, preclude or limit AT&T from arguing that the Pre-Closing Obligations

were assumed by Avaya by operation of law or otherwise and Avaya may not rely on any

provisions in the Enterprise Sale Order to contend that such Pre-Closing Obligations were not

assumed by Avaya.

22.     Claims Related to Pre-Closing Obligations.  The Parties have agreed to a

specified procedure in the claims process to resolve any outstanding Pre-Closing Obligations, as

more fully set out in Paragraph 5 of the Stipulation.

### Cure Amounts

23.     The Sale Agreement contemplates that to the extent necessary to consummate a

sale to Avaya, the Debtors shall pay the amount, if any, determined by the Debtors to be

necessary to be paid to cure any existing default in accordance with section 365(b) and 365(f)(2)

of the Bankruptcy Code (the "Cure Amount") promptly.  The Parties have agreed no Cure

Amounts are due and owing with respect to the Additional Contracts and have so agreed, as set

forth in paragraph 3 of the Stipulation.

### Reservation of Rights

24.     The Debtors' assumption and assignment of the Additional Contracts is subject to

Court approval and the consummation of the sale of the Assets to the Purchaser.  Accordingly,

the Debtors shall be deemed to have assumed each of the Additional Contracts as of the Closing

Date, and, absent the closing of the sale, the Additional Contracts shall be deemed neither

assumed nor assigned and shall in all respects be subject to subsequent assumption or rejection

by the Debtors under the Bankruptcy Code.  The Debtors also reserve the right, in consultation

with the Purchaser and subject to the terms of the Sale Agreement, to withdraw the designation

of an Additional Contract for assumption and assignment prior to the closing date of the sale.

25.    The Purchaser shall have no rights in and to a particular Additional Contract until

such time as the particular Additional Contract is assumed and assigned upon the Closing Date.

26.    Pursuant to Section 365(f) of the Bankruptcy Code, the assumption and

assignment of the Additional Contracts to the Purchaser occurs notwithstanding any provision to

the contrary in the Additional Contracts, or in applicable non-bankruptcy law, that prohibits,

restricts, or conditions the assignment.

27.    Upon assumption of the Additional Contracts by the Debtors and assignment to

the Purchaser, the Additional Contracts shall be valid and binding, in full force and effect in

accordance with their terms, subject to the provisions of the order approving such assumption

and assignment.  Finally, the Debtors and Avaya have demonstrated evidence of adequate

assurance of future performance, as to which AT&T agrees subject to the approval of the

Stipulation.

**Basis for Relief**

**A.    The Assumption and Assignment of the Additional Contracts Should Be Authorized**

28.    Under Bankruptcy Code section 365(a), a debtor, "subject to the court's approval,

may assume or reject any executory contract or unexpired lease of the debtor." 11 U.S.C.

§ 365(a).  Bankruptcy Code section 365(b)(1), in turn, codifies the requirements for assuming an

executory contract of a debtor.  This subsection provides:

(b) (1)    If there has been a default in an executory

contract or unexpired lease of the debtor, the trustee may not
assume such contract or lease unless, at the time of assumption of
such contract or lease, the trustee -

> (A)    cures, or provides adequate assurance that
> the trustee will promptly cure, such default . . . ;

> (B)    compensates, or provides adequate
> assurance that the trustee will promptly compensate, a party
> other than the debtor to such contract or lease, for any
> actual pecuniary loss to such party resulting from such
> default; and

> (C)    provides adequate assurance of future
> performance under such contract or lease.

11 U.S.C. § 365(b)(1). Section 365(f)(2) of the Bankruptcy Code provides, in pertinent part,

that:

> The trustee may assign an executory contract or unexpired lease of
> the debtor only if --

> (A)    the trustee assumes such contract or lease in
> accordance with the provisions of this section; and

> (B)    adequate assurance of future performance by
> the assignee of such contract or lease is provided, whether
> or not there has been a default in such contract or lease.

11 U.S.C. § 365(f)(2).

29.    The meaning of "adequate assurance of future performance" depends on the facts

and circumstances of each case, but should be given "practical, pragmatic construction." EBG

Midtown S. Corp. v. McLaren/Hart Envtl. Eng'g Corp. (In re Sanshoe Worldwide Corp.), 139

B.R. 585, 593 (S.D.N.Y. 1992); In re Prime Motor Inns Inc., 166 B.R. 993, 997 (Bankr. S.D. Fla.

1994); Carlisle Homes, Inc. v. Azzari (In re Carlisle Homes, Inc.), 103 B.R. 524, 538 (Bankr.

D.N.J. 1988).

30.    Among other things, adequate assurance may be provided by demonstrating the

assignee's financial health and experience in managing the type of enterprise or property

assigned.  See, e.g., In re Bygaph, Inc., 56 B.R. 596, 605-06 (Bankr. S.D.N.Y. 1986) (finding

adequate assurance of future performance present when prospective assignee of lease from

debtor has financial resources and has expressed willingness to devote sufficient funding to

business in order to give it strong likelihood of succeeding).

31.     To the extent any defaults exist under any Additional Contract, any such default

will be promptly cured or adequate assurance that such default will be cured will be provided

prior to the assumption and assignment.  If necessary, the Debtors will submit additional facts

prior to or at the hearing on this Motion to show the financial credibility of the Purchaser and

willingness and ability to perform under the Additional Contracts.  The hearing will therefore

provide the Court and other interested parties the opportunity to evaluate and, if necessary,

challenge the ability of the Purchaser to provide adequate assurance of future performance under

the Additional Contracts, as required under section 365(b)(1)(C) of the Bankruptcy Code.

32.     In addition, the Debtors submit that it is an exercise of their sound business

judgment to assume and assign the Additional Contracts to the Purchaser, and the assumption,

assignment, and sale of the Additional Contracts to the Purchaser are in the best interests of the

Debtors, their estates, their creditors, and all parties in interest.  The Additional Contracts being

assigned to the Purchaser are an integral part of the Assets being purchased by the Purchaser, and

accordingly, such assumption, assignment, and sale of the Additional Contracts are reasonable

and enhance the value of the Debtors' estates.  The Court should therefore authorize the Debtors

to assume and assign the Additional Contracts as set forth herein.

**B.      Approval of the Compromise of Controversy**

33.     The Debtors seek an order granting the relief sought in this Motion pursuant to

section 105(a) of the Bankruptcy Code and Rule 9019 of the Bankruptcy Rules.  Section 105(a)

of the Bankruptcy Code provides, in pertinent part, that "[t]he court may issue any order . . . that

12

is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]."  11 U.S.C. §105(a).

34.    Bankruptcy Rule 9019 provides, in pertinent part, that, "on motion by the trustee and after notice and a hearing, the court may approve a compromise or settlement."  Fed. R. Bankr. P. 9019(a).  Under this authority, the Third Circuit has emphasized that "[c]ompromises are favored in bankruptcy."  Myers v. Martin (In re Martin), 91 F.3d 389, 393 (3d Cir. 1996) (quoting 9 Collier on Bankruptcy ¶ 9019.03[1] (15th ed. 1993)).  In addition, the District of Delaware has recognized that the approval of a proposed compromise and settlement is committed to the sound discretion of the bankruptcy court.  See In re Coram Healthcare Corp., 315 B.R. 321, 330 (Bankr. D. Del. 2004).

35.    Before approving a settlement under Bankruptcy Rule 9019, a court must determine whether "the compromise is fair, reasonable, and in the interest of the estate."  In re Key3Media Group, Inc., 336 B.R. 87, 92 (Bankr. D. Del. 2005); In re Marvel Entm't Group, 222 B.R. 243, 249 (D. Del. 1998) (quoting In re Louise's, Inc., 211 B.R. 798, 801 (D. Del. 1997)); see also In re Nutritional Sourcing Corp., 398 B.R. 816, 833 (Bankr. D. Del. 2008).  Basic to the process of evaluating proposed settlements is "the need to compare the terms of the compromise with the likely rewards of litigation."  Protective Comm. for Independent Stockholders of TMT Trailer Ferry, Inc. v. Anderson, 390 U.S. 414, 424-25 (1968).  The court's obligation is to "canvass the issues and see whether the settlement falls below the lowest point in a range of reasonableness."  Travelers Cas. & Sur. Co. v. Future Claimants Representative, No. 07-2785, 2008 WL 821088, at *5 (D.N.J. Mar. 25, 2008) (citing In re Jasmine, Ltd., 258 B.R. 119 (D.N.J. 2000)); Coram, 315 B.R. at 330; Official Unsecured Creditors' Comm. of Pa. Truck Lines v. Pa.

Truck Lines, Inc., 150 B.R. 595, 598 (E.D. Pa. 1992). The court need not be convinced that the settlement is the best possible compromise in order to approve it. Coram, 315 B.R. at 330.

36.     In determining whether a settlement proposal is within the range of reasonableness the Third Circuit has set out four criteria that a bankruptcy court should consider including: "(1) the probability of success in litigation; (2) the likely difficulties in collection; (3) the complexity of the litigation involved and the expense, inconvenience and delay necessarily attending it; and (4) the paramount interest of the creditors." Martin, 91 F.3d at 393; see also Fry's Metals, Inc. v. Gibbons (In re RFE Indus., Inc.), 283 F.3d 159, 165 (3d Cir. 2002); In re eToys, Inc., 331 B.R. 176, 198 (Bankr. D. Del. 2005). The ultimate inquiry is whether the compromise is fair, reasonable, and in the interest of the estate. See In re Louise's, Inc., 211 B.R. 798, 801 (D. Del. 1997).

37.     Applying the above factors to the instant matter, the Debtors submit that the settlement set forth in the Stipulation is in the best interests of the Debtors' estates and their creditors. The Additional Contracts are material to the sale of the Assets and the Stipulation resolves the outstanding AT&T Objection and the reservation of rights in the Sale Order. Though the Parties could litigate the dispute, the Debtors have determined they are likely to gain little beyond what they have agreed upon in the Stipulation. Additionally, the Debtors submit it is in their best interest to expeditiously close the sale of the Assets and include the Additional Contracts for assumption and assignment as contemplated by the Sale Agreement.

**C.     Waiver of Automatic Ten-Day Stay Under Bankruptcy Rules 6004(h) and 6006(d)**

38.     Pursuant to Bankruptcy Rule 6004(h), unless the Court orders otherwise, all orders authorizing the sale of property pursuant to section 363 of the Bankruptcy Code are automatically stayed for fourteen days after entry of the order. Similarly, under Bankruptcy Rule 6006(d), unless the Court orders otherwise, all orders authorizing the assignment of contracts are

automatically stayed for fourteen days after entry of the order.  The purpose of Bankruptcy Rules 6004(h) and 6006(d) is to provide sufficient time for an objecting party to request a stay pending appeal before the order can be implemented.  See Advisory Committee Notes to Fed. R. Bankr. P. 6004(h); Advisory Committee Notes to Fed. R. Bankr. P. 6006(d).

39.     Although Bankruptcy Rules 6004(h) and 6006(d) and the Advisory Committee Notes are silent as to when a court should "order otherwise" and eliminate or reduce the 14-day stay period, commentators agree that the stay period should be eliminated to allow a sale or other transaction to close immediately where there has been no objection to the procedure.  See generally 10 Collier on Bankruptcy ¶ 6004.09 (15th ed. 1999).  Furthermore, if an objection is filed and overruled, and the objecting party informs the court of its intent to appeal, the stay may be reduced to the amount of time necessary to file such appeal.  Id.

40.     It is in the Debtors' interest to complete the assumption and assignment of the Additional Contracts either at closing or as soon thereafter as practicable.  Thus, waiver of any applicable stays is appropriate in this circumstance.

**Notice**

41.     Notice of the Motion has been given via facsimile, electronic transmission, hand delivery or overnight mail to (i) counsel to the Purchaser; (ii) counsel to AT&T; (iii) the U.S. Trustee; (iv) the Monitor; (v) counsel to the Committee; (vi) counsel to the Bondholder Group; and (vii) the general service list established in these chapter 11 cases pursuant to Bankruptcy Rule 2002.  The Debtors submit that under the circumstances no other or further notice is necessary.

**No Prior Request**

42.     No prior request for the relief sought herein has been made to this or any other court.

15

WHEREFORE, the Debtors respectfully request that this Court (i) grant this

Motion and the relief requested herein; (ii) enter the proposed order attached hereto; and

(iii) grant such other and further relief as it deems just and proper.

Dated:  December 14, 2009
Wilmington, Delaware

CLEARY GOTTLIEB STEEN & HAMILTON LLP

James L. Bromley
Lisa M. Schweitzer
One Liberty Plaza
New York, New York 10006
Telephone:  (212) 225-2000
Facsimile:  (212) 225-3999

- and -

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

/s/ Andrew R. Remming
Derek C. Abbott (No. 3376)
Eric D. Schwartz (No. 3134)
Ann C. Cordo (No. 4817)
Andrew R. Remming (No. 5120)
1201 North Market Street
P.O. Box 1347
Wilmington, Delaware 19801
Telephone:  (302) 658-9200
Facsimile: (302) 658-3989

*Counsel for the Debtors*
*and Debtors in Possession*