## EXHIBIT B

**China Side Agreement**

## CDMA/LTE CHINA SIDE AGREEMENT

This CDMA/LTE China Side Agreement (the "**Agreement**"), dated as of ~~October~~ N͟N͟ 2, 2009, is entered into by and among Nortel Networks (China) Limited ("**Nortel China**"), Nortel Networks Limited ("**NNL**") and Nortel Networks Inc. ("**NNI**") (Nortel China, NNL and NNI each as a "**Party**", and together as the "**Parties**").

WHEREAS, Nortel Networks Corporation ("**NNC**"), NNL, NNI, and certain other sellers (collectively, the "**Sellers**"), and Telefonaktiebolaget L M Ericsson (publ) ("**Ericsson**") have entered into that certain asset sale agreement for the sale of the Sellers' rights, interests and title in their respective CDMA/LTE businesses, dated as of July 24, 2009 (as the same may be amended from time to time, the "**ASA**"); and

WHEREAS, as part of the transactions contemplated by the ASA, Nortel China has agreed to sell certain of its assets relating to the CDMA/LTE business located in China (the "**Transferred China Assets**") to Ericsson China Communications Company Ltd. pursuant to that certain China Asset Sale Agreement, dated as of the date hereof (the "**China ASA**"); and

WHEREAS, the ASA and the China ASA do not prescribe the portion of the sale proceeds payable by Ericsson thereunder to be allocated to each of the Sellers and Nortel China; and

WHEREAS, the Parties acknowledge that the net book value of the Transferred China Assets, as of July 24, 2009, was approximately U.S.$2.6 million; and

WHEREAS, the allocation of the sale proceeds payable by Ericsson under the ASA and the China ASA among each of the Sellers and Nortel China will be determined pursuant to the Interim Sales Protocol (as such term is defined under that certain Interim Funding and Settlement Agreement dated as of June 9, 2009); and

WHEREAS, the Parties wish to enter into this Agreement so that the amount of sales proceeds allocated to Nortel China complies with applicable laws and regulations of the People's Republic of China ("**PRC**").

NOW, THEREFORE, in consideration of the foregoing and the representations, warranties, covenants and agreements set forth in the ASA, the China ASA and herein, intending to be legally bound hereby, the Parties hereto agree as follows:

1.  Adjustment Amount.

    (a)  Subject to Sections 1(b), 1(c), 1(d) and 2, and conditioned upon the actual receipt by each of NNL and NNI of sale proceeds paid by Ericsson for the sale of each of their respective CDMA/LTE assets at least equal to the amounts required to be paid by such entity under this Section 1(a), 1(c) or 2, as applicable, in the event that the Required Purchase Price exceeds the Allocated Purchase Price, NNL and NNI shall each pay to

Nortel China, as additional sale proceeds due to Nortel China in respect of the sale of the Transferred China Assets, 50% of the difference between the Required Purchase Price and the Allocated Purchase Price (such aggregate amount payable by NNL and NNI, the "**Adjustment Amount**"), where "**Allocated Purchase Price**" means the amount of sale proceeds allocated to Nortel China for the Transferred China Assets pursuant to the Interim Sales Protocol and in accordance with the terms of the ASA, and "**Required Purchase Price**" means the amount of sale proceeds to be allocated to Nortel China as consideration for the Transferred China Assets to comply with applicable laws and regulations of PRC. If necessary, the Adjustment Amount may be determined either (i) by an independent third-party valuation expert (the "**Valuation Firm**") retained by Nortel China, at its own expense and in consultation with NNL and NNI (the "**Initial Valuation Amount**"), (ii) pursuant to Section 1(c), or (iii) pursuant to Section 2, as applicable. For the avoidance of doubt, if the Initial Valuation Amount is less than the Allocated Purchase Price, then Nortel China's right to be paid the Allocated Purchase Price in accordance with the Interim Sale Protocol shall not be affected in any way.

(b) To the extent permitted by applicable PRC laws, Nortel China may elect to direct the Valuation Firm to consider a particular valuation methodology, and only to the extent Nortel China elects to exercise such right, Nortel China shall consult with NNL and NNI regarding the recommendation of such valuation methodology.

(c) In the event that either or both of NNL and NNI object to the Initial Valuation Amount within 30 calendar days of receipt of written notification of the Initial Valuation Amount from Nortel China (which notification shall be accompanied by a copy of the Valuation Firm's report), Nortel China shall seek a valuation of the Transferred China Assets from two (2) additional independent third-party valuation experts (collectively, the "**Additional Valuation Amounts**"), who shall be retained by Nortel China with the prior written consent of the relevant objecting Party or Parties (such consent not to be unreasonably withheld, delayed or conditioned). If neither NNL nor NNI object to the Additional Valuation Amounts within 30 calendar days of receipt of written notification of the Additional Valuation Amounts from Nortel China (which notification shall be accompanied by a copy of each additional experts' valuation report), the Adjustment Amount shall be re-calculated where the Required Purchase Price shall equal the sum of the two Additional Valuation Amounts and the Initial Valuation Amount, divided by 3, and NNL and NNI shall each pay Nortel China 50% of the Adjustment Amount, as so re-calculated, within 30 calendar days thereafter.

(d) The Parties hereby agree that any payment by NNL or NNI of its portion of the Adjustment Amount shall be considered to be a corresponding deduction in the amount of sale proceeds allocated to NNL and NNI for the sale of their respective CDMA/LTE assets pursuant to the ASA.

2. Arbitration of Adjustment Amount. If NNL and/or NNI object to the Additional Valuation Amounts within 30 days of receipt of written notification of the Additional Valuation Amounts, the Parties shall submit the determination of the Adjustment Amount to arbitration in Beijing under the auspices of the China International Economic and Trade Arbitration Commission ("**CIETAC**"). The

2

arbitration shall be conducted in accordance with the rules of CIETAC in effect at the time of the arbitration. There shall be three arbitrators. Nortel China shall appoint one arbitrator and the objecting Party or Parties, as the case may be, shall together appoint one arbitrator. The third arbitrator shall be appointed by agreement of the Party-appointed arbitrators and shall act as the presiding arbitrator. If no agreement on such appointment can be reached, the Chairman of CIETAC shall make the appointment. The award for the determination of the Adjustment Amount arising from the arbitration shall be final and binding upon the Parties, and the winning Party or Parties may, at the cost and expenses of the losing Party or Parties, apply to any court of competent jurisdiction for enforcement of such award.

3. <u>Other Covenants</u>. In the event that subsequent to the payment of the Adjustment Amount Nortel China makes one or more dividend payments, distributions or other payments to NNL in its capacity as a shareholder of Nortel China ("**Distributed Amounts**"), NNL hereby agrees to pay 50% of the after-tax amounts of such Distributed Amounts to NNI upon actual receipt of the Distributed Amounts, <u>provided</u> that such payments to NNI shall not in the aggregate exceed the portion of the Adjustment Amount paid by NNI to Nortel China. For greater certainty, the after-tax amount of such Distributed Amount shall be determined taking into account, <u>inter alia</u>, any withholding or deductions imposed by any relevant taxing authority in respect of the Distributed Amounts, any Canadian federal or provincial tax payable by NNL or utilization of Canadian federal or provincial tax losses, credits or deductions by NNL as a result of receiving the Distributed Amounts, and any Canadian federal or provincial tax payable or utilization of Canadian federal or provincial tax losses, credits or deductions by NNL as a consequence of the payment of their respective portions of the Adjustment Amount by NNL and NNI.

4. <u>Effectiveness</u>. No provision of this Agreement shall be effective until each of the U.S. Bankruptcy Court for the District of Delaware and the Ontario Superior Court of Justice approves the entirety of this Agreement and all of the provisions hereof (the "**Court Approval Condition**"). All provisions of this Agreement shall be effective as of the date of the satisfaction of the Court Approval Condition. Each Party hereto shall (i) use commercially reasonable efforts to satisfy the Court Approval Condition as soon as possible, taking into account the availability of the respective courts to address the matters set forth in this Agreement and (ii) keep all other Parties reasonably apprised of the progress of the satisfaction of the Court Approval Condition.

5. <u>Counterparts</u>. This Agreement may be executed by the Parties hereto in one or more counterparts, each of which when so executed and delivered shall be an original, but all such counterparts shall together constitute one and the same instrument.

6. <u>Governing Law.</u> This Agreement shall be governed exclusively by the laws of the State of New York without regard to the rules of conflict of laws of the State of New York or any other jurisdiction.

IN WITNESS WHEREOF, the Parties have duly executed this Agreement as of the date first written above.

Nortel Networks (China) Limited

By: _____
    Name: John Doolittle
    Title: Chairman

Nortel Networks Limited

By: _____
    Name: John Doolittle
    Title: SVP, Finance and Corporate Services

By: _____
    Name: Anna Ventresca
    Title: General Counsel-Corporate and Corporate Secretary

Nortel Networks Inc.

By: _____
    Name: Anna Ventresca
    Title: Chief Legal Officer

4