**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

```
------------------------------------------------------X
                                                      :
                                                      :    Chapter 11
                                                      :
In re                                                 :    Case No. 09-10138 (KG)
                                                      :
Nortel Networks Inc., et al., ¹                       :    Jointly Administered
                                                      :
                    Debtors.                          :    Hearing date: January 6, 2010 at 10:00 AM (ET)
                                                      :    (proposed)
                                                      :    Objections due: January 4, 2010 at 4:00 PM (ET)
                                                      :    (proposed)
                                                      :
------------------------------------------------------X
```

**DEBTORS' MOTION FOR ORDERS (I)(A) AUTHORIZING DEBTORS'**
**ENTRY INTO THE STALKING HORSE AGREEMENT,**
**(B) AUTHORIZING AND APPROVING THE BIDDING PROCEDURES**
**AND BID PROTECTIONS, (C) APPROVING PAYMENT OF AN**
**INCENTIVE FEE, (D) APPROVING THE NOTICE PROCEDURES**
**AND THE ASSUMPTION AND ASSIGNMENT PROCEDURES,**
**(E) AUTHORIZING THE FILING OF CERTAIN DOCUMENTS UNDER SEAL**
**AND (F) SETTING A DATE FOR THE SALE HEARING, AND**
**(II) AUTHORIZING AND APPROVING (A) THE SALE OF CERTAIN**
**ASSETS OF DEBTORS' CARRIER VOICE OVER IP AND**
**APPLICATION SOLUTIONS BUSINESS FREE AND CLEAR OF**
**ALL LIENS, CLAIMS AND ENCUMBRANCES AND (B) THE**
**ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS**

Nortel Networks Inc. ("NNI") and certain of its affiliates, as debtors and debtors in

possession (collectively, the "Debtors"), hereby move this Court (the "Motion") for the entry of

orders pursuant to sections 105, 107(b)(1), 363 and 365 of title 11 of the United States Code (the

"Bankruptcy Code"), Rules 2002, 6004, 6006, 9014 and 9018 of the Federal Rules of

---

¹      The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's tax identification number, are: Nortel Networks Inc. (6332), Nortel Networks Capital Corporation (9620), Nortel Altsystems Inc. (9769), Nortel Altsystems International Inc. (5596), Xros, Inc. (4181), Sonoma Systems (2073), Qtera Corporation (0251), CoreTek, Inc. (5722), Nortel Networks Applications Management Solutions Inc. (2846), Nortel Networks Optical Components Inc. (3545), Nortel Networks HPOCS Inc. (3546), Architel Systems (U.S.) Corporation (3826), Nortel Networks International Inc. (0358), Northern Telecom International Inc. (6286), Nortel Networks Cable Solutions Inc. (0567) and Nortel Networks (CALA) Inc. (4226). Addresses for the Debtors can be found in the Debtors' petitions, which are available at http://chapter11.epiqsystems.com/nortel.

Bankruptcy Procedure (the "Bankruptcy Rules"), and Rules 6004-1 and 9018-1 of the Local

Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the

District of Delaware (the "Local Rules") (i)(a) authorizing the Debtors' entry into that certain

asset sale agreement dated as of December 22, 2009 among NNI, Nortel Networks Limited

("NNL"), Nortel Networks Corporation ("NNC") and certain other entities identified therein as

sellers (together, the "Sellers") and GENBAND Inc., as purchaser ("GENBAND" or the

"Stalking Horse Purchaser") for the sale of certain assets of the Sellers' Carrier Voice Over IP

and Application Solutions business (the "CVAS Business") as described therein (the "Purchased

Assets") as a "stalking-horse" sale agreement (as appended hereto as Exhibit A, the "Stalking

Horse Agreement"), (b) authorizing and approving the bidding procedures and Bid Protections

(as defined in the Bidding Procedures Order) (as appended as Exhibit 1 to the Bidding

Procedures Order (as defined below), the "Bidding Procedures"), including granting

administrative expense status to the Bid Protections payable by the Debtors to the Stalking Horse

Purchaser, (c) approving payment of an Incentive Fee (as defined below) to One Equity Partners

III, L.P. ("OEP"), as an equity sponsor for the transaction, (d) approving the form and manner of

sale notice and publication notice (the "Notice Procedures") and the procedures (the

"Assumption and Assignment Procedures") as set forth below for the assumption and assignment

of the Assumed and Assigned Contracts (as defined below, and together with the Purchased

Assets and other contracts as described in the Stalking Horse Agreement, the "Assets"), (e)

authorizing the Debtors to file certain documents under seal and (f) setting the time, date and

place for a hearing (the "Sale Hearing") to consider the sale of the Assets and the assumption and

assignment of the Assumed and Assigned Contracts (the "Sale"), (ii) authorizing and approving

(a) the sale of the Purchased Assets, free and clear of all liens, claims, and encumbrances,

pursuant to section 363 of the Bankruptcy Code, except as set forth in the Stalking Horse

Agreement and (b) the assumption and assignment of the Assumed and Assigned Contracts (as

defined below) pursuant to section 365 of the Bankruptcy Code; and (iii) granting them such

other and further relief as the Court deems just and proper.  In support of this Motion, the

Debtors rely on the declaration of George Riedel (the "Riedel Declaration"), attached hereto as

Exhibit B.  In further support of this Motion, the Debtors respectfully represent as follows:

## Jurisdiction

1.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and

1334.  This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).  Venue is

proper pursuant to 28 U.S.C. §§ 1408 and 1409.

2.      The statutory bases for the relief requested herein are sections 105, 107(b)(1), 363

and 365 of the Bankruptcy Code, Rules 2002, 6004, 6006, 9014 and 9018 of the Bankruptcy

Rules, and Rules 6004-1 and 9018-1 of the Local Rules.

## Background

**A.      Introduction**

3.      On January 14, 2009 (the "Petition Date"), the Debtors, other than NN CALA

(defined below), filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code.

4.      The Debtors continue to operate their businesses and manage their properties as

debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

5.      Also on the Petition Date, the Debtors' ultimate corporate parent NNC, NNI's

direct corporate parent NNL (together with NNC and their affiliates, including the Debtors,

"Nortel"), and certain of their Canadian affiliates (collectively, the "Canadian Debtors")  filed an

application with the Ontario Superior Court of Justice (the "Canadian Court") under the

Companies' Creditors Arrangement Act (Canada) (the "CCAA"), seeking relief from their

creditors (collectively, the "Canadian Proceedings"). The Canadian Debtors continue to manage their properties and operate their businesses under the supervision of the Canadian Court. Ernst & Young Inc., as court-appointed Monitor in the Canadian Proceedings and as foreign representative for the Canadian Debtors (the "Monitor"), has filed petitions in this Court for recognition of the Canadian Proceedings as foreign main proceedings under chapter 15 of the Bankruptcy Code. On January 14, 2009, the Canadian Court entered an order recognizing these chapter 11 proceedings as a foreign proceeding under section 18.6 of the CCAA. On February 27, 2009, this Court entered an order recognizing the Canadian Proceedings as foreign main proceedings under chapter 15 of the Bankruptcy Code. In addition, at 8 p.m. (London time) on January 14, 2009, the High Court of Justice in England placed nineteen of Nortel's European affiliates (collectively, the "EMEA Debtors") into administration under the control of individuals from Ernst & Young LLC (collectively, the "Joint Administrators"). On May 28, 2009, at the request of the Administrators, the Commercial Court of Versailles, France (Docket No. 2009P00492) ordered the commencement of secondary proceedings in respect of Nortel Networks S.A. ("NNSA"), which consist of liquidation proceedings during which NNSA will continue to operate as a going concern for an initial period of three months. In accordance with the European Union's Council Regulation (EC) No 1346/2000 on Insolvency Proceedings, the English law proceedings (the "English Proceedings") remain the main proceedings in respect of NNSA. On June 8, 2009, Nortel Networks UK Limited ("NNUK") filed petitions in this Court for recognition of the English Proceedings as foreign main proceedings under chapter 15 of the Bankruptcy Code. On June 26, 2009, the Court entered an order recognizing the English Proceedings as foreign main proceedings under chapter 15 of the Bankruptcy Code.

6.     On January 15, 2009, this Court entered an order of joint administration pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") that provided for the joint administration of these cases and for consolidation for procedural purposes only [D.I. 36].

7.     On January 18, 2009, certain Nortel affiliates, including Nortel Networks Israel (Sales and Marketing) Limited, filed an application with the Tel-Aviv-Jaffa District Court, pursuant to the Israeli Companies Law, 1999, and the regulations relating thereto for a stay of proceedings. On January 19, 2009, the Israeli Court appointed Yaron Har-Zvi and Avi D. Pelossof as joint administrators of the Israeli Company under the Israeli Companies Law (the "Joint Israeli Administrators").

8.     On January 26, 2009, the Office of the United States Trustee for the District of Delaware (the "U.S. Trustee") appointed an Official Committee of Unsecured Creditors (the "Committee") pursuant to section 1102(a)(1) of the Bankruptcy Code [D.I.s 141, 142]. An ad hoc group of bondholders holding claims against certain of the Debtors and certain of the Canadian Debtors has also been organized (the "Bondholder Group"). No trustee or examiner has been appointed in the Debtors' cases.

9.     On July 14, 2009 (the "CALA Petition Date"), Nortel Networks (CALA) Inc. ("NN CALA"), an affiliate of NNI, filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. On July 17, this Court entered orders approving the joint administration and consolidation of NN CALA's chapter 11 case with the other Debtors' chapter 11 cases for procedural proposes [D.I. 1098], and applying to NN CALA certain previously entered orders in the Debtors' chapter 11 cases [D.I. 1099].

10.    On August 4, 2009, this Court entered an order fixing the general bar date for filing proofs of claim or interest [D.I. 1280].  The General Bar Date for this case was September 30, 2009 at 4:00 PM (Eastern Time).  On December 3, 2009 this Court entered an order fixing January 25, 2010 at 4:00 PM (Eastern Time) as the general bar date for filing proofs of claim or interest against NN CALA [D.I. 2059].

**B.    Debtors' Corporate Structure and Business**

11.    Nortel is a technology company that designs, develops and deploys communication products, systems and solutions to its customers around the globe.  Its principal assets include its employees, the intellectual property derived and maintained from its research and development activities, its customers and other significant contracts and agreements.

12.    Additional information regarding the Debtors' corporate structure and business and the events leading to the chapter 11 cases is set forth in the Declaration of John Doolittle in Support of First Day Motions and Applications [D.I. 3] (the "First Day Declaration").

## Relief Requested

13.    By this Motion, the Debtors seek orders:  (i)(a) authorizing the Debtors to enter into the Stalking Horse Agreement and take other such steps as are necessary to consummate the Sale, (b) authorizing and approving the Bidding Procedures and Bid Protections, (c) approving payment of an Incentive Fee to OEP, as an equity sponsor, (d) approving the Notice Procedures and the Assumption and Assignment Procedures, (e) authorizing the Debtors to file certain documents under seal, and (f) setting the time, date, and place of the Sale Hearing (such order, substantially in the form attached hereto as Exhibit C, the "Bidding Procedures Order"); (ii) authorizing and approving (a) the sale of the Assets, free and clear of all liens, claims and encumbrances, and (b) the assumption and assignment of certain executory contracts (such order, substantially in the form attached hereto as Exhibit D, the "Sale Order"); and (iii) granting them

6

such other and further relief as the Court deems just and proper.

## Facts Relevant to this Motion

**C.     The Carrier Voice Over IP and Application Solutions Business**

14.     Nortel's CVAS Business provides telecom service providers with network solutions that help them improve operational efficiency, reduce costs, and generate new revenue through the deployment of multimedia applications and voice over internet protocol ("VoIP") solutions that enhance the communications experience for businesses and consumers.

15.     The CVAS Business specializes in deploying new VoIP networks for operators, in helping carriers transition their older voice infrastructure to state-of-the-art VoIP networks, and in delivering advanced multimedia offerings that unify and simplify communications for users.

16.     The CVAS Business unit sells VoIP platforms (such as softswitches and media gateways), TDM switching systems (for local, toll and long-distance deployments), and associated services (such as installation, technical support, repairs management).  These and other products from the CVAS portfolio are combined into solutions that address specific service provider requirements and opportunities, including: business voice and multimedia, consumer voice and multimedia, transit and multimedia interconnect, and class 5.

17.     Nortel's CVAS Business has a global presence – with nearly 2,100 employees in North America, Europe, the Middle East, Africa, Caribbean, Latin America, Asia-Pacific – and a worldwide customer base.  Nortel's CVAS customers include many of the world's large carriers (including two-thirds of the top 20 service providers globally), leading regional operators, and major cable operators.

18.     Nortel's principal competitors include Alcatel-Lucent, Huawei Technologies, Nokia Siemens Networks, Ericsson, Sonus Networks, GENBAND and Broadsoft.  Despite a challenging economic environment and increasing competition in the carrier VoIP market space,

CVAS remains the number one carrier VoIP and softswitch market leader, a position Nortel has held for the past seven and half years according to industry analyst firm Dell'Oro Group.

**D.    Nortel's Divestiture Efforts**

19.    As set forth in the Riedel Declaration, the environment in which Nortel operates is highly competitive, the competition for market share is fierce, and the cost of rapid technological development is steep. Furthermore, the scale requirements to compete in this industry are substantial. Due to the global economic downturn, Nortel has been experiencing significant pressure on its businesses and facing competing demands on its cash resources, globally as well as on a regional basis, as customers across all businesses suspend, delay and reduce capital expenditures. The extreme volatility in the financial, foreign exchange and credit markets globally and the uncertainty created by the ongoing creditor protection proceedings has compounded the situation. On June 19, 2009, Nortel announced that it had determined that the sale of its businesses is the best path for Nortel to maximize value. Over the last several months Nortel has been engaged in a process for the orderly disposition of its businesses.

20.    To date, these efforts have led to Nortel closing: (i) the sale of certain portions of its Layer 4-7 data portfolio to Radware Ltd. [D.I. 539]; (ii) the sale of substantially all of its Code Division Multiple Access business and Long Term Evolution Access assets business to Telefonaktiebolaget LM Ericsson (publ) ("Ericsson") [D.I. 1205]; (iii) the sale of the assets of its Wireless Networks business associated with the development of Next Generation Packet Core network components to Hitachi Ltd. [D.I. 1760]; and (iv) the sale of substantially all of the assets of the Enterprise Solutions business globally, including the shares of Nortel Government Solutions Incorporated and DiamondWare Ltd. to Avaya Inc. [D.I. 1514]. In addition, Nortel has completed auction processes and obtained Court approval for the planned sale of substantially all the assets of its Optical Networking and Carrier Ethernet businesses associated with its Metro

8

Ethernet Networks ("MEN") business unit [D.I. 2070]; as well as for the planned sale of substantially all of its GSM/GSM-R business [D.I. 2065].

**E.   Efforts to Market and Sell the CVAS Business**

21.   Nortel first began to explore a divestiture of the CVAS Business in April of 2009. With a strong customer base and industry-leading technology, the CVAS Business is considered a premium asset with a highly differentiated offering, making it attractive to potential purchasers.

22.   In connection with this initial effort, Nortel, in consultation with its financial advisors, approached approximately twenty five (25) parties likely to be interested and able to acquire the CVAS Business, including a mix of financial investors and strategic buyers.  An information memorandum was provided to the eighteen (18) parties who had executed confidentiality agreements.  Of those parties who subsequently submitted expressions of interest, Nortel conducted management presentations with the ten (10) entities it deemed able to consummate a transaction for the CVAS Business, and ultimately gave eight (8) companies access to an electronic data room containing confidential diligence materials regarding the CVAS Business.

**Summary of Transaction Documents**

**A.   The Stalking Horse Agreement[2]**

23.   After extensive arm's-length, good faith negotiations among the Sellers and the EMEA Sellers (as defined below) and the Stalking Horse Purchaser and their respective advisors, the Sellers and the EMEA Sellers have agreed, among other things, to convey the Assets and the EMEA Assets (as defined in the Stalking Horse Agreement) and assign the Assumed and Assigned Contracts to the Stalking Horse Purchaser in accordance with the terms and conditions

---

[2]   Capitalized terms used but not defined herein have the meanings ascribed to them in the Stalking Horse Agreement.  To the extent that there are inconsistencies between any summary description of the Stalking Horse Agreement contained herein and the terms and conditions of the Stalking Horse Agreement, the terms and conditions of the Stalking Horse Agreement shall control.

of the Stalking Horse Agreement, subject to the approval of the Sale in the various jurisdictions

in which the Sellers are subject to creditor protection proceedings. The Sellers, the EMEA

Sellers and the Stalking Horse Purchaser have entered into two separate purchase agreements for

the sale of the Assets and the EMEA Assets: (a) the Stalking Horse Agreement relating to the

sale and purchase of the Assets among the Sellers and the Stalking Horse Purchaser, and (b) an

asset sale agreement relating to the sale and purchase of the EMEA Assets among certain of the

EMEA Debtors and their affiliates (the "EMEA Sellers"), the Joint Administrators, the Joint

Israeli Administrators, and the Stalking Horse Purchaser, dated December 23, 2009 (the "EMEA

Agreement"). The Debtors have determined that the Stalking Horse Agreement and the EMEA

Agreement represent the best opportunity for the Debtors to maximize the value of their assets

relating to the CVAS Business by serving as a basis for conducting an auction to seek higher

and/or better offers. The Stalking Horse Agreement contemplates the sale of the Assets, subject

to higher and/or better bids, on the following material terms:[3]

- Purchase Price. At the Closing, the Stalking Horse Purchaser will pay to the Sellers and the EMEA Sellers, through their Distribution Agent, a base purchase price of $282 million in cash, subject to balance sheet and other adjustments currently estimated at approximately $100 million. (Stalking Horse Agreement § 2.2.)

- Certain Fees. As further described in section C below, in certain circumstances the Sellers and the EMEA Sellers may be required to pay to the Stalking Horse Purchaser a Break-Up Fee, and/or an Expense Reimbursement. (Stalking Horse Agreement § 9.2.)

- Good Faith Deposit. On the date following the entry of the Bidding Procedures Order, the Stalking Horse Purchaser will deliver to the Escrow Agent for the Sellers a good faith deposit of 5% of the base Purchase Price, an estimated $14,100,000 in cash. The good faith deposit will be applied to the balance of the Purchase Price to be paid by the Stalking Horse Purchaser at Closing. (Stalking Horse Agreement § 2.2.5.)

- Assets. The Assets to be acquired by the Stalking Horse Purchaser include, among

---

[3]    The Debtors are not parties to the EMEA Agreement, and therefore this Motion does not discuss the terms and conditions of the EMEA Agreement.

other things, certain (i) inventory and supplies, (ii) unbilled accounts receivable, (iii) equipment, (iv) contracts and certain bids made by the Sellers for a contract which could result in a contract after the Closing Date, (v) prepaid expenses, (vi) tangible embodiment of business information, (vii) intellectual property, (viii) rights under warranties, representations and guarantees by suppliers, manufacturers and contractors and third parties related to the Assets, (ix) net insurance proceeds to be received in respect of equipment, and (x) tax records required by law to be transferred. The assets to be acquired by the Stalking Horse Purchaser exclude, among other things, certain cash and cash equivalents, accounts receivable (excluding receivables that are unbilled as of the Closing date), bank account balances and petty cash, and certain assets and rights (for example, the right to tax refunds, credits, or similar benefits, and rights under certain contracts (other than Assigned Contracts)) relating to the pre-closing period. (Stalking Horse Agreement §§ 2.1.1 and 2.1.2.)

- Assigned Contracts. The Sellers agree to assign certain Seller Contracts, including customer contracts, to the Stalking Horse Purchaser, and to cooperate with the Stalking Horse Purchaser to assist in the transition of Bundled Contracts to the Stalking Horse Purchaser as they relate to the CVAS Business. The Sellers have agreed to pay the Cure Costs associated with the assignment of customer contracts. (Stalking Horse Agreement §§ 2.1.5, 2.1.6, and 2.1.7.)

- Assumed Liabilities. The liabilities to be assumed by the Stalking Horse Purchaser include, among others, (i) liabilities arising after the Closing Date to the extent related to the operation of the CVAS Business by the Stalking Horse Purchaser following the Closing, (ii) liabilities arising from the performance of Assigned Contracts after the Closing Date, (iii) certain liabilities relating to transferred intellectual property, (iv) certain tax liabilities, (v) certain warranty liabilities and (vi) certain liabilities related to employees and employee benefit plans and under employment laws. (Stalking Horse Agreement § 2.1.3.)

- Sale Free and Clear. The Assets to be transferred by the Sellers will be transferred free and clear of all liens, claims and encumbrances, other than those expressly assumed by the Stalking Horse Purchaser or otherwise expressly permitted under the Stalking Horse Agreement. (Stalking Horse Agreement § 2.1.1.)

- Avoidance Actions. The Sellers have covenanted not to commence avoidance actions with respect to any assumed and assigned customer contracts. (Stalking Horse Agreement § 5.28.)

- Ancillary Agreements. Pursuant to the Stalking Horse Agreement, at or prior to the Closing, certain Sellers, certain EMEA Sellers and the Stalking Horse Purchaser will enter into, among others, the following ancillary agreements:

  - Transition Services Agreement. At the Closing, NNL, NNC, NNI, NNUK, Nortel Networks (Ireland) Limited, certain of their affiliates and the Stalking Horse Purchaser will enter into one or more agreements under which NNL, NNC, NNI, NNUK, Nortel Networks (Ireland) Limited and their affiliates will agree to

11

provide to the Stalking Horse Purchaser and its affiliates certain information technology, business transition and related services, commencing at the Closing and continuing for a period not to exceed eighteen (18) months.

- Intellectual Property License Agreement. At the Closing, NNL, NNI, the EMEA Sellers (the "Nortel Parties") and the Stalking Horse Purchaser will enter into an intellectual property license agreement (the "IPLA") pursuant to which (i) the Nortel Parties will grant to the Stalking Horse Purchaser a non-exclusive license to certain intellectual property necessary for the commercialization of the products and the provision of services within a defined field of use, and (ii) the Nortel Parties will receive a license back to all intellectual property included in the Assets as necessary for use in their other businesses or to comply with terms of other divestitures. The IPLA licenses will be perpetual.

- Trademark License Agreement. At the Closing, NNL and the Stalking Horse Purchaser will enter into a license agreement allowing the Stalking Horse Purchaser to use certain Nortel trademarks in connection with its sales of the Products for a limited period after the Closing.

- Loaned Employee Agreement. At the Closing, Nortel and the Stalking Horse Purchaser will enter into an agreement under which certain employees of Nortel and its affiliates will be seconded to the Stalking Horse Purchaser to perform services for the Stalking Horse Purchaser for a 90-day period beginning on the Closing Date and certain visa employees will be seconded to the Stalking Horse Purchaser for a period of up to twelve months beginning on the Closing Date. Nortel will continue to pay all employment costs in respect of the Loaned Employees that relate to the period of the Loaned Employee Agreement, and the Stalking Horse Purchaser will provide for the payment of, or if not paid pursuant to the pre-funding mechanism in the Loaned Employee Agreement, promptly reimburse Nortel for, all such employment costs.

- Real Estate Terms and Conditions. At the Closing, the Sellers and the Stalking Horse Purchaser will finalize the general terms to which the parties agree, which will govern the applicable leases, subleases or license agreements in respect of certain real property which the Sellers will lease, sublease or license to the Stalking Horse Purchaser (or an affiliate) from and after Closing.

- Restrictions on Solicitation of Competing Bids. As set forth in section 5.29 of the Stalking Horse Agreement and subject to the terms and limitations therein, the Stalking Horse Agreement prohibits the Sellers from soliciting competing transactions or seeking relief inconsistent with the Stalking Horse Agreement from the date of execution of the Stalking Horse Agreement until the entry of the Bidding Procedures Order, and from the date of the conclusion of the Auction until the Closing Date or termination of the Stalking Horse Agreement. (Stalking Horse Agreement § 5.29.)

- Closing Conditions: In addition to certain other customary closing conditions,

including conditions relating to bankruptcy court approvals, the obligation of the Stalking Horse Purchaser to close the sale is subject to the satisfaction of the performance in all material respects of all material covenants, obligations and agreements required to be performed by the Sellers on or before the Closing. (Stalking Horse Agreement § 8.3.)

- <u>Ongoing Covenants and Restrictions</u>: In addition to certain other customary postclosing obligations such as information-sharing and redirection of customers and payments, the Sellers have agreed to cooperate with the Stalking Horse Purchaser for an agreed period after Closing in relation to arrangements regarding (i) Bundled Contracts, (ii) Assets which were not transferred at Closing due to bankruptcy proceedings commenced in other jurisdictions following execution of the Stalking Horse Agreement and (iii) Contracts for which required consents were not obtained prior to Closing. (Stalking Horse Agreement §§ 5.13, 5.14, and 5.26.)

- <u>Post-Closing Access to Books and Records</u>. For five (5) years after the Closing, and subject to its right to destroy such document upon sixty (60) days notice to the Sellers, the Purchaser must preserve pre-closing records to the extent related to the CVAS Business. The Purchaser and the Seller must preserve tax records through the end of the applicable statute of limitations period. Through such periods the Sellers and the Purchaser, as applicable, shall, and/or shall cause the person holding such records to provide to the party requesting the records or its representative reasonable access to such records during normal business hours. (Stalking Horse Agreement §§ 5.22 and 6.5.)

- <u>Status of Payments</u>. The portion of the Bid Protections to be paid or borne by the Debtors shall constitute an administrative expense under section 503(b) of the Bankruptcy Code.

## B.   The Bidding Procedures[4]

24.     In order to ensure that the Sellers receive the maximum value for the Assets, the Stalking Horse Agreement is subject to higher or better offers, and, as such, the Stalking Horse Agreement will serve as the "stalking-horse" bid for the Assets. The Assets may be sold in a single sale to a single purchaser or in parts to several purchasers.

25.     The Bidding Procedures are attached as <u>Exhibit 1</u> to the proposed Bidding Procedures Order (attached as <u>Exhibit C</u>). The Debtors respectfully request, subject to the

---

[4]     Capitalized terms used in this Section, but not defined herein have the meanings ascribed to them in the Bidding Procedures. To the extent there are inconsistencies between any summary description of the Bidding Procedures contained herein and the Bidding Procedures as attached as Exhibit 1 to the proposed Bidding Procedures Order, the terms of the Bidding Procedures shall control.

availability of the Court and the Canadian Court, that the Sale Hearing be scheduled for the last

week of February.  However, the dates proposed below are premised on a March 3, 2010 Sale

Hearing, in the event that the Sale Hearing cannot be set at an earlier date mutually convenient to

both courts.[5]

26.     The key provisions of the Bidding Procedures to be employed with respect to the

proposed sale of certain assets and assumption of certain liabilities as set forth in the Stalking

Horse Agreement (collectively, the "Bidding Process") include the following:

a.   Provisions Governing Qualifications of Bidders.  Each person other than the Stalking Horse
Purchaser, who wishes to participate in the Bidding Process (a "Potential Bidder") must
deliver to the Notice Parties (including the Sellers, their counsel, and financial advisors, the
counsel and financial advisors to the Creditors Committee and Bondholders Group, the
Monitor and the UK Administrators and their counsel):

(i)     an executed confidentiality agreement in conformance with the requirements
set forth in the Bidding Procedures;

(ii)     current audited financial statements and latest unaudited financial statements
of the Potential Bidder or such other form of financial disclosure and credit-quality support
or enhancement that will allow the Sellers and their respective financial advisors, in
consultation with the Creditors' Committee, the Bondholder Group and the Monitor, to make
a reasonable determination as to the Potential Bidder's financial and other capabilities to
consummate the Transaction; and

(iii)     a preliminary (non-binding) written proposal regarding: (i) the purchase price
range (including liabilities to be assumed by the Potential Bidder); (ii) any Assets expected to
be excluded or any additional assets desired to be included; (iii) the structure and financing
of the Transaction (including, but not limited to, the sources of financing for the purchase
price and all requisite financial assurance); (iv) any anticipated corporate, stockholder,
internal or regulatory approvals required to close the Transaction, the anticipated time frame
and any anticipated impediments for obtaining such approvals; (v) the proposed number of
employees of the Sellers who will become employees of the Potential Bidder (save in
jurisdictions where employees transfer by operation of law), and any proposed measures
associated with the continued employment of all employees who will become employees of
the Qualified Bidder; and (vi) any conditions to closing that the Potential Bidder may wish to
impose in addition to those set forth in the Purchase Agreements.

---

[5]     Regardless of the date of the Sale Hearing, the Debtors will not establish a Bid Deadline any earlier than
February 4, 2010.

A Potential Bidder who has executed and delivered the documents described above, in the Sellers' judgment has the financial capability to consummate the Transaction, has submitted a reasonably competitive and realistic non-binding proposal, as described above, and that the Sellers determine in their reasonable business judgment, after consultation with their counsel and financial advisors, the Creditors' Committee, the Bondholder Group and the Monitor, is likely to be able to consummate the Transactions, will be deemed a "Qualified Bidder".

b.    Provisions Governing Qualified Bids.  A bid submitted will be considered a Qualified Bid only if the bid is submitted by a Qualified Bidder and complies with all of the following (a "Qualified Bid"):

(i)    it offers to purchase the Assets upon the terms and conditions substantially as set forth in the Purchase Agreements, including without limitation, with respect to certainty and timing of closing, or pursuant to an alternative structure (including without limitation, an offer conditioned upon confirmation of a plan of reorganization proposed by the U.S. Debtors either individually or in collaboration with such Qualified Bidder), or upon alternative terms and conditions that the Sellers reasonably determine, after consultation with the Creditors' Committee, the Bondholder Group and the Monitor, are no less favorable than the terms and conditions of the Purchase Agreements.

(ii)    the bidder's offer is irrevocable until the selection of the Successful Bidder and, if applicable, the Alternate Bidder (as defined below), and if selected as the Successful Bidder or the Alternate Bidder, its offer shall remain irrevocable until the earlier of (i) closing of the Sale to the Successful Bidder or the Alternate Bidder, and (ii) (x) with respect to the Successful Bidder only, June 30, 2010 subject to further extensions as may be agreed to under the applicable purchase agreements and (y) with respect to the Alternate Bidder only, March 20, 2010 (the "Alternate Bid Expiration Date").  The Stalking Horse Purchaser shall not serve as an Alternative Bidder;

(iii)    it includes duly authorized and executed Purchase Agreements, including the purchase price for the Assets expressed in U.S. Dollars (the "Purchase Price"), together with all exhibits and schedules thereto, and the additional ancillary agreements and proposed orders set forth in the Bidding Procedures;

(iv)    it includes written evidence of a firm, irrevocable commitment for financing, or other evidence of ability to consummate the proposed transaction;

(v)    it is not conditioned on (1) the outcome of unperformed due diligence by the bidder and/or (2) obtaining financing;

(vi)    it fully discloses the identity of each entity that will be bidding for the Assets or otherwise sponsoring or participating in connection with such bid, and the complete terms of any such participation;

(vii)    it has a value to the Sellers, in the Sellers' reasonable business judgment, after consultation with their financial advisors, the Creditors' Committee, the Bondholder Group and the Monitor, that either individually or, when evaluated in conjunction with any other Qualified Bid for the Assets, is greater than or equal to the sum of the value offered under the

Purchase Agreements, plus (i) the amount of the Break-Up Fee and Expense Reimbursement (as defined below), plus (ii) U.S.$4,000,000;

(viii)    the bidder acknowledges it will assume the Sellers' obligations under the executory contracts and unexpired leases proposed to be assigned pursuant to the Purchase Agreements (or which contracts and leases the bidder wishes to exclude or add), including any that are a condition to closing, and offers a proposal for the treatment of related cure costs;

(ix)    the bidder acknowledges and represents regarding access to due diligence and the basis for the formulation of its bid, and states that the bidder is not entitled to any expense reimbursement or break-up fee in connection with its bid;

(x)    it includes evidence of authorization and approval from the bidder's board of directors (or comparable governing body) with respect to the bid;

(xi)    it is accompanied by a good faith deposit in the form of a wire transfer (to a bank account specified by the Sellers), certified check or such other form acceptable to the Sellers, payable to the order of the Sellers (or such other party as the Sellers may determine) in an amount equal to 5% of the Purchase Price to be dealt with as provided for under the Bidding Procedures;

(xii)    it includes evidence of the Potential Bidder's ability to comply with section 365 of the U.S. Bankruptcy Code (to the extent applicable), including providing adequate assurance of such Potential Bidder's ability to perform in the future the contracts and leases proposed in its bid to be assumed by the Sellers and assigned or subleased to the Potential Bidder;

(xiii)    it contains other information reasonably requested by the Sellers; and

(xiv)    it is received by the Bid Deadline.

The Sellers will determine, in their reasonable business judgment, after consultation with the Creditors' Committee, the Bondholder Group and the Monitor, whether to entertain bids for the Assets that do not conform to one or more of the requirements specified herein and deem such bids to be Qualified Bids; provided that the Sellers, in evaluating such bids, may not waive substantial compliance with certain of the above aspects without the consent of the Creditors' Committee, the Bondholder Group and the Monitor as set forth in the Bidding Procedures. Notwithstanding the foregoing, the Purchaser will be deemed a Qualified Bidder, and the Purchase Agreements will be deemed a Qualified Bid, for all purposes in connection with the Bidding Process, the Auction, and the Sale.

The Sellers shall notify the Stalking Horse Purchaser and all Qualified Bidders in writing as to whether or not any bids constitute Qualified Bids on the day that the determination is made as to whether the Qualified Bidder's bid constitutes a Qualified Bid, and no later than two (2) Business Days following the expiration of the Bid Deadline. The Sellers shall provide the Stalking Horse Purchaser with a copy of any Qualified Bid received by the Sellers on the day

that the determination is made that such bid is a Qualified Bid but in no event later than two (2) Business Days prior to the commencement of the Auction.

c.  <u>Evaluation of Competing Bids</u>.  The Bidding Procedures set forth various factors that would be considered by the Sellers in evaluating each Qualified Bid.

d.  <u>No Qualified Bids</u>.  If the Sellers do not receive any Qualified Bids other than the Purchase Agreements received from the Stalking Horse Purchaser, the Auction shall be cancelled and the U.S. Debtors shall report the same to the Bankruptcy Court, the Canadian Debtors shall report the same to the Canadian Court and the Monitor and subject to requiring and obtaining approvals of the Bankruptcy Court, the Canadian Court or any other applicable court and satisfaction of the conditions set forth in the Purchase Agreements, the Sellers shall promptly proceed to complete the Transaction contemplated by the terms of the Purchase Agreements.

e.  <u>Auction Process</u>.  If the Sellers receive one or more Qualified Bids in addition to the Purchase Agreements, the Sellers will conduct an auction (the "<u>Auction</u>") of the Assets, which shall be transcribed or recorded on video, at 9:00 a.m. (ET) on February 24, 2010, at the offices of Cleary Gottlieb Steen & Hamilton LLP located at One Liberty Plaza, New York, New York 10006 or such other location as shall be timely communicated to all entities entitled to attend the Auction.  The Auction shall run in accordance with the following procedures:

(i)  Only the Sellers, the Stalking Horse Purchaser, the Creditors' Committee, the Bondholder Group, the Monitor and the Administrators (and the advisors to each of the foregoing), any creditor of the U.S. Debtors or the Canadian Debtors and any other Qualified Bidder that has timely submitted a Qualified Bid, shall attend the Auction in person, and only the Stalking Horse Purchaser and such other Qualified Bidders will be entitled to make any subsequent bids at the Auction.  The Bidding Procedures contain additional provisions regarding attendance and participation in the Auction.

(ii)  Each Qualified Bidder shall be required to confirm that it has not engaged in any collusion with respect to the bidding or the Sale.

(iii)  At least one (1) Business Day prior to the Auction, each Qualified Bidder who has timely submitted a Qualified Bid must inform the Sellers whether it intends to attend the Auction; provided that in the event a Qualified Bidder elects not to attend the Auction, such Qualified Bidder's Qualified Bid shall nevertheless remain fully enforceable against such Qualified Bidder as provided in the Bidding Procedures.  At least one (1) Business Day prior to the Auction, the Sellers will provide copies of the Qualified Bid or combination of Qualified Bids which the Sellers believe, in their reasonable business judgment, after consultation with the Creditors' Committee, the Bondholder Group and the Monitor, is the highest or otherwise best offer (the "<u>Starting Bid</u>") to the Purchaser and all other Qualified Bidders which have informed the Sellers of their intent to participate in the Auction.

(iv)  The Sellers, after consultation with their counsel and financial advisors, the Creditors' Committee, the Bondholder Group and the Monitor, may employ and announce at the Auction additional procedural rules that are reasonable under the circumstances (e.g., the

amount of time allotted to make Subsequent Bids) for conducting the Auction, provided that such rules are (i) not inconsistent with these Bidding Procedures, the Bankruptcy Code, or any order of the Bankruptcy Court, the Canadian Court or any other applicable court entered in connection herewith, and (ii) disclosed to each Qualified Bidder at the Auction.

(v)     Bidding at the Auction will begin with the Starting Bid and continue, in one or more rounds of bidding, so long as during each round at least one subsequent bid is submitted by a Qualified Bidder that (i) improves upon such Qualified Bidder's immediately prior Qualified Bid (a "Subsequent Bid") and (ii) the Sellers determine, in consultation with their advisors, the Creditors' Committee, the Bondholder Group and the Monitor that such Subsequent Bid is (A) for the first round, a higher or otherwise better offer than the Starting Bid, and (B) for subsequent rounds, a higher or otherwise better offer than the Leading Bid (as defined below). Each incremental bid at the Auction shall provide net value to the estate of at least U.S.$3,000,000 over the Starting Bid or the Leading Bid (as defined in the Bidding Procedures), as the case may be, provided that the Sellers, in consultation with the Creditors' Committee, the Bondholder Group and the Monitor, shall retain the right to modify the increment requirements at the Auction. Effect will be given to the Break-Up Fee and Expense Reimbursement as well as any additional liabilities to be assumed by a Qualified Bidder and any additional costs which may be imposed on the Sellers.

f.   Selection Of Successful Bid.   Prior to the conclusion of the Auction, the Sellers, in consultation with their advisors, the Creditors' Committee, the Bondholder Group and the Monitor will identify the highest or otherwise best offer or offers for the Assets received at the Auction (one or more such bids, collectively the "Successful Bid" and the bidder(s) making such bid, collectively, the "Successful Bidder"). The determination of the Successful Bid and Alternate Bid by the Sellers, after consultation with the Creditors' Committee, the Bondholder Group and the Monitor, at the conclusion of the Auction, shall be final subject to approval by the Bankruptcy Court and the Canadian Court. The Stalking Horse Purchaser shall not be an Alternative Bidder.

g.   Other Limitations.   The Sellers may not, without the prior written consent of the Committee, the Bondholder Group, the Monitor and the Stalking Horse Purchaser, which consent shall not be unreasonably withheld, extend the Bid Deadline beyond seven (7) calendar days, extend certain deadlines relating to the selection and distribution of the Qualified Bids, commence the Auction more than ten (10) Business Days after the Bid Deadline, adjourn the Auction for more than three (3) Business Days, or, subject to the availability of the Court and the Canadian Court, adjourn the Sale Hearing for more than three (3) Business Days if the Auction has concluded.

## C.     The Bid Protections

27.     The Stalking Horse Purchaser and its advisors have expended, and likely will

continue to expend, considerable time, energy and resources pursuing the purchase of the Assets

and the assumption and assignment of the Assumed and Assigned Contracts, and have engaged

in extended, good faith negotiations with the Sellers to facilitate such transaction. The Stalking Horse Agreement is the culmination of these efforts.

28.     In recognition of this expenditure of time, energy, and resources, the Sellers and the EMEA Sellers, in accordance with section 9.2 of the Stalking Horse Agreement and section 15.5 of the EMEA Agreement and upon the termination events described therein, have agreed to pay the Stalking Horse Purchaser an aggregate fee of five million dollars and 00/100 ($5,000,000), which is equal to approximately two and eight-tenths percent (2.8%) of the estimated aggregate Purchase Price, after accounting for balance sheet and other adjustments currently estimated at approximately $100 million (to the extent payable by the Sellers, the "Break-Up Fee"). In accordance with section 9.2 of the Stalking Horse Agreement and section 15.5 of the EMEA Agreement and upon the termination events described therein, the Sellers and the EMEA Sellers also have agreed to pay Purchaser's reasonable and documented fees, out-of-pocket costs and expenses (including fees and expenses of the Stalking Horse Purchaser's advisors and notification and filing fees) in connection with the preparation, execution and performance of the Stalking Horse Agreement and the EMEA Agreement, which shall not exceed five million dollars and 00/100 ($5,000,000), which is equal to approximately two and eight-tenths percent (2.8%) of the estimated aggregate Purchase Price after accounting for balance sheet and other adjustments currently estimated at approximately $100 million (to the extent payable by the Sellers, the "Expense Reimbursement," and together with the Break-Up Fee, the "Bid Protections"). Under the Stalking Horse Agreement and the EMEA Agreement, two-thirds of the aggregate Bid Protections will be payable by the Sellers, including the Debtors that are Sellers, and the remaining one-third will be payable by the EMEA Sellers.

29.     Specifically, section 9.2 of the Stalking Horse Agreement provides for payment of

the Break-Up Fee upon termination of the Stalking Horse Agreement under the following circumstances: (i) if the Stalking Horse Purchaser is not in material breach of the Stalking Horse Agreement or the EMEA Agreement such that it would result in a failure to satisfy certain closing conditions, and (a) if the EMEA Agreement is terminated in accordance with certain of its terms, (b) upon the Sellers' material breach of their obligation to close the Sale, which breach is not cured within five (5) days from the receipt of a written notice, (c) in the event of a material breach by the Sellers of the Sellers' representations, warranties, agreements or covenants, which would result in a failure to satisfy certain closing conditions, which breaches are not cured within twenty-five (25) days from receipt of a written notice, or (d) upon the sale, transfer or other disposition, directly or indirectly, of any material portion of the Assets (other than as a going concern) in connection with the closure, liquidation or winding up of the Business or any of the Sellers other than as reflected in any Downward Adjustment or EMEA Downward Adjustment; (ii) if the Stalking Horse Purchaser is not in material breach of the Stalking Horse Agreement, the Sellers consummate an Alternative Transaction within twelve (12) months following termination of the Stalking Horse Agreement and (a) if the Sale Order and the Canadian Approval and Vesting Order in a form reasonably acceptable to the Stalking Horse Purchaser are not entered within twenty (20) days after completion of the Auction, (b) if the EMEA Asset Sale Agreement is terminated in accordance with certain of its terms, or (c) if the Auction does not conclude by forty-five (45) Business Days after the later of the entry of the Bidding Procedures Order or the Canadian Sales Process Order; or (iii) if the Sellers consummate an Alternative Transaction within twelve (12) months following termination of the Stalking Horse Agreement regardless of whether the Stalking Horse Purchaser is in breach of the Stalking Horse Agreement (a) upon the entry of an order by the Court or the Canadian Court approving an Alternative

20

Transaction, (b) if the Purchaser is not selected as the Successful Bidder, or (c) if the EMEA Sale Agreement is terminated in accordance with its terms.

30.    Under the Stalking Horse Agreement, no expense reimbursement is payable if such agreement is terminated because the Bidding Procedures Order is not timely entered or because of the Stalking Horse Purchaser's material breach of such agreement. The Expense Reimbursement is payable upon all other termination events, provided that to be entitled to the Expense Reimbursement, the Stalking Horse Purchaser generally must not be in material breach of the Stalking Horse Agreement. Even if the Stalking Horse Purchaser is in breach of the Stalking Horse Agreement, the Stalking Horse Purchaser would be entitled to the Expense Reimbursement if the Stalking Horse Agreement is terminated because (a) the Bankruptcy Court or the Canadian Court approve an Alternative Transaction, (b) the EMEA Agreement is terminated in accordance with its terms or (c) the Stalking Horse Purchaser is not selected as the Successful Bidder or Alternate Bidder.

31.    The Sellers have further agreed that their obligation to pay the Break-Up Fee and the Expense Reimbursement shall survive termination of the Stalking Horse Agreement, and shall, to the extent owed by the Debtors, constitute an administrative expense claim under section 503(b) of the Bankruptcy Code. The timing of the Debtors' obligation to pay the Expense Reimbursement and the Break-Up Fee is set forth in section 9.2 of the Stalking Horse Agreement.

32.    Other than the Purchaser's ability to seek equitable relief, the Break-Up Fee and the Expense Reimbursement, if payable, will be the sole and exclusive remedy of the Stalking Horse Purchaser for the Sellers' or the EMEA Sellers' failure to consummate the transaction or breach the Stalking Horse Agreement prior to Closing. The Break-Up Fee and the Expense

Reimbursement are not remedies for the Sellers' or the EMEA Sellers' post-Closing breach.

**D.      The Incentive Fee**

33.      OEP is the largest single equity investor in GENBAND, currently holding approximately thirty five percent (35%) of GENBAND's common stock. OEP's support of the proposed Sale, both as an equity holder and as a financial sponsor of the Sale is essential to the Purchaser's ability to execute the Stalking Horse Agreement. OEP has provided a financing commitment letter that provides for payment of the Purchase Price by OEP. OEP also has been an active participant in other Nortel divestitures. Over the entire course of these proceedings, OEP has conducted extensive diligence with respect to multiple potential transactions. Most recently and notably, OEP was an equity sponsor of MEN Acquisition LLC in its submission of a bid and its participation at the auction of the MEN business. OEP has informed the Sellers and the EMEA Sellers that it has incurred significant un-reimbursed costs, in excess of four million dollars ($4,000,000), in connection with its pursuit of these various other transactions, and that it requires compensation for these costs as a condition to its financial sponsorship of the Stalking Horse Agreement.

34.      In recognition of OEP's good faith efforts to pursue the Sale and the value provided to the Debtors through its participation in other transactions, the Sellers and EMEA Sellers have agreed, subject to obtaining the required court approvals, to pay to OEP an incentive fee in connection with the execution of the Stalking Horse Agreement, to induce OEP's continued participation in the auction process. The incentive fee agreed to by the parties consists of a payment of US $3,600,000, funded as $1.2 million by each of: (i) NNI, (ii) NNC, and (iii) NNUK (NNI's obligation to pay $1.2 million is referred to herein as the "Incentive Fee").

35.      OEP informed the Sellers that the provision of financing for GENBAND's entry into the Stalking Horse Agreement is dependent upon the payment of the Incentive Fee, which

represents the fees and expenses OEP has incurred as an active participant in multiple Nortel sale processes, including the MEN auction. Without the Sellers' agreement to provide OEP with the Incentive Fee, the Stalking Horse Purchaser would not have undertaken efforts to research the value of the Assets or have entered into the Stalking Horse Agreement and will not continue to participate in the auction process, precluding the use of the Stalking Horse agreement as the floor at a subsequent auction. Furthermore, time is of the essence in order to maximize the value that the Debtors can realize from the sale of the Assets, and the Stalking Horse Agreement represents the best opportunity to quickly realize value from the sale of the Assets.

36. NNC, NNL, NNI and NNUK and the Joint Administrators have executed a letter agreement that provides that the $3.6 million in incentive fee payments, including the Incentive Fee, would be subject to further allocation amongst the estates if the Sale or Alternate Transaction is consummated (the "Incentive Fee Letter"). A copy of the Incentive Fee Letter is attached hereto as Exhibit H, and the Debtors seek approval of the Incentive Fee Letter, and authorization to perform all of their obligations thereunder in connection with approval of the Incentive Fee.

**E. The Notice Procedures**

37. The Debtors propose to give notice as soon as reasonably practicable after the entry of the Bidding Procedures Order of the Bidding Procedures, the time and place of the Auction, the time and place of the Sale Hearing, and the objection deadline for the Sale Hearing by sending a notice (the "Sale Notice"), substantially in the form attached hereto as Exhibit E by first-class mail, postage prepaid, facsimile, electronic transmission, hand delivery or overnight mail upon (i) all entities reasonably known to have expressed an interest in a transaction with respect to the Assets during the past nine (9) months, (ii) all entities reasonably known to have asserted any claim, lien, encumbrance or interest in the Assets, (iii) the attorneys general for all

states in which Purchased Assets owned by the Debtors are located, all federal and state taxing

authorities, the Securities and Exchange Commission, the Environmental Protection Agency,

state environmental protection agencies, the Internal Revenue Service, and the Department of

Labor and similar state labor or employment agencies, (iv) all parties entitled to notice pursuant

to Local Rule 2002-1(b), (v) all counterparties to the Assumed and Assigned Contracts, (vi) all

known creditors of the Debtors, (vii) the Committee, and (viii) the Bondholders Group.

38.    In addition, within five (5) Business Days of entry of the Bidding Procedures

Order and the Canadian Sales Process Order (as defined below) or as soon as reasonably

practicable thereafter, the Sellers shall publish notice of the Bidding Procedures, the time and

place of the Auction, the time and place of the Sale Hearing, and the objection deadline for the

Sale Hearing in <u>The Wall Street Journal</u> (National Edition), <u>The Globe & Mail</u> (National

Edition) and <u>The Financial Times</u> (International Edition), substantially in the form attached

hereto as <u>Exhibit F</u> (the "<u>Publication Notice</u>").

39.    The Debtors propose to give notice of the Sale to the counterparties under all

Assumed and Assigned Contracts (as defined below) (the "<u>Counterparties</u>" and each individually

the "<u>Counterparty</u>") in accordance with section F below.

**F.    The Assumption and Assignment Procedures**

40.    To facilitate and effect the sale of the Assets, the Debtors seek authorization to

assume certain pre-petition executory contracts of the Debtors related to the Purchased Assets as

further discussed below, and to assign such executory contracts to the Stalking Horse Purchaser

or the Successful Bidder.

41.    Included in the Assumed and Assigned Contracts designated for assumption and

assignment to the Stalking Horse Purchaser or other Successful Bidder are contracts between the

Debtors and their customers (the "Customer Contracts").[6] The identity of the counterparties to

the Customer Contracts (the "Customer Counterparties") constitutes an integral component of

the Assumed and Assigned Contracts' value.  Access to the list of Customer Counterparties

absent appropriate confidentiality restrictions would entail releasing valuable confidential

information of critical value not only to any prospective purchaser of the Assets but also to the

Debtors' other businesses, many of which share overlapping customer lists.  Thus, publicly

releasing the names of the Customer Counterparties would have an immediate detrimental

impact on the value of the Assets as well as other aspects of the Debtors' business.

      42.      In light of the foregoing and the need to coordinate the sale of the Assets, the

Debtors submit the following procedures (the "Assumption and Assignment Procedures") for the

Court's approval:

***Notice***

      43.      The Debtors shall, no later than January 15, 2010, serve an individual notice

substantially in the form attached hereto as Exhibit G (each an "Assumption and Assignment

Notice") by first class mail, postage prepaid, facsimile, electronic transmission, hand delivery or

overnight mail on each Customer Counterparty under each Assumed and Assigned Contract (and

its attorney, if known) at the last known address available to the Debtors.  Each Assumption and

Assignment Notice shall set forth the following information:  (i) the name and address of the

Counterparty, (ii) notice of the proposed effective date of the assignment (subject to the Debtors'

and Stalking Horse Purchaser or other Successful Bidder's right to withdraw such request for

assumption and assignment of the Assumed and Assigned Contract prior to the Closing), (iii)

---

[6]      While Debtors have made an effort to limit the list of Assumed and Assigned Contracts to include only those contracts to which they are parties, in the event that Debtors later determine that they are not in fact a party to an agreement included on the list of Assumed and Assigned Contracts, the Debtors reserve the right to remove such contract from the list and from the relief requested herein for the Assumed and Assigned Contracts.

identification of the Assumed and Assigned Contract, (iv) the amount, if any, determined by the Debtors to be necessary to be paid to cure any existing default in accordance with sections 365(b) and 365(f)(2) of the Bankruptcy Code (the "Cure Amount"), and (v) a description of the Stalking Horse Purchaser and a statement as to the Stalking Horse Purchaser's ability to perform the Debtors' obligations under the Assumed and Assigned Contract.

44.    For Assumed and Assigned Contracts, the Debtors shall file with the Court a master notice of assignment of contracts (a "Master Assumption Notice") that sets forth: (i) the name and address of each Counterparty, (ii) notice of the proposed effective date of the assignment (subject to the right of the Debtors and Stalking Horse Purchaser or other Successful Bidder to withdraw such request for assumption and assignment of the Assumed and Assigned Contract prior to the Closing), (iii) description of the Assumed and Assigned Contract, and (iv) the Cure Amount, if any.

45.    At this time, the only contracts for which the Debtors are seeking assumption and assignment are Customer Contracts. Accordingly, the Debtors shall file under seal with the Court, on or prior to three (3) days before the Sale Hearing, a Master Assumption Notice as well as an affidavit confirming that an Assumption and Assignment Notice has been sent to each Counterparty, and shall serve copies on (a) counsel to the Stalking Horse Purchaser, (b) the U.S. Trustee, (c) counsel to the Monitor, (d) counsel to the Committee, and (e) counsel to the Bondholder Group.

*Supplemental Notice*

46.    While the Debtors have made a good faith effort to identify the contracts to be assumed and assigned in connection with the proposed sale, they may discover additional contracts the parties desire to assign in connection with the Sale. Accordingly, the Debtors propose the following supplemental procedures. If at any time after the entry of the Bidding

Procedures Order, whether before or after Closing, the Debtors identify additional pre-petition

executory contracts to be assumed and assigned to the Stalking Horse Purchaser or other

Successful Bidder as Assumed and Assigned Contracts, the Debtors shall serve an individual

Assumption and Assignment Notice by first class mail, postage prepaid, facsimile, electronic

transmission, hand delivery or overnight mail on the Counterparty to each supplemental

Assumed and Assigned Contract (and its attorney, if known) at the last known address available

to the Debtors by no later than ten (10) calendar days before the proposed effective date of the

assignment. Each supplemental Assumption and Assignment Notice shall set forth the following

information: (i) the name and address of the Counterparty, (ii) notice of the proposed effective

date of the assignment (subject to the right of the Debtors and Stalking Horse Purchaser or other

Successful Bidder to withdraw such request for assumption and assignment of the Assumed and

Assigned Contract prior to the Closing), (iii) identification of the Assumed and Assigned

Contract, (iv) the Cure Amount, if any, and (v) a description of the Stalking Horse Purchaser or

Successful Bidder, and a statement as to the ability of the Stalking Horse Purchaser or Successful

Bidder to perform the Debtors' obligations under the Assumed and Assigned Contract. The Cure

Amount shall be paid as agreed by the Stalking Horse Purchaser or Successful Bidder and Sellers

pursuant to the procedures set forth in the section below. The Debtors also will file a

Supplemental Master Assumption Notice for such contracts (which shall be filed under seal in

the case of customer contracts) and serve copies of the Supplemental Master Assumption Notice

to (a) counsel to the Stalking Horse Purchaser, (b) the U.S. Trustee, (c) counsel to the Monitor,

(d) counsel to the Committee, and (e) counsel to the Bondholder Group.

47.     Unless the contract counterparty or any other entity properly files an objection to

the supplemental Assumption and Assignment Notice in accordance with the General Objection

Procedures (as defined below) within ten (10) calendar days of the date of the Assumption and

Assignment Notice, the Debtors may assume and assign the Assumed and Assigned Contract,

subject to the occurrence of the Closing, without further order or notice of hearing. If an

objection is filed and served in accordance with the General Objection Procedures within ten

(10) calendar days of the date of the supplemental Assumption and Assignment Notice, and the

objection cannot be resolved consensually, then the Debtors will schedule a hearing to consider

the objection on the next scheduled omnibus hearing date.

### Cure Amounts

48.     To the extent necessary to consummate the Sale, the Cure Amounts shall be paid

promptly by the Stalking Horse Purchaser or other Successful Bidder and the Debtors in

accordance with the Stalking Horse Agreement or a similar agreement entered into between the

Sellers and any Successful Bidder, but in no event later than the later of (a) twenty (20) days

following the resolution of the Cure Amounts in accordance with these procedures and (b) ten

(10) days following the Closing.

49.     Any Counterparty will be deemed to have received adequate assurance of future

performance as required by section 365 of the Bankruptcy Code if the Debtors, after payment of

any Cure Amounts, would no longer have any payment or delivery obligations under the relevant

Assumed and Assigned Contract.

### Counterparty Objection Procedures

50.     To the extent that any Counterparty wishes to object to any matter pertaining to

the proposed assumption and assignment of the Assumed and Assigned Contracts, including,

without limitation, to the proposed Cure Amount and the adequate assurance of future

performance by the Stalking Horse Purchaser under the applicable Assumed and Assigned

Contract, then such Counterparty must file a written objection with the Court so that such

28

objection is received by the applicable objection deadline (as further discussed below).

### *Requests for Adequate Assurance*

51.    Any Counterparty to an Assumed and Assigned Contract that wishes to obtain

adequate assurance information regarding bidders other than the Stalking Horse Purchaser that

will or may participate at the Auction, and to which the Debtors may ultimately elect, at the

conclusion of the Auction, to assume and assign the Assumed and Assigned Contracts, must

provide written notice (a "Request for Adequate Assurance") to counsel to the Debtors by mail,

facsimile or hand delivery at Cleary Gottlieb Steen & Hamilton LLP, One Liberty Plaza, New

York, New York 10006, Facsimile:  (212) 225-3999 (Attention:  James L. Bromley and Lisa

Schweitzer) so as to be received on or before the General Objection Deadline (as defined below).

All Requests for Adequate Assurance must include an email address and/or facsimile number to

which a response to such request will be sent.

52.    If a Counterparty timely submits a Request for Adequate Assurance, the Debtors

shall supply such Counterparty with any non-confidential information reasonably related to

adequate assurance with respect to such other bidders by email or facsimile delivery one day

prior to the Auction.  If a bidder other than the Stalking Horse Purchaser is the Successful Bidder

at the end of the Auction, the Debtors shall immediately notify all Counterparties that filed a

Request for Adequate Assurance of the name of the Successful Bidder and the Alternate Bidder,

if any.

53.    If the Stalking Horse Purchaser is not the Successful Bidder at the Auction and if

a Counterparty does not timely submit a Request for Adequate Assurance and does not timely

object to adequate assurance of future performance by bidders other than the Stalking Horse

Purchaser on or before the General Objection Deadline (as defined below), the Court may enter

an order forever barring such Counterparty from objecting to adequate assurance of future

29

performance. Any party that has submitted a Request for Adequate Assurance shall have until **March 2, 2010 at 4 p.m. (ET)** (the "Supplemental Objection Deadline") to file an objection to adequate assurance of future performance by any Successful Bidder or Alternate Bidder that is not the Stalking Horse Purchaser.

### *Service of Objections*

54.     All objections by Counterparties to Assumed and Assigned Contracts other than those filed pursuant to the above procedures regarding Requests for Adequate Assurance must be filed by the General Objection Deadline (as defined below). Any objection filed with respect to Assumed and Assigned Contracts will be addressed at the Sale Hearing unless adjourned or withdrawn.

55.     All Counterparty objections must be served in accordance with the General Objection Procedures (as defined below) and must specify the grounds for such objection, including stating the Counterparty's alleged Cure Amount (including, on a transaction by transaction basis, calculations and detail of specific charges and dates, and any other amounts receivable or payable supporting such alleged Cure Amount) if the Counterparty disagrees with the Debtors' proposed Cure Amount and any other defaults or termination events the Counterparty alleges must be cured to effect assignment of the Assumed and Assigned Contract.

56.     To the extent that any Counterparty does not timely serve an objection as set forth above, such Counterparty will be: (i) deemed to have consented to such Cure Amounts, if any, and to the assumption and assignment of the applicable Assumed and Assigned Contract; (ii) bound to such corresponding Cure Amount, if any; (iii) deemed to have agreed that the Stalking Horse Purchaser or any Successful Bidder has provided adequate assurance of future performance within the meaning of Bankruptcy Code section 365(b)(1)(C); (iv) deemed to have agreed that all defaults under the Assumed and Assigned Contracts arising or continuing prior to

the effective date of the assignment have been cured as a result or precondition of the assignment, such that the Stalking Horse Purchaser or any Successful Bidder or the Debtors shall have no liability or obligation with respect to any default occurring or continuing prior to the assignment, and from and after the date of the assignment the Assumed and Assigned Contract shall remain in full force and effect for the benefit of the Stalking Horse Purchaser or any Successful Bidder and the Counterparty in accordance with its terms; (v) deemed to have waived any right to terminate the Assumed and Assigned Contract or designate an early termination date under the applicable Assumed and Assigned Contract as a result of any default that occurred and/or was continuing prior to the assignment date; and (vi) deemed to have agreed that the terms of the Sale Order shall apply to the assumption and assignment of the applicable Assumed and Assigned Contract.

### Reservation of Rights

57.    The Debtors' assumption and assignment of the Assumed and Assigned Contracts is subject to Court approval and consummation of the sale of the Assets to the Stalking Horse Purchaser or other Successful Bidder.  The Debtors shall be deemed to have assumed each of the Assumed and Assigned Contracts as of the date of and effective only upon the Closing Date of the Stalking Horse Agreement or a similar agreement entered into between the Sellers and any Successful Bidder (or such later date as noticed by the Debtors).  Absent such closing, the Assumed and Assigned Contracts shall be deemed neither assumed nor assigned and shall in all respects be subject to subsequent assumption or rejection by the Debtors under the Bankruptcy Code.

58.    The Stalking Horse Purchaser shall have no rights in and to a particular Assumed and Assigned Contract until such time as the particular Assumed and Assigned Contract is

assumed and assigned in accordance with the procedures set forth herein.

59.     In the event that the Stalking Horse Purchaser is not the Successful Bidder at the Auction, the Debtors reserve the right to modify the Assumption and Assignment Procedures, subject to approval of the Court.

60.     Regardless of whether any objection with respect to adequate assurance has been received from a Counterparty, prior to the entry of the Sale Order, the Stalking Horse Purchaser or any bidder other than the Stalking Horse Purchaser that is the Successful Bidder at the Auction shall provide such adequate assurance of its future performance under the Assumed and Assigned Contracts for the benefit of the parties thereto (other than the Debtors) as reasonably necessary to satisfy section 365(f)(2)(B) of the Bankruptcy Code.

61.     The same Assumption and Assignment Procedures will be used for each of the Assumed and Assigned Contracts.  Bankruptcy Rule 6006(e) allows for the sale of multiple contracts in one motion upon authorization of the Court.  The Debtors therefore request that the Court grant authorization to seek approval of the assumption and assignment of the Assumed and Assigned Contracts through this Motion and the notice and procedures set forth in the Assumption and Assignment Procedures including to seek approval of the assumption and assignment of more than one hundred (100) contracts pursuant to this motion and Bankruptcy Rule 6006(f)(6)).

62.     To facilitate the assumption and assignment of the Assumed and Assigned Contracts, the Debtors further request that the Court find the anti-assignment provisions of the Assumed and Assigned Contracts, if any, to be unenforceable under section 365(f) of the Bankruptcy Code.[7]

---

[7]     Section 365(f)(1) provides in part that, "notwithstanding a provision in an executory contract or unexpired lease of the debtor, or in applicable law, that prohibits, restricts, or conditions the assignment of such contract or

63.     In the event an objection to the assumption and assignment of a contract by a Customer Counterparty is not resolved prior to Closing, including objections related to Cure Amounts, the Debtors, in consultation with the Stalking Horse Purchaser or other Successful Bidder, may elect to (i) not assume such Assumed and Assigned Contracts, or (ii) postpone the assumption of such Assumed and Assigned Contracts until the resolution of such objection.  Any Cure Costs outstanding on the Closing Date shall be paid to the appropriate Counterparty as a condition subsequent to such assumption and/or assumption and assignment of the relevant Assumed and Assigned Contracts.

64.     The Debtors reserve and do not waive the right to amend, supplement, withdraw or otherwise modify the information contained in Schedule A of any individualized Assumption and Assignment Notice sent to a Counterparty.

**G.      Request to Set a Date for the Sale Hearing**

65.     The Debtors intend to present the Successful Bid and the Alternate Bid, if any, for approval by the Court pursuant to the provisions of sections 105, 363 and 365 of the Bankruptcy Code at the Sale Hearing to be scheduled by the Court and currently proposed as **March 3, 2010 at 2:00 p.m. (ET)**, (unless the Court and the Canadian Court are able schedule the Sale Hearing at an earlier time).  The Debtors shall be deemed to have accepted a bid only when the Court has approved the bid at the Sale Hearing.  The Debtors propose that upon the failure to consummate a sale of the Assets after the Sale Hearing because of the occurrence of a breach or default under the terms of the Successful Bid, the next highest or otherwise best Alternate Bid, if any, as disclosed at the Sale Hearing, shall be deemed the Successful Bid without need for further order

---

lease, the trustee may assign such contract or lease . . ." 11 U.S.C. § 365(f)(1).  Section 365(f)(3) further provides that "Notwithstanding a provision in an executory contract or unexpired lease of the debtor, or in applicable law that terminates or modifies, or permits a party other than the debtor to terminate or modify, such contract or lease or a right or obligation under such contract or lease on account of an assignment of such contract or lease, such contract, lease, right, or obligation may not be terminated or modified under such provision because of the assumption or assignment of such contract or lease by the trustee." 11 U.S.C. § 365(f)(3).

of the Court, and the parties shall be authorized to consummate the transaction contemplated by the Alternate Bid.

## H.    Objections

66.    All objections to the sale of the Assets, the assumption and assignment of the Assumed and Assigned Contracts, or any relief requested in the Motion other than the relief granted by this Court in the Bidding Procedures Order must be:  (a) in writing; (b) signed by counsel or attested to by the objecting party; (c) in conformity with the Bankruptcy Rules and the Local Rules; (d) filed with the Clerk of the Bankruptcy Court, 824 Market Street, Wilmington, Delaware 19801 by no later than **4 p.m. (ET) on February 17, 2010** (the "General Objection Deadline"), or other applicable deadline as indicated in this Motion; and (e) served in accordance with the Local Rules so as to be received on or before the relevant objection deadline by the following (collectively, the "Objection Notice Parties"):  (a) counsel to the Debtors:  Cleary Gottlieb Steen & Hamilton LLP, One Liberty Plaza, New York, New York 10006, Facsimile: (212) 225-3999 (Attention:  James L. Bromley and Lisa M. Schweitzer) and Morris, Nichols, Arsht & Tunnell LLP, 1201 North Market Street, Wilmington, Delaware 19801, Fax:  (302) 658-3989 (Attention:  Derek C. Abbott); (b) counsel to the Stalking Horse Purchaser:  Latham & Watkins LLP, 885 Third Avenue, New York, NY 10022, Fax: (212) 751-4864 (Attention: Thomas Allinson, Thomas Malone and Alexandra Croswell), (c) counsel to the Committee: Akin Gump Strauss Hauer & Feld LLP, One Bryant Park, New York, New York 10036, Fax: (212) 872-1002 (Attention:  Fred Hodara, Stephen Kuhn and Kenneth Davis) and Richards, Layton & Finger, P.A., One Rodney Square, 920 North King Street, Wilmington, Delaware 19801 (Attention:  Christopher M. Samis), (d) counsel to the Bondholder Group:  Milbank, Tweed, Hadley & McCloy, One Chase Manhattan Plaza, New York, New York 10006, Fax: (212) 822-5735 (Attention:  Roland Hlawaty) and (e) the Office of the United States Trustee, 844

King Street, Suite 2207, Wilmington, Delaware 19801, Fax: (302) 573-6497 (Attention: Patrick

Tinker) (these procedures collectively referred to as the "General Objection Procedures").

67.     Each objection shall state the legal and factual basis of such objection and may be

orally supplemented at the relevant hearing.

68.     If the Stalking Horse Purchaser is not the Successful Bidder at the Auction,

objections to issues arising from and in connection with the Auction and/or the Debtors'

selection of a Successful Bid made by a Successful Bidder other than the Stalking Horse

Purchaser must be filed by the Supplemental Objection Deadline in accordance with the General

Objection Procedures.

69.     Only those objections made in compliance with the General Objection Procedures

will be considered by the Court at the relevant hearing.  The failure of any objecting person or

entity to file its objections by the relevant objection deadline and in accordance with the General

Objection Procedures will be a bar to the assertion, at the Sale Hearing or thereafter, of any

objection (including to the sale of the Assets and assumption and assignment of the Assumed and

Assigned Contracts free and clear of liens, claims and encumbrances), and shall be deemed to be

"consent" for purposes of Bankruptcy Code section 363(f).

I.     **Sale Free and Clear of All Liens, Claims and Interests**

70.     The Debtors have agreed to sell, transfer and assign pursuant to sections 363 and

365 of the Bankruptcy Code, the Debtors' right, title and interest in the Assets, free and clear of

any and all interests (other than with respect to Assumed Liabilities and Permitted

Encumbrances), including (without limitation) (i) any and all liens, including any lien (statutory

or otherwise), mortgage, pledge, security interest, charge, right of first refusal, hypothecation,

encumbrance on real property, easement, encroachment, right-of-way, restrictive covenant on

real property, real property license, lease or conditional sale arrangement (collectively, including

35

"Liens" as defined in the Stalking Horse Agreement, the "Liens"),  and (ii) any and all debts,

liabilities and obligations, whether accrued or fixed, direct or indirect, liquidated or unliquidated,

absolute or contingent, matured or unmatured, determinable or undeterminable, known or

unknown, including those arising under any Law or Action and those arising under any Contract

or otherwise, including any Tax liability (collectively, the "Liabilities" and together with the

Liens, the "Interests"), with such Interests to attach to the sale proceeds in the same validity,

extent and priority as immediately prior to the Sale, subject to any rights, claims and defenses of

the Debtors and other parties in interest.

71.    The Debtors seek a finding by the Court that upon the Closing, and except as

otherwise expressly provided in the Stalking Horse Agreement, the Stalking Horse Purchaser

shall not be liable for any Claims against, and Interests and obligations of, the Debtors or any of

the Debtors' predecessors or affiliates.  The Debtors further seek a finding by the Court that as of

the Closing, subject to the provisions of this Order, the Stalking Horse Purchaser shall succeed to

the entirety of the Debtors' rights and obligations in the Assumed and Assigned Contracts first

arising and attributable to the time period occurring on or after the Closing and shall have all

rights thereunder.

72.    The Debtors further request that (i) all defaults (monetary and non-monetary)

under the Assumed and Assigned Contracts through the Closing shall be deemed cured, (ii) no

other amounts will be owed by the Debtors, their estates or the Stalking Horse Purchaser with

respect to amounts first arising or accruing during, or attributable or related to, the period prior to

Closing, (iii) any and all persons or entities shall be forever barred and estopped from asserting a

claim against the Debtors, their estates, or the Stalking Horse Purchaser that any additional

amounts are due or defaults exist under the Assumed and Assigned Contracts that arose or accrued, or relate to or are attributable to the period prior to the Closing.

**J.    Assumption and Assignment of the Assumed and Assigned Contracts**

73.    Pursuant to section 365(f) of the Bankruptcy Code, the Debtors seek authorization and approval to assume and assign the Assumed and Assigned Contracts to the Stalking Horse Purchaser notwithstanding any provision to the contrary in the Assumed and Assigned Contracts, or in applicable non-bankruptcy law, that prohibits, restricts, or conditions the assignment.

74.    Upon assumption of the Assumed and Assigned Contracts by the Debtors and assignment to the Stalking Horse Purchaser, the Assumed and Assigned Contracts shall be deemed valid and binding, in full force and effect in accordance with their terms, subject to the provisions of the Sale Order.

**K.    Canadian Proceedings**

75.    The Sellers subject to the Canadian Proceedings are seeking approval from the Canadian Court of the bidding procedures (the "Canadian Sales Process Order"), which request shall be considered at a joint hearing with this Court. The final sale of the Assets also will be submitted for approval by the Canadian Court. The Debtors may seek recognition of the Orders of this Court approving the sale from the Canadian Court.

**Basis for Relief**

**A.    Sale of the Assets Is a Product of the Debtors' Reasonable Business Judgment**

76.    Section 363(b)(1) of the Bankruptcy Code provides: "[t]he Trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." Section 105(a) of the Bankruptcy Code provides in relevant part: "The Court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title."

77.    Virtually all courts have held that approval of a proposed sale of assets of a debtor under section 363 of the Bankruptcy Code outside the ordinary course of business and prior to the confirmation of a plan of reorganization is appropriate if a court finds that the transaction represents a reasonable business judgment on the part of the trustee or debtor-in-possession. See In re Abbotts Dairies of Pa., 788 F.2d 143 (3d Cir. 1986); In re Delaware & Hudson Ry. Co., 124 B.R. 169, 176 (D. Del. 1991) (holding that the following non-exclusive list of factors may be considered by a court in determining whether there is a sound business purpose for an asset sale: "the proportionate value of the asset to the estate as a whole; the amount of elapsed time since the filing; the effect of the proposed disposition of [sic] the future plan of reorganization; the amount of proceeds to be obtained from the sale versus appraised values of the property; and whether the asset is decreasing or increasing in value"); In re Stroud Ford, Inc., 164 B.R. 730, 732 (Bankr. M.D. Pa 1993); Titusville Country Club v. Pennbank (In re Titusville Country Club), 128 B.R. 396, 399 (Bankr. W.D. Pa. 1991); In re Industrial Valley Refrigeration & Air Conditioning Supplies Inc., 77 B.R. 15, 21 (Bankr. E.D. Pa. 1987); In re Lionel Corp., 722 F.2d 1063 (2d Cir. 1983); Stephens Indus., Inc. v. McClung, 789 F.2d 386, 391 (6th Cir. 1986); In re Ionosphere Clubs, Inc., 100 B.R. 670, 675 (Bankr. S.D.N.Y. 1989); In re Phoenix Steel Corp., 82 B.R. 334, 335-36 (Bankr. D. Del. 1987) (stating that the elements necessary for approval of a section 363 sale in a chapter 11 case are "that the proposed sale is fair and equitable, that there is a good business reason for completing the sale and the transaction is in good faith").

78.    The "sound business reason" test requires a trustee or debtor-in-possession to establish four elements:  (1) that a sound business purpose justifies the sale of assets outside the ordinary course of business; (2) that accurate and reasonable notice has been provided to interested persons; (3) that the trustee or the debtor-in-possession has obtained a fair and

reasonable price; and (4) good faith.  In re Titusville Country Club, 128 B.R. at 399; In re

Sovereign Estates, Ltd., 104 B.R. 702, 704 (Bankr. E.D. Pa. 1989); Phoenix Steel Corp., 82 B.R.

at 335-36; see also Stephens Indus., 789 F.2d at 390; In re Lionel Corp., 722 F.2d at 1071.[8]

79.     Additionally, prior to and after enactment of the Bankruptcy Code, courts have

permitted a proposed sale of all or substantially all assets of a trustee outside the ordinary course

of business if such a sale is necessary to preserve the value of assets for the estate, its creditors or

interest holders.  See In re Abbotts Dairies of Pa., Inc., 788 F.2d at 143; In re Lionel Corp., 722

F.2d at 1063 (passim).

80.     The proposed procedures for the sale of the Debtors' Assets meet the "sound

business reason" test.  First, sound business purposes justify the sale.  The Debtors believe that a

prompt sale of the Assets conducted pursuant to the Bidding Procedures presents the best

opportunity to realize the maximum value of the Assets for distribution to the Debtors' estates

and their creditors.  The Debtors further believe that the benefit to their creditors will be

adversely affected absent an immediate sale.  See In re Lionel Corp., 722 F.2d at 1071 (of factors

for court to evaluate on motion under section 363(b), "most important perhaps, [is] whether the

asset is increasing or decreasing in value").

81.     The proposed procedures for the sale of the Assets also meet the other factors of

the "sound business reason" test.  As part of this Motion, the Debtors have sought to establish

procedures for notice to creditors and other prospective bidders.  Under the circumstances of this

case, the Debtors submit that the notice period proposed satisfies the requirements of the

Bankruptcy Rules, see Bankruptcy Rule 2002, and provides sufficient time for parties in interest

---

[8]     Lionel's "sound business purpose test" replaces an older rule that held that sales of substantially all of a
debtor's assets prior to the confirmation of a plan of reorganization could only be made in emergencies, i.e. when
the assets to be sold were "wasting" or perishable. Lionel, 722 F.2d at 1071.

to submit objections to the proposed sale and for bidders to formulate and submit competing proposals.

82.     Finally, the proposed procedures for the sale of the Assets, which require the Debtors to consult with the Committee, Bondholder Group and the Monitor throughout the process, satisfy the good faith requirement of <u>Abbotts Dairies</u>.  The Debtors submit that the results of the Auction will be the product of good faith, arm's-length negotiations with respect to the price and other terms of the sale of the Assets between the Debtors and highest and best bidder at the conclusion of the Auction.

83.     As set forth above, the Debtors have demonstrated compelling and sound business justifications for authorizing the sale of the Assets, entry into the Stalking Horse Agreement (as defined herein) as a "stalking horse" sale agreement and the payment of the Bid Protections under the circumstances, timing and procedures set forth herein and in the Bidding Procedures. The sale of the Assets pursuant to the Bidding Procedures will afford the Debtors' estates an opportunity to maximize the recoveries to creditors.  Accordingly, the Debtors request that the Court approve the proposed procedures for sale of the Assets to the highest or otherwise best bidder at the Auction and approve the sale presented to the Court at the Sale Hearing and authorize the Debtors to take such other steps as are necessary to consummate the Sale.

**B.     The Bidding Procedures Are Appropriate Under the Circumstances**

84.     A debtor may sell, after notice and a hearing, its assets outside the ordinary course of business.  11 U.S.C. § 363.  Generally, to obtain approval of a proposed sale of assets, a debtor must demonstrate that the "proffered purchase price is the highest and best offer" under the circumstances of the case.  See, e.g., <u>Four B. Corp. v. Food Barn Stores, Inc. (In re Food Barn Stores, Inc.)</u>, 107 F.3d 558, 564-65 (8th Cir. 1997) (holding that in bankruptcy sales, "a primary objective of the Code [is] to enhance the value of the estate at hand"); <u>In re Integrated</u>

Res., 147 B.R. 650, 659 (S.D.N.Y. 1992) ("It is a well-established principle of bankruptcy law that the . . . Debtors' duty with respect to such sales is to obtain the highest price or greatest overall benefit possible for the estate.") (quoting Cello Bay Co. v. Champion Int'l Corn. (In re Atlanta Packaging Prods., Inc.), 99 B.R. 124, 131 (Bankr. N.D. Ga. 1988)).

85.     The implementation of competitive bidding procedures to facilitate the sale of a debtor's assets outside of the ordinary course of a debtor's business is routinely approved by bankruptcy courts as a means of ensuring that such sale will generate the highest and best return for a debtor's estate.  The Debtors submit that the opportunity for competitive bidding embodied in the Bidding Procedures will generate the highest or otherwise best offer for the Assets and therefore is designed to maximize the value of the Assets.

86.     The Debtors believe that a prompt sale process is the best way to maximize the value of the Debtors' Assets for the benefit of their estates, creditors and other stakeholders. Accordingly, the Debtors have concluded that:  (a) a prompt sale of the Assets is the best way to maximize value for these estates, and (b) the proposed Bidding Procedures described herein are fair, reasonable, and appropriate and are designed to maximize recovery with respect to the sale of the Assets.

**C.      Provision for the Bid Protections in the Form of a Break-Up Fee and Expense Payment of an Incentive Fee are Necessary Under the Circumstances**

**1. The Bid Protections**

87.     The Debtors have formulated a bidding process that the Debtors believe will induce prospective competing bidders to expend the time, energy and resources necessary to submit a bid, and which the Debtors believe is fair and reasonable and will provide a benefit to the Debtors' estates and creditors.  The Debtors have concluded that for this Transaction, the provision of the Bidding Protections (including the Break-Up Fee and Expense Reimbursement)

and the payment of the Incentive Fee are warranted under the circumstances at hand.

88.     The use of bid protections such as the Break-Up Fee and the Expense
Reimbursement enables a debtor to ensure a sale to a contractually committed bidder at a price
the debtor believes is fair, while providing the debtor with the potential of obtaining an enhanced
recovery through an auction process.

89.     Historically, bankruptcy courts have approved bidding incentives (including bid
protections) solely by reference to the "business judgment rule," which proscribes judicial
second-guessing of the actions of a corporation's board of directors taken in good faith and in the
exercise of honest judgment. See, e.g., In re 995 Fifth Ave. Assocs., 96 B.R. 24, 28 (Bankr.
S.D.N.Y. 1992) (holding that bidding incentives may "be legitimately necessary to convince a
'white knight' to enter the bidding by providing some form of compensation for the risks it is
undertaking" and upholding the fee where the creditors' committee closely scrutinized the fee,
the fee was not unreasonable in relation to the size of the sale, and the work and expense
involved in negotiating the transaction were significant) (citation omitted); In re Marrose Corp.,
Nos. 89 B 12171-12179 (CB), 1992 WL 33848, at *5 (Bankr. S.D.N.Y. 1992) ("[bidding
incentives] are meant to compensate the potential acquirer who serves as a catalyst or 'stalking
horse' which attracts more favorable offers"). See also In re Integrated Res., at 657-58.

90.     The Third Circuit Court of Appeals, through its decision in In Calpine Corp. v.
O'Brien Envtl. Energy, Inc. (In re O'Brien Envtl. Energy, Inc.), 181 F. 3d 527 (3d Cir. 1999),
clarified that in the bankruptcy context, while a debtor's business judgment is relevant, a debtor
also must show that bidding incentives, as administrative expenses under section 503(b) of the
Bankruptcy Code, also provide a benefit to the debtor's estate. Id. at 533.

91.     The O'Brien opinion identified at least two instances in which bidding incentives may provide benefit to the estate. First, a benefit may be found if "assurance of a break-up fee promoted more competitive bidding, such as by inducing a bid that otherwise would not have been made and without which bidding would have been limited." Id. at 537. Second, where the availability of bidding incentives induced a bidder to research the value of the debtor and submit a bid that serves as a minimum or floor bid on which other bidders can rely, "the bidder may have provided a benefit to the estate by increasing the likelihood that the price at which the debtor is sold will reflect its true worth." Id.

92.     The Bid Protections, including the Break-Up Fee and the Expense Reimbursement proposed by the Debtors, are consistent with the "business judgment rule" and satisfy the Third Circuit's "administrative expense" standard. The Stalking Horse Purchaser has expressly stated that it will not pursue the Stalking Horse Agreement absent approval of the Bid Protections. The Debtors, the Canadian Debtors, the Monitor and the Joint Administrators all agree that the Bid Protections are warranted to induce the Stalking Horse Purchaser to continue to participate in the auction process, and that without such protections, bidding on the Purchased Assets may be reduced or nonexistent.

93.     The Break-Up Fee payable under section 9.2 of the Stalking Horse Agreement and Section 15.5 of the EMEA Agreement is five million dollars and 00/100 ($5,000,000), which is equal to approximately two and one eighth percent (2.8%) of the estimated aggregate Purchase Price, after accounting for balance sheet and other adjustments currently estimated at approximately $100 million. The Expense Reimbursement shall not exceed five million dollars and 00/100 ($5,000,000), which is equal to approximately two and one eighth percent (2.8%) of the estimated aggregate Purchase Price, after accounting for balance sheet and other adjustments

currently estimated at approximately $100 million.  Under the Stalking Horse Agreement, the

Sellers, including the Debtors that are Sellers, are responsible for payment of two-thirds of these

amounts.  While the Bid Protections are slightly higher on a percentage basis than bid protections

requested in other prior sales in these cases, the actual dollar amounts are not unreasonable and is

smaller than many approved by bankruptcy courts in this District.  Bankruptcy Courts in this

District have approved break-up fees and expense reimbursements that constitute more than five

percent of the purchase price, particularly in transactions with relatively smaller purchase prices.

See, e.g., In re Chi-Chi's, Inc., Case No. 03-13063 (CGC) (Bankr. D. Del. Nov. 4, 2003) (court

approved break up fee of 5% or $200,000 in connection with a $4 million sale transaction); In re

America Classic Voyages Co., Case No. 01-10954 (EIK) (Bankr. D. Del. March 20, 2002) (court

approved break up fee of 6.6% or $250,000 in connection with a $3.75 million sale transaction);

see also In re Kaiser Aluminum Corp., Case No. 02-10429 (JFK) (Bankr. D. Del. June 21, 2004)

(court approved break up fee of 4.6% or $1.05 million in connection with a $23 million sale

transaction).  In fact, courts routinely consider the size of the transaction as a relevant factor in

determining appropriate bid protections.  See, e.g., In re 995 Fifth Ave. Assocs., 96 B.R. at 28.

The Debtors have concluded the $5 million Expense Reimbursement similarly is warranted

based on the specific facts at hand, including without limitation the length of negotiations

leading up to the Stalking Horse Agreement and the complexity of the transaction and

accordingly respectfully request permission to pay the Break-up Fee and Expense

Reimbursement in accordance with the termination of the Stalking Horse Agreement and that the

Debtors' obligations to make such payments to be accorded administrative expense status under

section 503(b) of the Bankruptcy Code.

## 2. The Incentive Fee

94.    In addition to the Bid Protections, the Sellers propose to pay to OEP, as equity sponsor for the Sale, an Incentive Fee of $3.6 million (of which $1.2 million would be payable by NNI, subject to further allocation under the Incentive Fee Letter). The payment of this fee is consistent with the Debtors' business judgment and justifiable as an administrative expense under section 503(b) of the Bankruptcy Code. OEP has expressly stated that it will not finance Stalking Horse Purchaser's bid for the Purchased Assets absent payment of the Incentive Fee. The Debtors have concluded that under the unique circumstances present in this transaction, payment of the Incentive Fee is necessary to induce the Stalking Horse Purchaser to continue to participate in the auction process, and to advance an auction process generally. The Stalking Horse Purchaser and OEP have provided value to the Debtors and their estates by performing due diligence regarding the Assets, engaging in a lengthy and thorough contract negotiation process and submitting a bid that will serve both as a minimum bid and a springboard for higher or better offers at auction. OEP has informed the Sellers that it already has expended substantial sums in connection with the pursuit of other potential transactions in these cases, and that it is unwilling to pursue this transaction without payment of the Incentive Fee to compensate it for such prior out of pocket costs.

95.    Under such circumstances, payment of the Incentive Fee is clearly warranted as a necessary and beneficial expense in the Debtors' cases under section 503(b) of the Bankruptcy Code, as well as under the Court's discretion under section 105(a) of the Bankruptcy Code. Here, the passage of time and the absence of stalking horse bidder would clearly erode the value that could be realized by creditors in a divestiture. Simply put, the Stalking Horse Agreement represents the best opportunity to quickly realize value from the Assets, and the payment of the Incentive Fee is necessary to secure funding for the proposed sale.

96.     The Debtors seek approval of their payment of the Incentive Fee as an actual and necessary cost of preserving the Debtors' estates, within the meaning of section 503(b) of the Bankruptcy Code, that would provide substantial benefit to the Debtors' estates and creditors and all parties in interest herein by securing the Stalking Horse Agreement and therefore is reasonable and appropriate under the circumstances.

**D.     The Stalking Horse Purchaser Should be Granted the Protection of Bankruptcy Code Section 363(m)**

97.     As will be set forth in further detail at the Sale Hearing, the Debtors also maintain that the Stalking Horse Purchaser is entitled to the protections afforded by Bankruptcy Code section 363(m).

98.     Specifically, Bankruptcy Code section 363(m) provides that:

> [t]he reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease of property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal.

11 U.S.C. § 363(m).

99.     While the Bankruptcy Code does not define "good faith," the Third Circuit in In re Abbotts Dairies of Pennsylvania, Inc., 788 F.2d 143 (3d Cir. 1986) has held that:

> [t]he requirement that a purchaser act in good faith . . . speaks to the integrity of his conduct in the course of the sale proceedings.  Typically, the misconduct that would destroy a purchaser's good faith status at a judicial sale involves fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders.

788 F.2d at 147 (citations omitted); see generally Marin v. Coated Sales, Inc., (In re Coated Sales, Inc.), Case No. 89-3704 (KMW), 1990 WL 212899 (S.D.N.Y. Dec. 13, 1990) (holding that party, to show lack of good faith, must demonstrate "fraud, collusion, or an attempt to take

grossly unfair advantage of other bidders"); see also In re Sasson Jeans, Inc., 90 B.R. 608, 610

(S.D.N.Y. 1988) (quoting In re Bel Air Assocs., Ltd., 706 F.2d 301, 305 (10th Cir. 1983)); In re

Pisces Leasing Corp., 66 B.R. 671, 673 (E.D.N.Y. 1986) (examining facts of each case,

concentrating on "integrity of [an actor's] conduct during the sale proceedings" (quoting In re

Rock Indus. Mach. Corp., 572 F.2d 1195, 1198 (7th Cir. 1978)).

100.    As the Debtors will demonstrate at the Sale Hearing, over the last weeks and

months, the Debtors have spent a considerable amount of time and resources negotiating the

Stalking Horse Agreement at arm's length, with give and take on both sides.  Under the

circumstances, this Court should find that the Stalking Horse Purchaser is entitled to all of the

protections of Bankruptcy Code section 363(m).

**E.      The Stalking Horse Agreement is Not the Subject of Collusive Bidding Under Bankruptcy Code Section 363(n)**

101.    As set forth above, the Debtors have been negotiating with the Stalking Horse

Purchaser at arm's length and in good faith regarding the sale of the Assets.  Moreover, the

Debtors do not believe that any such sale will be the result of collusion or other bad faith

between bidders or that the sale price under the Stalking Horse Agreement has been or will be

controlled by an agreement between potential or actual bidders within the meaning of

Bankruptcy Code section 363(n).

102.    As will be set forth in further detail at the Sale Hearing, the Stalking Horse

Agreement with the Stalking Horse Purchaser has been negotiated, proposed, and entered into by

the Debtors and the Stalking Horse Purchaser without collusion, in good faith, and from arm's-

length bargaining positions.  Neither the Debtors nor the Stalking Horse Purchaser have engaged

in any conduct that would cause or permit the Stalking Horse Agreement to be avoided under

Bankruptcy Code section 363(n).

**F.      Privacy Ombudsman**

103.    Under section 363(b)(1) of the Bankruptcy Code, if the sale of a consumer

customer list containing personal information relating to individual persons is inconsistent with

the Debtors' consumer privacy policy, section 332 governs the appointment of a consumer

privacy ombudsman.  11 U.S.C. § 363(b)(1).  Here, none of the Debtors' customers that are

subject to the sale of the Assets are individuals, and the Debtors do not have a consumer privacy

policy, so section 363(b)(1) does not apply, and a consumer privacy ombudsman is not required.

**G.      Sale of the Assets Should Be Free and Clear of Liens, Claims and Interests**

104.    Pursuant to section 363(f) of the Bankruptcy Code, the Debtors seek authority to

sell and transfer the Debtors' right, interest and title in the Assets to the Stalking Horse Purchaser

or Successful Bidder free and clear of all Claims and Interests, except as set forth in the Stalking

Horse Agreement, with such Claims and Interests to attach to the proceeds of the sale of the

Assets, subject to any rights and defenses of the Debtors and other parties in interest with respect

thereto.  Section 363(f) of the Bankruptcy Code provides, in pertinent part:

> The trustee may sell property under subsection (b) or (c) of this
> section free and clear of any interest in such property of an entity
> other than the estate, only if –
>
> (1)      applicable nonbankruptcy law permits sale of such property
> free and clear of such interest;
>
> (2)      such entity consents;
>
> (3)      such interest is a lien and the price at which such property
> is to be sold is greater than the aggregate value of all liens on such
> property;
>
> (4)      such interest is in bona fide dispute; or
>
> (5)      such entity could be compelled, in a legal or equitable
> proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f).  See also In re Elliot, 94 B.R. 343, 345 (E.D. Pa. 1988) (holding that section

363(f) written in disjunctive; court may approve sale "free and clear" provided at least one of the requirements is met).

105.    With respect to each creditor asserting an Interest, one or more of the standards set forth in Bankruptcy Code § 363(f)(1)-(5) has been satisfied. Those holders of Claims and Interests who did not object or who withdrew their objections to the Sale or the Motion are deemed to have consented to the Motion and Sale pursuant to Bankruptcy Code § 363(f)(2). Those holders of Claims and Interests who did object fall within one or more of the other subsections of Bankruptcy Code section 363(f).

106.    A sale free and clear of Claims and Interests is necessary to maximize the value of the Assets. The Stalking Horse Purchaser would not have entered into the Stalking Horse Agreement and would not consummate the Sale if the sale of the Assets to the Stalking Horse Purchaser were not free and clear of all Claims and Interests (as defined herein), or if the Stalking Horse Purchaser would, or in the future could, be liable for any of such Interest. A sale of the Assets other than one free and clear of all Claims and Interests would yield substantially less value for the Debtors' estates, with less certainty than the proposed Sale. Therefore, the Sale contemplated by the Stalking Horse Agreement is in the best interests of the Debtors, their estates and creditors, and all other parties in interest. A sale free and clear of Claims and Interests is particularly appropriate under the circumstances because any lien or claim in, to or against the Debtors' right, interest and title in the Assets that exists immediately prior to the closing of any sales will attach to the sale proceeds allocated to the Debtors with the same validity, priority, force and effect as it had at such time, subject to the rights and defenses of the Debtors or any party in interest. The Debtors submit that holders of Claims and Interests, if any, will be adequately protected by the availability of the proceeds of the sale to satisfy their Claims

49

and Interests.

**H.    Notice of the Proposed Sale Is Reasonable Under the Circumstances**

107.    The Debtors submit that the Sale Notice as set forth above, along with the

Publication Notice in The Wall Street Journal (National Edition) and The Globe & Mail

(National Edition), and The Financial Times (International Edition) is appropriate and reasonably

calculated to provide all interested parties with timely and proper notice of the Bidding

Procedures, the Auction (if necessary) and the Sale Hearing.

**I.    The Assumption and Assignment of the Assumed and Assigned Contracts Should Be Authorized**

108.    Under Bankruptcy Code section 365(a), a debtor, "subject to the court's approval,

may assume or reject any executory contract or unexpired lease of the debtor." 11 U.S.C.

§ 365(a).  Bankruptcy Code section 365(b)(1), in turn, codifies the requirements for assuming an

executory contract of a debtor.  This subsection provides:

> (b) (1)    If there has been a default in an executory contract or unexpired lease of the debtor, the trustee may not assume such contract or lease unless, at the time of assumption of such contract or lease, the trustee -
>
> (A)    cures, or provides adequate assurance that the trustee will promptly cure, such default . . . ;
>
> (B)    compensates, or provides adequate assurance that the trustee will promptly compensate, a party other than the debtor to such contract or lease, for any actual pecuniary loss to such party resulting from such default; and
>
> (C)    provides adequate assurance of future performance under such contract or lease.

11 U.S.C. § 365(b)(1).  Section 365(f)(2) of the Bankruptcy Code provides, in pertinent part,

that:

> The trustee may assign an executory contract or unexpired lease of

the debtor only if --

> (A)    the trustee assumes such contract or lease in accordance with the provisions of this section; and

> (B)    adequate assurance of future performance by the assignee of such contract or lease is provided, whether or not there has been a default in such contract or lease.

11 U.S.C. § 365(f)(2).

109.    The meaning of "adequate assurance of future performance" depends on the facts and circumstances of each case, but should be given "practical, pragmatic construction." EBG Midtown S. Corp. v. McLaren/Hart Envtl. Eng'g Corp. (In re Sanshoe Worldwide Corp.), 139 B.R. 585, 593 (S.D.N.Y. 1992).

110.    Among other things, adequate assurance may be provided by demonstrating the assignee's financial health and experience in managing the type of enterprise or property assigned. See, e.g., In re Bygaph, Inc., 56 B.R. 596, 605-06 (Bankr. S.D.N.Y. 1986) (finding adequate assurance of future performance present when prospective assignee of lease from debtor has financial resources and has expressed willingness to devote sufficient funding to business in order to give it strong likelihood of succeeding).

111.    To the extent any defaults exist under any Assumed and Assigned Contracts, any such default will be promptly cured or adequate assurance that such default will be cured will be provided prior to the assumption and assignment.  If necessary, the Debtors will submit facts prior to or at the Sale Hearing to show the financial credibility of the Stalking Horse Purchaser or Successful Bidder and willingness and ability to perform under the Assumed and Assigned Contracts.  The Sale Hearing will therefore provide the Court and other interested parties the opportunity to evaluate and, if necessary, challenge the ability of the Stalking Horse Purchaser to provide adequate assurance of future performance under the Assumed and Assigned Contracts,

as required under section 365(b)(1)(C) of the Bankruptcy Code.

112.    In addition, the Debtors submit that it is an exercise of their sound business judgment to assume and assign the Assumed and Assigned Contracts to the Stalking Horse Purchaser in connection with the consummation of the Sale, and the assumption, assignment, and sale of Assumed and Assigned Contracts is in the best interests of the Debtors, their estates, their creditors, and all parties in interest.  The Assumed and Assigned Contracts being assigned to the Stalking Horse Purchaser are an integral part of the Assets being purchased by the Stalking Horse Purchaser, and accordingly, such assumption, assignment, and sale of Assumed and Assigned Contracts are reasonable and enhance the value of the Debtors' estates.  The Court should therefore authorize the Debtors to assume and assign the Assumed and Assigned Contracts as set forth herein.

**J.    Information Regarding the Debtors' Customers Is Confidential Commercial Information and Should Be Filed Under Seal**

113.    The Debtors propose to file the lists of Customer Contracts, including the Master Assumption Notice and any Supplemental Master Assumption Notice, to be assumed and assigned under seal and to serve individualized notices of the assignment to the relevant Counterparties.

114.    The relief requested by the Debtors is squarely authorized under the Bankruptcy Code.  Section 107(b) of the Bankruptcy Code provides bankruptcy courts with the power to issue orders to protect a party's confidential, commercial or proprietary information:

> On request of a party in interest, the bankruptcy court shall . . .
> protect an entity with respect to a trade secret or confidential
> research, development, or commercial information. . . .

11 U.S.C. § 107(b).

115.    Furthermore, Bankruptcy Rule 9018 defines the procedure by which a party may

move for relief under section 107(b) of the Bankruptcy Code:

> On motion or on its own initiative, with or without notice, the court may make any order which justice requires . . . to protect the estate or any entity in respect of a trade secret or other confidential research, development, or commercial information . . . .

Fed. R. Bankr. P. 9018.

116.    This Court has defined "commercial information" in the context of section 107(b) as follows:

> Commercial information is information which would result in 'an unfair advantage to competitors by providing them information as to the commercial operations of the debtor.'

In re Alterra Healthcare Corp., 353 B.R. 66, 75-76 (Bankr. D. Del. 2006) (citing In re Orion Pictures Corp., 21 F.3d 24, 27-28 (2d Cir. 1994)).  This Court has also explained that section 107(b)'s exception to usual public disclosure mandated by section 107(a) is "intended to avoid 'affording an unfair advantage to competitors by providing them information as to the commercial operations of the debtor.'"  In re MUMA Services Inc., 279 B.R. 478, 484 (Bankr. D. Del. 2002) (citing In re Itel Corp., 17 B.R. 942, 944 (B.A.P. 9th Cir. 1982)).

117.    Since information related to the Customer Contracts is "commercial information" within the ambit of section 107, the Court should enter an order permitting the Debtors to file under seal all confidential information related to the Customer Contracts.

118.    The identities of Customer Counterparties constitute confidential commercial information because they represent a significant aspect of the value of the CVAS Business and the Assets.  Access to the list of Customer Counterparties absent appropriate confidentiality restrictions would entail releasing confidential information of critical value not only to any prospective purchaser of the Customer Contracts but also to the Debtors' other businesses.  Therefore, it is critical to the preservation of the value of the Debtors' estate that the Court allow

for this confidential information to be filed under seal.

119.    As such, the Debtors respectfully submit that the Court should permit the Debtors to file documents listing the names and addresses of such parties under seal including the Master Assumption Notice, any Supplemental Master Assumption Notices and certificates of service.

### K.    Filing of Schedules Under Seal

120.    The Debtors respectfully submit that it is appropriate to allow the disclosure schedules and all exhibits and schedules to the Stalking Horse Agreement as well as any subsequent sale agreement with the Stalking Horse Purchaser or any Successful Bidder or Alternate Bidder (the "Schedules") be filed under seal.  The Schedules contain substantial sensitive commercial information concerning the Debtors' business, software, intellectual property and related documentation.  Disclosure of this confidential commercial information would be damaging to the Debtors and any Successful Bidder or Alternate Bidder if it is disclosed to their competitors.  The filing of the Schedules to the Stalking Horse Agreement and any subsequent sale agreement under seal is in the best interests of the Debtors and their estates, creditors, and interest holders and all other parties in interest herein.

### L.    Waiver of Bankruptcy Rule 6006(f)(6) with Respect to the Assumed and Assigned Contracts

121.    Bankruptcy Rule 6006(f)(6) requires that an omnibus motion to reject, assume or assign multiple executory contracts or unexpired leases "be limited to no more than 100 executory contracts or unexpired leases."  With regards to the Assumed and Assigned Contracts, the Debtors request that the Court waive the provision in Bankruptcy Rule 6006(f)(6) limiting the number of executory contracts and unexpired leases that may be incorporated into one omnibus motion.  Rule 6006(f)(6) seeks "to help the other parties to the contracts locate their information in the midst of the omnibus motion."  10 Collier on

Bankruptcy ¶ 6006.05 (15th ed. 1999).  Because the Debtors propose to send an individual notice to each Counterparty, the purpose of the rule will be satisfied without needlessly filing multiple motions with the Court.

**M.**     **Waiver of Automatic Fourteen-Day Stay Under Bankruptcy Rules 6004(h) and 6006(d)**

122.     Pursuant to Bankruptcy Rule 6004(h), unless the Court orders otherwise, all orders authorizing the sale of property pursuant to section 363 of the Bankruptcy Code are automatically stayed for fourteen days after entry of the order.  Similarly, under Bankruptcy Rule 6006(d), unless the Court orders otherwise, all orders authorizing the assignment of contracts or unexpired leases are automatically stayed for fourteen days after entry of the order.  The purpose of Bankruptcy Rules 6004(h) and 6006(d) is to provide sufficient time for an objecting party to request a stay pending appeal before the order can be implemented.  See Advisory Committee Notes to Fed. R. Bankr. P. 6004(h); Advisory Committee Notes to Fed. R. Bankr. P. 6006(d).

123.     Although Bankruptcy Rules 6004(h) and 6006(d) and the Advisory Committee Notes are silent as to when a court should "order otherwise" and eliminate or reduce the 14-day stay period, commentators agree that the 14-day stay period should be eliminated to allow a sale or other transaction to close immediately where there has been no objection to the procedure. See generally 10 Collier on Bankruptcy ¶ 6004.09 (15th ed. 1999).  Furthermore, if an objection is filed and overruled, and the objecting party informs the court of its intent to appeal, the stay may be reduced to the amount of time necessary to file such appeal.  Id.

124.     Pursuant to the Stalking Horse Agreement, and because of the potentially diminishing value of the Assets, the Debtors must close this sale promptly after all closing conditions have been met or waived.  Thus, waiver of any applicable stays is appropriate in this circumstance.

## Notice

125.     Notice of the Motion has been given via first-class mail, facsimile, electronic transmission, hand delivery or overnight mail to (i) counsel to the Stalking Horse Purchaser; (ii) the Office of the U.S. Trustee; (iii) the Monitor; (iv) counsel to the Committee; (v) counsel to the Bondholder Group; and (vi) the general service list established in these chapter 11 cases pursuant to Bankruptcy Rule 2002.  The Debtors submit that under the circumstances no other or further notice is necessary.

## No Prior Request

126.     No prior request for the relief sought herein has been made to this or any other court.

WHEREFORE, the Debtors respectfully request that this Court (i) grant this Motion and the relief requested herein; (ii) enter the proposed order attached hereto; and (iii) grant such other and further relief as it deems just and proper.

Dated:  December 23, 2009　　　　　　CLEARY GOTTLIEB STEEN & HAMILTON LLP
       Wilmington, Delaware

                                      James L. Bromley (No. 5125)
                                      Lisa M. Schweitzer (No. 1033)
                                      One Liberty Plaza
                                      New York, New York 10006
                                      Telephone:  (212) 225-2000
                                      Facsimile:  (212) 225-3999

                                          - and -

                                    MORRIS, NICHOLS, ARSHT & TUNNELL LLP

                                    _____
                                    Derek C. Abbott (No. 3376)
                                    Eric D. Schwartz (No. 3134)
                                    Ann C. Cordo (No. 4817)
                                    Andrew R. Remming (No. 5120)
                                    1201 North Market Street
                                    P.O. Box 1347
                                    Wilmington, Delaware 19801
                                    Telephone:  (302) 658-9200
                                    Facsimile: (302) 658-3989

                                    *Counsel for the Debtors*
                                    *and Debtors in Possession*