## Exhibit A

**Stalking Horse Agreement**

**EXECUTION VERSION**

---

## ASSET SALE AGREEMENT

### BY AND AMONG

### NORTEL NETWORKS CORPORATION

### NORTEL NETWORKS LIMITED

### NORTEL NETWORKS INC.

AND

### THE OTHER ENTITIES IDENTIFIED HEREIN AS SELLERS

AND

### GENBAND INC.

**DATED AS OF December 22, 2009**

# TABLE OF CONTENTS

Page

**ARTICLE I INTERPRETATION** .................................................................................3

Section 1.1.    Definitions.................................................................................3
Section 1.2.    Interpretation...........................................................................34
1.2.1.    Gender and Number.................................................................34
1.2.2.    Certain Phrases and Calculation of Time....................................34
1.2.3.    Headings, etc...........................................................................34
1.2.4.    Currency..................................................................................34
1.2.5.    Statutory References ...............................................................35

**ARTICLE II PURCHASE AND SALE OF ASSETS**.......................................................**35**

Section 2.1.    Purchase and Sale. ....................................................................35
2.1.1.    Assets 35
2.1.2.    Excluded Assets.........................................................................36
2.1.3.    Assumed Liabilities ...................................................................38
2.1.4.    Excluded Liabilities ..................................................................40
2.1.5.    Assumption and/or Assignment or Rejection of 365 Contracts and Assumption and Sublease and/or License of 365 Real Estate Leases ......................................................................................42
2.1.6.    Assignment of Non-365 Contracts and Sublease or License of Non-365 Real Estate Leases. ......................................................43
2.1.7.    Cure Costs; Adequate Assurance; Efforts....................................44
2.1.8.    Local Sale Agreements ..............................................................45
2.1.9.    EMEA Asset Sale Agreement.....................................................45
2.1.10.   Non-Assignable Assets ..............................................................45
Section 2.2.    Purchase Price. .........................................................................46
2.2.1.    Purchase Price. .........................................................................46
2.2.2.    Estimated Purchase Price. ..........................................................46
2.2.3.    Purchase Price Adjustment. ........................................................48
2.2.4.    Reserved...................................................................................50
2.2.5.    Good Faith Deposit....................................................................50
Section 2.3.    Escrow.....................................................................................51
Section 2.4.    Closing. ...................................................................................51
2.4.1.    Closing Date..............................................................................51
2.4.2.    Closing Actions and Deliveries ..................................................51
Section 2.5.    Designated Purchaser(s)............................................................53

**ARTICLE III REPRESENTATIONS AND WARRANTIES OF THE PURCHASER** .......**53**

Section 3.1.    Organization and Corporate Power..............................................54
Section 3.2.    Authorization; Binding Effect; No Breach. ..................................54
Section 3.3.    Financing..................................................................................55
Section 3.4.    Purchaser Financial Statements ..................................................55
Section 3.5.    Adequate Assurance of Future Performance .................................56

i

Section 3.6.    Purchaser's Acknowledgments; Exclusivity of Representations and
                Warranties ...................................................................................56
Section 3.7.    Brokers. ...........................................................................................58

**ARTICLE IV REPRESENTATIONS AND WARRANTIES OF THE SELLERS .............58**

Section 4.1.    Organization and Corporate Power. ...............................................58
Section 4.2.    Authorization; Binding Effect; No Breach. ...................................58
Section 4.3.    Title to Tangible Assets; Sufficiency of Assets. ...........................59
Section 4.4.    Material Contracts. .........................................................................60
Section 4.5.    Intellectual Property. ......................................................................61
Section 4.6.    Litigation. ........................................................................................64
Section 4.7.    Financial Statements. ......................................................................65
Section 4.8.    Compliance with Laws; Consents. .................................................66
Section 4.9.    Real Property. ..................................................................................66
Section 4.10.   Environmental Matters. ..................................................................67
Section 4.11.   Labor and Employee Benefits Matters. ..........................................68
Section 4.12.   Taxes. ...............................................................................................70
Section 4.13.   Brokers .............................................................................................71
Section 4.14.   Cultural Business ............................................................................72
Section 4.15.   Representations and Warranties by the Other Sellers. ...................72
      4.15.1.   Organization and Corporate Power. ...............................................72
      4.15.2.   Authorization; Binding Effect; No Breach. ...................................72

**ARTICLE V COVENANTS AND OTHER AGREEMENTS ..................................................73**

Section 5.1.    U.S. Bankruptcy Actions ................................................................73
Section 5.2.    Canadian Bankruptcy Actions. ......................................................74
      5.2.1.    Canadian Sales Process Order .......................................................74
      5.2.2.    Canadian Approval and Vesting Order. ..........................................74
      5.2.3.    Additional Requests .......................................................................75
Section 5.3.    Consultation; Notification. .............................................................75
Section 5.4.    Pre-Closing Cooperation. ...............................................................76
Section 5.5.    Antitrust and Other Regulatory Approvals. ....................................77
Section 5.6.    Pre-Closing Access to Information. ................................................80
Section 5.7.    Public Announcements. ...................................................................82
Section 5.8.    Further Actions ................................................................................83
Section 5.9.    Conduct of Business .......................................................................83
Section 5.10.   Transaction Expenses. .....................................................................85
Section 5.11.   Confidentiality. ...............................................................................85
Section 5.12.   Certain Payments or Instruments Received from Third Parties. ....86
Section 5.13.   Non-Assignable Contracts. .............................................................87
Section 5.14.   Bundled Contracts. ..........................................................................88
Section 5.15.   Post-Closing Assistance for Litigation. ..........................................90
Section 5.16.   Delivery of Assets. ..........................................................................91
Section 5.17.   Termination of Overhead and Shared Services and French
                Company Licenses. ..........................................................................91

ii

Section 5.18.  Financing.................................................................................92
Section 5.19.  Insurance Matters.....................................................................93
Section 5.20.  Deposits, Guarantees and Other Credit Support of the Business...............94
Section 5.21.  Use of Trademarks....................................................................94
Section 5.22.  Maintenance of Books and Records. ............................................95
Section 5.23.  Certain Ancillary Agreements. ..................................................96
Section 5.24.  Closing Unaudited Financial Statements .....................................97
Section 5.25.  Closing Audited Financial Statements.........................................98
Section 5.26.  Additional Bankruptcy Proceedings; Adverse International
               Injunctions...............................................................................98
Section 5.27.  Transition Services Agreement...................................................99
Section 5.28.  Avoidance Actions....................................................................99
Section 5.29.  Competing Transaction ............................................................99
Section 5.30.  Purchaser Financial Statements ...............................................100
Section 5.31.  Subleases...............................................................................101
Section 5.32.  Direct Leases..........................................................................101
Section 5.33.  Licenses.................................................................................101

**ARTICLE VI TAX MATTERS...............................................................101**

Section 6.1.   Transfer Taxes. .......................................................................101
Section 6.2.   Withholding Taxes...................................................................102
Section 6.3.   Tax Characterization of Payments Under This Agreement ...................103
Section 6.4.   Apportionment of Taxes. ..........................................................103
Section 6.5.   Records .................................................................................103
Section 6.6.   Tax Disclosure ........................................................................105
Section 6.7.   Tax Returns.............................................................................105
Section 6.8.   Canadian Tax Matters...............................................................107
Section 6.9.   Purchase Price Allocation. .........................................................107
Section 6.10.  Other Tax Matters ...................................................................108
Section 6.11.  North American Tax Escrow ......................................................109

**ARTICLE VII EMPLOYMENT MATTERS ...........................................111**

Section 7.1.   Employment Obligations with Respect to Non-Union Employees .........111
  7.1.1.       Employment Terms...................................................................111
  7.1.2.       Employee Benefits...................................................................114
Section 7.2.   Employment Obligations with Respect to Union Employees.................117
Section 7.3.   Excluded Employee Liabilities....................................................118
Section 7.4.   Other Employee Covenants. ......................................................118
Section 7.5.   Canadian Pension Plans. ...........................................................121
Section 7.6.   Sole Benefit of the Sellers and the Purchaser ...............................123

**ARTICLE VIII CONDITIONS TO THE CLOSING ...............................124**

Section 8.1.   Conditions to Each Party's Obligation .........................................124
Section 8.2.   Conditions to Sellers' Obligation................................................125
Section 8.3.   Conditions to Purchaser's Obligation ..........................................125

iii

**ARTICLE IX TERMINATION** ...............................................................................**126**

    Section 9.1.    Termination...................................................................126
    Section 9.2.    Expense Reimbursement and Break-Up Fee. ..........................128
    Section 9.3.    Effects of Termination ...............................................129

**ARTICLE X MISCELLANEOUS** .........................................................................**130**

    Section 10.1.   No Survival of Representations and Warranties or Covenants...............130
    Section 10.2.   Remedies...................................................................130
    Section 10.3.   No Third Party Beneficiaries ............................................130
    Section 10.4.   Consent to Amendments; Waivers.......................................130
    Section 10.5.   Successors and Assigns..................................................131
    Section 10.6.   Governing Law; Submission to Jurisdiction; Waiver of Jury Trial.........131
    Section 10.7.   Notices ...................................................................133
    Section 10.8.   Exhibits; Sellers Disclosure Schedule. ..................................135
    Section 10.9.   Counterparts..............................................................135
    Section 10.10. No Presumption .........................................................135
    Section 10.11. Severability ............................................................135
    Section 10.12. Entire Agreement........................................................136
    Section 10.13. Availability of Equitable Relief; Sole Remedy .........................136
    Section 10.14. Bulk Sales Laws.........................................................137
    Section 10.15. Main Sellers as Representatives of Other Sellers. ....................137
    Section 10.16. Execution by Other Sellers .............................................137
    Section 10.17. Obligations of the Sellers...............................................138

**EXHIBITS**

Exhibit A – Other Sellers

Exhibit B – EMEA Sellers

Exhibit C – Canadian Debtors; U.S. Debtors; EMEA Debtors; Israeli Companies; Non-Debtor Sellers

Exhibit D – EMEA Asset Sale Agreement

Exhibit E – Adjusted Net Working Capital Statement

Exhibit F – Contract Manufacturing Inventory Agreements Term Sheet

Exhibit G – [Reserved]

Exhibit H – Form of Intellectual Property License Agreement

Exhibit I – Knowledge of the Purchaser

Exhibit J – Form of Loaned Employee Agreement

Exhibit K – Mandatory Antitrust Approvals - Relevant Antitrust Authorities

Exhibit L – Other Seller Revenue

Exhibit M – Real Estate Terms and Conditions

Exhibit N – Form of Trademark License Agreement

Exhibit O – Form of Transition Services Agreement

Exhibit 3.3(a) – Commitment Letter

Exhibit 5.1(a) – Form of U.S. Bidding Procedures Order

Exhibit 5.1(b) – Form of U.S. Sale Order

Exhibit 5.2.1 – Form of Canadian Sales Process Order

Exhibit 5.2.2 – Form of Canadian Approval and Vesting Order

Exhibit 5.4(a) – Form of Letter

Exhibit 5.4(c) – Form of Notice to Microsoft Corporation

Exhibit 5.4(d) – Cross-Licenses for Spin-Out

v

Exhibit 5.7 – Permitted Disclosures and Announcements

Exhibit 5.15(c) – Cross-Licenses for Assignment

Exhibit 5.23  –  Interdependencies in the CVAS Business

Exhibit 5.27 –Transition Services Agreement

## ASSET SALE AGREEMENT

This Asset Sale Agreement is dated as of December 22, 2009, among Nortel Networks Corporation, a corporation organized under the laws of Canada ("**NNC**"), Nortel Networks Limited, a corporation organized under the laws of Canada ("**NNL**"), Nortel Networks Inc., a corporation organized under the laws of Delaware ("**NNI**" and, together with NNC and NNL, the "**Main Sellers**"), the Other Sellers (as defined below) (the Other Sellers, together with the Main Sellers, the "**Sellers**") and GENBAND Inc., a corporation organized under the laws of Delaware (the "**Purchaser**").

## W I T N E S S E T H:

WHEREAS, the Sellers and the affiliates of the Main Sellers listed in Exhibit B hereto (the "**EMEA Sellers**"), beneficially own and operate the Business (as defined below);

WHEREAS, on the Petition Date (as defined herein), NNC, NNL and the Other Sellers listed in part 1 of Exhibit C hereto (together, the "**Canadian Debtors**") filed with the Canadian Court (as defined below) an application for protection under the Companies' Creditors Arrangement Act (the "**CCAA**") (the proceedings commenced by such application, the "**CCAA Cases**") and were granted certain initial creditor protection pursuant to an order issued by the Canadian Court on the same date, which also appointed Ernst & Young Inc. as "Monitor" in connection with the CCAA Cases and has been extended by further order of the Canadian Court from time to time, most recently on December 18, 2009, as the same may be amended and restated from time to time by the Canadian Court;

WHEREAS, NNI and the Other Sellers listed in part 2 of Exhibit C hereto (the "**U.S. Debtors**") are debtors-in-possession under the U.S. Bankruptcy Code (as defined below) having commenced cases under Chapter 11 of the U.S. Bankruptcy Code on the Petition Date by filing voluntary petitions for relief in the U.S. Bankruptcy Court for the District of Delaware (the "**Chapter 11 Cases**");

WHEREAS, the entities listed under the heading "EMEA Debtors" in part 3 of Exhibit C hereto (the "**EMEA Debtors**") on the Petition Date filed applications with the English Court (as defined below), pursuant to the Insolvency Act of 1986, as amended (the "**Insolvency Act**") and the European Union's Council Regulation (EC) No 1346/2000 on Insolvency Proceedings (the proceedings commenced by such applications, the "**EMEA Cases**") and the English Court appointed Alan Bloom, Stephen Harris, Christopher Hill and Alan Hudson of Ernst & Young LLP as joint administrators of all the EMEA Debtors (other than Nortel Networks (Ireland) Limited, for which David Hughes of Ernst & Young Chartered Accountants and Alan Bloom serve as joint administrators) (the "**Joint Administrators**") under the Insolvency Act;

WHEREAS, the entities listed under the heading "Israeli Companies" in part 4 of Exhibit C hereto (the "**Israeli Companies**") on January 18, 2009 filed applications with the Tel-Aviv-Jaffa District Court (the "**Israeli Court**"), pursuant to the Israeli Companies Law, 1999, and the regulations relating thereto (collectively, the "**Israeli Companies Law**") for a stay of proceedings, and the Israeli Court appointed Yaron Har-Zvi and Avi D. Pelossof (the "**Joint**

1

**Israeli Administrators**") on January 19, 2009, as joint administrators of the Israeli Companies under the Israeli Companies Law;

WHEREAS, the Other Sellers listed in part 4 of Exhibit C hereto (the "**Non-Debtor Sellers**") are not subject to any Bankruptcy Proceedings (as defined below) as of the date hereof;

WHEREAS, the Sellers have agreed to transfer to the Purchaser and/or the Designated Purchasers (as defined below), and the Purchaser has agreed to purchase and assume, and cause the Designated Purchasers to purchase and assume, including, to the extent applicable, pursuant to Sections 363 and 365 of the U.S. Bankruptcy Code and pursuant to the Canadian Approval and Vesting Order, the Assets and the Assumed Liabilities (each as defined below) from the Sellers, upon the terms and conditions set forth hereinafter;

WHEREAS, simultaneously with the execution of this Agreement, the EMEA Sellers, the Joint Administrators, the Joint Israeli Administrators and the Purchaser are entering into a separate agreement in the form set forth in Exhibit D hereto (the "**EMEA Asset Sale Agreement**") providing for the sale to the Purchaser (and/or the EMEA Designated Purchasers (as defined therein)) of the assets of the Business held by the EMEA Sellers;

WHEREAS, the Parties (as defined below) acknowledge and agree that the purchase by the Purchaser (and the Designated Purchasers, if any) of the Assets and the EMEA Assets (as defined below), the license of Intellectual Property under the Intellectual Property License Agreement and the Trademark License Agreement (each as defined below), and the assumption by the Purchaser and the Designated Purchasers of the Assumed Liabilities and the EMEA Assumed Liabilities (as defined below) are being made at arm's length and in good faith and without intent to hinder, delay or defraud creditors of the Sellers and their Affiliates, and each Seller acknowledges that the consideration to be paid is fair value and reasonably equivalent value for the acquisitions by the Purchaser and the Designated Purchasers of the Assets and the EMEA Assets, the license of Intellectual Property under the Intellectual Property License Agreement and the Trademark License Agreement and the assumption by the Purchaser and the Designated Purchasers of the Assumed Liabilities and the EMEA Assumed Liabilities, as set forth hereunder and in the EMEA Asset Sale Agreement; and

WHEREAS, in addition, at the Closing, the Purchaser, certain Sellers (or Affiliates of the Sellers) and certain EMEA Sellers are entering into the following ancillary agreements:  (i) the Local Sale Agreements, (ii) the Intellectual Property License Agreement, (iii) the Transition Services Agreement, (iv) the Trademark License Agreement, (v) the Loaned Employee Agreement and the Purchaser will use its commercially reasonable efforts to negotiate in good faith and enter into the following agreements with the applicable parties thereto:  (vi) specified development and supply agreements with respect to interdependencies of the Business as contemplated in Section 5.23, (vii) the Subcontract Agreement, (viii) the Contract Manufacturing Inventory Agreements, (ix) the LGN Distribution Agreement and (x) the NN Turkey Agreements (together, the "**Ancillary Agreements**").

NOW, THEREFORE, in consideration of the respective covenants, representations and warranties made herein, and of the mutual benefits to be derived hereby (the sufficiency of which is acknowledged), the Parties agree as follows:

## ARTICLE I

## INTERPRETATION

Section 1.1.    Definitions.  Capitalized terms used but not otherwise defined herein shall have the meanings set forth below:

"**Accounting Arbitrator**" has the meaning set forth in Section 2.2.3.1(c).

"**Accrued Vacation Amount**" means the amount of compensation with respect to the accrued and unused vacation with respect to each Specified Transferred Employee (including all Taxes required to be withheld on behalf of the applicable Specified Transferred Employee by his or her respective employer) calculated by taking, with respect to each such employee an amount equal to (i) the product of (A) a number (not less than zero) of such employee's accrued and unused vacation hours as of the Closing Date as set forth on Section 7.1.2(c)(iii) of the Sellers Disclosure Schedule of this Agreement for Specified Transferred Employees and (B) such employee's hourly rate of pay (with such hourly rate of pay derived by dividing such employee's annual base salary set forth on Section 4.11(b) of the Sellers Disclosure Schedule by the number of standard work hours per year for such employee).

"**Action**" means any litigation, action, hearing, investigation, suit (whether civil, criminal or administrative), charge, binding arbitration, Tax audit or other legal, administrative or judicial proceeding.

"**Additional Bankruptcy Proceeding**" has the meaning set forth in Section 5.26(a).

"**Additional Employees**" has the meaning set forth in Section 7.1.1(a).

"**Adjusted Net Working Capital**" has the meaning set forth in Section 2.2.2(c).

"**Adjusted Net Working Capital Statement**" means the statement of certain specified asset and liability accounts and certain accounting principles, methodologies and policies used in the determination of such accounts in the form provided in Exhibit E hereto.

"**Adverse International Injunction**" has the meaning set forth in Section 5.26(a).

"**Affiliate**" means, as to any Person, any other Person that directly or indirectly through one or more intermediaries Controls, or is under common Control with, or is Controlled by, such Person; provided, that (i) no EMEA Seller or Subsidiary of an EMEA Seller (other than those Subsidiaries that are Sellers hereunder) shall be deemed an Affiliate of any Seller, and (ii) no joint venture listed in Section 1.1(a) of the Sellers Disclosure Schedule shall be deemed an Affiliate of any Seller.

"**Aggregate Escrow Amount**" means the aggregate of the Purchase Price Escrow Amount, the TSA Escrow Amount, the Tax Escrow Amount and the EMEA Tax Escrow Amount.

3

"**Agreement**" means this Asset Sale Agreement, the Sellers Disclosure Schedule and all Exhibits and Schedules attached hereto and thereto and all amendments hereto and thereto made in accordance with Section 10.4.

"**Alternative Bidder**" has the meaning set forth in the Bidding Procedures.

"**Alternative Transaction**" means (A) the sale, transfer or other disposition, directly or indirectly, including through an asset sale, stock sale, merger, amalgamation, plan of arrangement or other similar transaction, of all or a substantial portion of the Business or all or a substantial portion of the Assets and the EMEA Assets, considered as a whole, in a transaction or a series of transactions (x) with one or more Persons other than the Purchaser and/or its Affiliates or (y) with a Successful Bidder, and other than the Purchaser, which may include multiple bidders whose bids are combined or (B) the retention by all or part of the Sellers (or their successor entities emerging from the Bankruptcy Proceedings) of all or a majority of the Business, or all or a majority of the Assets and the EMEA Assets taken as a whole, pursuant to a plan of reorganization under Section 1129 of the Bankruptcy Code filed or otherwise sponsored by one or more third-party creditors of the Sellers pursuant to which all or a majority of the reorganized entity or its assets is acquired by one or more Persons (other than the third-party creditors or the Purchaser and/or the Purchaser's Affiliates) in a transaction announced prior to such reorganization or within six (6) months of such reorganization, rather than being retained by the creditors generally, provided, however, that an "Alternative Transaction" shall not include (i) except as specified in clause (B) above, the retention of all or any portion of the Business, the Assets or the EMEA Assets by all or part of the Sellers (or their successor entities emerging from the Bankruptcy Proceedings) under a standalone plan of reorganization or plan of arrangement approved by the U.S. Bankruptcy Court or another Bankruptcy Court or any plan of arrangement approved by the Canadian Court, or (ii) the sale, transfer or other disposition, directly or indirectly, of any portion of the Business, the Assets or the EMEA Assets (other than as a going concern) in connection with the closure, liquidation or winding up of the Business or any of the Sellers.

"**Ancillary Agreements**" has the meaning set forth in the recitals to this Agreement.

"**Antitrust Approvals**" means the HSR Approval, the Competition Act Approval and the Mandatory Antitrust Approvals.

"**Antitrust Laws**" means the Competition Act, the HSR Act, and any competition, merger control and antitrust Law of the European Union, any applicable European Union member states and EFTA states, and any other applicable supranational, national, federal, state, provincial or local Law designed or intended to prohibit, restrict or regulate actions having the purpose or effect of monopolizing or restraining trade or lessening competition of any other country or jurisdiction, to the extent applicable to the transactions contemplated by this Agreement or by the EMEA Asset Sale Agreement.

"**ARD Transferring Employees**" has the meaning set forth in the EMEA Asset Sale Agreement.

"**Assets**" has the meaning set forth in Section 2.1.1.

4

"**Assigned Contracts**" means (i) the Assumed and Assigned Contracts, (ii) the Designated Non-365 Contracts (iii) the Inbound License Agreements that are used, as of the date hereof, exclusively in connection with the Business or any Asset and pursuant to their terms are assignable by the Seller party thereto at no cost to such Seller, or to the extent assignable by such Seller with an associated cost, where Purchaser pays such associated cost to obtain such assignment, and (iv) specified contracts as described in Sections 5.13 and 5.14.

"**Assumed and Assigned Contracts**" has the meaning set forth in Section 2.1.5(f).

"**Assumed and Subleased Real Estate Leases**" has the meaning set forth in Section 2.1.5(b).

"**Assumed Liabilities**" has the meaning set forth in Section 2.1.3.

"**Audited Financial Statements**" has the meaning set forth in Section 4.7(a).

"**Bankruptcy Consents**" has the meaning set forth in Section 4.1(a).

"**Bankruptcy Court**" means the U.S. Bankruptcy Court, the Canadian Court, the English Court, the Israeli Court or any other court before which Bankruptcy Proceedings are held.

"**Bankruptcy Laws**" means the U.S. Bankruptcy Code, the CCAA, the Insolvency Act, the Israeli Companies Law and the other applicable bankruptcy, insolvency, administration or similar Laws of any jurisdiction where Bankruptcy Proceedings are held.

"**Bankruptcy Proceedings**" means the Chapter 11 Cases, the CCAA Cases, the EMEA Cases, and, in each case, any proceedings thereunder, as well as any other voluntary or involuntary bankruptcy, insolvency, administration or similar judicial proceedings concerning any of the Sellers or the EMEA Sellers that are held from time to time.

"**Base Purchase Price**" has the meaning set forth in Section 2.2.1.

"**Bid**" means any bid, proposal, offer or quotation which, if accepted, would result in the award of a Contract.

"**Bidding Procedures**" means the procedures to be employed with respect to the proposed sale of the Assets and the assumption of the Assumed Liabilities to be approved by the U.S. Bankruptcy Court and the Canadian Court pursuant to the U.S. Bidding Procedures Order and the Canadian Sales Process Order, respectively.

"**Break-Up Fee**" means five million dollars ($5,000,000).

"**Bundled Contracts**" has the meaning set forth in Section 5.14.

"**Business**" means, collectively:

   (i)     the business through which the Sellers and the EMEA Sellers research, advertise, design, develop, process components, directly or indirectly manufacture

5

through contract manufacturers, finally assemble, test, support, use, market, distribute and sell globally to carriers, channel partners and any other counterparty to a customer Contract that is not a carrier or channel partner, the CVAS Products (as defined below), including prior versions (if currently supported or if any Contract existing as of the date hereof related to the Business requires the support of such prior versions), current versions and future versions listed in the Plan of Record; and

(ii)    the following services, to the extent provided, or being developed, in relation to the CVAS Products, that the Sellers and the EMEA Sellers market, advertise, distribute and sell globally to carriers, channel partners and any other counterparty to a customer Contract that is not a carrier or channel partner: (A) network implementation services, consisting of the configuration, planning, installation and integration of a network migration, upgrade or green-field deployment into a new or existing network, including design and deploy services, audit and optimization services, and operations support system services; (B) network support services, including technical support, technical account manager service, network prime engineer service, online support and technical support for special projects, repair services, managed spares service, Third Party products spares management service, corrective content management, network discovery services, engineering helpdesk, network configuration, and software release services; and (C) assisted operator services (which are resources provided to customers of CVAS Products for a limited period of time to provide an initial knowledge transfer of CVAS Products) (collectively, the "**CVAS Services**");

all as conducted by the Sellers and the EMEA Sellers as of the date of this Agreement, but excluding, in each of clauses (i) and (ii) above: (A) any business, asset, product or service run, owned, managed and/or provided by the LGN Joint Venture, NN Turkey or GDNT; (B) any Excluded Asset; (C) Overhead and Shared Services (other than Transferred Overhead and Shared Services); and (D) any products and/or services provided by businesses or business segments of any Seller or EMEA Seller other than those specified in clauses (i) and (ii) above, including for the avoidance of doubt, the Excluded Products and Services.

"**Business Day**" means a day on which the banks are opened for business (Saturdays, Sundays, statutory and civic holidays excluded) in (i) New York, New York, United States, (ii) Toronto, Ontario, Canada, and (iii) London, England, United Kingdom.

"**Business Information**" means, whether in paper, digital or other tangible form, (i) if used exclusively in connection with the Business, all books, records, files, ledgers, sales literature or similar documents in the possession or under control of the Sellers and that, in each case, is used exclusively in connection with the Business, including information on past, present and prospective customers and suppliers, policies and procedures, Owned Equipment manuals and materials and procurement documentation exclusively used in the Business or in respect of any Asset or Assumed Liability, documents containing information relating to the research and development of the CVAS Products or the CVAS Services (whether relating to activities by the Sellers and the EMEA Sellers associated with the CVAS Products and CVAS Services as of the Closing or any time prior thereto), documents containing technical information, operating and production records, quality control records, blueprints, research and development notebooks and

6

files, customer credit data, manuals, documents containing engineering and scientific data, sales and promotional literature, drawings, technical plans, business plans, budgets and price lists and (ii) if used, but not exclusively, in connection with the Business or in respect of any Asset or Assumed Liability, to the extent reasonably separable from such items of any other business of the Sellers, copies of all books, records, files, ledgers, documentation, sales literature or similar documents in the possession or under control of the Sellers (including information on past, present and prospective customers and suppliers), policies and procedures and materials and procurement documentation used in the Business or in respect of any Asset or Assumed Liability, financial records, documents containing information relating to the research and development of the CVAS Products or the CVAS Services (whether relating to activities by the Sellers and the EMEA Sellers associated with the CVAS Products and CVAS Services as of the Closing or any time prior thereto), documents containing technical information, operating and production records, quality control records, blueprints, research and development notebooks and files, customer credit data, manuals, documents containing engineering and scientific data, sales and promotional literature, drawings, technical plans, business plans, budgets and price lists; provided, that with regards to copies provided pursuant to clause (ii) Business Information shall not include the competitively sensitive portions of the foregoing that relate to Excluded Assets, Excluded Liabilities or other business lines of the Sellers, and provided, further, that Business Information shall not include the Employee Records.

"**Business Registered IP**" has the meaning set forth in Section 4.5(b).

"**Canadian Approval and Vesting Order**" has the meaning set forth in Section 5.2.2.

"**Canadian Approval and Vesting Order Motion**" has the meaning set forth in Section 5.2.2.

"**Canadian Court**" means the Ontario Superior Court of Justice.

"**Canadian DB Replacement Plan**" has the meaning set forth in Section 7.5(c).

"**Canadian Debtors**" has the meaning set forth in the recitals to this Agreement.

"**Canadian Non-Union DC Replacement Plan**" has the meaning set forth in Section 7.5(a).

"**Canadian Sales Process Order**" has the meaning set forth in Section 5.2.1.

"**Canadian Sales Process Order Motion**" has the meaning set forth in Section 5.2.1.

"**Canadian Union DC Replacement Plan**" has the meaning set forth in Section 7.5(d).

"**CCAA**" has the meaning set forth in the recitals to this Agreement.

"**CCAA Cases**" has the meaning set forth in the recitals to this Agreement.

"**Chapter 11 Cases**" has the meaning set forth in the recitals to this Agreement.

7

"**Claim**" has the meaning set forth in Section 101(5) of the U.S. Bankruptcy Code.

"**Claim Notice**" has the meaning set forth in Section 6.11(b).

"**Clean Team Confidentiality Agreement**" means the clean team confidentiality agreement by and between NNL and the Purchaser, dated as of June 22, 2009, as amended from time to time.

"**Clean Room Agreements**" means the Clean Team Confidentiality Agreement and any other agreements by and between NNL and the Purchaser and/or, where applicable, other persons, in relation to the operation of clean rooms or clean teams relating to the transactions contemplated by this Agreement or the EMEA Asset Sale Agreement.

"**Closing**" has the meaning set forth in Section 2.4.1.

"**Closing Adjusted Net Working Capital**" has the meaning set forth in Section 2.2.3.1(a).

"**Closing Aggregate Downward Adjustment**" has the meaning set forth in Section 2.2.3.1(a).

"**Closing Aggregate EMEA Downward Adjustment**" has the meaning set forth in Section 2.2.3.1(a).

"**Closing Aggregate EMEA Upward Adjustment**" has the meaning set forth in Section 2.2.3.1(a).

"**Closing Audited Financial Statements**" has the meaning set forth in Section 5.25.

"**Closing Contractual Liabilities Amount**" has the meaning set forth in Section 2.2.3.1(a).

"**Closing Date**" has the meaning set forth in Section 2.4.1.

"**Closing Accrued Vacation Amount**" has the meaning set forth in Section 2.2.3.1(a).

"**Closing Deferred Profit Amount**" has the meaning set forth in Section 2.2.3.1(a).

"**Closing EMEA Holiday Downward Adjustment**" has the meaning set forth in Section 2.2.3.1(a).

"**Closing Excess ARD Employees Amount**" has the meaning set forth in Section 2.2.3.1(a).

"**Closing French Excess ARD Employees Amount**" has the meaning set forth in Section 2.2.3.1.

"**Closing Inventory Value**" has the meaning set forth in Section 2.2.3.1(a).

8

"**Closing Pre-Close Employment Payments Amount**" has the meaning set forth in Section 2.2.3.1.

"**Closing Prepaid Expenses Amount**" has the meaning set forth in Section 2.2.3.1(a).

"**Closing Product Exposures Amount**" has the meaning set forth in Section 2.2.3.1(a).

"**Closing Royalty Liability Amount**" has the meaning set forth in Section 2.2.3.1(a).

"**Closing Specified Employee Liabilities Amount**" has the meaning set forth in Section 2.2.3.1(a).

"**Closing Statement**" has the meaning set forth in Section 2.2.3.1(a).

"**Closing TFR Amount**" has the meaning set forth in Section 2.2.3.1(a).

"**Closing Unaudited Financial Statements**" has the meaning set forth in Section 5.24.

"**Closing Unbilled Accounts Receivable Amount**" has the meaning set forth in Section 2.2.3.1(a).

"**Closing Warranty Provision Amount**" has the meaning set forth in Section 2.2.3.1(a).

"**COBRA**" means the continuation coverage required by Section 4980B of the Code or any similar Law.

"**Code**" means the United States Internal Revenue Code of 1986, as amended.

"**Collective Labor Agreement**" means any written agreement that a Person has entered into with any union or collective bargaining agent with respect to terms and conditions of employment of such Person's employees.

"**Commissioner**" means the Commissioner of Competition appointed under the Competition Act or any person duly authorized to exercise the powers and perform the duties of the Commissioner of Competition.

"**Competing Transaction**" has the meaning set forth in Section 5.29.

"**Competition Act**" means the Competition Act (Canada), R.S. 1985, C. C-34, as it is now in effect and as it may be amended.

"**Competition Act Approval**" means that: (i) the waiting period, including any extension thereof, under Section 123 of the Competition Act shall have expired or been terminated or the obligation to provide a pre-merger notification in accordance with Part IX of the Competition Act shall have been waived in accordance with paragraph 113(c) of the Competition Act, and in either case the Purchaser shall have been advised in writing by the Commissioner that he or she is of the view that grounds do not exist as of the date of the advice to initiate proceedings under the merger provisions of the Competition Act in respect of the transactions contemplated by this

9

Agreement or by the EMEA Asset Sale Agreement (as applicable) and such advice shall have not been rescinded or amended; or (ii) the Commissioner shall have issued an advance ruling certificate pursuant to Subsection 102(1) of the Competition Act to the effect that the Commissioner is satisfied that he or she would not have sufficient grounds upon which to apply to the Competition Tribunal for an order under Section 92 of the Competition Act with respect to the transactions contemplated by this Agreement or by the EMEA Asset Sale Agreement (as applicable).

"**Confidential Information**" has the meaning set forth in Section 5.11(b).

"**Confidentiality Agreement**" means the confidentiality agreement among the Purchaser and the Seller parties listed therein dated April 17, 2009, as amended.

"**Consent**" means any approval, authorization, consent, order, license, permission, permit, qualification, exemption or waiver by or notice to any Government Entity or other Third Party.

"**Contract**" means any binding contract, agreement, subcontract, purchase order, work order, sales order, indenture, note, bond, instrument, lease, mortgage, ground lease, commitment, covenant or undertaking.

"**Contract Designation Date**" means, (i) with respect to the 365 Contracts and Non-365 Contracts listed in the Sellers Disclosure Schedule as of the date hereof, the date that is sixty (60) days from the date hereof and (ii) with respect to any Contract that is added to the 365 Customer Contract List or the Non-365 Customer Contract List after the date hereof pursuant to Section 2.1.5(e) or 2.1.6(f), as applicable, the later of (A) the date that is sixty (60) days from the date hereof and (B) the date that is five (5) Business Days after such Contract is added to or included in the relevant list.

"**Contract Manufacturing Inventory Agreements**" means the agreements among the Purchaser and/or any Designated Purchasers, the relevant Sellers, and the contract manufacturers of the Business listed in Section 1.1(b) of the Sellers Disclosure Schedule that the relevant Parties will use their commercially reasonable efforts to execute on or before the Closing in the form that shall be negotiated in good faith pursuant to Section 5.23 and the term sheet attached hereto as Exhibit F.

"**Contractual Liabilities Amount**" means, as of any given date, the amount of contractual liabilities of the Business, net of applicable provisions, determined in accordance with the Nortel Accounting Principles.

"**Control**", including, with its correlative meanings, "Controlled by" and "under common Control with", means, in connection with a given Person, the possession, directly or indirectly, or as trustee or executor, of the power to either (i) elect more than fifty percent (50%) of the directors or governing body of such Person or (ii) direct or cause the direction of the management and policies of such Person, whether through the ownership of securities, contract, credit arrangement or otherwise.

10

"**Covered Assets and Persons**" means the assets (including the Assets), tangible or intangible property, Liabilities, ownership, activities, businesses, operations, current and former shareholders, and current and former directors, officers, employees and agents of, the Business.

"**Cross-Border Protocol**" means that certain Cross-Border Insolvency Protocol approved by the U.S. Bankruptcy Court pursuant to Section 105(a) of the U.S. Bankruptcy Code in an order dated January 15, 2009 and by the Canadian Court pursuant to an order, dated January 14, 2009, as the same may be amended from time to time.

"**Cross-License Agreements**" means all Contracts between any Sellers, EMEA Sellers, or any of their respective Affiliates and any other Person under which any of such Sellers, EMEA Sellers, or their respective Affiliates, as applicable, both (i) grant a license under Patents owned by (or licensed to) them and (ii) receive from the counter-party a license under Patents owned by (or licensed to) such counter-party (but other than inbound and/or outbound license agreements where the only grant back from the licensee is under improvements on the licensed intellectual property), to the extent the scope of such licenses include Patents licensed under the Intellectual Property License Agreement or assigned pursuant to the terms of this Agreement or that are otherwise used in the Business.

"**Cure Cost**" means (i) any amounts required by Section 365(b)(1) of the U.S. Bankruptcy Code to cure any defaults by the relevant U.S. Debtor under an Assumed and Assigned Contract and any actual pecuniary losses that have resulted from such defaults under such Seller Contracts, and (ii) with respect to any Designated Non-365 Contract, any amounts required to cure any defaults and to pay any actual pecuniary losses under such Seller Contract in respect of the period prior to the Closing Date.

"**Customer Contract**" means any Seller Contract pursuant to which a Seller provides CVAS Products and/or CVAS Services to a customer, reseller or distributor.

"**CVAS Products**" means the software and/or hardware products set forth in Section 1.1(c) of the Sellers Disclosure Schedule.

"**CVAS Services**" has the meaning set forth in the definition of "Business" above.

"**Deferred Profit Amount**" means, as of the Closing Date, both short term and long term (i) deferred revenues for services to be performed or products to be provided by the Business after the Closing Date but for which an account receivable has been recorded or cash has been received prior to the Closing Date *minus* (ii) associated deferred costs to the extent incurred by the Business prior to the Closing Date in connection with such products or services, in each case, that would be required to be reflected on a balance sheet of the Business as of such date prepared in accordance with GAAP applied in a manner consistent with the Nortel Accounting Principles (to the extent consistent with GAAP). For the avoidance of doubt, the Deferred Profit Amount will include advance billings and deferred revenue consistent with Nortel Accounting Principles.

"**Designated Non-365 Contracts**" has the meaning set forth in Section 2.1.6(g).

"**Designated Purchaser**" has the meaning set forth in Section 2.5.

11

"**Direct Lease**" has the meaning set forth in Section 5.32.

"**Direct Lease Real Estate**" has the meaning set forth in Section 4.9(a).

"**Disagreement Notice**" has the meaning set forth in Section 2.2.3.1(b).

"**Distribution Agent**" means the Person that will act as distribution agent for the Sellers and the EMEA Sellers hereunder, to be notified by the Main Sellers to the Purchaser by and not later than five (5) Business Days before the Closing.

"**Downward Adjustment**" has the meaning set forth in Section 5.26(b).

"**Effective Hire Date**" means the day on which the employment of an Employee commences or continues with the Purchaser or its Affiliates as provided in this Agreement.

"**EFTA**" means the European Free Trade Association.

"**EMEA Asset Sale Agreement**" has the meaning set forth in the recitals to this Agreement.

"**EMEA Assets**" has the meaning attributed to that term in the EMEA Asset Sale Agreement.

"**EMEA Assumed Liabilities**" has the meaning attributed to that term in the EMEA Asset Sale Agreement.

"**EMEA Business**" has the meaning set forth in the definition of Business except that all references to the Sellers are stricken therefrom.

"**EMEA Cases**" has the meaning set forth in the recitals to this Agreement.

"**EMEA Debtors**" has the meaning set forth in the recitals to this Agreement.

"**EMEA Deposit**" has the meaning attributed to that term in the Transition Services Agreement.

"**EMEA Designated Purchaser**" has the meaning attributed to that term in the EMEA Asset Sale Agreement.

"**EMEA Downward Adjustment**" has the meaning attributed to the term "Downward Adjustment" in Schedule 7 of the EMEA Asset Sale Agreement.

"**EMEA Escrow Agent**" has the meaning attributed to that term in the Transition Services Agreement.

"**EMEA Holiday Calculation**" has the meaning set forth in Section 2.2.2 of the Sellers Disclosure Schedule.

12

"**EMEA Holiday Downward Adjustment**" has the meaning set forth in the EMEA Asset Sale Agreement.

"**EMEA Owned Inventory**" has the meaning attributed to that term in the EMEA Asset Sale Agreement.

"**EMEA Sellers**" has the meaning set forth in the recitals to this Agreement.

"**EMEA Tax Escrow Amount**" means $2,500,000 (two million five hundred thousand dollars).

"**EMEA Transferred Intellectual Property**" has the meaning attributed to that term in the EMEA Asset Sale Agreement.

"**Employee**" means any employee of the Sellers engaged in the Business, as listed in Section 4.11(b) of the Sellers Disclosure Schedule.

"**Employee Data**" has the meaning set forth in Section 7.4(b).

"**Employee Information**" has the meaning set forth in Section 4.11(b).

"**Employee Records**" means books, records, files, or other documentation with respect to Employees offered employment pursuant to Section 7.1 or Section 7.2.

"**Employee Transfer Date**" means, with respect to each jurisdiction where Employees will become Transferred Employees or Transitional Employees in accordance with this Agreement, 11:59 p.m. local time in such jurisdiction on the calendar day on which the Closing Date occurs.

"**English Court**" means the High Court of Justice of England and Wales.

"**Environmental Law**" means any applicable Law relating to or regulating: (i) the management, Release or remediation of Hazardous Materials; (ii) the exposure of persons to Hazardous Materials; (iii) occupational health and safety; or (iv) pollution or protection of the environment or natural resources, including the United States Resource Conservation and Recovery Act, the Comprehensive Environmental Response Compensation and Liability Act, the Clean Air Act, the Federal Water Pollution Control Act, the Safe Drinking Water Act, the Occupational Safety and Health Act and the Toxic Substances Control Act, all as amended, and any requirements of a Government Entity promulgated pursuant to these applicable laws or any analogous foreign, state, provincial or local laws.

"**Environmental Permit**" means any Consent required under any Environmental Law for the Business as currently conducted.

"**Equipment**" means tangible personal property, excluding any Inventory, Intellectual Property and, to the extent required by Law, any items of tangible property personally assigned to the Transferring Employees, but including all trade fixtures and fixtures, furniture,

13

furnishings, fittings, equipment, apparatus, appliances, business supplies and other articles of tangible personal property.

"**ERISA**" means the Employee Retirement Income Security Act of 1974, as amended.

"**ERISA Affiliate**" means any corporation which is a member of a controlled group or any trade or business (whether or not incorporated) which is under common control with the Sellers or any Subsidiary within the meaning of Sections 414(b) and 414(c) of the Code.

"**Escrow Agreement**" means an escrow agreement among NNC, NNL, NNI, NNUK, the Purchaser and the Escrow Agent to be entered into on or prior to the entry of the Bidding Procedures on terms and conditions reasonably satisfactory to each of the NNC, NNL, NNI, NNUK, the Purchaser and the Escrow Agent.

"**Escrow Agent**" means Wells Fargo Bank, National Association.

"**Estimated Adjusted Net Working Capital**" has the meaning set forth in Section 2.2.2(a).

"**Estimated Aggregate Downward Adjustment**" has the meaning set forth in Section 2.2.2(a).

"**Estimated Aggregate EMEA Downward Adjustment**" has the meaning set forth in Section 2.2.2(a).

"**Estimated Aggregate EMEA Upward Adjustment**" has the meaning set forth in Section 2.2.2(a).

"**Estimated Closing Accrued Vacation Amount**" has the meaning set forth in Section 2.2.2(a).

"**Estimated Closing Inventory Value**" has the meaning set forth in Section 2.2.2(a).

"**Estimated Closing TFR Amount**" has the meaning set forth in Section 2.2.2(a).

"**Estimated Contractual Liabilities Amount**" has the meaning set forth in Section 2.2.2(a).

"**Estimated Deferred Profit Amount**" has the meaning set forth in Section 2.2.2(a).

"**Estimated EMEA Holiday Downward Adjustment**" has the meaning set forth in Section 2.2.2(a).

"**Estimated Excess ARD Employees Amount**" means an amount that is equal to the Severance Amount multiplied by the number of Excess ARD Transferring Employees which the EMEA Sellers estimated that the Purchaser will have identified to the EMEA Sellers within

14

ninety (90) days of the Transfer Date as having been provisionally selected for redundancy, subject only to completion of applicable consultation.

"**Estimated French Excess ARD Employees Amount**" means an amount that is equal to $109,000 multiplied by the number of French Excess ARD Transferring Employees which the EMEA Sellers estimated that the Purchaser will have identified to the EMEA Sellers within 90 days of the Transfer Date.

"**Estimated Pre-Close Employment Payments Amount**" has the meaning set forth in Section 2.2.2(a).

"**Estimated Prepaid Expenses Amount**" has the meaning set forth in Section 2.2.2(a).

"**Estimated Product Exposures Amount**" has the meaning set forth in Section 2.2.2(a).

"**Estimated Purchase Price**" has the meaning set forth in Section 2.2.2(b).

"**Estimated Royalty Liability Amount**" has the meaning set forth in Section 2.2.2(a).

"**Estimated Specified Employee Liabilities Amount**" has the meaning set forth in Section 2.2.2(a).

"**Estimated Unbilled Accounts Receivable Amount**" has the meaning set forth in Section 2.2.2(a).

"**Estimated Warranty Provision Amount**" has the meaning set forth in Section 2.2.2(a).

"**Excess ARD Employees Amount**" has the meaning given to it in the EMEA Asset Sale Agreement.

"**Excluded Assets**" has the meaning set forth in Section 2.1.2.

"**Excluded Employee Liabilities**" has the meaning set forth in Section 7.3.

"**Excluded Liabilities**" has the meaning set forth in Section 2.1.4.

"**Excluded Non-365 Contracts**" has the meaning set forth in Section 2.1.6(d).

"**Excluded Products and Services**" means all products and services provided by businesses or business segments of any Seller or EMEA Seller other than the Business.

"**Excluded Taxes**" has the meaning set forth in Section 6.11(a).

"**Excluded 365 Customer Contracts**" has the meaning set forth in Section 2.1.5(d).

"**Exclusion Criteria**" means any Customer Contract or Bundled Contract that contains any non-competition provision with restrictions on the Sellers.

15

"**Executory Contract**" means an "executory contract" for the purposes of the U.S. Bankruptcy Code.

"**Expense Reimbursement**" means Purchaser's reasonable and documented fees, out-of-pocket costs and expenses (including fees and expenses of the Purchaser's advisors and notification and filing fees) in connection with the preparation, execution and performance of this Agreement and the EMEA Asset Sale Agreement and the transactions contemplated hereby and thereby, in an amount which shall not exceed five million dollars ($5,000,000).

"**Final Order**" means an order of any Bankruptcy Court or other court of competent jurisdiction (i) as to which no appeal, notice of appeal, motion to amend or make additional findings of fact, motion to alter or amend judgment, motion for rehearing or motion for new trial has been timely filed or, if any of the foregoing has been timely filed, it has been disposed of in a manner that upholds and affirms the subject order in all material respects without the possibility for further appeal or rehearing thereon; (ii) as to which the time for instituting or filing an appeal, motion for rehearing or motion for new trial shall have expired; and (iii) as to which no stay is in effect; provided, however, that, with respect to an order issued by the U.S. Bankruptcy Court, the filing or pendency of a motion under Federal Rule of Bankruptcy Procedure 9024 or Federal Rule of Civil Procedure 60 shall not cause an order not to be deemed a "Final Order" unless such motion shall be filed within fourteen (14) days of the entry of the order at issue.

"**Final Purchase Price**" has the meaning set forth in Section 2.2.3.1(a).

"**Financial Statements**" has the meaning set forth in Section 4.7(b).

"**Financing**" has the meaning set forth in Section 3.3(a).

"**Financing Commitment**" has the meaning set forth in Section 3.3(a).

"**French Excess ARD Employees Amount**" has the meaning given to it in the EMEA Asset Sale Agreement.

"**GAAP**" means the United States generally accepted accounting principles.

"**GDNT**" means Guangdong-Nortel Telecommunications Equipment Co. Ltd.

"**Good Faith Deposit**" has the meaning set forth in Section 2.2.5(a).

"**Government Entity**" means any United States, Canadian, United Kingdom, supranational, foreign, domestic, federal, territorial, provincial, state, municipal or local governmental authority, quasi-governmental authority, instrumentality, court, government or self-regulatory organization, commission, tribunal, arbitral body or organization or any regulatory, administrative or other agency, or any political or other subdivision, department or branch of any of the foregoing, including the European Commission.

"**GST**" means goods and services tax or harmonized sales tax payable under Part IX of the Excise Tax Act (Canada) and the Quebec sales tax payable under an Act respecting the Quebec sales tax.

16

"**Hazardous Materials**" means any chemical, material, waste or substance defined by or regulated under any Environmental Law as a hazardous waste, hazardous material, hazardous substance, extremely hazardous waste, restricted hazardous waste, pollutant, contaminant, toxic substance or toxic waste, including petroleum, petroleum products, asbestos, lead or polychlorinated biphenyls.

"**HSR Act**" means the United States Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended.

"**HSR Approval**" means expiration of all applicable waiting periods under the HSR Act (including any voluntary agreed extensions) or earlier termination thereof.

"**ICA Approval**" means that the Purchaser shall have received (i) notification from the responsible Minister under the Investment Canada Act that he/she is satisfied or is deemed to be satisfied that the transactions contemplated in this Agreement or by the EMEA Asset Sale Agreement (as applicable) that are subject to the provisions of Part IV of the Investment Canada Act are likely to be of net benefit to Canada and (ii) any other approvals, clearances or authorizations required under the Investment Canada Act to effect the Closing as contemplated by this Agreement or by the EMEA Asset Sale Agreement (as applicable).

"**Identified Employees**" has the meaning set forth in Section 7.1.1(a).

"**Inactive Employees**" means Employees (other than Employees whose employment transfers to Purchaser or a Designated Purchaser by operation of Law) who have accepted Purchaser or Designated Purchaser's offer of employment as provided in Section 7.1.1(a) and are on a Seller-approved leave of absence as of the Employee Transfer Date and are expected to return and actually return to work within the relevant time period set out below.  An Employee shall be an Inactive Employee for purposes hereof if and only if such individual is absent as a result of military service, pregnancy or parental leave, disability leave, medical leave, jury duty or any leave provided under applicable Law and, in the case of leaves provided under applicable Law, is expected to return to work and actually returns to work in the time permitted for such leave under applicable Law and, for any other leave, is expected to return to work and actually returns to work within six (6) months following the Closing Date.

"**Inbound License Agreements**" has the meaning set forth in Section 4.5(j).

"**Indebtedness**" of any Person means at any date, without duplication, all obligations of such Person to the extent incurred for the Business (i) for indebtedness for borrowed money (including any unpaid principal, premium and accrued and unpaid interest or fees), (ii) for indebtedness evidenced by bonds, debentures, notes or similar instruments, (iii) in respect of leases that are capitalized in accordance with GAAP under which such Person is the lessee, (iv) in respect of letters of credit issued for the account of such Person (to the extent drawn), (v) in respect of guarantees of the obligations of other Persons of the type referred to in clauses (i) through (iv) above and (vi) any termination fees, prepayment penalties, "breakage" cost or similar payments associated with the repayment or default under any of the Indebtedness referred to in items (i) and (ii) above.

"**Independent Auditor**" means KPMG LLP or, in the case such firm cannot carry-out its duties for whatever reason, such other auditing firm of international reputation that is (i) jointly selected by the Primary Parties, or (ii) in case they cannot agree on any such firm within 10 Business Days of the request of either Primary Party, by KPMG LLP at the request of the first Primary Party to move for the appointment of such Independent Auditor.

"**Insolvency Act**" has the meaning set forth in the recitals to this Agreement.

"**Intellectual Property**" means any and all intellectual and industrial property, whether protected or arising under the laws of the United States, Canada or any other jurisdiction, including all intellectual or industrial property rights in any of the following: (a) Trademarks; (b) Patents; (c) works of authorship (whether or not published) and copyrights (including any registrations therefor or applications for registration); (d) mask works (including any registrations therefor or applications for registration); (e) trade secrets, know-how and confidential information; (f) industrial designs and other rights in designs (including any registrations therefor or applications for registrations); (g) *sui generis* data base rights and (h) any Software and technology.

"**Intellectual Property License Agreement**" means the agreement to be entered into between the relevant Sellers, on the one hand, and the Purchaser (or the relevant Designated Purchasers), on the other hand, on or prior to the Closing in the form attached hereto as Exhibit H.

"**Inventory**" means any inventories of raw materials, manufactured and purchased parts, works in process, packaging, stores and supplies, unassigned finished goods inventories (which are finished goods not yet assigned to a specific customer order) and merchandise.

"**Inventory Value**" means, as of any given date, the book value of the Owned Inventory and the EMEA Owned Inventory, in each case net of applicable provisions, determined in accordance with the Nortel Accounting Principles.

"**Investment Canada Act**" means the Investment Canada Act, R.S. 1985, c.28, as it is now in effect and as it may be amended.

"**IP Escrow Agreements**" has the meaning set forth in Section 5.9(c).

"**IRS**" means the United States Internal Revenue Service.

"**Israeli Companies**" has the meaning set forth in the recitals to this Agreement.

"**Israeli Companies Law**" has the meaning set forth in the recitals to this Agreement.

"**Israeli Court**" has the meaning set forth in the recitals to this Agreement.

"**Joint Administrators**" has the meaning set forth in the recitals to this Agreement.

"**Joint Israeli Administrators**" has the meaning set forth in the recitals to this Agreement.

18

"**KEIP**" means the Nortel Networks Corporation Key Executive Incentive Plan approved by the U.S. Bankruptcy Court in the District of Delaware in part on March 5, 2009 and in part on March 20, 2009, and approved by the Canadian Court in part on March 6, 2009 and in part on March 20, 2009, as the same may be amended, modified, supplemented or replaced from time to time.

"**Known Product Defects**" has the meaning set forth in the Nortel Accounting Principles.

"**KERP**" means the Nortel Networks Corporation Key Employee Retention Plan approved by the U.S. Bankruptcy Court in the District of Delaware by an order dated March 5, 2009, and approved by the Canadian Court on March 6, 2009, as the same may be amended, modified, supplemented or replaced from time to time.

"**Knowledge**" or "**aware of**" or "**notice of**" or a similar phrase means, with reference to the Sellers, the actual knowledge of those Persons listed on Section 1.1(d) of the Sellers Disclosure Schedule, and, with reference to the Purchaser, the actual knowledge of those Persons listed on Exhibit I.

"**Law**" means any U.S., Canadian, UK, Israeli, foreign, supranational, domestic, federal, territorial, state, provincial, local or municipal statute, law, common law, ordinance, rule, regulation, judicial or administrative order, writ, injunction, directive, judgment, decree or policy or guideline having the force of law.

"**Leased Real Property**" means all real property subject to a Lease which is an Assumed and Subleased Real Estate Lease, a Non-365 Subleased Real Estate Lease, a Licensed Real Estate Lease or a Non-365 Licensed Real Estate Lease.

"**Lease(s)**" means all leases, subleases, real-property licenses and other agreements (written or oral), including all amendments, extensions and renewals thereof, pursuant to which real property is held.

"**LGN Distribution Agreement**" means the agreement between the Purchaser and/or a Designated Purchaser, on the one hand, and the LGN Joint Venture, on the other hand governing the distribution of certain CVAS Products by the LGN Joint Venture that the Purchaser will use commercially reasonable efforts to negotiate with the LGN Joint Venture and execute on or before the Closing pursuant to Section 5.23.

"**LGN Joint Venture**" means LG-Nortel Co. Ltd., which was established in November 2005 as a joint venture between NNL and LG Electronics Inc. for the purpose of jointly developing and marketing certain telecommunications equipment and network solutions.

"**Liabilities**" means debts, liabilities and obligations, whether accrued or fixed, direct or indirect, liquidated or unliquidated, absolute or contingent, matured or unmatured or determined or undeterminable, known or unknown, including those arising under any Law or Action and those arising under any Contract or otherwise, including any Tax liability.

19

"**License**" has the meaning set forth in Section 5.33.

"**Licensed Intellectual Property**" means the Intellectual Property being licensed to the Purchaser or the relevant Designated Purchasers under the Intellectual Property License Agreement and the Trademark License Agreement.

"**Licensed Real Estate Leases**" has the meaning set forth in Section 2.1.5(c).

"**Lien**" means any lien (statutory or otherwise), mortgage, pledge, security interest, charge, right of first refusal, hypothecation, encumbrance, easement, encroachment, right-of-way, restrictive covenant on real property, real property license, lease or conditional sale arrangement.

"**Loaned Employee Agreement**" means the agreement between the Main Sellers, on the one hand, and the Purchaser and/or any Designated Purchasers, on the other hand, to be executed on or before the Closing attached hereto as Exhibit J.

"**Local Sale Agreements**" has the meaning set forth in Section 2.1.8.

"**Losses**" has the meaning set forth in Section 6.11(a).

"**Main Sellers**" has the meaning set forth in the preamble to this Agreement.

"**Mandatory Antitrust Approvals**" means a decision, in whatever form (including a declaration of lack of jurisdiction or a mere filing or notification, if the Closing can take place, pursuant to the applicable Antitrust Law, without a decision or the expiry of any waiting period) by any Government Entity under the Laws of any of the jurisdictions listed in Exhibit K (the "**Relevant Antitrust Authorities**") or the expiry of the applicable waiting period, as applicable, under the Antitrust Laws of any of the jurisdictions listed in Exhibit K, authorizing or not objecting to the transactions contemplated by this Agreement and by the EMEA Asset Sale Agreement (as applicable), which includes any decision or consent by any such Relevant Antitrust Authority setting forth conditions or obligations on the Purchaser or any of its Affiliates.

"**Market Value**" means, in respect of the Restricted Assets and Restricted Liabilities, the greater of (i) the fair market value of the same, determined by reference to an amount equal to the product of (x) the sum of the revenues for the one year period ended on December 31, 2008 (the "**2008 Revenues**") for such Restricted Seller as set forth on Exhibit L, times (y) 0.2078 and (ii) the net book value of such Restricted Assets and Restricted Liabilities.

"**Material Adverse Effect**" means any event, change, circumstance, development, condition, fact, occurrence or effect that, individually or together with any other events, changes, circumstances, developments, conditions, facts, occurrences or effects has had, or would reasonably be expected to have a material adverse effect on the business, operations, assets, liabilities, results of operations or condition (financial or otherwise) of the Business to be transferred hereunder and under the EMEA Asset Sale Agreement, taken as a whole, but in each case shall not include the effect of events, changes, circumstances, developments, conditions,

facts, occurrences or effects to the extent resulting from (a) general changes to the industries and markets in which the Business operates, but only to the extent that such changes do not have a disproportionate effect on to the Business relative to other businesses in such industries and markets, (b) macroeconomic factors, interest rates, currency exchange rates, general financial market conditions, earthquakes, hurricanes, floods, tornados and similar natural causes, war, terrorism or hostilities, but only to the extent that such factors, rates, conditions, natural causes, war, terrorism or hostilities, in each case, do not have a disproportionate effect on the Business, relative to other businesses in the industries or markets in which the Business operates, (c) changes in Law, generally accepted accounting principles or official interpretations of the foregoing, (d) compliance with this Agreement, (e) the transactions contemplated hereby or any announcement of this Agreement or the identity of the Purchaser in accordance with terms of this Agreement, (f) the pendency of the Bankruptcy Proceedings and any action approved by the Bankruptcy Courts, (g) the attrition of customers or employees prior to the Closing Date (provided, that the reason for customer attrition, if not otherwise excluded pursuant to the other clauses of this definition in determining whether there has been a Material Adverse Effect pursuant to the other clauses in this definition, shall be included in determining whether there has been a Material Adverse Effect), (h) actions taken by the Sellers at the specific written request of the Purchaser or (i) the failure of the Business to achieve internal or external financial forecasts or projections, by itself, provided, however, that the effect of any underlying event, change, circumstance, development, condition, fact, occurrence or effect giving rise to any such failure to meet forecasts or projections, if not otherwise excluded pursuant to the other clauses of this definition in determining whether there has been a Material Adverse Effect pursuant to the other clauses in this definition, shall be included in determining whether a Material Adverse Effect has occurred.

"**Material Contracts**" has the meaning set forth in Section 4.4.

"**Monitor**" means Ernst & Young Inc., in its capacity as the Canadian Court-appointed Monitor in connection with the CCAA Cases.

"**Mutual Development and Support Agreement**" means the agreement between the Purchaser and/or any Designated Purchasers, on the one hand, and the relevant Sellers or the purchasers of former businesses, business segments or divisions of the Sellers, governing the development (i) by the Purchaser and/or any Designated Purchasers or any of their Affiliates of new features of certain of the products used by the Sellers or the purchasers of former businesses, business segments or divisions of the Sellers, and/or (ii) by the relevant Sellers or the purchasers of former businesses, business segments or divisions of the Sellers, of new features of certain of the CVAS Products, that the relevant Parties will use commercially reasonable efforts to negotiate with each other and such relevant purchasers and execute on or before the Closing pursuant to Section 5.23.

"**New York Courts**" has the meaning set forth in Section 10.6(b).

"**NNC**" has the meaning set forth in the preamble to this Agreement.

"**NNI**" has the meaning set forth in the preamble to this Agreement.

21

"**NN India**" has the meaning set forth in Section 2.1.8(b).

"**NNL**" has the meaning set forth in the preamble to this Agreement.

"**NNSA**" has the meaning set forth in the recitals to this Agreement.

"**NNTC**" has the meaning set forth in Section 6.5(b).

"**NN Turkey**" means Nortel Networks Netas Telekomunikasyon A.S., a joint stock co. corporation formed under the laws of Turkey.

"**NN Turkey Agreements**" means the NN Turkey Master Development Agreement, the NN Turkey Distribution Agreement and the NN Turkey Services Agreement.

"**NN Turkey Distribution Agreement**" means the agreement between NN Turkey, on the one hand, and the Purchaser and/or any Designated Purchasers, on the other hand, governing the distribution of certain CVAS Products by NN Turkey.

"**NN Turkey Services Agreement**" means the agreement between NN Turkey, on the one hand, and the Purchaser and/or any Designated Purchasers, on the other hand, governing the provision of services by NN Turkey to the Business.

"**NN Turkey Master Development Agreement**" means the agreement between NN Turkey, on the one hand, and the Purchaser and/or any Designated Purchasers, on the other hand, governing research and development operations by NN Turkey.

"**NNUK**" means Nortel Networks UK Limited.

"**Non-Assignable Contracts**" has the meaning set forth in Section 5.13(a).

"**Non-Assigned Contract**" means a Non-Assignable Contract as to which all applicable Consents to assignment have not been granted prior to the Closing Date.

"**Non-Debtor Sellers**" has the meaning set forth in the recitals to this Agreement.

"**Non-Exclusive Supply Contract**" means any supply Contract to which any Seller is a party that relates to the Business and also relates to one or more other businesses of the Sellers.

"**Non-Solicitation Period**" means the twenty-four (24) month period immediately following the Closing Date.

"**Non-365 Customer Contract List**" has the meaning set forth in Section 2.1.6(a).

"**Non-365 Customer Contract**" has the meaning set forth in Section 2.1.6(a).

"**Non-365 Licensed Real Estate Leases**" has the meaning set forth in Section 2.1.6(c).

"**Non-365 Real Estate Leases**" has the meaning set forth in Section 2.1.6(b).

22

"**Non-365 Subleased Real Estate Leases**" has the meaning set forth in Section 2.1.6(b).

"**Non-Union Employee**" means an Employee whose terms and conditions of employment are not governed by a Collective Labor Agreement.

"**Nortel Accounting Principles**" means the accounting principles employed in the preparation of the Unaudited Financial Statements, as set forth in Section 1.1(e) of the Sellers Disclosure Schedule.

"**Nortel Canadian Pension Plan**" has the meaning set forth in Section 7.5(a).

"**Nortel Retained Businesses**" has the meaning set forth in the Intellectual Property License Agreement.

"**OCNIS**" means (i) supply chain overhead costs (including supply chain management, procurement and manufacturing not otherwise covered pursuant to the Transition Service Agreement); (ii) sustaining engineering costs; (iii) "return on invested capital" or other third party overhead recovery costs (including additional materials pricing to cover contractual third party costs); (iv) royalty costs (where applicable); and (v) warranty costs (where applicable). OCNIS does not include inventory provision, Known Product Defects, outbound freight and logistics.

"**Offer**" or "**Offers**" has the meaning set forth in Section 7.1.1(a).

"**Offer Consideration Period**" has the meaning set forth in Section 7.1.1(a).

"**Omitted Cross-License Agreement**" has the meaning set forth in Section 4.5(g).

"**Open Source Software**" means Software that is made available under a license agreement that (i) conditions use, modification or distribution of any Software program, or any Software integrated with or derived from such Software program, or into which such Software program is incorporated, on the disclosure, licensing or distribution of the source code of such Software program (or such Software) or (ii) otherwise materially limits the licensee's freedom of action with regard to seeking compensation in connection with sublicensing, licensing or distributing such Software program or Software.

"**Order**" means any award, writ, injunction, judgment, order or decree entered into, issued, made or rendered by any Government Entity.

"**Ordinary Course**" means the ordinary course of the Business consistent with recent past practice as modified since the filing of the Bankruptcy Proceedings, and as such practice may be modified from time to time (i) to the extent necessary to reflect the Bankruptcy Proceedings or (ii) as may be required in the reasonable judgment of the Sellers to further effectuate the separation of the Business from the other businesses of the Sellers in a manner consistent with the Transaction Documents.

"**Other Loaned Employees**" means Employees located in or employed by the Sellers in Canada, who have accepted Offers of employment or whose employment transfers by operation

23

of Law, and who would otherwise be Transferred Employees immediately following the Closing Date but for the fact that the Purchaser or Designated Purchaser, despite their commercially reasonable efforts, are not ready to employ such employees as of such date.

"**Other Sellers**" means the Affiliates of the Main Sellers listed in Exhibit A hereto, except to the extent that (i) any such entity listed on Exhibit A is liquidated or wound up between the date of this Agreement and the Closing Date or (ii) despite the commercially reasonable efforts of the Main Sellers, they are unable to cause any such entity listed on Exhibit A to agree to execute this Agreement on or prior to the Closing Date, then such entities shall not be considered "Other Sellers" (and therefore, shall also not be considered Sellers) for any purposes of this Agreement notwithstanding their inclusion on Exhibit A and any Assets and Liabilities of such entities will not be transferred as part of this Agreement.

"**Overhead and Shared Services**" means corporate or shared services provided to or in support of the Business that are general corporate or other overhead services or provided (or were provided prior to any recent divestiture by any Seller since the filing of the Bankruptcy Proceedings) to both (i) the Business and (ii) other businesses or business segments of any Seller, including travel and entertainment services, temporary labor services, office supplies services (including copiers and faxes), personal telecommunications services, computer hardware and software services, fleet services, energy/utilities services, procurement and supply arrangements, research and development, treasury services, public relations, legal, compliance and risk management services (including workers' compensation), payroll services, sales and marketing support services, information technology and telecommunications services, accounting services, tax services, human resources and employee relations management services, employee benefits services, credit, collections and accounts payable services, logistics services, property management services, environmental support services and customs and excise services, in each case including services relating to the provision of access to information, operating and reporting systems and databases and including all hardware and software and other Intellectual Property necessary for or used in connection therewith.

"**Outbound License Agreement**" has the meaning set forth in Section 4.5(k).

"**Owned Equipment**" means (i) those items of Equipment owned by any of the Sellers that are held or used exclusively in connection with the Business including items of Equipment owned by any of the Sellers that are held or used exclusively in connection with the Business that are (A) located at the shared labs specified in Section 1.1(f) of the Sellers Disclosure Schedule or (B) on loan to NN Turkey or the Sellers' contract manufacturers as listed in Section 1.1(f) of the Sellers Disclosure Schedule, and (ii) the other Equipment listed in Section 1.1(g) of the Sellers Disclosure Schedule, provided, however, that "Owned Equipment" shall not include any (A) Owned Inventory, (B) any items of tangible property personally assigned to Employees who are not (w) Transferred Employees as of the Employee Transfer Date, (x) Visa Employees, (y) Other Loaned Employees, or (z) Transitional Employees, (C) any Intellectual Property, (D) information technology assets, such as data servers and large scale storage devices or (E) any furniture and fixtures other than trade fixtures located at the Direct Lease Real Estate, or any leasehold improvements owned by the head landlord and located at the demised premises which are the subject of any Sublease.

24

"**Owned Inventory**" means (i) Inventory owned by any of the Sellers that is held or used exclusively in connection with the Business, including any such Inventory which is owned by the Sellers but remains in the possession or control of a contract manufacturer or any other Person, and (ii) the other Inventory listed in Section 1.1(h) of the Sellers Disclosure Schedule.

"**Partial Allocation**" has the meaning set forth in Section 6.9.

"**Party**" or "**Parties**" means individually or collectively, as the case may be, the Sellers and the Purchaser.

"**Patents**" means all national (including the United States and Canada) and multinational statutory invention registrations, patents, patent applications and provisional patent applications, including all reissues, divisions, continuations, continuations-in-part, extensions and reexaminations, and all rights therein provided by multinational treaties or conventions.

"**Permitted Encumbrances**" means (i) statutory Liens for Taxes the payment of which is not yet due or, if due, for Taxes the validity of which is being contested in good faith by appropriate proceedings and which are set forth on Schedule 1.1(i), in each case, for which adequate reserves have been established in accordance with GAAP, other than Liens that will be discharged at Closing pursuant to the terms of the Canadian Approval and Vesting Order and the U.S. Sale Order; (ii) mechanics', carriers', workers', repairers', landlords', warehouses and similar Liens arising or incurred in the Ordinary Course for sums not yet delinquent or overdue or which are being contested in good faith by appropriate proceedings and for which adequate reserves have been established to the extent required by GAAP; (iii) Liens arising hereunder or under any Assigned Contracts (after giving effect to the assignment hereunder); (iv) any Liens imposed by any Bankruptcy Court in connection with the Bankruptcy Proceedings that are to be discharged at Closing pursuant to the terms of the Canadian Approval and Vesting Order and the U.S. Sale Order; (v) any other Liens set forth in Section 1.1(i) of the Sellers Disclosure Schedule; and (vi) zoning, entitlement, building and land use regulations, customary covenants, defects of title, easements, rights of way, restrictions and other similar charges or encumbrances which do not impair in any material respect the use or value of the related assets in the Business as currently conducted.

"**Person**" means an individual, a partnership, a corporation, an association, a limited or unlimited liability company, a joint stock company, a trust, a joint venture, an unincorporated organization or other legal entity or Government Entity.

"**Petition Date**" means January 14, 2009, except with respect to Nortel Networks (CALA) Inc. in which case "Petition Date" shall mean July 14, 2009.

"**Plan of Record**" means the CVAS Products under development by the Sellers as of the date hereof, as set forth in the "Plan of Record" portion of Section 1.1(c) of the Sellers Disclosure Schedule.

"**Pre-Close Employment Payments Amount**" has the same meaning as "Pre-Close Employment Payments" has under the EMEA Asset Sale Agreement.

25

"**Pre-Closing Segregation Costs**" has the meaning set forth in Exhibit 5.27.

"**Pre-Closing Taxable Period**" means any taxable period or portion thereof ending on or prior to the Closing Date.

"**Prepaid Expenses**" means prepaid expenses specifically identified as relating to the Business as indicated in the Adjusted Net Working Capital Statement.

"**Prepaid Expenses Amount**" means, as of any given date, the amounts classified as Prepaid Expenses of the Business, determined in a manner consistent with the Nortel Accounting Principles.

"**Primary Party**" means (i) each of the Main Sellers, on the one hand, and (ii) the Purchaser, on the other hand.

"**Product Exposures Provision**" means the provision (also known as "KPD provision") with respect to defects (other than defects covered by the Warranty Provision) of CVAS Products and/or CVAS Services that have been sold by the Sellers and the EMEA Sellers prior to Closing.

"**Product Exposures Provision Amount**" means the amount as of any date of the Product Exposures Provision determined in accordance with the Nortel Accounting Principles.

"**Property Taxes**" means all real property Taxes, personal property Taxes and similar ad valorem Taxes.

"**Provider**" has the meaning set forth in the Transition Services Agreement.

"**Purchase Price**" has the meaning set forth in Section 2.2.1.

"**Purchase Price Escrow Amount**" means eight million dollars ($8,000,000).

"**Purchaser**" has the meaning set forth in the preamble to this Agreement.

"**Purchaser Audited Financial Statements**" has the meaning set forth in Section 3.4(a).

"**Purchaser Authorized Canadian Agent**" has the meaning set forth in Section 10.6(c).

"**Purchaser Determination**" has the meaning set forth in Section 6.11(a).

"**Purchaser Disclosure Schedule**" means the disclosure schedule delivered by the Purchaser to the Sellers on the date hereof.

"**Purchaser Employee Plan**" means any "employee benefit plan" within the meaning of Section 3(3) of ERISA and any other employee benefit plan, including any profit sharing plan, savings plan, bonus plan, performance awards plan, incentive compensation plan, deferred compensation plan, stock purchase plan, stock option plan, vacation plan, leave of absence plan, employee assistance plan, automobile leasing/subsidy/allowance plan, expense reimbursement plan, meal allowance plan, redundancy or severance plan, termination or retirement indemnity

plan, relocation plan, family support plan, pension plan, supplemental pension plan, retirement plan, early or ill health retirement plan, retirement savings plan, post-retirement plan, medical, health, hospitalization or life insurance plan, disability plan, sick leave plan, retention plan, education assistance plan, expatriate assistance plan, compensation arrangement, including any base salary arrangement, overtime, on-call or call-in policy, death benefit plan, or any other similar plan, program, arrangement or policy that is maintained or otherwise contributed to, or required to be maintained or contributed to, by or on behalf of the Purchaser or any of its Subsidiaries or Affiliates with respect to their employees employed in those countries where they will employ Transferred Employees pursuant to this Agreement.

"**Purchaser Financial Statements**" has the meaning set forth in Section 3.4(b).

"**Purchaser Party**" has the meaning set forth in Section 6.11(a).

"**Purchaser Unaudited Financial Statements**" has the meaning set forth in Section 3.4(b).

"**Qualified Expenditures**" has the meaning set forth in Section 6.5(b).

"**Real Estate Agreements**" means the leases, subleases or license agreements between the relevant Sellers, on the one hand, and the Purchaser and/or any Designated Purchasers, on the other hand, in accordance with and as provided by the RETC.

"**Real Estate Lease**" means any Seller Contract that is a lease, sublease, license or other agreement for occupancy of real property.

"**Real Property**" means, collectively, the Direct Lease Real Estate and the Leased Real Property.

"**Records Custodian**" means Deloitte & Touche LLP or in case such firm is unable to carry out its duties for whatever reason, such other auditing firm of international reputation that is acceptable to each of the Purchaser and the Sellers, each acting reasonably.

"**Regulatory Approvals**" means the Antitrust Approvals and the ICA Approval.

"**Release**" when used in conjunction with Hazardous Materials, means any spilling, leaking, pumping, emitting, emptying, pouring, discharging, depositing, injecting, escaping, leaching, migrating, dumping, or disposing of Hazardous Materials (including the abandonment or discarding of barrels, containers or other receptacles containing Hazardous Materials) into the environment.

"**Relevant Antitrust Authorities**" has the meaning set forth in the definition of "Mandatory Antitrust Approvals" above.

"**Replacement Financing**" means debt financing to be disbursed on the Closing Date which the Purchaser wishes to obtain in replacement for part or all of the Financing.

"**Representatives**" has the meaning set forth in Section 5.29.

27

"**Respective Affiliates**" has the meaning set forth in Section 10.15(c).

"**Restricted Assets**" has the meaning set forth in Section 5.26(a).

"**Restricted Liabilities**" has the meaning set forth in Section 5.26(b).

"**Restricted Seller**" has the meaning set forth in Section 5.26(b).

"**Restricted Technical Records**" means the Livelink database or any other similar database containing only all necessary documents with respect to the technical aspects of the Qualified Expenditures of NNTC or NNL in their 2002 and subsequent taxation years.

"**Retained Contracts**" means any of those (i) 365 Customer Contracts or Non-365 Customer Contracts rejected by the Purchaser under either of Sections 2.1.5(d) or 2.1.6(e), (ii) Bundled Contracts that Purchaser chooses not to unbundle under any of clause (i), (ii) or (iii) of Section 5.14(a) or (iii) customer Contracts of the Business that are outside the scope of this Agreement and retained by the Sellers as a result of the jurisdiction in which they were originated or otherwise.

"**RETC**" means the Real Estate Terms and Conditions attached hereto as Exhibit M.

"**Royalty Liability Amount**" means, as of any given date, the amount of the royalty liabilities, net of applicable provisions, determined in accordance with the Nortel Accounting Principles.

"**Sales Employees**" has the meaning set forth in Section 7.1.1(a).

"**Seller Authorized Agent**" has the meaning set forth in Section 10.6(d).

"**Seller Authorized Canadian Agent**" has the meaning set forth in Section 10.6(d).

"**Seller Authorized U.S. Agent**" has the meaning set forth in Section 10.6(d).

"**Seller Bid**" has the meaning set forth in Section 2.1.1(k).

"**Seller Break-Up Fee**" means an amount equal to two-thirds (2/3) of the Break-Up Fee.

"**Seller Consents**" has the meaning set forth in Section 2.1.1(j)

"**Seller Contracts**" means (i) those Contracts of a Seller that relate exclusively to the Business or to the Assets (including Inbound License Agreements that are used, as of the date hereof, exclusively in connection with the Business or any Asset, but excluding any other licenses of Intellectual Property), and (ii) the Contracts of a Seller listed in Section 1.1(j) of the Sellers Disclosure Schedule.

"**Seller Employee Plan**" means (i) any "employee benefit plan" within the meaning of Section 3(3) of ERISA and any other employee benefit plan including any profit sharing plan, savings plan, bonus plan, performance awards plan, incentive compensation plan, deferred

compensation plan, stock purchase plan, stock option plan, vacation plan, leave of absence plan, employee assistance plan, automobile leasing/subsidy/allowance plan, expense reimbursement plan, meal allowance plan, redundancy or severance plan, relocation plan, family support plan, pension plan, supplemental pension plan, retirement plan, retirement savings plan, post retirement plan, medical, health, hospitalization or life insurance plan, disability plan, sick leave plan, retention plan, education assistance plan, expatriate assistance plan, compensation arrangement, including any base salary arrangement, overtime, on-call or call-in policy, death benefit plan, or any other similar plan, program, arrangement or policy that is maintained or otherwise contributed to, or required to be maintained or contributed to, by or on behalf of the Sellers or any of their Subsidiaries or Affiliates (other than the EMEA Sellers) with respect to Employees, and (ii) any other employee benefit plan with respect to which the Purchaser or any of its Affiliates could have any Liability as a result of the Sellers or any of their Subsidiaries or Affiliates (other than the EMEA Sellers) maintaining such plan prior to the Closing Date.

"**Seller Expense Reimbursement**" means an amount equal to two-thirds (2/3) of the Expense Reimbursement.

"**Seller Insurance Policies**" means all current or previous insurance policies of the Sellers and their Affiliates, including all environmental, directors' and officers' Liability, fiduciary Liability, employed lawyers, property and casualty flood, ocean marine, contaminated products insurance policies and all other insurance policies or programs arranged or otherwise provided or made available by the Sellers or their Affiliates that cover (or covered) any of the Covered Assets and Persons at any time prior to the Closing.

"**Sellers**" has the meaning set forth in the preamble to this Agreement.

"**Sellers Disclosure Schedule**" means the disclosure schedule delivered by the Sellers to the Purchaser on the date hereof.

"**Sellers' Trademarks**" has the meaning set forth in Section 5.21.

"**Severance Amount**" has the meaning given to it in the EMEA Asset Sale Agreement.

"**Software**" means any and all (i) computer programs, applications and interfaces, whether in source code or object code, (ii) computerized databases and compilations, and (iii) all user manuals and architectural and design specifications, training materials and other documentation relating to any of the foregoing.

"**Special Arrangements**" has the meaning set forth in Section 4.11(a).

"**Specified Employee Liabilities**" has the meaning set forth in Section 2.1.3(i).

"**Specified Employee Liabilities Amount**" means the amount specified on Section 7.1.2(c)(v) of the Sellers Disclosure Schedule with respect to each of the following: (i) gratuity payments due to Transferred Employees in India, (ii) long service leave due to Transferred Employees in Australia, (iii) long service leave due to Transferred Employees in New Zealand, (iv) end of service payments due to Transferred Employees in Saudi Arabia, (v) end of service

payments due to Transferred Employees in the United Arab Emirates, and (vi) end of service payments due to Transferred Employees in Tunisia. .

"**Specified Transferred Employees**" has the meaning set forth in Section 7.1.2(c)(ii).

"**Straddle Period**" has the meaning set forth in Section 6.4(b).

"**Subcontract Agreement**" means one or more agreements between the relevant Sellers, on the one hand, and the Purchaser and/or any Designated Purchasers, on the other hand, to be executed on or before the Closing in a form mutually agreed to by the Parties so as to pass through the benefits and burdens of the underlying Contract with customers as if the Purchaser or the applicable Designated Purchaser were party thereto.

"**Sublease**" has the meaning set forth in Section 5.31.

"**Subsidiary**" of any Person means any Person Controlled by such first Person.

"**Successful Bidder**" has the meaning set forth in the Bidding Procedures.

"**Target Working Capital**" means seventy three million dollars ($73,000,000).

"**Tax**" means (a) any domestic or foreign federal, state, local, provincial, territorial or municipal taxes, fees, levies, assessments or other impositions by or on behalf of any Government Entity, including net income, gross income, individual income, capital, value added, goods and services, gross receipts, sales, use, ad valorem, business rates, transfer, franchise, profits, business, environmental, real property, personal property, service, service use, withholding, payroll, employment, unemployment, severance, occupation, social security, excise, stamp, stamp duty reserve, customs, and all other taxes, fees, duties, levies, assessments, deductions, withholdings or charges of the same or of a similar nature, however denominated, together with any interest, penalties, additions to tax and additional amounts imposed or assessed with respect thereto, and (b) any obligation to pay any such amounts owing by any Person, whether by contract, as a result of transferee or successor liability, as a result of being a member of an affiliated, consolidated, combined or unitary group for any period or otherwise.

"**Tax Authority**" means any local, municipal, governmental, state, provincial, territorial, federal, including any U.S., Canadian, U.K. or other fiscal, customs or excise authority, body or officials (or any entity or individual acting on behalf of such authority, body or officials) anywhere in the world, including any Government Entity with responsibility for the imposition, collection or administration of any form of Tax or exercising Tax regulatory authority.

"**Tax Claim**" has the meaning set forth in Section 6.11(b).

"**Tax Claim Notice**" has the meaning set forth in Section 6.11(b).

"**Tax Credit Purchaser**" has the meaning set forth in Section 6.5(b).

"**Tax Escrow Amount**" means $2,500,000 (two million five hundred thousand dollars), which amount shall secure the Sellers' obligations under Section 6.11.

30

"**Tax Returns**" means all returns, reports (including elections, declarations, designations, disclosures, schedules, estimates and information returns) and other information filed or required to be filed with any Tax Authority relating to Taxes, including any amendments thereto.

"**TFR Amount**" means the amount of the actual unfunded obligation accrued in any period preceding the Closing Date that is assumed by the Purchaser, a Designated Purchaser or an EMEA Designated Purchaser at Closing under the Trattamento di Fine Rapporto in Italy, to the extent that it is required to be accounted for under FAS 87 (paragraphs 11, 72 and 73). The amount will be determined in accordance with GAAP.

"**Third Party**" means any Person that is neither a Party nor an Affiliate of a Party.

"**Third Party Operator**" has the meaning set forth in Section 7.1.2(f).

"**365 Contract**" means any Contract of a U.S. Debtor that is an Executory Contract and was entered into before the Petition Date that can be assumed and assigned by the relevant U.S. Debtor pursuant to Section 365 of the U.S. Bankruptcy Code.

"**365 Customer Contract**" has the meaning set forth in Section 2.1.5(a).

"**365 Customer Contract List**" has the meaning set forth in Section 2.1.5(a).

"**365 Real Estate Lease List**" has the meaning set forth in Section 2.1.5(b).

"**365 Real Estate Leases**" has the meaning set forth in Section 2.1.5(b).

"**Trademarks**" means, together with the goodwill associated therewith, all trademarks, service marks, trade dress, logos, trade names, corporate names, business names, domain names, whether or not registered, including all common law rights, and registrations, applications for registration and renewals thereof, including, but not limited to, all marks registered in the United States Patent and Trademark Office, the trademark offices of the states and territories of the United States of America, and the trademark offices of other nations throughout the world (including the Canadian Intellectual Property Office), and all rights therein provided by multinational treaties or conventions.

"**Trademark License Agreement**" means the trademark license agreement between NNL, on the one hand, and the Purchaser and/or any Designated Purchasers, on the other hand, in respect of certain Trademarks used in respect of the CVAS Products and/or CVAS Services to be entered into on or before the Closing in the form attached hereto as Exhibit N.

"**Transaction Documents**" means this Agreement, the EMEA Asset Sale Agreement, the Ancillary Agreements and all other ancillary agreements to be entered into, or documentation delivered by, any Party and/or any Designated Purchaser pursuant to this Agreement or any Local Sale Agreement.

"**Transfer Date**" has the meaning given to it in the EMEA Asset Sale Agreement.

31

"**Transfer Taxes**" means all goods and services, sales, excise, use, transfer, documentary, filing, recordation, value added, stamp, stamp duty reserve, and all other similar Taxes, duties or other like charges, however denominated (including any real property transfer Taxes and conveyance and recording fees and notarial fees), together with interest, penalties and additional amounts imposed with respect thereto.

"**Transfer Tax Returns**" has the meaning set forth in Section 6.7(a).

"**Transferred Employees**" means (i) Employees who accept an offer of employment by, and commence employment with, the Purchaser or a Designated Purchaser in accordance with the terms of Section 7.1.1(a) and (c) or Section 7.2, and (ii) those Employees whose employment transfers by operation of Law. For the avoidance of doubt, Transitional Employees shall not be considered Transferred Employees.

"**Transferred Employee Plan**" means any Seller Employee Plan that is (x) established or maintained in accordance with a Collective Labor Agreement that is transferred to the Purchaser or a Designated Purchaser under the terms of Section 7.2, and transferred (or the liabilities of which are transferred) to the Purchaser or Designated Purchaser pursuant to this Agreement or by operation of Law or (y) transferred (or the liabilities of which are transferred) to the Purchaser or Designated Purchaser pursuant to this Agreement or by operation of Law, in each case, excluding the Specified Employee Liabilities assumed by Purchaser pursuant to Section 2.1.3(i).

"**Transferred Intellectual Property**" means (i) the Transferred Patents, (ii) the Trademarks set forth in Section 1.1(k) of the Sellers Disclosure Schedule, and (iii) any Intellectual Property (other than Patents or Trademarks) owned by any of the Sellers that is used exclusively in connection with the Business.

"**Transferred Overhead and Shared Services**" means Overhead and Shared Services to be provided to or in support of the Business post-Closing by Transferred Employees as set forth in Section 1.1(l) of the Sellers Disclosure Schedule.

"**Transferred Patents**" means the Patents listed in Section 1.1(m) of the Sellers Disclosure Schedule.

"**Transferring Employee**" has the meaning set forth in the EMEA Asset Sale Agreement.

"**Transition Services Agreement**" means an agreement between the relevant Sellers or EMEA Sellers (or their Affiliates), on the one hand, and the Purchaser and/or any Designated Purchasers, on the other hand, to be executed on or prior to the Closing Date, in the form attached hereto as Exhibit O, except that the schedules to such agreement shall be agreed between the Parties in accordance with Section 5.27 hereof.

"**Transitional Employees**" means Employees who accept an offer of employment by, and commence employment with, the Purchaser or a Designated Purchaser in accordance with the terms of Section 7.1.1(f).

32

"**TSA Escrow Amount**" means ten million dollars ($10,000,000).

"**2008 Revenues**" has the meaning set forth in the definition of "Market Value" above.

"**Unaudited Financial Statements**" has the meaning set forth in Section 4.7(b).

"**Unbilled Accounts Receivable**" means, as of a given date, amounts classified in Construction-in-Process accounts in a manner consistent with the Nortel Accounting Principles.

"**Unbilled Accounts Receivable Amount**" means, as of any given date, the amount of Unbilled Accounts Receivable of the Business determined in accordance with the Nortel Accounting Principles.

"**Unexpired Leases**" means leases that constitute "unexpired leases" for the purposes of Section 365 of the U.S. Bankruptcy Code.

"**Union Employee**" means an Employee whose terms and conditions of employment are covered by a Collective Labor Agreement as specified in Section 4.11(b) of the Sellers Disclosure Schedule.

"**U.S. Bankruptcy Code**" means Title 11 of the United States Code.

"**U.S. Bankruptcy Court**" means the United States Bankruptcy Court for the District of Delaware.

"**U.S. Bankruptcy Rules**" means the U.S. Federal Rules of Bankruptcy Procedure.

"**U.S. Bidding Procedures and Sale Motion**" has the meaning set forth in Section 5.1(a).

"**U.S. Bidding Procedures Order**" has the meaning set forth in Section 5.1(a).

"**U.S. Debtor Contract**" means any Seller Contract to which a U.S. Debtor is a party.

"**U.S. Debtors**" has the meaning set forth in the recitals to this Agreement.

"**U.S. Sale Order**" has the meaning set forth in Section 5.1(a).

"**Visa Employees**" means Employees (other than Transitional Employees and Employees whose employment transfers by operation of Law) who are identified as having a visa or permit in Section 4.11(b) of the Sellers Disclosure Schedule and whose employment with Purchaser or a Designated Purchaser cannot commence or continue on the Employee Transfer Date solely due to Purchaser or Designated Purchaser's inability to obtain the required visa or permit with respect to such Employee's employment on the Employee Transfer Date.

"**WARN Act**" means the Worker Adjustment and Retraining Notification Act of 1989, as amended, or any similar Law relating to plant closing or mass layoff.

33

"**Warranty Obligations**" means the warranty obligations relating to CVAS Products and CVAS Services assumed by the Purchaser and/or a Designated Purchaser and/or an EMEA Designated Purchaser pursuant to Section 2.1.3(b) and Section 2.1.3(e) of this Agreement and Clauses 2.3.2(C) and 2.3.3.6 of the EMEA Asset Sale Agreement, excluding those warranty obligations that relate to Products Exposure Provisions.

"**Warranty Provision**" means the provision to be recognized and measured by the Business pursuant to the Nortel Accounting Principles for potential claims by customers under the Warranty Obligations.

"**Warranty Provision Amount**" means the amount of the Warranty Provision as of any given date as calculated in accordance with the Nortel Accounting Principles.

Section 1.2.   Interpretation.

1.2.1.   Gender and Number.  Any reference in this Agreement to gender includes all genders and words importing the singular include the plural and vice versa.

1.2.2.   Certain Phrases and Calculation of Time.  In this Agreement (i) the words "including" and "includes" mean "including (or includes) without limitation", (ii) the terms "hereof," "herein," and "herewith" and words of similar import shall, unless otherwise stated, be construed to refer to this Agreement and not to any particular provision of this Agreement, and Article, Section, paragraph, Exhibit and Schedule references are to the Articles, Sections, paragraphs, Exhibits and Schedules to this Agreement unless otherwise specified, (iii) in the computation of periods of time from a specified date to a later specified date, unless otherwise expressly stated, the word "from" means "from and including" and the words "to" and "until" each mean "to but excluding", (iv) the use of the words "or" and "any" shall not be exclusive, and (v) in determining whether an asset is "exclusively" used in connection with the Business, incidental, de minimis or casual uses outside the Business shall not be considered.  If the last day of any such period is not a Business Day, such period will end on the next Business Day.  References to "Assets" and "Assumed Liabilities" in Articles III, IV and IX and Section 5.9 shall omit "at the Closing", "at the Closing Date" and terms of similar meaning from the definitions of the terms that comprise such definitions.

When calculating the period of time "within" which, "prior to" or "following" which any act or event is required or permitted to be done, notice given or steps taken, the date which is the reference date in calculating such period is excluded from the calculation.  If the last day of any such period is not a Business Day, such period will end on the next Business Day.

1.2.3.   Headings, etc.  The inclusion of a table of contents, the division of this Agreement into Articles and Sections and the insertion of headings are for convenient reference only and are not to affect or be used in the construction or interpretation of this Agreement.

1.2.4.   Currency.  All monetary amounts in this Agreement, unless otherwise specifically indicated, are stated in United States currency.  All calculations and estimates to be performed or undertaken, unless otherwise specifically indicated, are to be expressed in United States currency.  All payments required under this Agreement shall be paid in United States currency in

immediately available funds, unless otherwise specifically indicated herein. Where another currency is to be converted into United States currency it shall be converted on the basis of the exchange rate published in the *Wall Street Journal* (Eastern Edition) newspaper for the day in question.

1.2.5. <u>Statutory References</u>. Unless otherwise specifically indicated, any reference to a statute in this Agreement refers to that statute and to the regulations made under that statute as in force from time to time.

## ARTICLE II

## PURCHASE AND SALE OF ASSETS

Section 2.1. <u>Purchase and Sale</u>.

2.1.1. <u>Assets</u>. Subject to the terms and conditions of this Agreement, at the Closing, the Purchaser shall, and shall cause the relevant Designated Purchasers to, purchase or accept assignment and assume from the relevant Sellers, and each Seller shall transfer or assign to the Purchaser or the relevant Designated Purchasers, all of such Seller's right, title and interest in and to the following assets (such assets, excluding the Excluded Assets, the "**Assets**") (x) in the case of Assets that are transferred or assigned by U.S. Debtors, free and clear of all Liens and Claims (other than Permitted Encumbrances, Assumed Liabilities and Liens created by or through the Purchaser, the Designated Purchasers or any of their Affiliates) pursuant to Sections 363 and 365 of the U.S. Bankruptcy Code, (y) in the case of Assets that are transferred or assigned by the Canadian Debtors, free and clear of all Liens (other than Permitted Encumbrances, Assumed Liabilities and Liens created by or through the Purchaser, the Designated Purchasers or any of their Affiliates) pursuant to the Canadian Approval and Vesting Order, when granted, and (z) in the case of Assets that are transferred or assigned by the Non-Debtor Sellers, free and clear of all Liens (other than Permitted Encumbrances, Assumed Liabilities and Liens created by or through the Purchaser, the Designated Purchasers or any of their Affiliates):

(a) the Owned Inventory as of the Closing Date;

(b) the Unbilled Accounts Receivable as of the Closing Date;

(c) the Owned Equipment as of the Closing Date;

(d) the Assigned Contracts in force as of the Closing Date;

(e) the Prepaid Expenses as of the Closing Date;

(f) all rights of the Sellers as of the Closing Date under non-disclosure, confidentiality, non-compete or non-solicitation agreements that are Assigned Contracts or, to the extent they relate exclusively to the Business or the Assets, with Transferred Employees (to the extent assignable without the applicable Transferred Employee's consent), contractors and agents of the Sellers or with other Third Parties;

(g) the tangible embodiments of the Business Information (whether in paper, digital or other tangible form) existing as of the Closing Date, subject to Section 2.1.2(f);

(h) the Transferred Intellectual Property as of the Closing Date, subject to the licenses granted to NNL, NNI and each of the EMEA Sellers pursuant to the Intellectual Property License Agreement and subject to any and all licenses granted under such Intellectual Property prior to the Closing Date not in violation of Section 5.9, together with (A) all income, royalties, damages and payments due or payable after the Closing Date relating to the Transferred Intellectual Property (except for (x) any income, royalties, damages and payments from claims asserted prior to the Closing Date or payment obligations accrued for periods prior to the Closing Date, whether or not due or payable after the Closing Date, and (y) any income or royalties payable under any contract, arrangement or agreement other than the Assigned Contracts), (B) the right, if any, to register, prosecute, maintain and defend the Transferred Intellectual Property before any public or private agency or registrar, and (C) the right to sue and recover damages or other compensation for past, present or future infringements, dilutions, misappropriations, or other violations thereof, the right to sue and obtain equitable relief in respect of such infringements, dilutions, misappropriations and other violations, and the right to fully and entirely stand in the place of the Sellers in all matters related thereto;

(i) all rights as of the Closing under all warranties, representations and guarantees made by suppliers, manufacturers, contractors, and Third Parties to the extent related to the Assets;

(j) to the extent assignable under applicable Law, all Consents of Government Entities exclusively pertaining to the Business (the "**Seller Consents**");

(k) all rights that may be freely transferred as of the Closing Date arising from or in connection with any Bid made prior to the Closing Date by any Seller or by a contractor team or joint venture in which any Seller is participating, which is capable of acceptance after the Closing and, if accepted, would result in the award of a Customer Contract that (if entered into after the date hereof and prior to the Closing Date) would be an Assigned Contract hereunder or to which the Purchaser has provided its prior written consent (to the extent required pursuant to Section 5.9) (any such Bid, a "**Seller Bid**");

(l) any net insurance proceeds received or to be received in respect of the Owned Equipment, to the extent payable to the Purchaser pursuant to Section 5.19; and

(m) any Tax records required by Law to be transferred to the Purchaser or a Designated Purchaser.

2.1.2. <u>Excluded Assets</u>. Notwithstanding anything in this Section 2.1 or elsewhere in this Agreement or in any of the other Transaction Documents to the contrary, nothing herein shall be deemed to sell, transfer, assign or convey (or require Sellers to do any of the foregoing as to) the following assets to the Purchaser or any Designated Purchaser, and the Sellers shall retain all of their respective rights, title and interests in and to, and the Purchaser and the Designated Purchasers shall have no rights with respect to, the rights, title and interests of the Sellers in and to, any of the following assets (the "**Excluded Assets**"):

36

(a) cash and cash equivalents, accounts receivable (including intercompany receivables but excluding Unbilled Accounts Receivable as of the Closing Date), bank account balances and all petty cash of the Sellers;

(b) all rights to Tax refunds, Tax credits or similar Tax benefits relating to the Assets or the Business allocable to a Pre-Closing Taxable Period or to the portion of a Straddle Period ending on and including the Closing Date, for the avoidance of doubt, excluding any such item with respect to Transfer Taxes that are the responsibility of the Purchaser pursuant to Section 6.1(a), which shall be for the benefit of the Purchaser;

(c) without limiting Section 5.28, all claims, causes of action and rights of Sellers or any Subsidiary thereof to the extent relating to any Excluded Liabilities or to any Liabilities for which Sellers are responsible under this Agreement (including rights of set-off, rights to refunds and rights of recoupment from or against any Third Party);

(d) other than the Assigned Contracts and any other contract rights transferred in connection with the Assets, any rights of the Sellers under any Contract (including, for the avoidance of doubt, and without limiting any rights under, the Subcontract Agreement, the Non-Assigned Contracts (except as provided for in Section 5.13), the Bundled Contracts, the Excluded 365 Customer Contracts, the Excluded Non-365 Customer Contracts and the Seller Insurance Policies (except pursuant to Section 2.1.1(l)));

(e) the minute books, stock ledgers and Tax records of the Sellers other than the Tax records described in Section 2.1.1(m);

(f) (i) any books, records, files, documentation or sales literature other than the Business Information (subject to clause (iii) of this subsection (f)), (ii) any Employee Records other than those required to be delivered to the Purchaser pursuant to Section 5.6(e) and ARTICLE VII and (iii) such portion of the Business Information that the Sellers are required by Law (including Laws relating to privacy but subject to any exemption from those Laws included in the Canadian Approval and Vesting Order or the U.S. Sale Order) or by any agreement with a Third Party to retain and/or not to disclose (provided that copies of such information shall be provided to the Purchaser to the extent permitted by applicable Law or such agreement);

(g) any right to any Intellectual Property (i) of any Seller (including Sellers' names) or any Affiliates of any Seller, with the exception of (A) the Transferred Intellectual Property, and (B) Intellectual Property to the extent rights are granted thereto pursuant to the Intellectual Property License Agreement or the Trademark License Agreement, and (ii) of any Third Party, except to the extent licensed under an Assigned Contract or otherwise granted pursuant to Section 5.4(c), 5.4(d) or 5.15(c);

(h) all rights of the Sellers under this Agreement and the other Transaction Documents;

(i) subject to Section 5.28, all of the rights and claims of the U.S. Debtors available to the U.S. Debtors under the U.S. Bankruptcy Code, of whatever kind or nature, as

37

set forth in Sections 544 through 551, inclusive, 553, 558 and any other applicable provisions of the U.S. Bankruptcy Code, and any related claims and actions arising under such Sections by operation of Law or otherwise, including any and all proceeds of the foregoing;

(j)  all records prepared in connection with the sale of the Assets;

(k)  all stock or other equity interests in any Person;

(l)  any assets set forth on Section 2.1.2(l) of the Sellers Disclosure Schedule;

(m) any assets owned by NN Turkey, the LGN Joint Venture or GDNT; and

(n)  any refunds due from, or payments due on, claims with the insurers of any Sellers in respect of losses arising prior to the Closing Date, other than as specified in Section 2.1.1(l);

(o)  any and all other assets and rights of the Sellers not specifically included in Section 2.1.1 (including any assets and rights of entities listed on Exhibit A who are ultimately not deemed to be Other Sellers); and

(p)  any Contract deemed an Excluded 365 Customer Contract or an Excluded Non-365 Customer Contract pursuant to Section 2.1.5 or Section 2.1.6; and

(q)  any Contract with an Affiliate of the Main Sellers that is not an EMEA Seller, an Other Seller or Seller.

In addition to the above, the Sellers shall have the right to retain, following the Closing, copies of any book, record, literature, list and any other written or recorded information constituting Business Information to which the Sellers in good faith determine they are reasonably likely to need access for bona fide business or legal purposes.

2.1.3.  <u>Assumed Liabilities</u>. On the terms and subject to the conditions set forth in this Agreement, at the Closing, the Purchaser shall, and shall cause the relevant Designated Purchasers to, assume and become responsible for, and perform, discharge and pay when due only the following Liabilities (such Liabilities, the "**Assumed Liabilities**"):

(a)  all Liabilities arising after the Closing Date, to the extent related to the conduct, operation or ownership by Purchaser of the Business after the Closing Date, including (i) all such Liabilities with respect to the ownership and operation of the Assets after the Closing Date, (ii) all such Liabilities related to Actions or claims brought against the Business after the Closing Date, (iii) all such Liabilities under any Environmental Laws after the Closing Date, (iv) all such Liabilities under any products liability Laws or similar Laws concerning defective products after the Closing Date, and (v) all such Liabilities under any applicable Laws in relation to telecommunications providers after the Closing Date;

(b)  (i) all Liabilities arising from or in connection with the performance of the Assigned Contracts (or breach thereof) or any arrangements entered into pursuant to Section 5.13 or 5.14 (or breach thereof) after the Closing Date, (ii) any Cure Costs payable pursuant to

38

Section 2.1.7, (iii) any obligation under any Assigned Contract to buy back from the relevant resellers the CVAS Products sold by the Business to such resellers under such Assigned Contract, and (iv) any obligations under any warranty Liabilities relating to CVAS Products and CVAS Services which have been supplied under any Assigned Contract;

(c) (i) all Liabilities resulting from any licensing assurances, declarations, agreements or undertakings relating to the Transferred Intellectual Property which the Sellers may have granted or committed to Third Parties, solely to the extent that the terms of such licensing assurances, declarations, agreements, or undertakings require assignees of the Transferred Intellectual Property to assume such Liability, and (ii) Liabilities resulting from the assurances, declarations and undertakings made to standard-setting bodies as listed in Section 2.1.3(c) of the Sellers Disclosure Schedule (including, with respect to such Liabilities, the name of each relevant standard-setting body and, to the extent available, any Patents included in the Transferred Intellectual Property that are subject to such Liability), it being understood that Sellers or their Affiliates may have made other licensing assurances, declarations or undertakings to various standard-setting bodies concerning the Transferred Intellectual Property, the Liabilities for such other assurances, declarations or undertakings are not assumed hereunder but are being referenced merely to provide notice thereof;

(d) all Liabilities for, or related to any obligation for, any Tax that the Purchaser or any Designated Purchaser bears under ARTICLE VI;

(e) all obligations under any warranty liabilities relating to CVAS Products and CVAS Services which have been supplied under any Bundled Contract or Non-Assignable Contract subcontracted to the Purchaser or any Designated Purchaser under any Subcontract Agreement or under the agreements set forth in Section 5.23(b);

(f) except to the extent otherwise expressly set forth in ARTICLE VII, all Liabilities related to or arising from any of the following: (i) the Purchaser's or any Designated Purchasers' (or any of their Affiliates') employment or termination of employment (whether or not arising under or in respect of any Purchaser Employee Plan) of Transferred Employees or Transitional Employees arising on or after the Closing Date; (ii) except where such Liability is attributable to an act or omission of the Sellers, the Purchaser's or relevant Designated Purchasers' (or any of their Affiliates') offer of employment or notice of continued employment (including any Liability, other than a Liability attributable to an act or omission by the Sellers, arising as a result of any breach of applicable employment Law by the Purchaser or relevant Designated Purchaser in connection with any pre-employment screening process), as applicable, to any Employee pursuant to the terms of Section 7.1; (iii) the Purchaser's or relevant Designated Purchasers' (or any of their Affiliates') decision to make or not make offers of employment to Employees, to the extent such offer violates applicable Law with respect to discrimination among employees or potential employees and except where such Liability is attributable to an act or omission of the Sellers, (iv) the employment, prospective employment or termination of employment of any Employee whose employment transfers by operation of Law arising after the Closing Date; and (v) the failure of the Purchaser or any Designated Purchasers or their Affiliates to satisfy their obligations with respect to the Employees, including the Transferred Employees and the Transitional Employees, as set out in ARTICLE VII;

39

(g) all Liabilities that relate to or arise from or in connection with any Purchaser Employee Plan;

(h) any obligation to provide continuation coverage pursuant to COBRA or any similar Law under any Purchaser Employee Plan that is a "group health plan" (as defined in Section 5000(b)(1) of the Code) to Transferred Employees and Transitional Employees and/or their qualified beneficiaries who have a qualifying event that occurs on or after such Transferred Employees' or Transitional Employees' Effective Hire Date;

(i) all Liabilities related to the Transferred Employees set forth on Section 2.1.3(i) of the Sellers Disclosure Schedule (the "**Specified Employee Liabilities**");

(j) all Liabilities related to Transferred Employees and Transitional Employees expressly assumed by Purchaser or a Designated Purchaser as set out in ARTICLE VII;

(k) Liabilities related to the obligation to repurchase Business-related Inventory under contract manufacturing agreements, as specified in the Contract Manufacturing Inventory Agreements;

(l) all Liabilities relating to executory supply purchase orders for products or services (other than raw materials, manufactured or purchased parts, work in process, packaging, stores, tooling, finished goods or supplies, in each case to be delivered to contract manufacturers), entered into by the Sellers in connection with the Business in the Ordinary Course before the Closing with any Person (other than a contract manufacturer) who is a supplier of the Business as of the date hereof (or a replacement supplier for any such supplier) and under which products and/or services have not been delivered or supplied as of the Closing Date;

(m) all Liabilities related to a Seller Bid; and

(n) all other Liabilities listed in Section 2.1.3(n) of the Sellers Disclosure Schedule.

2.1.4.  Excluded Liabilities.  For the avoidance of doubt, none of the Purchaser or the Designated Purchasers, as applicable, shall assume or be deemed to have assumed any Liabilities of the Sellers or their Affiliates other than the Assumed Liabilities (collectively the "**Excluded Liabilities**") and anything identified as an Excluded Liability is not an Assumed Liability. Without limiting the generality of the foregoing, Excluded Liabilities include:

(a) all Indebtedness of the Sellers and their Affiliates;

(b) all Liabilities arising out of the Contracts that are not Assigned Contracts;

(c) other than as specifically set forth herein, all Liabilities arising out of or relating to the Excluded Assets or the operation by the Sellers of any business other than the Business, whether before, on or after the Closing Date;

(d) other than as specifically set forth herein, any Liability relating to events or conditions occurring or existing in connection with, or arising out of, the Business as operated prior to the Closing Date, or the ownership, possession, use, operation or sale or other disposition prior to the Closing Date of the Assets (or any other assets, properties, rights or interests associated, at any time prior to the Closing Date, with the Business) including any liability with respect to Cure Costs payable by the Sellers pursuant to Section 2.1.7(b);

(e) other than as specifically set forth herein, litigation and related claims and Liabilities or any other claims against any Seller of any kind or nature whatsoever involving or relating to facts, events or circumstances arising or occurring prior to the Closing, no matter when raised (including Liability for breach, misfeasance or under any other theory relating to any Seller's conduct, performance or non-performance);

(f) all guarantees of Third Party obligations by the Sellers and reimbursement obligations to guarantors of the Sellers' obligations or under letters of credit;

(g) all accounts payable and trade payables of the Sellers, including intercompany payables (other than with respect to Assigned Contracts);

(h) all fees or commissions of any brokers, funds or investment banks in connection with the transactions contemplated by this Agreement and the other Transaction Documents based upon arrangements made by or on behalf of the Sellers or any of their Affiliates;

(i) all Excluded Employee Liabilities;

(j) all Liabilities for, or related to any obligation for, any Tax that the Sellers are required to bear under ARTICLE VI; for the avoidance of doubt, the Parties intend that no Purchaser or Designated Purchaser shall have any transferee or successor liability for any Tax that the Sellers bear under ARTICLE VI;

(k) all obligations to provide continuation coverage pursuant to COBRA or any similar Law to any Person who has been employed in the Business and who does not become a Transferred Employee or a Transitional Employee;

(l) except with respect to the Assumed Liabilities, all Liabilities or other obligations arising from Seller Employee Plans;

(m) any Liability of the Sellers or any ERISA Affiliate under Title IV of ERISA;

(n) any pension or retirement Liability of the Sellers or any ERISA Affiliate, which, for purposes of clarification, shall not include the Specified Employee Liabilities assumed by Purchaser pursuant to Section 2.1.3(i); and

(o) all Liabilities of Sellers arising under this Agreement and the Ancillary Agreements.

41

2.1.5.  Assumption and/or Assignment or Rejection of 365 Contracts and Assumption and Sublease and/or License of 365 Real Estate Leases.

(a) Section 2.1.5(a) of the Sellers Disclosure Schedule sets forth a list (the "**365 Customer Contract List**") of substantially all Customer Contracts of a U.S. Debtor that are Executory Contracts and were entered into before the Petition Date (Contracts that may be included on the 365 Customer Contract List, the "**365 Customer Contracts**"), which the relevant U.S. Debtor will, subject to Section 2.1.5(d), to the extent permitted by applicable Law, assume and assign to the Purchaser or a Designated Purchaser at Closing pursuant to section 365 of the U.S. Bankruptcy Code.

(b) Section 2.1.5(b) of the Sellers Disclosure Schedule sets forth a list (the "**365 Real Estate Lease List**") of all Real Estate Leases of a U.S. Debtor that previously have been assumed, pursuant to Section 365 of the U.S. Bankruptcy Code (the "**365 Real Estate Leases**"), and under which the Purchaser or a Designated Purchaser will enter into a Sublease to the extent permitted by, and in accordance with, the terms of the related 365 Real Estate Lease and applicable Law (the "**Assumed and Subleased Real Estate Leases**"), in accordance with and as provided by the terms of the RETC; and

(c) Section 2.1.5(c) of the Sellers Disclosure Schedule sets forth a list of all 365 Real Estate Leases under which the Purchaser or a Designated Purchaser has elected to have the relevant Seller enter into a License with the Purchaser or a Designated Purchaser to the extent permitted by, and in accordance with, the terms of the related 365 Real Estate Lease and applicable Law (the "**Licensed Real Estate Leases**") at Closing, in accordance with and as provided by the terms of the RETC.

(d) The Purchaser shall have until the Contract Designation Date, but not thereafter, to designate, by written notice to NNI, any 365 Customer Contracts listed on the 365 Customer Contract List (as supplemented and/or updated in accordance with Section 2.1.5(e)), that meet the Exclusion Criteria and which the Purchaser wishes to reject, which such 365 Customer Contracts shall be referred to as "**Excluded 365 Customer Contracts**" and shall not be Assigned Contracts hereunder.

(e) Prior to the Closing Date, the Sellers shall be entitled to update and/or supplement the 365 Customer Contract List from time to time by written notices to the Purchaser; provided, that within five (5) Business Days of Closing no update and/or supplement shall be permitted without Purchaser's prior written consent, and provided further that Sellers shall use commercially reasonable efforts to update the 365 Customer Contract List as soon as commercially practicable.  The Sellers shall use commercially reasonable efforts to make available to the Purchaser or the Purchaser's employees or representatives, complete unredacted copies of any Contract added to the 365 Customer Contract List no later than ten (10) Business Days after the date on which the Sellers add the Contract to the 365 Customer Contract List.

(f) The Contracts listed in the 365 Customer Contract List (as updated and/or supplemented pursuant to Section 2.1.5(e)) that are not Excluded 365 Customer Contracts are collectively referred to as the "**Assumed and Assigned Contracts.**"

42