IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

---------------------------------------------------------X
:
: Chapter 11
*In re* :
: Case No. 09-10138 (KG)
Nortel Networks Inc., *et al.*,[1] :
: Jointly Administered
              Debtors. :
:
---------------------------------------------------------X

## DECLARATION OF GEORGE RIEDEL IN SUPPORT OF DEBTORS' MOTION FOR ORDERS (I)(A) AUTHORIZING DEBTORS' ENTRY INTO THE STALKING HORSE AGREEMENT, (B) AUTHORIZING AND APPROVING THE BIDDING PROCEDURES AND BID PROTECTIONS, (C) APPROVING PAYMENT OF AN INCENTIVE FEE, (D) APPROVING THE NOTICE PROCEDURES AND THE ASSUMPTION AND ASSIGNMENT PROCEDURES, (E) AUTHORIZING THE FILING OF CERTAIN DOCUMENTS UNDER SEAL AND (F) SETTING A DATE FOR THE SALE HEARING, AND (II) AUTHORIZING AND APPROVING (A) THE SALE OF CERTAIN ASSETS OF DEBTORS' CARRIER VOICE OVER IP AND APPLICATION SOLUTIONS BUSINESS FREE AND CLEAR OF ALL LIENS, CLAIMS AND ENCUMBRANCES AND (B) THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS

I, George Riedel, declare under penalty of perjury as follows:

1. I am Chief Strategy Officer of Nortel Networks Corporation ("NNC") and Nortel Networks Limited ("NNL"), the direct corporate parent of Nortel Networks Inc. ("NNI" and, together with the other above-captioned debtors, the "Debtors" or the "U.S. Debtors"). I have held these positions since February 2006.

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's tax identification number, are: Nortel Networks Inc. (6332), Nortel Networks Capital Corporation (9620), Nortel Altsystems Inc. (9769), Nortel Altsystems International Inc. (5596), Xros, Inc. (4181), Sonoma Systems (2073), Qtera Corporation (0251), CoreTek, Inc. (5722), Nortel Networks Applications Management Solutions Inc. (2846), Nortel Networks Optical Components Inc. (3545), Nortel Networks HPOCS Inc. (3546), Architel Systems (U.S.) Corporation (3826), Nortel Networks International Inc. (0358), Northern Telecom International Inc. (6286), Nortel Networks Cable Solutions Inc. (0567) and Nortel Networks (CALA) Inc. (4226). Addresses for the Debtors can be found in the Debtors' petitions, which are available at http://chapter11.epiqsystems.com/nortel.

2. I submit this declaration in support of the Debtors' motion (the "Sale Motion")[2] for orders (i)(a) authorizing the Debtors' entry into that certain asset sale agreement dated as of December 22, 2009, among NNI, Nortel Networks Limited ("NNL"), Nortel Networks Corporation ("NNC") and certain other entities identified therein as sellers (together, the "Sellers") and GENBAND Inc. as purchaser ("GENBAND" or the "Stalking Horse Purchaser") for the sale of certain assets of the Sellers' Carrier Voice Over IP and Application Solutions business (the "CVAS Business") as described therein (the "Purchased Assets") as a "stalking-horse" sale agreement (as appended hereto as Exhibit A, the "Stalking Horse Agreement"), (b) authorizing and approving the bidding procedures and Bid Protections (as defined in the Bidding Procedures Order) (as appended as Exhibit 1 to the Bidding Procedures Order (as defined below), the "Bidding Procedures"), including granting administrative expense status to the Bid Protections payable by the Debtors to the Stalking Horse Purchaser, (c) approving payment of an Incentive Fee (as defined in the Motion), (d) approving the form and manner of sale notice and publication notice (the "Notice Procedures") and the procedures (the "Assumption and Assignment Procedures") as set forth below for the assumption and assignment of the Assumed and Assigned Contracts (included as part of the Purchased Assets as described in the Stalking Horse Agreement, the "Assets"), (e) authorizing the Debtors to file certain documents under seal and (f) setting the time, date and place for a hearing (the "Sale Hearing") to consider the sale of the Assets and the assumption and assignment of the Assumed and Assigned Contracts (the "Sale"), (ii) authorizing and approving (a) the sale of the Purchased Assets, free and clear of all liens, claims, and encumbrances, pursuant to section 363 of the Bankruptcy Code, except as set forth in the Stalking Horse Agreement and (b) the assumption

---

[2] Capitalized terms used but not defined herein shall have the meaning ascribed to them in the Sale Motion.

and assignment of the Assumed and Assigned Contracts pursuant to section 365 of the Bankruptcy Code; and (iii) granting them such other and further relief as the Court deems just and proper.

3. Except as otherwise indicated, all facts set forth in this declaration are based upon my personal knowledge, information supplied to me by other members of the Debtors' management and professionals, or learned from my review of relevant documents or upon my opinion based on my experience and knowledge of the Debtors' operations and financial condition. If I were called upon to testify, I could and would testify competently to the facts set forth herein. I am authorized to submit this declaration.

4. I have participated in or was informed of Nortel's exploration of opportunities to sell the Assets that have since resulted in the negotiations and execution of the Stalking Horse Agreement among the Sellers and Stalking Horse Purchaser, dated as of December 22, 2009, and the EMEA Agreement dated December 23, 2009.

5. The CVAS Business provides telecom service providers with network solutions that help them improve operational efficiency, reduce costs, and generate new revenue through the deployment of multimedia applications and voice over internet protocol ("VoIP") solutions that enhance the communications experience for businesses and consumers.

6. The CVAS Business specializes in deploying new VoIP networks for operators, in helping carriers transition their older voice infrastructure to state-of-the-art VoIP networks, and in delivering advanced multimedia offerings that unify and simplify communications for users.

7. The CVAS Business unit sells VoIP platforms (such as softswitches and media gateways), TDM switching systems (for local, toll and long-distance deployments), and associated services (such as installation, technical support, repairs management). These and

other products from the CVAS portfolio are combined into solutions that address specific service provider requirements and opportunities, including: business voice and multimedia, consumer voice and multimedia, transit and multimedia interconnect, and class 5.

8. The CVAS Business has a global presence – with nearly 2,100 employees in North America, Europe, the Middle East, Africa, Caribbean, Latin & South America, Asia-Pacific – and a worldwide customer base. Nortel's CVAS customers include many of the world's large carriers (including two-thirds of the top 20 service providers globally), leading regional operators, and major cable operators.

9. Nortel's principal competitors include Alcatel-Lucent, Huawei Technologies, Nokia Siemens Networks, Ericsson, Sonus Networks, GENBAND and Broadsoft. Despite a challenging economic environment and increasing competition in the carrier VoIP market space, CVAS remains the number one carrier VoIP and softswitch market leader, a position Nortel has held for the past seven and one half years according to industry analyst firm Dell'Oro Group.

10. The environment in which Nortel operates is highly competitive, and the cost of rapid technological development is high. Furthermore, the scale requirements to compete in this industry are substantial. Due to the global economic downturn, Nortel is experiencing significant pressure on its businesses and facing competing demands on its cash resources, globally as well as on a regional basis, as customers across all businesses suspend, delay and reduce capital expenditures. The extreme volatility in the financial, foreign exchange and credit markets globally and the uncertainty created by the ongoing creditor protection proceedings has compounded the situation. On June 19, 2009, Nortel announced that it had determined that the sale of its businesses is the best path to maximize value.

11. Nortel first announced its intention to explore a divestiture of the CVAS Business

in April of 2009. With a strong customer base and industry-leading technology, the CVAS Business was considered a premium asset with a highly differentiated offering, making it attractive to potential purchasers.

12.    In connection with this initial effort, Nortel, in consultation with its financial advisors, approached twenty-five (25) parties likely to be interested and able to acquire the CVAS Business, including a mix of financial investors and strategic buyers. An information memorandum was provided to the eighteen (18) parties who had executed confidentiality agreements. Of those parties who subsequently submitted expressions of interest, Nortel conducted management presentations to ten (10) of the entities it deemed able to consummate a transaction for the CVAS Business, and ultimately gave eight (8) companies access to an electronic data room containing confidential diligence materials regarding the CVAS Business.

13.    I believe, based on canvassing the marketplace since the commencement of these chapter 11 cases, that that the proposed transaction with the Stalking Horse Purchaser represents the best proposal available for the CVAS Business, subject to the receipt of a higher or better bid through the auction process contemplated in the Sale Motion.

14.    The potential purchase price that could be realized through a sale of the Assets is likely to decline over time if the Assets remain unsold. While it is clear that the Assets have significant value, the full value of the Assets may not be realized if a sale is not consummated quickly.

15.    One Equity Partners III, L.P. ("OEP"), is the largest single equity investor in GENBAND. OEP's support of the proposed transaction, both as an equity holder and as a financial sponsor of the transaction is essential to the Stalking Horse Purchaser's ability to execute the Stalking Horse Agreement. OEP has provided a financing commitment letter that

provides for payment of the Purchase Price by OEP. OEP also has been an active participant in other Nortel divestitures, and has conducted extensive diligence with respect to various potential transactions. OEP was an equity sponsor of MEN Acquisition LLC in its submission of a bid and its participation at the auction of the Metro Ethernet Networks Business.

16. OEP has informed the Seller that the provision of financing for GENBAND's entry into the Stalking Horse Agreement is dependent upon the payment of the Incentive Fee, which represents the fees and expenses OEP has incurred as an active participant in multiple Nortel sale processes. Without the Sellers' agreement to provide OEP with the Incentive Fee, the Stalking Horse Purchaser would not have undertaken efforts to research the value of the Assets or have entered into the Stalking Horse Agreement and will not continue to participate in the auction process, precluding the use of the Stalking Horse Agreement as the floor at a subsequent auction.

17. The Stalking Horse Agreement requires an expeditious sale process and provides the Stalking Horse Purchaser the right to terminate the Stalking Horse Agreement if certain milestones in the sale process are not timely met. For example, if the Court does not approve the Bidding Procedures Order by 30 days after the execution of the Stalking Horse Agreement, the Stalking Horse Purchaser may terminate the Stalking Horse Agreement. For these reasons, the expeditious sale of the Assets is critical to the maximization of the value of the Debtors' assets and, in turn, to a recovery for the Debtors' estates.

18. The Debtors' request that the Sale Motion be considered on an expedited basis at the January 6th hearing, which is reasonable and appropriate under the circumstances. The Debtors' request is appropriate in this instance because, as discussed herein, the expeditious sale of the Assets is critical to the maximization of the value of the Assets and, in turn, to a recovery

of the Debtors' estates. Therefore, I believe that a hearing on certain elements of the Sale Motion on shortened notice is in the best interests of the Debtors' estates and creditors.

19. As part of the Sale Motion, the Debtors seek authority to file certain notices identifying their Customer Contracts under seal. A significant aspect of the value of the CVAS Business is the established relationships the Debtors maintain with hundreds of customers with whom they have entered into the contracts at issue in the Sale Motion. These Customer Contracts are of critical value not only to any prospective purchaser of the Customer Contracts but also to the Debtors' other businesses.

20. If a list of counterparties to the Debtors' Customer Contracts were to be made publicly available, I believe that the value of the Assets would decline further, and as a result, the Stalking Horse Purchaser may become less likely to consummate the transaction.

21. In addition, publicizing such a list would disclose confidential proprietary information enabling competitors of the Debtors to solicit such customers for the sale of competing products and services, which would be detrimental to the preservation of the value of the Debtors' estates.

22. Accordingly, I believe the best interests of the Debtors and their creditors require that the sale of the Assets and contracts be completed as expeditiously as possible, and that the Court approve procedures by which the sale can be carried out without publicly divulging the names of the counterparties to the Customer Contracts.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct to the best of my knowledge, information and belief.

Dated: December 23, 2009
Boston, MA

_____
George Riedel