## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

-------------------------------------------------------X
: 
*In re*                                  :

Nortel Networks Inc., *et al.*,[1]        :

            Debtors.          :

:
:
:
:
-------------------------------------------------------X

Chapter 11

Case No. 09-10138 (KG)

Jointly Administered

**Hearing date: January 21, 2010 at 11:00 a.m. (ET)**
**Objections due: January 14, 2010 at 4:00 p.m. (ET)**

## MOTION PURSUANT TO 11 U.S.C. § 105(A), § 363, § 503 AND FED. R. BANKR. P. 9019 FOR AN ORDER (A) APPROVING THE CANADIAN FUNDING AND SETTLEMENT AGREEMENT, AND (B) GRANTING RELATED RELIEF

Nortel Networks Inc. ("NNI") and certain of its affiliates, as debtors and debtors in possession, (collectively, the "Debtors")[2], hereby move this Court (the "Motion"), for the entry of an order substantially in the form attached hereto as Exhibit A, approving the Final Canadian Funding and Settlement Agreement dated as of December 23, 2009 (the "Canadian Funding Agreement" or the "Agreement")[3], attached hereto as Exhibit B, by and among the Debtors (other than Nortel Networks (CALA) Inc. ("NN CALA")), the Canadian Debtors (as defined

---

[1]       The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's tax identification number, are: Nortel Networks Inc. (6332), Nortel Networks Capital Corporation (9620), Nortel Altsystems Inc. (9769), Nortel Altsystems International Inc. (5596), Xros, Inc. (4181), Sonoma Systems (2073), Qtera Corporation (0251), CoreTek, Inc. (5722), Nortel Networks Applications Management Solutions Inc. (2846), Nortel Networks Optical Components Inc. (3545), Nortel Networks HPOCS Inc. (3546), Architel Systems (U.S.) Corporation (3826), Nortel Networks International Inc. (0358), Northern Telecom International Inc. (6286), Nortel Networks Cable Solutions Inc. (0567) and Nortel Networks (CALA) Inc. (4226). Addresses for the Debtors can be found in the Debtors' petitions, which are available at http://chapter11.epiqsystems.com/nortel.

[2]       The Debtors for purposes of this Motion include all of the entities listed above except Nortel Networks (CALA) Inc.

[3]       The description of the Agreement set forth herein is for informational purposes only. In the event of any discrepancy between the description and the terms of the Agreement, the terms of the Agreement shall govern.

below) including Nortel Networks Limited ("NNL") and Ernst & Young Inc., as court-appointed

Monitor in the Canadian Proceedings and as foreign representative for the Canadian Debtors (the

"Monitor"), (collectively, the "Parties"), and granting them such other and further relief as the

Court deems just and proper.  In support of this Motion, the Debtors respectfully represent as

follows:

## Jurisdiction

1.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157

and 1334.  This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).  Venue

is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

2.      The statutory bases for the relief requested herein are sections 105(a) and

363 of chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"), and Rule 9019

of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

## Background

### A.      Procedural History

3.      On January 14, 2009 (the "Petition Date"), the Debtors, filed voluntary

petitions for relief under chapter 11 of the Bankruptcy Code.

4.      The Debtors continue to operate their businesses and manage their

properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy

Code.

5.      On January 15, 2009, this Court entered an order of joint administration

pursuant to Bankruptcy Rule 1015(b) that provided for the joint administration of these cases and

for consolidation for procedural purposes only [D.I. 36].

6.      Also on the Petition Date, the Debtors' ultimate corporate parent Nortel

Networks Corporation ("NNC"), NNI's direct corporate parent NNL (NNL, and together with

2

NNC and their affiliates, including the Debtors, "Nortel"), and certain of their Canadian affiliates (collectively, the "Canadian Debtors")[4] filed an application with the Ontario Superior Court of Justice (the "Canadian Court") under the Companies' Creditors Arrangement Act (Canada) (the "CCAA"), seeking relief from their creditors (collectively, the "Canadian Proceedings"). The Canadian Debtors continue to manage their properties and operate their businesses under the supervision of the Canadian Court.

7.    On January 14, 2009, the Canadian Court entered an order recognizing these chapter 11 proceedings as a foreign proceeding under section 18.6 of the CCAA. On February 27, 2009, based on a petition filed by Ernst & Young Inc., as court-appointed Monitor in the Canadian Proceedings and as foreign representative for the Canadian Debtors, this Court entered an order recognizing the Canadian Proceedings as foreign main proceedings under chapter 15 of the Bankruptcy Code.

8.    On January 14, 2009, the High Court of England and Wales placed nineteen of Nortel's European affiliates (collectively, the "EMEA Debtors")[5] into administration under the control of individuals from Ernst & Young LLC (collectively, the "Joint Administrators"). On May 28, 2009, at the request of the Joint Administrators, the Commercial Court of Versailles, France (the "French Court") (Docket No. 2009P00492) ordered the commencement of secondary proceedings in respect of Nortel Networks S.A. ("NNSA"), which consist of liquidation proceedings during which NNSA was originally authorized to continue to

---

[4]    The Canadian Debtors include the following entities: NNC, NNL, Nortel Networks Technology Corporation, Nortel Networks Global Corporation and Nortel Networks International Corporation.

[5]    The EMEA Debtors include the following entities: Nortel Networks UK Limited, Nortel Networks S.A., Nortel Networks (Ireland) Limited, Nortel GmbH, Nortel Networks France S.A.S., Nortel Networks Oy, Nortel Networks Romania SRL, Nortel Networks AB, Nortel Networks N.V., Nortel Networks S.p.A., Nortel Networks B.V., Nortel Networks Polska Sp. z.o.o., Nortel Networks Hispania, S.A., Nortel Networks (Austria) GmbH, Nortel Networks, s.r.o., Nortel Networks Engineering Service Kft, Nortel Networks Portugal S.A., Nortel Networks Slovensko, s.r.o. and Nortel Networks International Finance & Holding B.V.

operate as a going concern for an initial period of three months, which period was subsequently extended to November 28, 2009.  In accordance with the European Union's Council Regulation (EC) No 1346/2000 on Insolvency Proceedings, the English law proceedings (the "English Proceedings") remain the main proceedings in respect of NNSA although a French administrator and a French liquidator have been appointed and are in charge of the day-to-day affairs and continuing business of NNSA in France.  On October 1, 2009, pursuant to a motion filed by the Joint Administrators, the French Court approved an order to:  (i) suspend the liquidation operations relating to the sale of the assets and/or businesses of NNSA for a renewable period of two months; (ii) authorize the continuation of the business of NNSA so long as the liquidation operations are suspended; and (iii) maintain the powers of the French Administrator and Liquidator during the suspension period, except with respect to the sale of assets and/or businesses of NNSA.  On November 30, 2009, the French Court extended the suspension of liquidation for a further period of three months.  On June 26, 2009, this Court entered an order recognizing the English Proceedings of Nortel Networks UK Limited ("NNUK") as foreign main proceedings under chapter 15 of the Bankruptcy Code.[6]

9.    On January 26, 2009, the Office of the United States Trustee for the District of Delaware (the "U.S. Trustee") appointed an Official Committee of Unsecured Creditors (the "Committee") pursuant to section 1102(a)(1) of the Bankruptcy Code [D.I.s 141, 142].  An ad hoc group of bondholders holding claims against certain of the Debtors and certain of the Canadian Debtors has also been organized (the "Bondholder Group").  No trustee or examiner has been appointed in the Debtors' cases.

---

[6]    Additionally, on January 18, 2009, certain Nortel affiliates, including Nortel Networks Israel (Sales and Marketing) Limited, filed an application with the Tel-Aviv-Jaffa District Court, pursuant to the Israeli Companies Law, 1999, and the regulations relating thereto for a stay of proceedings.  On January 19, 2009, the Israeli Court appointed Yaron Har-Zvi and Avi D. Pelossof as joint administrators of the Israeli Company under the Israeli Companies Law (the "Joint Israeli Administrators").

10.    On July 14, 2009 (the "CALA Petition Date"), NN CALA (which is not a

party to the Canadian Funding Agreement), an affiliate of NNI, filed a voluntary petition for

relief under chapter 11 of the Bankruptcy Code.  On July 17, 2009, this Court entered orders

approving the joint administration and consolidation of NN CALA's chapter 11 case with the

other Debtors' chapter 11 cases for procedural proposes [D.I. 1098], and applying to NN CALA

certain previously entered orders in the Debtors' chapter 11 cases [D.I. 1099].

**B.     Debtors' Corporate Structure and Business**

11.    Nortel is a technology company that designs, develops and deploys

communication products, systems and solutions to its customers around the globe.  Its principal

assets include its employees, the intellectual property derived and maintained from its research

and development activities, its customers and other significant contracts and agreements.

12.    Additional information regarding the Debtors' corporate structure and

business and the events leading to the chapter 11 cases is set forth in the Declaration of John

Doolittle in Support of First Day Motions and Applications [D.I. 3] (the "First Day

Declaration").[7]

**C.     Case Milestones**

13.    On June 19, 2009, Nortel announced that it was advancing in discussions

with external parties to sell its businesses and it would assess other restructuring alternatives for

its businesses in the event it is unable to maximize value through sales.  To date, Nortel has

closed (i) the sale of certain portions of its Layer 4-7 data portfolio to Radware Ltd. [D.I. 539];

(ii) the sale of substantially all of the assets of its CDMA and LTE Access businesses to

Telefonaktiebolaget LM Ericsson (publ) [D.I. 1205] (the "CDMA/LTE Sale"); (iii) the sale of

---

[7]      Capitalized terms used but not defined herein have the meanings ascribed to them in the First Day
Declaration.

the assets of its Wireless Networks business associated with the development of Next Generation

Packet Core network components to Hitachi Ltd. [D.I. 1760]; and (iv) the sale of substantially all

of the assets of the Enterprise Solutions business globally, including the shares of Nortel

Government Solutions Incorporated and DiamondWare Ltd. to Avaya Inc. [D.I. 1514] (the

"Enterprise Sale").  In addition, Nortel has completed auction processes and obtained Court

approval for the planned sale of substantially all the assets of its Optical Networking and Carrier

Ethernet businesses associated with its Metro Ethernet Networks business unit [D.I. 2070]; as

well as for the planned sale of substantially all of its GSM/GSM-R business [D.I. 2065] (the

foregoing, collectively, the "Sale Transactions").

       14.    On August 4, 2009, this Court entered an order fixing September 30, 2009

at 4:00 PM (Eastern Time) as the general bar date for filing proofs of claim or interests [D.I.

1280].  On December 3, 2009 this Court entered an order fixing January 25, 2010 at 4:00 PM

(Eastern Time) as the bar date for filing proofs of claim or interests against NN CALA [D.I.

2059].

## Relief Requested

       15.    By this Motion, the Debtors seek an order, pursuant to sections 105(a) and

363(b) of the Bankruptcy Code and Bankruptcy Rule 9019, (a) approving the terms of the

Canadian Funding Agreement, and (b) granting related relief.

## Facts Relevant to this Motion

**A.    History**

       16.    As described in the First Day Declaration, the Nortel entities have

operated and continue to operate on an integrated basis across multiple jurisdictions.  Nortel's

business has been based on the development, licensing and maintenance of intellectual property

and the marketing of products and services based on that intellectual property.  Certain Nortel

affiliates, including NNL, NNI, NNUK, NNIR and NNSA (collectively, the "Main Nortel Companies"), are or have been the primary source of the research and development that has created Nortel's global technology footprint, the benefits of which are shared across multiple corporate entities. These five Nortel entities also provided and continue to provide service and support on an ongoing basis to Nortel customers in their respective jurisdictions, as well as certain overhead and institutional support to Nortel entities and customers outside of their jurisdictions. Certain other Nortel companies function primarily as sales operations, acting as intermediaries between the Main Nortel Companies and customers in jurisdictions not served by the Main Nortel Companies, and, in certain circumstances, providing ongoing service and support in their local jurisdictions.

      17.     In light of the foregoing, certain Nortel entities, including the Main Nortel Companies, have entered into a number of agreements and have been engaged in certain practices designed both to allow Nortel to operate on a global basis and to allocate profits and losses, and certain costs, across the corporate entities within Nortel. These agreements include certain distribution agreements between one or more Nortel entities (the "Distribution Agreements"), and the Master R&D Agreement, dated as of December 22, 2004 among NNL, NNI, NNUK, NNIR, NNSA and other affiliates (as amended from time to time, the "Master R&D Agreement," and together with the Distribution Agreements, the "Transfer Pricing Agreements").

      18.     Historically, Nortel has used "transfer pricing" to allocate operating profits and losses, and certain costs, among the various Nortel companies. Transfer pricing is an accepted method for such allocation, used widely by multinational enterprises similar in structure and geographic scope to Nortel. Transfer pricing principles similar to those used by Nortel have

been accepted by most of the world's largest economies and are monitored by the Organization

for Economic Co-operation and Development, an international non-profit organization

headquartered in Paris, France, with 30 member states (including the United States, Canada,

United Kingdom and France).

19.    In the case of Nortel, the Master R&D Agreement is the governing

document pursuant to which Nortel implemented its transfer pricing regime using a "residual

profit split" methodology (the "Nortel Transfer Pricing Regime").  Among other things, the

Nortel Transfer Pricing Regime was designed to determine the arm's-length allocation of global

operating profits and losses among the Main Nortel Companies based on the proportionate share

of research and development activity conducted by or on behalf of such affiliates.  Among other

things, the Nortel Transfer Pricing Regime typically required that profits and losses, and certain

costs, be allocated among such affiliates during a calendar year under the Transfer Pricing

Agreements (the "Transfer Pricing Payments") and that a true-up allocation is determined after

the actual results for the year are known.

**B.    Background of the Canadian Funding Agreement**

20.    The continued viability of NNL is important to Nortel generally and to the

Debtors in particular.  Among other things, NNL provides corporate support to its affiliates

throughout the world and is contractually obligated to provide transition services to the various

purchasers of Nortel's assets  (the "Services" and the costs related thereto, the "Expenses").

Additionally, NNL holds legal title to nearly all of the group's intellectual property, which it

licenses to its affiliates.[8]

---

[8]    Although NNL holds legal title to nearly all of Nortel's intellectual property, nothing stated herein shall be
binding on any party-in-interest as to the beneficial ownership of Nortel's intellectual property.

21.    As was described in the Cash Management Motion filed on the Petition Date, the Debtors originally intended to reconcile amounts owed under the Master R&D Agreement on a monthly basis in the post-filing period.  However, following commencement of these proceedings, discussions began with various interested parties, including Nortel, the Monitor, the Joint Administrators, the Committee and the Bondholder Group concerning continued payments under the Nortel Transfer Pricing Regime within the context of Nortel's worldwide insolvency proceedings.  In particular, issues were raised in light of substantial changes that have occurred and may continue to occur in respect of Nortel's business model given the uncertainties facing Nortel's business.

22.    Following lengthy, difficult, and good faith negotiations, on or about June 9, 2009, the Parties entered into the Interim Funding and Settlement Agreement (the "Interim Funding Agreement"). [D.I. 874].  The Court approved the Interim Funding Agreement on June 29, 2009.  [D.I. 874].  The Interim Funding Agreement authorized funding in the amount of $187 million, which assisted in partially financing the Canadian Debtors operations from the Petition Date through September 30, 2009.

23.    As described above, on June 19, 2009, shortly after entering the Interim Funding Agreement, Nortel announced its intention to commence an orderly disposition of its businesses through a series of asset sales.  To date, the six Sale Transactions approved by this Court and the Canadian Court will generate, upon closing, a total of nearly US $3 billion in proceeds.

24.    To state the obvious, consummation of the Sale Transactions are critical to the realization of value for the Debtors as well as to Nortel as a whole.  To date, two transactions, the CDMA/LTE and Enterprise Sales, have closed, but at least three additional material

transactions remain open.  Until the date of the last closing of the Sale Transactions, NNL must continue to provide the corporate overhead and research and development to support the ongoing businesses.

25.     Moreover, as each Sale Transaction closes, both NNL and NNI will begin to provide transition services under the transition services agreements (the "TSAs") with each purchaser.  Material transition services, at total costs in the hundreds of millions of dollars, must be provided by NNI and NNL (together with other Nortel entities) and such services will be provided on a cross-jurisdictional basis.  Without continued performance by NNL under the TSAs, the provision of transition services to purchasers would be jeopardized and the risk to NNI would be substantial.

26.     Finally, the Interim Funding Agreement provided for funding to NNL through September 30, 2009, and NNI has not provided any additional funding to NNL since that date.  During the period since October 1, 2009, NNI has continued to receive the benefit of Services provided by NNL to NNI and NNL has continued to provide Services to NNI.  As such, NNL has made claims against NNI in the context of negotiations requesting reimbursement for the Expenses related to such Services.

27.     Since September 30, 2009, the various interested parties have been discussing the appropriate means to alleviate NNL's liquidity issues.  As a result of these good faith and lengthy discussions and negotiations, NNI, NNL, the Monitor, the Committee and the Bondholder Group reached consensus on the form of the Canadian Funding Agreement pursuant to which, among other things, NNI will make certain payments to NNL as a full and final settlement of any and all claims of the Canadian Debtors against the Debtors in respect of the Services and Expenses provided to NNI for the Settlement Period (as defined in the Canadian

Funding Agreement and on the basis described below), and such payments should provide NNL

with sufficient liquidity through the Settlement Period and whereby NNL will acknowledge

certain pre-filing intercompany claims in the Canadian Proceedings in favor of NNI, including

claims for overpayment, which claims will not be subject to setoff or reduction as described

below.

28.     Prior to reaching the Canadian Funding Agreement, NNI and NNL

provided the Committee and the Bondholder Group with access to relevant documents and

related materials to allow the Committee and the Bondholder Groups' advisors to conduct due

diligence concerning the appropriate amount owed by NNI to NNL, whether for the provision of

Services and the reimbursement of the related Expenses, or in respect of the Nortel Transfer

Pricing Regime.  Furthermore, representatives of the Canadian Debtors, the Monitor, the

Debtors, the Committee and the Bondholder Group have met multiple times in person and by

phone, in Toronto and in New York, to discuss these important issues.

29.     In addition to the Canadian funding issues, despite the best efforts of the

Nortel companies to accurately calculate payments under the Nortel Transfer Pricing Regime,

certain overpayments may have occurred in the past.  In particular, it has been determined that

NNI overpaid NNL during the period from 2001 to 2005.  After considering the complexities

relating to the Nortel Transfer Pricing Regime, NNI and NNL agreed to the US $2 billion

adjustment discussed below.  In order to reach agreement on Canadian funding, it was also

necessary to address the overpayment as well as certain related tax issues.

30.     Therefore, NNI, NNL and the Monitor have reached, as part of the

Canadian Funding Agreement, an understanding for the recognition of this overpayment and

related tax treatment.  As described in more detail below, an intercompany claim shall be

established by NNL in favor of NNI pursuant to the Master R&D Agreement and allowed in full, without right of setoff or reduction, in NNL's Canadian Proceedings. In addition, NNI has agreed with the Internal Revenue Service (the "IRS") to enter into a stipulation (the "Settlement Stipulation") providing for, among other things, the settlement of the IRS Claim (as defined below) and NNI's entry into an Advance Pricing Agreement (an "APA") that will provide for a positive adjustment in NNI's income (the "IRS APA"). It is anticipated that NNL will enter into a similar APA (the "CRA APA", and together with the IRS APA, the "APAs") with the Canada Revenue Agency (the "CRA") that will provide for a negative adjustment to NNL's income. The Settlement Stipulation is described in greater detail in the Debtors' motion seeking authorization to enter into the Settlement Stipulation, the IRS APA, and related relief (the "IRS Settlement Motion"), filed contemporaneously herewith.

31.     The APAs are part of a package of agreements that address, among other things, funding to be provided by NNI to NNL pursuant to the Canadian Funding Agreement; NNI's possible liability for pre-petition U.S. federal taxes, including but not limited to the taxes described in the proofs of claim filed by the IRS against NNI, dated as of February 13, 2009, May 22, 2009 and August 20, 2009, bearing the respective claim identification numbers 250, 1226 and 1935 (collectively, the "IRS Claim"); and any claim NNI may have against NNL with respect to overpayment by NNI to NNL during the 2001 to 2005 tax years, including relating to the income adjustments contemplated by the APAs. The agreements, which are described below, are all interdependent. In particular, the Canadian Funding Agreement, which is the subject of this Motion, shall become effective only upon satisfaction of the conditions in Section 17 of the Canadian Funding Agreement, which conditions include entry of the Final Orders (as defined in the Canadian Funding Agreement) approving: (i) the Debtors' entry into the Canadian Funding

Agreement; (ii) the Canadian Debtors' entry into the Canadian Funding Agreement; (iii) NNI's

entry into the Settlement Stipulation; (iv) NNI's entry into the IRS APA; (v) NNL's entry into

the CRA APA; and (vi) the establishment of the NNI Claim (as defined herein) in the Canadian

Proceedings.

**C.    Terms of the Final Canadian Funding and Settlement Agreement**

               32.    Following lengthy, difficult, and good faith negotiations, on or about

December 23, 2009, the Canadian Funding Agreement was executed.  In very broad terms, the

Canadian Funding Agreement provides for the following:

- Payment by NNI to NNL of $190.8 million (subject to adjustment as described in the Canadian Funding Agreement) in five installments.

- Settlement of certain claims by NNL against NNI for goods and services provided during the period covered by the Canadian Funding Agreement.

- Allocation of corporate costs for the period covered by the Canadian Funding Agreement among NNL and NNI on a 50% / 50% basis, subject to a subsequent true-up based on the allocation of purchase prices.

- Allocation of M&A Costs on a transaction by transaction basis to be satisfied out of sale proceeds.

- Establishment of a claim against NNL in favor of NNI in the amount of US $2.0627 billion to take account of any overpayments made by NNI to NNL during the period 2001 to 2005 and reconciling certain of the pre-filing obligations of NNI and NNL.

- Finalization of the APAs between NNI and the IRS and between NNL and the CRA for the taxable years 2001 to 2005.

- Certain other agreements relating to intercompany bar dates, a cross-border claims protocol and an agreement to not exercise any right of termination under the Master R&D Agreement.

- Certain reservations of rights in respect of the allocation of sale proceeds.

33.     The main terms of the Canadian Funding Agreement are as follows:[9]

- PART A – NNI FUNDING TO NNL; SETTLEMENT MATTERS

  - Settlement Payment:  NNI shall pay to NNL an amount equal to US$190.8 million, a portion of which may be adjusted by the Parties, pursuant to the Canadian Funding Agreement, payable in five installments.

  - Use of Funds:  To the extent NNL seeks to use funds from the Settlement Payment for purposes other than for working capital and those other purposes as reflected in the 13 Week CF Forecast, NNL must obtain the consent for such uses from NNI, the Committee and the Bondholder Group.

  - Settlement:  The Settlement Payment represents (A) the maximum payment that the Debtors may or could owe in respect of the Covered Obligations[10] for the Settlement Period, (B) the maximum post-filing or administrative claim (or such other applicable priority claim) that any of the Canadian Debtors may have or could assert against one or more Debtors in any Proceeding with respect to the Covered Obligations, and (C) constitutes a full and final settlement of any and all Covered Obligations.

  - Indemnity:  Each of NNL and the other Canadian Debtors agrees to indemnify each Debtor from and against any and all claims, damages, taxes, and expenses (including without limitation reasonable attorneys' fees and disbursements) resulting from a claim, demand, lawsuit, action or proceeding relating to, arising from or in connection with (x) Section 1 of the Canadian Funding Agreement, (y) the Transfer Pricing Payments for the calculation period in the applicable Transfer Pricing Agreements in respect of the Settlement Period, or (z) the Covered Obligations.

- PART B – ALLOCATION OF CERTAIN COSTS

  - Allocated Corporate Costs.  NNL agrees to use commercially reasonable efforts to recover from Nortel entities a portion of the Allocated Corporate

---

[9]     Capitalized terms used but not defined herein have the meanings ascribed to them in the Canadian Funding Agreement, certain of which definitions appear in sections of the Canadian Funding Agreement not set forth herein. The entire Canadian Funding Agreement is attached hereto as Exhibit B.  In the event of any inconsistencies between the Canadian Funding Agreement and the Motion, the Canadian Funding Agreement shall control.

[10]     "Covered Obligations" means claims for corporate overhead, research and development costs, or such other alleged payment or cost reimbursement obligations under any legal theory or contractual or extra-contractual arrangement including, without limitation, pursuant to Transfer Pricing Agreements, such other agreements between and among the Nortel entities or otherwise, incurred by any Canadian Debtor for the benefit of the Debtors which any Canadian Debtor has asserted or could assert (without admission by the Debtors and subject to Section 23 of the Agreement) and would have been reimbursed to the Canadian Debtors through payments (including without limitation Transfer Pricing Payments) payable by the Debtors to the Canadian Debtors during, or with respect to, the period from October 1, 2009 through the later of the conclusion of the Canadian Proceedings or the consummation of the wind-down of the Canadian Debtors' estates (the "Settlement Period").

14

Costs[11] incurred by NNL on behalf of Nortel entities globally, which will be allocated to those entities (including both NNL and NNI) that are considered to benefit from such costs and to have the financial ability to pay their respective share of such costs. NNL and NNI each agree that it will initially pay fifty percent (50%) of the aggregate Allocated Corporate Costs, respectively, of the Canadian Debtors and the Debtors.

- <u>Certain Fixed Payments</u>. NNL and NNI each agree that it will initially make fifty percent (50%) of Certain Fixed Payments (as defined in the Canadian Funding Agreement); *provided, however*, that it is understood and agreed by the Parties that $62.5 million of the Certain Fixed Payments shall be paid solely by NNI and shall not be shared by NNL or any other Nortel entity, and such payment shall be made by NNI three (3) Business Days following satisfaction in full of all of the Conditions; *provided, further,* that the remaining Certain Fixed Payments, to the extent not recovered from other Nortel entities participating as sellers in the Sale Transactions, will ultimately be adjusted and borne by the Debtors and the Canadian Debtors on an overall weighted average basis in proportion to the amount of the aggregate proceeds of sale allocated to each of such Debtors from the Sale Transactions.

- <u>M&A Costs</u>. The Parties agree, and shall use reasonable best efforts to cause the other relevant Selling Debtors to agree, to the extent permitted by applicable law, that the M&A Costs[12] incurred by the Canadian Debtors or the Debtors shall be treated as transaction costs and will be recovered by such Debtors, on a transaction-by-transaction basis, from the respective proceeds of sale from the Sale Transactions prior to any allocation of sale proceeds among the relevant Selling Debtors, participating in each such transaction.

- <u>PART C – ADVANCE PRICING AGREEMENTS</u>[13]

  - NNL and the Monitor agree that NNL shall, in a timely manner, enter into the CRA APA with the CRA, which shall apply to the five taxable years beginning on January 1, 2001 and ending on December 31, 2005 (the "<u>APA Years</u>").

---

[11]     "<u>Allocated Corporate Costs</u>" means the insurance costs (other than property and casualty insurance) paid by NNL, public company compliance costs, including certain audit and accounting fees and related costs, incurred by NNL for the benefit of Nortel, costs for certain officers and employees of NNL that perform global corporate functions and any other costs mutually agreed by the Debtors, the Canadian Debtors, the Monitor, the Creditors' Committee and the Bondholders' Committee.

[12]     "<u>M&A Costs</u>" mean the following costs and expenses incurred by the Canadian Debtors or the Debtors in connection with the Sale Transactions and sales of other assets of Nortel: (a) fees and expenses of Lazard Ltd; (b) costs and expenses (including professional fees) to prepare carve-out financial statements of the various businesses of Nortel; and (c) salaries of the employees of the Nortel's corporate merger and acquisitions team ("<u>M&A Group</u>") and the cost of other benefits provided to the M&A Group, and any expenses incurred by the M&A Group.

[13]     The IRS Settlement Motion contains a detailed summary of the terms of the APAs.

- NNI agrees that NNI shall, in a timely manner, enter into the IRS APA with the IRS, which shall apply to the APA Years.

- Each of NNL, the Monitor and NNI shall cooperate with each other in finalizing the terms and conditions of the CRA APA and the IRS APA with the CRA and the IRS, as applicable.

- ## PART D – NNI CLAIM

  - The Parties agree that a US $2.0627 billion pre-filing claim in the Canadian Proceedings shall be established in favor of NNI for the full and final settlement of the following claims:

    - o any claims of the Debtors against the Canadian Debtors for overpayments to the Canadian Debtors under the Transfer Pricing Agreements for, or with respect to, the period from January 1, 2001 to December 31, 2005,

    - o certain claims of NNI against NNL due and owing under that certain Revolving Loan Agreement, dated as of March 21, 2008; and

    - o any claims of the Canadian Debtors (A) for corporate overhead, research and development costs, or such other alleged payment or cost reimbursement obligations pursuant to Transfer Pricing Agreements or otherwise incurred by any Canadian Debtor for the benefit of the Debtors for the period prior to the Petition Date or (B) relating to pre-filing intercompany trading of goods and services.

  - The NNI Claim, unlike other unsecured pre-filing claims against NNL, shall not be subject to any offsets or counterclaims. The priority of the NNI Claim shall be as follows: (A) US $2 billion of the NNI Claim shall be a pre-petition unsecured claim against NNL ranking *pari passu* with other unsecured pre-petition claims against NNL and (B) the remaining US $62.7 million of the NNI Claim shall constitute the remainder of the secured Revolver Claim (the "Remaining Revolver Claim") and shall continue to have the benefit of the court-ordered charge in the Canadian Proceedings relating to the Revolving Loan Agreement.

  - The Parties agree that NNI and other Debtors shall retain the right to assert Claims against the Canadian Debtors relating to the period prior to the Filing Date, *provided, however,* that the Debtors shall have no right to assert any NNI TPA Claim or Revolver Claim (other than the Remaining Revolver Claim) against the Canadian Debtors (such pre-petition Claim but excluding NNI Claim (including Remaining Revolver Claim), NNI TPA Claim or Revolver Claim, an "Additional NNI Claim"). Upon the filing of an Additional NNI Claim in the Canadian Proceedings or subsequent proceedings, the waivers of the Canadian Debtors under Section 12 of the Canadian Funding Agreement shall automatically terminate and shall be of no

16

further force and effect and the Canadian Debtors shall have the right to defend against such Additional NNI Claim, assert counterclaims against the Debtors in the Canadian Proceedings or subsequent proceedings with regards to such Additional NNI Claim, and assert any additional Claims against the Debtors in the US Proceedings or subsequent proceedings.  For the avoidance of doubt, the filing of one or more Additional NNI Claims by the Debtors shall in no way affect the obligations and waivers of the Canadian Debtors and the Monitor under Section 11 of the Canadian Funding Agreement and such obligations and waivers shall continue to be in full force and effect.

- The Parties agree that (i) no Canadian Debtor shall establish a deadline for the filing of claims by the Debtors in the Canadian Proceedings and (ii) no US Debtor shall establish a deadline for the filing of claims by the Canadian Debtors in the US Proceedings, without the prior written consent of all other Parties to this Agreement and the Creditor Groups, which consent shall not be unreasonably withheld or delayed.

- PART E – OTHER SETTLEMENT MATTERS

  - The Canadian Debtors and the Debtors agree to work with the Monitor, the Committee and the Bondholder Group to develop and timely seek approval from each of the Courts of a cross-border claims protocol and claims resolution procedures for the resolution of claims filed in the Canadian Proceedings and the US Proceedings, each of which shall be acceptable in form and substance to the Monitor, the Committee, and the Bondholder Group.

- PART F – PROVISIONS OF GENERAL APPLICATION

  - Written confirmation has been received from the Committee and from counsel to the Bondholder Group confirming that they will each file appropriate materials with the applicable Courts in support of the motions by the Debtors and the Canadian Debtors for Court approval of the Canadian Funding Agreement.

  - Except as expressly provided in the Canadian Funding Agreement, nothing in the Canadian Funding Agreement shall constitute an amendment, modification or waiver of rights of any Party (i) under any other agreement, including, without limitation, the Transfer Pricing Agreements, applicable law or otherwise, or (ii) with respect to any potential tax contingencies, assessments, rulings or agreements arising from Transfer Pricing Payments pursuant to the Transfer Pricing Agreements or any offset arising therefrom or otherwise; *provided, however,* that the Parties waive any and all rights to object to or otherwise seek to amend or revisit (A) any payments made pursuant to the Canadian Funding Agreement, (B) the APAs, (C) the Canadian Proceedings, or (D) the NNI Claim and the waiver by the Canadian

17

Debtors and the Monitor of their rights to setoff or in any way reduce the amount of the NNI Claim (including the Remaining Revolver Claim).

- Neither the Canadian Debtors nor the Debtors will exercise a right of termination under the Master R&D Agreement without the prior written consent of the other Parties to the Canadian Funding Agreement, and the Creditor Groups.

- Among the conditions to the effectiveness of the Canadian Funding Agreement are the following:

  o Approving an extension of that certain Amended and Restated Revolving Loan Agreement dated March 27, 2009 among NNL, NNI and Nortel Networks Technology Corporation (the "NNI Loan") through December 31, 2010. Attached hereto as Exhibit C is the proposed amendment to the NNI Loan (the "NNI Loan Amendment").

  o The orders of the Canadian Court and this Court set forth in Section 17.a.i. and Section 17.a.ii. of the Canadian Funding Agreement shall have each become a Final Order.[14]

34.    The Debtors have filed a motion seeking the Court's approval to redact certain portions of Annex C to the Canadian Funding Agreement and to file Annex D to the Canadian Funding Agreement under seal, filed contemporaneously herewith.

## Basis for Relief

35.    The relief requested herein is authorized by sections 105(a) and 363(b) of the Bankruptcy Code and Bankruptcy Rule 9019. Section 105(a) of the Bankruptcy Code provides that "[t]he court may issue any order . . . that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105.

36.    Section 363(b) of the Bankruptcy Code permits a debtor to use property of the estate outside of the ordinary course of business after notice and a hearing. 11 U.S.C. § 363.

---

[14]    "Final Order" means the order has been approved and entered by the Canadian Court and/or this Court, as applicable, and is no longer subject to appeal, writ of certiorari, reargument, rehearing, motion to vary or set aside or, in the event that a timely appeal has been noticed, or a timely writ of certiorari, reargument or rehearing, or a motion to vary or set aside has been sought with regard to such order, then the order has been affirmed by the highest court to which the order was appealed and the time to take any further appeal, to petition for writ of certiorari or to move for reargument, rehearing, or to vary or set aside has expired

18

Section 363 applies when an agreement involves the disposition of the estate's assets in such a way that it ventures beyond an ordinary course transaction. Myers v. Martin (In re Martin), 91 F.3d 389, 395 (3d Cir. 1996).

       37.     The use or transfer of estate property under this provision must be supported by a sound business purpose. The Committee of Equity Security Holders v. Lionel Corporation (In re Lionel Corporation), 722 F.2d 1063, 1070-71 (2d Cir. 1983); In re Decora Industries, Inc., No. 00-4459, 2002 WL 32332749, at *2 (D. Del. May 20, 2002); The Dai-Ichi Kangyo Bank, Ltd. v. Montgomery Ward Holding Corp. (In re Montgomery Ward Holding Corp.), 242 B.R. 147, 153 (D. Del. 1999); In re Delaware & Hudson Ry. Co., 124 B.R. 169, 176 (D. Del. 1991); Travelers Casualty and Surety Company v. Future Claimants Representative, No. 07-2785, 2008 WL 821088, at *4 (D.N.J. Mar. 25, 2008). A court determining whether a sound business purpose justifies the transaction "should consider all salient factors pertaining to the proceeding and, accordingly, act to further the diverse interests of the debtor, creditors and equity holders, alike." In re Montgomery Ward, 242 B.R. at 153-54 (quoting In re Lionel, 722 F.2d at 1071). In addition, a debtor must show that the transaction has been proposed in good faith, that adequate and reasonable notice has been provided, and that it is receiving fair and reasonable value in exchange. See In re Delaware & Hudson Ry. Co., 124 B.R. at 176; In re Decora Industries, Inc., 2002 WL 32332749, at *2.

       38.     Bankruptcy Rule 9019 provides, in pertinent part, that, "on motion by the trustee and after notice and a hearing, the court may approve a compromise or settlement." Fed. R. Bankr. P. 9019. Under this authority, the Third Circuit has emphasized that "[c]ompromises are favored in bankruptcy." Martin, 91 F.3d at 393 (quoting 9 Collier on Bankruptcy ¶ 9019.03[1] (15th ed. 1993)). In addition, the District of Delaware has recognized that the

approval of a proposed compromise and settlement is committed to the sound discretion of the

bankruptcy court. See In re Coram Healthcare Corp., 315 B.R. 321, 329 (Bankr. D. Del. 2004).

39.    Before approving a settlement under Bankruptcy Rule 9019, a court must

determine whether "the compromise is fair, reasonable, and in the interest of the estate." In re

Marvel Entertainment Group, Inc., 222 B.R. 243, 249 (D. Del. 1998) (quoting In re Louise's,

Inc., 211 B.R. 798, 801 (D. Del. 1997)). Basic to the process of evaluating proposed settlements

is "the need to compare the terms of the compromise with the likely rewards of litigation."

Protective Committee for Independent Stockholders of TMT Trailer Ferry, Inc. v. Anderson, 390

U.S. 414, 424-25 (1968). The court's obligation is to "canvass the issues and see whether the

settlement falls below the lowest point in a range of reasonableness." Travelers, 2008 WL

821088, at *5 (citing Matter of Jasmine, Ltd., 258 B.R. 119 (D.N.J. 2000); Coram, 315 B.R. at

330; Pennsylvania Truck Lines, 150 B.R. at 598. The court need not be convinced that the

settlement is the best possible compromise in order to approve it. Coram, 315 B.R. at 330.

40.    The Third Circuit has set out four criteria for a bankruptcy court to

consider when evaluating a settlement proposal (the "Martin Factors"): "(1) the probability of

success in litigation; (2) the likely difficulties in collection; (3) the complexity of the litigation

involved, and the expense, inconvenience and delay necessarily attending it; and (4) the

paramount interest of the creditors." Martin, 91 F.3d at 393.

41.    The Debtors respectfully submit that the Canadian Funding Agreement

meets each of the requirements under section 363 and Bankruptcy Rule 9019. The Canadian

Funding Agreement is proposed as a means to reimburse NNL for costs NNL asserts it incurred

on behalf of NNI during the postpetition period while, at the same time, recognizing that

assertions have been made that the Nortel Transfer Pricing Regime may no longer apply in light

of the current circumstances relating to Nortel's business and recognizing certain material claims NNI has against NNL. With these positions in mind, good faith negotiations took place with the intention of avoiding the potential cost and delay of litigation relating to the funding of NNL. It was determined by NNI, NNL, the Committee and the Bondholder Group that a consensual resolution is in the best interest of the creditors (including those, such as the bondholders, with claims both in the United States and Canada) and the Debtors' estates.

42.    While the Canadian Funding Agreement provides several material benefits to the Debtors, the most important benefit is the recognition by NNL and the Monitor of an intercompany claim in favor of NNI in an amount in excess of US $2 billion, which claim shall be allowed by an order of the Canadian Court approving the Canadian Funding Agreement. This amount approximates overpayments made by NNI to NNL under the Nortel Transfer Pricing Regime during the 2001 to 2005 time period. By this claim, without right of offset or counterclaim as set forth in the Canadian Funding Agreement, NNI avoids the cost of litigation to enforce this or an even larger claim against NNL. In addition, both NNI and NNL, as well as the other Debtors and Canadian Debtors, benefit from the consensual resolution of a potentially contentious matter. Without such a consensual resolution, the value of the United States and Canadian estates would have been put in danger. Moreover, the ability of the Debtors and Canadian Debtors to fully perform their transition services obligations would have been tested were NNI and NNL to be at odds over intercompany claims.

43.    The reimbursement of NNL for the Services and Expenses provides NNL with the necessary funding in order for NNL to operate during the Settlement Period, which will allow NNL to continue to provide: (i) corporate overhead and research and development support until the date of the last close of the Sale Transactions, critically important to the realization of

value for the Debtors as well as to Nortel as a whole; (ii) transition services under the TSAs to the various purchasers of Nortel's assets, without which, the provision of services to the purchasers would be jeopardized and the risk to NNI would be substantial; and (iii) continued uninterrupted use by the Debtors of the intellectual property in which NNL holds legal title. Moreover, it will maximize the likelihood of a successful resolution of these cases and that NNL will provide the Services and pay the Expenses on the Debtors' behalf in the future.

44.    In addition, section 503(b) of the Bankruptcy Code provides administrative expense status for "the actual, necessary costs and expenses of preserving the estate." 11 U.S.C. § 503(b)(1)(A).  Courts generally require that an administrative expense arise from a postpetition transaction with the debtor that provided a benefit to the debtor in the operation of its business.  Calpine Corp. v. O'Brien Envtl. Energy, Inc., (In re O'Brien Envtl Energy, Inc.), 181 F.3d 527, 532-33 (3d Cir. 1999); In re Women First Healthcare, Inc., 332 B.R. 115, 121 (Bankr. D. Del. 2005).  These administrative expenses, in turn, are entitled to a second priority status pursuant to section 507(a)(2) of the Bankruptcy Code.  11 U.S.C. § 507(a)(2).

45.    The Canadian Funding Agreement is supported by a sound business purpose because it permits NNI to reimburse NNL for its share of the Services and Expenses while including terms protecting the Debtors in the event of an overpayment and capping the maximum liability of the Debtors.  NNL has provided postpetition benefits to the Debtors not only by continuing to conduct the research and development required by various customers and the purchasers in the Sale Transactions, but also by continuing to support the products incorporating the intellectual property in which NNL holds legal title, and by providing Services and paying the Expenses on their behalf pursuant to past practices.

46.      The Canadian Funding Agreement is further necessary to preserve the

Debtors' estates, because if NNI does not pay NNL the amounts provided for in the Canadian

Funding Agreement, NNL faces a potential funding crisis that would seriously harm the entities'

interconnected global business operations and substantially decrease the value of the Debtors'

estates.  Such a crisis could also complicate the Debtors' continued use of NNL's intellectual

property.  If NNL were to stop sharing costs with NNI, it is also likely that the resources of the

Debtors' estates would be wasted duplicating efforts and trying to separate out overhead between

the intertwined affiliates.  Moreover, if at any point NNL is unable to demonstrate to the

Canadian Court that it has sufficient funds, it would be at risk of losing the protection of the

CCAA stay imposed by the Initial Order, as extended from time to time.  Termination or

expiration of the CCAA stay protecting the Canadian Debtors would likely result in a rapid

deterioration of Nortel's Canadian assets and could have a significant negative impact on the

Debtors.

47.      Furthermore, the Debtors have received, and will continue to receive, fair

value in exchange for their performance under the Canadian Funding Agreement, including use

of intellectual property that is crucial to the Debtors' business, the benefit of research and

development activity performed by NNL, and the payment of certain overhead costs, which are

necessary to its operations.  As such, the Canadian Funding Agreement is fair and its terms are

reasonable.

48.      If the Canadian Funding Agreement were not approved, NNL may have

no choice but to pursue legal action to recover amounts claimed to be owing, whether in respect

of the Services, the Expenses or under the Transfer Pricing Agreements, and NNL may have no

choice but to also seek recovery of the value of the Services it provided and the Expenses it paid

on the Debtors' behalf as an administrative expense.  By the same token, NNI would have

litigation claims against NNL relating to past overpayments (as described above and in the IRS

Settlement Motion) and the related costs and uncertainties.  Any such lawsuits are likely to be

complicated and drawn out given the factual nature of the disputes and the interconnected

workings of the businesses, and will drain resources from the Debtors' estates and detract

attention from other important matters facing the Debtors' estates.   In addition, the IRS APA

and the Settlement Stipulation are essential elements of a package of agreements that, among

other items, reduces the IRS Claim from $3,016,650,830.82 to $37.5 million, memorializes a

large claim by NNI against NNL and are also supported by sound business purposes.[15]

      49.     Accordingly, the Debtors submit that approval of the Canadian Funding

Agreement  and the terms and conditions thereof are fair and reasonable.  The Canadian Funding

Agreement has been proposed in good faith upon reasonable and adequate notice, and is in the

best interest of the Debtors' estates, creditors and other stakeholders and should, therefore, be

approved by the Court.

## Notice

      50.     Notice of the Motion has been given via first class mail to the (i) U.S.

Trustee; (ii) counsel to the Committee; (iii) counsel to the Bondholder Group; (iv) the Joint

Administrators, and (v) the general service list established in these chapter 11 cases.  The

Debtors submit that under the circumstances no other or further notice is necessary.

## No Prior Request

      51.     No prior request for the relief sought herein has been made to this or any

other court.

---

[15]     The background facts, relief requested and description of the IRS APA and the Settlement Stipulation are
detailed in the IRS Settlement Motion.

WHEREFORE, the Debtors respectfully request that this Court (i) grant this Motion and the relief requested herein; (ii) enter the proposed order attached hereto; and (iii) grant such other and further relief as it deems just and proper.

Dated:  December 23, 2009
       Wilmington, Delaware

CLEARY GOTTLIEB STEEN & HAMILTON LLP

James L. Bromley (*admitted pro hac vice*)
Lisa M. Schweitzer (*admitted pro hac vice*)
One Liberty Plaza
New York, New York 10006
Telephone:  (212) 225-2000
Facsimile:  (212) 225-3999

- and -

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

Derek C. Abbott (No. 3376)
Eric D. Schwartz (No. 3134)
Ann C. Cordo (No. 4817)
Andrew R. Remming (No. 5120)
1201 North Market Street
P.O. Box 1347
Wilmington, Delaware 19801
Telephone:  (302) 658-9200
Facsimile: (302) 658-3989

*Counsel for the Debtors*
*and Debtors in Possession*