**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

```
----------------------------------------------------------X
                                                          :
                                                          :     Chapter 11
                                                          :
In re                                                     :     Case No. 09-10138 (KG)
                                                          :
Nortel Networks Inc., et al.,¹                            :     Jointly Administered
                                                          :
                    Debtors.                              :     Hearing date: January 21, 2010 at 11:00 a.m. (ET)
                                                          :     Objections due: January 14, 2010 at 4:00 p.m. (ET)
                                                          :
                                                          :
----------------------------------------------------------X
```

**MOTION PURSUANT TO 11 U.S.C. § 105(a), § 363, § 505(a) AND
FED. R. BANKR. P. 9019 FOR AN ORDER APPROVING THE
SETTLEMENT STIPULATION BETWEEN NORTEL NETWORKS INC.
AND THE INTERNAL REVENUE SERVICE, ENTRY INTO
THE ADVANCE PRICING AGREEMENT, AND RELATED RELIEF**

Nortel Networks Inc. ("NNI") and certain of its affiliates, as debtors and debtors in

possession (collectively, the "Debtors"), hereby move this Court (the "Motion") for the entry of

an order, substantially in the form attached hereto as Exhibit A, approving the Settlement

Stipulation Between Nortel Networks Inc. and the Internal Revenue Service (the "Settlement

Stipulation"), attached hereto as Exhibit B, and approving the Advance Pricing Agreement (the

"IRS APA") by and among the Debtors and the Internal Revenue Service (the "IRS", and

together, the "Parties") in a form to be submitted to the Court prior to the hearing date on the

---

[1]      The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's tax identification
number, are:  Nortel Networks Inc. (6332), Nortel Networks Capital Corporation (9620), Nortel Altsystems Inc.
(9769), Nortel Altsystems International Inc. (5596), Xros, Inc. (4181), Sonoma Systems (2073), Qtera Corporation
(0251), CoreTek, Inc. (5722), Nortel Networks Applications Management Solutions Inc. (2846), Nortel Networks
Optical Components Inc. (3545), Nortel Networks HPOCS Inc. (3546), Architel Systems (U.S.) Corporation (3826),
Nortel Networks International Inc. (0358), Northern Telecom International Inc. (6286), Nortel Networks Cable
Solutions Inc. (0567) and Nortel Networks (CALA) Inc. (4226).  Addresses for the Debtors can be found in the
Debtors' petitions, which are available at http://chapter11.epiqsystems.com/nortel.

Motion,[2] and granting the Debtors such other and further relief as the Court deems just and proper.  In support of the Motion, the Debtors respectfully represent as follows:

## Jurisdiction

1.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.  This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

2.      The statutory bases for the relief requested herein are sections 105(a), 363 and 505(a) of chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"), as supplemented by Rule 9019 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

## Background

**A.      Procedural History**

3.      On January 14, 2009 (the "Petition Date"), the Debtors, other than NN CALA (defined below), filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code.

4.      The Debtors continue to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

5.      On January 15, 2009, this Court entered an order of joint administration pursuant Rule 1015(b) of the Bankruptcy Rules that provided for the joint administration of these cases and for consolidation for procedural purposes only [D.I. 36].

6.      Also on the Petition Date, the Debtors' ultimate corporate parent Nortel Networks Corporation ("NNC"), NNI's direct corporate parent Nortel Networks Limited ("NNL," and

---

[2]      The IRS APA is in the process of being finalized.  The summary description of the IRS APA set forth herein is for informational purposes only.  In the event of any discrepancy between the description and the terms of the IRS APA, the terms of the IRS APA shall govern.  Due to confidentiality concerns, the Debtors will file a motion seeking confidential treatment of the IRS APA, at the time the IRS APA is filed with the Court.

together with NNC and their affiliates, including the Debtors, "Nortel"), and certain of their Canadian affiliates (collectively, the "Canadian Debtors")[3] filed an application with the Ontario Superior Court of Justice (the "Canadian Court") under the Companies' Creditors Arrangement Act (Canada) (the "CCAA"), seeking relief from their creditors (collectively, the "Canadian Proceedings"). The Canadian Debtors continue to manage their properties and operate their businesses under the supervision of the Canadian Court.

7.    On January 14, 2009, the Canadian Court entered an order recognizing these chapter 11 proceedings as a foreign proceeding under section 18.6 of the CCAA. On February 27, 2009, based on a petition filed by Ernst & Young Inc., as court-appointed Monitor in the Canadian Proceedings and as foreign representative for the Canadian Debtors (the "Monitor"), this Court entered an order recognizing the Canadian Proceedings as foreign main proceedings under chapter 15 of the Bankruptcy Code.

8.    On January 14, 2009, the High Court of England and Wales placed nineteen of Nortel's European affiliates (collectively, the "EMEA Debtors")[4] into administration under the control of individuals from Ernst & Young LLC (collectively, the "Joint Administrators"). On May 28, 2009, at the request of the Joint Administrators, the Commercial Court of Versailles, France (the "French Court") (Docket No. 2009P00492) ordered the commencement of secondary proceedings in respect of Nortel Networks S.A. ("NNSA"), which consist of liquidation proceedings during which NNSA was originally authorized to continue to operate as a going

---

[3]    The Canadian Debtors include the following entities: NNC, NNL, Nortel Networks Technology Corporation, Nortel Networks Global Corporation and Nortel Networks International Corporation.

[4]    The EMEA Debtors include the following entities: Nortel Networks UK Limited, Nortel Networks S.A., Nortel Networks (Ireland) Limited, Nortel GmbH, Nortel Networks France S.A.S., Nortel Networks Oy, Nortel Networks Romania SRL, Nortel Networks AB, Nortel Networks N.V., Nortel Networks S.p.A., Nortel Networks B.V., Nortel Networks Polska Sp. z.o.o., Nortel Networks Hispania, S.A., Nortel Networks (Austria) GmbH, Nortel Networks, s.r.o., Nortel Networks Engineering Service Kft, Nortel Networks Portugal S.A., Nortel Networks Slovensko, s.r.o. and Nortel Networks International Finance & Holding B.V.

concern for an initial period of three months, which period was subsequently extended to

November 28, 2009. In accordance with the European Union's Council Regulation (EC) No.

1346/2000 on Insolvency Proceedings, the English law proceedings (the "English Proceedings")

remain the main proceedings in respect of NNSA although a French administrator and a French

liquidator have been appointed and are in charge of the day-to-day affairs and continuing

business of NNSA in France. On October 1, 2009, pursuant to a motion filed by the Joint

Administrators, the French Court approved an order to: (i) suspend the liquidation operations

relating to the sale of the assets and/or businesses of NNSA for a renewable period of two

months; (ii) authorize the continuation of the business of NNSA so long as the liquidation

operations are suspended; and (iii) maintain the powers of the French Administrator and

Liquidator during the suspension period, except with respect to the sale of assets and/or

businesses of NNSA. On November 30, 2009, the French Court extended the suspension of

liquidation for a further period of three months. On June 26, 2009, this Court entered an order

recognizing the English Proceedings of Nortel Networks UK Limited ("NNUK") as foreign main

proceedings under chapter 15 of the Bankruptcy Code.[5]

     9.     On January 26, 2009, the Office of the United States Trustee for the District of

Delaware (the "U.S. Trustee") appointed an Official Committee of Unsecured Creditors (the

"Committee") pursuant to section 1102(a)(1) of the Bankruptcy Code [D.I.s 141, 142]. An ad

hoc group of bondholders holding claims against certain of the Debtors and certain of the

Canadian Debtors has also been organized (the "Bondholder Group"). No trustee or examiner

has been appointed in the Debtors' cases.

---

[5]     Additionally, on January 18, 2009, certain Nortel affiliates, including Nortel Networks Israel (Sales and Marketing) Limited, filed an application with the Tel-Aviv-Jaffa District Court, pursuant to the Israeli Companies Law, 1999, and the regulations relating thereto for a stay of proceedings. On January 19, 2009, the Israeli Court appointed Yaron Har-Zvi and Avi D. Pelossof as joint administrators of the Israeli Company under the Israeli Companies Law (the "Joint Israeli Administrators").

10.     On July 14, 2009 (the "CALA Petition Date"), Nortel Networks (CALA) Inc.

("NN CALA" and a Debtor with NNI and its affiliates), a subsidiary of NNI, filed a voluntary

petition for relief under chapter 11 of the Bankruptcy Code.  On July 17, 2009 this Court entered

orders approving the joint administration and consolidation of NN CALA's chapter 11 case with

the other Debtors' chapter 11 cases for procedural proposes [D.I. 1098], and applying to NN

CALA certain previously entered orders in the Debtors' chapter 11 cases [D.I. 1099].

**B.      Debtors' Corporate Structure and Business**

11.     Nortel is a technology company that designs, develops and deploys

communication products, systems and solutions to its customers around the globe.  Its principal

assets include its employees, the intellectual property derived and maintained from its research

and development activities, its customers and other significant contracts and agreements.

12.     Additional information regarding the Debtors' corporate structure and business

and the events leading to the chapter 11 cases is set forth in the Declaration of John Doolittle in

Support of First Day Motions and Applications [D.I. 3] (the "First Day Declaration").[6]

**C.      Case Milestones**

13.     On June 19, 2009, Nortel announced that it was advancing in discussions with

external parties to sell its businesses and that it would assess other restructuring alternatives for

its businesses in the event it is unable to maximize value through sales.  To date, Nortel has

closed (i) the sale of certain portions of its Layer 4-7 data portfolio to Radware Ltd. [D.I. 539];

(ii) the sale of substantially all of the assets of its CDMA business and LTE Access business to

Telefonaktiebolaget LM Ericsson (publ) [D.I. 1205]; (iii) the sale of the assets of its Wireless

Networks business associated with the development of Next Generation Packet Core network

---

[6]      Capitalized terms used but not defined herein have the meanings ascribed to them in the First Day
Declaration.

components to Hitachi Ltd. [D.I. 1760]; and (iv) the sale of substantially all of the assets of the Enterprise Solutions business globally, including the shares of Nortel Government Solutions Incorporated and DiamondWare Ltd. to Avaya Inc. [D.I. 1514] (the "Enterprise Sale").  In addition, Nortel has completed auction processes and obtained Court approval for the planned sale of substantially all the assets of its Optical Networking and Carrier Ethernet businesses associated with its Metro Ethernet Networks business unit [D.I. 2070]; as well as for the planned sale of substantially all of its GSM/GSM-R business [D.I. 2065] (the foregoing, collectively, the "Sale Transactions").

14.     On August 4, 2009, this Court entered an order fixing September 30, 2009 at 4:00 PM (Eastern Time) as the general bar date for filing proofs of claim or interests [D.I. 1280].  On December 3, 2009 this Court entered an order fixing January 25, 2010 at 4:00 PM (Eastern Time) as the bar date for filing proofs of claim or interests against NN CALA [D.I. 2059].

## Relief Requested

15.     By this Motion, the Debtors seek an order or orders, pursuant to sections 105(a), 363(b) and 505(a) of the Bankruptcy Code and Bankruptcy Rule 9019, (a) approving the terms of the Settlement Stipulation, (b) approving the terms of the IRS APA and authorizing the Debtors to enter into the IRS APA on the Effective Date (defined below), and (c) granting related relief.

## Facts Relevant to This Motion

**A.     History**

16.     As described in the First Day Declaration, the Nortel entities have operated and continue to operate on an integrated basis across multiple jurisdictions.  Nortel's business has been based on the development, licensing and maintenance of intellectual property and the marketing of products and services based on that intellectual property.  Certain Nortel affiliates,

6

including NNL, NNI, NNUK, NNIR and NNSA (collectively, the "Main Nortel Companies"),
are or have been the primary source of the research and development that has created Nortel's
global technology footprint, the benefits of which are shared across multiple corporate entities.
These five Nortel entities also provided and continue to provide service and support on an
ongoing basis to Nortel customers in their respective jurisdictions, as well as certain overhead
and institutional support to Nortel entities and customers outside of their jurisdictions. Certain
other Nortel companies function primarily as sales operations, acting as intermediaries between
the Main Nortel Companies and customers in jurisdictions not served by the Main Nortel
Companies, and, in certain circumstances, providing ongoing service and support in their local
jurisdictions.

17.    In light of the foregoing, certain Nortel entities, including the Main Nortel
Companies, have entered into a number of agreements and have been engaged in certain
practices designed both to allow Nortel to operate on a global basis and to allocate profits and
losses, and certain costs, across the corporate entities within Nortel. These agreements include
certain distribution agreements between one or more Nortel entities (the "Distribution
Agreements"), and the Master R&D Agreement, dated as of December 22, 2004 among NNL,
NNI, NNUK, NNIR, NNSA and other affiliates (as amended from time to time, the "Master
R&D Agreement," and together with the Distribution Agreements, the "Transfer Pricing
Agreements").

18.    Historically, Nortel has used "transfer pricing" to allocate global operating profits
and losses, and certain costs, among the various Nortel companies. Transfer pricing is an
accepted method for such allocation, used widely by multinational enterprises similar in structure
and geographic scope to Nortel. Transfer pricing principles similar to those used by Nortel have

been accepted by most of the world's largest economies and are monitored by the Organization

for Economic Co-operation and Development, an international non-profit organization

headquartered in Paris, France, with 30 member states (including the United States, Canada, the

United Kingdom and France).

19.     In the case of Nortel, the Master R&D Agreement is the governing document

pursuant to which Nortel implemented its transfer pricing regime using a "residual profit split"

methodology (the "Nortel Transfer Pricing Regime").  Among other things, the Nortel Transfer

Pricing Regime was designed to determine the arm's-length allocation of global operating profits

and losses among the Main Nortel Companies based on the proportionate share of research and

development activity conducted by, or on behalf of, such affiliates.  Among other things, the

Nortel Transfer Pricing Regime typically required that profits and losses, and certain costs, be

allocated among such affiliates during a calendar year under the Transfer Pricing Agreements

(the "Transfer Pricing Payments") and that a true-up allocation is determined after the actual

results for the year are known.

20.     One key purpose of the Nortel Transfer Pricing Regime, and the Transfer Pricing

Agreements that serve as its foundation, was to establish a method for allocating profits and

losses, and certain costs, among the Main Nortel Companies to prove to taxing authorities in

multiple jurisdictions that Nortel has allocated such items among its entities in an arm's length

fashion.  Under section 482 of the Internal Revenue Code of 1986, as amended (the "Tax

Code"), the IRS has the authority to review, and if necessary reallocate, taxable income, loss and

other items among related entities to "prevent evasion of taxes or clearly to reflect the income of

[related] organizations."  Other taxing authorities, including the Canada Revenue Agency (the

"CRA"), are similarly authorized to adjust transfer pricing arrangements among related parties to

8

reflect "arm's-length" terms.  Multinational entities such as Nortel therefore can face reviews by multiple taxing authorities, which raises a significant risk that inconsistent reallocations will subject the same income to repeat taxation.

21.    To minimize compliance burdens and to encourage compliance with the arm's length standard, many jurisdictions, including the United States and Canada, have developed "advance pricing agreement" ("APA") procedures whereby a multinational entity such as Nortel can agree with the relevant tax authorities to use a specified transfer pricing method for international transactions in a specified period.  In the case of a bilateral APA, a multinational entity can apply for "competent authority consideration," pursuant to a bilateral income tax treaty, to request that two taxing authorities mutually agree on the transfer pricing method to be applied, and on any reallocations of income between the authorities' jurisdictions, to avoid the risk of double taxation by those authorities.  The process of negotiating and finalizing an APA is complex, and can take many years.  Once a taxpayer has executed an APA with taxing authorities, those authorities are bound to respect the agreed-upon transfer pricing method and may audit the taxpayer (with respect to transfer pricing) only for taxpayer compliance with that method.

22.    On March 15, 2002, NNI and NNL submitted a joint request for a bilateral APA to the IRS and the CRA and requested competent authority consideration.  As amended, the request covered NNI's and NNL's taxable years ending December 31, 2001 through December 31, 2005 (the "Review Period").  In connection with its request, NNI executed IRS Forms 872 to extend the time for which the IRS could assess tax against NNI and its subsidiaries, with which it files U.S. federal tax returns on a consolidated basis (collectively, the "NNI Filing Group"), for the taxable years covered by the IRS APA.

9

23.    Over the past seven years, the competent authority divisions of the IRS and the CRA have been engaged in competent authority review regarding a bilateral APA relating to Nortel, which review eventually resulted in the IRS APA.

24.    On June 26, 2009, the IRS verbally informed NNI's representatives that, in its view, NNI had overpaid NNL during the Review Period in respect of Transfer Pricing Payments and that the taxable income of each of NNI and NNL for the Review Period should be adjusted accordingly.

25.    On August 25, 2009, October 16, 2009, and December 8, 2009, the IRS provided NNI with drafts of an APA that each provided that NNI's taxable income would be adjusted by an amount for the Review Period that had been determined jointly by the IRS and CRA as having been the overpayment of Transfer Pricing Payments for those years (the "Adjustment Amount."). On December 22, 2009, the IRS provided NNI with the proposed final form of the IRS APA, which provides, among other things, for an increase in NNI's taxable income over the course of the Review Period in the Adjustment Amount. NNI anticipates receiving from the IRS, no later than one business day before this Court holds a hearing on this Motion, the final IRS APA in form and substance substantially similar to the December 22 draft. The Debtors will file this final IRS APA with the Court together with a request that such document be placed under seal.

26.    It is anticipated that in the very near term the CRA will provide NNL with a final APA for signature that will provide for, among other things, a decrease in NNL's taxable income over the course of the Review Period in the Adjustment Amount (the "CRA APA," and together with the IRS APA, the "APAs").

27.     On February 13, 2009, May 22, 2009, and August 20, 2009, the IRS filed proofs

of claim bearing the respective claim identification numbers 250, 1226, and 1935 (collectively,

the "IRS Proofs of Claim"), which collectively assert (a) an unsecured priority claim against NNI

pursuant to section 507(a)(8) of the Bankruptcy Code for the taxable years 1998–2008 for

income taxes due in the amount of $1,804,637,586.00 and interest to the Petition Date in the

amount of $1,162,748,632.82, for an aggregate amount of $2,967,386,218.82; (b) an unsecured

non-priority claim for penalties (including interest thereon) to date in the amount of

$49,264,612.00, for a total claim of $3,016,650,830.82; and (c) an unassessed, unliquidated, and

contingent FICA withholding tax claim.

28.     The Debtors on September 15, 2009 filed with the Court Debtor NNI's Objection

to Proof of Claim Filed by the Internal Revenue Service, pursuant to section 502(d) of the

Bankruptcy Code (the "IRS Claim Objection").  The Court ordered that the IRS Proofs of Claim

would be considered at an expedited hearing on October 13, 2009.

29.     Among other things, the IRS Proofs of Claim set forth the maximum claim the

IRS could assert against NNI relating to income adjustments in the event that an agreement was

not reached on the IRS APA.  Those alleged income adjustments, of up to $7.5 billion, were far

in excess of the Adjustment Amount embodied in the draft IRS APA and would have been

highly detrimental to NNI and the other Debtors, if proven by the IRS.  In particular, valuable tax

attributes of the Debtors would have been destroyed if the IRS Proofs of Claim were allowed in

full.  Moreover, NNI and the other Debtors could have been subject to liability for withholding

taxes arising from the income adjustments in an amount as high as $375 million.  As described in

paragraph 39 hereof and in the Canadian Funding Motion (as defined below), after considering

the various complexities related to the Nortel Transfer Pricing Regime and in the context of the

11

package of agreements including the Settlement Stipulation and the Canadian Funding Agreement (as defined below), NNI and NNL have agreed that NNI overpaid NNL during the review period by the amount of $2 billion.

30.    The presence of the IRS Proofs of Claim also put at risk certain important elements of the Enterprise Sale.  In particular, the potential for successor liability under Treasury Regulations section 1.1502-6 required that the IRS Proofs of Claim be litigated to successful conclusion or chapter 11 filings would have to be commenced for certain non-debtor subsidiaries (the "–6 Issue").

31.    Following mediation and arm's-length negotiations between the Parties, and in order to avoid the cost and risk inherent in litigating the IRS Proofs of Claim, the Parties agreed to a stipulation (i) waiving any liability of the Non-Debtor Subsidiaries arising under Treasury Regulation section 1.1502-6, (ii) setting a minimum claim for certain U.S. federal tax liabilities of NNI and the NNI Filing Group for US federal tax purposes (the "IRS Minimum Claim"); and (iii) granting a lien in favor of the IRS to secure the IRS Minimum Claim (the "IRS Lien") against certain proceeds that will be generated by the sale of the Enterprise Solutions Business (the "–6 Stipulation").  On October 13, 2009, in view of the –6 Stipulation, the Court adjourned consideration of the objection to the remainder of the IRS Proofs of Claim without date.

32.    The Debtors are of the opinion that their tax liability for years relating to the IRS Proofs of Claim would not begin to approach the amount stated in the IRS Proofs of Claim.  IRS officials nevertheless have indicated to the Debtors that, if the Debtors do not execute the IRS APA, the IRS will not withdraw or reduce its claim.  Accordingly, if NNI does not sign the IRS APA, it will have no choice but to litigate the IRS Proofs of Claim, and final determination of the

NNI's tax liability for tax years 1998 through 2008 will be time-consuming, difficult, and expensive.

**B.      The Settlement Stipulation**

33.      Representatives of NNI, NNL, the Monitor, the Committee, and the Bondholder Group have engaged in extensive discussions and negotiations with each other regarding many complex and material inter-estate issues between the US Debtors and the Canadian Debtors, including without limitation, issues relating to overpayments made in the 2001–2005 period by NNI to NNL, certain open balances between NNI and NNL relating to the period prior to the Petition Date (the "Pre-Filing Period"), claims for reimbursement of certain costs and for funding in the period after the Petition Date, the APAs and possible claims in respect of the income adjustments reflected therein, and regarding an agreement for the Debtors to provide funding to NNL.

34.      Representatives of NNI have engaged in extensive discussions with the IRS regarding the IRS APA, the IRS Proofs of Claim, and NNI's possible tax liabilities for the tax years 1998 through 2008.  Representatives of NNL and the Monitor have engaged in similar discussions with the CRA with respect to the CRA APA.

35.      NNI and NNL have shared information relevant to determining whether the APAs should be signed with representatives of NNI, NNL, the Monitor, the Committee, and the Bondholder Group.  All parties to those discussions have agreed that entry into the IRS APA and the related Settlement Stipulation and Closing Agreement (defined below) represents an acceptable compromise of NNI's tax liabilities for the years in question.

36.      Pursuant to these discussions, NNI and NNL have each agreed to accept the APAs as part of a package of agreements by and among NNI, NNL, the IRS, and the CRA, as

appropriate, that addresses: NNI's possible liability for pre-petition U.S. federal taxes, including

but not limited to the taxes described in the IRS Proofs of Claim; funding to be provided by NNI

to NNL pursuant to the Canadian Funding Agreement (defined below); and any claim NNI may

have against NNL with respect to the Adjustment Amount contemplated by the APAs.

37.     <u>Settlement Stipulation and Closing Agreement</u>.  NNI and the IRS have agreed that

execution of the IRS APA will result in a total aggregate U.S. federal tax liability (including all

income taxes, withholding taxes, alternative minimum taxes, and any other taxes, without

limitation) of $37.5 million for NNI (and its consolidated group for U.S. federal tax purposes)

with respect to all taxable years up to and including the taxable year ending December 31, 2008,

and have agreed to express that agreement in (a) the Settlement Stipulation attached hereto as

Exhibit B, and (b) an IRS Form 906 closing agreement that is to be executed within two business

days of the Effective Date of the Settlement Stipulation (the "<u>Closing Agreement</u>").  The key

terms of the Settlement Stipulation and Closing Agreement are described in paragraph 40, below.

The agreements, acknowledgements and obligations contained in the Settlement Stipulation shall

become effective only upon (i) entry by this Court of an order or orders approving the Stipulation

and entry into the IRS APA; and (ii) satisfaction of the conditions to effectiveness of the

Canadian Funding Agreement (such date, the "<u>Effective Date</u>").

38.     <u>IRS APA</u>.  NNI has agreed with the IRS to sign the IRS APA and to file this

Motion seeking the Court's approval thereof.  Pursuant to the IRS APA, and contingent upon

such approval, NNI will adjust its taxable income to reflect an increase in the Adjustment

Amount ratably over the course of the Review Period (the "<u>Income Adjustment</u>") and a decrease

of $57,356,652 for NNI's taxable years ending December 31, 1998 through December 31, 2001.

Solely for tax purposes, the Settlement Stipulation and the IRS APA will treat the Income

Adjustment as giving rise to a deemed distribution from NNI to NNL that is subject to

withholding tax, and the IRS's right to such withholding tax will be satisfied in full as provided

in the Settlement Stipulation.

39.    Funding Agreement.  NNI, NNL, the Monitor, the Committee and the Bondholder

Group recently reached an agreement, the Final Canadian Funding and Settlement Agreement

(the "Canadian Funding Agreement"), subject to court approval, that will resolve material issues

among the US and Canadian Debtors and will, among other things, establish a valid and

enforceable pre-filing claim in favor of NNI against NNL in the amount of $2,062,700,000 (the

"NNI Claim") and provide for payments to NNL in the amount of $190,800,000 (subject to

certain adjustments).  Contemporaneously with this Motion, the Debtors have sought this Court's

approval of the Canadian Funding Agreement by filing a Motion Pursuant to 11 U.S.C. §

105(A), § 363, § 503 and Fed. R. Bankr. P. 9019 for an Order (A) Approving the Final Canadian

Funding and Settlement Agreement, and (B) Granting Related Relief  (the "Canadian Funding

Motion").

**C.    Terms of the Settlement Stipulation and Closing Agreement**

40.    The key terms of the Settlement Stipulation and Closing Agreement between NNI

and the IRS may be summarized as follows:[7]

- Parties.  The Parties to the Settlement Stipulation and Closing Agreement are the Internal Revenue Service ("IRS") and Nortel Networks, Inc., ("NNI"), on its own behalf and on behalf of the NNI Filing Group.

- Effectiveness.  The agreements, acknowledgements and obligations contained in the Settlement Stipulation are expressly contingent upon, and shall become effective only upon (i) entry by this Court of an order or orders approving the

---

[7]    Capitalized terms used but not defined herein have the meanings ascribed to them in the Settlement Stipulation, certain of which definitions appear in sections of the Settlement Stipulation not set forth herein, but in the entire Settlement Stipulation attached hereto as Exhibit B.

Stipulation and entry into the IRS APA; and (ii) satisfaction of the conditions
to effectiveness of the Canadian Funding Agreement (such date, the
"Effective Date").

- IRS Release. As of the Effective Date, the IRS will fully and finally release,
  and waive as against, each of the members of the NNI Filing Group, and their
  respective assets, any claim, lien, interest or obligation, the right to assert or
  take any action giving rise to any such claim, lien, interest or obligation, and
  the right to assess or impose any liability based on any such claim, lien,
  interest or obligation, whether arising under the Internal Revenue Code of
  1986, as amended, or any Treasury Regulations thereunder or any other legal
  or equitable doctrine or theory, for all taxable years of NNI ending December
  31, 1998 through December 31, 2008 (the "IRS Claim Release Period"), for
  any amount in excess of the IRS Final Claim Amount (as defined below) (the
  "IRS Release"), by delivering to NNI an executed original of the Closing
  Agreement (as defined below). For the avoidance of doubt, the IRS Release
  covers any and all claims by the IRS against the NNI Filing Group, including
  but not limited to the claims described in the proofs of claim filed by the IRS
  against NNI, dated as of February 13, 2009, May 22, 2009 and August 20,
  2009, bearing the respective claim identification numbers 250, 1226 and 1935
  (collectively, the "IRS Claim"), and the IRS will make no additional claims
  against the NNI Filing Group in connection with the IRS Claim Release
  Period and seek no relief from the Bar Date or the Bar Date Order. The IRS
  Release shall be effective immediately upon receipt of the Settlement Payment
  (as defined below).

- The Closing Agreement. The Parties agree to negotiate in good faith to agree
  upon the terms and conditions of a closing agreement (the "Closing
  Agreement"), by and among the IRS and NNI, as agent for the NNI Filing
  Group, that determines the final tax liability of the NNI Filing Group for the
  IRS Claim Release Period to be $37.5 million. The Parties acknowledge and
  agree that the terms of the Closing Agreement will be consistent with the
  Settlement Stipulation. The Parties further agree that they will present a final
  version of the Closing Agreement to this Court for approval, along with the
  Settlement Stipulation, by no later than one business day before the date on
  which this Court holds a hearing to approve the Settlement Stipulation. On
  the second business day following the Effective Date (the "Settlement Date"),
  the IRS will deliver an executed original of the Closing Agreement to NNI.

- The IRS Final Claim. As of the Effective Date, the US Debtors that are part
  of the NNI Filing Group will be deemed to have acknowledged a claim in
  favor of the IRS (the "IRS Final Claim") in respect of US federal tax for the
  IRS Claim Release Period, in an amount of $37.5 million (the "IRS Final
  Claim Amount"). The Parties acknowledge and agree that the IRS Final
  Claim Amount includes, and is not in addition to, the IRS Minimum Claim.
  Subject to the occurrence of the Effective Date, the IRS Claim will be agreed
  and allowed solely to the extent of the IRS Final Claim Amount, the Parties

16

acknowledge and agree that the IRS will be entitled to a claim for no less than the IRS Final Claim Amount, and the Parties also agree that in no event shall the allowed amount of the IRS Claim exceed the IRS Final Claim Amount.

- <u>Payment on the IRS Final Claim</u>. On the Settlement Date, NNI will make a cash payment to the IRS in an amount equal to the IRS Final Claim Amount (the "<u>Settlement Payment</u>").

- <u>Extinguishment of the IRS Lien</u>. The Parties agree that upon payment of the Settlement Payment by NNI to the IRS, the IRS Lien will be extinguished, and any and all rights of the IRS arising out of the –6 Stipulation will be null and void.

- <u>The IRS APA</u>. The Parties agree that no later than the Settlement Date, they will execute the IRS APA in a form that will be presented to this Court, under seal, by no later than one business day before the date on which this Court holds a hearing to approve the Stipulation. NNI agrees that it will seek authorization from this Court of NNI's entry into the IRS APA. NNI further agrees that, pursuant to the IRS APA and contingent upon receipt of this Court's approval of NNI's entry into the IRS APA, it will file amended U.S. federal income tax returns that adjust NNI's taxable income to reflect the Adjustment Amount for the APA Term. The IRS acknowledges that NNI has provided the IRS with draft amended returns (the "<u>Amended Returns</u>") that reflect the Adjustment Amount for the APA Term, and the IRS agrees that the Amended Returns are satisfactory in form to the IRS. The IRS agrees that, upon NNI's formal filing of the Amended Returns with the IRS, NNI will be deemed to have satisfied all of the requirements set forth in the IRS APA, including but not limited to the reporting requirements contained in paragraphs 5(e), 5(f) and 5(g) and Appendix C of the IRS APA. NNI agrees that the IRS APA is highly confidential and implicates confidential taxpayer information as well as other confidential information and, as such, will file a motion with this Court requesting confidential treatment of the IRS APA.

- <u>Remaining Tax Attributes</u>. The Parties acknowledge and agree, and the Closing Agreement will provide, that after increasing NNI's taxable income by the Adjustment Amount for the APA Term, as of January 1, 2009, the NNI Filing Group has a federal tax net operating loss carryforward of $813,886,666 available to offset taxable income. The Parties further acknowledge and agree that as of January 1, 2009, the NNI Filing Group may be entitled to general business credits, and the Parties will work in good faith to determine the amount thereof in a timely manner.

- <u>Payments from NNL to NNI</u>. The IRS acknowledges that the Canadian Funding Agreement requires the establishment of the NNI Claim and the IRS further acknowledges that NNI may receive payments in respect of the NNI Claim up to the face amount of the NNI Claim. The IRS agrees (i) to treat, solely for U.S. federal income tax purposes, any such amounts received by

17

NNI in respect of the NNI Claim as a nontaxable event and (ii) that the cancellation or discharge, without payment, of any portion of the NNI Claim will not give rise to any U.S. federal taxes.

- <u>IRS Forms 872</u>.  NNI agrees to execute and deliver to the IRS the IRS Forms 872 by December 30, 2009; *provided, however,* that, by executing the IRS Forms 872, NNI neither acknowledges the validity of nor creates any claims against NNI in favor of the IRS nor waives any protections against assessment of taxes provided by the bankruptcy process.  The IRS agrees that immediately upon payment by NNI of the Settlement Payment to the IRS, the IRS Forms 872 shall be deemed revoked and NNI's consent to extend the statute of limitations on assessment shall be terminated.

- <u>Refund Claims</u>.  On the Settlement Date, NNI, on behalf of the NNI Filing Group, (i) agrees to withdraw any Refund Claims previously filed by NNI on behalf of the NNI Filing Group against the IRS for taxable years through 2008, and (ii) waives, and agrees not to assert, any additional Refund Claims by NNI on behalf of the NNI Filing Group for taxable years through 2008 against the IRS.  The IRS hereby acknowledges that NNI has provided the IRS with calculations to support the Refund Claims.  The Parties acknowledge that, but for the Settlement Stipulation, NNI would have asserted and defended, as necessary, the Refund Claims on behalf of the NNI Filing Group against the IRS.  NNI agrees that withdrawal and waiver of the Refund Claims by NNI will be with prejudice against NNI and the NNI Filing Group.

- <u>Additional Agreements</u>.  On the Settlement Date, NNI will withdraw its Claim Objection with prejudice, and the IRS will withdraw, with prejudice, its Motion for Withdrawal of Reference of All Issues Relating to Debtor NNI's Objection to Proof of Claim filed by the Internal Revenue Service.

### Basis for Relief

41.     The relief requested herein is authorized by sections 105(a), 363(b) and 505(a) of the Bankruptcy Code and Bankruptcy Rule 9019.

42.     Section 105(a) of the Bankruptcy Code provides that "[t]he court may issue any order . . . that is necessary or appropriate to carry out the provisions of this title."  11 U.S.C. § 105.

43.     Section 363(b) of the Bankruptcy Code permits a debtor to use property of the estate outside of the ordinary course of business after notice and a hearing.  11 U.S.C. § 363.  Section 363 applies when an agreement involves the disposition of the estate's assets in such a

way that it ventures beyond an ordinary course transaction. <u>Myers v. Martin (In re Martin)</u>, 91

F.3d 389, 395 (3d Cir. 1996).

44.     The use or transfer of estate property under this provision must be supported by a

sound business purpose. <u>The Committee of Equity Security Holders v. Lionel Corporation (In re</u>

<u>Lionel Corporation)</u>, 722 F.2d 1063, 1070-71 (2d Cir. 1983); <u>In re Decora Industries, Inc.</u>, No.

00-4459, 2002 WL 32332749, at *2 (D. Del. May 20, 2002); <u>The Dai-Ichi Kangyo Bank, Ltd. v.</u>

<u>Montgomery Ward Holding Corp. (In re Montgomery Ward Holding Corp.)</u>, 242 B.R. 147, 153

(D. Del. 1999); In re Delaware & Hudson Ry. Co., 124 B.R. 169, 176 (D. Del. 1991); <u>Travelers</u>

<u>Casualty and Surety Company v. Future Claimants Representative</u>, No. 07-2785, 2008 WL

821088, at *4 (D.N.J. Mar. 25, 2008).  A court determining whether a sound business purpose

justifies the transaction "should consider all salient factors pertaining to the proceeding and,

accordingly, act to further the diverse interests of the debtor, creditors and equity holders, alike."

<u>In re Montgomery Ward</u>, 242 B.R. at 153-54 (quoting In re Lionel, 722 F.2d at 1071).  In

addition, a debtor must show that the transaction has been proposed in good faith, that adequate

and reasonable notice has been provided, and that it is receiving fair and reasonable value in

exchange.  See <u>In re Delaware & Hudson Ry. Co.</u>, 124 B.R. at 176; <u>In re Decora Industries, Inc.</u>,

2002 WL 32332749, at *2.

45.     Section 505(a) of the Bankruptcy Code authorizes a court with jurisdiction over a

bankruptcy estate to "determine the amount or legality of any tax, any fine or penalty relating to

a tax, or any addition to tax, whether or not previously assessed, whether or not paid, and

whether or not contested before and adjudicated by a judicial or administrative tribunal of

competent jurisdiction."  Pursuant to section 505(a), the Court may determine tax liabilities of

the Debtors, <u>Quattrone Accountants Inc. v. Commissioner</u>, 895 F.2d 921, 923 (3d Cir.1990)

(holding section 505(a) authorizes bankruptcy court to determine taxes of debtors or the estate but not of non-debtor third-parties), and the Court's approval of a settlement of tax liabilities may be afforded preclusive effect as a final judgment under that section, see In re Matunas, 261 B.R. 129, 136 (Bankr. D.N.J. 2001) (giving preclusive effect to stipulation agreement between debtor and IRS).

46.    Bankruptcy Rule 9019 provides, in pertinent part, that, "on motion by the trustee and after notice and a hearing, the court may approve a compromise or settlement." Fed. R. Bankr. P. 9019. Under this authority, the Third Circuit has emphasized that "[c]ompromises are favored in bankruptcy." Martin, 91 F.3d at 393 (quoting 9 Collier on Bankruptcy 9019.03[1] (15th ed. 1993)). In addition, the District of Delaware has recognized that the approval of a proposed compromise and settlement is committed to the sound discretion of the bankruptcy court. See In re Coram Healthcare Corp., 315 B.R. 321, 329 (Bankr. D. Del. 2004).

47.    Before approving a settlement under Bankruptcy Rule 9019, a court must determine whether "the compromise is fair, reasonable, and in the interest of the estate." In re Marvel Entertainment Group, Inc., 222 B.R. 243, 249 (D. Del. 1998) (quoting In re Louise's, Inc., 211 B.R. 798, 801 (D. Del. 1997)). Basic to the process of evaluating proposed settlements is "the need to compare the terms of the compromise with the likely rewards of litigation." Protective Committee for Independent Stockholders of TMT Trailer Ferry, Inc. v. Anderson, 390 U.S. 414, 424-25 (1968). The court's obligation is to "canvass the issues and see whether the settlement falls below the lowest point in a range of reasonableness." Travelers, 2008 WL 821088, at *5 (citing Matter of Jasmine, Ltd., 258 B.R. 119 (D.N.J. 2000); Coram, 315 B.R. at 330; Pennsylvania Truck Lines, 150 B.R. at 598. The court need not be convinced that the settlement is the best possible compromise in order to approve it. Coram, 315 B.R. at 330.

48.     The Third Circuit has set out four criteria for a bankruptcy court to consider when evaluating a settlement proposal (the "Martin Factors"): "(1) the probability of success in litigation; (2) the likely difficulties in collection; (3) the complexity of the litigation involved, and the expense, inconvenience and delay necessarily attending it; and (4) the paramount interest of the creditors." Martin, 91 F.3d at 393.

49.     The Debtors respectfully submit that the IRS APA and Settlement Stipulation meet each of the requirements of section 363, section 505(a) and Bankruptcy Rule 9019. The IRS APA and Settlement Stipulation resolve key issues regarding NNI's taxable income for the Review Period, while preventing dual taxation in the United States and Canada. The IRS APA is the result of more than seven years of competent authority review, as well as arm's-length negotiations among NNI, NNL, the Monitor, the Committee, and the Bondholder Group, and conclusively resolves any issues with respect to Nortel's Transfer Pricing Regime that might give rise to a claim for additional taxes for pre-filing years. Moreover, NNI, the Committee, and the Bondholder Group each has determined that NNI's entry into the IRS APA is in the best interests of the creditors and the Debtors' estates.

50.     The IRS APA and Settlement Stipulation are supported by sound business purposes because they allow the Debtors to close all possibility of assessment of U.S. federal taxes for the tax years up to and including NNI's taxable year ending on December 31, 2008. In addition, the IRS APA and Settlement Stipulation are essential elements of a package of agreements that, among other items, reduces the IRS Proofs of Claim amount from $3,016,650,830.82 to $37.5 million and acknowledges a claim against NNL in favor of NNI in excess of US $2 billion. They also provide finality with respect to the IRS APA and the IRS Proofs of Claim and allow the Debtors to refocus the time, energy and expenses heretofore

21

expended on those matters on other matters important to maximizing the value of the Debtors' estate, including Nortel's various asset sales.

51.    If the IRS APA and Settlement Stipulation are not approved, NNI will be forced to engage in litigation with the IRS on the IRS Proofs of Claim and with NNL on a related massive intercompany claim.  Litigation of all transfer pricing matters relating to the IRS Proofs of Claim, and of the ten tax years addressed by the IRS Proofs of Claim, would be extensive and complex.  Such litigation would require expert testimony, factual witnesses, voluminous submissions to the Court containing ten years' worth of transfer pricing calculations, and lengthy discussions by economists on which transfer pricing methodology Nortel should have used to allocate income among the Main Nortel Companies.  Litigation of the IRS Proofs of Claim would drain resources from the Debtors' estates and detract attention from other important matters.  Additionally, litigation of the IRS Proofs of Claim would result in uncertain consequences to the Debtors.  Although the Debtors might prove that their tax liability is less than the amount asserted in the IRS Proofs of Claim, there would be no guarantee of a judgment in the Debtors' favor or a determination that the Debtors' taxable income should be adjusted in an amount less than the maximum adjustment to income implied by the IRS Proofs of Claim.  Similarly, any litigation on a claim against NNL would be expensive, time-consuming, and ultimately uncertain in terms of results.

52.    Furthermore, the Settlement Stipulation and the IRS APA are essential elements of the resolution of material matters among the estates of NNI and NNL.  As set forth in more detail in the Canadian Funding Motion, the resolution of such issues permits the US and Canadian Debtors to focus on the tasks of delivering transition services to their various purchasers and the allocation of sale proceeds.

22

53.     Accordingly, the Debtors submit that approval of the Settlement Stipulation and IRS APA has a valid business purpose, including resolution of the outstanding IRS Proofs of Claim.  The Settlement Stipulation and IRS APA have been proposed in good faith upon reasonable and adequate notice, and are in the best interests of the Debtors' estates, creditors and other stakeholders.  The Court therefore should approve the Settlement Stipulation and the IRS APA, and should authorize the Debtors to enter into the IRS APA on the Effective Date.

## Notice

54.     Notice of the Motion has been given via first class mail to the (i) U.S. Trustee; (ii) counsel to the Committee; (iii) counsel to the Bondholder Group; (iv) the Joint Administrators; and (v) the general service list established in these chapter 11 cases.  The Debtors submit that under the circumstances no other or further notice is necessary.

## No Prior Request

55.     No prior request for the relief sought herein has been made to this or any other court.

WHEREFORE, the Debtors respectfully request that this Court (i) grant this Motion and the relief requested herein; (ii) enter the proposed order attached hereto; and (iii) grant such other and further relief as it deems just and proper.

Dated:  December 23, 2009
        Wilmington, Delaware

CLEARY GOTTLIEB STEEN & HAMILTON LLP

James L. Bromley (*admitted pro hac vice*)
Lisa M. Schweitzer (*admitted pro hac vice*)
One Liberty Plaza
New York, New York 10006
Telephone:  (212) 225-2000
Facsimile:  (212) 225-3999

- and -

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

Derek C. Abbott (No. 3376)
Eric D. Schwartz (No. 3134)
Ann C. Cordo (No. 4817)
Andrew R. Remming (No. 5120)
1201 North Market Street
P.O. Box 1347
Wilmington, Delaware 19801
Telephone:  (302) 658-9200
Facsimile: (302) 658-3989

*Counsel for the Debtors
and Debtors in Possession*