UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

```
IN RE:                          )  Case No. 09-10138(KG)
                                )  (JOINTLY ADMINISTERED)
                                )  Chapter 11
NORTEL NETWORKS, INC.,          )
et al.,                         )  Courtroom 3
                                )  824 Market Street
                    Debtors.    )  Wilmington, Delaware 19801
                                )
                                )  December 15, 2009
                                )  10:03 A.M.
```

TRANSCRIPT OF OMNIBUS HEARING
BEFORE HONORABLE KEVIN GROSS
UNITED STATES BANKRUPTCY JUDGE

APPEARANCES:

For the Debtors:           Morris Nichols Arsht & Tunnell, LLP
                           By:  DEREK ABBOTT, ESQ.
                                ANDREW REMMING, ESQ.
                           1201 North Market Street
                           P.O. Box 1347
                           Wilmington, Delaware 19899-1347

For AT&T:                  Ashby & Geddes
                           By:  AMANDA M. WINFREE, ESQ.
                           222 Delaware Avenue, 17th Floor
                           Wilmington, Delaware 19801
ECRO:                      LESLIE MURIN

TRANSCRIPTION SERVICE:     TRANSCRIPTS PLUS, INC.
                           435 Riverview Circle
                           New Hope, Pennsylvania 18938
                           Telephone:  215-862-1115
                           Facsimile: 215-862-6639
                           e-mail CourtTranscripts@aol.com


 Proceedings recorded by electronic sound recording, transcript
                produced by transcription service.

APPEARANCES:
(Continued)


For the Committee:          Richards Layton & Finger, PA
                            By:  CHRIS SAMIS, ESQ.
                            One Rodney Square, P.O. Box 551
                            Wilmington, Delaware 19899

For Joint Administrators  Young Conaway Stargatt & Taylor, LLP
for Nortel, et al:          By:  MARIS FINNEGAN, ESQ.
                            The Brandywine Building
                            1000 West Street, 17th Floor
                            Wilmington, Delaware 19899-0391

For Jefferies & Co.:        Cross & Simon, LLC
                            By:  KEVIN MANN, ESQ.
                            913 North Market Street, Suite 1001
                            Wilmington, Delaware 19801


TELEPHONIC PARTICIPANTS:

For the Debtors:            Cleary Gottlieb Steen & Hamilton LLP
                            By:  JIM BROMLEY, ESQ.

For the Debtor:             Nortel Networks, Inc.
                            By:  EDWARD PLACENIS

For Hondo Sen:              HONDO SEN, Pro Se

For Creditors'             Akin Gump Strauss Hauer & Feld
Committee:                  By:  DAVID BOTTER, ESQ.
                                 RYAN JACOBS, ESQ.

For Tricadia Capital:       Tricadia Capital
                            By:  STEPHEN GRISANTI

For AT&T:                   Fulbright & Jaworski
                            By:  MARK C. HAUT, ESQ.
                                 DAVID ROSENZWEIG, ESQ.

For D.E. Shaw:              D.E. Shaw
                            By:  SARAH JOHNSON, ESQ.

TELEPHONIC PARTICIPANTS:
(Continued)


For Official Committee     Jefferies & Co., Inc.
of Unsecured Creditors:    By:  CLAIR MORRISON, ESQ.

For Ernst & Young:         Allen & Overy, LLP
                           By:  DANIEL MORSE, ESQ.

4

1           THE COURT:  Good morning, everyone.  Thank you.  And

2  please be seated.  Good morning.

3           Mr. Abbott, good morning.

4           MR. ABBOTT:  Good morning, Your Honor.  Derek Abbott

5  here for the Nortel debtors, Your Honor.  And we have what I

6  think should be a largely noncontroversial hearing today.

7  We're going to try to average the length of these hearings down

8  today, if we can help it, Your Honor.

9                     (Laughter)

10          THE COURT:  Good.

11          MR. ABBOTT:  Your Honor, you may have seen the

12 amended agenda --

13          THE COURT:  I did.

14          MR. ABBOTT:  -- that should have been forwarded to

15 your office.

16          THE COURT:  Yes.

17          MR. ABBOTT:  Your Honor, Items Number 1 through 4

18 have been adjourned.

19          THE COURT:  Right.

20          MR. ABBOTT:  5 and 6, Your Honor acted on

21 certificates, and entered orders previously.

22          That would leave Matters 7 and 8, Your Honor.  Mr.

23 Remming is going to handle those matters generally.

24          The one thing I would ask the Court, Your Honor, to

25 do, if we can, is the professional fees are sort of slotted in

1  between 9 and 10.  I think we probably ought to just address

2  those at the end of the hearing.

3        THE COURT:  Yes, that's fine.

4        MR. ABBOTT:  Get through the meat first.  But at this

5  point, I'd like to cede the podium to Mr. Remming to deal with

6  7 and 8.

7        The other thing, Your Honor, is that one of these

8  matters -- Number 10 has been a bit of a moving target.  And

9  we're trying to get things done in advance of a closing so that

10 we know where to put the funds.  There's been a little more

11 twist on that.  Mr. Bromley is going to address the Court if

12 it's acceptable to the Court, telephonically on that motion --

13       THE COURT:  Of course.

14       MR. ABBOTT:  -- when we get there.

15       THE COURT:  And, by the way, I didn't sign the order.

16 Not that I have necessarily a problem with it, but I know it

17 just came in and I wanted to make sure that no one had an issue

18 with shortening the time, that's all.

19       MR. ABBOTT:  We appreciate that, Your Honor.

20       THE COURT:  You bet.

21       MR. ABBOTT:  Thank you.  And I'll let Mr. Remming

22 address those first two items.

23       THE COURT:  All right.  Thank you.  Mr. Remming, it's

24 good to see you again.

25       MR. REMMING:  Good morning, Your Honor.

1          THE COURT:  Good morning.

2          MR. REMMING:  For the record, Andrew Remming, Morris

3  Nichols Arsht & Tunnell for the debtors.

4          THE COURT:  Yes, sir.

5          MR. REMMING:  Item Number 7 on the agenda is a motion

6  to approve an assumption and assignment of a lease.

7  Specifically there's a lease between Technology Park, LP, the

8  landlord, and under that lease, NNI is the tenant.

9          There's also a sublease where NNI is the sublandlord

10 and --

11         THE COURT:  Right.

12         MR. REMMING:  -- and Raytheon is the subtenant.  The

13 motion seeks to approve the assumption and assignment of both

14 those agreements to Avaya in connection with the enterprise

15 sale.

16         There were no objections to the motion.  And -- but I

17 do have a clean and blackline of the order.  There was a small

18 change to cure amounts, Paragraph 7 of the order.

19         THE COURT:  All right.

20         MR. REMMING:  May I approach?

21         THE COURT:  You certainly may, Mr. Remming.  Thank

22 you.

23                      (Pause)

24         THE COURT:  That's actually in the debtors' favor.

25         MR. REMMING:  I'm sorry, Your Honor?

1            THE COURT:  I say it's -- the change is in the

2   debtors' favor.

3            MR. REMMING:  Yes.

4            THE COURT:  That's good news.  Does anyone else wish

5   to be heard on this matter?

6                  (No audible response heard)

7            THE COURT:  Well, clearly it's appropriate.  This is

8   in connection with the sale to Avaya.  It's undoubtedly in the

9   debtors' best interest.  And I am pleased to grant the motion,

10  and I'm signing the order.

11           MR. REMMING:  Thank you.

12                       (Pause)

13           THE COURT:  All right.

14           MR. REMMING:  Your Honor, the next item on the agenda

15  is a motion to approve a settlement agreement between IBM and

16  Nortel.

17           THE COURT:  Yes.

18           MR. REMMING:  The motion is pursuant to Section 105

19  of the Bankruptcy Code and Bankruptcy Rule 9019.  The -- as I

20  said, the motion seeks approval of a settlement agreement

21  between NNI and IBM.

22           Just to give you a little bit of background about the

23  relationship between IBM and Nortel.  IBM and Nortel were

24  parties to two master services agreements that were executed in

25  2008 and 2007 respectively.  I'll call these agreements the

1  agreements.

2          Separately one agreement was known as the PV&T

3  agreement, and that stands for Product Verification and

4  Testing.  And the second agreement was known as the HLR or HSS

5  agreement, and that stands for Home Location Registry and Home

6  Subscriber Service.

7          Both of those are acronym used in the industry and

8  referred to various technology products.

9          The PV&T agreement is -- spans the entire Nortel

10 business, and there are multiple Nortel products that are under

11 that agreement.  And the services that IBM provided was known

12 as R&D testing services.  And the reason -- the need for these

13 agreements is that when you develop a technology product,

14 there's going to be certain bugs and things like that.  So,

15 Nortel had developed a product, and then outsourced the testing

16 of that produced to IBM.  And IBM would run certain scripts,

17 and come back to Nortel when they discovered problems.

18         After the debtors commenced their bankruptcy in May,

19 2009, we rejected the PV&T agreement.  And in September, 2009,

20 we rejected the HLR or HSS agreement.

21         And the agreements were also repudiated in Canada,

22 which is the equivalent of rejection under CCA.

23         IBM filed certain proofs of claim in connection with

24 these agreements.  And they alleged four point -- over $4.6

25 million in administrative expenses in connection with the two

1 | agreements.

2 | There's essentially three parts of their
3 | administrative expense claim:

4 | One is what's known as termination charges.  And
5 | these are charges that are -- under the agreement were put into
6 | a -- called a capital account.  And specifically in the capital
7 | account was charges for equipment that IBM provided to Nortel.
8 | Nortel didn't want to extend this large sum at the beginning of
9 | the contract, so the cost of the equipment was amortized over
10 | the course of the agreement.

11 | And the second element was called knowledge transfer.
12 | And that basically is when the IBM employees were getting up to
13 | speed on the testing, there was a certain period where they
14 | weren't 100 percent efficient.  So, those costs were amortized
15 | over the cost of the agreement -- over the course of the
16 | agreement, rather than an up-front cost to Nortel.

17 | The second element is wind-down charges.  And those
18 | were essentially severance pay.

19 | And the third element was what was called termination
20 | for convenience.  And it's basically just an early termination
21 | charge for the contract.

22 | Now, the terms of the settlement provide that IBM
23 | agrees to reduce its post petition claim to $2.5 million.  And
24 | with respect to that payment, if Your Honor enters the order
25 | today, the payment will be made from NNI upon Your Honor's

1 order to become a final order, as that term is defined under

2 the settlement agreement.

3          And IBM also agrees to waive and release all other

4 post petition claims against the debtors.

5          THE COURT:  Good.

6          MR. REMMING:  The second element of the settlement

7 agreement is with respect to the termination of wind-down

8 charges.  As I mentioned before, under the agreement, there's

9 certain termination and wind-down charges, and also charges for

10 lab start-up costs.  IBM asserts that these agreements are post

11 petition.  And under the settlement agreement, IBM agrees to

12 waive these charges -- waive the right to argue that these are

13 post petition or otherwise entitled to administrative expense.

14          And the final point is that IBM agrees that it will

15 have one claim against one -- it will be able to have one

16 allowed claim against the debtor.

17          THE COURT:  Instead of against multiple debtors, you

18 mean?

19          MR. REMMING:  Yes.

20          THE COURT:  Okay.

21          MR. REMMING:  And finally, consideration of the

22 reduction in IBM's claim and the -- you know, we are prepared

23 to litigate the IBM claim, but considering the cost of that

24 litigation and the benefit of the settlement, we believe that

25 the costs outweigh any litigation.  And that the settlement is

1  otherwise in the best interest of the debtors, their estates,

2  and their creditors.

3         So, unless Your Honor has any questions, we believe

4  that the motion meets the applicable standard and should be

5  approved.

6         THE COURT:  Thank you, Mr. Remming.  My only question

7  is whether anyone wishes to be heard on this?

8               (No audible response heard)

9         THE COURT:  Well, hearing no one, I am satisfied

10 certainly based upon the papers and your presentation, Mr.

11 Remming, that the settlement does meet the standards of Rule

12 9019, is in the best interest of the debtors' estate, and I

13 certainly have to defer, to some extent, to the debtors'

14 business judgment in a matter such as this.  And doing so, I

15 will approve the settlement.

16         MR. REMMING:  Okay.  And just -- we also have been in

17 communication with the Creditors' Committee and the Bondholders

18 Committee.  And they have represented to me that they have no

19 objections.

20         The Committee did have one comment to the order,

21 which we incorporated.  And that comment -- the incorporation

22 resolves our concern.

23         So, I have a clean and black line of the order, as

24 well.

25         THE COURT:  Okay.  I will certainly be pleased to

1  have you approach and take those from you.

2          I agree with you, Mr. Remming, that the certainty is

3  significant here, given the amount.  And it is a significant

4  reduction in the claim.

5          Thank you.

6                          (Pause)

7          THE COURT:  Okay.  I see the change, and it certainly

8  is acceptable.

9          MR. REMMING:  Thank you, Your Honor.  I will turn the

10  podium to my colleague, Derek Abbott.

11          THE COURT:  All right.  Thank you, Mr. Remming.

12          MR. REMMING:  Thank you.

13          MR. ABBOTT:  Derek Abbott for the debtors.  Your

14  Honor, that brings us to Item Number 9, which is another

15  settlement agreement between the debtors and the Chapter 7

16  trustee of an outfit called NETtel.  Your Honor, in short --

17  and it's spelled out, I think, reasonably well in the motion.

18  NNI was the agent for a number of lenders that essentially lent

19  money to NETtel to build out a telephone network.  Ultimately

20  that project was not successful.  And as a result, Your Honor,

21  NETtel filed a Chapter 11 last fall, and it was -- it lived

22  there for about 25 days, and then became a Chapter 7, Your

23  Honor, as you may have seen in the papers.

24          THE COURT:  I recall.

25          MR. ABBOTT:  Unfortunately, despite an aggregate

1  claim on behalf of NNI who was agent for lenders, as well as a

2  lender itself, there's not close to $92 million around to

3  satisfy that judgment, Your Honor.

4          There were a number of negotiations.  An awful lot of

5  sort of motion practice in that case.  At the end of the case,

6  Your Honor, Nortel was able to reach an appropriate compromise

7  as agent for these lenders to settle this case.

8          What we're seeking authority for today is obviously

9  NNI's piece of that.  Your Honor, in the aggregate, the

10 trustee's going to pay approximately $2.7 million, almost 2.8,

11 to the lenders.  Of that, the debtors would take, as I

12 understand it, about $1.8 million.

13         There are fairly standard other terms, including lien

14 releases, et cetera.  Your Honor, I don't believe there's any

15 objection.  We do believe this is in the debtors' best

16 interest, as set forth in the motion.

17         And absent questions from the Court, I'd ask the

18 Court to approve that settlement.

19         THE COURT:  All right.  Thank you, Mr. Abbott.

20 Anyone else?

21              (No audible response heard)

22         THE COURT:  Well, hearing no one, I, too, am

23 satisfied that given the circumstances of the NETtel bankruptcy

24 and the uncertainty of collection, that it is appropriate to,

25 again, defer to the business judgment of the debtor and, as

1  well, to find that this is a fair and reasonable settlement,

2  and in the debtors' best interest.

3          MR. ABBOTT:  Your Honor, may I approach with an

4  order?

5          THE COURT:   You may.

6                      (Pause)

7          THE COURT:  All right.

8          MR. ABBOTT:  Your Honor, the next matter on the

9  agenda is the escrow motion.

10          THE COURT:  Yes.

11          MR. ABBOTT:  Your Honor, I think it might be helpful

12  if I were to hand up just a blackline of the escrow agreement,

13  as Mr. Bromley presents the motion?

14          THE COURT:  That would be fine.

15          MR. ABBOTT:  If I may approach, Your Honor?

16          THE COURT:  Yes.  Yes, Mr. Abbott, always.

17          MR. ABBOTT:  Let me make sure that Mr. Bromley is on

18  the phone to actually present this.  I believe he is, Your

19  Honor.

20          THE COURT:  Mr. Bromley, good morning.

21          MR. BROMLEY:  Good morning, Judge.  Thank you for

22  allowing us to appear by telephone.

23          THE COURT:  I certainly am pleased.

24          MR. BROMLEY:  I'm also here, Your Honor -- and Ryan

25  Jacobs of the Akin Gump firm.

1         THE COURT:  Okay.

2         MR. JACOBS:  Good morning, Your Honor.

3         THE COURT:  Good morning.  Good morning, everyone.

4         MR. BROMLEY:  We are yet, again, here working on at

5  least two major matters trying to get things done before the

6  holidays.  So, we do appreciate your indulgence.

7         Where we stand -- we're at Item 10.  This is the

8  motion to approve an escrow agreement.  This is also related to

9  the closing on the Enterprise transaction, which is now

10 contemplated to occurring on Friday, the 18th of December.

11        As we have done in prior transactions, Your Honor, we

12 have negotiated an escrow agreement.  And it is between the

13 various sellers and JPMorgan Chase, as we have done in prior

14 deals.

15        There are -- I think there is substantial agreement

16 on the form of the escrow.  There are two open points, however.

17 And if I can describe them for you.  They are two open points

18 as relates to the form that has already been submitted to the

19 motions.

20        And what we are proposing to do is resolve those open

21 points amongst the constituents, and that would be the

22 administrators in the U.K., the monitor, the debtors in the

23 U.S. and Canada, as well as the Creditors' Committee and

24 Bondholders' group.

25        And when we finish those two minor points that I will

1  describe to you, we will then be able to submit the form of

2  escrow agreement with the form of order.  And the form of order

3  does have in Paragraph 2 a new sentence that says that the form

4  of the escrow agreement attached to the order may be modified

5  or supplemented by the parties without further order of the

6  Court, provided that any material modifications should not be

7  made, except with the consent of the debtors, the Canadian

8  debtors, the monitor, the Creditors' Committee, the Bondholders

9  group, and the joint administrators.

10            THE COURT:  All right.

11            MR. BROMLEY:  And we are, in Canada, seeking approval

12  of the form of escrow agreement on the 17th.  It is our hope

13  that by that time, we are finalized with the form of the

14  agreement.

15            If I could, Your Honor, there are really three major

16  changes from the form that has been distributed with the

17  motion.

18            THE COURT:  And I do have a blackline in front of me,

19  Mr. Bromley.

20            MR. BROMLEY:  You do?

21            THE COURT:  Yes.

22            MR. BROMLEY:  Very good, Your Honor.  Paragraph 5B of

23  the blackline, beginning on Page 9, is agreed amongst the

24  parties.

25            These are a number of three separate provisions that

1 relate to disbursements out of the proceeds basically that deal

2 with certain allocation issues, pricing adjustments, but are

3 agreed to.  So, these are not at issue any further.

4          The next element, Your Honor, is on Page 20 of the

5 blackline, Paragraph 27.  And at the end of that paragraph,

6 there's a reference to Nortel India and Nortel China.

7          THE COURT:  Yes.

8          MR. BROMLEY:  The way this transaction works, as

9 we've described to you in excruciating detail in the past, is

10 that there are sellers located all over the world.  Two of the

11 sellers are Nortel India and Nortel China.  There are

12 additional sellers throughout the world, as well, and there are

13 local law requirements that require separate sale agreements at

14 these jurisdictions.  And there are, I think, still minor open

15 issues as to how the proceeds will be accounted for under those

16 local sale agreements.  I think we're very close to resolution,

17 and there's a difference between the net book value of these --

18 of the assets that are being transferred and the -- what would

19 otherwise be provided in a subsequent allocation.  But we

20 believe that we're very close on this language.  In fact, I

21 think we are agreed on India and China.  We heard yesterday

22 that also there may be issues in Italy and France.  So, we are

23 simply trying to pin those down.  And that is a matter that we

24 are working particularly with the U.K. administrators on.

25          So, that is something that we think is simply a

1   matter of tying down some additional information.

2          On Paragraph 29, that, I think, is the one issue that

3   remains outstanding.  And it's entitled "NNI payment."  You'll

4   recall, Your Honor, that one of the assets that's being

5   transferred is the stock of a company called NGS.

6          THE COURT:  Yes.

7          MR. BROMLEY:  Which we have successfully kept out of

8   Chapter 11 as a result of our settlement with the IRS.

9          There is an adjustment that's required under the

10  asset sale of a stock and sale agreement that relates to the

11  working capital of that entity and what will be transferred.

12  And right now, we are working through the issue.  But there is

13  -- there is a requirement under the agreement that the company

14  be transferred with essentially working capital of $16.1

15  million.  And that requires adjustments within the books and

16  records of the company.  And it is the position of the U.S.

17  estate that there's a -- that the proceeds -- well, that the

18  sums that NGS in excess of 16.1 should be transferred directly

19  to NNI.  And we're working through that.

20         There is not agreement, particularly from the U.K.

21  administrator at this point, and we anticipate working through

22  that during the course of today and tomorrow.

23         As soon as we have resolution on Paragraph 29, we

24  will be, I think, in a position to submit a final form of

25  escrow agreement.

1           THE COURT:  All right.

2           MR. BOTTER:  Your Honor, this is David Botter of Akin

3 Gump on behalf of the Creditors' Committee.

4           Mr. Bromley has described where we are correctly.  We

5 are fine proceeding in this manner.  Two comments, though:

6           With respect to Paragraph 27, I think we would like

7 to make it crystal clear on the record that any of these

8 allocations that are pursuant to local law requirement should

9 not be binding, nor have any precedential effect on ultimately

10 allocations that will be decided down the road.  I think that's

11 important for purposes of the U.S. debtors and, frankly, for

12 the purposes of all the debtors here.

13           THE COURT:  And I certainly appreciate that, Mr.

14 Botter.  I know -- I have a good sense of what you're talking

15 about, and these are clearly unique situations to meet unique

16 law, and will not affect the greater issue later.

17           MR. BOTTER:  Thank you, Your Honor.  That's exactly

18 what I'm talking about.

19           And then, Your Honor, with respect to Paragraph 29, I

20 think it's important to note for all parties that what Mr.

21 Bromley has described is a working capital adjustment.  That

22 these are not proceeds of sale, but rather the working capital

23 that exists within the business right now.  And that's a very

24 important point because the working -- the sales proceeds are

25 dealt with dramatically different under existing agreements,

1  and particularly this ipsa that was entered in these cases

2  quite a long time ago.  Working capital is something that

3  belongs to the entity that is the actual seller.  And here, the

4  entity that is the working capital we're talking about is NGS,

5  a U.S. nondebtor, but U.S. debtor subsidiary company.  And so

6  that is the issue we're talking about.  And I'm hopeful that we

7  will resolve this issue, but I think it needs to be clear that,

8  again, this is not proceeds of sale, but rather working

9  capital.

10          THE COURT:  Yes.  And I think that the document

11  itself makes that clear.  That we're talking about closing

12  company's net working capital.

13          MR. BOTTER:  Thank you, Your Honor.

14          THE COURT:  Does anyone take issue with that

15  description by Mr. Botter?

16                  (No audible response heard)

17          THE COURT:  All right.  Now, in the unlikely event

18  that you're not able to resolve this, I certainly offer you the

19  opportunity to get me on the telephone because I suspect that

20  this is a matter of some urgency.

21          MR. BROMLEY:  It is, Your Honor.  And we recognize

22  that the -- that everyone is -- I'm sorry -- working hard to

23  make sure that this would -- that we're going to be able to

24  close this by Friday.  So, it is certainly our hope that we'll

25  be able to resolve this without the need to come back.  But we

1  take -- we appreciate your offer and we'll do our level best to

2  make sure we don't need to accept that offer.

3          THE COURT:  All right.  And certainly Mr. Remming and

4  Mr. Abbott are not bashful to call.

5          MR. ABBOTT:  No, Your Honor.  I wonder if it makes

6  sense to just plug a holding time.  I don't, frankly,

7  understand perfectly the Court's calendar over Thursday and

8  Friday, but it might make sense to -- subject obviously to Mr.

9  Bromley's calendar, and Mr. Botter's calendar, to figure out a

10 way to just have a holding date if necessary.

11         THE COURT:  Well, I assume you would like this on

12 Thursday.  That you'd like to give yourselves additional time

13 to try to resolve it, is that right?

14         MR. ABBOTT:  It makes sense to me, Your Honor.

15         THE COURT:  So --

16         MR. SAMIS:  Your Honor?

17         THE COURT:  Mr. Samis, good morning.

18         MR. SAMIS:  Good morning.  Chris Samis on behalf of

19 the Creditors' Committee.

20         Your Honor, if it makes -- if it helps you with

21 scheduling, I believe the Mervyn's matter that's calendared for

22 Thursday is going to come off calendar.

23         THE COURT:  Oh, that's good news.  Well, thank you.

24 So, we could do this at 10 o'clock.

25         MR. BROMLEY:  That would be fine, Your Honor.  We

1  very much appreciate it.

2          THE COURT:  All right.  I've got you in a holding

3  pattern.

4          MR. ABBOTT:  Your Honor, my suggestion would be that

5  we'll alert the Court if that becomes necessary and distribute

6  a phone number.

7          THE COURT:  Yes.

8          MR. ABBOTT:  That would probably be the easiest way

9  to do that, I guess?

10          THE COURT:  Well --

11          MR. ABBOTT:  Or do we need to set up with CourtCall

12  probably?

13          THE COURT:  I think if we want to -- yes, we ought to

14  be on the record probably just in an abundance of caution.

15          MR. ABBOTT:  All right, Your Honor.  Well, then why

16  don't we -- we'll alert chambers as early as we know whether or

17  not that, you know, is going to be needed.  Given procedurally

18  where we are, Your Honor, would it be necessary for a

19  subsequent agenda, do you think, for that call?

20          THE COURT:  No.

21          MR. ABBOTT:  Or can we just get on the phone?

22          THE COURT:  We'll just get on the phone for that.

23          MR. ABBOTT:  Thank you, Your Honor.

24          THE COURT:  And I'll keep -- I'll obviously keep the

25  binder available.  So, I'll be ready.

1          MR. ABBOTT:  Thank you, Your Honor.  So, Your Honor,
2  I think that moves us to Item Number 11.

3          THE COURT:  Yes.

4          MR. ABBOTT:  Your Honor, Item Number 11 is a bit of a
5  hybrid.  In all candor, had this deal been reached between a
6  buy and this executory contract party at the time of the sale
7  hearing, we probably just would have handed up a stipulation or
8  built it into the sale order.

9          THE COURT:  Certainly.

10         MR. ABBOTT:  Because it wasn't done at the time, and
11 obviously things in this case, particularly with these large
12 creditors and large sort of multi business unit contracts, it
13 takes a little effort to get through them.

14         Your Honor, what Item 11 is is a motion asking the
15 Court to really approve a couple of things:

16         The assumption and assignment of contracts, and a
17 modest compromise between the various parties.  AT&T, as Your
18 Honor knows, is a large vendor to the debtors --

19         THE COURT:  Yes.

20         MR. ABBOTT:  -- and is somebody who's going to be
21 important to Avaya on the other side of the transaction.  They,
22 Your Honor, after lengthy discussions, have cut a deal that
23 reserve certain rights between them, establishes an agreement
24 that there's no cure amount due, but also calls for the
25 assumption and assignment of the contract, which would be

1   assumed and assigned to Avaya, I believe, as of closing.

2          Your Honor, that's all laid out in a stipulation that
3   was attached to the motion.

4          THE COURT:  Yes.

5          MR. ABBOTT:  Again, this is a matter that I don't
6   believe there's any controversy about.  We apologize, Your
7   Honor, for bringing it on as short of notice as we did.  We're
8   trying to accommodate the parties' needs and get this done in
9   order to advance the ball.

10          THE COURT:  I certainly understand.  I understand,
11  Mr. Abbott.  No apology necessary.  I've done enough closings
12  in my day to understand that things do come up at the last
13  minute.

14          MR. ABBOTT:  With that, Your Honor, I'd try to answer
15  the Court's questions or cede the podium to other parties that
16  wish to be heard, and ask the Court to approve it.

17          THE COURT:  Well, first, let me just make certain
18  that no one objects to my hearing this on the shortened notice.
19  It was very -- you know, obviously and necessarily very short
20  notice.

21               (No audible response heard)

22          THE COURT:  All right.  Well, if no one objects, I am
23  going to grant the motion to shorten time.

24          MR. ABBOTT:  Your Honor, if I may approach, I've got
25  both a motion to -- order on the motion to shorten and a

1  proposed form of order on the motion itself.

2         THE COURT:  Oh, very well.  Thank you, Mr. Abbott.

3  Good.  Thank you.

4         All right.  So, just so we're procedurally correct, I

5  am signing the order to shorten time.

6         And then -- does anyone else wish to be heard on the

7  substantive motion?

8                    (No audible response heard)

9         THE COURT:  Everyone is in favor?

10                    (No audible response heard)

11         THE COURT:  All right.  I certainly understand the

12  necessity for this, and I -- it is clearly not only in the best

13  interest of the debtors' estate, but necessary in order to

14  close with Avaya.  And under the circumstances, I will approve

15  the settlement.

16         MR. ABBOTT:  Thank you, Your Honor.

17         THE COURT:  Okay.

18         MR. ROSENZWEIG:  Your Honor?

19         THE COURT:  Yes.

20         MR. ROSENZWEIG:  Hi.  Good morning.  This is David

21  Rosenzweig from Fulbright.  We represent AT&T.

22         THE COURT:  Good morning, Mr. Rosenzweig.

23         MR. ROSENZWEIG:  Good morning.  I think we can drop

24  off the line, but I didn't want to just do that without asking

25  permission.

1          THE COURT:  I appreciate that very much, the courtesy

2  and the respect.  And, yes, you certainly may.

3          MR. ROSENZWEIG:  Thank you.

4          THE COURT:  All right, sir.  Good day to you.

5          MR. ROSENZWEIG:  Bye.

6          THE COURT:  Good morning.

7          MS. FINNEGAN:  Good morning, Your Honor.  With your

8  indulgence, I'd like to revisit Item Number 10, the escrow

9  agreement.

10          THE COURT: Yes.

11          MS. FINNEGAN:  Maris Finnegan for the record, Young

12  Conaway Stargatt & Taylor.

13          THE COURT:  I'm sorry, yes, I should have --

14          MS. FINNEGAN:  On behalf of the U.K. joint

15  administrators.

16          Paragraph 29 was a late entry into the escrow

17  agreement.  It came over around midnight our time.  And my

18  client hasn't had a chance to really review it.  But in

19  reviewing my e-mails, I have to disagree with Mr. Botter's

20  characterization of Paragraph 29 for the record.

21          THE COURT:  Okay.

22          MS. FINNEGAN  I just wanted to make that clear.

23          THE COURT:  And precisely -- and what is the

24  disagreement?  I'm sorry.

25          MS. FINNEGAN:  I believe -- and I apologize because I

1  am covering this hearing for a colleague, and perhaps don't

2  have the institutional knowledge of this case --

3          THE COURT:  Okay.

4          MS. FINNEGAN: -- as some of the other people in the

5  room.  But whether the proceeds should be --

6          THE COURT:  Whether it's working capital?

7          MS. FINNEGAN:  Right.  Whether they're -- the capital

8  -- uh -- whether they should be dealt with through the IFSA

9  rather than whether the working capital belongs to NGS, that

10 issue.

11         THE COURT:  Well, let me do this, just so the record

12 is clear.  Certainly Mr. Botter can make his argument and

13 representation, and you're certainly at liberty to dispute it.

14 I think where we may have gone a little bit astray is in my

15 endorsing either position.  And why don't I withdraw at least

16 my agreement with Mr. Botter so that the parties can at least

17 address the issue and hopefully reach an agreement on it, but

18 that I shouldn't be making a premature ruling, if you will.

19         MS. FINNEGAN  I appreciate that, Your Honor.

20         THE COURT:  Yes.

21         MS. FINNEGAN  Thank you.

22         THE COURT:  Thank you.

23         MR. ABBOTT:  Thank you, Your Honor.  Now it's time, I

24 guess, to address, Your Honor, the fee applications.  And, Your

25 Honor, I believe there's been no objection.  I have an omnibus

1  order.  Obviously as we get close to year end, getting this

2  order entered is important to all the professionals in the

3  case.

4        THE COURT:  Oh, we have been -- you have no idea how

5  much time we've been spending reviewing these, this, and many,

6  many others.  But I understand the importance to counsel.

7        MR. ABBOTT:  Your Honor, and I'm not sure what

8  questions, if any, Your Honor may have with respect to

9  particular professionals.  We have prepared an omnibus order

10  that we think encompasses all the estate approved professionals

11  whose interim fee applications are pending today.  And subject

12  to Your Honor's questions, I would simply ask to submit that

13  order and ask the Court to grant it.

14        THE COURT:  I will be pleased to do so.  I did not

15  have questions.  I do like counsel to know that we really truly

16  go through these very carefully, all of the fee applications.

17  And it takes a great deal of time.  But that I'm not a

18  nitpicker, and I'm not a hindsight type of judge because I know

19  that there are many matters that lawyers work on that, you

20  know, looking back, may have been a little too much time, or

21  not necessary, but that attorneys can't possibly know that when

22  the work begins.

23        And I was certainly -- I found the fee applications,

24  first of all, helpful and in good order, and I'm pleased to

25  approve them.

1          MR. ABBOTT:  Thank you, Your Honor.  May I approach?

2          THE COURT:  You may.  Thank you.

3                    (Pause)

4          THE COURT:  And I assume no one on the phone objects?

5  None of the professionals whose fees are being approved has any

6  comments?

7          MR. BROMLEY:  Your Honor, we would like simply to

8  thank you very much for your indulgence, both for hearing us by

9  phone on this, and for also reviewing these and approving them

10  before year end.  We very much appreciate it.

11          THE COURT:  Well, it's my pleasure.  And, thank you,

12  Mr. Bromley.  And the work in the case, I think, has been

13  excellent and deserving of reward.  So, I am pleased to sign

14  the fee apps.

15          I'm signing the order now.  And hopefully the money

16  will make its way to your bank account soon.

17          MR. ABBOTT:  That's our hope, Your Honor.  Your

18  Honor, that does conclude the matters for today.  Again, we do

19  thank the Court for telephonic opportunities here, as well as

20  the prompt rulings on some of these matters that were brought

21  on shorter notice than we otherwise would have preferred.

22          THE COURT:  I understand.  And certainly I appreciate

23  the necessity on occasion.

24          And, again, I remind you that I've kind of written

25  you in on a holding schedule for Thursday at 10 o'clock if

30

1 | necessary.

2 | MR. ABBOTT:  Thank you, Your Honor.

3 | THE COURT:  Thank you, Counsel.  I wish you all a

4 | good day.

5 | MR. ABBOTT:  Appreciate it, Your Honor.

6 | (Whereupon, at 10:37 A.M., the hearing was adjourned.)

7 |

8 | CERTIFICATE

9 |

10 | I certify that the foregoing is a correct transcript from

11 | the electronic sound recording of the proceedings in the

12 | above-entitled matter.

13 |

14 |

15 | /s/ *Karen Hartmann*     AAERT CET**D0475 Date: December 20, 2009

16 | TRANSCRIPTS PLUS, INC.

17 |

18 |

19 |

20 |

21 |

22 |

23 |

24 |

25 |

**$**

**$1.8-** 13:12
**$16.1-** 18:14
**$2.5-** 9:23
**$2.7-** 13:10
**$4.6-** 8:24
**$92-** 13:2

**&**

**&-** 6:3 26:12

**/**

**/S/-** 30:15

**1**

**1-** 4:17
**10-** 5:1,8 15:7
21:24 26:8 29:25
**100-** 9:14
**105-** 7:18
**10:37-** 30:6
**11-** 12:21 18:8
23:2,4,14
**16.1-** 18:18
**17ᵀᴴ-** 16:12
**18ᵀᴴ-** 15:10

**2**

**2-** 16:3
**2.8-** 13:10
**20-** 17:4 30:15
**2007-** 7:25
**2008-** 7:25
**2009-** 8:19 30:15
**25-** 12:22
**27-** 17:5 19:6
**29-** 18:2,23 19:19
26:16,20

**4**

**4-** 4:17

**5**

**5-** 4:20
**5B-** 16:22

**6**

**6-** 4:20

**7**

**7-** 4:22 5:6
6:5,18 12:15,22

**8**

**8-** 4:22 5:6

**9**

**9-** 5:1 12:14
16:23
**9019-** 7:19 11:12

**A**

**ABBOTT-**
4:3,4,11,14,17,20
5:4,14,19,21
14:3,8,11,15,16,1
7
12:10,13,25 13:19

22:4,8,11,15,21,2
3
21:4,5,14
23:1,4,10,20
24:5,11,14,24
25:2,16 27:23
28:7 29:1,17
30:2,5
**ABLE-** 10:15 13:6
16:1 20:18,23,25
**ABSENT-** 13:17
**ABUNDANCE-** 22:14
**ACCEPT-** 21:2
**ACCEPTABLE-** 5:12
12:8
**ACCOMMODATE-** 24:8
**ACCOUNT-** 9:6,7
29:16
**ACCOUNTED-** 17:15
**ACRONYM-** 8:7
**ACTED-** 4:20
**ACTUAL-** 20:3
**ADDITIONAL-** 17:12
18:1 21:12
**ADDRESS-**
5:1,11,22
27:17,24
**ADJOURNED-** 4:18
30:6
**ADJUSTMENT-** 18:9
19:21
**ADJUSTMENTS-** 17:2
18:15
**ADMINISTRATIVE-**
8:25 9:3 10:13
**ADMINISTRATOR-**
18:21
**ADMINISTRATORS-**
15:22 16:9 17:24
26:15
**ADVANCE-** 5:9 24:9
**AFFECT-** 19:16
**AGAINST-**
10:4,15,16,17
**AGENDA-** 4:12 6:5
7:14 14:9 22:19
**AGENT-** 12:18
13:1,7
**AGGREGATE-** 12:25
13:9
**AGREE-** 12:2
**AGREED-** 16:23
17:3,21
**AGREEMENT-**
8:2,3,4,5,9,11,19
,20
7:15,20
9:5,10,15,16
10:2,7,8,11 12:15
14:12 15:8,12,15
16:2,4,12,14
18:10,13,20,25
23:23 26:9,17
27:16,17
**AGREEMENTS-** 6:14
7:24,25
8:1,13,21,24 9:1
10:10 17:13,16
19:25

**AGREES-** 9:23
10:3,11,14
**AKIN-** 14:25 19:2
**ALERT-** 22:5,16
**ALLEGED-** 8:24
**ALLOCATION-**
17:2,19
**ALLOCATIONS-**
19:8,10
**ALLOWED-** 10:16
**ALLOWING-** 14:22
**AMENDED-** 4:12
**AMONGST-** 15:21
16:23
**AMORTIZED-** 9:9,14
**AMOUNT-** 12:3
23:24
**AMOUNTS-** 6:18
**ANDREW-** 6:2
**ANSWER-** 24:14
**ANTICIPATE-** 18:21
**APOLOGIZE-** 24:6
26:25
**APOLOGY-** 24:11
**APPEAR-** 14:22
**APPLICABLE-** 11:4
**APPLICATIONS-**
27:24 28:11,16,23
**APPRECIATE-** 5:19
15:6 19:13 21:1
22:1 26:1 27:19
29:10,22 30:5
**APPROACH-** 6:20
12:1 14:3,15
24:24 29:1
**APPROPRIATE-** 7:7
13:6,24
**APPROVAL-** 7:20
16:11
**APPROVE-** 6:6,13
7:15 11:15 13:18
15:8 23:15 24:16
25:14 28:25
**APPROVED-** 11:5
28:10 29:5
**APPROVING-** 29:9
**APPROXIMATELY-**
13:10
**APPS-** 29:14
**ARGUE-** 10:12
**ARGUMENT-** 27:12
**ARSHT-** 6:3
**ASSERTS-** 10:10
**ASSET-** 18:10
**ASSETS-** 17:18
18:4
**ASSIGNED-** 24:1
**ASSIGNMENT-**
6:6,13 23:16,25
**ASSUME-** 21:11
29:4
**ASSUMED-** 24:1
**ASSUMPTION-**
6:6,13 23:16,25
**ASTRAY-** 27:14
**AT&T-** 23:17 25:21
**ATTACHED-** 16:4
24:3
**ATTORNEYS-** 28:21

**AUTHORITY-** 13:8
**AVAILABLE-** 22:25
**AVAYA-** 6:14 7:8
23:21 24:1 25:14
**AVERAGE-** 4:7
**AWFUL-** 13:4

**B**

**BACK-** 8:17 20:25
28:20
**BACKGROUND-** 7:22
**BALL-** 24:9
**BANK-** 29:16
**BANKRUPTCY-** 7:19
8:18 13:23
**BASED-** 11:10
**BASHFUL-** 21:4
**BECAME-** 12:22
**BECOME-** 10:1
**BECOMES-** 22:5
**BEGINNING-** 9:8
16:23
**BEGINS-** 28:22
**BELONGS-** 20:3
27:9
**BENEFIT-** 10:24
**BET-** 5:20
**BETWEEN-** 5:1 6:7
7:15,21,23 12:15
15:12 17:17
23:5,17,23
**BINDER-** 12:22
**BINDING-** 19:9
**BIT-** 5:8 7:22
23:4 27:14
**BLACK-** 11:23
**BLACKLINE-** 6:17
14:12 16:18,23
17:5
**BONDHOLDERS-**
11:17 16:8
**BONDHOLDERS'-**
15:24
**BOOK-** 17:17
**BOOKS-** 18:15
**BOTH-** 6:13 8:7
24:25 29:8
**BOTTER-**
19:2,14,17
20:13,15 27:12,16
**BOTTER'S-** 21:9
26:19
**BRINGS-** 12:14
**BROMLEY-** 5:11
14:13,17,20,21,24
15:4
16:11,19,20,22
17:8 18:7 19:4,21
20:21 21:25
29:7,12
**BROMLEY'S-** 21:9
**BROUGHT-** 29:20
**BUGS-** 8:14
**BUILD-** 12:19
**BUILT-** 23:8
**BUSINESS-** 8:10
11:14 13:25 19:23
23:12
**BUY-** 23:6

**BYE-** 26:5

**C**

**CALENDAR-**
21:7,9,22
**CALENDARED-** 21:21
**CALL-** 7:25 21:4
22:19
**CALLED-** 9:6,11,19
12:16 18:5
**CALLS-** 23:24
**CAN-** 4:8,25 15:17
22:21 25:23
27:12,16
**CAN'T-** 28:21
**CANADA-** 8:21
15:23 16:11
**CANADIAN-** 16:7
**CANDOR-** 23:5
**CAPITAL-** 9:6
18:11,14 19:21,22
20:2,4,9,12
27:6,7,9
**CAREFULLY-** 28:16
**CASE-** 13:5,7
23:11 27:2 28:3
29:12
**CASES-** 20:1
**CAUTION-** 22:14
**CCA-** 8:22
**CEDE-** 5:5 24:15
**CERTAIN-**
8:14,16,23 9:13
10:9 17:2 23:23
24:17
**CERTAINLY-** 6:21
11:10,13,25 12:7
14:23 19:13
20:18,24 21:3
23:9 24:10 25:11
26:2 27:12,13
28:23 29:22
**CERTAINTY-** 12:2
**CERTIFICATE-** 30:8
**CERTIFICATES-**
4:21
**CERTIFY-** 30:10
**CETERA-** 13:14
**CHAMBERS-** 22:16
**CHANCE-** 26:18
**CHANGE-** 6:18 7:1
12:7
**CHANGES-** 16:16
**CHAPTER-**
12:15,21,22 18:8
**CHARACTERIZATION-**
26:20
**CHARGE-** 9:21
**CHARGES-**
9:4,5,7,17
10:8,9,12
**CHASE-** 15:13
**CHINA-** 17:6,11,21
**CHRIS-** 21:18
**CIRCUMSTANCES-**
13:23 25:14
**CLAIM-** 8:23
9:3,23
10:15,16,22,23

12:4 13:1
CLAIMS- 10:4
CLEAN- 6:17 11:23
CLEAR- 19:7
20:7,11 26:22
27:12
CLEARLY- 7:7
19:15 25:12
CLOSE- 13:2
17:16,20 20:24
25:14 28:1
CLOSING- 5:9 15:9
20:11 24:1
CLOSINGS- 24:11
CODE- 7:19
COLLEAGUE- 12:10
27:1
COLLECTION- 13:24
COME- 8:17 20:25
21:22 24:12
COMMENCED- 8:18
COMMENT- 11:20,21
COMMENTS- 19:5
29:6
COMMITTEE-
11:17,18,20 15:23
16:18 19:3 21:19
COMMUNICATION-
11:17
COMPANY-
18:5,13,16 20:5
COMPANY'S- 20:12
COMPROMISE- 13:6
23:17
CONAWAY- 26:12
CONCERN- 11:22
CONCLUDE- 29:18
CONNECTION- 6:14
7:8 8:23,25
CONSENT- 16:7
CONSIDERATION-
10:21
CONSIDERING-
10:23
CONSTITUENTS-
15:21
CONTEMPLATED-
15:10
CONTRACT- 9:9,21
23:6,25
CONTRACTS-
23:12,16
CONTROVERSY- 24:6
CONVENIENCE- 9:20
CORRECT- 25:4
30:10
CORRECTLY- 19:4
COST- 9:9,15,16
10:23
COSTS- 9:14
10:10,25
COUNSEL- 28:6,15
30:3
COUPLE- 23:15
COURSE- 5:13
9:10,15 18:22
COURT'S- 21:7
24:15
COURTCALL- 22:11

COURTESY- 26:1
COVERING- 27:1
CREDITORS- 11:2
23:12
CREDITORS'- 11:17
15:23 16:8 19:3
21:19
CRYSTAL- 19:7
CURE- 6:18 23:24
CUT- 23:22

**D**

DATE- 21:10 30:15
DAVID- 19:2 25:20
DAY- 24:12 26:4
30:4
DAYS- 12:22
DEAL- 5:5 17:1
23:5,22 28:17
DEALS- 15:14
DEALT- 19:25 27:8
DEBTOR- 10:16
13:25 20:5
DEBTORS- 4:5 6:3
8:18 10:4,17 11:1
12:13,15 13:11
15:22 16:7,8
19:11,12 23:18
DEBTORS'- 6:24
7:2,9 11:12,13
13:15 14:2 25:13
DECEMBER- 15:10
30:15
DECIDED- 19:10
DEFER- 11:13
13:25
DEFINED- 10:1
DEREK- 4:4
12:10,13
DESCRIBE- 15:17
16:1
DESCRIBED- 17:9
19:4,21
DESCRIPTION-
20:15
DESERVING- 29:13
DESPITE- 12:25
DETAIL- 17:9
DEVELOP- 8:13
DEVELOPED- 8:15
DIDN'T- 5:15 9:8
25:24
DIFFERENCE- 17:17
DIFFERENT- 19:25
DIRECTLY- 18:18
DISAGREE- 26:19
DISAGREEMENT-
26:24
DISBURSEMENTS-
17:1
DISCOVERED- 8:17
DISCUSSIONS-
23:22
DISPUTE- 27:13
DISTRIBUTE- 22:5
DISTRIBUTED-
16:16
DOCUMENT- 20:10
DRAMATICALLY-

19:25
DROP- 25:23
DUE- 23:24

**E**

EARLY- 9:20 22:16
EASIEST- 22:8
EFFECT- 19:9
EFFICIENT- 9:14
EFFORT- 23:13
ELECTRONIC- 30:11
ELEMENT-
9:11,17,19 10:6
17:4
EMAILS- 26:19
EMPLOYEES- 9:12
ENCOMPASSES-
28:10
ENDORSING- 27:15
ENTERED- 4:21
20:1 28:2
ENTERPRISE- 6:14
15:9
ENTERS- 9:24
ENTIRE- 8:9
ENTITLED- 10:13
18:3
ENTITY- 18:11
20:3,4
ENTRY- 26:16
EQUIPMENT- 9:7,9
EQUIVALENT- 8:22
ESCROW- 14:9,12
15:8,12,16
16:2,4,12 18:25
26:8,16
ESSENTIALLY-
9:2,18 12:18
18:14
ESTABLISHES-
23:23
ESTATE- 11:12
18:17 25:13 28:10
ESTATES- 11:1
ET- 13:14
EVERYONE- 4:1
15:3 20:22 25:9
EXACTLY- 19:17
EXCELLENT- 29:13
EXCEPT- 16:7
EXCESS- 18:18
EXCRUCIATING-
17:9
EXECUTED- 7:24
EXECUTORY- 23:6
EXISTING- 19:25
EXISTS- 19:23
EXPENSE- 9:3
10:13
EXPENSES- 8:25
EXTENT- 11:13

**F**

FAIR- 14:1
FAIRLY- 13:13
FALL- 12:21
FAVOR- 6:24 7:2
25:9
FEE- 27:24

28:11,16,23 29:14
FEES- 4:25 29:5
FIGURE- 21:9
FILED- 8:23 12:21
FINAL- 10:1,14
18:24
FINALIZED- 16:13
FINALLY- 10:21
FIND- 14:1
FINE- 5:3 14:14
19:5 21:25
FINNEGAN-
26:7,11,14,22,25
27:4,7,19,21
FIRM- 14:25
FIRST- 5:4,22
24:17 28:24
FOREGOING- 30:10
FORM- 15:16,18
16:1,2,3,12,13,16
18:24 25:1
FORTH- 13:16
FORWARDED- 4:14
FOUND- 28:23
FOUR- 8:24
FRANCE- 17:22
FRANKLY- 19:11
21:6
FRIDAY- 15:10
20:24 21:8
FRONT- 16:18
FULBRIGHT- 25:21
FUNDS- 5:10
FURTHER- 16:5
17:3

**G**

GENERALLY- 4:23
GET- 5:4,9,14
15:5 20:19
22:21,22 23:13
24:8 28:1
GIVE- 7:22 21:12
GIVEN- 12:3 13:23
22:17
GO- 28:16
GOING- 4:7,23
5:11 8:14 13:10
20:23 21:22 22:17
23:20 24:23
GONE- 27:14
GOOD-
4:1,2,3,4,10
5:24,25 6:1 7:4
10:5 14:20,21
15:2,3 16:22
19:14 21:17,18,23
25:3,20,22,23
26:4,6,7 28:24
30:4
GOT- 22:2 24:24
GRANT- 7:9 24:23
28:13
GREATER- 19:16
GROUP- 15:24 16:9
GUESS- 22:9 27:24
GUMP- 14:25 19:3

**H**

HAND- 14:12
HANDED- 23:7
HANDLE- 4:23
HARD- 20:22
HASN'T- 26:18
HEARD- 7:5,6
11:7,8 13:21
17:21 20:16
24:16,21
25:6,8,10
HEARING- 4:6 5:2
11:9 13:22 23:7
24:18 27:1 29:8
30:6
HEARINGS- 4:7
HELP- 14:3
HELPFUL- 14:11
28:24
HELPS- 21:20
HI- 25:20
HINDSIGHT- 28:18
HLR- 8:4,20
HOLDING- 21:6,10
22:2 29:25
HOLIDAYS- 15:6
HOME- 8:5
HONOR'S- 9:25
28:12
HOPE- 16:12 20:24
29:17
HOPEFUL- 20:6
HOPEFULLY- 27:17
29:15
HSS- 8:4,20
HYBRID- 23:5

**I**

IBM- 7:15,21,23
8:11,16,23
9:7,12,22
10:3,10,11,14,23
IBM'S- 10:22
IDEA- 28:4
IFSA- 27:8
IMPORTANCE- 28:6
IMPORTANT-
19:11,20,24 23:21
28:2
INC- 30:16
INCORPORATED-
11:21
INCORPORATION-
11:21
INDIA- 17:6,11,21
INDULGENCE- 15:6
26:8 29:8
INDUSTRY- 8:7
INFORMATION- 18:1
INSTEAD- 10:17
INSTITUTIONAL-
27:2
INTEREST- 7:9
11:1,12 13:16
14:2 25:13
INTERIM- 28:11
IPSA- 20:1
IRS- 18:8

ISSUE- 5:17 17:3 18:2,12 19:16 20:6,7,14 27:10,17
ISSUES- 17:2,15,22
IT'S- 5:12,23 7:1,7,8 9:20 12:17 18:3 19:20 27:6,23 29:11
ITALY- 17:22
ITEM- 6:5 7:14 12:14 15:7 23:2,4,14 26:8
ITEMS- 4:17 5:22

J
JACOBS- 14:25 15:2
JOINT- 16:9 26:14
JPMORGAN- 15:13
JUDGE- 14:21 28:18
JUDGMENT- 11:14 13:3,25
JURISDICTIONS- 17:14

K
KNOWLEDGE- 9:11 27:2
KNOWN- 8:2,4,11 9:4
KNOWS- 23:18

L
LAB- 10:10
LAID- 24:2
LANDLORD- 6:8
LANGUAGE- 17:20
LARGE- 9:8 23:11,12,18
LARGELY- 4:6
LATE- 26:16
LATER- 19:16
LAUGHTER- 4:9
LAWYERS- 28:19
LEASE- 6:6,7,8
LEAVE- 4:22
LENDER- 13:2
LENDERS- 12:18 13:1,7,11
LENGTH- 4:7
LENGTHY- 23:22
LENT- 12:18
LEVEL- 21:1
LIBERTY- 27:13
LIEN- 13:13
LINE- 11:23 25:24
LITIGATE- 10:23
LITIGATION- 10:24,25
LIVED- 12:21
LOCAL- 17:13,16 19:8
LOCATED- 17:10
LOCATION- 8:5
LONG- 20:2
LOOKING- 28:20

LOT- 13:4
LP- 6:7

M
MAJOR- 15:5 16:15
MAKING- 27:18
MANNER- 19:5
MANY- 28:5,6,19
MARIS- 26:11
MASTER- 7:24
MATERIAL- 16:6
MATTER- 7:5 11:14 14:8 17:23 18:1 20:20 21:21 24:5 30:12
MATTERS- 4:22,23 5:8 15:5 28:19 29:18,20
MEAT- 5:4
MEET- 11:11 19:15
MEETS- 11:4
MERVYN'S- 21:21
MIDNIGHT- 26:17
MILLION- 8:25 9:23 13:2,10,12 18:15
MINOR- 15:25 17:14
MODEST- 23:17
MODIFICATIONS- 16:6
MODIFIED- 16:4
MONEY- 12:19 29:15
MONITOR- 15:22 16:8
MORNING- 4:1,2,3,4 5:25 6:1 14:20,21 15:2,3 21:17,18 25:20,22,23 26:6,7
MORRIS- 6:2
MOTION- 5:12 6:5,13,16 7:9,15,18,20 11:4 12:17 13:5,16 14:9,13 15:8 16:17 23:14 24:3,23,25 25:1,7
MOTIONS- 15:19
MOVES- 23:2
MOVING- 5:8
MUCH- 22:1 26:1 28:5,20 29:8,10
MULTI- 23:12
MULTIPLE- 8:10 10:17

N
NECESSARILY- 5:16 24:19
NECESSARY- 21:10 22:5,18 24:11 25:13 28:21 30:1
NECESSITY- 25:12 29:23
NEEDED- 22:17
NEGOTIATED- 15:12

NEGOTIATIONS- 13:4
NET- 17:17 20:12
NETTEL- 12:16,19,21 13:23
NETWORK- 12:19
NEW- 16:3
NEWS- 7:4 21:23
NGS- 18:5,18 20:4 27:9
NICHOLS- 6:3
NITPICKER- 28:18
NNI- 6:8,9 7:21 9:25 12:18 13:1 18:3,19
NNI'S- 13:9
NONCONTROVERSIAL- 4:6
NONDEBTOR- 20:5
NOR- 19:9
NORTEL- 4:5 7:16,23 8:9,10,15,17 9:7,8,16 13:6 17:6,11
NOTE- 19:20
NOTICE- 24:7,18,20 29:21

O
OBJECTION- 13:15 27:25
OBJECTIONS- 6:16 11:19
OBJECTS- 24:18,22 29:4
OBVIOUSLY- 13:8 21:8 22:24 23:11 24:19 28:1
OCCASION- 29:23
OCCURRING- 15:10
OFFER- 20:18 21:1,2
OFFICE- 4:15
OMNIBUS- 27:25 28:9
ONE- 4:24 5:7,17 8:2 9:4 10:15 11:9,20 13:22 18:2,4 24:18,22 29:4
OPEN- 15:16,17,20 17:14
OPPORTUNITIES- 29:19
OPPORTUNITY- 20:19
ORDER- 5:15 6:17,18 7:10 9:24 10:1 11:20,23 14:4 16:2,4,5 23:8 24:9,25 25:1,5,13 28:1,2,9,13,24 29:15
ORDERS- 4:21
OTHERWISE- 10:13 11:1 17:19 29:21
OUTFIT- 12:16

OUTSOURCED- 8:15
OUTSTANDING- 18:3
OUTWEIGH- 10:25

P
PAPERS- 11:10 12:23
PARK- 6:7
PARTICULAR- 28:9
PARTICULARLY- 17:24 18:20 20:1 23:11
PARTIES- 7:24 16:5,24 19:20 23:17 24:15 27:16
PARTIES'- 24:8
PARTS- 9:2
PARTY- 23:6
PAST- 17:9
PATTERN- 22:3
PAUSE- 6:23 7:12 12:6 14:6 29:3
PAY- 9:18 13:10
PAYMENT- 9:24,25 18:3
PENDING- 28:11
PEOPLE- 27:4
PERCENT- 9:14
PERFECTLY- 21:7
PERHAPS- 27:1
PERIOD- 9:13
PERMISSION- 25:25 10:4,11,13
PHONE- 14:18 22:6,21,22 29:4,9
PIECE- 13:9
PIN- 17:23
PLEASED- 7:9 11:25 14:23 28:14,24 29:13
PLEASURE- 29:11
PLUG- 21:6
PODIUM- 5:5 12:10 24:15
POINTS- 15:16,17,21,25
POSITION- 18:16,24 27:15
POST- 9:23 10:4,10,13
PRACTICE- 13:5
PRECEDENTIAL- 19:9
PRECISELY- 26:23
PREFERRED- 29:21
PREMATURE- 27:18
PREPARED- 10:22 28:9
PRESENT- 14:18
PRESENTATION- 11:10
PRESENTS- 14:13
PREVIOUSLY- 4:21
PRICING- 17:2
PRIOR- 15:11,13
PROBABLY- 5:1 22:8,12,14 23:7
PROBLEM- 5:16

PROBLEMS- 8:17
PROCEDURALLY- 22:17 25:4
PROCEEDINGS- 30:11
PROCEEDS- 17:1,15 18:17 19:22,24 20:8 27:5
PRODUCED- 8:16
PRODUCT- 8:3,13,15
PRODUCTS- 8:8,10
PROFESSIONAL- 4:25
PROFESSIONALS- 28:2,9,10 29:5
PROJECT- 12:20
PROMPT- 29:20
PROOFS- 8:23
PROPOSED- 25:1
PROPOSING- 15:20
PROVIDE- 9:22
PROVIDED- 8:11 9:7 16:6 17:19
PROVISIONS- 16:25
PURPOSES- 19:11,12
PURSUANT- 7:18 19:8
PV&T- 8:2,9,19

Q
QUESTIONS- 11:3 13:17 24:15 28:8,12,15

R
R&D- 8:12
RATHER- 9:16 19:22 20:8 27:9
RAYTHEON- 6:12
REACH- 13:6 27:17
REACHED- 23:5
READY- 22:25
REASON- 8:12
REASONABLE- 14:1
REASONABLY- 12:17
RECOGNIZE- 20:21
RECORDING- 30:11
RECORDS- 18:16
REDUCE- 9:23
REDUCTION- 10:22 12:4
REFERRED- 8:8
REGISTRY- 8:5
REJECTED- 8:19,20
REJECTION- 8:22
RELATE- 17:1
RELATIONSHIP- 7:23
RELEASE- 10:3
RELEASES- 13:14
REMAINS- 18:3
REMIND- 29:24
REMMING- 4:23 5:5,21,23,25 6:2,5,12,20,21,25 7:3,11,14,18 10:6,19,21

11:6,11,16
12:2,9,11,12 21:3
REPRESENTATION-
27:13
REPRESENTED-
11:18
REPUDIATED- 8:21
REQUIRE- 17:13
REQUIRED- 18:9
REQUIREMENT-
18:13 19:8
REQUIREMENTS-
17:13
REQUIRES- 18:15
RESERVE- 23:23
RESOLUTION- 17:16
18:23
RESOLVE- 15:20
20:7,18,25 21:13
RESOLVES- 11:22
RESPECT- 9:24
10:7 19:6,19 26:2
28:8
RESPECTIVELY-
7:25
RESPONSE- 7:6
11:8 13:21 20:16
24:21 25:8,10
RESULT- 12:20
18:8
REVIEWING- 26:19
28:5 29:9
REVISIT- 26:8
REWARD- 29:13
RIGHTS- 23:23
ROAD- 19:10
ROOM- 27:5
ROSENZWEIG-
25:18,20,21,22,23
26:3,5
RULE- 7:19 11:11
RULING- 27:18
RULINGS- 29:20
RUN- 8:16
RYAN- 14:24

S

SALE- 6:15 7:8
17:13,16 18:10
19:22 20:8 23:6,8
SALES- 19:24
SAMIS-
21:16,17,18
SATISFIED- 11:9
13:23
SATISFY- 13:3
SCHEDULE- 29:25
SCHEDULING- 21:21
SCRIPTS- 8:16
SEATED- 4:2
SECOND- 8:4
9:11,17 10:6
SEE- 5:24 12:7
SEEKING- 13:8
16:11
SEEKS- 6:13 7:20
SEEN- 4:11 12:23
SELLER- 20:3
SELLERS- 15:13

17:10,11,12
SENTENCE- 16:3
SEPARATE- 16:25
17:13
SEPARATELY- 8:2
SEPTEMBER- 8:19
SERVICE- 8:6
SERVICES- 7:24
8:11,12
SET- 13:16 22:11
SETTLE- 13:7
SETTLEMENT-
7:15,20 9:22
10:2,6,11,24,25
11:11,15 12:15
13:18 14:1 18:8
25:15
SEVERANCE- 9:18
SHORTEN- 24:23,25
25:5
SHORTENED- 24:18
SHORTENING- 5:18
SHORTER- 29:21
SHOULDN'T- 27:18
SIDE- 23:21
SIGN- 5:15 29:13
SIGNIFICANT- 12:3
SIGNING- 7:10
25:5 29:15
SIMPLY- 17:23,25
28:12 29:7
SITUATIONS- 19:15
SLOTTED- 4:25
SMALL- 6:17
SOUND- 30:11
SPANS- 8:9
SPECIFICALLY- 6:7
9:6
SPEED- 9:13
SPELLED- 12:17
SPENDING- 28:5
STAND- 15:7
STANDARD- 11:4
13:13
STANDARDS- 11:11
STANDS- 8:3,5
STARGATT- 26:12
STARTUP- 10:10
STIPULATION- 23:7
24:2
STOCK- 18:5,10
SUBLANDLORD- 6:9
SUBLEASE- 6:9
SUBMITTED- 15:18
SUBSCRIBER- 8:6
SUBSEQUENT- 17:19
22:19
SUBSIDIARY- 20:5
SUBSTANTIAL-
15:15
SUBSTANTIVE- 25:7
SUBTENANT- 6:12
SUCCESSFUL- 12:20
SUCCESSFULLY-
18:7
SUGGESTION- 22:4
SUM- 9:8
SUMS- 18:18
SUPPLEMENTED-

16:5
SUSPECT- 20:19

T

TARGET- 5:8
TAYLOR- 26:12
TECHNOLOGY- 6:7
8:8,13
TELEPHONE- 12:19
14:22 20:19
TELEPHONIC- 29:19
TELEPHONICALLY-
5:12
TENANT- 6:8
TERM- 10:1
TERMINATION-
9:4,19,20 10:7,9
TERMS- 9:22 13:13
TESTING-
8:4,12,15 9:13
THIRD- 9:19
THREE- 9:2
16:15,25
THURSDAY-
21:7,12,22 29:25
TIME- 5:18 16:13
20:2 21:6,12
23:6,10 24:23
25:5 26:17 27:23
28:5,17,20
TODAY- 4:6,8 9:25
13:8 18:22 28:11
29:18
TOMORROW- 18:22
TRANSACTION- 15:9
17:8 23:21
TRANSACTIONS-
15:11
TRANSCRIPT- 30:10
TRANSCRIPTS-
30:16
TRANSFER- 9:11
TRANSFERRED-
17:18
18:5,11,14,18
TRULY- 28:15
TRUSTEE- 12:16
TRUSTEE'S- 13:10
TUNNELL- 6:3
TURN- 12:9
TWIST- 5:11
TWO- 5:22 7:24
8:25
15:5,16,17,25
17:10 19:5
TYING- 18:1

U

UK- 15:22 17:24
18:20 26:14
ULTIMATELY- 12:19
19:9
UNCERTAINTY-
13:24
UNDOUBTEDLY- 7:8
UNFORTUNATELY-
12:25
UNIQUE- 19:15
UNIT- 23:12

UNLESS- 11:3
UNLIKELY- 20:17
UP-FRONT- 9:16
URGENCY- 20:20
USED- 8:7

V

VALUE- 17:17
VARIOUS- 8:8
15:13 23:17
VENDOR- 23:18
VERIFICATION- 8:3

W

WASN'T- 23:10
WE'RE- 4:7 5:9
13:8 15:7
17:16,20 18:19
20:4,6,11,23 24:7
25:4
WEREN'T- 9:14
WHEREUPON- 30:6
WHO'S- 23:20
WILL- 9:25
10:14,15 11:15,25
12:9 15:25 16:1
17:15 18:11,24
19:10,16 20:7
25:14 27:18 28:14
29:16
WIND-DOWN- 9:17
10:7,9
WISH- 7:4 24:16
25:6 30:3
WISHES- 11:7
WITHDRAW- 27:15
WORK- 28:19,22
29:12
WORKING- 15:4
17:24
18:11,12,14,19,21
19:21,22,24
20:2,4,8,12,22
27:6,9
WORKS- 17:8
WORLD- 17:10,12
WRITTEN- 29:24

Y

YEAR- 28:1 29:10
YESTERDAY- 17:21
YOU'D- 21:12
YOU'LL- 18:3
YOU'RE- 19:14
20:18 27:13
YOUNG- 26:11