## EXHIBIT A

Court File No. 09-CL-7950

*ONTARIO*
**SUPERIOR COURT OF JUSTICE**
**(COMMERCIAL LIST)**

IN THE MATTER OF THE *COMPANIES' CREDITORS*
*ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED

**AND IN THE MATTER OF A PLAN OF**
**COMPROMISE OR ARRANGEMENT OF**
**NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED,**
**NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS**
**INTERNATIONAL CORPORATION AND NORTEL NETWORKS**
**TECHNOLOGY CORPORATION**

**THIRTY-FOURTH REPORT OF THE MONITOR**
**DATED JANUARY 3, 2010**

**INTRODUCTION**

1.      On January 14, 2009 (the "Filing Date") Nortel Networks Corporation ("NNC" and collectively with all its subsidiaries "Nortel" or the "Company"), Nortel Networks Limited ("NNL"), Nortel Networks Technology Corporation, Nortel Networks International Corporation and Nortel Networks Global Corporation (collectively the "Applicants") filed for and obtained protection under the *Companies' Creditors Arrangement Act* ("CCAA"). Pursuant to the Order of this Honourable Court dated January 14, 2009, as amended and restated (the "Initial Order"). Ernst & Young Inc. was appointed as the Monitor of the Applicants (the "Monitor") in the CCAA proceedings. The stay of proceedings was extended to January 29, 2010, by this Honourable Court in its Order dated December 18, 2009.

2.      Nortel Networks Inc. ("NNI") and certain of its U.S. subsidiaries concurrently filed voluntary petitions under Chapter 11 of Title 11 of the U.S. Bankruptcy Code (the "Code") in the United States Bankruptcy Court for the District of Delaware (the "U.S. Court") on January 14, 2009 (the "Chapter 11 Proceedings"). As required by U.S. law, an official unsecured creditors committee (the "Committee") was established in January, 2009.

- 2 -

3.    An ad hoc group of holders of bonds issued by NNL, NNC and Nortel Networks Capital Corporation has been organized and is participating in these proceedings as well as the Chapter 11 Proceedings (the "Bondholder Group"). In addition, pursuant to Orders of this Honourable Court dated May 27, 2009, and July 22, 2009, representative counsel was appointed on behalf of the former employees of the Applicants and on behalf of the continuing employees of the Applicants, respectively, and each of these groups is participating in the CCAA proceedings.

4.    Nortel Networks (CALA) Inc. (together with NNI and certain of its subsidiaries that filed on January 14, 2009, the "U.S. Debtors") filed a voluntary petition under Chapter 11 of Title 11 of the Code in the U.S. Court on July 14, 2009.

5.    Nortel Networks UK Limited ("NNUK") and certain of its subsidiaries located in EMEA were granted Administration orders (the "UK Administration Orders") by the High Court of England and Wales on January 14, 2009 (collectively the "EMEA Debtors"). The UK Administration Orders appointed Alan Bloom, Stephen Harris, Alan Hudson and Chris Hill of Ernst & Young LLP as Administrators of the various EMEA Debtors, except for Ireland, to which David Hughes (Ernst & Young LLP Ireland) and Alan Bloom were appointed (collectively the "Joint Administrators"). On June 8, 2009, the Joint Administrators appointed in respect of NNUK filed a petition with the U.S. Court for the recognition of the Administration Proceedings as they relate to NNUK (the "English Proceedings") under Chapter 15 of the Code. On June 26, 2009, the U.S. Court entered an order recognizing the English Proceedings as foreign main proceedings under Chapter 15 of the Code.

6.    On January 20, 2009, Nortel Networks Israel (Sales and Marketing) Limited and Nortel Communications Holdings (1997) Limited (together "NN Israel") were granted Administration orders by the court in Israel (the "Israeli Administration Orders"). The Israeli Administration Orders appointed representatives of Ernst & Young LLP in the UK and Israel as Administrators of NN Israel (the "Joint Israeli Administrators") and provided a stay of NN Israel's creditors which, subject to further order of the Israeli Court, remains in effect during the Administration.

- 3 -

7.     Subsequent to the Filing Date, Nortel Networks SA commenced secondary insolvency proceedings within the meaning of Article 27 of the European Union's Council Regulation (EC) No 1346/2000 on Insolvency Proceedings in the Republic of France pursuant to which a liquidator and an administrator have been appointed by the Versailles Commercial Court.


**PURPOSE**

8.     The purpose of this Thirty-Fourth Report of the Monitor (the "Thirty-Fourth Report") is to provide this Honourable Court with information regarding the Applicants' motion seeking:

- approval of an asset sale agreement dated December 22, 2009 (the "GENBAND Agreement"), amongst NNC, NNL and NNI (the "Main Sellers") and certain of their affiliates (the "Other Sellers" and, with the Main Sellers, the "Sellers"), and GENBAND Inc. ("GENBAND" or the "Purchaser") in respect of the sale of substantially all of the assets of Nortel's Carrier Voice and Application Solutions business (the "CVAS Business") as a "stalking horse" agreement;

- a sealing order in respect of the exhibits and the Sellers Disclosure Schedule to the GENBAND Agreement for the reasons set out below;

- approval of the Bidding Procedures (as defined below);

- approval of the terms and conditions of the Break-Up Fee and Expense Reimbursement (each as defined below); and

- an order authorizing and directing NNC to pay 1/3 of the Incentive Fee (as defined below) and approving the Incentive Fee Side Letter (as defined below),

and to provide the Monitor's support thereof.

- 4 -

**TERMS OF REFERENCE**

9.   In preparing this Thirty-Fourth Report, EYI has relied upon unaudited financial information, the Company's books and records, financial information prepared by the Company and discussions with the management of Nortel.  EYI has not audited, reviewed nor otherwise attempted to verify the accuracy or completeness of the information and, accordingly, EYI expresses no opinion or other form of assurance on the information contained in this Thirty-Fourth Report.

10.  Unless otherwise stated, all monetary amounts contained herein are expressed in U.S. dollars.

11.  Capitalized terms not defined in this Thirty-Fourth Report are as defined in the Affidavit of John Doolittle sworn on January 14, 2009 (the "Doolittle Affidavit"), the Pre-Filing Report, previous Reports of the Monitor, the GENBAND Agreement or the Bidding Procedures.

**GENERAL BACKGROUND**

12.  Nortel is a technology company that designs, develops and deploys communication products, systems, and solutions to its carrier and enterprise customers around the globe. Its principal assets include its people, the intellectual property derived and maintained from its research and development activities, its customers and other significant contracts and agreements.

13.  Since September 30, 2009, Nortel has conducted its global business through four reportable business unit segments: Wireline and Wireless Networks, Metro Ethernet Networks, Carrier Voice Application Solutions ("CVAS"), and LG Nortel Co. Ltd. ("LGN").  As of September 30, 2009, Nortel's Enterprise Solutions business unit has been accounted for as a discontinued operation.  The revenue and assets of each of the business units, except for LGN, are distributed among the multiple Nortel legal entities and joint ventures around the world.

- 5 -

14.     The Monitor has made various materials relating to the CCAA proceedings available on its website at www.ey.com/ca/nortel. The Monitor's website also contains a dynamic link to Epiq Bankruptcy LLC's website where materials relating to the voluntary proceedings under Chapter 11 of the Code are posted.

## THE CARRIER VOICE AND APPLICATION SOLUTIONS BUSINESS

### *Background*

15.     The CVAS Business is not operated through a dedicated legal entity or stand-alone division. Generally, Nortel has one legal entity in each country in which it operates and sales of all Nortel products and services in that country are made through that single legal entity. A more detailed description of this structure is set out in the Pre-Filing Report.

16.     The CVAS Business is composed of the carrier voice and application solutions segment of Nortel's former "Carrier Networks" business unit. The CVAS Business encompasses both CVAS products and services.

17.     The CVAS Business delivers products and services principally to telecommunications services providers and multi-system operators that enables them to provide voice, data and multi-media telecommunications solutions to their end clients. CVAS products are deployed at two-thirds of the top twenty telecommunications carriers globally. Nortel is the leading global provider of CVAS products and services in its market segment.

18.     Principal competitors to the CVAS Business include Nokia Siemens Networks B.V., Alcatel-Lucent and Huawei Technologies Co., Ltd. as well as other companies that compete in certain niches within this market including BroadSoft, Inc., MetaSwitch and Sonus Networks, Inc.

19.     The CVAS Business operates approximately 774 deployment sites across approximately 48 countries. It has a base of over 100 million voice over internet protocol ports shipped world-wide and 21 million internet protocol telephony lines shipped. Fiscal 2008 revenues were over $870 million representing nearly 9% of Nortel's 2008 revenues.

- 6 -

20.    The CVAS Business had revenues in Canada in fiscal 2008 of approximately **$115** million representing approximately **17%** of Nortel's 2008 Canadian revenue.

21.    In addition, the Applicants have an interest in the intellectual property upon which the products of the CVAS Business are based. Generally speaking, the owner of the intellectual property in the Nortel group, which in most cases is NNL, licenses the intellectual property in question to various other Nortel legal entities around the world, in some cases on an exclusive basis and in other cases, on a non-exclusive basis. These Nortel entities in turn license the intellectual property related to the CVAS Business to customers in their respective geographic regions.

22.    The CVAS Business currently employs the equivalent of approximately 2,185 full time employees. This includes individuals directly involved in the CVAS Business as well as individuals in other Nortel functional areas and corporate departments that are dedicated to the CVAS Business. Of the 2,185 employees dedicated to the CVAS Business, approximately 592 are located in Canada. The majority of the Canadian employees perform research and development activities and, as a result, a significant percentage of the global CVAS Business's research and development expenditures are incurred by the Applicants. The majority of the remaining employees are located in the United States, the U.K. and China. Generally, these individuals are employed by the Nortel legal entity established in the country in which they work.

*Sale Process*

23.    In April, 2009, Nortel commenced efforts to market the CVAS Business. With the assistance of Lazard Frères & Co., the Company approached or was contacted by 25 buyers or buyer groups. As a result of those efforts, 19 parties indicated an interest in purchasing the CVAS Business and executed confidentiality agreements, and 18 of these parties were provided with a confidential information memorandum. Ten parties were provided access to additional confidential information relating to the CVAS Business via an electronic data room and 11 parties participated in management presentations commencing in May, 2009.

- 7 -

24.    Seven parties ultimately submitted expressions of interest with respect to acquiring the CVAS Business and the Company proceeded to engage in parallel negotiations with these parties.    These negotiations culminated with Nortel entering into the GENBAND Agreement as described below.

25.    The Monitor has had extensive involvement in the sale process including attending and participating in the management presentations and negotiations with prospective buyers described above, performing its own review of materials submitted by prospective purchasers (including the GENBAND Agreement) and providing input to the Company with respect to these matters.

**THE GENBAND AGREEMENT**

26.    On December 22, 2009, the Sellers entered into the GENBAND Agreement with the Purchaser.    Concurrently, the EMEA Sellers, the Joint Administrators and the Joint Israeli Administrators entered into a separate Asset Sale Agreement (the "EMEA ASA") with GENBAND dated December 23, 2009.    Collectively, the GENBAND Agreement and the EMEA ASA set forth the terms of the Sellers' and the EMEA Sellers' sale of the assets and certain associated liabilities of the CVAS Business to GENBAND.    The GENBAND Agreement (without exhibits or the Sellers Disclosure Schedule) is attached as Appendix "A" hereto.    A copy of the exhibits and the Sellers Disclosure Schedule to the GENBAND Agreement is attached as confidential Appendix "B" hereto.    As these exhibits and schedules contain sensitive competitive information and information with respect to employees, the Monitor requests that confidential Appendix "B" to this Thirty-Fourth Report be sealed by this Honourable Court.

27.    GENBAND is a leading worldwide supplier of next-generation internet protocol gateways, session border controllers and security solutions.    GENBAND's gateway solutions to enhance, secure and evolve communications networks are used by fixed and mobile network operators around the world.    GENBAND was founded in 1999 by venture capital firms and remains a private company.    Headquartered in Plano, Texas,

- 8 -

GENBAND operates research and development facilities in Texas, Massachusetts and China.

28.    A summary of the key provisions of the GENBAND Agreement is provided in the paragraphs that follow.    Reference should be made directly to the GENBAND Agreement, a copy of which is attached as Appendix "A" hereto, for a complete understanding of the terms governing the transactions.

*Assets*

29.    The assets of the Sellers relating to the CVAS Business being sold are as follows (collectively, the "Assets"):

- the Owned Inventory as of the Closing Date;

- the Unbilled Accounts Receivable as of the Closing Date;

- the Owned Equipment as of the Closing Date;

- the Assigned Contracts in force as of the Closing Date;

- the Prepaid Expenses as of the Closing Date;

- all rights of the Sellers as of the Closing Date under non-disclosure, confidentiality, non-compete or non-solicitation agreements that are Assigned Contracts;

- the tangible embodiments of the Business Information existing as of the Closing Date;

- the Transferred Intellectual Property as of the Closing Date, subject to license rights granted to NNL, NNI and each of the EMEA Sellers pursuant to the Intellectual Property License Agreement prior to the Closing Date, together with, amongst other things, all income, royalties, damages and payments due or payable after the Closing Date relating to the Transferred Intellectual Property and all

- 9 -

claims against Third Parties for infringement, misappropriation or other violation of law with respect to the Transferred Intellectual Property;

- all rights as of the Closing Date under all warranties, representations and guarantees made by suppliers, manufacturers and contractors to the extent related to the Assets described above;

- to the extent assignable, certain consents of Government Entities and pending applications therefor;

- certain rights that may be freely transferred arising from any bid made prior to the Closing Date by any Seller, which is capable of acceptance after the Closing Date and, if accepted, would result in a Customer Contract (any such bid a "Seller Bid");

- any net insurance proceeds in respect of Owned Equipment to the extent payable to the Purchaser pursuant to the terms of the GENBAND Agreement; and

- any Tax records required by law to be transferred.

30. The Assets to be acquired by the Purchaser exclude, among other things, cash and cash equivalents, accounts receivable (including intercompany receivables but excluding Unbilled Accounts Receivable), bank account balances and petty cash of the Sellers, certain rights and refunds (including Tax refunds) relating to the pre-Closing period, any rights under any contracts (other than the Assigned Contracts), shares of any person, and any assets owned by certain subsidiaries and joint ventures of the Sellers including those assets owned by LGN, Nortel Networks Netas Telekomunikasyon A.S. ("NN Turkey") or Guandong-Nortel Telecommunications Equipment Co. Ltd.

### *Assumed Liabilities*

31. The Purchaser will assume the following liabilities:

- all liabilities of the CVAS Business arising after the Closing Date to the extent related to the operation of the CVAS Business by the Purchaser following the

- 10 -

Closing Date including all liabilities (i) with respect to the ownership and operation of the Assets; (ii) related to actions or claims brought against the CVAS Business; (iii) under Environmental Laws; (iv) under any product liability laws or similar laws concerning defective products manufactured or sold by the CVAS Business; and (v) under applicable laws in relation to telecommunications providers;

- all liabilities arising from or in connection with the performance (or breach) of the Assigned Contracts after the Closing Date and liabilities with respect to Cure Costs payable pursuant to the GENBAND Agreement (to the extent not payable by the Sellers thereunder), obligations to buy back from relevant resellers the products sold to resellers under Assigned Contracts and obligations under any warranty liabilities relating to CVAS products and services which have been supplied under any Assigned Contract;

- all liabilities resulting from any licensing assurances, declarations, agreements or undertakings relating to the Transferred Intellectual Property which the Sellers may have granted to third parties, solely to the extent that the terms of such licensing assurances, declarations, agreements or undertakings require assignees of the Transferred Intellectual Property to assume such liability and all liabilities resulting from the assurances, declarations and undertakings made to standard-setting bodies that are listed in the Sellers Disclosure Schedule;

- all liabilities for, or related to any obligation for, any Tax that the Purchaser bears pursuant to the GENBAND Agreement;

- except to the extent otherwise set forth in the GENBAND Agreement, all liabilities related to the Purchaser's: (i) employment or termination of employment (whether or not arising under or in respect of any Purchaser Employee Plan) of Transferred Employees or Transitional Employees after Closing; (ii) offers of employment or notice of continued employment to any Employees; (iii) decision to make or not make offers of employment to any Employee that violates applicable law; (iv) employment of any Employee whose

- 11 -

employment transfers by operation of Law; and (v) failure to satisfy its obligations with respect to the Employees, including the Transferred Employees and the Transitional Employees, as set out in the GENBAND Agreement;

- all liabilities that relate to or arise under any Purchaser Employee Plan;

- any obligation to provide continuation coverage pursuant to COBRA or any similar law under any Purchaser Employee Plan that is a "group health plan" (as defined in section 5000(b)(1) of the United States Internal Revenue Code of 1986, as amended) to Transferred Employees and Transitional Employees and/or their qualified beneficiaries who have a qualifying event on or after such Transferred Employees' or Transitional Employees' Effective Hire Date;

- certain other liabilities related to the Transferred Employees as set forth in the Sellers Disclosure Schedule;

- all liabilities related to the Transferred Employees and the Transitional Employees expressly assumed by the Purchaser as set out in the GENBAND Agreement;

- all liabilities related to the obligation to repurchase CVAS Business-related Inventory as specified in the Contract Manufacturing Inventory Agreements;

- all liabilities relating to executory supply purchase orders for products or services (other than materials to be delivered to a contract manufacturer) entered into by the Sellers in the ordinary course before Closing with a person (other than a contract manufacturer) who is a supplier of the CVAS Business as of the date hereof and under which products and/or services have not been delivered as of the Closing Date; and

- all liabilities related to a Seller Bid; and

- certain liabilities listed in the Sellers Disclosure Schedule.

- 12 -

*Purchase Price*

32.    The Purchase Price is $282,000,000 (the "Base Purchase Price"), as adjusted in the manner described below, plus the Purchaser's obligation to pay, perform and discharge the Assumed Liabilities and the EMEA Assumed Liabilities.

33.    At the Closing, the Purchaser shall deliver the Estimated Purchase Price (less the Good Faith Deposit and the various escrow amounts described below) to the Distribution Agent, as agent for the Sellers and the EMEA Sellers, being an amount equal to:

- the Base Purchase Price; plus

- the difference, which may be positive or negative, equal to the Estimated Adjusted Net Working Capital minus the Target Working Capital; minus

- the Estimated Aggregate EMEA Downward Adjustment (if any); minus

- the Estimated Aggregate Downward Adjustment (if any); minus

- the Estimated Deferred Profit Amount; minus

- the Estimated Closing Accrued Vacation Amount; minus

- the Estimated Specified Employee Liabilities Amount; minus

- the Estimated TFR Amount; minus

- the Estimated Excess ARD Employees Amount; minus

- the Estimated EMEA Holiday Downward Adjustment; minus

- the Estimated French Excess ARD Employees Amount; minus

- the Estimated Pre-Close Employment Payments Amount.

- 13 -

34.    The Monitor understands that the Purchase Price adjustments described above are currently estimated to result in a downward adjustment to the Purchase Price of approximately $100,000,000.

35.    The following amounts will be deducted from the Estimated Purchase Price to be delivered to the Sellers at Closing:

   (a)    the Good Faith Deposit, being an amount equal to five percent of the Base Purchase Price which shall be delivered by the Purchaser to the Escrow Agent on the Business Day following the entry of the U.S. Bidding Procedures Order;

   (b)    the Aggregate Escrow Amount, comprised of: (i) the Purchase Price Escrow Amount ($8,000,000); (ii) the TSA Escrow Amount ($10,000,000); (iii) the Tax Escrow Amount ($2,500,000); and (iv) the EMEA Tax Escrow Amount ($2,500,000), which will be delivered to the Escrow Agent; and

   (c)    the EMEA Deposit ($5,000,000), which will be delivered to the EMEA Escrow Agent.

### *Post-Closing Purchase Price Adjustment*

36.    Within 95 days of Closing, the Purchaser shall deliver the Closing Statement to the Main Sellers and the EMEA Sellers, which shall contain the Purchaser's final calculation of the Adjusted Net Working Capital (including the underlying amounts used to calculate same) and the other purchase price adjustment amounts specified above in paragraph 33.

37.    The Final Purchase Price shall be equal to:

   •    the Base Purchase Price; plus

   •    the difference, which may be positive or negative, equal to the Closing Adjusted Net Working Capital minus the Target Working Capital; plus

   •    the Closing Aggregate EMEA Upward Adjustment (if any); minus

   •    the Closing Aggregate EMEA Downward Adjustment (if any); minus

- 14 -

- the Closing Aggregate Downward Adjustment (if any); minus

- the Closing Deferred Profit Amount; minus

- the Closing Excess ARD Employees Amount; minus

- the Closing TFR Amount; minus

- the Closing EMEA Holiday Downward Adjustment; minus

- the Closing French Excess ARD Employees Amount; minus

- the Closing Pre-Close Employment Payments Amount.

38.    The Main Sellers shall have 30 days from the date of receipt of the Closing Statement to notify the Purchaser of a disagreement with same. The Purchaser and the Main Sellers shall use commercially reasonable efforts to resolve any disagreements for a period of 15 days thereafter, after which the Accounting Arbitrator shall be appointed to resolve any remaining disagreements.

39.    If the Final Purchase Price is less than the Estimated Purchase Price, the Escrow Agent shall pay to the Purchaser the lesser of the excess of the Estimated Purchase Price over the Final Purchase Price and the Purchase Price Escrow Amount and the Sellers and the EMEA Sellers shall pay the amount of any such excess not paid by the Escrow Agent, provided that if the excess of the Estimated Purchase Price over the Final Purchase Price is less than the Escrow Amount, the Parties agree to cause the Escrow Agent to pay to the Distribution Agent, as distribution agent for the Sellers and the EMEA Sellers, the balance of the Purchase Price Escrow Amount, and provided further that in no event shall the Sellers and the EMEA Sellers, in the aggregate, have any obligation to pay any amounts under the GENBAND Agreement or the EMEA ASA in excess of the Base Purchase Price less the Purchase Price Escrow Amount.

40.    If the Final Purchase Price exceeds the Estimated Purchase Price, the Purchaser shall pay to the Distribution Agent the amount of such excess and the Escrow Agent shall pay the full Purchase Price Escrow Amount to the Distribution Agent.

- 15 -

*North American Tax Escrow*

41.     In the event that any tax authority shall make any claim against the Purchaser or its affiliates for any taxes that are Excluded Liabilities or have in its favour a lien on any of the Assets arising out of the non-payment of any taxes that are Excluded Liabilities ("Excluded Taxes"), the Purchaser shall be entitled to recover all losses arising out of or in connection with such Excluded Taxes from the Tax Escrow Amount, provided that the aggregate amount to be recovered in respect of such losses shall not exceed the Tax Escrow Amount. The Tax Escrow Amount is available as the sole and exclusive remedy to the Purchaser and any Designated Purchaser following the Closing in respect of any Excluded Liabilities or liabilities for non-payment of any Excluded Taxes that give rise to any Lien on any Assets in each case for jurisdictions identified by the Purchaser in a schedule to the ASA. Any remaining balance in the Tax Escrow Amount (less a reserve amount for claims for Excluded Taxes which have not yet been resolved) will be released to the Distribution Agent on the first Business Day after the first anniversary of the Closing Date.

*Employees*

42.     The Purchaser has committed to offer employment to a minimum of 1,638 Employees of the CVAS Business (the "Transferred Employees"), including all employees whose employment transfers by operation of Law, and all employees in the EMEA region whose employment is governed by the EMEA ASA, but excluding Transitional Employees. Except with respect to Union Employees, such Offers pursuant to the GENBAND Agreement shall, except to the extent otherwise required by Law, be for employment on terms and conditions that are substantially comparable to those terms and conditions of employment of similarly situated employees of the Purchaser and shall include: (i) (A) for each Employee (excluding Sales Employees), an annual base salary and annual target incentive that is equal to the current annual base salary and annual target incentive for such Employee; and (B) for each Sales Employee, an annual base salary plus annual target incentive equal in the aggregate to the current annual base salary plus annual target incentive for such Employee; provided that the annual base salary for each Sales

- 16 -

Employee shall not be less than 95% of the annual base salary for such Sales Employee; (ii) employment in a reasonably comparable position; and (iii) employment at a location reasonably near to the Employee's current location. Except as set forth in the Sellers Disclosure Schedule, the Purchaser shall provide Transferred Employees with benefits substantially comparable in the aggregate to their current benefits under Seller Employee Plans and shall recognize the service date of each Transferred Employee for all purposes including membership and entitlement to benefits under all relevant Purchaser Employee Plans, but not for purposes of benefit accrual, vesting or otherwise for determination of the amount or duration of benefits under any Purchaser Employee Plan that is a defined benefit pension plan or under an equity incentive plan. The Sellers shall be solely responsible for any required notice under the WARN Act or similar state or local laws with respect to terminations of employment of Employees other than Transferred Employees and Transitional Employees.

43.    With respect to Union Employees, as of the Closing Date the Purchaser will be bound by the terms and obligations of the Collective Labour Agreements with respect to the employment of Union Employees who are Transferred Employees.

44.    The Sellers shall retain any of the following Liabilities of the Sellers (the "Excluded Employee Liabilities"): (i) liabilities related to the Seller Employee Plans; (ii) any liability related to the KERP, the KEIP or any other retention plan; (iii) any obligation to provide continued coverage pursuant to COBRA under any Seller Employee Plan that is a "group health plan" to Employees with a qualifying event that occurs prior to such Employees' Effective Hire Date; and (iv) except as otherwise provided in the GENBAND Agreement, liabilities relating to any Employee's or a former employee's employment or termination of employment with any of the Sellers, including any severance or similar obligations.

45.    As of the Effective Hire Date, the Non-Union Employees who have any entitlement to defined benefits under the Nortel Networks Limited Managerial and Non-Negotiated Pension Plan or who participate in the defined contribution component of the Nortel Networks Limited Managerial and Non-Negotiated Pension Plan shall cease to participate

actively in such Seller Employee Plan. The Purchaser shall cause such Non-Union Employees who become Transferred Employees to participate in a defined contribution registered pension plan, which shall contain an employer contribution formula of at least 1% of the salary of such Transferred Employees, subject to any applicable tax law.

46.    As of the Effective Hire Date, the Union Employees who are accruing defined benefits under the Nortel Networks Negotiated Pension Plan shall cease to participate actively in such Seller Employee Plan. The Purchaser shall cause such Union Employees who become Transferred Employees to participate in a defined benefit registered pension plan unless otherwise agreed to with the relevant union.

47.    As of the Effective Hire Date, the Union Employees who participate in the defined contribution component of the Nortel Networks Negotiated Pension Plan shall cease to participate actively in such Seller Employee Plan. The Purchaser shall cause such Union Employees who become Transferred Employees to participate in a defined contribution registered pension plan unless otherwise agreed to with the relevant union.

### Assignment of Contracts

48.    The Sellers will assign certain Customer Contracts pursuant to Section 365 of the Code or otherwise, as applicable, and will sublease or license premises leased under certain Real Estate Leases to the Purchaser upon Closing as specified in the Sellers Disclosure Schedule. The Parties shall use commercially reasonable efforts to obtain all consents required to permit the assignment to the Purchaser of the Assigned Contracts in force as of the Closing Date.

49.    The Purchaser and the Sellers shall, as applicable, use their reasonable best efforts to cause the counterparty to each Bundled Contract (i.e., Contracts that provide for the sale or provision of CVAS products or services and the sale or provision of other products or services of the Sellers) to amend such Bundled Contract so as to delete all obligations and Liabilities therefrom as they relate to the CVAS products and services and to enter into a new Contract (effective as of, and conditioned upon the occurrence of, the Closing) with the Purchaser which only relates to CVAS products and services.

- 18 -

*Cure Costs*

50.    To the extent that the assignment of any Customer Contract to the Purchaser entails the payment of any Cure Cost, the relevant Main Sellers shall pay such amounts directly to such counterparty. The Sellers shall not be responsible for any other Cure Costs.

*Additional Adverse Bankruptcy Proceedings*

51.    Prior to Closing, if any Seller that is a Non-Debtor Seller commences insolvency proceedings, any law or order comes into effect preventing the Seller from assigning the assets in its jurisdiction, or any entity is not deemed an Other Seller, the Main Sellers shall promptly notify the Purchaser of same and identify the Assets that are affected (the "Restricted Assets") and the Parties shall use their commercially reasonable efforts to cause the transfer of the Restricted Assets to the Purchaser, provided that if it becomes apparent to the Parties that the Restricted Assets cannot be assigned, such Restricted Assets shall automatically be deemed Excluded Assets, the applicable Seller shall be excused from delivering the Restricted Assets and the Purchaser shall be relieved from its rights and obligations to acquire such Restricted Assets or assume any Assumed Liabilities in respect thereof (the "Restricted Liabilities") and the Purchase Price shall be reduced by an amount equivalent to the Market Value of such Restricted Assets and Restricted Liabilities.  For a period of 180 days following the Closing, the Sellers and the Purchaser shall use commercially reasonable efforts to attempt to cause any Restricted Assets to be conveyed to the Purchaser.

*Exclusion of Sellers*

52.    At any time within 15 calendar days after the selection of the Purchaser as the Successful Bidder, the Purchaser may elect, without effect on the Purchase Price or the Purchaser's obligation to offer employment to a minimum number of employees, to exclude the assets and any related rights and liabilities of Nortel Networks (India) Private Limited from the transaction.

- 19 -

*Sale Free and Clear*

53.    The Assets to be transferred by the Sellers will be transferred free and clear of all liens, claims and interests, other than those expressly assumed by the Purchaser or otherwise expressly permitted under the GENBAND Agreement.

*Representations and Warranties or Covenants*

54.    The GENBAND Agreement contains a number of representations, warranties and covenants by the Main Sellers or the Sellers, as applicable, with respect to various matters including title to assets, sufficiency of assets, intellectual property, preparation of financial statements, status of litigation, compliance with laws, status of real property, environmental matters, employee matters and taxes.    In addition, the GENBAND Agreement includes a number of covenants with respect to matters including pre-Closing cooperation and access to information, preparation and filings regarding antitrust and other Regulatory Approvals, preparation and delivery of certain financial statements of the CVAS Business, pre-Closing conduct of the Business, post-Closing assistance and maintenance of books and records, post-Closing arrangements with respect to certain non-assignable and/or Bundled Contracts, post-Closing assistance for litigation, negotiation and completion of Ancillary Agreements, and insurance and real estate matters including the sub-lease and lease of certain real property to the Purchaser.

*Survival of Representations and Warranties or Covenants*

55.    No representations, warranties, covenants, or agreements of the Sellers contained in the GENBAND Agreement shall survive beyond the Closing Date, except for certain specified covenants, and covenants that by their terms are to be satisfied after the Closing Date, which covenants will survive until satisfied in accordance with their terms.

*Termination Rights*

56.    The GENBAND Agreement may be terminated prior to Closing in a number of instances including:

- 20 -

- by mutual written consent of the Purchaser and the Main Sellers;

- by either the Purchaser or the Main Sellers:

    o   if the U.S. Bidding Procedures Order and the Canadian Sales Process Order have not been entered within 30 days of the date of the GENBAND Agreement;

    o   if the U.S. Sale Order and the Canadian Approval and Vesting Order have not been entered within 20 days after completion of the Auction;

    o   upon entry of an order of the U.S. Bankruptcy Court or the Canadian Court approving an Alternative Transaction;

    o   if a Government Entity in the U.S., Canada or the United Kingdom (other than a Bankruptcy Court) issues a Final Order prohibiting the transactions contemplated by the GENBAND Agreement and the EMEA ASA;

    o   if the EMEA ASA is terminated in accordance with its terms;

    o   if the Closing does not take place on or prior to June 30, 2010;

    o   in the event of a material breach by the other Party of its representations, warranties, agreements or covenants set forth in the GENBAND Agreement, which breach would result in a failure to satisfy certain specified closing conditions which, if capable of being cured, is not cured within 25 days; or

    o   upon the other Party's material breach of its obligation to close the transactions contemplated by the GENBAND Agreement at the Closing, which breach is not cured within five days.

- by the Purchaser:

- 21 -

    o    upon the sale, transfer or disposal of any material portion of the CVAS Business or the Assets (other than as a going concern) in connection with the closure, liquidation or winding up of the CVAS Business;

    o    if the Auction does not conclude by 45 business days after the later of the entry of the U.S. Bidding Procedures Order or the Canadian Sales Process Order;

    o    if the Purchaser is not selected as the Successful Bidder or the Alternate Bidder; or

    o    upon withdrawal, revocation or alternation of the U.S. Bidding Procedures Order, the Canadian Sale Process Order, the U.S. Sale Order or the Canadian Approval and Vesting Order in a manner materially adverse to the Purchaser, or the Sellers' material failure to comply with the Bidding Procedures which, in either case, if capable of being cured, is not cured within ten days of Sellers' receipt of a written notice of such withdrawal, revocation, alteration or failure.

*Expense Reimbursement*

57.    Collectively, the GENBAND Agreement and the EMEA ASA provide for an aggregate expense reimbursement payable by the Sellers and the EMEA Sellers to the Purchaser in certain circumstances in respect of its reasonable and documented fees, out-of-pocket costs and expenses, to a maximum of $5,000,000 (the "Expense Reimbursement").

58.    The Sellers shall pay a cash fee of $3,333,333 (the "Seller Expense Reimbursement") to the Purchaser if:

    •    the GENBAND Agreement is terminated pursuant to its termination provisions except where such termination is: i) by mutual written consent; ii) due to the U.S. Bidding Procedures Order or the Canadian Sales Process Order not having been entered within 30 days of the date of the GENBAND Agreement; or (iii) as a result of a material breach by the Purchaser of the GENBAND Agreement or the

- 22 -

EMEA ASA which breach would result in a failure to satisfy certain conditions to Closing and which are not cured within 25 days; and

- other than with respect to termination as a result of: (i) the entry of an Order of the U.S. Bankruptcy Court or the Canadian Court approving an Alternative Transaction; (ii) the EMEA ASA being terminated in accordance with certain specified provisions thereof; or (iii) the Purchaser not being selected as the Successful Bidder or the Alternate Bidder, when the GENBAND Agreement is terminated, the Purchaser is not in breach of the GENBAND Agreement or the EMEA ASA, which breach would result in a failure to satisfy certain specified closing conditions.

*Break-Up Fee*

59.    The GENBAND Agreement and the EMEA ASA also provide for an aggregate break-up fee of $5,000,000 to be paid by the Sellers and the EMEA Sellers to the Purchaser in certain circumstances (the "Break-Up Fee").

60.    The Sellers shall pay a cash fee of $3,333,333 (the "Seller Break-Up Fee") to the Purchaser if:

- the GENBAND Agreement is terminated as a result of: (i) the EMEA ASA being terminated in accordance with certain specified provisions thereof; (ii) the Sellers' material breach of their obligation to close the transactions contemplated by the GENBAND Agreement at Closing; (iii) a material breach of the Sellers' representations, warranties, agreements or covenants set forth in the GENBAND Agreement; or (iv) the sale, transfer or disposal of any material portion of the CVAS Business or the Assets (other than as a going concern) in connection with the closure, liquidation or winding up of the CVAS Business, and when the GENBAND Agreement is terminated the Purchaser is not in breach of the GENBAND Agreement or the EMEA ASA, which breach would result in a failure to satisfy the mutual Closing conditions or the Sellers' conditions to Closing; or

- 23 -

- the GENBAND Agreement is terminated as a result of: (A) (i) the U.S. Sale Order and the Canadian Approval and Vesting Order not being entered within 20 days after the completion of the Auction; (ii) the entry of an Order of the U.S. Bankruptcy Court or the Canadian Court approving an Alternative Transaction; (iii) the EMEA ASA being terminated in accordance with certain specified provisions thereof; (iv) the Auction not having concluded by 45 business days after the later of the entry of the U.S. Bidding Procedures Order or the Canadian Sales Process Order; or (v) the Purchaser not being selected as the Successful Bidder or the Alternate Bidder; (B) other than with respect to termination pursuant to the conditions specified in (ii), (iii) or (v), when the GENBAND Agreement is terminated the Purchaser is not in breach of the GENBAND Agreement or the EMEA ASA, which breach would result in a failure to satisfy the mutual Closing conditions or the Sellers' conditions to Closing; and (C) the Sellers consummate an Alternative Transaction within 12 months following the termination of the GENBAND Agreement.

*Incentive Fee*

61.    As an inducement to the Purchaser and to compensate One Equity Partners III, L.P. ("OEP"), an existing shareholder of the Purchaser, for its willingness to provide financing to the Purchaser for the proposed transactions under the GENBAND Agreement and the EMEA ASA, the Main Sellers and NNUK have agreed to pay a fee in the amount of $3,600,000 to OEP (the "Incentive Fee"). The Monitor understands that the Incentive Fee is intended to defray the cost of OEP having participated in various of Nortel's sales processes and that OEP has indicated that its financial sponsorship of the GENBAND Agreement is conditional upon receipt of the Incentive Fee. The Incentive Fee will be paid to OEP within five business days of the later of the date on which: (i) the U.S. Bidding Procedures Order is entered; and (ii) the Canadian Sales Process Order is entered. Pursuant to an Incentive Fee Side Agreement amongst the Main Sellers, NNUK and the Joint Administrators dated December 22, 2009 (the "Incentive Fee Side Agreement"), each of NNC/NNL, NNI and NNUK (and their respective Affiliates) have initially agreed to pay 1/3 of the Incentive Fee, provided that if the transactions

- 24 -

contemplated by the GENBAND Agreement/EMEA ASA are consummated or an Alternative Transaction is consummated, each of NNC/NNL, NNI and NNUK (and their respective Affiliates) shall ultimately bear a portion of the Incentive Fee equal to their percentage allocation of the sale proceeds of such transaction. A copy of the Incentive Fee Side Agreement is attached as Appendix "C" hereto.

*Limitation of Liability*

62.    Other than equitable relief to the extent permitted pursuant to the terms of the GENBAND Agreement, payment of the Seller Expense Reimbursement or the Seller Break-Up Fee shall be the sole and exclusive remedy of the Purchaser for any failure by the Sellers to consummate the transaction contemplated by, or for any pre-Closing breach of, the GENBAND Agreement.

*Standstill Period*

63.    From the date of the GENBAND Agreement to the entry of the U.S. Bidding Procedures Order and from the conclusion of the Auction to Closing or termination of the GENBAND Agreement, the Sellers and their affiliates are, amongst other things, prohibited from soliciting, initiating, encouraging, engaging in any discussions or negotiations, or furnishing any information with respect to an Alternative Transaction; participating or assisting in any effort or attempt to do or seek the foregoing; or, executing a letter of intent or agreement providing for such a transaction, provided however, that the Sellers shall not be prohibited from providing any person with the Bidding Procedures and related documents, answering questions about the Bidding Procedures or announcing the execution of the GENBAND Agreement or the Auction. Notwithstanding the foregoing, from the date of the GENBAND Agreement until the entry of the U.S. Bidding Procedures Order, the Sellers may provide continued access to written due diligence materials in an electronic data room to persons that have such access presently or that execute a confidentiality agreement in accordance with the Bidding Procedures within ten Business Days from the date of the GENBAND Agreement, provided, however, that the Sellers must provide the Purchaser at least equivalent access to all such written due diligence materials.

- 25 -

*Ancillary Agreements*

64.    On or before Closing, the Purchaser and the relevant Sellers and EMEA Sellers will enter into the following ancillary agreements:

- Local Sales Arrangements -- To the extent necessary to effect the Closing, the Sellers and the Purchaser shall enter into agreements or instruments providing for the sale, transfer, assignment or other conveyance of the Assets in accordance with local law and the assumption of Assumed Liabilities.

- Intellectual Property License Agreement - an intellectual property license agreement (the "IPLA") amongst NNL, NNI, the EMEA Sellers and the Purchaser pursuant to which NNL, NNI and the EMEA Sellers will grant to the Purchaser a non-exclusive, fully paid-up, perpetual and irrevocable license with respect to intellectual property which has not been assigned, to, among other things: (i) use, distribute and otherwise commercially exploit intellectual property, other than patents, used in connection with the CVAS Business; and (ii) under the patents associated with the CVAS Business, make, develop, use, support and otherwise dispose of products and services in connection therewith, in each case solely within a defined field of use. The licenses granted to the Purchaser under the IPLA include certain limited sublicensing rights and are not assignable except in certain limited circumstances.

- Transition Services Agreement -- an agreement between NNL, NNC, NNI, NNUK, NN Ireland, certain Other Sellers, the U.K. Administrators and the Purchaser pursuant to which the Sellers and their affiliates will agree to provide certain information technology, business transition and related services to the Purchaser for up to 18 months post-Closing. The final form of the Transition Services Agreement will set forth the fees to be paid by the Purchaser to the Sellers for these services as well as certain other terms that will regulate the provision of services thereunder. The agreed form of Transition Services Agreement sets out the general scope of transition services to be provided and the parties have agreed to negotiate in good faith to refine the description of the

- 26 -

transitional services to be provided in accordance with the terms and guidelines set forth in Exhibit 5.27. The parties have agreed to an arbitration procedure to resolve any disputes regarding, among other things, the services to be provided or the amount to be billed for such services. Pursuant to the GENBAND Agreement, the Purchaser and the TSA Sellers and the TSA EMEA Sellers or, if necessary, the TSA Arbitrator (as defined in Exhibit 5.27), shall determine, among other things, whether the information technology systems and business processes to be used in the performance of TSA services for the Purchaser are Closing Day Ready (as defined in Exhibit 5.27). To the extent that the TSA Arbitrator ultimately determines that Closing Day Ready was not achieved as of June 30, 2010, then the Sellers shall pay to the Purchaser an amount of $10,000,000.

- Transitional Trademark License Agreement – an agreement between NNL and the Purchaser granting a non-exclusive and royalty-free license to use certain trademarks that are currently used in the CVAS Business in connection with the CVAS products for a transitional period of 18 months, solely within the field of the CVAS Business. The licenses granted to the Purchaser under the Transitional Trademark License Agreement include certain limited sublicensing rights and are not assignable except in certain limited circumstances.

- Loaned Employee Agreement – an agreement between the relevant Sellers and the Purchaser pursuant to which certain employees of the Sellers that cannot be transferred to the Purchaser at Closing will be seconded to the Purchaser for a period of up to 90 days, and in certain cases up to twelve months. The Loaned Employees will remain on the payroll of the applicable Seller and will continue to participate in the Seller's pension and benefit plans. The Purchaser shall reimburse the Sellers for the cost of retaining the Loaned Employees, subject to certain exceptions.

- Mutual Development and Support Agreements – Agreements to address the interdependencies among current and former businesses of the Sellers as they relate to the CVAS Business.

- 27 -

- Subcontract Agreement – one or more agreements between the relevant Sellers and the Purchaser to be executed on or before Closing so as to pass through the benefits and burdens of the underlying Contract with customers as if the Purchaser were party thereto.

- Contract Manufacturing Inventory Agreements – agreements between the Purchaser, the Sellers and certain Contract Manufacturers of the Sellers to sell Contract Manufacturer Inventories related to the CVAS Business to the Purchaser after closing.

- LGN Distribution Agreement – an agreement between LGN and the Purchaser with respect to the sale of certain CVAS products to LGN for resale in South Korea.

- NN Turkey Agreements – agreements to be entered into between NN Turkey and the Purchaser governing the distribution of certain CVAS products by NN Turkey, the provision of services by NN Turkey to the CVAS Business, and research and development activities of NN Turkey in connection with the CVAS Business.

- Real Estate Terms and Conditions - The Sellers and the Purchaser will finalize the general terms that will govern the applicable leases, subleases or license agreements in respect of certain real property which the Sellers will lease, sublease or license to the Purchaser.

### Closing

65.  Closing shall occur five Business Days after the date upon which all Closing conditions have been satisfied or waived, unless such date is sooner than April 30, 2010, in which case the Closing shall occur on April 30, 2010.

### Closing Conditions

66.  The Parties' obligation to effect the Closing is subject to the satisfaction of the following conditions:

- 28 -

- all Regulatory Approvals shall have been obtained and remain in force;

- there shall be in effect no law or order of any Court or other Governmental Entity in Canada, the U.S. or the United Kingdom, prohibiting the consummation of any of the transactions contemplated by the GENBAND Agreement or the EMEA ASA;

- the U.S. Bidding Procedures Order and the Canadian Sales Process Order shall have been entered and shall have become Final Orders;

- the U.S. Sale Order and the Canadian Approval and Vesting Order shall have been entered, shall not have been stayed and shall not be subject to appeal, stay, reversal or modification that poses a material challenge to such order as of the Closing Date;

- the satisfaction of conditions to closing under the EMEA ASA; and

- the simultaneous consummation of the transactions contemplated by the EMEA ASA.

67. The obligation of the Purchaser to close the sale is subject to satisfaction of the following conditions:

- each of the Sellers' representations and warranties (other than those set forth below) being true and correct, except for any failure that has not had, and would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect;

- each of the Sellers' representations and warranties set forth in Sections 4.1, 4.2, 4.3(a) and 4.15 of the GENBAND Agreement being true and correct in all material respects;

- each of the Sellers' material pre-Closing covenants, obligations and agreements pursuant to the GENBAND Agreement shall not have been breached in any material respect; and

- 29 -

- the failure to transfer the Restricted Assets (if any) would not reasonably be expected to be materially adverse to the operations, results of operations or financial condition of the CVAS Business taken as a whole.

## BIDDING PROCEDURES AND AUCTION PROCESS

68. Given that certain of the U.S. Debtors are parties to the GENBAND Agreement and given the desire to maximize value for the benefit of stakeholders in relation to the assets which are the subject of the GENBAND Agreement, Nortel has determined and has agreed with GENBAND that the GENBAND Agreement is subject to higher or better offers being obtained pursuant to a sale process under section 363 of the Code and that the GENBAND Agreement shall serve as a "stalking horse" bid pursuant to that process. The Assets may be sold in a single sale to a single purchaser or in parts to several purchasers.

69. A copy of the proposed bidding procedures is attached as Appendix "D" hereto (the "Bidding Procedures").

70. The GENBAND Agreement provides that the Sellers that are U.S. Debtors shall, as promptly as possible, file the U.S. Bidding Procedures and Sale Motion with the U.S. Court. This motion was filed with the U.S. Court on December 23, 2009. The GENBAND Agreement also provides that the Applicants shall, as promptly as possible and in any event no later than the date on which the U.S. Bidding Procedures Order is granted, file the Canadian Sales Process Order Motion with this Honourable Court. This motion was filed on December 29, 2009.

71. Pursuant to the GENBAND Agreement, the Sellers who are U.S. Debtors shall use their reasonable best efforts to cause the U.S. Court to schedule a hearing to consider the U.S. Bidding Procedures and Sale Motion and to enter the U.S. Bidding Procedures Order within 15 days of the filing of the U.S. Bidding Procedures and Sale Motion.

- 30 -

72. The Monitor understands that the Applicants and the U.S. Debtors will seek approval of the Bidding Procedures at a videoconference joint hearing between this Honourable Court and the U.S. Court scheduled for January 6, 2010, conducted pursuant to the Cross-Border Insolvency Protocol previously approved by both Courts.

73. The Bidding Procedures presently provide that all bids must be received by the Sellers not later than 4:00 p.m. (ET) on February 16, 2010, and that the Sellers will conduct an auction of the Assets on February 24, 2010, beginning at 9:00 a.m. (ET) (the "Auction")[1].

74. Pursuant to the GENBAND Agreement, the Sellers who are U.S. Debtors shall request the U.S. Court to schedule a Sale Hearing on or prior to the fifth Business Day following the conclusion of the Auction and shall use their commercially reasonable efforts to cause the Sale Hearing to be heard on that date or the earliest date thereafter permitted by the U.S. Court's schedule. As promptly as practicable, but in no event later than the date on which the U.S. Sale Order is granted, the Canadian Debtors shall file a motion with this Honourable Court seeking that the Canadian Approval and Vesting Order be granted.

75. The Monitor recognizes the expeditious nature of the proposed sale process. However, given the extensive process conducted to date and that there are likely to be a limited number of parties interested in acquiring the CVAS Business, the Monitor is supportive of the proposed sale process. In addition, Nortel has consulted with, among others, the Committee and the Bondholder Group regarding the Bidding Procedures and believes that these parties are supportive of the timing of this sale process.

76. The key provisions of the Bidding Procedures are outlined in the paragraphs that follow.

*Bid Deadline*

77. A Qualified Bidder (as defined below) that desires to make a bid will deliver written copies of its bid to: the Sellers, counsel and financial advisors to the Sellers, counsel and financial advisors to the Committee, counsel to the Bondholders' Committee, the

---

[1] The dates for the Bid Deadline and Auction discussed herein are premised on a March 3, 2010 Sale Hearing, in the event that the Sale Hearing cannot be set at an earlier date mutually convenient to both the U.S. Court and this Honourable Court.

- 31 -

Monitor, the U.K. Administrators and counsel to the U.K. Administrators (collectively, the "Notice Parties"), so as to be received not later than 4:00 p.m. (Eastern Time) on February 16, 2010 (the "Bid Deadline"). The Sellers, after consultation with the Creditors' Committee, the Bondholder Group and the Monitor, may, in accordance with the procedures set forth below under the heading "Reservation of Rights", extend the Bid Deadline once or successively, but they are not obligated to do so.

*Provisions Governing Qualifications of Bidders*

78.   Unless otherwise ordered by both the U.S. Court and this Honourable Court and accepted by the U.K. Administrators, for cause shown, or as otherwise determined by the Sellers, in consultation with the Committee, the Bondholder Group and the Monitor, in order to participate in the bidding process, each person (a "Potential Bidder"), other than GENBAND, must deliver (unless previously delivered) to the Notice Parties:

(a)   an executed confidentiality agreement (to be delivered prior to the distribution of any confidential information by the Sellers to a Potential Bidder) in form and substance satisfactory to the Sellers and on terms that are substantially similar to those contained in the confidentiality agreement executed by GENBAND;

(b)   current audited financial statements and latest unaudited financial statements or such other form of financial disclosure of the Potential Bidder or the entity who will guarantee the obligations of the Potential Bidder that will allow the Sellers and their financial advisors, in consultation with the Committee, the Bondholders' Committee and the Monitor, to make a reasonable determination as to the Potential Bidder's financial and other capabilities to consummate a purchase of the Assets; and

(c)   a preliminary (non-binding) written proposal regarding: (i) the purchase price range (including liabilities to be assumed by the Potential Bidder); (ii) any Assets expected to be excluded or any additional assets desired to be included; (iii) the structure and financing of the transaction (including, but not limited to, the sources of financing for the purchase price and all requisite financial assurance);

- 32 -

(iv) any anticipated corporate, stockholder, internal or regulatory approvals required to close the transaction and the anticipated time frame and any anticipated impediments for obtaining such approvals; (v) the proposed number of employees of the Sellers who will become employees of the Potential Bidder, and any proposed measures associated with their continued employment; and (vi) any conditions to closing that the Potential Bidder may wish to impose in addition to those set forth in the GENBAND Agreement and the EMEA ASA.

79. A Potential Bidder that satisfies the above requirements, whose financial information and credit quality support or enhancement demonstrate in the Sellers' judgment the financial capability of the Potential Bidder to consummate the transaction, and who has submitted a reasonably competitive and realistic non-binding proposal, as described above, and who has executed a confidentiality agreement, as described above, and that the Sellers determine in their reasonable business judgement, after consultation with their counsel and financial advisors, the Committee, the Bondholder Group and the Monitor, is likely (based on availability of financing, experience and other considerations) to be able to consummate the transaction, will be deemed a "Qualified Bidder". The determination as to whether a Potential Bidder meets the requirements of a Qualified Bidder will be made as promptly as practicable and the Sellers will so notify the Potential Bidder. At the same time that the Sellers notify the Potential Bidder that it is a Qualified Bidder, the Sellers will allow the Qualified Bidder to begin or continue to conduct due diligence with respect to the Assets.

*Provisions Governing Qualified Bids*

80. A bid submitted will be considered a Qualified Bid only if the bid is submitted by a Qualified Bidder and complies with all of the following (a "Qualified Bid"):

(a)     the Qualified Bidder offers to purchase the Assets upon the terms and conditions substantially as set forth in the GENBAND Agreement and the EMEA ASA, or pursuant to alternate terms and conditions that the Sellers determine, after consultation with the Committee, the Bondholder Group and the Monitor, are no

- 33 -

less favourable than the terms and conditions of the GENBAND Agreement and the EMEA ASA;

(b)  the Qualified Bidder's offer is irrevocable until the selection of the Successful Bidder (as defined below) and, if applicable, the Alternate Bidder (as defined below), provided that if such bidder is selected as the Successful Bidder or the Alternative Bidder, its offer shall remain irrevocable until the earlier of (i) closing of the sale to the Successful Bidder or the Alternate Bidder, and (ii) (x) with respect to the Successful Bidder only, June 30, 2010 and (y) with respect to the Alternate Bidder only, the Alternate Bid Expiration Date (as defined below);

(c)  it includes a duly authorized and executed sale agreement, including the purchase price for the Assets expressed in U.S. Dollars, together with all exhibits, schedules thereto and ancillary agreements as well as copies of such materials marked to show those amendments and modifications to the GENBAND Agreement, the EMEA ASA, ancillary agreements and proposed orders to approve the sale by the U.S. Court, this Honourable Court and any other applicable court(s) whose approval may be required, as  proposed by the Qualified Bidder;

(d) . it includes written evidence of a firm, irrevocable commitment for financing, or other evidence of ability to consummate the proposed transaction;

(e)  it is not conditioned on (i) the outcome of unperformed due diligence by the bidder and/or (ii) obtaining financing;

(f)  it fully discloses the identity of each entity that will be bidding for the Assets or otherwise sponsoring or participating in connection with such bid, and the complete terms of any such participation;

(g)  it has a value to the Sellers, in the Sellers' reasonable business judgment, after consultation with their financial advisors, the Committee, the Bondholder Group and the Monitor, that either individually or, when evaluated in conjunction with any other Qualified Bid for the Assets, is greater than or equal to the sum of the

- 34 -

value offered under the GENBAND Agreement and the EMEA ASA, plus (i) the amount of the Break-Up Fee and Expense Reimbursement, plus (ii) $4 million;

(h)     it includes an acknowledgement and representation with respect to the executory contracts and unexpired leases which the Qualified Bidder proposes to assume or not assume, the Qualified Bidder's proposal for the treatment of related cure costs and identifies any executory contract or unexpired lease the assumption and assignment of which is a condition to Closing;

(i)     it includes an acknowledgement and representation that the Qualified Bidder: (i) has had an opportunity to conduct all required due diligence regarding the Assets prior to making its offer; ii) has relied solely upon its own independent review, investigation and/or inspection of any documents and/or the Assets; (iii) has not relied upon any written or oral statements, representations, promises, warranties or guaranties whatsoever, except as expressly stated in its bid; and (iv) is not entitled to any expense reimbursement or break-up fee in connection with its bid;

(j)     it includes evidence of authorization and approval from the Qualified Bidder's board of directors (or comparable governing body);

(k)     it is accompanied by a good faith deposit in an amount equal to five percent of the Purchase Price;

(l)     it contains full details of the proposed number of employees of the Sellers (apportioned by jurisdiction) who will become employees of the Qualified Bidder and any proposed measures associated with their continued employment and identifies any pension liabilities and assets related to any employees currently covered under the Nortel Retirement Income Plan who will become employees of the Qualified Bidder that the Qualified Bidder intends to assume or purchase;

(m)     it includes evidence of the Qualified Bidder's ability to comply with Section 365 of the Code (to the extent applicable), including providing adequate assurance of such Qualified Bidder's ability to perform in the future the contracts and leases proposed to be assigned or subleased to the Potential Bidder;

- 35 -

(n)    it contains other information reasonably requested by the Sellers; and

(o)    it is received by the Bid Deadline.

81.    The Sellers will determine, in their reasonable business judgment, after consultation with the Committee, the Bondholder Group and the Monitor, whether to deem bids for the Assets that do not conform to one or more of the requirements specified in the Bidding Procedures to be Qualified Bids, provided that the Sellers may not waive substantial compliance with any items in paragraphs (d), (e), (f), (i)(iv), (j) or (o) in paragraph 80, above, without the consent of the Committee, the Bondholder Group and the Monitor, provided further that, with respect to paragraph (e) in paragraph 80, above, such consent shall not be unreasonably withheld in connection with any bid that would (i) otherwise fully satisfy the requirements of a Qualified Bid hereunder but for a de minimus failure to comply with those criteria; and (ii) such noncompliance is cured within 24 hours of the Bid Deadline. Notwithstanding the foregoing, the Purchaser will be deemed a Qualified Bidder and the GENBAND Agreement and the EMEA ASA will be deemed a Qualified Bid.

82.    The Sellers shall notify GENBAND and all Qualified Bidders in writing as to whether or not any bids constitute Qualified Bids on the day that the determination is made, provided that such notification shall be given no later than two Business Days following the expiration of the Bid Deadline. The Sellers shall provide the Purchaser with a copy of any Qualified Bid received by the Sellers on the day that the determination is made that such bid is a Qualified Bid but in no event later than two Business Days prior to the commencement of the Auction.

*Evaluation of Competing Bids*

83.    A Qualified Bid will be valued based upon several factors including, without limitation, items such as the purchase price and the net value provided by such bid, the claims likely to be created by such bid in relation to other bids, the counterparties to such transaction, the proposed revisions to the relevant transaction documents, the effect of the transaction on the value of the ongoing businesses of Sellers, other factors affecting the speed,

- 36 -

certainty and value of the transaction, the assets included or excluded from the bid, the estimated number of in-scope employees of the Sellers (apportioned by jurisdiction) to be offered post-closing employment by the Qualified Bidder and any proposed measures associated with their continued employment, the transition services required from the Sellers post-closing and any related restructuring costs, and the likelihood and timing of consummating such transaction, each as determined by the Sellers, in consultation with their advisors, the Committee, the Bondholder Group and the Monitor.

84.   If the Sellers do not receive any Qualified Bids other than the GENBAND Agreement and the EMEA ASA, the Auction shall be cancelled and the Sellers shall promptly proceed to complete the transactions contemplated by the terms of the GENBAND Agreement and the EMEA ASA, subject to obtaining the approval of the U.S. Court, this Honourable Court and any other applicable court.

*Auction Process*

85.   If the Sellers receive one or more Qualified Bids in addition to the GENBAND Agreement and the EMEA ASA, the Sellers will conduct the Auction of the Assets, upon notice to all Qualified Bidders who have submitted Qualified Bids, at 9:00 am ET on February 24, 2010, which Auction may be cancelled or adjourned, subject to the provisions under the heading "Reservation of Rights", below.

86.   The Auction shall run in accordance with the following procedures:

- only the Sellers, the Purchaser, the Committee, the Bondholder Group, the Monitor and the U.K. Administrators (and the advisors to each of the foregoing), any creditor of the U.S. Debtors or the Applicants and any other Qualified Bidder that has timely submitted a Qualified Bid, shall attend the Auction in person, and only the Purchaser and such other Qualified Bidders will be entitled to make any subsequent bids at the Auction;

- each Qualified Bidder shall be required to confirm that it has not engaged in any collusion with respect to the bidding or the transaction;

- 37 -

- at least one business day prior to the Auction, each Qualified Bidder who has timely submitted a Qualified Bid must inform the Sellers whether it intends to attend the Auction;

- at least one business day prior to the Auction, the Sellers will provide copies of the Qualified Bid or combination of Qualified Bids which the Sellers believe, in their reasonable business judgment, after consultation with the Committee, the Bondholder Group and the Monitor, is the highest or otherwise best offer (the "Starting Bid") to the Purchaser and all other Qualified Bidders;

- all Qualified Bidders who have timely submitted Qualified Bids will be entitled to be present for all Subsequent Bids (as defined below) at the Auction with the understanding that the true identity of each Qualified Bidder at the Auction will be fully disclosed to all other Qualified Bidders at the Auction and that all material terms of each Subsequent Bid will be fully disclosed to all other bidders throughout the entire Auction;

- the Sellers, after consultation with their counsel and financial advisors, the Committee, the Bondholder Group and the Monitor, may employ and announce at the Auction additional procedural rules that are reasonable under the circumstances for conducting the Auction provided that such rules are (i) not inconsistent with the Bidding Procedures, the Code, or any order of the U.S. Court, this Honourable Court or any other applicable court entered in connection herewith, and (ii) disclosed to each Qualified Bidder at the Auction; and

- bidding at the Auction will begin with the Starting Bid and continue, in one or more rounds of bidding, so long as during each round at least one subsequent bid is submitted by a Qualified Bidder that improves upon such Qualified Bidder's immediately prior Qualified Bid (a "Subsequent Bid") and the Sellers determine, in consultation with their advisers, the Committee, the Bondholder Group and the Monitor, that such Subsequent Bid improves upon the Starting Bid or previous Leading Bid (as defined below). Each incremental bid at the Auction shall provide additional net value to the estate of at least $3 million, or such other

- 38 -

amount to be determined by the Sellers, in consultation with the Committee, the Bondholder Group and the Monitor. After each round of bidding, the Sellers shall announce the bid or combination of bids (and the value of such bid(s)) that it believes to be the highest or otherwise better offer (the "Leading Bid"). A round of bidding will conclude after each participating Qualified Bidder has had the opportunity to submit a Subsequent Bid with full knowledge of the Leading Bid.

*Selection of Successful Bid*

87. Prior to the conclusion of the Auction, the Sellers, in consultation with their advisors, the Committee, the Bondholder Group and the Monitor, will (a) review each Qualified Bid and evaluate each Qualified Bid as set forth under the heading "Evaluation of Competing Bids", above, (b) identify the highest or otherwise best offer or offers for the Assets received at the Auction (the "Successful Bid" and the bidder making such bid, the "Successful Bidder"), and (c) communicate to GENBAND and the other Qualified Bidders the identity of the Successful Bidder, the Alternate Bidder (as defined below), if any, and the details of the Successful Bid and Alternate Bid (as defined below), if any. The determination of the Successful Bid and Alternate Bid at the conclusion of the Auction shall be final subject to approval by the U.S. Court and this Honourable Court.

88. The Sellers will sell the Assets to the Successful Bidder pursuant to the terms of the Successful Bid (or, under certain circumstances described below, the Alternate Bidder) upon approval of such Successful Bid by the U.S. Court, this Honourable Court and any other applicable court(s) and approval and execution by the U.K. Administrators of the relevant Successful Bid transaction documents (or, under certain circumstances described below, the Alternate Bidder).

*Closing with Alternative Bidders*

89. If the Sellers receive one or more additional Qualified Bid(s), then, at the Sale Hearing and at any other hearings of any other applicable court(s) to approve the entering into agreements with respect to the Successful Bid, the Sellers will seek approval of the Successful Bid, and, at the Sellers' election, the next highest or best Qualified Bid (the

- 39 -

"Alternate Bid," and such bidder, the "Alternate Bidder"). Following approval of the sale to the Successful Bidder, if the Successful Bidder fails to consummate the sale for any reason, then the Alternate Bid will be deemed to be the Successful Bid and the Sellers will be authorized, but not directed, to effectuate a sale to the Alternate Bidder subject to the terms of the Alternate Bid. The Alternate Bid shall remain open until the earlier of (a) March 20, 2010, or (b) the consummation of the sale to the Successful Bidder (the "Alternate Bid Expiration Date").

90.    Notwithstanding the foregoing, under no circumstance will the Purchaser be deemed the Alternate Bidder.

*Reservation of Rights*

91.    The Bidding Procedures are subject to the rights of the Sellers, in consultation with the Committee, the Bondholder Group and the Monitor, to: a) after each round of bidding at the Auction, determine which Qualified Bid, if any, is the highest or otherwise best offer; b) reject, at any time, any bid that is inadequate or insufficient, not in conformity with the requirements of the Code, the Bidding Procedures, any orders of this Honourable Court or any other applicable orders, contrary to the best interests of the Sellers, their estates and stakeholders, or contrary to the statutory duties or legal obligations of the U.K. Administrators; and c) except as otherwise expressly provided in the Bidding Procedures with respect to instances in which the consent of the Committee, the Bondholder Group, the Monitor or the Purchaser is required, modify the Bidding Procedures or impose at, or prior to the Auction, additional customary terms and conditions on the sale of the Assets.

92.    Notwithstanding any of the foregoing, the Sellers may not, without the prior written consent of the Committee, the Bondholder Group, the Monitor and the Purchaser, which consent may not be unreasonably withheld, (i) extend the Bid Deadline beyond seven calendar days after February 16, 2010, (ii) extend the deadlines in the last paragraph under the heading "Provisions Governing Qualified Bids", (iii) commence the Auction more than ten Business Days after the Bid Deadline, (iv) adjourn the Auction for more than three Business Days, or (v) subject to the availability of the U.S. Court and this Honourable Court, adjourn the Sale Hearing for more than three Business Days if the

- 40 -

Auction has concluded. Each of the foregoing actions shall be made by the Sellers in consultation with the Committee, the Bondholder Group and the Monitor, and their respective advisors. Notwithstanding the foregoing, the Sellers may not, without the prior written consent of the Purchaser, impair or modify the Purchaser's rights and obligations under the GENBAND Agreement or the EMEA ASA or the Purchaser's right to credit the Break-Up Fee and the Expense Reimbursement as part of any subsequent bids (except as specifically set forth in the Bidding Procedures).

## ALLOCATION OF PROCEEDS OF SALE AMONGST NORTEL ENTITIES AND THE SIDE AGREEMENT

93.    As previously indicated, the CVAS Business is not operated through a dedicated legal entity or stand-alone division. The Applicants have, amongst other things, an interest in intellectual property of the CVAS Business which, in turn, is subject to various intercompany licensing agreements with other Nortel legal entities around the world, in some cases on an exclusive basis and in other cases, on a non-exclusive basis. Therefore, the task of allocating the sale proceeds stemming from a sale agreement amongst the various Nortel entities in the various jurisdictions is complex.

94.    As set out in the Fifteenth Report, the Applicants, U.S. Debtors, and certain of the EMEA entities, through the U.K. Administrators, entered into the Interim Funding and Settlement Agreement ("IFSA") which was approved by this Honourable Court on June 29, 2009. Pursuant to the IFSA, each of the Applicants, U.S. Debtors, and EMEA Debtors agreed that their execution of definitive documentation with a purchaser of any material Nortel assets shall not be conditional upon reaching an agreement regarding the allocation of the sale proceeds or binding procedures for the allocation of the sale proceeds. In addition, the parties agreed that in the absence of any agreement regarding the allocation of any sale proceeds, the proceeds shall be deposited in an escrow account and any distribution from the escrow account shall be contingent upon (i) the agreement of all of the Selling Debtors (as defined in the IFSA) or (ii) in the case where the Selling Debtors fail to reach an agreement, a determination of the allocation by the relevant

- 41 -

dispute resolvers. The parties to the IFSA agreed to negotiate in good faith and attempt to reach an agreement on a protocol for resolving disputes concerning the allocation of sales proceeds, including binding procedures for the allocation of sales proceeds where the Selling Debtors have been unable to reach an agreement regarding such allocation.

95.    As of the current date, no agreement has been reached regarding the allocation of any sales proceeds and the terms of a protocol with respect to the resolution of disputes in connection with the allocation of sale proceeds are still under discussion. Accordingly, the Monitor presently expects that the sale proceeds derived from the sale of the CVAS Business will be paid into an escrow account pursuant to the terms of an escrow agreement which the Applicants will seek approval of at a later date.

## MONITOR'S ANALYSIS AND RECOMMENDATIONS

96.    The Monitor has reviewed Nortel's efforts to divest the CVAS Business and is of the view that the Applicants are acting in good faith to maximize value. As set out above, the Monitor has been advised that OEP's willingness to provide financial support to GENBAND in connection with this transaction is dependent on payment of the Incentive Fee. It is the Monitor's view that an expeditious sale of the CVAS Business is in the best interests of the Applicants and its stakeholders and therefore, the Monitor considers the payment of the Incentive Fee to OEP, along with the potential payment of the Seller Break-Up Fee and the Seller Expense Reimbursement to GENBAND as reasonable in the circumstances. Accordingly, the Monitor recommends approval of the GENBAND Agreement as a "stalking horse" bid and approval of the Bidding Procedures and Incentive Fee Side Letter as described above.

- 42 -

97.   For the reasons described at paragraph 26, above, the Monitor recommends that confidential Appendix "B" to this Thirty-Fourth Report be sealed by this Honourable Court.

All of which is respectfully submitted this 3rd day of January, 2010.

**ERNST & YOUNG INC.**
In its capacity as Monitor of the Applicants

Per:

Murray A. McDonald
President

**APPENDIX A**

**[ATTACHED]**

EXECUTION VERSION

## ASSET SALE AGREEMENT

### BY AND AMONG

### NORTEL NETWORKS CORPORATION

### NORTEL NETWORKS LIMITED

### NORTEL NETWORKS INC.

AND

### THE OTHER ENTITIES IDENTIFIED HEREIN AS SELLERS

AND

### GENBAND INC.

DATED AS OF December 22, 2009

# TABLE OF CONTENTS

Page

ARTICLE I INTERPRETATION .................................................................................3
Section 1.1.    Definitions.............................................................................3
Section 1.2.    Interpretation.........................................................................34
    1.2.1.    Gender and Number ..................................................34
    1.2.2.    Certain Phrases and Calculation of Time.................34
    1.2.3.    Headings, etc.............................................................34
    1.2.4.    Currency....................................................................34
    1.2.5.    Statutory References .................................................35

ARTICLE II PURCHASE AND SALE OF ASSETS........................................35
Section 2.1.    Purchase and Sale. ...............................................................35
    2.1.1.    Assets 35
    2.1.2.    Excluded Assets........................................................36
    2.1.3.    Assumed Liabilities ..................................................38
    2.1.4.    Excluded Liabilities ..................................................40
    2.1.5.    Assumption and/or Assignment or Rejection of 365 Contracts and
             Assumption and Sublease and/or License of 365 Real Estate
             Leases ........................................................................42
    2.1.6.    Assignment of Non-365 Contracts and Sublease or License of
             Non-365 Real Estate Leases. ...................................43
    2.1.7.    Cure Costs; Adequate Assurance; Efforts.................44
    2.1.8.    Local Sale Agreements .............................................45
    2.1.9.    EMEA Asset Sale Agreement....................................45
    2.1.10.   Non-Assignable Assets .............................................45
Section 2.2.    Purchase Price.......................................................................46
    2.2.1.    Purchase Price............................................................46
    2.2.2.    Estimated Purchase Price...........................................46
    2.2.3.    Purchase Price Adjustment. .......................................48
    2.2.4.    Reserved.....................................................................50
    2.2.5.    Good Faith Deposit. ..................................................50
Section 2.3.    Escrow..................................................................................51
Section 2.4.    Closing..................................................................................51
    2.4.1.    Closing Date...............................................................51
    2.4.2.    Closing Actions and Deliveries ................................51
Section 2.5.    Designated Purchaser(s).......................................................53

ARTICLE III REPRESENTATIONS AND WARRANTIES OF THE PURCHASER .......53
Section 3.1.    Organization and Corporate Power..........................................54
Section 3.2.    Authorization; Binding Effect; No Breach. ..............................54
Section 3.3.    Financing...............................................................................55
Section 3.4.    Purchaser Financial Statements ...............................................55
Section 3.5.    Adequate Assurance of Future Performance ............................56

i

Section 3.6.   Purchaser's Acknowledgments; Exclusivity of Representations and
Warranties..........................................................................................56
Section 3.7.   Brokers..............................................................................................58

**ARTICLE IV REPRESENTATIONS AND WARRANTIES OF THE SELLERS ..............58**

Section 4.1.   Organization and Corporate Power................................................58
Section 4.2.   Authorization; Binding Effect; No Breach. ...................................58
Section 4.3.   Title to Tangible Assets; Sufficiency of Assets. ..........................59
Section 4.4.   Material Contracts.............................................................................60
Section 4.5.   Intellectual Property.........................................................................61
Section 4.6.   Litigation...........................................................................................64
Section 4.7.   Financial Statements. .......................................................................65
Section 4.8.   Compliance with Laws; Consents....................................................66
Section 4.9.   Real Property. ...................................................................................66
Section 4.10.  Environmental Matters......................................................................67
Section 4.11.  Labor and Employee Benefits Matters. ..........................................68
Section 4.12.  Taxes. ................................................................................................70
Section 4.13.  Brokers..............................................................................................71
Section 4.14.  Cultural Business ..............................................................................72
Section 4.15.  Representations and Warranties by the Other Sellers.....................72
        4.15.1. Organization and Corporate Power............................................72
        4.15.2. Authorization; Binding Effect; No Breach. ..............................72

**ARTICLE V COVENANTS AND OTHER AGREEMENTS................................................73**

Section 5.1.   U.S. Bankruptcy Actions ..................................................................73
Section 5.2.   Canadian Bankruptcy Actions. ........................................................74
        5.2.1. Canadian Sales Process Order ..................................................74
        5.2.2. Canadian Approval and Vesting Order......................................74
        5.2.3. Additional Requests...................................................................75
Section 5.3.   Consultation; Notification.................................................................75
Section 5.4.   Pre-Closing Cooperation...................................................................76
Section 5.5.   Antitrust and Other Regulatory Approvals.......................................77
Section 5.6.   Pre-Closing Access to Information....................................................80
Section 5.7.   Public Announcements. .....................................................................82
Section 5.8.   Further Actions ..................................................................................83
Section 5.9.   Conduct of Business ..........................................................................83
Section 5.10.  Transaction Expenses.........................................................................85
Section 5.11.  Confidentiality. ..................................................................................85
Section 5.12.  Certain Payments or Instruments Received from Third Parties.................86
Section 5.13.  Non-Assignable Contracts. ................................................................87
Section 5.14.  Bundled Contracts..............................................................................88
Section 5.15.  Post-Closing Assistance for Litigation. ...........................................90
Section 5.16.  Delivery of Assets..............................................................................91
Section 5.17.  Termination of Overhead and Shared Services and French
Company Licenses............................................................................91

ii

Section 5.18.  Financing.......................................................................................92
Section 5.19.  Insurance Matters.............................................................................93
Section 5.20.  Deposits, Guarantees and Other Credit Support of the Business...............94
Section 5.21.  Use of Trademarks...........................................................................94
Section 5.22.  Maintenance of Books and Records. ...................................................95
Section 5.23.  Certain Ancillary Agreements............................................................96
Section 5.24.  Closing Unaudited Financial Statements..............................................97
Section 5.25.  Closing Audited Financial Statements.................................................98
Section 5.26.  Additional Bankruptcy Proceedings; Adverse International
                Injunctions.....................................................................................98
Section 5.27.  Transition Services Agreement...........................................................99
Section 5.28.  Avoidance Actions...........................................................................99
Section 5.29.  Competing Transaction......................................................................99
Section 5.30.  Purchaser Financial Statements ........................................................100
Section 5.31.  Subleases......................................................................................101
Section 5.32.  Direct Leases.................................................................................101
Section 5.33.  Licenses.......................................................................................101

ARTICLE VI TAX MATTERS......................................................................................101

Section 6.1.   Transfer Taxes. ..............................................................................101
Section 6.2.   Withholding Taxes...........................................................................102
Section 6.3.   Tax Characterization of Payments Under This Agreement ......................103
Section 6.4.   Apportionment of Taxes. .................................................................103
Section 6.5.   Records ........................................................................................103
Section 6.6.   Tax Disclosure ...............................................................................105
Section 6.7.   Tax Returns....................................................................................105
Section 6.8.   Canadian Tax Matters.......................................................................107
Section 6.9.   Purchase Price Allocation. ................................................................107
Section 6.10.  Other Tax Matters ..........................................................................108
Section 6.11.  North American Tax Escrow ..............................................................109

ARTICLE VII EMPLOYMENT MATTERS ....................................................................111

Section 7.1.   Employment Obligations with Respect to Non-Union Employees .........111
   7.1.1.     Employment Terms.............................................................................111
   7.1.2.     Employee Benefits.............................................................................114
Section 7.2.   Employment Obligations with Respect to Union Employees.................117
Section 7.3.   Excluded Employee Liabilities ..........................................................118
Section 7.4.   Other Employee Covenants. ..............................................................118
Section 7.5.   Canadian Pension Plans....................................................................121
Section 7.6.   Sole Benefit of the Sellers and the Purchaser ......................................123

ARTICLE VIII CONDITIONS TO THE CLOSING ...........................................................124

Section 8.1.   Conditions to Each Party's Obligation ................................................124
Section 8.2.   Conditions to Sellers' Obligation.......................................................125
Section 8.3.   Conditions to Purchaser's Obligation .................................................125

**ARTICLE IX TERMINATION** ...................................................................................................126

    Section 9.1.   Termination.........................................................................................126
    Section 9.2.   Expense Reimbursement and Break-Up Fee. .........................................128
    Section 9.3.   Effects of Termination .........................................................................129

**ARTICLE X MISCELLANEOUS** ...........................................................................................130

    Section 10.1.  No Survival of Representations and Warranties or Covenants................130
    Section 10.2.  Remedies...........................................................................................130
    Section 10.3.  No Third Party Beneficiaries ...............................................................130
    Section 10.4.  Consent to Amendments; Waivers.........................................................130
    Section 10.5.  Successors and Assigns........................................................................131
    Section 10.6.  Governing Law; Submission to Jurisdiction; Waiver of Jury Trial.........131
    Section 10.7.  Notices ..............................................................................................133
    Section 10.8.  Exhibits; Sellers Disclosure Schedule. ..................................................135
    Section 10.9.  Counterparts.......................................................................................135
    Section 10.10. No Presumption .................................................................................135
    Section 10.11. Severability ........................................................................................135
    Section 10.12. Entire Agreement. ..............................................................................136
    Section 10.13. Availability of Equitable Relief; Sole Remedy .......................................136
    Section 10.14. Bulk Sales Laws..................................................................................137
    Section 10.15. Main Sellers as Representatives of Other Sellers. ...................................137
    Section 10.16. Execution by Other Sellers ..................................................................137
    Section 10.17. Obligations of the Sellers.....................................................................138

**EXHIBITS**

Exhibit A – Other Sellers

Exhibit B – EMEA Sellers

Exhibit C – Canadian Debtors; U.S. Debtors; EMEA Debtors; Israeli Companies; Non-Debtor Sellers

Exhibit D – EMEA Asset Sale Agreement

Exhibit E – Adjusted Net Working Capital Statement

Exhibit F – Contract Manufacturing Inventory Agreements Term Sheet

Exhibit G – [Reserved]

Exhibit H – Form of Intellectual Property License Agreement

Exhibit I – Knowledge of the Purchaser

Exhibit J – Form of Loaned Employee Agreement

Exhibit K – Mandatory Antitrust Approvals - Relevant Antitrust Authorities

Exhibit L – Other Seller Revenue

Exhibit M – Real Estate Terms and Conditions

Exhibit N – Form of Trademark License Agreement

Exhibit O – Form of Transition Services Agreement

Exhibit 3.3(a) – Commitment Letter

Exhibit 5.1(a) – Form of U.S. Bidding Procedures Order

Exhibit 5.1(b) – Form of U.S. Sale Order

Exhibit 5.2.1 – Form of Canadian Sales Process Order

Exhibit 5.2.2 – Form of Canadian Approval and Vesting Order

Exhibit 5.4(a) – Form of Letter

Exhibit 5.4(c) – Form of Notice to Microsoft Corporation

Exhibit 5.4(d) – Cross-Licenses for Spin-Out

Exhibit 5.7 – Permitted Disclosures and Announcements

Exhibit 5.15(c) – Cross-Licenses for Assignment

Exhibit 5.23 – Interdependencies in the CVAS Business

Exhibit 5.27 –Transition Services Agreement

## ASSET SALE AGREEMENT

This Asset Sale Agreement is dated as of December 22, 2009, among Nortel Networks Corporation, a corporation organized under the laws of Canada ("**NNC**"), Nortel Networks Limited, a corporation organized under the laws of Canada ("**NNL**"), Nortel Networks Inc., a corporation organized under the laws of Delaware ("**NNI**" and, together with NNC and NNL, the "**Main Sellers**"), the Other Sellers (as defined below) (the Other Sellers, together with the Main Sellers, the "**Sellers**") and GENBAND Inc., a corporation organized under the laws of Delaware (the "**Purchaser**").

### W I T N E S S E T H:

WHEREAS, the Sellers and the affiliates of the Main Sellers listed in Exhibit B hereto (the "**EMEA Sellers**"), beneficially own and operate the Business (as defined below);

WHEREAS, on the Petition Date (as defined herein), NNC, NNL and the Other Sellers listed in part 1 of Exhibit C hereto (together, the "**Canadian Debtors**") filed with the Canadian Court (as defined below) an application for protection under the Companies' Creditors Arrangement Act (the "**CCAA**") (the proceedings commenced by such application, the "**CCAA Cases**") and were granted certain initial creditor protection pursuant to an order issued by the Canadian Court on the same date, which also appointed Ernst & Young Inc. as "Monitor" in connection with the CCAA Cases and has been extended by further order of the Canadian Court from time to time, most recently on December 18, 2009, as the same may be amended and restated from time to time by the Canadian Court;

WHEREAS, NNI and the Other Sellers listed in part 2 of Exhibit C hereto (the "**U.S. Debtors**") are debtors-in-possession under the U.S. Bankruptcy Code (as defined below) having commenced cases under Chapter 11 of the U.S. Bankruptcy Code on the Petition Date by filing voluntary petitions for relief in the U.S. Bankruptcy Court for the District of Delaware (the "**Chapter 11 Cases**");

WHEREAS, the entities listed under the heading "EMEA Debtors" in part 3 of Exhibit C hereto (the "**EMEA Debtors**") on the Petition Date filed applications with the English Court (as defined below), pursuant to the Insolvency Act of 1986, as amended (the "**Insolvency Act**") and the European Union's Council Regulation (EC) No 1346/2000 on Insolvency Proceedings (the proceedings commenced by such applications, the "**EMEA Cases**") and the English Court appointed Alan Bloom, Stephen Harris, Christopher Hill and Alan Hudson of Ernst & Young LLP as joint administrators of all the EMEA Debtors (other than Nortel Networks (Ireland) Limited, for which David Hughes of Ernst & Young Chartered Accountants and Alan Bloom serve as joint administrators) (the "**Joint Administrators**") under the Insolvency Act;

WHEREAS, the entities listed under the heading "Israeli Companies" in part 4 of Exhibit C hereto (the "**Israeli Companies**") on January 18, 2009 filed applications with the Tel-Aviv-Jaffa District Court (the "**Israeli Court**"), pursuant to the Israeli Companies Law, 1999, and the regulations relating thereto (collectively, the "**Israeli Companies Law**") for a stay of proceedings, and the Israeli Court appointed Yaron Har-Zvi and Avi D. Pelossof (the "**Joint**

1

Israeli Administrators") on January 19, 2009, as joint administrators of the Israeli Companies under the Israeli Companies Law;

WHEREAS, the Other Sellers listed in part 4 of Exhibit C hereto (the "Non-Debtor Sellers") are not subject to any Bankruptcy Proceedings (as defined below) as of the date hereof;

WHEREAS, the Sellers have agreed to transfer to the Purchaser and/or the Designated Purchasers (as defined below), and the Purchaser has agreed to purchase and assume, and cause the Designated Purchasers to purchase and assume, including, to the extent applicable, pursuant to Sections 363 and 365 of the U.S. Bankruptcy Code and pursuant to the Canadian Approval and Vesting Order, the Assets and the Assumed Liabilities (each as defined below) from the Sellers, upon the terms and conditions set forth hereinafter;

WHEREAS, simultaneously with the execution of this Agreement, the EMEA Sellers, the Joint Administrators, the Joint Israeli Administrators and the Purchaser are entering into a separate agreement in the form set forth in Exhibit D hereto (the "EMEA Asset Sale Agreement") providing for the sale to the Purchaser (and/or the EMEA Designated Purchasers (as defined therein)) of the assets of the Business held by the EMEA Sellers;

WHEREAS, the Parties (as defined below) acknowledge and agree that the purchase by the Purchaser (and the Designated Purchasers, if any) of the Assets and the EMEA Assets (as defined below), the license of Intellectual Property under the Intellectual Property License Agreement and the Trademark License Agreement (each as defined below), and the assumption by the Purchaser and the Designated Purchasers of the Assumed Liabilities and the EMEA Assumed Liabilities (as defined below) are being made at arm's length and in good faith and without intent to hinder, delay or defraud creditors of the Sellers and their Affiliates, and each Seller acknowledges that the consideration to be paid is fair value and reasonably equivalent value for the acquisitions by the Purchaser and the Designated Purchasers of the Assets and the EMEA Assets, the license of Intellectual Property under the Intellectual Property License Agreement and the Trademark License Agreement and the assumption by the Purchaser and the Designated Purchasers of the Assumed Liabilities and the EMEA Assumed Liabilities, as set forth hereunder and in the EMEA Asset Sale Agreement; and

WHEREAS, in addition, at the Closing, the Purchaser, certain Sellers (or Affiliates of the Sellers) and certain EMEA Sellers are entering into the following ancillary agreements: (i) the Local Sale Agreements, (ii) the Intellectual Property License Agreement, (iii) the Transition Services Agreement, (iv) the Trademark License Agreement, (v) the Loaned Employee Agreement and the Purchaser will use its commercially reasonable efforts to negotiate in good faith and enter into the following agreements with the applicable parties thereto: (vi) specified development and supply agreements with respect to interdependencies of the Business as contemplated in Section 5.23, (vii) the Subcontract Agreement, (viii) the Contract Manufacturing Inventory Agreements, (ix) the LGN Distribution Agreement and (x) the NN Turkey Agreements (together, the "Ancillary Agreements").

NOW, THEREFORE, in consideration of the respective covenants, representations and warranties made herein, and of the mutual benefits to be derived hereby (the sufficiency of which is acknowledged), the Parties agree as follows:

2

## ARTICLE I

## INTERPRETATION

Section 1.1.    Definitions.  Capitalized terms used but not otherwise defined herein shall have the meanings set forth below:

"**Accounting Arbitrator**" has the meaning set forth in Section 2.2.3.1(c).

"**Accrued Vacation Amount**" means the amount of compensation with respect to the accrued and unused vacation with respect to each Specified Transferred Employee (including all Taxes required to be withheld on behalf of the applicable Specified Transferred Employee by his or her respective employer) calculated by taking, with respect to each such employee an amount equal to (i) the product of (A) a number (not less than zero) of such employee's accrued and unused vacation hours as of the Closing Date as set forth on Section 7.1.2(c)(iii) of the Sellers Disclosure Schedule of this Agreement for Specified Transferred Employees and (B) such employee's hourly rate of pay (with such hourly rate of pay derived by dividing such employee's annual base salary set forth on Section 4.11(b) of the Sellers Disclosure Schedule by the number of standard work hours per year for such employee).

"**Action**" means any litigation, action, hearing, investigation, suit (whether civil, criminal or administrative), charge, binding arbitration, Tax audit or other legal, administrative or judicial proceeding.

"**Additional Bankruptcy Proceeding**" has the meaning set forth in Section 5.26(a).

"**Additional Employees**" has the meaning set forth in Section 7.1.1(a).

"**Adjusted Net Working Capital**" has the meaning set forth in Section 2.2.2(c).

"**Adjusted Net Working Capital Statement**" means the statement of certain specified asset and liability accounts and certain accounting principles, methodologies and policies used in the determination of such accounts in the form provided in Exhibit E hereto.

"**Adverse International Injunction**" has the meaning set forth in Section 5.26(a).

"**Affiliate**" means, as to any Person, any other Person that directly or indirectly through one or more intermediaries Controls, or is under common Control with, or is Controlled by, such Person; provided, that (i) no EMEA Seller or Subsidiary of an EMEA Seller (other than those Subsidiaries that are Sellers hereunder) shall be deemed an Affiliate of any Seller, and (ii) no joint venture listed in Section 1.1(a) of the Sellers Disclosure Schedule shall be deemed an Affiliate of any Seller.

"**Aggregate Escrow Amount**" means the aggregate of the Purchase Price Escrow Amount, the TSA Escrow Amount, the Tax Escrow Amount and the EMEA Tax Escrow Amount.

3

"**Agreement**" means this Asset Sale Agreement, the Sellers Disclosure Schedule and all Exhibits and Schedules attached hereto and thereto and all amendments hereto and thereto made in accordance with Section 10.4.

"**Alternative Bidder**" has the meaning set forth in the Bidding Procedures.

"**Alternative Transaction**" means (A) the sale, transfer or other disposition, directly or indirectly, including through an asset sale, stock sale, merger, amalgamation, plan of arrangement or other similar transaction, of all or a substantial portion of the Business or all or a substantial portion of the Assets and the EMEA Assets, considered as a whole, in a transaction or a series of transactions (x) with one or more Persons other than the Purchaser and/or its Affiliates or (y) with a Successful Bidder, and other than the Purchaser, which may include multiple bidders whose bids are combined or (B) the retention by all or part of the Sellers (or their successor entities emerging from the Bankruptcy Proceedings) of all or a majority of the Business, or all or a majority of the Assets and the EMEA Assets taken as a whole, pursuant to a plan of reorganization under Section 1129 of the Bankruptcy Code filed or otherwise sponsored by one or more third-party creditors of the Sellers pursuant to which all or a majority of the reorganized entity or its assets is acquired by one or more Persons (other than the third-party creditors or the Purchaser and/or the Purchaser's Affiliates) in a transaction announced prior to such reorganization or within six (6) months of such reorganization, rather than being retained by the creditors generally, provided, however, that an "Alternative Transaction" shall not include (i) except as specified in clause (B) above, the retention of all or any portion of the Business, the Assets or the EMEA Assets by all or part of the Sellers (or their successor entities emerging from the Bankruptcy Proceedings) under a standalone plan of reorganization or plan of arrangement approved by the U.S. Bankruptcy Court or another Bankruptcy Court or any plan of arrangement approved by the Canadian Court, or (ii) the sale, transfer or other disposition, directly or indirectly, of any portion of the Business, the Assets or the EMEA Assets (other than as a going concern) in connection with the closure, liquidation or winding up of the Business or any of the Sellers.

"**Ancillary Agreements**" has the meaning set forth in the recitals to this Agreement.

"**Antitrust Approvals**" means the HSR Approval, the Competition Act Approval and the Mandatory Antitrust Approvals.

"**Antitrust Laws**" means the Competition Act, the HSR Act, and any competition, merger control and antitrust Law of the European Union, any applicable European Union member states and EFTA states, and any other applicable supranational, national, federal, state, provincial or local Law designed or intended to prohibit, restrict or regulate actions having the purpose or effect of monopolizing or restraining trade or lessening competition of any other country or jurisdiction, to the extent applicable to the transactions contemplated by this Agreement or by the EMEA Asset Sale Agreement.

"**ARD Transferring Employees**" has the meaning set forth in the EMEA Asset Sale Agreement.

"**Assets**" has the meaning set forth in Section 2.1.1.

4

"**Assigned Contracts**" means (i) the Assumed and Assigned Contracts, (ii) the Designated Non-365 Contracts (iii) the Inbound License Agreements that are used, as of the date hereof, exclusively in connection with the Business or any Asset and pursuant to their terms are assignable by the Seller party thereto at no cost to such Seller, or to the extent assignable by such Seller with an associated cost, where Purchaser pays such associated cost to obtain such assignment, and (iv) specified contracts as described in Sections 5.13 and 5.14.

"**Assumed and Assigned Contracts**" has the meaning set forth in Section 2.1.5(f).

"**Assumed and Subleased Real Estate Leases**" has the meaning set forth in Section 2.1.5(b).

"**Assumed Liabilities**" has the meaning set forth in Section 2.1.3.

"**Audited Financial Statements**" has the meaning set forth in Section 4.7(a).

"**Bankruptcy Consents**" has the meaning set forth in Section 4.1(a).

"**Bankruptcy Court**" means the U.S. Bankruptcy Court, the Canadian Court, the English Court, the Israeli Court or any other court before which Bankruptcy Proceedings are held.

"**Bankruptcy Laws**" means the U.S. Bankruptcy Code, the CCAA, the Insolvency Act, the Israeli Companies Law and the other applicable bankruptcy, insolvency, administration or similar Laws of any jurisdiction where Bankruptcy Proceedings are held.

"**Bankruptcy Proceedings**" means the Chapter 11 Cases, the CCAA Cases, the EMEA Cases, and, in each case, any proceedings thereunder, as well as any other voluntary or involuntary bankruptcy, insolvency, administration or similar judicial proceedings concerning any of the Sellers or the EMEA Sellers that are held from time to time.

"**Base Purchase Price**" has the meaning set forth in Section 2.2.1.

"**Bid**" means any bid, proposal, offer or quotation which, if accepted, would result in the award of a Contract.

"**Bidding Procedures**" means the procedures to be employed with respect to the proposed sale of the Assets and the assumption of the Assumed Liabilities to be approved by the U.S. Bankruptcy Court and the Canadian Court pursuant to the U.S. Bidding Procedures Order and the Canadian Sales Process Order, respectively.

"**Break-Up Fee**" means five million dollars ($5,000,000).

"**Bundled Contracts**" has the meaning set forth in Section 5.14.

"**Business**" means, collectively:

      (i)     the business through which the Sellers and the EMEA Sellers research, advertise, design, develop, process components, directly or indirectly manufacture

5

through contract manufacturers, finally assemble, test, support, use, market, distribute and sell globally to carriers, channel partners and any other counterparty to a customer Contract that is not a carrier or channel partner, the CVAS Products (as defined below), including prior versions (if currently supported or if any Contract existing as of the date hereof related to the Business requires the support of such prior versions), current versions and future versions listed in the Plan of Record; and

      (ii)    the following services, to the extent provided, or being developed, in relation to the CVAS Products, that the Sellers and the EMEA Sellers market, advertise, distribute and sell globally to carriers, channel partners and any other counterparty to a customer Contract that is not a carrier or channel partner: (A) network implementation services, consisting of the configuration, planning, installation and integration of a network migration, upgrade or green-field deployment into a new or existing network, including design and deploy services, audit and optimization services, and operations support system services; (B) network support services, including technical support, technical account manager service, network prime engineer service, online support and technical support for special projects, repair services, managed spares service, Third Party products spares management service, corrective content management, network discovery services, engineering helpdesk, network configuration, and software release services; and (C) assisted operator services (which are resources provided to customers of CVAS Products for a limited period of time to provide an initial knowledge transfer of CVAS Products) (collectively, the "**CVAS Services**");

all as conducted by the Sellers and the EMEA Sellers as of the date of this Agreement, but excluding, in each of clauses (i) and (ii) above: (A) any business, asset, product or service run, owned, managed and/or provided by the LGN Joint Venture, NN Turkey or GDNT; (B) any Excluded Asset; (C) Overhead and Shared Services (other than Transferred Overhead and Shared Services); and (D) any products and/or services provided by businesses or business segments of any Seller or EMEA Seller other than those specified in clauses (i) and (ii) above, including for the avoidance of doubt, the Excluded Products and Services.

      "**Business Day**" means a day on which the banks are opened for business (Saturdays, Sundays, statutory and civic holidays excluded) in (i) New York, New York, United States, (ii) Toronto, Ontario, Canada, and (iii) London, England, United Kingdom.

      "**Business Information**" means, whether in paper, digital or other tangible form, (i) if used exclusively in connection with the Business, all books, records, files, ledgers, sales literature or similar documents in the possession or under control of the Sellers and that, in each case, is used exclusively in connection with the Business, including information on past, present and prospective customers and suppliers, policies and procedures, Owned Equipment manuals and materials and procurement documentation exclusively used in the Business or in respect of any Asset or Assumed Liability, documents containing information relating to the research and development of the CVAS Products or the CVAS Services (whether relating to activities by the Sellers and the EMEA Sellers associated with the CVAS Products and CVAS Services as of the Closing or any time prior thereto), documents containing technical information, operating and production records, quality control records, blueprints, research and development notebooks and

6

files, customer credit data, manuals, documents containing engineering and scientific data, sales and promotional literature, drawings, technical plans, business plans, budgets and price lists and (ii) if used, but not exclusively, in connection with the Business or in respect of any Asset or Assumed Liability, to the extent reasonably separable from such items of any other business of the Sellers, copies of all books, records, files, ledgers, documentation, sales literature or similar documents in the possession or under control of the Sellers (including information on past, present and prospective customers and suppliers), policies and procedures and materials and procurement documentation used in the Business or in respect of any Asset or Assumed Liability, financial records, documents containing information relating to the research and development of the CVAS Products or the CVAS Services (whether relating to activities by the Sellers and the EMEA Sellers associated with the CVAS Products and CVAS Services as of the Closing or any time prior thereto), documents containing technical information, operating and production records, quality control records, blueprints, research and development notebooks and files, customer credit data, manuals, documents containing engineering and scientific data, sales and promotional literature, drawings, technical plans, business plans, budgets and price lists; provided, that with regards to copies provided pursuant to clause (ii) Business Information shall not include the competitively sensitive portions of the foregoing that relate to Excluded Assets, Excluded Liabilities or other business lines of the Sellers, and provided, further, that Business Information shall not include the Employee Records.

"**Business Registered IP**" has the meaning set forth in Section 4.5(b).

"**Canadian Approval and Vesting Order**" has the meaning set forth in Section 5.2.2.

"**Canadian Approval and Vesting Order Motion**" has the meaning set forth in Section 5.2.2.

"**Canadian Court**" means the Ontario Superior Court of Justice.

"**Canadian DB Replacement Plan**" has the meaning set forth in Section 7.5(c).

"**Canadian Debtors**" has the meaning set forth in the recitals to this Agreement.

"**Canadian Non-Union DC Replacement Plan**" has the meaning set forth in Section 7.5(a).

"**Canadian Sales Process Order**" has the meaning set forth in Section 5.2.1.

"**Canadian Sales Process Order Motion**" has the meaning set forth in Section 5.2.1.

"**Canadian Union DC Replacement Plan**" has the meaning set forth in Section 7.5(d).

"**CCAA**" has the meaning set forth in the recitals to this Agreement.

"**CCAA Cases**" has the meaning set forth in the recitals to this Agreement.

"**Chapter 11 Cases**" has the meaning set forth in the recitals to this Agreement.

"**Claim**" has the meaning set forth in Section 101(5) of the U.S. Bankruptcy Code.

"**Claim Notice**" has the meaning set forth in Section 6.11(b).

"**Clean Team Confidentiality Agreement**" means the clean team confidentiality agreement by and between NNL and the Purchaser, dated as of June 22, 2009, as amended from time to time.

"**Clean Room Agreements**" means the Clean Team Confidentiality Agreement and any other agreements by and between NNL and the Purchaser and/or, where applicable, other persons, in relation to the operation of clean rooms or clean teams relating to the transactions contemplated by this Agreement or the EMEA Asset Sale Agreement.

"**Closing**" has the meaning set forth in Section 2.4.1.

"**Closing Adjusted Net Working Capital**" has the meaning set forth in Section 2.2.3.1(a).

"**Closing Aggregate Downward Adjustment**" has the meaning set forth in Section 2.2.3.1(a).

"**Closing Aggregate EMEA Downward Adjustment**" has the meaning set forth in Section 2.2.3.1(a).

"**Closing Aggregate EMEA Upward Adjustment**" has the meaning set forth in Section 2.2.3.1(a).

"**Closing Audited Financial Statements**" has the meaning set forth in Section 5.25.

"**Closing Contractual Liabilities Amount**" has the meaning set forth in Section 2.2.3.1(a).

"**Closing Date**" has the meaning set forth in Section 2.4.1.

"**Closing Accrued Vacation Amount**" has the meaning set forth in Section 2.2.3.1(a).

"**Closing Deferred Profit Amount**" has the meaning set forth in Section 2.2.3.1(a).

"**Closing EMEA Holiday Downward Adjustment**" has the meaning set forth in Section 2.2.3.1(a).

"**Closing Excess ARD Employees Amount**" has the meaning set forth in Section 2.2.3.1(a).

"**Closing French Excess ARD Employees Amount**" has the meaning set forth in Section 2.2.3.1.

"**Closing Inventory Value**" has the meaning set forth in Section 2.2.3.1(a).

"**Closing Pre-Close Employment Payments Amount**" has the meaning set forth in Section 2.2.3.1.

"**Closing Prepaid Expenses Amount**" has the meaning set forth in Section 2.2.3.1(a).

"**Closing Product Exposures Amount**" has the meaning set forth in Section 2.2.3.1(a).

"**Closing Royalty Liability Amount**" has the meaning set forth in Section 2.2.3.1(a).

"**Closing Specified Employee Liabilities Amount**" has the meaning set forth in Section 2.2.3.1(a).

"**Closing Statement**" has the meaning set forth in Section 2.2.3.1(a).

"**Closing TFR Amount**" has the meaning set forth in Section 2.2.3.1(a).

"**Closing Unaudited Financial Statements**" has the meaning set forth in Section 5.24.

"**Closing Unbilled Accounts Receivable Amount**" has the meaning set forth in Section 2.2.3.1(a).

"**Closing Warranty Provision Amount**" has the meaning set forth in Section 2.2.3.1(a).

"**COBRA**" means the continuation coverage required by Section 4980B of the Code or any similar Law.

"**Code**" means the United States Internal Revenue Code of 1986, as amended.

"**Collective Labor Agreement**" means any written agreement that a Person has entered into with any union or collective bargaining agent with respect to terms and conditions of employment of such Person's employees.

"**Commissioner**" means the Commissioner of Competition appointed under the Competition Act or any person duly authorized to exercise the powers and perform the duties of the Commissioner of Competition.

"**Competing Transaction**" has the meaning set forth in Section 5.29.

"**Competition Act**" means the Competition Act (Canada), R.S. 1985, C. C-34, as it is now in effect and as it may be amended.

"**Competition Act Approval**" means that: (i) the waiting period, including any extension thereof, under Section 123 of the Competition Act shall have expired or been terminated or the obligation to provide a pre-merger notification in accordance with Part IX of the Competition Act shall have been waived in accordance with paragraph 113(c) of the Competition Act, and in either case the Purchaser shall have been advised in writing by the Commissioner that he or she is of the view that grounds do not exist as of the date of the advice to initiate proceedings under the merger provisions of the Competition Act in respect of the transactions contemplated by this

Agreement or by the EMEA Asset Sale Agreement (as applicable) and such advice shall have not been rescinded or amended; or (ii) the Commissioner shall have issued an advance ruling certificate pursuant to Subsection 102(1) of the Competition Act to the effect that the Commissioner is satisfied that he or she would not have sufficient grounds upon which to apply to the Competition Tribunal for an order under Section 92 of the Competition Act with respect to the transactions contemplated by this Agreement or by the EMEA Asset Sale Agreement (as applicable).

"**Confidential Information**" has the meaning set forth in Section 5.11(b).

"**Confidentiality Agreement**" means the confidentiality agreement among the Purchaser and the Seller parties listed therein dated April 17, 2009, as amended.

"**Consent**" means any approval, authorization, consent, order, license, permission, permit, qualification, exemption or waiver by or notice to any Government Entity or other Third Party.

"**Contract**" means any binding contract, agreement, subcontract, purchase order, work order, sales order, indenture, note, bond, instrument, lease, mortgage, ground lease, commitment, covenant or undertaking.

"**Contract Designation Date**" means, (i) with respect to the 365 Contracts and Non-365 Contracts listed in the Sellers Disclosure Schedule as of the date hereof, the date that is sixty (60) days from the date hereof and (ii) with respect to any Contract that is added to the 365 Customer Contract List or the Non-365 Customer Contract List after the date hereof pursuant to Section 2.1.5(e) or 2.1.6(f), as applicable, the later of (A) the date that is sixty (60) days from the date hereof and (B) the date that is five (5) Business Days after such Contract is added to or included in the relevant list.

"**Contract Manufacturing Inventory Agreements**" means the agreements among the Purchaser and/or any Designated Purchasers, the relevant Sellers, and the contract manufacturers of the Business listed in Section 1.1(b) of the Sellers Disclosure Schedule that the relevant Parties will use their commercially reasonable efforts to execute on or before the Closing in the form that shall be negotiated in good faith pursuant to Section 5.23 and the term sheet attached hereto as Exhibit F.

"**Contractual Liabilities Amount**" means, as of any given date, the amount of contractual liabilities of the Business, net of applicable provisions, determined in accordance with the Nortel Accounting Principles.

"**Control**", including, with its correlative meanings, "Controlled by" and "under common Control with", means, in connection with a given Person, the possession, directly or indirectly, or as trustee or executor, of the power to either (i) elect more than fifty percent (50%) of the directors or governing body of such Person or (ii) direct or cause the direction of the management and policies of such Person, whether through the ownership of securities, contract, credit arrangement or otherwise.

10