relating to the payment or collection of material Taxes relating to any Asset or the Business (excluding the EMEA Business).

(d) There is no Lien for Taxes on any Asset other than Permitted Encumbrances.

(e) None of the Assets located within the United States or which is owned by a U.S. Debtor (i) is property required to be treated as being owned by another person pursuant to the provisions of Section 168(f)(8) of the Internal Revenue Code of 1954, as amended and in effect immediately prior to the enactment of the Tax Reform Act of 1986, (ii) constitutes "tax-exempt use property" within the meaning of Section 168(h)(1) of the Code or (iii) is "tax-exempt bond financed property" within the meaning of Section 168(g) of the Code.

(f) No Seller other than Sellers which are "United States persons" under section 7701 of the Code or applicable Treasury Regulations will transfer any United States real property interest (within the meaning of Section 897(c)(1) of the Code) to Purchaser or any Designated Purchaser pursuant to this Agreement.

(g) NNL and NNTC are duly registered for GST and for purposes of *An Act respecting the Quebec Sales Tax* ("QST") their registration numbers being as follows:

| **NNL:** | |
|----------|----------------------|
| GST # : | 11940 9258 RT0001 |
| QST #: | 1001830151 TQ0007 |
| | |
| **NNTC:** | |
| GST #: | 11880 2974 RT0001 |
| QST #: | 1000242965 TQ0008 |

(h) No Seller other than a Seller that is not a non-resident of Canada (as defined in the Income Tax Act (Canada)) will transfer property that is a taxable Canadian property (as defined in the Income Tax Act (Canada))

(i) Notwithstanding the foregoing, the representations and warranties set forth in Sections 4.12(a) through 4.12(c) shall not be applicable to the extent that no Asset can be made subject to a Tax Lien and neither the Purchaser nor any Designated Purchaser can be held liable for Taxes relating to any matter constituting a breach of any such representation or warranty.

Section 4.13.  Brokers.  Except for fees and commissions that will be paid or otherwise settled or provided for by the Sellers, no broker, finder or investment banker is entitled to any brokerage, finder's or other similar fee or commission in connection with the transactions contemplated by this Agreement and the other Transaction Documents based upon arrangements made by or on behalf of the Sellers or any of their Affiliates.

Section 4.14.  Cultural Business.  The Assets are not used to provide any of the services, and are not engaged in any of the activities of a "cultural business" within the meaning of the Investment Canada Act.

Section 4.15.  Representations and Warranties by the Other Sellers.  Except as set forth in the Sellers Disclosure Schedule, each Other Seller severally but not jointly will, as of the date such Other Seller will execute this Agreement pursuant to Section 10.16, represent and warrant to the Purchaser as follows:

4.15.1. Organization and Corporate Power.

(a)  Such Other Seller is duly organized and validly existing under the Laws of the jurisdiction in which it is organized.  Subject to the receipt of the Bankruptcy Consents, at the time it executes this Agreement, such Other Seller will have the requisite corporate power and authority to enter into, deliver and perform its obligations pursuant to each of the Transaction Documents to which it is a party or, at the Closing Date, will become a party.

(b)  Such Other Seller is duly qualified or licensed to do business and to own, lease and operate its assets, including the Assets, and to carry on the Business (excluding the EMEA Business) as it is currently conducted, as applicable in each jurisdiction in which its ownership of property or conduct of business relating to the Business (excluding the EMEA Business) requires it to so qualify or to be so licensed, except to the extent that the failure to be so qualified or licensed would not have, or would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

4.15.2. Authorization; Binding Effect; No Breach.

(a)  Subject to the receipt of the Bankruptcy Consents, the execution, delivery and performance by such Other Seller of each Transaction Document to which such Other Seller will be a party will have been duly authorized by such Other Seller.  Subject to the receipt of the Bankruptcy Consents, and assuming due authorization, execution and delivery by the Purchaser, each Transaction Document to which such Other Seller will be a party constitutes a legal, valid and binding obligation of such Other Seller, enforceable against it in accordance with its terms, subject to (in the case of Non-Debtor Sellers) applicable bankruptcy, insolvency, reorganization, moratorium or other Laws affecting creditors' rights generally and subject to general principles of equity, regardless of whether considered in a proceeding in equity or at Law.

(b)  Subject to the receipt of the Bankruptcy Consents, the execution, delivery and performance by such Other Seller of the Transaction Documents to which such Other Seller will be a party will not conflict with or result in a breach of the terms, conditions or provisions of, constitute a default (or an event that, with notice or lapse of time or both, would become a default) under, result in a violation of, give to any Person any right of termination, amendment, modification, acceleration or cancellation or any preemptive right or right to the payment of any penalty under, result in the creation or imposition of any Lien upon any of the Assets owned by such Other Seller, or (subject to the receipt of Consents in connection with the Assigned Contracts and other Consents expressly provided for herein) require any Consent

72

(other than the Regulatory Approvals and the Bankruptcy Consents) or other action by or declaration or notice to any Government Entity pursuant to (i) the articles, charter or by-laws of such Other Seller, (ii) any Material Contract or Inbound License Agreement that is an Assigned Contract to which such Other Seller is a party or to which any of the Assets or the Business is subject or (iii) any Laws to which such Other Seller, or any of the Assets owned by such Other Seller, is subject, except, in the case of (ii) and (iii), for such defaults, violations, actions and notifications that would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

**ARTICLE V**

**COVENANTS AND OTHER AGREEMENTS**

Section 5.1.    U.S. Bankruptcy Actions.    On the timetables and subject to the terms set forth below, the Sellers who are U.S. Debtors shall (i) file with the U.S. Bankruptcy Court one or more motions and proposed orders as set forth below, (ii) notify, as required by the U.S. Bankruptcy Code, the U.S. Bankruptcy Rules, and an order of the U.S. Bankruptcy Court, all parties entitled to notice of such motions and orders, as modified by orders in respect of notice which may be issued at any time and from time to time by the U.S. Bankruptcy Court, and such additional parties as the Purchaser may reasonably request, and (iii) subject to the provisions of this Agreement, including the provisions of Section 9.1, and the U.S. Bidding Procedures Order, if entered, use their commercially reasonable efforts to obtain U.S. Bankruptcy Court approval of such orders.

(a) As promptly as practicable, the U.S. Debtors shall file with the U.S. Bankruptcy Court a motion (the "**U.S. Bidding Procedures and Sale Motion**") and two proposed orders substantially in the forms set forth in Exhibit 5.1(a) and Exhibit 5.1(b), without material modification thereto unless the parties consent in writing to such modification (which consent shall not be unreasonably withheld, conditioned or delayed) (as approved, the "**U.S. Bidding Procedures Order**" and the "**U.S. Sale Order**") seeking approval by the U.S. Bankruptcy Court of, respectively, (i) as for the U.S. Bidding Procedures Order, the Bidding Procedures and the provision of a Break-Up Fee and Expense Reimbursement, and (ii) as for the U.S. Sale Order, the sale of the Assets to the Purchaser or a Designated Purchaser and the assumption by the U.S. Debtors and assignment to the Purchaser or a Designated Purchaser of the Assumed and Assigned Contracts and the Assumed Liabilities pursuant to Sections 105, 363 and 365 of the U.S. Bankruptcy Code, as specified below.

(b) The Sellers who are U.S. Debtors shall use their commercially reasonable efforts to cause the U.S. Bankruptcy Court to (i) schedule a hearing to consider the U.S. Bidding Procedures and Sale Motion and (ii) enter the U.S. Bidding Procedures Order within fifteen (15) days of the filing of the U.S. Bidding Procedures and Sale Motion.

(c) The U.S. Bidding Procedures Order shall be substantially in the form of Exhibit 5.1(a) hereto (with such changes thereto as the Purchaser and the Seller both shall approve in writing (such approval not to be unreasonably withheld, conditioned or delayed)).

(d) The U.S. Sale Order shall be substantially in the form of Exhibit 5.1(b) hereto (with such changes thereto as the Purchaser and the Sellers both shall approve in writing, such approval not to be unreasonably withheld, conditioned or delayed) (it being understood that certain of such provisions must constitute findings of fact or conclusions of Law to be made by the U.S. Bankruptcy Court as part of the U.S. Sale Order).

(e) The U.S. Debtors shall request that the U.S. Bankruptcy Court schedule, subject to the availability of the U.S. Bankruptcy Court, a Sale Hearing on or prior to the fifth (5th) Business Day following the conclusion of the Auction and shall use their commercially reasonable efforts to cause the Sale Hearing to be heard on that date or the earliest date thereafter permitted by the Bankruptcy Court's schedule.

Section 5.2.    Canadian Bankruptcy Actions.

5.2.1.    Canadian Sales Process Order.  As promptly as practicable, but in no event later than the date on which the U.S. Bidding Procedures Order is granted, the Canadian Debtors shall file with the Canadian Court a motion (the "**Canadian Sales Process Order Motion**") and a proposed order seeking approval of the execution, delivery and performance of this Agreement, including payment of the Break-Up Fee, the Expense Reimbursement and a process for the sale of the Business, each substantially in the form set forth in Exhibit 5.2.1 (with such changes thereto as the Purchaser and the Sellers both shall approve in writing, such approval not to be unreasonably withheld, conditioned or delayed) (such order as approved, the "**Canadian Sales Process Order**").  The Canadian Sales Process Order shall be substantially in the form of Exhibit 5.2.1 (with such changes thereto as the Purchaser and the Sellers both shall approve in writing (such approval not to be unreasonably withheld, conditioned or delayed) (it being understood that certain of such provisions must constitute findings of fact or conclusions of Law to be made by the Canadian Court as part of the Canadian Sales Process Order or endorsement thereof).

5.2.2.    Canadian Approval and Vesting Order.  As promptly as practicable, but in no event later than the date on which the U.S. Sale Order is granted, and subject to their rights and obligations set forth in the Canadian Sales Process Order, the Canadian Debtors shall file with the Canadian Court one or more motions (the "**Canadian Approval and Vesting Order Motion**") seeking an order substantially in the form set forth in Exhibit 5.2.2 (with such changes thereto as the Purchaser and the Sellers both shall approve in writing, such approval not to be unreasonably withheld, conditioned or delayed) (such order as approved, the "**Canadian Approval and Vesting Order**") of the Canadian Court approving this Agreement and the transactions contemplated herein.  The Canadian Approval and Vesting Order shall be substantially in the form of Exhibit 5.2.2 hereto (with such changes thereto as the Purchaser and the Sellers both shall approve in writing, such approval not to be unreasonably withheld, conditioned or delayed) (it being understood that certain of such provisions must constitute findings of fact or conclusions of Law to be made by the Canadian Court as part of the Canadian Approval and Vesting Order or endorsement thereof).

5.2.3.  Additional Requests.  In connection with the foregoing, the Canadian Debtors shall seek in good faith in the Canadian Approval and Vesting Order Motion to (i) have the Canadian Approval and Vesting Order include a finding that, to the extent permitted by Law, neither the Purchaser nor any relevant Designated Purchaser is a successor to the Sellers or their bankruptcy estate by reason of any theory of law or equity, and neither the Purchaser nor any Designated Purchaser shall assume or in any way be responsible for any Liability of any of the Sellers and/or their bankruptcy estates, except as otherwise expressly provided in this Agreement or the Transaction Documents; and (ii) have the endorsement of the Canadian Approval and Vesting Order or the order itself, include a finding that the consideration provided by the Purchaser and any Designated Purchaser pursuant to this Agreement constitutes reasonably equivalent value and fair consideration for the Assets. For greater certainty, nothing herein shall require the items in the preceding sentence to be included in the Canadian Approval and Vesting Order or any endorsement thereof, notwithstanding that such provisions may be included in the form of the order set forth in Exhibit 5.2.2.

Section 5.3.    Consultation; Notification.

(a)  The Purchaser and the U.S. Debtors shall cooperate with filing and prosecuting the U.S. Bidding Procedures and Sale Motion, and obtaining entry of the U.S. Bidding Procedures Order and the U.S. Sale Order, and the U.S. Debtors shall deliver to the Purchaser prior to filing, and as early in advance as is practicable to permit adequate and reasonable time for the Purchaser and its counsel to review and comment, copies of all proposed pleadings, motions, responses to objections, notices, statements, schedules, applications, reports and other material papers to be filed by the U.S. Debtors in connection with such motions and relief requested therein and any challenges thereto.

(b)  The Purchaser and the Canadian Debtors shall cooperate with filing and prosecuting the Canadian Sales Process Order Motion and the Canadian Approval and Vesting Order Motion, and obtaining issuance and entry of the Canadian Sales Process Order and the Canadian Approval and Vesting Order, and the Canadian Debtors shall deliver to the Purchaser prior to filing, and as early in advance as is practicable to permit adequate and reasonable time for the Purchaser and its counsel to review and comment, copies of all proposed pleadings, motions, responses to objections, notices, statements schedules, applications, reports and other material papers to be filed by the Canadian Debtors in connection with such motions and relief requested therein and any challenges thereto.

(c)  If the U.S. Sale Order or any other order of the U.S. Bankruptcy Court relating to this Agreement shall be appealed by any Person (or a petition for certiorari or motion for rehearing, re-argument or stay shall be filed with respect thereto), the U.S. Debtors agree to, and to cause their Affiliates to, use their commercially reasonable efforts, to defend against such appeal, petition or motion, and the Purchaser agrees to cooperate in such efforts. Each of the Parties hereby agrees to use its commercially reasonable efforts to obtain an expedited resolution of such appeal; provided, however, that, subject to the conditions set forth herein, nothing contained in this Section 5.3(c) shall preclude the Parties from consummating, or permit the Parties not to consummate, the transactions contemplated hereby if the U.S. Sale Order shall have been entered and shall not have been stayed, modified, revised or amended, in which event the Purchaser and the relevant Designated Purchasers shall be able to assert the

75

benefits of Section 363(m) of the U.S. Bankruptcy Code and, as a consequence of which, such appeal shall become moot.

(d) If the Canadian Approval and Vesting Order or any other order of the Canadian Court relating to this Agreement shall be appealed by any Person (or a petition for certiorari or motion for rehearing, re-argument or stay shall be filed with respect thereto), the Canadian Debtors agree to, and to cause their Affiliates to, take all reasonable steps, and use their commercially reasonable efforts, to defend against such appeal, petition or motion, and the Purchaser agrees to cooperate in such efforts. Each of the Parties hereby agrees to use its commercially reasonable efforts to obtain an expedited resolution of such appeal; provided, however, that, subject to the conditions set forth herein, nothing in this Section 5.3(d) shall preclude the Parties from consummating, or permit the Parties not to consummate, the transactions contemplated hereby if the Canadian Approval and Vesting Order shall have been entered and shall not have been stayed, modified, revised or amended.

Section 5.4.    Pre-Closing Cooperation.

(a) Prior to, and in connection with, the Closing, upon the terms and subject to the conditions of this Agreement, each of the Parties shall use its commercially reasonable efforts to take, or cause to be taken, all actions and to do, or cause to be done, and cooperate with each other in order to do, all things necessary, proper or advisable under applicable Law to consummate the transactions contemplated by this Agreement as soon as practicable and cause the fulfillment at the earliest practicable date of all of the conditions to the other Parties' obligations to consummate the transactions contemplated by this Agreement, including: (i) the preparation and filing of all forms, registrations, notices, applications and submissions required or advisable to be filed to consummate the Closing and the taking of such actions as are necessary to obtain any requisite Consent (other than Consents in respect of Assigned Contracts, which are covered by Section 2.1.7(d)); provided that the Sellers shall not be obligated to make any payment or deliver anything of value to any Third Party (other than filing and application fees to Government Entities, all of which shall be paid or reimbursed by the Purchaser) in order to obtain any Consent; (ii) defending all Actions by or before any Government Entity challenging this Agreement or the consummation of the Closing, (iii) using commercially reasonable efforts to cause to be lifted or rescinded any injunction, decree, ruling, order or other action of any Government Entity that would prohibit, prevent, restrict or materially delay the consummation of the transactions contemplated by this Agreement, and (iv) cooperating in any reorganization of the Sellers that the Sellers consider necessary for the Sellers to facilitate the transactions contemplated hereby, any such reorganization to occur on or prior to the Closing Date. With respect to all supply Contracts related to the Business, after the entry of the U.S. Sale Order, and in respect of the Canadian Debtors, after the entry of the Canadian Sales Process Order, the Sellers shall (i) at the Purchaser's request to the extent permitted by Law (including any applicable Antitrust Laws), send a letter substantially in the form set forth in Exhibit 5.4(a) to each of the counterparties to such Contracts, as identified in writing to by the Purchaser to the Main Sellers, and (ii) provide to the Purchaser such contact information as is reasonably requested by the Purchaser with respect to the counterparties to such Contracts.

(b) Each Primary Party shall promptly notify the other Primary Party of the occurrence, to such Party's Knowledge, of any event or condition, or the existence, to such Party's Knowledge, of any fact, that would reasonably be expected to result in any of the conditions set forth in ARTICLE VIII not being satisfied.

(c) NNC and NNL shall execute at Closing, upon the Purchaser's request, a written notice to Microsoft Corporation, which notice will be substantially in the form set forth in Exhibit 5.4(c), notifying Microsoft Corporation that the Sellers have sold the Business to Purchaser at Closing, that the Business is an "Eligible Spin Off" (as defined in the Patent Cross-License Agreement dated as of July 17, 2006 among Microsoft Corporation, NNC and NNL), and that as such it will receive an "Extended License" in accordance with the terms of such agreement, and the Sellers agree that the Business shall receive such an "Extended License."

(d) NNC and NNL shall execute at Closing, upon the Purchaser's request, such documents as reasonably requested by the Purchaser and as contemplated or otherwise permitted under the Cross-License Agreements listed on Exhibit 5.4(d) in order to provide a sublicense to the Business (to the extent permitted thereunder) or trigger any spin-off right thereunder, such that the Business may continue to be licensed or sublicensed thereunder, all in accordance with the relevant Section of each such Cross-License Agreement that permits NNC or NNL to sublicense or spin off the license granted to NNC or NNL thereunder to a divested business unit or product line. To the extent that any Cross-License Agreement listed in Exhibit 5.4(d) contains a limitation on the number of times the relevant Seller may exercise any sublicense or spin off rights thereunder and such rights have not been exhausted prior to the date hereof, the Sellers agree that they shall not exhaust any such rights they may have between the date hereof and the Closing in a manner that would render this Section 5.4(d) ineffective. Notwithstanding the foregoing, the Sellers shall be under no obligation to execute any such documents prior to the completion of the Auction or to expend any amount (other than as directly resulting from the execution of relevant documents), incur any Liability or provide any other consideration in complying with their obligations under this Section 5.4(d).

(e) Seller and Purchaser agree to negotiate in good faith to enter into the Real Estate Agreements provided for in this Agreement on the terms and conditions contained in and otherwise in accordance with the RETC.

Section 5.5.    Antitrust and Other Regulatory Approvals.

(a) In furtherance and not in limitation of the provisions of Section 5.4, each of the Parties agrees (i) to prepare and file as promptly as practicable, and in any event by no later than (a) fifteen (15) Business Days from the date of this Agreement if the Agreement is executed on or before December 31, 2009 or (b) ten (10) Business Days from the date of this Agreement if the Agreement is executed on or after January 1, 2010, an appropriate filing of a Notification and Report Form pursuant to the HSR Act and a request for an advance ruling certificate pursuant to Section 102 of the Competition Act, and if deemed advisable by the Purchaser, acting reasonably, a pre-merger notification filing under the Competition Act and (ii) prepare and file as promptly as practicable, and in any event by no later than twenty (20) Business Days (thirty (30) Business Days in the case of filings under Antitrust Laws in Russia)

77

from the date of this Agreement all other necessary documents, registrations, statements, petitions, filings and applications for other Regulatory Approvals, and any other Consent of any other Government Entities either required or that the Primary Parties mutually agree are advisable to satisfy the condition set forth in Section 8.1(a).

(b) If a Party or any of its Affiliates receives a request for information or documentary material from any Government Entity with respect to this Agreement or any of the transactions contemplated hereby and/or by the EMEA Asset Sale Agreement, then such Party shall endeavor in good faith to make, or cause to be made, as soon as reasonably practicable and after consultation with the other Party, an appropriate response in compliance with such request.

(c) The Parties shall keep each other apprised of the status of matters relating to the completion of the transactions contemplated by this Agreement and/or by the EMEA Asset Sale Agreement and work cooperatively in connection with obtaining the Regulatory Approvals of each applicable Government Entity, including:

(i)      cooperating with each other in connection with filings required to be made by any Party under the applicable Antitrust Laws or any Laws regulating foreign investment of any jurisdiction in connection with the transactions contemplated by this Agreement and/or by the EMEA Asset Sale Agreement, and each Antitrust Approval, and liaising with each other in relation to each step of the procedure before the relevant Government Entities and as to the contents of all communications with such Government Entities. In particular, and except for any filings made pursuant to the Investment Canada Act, to the extent permitted by Law or Government Entity, no Party will make any notification or other filing with or to any Governmental Entity in relation to the transactions contemplated hereunder without first providing the other Parties or their respective outside counsels on an outside counsel only basis with a copy of such notification in draft form (except that with respect to the notification form required by the HSR Act, only Items 1-3 are required to be shared) and giving such other party or its outside counsel a reasonable opportunity to discuss its content before it is filed with the relevant Government Entities, and such first Party shall consider and take account of all reasonable comments timely made by the other Party or its outside counsel in this respect. For the avoidance of doubt, draft filings, materials or information provided under this Section or under any other provision of this Agreement to the other Party's counsel on an outside counsel only basis shall only be given to outside counsel of the recipient and will not be disclosed by such outside counsel to employees, officers or directors of the recipient without the advance written consent of the Party providing such draft filing or materials;

(ii)     furnishing to the other Primary Parties or its outside counsel all information within its possession that is required for any application or other filing to be made by the other Party pursuant to the applicable Antitrust Laws or any Laws regulating foreign investment of any jurisdiction, including the Investment Canada Act, in connection with the transactions contemplated by this Agreement and/or by the EMEA Asset Sale Agreement; provided, however, that (a) no such information shall be required to be provided by a Party if it determines, acting reasonably, that such information is

78

material and competitively sensitive or that the provision of such information could reasonably be expected to have a material adverse effect upon it if the transactions contemplated by this Agreement and/or by the EMEA Asset Sale Agreement were not completed or if it determines, acting reasonably, after good faith discussions with the other Party's counsel, that the provision of such information would jeopardize any attorney-client or other legal privilege (it being understood, however, that the Parties shall cooperate in any reasonable efforts and requests that would enable otherwise required disclosure to the other Parties to occur without so jeopardizing privilege), and (b) in any such case the Purchaser and the Main Sellers shall cooperate with a view to establishing a mutually satisfactory procedure for providing such information to counsel for the Purchaser, the Main Sellers and the Joint Administrators on an outside counsel only basis and directly to the Government Entity requiring or requesting such information, and the relevant Main Seller or the Purchaser or the relevant Designated Purchaser required to provide such information shall provide it directly to such Government Entity requiring or requesting such information;

(iii)    promptly notifying each other of any communications from or with any Government Entity with respect to the transactions contemplated by this Agreement and/or by the EMEA Asset Sale Agreement and ensuring to the extent permitted by Law or Government Entity that each of the Primary Parties is entitled to attend any meetings with or other appearances before any Government Entity with respect to the transactions contemplated by this Agreement and/or by the EMEA Asset Sale Agreement;

(iv)    consulting and cooperating with one another in connection with all analyses, appearances, presentations, memoranda, briefs, arguments, opinions and proposals made or submitted by or on behalf of any Party hereto in connection with proceedings under or relating to the Antitrust Laws or any Laws regulating foreign investment of any jurisdiction including the Investment Canada Act in connection with the transactions contemplated by this Agreement and/or by the EMEA Asset Sale Agreement; and

(v)    without prejudice to any rights of the Parties hereunder, consulting and cooperating in all respects with the other in defending all lawsuits and other proceedings by or before any Government Entity challenging this Agreement or the consummation of the transactions contemplated by this Agreement and/or by the EMEA Asset Sale Agreement.

(d) Subject to the provisions of Section 5.5(e) below, the Purchaser shall, and shall cause each of the Designated Purchasers to, use its commercially reasonable efforts to satisfy (or cause the satisfaction of) the conditions precedent to the Purchaser's obligations hereunder as set forth in Section 8.1 and to take, or cause to be taken, all other action and to do, or cause to be done, all other things necessary, proper or advisable under all applicable Laws to consummate the transactions contemplated by this Agreement and/or by the EMEA Asset Sale Agreement, including using its commercially reasonable efforts to submit all required regulatory filings and obtain all Regulatory Approvals, and any other Consent of a Government Entity required to be obtained in order for the Parties to consummate the transactions contemplated by this Agreement and/or by the EMEA Asset Sale Agreement.

(e) The obligations of the Purchaser pursuant to Section 5.5(d) shall include committing, and causing the Designated Purchasers to commit, to any and all undertakings, divestitures, licenses or hold separate or similar arrangements with respect to their respective assets or the Assets and/or the EMEA Assets or conduct of business arrangements or terminating any and all existing relationships and contractual rights and obligations as a condition to obtaining any and all Consents from any Government Entity necessary to consummate the transactions contemplated hereby and/or by the EMEA Asset Sale Agreement, including taking any and all actions necessary in order to ensure the receipt of the necessary Consents and Regulatory Approvals ; provided, however, that the Purchaser and the EMEA Designated Purchasers are under no obligation under Section 5.5(d) or Section 5.5(e) of this Agreement or the applicable provisions of the EMEA Asset Sale Agreement, in respect of obtaining Regulatory Approvals, to commit, or cause the Designated Purchasers to commit, to any undertakings, divestitures, licenses or hold separate or similar arrangements with respect to their respective assets or the Assets and/or the EMEA Assets or conduct of business arrangements or terminate any and all existing relationships and contractual rights and obligations or take any other action where to do so would reasonably be expected to have (i) a material adverse effect on the business or assets of the Purchaser taken as a whole, or (ii) a Material Adverse Effect on the Business or Assets being acquired pursuant to this Agreement (or the EMEA Agreement).

(f) For the avoidance of doubt, the covenants under this Section 5.5 shall not apply to any action, effort, filing, Consent, proceedings, or other activity or matter relating to the Bankruptcy Courts, the Bankruptcy Proceedings and/or the Bankruptcy Consents.

Section 5.6.   Pre-Closing Access to Information.

(a) Without prejudice to the provisions of this Agreement governing the Sellers' obligations to make available documentation and information relating to certain Seller Contracts or Bundled Contracts including Section 5.6(c) below, prior to the Closing but after entry of the U.S. Sale Order, subject to applicable Law, the Main Sellers shall, and shall cause the Other Sellers (other than the EMEA Debtors or EMEA Sellers) to, (i) give the Purchaser and its authorized representatives, upon reasonable advance notice and during regular business hours, reasonable access to all books, records, personnel, officers and other facilities and properties of the Business, including access to (x) certain managerial Employees designated by the Sellers, who have knowledge of the skills and competencies of Employees relative to the Business and will provide such information to the Purchaser for the purposes of Purchaser identifying Identified Employees and (y) Human Resources personnel designated by the Sellers who can provide information relevant to Purchaser otherwise complying with the Purchaser's obligations pursuant to ARTICLE VII, (ii) permit the Purchaser and its representatives to make such copies and inspections thereof, upon reasonable advance notice and during regular business hours, as the Purchaser may reasonably request, (iii) cause the officers of the Sellers to furnish the Purchaser with such financial business and operating data and other information with respect to the Business as is regularly prepared in the Ordinary Course that the Purchaser may from time to time reasonably request, (iv) without limiting the generality of subsections (i), (ii) and (iii), deliver to the Purchaser no later than ten (10) Business Days following the end of each fiscal quarter a report reflecting any changes to the Plan of Record and the headcount

80

of the Business since the previous fiscal quarter; provided, however, that (A) any such access shall be conducted at Purchaser's expense, in accordance with Law (including any applicable Antitrust Law and Bankruptcy Law), at a reasonable time, under the supervision of the Sellers' personnel and in such a manner as to maintain confidentiality and not to unreasonably interfere with the normal operations of the Business or the other businesses of the Sellers and their Affiliates, (B) subject to Section 7.4(e), the Sellers will not be required to provide to the Purchaser access to or copies of any Employee Records, other than as provided in Section 5.6(e). If any requested documentation and information includes what can reasonably be considered competitively sensitive information relating to sales, marketing or pricing of Sellers products or services, such information shall be shared with any employees or representatives of the Purchaser who are designated by the Purchaser, who reasonably require access to such information for any reasonable business purpose related to the acquisition of the Business by the Purchasers and who have executed Clean Room Agreements, provided, however, that where such documentation or information relates to pricing or other material competitive terms offered to any customer of the Business, the employees of the Purchaser shall not have access to such information unless they are not involved in making decisions regarding pricing or the other material competitive terms for a competing business to the Business, and if the transaction does not close, agree not to be employed in such a role for an agreed-upon minimum period of time.

(b) Notwithstanding anything contained in this Agreement or any other agreement between the Purchaser and the Sellers executed on or prior to the date hereof (other than Section 6.5), the Sellers shall not have any obligation to make available to the Purchaser or its representatives, or provide the Purchaser or its representatives with, (i) any Tax Return filed by the Sellers or any of their Affiliates or predecessors, or any related material, or (ii) more generally, any information if, in the good faith opinion of the Sellers, making such information available would (A) result in the loss of any attorney-client or other legal privilege or (B) cause the Sellers to be found in contravention of any applicable Law or contravene any fiduciary duty or agreement existing on the date hereof (including any confidentiality agreement to which the Sellers or any of their Affiliates are a party), it being understood that the Sellers shall cooperate in any reasonable efforts and requests that would enable otherwise required disclosure to the Purchaser to occur without so jeopardizing privilege or contravening such Law, duty or agreement.

(c) To the extent not already made available to the Purchaser, the Purchaser's employees or the Purchaser's representatives (including its outside counsel), in order to facilitate the Purchaser's entry into new supply arrangements effective as of the Closing, the Sellers shall make available to the Purchaser, its employees and representatives (including its outside counsel) unredacted copies of all Contracts relating to the Business with suppliers of the Business, or in the case of any Non-Exclusive Supply Contracts, unredacted copies of any portion thereof that are applicable to the Business (other than pricing/cost information or other competitively sensitive information the sharing of which Sellers or their representatives reasonably determine may violate applicable Law), promptly following the date hereof (or in the event that any such Contract is subject to confidentiality restrictions promptly following the receipt of any required consent which the Sellers will cooperate with the Purchaser to obtain as promptly as practicable).  So long as the Purchaser is the Successful Bidder, the Sellers shall

provide such information not provided in accordance with the preceding sentence (including but not limited to Customer Contracts and Bundled Contracts) promptly following the later of the entry of the U.S. Sale Order and the receipt of Antitrust Approvals; provided, that, access to Bundled Contracts shall be limited to unredacted copies of any portion of any Bundled Contracts that relates to the Business including any portion that relates to the Business and other businesses of the Sellers. Any such disclosures shall be made to any employees or representatives of the Purchaser who are designated by the Purchaser, who reasonably require access to such information for any reasonable business purpose related to the acquisition of the Business by the Purchasers and who have executed the applicable Clean Room Agreements, provided, however, that employees of the Purchaser shall not have access to such information unless they are not involved in making decisions regarding pricing or the other material competitive terms offered to any customer of a competing business to the Business, and if the transaction does not close, agree not to be employed in such a role for an agreed-upon minimum period of time.

(d) Following the later of the entry of the U.S. Sale Order, the receipt of Antitrust Approvals, the Sellers and the Purchaser shall cooperate (consistent with applicable Laws and any confidentiality restrictions requiring consent of Third Parties) in developing a strategy with respect to transitioning customers of the Business to the Purchaser, including a plan for the engagement of customers of the Business by Purchaser. Commencing reasonably in advance of the expected Closing Date, the Sellers shall make introductions of the Purchaser to such customers with whom the Purchaser does not have an existing customer relationship, by, subject to applicable Law, participating in telephone calls and meetings with such customers.

(e) Within five (5) Business Days following the entry of the U.S. Sale Order and, in respect of the Canadian Debtors, the Canadian Approval and Vesting Order, the Sellers will provide the following additional information with respect to each of the Employees whose information was provided in Section 4.11(b) of the Sellers Disclosure Schedule: (i) full name and (ii) work e-mail address. Following the expiration of the Offer Consideration Period, provided that Purchaser provides Seller with proof that an Identified Employee has consented in the Offer to its release and, if applicable, transfer across geographical boundaries, the Sellers will provide the Purchaser with the following additional information with respect to such Identified Employees, as permitted under applicable Law and within five (5) Business Days following the receipt by Seller of such proof: the HR SAP data elements (excluding data related to protected status under applicable Law) with respect to each such Identified Employee, including payroll information where applicable from vendors, with such data elements to be updated by Sellers ten (10) Business Days prior to the Closing Date. In addition, upon Purchaser's reasonable request, the Sellers will promptly provide Purchaser with aggregate census data with respect to gender and age (using five-year bands) of the Identified Employees' employee population (without individually identifying any Identified Employee).

Section 5.7.    Public Announcements.    Subject to (a) the provisions of Section 7.4(a) with respect to communications and announcements to the Employees and the employees of the Purchaser and the Designated Purchasers and (b) each Party's disclosure obligations imposed by

Law (including any obligations under any Bankruptcy Laws), during the period from the date hereof until the Closing Date, the Purchaser and the Main Sellers shall, and shall cause their respective Affiliates to, (i) cooperate with the other Primary Party in the development and distribution of all news releases, other public information disclosures and announcements, including announcements and notices to customers, suppliers and Employees with respect to this Agreement, or any of the transactions contemplated by this Agreement and the other Transaction Documents and (ii) not issue any such announcement or statement prior to consultation with, and the approval of, the other Primary Parties (such approval not to be unreasonably withheld or delayed); provided, that, approval shall not be required where the disclosing Primary Party determines, based on advice of counsel and after consultation with the other Primary Parties, that such disclosure is required by Law; provided, further, that the Purchaser shall be permitted to make disclosures and announcements in accordance with the terms set forth in Exhibit 5.7 hereto. For the avoidance of doubt, this Section 5.7 shall not impose any restrictions in addition to those set forth in the Confidentiality Agreement with respect to non-public communications between the Purchaser and its direct shareholders.

Section 5.8. Further Actions. From and after the Closing Date, each of the Parties shall execute and deliver such documents and other papers and take such further actions as may reasonably be required to carry out the provisions of this Agreement and give effect to the transactions contemplated herein, including the execution and delivery of such assignments, deeds and other documents as may be necessary to transfer any Assets as provided in this Agreement; provided that, subject to Section 2.1.7 and Section 5.5, neither the Purchaser nor the Sellers shall be obligated to make any payment or deliver anything of value to any Third Party (other than filing and application fees to Government Entities) in order to obtain any Consent to the transfer of Assets or the assumption of Assumed Liabilities.

Section 5.9. Conduct of Business. The Sellers covenant that, subject to any limitation imposed as a result of being subject to the Bankruptcy Proceedings and except as (i) the Purchaser may approve otherwise in writing (such approval not to be unreasonably withheld or delayed), (ii) set forth in Section 5.9 of the Sellers Disclosure Schedule, (iii) otherwise expressly contemplated or permitted by this Agreement or another Transaction Document, including Section 5.4, (iv) required by Law (including any applicable Bankruptcy Law or by order of a Bankruptcy Court), or (v) relates to Excluded Assets or Excluded Liabilities in a manner that does not materially relate to or affect the Business, Assets or Assumed Liabilities, the Sellers shall, (A) conduct the Business and maintain the Owned Equipment in the Ordinary Course, (B) use commercially reasonable efforts in the context of the Bankruptcy Proceedings and taking into account employee attrition to continue operating the Business as a going concern and to maintain the business organizations of the Business intact, and (C) abstain from any of the following actions:

(a) (i) sell, lease or dispose of a material portion of the Assets or any Assets material to the Business (other than sales of Inventory), in any single transaction or series of related transactions, or (ii) enter into any exclusive license agreement that would restrict the Business or the Assets after the Closing in any material respect;

(b) incur any Lien on any Assets, other than (i) Liens that will be discharged at or prior to Closing or (ii) Permitted Encumbrances;

83

(c) (A) sell, assign or transfer any Transferred Intellectual Property, (B) grant any material licenses to the Transferred Intellectual Property other than (i) licenses or sublicenses granted to suppliers, resellers and customers in the Ordinary Course, (ii) such licenses or sublicenses as would be permitted by the grant back license rights set forth in the Intellectual Property License Agreement (if such agreement were in effect as of the date hereof) or (iii) licenses or sublicenses granted pursuant to source code escrow arrangements listed in Section 5.9(c) of the Sellers Disclosure Schedule (the "**IP Escrow Agreements**"), where such IP Escrow Agreements contain release conditions that are at least as narrow as those set forth in Section 5.9(c) of the Sellers Disclosure Schedule, and provided that the Sellers agree to cooperate with the Purchaser and to take all commercially reasonable steps required to perform the terms of the IP Escrow Agreements that will prevent the release of escrowed code to the counterparty of the respective IP Escrow Agreements, or (C) intentionally fail to make any filing, pay any fee, or take any other action necessary to maintain the ownership, validity and enforceability of any material Transferred Intellectual Property; provided that if the Sellers unintentionally fail to make any filing, pay any fee, or take any other action necessary to maintain the ownership, validity and enforceability of any material Transferred Intellectual Property, the Sellers will, upon becoming aware of any such failure, make all reasonable efforts to correct any adverse effects of such failure;

(d) increase the rate of cash compensation or other fringe, incentive, equity incentive, pension, welfare or other employee benefits payable to the Employees, other than (i) increases in the Ordinary Course or as required by applicable Law, Contracts or Seller Employee Plans in effect as of the date hereof, or pursuant to the KEIP or KERP (provided that the Sellers provide the Purchaser with notice of amendments, modifications, supplements or replacements to the KEIP or to the KERP as may be approved by the Canadian Court or the U.S. Bankruptcy Court), or as otherwise approved by the Bankruptcy Court from time to time, or (ii) increases to welfare benefits that apply to substantially all similarly situated employees (including the Employees) of the Sellers or the applicable Affiliates of the Sellers;

(e) enter into or amend to provide for greater benefits under any Special Arrangements, except as required by applicable Law;

(f) enter into any Collective Labor Agreement affecting Employees, except as required by applicable Law;

(g) take any action, other than in the Ordinary Course, to cause any employee of the Sellers who would otherwise be an Employee as of the Closing not to be such an employee (other than termination for cause or termination of Employees who failed to receive an Offer (as defined below) from the Purchaser or a Designated Purchaser pursuant to this Agreement; provided that the Sellers make a reasonable effort to provide notice to the Purchaser prior to any such employment termination);

(h) voluntarily terminate, waive any material right under, or materially amend (including by materially increasing the obligations of the Sellers under a supply Contract, materially reducing the obligations of a customer under a customer Contract of the Sellers, or materially modifying the standard warranty terms or return policy for CVAS Products or CVAS Services under a Material Contract so as to materially increase the Liabilities of the

84

Sellers thereunder) any Material Contract, Cross-License Agreements referenced in Exhibit 5.4(c) and listed in Exhibits 5.4(d) and 5.15(c), Inbound License Agreement that is an Assigned Contract or Bundled Contract material to the Business (other than as necessary to effect the unbundling of any Bundled Contract required with respect to any other business or business segment of the Sellers), unless (i) such Contract has become a Non-Assigned Contract, an Excluded 365 Customer Contract, an Excluded Non-365 Customer Contract or will not be assigned to the Purchaser or any Designated Purchaser at Closing or (ii) such amendment, waiver or change is contemplated pursuant to Section 5.23 hereof, and in each case other than in the Ordinary Course;

(i)   fail to make commercially reasonable efforts to maintain Owned Inventory at levels consistent with customer orders;

(j)   waive, release, assign, settle or compromise any material claim, litigation or arbitration relating to the Business to the extent that such waiver, release, assignment, settlement or compromise imposes any binding obligation, whether contingent or realized, on the Business that will bind the Purchaser or a Designated Purchaser after the Closing Date and is materially adverse to the Business;

(k)   enter into any Material Contract pursuant to Section 4.4(a)(ii) or amend any Contract to thereafter be a Material Contract pursuant to Section 4.4(a)(ii) that would reasonably be expected to bind the Purchaser or any of its Affiliates in any material respect after the Closing;

(l)   fail to maintain tangible property which, individually or in the aggregate, is material to the Business and which is included in the Assets, in the Ordinary Course;

(m) fail to maintain the material Consents with respect to the Business in the Ordinary Course;

(n)   make or rescind any material election in relation to Taxes that would reasonably be expected to materially and adversely impact the Purchaser or a Designated Purchase after the Closing; or

(o)   authorize, or commit or agree to take, any of the foregoing actions.

Section 5.10.   Transaction Expenses.  Except as otherwise provided in this Agreement or the Ancillary Agreements, each of the Purchaser and the Sellers shall bear its own costs and expenses (including brokerage commissions, finders' fees or similar compensation, and legal fees and expenses) incurred in connection with this Agreement, the other Transaction Documents and the transactions contemplated hereby and thereby.

Section 5.11.   Confidentiality.

(a) The Parties acknowledge that the Confidentiality Agreement remains in full force and effect in accordance with its terms, which are incorporated herein by reference, and the Parties agree to be bound thereby in the same manner and to the same extent as if the terms

had been set forth herein in full, except that the Sellers shall be at liberty to disclose the terms of this Agreement to any court or to any liquidator or in connection with any auction process approved by the Bankruptcy Court and show appropriate figures in their administration records, accounts and returns.

(b) From the Closing Date until the date that is five (5) years after the Closing Date, the Sellers shall not, and shall cause their Affiliates not to, and shall use commercially reasonable efforts to cause the respective representatives of the Sellers and their Affiliates not to, use or disclose to any Third Party, any Confidential Information. For purposes of this Agreement, **"Confidential Information"** consists of all competitively sensitive information and data related to the Business or the Assets (including Transferred Intellectual Property and competitively sensitive Business Information existing as of the Closing Date), Purchaser or its Affiliates that is not, in each case, already available to the public (it being agreed that disclosure of Confidential Information to prospective purchasers, their representatives and other Persons affiliated with the sale process of the Business shall not be public disclosure thereof), provided that nothing herein or in the other Transaction Documents shall be construed as precluding, prohibiting, restricting or otherwise limiting the ability of the Sellers, Seller's Affiliates or their respective representatives to (i) disclose the terms of any of the Transaction Documents to any court or to any liquidator or in connection with any auction process approved by a Bankruptcy Court and show appropriate figures in their administration records, accounts and return; (ii) exercise or enforce any of their rights, or perform any obligations under this Agreement or the other Transaction Documents, including the Transition Services Agreement and the Intellectual Property License Agreement, (iii) make permitted disclosures under Section 5.7; (iv) make any disclosures that are required by applicable Law; (v) own, use or disclose Confidential Information that is not exclusive to the Business to the extent necessary to (in the reasonable judgment of the Sellers) operate the other business segments of the Sellers or their Affiliates or otherwise engage in any manner in any business activities unrelated to the Business; (vi) use Confidential Information to the extent necessary to perform any Seller Contracts not assigned to the Purchaser; (vii) share information to the extent reasonably necessary to allocate the purchase proceeds from the sale of the Assets; or (viii) make customary disclosures, subject to customary confidentiality agreements, regarding Confidential Information that is not exclusive to the Business and is primarily related to other business segments of the Sellers in connection with acquiring, merging or otherwise combining with, or being acquired by, or selling all or part of their assets to, any Person (whether in a single transaction or a series of related transactions or whether structured as an acquisition of assets, securities or otherwise).

(c) It is acknowledged by the Purchaser and the Sellers that in the course of attempting to sell the Assets, one or more of the Sellers has entered into several confidentiality agreements with Third Parties in respect of information relating to the Assets and has disclosed such information to certain of those Third Parties.

Section 5.12.  Certain Payments or Instruments Received from Third Parties.  To the extent that, after the Closing Date, (a) the Purchaser and/or any Designated Purchaser receives any payment or instrument that is for the account of a Seller according to the terms of any Transaction Document or relates primarily to any business or business segment of the Sellers

86

other than the Business, the Purchaser shall, and shall cause the Designated Purchasers to promptly deliver such amount or instrument to the relevant Seller, and (b) any of the Sellers receives any payment that is for the account of the Purchaser, any of the Designated Purchasers according to the terms of any Transaction Document or relates primarily to the Business, the Sellers shall, and shall cause the other Sellers to promptly deliver such amount or instrument to the Purchaser or the relevant Designated Purchaser, as applicable. All amounts due and payable under this Section 5.12 shall be due and payable by the applicable Party in immediately available funds, by wire transfer to the account designated in writing by the relevant Party. Notwithstanding the foregoing, each Party hereby undertakes to use its commercially reasonable efforts to direct or forward all bills, invoices or like instruments to the appropriate Party.

Section 5.13.  Non-Assignable Contracts.

(a) To the extent that any Seller Contract or any Seller Consent is not capable of being assigned under Section 365 of the U.S. Bankruptcy Code (or, if inapplicable, pursuant to other applicable Laws or the terms of such Contract or Consent) to the Purchaser or a Designated Purchaser at the Closing, or cannot be entered into (A) without the Consent of the issuer thereof or the other party thereto or any Third Party (including a Government Entity) or (B) without Sellers' and their Affiliates' compromising any right, asset or benefit or expending any amount or incurring any Liability or providing any other consideration  (collectively, the "**Non-Assignable Contracts**"), this Agreement will not constitute an assignment thereof, or an attempted assignment, unless and until any such Consent is obtained, including any Consents obtained following Closing; provided, however, that the Sellers will use commercially reasonable efforts (without incurring any third party costs) to (i) cooperate with the Purchaser in any reasonable arrangement to provide the Purchaser the same interest, benefits, rights and liabilities under any such Non-Assignable Contracts that are not licenses of Intellectual Property as the applicable Seller had immediately prior to the Closing, including using commercially reasonable efforts to enter into one or more mutually agreed Subcontract Agreements, and (ii) facilitate Purchaser's negotiation with the other party to each Non-Assignable Contract that is a license of Intellectual Property to provide the Purchaser the same interest, benefits and rights under any such Non-Assignable Contracts as the applicable Seller had immediately prior to the Closing (including that Sellers shall request such Third Party's Consent if so requested by the Purchaser); provided that there shall be no obligation on Sellers or their Affiliates to compromise any material right, asset or benefit or expend any amount or incur any Liability. As between the Sellers and the Purchaser (or the relevant Designated Purchaser), such Non-Assignable Contracts described above shall be deemed to be assigned and the Purchaser (or the relevant Designated Purchaser) shall perform all obligations and covenants thereunder. Notwithstanding the foregoing sentences, (x) nothing in this Section 5.13 shall require any Seller to renew, modify or amend any Non-Assignable Contract once it has expired, (y) any efforts required of the Sellers pursuant to this paragraph shall be strictly on an interim basis and in no event shall such efforts or arrangements be required after one hundred and eighty (180) days from the Closing Date, and (z) the Sellers shall have the right, any time after the day that is one hundred and eighty one (181) days after the Closing Date, to exercise any right to terminate any Non-Assignable Contract. The Purchaser or the Designated Purchaser, as applicable, shall reimburse the relevant Seller for the out-of-pocket expenses incurred or asserted, as a result of any actions taken pursuant to this Section 5.13. The Parties

87

acknowledge that the fact that any Contract constitutes a Non-Assignable Contract shall not (i) constitute a breach of any covenant hereunder, (ii) entitle Purchaser to terminate this Agreement or (iii) result in any reduction of the Purchase Price payable hereunder. Any Non-Assignable Contract assigned pursuant to the terms of this Section 5.13 shall, when assigned, constitute an Assigned Contract hereunder from and after such date.

(b) For the purposes of this Agreement (including Section 5.13(a) and all representations and warranties of the Sellers contained herein), the relevant Sellers shall be deemed to have obtained all required Consents in respect of the assignment of any Assumed and Assigned Contract if, and to the extent that, pursuant to the U.S. Sale Order, the Sellers are authorized to assume and assign to the Purchaser or the Designated Purchasers such Seller Contract pursuant to Section 365 of the U.S. Bankruptcy Code and any applicable Cure Cost has been satisfied as provided in Section 2.1.7.

Section 5.14.   Bundled Contracts.

(a) Section 5.14(a)(i) of the Sellers Disclosure Schedule lists each Contract that the Sellers have entered into prior to the date hereof providing for the sale or provision of CVAS Products or CVAS Services and the sale or provision of other products or services of the Sellers or their Affiliates (as such list may be amended or supplemented pursuant to Section 5.14(c)) (each, a "**Bundled Contract**"). Subject to applicable Law and the terms of such Bundled Contracts, each of the Purchaser and the Sellers shall (and the Purchaser shall cause any relevant Designated Purchaser to), as applicable, use their reasonable best efforts to, at least fifteen (15) Business Days prior to the Closing Date, cause the counterparty to each Bundled Contract listed on Section 5.14(a)(i) of the Sellers Disclosure Schedule to amend such Bundled Contract so as to delete all obligations and Liabilities therefrom as they relate to the CVAS Products and the CVAS Services and to enter into a new Contract (effective as of, and conditioned upon the occurrence of, the Closing) with the Purchaser or applicable Designated Purchaser and such applicable customer which only relates to CVAS Products and CVAS Services, in which event such new Contract shall be deemed to be an Assigned Contract; provided, however, that the Sellers shall be under no obligation to compromise any right, asset or benefit or to expend any amount or incur any Liability in obtaining such arrangements and the failure to enter into such arrangements with respect to any Bundled Contract shall not entitle the Purchaser to terminate this Agreement, not to complete the transactions contemplated hereby or reduce the Purchase Price payable hereunder; provided, further, that the Purchaser shall not be obligated to enter into any such new Contract (i) if such new Contract meets the Exclusion Criteria, (ii) that relates to the Bundled Contracts specified in Section 5.14(a)(ii) of the Sellers Disclosure Schedule and for which the respective counterparty to its Contract does not agree to reduce the aggregate limitation of liability in the related Bundled Contract proportionally based on the amount of revenues of the Sellers and their Affiliates under such Contract that relate to the Business compared to the aggregate revenues of the Sellers and their Affiliates under such Contract for 2008 or (iii) relates to the Bundled Contracts specified in Section 5.14(a)(iii) of the Sellers Disclosure Schedule and for which the respective counterparty to such Contract does not agree to release the Purchaser from any obligation to indemnify the counterparty for intellectual property infringement claims for products sold by the Sellers under such Bundled Contract prior to the Closing, in each case to

the extent the Purchaser notifies the Main Sellers of its decision that such Contract falls within clauses (i), (ii) or (iii) of this sentence no later than April 1, 2010. Without the express written consent of Purchaser, Sellers shall not agree to amend the material terms applicable to the Business of any Bundled Contract as a condition of such counterparty agreeing to amend such portion of such Bundled Contract. To the extent permitted by the terms of such Bundled Contract and applicable Law, each of the Sellers and the Purchaser shall notify the other Party if any customer has contacted such Party with regard to the matters set forth in this Section 5.14 and shall keep such other Party reasonably informed regarding the content of any discussions with the customer. For the avoidance of doubt, nothing in this Section 5.14(a) shall restrict the Sellers from taking any actions with respect to Bundled Contracts, including any amendments thereof, to the extent they relate to businesses or business segments of the Sellers or their Affiliates other than the Business and such actions do not materially affect the Business.

(b) Subject to applicable Law and the terms of such Bundled Contracts, for those Bundled Contracts for which the arrangements mentioned in Section 5.14(a) could not be entered into fifteen (15) Business Days prior to the Closing Date, (i) the relevant Sellers shall, until the date that is one hundred eighty (180) after the Closing Date, to the extent requested by the Purchaser, use their commercially reasonable efforts to facilitate the entry by the Purchaser or the relevant Designated Purchaser and the other party to each such Bundled Contract into a new Contract that only relates to CVAS Products and/or CVAS Services, including by making available those employees who are responsible for managing the customer relationships with the customers of such Bundled Contracts (to the extent reasonably practicable and to the extent such employees remain in the employ of the Sellers), reasonably cooperating with the Purchaser to jointly contact each counterparty to such Bundled Contracts by making such contacts (by phone or in person) as may be reasonably requested by the Purchaser and by sending a joint letter, in form and substance satisfactory to each of Sellers and the Purchaser notifying the counterparty to each such Bundled Contract of the transactions and requesting the counterparty to agree to amending such Bundled Contract after the Closing Date or (ii) the Sellers and the Purchaser shall use their commercially reasonable efforts to cooperate in any commercially reasonable arrangement to provide the Purchaser or Designated Purchaser, as applicable, the same interest, benefits, rights and liabilities under any such Bundled Contract only to the extent relating to CVAS Products and/or CVAS Services as the applicable Seller had immediately prior to the Closing under such Bundled Contract, in so far as they relate to the Business, including using commercially reasonable efforts to enter into one or more mutually agreed Subcontract Agreements with respect to such Bundled Contracts; provided that (A) nothing in this Section 5.14 shall require the Sellers to renew any Bundled Contract once it has expired, (B) the Sellers shall have the right, any time after the date that is one hundred eighty (180) after the Closing Date, to exercise any right to terminate any Bundled Contract, and (C) the Sellers shall be under no obligation to compromise any right, asset or benefit or to expend any amount or incur any Liability in order to comply with its obligations under this sentence. Upon the execution of the relevant Subcontract Agreements the Purchaser (or the relevant Designated Purchaser) shall perform all obligations and covenants of the relevant Seller under the applicable Bundled Contracts (to the extent relating to the Business and including obligations relating to warranties and Known Product Defects (as defined in the Nortel Accounting Principles)). Without limiting the generality of the foregoing, the Purchaser

89

expressly agrees that any obligations under any warranty liabilities or any obligations associated with any Known Product Defects relating to CVAS Products and CVAS Services which have been supplied under any Bundled Contract subcontracted to the Purchaser or any Designated Purchaser under any Subcontract Agreement shall be assumed by the Purchaser or such Designated Purchaser and no Sellers shall have or retain any Liability, cost or expenses in connection with any such warranty liabilities or Known Product Defects related to the CVAS Products and CVAS Services.

(c) Prior to the Closing Date, the Sellers shall be entitled to update and/or supplement the list of Bundled Contracts from time to time by written notices to the Purchaser; provided, that within five (5) Business Days of Closing (but which additions, for the avoidance of doubt, will not delay the Closing) no update and/or supplement shall be permitted without Purchaser's prior written consent, and provided further that Sellers shall use commercially reasonable efforts to update the list of Bundled Contracts as soon as commercially practicable.

Section 5.15.   Post-Closing Assistance.

(a) After the Closing, the Purchaser shall, upon the request of the Sellers, and at no cost to the Sellers (other than reimbursement of reasonable and documented out of pocket expenses of the Purchaser or a Designated Purchaser and the payment of a reasonable per diem to the Purchaser or a Designated Purchaser, which per diem shall be based upon the total compensation of the affected Transferred Employee or Transitional Employee at the applicable time), require the Transferred Employees or Transitional Employees to make themselves reasonably available at reasonable times and cooperate in all reasonable respects with the Sellers and their Affiliates in the preparation for, and defense of, any lawsuit, arbitration or other Action (whether disclosed or not disclosed in the Sellers Disclosure Schedule) filed or claimed against the Sellers or any of their Affiliates or any of the respective agents, directors, officers and employees of the Sellers and their Affiliates, whether currently pending or asserted in the future, concerning the operation or conduct of the Business prior to the Closing Date; provided, however, that the obligations of the Purchasers or their Affiliates hereunder shall only extend to the employees of such Purchasers or Purchasers' Affiliates as of the date such employees are to be made available and shall not apply to former employees of such Purchaser or Purchaser's Affiliates that have been terminated prior to such date.

(b) After the Closing, the Sellers and their Affiliates shall, upon the request of the Purchaser, and at no cost to the Purchaser or its Affiliates (other than reimbursement of reasonable and documented out of pocket expenses of the Sellers and their applicable Affiliates and the payment of a reasonable per diem to a Seller or Seller Affiliate, which per diem shall be based upon the total compensation of the affected employee at the applicable time) require their employees that were not Transferred Employees or Transitional Employees to make themselves reasonably available and cooperate in all reasonable respects with the Purchaser and the Designated Purchasers and their Affiliates in the preparation for, and defense of, any lawsuit, arbitration or other Action filed or claimed against the Purchaser, any of the Designated Purchasers, any of their Affiliates or any of the respective agents, directors, officers and employees of any of the foregoing, whether currently pending or asserted in the future, concerning the operation or conduct of the Business prior to the Closing Date; provided, however, that the obligations of the Sellers or their Affiliates hereunder shall only extend to the

90

employees of such Sellers or Sellers' Affiliates as of the date of Purchaser's request and so long thereafter as they continue to be employed by such Seller or its Affiliates and shall not apply at any time with respect to individuals no longer employed by such Sellers or Seller's Affiliates and shall not require any Sellers or Seller's Affiliates to continue the employment of any such employee.

(c) Upon the conclusion of the Bankruptcy Proceedings, the Sellers shall exercise any rights they may have to assign to the Purchaser the Cross-License Agreements listed in Exhibit 5.15(c). The Sellers agree that they shall not assign such Cross-License Agreements to any other Person.

Section 5.16.  Delivery of Assets.

(a) The Purchaser shall, and shall cause the relevant Designated Purchasers to, at Purchaser's sole cost and expense, within thirty (30) days after the Closing Date relocate all tangible Assets and Purchaser's activities from all premises owned or leased by the Sellers or their Affiliates after the Closing other than those premises to be occupied by the Purchaser or any Designated Purchasers after the Closing Date pursuant to the provisions of the Real Estate Agreements.

(b) As promptly as reasonably practicable, and in no event more than thirty (30) days, after the Closing Date, the Sellers shall deliver to the Purchaser copies of filings, prosecution files, dockets and certifications relating to the filing, prosecution, issuance, renewal and enforcement of the Business Registered IP, provided that all items to be delivered hereunder shall be delivered solely by remote telecommunication to the extent the Purchaser may so request. Without limiting the generality of the foregoing, within thirty (30) days of Closing, the Sellers shall and shall cause their Affiliates to, instruct their current attorneys and agents to deliver to the Purchaser, or attorneys designated by Purchaser, any and all records in the possession of such attorneys and agents relating to the prosecution of any applications, registrations and renewals of any Business Registered IP.

Section 5.17.  Termination of Overhead and Shared Services and French Company Licenses.

(a) The Purchaser acknowledges and agrees that, except as otherwise expressly provided in the Transition Services Agreement, effective as of the Closing Date (i) all Overhead and Shared Services provided to the Business (except the Transferred Overhead and Shared Services) shall cease and (ii) the Sellers or their Affiliates shall have no further obligation to provide any Overhead and Shared Services to the Business.

(b) If Nortel Networks S.A. ("NNSA") has not ceased to trade (conduct business) as of the Closing Date, then the Sellers shall, on or before Closing, provide the Purchaser with reasonable evidence confirming that NNSA has agreed:

(i)    not to assert its Intellectual Property and exclusive license rights, if any, in a manner that could restrict or conflict with the ability of the Purchaser or its

91

successors, assigns, licensees, sub-licensees or customers to operate in the field of the Business and its natural evolutions; and

(ii)    to the fullest extent permitted under French Law, to relinquish, waive or terminate all its Intellectual Property and license rights (including any enforcement rights) to the extent (but only to the extent) that they relate to the Intellectual Property that is sold or licensed to the Purchaser in connection with the sale of the Business;

provided that the Purchaser agrees that NNSA shall be permitted to continue using (on a non-exclusive, non-transferable basis) its intellectual property and license rights, as currently being used, in connection with (x) the performance by NNSA of its existing obligations under its contracts with its customers within the Business in accordance with the terms and conditions of such contracts, as they are in effect as of the Closing, and (y) the continued operation of its business as currently conducted, outside of the field of the Business.

(c)  If NNSA has ceased to trade as of the Closing Date, then, solely to the extent any grant of rights by the Sellers to the Purchaser herein or under the Intellectual Property License Agreement (including the assignment to the Purchaser of Transferred Intellectual Property) appears to be restricted by or to conflict with any rights granted by the Sellers to NNSA under any internal agreement or arrangement of the NNL, NNC, NNI, NNUK, any of the EMEA Sellers or any Affiliates of any of them, the Sellers agree, at their expense, to use, during a period of up to 180 days after the Closing Date, commercially reasonable efforts (taking into account the value of NNSA's rights and the scope of the Business conducted by NNSA) to (i) exercise any rights the Sellers may have to terminate any such rights of NNSA or (ii) provide reasonable evidence that any such rights of NNSA do not restrict or conflict with the grant of rights by the Sellers to the Purchaser herein or under the Intellectual Property License Agreement.

Section 5.18.  Financing.

(a)  The Purchaser shall obtain the Financing to the extent required to consummate the transactions contemplated hereby.  The Purchaser shall enforce all of its rights under the Financing Commitment (including by seeking specific performance).

(b)  In the event that the Purchaser wishes to obtain Replacement Financing, then, during the period commencing upon the entry of both the U.S. Sale Order and the Canadian Approval and Vesting Order and ending on the Closing Date, Sellers shall, and shall use their commercially reasonable efforts to cause their respective Affiliates, officers, directors, employees, agents and representatives to, provide to the Purchaser commercially reasonable cooperation requested by the Purchaser with respect to actions that are necessary, proper or advisable in connection with obtaining the Replacement Financing, including in each case, to the extent commercially reasonable and requested with reasonable advance notice (i) participation in meetings, presentations, due diligence sessions and sessions with financing sources and rating agencies, (ii) assisting with the preparation of Purchaser's materials for rating agency presentations, offering documents, business projections  and similar marketing documents required by Purchaser in connection with the Replacement Financing, (iii) giving to

the Purchaser's financing sources access to the electronic data room to which the Purchaser has been given access, (iv) furnishing the Purchaser and its financing sources with other financial and other information regarding the Business as may be reasonably requested by the Purchaser and reasonably available to Sellers or its Representatives, (v) reasonably facilitating the pledging of collateral (including obtaining releases, terminations, waivers, consents, estoppels and approvals as may be required in connection therewith) and (vi) taking other commercially reasonable actions requested by the Sellers and necessary to permit the consummation of the Replacement Financing, in each case to the extent Sellers are not restricted from making such information available and subject to customary confidentiality agreements.

(c) Notwithstanding anything to the contrary set forth herein, the Purchaser acknowledges and agrees that (i) the Purchaser shall at all times maintain the Financing Commitment in full force and effect, (ii) its obligations to consummate the transactions contemplated by this Agreement are not conditioned or contingent in any way upon receipt of the Financing, the Replacement Financing or any other financing, (iii) failure to consummate the transactions contemplated herein as a result of the failure to obtain any financing shall constitute a breach of this Agreement by the Purchaser (including its obligations pursuant to Section 2.4) and (iv) in no event shall a breach by any of the Sellers of any of its obligations in this Section 5.18 be deemed a breach by any of the Sellers for purposes of Article VIII or IX hereof. The Purchaser and its Affiliates shall not take any action that impairs the ability of the Purchaser to fulfill its obligations hereunder or make any payment required in respect of this Agreement or the EMEA Asset Sale Agreement.

Section 5.19.    Insurance Matters.

(a) The Purchaser acknowledges and agrees that coverage of the Covered Assets and Persons under the Seller Insurance Policies shall cease as of the Closing Date and the Covered Assets and Persons will be deleted in all respects as insured (or additional insured, as the case may be) under all Seller Insurance Policies. Except to the extent provided in Section 2.1.1(l) or Section 5.19(c), the Sellers shall retain any rights to, including any right to any proceeds received in respect of, any claim pending as of the date hereof or made after the date hereof under any Seller Insurance Policy, even if such claims relates to the capital assets or properties of the Business.

(b) If after the Closing Date the Purchaser, a Designated Purchaser, or the Sellers (or any of their respective Affiliates) reasonably require any information regarding claim data or other information pertaining to a claim or an occurrence reasonably likely to give rise to a claim (including any pre-Closing claims under the Seller Insurance Policies that are to be covered under the retrospective component of the new insurance policy) in order to give notice to or make filings with insurance carriers or claims adjustors or administrators or to adjust, administer or otherwise manage a claim, then the Sellers or the Purchaser, as the case may be, shall cause such information to be supplied to the other (or their designee), to the extent such information is in their possession and control or can be reasonably obtained by the Sellers or the Purchaser (or their respective Affiliates), as applicable, promptly upon a written request therefore. If the Purchaser desires access to, and utilization of, claims data or information maintained by an insurance company or other Third Party in respect of any claim (including any pre-Closing claims under any Seller Insurance Policies that are covered under

93

the retrospective component of the new insurance policies), the Purchaser shall be exclusively responsible for acquiring from such insurance company or Third Party, at the Purchaser's sole cost and expense, the rights necessary to permit them to obtain access to and utilization of such claims data or information. If any Third Party requires the consent of the Sellers or any of their Affiliates to the disclosure of such information, such consent shall not be unreasonably withheld.

(c) Prior to Closing, the Sellers shall at all times maintain their current property insurance in respect of the Owned Equipment, or in the event any such policies are cancelled or otherwise terminated, shall obtain other substantially comparable insurance policies that have substantially the same terms and conditions and make and diligently pursue any applicable insurance claims related to damage or destruction to any Owned Equipment. Notwithstanding anything in this Agreement to the contrary if and to the extent that any piece of Owned Equipment, wherever located, is destroyed or damaged prior to Closing, and is not replaced or repaired or restored to its condition prior to such damage or destruction, then at Closing, the Sellers shall pay to the Purchaser the amount of any net insurance proceeds received in respect of such Owned Equipment (excluding any insurance proceeds related to business interruption insurance) that have not been applied to repair, replacement or restoration, as applicable, and assign any such claim and the rights to receive the proceeds of any such claim that has not yet been finally adjusted. For the avoidance of doubt, in the event that the Sellers transfer such proceeds to the Purchaser, the Sellers shall have no further obligations with respect to the Owned Equipment that was destroyed or damaged and the Purchaser shall not be entitled to terminate this Agreement and such events shall not result in any reduction of the Purchase Price payable hereunder.

Section 5.20.   Deposits, Guarantees and Other Credit Support of the Business.

(a) Following the Closing, the Purchaser shall, or shall cause the applicable Designated Purchaser to:

(i)   procure the return and/or release by the applicable counterparty, as soon as reasonably practicable but in no event later than thirty (30) days after the Closing Date, of any continuing obligation of any Seller or any Affiliate thereof with respect to any Assigned Contract or any Contract, asset or obligation of the Business (including any guarantee or credit support provided by, or any letter of credit, performance bond or surety posted by, any Seller or any of its Affiliates or any Third Party on behalf of the Sellers (and with a counter guarantee of the Sellers)) listed in Section 5.20(a)(i)(B) of the Sellers Disclosure Schedule; and

(ii)   indemnify and hold harmless the Sellers and their Affiliates from and against any Loss resulting from any failure of the Purchaser or Designated Purchasers to comply with the obligations set forth in clauses (a)(i) of this Section 5.20.

Section 5.21.   Use of Trademarks.  Except as expressly provided in the Trademark License Agreement, as of the Closing Date, neither the Purchaser nor any Designated Purchaser shall have the right to use the name "Nortel" or any other Trademarks owned by the Sellers or

94

any of their Affiliates or any other Trademark employing the word "Nortel" or any confusingly similar Trademarks to any of the foregoing (collectively, the "**Sellers' Trademarks**").

Section 5.22.  Maintenance of Books and Records.

(a)  After the Closing, the Purchaser shall, and shall cause the Designated Purchasers to, preserve, until at least the fifth (5th) anniversary of the Closing Date, all pre-Closing Date records to the extent relating to the Business possessed by, or that comes into the possession of, such Person.  After the Closing Date and up until at least the fifth (5th) anniversary of the Closing Date, upon any reasonable request from the Sellers or their representatives, the Purchaser shall, and/or shall cause the Person holding such records to, (i) provide to the Sellers or their representatives reasonable access to such records during normal business hours and (ii) permit the Sellers or their representatives to make copies of such records, in each case at no cost to the Sellers or their representatives (other than for reasonable out-of-pocket expenses).  In addition, in the event that the financial statements of the Business are audited for any period prior to the Closing Date, upon execution of a customary access letter if required, the Sellers and their representatives (including their outside accountants) shall be granted access to all relevant work papers, schedules, memoranda and other documents prepared by the Business or their representatives (including outside accountants) in connection with the Sellers' completing the audit of their accounts for the 2009 fiscal year; provided, however, that nothing herein shall require the Purchaser to disclose any information to the Sellers if such disclosure would jeopardize any attorney-client or other legal privilege or contravene any applicable Law, fiduciary duty or agreement (it being understood that the Purchaser shall cooperate in any reasonable efforts and requests for waivers that would enable otherwise required disclosure to the Sellers to occur without so jeopardizing privilege or contravening such Law, duty or agreement) or, other than as provided in Section 6.5, require the Purchaser to disclose its Tax records.  Such records may be sought under this Section 5.22(a) for any reasonable purpose, including to the extent reasonably required in connection with accounting, litigation, federal securities disclosure or other similar needs of the Sellers (other than claims between the Sellers and the Purchaser or any of their respective Subsidiaries under this Agreement or any Ancillary Agreement).  Notwithstanding the foregoing, (y) any and all such records may be destroyed by the Purchaser if the Purchaser sends to the Sellers written notice of its intent to destroy such records, specifying in reasonable detail the contents of the records to be destroyed; such records may then be destroyed after the sixtieth (60th) day following such notice unless the Sellers notify the destroying party that the Sellers desire to obtain possession of such records, in which event the Purchaser shall transfer or cause to be transferred the records to the Sellers and the Sellers shall pay all reasonable expenses of the Purchaser in connection therewith and (z) other than as provided in Section 6.5, the Purchaser shall not be required to provide the Sellers access to, or copies of, any Tax records.

(b)  After the Closing, Sellers shall preserve, until the fifth (5th) anniversary of the Closing Date, all pre-Closing Date records to the extent relating to the Business possessed by, or that comes into the possession of, such Person.  After the Closing Date and up until the fifth (5th) anniversary of the Closing Date, upon any reasonable request from the Purchaser, any Designated Purchaser or their respective representatives, the relevant Seller shall, and/or shall cause the Person holding such records to, (i) provide to the Purchaser, any Designated

95

Purchaser or their respective representatives reasonable access to such records during normal business hours and (ii) permit the Purchaser, any Designated Purchaser or their respective representatives to make copies of such records, in each case at no cost to the Purchaser, any Designated Purchaser or their respective representatives (other than for reasonable out-of-pocket expenses); provided, however, that nothing herein shall require the Sellers or their Affiliates to disclose any information to the Purchaser, any Designated Purchaser or their respective representatives if such disclosure would jeopardize any attorney-client or other legal privilege or contravene any applicable Law, fiduciary duty or agreement (it being understood that the Sellers shall cooperate in any reasonable efforts and requests for waivers that would enable otherwise required disclosure to the Purchaser, any Designated Purchaser or their respective representatives to occur without so jeopardizing privilege or contravening such Law, duty or agreement).  Such records may be sought under this Section 5.22(b) for any reasonable purpose, including to the extent reasonably required in connection with accounting, litigation, federal securities disclosure, financing or other similar needs of the Purchaser, any Designated Purchaser or their respective representatives (other than claims between the Sellers and the Purchaser or any of their respective Subsidiaries under this Agreement or any Ancillary Agreement).  Notwithstanding the foregoing, (y) any and all such records may be destroyed by the Sellers if the Sellers send to the Purchaser written notice of their intent to destroy such records, specifying in reasonable detail the contents of the records to be destroyed; such records may then be destroyed after the sixtieth (60th) day following such notice unless the Purchaser notifies the destroying party that the Purchaser or any Designated Purchaser desire to obtain possession of such records, in which event the Sellers shall transfer or cause to be transferred the records to the Purchaser and the Purchaser shall pay all reasonable expenses of the Sellers in connection therewith and (z) the Sellers shall not be required to provide the Purchaser, any Designated Purchaser or their respective representatives access to, or copies of, any Tax records or audited financial statements covering any pre-Closing period, except as specifically required pursuant to the terms of this Agreement.

Section 5.23.  Certain Ancillary Agreements.

(a) The Primary Parties and, to the extent applicable, the relevant EMEA Sellers, shall use their commercially reasonable efforts to:

(i)    promptly negotiate in good faith with the relevant contract manufacturers and finalize the terms of the Contract Manufacturing Inventory Agreements based on the term sheet attached hereto as Exhibit F;

(ii)    promptly negotiate in good faith with the LGN Joint Venture the LGN Distribution Agreement; and

(iii)    promptly negotiate in good faith with NN Turkey the NN Turkey Agreements.

(b) The Parties and the EMEA Sellers acknowledge that, as of the date hereof, the Business entertains several bilateral relationships with other businesses, business segments or divisions (or former businesses, business segments or divisions) of certain Sellers or their Affiliates for the supply and/or development of products and services (including certain CVAS

Products and CVAS Services). To the extent such relationships are required to be in place in order to fulfill customer commitments existing as of the Closing Date and which will continue thereafter (for the duration of any individual customer contract including frame contracts), the Primary Parties and the relevant EMEA Sellers shall use their commercially reasonable efforts to negotiate, or to cause to be negotiated, in good faith, commercially reasonable terms in order to address the interdependencies among current and former businesses of the Sellers set forth on Exhibit 5.23, including through one or more Mutual Development and Support Agreements, supply agreements, or other appropriate commercial arrangements; provided, that, Sellers shall keep Purchaser informed regarding the negotiation of such agreements between Sellers' business units or between Sellers and Third Parties, which agreements, in each case, relate to CVAS Products or CVAS Services, and Seller shall use reasonable efforts to consult with Purchaser with respect to such agreements. The Primary Parties shall also use their commercially reasonable efforts to negotiate in good faith the Subcontract Agreement pursuant to which the seller will subcontract to Purchaser the rights and obligations of the Sellers under Retained Contracts. Notwithstanding the above, on or prior to the Closing Date, the Purchaser will enter into (i) a development and support agreement and (ii) a supply agreement with Ericsson AB, related to the CDMA and GSM interdependencies and with Kapsch related to the GSM interdependencies set forth on Exhibit 5.23, substantially similar to the forms of the agreements previously disclosed to the Purchaser with respect to CDMA and in forms of agreements substantially similar to the CDMA agreements with respect to agreements relating to GSM interdependencies. The Purchaser will assume all obligations under any warranty liabilities relating to CVAS Products and CVAS Services which have been supplied under such agreements mentioned in the immediately preceding sentence. For the avoidance of doubt, other than the Intellectual Property License Agreement, the Transition Services Agreement, the Loaned Employee Agreement, and the Real Estate Agreements and the agreements with respect to the CDMA and GSM interdependencies mentioned in this Section 5.23(b), the failure to execute and deliver at Closing any of the Ancillary Agreements shall not be deemed a failure of any condition precedent to this Agreement or allow any Party to terminate this Agreement.

Section 5.24. <u>Closing Unaudited Financial Statements</u>. Prior to the Closing Date, the Sellers shall cause to be prepared and shall deliver to the Purchaser unaudited management statements of certain assets and liabilities of the Business as of the Closing Date and the related unaudited management statements of income of the Business for the fiscal year ended December 31, 2009 and the period from January 1, 2010 until the end of the last fiscal quarter prior to the Closing Date; provided, that if the Closing Date is less than twenty (20) Business Days following the end of a fiscal quarter, then the last fiscal quarter prior to the Closing Date shall be deemed to be the previous fiscal quarter (together, the **"Closing Unaudited Financial Statements"**). The Closing Unaudited Financial Statements shall be prepared based upon the financial books and records maintained by the Sellers and the EMEA Sellers for the Business on the basis of the Nortel Accounting Principles and shall represent the Seller's good faith estimate of the selected balance sheet accounts, income statements and results from operations set forth therein for the Business for the applicable date and period. The Closing Unaudited Financial Statements (a) will not be prepared in accordance with GAAP, except as set forth in the Nortel Accounting Principles, (b) will include estimated costs that do not necessarily represent the costs that were actually allocated to the Business for the relevant periods (or that the Business will incur after the

Closing), (c) will include assets that have not been tested for impairment or otherwise adjusted for fair value, (d) will reflect the estimated historical operation of the Business (including the Overhead and Shared Services and the Excluded Assets) for the periods specified therein and (e) will not represent the balance sheet accounts or the income statements that would have occurred if the Business had been operated by the Sellers as a "stand alone" entity.

Section 5.25.  Closing Audited Financial Statements.  The Sellers shall engage their independent accountants to prepare the audited balance sheets of the Business and the related statement of earnings and cash flows for the Business for the (i) fiscal year ended December 31, 2009 and (ii) (A) for the period January 1, 2010 – March 31, 2010 if the Closing Date occurs on or after March 31, 2010 and prior to June 30, 2010 and (B) for the period January 1, 2010 – June 30, 2010 if closing occurs on or after June 30, 2010 (the "**Closing Audited Financial Statements**").  The Sellers shall cooperate with the Purchaser's preparation of audited financial statements for any other periods in 2010 prior to the Closing Date.  The Purchaser shall cooperate with Seller's preparation of the Closing Audited Financial Statements.  The Closing Audited Financial Statements shall be prepared based upon the financial books and records maintained by the Sellers and the EMEA Sellers for the Business on the basis of GAAP, consistently applied, and shall present the selected balance sheet accounts, income statements and results from operations set forth therein for the Business for the applicable date and period, except that they will not represent the balance sheet accounts or the income statements that would have occurred if the Business had been operated by the Sellers as a "stand alone" entity.  The Sellers shall deliver the Closing Audited Financial Statements to the Purchaser as soon as reasonably practicable and in no event later than four (4) months following the Closing Date.  For the avoidance of doubt, Sellers shall furnish customary representation letters in connection with the Closing Audited Financial Statements to the extent Sellers employ persons in a position to sign such letters.

Section 5.26.  Additional Bankruptcy Proceedings; Adverse International Injunctions.

(a)  If at any time prior to the Closing Date, (i) any Seller that is a Non-Debtor Seller as of the date hereof shall have commenced Bankruptcy Proceedings in any country or other jurisdiction (other than the U.S., Canada or the United Kingdom) (an "**Additional Bankruptcy Proceeding**"), (ii) there shall be in effect any Law, material order, injunction, decree or judgment of any court or other Government Entity prohibiting in such jurisdiction (other than the U.S., Canada or the United Kingdom) the consummation of the transactions contemplated hereby (such Law, material order, injunction, decree or judgment, an "**Adverse International Injunction**") or (iii) any entity is not deemed an Other Seller pursuant to clause (ii) of the definition thereto, then (A) the Main Sellers shall reasonably promptly notify the Purchaser of the commencement of such Additional Bankruptcy Proceeding, the issuance of such an Adverse International Injunction or the exclusion of such entity as an Other Seller, as applicable, and, to the extent the Main Sellers are aware of the same, identify the Assets that are subject to such Additional Bankruptcy Proceeding, Adverse International Injunction or belong to such entity listed on Exhibit A (the "**Restricted Assets**") and (B) the Parties shall, in respect of the Restricted Assets, use their commercially reasonable efforts to take, or cause to be taken, all actions and to do, or cause to be done, and cooperate with each other in order to do, all things necessary, proper or advisable under applicable Law to assign all of Sellers'

98

right, title and interest in the Restricted Assets to Purchaser or a Designated Purchaser, as applicable, as contemplated hereby on the Closing Date, notwithstanding the Additional Bankruptcy Proceeding, Adverse International Injunction or inability of the Main Sellers to cause such entity listed on Exhibit A to sign this Agreement, as applicable.

(b) If, ten (10) Business Days prior to the Closing Date, it has become apparent to the Parties that such Additional Bankruptcy Proceeding, Adverse International Injunction or inability of the Main Sellers to cause such entity listed on Exhibit A to sign this Agreement, will prevent a Seller or entity listed on Exhibit A, as applicable (the "**Restricted Seller**") from assigning the Restricted Assets to the Purchaser or a Designated Purchaser, as applicable, as of the Closing Date, then, as of the Closing Date, such Restricted Assets shall automatically be deemed Excluded Assets hereunder, the Restricted Seller shall be excused from delivering the Restricted Assets and, without prejudice to all other obligations of the Purchaser and the other Sellers hereunder, Purchaser shall be relieved from its rights and obligations to acquire such Restricted Assets or assume any Assumed Liabilities in respect thereof (the "**Restricted Liabilities**") and  the Purchase Price shall be reduced by an amount equivalent to the Market Value of such Restricted Assets and Restricted Liabilities (the "**Downward Adjustment**").

(c) For a period of one-hundred eighty (180) days following the Closing, the Sellers and the Purchaser shall, in respect of the Restricted Assets that have become Excluded Assets pursuant to Section 5.26(b), continue to use their commercially reasonable efforts to take, or cause to be taken, all actions and to do, or cause to be done, and cooperate with each other in order to do, all things necessary, proper or advisable under applicable Law to assign such Restricted Assets of the relevant Restricted Seller to Purchaser or a Designated Purchaser, as promptly as reasonably practicable within such period.  To the extent the Restricted Assets are assigned to Purchaser or a Designated Purchaser, as applicable, Purchaser or a Designated Purchaser shall assume the related Restricted Liabilities, then as of the transfer date (i) the Restricted Assets and the Restricted Liabilities shall be deemed respectively Assets and Assumed Liabilities hereunder and (ii) Purchaser shall pay to the Distribution Agent by wire transfer to the account designated by the Main Sellers pursuant to Section 2.4 an amount in cash equal to the Downward Adjustment.

Section 5.27.   Transition Services Agreement.

The Parties agree to enter into and finalize the schedules to the Transition Services Agreement in accordance with the provisions of Exhibit 5.27.

Section 5.28.   Avoidance Actions. The Sellers covenant that they shall not commence any action under sections 544 through 551, 553 and 558 of the U.S. Bankruptcy Code against any counterparty to a 365 Customer Contract with respect to such 365 Customer Contract.

Section 5.29.   Competing Transaction.  From the date of this Agreement until the entry of the U.S. Bidding Procedures Order, and from the date of the conclusion of the Auction (as defined in the U.S. Bidding Procedures Order) until the Closing Date or termination of this Agreement, neither any Seller nor any Affiliate of any Seller shall, directly or indirectly through any of its officers, directors, employees, agents, professional advisors or other representatives (collectively, the "**Representatives**"), (i) solicit, initiate or encourage or engage in discussions or

negotiations with respect to any proposal or offer from any Person (other than the Purchaser or its affiliates) relating to in each case any transaction that would be considered an Alternative Transaction (a **"Competing Transaction"**), (ii) furnish any information with respect to, or participate in, or assist, any effort or attempt by any Person to do or seek the foregoing, (iii) execute any letter of intent or agreement providing for a Competing Transaction, or (iv) seek or support Bankruptcy Court approval of a motion or Order inconsistent with the transactions contemplated herein (provided, however, that nothing contained herein shall prohibit the Sellers from providing any Person with the Bidding Procedures and related documents, answering questions about the Bidding Procedures or announcing the execution of this Agreement or the Auction). Notwithstanding the foregoing, from the date of this Agreement until the entry of the U.S. Bidding Procedures Order, the Sellers may provide continued access to written due diligence materials about the Business in an electronic data room (including written responses to requests for information made after the date hereof), to only such Person or Persons (and their representatives) that (A) have access to such electronic data room as of the date hereof and (B) have satisfied the requirements of paragraph (a) of the "Participation Requirements" of the U.S. Bidding Procedures Order within ten (10) Business Days from the date hereof (it being understood that, during such ten (10) Business Day period, the Sellers will be allowed to (x) request such Persons to enter into amendments to their existing confidentiality agreements in order to render them compliant with the requirements of the U.S. Bidding Procedures, (y) discuss and negotiate such amendments with those Persons and (z) execute such amendments, and each such action shall not constitute a breach of this Section 5.29); provided, however, that the Sellers must provide the Purchaser at least equivalent access to all such written due diligence materials. Without prejudice to any other methods or actions that may result in the cure of any breach of this Section 5.29, the Parties acknowledge and agree that in the event that any officer or other employee of any Seller acting alone (without the assistance of outside advisors) in violation of a corporate policy approved by the board of directors of NNC takes an action that constitutes a breach of clause (i) of this Section 5.29 but does not constitute a breach of any other clause of this Section 5.29, such breach shall be deemed cured in the event such action ceases and one or more of the Sellers notifies the counterparty or counterparties to the potential Competing Transaction in writing that the Sellers will not undertake such Competing Transaction, in each case no later than the fifth (5th) day after the Sellers become aware of such breach (for such purposes excluding the knowledge of the employee or officer whose action constitutes such breach), provided that such action that constituted the breach did not involve substantive negotiations regarding the terms of such Competing Transaction.

   Section 5.30. Purchaser Financial Statements. To the extent the Closing has not occurred prior to March 1, 2010, prior to the Closing the Purchaser shall provide to the Main Sellers true and complete copies of the audited consolidated balance sheets of the Purchaser and its consolidated Subsidiaries as of December 31, 2009 and December 31, 2008 and the related consolidated audited statements of income, cash flows and statements of changes of stockholders' equity for the years then ended, accompanied by the reports thereon of the Purchasers' independent auditors. Such financial statements shall be prepared based upon the financial books and records maintained by the Purchaser in accordance with GAAP and fairly present in all material respects the consolidated financial position, results of operations, cash flows and stockholders' equity of the Purchaser and its consolidated Subsidiaries as of their respective dates and for the respective periods indicated.

Section 5.31.  Subleases.  For each of the Assumed and Subleased Real Estate Leases and Non-365 Subleased Real Estate Leases, to the extent permitted by, and in accordance with, the terms of the related master lease and applicable Law, the relevant Seller, as sublandlord, and Purchaser or a Designated Purchaser, as subtenant, will enter into a sublease (each, a "**Sublease**") in accordance with and as provided by the terms of the RETC.  For the avoidance of doubt, Seller's and Purchaser's respective obligation to enter into and the effectiveness of a Sublease shall be conditioned upon receipt of consent of the master landlord to the extent required by the terms of the related master lease.

Section 5.32.  Direct Leases.  With respect to the Direct Lease Real Estate, to the extent permitted by, and in accordance with, the terms of the related ground lease, if applicable, and applicable Law, Purchaser agrees that the relevant Seller, as landlord, and Purchaser or a Designated Purchaser, as tenant, will enter into a lease (each, a "**Direct Lease**") in accordance with and as provided by the terms of the RETC.  For the avoidance of doubt, Seller's and Purchaser's respective obligation to enter into and the effectiveness of a Direct Lease shall be conditioned upon receipt of consent of the ground lessor to the extent required by the terms of the related ground lease, if applicable.

Section 5.33.  Licenses.  For each of the Licensed Real Estate Leases, the Non-365 Licensed Real Estate Leases and the Direct Lease Real Estate, to the extent permitted by, and in accordance with, the terms of the related master lease and applicable Law, Purchaser agrees that the relevant Seller, as licensor, and Purchaser or a Designated Purchaser, as licensee, will enter into a license (each, a "**License**") at Closing in accordance with and as provided by the terms of the RETC.  For the avoidance of doubt, Seller's and Purchaser's respective obligation to enter into and the effectiveness of a License shall be conditioned upon receipt of consent of the master landlord to the extent required by the terms of the related master lease.

## ARTICLE VI

## TAX MATTERS

Section 6.1.    Transfer Taxes.

(a)  The Parties agree that the Purchase Price is exclusive of any Transfer Taxes. The Purchaser shall (on behalf of itself and the Designated Purchasers) promptly pay directly to the appropriate Tax Authority all applicable Transfer Taxes imposed upon or payable or collectible or incurred, in each case, as a direct result of the transfer of Assets to the Purchaser or a Designated Purchaser pursuant to this Agreement or the Local Sale Agreements; provided, that if any such Transfer Taxes are required to be collected, remitted or paid by a Seller or any Subsidiary, Affiliate, representative or agent thereof, such Transfer Taxes shall be paid by the Purchaser to such Seller, Subsidiary, Affiliate, representative or agent, as applicable, in accordance with Section 6.7(b) and as requested of or by the applicable Seller.  To the extent that any Seller or any Subsidiary, Affiliate, representative or agent thereof is required to collect, remit or pay such Transfer Taxes but is entitled to a deduction, credit or refund for such Transfer Taxes, such Seller shall reimburse the Purchaser or the relevant Designated Purchaser the amount of such deduction, credit or refund within thirty (30) days of the use or receipt of such deduction, credit or refund by such Seller or other Person, provided that, for the

101

avoidance of doubt, the Seller shall not be required to reimburse the Purchaser for Seller's or any Subsidiary's use of any credit that is unrelated to the Transfer Taxes for which the Purchaser is responsible pursuant to this Section 6.1(a). The Sellers hereby agree to use commercially reasonable efforts (taking into account available resources) to claim or apply for any deduction, credit or refund in all jurisdictions where permissible pursuant to applicable Law. For the avoidance of doubt, Purchaser shall be liable in respect of any Transfer Taxes as provided in this Section 6.1(a) regardless of the date that the Assets are removed from the premises of a Seller or any Seller's supplier. Upon request from a Seller, the Purchaser shall provide to such Seller an original receipt (or such other evidence as shall be reasonably satisfactory to such Seller) evidencing the payment of Transfer Taxes by the Purchaser to the applicable Tax Authority under this Section 6.1(a) and, in the case set forth in the proviso of the second sentence of this Section 6.1(a), vice versa.

(b) The Sellers, the Purchaser and any Designated Purchasers shall cooperate in timely filing all Tax Returns as may be required in connection with the payment of such Transfer Taxes. The Sellers, on the one hand, and the Purchaser and the Designated Purchasers, on the other hand, shall, as appropriate, use commercially reasonable efforts to execute and deliver all instruments and certificates reasonably necessary to enable the other to comply with any filing requirements and Laws relating to any such Transfer Taxes.

(c) If the Purchaser or any Designated Purchaser wishes to claim any exemption relating to, or a reduced rate of, or make an election with the effect of reducing, Transfer Taxes, in connection with this Agreement or the transactions contemplated herein, or in connection with the execution of any other Transaction Document, the Purchaser or any Designated Purchaser, as the case may be, shall be solely responsible for ensuring that such exemption, reduction or election applies and, in that regard, shall provide the Sellers prior to Closing with its permit number, GST, VAT or other similar registration numbers and/or any appropriate certificate of exemption, election and/or other document or evidence to support the claimed entitlement to such exemption or reduction by the Purchaser or such Designated Purchaser, as the case may be. All Parties shall make reasonable efforts to cooperate to the extent necessary to obtain any such exemption or reduction.

(d) Provided that in the opinion of the relevant Sellers and the Purchaser the sale qualifies for such an election or application, the Purchaser and the relevant Designated Purchasers shall jointly execute with the applicable Seller an election under Section 167(1) of Part IX of the Excise Tax Act (Canada) and any similar election or application provided under applicable Laws, in the forms prescribed for such purposes, such that the sale of the Assets will take place without payment of any GST, value-added Tax or similar Tax. The Purchaser or the relevant Designated Purchaser, as the case may be, shall file within the prescribed filing period all forms supporting such election or application with the relevant Tax Authority, together with its Tax Returns for the applicable reporting periods during which the sale of the Assets contemplated herein occurs.

Section 6.2.    Withholding Taxes.  To the extent that the Purchaser or a Designated Purchaser is required under the Code or any provision of U.S. state or local, or non-U.S. Law to deduct and withhold an amount on payment of the Purchase Price, such withheld amounts shall be treated for all purposes of this Agreement as having been paid to the Persons in respect of

which such deductions and withholdings were made. The Purchaser and the Designated Purchasers shall promptly remit such withheld amounts to the appropriate Government Entity. None of the Parties is aware of any obligation to deduct and withhold any amounts from the Purchase Price under the Code or any provision of U.S. state or local, or non-U.S. Law, with respect to the making of such payment. If any of the Parties learns of any such obligation on or prior to the Closing Date, then (i) in the case of a Seller, such Seller shall promptly provide reasonable notice of such obligation to the Purchaser and (ii) in the case of the Purchaser, the Purchaser shall promptly provide reasonable notice of such obligation to the Sellers. The Parties shall make commercially reasonable efforts to cooperate in good faith to minimize the amounts that the Purchaser or Designated Purchasers, as the case may be, are required to deduct and withhold.

Section 6.3.    Tax Characterization of Payments Under This Agreement. The Sellers and the Purchaser agree to treat all payments made either to or for the benefit of the other Party under this Agreement (other than payment of the Estimated Purchase Price and any interest payments) as adjustments to the Purchase Price for Tax purposes to the extent permitted under applicable Tax Law.

Section 6.4.    Apportionment of Taxes.

(a) Except as otherwise provided in this ARTICLE VI, (i) the Sellers shall and shall cause the other Sellers, as the case may be, to bear (A) all Taxes of any kind relating to the Assets or the conduct or operation of the Business (excluding the EMEA Business) for all Tax periods or portions thereof ending on or before the Closing Date and (B) all Taxes of any Seller imposed on or measured by such Seller's net income, gross income, capital, gross receipts, profits, and all Taxes of the same or of a similar nature, for any Tax period (excluding Transfer Taxes that are the responsibility of the Purchaser pursuant to Section 6.1(a)) and (ii) the Purchaser shall and shall cause the Designated Purchasers to bear all Taxes relating to the Assets or the conduct or operation of the Business (excluding the EMEA Business) for all Tax periods or portions thereof beginning after the Closing Date.

(b) For purposes of this Agreement, any Taxes for a "**Straddle Period**" (a Tax period that includes, but does not end on, the Closing Date) shall be apportioned between the Sellers, on the one hand, and the Purchaser and the Designated Purchasers, on the other hand, based on the portion of the period ending on and including the Closing Date and the portion of the period beginning after the Closing Date, respectively. The amount of Taxes shall be allocated between portions of a Straddle Period in the following manner: (i) in the case of a Property Tax, the amount of Tax allocable to a portion of the Straddle Period shall be the total amount of such Tax for the period in question multiplied by a fraction, the numerator of which is the total number of days in such portion of such Straddle Period and the denominator of which is the total number of days in such Straddle Period, and (ii) in the case of all other Taxes (other than Transfer Taxes allocated under Section 6.1), such Taxes shall be determined from the books and records of the relevant Person as though the taxable period terminated at the close of business on the Closing Date.

Section 6.5.    Records.

103

(a) Notwithstanding the provisions of Section 5.22, (i) after the Closing Date, the Purchaser and the Designated Purchasers, on the one hand, and the Sellers, on the other hand, will make available to the other, as reasonably requested, and to any Tax Authority, all information, records or documents relating to liability for Taxes with respect to the Assets, the Assumed Liabilities, or the Business (excluding the EMEA Business) for all periods prior to or including the Closing Date (including Straddle Periods), and will preserve such information, records or documents until the expiration of any applicable statute of limitations or extensions thereof, and (ii) in the event that one party needs access to records in the possession of a second party relating to any of the Assets, the Assumed Liabilities or the Business (excluding the EMEA Business) for purposes of preparing Tax Returns or complying with any Tax audit request, subpoena or other investigative demand by any Tax Authority, or for any other legitimate Tax-related purpose not injurious to the second party, the second party will allow representatives of the other party access to such records during regular business hours at the second party's place of business for the sole purpose of obtaining information for use as aforesaid and will permit such other party to make extracts and copies thereof as may be necessary or convenient. The obligation to cooperate pursuant to this paragraph shall terminate at the time the relevant applicable statute of limitations expires (giving effect to any extension thereof).

(b) At any time within the ten (10) years immediately following the Closing, NNL and Nortel Networks Technology Corporation ("**NNTC**") may cause copies of Restricted Technical Records to be placed into escrow with the Records Custodian, who shall hold such Restricted Technical Records for a term ending no later than ten (10) years after the Closing Date in accordance with an escrow agreement between the Purchaser (or the Designated Purchaser, as applicable), NNL and NNTC and the Records Custodian, in form satisfactory to the Purchaser (or the Designated Purchaser), NNL and NNTC. The Purchaser (or the Designated Purchaser) shall have no obligation to provide any assistance to NNL and NNTC with respect to placing copies of Restricted Technical Records into escrow unless NNL and NNTC pay all of the Purchaser's (or the Designated Purchaser's) reasonable costs and expenses in connection with the foregoing, including a reasonable per diem rate for access to former employees of NNL or NNTC, as the case may be (based on the total compensation of the employee at the time access is provided). The escrow agreement will provide for access to the copies of the Restricted Technical Records only by the relevant Canadian Tax Authority or by Tax advisors of any purchaser ("**Tax Credit Purchaser**") relating to the scientific research and experimental development tax credits of NNL and NNTC under the Income Tax Act (Canada), and only if such advisors have executed an appropriate confidentiality agreement in form satisfactory to the Purchaser (or the Designated Purchaser), acting reasonably. The access permitted by the escrow agreement shall be only for the limited purpose of defending any audit, claim or action by any Canadian Tax Authority in respect of the characterization of expenditures by NNL or NNTC as qualified expenditures on scientific research and experimental development for purposes of the applicable provisions of the Income Tax Act (Canada) ("**Qualified Expenditures**").

(c) The Purchaser or the Designated Purchaser shall use reasonable efforts to make available to the relevant Tax Authority or Tax advisors of the Tax Credit Purchaser, those former employees of NNL or NNTC, as the case may be, with direct knowledge of the Qualified Expenditures who are then employed by the Purchaser and whose cooperation is necessary for the purpose of defending any audit, claim or action by any Tax Authority of the characterization

of expenditures by NNL or NNTC, as the case may be, as Qualified Expenditures, and provided such advisors have executed an appropriate confidentiality agreement satisfactory to the Purchaser or the Designated Purchaser.

(d)  The Purchaser shall have no obligation to provide any access under this provision unless the Sellers (if there is no Tax Credit Purchaser in respect of the request for access) or the Tax Credit Purchaser pays all the Purchaser's reasonable expenses in connection with the foregoing provisions, including a reasonable per diem rate for access to former employees of NNL or NNTC, as the case may be (based on the total compensation of the employee at the time access is provided).

(e)  The Sellers shall have no obligation to provide any access under this provision unless the Purchaser pays all of the Sellers' reasonable expenses in connection with the foregoing provisions, including a reasonable per diem rate for access to employees of the Sellers (based on the total compensation of the employee at the time access is provided).

Section 6.6.    Tax Disclosure.  Notwithstanding anything to the contrary in this Agreement, except as reasonably necessary to comply with applicable securities laws and regulations, any Party may (i) consult any Tax adviser regarding the U.S. and Canadian federal income Tax treatment or Tax structure of the transactions contemplated by this Agreement, and (ii) disclose to any and all Persons, without limitation of any kind, the U.S. and Canadian federal income Tax treatment and Tax structure of the transactions contemplated hereunder and all materials of any kind (including opinions or other Tax analyses) that are provided to such Person relating to such Tax treatment and Tax structure (but without disclosure of identifying information or any non-public commercial or financial information); provided, however, that clause (ii) of this Section 6.6 shall not apply until the date of the public announcement of the execution of this Agreement and performance of the transactions contemplated hereunder. For this purpose, "Tax structure" is limited to any facts relevant to the U.S. and Canadian federal income Tax treatment of the transactions contemplated hereunder.

Section 6.7.    Tax Returns.

(a)  The Sellers shall be responsible for the preparation and timely filing (taking into account any extensions received from the relevant Tax Authorities) of all Tax Returns in respect of the Assets or the Business (excluding the EMEA Business), for all Pre-Closing Taxable Periods (other than any Tax Returns with respect to Transfer Taxes ("**Transfer Tax Returns**"), the preparation of which is described below in Section 6.7(b)). Such Tax Returns shall be true, correct and complete in all material respects. Except as otherwise provided in this Agreement, all Taxes indicated as due and payable on such Tax Returns shall be paid by (or shall be caused to be paid by) Sellers as and when required by Law. The Sellers shall provide drafts of such Tax Returns with respect to non-income Taxes to the Purchaser no later than five (5) Business Days prior to the relevant due date and shall in good faith consider any comments made by the Purchaser with respect thereto.

(b)  Each Transfer Tax Return with respect to Transfer Taxes imposed in respect of this Agreement and the transactions contemplated herein or in respect of the execution of any other Transaction Document shall be prepared by the Party that has primary responsibility

105

for filing such Transfer Tax Return pursuant to the applicable Tax Laws. Any Transfer Tax Returns prepared by the Sellers pursuant to this Section 6.7(b) (along with such information as will enable the Purchaser to review that portion of such Transfer Tax Returns that is applicable to the sale and purchase transaction contemplated by this Agreement) shall be provided to the Purchaser at least five (5) Business Days before such Tax Returns are due to be filed. Purchaser shall be entitled to comment on any Transfer Tax Return prepared by a Seller prior to making any payment in respect thereof, such comments to be provided at least three (3) Business Days before such Transfer Tax Returns are due to be filed, and in the event of disagreement between the Parties, and subject to Section 6.9(b), the relevant Transfer Tax Return shall be filed in accordance with the Purchaser's reasonable comments, it being understood that the Purchaser shall remain responsible for any Transfer Taxes for which it is responsible pursuant to Section 6.1(a) whether or not shown on such Tax Return. The Purchaser shall pay to the Sellers any amount of Transfer Taxes payable in respect of Transfer Tax Returns to be filed by the Sellers pursuant to this Section 6.7(b) at least one (1) Business Day before such Transfer Tax becomes due and payable, in each case to the extent such Transfer Taxes are the responsibility of the Purchaser pursuant to Section 6.1(a).

(c) The Purchaser or a Designated Purchaser shall be responsible for the preparation and timely filing (taking into account any extensions received from the relevant Tax Authorities) of all Tax Returns with respect to the Assets or the Business (excluding the EMEA Business) for all Straddle Periods. Such Tax Returns shall be true, correct and complete in all material respects. All Taxes indicated as due and payable on such Tax Returns shall be paid by (or shall be caused to be paid by) the Purchaser or a Designated Purchaser as and when required by Law, except for such Taxes that are the responsibility of Sellers pursuant to this ARTICLE VI. Taxes that are the responsibility of the Sellers pursuant to this ARTICLE VI shall be paid by the Sellers to the Purchaser or Designated Purchaser no later than three (3) Business Days prior to the due date for the applicable Straddle Period Tax Return.

(d) The Sellers shall be entitled to review and comment on any Tax Return (other than a Transfer Tax Return described in Section 6.7(b)) prepared by the Purchaser or a Designated Purchaser for any Straddle Period before any such Tax Return is filed. The Purchaser shall submit a draft of any such Tax Return to the Main Sellers at least thirty (30) days before the date such Tax Return is required to be filed with the relevant Tax Authority. The Main Sellers shall have ten (10) days after the date of receipt thereof to submit to the Purchaser, in writing, the Main Sellers' written comments with respect to such Tax Return. The Purchaser shall notify the Main Sellers within five (5) days after receipt of such comments of (a) the extent, if any, to which the Purchaser accepts such comments and will file such Tax Return in accordance therewith and (b) the extent, if any, to which the Purchaser rejects such comments. To the extent the Purchaser rejects the comments of the Main Sellers, the Purchaser and the Main Sellers promptly shall negotiate in good faith to resolve their disagreements; if no agreement has been reached within three (3) days, the Parties immediately shall appoint an Independent Auditor to determine the correct manner for reporting the items that are in dispute and shall provide to the Independent Auditor all relevant information. The Independent Auditor shall have ten (10) days to submit its determination, which shall be binding upon the Parties, and the Purchaser shall file such Tax Return in accordance therewith.

The fees and expenses of the Independent Auditor shall be paid by the Party whose position is deemed to be least correct by the Independent Auditor.

(e) Prior to Closing, the Seller shall use its best efforts to obtain and deliver to the Purchaser certificates issued pursuant to (i) section 99 of the Social Service Tax Act (British Columbia) (the "BC SSTA"); (ii) subsection 56(2) of the Revenue Tax Act (Prince Edward Island) (the "PEI RTA"); (iii) section 45 of the Tax Administration and Miscellaneous Taxes Act (Manitoba) and (iv) section 51 of the Revenue and Financial Services Act (Saskatchewan) indicating that all requisite Taxes collectible under the BC SSTA, the PEI RTA, the Retail Sales Tax Act (Manitoba) and the Provincial Sales Tax Act (Saskatchewan), as the case may be, have been paid by the Sellers.

Section 6.8.    Canadian Tax Matters.

(a) The Sellers and the Purchaser or Designated Purchaser shall elect jointly under Section 22 of the Income Tax Act (Canada) and the corresponding provision of any other provincial legislation with respect to the sale of the Unbilled Accounts Receivable in a manner consistent with the Allocation, if such election is available in the opinion of the Sellers, acting reasonably.

(b) The Parties acknowledge and agree that the Purchase Price is consideration for and relates directly to the sale of the Assets and that no portion relates to a restrictive covenant as defined in Section 56.4 of the Income Tax Act (Canada).

Section 6.9.    Purchase Price Allocation.

(a) The Parties and the EMEA Sellers shall (i) first allocate to the tangible Assets, the tangible EMEA Assets and the Unbilled Accounts Receivable a proportion of the Purchase Price (and to the extent properly taken into account under applicable Tax Laws, the Assumed Liabilities and the EMEA Assumed Liabilities) equal to the net book value of such Assets and such EMEA Assets as of the Closing Date and (ii) then allocate the balance of the Purchase Price, as adjusted in clause (i) of this Section, to the intangible Assets and the intangible EMEA Assets.

(b) To the extent necessary to file Transfer Tax Returns, the Parties agree to negotiate in good faith to determine an allocation of the Purchase Price (and, to the extent properly taken into account under the applicable Tax Laws, the Assumed Liabilities and EMEA Assumed Liabilities) among the Assets and the EMEA Assets in accordance with the principles of Section 1060 of the Code and the Treasury regulations promulgated thereunder and other applicable Tax Laws (such allocation, a **"Partial Allocation"**). The Partial Allocation shall be consistent with the principles of Section 6.9(a). If the Parties do not reach agreement on a Partial Allocation after negotiating in good faith, the Partial Allocation shall be submitted to the Independent Auditor, which shall prepare a final Partial Allocation; provided, however, that if a different Partial Allocation is required by a Government Entity (including, for this purpose, an allocation required, approved or authorized pursuant to a Bankruptcy Proceeding), then the Partial Allocation shall be modified as necessary to be consistent with the required allocation (but in all cases shall be subject to the principles of Section 6.9(a) to the extent permitted by such

107

Government Entity). Notwithstanding the preceding sentence, if the Parties have not reached agreement on the Partial Allocation and the Independent Auditor has not submitted its determination on or before the date that a Transfer Tax Return is required to be filed with the relevant Tax Authority (giving effect to any valid extensions) pursuant to Section 6.7(b), then such Transfer Tax Return shall be timely filed in the manner that the Purchaser reasonably determines (the **"Transfer Tax Determination"**) and the Party responsible for filing such Transfer Tax Return shall, upon receiving the Independent Auditor's later determination and to the extent permitted under applicable Law, promptly file an amended return in accordance therewith. The Purchaser agrees to indemnify and hold harmless Sellers' respective officers and directors from any Transfer Taxes (for which the Purchaser is responsible pursuant to Section 6.1(a)), penalties, fines and attorneys fees they incur solely arising out of or resulting from the Transfer Tax Determination, for the avoidance of doubt, which Transfer Taxes, penalties, fines and attorneys fees would not have arisen or resulted had the relevant Transfer Tax Return been filed pursuant to the position advocated by the Sellers. The Parties agree (i) to be bound by the final Partial Allocation accepted by the Parties or prepared by the Independent Auditor (as modified to be consistent with the allocation required by a Government Entity, as described in the foregoing sentence), as applicable, and (ii) to act in accordance with the allocations contained in such final Partial Allocation for all purposes relating to Transfer Taxes, including the preparation and filing of any Transfer Tax Returns. For purposes of this Section 6.9(b), the term Parties shall include the EMEA Sellers only to the extent any negotiations or agreement (to be bound) required hereunder concern Transfer Tax Returns, provided that, in respect of the EMEA Sellers, the term "Transfer Tax Determination" exclusively means any allocation arrived at pursuant to Clause 11.21 of the EMEA ASA.

      Section 6.10.  Other Tax Matters.

      (a) The Sellers, on the one hand, and the Purchaser, on the other hand, shall use commercially reasonable efforts (taking into account available resources) to cooperate fully with each other in the conduct of any audit, litigation or other proceeding or Action relating to Taxes involving the Assets or the Partial Allocation. The Sellers shall promptly notify the Purchaser in writing upon receipt by any Seller of notice of any pending or threatened Tax audit, assessment or Action relating to the income, properties or operations of the Sellers that reasonably may be expected to relate to or give rise to a Lien on the Assets. The Sellers, on the one hand, and the Purchaser, on the other hand, shall promptly notify the other in writing upon receipt of written notice of any pending or threatened Tax audit, assessment or Action challenging a Partial Allocation with respect to Transfer Taxes.

      (b) The Sellers shall make commercially reasonable efforts to cooperate with the Purchaser and its Affiliates (i) to obtain any applicable forms, certificates or other information and (ii) to comply with any procedure established by applicable Law or a Government Entity, in each case as is reasonably requested and reasonably necessary to establish, quantify, reduce or eliminate the extent to which the Purchaser or any Designated Purchaser could be liable under applicable Law for any Taxes of the Sellers that are Excluded Liabilities, including by reason of a Lien being filed on the Assets or as a result of such Purchaser or Designated Purchaser being a transferee or successor under applicable Law, and the Sellers and the Purchaser shall reasonably cooperate with each other in order to eliminate

108

or reduce any material successor Tax liability or material Lien for Taxes on the Assets, provided that the Parties agree and acknowledge that any information, records or documents provided pursuant to this Section 6.10(b) shall only be used for the purposes contemplated in this Section 6.10(b) and provided further that any such cooperation to be provided in this Section 6.10(b) shall not include or extend to (a) a liquidation or restructuring of a Seller or any business of a Seller, including the transfer of any assets or Assets or liabilities or Assumed Liabilities between Sellers or their Affiliates, except in the Sellers' commercially reasonable discretion, but in no case if there is a material cost to Seller or its Affiliates resulting from such liquidation or restructuring, unless the Seller or the relevant Affiliate is indemnified (prior to such liquidation or restructuring) against any cost or expense of such liquidation or restructuring to its satisfaction (acting at all times reasonably and in good faith); (b) any action or omission that would result in the imposition on any Seller or any Affiliate of any Seller of any additional Tax liability or making any additional payment to any Tax Authority or Government Entity in respect of Tax which is an Excluded Liability, unless such Seller or Affiliate is (prior to the relevant action or omission), indemnified against such additional Tax liability or payment, (c) any action or omission that would result in any material out of pocket cost or expense for any Seller or any Affiliate of any Seller, unless such Seller or Affiliate is (prior to the relevant action or omission), indemnified against such cost or expense to their satisfaction (acting at all times reasonably and in good faith) by the Purchaser; (d) any action or omission which would cause the Sellers or any Affiliates of the Sellers to be in contravention of any applicable Law (including Bankruptcy Law) or published practice of a Tax Authority; (e) changing the identity or Tax residence of any Sellers, the location of any Assets or Assumed Liabilities, the nature or extent of any Assets or Assumed Liabilities, the Assets or Assumed Liabilities to be transferred by any particular Seller or the structure of the transaction as an asset sale rather than the sale of any form of entity, except in the Sellers' commercially reasonable discretion, but in no case if there is a material cost to Seller or its Affiliates resulting from such action, unless the Seller or the relevant Affiliate is indemnified (prior to such action) against any cost or expense of such action to its satisfaction (acting at all times reasonably and in good faith); or (f) any reduction in the obligations of the Purchaser or rights of the Sellers, in each case under Section 2.5.

(c) Notwithstanding the provisions of Section 6.10(b), the Purchasers and the Designated Purchasers shall not, and shall not request that the Sellers or any Affiliate of any Seller, approach, contact or otherwise apply to any Tax Authority or Government Entity in India, or any political subdivision thereof or therein, or any representative of the foregoing, for forms, certificates (including any clearance certificate or approval under the Income Tax Act, 1961) or other information, or to engage in any procedure, in each case to establish, quantify, reduce or eliminate the extent to which the Purchaser or any Designated Purchaser could be liable under applicable Law for any Taxes of the Sellers that are Excluded Liabilities.

Section 6.11.  North American Tax Escrow

(a) In the event that any Tax Authority shall (A) make any claim against any Purchaser, Designated Purchaser, or any of their Affiliates (a "**Purchaser Party**") for any Taxes that are Excluded Liabilities of any Seller or (B) have in its favor a Lien on any of the Assets arising out of the non-payment of any Taxes that are Excluded Liabilities of a Seller

109

(any Taxes described in (A) and (B) above hereby are referred to collectively as "**Excluded Taxes**"), such Purchaser Party shall be entitled to recover all losses, damages and reasonable and documented out of pocket expenses ("**Losses**") arising out of or in connection with such Excluded Taxes promptly (in accordance with the following provisions) by obtaining cash from the Tax Escrow Amount in an amount equal to the aggregate amount of such Losses, provided that (i) the aggregate amount to be recovered under this Section 6.11 in respect of such Losses shall not exceed the Tax Escrow Amount (plus any accrued interest on the Tax Escrow Amount); and (ii) the only Losses recoverable under this Section 6.11 shall be the amount of Excluded Taxes claimed, and any additional Losses incurred by a Purchaser Party after the earlier of the date on which a Tax Authority has made a claim described in (A) above or registered or imposed a Lien described in (B) above, as applicable.

(b) If a claim for Losses under Section 6.11(a) (a "**Tax Claim**") is to be made by a Purchaser Party, the Purchaser shall give written notice (a "**Tax Claim Notice**") on behalf of such Purchaser Party to the Main Sellers promptly after such Purchaser Party becomes aware that a Tax Authority has made a claim against it for any Excluded Taxes or that such Taxes have given rise to a Lien described in clause (B) of subsection (a) above, as applicable, stating, with reasonable specificity, the basis for the Tax Claim, and including a copy of all relevant documents received from the relevant Tax Authority. In the event that any Purchaser Party is entitled to recover the amount of any such Losses from the Tax Escrow Amount, the Purchaser and the Main Sellers shall issue joint written instructions to the Escrow Agent authorizing distribution of the amount of such Losses to such Purchaser Party and such Purchaser Party shall be responsible for paying over to the relevant Tax Authority the amount of Excluded Taxes distributed to it from the Tax Escrow Amount to the extent it has not already done so at the time of the distribution of such amount from such fund and shall provide Sellers with such written evidence as is reasonably requested in writing to confirm that payment to the relevant Tax Authority has been duly made.

(c) On the date that is the first Business Day after the first anniversary of the Closing Date, the Purchaser and the Main Sellers shall deliver to the Escrow Agent joint written instructions to release to the Distribution Agent, on behalf of the Sellers and the EMEA Sellers, any remaining portion of the Tax Escrow Amount (including any accrued interest thereon) in excess of an amount equal to the aggregate of all Tax Claims which have been asserted prior to such date evidenced by one or more Claim Notices and which remain pending and unresolved on such date. Thereafter, as soon as reasonably practicable after the final resolution of any such Tax Claims, the Purchaser and the Main Sellers shall issue joint written instructions to the Escrow Agent to release to the Distribution Agent, on behalf of the Sellers and the EMEA Sellers, any remaining portion of the Tax Escrow Amount (including any accrued interest thereon).

(d) In the event that a Claim Notice is served, the Purchaser shall take such steps as are commercially reasonable to mitigate or otherwise defend the assessment(s) made by the relevant Tax Authority. In the event that a payment from the Tax Escrow Amount is made to a Purchaser Party pursuant to this Section 6.11, and subsequently a Purchaser Party becomes entitled to and receives a refund that is attributable to Excluded Taxes that were paid to such Purchaser Party from the Tax Escrow Amount (in whole or in part), then the Purchaser

110

shall, or shall cause the relevant Purchaser Party to, promptly pay to the Distribution Agent, on behalf of the Sellers and the EMEA Sellers, an amount equal to the portion of such refund so attributable (including any interest paid in connection with such portion), net of reasonable out-of-pocket expenses incurred by the Purchaser Party in obtaining such portion, unless (i) such refund is received prior to the first anniversary of the Closing Date or (ii) at the time the refund is received, the Tax Escrow Amount is less than the sum of the Tax Claims that are evidenced by one or more Claim Notices and which remain pending and unresolved on such date, then, in each case, the Purchaser Party shall pay the net amount of such portion to the Escrow Agent to be added to the Tax Escrow Amount.

(e) Notwithstanding anything to the contrary in this Agreement, recourse to the Tax Escrow Amount under this Section 6.11 shall be the sole and exclusive remedy available to the Purchaser and any Designated Purchaser following the Closing in respect of any liability for Taxes that are Excluded Liabilities of a Seller or any liability for Taxes that give rise to any Lien on any Assets in each case in the jurisdictions set forth on Schedule 6.11(e),

## ARTICLE VII

## EMPLOYMENT MATTERS

Section 7.1.     Employment Obligations with Respect to Non-Union Employees. Except for the provisions of Section 7.1.1(a)-(d) and Section 7.1.2(c)(iii), which shall apply to all Transferred Employees, the provisions of this Section 7.1 shall apply only to Non-Union Employees. Subject to the first two sentences of Section 7.1.1(a), the provisions of this Agreement shall not apply to EMEA Employees.

7.1.1.  Employment Terms.

(a) The Purchaser hereby agrees to offer employment to a minimum aggregate number of one thousand six hundred thirty-eight (1,638) Employees, which shall include the minimum number of Employees to be offered employment in each region as specified in Section 7.1.1(a) of the Sellers Disclosure Schedule;  provided, however, that if as of the Closing Date the number of Transferring Employees is fewer than the number of employees specified in Section 7.1.1 of the Sellers Disclosure Schedule for the EMEA region, the Purchaser shall not be required to extend a number of additional offers to Employees equal to such difference. For the avoidance of doubt, such aggregate minimum shall include all Employees who transfer by operation of Law (including all Union Employees employed in Canada) and all Transferring Employees, whose employment shall be governed by the EMEA Asset Sale Agreement (for the avoidance of doubt, no Offers will be required to be made to ARD Transferring Employees (as defined in the EMEA Asset Sale Agreement) whose contracts of employment will transfer to the Purchaser by operation of Law), but the number of Transferring Employees will be included within the minimum number set forth above, and the terms of Offers made to Non-ARD Transferring Employees (as defined in the EMEA Asset Sale Agreement) will be governed by the EMEA Asset Sale Agreement). The minimum aggregate number above shall not include Transitional Employees. Within thirty (30) days following the granting of the U.S. Sale Order and the Canadian Approval and Vesting Order, the Purchaser shall notify the Sellers of the identity of the Employees on Section 4.11(b) of the

111

Sellers Disclosure Schedule by unique identifier (the **"Identified Employees"**) to whom the Purchaser or a Designated Purchaser intends to provide a written offer of employment or notice of continued employment (each an **"Offer"** and collectively, the **"Offers"**); provided that, promptly after the date hereof, the Sellers and their Affiliates have provided the Purchaser with access to such information as the Purchaser reasonably requires in accordance with Section 5.6(a), Section 5.6(e) and Section 7.4(d) in order to make such identifications (except as prohibited by Law); provided, further, that up to two weeks prior to the Closing Date and subject to Section 7.4(g), the Purchaser shall be permitted to notify the Sellers of names of additional Employees who remain employed with the Sellers at the time of such notice that the Purchaser shall wish to make an Offer to in the event that the initial Employees who receive Offers do not meet the contingencies in the Offer set forth below (other than the contingency in clause (D)) or do not accept the Offer, and such additional Employees shall be deemed to be Identified Employees upon the later to occur of the initial Employees' (who receive Offers) failure to meet the contingencies in the Offer or accept the Offer and Purchaser's notice to Seller of the names of such additional employees (such employees, **"Additional Employees"**). Promptly following Purchaser's notification to Seller of Identified Employees, but in any event no later than the time required to provide the Offer Consideration Period described below, the Purchaser shall, or shall cause a Designated Purchaser to, extend Offers to the Identified Employees.  Such Offers shall be in compliance with applicable Law, and the Sellers shall have the right to review any form of Offer with respect to a particular jurisdiction (and any Offer that deviates in any material respect from the form of Offer with respect to the relevant country).  Except with respect to Union Employees, such Offers shall, except to the extent otherwise required by Law, be for employment on terms and conditions that are substantially comparable to those terms and conditions of employment of similarly situated employees of the Purchaser or a Designated Purchaser, as applicable and, without limiting the generality of the foregoing, shall include (i) (A) for each such Employee (other than any such Employee who is engaged in sales or otherwise is subject to a commission or other bonus plan related to sales (collectively, **"Sales Employees"**)), an annual base salary and annual target incentive that is equal to the annual base salary and annual target incentive for such Employee as set out in the Employee Information, and (B) for each Sales Employee, an annual base salary plus annual target incentive equal in the aggregate to the annual base salary plus annual target incentive for such Employee as set out in the Employee Information; provided that annual base salary for each Sales Employee shall not be less than 95% of the annual base salary for such Sales Employee as set out in the Employee Information, (ii) employment in a reasonably comparable position as set out for such Employee in the Employee Information, and (iii) a location reasonably near to the Employee's current location as set out for such Employee in the Employee Information.  The Purchaser shall provide in its Offers that the Employee's acceptance of such Offer will be deemed to be a consent to the transfer of such Employee's particular Employee Record as provided in Section 7.4(e).  Seller shall provide to the Purchaser such available and relevant information in accordance with Section 5.6(a), and Seller and Purchaser shall cooperate in good faith, so as to enable Purchaser to comply with its undertakings under this Section 7.1.1.  Employees' employment with Purchaser or a Designated Purchaser or, with respect to Employees whose employment transfers by operation of Law, continued employment after the Employee Transfer Date, shall not include a probationary period but may be contingent, except with respect to Union Employees, (A) on each such Employee passing a background check, to the extent permitted and consistent with

112

applicable Law, (B) on such Employee's production of evidence that he or she is legally permitted to be employed by the Purchaser or a Designated Purchaser, as required by applicable Law, (C) in the case of Inactive Employees (other than Employees whose employment transfers by operation of Law), upon such Employee's return to active status with the Purchaser or one of its Affiliates and (D) upon the Closing.  The Offers shall be made prior to the Closing in compliance with this Section 7.1.1 and shall provide each such Employee with a consideration period prior to the Closing that is no less than two weeks, or such longer period as required by applicable Law (the **"Offer Consideration Period"**).  As soon as reasonably practicable following the Sellers' receipt from the Purchaser of the notice containing the Identified Employees (as required pursuant to the fourth sentence of this Section 7.1.1(a)) but in all events prior to Closing, the Sellers shall take any and all action permitted under applicable Law and applicable Collective Labor Agreements legally necessary to cause the termination of employment, effective prior to the Closing, of each Employee set forth on Section 4.11(b) of Sellers Disclosure Schedule who is not an Identified Employee but only to the extent such employment would otherwise transfer to the Purchaser or a Designated Purchaser by operation of Law.

(b) Purchaser shall notify the Main Sellers of the acceptance and rejections of offers of employment that have been received from each of the Employees (x) on at least a weekly basis during the Offer Consideration Period and (y) in total within three (3) Business Days following the end of the Offer Consideration Period.

(c) Any Identified Employee who accepts an Offer of employment and commences employment with the Purchaser or a Designated Purchaser, and any Employees whose employment transfers by operation of Law, shall be deemed to be a Transferred Employee for all purposes of this Agreement. Inactive Employees shall remain employed by the relevant Seller until the first (1st) Business Day that such Inactive Employee reports to work with the Purchaser or a Designated Purchaser after having been released to return to active employment in accordance with Sellers' leave policies.  Visa Employees and Other Loaned Employees shall remain employed by the relevant Seller under the terms and conditions of the Loaned Employee Agreement. The Purchaser or a Designated Purchaser shall use its commercially reasonable efforts from the date of notification to Sellers of the Identified Employees (as provided for in Section 7.1.1(a)) until the Closing Date to obtain, at its cost, such visas or permits as are required for the Purchaser or Designated Purchaser to employ Visa Employees who accept Offers.

(d) The Effective Hire Date is (i) the Employee Transfer Date for those Employees other than Inactive Employees, Visa Employees, Transitional Employees and Other Loaned Employees (ii) 12:01 a.m. on the first Business Day that each Inactive Employee reports to work with the Purchaser or a Designated Purchaser after having been released to return to active employment in accordance with Sellers' leave policies for all Inactive Employees, (iii) the date specified in the Loaned Employee Agreement with respect to Visa Employees and Other Loaned Employees, and (iv) 12:01a.m. on the first Business Day that each Transitional Employee reports to work with the Purchaser or Designated Purchaser.

(e) As of the Effective Hire Date and, except as otherwise provided herein and on Section 7.1.1(e) of the Sellers Disclosure Schedule, for a period of not less than twelve (12)

113

months after the Closing Date, the employment of Transferred Employees shall be on terms and conditions set forth in Section 7.1 or on terms and conditions that are substantially the same in the aggregate thereto except as otherwise required by applicable Law.

(f) Notwithstanding the forgoing provisions of this Section 7.1.1, the Purchaser may, in its sole discretion, make offers of employment to up to fifty (50) Employees, other than Identified Employees, Additional Employees, Inactive Employees, Visa Employees, Other Loaned Employees and Employees whose employment transfers by operation of Law, on such terms and conditions as it determines in its sole discretion. The Purchaser shall provide the Sellers with the opportunity to review such offers of employment, and shall notify the Sellers of the identity of the Transitional Employees as soon as reasonably practicable after the date hereof, but in any event as of the date the Purchaser notifies the Sellers of the identity of Identified Employees as provided in Section 7.1.1(a).

7.1.2.   Employee Benefits.

(a) The Purchaser or a Designated Purchaser shall, and shall cause its relevant Affiliates to, recognize the service date of each Transferred Employee as set out in the Employee Information for all purposes, including membership and entitlement to benefits under all relevant Purchaser Employee Plans, but not for purposes of benefit accrual or otherwise for determination of the amount or duration of benefits under any Purchaser Employee Plan that is a defined benefit pension plan or under an equity incentive plan, except as otherwise provided herein, and, with respect to providing service recognition under Purchaser Employee Plans, to the extent each such Transferred Employee was entitled to recognition of such service date under the corresponding Seller Employee Plan in which such Transferred Employee participated or was eligible to participate (including any Seller Employee Plan that is suspended or the benefits of which are suspended), and to the extent that such crediting would not result in duplication of benefits or the funding thereof.

(b) After the date hereof, the Sellers and the Purchaser shall cooperate promptly and in good faith in preparing the transition of the Transferred Employees as applicable from coverage under the Seller Employee Plans to coverage under the Purchaser Employee Plans effective as of the Transferred Employee's Effective Hire Date. Except as set forth on Section 7.1.2(b) of the Sellers Disclosure Schedule, Purchaser shall provide Transferred Employees with benefits substantially comparable in the aggregate to the benefits provided to such Transferred Employees under Seller Employee Plans prior to the Closing.

(c) Without limiting the generality of the foregoing, the Sellers and the Purchaser shall, or shall cause their relevant Affiliates to, as applicable, provide the following benefits to Transferred Employees:

(i)    For the period beginning on the Closing Date and ending on the date that is twelve (12) months from the Closing Date, the Purchaser shall, or shall cause its relevant Affiliates to, provide Transferred Employees with the same severance payments and benefits as similarly situated employees of Purchaser or a Designated Purchaser following the crediting of such Transferred Employees with service as provided in Section 7.1.2(a).

114

(ii)     The Sellers shall pay the amount of compensation with respect to the accrued and unused vacation hours that is due and owing to the Transferred Employees (excluding those Transferred Employees specified in Section 7.1.2(c)(iii) of the Sellers Disclosure Schedule, which shall include Union Employees (the "**Specified Transferred Employees**")), up to their Effective Hire Date, to such Transferred Employees at or as soon as reasonably practicable following their Effective Hire Date or such earlier time as may be required under applicable Law. With respect to those Transferred Employees located in Canada, the payment by the Sellers pursuant to this Section 7.1.2(c)(ii) shall be in exchange for an acknowledgement and consent, which shall be included by Purchaser in the Offer, by each such Transferred Employee that he or she has received full compensation from the Sellers for such accrued and unused vacation days and has no entitlement to the vacation time associated therewith. The Purchaser will, and will cause the relevant Designated Purchasers to, use its commercially reasonable efforts to accommodate requests for unpaid time off of such Transferred Employees until such time as they accrue sufficient paid time off under the Purchaser Employee Plans to address their vacation plans.

(iii)Section     7.1.2(c)(iii) of the Sellers Disclosure Schedule sets forth the Accrued Vacation Amount and the number of accrued and unused vacation days that are due and owing to the Specified Transferred Employees as of the date hereof and updated by Sellers as of the Closing Date. The Purchaser shall, or shall cause its relevant Affiliates to, grant each Specified Transferred Employee covered by Section 7.1.2(c)(iii) of the Sellers Disclosure Schedule paid time off in an amount equal to such accrued unused vacation days for Specified Transferred Employee as set forth in the Section 7.1.2(c)(iii) of the Sellers Disclosure Schedule. If such Specified Transferred Employee terminates employment with the Purchaser or an Affiliate of the Purchaser prior to receiving such paid time off, as described above, the Purchaser shall pay such Specified Transferred Employee an amount equal to any such unused paid time off upon such employment termination.

(iv)     The vacation accrual rate and maximum accrual of each Transferred Employee on and after the Effective Hire Date shall be determined (i) under the vacation policy of the Purchaser or the Designated Purchaser applicable to similarly situated employees, if any, located in the country where such Transferred Employee is employed (or if no such employees exist in the applicable country, at the discretion of the Purchaser exercised in a manner consistent with Section 7.1.2(b)) as of the relevant Effective Hire Date, and (ii) following the crediting of such Transferred Employee with service as provided in Section 7.1.2(a). For the avoidance of doubt, such vacation accrual rate and maximum accrual applicable to Specified Transferred Employees shall not be decreased by the Purchaser or an Affiliate of the Purchaser as a result of the obligation in this Section 7.1.2(c) that the Purchaser or its Affiliates grant such Specified Transferred Employees accrued and unused vacation days due and owing as of the Closing Date.

(v)     The Purchaser or Designated Purchaser shall provide each Transferred Employee employed in India with the benefit of the amount set forth on Section 7.1.2(c)(v) of the Sellers Disclosure Schedule of gratuity payment, at such time,

115

if any, as such payment thereof is due and owing to each such Transferred Employee under applicable Law, taking into account in the calculation of such payment the service of such Transferred Employee as set forth in the Employee Information and such Transferred Employee's service with Purchaser on and after the Closing Date. The Purchaser or Designated Purchaser shall provide each Transferred Employee employed in Australia and New Zealand with the benefit of the amount set forth on Section 7.1.2(c)(v) of the Sellers Disclosure Schedule of long service leave and sick leave and each Transferred Employee located in Hong Kong with the benefit of the amount set forth in Section 7.1.2(c)(v) of the Sellers Disclosure Schedule of sick leave, at such time, if any, as payment of such amount is due and owing to each such Transferred Employee under applicable Law, taking into account in the calculation of such payment the service of such Transferred Employee as set forth in the Employee Information and such Transferred Employee's service with Purchaser on and after the Closing Date. The Purchaser or Designated Purchaser shall provide each Transferred Employee employed in the U.A.E., Saudi Arabia and Tunisia with any end of service payment for which they are eligible upon the termination of such Transferred Employee's employment, taking into account such Transferred Employee's service with Sellers as set out in Section 7.1.2(c)(v) of the Sellers Disclosure Schedule and such Transferred Employee's service with Purchaser on and after the Closing Date. Section 7.1.2(c)(v) of the Sellers Disclosure Schedule shall be updated as of the Closing Date to reflect status changes and attrition, and further accruals or reductions or other changes from the date hereof to the Closing Date.

(vi)    With respect to each Transferred Employee (and their eligible dependents, as applicable), the Purchaser or the relevant Purchaser's Affiliates shall cause Purchaser Employee Plans applicable to such Transferred Employees in the United States and Canada to and shall use commercially reasonable efforts to cause Purchaser Employee Plans applicable to Transferred Employees in other jurisdictions to waive any eligibility periods, evidence of insurability or pre-existing condition limitations. With respect to each Transferred Employee (and their eligible dependants, as applicable), the Purchaser or the Relevant Designated Purchaser shall use commercially reasonable efforts to cause Purchaser Employee Plans to honor any deductibles, co-payments, co-insurance or out-of-pocket expenses paid or incurred by such employees, including with respect to their dependents, under comparable Seller Employee Plans during the Purchaser Employee Plan year in which the relevant Effective Hire Date occurs; provided that such employee provides an explanation of benefits or similar documentation of such expenses paid or incurred to the Purchaser or its Affiliates, and in each case to the extent waived, inapplicable to such Transferred Employee, or honored under the Seller Employee Plans in which such Transferred Employee participated immediately prior to the Closing and to the extent doing so will not result in the duplication of benefits.

(d) The Sellers shall be solely responsible for any required notice under the WARN Act with respect to terminations of employment of Employees other than Transferred Employees and Transitional Employee that occur on or prior to the Closing Date and for any individual who does not become a Transferred Employee or Transitional Employee regardless of the date of termination provided that the Purchaser or Designated Purchaser, as applicable,

116

has satisfied its obligations as set out in this ARTICLE VII. The Purchaser shall be solely responsible for any required notice under the WARN Act with respect to terminations of employment of Transferred Employees or Transitional Employee that occur after the Closing Date. On the Closing Date, the Sellers shall provide to Purchaser, in writing, the number of Employees, by facility and operating unit, who have experienced an "employment loss" (as defined under the WARN Act) during the ninety (90) days prior to Closing. For the purposes of the preceding sentence, the "WARN Act" means the Worker Adjustment and Retraining Notification Act of 1989, as amended, or any similar Law in the United States relating to plant closing or mass layoff.

(e) Nothing express or implied in this Agreement (including without limitation anything set forth in this Section 7.1) restricts the right of the Purchaser or any Designated Purchaser after the Closing Date to terminate the employment of any Transferred Employee, to modify the compensation or employee benefits of any Transferred Employee or relocate any Transferred Employee's principal place of employment, provided any such termination, modification or relocation is effected in accordance with applicable Law, the terms of any applicable Purchaser Employee Plan and the terms and conditions of this Section 7.1.

(f) Notwithstanding anything to the contrary in this Article VII, on and after the Closing Date, the Purchaser or any Designated Purchaser shall be entitled to designate, in accordance with the terms and subject to the limitations set forth in this Section 7.1.2(f), one or more third party operators or Affiliates of the Purchaser or any Designated Purchaser to employ any Transferred Employees (other than Union Employees) resident in a country (other than Canada or the United States) in which the Purchaser or any Designated Purchaser does not otherwise directly employ any individuals as of the date hereof (any such third party operator or Affiliate of the Purchaser or Designated Purchaser that shall be properly designated by the Purchaser or Designated Purchaser in accordance with this Section 7.1.2(f) a "Third Party Operator"); it being understood and agreed, however, that any such right of the Purchaser or a Designated Purchaser to designate a Third Party Operator is conditioned upon (i) such Third Party Operator being able to perform the applicable covenants set forth in this ARTICLE VII, and (ii) any such designation not creating any Liability (including any Liability relating to Taxes) for the Sellers or their Affiliates that would not have existed had the Purchaser or a Designated Purchaser employed the Transferred Employees or Transitional Employees, and which Liability is not fully reimbursed by or on behalf of the Purchaser or a Designated Purchaser. No such designation shall relieve the Purchaser or a Designated Purchaser of any of its obligations under this Article VII. Any breach hereof by a Third Party Operator shall be deemed a breach by the Purchaser or the relevant Designated Purchaser. The Purchaser shall inform the Main Sellers of its designation of any Third Party Operator at least ten (10) Business Days prior to delivering Offers to the Employees that such Third Party Operator shall employ pursuant to Section 7.1.1(a), and shall provide reasonable information with respect to such Third Party Operators promptly upon the reasonable request of the Main Sellers.

Section 7.2.    Employment Obligations with Respect to Union Employees. The provisions of this Section 7.2 shall apply to Union Employees. As of the Closing Date the Purchaser or its relevant Affiliate will be bound by the terms and obligations of the Collective Labor Agreements specified in the Employee Information with respect to the employment of

117

Union Employees who are Transferred Employees as a successor, assign or purchaser of the relevant Seller and shall employ such Union Employees in accordance therewith. Notwithstanding anything to the contrary herein, nothing in this Section 7.2 shall be deemed to preclude the Purchaser or the relevant Affiliates from renegotiating the terms of any Collective Labor Agreement after the Closing Date.

Section 7.3.    Excluded Employee Liabilities.  For purposes of clarity, the Sellers shall retain, and neither the Purchaser nor any of the Designated Purchasers or Purchaser Employee Plans shall assume at the Closing, any of the following Liabilities of the Sellers, their Affiliates or Seller Employee Plans (the "**Excluded Employee Liabilities**"):

(a)  Liabilities related to the Seller Employee Plans or any employee plans or arrangements related to former employees of the Business (excluding the EMEA Business) employed by the Sellers, including the Sellers' or any of their Affiliates' or Seller Employee Plans' obligations to contribute to, make payments with respect to or provide benefits under any Seller Employee Plan, except with respect to (i) the Specified Employee Liabilities, (ii) the Assumed Liabilities, and (iii) as specified in the Loaned Employee Agreement;

(b)  any Liability with respect to the KERP, the KEIP or any other retention plan, program or arrangement of the Sellers that provides benefits to any Transferred Employee or Transitional Employee;

(c)  any obligation to provide continuation coverage pursuant to COBRA under any Seller Employee Plan that is a "group health plan" (as defined in Section 5000(b)(1) of the Code) to the Employees and/or their qualified beneficiaries with respect to a COBRA qualifying event that occurs prior to such Employees' Effective Hire Date including, for avoidance of doubt, an Employee's termination of employment from the Sellers or their Affiliates;

(d)  Except with respect to the Assumed Liabilities and as provided for in Article VII, Liabilities relating to (i) any Employee's or a former employee's employment or termination of employment with any of the Sellers or their Affiliates, including any severance or similar obligations that may arise as a result of the transfer of an Employee's employment to the Purchaser or one of its Affiliates or as a result of the Employee's refusal of the Offer and any Liabilities that relate to the Inactive Employees', Visa Employees' and Other Loaned Employees' employment or termination of employment with any of the Sellers or their Affiliates, except as otherwise provided in the Loaned Employee Agreement, or (ii) an applicant with respect to potential employment with any of the Sellers or their Affiliates in the Business (excluding the EMEA Business);

(e)  Except with respect to the Assumed Liabilities and as provided for in Article VII or the Loaned Employee Agreement, Liabilities resulting from any Action relating to any Seller Employee Plan or any Employee with respect to periods of employment with the Sellers prior to the Effective Hire Date.

Section 7.4.    Other Employee Covenants.

118

(a) After the date hereof, and subject to each Party's disclosure obligations imposed by Law or by Government Entities and each Party's obligations hereunder, neither the Sellers, the Purchaser, nor any of their respective Affiliates shall issue any announcement or communication to their respective employees or the Employees, prior to consultation with, and the approval of, the other Party (not to be unreasonably withheld or delayed) with respect to this Agreement or any of the transactions contemplated hereby. If requested, the non-requesting Party shall reasonably cooperate with the requesting Party in respect of the development and distribution of any announcement and communication to the employees of the Sellers, including Employees, with respect to this Agreement or any of the transactions contemplated hereby.

(b) The Purchaser undertakes to keep the Employee Information and any additional information provided to the Purchaser by the Sellers with respect to individually identifiable Employees (collectively, "**Employee Data**") in confidence including taking the following actions (until the relevant Effective Hire Date with respect to those Employees who become Transferred Employees or Transitional Employees, and at all times with respect to those Employees who do not become Transferred Employees or Transitional Employees):

(i)     the Purchaser shall, and shall cause the Designated Purchasers to, restrict the disclosure of the Employee Data only to such of its employees, agents and advisors as is reasonably necessary for the purposes of complying with its obligations pursuant to this Agreement;

(ii)    the Employee Data shall not be used except for the purposes of complying with the obligations of the Purchaser and the Designated Purchasers pursuant to this Agreement and shall be returned to the Sellers or destroyed, at the Sellers' election, if this Agreement is terminated; and

(iii)   the Purchaser shall, and shall cause the Designated Purchasers to, comply with such additional obligations as may be reasonably required in any particular jurisdiction to comply with any applicable data privacy Laws.

(c) The Sellers shall use reasonable efforts to provide updated Employee Information to the Purchaser on the first Business Day of each month beginning after the date hereof, provided that from and after the date on which the Purchaser notifies Seller of its initial list of Identified Employees to whom Offers shall be made under Section 7.1.1, the Sellers shall provide updated Employee Information only with respect to the Identified Employees and Additional Employees, and shall provide the Purchaser with the final updated Employee Information with respect to Identified Employees (including any applicable Additional Employees) to whom the Purchaser has made Offers under Section 7.1.1 ten (10) Business Days prior to the Closing Date in order to reflect Employee hiring, promotions, demotions, transfers, or other status changes and attrition, and further accruals or reductions or, if and to the extent applicable to such schedule, other changes in each Employee's compensation from the date hereof to the Closing Date, in each case if and only to the extent permitted under Section 5.9.

119

(d) The Purchaser and the Sellers shall cooperate with each other to provide for an orderly transition of the Transferred Employees and Transitional Employees from the Sellers to the Purchaser or the Designated Purchasers, as applicable (including the providing of any information by the Sellers to the Purchaser as may be reasonably requested by the Purchaser for purposes of complying with its obligations pursuant to ARTICLE VII, subject to Section 5.6(a)), and to minimize the disruption to the respective businesses of the Parties resulting from the transactions contemplated hereby.

(e) On or prior to the six (6) month anniversary of each Transferred Employee's Effective Hire Date, except to the extent prohibited by applicable data privacy Laws and subject to consent by such employee to be obtained by the Purchaser or Designated Purchaser in his or her Offer (including any consent, if required, to transfer Employee Records across geographical boundaries), or as otherwise required by Law, the Sellers shall provide the Purchaser or the Designated Purchaser with the Employee Records (or a copy thereof) of such Transferred Employee, excluding data related to such Transferred Employees' protected status under applicable Law and HR SAP data elements previously provided to the Purchaser or the Designated Purchaser pursuant to Section 5.6(e). Further, after the Effective Hire Date and prior to Sellers' delivery to Purchaser of the relevant Employee Records as provided herein, the Purchaser may request in writing an individual Employee Record in relation to a reasonably contemplated employment termination by the Purchaser or a Designated Purchaser or other reasonable business purpose and, except to the extent prohibited by applicable data privacy Laws and subject to consent by such employee to be obtained by the Purchaser or Designated Purchaser in his or her Offer (including any consent, if required, to transfer Employee Records across geographical boundaries), the Seller shall provide such individual Employee Record as soon as practicable but in any event within five (5) Business Days following receipt of such request. With respect to such Employee Records provided by the Sellers to the Purchaser or Designated Purchasers, in the event that the Sellers reasonably need access to such Employee Records for purposes of complying with a subpoena or in connection with any pending or threatened Action, the Purchaser or Designated Purchaser will allow the Sellers reasonable access to such Employee Records for the sole purpose of obtaining information for use as aforesaid and will permit the Sellers to make copies thereof as may be necessary or convenient.

(f) During the Non-Solicitation Period, the Sellers shall not, and shall not permit, cause or encourage any of their Affiliates to, without the advance written consent of the Purchaser, either directly or indirectly solicit for employment or hire any Transferred Employee unless the employment of such Transferred Employee is involuntarily terminated by the Purchaser or Designated Purchaser prior to such action by the Sellers; provided, however, that nothing in this Section 7.4(f) shall prevent the Sellers from (i) conducting generalized employment searches, including placing bona fide public advertisements, that are not specifically targeted at such Transferred Employees or (ii) hiring such Transferred Employees identified through such employment searches.

(g) During the Non-Solicitation Period, the Purchaser and the Designated Purchasers shall not, without the Seller's advance written consent or as expressly permitted by this Agreement or an Ancillary Agreement, either directly or indirectly solicit for employment or hire (i) any of the employees of the Sellers who are not Employees, unless the employment

120

of such employee is involuntarily terminated by the Sellers prior to such action by the Purchaser or the Designated Purchasers, (ii) any Employees who have rejected their Offer or objected to their transfer of employment to the Purchaser or Designated Purchasers pursuant to this Agreement, or (iii) any Employees to whom the Purchaser or any Designated Purchaser have not made an Offer; provided, however, that nothing in this Section 7.4(g) shall prevent the Purchaser or the Designated Purchasers from (x) conducting generalized employment searches, including placing bona fide public advertisements, that are not specifically targeted at such employees or former employees of the Sellers or (y) hiring such employees or former employees of the Sellers identified through such employment searches; provided, further, that, with respect to any Employee described in clauses (ii) and (iii) above who becomes employed with the Purchaser or a Designated Purchaser (other than by operation of Law) during the twelve (12) month period following the Closing Date (other than Transitional Employees who have received offers of employment pursuant to Section 7.1.1(f)), the Purchaser and the Designated Purchasers shall be required to reimburse the Sellers, if applicable, for any pay in lieu of notice (including WARN Act notice) and/or severance payments to the extent paid by the Sellers to such Employee and, if applicable, obtain releases from such Employees of any rights to such payments from Sellers.

(h)  As of the Effective Hire Date, neither the Sellers nor any of their Affiliates shall enforce any non-competition, non-solicitation, confidentiality or similar contractual obligation in respect of the Business or Assets binding to the Transferred Employees which would survive the termination of the employment relationship between the Sellers and the Transferred Employees.

(i)  During the period beginning on the later of (i) the approval of the U.S. Sale Order and (ii) the Canadian Approval and Vesting Order, and ending on the Closing Date, unless otherwise specifically required by applicable Law, the Sellers shall not limit the Purchaser or the Designated Purchasers' ability to contact and communicate with the unions or any collective bargaining agents that are parties to the Collective Labor Agreements listed in Section 4.11(d) of the Sellers Disclosure Schedule. For the avoidance of doubt, unless otherwise specifically required by applicable Law, the Sellers shall not limit the Purchaser or the Designated Purchasers' ability to negotiate with the union or any collective bargaining agent regarding the terms and conditions of employment with respect to the Union Employees who are Transferred Employees; provided, however, that (i) the Purchaser or the Designated Purchasers shall not negotiate directly or indirectly with any Union Employee who is not a recognized representative of a union or a member of the union's collective bargaining team, (ii) the Purchaser or Designated Purchaser shall provide, upon the Sellers' reasonable request, updated information regarding the Purchaser's or Designated Purchaser's contact and communication with the unions or collective bargaining agent, as applicable, and the status of any such negotiations, (iii) the Purchaser or the Designated Purchasers shall not bind or purport to bind any of the Sellers to any amendment to any collective agreement or any other agreement with any union, and (iv) any changes that the Purchaser or the Designated Purchasers may negotiate with a union shall be conditional upon and only take effect following Closing.

Section 7.5.    Canadian Pension Plans.

121

(a) Non-Union Defined Benefit. As of the relevant Effective Hire Date, the Non-Union Employees who have any entitlement to defined benefits under the Nortel Networks Limited Managerial and Non-Negotiated Pension Plan (the **"Nortel Canadian Pension Plan"**), whether such Non-Union Employees were accruing such benefits as of the Effective Hire Date or whether accrual had ceased prior to the Effective Hire Date, shall cease to participate actively in such Seller Employee Plan. The Purchaser shall cause such Non-Union Employees who become Transferred Employees to participate in a defined contribution registered pension plan (the **"Canadian Non-Union DC Replacement Plan"**) to be established by the relevant Designated Purchaser effective as of the day after the Closing Date. The Purchaser shall cause the Canadian Non-Union DC Replacement Plan to recognize the prior service of such Transferred Employees with the Seller for the purpose of eligibility to participate, vesting and entitlement to benefits. The Canadian Non-Union DC Replacement Plan shall contain an employer contribution formula of at least 1% of the salary of such Transferred Employees, subject to any applicable tax Law. The Designated Purchaser shall maintain the Canadian Non-Union DC Replacement Plan in respect of such Transferred Employees without any adverse amendment until the earlier of (i) five (5) years after the Closing Date or their respective employment termination dates with the Designated Purchaser, whichever is earlier, or (ii) such time as the wind-up of the Nortel Canadian Pension Plan occurs.

(b) Non-Union Defined Contribution. As of the relevant Effective Hire Date, the Non-Union Employees who participate in the defined contribution component of the Nortel Networks Limited Managerial and Non-Negotiated Pension Plan shall cease to participate actively in, and accrue benefits under, such Seller Employee Plan. The Purchaser shall cause such Non-Union Employees who become Transferred Employees to participate in the Canadian Non-Union DC Replacement Plan beginning as of the relevant Effective Hire Date. The Purchaser shall cause the Canadian Non-Union DC Replacement Plan to recognize the prior service of such Transferred Employees with the Seller for the purposes of eligibility to participate, vesting and entitlement to benefits. The Canadian Non-Union DC Replacement Plan shall contain an employer contribution formula of at least 1% of the salary of such Transferred Employees, subject to any applicable tax Law.

(c) Union Defined Benefit. As of the relevant Effective Hire Date, the Union Employees who were accruing defined benefits under the Nortel Networks Negotiated Pension Plan shall cease to participate actively in, and accrue benefits under, such Seller Employee Plan. Except as otherwise agreed to with the relevant union, the Purchaser shall cause such Union Employees who become Transferred Employees to participate in a defined benefit registered pension plan (the **"Canadian DB Replacement Plan"**) to be established by the relevant Designated Purchaser effective as of the day after the Closing Date and which shall contain a benefit formula which is no less favorable than the formula in the Nortel Networks Negotiated Pension Plan and which shall otherwise comply with the terms and obligations of the applicable Collective Labor Agreements. . The Purchaser shall cause the Canadian DB Replacement Plan to recognize the prior service of such Transferred Employees with the Seller for the purposes of eligibility to participate, vesting and entitlement to benefits, but not for the purpose of benefit accrual.

122

(d) <u>Union Defined Contribution</u>. As of the relevant Effective Hire Date, the Union Employees who participate in the defined contribution component of the Nortel Networks Negotiated Pension Plan shall cease to participate actively in, and accrue benefits under, such plan. Except as otherwise agreed to with the relevant union, the Purchaser shall cause such Union Employees who become Transferred Employees to participate in a defined contribution registered pension plan (the "**Canadian Union DC Replacement Plan**") to be established by the Purchaser effective as of the day after the Closing Date. The Purchaser shall cause the Canadian Union DC Replacement Plan to recognize the prior service of such Transferred Employees with the Seller for the purposes of eligibility to participate, vesting and entitlement to benefits. The Canadian Union DC Replacement Plan shall comply with the terms and obligations of the Collective Labor Agreements specified in the Employee Information with respect to the employment of the relevant Union Employees as a successor, assign or purchaser of the relevant Seller and shall not affect or change in any respect the provisions in such Collective Labor Agreement.

(e) <u>Pension Liability</u>. For greater certainty, (i) none of the Seller, the Nortel Networks Managerial and Non-Negotiated Pension Plan, nor the Nortel Networks Negotiated Pension Plan shall have any obligation to transfer, and none of the Purchaser, the Canadian Non-Union DC Replacement Plan, the Canadian DB Replacement Plan, the Canadian Union DC Replacement Plan, nor any other Purchaser Employee Plan shall have any obligation to accept assets or Liabilities in respect of defined benefit or defined contribution accruals accrued prior to the Closing Date, and (ii) any Liability with respect to any pension entitlement accrued by any Non-Union Employee or Union Employee prior to the Closing Date shall remain the exclusive liability of the Seller, the Nortel Networks Managerial and Non-Negotiated Pension Plan, and the Nortel Networks Negotiated Pension Plan, as the case may be, and none of the Purchaser, the Canadian Non-Union DC Replacement Plan, the Canadian DB Replacement Plan, the Canadian Union DC Replacement Plan, nor any other Purchaser Employee Plan shall have any Liability or obligation with respect to any pension entitlement accrued prior to the Closing Date.

Section 7.6.    <u>Sole Benefit of the Sellers and the Purchaser</u>. The terms and provisions of this ARTICLE VII are for the sole benefit of the Sellers and the Purchaser. Nothing contained herein, express or implied (i) shall be construed to establish, amend, or modify any Seller Employee Plan, any Purchaser Employee Plan, or any other benefit plan, program, agreement or arrangement, except as otherwise provided in Section 7.5, subject to the Purchaser's compliance with the provisions of ARTICLE VII, (ii) shall alter or limit the ability of the Purchaser, the Sellers, or any of their respective Affiliates to amend, modify or terminate any Seller Employee Plan, any Purchaser Employee Plan, or any other benefit or employment plan, program, agreement or arrangement after the Closing Date, subject to the Purchaser's compliance with the provisions of ARTICLE VII, except as otherwise provided in Section 7.5 (iii) is intended to confer or shall confer upon any current or former employee any right to employment or continued employment, or constitute or create an employment agreement with any Transferred Employee, or (iv) is intended to confer or shall confer upon any individual or any legal representative of any individual (including employees, retirees, or dependents or beneficiaries of employees or retirees, and collective bargaining agents or representatives) any right as a third-party beneficiary of this Agreement.

## ARTICLE VIII

## CONDITIONS TO THE CLOSING

Section 8.1.    Conditions to Each Party's Obligation. The Parties' obligation to effect, and, as to the Purchaser, to cause the relevant Designated Purchasers to effect, the Closing is subject to the satisfaction or the express written waiver of the Primary Parties, at or prior to the Closing, of the following conditions:

(a) *Regulatory Approvals.* All Regulatory Approvals shall have been obtained and shall remain in force and have not been set aside or modified, on appeal or otherwise.

(b) *No Injunctions or Restraints.* There shall be in effect no Law or material Order of any court or other Government Entity in the U.S., Canada or the United Kingdom prohibiting the consummation of the transactions contemplated hereby or by the EMEA Asset Sale Agreement.

(c) *U.S. Bidding Procedures Order and Canadian Sales Process Order.* The U.S. Bidding Procedures Order and the Canadian Sales Process Order, which shall include provisions that are substantially similar to the provisions set forth in the form of orders in Exhibit 5.1(b) (in the case of the U.S. Sale Order) and Exhibit 5.2.1 (in the case of the Canadian Sales Process Order) (in each case, with such changes thereto as the Purchaser and the Sellers both shall approve in writing, such approval not to be unreasonably withheld, conditioned or delayed), shall have been entered and become Final Orders.

(d) *U.S. Sale Order and Canadian Approval and Vesting Order.* The U.S. Sale Order and the Canadian Approval and Vesting Order, which shall include provisions that are substantially similar to the provisions set forth in Exhibit 5.1(b) (in the case of the U.S. Sale Order) and Exhibit 5.2.2 (in the case of the Canadian Approval and Vesting Order) (in each case, with such changes thereto as the Purchaser and the Sellers both shall approve in writing, such approval not to be unreasonably withheld, conditioned or delayed), (i) shall have been entered and (ii) shall not have been stayed as of the Closing Date and shall not be subject to appeal, stay, reversal or modification as of the Closing Date, provided that this condition under Section 8.1(d)(ii) shall be deemed satisfied if such appeal of or other request for stay reversal or modification of the U.S. Sale Order or Canadian Approval and Vesting Order does not pose a material challenge to such order.

(e) *Satisfaction of Conditions under EMEA Asset Sale Agreement.* The conditions to Closing of the EMEA Asset Sale Agreement set out in Clauses 15.1, 15.2 and 15.3 thereof (other than the condition regarding the satisfaction or waiver of the conditions hereunder) shall have been satisfied or waived in accordance with the terms of the EMEA Asset Sale Agreement (provided, that a Party may not assert the failure of this condition to be satisfied in the event that such failure is the result of, or has been caused by, a breach by such Party or its Affiliates of this Agreement or the EMEA Asset Sale Agreement that caused the applicable condition to Closing in the EMEA Asset Sale Agreement to not be satisfied).

124

(f) *Consummation of Closing under EMEA Asset Sale Agreement.* The transactions contemplated by the EMEA Asset Sale Agreement shall be completed simultaneously with the Closing hereunder.

Section 8.2.    Conditions to Sellers' Obligation. The Sellers' obligation to effect the Closing shall be subject to the fulfillment (or express written waiver by the Main Sellers), at or prior to the Closing, of each of the following conditions:

(a) No Breach of Representations and Warranties.

(i)    Each of the representations and warranties set forth in ARTICLE III (other than those referred to in clause (ii) below), disregarding all materiality qualifications contained therein, shall be true and correct (x) as if restated on and as of the Closing Date or (y) if made as of a date specified therein, as of such date, except, in each case, for any failure to be true and correct that, individually or together with such other failures, has not had, and would not reasonably be expected to have, a material adverse effect on the ability of the Purchaser to consummate the transactions contemplated by this Agreement and the Ancillary Agreements.

(ii)    Each of the representations and warranties set forth in Sections 3.1, 3.2 and 3.3, disregarding all materiality qualifications contained therein, shall be true and correct in all material respects (x) as if restated on and as of the Closing Date or (y) if made as of a date specified therein, as of such date.

(b) *No Breach of Covenants.* The covenants, obligations and agreements contained in Article II of this Agreement and the material covenants, obligations and agreements contained in other provisions of this Agreement, in each case to be complied with by the Purchaser or the Designated Purchasers on or before the Closing, shall not have been breached in any material respect.

Section 8.3.    Conditions to Purchaser's Obligation. The Purchaser's obligation to effect, and to cause the relevant Designated Purchasers to effect, the Closing shall be subject to the fulfillment (or express written waiver by the Purchaser), at or prior to the Closing, of each of the following conditions:

(a) No Breach of Representations and Warranties.

(i)    Each of the representations and warranties set forth in ARTICLE IV (other than those referred to in clause (ii) below), disregarding all materiality and Material Adverse Effect qualifications contained therein, shall be true and correct (x) as if restated on and as of the Closing Date or (y) if made as of a date specified therein, as of such date, except, in each case, for any failure to be true and correct that, individually or together with such other failures, has not had, and would not reasonably be expected to have, a Material Adverse Effect.

(ii)    Each of the representations and warranties set forth in Sections 4.1, 4.2, 4.3(a) and 4.15, disregarding all materiality and Material Adverse Effect

125

qualifications contained therein, shall be true and correct in all material respects (x) as if restated on and as of the Closing Date or (y) if made as of a date specified therein, as of such date.

(b) *No Breach of Covenants.* The covenants, obligations and agreements contained in Article II of this Agreement and the material covenants, obligations and agreements contained in other provisions of this Agreement, in each case to be complied with by the Purchaser or the Designated Purchasers on or before the Closing, shall not have been breached in any material respect.

(c) *Transfer of Assets.* The failure to transfer the Restricted Assets (if any), as set forth in Section 5.26, would not reasonably be expected to be materially adverse to the operations, results of operations or financial condition of the Business to be transferred hereunder and under the EMEA Asset Sale Agreement, taken as a whole, as compared to a transfer including such Restricted Assets.

## ARTICLE IX

## TERMINATION

Section 9.1.    <u>Termination</u>.  This Agreement may be terminated at any time prior to the Closing:

(a) by mutual written consent of the Primary Parties;

(b) by either the Main Sellers or the Purchaser, upon written notice to the other:

(i)    if the U.S. Bidding Procedures Order, in substantially the form attached as Exhibit 5.1(a) or in a form reasonably acceptable to the Purchaser and the Canadian Sales Process Order in substantially the form attached as Exhibit 5.2.1 or in a form reasonably acceptable to the Purchaser have not been entered within thirty (30) days from the date of this Agreement, then this agreement may be terminated within five (5) Business Days of the end of such thirty (30) day period, but shall not be capable of termination pursuant to this Section 9.1(b)(i) thereafter;

(ii)    if the U.S. Sale Order in substantially the form attached as Exhibit 5.1(b) or in a form reasonably acceptable to the Purchaser and the Canadian Approval and Vesting Order in substantially the form attached as Exhibit 5.2.2 or in a form reasonably acceptable to the Purchaser are not entered within twenty (20) days after completion of the Auction (as defined in the U.S. Bidding Procedures Order);

(iii)upon the    entry of an order by the U.S. Bankruptcy Court or the Canadian Court approving an Alternative Transaction;

126

        (iv)     if a Governmental Entity in the U.S., Canada or the United Kingdom (other than a Bankruptcy Court) issues a Final Order prohibiting the transactions contemplated hereby or by the EMEA Asset Sale Agreement;

        (v)     if the EMEA Asset Sale Agreement is terminated in accordance with its terms;

        (vi)     if the Closing does not take place on or prior to June 30, 2010; or

        (vii)     upon written notice to the other Party, upon such other Party's material breach of its obligation to close the transactions contemplated hereby at the Closing, which breach is not cured within five (5) days from the receipt of a written notice thereof;

        (c) (i) by the Main Sellers in the event of a material breach by the Purchaser of the Purchaser's representations, warranties, agreements or covenants set forth in this Agreement or the EMEA Asset Sale Agreement, which breach would result in a failure to satisfy the conditions to Closing set forth in Sections 8.1(a), 8.1(d), 8.1(e) or 8.2 or (ii) by the Purchaser in the event of a material breach by the Sellers of the Sellers' representations, warranties, agreements or covenants set forth in this Agreement, which breach would result in a failure to satisfy the conditions to Closing set forth in Sections 8.1(a), 8.1(d), 8.1(e), 8.3(a) or 8.3(b), as applicable, and, in each case, which, if capable of being cured, is not cured within twenty-five (25) days from receipt of a written notice from the non-breaching Party; or

        (d) by the Purchaser, upon written notice to the Main Sellers:

        (i)     upon the sale, transfer or other disposition, directly or indirectly, of any material portion of the Business or the Assets (other than as a going concern) in connection with the closure, liquidation or winding up of the Business or any of the Sellers other than as reflected in any Downward Adjustment or EMEA Downward Adjustment; or

        (ii)     if the Auction does not conclude by forty-five (45) Business Days after the later of the entry of the U.S. Bidding Procedures Order or the Canadian Sales Process Order; or

        (iii)     if the Purchaser is not selected as the Successful Bidder or the Alternate Bidder; or

        (iv)     upon (i) withdrawal, revocation or alteration of the U.S. Bidding Procedures Order, the Canadian Sale Process Order, the U.S. Sale Order or the Canadian Approval and Vesting Order in a manner materially adverse to the Purchaser or (ii) the Sellers' material failure to comply with the Bidding Procedures (as defined in the U.S. Bidding Procedures Order), which, in the case of either (i) or (ii) of this subsection, if capable of being cured, is not cured within ten (10) days of Sellers' receipt of a written notice of such withdrawal, revocation, alteration or failure;

provided, however, that the right to terminate this Agreement pursuant to Section 9.1(b)(i), Section 9.1(b)(ii), Section 9.1(b)(v) (pursuant to Clauses 15.4.2(E), 15.4.2(F), 15.4.3, 15.4.2(F), 15.4.4(A), 15.4.4(C), 15.4.4(D) and 15.4.4(E) of the EMEA Asset Sale Agreement), Section 9.1(b)(vi), Section 9.1(b)(vii), Section 9.1(c), Section 9.1(c), Section 9.1(d)(ii), Section 9.1(d)(iii) and Section 9.1(d)(iv) shall not be available to any Party whose breach hereof, or the EMEA Asset Sale Agreement, has been the principal cause of, or has directly resulted in, the event or condition purportedly giving rise to a right to terminate this Agreement under such clauses; provided, further, that a Party shall not be permitted to terminate this Agreement under Section 9.1(b)(v) or Section 9.1(c) if such Party is then itself in material breach of this Agreement.

Section 9.2.    Expense Reimbursement and Break-Up Fee.

(a) In the event that (i) this Agreement is terminated pursuant to Section 9.1(b)(ii), Section 9.1(b)(iii), Section 9.1(b)(iv), Section 9.1(b)(v)(pursuant to Clauses 15.4.2(B), 15.4.2(C), 15.4.2(E), 15.4.2(F), 15.4.2(G), 15.4.4(A), 15.4.4(B), 15.4.4(C), 15.4.4(D) and 15.4.4(E) of the EMEA Asset Sale Agreement), Section 9.1(b)(vi), Section 9.1(b)(vii)(by the Purchaser), Section 9.1(c)(ii), Section 9.1(d)(i), Section 9.1(d)(ii), Section 9.1(d)(iii) or Section 9.1(d)(iv), and (ii) other than with respect to termination pursuant to Section 9.1(b)(iii), Section 9.1(b)(v) (Pursuant to Clauses 15.4.2(C) and 15.4.2(D) of the EMEA Asset Sale Agreement) or Section 9.1(d)(iii), when this Agreement is terminated, the Purchaser is not in breach of this Agreement or the EMEA Asset Sale Agreement, which breach would result in a failure to satisfy any of the conditions to Closing set forth in Section 8.1 (other than (c) and (d) thereof in respect of a termination pursuant to Section 9.1(b)(ii) or 9.1(d)(iv)) or Section 8.2 of this Agreement, then the Sellers shall pay to the Purchaser a cash fee equal to the Seller Expense Reimbursement. Such amount shall be paid by wire transfer of immediately available funds to an account designated by the Purchaser and shall be paid after the termination of this Agreement within five (5) Business Days following receipt by the Main Sellers and NNUK of written notice from the Purchaser describing the fees and expenses that constitute the Expense Reimbursement in reasonable detail.

(b) If this Agreement is (i) (A) terminated pursuant to Section 9.1(b)(v)(pursuant to Clauses 15.4.2(F), 15.4.4(A) and 15.4.4(B) of the EMEA Asset Sale Agreement), Section 9.1(b)(vii)(by the Purchaser), Section 9.1(c)(ii) or Section 9.1(d)(i) and (B) when this Agreement is terminated, the Purchaser is not in breach of this Agreement or the EMEA Asset Sale Agreement, which breach would result in a failure to satisfy any of the conditions to Closing set forth in Section 8.1 or Section 8.2 of this Agreement or (ii) (A) terminated pursuant to Section 9.1(b)(ii), Section 9.1(b)(iii), Section 9.1.(b)(v)(pursuant to 15.4.2(B), Clauses 15.4.2(C),15.4.4(C) and 15.4.4(D) of the EMEA Asset Sale Agreement), Section 9.1(d)(ii) or Section 9.1(d)(iii), (B) other than with respect to termination pursuant to Section 9.1(b)(iii), Section 9.1(b)(v) (pursuant to Clauses 15.4.2(C) or 15.4.4(D) of the EMEA Asset Sale Agreement) or Section 9.1(d)(iii), when this Agreement is terminated, the Purchaser is not in breach of this Agreement or the EMEA Asset Sale Agreement, which breach which would result in a failure to satisfy any of the conditions to Closing set forth in Section 8.1 or Section 8.2 of this Agreement and (C) the Sellers consummate an Alternative Transaction within twelve (12) months following the termination of this Agreement, then the Sellers shall,

128

in addition to the Seller Expense Reimbursement, pay to the Purchaser pursuant to a wire transfer of immediately available funds to an account designated by the Purchaser, a cash fee equal to the Seller Break-Up Fee. If the Seller Break-Up Fee is payable pursuant to clause (i) of the preceding sentence then the Seller Break-Up Fee shall be payable with three (3) Business Days of termination. If the Seller Break-up Fee is payable pursuant to clause (ii) of this first sentence of this Section 9.2(b) then the Seller Break-up Fee shall be payable within three (3) Business Days of the consummation of the Alternative Transaction.

(c) Other than equitable relief to the extent permitted under Section 10.13, payment of the Seller Expense Reimbursement or the Seller Break-Up Fee as specified in this Section 9.2 shall be the sole and exclusive remedy of the Purchaser, whether at Law or in equity, for any failure by the Sellers or any of their respective Affiliates to consummate the transactions contemplated hereby or for any pre-Closing breach of this Agreement.

(d) The obligation of the Sellers to pay the Seller Break-Up Fee and the Seller Expense Reimbursement shall be joint and several among the Sellers and shall survive termination of this Agreement and shall, to the extent owed by the U.S. Debtors, constitute an administrative expense of the U.S. Debtors under sections 503(b) or 507(a)(2) of the U.S. Bankruptcy Code and to the extent owed by the Canadian Debtors be secured by an Inter-company Charge.

(e) Notwithstanding anything to the contrary herein, the Sellers' obligation to pay the Seller Break-Up Fee pursuant to this Section 9.2 is expressly subject to entry of the Bidding Procedures Order.

Section 9.3.   Effects of Termination. If this Agreement is terminated pursuant to Section 9.1:

(a) all further obligations of the Parties under or pursuant to this Agreement shall terminate without further liability of any Party to the other except for the provisions of (i) Section 5.7 (Public Announcements), (ii) Section 5.10 (Transaction Expenses), (iii) Section 5.11 (Confidentiality), (iv) Section 7.4(b)(ii) (Other Employee Covenants), (v) Section 9.1 (Termination), (vi) Section 9.2 (Expense Reimbursement and Break-Up Fee), (vii) Section 9.3 (Effects of Termination) and (viii) ARTICLE X (Miscellaneous); provided, that neither the termination of this Agreement nor anything in this Section 9.3 shall relieve any Party from liability for any breach of this Agreement occurring before the termination hereof;

(b) except as required by applicable Law, the Purchaser shall return to the Sellers all documents, work papers and other material of any of the Sellers relating to the transactions contemplated hereby, whether so obtained before or after the execution hereof to the extent and in the manner required by the Confidentiality Agreement; and

(c) the provisions of the Confidentiality Agreement shall continue in full force and effect.

129

## ARTICLE X

## MISCELLANEOUS

Section 10.1.  <u>No Survival of Representations and Warranties or Covenants</u>.  Except for the representations set forth in Section 3.6, no representations, warranties, covenants or agreements in this Agreement or in any instrument delivered pursuant to this Agreement shall survive beyond the Closing Date, except for covenants in ARTICLE VI and covenants and agreements that by their terms are to be satisfied after the Closing Date, which covenants and agreements shall survive until satisfied in accordance with their terms.

Section 10.2.  <u>Remedies</u>.  No failure to exercise, and no delay in exercising, any right, remedy, power or privilege under this Agreement by any Party will operate as a waiver of such right, remedy, power or privilege, nor will any single or partial exercise of any right, remedy, power or privilege under this Agreement preclude any other or further exercise of such right, remedy, power or privilege or the exercise of any other right, remedy, power or privilege.

Section 10.3.  <u>Third Party Beneficiaries</u>.  The acknowledgements, rights, undertakings, representations or warranties contained in this Agreement and expressed to be for the benefit of the EMEA Sellers and the Joint Administrators (including, without limitation, Sections 2.1.9 (*EMEA Asset Sale Agreement*), 2.2 (*Purchase Price*), 10.3 (*Third Party Beneficiaries*) and 10.4 (*Consent to Amendments; Waivers*)) (collectively, the "**Third Party Provisions**") shall inure to, are expressly intended to be for the benefit of, and shall be enforceable by, each of the EMEA Sellers and the Joint Administrators (and their applicable successors or representatives) (the "**Third Party Beneficiaries**"), as applicable, and shall be binding on the Purchaser and its successors and assigns. Subject to Section 2.5, in the event that any Party or any of its successors or assigns (a) consolidates with or merges into any other Person and shall not be the continuing or surviving corporation or entity in such consolidation or merger, or (b) transfers all or a majority of its properties and assets to any Person, then, and in each such case, proper provision shall be made so that the successors and assigns of such Party, assumes the obligations thereof contained in the Third Party Provisions or otherwise in this Agreement. Except as provided in this Section 10.3, this Agreement is for the sole benefit of the Parties and their permitted assigns and nothing herein, express or implied, is intended to or shall confer upon any other Person any legal or equitable right, benefit or remedy of any nature whatsoever under or by reason of this Agreement.

Section 10.4.  <u>Consent to Amendments; Waivers</u>.  No Party shall be deemed to have waived any provision of this Agreement or any of the other Transaction Documents unless such waiver is in writing, and then such waiver shall be limited to the circumstances set forth in such written waiver. This Agreement and the Ancillary Documents shall not be amended, altered or qualified except by an instrument in writing signed by all the parties hereto or thereto, as the case may be. Notwithstanding the foregoing provisions of this Section 10.4, (a) no Third Party Beneficiary shall be deemed to have waived any Third Party Provision unless such waiver is in writing, and then such waiver shall be limited to the circumstances set forth in such written waiver and (b) no Third Party Provision shall be amended, altered or qualified except by an instrument in writing signed by all the parties hereto and the Third Party Beneficiaries affected by such amendment, alteration or qualification.

130