## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

```
-----------------------------------------------------------X
                                                           :
In re                                                      :      Chapter 11
                                                           :
Nortel Networks Inc., et al.,[1]                           :      Case No. 09-10138 (KG)
                                                           :
                                   Debtors.                :      Jointly Administered
                                                           :
                                                           :      Hearing date: January 21, 2010 at 11:00 AM (ET)
                                                           :      Objections due: January 14, 2010 at 4:00 PM (ET)
-----------------------------------------------------------X
```

### MOTION OF DEBTORS PURSUANT TO SECTION 1121(d)(1) OF THE
### BANKRUPTCY CODE TO EXTEND THE EXCLUSIVE PERIODS TO
### (I) FILE A CHAPTER 11 PLAN AND (II) SOLICIT ACCEPTANCES THEREOF

Nortel Networks Inc. ("NNI") and certain of its affiliates, as debtors and debtors in

possession (collectively, the "Debtors"), hereby move this Court  (the "Motion") for the entry of

an order substantially in the form attached hereto as Exhibit A (the "Order"), pursuant to section

1121(d) of title 11 of the United States Code (the "Bankruptcy Code") (i) extending the period

during which the Debtors have the exclusive right to file a plan or plans (the "Exclusive Filing

Period") through and including July 13, 2010, and (ii) extending the period during which the

Debtors have the exclusive right to solicit acceptances thereof (the "Exclusive Solicitation

Period" and, together with the Exclusive Filing Period, the "Exclusive Periods") through and

including September 13, 2010.  In support of this Motion, the Debtors respectfully represent as

follows:

---

[1]      The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's tax identification
number, are:  Nortel Networks Inc. (6332), Nortel Networks Capital Corporation (9620), Nortel Altsystems Inc.
(9769), Nortel Altsystems International Inc. (5596), Xros, Inc. (4181), Sonoma Systems (2073), Qtera Corporation
(0251), CoreTek, Inc. (5722), Nortel Networks Applications Management Solutions Inc. (2846), Nortel Networks
Optical Components Inc. (3545), Nortel Networks HPOCS Inc. (3546), Architel Systems (U.S.) Corporation (3826),
Nortel Networks International Inc. (0358), Northern Telecom International Inc. (6286), Nortel Networks Cable
Solutions Inc. (0567) and Nortel Networks (CALA) Inc. (4226).  Addresses for the Debtors can be found in the
Debtors' petitions, which are available at http://chapter11.epiqsystems.com/nortel.

**Jurisdiction**

1.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and

1334.  This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).  Venue is

proper pursuant to 28 U.S.C. §§ 1408 and 1409.

2.      The statutory basis for the relief requested herein is section 1121(d) of the

Bankruptcy Code.

**Background**

**A.      Procedural History**

3.      On January 14, 2009 (the "Petition Date"), the Debtors, other than NN CALA

(defined below), filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code.

4.      The Debtors continue to operate their businesses and manage their properties as

debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

5.      On January 15, 2009, this Court entered an order of joint administration pursuant

to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") that

provided for the joint administration of these cases and for consolidation for procedural purposes

only [D.I. 36].

6.      Also on the Petition Date, the Debtors' ultimate corporate parent Nortel Networks

Corporation ("NNC"), NNI's direct corporate parent Nortel Networks Limited ("NNL," and

together with NNC and their affiliates, including the Debtors, "Nortel"), and certain of their

Canadian affiliates (collectively, the "Canadian Debtors")[2] filed an application with the Ontario

Superior Court of Justice (the "Canadian Court") under the Companies' Creditors Arrangement

Act (Canada) (the "CCAA"), seeking relief from their creditors (collectively, the "Canadian

---

[2]      The Canadian Debtors include the following entities:  NNC, NNL, Nortel Networks Technology
Corporation, Nortel Networks Global Corporation and Nortel Networks International Corporation.

Proceedings"). The Canadian Debtors continue to manage their properties and operate their businesses under the supervision of the Canadian Court.

7.    On January 14, 2009, the Canadian Court entered an order recognizing these chapter 11 proceedings as a foreign proceeding under section 18.6 of the CCAA. On February 27, 2009, based on a petition filed by Ernst & Young Inc., as court-appointed Monitor in the Canadian Proceedings and as foreign representative for the Canadian Debtors (the "Monitor"), this Court entered an order recognizing the Canadian Proceedings as foreign main proceedings under chapter 15 of the Bankruptcy Code.

8.    On January 14, 2009, the High Court of England and Wales placed nineteen of Nortel's European affiliates (collectively, the "EMEA Debtors")[3] into administration under the control of individuals from Ernst & Young LLC (collectively, the "Joint Administrators"). On May 28, 2009, at the request of the Joint Administrators, the Commercial Court of Versailles, France (the "French Court") (Docket No. 2009P00492) ordered the commencement of secondary proceedings in respect of Nortel Networks S.A. ("NNSA"), which consist of liquidation proceedings during which NNSA was originally authorized to continue to operate as a going concern for an initial period of three months, which period was subsequently extended to November 28, 2009. In accordance with the European Union's Council Regulation (EC) No. 1346/2000 on Insolvency Proceedings, the English law proceedings remain the main proceedings in respect of NNSA although a French administrator and a French liquidator have been appointed and are in charge of the day-to-day affairs and continuing business of NNSA in France. On

---

[3]    The EMEA Debtors include the following entities: Nortel Networks UK Limited, Nortel Networks S.A., Nortel Networks (Ireland) Limited, Nortel GmbH, Nortel Networks France S.A.S., Nortel Networks Oy, Nortel Networks Romania SRL, Nortel Networks AB, Nortel Networks N.V., Nortel Networks S.p.A., Nortel Networks B.V., Nortel Networks Polska Sp. z.o.o., Nortel Networks Hispania, S.A., Nortel Networks (Austria) GmbH, Nortel Networks, s.r.o., Nortel Networks Engineering Service Kft, Nortel Networks Portugal S.A., Nortel Networks Slovensko, s.r.o. and Nortel Networks International Finance & Holding B.V.

October 1, 2009, pursuant to a motion filed by the Joint Administrators, the French Court approved an order to: (i) suspend the liquidation operations relating to the sale of the assets and/or businesses of NNSA for a renewable period of two months; (ii) authorize the continuation of the business of NNSA so long as the liquidation operations are suspended; and (iii) maintain the powers of the French Administrator and Liquidator during the suspension period, except with respect to the sale of assets and/or businesses of NNSA.  On November 30, 2009, the French Court extended the suspension of liquidation for a further period of three months.  On June 26, 2009, this Court entered an order recognizing the English Proceedings of Nortel Networks UK Limited ("NNUK") as foreign main proceedings under chapter 15 of the Bankruptcy Code.[4]

9.      On January 26, 2009, the Office of the United States Trustee for the District of Delaware (the "U.S. Trustee") appointed an Official Committee of Unsecured Creditors (the "Committee") pursuant to section 1102(a)(1) of the Bankruptcy Code [D.I.s 141, 142].  An ad hoc group of bondholders holding claims against certain of the Debtors and certain of the Canadian Debtors has also been organized (the "Bondholder Group").  No trustee or examiner has been appointed in the Debtors' cases.

10.      On July 14, 2009 (the "CALA Petition Date"), Nortel Networks (CALA) Inc. ("NN CALA" and a Debtor with NNI and its affiliates), an affiliate of NNI, filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  On July 17, this Court entered orders approving the joint administration and consolidation of NN CALA's chapter 11 case with

---

[4]      Additionally, on January 18, 2009, certain Nortel affiliates, including Nortel Networks Israel (Sales and Marketing) Limited, filed an application with the Tel-Aviv-Jaffa District Court, pursuant to the Israeli Companies Law, 1999, and the regulations relating thereto for a stay of proceedings.  On January 19, 2009, the Israeli Court appointed Yaron Har-Zvi and Avi D. Pelossof as joint administrators of the Israeli Company under the Israeli Companies Law (the "Joint Israeli Administrators").

the other Debtors' chapter 11 cases for procedural proposes [D.I. 1098], and applying to NN

CALA certain previously entered orders in the Debtors' chapter 11 cases [D.I. 1099].

**B.      Debtors' Corporate Structure and Business**

11.      Nortel is a technology company that designs, develops and deploys

communication products, systems and solutions to its customers around the globe.  Its principal

assets include its employees, the intellectual property derived and maintained from its research

and development activities, its customers and other significant contracts and agreements.

12.      Additional information regarding the Debtors' corporate structure and business

and the events leading to the chapter 11 cases is set forth in the Declaration of John Doolittle in

Support of First Day Motions and Applications [D.I. 3] (the "First Day Declaration").[5]

**C.      Case Milestones**

13.      On June 19, 2009, Nortel announced that it was advancing in discussions with

external parties to sell its businesses and it would assess other restructuring alternatives for its

businesses in the event it is unable to maximize value through sales.  To date, Nortel has closed

(i) the sale of certain portions of its Layer 4-7 data portfolio to Radware Ltd. [D.I. 539]; (ii) the

sale of substantially all of its CDMA business and LTE Access assets business to

Telefonaktiebolaget LM Ericsson (publ) [D.I. 1205]; (iii) the sale of the assets of its Wireless

Networks business associated with the development of Next Generation Packet Core network

components to Hitachi Ltd. [D.I. 1760]; and (iv) the sale of substantially all of the assets of the

Enterprise Solutions business globally, including the shares of Nortel Government Solutions

Incorporated and DiamondWare Ltd. to Avaya Inc. [D.I. 1514].  In addition, Nortel has

completed auction processes and obtained Court approval for the planned sale of substantially all

---

[5]      Capitalized terms used but not defined herein have the meanings ascribed to them in the First Day
Declaration.

the assets of its Optical Networking and Carrier Ethernet businesses associated with its Metro

Ethernet Networks business unit [D.I. 2070]; as well as for the planned sale of substantially all of

its GSM/GSM-R business [D.I. 2065].  On December 23, 2009, the Debtors filed a motion

seeking approval of the sale of assets associated with their CVAS business to GENBAND Inc.,

subject to the receipt of higher and better offers [D.I. 2193] (the foregoing, collectively, the "Sale

Transactions").

14.     On August 4, 2009, this Court entered an order fixing September 30, 2009 at 4:00

PM (Eastern Time) as the general bar date for filing proofs of claim or interests [D.I. 1280].  On

December 3, 2009 this Court entered an order fixing January 25, 2010 at 4:00 PM (Eastern

Time) as the bar date for filing proofs of claim or interests against NN CALA [D.I. 2059].

### Relief Requested

15.     By this Motion, the Debtors seek an order pursuant to section 1121(d) of the

Bankruptcy Code extending (a) the Exclusive Filing Period through and including July 13, 2010,

and (b) the Exclusive Solicitation Period through and including September 13, 2010.

### Facts Relevant to this Motion

16.     The Debtors' current Exclusive Filing Period under section 1121(b) of the

Bankruptcy Code extends through February 1, 2010, and the current Exclusive Solicitation

Period extends through April 2, 2010.[6]

17.     Since the Petition Date, the Debtors have worked diligently on a variety of fronts

to administer their estates, to maximize value for their stakeholders, and to further their

---

[6]     While this Motion is scheduled to be heard prior to the expiration of these periods, Rule 9006-2 of the Local Rules of Bankruptcy Practice and Procedure of the Untied States Bankruptcy Court for the District of Delaware provides: "[I]f a motion to extend the time to take any action is filed before the expiration of the period prescribed by the Code, Fed. R. Bankr. P., these Local Rules or Court order, the time shall automatically be extended until the Court acts on the motion, without the necessity for the entry of a bridge order."

restructuring efforts.  As discussed in greater detail below, the Debtors have undertaken

significant steps with respect to the ultimate disposition of their assets and the transfer of

substantial groups of employees to purchasers through their pursuit of business divestitures, the

design and implementation of an internal reorganization to further such sales and, together with

the Canadian Debtors, the restructuring of certain of Nortel's Asia-Pacific affiliates.  At the same

time, the Debtors have made substantial efforts to reduce costs, including the rejection of real

property leases and contracts not necessary for their continued business operations.  The Debtors

also have taken other steps to preserve and maximize value, including the development of a key

employee incentive and retention plan, the resolution of significant inter-company funding and

coordination issues, the prompt resolution of reclamation claims asserted by suppliers against the

Debtors and the establishment of a September 30, 2009 claims bar date.  Recently, after

consultation with the Committee, the Bondholder Group, the Monitor and the Canadian Debtors,

NNI also named John Ray its principal officer to help lead the next stage of the Debtors' efforts

to maximize value.

18.    Additionally the Debtors have engaged suppliers and customers of Nortel's

worldwide operations in an effort to preserve the value of their business operations while

divestitures are pursued.  The Debtors also have actively coordinated the U.S. restructuring

efforts and court proceedings with the various other multi-jurisdictional proceedings and their

non-debtor affiliates, and have actively solicited input from, provided input to and coordinated

restructuring efforts with the Committee, the Bondholder Group, the Monitor and the Joint

Administrators.

19.    In light of the foregoing and as described below, the Debtors have made and

continue to make substantial progress toward the stated objective of value maximization.  In

addition, with the Sale Transactions either complete or well underway, the focus will now shift

to proceeds allocation and the realization of value from Nortel's intellectual property portfolio.

These efforts will occupy the next several months, at a minimum.  Given the Debtors' successes

since the Petition Date and the additional tasks to be addressed, the best interests of the Debtors,

their estates, and their creditors would be well served by extending the Debtors' exclusive

periods to file a plan of reorganization and solicit support for such a plan for the reasons set forth

herein.

### Basis for Relief

20.     Section 1121(b) of the Bankruptcy Code provides for an initial period of 120 days

after the commencement of a chapter 11 case during which a debtor has the exclusive right to

propose and file a plan.  Section 1121(c)(3) of the Bankruptcy Code provides that if the debtor

proposes and files a plan within the initial 120-day exclusive period, the debtor then has until

180 days after the commencement of the chapter 11 case to solicit and obtain acceptances of

such plan.  Pursuant to section 1121(d)(1) of the Bankruptcy Code, "on request of a party in

interest made within the respective periods specified in subsections (b) and (c) of this section and

after notice and a hearing, the court may for cause reduce or increase the 120-day period or the

180-day period referred to in this section."  11 U.S.C. § 1121(d)(1).  Such extensions are capped,

however, by section 1121(d)(2) of the Bankruptcy Code, which limits any extension of the

exclusive filing period to eighteen (18) months after the petition date and any extension of the

solicitation period to twenty (20) months after the petition date.  11 U.S.C. § 1121(d)(2)(A)-(B).

By this Motion, the Debtors' seek to extend the Debtors' exclusivity period to the latest dates

permitted by section 1121(d)(2) of the Bankruptcy Code.[7]

---

[7]     One Debtor, NN CALA, has an additional six months of potential exclusivity in light of its late petition
date.

21.     Although, the Bankruptcy Code does not define the term "cause," the legislative history indicates that it is to be viewed flexibly "in order to allow the debtor to reach an agreement." H.R. Rep. No. 95, 95th Cong., 1st Sess. 232 (1977); see also In re Public Serv. Co. of N.H., 88 B.R. 521, 534 (Bankr. D.N.H. 1988) ("[T]he legislative intent…[is] to promote maximum flexibility.").  To facilitate this legislative intent, a debtor should be given a reasonable opportunity to negotiate an acceptable plan with creditors and to prepare adequate financial and non-financial information concerning the ramifications of any proposed plan for disclosure to creditors. See, e.g., McLean, 87 B.R. at 833-34; In re Texaco, Inc., 76 B.R. 322, 327 (Bankr. S.D.N.Y. 1987).

22.     The decision to extend a debtor's exclusive periods is committed to the bankruptcy court's sound discretion, guided by the facts and circumstances of each case.  See, e.g., First Am. Bank of N.Y. v. S.W. Gloves and Safety Equip., Inc., 64 B.R. 963, 965 (D. Del. 1986).  Courts consider a variety of factors in determining whether "cause" exists to warrant an extensions of the exclusive periods, including:  (a) the size and complexity of the case, (b) the debtor's progress in resolving issues facing the estate, and (c) whether an extension of time will harm the debtor's creditors.  See, e.g., In re Gibson & Cushman Dredging Corp., 101 B.R. 405, 409-10 (E.D.N.Y. 1989) (listing above-referenced factors); see also In re Dow Corning Corp., 208 B.R. 661, 664-65 (Bankr. E.D. Mich. 1997) (citing In re Express One International, Inc., 194 B.R. 98, 100 (Bankr. E.D. Tex. 1996)).  The existence of good faith progress and the need for additional time to continue such progress is a also factor in establishing cause for extending the exclusive periods under section 1121(d) of the Bankruptcy Code.  See Jasik v. Conrad (In re Jasik), 727 F.2d 1379, 1382-3 (5th Cir. 1984); Express One Int'l, Inc., 194 B.R. at 101; McLean, 87 B.R. at 834; In re Pine Run Trust, Inc., 67 B.R. 432, 435 (Bankr. E.D. Pa. 1986).

23.     As demonstrated in this Motion, "cause" exists to further extend the Exclusive

Periods in these chapter 11 cases.

**A.     The Size and Complexity of these Chapter 11 Cases**

24.     Both Congress and the courts have recognized that the size and complexity of a

debtor's case alone may constitute cause for the extension of a debtor's exclusive period to file a

plan and the period to solicit acceptances of such a plan.  "[I]f an unusually large company were

to seek reorganization under chapter 11, the court would probably need to extend the time in

order to allow the debtor to reach an agreement."  H.R. Rep. No. 595, 9th Cong., 1st Sess., 232

(1978), reprinted in 1978 U.S.C.C.A.N. 5787, 6191.  In fact, the size and complexity of a chapter

11 case is the basis upon which courts most commonly grant extensions.  See, e.g., Express One

Int'l, 194 B.R. at 100; In re Texaco, Inc., 76 B.R. at 326 ("The large size of a debtor and the

consequent difficulty in formulating a plan or reorganization for a huge debtor with a complex

financial structure are important factors which generally constitute cause for extending the

exclusivity periods.").

25.     As described in the First Day Declaration, these cases are both large and complex.

The enormous post-petition efforts on the many Sale Transactions clearly demonstrate that these

cases also present unique challenges that have consumed, and will continue to consume,

substantial attention and resources.  In particular, the Debtors' businesses are highly integrated

and have been, and continue to be, operated on a consolidated basis.  As such, the de-coupling of

businesses for sale and the multiple plenary insolvency proceedings in multiple jurisdictions has

required careful planning and coordination among jurisdictions and constituencies.  Moreover,

the transition services required by each of the Sale Transactions requires continued operation of

material elements of multiple businesses on a consolidated basis through the fourth quarter of

10

2011.  Accordingly, the size and complexity of the Debtors' chapter 11 cases have warranted and continue to warrant extending the Exclusive Periods.

**B.    The Debtors' Progress in These Cases**

26.    The Debtors have made substantial progress in their chapter 11 cases and continue to work diligently on matters related to their reorganization.  In addition to the substantial effort that is required to operate a large enterprise, since the Petition Date, the Debtors have concentrated on a myriad of significant issues relating to these chapter 11 cases.  The Debtors continue to work to build consensus and develop procedures for the resolution of key issues among numerous and diverse constituencies regarding what must necessarily be a global plan during the Exclusive Periods as a result of their focus on the following issues and the numerous other matters relating to their chapter 11cases.

27.    ***Sale Transactions.***  Since the Petition Date, the Debtors have made substantial progress in the pursuit of asset sales in coordination with their counterparts in Canada, Europe, and other global affiliates.  As described above, and as a result of these efforts, the Debtors have entered into, and sought approval for, seven separate Sale Transactions.

- On February 20, 2009, the Debtors filed a motion seeking approval of the sale of the Debtors' Layer 4-7 assets and related sale procedures [D.I. 353].  On March 26, 2009, this Court entered an order approving the sale of the Layer 4-7 assets to Radware Ltd for $17.65 million in cash [D.I. 539].  The sale closed on March 31, 2009.

- On June 19, 2009, the Debtors filed a motion seeking to approve the sale of certain CDMA and LTE-related assets (which fall under Nortel's Carrier business) and related sale procedures [D.I. 931].  In accordance with the relevant bidding procedures, an auction took place on July 24, 2009.  The stalking horse bid was $650 million in cash and the initial bid at the auction was $730 million in cash.  On July 28, 2009, this Court entered an order approving the sale of the CDMA and LTE business to Telefonaktiebolaget LM Ericsson (publ) for $1.13 billion in cash [D.I. 1205].  The sale closed on November 13, 2009.

- On July 20, 2009, the Debtors filed a motion seeking to approve the sale of the Enterprise Solutions business and related sale procedures [D.I. 1131].  In accordance with the relevant bidding procedures, an auction took place beginning on September 11, 2009 and concluding on September 14, 2009.  The stalking horse bid was $475 million in cash.   On September 16, 2009, this Court entered an order approving the sale of the Enterprise Solutions business to Avaya Inc. for $900 million, plus an additional $15 million for employee retention [D.I. 1514].  The sale closed on December 18, 2009.

- On September 21, 2009, the Debtors filed a motion seeking to approve the sale of the Next Generation Packet Core Network Components business and related sale procedures. [D.I. 1525].  In accordance with the relevant bidding procedures, a closed-bid auction took place and Hitachi, Ltd. was determined to be the highest and best bidder.  On October 28, 2009, this Court entered an order approving the sale of the Next Generation Packet Core Network Components business for $10 million in cash.  [D.I. 1760].  The sale closed on December 8, 2009.

- On September 30, 2009, the Debtors filed a motion seeking to approve the sale of the GSM/GSM-R business and related sale procedures [D.I. 1587].  In accordance with the relevant bidding procedures, an auction took place on November 24, 2009.  On December 2, 2009, this Court entered an order approving the sale of certain assets of the GSM/GSM-R business to Telefonaktiebolaget L M Ericsson (publ) and Kapsch Carriercom AG for $103 million in cash [D.I. 2065].  The sale is expected to close on February 26, 2010.

- On October 7, 2009, the Debtors filed a motion seeking to approve the sale of the Metro Ethernet Networks business and related sale procedures [D.I. 1627].  In accordance with the relevant bidding procedures, an auction took place beginning on November 20, 2009 and concluding on November 24, 2009.  On December 3, 2009, this Court entered an order approving the sale of the Metro Ethernet Networks business to Ciena Corporation for $530 million in cash plus $239 million (aggregate principal amount) of a new class of Ciena's senior convertible notes [D.I. 2070].  The sale is expected to close in the first quarter of 2010.

- On December 23, 2009, the Debtors filed a motion seeking approval of the sale of assets associated with their CVAS business to GENBAND Inc. for a price of approximately $282 million (subject to certain adjustments), subject to the receipt of higher and better offers [D.I. 2193].  The motion on the bidding procedures is expected to be heard on January 6, 2010.  An auction is expected to be held in mid to late February 2010.  A final sale hearing is expected to be held in late February or early March 2010.

Additionally, the Debtors anticipate certain additional divestitures of less substantial assets, as

well as working with various constituents on the development of a process for the maximization of value of Nortel's intellectual property portfolio.

28.     ***Inter-company issues.***  The Debtors have worked throughout these proceedings to coordinate their restructuring with their affiliates, including the Canadian Debtors, the EMEA Debtors and other non-debtor affiliates around the globe.  Significant headway has been made in respect of various substantive and procedural issues related to these efforts.

29.     Among other things, the Debtors have entered into various agreements to further stabilize Nortel's inter-company trading during the restructuring.  For instance, NNI is a party to a Global Supply Protocol Agreement, as extended from time to time, with certain EMEA Debtors to ensure that Nortel's global supply chain continues to function in an orderly manner.

30.     The Debtors also have engaged in ongoing and rigorous discussions with the representatives of the Canadian and EMEA Debtors, the Monitor, the Joint Administrators, the Committee and the Bondholder Group regarding a number of inter-company issues, including transfer pricing, inter-company funding and tax issues.  In the second quarter of 2009, these discussions led to the execution of the Interim Funding and Settlement Agreement (the "IFSA") between the Debtors, the Canadian Debtors and the EMEA Debtors that provided for certain payments to be made to the Canadian estates in lieu of full and final settlement of certain transfer pricing obligations for the period from the Petition Date through September 30, 2009.  The Court approved the IFSA on June 29, 2009 [D.I. 993].  A cross-border protocol, as amended, also was approved by the Court on June 29, 2009, to further facilitate the consideration and resolution of cross-border issues [D.I. 990].

31.     The IFSA addressed certain inter-company funding issues through the end of the third quarter of 2009.  Over the past several months, the Debtors, the Canadian Debtors, the

Monitor, the Committee and the Bondholder Group have engaged in a series of discussions regarding additional funding of the Canadian Debtors for the period beginning October 1, 2009, resolution of certain claims among the Debtors and the Canadian Debtors, and resolution of certain material tax issues involving the Debtors and the Canadian Debtors. These discussions led to the execution of the Final Canadian Funding and Settlement Agreement (the "CFA") and the resolution of certain claims of the Internal Revenue Service ("IRS") against the Debtors. The Debtors have filed motions seeking approval of the CFA [D.I. 2205] and the settlement with the IRS [D.I. 2207]. Both motions are currently scheduled to be heard at a joint hearing to be held on January 21, 2010.

32.     Other discussions regarding inter-company issues remain ongoing. For example, in accordance with the terms of the IFSA, the Debtors are engaged in ongoing discussions with the Canadian Debtors, the EMEA Debtors, the Monitor, the Joint Administrators, the Committee, and the Bondholder Group regarding the development of a protocol to resolve the allocation of proceeds from the various asset sales. It is expected that efforts relating to this protocol will consume substantial attention of the relevant parties during the first two quarters of 2010. The Debtors also are engaged in ongoing discussions with multiple constituents and consideration of issues relating to their non-debtor affiliates, including those in Asia and Latin America. For example, the Debtors, the Canadian Debtors, the EMEA Debtors and certain affiliates of the Debtors in the Asia-Pacific region (the "APAC Debtors") entered into the Asia Restructuring Agreement in order to address certain solvency issues of the APAC Debtors so that these entities could continue their respective business operations and participate in the various Sale Transactions (the "APAC Restructuring Agreement"). The APAC Restructuring Agreement was approved by this Court on December 2, 2009 [D.I. 2061].

33.     ***Schedules of Assets and Liabilities.***  On April 20, 2009 and May 29, 2009, the

Debtors filed their Schedules of Assets and Liabilities (the "<u>Schedules</u>") and Statements of

Financial Affairs (the "<u>Statements</u>") [D.I. 616-627, 801-810].  The preparation of the Schedules

and the Statements for the Debtors required the accumulation and review of substantial amounts

of information related to the Debtors' assets, liabilities, contracts, and operations.  The Debtors

filed Schedules and Statements for NN CALA on September 11, 2009.  The Debtors have filed

periodic monthly operating reports, and the reports required under Bankruptcy Rule 2015.3.

34.     ***Claims Resolution.***  To proceed with the development of a plan of reorganization,

the Debtors will need complete and accurate information describing the nature, validity, amount

and status of all claims that will be asserted against them in addition to those listed on the

Debtors' Schedules.  Accordingly, the Debtors requested, and the Court ordered, the

establishment of a September 30, 2009 general bar date (the "<u>Bar Date</u>") for the filing of claims

(other than those against NN CALA) [D.I. 1280].  On August 10, 2009, the Debtors completed

mail service of notice of the claims bar dates to all known creditors.  On December 3, 2009, the

Court entered an order establishing January 25, 2010 as the general claims bar date for claims

against NN CALA [D.I. 2059].  To date, the Debtors have received over 6,000 proofs of claim in

connection with their chapter 11 cases.  Since the Bar Date, the Debtors and their advisors have

been taking all necessary and appropriate actions to administer the claims reconciliation process.

The Debtors have recently filed their first objections to claims [D.I.s 2188-2190] and expect to

file additional objections throughout the period during which exclusivity is proposed to be

extended.

35.     The Debtors also have expeditiously resolved most of the reclamation claims

asserted in these cases.  Of the thirty reclamation demands made against the Debtors in these

chapter 11 cases, twenty-seven have been resolved and only three remain outstanding.  Pursuant

to the *Order Establishing Procedures for Addressing Reclamation Demands Pursuant to*

*Sections 105(a), 362 and 546(c) and Rule 9019 of the Federal Rules of Bankruptcy Procedure*

[D.I. 336], the Debtors have settled twenty demands on a consensual basis and resolved another

seven demands through filing of the Debtors' Second Reclamation Notice [D.I. 756].  The

Debtors are actively working to resolve the remaining reclamation demands.

36.     Finally, the Debtors are working with the Canadian Debtors, the Monitor, the

Committee, and the Bondholder Group on the development of a protocol for the resolution of

claims that raise cross-border issues with the Canadian Debtors.  The finalization of this protocol

is a requirement of the CFA.  It is possible that additional claims protocols will be developed

with other jurisdictions as well.

37.     ***Real Estate.***  The Debtors have made significant progress in managing their real

estate portfolio in furtherance of the restructuring.  As of the Petition Date, the Debtors were

lessees under approximately 70 leases of non-residential real property.  Since the Petition Date,

the Debtors have rejected 57 leases, had one lease deemed rejected, assumed five leases and

three leases have expired by their terms in the ordinary course of business.  Thus, the Debtors are

currently lessees under approximately four unexpired leases of non-residential real property

which they have not yet assumed or rejected.[8]  Pursuant to the *Order Under 11 U.S.C. 363(b)(1)*

*And 365(d)(4) Granting Extension Of The Deadline By Which The Debtors Must Assume Or*

*Reject Unexpired Leases Of Non-Residential Real Property Upon Receipt Of Written Consent*

*From Lessors* [D.I. 965], the Debtors have obtained written consent from the remaining

---

[8]      The leases described in this sentence include all unexpired leases of nonresidential real property to which
the Debtors are lessees and have not previously assumed or rejected.  Inclusion or omission of any instrument in this
paragraph does not constitute an admission by the Debtors that such instrument is or is not a true lease or otherwise.

landlords to extend the lease rejection/assumption deadline beyond the August 12, 2009 statutory

deadline.  The Debtors continue to assess which leases may no longer be necessary for their

continued business operations and which leases may be conveyed to potential purchasers in

pending divestiture transactions or used for continuing business purposes.

38.    ***NNI Principal Officer.***  On December 8, 2009, the Debtors filed a motion seeking

approval of the retention of John Ray as the Debtors' Principal Officer, *nunc pro tunc* to

December 7, 2009 [D.I. 2095].  As described more fully in the motion, in his capacity as

Principal Officer and in light of his substantial experience, Mr. Ray will provide important

leadership to the Debtors as these proceedings move into the next phase.  The motion on Mr.

Ray's retention is scheduled to be heard by this Court at a hearing to be held on January 6, 2010.

39.    ***Other Efforts.***  In addition to the above, the Debtors (1) are working with the

Pension Benefit Guarantee Corporation to reach agreement regarding issues related to the

Debtors' defined pension plans, (2) have filed settlements pursuant to Bankruptcy Rule 9019,

and (3) have rejected several executory contracts determined to be non-essential for their

continued business operations.

40.    Accordingly, in light of the accomplishments of the Debtors thus far in these

chapter 11 cases, as well as the extraordinary complexity and breadth of Nortel's global business,

further extension of the Exclusive Periods is warranted.  The various matters described above, as

well as various others that will require the Debtors' attention over the next several months, will

need to be resolved before the Debtors will have adequate information necessary to prepare a

plan of reorganization and disclosure statement.

**C.      The Requested Extension Of The Exclusive Periods Is Consistent With The Purpose Of Section 1121 Of The Bankruptcy Code And Will Not Harm Creditors**

41.      The extension of the Exclusive Periods as requested will afford the Debtors and all other parties in interest an opportunity to develop fully the grounds upon which serious negotiations toward a plan of reorganization can be based.  The Debtors intend to use the extended Exclusive Periods to continue to operate their businesses and pursue strategic transactions, further review executory contracts and nonresidential leases for assumption or rejection, review claims that are filed against the Debtors, as well as engage in further coordinated efforts with the Committee, the Bondholder Group, the Monitor, the Joint Administrators and the other Nortel entities in furtherance of the Debtors' restructuring and, ultimately, the development of a plan of reorganization.

42.      The Debtors' requested extension of the Exclusive Periods does not exceed the eighteen (18) month limitation for the exclusive period to file a plan or the twenty (20) month limitation for the exclusive period to solicit acceptances of a plan.  As a result, the Court is not precluded from granting the relief requested by section 1121(d)(2) of the Bankruptcy Code

43.      Affording the Debtors a full opportunity to develop a plan of reorganization by extending the Exclusive Periods will not prejudice creditors.  Terminating the Exclusive Periods before this process is complete and the process of negotiation has been developed fully, would defeat the very purpose of section 1121 (*i.e.*, to afford the Debtors a meaningful and reasonable opportunity to negotiate with creditors and propose and confirm a consensual plan of reorganization).  Furthermore, the requested extension will not preclude parties in interest from seeking a reduction or termination of the Exclusive Periods for cause.[9]

---

[9]      Nothing herein shall prejudice the Debtors' right to oppose such relief if sought.

44.    Based upon the foregoing, the Debtors submit that cause exists to extend the Exclusive Filing Period through and including July 13, 2010, and the Exclusive Solicitation Period through and including September 13, 2010.

## **Notice**

45.    Notice of the Motion has been given via first class mail to the (i) Office of the United States Trustee for the District of Delaware; (ii) counsel to the Committee; (iii) counsel to the Bondholder Group; and (iv) the general service list established in these chapter 11 cases. The Debtors submit that under the circumstances no other or further notice is necessary.

## **No Prior Request**

46.    No prior request for the relief sought herein has been made to this or any other court.

WHEREFORE, the Debtors respectfully request that the Court (i) grant this Motion and

the relief requested herein, (ii) enter the proposed order attached hereto, extending (a) the

Exclusive Filing Period through and including July 13, 2010 and (b) the Exclusive Solicitation

Period through and including September 13, 2010 and (iii) grant such further relief as is just and

proper.

Dated:  January 4, 2010          CLEARY GOTTLIEB STEEN & HAMILTON LLP
       Wilmington, Delaware

James L. Bromley (*admitted pro hac vice*)
Lisa M. Schweitzer (*admitted pro hac vice*)
One Liberty Plaza
New York, New York 10006
Telephone:  (212) 225-2000
Facsimile:  (212) 225-3999

- and -

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/ Andrew R. Remming*
Derek C. Abbott (No. 3376)
Eric D. Schwartz (No. 3134)
Ann C. Cordo (No. 4817)
Andrew R. Remming (No. 5120)
1201 North Market Street
P.O. Box 1347
Wilmington, Delaware 19801
Telephone:  (302) 658-9200
Facsimile:  (302) 658-3989

*Counsel for the Debtors*
*and Debtors in Possession*