## IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re ) | Chapter 11 |
| ) | |
| NORTEL NETWORKS INC., et al., [1] ) | Case No. 09-10138 (KG) |
| ) | |
| Debtors. ) | Jointly Administered |
| ) | |
| ) | **Re: Docket No. 2193** |
| ) | |

**OBJECTION OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS
TO DEBTORS' MOTION FOR ORDERS (I)(A) AUTHORIZING DEBTORS'
ENTRY INTO THE STALKING HORSE AGREEMENT, (B) AUTHORIZING AND
APPROVING THE BIDDING PROCEDURES AND BID PROTECTIONS, (C)
APPROVING PAYMENT OF AN INCENTIVE FEE, (D) APPROVING THE NOTICE
PROCEDURES AND THE ASSUMPTION AND ASSIGNMENT PROCEDURES,
(E) AUTHORIZING THE FILING OF CERTAIN DOCUMENTS UNDER SEAL
AND (F) SETTING A DATE FOR THE SALE HEARING, AND (II) AUTHORIZING
AND APPROVING (A) THE SALE OF CERTAIN ASSETS OF DEBTORS' CARRIER
VOICE OVER IP AND APPLICATION SOLUTIONS BUSINESS FREE AND
CLEAR OF ALL LIENS, CLAIMS AND ENCUMBRANCES AND (B) THE
ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS**

The Official Committee of Unsecured Creditors (the "Committee") of Nortel Networks

Inc., et al. (collectively, the "Debtors"), by and through its undersigned counsel, hereby files this

objection (the "Objection") to the Debtors' Motion for Orders (i)(a) Authorizing Debtors' Entry

into the Stalking Horse Agreement, (b) Authorizing and Approving the Bidding Procedures and

Bid Protections, (c) Approving Payment of an Incentive Fee, (d) Approving the Notice

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's tax identification number, are: Nortel Networks Inc. ("NNI") (6332), Nortel Networks Capital Corporation (9620), Nortel Altsystems Inc. (9769), Nortel Altsystems International Inc. (5596), Xros, Inc. (4181), Sonoma Systems (2073), Qtera Corporation (0251), CoreTek, Inc. (5722), Nortel Networks Applications Management Solutions Inc. (2846), Nortel Networks Optical Components Inc. (3545), Nortel Networks HPOCS Inc. (3546), Architel Systems (U.S.) Corporation (3826), Nortel Networks International Inc. (0358), Northern Telecom International Inc. (6286), Nortel Networks Cable Solutions Inc. (0567) and Nortel Networks (CALA) Inc. (4226).

Procedures and the Assumption and Assignment Procedures, (e) Authorizing the Filing of

Certain Documents Under Seal and (f) Setting a Date for the Sale Hearing, and (ii) Authorizing

and Approving (a) the Sale of Certain Assets of Debtors' Carrier Voice Over IP and Application

Solutions Business Free and Clear of all Liens, Claims and Encumbrances and (b) the

Assumption and Assignment of Certain Executory Contracts [D.I. 2193] (the "Motion"),[2] as

more particularly described below. In support of its Objection, the Committee respectfully

represents as follows:

## PRELIMINARY STATEMENT

1.      Although generally supportive of the Debtors' efforts to enter into a stalking horse

purchase agreement with GENBAND Inc. (the "Stalking Horse") for the sale of their carrier

voice over IP and application solutions business (the "CVAS Business"), the Committee cannot

support the Debtors' request to pay exorbitant and unprecedented fees to the Stalking Horse and

One Equity Partners III, L.P. ("OEP," together with the Stalking Horse, the "Stalking Horse

Parties") in connection with the Sale. Rather than fostering a competitive sales process, the

Committee believes that the payment of such fees in order to cover the costs of OEP's failed

attempts to acquire other assets of the Nortel Debtors will chill the process. The Committee

believes that, in order to maximize value for the CVAS Business, (i) the buyer protections must

be significantly amended to bring them in line with existing precedents, (ii) key auction dates

must be changed to provide the maximum time for competitive bids to be made, (iii) certain

patents unrelated to the CVAS Business must be excluded from the Sale, and (iv) other

---

[2] Capitalized terms not defined herein shall have the meanings ascribed to them in the Motion or the ASA, (as defined below), as applicable.

RLF1 3522921v.1

significant issues, must be addressed and/or modified before the Debtors' proposed bidding procedures may be approved.

2.      The most offensive portion of the relief requested by the Debtors, which is clearly not permitted by the law of this Circuit, is the Debtors' request for Court approval to pay the Stalking Horse Parties as much as $13.6 million, comprised of an unprecedented and guaranteed $3.6 million incentive fee, a $5 million prospective breakup fee and a maximum of $5 million in expense reimbursement.  This unprecedented request for buyer protection cannot, and should not, be approved.

3.      The "incentive fee" is the method employed by the Debtors to repay OEP for expenses incurred by OEP in *past* Nortel auctions, and is payable upon this Court's entry of the proposed bidding procedures order.  The "incentive fee," or more appropriately characterized as a ransom payment, is completely at odds with the dictates of <u>Calpine Corp. v. O'Brien Envtl. Energy, Inc. (In re O'Brien Envtl. Energy, Inc.)</u>, 181 F.3d 527 (3d Cir. 1999), which mandates that the payment of any administrative expense to a stalking horse bidder must result in a specific benefit to the estate.  This ransom payment does not pass that test, and the Committee is aware of no precedent supporting payment of such an exorbitant and inappropriate fee.

4.      In addition, the Debtors should not be permitted to provide the Stalking Horse with a breakup fee and expense reimbursement in the absence of the closing of an Alternative Transaction that actually generates value for the Debtors' estates.  See, e.g., ASA Sections 9.2(b), 9.1(c)(ii), and 9.1(d)(i).  For example, if this proposed Sale does not close and the Debtors end up having to liquidate the CVAS Business, and in so doing manage to sell some of the related assets, the Stalking Horse should not be entitled to payment of a breakup fee.  Consistent with binding precedent in this Circuit, as well as this Court's past rulings in these

3

cases, such payments must only be provided to the Stalking Horse if the payments can be offset

by a corresponding benefit to the estates, such as the closing of an alternative transaction.

O'Brien, 181 F.3d at 535. The Court cannot approve the Motion and ASA unless the Break-Up

Fee and Incentive Fee will only be paid in appropriate circumstances.

     5.     To add insult to injury, in addition to the entirely inappropriate Incentive Fee, the

Debtors seek approval of a Break-Up Fee and Expense Reimbursement (each, as defined below),

which, when added to the Incentive Fee, total a maximum of roughly 7.5% of the estimated net

purchase price for the Assets. The $5 million Break-Up Fee itself is on the high end of similar

fees approved in this District, but the Committee is hard pressed to understand the addition of the

high Break-Up Fee to the Incentive Fee, which itself is another $3.6 million. Even when

applying a legitimate spin to the Incentive Fee, both of these payments would seem to be

intended to serve the same purpose of inducing the Stalking Horse Parties to make the Stalking

Horse bid. Taken together, the proposed Bidder Payments of $13.6 million or 7.5% of the

estimated net purchase price are extraordinarily high, inconsistent with the Debtors' obligation to

maximize value for the benefit of their estates, and at odds with applicable precedent.

     6.     Other aspects of the proposed Sale also contradict the Debtors' duty to maximize

value for their creditors, including the timing of certain aspects of the auction, as well as the

identity of certain assets to be included in the CVAS Business Sale.

- **Compressed Auction Timing.** As discussed further below, following a brief marketing period, the Debtors propose to set an auction seven days in advance of a March 3, 2010 sale hearing, and a bid deadline a full eight days before the Auction. In past auctions, in order to maximize the ability of bidders to formulate bids, the Debtors have set the bid deadline and auction as close to the sale hearing as possible. Indeed, the Committee expects that prospective bidders will require as much time as possible in order to formulate their bids. The bidding procedures should be amended to allow prospective bidders as much time as possible to do so.

4

- **Patents Inappropriately Included in Sale.** Apparently at the insistence of the Stalking Horse, the Debtors also inappropriately violate their duty to maximize creditor recoveries by including an additional 20 patents in the auction, which are not predominantly related to the Debtors' CVAS Business. As such, they are outside the scope of the patents included by the Debtors in their past asset sales. Accordingly, prospective bidders for these unrelated assets may be unaware that these patents are to be included in the auction, or may be unwilling to bid in an auction for the entire CVAS Business. The inclusion of the 20 patents at issue is an inefficient method of marketing them, and thus counter to the Debtors' obligation to maximize the value of each of the estates' assets for the benefit of all creditors. These additional patents should be removed from the Auction in order to allow the Debtors, in consultation with the Committee, to determine the best means of maximizing the value of these assets for the benefit of the Debtors' creditors.

7.    In the absence of the necessary modifications addressed herein, the proposed ASA and bidding procedures cannot be approved.

## BACKGROUND

8.    On January 14, 2009 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief in the United States Bankruptcy Court for the District of Delaware (the "Court") under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"). On January 15, 2009, the Court entered an order jointly administering these chapter 11 cases pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure.[3]

9.    On January 14, 2009, the Debtors' ultimate corporate parent, Nortel Networks Corporation, together with Nortel Networks Limited and certain of their Canadian affiliates commenced a proceeding before the Ontario Superior Court of Justice (the "Canadian Court") for a plan of compromise or arrangement under the Canadian Companies' Creditors

---

[3] On July 14, 2009, Nortel Networks (CALA) Inc. ("NN CALA"), an affiliate of NNI, filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. On July 17, this Court entered orders approving the joint administration and consolidation of NN CALA's chapter 11 case with the other Debtors' chapter 11 cases for procedural proposes, and applying to NN CALA certain previously entered orders in the Debtors' chapter 11 cases.

RLF1 3522921v.1

Arrangement Act. The Canadian Debtors continue to operate their businesses and manage their properties under the supervision of the Canadian Court.

10.     On January 14, 2009, the High Court of Justice in England placed nineteen of the Debtors' European affiliates into administration under the control of individuals from Ernst & Young LLC.

11.     Since the Petition Date, the Debtors continue to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

12.     On January 22, 2009, pursuant to section 1102 of the Bankruptcy Code, the United States Trustee for the District of Delaware appointed the Committee.[4]

13.     Pursuant to the Motion, the Debtors seek, among other things, the entry of an order (i) authorizing the Debtors to enter into the asset sale agreement (the "ASA"), dated as of December 22, 2009, pursuant to which the entities identified therein as sellers (together, the "Sellers") propose to sell the Assets to the Stalking Horse for cash consideration of $282 million, subject to certain purchase price reductions of approximately $100 million, as estimated by the Debtors, see Motion at ¶¶ 23, 93, (ii) establishing bidding procedures (the "Bidding Procedures") to govern the Sale of the Assets, and (iii) approving (a) payment of the Incentive Fee of $3.6 million, see Motion at ¶¶33-36, (b) a break-up fee of $5.0 million (the "Break-Up Fee"), see Motion at ¶28, and (c) an expense reimbursement of up to a maximum of $5.0 million (the "Expense Reimbursement", see Motion at ¶28.

---

[4] The Committee currently consists of the following four entities:  Flextronics Corporation (Chairperson); Law Debenture Trust Company of New York, as indenture trustee; Pension Benefit Guaranty Corp.; and The Bank of New York Mellon, as indenture trustee.

14.    As part of the Sale transaction, the Debtors entered into an incentive fee side agreement (the "Incentive Fee Agreement"), whereby certain of the Sellers and the EMEA Sellers agreed to pay a total of $3.6 million to OEP within five business days of entry of Orders by the Court and the Canadian Court approving the Bidding Procedures, regardless of whether or not the Stalking Horse ultimately purchases the CVAS Business. In the Motion, the Debtors explain that OEP requires payment of the Incentive Fee to compensate OEP for expenses that it incurred in participating in prior Nortel sale processes. See Motion at ¶94.

15.    The Stalking Horse's offer to purchase the Assets will be subject to higher and better offers, if any, received during an auction process (the "Auction") to be conducted in accordance with the Bidding Procedures. The Motion and Bidding Procedures propose scheduling the Bid Deadline on February 16, 2010, the Auction on February 24, 2010 and the Sale Hearing on March 3, 2010. Bidding Procedures at 5-6, 10; Motion at ¶¶ 26 (e), 64.

16.    Pursuant to the ASA, under certain circumstances, the Stalking Horse will be entitled to the Break-Up Fee in the amount of $5.0 million in the event the ASA is terminated because (i) a sale or other disposition of a material portion of the CVAS Business occurs in connection with a closure, liquidation or winding up, see ASA at Sections 9.2(b) and 9.1(d)(i), or (ii) the Sellers breach their representations, warranties or covenants in the ASA, see ASA at Sections 9.2(b) and 9.1(c)(ii). Additionally, the Stalking Horse will be entitled to Expense Reimbursement in the amount of up to $5.0 million under specified circumstances when the ASA is terminated without the Sellers consummating an Alternative Transaction. See ASA at Secion 9.2(a).

17.    Section 1.1(m) of the Sellers' Disclosure Schedule, which was delivered by the Sellers to the Purchaser on December 22, 2009, lists certain Transferred Patents to be sold as part

7

of the Sale. See ASA at Section 2.1.1(h). Approximately 20 of such patents are not predominantly related to the CVAS Business, which patents the Committee and the Debtors believe are very valuable.

18.     A hearing to consider, among other things, the proposed Bidding Procedures, the Incentive Payment and the Bidding Incentives is scheduled for January 6, 2010.

## THE COMMITTEE'S OBJECTION

### I.    The Bidder Payments Violate Applicable Precedent

19.     The Debtors' proposal to pay as much as $13.6 million in Bidder Payments, or an unprecedented 7.5% of the net estimated value of the Stalking Horse bid, to the Stalking Horse Parties violates applicable precedent in this Circuit and cannot be approved.

20.     As the Court has previously held in these cases, in the Third Circuit, the proponent of any fee payable to a stalking horse bidder, like the proponent of any other prospective administrative expense, must demonstrate that the fee is actually necessary to preserve estate value. See In re O'Brien Envtl. Energy, Inc., 181 F.3d at 535. Courts recognize that such fees may yield large profits to the recipient at the expense of unsecured creditors. See In re S.N.A. Nut Co., 186 B.R. 98, 105-106 (Bankr. N.D. Ill. 1995) (recognizing that "any money that a bidder receives through a bidding incentive comes out of the pockets of the creditors of the estate . . . there should be a direct relationship between the reimbursement an unsuccessful buyer receives and the benefit to the estate from the unsuccessful buyer's bid."). Absent an actual sale of the Assets at a price equal to or greater than the Stalking Horse bid, the Stalking Horse bid will not have provided a benefit to the Debtors' estates. Accordingly, the only circumstance where the Bidder Payments should be paid is upon the closing of a competing transaction that provides a demonstrable benefit to the Debtors' estates and creditors.

8

21.     The proposed Bidder Payments in this transaction, however, are payable by the Debtors in a variety of circumstances not connected to any demonstrable benefit to the Debtors' estates and creditors and are for aggregate amounts greatly exceeding amounts typically approved by Courts in this or any other district. The Incentive Fee is even payable completely irrespective of the outcome of the auction process. Accordingly, the Bidder Payments cannot be approved by this Court.

A.     *The Incentive Fee Designed to Reimburse OEP for Expenses Related to Past Nortel Auctions Does NOT Preserve or Create Value for the Debtors' Estates*

22.     Although gamely attempting to rationalize the $3.6 million Incentive Fee – which is equal to 2% of the estimated net purchase price under the ASA – as a simple cost of conducting an auction, the Debtors admit that the Incentive Fee is intended to compensate OEP for expenses that it incurred participating in *past* Nortel auction processes. See Motion at ¶94. A pay-to-play ransom such as this, for a party who has been a disruptive force in the course of the Debtors' prior sale processes, has no relation to any benefit to the estate, has no legal precedent, and runs completely contrary to O'Brien and any other case construing allowable administrative expenses under section 503(b) of the Bankruptcy Code. See 11 U.S.C. §503(b). Not surprisingly, the Debtors cannot cite any examples in their Motion of cases where these types of incentive fee payments to a stalking horse were approved.

23.     The sole condition for payment of the Incentive Fee is entry, by the U.S. and Canadian Courts, of Orders approving the Bidding Procedures. Under the terms of the Incentive Fee Agreement, OEP will "earn" the Incentive Fee regardless of whether the Stalking Horse is the Successful Bidder or another bidder offers a higher and better bid. In fact, even if the Stalking Horse is the Successful Bidder and then fails to close the transaction, OEP will keep its $3.6 million ransom. The terms for the payment of the Incentive Fee are not dependant on the

9

Debtors' estates achieving **any** actual benefit from the transaction, but rather serve only to enrich

OEP at the expense of the Debtors and their creditors.  In accordance with O'Brien, the payment

of such a fee must be tied to the Debtors' realization of some actual benefit arising from the

Stalking Horse transaction; it cannot be a ransom payment intended to reimburse a demanding

Stalking Horse Party for expenses incurred in past, unrelated transactions.

**B.     The Break-Up Fee and Expense Reimbursement Are Payable Even in the Absence of the Closing of a Alternative Transaction**

24.     The Break-Up Fee and Expense Reimbursement are also at odds with the

requirements of the O'Brien decision.  The ASA inappropriately provides for the payment of the

Break-Up Fee and Expense Reimbursement upon a variety of circumstances other than the

closing of an actual competing transaction.  Specifically, the ASA may be terminated by the

Purchaser, and a Break-Up Fee will be payable, upon, among other events: (i) a sale or other

disposition of a material portion of the CVAS Business or Assets in connection with a closure,

liquidation or winding up, see ASA at Sections 9.2(b), 9.1(d)(i), and (ii) the Sellers' breach of

the representations, warranties or covenants in the ASA, see ASA at Sections 9.2(b) and

9.1(c)(ii).  Moreover, the ASA also provides for the payment of the Expense Reimbursement

upon a variety of circumstances entailing no benefit to the Debtors' estates.  See ASA at Section

9.2(a).[5]

25.     The Debtors are thus obligated to pay the Purchaser the Break-Up Fee and

Expense Reimbursement upon events other than the closing of an Alternative Transaction and

not from the proceeds of another sale.  If no Alternative Transaction closes, or the Break-Up Fee

---

[5] The Expense Reimbursement is payable under a number of circumstances not requiring the closing of an Alternative Transaction, including, among others, the Debtors' inability to (i) meet various Sale-related deadlines, or (ii) bring down a representation through no fault of their own, which triggers a Termination Event.  See ASA at Sections 9.1, 9.2(a).

becomes payable by reason of a condition other than the existence of an Alternative Transaction, then the Debtors' estates will have received no benefit from the Break-Up Fee. There simply is no justification for the payment of a Break-Up Fee if, for instance, the Sale does not occur because of a breach of a representation and warranty. The Break-Up Fee also should not be payable if the Sale does not close and the Debtors liquidate the CVAS Business piecemeal, in a series of smaller transactions. The Break-Up Fee must only be payable from and upon consummation of an Alternative Transaction because only at such time will the benefit of the Break-Up Fee to the Debtors' estates be received. Accordingly, the Committee requests that this Court allow the payment of the Break-Up Fee and Expense Reimbursement solely upon the **closing** of a competing transaction.

    *C.*    ***Bidder Payments of 7.5% of the Estimated Purchase Price Violate Applicable Precedent***

    26.    Even if the conditions under which the Bidder Payments are payable were consistent with O'Brien and occurred only upon the closing of an Alternative Transaction, the aggregate amount of those fees must "constitute a fair and reasonable percentage of the proposed purchase price [and must be] reasonably related to the risk, effort, and expenses of the prospective purchaser." Official Comm. of Subordinated Bondholders v. Integrated Res., Inc. (In re Integrated Res., Inc.), 147 B.R. 650, 662 (S.D.N.Y. 1992), appeal dismissed, 3 F.3d 49 (2d Cir. 1993); see also In re O'Brien Envt'l Energy, Inc., 181 F.3d at 537. Thus, even if the Debtors could establish that the Bidder Payments preserve value for their estates in all cases, they must also show that the amount of the proposed fees are fair and reasonable, and serve as a catalyst to other higher bids. Id.

    27.    In these cases, the Debtors propose Bidder Payments totaling $13.6 million or approximately 7.5% of the estimated net purchase price, which is well in excess of the highest

amounts typically approved by Courts in this district.  Even the Break-Up Fee and Expense Reimbursement, considered alone, aggregate $10 million or 5.5% of the estimated net purchase price, exceeding the amount Courts approve for such fees.  Indeed, the combined amount of the Break-Up Fee and Expense Reimbursement of 5.5% is materially higher than the 4% approved for breakup fees and expense reimbursement in the Debtors' sales of their metro ethernet[6] and enterprise businesses[7] and the 3.5% approved in the sale of the Debtors' CDMA business.[8]  When the Incentive Fee is included, the already egregious 5.5% jumps to a wholly offensive 7.5%.

28.    Bankruptcy Courts in this district typically approve breakup fees for large bankruptcy sale transactions ranging from 1-3% of the aggregate purchase price.  See, e.g., In re Foamex International Inc., Case No. 09-10560 (Bankr. D. Del. April 9, 2009) (court approved breakup fee of 1.9%, or $2 million, in connection with a $105 million sale of assets); In re Ameriserve Food Distrib., Inc., Case No. 00-00358 (Bankr. D. Del. Jan 31, 2000) (court approved breakup fee of 3.6%, or $4 million, in connection with a $110 million sale of assets); In re Fruit of the Loom, Inc., Case No. 99-04497 (Bankr. D. Del. Dec. 29, 1999) (court approved

---

[6] Order Pursuant to Bankruptcy Code Sections 105, 363 and 365 (A) Authorizing Debtors Entry into the Stalking Horse Asset Sale Agreement, (B) Authorizing and Approving the Bidding Procedures and Bid Protections, (C) Approving the Notice Procedures and the Assumption and Assignment Procedures, (D) Authorizing the Filing of Certain Documents Under Seal and (E) Setting a Date for the Sale Hearing, entered October 16, 2009 (D.I. 1685) (the "MEN Bidding Procedures Order") at ¶ 16.

[7] Order (A) Authorizing Debtors Entry into the Asset and Share Sale Agreement, (B) Authorizing and Approving the Bidding Procedures, (C) Authorizing and Approving a Break-Up Fee and Expense Reimbursement, (D) Approving the Notice Procedures, (E) Approving the Assumption and Assignment Procedures, (F) Authorizing the Filing of Certain Documents Under Seal, and (G) Setting A Date For The Sale Hearing, entered on August 4, 2009 (D.I. 1278) (the "Enterprise Bidding Procedures Order") at ¶ 14 (assumes the maximum $9.5 million of expense reimbursement allowed under the applicable sale agreement and bidding procedures).

[8] Order Pursuant to Bankruptcy Code Sections 105, 363 and 365 (A) Authorizing Debtors Entry into the Asset Sale Agreement, (B) Authorizing and Approving the Bidding Procedures, (C) Authorizing and Approving a Break-Up Fee and Expense Reimbursement, (D) Approving the Notice Procedures, (E) Approving the Assumption and Assignment Procedures, (F) Authorizing the Filing of Certain Documents Under Seal and (G) Setting a Date for the Sale Hearing, entered on June 30, 2009 (D.I. 1012) (the "CDMA Bidding Procedures Order") at ¶ 11.

break-up fee of 3.0%, or $25 million, in connection with a $835 million sale of business); In re Worldwide Direct, Inc., Case No. 99-108 (Bankr. D. Del. Feb. 26, 1999) (approving break-up fee of 3.1% of the proposed purchase price); In re Montgomery Ward Holding Corp., et al., Case No. 97-1409 (Bankr. D. Del. June 15, 1998) (court approved break-up fee of 2.7%, or $3 million, in connection with $100 million sale of real estate); In re Medlab, Inc., Case No. 97-1893 (Bankr. D. Del. Apr. 28, 1999) (court approved break-up fee of 3.12% or $250,000 in connection with $8 million sale transaction).[9]  In contrast, Courts have rejected stalking horse payments that are too large relative to the stalking horse bid on the grounds that such fees would hinder rather than promote the bidding process by substantially increasing the bid that another prospective purchaser would have to make even to enter the bidding. See, e.g., In re Twenver, Inc., 149 B.R. 954 (Bankr. D. Colo. 1992).

29.    Although the amount of the Break-Up Fee, considered alone, may be consistent with the high end of the amounts permitted in this District, considering the Incentive Fee and Expense Reimbursement, which are all payable regardless of whether an Alternate Transaction ever occurs, the combined amounts payable to the Stalking Horse and its affiliates of $13.6 million renders the Bidder Payments impermissibly rich.  These payments cannot be approved.

---

[9] See also GWLS Holdings Inc., Case No. 08-12430 (PJW) (Bankr. D. Del. January 23, 2009) (2.0%); Mervyn's Holdings LLC, Case No. 08-11586 (KG) (Bankr. D. Del. January 21, 2009) (0.7%); NetVersant Solutions Inc., Case No. 08-12973 (PJW) (Bankr. D. Del. December 19, 2008) (0.4%); Hines Horticulture, Case No. 08-11922 (KJC) (Bankr. D. Del. December 10, 2008) (2.6%); Tropicana Entertainment, LLC (Casino Aztar Evansville), Case No. 08-10856 (KJC) (Bankr. D. Del. September 17, 2008) (2.9%); Syntax-Brillian Corp., Case No. 08-11407 (BLS) (Bankr. D. Del. August 4, 2008) (3.3%); Leiner Health Products, Inc., Case No. 08-10446 (KJC) (Bankr. D. Del. April 10, 2008) (2.2%); Fedders International Inc. (Air Quality Division), Case No. 07-11176 (BLS) (Bankr. D. Del. May 14, 2008) (2.5%); Nutritional Sourcing Corp. (Pueblo International, LLC), Case No. 07-11038 (PJW) (Bankr. D. Del. February 25, 2008) (2.8%); Wickes Holdings, LLC, and Wickes Furniture Company, Inc., Case No. 08-10212 (KJC) (Bankr. D. Del. February 19, 2008) (3.0%); Pope & Talbot, Inc., Case No. 07-11738 (CSS) (Bankr. D. Del. November 30, 2007) (3.3%); TWTR, Inc., et al. f/k/a Tweeter Home Entertainment, Case No. 07-10787 (PJW) (Bankr. D. Del. June 27, 2007) (3.0%); New Century TRS Holdings, Inc., Case No. 07-10416 (KJC) (Bankr. D. Del. April 20, 2007) (2.1%); New Century Financial Corp., (Parcel of Loans), Case No. 07-10416 (KJC) (Bankr. D. Del. April 12, 2007) (2.0%).

13

## II.    The Compressed Auction Deadlines Unnecessarily Stifle Bidding

30.      While the Committee believes that third-party bidders are interested in participating in the Auction, such alternative bidders will require every bit of available time to diligence and formulate bids. Unfortunately, the proposed bidding procedures needlessly limit the period available to prospective bidders to submit their bids despite the Debtors' obligation to provide as much time as possible in order to attract every last potential bidder and every last bit of value to the Auction. See In re Reading Broad., Inc., 386 B.R. 562, 575 (Bankr. E.D. Pa. 2008) (noting that the purpose of a bankruptcy sale is to obtain the highest and best price for the estate and thus for its creditors); In re Edwards, 228 B.R. 552, 561 (Bankr. E.D. Pa. 1998) ("The purpose of procedural bidding orders is to facilitate an open and fair public sale designed to maximize value for the estate."). As the Debtors are artificially restricting prospective bidders' time to submit a Qualified Bid, the Bidding Procedures run counter to the Debtors' obligations and cannot be approved.

31.      As currently formulated, the Debtors' proposed Bidding Procedures contemplate (a) a Bid Deadline on February 16, 2010, approximately 41 days after this Court's prospective entry of an order approving the Bidding Procedures, (b) an Auction on February 24, 2010, eight full days after the Bid Deadline, and (c) a hearing to consider approval of the Sale to the Successful Bidder on March 3, 2010, another seven days following the Auction. Bidding Procedures at 5-6, 10; Motion at ¶¶ 26 (e), 64. This contrasts markedly with the Debtors' past auction processes, in which only several days elapsed between bid deadline and auction and auction and sale hearing.[10] The consequence of such a compressed time schedule is a restriction

---

[10] See Order Authorizing and Approving (A) Bidding Procedures, (B) Break-Up Fee and Expense Reimbursement, (C) Notice Procedures, (D) Assumption and Assignment Procedures (E) Filing of Certain Schedules Under Seal and (F) Setting Time, Date and Place for Sale Hearing, entered February 27, 2009 (D.I. 386)

14

of the time available to bidders to diligence and formulate bids. Indeed, bidders needing several more days to formulate bids may submit lower bids or no bids at all.

32.     The Debtors' experiences in these cases have established that competing bidders often need every last minute to prepare viable bids. Those bids have led to auctions that generated hundreds of millions of dollars for the Debtors' estates, and hundreds of millions of dollars more than would have been realized had no overbids been submitted. Assuming a Sale Hearing on March 3, 2010, the Committee submits that more appropriate Bid Deadline and Auction dates are Thursday, February 25, 2010 and Monday, March 1, 2010, respectively. The Debtors' currently proposed schedule needlessly compresses available time, and creates an uneven playing field in favor of the Stalking Horse, and thus should not be approved.

## III. Certain of the Patents Being Sold Should Not Be Bundled into the Sale of the CVAS Business

33.     In order to fulfill their obligation to maximize the value of their estates for the benefit of their creditors, the proposed CVAS Business Sale should not include valuable patents not predominantly related to the CVAS Business. See generally Reading, 386 B.R. at 575 (discussing debtors' obligation to seek the highest possible value for their assets). Approximately 20 of the patents that the Debtors propose to include in the Sale – which the Committee believes may have significant value to the Debtors' estates – are simply not

---

(approving auction procedures for the Debtors' "Layer 4-7 business," including a four day period between the bid deadline and auction and a two day period between the auction and sale hearing); CDMA Bidding Procedures Order approving auction procedures for the Debtors' "CDMA business," including a three day period between the bid deadline and auction and a four day period between the auction and sale hearing); Enterprise Bidding Procedures Order (approving auction procedures for the Debtors' "Enterprise business," including a seven day period between the bid deadline and auction and a four day period between the auction and sale hearing); Order Authorizing and Approving (I) Bidding Procedures, (II) Notice Procedures, and (III) Setting a Date for the Sale Hearing, for the Sale of Certain Assets of Debtors GSM/GSM-R Business, entered on October 15, 2009 (D.I. 1676) (approving auction procedures for the Debtors' "GSM/GSM/R business," including a four day period between the bid deadline and auction and a ten day period between the auction and sale hearing, which dates were ultimately extended in accordance with the applicable bidding procedures).

15

predominantly related to the CVAS Business (the "Non-CVAS Patents"). Although the Stalking

Horse appears to have a unique interest in the Non-CVAS Patents, it is far from certain that other

bidders for the CVAS Business will share such an interest. Moreover, parties interested in the

Non-CVAS Patents for purposes unrelated to the CVAS Business may be unaware that the Non-

CVAS Patents are to be included in the Sale because they are not predominantly related to the

CVAS Business. Simply including Non-CVAS Patents in the list of patents to be included with

the Sale will not fulfill the Debtors' obligation to market the Non-CVAS Patents. Even if

potential bidders are aware of the Auction, because the assets are unrelated to the CVAS

Business unit, parties interested in the Non-CVAS Patents, but not the CVAS Business itself, are

unlikely to submit a bid at all. In order to fulfill their obligation to maximize the value of the

Debtors' estates for the benefit of their creditors, the Non-CVAS Patents should be excised from

the Sale in order to allow the Debtors, in consultation with the Committee, to determine how best

to market these Non-CVAS Patents.

## IV.    Additional Critical Committee Sale Concerns Must Be Addressed

34.    In addition to the inappropriate provisions discussed above, the following

concerns of the Committee must be resolved prior to this Court's approval of the ASA and

Bidding Procedures:[11]

- **Funds Escrowed Under the TSA Must Be Released to the Distribution Agent**.
  In accordance with that certain Interim Funding and Settlement Agreement, dated
  June 9, 2009 (the "IFA"), all proceeds of the Sale must be deposited into an
  Escrow Account for the benefit of the Sellers and their creditors (the "Escrow
  Account"). This also applies to Sale proceeds that are placed into escrow
  accounts (the "TSA Escrow Accounts") pursuant to the transition services
  agreement contemplated by the ASA (the "TSA"). Accordingly, any amounts

---

[11] The Creditors' Committee reserves the right to raise any and all appropriate objections to the Sale at the
Sale Hearing, including, without limitation, the Debtors' failure to modify the ASA to address the Committee's
concerns.

released from the TSA Escrow Accounts must get released only to the Distribution Agent, for allocation in accordance with the IFA. The Committee reserves all of its rights with respect to the proper allocation of proceeds received by the Sellers in respect of the Assets until an Allocation Determination (as defined in the IFA) becomes final.

- **Purchase Price Adjustments and Escrow**. A number of purchase price adjustments were added to the ASA during the final stages of negotiation without any prior discussion or consultation with the Committee. As the statutory representative of the Debtors' unsecured creditors, the Committee believes that the Debtors should provide it with a reconciliation of the final purchase price adjustments and escrow amounts.

## CONCLUSION

For the foregoing reasons, the Committee respectfully requests that the Court (i) deny the

Motion, unless and until the objections raised herein are resolved, and (ii) grant such other and

further relief as this Court deems just, proper and equitable.

Dated: January 5, 2010
     Wilmington, Delaware

Respectfully submitted,

By: _____
Mark D. Collins (No. 2981)
Christopher M. Samis (No. 4909)
Richards, Layton & Finger, P.A.
One Rodney Square
920 North King Street
Wilmington, DE  19801
Telephone.:  (302) 651-7700

and

Fred S. Hodara (*pro hac vice*)
David H. Botter (*pro hac vice*)
Akin Gump Strauss Hauer & Feld LLP
One Bryant Park
New York, NY  10036
Telephone.:  (212) 872-1000
Co-counsel to the Committee

RLF1 3522921v.1