**EXHIBIT B**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

-------------------------------------------------------X
                        :

*In re*                           :

Nortel Networks Inc., *et al.*, [1]     :

           Debtors.         :

                         :
-------------------------------------------------------X

Chapter 11

Case No. 09-10138 (KG)

Jointly Administered

**RE: D.I. ———2193**

**ORDER (A) AUTHORIZING DEBTORS' ENTRY INTO THE STALKING HORSE
AGREEMENT, (B) AUTHORIZING AND APPROVING THE BIDDING PROCEDURES
AND BID PROTECTIONS, (C) APPROVING PAYMENT OF AN INCENTIVE FEE,
(D) APPROVING THE NOTICE PROCEDURES AND THE ASSUMPTION AND
ASSIGNMENT PROCEDURES, (E) AUTHORIZING THE FILING OF CERTAIN
DOCUMENTS UNDER SEAL AND  (F) SETTING A DATE FOR THE SALE HEARING**

Upon the motion dated December 23, 2009 **[D.I. 2193]** (the "Motion"),[2] of Nortel

Networks Inc. ("NNI") and its affiliated debtors, as debtors and debtors in possession in the

above-captioned cases (the "Debtors"), for entry of orders, under Bankruptcy Code sections 105,

107(b)(1), 363 and 365, Bankruptcy Rules 2002, 6004, 6006, 9014 and 9018 and Local Rules

6004-1 and 9018-1 (i)(a) authorizing the Debtors' entry into that certain asset sale agreement

dated as of December 22, 2009 among NNI, Nortel Networks Limited ("NNL"), Nortel

Networks Corporation ("NNC") and certain other entities identified therein as sellers (together,

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's tax identification number, are:  Nortel Networks Inc. (6332), Nortel Networks Capital Corporation (9620), Nortel Altsystems Inc. (9769), Nortel Altsystems International Inc. (5596), Xros, Inc. (4181), Sonoma Systems (2073), Qtera Corporation (0251), CoreTek, Inc. (5722), Nortel Networks Applications Management Solutions Inc. (2846), Nortel Networks Optical Components Inc. (3545), Nortel Networks HPOCS Inc. (3546), Architel Systems (U.S.) Corporation (3826), Nortel Networks International Inc. (0358), Northern Telecom International Inc. (6286) and Nortel Networks Cable Solutions Inc. (0567) and Nortel Networks (CALA) Inc. (4226).  Addresses for the Debtors can be found in the Debtors' petitions, which are available at http://chapter11.epiqsystems.com/nortel.

the "Sellers") and GENBAND, Inc. as purchaser ("GENBAND" or the "Stalking Horse

Purchaser") for the sale of certain assets of the Sellers' Carrier Voice Over IP and Application

Solutions business (the "CVAS Business") as described therein (the "Purchased Assets") as a

"stalking-horse" sale agreement (as appended hereto as Exhibit A, the "Stalking Horse

Agreement"), (b) authorizing and approving the bidding procedures (appended hereto as Exhibit

1, the "Bidding Procedures") and the Bid Protections (as defined below), (c) approving payment

of an Incentive Fee (as defined in the Motion), including granting administrative expense status

to the Incentive Fee and Bid Protections payable by the Debtors to the Stalking Horse Purchaser,

(d) approving the form and manner of sale notice and publication notice (the "Notice

Procedures") and the procedures (the "Assumption and Assignment Procedures") as set forth

below for the assumption and assignment of the Assumed and Assigned Contracts (as defined

below, and together with the Purchased Assets and contracts as described in the Stalking Horse

Agreement, the "Assets"),  (e) authorizing the Debtors to file certain documents under seal and

(f) setting the time, date and place for a hearing (the "Sale Hearing") to consider the sale of the

Assets and the assumption and assignment of the Assumed and Assigned Contracts (the "Sale");

(ii) authorizing and approving (a) the sale of the Purchased Assets, free and clear of all liens,

claims, and encumbrances, pursuant to section 363 of the Bankruptcy Code, except as set forth in

the Stalking Horse Agreement and (b) the assumption and assignment of the Assumed and

Assigned Contracts pursuant to section 365 of the Bankruptcy Code; and (iii) granting them such

other and further relief as the Court deems just and proper; and the Court having reviewed the

Motion; and the Court having determined that the relief requested in the Motion is in the best

---

[2]      Capitalized terms not otherwise defined herein shall have the meanings ascribed to such terms in the
Motion, or if not defined in the Motion, shall have the meanings ascribed to such terms in the Stalking Horse
Agreement (as defined herein).

interests of the Debtors, their estates, their creditors and other parties in interest; and it appearing

that proper and adequate notice of the Motion has been given and that no other or further notice

is necessary; and upon the record herein; and after due deliberation thereon; and good and

sufficient cause appearing therefore **including for the reasons stated on the record at the**

**Bidding Procedures Hearing**, it is hereby

### FOUND AND DETERMINED THAT:[3]

A.    The court has jurisdiction to hear and determine the Motion and to grant the relief

requested in the Motion pursuant to 28 U.S.C. § 157 and 1334.

B.    Venue of these cases and the Motion in this district is proper under 28 U.S.C. §

1408 and 1409.  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).

C.    The statutory and legal predicates for the relief requested in the Motion are

Bankruptcy Code sections 105, 107(b)(1), 363 and 365, Bankruptcy Rules 2002, 6004, 6006,

9014 and 9018, and Local Rules 6004-1 and 9018-1.

D.    Good and sufficient notice of the relief granted by this Order has been given and

no further notice is required.  A reasonable opportunity to object or be heard regarding the relief

granted by this Order (including, without limitation, with respect to the proposed Bidding

Procedures, Incentive Fee and Bid Protections) has been afforded to those parties entitled to

notice pursuant to Local Rule 2002-1(b).

E.    The Debtors' proposed sale notice, substantially in the form attached to the

Motion as Exhibit E (the "Sale Notice") and the Debtors' proposed publication notice,

substantially in the form attached to the Motion as Exhibit F (the "Publication Notice"), are each

appropriate and reasonably calculated to provide all interested parties with timely and proper

---

[3]    Findings of fact shall be construed as conclusions of law and conclusions of law shall be construed as
findings of fact to the fullest extent of the law.  See. Fed. R. Bankr. P. 7052.

notice of the Bidding Procedures, the Auction (if necessary) and the Sale Hearing, and no other or further notice is required.

F.      The Bidding Procedures, substantially in the form attached hereto as <u>Exhibit 1</u>, are fair, reasonable, and appropriate and are designed to maximize recovery with respect to the sale of the Assets.

G.      The Debtors have demonstrated compelling and sound business justifications for authorizing the sale of the Assets, entry into the Stalking Horse Agreement and the payment of the Incentive Fee and Bid Protections (as defined below) under the circumstances, timing, and procedures set forth herein, in the Motion and in the Stalking Horse Agreement.

H.      Entry into the Stalking Horse Agreement with the Stalking Horse Purchaser as a "stalking-horse" sale agreement is in the best interest of the Debtors and the Debtors' estates and creditors.  The Stalking Horse Agreement will enable the Debtors to secure an adequate floor for the Auction and will provide a clear benefit to the Debtors' estates.

I.      The Break-Up Fee and Expense Reimbursement (each as defined below, and together the "<u>Bid Protections</u>") are fair and reasonable and provide a benefit to the Debtors' estates and creditors.

J.      The Incentive Fee is fair and reasonable and provides a benefit to the Debtors' estates and creditors, and NNI's entry into the Incentive Fee Letter is in its best interest and the best interest of its estate and creditors.

K.      The Debtors' payment of the Bid Protections under the conditions set forth in section 9.2 of the Stalking Horse Agreement, the Motion and this Order, and the payment of the Incentive Fee each are (a) an actual and necessary cost of preserving the Debtors' estates, within the meaning of section 503(b) of the Bankruptcy Code, (b) of substantial benefit to the Debtors'

estates and creditors and all parties in interest herein, (c) reasonable and appropriate, and (d) necessary to ensure that the Stalking Horse Purchaser will continue to pursue the proposed Stalking Horse Agreement to undertake the sale of the Assets.  Notwithstanding anything to the contrary in this or any other order of this Court, the Bid Protections and Incentive Fee shall constitute administrative expenses with priority pursuant to Bankruptcy Code sections 503(b).

L.     The filing of certain documents under seal, including the Schedules, is in the best interests of the Debtors and their estates, creditors, and interest holders and all other parties in interest herein.

M.     The entry of this Order is in the best interests of the Debtors and their estates, creditors, and interest holders and all other parties in interest herein; and it is therefore

### ORDERED, ADJUDGED AND DECREED THAT:

1.     Those portions of the Motion seeking approval of the Debtors' entry into the Stalking Horse Agreement, the Bidding Procedures, the Bid Protections, the Incentive Fee, the Notice Procedures, the Assumption and Assignment Procedures, setting the time, date and place of the Sale Hearing, setting the deadline by which to object to the relief sought in the Motion and authorizing the Debtors to file certain documents under seal, including the Schedules, are GRANTED and any objections thereto are OVERRULED except as set forth on the record or herein.

2.     Except as expressly provided herein, nothing herein shall be construed as a determination of the rights of any party in interest in these chapter 11 cases.

### The Bidding Procedures

3.     The Bidding Procedures attached hereto as <u>Exhibit 1</u> are hereby APPROVED. Subject to the approval of the Bidding Procedures by the Ontario Superior Court of Justice in the

Canadian Proceedings regarding the Canadian Debtors, the Debtors are hereby authorized to conduct a sale by auction of the Assets pursuant to the Bidding Procedures and the terms of this Order.

4.      The Stalking Horse Purchaser shall be deemed a Qualified Bidder pursuant to the Bidding Procedures for all purposes.

5.      The Bidding Procedures shall apply to the Qualified Bidders and the conduct of the sale of the Assets and the Auction.

## The Assumption and Assignment Procedures

6.      The Assumption and Assignment Procedures as set forth in the Motion are hereby authorized, approved and made part of this Order as if fully set forth herein.

7.      The Court recognizes that the list of Customer Contracts (as defined in the Motion) and affidavits of service that identify the Debtors' customers constitute confidential commercial information, and therefore authorizes that any such lists and affidavits to be filed in connection with this Motion and the procedures approved herein may be filed under seal.

8.      The Debtors shall provide unredacted lists of Customer Contracts to be assumed and assigned and affidavits of service identifying the Debtors' customers to the Clerk's Office of the United States Bankruptcy Court for the District of Delaware in a prominently marked envelope with a cover sheet attached containing (i) the caption, (ii) the docket number of the Motion, (iii) the docket number of this Order, (iv) the title of the list of Customer Contracts and affidavits of service that identify the Debtors' customers and (v) the legend "DOCUMENTS TO BE KEPT UNDER SEAL" in bold print.

9.      Pursuant to Bankruptcy Rule 6006(f)(6), the Court hereby authorizes the Debtors to file an omnibus motion incorporating more than one hundred (100) executory contracts to be assumed and assigned pursuant to section 365 of the Bankruptcy Code.

### The Stalking Horse Agreement

10.      Subject to the Bidding Procedures and approval of the sale at the Sale Hearing, the Debtors' entry into the Stalking Horse Agreement is hereby approved.

### The Break-Up Fee and Expense Reimbursement

11.      To the extent due under section 9.2 of the Stalking Horse Agreement, the Sellers (including the Debtors) are authorized to pay to the Stalking Horse Purchaser:  (i) a fee of two-thirds of five million dollars and 00/100 ($3,333,333.33)(the "Break-Up Fee") and (ii) an amount in cash equal to the total amount of all reasonable and documented fees, costs and expenses incurred by the Stalking Horse Purchaser in connection with the preparation, performance and execution of the Stalking Horse Agreement and the EMEA Agreement and the transactions contemplated thereby,[4] including all filing and notification fees, and all fees and expenses of the Stalking Horse Purchaser's representatives in an amount not to exceed two-thirds of five million dollars and 00/100 ($3,333,333.33)(the "Expense Reimbursement," and together with the Break-Up Fee, the "Bid Protections"), which shall be payable as provided for pursuant to the terms of the Stalking Horse Agreement, regardless of whether the Stalking Horse Agreement and the Sale are ultimately approved by this Court or any other court.

12.      The Sellers' obligation to pay the Break-Up Fee and Expense Reimbursement pursuant to section 9.2 of the Stalking Horse Agreement shall survive termination of the Stalking Horse Agreement, shall constitute an administrative expense claim under section 503(b) of the Bankruptcy Code to the extent payable by the Debtors, and shall be payable under the terms and

---

[4]      For the avoidance of doubt, the standard fee and expense structures of Latham and Watkins LLP shall be deemed reasonable.

conditions of the Stalking Horse Agreement and this Order, notwithstanding section 507(a) of the Bankruptcy Code.

13.    Other than the Purchaser's ability to seek equitable relief, the Break-Up Fee and/or the Expense Reimbursement, if payable, will be the sole and exclusive remedy of the Stalking Horse Purchaser for the Sellers' failure to consummate the transaction or breach the Stalking Horse Agreement prior to Closing.  The Break-Up Fee and/or the Expense Reimbursement will not be payable and will not be the sole and exclusive remedy of the Stalking Horse Purchaser for the Sellers' post-Closing breach.

14.    In no event shall the Sellers be responsible or liable for any losses or liabilities under the Stalking Horse Agreement that are consequential, in the nature of lost profits, diminution in the value of property, special or punitive, or otherwise not actual damages.

## Incentive Fee

15.    NNI's entry into the~~the~~**that certain** Incentive Fee Letter **by and between NNC, NNL, NNI and NNUK dated as of January 8, 2010 (attached hereto as Exhibit 2),** is hereby approved and NNI is authorized to perform all of its obligations thereunder.

16.    NNI is authorized to pay to One Equity Partners III, L.P. an Incentive Fee of 1.2 million dollars and 00/100 ($1,200,000), which shall be payable within five (5) business days ~~of following the entry of this Order and an order of the Canadian Court approving the Incentive Fee~~**following completion of the Auction,** regardless of **the outcome of the Auction and** whether the Stalking Horse Agreement and the Sale are ultimately approved as a Successful Bid by this Court or any other court**, so long as GENBAND participates in the Auction and the Financing Commitment remains in full force and effect.  In the event that (i) the Auction is cancelled because no Qualified Bids other than the Purchase Agreements received from the**

**Purchaser are received or (ii) the Auction is terminated prior to the selection of a
Successful Bid or (iii) the Purchase Agreements are terminated by the Sellers or the EMEA
Sellers prior to the Auction for any reason other than as a result of a breach by GENBAND
under the Purchase Agreements, the Incentive Fee shall be payable within five (5) business
days following the filing of the notice of the cancellation of the Auction, notice of
termination of the Auction or notice of the termination of the Purchase Agreements with
this Court, as applicable.**

17.     The Sellers' obligation to pay the Incentive Fee shall survive termination of the
Stalking Horse Agreement, shall constitute an administrative expense claim under section 503(b)
of the Bankruptcy Code to the extent payable by the Debtors, and shall be payable under the
terms and conditions of this Order, notwithstanding section 507(a) of the Bankruptcy Code.

### Notice Procedures

18.     The notices, in substantially the same form as annexed to the Motion as Exhibits
E, F and G, are sufficient to provide effective notice to all interested parties of the Bidding
Procedures, the Auction, the Sale and the ~~Assignment and~~ Assumption **and Assignment**
Procedures, pursuant to Bankruptcy Rules 2002(a)(2), 6004 and 6006, and are hereby approved.

19.     As soon as reasonably practicable after entry of this Bidding Procedures Order
and the Canadian Sale Process Order, the Debtors (or their agent) shall serve the Sale Notice, in
substantially the form attached as Exhibit E to the Motion, by first-class mail, postage prepaid,
and/or via overnight mail, facsimile, hand delivery or electronic transmission upon (i) all entities
reasonably known to have expressed an interest in a transaction with respect to the Assets (as
defined in the Stalking Horse Agreement) during the past nine (9) months, (ii) all entities
reasonably known to have asserted any claim, lien, encumbrance or interest in the Assets, (iii)

the attorneys general for all states in which Purchased Assets (as defined below) owned by the

Debtors are located, all federal and state taxing authorities, the Securities and Exchange

Commission, the Environmental Protection Agency, state environmental protection agencies, the

Internal Revenue Service, and the Department of Labor and similar state labor or employment

agencies, (iv) all parties entitled to notice pursuant to Local Rule 2002-1(b), (v) all counterparties

to the Assumed and Assigned Contracts, (vi) all known creditors of the Debtors, the (vii) the

Committee, and (viii) the Bondholders Group.  The Debtors also shall publish notice

substantially in the form attached as Exhibit G to the Motion in The Wall Street Journal

(National Edition), The Globe and Mail (National Edition) and The Financial Times

(International Edition) within five (5) business days of entry of this Bidding Procedures Order

and the Canadian Bidding Procedures Order or as soon as reasonably practicable thereafter.

      20.     The Assumption and Assignment Notice, in substantially the same form as

annexed to the Motion as Exhibit G, is sufficient to provide effective notice pursuant to

Bankruptcy Rules 2002(a)(2), 6004(a) and 6006(c) to all Counterparties (as defined in the

Motion) of the Debtors' intent to assume and assign some or all of the Assumed and Assigned

Contracts, and is hereby approved.  Each Assumption and Assignment Notice shall set forth the

following information:  (i) the name and address of the Counterparty, (ii) notice of the proposed

effective date of the assignment (subject to the Debtors' and the Stalking Horse Purchaser's or

other Successful Bidder's right to withdraw such request for assumption and assignment

pursuant to the Stalking Horse Agreement), (iii) identification of the Assumed and Assigned

Contract, (iv) the Cure Amount, if any, and (v) a description of the Stalking Horse Purchaser and

a statement as to the Stalking Horse Purchaser's ability to perform the Debtors' obligations under

the Assumed and Assigned Contracts.

21.     The Debtors (or their agent) shall serve the Assumption and Assignment Notice, in substantially the form attached as Exhibit G to the Motion upon each Counterparty pursuant to the Assumption and Assignment Procedures set forth in the Motion.  For Customer Contracts, the Debtors shall file under seal with the Court and deliver to (a) counsel to the Stalking Horse Purchaser, (b) the U.S. Trustee, (c) counsel to the Monitor, (d) counsel to the Bondholder Group, and (e) counsel to the Committee, a master notice of assignment of contracts that sets forth: (i) the name and address of each Counterparty, (ii) notice of the proposed effective date of each assignment, ~~and~~ (iii) a description of each Assumed and Assigned Contract, and (iv) the Cure Amount, if any, as well as an affidavit confirming that Assumption and Assignment Notices have been sent to each.

## Objection Procedures

22.     Any party that seeks to object to the relief requested in the Motion pertaining to approval of the sale of the Assets, including (without limitation) the sale, assumption and assignment of the Assumed and Assigned Contracts shall file a formal objection that complies with the objection procedures as set forth in the Motion.  Each objection shall state the legal and factual basis of such objection and may be orally supplemented at the Sale Hearing.  To the extent that any party to an Assumed and Assigned Contract does not timely file an objection to the Motion pursuant to the procedures set forth therein, such party shall be bound to the corresponding Cure Amount.

23.     Any and all written objections as contemplated by this Order (including, without limitation, any objection to the assumption and assignment of any contract or the Cure Amount under any contract) must be:  (a) in writing; (b) signed by counsel or attested to by the objecting party; (c) in conformity with the Bankruptcy Rules and the Local Rules; (d) filed with the Bankruptcy Court; and (e) served in accordance with the Local Rules so as to be received on or

before the appropriate deadline as set forth in the Motion on the following: (a) counsel to the

Debtors, (b) counsel to the Stalking Horse Purchaser, (c) counsel to the Committee, (d) counsel

to the Bondholder Group, and (e) the Office of the U.S. Trustee.

24.     Failure to object to the relief requested in the Motion shall be deemed to be

"consent" for purposes of Bankruptcy Code section 363(f).

**25.     The General Objection Deadline (as defined in the Motion) is 4:00 p.m. (ET)**

**on February 17, 2010.**

**26.     The Supplemental Objection Deadline (as defined in the Motion) is 4:00 p.m.**

**(ET) on March 2, 2010.**

**27.**     25. All objections to the Motion or the relief requested therein (and all

reservations of rights included therein), as it pertains to the entry of this Order, are overruled to

the extent they have not been withdrawn, waived or otherwise resolved.

**Other Relief Granted**

**28.**     26. The Auction is scheduled for **9:00 a.m. (ET) on February** 24, **25, 2010** at the

offices of Cleary Gottlieb Steen & Hamilton LLP, One Liberty Plaza, New York, New York

10006.

**29.**     27. The Sale Hearing shall be held in this Court on **March** 3 **3, 2010, at 2:00 p.m.**

(ET).  The Sale Hearing may be adjourned or rescheduled without further notice by an

announcement of the adjourned date at the Sale Hearing or by the filing of a hearing agenda.

**30.     The Purchaser shall deposit the Good Faith Deposit into an escrow account**

**(the "Escrow Account") in accordance with section 2.2.5 of the Stalking Horse Agreement.**

**The Debtors are hereby authorized to negotiate and enter into an escrow agreement on**

**terms and conditions reasonably satisfactory to the Committee and the Monitor, acting in**

**good faith, with an escrow agent to establish the Escrow Account without further order of this Court.**

31. ~~28.~~ The Debtors are authorized to conduct the Sale (as defined in the Bidding Procedures) without the necessity of complying with any state or local bulk transfer laws or requirements.

32. ~~29.~~ The Debtors are authorized to file the Schedules under seal. The Debtors shall provide the Schedules to the Clerk's Office of the United States Bankruptcy Court for the District of Delaware in a prominently marked envelope with a cover sheet attached containing (i) the caption, (ii) the docket number of the Motion, (iii) the docket number of this Order, (iv) a statement identifying the contents of the envelope as the Schedules and (v) the legend "DOCUMENTS TO BE KEPT UNDER SEAL" in bold print.

33. ~~30.~~ In the event there is a conflict between this Order and the Motion or the Stalking Horse Agreement, this Order shall control and govern.

34. ~~31.~~ Nothing in this Order, the Stalking Horse Agreement or the Motion shall be deemed to or constitute the assumption or assignment of an executory contract.

35. ~~32.~~ Notwithstanding any provision in the Federal Rules of Bankruptcy Procedure to the contrary, (i) the terms of this Order shall be immediately effective and enforceable upon its entry, (ii) the Debtors are not subject to any stay in the implementation, enforcement or realization of the relief granted in this Order, and (iii) the Debtors may, in their discretion and without further delay, take any action and perform any act authorized under this Order. For the avoidance of doubt, the Bid Protections approved by this Order shall be immediately appealable and failure to appeal in accordance with the Bankruptcy Rules or other applicable law shall constitute a waiver of such rights.

**36.**      33. The Court retains jurisdiction with respect to all matters arising from or related to the implementation of this Order.

Dated: _____, 2010
          Wilmington, Delaware

                                        _____
                                        THE HONORABLE KEVIN GROSS
                                        UNITED STATES BANKRUPTCY JUDGE

14

## **EXHIBIT 1**

(Bidding Procedures)

BIDDING PROCEDURES

Set forth below are the bidding procedures (the "Bidding Procedures") to be employed with respect to the proposed sale of certain assets and assumption of certain liabilities as set forth in the Purchase Agreements (as defined below) with respect to the Purchaser, or, as set forth in the relevant purchase agreement(s) with respect to a Successful Bidder (as defined below) (in either event, the "Sale"). Capitalized terms used but not defined herein shall have the meanings ascribed to them in the North American Agreement (as defined below).

On December 22, 2009, Nortel Networks Inc. and certain of its U.S. subsidiaries that are debtors and debtors-in-possession (collectively, the "U.S. Debtors") as well as Nortel Networks Limited and certain other affiliates of the U.S. Debtors that have commenced proceedings under the Canadian Companies' Creditors Arrangement Act (the "Canadian Debtors"), and certain non-debtor affiliates of the U.S. Debtors and the Canadian Debtors (together with the U.S. Debtors and the Canadian Debtors, the "North American Sellers") executed that certain Asset Sale Agreement (the "North American Agreement") with GENBAND Inc. (together with any of its designees, the "Purchaser").

On December 23, 2009, certain other affiliates of the North American Sellers (the "EMEA Sellers" and together with the North American Sellers, the "Sellers"), certain of which are under the control of Alan Bloom, Stephen Harris, Chris Hill and Alan Hudson of Ernst & Young LLP, in their capacities as the joint administrators of those EMEA Sellers appointed by the English High Court of Justice in connection with the proceedings (the "UK Proceedings") under the Insolvency Act 1986 (such individuals collectively, the "Administrators"), and the Administrators executed that certain Asset Sale Agreement relating to the sale and purchase of the EMEA Assets with the Purchaser (the "EMEA Agreement" and together with the North American Agreement, the "Purchase Agreements").

The Sellers have determined that: (A) the transaction contemplated by the Purchase Agreements and the ancillary agreements discussed therein with respect to the Purchaser, or, as set forth in the relevant sale agreement and ancillary agreements with respect to a Successful Bidder (collectively, the "Transaction") should be subject to competitive bidding as set forth herein; (B) the transfer of the U.S. Debtors' rights, title and interests in and to the Assets (as defined below) should be subject to approval by the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") pursuant to sections 363 and 365 of title 11 of the United States Code, 11 U.S.C. §§ 101-1330, as amended (the "Bankruptcy Code"); (C) the transfer of the rights, title and interests of the Canadian Debtors (as such term is defined in the North American Agreement) in and to the Assets should be subject to approval by the Ontario Superior Court of Justice (the "Canadian Court"); and (D) the Transaction contemplated by the Purchase Agreements and the ancillary agreements discussed therein with respect to the Purchaser, or, as set forth in the relevant purchase agreement(s) and the ancillary agreements with respect to a Successful Bidder shall be (i) submitted for approval by such other applicable court(s) as the Sellers, in consultation with the Creditors' Committee (as defined below), the Bondholder Group (as defined below) and the Monitor (as defined below), may determine are necessary or appropriate and (ii) subject to such other closing conditions as are set forth in the Purchase Agreements with respect to the Purchaser, or, as set forth in the relevant purchase agreement(s) with respect to a Successful Bidder.

1

On December 23, 2009, the U.S. Debtors filed a Motion for Orders (I)(A) Authorizing Debtors' Entry into the Stalking Horse Agreement, (B) Authorizing and Approving the Bidding Procedures and Bid Protections, (C) Approving Payment of an Incentive Fee (D) Authorizing and Approving a Break-Up Fee and Expense Reimbursement, (E) Approving the Notice Procedures and the Assumption and Assignment Procedures, (F) Authorizing the Filing of Certain Documents Under Seal, and (G) Setting a Date for the Sale Hearing, and (II) Authorizing and Approving (A) the Sale of Certain Assets of Debtors' Carrier Voice Over IP and Applications Solutions Business Free and Clear of All Liens, Claims and Encumbrances and (B) the Assumption and Assignment of Certain Contracts Executory Contracts (the "Sale Motion").

On [●], 2009,January 8, 2010 the Bankruptcy Court entered an Order approving, among other things, the Bidding Procedures set forth herein and the payment, in certain circumstances, of the Break-Up Fee and Expense Reimbursement (the "Bidding Procedures Order").

On [●],December 29, 2009, the Canadian Debtors filed a motion with the Canadian Court seeking an order for approval of (I) execution and delivery of the North American Agreement by the Canadian Debtors, (II) payment of the Break-Up Fee and Expense Reimbursement in the circumstances provided for in the North American Agreement, and (III) a process for the Sale of the Canadian Debtors' rights, title and interests in and to the Assets (as defined below).

On [●], 2009,January 6, 2010, the Canadian Court entered an Order approving, among other things, the Bidding Procedures set forth herein and the payment, in certain circumstances, of the Break-Up Fee and Expense Reimbursement (the "Canadian Sales Process Order").

Bidding Process

The Bidding Procedures set forth herein describe, among other things, the assets available for sale, the manner in which prospective bidders may gain access to or continue to have access to due diligence materials concerning the Assets, the manner in which bidders and bids become Qualified Bidders (as defined below) and Qualified Bids (as defined below), respectively, the receipt and negotiation of bids received, the conduct of any subsequent Auction (as defined below), the ultimate selection of the Successful Bidder (as defined below), and the Bankruptcy Court's and the Canadian Court's and, if required, such other applicable courts' approval thereof (collectively, the "Bidding Process"). The Sellers intend to consult with, among others, the Official Committee of Unsecured Creditors in connection with the chapter 11 cases of Nortel Networks Inc., *et al.* (jointly administered under Case No. 09-10138) involving the U.S. Debtors (the "Creditors' Committee"), the ad hoc group of bondholders holding claims against certain of the U.S. Debtors and certain of the Canadian Debtors (the "Bondholder Group"), Ernst & Young Inc., in its capacity as the Canadian Court-appointed monitor in connection with the proceedings under the Companies' Creditors Arrangement Act (the "Monitor"), the Administrators in connection with the UK Proceedings, and their respective advisors throughout the Bidding Process. In the event that the Sellers and any party disagree as to the interpretation or application of these Bidding Procedures, the Canadian Court and the Bankruptcy Court will have jurisdiction to hear and resolve such dispute.[1]

---

[1] For the avoidance of doubt, the Bidding Process shall not govern any disagreements among the Sellers.

## Assets To Be Sold

The Sellers are offering for sale, in one or more Transactions, certain of the Sellers' assets pertaining to the business segment described in the Purchase Agreements (to the extent that such assets are not subsequently excluded from the sale in accordance with the terms of the Purchase Agreements) with respect to the Purchaser, or, as set forth in the relevant sale or purchase agreement(s) with respect to a Successful Bidder, and related schedules and in an information memorandum made available by the Sellers to the Purchaser and other potential bidders, and to be made available to other potential bidders that have executed a confidentiality agreement with the Sellers (the "Assets").

## "As Is, Where Is"

The sale of the Assets will be on an "as is, where is" basis and without surviving representations or warranties of any kind, nature, or description by the Sellers, their agents, or estates, except, with respect to the Purchaser, to the extent set forth in the Purchase Agreements or, with respect to a Successful Bidder (as defined below), to the extent set forth in the relevant sale agreement(s) of such Successful Bidder. In addition, in the case of the EMEA Sellers, the sale of whatever rights, title and interests that such EMEA Seller may have (if any) in and to the Assets will be on an "as-is" basis and will be without any representations or warranties, except, with respect to the Purchaser, to the extent set forth in the EMEA Agreement or, with respect to a Successful Bidder, to the extent set forth in the relevant purchase agreement(s) of such Successful Bidder.

## Free Of Any And All Claims And Interests

All of the rights, title and interests of the U.S. Debtors and the Canadian Debtors in and to the Assets, or any portion thereof, to be acquired will be sold free and clear of all pledges, liens, security interests, encumbrances, claims, charges, options, and interests thereon and there against (collectively, the "Claims and Interests") to the extent permitted by sections 363 and 365 of the Bankruptcy Code and other applicable law, such Claims and Interests to attach to the net proceeds of the sale of such Assets (without prejudice to any claims or causes of action regarding the priority, validity or enforceability thereof), except, with respect to the Purchaser, to the extent otherwise set forth in the North American Agreement or, with respect to a Successful Bidder, to the extent otherwise set forth in the relevant sale agreement of such Successful Bidder with the U.S. Debtors and the Canadian Debtors.

## Publication Notice

Within five (5) days of entry of orders by the Bankruptcy Court and the Canadian Court approving these Bidding Procedures or as soon as practicable thereafter, the Sellers shall publish notice of these Bidding Procedures, the time and place of the Auction (as defined below), the time and place of the Sale Hearing (as defined below), and the objection deadline for the Sale Hearing in The Financial Times (International Edition), The Wall Street Journal (National Edition), and The Globe & Mail (National Edition).

## Participation Requirements

Unless otherwise ordered by both the Bankruptcy Court and the Canadian Court and accepted by the Administrators, for cause shown, or as otherwise determined by the Sellers (in

consultation with the Creditors' Committee, the Bondholder Group and the Monitor), in order to participate in the Bidding Process, prior to the Bid Deadline (as defined below), each person other than the Purchaser, who wishes to participate in the Bidding Process (a "Potential Bidder") must deliver to the Notice Parties (as defined below) at the addresses provided below:

(a)    an executed confidentiality agreement (to be delivered prior to the distribution of any confidential information by the Sellers to a Potential Bidder) in substantially the same form as the confidentiality agreement executed by the Purchaser and otherwise in form and substance satisfactory to the Sellers, and which shall inure to the benefit of any purchaser of the Assets. In the event that the Potential Bidder has already entered into a confidentiality agreement with the Sellers, it must provide a statement (i) agreeing that such agreement shall be deemed to be amended so as to be in substantially the same form as the confidentiality agreement executed by the Purchaser; (ii) agreeing that its obligations under such agreement shall inure to the benefit of any purchaser of the Assets; and (iii) waiving any of its rights under such confidentiality agreement that are in conflict with the Bidding Procedures or that would otherwise prohibit disclosures regarding the Potential Bidder, or any Transaction it may enter into, to the Notice Parties (as defined below);

(b)    current audited financial statements and latest unaudited financial statements of the Potential Bidder, or, if the Potential Bidder is an entity formed for the purpose of acquiring the Assets (or any portion thereof), current audited financial statements and latest unaudited financial statements of the equity holders of the Potential Bidder who will guarantee the obligations of the Potential Bidder, or such other form of financial disclosure and credit-quality support or enhancement that will allow the Sellers and their respective financial advisors, in consultation with the Creditors' Committee, the Bondholder Group and the Monitor, to make a reasonable determination as to the Potential Bidder's financial and other capabilities to consummate the Transaction; and

(c)    a preliminary (non-binding) written proposal regarding: (i) the purchase price range (including liabilities to be assumed by the Potential Bidder); (ii) any Assets expected to be excluded or any additional assets desired to be included; (iii) the structure and financing of the Transaction (including, but not limited to, the sources of financing for the purchase price and all requisite financial assurance); (iv) any anticipated corporate, stockholder, internal or regulatory approvals required to close the Transaction, the anticipated time frame and any anticipated impediments for obtaining such approvals; (v) the proposed number of employees of the Sellers who will become employees of the Potential Bidder (save in jurisdictions where employees transfer by operation of law), and any proposed measures associated with the continued employment of all employees who will become employees of the Qualified Bidder; and (vi) any conditions to closing that the Potential Bidder may wish to impose in addition to those set forth in the Purchase Agreements.

A Potential Bidder (i) who has delivered the documents described above, (ii) whose financial information and credit quality support or enhancement demonstrate in the Sellers' judgment the financial capability of the Potential Bidder to consummate the Transaction, (iii) who has submitted a reasonably competitive and realistic non-binding proposal, as described above, (iv) who has executed a confidentiality agreement, as described above, and (v) that the Sellers determine in their reasonable business judgment, after consultation with their counsel and

financial advisors, the Creditors' Committee, the Bondholder Group and the Monitor, is likely (based on availability of financing, experience and other considerations) to be able to consummate the Transaction, will be deemed a "Qualified Bidder".

As promptly as practicable after a Potential Bidder delivers all of the materials required above, the Sellers will determine, in consultation with the Creditors' Committee, the Bondholder Group and the Monitor, and will notify the Potential Bidder, if such Potential Bidder is a Qualified Bidder. At the same time that the Sellers notify the Potential Bidder that it is a Qualified Bidder, the Sellers will allow the Qualified Bidder to begin or continue to conduct due diligence with respect to the Assets as provided in the following paragraph.

### Due Diligence

The Sellers may in their reasonable business judgment, and subject to competitive and other business considerations, afford each Qualified Bidder and any person seeking to become a Qualified Bidder that has executed a confidentiality agreement with the Sellers such due diligence access to materials and information relating to the Assets as the Sellers deem appropriate after consultation with the Creditors' Committee, the Bondholder Group and the Monitor. Due diligence access may include management presentations as may be scheduled by the Sellers, access to electronic data rooms, on-site inspections, and other matters which a Qualified Bidder may reasonably request and as to which the Sellers, in their reasonable business judgment, may agree. The Sellers will designate an employee or other representative to coordinate all reasonable requests for additional information and due diligence access from Qualified Bidders. No additional due diligence for any party other than a Qualified Bidder who has submitted a Qualified Bid will continue after the Bid Deadline (as defined below). The Sellers may, in their discretion, coordinate diligence efforts such that multiple Qualified Bidders have simultaneous access to due diligence materials and/or simultaneous attendance at management presentations or site inspections. In any event, the Purchaser shall be provided access to all material due diligence materials, management presentations, on-site inspections and other information provided to any Qualified Bidders that were not previously made available to the Purchaser as soon as commercially practicable and in no event later than five (5) calendar days after the date that the Sellers made such information available to any such Qualified Bidder. Neither the Sellers nor any of their affiliates (or any of their respective representatives) will be obligated to furnish any information relating to the Assets to any person other than to Qualified Bidders. The Sellers make no representation or warranty as to the information to be provided through this due diligence process or otherwise, except to the extent set forth in the Purchase Agreements or in any other definitive agreement(s) with any Successful Bidder executed and delivered by Sellers.

### Bid Deadline

A Qualified Bidder that desires to make a bid will deliver written copies of its bid to the following parties (collectively, the "Notice Parties"): (i) Nortel Networks Limited and Nortel Networks Inc., c/o Nortel Networks Limited, Attn: Anna Ventresca, Esq., 5945 Airport Road, Suite 360, Mississauga, Ontario L4V 1R9, Facsimile: (905) 863-1984; (ii) U.S. Debtors' counsel: Cleary Gottlieb Steen & Hamilton LLP, Attn: James L. Bromley and Lisa M. Schweitzer, One Liberty Plaza, New York, New York 10006, Facsimile: (212) 225-3999; (iii) U.S. Debtors' counsel: Morris, Nichols, Arsht & Tunnell LLP, Attn: Derek C. Abbott, 1201 North Market Street, Wilmington, Delaware 19801, Facsimile: (302) 658-3989; (iv) Canadian Debtors' counsel: Ogilvy Renault LLP, Attn: Derrick C. Tay and Jennifer Stam, Royal Bank Plaza, South

Tower, Suite 3800, 200 Bay Street, Toronto, Ontario, Canada, Facsimile: (416) 216-3930; (v) Sellers' financial advisors: Lazard Frères & Co., Attn: Frank A. (Terry) Savage, 30 Rockefeller Plaza, New York, NY 10020, Facsimile: (212) 332-1748; (vi) counsel to the Creditors' Committee: Akin Gump Strauss Hauer & Feld LLP, Attn: Fred S. Hodara, Stephen B. Kuhn, David H. Botter and Kenneth A. Davis, One Bryant Park, New York, New York 10036, Facsimile: (212) 872-1002; (vii) financial advisor to the Creditors' Committee: Jefferies & Company, Inc., Attn: General Counsel, Investment Banking, 520 Madison Avenue, New York, New York, Facsimile: (212) 284-2280; (viii) counsel to the Bondholder Group: Milbank, Tweed, Hadley & McCloy, Attn: Roland Hlawaty, One Chase Manhattan Plaza, New York, New York, 10006, Facsimile: (212) 822-5735; (ix) the Monitor: Murray A. McDonald, Ernst & Young Inc., Ernst & Young Tower, 222 Bay Street, P.O. Box 251, Toronto, ON M5K 1J7 Canada, Facsimile: (416) 943-3300; and (x) the Administrators: Ernst & Young LLP, Attn: Stephen Harris, 1 More Place, London SE1 2AF, United Kingdom, Facsimile +44 20 7951 9002; and (xi) counsel to the Administrators: Herbert Smith LLP, Attn: Stephen Gale, Exchange House, Primrose Street, London, EC2A 2HS, Facsimile: +44 20 7098 4878; so as to be received not later than **February 16,23, 2010 at 4 p.m. (ET)** by the Sellers (as may be extended as set out below, the "Bid Deadline"). The Sellers, after consultation with the Creditors' Committee, the Bondholder Group and the Monitor, may, in accordance with the procedures set forth in the section titled "Reservation of Rights," extend the Bid Deadline once or successively, but they are not obligated to do so. If the Sellers extend the Bid Deadline, they will promptly notify all Qualified Bidders (including the Purchaser) and the parties listed above of such extension.

Qualified Bid

A bid submitted will be considered a Qualified Bid only if the bid is submitted by a Qualified Bidder, pursuant to the previous paragraph and complies with all of the following (a "Qualified Bid"):

(a)    it states that the applicable Qualified Bidder offers to purchase the Assets upon the terms and conditions substantially as set forth in the Purchase Agreements, including without limitation, with respect to certainty and timing of closing, or pursuant to an alternative structure (including without limitation, an offer conditioned upon confirmation of a plan of reorganization proposed by the U.S. Debtors either individually or in collaboration with such Qualified Bidder), or upon alternative terms and conditions that the Sellers reasonably determine, after consultation with the Creditors' Committee, the Bondholder Group and the Monitor, are no less favorable than the terms and conditions of the Purchase Agreements.

(b)    it includes a letter stating that the bidder's offer is irrevocable until the selection of the Successful Bidder and, if applicable, the Alternate Bidder (as defined below), provided that if such bidder is selected as the Successful Bidder or the Alternate Bidder, its offer shall remain irrevocable until the earlier of (i) closing of the Sale to the Successful Bidder or the Alternate Bidder, and (ii) (x) with respect to the Successful Bidder only, June 30, 2010, subject to further extensions as may be agreed to under the applicable purchase agreements and (y) with respect to the Alternate Bidder only, the Alternate Bid Expiration Date (as defined below);

(c)    it includes duly authorized and executed Purchase Agreements, including the purchase price for the Assets expressed in U.S. Dollars (the "Purchase Price"), together with all exhibits and schedules thereto, the Intellectual Property License

Agreement, the Transition Services Agreement, the Trademark License Agreement, the Manufacturing Inventory Agreements Term Sheet and the other ancillary agreements as described in the Purchase Agreements and such additional ancillary agreements as may be required by the bidder with all exhibits and schedules thereto (or term sheets that describe the material terms and provisions of such agreements), as well as copies of such materials marked to show those amendments and modifications to the Purchase Agreements ("Marked Agreements") and such ancillary agreements (the "Marked Ancillary Agreements") (to the extent applicable) and the proposed orders to approve the Sale by the Bankruptcy Court, the Canadian Court and any other applicable court(s) whose approval may be required, proposed by the bidder;

(d)     it includes written evidence of a firm, irrevocable commitment for financing, or other evidence of ability to consummate the proposed transaction, that will allow the Sellers, in consultation with the Creditors' Committee, the Bondholder Group and the Monitor, to make a reasonable determination as to the Qualified Bidder's financial and other capabilities to consummate the transaction contemplated by the Marked Agreements;

(e)     it is not conditioned on (i) the outcome of unperformed due diligence by the bidder and/or (ii) obtaining financing;

(f)     it fully discloses the identity of each entity that will be bidding for the Assets or otherwise sponsoring or participating in connection with such bid, and the complete terms of any such participation;

(g)     it has a value to the Sellers, in the Sellers' reasonable business judgment, after consultation with their financial advisors, the Creditors' Committee, the Bondholder Group and the Monitor, that either individually or, when evaluated in conjunction with any other Qualified Bid for the Assets, is greater than or equal to the sum of the value offered under the Purchase Agreements, plus (i) the amount of the Break-Up Fee and Expense Reimbursement (as defined below), plus (ii) U.S.$4 million;

(h)     it includes an acknowledgment and representation that the bidder will assume the Sellers' obligations under the executory contracts and unexpired leases proposed to be assigned pursuant to the Purchase Agreements (or identifies with particularity which of such contracts and leases the bidder wishes not to assume, or alternatively which additional executory contracts or unexpired leases the bidder wishes to assume), contains full details of the bidder's proposal for the treatment of related cure costs; and it identifies with particularity any executory contract or unexpired lease the assumption and assignment of which is a condition to closing;

(i)     it includes an acknowledgement and representation that the bidder: (i) has had an opportunity to conduct any and all required due diligence regarding the Assets prior to making its offer; (ii) has relied solely upon its own independent review, investigation and/or inspection of any documents and/or the Assets in making its bid; (iii) did not rely upon any written or oral statements, representations, promises, warranties or guaranties whatsoever, whether express or implied (by operation of law or otherwise), regarding the Assets or the completeness of any information provided in connection therewith or the Auction, except as expressly stated in the Marked Agreements or the

Marked Ancillary Agreements; and (iv) is not entitled to any expense reimbursement or break-up fee in connection with its bid;

(j)    it includes evidence, in form and substance reasonably satisfactory to Sellers, of authorization and approval from the bidder's board of directors (or comparable governing body) with respect to the submission, execution, delivery and closing of the Marked Agreements and Marked Ancillary Agreements;

(k)    it is accompanied by a good faith deposit in the form of a wire transfer (to a bank account specified by the Sellers), certified check or such other form acceptable to the Sellers, payable to the order of the Sellers (or such other party as the Sellers may determine) in an amount equal to 5% of the Purchase Price to be dealt with as provided for under "Good Faith Deposit" herein;

(l)    it (i) contains full details of the proposed number of employees of the Sellers (apportioned by jurisdiction) who will become employees of the Qualified Bidder (save in jurisdictions where employees transfer by operation of law) and any proposed measures associated with their continued employment and associated with the employment of all employees who will become employees of the Qualified Bidder, and (ii) identifies any pension liabilities and assets related to any employees currently covered under the Nortel Retirement Income Plan who will become employees of the Qualified Bidder that the Qualified Bidder intends to assume or purchase;

(m)    it includes evidence of the Potential Bidder's ability to comply with section 365 of the U.S. Bankruptcy Code (to the extent applicable), including providing adequate assurance of such Potential Bidder's ability to perform in the future the contracts and leases proposed in its bid to be assumed by the Sellers and assigned or subleased to the Potential Bidder, in a form that will permit the immediate dissemination of such evidence to the counterparties to such contracts and leases;

(n)    it contains other information reasonably requested by the Sellers; and

(o)    it is received by the Bid Deadline.

The Sellers will determine, in their reasonable business judgment, after consultation with the Creditors' Committee, the Bondholder Group and the Monitor, whether to entertain bids for the Assets that do not conform to one or more of the requirements specified herein and deem such bids to be Qualified Bids; provided that the Sellers, in evaluating such bids, may not waive substantial compliance with any items in paragraphs (d), (e), (f), (i)(iv), (j) or (o) without the consent of the Creditors' Committee, the Bondholder Group and the Monitor; provided further that, with respect to paragraph (e), such consent shall not be unreasonably withheld in connection with any bid that would (1) otherwise fully satisfy the requirements of a Qualified Bid but for a de minimis failure to comply with those criteria and (2) such non-compliance is cured within twenty-four (24) hours of the Bid Deadline. Notwithstanding the foregoing, the Purchaser will be deemed a Qualified Bidder, and the Purchase Agreements will be deemed a Qualified Bid, for all purposes in connection with the Bidding Process, the Auction, and the Sale.

The Sellers shall notify the Purchaser and all Qualified Bidders in writing as to whether or not any bids constitute Qualified Bids (and, with respect to each Qualified Bidder that submitted a bid other than the Purchaser, whether such Qualified Bidder's bid constitutes a Qualified Bid)

8

on the day that the determination is made; provided that such notification shall be given no later than two (2) Business Days following the expiration of the Bid Deadline, **but in no case less than one (1) Business Day before the Auction**. The Sellers shall provide the Purchaser with a copy of any Qualified Bid received by the Sellers on the day that the determination is made that such bid is a Qualified Bid but in no event later than ~~two~~**one** (~~2~~**1**) Business ~~Days~~**Day** prior to the commencement of the Auction.

## Aggregate Bids

The Sellers may aggregate separate bids from unaffiliated persons to create one "Qualified Bid" from a "Qualified Bidder"; provided that all bidders shall remain subject to the provisions of 11 U.S.C. § 363(n) regarding collusive bidding.

## Evaluation of Competing Bids

A Qualified Bid will be valued based upon several factors including, without limitation, items such as the purchase price and the net value (including assumed liabilities and the other obligations to be performed or assumed by the bidder, including any assumed pension liabilities) provided by such bid, the claims likely to be created by such bid in relation to other bids, the counterparties to such Transaction, the proposed revisions to the relevant Transaction documents, the effect of the Transaction on the value of the ongoing businesses of the Sellers (including ongoing relationships with customers and suppliers), other factors affecting the speed, certainty and value of the Transaction (including any regulatory approvals required to close the Transaction), the assets included or excluded from the bid, the estimated number of in-scope employees of the Sellers (apportioned by jurisdiction) to be offered post-closing employment by the Qualified Bidder and any proposed measures associated with their continued employment, the transition services required from the Sellers post-closing and any related restructuring costs, and the likelihood and timing of consummating such transaction, each as determined by the Sellers, in consultation with their advisors, the Creditors' Committee, the Bondholder Group and the Monitor.

## No Qualified Bids

If the Sellers do not receive any Qualified Bids other than the Purchase Agreements received from the Purchaser, the Auction shall be cancelled and the U.S. Debtors shall report the same to the Bankruptcy Court, the Canadian Debtors shall report the same to the Canadian Court and the Monitor and subject to requiring and obtaining approvals of the Bankruptcy Court, the Canadian Court or any other applicable court and satisfaction of the conditions set forth in the Purchase Agreements, the Sellers shall promptly proceed to complete the Transaction contemplated by the terms of the Purchase Agreements. In addition, if no Qualified Bid is received, the U.S. Debtors reserve the right to request that the Bankruptcy Court advance the date of the Sale Hearing (as defined below) and provide notice of such new date to those parties in interest entitled to notice thereof and the Canadian Debtors reserve the right to file a motion with the Canadian Court seeking advancement of the date for approval of the sale of the Canadian Debtors' rights, title and interests in and to the Assets to the Purchaser. In addition, if approval of any other applicable court is required, the Sellers will as soon as practicable file an appropriate pleading with such court(s) seeking approval of the Transaction.

## Break-Up Fee and Expense Reimbursement

Recognizing the value and benefits that the Purchaser has provided to the U.S. Debtors and the other Sellers by entering into the Purchase Agreements, as well as the Purchaser's expenditure of time, energy and resources, the Sellers have agreed, under the circumstances set forth in the Purchase Agreements and as set forth in the Bidding Procedures Order and the Canadian Sales Process Order, to pay to the Purchaser (i) a break-up fee of $5,000,000 (the "Break-Up Fee") and (ii) reimburse the Purchaser for certain expenses as set forth in the Agreements and Bidding Procedures Order up to $5,000,000 (the "Expense Reimbursement").

## Auction

If the Sellers receive one or more Qualified Bids in addition to the Purchase Agreements, the Sellers will conduct an auction (the "Auction") of the Assets, which shall be transcribed or recorded on video, at **9:00 a.m. (ET) on February ~~24~~,25, 2010**, at the offices of Cleary Gottlieb Steen & Hamilton LLP located at One Liberty Plaza, New York, New York 10006 or such other location as shall be timely communicated to all entities entitled to attend the Auction, which Auction may be cancelled or adjourned, subject to the provisions set forth in the section titled "Reservation of Rights." The Auction shall run in accordance with the following procedures:

(a)    Only the Sellers, the Purchaser, the Creditors' Committee, the Bondholder Group, the Monitor and the Administrators (and the advisors to each of the foregoing), any creditor of the U.S. Debtors or the Canadian Debtors and any other Qualified Bidder that has timely submitted a Qualified Bid, shall attend the Auction in person, and only the Purchaser and such other Qualified Bidders will be entitled to make any subsequent bids at the Auction.

(b)    Each Qualified Bidder shall be required to confirm that it has not engaged in any collusion with respect to the bidding or the Transaction.

(c)    At least one (1) Business Day prior to the Auction, each Qualified Bidder who has timely submitted a Qualified Bid must inform the Sellers whether it intends to attend the Auction; provided that in the event a Qualified Bidder elects not to attend the Auction, such Qualified Bidder's Qualified Bid shall nevertheless remain fully enforceable against such Qualified Bidder until (i) the date of the selection of the Successful Bidder at the conclusion of the Auction and (ii) if such bidder is selected as an Alternate Bidder (as defined below), the Alternate Bid Expiration Date. At least one (1) Business Day prior to the Auction, the Sellers will provide copies of the Qualified Bid or combination of Qualified Bids which the Sellers believe, in their reasonable business judgment, after consultation with the Creditors' Committee, the Bondholder Group and the Monitor, is the highest or otherwise best offer (the "Starting Bid") to the Purchaser and all other Qualified Bidders which have informed the Sellers of their intent to participate in the Auction.

(d)    All Qualified Bidders who have timely submitted Qualified Bids will be entitled to be present for all Subsequent Bids (as defined below) at the Auction with the understanding that the true identity of each Qualified Bidder at the Auction will be fully disclosed to all other Qualified Bidders at the Auction and that all material terms of each Subsequent Bid will be fully disclosed to all other bidders throughout the entire Auction; provided that all Qualified Bidders wishing to attend the Auction must have at least one

individual representative with authority to bind such Qualified Bidder attend the Auction in person.

(e)    The Sellers, after consultation with their counsel and financial advisors, the Creditors' Committee, the Bondholder Group and the Monitor, may employ and announce at the Auction additional procedural rules that are reasonable under the circumstances (e.g., the amount of time allotted to make Subsequent Bids) for conducting the Auction, provided that such rules are (i) not inconsistent with these Bidding Procedures, the Bankruptcy Code, or any order of the Bankruptcy Court, the Canadian Court or any other applicable court entered in connection herewith, and (ii) disclosed to each Qualified Bidder at the Auction.

(f)    Bidding at the Auction will begin with the Starting Bid and continue, in one or more rounds of bidding, so long as during each round at least one subsequent bid is submitted by a Qualified Bidder that (i) improves upon such Qualified Bidder's immediately prior Qualified Bid (a "Subsequent Bid") and (ii) the Sellers determine, in consultation with their advisors, the Creditors' Committee, the Bondholder Group and the Monitor that such Subsequent Bid is (A) for the first round, a higher or otherwise better offer than the Starting Bid, and (B) for subsequent rounds, a higher or otherwise better offer than the Leading Bid (as defined below). Each incremental bid at the Auction shall provide net value to the estate of at least U.S.$3 million over the Starting Bid or the Leading Bid, as the case may be, provided that the Sellers, in consultation with the Creditors' Committee, the Bondholder Group and the Monitor, shall retain the right to modify the increment requirements at the Auction. After the first round of bidding and between each subsequent round of bidding, the Sellers shall announce the bid or combination of bids (and the value of such bid(s)) that it believes to be the highest or otherwise better offer (the "Leading Bid"). A round of bidding will conclude after each participating Qualified Bidder has had the opportunity to submit a Subsequent Bid with full knowledge of the Leading Bid. Except as specifically set forth herein, for the purpose of evaluating the value of the consideration provided by Subsequent Bids (including any Subsequent Bid by the Purchaser), the Sellers will, at each round of bidding, give effect to the Break-Up Fee and Expense Reimbursement that may be payable to the Purchaser under the Purchase Agreements as well as any additional liabilities to be assumed by a Qualified Bidder and any additional costs which may be imposed on the Sellers.

<u>Selection Of Successful Bid</u>

Prior to the conclusion of the Auction, the Sellers, in consultation with their advisors, the Creditors' Committee, the Bondholder Group and the Monitor will (a) review each Qualified Bid and evaluate each Qualified Bid as set forth in the section titled "Evaluation of Competing Bids" herein, (b) identify the highest or otherwise best offer or offers for the Assets received at the Auction (one or more such bids, collectively the "<u>Successful Bid</u>" and the bidder(s) making such bid, collectively, the "<u>Successful Bidder</u>") and (c) communicate to the Purchaser and the other Qualified Bidders the identity of the Successful Bidder, the Alternate Bidder (as defined below), if any, and the details of the Successful Bid and Alternate Bid (as defined below), if any. The determination of the Successful Bid and Alternate Bid by the Sellers, after consultation with the Creditors' Committee, the Bondholder Group and the Monitor, at the conclusion of the Auction, shall be final subject to approval by the Bankruptcy Court and the Canadian Court.

The Sellers will sell the Assets to the Successful Bidder pursuant to the terms of the Successful Bid (or, under certain circumstances described herein, the Alternate Bidder) upon the approval of such Successful Bid by the Bankruptcy Court at the Sale Hearing, the approval by the Canadian Court and any required approvals of any other applicable court(s) and approval and execution by the Administrators of the relevant Successful Bid transaction documents with such Successful Bidder (or, under certain circumstances described herein, the Alternate Bid transaction documents with the Alternate Bidder).

<u>Sale Hearing</u>

The sale hearing to authorize certain of the Sellers to enter into agreements with respect to the Successful Bid (the "<u>Sale Hearing</u>") will be held, in respect of those Sellers that are U.S. Debtors, before the Honorable Judge Kevin Gross (or any substitute therefor) in the United States Bankruptcy Court for the District of Delaware, located in Wilmington, Delaware, on a date to be scheduled by the court and currently proposed as **March 3, 2010 at 2:00 p.m. (ET)**, and, in respect of those Sellers that are Canadian Debtors, before the Honourable Mr. Justice Geoffrey B. Morawetz (or any substitute therefor) in the Ontario Superior Court of Justice, in Toronto, Ontario, and in any other applicable court(s) whose approval is required, as soon as practicable following the date of the Sale Hearing or with respect to the Canadian Court, in a joint hearing with the Bankruptcy Court at the Sale Hearing. The Sale Hearing and any hearings of any other applicable court(s) to approve the entering into agreements with respect to the Successful Bid, may be adjourned or rescheduled by the Sellers without further notice by an announcement of the adjourned date at the Sale Hearing or, in the case of an adjournment of a relevant hearing of any other applicable court, at such hearing.

If the Sellers do not receive any Qualified Bids (other than the Qualified Bid of the Purchaser), the Sellers shall proceed as set forth in the "No Qualified Bids" section above. If the Sellers receive one or more additional Qualified Bid(s), then, at the Sale Hearing and at any other hearings of any other applicable court(s) to approve the entering into agreements with respect to the Successful Bid, the Sellers will seek approval of the Successful Bid, and, at the Sellers' election, the next highest or best Qualified Bid (the "<u>Alternate Bid</u>" and, such bidder, the "<u>Alternate Bidder</u>"). The Sellers' presentation to the Bankruptcy Court, the Canadian Court and any other applicable court(s) whose approval the Sellers determine is necessary or appropriate, of the Successful Bid, and, if applicable, the Alternate Bid will not constitute the Sellers' acceptance of either of such bids, which acceptance will only occur upon the latest approval of such bids to be delivered by the Bankruptcy Court at the Sale Hearing, the Canadian Court and any other

applicable court(s) whose approval the Sellers reasonably determine in good faith is legally required or appropriate. Following approval of the Sale to the Successful Bidder, if the Successful Bidder fails to consummate the Sale for any reason, then the Alternate Bid will be deemed to be the Successful Bid and the Sellers will be authorized, but not directed, to effectuate a Sale to the Alternate Bidder subject to the terms of the Alternate Bid of such Alternate Bidder without further order of the Bankruptcy Court, the Canadian Court or any other court. The Alternate Bid shall remain open until the earlier of (a) March 20, 2010 or (b) the consummation of the Transaction to the Successful Bidder (the "Alternate Bid Expiration Date"). All the Qualified Bids other than the Successful Bid and the Alternate Bid shall be deemed rejected by the Sellers on and as of the date of approval of the Successful Bid and the Alternate Bid by the Bankruptcy Court, the Canadian Court and any other applicable court(s) whose approval is required, as indicated above.

Notwithstanding the foregoing, under no circumstance will the Purchaser be deemed the Alternate Bidder.

### Good Faith Deposits

The Good Faith Deposit of any Alternate Bidder shall be retained by the Sellers until the Alternate Bid Expiration Date and returned to the Alternate Bidder within five (5) Business Days thereafter or, if the Alternate Bid becomes the Successful Bid, shall be applied to the purchase price to be paid by the Alternate Bidder in accordance with the terms of the Alternate Bid. The Good Faith Deposits of Qualified Bidders not selected as either the Successful Bidder or Alternate Bidder shall be returned to such bidders within five (5) Business Days of the date of the selection of the Successful Bidder and the Alternate Bidder. The Good Faith Deposit of the Successful Bidder will be dealt with in accordance with the terms of the Successful Bid.

### Reservation Of Rights

The Sellers, after consultation with their advisors, the Creditors' Committee, the Bondholder Group and the Monitor, and their respective advisors, (a) after each round of bidding at the Auction may determine which Qualified Bid, if any, is the highest or otherwise best offer and the value thereof, (b) may reject, at any time, any bid (other than the Purchaser's initial bid) that is (i) inadequate or insufficient, (ii) not in conformity with the requirements of the Bankruptcy Code, the Bidding Procedures, any orders of the Canadian Court or any other orders applicable to one or more Sellers, or the terms and conditions of the Sale, (iii) contrary to the best interests of the Sellers, their estates, and stakeholders as determined by the Sellers in consultation with the Creditors' Committee, the Bondholder Group and the Monitor or (iv) contrary to the statutory duties or legal obligations of the Administrators in relation to the exercise of their duties or functions as administrators of certain EMEA Sellers, and (c) except as otherwise specifically set forth herein, with respect to instances in which the consent of the Creditors' Committee, the Bondholder Group, the Monitor or the Purchaser is required, may modify the Bidding Procedures or impose, at or prior to the Auction, additional customary terms and conditions on the Sale of the Assets.

Notwithstanding any of the foregoing, or anything else contained herein, the Sellers may not, without the prior written consent of the Creditors' Committee, the Bondholder Group, the Monitor and the Purchaser, which consent may not be unreasonably withheld, (i) extend the Bid Deadline beyond seven (7) calendar days after February 16,23, 2010, (ii) extend the deadlines in the last paragraph in the section titled "Qualified Bid," (iii) commence the Auction more than ten

(10) Business Days after the Bid Deadline, (iv) adjourn the Auction for more than three (3) Business Days, or (v) subject to the availability of the Bankruptcy Court and the Canadian Court, adjourn the Sale Hearing for more than three (3) Business Days if the Auction has concluded.

Each of the foregoing actions shall be made by the Sellers in consultation with the Creditors' Committee, the Bondholder Group and the Monitor, and their respective advisors.  For the purposes of these Bidding Procedures and all matters relating to them, the Administrators are acting only as agents for and on behalf of the EMEA Sellers that are controlled by the Administrators pursuant to the UK Proceedings and without personal liability.  Notwithstanding the foregoing, the Sellers may not, without the prior written consent of the Purchaser, impair or modify the Purchaser's rights and obligations under the Purchase Agreements or the Purchaser's right to credit the Break-Up Fee and the Expense Reimbursement as part of any subsequent bids (except as specifically set forth herein).

## INCENTIVE FEE SIDE AGREEMENT

This agreement (the "**Agreement**") is entered by and among (i) Nortel Networks Corporation, a corporation organized under the laws of Canada ("**NNC**"), (ii) Nortel Networks Limited, a corporation organized under the laws of Canada ("**NNL**"), (iii) Nortel Networks Inc., a corporation organized under the laws of Delaware ("**NNI**" and, together with NNC and NNL, the "**Main Sellers**"), (iv) Nortel Networks UK Limited (in administration) ("**NNUK**" and together with the Main Sellers, the "**Payment Parties**") acting by its joint administrators Alan Robert Bloom, Stephen John Harris, Alan Michael Hudson and Christopher John Wilkinson Hill of Ernst & Young LLP of 1 More London Place, London SE1 2AF who act as agents for NNUK without any personal liability whatsoever (the "**Joint Administrators**") and (v) the Joint Administrators (together, the "**Parties**").  To the extent capitalized words used in this Agreement are not defined in this Agreement, those words shall have the meanings given to them in the North American Agreement (as defined below).

WHEREAS, pursuant to that certain Asset Sale Agreement, dated the date hereof (the "**North American Agreement**"), among the Main Sellers and the Affiliates of the Main Sellers listed in Exhibit A thereto (the "**Other Sellers**" and together with the Main Sellers, the "**Sellers**") and GENBAND, Inc., a corporation organized under the laws of Delaware ("**Purchaser**"), the Sellers have agreed to transfer the Business (as defined in the North American Agreement) owned by the Sellers to the Purchaser;

WHEREAS, simultaneously with the execution of the North American Agreement, pursuant to that certain Asset Sale Agreement, dated the date hereof, among the EMEA Sellers (as defined in the EMEA Agreement) and certain other parties and the Purchaser (the "**EMEA Agreement**" and, together with the North American Agreement, the "**Sale Agreements**"), the EMEA Sellers have agreed to transfer the Business owned by the EMEA Sellers to the Purchaser; and

WHEREAS, as an inducement to the Purchaser and to compensate One Equity Partners III, L.P. ("**OEP**"), an existing shareholder of the Purchaser, for its willingness to provide financing to the Purchaser for the proposed transactions under the Sale Agreements, the Parties have agreed to pay a fee in the amount of US$3,600,000 to OEP (the "**Incentive Fee**").

NOW, THEREFORE, in further consideration of the respective covenants made herein, and of the mutual benefits to be derived hereby, the Parties hereto agree to the following terms:

## ARTICLE ONE

SECTION 1.1  Incentive Fee.  ~~Within five (5) Business Days of the Effectiveness Date (as defined below)~~**Upon US$1,200,000 of the Incentive Fee becoming payable by NNI to OEP in accordance with the U.S. Bidding Procedures Order and by NNC to OEP in accordance with the Canadian Sales Process Order**, the Payment Parties shall pay the Incentive Fee to OEP ~~in accordance with the terms of this Section 1.1.~~**as set forth herein.**  The Parties hereby agree and acknowledge that: (a) each of NNI, NNC and NNUK shall initially each pay one third (1/3) of the Incentive Fee on behalf of NNI and its Respective Affiliates;

1

NNC, NNL and their Respective Affiliates; and NNUK and the other EMEA Sellers, respectively; and (b) the EMEA Sellers intend to enter into a separate agreement to govern the allocation of their share of the Incentive Fee under this Agreement; provided that if the EMEA Sellers fail to reach such agreement, the payment obligations of NNUK under this Agreement shall continue to be in full force and effect; and provided, further that if the transactions contemplated by the Sale Agreements are consummated or an Alternative Transaction is consummated, the Incentive Fee shall be ultimately borne by the Payment Parties in proportion to the allocation of sales proceeds from such transactions or Alternative Transaction, as the case may be, to NNI and its Respective Affiliates (taken together); NNC, NNL and their Respective Affiliates (taken together); and NNUK and the other EMEA Sellers (taken together).

~~SECTION 1.2    Effectiveness.   No provision of this Agreement or the obligations of the Parties under this Agreement shall be effective until the later of the date that (x) the U.S. Bidding Procedures Order is entered and (y) the Canadian Sales Process Order is entered (the "Effectiveness Date").~~

## ARTICLE TWO

SECTION 2.1  Exclusion of Liability and Acknowledgments re Joint Administrators.

(a)    The Parties agree that the Joint Administrators have negotiated and are entering into this Agreement as agents for NNUK to which they are appointed and that none of the Joint Administrators, their firm, partners, employees, advisers, representatives or agents shall incur any personal liability whatsoever whether such liability would arise under Paragraph 99(4) of Schedule B1 of the Insolvency Act or otherwise howsoever, whether on their own part or in respect of any failure on the part of any other Party to observe, perform or comply with any of its obligations under this Agreement or under or in relation to any associated arrangements or negotiations.

(b)    The Joint Administrators are a party to this Agreement: (i) as agents for, and on behalf of, NNUK; and (ii) in their own capacities solely for (1) taking the benefit of the statutory charges under Paragraph 99(3) of Schedule B1 of the Insolvency Act, (2) obtaining the benefit of any provisions of this Agreement expressed to be conferred on them and (3) enforcing the obligations of the other Parties to this Agreement.

(c)    Notwithstanding anything to the contrary in Section 3.3 of this Agreement, any claim, action or proceeding against the Joint Administrators arising from or related to (i) the personal liability of the Joint Administrators, their firm or partners, (ii) their qualification to act as insolvency practitioners in accordance with Part XIII of the Insolvency Act or (iii) their appointment as joint administrators of NNUK and their remaining as current joint administrators thereof under this Agreement shall be governed exclusively by English law and subject to the exclusive jurisdiction of the English Courts.

2

# ARTICLE THREE

SECTION 3.1 <u>Counterparts</u>. The Parties may execute this Agreement in three or more counterparts (no one of which need contain the signatures of all Parties), each of which will be an original and all of which together will constitute one and the same instrument.

SECTION 3.2 <u>Severability</u>. In the event that any provision of this Agreement shall be illegal, invalid, or unenforceable, such provision shall be construed by limiting it in such a way so as to render it legal, valid and enforceable to the maximum extent provided by applicable law, and the legality, validity and enforceability of the remaining provisions shall not in any way be affected or impaired by any illegality, invalidity or unenforceability of any provision. The Parties hereto shall negotiate in good faith with respect to any provision to this Agreement found to be illegal, invalid or unenforceable, in order to agree on a substitute provision giving effect, to the maximum extent possible, to the original intent of such provision.

SECTION 3.3 <u>Governing Law</u>. The Parties agree that this Agreement shall be governed exclusively by the laws of the State of New York without regard to the rules of conflict of laws of the State of New York or any other jurisdiction; <u>provided</u> that Article 2 shall be governed exclusively by English law.

SECTION 3.4 <u>Jurisdiction</u>. To the fullest extent permitted by applicable Law, each Party (i) agrees to submit to the non-exclusive jurisdiction of the U.S. Bankruptcy Court and the Canadian Court (in a joint hearing conducted under the Cross-Border Protocol adopted by such courts, as it may be in effect from time to time), for purposes of all legal proceedings to the extent relating to the matters agreed in this Agreement, (ii) agrees that any claim, action or proceeding by such party seeking any relief whatsoever to the extent relating to the matters agreed in this Agreement may be brought in the U.S. Bankruptcy Court and the Canadian Court, (iii) waives and agrees not to assert any objection that it may now or hereafter have to the laying of the venue of any such action brought in such a court or any claim that any such action brought in such a court has been brought in an inconvenient forum, (iv) agrees that mailing of process or other papers in connection with any such action or proceeding or any other manner as may be permitted by law shall be valid and sufficient service thereof and (v) agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by applicable Law; <u>provided</u> that any claim, action or proceeding set forth in Article Two shall be brought exclusively in the English courts.

SECTION 3.5 <u>Successors</u>. Except as otherwise expressly provided in this Agreement, all covenants and agreements set forth in this Agreement will be binding upon and inure to the benefit of such parties and their respective successors

SECTION 3.6 <u>Headings</u>. The headings used in this Agreement are for the purpose of reference only and shall not affect the meaning or interpretation of any provision of this Agreement.

3

**SECTION 3.7  Termination.  The Parties agree that the Incentive Fee Side Agreement to which they are parties and which was executed and delivered as of December 23, 2009 is terminated in its entirety and replaced by this Agreement as of the execution and delivery of this Agreement.**

4

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed and delivered as of ~~this date:  December 22, 2009.~~_____:

Nortel Networks Corporation

By:_____
    Name:
    Title:

By:_____
    Name:
    Title:

Nortel Networks Limited

By:_____
    Name:
    Title:

By:_____
    Name:
    Title:

Nortel Networks Inc.

By:_____
    Name:
    Title:

**SIGNED** for and on behalf of **Nortel Networks**       )    …………………………………………..
**UK Limited** (in administration) by Christopher       )    Christopher Hill
Hill                                                       )
as Joint Administrator (acting as agent and               )
without personal liability) in the presence of:


Witness signature

…………………………………………    )
Name:                                             )
Address:                                          )

**SIGNED** by Christopher Hill

in his own capacity and on behalf of the Joint
Administrators without personal liability and
solely for the benefit of the provisions of this
Agreement expressed to be conferred on or
given to the Joint Administrators:

)
)    …………………………………………..
)    Christopher Hill
)

Witness signature

…………………………………………….    )
Name:                                   )
Address:                                )