45

- 18 -

**THE NNI CLAIM**

41.    The creation and allowance of the NNI Claim, as described above, is fundamental to the Canadian Funding Agreement and is closely associated with the entering into of the CRA APA and NNI's entry into the IRS APA.

42.    I believe that the NNI Claim is a fundamental element to the resolution of NNL's funding issues as well as the resolution of the tax claims relating to the APA Years. As such, I believe the creation and allowance of the NNI Claim is fair and reasonable in the circumstances.

**OTHER MATTERS**

*NNI Loan Agreement Extension*

43.    Pursuant to an order of this Court made on April 7, 2009, this Court approved an amended and restated loan agreement dated as of March 27, 2009 (the "NNI Loan Agreement") among NNI, as lender, NNL as borrower and NNC and the other Applicants as guarantors. The NNI Loan Agreement amended and restated an earlier original NNI loan agreement that had been approved by this Court on January 14, 2009.

44.    Among other things, the NNI Loan Agreement provided for the creation of a $200 million post-filing loan in favour of NNL. As part of the first day orders granted in the Chapter 11 Proceedings, NNI was authorized to advance up to $75 million to NNL pursuant to the NNL Loan Agreement, which advance was made. Since then, no further advances have been made.

45.    The original term of the NNI Loan Agreement expired on December 31, 2009 but was subject to a further extension. As part of the larger negotiations relating to the Canadian Funding Agreement, NNI has agreed to extend the term of the NNI Loan Agreement and NNI and NNL entered into an amendment to the NNI Loan Agreement dated as of December 23, 2009 (the "NNI Loan Agreement Extension"), which provides for, among other things, the following amendments:[5]

      (a)    Section 2.5(a) of the Loan Agreement is hereby replaced in its entirety with "(a) March 31, 2010, subject to further extension until December 31, 2010 at the

---

[5] Capitalized terms used in this paragraph and not otherwise defined have the meaning given to them in the NNI Loan Agreement Extension.

46

request of the Borrower and with (i) prior written consent of the Lender, the Monitor (as defined in the CFA), the Creditors' Committee (as defined in the CFA) and the Bondholders' Committee (as defined in the CFA) and (ii) approval of this Amendment and the CFA pursuant to a Final Order (as defined in the CFA) of the Canadian Bankruptcy Court and the U.S. Bankruptcy Court in connection with the Canadian Proceeding and the U.S. Proceeding, respectively;

(b)     immediately upon receipt of approval pursuant to a Final Order (as defined in the CFA) of the Canadian Bankruptcy Court and the U.S. Bankruptcy Court in connection with the Canadian Proceeding and the U.S. Proceeding, respectively, of this Amendment and the CFA, Section 2.5(a) of the Loan Agreement, as amended by Section 1(a) of this Amendment, shall be replaced in its entirety with "(a) December 31, 2010, subject to further extension until June 30, 2011 at the request of the Borrower and with prior written consent of the Lender, the Monitor (as defined in the CFA), the Creditors' Committee (as defined in the CFA) and the Bondholders' Committee (as defined in the CFA)".

46.     I am aware that a copy of the NNI Loan Agreement Extension will be attached as an appendix to the Thirty-Fifth Report. The approval of the NNI Loan Agreement Extension is a condition to the effectiveness of the Canadian Funding Agreement and I believe it to be fair and reasonable in the circumstances.

*Group Supplier Protocol Agreement*

47.     As set out above, upon filing under these CCAA Proceeding and in the U.S. Chapter 11 cases, Nortel entered into the Canadian GSPA and the US GSPA.

48.     Pursuant to previous orders of this Court, extensions of the Canadian GSPA have been previously approved, up to and including a twelfth extension. The twelfth extension expired January 15, 2010.

49.     The Applicants have entered into and seek approval of the thirteenth extension of the Canadian GSPA, which extension was completed by way of the thirteenth extension deed dated January 15, 2010 (the "Thirteenth Extension").

47

- 20 -

50.    As a result of the Thirteenth Extension, the Canadian GSPA has been extended to March 31, 2010. A similar extension has been entered into to extend the US GSPA.

*Employee Hardship Process*

51.    Pursuant to an Order of this Court made on July 30, 2009, an employee hardship process (the "Employee Hardship Process") was approved in recognition of the fact that there may be cases in which former employees of one of the Applicants is experiencing financial hardship due to illness or healthcare costs, or due to ineligibility for pension or employment insurance benefits.

52.    The maximum amount that was made available for the Employee Hardship Process was $750,000. Further, any hardship payments are considered advances against future distributions based on the claims of these former employees.

53.    The original expiration of the Employee Hardship Process was November 30, 2009. Pursuant to an Order of this Court made on December 2, 2009, the period for receipt of employee hardship applications was extended to January 31, 2010.

54.    I am aware that the Thirty-Fifth Report will provide details as to the remaining funds available in the Employee Hardship Process. As there will continue to be terminations and the potential for hardship, the Applicants are requesting that the period for receipt of hardship applications be extended to April 23, 2010, and that the document "Eligibility Requirements and Procedure with Respect to Hardship Payment Applications", attached as an appendix to the Thirty-Fifth Report be amended accordingly.

**EXTENSION OF THE STAY PERIOD**

55.    The Applicants and Nortel generally have and continue to work diligently and in good faith on their stated restructuring efforts. As set out in previous affidavits, Nortel has continued to focus on its sales efforts. To date, Nortel has closed two significant sales, namely the sale of substantially all of its CDMA business and LTE Access assets as well as substantially all of its Enterprise Solutions business. In addition, Nortel has completed the sale of the assets of its Wireless Networks business associated with the development of Next Generation Packet Core network components. Further, Court approvals in the U.S. and Canada have been obtained in

48

- 21 -

respect of the planned sale of substantially all of the assets of its Optical Networking and Carrier Ethernet businesses as well as its Global System for Mobile communications (GSM)/GSM for Railways (GSM-R) business and sales processes have been approved for the planned sale of substantially all of the assets of it Carrier VoIP and Application Solutions business as well as its interest in LG Nortel Co. Ltd its joint venture with LG Electronics, Inc.

56.    I am aware that the Thirty-Fifth Report will contain updated cash flow information with respect to the Applicants for the period January 1, 2010 to April 23, 2010.

57.    As the Applicants continue to work to complete these transactions as well as resolve claims and carry out their other restructuring efforts, they continue to need the protection of this Court. As such, the Applicants are requesting an extension of the Stay Period (as defined in the Initial Order) to April 23, 2010.

**CONCLUSION**

58.    For the reasons set out above, the Applicants respectfully ask that the requested relief be granted.

| | |
|---|---|
| SWORN BEFORE ME at the City of Toronto, in the Province of Ontario on this 18th day of January, 2010. | |
| | |
| Commissioner for Taking Affidavits or Notary Public | John Doolittle |
| Samantha Graff | |

49

Court File No: 09-CL-7950

IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL
NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL NETWORKS
GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL CORPORATION AND
NORTEL NETWORKS TECHNOLOGY CORPORATION

*ONTARIO*
SUPERIOR COURT OF JUSTICE
(COMMERCIAL LIST)

Proceeding commenced at Toronto

AFFIDAVIT OF JOHN DOOLITTLE
(sworn January 18, 2010)

OGILVY RENAULT LLP
Suite 3800
Royal Bank Plaza, South Tower
200 Bay Street
P.O. Box 84
Toronto, Ontario  M5J 2Z4, Canada

Derrick Tay LSUC#: 21152A
Tel: (416) 216-4832
Email: dtay@ogilvyrenault.com

Mario Forte LSUC#: 27293F
Tel: (416) 216-4870
Email: mforte@ogilvyrenault.com

Jennifer Stam LSUC #46735J
Tel: (416) 216-2327
Email: jstam@ogilvyrenault.com
Fax: (416) 216-3930
Lawyers for the Applicants

DOCSTOR: 1841685.4

# TAB 3

*50¹*

Court File No: 09-CL-7950

**ONTARIO**
**SUPERIOR COURT OF JUSTICE**
**(COMMERCIAL LIST)**

**IN THE MATTER OF THE COMPANIES' CREDITORS ARRANGEMENT ACT,**
**R.S.C. 1985, c. C-36, AS AMENDED**

**AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF**
**NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL**
**NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL**
**CORPORATION AND NORTEL NETWORKS TECHNOLOGY CORPORATION**

**APPLICATION UNDER THE COMPANIES' CREDITORS ARRANGEMENT ACT,**
**R.S.C. 1985, c. C-36, AS AMENDED**

**AFFIDAVIT OF JOHN DOOLITTLE**
**(sworn June 22, 2009)**

I, John Doolittle, of the city of Oakville in the Province of Ontario, MAKE OATH AND
SAY:

1.    I am the Treasurer of Nortel Networks Corporation ("NNC") and Nortel Networks

Limited ("NNL") and have held those positions since June 23, 2008. From October 14,

2002 to June 12, 2006 I was the Vice-President, Tax for NNC and NNL. As such, I have

personal knowledge of the matters to which I hereinafter depose in this Affidavit. Where

I do not possess personal knowledge, I have stated the source of my information and, in

all such cases, believe it to be true.

2.    I swear this affidavit in support of the motion to approve:

(a)    an interim funding and settlement agreement dated as of June 9, 2009 (the

"Interim Funding Agreement") among the Applicants (as defined below), the

51

- 2 -

Chapter 11 Debtors (as defined below), the EMEA Debtors (as defined below)[1] and the Joint Administrators (as defined below). A copy of the Interim Funding Agreement is attached as Exhibit "A" hereto;

(b)    certain amendments to the Initial Order (as defined below) arising from the Interim Funding Agreement providing for, *inter alia*, the creation of the Excess Funding Charge and the Shortfall Charge (each as defined below);

(c)    certain amendments to the Initial Order arising from amendments to the EDC Short Term Support Agreement (as defined and discussed in more detail below); and

(d)    the fifth, sixth and seventh extensions of the Canadian GSPA (as defined below).

3.    References to "Nortel" herein are references to the global enterprise as a whole.

## BACKGROUND

4.    On January 14, 2009 (the "Filing Date"), NNC, NNL, Nortel Networks Technology Corporation, Nortel Networks Global Corporation and Nortel Networks International Corporation (collectively, the "Applicants") were granted protection under the *Companies' Creditors Arrangement Act*, R.S.C. 1985, c. C-36, as amended (the "CCAA") pursuant to an initial order (as subsequently amended and restated, the "Initial Order") of this Honourable Court, and Ernst & Young Inc. was appointed as monitor (the "Monitor") in the CCAA proceedings.

---

[1] All EMEA Debtors other than Nortel Networks S.A., a French entity, are parties to the Interim Funding Agreement.

DOCSTOR: 1709155\10

52

- 3 -

5.    Also on January 14, 2009, certain of NNC's U.S. subsidiaries, including its principal U.S. operating subsidiary, Nortel Networks Inc. ("NNI" and together with the other U.S. filing entities, the "Chapter 11 Debtors"), made voluntary filings under Chapter 11 of the United States Bankruptcy Code (the "Code") with the United States Bankruptcy Court for the District of Delaware (the "U.S. Court"). On the same date, this Honourable Court granted an Order pursuant to Section 18.6(4) of the CCAA recognizing the Chapter 11 cases as "foreign proceedings" in Canada and giving effect in Canada to the automatic stay under the Code.

6.    Additionally, on January 15, 2009, Nortel Networks UK Limited ("NNUK") and certain subsidiaries (the "EMEA Debtors") of the Nortel group incorporated in Europe, the Middle East or Africa each obtained an administration order for the appointment of administrators (the "Joint Administrators") from the English High Court of Justice (the "UK Court") under the Insolvency Act 1986 (the "UK Insolvency Act").

7.    On February 27, 2009, the U.S. Court granted petitions recognizing these proceedings as "foreign main proceedings" pursuant to Chapter 15 of the Code.

8.    On May 28, 2009, the Commercial Court of Versailles, France (the "French Court") ordered the commencement of secondary insolvency proceedings in respect of Nortel Networks S.A. ("NNSA"), which consist of liquidation proceedings during which NNSA will continue to operate as a going concern for an initial period of three months. In accordance with the European Union's Counsel Regulation, the English law proceedings remain the main proceedings in respect of NNSA.

53

- 4 -

9.     Lastly, on June 8, 2009, the Joint Administrators appointed in respect of NNUK filed a
       petition with the U.S. Court for the recognition of the Administration Proceedings as they
       relate to NNUK under Chapter 15 of the Code.

10.    Further details regarding the background to these proceedings are set out in my affidavit
       sworn January 14, 2009 (the "Initial Order Affidavit") previously filed in these
       proceedings and are therefore not repeated herein.

## THE INTERIM FUNDING AGREEMENT

*Background*

11.    As was set out in the Initial Order Affidavit, Nortel is a highly integrated business with
       significant distribution and research and development operations around the world.  The
       Initial Order Affidavit set out several of the ways in which business was integrated across
       international lines, including cost allocation and profit sharing.

12.    NNL, NNI, NNUK, Nortel Networks (Ireland) Limited ("NNIR") and NNSA
       (collectively, the "Main Companies"), among others, are or have been the primary source
       of the research and development that has created Nortel's global technology footprint, the
       benefits of which are shared across multiple corporate entities within the Nortel group.
       These five Nortel entities also provide service and support on an ongoing basis to Nortel
       customers in their respective jurisdictions, as well as certain overhead and institutional
       support to Nortel entities and customers outside of their jurisdictions.  Certain other
       Nortel companies function primarily as sales operations, acting as intermediaries between
       the Main Nortel Companies and customers in jurisdictions not served by the Main Nortel

54

- 5 -

Companies, and, in certain circumstances, providing ongoing service and support in their local jurisdictions.

13.   In light of the foregoing, certain Nortel entities, including the Main Nortel Companies, have entered into a number of agreements and have been engaged in certain practices designed both to allow Nortel to operate on a global basis and to allocate profits and losses, and certain costs, across the corporate entities within the Nortel Group. These agreements include:

(a)   the Master R&D Agreement, dated as of December 22, 2004 among NNL, NNI, NNUK, NNIR, NNSA and other affiliates (as amended from time to time, the "Master R&D Agreement"); and

(b)   certain distribution agreements between one or more Nortel entities (the "Distribution Agreements" and together with the Master R&D Agreement, the "Transfer Pricing Agreements").

14.   For a number of years, Nortel has used "transfer pricing" to allocate profits and losses, and certain costs, among the various Nortel companies. A more detailed description of Nortel's transfer pricing model was set out in the Initial Order Affidavit. Transfer pricing is an accepted method for such allocation, used widely by multinational enterprises similar in structure and geographic scope to Nortel.

15.   In the case of Nortel, the Master R&D Agreement is the governing document pursuant to which the Nortel Group implemented its transfer pricing regime using the residual profit split methodology (the "Nortel Transfer Pricing Regime"). Among other things, the Nortel Transfer Pricing Regime was designed to determine the arm's length allocation

- 6 -

due to each of the parties for their share of the profits and losses arising from "R&D Activity," as that term is defined in the Master R&D Agreement.

16.     In general terms, the Nortel Transfer Pricing Regime historically sought to allocate residual profits and losses among the Main Nortel Companies based on the proportionate share of R&D Activity conducted by or on behalf of, such affiliates. Among other things, the Nortel Transfer Pricing Regime typically requires that profits and losses, and certain costs, be allocated among such affiliates during a calendar year under the Transfer Pricing Agreements (the "Transfer Pricing Payments") and that a true-up allocation is determined after the actual results for the year are known.

17.     Within Nortel, NNL is the owner of the vast majority of Nortel's intellectual property assets and, in accordance with the Master R&D Agreement, NNL licenses its intellectual property to the Main Nortel Companies on a royalty-free basis. The Nortel Transfer Pricing Regime, in normal times, is the means by which NNL is compensated for the development and use of its intellectual property by affiliates. NNL has historically been a net recipient of payments under the Nortel Transfer Pricing Regime given that NNL generates lower levels of revenue when compared to the high level of corporate overhead and R&D Activity incurred in Canada.

*Events Since Filing*

18.     As was set out in the Initial Order Affidavit, on filing, Nortel entered into two group supplier protocol agreements, one between the Applicants and the Joint Administrators on behalf of the EMEA Debtors, and the other between the Chapter 11 Debtors and the Joint Administrators on behalf of the EMEA Debtors (the "Canadian GSPA" and the "US

- 7 -

GSPA", respectively, and together, as each has been and may be amended from time to time, the "GSPAs"). The GSPAs were entered into in respect of the inter-company trading of goods and services after the Filing Date.

19.     Since filing, the parties have continued to extend and rely on the GSPAs in respect of basic trade payables. However, following the commencement of these proceedings, discussions began with various interested parties, including Nortel, the Monitor, the Joint Administrators, the Official Committee of Unsecured Creditors of NNI (the "Creditors' Committee") and the ad hoc Bondholder Committee (the "Bondholders' Committee", together with the Creditors' Committee, the "Creditor Groups") concerning continued payments under the Nortel Transfer Pricing Regime within the context of Nortel's worldwide insolvency proceedings. In particular, issues were raised in light of substantial changes that have occurred and may continue to occur in respect of Nortel's business model given the uncertainties facing Nortel's business.

20.     As a result, only one payment has been made in respect of amounts that could arguably be owed in respect of the Master R&D Agreement – a January 2009 payment of US$30 million by NNI to NNL (the "January Payment"). In addition, the EMEA Debtors have neither made, nor received, any payments under the Nortel Transfer Pricing Regime since the Filing Date. Without the receipt of these payments, NNL is currently facing significant liquidity pressure – pressure that puts NNL, and thus all of Nortel, at risk.

21.     The various interested parties have been discussing possible solutions to NNL's liquidity issues for over two months. Among other possible solutions, NNL requested that payments be made by both NNI and certain of the EMEA Debtors to NNL in respect of research and development and other overhead services post-filing ("Post-filing

- 8 -

Services"). After extensive negotiation, NNL, NNI, the Monitor and the Joint Administrators, working with the Creditor Groups, reached the consensus outlined in the Interim Funding Agreement, which, if the conditions to its effectiveness are satisfied, should provide NNL with sufficient liquidity at least through September 30, 2009 based on the current weekly cash flow forecast attached to the Monitor's report.

*The Interim Funding Agreement*

22.   Following lengthy, difficult, and good faith negotiations, on or about June 9, 2009, the parties entered into the Interim Funding Agreement. The terms of the Interim Funding Agreement were premised on an agreement that the parties have reached that the value of the Post-filing Services and expenses incurred by NNL post-filing for the benefit of NNI for the period from the Filing Date through September 30, 2009 (respectively, the "NNI Interim Obligations" and the "Canada/US Interim Period"), would be estimated to be US$187 million (which includes the $30 million paid by NNI through the January Payment). Such amount is equal to the amount forecasted (in the March 2009 Financial Outlook) by NNL to be owed by NNI for such period under the Master R&D Agreement.

23.   These estimations were agreed upon by the parties in recognition of the fact that a precise allocation of the expenses that NNL incurs and the value of the Post-filing Services it provides on behalf of the other Nortel entities would be a time-consuming and difficult endeavour in light of the integrated nature of the Nortel entities. Additionally, any definitive and binding determination regarding the interpretation and applicability of the Nortel Transfer Pricing Regime similarly would be extremely time consuming and potentially contentious.

- 9 -

24.    Capitalized terms used in this section and not otherwise defined shall have the meaning given to them in the Interim Funding Agreement.

25.    The main terms of the Interim Funding Agreement are as follows:

US/Canada Settlement Terms

(a)    NNI shall pay to NNL a sum total of US$157 million (the "Total Payment"), payable in five equal instalments of US$31.4 million in accordance with the schedule attached as Annex C to the Interim Funding Agreement;

(b)    The Total Payment shall be comprised of two (2) components:

(i)    Permanent Payment: The first US$131 million of the Total Payment shall be paid on an indefeasible and permanent basis (the "Permanent Payment").

(ii)    Contingent Payment: If it is determined, pursuant to a process to be agreed upon by NNL, NNI and the Creditor Groups, that the value of the NNI Interim Obligations is less than US$187 million (being the sum of the Total Payment and the January Payment), then any such portion thereof (being the difference between US$187 million and the value of the NNI Interim Obligations so determined) in excess of US$161 million (any such portion, the "Contingent Payment") shall be repaid by NNL to NNI on October 30, 2009 with interest thereon as provided for in the Interim Funding Agreement.

(c)    True-up Obligations: NNL agrees to use commercially reasonable efforts to recover from Nortel entities, other than the Debtors (collectively, "Other Nortel Group Companies"), Transfer Pricing Payments that are determined to be owed to the Applicants by Other Nortel Group Companies with respect to the Canada/US Interim Period (the "ONGC Costs"). Solely to the extent that the Applicants actually receive funds in respect of the ONGC Costs from the Other Nortel Group Companies in excess of the amounts provided in the Applicants' forecast, based

59

- 10 -

on that certain March 2009 Financial Outlook dated April 14, 2009 previously furnished to the parties to the Interim Funding Agreement, from the Other Nortel Group Companies that are payors, with respect to such ONGC Costs (the "Excess Recoveries"), and it is also determined, pursuant to the process referred to in subparagraph (b)(ii) above, that the value of the NNI Interim Obligations is less than US$161 million (such difference, the "Overage Amount"), the Applicants shall, in addition to any payments made or required to be made in repayment of the Contingent Payment, pay U.S. Pro Rata Excess Recoveries (as defined below) to NNI, on behalf of the Chapter 11 Debtors, in an aggregate amount no greater than the lesser of (i) the Overage Amount, and (ii) US$30 million (the "Maximum Overage Repayment") within 30 days of the date of determination thereof; provided, however, that some or all of such payment shall not be made to the extent that such payment would, in the reasonable and sole judgment of the Monitor, after consultation with the Creditor Groups, materially and adversely impact the liquidity position of NNL, based on a pro forma 13 Week CF Forecast (as defined below) (giving pro forma effect to such payment) prepared by NNL, with assistance from the Monitor, and provided in advance of such decision by the Monitor to the Creditor Groups (the "NNL Liquidity Review Procedures"). The unpaid balance, if any, of the Maximum Overage Repayment shall be carried forward and shall be payable out of future U.S. Pro Rata Excess Recoveries actually received by the Applicants from Other Nortel Group Companies that are payors, subject to the NNL Liquidity Review Procedures outlined above, until paid in full. For the above-mentioned purposes, "U.S. Pro Rata Excess Recoveries," as of any date of determination shall equal the product of (i) the

60.

- 11 -

Excess Recoveries as of such date of such determination (excluding any Excess Recoveries in respect of which NNI has already been paid U.S. Pro Rata Excess Recoveries) and (ii) a fraction (x) the numerator of which shall equal US$161 million <u>minus</u> the Overage Amount and (y) the denominator of which shall equal the aggregate amount of Transfer Pricing Payments payable or paid to the Applicants by Nortel Group entities (excluding the Applicants) that are payors for the Canada/US Interim Period (rounded to four decimal points). The general effect of this provision is that up to an additional US$30 million of the Total Payment may be repayable by NNL to NNI, out of specific funds recovered by the Applicants from certain other Nortel entities, but only to the extent that the value of the NNI Interim Obligations is determined to be less than US$161 million.

(d)    *Excess Funding Charge*:   NNL's obligation to repay to NNI the Contingent Payment and interest, if any, thereon, shall be secured by a charge against all of the assets of the Applicants (the "Excess Funding Charge"), which charge shall be granted by order of this Court and shall rank *pari passu* with the existing court-ordered charge in favor of Export Development Canada (the "EDC Charge"); provided, however, that if the EDC Charge is extinguished, then in such case the Excess Funding Charge shall be a second-ranking charge in the Canadian Proceedings, subordinate only to the Administration Charge (and in the case of the Carling Facility, the Carling Facility Charges) (as both such terms are defined

- 12 -

in the Initial Order), and such Excess Funding Charge shall not rank *pari passu* with any other charge that exists or may be granted in these proceedings.[2]

(e)   *Use of Funds:*   Under the terms of the Interim Funding Agreement, NNL is entitled to use the Total Payment for working capital and those other purposes as reflected in the 13 Week CF Forecast (the "Permitted Uses").  To the extent NNL seeks to use funds from the Total Payment for purposes other than the Permitted Uses, NNL must obtain the consent for such uses from NNI and the Creditor Groups.

(f)   *Settlement:*   The sum of the Total Payment and the January Payment (being US$187 million) is intended to be a full and final settlement of any and all NNI Interim Obligations.  Under the terms of the Interim Funding Agreement, the Applicants have agreed to indemnify, defend and hold harmless each Chapter 11 Debtor from and against any and all actions, claims, proceedings, costs, damages, losses, liabilities, judgments, amounts, fines, penalties, levies, compensations paid in settlement (provided NNL has agreed in writing to any such settlement or such settlement has been approved pursuant to a final court order) and expenses (including without limitation reasonable attorneys' fees and disbursements) resulting from a claim, demand, lawsuit, action or proceeding relating to, arising from or in connection with Transfer Pricing Payments for the calculation period in the applicable Transfer Pricing Agreements in respect of the Canada/US Interim Period.

---

[2] Since the entering into of the Interim Funding Agreement, the Applicants have confirmed with the Committees that .the Goldman Charge (as defined in the Order of this Court made on June 1, 2009) shall continue to be a first priority charge, ranking *pari passu* with the Administration Change, with respect to the assets secured by that charge.

DOCSTOR: 1709155\10

- 13 -

### Settlement Terms with EMEA Debtors

(g)   *EMEA Self-Funding; Shortfall Payments:*  Under the terms of the Interim Funding Agreement, NNUK is irrevocably authorized to seek payment from other EMEA Debtors of Transfer Pricing Payments owed, or as such payments become due, under the relevant Transfer Pricing Agreements during, or with respect to, the period from the Filing Date to December 31, 2009 (the "EMEA Interim Period"), which amounts have been fixed by the Interim Funding Agreement.

(h)   *First Shortfall Payment:*  Subject to the terms of the Interim Funding Agreement, NNL shall pay to NNUK the sum of US$10 million (the "First Shortfall Payment"):

    (i)   The First Shortfall Payment is to be paid out of the sale proceeds allocated to, and actually received by, NNL from the sale of assets where the aggregate amount of one or more allocations of sale proceeds to NNL from such sale (after taking into account certain adjustments) exceeds a threshold amount communicated to the Joint Administrators by NNL in a letter dated June 9, 2009 (with copies to the Monitor and the Creditor Groups) and counter-signed by the Joint Administrators (any such sale, a "Material Asset Sale");

    (ii)   Some or all of such payment shall be subject to the performance of NNL Liquidity Review Procedures (as set forth in the Interim Funding Agreement).

(i)   *Second Shortfall Payment:*  Subject to the terms of the Interim Funding Agreement, NNL shall pay to NNUK the sum of US$10 million (the "Second Shortfall Payment" and together with the First Shortfall Payment, the "Shortfall Payments"), such amount to be paid out of the sale proceeds of a Material Asset Sale allocated to, and actually received by, NNL; *provided, however,* that some or

- 14 -

all of such payment shall again be subject to the performance of NNL Liquidity Review Procedures.

NNL, as the "clearing house" for transfer pricing, would normally be the recipient of payments from the payor Nortel entities and the distributor of such funds received to the recipient Nortel entities, under the transfer pricing regime. The provisions relating to the Shortfall Payments provide the Applicants with certainty of settling transfer pricing related claims by EMEA Debtors during the EMEA Interim Period.

(j)     *Shortfall Charge*:   NNL's obligation to make the Shortfall Payments shall be secured by a charge against all of the assets of the Applicants (the "Shortfall Charge"), which charge shall at all times rank *pari passu* with the Inter-company Charge (as defined in the Initial Order).   Without prejudice to the foregoing sentence, NNUK acknowledges that any current or future charges that have been, or may be granted to the Chapter 11 Debtors in connection with any funding provided by the Chapter 11 Debtors to the Applicants may, or could be senior to the Shortfall Charge, and consents to such charges being senior to the Shortfall Charge.

(k)     *Effectiveness of the Shortfall Payments and the Shortfall Charge*: The obligation of NNL to make the Shortfall Payments and the triggering of the Shortfall Charge

- 15 -

only occur upon the execution of transaction documents in respect of a "Subject Transaction".[3]

(l)    *Settlement:*  Except with respect to the obligation of NNL to make the Shortfall Payments,

      (i)    the Interim Funding Agreement shall constitute a full and final settlement of any and all Transfer Pricing Payments owing and that may, or could be, owing between (i) the EMEA Debtors *inter se*, and (ii) an EMEA Debtor, on the one hand, and a Canadian Debtor or a US Debtor, on the other hand, as Transfer Pricing Payments under the Transfer Pricing Agreements for all calculation periods or parts thereof within the EMEA Interim Period including, without limitation, any subsequent determination by any revenue authority with respect to the EMEA Interim Period giving rise to any subsequent liability to taxation of any party to the Interim Funding Agreement;

      (ii)    Upon payment of the Shortfall Payments in full, the Shortfall Charge shall be automatically extinguished; and

      (iii)    It is expressly understood that Part B of the Interim Funding Agreement is intended to constitute a full and final settlement of all of the matters between the Applicants and the Chapter 11 Debtors, on the one hand, and the EMEA Debtors, on the other hand, set forth in Part B of the Interim Funding Agreement whether arising during, or related to, the EMEA Interim Period.

General Settlement Terms

(m)    *Intellectual Property Licenses:*  Each of the Chapter 11 Debtors and the EMEA Debtors has agreed that it will enter into an Appropriate License Termination (as defined in Section 11.b. of the Interim Funding Agreement) with respect to the licenses and rights granted by NNL to such parties under or pursuant to the provisions of the Master R&D Agreement (such licenses and rights, the "IP

---

[3] "Subject Transaction" means the first sale of any material assets of any one or more of the Debtors of each of (i) the Applicants; (ii) the Chapter 11 Debtors; and (iii) the EMEA Debtors (excluding, however, any sale where the involvement of the EMEA Debtors is solely limited to Appropriate License Terminations).

DOCSTOR: 1709155\10

65

- 16 -

Licenses") for the purpose of facilitating, and in consideration of a right to an allocation to the parties of portions of the sale proceeds from, the sale of any material assets of any of the Applicants and/or the Chapter 11 Debtors to a third party (an "Asset Sale"); *provided, however*, that (x) in the case of the Chapter 11 Debtors, no Appropriate License Termination shall be effective without the prior written consent of the Creditor Groups (which consent in each case shall not be unreasonably withheld), and (y) in the case of the EMEA Debtors, Appropriate License Terminations shall be limited to only those Asset Sales where the project name of the referenced proposed transaction or/and the description of the scope of assets, businesses and technologies covered by such Asset Sales have been previously communicated to the Joint Administrators by NNL in a letter dated June 9, 2009 (with copies to the Monitor and the Creditor Groups) and counter-signed by the Joint Administrators.

(n)  *Sale Transactions*: Each of the Applicants, the Chapter 11 Debtors and the EMEA Debtors (collectively, the "Debtors" or individually, a "Debtor") has agreed that its execution of definitive documentation with a purchaser (or, in the case of any auction, the successful bidder in any such auction) of, or consummation of any sale of, material assets of any of the Debtors to which such Debtor (a "Selling Debtor") is proposed to be a party (each, a "Sale Transaction") shall not be conditioned upon such Selling Debtor reaching agreement with the other Selling Debtors regarding (A) allocation of the sale proceeds ("Sale Proceeds") from the relevant Sale Transaction or (B) the binding procedure for the allocation of Sale Proceeds from the relevant Sale Transaction. Pending the distribution of the Sale Proceeds, the entire amount of the Sale Proceeds (less

- 17 -

certain taxes and transaction costs) shall be deposited in an escrow account pursuant to an escrow agreement, the terms of which shall be negotiated and agreed by all Selling Debtors, in each case acting reasonably (the "Escrow Account"). In no case shall there be any distribution from the Escrow Account in advance of either (i) agreement of all of the Selling Debtors or (ii) in the case where the Selling Debtors fail to reach agreement, determination by the relevant dispute resolver(s) under the terms of the Sale Protocol (as defined below) applicable to the Sale Proceeds, and subject in each case to payment of the agreed or determined amount of allocation of Sale Proceeds to all Selling Debtors.

(o)    The parties have agreed to continue to negotiate in good faith and attempt to reach agreement on a timely basis on a protocol for resolving disputes concerning the allocation of Sale Proceeds from Sale Transactions (the "Sale Protocol"), which Sale Protocol shall provide binding procedures for the allocation of Sales Proceeds where the Selling Debtors in such Sale Transaction have been unable to reach agreement regarding such allocation.

(p)    The Selling Debtors shall, immediately following entry into any Sale Transaction, negotiate in good faith and on a timely basis to attempt to reach agreement regarding the allocation of the Sale Proceeds from such Sale Transaction within a reasonable period of time or as may be otherwise provided in the Sale Protocol, failing which the Sale Protocol shall apply to determine the allocation of the relevant Sale Proceeds.

(q)    No Debtor shall be required to enter into a Sale Transaction so long as such Debtor reasonably determines, acting in good faith and after consultation with the

- 18 -

other parties to the Interim Funding Agreement, that such Sale Transaction is not in the best economic interests of its creditors generally.

(r)     For the purposes of Sections 11.c. and 12.a. through 12.f. (inclusive) of the Interim Funding Agreement, the Chapter 11 Debtors have agreed that with respect to any of the matters referred to in such Sections as to which the agreement or determination of any of the Chapter 11 Debtors is required, the Chapter 11 Debtors shall include the Creditor Groups in any negotiations on such issues with the other Debtors or any related proceedings and any such agreement or determination by the Chapter 11 Debtors shall require the prior consent of the Creditor Groups acting in good faith. For purposes of the same such Sections, the Applicants have agreed that with respect to any of the matters referred to in such Sections as to which the agreement regarding determination of the Applicants is required, the Applicants shall include the Bondholders' Committee in any negotiations on such issues with the other Debtors or any related proceedings and any agreement or determination by the Applicants shall require the prior consent of the Bondholders' Committee acting in good faith and the Monitor.

(s)     *Effectiveness:*    The Interim Funding Agreement is subject to the following conditions:

    (i)     approval of the US Court and this Honourable Court;

    (ii)    the UK Court giving a direction (the "UK Court's Directions") that, if so sought, the Joint Administrators be at liberty to enter into the Interim Funding Agreement (the "UK Court Condition"); provided, however, the Joint Administrators may at their election waive the UK Court Condition; and

- 19 -

(iii)    this Honourable Court and the US Court approving amendments to the cross-border protocol previously approved by the US Court and this Honourable Court (as may be in effect from time to time, the "Cross-Border Protocol") that are mutually satisfactory to NNL (on behalf of the Applicants), NNI (on behalf of the Chapter 11 Debtors), the Monitor and the Creditor Groups

(collectively, the "Conditions").

(t)    *Reservation of Rights*: Nothing in the Interim Funding Agreement shall constitute an amendment, modification or waiver of rights of any party thereto (i) under any other agreement, including, without limitation, the GSPAs and the Transfer Pricing Agreements (except as expressly set forth in Sections 3 and 8 of the Interim Funding Agreement), applicable law or otherwise, including, without limitation, the right to object to the propriety of any payments made under or in connection with the Transfer Pricing Agreements or any offset arising therefrom or otherwise, or (ii) with respect to any potential tax contingencies, assessments, rulings or agreements arising from Transfer Pricing Payments pursuant to the Transfer Pricing Agreements or any offset arising therefrom or otherwise; *provided, however,* that the parties to the Interim Funding Agreement waive any and all rights to object to or otherwise seek to amend or revisit (A) any payments made pursuant to the Interim Funding Agreement, except that (a) NNI and NNL do not waive their rights to the extent required to allow NNI to enforce its rights under the Interim Funding Agreement against NNL, and (b) NNUK does not waive its rights to the extent required to allow NNUK to enforce its rights against NNL under certain provisions of the Interim Funding Agreement, and (B) the January Payment. The use of the term Transfer Pricing Payment (or any similar term) or reference to the Master R&D Agreement (or similar agreement) in the Interim Funding Agreement is for convenience only and

- 20 -

shall have no evidentiary effect or be used by any of the parties thereto in any proceeding to determine the pre-petition or post-petition validity, applicability, assumption, affirmation or ratification by any entity of the Nortel Transfer Pricing Regime or the Master R&D Agreement.

26.   On June 15, 2009, the Joint Administrators, NNL and NNI entered into a side letter (the "Side Letter") pursuant to which the Joint Administrators acknowledged that there may be a circumstance in which the UK Court refused to make an order that the Joint Administrators are at liberty to enter into the Interim Funding Agreement, solely because the UK Court does not consider it appropriate to make an order in relation to the exercise of the Joint Administrators' powers under the UK Insolvency Act. The Side Letter confirms that if the UK Court does this and also does not make any determination or express any views on the appropriateness of the Joint Administrators entering into the Interim Funding Agreement on behalf of the EMEA Debtors, the Joint Administrators would be willing to waive the UK Court Condition. A copy of the Side Letter is attached as Exhibit "B" hereto.

*GSPAs*

27.   Pursuant to previous orders of this Honourable Court, extensions of the Canadian GSPA have been previously approved up through the fourth extension of the GSPAs. The relevant parties subsequently entered into the fifth, sixth and seventh extensions (collectively, the "Extensions") of the GSPAs and they are currently set to expire on July 9, 2009. On June 17, 2009, the administrator appointed by the French Court in the secondary proceedings acceded (the "Accession") to the sixth and seventh extensions of

DOCSTOR: 1709155\10

- 21 -

the GSPAs.  Copies of the Extensions and the Accession are attached as Exhibits "C" through "F" hereto.

28.     The terms of the Interim Funding Agreement expressly provide for the parties' intentions that they continue to make monthly payments in respect of the inter-company trading of goods and services among the various Nortel entities.

**EDC**

29.     As was set out in my Initial Order Affidavit, on filing, NNL and EDC entered into a Short Term Support Agreement dated as of January 14, 2009 (as the same has been subsequently amended and restated, the "Short Term Support Agreement") pursuant to which EDC agreed to provide further "Support" (as defined in the Short Term Support Agreement) to Nortel post-filing.  Any Support provided was to be secured by the EDC Charge.  At the time, the Applicants advised that they were continuing discussions with EDC to determine whether a longer term solution was possible.

30.     NNL and EDC have now concluded arrangements which will result in the EDC Charge as currently constituted under the Initial Order being replaced in favour of a mechanism whereby EDC will be provided with cash collateral.  Copies of the amendment to the Short Term Support Agreement and the Cash Collateral Agreement (the "Cash Collateral Agreement") both dated as of June 18, 2009 are attached as Exhibits "G" and "H" hereto, respectively.

31.     The previously committed support facility will become discretionary on EDC's part while at the same time, the Applicants will have the flexibility to post cash collateral in respect of any new Support provided to the Applicants up to a maximum of cash

collateral permitted by applicable approvals. In addition, any existing Support formerly secured by the EDC Charge (as defined in the initial Order) will be collateralized by the posting of cash collateral pursuant to the Cash Collateral Agreement. In addition to securing outstanding financial assurances, cash collateral will also secure certain fees and expenses of EDC arising from the provision of Support and from the CCAA proceedings themselves. Such fees also formed part of the previously approved EDC arrangements, but will be modestly expanded to include the additional expense of the cash collateral mechanism.

32.     EDC will permit the EDC Charge to be vacated upon the approval of the new arrangements and the posting of cash collateral in the amount of approximately US$6.5 million including a deposit for fees and expenses in the amount of US$540,000.00. This will make available to NNL the balance of US$30 million currently being held be the Applicants from the proceeds of the sale of the Westwinds property in Calgary, which sale closed on June 15, 2009.

33.     Finally, EDC has requested amendments to the Initial Order which reflect the fact that EDC will be relying upon the terms of the Cash Collateral Agreement, which amendments mirror those previously ordered in respect of those parties who currently have cash collateral facilities with the Applicant.

## CHANGES TO THE INITIAL ORDER

*Excess Funding Charge and the Shortfall Charge*

34.     As set out above, included in the terms of the Interim Funding Agreement are the creation of the Excess Funding Charge and Shortfall Charge (collectively, the "Proposed

72

- 23 -

Charges"). The Proposed Charges are to secure the payment obligations of NNL under the Interim Funding Agreement and, from the standpoint of the beneficiaries of those charges, are fundamental terms of the Agreement.

35.     I am not aware that any of the other beneficiaries of the Charges outstanding under the Initial Order object to the creation of the Proposed Charges.

*EDC Charge*

36.     As set out above, the EDC Charge will be extinguished and discharged and certain amendments with respect to the cash collateral to be posted with EDC are to be incorporated into the Initial Order.

*Cross-Border Protocol*

37.     As set out above, one of the conditions to the effectiveness of the Interim Funding Agreement are agreed upon changes to the Cross Border Protocol. As of the date of this affidavit, negotiations with respect to such changes are on going. To the extent that a consensus is reached, I intend to swear a supplemental affidavit in respect of such amendments.

## CONCLUSION

38.     As has been apparent from the last 13 week cashflow filed by the Applicants in these proceeding, NNL requires funding in order to address its near term liquidity needs. The parties have arrived at the terms of the Interim Funding Agreement after extensive negotiations involving numerous in person and teleconference negotiation sessions and due diligence reviews. It also provides an interim solution to NNL's funding needs as

73

- 24 -

well as an essential liquidity review process before payments are made by NNL. Further, the corresponding amendments to the Initial Order are fair and reasonable in the circumstances.

SWORN before me at the City of
Toronto in the Province of Ontario,
on the 22nd day of June, 2009.

_____
A Commissioner for taking affidavits

_____
John Doolittle

74

Court File No: 09-CL-7950

IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL
NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL NETWORKS
GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL CORPORATION AND
NORTEL NETWORKS TECHNOLOGY CORPORATION

*ONTARIO*
SUPERIOR COURT OF JUSTICE-
(COMMERCIAL LIST)

Proceeding commenced at Toronto

AFFIDAVIT OF JOHN DOOLITTLE
(sworn June 22, 2009)

**Ogilvy Renault LLP**
Suite 3800
Royal Bank Plaza, South Tower
200 Bay Street, P.O. Box 84
Toronto, Ontario  M5J 2Z4

**Derrick Tay LSUC#: 21152A**
Tel:      (416) 216-4832
Email:    dtay@ogilvyrenault.com

**Mario Forte LSUC#: 27293F**
Tel:      416-216-4870
Email:    mforte@ogilvyrenault.com

**Jennifer Stam LSUC #36735J**
Tel:      (416) 216-2327
Email:    jstam@ogilvyrenault.com

Lawyers for Applicants

# TAB 4

25

Court File No.: 09-CL-7950

### *ONTARIO*
### SUPERIOR COURT OF JUSTICE
### COMMERCIAL LIST

| THE HONOURABLE MR. | ) | THURSDAY, THE 21st |
|---|---|---|
| | ) | |
| JUSTICE MORAWETZ | ) | DAY OF JANUARY, 2010 |

IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,
R.S.C. 1985, c. C-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF
NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED,
NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS
INTERNATIONAL CORPORATION AND NORTEL NETWORKS TECHNOLOGY
CORPORATION

APPLICATION UNDER THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,
R.S.C. 1985, c. C-36, AS AMENDED

### ORDER

**THIS MOTION**, made by Nortel Networks Corporation, Nortel Networks Limited
("NNL"), Nortel Networks Technology Corporation, Nortel Networks Global Corporation and
Nortel Networks International Corporation (collectively, the "Applicants") the relief set out in
the Applicants' notice of motion dated January 18, 2010 was heard this day at 393 University
Avenue, Toronto, Ontario.

7b

- 2 -

**ON READING** the affidavit of John Doolittle sworn January 18, 2010 (the "Doolittle Affidavit") and the thirty-fifth report of Ernst & Young Inc. dated January ●, 2010 (the "Thirty-Fifth Report") in its capacity as monitor (the "Monitor"), and on hearing submissions of counsel for the Applicants, the Monitor and those other parties present,  no one appearing for any other person on the service list, although served as appears from the Affidavit of Service of Katie Legree sworn January ●, 2010, filed.

1.     **THIS COURT ORDERS** that the time for the service of the Notice of Motion, the Thirty-Fifth Report and the Motion Record is hereby abridged so that this Motion is properly returnable today and hereby dispenses with further service thereof.

2.     **THIS COURT ORDERS** that capitalized terms used herein and not otherwise defined shall have the meaning given to them in the Doolittle Affidavit or the Canadian Funding Agreement as the case may be.

*Canadian Funding Agreement*

3.     **THIS COURT ORDERS** that the Canadian Funding Agreement substantially in the form and substance attached as Appendix "●" to the Thirty-Fifth Report be and is hereby approved and that the Applicants are hereby authorized and directed to comply with their obligations thereunder.

4.     **THIS COURT ORDERS** pursuant to paragraph 4 of the Canadian Funding Agreement, each of the Applicants shall indemnify, defend and hold harmless each of the U.S. Debtors from and against any and all actions, suits, claims, proceedings, costs, damages, losses, liabilities, judgments, amounts, fines, penalties, levies, compensations paid in settlement (provided (i) NNL, with the prior consent of the Monitor, which consent shall not be unreasonably withheld,

77

- 3 -

has agreed in writing to such settlement or (ii) such settlement has been approved pursuant to a final order of this Court and/or the U.S. Court, as applicable), and expenses (including without limitation reasonable attorneys' fees and disbursements) resulting from a claim, demand, lawsuit, action or proceeding relating to, arising from or in connection with the matters set forth in Section 1 of the Canadian Funding Agreement, the Transfer Pricing Payments for the calculation period in the applicable Transfer Pricing Agreements in respect of the Settlement Period or the Covered Obligations.

5.      **THIS COURT ORDERS** that pursuant to paragraph 12 of the Canadian Funding Agreement, unless the U.S. Debtors assert an Additional NNI Claim, the Applicants and the Monitor waive any and all rights that may exist at law, in equity, or otherwise to assert any Claims against the U.S. Debtors relating to the period prior to the Filing Date.


*CRA APA*

6.      **THIS COURT ORDERS** that the CRA APA be and is hereby approved and NNL is hereby authorized and directed to enter into and comply with its obligations thereunder.

*NNI Claim*

7.      **THIS COURT ORDERS** that the creation of the NNI Claim as defined and described in the Canadian Funding Agreement is hereby approved and the same shall be allowed in full with the priority attributed to it in the Canadian Funding Agreement in full and final settlement of any NNI TPA Claim, Revolver Claim (other than the portion of the Revolver Claim that forms part of the NNI Claim) or Stayed TPA Claim (as each of those terms is defined in the Canadian Funding Agreement), without set off or deduction, in any inter-company claims process, all in accordance with the terms of the Canadian Funding Agreement.

DOCSTOR: 1844784\7

- 4 -

8.   **THIS COURT ORDERS** that, pursuant to and in accordance with the terms of Section 11 of the Canadian Funding Agreement, the Monitor and the Applicants irrevocably waive any and all rights that may exist at law, in equity or otherwise to setoff against, assert any counterclaims with respect to the amount or validity of, or otherwise reduce the amount of, the NNI Claim in any way.

*Stay Period*

9.   **THIS COURT ORDERS** that the Stay Period, as defined in paragraph 14 of the Third Amended and Restated Initial Order of this Court dated January 14, 2009, is hereby extended to and including April 23, 2010.

*NNI Loan Agreement Extension*

10.   **THIS COURT ORDERS** that the NNI Loan Agreement Extension dated as of December 23, 20009 among Nortel Networks Inc. and the Applicants and attached as Appendix "●" to the Thirty-Fifth Report be and is hereby approved.

*GSPA Extension*

11.   **THIS COURT ORDERS** that the thirteenth extension deed dated January 15, 2010 to the Canadian GSPA is hereby approved.

*Employee Hardship Process*

12.   **THIS COURT ORDERS AND DECLARES** that the application period for receipt of employee hardship applications pursuant to the Employee Hardship Process be and is hereby extended to April 23, 2010 (the "Extension Date").

DOCSTOR: 1844784\6



13.    **THIS COURT ORDERS** that the eligibility requirements in respect of the Employee Hardship Process as set out in the form attached as Appendix "●" be amended to reflect the Extension Date.

***Sealing***

14.    **THIS COURT ORDERS** that the confidential appendices to the Thirty-Fifth Report be and are hereby sealed pending further Order of this Court.

***Miscellaneous***

15.    **THIS COURT ORDERS** that, notwithstanding:

    (a)    the pendency of these proceedings;

    (b)    any applications for a bankruptcy order now or hereafter issued pursuant to the *Bankruptcy and Insolvency Act* (Canada) in respect of any of the Applicants and any bankruptcy order issued pursuant to any such applications; and

    (c)    any assignment in bankruptcy made in respect of any of the Applicants;

the provisions of the CFA, the approval of the CRA APA and the creation of the NNI Claim shall be binding on any trustee in bankruptcy that may be appointed in respect of any of the Applicants and shall not be void or voidable by creditors of the Applicants, nor shall it constitute oppressive conduct nor constitute or be deemed to be a preference, fraudulent conveyance, transfer at undervalue, or other challengeable or voidable transaction under the *Bankruptcy and Insolvency Act* (Canada) or any other applicable federal or provincial legislation, nor shall it constitute oppressive or unfairly prejudicial conduct pursuant to any applicable federal or provincial legislation.

16.    **THIS COURT HEREBY REQUESTS** the aid and recognition of any court, tribunal, regulatory or administrative body having jurisdiction in Canada, the United States, the United Kingdom or elsewhere, to give effect to this Order and to assist the Applicants, the Monitor and their respective agents in carrying out the terms of this Order. All courts, tribunals, regulatory and administrative bodies are hereby respectfully requested to make such orders and to provide

- 6 -



such assistance to the Applicants and to the Monitor, as an officer of this Court, as may be necessary or desirable to give effect to this Order, to grant representative status to the Monitor in any foreign proceeding, or to assist the Applicants and the Monitor and their respective agents in carrying out the terms of this Order.

17.    **THIS COURT ORDERS** that each of the Applicants and the Monitor be at liberty and is hereby authorized and empowered to apply to any court, tribunal, regulatory or administrative body, wherever located, for the recognition of this Order and for assistance in carrying out the terms of this Order.

_____

Court File No: 09-CL-7950

IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL
NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL NETWORKS
GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL CORPORATION AND
NORTEL NETWORKS TECHNOLOGY CORPORATION

| *ONTARIO*<br>SUPERIOR COURT OF JUSTICE<br>(COMMERCIAL LIST) |
| --- |
| Proceeding commenced at Toronto |
| **ORDER** |
| **OGILVY RENAULT LLP**<br>Suite 3800<br>Royal Bank Plaza, South Tower<br>200 Bay Street<br>P.O. Box 84<br>Toronto, Ontario  M5J 2Z4, Canada<br><br>**Derrick Tay LSUC#: 21152A**<br>Tel: (416) 216-4832<br>Email: dtay@ogilvyrenault.com<br><br>**Mario Forte  LSUC#: 27293F**<br>Tel: (416) 216-4870<br>Email: mforte@ogilvyrenault.com<br><br>**Jennifer Stam LSUC #46735J**<br>Tel: (416) 216-2327<br>Email: jstam@ogilvyrenault.com<br>Fax: (416) 216-3930<br>Lawyers for the Applicants |

DOCSTOR: 184478416

Court File No: 09-CL-7950

IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL NETWORKS
CORPORATION, NORTEL NETWORKS LIMITED,
NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL
CORPORATION AND NORTEL NETWORKS TECHNOLOGY
CORPORATION

*ONTARIO*
**SUPERIOR COURT OF JUSTICE
COMMERCIAL LIST**

Proceeding commenced at Toronto

**MOTION RECORD
(returnable January 21, 2010)**

**OGILVY RENAULT LLP**
Suite 3800
Royal Bank Plaza, South Tower
200 Bay Street
Toronto, Ontario  M5J 2Z4
CANADA

**Derrick Tay LSUC#: 21152A**
Tel:  (416) 216-4832
Email: dtay@ogilvyrenault.com

**Mario Forte  LSUC#: 27293F**
Tel: (416) 216-4870
Email: mforte@ogilvyrenault.com

**Jennifer Stam LSUC #46735J**
Tel: (416) 216-2327
Email: jstam@ogilvyrenault.com
Fax: (416) 216-3930

Lawyers for the Applicants