## EXHIBIT A

Court File No. 09-CL-7950

*ONTARIO*
**SUPERIOR COURT OF JUSTICE
(COMMERCIAL LIST)**

**IN THE MATTER OF THE *COMPANIES' CREDITORS
ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED**

**AND IN THE MATTER OF A PLAN OF
COMPROMISE OR ARRANGEMENT OF
NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED,
NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS
INTERNATIONAL CORPORATION AND NORTEL NETWORKS
TECHNOLOGY CORPORATION**

**THIRTY-FIFTH REPORT OF THE MONITOR
DATED JANUARY 18, 2010**

## INTRODUCTION

1.  On January 14, 2009 (the "Filing Date") Nortel Networks Corporation ("NNC" and
    collectively with all its subsidiaries "Nortel" or the "Company"), Nortel Networks
    Limited ("NNL"), Nortel Networks Technology Corporation, Nortel Networks
    International Corporation and Nortel Networks Global Corporation (collectively the
    "Applicants") filed for and obtained protection under the *Companies' Creditors
    Arrangement Act* ("CCAA"). Pursuant to the Order of this Honourable Court dated
    January 14, 2009, as amended and restated (the "Initial Order"). Ernst & Young
    Inc. was appointed as the Monitor of the Applicants (the "Monitor") in the CCAA
    proceedings. The stay of proceedings was extended to January 30, 2010 by this
    Honourable Court in its Order dated December 18, 2009.

2.  Nortel Networks Inc. ("NNI") and certain of its U.S. subsidiaries concurrently filed
    voluntary petitions under Chapter 11 of Title 11 of the U.S. Bankruptcy Code (the
    "Code") in the United States Bankruptcy Court for the District of Delaware (the
    U.S. Court") on January 14, 2009 (the "Chapter 11 Proceedings") (collectively the

"U.S. Debtors").   As required by U.S. law, an official unsecured creditors committee (the "Committee") was established in January, 2009.

3.   An ad hoc group of holders of bonds issued by NNL and NNC has been organized and is participating in these proceedings as well as the Chapter 11 Proceedings (the "Bondholder Group").   In addition, pursuant to Orders of this Honourable Court dated May 27, 2009 and July 22, 2009, representative counsel was appointed on behalf of the former employees of the Applicants behalf of the continuing employees of the Applicants, respectively. Each of these groups is participating in the CCAA proceedings.

4.   Nortel Networks (CALA) Inc. ("NN CALA") filed a voluntary petition under Chapter 11 of Title 11 of the Code in the U.S. Court on July 14, 2009.

5.   Nortel Networks UK Limited ("NNUK") and certain of its subsidiaries located in EMEA were granted administration orders (the "UK Administration Orders") by the High Court of England and Wales on January 14, 2009 (collectively the "EMEA Debtors").   The UK Administration Orders appointed Alan Bloom, Stephen Harris, Alan Hudson and Chris Hill of Ernst & Young LLP as administrators of the various EMEA Debtors, except for Ireland, to which David Hughes (Ernst & Young LLP Ireland) and Alan Bloom were appointed (collectively the "Joint Administrators"). On June 8, 2009, the Joint Administrators appointed in respect of NNUK filed a petition with the U.S. Court for recognition of the administration proceedings as they relate to NNUK (the "English Proceedings") under Chapter 15 of the Code. On June 26, 2009, the U.S. Court entered an order recognizing the English Proceedings as foreign main proceedings under Chapter 15 of the Code.

6.   On January 20, 2009, Nortel Networks Israel (Sales and Marketing) Limited and Nortel Communications Holdings (1997) Limited (together "NN Israel") were granted administration orders by the court in Israel (the "Israeli Administration Orders").   The Israeli Administration Orders appointed representatives of Ernst &

2

Young LLP in the UK and Israel as administrators of NN Israel and provided a stay of NN Israel's creditors which, subject to further orders of the Israeli Court, remains in effect during the administration.

7.  Subsequent to the Filing Date, Nortel Networks SA commenced secondary insolvency proceedings within the meaning of Article 27 of the European Union's Council Regulation (EC) No 1346/2000 on Insolvency Proceedings in the Republic of France pursuant to which a liquidator and an administrator have been appointed by the Versailles Commercial Court.

**PURPOSE**

8.  The purpose of this thirty-fifth report of the Monitor (the "Thirty-Fifth Report") is to report to this Honourable Court on the following matters:

    a)  consolidated cash position and liquidity as at January 2, 2010;

    b)  actual receipts and disbursements from November 29, 2009 to January 2, 2010;

    c)  cash flow forecast for the period from January 3 to April 24, 2010;

    d)  Canadian Funding and Settlement Agreement ("CFSA");

    e)  advanced pricing agreement;

    f)  NNI Loan Agreement;

    g)  current status of the Group Supplier Protocol Agreement ("GSPA");

    h)  status of foreign proceedings;

    i)  progress on restructuring;

    j)  request for an extension of the stay of proceedings until April 23, 2010; and

3

k)   Advanced Pricing Agreement with Canada Revenue Agency.

**TERMS OF REFERENCE**

9.   In preparing this Thirty-Fifth Report, the Monitor has relied upon unaudited financial information, the Company's books and records, financial information prepared by the Company and discussions with management of Nortel.   The Monitor has not audited, reviewed or otherwise attempted to verify the accuracy or completeness of the information and accordingly, the Monitor expresses no opinion or other form of assurance on the information contained in this Thirty-Fifth Report.

10.   Unless otherwise stated, all monetary amounts contained herein are expressed in U.S. dollars.

11.   Capitalized terms not defined in this Thirty-Fifth Report are as defined in the Affidavit of John Doolittle sworn on January 14, 2009 (the "Doolittle Affidavit"), the Pre-Filing Report, previous Reports of the Monitor or the CFSA.

12.   The Monitor has made various materials relating to the CCAA proceedings available on its website at www.ey.com/ca/nortel.   The Monitor's website also contains a dynamic link to Epiq Bankruptcy LLC's website where materials relating to the voluntary proceedings under Chapter 11 of the Code are posted.

**GENERAL BACKGROUND**

13.   Since September 30, 2009, Nortel has conducted its global business through four reportable business unit segments: Wireline and Wireless Networks ("WN"), Metro Ethernet Networks ("MEN"), Carrier Voice Application Solutions ("CVAS") and LG Nortel Co. Ltd. ("LGN").   As of September 30, 2009, the Enterprise Solutions business was accounted for as a discontinued operation.   The revenue and assets of each of the business units, except for LGN, are distributed among the multiple Nortel legal entities and joint ventures around the world.

**CONSOLIDATED CASH POSITION AND LIQUIDITY AS AT JANUARY 2, 2010**

14.   At January 2, 2010, Nortel's consolidated cash balance was approximately $5.0 billion including $2.9 billion of total treasury cash. Nortel's consolidated cash balance is held globally in various Nortel entities and joint ventures. The following is an overview of Nortel's consolidated cash position as at January 2, 2010:

| Region | Gross Cash | Restricted | Unavaliable (JV's and Other Items) | Available Cash |
|---|---|---|---|---|
| NNL | 116 | (31) | (8) | 77 |
| Other Canada | 36 | (25) | - | 11 |
| | | | | |
| NNI | 941 | (26) | - | 915 |
| NNI - Reserve MMF (ST/LT) | 18 | - | (18) | - |
| Other US | 2 | - | - | 2 |
| **North America** | 1,113 | (82) | (26) | 1,005 |
| | | | | |
| NN UK Limited | 370 | (26) | - | 344 |
| Other EMEA Filed Entities | 394 | (12) | - | 382 |
| JV - Netas | 66 | - | (66) | - |
| EMEA non-filed entities | 25 | - | - | 25 |
| **UK/Europe** | 855 | (38) | (66) | 751 |
| | | | | |
| Greater China | 198 | (8) | - | 190 |
| Other ASIA PAC (excl JVs) | 254 | (1) | - | 253 |
| LG Nortel | 250 | - | (250) | - |
| Other JVs | 122 | - | (122) | - |
| **ASIA** | 824 | (9) | (372) | 443 |
| | | | | |
| NN CALA | 82 | - | - | 82 |
| CALA non-filed entities | 66 | - | - | 66 |
| **Cala** | 148 | - | - | 148 |
| | | | | |
| **Total Treasury Cash** | **2,940** | **(129)** | **(464)** | **2,347** |
| | | | | |
| **Divestiture Proceeds** | 2,059 | (2,059) | - | - |
| | | | | |
| **Total Cash** | **4,999** | **(2,188)** | **(464)** | **2,347** |

15. As at January 2, 2010, North America had cash available for operations and post-filing inter-company settlements of approximately $1.0 billion compared to a gross cash position of approximately $1.1 billion. Of the $1.0 billion, approximately $88 million is held by Canadian entities and approximately $917 million is held by U.S. entities.

16. None of the Applicants' Restricted Cash and Unavailable Cash is readily available to them. Restricted Cash relates primarily to: (i) $15 million of cash collateral posted by Nortel in support of non-EDC performance bonds and letter of credit facilities; (ii) $11 million held in the D&O Trust as detailed in the Pre-Filing Report; (iii) $10 million held in escrow related to the settlement of the Global Class Action; (iv) $8 million posted in support of the EDC performance bonds issued in exotic foreign currencies; (v) $6 million of cash collateral posted with EDC in support of post-filing performance bonding; (vi) $4 million held in relation to benefits paid through the Health and Welfare Trust (the "H&WT"); and (vii) $2 million held in escrow in respect of a certain real estate leases. Unavailable Cash relates to $8 million from the sale of the Strandherd Lands.

17. NNI's Restricted Cash relates primarily to: (i) a deposit of $10 million held by NNI in respect of the sale of the GSM assets; (ii) $4 million of cash collateral posted by Nortel in support of non-EDC performance bonds and letter of credit facilities; (iii) $1 million held in escrow for the benefit of utility providers in accordance with the First Day Order; and (iv) $11 million held in trust related to a payment to Flextronics as part of the Flextronics Settlement and Release Agreement. NNI's Unavailable Cash as at January 2, 2010 includes $18 million related to the Money Market Reserve Primary Fund ("MMF"). Since filing, $47 million has been recovered from the MMF.

18. The U.K. Administrators, on behalf of NNUK and the other EMEA Debtors, had available cash for operations and post–filing inter-company settlements of approximately $726 million. The EMEA non-filed entities had available cash of

approximately $25 million which is expected to be used primarily to fund their in-country operations and inter-company settlements.

19.  NETAS, a joint venture in which Nortel owns a 53% interest, had approximately $66 .million of cash of which approximately $35 million represents Nortel's proportionate share.  Nortel believes these funds will continue to be used to fund NETAS's operations. Repatriation of these funds requires approval of the respective joint venture partners.

20.  Nortel entities in the APAC region have approximately $443 million of available cash for operations and inter-company settlements.  As a result of the regulatory regime in the People's Republic of China, the funds in Greater China of approximately $190 million are generally only available to fund operations within Greater China and inter-company settlements.  LGN and other joint ventures of which Nortel is a participant held approximately $372 million of unavailable cash of which $190 million represents Nortel's proportional share.  Repatriation of these funds requires approval of the respective joint venture partners.

21.  NN CALA's available cash was $82 million.  The CALA non-filed entities held approximately $66 million of available cash which is expected to be used to fund their in-country operations and inter-company settlements.

22.  Divesture proceeds of $2.059 billion are being held in escrow until an agreement is reached regarding the allocation of these proceeds to various Nortel legal entities, including NNL.  These divestiture proceeds relate to:

    a)  amounts held by JPMorgan Chase Bank, N.A. in escrow including:

        i.  $1.026 billion from the sale of CDMA business/LTE Access assets;

        ii.  $18 million from the sale of the Layer 4-7 Business;

    iii.  $9.86 million from the sale of the Next Generation Packet Core business; and

    iv.  $874 million from the sale of Enterprise assets;

b)  an amount of $70 million held in escrow by CitiBank relating to the sale of CDMA business/LTE Access assets pursuant to the respective asset purchase agreement. These divestiture proceeds include $50 million in support of the related Transition Service Agreements (the "TSA's") and $20 million subject to finalization of the related working capital adjustment; and

c)  an amount of $60.6 million held in escrow by Wells Fargo Bank relating to the sale of the Enterprise assets pursuant to the respective asset purchase agreement. These divestiture proceeds include:

    i.  $30 million in support of the finalization of purchase price adjustments;

    ii.  $25 million subject to the delivery by Nortel of the unaudited Enterprise profit and loss statement for the period October 1 to December 18, 2009; and

    iii.  $5.6 million subject to the resolution of certain succession tax liabilities in France.

23.  The consolidated cash position balances presented above do not reflect deposits of $38 million received from Ciena Inc. with respect to the sale of the MEN assets.

## ACTUAL RECEIPTS AND DISBURSEMENTS FROM NOVEMBER 29, 2009 TO JANUARY 2, 2010

24.  The Applicants' actual consolidated net cash outflow for the period November 29, 2009 to January 2, 2010 was $75.5 million. A summary of the actual receipts and

disbursements, as compared to the forecast filed with the Thirty-Third Report (the "Thirty-Third Report Forecast"), is attached at Appendix "A".

25. Actual net cash outflow was more than forecast by $38.6 million. Significant items contributing to this negative variance were as follows:

   a) a positive permanent variance of $2.8 million with respect to the collection of accounts receivable primarily resulting from higher than forecast sales;

   b) payroll and accounts payable reimbursement from the buyers of the CDMA business/LTE Access assets and Enterprise Solutions business were lower than forecast by $10.8 million due to the actual spend on payroll and accounts payable payments on behalf of the buyers also being lower than forecast by $10.8 million, resulting in no net variance;

   c) a negative net timing variance of approximately $5.8 million with respect to net inter-company receipts and disbursements primarily as a result of the NNI Loan Agreement interest of $3.1 million being paid earlier than originally forecast and lower than forecast inter-company receipts from NNI of $2.8 million due to a backlog in unmatched invoices. This is partially offset by increased inter-company recoveries from NNI and NNUK of $2.9 million on account of increased trade payable settlements;

   d) a negative timing variance of $4.5 million with respect to payroll primarily as a result of payroll source deductions of $3.4 million originally forecast to be paid in the first week of January that were actually remitted in the last week of December;

   e) a negative permanent variance of $10.0 million with respect to inventory disbursements as a backlog of unsettled post filing contract manufacturer invoices were cleared in December 2009. Of this amount, approximately $2.9

million was recovered from NNI and NNUK via inter-company settlements as noted above; and

f)  a negative timing variance of $19.6 million with respect to non-inventory purchases primarily due to higher than forecasted volume of vendor invoices being processed at year end.

26.  Available Cash was higher than forecast by approximately $1.1 million as a result of a favourable foreign exchange translation on Canadian dollar denominated cash balances due to the appreciation of the Canadian dollar relative to the U.S. dollar during the period.

**CASH FLOW FORECAST FOR THE PERIOD JANUARY 3 TO APRIL 24, 2010**

27.  Nortel, with the assistance of the Monitor, has prepared an updated 16-week cash flow forecast for the period January 3 to April 24, 2010 (respectively, the "January 3 Forecast" and the "Forecast Period"). A copy of the January 3 Forecast is attached as Appendix "B".

28.  As at January 2, 2010, the Applicants have Available Cash balances of approximately $87.1 million, excluding Restricted Cash and Unavailable Cash of approximately $64.6 million.

29.  Based on the January 3 Forecast, it is anticipated the Applicants will have total receipts of $371.0 million (including receipts in respect of the CFSA of $191.8 million) and total disbursements of $323.2 million resulting in a net cash inflow of $47.8 million during the Forecast Period.

30.  During the Forecast Period, it is assumed NNL does not make any additional draws pursuant to the NNI Loan Agreement (as herein defined) beyond the $75 million drawn prior to February 1, 2009.

31. The significant assumptions in respect of the Forecast Period used in preparing the January 3 Forecast include the following:

    a) remittances from NNI totalling $191.8 million pursuant to the CFSA;

    b) the impact of the divestiture of the CDMA business/LTE Access assets (which closed on November 13, 2009) and Enterprise Solutions business (which closed on December 18, 2009);

    c) receipts with respect to monthly billings to buyers of the CDMA business/ LTE Access assets and Enterprise Solutions business for transition services provided by the Applicants pursuant to their respective transitional services agreements ("TSA Recoveries");

    d) no additional business units will close within the Forecast Period. As a result of the significant operational, financial and transition preparation work, including various government and regulatory approvals required to close the pending sale transactions, Nortel cannot estimate, with a high degree of certainty, the closing dates for the remaining sale transactions. The closing of the MEN, CVAS or GSM sale transactions prior to April 24, 2010, would each individually have a positive impact on the Applicants' cash flow and forecast April 24, 2010 ending cash balance. The extent of the impact on the Forecast Period is dependent on the actual closing date. The range of monthly cash savings related to the divestiture of each of the business units is estimated as follows:

        i.   MEN - $10 to $15 million

        ii.   CVAS - $4 to $6 million; and

        iii.   GSM/GSM-R - $1 to $3 million.

11

If the closing dates for the sales transactions occur after March 31, 2010, the CFSA provides for an adjustment that would result in additional recoveries by NNL from NNI. If the closing dates occur before March 31, 2010, an adjustment under the CFSA would result in a reduction in the funding from NNI to NNL;

e) payroll and accounts payable disbursements relating to the CDMA business and LTE Access assets continue to be administered by Nortel subsequent to closing of the Ericsson sale transaction. During this transition period and in accordance with the relevant asset purchase agreement, Ericsson will pre-fund these expenses to Nortel resulting in no material working capital impact. The transition period for payroll concluded on December 31, 2009, whereas the administration of accounts payable disbursements is assumed to continue throughout of the Forecast Period;

f) Avaya is responsible for payroll and accounts payable disbursements relating to the Enterprise assets sold to it. Avaya assumed this responsibility on December 18, 2009;

g) sale proceeds from the CDMA business/LTE Access assets and Avaya transactions and from the pending sale of the other business unit transactions continue to be held or are paid into escrow and are not reflected in the January 3 Forecast;

h) accounts receivable collections, including collection of residual accounts receivable not acquired by the purchasers as part of the divestiture of the CDMA business/ LTE Access assets, is consistent with revenue forecasts and historic customer collection experience that has been estimated by the Applicants' collection group;

i)   all disbursements are made assuming pre-filing amounts owed to suppliers are stayed and post-filing amounts are paid on significantly reduced credit terms as a result of the CCAA proceedings;

j)   inter-company trade accounts for post-filing transactions continue to settle on a cash basis between the Applicants, U.S. Debtors, EMEA Debtors and other Nortel entities. Inter-company pre-filing trade accounts and loans between the Applicants and all other Nortel filed and non-filed entities are stayed;

k)   payroll includes payment of estimated Q4 2009 AIP;

l)   pension funding continues for both current and special service payments in the ordinary course with respect to the registered defined benefit and defined contribution plans. Funding for non-registered pension or other retirement plans is stayed;

m)   funding continues in the ordinary course for the H&WT; and

n)   all interest payments relating to the Company's pre-filing indebtedness are stayed. Interest with respect to the post filing NNI Loan continues to accrue, the next cash payment in respect of accrued interest is in July 2010 and the term of the NNI Loan is extended to December 31, 2010.

32.   Based on an analysis prepared by the Monitor, it appears NNL has sufficient cash resources to fund operations through April 23, 2010.

13

**CANADIAN FUNDING AND SETTLEMENT AGREEMENT[1]**

*Background*

33. The continued viability of the Applicants is necessary to the Nortel group of companies as NNL provides corporate administrative and management support to its affiliates on a global basis, is contractually obligated to provide transition services to the various purchasers of Nortel's global assets and NNL is the legal owner of substantially all of Nortel's intellectual property, which is licensed to its affiliates. In addition, a significant portion of Nortel's R&D activity, which is necessary to support the on-going business of Nortel, continues to be conducted by the Applicants.

34. The Interim Funding and Settlement Agreement (the "IFSA"), which was approved by this Honourable Court on June 29, 2009, provided, among other things, funding to NNL from NNI for the period from the Filing Date to September 30, 2009. The funding was in satisfaction of any claims NNL may have against NNI for reimbursement of corporate overhead and R&D costs, whether pursuant to the TPA or otherwise, incurred by NNL on behalf of NNI during such period. The total amount of such funding received by NNL from NNI is $187.4 million.

35. No similar funding has been provided by NNI to NNL in respect of the period subsequent to September 30, 2009, although the Applicants have continued to incur the cost of significant R&D activities and corporate support on behalf of NNI. Absent further funding to reimburse these costs and settle other matters, the Applicants are forecast to incur cash disbursements in excess of cash receipts of approximately $149.6 million during the Forecast Period.

---

[1] Certain terms used in this section of the Report, which have not been defined herein, shall have the same meaning as ascribed to them in the CFSA.

36. The CFSA represents the successful conclusion of extensive negotiations between the Applicants, U.S. Debtors, Monitor, Committee and Bondholder Group in addressing certain issues, which include:

    a) forecasting liquidity requirements of the Applicants;

    b) enabling NNI, on behalf of itself and the other U.S. Debtors (which for clarity excludes NN CALA, as it is not part of the CFSA), to settle any claims of NNL for reimbursement of corporate overhead, research and development or other obligations, whether pursuant to the TPA or otherwise, incurred by NNL for the benefit of those U.S. Debtors during the period from October 1, 2009 through the later of the conclusion of the Canadian Proceedings or the consummation of the wind-down of the Applicants' estates (respectively, the "Covered Obligations" and the "Settlement Period");

    c) resolving outstanding Advanced Pricing Agreement ("APA") issues with respect to the taxation years 2001 through 2005 as described in more detail below; and

    d) establishing the net pre-filing claim amount between the Applicants and the US Debtors.

*Significant terms of the CFSA*

37. A summary of the significant terms of the CFSA is provided in the following sub-paragraphs. Reference should be made directly to the CFSA, a redacted copy of which is attached as Appendix "C" hereto, for capitalized terms not otherwise defined and for a complete understanding of the terms of the agreement. A confidential non-redacted copy of the CFSA is attached as Appendix "D" to this Report. As the confidential non-redacted copy of the CFSA contains sensitive financial information, the Monitor supports the Applicants' request that confidential Exhibit "D" to this Thirty-Fifth report be sealed by this Honourable Court.

*NNI Funding and Settlement*

a) NNI shall pay to NNL an amount equal to $190.8 million (the "Settlement Payment") of which $156.1 million is to be paid within 3 business days following the satisfaction of all of the conditions and the effective date of the agreement. The remaining $34.7 million is to be paid in 4 instalments during 2010 as outlined in Annex C to the CFSA;

b) a portion of the Settlement Payment is subject only to the following:

    i. adjustments for actual closing dates of the various business units;

    ii. adjustments for actual D&O insurance premiums and public company reporting expenditures; and

    iii. a true-up to the allocation of corporate overhead costs between the Applicants and the U.S. Debtors based on the ultimate relative allocation of sale proceeds between the parties from the divestiture of the five primary business units (CDMA business/LTE Access assets, Enterprise, MEN, GSM and CVAS), the Passport business and the interest in LG Nortel;

c) the Settlement Payment represents:

    i. the maximum payment the U.S. Debtors may or could owe in respect of the Covered Obligations for the Settlement Period;

    ii. the maximum post-filing or administrative claim (or such other applicable priority claim) that any of the Applicants may have or could assert against the U.S. Debtors in any Proceeding with respect to the Covered Obligations; and

    iii. constitutes a full and final settlement of any and all Covered Obligations;

16

d) M&A Costs are to be treated as transaction costs and are to be recovered from the relevant sale or transaction proceeds.  No recoveries have been included during the Forecast Period;

e) the Applicants agree to indemnify the U.S. Debtors, from and against any and all claims, damages, taxes, and expenses resulting from a claim, demand, lawsuit, action or proceeding relating to the Settlement Payment, Transfer Pricing Payments in respect of the Settlement Period or the Covered Obligations;

*Advance Pricing Agreement*

f) NNL shall, in a timely manner, enter into an APA with Canada Revenue Agency (the "CRA APA" and "CRA", respectively) that will apply to the taxation years beginning January 1, 2001 and ending December 31, 2005 and shall be acceptable in form and substance to NNI, the Committee and the Bondholder Group;

g) NNI shall, in a timely manner, enter into an APA with U.S. Internal Revenue Service (the "IRS APA" and "IRS", respectively), that will apply to the taxation years beginning January 1, 2001 and ending December 31, 2005 and shall be acceptable in form and substance to NNL, the Monitor, the Committee and the Bondholder Group;

h) each of NNL, the Monitor and NNI shall cooperate with each other in finalizing the terms and conditions of the CRA APA and the IRS APA;

*NNI Claim*

i) NNL and NNI agree that a $2.0627 billion pre-filing claim in the Canadian Proceedings shall be established in favour of NNI (the "NNI Claim") for the full and final settlement of the following:

i. any claims of the U.S. Debtors against the Applicants for overpayments to the Applicants under the Transfer Pricing Agreements for the period from January 1, 2001 to December 31, 2005 whether or not resulting from any adjustment of taxable income of the U.S. Debtors as determined by the IRS;

ii. certain claims of NNI against NNL due and owing under the Revolving Loan Agreement dated as of March 21, 2008; and

iii. any claims of the Applicants (A) for corporate overhead, research and development costs or such other alleged payment or cost reimbursement obligations pursuant to Transfer Pricing Agreements or otherwise, incurred by any Applicant for the benefit of the U.S. Debtors for the period prior to the Petition Date or (B) relating to pre-petition inter-company trading of goods and services;

j) the priority of the NNI Claim shall be as follows:

i. (i) $2 billion of the NNI Claim shall be a pre-petition unsecured claim against NNL ranking pari passu with other unsecured pre-petition claims against NNL; and

ii. (ii) the remaining $62.7 million of the NNI Claim shall constitute the remainder of the secured Revolver Claim (the "Remaining Revolver Claim") and shall continue to have the benefit of the court-ordered charge in the Canadian Proceedings relating to the Revolving Loan Agreement;

k) under no circumstances shall the NNI Claim be subject to any offsets or counterclaims;

18

l)  the Parties agree that NNI and the other U.S. Debtors shall retain the right to assert Claims against the Applicants relating to the period prior to the Filing Date, provided, however, the U.S. Debtors shall have no right to assert any NNI TPA Claim or Revolver Claim (other than the Remaining Revolver Claim) against the Applicants (such pre-petition Claims but excluding the NNI Claim (including Remaining Revolver Claim), NNI TPA Claim or Revolver Claim, an "Additional NNI Claim"). Upon the filing of an Additional NNI Claim in the Canadian Proceedings or subsequent proceedings, the waivers of the Applicants' pre-filing claim against the U.S. Debtors under Section 12 of the CFSA shall automatically terminate and shall be of no further force and effect and the Applicants shall have the right to defend against such Additional NNI Claim, assert counter-claims against the U.S. Debtors in the Canadian Proceedings or subsequent proceedings with regards to such Additional NNI Claim, and assert any additional Claims against the U.S. Debtors in the US Proceedings or subsequent proceedings (the filing of Additional NNI Claims, however, shall have no impact on the Applicants' waivers of their setoff/counter-claim right against the NNI Claim);

m)  the Parties hereby agree that (i) the Applicants shall not establish a deadline for the filing of claims by the U.S. Debtors in the Canadian Proceedings and (ii) no U.S. Debtor shall establish a deadline for the filing of claims by the Applicants in the US Proceedings, without the prior written consent of all other Parties to the CFSA and the Committee and Bondholder Group, which consent shall not be unreasonably withheld or delayed;

*General Provisions*

n)  the Applicants and the U.S. Debtors agree to work with the Monitor, the Committee and the Bondholder Group to develop and timely seek approval from each of the Courts of a cross-border claims protocol and claims

resolution procedures for the resolution of claims filed in the Canadian Proceedings and the U.S. Proceedings;

o) one of the conditions precedent to the CFSA becoming effective is the extension of the Amended and Restated Revolving Loan Agreement dated March 27, 2009 among NNL, NNI and Nortel Networks Technology Corporation (the "NNI Loan Agreement") through to December 31, 2010;

p) except as provided in the CFSA, nothing in the CFSA shall constitute an amendment, modification or waiver of rights of any Party (i) under any other agreement, including, without limitation, the Transfer Pricing Agreements, applicable law or otherwise, or (ii) with respect to any potential tax contingencies, assessments, rulings or agreements arising from Transfer Pricing Payments pursuant to the Transfer Pricing Agreements or any offset arising therefrom or otherwise; provided, however, that the Parties waive any and all rights to object to or otherwise seek to amend or revisit (A) any payments made pursuant to the CFSA, (B) the APAs, (C) the allowance of the NNI Claim in the Canadian Proceedings or (D) the waiver by the Applicants and the Monitor of their rights to setoff or in any way reduce the amount of the NNI Claim (including the Remaining Revolver Claim); and

q) neither the Applicants nor the U.S. Debtors will exercise a right of termination under the Master R&D Agreement without the prior written consent of the other Parties to the CFSA and the Committee and Bondholder Group.

**ADVANCED PRICING AGREEMENT**

38. In addition to Canadian funding requirements, the CFSA addresses certain tax issues outstanding between NNL and NNI. The period from 2001 to 2005 has been under review by the taxing authorities in both Canada and the United States for several years.

39. After extensive discussion and review of Nortel's transfer pricing structure, NNL and NNI have agreed that certain transfer pricing overpayments by NNI to NNL occurred during the 2001 to 2005 period and have agreed to a $2 billion inter-company adjustment to satisfy this overpayment, subject to the satisfaction of certain conditions, including approvals of this Honourable Court and the US Court.

40. Pursuant to the terms of the CFSA, which are outlined in more detail below, each of NNL and NNI is to enter into an APA with its respective taxing authority that will apply to the taxation years beginning on January 1, 2001 and ending on December 31, 2005. The respective APAs will provide for a negative adjustment to NNL's income of $2 billion and a positive adjustment to NNI's income of $2 billion during this period.

41. The resolution of the transfer pricing overpayment and related tax issues was a necessary condition in order to reach an agreement on the funding and cost reimbursement to the Applicants.

**NNI LOAN AGREEMENT**

42. The NNI Loan Agreement, which provided for a post-filing revolving loan facility, under which NNI could loan up to $200 million to NNL ("NNI Loan"), was approved pursuant to the provisions of the Initial Order. As at December 31, 2009, $75 million is outstanding on the NNI Loan. As part of executing the CFSA, the term of the NNI Loan Agreement was, pursuant to an amending agreement dated December 23, 2009, extended to March 31, 2010. Subject to approval of this Honourable Court and the U.S. Court, the parties have agreed to extend the term of the NNI Loan Agreement until December 31, 2010, with an option to further extend the Term until June 30, 2011 upon prior written consent of the Lender, the Monitor, the Committee and the Bondholder Group (the "NNI Loan Amendment"). The NNI Loan Amendment is attached as Appendix "E".

**CURRENT STATUS OF GSPA**

43.  Since the Filing Date, Nortel entities have continued to purchase goods and services from one another on a basis consistent with the operation of the business prior to these proceedings. Post-filing transactions between the U.S. Debtors and the Applicants are pursuant to court orders entered in the Canadian Proceedings (e.g. the Initial Order) and the Chapter 11 Proceedings and/or in accordance with the Code (together, the "Trading Orders"). Trade between the EMEA Debtors and the Applicants is pursuant to the GSPA. The GSPA has continued to be extended by the parties, substantially in the same form as the initial GSPA.

44.  The purpose of the Trading Orders and GSPA is to ensure goods and services purchased after the Filing Date are paid in full without any set off, deduction, withholding, counter-claim or payment netting with respect to amounts owed as between the Nortel parties prior to the Filing Date. In addition, the Trading Orders and GSPA set out the requirement for the Applicants to secure any unpaid amount owing for post-filing purchases to the U.S. Debtors or EMEA Debtors by way of a charge on the assets of the Applicants (the "Inter-Company Charge").

45.  The Applicants have previously sought and obtained approval of the first to twelfth extensions to the GPSA.

46.  The Applicants are seeking this Honourable Court's approval of the thirteenth extension of the GSPA. The thirteenth extension of the GSPA expires on March 31, 2010. A copy of the GSPA is attached as Appendix "F". The Monitor supports the Applicants' request for approval of the thirteenth extension of the GSPA.

**STATUS OF FOREIGN PROCEEDINGS**

*Chapter 11*

47. The following is a summary of the court orders that have been issued and the financial information that has been filed in the U.S. Chapter 11 proceedings since the last update provided in the Monitor's Thirty-Third Report.

    a) On December 7, 2009, the U.S. Debtors filed the Debtor-in-Possession Monthly Operating Report for the period of October 2009.

    b) On December 15, 2009, the U.S. Debtors obtained orders:

        i. approving the U.S. Debtors' entry into a settlement agreement with International Business Machines Corporation; and

        ii. approving the U.S. Debtors' entry into a stipulation with NETtel Corporations, Inc.

    c) On December 16, 2009, the U.S. Debtors obtained an order approving the U.S. Debtors' entry into a stipulation with certain affiliates and the Pension Benefit Guaranty Corporation.

    d) On December 23, 2009, the U.S. Debtors filed:

        i. the Debtor-in-Possession Monthly Operating Report for the period of November 1, 2009 through November 28, 2009;

        ii. a motion to approve (a) the entry of Nortel Networks Inc. into a Settlement Stipulation with the Internal Revenue Service (the "IRS") and (b) the entry of the U.S. Debtors into an Advance Pricing Agreement with the IRS; and

23

    iii.  a motion to approve the entry of the U.S. Debtors into the Canadian Funding and Settlement Agreement;

e)  On January 6, 2010, the U.S. Debtors obtained orders:

    i.  approving the employment and retention of John Ray as the Principal Officer of the U.S. Debtors; and

    ii.  approving the U.S. Debtors' entry into the China Side Agreement related to the sale of CDMA business and LTE-related assets; and

f)  On January 8, 2010, the U.S. Debtors obtained an order approving the "stalking horse" asset sale agreement with GENBAND, Inc. for the sale of substantially all of the assets of the Carrier VoIP and Application Solutions (CVAS) business. The court order also established bidding procedures for an auction that allows qualified bidders to submit higher or otherwise better offers.

### *Chapter 15*

48.  Since the last update in the Thirty-Third Report, the Monitor has continued to file with the U.S. Court and serve on required parties notices of each of its reports to this Honourable Court.

49.  Pursuant to section 12(d) of the Cross-Border Protocol entered in these proceedings and the Chapter 11 Proceedings for the U.S. Debtors, the Monitor has, in advance of any joint-hearing, filed in the Chapter 11 Proceedings the relevant motion records submitted to this Honourable Court.

### *NNSA*

50.  NNSA acceded to the sixth and a seventh deed to the GSPA, pursuant to a deed of accession dated June 17, 2009 and has become a party to each subsequent extension

up to and including the twelfth extension of the GSPA. NNSA has reversed a right to terminate participation in the GSPA on five days prior notice. It is anticipated that NNSA will become a party to the thirteenth extension on similar terms.

51. As discussed in greater detail below, NNSA acceded to the APAC Agreement on December 24, 2009.

**PROGRESS ON RESTRUCTURING**

52. Nortel continues to assess a range of restructuring alternatives in consultation with their legal and financial advisors with respect to the sale of its remaining assets while at the same time exploring other options in the event it cannot maximize value through a sales transaction.

*Enterprise Solutions Sale*

53. The sale transaction was approved by this Honourable Court and the U.S. Court on September 16, 2009 and closed on December 18, 2009 generating proceeds in the amount of $874 million which are being held in escrow as discussed in paragraph 22(a)(iv).

*Carrier Voice Application Solutions Business Sale*

54. On January 6, 2010, this Honourable Court and the U.S. Court approved a "stalking horse" asset sale agreement between NNC, NNL, NNI and other parties identified therein with GENBAND Inc. for substantially all of Nortel's CVAS assets as well as approving a related sales process, auction and bidding procedures. The purchase price of $282 million is subject to balance sheet and other adjustments currently estimated to reduce the purchase price by $100 million. The terms and provisions of the agreement are more fully addressed in the Monitor's Thirty-Fourth Report.

*APAC Agreement*

55.  The APAC Agreement was approved by this Honourable Court on December 2, 2009.  On December 24, 2009, NNSA acceded to the APAC Agreement and on December 17, 2009, the UK Administrator waived its right to seek U.K. court approval.  Except with respect to certain regulatory conditions relating to certain parties to the APAC Agreement, all conditions have now been met and the APAC Agreement has become effective.

56.  Initial Payments to the Applicants by the APAC entities, as contemplated under the APAC Agreement, have now been received. The Applicants have received a total of $15.3 million of Initial Payments.

*Appeal of June 18, 2009 Order*

57.  On November 26, 2009, the Court of Appeal for Ontario dismissed the appeals of the CAW-Canada and the former employees of the Applicants relating to termination and severance pay as well as payments under various retirement benefit plans.  A copy of the decision of the Court of Appeal for Ontario is available on the Monitor's website. On December 23, 2009, the former employees filed an application for leave to appeal the decision to the Supreme Court of Canada.  The interested parties have now agreed to a timetable for the service and filing of materials with respect to the leave to appeal application. A decision on the leave to appeal application is not anticipated until at least late February 2010.

*Employee hardship application process*

58.  On July 30, 2009, an order was issued by this Honourable Court approving an employee hardship application process (the "Employee Hardship Order") described in the Monitor's Sixteenth Report and the Affidavit of John Doolittle dated July 24, 2009.

59. On December 18, 2009, this Honourable Court approved the Applicants' request to extend the Application Period until January 31, 2010 and that the eligibility requirements in respect of the Employee Hardship Process, as set out in the form attached as Appendix "G", be amended to reflect the Extension Date.

60. The Monitor is continuing to administer the hardship payment application process and report thereon to the relevant representative counsel. There remains $669,182 of the $750,000 originally provided for under the Employee Hardship Order. Applications continue to be received from former employees of the Applicants who are asserting financial hardship as a result of illness, healthcare costs or ineligibility for pension or employment insurance benefits.

61. While those individuals awarded hardship payments should also have claims against the Applicants in the CCAA proceedings, it is not anticipated that any distributions under a plan of compromise or arrangement will occur in the near term. Accordingly, the Monitor supports the Applicants' request that the Application Period be extended until and including April 23, 2010 and that Eligibility Requirements and the Procedure With Respect To Hardship Payment Applications be amended accordingly.

**REQUEST FOR AN EXTENSION TO THE STAY OF PROCEEDINGS**

62. The Stay Period presently expires on January 29, 2010. The Applicants are seeking an 84 day extension of the Stay Period until and including April 23, 2010.

**CRA APA**

63. As part of the CRA APA and related documents, NNL and the Monitor are required to maintain confidentiality of the details of the CRA APA and related documents and discussions.

64. The Monitor intends to file the confidential CRA APA under seal to provide additional supporting information solely for this Honourable Court. Nortel and the

27

Monitor will be requesting the CRA APA be sealed by this Honourable Court in its entirety.

## MONITOR'S ANALYSIS AND RECOMMENDATIONS

65. The Monitor has assisted and continues to assist the Applicants in their efforts to review operations and assess a range of restructuring alternatives in consultation with their legal and financial advisors. The Monitor believes the Applicants are working diligently and in good faith and continue to progress towards the development of a Plan.

66. The Monitor supports the Applicants' request to have the CFSA and the CRA APA approved by this Honourable Court.

67. The Monitor supports the Applicants' request to have the confidential Appendix "D" to this Thirty-Fifth Report sealed pending further Order of this Honourable Court.

68. The Monitor has reviewed the amounts comprising the $2.0627 NNI Claim, including the Transfer Pricing overpayment and tax issues relating to the $2 billion adjustment. The Monitor supports the Applicants' request to establish the $2.0627 billion NNI Claim, subject to the following priorities upon approval of this Honourable Court:

   a) $2 billion shall be a pre-filing unsecured claim against NNL ranking pari passu with other unsecured pre-filing claims against NNL; and

   b) the Remaining Revolver Claim totalling $62.7 million shall continue to have the benefit of the court-ordered charge in the Canadian Proceedings relating to the Revolving Loan Agreement.

69. Based upon the key assumptions used in the preparation of the Applicants' January 3 Forecast, it is the Monitor's view the Applicants will have sufficient cash resources to fund their operations through April 23, 2010 permitting them to:

   a) make further progress in their efforts to complete and close the sales of the GSM/GSM-R, Metro Ethernet Network, and Carrier Voice Application Solutions businesses; and

   b) pursue the sale of their other businesses or develop alternative restructuring strategies as appropriate.

70. The Monitor supports the Applicants' request:

   a)  to have the thirteenth extension to the GSPA approved by this Honourable Court;

   b) that the period for receipt of hardship applications be extended until and including April 23, 2010 and the eligibility requirements in respect of the Employee Hardship Process as set out in the form attached as Appendix "G" be amended to reflect the Extension Date; and

   c) for approval of the NNI Loan Amendment.

71. For the reasons outlined in this report, the Monitor supports the Applicants' request for an extension of the stay to April 23, 2010.

All of which is respectfully submitted this 18th day of January, 2010.

**ERNST & YOUNG INC.**
**In its capacity as Monitor of the Applicants**

Per:
Murray A. McDonald
President

APPENDIX A

## Nortel Networks
## CCAA Applicants
## Forecast Cash Flow - Variances
USD (Millions)

|  | | Forecast | Actuals | Variances |
|---|---|---|---|---|
| | Start of period | 29-Nov-09 | 29-Nov-09 | 29-Nov-09 |
| | End of period | 02-Jan-10 | 02-Jan-10 | 02-Jan-10 |

### 1 . Receipts & Disbursements

| | Forecast | Actuals | Variances |
|---|---|---|---|
| **Receipts** | | | |
| Collection of Accounts Receivable | 31.8 | 34.6 | 2.8 |
| Other Receipts | 27.4 | 27.4 | - |
| Payroll / Accounts Payable reimbursement from Buyers | 23.5 | 12.6 | (10.8) |
| Intercompany Receipts | 79.9 | 56.6 | (23.3) |
| Intercompany Receipts - Interim Funding Arrangement | - | - | - |
| NNL/NNI Restructuring Loan Advances | - | - | - |
| **Total Receipts** | 162.6 | 131.3 | (31.4) |
| **Disbursements** | | | |
| Payroll (Gross) | 43.5 | 48.0 | (4.5) |
| Benefits | 11.2 | 13.0 | (1.7) |
| Pension | 2.1 | 2.1 | 0.0 |
| Inventory Purchases | 1.7 | 11.7 | (10.0) |
| Non-Inventory Purchases | 82.4 | 102.0 | (19.6) |
| Payroll / Accounts Payable payments on behalf of Buyers | 23.5 | 12.6 | 10.8 |
| Intercompany Disbursements | 31.2 | 13.7 | 17.5 |
| Intercompany Disbursements - Interim Funding Arrangement | - | - | - |
| Restructuring Costs | 3.9 | 3.6 | 0.3 |
| NNL/NNI Restructuring Loan Repayments | - | - | - |
| **Total Disbursements** | 199.6 | 206.8 | (7.3) |
| **Net Cash Flow** | (36.9) | (75.5) | (38.6) |
| FX Impact | - | 1.1 | 1.1 |
| **Opening Available Cash Balance** | 161.6 | 161.6 | - |
| **Closing Available Cash Balance** | 124.6 | 87.1 | (37.5) |
| Unavailable Cash | 8.2 | 8.0 | (0.2) |
| **Total Cash** | 132.8 | 95.2 | (37.7) |
| Restricted Cash | 56.3 | 56.6 | 0.3 |
| **Total Cash + Restricted Cash** | 189.1 | 151.8 | (37.4) |

APPENDIX B

## Nortel Networks - January 3, 2010
### CCAA Applicants
### Forecast Cash Flow
USD (Millions)

*Note: This is a dense, rotated financial schedule. Values are transcribed to the best of legibility; some weekly cell placements are approximate. Printed row totals are reproduced as shown.*

| (Week ending) | 09-Jan-10 | 16-Jan-10 | 23-Jan-10 | 30-Jan-10 | 06-Feb-10 | 13-Feb-10 | 20-Feb-10 | 27-Feb-10 | 06-Mar-10 | 13-Mar-10 | 20-Mar-10 | 27-Mar-10 | 03-Apr-10 | 10-Apr-10 | 17-Apr-10 | 24-Apr-10 | 01-May-10 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **1. Receipts & Disbursements** | | | | | | | | | | | | | | | | | | |
| **Receipts** | | | | | | | | | | | | | | | | | | |
| Collection of Accounts Receivable | 7.2 | 8.9 | 7.0 | 10.3 | 4.4 | 3.6 | 4.4 | 11.3 | 3.4 | 3.4 | 3.4 | 6.0 | 9.0 | 2.5 | 5.0 | 5.0 | 7.6 | 102.5 |
| Other Receipts | | | | | | | | | | | | | | | | | | |
| TSA Receivables from Buyer | | 0.8 | 0.9 | 0.8 | | | | | | | | | 1.7 | 1.7 | | | | 15.0 |
| Payroll & AP reimbursement from Buyers | | 2.8 | 2.8 | 2.8 | 2.8 | 2.8 | 2.8 | 2.8 | 2.8 | 2.8 | 2.8 | 2.8 | 2.8 | 2.8 | 2.8 | 2.8 | 2.8 | 44.8 |
| Intercompany Receipts | | | | 12.0 | | | | | 2.0 | | | | | | 2.0 | | | 16.0 |
| Intercompany Receipts - CFSA | | | | 156.1 | 11.2 | | | | 11.2 | | | | 11.2 | | | | | 191.8 |
| **Total Receipts** | 10.0 | 12.5 | 10.6 | 182.0 | 20.0 | 6.4 | 9.2 | 18.3 | 19.1 | 6.2 | 8.2 | 13.1 | 22.3 | 6.9 | 7.8 | 7.8 | 10.4 | 371.0 |
| **Disbursements** | | | | | | | | | | | | | | | | | | |
| Payroll (Gross) | | 12.0 | | 10.9 | | 19.4 | | 11.3 | | 10.0 | | 11.3 | | 10.0 | | 10.0 | | 86.0 |
| Benefits | | 1.4 | | 4.5 | | 2.1 | | 2.5 | | 1.4 | | 1.4 | | 1.4 | | 1.4 | | 20.7 |
| Pension | | | | 2.1 | | 2.1 | | 2.1 | | | | | | | | | | 6.3 |
| Inventory Purchases | 0.2 | 0.2 | 0.2 | 0.2 | 0.2 | 0.2 | 0.2 | 0.2 | 0.2 | 0.2 | 0.2 | 0.2 | 0.2 | 0.2 | 0.2 | 0.2 | 0.2 | 3.4 |
| Non-Inventory Purchases | 4.9 | 4.3 | 4.9 | 6.6 | 4.9 | 4.9 | 4.9 | 4.9 | 4.9 | 4.9 | 4.9 | 7.2 | 1.9 | 4.9 | 4.9 | 4.9 | 4.9 | 82.7 |
| Payroll & AP payments on behalf of Buyers | | 2.8 | 2.8 | 2.8 | 2.8 | 2.8 | 2.8 | 2.8 | 2.8 | 2.8 | 2.8 | 2.8 | 2.8 | 2.8 | 2.8 | 2.8 | 2.8 | 44.8 |
| Intercompany Disbursements | 0.1 | 0.1 | 0.1 | 16.4 | 0.1 | 0.1 | 0.1 | 16.3 | 0.1 | 0.1 | 0.1 | 16.4 | 1.7 | 0.0 | 0.1 | 0.1 | 0.1 | 49.1 |
| Restructuring Costs | 1.4 | 1.6 | 1.4 | 1.4 | 1.4 | 7.6 | 1.4 | 1.4 | 1.4 | 1.6 | 1.7 | 1.4 | 1.4 | 0.7 | 1.2 | 1.4 | 1.2 | 22.0 |
| **Total Disbursements** | 10.3 | 22.3 | 9.4 | 47.4 | 8.4 | 36.3 | 11.0 | 43.5 | 9.4 | 21.0 | 11.0 | 30.1 | 12.7 | 5.7 | 20.8 | 20.8 | 20.6 | 324.1 |
| **Net Cash Flow** | (0.3) | (9.8) | 1.3 | 134.6 | 10.7 | (29.9) | (1.8) | (25.2) | 9.7 | (14.7) | (2.8) | (17.1) | 9.8 | 1.3 | (13.0) | (11.9) | (10.2) | 46.9 |
| Opening Available Cash Balance | 87.1 | 86.7 | 78.9 | 78.2 | 212.8 | 223.5 | 189.6 | 197.7 | 172.5 | 182.3 | 167.5 | 164.7 | 147.7 | 157.3 | 158.5 | 145.8 | 144.2 | 87.1 |
| Closing Available Cash Balance | 86.7 | 78.9 | 78.2 | 212.8 | 223.5 | 189.6 | 197.7 | 172.5 | 182.3 | 167.5 | 164.7 | 147.7 | 157.3 | 158.5 | 145.8 | 144.2 | 134.0 | 134.0 |
| Unavailable Cash | 8.0 | 8.0 | 8.0 | 8.0 | 8.0 | 8.0 | 8.0 | 8.0 | 8.0 | 8.0 | 8.0 | 8.0 | 8.0 | 8.0 | 8.0 | 8.0 | 8.0 | 8.0 |
| **Total Cash** | 94.7 | 86.9 | 86.2 | 220.8 | 231.5 | 207.6 | 205.7 | 180.5 | 190.2 | 175.5 | 172.7 | 155.7 | 165.2 | 166.5 | 153.8 | 152.2 | 142.0 | 142.0 |
| Restricted Cash | 56.6 | 55.6 | 55.6 | 58.3 | 58.3 | 58.3 | 58.3 | 58.3 | 58.3 | 58.3 | 58.3 | 58.3 | 58.3 | 58.3 | 58.3 | 58.3 | 58.3 | 58.3 |
| **Total Cash + Restricted Cash** | 151.3 | 141.5 | 142.8 | 279.1 | 289.8 | 265.9 | 264.0 | 238.8 | 248.5 | 233.8 | 231.0 | 214.0 | 223.5 | 224.8 | 212.1 | 210.6 | 200.3 | 200.3 |

**APPENDIX "C"**

**[ATTACHED]**

*EXECUTION VERSION*

### FINAL CANADIAN FUNDING AND SETTLEMENT AGREEMENT

This agreement (the "Agreement") is entered into by and among Nortel Networks Limited ("NNL") and the other entities set forth in Schedule 1 attached hereto, the Monitor (as defined herein), and Nortel Networks Inc. ("NNI") and the other entities set forth in Schedule 2 attached hereto. Each entity or individual included in this paragraph is referred to herein individually as a "Party" and collectively as the "Parties".

WHEREAS, on January 14, 2009 (the "Filing Date"), Nortel Networks Corporation ("NNC"), NNL and certain of NNC's other Canadian affiliates included in Schedule 1 (collectively, the "Canadian Debtors," and NNC and its debtor and non-debtor affiliates are sometimes referred to herein as, the "Nortel Group"), commenced creditor protection proceedings before the Ontario Superior Court of Justice (Commercial List) (the "Canadian Court") under the Companies' Creditors Arrangement Act (Canada) (the "Canadian Proceedings"), in connection with which Ernst & Young Inc. was appointed monitor (the "Monitor"); and

WHEREAS, on the Filing Date NNI and certain of NNI's United States affiliates included in Schedule 2 (collectively, the "US Debtors" and, together with the Canadian Debtors and the EMEA Debtors (as defined herein), the "Debtors") filed petitions in the United States Bankruptcy Court for the District of Delaware (the "US Court" and, together with the Canadian Court, the "Courts") under chapter 11 of title 11 of the United States Code (respectively, the "Bankruptcy Code", and the "US Proceedings"); and

WHEREAS, on the Filing Date, Nortel Networks UK Limited ("NNUK"), Nortel Networks (Ireland) Limited ("NNIR"), Nortel Networks S.A. ("NNSA") and certain of NNUK's affiliates in the Europe, Middle East and Africa ("EMEA") region (collectively the "EMEA Debtors"), commenced administration proceedings (the "UK Proceedings" and, together with the Canadian Proceedings, the US Proceedings and any other insolvency proceedings with respect to entities within the Nortel Group, the "Proceedings") before the High Court of Justice in London, England, represented by individuals from Ernst & Young LLP, and, in the case of NNIR only, Ernst & Young Chartered Accountants, serving as administrators in the UK Proceedings; and

WHEREAS, subsequent to the Filing Date, NNSA commenced secondary insolvency proceedings within the meaning of Article 27 of the European Union's·Council Regulation (EC) No 1346/2000 on Insolvency Proceedings in the Republic of France pursuant to which a liquidator and an administrator have been appointed by the Versailles Commercial Court (Docket No. 2009P00492) for NNSA; and

WHEREAS, on July 14, 2009, Nortel Networks (CALA) Inc. ("NN CALA") filed a petition in the US Court under chapter 11 of title 11 of the Bankruptcy Code and became subject to the US Proceedings; and

WHEREAS, prior to the Filing Date, certain members of the Nortel Group made quarterly payments (the "Transfer Pricing Payments") to other Nortel Group entities pursuant to a transfer pricing methodology ("Transfer Pricing") provided for in the Transfer Pricing Agreements, where "Transfer Pricing Agreements" means (i) the Master Research and

Development Agreement dated as of December 22, 2004 (as amended by, and together with the related understandings contained in, the documents listed in <u>Annex A</u> hereto, the "<u>Master R&D Agreement</u>") and (ii) certain distribution agreements, whether written or oral, between one or more Nortel Group entities, including without limitation the agreements listed in <u>Annex B</u> hereto and any other agreements similar to the agreements listed in <u>Annex B</u> hereto (as amended, supplemented or otherwise modified, the "<u>Distribution Agreements</u>"); and

WHEREAS, from the Filing Date until the execution of the IFSA (as defined herein), other than a payment of US $30 million made by NNI to NNL in January 2009 (the "<u>January 2009 Payment</u>") no other Transfer Pricing Payments had been made between or among the Nortel Group entities; and

WHEREAS, on June 9, 2009, the Canadian Debtors, the US Debtors and the EMEA Debtors entered into an Interim Funding and Settlement Agreement dated as of the same date (the "<u>IFSA</u>") pursuant to which, *inter alia*, NNI agreed to pay NNL a total of US $157 million, in addition to the January 2009 Payment, in full and final settlement of the NNI Interim Obligations (as such term is defined in the IFSA) in respect of the period from the Filing Date to September 30, 2009, subject to the terms of the IFSA; and

WHEREAS, NNL and other Canadian Debtors have liquidity constraints; and

WHEREAS, each of the Parties hereto has concluded it is appropriate and in the best interest of each to enter into this Agreement pursuant to which, *inter alia*: (i) NNI, on behalf of itself and the other US Debtors, shall settle any and all claims of the Canadian Debtors for Covered Obligations (as defined herein) during, or with respect to, the Settlement Period (as defined herein), (ii) NNL and NNI have each agreed to enter into certain advance pricing agreements with the CRA and IRS (as each such term is defined herein), as applicable, and (iii) NNL and certain other Canadian Debtors and the Monitor have agreed to acknowledge, defend if necessary, and obtain a Final Order (as defined herein) of the Canadian Court approving and allowing the NNI Claim (as defined herein) in favor of NNI against NNL in the Canadian Proceedings and to waive their rights in all respects to setoff or in any way reduce the NNI Claim in full and final settlement of certain claims of the US Debtors and the Canadian Debtors relating to the period prior to the Filing Date, in all cases subject to the terms of this Agreement; and

WHEREAS, NN CALA was not a party to the IFSA and is not a party to this Agreement, and NNL has reserved all rights it has or could have against NN CALA to recover corporate overhead and research and development costs, whether pursuant to Transfer Pricing Agreements or otherwise, incurred by NNL for the benefit of NN CALA; and

WHEREAS, the Parties intend to continue to meet their respective obligations to make the monthly payments in respect of the inter-company trading of goods and services by Nortel Group entities (the "<u>Inter-Company Trading Payments</u>") pursuant to and during the effectiveness of the group supplier protocol agreements approved in accordance with court orders entered in the Canadian Proceedings and the US Proceedings ("<u>Trading Orders</u>"); and

WHEREAS, the Official Committee of Unsecured Creditors appointed in the US Proceedings (the "<u>Creditors' Committee</u>") and the steering committee members of the ad hoc

2

group of bondholders that have executed confidentiality or non-disclosure agreements with NNL (the "Bondholders' Committee") have each agreed to support this Agreement.

NOW THEREFORE, THE PARTIES HEREBY AGREE THAT:

PART A – NNI FUNDING TO NNL; SETTLEMENT MATTERS

1.  Funding. Subject to the terms of this Agreement, and following the satisfaction in full of each of the Conditions (as defined herein), NNI shall pay to NNL, in accordance with the payment schedule attached as Annex C hereto, an amount equal to US $190.8 million, a portion of which shall be adjusted by the Parties, with the consent of the Creditors' Committee and the Bondholders' Committee, based on good faith negotiations, solely in the circumstances identified in Annex C hereto and, such adjustments shall be calculated using the same methodology as used to calculate the amounts in Annex C and Annex D hereto (the "Settlement Payment"). In consideration of the obligations of the Parties hereunder and except for such adjustments as may be provided in this Agreement, the Settlement Payment shall be paid on an indefeasible and permanent basis. The Settlement Payment and other payments under this Agreement shall not be subject to any actual or purported rights at law, in equity or otherwise, of setoff or reduction (other than as set forth in this Agreement). All payments under this Agreement shall be made in immediately available funds to a bank account specified in writing by the Party receiving such payment, and such notification shall be provided by the receiving Party no later than five (5) Business Days prior to the date such payment becomes due and payable under the terms of this Agreement.

2.  Use of Funds; Reporting.

    a.  NNL has informed NNI, the Creditors' Committee and the Bondholders' Committee, that NNL intends to use the funds from the Settlement Payment for working capital and those other purposes as reflected in the 13 Week CF Forecast (as defined herein) (the "Permitted Uses"). To the extent NNL seeks to use funds from the Settlement Payment for purposes other than the Permitted Uses, NNL must obtain the consent for such uses from NNI, the Creditors' Committee and the Bondholders' Committee.

    b.  NNL and NNI shall continue to provide to the Creditors' Committee and the Bondholders' Committee, on a bi-weekly basis, (i) rolling 13-week cash flow forecasts (each, a "13 Week CF Forecast"), and (ii) reports on actual weekly cash flow results. NNL further agrees to provide, to the extent not already provided in accordance with the foregoing sentence, each of NNI, the Creditors' Committee and the Bondholders' Committee with a cash flow schedule showing payments for the preceding monthly period and the use of proceeds from the Settlement Payment to the extent received by NNL, such schedule to be provided no later than the tenth day following the last day of each month commencing with the cash flow schedule for October 2009 until the consummation of the wind-down of the Canadian Debtors' estates.

3.    Maximum Payment; Full and Final Settlement. Subject to Part B hereof, the Settlement Payment represents (A) the maximum payment that the US Debtors may or could owe in respect of the Covered Obligations for the Settlement Period, (B) the maximum post-filing or administrative claim (or such other applicable priority claim) that any of the Debtors (excluding the US Debtors) may have or could assert against one or more US Debtors in any Proceeding with respect to the Covered Obligations, whether pursuant to Sections 503 and 507 of the Bankruptcy Code or otherwise, and (C) constitutes a full and final settlement of any and all Covered Obligations. For the purposes of this Agreement, "Covered Obligations" means claims for corporate overhead, research and development costs, or such other alleged payment or cost reimbursement obligations under any legal theory or contractual or extra-contractual arrangement including, without limitation, pursuant to Transfer Pricing Agreements, such other agreements between and among the Nortel Group entities or otherwise, incurred by any Canadian Debtor for the benefit of the US Debtors which any Canadian Debtor has asserted or could assert (without admission by the US Debtors and subject to Section 23 of this Agreement) and would have been reimbursed to the Canadian Debtors through payments (including without limitation Transfer Pricing Payments) payable by the US Debtors to the Canadian Debtors during, or with respect to, the period from October 1, 2009 through the later of the conclusion of the Canadian Proceedings or the consummation of the wind-down of the Canadian Debtors' estates (the "Settlement Period").

4.    Indemnity. Each of NNL and the other Canadian Debtors hereby agrees to indemnify, defend and hold harmless each US Debtor from and against any and all actions, suits, claims, proceedings, costs, damages, losses, liabilities, judgments, amounts, taxes, fines, penalties, levies, withholding obligations, compensations paid in settlement (provided (i) NNL, with the prior consent of the Monitor, which consent shall not be unreasonably withheld, has agreed in writing to any such settlement or (ii) such settlement has been approved pursuant to a final order of the applicable Courts), and expenses (including without limitation reasonable attorneys' fees and disbursements) resulting from a claim, demand, lawsuit, action or proceeding relating to, arising from or in connection with matters set forth in (x) Section 1 of this Agreement, (y) the Transfer Pricing Payments for the calculation period in the applicable Transfer Pricing Agreements in respect of the Settlement Period or (z) the Covered Obligations (collectively, the "Indemnifiable Claims"). The Canadian Debtors shall from time to time reserve reasonable amounts from proceeds of Sales Transactions (as defined herein) or IP Transactions (as defined herein) allocated, pursuant to the Interim Sales Protocol (as defined in the IFSA) or as agreed by the Selling Debtors (as such term is defined in the IFSA) in accordance with the IFSA, to the Canadian Debtors to provide for any Indemnifiable Claims, where the amount of such reserves will be mutually agreed by the Canadian Debtors, the US Debtors, the Monitor, the Creditors' Committee and the Bondholders' Committee. For the purposes of this Agreement, "IP Transaction" means any sale or licensing transaction, other than Sales Transactions, involving unassigned patent assets and other intellectual property rights of the Nortel Group.

4

5. <u>Settlement of Claims Between Canadian Debtors and US Debtors.</u> It is expressly understood that Part A of this Agreement is intended to constitute a full and final settlement of all of the matters set forth in Part A of this Agreement (whether arising during, or related to, the Settlement Period) between the Canadian Debtors and the US Debtors.

## PART B – ALLOCATION OF CERTAIN COSTS

6. <u>Allocated Corporate Costs.</u> NNL agrees to use commercially reasonable efforts to recover from Nortel Group entities a portion of the Allocated Corporate Costs (as defined herein) incurred by NNL on behalf of Nortel Group entities globally, which will be allocated to those entities (including both NNL and NNI) that are considered to benefit from such costs and to have the financial ability to pay their respective share of such costs. NNL and NNI each agree that it will initially pay fifty percent (50%) of the aggregate Allocated Corporate Costs, respectively, of the Canadian Debtors and the US Debtors; *provided, however,* that it is understood and agreed by the Parties that such costs, to the extent not recovered from other Nortel Group entities, will ultimately be adjusted and borne by the US Debtors and the Canadian Debtors on the same basis as described in Section 7. NNI's initial share of the Allocated Corporate Costs (before adjustment) is included in the amount of the Settlement Payment as disclosed in <u>Annex C</u> hereto. For the purposes of this Agreement, "<u>Allocated Corporate Costs</u>" means the insurance costs (other than property and casualty insurance) paid by NNL, public company compliance costs, including certain audit and accounting fees and related costs, incurred by NNL for the benefit of the Nortel Group, costs for certain officers and employees of NNL that perform global corporate functions and any other costs mutually agreed by the US Debtors, the Canadian Debtors, the Monitor, the Creditors' Committee and the Bondholders' Committee.

7. <u>Certain Fixed Payments.</u> NNL and NNI each agree that it will initially make fifty percent (50%) of payments set forth in the section titled "Certain Fixed Payments" in <u>Annex D</u> hereto ("<u>Certain Fixed Payments</u>"); *provided, however,* that it is understood and agreed by the Parties that $62.5 million of the Certain Fixed Payments shall be paid solely by NNI and shall not be shared by NNL or any other Nortel Group entity, and such payment shall be made by NNI three (3) Business Days following satisfaction in full of all of the Conditions; *provided, further,* that the remaining Certain Fixed Payments, to the extent not recovered from other Nortel Group entities participating as sellers in the Sale Transactions (as defined herein), will ultimately be adjusted and borne by the US Debtors and the Canadian Debtors on an overall weighted average basis in proportion to the amount of the aggregate proceeds of sale allocated to each of such Debtors from the sale transactions of the following businesses of the Nortel Group (collectively, the "<u>Sale Transactions</u>"):

     i. the sale of substantially all of the CDMA business and LTE Access ("<u>CDMA/LTE Access</u>") assets;

     ii. the sale of the Enterprise Solutions ("<u>ES</u>") business;

5

iii.  the sale of the global Optical Networking and Carrier Ethernet ("MEN")
      businesses;

iv.  the sale of substantially all of the global assets of the GSM/GSM-R
     ("GSM/GSM-R") business;

v.  the sale of Carrier VoIP and Application Solutions ("CVAS") business;

vi.  the sale of the interest in LG Nortel; and

vii.  the sale of the Passport business.

The US Debtors and the Canadian Debtors will from time to time reserve reasonable
amounts to cover such adjustments from proceeds of Sales Transactions or IP
Transactions, allocated pursuant to the Interim Sales Protocol (as defined in the IFSA) or
as agreed by the Selling Debtors in accordance with the IFSA, where the amount of such
reserves will be mutually agreed by the Canadian Debtors, the US Debtors, the Monitor,
the Creditors' Committee and the Bondholders' Committee.  NNI's initial share of the
Certain Fixed Payments is included in the amount of the Settlement Payment as
disclosed in Annex C hereto.

8.    M&A Costs.  The Parties hereby agree, and shall use reasonable best efforts (without
      a requirement to compromise any rights or to incur any liability or obligation in favor
      of the other Selling Debtors other than as contemplated in the foregoing) to cause the
      other relevant Selling Debtors to agree, to the extent permitted by applicable law, that
      the M&A Costs (as defined herein) incurred by the Canadian Debtors or the US
      Debtors shall be treated as transaction costs and will be recovered (and, to the extent
      funds are available, initially funded from the relevant Escrow Account (as such term
      is defined in the IFSA) holding sales proceeds received by the relevant Sales
      Transaction(s)) by such Debtors, on a transaction-by-transaction basis, from the
      respective proceeds of sale from the Sale Transactions prior to any allocation of sale
      proceeds among the relevant Selling Debtors participating in each such transaction.
      For the purposes of this Agreement, "M&A Costs" mean the following costs and
      expenses incurred by the Canadian Debtors or the US Debtors in connection with the
      Sales Transactions and sales of other assets of the Nortel Group:  (a) fees and
      expenses of Lazard Ltd; (b) costs and expenses (including professional fees) to
      prepare carve-out financial statements of the various businesses of the Nortel Group;
      and (c) salaries of the employees of the Nortel Group's corporate merger and
      acquisitions team ("M&A Group") and the cost of other benefits provided to the
      M&A Group, and any expenses incurred by the M&A Group.

## PART C – ADVANCE PRICING AGREEMENTS

9.    Advance Pricing Agreements.

      a.  NNL and the Monitor hereby agree that NNL shall, in a timely manner, enter into
          the Advanced Pricing Agreement, the final execution version of which shall be in
          form and substance acceptable to NNI, the Creditors' Committee and the

6

Bondholders' Committee (the "Canadian APA"), with the Minister of National Revenue, through its authorized representative the Director, Competent Authority Services Division International and Large Business Directorate of the Canada Revenue Agency (the "CRA"), which shall apply to the five taxable years beginning on January 1, 2001 and ending on December 31, 2005 (the "APA Years").

b. NNI hereby agrees that NNI shall, in a timely manner, enter into the Advance Pricing Agreement, the final execution version of which shall be in form and substance acceptable to NNL, the Monitor, the Creditors' Committee and the Bondholders' Committee (the "US APA" and, together with the Canadian APA, the "APAs"), with the United States Internal Revenue Service (the "IRS"), which shall apply to the APA Years.

c. Each of NNL, the Monitor and NNI shall cooperate with each other in finalizing the terms and conditions of the APAs with the CRA and the IRS, as applicable.

## PART D – NNI CLAIM

10. The Parties hereby agree that a pre-filing claim against NNL (the relative priority of which is described below) in the aggregate amount of US $2.0627 billion shall be established in the Canadian Proceedings in favor of NNI (the "NNI Claim") for the full and final settlement of the following claims:

a. any claims of the US Debtors against the Canadian Debtors for overpayments to the Canadian Debtors under the Transfer Pricing Agreements for, or with respect to, the period from January 1, 2001 to December 31, 2005, whether or not resulting from any adjustment of taxable income of the US Debtors as determined by the IRS (such claim, a "NNI TPA Claim");

b. other than as set forth in the last paragraph of this Section 10, any claims of NNI against NNL for amounts due and owing under that certain Revolving Loan Agreement, dated as of March 21, 2008 (the "Revolving Loan Agreement"), by and between NNI and NNL (such claim, a "Revolver Claim"); and

c. any claims of the Canadian Debtors (A) for corporate overhead, research and development costs, or such other alleged payment or cost reimbursement obligations pursuant to Transfer Pricing Agreements or otherwise incurred by any Canadian Debtor for the benefit of the US Debtors which any Canadian Debtor has asserted or could assert (without admission by the US Debtors and subject to Section 23 of this Agreement) and would have been reimbursed to the Canadian Debtors through payments (including without limitation Transfer Pricing Payments) payable by the US Debtors to the Canadian Debtors during, or with respect to, the period prior to the Filing Date or (B) relating to inter-company trading of goods and services during, or with respect to, the period prior to the Filing Date (any such claim under (A) or (B) above, a "Stayed TPA Claim").

7

The priority of the NNI Claim shall be as follows: (A) US $2 billion of the NNI Claim shall be a pre-filing unsecured claim against NNL ranking *pari passu* with other unsecured pre-filing claims against NNL (*provided, however,* that such claim, unlike other unsecured pre-filing claims against NNL, shall not be subject to any setoff or counterclaims) and (B) the remaining US $62.7 million of the NNI Claim shall constitute the remainder of the secured Revolver Claim (the "Remaining Revolver Claim") and shall continue to have the benefit of the court-ordered charge in the Canadian Proceedings relating to the Revolving Loan Agreement.

11.    Court Approval; No Setoff. The Canadian Debtors and the Monitor hereby agree to acknowledge, defend, if necessary, and obtain a Final Order (as defined herein) of the Canadian Court approving and allowing the NNI Claim. Regardless of whether the US Debtors have filed an Additional NNI Claim (as defined herein), the Canadian Debtors and the Monitor hereby irrevocably waive any and all rights that may exist at law, in equity or otherwise to setoff against, assert any counterclaims with respect to the amount or validity of, or otherwise reduce the amount of, the NNI Claim in any way.

12.    Waiver of Pre-petition Claims. Subject to Section 13 below, the Canadian Debtors and the Monitor hereby waive any and all rights that may exist at law, in equity or otherwise to assert any Claims (as defined herein) against the US Debtors relating to the period prior to the Filing Date. For the purpose of this Agreement, the term "Claim" shall have the same meaning as ascribed to it under Section 101(5) of the Bankruptcy Code.

13.    Additional NNI Claims. Notwithstanding any other provision of this Agreement, the Parties hereby agree that NNI and other US Debtors shall retain the right to assert Claims against the Canadian Debtors relating to the period prior to the Filing Date, *provided, however,* that the US Debtors shall have no right to assert any NNI TPA Claim or Revolver Claim (other than the Remaining Revolver Claim) against the Canadian Debtors (such pre-petition Claim but excluding NNI Claim (including Remaining Revolver Claim), NNI TPA Claim or Revolver Claim, an "Additional NNI Claim"). Upon the filing of an Additional NNI Claim in the Canadian Proceedings or subsequent proceedings, the waivers of the Canadian Debtors under Section 12 above shall automatically terminate and shall be of no further force and effect and the Canadian Debtors shall have the right to defend against such Additional NNI Claim, assert counterclaims against the US Debtors in the Canadian Proceedings or subsequent proceedings with regards to such Additional NNI Claim, and assert any additional Claims against the US Debtors in the US Proceedings or subsequent proceedings. For the avoidance of doubt, the filing of one or more Additional NNI Claims by the US Debtors shall in no way affect the obligations and waivers of the Canadian Debtors and the Monitor under Section 11 of this Agreement and such obligations and waivers shall continue to be in full force and effect.

14.    Inter-company Bar Date. The Parties hereby agree that (i) no Canadian Debtor shall establish a deadline for the filing of claims by the US Debtors in the Canadian Proceedings and (ii) no US Debtor shall establish a deadline for the filing of claims

8

by the Canadian Debtors in the US Proceedings, without the prior written consent of all other Parties to this Agreement, the Creditors' Committee and the Bondholders' Committee, which consent shall not be unreasonably withheld or delayed.

## PART E – OTHER SETTLEMENT MATTERS

15.    <u>Cross Border Claims Protocol.</u>  The Canadian Debtors and the US Debtors agree to work with the Monitor, the Creditors' Committee and the Bondholders' Committee to develop and timely seek approval from each of the Courts of a cross-border claims protocol (the "<u>Cross-Border Claims Protocol</u>") and claims resolution procedures for the resolution of claims filed in the Canadian Proceedings and the US Proceedings (collectively, the "<u>Claims Procedures</u>"), each in form and substance acceptable to the Monitor, the Creditors' Committee and the Bondholders' Committee, acting reasonably.  Until such time as both of the Courts have entered orders approving the Cross-Border Claims Protocol and the applicable Claims Procedures, (i) the Monitor and the Canadian Debtors agree that, except as otherwise provided herein, the Monitor and the Canadian Debtors will not seek Canadian Court approval to accept, reject or otherwise compromise (A) any Overlapping Claim, or (B) any claim that may materially impact the US Debtors' estates or recoveries to the US Debtors' creditors without seven (7) days' prior written notice to the US Debtors and the Creditors' Committee, and (ii) the US Debtors agree that, except as otherwise provided herein, the US Debtors will not seek US Court approval to accept, reject or otherwise compromise any Overlapping Claim, where "<u>Overlapping Claim</u>" refers to a Claim or Claims that have been filed in both the Canadian Proceedings and the US Proceedings by the same party or by the same affiliated parties, which Claims arise from the same underlying Claim, property, debt or transaction.

## PART F – PROVISIONS OF GENERAL APPLICATION

16.    <u>Scope of this Agreement.</u>  The Parties hereto agree that:

    a.    except as expressly provided herein, this Agreement is not, and shall not be deemed to be, an acknowledgement by any Party of the assumption, ratification, adoption or rejection of the Transfer Pricing Agreements or any other Transfer Pricing methodology employed by the Nortel Group or its individual members for any purpose nor shall it be determinative of, or have any impact whatsoever on, the allocation of proceeds to any Debtor from any IP Transaction; and

    b.    except as expressly provided herein, this Agreement shall not serve as the basis for any claim by any Party against any other Party in respect of Transfer Pricing or any other theory of cost reimbursement in respect of any period prior to or after the Settlement Period, or allocation of any sale proceeds, or any ownership of intellectual property; and

    c.    each Party approves all payments to be made pursuant to this Agreement and all other matters contemplated hereby, to the extent that such Party is a creditor of the Party making such payment; and

d.  except as expressly provided herein, this Agreement is without prejudice to any provision of the Master R&D Agreement; and

e.  this Agreement is without prejudice to any Party's claims relating to Inter-Company Trading Payments pursuant to the Trading Orders, and Covered Obligations shall not include any Party's claims relating to Inter-Company Trading Payments pursuant to the Trading Orders.

17.  Effectiveness.

a.  No provision of this Agreement or the obligations herein of the Parties (other than as set forth in Section 17.d. of this Agreement) shall be effective until the satisfaction of all of the following conditions (each, a "Condition" and, collectively, the "Conditions"):

  i.  the Canadian Court has entered orders, the form and substance of which are acceptable to NNI, the Creditors' Committee and Bondholders' Committee:

     (A) approving the entirety of this Agreement and all provisions hereof;

     (B) authorizing NNL to enter into the Canadian APA and to take all actions necessary to comply with its obligations thereunder, including the establishment of the Account Payable (as defined herein);

     (C) allowing the NNI Claim with the priorities as set forth in Section 10 of this Agreement and declaring that the Canadian Debtors, and the Monitor, have waived their rights at law, in equity or otherwise to setoff against or in any way reduce the NNI Claim, and that the NNI Claim and such waiver shall bind any trustee, receiver or similar individual appointed in any subsequent proceedings of the Canadian Debtors;

     (D) confirming that the Account Payable and the NNI Claim shall not have the benefit of any of the Charges (as such term is defined in the Initial Order, dated January 14, 2009, of the Canadian Court issued in the Canadian Proceedings, as the same may be amended and restated from time to time (the "Initial Order")) except to the extent set forth in the last paragraph of Section 10 and Section 22.ii. of this Agreement; and

     (E) approving an one-year extension of the Amended and Restated Revolving Loan Agreement dated March 27, 2009 among Nortel Networks Ltd., Nortel Networks Inc. and Nortel Networks Technology Corporation (the "NNI Loan") through December 31, 2010 (the "NNI Loan Extension").

10

  ii. the US Court has entered orders, the form and substance of which are acceptable to the Creditors' Committee, Bondholders' Committee, the Monitor and NNL:

    (A) approving the entirety of this Agreement and all provisions hereof;

    (B) authorizing NNI to enter into the US APA and to take all actions necessary to comply with its obligations thereunder;

    (C) approving a stipulation resolving and allowing the claims of the IRS against the US Debtors in the US Proceedings, in an amount acceptable to the Creditors' Committee and the Bondholders' Committee; and

    (D) approving the NNI Loan Extension.

  iii. the orders of the Canadian Court and US Court in respect of Section 17.a.i. and Section 17.a.ii. shall have each become a Final Order, where "Final Order" means the order has been approved and entered by the Canadian Court and/or US Court, as applicable, and is no longer subject to appeal, writ of certiorari, reargument, rehearing, motion to vary or set aside or, in the event that a timely appeal has been noticed, or a timely writ of certiorari, reargument or rehearing, or a motion to vary or set aside has been sought with regard to such order, then the order has been affirmed by the highest court to which the order was appealed and the time to take any further appeal, to petition for writ of certiorari or to move for reargument, rehearing, or to vary or set aside has expired.

  iv. NNL shall have entered into the Canadian APA with the CRA;

  v. NNI shall have entered into the US APA with the IRS; and

  vi. the Account Payable shall have been established by NNL.

b. Upon satisfaction of the Conditions, all provisions of this Agreement shall be effective as of the date of the satisfaction of the last Condition.

c. Each Party hereto shall:

  i. use commercially reasonable efforts to satisfy the Conditions as soon as possible, taking into account the availability of the respective Courts to address the matters set forth in this Agreement (without prejudice to the generality of the foregoing, in the case of the Monitor, the Monitor agrees to prepare and file with the Canadian Court in advance of a hearing on this Agreement a report describing and supporting the Agreement);

  ii. keep all other Parties, the Creditors' Committee and the Bondholders' Committee reasonably apprised of the progress of the satisfaction of the

11

Conditions and provide such other information regarding the satisfaction of the Conditions as reasonably requested by other Parties; and

    iii.   use commercially reasonable efforts to allow any other Party, the Creditors' Committee or the Bondholders' Committee which so requests in writing reasonable participation in connection with any proceedings in any Court related to the satisfaction of the Conditions.

d.  Notwithstanding any of the foregoing, the following provisions of this Agreement shall be effective as of the date hereof: Sections 9.c., 17.c., 17.d., 17.e., 18, 19, 20, 22(iii)(A), 23, 24, 25 and 30.

e.  No Condition may be waived by the Parties without the express written consent of the Creditors' Committee and the Bondholders' Committee.

18.    <u>Amendments; Waiver</u>. This Agreement may be amended and a term hereunder may be waived, on no less than ten (10) Business Days' notice, only by means of a writing signed by all Parties, and approved in writing by the Creditors' Committee and the Bondholders' Committee, which amendments or waivers, if material in the judgment of the Parties, the Creditors' Committee and the Bondholders' Committee must be approved by both Courts. For the purpose of this Section 18, "<u>Business Day</u>" shall mean a day that is not a Saturday, Sunday or national public holiday in Canada or the United States.

19.    <u>Governing Law and Jurisdiction</u>.

a.  This Agreement shall be governed exclusively by the laws of the State of New York without regard to the rules of conflict of laws of the State of New York or any other jurisdiction.

b.  To the fullest extent permitted by applicable law, each Party (i) agrees to submit to the non-exclusive jurisdiction of the US and Canadian Courts (in a joint hearing conducted under the cross-border protocol previously approved by the US Court and the Canadian Court (as the same may be in effect from time to time, the "<u>Cross-Border Protocol</u>")), for purposes of all legal proceedings to the extent relating to the matters agreed in this Agreement (but not, for the avoidance of doubt, any Transfer Pricing Agreement matter generally), (ii) agrees that any claim, action or proceeding by such Party seeking any relief whatsoever to the extent relating to the matters agreed in this Agreement must be commenced in the US Court if such claim, action or proceeding would solely affect the US Debtors, the Canadian Court if such claim, action or proceeding would solely affect the Canadian Debtors, or a joint hearing of both the Canadian and US Courts conducted under the Cross-Border Protocol if such claim, action or proceeding would affect the Canadian Debtors and the US Debtors, (iii) waives and agrees not to assert any objection that it may now or hereafter have to the laying of the venue of any such action brought in such a Court or any claim that any such action brought in such a Court has been brought in an inconvenient forum, (iv)

12

agrees that mailing of process or other papers in connection with any such action or proceeding or any other manner as may be permitted by law shall be valid and sufficient service thereof, and (v) agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by applicable law.

20. Creditors' Committee and Bondholders' Committee Support.

    a. Written confirmation has been received from the Creditors' Committee confirming that the members of the Creditors' Committee have granted permission to its advisors to file appropriate materials with the applicable Courts in support of the motions by the US Debtors and the Canadian Debtors for Court approval of this Agreement.

    b. Written confirmation has been received from the counsel to the Bondholders' Committee confirming that the Bondholders' Committee has granted permission to its advisors to file appropriate materials with the applicable Courts in support of the motions by the US Debtors and the Canadian Debtors for Court approval of this Agreement.

21. Representations and Warranties.  Subject to satisfaction of the Conditions, each Party hereby severally represents and warrants to each other that, as of the date hereof:

    i. it has the power and authority to enter into this Agreement and to carry out its obligations hereunder;

    ii. the execution of this Agreement, and the consummation of the transactions contemplated herein, have been authorized by all necessary approvals, and no other act or proceeding on its part is necessary to authorize the execution of this Agreement; and

    iii. this Agreement has been duly executed by it and constitutes its legal, valid and binding obligations.

22. Covenants.  The Parties hereby agree that:

    i. The Canadian Debtors and the Monitor will use reasonable best efforts to obtain as promptly as practicable an order in the Canadian Proceedings that provides for the reduction in the amount of the Directors & Officers Charge (as such term is defined in the Initial Order), and the amount of such reduction shall be mutually agreed by NNL, the Monitor and the board of directors of NNL; *provided, however,* that nothing in this Agreement shall obligate the board of directors of NNL to agree to any such reduction;

    ii. Upon satisfaction in full of each of the Conditions, (A) NNL and the Monitor shall jointly deliver to NNI a written acknowledgement of the establishment of an irrevocable non-interest bearing intercompany

13

account payable due unconditionally and owing to NNI in the aggregate amount of US $2.0627 billion (the "Account Payable"), and (B) promptly, and in any event no later than ten (10) days, following the satisfaction in full of each of the Conditions, NNL shall execute and deliver to NNI (I) a non-interest bearing, pre-filing, unsecured promissory note in favor of NNI in an aggregate principal amount of US $2 billion evidencing the $2 billion unsecured portion of the Account Payable, and (II) a non-interest bearing, pre-filing promissory note in favor of NNI in an aggregate principal amount of US $62.7 million evidencing the remaining portion of the Account Payable, which shall continue to have the benefit of the court-ordered charge relating to the Revolving Loan Agreement as set forth in the last paragraph of Section 10 of this Agreement, in each case in form and substance satisfactory to NNI, the Creditors' Committee, the Bondholders' Committee and the Monitor, and which notes shall not be transferable except (x) to a liquidation trust established in connection with the US Proceedings of one or more US Debtors, (y) transferred in connection with a plan of re-organization or (z) transferred otherwise with the consent of NNL, the Monitor, the Creditors' Committee and the Bondholders' Committee to a third party; and

iii. NNL and NNI agree to amend the NNI Loan to (A) extend the term of the NNI Loan from December 31, 2009 to March 31, 2010 (which amendment shall be effective as of the date hereof) and (B) further extend the term of the NNI Loan to December 31, 2010, *provided, however,* that the extension to December 31, 2010 shall be effective only upon receipt of approval of such extension by the Courts.

23. <u>Reservation of Rights</u>. Except as expressly provided for in this Agreement, nothing in this Agreement shall constitute an amendment, modification or waiver of rights of any Party (i) under any other agreement, including, without limitation, the Transfer Pricing Agreements (except as expressly set forth in this Agreement), applicable law or otherwise, including, without limitation, the right to object to the propriety of any payments made under or in connection with the Transfer Pricing Agreements or any offset arising therefrom or otherwise (including, without limitation, any rights NNL may have against any other Nortel Group entity that is not a Party hereto to recover payments made under or in connection with the Transfer Pricing Agreements or for any offset arising therefrom or otherwise by reason of the compensating adjustments required by the terms of the APAs) or (ii) with respect to any potential tax contingencies, assessments, rulings or agreements arising from Transfer Pricing Payments pursuant to the Transfer Pricing Agreements or any offset arising therefrom or otherwise; *provided, however,* that the Parties waive any and all rights to object to or otherwise seek to amend or revisit (A) any payments made pursuant to this Agreement, (B) the APAs, (C) the allowance in full of the NNI Claim (including the Remaining Revolver Claim) in the Canadian Proceedings or (D) the waiver by the Canadian Debtors and the Monitor of their rights to setoff or in any way reduce the amount of the NNI Claim (including the Remaining Revolver Claim). The use of the term Transfer Pricing Payment (or any similar term) or reference to the Transfer

14

Pricing Agreements (or similar agreement) in this Agreement is for convenience only and shall have no evidentiary effect or be used by any of the Parties hereto in any proceeding to determine the pre-petition or post-petition validity, applicability, assumption, affirmation or ratification by any Party of the Transfer Pricing Agreements or any transfer pricing methodology provided in the Transfer Pricing Agreements. Nothing in this Agreement shall bar, prohibit or in any way hinder the rights of the Parties to this Agreement to present any arguments, methodologies, legal or factual theories in support of a proposed allocation of the proceeds of any Sale Transaction or IP Transaction, and such presentation shall not, or otherwise be deemed to, constitute in any way a filing of an Additional NNI Claim or violation of the Canadian Debtors' obligations under Section 12 of this Agreement.

24.    Third-Party Beneficiaries. Nothing in this Agreement, whether express or implied, is intended to confer any rights or remedies under or by reason of this Agreement on any persons other than the Parties and their respective successors and assigns, nor is anything in this Agreement intended to relieve or discharge the obligation or liability of any third parties to the Parties, nor shall any provision give any third persons any right of subrogation or action against any party to this Agreement, nor shall any provision estop or otherwise limit the rights of the Parties to assert any claims, counterclaims or defenses against any third party; *provided, however,* that the Creditors' Committee (as a statutory fiduciary body appointed in the US Proceedings) and the Bondholders' Committee shall each be a third-party beneficiary of this Agreement entitled to enforce and take advantage of the benefits of this Agreement to their fullest extent as if it were a signatory hereto.

25.    Counterparts. This Agreement may be executed in separate counterparts (which may include counterparts delivered by facsimile transmission) and all of said counterparts taken together shall be deemed to be an original and shall be binding on the Party who signed the counterpart and all of which together shall constitute a single agreement.

26.    Severability. In the event that any provision of this Agreement shall be illegal, invalid or unenforceable, such provision shall be construed by limiting it in such a way so as to render it legal, valid and enforceable to the maximum extent provided by applicable law, and the legality, validity and enforceability of the remaining provisions shall not in any way be affected or impaired by any illegality, invalidity or unenforceability of any provision. The Parties shall negotiate in good faith with respect to any provision to this Agreement found to be illegal, invalid or unenforceable, in order to agree, with the consent of the Parties, the Creditors' Committee and the Bondholders' Committee, on a substitute provision giving effect, to the maximum extent possible, to the original intent of such provision. Notwithstanding any other provision set forth in this Section 26, in the event that all or any part of Section 17 of this Agreement shall be found pursuant to a Final Order of a court with competent jurisdiction to be illegal, invalid or unenforceable, or any part of Section 17 is in any way struck or modified without the consent of the Parties, the Creditors' Committee and the Bondholders' Committee, this Agreement in its entirety shall automatically terminate and shall cease to have any force and effect.

15

27.   <u>Several Obligations</u>. Except as specifically set forth in this Agreement, the obligations of each Party hereunder are several, and not joint and several.

28.   <u>Master R&D Agreement Standstill</u>. Neither the Canadian Debtors nor the US Debtors will exercise a right of termination under the Master R&D Agreement without the prior written consent of the other Parties to the Agreement, the Creditors' Committee and the Bondholders' Committee.

29.   <u>IFSA and Part A of this Agreement</u>. The Parties agree that the sum of the Total Payment (as defined in the IFSA), the January Payment (as defined in the IFSA) and the Settlement Payment constitutes a full and final settlement of NNI Interim Obligations (as defined in the IFSA) and the Covered Obligations for the period after the Filing Date through the later of the conclusion of the Canadian Proceedings or the consummation of the wind-down of the Canadian Debtors' estates.

30.   <u>Notices</u>. All demands, notices, communications and reports provided for in this Agreement shall be in writing and shall be either sent by facsimile transmission with confirmation to the number specified below, or personally delivered or sent by reputable overnight courier service (delivery charges prepaid) to any Party at the address specified below, or at such address, to the attention of such other person, and with such other copy, as the recipient Party has specified by prior written notice to the sending Party pursuant to the provisions of this Section 30.

**If to the US Debtors:**
c/o Nortel Networks Inc.
Attention: John Ray
             Principal Officer
Address: 2221 Lakeside Boulevard
             Richardson, Texas 75082
             U.S.A.
Facsimile No.: + 1 866 315 3498
Telephone No.: +1 972 684 2470

**With a copy to:**
Cleary Gottlieb Steen & Hamilton LLP
Attention: James L. Bromley, Esq.
Address: One Liberty Plaza
             New York, New York 10006
             U.S.A.
Facsimile No.: +1 212 225 3999
Telephone No.: +1 212 225 2264

**If to the Canadian Debtors:**
c/o Nortel Networks Limited
Attention: Anna Ventresca, Esq.
             Chief Legal Officer
             Address: 5945 Airport Road
             Suite 360
             Mississauga, Ontario L4V 1R9
             Canada
Facsimile No.: +1 905 863 2075
Telephone No.: +1 905 863 1204

**With a copy to:**
Ogilvy Renault LLP
Attention: Derrick Tay, Esq. and Michael J. Lang, Esq
Address: Suite 3800
             Royal Bank Plaza, South Tower
             200 Bay Street, P.O. Box 84
             Toronto, Ontario M5J 2Z4
             Canada
Facsimile No.: +1 416 216 4832 / 216 3930
Telephone No.: +1 416 216 4832 / 216 3939

**If to the Monitor:**
c/o Ernst & Young, Inc.
Attention: Murray A. McDonald
Address: Ernst & Young Tower
             222 Bay Street, P.O. Box 251
             Toronto, ON M5K 1J7
             Canada

**With a copy to:**
Goodmans LLP
Attention: Jay Carfagnini, Esq.
Address: 250 Yonge Street, Suite 2400
             Toronto, Ontario M5B 2M6
             Canada
Facsimile No.: +1 416 979 1234

Facsimile No.: +1 416 943 3300
Telephone No.: +1 416 943 3016

Telephone No.: +1 416 597 4107

**If to the Creditors' Committee:**
c/o Akin Gump Strauss Hauer & Feld LLP
Attention: Fred S. Hodara, Esq.
Address: One Bryant Park
       New York, New York 10036
       U.S.A.
Facsimile No.: +1 212 872 1002
Telephone No.: +1 212 872 8040

**If to the Bondholders' Committee:**
c/o Milbank, Tweed, Hadley & McCloy LLP
Attention: Albert A. Pisa, Esq.
Address: One Chase Manhattan Plaza
       New York, New York 10005-1413
       U.S.A.
Facsimile No.: +1 212 822 5319
Telephone No.: +1 212 530 5319

Any such demand, notice, communication or report shall be deemed to have been given pursuant to this Agreement when delivered personally, when confirmed if by facsimile transmission, or on the second calendar day after deposit with a reputable overnight courier service, as applicable.

IN WITNESS WHEREOF, the Parties hereto have caused this Agreement to be duly executed and delivered as of this 23rd day of December, 2009.

ERNST & YOUNG INC.
SOLELY IN ITS CAPACITY AS
MONITOR

By _____
    Name: Murray McDonald
    Title: President

NORTEL NETWORKS CORPORATION

By _____
    Name:
    Title:

By _____
    Name:
    Title:

NORTEL NETWORKS LIMITED

By _____
    Name:
    Title:

By _____
    Name:
    Title:

Signature page to Final Canadian Funding and Settlement Agreement