IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: <br><br> NORTEL NETWORKS INC., <u>et al.</u>,[1] <br><br> Debtors. | Chapter 11 <br><br> Case No. 09-10138 (KG) <br><br> Jointly Administered <br><br> Hearing date: January 21, 2010, at 11:00 a.m.[2] <br> Re: Docket No. 2205 |

**OBJECTION OF NORTEL NETWORKS UK LTD. AND THE EMEA DEBTORS
TO NNI'S MOTION PURSUANT TO 11 U.S.C. § 105(a), § 363, § 503 AND FED. R.
BANKR. P. 9019 FOR AN ORDER (A) APPROVING THE CANADIAN FUNDING AND
SETTLEMENT AGREEMENT, AND (B) GRANTING RELATED RELIEF**

Alan Robert Bloom, Christopher John Wilkinson Hill, Alan Michael Hudson, and Stephen John Harris, in their capacity as UK Administrators and Foreign Representatives for Nortel Networks UK Limited ("<u>NNUK</u>") and as UK Administrators for the EMEA Debtors (as defined below) except in respect of Nortel Networks (Ireland) Limited ("<u>NNIR</u>") for whom the UK Administrators are David Martin Hughes and Alan Robert Bloom in proceedings before the High Court of Justice, Chancery Division, England and Wales (the "<u>UK Court</u>"), (collectively, the "<u>UK Administrators</u>"), respectfully submit the following objections (the "<u>Objection</u>") to the motion by Nortel Networks, Inc. ("<u>NNI</u>") and certain of its affiliates, as debtors and debtors in possession, (collectively, the "<u>US Debtors</u>") for an order approving the Canadian Funding and Settlement Agreement and granting related relief [D.I. 2205] (the "<u>US Debtors' Motion</u>"):

**BACKGROUND**

1. Most of the relevant background is set forth in Paragraphs 1 through 26 of the US Debtors' Motion, which are incorporated herein by reference.

---

[1] The Debtors in these Chapter 11 cases are: Nortel Networks Inc., Nortel Networks Capital Corporation, Alteon WebSystems, Inc., Alteon WebSystems International, Inc., Xros, Inc., Sonoma Systems, Qtera Corporation, CoreTek, Inc., Nortel Networks Applications Management Solutions Inc., Nortel Networks Optical Components Inc., Nortel Networks HPOCS Inc., Architel Systems (U.S.) Corporation, Nortel Networks International Inc., Northern Telecom International Inc. and Nortel Networks Cable Solutions Inc.

[2] The US Debtors agreed to extend the date for filing and serving the Objection until noon on January 20, 2010.

2.  On January 14, 2009 (the "Petition Date"), the US Debtors filed voluntary petitions for relief under Chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 ("Bankruptcy Code"), and have thereafter continued to operate their businesses as debtors in possession pursuant to 11 U.S.C. §§ 1107 and 1108.  On the Petition Date, NNI's ultimate corporate parent, Nortel Networks Corporation ("NNC"), NNI's direct corporate parent Nortel Networks Limited ("NNL") and certain of their Canadian affiliates (the "Canadian Debtors") filed an application with the Ontario Superior Court of Justice (Commercial List) under the Companies' Creditors Arrangement Act, seeking relief from creditors (the "Canadian Proceedings").  The Canadian Proceedings have been recognized by this Court as foreign main proceedings pursuant to Chapter 15 of the Bankruptcy Code.

3.  Also on the Petition Date, nineteen of the US Debtors' European affiliates, including NNUK (the "EMEA Debtors"), commenced administration proceedings (the "UK Proceedings") under the Insolvency Act of 1986 before the UK Court, whereby the UK Administrators were appointed.  The UK Proceedings have been recognized by this Court as foreign main proceedings pursuant to Chapter 15 of the Bankruptcy Code.

4.  The US Debtors, the Canadian Debtors and the EMEA Debtors (collectively, the "Nortel Entities") operated on an integrated basis across multiple jurisdictions.  For additional background information on the corporate structure and business of the Nortel Entities and the EMEA Debtors, the UK Administrators respectfully refer the Court to the *Verified Petition for Recognition of Foreign Proceedings Pursuant to Chapter 15 of the United States Bankruptcy Code*, annexed hereto as Exhibit A.  A brief summary follows.

5.  In order to allow the Nortel group to operate on a global basis and to allocate profits, losses and certain costs across the corporate entities, several Nortel Entities entered into separate bilateral distribution agreements with NNL (the "Distribution Agreements").

2

Additionally, and for the same purposes, NNL, NNI, NNUK, NNIR, Nortel Networks S.A. ("NNSA") and other affiliates (who are no longer parties to the agreement) (the "Participating Nortel Entities") entered into the Master Research and Development Agreement, dated December 22, 2004 (as amended from time to time, the "Master R&D Agreement", a copy of which is attached hereto as Exhibit B). The Distribution Agreements and the Master R&D Agreement together with the documents and agreements listed in Annex A and Annex B of the Interim Funding and Settlement Agreement, entered into between certain Nortel entities, on or about June 9, 2009 and approved by this Court on June 29, 2009 (the "IFSA") form the "Transfer Pricing Agreements."

6. In broad terms, the purpose of the Transfer Pricing Agreements was to compensate the Nortel Entities for expenses related to their research and development activities and their production of intellectual property ("R&D Activity"). The Master R&D Agreement expressly provides that the allocation of residual profits and losses among Nortel Entities according to their relative R&D expenditures was an "acknowledge[ment of] the fact that the key profit driver in the Nortel business is the development and maintenance of rapidly depreciating intellectual property." (Master R&D Agreement at 15, Schedule A.) In addition, the Master R&D Agreement provides that the method of residual profit and loss allocation set forth in that agreement

> reflects the fact that the Participa[ting Nortel Entities] bear the full entrepreneurial risk of the Nortel business, such as the risks attendant with the substantial and continuous development and ownership of the [Nortel Networks] Technology. Mathematically, the [method of residual profit and loss allocation] accords the Participa[ting Nortel Entities] all the upside risk in the Nortel business as well as the downside risk.

(Master R&D Agreement at 13, Schedule A.)

7. The Master R&D Agreement also provides that "NNL agrees to administer this Agreement and the determinations under the RPSM as contemplated in this Agreement with

3

respect to its interests and the interests of the Participa[ting Nortel Entities] and in particular to compute the amount of any R&D Allocation to, and payment due from, each Participa[ting Nortel Entity] on a periodic basis….Any payment to, and payment from, a Participa[ting Nortel Entity] will be reflected in the inter-company accounts of the affected Participa[ting Nortel Entity] as a payable or a receivable ….." (Master R&D Agreement at 5, Art. 3(d).)  With respect to seeking payments from the participating Nortel entities, the Master R& D Agreement provides that "[a]ny amount owing by a Participant under this Agreement will be due and payable immediately upon written notice of its R&D Allocation from NNL." (Master R&D Agreement at 6, Art. 3(g).)

8.   Prior to filing for bankruptcy protection, the Nortel Entities transferred substantial sums among themselves not only pursuant to the Transfer Pricing Agreements, but also pursuant to many other agreements which they entered into individually so as to facilitate intra-group trading.

9.   To ensure that this intra-group trading continued and so as to allow the Nortel group to undergo a business and financial restructuring, on January 14, 2009 two Group Supplier Protocol Agreements were entered into in respect of post administration intra-group trading of goods and services (together the "GSPAs").  The GSPAs were entered into between NNL (and certain other Canadian entities) and each of the EMEA Debtors and separately between NNI (and certain other US entities) and each of the EMEA Debtors.  The GSPAs are otherwise in identical terms.

10.   The GSPAs, as periodically extended, enable each of the EMEA Debtors (party to the GSPAs) to continue to trade with NNI (and certain other US entities) and NNL (and certain other Canadian entities) in the ordinary course on the basis that goods and services provided post

4

administration would be paid for in full. The definition of "Goods and Services" in the GSPAs makes specific reference to the Master R&D Agreement.

11. As such, the Nortel Entities that have contributed the most to R&D Activity have continued to trade on the basis of the GSPA during the post-petition period. As a result the EMEA Debtors have continued to incur trading losses (which for some of these entities includes expenditure on R&D Activity) in the expectation that they will recoup a significant proportion of such losses by operation of the Transfer Pricing Agreements as protected by the GSPAs.

12. Following lengthy, difficult, and good faith negotiations, the parties entered into the IFSA, on or about June 9, 2009, which the Court approved on June 29, 2009. The IFSA essentially provided partial funding of NNL by NNI, in settlement of claims that NNL had made against NNI for amounts due under the Transfer Pricing Agreements for the period since the Filing Date through until September 30, 2009, while NNL obtained sufficient liquidity to continue the process of selling its assets. The IFSA also provided for the settlement of the amounts due under the Transfer Pricing Agreements for the period since the Filing Date through until December 31, 2009 owed to NNUK. The amounts due to NNUK was settled first by way of self-settlement amongst the EMEA Debtors and second by two shortfall payments from NNL to bridge some of the gap between the amount actually owed to NNUK under the Transfer Pricing Agreements and the amount to be paid by the EMEA Debtors through self-settlement (the "Shortfall Payments").

13. Critically, these matters were addressed in a multilateral way such that the parties to the IFSA included all the Participating Nortel Entities under the Master R&D Agreement.

14. The IFSA takes pains to preserve the Nortel Entities' pre and post-filing claims against each other under the Transfer Pricing Agreements as well as their other agreements. For example, Section 10 of the IFSA provides:

> The Parties hereto agree that: . . . this Agreement is not, and shall not be deemed to be . . . determinative of, or have any impact whatsoever on, the allocation of proceeds to any Debtor from any sale of assets of the Nortel Group; and . . . this Agreement shall not have any effect on any claims as to amounts owed or purported to be owed to or by any Party . . . except [with respect to payments] specifically provided herein . . . .

(Interim Funding and Settlement Agreement, executed June 9, 2009, annexed hereto as <u>Exhibit C</u>.)

15. Although the IFSA provides for the refund of certain amounts paid by NNI to NNL in excess of amounts provided in a March 2009 forecast, and also provides for the Shortfall Payments, the IFSA ensures the continued liquidity of NNL by providing that both the refunds and the Shortfall Payments would be postponed if such payments would materially and adversely affect the liquidity position of NNL, based on certain forecasts prepared by NNL.

## **OBJECTIONS**

16. The UK Administrators object to the Canadian Funding and Settlement Agreement (the "<u>CFA</u>") because, as written, its terms are subject to interpretation in a way that may be prejudicial to the EMEA Debtors and to the equitable administration of the proceedings concerning EMEA Debtors in this Court, as well as in Canada, England and Wales and the local courts of non-English EMEA Debtors.

17. The UK Administrators first raised their Objection on the CFA with the US Debtors by letter from Herbert Smith LLP dated January 12, 2010 (annexed hereto as <u>Exhibit D</u>). To date, none of the UK Administrators information requests or points of clarification sought in this letter have been addressed.

18. For the avoidance of doubt, nothing in this Objection should be taken as the EMEA Debtors challenging the validity, or undermining the operation, of the Transfer Pricing Agreements, and in particular the Master R&D Agreement.

A. **The CFA would prejudice the interests of the EMEA Debtors because it purports to affect the claims and interests of entities that were not parties to that Agreement.**

19. The CFA, as written, could be construed to regulate the claims and interests of entities that are not parties to the Agreement.

20. The US Debtors and the Canadian Debtors negotiated and completed the CFA without the consultation or participation of NNUK or the EMEA Debtors. Nevertheless, the third paragraph on page 1 of the CFA defines the "Debtors" bound by the agreement to include NNUK and the EMEA Debtors, and the Agreement purports to bind all "Debtors" to its terms. In particular, Section 3 of the CFA provides, inter alia, that "the Settlement Payment represents . . . the maximum post-filing or administrative claim (or such other applicable priority claim) that any of the "Debtors" (excluding the US Debtors) may have or could assert against one or more US Debtors in any proceeding with respect to the Covered Obligations . . . ." (Final Canadian Funding and Settlement Agreement, executed Dec. 23, 2009, annexed as Exhibit B to the US Debtors' Motion, at 4.) Read literally, this would prejudice the EMEA Debtors' right to bring any claim against one or more of the U.S. Debtors.

21. In order to address this failing, any Order approving the CFA should provide that:

> Nothing in this Order or the CFA shall be construed or operate to amend, modify, vary or change the rights or obligations of any entity or person that is not a party to the CFA (each, a "Non-Party") under any contract that a Non-Party has entered into with any party to the CFA, including (without limitation) any of the Transfer Pricing Agreements, the IFSA and the US GSPA.

B. **The CFA would prejudice the interests of the EMEA Debtors because it could seal off the US Debtors from direct or indirect claims by the EMEA Debtors.**

22. The CFA attempts to seal off the US Debtors' property from all further claims by any other Debtors not party to the Agreement and, thus, prejudices the legitimate interests of the EMEA Debtors as potential pre- and post-petition creditors of the US Debtors' estate. It seeks to do this in one of two ways. First, in respect of post filing claims Section 3 of the CFA

specifically attempts to prevent Debtors who were not party to the CFA—including the EMEA Debtors—from asserting claims against the US Debtors for any "corporate overhead, research and development costs . . . under any legal theory or contractual or extra-contractual arrangement," whether under the Transfer Pricing Agreements or otherwise. Second, in respect of pre filing claims, Section 12 of the CFA provides that the Canadian Debtors "waive any and all rights that may exist at law, in equity or otherwise to assert any Claims (as defined herein) against the US Debtors relating to the period prior to the Filing Date."

23. These provisions would prejudice rights of the EMEA Debtors that are protected under the Nortel Entities' prior agreements.

24. The CFA could frustrate not only the EMEA Debtors' direct claims against the US estate, but also their indirect claims. It may come to pass that the EMEA Debtors will have claims against the Canadian estate under, for example, the Transfer Pricing Agreements, but that the Canadian estate will only be able to satisfy these claims by seeking payments from the US Debtors under those same Agreements. As noted above, the Transfer Pricing Agreements contemplated that all Transfer Pricing claims would be resolved among the companies simultaneously, on "a periodic basis," and that NNL would be required to administer that process by seeking payment from each Nortel entity for any sums it owes, for distribution to other Nortel entities that are owed equalizing payments. (Master R&D Agreement at 5 (Art. 3(d), 15–16 (Schedule A).) In addition, through the continued operation of the Master R&D Agreement, the Participating Nortel Entities continue to share the upside and downside risks in the Nortel business together pursuant to the Master R&D Agreement, notwithstanding their filing for bankruptcy protection. The CFA would short circuit that process by restricting the assertion of any claims by NNL against the US Debtors for sums owed to other parties under the CFA. Although it is theoretically possible that the proposed lump-sum payments to be made from the

specifically attempts to prevent Debtors who were not party to the CFA—including the EMEA Debtors—from asserting claims against the US Debtors for any "corporate overhead, research and development costs . . . under any legal theory or contractual or extra-contractual arrangement," whether under the Transfer Pricing Agreements or otherwise. Second, in respect of pre filing claims, Section 12 of the CFA provides that the Canadian Debtors "waive any and all rights that may exist at law, in equity or otherwise to assert any Claims (as defined herein) against the US Debtors relating to the period prior to the Filing Date."

23. These provisions would prejudice rights of the EMEA Debtors that are protected under the Nortel Entities' prior agreements.

24. The CFA could frustrate not only the EMEA Debtors' direct claims against the US estate, but also their indirect claims. It may come to pass that the EMEA Debtors will have claims against the Canadian estate under, for example, the Transfer Pricing Agreements, but that the Canadian estate will only be able to satisfy these claims by seeking payments from the US Debtors under those same Agreements. As noted above, the Transfer Pricing Agreements contemplated that all Transfer Pricing claims would be resolved among the companies simultaneously, on "a periodic basis," and that NNL would be required to administer that process by seeking payment from each Nortel entity for any sums it owes, for distribution to other Nortel entities that are owed equalizing payments. (Master R&D Agreement at 5 (Art. 3(d), 15–16 (Schedule A).) In addition, through the continued operation of the Master R&D Agreement, the Participating Nortel Entities continue to share the upside and downside risks in the Nortel business together pursuant to the Master R&D Agreement, notwithstanding their filing for bankruptcy protection. The CFA would short circuit that process by restricting the assertion of any claims by NNL against the US Debtors for sums owed to other parties under the CFA. Although it is theoretically possible that the proposed lump-sum payments to be made from the

US Debtors to the Canadian Debtors under the CFA equitably incorporate all such future claims by other Debtors, that possibility seems exceedingly unlikely.

25. In any event, it is impossible to judge whether the US and Canadian Debtors have reached a settlement that equitably takes into account all future claims by the EMEA Debtors under the Transfer Pricing Agreements given the lack of accounting or explanation of the methodology that the US and Canadian Debtors used to reach their settlement amounts. Any agreement among two of the Debtors' estates should allow the third estate to obtain the funds that it is owed from whichever of the other estates has the funds.

26. In order to address these failings, any Order approving the CFA should provide:

> 8. Nothing in this Order or the CFA shall be construed or operate to amend, modify, vary or change any of the Transfer Pricing Agreements, the IFSA or the US GSPA or in any way affect any one or more of the EMEA Debtors' rights or obligations under these agreements.
>
> 9. Nothing in this Order or the CFA shall be construed to operate to amend, modify, vary or change the rights or obligations of any entity or person that is not a party to the CFA (each, a "Non-Party") under any contract that a Non-Party has entered into with any party to the CFA, including (without limitation) any of the Transfer Pricing Agreements, the IFSA and the US GSPA.
>
> 10. For greater certainty and without limitation to paragraphs (8) and (9) above:
>
> (i) the CFA, including without limitation Section 3 of the CFA, shall not be held or otherwise used or interpreted in any way to affect the ability of any one or more of the EMEA Debtors to assert, prove or otherwise enforce any claim any one or more of the EMEA Debtors may have against any one or more of the Canadian Debtors or US Debtors including, without limitation, claims pursuant to the Transfer Pricing Agreement; and
>
> (ii) should any one or more of the EMEA Debtors have a right under the Transfer Pricing Agreements or the IFSA to direct or otherwise obligate any one or more of the Canadian Debtors to assert claims against any one or more of the US Debtors (including, without limitation) for the payment of certain amounts under the Transfer Pricing Agreements or the IFSA which are owed to any one or more of the EMEA Debtors, the CFA shall not prevent, preclude or otherwise hinder any one or more of the

Canadian Debtors' ability to do so and to recover such payments for the benefit of the EMEA Debtors.

C. **The CFA may prejudice NNUK's rights regarding Shortfall Payments under the IFSA.**

27. The CFA may prejudice NNUK's rights regarding Shortfall Payments under the IFSA. The IFSA conditioned NNL's payment of the Shortfall Payments on NNL's liquidity. However, the CFA imposes a new obligation on NNL that has the potential to strain NNL's liquidity in a way never conceived by the Debtors when they entered into the IFSA.

28. Section 4 of the CFA provides that the Canadian Debtors will

> indemnify, defend and hold harmless each US Debtor from and against all actions, suits, claims, proceedings, costs, damages, losses, liabilities, judgments, . . . taxes fines . . . compensations paid in settlement . . . and expenses (including without limitation reasonable attorneys' fees and disbursements) resulting from a claim, demand, lawsuit, action or proceeding arising from or in connection to" corporate overhead, research and development costs or "other alleged payment or cost reimbursement obligations under any legal theory or contractual or extra-contractual arrangement . . . .

(Final Canadian Funding and Settlement Agreement, executed Dec. 23, 2009, annexed as Exhibit B to the US Debtors' Motion, at 4.) Thus, under the CFA the Canadian Debtors would be obliged to fund the defense of any future claims or lawsuits by any other Nortel Entities against any of the US Debtors, including not simply the claims under the Transfer Pricing Agreements, but potentially other looming claims regarding other amounts owed by and among those Entities. The EMEA Debtors could be substantially prejudiced by the Canadian Debtors' assumption of this new liability. Further, the provision that requires the setting aside of reserves for such liability could postpone and prejudice NNUK's right to Shortfall Payments for the indefinite future.

29. In order to address this failing, any Order approving the CFA should provide that:

> Any and all reserves taken by the Canadian Debtors pursuant to Section 4 of the CFA shall not be taken into account when determining NNL's

10

> liquidity position pursuant to the NNL Liquidity Review Procedures as set out in Section 5 of the IFSA.

D. **The CFA would prejudice the interests of the EMEA Debtors by purporting to amend the IFSA without the requisite approvals, including the approval of the EMEA Debtors.**

30. The CFA purports to amend the IFSA without the approvals of the parties and the courts explicitly required by the IFSA. Section 29 of the CFA states that its provisions constitute a "full and final settlement" of certain obligations memorialized in the IFSA. This bilateral "settlement" by two of the parties to the multilateral IFSA functions as an amendment of the IFSA. The IFSA expressly provides that it may only be amended by means of a writing signed by all Parties and approved by all Courts that initially approved or gave directions concerning the Agreement, including the UK Court. The US and Canadian Debtors should not be allowed to circumvent the procedural safeguards in the IFSA that were meant to curtail such attempts to alter that agreement.

31. In order to address this failing, any Order approving the CFA should provide that:

> Section 29 of the CFA shall not be effective unless the IFSA is amended to reflect the agreement set out in Section 29 of the CFA in accordance with the terms regarding amendments as set out in the IFSA.

E. **The CFA would prejudice the interests of the EMEA Debtors by approving the NNI Claim and potentially creating a new claim on the part of NNL against the EMEA Debtors without factual or analytical justification.**

32. The $2.0627 Billion claim to be allowed in favor of NNI against NNL (the "NNI Claim") may hinder the EMEA Debtors' potential claims on both the US and the Canadian estates without any factual or analytical justification for that claim's superiority, enforceability or content. Section 10 of the CFA provides that a $2.0627 Billion claim will be allowed against NNL in the Canadian proceedings in favor of NNI, and that this allowance constitutes a settlement of "any claims of the US Debtors against the Canadian Debtors for overpayments to the Canadian Debtors under the Transfer Pricing Agreements," as well as other cost

11

reimbursement obligations. The US and Canadian Debtors have made no other substantive disclosure concerning the factual and legal bases on which the Canadian Debtors decided to allow the NNI Claim. The CFA is essentially silent as to whether and to what extent the claims that it purports to settle are real and valid. Furthermore, the CFA appears to be silent as to whether the Canadian Debtors may seek recourse against the EMEA Debtors in order to recoup the two-billion-dollar allowance. For the avoidance of doubt, the EMEA Debtors do not accept that there has been any overpayment under the Transfer Pricing Agreements.

33. The US and Canadian Debtors should not, in fairness, be permitted to obtain Court approval of a bilateral "settlement" of a third party's claim against one of the estates, as they have with the NNI Claim, when that settlement will potentially impact a multitude of claims of parties that were never present at the bargaining table.

34. The Canadian Debtors' waiver of claims against the US Debtors would create an imbalance of power that would undermine the establishment of a legitimate and orderly intercompany claims process. Section 12 of the CFA provides that the Canadian Debtors waive any and all rights to assert claims, as that term is defined in section 101(5) of the Bankruptcy Code, against the US Debtors "relating to the period prior to the Filing Date." Thus, the CFA simultaneously insulates the US estate from any claims against it by the Canadian Debtors during the formal claims process but leaves the US Debtors free to make additional claims for themselves during that process. At the same time, the CFA creates a windfall for the US estate by allowing the NNI Claim prior to the initiation of the formal claims process. The combination of these provisions creates an extraordinary lack of parity between the US Debtors and all other Debtors.

35. In circumstances where there are these prejudicial consequences and where no factual detail, justification or rationale has, despite request, as to the NNI Claim, the US and

Canadian Debtors should not be able to discharge their evidential burden to have the Court approve the NNI Claim.

36. However, if the US and Canadian Debtors are able to discharge their evidential burden, the Order approving the CFA and the NNI Claim should provide that that approval does not unfairly prejudice the EMEA Debtors by providing (in addition to the requested additional paragraphs to the Order set out in paragraph 26 above):

> 11. Nothing in the CFA, this Order or in this Order's approval of the CFA or the NNI Claim shall be construed or operate to take away or preclude or in any way affect the right of any EMEA Debtor to dispute or defend against any claim that may be asserted against such EMEA Debtor arising out of or resulting from the NNI Claim;

> 12. Nothing in the CFA, this Order or in this Order's approval of the CFA or the NNI Claim shall be considered in any way to be an adjudication of or comment (positive or negative) on the validity or merit of any claim by the IRS or the CRA as against any one or more of the Canadian Debtors and US Debtors or against any other party.

### CONCLUSION

37. Accordingly, for all the foregoing reasons, the UK Administrators respectfully request that the Court when entering an order in respect of the CFA include within that order the following new paragraphs:

> 8. Nothing in this Order or the CFA shall be construed or operate to amend, modify, vary or change any of the Transfer Pricing Agreements, the IFSA or the US GSPA or in any way affect any one or more of the EMEA Debtors' rights or obligations under these agreements.

> 9. Nothing in this Order or the CFA shall be construed to operate to amend, modify, vary or change the rights or obligations of any entity or person that is not a party to the CFA (each, a "<u>Non-Party</u>") under any contract that a Non-Party has entered into with any party to the CFA, including (without limitation) any of the Transfer Pricing Agreements, the IFSA and the US GSPA.

> 10. For greater certainty and without limitation to paragraphs (8) and (9) above:

(i) the CFA, including without limitation Section 3 of the CFA, shall not be held or otherwise used or interpreted in any way to affect the ability of any one or more of the EMEA Debtors to assert, prove or otherwise enforce any claim any one or more of the EMEA Debtors may have against any one or more of the Canadian Debtors or US Debtors including, without limitation, claims pursuant to the Transfer Pricing Agreement; and

(ii) should any one or more of the EMEA Debtors have a right under the Transfer Pricing Agreements or the IFSA to direct or otherwise obligate any one or more of the Canadian Debtors to assert claims against any one or more of the US Debtors (including, without limitation) for the payment of certain amounts under the Transfer Pricing Agreements or the IFSA which are owed to any one or more of the EMEA Debtors, the CFA shall not prevent, preclude or otherwise hinder any one or more of the Canadian Debtors' ability to do so and to recover such payments for the benefit of the EMEA Debtors.

11. Nothing in the CFA, this Order or in this Order's approval of the CFA or the NNI Claim shall be construed or operate to take away or preclude or in any way affect the right of any EMEA Debtor to dispute or defend against any claim that may be asserted against such EMEA Debtor arising out of or resulting from the NNI Claim;

12. Nothing in the CFA, this Order or in this Order's approval of the CFA or the NNI Claim shall be considered in any way to be an adjudication of or comment (positive or negative) on the validity or merit of any claim by the IRS or the CRA as against any one or more of the Canadian Debtors and US Debtors or against any other party;

13. Any and all reserves taken by the Canadian Debtors pursuant to Section 4 of the CFA shall not be taken into account when determining NNL's liquidity position pursuant to the NNL Liquidity Review Procedures as set out in Section 5 of the IFSA.

14. Section 29 of the CFA shall not be effective unless the IFSA is amended to reflect the agreement set out in Section 29 of the CFA in accordance with the terms regarding amendments as set out in the IFSA.

38. For the avoidance of doubt, and for all of the foregoing reasons, the EMEA Debtors are not consenting to the entering into of the CFA, given, in particular, that no substantive disclosure concerning the factual and legal bases upon which the Parties have entered into the CFA has been disclosed, the UK Administrators are not in a position to satisfy

themselves as to the appropriateness of the matters addressed therein. In this regard, the EMEA Debtors' rights are fully reserved.

| | |
|---|---|
| Dated: Wilmington, Delaware<br>January 20, 2010 | **YOUNG CONAWAY STARGATT & TAYLOR, LLP**<br><br> /s/ Edwin J. Harron<br>James L. Patton (No. 2202)<br>Edwin J. Harron (No. 3396)<br>The Brandywine Building<br>1000 West Street, 17th Floor<br>Wilmington, Delaware 19801<br>Telephone: (302) 571-6600<br>Facsimile: (302) 571-1253<br><br>- and -<br><br>**HUGHES HUBBARD**<br>Michael Luskin<br>Derek J.T. Adler<br>One Battery Park Plaza<br>New York, New York 10004<br>Telephone: (212) 837-6000<br>Facsimile: (212) 422-4726<br>E-Mail:  luskin@hugheshubbard.com<br>            adler@hugheshubbard.com<br><br>Counsel for Alan Robert Bloom, Christopher John Wilkinson Hill, Alan Michael Hudson, and Steven John Harris in their Capacity as UK Administrators and Foreign Representatives for Nortel Networks UK Limited |