**EXHIBIT B**

# MASTER R&D AGREEMENT

Agreement made and entered into on December 22, 2004, confirming and formalizing the operating arrangements of the Participants at and from January 1, 2001 (the "Effective Date").

BY AND BETWEEN:

> **NORTEL NETWORKS LTD.**, a corporation duly incorporated under the laws of Canada, having its executive offices at 8200 Dixie Road, Suite 100, Brampton, Ontario, Canada L6T 5P6 ("NNL")

AND:

> **NORTEL NETWORKS INC.**, a corporation duly incorporated under the laws of the State of Delaware, having its head office at 4001 East Chapel Hill Nelson Hwy Research Triangle Park, NC 27709 United States of America (including predecessor corporations in interest)

AND:

> **NORTEL NETWORKS UK LIMITED**, an entity duly formed under the laws of the United Kingdom having its head office at Maidenhead Office Park, Westacott Way, Maidenhead, Berkshire, United Kingdom, SL6 3QH

AND:

> **NORTEL NETWORKS, S.A.**, an entity duly formed under the laws of France having its head office at Parc d'Activites de Magny-Chateaufort, Chateaufort Cedex 9, France, 78928

AND:

> **NORTEL NETWORKS AUSTRALIA**, an entity duly formed under the laws of Australia having its head office at Level 5, 495 Victoria Avenue, Chatswood, New South Wales, Australia, 2067

AND:

> **NORTEL NETWORKS IRELAND**, an entity duly formed under the laws of the Republic of Ireland having its

WO 328838.3

head office at Mervue Business Park, Mervue. Galway. Republic of Ireland

(referred to individually as "Participant" or collectively, as "Participants")

WHEREAS legal title to all NN Technology is held in the name of NNL;

WHEREAS each Licensed Participant held and enjoyed equitable and beneficial ownership of certain exclusive rights under NT Technology for a Specified Territory pursuant to the Amended Research and Development Cost Sharing Agreement entered into on January 1, 1992, and it is the intent of NNL and the Licensed Participants that the Licensed Participants continue, as of the effective date of this Agreement, to hold and enjoy such rights;

WHEREAS each Participant bears the full entrepreneurial risks and benefits for the Nortel Networks business;

WHEREAS each Participant has performed, in the past, and intends to continue to perform R&D Activity with respect to the Nortel Products;

WHEREAS each Participant desires to avoid the duplication of R&D Activity;

WHEREAS each Participant believes that it is appropriate that each Participant should benefit from its contribution to R&D activity commensurate with the value of its contribution to that R&D activity in the context of the manner in which the Nortel Networks business is conducted and that the residual profit split methodology (RPSM) is the best arm's length measure, in the circumstances of NNL and the Participants, of such contributions with reference to such benefits;

WHEREAS this Agreement reflects the Participants' intent and agreement since January 1, 2001 to enter a license arrangement with the Licensed Participants, and the Participants have operated from January 1, 2001 in accordance with the terms set forth herein;

WHEREAS Participants acknowledge that as a result of a collective review by the Canadian Customs and Revenue Agency, the US Internal Revenue Service, and the UK Inland Revenue (collectively, the "Revenue Authorities") regarding the application of the RPSM, the calculation of the RPSM as set forth in Schedule A may be amended which amendments would require the consent of the Participants;

NOW, THEREFORE, in consideration of the premises and of the mutual covenants of the parties hereto, it is hereby agreed as follows:

## Article 1 - Definitions

As used herein:

(a)  "**Affiliate**" shall be defined as any Person,

    (1)  more than fifty percent (50%) of whose voting shares or outstanding capital stock is owned or controlled (directly or indirectly) by a Party;

    (2)  which owns or controls (directly or indirectly) more than fifty percent (50%) of the voting shares or outstanding capital stock of a Party; or

    (3)  more than fifty percent (50%) of whose voting shares or outstanding capital stock is owned or controlled (directly or indirectly) by an Affiliate (as defined herein) of a Party;

provided, however, such corporation, company or entity shall be deemed to be an Affiliate for purposes of this Agreement only so long as such ownership or control exists.

(b)  "**Admission Eligibility Requirements**" with respect to any NNL Affiliate shall mean an Affiliate that has a level of research and development spending for the three (3) year period prior to the year of admission that exceeds the Threshold Level. The Threshold Level of research and development spending will be determined by mutual agreement of the Participants to this Agreement at the time of consideration for admission of any party.

(c)  "**Eligible Party**" shall mean any Affiliate of NNL provided such Affiliate meets the Admission Eligibility Requirements for admission as a Participant to this Agreement and fully pays any Special Balancing Payment to NNL prior to the effective date of its admission.

(d)  "**Eligible Participant**" shall mean any Participant that is not a party to the Advance Pricing Agreement establishing the transfer price for the R&D Activity provided herein.

(e)  "**Licensed Participant**" shall mean a Participant other than NNL and "**Licensed Participants**" shall mean all Participants other than NNL.

(f)  "**NN Technology**" shall mean, any and all intangible assets including but not limited to patents, industrial designs, copyrights and applications thereof, derivative works, technical know-how, drawings, reports, practices, specifications, designs, software and other documentation or information produced or conceived as a result of research and development by, or for, any of the Participants, but excluding trademarks and any associated goodwill.

(g)    "**Products**" shall mean all products, software and services designed, developed, manufactured or marketed, or proposed to be designed, developed, manufactured or marketed, at any time by, or for, any of the Participants, and all components, parts, sub-assemblies, features, software associated with or incorporated in any of the foregoing, and all improvements, upgrades, updates, enhancements or other derivatives associated with or incorporated in any of the foregoing.

(h)    "**R&D Activity**" shall mean all research and development activity (determined in accordance with US GAAP) performed by, or for, any Participant including, without limitation, development of Products and methods, processes, procedures and tools related to manufacturing, installation, operation, interoperability, maintenance and use of Products.

(i)    "**RPSM**" shall mean the transfer pricing methodology which establishes the fair market value of the compensation to be received by each Participant for its R&D Activity and shall have the meaning defined in Schedule A.

(j)    "**Retirement Allocation**" shall mean an amount mutually determined by NNL and any retiring Participant that represents the fair market value (at the time of retirement) of the Exclusive License provided in Article 5 and any prior License to the NN Technology granted by NNL to such retiring Participant, all rights to which are surrendered by such Participant effective on the date of retirement from this Agreement.

(k)    "**Special Balancing Payment**" shall mean an amount mutually determined by NNL and an Eligible Party to represent the fair market value for an Exclusive License from NNL as provided in Article 5 with respect to NN Technology existing at the time of admission.

(l)    "**Territory**" shall mean with respect to a Licensed Participant, the designated geographic area specified in Schedule B for that Licensed Participant. With respect to NNL, "**Territory**" shall mean the entire world except those geographic areas designated to each of the Licensed Participants in Schedule B.

## Article 2 – Performance of R&D Activity

(a)    Each Participant hereby agrees to use it best efforts to perform R&D Activity at a level consistent with past practices and the ongoing needs of the Nortel Networks business for its respective Territory.

(b)    Each Participant agrees to account for the R&D Activity by disclosing or otherwise making available to each of the other Participants the relevant results, studies etc. resulting from such R&D Activity.

WO 328838.3                                4

(c)    All costs incurred directly or indirectly by each Participant for R&D Activity shall be borne exclusively by it. Any reimbursement for costs including any other compensation shall be provided to such Participant for its R&D Activity solely as provided in Article 3 below.

<u>Article 3 –R&D Activity Payments</u>

(a)    For and as a consequence of the performance of R&D Activity, each Participant shall be entitled to receive a payment in an amount equal to the allocation determined under the RPSM (the "R&D Allocation") as the measure of the benefit to which it is entitled commensurate with its performance of, and contribution to, R&D Activity.

(b)    Each Participant hereby accepts and agrees to make the payment determined under the RPSM in Schedule A as representing such Participant's share of the R&D Allocation.

(c)    The R&D Allocation will be computed pursuant Schedule A which sets forth the basis of the RPSM as originally proposed to the Revenue Authorities. The Participants understand that the RPSM is the subject of review, discussions and negotiations with the Revenue Authorities. The Participants agree to amend this Agreement and to adjust the RPSM to the extent necessary to reflect any negotiated determination with the Revenue Authorities as to the final R&D Allocation.

(d)    NNL agrees to administer this Agreement and the determinations under the RPSM as contemplated in this Agreement with respect to its interest and the interests of the Participants, and in particular, to compute the amount of any R&D Allocation to, and payment due from, each Participant on a periodic basis. Each Participant will be supplied with a copy of the calculations required under the RPSM as set forth in Schedule A. Any payment to, and payment from, a Participant will be reflected in the inter-company accounts of the affected Participant as a payable or a receivable, whatever the case may be and may be netted pursuant to the standard NNL practice for managing inter-company accounts.

(e)    Each Participant and NNL, in its capacity as described in (d) above, agree to keep clear and accurate records to support the calculations under the RPSM as set forth in Schedule A. Each Participant and NNL, in its capacity as described in (d) above, shall provide to each other, upon request in such form as may reasonably be requested, documentation with respect to the foregoing. Each Participant shall have the right to examine and audit, during normal business hours all such records and accounts as may under recognized accounting practices contain information bearing upon the amounts payable under this Article 3. Prompt adjustment shall be made by the appropriate Participant in order to correct any errors or omissions disclosed by an examination or audit.

(f)      Any amount owing by a Participant under this Agreement shall be due and payable in U.S. dollars or equivalent.

(g)      Any amount owing by a Participant under this Agreement will be due and payable immediately upon written notice of its R&D Allocation from NNL. Any amount owed by a Participant that is paid after 90 days after notice of its R&D Allocation from NNL will accrue interest at the short-term applicable federal rate (as determined from time-to-time under section 1274(d) of the U. S. Internal Revenue Code of 1986) for such period commencing with the 91st day after NNL notice of payment until the date that the overdue amount is paid.

## Article 4 – Legal Title to NN Technology

(a)      Except as otherwise specifically agreed, legal title to any and all NN Technology whether now in existence or acquired or developed pursuant to the terms of this Agreement shall be vested in NNL. In consideration therefor, NNL agrees to enter into an Exclusive License with each of the Licensed Participants as set forth in Article 5.

(b)      Each Licensed Participant shall execute or cause to be executed such documents reasonably requested by NNL as may be necessary or desirable to give effect to, or perfect the foregoing. For purposes of Article 4, copyrighted works included in NN Technology pursuant to this Agreement shall be considered a "work made for hire" for copyright law purposes as applicable in the relevant jurisdiction.

(c)      Each Licensed Participant shall, from time to time, promptly upon receipt of NNL request and at NNL's expense, furnish to NNL all available and requested documentation relating to the NN Technology developed by, or for, such Licensed Participant.

(d)      With respect to patentable inventions and copyrightable property encompassed by NN Technology whether in existence at the Effective Date or acquired subsequent to the Effective Date by any Participant pursuant to this Agreement, NNL shall have the exclusive right but not the obligation to file and prosecute the applications in its name for patents, copyrights, mask works, industrial designs, and all other registered forms of intellectual property encompassed by such NN Technology in every country of the world.

(e)      Licensed Participants have the right to assert actions and recover damages or other remedies in their respective Territories for infringement or misappropriation of NN Technology by others.

## Article 5 - Grant of Exclusive Licenses by NNL

(a)      To the extent of its legal right to do so, and subject to the rights of relevant third parties, NNL hereby continues to grant to each Licensed Participant an exclusive, royalty-free license, including (i) the right to sublicense, which except as hereinafter

provided shall be in perpetuity, (ii) rights to make, have made, use, lease, license, offer to sell, and sell Products using or embodying NN Technology in and for the Territory designated for that Licensed Participant, and (iii) all rights to patents, industrial designs (or equivalent) and copyrights, and applications therefor, and technical know-how, as necessary or appropriate in connection therewith ("Exclusive License").

(b)     NNL shall, from time to time, promptly upon receipt of a Licensed Participant's request, and at such Licensed Participant's expense, furnish all available and requested documentation and other information relating to the NN Technology.

(c)     The rights granted under this Article shall not relieve any Participant from its obligations in respect of royalty payments to third parties.

### Article 6 – Confidential Information

(a)     The Licensed Participants acknowledge that the NN Technology is proprietary and constitutes a trade secret. Each Licensed Participant shall hold the NN Technology in confidence and only make use of, or disclose it, as permitted by this Agreement.

(b)     During the full term of this Agreement and thereafter for a period of ten (10) years or so long as it remains secret (whichever is longer), each Licensed Participant shall hold secret and not disclose, make known, divulge or communicate to any person (except to such Licensed Participant's employees and permitted licensees and then only under an obligation of secrecy binding upon such employees and licensees) any of the NN Technology.

(c)     Copies or translations of NN Technology made, or permitted to be made in the exercise of a Participant's rights granted pursuant to this Agreement, shall upon reproduction by such Participant contain the same proprietary or confidentiality notices or legends which appear on the NN Technology made available to Participant under this Agreement.

(d)     Notwithstanding the foregoing, each Participant shall have the right:

(i)     to communicate relevant portions of the NN Technology to suppliers in all countries of the world reasonably necessary for, and solely for, the procurement by such Participant of commercially available materials and parts for use in the manufacture and/or installation of the Products; and

(ii)    to communicate to customers purchasing the Products, such portions of the NN Technology as are reasonably needed by such customers for operating and maintaining the Products; and

    (iii)    to communicate to third persons licensing rights to use NN Technology, such portions of the NN Technology as are reasonably needed by such licensees in accordance with the applicable license agreement negotiated;

provided, however, that the recipients of the NN Technology be advised by each Participant, in writing, at the time, or before such communication, that proprietary information is being communicated and that such information is to be kept confidential and not used except as permitted hereunder, and provided further, that such recipients undertake, in writing, prior to disclosure, to respect such confidentiality.

    (e)    The provisions of this Agreement concerning confidentiality shall survive the expiration or termination of this Agreement, but in no event shall such provisions apply to the extent that:

    (i)    NN Technology was independently supplied to any Participant by a third party prior to the effective date of this Agreement without access to NN Technology; or

    (ii)    NN Technology becomes known or readily ascertainable by the general public through no fault of a Participant.

## Article 7 - Liability

    (a)    No Participant makes any representation with respect to, and does not warrant any R&D Activity provided hereunder or any NN Technology provided to NNL, but shall furnish such in good faith to the best of its knowledge and ability. Without restricting the generality of the foregoing, no Participant makes any representation or warranty as to whether or not use of the NN Technology supplied hereunder to NNL or the R&D Activity provided hereunder will infringe any patent or other rights of any other person.

    (b)    Each Licensed Participant shall indemnify and hold harmless NNL from any and all claims and liabilities for damages, losses, expenses or costs (including counsel fees and expenses) arising in its Territory with respect to NN Technology.

## Article 8 – Force Majeure

No Participant shall be in default or liable for any loss or damage resulting from delays in performance of, or from failure to perform or comply with terms of this Agreement due to any causes beyond its reasonable control, which causes include but are not limited to Acts of God or the public enemy; riots and insurrection, war, accidents, fire, strikes and other labour difficulties (whether or not the Participant is in a position to concede to such demands), embargoes, judicial action; lack of or inability to obtain export permits or approvals, necessary labour, materials, energy, components or machinery; acts of civil or military authorities.

## Article 9 – Duration and Continuing Rights and Obligations

(a)    This Agreement shall be effective from January 1, 2001 until December 31, 2004, provided however that this Agreement will automatically renew for additional and unlimited one-year terms until terminated by the mutual written consent of all Participants.

(b)    Upon the expiry or termination of this Agreement as provided herein, each Licensed Participant shall be deemed to have acquired a fully paid up license permitting it to continue to exercise the rights granted to it herein, and, in particular, the rights granted to it in Article 5 as though this Agreement had continued.

(c)    The provisions of Article 4 (Legal Title to NN Technology) with respect to NN Technology acquired or developed pursuant to this Agreement from the Effective Date of this Agreement up to and including its expiry or termination date, Article 6 (relating to confidentiality) and Article 7 (relating to liability) shall survive notwithstanding the expiry of this Agreement, or any termination of this Agreement for any cause whatsoever.

(d)    Upon the expiry or termination of this Agreement, all payments accruing under Article 3 for periods prior to such expiry or termination shall become immediately due and payable, and the obligation to pay any outstanding amounts required by Article 3 shall survive notwithstanding the expiry or termination of this Agreement, or any termination of this Agreement for any cause whatsoever.

## Article 10 - Admission of New Participants

(a)    Upon the written request to NNL, an Eligible Party may be admitted as a signatory to this Agreement thereby becoming a Participant to this Agreement provided there is unanimous consent of the Participants existing at the time of the requested admission. Such Eligible Party's admission may be evidenced as an addendum to this Agreement provided however that the Eligible Party agrees to all the terms and conditions of this Agreement (as amended from time-to-time).

(b)    Upon admission, the New Participant will become a Licensed Participant for the NN Technology in a Territory as amended to Schedule B. Accordingly, NNL will grant the New Participant an Exclusive License pursuant to Article 5.

## Article 11 - Retirement of Participants

(a)    Eligible Participants may elect to withdraw from participation in this Agreement (Elective Retirement) effective at the end of any calendar year subsequent to such election, provided however that the retiring Participant provides written notice of its intent to retire to NNL at least 6 months prior to the proposed effective date.

(b)    On the occurrence of a Defaulting Event, a Participant (or solely an Eligible Participant in the case of a Defaulting Event under (c)(i)) will automatically be terminated from participation in this Agreement (Forced Retirement).

(c)    A Defaulting Event will occur if any of the following provisions apply:

(i)    In the event any Eligible Participant fails to perform any R&D Activity for each of the two previous years,

(ii)    In the event any Participant loses its status as an Affiliate of NNL,

(iii)    In the event any Participant shall be in breach of this Agreement or fail to perform one or more of its material obligations under this Agreement, any other Participant may, by written notice to the Participant in default, require the remedy of the breach or the performance of the obligation and, the defaulting Participant so notified fails to remedy or perform within sixty (60) days of the forwarding of a notice so to do, or

(iv)    In the event that any one of the Participants becomes insolvent or is the object of bankruptcy or insolvency proceedings, or makes an assignment for the benefit of its creditors, or is placed in receivership or liquidation, or a substantial part of the assets of a Participant. or a controlling interest in the stock of a Participant, is expropriated, seized, or required to be transferred to, or into the control of, a third party, pursuant to a judicial, administrative or other governmental order or decision.

(d)    In the event of an Elective or a Forced Retirement, a retiring Participant's rights in the NN Technology will terminate and any and all NNL Exclusive Licenses with such Participant with respect to the NN Technology will be cancelled as of the effective date of such Participant's retirement, and in consideration therefor, such retiring Participant shall be entitled to a Retirement Allocation from NNL. Any payment due from such retiring Participant pursuant to this Agreement will become immediately payable as of the effective date of retirement and may be offset, in part or in whole, against the Retirement Allocation due from NNL.

(e)    The obligations of a retiring Participant under Article 4 (Legal Title to NN Technology) acquired or developed by such retiring Participant pursuant to this Agreement from the Effective Date of this Agreement up to and including such retiring Participant's retirement date, Article 6 (relating to confidentiality) and of Article 7 (relating to liability) of this Agreement shall survive notwithstanding the retirement of a Participant for any cause whatsoever.

### Article 12 - Notices

(a)    Any and all notices or other information to be given by one of the Participants to the other shall be deemed sufficiently given when forwarded by prepaid registered or certified first class air mail or by facsimile transmission or hand delivery to the other Party at the following address:

If to:

> Nortel Networks Ltd.
> 8200 Dixie Road, Suite 100
> Brampton, Ontario
> Canada L6T 5P6
>
> Attention: Secretary

If to:

> Nortel Networks Inc.
> 4001 East Chapel Hill Nelson Hwy
> Research Triangle Park, NC 27709
> United States of America
>
> Attention: Secretary

If to:

> Nortel Networks UK Limited
> Maidenhead Office Park,
> Westacott Way, Maidenhead,
> Berkshire, United Kingdom, SL6 3QH
>
> Attention: Secretary

If to:

> Nortel Networks, S.A.
> Parc d'Activites de Magny-Chateaufort,
> Chateaufort Cedex 9, France, 78928
>
> Attention: Secretary

If to:

> Nortel Networks Australia
> Level 5, 495 Victoria Avenue,
> Chatswood, New South Wales, Australia, 2067
>
> Attention: Secretary

If to:

    Nortel Networks Ireland
    Mervue Business Park,
    Mervue, Galway, Republic of Ireland

    Attention:  Secretary

and such notices shall be deemed to have been received fifteen (15) business days after mailing if forwarded by mail, and the following business day if forwarded by facsimile transmission or hand.

(b)    The aforementioned address of any Participant may be changed at any time by giving fifteen (15) business days prior notice to any other Participant in accordance with the foregoing.

(c)    In the event of a generally-prevailing labor dispute or other situation which will delay or impede the giving of notice by any such means, in either the country of origin or of destination, the notice shall be given by such specified mode as will be most reliable and expeditious and least affected by such dispute or situation.

## Article 13 – Relationship of the Participants

The relationship of the Participants under this Agreement shall not constitute a partnership or joint venture for any purpose.  In addition, no Participant is a fiduciary, an agent, a servant, or a subcontractor of any other Participant as a result of this Agreement, and no Participant has the right, power or authority, expressly or impliedly, to represent or bind any other Participant pursuant to and in performance of any acts under this Agreement, except as expressly authorized herein.

## Article 14 - General Provisions

(a)    This Agreement shall not be assigned by any Participant except with the written consent of each of the other Participants.

(b)    The failure of any Participant to give notice to another Participant of the breach or non-fulfilment of any term, clause, provision or condition of this Agreement shall not constitute a waiver thereof, nor shall the waiver of any breach or non-fulfilment of any term, clause, provision or condition of this Agreement constitute a waiver of any other breach or non-fulfilment of that, or any other, term, clause, provision or condition of this Agreement.

(c)    In the event that any term, clause, provision or condition of this Agreement shall be adjudged invalid for any reason whatsoever, such invalidity shall not affect the validity or operation of any other term, clause, provision or condition and such invalid term, clause, provision or condition shall be deemed to have been deleted from this Agreement.

WO 328838.3

12

(d)    In respect to the subject matter hereof, this Agreement sets forth the entire agreement and understanding between the Participants.

(e)    This Agreement may be executed in two or more counterparts and upon delivery of counterparts which together show the execution by the Participants hereto, shall constitute one agreement which shall inure to the benefit of, and be binding upon, the Participants.

(f)    This Agreement shall be construed in accordance with and governed by the laws of the Province of Ontario, Canada.

IN WITNESS WHEREOF, the Participants have caused this Agreement to be executed by their duly authorized officers as of the date first written above.

Nortel Networks Ltd.

Per:    _____

Nortel Networks Inc.

Per:    _____

Nortel Networks UK Limited

Per:    _____

Nortel Networks, S.A.

Per:    _____

Nortel Networks Australia

Per: _____

Nortel Networks Ireland

Per: _____

<u>Schedule A</u>
## Calculation of Arm's Length R&D Allocation to each Participant

The purpose of this section is to provide a brief summary of Nortel's transfer pricing policy and to provide clarity as to how each Participant is to be compensated under this Agreement.

In 2002, Nortel made a submission to Canada Revenue Agency ("CRA"), the Internal Revenue Service ("IRS") and Inland Revenue ("IR") seeking approval to an Advance Pricing Arrangement ("APA"). The current APA submission is for the 2000 to 2004 taxation years but could be extended for a longer term if requested by either Nortel or the tax authorities.

The current transfer pricing methodology is the residual profit split method ("RPSM") which was adopted by the Participants at the request of the tax authorities as the most appropriate method for determining the arm's length compensation to each of the Participants for the R&D Activity to be provided pursuant to the Master R&D Agreement. The RPSM acknowledges the fact that the key profit driver in the Nortel business is the development and maintenance of rapidly depreciating intellectual property ("IP").

Accordingly, the compensation provided to Participants under RPSM reflects the fact that the Participants bear the full entrepreneurial risk of the Nortel business such as the risks attendant with the substantial and continuous development and ownership of the NN Technology. Mathematically the RPSM accords the Participants all the upside risk in the Nortel business as well as the downside risk in such business.

On the other hand, other Nortel entities not subject to the Master R&D Agreement (i.e., Nortel Distribution Entities)[1] generally are the least complex entities in the group. They do not perform R&D, and generally perform routine activities. In addition, these entities have limited business risks in that they engage in a limited amount of functions. Thus, these entities are provided a routine return as compensation for the distribution function that they perform (generally, a nominal amount of operating profit ranging from 0% to 4% of sales).

The formulaic steps for calculating the R&D Allocation to each Participant is as follows:
1. Identify RPSM Participants
2. Determine Accounting Operating Profit
   (a)   add back R&D Expense

---

[1] Also excluded are entities that are excluded from the Nortel transfer pricing policy. This generally applies to our joint ventures companies because Nortel does not control the joint venture entities. The results of the excluded entities are removed from consolidated results (leaving only the global results that are subject to the RPSM)

(b)    deduct R&D Capital Stock Amortization in order to arrive at the gross economic profit;

5.  From the gross economic profit,

    (a)    deduct the Functional Routine Return of Distributors (as provided by the selected transfer pricing method that establishes such return or as may be finally determined by, or negotiated with, any relevant taxing authority)

    (b)    deduct the Functional Routine Return of RPSM Participants (as provided by the selected transfer pricing method that establishes such return or as may be finally determined by, or negotiated with, any relevant taxing authority)

to arrive at the Residual Profit pool.

6.  Compute each RPSM Participants relative level of R&D Capital Stock

7.  Calculate R&D Allocation attributable to each RPSM Participant equal to that portion of the Residual Profit pool with bears the same ratio as such Participant's ratio of its R&D Capital Stock as a percentage of the total R&D Capital Stock for all RPSM Participants.

9.  Establish entity level adjustments to the reflect arm's length R&D Allocation calculations of profit or loss for each entity.[2]

---

[2] The final R&D Allocation for any particular year could be adjusted upward or downward in order to reflect the final determination of any taxing authority that would affect the RPSM calculation for such taxable year.

WO 328808.J          16

The following examples clarify the RPSM:

| Scenario 1 | NNL | Distributors | NN Ireland | France | NN Brasil | NN UK | NN AUS | NNC | NNI | Total |
|---|---|---|---|---|---|---|---|---|---|---|
| Operating income/(loss) | (252.9) | 125.9 | 49.1 | (31.4) | (75.6) | (316.8) | 39.9 | 7.6 | 1,046.7 | 662.7 |
| Add: R&D Spend | 549.7 | 3.0 | 20.8 | 262.9 | 5.3 | 547 | 9.5 | 3.0 | 752.8 | 2,002.7 |
| Less: Amortization of R&D capital stock | (848.8) | 0.0 | (21.4) | (207.5) | (7.4) | (226.7) | (11.9) | (3.9) | (1,296.4) | (2,503.2) |
| Combined profits (less inter-firm) (SH-TP) | (327.7) | 125.8 | 78.3 | 24.0 | 190.7 | (427.6) | 37.9 | 1.7 | 502.1 | 154.0 |
| RCNA | 312.4 | 0.0 | 4.8 | 230 | 9.6 | 32.4 | (2.1) | (1.7) | 28.7 | 263.8 |
| Distribution return | 6.3 | 17.6 | 0.0 | 3.0 | 3.0 | 0.0 | 2.6 | 0.0 | 0.0 | 12.8 |
| Total routine returns - at cost | 312.4 | 17.6 | 4.8 | 23.0 | 4.6 | 32.4 | (2.1) | (1.7) | (8.7) | 62.0 |
| Residual | | | | | | | | | | 1480.10 |
| R&D capital stock | 2,079.0 | 0.0 | 61.2 | 572.0 | 0.0 | 542.9 | 33.6 | 10.8 | 2,573.1 | 7,054.3 |
| R&D capital stock percentage | 35.35% | 0.00% | 0.90% | 7.62% | 0.00% | 7.52% | 0.44% | 0.22% | 47.02% | 100.00% |
| Allocation of Residual | (113.5) | 0.0 | (2.0) | 33.71 | 0.0 | (33.0) | (1.9) | (1.2) | (210.0) | (440.0) |
| Target economic profit/(loss) | 150.0 | 17.6 | 1.3 | 4.9 | 5.6 | (1.3) | (4.0) | (2.7) | (211.6) | (29.4) |
| Transfer Pricing Adjustment | 416.5 | (154.8) | (78.0) | (25.9) | 93.2 | 426.7 | (41.9) | (4.4) | (213.7) | 0.0 |

| Scenario 2 | NNL | Distributors | NN Ireland | France | NN Brasil | NN UK | NN AUS | NNC | NNI | Total |
|---|---|---|---|---|---|---|---|---|---|---|
| Operating income/(loss) | 197.4 | 125.9 | 49.1 | (31.4) | (75.6) | (316.8) | 39.9 | 7.6 | 646.7 | 443.7 |
| Add: R&D Spend Less: Amortization of R&D capital stock | 549.7 (348.8) | 0.0 0.0 | 20.8 (21.4) | 262.9 (207.5) | 5.3 (7.4) | 547 (226.7) | 9.6 (11.9) | 3.0 (3.9) | 752.8 (1,296.4) | 2,002.8 (2,503.2) |
| Expected economic profit/loss | 98.3 | 125.8 | 78.3 | 24.0 | 190.7 | (427.6) | 37.9 | 1.7 | 102.1 | 129.41 |
| RCNA | 312.4 | 0.0 | 4.8 | 23.0 | 9.6 | 32.4 | (2.1) | (1.7) | 28.7 | 263.8 |
| Distribution return | 0.0 | 17.6 | 0.0 | 3.0 | 3.0 | 0.0 | 2.6 | 0.0 | 0.0 | 17.3 |
| Routine returns | 312.4 | 17.6 | 4.8 | 23.0 | 9.6 | 32.4 | (2.1) | (1.7) | 40.75 | 400.6 |
| Revised Residual | | | | | | | | | | 1413.23 |
| Revised R&D capital stock | 2,079.0 | 0.0 | 61.2 | 547.4 | 0.0 | 542.4 | 33.6 | 10.8 | 2,573.1 | 7,054.3 |
| Revised R&D capital stock percentage | 35.3% | 0.0% | 0.9% | 7.2% | 0.0% | 7.6% | 0.44% | 0.2% | 47.9% | 100.0% |
| Revised Allocation of Residual | (113.5) | 0.0 | (2.0) | (33.7) | 0.0 | (33.0) | (1.9) | (1.2) | (210.0) | (440.0) |
| Revised economic profit/loss (after TP) | 150.0 | 17.6 | 1.3 | (4.9) | 9.6 | (1.3) | (4.0) | (2.7) | (211.6) | (39.4) |
| Revised transfer pricing adjustment | 58.5 | (154.8) | (78.0) | (29.8) | 93.2 | 426.7 | (41.9) | (4.4) | (213.7) | 0.0 |

<u>Schedule B</u>
Territory for Each Licensed Participant

1) With respect to Nortel Networks Inc., "Territory" shall mean that United States of America and the Commonwealth of Puerto Rico.

2) With respect to Nortel Networks UK Limited, "Territory" shall mean the United Kingdom.

3) With respect to Nortel Networks S.A., "Territory" shall mean France.

4) With respect to Nortel Networks Australia, "Territory" shall mean Australia.

5) With respect to Nortel Networks Ireland, "Territory" shall mean the Republic of Ireland.

# Addendum to Master R&D Agreement

This Addendum corrects certain minor errors contained in the terms of a Master R&D Agreement (dated December 22, 2004) entered into between NORTEL NETWORKS LTD (NNL) and certain of its direct and indirect wholly owned affiliates (referred to individually as "Participant" or collectively, as "Participants"), and adds Nortel Networks Australia Pty Limited as a Participant with effect from the Effective Date (as defined in that Agreement). The terms of the Master R&D Agreement are hereby incorporated by reference and the parties intend that the corrections are effective as if originally incorporated into the Master R&D Agreement.

Now therefore, for good and valuable consideration, the Parties wish to correct the minor errors by amending the terms of the Master R&D Agreement as set forth below.

I.    Opening Paragraph
       The opening paragraph is deleted and replaced with the following

       *Agreement confirming and formalizing the operating arrangements of the Participants at and from January 1, 2001 (the "Effective Date"),*

II.    Correction to Name of Participant
       All references to Nortel Networks Australia are amended by adding to the end thereof "PTY LIMITED".

III.    Article 5 – Grant of Exclusive Licenses by NNL
       The text of Article 5(a) is deleted and replaced with the following -

       *(a)    To the extent of its legal right to do so, and subject to the rights of relevant third parties, NNL hereby continues to grant to each Licensed Participant an exclusive, royalty-free license, including the right to sublicense, which except as hereinafter provided shall be in perpetuity, rights to make, have made, use, lease, license, offer to sell, and sell Products using or embodying NN Technology in and for the Territory designated for that Licensed Participant, and all rights to patents, industrial designs (or equivalent) and copyrights, and applications therefore, and technical know-how, as necessary or appropriate in connection therewith. ("Exclusive License")*

       All other terms of the Master R&D Agreement shall remain in full force and effect

       This Addendum shall be construed in accordance with and governed by the laws of Ontario, Canada.

       IN WITNESS WHEREOF, the Parties have caused this Addendum to be executed by their duly authorized officers on the date noted below.

10/25/2035  03:51    9159959521               NORTEL TAX DEPT                    PAGE  02/03

Nortel Networks Ltd.


Per:
Date: _____


Nortel Networks Inc.


Per:   *Larry G. Fields* (signature)
Date:  10/18/05


Nortel Networks UK Limited


Per: _____
Date: _____


Nortel Networks, S.A.


Per: _____
Date: _____


Nortel Networks Australia Pty Limited


Per:
Date:


WO 415155.1                           2

Nortel Networks Ltd.

Per: _____
Date: _____ Nov 11/05


Nortel Networks Inc.


Per:
Date:


Nortel Networks UK Limited


Per: _____
Date: _____


Nortel Networks, S.A.


Per: _____
Date: _____


Nortel Networks Australia Pty Limited


Per: _____
Date: _____

Privileged and Confidential
December 14, 2007

## Addendum to Master R&D Agreement

This Addendum modifies and amends the Master R&D Agreement (dated December 22, 2004) and all amendments and addendums thereto (collectively referred to as the "Prior Agreement") by adopting certain changes to the terms of the Master R&D Agreement that have been reflected in the financial statements of the Participants as of, and effective from, January 1, 2006 (the "Effective Date"). The terms of the Prior Agreement are hereby incorporated by reference.

Whereas each Participant holds and enjoys equitable and beneficial ownership of NN Technology as defined in the Prior Agreement,

Whereas this Addendum continues each Participant's rights and obligations in the NN Technology,

Whereas given changes in the Nortel business, NNL and certain other Participants are seeking governmental approval of various modifications to the RPSM;

Whereas Participants desire to execute this Addendum in order to formally adopt these modifications to the Prior Agreement.

Now therefore, for good and valuable consideration, the Parties wish to amend the Prior Agreement as set forth below.

I.    Referenced Agreement
    For purposes of interpreting the Prior Agreement, all references to this "Agreement" should include all subsequent addendums including this Addendum.

II.    Whereas Clauses
    In the eighth (8th) Whereas clause delete the parenthetical "*(collectively, the "Revenue Authorities")*".

III.    Definitions
    (a)  The term "*Retirement Allocation*" as defined in Article 1(j) should be deleted and replaced with "*Special Retirement Allocation.* In addition, the phrase in the last line of Article 1(j) should be deleted and replaced with "*effective on the Termination Date*".

    (b)  The terms "*Special Balancing Payment*" and "*Territory*" found in Article 1(k) and (l) are redesignated as Article 1(m) and (n), respectively.

    (c)  A new term "*Revenue Authority or Revenue Authorities*" is inserted as Article 1(k) as follows.

        (k) *"Revenue Authority or Revenue Authorities" shall mean one or more governmental taxing authorities or instrumentalities thereof.*

WO 830534.4

(d) A new term *"Termination Date"* is inserted as Article 1(l) as follows.

*(l) "Termination Date" shall mean with respect to an Elective Retirement the last day of the calendar year in which such election is effective and with respect to a Forced Retirement under Article 11(c)(i), the last day of the second calendar year in which there is no R&D Activity. For all other Forced Retirement events defined in Article 11(c) (ii) through (iv), the Termination Date is the date on which the Defaulting Event occurs.*

IV.   Participant's Share of R&D Allocation

Article 3(b) provides that each Participant accepts and agrees to make the payment determined under the RPSM as its shares of the R&D Allocation as defined reference to Schedule A of the Prior Agreement. The Participants have amended the computation of the R&D Allocation as set forth in new Schedule A ("Amended Schedule A"), attached hereto. Thus, all references to Schedule A in the Prior Agreement shall be deleted and replaced with references to Amended Schedule A and all references to each Participant's share of the R&D Allocation in the Prior Agreement will be made by reference to the computations set forth in Amended Schedule A.

V.   Retiring Eligible Participants

(a) For retiring Participants with a Termination Date that is after the Effective Date of this Addendum, Article 11 is hereby amended.

(i)   The last line in Article 11(b) is deleted and replaced with the following.

*terminated from participation in this Agreement as of the Termination Date (Forced Retirement).*

(ii)   The last line in Article 11(c)(i) is amended to read – *"Activity for two consecutive years,"*

(iii)   Article 11(d) is deleted and replaced with the following.

*(d)(i)   In the event of an Elective or Forced Retirement, the retiring Participant consents, in advance, to transfer all of its rights in the NN Technology to NNL as of, and from, the Termination Date. In exchange for the Participant's transfer of its rights and obligations, such retiring Participant accepts as full payment, its R&D allocation (without any obligation to perform R&D activity) (Retiring R&D Allocation) for the shorter period of years equal to (x) each post-Termination Date year for a five-year period following the Termination Date, or, (y) each post-Termination Date year preceding the year in which the level of the five-year rolling sum of R&D Stock (as defined in Amended Schedule A) for such retiring Participant is zero. The Retiring R&D Allocation cannot be less than zero for any single year in which there is an obligation to make such allocation. The Participants agree that any negative amount (up to zero) tentatively allocated*

to a retired Participant under the RSPM set forth in Schedule A will be reallocated to the remaining Participants disregarding any R&D spend of the retired Participant in the calculation.

(d)(ii)  For the avoidance of doubt the following example is provided. Assuming Participant A fails to perform any R&D activity in 2006 and 2007, the Termination Date will be December 31, 2007.  The R&D Allocation for 2007 will be determined treating Participant A as a Participant of the Prior Agreement and this Addendum for the entirety of 2007.  The sole payment for Participant A's transfer of its rights in the NN Technology and other rights and obligations under the Prior Agreement and this Addendum shall be its positive Retiring R&D Allocation for each of 2008 through 2012.  However, since Participant A's level of the five-year rolling sum of R&D Stock for the 2006-2010 years is zero at the end of 2011, then pursuant to Article 11(d)(i), Participant A will only receive a Retiring R&D Allocation for three post-Termination Date years (i.e., years 2008 through 2010).  Thus, for purposes of computing the Retiring R&D Allocation as set forth in Schedule A, the five-year rolling sum of R&D Stock will include Participant A's R&D activity for years 2003-2007 [first year (2008) allocation], 2004-2008 [second year (2009) allocation],and 2005-2009 [third and final year (2010) allocation].

(d)(iii)  Notwithstanding Article 11(d)(i) and (ii), no Retiring R&D Allocation will be due to a retiring Participant for any year in which such Participant is subject to a Defaulting Event described in Article 11(c)(ii) through (iv) (individually, a "Special Default Event").  In the case of any Special Default Event, the retiring Participant agrees to accept the Special Retirement Allocation as full payment for its rights in the NN Technology surrendered on the Termination Date.

(d)(iv)  The Participants agree to amend the terms of Article 11 in order to reflect any negotiated determinations with a Revenue Authority.

(iii)  The reference to "*retirement date*" in line 4 of Article 11(e) should be deleted and replaced with "*Retirement Date*".

All other terms of the Master R&D Agreement shall remain in full force and effect.

This Addendum shall be construed in accordance with and governed by the laws of Ontario, Canada.

IN WITNESS WHEREOF, the Parties have caused this Addendum to be executed by their duly authorized officers on the date noted below.

Nortel Networks Ltd.

Per: _____
Date: Dec 18, 2007 _____

Nortel Networks Inc.

Per: _____
Date: _____

Nortel Networks UK Limited

Per: _____
Date: _____

Nortel Networks, S.A.

Per: _____
Date: _____

Nortel Networks Australia Pty Limited

Per: _____
Date: _____

WO 830534.4                          4

Nortel Networks Ireland

Per:    _____

Date:   _____

## Amended Schedule A

### Calculation of Arm's Length R&D Allocation to each Participant

The purpose of this section is to provide a brief summary of Nortel's transfer pricing policy and to provide clarity as to how each Participant is to be compensated under this Agreement.

The current transfer pricing methodology is the residual profit split method ("RPSM") which was adopted by the Participants at the request of the tax authorities as the most appropriate method for determining the arm's length compensation to each of the Participants for the R&D Activity to be provided pursuant to the Master R&D Agreement. The RPSM acknowledges the fact that the key profit driver in the Nortel business is the development and maintenance of rapidly depreciating intellectual property ("IP").

Accordingly, the compensation provided to Participants under RPSM reflects the fact that the Participants bear the full entrepreneurial risk of the Nortel business such as the risks attendant with the substantial and continuous development and ownership of the NN Technology. Mathematically the RPSM accords the Participants all the upside risk in the Nortel business as well as the downside risk in such business.

On the other hand, other Nortel Affiliates that are not signatories to the Master R&D Agreement and have signed distribution agreements with NNL (the "Nortel Distribution Entities") generally are the least complex entities in the group. They do not perform R&D, and generally perform routine activities. In addition, these entities have limited business risks in that they engage in a limited amount of functions. Thus, these entities are provided a routine return as compensation for the distribution function that they perform (generally, a nominal amount of operating profit ranging from 0% to 4% of sales).

The formulaic steps for calculating the R&D Allocation to each Participant is as follows:
1. Identify RPSM Participants
2. Determine Accounting Operating Profit (as determined by the selected transfer pricing method or as may be finally determined by, or negotiated with, any relevant taxing authority)
3. From the Accounting Operating Profit,
   (a)  deduct the Functional Routine Return of Distributors (as provided by the selected transfer pricing method that establishes such return or as may be finally determined by, or negotiated with, any Revenue Authority)

   (b)  deduct the Functional Routine Return of RPSM Participants (as provided by the selected transfer pricing method that establishes such return or as may be finally determined by, or negotiated with, any Revenue Authority) to arrive at the Residual Profit pool.
4. Compute each RPSM Participants relative level of R&D Stock (as determined by the selected transfer pricing method or as may be finally determined by, or negotiated with, any Revenue Authority)

5. Calculate R&D Allocation attributable to each RPSM Participant equal to that portion of the Residual Profit pool which bears the same ratio as such Participant's ratio of its R&D Stock as a percentage of the total R&D Stock for all RPSM Participants.

6. Establish entity level adjustments to the reflect arm's length R&D Allocation calculations of profit or loss for each entity.[1]

---

[1] The final R&D Allocation for any particular year could be adjusted upward or downward in order to reflect the final determination of any Revenue Authority that would affect the RPSM calculation for such taxable year.

Dec 07 07 02:31p    Janssen Pharmaceutica    201-944-9475    p.1

## Agreement With Respect to Certain NN Technology

This Agreement is made and entered into effective as of the [day before] the Closing Date of the Share and Asset Sale Agreement between NNL and Alcatel ("Share and Asset Sale Agreement"),

BY AND BETWEEN:

※ December 30, 2006

**NORTEL NETWORKS LTD.**, a corporation duly incorporated under the laws of Canada, having its executive offices at 195 The West Mall, T05-04-005, Toronto, Ontario M9C 5K1, Canada ("NNL")

AND:

**NORTEL NETWORKS INC.**, a corporation duly incorporated under the laws of the State of Delaware, having its head office at 4008 E. Chapel Hill Nelson Highway, Research Triangle Park, North Carolina, U.S.A., 27709 (including predecessor corporations in interest)

AND:

**NORTEL NETWORKS UK LIMITED**, an entity duly formed under the laws of the United Kingdom having its head office at Maidenhead Office Park, Westacott Way, Maidenhead, Berkshire, United Kingdom, SL6 3QH

AND:

**NORTEL NETWORKS, S.A.**, an entity duly formed under the laws of France having its head office at Parc d'Activites de Magny-Chateaufort, Chateaufort Cedex 9, France, 78928

AND:

**NORTEL NETWORKS AUSTRALIA**, an entity duly formed under the laws of Australia having its head office at Level 5, 495 Victoria Avenue, Chatswood, New South Wales, Australia, 2067

AND:

**NORTEL NETWORKS (IRELAND) LIMITED**, an entity duly formed under the laws of the Republic of Ireland having its head office at Mervue Business Park, Mervue, Galway, Republic of Ireland

WO 646955.1

1

Post-It® Fax Note    7671    Date 12/7/07    # of pages ▶ 8
To Giovanna Sparagna    From Mike Orlando
Co./Dept.    Co. nortel
Phone #    Phone # 919-905-6679
Fax # 202-637-3593    Fax #

(referred to individually as "Participant" or collectively, as "Participants")

WHEREAS the parties hereto are also Participants to the Master R&D Agreement effective as of January 1, 2001 (as amended) and desire to further amend such agreement.

WHEREAS  Nortel Networks Ltd ("NNL") on its own behalf and on behalf of its affiliates is currently in negotiations with Alcatel, an unrelated French company, regarding the sale of a specific NNL global business (hereinafter collectively referred to as the NNL Disposed Business) beneficially owned by the Participants in their respective Territories in accordance with the terms of the Master R&D Agreement (the terms of which are incorporated by reference hereto unless otherwise specified). For purposes of this Agreement, the term "NNL Disposed Business" shall include the assets to be transferred to (including "Transferred Intellectual Property"), and the liabilities to be assumed by, Alcatel (or its affiliates) including the grant of a license to Alcatel (or its affiliates) for intellectual property ("Licensed Intellectual Property") relating to Nortel Products as more fully described in the executed Share and Asset Sale Agreement.

WHEREAS in order to facilitate the local country transfer of the Transferred Intellectual Property and a license of the Licensed Intellectual Property used in the NNL Disposed Business as contemplated by the Share and Asset  Sale Agreement, the Participants desire to modify the Master R&D Agreement as follows-

1.  The Participants agree that as of the effective date of this Agreement, for purposes of applying the terms of the Master R&D Agreement, the term "NN Technology" as defined therein will exclude all Transferred Intellectual Property (as defined in the executed Share and Asset Sale Agreement and the Licensed Intellectual Property (as defined in the executed Share and Asset Sale Agreement.

2.  This Agreement will govern the rights and obligations of the Participants existing as of the effective date of this Agreement, or created in the future, with respect to the Transferred Intellectual Property and the Licensed Intellectual Property (collectively referred to herein as the "Disposed Intellectual Property").

3.  The rights and obligations of the Participants with respect to the Disposed Intellectual Property are to be governed by terms substantially similar to those applicable to the NN Technology as set forth in the Master R&D Agreement (as amended from time to time) except that for purposes of this Agreement, the term "Disposed Intellectual Property" as defined herein should be substituted for the term "NN Technology" and Articles 9, 10, 11, and 14 of the Master R&D Agreement should be disregarded.  In the event that terms contained in the Master R&D Agreement conflict with the terms of this Agreement or with the intent of the Participants to facilitate the sale of the NNL Disposed Business and Disposed Intellectual Property, the terms of this Agreement will take precedence in determining the rights and obligations of the Participants with respect to the Disposed Intellectual Property.

WO 646955.1

4.  For the avoidance of doubt under this Agreement, legal title to any and all Disposed Intellectual Property whether now in existence or acquired or developed pursuant to the terms of this Agreement will be vested in NNL. In consideration therefore, NNL hereby grants to each of the other Participants (a "Licensed Participant") an Exclusive License for the Transferred Intellectual Property in and for the Territory designated for that Licensed Participant (as described below in Article 5 of this Agreement) and a Non-Exclusive License for the Licensed Intellectual Property in and for the Territory designated for that Licensed Participant (as described below in Article 6 of this Agreement).

5.  With respect to Transferred Intellectual Property, to the extent of its legal right to do so, and subject to the rights of relevant third parties, NNL hereby continues to grant an *exclusive* royalty-free license to use the Transferred Intellectual Property in and for the Territory designated for that Licensed Participant, including (i) the right to sublicense, which except as hereinafter provide shall be in perpetuity, (ii) rights to make, have made, use, lease, license, offer to sell, and sell Nortel Products using or embodying Transferred Intellectual Property in and for the Territory designated for that Licensed Participant, and (iii) all rights to patents, industrial designs (or equivalent) and copyrights, and applications therefore, and technical know-how, as necessary or appropriate in connection therewith (the "Exclusive License" for Transferred Intellectual Property).

6.  With respect to Licensed Intellectual Property, to the extent of its legal right to do so, and subject to the rights of relevant third parties, NNL grants each Licensed Participant a *non-exclusive* royalty-free license to use the Licensed Intellectual Property in and for the Territory designated for that Licensed Participant, including (i) the right to sublicense, which except as hereinafter provide shall be in perpetuity, (ii) rights to make, have made, use, lease, license, offer to sell, and sell Nortel Products using or embodying Licensed Intellectual Property in and for the Territory designated for that Licensed Participant, and (iii) all rights to patents, industrial designs (or equivalent) and copyrights, and applications therefore, and technical know-how, as necessary or appropriate in connection therewith (the "Non-Exclusive License" for the Licensed Intellectual Property).

7.  Each Participant (including NNL) may assign all (but not part) of its rights and obligations under this Agreement. At the effective date of any such assignment, such assignee shall be substituted for the transferring Participant for purposes of determining the rights and obligations of the parties to this Agreement.

8.  Immediately prior to the Closing of the Share and Asset Sale Agreement, each entity's status as a Licensed Participant under this Agreement shall be deemed terminated, and its sole compensation for the surrender of its Licensed Participant interest will be a fully paid up Exclusive License or Non-Exclusive License as described above in Articles 5 and 6, respectively provided that for purposes of this clause only, Article 4, Article 6, and Article 7 (incorporated by reference from the Master R&D Agreement) shall survive notwithstanding the Licensed Participant's terminated status under this Agreement.

WO 646955.1

3

9. Except as provided in paragraph 8, this Agreement will continue until as long as there is at least two Participants, provided however, that the Participants can agree to terminate this Agreement at any time, the terms upon which will be determined at the time of any such termination.

10. The relationship of the Participants under this Agreement shall not constitute a partnership or joint venture for any purpose. In addition, no Participant is a fiduciary, an agent, a servant or a subcontractor of any other Participant as a result of this Agreement, and no Participant has the right, power or authority, expressly or impliedly, to represent or bind any other Participant pursuant to and in performance of any acts under this Agreement, except as expressly authorized herein.

11. General Provisions

    (a)    The failure of any Participant to give notice to another Participant of the breach or non-fulfillment of any term, clause, provision or condition of this Agreement shall not constitute a waiver thereof, nor shall the waiver of any breach or non-fulfillment of any term, clause, provision or condition of this Agreement constitute a waiver of any other breach or non-fulfillment of that, or any other, term, clause, provision or condition of this Agreement.

    (b)    In the event that any term, clause, provision or condition of this Agreement shall be adjudged invalid for any reason whatsoever, such invalidity shall not affect the validity or operation of any other term, clause, provision or condition and such invalid term, clause, provision or condition shall be deemed to have been deleted from this Agreement.

    (d)    In respect to the subject matter hereof, this Agreement sets forth the entire agreement and understanding between the Participants.

    (e)    This Agreement may be executed in two or more counterparts and upon delivery of counterparts which together show the execution by the Participants hereto, shall constitute one agreement which shall inure to the benefit of, and be binding upon, the Participants.

    (f)    This Agreement shall be construed in accordance with and governed by the laws of the Province of Ontario, Canada.

IN WITNESS WHEREOF, the Participants have caused this Agreement to be executed by their duly authorized officers as of the date first written above.

WO 646955.1

4

Nortel Networks Ltd.

Per: _____

Nortel Networks Inc.

Per: _____

Nortel Networks UK Limited

Per: _____

Nortel Networks, S.A.

Per: _____

Nortel Networks Australia

Per: _____

Nortel Networks Ireland

Per: _____

WO 646955.1                        5

Nortel Networks Ltd.

Per: _____

Nortel Networks Inc.

Per: _____

Nortel Networks UK Limited

Per: _____

Nortel Networks, S.A.

Per: _____

Nortel Networks Australia

Per: _____

Nortel Networks Ireland

Per: _____

WO 646955 1

.5

Nortel Networks Ltd.

Per: _____

Nortel Networks Inc.

Per: _____

Nortel Networks UK Limited

Per: _____

Nortel Networks, S.A.

Per: _____

Nortel Networks Australia

Per: _____

Nortel Networks Ireland

Per: _____

WO 646955.1

Nortel Networks Ireland

Per: _____

Date: _____

WO 415155.1

3

# Memorandum of Understanding

This Memorandum of Understanding ("MOU") is entered into on this ___ day of December, 2008, effective as of January 1, 2006 ("Effective Date"), to provide a record of certain operating arrangements and understandings of NNL and the Licensed Participants (as defined below) at and from the Effective Date. This MOU creates no liability or obligation or rights among the parties hereto.

> **NORTEL NETWORKS LIMITED**, a corporation duly incorporated under the laws of Canada, having its executive offices at 195 The West Mall, Toronto, Ontario, Canada M9C 5K1 ("NNL"),

AND:

> **NORTEL NETWORKS INC.**, a corporation formed and existing under the laws of the State of Delaware, USA, having its executive office at 2221 Lakeside Boulevard, Richardson, Texas USA,

> **NORTEL NETWORKS UK LIMITED**, a private company formed and existing under the laws of the United Kingdom, having its executive office at Maidenhead Office Park, Westacott Way, Maidenhead, Berkshire, U.K.,

> **NORTEL NETWORKS SA**, a corporation formed and existing under the laws of France, having its executive offices at Parc d'Activities de Magny, 78117 Chateaufort, France,

> **NORTEL NETWORKS AUSTRALIA PTY LIMITED**, a corporation formed and existing under the laws of the State of New South Wales, Australia, having its executive office at Nortel Networks Centre, 1 Innovation Road, Macquarie University Research Park, Macquarie Park, New South Wales 2109, Australia, and

> **NORTEL NETWORKS (IRELAND) LIMITED**, a corporation formed and existing under the laws of Ireland, having its executive office at Mervue Business Park, Mervue, Galway, Ireland.

1. Any capitalized term used herein and not defined herein shall have the meaning set forth for such term in the 2004 Agreement (as defined below). "Participants" refers to the Nortel entities listed directly above, including NNL, that are "Participants" under the 2004 Agreement as defined below. "Licensed Participants" refers to all of the Participants other than NNL.

## Background

2. Each Licensed Participant entered into a bi-lateral Amended Research and Development Cost Sharing Agreement ("1992 Agreement") with NNL effective as of January 1, 1992, which was terminated by each party thereto as of January 1, 2001. The 1992 Agreement was a cost sharing agreement under which NNL, as consideration for the Participant's sharing of costs of research and development, granted to the Participant an exclusive, perpetual, royalty-free license to make, have made, use, lease and sell Products (as defined in the 1992 Agreement) embodying NT Technology (as defined in the 1992 Agreement), and to all rights to patents, industrial designs, copyrights and technical know-how connected thereto, within the Participant's country of residence. The income and taxable income attributable to the exploitation of the research and development efforts of the Participant under the 1992 Agreement was derived from the exploitation of such efforts by the Participant in its country of residence. Notwithstanding the termination of the 1992 Agreement, the fully vested and fully paid rights of each Licensed Participant in and to the NN Technology (as defined therein) granted under the 1992 Agreement survived the termination of the 1992 Agreement, and each Licensed Participant continues to hold such exclusive rights, as stated in the recitals to the 2004 Agreement.

Nortel Networks Confidential

3.  The Licensed Participants are parties, along with NNL, to that certain multi-lateral Master R&D Agreement effective from January 1, 2001 as amended from time to time ("Master R&D Agreement"), and as amended by (i) that certain undated Addendum to Master R&D Agreement executed by the Participants between October 2005 and June 2006 ("First Addendum"), (ii) the Agreement with Respect to Certain NN Technology effective as of December 30, 2006 (being the day before the closing date of Nortel's sale of its UMTS Access business to Alcatel-Lucent) (the "Alcatel-related Amendment"), and (iii) an Addendum to Master R&D Agreement executed by the Participants on December 14, 2007 with an effective date of January 1, 2006 ("Second Addendum", referred to herein collectively with the Master R&D Agreement, the First Addendum, the Alcatel-Related Amendment, the Second Addendum and the Third Addendum (as hereinafter defined) as the "2004 Agreement"). The 2004 Agreement continues in effect as of the date hereof and is intended to apply indefinitely from the 2001 taxation year. Under it, NNL and the Licensed Participants have established a residual profit sharing ("RPS") methodology ("RPSM", as more specifically defined in the 2004 Agreement) by which they measure, on an arm's length basis, amounts allocated to each Participant as compensation for its R&D Activity including for products and services in each Licensed Participant's Exclusive Territory and, per an amendment effective as of the date hereof, each Licensed Participant's Non-Exclusive Territory, as appropriate for the highly integrated and inter-connected nature of the worldwide business of NNL and its Affiliates. The 2004 Agreement also memorializes the agreements of NNL and the Licensed Participants as to the development and deployment of existing and future NN Technology and ownership of the NN Technology, with NNL holding legal title thereto.

4.  The RPSM under the 2004 Agreement is intended to determine the allocation of residual profits derived from the distribution and sale of Products developed from the NN Technology and as a result of R&D Activity carried out by each of the Participants, after allocating the relevant routine returns to them and the Nortel Distribution Entities (as defined in Schedule A to the 2004 Agreement to mean those Nortel entities that are not signatories to the 2004 Agreement).

5.  NNL has applied for two advance pricing agreements ("APAs"), both of which are pending as of the date hereof. The first application was made to authorities of Canada, the U.S. and the U.K. for the period from January 1, 2001 through December 31, 2005, and the second application was made to authorities of Canada, the U.S., the U.K., and is expected to be made to France shortly, for the current period beginning January 1, 2006. The tax authorities of these countries are currently engaged in negotiations with each other and discussions with the Participants with the goal of finalizing the two APAs to give effect to the RPSM in the relevant jurisdictions. Certain modifications to the manner in which the RPS is calculated are under discussion with APA authorities in the United States and Canada with respect to the period beginning January 1, 2006.

6.  Nortel expected that the RPSM attached to the 2004 Agreement (as originally executed) as Schedule A would apply for an indefinite period beginning in January 1, 2001. However it was determined in discussions with certain Revenue Authorities in 2007 that certain amendments thereto retroactive from January 1, 2006 were necessary or desirable, as reflected in the revised RPSM attached as a revised Schedule A to the Second Addendum. It has been determined at this time as a result of further discussions with Revenue Authorities that further amendments thereto, retroactive to January 1, 2006, are necessary or desirable due to changes in the Nortel business, primarily as a result of Nortel's completion of the process of outsourcing its manufacturing activities, which changes have been reflected in the financial statements of each Participant since January 1, 2006. In Nortel's view, the Revenue Authorities would expect, as a consequence of the relevant governmental processes, for Nortel to make these changes for the year 2006 going forward. The Participants believe that, through the date hereof under the prior formula, and going forward under the new formula as amended in the Third Addendum to the 2004 Agreement executed on the date hereof with effect from January 1, 2006 ("Third Addendum"), their respective ownership interests in the NN Technology and their respective R&D Activity have been and will be adequately and fairly compensated, as envisioned in the APA discussions referenced in Paragraph 5 above.

7.  Under the RPSM, certain payments may be required to be made to or from the Participants during both periods to which the RPSM applies (January 1, 2001 through December 31, 2005, and the period beginning January 1, 2006 and following). In addition, other balancing payments may be made among them from time

Nortel Networks Confidential

to time as required under the RPSM as amended from time to time and the 2004 Agreement, including without limitation payments for performance of administrative services with respect to the 2004 Agreement provided by one of them or a third party.

8.  The Participants wish to memorialize hereby certain understandings as set forth below, including as to the nature and effect of any such adjusting payments that may take place between and among them pursuant to the 2004 Agreement, through this MOU.

Subjects of Understanding

9.  The relationship of the Participants to each other is as stated in Article 13 of the 2004 Agreement.

10. The RPSM as established under the 2004 Agreement and as amended through the date hereof does not result in any payment to or from NNL or the Licensed Participants compensating them for commercial transactions between or among them. Rather, it is a method for measuring profit allocable to each of them, acting in and carrying on its own business in its own right in its own Territory, and as compensation for its R&D Activity in its Territory, as appropriate for the highly integrated and inter-connected nature of the worldwide business of the Nortel group of companies.

11. Nothing in this MOU is intended to derogate from or act as a substitute for the commercial transactions undertaken by the Participants in the course of their commercial business with their customers and resellers. Neither the RPSM, the 2004 Agreement, nor this MOU is intended to constitute a separate or supervening transactional arrangement, or to represent an agreement of partnership or other legal relationship among any Participants. Payments to or from any of them under the RPMS represent the fulfillment of the RPMS allocation rather than a commercial transaction, as "true up" payments whereby a Participant that holds profits from its own sales and distribution activity in excess of its attributable share under the RPSM formula, pays amounts to parties that hold profit in an amount less than their attributable share. The use of a profit split calculation such as the RPSM is not intended by the Participants to be a transaction among them and should not give rise to consequences or relationships among them independent of their commercial transactions, as if the PRMS allocation were a commercial transaction in itself, or as if the methodology gave rise to a *de facto* partnership arrangement among them.

12. If and to the extent that, based on the final application of the RPSM calculation for any taxable year, one or more Participants is entitled to receive amounts to which it is/they are not entitled under such final calculation based on income from the underlying commercial transactions that the RPSM measures, then the following applies:

    a.  Each Participant that is entitled under the RPSM to receive an amount in excess of the amount to which it would be entitled based on the underlying commercial transactions that the RPSM measures, shall be considered to have received such excess amount in error, and shall hold such amount for the account of such other Participant(s) as are entitled to it according to the RPSM, and shall pay such amount as agreed or directed to or for the account of such entitled Participant(s);

    b.  A Participant holding such excess amount shall never have had any entitlement thereto; and

    c.  The Participant that is entitled to receive such excess amount is the only entity entitled to it, and that Participant shall be considered to have earned such amount exclusively by and from its activities in its Exclusive Territory or Non-Exclusive Territory and not from any connection, actually or derivatively, in the jurisdiction of the Participant that initially held such excess and disgorged it in accordance with the terms hereof and the 2004 Agreement.

General Provisions

13. The Participants acknowledge that, as a result of a collective review by the Canadian Customs and Revenue Agency, the US Internal Revenue Service, and the UK Inland Revenue and any other applicable Revenue Authorities regarding the application of the RPSM, the calculation of the RPSM as set forth in Schedule A

Nortel Networks Confidential

to the 2004 Agreement, as amended as of the date hereof, may be further amended, which amendments would require the consent of the Participants.

15. This MOU may be executed in two or more counterparts and upon delivery of counterparts in original form, by facsimile or electronic image which together show the execution by all of the parties hereto, shall constitute one document.

16. This MOU shall be construed in accordance with and governed by the laws of the Province of Ontario, Canada.

IN WITNESS WHEREOF, the Participants have caused this MOU to be executed by their duly authorized officers as of the date first written above, with effect from the Effective Date.

**Nortel Networks Limited**

Per: _____

Per: _____

**Nortel Networks Inc.**

Per: _____

**Nortel Networks UK Limited**

Per: _____  9/1/09

**Nortel Networks SA**

Per: _____

## Third Addendum to Master R&D Agreement

This Third Addendum to Master R&D Agreement ("**Third Addendum**") modifies and amends that certain Master R&D Agreement ("**Original Agreement**") that had an original effective date of January 1, 2001, among Nortel Networks Limited (referred to in the Prior Agreement (as hereinafter defined) as Nortel Networks Ltd.), Nortel Networks Inc., Nortel Networks UK Limited, Nortel Networks SA (referred to in the Prior Agreement as Nortel Networks, S.A.), Nortel Networks Australia Pty Limited, and Nortel Networks (Ireland) Limited (referred to in the Prior Agreement as Nortel Networks Ireland), as amended by (i) that certain undated Addendum to Master R&D Agreement ("**First Addendum**") executed by the parties between October 2005 and June 2006, (ii) the Agreement with Respect to Certain NN Technology effective as of December 30, 2006 (being the day before the closing date of Nortel's sale of its UMTS Access business to Alcatel-Lucent) (the "Alcatel-related Amendment"), and (iii) an Addendum to Master R&D Agreement dated December 14, 2007 with an effective date of January 1, 2006 ("**Second Addendum**"). The Original Agreement, the First Addendum, the Alcatel-related Amendment and the Second Addendum are collectively referred to as the "**Prior Agreement**"). The Prior Agreement and this Third Addendum are collectively referred to herein as the "**Agreement**"). The terms of the Prior Agreement are hereby incorporated by reference. Capitalized terms used herein and not otherwise defined herein have the meanings set forth for those terms in the Prior Agreement.

Except as otherwise provided in Article 5(a)(ii) hereof as amended herein with respect to the Non-Exclusive License Effective Date, the effective date of this Third Addendum is January 1, 2006 ("**Third Addendum Effective Date**").

Whereas Nortel expected that the RPSM attached to the Original Agreement as Schedule A would apply for an indefinite period beginning in January 1, 2001; however it was determined in discussions with certain Revenue Authorities in 2007 that certain amendments thereto retroactive from January 1, 2006 were necessary or desirable, as reflected in the revised RPSM attached as a revised Schedule A to the Second Addendum; and it has been determined at this time as a result of further discussions with Revenue Authorities that further amendments thereto, retroactive to the Third Addendum Effective Date, are necessary or desirable due to changes in the Nortel business, primarily as a result of Nortel's completion of the process of outsourcing its manufacturing activities, which changes have been reflected in the financial statements of each Participant since the Third Addendum Effective Date;

Whereas, the Participants wish to provide for additional flexibility in administration of the agreement to effect routine process and business efficiencies, as set forth in Article 3(d) as amended herein;

Whereas, NNL wishes to grant additional rights to the Licensed Participants effective January 1, 2009 as provided in amended Article 5(a)(ii) as set forth herein, also to effect routine process and business efficiencies; and

Whereas the Participants desire to execute this Third Addendum in order to formally adopt these modifications to the Prior Agreement.

Now therefore, in consideration of the premises and of the mutual covenants of the parties hereto, it is hereby agreed as follows:

I.   Referenced Agreement

For purposes of interpreting the Prior Agreement, all references to this "Agreement" shall include all prior and subsequent addenda including this Third Addendum.

II.   Definitions

(a) The term "Exclusive License", defined in Article 5(a) of the Prior Agreement, is added as a new defined term in Article I of the Agreement as follows:

*"Exclusive License" shall mean the exclusive licence granted to a Licensed Participant as further described in Article 5(a)(i) hereof.*

(b) The following are inserted as new defined terms in Article I of the Agreement:

*"Exclusive Territory" shall mean the exclusive geographic area specified for a Licensed Participant in Schedule B.*

*"Non-Exclusive License" shall mean the non-exclusive licence granted to a Licensed Participant as further described in Article 5(a)(ii) hereof.*

*"Non-Exclusive License Effective Date" has the meaning set forth in Article 5(a)(ii) hereof.*

*"Non-Exclusive Territory" shall mean, for each Licensed Participant, the entire world except (i) Canada where NNL retains its exclusive rights, and (ii) those geographic areas designated in Schedule B as the Exclusive Territory of another Licensed Participant.*

(c) The definition for the term "Territory" is hereby deleted in its entirety and replaced with the following:

*"Territory" shall mean, with respect to each Licensed Participant, its Exclusive Territory as described on Schedule B, and its Non-Exclusive Territory.*

III.   Article 3 – R&D Activity Payments; Participant's Share of R&D Allocation

(a)   The Participants wish to again amend the computation of the R&D Allocation retroactively with effect from the Third Addendum Effective Date, as set forth in a second amendment to Schedule A ("**Amended Schedule A**") attached hereto and made a part hereof. As of the Third Addendum Effective Date, (i) any reference to Schedule A in the Prior

2

Agreement shall be deemed to be a reference to the Amended Schedule A and (ii) any reference to each Participant's share of its R&D Allocation in the Prior Agreement shall be deemed to be a reference to the computations set forth in the Amended Schedule A.

      (b)      The text of Article 3(d) is deleted in its entirety and replaced with the following:

*NNL agrees to administer this Agreement, or cause this Agreement to be administered by a Licensed Participant or a third party, including without limitation the making of any determinations required under the RPSM with respect to the Participants' respective interests, and the computation of amounts of the R&D Allocations due to and payments due from, as applicable, each Participant on a periodic basis. The Participants will agree to appropriate compensation for administers of this Agreement. Each Participant will be supplied with a copy of the calculations required under the RPSM as set forth in* Schedule A. *Any true up payment to or from a Participant as described in paragraph 6 of Schedule A will be reflected in the inter-company accounts of the affected Participant as a payable or a receivable as applicable, and may be netted pursuant to the standard Nortel practice for managing inter-company accounts.*

IV.     Article 4 – Legal Title to NN Technology

The text of Article 4(a) is deleted in its entirety and replaced with the following:

*Except as otherwise specifically agreed, legal title to any and all NN Technology, whether now in existence or hereafter acquired, or developed pursuant to the terms of this Agreement, shall be vested in NNL. In consideration therefor, NNL agrees to enter into an Exclusive License and a Non-Exclusive License with each of the Licensed Participants as set forth in Article 5.*

The text of Article 4(e) is deleted in its entirety and replaced with the following:

*Licensed Participants have the right to assert actions and recover damages or other remedies in their respective Exclusive Territories for infringement or misappropriation of NN Technology by others.*

V.     Article 5 – Grant of Exclusive Licenses by NNL

Article 5 is hereby amended to change the title of Article 5 to read as follows: *Article 5 – Grant of Licenses by NNL.*

Article 5(a) is deleted in its entirety and replaced with the following:

*To the extent of its legal right to do so, and subject to the rights of relevant third parties, NNL hereby:*

         *(i)*     *continues to grant to each Licensed Participant an exclusive, royalty-free license, including the right to sublicense, which except as hereinafter*

3

*provided shall be in perpetuity, rights to make, have made, use, lease, license, offer to sell, and sell Products using or embodying NN Technology in and for the Exclusive Territory designated for that Licensed Participant, and all rights to patents, industrial designs (or equivalent) and copyrights, and applications therefor, and technical know-how, as necessary or appropriate in connection therewith ("Exclusive License"); and*

(ii)    *grants to each Licensed Participant, as of January 1, 2009 (the "Non-Exclusive License Effective Date"), a non-exclusive, royalty-free license, including the right to sublicense, which except as hereinafter provided shall be in perpetuity, rights to make, have made, use, lease, license, offer to sell, and sell Products using or embodying NN Technology in and for the Non-Exclusive Territory, and all rights to patents, industrial designs (or equivalent) and copyrights, and applications therefor, and technical know-how, as necessary or appropriate in connection therewith ("Non-Exclusive License").*

Schedule B, Territory for each Licensed Participant, is hereby deleted in its entirety and replaced with the First Amendment to Schedule B, attached hereto, and the title of that schedule is hereby changed to read "Exclusive Territory for Each Licensed Participant".

All other terms of the Prior Agreement shall remain in full force and effect.

This Third Addendum shall be construed in accordance with and governed by the laws of Ontario, Canada.

IN WITNESS WHEREOF, each Participant has caused this Third Addendum to Master R&D Agreement to be executed by its duly authorized officer(s) on the date noted below, as of the Third Addendum Effective Date and, for the Non-exclusive License, as of the Non-exclusive License Effective Date, as applicable.

**Nortel Networks Limited**

Per:    _____
Date:   _____

Per:    _____
Date:   _____

**Nortel Networks Inc.**

Per:    _____
Date:   _____

4

Schedule A
to that certain
Third Addendum to Master R&D Agreement

## Second Amendment to Schedule A

## Calculation of Arm's Length R&D Allocation ("R&D Allocation")

Nortel uses the residual profit split method ("RPSM") embodied in the calculation described below, which was originally adopted as of January 1, 2001 at the request of certain Revenue Authorities as the most appropriate method for determining the arm's length compensation due to each Participant for its respective R&D Activity provided pursuant to the Agreement. The RPSM acknowledges the fact that the key profit driver in the Nortel business is the development and maintenance of rapidly depreciating intellectual property.

Accordingly, the R&D Allocation provided to Participants under the RPSM reflects the fact that the Participants bear the full entrepreneurial risk of the Nortel business, such as the risks attendant with the substantial and continuous development and ownership of the NN Technology. Mathematically, the RPSM accords the Participants all the upside risk in the Nortel business as well as the downside risk. A functional rate of return ("Functional Rate of Return") is provided to each Participant as compensation for its distribution function and other activities that support revenue outside of the Participant's country of residence.

Other Nortel Affiliates that are not signatories to the Agreement and that have signed (or will sign) a distribution agreement with NNL ("Nortel Distribution Entities") generally are the least complex entities in the Nortel group of companies. They do not perform R&D Activity, and generally perform routine activities. In addition, these entities have limited business risks in that they engage in a limited number of functions. Thus, these entities are provided a Functional Routine Return as compensation for their distribution function and ancillary services (generally, a nominal amount of operating earnings ranging from 0% to 4% of sales, as determined based on current industry standards and third party studies).

The steps for calculating the R&D Allocation for each Participant are as follows:

1. Identify the Nortel entities that are "Participants" under the Agreement as amended from time to time.

2. Determine consolidated Nortel operating earnings/loss in accordance with U.S. GAAP.

3. From the consolidated Nortel operating earnings/loss:

   (i)  Deduct the operating earnings/loss of Nortel's existing joint ventures; deduct the operating earnings/loss of Nortel's former joint venture entities that own significant intangibles, as determined by the Participants from time to time;

6

and deduct the operating earnings/loss of Nortel entities that do not perform the function of distribution of Products containing NN Technology.

(ii)   The resulting operating earnings/loss is then further adjusted to deduct the following items not related to Nortel's operations:

> amortization of intangibles[1]
> gain/loss on the sale of business
> restructuring charges
> stewardship costs

The resulting amount is the adjusted operating earnings/loss ("Adjusted Operating Earnings/Loss").

(iii) From the Adjusted Operating Earnings/Loss:

> deduct the Functional Routine Return of each Nortel Distribution Entity, and
> deduct the Functional Routine Returns of each Participant,

in each case as determined by the selected transfer pricing method that establishes such return based on current industry standards and third party studies, or as may be finally determined by Nortel's negotiations with Revenue Authorities, to determine the amount representing the residual profit or loss ("Residual Pool").

4.  Determine the R&D Allocation for each Participant:

(i)   Calculate the relative ratios of each Participant's spending on its R&D Activity to the R&D spend of all Participants, by taking each Participant's total R&D spend over the previous five years as a ratio of the total R&D spend of the previous five years for all Participants.

(ii)  Apply the ratio determined above to the Residual Pool to determine each Participant's R&D Allocation.

Take the R&D Allocation and Functional Routine Return for each Participant and compare it to such Participant's operating earnings/loss, adjusted in the manner described in paragraph 3(ii), to determine whether any "true up" payments are necessary (whereby a Participant that holds profits in excess of its attributable share hereunder would be required to pay amounts to Participants that hold profit in an amount less than their attributable share)

---

[1] Amortization of intangibles includes goodwill impairment, purchased in-process research and development, amortization of acquired technology, and other intangibles such as trademarks, patents, etc.

7

<u>Schedule B</u>
to that certain
Third Addendum to Master R&D Agreement


## <u>First Amendment to Schedule B</u>

## Exclusive Territory for Each Licensed Participant

1) With respect to Nortel Networks Inc., "Exclusive Territory" shall mean the United States of America and the Commonwealth of Puerto Rico.

2) With respect to Nortel Networks UK Limited, "Exclusive Territory" shall mean the United Kingdom.

3) With respect to Nortel Networks SA, "Exclusive Territory" shall mean France.

4) With respect to Nortel Networks Australia Pty Limited, "Exclusive Territory" shall mean Australia.

5) With respect to Nortel Networks (Ireland) Limited, "Exclusive Territory" shall mean the Republic of Ireland.

8

v. 4

# Fourth Addendum to Master R&D Agreement

This Fourth Addendum to Master R&D Agreement (**"Fourth Addendum"**) modifies and amends that certain Master R&D Agreement (**"Original Agreement"**) that had an original effective date of January 1, 2001, among Nortel Networks Limited (referred to in the Prior Agreement (as hereinafter defined) as Nortel Networks Ltd.), Nortel Networks Inc., Nortel Networks UK Limited, Nortel Networks SA (referred to in the Prior Agreement as Nortel Networks, S.A.), Nortel Networks Australia Pty Limited, and Nortel Networks (Ireland) Limited (referred to in the Prior Agreement as Nortel Networks Ireland), as amended by (i) that certain undated Addendum to Master R&D Agreement (**"First Addendum"**) executed by the parties between October 2005 and June 2006, (ii) the Agreement with Respect to Certain NN Technology effective as of December 30, 2006 (being the day before the closing date of Nortel's sale of its UMTS Access business to Alcatel-Lucent) (the "Alcatel-related Amendment"), and (iii) an Addendum to Master R&D Agreement dated December 14, 2007 with an effective date of January 1, 2006 (**"Second Addendum"**), and (iv) the Third Addendum to Master R&D Agreement with an effective date of January 1, 2006 (except as otherwise provided therein) (**"Third Addendum"**). The Original Agreement, the First Addendum, the Alcatel-related Amendment, the Second Addendum and the Third Addendum are collectively referred to as the **"Prior Agreement"**). The Prior Agreement and this Fourth Addendum are collectively referred to herein as the **"Agreement"**). The terms of the Prior Agreement are hereby incorporated by reference. Capitalized terms used herein and not otherwise defined herein have the meanings set forth for those terms in the Prior Agreement.

The effective date of this Fourth Addendum is December 31, 2008 (**"Fourth Addendum Effective Date"**).

In consideration of the premises and of the mutual covenants of the parties hereto, it is hereby agreed as follows:

I.    Referenced Agreement
For purposes of interpreting the Prior Agreement, all references to this "Agreement" shall include all prior and subsequent addenda including this Fourth Addendum.

II.    Standstill Provision

The Participants hereby agree that, notwithstanding anything to the contrary in the Agreement, in the event of the occurrence of an event described at Section 11(c)(iv):

      (i)    no Participant affected by such event shall be automatically terminated from participation in the Agreement under Article 11(b) for reasons relating to such event;

      (ii)    no Participant shall elect to withdraw from participation in the Agreement under Article 11(a); and

      (iii)    NNL shall have the right, in its sole discretion, to terminate participation in this Agreement of any Participant affected by such event, upon written notice to such Participant.

The standstill provision above shall be deemed to form a part of the Agreement from its initial effective date and shall serve to prevent any termination or withdrawal described at (i) above from occurring, so that the

Participants shall be in the same position as if the Agreement did not originally provide for termination upon the occurrence of an event described at Article 11(b).

All other terms of the Prior Agreement shall remain in full force and effect.

This Fourth Addendum shall be construed in accordance with and governed by the laws of Ontario, Canada.

IN WITNESS WHEREOF, each Participant has caused this Fourth Addendum to Master R&D Agreement to be executed by its duly authorized officer(s) on the date noted below, as of the Fourth Addendum Effective Date.

**Nortel Networks Limited**

Per: _____  Gordon A. Davies
                                 Chief Legal Officer
Date: _____  and Corporate Secretary


Per: _____
                                 Tracy S.J. Connelly McGiney
Date: _____  Assistant Secretary


**Nortel Networks Inc.**

Per: _____

Date: _____

2

**Nortel Networks UK Limited**

Per: _____

Date: _____


**Nortel Networks (Ireland) Limited**

Per: _____

Date: _____


**Nortel Networks SA**

Per: _____

Date: _____


**Nortel Networks Australia Pty Limited**

Per: _____

Date: _____


*[Signature page to Fourth Addendum to Master R&D Agreement]*

**Nortel Networks Limited**
**195 The West Mall**
**Toronto, Ontario, Canada M9C 5K1**

RELEASE

January 1, 2009

Nortel Networks Inc.
2221 Lakeside Boulevard
Richardson, Texas
United States of America
Attention:  Corporate Secretary

Nortel·Networks UK Limited
Maidenhead Office Park,
Westacott Way, Maidenhead,
Berkshire, United Kingdom, SL6 3QH
Attention:  Corporate Secretary

Nortel Networks SA
Parc d'Activites de Magny
78117 Chateaufort, France
Attention:  Corporate Secretary

Nortel Networks Australia Pty Limited
Nortel Networks Centre
1 Innovation Road
Macquarie University Research Park
Macquarie Park, New South Wales, Australia 2109
Attention:  Corporate Secretary

Nortel Networks (Ireland) Limited
Mervue Business Park,
Mervue, Galway, Republic of Ireland
Attention:  Corporate Secretary

        Re:  Release ("Release") relating to Master R&D Agreement dated
        December 22, 2004 ("Agreement")

Gentlemen:

      Defined terms used herein and not defined herein shall have the meaning set forth for
such terms in the Agreement.  The purpose of this letter is to document the complete and final
resolution of matters relating to the alleged use, if any, prior to the date hereof, of the NN
Technology by some or all of the Licensed Participants beyond their respective Exclusive
Territories (as defined in that certain Third Addendum to Master R&D Agreement executed by
the Licensed Participants and NNL effective January 1, 2006 ("Third Addendum")).

      For good and valuable consideration, the receipt and sufficiency of which are hereby
acknowledged, the undersigned Nortel Networks Limited, a corporation formed under the laws of

Canada, on behalf of itself and its successors, assigns, administrators, trustees, beneficiaries, subsidiaries and affiliated entities, hereby releases and forever discharges each Licensed Participant and its directors, officers and employees from any and all liabilities, rights, costs, losses, damages, expenses, claims or rights of action of any nature whatsoever, whether in law or equity, known and unknown, fixed or contingent, arising out of or relating to the use, if any, by such Licensed Participant, of the NN Technology beyond such Licensed Participant's Exclusive Territory prior to January 1, 2009 (being the Non-Exclusive License Effective Date as defined in the Third Addendum), and including any claims for special, indirect, incidental, and/or consequential damages.

Please indicate your acceptance of this Release by having six originals of this letter executed by an authorized representative and return them to Karina O (Nortel Tax, Toronto).

Very truly yours,

Nortel Networks Limited

Per: _____

Per: _____

Acknowledged and accepted as of the date first set forth above:

Nortel Networks Inc.

Per: _____

Nortel Networks UK Limited

Per: *Sharin Ralston*    9·1·09

Nortel Networks SA

Per: _____

Canada, on behalf of itself and its successors, assigns, administrators, trustees, beneficiaries, subsidiaries and affiliated entities, hereby releases and forever discharges each Licensed Participant and its directors, officers and employees from any and all liabilities, rights, costs, losses, damages, expenses, claims or rights of action of any nature whatsoever, whether in law or equity, known and unknown, fixed or contingent, arising out of or relating to the use, if any, by such Licensed Participant, of the NN Technology beyond such Licensed Participant's Exclusive Territory prior to January 1, 2009 (being the Non-Exclusive License Effective Date as defined in the Third Addendum), and including any claims for special, indirect, incidental, and/or consequential damages.

Please indicate your acceptance of this Release by having six originals of this letter executed by an authorized representative and return them to Karina O (Nortel Tax, Toronto).

Very truly yours,

**Nortel Networks Limited**

Per:_____

Per:_____

Acknowledged and accepted as of the date first set forth above:

**Nortel Networks Inc.**

Per: _____

**Nortel Networks UK Limited**

Per: _____  9/1/09

**Nortel Networks SA**

Per: _____

Page 2 of 3

Canada, on behalf of itself and its successors, assigns, administrators, trustees, beneficiaries, subsidiaries and affiliated entities, hereby releases and forever discharges each Licensed Participant and its directors, officers and employees from any and all liabilities, rights, costs, losses, damages, expenses, claims or rights of action of any nature whatsoever, whether in law or equity, known and unknown, fixed or contingent, arising out of or relating to the use, if any, by such Licensed Participant, of the NN Technology beyond such Licensed Participant's Exclusive Territory prior to January 1, 2009 (being the Non-Exclusive License Effective Date as defined in the Third Addendum), and including any claims for special, indirect, incidental, and/or consequential damages.

Please indicate your acceptance of this Release by having six originals of this letter executed by an authorized representative and return them to Karina O (Nortel Tax, Toronto).

Very truly yours,

**Nortel Networks Limited**

Per:_____

Per:_____

Acknowledged and accepted as of the date first set forth above:

**Nortel Networks Inc.**

Per:    _____

**Nortel Networks UK Limited**

Per:    _____

Nortel Networks SA

Per:    _____

Nortel Networks Australia Pty Limited

Per: _____


Nortel Networks (Ireland) Limited

Per: *Shawn Cowton*
9-1-09


*[signature page to Release]*


Page 3 of 3

Nortel Networks Limited
195 The West Mall
Toronto, Ontario, Canada M9C 5K1

January 14, 2009

The Directors
Nortel Networks UK Limited
Nortel Networks SA
Nortel Networks (Ireland) Limited

*David Martin Hughes*

Alan Robert Bloom, Christopher John Wilkinson Hill, Stephen John Harris, and Alan Michael
Hudson each of Ernst & Young LLP (UK)
as proposed administrator (the "Administrator")
of one or more of Nortel Networks UK Limited
Nortel Networks SA
Nortel Networks (Ireland) Limited

Re: Acknowledgment relating to Master R&D Agreement dated December
22, 2004, as amended ("Agreement")

Gentlemen:

Defined terms used herein and not defined herein shall have the meaning set forth for
such terms in the Agreement. The purpose of this letter is confirm the understanding of the
parties with respect to certain matters related to the Fourth Addendum to Master R&D
Agreement executed by the Licensed Participants and NNL ("Fourth Addendum").

For good and valuable consideration, the receipt and sufficiency of which are hereby
acknowledged, the undersigned Nortel Networks Limited, acknowledges and agrees that,
notwithstanding the terms of the Agreement, including the Fourth Addendum, it will not
terminate participation in the Agreement of any Participant that has filed an application for the
making of a an administration order under the UK Insolvency Act 1986 or is subject to
administration pursuant to the UK Insolvency Act 1986 until the earlier to occur of (i) such
Participant ceasing to be in administration and (ii) such Participant ceasing to trade .

This deed is governed by the laws of Ontario, Canada.

Executed as of the date first above written.
Nortel Networks Limited

Per: _____    Tracy S.J. Connelly McGilley
                                Assistant Secretary

Per: _____ , Vice President, Tax

MASTER R&D AGREEMENT
CONFORMED COPY – INCLUDES 3RD AND 4TH ADDENDUMS AND WAIVER IN
CONNECTION WITH 4TH ADDENDUM

## MASTER R&D AGREEMENT

Agreement confirming and formalizing the operating arrangements of the Participants at and from January 1, 2001 (the "Effective Date"),

BY AND BETWEEN:

> **NORTEL NETWORKS LTD.,** a corporation duly incorporated under the laws of Canada, having its executive offices at 8200 Dixie Road, Suite 100, Brampton, Ontario, Canada L6T 5P6 ("NNL")

AND:

> **NORTEL NETWORKS INC,** a corporation duly incorporated under the laws of the State of Delaware, having its head office at 4001 East Chapel Hill Nelson Hwy Research Triangle Park, NC 27709 United States of America (including predecessor corporations in interest)

AND:

> **NORTEL NETWORKS UK LIMITED,** an entity duly formed under the laws of the United Kingdom having its head office at Maidenhead Office Park, Westacott Way, Maidenhead, Berkshire, United Kingdom, SL6 3QH

AND:

> **NORTEL NETWORKS, S.A.,** an entity duly formed under the laws of France having its head office at Parc d'Activites de Magny-Chateaufort, Chateaufort Cedex 9, France, 78928

AND:

> **NORTEL NETWORKS AUSTRALIA PTY LIMITED,** an entity duly formed under the laws of Australia having its head office at Level 5, 495 Victoria Avenue, Chatswood, New South Wales, Australia, 2067

AND:

> **NORTEL NETWORKS IRELAND,** an entity duly formed under the laws of the Republic of Ireland having its head office at Mervue Business Park, Mervue, Galway, Republic of Ireland

(referred to individually as "**Participant**" or collectively, as "**Participants**")

WHEREAS legal title to all NN Technology is held in the name of NNL;

WHEREAS each Licensed Participant held and enjoyed equitable and beneficial ownership of certain exclusive rights under NT Technology for a Specified Territory pursuant to the Amended Research and Development Cost Sharing Agreement entered into on January 1, 1992, and it is the intent of NNL and the Licensed Participants that the Licensed Participants continue, as of the effective date of this Agreement, to hold and enjoy such rights;

WHEREAS each Participant bears the full entrepreneurial risks and benefits for the Nortel Networks business;

MASTER R&D AGREEMENT
CONFORMED COPY – INCLUDES 3RD AND 4TH ADDENDUMS AND WAIVER IN
CONNECTION WITH 4TH ADDENDUM

WHEREAS each Participant has performed, in the past, and intends to continue to perform R&D Activity with respect to the Nortel Products;

WHEREAS each Participant desires to avoid the duplication of R&D Activity;

WHEREAS each Participant believes that it is appropriate that each Participant should benefit from its contribution to R&D activity commensurate with the value of its contribution to that R&D activity in the context of the manner in which the Nortel Networks business is conducted and that the residual profit split methodology (RPSM) is the best arm's length measure, in the circumstances of NNL and the Participants, of such contributions with reference to such benefits;

WHEREAS this Agreement reflects the Participants' intent and agreement since January 1, 2001 to enter a license arrangement with the Licensed Participants, and the Participants have operated from January 1, 2001 in accordance with the terms set forth herein;

WHEREAS Participants acknowledge that as a result of a collective review by the Canadian Customs and Revenue Agency, the US Internal Revenue Service, and the UK Inland Revenue regarding the application of the RPSM, the calculation of the RPSM as set forth in Schedule A may be amended which amendments would require the consent of the Participants;

NOW, THEREFORE, in consideration of the premises and of the mutual covenants of the parties hereto, it is hereby agreed as follows:

## Article 1 - Definitions

As used herein:

(a) **"Affiliate"** shall be defined as any Person,

    (1) more than fifty percent (50%) of whose voting shares or outstanding capital stock is owned or controlled (directly or indirectly) by a Party;

    (2) which owns or controls (directly or indirectly) more than fifty percent (50%) of the voting shares or outstanding capital stock of a Party; or

    (3) more than fifty percent (50%) of whose voting shares or outstanding capital stock is owned or controlled (directly or indirectly) by an Affiliate (as defined herein) of a Party;

provided, however, such corporation, company or entity shall be deemed to be an Affiliate for purposes of this Agreement only so long as such ownership or control exists.

(b) **"Admission Eligibility Requirements"** with respect to any NNL Affiliate shall mean an Affiliate that has a level of research and development spending for the three (3) year period prior to the year of admission that exceeds the Threshold Level. The Threshold Level of research and development spending will be determined by mutual agreement of the Participants to this Agreement at the time of consideration for admission of any party.

(c) **"Eligible Party"** shall mean any Affiliate of NNL provided such Affiliate meets the Admission Eligibility Requirements for admission as a Participant to this Agreement and fully pays any Special Balancing Payment to NNL prior to the effective date of its admission.

2

MASTER R&D AGREEMENT
CONFORMED COPY – INCLUDES 3RD AND 4TH ADDENDUMS AND WAIVER IN
CONNECTION WITH 4TH ADDENDUM

(d)  **"Eligible Participant"** shall mean any Participant that is not a party to the Advance Pricing Agreement establishing the transfer price for the R&D Activity provided herein.

(e)  **"Exclusive License"** shall mean the exclusive licence granted to a Licensed Participant as further described in Article 5(a)(i) hereof.

(f)  **"Exclusive Territory"** shall mean the exclusive geographic area specified for a Licensed Participant in Schedule B.

(g)  **"Licensed Participant"** shall mean a Participant other man NNL and **"Licensed Participants"** shall mean all Participants other than NNL.

(h)  **"NN Technology"** shall mean, any and all intangible assets including but not limited to patents, industrial designs, copyrights and applications thereof, derivative works, technical know-how, drawings, reports, practices, specifications, designs, software and other documentation or information produced or conceived as a result of research and development by, or for, any of the Participants, but excluding trademarks and any associated goodwill, and excluding all Transferred Intellectual Property and Licensed Intellectual Property (each as defined in the Share and Asset Sale Agreement between NNL and Alcatel).

(i)  **"Non-Exclusive License"** shall mean the non-exclusive licence granted to a Licensed Participant as further described in Article 5(a)(ii) hereof.

(j)  **"Non-Exclusive License Effective Date"** has the meaning set forth in Article 5(a)(ii) hereof.

(k)  **"Non-Exclusive Territory"** shall mean, for each Licensed Participant, the entire world except (i) Canada where NNL retains its exclusive rights, and (ii) those geographic areas designated in Schedule B as the Exclusive Territory of another Licensed Participant.

(l)  **"Products"** shall mean all products, software and services designed, developed, manufactured or marketed, or proposed to be designed, developed, manufactured or marketed, at any time by, or for, any of the Participants, and all components, parts, sub-assemblies, features, software associated with or incorporated in any of the foregoing, and all improvements, upgrades, updates, enhancements or other derivatives associated with or incorporated in any of the foregoing.

(m)  **"R&D Activity"** shall mean all research and development activity (determined in accordance with US GAAP) performed by, or for, any Participant including, without limitation, development of Products and methods, processes, procedures and tools related to manufacturing, installation, operation, interoperability, maintenance and use of Products.

(n)  **"RPSMM"** shall mean the transfer pricing methodology which establishes the fair market value of the compensation to be received by each Participant for its R&D Activity and shall have the meaning defined in Schedule A.

(o)  **"Special Retirement Allocation"** shall mean an amount mutually determined by NNL and any retiring Participant that represents the fair market value (at the time of retirement) of the Exclusive License provided in Article 5 and any prior License to the NN Technology granted by NNL to such retiring Participant, all

MASTER R&D AGREEMENT
CONFORMED COPY – INCLUDES 3RD AND 4TH ADDENDUMS AND WAIVER IN
CONNECTION WITH 4TH ADDENDUM

rights to which are surrendered by such Participant effective on the Termination Date.

(p) **"Revenue Authority or Revenue Authorities"** shall mean one or more governmental taxing authorities or instrumentalities thereof.

(q) **"Termination Date"** shall mean with respect to an Elective Retirement the last day of the calendar year in which such election is effective and with respect to a Forced Retirement under Article 11(c)(i), the last day of the second calendar year in which there is no R&D Activity. For all other Forced Retirement events defined in Article 11(c) (ii) through (iv), the Termination Date is the date on which the Defaulting Event occurs.

(r) **"Special Balancing Payment"** shall mean an amount mutually determined by NNL and an Eligible Party to represent the fair market value for an Exclusive License from NNL as provided in Article 5 with respect to NN Technology existing at the time of admission.

(s) **"Territory"** shall mean, with respect to each Licensed Participant, its Exclusive Territory as described on Schedule B, and its Non-Exclusive Territory.

## Article 2 ~ Performance of R&D Activity

(a) Each Participant hereby agrees to use it best efforts to perform R&D Activity at a level consistent with past practices and the ongoing needs of the Nortel Networks business for its respective Territory.

(b) Each Participant agrees to account for the R&D Activity by disclosing or otherwise making available to each of the other Participants the relevant results, studies etc resulting from such R&D Activity.

(c) All costs incurred directly or indirectly by each Participant for R&D Activity shall be borne exclusively by it. Any reimbursement for costs including any other compensation shall be provided to such Participant for its R&D Activity solely as provided in Article 3 below.

## Article 3 -R&D Activity Payments

(a) For and as a consequence of the performance of R&D Activity, each Participant shall be entitled to receive a payment in an amount equal to the allocation determined under the RPSM (the "R&D Allocation") as the measure of the benefit to which it is entitled commensurate with its performance of, and contribution to, R&D Activity.

(b) Each Participant hereby accepts and agrees to make the payment determined under the RPSM in Schedule A as representing such Participants share of the R&D Allocation.

(c) The R&D Allocation will be computed pursuant to Schedule A which sets forth the basis of the RPSM as originally proposed to the Revenue Authorities. The Participants understand that the RPSM is the subject of review, discussions and negotiations with the Revenue Authorities. The Participants agree to amend this Agreement and to adjust the RPSM to the extent necessary to reflect any negotiated determination with the Revenue Authorities as to the final R&D Allocation.

(d) NNL agrees to administer this Agreement, or cause this Agreement to be administered by a Licensed Participant or a third party, including without limitation the making of

4

MASTER R&D AGREEMENT
CONFORMED COPY – INCLUDES 3RD AND 4TH ADDENDUMS AND WAIVER IN
CONNECTION WITH 4TH ADDENDUM

any determinations required under the RPSM with respect to the Participants' respective interests, and the computation of amounts of the R&D Allocations due to and payments due from, as applicable, each Participant on a periodic basis. The Participants will agree to appropriate compensation for administers of this Agreement. Each Participant will be supplied with a copy of the calculations required under the RPSM as set forth in Schedule A. Any true up payment to or from a Participant as described in paragraph 6 of Schedule A will be reflected in the inter-company accounts of the affected Participant as a payable or a receivable as applicable, and may be netted pursuant to the standard Nortel practice for managing inter-company accounts.

(e)     Each Participant and NNL, in its capacity as described in (d) above, agree to keep clear and accurate records to support the calculations under the RPSM as set forth in Schedule A. Each Participant and NNL, in its capacity as described in (d) above, shall provide to each other, upon request in such form as may reasonably be requested, documentation with respect to the foregoing. Each Participant shall have the right to examine and audit, during normal business hours all such records and accounts as may under recognized accounting practices contain information bearing upon the amounts payable under this Article 3. Prompt adjustment shall be made by the appropriate Participant in order to correct any errors or omissions disclosed by an examination or audit.

(f)     Any amount owing by a Participant under this Agreement shall be due and payable in U.S. dollars or equivalent.

(g)     Any amount owing by a Participant under this Agreement will be due and payable immediately upon written notice of its R&D Allocation from NNL. Any amount owed by a Participant that is paid after 90 days after notice of its R&D Allocation from NNL will accrue interest at the short-term applicable federal rate (as determined from time-to-time under section 1274(d) of the U.S. Internal Revenue Code of 1986) for such period commencing with the 91st day after NNL notice of payment until the date that the overdue amount is paid.

### Article 4 - Legal Title to NN Technology

(a)     Except as otherwise specifically agreed, legal title to any and all NN Technology, whether now in existence or hereafter acquired, or developed pursuant to the terms of this Agreement, shall be vested in NNL. In consideration therefor, NNL agrees to enter into an Exclusive License and a Non-Exclusive License with each of the Licensed Participants as set forth in Article 5.

(b)     Each Licensed Participant shall execute or cause to be executed such documents reasonably requested by NNL as may be necessary or desirable to give effect to, or perfect the foregoing. For purposes of Article 4, copyrighted works included in NN Technology pursuant to this Agreement shall be considered a "work made for hire" for copyright law purposes as applicable in the relevant jurisdiction.

(c)     Each Licensed Participant shall, from time to time, promptly upon receipt of NNL request and at NNL's expense, furnish to NNL all available and requested documentation relating to the NN Technology developed by, or for, such Licensed Participant.

(d)     With respect to patentable inventions and copyrightable property encompassed by NN Technology whether in existence at the Effective Date or acquired subsequent to the Effective Date by any Participant pursuant to this Agreement, NNL shall have the exclusive right but not the obligation to file and prosecute the applications in its name for patents, copyrights, mask works, industrial designs, and all other registered forms of intellectual property encompassed by such NN Technology in every country of the world.

MASTER R&D AGREEMENT
CONFORMED COPY – INCLUDES 3RD AND 4TH ADDENDUMS AND WAIVER IN
CONNECTION WITH 4TH ADDENDUM

(e)     Licensed Participants have the right to assert actions and recover damages or other remedies in their respective Exclusive Territories for infringement or misappropriation of NN Technology by others.

## Article 5 – Grant of Licenses by NNL

(a)     To the extent of its legal right to do so, and subject to the rights of relevant third parties, NNL hereby:

(i)     continues to grant to each Licensed Participant an exclusive, royalty-free license, including the right to sublicense, which except as hereinafter provided shall be in perpetuity, rights to make, have made, use, lease, license, offer to sell, and sell Products using or embodying NN Technology in and for the Exclusive Territory designated for that Licensed Participant, and all rights to patents, industrial designs (or equivalent) and copyrights, and applications therefor, and technical know-how, as necessary or appropriate in connection therewith ("Exclusive License"); and

(ii)     grants to each Licensed Participant, as of January 1, 2009 (the "Non-Exclusive License Effective Date"), a non-exclusive, royalty-free license, including the right to sublicense, which except as hereinafter provided shall be in perpetuity, rights to make, have made, use, lease, license, offer to sell, and sell Products using or embodying NN Technology in and for the Non-Exclusive Territory, and all rights to patents, industrial designs (or equivalent) and copyrights, and applications therefor, and technical know-how, as necessary or appropriate in connection therewith ("Non-Exclusive License").

(b)     NNL shall, from time to time, promptly upon receipt of a Licensed Participant's request, and at such licensed Participant's expense, furnish all available and requested documentation and other information relating to the NN Technology.

(c)     The rights granted under this Article shall not relieve any Participant from its obligations in respect of royalty payments to third parties.

## Article 6 - Confidential Information

(a)     The Licensed Participants acknowledge that the NN Technology is proprietary and constitutes a trade secret. Each Licensed Participant shall hold the NN Technology in confidence and only make use of, or disclose it, as permitted by this Agreement.

(b)     During the full term of this Agreement and thereafter for a period often (10) years or so long as it remains secret (whichever is longer), each Licensed Participant shall hold secret and not disclose, make known, divulge or communicate to any person (except to such Licensed Participant's employees and permitted licensees and then only under an obligation of secrecy binding upon such employees and licensees) any of the NN Technology.

(c)     Copies or translations of NN Technology made, or permitted to be made in the exercise of a Participant's rights granted pursuant to this Agreement, shall upon reproduction by such Participant contain the same proprietary or confidentiality notices or legends which appear on the NN Technology made available to Participant under this Agreement.

MASTER R&D AGREEMENT
CONFORMED COPY – INCLUDES 3RD AND 4TH ADDENDUMS AND WAIVER IN
CONNECTION WITH 4TH ADDENDUM

(d)  Notwithstanding the foregoing, each Participant shall have the right:

(i)  to communicate relevant portions of the NN Technology to suppliers in all countries of the world reasonably necessary for, and solely for, the procurement by such Participant of commercially available materials and parts for use in the manufacture and/or installation of the Products; and

(ii)  to communicate to customers purchasing the Products, such portions of the NN Technology as are reasonably needed by such customers for operating and maintaining the Products; and

(iii)  to communicate to third persons licensing rights to use NN Technology, such portions of the NN Technology as are reasonably needed by such licensees in accordance with the applicable license agreement negotiated;

provided, however, that the recipients of the NN Technology be advised by each Participant, in writing, at the time, or before such communication, that proprietary information is being communicated and that such information is to be kept confidential and not used except as permitted hereunder, and provided further, that such recipients undertake, in writing, prior to disclosure, to respect such confidentiality.

(e)  The provisions of this Agreement concerning confidentiality shall survive the expiration or termination of this Agreement, but in no event shall such provisions apply to the extent that:

(i)  NN Technology was independently supplied to any Participant by a third party prior to the effective date of this Agreement without access to NN Technology; or

(ii)  NN Technology becomes known or readily ascertainable by the general public through no fault of a Participant.

## Article 7 - Liability

(a)  No Participant makes any representation with respect to, and does not warrant any R&D Activity provided hereunder or any NN Technology provided to NNL, but shall furnish such in good faith to the best of its knowledge and ability. Without restricting the generality of the foregoing, no Participant makes any representation or warranty as to whether or not use of the NN Technology supplied hereunder to NNL or the R&D Activity provided hereunder will infringe any patent or other rights of any other person.

(b)  Each Licensed Participant shall indemnify and hold harmless NNL from any and all claims and liabilities for damages, losses, expenses or costs (including counsel fees and expenses) arising in its Territory with respect to NN Technology.

## Article 8 - Force Majeure

No Participant shall be in default or liable for any loss or damage resulting from delays in performance of, or from failure to perform or comply with terms of this Agreement due to any causes beyond its reasonable control, which causes include but are not limited to Acts of God or the public enemy; riots and insurrection, war, accidents, fire, strikes and other labour difficulties (whether or not the Participant is in a position to concede to such demands), embargoes, judicial action; lack of or inability to obtain export permits or approvals, necessary labour, materials, energy, components or machinery; acts of civil or military authorities.

MASTER R&D AGREEMENT
CONFORMED COPY – INCLUDES 3RD AND 4TH ADDENDUMS AND WAIVER IN
CONNECTION WITH 4TH ADDENDUM

## Article 9 - Duration and Continuing Rights and Obligations

(a)     This Agreement shall be effective from January 1, 2001 until December 31, 2004, provided however that this Agreement will automatically renew for additional and unlimited one-year terms until terminated by the mutual written consent of all Participants.

(b)     Upon the expiry or termination of this Agreement as provided herein, each Licensed Participant shall be deemed to have acquired a fully paid up license permitting it to continue to exercise the rights granted to it herein, and, in particular, the rights granted to it in Article 5 as though this Agreement had continued.

(c)     The provisions of Article 4 (Legal Title to NN Technology) with respect to NN Technology acquired or developed pursuant to this Agreement from the Effective Date of this Agreement up to and including its expiry or termination date, Article 6 (relating to confidentiality) and Article 7 (relating to liability) shall survive notwithstanding the expiry of this Agreement, or any termination of this Agreement for any cause whatsoever.

(d)     Upon the expiry or termination of this Agreement, all payments accruing under Article 3 for periods prior to such expiry or termination shall become immediately due and payable, and the obligation to pay any outstanding amounts required by Article 3 shall survive notwithstanding the expiry or termination of this Agreement, or any termination of this Agreement for any cause whatsoever.

## Article 10 - Admission of New Participants

(a)     Upon the written request to NNL, an Eligible Party may be admitted as a signatory to this Agreement thereby becoming a Participant to this Agreement provided there is unanimous consent of the Participants existing at the time of the requested admission. Such Eligible Party's admission may be evidenced as an addendum to this Agreement provided however that the Eligible Party agrees to all the terms and conditions of this Agreement (as amended from time-to-time).

(b)     Upon admission, the New Participant will become a Licensed Participant for the NN Technology in a Territory as amended to Schedule B. Accordingly, NNL will grant the New Participant an Exclusive License pursuant to Article 5.

## Article 11 - Retirement of Participants

(a)     Eligible Participants may elect to withdraw from participation in this Agreement (Elective Retirement) effective at the end of any calendar year subsequent to such election, provided however that the retiring Participant provides written notice of its intent to retire to NNL at least 6 months prior to the proposed effective date.

(b)     On the occurrence of a Defaulting Event, a Participant (or solely an Eligible Participant in the case of a Defaulting Event under (c)(i)) will automatically be terminated from participation in this Agreement as of the Termination Date (Forced Retirement).

(c)     A Defaulting Event will occur if any of the following provisions apply:

(i)     In the event any Eligible Participant fails to perform any R&D Activity for two consecutive years,

(ii)    In the event any Participant loses its status as an Affiliate of NNL,

8

MASTER R&D AGREEMENT
CONFORMED COPY – INCLUDES 3RD AND 4TH ADDENDUMS AND WAIVER IN
CONNECTION WITH 4TH ADDENDUM

(iii)    In the event any Participant shall be in breach of this Agreement or fail to perform one or more of its material obligations under this Agreement, any other Participant may, by written notice to the Participant in default, require the remedy of the breach or the performance of the obligation and, the defaulting Participant so notified fails to remedy or perform within sixty (60) days of the forwarding of a notice so to do, or

(iv)    In the event that any one of the Participants becomes insolvent or is the object of bankruptcy or insolvency proceedings, or makes an assignment for the benefit of its creditors, or is placed in receivership or liquidation, or a substantial part of the assets of a Participant, or a controlling interest in the stock of a Participant, is expropriated, seized, or required to be transferred to, or into the control of, a third party, pursuant to a judicial, administrative or other governmental order or decision.

(d)

(i)    In the event of an Elective or Forced Retirement, the retiring Participant consents, in advance, to transfer all of its rights in the NN Technology to NNL as of, and from, the Termination Date. In exchange for the Participant's transfer of its rights and obligations, such retiring Participant accepts as full payment, its R&D allocation (without any obligation to perform R&D activity) for a four (4) year period following the Termination Date (Retiring R&D Allocation). The Retiring R&D Allocation cannot be less than zero for any single year in which there is an obligation to make such allocation. The Participants agree that any negative amount (up to zero) tentatively allocated to a retired Participant under the RSPM set forth in Schedule A will be reallocated to the remaining Participants disregarding any R&D spend of the retired Participant in the calculation.

(ii)    For the avoidance of doubt the following example is provided. Assuming Participant A fails to perform any R&D activity in 2006 and 2007, the Termination Date will be December 31, 2007. The sole payment for Participant A's transfer of its rights in the NN Technology and other rights and obligations under the Prior Agreement and this Addendum shall be its positive R&D Allocation for each of 2008 through 2011. For purposes of computing the R&D Allocation as set forth in Schedule A, the 5-year rolling sum of R&D spend will include Participant A's R&D activity for years 2002-2006 (first year allocation), 2003-2007 (second year allocation), 2004-2008 (third year allocation), 2005-2009 (fourth and final year allocation).

(iii)    Notwithstanding Article 11(d)(i) and (ii), no Retiring R&D Allocation will be due to a retiring Participant for any year in which such Participant is subject to a Defaulting Event described in Article 11(c)(ii) through (iv) (individually, a "Special Default Event"). In the case of any Special Default Event, the retiring Participant agrees to accept the Special Retirement Allocation as full payment for its rights in the NN Technology surrendered on the Termination Date.

9

MASTER R&D AGREEMENT
CONFORMED COPY – INCLUDES 3RD AND 4TH ADDENDUMS AND WAIVER IN
CONNECTION WITH 4TH ADDENDUM

    (iv)    The Participants agree to amend the terms of Article 11 in order to reflect any negotiated determinations with a Revenue Authority.

    (c)    The obligations of a retiring Participant under Article 4 (Legal Title to NN Technology) acquired or developed by such retiring Participant pursuant to this Agreement from the Effective Date of this Agreement up to and including such retiring Participants Retirement Date, Article 6 (relating to confidentiality) and of Article 7 (relating to liability) of this Agreement shall survive notwithstanding the retirement of a Participant for any cause whatsoever.

[NOTE: 4th Addendum provides that: "in the event of the occurrence of an event described at Section 11(c)(iv):

    (i)    no Participant affected by such event shall be automatically terminated from participation in the Agreement under Article 11(b) for reasons relating to such event;

    (ii)    no Participant shall elect to withdraw from participation in the Agreement under Article 11(a); and

    (iii)    NNL shall have the right, in its sole discretion, to terminate participation in this Agreement of any Participant affected by such event, upon written notice to such Participant."]

[NOTE: Waiver dated 14 January 2009 provides that: "notwithstanding the terms of the [Master R&D] Agreement, including the Fourth Addendum, [NNL] will not terminate participation in the Agreement of any Participant that has filed an application for the making of a an administration order under the UK Insolvency Act 1986 or is subject to administration pursuant to the UK Insolvency Act 1986 until the earlier to occur of (i) such Participant ceasing to be in administration and (ii) such Participant ceasing to trade."]

## Article 12 - Notices

    (a)    Any and all notices or other information to be given by one of the Participants to the other shall be deemed sufficiently given when forwarded by prepaid registered or certified first class air mail or by facsimile transmission or hand delivery to the other Party at the following address:

If to:

    Nortel Networks Ltd.
    8200 Dixie Road, Suite 100
    Brampton, Ontario
    Canada L6T 5P6

    Attention: Secretary

10

MASTER R&D AGREEMENT
CONFORMED COPY – INCLUDES 3RD AND 4TH ADDENDUMS AND WAIVER IN
CONNECTION WITH 4TH ADDENDUM

If to:

Nortel Networks Inc.
4001 East Chapel Hill Nelson Hwy
Research Triangle Park, NC 27709
United States of America

Attention: Secretary

If to:

Nortel Networks UK Limited
Maidenhead Office Park,
Westacott Way, Maidenhead,
Berkshire, United Kingdom, SL6 3QH

Attention: Secretary

If to:

Nortel Networks, S.A.
Pare d'Activites de Magny-Chateaufort,
Chateaufort Cedex 9, France, 78928

Attention: Secretary

If to:

Nortel Networks Australia PTY LIMITED
Level 5, 495 Victoria Avenue,
Chatswood, New South Wales, Australia, 2067

Attention: Secretary

If to:

Nortel Networks Ireland
Mervue Business Park,
Mervue, Galway, Republic of Ireland

Attention: Secretary

and such notices shall be deemed to have been received fifteen (15) business days after mailing if
forwarded by mail, and the following business day if forwarded by facsimile transmission or hand.

(b)      The aforementioned address of any Participant may be changed at any time by
giving fifteen (15) business days prior notice to any other Participant in accordance with the
foregoing.

(c)      In the event of a generally-prevailing labor dispute or other situation which will
delay or impede the giving of notice by any such means, in either the country of origin or of
destination, the notice shall be given by such specified mode as will be most reliable and
expeditious and least affected by such dispute or situation.

MASTER R&D AGREEMENT
CONFORMED COPY – INCLUDES 3RD AND 4TH ADDENDUMS AND WAIVER IN
CONNECTION WITH 4TH ADDENDUM

## Article 13 - Relationship of the Participants

The relationship of the Participants under this Agreement shall not constitute a partnership or joint venture for any purpose. In addition, no Participant is a fiduciary, an agent, a servant, or a subcontractor of any other Participant as a result of this Agreement, and no Participant has the right, power or authority, expressly or impliedly, to represent or bind any other Participant pursuant to and in performance of any acts under this Agreement, except as expressly authorized herein.

## Article 14 - General Provisions

(a)    This Agreement shall not be assigned by any Participant except with the written consent of each of the other Participants.

(b)    The failure of any Participant to give notice to another Participant of the breach or non-fulfilment of any term, clause, provision or condition of this Agreement shall not constitute a waiver thereof nor shall the waiver of any breach or non-fulfilment of any term, clause, provision or condition of this Agreement constitute a waiver of any other breach or non-fulfilment of that, or any other, term, clause, provision or condition of this Agreement.

(c)    In the event that any term, clause, provision or condition of this Agreement shall be adjudged invalid for any reason whatsoever, such invalidity shall not affect the validity or operation of any other term, clause, provision or condition and such invalid term, clause, provision or condition shall be deemed to have been deleted from this Agreement.

(d)    In respect to the subject matter hereof, this Agreement sets forth the entire agreement and understanding between the Participants.

(e)    This Agreement may be executed in two or more counterparts and upon delivery of counterparts which together show the execution by the Participants hereto, shall constitute one agreement which shall inure to the benefit of, and be binding upon, the Participants.

(f)    This Agreement shall be construed in accordance with and governed by the laws of the Province of Ontario, Canada.

IN WITNESS WHEREOF, the Participants have caused this Agreement to be executed by their duly authorized officers as of the date first written above.

MASTER R&D AGREEMENT
CONFORMED COPY – INCLUDES 3RD AND 4TH ADDENDUMS AND WAIVER IN
CONNECTION WITH 4TH ADDENDUM

## Schedule A

### Calculation of Arm's Length R&D Allocation ("R&D Allocation")

Nortel uses the residual profit split method ("RPSM") embodied in the calculation described below, which was originally adopted as of January 1, 2001 at the request of certain Revenue Authorities as the most appropriate method for determining the arm's length compensation due to each Participant for its respective R&D Activity provided pursuant to the Agreement. The RPSM acknowledges the fact that the key profit driver in the Nortel business is the development and maintenance of rapidly depreciating intellectual property.

Accordingly, the R&D Allocation provided to Participants under the RPSM reflects the fact that the Participants bear the full entrepreneurial risk of the Nortel business, such as the risks attendant with the substantial and continuous development and ownership of the NN Technology. Mathematically, the RPSM accords the Participants all the upside risk in the Nortel business as well as the downside risk. A functional rate of return ("Functional Rate of Return") is provided to each Participant as compensation for its distribution function and other activities that support revenue outside of the Participant's country of residence.

Other Nortel Affiliates that are not signatories to the Agreement and that have signed (or will sign) a distribution agreement with NNL ("Nortel Distribution Entities") generally are the least complex entities in the Nortel group of companies. They do not perform R&D Activity, and generally perform routine activities. In addition, these entities have limited business risks in that they engage in a limited number of functions. Thus, these entities are provided a Functional Routine Return as compensation for their distribution function and ancillary services (generally, a nominal amount of operating earnings ranging from 0% to 4% of sales, as determined based on current industry standards and third party studies).

The steps for calculating the R&D Allocation for each Participant are as follows:

1. Identify the Nortel entities that are "Participants" under the Agreement as amended from time to time.

2. Determine consolidated Nortel operating earnings/loss in accordance with U.S. GAAP.

3. From the consolidated Nortel operating earnings/loss:

    (i) Deduct the operating earnings/loss of Nortel's existing joint ventures; deduct the operating earnings/loss of Nortel's former joint venture entities that own significant intangibles, as determined by the Participants from time to time; and deduct the operating earnings/loss of Nortel entities that do not perform the function of distribution of Products containing NN Technology.

    (ii) The resulting operating earnings/loss is then further adjusted to deduct the following items not related to Nortel's operations:

MASTER R&D AGREEMENT
CONFORMED COPY – INCLUDES 3RD AND 4TH ADDENDUMS AND WAIVER IN
CONNECTION WITH 4TH ADDENDUM

☐    amortization of intangibles[1]

☐    gain/loss on the sale of business

☐    restructuring charges

☐    stewardship costs

The resulting amount is the adjusted operating earnings/loss ("Adjusted Operating Earnings/Loss").

(iii)    From the Adjusted Operating Earnings/Loss:

☐    deduct the Functional Routine Return of each Nortel Distribution Entity, and

☐    deduct the Functional Routine Returns of each Participant,

in each case as determined by the selected transfer pricing method that establishes such return based on current industry standards and third party studies, or as may be finally determined by Nortel's negotiations with Revenue Authorities, to determine the amount representing the residual profit or loss ("Residual Pool").

4.    Determine the R&D Allocation for each Participant:

(i)    Calculate the relative ratios of each Participant's spending on its R&D Activity to the R&D spend of all Participants, by taking each Participant's total R&D spend over the previous five years as a ratio of the total R&D spend of the previous five years for all Participants.

(ii)    Apply the ratio determined above to the Residual Pool to determine each Participant's R&D Allocation.

Take the R&D Allocation and Functional Routine Return for each Participant and compare it to such Participant's operating earnings/loss, adjusted in the manner described in paragraph 3(ii), to determine whether any "true up" payments are necessary (whereby a Participant that holds profits in excess of its attributable share hereunder would be required to pay amounts to Participants that hold profit in an amount less than their attributable share)

---

[1] Amortization of intangibles includes goodwill impairment, purchased in-process research and development, amortization of acquired technology, and other intangibles such as trademarks, patents, etc.

MASTER R&D AGREEMENT
CONFORMED COPY – INCLUDES 3RD AND 4TH ADDENDUMS AND WAIVER IN
CONNECTION WITH 4TH ADDENDUM

## Schedule B

**Exclusive Territory for Each Licensed Participant**

1) With respect to Nortel Networks Inc., "Exclusive Territory" shall mean the United States of America and the Commonwealth of Puerto Rico.

2) With respect to Nortel Networks UK Limited, "Exclusive Territory" shall mean the United Kingdom.

3) With respect to Nortel Networks SA, "Exclusive Territory" shall mean France.

4) With respect to Nortel Networks Australia Pty Limited, "Exclusive Territory" shall mean Australia.

5) With respect to Nortel Networks (Ireland) Limited, "Exclusive Territory" shall mean the Republic of Ireland.