**EXHIBIT C**

**EXECUTION VERSION**

## INTERIM FUNDING AND SETTLEMENT AGREEMENT

This agreement (the "Agreement") is entered into by and among Nortel Networks Limited ("NNL") and the other entities set forth in Schedule 1 attached hereto, Nortel Networks Inc. ("NNI") and the other entities set forth in Schedule 2 attached hereto, and the Joint Administrators (as defined below) and the entities set forth in Schedule 3 attached hereto (the "EMEA Debtors"). The Joint Administrators, in their individual capacity, shall be party to this Agreement solely for the purposes of Section 17 and references to the Parties shall be construed accordingly.

WHEREAS, on January 14, 2009 (the "Filing Date"), Nortel Networks Corporation ("NNC"), NNL and certain of NNC's other Canadian affiliates included in Schedule 1 (collectively, the "Canadian Debtors," and NNC and its debtor and non-debtor affiliates are sometimes referred to herein (including, without limitation, the EMEA Debtors), as the "Nortel Group"), commenced creditor protection proceedings before the Ontario Superior Court of Justice (Commercial List) (the "Canadian Court") under the Companies' Creditors Arrangement Act (Canada) (respectively, "CCAA" and the "Canadian Proceedings"), in connection with which Ernst & Young Inc. was appointed monitor (the "Monitor"); and

WHEREAS, on the Filing Date, NNI and certain of NNI's United States affiliates included in Schedule 2 (collectively, the "US Debtors" and, together with the Canadian Debtors and the EMEA Debtors, the "Debtors") filed petitions in the United States Bankruptcy Court for the District of Delaware (the "US Court") under chapter 11 of title 11 of the United States Code (respectively, the "Bankruptcy Code," and the "US Proceedings"); and

WHEREAS, on the Filing Date, Nortel Networks UK Limited ("NNUK"), Nortel Networks (Ireland) Limited ("NNIR"), Nortel Networks S.A. ("NNSA") and certain of NNUK's affiliates in the Europe, Middle East and Africa ("EMEA") region, including those in Schedule 3 attached hereto, commenced administration proceedings (the "UK Proceedings" and, together with the Canadian Proceedings and the US Proceedings, the "Proceedings") before the High Court of Justice in London, England (the "UK Court" and, together with the Canadian Court and the US Court, the "Courts"), represented by individuals from Ernst & Young LLP (the "UK Administrator"), and, in the case of NNIR only, Ernst & Young Chartered Accountants (the "NNIR Administrator"), serving as administrators in the UK Proceedings (the UK Administrator and the NNIR Administrator collectively, the "Joint Administrators"); and

WHEREAS, subsequent to the Filing Date, NNSA commenced secondary insolvency proceedings within the meaning of Article 27 of the European Union's Council Regulation (EC) No 1346/2000 on Insolvency Proceedings in the Republic of France pursuant to which a liquidator (the "NNSA Liquidator") and an administrator (the "NNSA Administrator") have been appointed by the Versailles Commercial Court (Docket No. 2009P00492) for NNSA; and

WHEREAS, prior to the Filing Date, certain members of the Nortel Group made quarterly payments (the "Transfer Pricing Payments") to other Nortel Group entities pursuant to a transfer pricing methodology ("Transfer Pricing") provided for in the Transfer Pricing Agreements, where "Transfer Pricing Agreements" means (i) the Master Research and Development Agreement dated as of December 22, 2004 (as amended by, and together with the

related understandings contained in, the documents listed in <u>Annex A</u> hereto, the "<u>Master R&D Agreement</u>") and (ii) certain distribution agreements, whether written or oral, between one or more Nortel entities, including without limitation the agreements listed in <u>Annex B</u> hereto and any other agreements similar to the agreements listed in <u>Annex B</u> hereto (as amended, supplemented or otherwise modified, the "<u>Distribution Agreements</u>"); and

WHEREAS, notwithstanding a US$30 million payment made by NNI to NNL in January, 2009 (the "<u>January Payment</u>"), certain members of the Nortel Group, including, in particular, NNL, have liquidity constraints; and

WHEREAS, it should be noted that no other payments similar to the January Payment have been made between or among the Nortel Group entities since the Filing Date; and

WHEREAS, each of the Parties hereto has concluded it is appropriate and in the best interest of each to enter into this Agreement pursuant to which, *inter alia*: (i) NNI, on behalf of itself and the other US Debtors, shall settle any claims of NNL for corporate overhead and research and development costs, whether pursuant to Transfer Pricing Agreements or otherwise, incurred by NNL for the benefit of the US Debtors which NNL has asserted or could assert (without admission by the US Debtors and subject to Section 20 of this Agreement) would have been reimbursed to NNL through Transfer Pricing Payments payable by the US Debtors to the Canadian Debtors during, or with respect to, the period after the Filing Date through and including September 30, 2009 (respectively, the "<u>Canada/US Interim Period</u>" and the "<u>NNI Interim Obligations</u>") and (ii) the EMEA Debtors shall among themselves and as between one or more EMEA Debtors, on the one hand, and one or more Canadian Debtors and/or US Debtors, on the other hand, settle amounts payable and anticipated to become payable as Transfer Pricing Payments as provided for herein for the period from the Filing Date to December 31, 2009 (the "<u>EMEA Interim Period</u>"), in all cases subject to the terms of this Agreement; and

WHEREAS, the Parties hereto intend this Agreement to constitute a full and final settlement of all matters set forth in this Agreement, whether arising during or related to the Canada/US Interim Period or the EMEA Interim Period, as applicable; and

WHEREAS, the Parties intend to continue to meet their respective obligations to make the monthly payments in respect of the inter-company trading of goods and services by Nortel Group entities (the "<u>Inter-Company Trading Payments</u>") pursuant to and during the effectiveness of the group supplier protocol agreements approved in the applicable Proceedings from time to time (the "<u>GSPAs</u>") or pursuant to and in accordance with court orders entered in the Canadian Proceedings and the US Proceedings ("<u>Trading Orders</u>"); and

WHEREAS, the Official Committee of Unsecured Creditors appointed in the US Proceedings (the "<u>Creditors' Committee</u>") and the steering committee members of the ad hoc group of bondholders that have executed confidentiality or non-disclosure agreements with NNL (the "<u>Bondholders' Committee</u>") have each agreed to support this Agreement.

NOW THEREFORE, THE PARTIES HEREBY AGREE THAT:

PART A – NNI FUNDING TO NNL; SETTLEMENT MATTERS

1. <u>Funding</u>.

    a. NNI shall pay to NNL a sum total of US$157 million (the "<u>Total Payment</u>"), payable in five equal installments of US$31.4 million in accordance with the schedule attached as <u>Annex C</u> hereto, subject to the following limitations:

        i. the first US$131 million of the Total Payment shall be paid on an indefeasible and permanent basis (the "<u>Permanent Payment</u>"); and

        ii. if it is determined, pursuant to a process to be agreed upon by NNL, NNI, the Creditors' Committee and the Bondholders' Committee, that the value of the NNI Interim Obligations is less than US$187 million (being the sum of the Total Payment and the January Payment), then any such portion thereof (being the difference between US$187 million and the value of the NNI Interim Obligations so determined) in excess of US$161 million (any such portion, the "<u>Contingent Payment</u>") shall be repaid by NNL to NNI on October 30, 2009.

    b. NNL's obligation to repay to NNI the Contingent Payment and interest, if any, thereon, shall be secured by a charge against all of the assets of the Canadian Debtors (the "<u>Excess Funding Charge</u>"), which charge shall be granted by order of the Canadian Court and shall rank *pari passu* with the existing court-ordered charge in favor of Export Development Canada (the "<u>EDC Charge</u>"); *provided, however,* that if the EDC Charge is extinguished, then in such case the Excess Funding Charge shall be a second-ranking charge in the Canadian Proceedings, subordinate only to the Administration Charge (and in the case of the Carling Facility, the Carling Facility Charges), and such Excess Funding Charge shall not rank *pari passu* with any other charge that exists or may be granted in the Canadian Proceedings. For the purposes of this provision, the terms "Administration Charge," "Carling Facility" and "Carling Facility Charges" shall have the same meaning as ascribed to each such term in the initial order granted by the Canadian Court on the Filing Date in the Canadian Proceedings, as amended and restated from time to time (the "<u>Canadian Initial Order</u>").

    c. Simple interest shall be payable on the Contingent Payment at the time of repayment at a rate of 10% per annum and shall accrue from the date of NNL's receipt of the Contingent Payment to, but not including, the date of repayment.

    d. Upon payment in full of the Contingent Payment and any accrued interest thereon, the Excess Funding Charge shall be automatically extinguished.

2.  <u>Use of Funds; Reporting.</u>

    a.  NNL has informed NNI, the Creditors' Committee and the Bondholders' Committee, that NNL intends to use the funds from the Total Payment for working capital and those other purposes as reflected in the 13 Week CF Forecast (as defined below) (the "<u>Permitted Uses</u>"). To the extent NNL seeks to use funds from the Total Payment for purposes other than the Permitted Uses, NNL must obtain the consent for such uses from NNI, the Creditors' Committee and the Bondholders' Committee.

    b.  NNL and NNI shall continue to provide to the Creditors' Committee and the Bondholders' Committee, on a weekly basis, (i) rolling 13-week cash flow forecasts (each, a "<u>13 Week CF Forecast</u>"), and (ii) reports on actual weekly cash flow results. NNL further agrees to provide, to the extent not already provided in accordance with the foregoing sentence, each of NNI, the Creditors' Committee and the Bondholders' Committee with a cash flow schedule showing payments for the preceding monthly period and the use of proceeds from the Total Payment to the extent received by NNL, such schedule to be provided no later than the tenth day following the last day of each month commencing with the cash flow schedule for June 2009 and ending with the cash flow schedule for September 2009.

3.  <u>Maximum Payment; Full and Final Settlement.</u> The sum of the Total Payment and the January Payment (being US$187 million) represents (A) the maximum payment that the US Debtors may or could owe in respect of the NNI Interim Obligations, (B) the maximum administrative claim (or such other applicable priority claim) that any of the Debtors (excluding the US Debtors) may have or could assert against one or more US Debtors in any Proceedings with respect to the NNI Interim Obligations, whether pursuant to Sections 503 and 507 of the Bankruptcy Code or otherwise, and (C) constitutes a full and final settlement of any and all NNI Interim Obligations. Each of NNL and the other Canadian Debtors hereby agrees to indemnify, defend and hold harmless each US Debtor from and against any and all actions, suits, claims, proceedings, costs, damages, losses, liabilities, judgments, amounts, fines, penalties, levies, compensations paid in settlement (provided NNL has agreed in writing to any such settlement or such settlement has been approved pursuant to a final court order), and expenses (including without limitation reasonable attorneys' fees and disbursements) resulting from a claim, demand, lawsuit, action or proceeding relating to, arising from or in connection with Transfer Pricing Payments for the calculation period in the applicable Transfer Pricing Agreements in respect of the Canada/US Interim Period.

4.  <u>Settlement of Motions.</u> It is expressly understood that Part A of this Agreement is intended to constitute a full and final settlement of all of the matters set forth in Part A of this Agreement whether arising during, or related to, the Canada/US Interim Period, including, without limitation, any funding motions of the Canadian Debtors and the US Debtors scheduled to be heard by the Canadian Court and the US Court on June 29 and 30, 2009 or such later date or dates as might be agreed or ordered.

4

5.  <u>True-up Obligations</u>.  NNL agrees to use commercially reasonable efforts to recover from Nortel Group entities, other than the Debtors (collectively, "<u>Other Nortel Group Companies</u>"), Transfer Pricing Payments that are determined to be owed to the Canadian Debtors by Other Nortel Group Companies with respect to the Canada/US Interim Period (the "<u>ONGC Costs</u>").  Solely to the extent that the Canadian Debtors actually receive funds in respect of the ONGC Costs from the Other Nortel Group Companies in excess of the amounts provided in the Canadian Debtors' forecast, based on that certain March 2009 Financial Outlook dated April 14, 2009 previously furnished to the Parties, from the Other Nortel Group Companies that are payors, with respect to such ONGC Costs (the "<u>Excess Recoveries</u>"), and it is also determined, pursuant to the process referred to in Section 1.a.ii above, that the value of the NNI Interim Obligations is less than US$161 million (such difference, the "<u>Overage Amount</u>"), the Canadian Debtors shall, in addition to any payments made or required to be made in accordance with Section 1.a.ii. above,  pay U.S. Pro Rata Excess Recoveries (as defined below) to NNI, on behalf of the US Debtors, in an aggregate amount no greater than the lesser of (i) the Overage Amount, and (ii) US$30 million (the "<u>Maximum Overage Repayment</u>") within 30 days of the date of determination thereof; *provided, however,* that some or all of such payment shall not be made to the extent that such payment would, in the reasonable and sole judgment of the Monitor, after consultation with the Creditors' Committee and the Bondholders' Committee, materially and adversely impact the liquidity position of NNL, based on a pro forma 13 Week CF Forecast (giving pro forma effect to such payment) prepared by NNL, with assistance from the Monitor, and provided in advance of such decision by the Monitor to the Creditors' Committee and the Bondholders' Committee (the "<u>NNL Liquidity Review Procedures</u>").  The unpaid balance, if any, of the Maximum Overage Repayment shall be carried forward and shall be payable out of future U.S. Pro Rata Excess Recoveries actually received by the Canadian Debtors from Other Nortel Group Companies that are payors, subject to the NNL Liquidity Review Procedures outlined above, until paid in full.  For the purposes of this Section, "<u>U.S. Pro Rata Excess Recoveries</u>," as of any date of determination shall equal the product of (i) the Excess Recoveries as of such date of such determination (excluding any Excess Recoveries in respect of which NNI has been paid U.S. Pro Rata Excess Recoveries in accordance with this Section 5) and (ii) a fraction (x) the numerator of which shall equal US$161 million <u>minus</u> the Overage Amount and (y) the denominator of which shall equal the aggregate amount of Transfer Pricing Payments payable or paid to the Canadian Debtors by Nortel Group entities (excluding the Canadian Debtors) that are payors for the Canada/US Interim Period (rounded to four decimal points).

<u>PART B – EMEA SELF-FUNDING; SETTLEMENT MATTERS</u>

6.  <u>Administration; Funding</u>.

a.  NNUK is hereby irrevocably authorized to seek payment for its own account from other EMEA Debtors of Transfer Pricing Payments owed, or as such payments become due, under the relevant Transfer Pricing Agreements during, or with respect to, the EMEA Interim Period which would otherwise be made to or administered by NNL, in consideration of the full and final settlement set out in Section 8 below.  Each of the EMEA Debtors hereby appoints NNUK as its agent

5

(without liability, including as to failure of any EMEA Debtor to make any Transfer Pricing Payment) to administer the collection and pro rata distribution of the Transfer Pricing Payments received, solely with respect to the EMEA Interim Period, as detailed on Annex D hereto. Each of the EMEA Debtors agrees that the payments set out in Annex D shall be made to NNUK in cleared funds and without set-off, in consideration of the matters set out in this Agreement, within 30 days of the date hereof, except as otherwise agreed between any EMEA Debtor and NNUK. To the extent that any EMEA Debtor breaches any obligation to make its Transfer Pricing Payment with respect to the EMEA Interim Period, only NNUK and none of NNL, NNI or any of their other affiliates shall have any claim against such defaulting EMEA Debtor for such payment and no EMEA Debtor shall have any claim against NNL, NNI or any of their affiliates (other than such EMEA Debtor) for such payment.

b. Subject to the terms of this Agreement (including without limitation Sections 12.a. and 13.b. of this Agreement), NNL shall pay to NNUK the sum of US$10 million (the "First Shortfall Payment"), such amount to be paid out of the sale proceeds allocated to, and actually received by, NNL from the sale of assets entered into subsequent to the date hereof where the aggregate amount of one or more allocations of sale proceeds to NNL from such sale (after taking into account all purchase price adjustments, taxes and other transaction costs, and excluding the amount of any holdback or escrow for indemnification or otherwise) exceeds the amount previously communicated to the Joint Administrators by NNL in a letter dated the date hereof (with copies to the Monitor, the Creditors' Committee and the Bondholders' Committee) and such communication having been counter-signed by the Joint Administrators (such sale, a "Material Asset Sale"); *provided, however,* that some or all of such payment shall be subject to NNL Liquidity Review Procedures (in this case, however, the NNL Liquidity Review Procedures shall provide the UK Administrator with the same information and consultation rights as provided to the Creditors' Committee and the Bondholders' Committee under the procedures set forth in Section 5 of this Agreement and shall give pro forma effect to such payment and take into account any payments actually received by NNL in connection with such Material Asset Sale).

c. Subject to the terms of this Agreement (including without limitation Sections 12.a. and 13.b. of this Agreement), NNL shall pay to NNUK the sum of US$10 million (the "Second Shortfall Payment" and together with the First Shortfall Payment, the "Shortfall Payments"), such amount to be paid out of the sale proceeds of a Material Asset Sale allocated to, and actually received by, NNL; *provided, however,* that some or all of such payment shall be subject to NNL Liquidity Review Procedures (modified as set forth in Section 6.b. above).

d. The unpaid balance of the Shortfall Payments, if any, shall be carried forward and shall be paid in full or in part to NNUK on the earlier of the date or dates that, (i) in the reasonable and sole judgment of the Monitor, upon consultation with the Creditors' Committee and the Bondholders' Committee, after the

application of the NNL Liquidity Review Procedures (giving pro forma effect to such payment) such payment would not materially and adversely impact the liquidity position of NNL, and (ii) sale proceeds are allocated to, and actually received by, NNL from one or more subsequent Material Asset Sales, subject to the NNL Liquidity Review Procedures (giving pro forma effect to such payment and taking into account the payments actually received by NNL in connection with such Material Asset Sales), until paid in full.  The obligation relating to the Shortfall Payments shall be an obligation of NNL only and of no other entity within the Nortel Group.  Until the Shortfall Payments have been fully paid, NNL shall (i) promptly notify NNUK of the signing and closing of any Material Asset Sale, (ii) provide material information regarding such Material Asset Sale as may be reasonably requested by the UK Administrator, and (iii) upon actual receipt of sale proceeds from such Material Asset Sale, NNL shall promptly inform NNUK of the calculation and allocation of the sale proceeds from such Material Asset Sale to NNL.  For the avoidance of doubt, any Shortfall Payments relating to any Material Asset Sale shall not be used as any basis for claiming that the purchase price allocation to NNUK in respect of such Material Asset Sale has been satisfied in whole or in part, and the Shortfall Payments shall not be excluded from the total amount of sale proceeds available for allocation to the relevant parties to such Material Asset Sale.

e.  NNL's obligation to make the Shortfall Payments shall be secured by a charge against all of the assets of the Canadian Debtors (the "Shortfall Charge"), which charge shall be granted by order of the Canadian Court and shall at all times rank *pari passu* with the Inter-company Charge (as defined in the Canadian Initial Order and as modified from time to time, including without limitation any modifications relating to the priority of such charge).  Without prejudice to the previous sentence, NNUK hereby acknowledges that any current or future charges that have been, or may be, granted to the US Debtors in connection with any funding provided by the US Debtors to the Canadian Debtors may, or could, be senior to the Shortfall Charge, and consents to such charges being senior to the Shortfall Charge.

f.  The Canadian Debtors and the EMEA Debtors hereby confirm that the Shortfall Payments resulted from arm's length negotiations among such Parties.

g.  In the event of any breach of Section 12.a. in connection with the Subject Transaction by any EMEA Debtor, NNL's obligation to make any Shortfall Payments shall be automatically forfeited, and the Shortfall Payments shall not be payable pursuant to Sections 6.b. and 6.c. of this Agreement under any circumstances.  In addition, in such circumstances the Shortfall Charge shall be automatically extinguished.

h.  The Canadian Debtors and the EMEA Debtors hereby confirm that the calculation of the payments set forth in Annex D resulted from arm's length negotiations among such Parties and are based on principles to fairly allocate profits and costs among the EMEA Debtors.

7

7. <u>Covenants</u>.

    a.  [left intentionally blank].

    b.  In respect of NNSA, the EMEA Debtors shall use commercially reasonable efforts to obtain (i) within 30 days of the date hereof, a letter from the NNSA Administrator and the NNSA Liquidator (to the extent legally required) authorizing the UK Administrator to bind NNSA to all provisions of this Agreement applicable to an EMEA Debtor, other than Sections 11.a., 11.b. and 12 of this Agreement, and (ii) within 45 days of the date hereof, a letter from the NNSA Administrator and the NNSA Liquidator (to the extent legally required) authorizing the UK Administrator to bind NNSA to Sections 11.a., 11.b. and 12 as applicable to an EMEA Debtor. The EMEA Debtors hereby agree to provide copies of such letters, upon receipt, to NNL (on behalf of the Canadian Debtors), NNI (on behalf of the US Debtors), the Creditors' Committee and the Bondholders' Committee.

8. <u>Maximum Payment; Full and Final Settlement</u>. Except with respect to the obligation of NNL to make the Shortfall Payments as herein provided, this Agreement shall constitute a full and final settlement of any and all Transfer Pricing Payments owing and that may, or could be, owing between (i) the EMEA Debtors *inter se*, and (ii) an EMEA Debtor, on the one hand, and a Canadian Debtor or a US Debtor, on the other hand, as Transfer Pricing Payments under the Transfer Pricing Agreements for all calculation periods or parts thereof within the EMEA Interim Period including, without limitation, any subsequent determination by any revenue authority with respect to the EMEA Interim Period giving rise to any subsequent liability to taxation of any Party hereto. Upon payment of the Shortfall Payments in full, the Shortfall Charge shall be automatically extinguished.

9. <u>Settlement of Claims Between the US/Canadian Debtors and the EMEA Debtors</u>. It is expressly understood that Part B of this Agreement is intended to constitute a full and final settlement of all of the matters between the US and Canadian Debtors, on the one hand, and the EMEA Debtors, on the other hand, set forth in Part B of this Agreement whether arising during, or related to, the EMEA Interim Period.

<u>PART C – PROVISIONS OF GENERAL APPLICATION</u>

10. <u>Scope of this Agreement</u>. The Parties hereto agree that:

    a.  this Agreement is not, and shall not be deemed to be, an acknowledgement by any Party of the assumption, ratification, adoption or rejection of the Transfer Pricing Agreements or any other Transfer Pricing methodology employed by the Nortel Group or its individual members for any purpose nor shall it be determinative of, or have any impact whatsoever on, the allocation of proceeds to any Debtor from any sale of assets of the Nortel Group; and

    b.  this Agreement shall not have any effect on any claims as to amounts owed or purported to be owed to or by any Party, either: (i) prior to the Filing Date, or (ii)

8

after the Canada/US Interim Period or the EMEA Interim Period, as applicable; *provided, however*, the Parties agree, except as specifically provided herein, that payments required hereunder shall be made in accordance with the terms hereof regardless of any actual or purported right of offset or other defense; and

c.  this Agreement shall not serve as the basis for any claim by any Party against any other Party in respect of Transfer Pricing or any other theory of cost reimbursement in respect of any period prior to or after the Canada/US Interim Period or the EMEA Interim Period, as applicable, or allocation of any sale proceeds, or any ownership of intellectual property; and

d.  each Party approves all payments to be made pursuant to this Agreement and all other matters contemplated hereby, to the extent that such Party is a creditor of the Party making such payment; and

e.  this Agreement is without prejudice to any provision of the Master R&D Agreement, except full and final settlement in relation to Transfer Pricing Payments with respect to the Canada/US Interim Period or the EMEA Interim Period, as applicable, as set out herein; and

f.  this Agreement is without prejudice to any Party's claims relating to Inter-Company Trading Payments, whether pursuant to the GSPAs or the Trading Orders; *provided, however,* that upon satisfaction of the Conditions, it is expressly understood and agreed that the GSPAs do not require, and shall be deemed not to have required, any Party to make Transfer Pricing Payments.

11. Relinquishment of Intellectual Property Licenses.

a.  Each of the US Debtors and the EMEA Debtors hereby agrees to enter into an Appropriate License Termination (as defined below) with respect to the licenses and rights granted by NNL to such Debtors under or pursuant to the provisions of the Master R&D Agreement (such licenses and rights, the "IP Licenses") for the purpose of facilitating, and in consideration of a right to an allocation, to be determined in accordance with this Section 11, to such Debtors of portions of the sale proceeds from, the sale of any material assets of any of the Canadian Debtors and/or the US Debtors to a third party (an "Asset Sale"); *provided, however*, that (x) in the case of the US Debtors, no Appropriate License Termination shall be effective without the prior written consent of the Creditors' Committee and the Bondholders' Committee (which consent in each case shall not be unreasonably withheld), and (y) in the case of the EMEA Debtors, Appropriate License Terminations shall be limited to only those Asset Sales where the project name of the referenced proposed transaction or/and the description of the scope of assets, businesses and technologies covered by such Asset Sales have been previously communicated to the Joint Administrators by NNL in a letter dated the date hereof (with copies to the Monitor, the Creditors' Committee and the Bondholders' Committee) and such communication having been counter-signed by the Joint Administrators.

9

b. For the purposes of this Agreement, the term "Appropriate License Termination" means an agreement to be entered into between NNL, the US Debtors and the EMEA Debtors, providing, effective as of the date of closing of each Asset Sale, (i) for the termination of the IP Licenses (including the right to sublicense) with respect only to any intellectual property used in or related to the businesses or assets being sold in that Asset Sale (the "Transaction IP"); (ii) for the grant by NNL or for the procurement by NNL of the grant by the relevant purchaser of the Transaction IP, as applicable, of a non-exclusive license or sublicense, as applicable, to the EMEA Debtors permitting each such EMEA Debtor to use the Transaction IP to the extent necessary for such Debtor to continue, for the purposes of winding-down its business, the use of such Transaction IP (except for any Transaction IP that is used exclusively in or relates exclusively to the businesses or assets which are the subject of that Asset Sale), as such Transaction IP is being used by such Debtor as of the date of closing of such Asset Sale and only in connection with the types of products and services sold or provided by such Debtor as of that date, including to perform such Debtor's obligations under any customer contract or end user contract that is in existence as of the date of closing of such Asset Sale and is not assigned to the purchaser in such Asset Sale, solely as such contract and such obligations are in effect as of that date (the "Existing Customer Contract"), with the right to sublicense the Transaction IP to such customers (but not to any person or entity which is not a customer of such Debtor as of the date of closing of such Asset Sale) to the extent required under the applicable Existing Customer Contract; (iii) that the foregoing non-exclusive license shall terminate on the date of termination of the applicable Existing Customer Contract (except to the extent that such license remains in effect with respect to the performance of any other Existing Customer Contracts), it being understood that the term of the Existing Customer Contract shall not be extended or renewed beyond its scheduled expiry date except to the extent any automatic extension rights are in effect at the date of closing of such Asset Sale that may be exercised solely at the option of the other party to the relevant Existing Customer Contract without the consent of the Debtor party to such Contract; *provided, however,* that in the event of such automatic extension such Debtor shall be required to seek to terminate the Existing Customer Contract as soon as possible in accordance with the terms of such Existing Customer Contract; and (iv) that the Appropriate License Termination shall not affect the ownership rights that such Debtors and NNL may have to any intellectual property. For the avoidance of doubt, the Appropriate License Termination will not be deemed to be or result in an expiry or termination of the Master R&D Agreement.

c. The Parties hereby agree that, within a reasonable period of the date hereof, the Debtors shall negotiate in good faith and attempt to reach agreement on a timely basis on a sample form agreement to effectuate an Appropriate License Termination, such form to include more specific details as to the scope of "used in or related to", as used in clause (i) of the definition of the term "Appropriate License Termination." In addition, the Parties hereby agree that such sample form agreement shall have additional provisions that the Parties deem appropriate and customary for such license termination agreements.

10

    d.   Where any Debtor enters into any Appropriate License Termination in accordance with the provisions of this Section 11, such Debtor shall be deemed to be a Selling Debtor, and the proceeds of such Asset Sale shall be deemed to be Sale Proceeds, for the purposes of Sections 12.b. and 12.d., and Sections 12.b. and 12.d. shall apply accordingly.

12. <u>Entry into Sale Transactions.</u>

    a.   Each Debtor hereby agrees that its execution of definitive documentation with a purchaser (or, in the case of any auction, the successful bidder in any such auction) of, or closing of any sale of, material assets of any of the Debtors to which such Debtor (a "<u>Selling Debtor</u>") is proposed to be a party (each, a "<u>Sale Transaction</u>") shall not be conditioned upon such Selling Debtor reaching agreement with the other Selling Debtors regarding (A) allocation of the sale proceeds ("<u>Sale Proceeds</u>") from the relevant Sale Transaction or (B) the binding procedure for the allocation of Sale Proceeds from the relevant Sale Transaction.

    b.   Pending the distribution of the Sale Proceeds as described in the second sentence of this Section 12.b., the entire amount of the Sale Proceeds (less applicable transfer or value-added taxes and, to the extent agreed by the Selling Debtors, transaction costs) shall be deposited in an escrow account pursuant to an escrow agreement, the terms of which shall be negotiated and agreed by all Selling Debtors, in each case acting reasonably (the "<u>Escrow Account</u>"). In no case shall there be any distribution from the Escrow Account in advance of either (i) agreement of all of the Selling Debtors or (ii) in the case where the Selling Debtors fail to reach agreement, determination by the relevant dispute resolver(s) under the terms of the Protocol (as defined below) applicable to the Sale Proceeds, and subject in each case to payment of the agreed or determined amount of allocation of Sale Proceeds to all Selling Debtors.

    c.   Without derogating from the obligations provided in Section 12.a., the Debtors shall, as soon as reasonably practicable following the execution of this Agreement, negotiate in good faith and attempt to reach agreement on a timely basis on a protocol for resolving disputes concerning the allocation of Sale Proceeds from Sale Transactions (the "<u>Interim Sales Protocol</u>"), which Protocol shall provide binding procedures for the allocation of Sales Proceeds where the Selling Debtors in such Sale Transaction have been unable to reach agreement regarding such allocation.

    d.   The Selling Debtors shall, immediately following entry into any Sale Transaction, negotiate in good faith and on a timely basis to attempt to reach agreement regarding the allocation of the Sale Proceeds from such Sale Transaction within a reasonable period of time or as may be otherwise provided in the Interim Sales Protocol, failing which the Interim Sales Protocol shall apply to determine the allocation of the relevant Sale Proceeds.

e.  Notwithstanding any other provision of this Section 12, (i) no Debtor shall be required to enter into a Sale Transaction so long as such Debtor reasonably determines, acting in good faith and after consultation with the other Parties to this Agreement, that such Sale Transaction is not in the best economic interests of its creditors generally, and (ii) it is expressly acknowledged by all Debtors that, in relation to any Sale Transaction, neither (A) any matter in the course of negotiation with any prospective purchaser, nor (B) any discussion of, or agreement in relation to, the sharing of liabilities relating to such Sale Transaction (which include severance and other restructuring costs of each Selling Debtor) and sharing of transaction costs relating to such Sale Transaction (which include break fees and indemnification escrow accounts) between the Selling Debtors shall constitute a breach of Section 12.a. of this Agreement.

f.  Nothing in this Section 12 shall prejudice the rights of any Party, or otherwise constitute an amendment, modification or waiver of the rights of any Party, to seek its entitlement to Sale Proceeds from any Sale Transaction.

g.  For the purposes of Sections 11.c. and 12.a. through 12.f. (inclusive):

  i.  the US Debtors hereby agree that with respect to any of the matters referred to in such Sections as to which the agreement or determination of any of the US Debtors is required, the US Debtors shall include the Creditors' Committee and the Bondholders' Committee in any negotiations on such issues with the other Debtors or any related proceedings and any agreement or determination by the US Debtors shall require the prior consent of the Creditors' Committee and the Bondholders' Committee acting in good faith; and

  ii.  the Canadian Debtors hereby agree that with respect to any of the matters referred to in such Sections as to which the agreement or determination of any of the Canadian Debtors is required, the Canadian Debtors shall include the Bondholders' Committee in any negotiations on such issues with the other Debtors or any related proceedings and any agreement or determination by the Canadian Debtors shall require the prior consent of the Bondholders' Committee acting in good faith and the Monitor.

13. Effectiveness.

a.  No provision of this Agreement (other than as set forth in Section 13.f. of this Agreement) shall be effective until the satisfaction of the following conditions: (A) each of the US Court and the Canadian Court approving the entirety of this Agreement and all of the provisions hereof (the "North American Court Condition"), (B) the UK Court giving a direction (the "UK Court's Directions") that, if so sought, the Joint Administrators be at liberty to enter into this Agreement (the "UK Court Condition" and, together with the North American Court Condition, the "Court Approval Condition"); provided, however, the Joint Administrators may at their election waive the UK Court Condition, and (C) the

12

Canadian Court and the US Court approving amendments to the cross-border protocol previously approved by the US Court and the Canadian Court (as may be in effect from time to time, the "Cross-Border Protocol") that are mutually satisfactory to NNL (on behalf of the Canadian Debtors), NNI (on behalf of the US Debtors), the Monitor, the Creditors' Committee and the Bondholders' Committee (the "Cross-Border Protocol Condition", and together with the Court Approval Condition, the "Conditions").

b.  Upon satisfaction of each of the Conditions, all provisions of this Agreement, other than Sections 6.b., 6.c., 6.d., 6.e. and 6.f. of this Agreement, shall be effective as of the date of the satisfaction of the last Condition. Upon execution of the transaction documents relating to the Subject Transaction, Sections 6.b., 6.d., 6.e. and 6.f. of this Agreement shall be effective (except that the term "Shortfall Payments" as used in Sections 6.d., 6.e. and 6.f. shall mean only the First Shortfall Payment until Section 6.c. shall become effective). Upon agreement among the various sellers under the Subject Transaction and the Creditors' Committee and the Bondholders' Committee with regards to (A) the allocation of sale proceeds from the Subject Transaction or (B) the binding procedure for the allocation of sale proceeds from the Subject Transaction, Section 6.c. of this Agreement shall be effective. For the purposes of this Agreement, "Subject Transaction" means the first sale of any material assets of any one or more of the Debtors of each of (i) the Canadian Debtors, (ii) the US Debtors and (iii) the EMEA Debtors (excluding, for the avoidance of doubt, any sale where the involvement of the EMEA Debtors is solely limited to Appropriate License Terminations).

c.  Notwithstanding any of the foregoing, if (i) (x) the UK Court Condition is neither satisfied nor waived by the Joint Administrators in accordance with the terms of Section 13.a. and (y) the Canadian Court and the US Court approve this Agreement, and (ii) the Cross-Border Protocol Condition is fully satisfied, then Part A of this Agreement and those provisions of Part C applicable to Part A shall be effective with regards to the Canadian Debtors and the US Debtors.

d.  Each Party hereto shall:

i.   use commercially reasonable efforts to satisfy the Conditions as soon as possible, taking into account the availability of the respective Courts to address the matters set forth in this Agreement;

ii.  keep all other Parties, the Creditors' Committee and the Bondholders' Committee reasonably apprised of the progress of the satisfaction of the Conditions and provide such other information regarding the satisfaction of the Conditions as reasonably requested by other Parties; and

iii. use commercially reasonable efforts to allow any other Party, the Creditors' Committee or the Bondholders' Committee which so requests in writing reasonable participation in connection with any proceedings in

13

any Court related to the satisfaction of the Conditions; *provided, however,* that no Canadian Debtor or US Debtor shall have any obligation to facilitate the participation by the Joint Administrators or the EMEA Debtors in any proceedings related to the satisfaction of the Cross-Border Protocol Condition; and *provided further* that the foregoing proviso shall not constitute an amendment, modification or waiver of rights of the Joint Administrators and the EMEA Debtors to participate in any court proceedings where they would be entitled to otherwise participate.

e.  If the Joint Administrators elect to seek the UK Court's Directions, then the EMEA Debtors shall (A) use commercially reasonable efforts to obtain the UK Court's Directions as soon as possible, taking into account the availability of the UK Court, (B) keep all other Parties, the Creditors' Committee and the Bondholders' Committee reasonably apprised of the progress of the efforts to obtain UK Court's Directions and provide such other information regarding the efforts to obtain UK Court's Directions as reasonably requested by other Parties, and (C) use commercially reasonable efforts to allow any other Party, the Creditors' Committee or the Bondholders' Committee which so requests in writing reasonable participation in connection with any proceedings in the UK Court related to the UK Court's Directions.

f.  Notwithstanding any of the foregoing, the following provisions of the Agreement shall be effective as of the date hereof: Sections 7.b., 11.c., 12.c., 12.g., 13.d, 13.e., 13.f.,15 – 19, and 21 – 23.

14. <u>Term</u>.  This Agreement shall expire on December 31, 2009 (the "<u>Expiration Date</u>"). Upon termination, the Parties' rights and obligations, except in respect of the obligations under Sections 1, 2, 3, 4, 5, 6, 8, 9, 10, 11, 12, 14, 15, 16, 17, 20, 21 and 22 of this Agreement (but only to the extent that these provisions were effective in accordance with Section 13 of this Agreement prior to the Expiration Date) shall cease immediately but without prejudice to the rights and obligations of the Parties existing before termination.

15. <u>Amendments</u>.  This Agreement may be amended, on no less than 10 Business Days' notice, only by means of a writing signed by all Parties, and approved by the Creditors' Committee and the Bondholders' Committee, which amendments, if material in the judgment of the Parties, must be approved by all of the Courts that initially approved this Agreement or gave directions in respect of this Agreement (in the case of the UK Court). For the purpose of this Section 15, "<u>Business Day</u>" shall mean a day that is not a Saturday, Sunday or national public holiday in Canada, the United States or the United Kingdom.

16. <u>Governing Law and Jurisdiction</u>.

a.  This Agreement shall be governed exclusively by the laws of the State of New York without regard to the rules of conflict of laws of the State of New York or any other jurisdiction; *provided, however,* that Section 17 shall be governed exclusively by English law.

14

b. To the fullest extent permitted by applicable law, each Party (i) agrees to submit to the non-exclusive jurisdiction of the US and Canadian Courts (in a joint hearing conducted under the Cross-Border Protocol adopted by such Court, as it may be in effect from time to time), for purposes of all legal proceedings to the extent relating to the matters agreed in this Agreement (but not, for the avoidance of doubt, any Transfer Pricing Agreement matter generally), (ii) agrees that any claim, action or proceeding by such Party seeking any relief whatsoever to the extent relating to the matters agreed in this Agreement must be commenced in the US Court if such claim, action or proceeding would solely affect the US Debtors, the Canadian Court if such claim, action or proceeding would solely affect the Canadian Debtors, a joint hearing of both the Canadian and US Courts conducted under the Cross-Border Protocol if such claim, action or proceeding would affect the Canadian Debtors and the US Debtors or the EMEA Debtors and the English courts if such claim, action or proceeding would solely affect the EMEA Debtors, (iii) waives and agrees not to assert any objection that it may now or hereafter have to the laying of the venue of any such action brought in such a Court or any claim that any such action brought in such a Court has been brought in an inconvenient forum, (iv) agrees that mailing of process or other papers in connection with any such action or proceeding or any other manner as may be permitted by law shall be valid and sufficient service thereof, and (v) agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by applicable law; *provided, however,* that any claim, action or proceeding set forth in Section 17 of this Agreement shall be brought exclusively in the English courts.

17. <u>No Personal Liability of the Joint Administrators</u>.

a. The Parties agree that the Joint Administrators have negotiated and are entering into this Agreement as agents for the EMEA Debtors to which they are appointed and that none of the Joint Administrators, their firm, partners, employees, advisers, representatives or agents shall incur any personal liability whatsoever whether on their own part or in respect of any failure on the part of any Nortel Group company to observe, perform or comply with any of its obligations under this Agreement or under or in relation to any associated arrangements or negotiations.

b. The Joint Administrators are a Party to this Agreement: (i) as agents of certain of the respective EMEA Debtors of which they are administrators; and (ii) in their own capacities solely for taking the benefit of the statutory charges under Paragraph 99(3) of Schedule B1 of the United Kingdom Insolvency Act 1986 and enforcing the obligations of certain other Parties to this Agreement.

c. Notwithstanding anything in Section 16, any claim, action or proceeding against the Joint Administrators in their personal capacities (and not as agents for any EMEA Debtors) under this Agreement shall be governed exclusively by English law and subject to the exclusive jurisdiction of the English Courts.

15

18. Creditors' Committee and Bondholders' Committee Support.

    a.   Written confirmation has been received from the Creditors' Committee confirming that the members of the Creditors' Committee, after thorough review and due deliberation of this Agreement, have voted, in compliance with the by-laws of the Creditors' Committee, in favor of supporting this Agreement and have granted permission to their advisors to file appropriate materials with the applicable Courts in support of the motions by the Debtors for Court approval of this Agreement.

    b.   Written confirmation has been received from the counsel to the Bondholders' Committee confirming that the Bondholders' Committee has granted permission to its advisors to file appropriate materials with the applicable Courts in support of the motions by the Debtors for Court approval of this Agreement.

19. Representations and Warranties.

    a.   Subject to satisfaction of the Court Approval Condition, each Party (but, for the avoidance of doubt, not the Joint Administrators in their personal capacities) hereby severally represents and warrants to each other that, as of the date hereof:

        i.   it has the power and authority to enter into this Agreement and to carry out its obligations hereunder;

        ii.   the execution of this Agreement, and the consummation of the transactions contemplated herein, have been authorized by all necessary approvals, and no other act or proceeding on its part is necessary to authorize the execution of this Agreement; and

        iii.   this Agreement has been duly executed by it and constitutes its legal, valid and binding obligations.

    b.   Other than entities in or related to the regions of Asia / Pacific, Central and South America, NNSA and Nortel Networks A.G., each Party hereby severally represents and warrants to each other Party that, to the best of such Party's knowledge based on due and reasonable inquiry, including of NNL, it is not party to any Transfer Pricing Agreement with any other Nortel Group entity other than as set forth in this Agreement.

20. Reservation of Rights.  Nothing in this Agreement shall constitute an amendment, modification or waiver of rights of any Party (i) under any other agreement, including, without limitation, the GSPAs and the Transfer Pricing Agreements (except as expressly set forth in Sections 3 and 8 of this Agreement), applicable law or otherwise, including, without limitation, the right to object to the propriety of any payments made under or in connection with the Transfer Pricing Agreements or any offset arising therefrom or otherwise or (ii) with respect to any potential tax contingencies, assessments, rulings or agreements arising from Transfer Pricing Payments pursuant to the Transfer Pricing Agreements or any offset arising therefrom or otherwise; *provided, however,* that the

Parties waive any and all rights to object to or otherwise seek to amend or revisit (A) any payments made pursuant to this Agreement, except that (a) NNI and NNL do not waive their rights to the extent required to allow NNI to enforce its rights against NNL pursuant to Sections 1.a.ii. and 5 of this Agreement, and (b) NNUK does not waive its rights to the extent required to allow NNUK to enforce its rights against NNL pursuant to Section 6 of this Agreement, and (B) the January Payment. The use of the term Transfer Pricing Payment (or any similar term) or reference to the Transfer Pricing Agreements (or similar agreement) in this Agreement is for convenience only and shall have no evidentiary effect or be used by any of the Parties hereto in any proceeding to determine the pre-petition or post-petition validity, applicability, assumption, affirmation or ratification by any Party of the Transfer Pricing Agreements or any transfer pricing methodology provided in the Transfer Pricing Agreements.

21. Counterparts. This Agreement may be executed in separate counterparts (which may include counterparts delivered by facsimile transmission) and all of said counterparts taken together shall be deemed to be an original and shall be binding on the Party who signed the counterpart and all of which together shall constitute a single agreement.

22. Severability. In the event that any provision of this Agreement shall be illegal, invalid or unenforceable, such provision shall be construed by limiting it in such a way so as to render it legal, valid and enforceable to the maximum extent provided by applicable law, and the legality, validity and enforceability of the remaining provisions shall not in any way be affected or impaired by any illegality, invalidity or unenforceability of any provision. The Parties shall negotiate in good faith with respect to any provision to this Agreement found to be illegal, invalid or unenforceable, in order to agree on a substitute provision giving effect, to the maximum extent possible, to the original intent of such provision.

23. Several Obligations. Except as specifically set forth in this Agreement, the obligations of each Party hereunder are several, and not joint and several.

24. Defunct Distributors' Covenant. Each of the Debtors hereby covenants that such Debtor is not currently a party to, and shall not enter, into any arrangement pursuant to which any Transfer Pricing Payments may become payable to or by the following entities: Nortel Networks OY, Nortel Networks AB, or Nortel Networks Shannon Limited.

IN WITNESS WHEREOF, the Parties hereto have caused this Agreement to be duly executed and delivered as of this 9th day of June, 2009.

NORTEL NETWORKS CORPORATION

By _____
    Name: Paviter S. Binning
    Title:  Executive Vice-President,
    Chief Financial Officer and Chief
    Restructuring Officer

By _____
    Name: Tracy S. J. Connelly McGilley
    Title:    Assistant Secretary

NORTEL NETWORKS LIMITED

By _____
    Name: Paviter S. Binning
    Title:  Executive Vice-President,
    Chief Financial Officer and Chief
    Restructuring Officer

By _____
    Name: Tracy S. J. Connelly McGilley
    Title:  Assistant Secretary

NORTEL NETWORKS GLOBAL
CORPORATION

By _____
    Name: Paviter S. Binning
    Title:  Director

By: _____
    Tracy S. J. Connelly McGilley
    Assistant Secretary

Signature page to Interim Funding
and Settlement Agreement

NORTEL NETWORKS INTERNATIONAL
CORPORATION

By _____

    Name: Paviter S. Binning

    Title:  Director

By _____

    Tracy S. J. Connelly McGilley

    Assistant Secretary


NORTEL NETWORKS TECHNOLOGY
CORPORATION

By _____

    Name: Paviter S. Binning

    Title: Director

By: _____

    Name: Tracy S. J. Connelly McGilley

    Title:   Assistant Secretary


Signature page to Interim Funding
and Settlement Agreement

NORTEL NETWORKS INC.

By _____
    Name: John Doolittle
    Title: Vice President


ARCHITEL SYSTEMS (U.S.)
CORPORATION

By _____
    Name: John Doolittle
    Title: Vice President


CORETEK, INC.

By _____
    Name: John Doolittle
    Title: Vice President


NORTEL ALTSYSTEMS, INC.

By _____
    Name: John Doolittle
    Title: Vice President


NORTEL ALTSYSTEMS
INTERNATIONAL INC.

By _____
    Name: John Doolittle
    Title: Vice President


NORTEL NETWORKS APPLICATIONS
MANAGEMENT SOLUTIONS INC.

By _____
    Name: John Doolittle
    Title: Vice President

Signature page to Interim Funding
and Settlement Agreement

NORTEL NETWORKS CABLE
SOLUTIONS INC.

By _____
    Name: John Doolittle
    Title: Vice President


NORTEL NETWORKS CAPITAL
CORPORATION

By _____
    Name: John Doolittle
    Title: Vice President


NORTEL NETWORKS HPOCS INC.

By _____
    Name: John Doolittle
    Title: Vice President


NORTEL NETWORKS INTERNATIONAL
INC.

By _____
    Name: John Doolittle
    Title: Vice President

NORTEL NETWORKS OPTICAL
COMPONENTS INC.

By _____
    Name: John Doolittle
    Title: Vice President


NORTHERN TELECOM
INTERNATIONAL INC.

By _____
    Name: John Doolittle
    Title: Vice President


Signature page to Interim Funding
and Settlement Agreement

QTERA CORPORATION

By _____

Name: John Doolittle

Title: Vice President


SONOMA SYSTEMS

By _____

Name: John Doolittle

Title:  Vice President


XROS, INC.

By _____

Name: John Doolittle

Title:  Vice President

Signed by ALAN BLOOM on behalf of each
of the Joint Administrators of each of the
EMEA Debtors over which they have been
appointed, without personal liability as
provided in Section 17 of this Agreement
and solely for the purpose of obtaining the
benefit of the provisions of this Agreement
expressed to be conferred on or given to each
of the Joint Administrators

By _____

Name: _____

Title: _____

in the presence of: _____

Witness Signature _____

_____

Name: _____
Address: _____

_____

SIGNED for and on behalf of NORTEL          )
NETWORKS UK LIMITED (IN                      )     ALAN BLOOM
ADMINISTRATION)                              )
by ALAN BLOOM as Joint Administrator         )
(acting as agent and without personal
liability) in the presence of:

Witness signature _____

Name: _____
Address: _____

_____

SIGNED for and on behalf of NORTEL ) 
NETWORKS (IRELAND) LIMITED ) ALAN BLOOM
(IN ADMINISTRATION) )
by ALAN BLOOM as Joint Administrator )
(acting as agent and without personal
liability) in the presence of:

Witness signature

Name:
Address:

SIGNED for and on behalf of NORTEL )
NETWORKS NV (IN )
ADMINISTRATION) ) ALAN BLOOM
by ALAN BLOOM as Joint Administrator )
(acting as agent and without personal
liability) in the presence of:

Witness signature

Name:
Address:

SIGNED for and on behalf of NORTEL )
NETWORKS SPA (IN )
ADMINISTRATION) ) ALAN BLOOM
by ALAN BLOOM as Joint Administrator )
(acting as agent and without personal
liability) in the presence of:

Witness signature

Name:
Address:

SIGNED for and on behalf of NORTEL            )
NETWORKS BV (IN                              )      ALAN BLOOM
ADMINISTRATION)                              )
by ALAN BLOOM as Joint Administrator         )
(acting as agent and without personal
liability) in the presence of:

Witness signature

Name: _____
Address: _____


SIGNED for and on behalf of NORTEL            )
NETWORKS POLSKA SP Z.O.O. (IN                )      ALAN BLOOM
ADMINISTRATION)                              )
by ALAN BLOOM as Joint Administrator         )
(acting as agent and without personal
liability) in the presence of:

Witness signature

Name: _____
Address: _____


SIGNED for and on behalf of NORTEL            )
NETWORKS HISPANIA SA (IN                     )      ALAN BLOOM
ADMINISTRATION)                              )
by ALAN BLOOM as Joint Administrator         )
(acting as agent and without personal
liability) in the presence of:

Witness signature

Name: _____

Address: _(handwritten)_

SIGNED for and on behalf of NORTEL
NETWORKS (AUSTRIA) GMBH (IN                )
ADMINISTRATION)                             )        ALAN BLOOM
by ALAN BLOOM as Joint Administrator        )
(acting as agent and without personal
liability) in the presence of:

Witness signature _(signature)_

Name: _(handwritten)_
Address: _(handwritten)_


SIGNED for and on behalf of NORTEL
NETWORKS SRO (IN                            )
ADMINISTRATION)                             )        ALAN BLOOM
by ALAN BLOOM as Joint Administrator        )
(acting as agent and without personal
liability) in the presence of:

Witness signature _(signature)_

Name: _(handwritten)_
Address: _(handwritten)_

SIGNED for and on behalf of NORTEL
NETWORKS ENGINEERING
SERVICES KFT (IN
ADMINISTRATION)
by ALAN BLOOM as Joint Administrator
(acting as agent and without personal
liability) in the presence of:

)
)
)
)   ALAN BLOOM

Witness signature

Name:
Address:

SIGNED for and on behalf of NORTEL
NETWORKS PORTUGAL SA (IN
ADMINISTRATION)
by ALAN BLOOM as Joint Administrator
(acting as agent and without personal
liability) in the presence of:

)
)   ALAN BLOOM
)
)

Witness signature

Name:
Address:

SIGNED for and on behalf of NORTEL
NETWORKS SLOVENSKO SRO (IN
ADMINISTRATION)
by ALAN BLOOM as Joint Administrator
(acting as agent and without personal
liability) in the presence of:

)
)   ALAN BLOOM
)
)

Witness signature

Name: *Helen Macnaughton*

Address: *1 More London Place*

*London SE1.*

**SIGNED** for and on behalf of **NORTEL**          )
**NETWORKS ROMANIA SRL (IN**                         )  **ALAN BLOOM**
**ADMINISTRATION)**                                  )
by **ALAN BLOOM** as Joint Administrator            )
(acting as agent and without personal
liability) in the presence of:

Witness signature

Name: *Helen Macnaughton*

Address: *1 More London Place*

*London SE.*

**SIGNED** for and on behalf of **NORTEL**          )
**GMBH (IN ADMINISTRATION)**                         )  **ALAN BLOOM**
by **ALAN BLOOM** as Joint Administrator            )
(acting as agent and without personal               )
liability) in the presence of:

Witness signature

Name: *Helen Macnaughton*

Address: *1 More London Place*

*London SE1.*

SIGNED for and on behalf of NORTEL
NETWORKS OY (IN                     )     ALAN BLOOM
ADMINISTRATION)                     )
by ALAN BLOOM as Joint Administrator )
(acting as agent and without personal
liability) in the presence of:

Witness signature

Name:
Address:

SIGNED for and on behalf of NORTEL
NETWORKS AB (IN                     )     ALAN BLOOM
ADMINISTRATION)                     )
by ALAN BLOOM as Joint Administrator )
(acting as agent and without personal
liability) in the presence of:

Witness signature

Name:
Address:

SIGNED for and on behalf of NORTEL
NETWORKS INTERNATIONAL             )     ALAN BLOOM
FINANCE AND HOLDING BV (IN         )
ADMINISTRATION)                    )
by ALAN BLOOM as Joint Administrator
(acting as agent and without personal
liability) in the presence of:

Witness signature

Name:
Address:

SIGNED for and on behalf of NORTEL        )
NETWORKS FRANCE S.A.S. (IN               )        ALAN BLOOM
ADMINISTRATION)                          )
by ALAN BLOOM as Joint Administrator     )
(acting as agent and without personal
liability) in the presence of:

Witness signature ——

Name: _Helen Macnaughta_
Address: _1 More London Place_
_London SE._

**Schedule 1**

**Canadian Debtors**

Nortel Networks Corporation

Nortel Networks Limited

Nortel Networks Global Corporation

Nortel Networks International Corporation

Nortel Networks Technology Corporation

**Schedule 2**

**US Debtors**

Nortel Networks Inc.

Architel Systems (U.S.) Corporation

CoreTek, Inc.

Nortel Altsystems, Inc. (previously "Alteon WebSystems, Inc.")

Nortel Altsystems International Inc. (previously "Alteon WebSystems International, Inc.")

Nortel Networks Applications Management Solutions Inc.

Nortel Networks Cable Solutions Inc.

Nortel Networks Capital Corporation

Nortel Networks HPOCS Inc.

Nortel Networks International Inc.

Nortel Networks Optical Components Inc.

Northern Telecom International Inc.

Qtera Corporation

Sonoma Systems

Xros, Inc.

**Schedule 3**

**EMEA Debtors**

Nortel Networks UK Limited (In Administration)

Nortel Networks (Ireland) Limited (In Administration)

Nortel Networks NV (In Administration)

Nortel Networks SpA (In Administration)

Nortel Networks BV (In Administration)

Nortel Networks Polska Sp z.o.o. (In Administration)

Nortel Networks Hispania, SA (In Administration)

Nortel Networks (Austria) GmbH (In Administration)

Nortel Networks sro (In Administration)

Nortel Networks Engineering Services Kft (In Administration)

Nortel Networks Portugal SA (In Administration)

Nortel Networks Slovensko, sro (In Administration)

Nortel Networks Romania Srl (In Administration)

Nortel GmbH (In Administration)

Nortel Networks Oy (In Administration)

Nortel Networks AB (In Administration)

Nortel Networks International Finance & Holding BV (In Administration)

Nortel Networks France S.A.S. (In Administration)

**Annex A**

**Amendments to and Related Understandings Regarding
Master Research and Development Agreement
dated as of December 22, 2004 ("Master R&D Agreement")**

1.    Undated Addendum to Master R&D Agreement executed between October 2005 and June 2006.

2.    Agreement with Respect to Certain NN Technology effective as of December 30, 2006 (being the day before the closing date of the Share and Asset Sale Agreement between NNL and Alcatel-Lucent).

3.    Addendum to Master R&D Agreement dated December 14, 2007 with an effective date of January 1, 2006.

4.    Third Addendum to Master R&D Agreement with an effective date of January 1, 2006.

5.    Fourth Addendum to Master R&D Agreement with an effective date of December 31, 2008.

6.    Letter of acknowledgment dated January 14, 2009 from NNL to the Directors of NNUK, NNSA and NNIR and the UK Administrator.

7.    Release in Connection with Master R&D Agreement dated 1 January 2009.

8.    Memorandum of Understanding in Connection with Master R&D Agreement, undated with an effective date of 1 January 2006.

A-1

## Annex B

### Distribution Agreements

| Party | Date |
|---|---|
| Nortel Networks Limited ("NNL") and Nortel Networks N.V. | undated, effective as of 1 January 2001 |
| NNL and Nortel Networks S.p.A. | undated, effective as of 1 January 2002 (plus undated and unsigned Addendum, effective as of 1 January 2003) |
| NNL and Nortel Networks B.V. | dated 22 December 2003, effective as of 1 January 2001 |
| NNL and Nortel Networks Polska Sp. z. o. o. | undated, effective as of 1 January 2001 (letter of amendment executed in November 2003, effective as of 1 January 2001 plus Addendum executed in August 2005, effective as of 1 January 2003) |
| NNL and Nortel Networks Hispania, S.A. | undated, effective as of 1 January 2001 |
| NNL and Nortel Networks (Austria) GmbH | undated, effective as of 1 January 2001 |
| NNL and Nortel Networks, s.r.o. | dated 15 April 2003, effective as of 1 January 2001 |
| NNL and Nortel Networks Engineering Services Kft | undated, effective as of 1 January 2001 |
| NNL and Nortel Networks Portugal S.A. | undated, effective as of 1 January 2001 |
| NNL and Nortel Networks Slovensko, s.r.o. | undated, effective as of 1 January 2001 |
| NNL and Nortel Networks Romania SRL | executed 22 January 2004, effective 1 January 2003 |
| NNL and Nortel Networks AG | undated, effective 1 January 2001 |

**Annex C**

**Funding Schedule**

Payments pursuant to Section 1.a. of this Agreement shall be paid in the following amounts and on the following dates (if the Conditions (other than the UK Court's Directions) are not satisfied by the payment dates set forth below, each such payment date shall be automatically postponed to one (1) business day after the date of satisfaction of such Conditions):

| | |
|---|---|
| June 10, 2009 | US$31,400,000.00 |
| June 15, 2009 | US$31,400,000.00 |
| July 31, 2009 | US$31,400,000.00 |
| August 31, 2009 | US$31,400,000.00 |
| September 30, 2009 | US$31,400,000.00 |
| **TOTAL** | **US$157,000,000.00** |

C-1

**Annex D**

**Intra-EMEA Transfer Pricing Settlement Amounts**

| EMEA Debtor | Amount payable US$m |
|---|:---:|
| [Nortel Networks S.A.][1] | [(4.80)] |
| Nortel Networks (Ireland) Limited | (20.84) |
| [Nortel Networks AG][1] | [(4.08)] |
| Nortel Networks Hispania SA | (1.72) |
| Nortel Networks Slovensko s.r.o | (0.52) |
| Nortel Networks Romania SRL | (0.19) |
| Nortel Networks Portugal S.A. | (1.50) |
| Nortel Networks Polska S.p.z.o.o | (8.22) |
| Nortel Networks B.V. | (17.99) |
| Nortel Networks S.p.A. | (2.73) |
| Nortel Networks Engineering Services Kft | (1.92) |
| Nortel Networks s.r.o | (2.79) |
| Nortel Networks N.V. | (6.43) |
| Nortel Networks Austria GmbH | (2.35) |

---

[1] To the extent it becomes a Party hereto.

| EMEA Debtor | Amount receivable US$m |
|---|---|
| Nortel Networks UK Limited | [4.80 (Nortel Networks S.A.)] [1] |
| | 20.84 (Nortel Networks (Ireland) Limited) |
| | [4.08 (Nortel Networks AG)] [1] |
| | 1.72 (Nortel Networks Hispania SA) |
| | 0.52 (Nortel Networks Slovensko s.r.o) |
| | 0.19 (Nortel Networks Romania SRL) |
| | 1.50 (Nortel Networks Portugal S.A.) |
| | 8.22 (Nortel Networks Polska S.p.z.o.o) |
| | 17.99 (Nortel Networks B.V.) |
| | 2.73 (Nortel Networks S.p.A.) |
| | 1.92 (Nortel Networks Engineering Services Kft) |
| | 2.79 (Nortel Networks s.r.o) |
| | 6.43 (Nortel Networks N.V.) |
| | 2.35 (Nortel Networks Austria GmbH) |