## EXHIBIT C

Court File No.  09-CL-7950

*ONTARIO*
**SUPERIOR COURT OF JUSTICE**
**(COMMERCIAL LIST)**

IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL CORPORATION AND NORTEL NETWORKS TECHNOLOGY CORPORATION

APPLICATION UNDER THE *COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED

**AFFIDAVIT OF ALAN ROBERT BLOOM**

I, Alan Robert Bloom, of the City of London, in the United Kingdom, MAKE OATH AND SAY:

1.        I am a licensed insolvency practitioner and partner in the firm of Ernst & Young LLP ("E&Y") and was appointed as a joint administrator of each of the EMEA Companies in Administration (defined below) on January 14, 2009 together with Stephen John Harris, Alan Michael Hudson, and Christopher John Wilkinson Hill, of E&Y, save in respect of Nortel Networks (Ireland) Limited (**"NN Ireland"**) where David Martin Hughes, of Ernst & Young Chartered Accountants, and myself were appointed as the joint administrators, pursuant to the orders of Mr. Justice Blackburne of the High

- 2 -

Court of Justice, Chancery Division, Companies Court (the "UK Court"). I will refer to us collectively in this affidavit as the "Joint Administrators".

2.          As one of the Joint Administrators, I have personal knowledge of the matters to which I depose. To the extent that I do not have personal knowledge, I verily believe the information to which I depose.

3.          I swear this affidavit in support of the objection by the EMEA Debtors (as defined below at paragraph 6) to the motion by the Applicants (as defined in the motion returnable in these proceedings on January 21, 2010), seeking an order of this Honourable Court approving, *inter alia*, the Canadian Funding and Settlement Agreement dated December 23, 2009 (the "Motion" and the "CFA" respectively) and the CRA APA and NNI Claim (as defined in the Doolittle Affidavit (defined below)).

**Background**

4.          On January 14, 2009, the Canadian Debtors (as defined below) were granted protection under the Companies' Creditors Arrangement Act, R.S.C. 1985, c. C-36, as amended pursuant to an initial order (as subsequently amended and restated, the "Initial Order") and Ernst & Young Inc. was appointed the monitor (the "Monitor") in these CCAA proceedings. A copy of the Initial Order is attached hereto as Exhibit "A".

5.          On August 14, 2009, this Court issued an order expanding the powers of the Monitor. A copy of this Order is attached hereto as Exhibit "B". A copy of this Court's endorsement made in connection with that Order is attached as Exhibit "C". A copy of the affidavit of Gordon A. Davies sworn on August 11, 2009 in support of that Order is attached (without exhibits) as Exhibit "D" and a copy of the Nineteenth Report

- 3 -

of the Monitor dated August 11, 209 in connection with that Order is attached as Exhibit "E".

6.          On January 14, 2009, the following Nortel companies were placed into administration under the Insolvency Act 1986 by orders of the UK Court (the "Administration Orders"):

(a)    Nortel Networks UK Limited (England) ("**NNUK**");

(b)    Nortel GmbH (Germany);

(c)    NN Ireland;

(d)    Nortel Networks NV (Belgium);

(e)    Nortel Networks S.P.A. (Italy);

(f)    Nortel Networks BV (Netherlands);

(g)    Nortel Networks Polska SP. Z O.O. (Poland);

(h)    Nortel Networks Hispania SA (Spain);

(i)    Nortel Networks International Finance & Holdings BV (Netherlands);

(j)    Nortel Networks (Austria) GmbH (Austria);

(k)    Nortel Networks S.R.O. (Czech Republic);

(l)    Nortel Networks Engineering Service KFT. (Hungary);

(m)    Nortel Networks Portugal SA (Portugal);

(n)    Nortel Networks Slovensko S.R.O. (Slovakia);

(o)    Nortel Networks France SAS (France);

(p)    Nortel Networks Oy (Finland);

25633152-1

- 4 -

(q)   : Nortel Networks Romania SRL (Romania);

(r)    Nortel Networks AB (Sweden); and

(s)    Nortel Networks SA (France) ("**NN France**") (collectively the entities listed
        in (a) to (s) are referred to herein as the "**EMEA Debtors**").

7.        By way of the Administration Orders, the UK Court also found that the centre of main interest (the "**COMI**"), as defined by the Council Regulation (EC) on Insolvency Proceedings 2000 (No 1346/2000) (the "**Regulation**"), of each of the EMEA Companies in Administration was in England.  Accordingly, each of the administrations is a main insolvency proceeding as defined in Article 3(1) of the Regulation (the "**Main Proceedings**").

8.        The Joint Administrators for NN France subsequently considered it in the best interests of the creditors of that company for it to commence secondary proceedings under Article 27 of the Regulation ("**Secondary Proceedings**") in France.  As such, on May 28, 2009 the Commercial Court of Versailles, France (the "**French Court**") ordered the commencement of Secondary Proceedings in respect of NN France pursuant to which a liquidator ("**NN France Liquidator**") and an administrator ("**NN France Administrator**"), (together the "**French Office Holders**") were appointed by the French Court.  While NN France remains in administration under the Administration Orders, its assets situated in France are subject to the French insolvency regime and the control of the French Office Holders which consists of liquidation proceedings during which NN France would continue to operate as a going concern for an initial period.

25633152-1

- 5 -

9.          Prior to the opening of Secondary Proceedings, on the application of the

Joint Administrators of NN France, on May 20, 2009 the UK Court ordered, *inter alia*,

that the Joint Administrators be at liberty to enter into a protocol (the "**Protocol**") to

ensure the coordination of the Main Proceedings and Secondary Proceedings in relation

to NN France.  A further hearing of the Commercial Court of Versailles took place on 26

June 2009 in order to approve the terms of the NN France Protocol which was entered

into by the office holders in the French liquidation.

**Transfer Pricing Agreements**

10.          As discussed in the Affidavit of John Doolittle sworn January 18, 2010 as

filed in the Motion Record of the Applicants in connection with the Motion (the "**Doolittle**

**Affidavit**"), the Nortel group is a highly integrated business with significant distribution

and research and development operations around the world.  In particular, the Nortel

group's purchasing arrangements result in very large numbers of inter-company

receivables and payables, which necessitates transfer pricing and inter-group settling

methods.

11.          Nortel's business requires the development, licensing and maintenance of

intellectual property and the marketing of products and services based on that

intellectual property (the "**NN Technology**").  Nortel Networks Limited ("**NNL**"), Nortel

Networks Inc ("**NNI**"), NNUK, NN Ireland and NN France (the "**Participating Nortel**

**Entities**") are or have been the primary source of the research and development that

has created the NN Technology, the benefits of which are shared across multiple Nortel

corporate entities.  The Participating Nortel Entities also provide service and support on

25633152-1

- 6 -

an ongoing basis to Nortel customers in their respective jurisdictions, as well as certain overhead and institutional support to Nortel entities and customers outside of their jurisdictions.

12.        Certain other Nortel group companies function primarily as "limited risk" sales and distribution operations. They act as intermediaries between the Participating Nortel Entities and customers in jurisdictions not served by the Participating Nortel Entities and they provide ongoing service and support in their local jurisdictions ("**LR Distributors**").

13.        To facilitate the integrated Nortel group operations, certain Nortel companies (including the Participating Nortel Entities and the LR Distributors) have entered into a number of agreements and have been engaged in certain practices designed both to allow Nortel to operate on a global basis and to allocate profits and losses, and certain costs.

14.        Since at least January 1, 2001, the "Master R&D Agreement" (as amended) ("**MRDA**") has governed the transfer pricing arrangements between the Participating Nortel Entities. The MRDA operates in tandem with separate but dependant bilateral sale and distribution "Limited Risk Agreements" (the "**Distribution Agreements**") between the LR Distributors and NNL. The Distribution Agreements and the MRDA together with the documents and agreements listed in Annex A and Annex B of the IFSA (as defined in paragraph 24 below) form the "**Transfer Pricing Agreements**"). A copy of the MRDA is attached hereto as Exhibit "F".

**The MRDA**

25633152-1

- 7 -

15.        The MRDA is the key agreement which governs transfer pricing arrangements for the Participating Nortel Entities that undertake research and development activity and thereby have incurred or are likely to incur research and development expenditure and which are granted  licences in respect of intellectual property.

16.        The MRDA is a multilateral agreement between the Participating Nortel Entities and provides that NNL is to administer the agreement as between them.

17.        As provided for in Article 3(d) of the MRDA "NNL agrees to administer this Agreement. . . including without any limitation the making of any determinations required under the RPSM".

18.        The residual profit split methodology ("**RPSM**") determines the compensation due to the Participating Nortel Entities for their respective research and development activity for the benefit of the Nortel group (see in particular Schedule A of the MRDA).

19.        With respect to seeking such payments from the Participating Nortel Entities, the MRDA provides that "[a]ny amount owning by a Participant under this Agreement will be due and payable immediately upon written notice of its R&D Allocation from NNL" (see Article 3(g) of the MRDA).

**The Group Supplier Protocol Agreements**

20.        The Transfer Pricing Agreements (along with other intra group agreements) were intended to facilitate intra-group trading.  To ensure that this intra-

25633152-1

- 8 -

group trading continued and so as to allow the Nortel group to undergo a business and financial restructure, on January 14, 2009, two Group Supplier Protocol Agreements were entered into in respect of post administration intra-group trading of goods and services (together the "**GSPAs**").

21.        The GSPAs were entered into between NNL (and certain other Canadian entities) and each of the EMEA Debtors and separately between NNI (and certain other US entities) and each of the EMEA Debtors. The GSPAs are otherwise in identical terms. The initial GSPA with NNL was approved by this Court pursuant to the Initial Order. A copy of the initial GSPA with NNL is attached hereto as Exhibit "G".

22.        The GSPAs, as periodically extended, enable each of the EMEA Debtors (party to the GSPAs) to continue to trade with NNI (and certain other US entities) and NNL (and certain other Canadian entities) in the ordinary course on the basis that goods and services provided post administration would be paid for in full. The definition of "Goods and Services" in the GSPAs makes specific reference to the MRDA.

23.        As such, the Nortel entities that have contributed the most to research and development activity have continued to trade on the basis of the GSPA during the post-petition period. As a result, these entities have continued to incur trading losses (which for some of these entities includes expenditure on research and development activity) in the expectation that they will recoup a significant proportion of such losses by operation of the Transfer Pricing Agreements as protected by the GSPAs.

**The Interim Funding and Settlement Agreement**

25633152-1

- 9 -

24.        Despite the operation of the GSPAs, since January 14, 2009, and therefore the continuation of the Transfer Pricing Agreements within the Nortel group, the only payment that the Participating Nortel Entities made until the entry into the Interim Funding and Settlement Agreement on June 9, 2009 and as approved by this Court on June 29, 2009 (the "IFSA") that could arguably be said to have been one of the "true up payments" that are required to operate the Transfer Pricing Agreements, and in particular the MRDA, was a payment made in January 2009 of US$30 million by NNI to NNL.

25.        Without receiving the payments it normally received under the Transfer Pricing Agreements as protected by the GSPA for the period post administration NNL faced significant liquidity issues.

26.        Further, NNL and NNUK continued to incur trading losses (which included research and development expenditure) on the basis of the GSPA during the post administration period. Both NNL and NNUK did so in the expectation that they would recoup a significant proportion of such losses by operation of the Transfer Pricing Agreements as protected by the GSPAs.

27.        To resolve this and after lengthy negotiations the following parties entered into the IFSA to resolve NNL's liquidity issues and to enable NNUK to continue incurring trading losses:

    (i)    The **"Canadian Debtors"**, comprising:

        (a)    NNC

        (b)    NNL;

25633152-1

- 10 -

    (c)    Nortel Networks Global Corporation;

    (d)    Nortel Networks International Corporation; and

    (e)    Nortel Networks Technology Corporation.

(ii)    The "**US Debtors**", comprising:

    (a)    NNI;

    (b)    Architel Systems (U.S.) Corporation;

    (c)    CoreTek, Inc.;

    (d)    Nortel Alsystems, Inc. (previously Alteon WebSystems, Inc.);

    (e)    Nortel Alsystems International Inc. (previously Alteon WebSystems International, Inc.);

    (f)    Nortel Networks Applications Management Solutions Inc.;

    (g)    Nortel Networks Cable Solutions Inc.;

    (h)    Nortel Networks Capital Corporation;

    (i)    Nortel Networks HPOCS Inc.;

    (j)    Nortel Networks International Inc.;

    (k)    Nortel Networks Optical Components Inc.;

    (l)    Northern Telecom International Inc.;

    (m)    Qtera Corporation;

    (n)    Sonoma Systems; and

    (o)    Xros, Inc.

(iii)    The EMEA Debtors, ((i) to (iii) collectively the "**IFSA Parties**").

25633152-1

- 11 -

28.        The IFSA Parties included all of the Participating Nortel Entities under the MRDA.

29.        The IFSA essentially provided partial funding of NNL by NNI, in settlement of claims that NNL had made against NNI for amounts due under the Transfer Pricing Agreements for the period since the January 14, 2009 through until September 30, 2009 while NNL obtained sufficient liquidity to continue the process of selling its assets.  The IFSA also provided for the settlement of the amounts due under the Transfer Pricing Agreements for the period since the January 14, 2009 through until December 31, 2009 owed to NNUK.  The amounts owed to NNUK were satisfied first by way of self-settlement amongst the EMEA Debtors and second by two shortfall payments from NNL to bridge some of the gap between the amount actually owed to NNUK under the Transfer Pricing Agreements and the amount to be paid by the EMEA Debtors through self-settlement (the "**Shortfall Payments**").

30.        The IFSA takes pains to preserve the Nortel Entities' pre and post-filing claims against each other under the Transfer Pricing Agreements as well as their other agreements.

31.        Although the IFSA provides for the refund of certain amounts paid by NNI to NNL in excess of amounts provided in a March 2009 forecast, and also provides for the Shortfall Payments, the IFSA ensures the continued liquidity of NNL by providing that both the refunds and the Shortfall Payments would be postponed if such payments would materially and adversely affect the liquidity position of NNL, based on certain forecasts prepared by NNL.

25633152-1

- 12 -

32.        The IFSA was approved by this Court by Order dated June 29, 2009, a
copy of which is attached as Exhibit "H". A copy of the IFSA as approved by that Order
is attached as Exhibit "I".

**Funding of NNL After September 30, 2009**

33.        Whilst the IFSA sought to ensure the continued liquidity of NNL for the
period up to September 30, 2009, it was always envisaged by the IFSA Parties that it
would be necessary, after that date, for NNL to receive further funding in order for it to
continue to trade.

34.        As three of the EMEA Debtors are Participating Nortel Entities and party to
the MRDA and all of the EMEA Debtors were IFSA Parties, the EMEA Debtors
considered that any future arrangement to resolve any issues under the Transfer Pricing
Agreements would involve the EMEA Debtors and be multilateral in nature. One of the
reasons for this is that the MRDA is multilateral in nature and does not provide for and
has not operated on the basis of bilateral arrangements.

35.        From late 2009, the EMEA Debtors were aware that the Canadian Debtors
were discussing funding issues with the US Debtors. Whilst the EMEA Debtors were
not a direct party to these negotiations it was presumed, given the multilateral nature of
the MRDA and the IFSA, that the EMEA Debtors would be consulted with and/ or
involved in the discussions at some stage if those agreements were to be affected. On
this basis, the EMEA Debtors requested that the Monitor keep them informed of the
progress of the funding negotiations.

25633152-1

- 13 -

**The Canadian Funding Agreement**

36.        Despite these requests to be kept informed on the funding negotiations, the US Debtors filed a motion on December 23, 2009 requesting that the United States Bankruptcy Court for the District of Delaware (the "**US Court**") approve the US Debtors entry into the CFA and granting the related relief (the "**US Motion**") without prior notice of, or consultation with, the EMEA Debtors.  The objection deadline for the US Motion was January 14, 2010 (the "**Objection Deadline**").

37.        As the US Motion was filed over the holiday period the EMEA Debtors were only able to properly consider the terms of CFA and the US Motion in the first week of January 2010.  Having reviewed the CFA and the accompanying US Motion, Herbert Smith LLP (UK counsel to the EMEA Debtors and Joint Administrators) on behalf of the EMEA Debtors wrote a letter on January 12, 2010 to the US Debtors and the Monitor requesting that they provide some clarification on the CFA and its terms as they impacted on the EMEA Debtors (the "**Letter**").  A copy of the Letter is attached hereto at Exhibit "J"

38.        The Letter explained that whilst the EMEA Debtors were requesting clarification on the CFA and some further information from the Monitor they wanted to avoid filing a formal objection or reservation of rights with the US Court.  In order to avoid filing an objection the EMEA Debtors requested that the US Debtors confirm that the EMEA Debtors were granted an extension until 4:00pm EST January 18, 2010 to the Objection Deadline.  The rationale for this was that the extension would enable the

25633152-1

- 14 -

EMEA Debtors to resolve their concerns with the US Debtors and the Monitor and avoid the need to file an objection.

39.        Despite the EMEA Debtors' request for an extension until 4:00pm EST January 18, 2010, Joe Pasquariello of Goodmans LLP (counsel to the Monitor), on behalf of the Monitor, wrote to the EMEA Debtors on January 13, 2009 and suggested that the EMEA Debtors have a conference call with the representatives of the US Debtors and the Canadian Debtors and the Monitor. A copy of this email is attached hereto at Exhibit "K". In agreeing to participate in this conference call, the EMEA Debtors hoped that the US Debtors, Canadian Debtors and the Monitor would address their concerns on the CFA.

40.        Whilst I was unable to attend the conference call I have been informed by Herbert Smith LLP that the US Debtors, Canadian Debtors and the Monitor did not address any of the EMEA Debtors' concerns on the conference call. Furthermore, the EMEA Debtors were told that the Monitor may be prepared to provide some of information which the EMEA Debtors had requested as long as it remained confidential. It was proposed that the counsel to the Monitor, Goodmans, would send a draft confidentiality agreement to the EMEA Debtors.

41.        Following the conference call, on January 14, 2010, Stephen Gale of Herbert Smith LLP wrote an email to the US Debtors and the Monitor on behalf of the EMEA Debtors noting that the US Debtors had still not granted the requested extension and that the EMEA Debtors would be forced to file an objection to protect their position unless an extension was granted. The email noted that Goodmans had not yet

25633152-1

- 15 -

provided a draft of any confidentiality agreement. It also explained that any confidentiality agreement would need to allow the EMEA Debtors to rely on that confidential information at Court, subject to the EMEA Debtors applying for the appropriate sealing orders. A copy of this email is attached hereto at Exhibit "L".

42.        James Bromley of Cleary Gottlieb Steen & Hamilton LLP ("**Cleary**") responded to Stephen Gale's email on January 14, 2010 on behalf of the US Debtors and granted the EMEA Debtors an extension until 4:00pm January 15, 2010. A copy of this email is attached hereto at Exhibit "M".

43.        On January 15, 2010 Joe Pasquariello of Goodmans, on behalf of the Monitor, sent a draft confidentiality agreement to the EMEA Debtors. A copy of this confidentiality agreement and its cover email is attached hereto at Exhibit "N".

44.        On January 15, 2010 Stephen Gale again wrote to the US Debtors, Canadian Debtors and the Monitor noting that the EMEA Debtors had still not been granted the requested extension until 4:00pm EST January 18, 2010 but that to assist the US Debtors and the Monitor in better understanding the EMEA Debtors' concerns we would send them a draft copy of the EMEA Debtors' objection to the US Motion (the "**Draft Objection**"). On this basis the EMEA Debtors requested an extension until 4:00pm EST January 19, 2010.

45.        Stephen Gale's email also noted that the confidentiality agreement that the Monitor had provided on January 15, 2010 would prevent the EMEA Debtors from being able to use any information and that whilst the EMEA Debtors were happy to sign a

25633152-1

- 16 -

confidentiality agreement they would need to be able to use the information, if necessary, before a court. A copy of this email is attached hereto at Exhibit "O".

46.        In response to this email James Bromley granted the EMEA Debtors an extension until 4:00pm EST January 19, 2010. A copy of this email is attached hereto at Exhibit "P".

47.        No substantive response has been received to the Letter although I understand that there are confidentiality concerns regarding the Canadian Revenue Authority.

48.        Since January 18, 2010 the US Debtors, the Canadian Debtors, the Monitor and the EMEA Debtors have also discussed the scope of the EMEA Debtors' objections on a without prejudice basis. To facilitate these discussions the US Debtors granted a further extension to file an objection in the US proceedings to midday on January 20, 2010.

49.        As at the time of this affidavit, the Joint Administrators have not been able to agree the terms of the order.

50.        As such the Joint Administrators have filed an objection in the US Court which sets out their position with respect to the proposed orders. A copy of this objection is attached hereto as Exhibit "Q".

25633152-1

- 17 -

**Conclusion**

51.        Whilst I am aware and accept that NNL requires funding in order to be able to continue to trade I believe that the Applicants had and continue to have other avenues of funding available to them in order to deal with their liquidity issues. For example, such funding needs may be able to be addressed by an interim release of sales proceeds pursuant to the various sale escrow agreements (subject to appropriate protections). As I understand it the Canadian Debtors have not explored this option. Instead the Applicants have sought to agree funding by way of the CFA which is a bilateral arrangement in a way which is contrary to the operation of the MRDA, the IFSA and the Transfer Pricing Agreements and the interests of the EMEA Debtors.

SWORN BEFORE ME at            )
the City of _London_____ , in the   )
_United Kingdom_____ , this   )
20th day of ~~November~~ January, 2010   )

                                            _ALAN ROBERT BLOOM_

25633152-1

This is Exhibit "A"

referred to in the Affidavit of

Alan Robert Bloom

sworn before me

this _20_ day of January, 2010

Court File No.    09-CL-7950

### *ONTARIO*
### SUPERIOR COURT OF JUSTICE
### COMMERCIAL LIST

| | | |
|---|---|---|
| THE HONOURABLE MR. | ) | WEDNESDAY, THE 14TH |
| | ) | |
| JUSTICE MORAWETZ | ) | DAY OF JANUARY, 2009 |



IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,
R.S.C. 1985, c. C-36, AS AMENDED

**AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF
NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED,
NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS
INTERNATIONAL CORPORATION AND NORTEL NETWORKS TECHNOLOGY
CORPORATION (the "Applicants")**

**APPLICATION UNDER THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,
R.S.C. 1985, c. C-36, AS AMENDED**

#### THIRD AMENDED AND RESTATED INITIAL ORDER

THIS APPLICATION, made by the Applicants, pursuant to the *Companies' Creditors
Arrangement Act*, R.S.C. 1985, c. C-36, as amended (the "CCAA") was heard this day at 330
University Avenue, Toronto, Ontario.

ON READING the affidavit of John Doolittle sworn January 14, 2009 (the "Doolittle Affidavit")
and the Exhibits thereto, the affidavit of John Doolittle sworn June 22, 2009 (the "June
Affidavit") and the Exhibits thereto, the report dated January 14, 2009 of Ernst & Young Inc.
("E&Y"), the proposed monitor, and on hearing the submissions of counsel for the Applicants,
counsel for the boards of directors of Nortel Networks Corporation and Nortel Networks
Limited, counsel for E&Y, counsel for Export Development Canada ("EDC"), Flextronics

- 2 -

Telecom Systems Ltd., no one else appearing on this Application and on reading the consent of E&Y to act as the Monitor,

**SERVICE**

1.      THIS COURT ORDERS that the time for service of the Notice of Application and the Application Record is hereby abridged so that this Application is properly returnable today and hereby dispenses with further service thereof.

**APPLICATION**

2.      THIS COURT ORDERS AND DECLARES that each of the Applicants is a "debtor company" to which the CCAA applies.

**PLAN OF ARRANGEMENT**

3.      THIS COURT ORDERS that each of the Applicants shall have the authority to file and may, subject to further order of this Court, file with this Court a plan of compromise or arrangement (hereinafter referred to as the "Plan") between, *inter alia*, such Applicant and one or more classes of its secured and/or unsecured creditors as it deems appropriate.

**POSSESSION OF PROPERTY AND OPERATIONS**

4.      THIS COURT ORDERS that each of the Applicants shall remain in possession and control of its current and future assets, undertakings and properties of every nature and kind whatsoever, and wherever situate including all proceeds thereof (the "Property"). Subject to further Order of this Court, each of the Applicants shall continue to carry on business in a manner consistent with the preservation of its business (the "Business") and Property. Each of the Applicants shall be authorized and empowered to continue to retain and employ the employees, consultants, agents, experts, brokers, accountants, legal counsel, financial advisors and such other persons (collectively "Assistants") currently retained or employed by such Applicant, with liberty to retain such further Assistants as such Applicant deems reasonably necessary or desirable for the Business or to carry out the terms of this Order or for the purposes of the Plan.

DOCSTOR: 1713506\5

-3-

5.      THIS COURT ORDERS that the Applicants shall be entitled to continue to utilize the central cash management system currently in place as described in the Doolittle Affidavit or replace it with another substantially similar central cash management system (the "Cash Management System") and that any present or future bank or banks providing the Cash Management System shall not be under any obligation whatsoever to inquire into the propriety, validity or legality of any transfer, payment, collection or other action taken under the Cash Management System, or as to the use or application by the Applicants of funds transferred, paid, collected or otherwise dealt with in the Cash Management System; shall be entitled to provide the Cash Management System without any liability in respect thereof to any Person (as hereinafter defined) other than the Applicants, pursuant to the terms of the documentation applicable to the Cash Management System; and shall be, in its capacity as provider of the Cash Management System, an unaffected creditor under the Plan with regard to any claims or expenses it may suffer or incur in connection with the provision of the Cash Management System.

6.      THIS COURT ORDERS that each of the Applicants, either on its own behalf or on behalf of another Applicant, shall be entitled but not required to pay the following expenses whether incurred prior to, on or after the date of this Order:

   (a)    all outstanding and future wages, salaries and employee benefits (including, but not limited to, employee medical and similar benefit plans, relocation and tax equalization programs, the Incentive Plan (as defined in the Doolittle Affidavit) and employee assistance programs), current service, special and similar pension benefit payments, vacation pay, commissions and employee and director expenses, in each case incurred in the ordinary course of business and consistent with existing compensation policies and arrangements;

   (b)    compensation to employees in respect of any payments made to employees prior to the date of this Order by way of the issuance of cheques or electronic transfers, which are subsequently dishonoured due to the commencement of proceedings under the CCAA;

- 4 -

(c)    all outstanding and future amounts owing to or in respect of individuals working as independent contractors in connection with the Business;

(d)    the fees and disbursements of any Assistants retained or employed in accordance with paragraph 4 hereof;

(e)    subject to the consent of the Monitor, amounts owing by one of more of the Applicants in respect of its Customer Programs (as defined in the Doolittle Affidavit);

(f)    subject to consent of the Monitor, amounts owing by one or more of the Applicants to any other Nortel Company (as defined in the Doolittle Affidavit) in order to settle their inter-company accounts and make inter-company loans in the ordinary course of business, including as a result of the Nortel Companies' Transfer Pricing Model (as defined in the Doolittle Affidavit); and

(g)    subject to the consent of the Monitor, amounts owing to the Applicants' carriers and warehousemen.

7.    THIS COURT ORDERS that, except as otherwise provided to the contrary herein, each of the Applicants shall be entitled but not required to pay all reasonable expenses incurred by it in carrying on the Business in the ordinary course on and after the date of this Order, and in carrying out the provisions of this Order, which expenses shall include, without limitation:

(a)    all expenses and capital expenditures reasonably necessary for the preservation of the Property or the Business including, without limitation, payments on account of insurance (including directors and officers insurance) and maintenance and security services;

(b)    payment for goods or services actually supplied to the Applicants on or after the date of this Order;

(c)    with the written approval of the Monitor, the posting of additional cash collateral into existing cash collateral accounts (collectively, and together with the cash collateral posted as at February 10, 2009, the "LC Cash Collateral") held by either or both of ABN AMRO Bank N.V., Canada Branch ("ABN") and Royal Bank of Canada

- 5 -

("RBC") as additional and continuing security for existing, renewed and new letters of credit, letters of guarantee, surety bonds, and similar instruments (collectively, "LCs") issued (whether before or after January 14, 2009) for the account of or requested by the Applicants or any of them to third parties pursuant to the existing letter of credit agreements between the Applicants and ABN and RBC and any amendments thereto made with the written approval of the Monitor, and for any foreign exchange losses incurred by ABN and its correspondent banks, if any, under LCs issued in currencies other than Canadian dollars, U.S. dollars, British pounds sterling and Euros, on the following basis:

(i)    the posting of such additional cash collateral is for the purposes of paragraph 10 hereof specifically permitted herein and authorized hereby and shall not and will not constitute a fraudulent preference, fraudulent conveyance, oppressive conduct, settlement or other challengeable, voidable or reviewable transaction under any applicable law;

(ii)    the aggregate of all cash collateral that may be posted (inclusive of the cash collateral posted as at February 10, 2009) in respect of LCs issued in Canadian dollars, U.S. dollars, British pounds sterling and Euros shall not exceed the amount of U.S.$40 million (converting Canadian dollars at the Bank of Canada's Noon spot exchange rate for any day), provided that the LC Banks shall have no liability in the event that cash collateral is posted in an amount that exceeds such maximum and the validity of their claims with respect to any or all of the LC Cash Collateral shall not be limited, lessened or otherwise impaired in any way as a result of such excess; and

(iii)    cash collateral may be posted in respect of LCs issued by ABN in any other currencies in such amounts as are required by the provisions of the applicable letter of credit agreement, including any amendments thereto made with the written approval of the Monitor as security for ABN's exposure to foreign exchange losses;

- 6 -

(d)    if the same is not guaranteed by EDC, payment of any indebtedness of the Applicants to the LC Banks (as defined in paragraph 10A hereof) when due under the LC Agreements (as defined in paragraph 10A hereof) by way of set-off and transfer of LC Cash Collateral posted as at January 14, 2009 or posted thereafter pursuant to the LC Agreements and subparagraph (c) above;

(e)    without limiting (d), payment of costs and expenses of the LC Banks in connection with the amendment and enforcement of rights under the LC Agreements and any related guarantee bonds issued by EDC if so provided for under an applicable LC Agreement, whether incurred before or after February 10, 2009, including by way of set-off and transfer of LC Cash Collateral;

(f)    the posting of cash collateral in favour of Export Development Canada ("EDC") (collectively, the "EDC Cash Collateral") pursuant to the second amended and restated short-term support agreement between Nortel Networks Limited ("NNL") and EDC dated April 24, 2009, as amended by the amending agreement between NNL and EDC dated June 18, 2009, and the cash collateral agreement between NNL and EDC dated June 18, 2009 and any further amendments to the foregoing made with the written approval of the Monitor (collectively, the "EDC Support Agreements"), on the basis that the EDC Support Agreements are hereby ratified and approved and the posting of such cash collateral is for the purposes of paragraph 10 hereof specifically permitted herein and authorized hereby and shall not and will not constitute a fraudulent preference, fraudulent conveyance, oppressive conduct, settlement or other challengeable, voidable or reviewable transaction under any applicable law;

(g)    payment of any indebtedness of NNL to EDC under the EDC Support Agreements by way of set-off or transfer of EDC Cash Collateral posted as at June 29, 2009 or posted thereafter pursuant to the EDC Support Agreements and subparagraph (f) above; and

(h)    without limiting (g), payment of costs and expenses of EDC provided for under the EDC Support Agreements by way of set-off or transfer of EDC Cash Collateral, to the extent provided for in the EDC Support Agreements.

- 7 -

7A.    THIS COURT ORDERS that no provision of this Order shall require EDC to provide its approval for any proposed amendments to any of the LC Agreements pursuant to any agreement between EDC and any of the LC Banks.

8.    THIS COURT ORDERS that the each of the Applicants shall remit, in accordance with legal requirements, or pay:

     (a)    any statutory deemed trust amounts in favour of the Crown in right of Canada or of any Province thereof or any other taxation authority which are required to be deducted from employees' wages, including, without limitation, amounts in respect of (i) employment insurance, (ii) Canada Pension Plan, (iii) Quebec Pension Plan, and (iv) income taxes;

     (b)    all goods and services or other applicable sales taxes (collectively, "Sales Taxes") required to be remitted by such Applicant in connection with the sale of goods and services by such Applicant, but only where such Sales Taxes are accrued or collected after the date of this Order, or where such Sales Taxes were accrued or collected prior to the date of this Order but not required to be remitted until on or after the date of this Order; and

     (c)    any amount payable to the Crown in right of Canada or of any Province or Territory thereof or any political subdivision thereof or any other taxation authority in respect of municipal realty, municipal business or other taxes, assessments or levies of any nature or kind which are entitled at law to be paid in priority to claims of secured creditors and which are attributable to or in respect of the carrying on of the Business by such Applicant.

9.    THIS COURT ORDERS that until such time as an Applicant delivers a notice in writing to repudiate a real property lease in accordance with paragraph 11(c) of this Order (a "Notice of Repudiation"), each Applicant shall pay all amounts constituting rent or payable as rent under real property leases (including, for greater certainty, common area maintenance charges, utilities and realty taxes and any other amounts payable to the landlord under the lease) or as otherwise may be negotiated by such Applicant and the landlord from time to time ("Rent"), for the period commencing from and including the date of this Order, monthly on the first day of each month,

- 8 -

in advance (but not in arrears).  On the date of the first of such payment, any arrears relating to the period commencing from and including the date of this Order shall also be paid.  Upon delivery of a Notice of Repudiation, such Applicant shall pay all Rent due for the notice period stipulated in paragraph 11(c) of this Order, to the extent that Rent for such period has not already been paid.

10.    THIS COURT ORDERS that, except as specifically permitted herein, each of the Applicants is hereby directed, until further Order of this Court: (a) to make no payments of principal, interest thereon or otherwise on account of amounts owing by such Applicant to any of its creditors as of this date unless such payments have been approved by the Monitor; (b) to grant no security interests, trust, liens, charges or encumbrances upon or in respect of any of its Property; and (c) to not grant credit or incur liabilities except in the ordinary course of business unless such obligation has been approved by the Monitor.

10A.    THIS COURT ORDERS that, notwithstanding paragraph 10 hereof,

(a)    the existing letter of credit agreements between the Applicants and ABN, RBC and Citibank, N.A. acting through its Canadian branch ("Citibank") and any amendments thereto made after January 14, 2009 with the written approval of the Monitor, together with any agreements entered into by the Applicants or any of them with any other lenders with the written approval of the Monitor providing letter of credit facilities or similar facilities to the Applicants or any of them (including those which may be the subject of EDC guarantee bonds issued pursuant to the EDC Support Facility) (collectively, the "LC Agreements"), and the issuance or renewal of LC's pursuant thereto by ABN, RBC, Citibank and any other lenders (collectively, the "LC Banks"), together with any payments made by the Applicants or EDC with respect thereto; and

(b)    the EDC Support Agreements and any amendments thereto made after June 18, 2009 with the written consent of the Monitor, together with any payments made by NNL with respect thereto,

-9-

are specifically permitted herein and authorized hereby and shall not and will not constitute fraudulent preferences, oppressive conduct, settlements or other challengeable, voidable or reviewable transactions under any applicable law

10B.    THIS COURT ORDERS that, notwithstanding any other provision in this Order, no LC Bank shall be required to issue a letter of credit to the Applicants or any of them and EDC shall not be required to provide any Secured Support to the Applicants or any of them.

**RESTRUCTURING**

11.    THIS COURT ORDERS that each of the Applicants shall, have the right to:

    (a)    permanently or temporarily cease, downsize or shut down any of its business or operations and to dispose of redundant or non-material assets not exceeding CDN$10,000,000 in any one transaction or CDN$50,000,000 in the aggregate, subject to paragraph (c), if applicable;

    (b)    terminate the employment of such of its employees or temporarily lay off such of its employees as it deems appropriate and to deal with the consequences thereof in the Plan or on further order of the Court;

    (c)    in accordance with paragraphs 12 and 13, vacate, abandon or quit the whole but not part of any leased premises and/or repudiate any real property lease and any ancillary agreements relating to any leased premises, on not less than seven (7) days notice in writing to the relevant landlord on such terms as may be agreed upon between the Applicant and such landlord, or failing such agreement, to deal with the consequences thereof in the Plan;

    (d)    repudiate such of its arrangements or agreements of any nature whatsoever, including, without limitation, any of its deferred compensation, or bonus plans, change of control plans, stock options or restructured stock unit plans and shareholder rights plans whether oral or written, as such Applicant may deem appropriate on such terms as may be agreed upon between such Applicant or any one of them and such counter-

- 10 -

parties, or failing such agreement, to deal with the consequences thereof in the Plan; and

(e)   pursue all avenues of refinancing and offers for material parts of its Business or Property, in whole or part, subject to prior approval of this Court being obtained before any material refinancing or any sale (except as permitted by subparagraph (a), above);

all of the foregoing to permit the Applicants to proceed with an orderly restructuring of the Business (the "Restructuring").

12.   THIS COURT ORDERS that each of the Applicants shall provide each of the relevant landlords with notice of such Applicant's intention to remove any fixtures from any leased premises at least seven (7) days prior to the date of the intended removal. The relevant landlord shall be entitled to have a representative present in the leased premises to observe such removal and, if the landlord disputes such Applicant's entitlement to remove any such fixture under the provisions of the lease, such fixture shall remain on the premises and shall be dealt with as agreed between any applicable secured creditors, such landlord and such Applicant, or by further Order of this Court upon application by such Applicant on at least two (2) days notice to such landlord and any such secured creditors. If such Applicant repudiates the lease governing such leased premises in accordance with paragraph 11(c) of this Order, it shall not be required to pay Rent under such lease pending resolution of any such dispute (other than Rent payable for the notice period provided for in paragraph 11(c) of this Order), and the repudiation of the lease shall be without prejudice to such Applicant's claim to the fixtures in dispute.

13.   THIS COURT ORDERS that if a Notice of Repudiation is delivered, then (a) during the notice period prior to the effective time of the repudiation, the landlord may show the affected leased premises to prospective tenants during normal business hours, on giving the Applicants and the Monitor 24 hours' prior written notice, and (b) at the effective time of the repudiation, the relevant landlord shall be entitled to take possession of any such leased premises without waiver of or prejudice to any claims or rights such landlord may have against the Applicants in respect of such lease or leased premises and such landlord shall be entitled to notify the Applicants of the basis on which it is taking possession and to gain possession of and re-lease such leased

- 11 -

premises to any third party or parties on such terms as such landlord considers advisable, provided that nothing herein shall relieve such landlord of its obligation to mitigate any damages claimed in connection therewith.

## NO PROCEEDINGS AGAINST THE APPLICANTS OR THE PROPERTY

14.    THIS COURT ORDERS that until and including February 13, 2009 or such later date as this Court may order (the "Stay Period"), no proceeding or enforcement process in any court or tribunal (each, a "Proceeding") shall be commenced, or continued against or in respect of any of the Applicants or the Monitor, or affecting the Business or the Property, except with the written consent of the affected Applicant and the Monitor, or with leave of this Court, and any and all Proceedings currently under way against or in respect of the affected Applicant or affecting the Business or the Property are hereby stayed and suspended pending further Order of this Court.

## NO EXERCISE OF RIGHTS OR REMEDIES

15.    THIS COURT ORDERS that during the Stay Period, all rights and remedies of any individual, firm, corporation, governmental body or agency, or any other entities (all of the foregoing, collectively being "Persons" and each being a "Person") against or in respect of the Applicants or the Monitor, or affecting the Business or the Property, are hereby stayed and suspended except with the written consent of the affected Applicant and the Monitor, or leave of this Court, provided that nothing in this Order shall (i) empower the Applicants to carry on any business which the Applicants are not lawfully entitled to carry on, (ii) exempt the Applicants from compliance with statutory or regulatory provisions relating to health, safety or the environment, (iii) prevent the filing of any registration to preserve or perfect a security interest, or (iv) prevent the registration of a claim for lien.

## NO INTERFERENCE WITH RIGHTS

16.    THIS COURT ORDERS that during the Stay Period, no Person shall discontinue, fail to honour, alter, interfere with, repudiate, terminate or cease to perform any right, renewal right, contract, agreement, licence or permit in favour of or held by the Applicants, except with the written consent of the Applicants and the Monitor, or leave of this Court.

- 12 -

**CONTINUATION OF SERVICES**

17.    THIS COURT ORDERS that during the Stay Period, all Persons having oral or written agreements with the Applicants or with third parties on behalf of the Applicants, or statutory or regulatory mandates for the supply of goods and/or services, including without limitation all computer software, communication and other data services, centralized banking services, payroll services, employment agency services, insurance, transportation services, utility, leasing or other services to the Business or to any of the Applicants, are hereby restrained until further Order of this Court from discontinuing, altering, interfering with or terminating the supply of such goods or services as may be required by the applicable Applicant and that such Applicant shall be entitled to the continued use of its current premises, telephone numbers, facsimile numbers, internet addresses and domain names, provided in each case that the normal prices or charges for all such goods or services received after the date of this Order are paid by such Applicant, in accordance with normal payment practices of such Applicant, as applicable, or such other practices as may be agreed upon by the supplier or service provider and the affected Applicant and the Monitor, or as may be ordered by this Court.

**NON-DEROGATION OF RIGHTS**

18.    THIS COURT ORDERS that, notwithstanding anything else contained herein, no creditor of the Applicants shall be under any obligation after the making of this Order to advance or re-advance any monies or otherwise extend any credit to the Applicants.  Nothing in this Order shall derogate from the rights conferred and obligations imposed by the CCAA.

**PROCEEDINGS AGAINST DIRECTORS AND OFFICERS**

19.    THIS COURT ORDERS that during the Stay Period, and except as permitted by subsection 11.5(2) of the CCAA, no Proceeding may be commenced or continued against any of the former, current or future directors or officers of the Applicants with respect to any claim against the directors or officers that arose before the date hereof and that relates to any obligations of the Applicants whereby the directors or officers are alleged under any law to be liable in their capacity as directors or officers for the payment or performance of such

- 13 -

obligations, until a compromise or arrangement in respect of the Applicants, if one is filed, is sanctioned by this Court or is refused by the creditors of the Applicants or this Court.

**DIRECTORS AND OFFICERS**

20.     THIS COURT ORDERS that each of the Applicants shall indemnify its directors and officers from all claims, costs, charges and expenses relating to the failure of such Applicant, after the date hereof, to make payments of the nature referred to in subparagraphs 6(a), 6(b), 8(a), 8(b) and 8(c) of this Order or for the Applicants' failure to make payments in respect of employer health tax or workers' compensation which they sustain or incur by reason of or in relation to their respective capacities as directors and/or officers except to the extent that, with respect to any officer or director, such officer or director has actively participated in the breach of any related fiduciary duties or has been grossly negligent or guilty of wilful misconduct.

21.     THIS COURT ORDERS that the directors and officers of the Applicants shall be entitled to the benefit of and are hereby granted a charge (the "Directors' Charge") on the Property, which charge shall not exceed an aggregate amount of CDN$90 million, as security for the indemnities provided in paragraph 20 of this Order as well as the fees and disbursements of their legal counsel. The Directors' Charge shall have the priority set out in paragraphs 42 and 44 herein.

22.     THIS COURT ORDERS that, notwithstanding any language in any applicable insurance policy to the contrary, (a) no insurer shall be entitled to be subrogated to or claim the benefit of the Directors' Charge, and (b) each of the Applicants' directors and officers shall only be entitled to the benefit of the Directors' Charge to the extent that they do not have coverage under any directors' and officers' insurance policy, or to the extent that such coverage is insufficient to pay amounts indemnified in accordance with paragraph 20 of this Order.

23.     THIS COURT ORDERS that each of NNC's and NNL's directors shall be entitled to receive remuneration in cash on a current basis at current compensation levels (less an overall U.S.$25,000 reduction) notwithstanding the terms of, or elections made under, the Directors' Compensation Plan.

- 14 -

**APPOINTMENT OF MONITOR**

24.     THIS COURT ORDERS that E&Y is hereby appointed pursuant to the CCAA as the Monitor, an officer of this Court, to monitor the Property and the Applicants' conduct of the Business with the powers and obligations set out in the CCAA or set forth herein and that each of the Applicants and its officers, directors, and Assistants shall advise the Monitor of all material steps taken by such Applicant pursuant to this Order, and shall co-operate fully with the Monitor in the exercise of its powers and discharge of its obligations.

25.     THIS COURT ORDERS that the Monitor, in addition to its prescribed rights and obligations under the CCAA, is hereby directed and empowered to:

  (a)     monitor the Applicants' receipts and disbursements;

  (b)     provide the consents contemplated herein;

  (c)     report to this Court at such times and intervals as the Monitor may deem appropriate with respect to matters relating to the Property, the Business, and such other matters as may be relevant to the proceedings herein;

  (d)     advise the Applicants in their preparation of the Applicants' cash flow statements and any other reporting to the Court or otherwise;

  (e)     advise the Applicants in their development of the Plan or Plans and any amendments to such Plan or Plans;

  (f)     assist the Applicants, to the extent required by the Applicants, with the Restructuring;

  (g)     assist the Applicants, to the extent required by the Applicants, with the holding and administering of creditors' or shareholders' meetings for voting on the Plan or Plans;

  (h)     have full and complete access to the books, records and management, employees and advisors of the Applicants and to the Business and the Property to the extent required to perform its duties arising under this Order;

- 15 -

(i)     be at liberty to engage independent legal counsel or such other persons as the Monitor deems necessary or advisable respecting the exercise of its powers and performance of its obligations under this Order including, without limitation, one or more entities related to or affiliated with the Monitor;

(j)     consider, and if deemed advisable by the Monitor, prepare a report and assessment on the Plan or Plans;

(k)     assist the Applicants with respect to any insolvency proceedings commenced by or with respect to any other Nortel Company (as defined in the Doolittle Affidavit) in any foreign jurisdiction (collectively, "Foreign Proceedings") and report to this Court, as it deems appropriate, on the Foreign Proceedings with respect to matters relating to the Applicants;

(l)     apply as the foreign representative of the Applicants, for recognition of these proceedings as "Foreign Main Proceedings", pursuant to Chapter 15 of the United States Bankruptcy Code, 11 U.S.C. §101 (the "U.S. Bankruptcy Code") or similar legislation in any other jurisdiction; and

(m)     perform such other duties as are required by this Order or by this Court from time to time.

26.     THIS COURT ORDERS that the Monitor shall not take possession of the Property and shall take no part whatsoever in the management or supervision of the management of the Business and shall not, by fulfilling its obligations hereunder, be deemed to have taken or maintained possession or control of the Business or Property, or any part thereof.

27.     THIS COURT ORDERS that nothing herein contained shall require the Monitor to occupy or to take control, care, charge, possession or management (separately and/or collectively, "Possession") of any of the Property that might be environmentally contaminated, might be a pollutant or a contaminant, or might cause or contribute to a spill, discharge, release or deposit of a substance contrary to any federal, provincial or other law respecting the protection, conservation, enhancement, remediation or rehabilitation of the environment or relating to the disposal of waste or other contamination including, without limitation, the

- 16 -

*Canadian Environmental Protection Act*, the Ontario *Environmental Protection Act*, the *Ontario Water Resources Act*, or the Ontario *Occupational Health and Safety Act* and regulations thereunder (the "Environmental Legislation"), provided however that nothing herein shall exempt the Monitor from any duty to report or make disclosure imposed by applicable Environmental Legislation. The Monitor shall not, as a result of this Order or anything done in pursuance of the Monitor's duties and powers under this Order, be deemed to be in Possession of any of the Property within the meaning of any Environmental Legislation, unless it is actually in possession.

28.    THIS COURT ORDERS that that the Monitor shall provide any creditor of the Applicants with information provided by the Applicants in response to reasonable requests for information made in writing by such creditor addressed to the Monitor. The Monitor shall not have any responsibility or liability with respect to the information disseminated by it pursuant to this paragraph. In the case of information that the Monitor has been advised by the Applicants is confidential, the Monitor shall not provide such information to creditors unless otherwise directed by this Court or on such terms as the Monitor and the Applicants may agree.

29.    THIS COURT ORDERS that, in addition to the rights and protections afforded the Monitor under the CCAA or as an officer of this Court, the Monitor shall incur no liability or obligation as a result of its appointment and the fulfilment of its duties or the carrying out of the provisions of this Order, save and except for any gross negligence or wilful misconduct on its part. Nothing in this Order shall derogate from the protections afforded the Monitor by the CCAA or any applicable legislation.

30.    THIS COURT ORDERS that the Monitor, counsel to the Monitor, counsel to the Applicants and counsel to directors shall be paid their reasonable fees and disbursements incurred both before and after the making of the Order, in each case at their standard rates and charges, by the Applicants as part of the costs of these proceedings. Each of the Applicants is hereby authorized and directed to pay the accounts of the Monitor, counsel for the Monitor, counsel for the Applicants and counsel to directors on a weekly basis and, in addition, each of the Applicants is hereby authorized to pay to: (a) the Monitor and its Canadian and U.S. counsel a retainer in the aggregate amount of CDN$750,000; and (b) counsel to the Applicants a retainer

- 17 -

in the amount of CDN$750,000 (collectively, the "Retainers") to be held by them as security for payment of their respective fees and disbursements outstanding from time to time.

31.     THIS COURT ORDERS that the Monitor and its legal counsel shall pass their accounts from time to time, and for this purpose the accounts of the Monitor and its legal counsel are hereby referred to a judge of the Commercial List of the Ontario Superior Court of Justice.

32.     THIS COURT ORDERS that the Monitor, counsel to the Monitor, if any, and the Applicants' counsel shall be entitled to the benefit of and are hereby granted a charge (the "Administration Charge") on the Property, which charge shall not exceed an aggregate amount of $5,000,000, as security for their professional fees and disbursements incurred at the standard rates and charges of the Monitor and such counsel, both before and after the making of this Order in respect of these proceedings. The Administration Charge shall have the priority set out in paragraphs 42 and 44 hereof.

**EDC**

33.     Intentionally Deleted.

**INTERCOMPANY LOANS**

34.     THIS COURT ORDERS to the extent that an Applicant receives a post-filing inter-company loan or other transfer (including goods and services) from a Chapter 11 Entity (as defined in the Doolittle Affidavit) (including as a result of the Applicants' cash management system or otherwise) (each such Applicant, a "Beneficiary Applicant"), and such post-filing inter-company loan or other transfer is made (each an "Advance") by a Chapter 11 Entity (together with NNL for the purposes of paragraph 34A below, a "Protected Entity"), then, subject to the limitations set forth in this paragraph:

(a)     the Protected Entity shall have a proven and valid claim against such Beneficiary Applicant for the amount of such Advance (each, an "Inter-company Reimbursement Claim"), which Inter-company Reimbursement Claim shall bear interest at a rate agreed between the applicable Beneficiary Applicant and Protected Entity from time to time for the period in accordance with past practice; and

- 18 -

(b)     all of the Property of the Beneficiary Applicant, is hereby charged by a mortgage, lien and security interest (such mortgage, lien and security interest, "Inter-company Charge") in favour of each of the Protected Entities as security for payment of the Inter-company Reimbursement Claim (including principal, interest and expenses) by the applicable Beneficiary Applicant to the corresponding Protected Entity.

34A.    THIS COURT ORDERS that the Inter-Company Charge shall also secure any Advances made by NNL to Nortel Networks Technology Corporation ("NNTC") on or after January 14, 2009 and that NNL shall be a "Protected Entity" and NNTC shall be a "Beneficiary Applicant" in respect of such Advances.

35.     THIS COURT ORDERS that the Inter-company Charge shall also secure any amounts owed by any of the Applicants to any Chapter 11 Entity at the date of filing under the Existing NNI Revolver (as defined in the Doolittle Affidavit) and all rights that such Chapter 11 Entity has with respect thereto are preserved.

36.     THIS COURT ORDERS the Inter-company Charge shall be junior, subject and subordinate only to the other Charges (defined below), and any other future charges against such Beneficiary Applicant that, by the Court order creating them, are expressly stated to be senior to the Inter-company Charges entered after notice and a hearing.

37.     THIS COURT ORDERS that pending further order of this Court, an Inter-company Charge shall be a "silent" charge and the Protected Entity shall forbear from exercising, and shall not be entitled to exercise, any right or remedy relating to any Inter-company Reimbursement Claim held by such party, including, without limitation, as to seeking relief from the stay granted hereunder, or seeking any sale, foreclosure, realization upon repossession or liquidation of any Property of a Beneficiary Applicant, or taking any position with respect to any disposition of the Property, the business operations, or the reorganization of a Beneficiary Applicant. An Inter-company Charge automatically, and without further action of any person or entity of any kind, shall be released or otherwise terminated to the extent that Property subject to such Inter-company Charge is sold or otherwise disposed of in accordance with the terms of this Order or further order of this Court after notice and a hearing, with respect to the effect of an Inter-company Charge on any sale of Property by any Beneficiary Applicant.

- 19 -

38.    THIS COURT ORDERS that the Beneficiary Applicants may sell Property, in accordance with the terms of this Order or further order of this Court after notice and a hearing, in each case free and clear of any Inter-company Charge, with such Inter-company Charge attaching to the proceeds of sale in the same priority and subject to the same limitations and restrictions as existed in respect of the Property sold.

**INTERIM GROUP SUPPLIER PROTOCOL AGREEMENT**

39.    THIS COURT ORDERS that the Applicants be and are hereby authorized to enter into a group supplier protocol agreement (the "Interim GSPA") substantially in the form attached as Exhibit "C" to the Doolittle Affidavit which agreement shall be effective upon the appointment of the Administrators in the United Kingdom, and the Applicants are hereby authorized to perform each of their obligations, if any, under the Interim GSPA. The obligations of the Applicants under the Interim GSPA shall be secured by the Inter-Company Charge.

**NNI LOAN**

40.    THIS COURT ORDERS that the amended and restated loan agreement entered into between NNL, as borrower, NNTC and the other Applicants as guarantors, and Nortel Networks Inc. ("NNI") as lender (the "NNI Loan Agreement"), substantially in the form attached as Exhibit "B" to the Affidavit of John Doolittle sworn March 27, 2009 providing for a revolving loan facility of up to U.S.$200 million is hereby approved and each of the Applicants is hereby directed to execute and to comply with its obligations under the NNI Loan Agreement.

41.    THIS COURT ORDERS that as security for NNL's and NNTC's obligations under the NNI Loan Agreement, NNI shall be entitled to the benefit of and is hereby granted charges (the "Carling Facility Charges") by each of NNL and NNTC, NNL's wholly owned subsidiary, on all of the fee simple interest of NNTC and leasehold interest of NNL respectively in the Carling Facility (as defined in the Doolittle Affidavit) and that no equal or higher charge shall be granted by the Court order unless consented to by NNI as authorized by the United States Bankruptcy Court for the District of Delaware. The Carling Facility Charges shall have the priority set out in paragraphs 42 and 44, hereof. For greater certainty, NNI shall not be required to have exhausted

- 20 -

its remedies under the Carling Facility Charges prior to realizing on or being entitled to proceeds from the NNI Loan Charge.

41A.    THIS COURT ORDERS that in addition to the Carling Facility Charges, NNI shall be entitled to the benefit of and is hereby granted a charge on the Property (the "NNI Loan Charge") as security for the Applicants obligations under the NNI Loan Agreement. The NNI Loan Charge shall have the priority set out in paragraphs 42 and 44 hereof.

41B.    THIS COURT ORDERS that pending further order of this Court, NNI shall forbear from exercising, and shall not be entitled to exercise, any right or remedy relating to the Applicants' obligations under the NNI Loan Agreement, including, without limitation, as to seeking relief from the stay granted hereunder, or seeking any sale, foreclosure, realization upon repossession or liquidation of any Property of an Applicant, or taking any position with respect to any disposition of the Property, the business operations, or the reorganization of an Applicant. The NNI Loan Charge automatically, and without further action of any person or entity of any kind, shall be released or otherwise terminated to the extent that Property subject to such NNI Loan Charge is sold or otherwise disposed of in accordance with the terms of this Order or further order of this Court after notice and a hearing, with respect to the effect of an NNI Loan Charge on any sale of Property by any Applicant.

41C.    THIS COURT ORDERS that the Applicants may sell Property, in accordance with the terms of this Order or further order of this Court after notice and a hearing, in each case free and clear of the NNI Loan Charge, with the NNI Loan Charge attaching to the proceeds of sale in the same priority and subject to the same limitations and restrictions as existed in respect of the Property sold.

**EXCESS FUNDING CHARGE**

41D.    THIS COURT ORDERS that as security for NNL's obligation to repay to NNI the Contingent Payment (as defined in the Interim Funding Agreement, as defined in the June Affidavit) along with interest, if any, NNI shall be entitled to the benefit of and is hereby granted a charge on the Property (the "Excess Funding Charge"). The Excess Funding Charge shall have the priority set out in paragraphs 42 and 44 hereof.

- 21 -

## SHORTFALL CHARGE

41E.  THIS COURT ORDERS that as security for any obligation of NNL to make the Shortfall Payments (as defined in the Interim Funding Agreement, as defined in the June Affidavit), Nortel Networks UK Limited shall be entitled to the benefit of and is hereby granted a charge on the Property (the "Shortfall Charge").  The Shortfall Charge shall have the priority set out in paragraphs 42 and 44 hereof.

## VALIDITY AND PRIORITY OF CHARGES CREATED BY THIS ORDER

42.      THIS COURT ORDERS that the priorities of the Administration Charge, the Goldman Charge, the Carling Facility Charges, the Excess Funding Charge, the Directors' Charge, the NNI Loan Charge, the Inter-company Charge and the Shortfall Charge on all Property:

> First -
>
> > (a) the Administration Charge;
> >
> > (b) the Goldman Charge (as defined in the Nortel-LGE Joint Venture Sale Process Order of this Court made on June 1, 2009), ranking *pari passu* with the Administration Charge but only with respect to the assets which are the subject of the Goldman Charge
>
> Second – the Carling Facility Charges;
>
> Third – the Excess Funding Charge
>
> Fourth – the Directors' Charge;
>
> Fifth – the NNI Loan Charge; and
>
> Sixth -
>
> > (a) the Inter-Company Charge;
> >
> > (b) the Shortfall Charge,

- 22 -

which Inter-company Charge and Shortfall Charge shall rank *pari passu* with one another.

43.    THIS COURT ORDERS that the filing, registration or perfection of the Administration Charge, the Goldman Charge, the Carling Facility Charges, Excess Funding Charge, the Directors' Charge, the NNI Loan Charge, the Inter-company Charge and the Shortfall Charge (collectively, the "Charges") shall not be required, and that the Charges shall be valid and enforceable for all purposes, including as against any right, title or interest filed, registered, recorded or perfected subsequent to the Charges coming into existence, notwithstanding any such failure to file, register, record or perfect. Notwithstanding anything herein, the Charges shall not attach to the Retainers.

44.    THIS COURT ORDERS that each of the Charges (all as constituted and defined herein), shall subject to this paragraph 44 and to paragraph 46 herein constitute a charge on the Property secured thereunder, and such Charges shall rank in priority to all other security interests, trusts, liens, charges and encumbrances, statutory or otherwise (collectively, "Encumbrances") in favour of any Person. For greater certainty,

   (a)    the Charges shall attach to the LC Cash Collateral junior in priority to any rights or Encumbrances in favour of LC Banks in respect of LC Cash Collateral and only to the extent of the rights of the Applicants to the return of any LC Cash Collateral from the LC Banks following the exercise of the rights of the LC Banks as against any such LC Cash Collateral pursuant to the LC Agreements or section 18.1 of the CCAA, and

   (b)    the Charges shall attach to the EDC Cash Collateral junior in priority to any rights or Encumbrances in favour of EDC in respect of EDC Cash Collateral and only to the extent of the rights of NNL to the return of any EDC Cash Collateral from EDC following the exercise of the rights of EDC as against any such EDC Cash Collateral pursuant to the EDC Support Agreements or section 18.1 of the CCAA

notwithstanding anything to the contrary contained in this Order.

45.    THIS COURT ORDERS that except as otherwise expressly provided for herein, or as may be approved by this Court, the Applicants shall not grant any Encumbrances over any Property that rank in priority to, or *pari passu* with, any of the Charges charging such Property,

- 23 -

unless the Applicants also obtain the prior written consent of the Monitor and the beneficiaries of such Charges, or by further Order of this Court.

46.     THIS COURT ORDERS that none of the Charges, the LC Agreements and the EDC Support Agreements shall be rendered invalid or unenforceable and the rights and remedies of the chargees entitled to the benefit of the Charges (collectively, the "Chargees") thereunder, the rights of the LC Banks under LC Agreements and the rights of EDC under the EDC Support shall not otherwise be limited or impaired in any way by (a) the pendency of these proceedings and the declarations of insolvency made herein; (b) any application(s) for bankruptcy order(s) issued pursuant to BIA, or any bankruptcy order made pursuant to such applications; (c) the filing of any assignments for the general benefit of creditors made pursuant to the BIA; (d) the provisions of any federal or provincial statutes; or (e) any negative covenants, prohibitions or other similar provisions with respect to borrowings, incurring debt or the creation of Encumbrances, contained in any existing loan documents, lease, sublease, offer to lease or other agreement (collectively, an "Agreement") which binds the Applicants, and notwithstanding any provision to the contrary in any Agreement:

(a)     the creation of the Charges, the entering into of the LC Agreements and the issuance or renewal of LC's thereunder and the entering into of the EDC Support Agreements and the provision of Secured Support, as defined and contemplated thereunder, shall not create or be deemed to constitute a breach by any of the Applicants of any Agreement to which it is a party;

(b)     none of the Chargees, the LC Banks and EDC shall have any liability to any Person whatsoever as a result of any breach of any Agreement caused by or resulting from, the creation of the Charges, the entering into of the LC Agreements or the issuance or renewal of LC's thereunder or the entering into of the EDC Support Agreements and the provision of Secured Support; and

(c)     the payments made by the Applicants pursuant to this Order and the granting of the Charges and the entering into of the LC Agreements and the EDC Support Agreements do not and will not constitute fraudulent preferences, fraudulent

- 24 -

conveyances, oppressive conduct, settlements or other challengeable, voidable or reviewable transactions under any applicable law.

47.     THIS COURT ORDERS that any Charge created by this Order over leases of real property in Canada shall only be a Charge in the Applicants' interest in such real property leases.

**FLEXTRONICS AMENDING AGREEMENT**

48.     THIS COURT ORDERS that the Flextronics Amending Agreement in the form attached as Exhibit "B" to the Doolittle Affidavit be and is hereby approved and NNL is hereby authorized and directed to comply with its obligations thereunder.

**CROSS-BORDER PROTOCOL**

49.     THIS COURT ORDERS that the cross-border protocol, as amended, in the form attached as Schedule "A" hereto be and is hereby approved and shall become effective upon its approval by the United States Bankruptcy Court for the District of Delaware and the parties to these proceedings and any other Person shall be governed by it and shall comply with the same.

**FOREIGN PROCEEDINGS**

50.     THIS COURT ORDERS that the Monitor is hereby authorized and directed to apply for recognition of these proceedings as "Foreign Main Proceedings" in the United States pursuant to Chapter 15 of the U.S. Bankruptcy Code.

51.     THIS COURT HEREBY REQUESTS the aid and recognition of any court, tribunal, regulatory or administrative body having jurisdiction in Canada, the United States, the United Kingdom or elsewhere, to give effect to this Order and to assist the Applicants, the Monitor and their respective agents in carrying out the terms of this Order.  All courts, tribunals, regulatory and administrative bodies are hereby respectfully requested to make such orders and to provide such assistance to the Applicants and to the Monitor, as an officer of this Court, as may be necessary or desirable to give effect to this Order, to grant representative status to the Monitor in any foreign proceeding, or to assist the Applicants and the Monitor and their respective agents in carrying out the terms of this Order.

- 25 -

52.     THIS COURT ORDERS that each of the Applicants and the Monitor be at liberty and is hereby authorized and empowered to apply to any court, tribunal, regulatory or administrative body, wherever located, for the recognition of this Order and for assistance in carrying out the terms of this Order.

**SERVICE AND NOTICE**

53.     THIS COURT ORDERS that the Monitor shall, within ten (10) business days of the date of entry of this Order, send notice of this Order and the commencement of the within proceedings to the Applicants' known creditors, other than employees and creditors to which the Applicants owe less than $5,000, at their addresses as they appear on the Applicants' records, and shall promptly send a copy of this Order (a) to all parties filing a Notice of Appearance in respect of this Application, and (b) to any other interested Person requesting a copy of this Order, and the Monitor is relieved of its obligation under Section 11(5) of the CCAA to provide similar notice, other than to supervise this process. The Monitor, on behalf of the Applicants, shall, in its discretion, be entitled to engage a third party mailing service in order to assist or complete the mailing. Any such service provider shall be considered an "Assistant" hereunder.

54.     THIS COURT ORDERS that the Applicants and the Monitor be at liberty to serve this Order, any other materials and orders in these proceedings, and any notices or other correspondence, by forwarding true copies thereof by prepaid ordinary mail, courier, personal delivery or electronic transmission to the Applicants' creditors or other interested parties at their respective addresses as last shown on the records of the Applicants and that any such service or notice by courier, personal delivery or electronic transmission shall be deemed to be received on the next business day following the date of forwarding thereof, or if sent by ordinary mail, on the third business day after mailing.

55.     THIS COURT ORDERS that the Applicants, the Monitor, and any party who has filed a Notice of Appearance may serve any court materials in these proceedings by e-mailing a PDF or other electronic copy of such materials to counsels' email addresses as recorded on the Service List from time to time, in accordance with the E-filing protocol of the Commercial List to the extent practicable, and the Monitor may post a copy of any or all such materials on its website at http://www.ey.com/ca/nortel.

- 26 -

**GENERAL**

56.     THIS COURT ORDERS that any of the Applicants or the Monitor may from time to time apply to this Court for advice and directions in the discharge of its powers and duties hereunder.

57.     THIS COURT ORDERS that nothing in this Order shall prevent the Monitor from acting as an interim receiver, a receiver, a receiver and manager, or a trustee in bankruptcy of the Applicants, the Business or the Property.

58.     THIS COURT ORDERS that any interested party (including the Applicants and the Monitor) may apply to this Court to vary or amend this Order on not less than seven (7) days notice to any other party or parties likely to be affected by the order sought or upon such other notice, if any, as this Court may order.

59.     THIS COURT ORDERS that this Order and all of its provisions are effective as of 12:01 a.m. Eastern Standard Time on the date of this Order.

ENTERED AT / INSCRIT À TORONTO
ON / BOOK NO:
LE / DANS LE REGISTRE NO.:

JUN 3 0 2009

PER / PAR:

DOCSTOR: 1713506\5

**SCHEDULE "A" – CROSS-BORDER PROTOCOL**

**Attached.**

## CROSS-BORDER INSOLVENCY PROTOCOL

This cross-border insolvency protocol (the "Protocol") shall govern the conduct of all parties in interest in the Insolvency Proceedings (as such term is defined herein).

The Guidelines Applicable to Court-to-Court Communications in Cross-Border Cases (the "Guidelines") attached as Schedule "A" hereto, shall be incorporated by reference and form part of this Protocol. Where there is any discrepancy between the Protocol and the Guidelines, this Protocol shall prevail.

A.    **Background**

1.    Nortel Networks Inc. ("NNI") is the wholly owned U.S. subsidiary of Nortel Networks Limited ("NNL"), the principal Canadian operating subsidiary of Nortel Networks Corporation ("NNC"). NNC is a telecommunications company headquartered in Toronto, Ontario, Canada. NNI is incorporated under Delaware law and is headquartered in Richardson, Texas.

2.    NNI and certain of its affiliates (collectively, the "U.S. Debtors"),[1] have commenced reorganization proceedings (the "U.S. Proceedings") under chapter 11 of the United States Bankruptcy Code, 11 U.S.C. § 101 *et seq.* (the "Bankruptcy Code"), in the United States Bankruptcy Court for the District of Delaware (the "U.S. Court"), and such cases have been consolidated (for procedural purposes only) under Case No. 09-10138 (KG). The U.S. Debtors are continuing in possession of their respective properties and are operating and managing their businesses, as debtors in possession, pursuant to sections 1107 and 1108 of the Bankruptcy Code. No trustee or examiner has been appointed in the U.S. Proceedings. On January 22, 2009,

---

[1]    The Debtors in the U.S. Proceedings (as defined herein) are: NNI, Nortel Networks Capital Corporation, Nortel Altsystems Inc., Nortel Altsystems International Inc., XROS, Inc., Sonoma Systems, QTERA Corporation, CoreTek, Inc., Nortel Networks Applications Management Solutions Inc., Nortel Networks Optical Components Inc., Nortel Networks HPOCS Inc., Architel Systems (U.S.) Corporation, Nortel Networks International Inc., Northern Telecom International Inc. and Nortel Networks Cable Solutions Inc.

the Office of United States Trustee (the "U.S. Trustee") appointed an official committee of

unsecured creditors (the "Creditors Committee") in the U.S. Proceeding. An ad hoc committee

of bondholders (the "Bondholders Committee") has also been organized.

        3.      On January 14, 2009, the U.S. Debtors' ultimate corporate parent NNC,

NNI's direct corporate parent NNL (together with NNC and their affiliates, including the U.S.

Debtors, "Nortel"), and certain of their Canadian affiliates (collectively, the "Canadian

Debtors")[2] filed an application with the Ontario Superior Court of Justice (the "Canadian Court")

under the Companies' Creditors Arrangement Act (Canada) (the "CCAA"), seeking relief from

their creditors (collectively, the "Canadian Proceedings"). The Canadian Debtors have obtained

an initial order of the Canadian Court (as amended and restated, the "Canadian Order"), under

which, inter alia: (a) the Canadian Debtors have been determined to be entitled to relief under

the CCAA; (b) Ernst & Young Inc. has been appointed as monitor (the "Monitor") of the

Canadian Debtors, with the rights, powers, duties and limitations upon liabilities set forth in the

CCAA and the Canadian Order; and (c) a stay of proceedings in respect of the Canadian Debtors

has been granted.

        4.      The Monitor filed petitions and obtained an order in the U.S. Court

granting recognition of the Canadian Proceedings under chapter 15 of the Bankruptcy Code (the

"Chapter 15 Proceedings"). NNI also filed an application and obtained an order in the Canadian

Court pursuant to section 18.6 of the CCAA recognizing the U.S. Proceedings as "foreign

proceedings" in Canada and giving effect to the automatic stay thereunder in Canada. None of

the U.S. Debtors or Canadian Debtors are applicants in both the U.S. Proceedings and Canadian

Proceedings.

---

[2]   The Canadian Debtors include the following entities: NNC, NNL, Nortel Networks Technology Corporation, Nortel Networks Global Corporation and Nortel Networks International Corporation.

5.    For convenience, (a) the U.S. Debtors and the Canadian Debtors shall be referred to herein collectively as the "Debtors," (b) the U.S. Proceedings and the Canadian Proceedings shall be referred to herein collectively as the "Insolvency Proceedings," and (c) the U.S. Court and the Canadian Court shall be referred to herein collectively as the "Courts", and each individually as a "Court."

**B.    Purpose and Goals**

6.    Though full and separate plenary proceedings are pending in the United States for the U.S. Debtors and in Canada for the Canadian Debtors, the implementation of administrative procedures and cross-border guidelines is both necessary and desirable to coordinate certain activities in the Insolvency Proceedings, protect the rights of parties thereto, ensure the maintenance of the Courts' respective independent jurisdiction and give effect to the doctrines of comity. Accordingly, this Protocol has been developed to promote the following mutually desirable goals and objectives in the Insolvency Proceedings:

a.    harmonize and coordinate activities in the Insolvency Proceedings before the Courts;

b.    promote the orderly and efficient administration of the Insolvency Proceedings to, among other things, maximize the efficiency of the Insolvency Proceedings, reduce the costs associated therewith and avoid duplication of effort;

c.    honor the independence and integrity of the Courts and other courts and tribunals of the United States and Canada, respectively;

d.    promote international cooperation and respect for comity among the Courts, the Debtors, the Creditors Committee, the Estate Representatives (which include the Chapter 11 Representatives and the Canadian Representatives as such terms are defined below) and other creditors and interested parties in the Insolvency Proceedings;

e.    facilitate the fair, open and efficient administration of the Insolvency Proceedings for the benefit of all of the Debtors' creditors and other interested parties, wherever located; and

4

     f.     implement a framework of general principles to address basic administrative issues arising out of the cross-border nature of the Insolvency Proceedings.

As the Insolvency Proceedings progress, the Courts may also jointly determine that other cross-border matters that may arise in the Insolvency Proceedings should be dealt with under and in accordance with the principles of this Protocol. Subject to the provisions of this Protocol, including, without limitation, those included in paragraph 15 hereof, where an issue is to be addressed only to one Court, in rendering a determination in any cross-border matter, such Court may: (a) to the extent practical or advisable, consult with the other Court; and (b) in its sole discretion and bearing in mind the principles of comity, either (i) render a binding decision after such consultation; (ii) defer to the determination of the other Court by transferring the matter, in whole or in part to the other Court; or (iii) seek a joint hearing of both Courts.

**C.**    **Comity and Independence of the Courts**

     7.     The approval and implementation of this Protocol shall not divest nor diminish the U.S. Court's and the Canadian Court's respective independent jurisdiction over the subject matter of the U.S. Proceedings and the Canadian Proceedings, respectively. By approving and implementing this Protocol, neither the U.S. Court, the Canadian Court, the Debtors nor any creditors or interested parties shall be deemed to have approved or engaged in any infringement on the sovereignty of the United States of America or Canada.

     8.     The U.S. Court shall have sole and exclusive jurisdiction and power over the conduct of the U.S. Proceedings and the hearing and determination of matters arising in the U.S. Proceedings. The Canadian Court shall have sole and exclusive jurisdiction and power over the conduct of the Canadian Proceedings and the hearing and determination of matters arising in the Canadian Proceedings.

5

9.    In accordance with the principles of comity and independence recognized

herein, nothing contained herein shall be construed to:

a.    increase, decrease or otherwise modify the independence, sovereignty or
jurisdiction of the U.S. Court, the Canadian Court or any other court or
tribunal in the United States or Canada, including the ability of any such
court or tribunal to provide appropriate relief on an ex parte or "limited
notice" basis to the extent permitted under applicable law;

b.    require the U.S. Court to take any action that is inconsistent with its
obligations under the laws of the United States;

c.    require the Canadian Court to take any action that is inconsistent with its
obligations under the laws of Canada;

d.    require the Debtors, the Creditors Committee, the Estate Representatives
or the U.S. Trustee to take any action or refrain from taking any action that
would result in a breach of any duty imposed on them by any applicable
law;

e.    authorize any action that requires the specific approval of one or both of
the Courts under the Bankruptcy Code or the CCAA after appropriate
notice and a hearing (except to the extent that such action is specifically
described in this Protocol); or

f.    preclude the Debtors, the Creditors Committee, the Monitor, the U.S.
Trustee, any creditor or other interested party from asserting such party's
substantive rights under the applicable laws of the United States, Canada
or any other relevant jurisdiction including, without limitation, the rights
of parties in interest to appeal from the decisions taken by one or both of
the Courts.

10.  The Debtors, the Creditors Committee, the Estate Representatives and their

respective employees, members, agents and professionals shall respect and comply with the

independent, non-delegable duties imposed upon them, if any, by the Bankruptcy Code, the

CCAA, the Canadian Order and other applicable laws.

D.    **Cooperation**

11.    To assist in the efficient administration of the Insolvency Proceedings and

in recognizing that the U.S. Debtors and Canadian Debtors may be creditors of the others'

6

estates, the Debtors and their respective Estate Representatives shall, where appropriate: (a)

cooperate with each other in connection with actions taken in both the U.S. Court and the

Canadian Court and (b) take any other appropriate steps to coordinate the administration of the

Insolvency Proceedings for the benefit of the Debtors' respective estates.

    12.  To harmonize and coordinate the administration of the Insolvency

Proceedings, the U.S. Court and the Canadian Court each may coordinate activities and consider

whether it is appropriate to defer to the judgment of the other Court. In furtherance of the

foregoing:

    a.  The U.S. Court and the Canadian Court may communicate with one another, with or without counsel present, with respect to any procedural matter relating to the Insolvency Proceedings.

    b.  Where the issue of the proper jurisdiction of either Court to determine an issue is raised by an interested party in either of the Insolvency Proceedings with respect to a motion or application filed in either Court, the Court before which such motion or application was initially filed may contact the other Court to determine an appropriate process by which the issue of jurisdiction will be determined; which process shall be subject to submissions by the Debtors, the Creditors Committee, the Monitor, the Bondholders Committee (collectively the "Core Parties"), the U.S. Trustee and any interested party prior to a determination on the issue of jurisdiction being made by either Court.

    c.  The Courts may, but are not obligated to, coordinate activities in the Insolvency Proceedings such that the subject matter of any particular action, suit, request, application, contested matter or other proceeding is determined in a single Court.

    d.  The U.S. Court and the Canadian Court may conduct joint hearings (each a "Joint Hearing") with respect to any cross-border matter or the interpretation or implementation of this Protocol where both the U.S. Court and the Canadian Court consider such a Joint Hearing to be necessary or advisable, or as otherwise provided herein, to, among other things, facilitate or coordinate proper and efficient conduct of the Insolvency Proceedings or the resolution of any particular issue in the Insolvency Proceedings. With respect to any Joint Hearing, unless otherwise ordered, the following procedures will be followed:

(i)     A telephone or video link shall be established so that both the U.S. Court and the Canadian Court shall be able to simultaneously hear and/or view the proceedings in the other Court.

(ii)    Submissions or applications by any party that are or become the subject of a Joint Hearing (collectively, "Pleadings") shall be made or filed initially only to the Court in which such party is appearing and seeking relief. Promptly after the scheduling of any Joint Hearing, the party submitting such Pleadings to one Court shall file courtesy copies with the other Court. In any event, Pleadings seeking relief from both Courts shall be filed in advance of the Joint Hearing with both Courts.

(iii)   Any party intending to rely on any written evidentiary materials in support of a submission to the U.S. Court or the Canadian Court in connection with any Joint Hearing (collectively, "Evidentiary Materials") shall file or otherwise submit such materials to both Courts in advance of the Joint Hearing. To the fullest extent possible, the Evidentiary Materials filed in each Court shall be identical and shall be consistent with the procedural and evidentiary rules and requirements of each Court.

(iv)    If a party has not previously appeared in or attorned or does not wish to attorn to the jurisdiction of a Court, it shall be entitled to file Pleadings or Evidentiary Materials in connection with the Joint Hearing without, by the mere act of such filings, being deemed to have appeared in or attorned to the jurisdiction of such Court in which such material is filed, so long as such party does not request any affirmative relief from such Court.

(v)     The Judge of the U.S. Court and the Justice of the Canadian Court who will preside over the Joint Hearing shall be entitled to communicate with each other in advance of any Joint Hearing, with or without counsel being present, (1) to establish guidelines for the orderly submission of Pleadings, Evidentiary Materials and other papers and for the rendering of decisions by the Courts; and (2) to address any related procedural, administrative or preliminary matters.

(vi)    The Judge of the U.S. Court and the Justice of the Canadian Court, shall be entitled to communicate with each other during or after any joint hearing, with or without counsel present, for the purposes of (1) determining whether consistent rulings can be made by both Courts; (2) coordinating the terms upon of the Courts' respective rulings; and (3) addressing any other procedural or administrative matters.

8

13.    Notwithstanding the terms of the paragraph 12 above, this Protocol recognizes that the U.S. Court and the Canadian Court are independent courts. Accordingly, although the Courts will seek to cooperate and coordinate with each other in good faith, each of the Courts shall be entitled at all times to exercise its independent jurisdiction and authority with respect to: (a) the conduct of the parties appearing in matters presented to such Court; and (b) matters presented to such Court, including, without limitation, the right to determine if matters are properly before such Court.

14.    Where one Court has jurisdiction over a matter which requires the application of the law of the jurisdiction of the other Court, such Court may, without limitation, hear expert evidence of such law or, subject to paragraph 15 herein, seek the written advice and direction of the other Court which advice may in the discretion of the receiving Court, be made available to parties in interest.

15.    Notwithstanding anything to the contrary herein contained, to the extent any motion is filed or relief is sought (collectively, "Requested Relief") in either Court relating to: (i) the proposed sale of assets for gross proceeds in excess of U.S. $30 million and where at least one U.S. Debtor and one Canadian Debtor are parties to the related sale agreement or that involves assets owned by at least one U.S. Debtor and one Canadian Debtor; (ii) any motion to allocate sale proceeds which are in the aggregate more than U.S. $30 million and where at least one U.S. Debtor and one Canadian Debtor are parties to the related sale agreement or that involves assets owned by at least one U.S. Debtor and one Canadian Debtor; (iii) matters relating to the advanced pricing agreement involving both the United States and Canadian taxing authorities; (iv) matters regarding transfer pricing methodology relating to an obligation for the transfer of goods and services between one or more U.S. Debtors and one or more Canadian

9

Debtors; (v) any matter relating to alleged fraudulent conveyance or preference claims in excess of U.S. $30 million and which may have a material impact on both one or more U.S. Debtors and one or more Canadian Debtors; (vi) matters relating to any proposal or approval of a disclosure statement, information circular, plan of reorganization or plan of compromise and arrangements in either the U.S. Proceedings or the Canadian Proceedings; (vii) any motion to appoint a Trustee or Examiner in the U.S. Proceedings, any motion to convert the U.S. Proceedings to a Chapter 7 proceeding, any motion to appoint a Receiver in the Canadian Proceedings, or any motion to convert the Canadian Proceedings to a bankruptcy or proposal proceeding under the Bankruptcy and Insolvency Act (Canada); (viii) any motion to substantively consolidate the Debtors' estates; (ix) matters impacting the material tax attributes of the U.S. Debtors, including the net operating losses of the U.S. Debtors in any prior fiscal year; (x) any motion to amend the terms of any of the Debtors' registered pension plans the effect of which would increase the liability of any Debtor thereunder; (xi) any motion to assume, ratify, reject, repudiate, modify or assign executory contracts having a material impact on the assets, operations, obligations, rights, property or business of both the U.S. and Canadian estates and accounting for annual gross revenue in excess of U.S. $30 million ("Material Contracts"); (xii) any motion seeking relief from the automatic stay in the U.S. Proceedings and/or the stay of proceedings in the Canadian Proceedings (1) involving any Material Contract or (2) to pursue actions having a material impact on the assets, operations, obligations, rights, property or business of at least one U.S. Debtor and one Canadian Debtor and involving damages in excess of U.S. $30 million; (xiii) any motion seeking to create or extend any program, plan, proposal or scheme relating to or authorizing payments to employees where the consideration relates to non-ordinary course incentive performance, retention, severance, termination or such like payments; and (xiv) any

10

motion regarding any program, plan proposal, scheme or similar course of action related to the

wind-down of one or more of the Debtors' businesses;

Then the following procedures shall be followed:

a.   unless otherwise consented to by the Core Parties, any and all documents, other than any Monitor's report related to the Requested Relief, shall be filed (as applicable) and served on the Core Parties on not less than seven days notice prior to the proposed hearing date for such Requested Relief in the Court of the forum country where the party seeking the Requested Relief intends the Requested Relief to be heard; *provided, however,* that to the extent the Requested Relief is necessary to avoid irreparable harm to the Debtors and/or the Debtors' bankruptcy estates, as may be determined by the Court of the forum country where the Requested Relief is being sought or such Court otherwise determines, such documents related to the Requested Relief shall be served on the Core Parties on such reasonable notice as such Court may determine;

b.   upon notice of such Requested Relief being provided to the Core Parties, each of the Core Parties will have not less than two business days from receipt of such notice (or such shorter period as the Court of the forum country where the Requested Relief is being sought shall determine, as set forth in paragraph 15(a) herein) to request, in writing, that the filing party seek a Joint Hearing for the Requested Relief;

c.   if the filing party agrees to seek a Joint Hearing, the Requested Relief shall be heard at a Joint Hearing conducted by the Courts in accordance with the procedures set forth in paragraph 12 herein; and

d.   if the filing party does not agree to seek a Joint Hearing, the party seeking to have the Requested Relief heard at a Joint Hearing may file a notice of Joint Hearing dispute in both the Court of the forum country and the Court of the non-forum country and serve notice thereof on the remaining Core Parties, whereupon the respective Courts of the forum country and the non-forum country may consult with one another in accordance with paragraphs 6 and 12 hereof, in order to determine whether a Joint Hearing is necessary or may otherwise consult with the Core Parties prior to any party proceeding with the underlying Requested Relief in the original proposed forum country.

E.   **Recognition of Stays of Proceedings**

16.   The Canadian Court hereby recognizes the validity of the stay of

proceedings and actions against the U.S. Debtors and their property under section 362 of the

11

Bankruptcy Code (the "U.S. Stay"). In implementing the terms of this paragraph, the Canadian Court may consult with the U.S. Court regarding: (i) the interpretation, extent, scope and applicability of the U.S. Stay and any orders of the U.S. Court modifying or granting relief from the U.S. Stay; and (ii) the enforcement of the U.S. Stay in Canada.

17.    The U.S. Court hereby recognizes the validity of the stay of proceedings and actions against the Canadian Debtors and their property under the Canadian Order (the "Canadian Stay"). In implementing the terms of this paragraph, the U.S. Court may consult with the Canadian Court regarding: (i) the interpretation, extent, scope and applicability of the Canadian Stay and any orders of the Canadian Court modifying or granting relief from the Canadian Stay; and (ii) the enforcement of the Canadian Stay in the United States.

18.    Nothing contained herein shall affect or limit the Debtors' or other parties' rights to assert the applicability or nonapplicability of the U.S. Stay or the Canadian Stay to any particular proceeding, property, asset, activity or other matter, wherever pending or located. Subject to paragraph 15, herein, motions brought respecting the application of the stay of proceedings with respect to assets or operations of the Canadian Debtors shall be heard and determined by the Canadian Court. Subject to paragraph 15 herein, motions brought respecting the application of the stay of proceedings with respect to assets or operations of the U.S. Debtors shall be heard and determined by the U.S. Court.

F.    **Rights to Appear and Be Heard**

19.    The Debtors, the Core Parties, and any other committee that may be appointed by the U.S. Trustee, and the professionals and advisors for each of the foregoing, shall have the right and standing: (i) to appear and to be heard in either the U.S. Court or Canadian Court in the U.S. Proceedings or Canadian Proceedings, respectively, to the same extent as creditors and other interested parties domiciled in the forum country, subject to any local rules or

regulations generally applicable to all parties appearing in the forum; and (ii) to file notices of appearance or other papers with the clerk of the U.S. Court or the Canadian Court in respect of the U.S. Proceedings or Canadian Proceedings, respectively; provided, however, that any appearance or filing may subject a creditor or interested party to the jurisdiction of the Court in which the appearance or filing occurs; provided further, that an appearance by the Creditors Committee in the Canadian Proceedings shall not form a basis for personal jurisdiction in Canada over the members of the Creditors Committee. Notwithstanding the foregoing, and in accordance with the policies set forth above, including, inter alia, paragraph 12 above; (i) the Canadian Court shall have jurisdiction over the Chapter 11 Representatives (as defined below) solely with respect to the particular matters as to which the Chapter 11 Representatives appear before the Canadian Court; and (ii) the U.S. Court shall have jurisdiction over the Canadian Representatives (as defined below) solely with respect to the particular matters as to which the Canadian Representatives appear before the U.S. Court.

20.     In connection with any matter in the Canadian Proceedings in which the Creditors Committee seeks to become involved and which would otherwise require the Creditors Committee to execute a confidentiality agreement, the Creditors Committee, its individual members and professionals shall not be required to execute confidentiality agreements but instead the Creditors Committee and its members shall be bound by the confidentiality provisions contained in the Creditors Committee bylaws, and the Creditors Committee's professionals shall be bound by the terms of the confidentiality agreement with the Debtors dated February 2, 2009.

G.    **Claims Protocol**

21.     The Debtors anticipate that it will be necessary to implement a specific claims protocol to address, among other things and without limitation, the timing, process,

13

jurisdiction and applicable governing law to be applied to the resolution of intercompany claims filed by the Debtors' creditors in the Canadian Proceedings and the U.S. Proceedings. In such event, and in recognition of the inherent complexities of the inter-company claims that may be asserted in the Insolvency Proceedings, the Debtors shall use commercially reasonable efforts to negotiate a specific claims protocol, in form and substance satisfactory to the Debtors, the Monitor, and the Creditors Committee, which protocol shall be submitted to the Canadian Court and the U.S. Court for approval. In the event that the Debtors fail to reach agreement among such parties, the Debtors shall file a motion in both the Canadian Court and the U.S. Court seeking approval of such claims protocol as the Debtors shall determine to be in the best interest of the Debtors and their creditors.

**H.      Retention and Compensation of Estate Representative and Professionals**

          22.      The Monitor, its officers, directors, employees, counsel and agents, wherever located, (collectively the "Monitor Parties") and any other estate representatives appointed in the Canadian Proceedings (collectively, the "Canadian Representatives") shall (subject to paragraph 19) be subject to the sole and exclusive jurisdiction of the Canadian Court with respect to all matters, including: (a) the Canadian Representatives' tenure in office; (b) the retention and compensation of the Canadian Representatives; (c) the Canadian Representatives' liability, if any, to any person or entity, including the Canadian Debtors and any third parties, in connection with the Insolvency Proceedings; and (d) the hearing and determination of any other matters relating to the Canadian Representatives arising in the Canadian Proceedings under the CCAA or other applicable Canadian law. The Canadian Representatives shall not be required to seek approval of their retention in the U.S. Court for services rendered to the Debtors. Additionally, the Canadian Representatives: (a) shall be compensated for their services to the Canadian Debtors solely in accordance with the CCAA, the Canadian Order and other applicable

14

Canadian law or orders of the Canadian Court; and (b) shall not be required to seek approval of their compensation in the U.S Court.

23.     The Monitor Parties shall be entitled to the same protections and immunities in the United States as those granted to them under the CCAA and the Canadian Order.  In particular, except as otherwise provided in any subsequent order entered in the Canadian Proceedings, the Monitor Parties shall incur no liability or obligations as a result of the Canadian Order, the appointment of the Monitor, the carrying out of its duties or the provisions of the CCAA and the Canadian Order by the Monitor Parties, except any such liability arising from actions of the Monitor Parties constituting gross negligence or willful misconduct.

24.     Any estate representative appointed in the U.S. Proceedings, including without limitation any examiners or trustees appointed in accordance with section 1104 of the Bankruptcy Code (collectively, the "Chapter 11 Representatives") shall (subject to paragraph 19) be subject to the sole and exclusive jurisdiction of the U.S. Court with respect to all matters, including:  (a) the Chapter 11 Representatives' tenure in office; (b) the retention and compensation of the Chapter 11 Representatives; (c) the Chapter 11 Representatives' liability, if any, to any person or entity, including the U.S. Debtors and any third parties, in connection with the Insolvency Proceedings; and (d) the hearing and determination of any other matters relating to the Chapter 11 Representatives arising in the U.S. Proceedings under the Bankruptcy Code or other applicable laws of the United States.  The Chapter 11 Representatives shall not be required to seek approval of their retention in the Canadian Court and (a) shall be compensated for their services to the U.S. Debtors solely in accordance with the Bankruptcy Code and other applicable laws of the United States or orders of the U.S. Court; and (b) shall not be required to seek

15

approval of their compensation for services performed for the U.S. Debtors in the Canadian Court.

25.    Any professionals (i) retained by and being compensated solely by, or (ii) being compensated solely by, the Canadian Debtors including in each case, without limitation, counsel and financial advisors (collectively, the "Canadian Professionals"), shall be subject to the sole and exclusive jurisdiction of the Canadian Court. Such Canadian Professionals: (a) shall be subject to the procedures and standards for retention and compensation applicable in the Canadian Court under the CCAA, the Canadian Order and any other applicable Canadian law or orders of the Canadian Court with respect to services performed on behalf of the Canadian Debtors; and (b) shall not be required to seek approval of their retention or compensation in the U.S. Court.

26.    Any professionals (i) retained by, or (ii) being compensated by, the U.S. Debtors including in each case, without limitation, counsel and financial advisors (collectively, the "U.S. Professionals") shall be subject to the sole and exclusive jurisdiction of the U.S. Court. Such U.S. Professionals: (a) shall be subject to the procedures and standards for retention and compensation applicable in the U.S. Court under the Bankruptcy Code and any other applicable laws of the United States or orders of the U.S. Court; and (b) shall not be required to seek approval of their retention or compensation in the Canadian Court. ·

27.    Subject to paragraph 19 herein, any professional retained by the Creditors Committee, including in each case, without limitation, counsel and financial advisors (collectively, the "Committee Professionals") shall be subject to the sole and exclusive jurisdiction of the U.S. Court. Such Committee Professionals: (a) shall be subject to the procedures and standards for retention and compensation applicable in the U.S. Court under the

16

Bankruptcy Code and any other applicable laws of the United States or orders of the U.S. Court; and (b) shall not be required to seek approval of their retention or compensation in the Canadian Court or any other court.

## I.    Notice

28.    Notice of any motion, application or other Pleading or paper (collectively the "Court Documents") filed in one or both of the Insolvency Proceedings involving or relating to matters addressed by this Protocol and notice of any related hearings or other proceedings shall be given by appropriate means (including, where circumstances warrant, by courier, telecopier or other electronic forms of communication) to the following:  (a) all creditors and interested parties, in accordance with the practice of the jurisdiction where the papers are filed or the proceedings are to occur; and (b) to the extent not otherwise entitled to receive notice under clause (a) of this sentence, counsel to the Debtors; the U.S. Trustee; the Monitor; the Creditors Committee; the Bondholders Committee and any other statutory committees appointed in the Insolvency Proceedings and such other parties as may be designated by either of the Courts from time to time.  Notice in accordance with this paragraph shall be given by the party otherwise responsible for effecting notice in the jurisdiction where the underlying papers are filed or the proceedings are to occur.  In addition to the foregoing, upon request, the U.S. Debtors or the Canadian Debtors shall provide the U.S. Court or the Canadian Court, as the case may be, with copies of any orders, decisions, opinions or similar papers issued by the other Court in the Insolvency Proceedings.

29.    When any cross-border issues or matters addressed by this Protocol are to be addressed before a Court, notices shall be provided in the manner and to the parties referred to in paragraph 28 above.

17

**J.** **Effectiveness; Modification**

        30.     This Protocol shall become effective only upon its approval by both the U.S. Court and the Canadian Court.

        31.     This Protocol may not be supplemented, modified, terminated, or replaced in any manner except upon the approval of both the U.S. Court and the Canadian Court after notice and a hearing. Notice of any legal proceeding to supplement, modify, terminate or replace this Protocol shall be given in accordance with the notice provisions set forth above.

**K.** **Procedure for Resolving Disputes Under this Protocol**

        32.     Disputes relating to the terms, intent or application of this Protocol may be addressed by interested parties to the U.S. Court, the Canadian Court or both Courts upon notice in accordance with the notice provisions outlined in paragraph 28 above. In rendering a determination in any such dispute, the Court to which the issue is addressed: (a) shall consult with the other Court; and (b) may, in its sole and exclusive discretion, either: (i) render a binding decision after such consultation; (ii) defer to the determination of the other Court by transferring the matter, in whole or in part, to such other Court; or (iii) seek a Joint Hearing of both Courts in accordance with paragraph 12 above. Notwithstanding the foregoing, in making a determination under this paragraph, each Court shall give due consideration to the independence, comity and inherent jurisdiction of the other Court established under existing law.

        33.     In implementing the terms of this Protocol, the U.S. Court and the Canadian Court may, in their sole, respective discretion, provide advice or guidance to each other with respect to legal issues in accordance with the following procedures:

        a.     the U.S. Court or the Canadian Court, as applicable, may determine that such advice or guidance is appropriate under the circumstances;

        b.     the Court issuing such advice or guidance shall provide it to the non-issuing Court in writing;

c.      copies of such written advice or guidance shall be served by the applicable Court in accordance with paragraph 28 hereof;

d.      the Courts may jointly decide to invite the Debtors, the Creditors Committee, the Estate Representatives, the U.S. Trustee and any other affected or interested party to make submissions to the appropriate Court in response to or in connection with any written advice or guidance received from the other Court; and

e.      for clarity, the provisions of this paragraph shall not be construed to restrict the ability of either Court to confer as provided in paragraph 12 above whenever it deems it appropriate to do so.

**L.      Preservation of Rights**

34.      Except as specifically provided herein, neither the terms of this Protocol nor any actions taken under the terms of this Protocol shall: (a) prejudice or affect the powers, rights, claims and defenses of the Debtors and their estates, the Creditors Committee, the Estate Representatives, the U.S. Trustee or any of the Debtors' creditors under applicable law, including, without limitation, the Bankruptcy Code the CCAA, and the orders of the Courts; or (b) preclude or prejudice the rights of any person to assert or pursue such person's substantive rights against any other person under the applicable laws of Canada or the United States.

19

Court File No: 09-CL-7950

IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL
NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL NETWORKS
GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL CORPORATION AND
NORTEL NETWORKS TECHNOLOGY CORPORATION

*ONTARIO*
SUPERIOR COURT OF JUSTICE
(COMMERCIAL LIST)

Proceeding commenced at Toronto

**THIRD AMENDED AND RESTATED
INITIAL ORDER**

**OGILVY RENAULT LLP**
Suite 3800
Royal Bank Plaza, South Tower
200 Bay Street
P.O. Box 84
Toronto, Ontario  M5J 2Z4, Canada

**Derrick Tay LSUC#: 21152A**
Tel: (416) 216-4832
Email: dtay@ogilvyrenault.com

**Mario Forte  LSUC#: 27293F**
Tel: (416) 216-4870
Email: mforte@ogilvyrenault.com

**Jennifer Stam LSUC #46735J**
Tel: (416) 216-2327
Email: jstam@ogilvyrenault.com
Fax: (416) 216-3930
Lawyers for the Applicants

DOCSTOR: 1717605\2

This is Exhibit "B"
referred to in the Affidavit of
Alan Robert Bloom
sworn before me
this $\underline{1}$ day of January, 2010



Court File No.: 09-CL-7950

***ONTARIO***
**SUPERIOR COURT OF JUSTICE**
**COMMERCIAL LIST**

THE HONOURABLE MR.      )     FRIDAY, THE 14th
                                  )
JUSTICE MORAWETZ         )     DAY OF AUGUST, 2009

**IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,
R.S.C. 1985, c. C-36, AS AMENDED**

**AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF
NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED,
NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS
INTERNATIONAL CORPORATION AND NORTEL NETWORKS TECHNOLOGY
CORPORATION**

**APPLICATION UNDER THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,
R.S.C. 1985, c. C-36, AS AMENDED**

**ORDER**

THIS MOTION, made by Nortel Networks Corporation ("NNC"), Nortel Networks
Limited ("NNL"), Nortel Networks Technology Corporation, Nortel Networks Global
Corporation and Nortel Networks International Corporation (collectively, the "Applicants") for
the relief set out in the Applicants' Notice of Motion dated August 11, 2009 was heard this day
at 330 University Avenue, Toronto, Ontario.

ON READING the affidavit of Gordon A. Davies sworn August 11, 2009 (the "Davies
Affidavit") and the Nineteenth report of Ernst & Young Inc. in its capacity as monitor (the
"Monitor") dated August 11, 2009 (the "Nineteenth Report") and on hearing the submissions of
counsel for the Applicant, the Monitor and those other parties present, no one appearing for any

other person on the service list, although properly served as appears from the affidavit of Katie Legree sworn August 11, 2009, filed:

1.      THIS COURT ORDERS that the time for the service of the Notice of Motion, the Nineteenth Report and the Motion Record is hereby abridged so that this Motion is properly returnable today and hereby dispenses with further service thereof.

2.      THIS COURT ORDERS that capitalized terms used herein and not otherwise defined shall have the meaning given to them in the Initial Order granted by this Court on January 14, 2009 (as the same has been amended and amended and restated and as the same may be amended or amended and restated further from time to time, the "Initial Order").

3.      THIS COURT ORDERS that in addition to the powers and duties set out in the Initial Order but without altering in any way the powers, abilities, limitations and obligations of the Applicants within or as a result of these proceedings, the Monitor be and is hereby authorized and empowered to:

     (a)    cause the Applicants, or any one or more of them, to exercise rights under paragraph 11 of the Initial Order;

     (b)    cause the Applicants to perform such other functions or duties as the Monitor considers necessary or desirable in order to facilitate or assist the Applicants in dealing with the Property or their operations, restructuring, wind-down, liquidation or other activities;

     (c)    conduct, supervise and direct one or more Court-approved sales processes for the Property or the business and any procedure regarding the allocation and/or distribution of proceeds of any sales;

     (d)    cause the Applicants to administer the Property and operations of the Applicants as the Monitor considers necessary or desirable for the purposes of completing any transaction for the sale of the business or any part of it or for purposes of facilitating a Plan or Plans for all or part of the business;

(e)    administer the Applicants' claims process pursuant to the Claims Procedure Order dated July 30, 2009 (the "Claims Procedure Order") and any other claims bar and/or claims resolution process, or protocol as may be approved by Order of this Court within these proceedings;

(f)    propose or cause the Applicants or any one or more of them to propose one or more Plans in respect of the Applicants or any one or more of them;

(g)    engage assistants or advisors or cause the Applicants to engage assistants or advisors as the Monitor deems necessary or desirable to carry out the terms of the Initial Order or any other Order made in these proceedings or for the purposes of the Plan and such persons shall be deemed to be "Assistants" under the Initial Order;

(h)    apply to this Court for any orders necessary or advisable to carry out its powers and obligations under this Order or any other Order granted by this Court including for advice and directions with respect to any matter;

(i)    meet and coordinate with the chief restructuring officer of the Applicants or any person holding any similar position;

(j)    meet and consult with the board of directors of the Applicants as it deems necessary or appropriate;

(k)    meet with and direct management of the Applicants with respect to any of the foregoing including, without limitation, operational and restructuring matters; and

(l)    coordinate with the individual appointed as the principal officer (or such similar title) of Nortel Networks Inc. or any successor or assign of such entity with respect to operational and restructuring matters, provided that the Monitor shall have no supervisory authority or control over such individuals;

provided, however, that the Monitor shall comply with all applicable law and shall not have any authority or power to elect or to cause the election or removal of directors of

any of the Applicants or any of their subsidiaries or to take any action to restrict or to transfer to the Monitor any of their powers, duties or obligations.

4.      THIS COURT ORDERS that, other than with respect to the Retainers, the Monitor shall not receive or hold any property or funds of the Applicants, including without limitation, any proceeds of dispositions of Property or other cash or cash equivalents.

5.      THIS COURT ORDERS that nothing in this Order shall diminish or vary the obligations of the Applicants, or the Monitor when directing the Applicants, where required, either contractually or by Order of the Court, to consult with, obtain the consent of or provide notice to the official committee of unsecured creditors of Nortel Networks Inc., the ad hoc bondholders committee and/or the Joint Administrators (as defined in the Davies Affidavit), prior to taking any action for which consent or notice is required including pursuant to and in accordance with the Orders previously made in these proceedings and in accordance with the applicable provisions of the Amended Cross-Border Protocol dated July 6, 2009 (the "Cross-Border Protocol"), the Interim Funding and Settlement Agreement dated as of June 9, 2009 (the "IFSA") and the Interim GSPA (as the same has been amended and extended from time to time) and provided further that nothing in this Order shall diminish or vary the Applicants' obligations under the Cross-Border Protocol, the IFSA or the Interim GSPA (or any Orders in respect of the Cross-Border Protocol, the IFSA or the Interim GSPA).

6.      THIS COURT ORDERS that, without limiting the provisions of the Initial Order, the Applicants shall remain in possession and control of the Property and the Business and that the Monitor shall not take possession of the Property and/or the Business or any part thereof.

7.      THIS COURT ORDERS that, without limiting the provisions of the Initial Order, all employees of the Applicants shall remain employees of the Applicants until such time as the Applicants may terminate the employment of such employees. Nothing in this Order shall, in and of itself, cause the Monitor to be liable for any employee-related liabilities or duties, including, without limitation, wages, severance pay, termination pay, vacation pay and pension or benefit amounts.

8.      THIS COURT ORDERS that the Monitor shall continue to have the benefit of all of the protections and priorities as set out in the Initial Order and any such protections and priorities

shall apply to the Monitor in fulfilling its duties under this Order or carrying out the provisions of this Order.

9.      THIS COURT ORDERS AND DECLARES that nothing in this Order shall constitute or be deemed to constitute the Monitor as a receiver, assignee, liquidator, administrator, receiver-manager, agent of the creditors or legal representative of any of the Applicants within the meaning of any relevant legislation and that any distribution ultimately made to creditors of the Applicants by the Monitor will be deemed to have been made by the Applicants themselves.

10.     THIS COURT ORDERS that the Applicants and their advisors shall cooperate fully with the Monitor and any directions it may provide pursuant to this Order and shall provide the Monitor with such assistance as the Monitor may request from time to time to enable the Monitor to carry out its duties and powers as set out in the Initial Order, this Order or any other Order of this Court under the CCAA or applicable law generally.

11.     THIS COURT ORDERS that a further hearing shall be held on September 15, 2009 or such alternate date as this Court may fix, at which time this Order may be varied. Materials for such further hearing shall be served upon the Service List for this proceeding by no later than ten days prior to the date schedule for the further hearing save and except in the case of the Monitor and the Applicants, which shall serve their materials (either in response or otherwise), if any, by no later than four days prior to the date scheduled for the further hearing.

ENTERED AT / INSCRIT À TORONTO
ON / BOOK NO:
LE / DANS LE REGISTRE NO.:

AUG 1 4 2009

PER / PAR:      Joanne Nicoara
                Registrar, Superior Court of Justice

DOCSTOR: 1730524\8B

Court File No: 09-CL-7950

IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL
NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL NETWORKS
GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL CORPORATION AND
NORTEL NETWORKS TECHNOLOGY CORPORATION

*ONTARIO*
SUPERIOR COURT OF JUSTICE
COMMERCIAL LIST

Proceeding commenced at Toronto

**ORDER**

**OGILVY RENAULT LLP**
Suite 3800
Royal Bank Plaza, South Tower
200 Bay Street
Toronto, Ontario M5J 2Z4
CANADA

**Derrick Tay LSUC#: 21152A**
Tel: (416) 216-4832
Email: dtay@ogilvyrenault.com

**Mario Forte  LSUC#: 27293F**
Tel: (416) 216-4870
Email: mforte@ogilvyrenault.com

**Jennifer Stam LSUC #46735J**
Tel: (416) 216-2327
Email: jstam@ogilvyrenault.com
Fax: (416) 216-3930

Lawyers for the Applicants

DOCSTOR: 1730524\1B

This is Exhibit "C"
referred to in the Affidavit of
Alan Robert Bloom
sworn before me
this $2$ day of January, 2010

08/14/2009  16:08    4163276228    MIN ATTORNEY GENERAL    PAGE 02/05

14 Aug 2005

Court File No: 09-CL-7950

IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL
NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL NETWORKS
GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL CORPORATION AND
NORTEL NETWORKS TECHNOLOGY CORPORATION

*ONTARIO*
SUPERIOR COURT OF JUSTICE
(COMMERCIAL LIST)

Proceeding commenced at Toronto

MOTION RECORD
Expanding the powers and role of the Monitor,
Ernst & Young Inc.
(returnable August 14, 2009)

OGILVY RENAULT LLP
Suite 3800
Royal Bank Plaza, South Tower
200 Bay Street
P.O. Box 84
Toronto, Ontario M5J 2Z4

Derrick Tay LSUC#: 21152A
Tel: (416) 216-4832
Email: dtay@ogilvyrenault.com

Mario Forte LSUC#: 27293F
Tel: (416) 216-4870
Email: mforte@ogilvyrenault.com

Jennifer Stam LSUC #46735J
Tel: (416) 216-2327
Email: jstam@ogilvyrenault.com
Fax: (416) 216-3930

Lawyers for the Applicants

DOCSTOR: 1730524M3

point has been reached and that going
forward it is appropriate and necessary
for the Monitor to take on an enhanced
role in the Nortel's CCAA proceeding.
The reasons for why giving rise to
this submission are set out in the
affidavit of Mr. Davies sworn
Aug 11/09 and they are also referenced
in the 19th Report of the Monitor.
Having reviewed the record and having
heard submissions, I am satisfied
that it is appropriate to grant the
requested relief to expand the powers
and role of the Monitor in the form
requested. In doing so, it is noted
that Ernst & Young Inc. has indicated

⎿3

its willingness and consent to the
proposed expansion of the powers and
duties of the Monitor as reflected in the
draft Order

In seeking this Order, the Applicants
have noted that "given the decisions
that have been made and the
direction that the restructuring has taken,
Nortel has reached a natural transition
point for certain matters." In light
of these circumstances and in furtherance
of expanding the powers of the Monitor,
the Monitor advises that it will consult
on a timely basis (with regard to
the circumstances) with the Applicants'
major creditor constituencies (in each

424

case as appropriate in light of their respective
potential interests with regard to the specific
issue) in exercising powers in relation to
matters of material substance and that it
will provide timely (with regard to the
circumstances) delivery of relevant information
reasonably requested by such appropriate
creditor constituent, subject to the terms
of the Initial Order, as amended.

I also note that a further hearing has
been scheduled to deal with this matter.

Paragraph 11 of this order is to
be considered as a trial come back
this clause to address any matters
arising out of this Order.

An order has been signed in the form
presented to give effect to the foregoing
[subject to edit if typed]

This is Exhibit "D"
referred to in the Affidavit of
Alan Robert Bloom
sworn before me
this _2o_ day of January, 2010

023

Court File No: 09-CL-7950

*ONTARIO*
SUPERIOR COURT OF JUSTICE
(COMMERCIAL LIST)

IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT,*
R.S.C. 1985, c. C-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF
NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL
NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL
CORPORATION AND NORTEL NETWORKS TECHNOLOGY CORPORATION

APPLICATION UNDER THE *COMPANIES' CREDITORS ARRANGEMENT ACT,*
R.S.C. 1985, c. C-36, AS AMENDED

AFFIDAVIT OF GORDON A. DAVIES
(sworn August 11, 2009)

·I, Gordon A. Davies, of the city of Oakville in the Province of Ontario, MAKE OATH
AND SAY:

1.      I am the Chief Legal Officer of Nortel Networks Corporation ("NNC") and Nortel
Networks Limited ("NNL") and have held those positions since January 2009. Prior to that time
I acted as Deputy General Counsel from January 2008 to January 2009 and interim Chief Legal
Officer in 2005 and 2007. In total, have been employed by NNC and/or NNL since 1993. As
such, I have personal knowledge of the matters to which I hereinafter depose in this Affidavit.
Where I do not possess personal knowledge, I have stated the source of my information and, in
all such cases, believe it to be true.

2.      I swear this Affidavit in support of the motion for an Order, among other things,
expanding the powers and role of Ernst & Young Inc., in its capacity as monitor (the "Monitor")
of the Applicants (defined below).

DOCSTOR: 1743068\3

- 024

-2-

3.    All dollar references are US$ unless otherwise indicated.  All references to "Nortel" or the "Company" are references to the enterprise as a whole.

**BACKGROUND**

4.    Further details regarding the background to these proceedings are set out in the affidavit of John Doolittle sworn January 14, 2009 (the "Initial Order Affidavit") previously filed in these proceedings and are therefore not repeated herein.

*The Insolvency Proceedings*

5.    On January 14, 2009 (the "Filing Date"), NNC, NNL, Nortel Networks Technology Corporation, Nortel Networks Global Corporation and Nortel Networks International Corporation (collectively, the "Applicants") were granted protection under the *Companies' Creditors Arrangement Act*, R.S.C. 1985, c. C-36, as amended (the "CCAA") pursuant to an initial order (as subsequently amended and restated, the "Initial Order") of this Honourable Court and Ernst & Young Inc. was appointed as Monitor in the CCAA proceedings.  A copy of the Initial Order is attached hereto as Exhibit "A".

6.    Also on January 14, 2009, certain of NNC's U.S. subsidiaries, including its principal U.S. operating subsidiary NNI (together with the other U.S. filing entities, the "Chapter 11 Debtors"), made voluntary filings in the United States Bankruptcy Court for the District of Delaware (the "U.S. Court") under Chapter 11 of the United States Bankruptcy Code (the "Code").  On the same date, this Honourable Court granted an Order pursuant to Section 18.6(4) of the CCAA recognizing the Chapter 11 cases as "foreign proceedings" in Canada and giving effect in Canada to the automatic stay under the Code.

DOCSTOR: 1743068\3

- 3 -

7.      Additionally, on January 15, 2009, Nortel Networks UK Limited ("NNUK") and certain subsidiaries of the Nortel group incorporated in Europe, the Middle East or Africa each obtained an administration order for the appointment of administrators (the "Joint Administrators") from the English High Court of Justice under the Insolvency Act 1986.

8.      On February 27, 2009, the U.S. Court granted petitions recognizing these proceedings as "foreign main proceedings" pursuant to Chapter 15 of the Code.

9.      On May 28, 2009, the Commercial Court of Versailles, France (the "French Court") ordered the commencement of secondary insolvency proceedings in respect of Nortel Networks S.A. ("NNSA"), which consist of liquidation proceedings during which NNSA will continue to operate as a going concern for an initial period of three months.[1]  In accordance with the European Union's Counsel Regulation, the English law proceedings remain the main proceedings in respect of NNSA.

10.     On June 8, 2009, the Joint Administrators appointed in respect of NNUK filed a petition with the U.S. Court for the recognition of the Administration Proceedings as they relate to NNUK (the "English Proceedings") under Chapter 15 of the Code.  On June 26, 2009, the U.S. Court entered an order recognizing the English Proceedings as foreign main proceedings under Chapter 15 of the Code.

11.     On July 15, 2009, Nortel Networks (CALA) Inc. made a voluntary filing with the U.S. Court under Chapter 11 of the Code.

---

[1] A hearing has been scheduled for extension of this initial period to be heard later this month.

- 4 -

*Events to Date*

12.    At the outset of the proceedings, the Applicants announced their intention to reassess their business strategy and consider restructuring opportunities with a view to emerging as a stronger enterprise.  In that regard, the Applicants took a number of steps to reduce costs and increase efficiencies within the enterprise.  During the last eight (8) months, the Applicants have repudiate or rejected redundant contracts, including real property leases, announced significant headcount reductions, terminated Nortel's equity plans and the Nortel Networks Corporation change in control plan and took steps to sell certain non-core assets, including the sale of (a) the Layer 4-7 business, which sale closed on April 1, 2009; and (b) the "Westwinds Facility" in Alberta, which sale closed on June 16, 2009 NNL has also commenced a sale process for its shareholder interest in its joint venture of LG Electronics Inc., which sale process is still underway.

13.    On June 19, 2009, Nortel announced that it had entered into a stalking horse agreement for the sale of certain core assets generally referred to as its CDMA and LTE businesses and that it was advancing in its discussions with external parties to sell its other businesses (including the sale of its Enterprise Solutions business to Avaya Inc., discussed below).  This decision was not taken lightly and was made with extensive and intense consultation with outside advisors and key stakeholders over a period of several months.

14.    Although all restructuring alternatives were considered, the Company concluded that given the impact of the filings on the businesses, conducting specific sales processes of Nortel's various businesses on a "going concern" basis provided the greatest chance to maximize the value of its operations to preserve as many jobs as possible and continue businesses in Canada and the U.S.

DOCSTOR: 1743068\3

027

- 5 -

15.    In furtherance of that announcement, the Applicants have obtained Court Orders both in these proceedings as well as the Chapter 11 Proceedings for the approval of:

(a)    Bidding procedures and a stalking horse agreement entered into with Nokia Siemens Networks B.V. for the sale of certain of Nortel's CDMA and LTE related assets and subsequently sale orders approving the sale to the ultimate successful bidder, Telefonaktiebolaget L M Ericsson (publ);  and

(b)    Bidding procedures and a stalking horse agreement entered into with Avaya Inc. for the sale of substantially all of its assets related to its Enterprise Solutions business (subject to higher and better offers).

16.    Nortel has also taken steps to progress within its insolvency proceedings in Canada and the U.S., most recently obtaining claims bar orders in both the CCAA and the Chapter 11 proceedings, setting a claims bar date of September 30, 2009. Additionally, the Applicants have worked with the Chapter 11 Debtors, the Joint Administrators and certain key stakeholders to develop funding arrangements to address the Applicants' funding needs and it is contemplated that a sales allocation protocol will eventually be developed to set up a method for determining the allocation of sales proceeds among the various estates.

17.    Although there is still much progress to be made, given the decisions that have been made and the direction that that restructuring has taken, Nortel has reached a natural transition point for certain matters. As such, yesterday, Nortel made several announcements, including that Nortel's President and Chief Executive Officer, Mike Zafirovski will be stepping down, and the reduction of the board of directors of NNC and NNL from nine (9) to three (3) remaining

- 6 -

directors. The three (3) remaining directors will also serve as members of NNC's and NNL's audit committees.

**NEW ORGANIZATIONAL STRUCTURE INCLUDING EXPANSION OF THE MONITOR'S POWERS**

18.    In connection with the announcement, a number of organizational updates and changes were also announced including:

(a)    a change in the reporting structure such that all businesses report to Pavi Binning, the Chief Restructuring Officer (the "CRO");

(b)    the continuation of the Company's mergers and acquisitions teams led by Nortel's Chief Strategy Officer, George Riedel;

(c)    confirmation of the Nortel business services group to support the transitional services and other operational requirements of the businesses to be led by Joe Flanagan;

(d)    the establishment of a corporate group to be primarily responsible for the management of activities during the sales process as well as post-business disposition matters, to be led by John Doolittle;

(e)    the expansion of the Monitor's role in the CCAA proceedings, which is discussed in greater detail in the following paragraphs; and

(f)    the commencement of a process to identify a principal officer in the Chapter 11 Proceedings.

029

- 7 -

19.    In connection with these organizational changes, Nortel is also implementing corresponding changes to its reporting structure.

20.    The Monitor's current powers are as set out in the Initial Order. The contemplated organizational changes were designed with the contemplation that the Monitor was to have an expanded role in the Applicants' CCAA proceedings, and indeed, in the Company's restructuring generally. A summary of the proposed expanded powers is as follows:

(a)    cause the Applicants, or any one or more of them, to exercise rights under paragraph 11 of the Initial Order;

(b)    cause the Applicants to perform such other functions or duties as the Monitor considers necessary or desirable in order to facilitate or assist the Applicants' operations, restructuring, wind-down, liquidation or other activities;

(c)    conduct, supervise and direct one or more sales processes for the Property or the business and any procedure regarding the allocation and/or distribution of proceeds of any sales, and such authority shall be in respect of sales processes and/or sales that have already been or may be in the future approved by this Court;

(d)    cause the Applicants to administer the business, affairs and operations of the Applicants as the Monitor considers necessary or desirable for the purposes of completing any transaction (whether or not already approved by this Court) for the sale of the business or any part of it;

(e)    administer the Applicants' claims process (established pursuant to an Order of this Court dated July 30, 2009) and any other claims bar and/or claims resolution process approved by Order of this Court within these proceedings;

(f)    propose or cause the Applicants or any one or more of them to propose one or more plans of compromise and/or arrangement in respect of the Applicants or any one or more of them;

DOCSTOR: 1743068\3

(g)    engage assistants or advisors or cause the Applicants to engage assistants or
advisors as the Monitor deems necessary or desirable to carry out the terms of the
Initial Order or any other Order made in these proceedings or for the purposes of
the Plan and such persons shall be deemed to be "Assistants" under the Initial
Order;

(h)    apply for any orders necessary or advisable to carry out its powers and obligations
under this Order or any other Order granted by this Court including for advice and
directions with respect to any matter;

(i)    meet and coordinate with the chief restructuring officer of the Applicants or any
person holding any similar position;

(j)    cause the Applicants to exercise any and all of their authority in their capacities as
shareholder(s) of any subsidiary of the Applicants, or any one of them;

(k)    meet and consult with the board of directors of the Applicants as it deems
necessary or appropriate;

(l)    meet with and direct management of the Applicants with respect to any of the
foregoing including, without limitation, operational and restructuring matters; and

(m)    coordinate with individual appointed as the principal officer or any person
holding a similar title of Nortel Networks Inc. or any successor or assign of such
entity with respect to operational and restructuring matters.

21.    Notwithstanding the additional powers to be authorized for the Monitor, it is not
intended that any of these changes will alter the obligations of the Applicants, where required, to
obtain the consent of or provide notice to the official committee of unsecured creditors of Nortel
Networks Inc. or the ad hoc bondholders committee, prior to taking any action for which consent
or notice is required.

- 9 -

**CONCLUSION**

22.     The specific powers contemplated have been developed after discussion with the

Applicants' legal advisors and with consideration to the organization changes taking place within

Nortel.  I believe that at this critical transition point in the proceedings, the expansion of the role

of the Monitor is an important step to facilitate the Applicants' ongoing goal of maximizing

value for the businesses as well the conduct of the claims process and other matters related to the

CCAA proceedings.


SWORN BEFORE ME at the City of
Toronto, in the Province of Ontario on
this 11th day of August, 2009.

_____
Commissioner for Taking Affidavits or
Notary Public
Samantha Graff

_____
Gordon A. Davies


DOCSTOR: 1743068\3

This is Exhibit "E"
referred to in the Affidavit of
Alan Robert Bloom
sworn before me
this 7\_ day of January, 2010

Court File No. 09-CL-7950

**ONTARIO**
**SUPERIOR COURT OF JUSTICE**
**(COMMERCIAL LIST)**

**IN THE MATTER OF THE** *COMPANIES' CREDITORS*
*ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED

**AND IN THE MATTER OF A PLAN OF**
**COMPROMISE OR ARRANGEMENT OF**
**NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED,**
**NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS**
**INTERNATIONAL CORPORATION AND NORTEL NETWORKS**
**TECHNOLOGY CORPORATION**

**NINETEENTH REPORT OF THE MONITOR**
**DATED AUGUST 11, 2009**

**INTRODUCTION**

1.    On January 14, 2009 (the "Filing Date") Nortel Networks Corporation ("NNC" and
      collectively with all its subsidiaries, "Nortel" or "Company"), Nortel Networks
      Limited ("NNL"), Nortel Networks Technology Corporation ("NNTC"), Nortel
      Networks International Corporation ("NNIC") and Nortel Networks Global
      Corporation ("NNGC") (collectively the "Applicants") filed for and obtained
      protection under the Companies' Creditors Arrangement Act ("CCAA"). Pursuant
      to the Order of this Honourable Court dated January 14, 2009, as amended and
      restated (the "Initial Order"). Ernst & Young Inc. ("EYI") was appointed as the
      Monitor of the Applicants (the "Monitor") in the CCAA proceeding. The stay of
      proceedings was extended to October 30, 2009 by this Honourable Court in its
      Order dated July 30, 2009.

2.    Nortel Networks Inc. ("NNI") and certain of its U.S. subsidiaries concurrently filed
      voluntary petitions under Chapter 11 of the U.S. Bankruptcy Code (the "Code") in
      the U.S. Court on January 14, 2009. As required by U.S. law, an official unsecured
      creditors committee ("UCC") was established in January, 2009. In addition, an

ad hoc group of holders of bonds issued by NNL and NNC has been organized and is participating in these proceedings as well as those in the U.S. (the "Bondholder Group").

3.   Nortel Networks (CALA) Inc. ("NCI") (together with NNI and certain of its subsidiaries which filed on January 14, 2009, the "U.S. Debtors") filed a voluntary petition under Chapter 11 of the Code in the U.S. Court on July 14, 2009.

4.   Nortel Networks UK Limited ("NNUK") and certain of its subsidiaries located in EMEA (together the "EMEA Debtors") were granted Administration orders (the "U.K. Administration Orders") by the English High Court (the "U.K. Court") on January 14, 2009. The U.K. Administration Orders appointed Alan Bloom, Stephen Harris, Alan Hudson and Chris Hill of Ernst & Young LLP as Administrators of the various EMEA Debtors, except for Ireland, to which David Hughes (Ernst & Young LLP Ireland) and Alan Bloom were appointed (collectively the "U.K. Administrators").

5.   On January 20, 2009, Nortel Networks Israel (Sales and Marketing) Limited and Nortel Communications Holdings (1997) Limited (together "NN Israel") were granted Administration orders by the court in Israel (the "Israeli Administration Orders"). The Israeli Administration Orders appointed representatives of Ernst & Young LLP in the U.K. and Israel as Administrators of NN Israel (the "Joint Israeli Administrators") and provided a stay of NN Israel's creditors which, subject to further orders of the Israeli Court, remains in effect during the Administration.

6.   Subsequent to the Filing Date, Nortel Networks SA ("NNSA") commenced secondary insolvency proceedings within the meaning of Article 27 of the European Union's Council Regulation (EC) No 1346/2000 on Insolvency Proceedings in the Republic of France pursuant to which a liquidator (the "NNSA Liquidator") and an administrator (the "NNSA Administrator") have been appointed by the Versailles Commercial Court.

**PURPOSE**

7.   The purpose of this nineteenth report of the Monitor (the "Nineteenth Report") is to
     update and report to this Honourable court on:

     a)  the status of the Applicants' restructuring initiatives;

     b)  changes to the Applicants' corporate governance; and

     c)  the motion seeking the approval of this Honourable Court for expanding the ·
         powers and duties of the Monitor to permit it to undertake activities necessary
         to oversee and continue the administration of the Applicants' restructuring.

**TERMS OF REFERENCE**

8.   In preparing this Nineteenth Report, EYI has relied upon unaudited financial
     information, the Company's books and records, financial information prepared by
     the Company and discussions with management of Nortel. EYI has not audited,
     reviewed or otherwise attempted to verify the accuracy or completeness of the
     information and, accordingly, EYI expresses no opinion or other form of assurance
     on the information contained in this Nineteenth Report.

9.   Unless otherwise stated, all monetary amounts contained herein are expressed in
     U.S. dollars.

10.  Capitalized terms not defined in this Nineteenth Report are as defined in the
     Affidavit of John Doolittle sworn on January 14, 2009 (the "Doolittle Affidavit"),
     the Pre-Filing Report or previous Reports of the Monitor.

**GENERAL BACKGROUND**

11.  Nortel is a technology company that designs, develops and deploys communication
     products, systems, and solutions to its carrier and enterprise customers around the
     globe. Its principal assets include its people, the intellectual property derived and

maintained from its R&D activities, its customers and other significant contracts and agreements.

12. Effective July 1, 2009 Nortel conducts its global business through five reportable business unit segments, Carrier Networks ("CN"), Carrier VoIP and Application Solutions ("CVAS"), Enterprise Solutions ("ES"), Metro Ethernet Networks ("MEN") and LG Nortel Co. Ltd. ("LGN"). The revenue and assets of each of the business units, except for LGN, is distributed among the multiple Nortel legal entities and joint ventures around the world.

13. The Monitor has made various materials relating to the CCAA proceedings available on its website at www.ey.com/ca/nortel. The Monitor's website also contains a dynamic link to Epiq Bankruptcy LLC's website where materials relating to the voluntary proceedings under Chapter 11 of the Code are posted.

**STATUS OF RESTRUCTURING INITITTIVES**

14. As discussed in previous reports of the Monitor, the Applicants, with the assistance of the Monitor and in consultation with certain stakeholders, have developed a restructuring strategy which principally focuses on the divestiture of Nortel's main business unit segments: CN, CVAS, ES, MEN and LGN.

15. On June 19, 2009, NNC issued a press release announcing it was engaging in discussions with numerous parties for the sale of its various businesses.

16. NNC also announced its intention to apply for a delisting of its common shares and the NNL preferred shares from trading on the Toronto Stock Exchange and delisting occurred on June 26, 2009 at the close of trading.

17. As further described below, the Applicants continue to make progress in the implementation of their restructuring strategy.

*Sales Process*

18. As discussed in the Seventeenth Report, pursuant to the Bidding Procedures approved by this Honourable Court on June 29, 2009, Nortel selected Telefonaktiebolaget LM Ericsson (publ) ("Ericsson") as the Successful Bidder for the sale of substantially all of its CDMA Business and LTE Assets for US $1.13 billion. The Ericsson Sale Agreement was approved by this Honourable Court and the U.S. Court on July 28, 2009 and is anticipated to close in September 2009.

19. As discussed in the Eighteenth Report, on July 20, 2009, Nortel announced NNL, NNI and certain of its other subsidiaries entered into an asset and share sale agreement with Avaya Inc. ("Avaya") for its North American, CALA and APAC enterprise solutions business as well as the shares of Nortel Government Solutions Incorporated and DiamondWare, Ltd. At the same time, NNUK, through the U.K. Administrator, entered into an asset sale agreement with Avaya for the EMEA portion of its enterprise solutions business. These agreements include the planned sale of substantially all of the assets of the enterprise solutions business globally for a purchase price of US $475 million.

20. The Bidding Procedures to be employed in connection with the sale process were approved by this Honourable Court and by the U.S. Court on August 4, 2009.

21. The Bidding Procedures provide that all bids must be received by the Sellers not later than 12:00 p.m. (prevailing Eastern Time) on September 4, 2009 and that the Sellers will conduct an auction of the Purchased Assets on September 11, 2009.

22. Nortel continues to advance its discussions with interested parties for its other businesses. In parallel with these sales discussions, the Company continues to assess other restructuring alternatives for these businesses in the event it is unable to maximize value through a sale of these assets.

23. The Monitor believes the Applicants are working diligently and in good faith to execute their restructuring strategy and continue to progress toward development of a Plan.

**CHANGES IN APPLICANTS' CORPORATE GOVERNANCE**

24. Prior to commencing insolvency proceedings, Nortel operated and functioned as a global firm. Generally, Nortel has one legal entity in each country in which it operates and sales of all Nortel products in that country are made through the single legal entity. A more detailed description of this global structure is set out in the Pre-Filing Report.

25. The Board of Directors of NNC and NNL (the "Board") is responsible for the governance of the Applicants. As of August 1, 2009, the Board was comprised of 9 individuals.

26. As discussed in paragraphs 2 through 6 of this Report, certain of the other Nortel entities have commenced their own individual insolvency proceedings. Each proceeding impacts on other Nortel entities due to the many intercompany relationships but each entity also has unique stakeholders. The interest of the Nortel entities and the unique stakeholders may differ.

27. The Applicants have indicated that the Board and its Chief Executive Officer ("CEO") believe Nortel has reached an appropriate transition point for its governance structure. Since filing the Applicants have:

   a) stabilized the business operations;

   b) made progress with respect to the sale of the various businesses, as described in more detail above;

   c) made organizational and reporting structure changes towards stand alone business units; and

d) established both Nortel Business Services ("NBS"), a business reporting unit to provide transitional services with respect to the sale of the business, and Corporate Group ("CG") to continue the implementation of Nortel's restructuring strategy.

28. Nortel has announced that effective August 10, 2009, its CEO is stepping down and the number of Board members is being reduced from 9 to 3.

29. The Applicants have indicated that as a result of additional responsibilities being assumed by the 3 remaining directors, their compensation, specifically the director fees, will be increased to $225,000 per director per annum and the fee for the Chairman of the Board will increase to $325,000 per annum (inclusive of the Chairman's director fees).

30. These governance changes will not impact on the level of customer service and supplier relationships on an on-going, day-to-day, operational basis.

31. In conjunction with these governance changes, the Applicants are also seeking an enhanced role for the Monitor with respect to the oversight of the business, sales processes and other restructuring activities pursuant to the CCAA proceedings. These enhanced powers are described in more detail later in this Report.

32. In addition, the Company is in the process of identifying a principal officer for the Nortel companies in the U.S. Chapter 11 proceedings who will work in conjunction with the UCC, the Bondholder Group and the Monitor to ensure the interests of Nortel's U.S. creditors continue to be served.

33. The CRO, Chief Strategy Officer and the leaders of NBS and CG will report to the Board, the Monitor and the proposed U.S. Chapter 11 principal officer.

**EXPANDED POWERS AND DUTIES OF THE MONITOR**

34. The Applicants, to date, have made progress in implementing their restructuring strategy, however, there is significant work still to be completed, including without limitation:

   a) closing the sale of the CDMA Business and LTE Assets to Ericsson;

   b) identifying stalking horse bidders, conducting auctions and closing sales for business units;

   c) fulfilling transition service obligations with respect to the sale of business units in respect of which the Applicants and other Nortel entities are required to provide support and service to various purchasers for a certain time frame post-closing of a sale transaction;

   d) realizing upon residual assets;

   e) administering the claims process; and

   f) development of a Plan.

35. In conjunction with the organizational changes described in the previous section, the Applicants have concluded it is necessary and appropriate to seek additional powers for the Monitor. These additional powers have been developed with Nortel's legal and financial advisors and the Monitor to address the appropriate governance requirements of the Applicants during the remainder of the CCAA proceedings.

36. The Applicants' motion proposes that the Monitor be granted the following additional powers and be authorized to perform the following duties, in addition to the powers and duties set out in the Initial Order (capitalized terms, unless otherwise defined, have the meaning as ascribed in the Initial Order):

   (a)   cause the Applicants, or any one or more of them, to exercise rights under paragraph 11 of the Initial Order to permit the Applicants to proceed with

an orderly restructuring of the Business, including, subject to certain conditions outlined in the Initial Order, the following rights of the Applicants:

    (i)    permanently or temporarily cease, downsize or shut down any of its business or operations and to dispose of redundant or non-material assets;

    (ii)    terminate the employment of such of its employees or temporarily lay off such of its employees as it deems appropriate and to deal with the consequences thereof in the Plan or on further order of the Court;

    (iii)    vacate, abandon or quit the whole but not part of any leased premises and/or repudiate any real property lease and any ancillary agreements relating to any leased premises, on written notice to the landlord on such terms as may be agreed upon between the Applicant and such landlord, or failing such agreement, to deal with the consequences thereof in the Plan;

    (iv)    repudiate such of its arrangements or agreements of any nature whatsoever, including, without limitation, any of its deferred compensation, or bonus plans, change of control plans, stock options or restructured stock unit plans and shareholder rights plans whether oral or written, as such Applicant may deem appropriate on such terms as may be agreed upon between such Applicant or any one of them and such counter-parties, or failing such agreement, to deal with the consequences thereof in the Plan; and

    (v)    pursue all avenues of refinancing and offers for material parts of its Business or Property, in whole or part, subject to prior approval of this Court being obtained before any material refinancing or any sale.

(b)    cause the Applicants to perform such other functions or duties as the Monitor considers necessary or desirable in order to facilitate or assist the Applicants' operations, restructuring, wind-down, liquidation or other activities;

(c)    conduct, supervise and direct one or more sales processes for the Property or the Business and any procedure regarding the allocation and/or distribution of proceeds of any sales, and such authority shall be in respect