**FRANCE**

| | |
|---|---|
| **EXECUTED AS A DEED** | ) |
| for and on behalf of | ) |
| **Nortel Networks S.A.    (in administration)** | ) |
| by ~Stephen John Harris~ | ) |
| as joint administrator | ) |
| (acting as agent and without personal | ) |
| liability) in the presence of: | ) |
| | ) |
| | ) |
| **Signature of witness** | )    **Signature of administrator** |
| | ) |
| .................................................... | ) |
| | ) |
| **JUSTIN VAUGHAN** | ) |
| **Name of witness** | ) |
| **(in BLOCK CAPITALS)** | ) |
| | ) |
| ............................................ | ) |
| | ) |
| **Address of witness** | ) |
| ~Exchange House~ | ) |
| ~Primrose Street~ | ) |
| ~London~ | ) |

ROMANIA

**EXECUTED AS A DEED**                                          )
**for and on behalf of**                                        )
**Nortel Networks Romania SRL**                                 )
**(in administration)**                                         )
by Stephen John Harris                                          )
**as joint administrator**                                      )
**(acting as agent and without personal**                       )
**liability) in the presence of:**                              )
                                                                )
Signature of witness                                            )          Signature of administrator
                                                                )
.........................................                       )          .........................................
         JUSTIN VAUGHAN                                         )
**Name of witness**                                            )
**(in BLOCK CAPITALS)**                                        )
                                                                )
.........................................                       )
**Address of witness**                                         )
Exchange House                                                  )
Primrose Street                                                 )
London                                                          )
.........................................                       )

SWEDEN

| | |
|---|---|
| **EXECUTED AS A DEED** | ) |
| **for and on behalf of** | ) |
| **Nortel Networks AB**    (**in administration**) | ) |
| by ~Stephen John Harris~ | ) |
| **as joint administrator** | ) |
| (**acting as agent and without personal** | ) |
| **liability**) **in the presence of:** | ) |
| | ) |
| | ) |
| **Signature of witness** | ) |
| | ) |
| .................................................... | ) |
|        JUSTIN VAUGHAN | ) |
| **Name of witness** | ) |
| (**in BLOCK CAPITALS**) | ) |
| | ) |
| .................................................... | ) |
| **Address of witness** | ) |
| Exchange House | ) |
| Primrose Street | ) |
| London | ) |

**Signature of administrator**

..................................................

Executed as a DEED by Alan Robert
Bloom in his own capacity without
personal liability and solely for the
purpose of obtaining the benefit of the
provisions of this agreement expressed
to be conferred on the Administrators

..................................................
Signature

ALAN BLOOM..................
Name of signatory

..................................................
Title

in the presence of:

Signature of witness

..................................................

Name of witness

(In BLOCK CAPITALS)

HUS B DANDRIDGE......

Address of witness

(R NORTEL NETWORKS
MAIDEN HEAD OFFICE PARK
WESTACCTT LOAT......

MAIDENHEAD............
BERKS SL6 3QH....

**Executed as a DEED by Christopher
John Wilkinson Hill in his own capacity
without personal liability and solely
for the purpose of obtaining the
benefit of the provisions of this
agreement expressed to be conferred
on the Administrators**

.................................................
Signature

.................................................
Name of signatory

C. J. W. HILL

.................................................
Title

in the presence of:

Signature of witness

.................................................

Name of witness

**(In BLOCK CAPITALS)**.

MRS B. DANDRIDGE.....

Address of witness

C/o NORTEL NETWORKS
MAIDENHEAD OFFICE PARK
WESTACOTT WAY, MAIDENHEAD,
BERKS SL6 3QH

Executed as a DEED by Stephen John
Harris in his own capacity without
personal liability and solely for the
purpose of obtaining the benefit of the
provisions of this agreement expressed
to be conferred on the Administrators

Signature

Name of signatory

STEPHEN HARRIS

Title  JOINT ADMINISTRATOR

in the presence of:

Signature of witness

Name of witness

(In BLOCK CAPITALS)

....JUSTIN VAUGHAN................

Address of witness
Exchange House
Primrose Street
London

**Executed as a DEED by Alan Michael**
**Hudson in his own capacity without**
**personal liability and solely for the**
**purpose of obtaining the benefit of**
**the provisions of this agreement**
**expressed to be conferred on the**
**Administrators**

...............................................
Signature

..... *ALAN MICHAEL HUDSON*
Name of signatory

.... *PRINT ADMINISTRATOR*
Title

in the presence of:

Signature of witness

. *Elizabeth Garner*

. Name of witness

**(In BLOCK CAPITALS)**

*ELIZABETH ... GARNER*

Address of witness

*ONE MORE LONDON PLACE*

. *London* ........................

. *SE1 2AF* ........................

..............................................

**Executed as a DEED by David
Martin Hughes in his own capacity
without personal liability and
solely for the purpose of obtaining
the benefit of the provisions of
this agreement expressed to be
conferred on the Administrators**

.................................
Signature

.DAVID M HUGHES.
Name of signatory

.Joint Administrator
Title

in the presence of:

Signature of witness

.................................

Name of witness

**(In BLOCK CAPITALS)**

WILLIAM COTTON

Address of witness

.City Quanza.

.LAPPS Quay.

.Cork.

.................................

This is Exhibit "H"
referred to in the Affidavit of
Alan Robert Bloom
sworn before me
this ___ day of January, 2010

Court File No.: 09-CL-7950

**ONTARIO**
**SUPERIOR COURT OF JUSTICE**
**COMMERCIAL LIST**

THE HONOURABLE MR.              )          MONDAY, THE 29th
                                )
JUSTICE MORAWETZ                 )          DAY OF JUNE, 2009

IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,
R.S.C. 1985, c. C-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF
NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED,
NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS
INTERNATIONAL CORPORATION AND NORTEL NETWORKS TECHNOLOGY
CORPORATION

APPLICATION UNDER THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,
R.S.C. 1985, c. C-36, AS AMENDED

**ORDER**
**(Interim Funding Agreement)**

THIS MOTION, made by Nortel Networks Corporation, Nortel Networks Limited

("NNL"), Nortel Networks Technology Corporation, Nortel Networks Global Corporation and

Nortel Networks International Corporation (collectively, the "Applicants") for, *inter alia*, the

approval of an interim funding and settlement agreement dated as of June 9, 2009 (the "Interim

Funding Agreement") among the Applicants, the Chapter 11 Debtors (as defined in the Doolittle

Affidavit, as defined below), the EMEA Debtors (as defined in the Doolittle Affidavit) and the

- 3 -

Applicants is required, the Applicants shall include the Bondholders' Committee in any negotiations on such issues with the other Debtors or any related proceedings and any agreement or determination by the Applicants shall require prior consent of the Bondholders' Committee acting in good faith and the Monitor.

5.    **THIS COURT ORDERS** that, subject to the terms of the Interim Funding Agreement, the Extensions to the Canadian GSPA and the Accession be and are hereby approved.

6.    **THIS COURT HEREBY REQUESTS** the aid and recognition of any court, tribunal, regulatory or administrative body having jurisdiction in Canada, the United States, the United Kingdom or elsewhere, to give effect to this Order and to assist the Applicants, the Monitor and their respective agents in carrying out the terms of this Order. All courts, tribunals, regulatory and administrative bodies are hereby respectfully requested to make such orders and to provide such assistance to the Applicants and to the Monitor, as an officer of this Court, as may be necessary or desirable to give effect to this Order, to grant representative status to the Monitor in any foreign proceeding, or to assist the Applicants and the Monitor and their respective agents in carrying out the terms of this Order.

7.    **THIS COURT ORDERS** that each of the Applicants and the Monitor be at liberty and is hereby authorized and empowered to apply to any court, tribunal, regulatory or administrative body, wherever located, for the recognition of this Order and for assistance in carrying out the terms of this Order.

ENTERED AT / INSCRIT À TORONTO
ON / BOOK NO:
LE / DANS LE REGISTRE NO.:

JUN 3 0 2009

PER / PAR:

Court File No: 09-CL-7950

IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL CORPORATION AND NORTEL NETWORKS TECHNOLOGY CORPORATION

*ONTARIO*
SUPERIOR COURT OF JUSTICE
(COMMERCIAL LIST)

Proceeding commenced at Toronto

ORDER
(Interim Funding Agreement)

OGILVY RENAULT LLP
Suite 3800
Royal Bank Plaza, South Tower
200 Bay Street
P.O. Box 84
Toronto, Ontario ·M5J 2Z4, Canada

Derrick Tay LSUC#: 21152A
Tel:  (416) 216-4832
Email: dtay@ogilvyrenault.com

Mario Forte  LSUC#: 27293F
Tel: (416) 216-4870
Email: mforte@ogilvyrenault.com

Jennifer Stam LSUC #46735J
Tel: (416) 216-2327
Email: jstam@ogilvyrenault.com
Fax: (416) 216-3930
Lawyers for the Applicants

DOCSTOR: 1712969\3

This is Exhibit "I"
referred to in the Affidavit of
Alan Robert Bloom
sworn before me
this  20  day of January, 2010

**EXECUTION VERSION**

## INTERIM FUNDING AND SETTLEMENT AGREEMENT

This agreement (the "Agreement") is entered into by and among Nortel Networks Limited ("NNL") and the other entities set forth in Schedule 1 attached hereto, Nortel Networks Inc. ("NNI") and the other entities set forth in Schedule 2 attached hereto, and the Joint Administrators (as defined below) and the entities set forth in Schedule 3 attached hereto (the "EMEA Debtors"). The Joint Administrators, in their individual capacity, shall be party to this Agreement solely for the purposes of Section 17 and references to the Parties shall be construed accordingly.

WHEREAS, on January 14, 2009 (the "Filing Date"), Nortel Networks Corporation ("NNC"), NNL and certain of NNC's other Canadian affiliates included in Schedule 1 (collectively, the "Canadian Debtors," and NNC and its debtor and non-debtor affiliates are sometimes referred to herein (including, without limitation, the EMEA Debtors), as the "Nortel Group"), commenced creditor protection proceedings before the Ontario Superior Court of Justice (Commercial List) (the "Canadian Court") under the Companies' Creditors Arrangement Act (Canada) (respectively, "CCAA" and the "Canadian Proceedings"), in connection with which Ernst & Young Inc. was appointed monitor (the "Monitor"); and

WHEREAS, on the Filing Date, NNI and certain of NNI's United States affiliates included in Schedule 2 (collectively, the "US Debtors" and, together with the Canadian Debtors and the EMEA Debtors, the "Debtors") filed petitions in the United States Bankruptcy Court for the District of Delaware (the "US Court") under chapter 11 of title 11 of the United States Code (respectively, the "Bankruptcy Code," and the "US Proceedings"); and

WHEREAS, on the Filing Date, Nortel Networks UK Limited ("NNUK"), Nortel Networks (Ireland) Limited ("NNIR"), Nortel Networks S.A. ("NNSA") and certain of NNUK's affiliates in the Europe, Middle East and Africa ("EMEA") region, including those in Schedule 3 attached hereto, commenced administration proceedings (the "UK Proceedings" and, together with the Canadian Proceedings and the US Proceedings, the "Proceedings") before the High Court of Justice in London, England (the "UK Court" and, together with the Canadian Court and the US Court, the "Courts"), represented by individuals from Ernst & Young LLP (the "UK Administrator"), and, in the case of NNIR only, Ernst & Young Chartered Accountants (the "NNIR Administrator"), serving as administrators in the UK Proceedings (the UK Administrator and the NNIR Administrator collectively, the "Joint Administrators"); and

WHEREAS, subsequent to the Filing Date, NNSA commenced secondary insolvency proceedings within the meaning of Article 27 of the European Union's Council Regulation (EC) No 1346/2000 on Insolvency Proceedings in the Republic of France pursuant to which a liquidator (the "NNSA Liquidator") and an administrator (the "NNSA Administrator") have been appointed by the Versailles Commercial Court (Docket No. 2009P00492) for NNSA; and

WHEREAS, prior to the Filing Date, certain members of the Nortel Group made quarterly payments (the "Transfer Pricing Payments") to other Nortel Group entities pursuant to a transfer pricing methodology ("Transfer Pricing") provided for in the Transfer Pricing Agreements, where "Transfer Pricing Agreements" means (i) the Master Research and Development Agreement dated as of December 22, 2004 (as amended by, and together with the

related understandings contained in, the documents listed in <u>Annex A</u> hereto, the "<u>Master R&D Agreement</u>") and (ii) certain distribution agreements, whether written or oral, between one or more Nortel Group entities, including without limitation the agreements listed in <u>Annex B</u> hereto and any other agreements similar to the agreements listed in <u>Annex B</u> hereto (as amended, supplemented or otherwise modified, the "<u>Distribution Agreements</u>"); and

WHEREAS, notwithstanding a US$30 million payment made by NNI to NNL in January, 2009 (the "<u>January Payment</u>"), certain members of the Nortel Group, including, in particular, NNL, have liquidity constraints; and

WHEREAS, it should be noted that no other payments similar to the January Payment have been made between or among the Nortel Group entities since the Filing Date; and

WHEREAS, each of the Parties hereto has concluded it is appropriate and in the best interest of each to enter into this Agreement pursuant to which, *inter alia*: (i) NNI, on behalf of itself and the other US Debtors, shall settle any claims of NNL for corporate overhead and research and development costs, whether pursuant to Transfer Pricing Agreements or otherwise, incurred by NNL for the benefit of the US Debtors which NNL has asserted or could assert (without admission by the US Debtors and subject to Section 20 of this Agreement) would have been reimbursed to NNL through Transfer Pricing Payments payable by the US Debtors to the Canadian Debtors during, or with respect to, the period after the Filing Date through and including September 30, 2009 (respectively, the "<u>Canada/US Interim Period</u>" and the "<u>NNI Interim Obligations</u>") and (ii) the EMEA Debtors shall among themselves and as between one or more EMEA Debtors, on the one hand, and one or more Canadian Debtors and/or US Debtors, on the other hand, settle amounts payable and anticipated to become payable as Transfer Pricing Payments as provided for herein for the period from the Filing Date to December 31, 2009 (the "<u>EMEA Interim Period</u>"), in all cases subject to the terms of this Agreement; and

WHEREAS, the Parties hereto intend this Agreement to constitute a full and final settlement of all matters set forth in this Agreement, whether arising during or related to the Canada/US Interim Period or the EMEA Interim Period, as applicable; and

WHEREAS, the Parties intend to continue to meet their respective obligations to make the monthly payments in respect of the inter-company trading of goods and services by Nortel Group entities (the "<u>Inter-Company Trading Payments</u>") pursuant to and during the effectiveness of the group supplier protocol agreements approved in the applicable Proceedings from time to time (the "<u>GSPAs</u>") or pursuant to and in accordance with court orders entered in the Canadian Proceedings and the US Proceedings ("<u>Trading Orders</u>"); and

WHEREAS, the Official Committee of Unsecured Creditors appointed in the US Proceedings (the "<u>Creditors' Committee</u>") and the steering committee members of the ad hoc group of bondholders that have executed confidentiality or non-disclosure agreements with NNL (the "<u>Bondholders' Committee</u>") have each agreed to support this Agreement.

NOW THEREFORE, THE PARTIES HEREBY AGREE THAT:

PART A – NNI FUNDING TO NNL; SETTLEMENT MATTERS

1. Funding.

    a. NNI shall pay to NNL a sum total of US$157 million (the "Total Payment"), payable in five equal installments of US$31.4 million in accordance with the schedule attached as Annex C hereto, subject to the following limitations:

        i. the first US$131 million of the Total Payment shall be paid on an indefeasible and permanent basis (the "Permanent Payment"); and

        ii. if it is determined, pursuant to a process to be agreed upon by NNL, NNI, the Creditors' Committee and the Bondholders' Committee, that the value of the NNI Interim Obligations is less than US$187 million (being the sum of the Total Payment and the January Payment), then any such portion thereof (being the difference between US$187 million and the value of the NNI Interim Obligations so determined) in excess of US$161 million (any such portion, the "Contingent Payment") shall be repaid by NNL to NNI on October 30, 2009.

    b. NNL's obligation to repay to NNI the Contingent Payment and interest, if any, thereon, shall be secured by a charge against all of the assets of the Canadian Debtors (the "Excess Funding Charge"), which charge shall be granted by order of the Canadian Court and shall rank *pari passu* with the existing court-ordered charge in favor of Export Development Canada (the "EDC Charge"); *provided, however,* that if the EDC Charge is extinguished, then in such case the Excess Funding Charge shall be a second-ranking charge in the Canadian Proceedings, subordinate only to the Administration Charge (and in the case of the Carling Facility, the Carling Facility Charges), and such Excess Funding Charge shall not rank *pari passu* with any other charge that exists or may be granted in the Canadian Proceedings. For the purposes of this provision, the terms "Administration Charge," "Carling Facility" and "Carling Facility Charges" shall have the same meaning as ascribed to each such term in the initial order granted by the Canadian Court on the Filing Date in the Canadian Proceedings, as amended and restated from time to time (the "Canadian Initial Order").

    c. Simple interest shall be payable on the Contingent Payment at the time of repayment at a rate of 10% per annum and shall accrue from the date of NNL's receipt of the Contingent Payment to, but not including, the date of repayment.

    d. Upon payment in full of the Contingent Payment and any accrued interest thereon, the Excess Funding Charge shall be automatically extinguished.

3

2. <u>Use of Funds; Reporting</u>.

    a. NNL has informed NNI, the Creditors' Committee and the Bondholders' Committee, that NNL intends to use the funds from the Total Payment for working capital and those other purposes as reflected in the 13 Week CF Forecast (as defined below) (the "<u>Permitted Uses</u>"). To the extent NNL seeks to use funds from the Total Payment for purposes other than the Permitted Uses, NNL must obtain the consent for such uses from NNI, the Creditors' Committee and the Bondholders' Committee.

    b. NNL and NNI shall continue to provide to the Creditors' Committee and the Bondholders' Committee, on a weekly basis, (i) rolling 13-week cash flow forecasts (each, a "<u>13 Week CF Forecast</u>"), and (ii) reports on actual weekly cash flow results. NNL further agrees to provide, to the extent not already provided in accordance with the foregoing sentence, each of NNI, the Creditors' Committee and the Bondholders' Committee with a cash flow schedule showing payments for the preceding monthly period and the use of proceeds from the Total Payment to the extent received by NNL, such schedule to be provided no later than the tenth day following the last day of each month commencing with the cash flow schedule for June 2009 and ending with the cash flow schedule for September 2009.

3. <u>Maximum Payment; Full and Final Settlement</u>. The sum of the Total Payment and the January Payment (being US$187 million) represents (A) the maximum payment that the US Debtors may or could owe in respect of the NNI Interim Obligations, (B) the maximum administrative claim (or such other applicable priority claim) that any of the Debtors (excluding the US Debtors) may have or could assert against one or more US Debtors in any Proceedings with respect to the NNI Interim Obligations, whether pursuant to Sections 503 and 507 of the Bankruptcy Code or otherwise, and (C) constitutes a full and final settlement of any and all NNI Interim Obligations. Each of NNL and the other Canadian Debtors hereby agrees to indemnify, defend and hold harmless each US Debtor from and against any and all actions, suits, claims, proceedings, costs, damages, losses, liabilities, judgments, amounts, fines, penalties, levies, compensations paid in settlement (provided NNL has agreed in writing to any such settlement or such settlement has been approved pursuant to a final court order), and expenses (including without limitation reasonable attorneys' fees and disbursements) resulting from a claim, demand, lawsuit, action or proceeding relating to, arising from or in connection with Transfer Pricing Payments for the calculation period in the applicable Transfer Pricing Agreements in respect of the Canada/US Interim Period.

4. <u>Settlement of Motions.</u> It is expressly understood that Part A of this Agreement is intended to constitute a full and final settlement of all of the matters set forth in Part A of this Agreement whether arising during, or related to, the Canada/US Interim Period, including, without limitation, any funding motions of the Canadian Debtors and the US Debtors scheduled to be heard by the Canadian Court and the US Court on June 29 and 30, 2009 or such later date or dates as might be agreed or ordered.

5. <u>True-up Obligations</u>. NNL agrees to use commercially reasonable efforts to recover from Nortel Group entities, other than the Debtors (collectively, "<u>Other Nortel Group Companies</u>"), Transfer Pricing Payments that are determined to be owed to the Canadian Debtors by Other Nortel Group Companies with respect to the Canada/US Interim Period (the "<u>ONGC Costs</u>"). Solely to the extent that the Canadian Debtors actually receive funds in respect of the ONGC Costs from the Other Nortel Group Companies in excess of the amounts provided in the Canadian Debtors' forecast, based on that certain March 2009 Financial Outlook dated April 14, 2009 previously furnished to the Parties, from the Other Nortel Group Companies that are payors, with respect to such ONGC Costs (the "<u>Excess Recoveries</u>"), and it is also determined, pursuant to the process referred to in Section 1.a.ii above, that the value of the NNI Interim Obligations is less than US$161 million (such difference, the "<u>Overage Amount</u>"), the Canadian Debtors shall, in addition to any payments made or required to be made in accordance with Section 1.a.ii. above, pay U.S. Pro Rata Excess Recoveries (as defined below) to NNI, on behalf of the US Debtors, in an aggregate amount no greater than the lesser of (i) the Overage Amount, and (ii) US$30 million (the "<u>Maximum Overage Repayment</u>") within 30 days of the date of determination thereof; *provided, however,* that some or all of such payment shall not be made to the extent that such payment would, in the reasonable and sole judgment of the Monitor, after consultation with the Creditors' Committee and the Bondholders' Committee, materially and adversely impact the liquidity position of NNL, based on a pro forma 13 Week CF Forecast (giving pro forma effect to such payment) prepared by NNL, with assistance from the Monitor, and provided in advance of such decision by the Monitor to the Creditors' Committee and the Bondholders' Committee (the "<u>NNL Liquidity Review Procedures</u>"). The unpaid balance, if any, of the Maximum Overage Repayment shall be carried forward and shall be payable out of future U.S. Pro Rata Excess Recoveries actually received by the Canadian Debtors from Other Nortel Group Companies that are payors, subject to the NNL Liquidity Review Procedures outlined above, until paid in full. For the purposes of this Section, "<u>U.S. Pro Rata Excess Recoveries</u>," as of any date of determination shall equal the product of (i) the Excess Recoveries as of such date of such determination (excluding any Excess Recoveries in respect of which NNI has been paid U.S. Pro Rata Excess Recoveries in accordance with this Section 5) and (ii) a fraction (x) the numerator of which shall equal US$161 million <u>minus</u> the Overage Amount and (y) the denominator of which shall equal the aggregate amount of Transfer Pricing Payments payable or paid to the Canadian Debtors by Nortel Group entities (excluding the Canadian Debtors) that are payors for the Canada/US Interim Period (rounded to four decimal points).

## PART B – EMEA SELF-FUNDING; SETTLEMENT MATTERS

6. <u>Administration; Funding</u>.

   a. NNUK is hereby irrevocably authorized to seek payment for its own account from other EMEA Debtors of Transfer Pricing Payments owed, or as such payments become due, under the relevant Transfer Pricing Agreements during, or with respect to, the EMEA Interim Period which would otherwise be made to or administered by NNL, in consideration of the full and final settlement set out in Section 8 below. Each of the EMEA Debtors hereby appoints NNUK as its agent

5

(without liability, including as to failure of any EMEA Debtor to make any Transfer Pricing Payment) to administer the collection and pro rata distribution of the Transfer Pricing Payments received, solely with respect to the EMEA Interim Period, as detailed on Annex D hereto. Each of the EMEA Debtors agrees that the payments set out in Annex D shall be made to NNUK in cleared funds and without set-off, in consideration of the matters set out in this Agreement, within 30 days of the date hereof, except as otherwise agreed between any EMEA Debtor and NNUK. To the extent that any EMEA Debtor breaches any obligation to make its Transfer Pricing Payment with respect to the EMEA Interim Period, only NNUK and none of NNL, NNI or any of their other affiliates shall have any claim against such defaulting EMEA Debtor for such payment and no EMEA Debtor shall have any claim against NNL, NNI or any of their affiliates (other than such EMEA Debtor) for such payment.

b.  Subject to the terms of this Agreement (including without limitation Sections 12.a. and 13.b. of this Agreement), NNL shall pay to NNUK the sum of US$10 million (the "First Shortfall Payment"), such amount to be paid out of the sale proceeds allocated to, and actually received by, NNL from the sale of assets entered into subsequent to the date hereof where the aggregate amount of one or more allocations of sale proceeds to NNL from such sale (after taking into account all purchase price adjustments, taxes and other transaction costs, and excluding the amount of any holdback or escrow for indemnification or otherwise) exceeds the amount previously communicated to the Joint Administrators by NNL in a letter dated the date hereof (with copies to the Monitor, the Creditors' Committee and the Bondholders' Committee) and such communication having been counter-signed by the Joint Administrators (such sale, a "Material Asset Sale"); *provided, however,* that some or all of such payment shall be subject to NNL Liquidity Review Procedures (in this case, however, the NNL Liquidity Review Procedures shall provide the UK Administrator with the same information and consultation rights as provided to the Creditors' Committee and the Bondholders' Committee under the procedures set forth in Section 5 of this Agreement and shall give pro forma effect to such payment and take into account any payments actually received by NNL in connection with such Material Asset Sale).

c.  Subject to the terms of this Agreement (including without limitation Sections 12.a. and 13.b. of this Agreement), NNL shall pay to NNUK the sum of US$10 million (the "Second Shortfall Payment" and together with the First Shortfall Payment, the "Shortfall Payments"), such amount to be paid out of the sale proceeds of a Material Asset Sale allocated to, and actually received by, NNL; *provided, however,* that some or all of such payment shall be subject to NNL Liquidity Review Procedures (modified as set forth in Section 6.b. above).

d.  The unpaid balance of the Shortfall Payments, if any, shall be carried forward and shall be paid in full or in part to NNUK on the earlier of the date or dates that, (i) in the reasonable and sole judgment of the Monitor, upon consultation with the Creditors' Committee and the Bondholders' Committee, after the

6

application of the NNL Liquidity Review Procedures (giving pro forma effect to such payment) such payment would not materially and adversely impact the liquidity position of NNL, and (ii) sale proceeds are allocated to, and actually received by, NNL from one or more subsequent Material Asset Sales, subject to the NNL Liquidity Review Procedures (giving pro forma effect to such payment and taking into account the payments actually received by NNL in connection with such Material Asset Sales), until paid in full.  The obligation relating to the Shortfall Payments shall be an obligation of NNL only and of no other entity within the Nortel Group.  Until the Shortfall Payments have been fully paid, NNL shall (i) promptly notify NNUK of the signing and closing of any Material Asset Sale, (ii) provide material information regarding such Material Asset Sale as may be reasonably requested by the UK Administrator, and (iii) upon actual receipt of sale proceeds from such Material Asset Sale, NNL shall promptly inform NNUK of the calculation and allocation of the sale proceeds from such Material Asset Sale to NNL.  For the avoidance of doubt, any Shortfall Payments relating to any Material Asset Sale shall not be used as any basis for claiming that the purchase price allocation to NNUK in respect of such Material Asset Sale has been satisfied in whole or in part, and the Shortfall Payments shall not be excluded from the total amount of sale proceeds available for allocation to the relevant parties to such Material Asset Sale.

e.  NNL's obligation to make the Shortfall Payments shall be secured by a charge against all of the assets of the Canadian Debtors (the "Shortfall Charge"), which charge shall be granted by order of the Canadian Court and shall at all times rank *pari passu* with the Inter-company Charge (as defined in the Canadian Initial Order and as modified from time to time, including without limitation any modifications relating to the priority of such charge).  Without prejudice to the previous sentence, NNUK hereby acknowledges that any current or future charges that have been, or may be, granted to the US Debtors in connection with any funding provided by the US Debtors to the Canadian Debtors may, or could, be senior to the Shortfall Charge, and consents to such charges being senior to the Shortfall Charge.

f.  The Canadian Debtors and the EMEA Debtors hereby confirm that the Shortfall Payments resulted from arm's length negotiations among such Parties.

g.  In the event of any breach of Section 12.a. in connection with the Subject Transaction by any EMEA Debtor, NNL's obligation to make any Shortfall Payments shall be automatically forfeited, and the Shortfall Payments shall not be payable pursuant to Sections 6.b. and 6.c. of this Agreement under any circumstances.  In addition, in such circumstances the Shortfall Charge shall be automatically extinguished.

h.  The Canadian Debtors and the EMEA Debtors hereby confirm that the calculation of the payments set forth in Annex D resulted from arm's length negotiations among such Parties and are based on principles to fairly allocate profits and costs among the EMEA Debtors.

7

7. <u>Covenants</u>.

    a. [left intentionally blank].

    b. In respect of NNSA, the EMEA Debtors shall use commercially reasonable efforts to obtain (i) within 30 days of the date hereof, a letter from the NNSA Administrator and the NNSA Liquidator (to the extent legally required) authorizing the UK Administrator to bind NNSA to all provisions of this Agreement applicable to an EMEA Debtor, other than Sections 11.a., 11.b. and 12 of this Agreement, and (ii) within 45 days of the date hereof, a letter from the NNSA Administrator and the NNSA Liquidator (to the extent legally required) authorizing the UK Administrator to bind NNSA to Sections 11.a., 11.b. and 12 as applicable to an EMEA Debtor. The EMEA Debtors hereby agree to provide copies of such letters, upon receipt, to NNL (on behalf of the Canadian Debtors), NNI (on behalf of the US Debtors), the Creditors' Committee and the Bondholders' Committee.

8. <u>Maximum Payment; Full and Final Settlement</u>. Except with respect to the obligation of NNL to make the Shortfall Payments as herein provided, this Agreement shall constitute a full and final settlement of any and all Transfer Pricing Payments owing and that may, or could be, owing between (i) the EMEA Debtors *inter se*, and (ii) an EMEA Debtor, on the one hand, and a Canadian Debtor or a US Debtor, on the other hand, as Transfer Pricing Payments under the Transfer Pricing Agreements for all calculation periods or parts thereof within the EMEA Interim Period including, without limitation, any subsequent determination by any revenue authority with respect to the EMEA Interim Period giving rise to any subsequent liability to taxation of any Party hereto. Upon payment of the Shortfall Payments in full, the Shortfall Charge shall be automatically extinguished.

9. <u>Settlement of Claims Between the US/Canadian Debtors and the EMEA Debtors</u>. It is expressly understood that Part B of this Agreement is intended to constitute a full and final settlement of all of the matters between the US and Canadian Debtors, on the one hand, and the EMEA Debtors, on the other hand, set forth in Part B of this Agreement whether arising during, or related to, the EMEA Interim Period.

PART C – <u>PROVISIONS OF GENERAL APPLICATION</u>

10. <u>Scope of this Agreement</u>. The Parties hereto agree that:

    a. this Agreement is not, and shall not be deemed to be, an acknowledgement by any Party of the assumption, ratification, adoption or rejection of the Transfer Pricing Agreements or any other Transfer Pricing methodology employed by the Nortel Group or its individual members for any purpose nor shall it be determinative of, or have any impact whatsoever on, the allocation of proceeds to any Debtor from any sale of assets of the Nortel Group; and

    b. this Agreement shall not have any effect on any claims as to amounts owed or purported to be owed to or by any Party, either: (i) prior to the Filing Date, or (ii)

after the Canada/US Interim Period or the EMEA Interim Period, as applicable; *provided, however,* the Parties agree, except as specifically provided herein, that payments required hereunder shall be made in accordance with the terms hereof regardless of any actual or purported right of offset or other defense; and

c.  this Agreement shall not serve as the basis for any claim by any Party against any other Party in respect of Transfer Pricing or any other theory of cost reimbursement in respect of any period prior to or after the Canada/US Interim Period or the EMEA Interim Period, as applicable, or allocation of any sale proceeds, or any ownership of intellectual property; and

d.  each Party approves all payments to be made pursuant to this Agreement and all other matters contemplated hereby, to the extent that such Party is a creditor of the Party making such payment; and

e.  this Agreement is without prejudice to any provision of the Master R&D Agreement, except full and final settlement in relation to Transfer Pricing Payments with respect to the Canada/US Interim Period or the EMEA Interim Period, as applicable, as set out herein; and

f.  this Agreement is without prejudice to any Party's claims relating to Inter-Company Trading Payments, whether pursuant to the GSPAs or the Trading Orders; *provided, however,* that upon satisfaction of the Conditions, it is expressly understood and agreed that the GSPAs do not require, and shall be deemed not to have required, any Party to make Transfer Pricing Payments.

11. Relinquishment of Intellectual Property Licenses.

a.  Each of the US Debtors and the EMEA Debtors hereby agrees to enter into an Appropriate License Termination (as defined below) with respect to the licenses and rights granted by NNL to such Debtors under or pursuant to the provisions of the Master R&D Agreement (such licenses and rights, the "IP Licenses") for the purpose of facilitating, and in consideration of a right to an allocation, to be determined in accordance with this Section 11, to such Debtors of portions of the sale proceeds from, the sale of any material assets of any of the Canadian Debtors and/or the US Debtors to a third party (an "Asset Sale"); *provided, however,* that (x) in the case of the US Debtors, no Appropriate License Termination shall be effective without the prior written consent of the Creditors' Committee and the Bondholders' Committee (which consent in each case shall not be unreasonably withheld), and (y) in the case of the EMEA Debtors, Appropriate License Terminations shall be limited to only those Asset Sales where the project name of the referenced proposed transaction or/and the description of the scope of assets, businesses and technologies covered by such Asset Sales have been previously communicated to the Joint Administrators by NNL in a letter dated the date hereof (with copies to the Monitor, the Creditors' Committee and the Bondholders' Committee) and such communication having been counter-signed by the Joint Administrators.

9

b. For the purposes of this Agreement, the term "<u>Appropriate License Termination</u>" means an agreement to be entered into between NNL, the US Debtors and the EMEA Debtors, providing, effective as of the date of closing of each Asset Sale, (i) for the termination of the IP Licenses (including the right to sublicense) with respect only to any intellectual property used in or related to the businesses or assets being sold in that Asset Sale (the "<u>Transaction IP</u>"); (ii) for the grant by NNL or for the procurement by NNL of the grant by the relevant purchaser of the Transaction IP, as applicable, of a non-exclusive license or sublicense, as applicable, to the EMEA Debtors permitting each such EMEA Debtor to use the Transaction IP to the extent necessary for such Debtor to continue, for the purposes of winding-down its business, the use of such Transaction IP (except for any Transaction IP that is used exclusively in or relates exclusively to the businesses or assets which are the subject of that Asset Sale), as such Transaction IP is being used by such Debtor as of the date of closing of such Asset Sale and only in connection with the types of products and services sold or provided by such Debtor as of that date, including to perform such Debtor's obligations under any customer contract or end user contract that is in existence as of the date of closing of such Asset Sale and is not assigned to the purchaser in such Asset Sale, solely as such contract and such obligations are in effect as of that date (the "<u>Existing Customer Contract</u>"), with the right to sublicense the Transaction IP to such customers (but not to any person or entity which is not a customer of such Debtor as of the date of closing of such Asset Sale) to the extent required under the applicable Existing Customer Contract; (iii) that the foregoing non-exclusive license shall terminate on the date of termination of the applicable Existing Customer Contract (except to the extent that such license remains in effect with respect to the performance of any other Existing Customer Contracts), it being understood that the term of the Existing Customer Contract shall not be extended or renewed beyond its scheduled expiry date except to the extent any automatic extension rights are in effect at the date of closing of such Asset Sale that may be exercised solely at the option of the other party to the relevant Existing Customer Contract without the consent of the Debtor party to such Contract; *provided, however,* that in the event of such automatic extension such Debtor shall be required to seek to terminate the Existing Customer Contract as soon as possible in accordance with the terms of such Existing Customer Contract; and (iv) that the Appropriate License Termination shall not affect the ownership rights that such Debtors and NNL may have to any intellectual property. For the avoidance of doubt, the Appropriate License Termination will not be deemed to be or result in an expiry or termination of the Master R&D Agreement.

c. The Parties hereby agree that, within a reasonable period of the date hereof, the Debtors shall negotiate in good faith and attempt to reach agreement on a timely basis on a sample form agreement to effectuate an Appropriate License Termination, such form to include more specific details as to the scope of "used in or related to", as used in clause (i) of the definition of the term "Appropriate License Termination." In addition, the Parties hereby agree that such sample form agreement shall have additional provisions that the Parties deem appropriate and customary for such license termination agreements.

10

d. Where any Debtor enters into any Appropriate License Termination in accordance with the provisions of this Section 11, such Debtor shall be deemed to be a Selling Debtor, and the proceeds of such Asset Sale shall be deemed to be Sale Proceeds, for the purposes of Sections 12.b. and 12.d., and Sections 12.b. and 12.d. shall apply accordingly.

12. Entry into Sale Transactions.

a. Each Debtor hereby agrees that its execution of definitive documentation with a purchaser (or, in the case of any auction, the successful bidder in any such auction) of, or closing of any sale of, material assets of any of the Debtors to which such Debtor (a "Selling Debtor") is proposed to be a party (each, a "Sale Transaction") shall not be conditioned upon such Selling Debtor reaching agreement with the other Selling Debtors regarding (A) allocation of the sale proceeds ("Sale Proceeds") from the relevant Sale Transaction or (B) the binding procedure for the allocation of Sale Proceeds from the relevant Sale Transaction.

b. Pending the distribution of the Sale Proceeds as described in the second sentence of this Section 12.b., the entire amount of the Sale Proceeds (less applicable transfer or value-added taxes and, to the extent agreed by the Selling Debtors, transaction costs) shall be deposited in an escrow account pursuant to an escrow agreement, the terms of which shall be negotiated and agreed by all Selling Debtors, in each case acting reasonably (the "Escrow Account"). In no case shall there be any distribution from the Escrow Account in advance of either (i) agreement of all of the Selling Debtors or (ii) in the case where the Selling Debtors fail to reach agreement, determination by the relevant dispute resolver(s) under the terms of the Protocol (as defined below) applicable to the Sale Proceeds, and subject in each case to payment of the agreed or determined amount of allocation of Sale Proceeds to all Selling Debtors.

c. Without derogating from the obligations provided in Section 12.a., the Debtors shall, as soon as reasonably practicable following the execution of this Agreement, negotiate in good faith and attempt to reach agreement on a timely basis on a protocol for resolving disputes concerning the allocation of Sale Proceeds from Sale Transactions (the "Interim Sales Protocol"), which Protocol shall provide binding procedures for the allocation of Sales Proceeds where the Selling Debtors in such Sale Transaction have been unable to reach agreement regarding such allocation.

d. The Selling Debtors shall, immediately following entry into any Sale Transaction, negotiate in good faith and on a timely basis to attempt to reach agreement regarding the allocation of the Sale Proceeds from such Sale Transaction within a reasonable period of time or as may be otherwise provided in the Interim Sales Protocol, failing which the Interim Sales Protocol shall apply to determine the allocation of the relevant Sale Proceeds.

11

e. Notwithstanding any other provision of this Section 12, (i) no Debtor shall be required to enter into a Sale Transaction so long as such Debtor reasonably determines, acting in good faith and after consultation with the other Parties to this Agreement, that such Sale Transaction is not in the best economic interests of its creditors generally, and (ii) it is expressly acknowledged by all Debtors that, in relation to any Sale Transaction, neither (A) any matter in the course of negotiation with any prospective purchaser, nor (B) any discussion of, or agreement in relation to, the sharing of liabilities relating to such Sale Transaction (which include severance and other restructuring costs of each Selling Debtor) and sharing of transaction costs relating to such Sale Transaction (which include break fees and indemnification escrow accounts) between the Selling Debtors shall constitute a breach of Section 12.a. of this Agreement.

f. Nothing in this Section 12 shall prejudice the rights of any Party, or otherwise constitute an amendment, modification or waiver of the rights of any Party, to seek its entitlement to Sale Proceeds from any Sale Transaction.

g. For the purposes of Sections 11.c. and 12.a. through 12.f. (inclusive):

   i. the US Debtors hereby agree that with respect to any of the matters referred to in such Sections as to which the agreement or determination of any of the US Debtors is required, the US Debtors shall include the Creditors' Committee and the Bondholders' Committee in any negotiations on such issues with the other Debtors or any related proceedings and any agreement or determination by the US Debtors shall require the prior consent of the Creditors' Committee and the Bondholders' Committee acting in good faith; and

   ii. the Canadian Debtors hereby agree that with respect to any of the matters referred to in such Sections as to which the agreement or determination of any of the Canadian Debtors is required, the Canadian Debtors shall include the Bondholders' Committee in any negotiations on such issues with the other Debtors or any related proceedings and any agreement or determination by the Canadian Debtors shall require the prior consent of the Bondholders' Committee acting in good faith and the Monitor.

13. Effectiveness.

   a. No provision of this Agreement (other than as set forth in Section 13.f. of this Agreement) shall be effective until the satisfaction of the following conditions: (A) each of the US Court and the Canadian Court approving the entirety of this Agreement and all of the provisions hereof (the "North American Court Condition"), (B) the UK Court giving a direction (the "UK Court's Directions") that, if so sought, the Joint Administrators be at liberty to enter into this Agreement (the "UK Court Condition" and, together with the North American Court Condition, the "Court Approval Condition"); *provided, however,* the Joint Administrators may at their election waive the UK Court Condition, and (C) the

12

Canadian Court and the US Court approving amendments to the cross-border protocol previously approved by the US Court and the Canadian Court (as may be in effect from time to time, the "Cross-Border Protocol") that are mutually satisfactory to NNL (on behalf of the Canadian Debtors), NNI (on behalf of the US Debtors), the Monitor, the Creditors' Committee and the Bondholders' Committee (the "Cross-Border Protocol Condition", and together with the Court Approval Condition, the "Conditions").

b.  Upon satisfaction of each of the Conditions, all provisions of this Agreement, other than Sections 6.b., 6.c., 6.d., 6.e. and 6.f. of this Agreement, shall be effective as of the date of the satisfaction of the last Condition. Upon execution of the transaction documents relating to the Subject Transaction, Sections 6.b., 6.d., 6.e. and 6.f. of this Agreement shall be effective (except that the term "Shortfall Payments" as used in Sections 6.d., 6.e. and 6.f. shall mean only the First Shortfall Payment until Section 6.c. shall become effective). Upon agreement among the various sellers under the Subject Transaction and the Creditors' Committee and the Bondholders' Committee with regards to (A) the allocation of sale proceeds from the Subject Transaction or (B) the binding procedure for the allocation of sale proceeds from the Subject Transaction, Section 6.c. of this Agreement shall be effective. For the purposes of this Agreement, "Subject Transaction" means the first sale of any material assets of any one or more of the Debtors of each of (i) the Canadian Debtors, (ii) the US Debtors and (iii) the EMEA Debtors (excluding, for the avoidance of doubt, any sale where the involvement of the EMEA Debtors is solely limited to Appropriate License Terminations).

c.  Notwithstanding any of the foregoing, if (i) (x) the UK Court Condition is neither satisfied nor waived by the Joint Administrators in accordance with the terms of Section 13.a. and (y) the Canadian Court and the US Court approve this Agreement, and (ii) the Cross-Border Protocol Condition is fully satisfied, then Part A of this Agreement and those provisions of Part C applicable to Part A shall be effective with regards to the Canadian Debtors and the US Debtors.

d.  Each Party hereto shall:

i.   use commercially reasonable efforts to satisfy the Conditions as soon as possible, taking into account the availability of the respective Courts to address the matters set forth in this Agreement;

ii.  keep all other Parties, the Creditors' Committee and the Bondholders' Committee reasonably apprised of the progress of the satisfaction of the Conditions and provide such other information regarding the satisfaction of the Conditions as reasonably requested by other Parties; and

iii. use commercially reasonable efforts to allow any other Party, the Creditors' Committee or the Bondholders' Committee which so requests in writing reasonable participation in connection with any proceedings in

13

any Court related to the satisfaction of the Conditions; *provided, however,* that no Canadian Debtor or US Debtor shall have any obligation to facilitate the participation by the Joint Administrators or the EMEA Debtors in any proceedings related to the satisfaction of the Cross-Border Protocol Condition; and *provided further* that the foregoing proviso shall not constitute an amendment, modification or waiver of rights of the Joint Administrators and the EMEA Debtors to participate in any court proceedings where they would be entitled to otherwise participate.

e.  If the Joint Administrators elect to seek the UK Court's Directions, then the EMEA Debtors shall (A) use commercially reasonable efforts to obtain the UK Court's Directions as soon as possible, taking into account the availability of the UK Court, (B) keep all other Parties, the Creditors' Committee and the Bondholders' Committee reasonably apprised of the progress of the efforts to obtain UK Court's Directions and provide such other information regarding the efforts to obtain UK Court's Directions as reasonably requested by other Parties, and (C) use commercially reasonable efforts to allow any other Party, the Creditors' Committee or the Bondholders' Committee which so requests in writing reasonable participation in connection with any proceedings in the UK Court related to the UK Court's Directions.

f.  Notwithstanding any of the foregoing, the following provisions of the Agreement shall be effective as of the date hereof: Sections 7.b., 11.c., 12.c., 12.g., 13.d, 13.e., 13.f.,15 – 19, and 21 – 23.

14. <u>Term</u>. This Agreement shall expire on December 31, 2009 (the "<u>Expiration Date</u>"). Upon termination, the Parties' rights and obligations, except in respect of the obligations under Sections 1, 2, 3, 4, 5, 6, 8, 9, 10, 11, 12, 14, 15, 16, 17, 20, 21 and 22 of this Agreement (but only to the extent that these provisions were effective in accordance with Section 13 of this Agreement prior to the Expiration Date) shall cease immediately but without prejudice to the rights and obligations of the Parties existing before termination.

15. <u>Amendments</u>. This Agreement may be amended, on no less than 10 Business Days' notice, only by means of a writing signed by all Parties, and approved by the Creditors' Committee and the Bondholders' Committee, which amendments, if material in the judgment of the Parties, must be approved by all of the Courts that initially approved this Agreement or gave directions in respect of this Agreement (in the case of the UK Court). For the purpose of this Section 15, "<u>Business Day</u>" shall mean a day that is not a Saturday, Sunday or national public holiday in Canada, the United States or the United Kingdom.

16. <u>Governing Law and Jurisdiction</u>.

a.  This Agreement shall be governed exclusively by the laws of the State of New York without regard to the rules of conflict of laws of the State of New York or any other jurisdiction; *provided, however,* that Section 17 shall be governed exclusively by English law.

14

b.  To the fullest extent permitted by applicable law, each Party (i) agrees to submit to the non-exclusive jurisdiction of the US and Canadian Courts (in a joint hearing conducted under the Cross-Border Protocol adopted by such Court, as it may be in effect from time to time), for purposes of all legal proceedings to the extent relating to the matters agreed in this Agreement (but not, for the avoidance of doubt, any Transfer Pricing Agreement matter generally), (ii) agrees that any claim, action or proceeding by such Party seeking any relief whatsoever to the extent relating to the matters agreed in this Agreement must be commenced in the US Court if such claim, action or proceeding would solely affect the US Debtors, the Canadian Court if such claim, action or proceeding would solely affect the Canadian Debtors, a joint hearing of both the Canadian and US Courts conducted under the Cross-Border Protocol if such claim, action or proceeding would affect the Canadian Debtors and the US Debtors or the EMEA Debtors and the English courts if such claim, action or proceeding would solely affect the EMEA Debtors, (iii) waives and agrees not to assert any objection that it may now or hereafter have to the laying of the venue of any such action brought in such a Court or any claim that any such action brought in such a Court has been brought in an inconvenient forum, (iv) agrees that mailing of process or other papers in connection with any such action or proceeding or any other manner as may be permitted by law shall be valid and sufficient service thereof, and (v) agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by applicable law; *provided, however,* that any claim, action or proceeding set forth in Section 17 of this Agreement shall be brought exclusively in the English courts.

17. <u>No Personal Liability of the Joint Administrators</u>.

a.  The Parties agree that the Joint Administrators have negotiated and are entering into this Agreement as agents for the EMEA Debtors to which they are appointed and that none of the Joint Administrators, their firm, partners, employees, advisers, representatives or agents shall incur any personal liability whatsoever whether on their own part or in respect of any failure on the part of any Nortel Group company to observe, perform or comply with any of its obligations under this Agreement or under or in relation to any associated arrangements or negotiations.

b.  The Joint Administrators are a Party to this Agreement: (i) as agents of certain of the respective EMEA Debtors of which they are administrators; and (ii) in their own capacities solely for taking the benefit of the statutory charges under Paragraph 99(3) of Schedule B1 of the United Kingdom Insolvency Act 1986 and enforcing the obligations of certain other Parties to this Agreement.

c.  Notwithstanding anything in Section 16, any claim, action or proceeding against the Joint Administrators in their personal capacities (and not as agents for any EMEA Debtors) under this Agreement shall be governed exclusively by English law and subject to the exclusive jurisdiction of the English Courts.

15

18. <u>Creditors' Committee and Bondholders' Committee Support.</u>

    a.  Written confirmation has been received from the Creditors' Committee confirming that the members of the Creditors' Committee, after thorough review and due deliberation of this Agreement, have voted, in compliance with the by-laws of the Creditors' Committee, in favor of supporting this Agreement and have granted permission to their advisors to file appropriate materials with the applicable Courts in support of the motions by the Debtors for Court approval of this Agreement.

    b.  Written confirmation has been received from the counsel to the Bondholders' Committee confirming that the Bondholders' Committee has granted permission to its advisors to file appropriate materials with the applicable Courts in support of the motions by the Debtors for Court approval of this Agreement.

19. <u>Representations and Warranties.</u>

    a.  Subject to satisfaction of the Court Approval Condition, each Party (but, for the avoidance of doubt, not the Joint Administrators in their personal capacities) hereby severally represents and warrants to each other that, as of the date hereof:

        i.  it has the power and authority to enter into this Agreement and to carry out its obligations hereunder;

        ii.  the execution of this Agreement, and the consummation of the transactions contemplated herein, have been authorized by all necessary approvals, and no other act or proceeding on its part is necessary to authorize the execution of this Agreement; and

        iii.  this Agreement has been duly executed by it and constitutes its legal, valid and binding obligations.

    b.  Other than entities in or related to the regions of Asia / Pacific, Central and South America, NNSA and Nortel Networks A.G., each Party hereby severally represents and warrants to each other Party that, to the best of such Party's knowledge based on due and reasonable inquiry, including of NNL, it is not party to any Transfer Pricing Agreement with any other Nortel Group entity other than as set forth in this Agreement.

20. <u>Reservation of Rights.</u>  Nothing in this Agreement shall constitute an amendment, modification or waiver of rights of any Party (i) under any other agreement, including, without limitation, the GSPAs and the Transfer Pricing Agreements (except as expressly set forth in Sections 3 and 8 of this Agreement), applicable law or otherwise, including, without limitation, the right to object to the propriety of any payments made under or in connection with the Transfer Pricing Agreements or any offset arising therefrom or otherwise or (ii) with respect to any potential tax contingencies, assessments, rulings or agreements arising from Transfer Pricing Payments pursuant to the Transfer Pricing Agreements or any offset arising therefrom or otherwise; *provided, however,* that the

Parties waive any and all rights to object to or otherwise seek to amend or revisit (A) any payments made pursuant to this Agreement, except that (a) NNI and NNL do not waive their rights to the extent required to allow NNI to enforce its rights against NNL pursuant to Sections 1.a.ii. and 5 of this Agreement, and (b) NNUK does not waive its rights to the extent required to allow NNUK to enforce its rights against NNL pursuant to Section 6 of this Agreement, and (B) the January Payment. The use of the term Transfer Pricing Payment (or any similar term) or reference to the Transfer Pricing Agreements (or similar agreement) in this Agreement is for convenience only and shall have no evidentiary effect or be used by any of the Parties hereto in any proceeding to determine the pre-petition or post-petition validity, applicability, assumption, affirmation or ratification by any Party of the Transfer Pricing Agreements or any transfer pricing methodology provided in the Transfer Pricing Agreements.

21. Counterparts. This Agreement may be executed in separate counterparts (which may include counterparts delivered by facsimile transmission) and all of said counterparts taken together shall be deemed to be an original and shall be binding on the Party who signed the counterpart and all of which together shall constitute a single agreement.

22. Severability. In the event that any provision of this Agreement shall be illegal, invalid or unenforceable, such provision shall be construed by limiting it in such a way so as to render it legal, valid and enforceable to the maximum extent provided by applicable law, and the legality, validity and enforceability of the remaining provisions shall not in any way be affected or impaired by any illegality, invalidity or unenforceability of any provision. The Parties shall negotiate in good faith with respect to any provision to this Agreement found to be illegal, invalid or unenforceable, in order to agree on a substitute provision giving effect, to the maximum extent possible, to the original intent of such provision.

23. Several Obligations. Except as specifically set forth in this Agreement, the obligations of each Party hereunder are several, and not joint and several.

24. Defunct Distributors' Covenant. Each of the Debtors hereby covenants that such Debtor is not currently a party to, and shall not enter, into any arrangement pursuant to which any Transfer Pricing Payments may become payable to or by the following entities: Nortel Networks OY, Nortel Networks AB, or Nortel Networks Shannon Limited.

17

IN WITNESS WHEREOF, the Parties hereto have caused this Agreement to be duly executed and delivered as of this 9th day of June, 2009.

NORTEL NETWORKS CORPORATION

By _____
Name: Paviter S. Binning
Title:  Executive Vice-President,
Chief Financial Officer and Chief
Restructuring Officer

By _____
Name: Tracy S. J. Connelly McGilley
Title:   Assistant Secretary

NORTEL NETWORKS LIMITED

By _____
Name: Paviter S. Binning
Title:  Executive Vice-President,
Chief Financial Officer and Chief
Restructuring Officer

By _____
Name: Tracy S. J. Connelly McGilley
Title:  Assistant Secretary

NORTEL NETWORKS GLOBAL
CORPORATION

By _____
Name: Paviter S. Binning
Title:  Director

By: _____
Tracy S. J. Connelly McGilley
Assistant Secretary

Signature page to Interim Funding
and Settlement Agreement

NORTEL NETWORKS INTERNATIONAL
CORPORATION

By _____
    Name: Paviter S. Binning
    Title: Director

By _____
    Tracy S. J. Connelly McGilley
    Assistant Secretary


NORTEL NETWORKS TECHNOLOGY
CORPORATION

By _____
    Name: Paviter S. Binning
    Title: Director

By: _____
    Name: Tracy S. J. Connelly McGilley
    Title: Assistant Secretary


Signature page to Interim Funding
and Settlement Agreement

NORTEL NETWORKS INC.

By _____
  Name: John Doolittle
  Title: Vice President


ARCHITEL SYSTEMS (U.S.)
CORPORATION

By _____
  Name: John Doolittle
  Title: Vice President


CORETEK, INC.

By _____
  Name: John Doolittle
  Title: Vice President


NORTEL ALTSYSTEMS, INC.

By _____
  Name: John Doolittle
  Title: Vice President


NORTEL ALTSYSTEMS
INTERNATIONAL INC.

By _____
  Name: John Doolittle
  Title: Vice President


NORTEL NETWORKS APPLICATIONS
MANAGEMENT SOLUTIONS INC.

By _____
  Name: John Doolittle
  Title: Vice President


Signature page to Interim Funding
and Settlement Agreement

NORTEL NETWORKS CABLE
SOLUTIONS INC.

By _____
    Name: John Doolittle
    Title: Vice President


NORTEL NETWORKS CAPITAL
CORPORATION

By _____
    Name: John Doolittle
    Title: Vice President


NORTEL NETWORKS HPOCS INC.

By _____
    Name: John Doolittle
    Title: Vice President


NORTEL NETWORKS INTERNATIONAL
INC.

By _____
    Name: John Doolittle
    Title: Vice President

NORTEL NETWORKS OPTICAL
COMPONENTS INC.

By _____
    Name: John Doolittle
    Title: Vice President


NORTHERN TELECOM
INTERNATIONAL INC.

By _____
    Name: John Doolittle
    Title: Vice President


Signature page to Interim Funding
and Settlement Agreement

QTERA CORPORATION

By _____
  Name: John Doolittle
  Title: Vice President

SONOMA SYSTEMS

By _____
  Name: John Doolittle
  Title: Vice President

XROS, INC.

By _____
  Name: John Doolittle
  Title: Vice President

Signed by ALAN BLOOM on behalf of each
of the Joint Administrators of each of the
EMEA Debtors over which they have been
appointed, without personal liability as
provided in Section 17 of this Agreement
and solely for the purpose of obtaining the
benefit of the provisions of this Agreement
expressed to be conferred on or given to each
of the Joint Administrators

By _____

Name: _____
Title: _____

in the presence of: _____

Witness Signature _____

Name: _____
Address: _____

_____

SIGNED for and on behalf of NORTEL        )
NETWORKS UK LIMITED (IN                    )    ALAN BLOOM
ADMINISTRATION)                            )
by ALAN BLOOM as Joint Administrator       )
(acting as agent and without personal
liability) in the presence of:

Witness signature _____

Name: _____
Address: _____

_____

10-05-2009  01:02    FRÅN-RADISSON SAS STRAND HOTEL                    +46                    T-141  P.003/009  F-787

SIGNED for and on behalf of NORTEL )
NETWORKS (IRELAND) LIMITED ) **ALAN BLOOM**
(IN ADMINISTRATION) )
by ALAN BLOOM as Joint Administrator )
(acting as agent and without personal
liability) in the presence of:

Witness signature

Name:
Address:

SIGNED for and on behalf of NORTEL )
NETWORKS NV (IN )
ADMINISTRATION) ) **ALAN BLOOM**
by ALAN BLOOM as Joint Administrator )
(acting as agent and without personal
liability) in the presence of:

Witness signature

Name:
Address:

SIGNED for and on behalf of NORTEL )
NETWORKS SPA (IN )
ADMINISTRATION) ) **ALAN BLOOM**
by ALAN BLOOM as Joint Administrator )
(acting as agent and without personal
liability) in the presence of:

Witness signature

Name:
Address:

SIGNED for and on behalf of NORTEL
NETWORKS BV (IN
ADMINISTRATION)
by ALAN BLOOM as Joint Administrator
(acting as agent and without personal
liability) in the presence of:

)
)
)
)    **ALAN BLOOM**

Witness signature

Name:
Address:

SIGNED for and on behalf of NORTEL
NETWORKS POLSKA SP Z.O.O. (IN
ADMINISTRATION)
by ALAN BLOOM as Joint Administrator
(acting as agent and without personal
liability) in the presence of:

)
)
)
)    **ALAN BLOOM**

Witness signature

Name:
Address:

SIGNED for and on behalf of NORTEL
NETWORKS HISPANIA SA (IN
ADMINISTRATION)
by ALAN BLOOM as Joint Administrator
(acting as agent and without personal
liability) in the presence of:

)
)
)    **ALAN BLOOM**

Witness signature

Name:

10-06-2009   01:03   FRÅN-RADISSON SAS STRAND HOTEL                    +46              T-141   P.005/009   F-787

Address: _(handwritten)_ 1 MORE LONDON PLACE
LONDON SE1.

**SIGNED** for and on behalf of **NORTEL**                )
**NETWORKS (AUSTRIA) GMBH (IN**                )    **ALAN BLOOM** _(signature)_
**ADMINISTRATION)**                )
by **ALAN BLOOM** as Joint Administrator                )
(acting as agent and without personal
liability) in the presence of:

Witness signature _(signature)_

Name: _(handwritten)_ HELEN MICHAUGHTON
Address: _(handwritten)_ 1 MORE LONDON PLACE
LONDON SE1.

**SIGNED** for and on behalf of **NORTEL**                )
**NETWORKS SRO (IN**                )    **ALAN BLOOM** _(signature)_
**ADMINISTRATION)**                )
by **ALAN BLOOM** as Joint Administrator                )
(acting as agent and without personal
liability) in the presence of:

Witness signature _(signature)_

Name: _(handwritten)_ HELEN MICHAUGHTON
Address: _(handwritten)_ 1 MORE LONDON PLACE
LONDON SE1.

SIGNED for and on behalf of NORTEL ) ALAN BLOOM
NETWORKS ENGINEERING )
SERVICES KFT (IN )
ADMINISTRATION)
by ALAN BLOOM as Joint Administrator
(acting as agent and without personal
liability) in the presence of:

Witness signature

Name:
Address:

SIGNED for and on behalf of NORTEL ) ALAN BLOOM
NETWORKS PORTUGAL SA (IN )
ADMINISTRATION) )
by ALAN BLOOM as Joint Administrator
(acting as agent and without personal
liability) in the presence of:

Witness signature

Name:
Address:

SIGNED for and on behalf of NORTEL ) ALAN BLOOM
NETWORKS SLOVENSKO SRO (IN )
ADMINISTRATION) )
by ALAN BLOOM as Joint Administrator
(acting as agent and without personal
liability) in the presence of:

Witness signature

10-08-2009  01:03    FRAN-RADISSON SAS STRAND HOTEL              +46              T-141  P.007/008  F-787

Name: *Helen Maccnaughton*
Address: *1 more london place*
        *london SE1.*

**SIGNED** for and on behalf of **NORTEL**          )
**NETWORKS ROMANIA SRL (IN**                        )      **ALAN BLOOM**
**ADMINISTRATION)**                                 )
by **ALAN BLOOM** as Joint Administrator            )
(acting as agent and without personal
liability) in the presence of:

Witness signature _____

Name: *Helen Maccnaughton*
Address: *1 more london place*
         *london SE1.*


**SIGNED** for and on behalf of **NORTEL**          )
**GMBH (IN ADMINISTRATION)**                        )      **ALAN BLOOM**
by **ALAN BLOOM** as Joint Administrator            )
(acting as agent and without personal               )
liability) in the presence of:

Witness signature _____

Name: *Helen Maccnaughton*
Address: *1 more london place*
         *london SE1.*

PAGE 7/9 * RCVD AT 10/08/2009 01:00:27 [GMT Daylight Time] * SVR:LK3FX01/5 * DNIS:888 * CSID:+46 * DURATION (mm-ss):01-13

**SIGNED** for and on behalf of NORTEL                )
**NETWORKS OY (IN**                                   )    **ALAN BLOOM**
**ADMINISTRATION)**                                   )
by **ALAN BLOOM** as Joint Administrator              )
(acting as agent and without personal
liability) in the presence of:

Witness signature

Name:
Address:

**SIGNED** for and on behalf of NORTEL               )
**NETWORKS AB (IN**                                  )    **ALAN BLOOM**
**ADMINISTRATION)**                                  )
by **ALAN BLOOM** as Joint Administrator             )
(acting as agent and without personal
liability) in the presence of:

Witness signature

Name:
Address:

**SIGNED** for and on behalf of NORTEL               )
**NETWORKS INTERNATIONAL**                            )    **ALAN BLOOM**
**FINANCE AND HOLDING BV (IN**                        )
**ADMINISTRATION)**
by **ALAN BLOOM** as Joint Administrator
(acting as agent and without personal
liability) in the presence of:

Witness signature

Name:
Address:

SIGNED for and on behalf of NORTEL       )
NETWORKS FRANCE S.A.S. (IN               )    ALAN BLOOM
ADMINISTRATION)                          )
by ALAN BLOOM as Joint Administrator     )
(acting as agent and without personal
liability) in the presence of:

Witness signature

Name:
Address:

**Schedule 1**

**Canadian Debtors**

Nortel Networks Corporation

Nortel Networks Limited

Nortel Networks Global Corporation

Nortel Networks International Corporation

Nortel Networks Technology Corporation

**Schedule 2**

**US Debtors**

Nortel Networks Inc.

Architel Systems (U.S.) Corporation

CoreTek, Inc.

Nortel Altsystems, Inc. (previously "Alteon WebSystems, Inc.")

Nortel Altsystems International Inc. (previously "Alteon WebSystems International, Inc.")

Nortel Networks Applications Management Solutions Inc.

Nortel Networks Cable Solutions Inc.

Nortel Networks Capital Corporation

Nortel Networks HPOCS Inc.

Nortel Networks International Inc.

Nortel Networks Optical Components Inc.

Northern Telecom International Inc.

Qtera Corporation

Sonoma Systems

Xros, Inc.

**Schedule 3**

**EMEA Debtors**

Nortel Networks UK Limited (In Administration)

Nortel Networks (Ireland) Limited (In Administration)

Nortel Networks NV (In Administration)

Nortel Networks SpA (In Administration)

Nortel Networks BV (In Administration)

Nortel Networks Polska Sp z.o.o. (In Administration)

Nortel Networks Hispania, SA (In Administration)

Nortel Networks (Austria) GmbH (In Administration)

Nortel Networks sro (In Administration)

Nortel Networks Engineering Services Kft (In Administration)

Nortel Networks Portugal SA (In Administration)

Nortel Networks Slovensko, sro (In Administration)

Nortel Networks Romania Srl (In Administration)

Nortel GmbH (In Administration)

Nortel Networks Oy (In Administration)

Nortel Networks AB (In Administration)

Nortel Networks International Finance & Holding BV (In Administration)

Nortel Networks France S.A.S. (In Administration)

**Annex A**

**Amendments to and Related Understandings Regarding
Master Research and Development Agreement
dated as of December 22, 2004 ("Master R&D Agreement")**

1.   Undated Addendum to Master R&D Agreement executed between October 2005 and June 2006.

2.   Agreement with Respect to Certain NN Technology effective as of December 30, 2006 (being the day before the closing date of the Share and Asset Sale Agreement between NNL and Alcatel-Lucent).

3.   Addendum to Master R&D Agreement dated December 14, 2007 with an effective date of January 1, 2006.

4.   Third Addendum to Master R&D Agreement with an effective date of January 1, 2006.

5.   Fourth Addendum to Master R&D Agreement with an effective date of December 31, 2008.

6.   Letter of acknowledgment dated January 14, 2009 from NNL to the Directors of NNUK, NNSA and NNIR and the UK Administrator.

7.   Release in Connection with Master R&D Agreement dated 1 January 2009.

8.   Memorandum of Understanding in Connection with Master R&D Agreement, undated with an effective date of 1 January 2006.

A-1

**Annex B**

**Distribution Agreements**

| Party | Date |
|---|---|
| Nortel Networks Limited ("<u>NNL</u>") and Nortel Networks N.V. | undated, effective as of 1 January 2001 |
| NNL and Nortel Networks S.p.A. | undated, effective as of 1 January 2002 (plus undated and unsigned Addendum, effective as of 1 January 2003) |
| NNL and Nortel Networks B.V. | dated 22 December 2003, effective as of 1 January 2001 |
| NNL and Nortel Networks Polska Sp. z. o. o. | undated, effective as of 1 January 2001 (letter of amendment executed in November 2003, effective as of 1 January 2001 plus Addendum executed in August 2005, effective as of 1 January 2003) |
| NNL and Nortel Networks Hispania, S.A. | undated, effective as of 1 January 2001 |
| NNL and Nortel Networks (Austria) GmbH | undated, effective as of 1 January 2001 |
| NNL and Nortel Networks, s.r.o. | dated 15 April 2003, effective as of 1 January 2001 |
| NNL and Nortel Networks Engineering Services Kft | undated, effective as of 1 January 2001 |
| NNL and Nortel Networks Portugal S.A. | undated, effective as of 1 January 2001 |
| NNL and Nortel Networks Slovensko, s.r.o. | undated, effective as of 1 January 2001 |
| NNL and Nortel Networks Romania SRL | executed 22 January 2004, effective 1 January 2003 |
| NNL and Nortel Networks AG | undated, effective 1 January 2001 |

**Annex C**

**Funding Schedule**

Payments pursuant to Section 1.a. of this Agreement shall be paid in the following amounts and on the following dates (if the Conditions (other than the UK Court's Directions) are not satisfied by the payment dates set forth below, each such payment date shall be automatically postponed to one (1) business day after the date of satisfaction of such Conditions):

| | |
|---|---|
| June 10, 2009 | US$31,400,000.00 |
| June 15, 2009 | US$31,400,000.00 |
| July 31, 2009 | US$31,400,000.00 |
| August 31, 2009 | US$31,400,000.00 |
| September 30, 2009 | US$31,400,000.00 |
| **TOTAL** | **US$157,000,000.00** |

C-1

**Annex D**

**Intra-EMEA Transfer Pricing Settlement Amounts**

| EMEA Debtor | Amount payable US$m |
|---|---|
| [Nortel Networks S.A.][1] | [(4.80)] |
| Nortel Networks (Ireland) Limited | (20.84) |
| [Nortel Networks AG][1] | [(4.08)] |
| Nortel Networks Hispania SA | (1.72) |
| Nortel Networks Slovensko s.r.o | (0.52) |
| Nortel Networks Romania SRL | (0.19) |
| Nortel Networks Portugal S.A. | (1.50) |
| Nortel Networks Polska S.p.z.o.o | (8.22) |
| Nortel Networks B.V. | (17.99) |
| Nortel Networks S.p.A. | (2.73) |
| Nortel Networks Engineering Services Kft | (1.92) |
| Nortel Networks s.r.o | (2.79) |
| Nortel Networks N.V. | (6.43) |
| Nortel Networks Austria GmbH | (2.35) |

---

[1] To the extent it becomes a Party hereto.

| **EMEA Debtor** | **Amount receivable US$m** |
| --- | --- |
| Nortel Networks UK Limited | [4.80 (Nortel Networks S.A.)][1] |
| | 20.84 (Nortel Networks (Ireland) Limited) |
| | [4.08 (Nortel Networks AG)][1] |
| | 1.72 (Nortel Networks Hispania SA) |
| | 0.52 (Nortel Networks Slovensko s.r.o) |
| | 0.19 (Nortel Networks Romania SRL) |
| | 1.50 (Nortel Networks Portugal S.A.) |
| | 8.22 (Nortel Networks Polska S.p.z.o.o) |
| | 17.99 (Nortel Networks B.V.) |
| | 2.73 (Nortel Networks S.p.A.) |
| | 1.92 (Nortel Networks Engineering Services Kft) |
| | 2.79 (Nortel Networks s.r.o) |
| | 6.43 (Nortel Networks N.V.) |
| | 2.35 (Nortel Networks Austria GmbH) |

This is Exhibit "J"
referred to in the Affidavit of
Alan Robert Bloom
sworn before me
this _6_ day of January, 2010

# Herbert Smith

Goodmans LLP
Bay Adelaide Centre
333 Bay Street, Suite 3400
Toronto,ON
M5H 2S7
**For the attention of Joe Pasquariello**

Cleary Gottlieb, Steen & Hamilton LLP
One Liberty Plaza
New York, NY 10006
**For the attention of Jim Bromley**

Herbert Smith LLP
Exchange House
Primrose Street
London EC2A 2HS
T  +44 (0)20 7374 8000
F  +44 (0)20 7374 0888
DX 28

www.herbertsmith.com

Our ref
308899402/ 2878/ 1403
Your ref

Date
12 January 2010

Dear Jim and Joe

**Canadian Funding Agreement entered into by Nortel Networks Inc ("NNI") and Nortel
Networks Limited ("NNL"), amongst others**

I write on behalf of the Joint Administrators for each of the EMEA filed entities, in particular
Nortel Networks UK Limited ("NNUK"), Nortel Networks (Ireland) Limited ("NN Ireland") and
Nortel Networks SA ("NNSA") (collectively "**EMEA Debtors**").

I note from court filings that the US and Canadian Debtors entered into a Canadian Funding
Agreement ("**CFA**") on 23 December 2009. I also note that the motion for approval of the CFA is
set down for a joint hearing on 21 January 2010 with objections to be filed (in the US proceedings)
by 14 January 2010.

As you know, although NNL has not formally called for proofs of claims from intercompany
creditors, it is likely several EMEA Debtors will be substantial creditors of the Canadian Debtors.
As well, each of the EMEA Debtors have entered into intercompany agreements with the Canadian
Debtors.

The Joint Administrators have now had an opportunity to review the CFA. There are a few matters
which we have concerns about and which we would appreciate some clarification on from you. I
anticipate that these matters should be able to be readily resolved between us without the need for
formal objections or reservation of rights being made to the court. However, I am also conscious
that the date to file objections with the US court is 14 January 2010. To enable us to discuss our
concerns and seek the clarification that we require, I ask that the date for filing objections be
extended for the EMEA Debtors until 4:00pm (EST) on 18 January 2010. Please confirm that NNI
is prepared to grant us this extension.

Herbert Smith LLP is a limited liability partnership registered in England and Wales with registered number OC310989. It is regulated by the Solicitors' Regulation
Authority of England and Wales. A list of the members and their professional qualifications is open to inspection at the registered office, Exchange House, Primrose
Street, London EC2A 2HS. We use the word partner to refer to a member of Herbert Smith LLP, or an employee or consultant with equivalent standing and
qualifications.

10/25475995_2



Herbert Smith in association with
Gleiss Lutz and Stibbe

# Herbert Smith

I set out our concerns below. I am, of course, happy to discuss these with you and, hopefully, to reach a resolution to them prior to 18 January 2010.

**Settlement of Covered Obligations**

Clause 3 of the CFA states, inter alia, that the Settlement Payment is in full and final settlement of the Covered Obligations (as defined) and represents the maximum post-filing or administrative claim (or such other priority claim) that any of the **Debtors** (excluding the US Debtors) may have or could assert against one or more US Debtor in any proceeding with respect to the Covered Obligations. Debtors are defined in the CFA to include the EMEA Debtors. Obviously the EMEA Debtors are not a party to the CFA nor have they approved it or acceded to it. I am, therefore, puzzled as to why the CFA purports to prejudice the EMEA Debtors' rights to bring any claim (whether or not post-filing or administrative in nature or otherwise) against one or more of the US Debtors, especially in light of the fact that the CFA is to be approved by both the Canadian and the US Courts. I note that paragraph 33 of the US motion supporting the CFA states that this provision is only intended to be the maximum post-filing or administrative claim that any of the *Canadian Debtors* may have or could assert against one or more of the Debtors in any proceeding with respect to the Covered Obligations. Which statement, if either, correctly reflects the intent of the parties to the CFA? I would appreciate this concern being resolved by way of a minor amendment that makes abundantly clear that this provision only relates to the Canadian Debtors as against the US Debtors.

Second, the Covered Obligations relate to transfer pricing agreements, including the MRDA. As you will appreciate the MRDA is not a bilateral agreement, but a multilateral agreement between NNI, NNL, NNUK, NNSA and NN Ireland. Under that agreement NNL operates not only in its own right but also as "administrative agent" on behalf of the parties to that agreement. The CFA cannot prejudice any rights that NNUK, NNSA or NN Ireland have under the MRDA, including to call for the due performance of the agreement or to require NNL to act or bring any claim on its behalf. Equally nothing in the CFA can alter the content or effect of the MRDA insofar as it relates to NNUK, NNSA or NN Ireland. Given the broad way clause 3 is drafted, the agreement could potentially impact the rights of NNUK, NN Ireland and NNSA under the MRDA I therefore request that appropriate wording be included in the CFA or by way of side letter that makes clear that the rights of NNUK, NN Ireland and NNSA are unaffected by the CFA.

Third, I note that clause 4 of the CFA requires the Canadian Debtors to indemnify the US Debtors and to also reserve reasonable amounts from Sales Transactions or IP Transactions (as defined) to provide for any indemnified claims. Please confirm that any amounts that the Canadian Debtors reserve for this purpose will not be taken into account by the Monitor, the Creditors' Committee and the Bondholders' Committee in determining NNL's liquidity pursuant to the NNL Liquidity Review Procedures pursuant to clause 5 of the IFSA. Otherwise, this provision could affect the ability of the EMEA Debtors to recover the Shortfall Payments under the IFSA.

Fourth, I would generally appreciate some clarification as to the intent behind clauses 3 and 4 of the CFA. These provisions seem to suggest that the Canadian Debtors will be precluded from claiming against the US Debtors if a subsequent transfer pricing claim is made against the Canadian Debtors for which they would be entitled to, in turn, seek payment from the US Debtors. If this is the case, then the Joint Administrators require some information as to how an appropriate settlement amount:

10/25475995_2                                                                                          2

# Herbert Smith

(a) was determined and calculated; and

(b) can be supported without the knowledge of what other transfer pricing claims are, or are likely to be made.

**IRS Claim**

I note that the CFA also deals with intercompany claims between the Canadian and US Debtors, in particular in relation to a $2.067 billion IRS claim. Under the terms of the CFA the IRS claim is accepted by NNL. Further the part of that claim is secured and the unsecured portion is allowed free from any set-off or counterclaim which will apply to other unsecured claims.

I anticipate that the Monitor's report that will be filed in connection with the motion to approve the CFA will provide an appropriately comprehensive summary of the settlement of the IRS claims and the rationale for supporting the claims of the US Debtors against the Canadian Debtors (including the secured versus unsecured portions). Such detail will assist the Joint Administrators in fulfilling their diligence requirements in connection with this issue. If an appropriately comprehensive summary will not be provided in the Monitor's report for confidentiality reasons or otherwise, then the Joint Administrators would appreciate a meeting with the Monitor to better understand this aspect of the settlement in order to fulfil their diligence requirements.

In that report or discussion we would expect the following to be addressed:

(a) Clause 11 of the CFA appears to suggest that court approval will be sought in order to approve and allow the IRS claim as an intercompany claim against the Canadian Debtors prior to a formal intercompany claims process being established. Further, the Canadian Debtors have agreed that they will waive any intercompany claims available to the Canadian Debtor (pre- petition) as against the US Debtor. Conversely, the US Debtors only restrictions on claiming against the Canadian Debtors relate to the matters which have been settled by the CFA. It would be helpful to understand the rationale behind this element of the CFA.

(b) We understand that the IRS claim itself relates to an alleged overpayment by the US Debtors pursuant to the transfer pricing agreements. As you will appreciate we do not have the necessary details to evaluate the IRS claim or the basis on which the Canadian Debtors have decided to admit this claim. We look forward to receiving more information, including in relation to:

    a.  the basis that this claim and its quantum has been admitted by NNL;

    b.  the taxation implications for the Canadian Debtors, including in relation to tax refunds from the Canada Revenue Agency; and

    c.  Whether the NNL is intending to seek to recover any of this amount from any other party, including the EMEA Debtors. From the information we currently have, we would be concerned if having accepted and prioritised this claim in the manner which it has, NNL could seek to claim these amounts from any other Nortel entity.

Herbert Smith in association with
Gleiss Lutz and Stibbe

# Herbert Smith

The Joint Administrators necessarily reserve all of their rights in respect of the IRS claim including as to its validity, quantum and the underlying facts that constitute that claim. Nothing in the acceptance of that claim by NNL nor in any ultimate approval of it by the Canadian and US Courts should prejudice the EMEA Debtors in anyway. Please confirm that you agree to this proposition.

If it all possible, receiving a draft of the Monitor's report and form of order being sought as soon as possible would greatly assist us in ensuring that the Joint Administrators are properly informed and that we, in turn, are properly instructed in connection with this upcoming motion. This will permit us to deal with any issues, if any, before the motion on a consensual basis without having to worry about the need to make any submissions on such motion.

I would also like to suggest that the Monitor keep in mind that other Nortel entities and tax authorities may well be looking at the Monitor's description of its rationale for supporting the IRS claim for the purposes of making their own related transfer pricing related tax claims against NNL and other Nortel entities.

**Amendment to the IFSA**

Clause 29 of the CFA seeks to amend the IFSA. As you will be aware an amendment to the IFSA requires the consent of all the parties under clause 15 of the IFSA. How do you propose to deal with this?

We suspect these matters should be readily able to be resolved. I am, of course, happy to discuss these with you. Would you, however, be able to confirm by close of business in the US today that the US Debtors agree to the extension I have requested for filing an objection. On the assumption that the US Debtors are content to agree to this I look forward to hearing from you more comprehensively shortly.

Regards

**Stephen Gale**
Partner
Herbert Smith LLP

4

Herbert Smith in association with
Gleiss Lutz and Stibbe

This is Exhibit "K"
referred to in the Affidavit of
Alan Robert Bloom
sworn before me
this ___ day of January, 2010

## Walsh, Thomas

**Subject:** RE: Nortel - US Motion to approve Canadian Funding Agreement

---

**From:** Pasquariello, Joe [mailto:jpasquariello@goodmans.ca]
**Sent:** 13 January 2010 15:37
**To:** GALE, STEPHEN; 'James L BROMLEY'
**Cc:** 'Craig B BROD'; 'Sanjeet Malik'; 'Lisa M SCHWEITZER'
**Subject:** RE: Nortel - US Motion to approve Canadian Funding Agreement

Stephen,

Are you able to do a call with us later today, either at 3pm EST or after 5pm EST?

Joe

---

**From:** GALE, STEPHEN [mailto:Stephen.Gale@herbertsmith.com]
**Sent:** Wednesday, January 13, 2010 4:19 AM
**To:** James L BROMLEY; Pasquariello, Joe
**Cc:** Craig B BROD; Sanjeet Malik; Lisa M SCHWEITZER
**Subject:** RE: Nortel - US Motion to approve Canadian Funding Agreement

thanks

**Stephen Gale**
Partner
Herbert Smith LLP
Email: stephen.gale@herbertsmith.com
Tel: 020 7466 2878
Fax: 020 7098 4878
Mobile: 07785 254901

---

**From:** James L BROMLEY [mailto:jbromley@cgsh.com]
**Sent:** 13 January 2010 00:50
**To:** GALE, STEPHEN; Joe Pasquariello
**Cc:** Craig B BROD; Sanjeet Malik; Lisa M SCHWEITZER
**Subject:** Re: Nortel - US Motion to approve Canadian Funding Agreement

Steve,

We will consult tomorrow morning and revert.

Jim

---

CONTACT INFORMATION

James L. Bromley
Cleary Gottlieb Steen & Hamilton LLP
One Liberty Plaza
New York, New York  10006
Direct:  212-225-2264
Fax:  212-225-3999
Mobile:  646-894-3014
jbromley@cgsh.com

20/01/2010

www.cgsh.com

---

**From:** "GALE, STEPHEN" [Stephen.Gale@herbertsmith.com]
**Sent:** 01/12/2010 09:04 PM GMT
**To:** jpasquariello@goodmans.ca; James BROMLEY
**Subject:** Nortel - US Motion to approve Canadian Funding Agreement

Jim and Joe

I attach a letter which outlines some concerns the Joint Administrators have to the the Canadian Funding Agreement which is subject to court approval on 21 January 2010. I thought it would be helpful if I set out these concerns in detail. I am hopeful our concerns will be able to be readily resolved between ourselves.

To give us time to discuss these issues, I request that the US Debtors grant us an extension to file any objection to the US motion to Monday 18 January 2010, 4:00pm (EST). Would you be able to let me know by COB today whether the US Debtors are prepared to grant us this extension?

Otherwise let me know when we can discuss the contents of this letter.

Many thanks

Kind regards

Steve

**Stephen Gale**
Partner
Herbert Smith LLP
Email: stephen.gale@herbertsmith.com
Tel: 020 7466 2878
Fax: 020 7098 4878
Mobile: 07785 254901

This message is confidential and may be covered by legal professional privilege. If you have received this message in error please delete it and notify the sender immediately by contacting our main switchboard +44 (0)20 7374 8000; you should not retain the message or disclose its contents to anyone. Herbert Smith LLP may monitor e-mail communications in accordance with applicable law and regulations.

Herbert Smith LLP is a Limited Liability Partnership registered in England and Wales with registered number OC310989. It is regulated by the Solicitors' Regulation Authority of England and Wales whose rules can be accessed via www.sra.org.uk/code-of-conduct.page. A list of the members and their professional qualifications is open to inspection at the registered office, Exchange House, Primrose Street, London EC2A 2HS. We use the word partner to refer to a member of Herbert Smith LLP, or an employee or consultant with equivalent standing and qualifications. Herbert Smith LLP's registration number for Value Added Tax in the United Kingdom is GB 927 1996 83.

Herbert Smith LLP, Gleiss Lutz and Stibbe are three independent firms which have a formal alliance. Further information is available from www.herbertsmith.com.

This message is being sent from a law firm and may contain confidential or privileged information.  If you are not the intended recipient, please advise the sender

immediately by reply e-mail and delete this message and
any attachments without retaining a copy.

••••••••••

Goodmans' Toronto office has moved to Bay Adelaide Centre.

Our new address:

Goodmans LLP
Bay Adelaide Centre
333 Bay Street, Suite 3400
Toronto, ON M5H 2S7

Our email addresses, telephone and fax numbers remain the same.

This communication is intended solely for the named addressee(s) and may contain information that is privileged, confidential, protected or otherwise exempt from disclosure. No waiver of confidence, privilege, protection or otherwise is made. If you are not the intended recipient of this communication, please advise us immediately and delete this email without reading, copying or forwarding it to anyone.

20/01/2010

This is Exhibit "L"
referred to in the Affidavit of
Alan Robert Bloom
sworn before me
this _10_ day of January, 2010

## Kols, Maria

**Subject:** Nortel - US Motion to approve Canadian Funding Agreement

**From:** GALE, STEPHEN
**Sent:** 14 January 2010 15:20
**To:** 'jpasquariello@goodmans.ca'; 'smalik@cgsh.com'; 'Bromley, James L'; 'Brod, Craig B'; 'Schweitzer, Lisa M'
**Cc:** Whiteoak, John; LLOYD, KEVIN; 'Schwill, Robin'
**Subject:** Nortel - US Motion to approve Canadian Funding Agreement

Dear All,

I apologise that I was unable to make the call last night to discuss our letter on the CFA.

John Whiteoak has updated me on the call which was apparently only procedural in nature. I note you have still not agreed to our request for an extension to the date for filing of objections until 4:00pm EST on 18 January 2010. I must say that I am disappointed. Please may I have your confirmation that an extension will be granted as soon as possible and no later than 12:00 noon EST, otherwise we will be forced to file an objection today.

The question of the extension was left subject to two conditions:

1. That we confirm that the entirety of our objections were contained in our letter to you; and

2. That we send you a copy of our draft objections this week.

We agree to these conditions.

As John indicated on the call, our letter sets out all of our concerns on the CFA. As John further pointed out this confirmation is, of course, subject to the fact that our letter seeks certain information and this information might well give rise to additional concerns. The only other matter, and it is a point of clarification and not objection, is that relating to the allocated costs (i.e. Part B of the CFA). We do not read the CFA as actually seeking to make EMEA Debtors liable for those costs. Whether or not the EMEA Debtors will be prepared to agree to those costs will obviously be a matter of separate discussion with us. I think, however, we are all on the same page with this.

I am also disappointed that you have not, as yet, engaged with us substantively on our real concerns on the CFA. Some of our concerns, particularly our questions on clauses 3 and 4 of the CFA, could have simply been answered on the call last night.

In my letter I also sought information from the Monitor. I understand that the Monitor would be prepared to provide such information on the basis that it is confidential. We have not yet received the proposed confidentiality agreement from Goodmans. Any should such agreement should provide that the information that is provided to the EMEA Debtors will be treated as confidential, however, should these discussions give rise to an issue which we need to bring to the attention of the court, we will be at liberty to use it subject to us applying for appropriate sealing orders.

It was indicated on the call last night that the Monitor was available for a call this afternoon Toronto time to discuss the information requests. To accommodate this we had lined up EY and our US and Canadian Counsel to be available as and when suited the Monitor. Whilst we appreciate your offer of a call on Friday afternoon EST or Friday evening London time to discuss matters with the Monitor this falls after the current deadline for filing any US objection and your request for a draft objection. Given the urgency we would like to proceed with the Monitor's original offer of a discussion this afternoon EST time. Please indicate a time for this call and we will assemble at this end.

Finally, as noted in our letter, we would appreciate early sight of the Monitor's report and court papers. When can these be provided?

As noted above, in order for us to begin this dialogue at all we will need your confirmation by 12:00 noon EST today the EMEA Debtors are granted an extension to file any objection. We will then need to establish a timetable to resolve our legitimate and what we consider to be uncontroversial concerns.

I look forward to hearing from you.

Regards

**Steve**

**Stephen Gale**
Partner
Herbert Smith LLP
Email: stephen.gale@herbertsmith.com
Tel: 020 7466 2878
Fax: 020 7098 4878
Mobile: 07785 254901

20/01/2010

This is Exhibit "M"
referred to in the Affidavit of
Alan Robert Bloom
sworn before me
this _2ᴏ_ day of January, 2010

## Walsh, Thomas

**Subject:** Re: Nortel - US Motion to approve Canadian Funding Agreement

---

**From:** James L BROMLEY [mailto:jbromley@cgsh.com]
**Sent:** 14 January 2010 17:02
**To:** GALE, STEPHEN
**Cc:** Brod, Craig B; Whiteoak, John; jpasquariello@goodmans.ca; LLOYD, KEVIN; Schweitzer, Lisa M; Schwill, Robin; smalik@cgsh.com; John Ray
**Subject:** Re: Nortel - US Motion to approve Canadian Funding Agreement

Dear Steve,

Thank you for the written confirmation.  We have scheduled a call with the two committees this afternoon.  While it is likely that the extension to Monday will be acceptable, we wish to consult with our committees before granting your request.  In the meantime, however, we can confirm that the deadline for the Joint Administrators to object to the Motion to Approve the Canadian Funding Agreement is extended until 4 pm, EST, tomorrow, January 15, 2010.  We will be back to you with further information later today.

Best regards,

Jim

---

James L. Bromley
Cleary Gottlieb Steen & Hamilton LLP
One Liberty Plaza, New York NY 10006
t: +1 212 225 2264 | f: +1 212 225 3999 | m: +1 646 894 3014
www.clearygottlieb.com | jbromley@cgsh.com

| | |
|---|---|
| **"GALE, STEPHEN"** <Stephen.Gale@herbertsmith.com> | To jpasquariello@goodmans.ca, smalik@cgsh.com, "Bromley, James L" <jbromley@cgsh.com>, "Brod, Craig B" <cbrod@cgsh.com>, "Schweitzer, Lisa M" <lschweitzer@cgsh.com> |
| 14 January 2010 10:19 AM | cc "Whiteoak, John" <John.Whiteoak@herbertsmith.com>, "LLOYD, KEVIN" <Kevin.Lloyd@herbertsmith.com>, "Schwill, Robin" <rschwill@dwpv.com> |
| | Subject Nortel - US Motion to approve Canadian Funding Agreement |

Dear All,

I apologise that I was unable to make the call last night to discuss our letter on the CFA.

John Whiteoak has updated me on the call which was apparently only procedural in nature. I note you have still not agreed to our request for an extension to the date for filing of objections until 4:00pm EST on 18 January 2010. I must say that I am disappointed. Please may I have your confirmation that an extension will be granted as soon as possible and no later than 12:00 noon EST, otherwise we will be forced to file an objection today.

The question of the extension was left subject to two conditions:

20/01/2010

1. That we confirm that the entirety of our objections were contained in our letter to you; and

2. That we send you a copy of our draft objections this week.

We agree to these conditions.

As John indicated on the call, our letter sets out all of our concerns on the CFA. As John further pointed out this confirmation is, of course, subject to the fact that our letter seeks certain information and this information might well give rise to additional concerns. The only other matter, and it is a point of clarification and not objection, is that relating to the allocated costs (i.e. Part B of the CFA). We do not read the CFA as actually seeking to make EMEA Debtors liable for those costs. Whether or not the EMEA Debtors will be prepared to agree to those costs will obviously be a matter of separate discussion with us. I think, however, we are all on the same page with this.

I am also disappointed that you have not, as yet, engaged with us substantively on our real concerns on the CFA. Some of our concerns, particularly our questions on clauses 3 and 4 of the CFA, could have simply been answered on the call last night.

In my letter I also sought information from the Monitor. I understand that the Monitor would be prepared to provide such information on the basis that it is confidential. We have not yet received the proposed confidentiality agreement from Goodmans. Any should such agreement should provide that the information that is provided to the EMEA Debtors will be treated as confidential, however, should these discussions give rise to an issue which we need to bring to the attention of the court, we will be at liberty to use it subject to us applying for appropriate sealing orders.

It was indicated on the call last night that the Monitor was available for a call this afternoon Toronto time to discuss the information requests. To accommodate this we had lined up EY and our US and Canadian Counsel to be available as and when suited the Monitor. Whilst we appreciate your offer of a call on Friday afternoon EST or Friday evening London time to discuss matters with the Monitor this falls after the current deadline for filing any US objection and your request for a draft objection. Given the urgency we would like to proceed with the Monitor's original offer of a discussion this afternoon EST time. Please indicate a time for this call and we will assemble at this end.

Finally, as noted in our letter, we would appreciate early sight of the Monitor's report and court papers. When can these be provided?

As noted above, in order for us to begin this dialogue at all we will need your confirmation by 12:00 noon EST today the EMEA Debtors are granted an extension to file any objection. We will then need to establish a timetable to resolve our legitimate and what we consider to be uncontroversial concerns.

I look forward to hearing from you.

Regards

**Steve**

**Stephen Gale**
Partner
Herbert Smith LLP
Email: stephen.gale@herbertsmith.com
Tel: 020 7466 2878
Fax: 020 7098 4878
Mobile: 07785 254901

This message is confidential and may be covered by legal professional privilege. If you have received this message in error please delete it and notify the sender immediately by contacting our

20/01/2010

main switchboard +44 (0)20 7374 8000; you should not retain the message or disclose its contents to anyone. Herbert Smith LLP may monitor e-mail communications in accordance with applicable law and regulations.

Herbert Smith LLP is a Limited Liability Partnership registered in England and Wales with registered number OC310989. It is regulated by the Solicitors' Regulation Authority of England and Wales whose rules can be accessed via www.sra.org.uk/code-of-conduct.page. A list of the members and their professional qualifications is open to inspection at the registered office, Exchange House, Primrose Street, London EC2A 2HS. We use the word partner to refer to a member of Herbert Smith LLP, or an employee or consultant with equivalent standing and qualifications. Herbert Smith LLP's registration number for Value Added Tax in the United Kingdom is GB 927 1996 83.

Herbert Smith LLP, Gleiss Lutz and Stibbe are three independent firms which have a formal alliance. Further information is available from www.herbertsmith.com.

This message is being sent from a law firm and may contain
confidential or privileged information.  If you are not
the intended recipient, please advise the sender
immediately by reply e-mail and delete this message and
any attachments without retaining a copy.

20/01/2010

This is Exhibit "N"
referred to in the Affidavit of
Alan Robert Bloom
sworn before me
this 20 day of January, 2010

**Kois, Maria**

**Subject:**       Nortel - US Motion to approve Canadian Funding Agreement
**Attachments:** GOODMANS-#5804133-v2-Confidentiality_Agreement_-_UKA.DOC

---

**From:** Pasquariello, Joe [mailto:jpasquariello@goodmans.ca]
**Sent:** 15 January 2010 15:23
**To:** GALE, STEPHEN; 'smalik@cgsh.com'; 'Bromley, James L'; 'Brod, Craig B'; 'Schweitzer, Lisa M'
**Cc:** Whiteoak, John; LLOYD, KEVIN; 'Schwill, Robin'; 'Tay, Derrick C.'; 'Lang, Michael'; 'Stam, Jennifer';
'Murray.A.McDonald@ca.ey.com'; 'Brent.R.Beekenkamp@ca.ey.com'; Carfagnini, Jay
**Subject:** RE: Nortel - US Motion to approve Canadian Funding Agreement

Further to my email below, please find attached a form of Confidentiality Agt which we expect to be
executed by the UKAs and their advisors. Please note that the attached is being provided to our client by
way of a copy of this email and therefore the attached remains subject to its comments.

If the terms of the attached are acceptable, we ask that you kindly arrange for completion of the agreement
and execution by the appropriate authorized signatories and return same to me. We can then make
arrangements for our conference call.

Regards,

**Joseph Pasquariello**
Goodmans LLP

416.597.4216
jpasquariello@goodmans.ca

Bay Adelaide Centre
333 Bay Street, Suite 3400
Toronto, ON  M5H 2S7
goodmans.ca

---

**From:** Pasquariello, Joe
**Sent:** Thursday, January 14, 2010 12:44 PM
**To:** 'GALE, STEPHEN'; 'smalik@cgsh.com'; 'Bromley, James L'; 'Brod, Craig B'; 'Schweitzer, Lisa M'
**Cc:** 'Whiteoak, John'; 'LLOYD, KEVIN'; 'Schwill, Robin'; 'Tay, Derrick C.'; 'Lang, Michael'; 'Stam, Jennifer';
'Murray.A.McDonald@ca.ey.com'; 'Brent.R.Beekenkamp@ca.ey.com'; Carfagnini, Jay
**Subject:** RE: Nortel - US Motion to approve Canadian Funding Agreement

Stephen,

The Monitor and other North American parties will not be in a position to have the discussion with your
group today. We are working towards having a discussion with you tomorrow afternoon EST.

To be clear, the Monitor has not committed to provide all of the information you requested in your letter.
The Monitor is considering the scope of the request and will, assuming we agree upon confidentiality and
related terms, address some of the information requests during our call tomorrow.

With respect to confidentiality, we are preparing a form of confidentiality agreement and will circulate same
to you later today or tomorrow morning. However, it should be noted that we will not permit the
information provided to you to be used against the Debtors in any proceeding or otherwise.

I will be back to you with a proposed time for our call tomorrow.

Regards,


**Joseph Pasquariello**
Goodmans LLP

416.597.4216
jpasquariello@goodmans.ca

Bay Adelaide Centre
333 Bay Street, Suite 3400
Toronto, ON  M5H 2S7
goodmans.ca

---

**From:** GALE, STEPHEN [mailto:Stephen.Gale@herbertsmith.com]
**Sent:** Thursday, January 14, 2010 10:20 AM
**To:** Pasquariello, Joe; smalik@cgsh.com; Bromley, James L; Brod, Craig B; Schweitzer, Lisa M
**Cc:** Whiteoak, John; LLOYD, KEVIN; Schwill, Robin
**Subject:** Nortel - US Motion to approve Canadian Funding Agreement


Dear All,

I apologise that I was unable to make the call last night to discuss our letter on the CFA.

John Whiteoak has updated me on the call which was apparently only procedural in nature. I note you have still not agreed to our request for an extension to the date for filing of objections until 4:00pm EST on 18 January 2010. I must say that I am disappointed. Please may I have your confirmation that an extension will be granted as soon as possible and no later than 12:00 noon EST, otherwise we will be forced to file an objection today.

The question of the extension was left subject to two conditions:

1. That we confirm that the entirety of our objections were contained in our letter to you; and

2. That we send you a copy of our draft objections this week.

We agree to these conditions.

As John indicated on the call, our letter sets out all of our concerns on the CFA. As John further pointed out this confirmation is, of course, subject to the fact that our letter seeks certain information and this information might well give rise to additional concerns. The only other matter, and it is a point of clarification and not objection, is that relating to the allocated costs (i.e. Part B of the CFA). We do not read the CFA as actually seeking to make EMEA Debtors liable for those costs. Whether or not the EMEA Debtors will be prepared to agree to those costs will obviously be a matter of separate discussion with us. I think, however, we are all on the same page with this.

I am also disappointed that you have not, as yet, engaged with us substantively on our real concerns on the CFA. Some of our concerns, particularly our questions on clauses 3 and 4 of the CFA, could have simply been answered on the call last night.

In my letter I also sought information from the Monitor. I understand that the Monitor would be prepared to provide such information on the basis that it is confidential. We have not yet received the proposed confidentiality agreement from Goodmans. Any should such agreement should provide that the information that is provided to the EMEA Debtors will be treated as confidential, however, should these discussions give rise to an issue which we need to bring to the attention of the court, we will be at liberty to use it subject to us applying for appropriate sealing orders.


20/01/2010

It was indicated on the call last night that the Monitor was available for a call this afternoon Toronto time to discuss the information requests. To accommodate this we had lined up EY and our US and Canadian Counsel to be available as and when suited the Monitor. Whilst we appreciate your offer of a call on Friday afternoon EST or Friday evening London time to discuss matters with the Monitor this falls after the current deadline for filing any US objection and your request for a draft objection. Given the urgency we would like to proceed with the Monitor's original offer of a discussion this afternoon EST time. Please indicate a time for this call and we will assemble at this end.

Finally, as noted in our letter, we would appreciate early sight of the Monitor's report and court papers. When can these be provided?

As noted above, in order for us to begin this dialogue at all we will need your confirmation by 12:00 noon EST today the EMEA Debtors are granted an extension to file any objection. We will then need to establish a timetable to resolve our legitimate and what we consider to be uncontroversial concerns.

I look forward to hearing from you.

Regards

**Steve**

**Stephen Gale**
Partner
Herbert Smith LLP
Email: stephen.gale@herbertsmith.com
Tel: 020 7466 2878
Fax: 020 7098 4878
Mobile: 07785 254901

This message is confidential and may be covered by legal professional privilege. If you have received this message in error please delete it and notify the sender immediately by contacting our main switchboard +44 (0)20 7374 8000; you should not retain the message or disclose its contents to anyone. Herbert Smith LLP may monitor e-mail communications in accordance with applicable law and regulations.

Herbert Smith LLP is a Limited Liability Partnership registered in England and Wales with registered number OC310989. It is regulated by the Solicitors' Regulation Authority of England and Wales whose rules can be accessed via www.sra.org.uk/code-of-conduct.page. A list of the members and their professional qualifications is open to inspection at the registered office, Exchange House, Primrose Street, London EC2A 2HS. We use the word partner to refer to a member of Herbert Smith LLP, or an employee or consultant with equivalent standing and qualifications. Herbert Smith LLP's registration number for Value Added Tax in the United Kingdom is GB 927 1996 83.

Herbert Smith LLP, Gleiss Lutz and Stibbe are three independent firms which have a formal alliance. Further information is available from www.herbertsmith.com.

••••••••••

Goodmans' Toronto office has moved to Bay Adelaide Centre.

Our new address:

Goodmans LLP
Bay Adelaide Centre
333 Bay Street, Suite 3400
Toronto, ON M5H 2S7

20/01/2010

Our email addresses, telephone and fax numbers remain the same.

This communication is intended solely for the named addressee(s) and may contain information that is privileged, confidential, protected or otherwise exempt from disclosure. No waiver of confidence, privilege, protection or otherwise is made. If you are not the intended recipient of this communication, please advise us immediately and delete this email without reading, copying or forwarding it to anyone.

20/01/2010

**For Discussion Purposes Only**
**DRAFT: 1 - January 15, 2010 at 10:14 AM**

## CONFIDENTIALITY AGREEMENT

This Confidentiality Agreement (the "**Agreement**") is entered into on this _____ day of January, 2010, by Nortel Networks UK Limited ("**NNUK**"), acting by its joint administrators Alan Robert Bloom, Stephen John Harris, Alan Michael Hudson and Christopher John Wilkinson Hill of Ernst & Young LLP of 1 More London Place, London SE1 2AF (the "**Joint Administrators**") who act as agents for NNUK, the Nortel companies specified on Exhibit A (the "**EMEA Debtors**" and, with NNUK and the Joint Administrators, the "**Principals**"), Herbert Smith LLP (the "**Advisor**" and, collectively with the Principals, the "**Recipients**" and each, a "**Recipient**"), Nortel Networks Inc. ("**NNI**") and certain other Nortel companies specified on Exhibit B (such companies collectively with NNI, the "**U.S. Debtors**") and Nortel Networks Limited ("**NNL**") and certain other Nortel companies specified in Exhibit C (such companies collectively with NNL, the "**Canadian Debtors**") (the U.S. Debtors and the Canadian Debtors are hereinafter collectively referred to as the "**North American Debtors**").

RECITALS

WHEREAS on January 14, 2009, the Canadian Debtors commenced proceedings pursuant to the Companies' Creditors Arrangement Act before the Ontario Superior Court of Justice (the "**CCAA Proceedings**");

WHEREAS, on January 14, 2009, NNI and certain of the other U.S. Debtors filed voluntary petitions and certain orders for relief pursuant to Title 11 of the United States Code in the United States Bankruptcy Court for the District of Delaware (the "**Chapter 11 Cases**");

WHEREAS, the Recipients desire to receive certain Confidential Information (as defined below) from the North American Debtors;

WHEREAS, the North American Debtors are willing to provide the Recipients with certain Confidential Information (as defined below), subject to the terms and conditions contained in this Agreement.

NOW, THEREFORE, in consideration of the mutual agreements contained herein, each of the Recipients, the U.S. Debtors and the Canadian Debtors agree as follows:

## I.    Confidentiality

1.    As used in this Agreement, "**Confidential Information**" shall mean any information relating to the North American Debtors and/or any of their affiliates that is non-public, confidential, or proprietary in nature including, without limitation, information relating to that certain Final Canadian Funding and Settlement Agreement amongst the Canadian Debtors, Ernst & Young Inc. in its capacity as the monitor of the Canadian Debtors in the CCAA Proceedings (the "**Monitor**") and the U.S. Debtors dated December 23, 2009 (the "**Canadian Funding Agreement**"), the Settlement Payment, the APAs, the NNI Claim (each as defined in the Canadian Funding Agreement) and the Bilateral Advance Pricing Arrangement relating to NNL and NNI dated June 17, 2009 as amended, and including the content of all discussions, communications, negotiations, and evaluations in writing, orally, or otherwise related to the foregoing, in each case received before or after the date hereof by a Recipient or any of their respective affiliates, members, partners, counsels,

associates, employees, agents, advisors or representatives (each of the foregoing, other than a Recipient, a "**Representative**") from any of the North American Debtors, the Monitor, the Official Committee of Unsecured Creditors of the U.S. Debtors, the Ad Hoc Committee of Bondholders of the North American Debtors or any of their respective representatives, agents, advisors or counsels, or to which a Recipient or any of their Representatives was a party and all notes, reports, analyses, compilations, studies, files or other documents or material, whether prepared by a Recipient or others, which are based on, contain or otherwise reflect such information.

Notwithstanding the foregoing, Confidential Information shall not include any information:

(a)     that was already in the possession of a Recipient, or that was available to them on a non-confidential basis from a source other than any of the North American Debtors, their agents or representatives, or the Monitor, in each case prior to the time of disclosure by any of the North American Debtors or the Monitor to such Recipient;

(b)     obtained by a Recipient from a third person, which insofar as is known to such Recipient, is not subject to any legal, contractual, or fiduciary prohibition or obligation against disclosure by that third person in favour any of the North American Debtors (a Recipient shall be deemed to have "knowledge" if it reasonably should have known of such violation);

(c)     which is or becomes generally available to the public other than as a result of a violation of this Agreement by a Recipient; or

(d)     that is developed by a Recipient without use of or reference to Confidential Information.

2.     Each Recipient agrees, except as otherwise provided herein:

(a)     not to disclose in any manner whatsoever to any person or entity other than its Representatives on a need-to-know basis all or any part of the Confidential Information without the prior written consent of the U.S. Debtors and the Canadian Debtors; and

(b)     not to use the whole or any part of the Confidential Information for any purpose other than in connection with the consideration of motions to approve the Canadian Funding Agreement and related relief to be sought by the North American Debtors in the Chapter 11 Cases and the CCAA Proceedings, respectively.

A Recipient will be liable for any action or failure to act that would constitute a breach of the obligations of this Agreement by any of its Representatives to whom it provides Confidential Information.

3.     Notwithstanding any other provision of this Agreement, in no event shall a Recipient disclose, introduce as evidence, preface any arguments, objections or pleadings upon, or

- 3 -

otherwise refer to, whether orally or in writing, or directly or indirectly, any Confidential Information including, without limitation, in the CCAA Proceedings, the Chapter 11 Cases, a joint hearing conducted pursuant to that certain Cross-Border Insolvency Protocol approved by the Ontario Superior Court of Justice and the United States Bankruptcy Court for the District of Delaware in the CCAA Proceedings and the Chapter 11 Cases, respectively, or in any other judicial or quasi-judicial process.

4.      If a Recipient (i) receives any request or requirement, arising in connection with any judicial, regulatory, self-regulatory, or other proceedings, for the Recipient to disclose all or any portion of the Confidential Information and (ii) in the opinion of the Recipient's legal counsel, is legally required to disclose such Confidential Information, a Recipient may disclose such Confidential Information; provided, however, that where legally permissible under the circumstances, prior to making any such disclosure, the Recipient shall provide prompt notice of such request or requirement for disclosure to the U.S. Debtors and the Canadian Debtors so that the U.S. Debtors and/or the Canadian Debtors may seek a protective order or other appropriate remedy at the U.S. Debtors' and/or the Canadian Debtors' (as applicable) sole cost and expense or waive compliance with the applicable provisions of this Agreement by a Recipient, and in any event, shall provide notice to the U.S. Debtors and the Canadian Debtors concurrently with such disclosure. In the event the U.S. Debtors and/or the Canadian Debtors determine to seek such protective order or other remedy, the Recipients will cooperate with the U.S. Debtors and the Canadian Debtors (as applicable) in seeking such protective order or other remedy. In the event that such protective order or other remedy is not obtained and disclosure of Confidential Information is required, or the U.S. Debtors and the Canadian Debtors (as applicable) grant a waiver hereunder, a Recipient (A) may, without liability hereunder furnish that portion (and only that portion) of the Confidential Information which, in the written good faith opinion of such Recipient's legal counsel, such Recipient is legally required to disclose and (B) will exercise its commercially reasonable efforts to have confidential treatment accorded any Confidential Information so furnished.

5.      The Recipients acknowledge that the Confidential Information is and remains the property of the North American Debtors. In no event shall the Recipients or any of their Representatives be deemed, by virtue of this Agreement, to have acquired any right or interest of any kind or nature whatsoever, in or to, any Confidential Information. The Recipients shall, promptly upon request by the U.S. Debtors or the Canadian Debtors, destroy any Confidential Information provided by the North American Debtors or the Monitor or any of their respective representatives, agents, advisors or counsel to a Recipient or any of its Representatives that exists in any tangible form, including all copies and notes thereof, and including Confidential Information incorporated into analyses, compilations, studies, or other documents prepared by a Recipient or its Representatives (with such destruction being certified in writing by the Recipients), except for copies of any computer records and files containing any Confidential Information which have been created pursuant to a Recipient's automatic electronic archiving and back-up procedures to the extent such copies are retained in accordance with the confidentiality obligations specified in this Agreement.

6.      None of the North American Debtors or the Monitor, or any of their respective representatives, agents, advisors, counsels or affiliates, makes any representation or

warranty, express or implied, as to the accuracy or completeness of the Confidential Information or any other information provided to the Recipients or the Representatives by the North American Debtors or the Monitor or any of their respective representatives, agents, advisors, counsels or affiliates in connection with matters contemplated hereby. Furthermore, none of the North American Debtors or the Monitor or any of their respective representatives, agents, advisors, counsels or affiliates shall have any liability to the Recipients or any other party, including, without limitation, the Representatives, resulting from the use of, or reliance on, Confidential Information by a Recipient or the Representatives.

**II.     Termination**

7.     This Agreement shall terminate on the date that the North American Debtors notify the Recipients in writing that the North American Debtors have publicly disclosed any of the Confidential Information, but only with respect to such portion of the Confidential Information that has been disclosed; provided that following termination of this Agreement, any right that the U.S. Debtors and the Canadian Debtors may have to enforce the provisions of this Agreement or to seek any remedy for any action or failure to act by any of the Recipients or Representatives or other breach of this Agreement prior to such termination shall survive any such terminations, subject to any applicable statute of limitations.

**III.    Miscellaneous**

8.     This Agreement shall be governed by and construed in accordance with the laws of the Province of Ontario without giving effect to the choice of law provisions thereof. The Recipients hereby irrevocably submit to and accept the exclusive jurisdiction of the Ontario Superior Court of Justice and the United States Bankruptcy Court for the District of Delaware for the purposes of any action, suit or proceeding arising out of or relating to this Agreement. To the fullest extent permitted by law, the Recipients and the North American Debtors hereby agree to waive trial by jury in any action proceeding or counterclaim brought by or on behalf of either party with respect to any matter whatsoever relating to this Agreement.

9.     It is understood and agreed that money damages are not an appropriate remedy for any breach of this Agreement and, accordingly, the North American Debtors shall be entitled to seek specific performance and injunctive or other equitable relief as a remedy for any such breach.

10.     If any portion of this Agreement shall be declared invalid or unenforceable, the remainder of this Agreement shall be unaffected thereby and shall remain in full force and effect. This Agreement may be signed in one or more counterparts (including by means of facsimile or electronically mailed facsimiles of signatures pages), each of which need not contain the signature of all parties hereto, and all of such counterparts taken together shall constitute a single agreement. This Agreement contains the entire agreement between the parties concerning the confidentiality of the Confidential Information and shall be binding upon any respective successors and permitted assigns. This Agreement may be modified or waived only by a separate writing executed by the North American Debtors

- 5 -

and the Recipients expressly so modifying this Agreement or waiving any provision thereof. No course of dealing between the parties shall be deemed to modify or amend any provision of this Agreement.

11.  No delay in exercising any rights hereunder shall be construed to be a waiver of such rights, nor shall any single or partial exercise thereof preclude any other or further exercise thereof or the exercise of any right hereunder.

12.  Any notices or consents to be given hereunder by any party to another party may be effected in writing by personal delivery, overnight courier, or facsimile. Notices to the North American Debtors shall be provided to Nortel Networks Corporation, Attn: Anna Ventresca, Chief Legal Officer, 5495 Airport Road, Suite 360, Mississauga, Ontario, Canada, L4V 1R9, with a copy (which shall not constitute notice) to Ogilvy Renault LLP, Attn: Derrick Tay, Royal Bank Plaza, South Tower, Suite 3800, P.O. Box 84, 200 Bay Street, Toronto, Ontario, M5J 2Z4 and to Cleary Gottlieb Steen & Hamilton LLP, Attn: Jim Bromley, Esq., One Liberty Plaza, New York, New York 10006, U.S.A. Notices to the Recipients shall be provided to ●.

**For Discussion Purposes Only**
**DRAFT: 1 - January 15, 2010 at 10:14 AM**

- 6 -

IN WITNESS WHEREOF, the North American Debtors and the Recipients have executed this Agreement by their duly authorized signatories as of the date first set forth above.

**NORTEL NETWORKS INC. AND THE OTHER U.S. DEBTORS**

Per: _____
        Name:
        Title:


**NORTEL NETWORKS LIMITED AND THE OTHER CANADIAN DEBTORS**

Per: _____
        Name:
        Title:


**[NTD: To insert Recipients signature blocks.]**

\5804133

For Discussion Purposes Only
DRAFT: 1 - January 15, 2010 at 10:14 AM

## EXHIBIT A

### OTHER EMEA DEBTORS

[NTD: Insert list of EMEA Debtors.]

**For Discussion Purposes Only**
**DRAFT: 1 - January 15, 2010 at 10:14 AM**

## EXHIBIT B

### OTHER U.S. DEBTORS

Nortel Networks Capital Corporation

Nortel Networks Cable Solutions Inc.

Xros, Inc.

NN Applications Management Solutions Inc.

CoreTek, Inc.

Alteon WebSystems Inc.

Alteon WebSystems International Inc.

Sonoma Systems, Qtera Corporation

Nortel Networks International Inc.

Northern Telecom International Inc.

Nortel Networks Optical Components Inc.

Nortel Networks HPOCS Inc.

Architel Systems (U.S.) Corporation

Nortel Networks (CALA), Inc.

**For Discussion Purposes Only**
**DRAFT: 1 - January 15, 2010 at 10:14 AM**

## EXHIBIT C

## OTHER CANADIAN DEBTORS

Nortel Networks Corporation

Nortel Networks Global Corporation

Nortel Networks International Corporation

Nortel Networks Technology Corporation

\5804133

This is Exhibit "O"
referred to in the Affidavit of
Alan Robert Bloom
sworn before me
this ___ day of January, 2010

## Kois, Maria

**Subject:** Nortel - US Motion to approve Canadian Funding Agreement

**From:** Andrews, Sam **On Behalf Of** GALE, STEPHEN
**Sent:** 15 January 2010 18:09
**To:** 'jpasquariello@goodmans.ca'; 'smallk@cgsh.com'; 'Bromley, James L'; 'Brod, Craig B'; 'Schweitzer, Lisa M'
**Cc:** Whiteoak, John; 'Murray.A.McDonald@ca.ey.com'; 'Brent.R.Beekenkamp@ca.ey.com';
'dtay@ogilvyrenault.com'; LLOYD, KEVIN; 'Schwill, Robin'; 'Lang, Michael J'; 'Stam, Jennifer';
'jcarfagnini@goodmans.ca'
**Subject:** RE: Nortel - US Motion to approve Canadian Funding Agreement

Joe

Thanks for your email of last night and this morning. I also understand that Alan has spoken to Murray this morning.

As you know, the US Debtors have granted us an extension only until this afternoon to file our objection. We are currently preparing an objection based on that timeframe.

When I wrote earlier this week, I had hoped we would have been able to receive more information about the CFA and to discuss the substance of our concerns about it, without having to lodge formal court objections.

Although I appreciate the offer of a discussion, I note that the terms of the confidentiality agreement you sent through would prevent us from actually using this information. This does rather defeat the point of obtaining the information. As such I am not sure a call this evening will be all that productive.

However, I am still keen to progress this collaboratively if we can. To assist in this and so that the US Debtors can better understand our position my colleague John Whiteoak will shortly send you all a copy of our draft objection and what I propose is:

(a) On the basis of our draft objection the US Debtor gives us an extension until Tuesday 4:00pm EST by which to file an objection. I understand Monday is a public holiday in the US.

(b) By Monday morning EST, the Monitor either sets out in writing or in a conference call with us answers to the questions we have asked in my letter. We are happy to sign a confidentiality agreement and to treat the information in the strictest confidence. However, we need to be able to use the information, if necessary, in a court. Before using any information in court we are prepared to first apply for sealing orders, to protect its confidentiality. We also repeat our request for at least a draft of the Monitor's report so that we may understand what evidence it is putting before the Canadian court.

(c) With the benefit of this information, all the stakeholders can then use Tuesday to try and deal with the legitimate concerns we have raised. Hopefully we will be then able to resolve this. If not, we will file our objection and deal with the matter in court next Thursday.

I think this is the most sensible course of action.

Please let me know if you agree. Jim/Craig please also let me know if the US Debtor agrees to this as well.

Should we not receive your agreement to the extension until Tuesday 4:00pm EST by **3:00pm EST today** we will file our objection with the court.

I should note that I understand that the PPF has or will raise some concerns about the CFA. For the avoidance of doubt, we do not propose, nor are we asking, that any of the information which we have requested from the Monitor be shared with the PPF.

I look forward to hearing from you.

Regards

20/01/2010

Steve

---

**From:** Pasquariello, Joe [mailto:jpasquariello@goodmans.ca]
**Sent:** 14 January 2010 17:44
**To:** GALE, STEPHEN; 'smalik@cgsh.com'; 'Bromley, James L'; 'Brod, Craig B'; 'Schweitzer, Lisa M'
**Cc:** Whiteoak, John; LLOYD, KEVIN; 'Schwill, Robin'; 'Tay, Derrick C.'; 'Lang, Michael'; 'Stam, Jennifer';
'Murray.A.McDonald@ca.ey.com'; 'Brent.R.Beekenkamp@ca.ey.com'; Carfagnini, Jay
**Subject:** RE: Nortel - US Motion to approve Canadian Funding Agreement

Stephen,

The Monitor and other North American parties will not be in a position to have the discussion with your group today.  We are working towards having a discussion with you tomorrow afternoon EST.

To be clear, the Monitor has not committed to provide all of the information you requested in your letter. The Monitor is considering the scope of the request and will, assuming we agree upon confidentiality and related terms, address some of the information requests during our call tomorrow.

With respect to confidentiality, we are preparing a form of confidentiality agreement and will circulate same to you later today or tomorrow morning.  However, it should be noted that we will not permit the information provided to you to be used against the Debtors in any proceeding or otherwise.

I will be back to you with a proposed time for our call tomorrow.

Regards,


**Joseph Pasquariello**

Goodmans LLP


416.597.4216

jpasquariello@goodmans.ca


Bay Adelaide Centre
333 Bay Street, Suite 3400
Toronto, ON  M5H 2S7

goodmans.ca

---

**From:** GALE, STEPHEN [mailto:Stephen.Gale@herbertsmith.com]
**Sent:** Thursday, January 14, 2010 10:20 AM
**To:** Pasquariello, Joe; smalik@cgsh.com; Bromley, James L; Brod, Craig B; Schweitzer, Lisa M
**Cc:** Whiteoak, John; LLOYD, KEVIN; Schwill, Robin
**Subject:** Nortel - US Motion to approve Canadian Funding Agreement

20/01/2010

Dear All,

I apologise that I was unable to make the call last night to discuss our letter on the CFA.

John Whiteoak has updated me on the call which was apparently only procedural in nature. I note you have still not agreed to our request for an extension to the date for filing of objections until 4:00pm EST on 18 January 2010. I must say that I am disappointed. Please may I have your confirmation that an extension will be granted as soon as possible and no later than 12:00 noon EST, otherwise we will be forced to file an objection today.

The question of the extension was left subject to two conditions:

1. That we confirm that the entirety of our objections were contained in our letter to you; and

2. That we send you a copy of our draft objections this week.

We agree to these conditions.

As John indicated on the call, our letter sets out all of our concerns on the CFA. As John further pointed out this confirmation is, of course, subject to the fact that our letter seeks certain information and this information might well give rise to additional concerns. The only other matter, and it is a point of clarification and not objection, is that relating to the allocated costs (i.e. Part B of the CFA). We do not read the CFA as actually seeking to make EMEA Debtors liable for those costs. Whether or not the EMEA Debtors will be prepared to agree to those costs will obviously be a matter of separate discussion with us. I think, however, we are all on the same page with this.

I am also disappointed that you have not, as yet, engaged with us substantively on our real concerns on the CFA. Some of our concerns, particularly our questions on clauses 3 and 4 of the CFA, could have simply been answered on the call last night.

In my letter I also sought information from the Monitor. I understand that the Monitor would be prepared to provide such information on the basis that it is confidential. We have not yet received the proposed confidentiality agreement from Goodmans. Any should such agreement should provide that the information that is provided to the EMEA Debtors will be treated as confidential, however, should these discussions give rise to an issue which we need to bring to the attention of the court, we will be at liberty to use it subject to us applying for appropriate sealing orders.

It was indicated on the call last night that the Monitor was available for a call this afternoon Toronto time to discuss the information requests. To accommodate this we had lined up EY and our US and Canadian Counsel to be available as and when suited the Monitor. Whilst we appreciate your offer of a call on Friday afternoon EST or Friday evening London time to discuss matters with the Monitor this falls after the current deadline for filing any US objection and your request for a draft objection. Given the urgency we would like to proceed with the Monitor's original offer of a discussion this afternoon EST time. Please indicate a time for this call and we will assemble at this end.

Finally, as noted in our letter, we would appreciate early sight of the Monitor's report and court papers. When can these be provided?

As noted above, in order for us to begin this dialogue at all we will need your confirmation by 12:00 noon EST today the EMEA Debtors are granted an extension to file any objection. We will then need to establish a timetable to resolve our legitimate and what we consider to be uncontroversial concerns.

I look forward to hearing from you.

Regards

**Steve**

20/01/2010

**Stephen Gale**

Partner

Herbert Smith LLP

Email: stephen.gale@herbertsmith.com

Tel: 020 7466 2878

Fax: 020 7098 4878

Mobile: 07785 254901

20/01/2010

This is Exhibit "P"
referred to in the Affidavit of
Alan Robert Bloom
sworn before me
this 7o day of January, 2010

**Kols, Marla**

----- Original Message -----
From: James L BROMLEY <jbromley@cgsh.com>
To: GALE, STEPHEN
Cc: Sanjeet Malik <smalik@cgsh.com>; Derrick C. Tay <dtay@ogilvyrenault.com>; Craig B BROD <cbrod@cgsh.com>
Sent: Fri Jan 15 20:04:28 2010

Dear Steve,

Thank you providing us with a copy of the EMEA Debtors' draft objection to the US Debtors' motion seeking approval of the CFA. The US Debtors confirm the extension of the deadline for the Joint Administrators to file an objection to the US Debtors' motion seeking approval of the CFA from 4:00 pm, EST, today Friday, January 15, 2010, to 4:00 pm, EST, Tuesday, January 19, 2010. The rights of the US Debtors to oppose any such objection on any basis whatsoever are fully reserved.

Regards,

Jim

CONTACT INFORMATION

James L. Bromley
Cleary Gottlieb Steen & Hamilton LLP
One Liberty Plaza
New York, New York  10006
Direct:  212-225-2264
Fax:  212-225-3999
Mobile:  646-894-3014
jbromley@cgsh.com
www.cgsh.com
This message is being sent from a law firm and may contain confidential or privileged information. If you are not the intended recipient, please advise the sender immediately by reply e-mail and delete this message and any attachments without retaining a copy.

This is Exhibit "Q"
referred to in the Affidavit of
Alan Robert Bloom
sworn before me
this 2̲6̲ day of January, 2010

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| NORTEL NETWORKS INC., et al.,[1] | Case No. 09-10138 (KG) |
| Debtors. | Jointly Administered |
| | **Hearing date: January 21, 2010, at 11:00 a.m.**[2]<br>Re: Docket No. 2205 |

**OBJECTION OF NORTEL NETWORKS UK LTD. AND THE EMEA DEBTORS
TO NNI'S MOTION PURSUANT TO 11 U.S.C. § 105(a), § 363, § 503 AND FED. R.
BANKR. P. 9019 FOR AN ORDER (A) APPROVING THE CANADIAN FUNDING AND
SETTLEMENT AGREEMENT, AND (B) GRANTING RELATED RELIEF**

Alan Robert Bloom, Christopher John Wilkinson Hill, Alan Michael Hudson, and

Stephen John Harris, in their capacity as UK Administrators and Foreign Representatives for

Nortel Networks UK Limited ("NNUK") and as UK Administrators for the EMEA Debtors (as

defined below) except in respect of Nortel Networks (Ireland) Limited ("NNIR") for whom the

UK Administrators are David Martin Hughes and Alan Robert Bloom in proceedings before the

High Court of Justice, Chancery Division, England and Wales (the "UK Court"), (collectively,

the "UK Administrators"), respectfully submit the following objections (the "Objection") to the

motion by Nortel Networks, Inc. ("NNI") and certain of its affiliates, as debtors and debtors in

possession, (collectively, the "US Debtors") for an order approving the Canadian Funding and

Settlement Agreement and granting related relief [D.I. 2205] (the "US Debtors' Motion"):

## BACKGROUND

1.    Most of the relevant background is set forth in Paragraphs 1 through 26 of the US

Debtors' Motion, which are incorporated herein by reference.

---

[1]    The Debtors in these Chapter 11 cases are: Nortel Networks Inc., Nortel Networks Capital Corporation, Alteon WebSystems, Inc., Alteon WebSystems International, Inc., Xros, Inc., Sonoma Systems, Qtera Corporation, CoreTek, Inc., Nortel Networks Applications Management Solutions Inc., Nortel Networks Optical Components Inc., Nortel Networks HPOCS Inc., Architel Systems (U.S.) Corporation, Nortel Networks International Inc., Northern Telecom International Inc. and Nortel Networks Cable Solutions Inc.

[2]    The US Debtors agreed to extend the date for filing and serving the Objection until noon on January 20, 2010.

2.    On January 14, 2009 (the "Petition Date"), the US Debtors filed voluntary

petitions for relief under Chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101–

1532 ("Bankruptcy Code"), and have thereafter continued to operate their businesses as debtors

in possession pursuant to 11 U.S.C. §§ 1107 and 1108. On the Petition Date, NNI's ultimate

corporate parent, Nortel Networks Corporation ("NNC"), NNI's direct corporate parent Nortel

Networks Limited ("NNL") and certain of their Canadian affiliates (the "Canadian Debtors")

filed an application with the Ontario Superior Court of Justice (Commercial List) under the

Companies' Creditors Arrangement Act, seeking relief from creditors (the "Canadian

Proceedings"). The Canadian Proceedings have been recognized by this Court as foreign main

proceedings pursuant to Chapter 15 of the Bankruptcy Code.

3.    Also on the Petition Date, nineteen of the US Debtors' European affiliates,

including NNUK (the "EMEA Debtors"), commenced administration proceedings (the "UK

Proceedings") under the Insolvency Act of 1986 before the UK Court, whereby the UK

Administrators were appointed. The UK Proceedings have been recognized by this Court as

foreign main proceedings pursuant to Chapter 15 of the Bankruptcy Code.

4.    The US Debtors, the Canadian Debtors and the EMEA Debtors (collectively, the

"Nortel Entities") operated on an integrated basis across multiple jurisdictions. For additional

background information on the corporate structure and business of the Nortel Entities and the

EMEA Debtors, the UK Administrators respectfully refer the Court to the *Verified Petition for

Recognition of Foreign Proceedings Pursuant to Chapter 15 of the United States Bankruptcy

Code*, annexed hereto as Exhibit A. A brief summary follows.

5.    In order to allow the Nortel group to operate on a global basis and to allocate

profits, losses and certain costs across the corporate entities, several Nortel Entities entered into

separate bilateral distribution agreements with NNL (the "Distribution Agreements").

2

DB02:9165033.1                                                    068476.1001

Additionally, and for the same purposes, NNL, NNI, NNUK, NNIR, Nortel Networks S.A. ("NNSA") and other affiliates (who are no longer parties to the agreement) (the "Participating Nortel Entities") entered into the Master Research and Development Agreement, dated December 22, 2004 (as amended from time to time, the "Master R&D Agreement", a copy of which is attached hereto as Exhibit B). The Distribution Agreements and the Master R&D Agreement together with the documents and agreements listed in Annex A and Annex B of the Interim Funding and Settlement Agreement, entered into between certain Nortel entities, on or about June 9, 2009 and approved by this Court on June 29, 2009 (the "IFSA") form the "Transfer Pricing Agreements."

      6.    In broad terms, the purpose of the Transfer Pricing Agreements was to compensate the Nortel Entities for expenses related to their research and development activities and their production of intellectual property ("R&D Activity"). The Master R&D Agreement expressly provides that the allocation of residual profits and losses among Nortel Entities according to their relative R&D expenditures was an "acknowledge[ment of] the fact that the key profit driver in the Nortel business is the development and maintenance of rapidly depreciating intellectual property." (Master R&D Agreement at 15, Schedule A.) In addition, the Master R&D Agreement provides that the method of residual profit and loss allocation set forth in that agreement

> reflects the fact that the Participa[ting Nortel Entities] bear the full entrepreneurial risk of the Nortel business, such as the risks attendant with the substantial and continuous development and ownership of the [Nortel Networks] Technology. Mathematically, the [method of residual profit and loss allocation] accords the Participa[ting Nortel Entities] all the upside risk in the Nortel business as well as the downside risk.

(Master R&D Agreement at 13, Schedule A.)

      7.    The Master R&D Agreement also provides that "NNL agrees to administer this Agreement and the determinations under the RPSM as contemplated in this Agreement with

3

respect to its interests and the interests of the Participa[ting Nortel Entities] and in particular to compute the amount of any R&D Allocation to, and payment due from, each Participa[ting Nortel Entity] on a periodic basis....Any payment to, and payment from, a Participa[ting Nortel Entity] will be reflected in the inter-company accounts of the affected Participa[ting Nortel Entity] as a payable or a receivable ...." (Master R&D Agreement at 5, Art. 3(d).) With respect to seeking payments from the participating Nortel entities, the Master R& D Agreement provides that "[a]ny amount owing by a Participant under this Agreement will be due and payable immediately upon written notice of its R&D Allocation from NNL." (Master R&D Agreement at 6, Art. 3(g).)

8.    Prior to filing for bankruptcy protection, the Nortel Entities transferred substantial sums among themselves not only pursuant to the Transfer Pricing Agreements, but also pursuant to many other agreements which they entered into individually so as to facilitate intra-group trading.

9.    To ensure that this intra-group trading continued and so as to allow the Nortel group to undergo a business and financial restructuring, on January 14, 2009 two Group Supplier Protocol Agreements were entered into in respect of post administration intra-group trading of goods and services (together the "GSPAs"). The GSPAs were entered into between NNL (and certain other Canadian entities) and each of the EMEA Debtors and separately between NNI (and certain other US entities) and each of the EMEA Debtors. The GSPAs are otherwise in identical terms.

10.    The GSPAs, as periodically extended, enable each of the EMEA Debtors (party to the GSPAs) to continue to trade with NNI (and certain other US entities) and NNL (and certain other Canadian entities) in the ordinary course on the basis that goods and services provided post

DB02:9165033.1                                    068476.1001

administration would be paid for in full. The definition of "Goods and Services" in the GSPAs makes specific reference to the Master R&D Agreement.

11.    As such, the Nortel Entities that have contributed the most to R&D Activity have continued to trade on the basis of the GSPA during the post-petition period. As a result the EMEA Debtors have continued to incur trading losses (which for some of these entities includes expenditure on R&D Activity) in the expectation that they will recoup a significant proportion of such losses by operation of the Transfer Pricing Agreements as protected by the GSPAs.

12.    Following lengthy, difficult, and good faith negotiations, the parties entered into the IFSA, on or about June 9, 2009, which the Court approved on June 29, 2009. The IFSA essentially provided partial funding of NNL by NNI, in settlement of claims that NNL had made against NNI for amounts due under the Transfer Pricing Agreements for the period since the Filing Date through until September 30, 2009, while NNL obtained sufficient liquidity to continue the process of selling its assets. The IFSA also provided for the settlement of the amounts due under the Transfer Pricing Agreements for the period since the Filing Date through until December 31, 2009 owed to NNUK. The amounts due to NNUK was settled first by way of self-settlement amongst the EMEA Debtors and second by two shortfall payments from NNL to bridge some of the gap between the amount actually owed to NNUK under the Transfer Pricing Agreements and the amount to be paid by the EMEA Debtors through self-settlement (the "Shortfall Payments").

13.    Critically, these matters were addressed in a multilateral way such that the parties to the IFSA included all the Participating Nortel Entities under the Master R&D Agreement.

14.    The IFSA takes pains to preserve the Nortel Entities' pre and post-filing claims against each other under the Transfer Pricing Agreements as well as their other agreements. For example, Section 10 of the IFSA provides:

5

> The Parties hereto agree that: . . . this Agreement is not, and shall not be deemed to be . . . determinative of, or have any impact whatsoever on, the allocation of proceeds to any Debtor from any sale of assets of the Nortel Group; and . . . this Agreement shall not have any effect on any claims as to amounts owed or purported to be owed to or by any Party . . . except [with respect to payments] specifically provided herein . . . .

(Interim Funding and Settlement Agreement, executed June 9, 2009, annexed hereto as <u>Exhibit</u> <u>C</u>.)

15.    Although the IFSA provides for the refund of certain amounts paid by NNI to NNL in excess of amounts provided in a March 2009 forecast, and also provides for the Shortfall Payments, the IFSA ensures the continued liquidity of NNL by providing that both the refunds and the Shortfall Payments would be postponed if such payments would materially and adversely affect the liquidity position of NNL, based on certain forecasts prepared by NNL.

## OBJECTIONS

16.    The UK Administrators object to the Canadian Funding and Settlement Agreement (the "<u>CFA</u>") because, as written, its terms are subject to interpretation in a way that may be prejudicial to the EMEA Debtors and to the equitable administration of the proceedings concerning EMEA Debtors in this Court, as well as in Canada, England and Wales and the local courts of non-English EMEA Debtors.

17.    The UK Administrators first raised their Objection on the CFA with the US Debtors by letter from Herbert Smith LLP dated January 12, 2010 (annexed hereto as <u>Exhibit D</u>). To date, none of the UK Administrators information requests or points of clarification sought in this letter have been addressed.

18.    For the avoidance of doubt, nothing in this Objection should be taken as the EMEA Debtors challenging the validity, or undermining the operation, of the Transfer Pricing Agreements, and in particular the Master R&D Agreement.

6

**A.    The CFA would prejudice the interests of the EMEA Debtors because it purports to affect the claims and interests of entities that were not parties to that Agreement.**

19.    The CFA, as written, could be construed to regulate the claims and interests of entities that are not parties to the Agreement.

20.    The US Debtors and the Canadian Debtors negotiated and completed the CFA without the consultation or participation of NNUK or the EMEA Debtors.  Nevertheless, the third paragraph on page 1 of the CFA defines the "Debtors" bound by the agreement to include NNUK and the EMEA Debtors, and the Agreement purports to bind all "Debtors" to its terms. In particular, Section 3 of the CFA provides, <u>inter alia</u>, that "the Settlement Payment represents . . . the maximum post-filing or administrative claim (or such other applicable priority claim) that any of the "Debtors" (excluding the US Debtors) may have or could assert against one or more US Debtors in any proceeding with respect to the Covered Obligations . . . ." (Final Canadian Funding and Settlement Agreement, executed Dec. 23, 2009, annexed as Exhibit B to the US Debtors' Motion, at 4.) Read literally, this would prejudice the EMEA Debtors' right to bring any claim against one or more of the U.S. Debtors.

21.    In order to address this failing, any Order approving the CFA should provide that:

> Nothing in this Order or the CFA shall be construed or operate to amend, modify, vary or change the rights or obligations of any entity or person that is not a party to the CFA (each, a "Non-Party") under any contract that a Non-Party has entered into with any party to the CFA, including (without limitation) any of the Transfer Pricing Agreements, the IFSA and the US GSPA.

**B.    The CFA would prejudice the interests of the EMEA Debtors because it could seal off the US Debtors from direct or indirect claims by the EMEA Debtors.**

22.    The CFA attempts to seal off the US Debtors' property from all further claims by any other Debtors not party to the Agreement and, thus, prejudices the legitimate interests of the EMEA Debtors as potential pre- and post-petition creditors of the US Debtors' estate. It seeks to do this in one of two ways. First, in respect of post filing claims Section 3 of the CFA

7

specifically attempts to prevent Debtors who were not party to the CFA—including the EMEA

Debtors—from asserting claims against the US Debtors for any "corporate overhead, research

and development costs . . . under any legal theory or contractual or extra-contractual

arrangement," whether under the Transfer Pricing Agreements or otherwise.  Second, in respect

of pre filing claims, Section 12 of the CFA provides that the Canadian Debtors "waive any and

all rights that may exist at law, in equity or otherwise to assert any Claims (as defined herein)

against the US Debtors relating to the period prior to the Filing Date. "

     23.   These provisions would prejudice rights of the EMEA Debtors that are protected

under the Nortel Entities' prior agreements.

     24.   The CFA could frustrate not only the EMEA Debtors' direct claims against the

US estate, but also their indirect claims.  It may come to pass that the EMEA Debtors will have

claims against the Canadian estate under, for example, the Transfer Pricing Agreements, but that

the Canadian estate will only be able to satisfy these claims by seeking payments from the US

Debtors under those same Agreements.  As noted above, the Transfer Pricing Agreements

contemplated that all Transfer Pricing claims would be resolved among the companies

simultaneously, on "a periodic basis," and that NNL would be required to administer that process

by seeking payment from each Nortel entity for any sums it owes, for distribution to other Nortel

entities that are owed equalizing payments.  (Master R&D Agreement at 5 (Art. 3(d), 15–16

(Schedule A).)  In addition, through the continued operation of the Master R&D Agreement, the

Participating Nortel Entities continue to share the upside and downside risks in the Nortel

business together pursuant to the Master R&D Agreement, notwithstanding their filing for

bankruptcy protection.  The CFA would short circuit that process by restricting the assertion of

any claims by NNL against the US Debtors for sums owed to other parties under the CFA.

Although it is theoretically possible that the proposed lump-sum payments to be made from the

8

US Debtors to the Canadian Debtors under the CFA equitably incorporate all such future claims by other Debtors, that possibility seems exceedingly unlikely.

25.    In any event, it is impossible to judge whether the US and Canadian Debtors have reached a settlement that equitably takes into account all future claims by the EMEA Debtors under the Transfer Pricing Agreements given the lack of accounting or explanation of the methodology that the US and Canadian Debtors used to reach their settlement amounts. Any agreement among two of the Debtors' estates should allow the third estate to obtain the funds that it is owed from whichever of the other estates has the funds.

26.    In order to address these failings, any Order approving the CFA should provide:

8. Nothing in this Order or the CFA shall be construed or operate to amend, modify, vary or change any of the Transfer Pricing Agreements, the IFSA or the US GSPA or in any way affect any one or more of the EMEA Debtors' rights or obligations under these agreements.

9. Nothing in this Order or the CFA shall be construed to operate to amend, modify, vary or change the rights or obligations of any entity or person that is not a party to the CFA (each, a "Non-Party") under any contract that a Non-Party has entered into with any party to the CFA, including (without limitation) any of the Transfer Pricing Agreements, the IFSA and the US GSPA.

10. For greater certainty and without limitation to paragraphs (8) and (9) above:

(i)    the CFA, including without limitation Section 3 of the CFA, shall not be held or otherwise used or interpreted in any way to affect the ability of any one or more of the EMEA Debtors to assert, prove or otherwise enforce any claim any one or more of the EMEA Debtors may have against any one or more of the Canadian Debtors or US Debtors including, without limitation, claims pursuant to the Transfer Pricing Agreement; and

(ii)    should any one or more of the EMEA Debtors have a right under the Transfer Pricing Agreements or the IFSA to direct or otherwise obligate any one or more of the Canadian Debtors to assert claims against any one or more of the US Debtors (including, without limitation) for the payment of certain amounts under the Transfer Pricing Agreements or the IFSA which are owed to any one or more of the EMEA Debtors, the CFA shall not prevent, preclude or otherwise hinder any one or more of the

9

Canadian Debtors' ability to do so and to recover such payments for the benefit of the EMEA Debtors.

**C.      The CFA may prejudice NNUK's rights regarding Shortfall Payments under the IFSA.**

27.    The CFA may prejudice NNUK's rights regarding Shortfall Payments under the IFSA. The IFSA conditioned NNL's payment of the Shortfall Payments on NNL's liquidity. However, the CFA imposes a new obligation on NNL that has the potential to strain NNL's liquidity in a way never conceived by the Debtors when they entered into the IFSA.

28.    Section 4 of the CFA provides that the Canadian Debtors will

> indemnify, defend and hold harmless each US Debtor from and against all actions, suits, claims, proceedings, costs, damages, losses, liabilities, judgments, . . . taxes fines . . . compensations paid in settlement . . . and expenses (including without limitation reasonable attorneys' fees and disbursements) resulting from a claim, demand, lawsuit, action or proceeding arising from or in connection to" corporate overhead, research and development costs or "other alleged payment or cost reimbursement obligations under any legal theory or contractual or extra-contractual arrangement . . . .

(Final Canadian Funding and Settlement Agreement, executed Dec. 23, 2009, annexed as Exhibit B to the US Debtors' Motion, at 4.) Thus, under the CFA the Canadian Debtors would be obliged to fund the defense of any future claims or lawsuits by any other Nortel Entities against any of the US Debtors, including not simply the claims under the Transfer Pricing Agreements, but potentially other looming claims regarding other amounts owed by and among those Entities. The EMEA Debtors could be substantially prejudiced by the Canadian Debtors' assumption of this new liability. Further, the provision that requires the setting aside of reserves for such liability could postpone and prejudice NNUK's right to Shortfall Payments for the indefinite future.

29.    In order to address this failing, any Order approving the CFA should provide that:

> Any and all reserves taken by the Canadian Debtors pursuant to Section 4 of the CFA shall not be taken into account when determining NNL's

10

068476.1001

liquidity position pursuant to the NNL Liquidity Review Procedures as set
out in Section 5 of the IFSA.

**D.**   **The CFA would prejudice the interests of the EMEA Debtors by purporting to amend the IFSA without the requisite approvals, including the approval of the EMEA Debtors.**

30.   The CFA purports to amend the IFSA without the approvals of the parties and the

courts explicitly required by the IFSA. Section 29 of the CFA states that its provisions constitute

a "full and final settlement" of certain obligations memorialized in the IFSA. This bilateral

"settlement" by two of the parties to the multilateral IFSA functions as an amendment of the

IFSA. The IFSA expressly provides that it may only be amended by means of a writing signed

by all Parties and approved by all Courts that initially approved or gave directions concerning the

Agreement, including the UK Court. The US and Canadian Debtors should not be allowed to

circumvent the procedural safeguards in the IFSA that were meant to curtail such attempts to

alter that agreement.

31.   In order to address this failing, any Order approving the CFA should provide that:

Section 29 of the CFA shall not be effective unless the IFSA is amended
to reflect the agreement set out in Section 29 of the CFA in accordance
with the terms regarding amendments as set out in the IFSA.

**E.**   **The CFA would prejudice the interests of the EMEA Debtors by approving the NNI Claim and potentially creating a new claim on the part of NNL against the EMEA Debtors without factual or analytical justification.**

32.   The $2.0627 Billion claim to be allowed in favor of NNI against NNL (the "NNI

Claim") may hinder the EMEA Debtors' potential claims on both the US and the Canadian

estates without any factual or analytical justification for that claim's superiority, enforceability or

content. Section 10 of the CFA provides that a $2.0627 Billion claim will be allowed against

NNL in the Canadian proceedings in favor of NNI, and that this allowance constitutes a

settlement of "any claims of the US Debtors against the Canadian Debtors for overpayments to

the Canadian Debtors under the Transfer Pricing Agreements," as well as other cost

11

reimbursement obligations. The US and Canadian Debtors have made no other substantive disclosure concerning the factual and legal bases on which the Canadian Debtors decided to allow the NNI Claim. The CFA is essentially silent as to whether and to what extent the claims that it purports to settle are real and valid. Furthermore, the CFA appears to be silent as to whether the Canadian Debtors may seek recourse against the EMEA Debtors in order to recoup the two-billion-dollar allowance. For the avoidance of doubt, the EMEA Debtors do not accept that there has been any overpayment under the Transfer Pricing Agreements.

33.    The US and Canadian Debtors should not, in fairness, be permitted to obtain Court approval of a bilateral "settlement" of a third party's claim against one of the estates, as they have with the NNI Claim, when that settlement will potentially impact a multitude of claims of parties that were never present at the bargaining table.

34.    The Canadian Debtors' waiver of claims against the US Debtors would create an imbalance of power that would undermine the establishment of a legitimate and orderly intercompany claims process. Section 12 of the CFA provides that the Canadian Debtors waive any and all rights to assert claims, as that term is defined in section 101(5) of the Bankruptcy Code, against the US Debtors "relating to the period prior to the Filing Date." Thus, the CFA simultaneously insulates the US estate from any claims against it by the Canadian Debtors during the formal claims process but leaves the US Debtors free to make additional claims for themselves during that process. At the same time, the CFA creates a windfall for the US estate by allowing the NNI Claim prior to the initiation of the formal claims process. The combination of these provisions creates an extraordinary lack of parity between the US Debtors and all other Debtors.

35.    In circumstances where there are these prejudicial consequences and where no factual detail, justification or rationale has, despite request, as to the NNI Claim, the US and

12

Canadian Debtors should not be able to discharge their evidential burden to have the Court approve the NNI Claim.

36.    However, if the US and Canadian Debtors are able to discharge their evidential burden, the Order approving the CFA and the NNI Claim should provide that that approval does not unfairly prejudice the EMEA Debtors by providing (in addition to the requested additional paragraphs to the Order set out in paragraph 26 above):

> 11. Nothing in the CFA, this Order or in this Order's approval of the CFA or the NNI Claim shall be construed or operate to take away or preclude or in any way affect the right of any EMEA Debtor to dispute or defend against any claim that may be asserted against such EMEA Debtor arising out of or resulting from the NNI Claim;

> 12. Nothing in the CFA, this Order or in this Order's approval of the CFA or the NNI Claim shall be considered in any way to be an adjudication of or comment (positive or negative) on the validity or merit of any claim by the IRS or the CRA as against any one or more of the Canadian Debtors and US Debtors or against any other party.

## CONCLUSION

37.    Accordingly, for all the foregoing reasons, the UK Administrators respectfully request that the Court when entering an order in respect of the CFA include within that order the following new paragraphs:

> 8.    Nothing in this Order or the CFA shall be construed or operate to amend, modify, vary or change any of the Transfer Pricing Agreements, the IFSA or the US GSPA or in any way affect any one or more of the EMEA Debtors' rights or obligations under these agreements.

> 9.    Nothing in this Order or the CFA shall be construed to operate to amend, modify, vary or change the rights or obligations of any entity or person that is not a party to the CFA (each, a "Non-Party") under any contract that a Non-Party has entered into with any party to the CFA, including (without limitation) any of the Transfer Pricing Agreements, the IFSA and the US GSPA.

> 10.    For greater certainty and without limitation to paragraphs (8) and (9) above:

(i)    the CFA, including without limitation Section 3 of the CFA, shall not be held or otherwise used or interpreted in any way to affect the ability of any one or more of the EMEA Debtors to assert, prove or otherwise enforce any claim any one or more of the EMEA Debtors may have against any one or more of the Canadian Debtors or US Debtors including, without limitation, claims pursuant to the Transfer Pricing Agreement; and

(ii)    should any one or more of the EMEA Debtors have a right under the Transfer Pricing Agreements or the IFSA to direct or otherwise obligate any one or more of the Canadian Debtors to assert claims against any one or more of the US Debtors (including, without limitation) for the payment of certain amounts under the Transfer Pricing Agreements or the IFSA which are owed to any one or more of the EMEA Debtors, the CFA shall not prevent, preclude or otherwise hinder any one or more of the Canadian Debtors' ability to do so and to recover such payments for the benefit of the EMEA Debtors.

11. Nothing in the CFA, this Order or in this Order's approval of the CFA or the NNI Claim shall be construed or operate to take away or preclude or in any way affect the right of any EMEA Debtor to dispute or defend against any claim that may be asserted against such EMEA Debtor arising out of or resulting from the NNI Claim;

12. Nothing in the CFA, this Order or in this Order's approval of the CFA or the NNI Claim shall be considered in any way to be an adjudication of or comment (positive or negative) on the validity or merit of any claim by the IRS or the CRA as against any one or more of the Canadian Debtors and US Debtors or against any other party;

13. Any and all reserves taken by the Canadian Debtors pursuant to Section 4 of the CFA shall not be taken into account when determining NNL's liquidity position pursuant to the NNL Liquidity Review Procedures as set out in Section 5 of the IFSA.

14. Section 29 of the CFA shall not be effective unless the IFSA is amended to reflect the agreement set out in Section 29 of the CFA in accordance with the terms regarding amendments as set out in the IFSA.

38.    For the avoidance of doubt, and for all of the foregoing reasons, the EMEA

Debtors are not consenting to the entering into of the CFA, given, in particular, that no

substantive disclosure concerning the factual and legal bases upon which the Parties have entered

into the CFA has been disclosed, the UK Administrators are not in a position to satisfy

14

themselves as to the appropriateness of the matters addressed therein. In this regard, the EMEA

Debtors' rights are fully reserved.

Dated: Wilmington, Delaware          **YOUNG CONAWAY STARGATT & TAYLOR, LLP**
       January 20, 2010

     /s/ Edwin J. Harron
James L. Patton (No. 2202)
Edwin J. Harron (No. 3396)
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, Delaware 19801
Telephone: (302) 571-6600
Facsimile: (302) 571-1253

- and -

**HUGHES HUBBARD**
Michael Luskin
Derek J.T. Adler
One Battery Park Plaza
New York, New York 10004
Telephone: (212) 837-6000
Facsimile: (212) 422-4726
E-Mail:  luskin@hugheshubbard.com
       adler@hugheshubbard.com

Counsel for Alan Robert Bloom, Christopher John
Wilkinson Hill, Alan Michael Hudson, and Steven John
Harris in their Capacity as UK Administrators and
Foreign Representatives for Nortel Networks UK
Limited

DB02:9165033.1                                                          068476.1001