**EXHIBIT C**

EXECUTION VERSION

### INTERIM FUNDING AND SETTLEMENT AGREEMENT

This agreement (the "Agreement") is entered into by and among Nortel Networks Limited ("NNL") and the other entities set forth in Schedule 1 attached hereto, Nortel Networks Inc. ("NNI") and the other entities set forth in Schedule 2 attached hereto, and the Joint Administrators (as defined below) and the entities set forth in Schedule 3 attached hereto (the "EMEA Debtors"). The Joint Administrators, in their individual capacity, shall be party to this Agreement solely for the purposes of Section 17 and references to the Parties shall be construed accordingly.

WHEREAS, on January 14, 2009 (the "Filing Date"), Nortel Networks Corporation ("NNC"), NNL and certain of NNC's other Canadian affiliates included in Schedule 1 (collectively, the "Canadian Debtors," and NNC and its debtor and non-debtor affiliates are sometimes referred to herein (including, without limitation, the EMEA Debtors), as the "Nortel Group"), commenced creditor protection proceedings before the Ontario Superior Court of Justice (Commercial List) (the "Canadian Court") under the Companies' Creditors Arrangement Act (Canada) (respectively, "CCAA" and the "Canadian Proceedings"), in connection with which Ernst & Young Inc. was appointed monitor (the "Monitor"); and

WHEREAS, on the Filing Date, NNI and certain of NNI's United States affiliates included in Schedule 2 (collectively, the "US Debtors" and, together with the Canadian Debtors and the EMEA Debtors, the "Debtors") filed petitions in the United States Bankruptcy Court for the District of Delaware (the "US Court") under chapter 11 of title 11 of the United States Code (respectively, the "Bankruptcy Code," and the "US Proceedings"); and

WHEREAS, on the Filing Date, Nortel Networks UK Limited ("NNUK"), Nortel Networks (Ireland) Limited ("NNIR"), Nortel Networks S.A. ("NNSA") and certain of NNUK's affiliates in the Europe, Middle East and Africa ("EMEA") region, including those in Schedule 3 attached hereto, commenced administration proceedings (the "UK Proceedings" and, together with the Canadian Proceedings and the US Proceedings, the "Proceedings") before the High Court of Justice in London, England (the "UK Court" and, together with the Canadian Court and the US Court, the "Courts"), represented by individuals from Ernst & Young LLP (the "UK Administrator"), and, in the case of NNIR only, Ernst & Young Chartered Accountants (the "NNIR Administrator"), serving as administrators in the UK Proceedings (the UK Administrator and the NNIR Administrator collectively, the "Joint Administrators"); and

WHEREAS, subsequent to the Filing Date, NNSA commenced secondary insolvency proceedings within the meaning of Article 27 of the European Union's Council Regulation (EC) No 1346/2000 on Insolvency Proceedings in the Republic of France pursuant to which a liquidator (the "NNSA Liquidator") and an administrator (the "NNSA Administrator") have been appointed by the Versailles Commercial Court (Docket No. 2009P00492) for NNSA; and

WHEREAS, prior to the Filing Date, certain members of the Nortel Group made quarterly payments (the "Transfer Pricing Payments") to other Nortel Group entities pursuant to a transfer pricing methodology ("Transfer Pricing") provided for in the Transfer Pricing Agreements, where "Transfer Pricing Agreements" means (i) the Master Research and Development Agreement dated as of December 22, 2004 (as amended by, and together with the

related understandings contained in, the documents listed in <u>Annex A</u> hereto, the "<u>Master R&D Agreement</u>") and (ii) certain distribution agreements, whether written or oral, between one or more Nortel Group entities, including without limitation the agreements listed in <u>Annex B</u> hereto and any other agreements similar to the agreements listed in <u>Annex B</u> hereto (as amended, supplemented or otherwise modified, the "<u>Distribution Agreements</u>"); and

WHEREAS, notwithstanding a US$30 million payment made by NNI to NNL in January, 2009 (the "<u>January Payment</u>"), certain members of the Nortel Group, including, in particular, NNL, have liquidity constraints; and

WHEREAS, it should be noted that no other payments similar to the January Payment have been made between or among the Nortel Group entities since the Filing Date; and

WHEREAS, each of the Parties hereto has concluded it is appropriate and in the best interest of each to enter into this Agreement pursuant to which, *inter alia*: (i) NNI, on behalf of itself and the other US Debtors, shall settle any claims of NNL for corporate overhead and research and development costs, whether pursuant to Transfer Pricing Agreements or otherwise, incurred by NNL for the benefit of the US Debtors which NNL has asserted or could assert (without admission by the US Debtors and subject to Section 20 of this Agreement) would have been reimbursed to NNL through Transfer Pricing Payments payable by the US Debtors to the Canadian Debtors during, or with respect to, the period after the Filing Date through and including September 30, 2009 (respectively, the "<u>Canada/US Interim Period</u>" and the "<u>NNI Interim Obligations</u>") and (ii) the EMEA Debtors shall among themselves and as between one or more EMEA Debtors, on the one hand, and one or more Canadian Debtors and/or US Debtors, on the other hand, settle amounts payable and anticipated to become payable as Transfer Pricing Payments as provided for herein for the period from the Filing Date to December 31, 2009 (the "<u>EMEA Interim Period</u>"), in all cases subject to the terms of this Agreement; and

WHEREAS, the Parties hereto intend this Agreement to constitute a full and final settlement of all matters set forth in this Agreement, whether arising during or related to the Canada/US Interim Period or the EMEA Interim Period, as applicable; and

WHEREAS, the Parties intend to continue to meet their respective obligations to make the monthly payments in respect of the inter-company trading of goods and services by Nortel Group entities (the "<u>Inter-Company Trading Payments</u>") pursuant to and during the effectiveness of the group supplier protocol agreements approved in the applicable Proceedings from time to time (the "<u>GSPAs</u>") or pursuant to and in accordance with court orders entered in the Canadian Proceedings and the US Proceedings ("<u>Trading Orders</u>"); and

WHEREAS, the Official Committee of Unsecured Creditors appointed in the US Proceedings (the "<u>Creditors' Committee</u>") and the steering committee members of the ad hoc group of bondholders that have executed confidentiality or non-disclosure agreements with NNL (the "<u>Bondholders' Committee</u>") have each agreed to support this Agreement.

2

NOW THEREFORE, THE PARTIES HEREBY AGREE THAT:

PART A – NNI FUNDING TO NNL; SETTLEMENT MATTERS

1. Funding.

    a. NNI shall pay to NNL a sum total of US$157 million (the "Total Payment"), payable in five equal installments of US$31.4 million in accordance with the schedule attached as Annex C hereto, subject to the following limitations:

        i. the first US$131 million of the Total Payment shall be paid on an indefeasible and permanent basis (the "Permanent Payment"); and

        ii. if it is determined, pursuant to a process to be agreed upon by NNL, NNI, the Creditors' Committee and the Bondholders' Committee, that the value of the NNI Interim Obligations is less than US$187 million (being the sum of the Total Payment and the January Payment), then any such portion thereof (being the difference between US$187 million and the value of the NNI Interim Obligations so determined) in excess of US$161 million (any such portion, the "Contingent Payment") shall be repaid by NNL to NNI on October 30, 2009.

    b. NNL's obligation to repay to NNI the Contingent Payment and interest, if any, thereon, shall be secured by a charge against all of the assets of the Canadian Debtors (the "Excess Funding Charge"), which charge shall be granted by order of the Canadian Court and shall rank *pari passu* with the existing court-ordered charge in favor of Export Development Canada (the "EDC Charge"); *provided, however,* that if the EDC Charge is extinguished, then in such case the Excess Funding Charge shall be a second-ranking charge in the Canadian Proceedings, subordinate only to the Administration Charge (and in the case of the Carling Facility, the Carling Facility Charges), and such Excess Funding Charge shall not rank *pari passu* with any other charge that exists or may be granted in the Canadian Proceedings. For the purposes of this provision, the terms "Administration Charge," "Carling Facility" and "Carling Facility Charges" shall have the same meaning as ascribed to each such term in the initial order granted by the Canadian Court on the Filing Date in the Canadian Proceedings, as amended and restated from time to time (the "Canadian Initial Order").

    c. Simple interest shall be payable on the Contingent Payment at the time of repayment at a rate of 10% per annum and shall accrue from the date of NNL's receipt of the Contingent Payment to, but not including, the date of repayment.

    d. Upon payment in full of the Contingent Payment and any accrued interest thereon, the Excess Funding Charge shall be automatically extinguished.

2.  Use of Funds; Reporting.

    a.  NNL has informed NNI, the Creditors' Committee and the Bondholders' Committee, that NNL intends to use the funds from the Total Payment for working capital and those other purposes as reflected in the 13 Week CF Forecast (as defined below) (the "Permitted Uses"). To the extent NNL seeks to use funds from the Total Payment for purposes other than the Permitted Uses, NNL must obtain the consent for such uses from NNI, the Creditors' Committee and the Bondholders' Committee.

    b.  NNL and NNI shall continue to provide to the Creditors' Committee and the Bondholders' Committee, on a weekly basis, (i) rolling 13-week cash flow forecasts (each, a "13 Week CF Forecast"), and (ii) reports on actual weekly cash flow results. NNL further agrees to provide, to the extent not already provided in accordance with the foregoing sentence, each of NNI, the Creditors' Committee and the Bondholders' Committee with a cash flow schedule showing payments for the preceding monthly period and the use of proceeds from the Total Payment to the extent received by NNL, such schedule to be provided no later than the tenth day following the last day of each month commencing with the cash flow schedule for June 2009 and ending with the cash flow schedule for September 2009.

3.  Maximum Payment; Full and Final Settlement.  The sum of the Total Payment and the January Payment (being US$187 million) represents (A) the maximum payment that the US Debtors may or could owe in respect of the NNI Interim Obligations, (B) the maximum administrative claim (or such other applicable priority claim) that any of the Debtors (excluding the US Debtors) may have or could assert against one or more US Debtors in any Proceedings with respect to the NNI Interim Obligations, whether pursuant to Sections 503 and 507 of the Bankruptcy Code or otherwise, and (C) constitutes a full and final settlement of any and all NNI Interim Obligations. Each of NNL and the other Canadian Debtors hereby agrees to indemnify, defend and hold harmless each US Debtor from and against any and all actions, suits, claims, proceedings, costs, damages, losses, liabilities, judgments, amounts, fines, penalties, levies, compensations paid in settlement (provided NNL has agreed in writing to any such settlement or such settlement has been approved pursuant to a final court order), and expenses (including without limitation reasonable attorneys' fees and disbursements) resulting from a claim, demand, lawsuit, action or proceeding relating to, arising from or in connection with Transfer Pricing Payments for the calculation period in the applicable Transfer Pricing Agreements in respect of the Canada/US Interim Period.

4.  Settlement of Motions.  It is expressly understood that Part A of this Agreement is intended to constitute a full and final settlement of all of the matters set forth in Part A of this Agreement whether arising during, or related to, the Canada/US Interim Period, including, without limitation, any funding motions of the Canadian Debtors and the US Debtors scheduled to be heard by the Canadian Court and the US Court on June 29 and 30, 2009 or such later date or dates as might be agreed or ordered.

4

5. <u>True-up Obligations</u>. NNL agrees to use commercially reasonable efforts to recover from Nortel Group entities, other than the Debtors (collectively, "<u>Other Nortel Group Companies</u>"), Transfer Pricing Payments that are determined to be owed to the Canadian Debtors by Other Nortel Group Companies with respect to the Canada/US Interim Period (the "<u>ONGC Costs</u>"). Solely to the extent that the Canadian Debtors actually receive funds in respect of the ONGC Costs from the Other Nortel Group Companies in excess of the amounts provided in the Canadian Debtors' forecast, based on that certain March 2009 Financial Outlook dated April 14, 2009 previously furnished to the Parties, from the Other Nortel Group Companies that are payors, with respect to such ONGC Costs (the "<u>Excess Recoveries</u>"), and it is also determined, pursuant to the process referred to in Section 1.a.ii above, that the value of the NNI Interim Obligations is less than US$161 million (such difference, the "<u>Overage Amount</u>"), the Canadian Debtors shall, in addition to any payments made or required to be made in accordance with Section 1.a.ii. above, pay U.S. Pro Rata Excess Recoveries (as defined below) to NNI, on behalf of the US Debtors, in an aggregate amount no greater than the lesser of (i) the Overage Amount, and (ii) US$30 million (the "<u>Maximum Overage Repayment</u>") within 30 days of the date of determination thereof; *provided, however,* that some or all of such payment shall not be made to the extent that such payment would, in the reasonable and sole judgment of the Monitor, after consultation with the Creditors' Committee and the Bondholders' Committee, materially and adversely impact the liquidity position of NNL, based on a pro forma 13 Week CF Forecast (giving pro forma effect to such payment) prepared by NNL, with assistance from the Monitor, and provided in advance of such decision by the Monitor to the Creditors' Committee and the Bondholders' Committee (the "<u>NNL Liquidity Review Procedures</u>"). The unpaid balance, if any, of the Maximum Overage Repayment shall be carried forward and shall be payable out of future U.S. Pro Rata Excess Recoveries actually received by the Canadian Debtors from Other Nortel Group Companies that are payors, subject to the NNL Liquidity Review Procedures outlined above, until paid in full. For the purposes of this Section, "<u>U.S. Pro Rata Excess Recoveries</u>," as of any date of determination shall equal the product of (i) the Excess Recoveries as of such date of such determination (excluding any Excess Recoveries in respect of which NNI has been paid U.S. Pro Rata Excess Recoveries in accordance with this Section 5) and (ii) a fraction (x) the numerator of which shall equal US$161 million *minus* the Overage Amount and (y) the denominator of which shall equal the aggregate amount of Transfer Pricing Payments payable or paid to the Canadian Debtors by Nortel Group entities (excluding the Canadian Debtors) that are payors for the Canada/US Interim Period (rounded to four decimal points).

## PART B – EMEA SELF-FUNDING; SETTLEMENT MATTERS

6. <u>Administration; Funding</u>.

   a. NNUK is hereby irrevocably authorized to seek payment for its own account from other EMEA Debtors of Transfer Pricing Payments owed, or as such payments become due, under the relevant Transfer Pricing Agreements during, or with respect to, the EMEA Interim Period which would otherwise be made to or administered by NNL, in consideration of the full and final settlement set out in Section 8 below. Each of the EMEA Debtors hereby appoints NNUK as its agent

5

(without liability, including as to failure of any EMEA Debtor to make any Transfer Pricing Payment) to administer the collection and pro rata distribution of the Transfer Pricing Payments received, solely with respect to the EMEA Interim Period, as detailed on Annex D hereto. Each of the EMEA Debtors agrees that the payments set out in Annex D shall be made to NNUK in cleared funds and without set-off, in consideration of the matters set out in this Agreement, within 30 days of the date hereof, except as otherwise agreed between any EMEA Debtor and NNUK. To the extent that any EMEA Debtor breaches any obligation to make its Transfer Pricing Payment with respect to the EMEA Interim Period, only NNUK and none of NNL, NNI or any of their other affiliates shall have any claim against such defaulting EMEA Debtor for such payment and no EMEA Debtor shall have any claim against NNL, NNI or any of their affiliates (other than such EMEA Debtor) for such payment.

b. Subject to the terms of this Agreement (including without limitation Sections 12.a. and 13.b. of this Agreement), NNL shall pay to NNUK the sum of US$10 million (the "First Shortfall Payment"), such amount to be paid out of the sale proceeds allocated to, and actually received by, NNL from the sale of assets entered into subsequent to the date hereof where the aggregate amount of one or more allocations of sale proceeds to NNL from such sale (after taking into account all purchase price adjustments, taxes and other transaction costs, and excluding the amount of any holdback or escrow for indemnification or otherwise) exceeds the amount previously communicated to the Joint Administrators by NNL in a letter dated the date hereof (with copies to the Monitor, the Creditors' Committee and the Bondholders' Committee) and such communication having been counter-signed by the Joint Administrators (such sale, a "Material Asset Sale"); *provided, however,* that some or all of such payment shall be subject to NNL Liquidity Review Procedures (in this case, however, the NNL Liquidity Review Procedures shall provide the UK Administrator with the same information and consultation rights as provided to the Creditors' Committee and the Bondholders' Committee under the procedures set forth in Section 5 of this Agreement and shall give pro forma effect to such payment and take into account any payments actually received by NNL in connection with such Material Asset Sale).

c. Subject to the terms of this Agreement (including without limitation Sections 12.a. and 13.b. of this Agreement), NNL shall pay to NNUK the sum of US$10 million (the "Second Shortfall Payment" and together with the First Shortfall Payment, the "Shortfall Payments"), such amount to be paid out of the sale proceeds of a Material Asset Sale allocated to, and actually received by, NNL; *provided, however,* that some or all of such payment shall be subject to NNL Liquidity Review Procedures (modified as set forth in Section 6.b. above).

d. The unpaid balance of the Shortfall Payments, if any, shall be carried forward and shall be paid in full or in part to NNUK on the earlier of the date or dates that, (i) in the reasonable and sole judgment of the Monitor, upon consultation with the Creditors' Committee and the Bondholders' Committee, after the

6

application of the NNL Liquidity Review Procedures (giving pro forma effect to such payment) such payment would not materially and adversely impact the liquidity position of NNL, and (ii) sale proceeds are allocated to, and actually received by, NNL from one or more subsequent Material Asset Sales, subject to the NNL Liquidity Review Procedures (giving pro forma effect to such payment and taking into account the payments actually received by NNL in connection with such Material Asset Sales), until paid in full. The obligation relating to the Shortfall Payments shall be an obligation of NNL only and of no other entity within the Nortel Group. Until the Shortfall Payments have been fully paid, NNL shall (i) promptly notify NNUK of the signing and closing of any Material Asset Sale, (ii) provide material information regarding such Material Asset Sale as may be reasonably requested by the UK Administrator, and (iii) upon actual receipt of sale proceeds from such Material Asset Sale, NNL shall promptly inform NNUK of the calculation and allocation of the sale proceeds from such Material Asset Sale to NNL. For the avoidance of doubt, any Shortfall Payments relating to any Material Asset Sale shall not be used as any basis for claiming that the purchase price allocation to NNUK in respect of such Material Asset Sale has been satisfied in whole or in part, and the Shortfall Payments shall not be excluded from the total amount of sale proceeds available for allocation to the relevant parties to such Material Asset Sale.

e.  NNL's obligation to make the Shortfall Payments shall be secured by a charge against all of the assets of the Canadian Debtors (the "Shortfall Charge"), which charge shall be granted by order of the Canadian Court and shall at all times rank *pari passu* with the Inter-company Charge (as defined in the Canadian Initial Order and as modified from time to time, including without limitation any modifications relating to the priority of such charge). Without prejudice to the previous sentence, NNUK hereby acknowledges that any current or future charges that have been, or may be, granted to the US Debtors in connection with any funding provided by the US Debtors to the Canadian Debtors may, or could, be senior to the Shortfall Charge, and consents to such charges being senior to the Shortfall Charge.

f.  The Canadian Debtors and the EMEA Debtors hereby confirm that the Shortfall Payments resulted from arm's length negotiations among such Parties.

g.  In the event of any breach of Section 12.a. in connection with the Subject Transaction by any EMEA Debtor, NNL's obligation to make any Shortfall Payments shall be automatically forfeited, and the Shortfall Payments shall not be payable pursuant to Sections 6.b. and 6.c. of this Agreement under any circumstances. In addition, in such circumstances the Shortfall Charge shall be automatically extinguished.

h.  The Canadian Debtors and the EMEA Debtors hereby confirm that the calculation of the payments set forth in Annex D resulted from arm's length negotiations among such Parties and are based on principles to fairly allocate profits and costs among the EMEA Debtors.

7

7. <u>Covenants</u>.

    a. [left intentionally blank].

    b. In respect of NNSA, the EMEA Debtors shall use commercially reasonable efforts to obtain (i) within 30 days of the date hereof, a letter from the NNSA Administrator and the NNSA Liquidator (to the extent legally required) authorizing the UK Administrator to bind NNSA to all provisions of this Agreement applicable to an EMEA Debtor, other than Sections 11.a., 11.b. and 12 of this Agreement, and (ii) within 45 days of the date hereof, a letter from the NNSA Administrator and the NNSA Liquidator (to the extent legally required) authorizing the UK Administrator to bind NNSA to Sections 11.a., 11.b. and 12 as applicable to an EMEA Debtor. The EMEA Debtors hereby agree to provide copies of such letters, upon receipt, to NNL (on behalf of the Canadian Debtors), NNI (on behalf of the US Debtors), the Creditors' Committee and the Bondholders' Committee.

8. <u>Maximum Payment; Full and Final Settlement</u>. Except with respect to the obligation of NNL to make the Shortfall Payments as herein provided, this Agreement shall constitute a full and final settlement of any and all Transfer Pricing Payments owing between (i) the EMEA Debtors *inter se*, and (ii) an EMEA Debtor, on the one hand, and a Canadian Debtor or a US Debtor, on the other hand, as Transfer Pricing Payments under the Transfer Pricing Agreements for all calculation periods or parts thereof within the EMEA Interim Period including, without limitation, any subsequent determination by any revenue authority with respect to the EMEA Interim Period giving rise to any subsequent liability to taxation of any Party hereto. Upon payment of the Shortfall Payments in full, the Shortfall Charge shall be automatically extinguished.

9. <u>Settlement of Claims Between the US/Canadian Debtors and the EMEA Debtors</u>. It is expressly understood that Part B of this Agreement is intended to constitute a full and final settlement of all of the matters between the US and Canadian Debtors, on the one hand, and the EMEA Debtors, on the other hand, set forth in Part B of this Agreement whether arising during, or related to, the EMEA Interim Period.

PART C – <u>PROVISIONS OF GENERAL APPLICATION</u>

10. <u>Scope of this Agreement</u>. The Parties hereto agree that:

    a. this Agreement is not, and shall not be deemed to be, an acknowledgement by any Party of the assumption, ratification, adoption or rejection of the Transfer Pricing Agreements or any other Transfer Pricing methodology employed by the Nortel Group or its individual members for any purpose nor shall it be determinative of, or have any impact whatsoever on, the allocation of proceeds to any Debtor from any sale of assets of the Nortel Group; and

    b. this Agreement shall not have any effect on any claims as to amounts owed or purported to be owed to or by any Party, either: (i) prior to the Filing Date, or (ii)

after the Canada/US Interim Period or the EMEA Interim Period, as applicable; *provided, however,* the Parties agree, except as specifically provided herein, that payments required hereunder shall be made in accordance with the terms hereof regardless of any actual or purported right of offset or other defense; and

c.  this Agreement shall not serve as the basis for any claim by any Party against any other Party in respect of Transfer Pricing or any other theory of cost reimbursement in respect of any period prior to or after the Canada/US Interim Period or the EMEA Interim Period, as applicable, or allocation of any sale proceeds, or any ownership of intellectual property; and

d.  each Party approves all payments to be made pursuant to this Agreement and all other matters contemplated hereby, to the extent that such Party is a creditor of the Party making such payment; and

e.  this Agreement is without prejudice to any provision of the Master R&D Agreement, except full and final settlement in relation to Transfer Pricing Payments with respect to the Canada/US Interim Period or the EMEA Interim Period, as applicable, as set out herein; and

f.  this Agreement is without prejudice to any Party's claims relating to Inter-Company Trading Payments, whether pursuant to the GSPAs or the Trading Orders; *provided, however,* that upon satisfaction of the Conditions, it is expressly understood and agreed that the GSPAs do not require, and shall be deemed not to have required, any Party to make Transfer Pricing Payments.

11. **Relinquishment of Intellectual Property Licenses.**

a.  Each of the US Debtors and the EMEA Debtors hereby agrees to enter into an Appropriate License Termination (as defined below) with respect to the licenses and rights granted by NNL to such Debtors under or pursuant to the provisions of the Master R&D Agreement (such licenses and rights, the "IP Licenses") for the purpose of facilitating, and in consideration of a right to an allocation, to be determined in accordance with this Section 11, to such Debtors of portions of the sale proceeds from, the sale of any material assets of any of the Canadian Debtors and/or the US Debtors to a third party (an "Asset Sale"); *provided, however,* that (x) in the case of the US Debtors, no Appropriate License Termination shall be effective without the prior written consent of the Creditors' Committee and the Bondholders' Committee (which consent in each case shall not be unreasonably withheld), and (y) in the case of the EMEA Debtors, Appropriate License Terminations shall be limited to only those Asset Sales where the project name of the referenced proposed transaction or/and the description of the scope of assets, businesses and technologies covered by such Asset Sales have been previously communicated to the Joint Administrators by NNL in a letter dated the date hereof (with copies to the Monitor, the Creditors' Committee and the Bondholders' Committee) and such communication having been counter-signed by the Joint Administrators.

9

b. For the purposes of this Agreement, the term "<u>Appropriate License Termination</u>" means an agreement to be entered into between NNL, the US Debtors and the EMEA Debtors, providing, effective as of the date of closing of each Asset Sale, (i) for the termination of the IP Licenses (including the right to sublicense) with respect only to any intellectual property used in or related to the businesses or assets being sold in that Asset Sale (the "<u>Transaction IP</u>"); (ii) for the grant by NNL or for the procurement by NNL of the grant by the relevant purchaser of the Transaction IP, as applicable, of a non-exclusive license or sublicense, as applicable, to the EMEA Debtors permitting each such EMEA Debtor to use the Transaction IP to the extent necessary for such Debtor to continue, for the purposes of winding-down its business, the use of such Transaction IP (except for any Transaction IP that is used exclusively in or relates exclusively to the businesses or assets which are the subject of that Asset Sale), as such Transaction IP is being used by such Debtor as of the date of closing of such Asset Sale and only in connection with the types of products and services sold or provided by such Debtor as of that date, including to perform such Debtor's obligations under any customer contract or end user contract that is in existence as of the date of closing of such Asset Sale and is not assigned to the purchaser in such Asset Sale, solely as such contract and such obligations are in effect as of that date (the "<u>Existing Customer Contract</u>"), with the right to sublicense the Transaction IP to such customers (but not to any person or entity which is not a customer of such Debtor as of the date of closing of such Asset Sale) to the extent required under the applicable Existing Customer Contract; (iii) that the foregoing non-exclusive license shall terminate on the date of termination of the applicable Existing Customer Contract (except to the extent that such license remains in effect with respect to the performance of any other Existing Customer Contracts), it being understood that the term of the Existing Customer Contract shall not be extended or renewed beyond its scheduled expiry date except to the extent any automatic extension rights are in effect at the date of closing of such Asset Sale that may be exercised solely at the option of the other party to the relevant Existing Customer Contract without the consent of the Debtor party to such Contract; *provided, however*, that in the event of such automatic extension such Debtor shall be required to seek to terminate the Existing Customer Contract as soon as possible in accordance with the terms of such Existing Customer Contract; and (iv) that the Appropriate License Termination shall not affect the ownership rights that such Debtors and NNL may have to any intellectual property. For the avoidance of doubt, the Appropriate License Termination will not be deemed to be or result in an expiry or termination of the Master R&D Agreement.

c. The Parties hereby agree that, within a reasonable period of the date hereof, the Debtors shall negotiate in good faith and attempt to reach agreement on a timely basis on a sample form agreement to effectuate an Appropriate License Termination, such form to include more specific details as to the scope of "used in or related to", as used in clause (i) of the definition of the term "Appropriate License Termination." In addition, the Parties hereby agree that such sample form agreement shall have additional provisions that the Parties deem appropriate and customary for such license termination agreements.

10

d. Where any Debtor enters into any Appropriate License Termination in accordance with the provisions of this Section 11, such Debtor shall be deemed to be a Selling Debtor, and the proceeds of such Asset Sale shall be deemed to be Sale Proceeds, for the purposes of Sections 12.b. and 12.d., and Sections 12.b. and 12.d. shall apply accordingly.

12. Entry into Sale Transactions.

a. Each Debtor hereby agrees that its execution of definitive documentation with a purchaser (or, in the case of any auction, the successful bidder in any such auction) of, or closing of any sale of, material assets of any of the Debtors to which such Debtor (a "Selling Debtor") is proposed to be a party (each, a "Sale Transaction") shall not be conditioned upon such Selling Debtor reaching agreement with the other Selling Debtors regarding (A) allocation of the sale proceeds ("Sale Proceeds") from the relevant Sale Transaction or (B) the binding procedure for the allocation of Sale Proceeds from the relevant Sale Transaction.

b. Pending the distribution of the Sale Proceeds as described in the second sentence of this Section 12.b., the entire amount of the Sale Proceeds (less applicable transfer or value-added taxes and, to the extent agreed by the Selling Debtors, transaction costs) shall be deposited in an escrow account pursuant to an escrow agreement, the terms of which shall be negotiated and agreed by all Selling Debtors, in each case acting reasonably (the "Escrow Account"). In no case shall there be any distribution from the Escrow Account in advance of either (i) agreement of all of the Selling Debtors or (ii) in the case where the Selling Debtors fail to reach agreement, determination by the relevant dispute resolver(s) under the terms of the Protocol (as defined below) applicable to the Sale Proceeds, and subject in each case to payment of the agreed or determined amount of allocation of Sale Proceeds to all Selling Debtors.

c. Without derogating from the obligations provided in Section 12.a., the Debtors shall, as soon as reasonably practicable following the execution of this Agreement, negotiate in good faith and attempt to reach agreement on a timely basis on a protocol for resolving disputes concerning the allocation of Sale Proceeds from Sale Transactions (the "Interim Sales Protocol"), which Protocol shall provide binding procedures for the allocation of Sales Proceeds where the Selling Debtors in such Sale Transaction have been unable to reach agreement regarding such allocation.

d. The Selling Debtors shall, immediately following entry into any Sale Transaction, negotiate in good faith and on a timely basis to attempt to reach agreement regarding the allocation of the Sale Proceeds from such Sale Transaction within a reasonable period of time or as may be otherwise provided in the Interim Sales Protocol, failing which the Interim Sales Protocol shall apply to determine the allocation of the relevant Sale Proceeds.

11

e.  Notwithstanding any other provision of this Section 12, (i) no Debtor shall be required to enter into a Sale Transaction so long as such Debtor reasonably determines, acting in good faith and after consultation with the other Parties to this Agreement, that such Sale Transaction is not in the best economic interests of its creditors generally, and (ii) it is expressly acknowledged by all Debtors that, in relation to any Sale Transaction, neither (A) any matter in the course of negotiation with any prospective purchaser, nor (B) any discussion of, or agreement in relation to, the sharing of liabilities relating to such Sale Transaction (which include severance and other restructuring costs of each Selling Debtors) and sharing of transaction costs relating to such Sale Transaction (which include break fees and indemnification escrow accounts) between the Selling Debtors shall constitute a breach of Section 12.a. of this Agreement.

f.  Nothing in this Section 12 shall prejudice the rights of any Party, or otherwise constitute an amendment, modification or waiver of the rights of any Party, to seek its entitlement to Sale Proceeds from any Sale Transaction.

g.  For the purposes of Sections 11.c. and 12.a. through 12.f. (inclusive):

   i.  the US Debtors hereby agree that with respect to any of the matters referred to in such Sections as to which the agreement or determination of any of the US Debtors is required, the US Debtors shall include the Creditors' Committee and the Bondholders' Committee in any negotiations on such issues with the other Debtors or any related proceedings and any agreement or determination by the US Debtors shall require the prior consent of the Creditors' Committee and the Bondholders' Committee acting in good faith; and

   ii.  the Canadian Debtors hereby agree that with respect to any of the matters referred to in such Sections as to which the agreement or determination of any of the Canadian Debtors is required, the Canadian Debtors shall include the Bondholders' Committee in any negotiations on such issues with the other Debtors or any related proceedings and any agreement or determination by the Canadian Debtors shall require the prior consent of the Bondholders' Committee acting in good faith and the Monitor.

13. **Effectiveness**.

a.  No provision of this Agreement (other than as set forth in Section 13.f. of this Agreement) shall be effective until the satisfaction of the following conditions: (A) each of the US Court and the Canadian Court approving the entirety of this Agreement and all of the provisions hereof (the "<u>North American Court Condition</u>"), (B) the UK Court giving a direction (the "<u>UK Court's Directions</u>") that, if so sought, the Joint Administrators be at liberty to enter into this Agreement (the "<u>UK Court Condition</u>" and, together with the North American Court Condition, the "<u>Court Approval Condition</u>"); *provided, however,* the Joint Administrators may at their election waive the UK Court Condition, and (C) the

Canadian Court and the US Court approving amendments to the **cross-border protocol** previously approved by the US Court and the Canadian Court (as may be in effect from time to time, the "**Cross-Border Protocol**") that are mutually satisfactory to NNL (on behalf of the Canadian Debtors), NNI (on behalf of the US Debtors), the Monitor, the Creditors' Committee and the Bondholders' Committee (the "**Cross-Border Protocol Condition**", and together with the **Court Approval Condition**, the "**Conditions**").

b.  Upon satisfaction of each of the Conditions, all provisions of this Agreement, other than Sections 6.b., 6.c., 6.d., 6.e. and 6.f. of this Agreement, shall be effective as of the date of the satisfaction of the last Condition. Upon execution of the transaction documents relating to the Subject Transaction, Sections 6.b., 6.d., 6.e. and 6.f. of this Agreement shall be effective (except that the term "Shortfall Payments" as used in Sections 6.d., 6.e. and 6.f. shall mean only the First Shortfall Payment until Section 6.e. shall become effective). Upon agreement among the various sellers under the Subject Transaction and the Creditors' Committee and the Bondholders' Committee with regards to (A) the allocation of sale proceeds from the Subject Transaction or (B) the binding procedure for the allocation of sale proceeds from the Subject Transaction, Section 6.e. of this Agreement shall be effective. For the purposes of this Agreement, "**Subject Transaction**" means the first sale of any material assets of any one or more of the Debtors of each of (i) the Canadian Debtors, (ii) the US Debtors and (iii) the EMEA Debtors (excluding, for the avoidance of doubt, any sale where the involvement of the EMEA Debtors is solely limited to Appropriate License Terminations).

c.  Notwithstanding any of the foregoing, if (i) (x) the UK Court Condition is neither satisfied nor waived by the Joint Administrators in accordance with the terms of Section 13.a. and (y) the Canadian Court and the US Court approve this Agreement, and (ii) the Cross-Border Protocol Condition is fully satisfied, then Part A of this Agreement and those provisions of Part C applicable to Part A shall be effective with regard to the Canadian Debtors and the US Debtors.

d.  Each Party hereto shall:

i.  use commercially reasonable efforts to satisfy the Conditions as soon as possible, taking into account the availability of the respective Courts to address the matters set forth in this Agreement;

ii.  keep all other Parties, the Creditors' Committee and the Bondholders' Committee reasonably apprised of the progress of the satisfaction of the Conditions and provide such other information regarding the satisfaction of the Conditions as is reasonably requested by other Parties; and

iii.  use commercially reasonable efforts to allow any other Party, the Creditors' Committee and the Bondholders' Committee which so requests in writing reasonable participation in connection with any proceedings in

13

any Court related to the satisfaction of the Conditions; *provided, however,* that no Canadian Debtor or US Debtor shall have any obligation to facilitate the participation by the Joint Administrators or the EMEA Debtors in any proceedings related to the satisfaction of the Cross-Border Protocol Condition; and *provided further* that the foregoing proviso shall not constitute an amendment, modification or waiver of rights of the Joint Administrators and the EMEA Debtors to participate in any court proceedings where they would be entitled to otherwise participate.

e. If the Joint Administrators elect to seek the UK Court's Directions, then the EMEA Debtors shall (A) use commercially reasonable efforts to obtain the UK Court's Directions as soon as possible, taking into account the availability of the UK Court, (B) keep all other Parties, the Creditors' Committee and the Bondholders' Committee reasonably apprised of the progress of the efforts to obtain UK Court's Directions and provide such other information regarding the efforts to obtain UK Court's Directions as reasonably requested by other Parties, and (C) use commercially reasonable efforts to allow any other Party, the Creditors' Committee or the Bondholders' Committee which so requests in writing reasonable participation in connection with any proceedings in the UK Court related to the UK Court Directions.

f. Notwithstanding any of the foregoing, the following provisions of the Agreement shall be effective as of the date hereof: Sections 7.b., 11.e., 12.c., 12.g., 13.d, 13.e., 13.f.,15 – 19, and 21 – 2

14. <u>Term</u>. This Agreement shall expire on December 31, 2009 (the "<u>Expiration Date</u>"). Upon termination, the Parties' rights and obligations, except in respect of the obligations under Sections 1, 2, 3, 4, 5, 6, 8, 9, 10, 11, 12, 14, 15, 16, 17, 20, 21 and 22 of this Agreement (but only to the extent that these provisions were effective in accordance with Section 13 of this Agreement prior to the Expiration Date) shall cease immediately but without prejudice to the rights and obligations of the Parties existing before termination.

15. <u>Amendments</u>. This Agreement may be amended, on no less than 10 Business Days' notice, only by means of a writing signed by all Parties, and approved by the Creditors' Committee and the Bondholders' Committee, which amendments, if material in the judgment of the Parties, must be approved by the Courts that initially approved this Agreement or gave directions in respect of this Agreement (in the case of the UK Court). For the purpose of this Section 15, "Business Day" shall mean a day that is not a Saturday, Sunday or national public holiday in Canada, the United States or the United Kingdom.

16. <u>Governing Law and Jurisdiction</u>.

a. This Agreement shall be governed exclusively by the laws of the State of New York without regard to the rules of conflict of laws of the State of New York or any other jurisdiction; provided, however, that Section 17 shall be governed exclusively by English law.

b. To the fullest extent permitted by applicable law, each Party (i) agrees to submit to the non-exclusive jurisdiction of the US and Canadian Courts (in a joint hearing conducted under the Cross-Border Protocol adopted by such Court, as it may be in effect from time to time), for purposes of all legal proceedings to the extent relating to the matters raised in this Agreement (but not, for the avoidance of doubt, any Transfer Pricing Agreement matter generally), (ii) agrees that any claim, action or proceeding by each Party seeking any relief whatsoever to the extent relating to the matters raised in this Agreement must be commenced in the US Court if such claim, action or proceeding would solely affect the US Debtors, the Canadian Court if such claim, action or proceeding would solely affect the Canadian Debtors, a joint hearing of both the Canadian and US Courts conducted under the Cross-Border Protocol if such claim, action or proceeding would affect the Canadian Debtors and the US Debtors or the EMEA Debtors and the English courts if such claim, action or proceeding would solely affect the EMEA Debtors, (iii) waives and agrees not to assert any objection that it may now or hereafter have to the laying of the venue of any such action brought in such a Court or any claim that any such action brought in such a Court has been brought in an inconvenient forum, (iv) agrees that mailing of process or other papers in connection with any such action or proceeding or any other manner as may be permitted by law shall be valid and sufficient service thereof, and (v) agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by applicable law; *provided, however,* that any claim, action or proceeding set forth in section 7 of this Agreement shall be brought exclusively in the English courts.

17. No Personal Liability of the Joint Administrators.

a. The Parties agree that the Joint Administrators have negotiated and are entering into this Agreement as agents for the EMEA Debtors to which they are appointed and that none of them, their firm, partners, employees, advisers, representatives or agents shall incur any personal liability whatsoever whether on their own account or in respect of any failure on the part of any Nortel Group company to observe, perform or comply with any of its obligations under this Agreement or in relation to any associated arrangements or negotiations.

b. The Joint Administrators are Party to this Agreement: (i) as agents of certain of the respective EMEA Debtors of which they are administrators; and (ii) in their own capacities solely to take the benefit of the statutory charges under Paragraph 99(3) of Schedule 1 of the United Kingdom Insolvency Act 1986 and enforcing the obligations of certain other Parties to this Agreement.

c. Notwithstanding anything in section 16, any claim, action or proceeding against the Joint Administrators (in their personal capacities (and not as agents for any EMEA Debtors) and relating thereto shall be governed exclusively by English law and subject to the exclusive jurisdiction of the English Courts.

18. <u>Creditors' Committee and</u> ~~Bondholders' Committee~~ <u>Support.</u>

    a.  Written confirmation has been received from the Creditors' Committee confirming that the members of the Creditors' Committee, after thorough review and due deliberation of this Agreement, have voted, in compliance with the by-laws of the Creditors' Committee, in favor of supporting this Agreement and have granted permission to their advisors to file appropriate materials with the applicable Courts in support of the motions by the Debtors for Court approval of this Agreement.

    b.  Written confirmation has been received from the counsel to the Bondholders' Committee confirming that the Bondholders' Committee has granted permission to its advisors to file appropriate materials with the applicable Courts in support of the motions by the Debtors for Court approval of this Agreement.

19. <u>Representations and Warranties.</u>

    a.  Subject to satisfaction of the Court Approval Condition, each Party (but, for the avoidance of doubt, not the Joint Administrators in their personal capacities) hereby severally represents and warrants to each other that, as of the date hereof:

        i.  it has the power and authority to enter into this Agreement and to carry out its obligations hereunder;

        ii.  the execution of this Agreement and the consummation of the transactions contemplated herein, have been authorized by all necessary approvals, and no other act or proceeding on its part is necessary to authorize the execution of this Agreement; and

        iii.  this Agreement has been duly executed by it and constitutes its legal, valid and binding obligations.

    b.  Other than entities related to the regions of Asia / Pacific, Central and South America, NNSA and NNI, between whom each Party hereby severally represents and warrants to each other that, to the best of such Party's knowledge based on due and reasonable inquiry, including of NNL, it is not party to any Transfer Pricing Agreement with any other Nortel Group entity other than as set forth in this Agreement.

20. <u>Reservation of Rights.</u>  Nothing in this Agreement shall constitute an amendment, modification or waiver of any right of any Party (i) under any other agreement, including, without limitation, the GSPA and the Transfer Pricing Agreements (except as expressly set forth in Sections 3 and 7 of this Agreement), applicable law or otherwise, including, without limitation, the right to object to the propriety of any payments made under or in connection with the Transfer Pricing Agreements or any offset arising therefrom or otherwise or (ii) with respect to any potential tax contingencies, assessments, rulings or agreements arising from Transfer Pricing Payments pursuant to the Transfer Pricing Agreements or any offsets or the like or otherwise; *provided, however,* that the

Parties waive any and all rig... to obj... to o... otherwise seek to amend or revisit (A) any payments made pursuant to t.. Agr... ...nt, ...cept that (a) NNI and NNL do not waive their rights to the extent requ... ...to a... ...w NNL to enforce its rights against NNL pursuant to Sections 1.a.ii. and 5 of thi... ...gr... ...nt, an... (b) NNUK does not waive its rights to the extent required to allow ... ...UK... enforce it... rights against NNL pursuant to Section 6 of this Agreement, and (P... ...n January Paym... ...nt. The use of the term Transfer Pricing Payment (or any similar term... ...e reference to ... ...e Transfer Pricing Agreements (or similar agreement) in this A... ...ee...t is f...r convenience only and shall have no evidentiary effect or be us... ...i...ny of the Part...es hereto in any proceeding to determine the pre-petition or post-peti... ...alidi...y, appl...ability, assumption, affirmation or ratification by any Party of t... ...ransf...r Prici... ...greements or any transfer pricing methodology provided in th... ...nsfer Pricin... Agreements.

21. **Counterparts.** This Agr...ment may be executed in separate counterparts (which may include counterparts deliver...'...y fac...imile t...nsmission) and all of said counterparts taken together shall be deem...... ...to be... ...origi...al and shall be binding on the Party who signed the counterpart and a... ...f which...together shall constitute a single agreement.

22. **Severability.** In the event tha... ...y pr...ision of this Agreement shall be illegal, invalid or unenforceable, such provision... ...l... ...construe...l by limiting it in such a way so as to render it legal, valid and en...c...... ...whi...... to the maximum extent provided by applicable law, and the legality, validity and en...rce...bility of t...e remaining provisions shall not in any way be affected or impaire...l...y any illegality, invalidity or unenforceability of any provision. The Parties sha... ...n...oti... in good faith with respect to any provision to this Agreement found to be ille... ...nvali...l or unen...orceable, in order to agree on a substitute provision giving effect, to t... ...maxi...u...ext...t p...ssible, to the original intent of such provision.

23. **Several Obligations.** E...ep... ...spec...ically s...forth in this Agreement, the obligations of each Party hereunder ...e s...eral, ...d n...t j...nt and several.

24. **Defunct Distributors' Cove...** ...E...ch... ...the Debtors hereby covenants that such Debtor is not currently a party to, an...'...ll n...t...enter, into any arrangement pursuant to which any Transfer Pricing Paymen... ...p...a...le to or by the following entities: Nortel Networks OY, Nc...... ...s... ...AB, o... Nortel Networks Shannon Limited.

IN WITNESS WHEREOF, the Parties hereto have caused this Agreement to be duly executed and delivered as of this 9th day of June, 2009.

NORTEL NETWORKS CORPORATION

By _____
Name: Paviter S. Binning
Title: Executive Vice-President,
Chief Financial Officer and Chief
Restructuring Officer

By _____
Name: Tracy S. J. Connelly McGilley
Title: Assistant Secretary

NORTEL NETWORKS LIMITED

By _____
Name: Paviter S. Binning
Title: Executive Vice-President,
Chief Financial Officer and Chief
Restructuring Officer

By _____
Name: Tracy S. J. Connelly McGilley
Title: Assistant Secretary

NORTEL NETWORKS GLOBAL
CORPORATION

By _____
Name: Paviter S. Binning
Title: Director

By: _____
Name: Tracy S. J. Connelly McGilley
Title: Assistant Secretary

Signature page to Interim Funding
and Settlement Agreement

NORTEL NETWORKS INTERNATIONAL
CORPORATION

By _____
    Name: Paviter S. Binning
    Title: Director

By _____
    Tracy S. J. Connelly McGilley
    Assistant Secretary


NORTEL NETWORKS TECHNOLOGY
CORPORATION

By _____
    Name: Paviter S. Binning
    Title: Director

By: _____
    Name: Tracy S. J. Connelly McGilley
    Title: Assistant Secretary

Signature page to Interim Funding
and Settlement Agreement

NORTEL NETWORKS INC.

By _____
   Name: John Doolittle
   Title: Vice President


ARCHITEL SYSTEMS (U.S.)
CORPORATION

By _____
   Name: John Doolittle
   Title: Vice President


CORETEK, INC.

By _____
   Name: John Doolittle
   Title: Vice President


NORTEL ALTSYSTEMS, INC.

By _____
   Name: John Doolittle
   Title: Vice President


NORTEL ALTSYSTEMS
INTERNATIONAL INC.

By _____
   Name: John Doolittle
   Title: Vice President


NORTEL NETWORKS APPLICATIONS
MANAGEMENT SOLUTIONS INC.

By _____
   Name: John Doolittle
   Title: Vice President


Signature page to Interim Funding
  and Settlement Agreement

NORTEL NETWORKS CABLE
SOLUTIONS INC.

By _____
      Name: John Doolittle
      Title: Vice President

NORTEL NETWORKS CAPITAL
CORPORATION

By _____
      Name: John Doolittle
      Title: Vice President

NORTEL NETWORKS HPOCS INC.

By _____
      Name: John Doolittle
      Title: Vice President

NORTEL NETWORKS INTERNATIONAL
INC.

By _____
      Name: John Doolittle
      Title: Vice President

NORTEL NETWORKS OPTICAL
COMPONENTS INC.

By _____
      Name: John Doolittle
      Title: Vice President

NORTHERN TELECOM
INTERNATIONAL INC.

By _____
      Name: John Doolittle
      Title: Vice President

**Signature** page to Interim Funding
      and Settlement Agreement

QTERA CORPORATION

By _____
Name: John Doolittle
Title: Vice President

SONOMA SYSTEMS

By _____
Name: John Di Mittle
Title: Vice President

XROS, INC.

By _____
Name: John Doolittle
Title: Vice President

10-05-2009   01:02    FRAN-RADISSON SAS STRAND HOTEL              +46              T-141   P.002   F-787

Signed by ALAN BLOOM on behalf of each
of the Joint Administrators of each of the
EMEA Debtors over which they have been
appointed, without personal liability as
provided in Section 17 of this Agreement
and solely for the purpose of obtaining the
benefit of the provisions of this Agreement
expressed to be conferred on or given to each
of the Joint Administrators

By _____

Name: ALAN BLOOM

Title: ADMINISTRATOR

in the presence of: HELEN MACNAUGHTON

Witness Signature: _____

Name:

Address: 1 MORE LONDON PLACE
         LONDON SE1.

SIGNED for and on behalf of NORTEL        )
NETWORKS UK LIMITED (IN                   )    ALAN BLOOM
ADMINISTRATION)                           )
by ALAN BLOOM as Joint Administrator      )
(acting as agent and without personal
liability) in the presence of:

Witness signature _____

Name:    Helen Macnaughton
Address:    1 More London
            London (SE1)

**SIGNED** for and on behalf of **NORTEL
NETWORKS (IRELAND) LIMITED
(IN ADMINISTRATION)**
by **ALAN BLOOM** as Joint Administrator
(acting as agent and without personal
liability) in the presence of:

)
)
)
)

ALAN BLOOM

Witness signature

Name: Helen Monaghan
Address: 1 More London Place, London SE1,

**SIGNED** for and on behalf of **NORTEL
NETWORKS NV (IN
ADMINISTRATION)**
by **ALAN BLOOM** as Joint Administrator
(acting as agent and without personal
liability) in the presence of:

)
)
)
)

ALAN BLOOM

Witness signature

Name: Helen Monaghan
Address: 1 More London Place,
London (SE1)

**SIGNED** for and on behalf of **NORTEL
NETWORKS SPA (IN
ADMINISTRATION)**
by **ALAN BLOOM** as Joint Administrator
(acting as agent and without personal
liability) in the presence of:

)
)
)
)

ALAN BLOOM

Witness signature

Name: Helen Monaghan
Address: 1 More London Place
London SE1

SIGNED for and on behalf of NORTEL      )
NETWORKS BV (IN                         )    ALAN BLOOM
ADMINISTRATION)                         )
by ALAN BLOOM as Joint Administrator    )
(acting as agent and without personal
liability) in the presence of:

Witness signature

Name:   Helen Machuoghson
Address: 1 more London Place
         London SE1.

SIGNED for and on behalf of NORTEL      )
NETWORKS POLSKA SP Z.O.O. (IN           )    ALAN BLOOM
ADMINISTRATION)                         )
by ALAN BLOOM as Joint Administrator    )
(acting as agent and without personal
liability) in the presence of:

Witness signature

Name:   Helen Machuoghson
Address: 1 more London Place
         London SE1)

SIGNED for and on behalf of NORTEL      )
NETWORKS HISPANIA SA (IN                )    ALAN BLOOM
ADMINISTRATION)                         )
by ALAN BLOOM as Joint Administrator    )
(acting as agent and without personal
liability) in the presence of:

Witness signature

Name:   Helen Machuoghson

10-08-2009   01:03    FRÅN-RADISSON SAS STRAND HOTEL              +46              T-141   P.005/009  F-797

Address: *[handwritten]*

**SIGNED** for and on behalf of NORTEL     )
**NETWORKS (AUSTRIA)** GMBH (IN     )    **ALAN BLOOM**
**ADMINISTRATION)**     )
by **ALAN BLOOM** as Joint Administrator     )
(acting as agent and without personal
liability) in the presence of:

Witness signature *[signature]*

Name: *[handwritten]*
Address: *[handwritten]*

**SIGNED** for and on behalf of NORTEL     )
**NETWORKS SRO (IN**     )    **ALAN BLOOM**
**ADMINISTRATION)**     )
by **ALAN BLOOM** as Joint Administrator     )
(acting as agent and without personal
liability) in the presence of:

Witness signature *[signature]*

Name: *[handwritten]*
Address: *[handwritten]*

10-06-2009   01:03    FRAN-RADISSON SAS STRAND HOTEL        +46            T-141  P.006/009  F-787

SIGNED for and on behalf of NORTEL      )
NETWORKS ENGINEERING                    )    ALAN BLOOM
SERVICES KFT (IN                        )
ADMINISTRATION)                         )
by ALAN BLOOM as Joint Administrator
(acting as agent and without personal
liability) in the presence of:

Witness signature

Name:
Address:

SIGNED for and on behalf of NORTEL      )
NETWORKS PORTUGAL SA (IN                )    ALAN BLOOM
ADMINISTRATION)                         )
by ALAN BLOOM as Joint Administrator    )
(acting as agent and without personal
liability) in the presence of:

Witness signature

Name:
Address:

SIGNED for and on behalf of NORTEL      )
NETWORKS SLOVENSKO SRO (IN              )    ALAN BLOOM
ADMINISTRATION)                         )
by ALAN BLOOM as Joint Administrator
(acting as agent and without personal
liability) in the presence of:

Witness signature

PAGE 6/9 * RCVD AT 10/06/2009 01:00:27 [GMT Daylight Time] * SVR:XXX/X * DNIS:XX * CSID:XXX * DURATION (mm-ss):01-13

Name: _Helen ..._
Address: _1 more ... Price London SE1._

**SIGNED** for and on behalf of NORTEL
**NETWORKS ROMANIA** SRL (IN                    )
**ADMINISTRATION)**                              )     **ALAN BLOOM**
by **ALAN BLOOM** as Joint Administrator          )
(acting as agent and without personal            )
liability) in the presence of:

Witness signature _H.K. Machael_

Name: _Helen ..._
Address: _1 more ... Price London SE1._


**SIGNED** for and on behalf of NORTEL
**GMBH (IN ADMINISTRATION** )                    )     **ALAN BLOOM**
by **ALAN BLOOM** as Joint Administrator          )
(acting as agent and without personal            )
liability) in the presence of:

Witness signature _H.K. Machael_

Name: _Helen ..._
Address: _1 more ... London SE1._

10-06-2009  01:03   FRÅN-RADISSON SAS ST⦁⦁⦁ ⦁⦁⦁⦁         +46              T-141  P.008/009  F-747

SIGNED for and on behalf of NORTEL          )
NETWORKS OY (IN                             )     ALAN BLOOM
ADMINISTRATION)                             )
by ALAN BLOOM as Joint Administrator        )
(acting as agent and without personal
liability) in the presence of:

Witness signature

Name:  Helen M⦁⦁⦁⦁⦁⦁⦁⦁
Address:  ⦁⦁⦁⦁⦁ ⦁⦁⦁⦁⦁⦁⦁⦁

SIGNED for and on behalf of NORTEL          )
NETWORKS AB (IN                             )     ALAN BLOOM
ADMINISTRATION)                             )
by ALAN BLOOM as Joint Administrator        )
(acting as agent and without personal
liability) in the presence of:

Witness signature

Name:  Helen M⦁⦁⦁⦁⦁⦁⦁⦁
Address:  ⦁⦁⦁⦁⦁ ⦁⦁⦁⦁⦁⦁⦁⦁

SIGNED for and on behalf of NORTEL          )
NETWORKS INTERNATIONAL                      )     ALAN BLOOM
FINANCE AND HOLDING BV (IN                  )
ADMINISTRATION)                             )
by ALAN BLOOM as Joint Administrator
(acting as agent and without personal
liability) in the presence of:

Witness signature

Name:  Helen M⦁⦁⦁⦁⦁⦁⦁⦁
Address:  ⦁⦁⦁⦁⦁ ⦁⦁⦁⦁⦁⦁⦁⦁

SIGNED for and on behalf of NORTEL       )
NETWORKS FRANCE S.A.S. (IN              )    ALAN BLOOM
ADMINISTRATION)                         )
by ALAN BLOOM as Joint Administrator    )
(acting as agent and without personal
liability) in the presence of:

Witness signature

Name:
Address:

Schedule 1

Canadian Debtors

Nortel Networks Corporation
Nortel Networks Limited
Nortel Networks Global Corporation
Nortel Networks International Corporation
Nortel Networks Technology Corporation

Schedule **2**

US Debtors

Nortel Networks Inc.

Architel Systems (U.S.) Corporation

CoreTek, Inc.

Nortel Altsystems, Inc. (previously "Alteon WebSystems, Inc.")

Nortel Altsystems International Inc. (previously "Alteon WebSystems International, Inc.")

Nortel Networks Applications Management Solutions Inc.

Nortel Networks Cable Solutions Inc.

Nortel Networks Capital Corporation

Nortel Networks HPOCS Inc.

Nortel Networks International Inc.

Nortel Networks Optical Components Inc.

Northern Telecom International Inc.

Qtera Corporation

Sonoma Systems

Xros, Inc.

## Schedule 3

### EMEA Debtors

Nortel Networks UK Limited (In Administration)

Nortel Networks (Ireland) Limited (In Administration)

Nortel Networks NV (In Administration)

Nortel Networks SpA (In Administration)

Nortel Networks BV (In Administration)

Nortel Networks Polska Sp z.o.o. (In Administration)

Nortel Networks Hispania, SA (In Administration)

Nortel Networks (Austria) GmbH (In Administration)

Nortel Networks sro (In Administration)

Nortel Networks Engineering Services Kft (In Administration)

Nortel Networks Portugal SA (In Administration)

Nortel Networks Slovensko, sro (In Administration)

Nortel Networks Romania Srl (In Administration)

Nortel GmbH (In Administration)

Nortel Networks Oy (In Administration)

Nortel Networks AB (In Administration)

Nortel Networks International Finance & Holding BV (In Administration)

Nortel Networks France S.A.S. (In Administration)

Annex A

**Amendments to and Related Understandings Regarding**
**Master Research and Development Agreement**
**dated as of December 22, 2004 ("Master R&D Agreement")**

1. Undated Addendum to Master R&D Agreement executed between October 2005 and June 2006.

2. Agreement with Respect to Certain NN Technology effective as of December 30, 2006 (being the day before the closing date of the Share and Asset Sale Agreement between NNL and Alcatel-Lucent).

3. Addendum to Master R&D Agreement dated December 14, 2007 with an effective date of January 1, 2006.

4. Third Addendum to Master R&D Agreement with an effective date of January 1, 2006.

5. Fourth Addendum to Master R&D Agreement with an effective date of December 31, 2008.

6. Letter of acknowledgment dated January 14, 2009 from NNL to the Directors of NNUK, NNSA and NNIR and the UK Administrator.

7. Release in Connection with Master R&D Agreement dated 1 January 2009.

8. Memorandum of Understanding in Connection with Master R&D Agreement, undated with an effective date of 1 January 2006.

A-1

Annex B

Distribution Agreements

| Party | Date |
|-------|------|
| Nortel Networks Limited ("NNL") and Nortel Networks N.V. | undated, effective as of 1 January 2001 |
| NNL and Nortel Networks S.p.A. | undated, effective as of 1 January 2002 (plus undated and unsigned Addendum, effective as of 1 January 2003) |
| NNL and Nortel Networks B.V. | dated 22 December 2003, effective as of 1 January 2001 |
| NNL and Nortel Networks Polska Sp. z. o. o. | undated, effective as of 1 January 2001 (letter of amendment executed in November 2003, effective as of 1 January 2001 plus Addendum executed in August 2005, effective as of 1 January 2003) |
| NNL and Nortel Networks Hispania, S.A. | undated, effective as of 1 January 2001 |
| NNL and Nortel Networks (Austria) GmbH | undated, effective as of 1 January 2001 |
| NNL and Nortel Networks, s.r.o. | dated 15 April 2003, effective as of 1 January 2001 |
| NNL and Nortel Networks Engineering Services Kft | undated, effective as of 1 January 2001 |
| NNL and Nortel Networks Portugal S.A. | undated, effective as of 1 January 2001 |
| NNL and Nortel Networks Slovensko, s.r.o. | undated, effective as of 1 January 2001 |
| NNL and Nortel Networks Romania SRL | executed 22 January 2004, effective 1 January 2003 |
| NNL and Nortel Networks AG | undated, effective 1 January 2001 |

Annex C

Funding Schedule

Payments pursuant to Section 1.a. of this Agreement shall be paid in the following amounts and on the following dates (if the Conditions (other than the UK Court's Directions) are not satisfied by the payment dates set forth below, each such payment date shall be automatically postponed to one (1) business day after the date of satisfaction of such Conditions):

| | |
|---|---|
| June 10, 2009 | US$31,400,000.00 |
| June 15, 2009 | US$31,400,000.00 |
| July 31, 2009 | US$31,400,000.00 |
| August 31, 2009 | US$31,400,000.00 |
| September 30, 2009 | US$31,400,000.00 |
| **TOTAL** | **US$157,000,000.00** |

C-1

Annex **D**

Intra-EMEA Transfer Pricing Settlement Amounts

| **EMEA Debtor** | **Amount payable US$m** |
|---|---|
| [Nortel Networks S.A.][1] | [(4.80)] |
| Nortel Networks (Ireland) Limited | (20.84) |
| [Nortel Networks AG][1] | [(4.08)] |
| Nortel Networks Hispania SA | (1.72) |
| Nortel Networks Slovensko s.r.o | (0.52) |
| Nortel Networks Romania SRL | (0.19) |
| Nortel Networks Portugal S.A. | (1.50) |
| Nortel Networks Polska S.p.z.o.o | (8.22) |
| Nortel Networks B.V. | (17.99) |
| Nortel Networks S.p.A. | (2.73) |
| Nortel Networks Engineering Services Kft | (1.92) |
| Nortel Networks s.r.o | (2.79) |
| Nortel Networks N.V. | (6.43) |
| Nortel Networks Austria GmbH | (2.35) |

---

[1] To the extent it becomes a Party hereto.

D-1

| EMEA Debtor | Amount receivable US$m |
|---|---|
| Nortel Networks UK Limited | [4.80 (Nortel Networks S.A.)][1] |
| | 20.84 (Nortel Networks (Ireland) Limited) |
| | [4.08 (Nortel Networks AG)][1] |
| | 1.72 (Nortel Networks Hispania SA) |
| | 0.52 (Nortel Networks Slovensko s.r.o) |
| | 0.19 (Nortel Networks Romania SRL) |
| | 1.50 (Nortel Networks Portugal S.A.) |
| | 8.22 (Nortel Networks Polska S.p.z.o.o) |
| | 17.99 (Nortel Networks B.V.) |
| | 2.73 (Nortel Networks S.p.A.) |
| | 1.92 (Nortel Networks Engineering Services Kft) |
| | 2.79 (Nortel Networks s.r.o) |
| | 6.43 (Nortel Networks N.V.) |
| | 2.35 (Nortel Networks Austria GmbH) |

D-2

EXHIBIT D

## Kole, Maria

**Subject:**    Nortel - US Motion to approve Canadian Funding Agreement
**Attachments:** document2010-01-12-162108.pdf

**From:** GALE, STEPHEN
**Sent:** 12 January 2010 21:04
**To:** jpasquariello@goodmans.ca; James L BROMLEY
**Subject:** Nortel - US Motion to approve Canadian Funding Agreement

Jim and Joe

I attach a letter which outlines some concerns the Joint Administrators have to the the **Canadian Funding Agreement** which is subject to court approval on 21 January 2010. I thought it would be helpful if I set out these concerns in detail. I am hopeful our concerns will be able to be readily resolved between ourselves.

To give us time to discuss these issues, I request that the US Debtors grant us an extension to file any objection to the US motion to Monday 18 January 2010, 4:00pm (EST). Would you be able to let me know by COB today whether the US Debtors are prepared to grant us this extension?

Otherwise let me know when we can discuss the contents of this letter.

Many thanks

Kind regards

Steve

**Stephen Gale**
Partner
Herbert Smith LLP
Email: stephen.gale@herbertsmith.com
Tel: 020 7466 2878
Fax: 020 7098 4878
Mobile: 07785 254901

20/01/2010

# Herbert Smith

Goodmans LLP
Bay Adelaide Centre
333 Bay Street, Suite 3400
Toronto,ON
M5H 2S7
**For the attention of Joe Pasquariello**

Cleary Gottlieb, Steen & Hamilton LLP
One Liberty Plaza
New York, NY 10006
**For the attention of Jim Bromley**

Herbert Smith LLP
Exchange House
Primrose Street
London EC2A 2HS
T +44 (0)20 7374 8000
F +44 (0)20 7374 0888
DX 28

www.herbertsmith.com

Our ref
308899402/ 2878/ 1403
Your ref

Date
12 January 2010

Dear Jim and Joe

**Canadian Funding Agreement entered into by Nortel Networks Inc ("NNI") and Nortel
Networks Limited ("NNL"), amongst others**

I write on behalf of the Joint Administrators for each of the EMEA filed entities, in particular
Nortel Networks UK Limited ("NNUK"), Nortel Networks (Ireland) Limited ("NN Ireland") and
Nortel Networks SA ("NNSA") (collectively "EMEA Debtors").

I note from court filings that the US and Canadian Debtors entered into a Canadian Funding
Agreement ("CFA") on 23 December 2009. I also note that the motion for approval of the CFA is
set down for a joint hearing on 21 January 2010 with objections to be filed (in the US proceedings)
by 14 January 2010.

As you know, although NNL has not formally called for proofs of claims from intercompany
creditors, it is likely several EMEA Debtors will be substantial creditors of the Canadian Debtors.
As well, each of the EMEA Debtors have entered into intercompany agreements with the Canadian
Debtors.

The Joint Administrators have now had an opportunity to review the CFA. There are a few matters
which we have concerns about and which we would appreciate some clarification on from you. I
anticipate that these matters should be able to be readily resolved between us **without the need for
formal objections** or reservation of rights being made to the court. However, I am also conscious
that the date to file objections with the US court is 14 January 2010. To enable us to discuss our
concerns and seek the clarification that we require, I ask that the date for filing **objections** be
extended for the EMEA Debtors until 4:00pm (EST) on 18 January 2010. Please confirm that NNI
is prepared to grant us this extension.

Herbert Smith LLP is a limited liability partnership registered in England and Wales with registered number OC310006. It is regulated by the Solicitors' Regulation
Authority of England and Wales. A list of the members and their professional qualifications is open to inspection at its registered office, Exchange House, Primrose
Street, London EC2A 2HS. We use the word partner to refer to a member of Herbert Smith LLP, or an employee or consultant with equivalent standing and
qualifications.

10/25475993_2

 Herbert Smith in association with
Gleiss Lutz and Stibbe

## Herbert Smith

I set out our concerns below. I am, of course, happy to discuss these with you and, hopefully, to reach a resolution to them prior to 18 January 2010.

### Settlement of Covered Obligations

Clause 3 of the CFA states, inter alia, that the Settlement Payment is in full and final settlement of the Covered Obligations (as defined) and represents the maximum post-filing or administrative claim (or such other priority claim) that any of the Debtors (excluding the US Debtors) may have or could assert against one or more US Debtor in any proceeding with respect to the Covered Obligations. Debtors are defined in the CFA to include the EMEA Debtors. Obviously the EMEA Debtors are not a party to the CFA nor have they approved it or acceded to it. I am, therefore, puzzled as to why the CFA purports to prejudice the EMEA Debtors' rights to bring any claim (whether or not post-filing or administrative in nature or otherwise) against one or more of the US Debtors, especially in light of the fact that the CFA is to be approved by both the Canadian and the US Courts. I note that paragraph 33 of the US motion supporting the CFA states that this provision is only intended to be the maximum post-filing or administrative claim that any of the *Canadian Debtors* may have or could assert against one or more of the Debtors in any proceeding with respect to the Covered Obligations. Which statement, if either, correctly reflects the intent of the parties to the CFA? I would appreciate this concern being resolved by way of a minor amendment that makes abundantly clear that this provision only relates to the Canadian Debtors as against the US Debtors.

Second, the Covered Obligations relate to transfer pricing agreements, including the MRDA. As you will appreciate the MRDA is not a bilateral agreement, but a multilateral agreement between NNI, NNL, NNUK, NNSA and NN Ireland. Under that agreement NNL operates not only in its own right but also as "administrative agent" on behalf of the parties to that agreement. The CFA cannot prejudice any rights that NNUK, NNSA or NN Ireland have under the MRDA, including to call for the due performance of the agreement or to require NNL to act or bring any claim on its behalf. Equally, nothing in the CFA can alter the content or effect of the MRDA insofar as it relates to NNUK, NNSA or NN Ireland. Given the broad way clause 3 is drafted, the agreement could potentially impact the rights of NNUK, NNI Ireland and NNSA under the MRDA I therefore request that appropriate wording be included in the CFA or by way of side letter that makes clear that the rights of NNUK and NN Ireland and NNSA are unaffected by the CFA.

Third, I note that clause 4 of the CFA requires the Canadian Debtors to indemnify the US Debtors and to also reserve certain amounts from the Settlement Transactions or IP Transactions (as defined) to provide for any indemnity claims. We are confirm that any amounts that the Canadian Debtors reserve for this purpose will not be in excess and agreed by the Monitor, the Creditors' Committee and the Bondholders' Committee in advance of any NNL's liability payment to the NNL Liquidity Review Proceedings pursuant to clause 5 of the IFSA. Otherwise, this provision could affect the ability of the EMEA Debtors to recover the Settlement Payment under the IFSA.

Fourth, I would appreciate your reassurance and clarification as to the intent behind clauses 3 and 4 of the CFA. These provisions seem to suggest that the Canadian Debtors will be precluded from claiming against the Debtors or the US Debtors under any pricing claim is made against the Canadian Debtors for which they would be entitled, in turn, seek payment from the US Debtors. If this is the case, then it is a fundamental issue and I would appreciate information as to how an appropriate settlement amount ...



# Herbert Smith

(a) was determined and consisted; and

(b) can be supported without the knowledge of what other transfer pricing claims are, or are likely to be made.

## IRS Claim

I note that the CFA constitutes, legally, an allocation between the Canadian and US Debtors, in particular in relation to any liability to the IRS. Under the terms of the CFA the IRS claim is accepted by NNL. Part of the part of this claim is secured and the unsecured portion is allowed free from any set-off or cross-claim which will apply to other unsecured claims.

I anticipate that the US Debtors will provide in connection with the motion **to approve the CFA will provide an appropriately comprehensive summary of the settlement of the IRS claims and the rationale for supporting the claims of the US Debtors against the Canadian Debtors (including the secured versus** unsecured position and this order will assist the Joint Administrators in fulfilling their diligence requirements in relation to this issue. If an appropriately comprehensive summary will not set out all of the details for confidentiality reasons or otherwise, then the Joint Administrators would wish to work with the Monitor to better understand this aspect of the settlement and/or to fulfil its diligence requirements.

In that report or disclosure we would expect the following to be addressed:

(a) Clause 15 and the position where court approval will be sought in order to approve the settlement and US Debtors may make a claim against the Canadian Debtors prior to a formal tax liability amount being established. Further, the Canadian Debtor has intercompany claims available to the Canadian Debtor as against the US Debtor. Conversely, the US Debtors only restrict or settle a tax claim that relates to the matters which have been settled in the CFA. We would wish to understand the rationale behind this element of the CFA.

(b) We understand that in the current settlement an alleged overpayment by the US Debtors has been subsumed into the claim. As you will appreciate we do not have the necessary details and information on the basis on which the Canadian Debtors have decided on a settlement. We may require the providing more information, including in relation to:

a. the extent to which the claim's quantum has been admitted by NNL;

b. the intercompany claims of the Canadian Debtors including in relation to tax matters which have been settled; and

c. whether the US Debtors can recover any similar amount from any other entity and the information we currently have, we cannot prioritise this claim in the manner proposed or whether it is senior to any other Nortel entity.

Herbert Smith LLP and
Gleiss Lutz and Stibbe

Herbert ~ ...

The Joint Administr... ... ...'zr s ...'... ...'.. .. .'. in res.. .t of the IRS **claim including as to its validity, qu** ... ... ...'... ... ...'... ...'. ...'titute that claim. **Nothing in the acceptance of that c'... ...'. ...'... ...'... ... appro...l of it b.y the Canadian and US Courts should prejudice the** ... '... '... ... ... ... '.. ase confirm that **you agree to this proposition.**

**If it all possible, re**... ...'... ... ... of the Monitor's ... and **form of order being sought as soon as possible would g...** ... ...'... ... ing... ... ...'oint Administrators ... **properly informed and that we, in turn,** ... ... ... ... ... co... ... ... th. this upco...g ...otion. **This will permit us to deal wit'** ... ... ... ... ... ... ... ... ...sensual ...sis **without having to worry about the need** ... ... ... ... ... ... ...

**I would also** ...'e to ... ... ... ... ... ... .. ... ...' ...'et other ...ortel **entities and tax authorities** ... ...'... ... ... ... ... ... ... ... of its ... ...'... **for supporting the IRS claim for the p..po...** ... ... ... ... ... ... ... ...f...cing ...'...ed **tax claims against NNL and other** No... en... ...'s.

**Amendment** ... th...

**Clause 29 of** ... e C... ... ... ... ... ... ... ...'l be a...'... an **amendment to the IFSA requires** ... e c...se... ... ...'... ... ... ... the ...FSA. ..ow do **you propose to deal with this?**

**We susp...t th**... ... ... ... ... ...'... ... ...'... I... ... of ... urse, h**appy to discuss these wit'** ... ... ... ... ... ...'... ... ...'... ...lose ... ...'... ...s **in the US today that the US Debto...** ... ... ... ...'...'... ... ...'...ling ...'... ...'... ...n. **On the assumption that the US De...** ... ... ... ... ... ... ...'... ... ...'...'...ard to hearing f..om you more **comprehensive**... ... ...'...

Regards

Stephen G... ...
Partner
Herbert S...ith LLC

Herbert Smith Ho...'... ...'...on
Gleiss Lutz and '...'...n

Court File No.  09-CL-7950

**ONTARIO**
**SUPERIOR COURT OF JUSTICE – COMMERCIAL LIST**

IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT,* R.S.C. 1985, c. C-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL CORPORATION AND NORTEL NETWORKS TECHNOLOGY CORPORATION

APPLICATION UNDER THE *COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED

---

# FACTUM OF THE RESPONDENT,
## Nortel Networks UK Limited (In Administration)
### (Re: Motion Returnable January 21, 2010)

---

**DAVIES WARD PHILLIPS & VINEBERG LLP**
Barristers & Solicitors
44th Floor, 1 First Canadian Place
Toronto, ON  M5X 1B1

Robin B. Schwill (LSUC #38452I)
Tel:    416.863.5502
Fax:    416.863.0871

Lawyers for Nortel Networks UK Limited (In Administration)

Tor#: 2457720.4

Court File No.  09-CL-7950

***ONTARIO***
**SUPERIOR COURT OF JUSTICE – COMMERCIAL LIST**

IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL CORPORATION AND NORTEL NETWORKS TECHNOLOGY CORPORATION

APPLICATION UNDER THE *COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED

**FACTUM OF THE RESPONDENT,**
**Nortel Networks UK Limited (In Administration)**

**PART I ~ OVERVIEW**

1.         Capitalized terms used herein and not otherwise defined shall have the meaning ascribed to them in the Affidavit of Alan Robert Bloom, sworn on January 20, 2010 (the **"Bloom Affidavit"**) filed with the responding Motion Record of Nortel Networks UK Limited (In Administration) in response to the Applicants' motion returnable before this Court on January 21, 2010.

2.         Nortel Networks UK Limited (In Administration), on its own behalf and on behalf of the EMEA Debtors and the Joint Administrators (the **"Respondent"**) opposes certain relief being sought by the Applicants in their motion returnable

Tor#: 2457720.4

- 3 -

before this Court on January 21, 2010. In particular, the Respondent opposes this Court's approval of the CFA, the CRA APA and the creation and allowance of the NNI Claim (collectively, the **"Settlement Agreements"**).

3.        Approval of the Settlement Agreements will cause material and relevant prejudice to the Respondent and others so as to taint the process to the degree that the Court ought not to entertain the settlements contemplated by the Settlement Agreements. In addition, the Court has no evidence or material before it in order to conduct an analysis of the strengths and weaknesses of the case sufficient for the Court to conclude that the proposed settlement falls within the range of what is fair and commercially reasonable.

## PART II ~ FACTS

### The CFA is a Settlement Agreement

4.        The CFA represents a full and final settlement of any and all claims that the Applicants may have against the US Debtors in respect of the Services (as defined in the CFA) provided to NNI and related expenses incurred by NNL for the Settlement Period (as defined in the CFA).

Doolittle Affidavit, paras. 28, 32(a)(iii) and 32(d)(i).

5.        The CFA also represents an agreement to settle any overpayments made by NNI to NNL during the period 2001 to 2005 under the Nortel Transfer Pricing Regime (as defined in the Doolittle Affidavit) and certain of the net pre-filing obligations of NNI and NNL as a direct consequence of NNI reaching an agreement

with the Internal Revenue Service and NNL reaching a corresponding agreement with the Canada Revenue Agency (the CRA APA) by permitting and accepting a US$2.0627 billion claim by NNI against NNL (defined as the NNI Claim in the CFA).

Doolittle Affidavit, paras. 29, 31(e), 31(f), 32(a)(iii), 41 and 42.

6.          Neither the Doolittle Affidavit nor the Thirty-Fifth Report of the Monitor dated January 18, 2010 (the "35th Report") provide any explanation of the basis or rationale for such settlements that would permit this Court or any other party to conduct an analysis of the strengths and weaknesses of the claims being settled pursuant to the CFA.

7.          While the Respondent has requested, in writing, that such information to be provided by the Monitor, to date the Monitor has not provided this information.

Bloom Affidavit, para. 47.

**The Monitor's Expanded Powers**

8.          The Order of this Court made in these proceedings on August 14, 2009 expanding the powers of the Monitor (the **"August 14 Order"**) authorized and empowered the Monitor, among other things, to cause the Applicants to administer their property and operations as the Monitor considers necessary or desirable for the purposes of facilitating a Plan or Plans (as defined in the August 14 Order) for all or part of the business.

Bloom Affidavit, Exhibit B, para. 3(d).

9.          The handwritten endorsement of Mr. Justice Morawetz in connection

with the August 14 Order reads, in part, as follows:

>  In light of these circumstances and in furtherance of expanding
>  the powers of the Monitor, the Monitor advises that it will consult
>  on a timely basis (with regard to the circumstances) with the
>  Applicants' major creditors constituencies (in each case as
>  appropriate in light of their respective potential interests with
>  regard to the specific issue) in exercising powers in relation to
>  matters of material substance and that it will provide timely (with
>  regard to the circumstances) delivery of relevant information
>  reasonably requested by such appropriate creditor constituents,
>  subject to the terms of the Initial Order, as amended.

>  Bloom Affidavit, Exhibit C, pp. 3 and 4.

10.          The Applicants and the Monitor did not consult with the Respondent in

negotiating the CFA.

>  Bloom Affidavit, para. 36.

**Other Methods of Funding Were and Are Available to the Applicants**

11.          The Applicants had and continue to have other avenues of funding

available to them in order to deal with their liquidity issues but did not pursue and

have not pursued them.

>  Bloom Affidavit, para. 51.

**Existing Transfer Pricing Agreements**

The MRDA

12.          Since at least January 1, 2001, by the MRDA has governed the transfer

pricing arrangements between the Participating Nortel Entities.  The MRDA operates

in tandem with separate but dependant bilateral sale and distribution "Limited Risk Agreements" between the LR Distributors and NNL.

Bloom Affidavit, para. 14.

13.        The MRDA is the key agreement which governs transfer pricing arrangements for the Participating Nortel Entities that undertake research and development activity and thereby have incurred or are likely to incur research and development expenditure and which are granted licences in respect of intellectual property.

Bloom Affidavit, para. 15.

14.        The MRDA is a multilateral agreement between the Participating Nortel Entities and provides that NNL is to administer the agreement as between them.

Bloom Affidavit, para. 16.

15.        As provided for in Article 3(d) of the MRDA "NNL agrees to administer this Agreement. . . including without any limitation the making of any determinations required under the RPSM".    The residual profit split methodology ("**RPSM**") determines the compensation due to the Participating Nortel Entities for their respective research and development activity for the benefit of the Nortel group (see in particular Schedule A of the MRDA). With respect to seeking such payments from the Participating Nortel Entities, Article 3(g) of the MRDA provides that "[a]ny amount owing by a Participant under this Agreement will be due and payable immediately upon written notice of its R&D Allocation from NNL."

Bloom Affidavit, paras. 17, 18 and 19.

The Group Supplier Protocol Agreements

16.        The Transfer Pricing Agreements (along with other intra group agreements) were intended to facilitate intra-group trading.  To ensure that this intra-group trading continued and so as to allow the Nortel group to undergo a business and financial restructure, on January 14, 2009 to Group Supplier Protocol Agreements were entered into in respect of post administration intra-group trading of goods and services.  The GSPAs were entered into between NNL (and certain other Canadian entities) and each of the EMEA Debtors and separately between NNI (and certain other US entities) and each of the EMEA Debtors.  The GSPAs are otherwise in identical terms.  The GSPA with NNL was approved by this Court.

Bloom Affidavit, paras. 20 and 21.

17.        The GSPAs, as periodically extended, enable each of the EMEA Debtors (party to the GSPAs) to continue to trade with NNI (and certain other US entities) and NNL (and certain other Canadian entities) in the ordinary course on the basis that goods and services provided post administration would be paid for in full. The definition of "Goods and Services" in the GSPAs makes specific reference to the MRDA.

Bloom Affidavit, para. 22.

18.        As such, the Nortel entities that have contributed the most to research and development activity have continued to trade on the basis of the GSPA during the post-petition period.  As a result these entities have continued to incur trading

Tor#: 2457720.4

losses (which for some of these entities includes expenditure on research and development activity) in the expectation that they will recoup a significant proportion of such losses by operation of the Transfer Pricing Agreements as protected by the GSPAs.

Bloom Affidavit, para. 23.

The Interim Funding and Settlement Agreement

19.     Despite the operation of the GSPAs since 14 January 2009, and therefore the continuation of the Transfer Pricing Agreements within the Nortel group, the only payment that the Participating Nortel Entities made until the entry into the Interim Funding and Settlement Agreement on June 9, 2009 and as approved by this Court on June 29, 2009 (the "IFSA") that could arguably be said to have been one of the "true up payments" that are required to operate the Transfer Pricing Agreements, and in particular the MRDA, was a payment made in January 2009 of US$30 million by NNI to NNL.

Bloom Affidavit, para. 24.

20.     Without receiving the payments it normally received under the Transfer Pricing Agreements as protected by the GSPA for the period post administration NNL faced significant liquidity issues.   Further, NNL and NNUK continued to incur trading losses (which included research and development expenditure) on the basis of the GSPA during the post administration period. Both NNL and NNUK did so in the expectation that they would recoup a significant proportion of such losses by operation of the Transfer Pricing Agreements as protected by the GSPAs.

Bloom Affidavit, paras. 25 and 26.

21.        To resolve this and after lengthy negotiations the Canadian Debtors, US Debtors and EMEA Debtors entered into the IFSA to resolve NNL's liquidity issues and to enable NNUK to continue incurring trading losses. The IFSA Parties included all of the Participating Nortel Entities under the MRDA.

Bloom Affidavit, paras. 27 and 28.

22.        The IFSA essentially provided partial funding of NNL by NNI, in settlement of claims that NNL had made against NNI for amounts due under the Transfer Pricing Agreements for the period since the January 14, 2009 through until September 30, 2009 while NNL obtained sufficient liquidity to continue the process of selling its assets.  The IFSA also provided for the settlement of the amounts due under the Transfer Pricing Agreements for the period since the January 14, 2009 through until December 31, 2009 owed to NNUK.  The amounts owed to NNUK were satisfied first by way of self-settlement amongst the EMEA Debtors and second by two shortfall payments from NNL to bridge some of the gap between the amount actually owed to NNUK under the Transfer Pricing Agreements and the amount to be paid by the EMEA Debtors through self-settlement (the **"Shortfall Payments"**).  The IFSA takes pains to preserve the Nortel Entities' pre and post-filing claims against each other under the Transfer Pricing Agreements as well as their other agreements.

Bloom Affidavit, paras. 29 and 30.

23.        Whilst the IFSA sought to ensure the continued liquidity of NNL for the period up to September 30, 2009, it was always envisaged by the IFSA Parties that it

Tor#: 2457720.4

would be necessary, after that date, for NNL to receive further funding in order for it to continue to trade. As three of the EMEA Debtors are Participating Nortel Entities and party to the MRDA and all of the EMEA Debtors were IFSA Parties the EMEA Debtors considered that any future arrangement to provide funding for NNL and resolve any issues under the Transfer Pricing Agreements would involve the EMEA Debtors and be multilateral in nature. One of the reasons for this is that the MRDA is multilateral in nature and does not provide for and have not operated on the basis of bilateral arrangements.

        Bloom Affidavit, paras. 33 and 34.

24.        From late 2009 the EMEA Debtors were aware that the Canadian Debtors were discussing funding issues with the US Debtors. Whilst the EMEA Debtors were not a direct party to these negotiations it was presumed, given the multilateral nature of the MRDA and the IFSA, that the EMEA Debtors would be consulted with and/or involved in the discussions at some stage if those agreements were to be affected. On this basis, the EMEA Debtors requested that the Monitor keep them informed of the progress on the funding negotiations. Despite these requests to be kept informed on the funding negotiations, the US Debtors filed a motion on December 23, 2009 requesting that the US Court approve the US Debtors entry into the CFA and granting the related relief without prior notice of, or consultation with, the EMEA Debtors.

        Bloom Affidavit, paras. 35 and 36.

## PART III ~ ISSUES AND THE LAW

### The Legal Test for Approval of the Settlement Agreements

25.          In seeking the Court's approval of a settlement, the Court is the "expert" in respect of the law and it is the Court that should conduct an analysis of the strengths and weaknesses of the case sufficient for the Court to conclude that the proposed settlement falls within the range of what is fair and commercially reasonable. Accordingly, little or no reliance on the Monitor's commercial expertise is warranted, especially in this case given the Monitor's expanded powers as referred to above.

> Re Ravelston Corp. (2005), 14 C.B.R. (5th) 207 (Ont. S.C.J.) at
> 209 – 210 (para. 3).

26.          In seeking the Court's approval of a settlement, the Court must determine whether or not there has been material and relevant prejudice so as to taint the process to the degree that the court ought not to entertain the settlement.

> Re Ravelston Corp. (2005), 14 C.B.R. (5th) 207 (Ont. S.C.J.) at
> 209 (para. 2).

### The Court Cannot Conduct the Required Analysis

27.          In this case, the Court is unable to approve the Settlement Agreements because there is no information or evidence before the Court that would permit the Court to conduct an analysis of the strengths and weaknesses of the Settlement Agreements sufficient to conclude that the Settlement Agreements fall within the range of what is fair and commercially reasonable.

Tor#: 2457720.4

28.          In addition, even taking into light the Monitor's recommendation to approve the Settlement Agreements, which in the case of approval of settlements should not be substituted for the Court's own analysis, the Monitor has provided no information to this Court as to its own analysis of the strengths and weaknesses of the Settlement Agreements.

### The Settlement Agreements Cause Material and Relevant Prejudice to the Respondent

**The CFA prejudices the interests of the EMEA Debtors because it purports to affect the claims and interests of entities that are not parties to the CFA**

29.          The EMEA Debtors are not parties to the CFA.

30.          However, the CFA defines the term "Debtors" to be, collectively, the US Debtors, the Canadian Debtors and the EMEA Debtors (as those terms are defined in the CFA).

> CFA, preamble 3 on p. 1 at Tab C to the 35th Report.

31.          Section 3 of the CFA then provides, in part, that:

> ..., the Settlement Payment represents . . . (B) the maximum post-filing or administrative claim (or such other applicable priority claim) that any of the Debtors (excluding the US Debtors) may have or could assert against one or more US Debtors in any Proceeding with respect to the Covered Obligations . . . ." [emphasis added]

> CFA, Section 3, at Tab C to the 35th Report.

32.         This language obviously purports to prejudice the right of the EMEA

Debtors to bring any post-filing claim against one or more of the US Debtors when

the nature and quantum of such intercompany claims have yet to be resolved.

The CFA prejudices the interests of the EMEA Debtors because it insulates the US
Debtors from direct or indirect claims by the EMEA Debtors

33.         In addition, Section 3 of the CFA provides that the Settlement Payment

(as defined in the CFA) also represents the maximum payment that the US Debtors

may or could owe in respect of the Covered Obligations for the Settlement Period (as

those terms are defined in the CFA) and constitutes a full and final settlement of any

and all Covered Obligations. "Covered Obligations" is defined to mean:

> ... claims for corporate overhead, research and development
> costs, or such other alleged payment or cost reimbursement
> obligations under any legal theory or contractual or extra-
> contractual arrangement including, without limitation, pursuant to
> Transfer Pricing Agreements, such other agreements between
> and among the Nortel Group entities or otherwise, incurred by any
> Canadian Debtor for the benefit of the US Debtors which any
> Canadian Debtor has asserted or could assert (without admission
> by the US Debtors and subject to Section 23 of this Agreement)
> and would have been reimbursed to the Canadian Debtors
> through payments (including without limitation Transfer Pricing
> Payments) payable by the US Debtors to the Canadian Debtors
> during, or with respect to, the period from October 1, 2009 through
> the later of the conclusion of the Canadian Proceedings or the
> consummation of the wind-down of the Canadian Debtors' estates
> (the "Settlement Period").

CFA, Section 3, at Tab C to the 35th Report.

34.         In addition, Section 12 of the CFA reads, in part, as follows:

> ..., the Canadian Debtors and the Monitor hereby waive any and
> all rights that may exist at law, in equity or otherwise to assert any
> Claims (as defined herein) against the US Debtors relating to the
> period prior to the Filing Date.  For the purpose of this Agreement,

> the term "Claim" shall have the same meaning as ascribed to it under Section 101(5) of the Bankruptcy Code.
>
> CFA, Section 12, at Tab C to the 35th Report.

35.        These provisions obviously prejudice the existing rights of the EMEA Debtors that are currently provided for in Transfer Pricing Agreements, including the MRDA, which by their terms cannot be unilaterally amended.

36.        If approved, the CFA will frustrate not only the EMEA Debtors' direct claims against the US Debtors, but also their indirect claims. For example, it may come to pass that the EMEA Debtors will have claims against the Applicants under, for example, the Transfer Pricing Agreements, but that the Applicants will only be able to satisfy these claims by seeking payments from the US Debtors under those same agreements. As noted above, under the MRDA NNL would be required to administer that RPSM process by seeking payment from each Nortel entity for any sums it owes, for distribution to other Nortel entities that are owed equalizing payments.

> MRDA, Article 3(d) and Schedule A, Bloom Affidavit Exhibit F.

37.        In addition, through the continued operation of the MRDA, the Participating Nortel Entities continue to share the upside and downside risks in the Nortel business together pursuant to the MRDA, notwithstanding their filing for bankruptcy protection. In addition, in the IFSA, the Participating Nortel Entities memorialized their agreement that they would continue to share the upside and downside risks in the Nortel business together pursuant to the MRDA, notwithstanding their filing for bankruptcy protection. The CFA would short circuit

that process by restricting the assertion of any claims by NNL against the US Debtors

for sums owed to other parties under the IFSA and the MRDA.

MRDA, Schedule A, Bloom Affidavit Exhibit F.

38.        There is no evidence before this Court to even suggest that the

proposed lump-sum payments to be made from the US Debtors to the Applicants

under the CFA take into consideration (let alone equitable incorporate) all such future

claims by other Nortel entities.

39.        A bilateral agreement between the Canadian and US Debtors cannot

be the equitable basis for settling all intercompany claims among all Nortel entities.

<u>The CFA prejudices NNUK's rights regarding Shortfall Payments under the IFSA.</u>

40.        The CFA prejudices NNUK's rights regarding the Shortfall Payments

under the IFSA.  Section 6.c. of the IFSA conditioned NNL's payment of the Shortfall

Payments on NNL's liquidity.  However, the CFA imposes a new obligation on NNL

that adversely affects NNL's liquidity.  Section 4 of the CFA provides that the

Canadian Debtors will:

> indemnify, defend and hold harmless each US Debtor from and
> against all actions, suits, claims, proceedings, costs, damages, losses,
> liabilities, judgments, . . . taxes fines . . . compensations paid in
> settlement . . . and expenses (including without limitation reasonable
> attorneys' fees and disbursements) resulting from a claim, demand,
> lawsuit, action or proceeding arising from or in connection to"
> corporate overhead, research and development costs or "other alleged
> payment or cost reimbursement obligations under any legal theory or
> contractual or extra-contractual arrangement . . . The Canadian
> Debtors shall from time to time reserve reasonable amounts from the
> proceeds of Sales Transactions (as defined herein) or IP Transactions
> (as defined herein) allocated, pursuant to the Interim Sales Protocol
> (as defined in the IFSA) or as agreed by the Selling Debtors (as such

term is defined in the IFSA) in accordance with the IFSA, to the Canadian Debtors to provide for any Indemnifiable Claims, where the amount of such reserves will be mutually agreed by the Canadian Debtors, the US Debtors, the Monitor, the Creditors' Committee and the Bondholders' Committee.

41.        This provision essentially prioritizes such indemnity obligations over and above NNUK's right to Shortfall Payments under the IFSA for the indefinite future.

**The CFA prejudices the interests of the EMEA Debtors by purporting to amend the IFSA without the requisite approvals, including the approval of the EMEA Debtors**

42.        The CFA purports to amend the IFSA without the approvals of the parties and the courts explicitly required by Section 15 of the IFSA. Section 29 of the CFA states that its provisions constitute a "full and final settlement" of certain obligations memorialized in the IFSA. This bilateral "settlement" by two of the parties to the multilateral IFSA functions as an amendment of the IFSA. Section 15 of the IFSA expressly provides that it may only be amended by means of a writing signed by all parties to the IFSA and approved by all Courts that initially approved or gave directions concerning the Agreement, including the UK Court. The US and Canadian Debtors should not be allowed to circumvent the procedural safeguards in the IFSA that were meant to curtail such attempts to alter that agreement.

## PART IV ~ RELIEF SOUGHT

43.        The Respondent respectfully submits that this Court cannot approve the Settlement Agreements.

44.        In the alternative, the Respondent respectfully submits that if this Court approves the Settlement Agreements, then this Court must ensure that such approval does not unfairly prejudice the rights of the EMEA Debtors. Accordingly, any Order of this Court approving the Settlement Agreements must contain, at a minimum, the following additional provisions:

(a)    That nothing in the Order or the CFA shall be construed or operate to amend, modify, vary or change any of the Transfer Pricing Agreements, the IFSA or the GSPAs or in any way affect any one or more of the EMEA Debtors' rights or obligations under these agreements;

(b)    That nothing in the Order or the CFA shall be construed to operate to amend, modify, vary or change the rights or obligations of any entity or person that is not a party to the CFA (each, a "**Non-Party**") under any contract that a Non-Party has entered into with any party to the CFA, including (without limitation) any of the Transfer Pricing Agreements, the IFSA and the GSPAs;

(c)    That, for greater certainty and without limitation to (a) and (b) above:

(i)    the CFA, including without limitation Section 3 of the CFA, shall not be held or otherwise used or interpreted in any way to affect the ability of any one or more of the EMEA Debtors to assert, prove or otherwise enforce any claim any one or more of the EMEA Debtors may have against any one or more of the Canadian Debtors or US Debtors including, without limitation, claims pursuant to the Transfer Pricing Agreement; and

(ii)     should any one or more of the EMEA Debtors have a right under the Transfer Pricing Agreements or the IFSA to direct or otherwise obligate any one or more of the Canadian Debtors to assert claims against any one or more of the US Debtors (including, without limitation) for the payment of certain amounts under the Transfer Pricing Agreements or the IFSA which are owed to any one or more of the EMEA Debtors, the CFA shall not prevent, preclude or otherwise hinder any one or more of the Canadian Debtors' ability to do so and to recover such payments for the benefit of the EMEA Debtors;

(d)     That nothing in the CFA, the Order or in the Order's approval of the CFA or the NNI Claim shall be construed or operate to take away or preclude or in any way affect the right of any EMEA Debtor to dispute or defend against any claim that may be asserted against such EMEA Debtor arising out of or resulting from the NNI Claim;

(e)     That nothing in the CFA, the Order or in the Order's approval of the CFA or the NNI Claim shall be considered in any way to be an adjudication of or comment (positive or negative) on the validity or merit of any claim by the IRS or the CRA as against any one or more of the Canadian Debtors and US Debtors or against any other party;

(f)     That any and all reserves taken by the Canadian Debtors pursuant to Section 4 of the CFA shall not be taken into account when determining

- 19 -

NNL's liquidity position pursuant to the NNL Liquidity Review Procedures as set out in Section 5 of the IFSA; and

(g)     That Section 29 of the CFA shall not be effective unless the IFSA is amended to reflect the agreement set out in Section 29 of the CFA in accordance with the terms regarding amendments as set out in the IFSA.

ALL OF WHICH IS RESPECTFULLY SUBMITTED this 20th day of January, 2010.

Robin Schwill
Davies Ward Phillips & Vineberg LLP

Lawyers for Nortel Networks UK Limited
(In Administration)

- 20 -

**SCHEDULE "A"**

**LIST OF AUTHORITIES**

1.    *Re Ravelston Corp.* (2005), 14 C.B.R. (5th) 207 (Ont. S.C.J.)

COURT FILE NO. 09-CL-7950

IN THE MATTER OF THE COMPANIES' CREDITORS ARRANGEMENT ACT, R.S.C. 1985, c. C-36, AS AMENDED
AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS. INTERNATIONAL CORPORATION AND NORTEL NETWORKS TECHNOLOGY CORPORATION
APPLICATION UNDER THE COMPANIES' CREDITORS ARRANGEMENT ACT, R.S.C. 1985, c. C-36, AS AMENDED

---

*ONTARIO*
SUPERIOR COURT OF JUSTICE –
COMMERCIAL LIST

Proceeding Commenced at Toronto

---

**FACTUM OF THE RESPONDENT,
Nortel Networks UK Limited (In
Administration)**
(Re: Motion Returnable January 21, 2010)

---

DAVIES WARD PHILLIPS & VINEBERG LLP
1 First Canadian Place
Suite 4400
Toronto, ON M5X 1B1

Robin B. Schwill (LSUC #38452I)
Tel:    416.863.5502
Fax:    416.863.0871

Lawyers for Nortel Networks UK Limited (In Administration)

Torfl: 2457720.4

---

[Indexed as: **Ravelston Corp., Re**]

IN THE MATTER OF THE COMPANIES' CREDITORS
ARRANGEMENT ACT, R.S.C. 1985, c. C-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE OR
ARRANGEMENT OF THE RAVELSTON CORPORATION
LIMITED AND RAVELSTON MANAGEMENT INC.

AND IN THE MATTER OF THE BANKRUPTCY AND
INSOLVENCY ACT, R.S.C. 1985, c. B-3, AS AMENDED, AND
THE COURTS OF JUSTICE ACT, R.S.O. 1990, c. C.43, AS
AMENDED

Ontario Superior Court of Justice [Commercial List]

Farley J.

Heard: August 25, 2005

Judgment: August 26, 2005

Docket: 05-CL-5863

Alex MacFarlane for RSM Richter Inc. in its capacity as Receiver, Interim Receiver and Monitor of The Ravelston Corporation Limited, Ravelston Management Inc. Argus Corporation Limited, 509643 N.B. Inc., 509644 N.B. Inc., 509645 N.B. Inc., 509646 N.B. Inc., 509647 Inc.

Matthew Gottlieb for Hollinger Inc.

Robert W. Staley, Derek J. Bell for Hollinger International Inc.

Lyndon Barnes, Nancy Roberts for CanWest Global Communications Corporation

**Bankruptcy and insolvency** —— Proposal — Companies' Creditors Arrangement Act — Arrangements — Approval by court — "Fair and reasonable" —— Management services agreement existed between R company, C Corp. and NP — R company gave C Corp. notice of termination of management services agreement on day before R company filed for protection under Companies' Creditors Arrangement Act — Litigation ensued between receiver of R company and C Corp. regarding agreement — Receiver and C Corp. settled dispute subject to court approval for payment by C Corp. to receiver of $12.75 million, which was 50 percent of amount claimed by receiver — H Interna-

tional opposed settlement — Receiver brought motion for court approval of settlement — Settlement approved — If litigation had not been settled, decision would have been made on all-or-nothing basis — There was nothing approaching certainty of result — Settlement on 50-percent basis fell within general range of acceptability of fair and commercial reasonable basis.

**Cases considered by** *Farley J.***:**

*Bakemates International Inc., Re* (2003), 2003 CarswellOnt 3075, [2003] O.J. No. 3191 (Ont. S.C.J.) — referred to

*Bakemates International Inc., Re* (2004), 2004 CarswellOnt 2339 (Ont. C.A.) — referred to

*R. v. Mohan* (1994), 29 C.R. (4th) 243, 71 O.A.C. 241, 166 N.R. 245, 89 C.C.C. (3d) 402, 114 D.L.R. (4th) 419, [1994] 2 S.C.R. 9, 18 O.R. (3d) 160 (note), 1994 CarswellOnt 66, 1994 CarswellOnt 1155, [1994] S.C.J. No. 36 (S.C.C.) — referred to

*Royal Bank v. Soundair Corp.* (1991), 7 C.B.R. (3d) 1, 83 D.L.R. (4th) 76, 46 O.A.C. 321, 4 O.R. (3d) 1, 1991 CarswellOnt 205, [1991] O.J. No. 1137 (Ont. C.A.) — referred to

**Statutes considered:**

*Companies' Creditors Arrangement Act*, R.S.C. 1985, c. C-36
     Generally — referred to

MOTION by receiver for court approval of settlement.

*Farley J.***:**

1     These are the short reasons promised yesterday where I approved the settlement between the Receiver of Ravelston and CanWest concerning the dispute between them as to the termination fee owing under the Management Services Agreement dated November 15, 2000 between Ravelston, CanWest and National Post. As I pointed out, the business efficacy of the Management Services Agreement may well be questioned; however what was to be decided by me was not that, but rather the issue of the termination arrangements.

2     The Receiver and CanWest — the day before the hearing of this dispute reached a settlement, subject to court approval, whereby the parties would exchange mutual releases and CanWest would pay the Receiver $12.75 million. This amounted to 50% of the amount the Receiver was claiming pursuant to the notice of termination which Ravelston gave CanWest the day before Ravelston filed for protection pursuant to the CCAA (with the Receiver being the monitor under the CCAA proceedings) and for the appointment of the Receiver as the court appointed receiver of Ravelston. The two Hollinger companies, Inc. and International, were not happy with the amount of the settlement, although it appears that both were content with a settlement at a higher amount being paid the Receiver. Inc. did not support the approval of the settlement but did not oppose it. International actively opposed the settlement; its position was that the Re-

ceiver ought to have obtained a settlement in the 75% range. Both Inc. and International assert that they ought to have been more involved with the settlement process as they assert a special relationship owing to claimed security interests in the claim and its proceeds. One could well posit a situation where the process of settlement could have been improved by more involvement of Inc. and International. However, what we are concerned with is not perfection, but rather has there been material and relevant prejudice so as to taint the process to the degree that the court ought not to entertain the settlement. However, in this situation, Mr. Gottlieb for Inc. volunteered that Inc. had been alerted to the settlement prior to its being entered into, albeit just immediately prior (where in my view it would have been better to have alerted Inc. that settlement discussions were to be actively engaged in and then given progress reports at meaningful times along the way). International was kept more abreast of the situation; the Receiver and its Canadian counsel dialogued with International's counsel, Mr. Staley, including a meeting on June 7, 2005 which, *inter alia*, dealt with International's view concerning the dispute with CanWest. The Receiver of course had the benefit of the active participation of International leading up to the hearing scheduled for August 17th including a detailed factum by International opposing the CanWest position that it owed nothing. On August 15th, Mr. Staley was advised that the Receiver would be meeting with CanWest's counsel the next day to see if a settlement could be reached. While Mr. Staley was otherwise engaged on the 16th, he did indicate that a settlement would be preferable to having the matter litigated. International did not ask that another lawyer be allowed to participate in or observe the settlement discussions, nor did it indicate that a floor amount should be achieved in order that International would be supportive of a settlement.

3       The Receiver submitted that a motion to approve a settlement entered into by a court-appointed receiver is analogous to a motion to approve a sale of assets by a court-appointed receiver so that the 4 part set of principles/considerations of *Royal Bank v. Soundair Corp.* (1991), 4 O.R. (3d) 1 (Ont. C.A.) at para. 16 would come into play. See *Bakemates International Inc., Re*, [2003] O.J. No. 3191 (Ont. S.C.J.), affirmed 2004 CarswellOnt 2339 (Ont. C.A.). However, it seems to me that there is a subtle distinction to make between reliance on a receiver's commercial expertise concerning a recommended sale and the receiver's expertise in regards to a settlement of a legal dispute (while of course taking into account that such a receiver will have had appropriate legal advice from its own counsel). That distinction is based on the fact that the court is the "expert" in respect of the law and will generally be in a better position to assess the law involved in a situation than it would be as to the commercial aspects of a sale of property. In this regard, one may wish to consider the analogous situation of expert opinions as discussed in *R. v. Mohan*, [1994] 2 S.C.R. 9 (S.C.C.). Thus it seems to me that the court, with the assistance of counsel (both counsel supporting the approval of a settlement and counsel opposing), should conduct an

analysis of the strengths and weaknesses of the case, including the general vagaries of litigation plus the benefits of certainty and the avoidance of delay concerning possible appeals, sufficient for the court to conclude that the proposed settlement fell within the range of what was fair and commercially reasonable. The case here involved an all or nothing result if the case went on to a court decision.

4      I have had the benefit of reviewing in detail the material for the August 17th hearing immediately prior to being advised that the Receiver and CanWest had reached a settlement, subject to court approval. In my view there was much to be said for the merits of each side's position. There was much to be said about the pros and cons — and it was carefully detailed in that material and so was said. I have now had as well the benefit of the material filed and argued concerning the approval of the settlement as concerns the merits of the dispute which was to have been heard on August 17th. If the case had not settled, then I would have had to make a decision, a decision on an all or nothing basis. I would have made that decision — but I cannot predict now what it would have been, nor could I predict how the Court of Appeal would have decided, given the fact that inevitably my decision would have been appealed. It would have been an interesting decision to write. There certainly was no slam-dunk either way, nor nothing approaching that certainty of result. In my view, the settlement on a 50% basis falls within the general range of acceptability on a fair and commercially reasonable basis. I therefore have approved the settlement.

5      Allow me to observe that in the fact circumstances of this case and the law as eventually argued in the respective factums, I agree that it is highly likely that attempts to negotiate a settlement before almost reaching the court house steps would have been premature. It was indeed necessary and appropriate that each side reflect on its own strengths and weaknesses once it had the benefit of refined argument on the strengths of the other side.

6      Mr. Gottlieb makes a fair request in my view where he asks on behalf of Inc. for advance notice of any intention to deal with the proceeds of this settlement. I leave it to the Receiver in consultation with International and Inc. to deal with the issue of proceeds disposition and notice generally.

7      Order approving settlement to issue as per my fiat.

*Order accordingly.*