UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

IN RE:                          )
                                )  Chapter 11
NORTEL NETWORKS,                )
                                )  Case No. 09-10138 (KG)
                                )  January 6, 2010
                    Debtors     )  10:30 a.m.

TRANSCRIPT OF HEARING
BEFORE THE HONORABLE KEVIN GROSS
UNITED STATES BANKRUPTCY COURT JUDGE

APPEARANCES:

For the Debtors:            ERIC D. SCHWARTZ, ESQUIRE
Nortel Networks, Inc.       MORRIS, NICHOLS, ARSHT & TUNNELL
                            1201 North Market Street, 18th Fl.
                            P.O. Box 1347
                            Wilmington, DE 19899-1347

                            LISA M. SCHWEITZER, ESQUIRE
                            JAMES L. BROMLEY, ESQUIRE
                            CLEARY, GOTTLIEB, STEEN & HAMILTON
                            One Liberty Plaza
                            New York, NY  10006

For the U.S. Trustee:       PATRICK TINKER, ESQUIRE
                            OFFICE OF THE U.S. TRUSTEE
                            844 King Street, S.2207, Lockbox 35
                            Wilmington, DE 19801

For the Committee of        DAVID H. BOTTER, ESQUIRE
Unsecured Creditors:        AKIN, GUMP, STRAUSS, HAUER & FELD
                            One Bryant Park
                            New York, NY  10036

For One Equity Partners:    DAVID S. HELLER, ESQUIRE
                            LATHAM & WATKINS
                            233 South Wacker Drive, Suite 5800
                            Chicago, IL 60606

For the Bond Holders        THOMAS R. KRELLER, ESQUIRE
Group:                      MILBANK, TWEED, HADLEY & MCCLOY
                            601 South Figueroa Street
                            30th Floor
                            Los Angeles, CA  90017

APPEARANCES CONTINUED:

For Matlin Patterson:          JENNIFER FELDSHER, ESQUIRE
                               BRACEWELL & GIULIANI
                               1177 Avenue of the Americas, 19th F.
                               New York, NY  10036-2714

For Computer Science           JOSEPH H. HUSTON, ESQUIRE
Corporation:                   STEVENS & LEE
                               1105 North Market, 7th Floor
                               Wilmington, DE 19801

                               DALE K. CATHELL, ESQUIRE
                               DLA PIPER
                               6225 Smith Avenue
                               Baltimore, MD  21209-3600

Appearances by Video Conference: (Canadian Court)

                    JUSTICE GEOFFREY MORAWETZ

                          Derrick C. Tay, Esquire
                          Jennifer Stam, Esquire
                          OGILVY RENAULT LLP/S.E.N.C.R.L., s.r.l
                          Suite 3800, Royal Bank Plaza, S. Tower
                          200 Bay Street, P.O. Box 84
                          Toronto, Ontario  M5J 2Z4

                          James Carsagnini, Esquire

                          Robin B. Schwill, Esquire
                          DAVIES WARD PHILLIPS & VINEBERG LLP
                          44th Floor, 1 First Canadian Place
                          Toronto, Ontario M5X 1B2

                          Alex L. MacFarlane, Esquire
                          FRASER MILNER CASGRAIN LLP
                          39th Floor, 1 First Canadian Place
                          100 King Street West
                          Toronto, Ontario M5X 1B2

Audio Operator:                JENNIFER PASIERB

Transcribed by:                DIANA DOMAN TRANSCRIBING
                               P.O. Box 129
                               Gibbsboro, New Jersey  08026-129
                               (856) 435-7172
                               FAX:  (856) 435-7124
                               Email:  Dianadoman@comcast.net

Proceedings recorded by electronic sound recording; transcript
produced by transcription service.

I N D E X

| Witnesses | Direct | Cross | Redirect | Recross |
|---|---|---|---|---|
| FOR THE DEBTORS: | | | | |
| George Riedel | 12 | 34 | 50 | 54 |
| Michael Murray | 58 | 83 | 98 | 100 |

| | PAGE |
|---|---|
| Item 7, Sale of proceeds | 4 |
| ARGUMENT: | |
| BY:  Ms. Schweitzer | 104, 133 |
| BY:  Mr. Kreller | 121 |
| BY:  Ms. Feldsher | 123 |
| BY:  Mr. Tinker | 125 |
| JUDGE GROSS:  Decision | 149 |
| (Re: Canadian Proceeding): | |
| BY:  Mr. Tay | 136 |
| BY:  Mr. Carsagnini | 141 |
| BY:  Mr. Schwill | 141 |
| BY:  Mr. McFarland | 142 |
| JUSTICE MORAWETZ:  Decision | 143 |
| | |
| Item 8, Motion | 155 |
| Item 9, Debtor's 23rd notice of | 154 |
| rejection of executory contracts | |

4

| EXHIBITS: | Ident. | Evid. |
|---|---|---|

FOR THE DEBTOR:

D-1                                                          56

D-2                                                          56


***Exhibits attached to notice of

    debtors' motion for orders (docket 2193)

    admitted into evidence at page 33

```
                        Colloquy                        5
```

1                  (Court in Session)

2                  THE CLERK:  Please rise.

3                  JUDGE GROSS:  Good morning, everyone.  Thank you and

4      please be seated.  Good morning, Mr. Schwartz.

5                  MR. SCHWARTZ:  Good morning, Your Honor.  Happy New

6      Year.

7                  JUDGE GROSS:  And to you too --

8                  MR. SCHWARTZ:  And --

9                  JUDGE GROSS:  -- and all of you.

10                 MR. SCHWARTZ:  -- Good morning to His Honor from

11     Canada.

12                 JUDGE GROSS:  Justice Morawetz, good morning, sir.

13                 MR. SCHWARTZ:  For the record, Your Honor --

14                 JUSTICE MORAWETZ:  Good morning, Judge Gross.

15                 MR. SCHWARTZ:  -- Eric Schwartz of Morris, Nichols,

16     Arsht & Tunnel on behalf of the debtors.  Your Honor, if -- if

17     it's okay with the Court, we'd like to move to item 7, the sale

18     procedures.  Everything else is resolved.

19                 JUDGE GROSS:  Yes.

20                 MR. SCHWARTZ:  Okay.

21                 JUDGE GROSS:  And I was -- I did sign the order on

22     number 6, which came to me this morning with a certificate of

23     no objection.

24                 MR. SCHWARTZ:  Great.  Thank you, Your Honor.

25                 JUDGE GROSS:  You're welcome.

Colloquy                                                        6

1              MR. SCHWARTZ:  I'll cede the podium.

2              JUDGE GROSS:  Thank you.

3              MR. SCHWARTZ:  Thank you.

4              MS. SCHWEITZER:  Good morning, Your Honor.  Lisa

5     Schweitzer from Cleary, Gottlieb for Nortel.

6              JUDGE GROSS:  Good morning.

7              MS. SCHWEITZER:  And good morning, Justice --

8     Mr. Justice Morawetz, and I first want to say thank you to Mr.

9     Justice Morawetz for accommodating us by coming in today.  I

10    know this is -- we're -- trying hard to get joint -- joint

11    hearings scheduled is always tricky, but we appreciate him

12    taking the time today.  We also appreciate the Court's taking

13    the time to allow this morning to have discussions with the

14    creditor constituencies, and we do have -- I'm pleased to

15    report that we have reached peace with the Creditor Committee

16    on their objection on the hearing for the CVAS sale procedures.

17    The United States Trustee stands by their objections.

18             JUDGE GROSS:  Okay.

19             MS. SCHWEITZER:  So what I propose to do is just

20    start with a slight -- recognizing the time sensitivity

21    introduced, put witnesses on.  I think everyone has a desire to

22    have live witnesses.

23             JUDGE GROSS:  Okay.

24             MS. SCHWEITZER:  Have the testimony in the U.S., and

25    then we can turn to arguments and close at the end with the --

1    Canada obviously having the time to make their submissions as

2    part of those arguments --

3              JUDGE GROSS:  Very well.

4              MS. SCHWEITZER:  -- if that's all right with both

5    Courts.

6              JUDGE GROSS:  That is fine.

7              MS. SCHWEITZER:  Okay.  Well, first, of course, we

8    have a Happy New Year to everyone.  It's not only a New Year,

9    and we've suffered through enough tributes and recollections,

10   but it's also the one-year anniversary of the filing next week.

11   So I sit here reflecting on the fact that a year ago, we stood

12   before you saying that we were exploring all options for

13   restructuring, reorganization, and certainly, no one a year ago

14   would have seen an announcement in April that we decided to

15   pursue divestitures of all the assets in different times, and

16   certainly, I don't think anyone sitting here in January of last

17   year thought that there were going to be seven sales done last

18   year for a total headline prices of $3.0 million across the

19   estate.  So it's a nice time to reflect and to bring this

20   forward to you as the seventh sale on that list.

21             A couple quick good news points along those lines is

22   the Equinox sale -- or I'm sorry -- the Enterprise sale --

23             JUDGE GROSS:  Yes.

24             MS. SCHWEITZER:  -- had closed in December as well.

25   So that brought another $900.0 million of value into the

1    estate, and while not a sale, we also had two important

2    victories that will be heard on the end of the hearing at the

3    end of the month, the IRS claim of $3.0 billion has been -- a

4    settlement has been negotiated now which would resolve that

5    claim for $37.0 million, and that will be heard on the 21st,

6    and there was also a deal cut on Canadian Funding that would

7    resolve the Canadian Funding needs provided by the U.S.

8    debtors.  It's also set to be heard on January 21st.

9          So we had a lot of reasons to lift a glass of

10   champagne by December.  Of course, one of them was the fact

11   that we had managed to sign the CVAS sale to -- with Genban as

12   the stalking horse bidder.  As you'll hear from the witnesses

13   today, that was a significant accomplishment for the debtors in

14   terms of the size of the sale, the complexity of the deal, and

15   just the -- the toughness of the negotiations down to the end.

16         Certainly, it's similar to many of the other prior

17   sales that we've seen.  We've got two asset sale agreements.

18   We have a main agreement, ancillary agreements.  We've got, you

19   know, bidding procedures.  They're basically the same as other

20   deals, give or take a blip up or down, and we have now -- you

21   know, we have always had creditor support for the sale

22   generally, the sale to this buyer, and we now have full

23   creditor support for the fees to be paid in the transaction

24   subject to one or two modifications that I'll put on the

25   record.

1            You know, as the evidence will show, also, that the

2    sale is very unique and different from some of the other sales

3    we've seen.  It has a lower headline price than a sale like

4    Enterprise, but it doesn't have any less complexity than

5    Enterprise.  It certainly has a longer negotiation life than

6    most of the other sales, and the purchasers involved here and

7    the financing source here are a little unique from some of the

8    other sales that we've faced before now, and obviously, the

9    reason we're here today or the primary reason we're here today

10   having live witnesses and the like is because it also has the

11   existence of the fee payable to One Equity Partners, whether we

12   want to call it an incentive fee, inducement fee, ransom fee,

13   payment fee, compensation fee.  It's a $3.6 million fee payment

14   to One Equity Partners and 1.2 million of it particularly is

15   coming from the U.S. estate subject to allocation if the deal

16   closes and people do really well on the deal.

17            Originally, we had two objections filed in the U.S.

18   The U.S. Trustee had filed a limited objection.  I wouldn't

19   want to put words in Mr. Tinker's mouth, but I think the

20   concern is obviously, the debtors are held to the standard of

21   O'Brien and should in this case be required to come to this

22   Court and prove under O'Brien why this is necessary and

23   beneficial to the estate, and I don't think anyone disputes

24   that legal standard, and certainly, the debtors think we can

25   put evidence on that would meet that legal standard.

1           The second objection that was filed by the creditor

2    committee, while it raises various issues, the primary or first

3    issue was, again, the size of the bid protections, and

4    particularly, the cumulative effect, and then the fact that the

5    -- the OEP fee would be paid today rather than down the road.

6    What we've reached as an accommodation or acknowledgment of

7    that objection is that One Equity Partners has agreed that they

8    would be willing to postpone payment or receipt of payment for

9    that fee until the date of an auction, and so what that does is

10   it adds value to the -- the U.S. estate and to Nortel generally

11   in postponing the payment so that it's -- if there is any

12   frivolous concern that OEP is going to take the money and run

13   and walk away or that there is some, you know, hair trigger

14   thing in their pocket that they were holding behind and they

15   had a reason to walk away from the deal, it's not there.  They

16   have to hold their money in place, their financing source in

17   place, and they have to stay to the -- the auction.

18           If there is no auction but OEP and Genband are ready,

19   willing, and able to perform and were going to court to get

20   their deal approved, the fee is paid at auction.  If they're

21   topped at auction, they get their fee.  If they're not topped

22   at auction, they win, they get their fee.

23           So it creates the need for OEP to stay around, and it

24   also gives us the benefit of the delay and the primary goal,

25   which is to not only have them sign the stalking horse deal,

1    but to bring it forward and bring other bidders in.

2           So that was the one accommodation.  The second

3    accommodation is that we'd be willing to return -- in order to

4    address the Committee's concerns regarding timing -- we'd be

5    willing to return the schedule to the schedule in the motion

6    with a March 3rd hearing date for the sale hearing, and we

7    would also move out the bid deadline -- excuse me.  The bid

8    deadline would be moved to February 23rd, and the auction would

9    be held on February 25th, and we would need to tweak the

10   bidding procedures interim dates, because there is a date to

11   announce a qualified bid and stalking horse bid, but those

12   would all be done one day before the auction.

13          So because this was just resolved, we don't have

14   something to hand up at this point, but it basically would be

15   the -- the bidding procedures attached to the motion with those

16   tweaking on the margins to accommodate for those two dates.

17          And with those accommodations, the Committee is

18   willing to withdraw their objection, but, of course, the U.S.

19   Trustee would like us to still make our showing under O'Brien,

20   which we're happy to do, and so I think with that, what we

21   would propose is to just move right to the testimony.  We have

22   two witness -- well, first, I apologize.  I certainly will give

23   our colleagues in Canada the opportunity to address the Court

24   up there as an introductory matter and any statements they want

25   to make, but we have two witnesses in the court from the U.S.

1    side, which is George Riedel, the Chief Strategy Officer of

2    Nortel, and Michael Murray of Lazard, who is the investment

3    advisor banker for the DL.

4              So you know them both well.  We all know them both

5    well at this point, and they certainly know us well, but with

6    that, I'll turn it over to Mr. Tea to allow him to open with

7    the Court.

8              JUDGE GROSS:  Thank you, Ms. Schweitzer.

9              MR. TAY:  Good morning, Your Honor.

10             JUDGE GROSS:  Good morning, Mr. Tay.

11             MR. TAY:  Derrick Tay for the company, and also, my

12   newly appointed partner, Ms. Stan.  So I think the -- from the

13   Canadian side, there is -- I'm not aware of any objections now

14   that the UCC objection has been resolved.  I think that we all

15   believe that this is a deal that needs to be done and that it

16   impacts a lot of people, impacts the creditors, and we're ready

17   to move forward on the basis suggested by Ms. Schweitzer, and I

18   think if we then proceed to hear the witnesses from the U.S.,

19   we can then make the necessary arguments in Canada after our

20   U.S. colleagues are finished.

21             JUSTICE MORAWETZ:  That will be fine, Mr. Tea.  Thank

22   you.

23             JUDGE GROSS:  Justice Morawetz, if you might just --

24             JUSTICE MORAWETZ:  Thank you, Judge Gross.

25             JUDGE GROSS:  -- remind the speakers to speak a

1    little louder and into the microphone.

2              JUSTICE MORAWETZ:  Yes.  I intended to do that, and

3    I'll even apply the rule to myself.  So --

4              JUDGE GROSS:  Thank you.  Is there anyone else in

5    Canada who wished to be heard?

6              JUSTICE MORAWETZ:  No.  At this point, Judge Gross, I

7    think the process will be to hear the testimony before you

8    followed by argument in your court followed by argument in this

9    Court.

10             JUDGE GROSS:  Excellent.  Thank you.  All right.  M

11   s. Schweitzer, you may proceed when ready.

12             MS. SCHWEITZER:  With that, Your Honor, I'd like to

13   call Mr. George Riedel to the stand.

14             JUDGE GROSS:  Thank you.  Mr. Riedel.  Welcome back.

15   You probably know the drill by now.

16             THE CLERK:  Can you place your left hand on the

17   Bible?  State your full name and spell your last name for the

18   record.

19             MR. RIEDEL:  George Riedel, R I E D E L.

20               GEORGE RIEDEL, Debtors' WITNESS, SWORN

21             THE CLERK:  Please be seated.

22                       DIRECT EXAMINATION

23   BY MS. SCHWEITZER:

24   Q    Mr. Riedel, for the record, could you quickly go through

25   your position at Nortel and your background credentials that

1    got you to that position?

2    A    I'm George Riedel, the Chief Strategy Officer at Nortel.

3    My responsibilities encompass a range of things from M&A to

4    corporate strategy, business development and the like.  I've

5    been with Nortel for four years involved in the technology

6    industry for 20-some odd years, done probably 20 different M&A

7    transactions in the last five years either at my predecessor

8    company, Juniper, or here at Nortel Networks.

9    Q    Okay.  Thank you.  And today we're selling -- we're here

10   to present procedures for the sale of the CVAS business.  Can

11   you tell the Court what the CVAS business is and --

12   A    Sure.

13   Q    -- what it does?

14   A    You bet.  CVAS is a -- stands for Carrier VoIP and

15   Application Services.  It's the voice network of many telephone

16   companies basically.  So signaling media gateways, soft

17   switches, transmission switches to conduct the traffic and

18   related services, either implementation or support.  So think

19   of it as a -- a voice and related applications business sold to

20   large telecommunication companies around the world for long

21   term contracts.

22   Q    And how does the CVAS business interplay with other

23   various businesses at Nortel?

24   A    It's a -- it's a carve out of existing businesses.  It

25   depends a lot on common customers.  So our wireless customers

1    and our CVAS customers would be the same.  There are common

2    platforms.  There are common support systems.  So the

3    interdependencies both in geographic terms and in functional or

4    platform terms are quite strong here.  It's a business that's

5    been in existence for a hundred years.  It's one of our oldest

6    businesses.  So there is a lot of inner dependency and a lot of

7    complexity in this business.

8    Q    And what's the geographical scope of the business?

9    A    It's a global business.  We have a strong footprint in

10   North America in particular, but we operate in all of the major

11   theaters around the world, Europe, Latin America, Asia Pacific

12   and the like.

13   Q    Now, we -- this obviously, as I said before, this is the

14   seventh sale we've done in Nortel.  In preparing this asset for

15   sale, how does that -- this asset compare or different from

16   other assets that we've sold in the past?

17   A    Yeah.  It's an asset that has taken quite a long time to

18   get through the sales process.  Again, we describe it as a

19   carve out within a carve out.  So creating the organization,

20   the financials, the balance sheet, the intellectual property

21   that would be sold as part of this business took quite some

22   time.

23        The process started in earnest back in probably early

24   April.  We had early discussions with a number of buyers.  We

25   contacted about 25 different parties who expressed interest,

Riedel - Direct                                16

1    provided NDA's to about 18 of them.  That turned into about ten

2    who were serious, got management presentations, EDR Acess, the

3    like, seven that ultimately decided it was worth spending

4    serious time on, and then finally, three who placed serious

5    bids in the sort of late summer time frame.

6    Q    So here we are, four or five months after the last summer

7    time frame.  Can you walk us through what took us four months

8    to get here?

9    A    Aunt Jemima, what took you so long.  So we had focused on

10   one particular counter party from late August through September

11   who we thought, A, had the highest value, B, had the -- the

12   greatest likelihood of consummating a transaction.  That

13   counter party ended up in the sort of September time frame

14   saying there was too much risk, too much risk relative to

15   transition services, integration risk.  The outlook for the

16   business was starting to soften.  They were concerned about

17   that.

18        So that counter party had basically decided no longer

19   to participate.  I might add that that counter party in terms

20   of size of the business, unlike our other transactions, most of

21   the counter parties we've been dealing with in this CVAS

22   transaction are relatively small companies, a couple of hundred

23   million dollars in revenue as opposed to the large global

24   integrated giants like an Erricson or an Alcatel-Lucent, or the

25   like.  So the risk sensitivity of these smaller companies,

1    whether they were backed by private equity players or a stand

2    alone public is quite high relative to the size of this

3    transaction, and all of the counter parties, this deal would

4    represent a significant expansion in footprint, revenue, head

5    count, and the like.  So they -- they were quite concerned

6    about how much appetite for risk they were taking.

7              So when that counter party basically backed out, we

8    were left with a very delicate situation of having a business

9    that was complex, that was fragile, but was not -- there wasn't

10   a significant buyer ready, willing, and able to engage with us.

11   At that time, we worked with our creditor constituencies to

12   craft effectively an exclusively agreement with Genband and

13   OEP.  It had a rolling form of exclusivity but gave them time

14   to negotiate the documents, to finish their diligence, to

15   engage in the normal main document and ancillary document

16   development and negotiations.  That ran from probably early

17   October through to mid-November in terms of its first period.

18             Key points there are -- were two things.  One was the

19   exclusivity, but two was an agreement for a -- a break fee

20   based on a net price that we had agree with that counter party,

21   that counter party being Genband and OEP.

22             That -- that break fee was $10.0 million in terms of

23   expense reduction and break fee with the expectation of a net

24   purchase price of 200.  So roughly five percent.

25             What changed in the -- in that time frame is the

1    business continued -- as we continued to update the outlook of

2    the business was several things, significant requirements for

3    more working capital for the business, again, a softer outlook

4    for the business, and substantial cost relative to performing

5    the transition services.   It's important to note, as you said

6    earlier, this was our seventh transaction last year.  So if I

7    could use the phrase, this was the caboose at the end of the

8    train.  The length and the complexity, the need for ongoing

9    transitional services given when this would likely close placed

10   great concern on both the estate and on the counter parties

11   side about how would we maintain the ability to be able to

12   maintain those transition services.

13          So as a result, we ended up getting to a point where

14   given the combination of facts and circumstances, there was a

15   lower purchase price that we were willing to do the deal with

16   the other counter party.  That continued to be held throughout

17   the rest of the process.

18   Q    You had said that this is a fragile business.  What did

19   you mean by that in terms of customers and the business

20   operations?

21   A    So we have probably 25 major customers around the world

22   for this business.  Each has long term contracts.  It's

23   imbedded in their networks.  It's -- it's not something that

24   you easily displace, but given the concerns about how long this

25   asset was taking to sell, given the chance that it might not be

1    sold, customers were appropriately derisking their plans, i.e.

2    looking to other suppliers.  So as a result, the orders and the

3    revenue outlook for the business as the year progressed

4    continued to soften.

5              I might add that the business in Q4 from a cash flow

6    standpoint, was money losing in aggregate probably in the tone

7    of $15.0 to $17.0 million in aggregate or for cash flow losses

8    for Q4 '09.  That would get worse in Q1 '10 as a result of the

9    revenue continuing to drop.  So you has combination of

10   customers starting to move to other parties, attrition of key

11   employees, softening of revenue and orders, increasing concerns

12   about the long term ability to sustain this business, and

13   that's -- that's the bucket of fragile that we were as a

14   company concerned about.

15   Q    All right.  And that cash flow negative forecast was for

16   the U.S. as well as globally or just --

17   A    So -- so globally, it was expected to lose $15.0 to

18   $17.0 million in Q4.  The U.S. was actually expected to be

19   slightly positive, about eight to ten.  The rest of the

20   estates, Canada, EMEA, APAC, Latin America were all going to be

21   money losing in Q4 and that the outlook for Q1, '10 was worse.

22   Q    Now, you said as part of exclusivity agreement, you had

23   agreed to $10.0 million in break fee obligations.  Mr. Murray

24   is here in the courtroom and can testify to more details of how

25   that arose, but was that -- when would that break fee have been

1    approved by the Court?  Is that part of the ultimate sale

2    agreement or is that something you signed unconditionally at

3    that point?

4    A    We signed at that point.

5    Q    And what were the triggers?  It would have been after a

6    stalking horse agreement and baked into that?

7    A    Correct.  And again, I'd add just for emphasis that part

8    of this was at the behest of -- of the committees and their

9    advisors who were involved in the negotiation of the break fee

10   with -- with OEP and Genband.

11   Q    More generally, what has been the role of the Committee

12   and the bond holder group throughout the process?

13   A    We've tried to reinforce several things.  One is

14   transparency, two is candor, and three is frequency, and so as

15   a result of the -- both the weekly engagements and discussions

16   with the periodic new information or new updates, it involved

17   all the advisors and all the constituents, the U.K.A., the U.K.

18   administrator, the Canadian monitor, the ad hoc bond holder

19   committee, and, of course, the -- the UCC.

20   Q    Now, you testified that there was a push to sign the

21   agreement in December.

22   A    Right.

23   Q    You also testified that you had a counter party and

24   counter parties generally who were more sensitive to risk.

25   A    Correct.

Riedel - Direct                                                    21

1    Q    Can you describe the color of the negotiations in the

2    November/December time period --

3    A    Right.

4    Q    -- as a result of the confluence of those two factors?

5    A    Sure.  They were arms length.  They were at time

6    contentious, but I think at the end of the day, it was a joint

7    problem solving effort to get to a reasonable deal.  I think

8    one of the things that happened in the late December time frame

9    was, again, another downgrade in terms of the outlook and a --

10   an ability to then be concerned about how much revenue was the

11   business going to generate in '10 and '11.  We worked with OEP

12   and Genband to come up with a package of -- of considerations

13   that traded off a range of things, whether it was escrows,

14   whether it was patents, whether it was holding purchase price

15   in order to maintain the best benefit for the estate.

16   Q    And was there any discussion with OEP regarding the

17   payment of the incentive fee compared to the timing of signing?

18   A    There was.  We had a number of discussions about the

19   incentive fee and when it would be paid, whether it would be

20   paid at signing, whether it would be paid prior to signing and

21   the like.  Ultimately, we -- we agreed that we would pay it

22   after the bid procedures were approved.

23   Q    Do you feel at this point that you've contacted the

24   potential buyers that might be out there, and certainly an

25   auction process, but that you've scoured the market up to now

1    to find the potential stalking horse bidders?

2    A    I think we've been extraordinarily vigorous in trying to

3    contact the buyers multiple times to try and get all interested

4    parties in the process to make sure they're aware of the

5    opportunity, to provide them time, management, attention,

6    information, et cetera.  So yes, I do.

7    Q    And that it's the debtor -- it's an exercise of the

8    debtors' business judgment to sign this deal at this time in

9    light of all the factors?

10   A    It is.

11   Q    And you're -- you're generally familiar with the terms of

12   the asset sale agreement that's been executed with Genband?

13   A    I am.

14   Q    We certainly have Mr. Murray in the courtroom, and he can

15   go through some of the finer details of that transaction, of

16   the agreement, but you're familiar with the headline price of

17   $282.0 million?

18   A    Yes.

19   Q    And that the motion also disclosed the existence of a

20   $100.00 million purchase price adjustment.  You're familiar

21   with the general basis for that purchase --

22   A    I am.

23   Q    -- price adjustment?  What's the majority of that purchase

24   price adjustment based on?

25   A    Sure.  There are three pieces of it.  The majority of it

1    is around deferred revenue and working capital adjustments

2    relative to the business.  There is a minor single digit

3    million dollar adjustments around some EMEA related employee

4    matters.

5    Q    And in prior deals when we've -- in this motion -- you've

6    reviewed the motion that's been filed with the Court?

7    A    Yes.  Yes, I have.

8    Q    And you saw that in the motion, we calculated the break

9    fees and expense reimbursements in a conservative manner,

10   accounting for the net $100.0 million purchase price adjustment

11   including the working capital reserve?

12   A    Correct.

13   Q    In the debtors kind of figuring out the right break fee

14   and expense reimbursement and looking at other deals, would

15   that typically have been done and disclosed on the basis of net

16   or inclusive of the working capital adjustment?

17   A    Generally, it's done a net basis.

18   Q    So on the large -- so the numbers in the motions would

19   have been on the larger --

20   A    Correct.

21   Q    -- number.

22   A    Correct.

23   Q    Not discounting for a similar working capital adjustment?

24   A    That's correct.

25   Q    And here, the difference would be that the headline price

1   is lower or --

2   A    It's -- yeah.  It's an important point.  The size and

3   complexity of this business is not unlike what we had in

4   Enterprise or even in MEN in terms of the global nature, the

5   large long contracts, the complexity of the services required.

6   The fact that the headline price was lower was a function of

7   the, you know, profitability and the outlook of the business,

8   but the -- the complexity of the business and the risk that the

9   counter party was taking was equal or perhaps even greater than

10   some of our other asset sales.

11   Q    Okay.  Now, when you say some of your other assets, how

12   would you line this up in terms of complexity compared to the

13   CDMA transaction?

14   A    Sure.  So CDMA was probably the most straight forward.  It

15   was largely a North American only as opposed to a global sale.

16   It was a handful of customers.  It was -- it was relative to

17   either Enterprise or our Optical business a much more straight

18   forward.  Optical was complex.  Enterprise was probably the

19   most complex relative to CVAS.  Our CVAS business and

20   Enterprise would probably compete head-to-head for the biggest

21   challenge to sell.

22   Q    And one of the numbers in the -- that comprised the bid

23   protections that are being proposed here is a $5.0 million

24   expense reimbursement straight payable to Genband.

25   A    Right.

Riedel - Direct                                                 25

1    Q    Are you aware of the actual amount of costs that have been

2    incurred by Genband to date?

3    A    I am.

4    Q    And how much is that?

5    A    There are -- in total, the Genband expenses to date are

6    7.6 million, I believe is the number.

7    Q    How do you know that number?

8    A    They were provided to us by counsel from Genband.

9    Q    But they're definitely north of the five even --

10   A    They are.

11   Q    -- prehearing?

12   A    And it's -- again, it's not unsurprising given the

13   accounting effort required, the legal effort required to

14   basically put this business and all of its complex form into an

15   executable transaction.

16   Q    So in your view, that they're not unreasonable fees if

17   they, in fact, had incurred those types of costs?

18   A    Very -- very true.

19   Q    The other number is the incentive fee, payment fee, OEP,

20   1.2 million or $3.6 million fee.  Are you aware of expenses

21   that have been paid by OEP or incurred by OEP to date in

22   different transactions?

23   A    Yes, I am.

24   Q    And are those in excess of $3.6 million?

25   A    They are.

1   Q    And you're aware of that -- the time that that arrangement

2   was agreed to?

3   A    I am.

4   Q    As part of your experience and involvement in this

5   transaction, you're also familiar with the bidding procedures

6   generally --

7   A    Yes, I am.

8   Q    -- and the negotiation of the bidding procedures?

9   A    Yes.

10  Q    How would you describe the bidding procedures as a whole

11  compared to the other transactions that have been proposed?

12  A    There are many similarities.  There is a couple of minor

13  differences that relate more to a pragmatic aspect, some

14  calendar items, whether they're holiday or court dates or the

15  like, but in -- on balance, they are very similar.

16  Q    And can you describe your view of the process with

17  negotiating Genband on the finalization of those procedures?

18  A    Again, I think consistent with all the other aspects of

19  negotiation, it was robust in terms fo the discussion, but it

20  was consensual and problem solving in nature.  I would clearly

21  argue it was a lot of push and pull on -- on both sides to try

22  and come to a mutually agreeable solution.

23  Q    As part of the stalking horse bid and the -- the bidding

24  protections that are provided, there is an agreement to pay a

25  break fee on certain conditions not being met, either

1    conditions to closing or breaches by Nortel of the agreement,

2    for example.  Are you aware as you sit here today of any

3    reasons that you know that this deal is not going to close?

4    A    I am not.

5    Q    One of the things the debtors asked to show and is held

6    to, as you know well, sitting in the courtroom all the times

7    that you have, is the -- not only the signing of a stalking

8    horse bid, but particularly, the payment of protections is

9    necessary and beneficial --

10   A    Right.

11   Q    -- to the estate, and without, certainly not asking for

12   your legal opinion, but you, as one of the -- a corporate

13   officer, had to consider the beneficial nature of the fees as

14   compared to other options such as not signing -- not signing an

15   agreement with these fees in it or pushing harder for the

16   negotiating.  Can you talk a little bit about your views and

17   how you came to the conclusion of the defensability of these

18   fees?

19   A    All right.  Look, we have I think demonstrated over the

20   last year a pretty good track record for both getting to

21   stalking horses and then ultimately approving in the auction

22   both the terms and the -- obviously, the value to the estate

23   through that process.  So there is a comfort level and an

24   empirical sort of facts around why that makes sense for us.  I

25   don't think there is -- there is a lot of surprise there.

1              I think in this circumstance, we were -- frankly

2      speaking, we had fewer options.  We had less choices.  There

3      wasn't the robust tension for this asset that we had hoped to

4      create.  So in order to secure both several thousand jobs, in

5      order to capture value for the estate, in order to provide the

6      mechanism to get to the auction, I think what we ended up

7      negotiating in a very arms length and back and forth basis was

8      a very good outcome for the estate.

9      Q    Were you ever told by either Genband or OEP that, you

10     know, I want them, they're important to me, I'm going to walk

11     without them, I can live without them, there is some wiggle

12     room, I can trade this and that for the fees for other things?

13     Did you ever get a sense of how unconditional these

14     requirements were for the buyer and for OEP?

15     A    They were pretty consistent.  It was important to both

16     sides to have this.

17     Q    To have the -- the existence of payment or the payments at

18     this level?

19     A    Payments at this level.  Again, you've got to remember the

20     circumstances here.  OEP is effectively the bank here.  They

21     are providing the equity or the debt to -- to finance this

22     transaction.  As you may know, OEP has been involved in looking

23     at a number of our businesses, MEN, Enterprise, and subsequent

24     businesses still on the horizon.  So they're quite familiar

25     with the process.  They're quite familiar with our businesses,

1      the complexity of which is quite significant.

2              So we -- we were quite concerned about not being able

3      to get to a transaction that would effectively secure this

4      business before the business started to continue to unwind.  It

5      was already softening.  The holidays were coming.  We didn't

6      have a whole lot of willing parties in the process to help us

7      provide more tension.

8      Q    Right.  And you said OEP is providing the financing.

9      There is reference in the motion to that, but some of the

10     documents have been filed under seal.  Can you talk just in a

11     general level about OEP's commitment to financing the deal?

12     A    Well, they are effectively providing the commitment

13     letters for the financing of the deal.  There -- there will

14     ultimately be details to be determined, other parties who may

15     provide elements of it, but they are -- they are the ones who

16     are currently signing on the line for the commitment letter.

17     Q    And so are they committed to pay what percentage of the

18     purchase price?

19     A    All of it.

20     Q    All of it?  And so under the equity commitment letter, how

21     long do they have to hold open that obligation for?

22     A    I'd have to check the letter.  I'm not sure.

23     Q    Would it be at least until the sale hearing?

24     A    Yes.  I know that's for sure.

25     Q    If the asset sale agreement hasn't been terminated, would

1    it be until closing?

2    A    Yes.

3    Q    And when would you anticipate a closing on this deal?

4    A    Second quarter of '10.

5    Q    So that would be months away.

6    A    Months away.

7    Q    Four or five months.

8    A    Yes.

9    Q    And it was already signed.  The equity commitment letter

10   was signed last month.  So you would add another --

11   A    Correct.

12   Q    -- weeks or month to that time they were tying up capital?

13   A    That's correct.

14   Q    If we weren't in bankruptcy and a counter party, a

15   financing source had made this type of request for payment of

16   this fee, what would have been your view of paying this fee?

17   A    Well, whether it's in bankruptcy like DIP financing or in

18   other situations where there is effectively a commitment fee to

19   reserve the capital and to put your signature on the line, I

20   think it -- there is a -- there is a fairly significant body of

21   practice.  That's a reasonable expectation.

22   Q    And based on your many years of experience working in

23   strategic transactions, do you have a view of the size of the

24   3.6 payment in the aggregate compared to the size of the money

25   being held on the loan?

1    A    It's actually -- as a percentage of the thing, it's

2    relatively small compared to other normal bench marks of

3    commitment letter that would -- you know, you'd expect maybe

4    one or two percent of the total fee.

5    Q    And if we weren't able to obtain approval of the fees

6    today as part of a package of the entire bidding procedures

7    being approved and asset sale agreement being presented for

8    solicitation at auction, what do you think would happen?

9    A    Yeah.  Three bad things.  One is that we would effectively

10   stare at a significant price reduction for the asset either

11   because the existing counter party would say well, then fine,

12   we're going to have to -- to renegotiation, and you'd begin to

13   pull the threads, and this was a complex deal with a lot of

14   puts and takes in it, and I think you'd -- you'd struggle to

15   hold the deal in place that you have.  Certainly, you'd expect

16   a lower price.  It's possible that you may not even be able to

17   come to terms and that the business would have to be wound

18   down, in which case, you'd have substantial challenges on the

19   customer side, on the collection of receivables, on the

20   attrition and restructuring costs for people.

21        Again, recall, this is a business that effectively,

22   we've been trying to sell for almost a year now, and we've

23   gotten really one party who's willing to put their -- their

24   money on the line, and so I think we stare at customers walking

25   at other kinds of things that would have net damages to the

1    estate.

2    Q    And are you concerned as an officer of the company that --

3    that if you approve this once, you've now opened flood gates to

4    every other deal?

5    A    No.  I think -- I think you have to step back and look at

6    some of the unique circumstances around this particular process

7    and transaction.  One is we talked earlier about complexity.  I

8    won't -- I won't hammer on that, but this is a very complex

9    business.  Two is relative size.  You have a counter party

10   buying a business that's, frankly, five times the size or four

11   and a half times the size of the existing business.  That's a

12   fairly major step for them.

13         Secondly -- thirdly, this counter party has looked at

14   multiple businesses and incurred significant expense across

15   those multiple businesses.  Fourthly, this is sort of the

16   caboose at the end of the line.  You're staring at the last

17   business, the last principal business that we're selling.

18         Fifthly is we didn't really have a whole lot of other

19   options.  I spoke earlier about the concerns that if this

20   didn't happen, we would be staring at possibility of winding

21   down the business, and lastly, as I mentioned earlier, we have

22   a lot of common customers between the CVAS business and the

23   wireless and MEN businesses, customers we still have to collect

24   receivables on.  So not only would there be damage to this

25   asset value, that our ability, if we had to wind down this

1   business to collect the receivables for wireless or -- that is,

2   the GSM business that hasn't closed or Optical business, again,

3   hasn't closed, would be put at risk.

4           So I think for all those circumstances, you have a

5   unique set of facts that argue that this -- this has a -- a

6   fairly unusual sort of characteristic to it which requires this

7   kind of payment to get the deal done and preserve value for the

8   estate.

9   Q    Thank you.  Just as an aside while I have you on the stand

10  in order to make one more thing on the record, in prior sale

11  hearings and bidding procedure hearings, you've testified

12  regarding the need to put certain documents under seal

13  including ancillary agreements to the -- to the sale document,

14  and certainly, here, the equity commitment letter, and your

15  prior testimony has been along the lines of that there is

16  propriety information, pricing information, and other

17  confidential commercial terms.  Are the concerns here similar

18  or different than other?

19  A    Identical.  Identical.

20          MS. SCHWEITZER:  Thank you.  I don't know if anyone

21  wants to --

22          JUDGE GROSS:  All right.

23          MS. SCHWEITZER:  -- cross-examine.

24          JUDGE GROSS:  Thank you, Ms. Schweitzer.  Is there

25  anyone in this courtroom who wishes to examine Mr. Riedel?

1    Mr. Tinker, good morning.

2              MR. TINKER:  Good morning, Your Honor.  If I could

3    have just one moment to confer with counsel?

4              JUDGE GROSS:  Of course.

5                        (Pause)

6              MR. TINKER:  Good morning, Judge Gross and Justice

7    Morawetz.

8              JUDGE GROSS:  Mr. Tinker, good morning.

9              MR. TINKER:  Patrick Tinker appearing on behalf of

10   the Unites States Trustee.  Your Honor, the reason I asked for

11   just a short pause was I wanted to talk with counsel for the

12   debtors regarding exhibits, to know whether I need to have

13   anything substantiated by witnesses in order to get it to this

14   end, and what we've agreed at the outset is that there is a --

15   a document filed with the Court in the -- in the United States

16   Bankruptcy Court, and it's docket number 2193.  It's captioned

17   notice of debtors' motion for orders, et cetera, and it's the

18   -- the matter we're here for today.

19             JUDGE GROSS:  Yes.

20             MR. TINKER:  As part of that filing, there are

21   numerous attachments and exhibits and the stipulation of -- of

22   myself and counsel for the debtors is that those were all to be

23   considered exhibits introduced into evidence.

24             JUDGE GROSS:  All right.  Ms. Schweitzer?

25             MS. SCHWEITZER:  That's correct, Your Honor.

1          JUDGE GROSS:  All right.  Fine.  They are deemed

2     admitted.

3          MR. TINKER:  Thank you, Your Honor.

4                     CROSS-EXAMINATION

5     BY MR. TINKER:

6     Q    Good morning, Mr. Riedel.

7     A    Good morning.

8     Q    As -- Mr. Riedel, as part of your testimony, you discussed

9     in a little bit of detail the fact that you had an exclusivity

10    arrangement that you reached with I guess Genband, maybe OEP

11    who may be an affiliate of those entities, with regards to

12    trying to come up with a stalking horse bid, and that's when

13    they were trying to do various kinds of investigation, I

14    assume, and --

15    A    Correct.

16    Q    -- trying to come up with the terms, and you indicated, I

17    think, that at that point in time in connection with that

18    exclusivity arrangement, there was also a discussion of -- of

19    $10.0 million or so in break up fee obligations, is that right?

20    A    That's correct.

21    Q    Okay.  And the time frame we're talking about is roughly

22    October/November?

23    A    That's correct.

24    Q    Okay.  And when you say or when counsel said break up fee

25    obligations and you agreed as to the amount, does that include

1    what today we would call -- are calling a break up fee and

2    expense reimbursements?

3    A    I'm sorry.  Could you repeat that again?

4    Q    Okay.  Today we have a motion which has a $5.0 million

5    break up fee --

6    A    Yes.

7    Q    -- and a -- an expense reimbursement cap at 5.0 million.

8    A    Correct.

9    Q    Okay.  Adds up to 10.0 million, and when you're referring

10   to this break up fee concept that was in place back in October

11   and November and it's 10.0 million, is that the same

12   10.0 million?

13   A    Yes, it is.

14   Q    Okay.

15   A    Yes, it is.

16   Q    At that point in time in October and November, was the

17   incentive fee part of that arrangement?

18   A    It was not.

19   Q    Okay.  When did the incentive fee arise as an issue?

20   A    Late November.

21   Q    And I assume the request for incentive fee came from OEP

22   or Genband?

23   A    It came from OEP.

24   Q    Now, when you had this -- this exclusivity arrangement

25   with a break up fee also being a part of that, was that

1    arrangement with OEP or Genband or were there other entities

2    involved?

3    A    The original five and five, that was with OEP and Genband.

4    Q    OEP and Genband.

5    A    Yes.

6    Q    So both entities have been involved --

7    A    Yes.

8    Q    -- through that process.

9    A    Correct.

10   Q    Now, that break up fee, the 10.0 million plus the expense

11   reimbursement, at that point in time in October and through

12   mid-November those were amounts to be paid to Genband or OEP or

13   was it specific?

14   A    I'd have to go back and check the details.  I think it was

15   payable to both OEP and Genband, but I'll yield to the -- to

16   the details that are in the contract.

17          MS. SCHWEITZER:  And, Your Honor, Mr. Tinker also --

18   Mr. Murray is in the courtroom and --

19          MR. RIEDEL:  Yeah.

20          MS. SCHWEITZER:  -- is in a position, he can testify

21   in more detail about that prior arrangement.  So you're welcome

22   to cross Mr. Riedel, but we'll have another witness on that can

23   through the exclusivity arrangement as well.

24          MR. TINKER:  Okay.  It might be easier, Your Honor,

25   if we can just have a proffer as to whether or not that's true.

1   That might be easier, and then I don't have to worry about

2   which witness testifies.

3                   JUDGE GROSS:  Mr. Bromley.

4                   MR. BROMLEY:  Good morning, Your Honor.

5                   JUDGE GROSS:  Good morning.

6                   MR. BROMLEY:  Good morning, Mr. Justice Morawetz.

7   Yes.  We do have the actual exclusivity document.  We're going

8   to introduce it through Mr. Murray, but I will make a proffer

9   and provide a copy.  It is a document addressed to Genband and

10  signed by Genband, not signed by OEP.

11                  JUDGE GROSS:  All right.  Thank you for that

12  clarification.

13  BY MR. TINKER:

14  Q    Okay.  I've referenced thus far the 10.0 million for break

15  up fee obligations.

16  A    Correct.

17  Q    And then somewhere in I think you said late November --

18  A    That's correct.

19  Q    -- the incentive fee aspect was added, and that request

20  came from OEP, is that correct?

21  A    Correct.

22  Q    Okay.  And when that request was made, was there an

23  explanation as to why that should be made, what the basis for

24  it was?

25  A    Yes, there was.  There was -- the principle rational was

1    that they had incurred substantial expense in a number of

2    transactions with Nortel, MEN and Enterprise in particular.

3    There were other transactions that they were still engaged on

4    in addition to CVAS.  We had other assets that they were --

5    they were involved in bidding on, and that they basically said

6    as a condition for going forward, to complete a deal on CVAS,

7    that they would need some form of expense reimbursement to go

8    forward, to get a deal done on CVAS.

9    Q    And this incentive fee, at that point in time, the

10   discussion was that it would go to --

11   A    OEP.

12   Q    -- OEP?

13   A    Correct.

14   Q    Okay.  Not to Genband.

15   A    Correct.  It would go to OEP.  It would be shared by the

16   various three principal estates, Canada, the U.S., and the U.K.

17   administrator, and then there would be an adjustment ultimately

18   on an ultimate allocation.

19   Q    Now, when I think of a break up fee and expense

20   reimbursement, I usually think of items in connection with a

21   particular sale transaction.

22   A    Yes.

23   Q    When they were presenting the request for the incentive

24   fee, whatever it was called back then, were -- and these

25   expenses were being described that they had in connection with

1     various transactions, did those transactions include this one,

2     or were they really expenses that they want to have paid for

3     them in connection with sales other than this one?

4     A     It was other than this one.

5     Q     Now, at that point in time, was there any demand that

6     Nortel or any of the other debtors pay for those expenses

7     outside of this arrangement for the incentive fee?

8     A     I'm sorry.  Outside of which arrangement?

9     Q     At the time they made the request for incentive fee,

10    they're requesting a certain amount, and at that time, it was

11    3.6 million or --

12    A     Correct.

13    Q     Okay.  And at that point in time, were they also

14    requesting 3.6 million or the payment of some other expenses in

15    connection with those other sales aside from the -- doing it

16    through this transaction?

17    A     No, they were not.  It was only through this transaction.

18    Q     All right.  What I'm trying to get at, I'm trying to

19    figure out whether or not it might be some kind of alternative

20    theory they were going on, that they relied or -- or whatever

21    so that Nortel had to pay it regardless.  That wasn't the

22    discussion that was going on.

23    A     No, it was not.

24    Q     Okay.  The -- the $3.6 million, you indicated that -- I

25    think that you were comfortable that the actual expenses in

Riedel - Cross                                    41

1    connection with those other sales was greater than 3.6 million.

2    A    Yes.   That's true.

3    Q    And what's the basis for that conclusion?

4    A    A summary of expenses incurred by the parties, both

5    accounting expenses, legal expenses and the like that they

6    shared with us, and we had -- in earlier discussions with the

7    other counter party that was in this transaction who dropped

8    out, we had a dialogue with them about what their expenses were

9    through August, and they were roughly twice what this break

10   fee.   So we had a calibration point with another party.

11   Q    But that other party's expenses were in connection with

12   this transaction?

13   A    Only this transaction, but we have also knowledge of what

14   others have spent in the other transactions.   So the notion

15   that somebody would have to spend five, six, seven million

16   dollars in total fees, legal accounting, other, to conclude one

17   of these is not unreasonable.

18   Q    Right.   But -- but that other party to the sale

19   discussions leading up to September and October, that other

20   party didn't -- wasn't relaying to you information about their

21   expenses in connection with other sales.

22   A    Correct.

23   Q    Just this one.

24   A    Correct.

25   Q    Okay.   And in connection with this sale, your

1    understanding is that the basis for the $3.6 million is

2    expenses incurred for accountants and various kinds of legal

3    expenses --

4    A    Correct.

5    Q    -- in connection with sales other than this one.

6    A    Correct.  Sales other than this one -- just to add

7    parenthetically -- that -- that produced a lot of value for the

8    estates.  You know, the MEN transaction in particular, if you

9    recall, where OEP was heavily involved, the net increase

10   through the auction process was in the neighborhood of a

11   quarter of a billion dollars.

12   Q    Now, was OEP a bidder in the MEN sale?

13   A    They were.

14   Q    OEP itself was a bidder?

15   A    With NSN.  They were partnered and bid together.

16   Q    But -- so OEP was part of a joint venture that bid?

17   A    Correct.

18   Q    And is that joint venture being compensated as part of

19   this incentive fee?

20   A    Not to my knowledge.

21   Q    I think you indicated that OEP's counsel had indicated

22   that the accounting fees and the legal expenses exceed

23   3.6 million.  Did they actually give you a number?

24   A    Yes, they did.

25   Q    And what was the number?

1   A    7.65, I think is the -- the number.

2   Q    And that's when combined, the two categories?

3   A    Legal and accounting, yes.

4   Q    Okay.  Aside from that representation, did you have any

5   backup for it?

6   A    No.

7   Q    Any firsthand knowledge of it?

8   A    No.

9   Q    Your only reason for saying that is -- is on the basis of

10  what somebody else told you.

11  A    Well, no.  That -- what somebody else told us and the

12  experience we'd had with other counter parties who had

13  conducted similar transactions and incurred similar expenses.

14  So it was in the realm of what we'd seen in other situations.

15  So we had benchmarks.

16  Q    Now, you indicated that they were part of a joint venture

17  that bid in the MEN sale.  What was the -- the joint venture?

18  A    I believe the legal entity name was MEN, LLC.

19  Q    My recollection is that there was a long MEN sale hearing

20  that went on pretty much all day.

21  A    Correct.

22  Q    OEP was a vital part of that sale hearing?

23  A    Correct.

24  Q    And their counsel?  And can you tell me when that took

25  place roughly?

1   A    What was the date of that?  It was in November -- I don't

2   remember the -- late November.  I don't remember the exact

3   date.

4   Q    Well, was it before or after the demand for the incentive

5   fee?

6   A    The incentive fee request came right after the auction,

7   the MEN auction initially.  So that would have been

8   November 20th or thereabouts, 21st, in that realm.  So the sale

9   order hearing was December 2nd, if I remember, 3rd.

10           MS. SCHWEITZER:  Your Honor, I don't think it's a

11  contested fact.  It's December 2nd.

12  A    2nd.

13  BY MR. TINKER:

14  Q    Now, OEP or the joint venture with which it was associated

15  was -- was contesting the auction, and it was contesting that

16  MEN auction before the incentive fee was actually requested?

17  A    No.

18  Q    Well, the -- the auction itself was the 20th, and --

19  around the 20th or the 21st?

20  A    The auction was the 18th, 19th, and 20th, if I remember,

21  of November, and the sale order hearing was the 2nd of

22  December.

23  Q    All right.  So we had the auction.  We then had the demand

24  for the incentive fee.

25  A    Correct.

1    Q    We then had the sale hearing.

2    A    Correct.

3    Q    Okay.  And at the sale hearing, they were pressing their

4    objection to the auction.  That objection to the auction or the

5    joint venture, that was clear at the -- at the time of the

6    auction, right, that they were unhappy about the way --

7    A    Correct.

8    Q    -- the auction was proceeding?

9    A    Correct.

10   Q    All right.  And then after that, they made the incentive

11   fee demand.

12   A    Correct.

13   Q    And that incentive fee demand includes expenses in

14   connection with an MEN auction.

15   A    Correct.

16   Q    Okay.  Was OEP involved in any other -- in bidding in any

17   other assets for Nortel assets?

18   A    Yes, they were.

19   Q    And what -- what other sales did they bid in?

20   A    They participated in the Enterprise asset sale.

21   Q    Did they bid?

22   A    Ultimately, in the auction, no, but they incurred expenses

23   to evaluate the asset.  They had participated in the sale of

24   our LG Nortel interest, and they bid there.

25   Q    They did bid?

1   A    Yes, they did.

2   Q    As part of an auction?

3   A    It was a Canadian monitor sponsored process.  It wasn't a

4   363.

5   Q    All right.  So that wasn't a matter here in this court?

6   A    Correct.

7   Q    So I'm trying to keep track of it.  In so far as matters

8   in this court are concerned, we have the MEN --

9   A    And Enterprise.

10  Q    -- matter where they actually bid, and then we have the

11  Enterprise assets sale where they were interested but they did

12  not actually bid at the auction.

13  A    Correct.  Correct.

14  Q    Any other sale transactions in which they were involved?

15  A    Where they involved or where they bid?

16  Q    Stick with where -- where they bid.

17  A    No.

18  Q    In connection with both the MEN sale and the Enterprise

19  asset sale, are there any other interested parties, bidding or

20  otherwise, who got paid their expenses?

21  A    Other than -- sorry.  Repeat that again.  I'm sorry.

22  Q    Well, I'll rephrase it.

23  A    Yeah.

24  Q    Aside from break up fees and expenses approved by this

25  Court --

1   A    Right.

2   Q    -- are you aware of anybody else getting paid their

3   expenses in connection with these sales?

4   A    No.

5   Q    So this is the first one.

6   A    Correct.

7   Q    Do you expect any others?

8   A    No, I do not.

9   Q    All right.  So it's just -- it's just this one.  Okay.

10  A    And just if I could, Pat, the reason I don't expect any

11  others is the circumstances and the facts surrounding this

12  particular transaction, as I elaborated earlier, were quite

13  unique in terms of the time in which it took place, the

14  relative sequence of when the deals were done.  It's our --

15  it's our seventh sale of the year so to speak, the counter

16  party risk that they were taking and the relative size of the

17  transaction.

18  Q    Going back for a moment to the breakup fee and break up

19  expense reimbursement --

20  A    Right.

21  Q    -- requested just in this case --

22  A    Correct.

23  Q    -- you indicated an amount of 7.6 million.

24  A    That's -- sorry.  The break up fee was five, and the

25  expense reimbursement was five.

1    Q     Okay.

2    A     So that was the ten.

3    Q     The -- you testified as to an amount of 7.6 million.

4    Maybe if you could just restate what that is.

5    A     That is the expenses that were incurred by OEP in a

6    combination of transactions outside of the CVAS transaction.

7    In addition, there were expenses that were incurred inside, but

8    the 7.6 relates to the -- principally, the MEN and Enterprise

9    costs for accounting and legal services.

10   Q     All right.  So in your view then, the -- the 7.6 million

11   serves as a basis for the 3.6 --

12   A     Correct.

13   Q     -- incentive fee?

14   A     Correct.

15   Q     Okay.  And earlier, you indicated 7.65 million, and that

16   is -- that's the same number.

17   A     Same one.  Yes.

18   Q     Okay.  Well, there is a request for a -- a break up fee

19   and a break up expense reimbursement here.  What is the extent

20   of your knowledge as to the basis for those amounts?

21   A     The five and the five.  So they were negotiated in -- in

22   part by ourselves, in part by our financial advisors for the

23   committee back in October, mid-October time frame.

24   Q     Did Genband -- and these are amounts that would go to

25   Genband --

1    A    Correct.

2    Q    -- as contrasted with OEP?

3    A    Correct.

4    Q    Okay.  And did Genband present you with or present the

5    debtors with information to substantiate the need for

6    specifically, $5.0 million in expense reimbursement or

7    $5.0 million in a reimbursement fee?

8    A    I'm not aware of that.  They may well have, but I'm not

9    aware of it.

10   Q    Aside from the fact that this is a negotiated amount, can

11   you tell me what the factual basis is for the debtors

12   requesting a break up fee and expense reimbursement in these

13   specific amounts?

14   A    Right.  I would -- would perhaps better yield that

15   question to -- to Mike Murray and others who are in the midst

16   of it.

17   Q    All right.  So you're not aware yourself.

18   A    I'm not.

19   Q    Okay.  Now, when you testified earlier that there was a

20   demand that was -- and the word used was unconditional, was

21   that in reference to the incentive fee?

22   A    Yes.

23   Q    And when you say they -- they were pretty consistent in

24   that demand, you're talking about in regards to the incentive

25   fee from late November on.

1    A    Correct.  There were a couple of key issues to -- to this

2    transaction.  That was one of them.  There were other ones that

3    were important to them, but they -- they had incurred

4    substantial expense.  They had an investment committee who was

5    concerned about whether or not it made sense to continue to

6    incur substantial expense.  They were the only counter party

7    within the time frame that we -- we were focused on willing to

8    get to a deal.  So there were a number of circumstances.

9    Q    The demand back in late November was 3.6 million?

10   A    Correct.

11   Q    And was that negotiated -- that was -- was that the end

12   product of negotiation or --

13   A    Yes, it was.

14   Q    -- was that the demand?

15   A    That was -- that was the end product of negotiation.

16   Q    What was the initial demand?

17   A    Again, I'd yield to Mike Murray on some of the specifics.

18            MR. TINKER:  Thank you for your patience, Your Honor.

19   I have no other questions for this witness.

20            JUDGE GROSS:  All right, Mr. Tinker.  Thank you.

21   Does anyone else wish to cross-examine before we hear from

22   Ms. Schweitzer?  And, in fact, I might ask if anyone in Canada

23   wishes to examine the witness.

24                    (No verbal response)

25            JUDGE GROSS:  No one?

Riedel - Redirect                                    51

1          JUSTICE MORAWETZ:  Nobody is rising for that

2     opportunity, Judge Gross.

3          JUDGE GROSS:  Thank you, sir.  Ms. Schweitzer.

4          MS. SCHWEITZER:  Thank you, Your Honor.  I have only

5     a few questions.

6                    REDIRECT EXAMINATION

7     BY MS. SCHWEITZER:

8     Q    First, Mr. Riedel, you had testified that in the MEN

9     transaction, the bid was placed by a joint venture, MEN

10    Acquisition, LLC rather than OEP directly?

11    A    Correct.

12    Q    Was that joint venture an active joint venture at that

13    time?  Did it have an operating business or --

14    A    No, it did not.

15    Q    And what was it?

16    A    It was effectively a rapidly put together acquisition

17    vehicle.  The -- NSN had told us at the bid deadline that they

18    were not going to be able to bid.  We were able to extend the

19    bid deadline to give them time to work with OEP to construct a

20    bid in order to have an auction.  So it was a seven-day wonder

21    that was put together in terms of a lot of work on our part,

22    particularly on their part to -- to produce the outcome.

23    Q    And when you negotiated the -- or at auction received

24    bids, were there principals from MEN Acquisition Co. that were

25    negotiating against you and putting in bids, or was it

1    representatives of OEP and NSN themselves?

2    A    It was OEP and NSN.

3    Q    And was the counsel -- counsel to -- some unique counsel

4    to MEN Acquisition Co. or were the counsel and financial

5    advisors incurring fees in that process counsel to OEP and NSN?

6    A    They were counsel to OEP and counsel to NSN.

7    Q    Mr. Tinker also asked you certain questions regarding the

8    pressing of an objection at auction.  Was that objection

9    asserted by OEP in OEP's name or was that objection asserted by

10   MEN Acquisition, LLC, the infamous disgruntled bidder?

11   A    It was the -- it was the MEN, LLC -- MEN Acquisition, LLC

12   who led the objection.

13   Q    And were you -- in negotiating with and dealing with this

14   acquisition vehicle, in making decisions, were you privy to the

15   final result of the joint ventures working together, or were

16   you privy to all the dirty laundry between the joint ventures

17   and how they decided who was going to object and who's pushing

18   which objection?

19   A    We had a fairly good understanding of what was going on

20   between the parties.  I wouldn't say we were privy to all of

21   it, but we -- we certainly -- they were -- they were candid and

22   transparent with their comments to us.

23   Q    Right.  So you knew that they were interested in pressing

24   objections, but were you privy to their legal conversations

25   with their counsel, for example, or their decisions of whether

1    one objector felt stronger or less strongly or who was

2    consulting with the lawyers --

3    A    I was not.  No.

4    Q    -- to the acquisition co. --

5    A    I was not.

6    Q    -- in making those decisions?  And as a result of the

7    pressing of that objection at auction, were -- was there a

8    change to the deal made at the MEN auction?

9    A    There was.

10   Q    And the --

11   A    At the sale order hearing.

12   Q    At the sale order hearing.

13   A    Yes.  Yes.

14   Q    Yes.  And then that change was to increase the basis

15   price, the basis points on cash out --

16   A    Correct.

17   Q    -- of the note.

18   A    Correct.

19   Q    And it was the two basis price -- two point increase?

20   A    Two points.

21   Q    And was that in rough numbers?

22   A    Circa $5.0 million.

23   Q    So there was a $5.0 million arguable benefit obtained

24   through the pressing of that objection --

25   A    Correct.

1    Q    -- at their cost.  Now, the other questions you were asked

2    were regarding the support for or your personal knowledge of

3    the support for the fees that have been incurred by OEP and the

4    fees that have been incurred by Genband.  While you haven't

5    been given copies of the invoices, have you seen their lawyers

6    present, financial advisors present and you talk to them from

7    time to time?

8    A    Occasionally.  Occasionally.  Yeah.  They've been very

9    active.

10   Q    And who's been active?  Just one set lawyers in one

11   jurisdiction or --

12   A    No.  There has been two sets of lawyers involved, one in

13   -- in New York and one in Texas.  There has been bankers

14   involved.  There has been accountants involved.  It's a very

15   sizable effort.

16   Q    And that's the North American side of it?  There is --

17   A    Correct.

18   Q    -- also a European side as well?

19   A    Correct.

20   Q    And those various advisors have been advised -- involved

21   throughout the process or just in the final strokes?

22   A    Throughout the process.

23   Q    And without inviting comment on the reasonableness of our

24   fees, as we're in a fee application, you're aware of the fees

25   of certainly, Cleary, which are publically filed and the

Riedel - Redirect/Recross                                    55

1   committee and their advisors and other professionals incurred

2   in this case on these various sale transactions?

3   A    I am.

4   Q    And so did you have any reason to doubt when they told you

5   -- Genband and OEP told you the size of their fees, that their

6   numbers were credible or reasonable?

7   A    No, I did not.  Again, we had seen obviously the fees

8   we've incurred.  We've heard from other counter parties the

9   fees they have incurred.  It was -- it was an expensive

10  process.

11            MS. SCHWEITZER:  That's all.  Thank you.

12            JUDGE GROSS:  Thank you, Ms. Schweitzer.  Mr. Tinker?

13            MR. TINKER:  If I could just follow up on --

14            JUDGE GROSS:  You may.

15            MR. TINKER:  -- on redirect.

16                      RECROSS-EXAMINATION

17  BY MR. TINKER:

18  Q    You just testified that on the basis of other things you

19  know, you didn't view the amounts as -- as unreasonable.

20  A    Correct.

21  Q    And you can recall seeing financial advisors and other

22  lawyers, et cetera, but do you really have knowledge that it's

23  this amount rather than say two-thirds of that amount?

24  A    Well, I haven't seen the invoices, and so therefore, I

25  can't say I have firsthand knowledge of this stuff, but I have

1    seen the activity.

2    Q    Right, but you see the activity because you're -- you're

3    face-to-face with them or you're talking, et cetera.

4    A    Correct.

5    Q    But you would agree, wouldn't you, that there are other

6    things going on behind the scenes that may generate fees and

7    expenses, but you don't know the extent of those.

8    A    Well, I guess it's possible.  What I -- what I look to is

9    the end product.  The size of these major documents, the ASSA

10   for the main sellers or the MESA's is several hundred pages,

11   you know, and -- and the process that we've gone through now

12   seven times to negotiate with counter parties is a long,

13   complicated, lengthy process.  It has taken a lot of time.  So

14   I -- I know the energy and the effort necessary to produce

15   these outcomes, and it's not trivial.

16   Q    There are other parties involved in sales transactions

17   with Nortel who have also expended considerable resources and

18   are not getting paid, isn't that right?

19   A    That is correct.

20              MR. TINKER:  No other questions, Judge.

21              JUDGE GROSS:  Thank you, Mr. Tinker.  Anyone else?

22                      (No verbal response)

23              JUDGE GROSS:  Mr. Riedel, you may step down, sir.

24              MR. RIEDEL:  Thank you, Judge Gross.

25              JUDGE GROSS:  Thank you very much.

1      MS. SCHWEITZER:  Your Honor, I'd cede the podium to

2  my colleague, Mr. Bromley, who is going to call Mike Murray as

3  a witness.

4      JUDGE GROSS:  All right.  Thank you.  Mr. Murray, if

5  you'll just remain standing for a moment.

6      THE CLERK:  If you could state your full name for the

7  record and spell your last name.

8      MR. MURRAY:  Michael Murray, M U R R A Y.

9      MICHAEL MURRAY, Debtors' WITNESS, SWORN

10     JUDGE GROSS:  Whenever you're ready, Mr. Bromley.

11     MR. BROMLEY:  Thank you very much, Judge Gross, and

12  good afternoon, Mr. Justice Morawetz.  If I could take care of

13  an administrative matter before we get going.

14     JUDGE GROSS:  Yes.

15     MR. BROMLEY:  I do have two exhibits that I'd like to

16  use.  They are the exclusivity agreement and the first

17  amendment to the exclusivity agreement.  I've provided

18  Mr. Tinker with the exclusivity agreement but not the first

19  amendment.  If I may hand it to him now.

20     JUDGE GROSS:  Yes.

21     MR. BROMLEY:  And if I could, Your Honor, identify

22  the exclusivity agreement as debtors' exhibit 1 for

23  identification and the first amendment as debtors' exhibit 2

24  for identification and ask if anyone has any problem with us

25  offering then into evidence.  If -- if anyone has an issue, we

1    can certainly establish the -- the evidentiary basis, but to

2    try to shortcut that, I'd ask for a stipulation.

3              JUDGE GROSS:  I understand.  Mr. Tinker?

4              MR. TINKER:  Your Honor, I haven't had an opportunity

5    to look at them.  I, frankly, didn't even think of their

6    existence prior to this hearing, although maybe I should have.

7              The -- to the extent that these are documents signed

8    by the debtors, they -- they are business records, and I don't

9    have an objection to the introduction of these documents into

10   evidence as -- as records.  I don't know what propositions they

11   would be offered for.  So I would simply want to reserve the

12   right to object as we get into certain lines of testimony on

13   the basis of these documents.  I don't have an objection to

14   them being introduced into evidence kind of in the -- in the

15   abstract.

16             JUDGE GROSS:  In other words, you don't have an issue

17   with their authenticity.

18             MR. TINKER:  It doesn't seem like -- like I -- I

19   don't expect that I would, Judge.

20             JUDGE GROSS:  All right.

21             MR. TINKER:  I'm sure if they're signed by the

22   parties, that's fine.

23             JUDGE GROSS:  Very well.  Thank you, Mr. Tinker.

24             MR. BROMLEY:  Thank you, Your Honor.  We're just

25   trying to speed things along a little bit.

1         JUDGE GROSS:  Understood.

2         MR. BROMLEY:  If I may approach both the bench and

3    the witness?

4         JUDGE GROSS:  Yes, please.  Thank you.  Thank you,

5    Mr. Bromley.

6         MR. BROMLEY:  I'll even give one to the Committee,

7    Your Honor.

8                    DIRECT EXAMINATION

9    BY MR. BROMLEY:

10   Q    Mr. Murray, you've testified here on a number of

11   occasions.

12   A    I have.

13   Q    So I'd like to -- to ask you a very leading question.

14   Could you please just tell us who you are and what you do?

15   A    Michael Murray.  I'm a managing director with Lazard.  I

16   am an M&A advisor, and now a restructuring advisor in the TMT

17   industry.

18        JUDGE GROSS:  And we can certainly rely on the

19   earlier testimony for further background.

20        MR. BROMLEY:  Thank you very much, Your Honor.

21   BY MR. BROMLEY:

22   Q    Mr. Murray, you were present in the courtroom for

23   Mr. Riedel's testimony, is that correct?

24   A    That's correct.

25   Q    And are you familiar with the process that Nortel has

1    employed in the post-petition period in attempting to divest

2    the CVAS business?

3    A    Very much so.

4    Q    And you're familiar as well with what the CVAS business is

5    and what it does?

6    A    I am.

7    Q    And is it fair to say that you would adopt the testimony

8    of Mr. Riedel on those points?

9    A    I very much agree with everything that George said.

10   Q    I'd like to try to focus the testimony on the specific

11   issues of concern to the U.S. Trustee, and in particular, the

12   two documents that I've put before you are documents that have

13   been executed that relate to the so-called exclusivity

14   arrangement with Genband.  Can you look at what's been marked

15   as debtors' exhibit 1 --

16   A    Uh-huh.

17   Q    -- and tell me if you recognize that document?

18   A    I do.

19   Q    And is that the -- the exclusivity agreement that was

20   signed with Genband?

21   A    Yes.

22   Q    And so that's dated October 15th, is that correct?

23   A    October 15, 2009.  Yes.

24   Q    2009.  So how long was this document negotiated before it

25   was actually signed?

1    A    Three weeks, if I remember correctly.  Two to three weeks.

2    Q    And so the -- so that would move us back into the -- at

3    the end of September.

4    A    That's right.

5    Q    So beginning in the end of September, there were

6    negotiations between Nortel and its advisors and Genband and

7    its advisors about this exclusivity arrangement?

8    A    Yes.

9    Q    Can you tell me why it was important in your view as

10   Nortel's banker that an exclusivity arrangement of this sort be

11   signed with Genband?

12   A    We were very focused on re-engaging in a very wholesome

13   way with Genband as the acquirer of CVAS at that moment in

14   time, particularly because our lead bidder up to that moment

15   had recently informed us that they intended to leave the

16   process and, in fact, did.

17   Q    So -- so in late September, there was a point in time when

18   a prior interested party had indicated to the debtors that they

19   were no longer interested --

20   A    That's right.

21   Q    -- in participating?  And how -- that prior interested

22   party, how long were -- were Nortel and you involved in

23   discussions with that party?

24   A    Since April.

25   Q    Since April.  And had you -- had Nortel entered into an

1    exclusivity arrangement with that other bidder?

2    A    To my knowledge, no.

3    Q    So at the same time that Nortel was talking with the other

4    potential interested party, it was also talking with Genband?

5    Is that --

6    A    Genband and others.

7    Q    When did -- when did Genband first enter the -- the

8    picture with respect to CVAS?

9    A    Prior to April, but they participated beginning in April

10   when we initiated the process in a formal way.

11   Q    And why -- why would Genband be interested in the CVAS

12   business?  What is Genband?

13   A    Genband is a participant in the market, a much smaller

14   player, probably at least a third the size of this asset.  They

15   know the industry well.  They have similar customers.  They

16   supply products in not all cases exactly the same, but this is

17   a synergistic product line.  They know the industry very well.

18   Q    And so you said Genband is a third of the size?

19   A    Approximately.

20   Q    Of -- of what?  The CVAS business?

21   A    Of the CVAS business.

22   Q    And is that a third of the size in terms of revenue or

23   employees?

24   A    Revenue.

25   Q    What about employees?

Murray - Direct                                              63

1    A    Revenue.  It's smaller in terms of employees.  Probably 25

2    percent.

3    Q    And what about geographic scope?

4    A    Not nearly as global as the CVAS business is.

5    Q    So the -- the entry into this type of contract by Genband

6    is a -- is a substantial exercise on their part in your view?

7    A    We would refer to it as a bet the company move.

8    Q    Do you think that Genband has been over the course of the

9    past nine months been devoting substantial resources and

10   attention to this exercise?

11   A    They have.

12   Q    Is Genband able to do this deal without financing from OEP

13   in your view?

14   A    They're unable to do it without financing.  OEP is

15   certainly the best position to finance the deal at this

16   particular moment.

17   Q    And are -- is it your understanding that OEP has a -- an

18   ownership interest in Genband?

19   A    Yes.

20   Q    So going back to the -- to Mr. Riedel's testimony and the

21   number of parties that indicate an interest in the -- in the

22   asset, by the time we got to September, you had the other party

23   that you were dealing with.  You had Genband.  So when the

24   other party moved away, whose idea was exclusivity?  Was it

25   Nortel's or was it Genband's?

Murray - Direct                                                    64

1    A    It was introduced by Genband.

2    Q    And in considering whether or not to enter into the

3    exclusivity arrangement, did Nortel and its advisors consults

4    with the creditors and the bond holders, the monitor, the --

5    A    We --

6    Q    -- administrators?

7    A    We did.

8    Q    And did -- did that consultation include on all issues

9    including expense reimbursements and break up fees?

10   A    It did.

11   Q    And through the various -- well, through the three weeks

12   of negotiation, were there various versions of this document?

13   A    There were multiple versions.  It was a fairly

14   comprehensive negotiation.

15   Q    And was there give and take on -- on issues such as the --

16   the potential break up fee and -- and expense reimbursement?

17   A    Size of fee time frame of exclusivity, how it would

18   continue to roll in certain events, et cetera.

19   Q    And so at the time that this was signed in October, a -- a

20   number of -- of approximately $10.0 million was identified as

21   the potential break up fee and expense reimbursement --

22   A    Correct.

23   Q    -- assuming a headline price -- net price of

24   200.0 million --

25   A    That's right.

1   Q    -- is that correct?  And at that time, did you feel that

2   that number was an appropriate number?

3   A    Given the circumstances within which we were operating, I

4   do.  I was supportive -- supportive of signing this.

5   Q    And so when you say -- when you say circumstances, what do

6   you mean by that?

7   A    George covered them well.  I think that we have been

8   dealing with a very unique process in this particular instance.

9   It's a complex business.  It was pushed to the end of the line

10  so to speak, which meant that although we started in April,

11  there were long -- moments along the way where we weren't able

12  to focus on this process.  It's my opinion though that our

13  counter parties were continuing to work and therefore,

14  incurring expenses.  I think that it was taken into

15  consideration as we thought about the overall size of the --

16  the 10.0 million.

17  Q    In terms of the -- the exclusivity agreement, there is a

18  second document up there that's debtors' exhibit 2, and on top

19  of that, there is a heading, first amendment to the exclusivity

20  agreement.  Do you recognize that document?

21  A    I do.

22  Q    And I would note that the first bullet reads --

23           "Paragraph 3 of the exclusivity agreement shall be

24           replaced with the following.  The effective period of

25           this letter agreement shall commence on October 15,

1          2009 and shall terminate at 11:59 p.m., New York City

2          time, on November 30, 2009."

3          Do you recall the agreement to extend the term of the

4     exclusivity agreement?

5     A     I do.

6     Q     And why was that agreed to?

7     A     Both parties agreed that we needed more time to get to a

8     deal.

9     Q     And so at the time that this was agreed to, do you think

10    there were good faith efforts ongoing on both sides to reach an

11    agreement?

12    A     Absolutely.

13    Q     And was there any -- any lack of consensus among the

14    constituents about extending it?

15    A     No.

16    Q     And at the same time that this was being extended, were

17    there also a recognition that OEP was involved in a potential

18    bid on the assets for MEN with NSN?

19    A     It's fair to say that.  Yes.  The answer is yes, and it's

20    fair to say that both sides recognized that this deal yet again

21    was pushed back in time due to circumstances related to other

22    Nortel asset sales.

23    Q     And were you of the view that -- the same view in November

24    when it was extended, that -- that it was important to have an

25    exclusive relationship with Genband in trying to reach an

1    agreement?

2    A    Yes.

3    Q    Now, the -- the agreement with Genband was signed just

4    prior to -- to Christmas and the break that everyone took.  How

5    important in your mind was signing that agreement and

6    announcing it prior to the end of the year?

7    A    I believed it to be critical.  We were very sensitive to

8    allowing more time to pass and, in fact, moving into January,

9    which I thought was extreme deal risk.  We had a counter party

10   at the table that was ready to sign a deal in our opinion.  The

11   business was under pressure.  You heard George testify to that

12   effect.  We felt strongly that to the extent we could keep them

13   in the room and get this deal signed before the holiday, that

14   it was important to do so, and, in fact, we did.  It was a long

15   weekend.  It was a very at times contentious negotiation.  I

16   think at the end of day, a very fair deal for both sides that

17   was negotiated just prior to Christmas.

18   Q    Do you think that having that announcement prior to

19   Christmas was important to the customer base?

20   A    I do.

21   Q    And why is that?

22   A    Again, we were continually seeing signs as time went by

23   without a resolution for the CVAS asset, that there was

24   softening in the order books, just continuing questions about

25   the future of the business, and we just did not think that more

1    time was too great a risk to take to the extent we could avoid

2    it.

3    Q    What about the -- the potential impact on employees and

4    the -- of the business?

5    A    Attrition has been an issue with this business during --

6    all year long, and it was something that we thought with the

7    announcement of a -- of a deal or at least the beginning of the

8    process to a deal, that we would see an ability to retain

9    employees that we wanted to retain.

10   Q    And in your view, do you believe that the customers and

11   employees would view Genband as a credible purchaser of this

12   business?

13   A    I do.

14   Q    And do you think that was important as well?

15   A    Yes.

16   Q    So let's back up a little bit.  Have you been in meetings

17   with OEP on Nortel matters this year?

18   A    Many.

19   Q    And how many different potential transactions have you had

20   conversations with OEP or their representatives on?

21   A    Three.

22   Q    And which are those?

23   A    Enterprise, MEN, and CVAS.

24   Q    And each of those, do you believe that OEP was engaged in

25   -- in the process with the -- with the intention of attempting

1  to get to a transaction in each of those situations?

2  A    Absolutely.

3  Q    Do you believe that in any of those circumstances, that

4  OEP was doing anything other than operating in good faith?

5  A    I don't.  They have been consistently acting in good in my

6  opinion.

7  Q    So the first transaction that came up was the Enterprise

8  transaction, and I think Mr. Riedel testified that -- that OEP

9  did not put in a bid, is that correct?

10 A    That's correct.

11 Q    But did they put in substantial work in --

12 A    They did not bid in the auction.  If I could just clarify

13 that.

14 Q    Uh-huh.

15 A    They did put in a preliminary non-binding bid at one point

16 in time.

17 Q    And in your view in the marketplace, is OEP a credible

18 investor?

19 A    Yes.

20 Q    And could you give me a little bit of background on your

21 understanding of OEP and who they are?

22 A    They are a major private equity institution, wholly owned

23 by J.P. Morgan, the most valuable banking institution in the

24 United States market.

25 Q    So you mentioned that they're a private equity

1    organization.  So they're not -- they're not an operating or

2    strategic buyer, is that correct?

3    A    That's right.

4    Q    So the way that OEP would invest in a business is either

5    with a partner or through a portfolio company?  Is that fair?

6    A    Typically, that's probably their model.  I would think

7    that at times, they may attempt to bid on their own, but I

8    would think they probably see more leverage and synergy

9    potential by acting with a partner as they're doing in this

10   case.

11   Q    So in the context of -- of the -- the enterprise interest,

12   you -- you were -- you had participated in meetings with

13   representatives of OEP.  They did diligence.  They had

14   management presentations.  Is that all fair?

15   A    That's all fair.

16   Q    And then moving down the line, the next transaction was

17   the MEN transaction.

18   A    Right.

19   Q    Right?  So you were here and testified at the contested

20   sale hearing.

21   A    I was.

22   Q    And you were at the auction for --

23   A    Yes, I was.

24   Q    -- for the MEN assets, correct?  And representatives of

25   OEP were at that auction and at the sale hearing, correct?

1    A    They were.

2    Q    Is it fair to say that they were upset at the results?

3    A    Yes.

4    Q    Is it fair to say that you had a concern that the results

5    of the MEN auction might endanger their interest in the CVAS

6    business?

7    A    That is very fair.

8    Q    And after the conclusion of the MEN auction, did -- did

9    OEP re-engage along with Genband on CVAS?

10   A    They did.

11   Q    And do you believe in your -- in your view that that

12   re-engagement was -- was done in good faith?

13   A    Yes.

14   Q    And that it was -- and that their efforts to reach a deal

15   by the Christmas break were legitimate and -- and pursued

16   notwithstanding their disappointment on the MEN auction?

17   A    I do believe that, and furthermore, I give them a lot of

18   credit for refocusing, re-engaging, and getting to an announced

19   deal in that time frame.

20   Q    So in your experience, outside of bankruptcy, is it common

21   for investors, particularly private equity investors, to look

22   for fees, commitment fees in order to undertake diligence or to

23   make commitments to purchase assets?

24   A    It is.  It's also typical for banks.

25   Q    And so in looking at the transaction as it's structured

1   now, do you see OEP as Genband's bank in effect for this

2   transaction?

3   A    They are the sole source -- potentially, the sole source

4   provider of financing for this transaction, and they have

5   committed to the entirety of the purchase price.

6   Q    And so in your experience outside of bankruptcy, do you

7   think that the $3.6 million fee that would be proposed to be

8   paid here would be a market fee --

9   A    I do believe that.

10  Q    -- outside of bankruptcy?

11  A    If it were described as a commitment fee, it would be

12  within market.

13  Q    And would it have surprised you outside of bankruptcy that

14  a private equity investor such as OEP would have requested such

15  a fee?

16  A    No.

17  Q    And if you were outside of bankruptcy, what would the

18  exercise have been for the -- for a corporation such as Nortel

19  to -- to have made the decision to have paid the fee?

20  A    I think it would have been a fairly quick set of

21  discussions internally, and a decision would have been made to

22  proceed on the basis.

23  Q    So you think in your experience, the business judgment

24  would have been that that type of fee should be paid --

25  A    Yes.

1    Q    -- to pursue the transaction?

2    A    Just as the business judgment was here.

3    Q    In connection with -- with this particular transaction, at

4    the time that the incentive fee first came up, what was your

5    view of the likelihood of their continued participation in the

6    CVAS process, OEP that is, if the fee was not paid?

7    A    Their representation to me is that they would not continue

8    to participate in this process without some level of protection

9    for reimbursement of expenses, and I believe that.

10   Q    Now, had that position deviated at all in your

11   conversations with them?

12   A    No.

13   Q    And that has been consistent ever since the incentive fee

14   came up?

15   A    Very consistent.

16   Q    You've been involved in all of the sale processes that

17   we've had here, correct?

18   A    Yes.

19   Q    We've had a number of different styles that we've used.

20   A    We or they?

21   Q    We.  Including a so-called naked auction without a

22   stalking horse.

23   A    Yes.

24   Q    Is this business a sort of business that you think would

25   fair well in a naked auction?

1    A    First of all, I believe that a naked -- a stalking horse

2    based auction is preferable to a naked auction.  This business,

3    given its complexity, I do not think would lend itself well to

4    a naked auction.

5    Q    And when you say you think it's -- a stalking horse

6    process is preferable to a naked auction, on what basis do you

7    say that?

8    A    You have a target value that everyone can look at and

9    understand.  You have a time frame that's understood by the

10   bidders.  You can manage it both to the value and the timing

11   and get people where you want them to be at the right time to

12   potentially participate in the auction.

13   Q    So -- so you think that there is a -- a demonstrable

14   benefit to having a stalking horse rather than having no

15   stalking horse at all?

16   A    I do.

17   Q    In terms of the incentive fee, it's -- it's styled as

18   $3.6 million, but are you aware of how that actually is split

19   up amongst the estates?

20   A    My understanding is -- is that it's a third, a third, a

21   third.

22   Q    So that would be approximately $1.2 million attributable

23   to the U.S. estates.

24   A    Yes.

25   Q    Is that fair?  And I think there is an adjustment

1    mechanism depending on the way --

2    A    Right.

3    Q    -- the proceeds come out.

4    A    Exactly.

5    Q    But is it fair to say as well that this is not a hundred

6    percent a U.S. exercise in terms of --

7    A    It's --

8    Q    -- payment of the incentive fee?

9    A    That is fair to say.

10   Q    And therefore, the other estates have to bear the

11   remainder of the costs, correct?

12   A    That's correct.

13   Q    Is it your understanding that the -- the monitor and the

14   Canadian estate believes that the payment of the incentive fee

15   is appropriate?

16   A    That is my understanding.

17   Q    And it is your understanding that the joint administrators

18   are of the view that the incentive fee should be paid?

19   A    Yes.

20   Q    So when you look at the potential benefit of this

21   transaction with a stalking horse leading the transaction, do

22   you think that the cost to the U.S. estate of $1.2 million is

23   appropriate?

24   A    Absolutely.

25   Q    Now, each of the transactions that we've had have had some

1    level of protection except for the one where we had a naked

2    auction.  Are you aware of any other transaction in which fees

3    have been paid?

4    A    Well, NSN received fees in CDMA, because they did not

5    emerge as the winner bidder, but --

6    Q    So in the C --

7    A    -- those were court approved.

8    Q    So in the CDMA transaction, we actually did end up having

9    a higher or better offer --

10   A    Yes.

11   Q    -- correct?  And that -- that led to the payment to the

12   stalking horse --

13   A    That's right.

14   Q    -- of the break fee and expense reimbursement.  So -- and

15   of the other transactions, there was nothing --

16   A    No.

17   Q    -- in Enterprise, right?  Nothing in MEN?

18   A    No.

19   Q    So for over $3.0 billion of proceeds, so far, there has

20   been a payment of one break fee and expense reimbursement.

21   A    Correct.

22   Q    And do you recall in the CDMA how much that was?

23   A    If I remember correctly, it was approximately

24   $22.5 million.

25   Q    $22.5 million on 3.0 billion?

1    A    3.0 billion aggregate, 1.13 billion for that deal.

2    Q    For that deal.  Now, is it your understanding that absent

3    the payment of the incentive fee, that Genband is not willing

4    to go forward?

5    A    That's my understanding.

6    Q    I mean -- I should say OEP is not willing to go forward.

7    A    That's right.

8    Q    And do you think that the risk of -- of saying no to that

9    request for 1.2 million out of the U.S. estates is worth the

10   risk that they walk away?

11   A    Not at all.

12   Q    The -- the asset purchase agreement has built into it a

13   number of bidding protections.  Are you familiar with the asset

14   purchase agreement?

15   A    I am.

16   Q    And were you involved in the negotiation of it?

17   A    I was.

18   Q    And the negotiation of the bidding procedures?

19   A    Less so, but yes.

20   Q    Is it fair to say that they're similar to the bidding

21   procedures in other transactions that --

22   A    Very similar.

23   Q    -- have been approved here?

24   A    It focuses primarily on the time frame --

25   Q    Right.

1    A    -- and that's very consistent with prior precedents in our

2    -- in our case.

3    Q    Now, in terms of the expense reimbursement and -- and

4    break up fee that's built in, can you tell me how the

5    $10.0 million number came to -- to be in the agreement?

6    A    It was negotiated.  That's I think the reason we've

7    referred back to the exclusivity agreement.  It was first

8    proposed at a higher level by Genband as a condition under

9    which they would enter exclusivity and re-engage and begin to

10   essentially spend money to try to get to a deal back in

11   September resulting in the October 15th agreement.

12           That -- that was negotiated.  It involved all of our

13   constituents.  The financial advisors to the creditors, in

14   fact, were personally involved in negotiating that -- that

15   level.  So that has been on the table as part of our

16   negotiations with Genband and OEP for now three or four months.

17   Q    Now, Mr. Riedel also talked about the backup for the

18   expense reimbursement.  Is it fair to -- to say that you've

19   also seen the same sort of information Mr. Riedel has seen?

20   A    Again, I haven't seen the detailed invoices.  I've -- I've

21   heard about the same number.

22   Q    In prior transactions, did Nortel ever request detailed

23   invoices before agreeing to expense reimbursement numbers?

24   A    Not that I'm aware of.

25   Q    All right.  And you didn't ask for specific invoices in

1    this situation?

2    A     I didn't.

3    Q     Right.  And based on your understanding of the costs of

4    these different transactions, having been through all of them

5    here in the Nortel situation, do these numbers appear to be

6    from a dollar sign perspective in the ball park of what you

7    would assume to be appropriate?

8    A     On the expense side, I would be shocked if the combined

9    parties haven't spent in multiple of this number.

10   Q     And does that -- is that because of the complexity of this

11   business?

12   A     Complexity, the length of time we've been working on it,

13   the on again, off again nature of the negotiations to a degree,

14   but I would say first and foremost, the complexity.  This

15   business is every bit as complex and as difficult to sell as

16   Enterprise or MEN was.  So I think relative to price, the

17   expenses and time incurred are higher.

18   Q     The -- so is it -- is it fair to say that in your view,

19   the -- you would expect that any other stalking horse would

20   have spent as much money if not more and would be looking for

21   similar expense reimbursement treatment?

22   A     Absolutely.  In fact, the party that left the table in

23   September had represented to us that their expenditures to date

24   at that point in time were significantly higher than any of the

25   numbers we've talked about today.

1    Q    Do you think in light of the transactions we've done here

2    in Nortel and which you've been involved, that you would ever

3    be able to have a stalking horse bidder if you didn't have

4    robust bid productions in the form of expense reimbursement and

5    break fees?

6    A    I think given the circumstances of this deal and this

7    asset, that these numbers would be on the high side of

8    precedent.  Yes.

9    Q    But still appropriate?

10   A    Yes.

11   Q    Now, focusing on the incentive fee, there was some

12   discussion earlier about reimbursement with respect to prior

13   transactions that are different than the CVAS transaction.

14   A    Right.

15   Q    But is it fair to say that -- that it was OEP's position

16   and remains OEP's position that it would not do the CVAS

17   transaction unless this incentive fee was paid?

18   A    That's right.

19   Q    And that in terms of looking at the number on the

20   incentive fee, that backup was given with respect to prior

21   expenses?

22   A    That's my understanding.

23   Q    But first and foremost, what we're talking about here is a

24   fee that is being paid in order to incentivize OEP to provide

25   the financing from Genband to do this transaction.  Is that

1    fair?

2    A    That's fair.  I think of it as either an incentive fee or

3    a commitment fee, however you'd like to describe it.  It was a

4    necessary fee on our part to keep them in this deal.

5    Q    Once again, in the scheme of things, you think that the

6    $1.2 million that would have to be paid by the U.S. estate is a

7    -- a reasonable number to be paid under these circumstances?

8    A    Very much so.

9    Q    Now, we heard just as we came in the courtroom today that

10   as a result of the Creditors Committee's objection, that OEP

11   had agreed that the payment of this incentive fee would be

12   moved.  Are you aware of that?

13   A    I am aware of that.

14   Q    And so it had been the original proposal that it would be

15   payable immediately upon entry of the orders of both courts

16   approving this.  You're aware of that?

17   A    Yes.

18   Q    And now it's being moved to the conclusion of the auction.

19   A    Correct.

20   Q    That's approximately say six weeks based on the current

21   schedule?

22   A    That's right.

23   Q    Do you think that concession on the part of OEP is a

24   benefit to the estate?

25   A    I do.  I think it's material and beneficial.

1    Q    Now, do you think it -- it makes you more comfortable as

2    the banker that OEP is going to be there through the auction?

3    A    I do.

4    Q    And -- and do you think that based solely on that

5    movement, that the payment of the $1.2 million by the U.S.

6    estate is justified?

7    A    Solely on that movement, probably.  Is it incremental

8    benefit to the 1.2?  Absolutely.

9    Q    Now, this incentive fee structure has not come up in prior

10   transactions, is that correct?

11   A    That's correct.

12   Q    And do you have any reason to believe that any other

13   bidders in future deals will be requesting similar treatment?

14   A    I have no reason to believe it.  I think the more germane

15   question is whether or not we would have to entertain it.

16   Q    Do you think that the fact that OEP had been involved for

17   so many months on multiple deals with respect to Nortel is an

18   important element in their willingness to go forward with the

19   CVAS deal?

20   A    I do.

21   Q    And why is that?

22   A    I think that -- well, a couple of things.  They have been

23   involved with Nortel throughout the course of the year.  I

24   think that their expenditures of both time and opportunity,

25   cost and resources and money have been very significant.  I

1     share George's view that in the case of the MEN auction, they

2     contributed to a very significant value increase during the

3     course of that three-day auction to the tune of approximately

4     $250.0 million.

5              Furthermore, I think that providing them with this

6     incentive fee or expense protection, however you would like to

7     call it, gives them some level, I would say modest even, some

8     level of comfort that their time leading up to the announcement

9     of the deal would be well spent, and that in my estimation was

10    important to get them to the table.

11             And in your view, was it important to get them to the

12    signature prior to Christmas?

13    A    Yes.

14    Q    And if -- if the request for the incentive fee had simply

15    been rejected in November, what is your view of what would have

16    happened with respect to OEP's interest and Genband's interest?

17    A    I don't think we'd be sitting here today first of all.  I

18    think we'd be probably not negotiating with OEP, Genband at

19    this point, and trying to figure out what other options we

20    might have.

21    Q    So is it fair to say that the commitment of Nortel around

22    the world to support this fee has been essential in keeping OEP

23    in the game?

24    A    Yes.

25    Q    And without that, you don't think there would be a deal

1    here today?

2    A    I don't.

3              MR. BROMLEY:  I think that's all we have at this

4    point.  I reserve the right for redirect.

5              JUDGE GROSS:  Of course.  Thank you, Mr. Bromley.

6    Any cross-examination?  Mr. Tinker.

7              MR. TINKER:  Thank you, Your Honor.

8                        CROSS-EXAMINATION

9    BY MR. TINKER:

10   Q    Good afternoon, Mr. Murray.

11   A    Good afternoon.

12   Q    Back in October and November, once again, we had the

13   exclusivity arrangement.

14   A    Yes.

15   Q    At that point, the discussion or the obligation really was

16   with regards to a break up fee of 5.0 million and -- and

17   expense reimbursement of 5.0 million, total of 10.0 million.

18   A    It was -- it was a total of approximately 10.0 million.

19   We had not --

20   Q    Hadn't been allocated.

21   A    -- to my recollection defined the five and five.

22   Q    Okay.  And that's  in the attachment to that exclusivity

23   agreement.

24   A    That's right.  It's in the first -- October 15th document.

25   Q    Right.  Now, it's your understanding that when you were in

1  agreement as to that $10.0 million number, that was to get to a

2  deal, right?

3  A    That was to get to the bargaining table to hopefully get

4  to a deal.  That's correct.

5  Q    Okay.  And when you say deal, you mean getting to a

6  purchase agreement.

7  A    That's right.

8  Q    All right.

9  A    An announced stalking horse agreement.

10  Q    Okay.  And at that point in time, Nortel's view was that,

11  you know, they were -- while there might be court approval

12  required, you might be obligated to pay a $10.0 million number

13  to get to the deal.

14  A    That's correct.

15  Q    Okay.

16  A    No.  That the $10.0 million would represent the aggregate

17  of break fee and -- and expense reimbursement.

18  Q    But to get to a deal.

19  A    That's right.

20  Q    I'm sorry if I misspoke as to anything, but I accept your

21  correction if I did.  The incentive payment --

22  A    Yes.

23  Q    -- and the 3.6 million, that demand was made after the

24  first exclusivity arrangement was reached.  The demand was made

25  after the auction itself was conducted but prior to the -- the

1    hearing on the MEN sale, is that right?

2    A    That is not my recollection.

3    Q    What is your recollection?

4    A    It was made after the sale hearing.  So I have a slight

5    modification to George's testimony on that based on my

6    recollection.

7    Q    All right.  So the $3.6 million demand was made after the

8    MEN hearing.

9    A    That's right.

10   Q    And when I say hearing, I'm referring to the hearing on

11   the -- for the final sale order.

12   A    In this courtroom.

13   Q    Yes.

14   A    That's right.

15   Q    Okay.  Up until that point in time, OEP had made no demand

16   for additional sums beyond that which was agreed to in the

17   exclusivity letter.

18   A    That's correct.

19   Q    Except -- and superceded by that agreement.  Okay.

20   A    There was -- I should say relative to the ten, and I don't

21   remember the exact timing, there was further negotiation on

22   that number that took place.

23   Q    Relative to the what?

24   A    The 10.0 million aggregate.

25   Q    Further negotiation when?

1    A     During the course of I think November or December.

2    Q     Okay.

3    A     That number was further negotiated.  There were further

4    asks on their part and at one point, it was negotiated yet

5    again.

6    Q     Well, you had a -- an exclusivity agreement that was

7    expiring, right?

8    A     That's correct.

9    Q     And so the discussion with regards -- was with regards to

10   a possible increase of the break fee and expense reimbursement

11   for some period after the expiration of that first exclusivity

12   agreement.

13   A     Well, it was -- it was -- the whole listing of the

14   negotiation of the deal at that point in time was in full

15   negotiation mode.  The -- the expense reimbursement and break

16   fee and the, quote, incentive fee was all part of the

17   negotiating package.

18   Q     At what time?

19   A     Again, the -- the 3.6, the eventual number, 3.6, that came

20   up, to my recollection, for the first time after the sale

21   hearing.  The other components of the deal had been part of the

22   negotiating throughout the fall.

23   Q     Okay.  So the 3.6 million was new.

24   A     That's right.

25   Q     Okay.  During your testimony, you discussed the -- the

1    fact that OEP came back to the table in a sense after the

2    disappointment from the MEN hearing.

3    A    Correct.

4    Q    Okay.  And your statement I think was something to the

5    effect that you gave them lots of credit for redirecting

6    themselves to come back to this transaction, the CVAS

7    transaction.

8    A    That's right.

9    Q    Okay.  But at the same time, as they were coming back to

10   the table, they were demanding the $3.6 million, right?

11   A    That's correct.

12   Q    All right.  So your assumption is that that played a role

13   in their coming back.

14   A    I believe that to be the case.

15   Q    Okay.  In essence, they were saying unless you pay our --

16   our expenses in connection with other transactions, we won't

17   stay at the table here, we'll take our -- our chips and walk.

18   A    Yes.

19   Q    This financing to be provided by OEP, that -- that

20   financing that you understanding they're committing themselves

21   to provide to Genband --

22   A    Yes.

23   Q    -- that's only for a sale to Genband, right?

24   A    It's only for financing this transaction.

25   Q    For a transaction to Genband, where Genband is the

1    purchaser.

2    A    Correct.

3    Q    They're not going to provide financing for anybody else to

4    your knowledge.

5    A    No.  Not to my knowledge.

6    Q    Okay.  So when you say that, you know, and you might

7    compare it to a commitment fee, what you're talking about is a

8    commitment fee that typically, a -- a buyer would pay to their

9    lender, and here, the -- the lender of Genband, the purchaser,

10   is OEP.

11   A    True.

12   Q    Okay.  That commitment fee -- well, in the past sales

13   transactions that you've had in this case, has Nortel committed

14   themselves to pay a commitment fee to any other financer of a

15   sale transaction?

16   A    No.

17   Q    Okay.  Is that typical that you would ever agree to that

18   kind of a commitment fee?

19   A    Is -- no.

20   Q    When you testified that in your view, the $3.6 million

21   would be a -- a market rate, if you would, for a commitment

22   fee, you're speaking of a commitment fee paid by --

23   A    The borrower.

24   Q    -- a buyer -- a borrower.

25   A    That's right.

1   Q    Okay.  Maybe it goes without saying, but you would agree,

2   wouldn't you, that there is no market for commitment fees to be

3   paid by the seller?

4   A    That's true.

5   Q    Okay.  I just want to kind of pin down a little bit some

6   of your testimony with regards to the 1.2 million and the

7   allocation perhaps at the -- at the back end.  The incentive

8   fee arrangement as it is right now as part of this motion and

9   the related documents would entail approval of a $3.6 million

10  incentive fee, right?

11  A    Correct.

12  Q    All right.  So in essence, the debtor is looking for

13  Judge Gross in particular to approve a $3.6 million incentive

14  fee.  Regardless of how it's paid, you're asking for that

15  approval, right?

16  A    That's correct.

17       MR. BROMLEY:  Objection, Your Honor.  I think the

18  pleadings speak for themselves.  We're seeking -- we have a --

19  an agreement with respect to the payment of the fee, and it

20  allocates a certain percentage of that to the U.S. debtors.

21       JUDGE GROSS:  I'll sustain that objection.

22  BY MR. TINKER:

23  Q    The amount of 1.2 million, that's allocated in the

24  documents, right, as the American debtors portion of the

25  incentive fee?

1    A    I would defer to my legal counsel on that question, but my

2    understanding is that's the deal.  It's one -- a third, a

3    third, a third to be adjusted depending on allocations --

4    Q    Okay.

5    A    -- of purchase price.

6    Q    Now -- so subsequently, it may be the case that the

7    American debtors would end up paying more than 1.2 million,

8    because -- because of the allocation of the proceeds.  Do you

9    know?

10   A    My understanding is that's possible.  Yes.  I think that's

11   the case.

12   Q    All right.  And you don't know what the -- the end number

13   might be.

14   A    No.

15   Q    All right.  So it might not be 1.2 million.  It might be

16   something more.

17   A    That's possible.

18   Q    Okay.  You had testified in regards to the -- the break up

19   fee I think in connection with the CDMA sale where there was a

20   -- an actual break up fee paid.

21   A    Right.

22   Q    Okay.  And I think you testified that the amount was

23   $22.5 million.

24   A    That was my recollection.  That's right.

25   Q    And could you tell me roughly what percentage of the

1    purchase price that was?

2    A    Well, it was as a percentage of the original announced

3    purchase price.

4    Q    Okay.

5    A    Slightly over three.

6    Q    And that is just for the fee or for the -- what about the

7    expense reimbursement?

8    A    I believe it was -- I don't recall.  I think the aggregate

9    amount was just over three, maybe three and a half percent in

10   that case.

11   Q    All right.  So if you add the -- the break up fee plus the

12   expense reimbursement, it was just --

13   A    Yes.

14   Q    -- perhaps just over three, but somewhere in that range?

15   A    Somewhere in that range.

16   Q    Okay.  Now, the break up fee that we're talking about

17   here, it adds up to roughly $10.0 million, right, for the break

18   up portion of it, break up fee plus expense reimbursement?

19   A    Is ten.

20   Q    Okay.  And based on your knowledge of expenses generated

21   or your best guess as to what those expenses are, you expect

22   that the full amount will be requested and justifiably so.

23   A    Yes.

24   Q    So that at the end of the day, you would have

25   $10.0 million being paid out.

1    A    If there is a topping bid.

2    Q    Understood.  And right now, we -- we have a sale with a --

3    a headline price, if you would, of $282.0 million?

4    A    Correct.

5    Q    The parties actually expect that it would be somewhere in

6    the range maybe of 100 million less than that, although the

7    number is uncertain.

8    A    That is true, and that assumes a Q2 closing.

9    Q    Okay.

10   A    So it's an estimate of where we think the working capital

11   on deferred revenue would be at that point in time.

12   Q    And I'm not the greatest at math, but if you had a sale of

13   200 million --

14   A    Uh-huh.

15   Q    -- then the -- a $10.0 million break up fee would be five

16   percent.

17   A    Five percent.

18   Q    All right.  And that's actually more, considerably more

19   than was paid in any other sale transaction where a stalking

20   horse fee was paid in this case.

21   A    In this case.  It is not considerably more to my

22   recollection on the Enterprise side.

23   Q    Why don't you go ahead and explain that.

24   A    Relative to the original -- I seem to recall that in that

25   case, we were in the high fours relative to the original

1    $475.0 million announced transaction value, but my recollection

2    could be off.

3    Q    I previously asked Mr. Riedel questions along this line,

4    but I should probably ask it of you as well just to flush it

5    out a little bit.  To your knowledge, there are other potential

6    purchasers in the case who were looking at various assets, is

7    that right?

8    A    Could you repeat that?  I'm sorry.

9    Q    Let me rephrase it.  Nortel has had a lot of different

10   lines of business to sell.

11   A    Correct.

12   Q    Okay.  And Nortel has been trying to sell or considering

13   selling many of those lines of business since the case was

14   filed almost a year ago.

15   A    True.

16   Q    Okay.  And in connection with those various sales

17   transactions, from transaction to transaction, it's not

18   uncommon, is it, to see the same entity bidding on or looking

19   into one asset and then coming back to the table and looking at

20   a different asset, is that right?

21   A    That's right.

22   Q    And there were probably several potential purchasers out

23   there like that where they -- they're interested in multiple

24   transactions, not just one?

25   A    That has been the case.

1    Q    Okay.  And OEP or its affiliates, those are the only ones

2    where the debtor is agreeing to pay expenses incurred in

3    connection with those other transactions.

4    A    That is true.

5    Q    Okay.  Now, you described the $3.6 million as designed to,

6    you know, incentivize them to -- to get, you know, to the sale.

7    A    Correct.

8    Q    Get the deal done.  The -- a break up fee has the same

9    purpose, isn't that true?

10   A    Not exactly.  No.  The break up fee is more about expenses

11   or protection in the event their deal is topped.

12   Q    Uh-huh.

13   A    This was an agreement to actually get them, in my opinion,

14   to re-engage, to negotiate, to make a bet essentially about

15   spending the time and money required to get to a deal in the

16   time frame we asked them to do it.  It's a very different in my

17   opinion --

18   Q    From the --

19   A    -- mechanism.

20   Q    From the debtors' perspective though, the goal was to get

21   them to the table.

22   A    Correct.

23   Q    All right.  And when you do -- when you agree to a break

24   up fee, the goal is to get them to the table.

25   A    It's a component of -- of the deal, but it's not -- it's

1    not something used to get somebody to the bargaining table in

2    my opinion.

3    Q    Break up fee is not?

4    A    It's part of the overall transaction.

5    Q    Well, why do you give a break up fee to one person rather

6    than another?

7    A    Because they're the announced bidder.  They're the -- it's

8    the deal that we choose to announce.

9    Q    All right.  So you're -- you're agreeing to a break up

10   fee, because they're agreeing to -- to come to the deal.

11   A    Come to the deal and consummate it and announce it.

12   That's correct.

13   Q    Right.

14   A    Right.

15   Q    And that's -- that's the purpose.

16   A    That's correct.

17   Q    And that's the purpose of the incentive fee here as far as

18   the debtor is concerned.

19   A    It's -- it's -- it has that element.  I think it's

20   slightly different.

21   Q    Well, is it the debtors' goal to make sure that people who

22   come to multiple sales, they get paid their expenses in

23   connection with all those sales?

24   A    No.  In this particular case, it was the debtors' goal to

25   get a counter party to the table that we thought we could get a

1    deal consummated with.  That incentive fee was an element that

2    was required to do that.  It's unique to this situation.

3    Q    You stated in your earlier testimony that there is -- and

4    I'll paraphrase -- there is no reason to think others would ask

5    for such an incentive fee.

6    A    I agree with myself.

7    Q    Now, are you surprised that nobody has come -- else has

8    come forward and asked for an incentive fee?

9    A    No.

10   Q    Okay.  And have you ever been asked for an incentive fee

11   before?

12   A    No, not an incentive fee.  Have we been asked for expense

13   coverage in some cases?  To my knowledge, yes.  We've had that

14   discussion with other parties.

15   Q    Right, but you've never -- you're with Lazard.  You've

16   been doing this work for some time.

17   A    Uh-huh.

18   Q    You've never done a deal in bankruptcy where an incentive

19   fee has been agreed to, right?

20   A    I have not.

21   Q    You testified as to increased value as a result of the

22   efforts of the joint venture in the MEN sale.

23   A    Correct.

24   Q    Okay.  And I think you indicated that as a result of

25   efforts by -- at least in part by OEP or its joint venture,

1    there was an increase of value to the estate, and I think you

2    indicated $250.0 million as kind of a rough estimate of what

3    that --

4    A     Rough estimate.

5    Q     -- value would be?

6    A     That's right.

7    Q     Okay.

8    A     510 to 769.

9    Q     Okay.

10   A     259.

11   Q     All right.  And in that case, was there a stalking horse?

12   A     Yes.

13   Q     All right.  And so the debtors had already arranged with

14   somebody else to have their expenses paid if the sale didn't go

15   forward.

16   A     Could you -- I'm sorry.  Could you -- did we have a break

17   fee and expense reimbursement mechanism in that deal?  Yes.

18   Q     Right.  And OEP in this joint venture, they didn't get the

19   -- the break fee -- the break fee deal, the stalking horse deal

20   in that -- in that transaction, right?

21   A     That's right.

22   Q     All right.  Because somebody else beat them out for it.

23   A     Somebody else was the stalking horse.  They weren't.

24   Q     Okay.  When you get to an auction for this case, you're

25   hoping, I assume, that we have approval of -- of bidding

1    procedures and we get to an auction.

2    A    Absolutely.

3    Q    And you're hopeful that other people come forward at an

4    auction so you can get a good price.

5    A    I am.

6              MR. TINKER:  I have no other questions, Your Honor.

7              JUDGE GROSS:  All right.  Thank you, Mr. Tinker.

8    Mr. Bromley?

9              MR. BROMLEY:  I just have a couple of quick follow-

10   ups, Your Honor.

11                        REDIRECT EXAMINATION

12   BY MR. BROMLEY:

13   Q    The -- Mr. Murray, do you recall the Enterprise

14   transaction?

15   A    I do.

16   Q    And that there was a break up fee and expense

17   reimbursement?

18   A    Yes.

19   Q    What was the stalking horse purchase price in Enterprise?

20   Do you recall?

21   A    475.

22   Q    475?  I have here the information that I took out of the

23   motions.  I'll make that representation that I took this out of

24   the papers.  There was a break up fee of $14,250,000 and an

25   expense reimbursement of $9,500,000.  Do those numbers sound

1    familiar?

2    A    They do.

3    Q    And I just did the quick math.  That came to about five

4    percent of the purchase price.

5    A    So I was off a bit when I said high fours.

6    Q    We'll give you that one.

7    A    Thanks.

8    Q    Mr. Riedel testified earlier that he said that this --

9    this transaction was probably the second most complicated

10   transaction behind Enterprise.  Do you -- do you think that

11   given the numbers that were agreed to in Enterprise, that the

12   numbers agreed to here are appropriate?

13   A    I do.

14   Q    One of the things that Mr. Tinker was just asking you had

15   to do with whether or not you've seen something like this

16   before.

17   A    Yes.

18   Q    Have you ever seen a situation where a major corporation

19   has sold each of its business seriatim in this fashion in your

20   career?

21   A    No.

22   Q    Have you ever seen a situation where a business --

23   corporation is selling its businesses seriatim and you had one

24   party interested in major parts of the enterprise and engaging

25   fully in those exercises and being frustrated in two of them?

1    A    I can't say I have.

2    Q    And do you -- do you think that you're ever going to run

3    into the source of facts again in your career?

4    A    No, I don't.

5    Q    So is it fair to say that in your view, that the incentive

6    fee that's being asked here is a -- a unique exercise?

7    A    I think it's highly unique.

8    Q    And just once again, in your view, without the approval

9    and payment of this fee, is it your view that the transaction

10   will no longer be supported by OEP?

11   A    I'm fearful that that's the case.

12              MR. BROMLEY:  I have no further questions,

13   Your Honor.

14              JUDGE GROSS:  All right.  Thank you, Mr. Bromley.

15              MR. BROMLEY:  Unless Mr. Tinker has something that I

16   need to correct.

17              JUDGE GROSS:  Mr. Tinker, please.  Yes.  Of course.

18              MR. TINKER:  I appreciate the Court's indulgence.

19   I'll be --

20              JUDGE GROSS:  Of course.

21              MR. TINKER:  -- very brief on -- on the questioning.

22                        RECROSS-EXAMINATION

23   BY MR. TINKER:

24   Q    Mr. Murray, you've seen bankruptcy cases where you have

25   good assets and bad assets, right?

Murray - Recross                                              102

1    A    Yes.

2    Q    And you've seen cases where there are multiple sales.  You

3    sell -- you sell the good assets or the bad assets, and then

4    you sell the other ones.

5    A    True.

6    Q    All right.  People want to buy the bad assets, and then

7    they -- you have the bad assets leftover, and without

8    disparaging the assets here, what we're talking about is the --

9    the assets being sold to the extent you can, earlier, but this

10   is as -- somebody used the word the caboose.  You know, it's

11   more difficult.  For whatever reason, you're trying to sell

12   this asset at the tail end.

13   A    Yeah, but it's not a question of good or bad.  It's a

14   different issue.

15   Q    I understand, and that's why I said I don't want to be

16   disparaging as to this case, but what we have --

17   A    It actually relates to the complexity.

18   Q    -- is a harder to sell asset now.

19   A    Sorry?

20   Q    We have an asset now, the CVAS --

21   A    Correct.

22   Q    -- business is harder to sell.

23   A    That's true.

24   Q    All right.  So you sold the -- what you could earlier, and

25   now you're selling this one.

1    A     Fair enough.

2    Q     And that's a scenario that you see in other cases as well.

3    A     True.

4              MR. TINKER:  No other questions, Your Honor.

5              JUDGE GROSS:  Thank you, Mr. Tinker.  Anything

6    further, Mr. Bromley?

7              MR. BROMLEY:  No, Your Honor.

8              JUDGE GROSS:  All right.  Anyone else?

9                   (No verbal response)

10             JUDGE GROSS:  Mr. Murray, thank you, sir.

11             MR. MURRAY:  Thank you.

12             JUDGE GROSS:  You may step down.

13             MS. SCHWEITZER:  Your Honor, we thank both the Courts

14   for your indulgence in this process.  I know it's been running

15   long, and we have competing needs of people maybe wanting to

16   take a break, but also, we're fine pressing forward,

17   recognizing everyone's time pressure.  So we defer to you on

18   whether you'd like to take a break.  I think we're moving

19   towards argument.

20             JUDGE GROSS:  Yes.

21             MS. SCHWEITZER:  You're welcome -- we're happy to

22   give a break.  We're also happy to press forward, whatever

23   Your Honors would prefer.

24             JUDGE GROSS:  Justice Morawetz, any preference, sir?

25             JUSTICE MORAWETZ:  Perhaps, Judge Gross, you could

Colloquy                                              104

1   inquire as to how long you would expect the submissions in your

2   court to be.

3          JUDGE GROSS:  How much longer do you think,

4   Ms. Schweitzer?  I know that's difficult to estimate, but --

5          MS. SCHWEITZER:  Well, I promise not to take more

6   than two times anyone else.  Right?  So I think that the folks

7   who probably want to be heard are myself, Mr. Tinker --

8          JUDGE GROSS:  And the Committee perhaps.

9          MS. SCHWEITZER:  -- the Committee briefly.  We also

10  have on the phone the bond holder group and Matlin Patterson's

11  counsel is on the phone, although I -- I would believe it's

12  completely cursory without foreclosing anyone.  The purchaser's

13  counsel is in the courtroom, but I don't think necessarily

14  needs time or any substantial time to be heard unless something

15  were to come up.

16         JUDGE GROSS:  Right.

17         MS. SCHWEITZER:  So I would say on that, half hour.

18         JUDGE GROSS:  Half an hour?  Shall we press on,

19  Justice Morawetz, or would you like a short recess?

20         JUSTICE MORAWETZ:  I think we press on, Judge Gross.

21         JUDGE GROSS:  Let's press on then.  Yes.

22         MS. SCHWEITZER:  Okay.

23         JUDGE GROSS:  Thank you.  And if anyone needs to take

24  a break --

25         JUSTICE MORAWETZ:  If anybody needs to be excused --

Argument - Schweitzer                                    105

1        JUDGE GROSS:  -- certainly, you're welcome to --

2        JUSTICE MORAWETZ:  -- for five minutes --

3        JUDGE GROSS:  -- excuse yourself.

4        JUSTICE MORAWETZ:  -- you may take a break.

5        MS. SCHWEITZER:  Well, Your Honors, Judge Gross and

6   Mr. Justice Morawetz, we have -- we're very pleased to be here.

7   We have a wonderful transaction to present the Court.  As

8   you've heard, it's been a long, tenuous road to get here, and

9   it's the longest we've worked on a transaction to date.  It's

10  one of the hardest transactions we've worked on, and we sit

11  here today before you asking for you to approve procedures

12  where there is a face based price for the transaction of

13  $282.0 million.

14        In an effort to provide candor to the Court that

15  there are purchase price adjustments in that which provide cash

16  to the estates, working capital adjustments, which means the

17  debtors would get cash instead of getting -- keeping their own

18  cash versus getting purchase price payments, we filed a motion

19  that calculated break frees, bidding protections off of the net

20  number rather than the gross number whereas in all prior

21  transactions which themselves included working capital, fee

22  adjustments, and the like, we've always calculated off the base

23  number, as is the practice across transactions, and what we're

24  faced with today is I think that, you know, that's -- that is

25  what it is.  So whether we're arguing about a 4.7 fee or a 5.5

1    fee or a 7 percent fee, what we're arguing about is are these

2    fees individually and collectively necessary and beneficial to

3    the estate, and our test, as O'Brien makes very clear, is do we

4    satisfy 503(b), and so let's look at what the law is.

5        The law is O'Brien says you have -- these fees have

6    to be actually necessary to preserve value to the estate.  What

7    the law is not is there is no case saying you can never go over

8    five percent.  There is no case saying that it can never be a

9    benefit to the estate if you don't have an auction, if you

10   don't have a closing, if you don't have a topping fee, if you

11   don't have anything, and certainly, 503(b)(9) doesn't say this,

12   and O'Brien itself makes a point of citing cases from all

13   across the country, and all the standards that have been

14   offered by all the different courts are the factors that must

15   be considered or may be considered are the parameters, and

16   O'Brien says I'm not going there, I'm not setting a per se

17   rule.  It's discretion of the Court based on the unique facts

18   and circumstances present to the Court based on that

19   transaction and the benefits brought by the fees, how they're

20   structured, what the conditions are, and quite frankly, what

21   the other opportunities are for the debtor around them.

22       As you've heard today in, you know, 503(b) -- excuse

23   me -- 503(b) is certainly O'Brien, but it's for any expense of

24   the debtors paid post-petition, we hold debtors to that

25   standard, and reference has been made repeatedly through the

1    testimony to payment of commitment fees and diligence fees, and

2    those fees are routinely paid by debtors, not purchasers, but

3    paid by debtors to DIP lenders.  They're paid to debtors, to

4    exit financers, plan sponsors, and in order to get them to do

5    the work or stay on board in case that plan gets confirmed, in

6    case the loan is actually negotiated to conclusion.

7            So the idea that we have to thread a needle through a

8    very small buttonhole is just wrong.  There is no -- I don't

9    think anyone is necessarily arguing that, but we all have to

10   remember this is a facts and circumstances benefit to the

11   estate, and that's the standard we're being held to.

12           We do look -- O'Brien does give us some guidance.  It

13   doesn't throw up its hands.  The Third Circuit themselves said

14   hey, fees would be justifiable or certainly could be

15   justifiable if there was assurance of the fees, and the promise

16   to pay promoted more competitive bidding or brought someone to

17   the table who otherwise wouldn't have been there or otherwise

18   would have -- there would have been more limited bidding.

19           In O'Brien, the fees were turned down because in many

20   cases and most cases where they are turned down is where you

21   have another potential bidder, an actual bidder in the

22   courtroom saying I am ready, willing, and able.  We don't have

23   that here today.  I wish we did.  I wish five people stood up

24   today.  Haven't heard anyone, and this hasn't been an expedited

25   sale process.  This is something that started in April, went

1    across all the other sale processes.  Everyone knew we were

2    selling our businesses, and we worked with people, many people

3    up in the data rooms, full solicitation of people, worked

4    extensively and closely with another bidder who it ultimately

5    didn't come to fruition, and this is what we have.

6            JUDGE GROSS:  So the fact that this is the caboose,

7    as we described it, is not that you waited until the end to

8    proceed with the sale, but rather, events just simply held up

9    an earlier sale.

10           MS. SCHWEITZER:  Absolutely, and I think that there

11   is two elements to that.  Certainly, that there is band width

12   issues on OEP's side working on several transactions.  There is

13   band width issues on the debtors' side.  There was triaging,

14   but also, quite frankly, as the testimony made clear, there is

15   complexity issues here, and as everyone in the courtroom knows

16   by now, that Nortel's story is it's the jig -- the picture that

17   became a jigsaw puzzle, and you have to pull the pieces out in

18   a systematic way, and there is only so many pieces you can pull

19   at a time, and this is one of the more highly integrated

20   pieces.  It's the piece in the middle, and until you pull the

21   pieces around the side, it gets harder and harder and harder to

22   figure out what the conditions of the asset sale agreement are

23   here, what you're left with, what you can promise a bidder, and

24   quite frankly, even the committee objection, it had originally

25   made reference to patents coming in and out.

1          JUDGE GROSS:  Yes.

2          MS. SCHWEITZER:  We have conversations about patents,

3    contracts, employees, geographical scope, what's -- who you can

4    promise to deliver, what countries will be in proceedings at

5    the point the sale closes, what employees will be retained.

6    You don't know any of that until you can put a pin in some of

7    -- some element of all the different pieces that are moving.

8          So the length of time certainly is a caboose in the

9    sense that there are a lot of cars in the train that were being

10   sold, but also, the idea that this just -- it was hard, and

11   people were working for a very long time, very consistently and

12   very vigorously to get this done, and particularly, as the

13   testimony showed, this is different than some of our larger

14   bidders coming in, being willing to put billions of dollars

15   down, hundreds of millions to billions of dollars down,

16   certainly not without diligence, certainly not without

17   confronting the same issues, but with a less of the bet the

18   company stake to it, and I think the bet the company feel is

19   coming out a lot more on these later sales, and part of it is

20   just they have to look at every penny a little closer and every

21   risk a little closer, because the buyer has less ability to

22   absorb some of those shocks, and you have to keep -- every time

23   you hit a shock, you have to tell the buyer stay with us, we're

24   there, you want this business, keep working, I know it's going

25   to be another day, week, month that's going to set you back to

1    solve that problem, but you've got to stay in the game, because

2    it's not just good for us.  It's good for you, and along the

3    way, things we've promised to keep Genband and OEP in the game

4    were an exclusivity agreement and a commitment that we were

5    going to seek $10.0 million in break fees, which, as someone

6    had said, that the number did, in fact, -- was revisited and

7    revisited upward one time past and more fees were incurred, and

8    we held to the purchase price in the same magnitude despite

9    much more diligence and snags and this and that in every

10   direction, and we held to $10.0 million in break fees over an

11   extended period of time, but on the other hand, OEP is required

12   to, if they want to finance a deal, they have to hold capital,

13   and they have to hold capital before they sign in order to know

14   that when they sign, they're ready to deliver capital, and they

15   have to hold capital for the entire time they sign until they

16   close unless there is -- you know, something else happens in

17   the intervening moments, but they have to be prepared to do

18   that, and it's not an insignificant amount of capital.

19          Certainly, maybe we're a little jaded compared to the

20   size of some of the other transactions, but asking someone to

21   hold back 282.0 million or 200.0 million or $180.0 million is

22   not nothing, and asking them to be ready to negotiate and be in

23   a position to agree to hold that back for several months, over

24   several months, maybe a total of over a year when all is said

25   and done is not nothing.

1          And that's what -- OEP turned to us and finally said

2     you know what, we've sat around for along time, we've been

3     burned or we've gotten you value or we have to talk to our

4     investment committee to write a check, it almost doesn't really

5     matter.  They came to us and said we are still with you, we

6     looked through all the good, we looked through all the bad,

7     we're still with you, but we can't be with you having taken all

8     these losses, not knowing how this is going to come out unless

9     we can turn to our investment committee and say we're going to

10    get a small amount of payment secured so we know this is not

11    just sunk money, sunk money, sunk money for money that's being

12    tied up and not available to use for other investments.

13         And that's -- I don't think anyone disputes those

14    facts.  So those are the facts that they are, and the question

15    is -- is whether that request was unreasonable, and whether the

16    debtors looked at that regardless of what the basis of the

17    request was, whether it's past compensation, commitment fee,

18    whatever.  When the debtors look at that and say I have one

19    buyer, I can deliver before Christmas, I've got one lender that

20    I know of that can finance that buyer and I've got a request to

21    increase my expenses by 3.6 globally and $1.2 million, I have

22    the U.S. debtor who has over $5.0 million of cash in the bank,

23    and I have a stake to over $2.0 billion, climbing to

24    $3.0 billion of sale proceeds locked away, a very high class

25    problem these days, and I'm being asked to -- my personal

1   estate to deliver $1.2 million more to keep this in place, to

2   keep the deal, to avoid a liquidation, to avoid an extended

3   process.

4          You heard Mr. Murray.  You heard Mr. Riedel.  This

5   wasn't just an exercise in business judgment.  This was sort of

6   a no-brainer to them, because recognizing the unique

7   circumstances, this wasn't going to happen again.  We lived

8   with this, and they viewed it as necessary, and, you know, no

9   one wants to pay money.  No one certainly wants to set a

10  precedent.  No one expects to set a precedent, and anyone who's

11  listening should not see this as a precedent or as an

12  invitation to more requests for the same in future deals, but

13  given these very unique facts on the complexity, on the bidder,

14  on the transaction, on the timing and the caboose nature of it,

15  the company looked and said we've got to do this.

16         We consulted with as many people as we could.  We had

17  committee participation.  We had, you know, every estate

18  participation, and everyone thought long and hard about this

19  and negotiated quite heavily, and certainly pressed Genband and

20  pressed OEP and said this is hard, this is not normal, this is

21  unique, this is this, this is that, and everyone knows the law

22  and everyone knows the circumstances and are you really going

23  to walk, and all we kept hearing back was yes, we're really

24  going to walk, we really -- we're tired, we spent a long time,

25  we spent a lot of money on this and other deals, and we don't

1    think we're asking for so much and it's necessary.

2          And that's the message.  That's the basis, and so the

3    benefit to the estate was the ability to keep the buyer there.

4    To turn to the O'Brien factors, it's to keep the bid there that

5    otherwise wouldn't have existed as a stalking horse bid, maybe

6    not at all ever, even in a naked auction, and certainly, the

7    second half of O'Brien is that OEP through its work and Genband

8    through their work set the floor and the catalyst to further

9    bids, and I think this is the quintessential case of it's not

10   the piece of real estate for sale that you say here is my form

11   of contract, anyone who wants to bid, bid, give me your -- you

12   know, fill in four fields and give me your price and we're

13   done.

14          This contract was heavily, heavily negotiated for a

15   very long period of time, and OEP and Genband's willingness to

16   do that and their counsel and their advisor's willingness to do

17   that added value, because now the next bidder comes in and says

18   this was a fully, vigorously negotiated document as opposed to

19   something that I as a stalking horse bidder would have had to

20   start from scratch.

21          As Mr. Murray said in his own words, I have something

22   to shoot at.  I have a deadline to do it.  I've done my

23   homework.  So I can make an assessment of I either like this or

24   I don't, but if I like it, now is my opportunity and I've got

25   to make my bid.

1          We hope someone comes in.  If someone doesn't come

2     in, then we've done the right thing, because we've got a buyer.

3     If someone came in, we've done the right thing, because we've

4     incented (sic) them to come to the table and the way they

5     weren't coming to the table before.

6          So we view this as a total upside/upside in having

7     our ability to come to file this motion, and if we have to ask

8     for $1.2 million to do that, everyone views that as necessary,

9     beneficial, and, in fact, critical to getting that done, and if

10    it's not approved, everyone, as you heard, the professionals

11    and the companies officers are concerned and very concerned

12    about what the plan B would be or what the consequences of

13    nonapproval would be.

14         The other fact that does bear noting is that,

15    although it certainly hasn't been a theme today, is the idea

16    that courts are generally concerned with effective bid

17    chilling.  The one nice feature about the incentive fee is a

18    one-time up front payment or soon to be payment.  It's not

19    added into the bidding procedures and effectively, you know,

20    getting a leg up for the stalking horse or chilling bidding at

21    all in the auction process.  People don't have to over bid by

22    the 1.3 or the 3.6 every round of bidding.  It's paid.  It's

23    separate, and the 10.0 million is the -- the hurdle that people

24    are going to get credit for in each round.

25         I think on -- just to go back to the five percent

1    point, I know that there is -- you know, I would love to just

2    say O'Brien doesn't say five percent and so no one has to talk

3    about five percent, but let's just talk about five percent.

4            I think that as Mr. Murray had testified, that in

5    Enterprise itself, a similar deal and comparable difficulty of

6    complexity and something that was negotiated very heavily, but

7    in a shorter period of time in terms of months, the break fee

8    was itself five percent.  So again, we're talking about not

9    huge absolute dollars of incremental costs, and notably, in

10   Enterprise, again, a deal that was certainly as complex, there

11   was $9.0 million of actual expense reimbursement was the

12   component of the -- the deal.  So don't look at the -- the

13   break fee, which is sort of the bonus or the icing or the

14   incenting (sic) to the -- you know, you're going to get

15   something out of this, its upside.  The view there was $9.0

16   million was a reasonable expense payment.  So even the five

17   plus three here as an expense payment, if you want to call the

18   incentive fee an expense payment, it's still less than what was

19   approved in Enterprise, although, as you've heard from our

20   witnesses, no less complex, no less time consuming, in fact,

21   more time consuming, and with a buyer who is working very hard

22   and spending a lot of money on a bet the company way here.

23           So we do have precedent on the actual dollar numbers,

24   and the case law does suggest that the lower the -- the base

25   price goes, the higher the percentage is going to be just for

1    that reason.  There is only so little money you can spend

2    sometimes.  So the percentage is going to go up.

3           All that said, you know, no reason to get in a battle

4    of footnotes.  We have our footnotes of examples over five

5    percent.  We saw the Committee or whoever wants to pull it out

6    can find examples of zero to one percent.  It's not about

7    footnotes.  O'Brien certainly says it's not about footnotes.

8    It's about value, but even if you wanted to get in a battle of

9    the numbers, you do have to look at the facts that back the

10   numbers and the split and why those exist, and I think that

11   there are distinguishing unique factors here on why that --

12   those levels were picked.

13          I think Mr. Tinker in his line of questioning had

14   focused on this idea of the break fee and the expense

15   reimbursement being the same as the incentive fee.  It's all

16   the same.  It's just money and incentives to keep someone

17   bidding.

18          I think Mr. Murray in his testimony made clear and I

19   think the debtors in deciding to agree to these fees felt that

20   these are not equivalent numbers, that certainly, a break fee

21   and expense reimbursement promise to be paid at the end of an

22   auction or in a topping bid.  We're saying that we're willing

23   to stick with you, you're willing to come on day one, sign a

24   stalking horse agreement without compensation for those fees,

25   but you know what, if someone beats you, you don't walk away

1     empty handed.

2            Here, we had the equity investor or the lender or the

3     financer, however you want to call it, saying I'm not willing

4     to get to step one on the promise of a potential agreement down

5     the road to pay me if someone else, you know, comes along, I

6     need to know whatever happens here, I am not coming to the

7     table at all to finish negotiating this much less finish

8     negotiating in December, much less finishing negotiating it

9     with concession, much less finishing negotiating it at this

10    purchase price and to protect your customers without a payment

11    of $3.6 million, and that was different and it was

12    unconditional, and it's not bad.  There is nothing evil about

13    saying that's my condition for showing up, that's the unique

14    circumstances, and they -- they argued vociferously, loudly,

15    and longly why this is different and why they were entitled to

16    it, and everyone heard them, listened, though very hard, and

17    found this is different.  This is necessary to keep them in the

18    deal in Mr. Murray's words.

19           And so in the end, we look at this, and we say that

20    certainly, no one intends to set a precedent or even thinks

21    this should be viewed in any way as a precedent for any other

22    transaction in this case or any other case, and the fact is

23    it's hard to point to examples in favor, but there is also no

24    examples where this type of fee has been struck down in these

25    facts, because the facts are simply unique and the numbers,

1   quite frankly, are large, but not so large here that you're

2   going up to get Third Circuit opinions necessarily.  Maybe we

3   will.  Maybe we have to if it doesn't go our way today, but on

4   the other hand, it's not the type of thing that happens every

5   day, and it's not the type of thing that we'd be concerned

6   about it happening every day because of the uniqueness of the

7   facts, the size of the payments, and all -- and the fact that

8   this is just one big ball of wax.  This is not a separate fee,

9   that if you take this out, you can keep the deal together.

10          The testimony today has been clear.  We have OEP's

11  and Genband's counsel in the courtroom.  I'm sure they'd be

12  happy to make clear as loudly as anyone wanted them to make

13  clear that this is not simply something you can pull off the

14  side of the deal and keep the deal together.  You pull on this,

15  and you pull on the entire deal.  You pull on the timing of the

16  deal, the conditions of the deal, and the purchase price of the

17  deal, and the -- the business judgment of the debtors, the

18  Creditors Committee now, and certainly, the other creditor

19  constituencies is that it's not worth pulling that string.

20  This is something we really need to do, because the value so

21  far outweighs the 1.2 million that we're being asked to pay.

22          And on that, we submit to you that it's in the

23  debtors' best interest and in their only interest to approve

24  the fee and to approve the procedures collectively so that we

25  can get on and either close this deal or bring someone else to

Argument - otter                                    119

1    the table to approve value.

2              JUDGE GROSS:  All right.  Thank you, Ms. Schweitzer.

3    Mr. Botter for the Committee.  Good afternoon.

4              MR. BOTTER:  Good afternoon, Judge Gross.

5    Mr. Justice Morawetz, good afternoon as well.  I will be brief.

6    In the -- we said a lot of things in our pleading, but if you

7    read the first line of our preliminary statement, it indicated

8    that the Creditors' Committee was generally supportive of the

9    debtors' efforts to enter into a stalking horse purchase

10   agreement with Genband, and that is true, and I think that we

11   have been supportive of the debtors' efforts in transactions

12   one through six as well.

13             What we went on to say in our objection is that there

14   were problems, and we identified some of these problems, and we

15   continued to have our conversations right up through this

16   morning, right up through the scheduled time of this hearing in

17   an effort to resolve problems, and that is what we have done in

18   these cases, and that's what the debtors have done in these

19   cases, and we -- and Ms. Schweitzer, as we started out this

20   hearing, identified that we had resolved some of our problems,

21   and the resolution of the problems clearly are helpful.

22   They're not perfect.  They're helpful, but as Ms. Schweitzer

23   has indicated, we are presented with a very unique set of facts

24   here, and I think what we're all made to do when presented with

25   a unique set of facts is create a balance, and we have to look

1   at the balance and we have to look at the problems.  We have to

2   look at the resolutions, and we have to determine what is, in

3   fact, best for these estates and what is, in fact, best for the

4   creditor constituencies that we represent in these cases, and

5   because of the unique -- unique set of facts, we can't strive

6   for perfection.  We can only do the best that we can, and I

7   think that what we've done this morning is do the best that we

8   can, and going forward with these buyers on the terms that have

9   been negotiated thus far is best for these estates and for the

10  -- the unsecured creditors of these estates.

11          What we've been able to do is really, essentially

12  negotiate ourselves a little bit of downside protection, and

13  with respect to this particular asset and these very unique set

14  of facts, that is the best course for these estates and these

15  creditors.

16          So with that, Your Honor, and with the changes that

17  were announced this morning on the record, the Creditors'

18  Committee supports the entry of the order and wishes the

19  debtors and ourselves the best of luck in pursuing a successful

20  auction process as we've done in the past in these cases.

21          JUDGE GROSS:  All right.

22          MR. BOTTER:  Thank you, Your Honor.

23          JUDGE GROSS:  Thank you.  Mr. Botter, just one

24  question.  On the issue of the patents, which I know you raised

25  in your objection, are you now satisfied that those are

1    properly included within the auction?

2              MR. BOTTER:  Your Honor, as I said in my statement,

3    we've not achieved perfection here, but we are withdrawing our

4    objection, and so they are going forward as part of this

5    transaction itself.

6              JUDGE GROSS:  All right.  Thank you.

7              MR. BOTTER:  Thank you, Your Honor.

8              JUDGE GROSS:  Anyone else before I hear from --

9              MR. KRELLER:  Your Honor --

10             JUDGE GROSS:  Yes.

11             MR. KRELLER:  Yes, Your Honor.  I'm sorry.  It's Tom

12   Kreller of Milbank, Tweed on behalf of the Bond Holder Group in

13   support of the motion, and I'll be brief if this is an

14   appropriate time.

15             JUDGE GROSS:  Yes, it is.

16             MR. KRELLER:  Thank you, Your Honor.  Your Honor,

17   I'll be as short as I can.  I would echo Mr. Botter's comments,

18   and I would note that, you know, it's not unusual in the

19   context to get kind of tangled up in doing the math about

20   calculating percentages of break up fees and trying to compare

21   them to other deals.  I think it's important to step back,

22   because the main event here is the ultimate transaction and not

23   a negotiation over the break up fee.

24             There has really been -- I think there is no

25   incentive on the part of the debtors, certainly not my Bond

Argument - Kreller                                      122

1    Holder Committee, and I don't think the Unsecured Creditors

2    Committee to overpay a bidder in the form of -- of break up

3    fees or expense reimbursements or incentive fees.

4          What the incentive is is to protect the transaction

5    once you conclude that the transaction is the right thing for

6    the estate to be pursuing, and that is where the Bond Holder

7    Group has certainly arrived.  It's been extensive hard fought

8    negotiations, and the transaction that's in front of you now is

9    something that we support as being the debtors' best

10   alternative with respect to these assets.

11         If we believe there was a better deal or if we

12   believed that this deal could be had at a lower cost, I think

13   you'd be hearing something different from us, but we concur

14   with the debtors' business judgment on this one.  We believe

15   that the protections that are being proposed here to be granted

16   to the -- to the purchaser, the stalking horse purchaser are

17   the insurance that we need to buy to put this -- put this deal

18   in place and roll those process forward, and hopefully, we have

19   another successful auction and the price goes up, but if we

20   don't, then the cost of getting to this deal and setting the

21   floor, and for those reasons, Your Honor, the Bond Holder Group

22   supports the transaction and the approval of the bid

23   protection.

24         JUDGE GROSS:  All right, Mr. Kreller.  Thank you very

25   much.  Anyone else before I hear from Mr. Tinker?

Argument - Feldsher                                123

1         MS. FELDSHER:  Your Honor, this is Jennifer Feldsher

2    from Bracewell & Giuliani on behalf of Matlin Patterson.

3         JUDGE GROSS:  Yes, Ms. Feldsher.

4         MS. FELDSHER:  Your Honor, is now the appropriate

5    time?

6         JUDGE GROSS:  Yes.

7         MS. FELDSHER:  First, I'd like to thank the Court for

8    your indulgence in allowing me to participate in this hearing

9    telephonically, but we did think that what we had to say would

10   be important, and we wanted Your Honor to hear it in your

11   deliberations.

12        Your Honor, as you well know, Matlin Patterson has

13   appeared before you virtually in connection with every single

14   auction process that has occurred in these cases.  It is a

15   significant stakeholder and one of the debtors' large

16   creditors.

17        Your Honor, we're here today to sort of a familiar

18   territory, but also, a little but unfamiliar in that we are

19   very supportive of the debtors' efforts here.  As Your Honor is

20   aware, we were before you at the MEN hearing.  Our biggest fear

21   at that time, as we expressed to Your Honor, was that we knew

22   One Equity was involved in several of the other sales processes

23   that the debtors were engaged in, and we were particularly

24   concerned given what we heard firsthand from One Equity that,

25   you know, they would pull out and they would not be -- be there

1    for the other sales processes which we though were critical to

2    the debtors' estates and to the success of overall

3    restructuring that is at hand here.

4           We were very, very pleased in our discussions with

5    the debtors to learn that, in fact, One Equity remains involved

6    notwithstanding some hurt feelings after the MEN auction, which

7    Your Honor is aware about, and that MEN came in -- I apologize

8    -- that One Equity came in here and was willing to finance the

9    stalking horse -- you know, the -- the bidder that's proposed

10   to be the stalking horse bidder.

11          In our view, Your Honor, the fee is wholly

12   appropriate.  It is (inaudible) as we see it to make -- to a

13   commitment fee on financing, which is typical in transactions.

14   The costs are typically included in -- in transactions where

15   they're necessary in order to get that financing.  We think the

16   benefit to having a stalking horse in this very, very long

17   shopping period that the debtors have engaged in for their

18   business cannot be measured, and, you know, certainly, the

19   small fee, and I say that small in relative size to this

20   estate, is wholly justified here where there would be no

21   stalking horse bidder, and the debtors would go into an auction

22   process without anybody on the hook here so that we knew what

23   the downside risk was.

24          So on that basis, Your Honor, again, we support the

25   debtors.  We support their efforts.  We were happy that they

1   came to an agreement with the Committee.  We believe that the

2   fee is justified under the O'Brien standard as well as under

3   all of the other precedent in this Circuit.  We don't think

4   that this has precedential value and that by approving this

5   deal, Your Honor is saying that in all subsequent sales, the

6   debtors are authorized to agree to pay break up fees for

7   financing sources.  We don't -- we just don't think -- we don't

8   think that that's something that can be read into a

9   particularly unique situation.

10       So unless Your Honor has any other questions, on

11   that, we would just respectfully submit that, you know, we

12   would request that the Court approve the stalking horse bid as

13   has been proposed by the debtors.

14       JUDGE GROSS:  No.  Thank you, Ms. Belcher.  Your

15   comments were most helpful.  And now, Mr. Tinker.

16       MR. TINKER:  Thank you, Judge Gross and

17   Justice Morawetz.  Your Honor, I do agree with -- with one

18   statement that has been made by debtors' counsel, and that is

19   that the incentive fee is different.  It's -- it is different

20   in -- in a couple of different ways that I think are quite

21   important.  It's different because it's an incentive fee that's

22   paid up front.  It's agreed to up front and approved up front.

23   When Your Honor approves it today, it's approved, assuming

24   Your Honor were to do that.  It's not contingent.  Unlike a

25   break up fee, absolutely, break up fees and break up

1    reimbursement expenses, those are contingent in a sense that

2    they're payable if somebody comes in and overbids successfully,

3    and this fee -- this incentive fee is not continent.

4           So yes.  In those ways, this incentive fee is

5    different, but I would disagree with counsel as far as I think

6    they're different in a bad way, and they're in a bad way not

7    because motivations are, you know, illegal or somehow improper

8    on the part of -- of OEP or Genband.  I understand the

9    motivation to -- and the frustration that gives rise to a

10   request for a fee.  Rather, it's -- it's bad because it's bad

11   for the estate, bad for the -- the sale process in this case

12   and as we go forward, in particular, for the transactions and

13   for the cases.

14          One of the interesting aspects of O'Brien is the way

15   it's crafted, and the Court starts off addressing break up fee

16   case law, and you think that okay, the Court is going to be

17   following that case law, but they don't want to be bound by it,

18   and the most telling part of that decision to me was -- was

19   when I read the statement on page 532.  What they say -- what

20   the Court says is neither Calpine, the disappointed purchaser

21   in that case -- neither Calpine nor the Bankruptcy Court has

22   cited any support for the proposition that courts may create a

23   right to recover from the bankruptcy estate where no such right

24   exists under the Bankruptcy Code.

25          Later, the Court says --

1          "Respectful of this statutory background, we decline

2          the invitation to develop a general common law of

3          break up fees."

4          So you have to go with the statute, and yes, case law

5     is -- certainly is going to inform you, and I'm sure that the

6     Court didn't go through those other cases merely to disparage

7     them, but on the other hand, the point is that you can't have a

8     common law of break up fees.  You start with the statute.

9          And so as kind of a clue as to where I'm going,

10    Your Honor, there is no common law of incentive fees, and, you

11    know, the point is doubly strong here.  It's different, yes,

12    because it's not contingent.  It's different because, you know,

13    it's kind of an up front agreement as to what it is and advance

14    approval, but those are different in bad ways, because we're

15    talking about a transaction where, you know, there is no

16    nothing in the code that you point to.  It is new.  There is no

17    case that is being cited to you where a court has approved an

18    incentive fee like this.

19          So my preliminary point, Your Honor, is that this is

20    different, but what the O'Brien court did was it went to the

21    statute, and it says we're not looking at business judgment

22    rule.  We're not.  We're looking at 503(b)(1)(A), and the court

23    cites the Cramer v. Mammoth Mart decision from the First

24    Circuit, and -- and it says -- and it quotes, "For a claim to

25    be entitled...", and I'll read parts of it.

1               "For a claim to be entitled to first priority under

2               this section, the debt must arise from a transaction

3               with the debtor in possession."

4          Now, stopping right here, I would point out that the

5     expenses that we're talking about that give rise to the

6     3.6 million, they weren't the result of a transaction with the

7     debtor.  They were a result of efforts that they made in --

8     yes, in trying to get to a transaction, but these were not

9     expenses incurred in connection with the sale of CVAS or in

10    connection with any closed sale with OEP.  So these were not

11    fees or costs generated in connection with this specific

12    transaction at all, and factually, I don't think that's

13    disputable.

14          But reading on, again, it has to be from a

15    transaction with the debtor in possession and the consideration

16    supporting the claimant's right to payment must be beneficial

17    to the debtor in possession in the operation of the business.

18    The Bankruptcy Court noted -- and again, the Court is following

19    up from their citation to Cramer --

20               "A party seeking payment of costs and fees as

21               administrative expense must carry the heavy burden of

22               demonstrating that the costs and fees for which it

23               seeks payment provided an actual benefit to the

24               estate and that such costs and expenses were

25               necessary to preserve the value of the estate's

1   assets."

2        It might be argued that I am improperly linking

3   somehow the incentive fee to a break up fee, and let me give

4   you kind of an economic perspective on it which I think shows

5   that they are part and parcel with the same thing.

6        First of all, yes, you had the testimony regarding

7   this is to incentivize them to get to the -- to the deal and

8   get it done, and that is always the case with break up fees and

9   expenses, but let's look at the amounts here.  Right now, we're

10  talking about a headline price of 282.0 million adjusted down

11  maybe by a hundred million or so, but we have that price.  On

12  top of that, we have a fixed price of 3.6 million, and then we

13  have contingent costs of -- of another 10.0 million

14  representing the -- the break up fee and the break up expense

15  reimbursement.

16       If we're to recharacterize the transaction

17  economically and try to get Genband and OEP in the same

18  position later that they are seeking to be in today, you know,

19  a way to -- to translate this would be you simply, you know,

20  reduce the price by 3.6 million and you increase the break up

21  fee, and pretty much, that's the same economic effect, but you

22  don't have the incentive fee aspect to it.  You may have an

23  issue as to whether or not as a break up fee, the amount is

24  excessive.  All right?  But economically, what you would have

25  is a situation where later on, if they are successful, they get

1    it at a price which is 282 minus 3.6 million, okay, which is

2    what they would get, you know, today.

3              If they are unsuccessful, right, then you have the --

4    the break up fee.  So they -- they get the benefit of the -- of

5    the bargain later if you just translate it in terms of a break

6    up fee.

7              And so my point, Your Honor, is that in terms of the

8    motivation, in terms of the economics, when you're saying

9    incentive fee, it is really pretty much a break up fee and

10   expense reimbursement that we're talking about, but here is the

11   difference.  The difference is that you did -- if you did it

12   the way I just suggested, what's your price today?  It's 282

13   minus 3.6 million.  What's the chilling effect?  3.6 million.

14   It's the price today.  That is the chilling effect.

15             Some -- you know, somebody comes in and bids against

16   it, you know, is there -- is there an overbid?  Well, not

17   exactly.  There is a $3.6 million premium they're paying.  That

18   is the chilling effect.  That is the same kind of analysis you

19   do with any break up fee or break up expense, and, Your Honor,

20   my basic, you know, argument here is that when -- first of all,

21   there is no legal justification for 3.6 million as an incentive

22   fee, but secondarily, if you add the 3.6 million to the

23   5.0 million to the other 5.0 million, you're at 13.6 million

24   for $182.0 million sale, and that is quite high.  It's not five

25   percent.  Discussion has been, you know, is it above or below

1    five percent.  This is not close to five percent.

2              As Your Honor knows, you know, I come in here often

3    times with an agenda that goes beyond this case, because I'm

4    here in just about every Chapter 11 or --

5              JUDGE GROSS:  Yes.

6              MR. TINKER:  -- somebody else in my office is.

7              JUDGE GROSS:  And I appreciate that, Mr. Tinker.

8              MR. TINKER:  Yeah.

9              JUDGE GROSS:  Certainly, that's your office's

10   function.

11             MR. TINKER:  And my purpose in saying that is -- is

12   that the incentive fee as a concept is -- is new.  As was

13   testified, you don't have other instances.  Nobody is demanding

14   an incentive fee generally.  Your Honor doesn't see them in

15   this court, and you don't have it in the case law.  This

16   request for an incentive fee is something completely new.  It

17   is completely different.  It is an extraordinary precedent if

18   Your Honor were to agree to $3.6 million as an incentive fee.

19             I would go so far, Your Honor, as to say that yes,

20   this is a slippery slope, because while you may be able to

21   point to facts of the case that are somewhat different from

22   other cases, pointing to the different facts, that's a common

23   law -- that's a way of creating common law, and O'Brien says

24   you don't -- you know, this is not a common law of incentive

25   fees.

1          There is no principle way of distinguishing an

2     incentive fee here in some kind of legally significant way from

3     fees that anybody else might demand who -- who wants an extra

4     kicker and they want it at the -- at the outset, and they don't

5     want it contingent.  I can understand the motivation for

6     somebody doing that, and I see that motivation it seems like

7     every day where you have a sale transaction and -- and

8     understandably, you're negotiating, you know, break up fees and

9     prices and what not, and why not try for everything you can.

10         And so my concern, Your Honor, is that this is a

11    slippery slope.  If the incentive fee were approved, then it is

12    a slippery slope, and the end destination is a place where

13    anything goes, and that is what I don't want to see, and so my

14    -- my first and foremost concern is with the whole way they

15    have structured it in terms of incentive fee.  I don't think

16    there is any legal justification.  I don't think there is a

17    factual basis, and my secondary position is that if it were

18    considered as a break up fee, which I think it should be,

19    because economically, that's what it is, then it is excessive.

20         If I could just have one moment to make sure I cover

21    everything.

22         JUDGE GROSS:  You may.

23              (Pause)

24         MR. TINKER:  I don't think I have anything to add at

25    this point.  Thank you, Your Honor.

1    JUDGE GROSS:  Thank you, Mr. Tinker.  Ms. Schweitzer,

2    I'll ask you to be somewhat brief because of backing up other

3    hearings, and Justice Morawetz and I will be adjourning briefly

4    to discuss the -- the matter.

5    MS. SCHWEITZER:  Absolutely.  I recognize I'm a clean

6    up batter, and I have very discrete points to make in response

7    to Mr. Tinker.  I think that the -- Mr. Tinker's argument is

8    specially unique, different, and different in a bad way.

9    We're in a court of equity bound by the Bankruptcy

10   Code.  O'Brien is telling us to look at 503(b)(9).  This --

11   Mr. Tinker's argument in essence boils down to the fact that

12   every time you have to pay a person money out of the estate,

13   it's bad.  It's bad to have to pay a secured lender their fees.

14   It's bad to have to pay banks their fees.  It's actually bad

15   for every creditor to have to pay every other creditor.  It's

16   the nature of bankruptcy.  It's a zero sum game.

17   So we have to start with the premise that we're

18   debtors and we don't like paying money to anyone.  You heard

19   the creditors.  They certainly don't like paying money to

20   anyone unless it's actual, necessary, and beneficial, and I

21   wish I had Mr. Tinker on the phone every day next to me when I

22   get calls from suppliers who don't have contracts with us or

23   customers who are trying to decide whether to place new orders

24   or employees trying to figure out if -- you know, what their

25   salaries should be for the next year.

1            I'd love to be able to say I can't point to it in the

2    Bankruptcy Code, there is no section 360 something, something,

3    something, I'm not authorized to pay it to you.  The fact is I

4    am authorized to pay these things under 503(b) which says if I

5    can show it's actual, it's necessary, and beneficial.  If it's

6    fair and reasonable calculating the benefits and burdens and

7    weighing everything, I can pay it.  I have to come to the Court

8    and ask, but I can pay it, and that's what the law says.  It

9    says the Court has discretion to consider this, and O'Brien, we

10   can sit there and go through sound bytes throughout the case.

11   I can point to sound bytes in American West.  You know, they

12   were quoted saying they're concerned about kickers and up sides

13   and windfalls to purchasers, and Mr. Tinker picks up some of

14   those themes of -- that we don't need to make bidders rich at

15   our backs.

16           This isn't about making bidders rich in absolute

17   dollars.  It's not about making bidders rich who aren't putting

18   up money, aren't committing, and aren't committing for a long

19   time and haven't already committed for a long time and who,

20   quite frankly, would not be here.  If we take them at their

21   face value, which we've tested over and over again and every

22   constituency in this room has tested over and over again, we

23   would not be here but for a commitment to pay $1.2 million, and

24   that, again, is a no-brainer.  It's authorized.  It's well

25   within what the Court is allowed to do.

1       We are also here partially having this argument

2    because we, quite frankly, in our motion put the calculation

3    based off of a reduced purchase.  If we had a five percent

4    purchase price, I think we'd probably be having a different

5    argument, because we have a different number in our motion.

6       We wanted to be straight and narrow.  We've tried to

7    be straight and narrow in this case at all times.  We've tried

8    being conservative, and we've tried to be, quite frankly, when

9    it comes to bidders, cheap.  We try to pay them as least as we

10   can, and we have the benefit in this case of blaming it on the

11   entire world.  Every time we have to get anything approved, we

12   have to talk to the entire world and get everyone on board, and

13   you've seen the herding of cats and we've been very successful

14   at herding cats, but that's the good and bad, and when it comes

15   to counter parties, we have to tell them we have to go all

16   around the world to get these things approved.

17       We've gone all around the world.  We've gone all

18   around the world.  Every single person who has an interest in

19   this estate, who has an interest in the money that's being

20   spent and who has an interest in getting the value of the sale

21   supports this deal, and that's why we're before Your Honor, and

22   I think everyone in this courtroom has reiterated what our

23   primary point is here.  We do not intend to pay this to anyone

24   else.  We do not intend to set this as a precedent.  Every one

25   of us in another case does not want to say hey, this is

1    something I've now broken through a big new wall.

2            This is very factually specific, unique, non-

3    precedential, and I too would agree with Mr. Tinker in one word

4    he used, which is it's extraordinary, and it's extraordinary

5    both in the facts, circumstances, and in the value that we can

6    preserve, and that's what O'Brien asks us to do.  Is it

7    necessary to preserve value?  The answer here, quite frankly

8    and quite simply is yes, and every person who is a dollar at

9    risk and whose money is being spent said yes, it is, and it's

10   not only that we want it.  It's that we need it.

11           And that's why we're here.  We wish we didn't have to

12   be here.  We wish we didn't have to ask for five cents, much

13   less $1.2 million, but we do, and therefore, we respectfully

14   request that the Court approve the motion with accommodations

15   on the record at the hearing.

16           JUDGE GROSS:  All right.  Thank you, Ms. Schweitzer.

17   Justice Morawetz, are we ready to take a brief recess?

18           JUSTICE MORAWETZ:  I would like to have the

19   opportunity here, I think, Just Gross to hear some brief

20   submissions from counsel --

21           JUDGE GROSS:  Yes.  Excuse me.

22           JUSTICE MORAWETZ:  -- on the Canadian aspect motion.

23   All right.  Mr. Tay.

24           MR. TAY:  Thank you very much, Your Honor.  I'll be

25   very, very brief.  The -- the function of -- the reality of a

1    stalking horse process is that, number one, it's the result of

2    arms length negotiation, and the ability to conduct the arms

3    length negotiations and the various relative leverage between

4    the parties depends, amongst other things, on whether there is

5    competition out there in terms of people who want to be

6    stalking horse bidders.  The other thing that affects the

7    ability and the bargaining power of the debtors is what are the

8    available -- available options if you don't have a stalking

9    horse deal.

10         In the real world that the debtors have to live in,

11    that's what it's all about.  It's about available options, and

12    after considering everything, it's quite clear from the

13    evidence that without agreeing to the payment of this incentive

14    fee, we would not be here today.  We would not have a stalking

15    horse agreement today, and we'd be looking at the very ugly

16    alternative of a business that is draining money and that is

17    dying on the vine unless it can be put into safe hands.

18         That's the reality.  The other reality is that the

19    question being asked of the courts today is not should we or

20    should we not pay the incentive fee.  That's a theoretical

21    question that doesn't exist in this real world.  The other

22    question that's not being put before the Court today is should

23    we or should we not rewrite this contract so that the incentive

24    fee becomes a break up fee.  That's a theoretical question that

25    doesn't exist in this real world.

1        The only question before the Courts today is do we

2    approve this deal that all the people who have interest, an

3    economic interest in this deal have said please approve this

4    deal.  And who are those people?  It's not just the debtors.

5    The monitor has been involved in every step, and the monitor is

6    saying to you please approve this deal.  The various committees

7    have said -- have been involved, and they are saying please

8    approve this deal.

9        Outside of North America, the other Nortel entities

10   who have been part of this deal, the U.K. administrators, APAC

11   Nortel entities, they are all saying we think this is the deal

12   we have to do, and they are ready to go and they're waiting the

13   approval of both these Courts.

14       And just so we don't forget, this is not just about

15   money.  There are about 1,700 people, 1,700 employees who are

16   going to be picked up by the purchaser in this deal, 1,700

17   families who are waiting the decision of both these Courts so

18   that they can have some certainty in these turbulent times that

19   their jobs are going to be preserved and that they are going to

20   go forward and this business is going to survive.

21       That's the reality in this real world, and that's the

22   only question being put before this Court is should the Court

23   approve this deal, because there is nothing else before both

24   these Courts, and the resounding submissions from anyone who

25   has an economic interest in this, and we all agree this is a

1    unique deal.  This should not be precedential, and, you know,

2    Your Honor should feel free to make it very clear that this is

3    not precedential.  This is not the beginning of a slippery

4    slope, that this is a function of a very unique circumstances

5    that we find ourselves in and that we have no option but sign

6    on this deal, and we have no option but to ask the Courts to

7    approve this deal.  Thank you.

8         JUSTICE MORAWETZ:  Mr. Tay, I just have two issues

9    I'd just like your comment on.

10        MR. TAY:  Sure.

11        JUSTICE MORAWETZ:  One aspect with the precedential

12   nature of any ruling today.  I guess I am in the fortunate

13   position of not having to be considered or bound by the O'Brien

14   and Calpine decision, but having heard extensive evidence from

15   both Mr. Riedel and Mr. Murray today, is there any objection

16   from any part if I take that evidence into account for the

17   Canadian aspect of this motion?

18        MR. TAY:  Certainly not from anyone here.

19        JUSTICE MORAWETZ:  Okay.  I do not see any

20   dissenters.  The second was the issue of employees, and you

21   referenced some 16 -- or 1,700.  I think the number was --

22        MR. TAY:  1,683.

23        JUSTICE MORAWETZ:  -- 1,638 out of 2,185 to be

24   perhaps retained.  The number of Canadian employees, as set out

25   in the Monitor's report, is 592, but there is no indication and

1    I'm wondering whether you could be of some assistance as to the

2    percentage of Canadian employees who would likely be retained.

3               MR. TAY:  Just over 400.

4               JUSTICE MORAWETZ:  Okay.  So we're roughly in the

5    same percentage.  Thank you.

6               MR. TAY:  Thank you.

7               JUSTICE MORAWETZ:  Mr. Carsagnini.

8               MR. CARSAGNINI:  Your Honor, the Monitor has filed

9    its 34 report.  Mr. McDonald and Ms. Hamilton are in the

10   courtroom if you have any questions, but I think it's clear.

11   The Monitor's report is very clear that a Monitor has been

12   involved in this process.  The Monitor recommends approval of

13   the agreement and of the fees described therein and also

14   supports and recommends the ceiling of appendix B.  So unless

15   you have any --

16              JUSTICE MORAWETZ:  The two volumes that was provided.

17   Okay.

18              MR. CARSAGNINI:  Unless you have any specific

19   questions.  Thank you.

20              JUSTICE MORAWETZ:  Thank you.  Any other party

21   wishing to make submissions?  Mr. Schwill?

22              MR. SCHWILL:  Just here for the -- the U.K. estate.

23   I just wanted to echo what my friend, Mr. Tay, had said, but

24   just to remind the Courts both here and Judge Gross in the

25   U.S., that as has been mentioned in the evidence, this is a

1    very integrated transaction.  It involves the EMEA entities as

2    well as -- and Nortel entities outside of those jurisdictions,

3    but it's all linked and integrated.  So if we don't get

4    approval to sell one part, be it here in Canada or here in the

5    U.S., the whole thing implodes, and that has an impact not only

6    on Canadian employees and Canadian creditors, but globally.

7              JUSTICE MORAWETZ:  Okay.  And just so that I'm clear,

8    on the incentive fee of the 3.6, the U.K. is responsible

9    initially for the payment of 1.2 of that subject --

10             MR. SCHWILL:  That's correct.

11             JUSTICE MORAWETZ:  -- subject, again, to allocation

12   after the fact.

13             MR. SCHWILL:  Correct.

14             JUSTICE MORAWETZ:  All right.

15             MR. SCHWILL:  Thank you, Your Honor.

16             JUSTICE MORAWETZ:  Thank you.  Mr. McFarland?

17             MR. MCFARLAND:  Yes, Your Honor.  Just a housekeeping

18   matter for the purpose of the Committee and -- and Judge Gross.

19   As my co-counsel, Mr. Botter, noted, the objection that was

20   filed in the United States Bankruptcy Court has been withdrawn,

21   and the objection which was filed with Your Honor should be

22   noted as being withdrawn as well.  Thank you.

23             JUSTICE MORAWETZ:  Thank you.  Anybody else wish to

24   make submissions?

25                      (No verbal response)

1          JUSTICE MORAWETZ:  I think, Judge Gross, we're now

2     clear to take a recess for perhaps -- well, initially, for

3     about ten minutes, and then perhaps we could then advise

4     counsel if they require longer.

5          JUDGE GROSS:  Thank you.  Yes.  We'll stand in

6     recess, counsel.

7                         (Recess)

8          THE CLERK:  Please rise.

9          JUDGE GROSS:  Thank you, everyone.  Please be seated.

10    Justice Morawetz should be in any minute.

11                         (Pause)

12         THE CLERK:  Order.  All rise.

13         JUSTICE MORAWETZ:  Okay.  Judge Gross, is your

14    courtroom ready?

15         JUDGE GROSS:  Yes.  We are all ready, Justice

16    Morawetz, and I understand that you're going to proceed first

17    this time.

18         JUSTICE MORAWETZ:  Thank you, Judge Gross.  The

19    following is my endorsements in connection with this motion

20    brought by the Nortel entities this morning.

21          This hearing was conducted by way of video conference

22    with a motion being heard in the United States Bankruptcy Court

23    with His Honor Judge Gross presiding over the hearing in the

24    U.S. Court.  This joint hearing was conducted in accordance

25    with the provisions of the cross border protocol which has been

1   previously approved by both the U.S. Court and by this Court.

2           Nortel brings this motion for the approval of the

3   bidding procedures relating to the assets of the Carrier Voice

4   Over IP Application Solutions business known as the CVAS

5   business.  It also seeks approval of the stalking horse

6   agreement among the various Nortel entities and Genband, Inc.

7   as purchaser, the Nortel entities being, of course, the

8   sellers.

9           The stalking horse agreement provides for a break up

10  fee and expense reimbursement and an incentive fee.  The

11  applicants requested specific approval of the incentive fee

12  letter relating to the payment of the incentive fee to One

13  Equity Partners, III, Limited Partnership.  The applicants also

14  seek a sealing order to seal the confidential appendix B to the

15  34th report of the monitor which contains the schedules and

16  exhibits to the stalking horse agreement.

17          The CVAS business, the bidding procedures, and the

18  sale agreement are all described in detail in the affidavit of

19  Mr. George Riedel, Chief Strategy Officer of Nortel sworn

20  December 23, 2009, and they are also described in the 34th

21  report of the Monitor.  Mr. Riedel and Mr. Mike Murray of

22  Lazard also testified in the hearing today before His Honor,

23  Judge Gross.

24          No objection was taken by any party to the Canadian

25  motion that would in any way prohibit me from considering the

Justice Morawetz - Decision                    144

1    evidence provided in the U.S. Court in this endorsement.  Two

2    formal objections were filed to the U.S. proceedings.  The

3    objection of the Unsecured Creditors' Committee has been

4    resolved, and this motion proceeded with the full support of

5    the creditor community.  The other objection was in the form of

6    a limited objection filed by the United States Trustee.  The

7    limited fee -- I'm sorry.  This limited objection was directed

8    primarily at the incentive fee, and this will be addressed in

9    detail by His Honor, Judge Gross.  However, in view of the

10   obligation being incurred by Nortel Networks Corporation and

11   Nortel Networks, Ltd. in respect to the incentive fee, this

12   issue is relevant on this motion and has been taken into

13   consideration by me.

14          The CVAS business operates globally in approximately

15   48 countries.  The Monitor has indicated that the business has

16   a base of over 100.0 million, Voice Over Internet Protocol

17   parts shipped worldwide and 21.0 million internet protocol

18   telephone lines shipped.  The fiscal revenues in 2008 were over

19   $870.0 billion, which represents nearly nine percent of

20   Nortel's 2008 revenues.  With respect to the Canadian aspect of

21   the CVAS business, the fiscal revenues in 2008 were

22   approximately 115.0 million, which represents approximately 17

23   percent of Nortel's 2008 Canadian revenue.

24          The base price set out in the stalking horse

25   agreement is $282.0 million subject to a downward purchase

Justice Morawetz - Decision                              145

1    price adjustment of approximately $100.0 million.  It also

2    provides for a break up fee of $5.0 million and an expense

3    reimbursement cap of $5.0 million.

4           In addition, the stalking horse agreement provides

5    for an incentive fee of $3.6 million to compensate One Equity

6    Partners, which is defined as OEP, an existing shareholder of

7    the purchaser.  $1.2 million will be paid by Nortel Networks

8    Corporation and Nortel Networks, Ltd. subject to further

9    adjustments at a later date.

10          The materials indicate that bids are to be received

11   by February 16, 2010, with the sellers to conduct an auction on

12   February 24, 2010 followed by a motion to approve any

13   transaction both before this Court and the U.S. Court.  With

14   respect to the evidence in support of the transaction, I refer

15   to the conclusions of Mr. Riedel at paragraphs 43 to 47 of his

16   affidavit, and those paragraphs will be incorporated by

17   reference in this endorsement.

18          The Monitor has similarly provided extensive

19   background to the transaction and reports its analysis and

20   recommendations at paragraph 96 of the 34th report, and this

21   paragraph will also be incorporated by reference into these

22   reasons.

23          The bidding procedures as proposed are not unlike the

24   bidding procedures which have previously been approved in the

25   sale of the CDMA business, the LT business, the Enterprise

Justice Morawetz - Decision                    146

1    Solutions business, and the Metro Ethernet business.   The

2    proposed break fee and the proposed expense reimbursement

3    agreement are in my view comparable to agreements previously

4    approved in these proceedings and in non-Nortel proceedings.

5            The basis for the proposed incentive fee are set out

6    in the affidavit of Mr. Riedel and in the 34th report, and in

7    addition, Mr. Riedel and Mr. Murray gave specific evidence on

8    this point at the U.S. hearing today.

9            The issue before this Court is whether to -- it is

10   appropriate in this case to approve the sale process.  As with

11   previous transactions, I am satisfied that this Court has the

12   jurisdiction to authorize the sale agreement.  The factors to

13   consider on a sales process under the CCAA in the absence of a

14   plan have previously been considered in these proceedings, and

15   I refer to my reasons in Nortel dated July 23, 2009 at

16   paragraph 49.  These factors are as follows, one is a sales

17   transaction warranted at this time; two, will the sale benefit

18   the whole economic community; three, do any of the debtors'

19   creditors have a bonafide reason to object to a sale of the

20   business; four, is there a better alternative.

21           In this case, the details of the transaction and the

22   bidding procedures as described on the record establish the

23   basis for the approval of the stalking horse agreement.  I also

24   note that subject to the submissions of the U.S. Trustee, there

25   were no objections with respect to the sales process.

1          I am satisfied having considered the factors

2     referenced above as well as the facts summarized in the

3     affidavit of Mr. Riedel and the 34th report of the Monitor as

4     well as the testimony today that the applicants have met the

5     test.  I am therefore satisfied that this motion should be

6     granted.  In doing so, I have considered the arguments relating

7     to the payment of the incentive fee, and based on the record

8     before me and the -- including the testimony of Mr. Riedel and

9     Mr. Murray, it is uncontroverted that it is likely that One

10    Equity Partners would not have entered into the stalking horse

11    agreement without the agreement to pay the incentive fee.

12          In the circumstances of this transaction, I have

13    accepted the fact that the agreement to provide the incentive

14    fee, the break up fee, and the reimbursement fee are necessary

15    in order to preserve value for the entire Nortel estate.

16    Accordingly, I approve the bidding procedures as described in

17    Mr. Riedel's affidavit and in the 34th report, which procedures

18    will also be subject to a further ruling by Judge Gross in the

19    U.S. Court.

20          I have also been satisfied that appendix B to the

21    34th report contains information which is commercially

22    sensitive, the dissemination of which could be detrimental to

23    the stakeholders, and accordingly, I order that this document

24    be sealed pending further order of the Court.  In granting this

25    sealing order, I have considered the principles set forth by

1    the Supreme Court of Canada in the <u>Sierra Club</u> decision.

2              In approving the bidding procedures in the stalking

3    horse agreement, I have also taken into account that the

4    auction will be conducted prior to the sale approval motion.

5    This process is consistent with the practice of this Court.

6    The Court expects that the applicants will make reference to

7    both the sound (indiscernible) and the Crown Trust principles

8    at any sale approval motion.  This concludes my endorsement.

9    This concludes my endorsement.

10             Thank you, and over to you, Judge Gross.

11             JUDGE GROSS:  Thank you, Justice Morawetz.  I will

12   say at the outset that I am going to grant the motion, and I'm

13   doing so based upon the substantial evidence that we heard this

14   morning as well as the affidavit of Mr. Riedel, of course, who

15   also testified and the Court's knowledge of the record of the

16   case as a whole, and largely because the economic

17   constituencies are all in strong support of the motion.

18             Let me say that one thing that the evidence made

19   clear to the Court and something that I was not worried about,

20   of course, but wanted to make certain of is that there had been

21   a very thorough shopping effort, marketing effort for the CVAS

22   assets, and the testimony was very, very complete as to the

23   complexity of these assets and the entire complexity of the --

24   of the entire business, the global nature of these assets, the

25   fragile nature of the business.  In fact, at one point, I

Judge Gross - Decision                           149

1    thought about locking the door in fear of Genband wanting to

2    leave the room, but clearly, this is a very sensitive sale, and

3    that certainly influences my decision significantly.

4           I am satisfied that the bidding procedures are fair,

5    reasonable, and appropriate and are designed to maximize

6    recovery for the estate, and in particular, because those

7    bidding procedures will be implemented by the capable -- by the

8    capable debtor and its counsel.  The debtors have clearly

9    demonstrated a compelling and sound business justification for

10   the sale of these assets, the stalking horse agreement, and the

11   payment of the incentive fee and bid protections, which I'll

12   turn to in just a moment, and the stalking horse agreement and

13   the bid procedures are without question in the best interest of

14   the debtors' estate and its creditors.

15          I do find that the break up fee and expense

16   reimbursement are fair and reasonable, and I'm obviously guided

17   by the Third Circuit's decision in O'Brien in making that

18   decision, and I think that it's, first of all, fundamentally

19   clear that O'Brien doesn't set any specific percentages and

20   leaves it to the Court's discretion based upon the facts of the

21   case, and the facts of this case are, again, that this is a

22   difficult sale and has been a difficult sale, and the fact that

23   there are not other bidding -- other bidders pressing forward

24   today to replace the stalking horse, to replace Genband.  So

25   that certainly weighs heavily on my decision, plus I am most

Judge Gross - Decision                                    150

1    satisfied that without the stalking horse protections, the

2    assets of the debtors' estate would be at risk and that these

3    payments or at least the potential payments are designed to

4    preserve the debtors' assets, and I think that's very clear.

5           The difficult issue, of course, because it's a new

6    issue, is the incentive fee, and I think that, first of all, it

7    is clear that One Equity Partners, which was a disgruntled

8    bidder at the prior sale and the parties may recall I didn't

9    even grant them standing to object to that sale, has stepped

10   forward, and understandably, is -- was reluctant to again face

11   additional costs and expenses and disappointment, and under

12   those circumstances, was requiring an incentive to, in effect,

13   fund this purchase as the -- as a substantial equity holder in

14   the purchaser, Genband, and people are always concerned about

15   precedent, of course, but precedent I don't think is a concern

16   in this particular case because it is such an unusual case with

17   a series of transactions, a series of sales, a series of

18   disgruntled bidders and a limited universe of bidders for these

19   assets, and I think that that certainly commands an incentive

20   payment to -- to One Equity Partners.

21          I also will note that parties are always concerned

22   about slippery slopes, and I appreciate the Office of the

23   United States Trustee's concern, but I like to think that's why

24   we have judges and judges who are careful and consider the

25   facts, and these facts I don't expect, and, in fact, Mr. Murray

1    testified as such, I don't expect these facts to again present

2    themselves, and accordingly, it is not a matter of precedent

3    that the Court needs to be concerned about.  The fact of the

4    matter is there are many ways to justify the incentive fee as a

5    -- really, a commitment fee for the financing of the

6    transaction, but the bottom line is that there is no

7    alternative, and everyone has -- is in agreement who has an

8    interest in this case that this transaction must proceed for

9    the benefit of the debtors' estate and the debtors' creditors,

10   and as such, the Court finds that this incentive payment is

11   necessary and essential to hopefully actualizing the -- a

12   successful auction, and I think that that is abundantly clear

13   from the evidence presented.

14           And, of course, the order that's been presented, I am

15   not going to go through all of the findings of fact that are in

16   the order except to say that I have reviewed them and I am

17   prepared to make those findings of fact through the entry of

18   the order, and with that, I will rest.

19           JUSTICE MORAWETZ:  Thank you, Judge Gross.  If I

20   could ask Ms. Stan to provide me with a copy of the proposed

21   form of order which I'll consider after this hearing has

22   formerly concluded.  Is there anything else, Ms. Stan, that you

23   wish to add?

24           MS. STAN:  Well, Your Honor, I'm happy to hand up the

25   form of order.  What I thought we would do given the changes

Colloquy                                                    152

1    that have been agreed to --

2              JUSTICE MORAWETZ:  Yes.

3              MS. STAN:  -- is go back and confer with Mr. Bromley

4    and Ms. Schweitzer to make sure we have all the appropriate

5    changes and perhaps come see you later today or tomorrow or

6    whenever is convenient for you to get it signed, but I'm happy

7    to hand up the order in the meantime.

8              JUSTICE MORAWETZ:  You could perhaps hand it up to me

9    to give me some guidance, and then I'll see you when you've got

10   the final order prepared, and for completeness sake, I've

11   endorsed the record.  For oral reasons given, the motion is

12   granted.  An order is to be prepared to incorporate my

13   findings.

14             MS. STAN:  Thank you, Your Honor.

15             JUDGE GROSS:  And, Ms. Schweitzer, if I understand --

16             JUSTICE MORAWETZ:  Judge Gross, unless there is

17   anything further --

18             JUDGE GROSS:  -- there will be a revised order to

19   take into account the statements made on the record today as

20   far as when the payment -- the incentive payment will occur as

21   well as some of the scheduling changes.

22             MS. SCHWEITZER:  Correct, Your Honor.  We just need

23   to make minor changes to the order and the bidding procedures

24   to accommodate for the provisions on that, and we'll --

25             JUDGE GROSS:  Yes.

Colloquy                                      153

1          MS. SCHWEITZER:  -- submit a revised order and

2    certification of counsel once we've circulated it around.  So

3    given that, it will be later today or first thing in the

4    morning.

5          MR. HELLER:  Your Honor, David Heller on behalf of --

6          JUDGE GROSS:  Mr. Heller, yes.  Good to see you

7    again.  Please.

8          MR. HELLER:  Likewise, Your Honor.  Thank you very

9    much and thank you to the parties and the Court in Canada as

10   well.  Your Honor, I heard the recitation, but I may have

11   missed something.  I don't expect any issue whatsoever, but

12   we'll work to get the order entered, but I think the record got

13   it right, and I've had some sidebars.  I think we're fine.

14         JUDGE GROSS:  Okay.

15         MR. HELLER:  And thank you very much, Your Honor.

16         JUDGE GROSS:  Thank you, Mr. Heller.  It's good to

17   see you again.

18         MR. HELLER:  All right.  Thank you, Your Honor.

19   Happy New Year.

20         JUDGE GROSS:  Happy New Year to you, sir.

21         MS. SCHWEITZER:  So with that, Your Honor, I don't

22   think we have anything else up for joint hearing.  So if you

23   want to take one minute to allow people to leave who were here

24   only for that?

25         JUDGE GROSS:  That's fine.  I think we just have some

Colloquy                                                    154

1    matters, Justice Morawetz, that pertain strictly to the cases

2    here, and we can -- we can end our joint hearing.

3                 JUSTICE MORAWETZ:  Thank you, Judge Gross.  We look

4    forward to seeing you the next time.

5                 JUDGE GROSS:  Yes, sir.  Be well in the meantime.

6    Anyone who would like to leave is welcome to.  I think we just

7    have some other matters to attend to.

8                 MS. SCHWEITZER:  Literally one minute.

9                 JUDGE GROSS:  That's fine.

10                MR. BOTTER:  Your Honor, may I be excused?  My

11   colleague, Ken Davis, who's here?

12                JUDGE GROSS:  Yes.  Absolutely.  You may be excused.

13   Good to see you again.

14                MR. BOTTER:  Good to see you.  Thank you and --

15                JUDGE GROSS:  I hope it's a good year.

16                MR. BOTTER:  -- happy and a health new year --

17                JUDGE GROSS:  -- a good year for you, Mr. Botter.

18                MR. BOTTER:  Thank you.

19                JUDGE GROSS:  Thank you so much.

20                MR. BOTTER:  Thank you.

21                            (Recess)

22                JUDGE GROSS:  Mr. Bromley, it was a long year, wasn't

23   it?

24                MR. BROMLEY:  It was -- it was a long year.

25                JUDGE GROSS:  An interesting year.

Colloquy                                            155

1          MR. BROMLEY:  It was a very interesting year, and I
2    -- we -- the couple of things that we did wrap up in addition
3    to this at the end of the year were quite important as well,
4    the IRS and the --
5          JUDGE GROSS:  Oh, yes.
6          MR. BROMLEY:  -- the funding issues.  So --
7          JUDGE GROSS:  Oh, I've yet to hear about that.
8          MR. BROMLEY:  So we will -- we will be happy to bring
9    that in front of both Courts on the 21st.
10         JUDGE GROSS:  Excellent.
11         MR. BROMLEY:  Right now, Your Honor, if -- if I may,
12   I just have two minor things, and then Mr. Schwartz has one
13   thing.  These are relatively small matters.  One is there was a
14   motion that we filed, a cleanup motion, if you will, relating
15   to the Enterprise transaction where we had sought permission to
16   assume and assign certain additional executory contracts to
17   Avaya as of the December 18th closing day --
18         JUDGE GROSS:  Yes.
19         MR. BROMLEY:  -- and file certain additional
20   information under seal.  There were 64 customer contracts that
21   had been miscategorized in one of the -- the exercises that we
22   had to go through in terms of who to send what notice to.
23         JUDGE GROSS:  Yes.
24         MR. BROMLEY:  And so we needed to come back and ask
25   for some additional relief.  As it turns out, we had already

1    sent notices, incorrect notices to 60 of the 64.  So -- and we

2    haven't had any objection from anyone.  So I could go into

3    greater detail about how an error was made, but in sum and

4    substance, we have the motion.  There has been no objection,

5    and we'd ask that the Court enter the order.

6              JUDGE GROSS:  I reviewed it.  I certainly understand

7    the necessity of it, and I'm placed to grant it.

8              MR. BROMLEY:  Great.  Thank you very much,

9    Your Honor.  I'll hand that up in a moment.

10             JUDGE GROSS:  Okay.

11             MR. BROMLEY:  That I believe was item number --

12             JUDGE GROSS:  That was --

13             MR. BROMLEY:  -- 8, I think?

14             JUDGE GROSS:  -- 8.

15             MR. BROMLEY:  Yes.

16             JUDGE GROSS:  Exactly.

17             MR. BROMLEY:  The next one, Your Honor, is item

18   number 9, and this is a -- this is a related construct.  This

19   is a motion, really, a notice, the debtor's 23rd notice of

20   rejection of executory contracts that had been filed, and there

21   had been one response received from Computer Science

22   Corporation objecting to the notice.

23             We have been engaged in conversations with CSC, as

24   it's known, and have reached a resolution which I'd like to

25   read into the record.

Colloquy                                            157

1              JUDGE GROSS:  Yes.

2              MR. BROMLEY:  The -- the sum and substance of it is

3    that we still have the right to reject the contract and we will

4    do so, but in the meantime, we are going to add a reimbursement

5    of our costs related to maintaining the contract.  We will

6    continue to maintain it.  So that's the -- that's the high

7    level resolution.

8              The details are that --

9              "(a) the debtors will agree to postpone the rejection

10             of the master services agreement between Computer

11             Sciences Corporation and Nortel Networks, Inc. until

12             January 31, 2010International Entrees

13             "(b) unless the parties agree otherwise in writing,

14             the CSC agreement shall be rejected automatically on

15             January 31, 2010, and CSC irrevocably waives any

16             right to object to such rejection provided that upon

17             two days written notice from CSC, that NNI shall

18             reject the CSC agreement prior to January 31, 2010;

19             "© CSC confirms that in consideration for Nortel's

20             postponement of the rejection of the CSC agreement,

21             CSC shall cover all actual costs and any other out-

22             of-pocket expenses incurred by the debtors in

23             connection with the CSC agreement for the period from

24             December 21, 2010 to the effective date of rejection

25             of the CSC agreement, including without limitation

Colloquy                                                        158

1          any costs incurred in connection with transition of

2          CSC to a third-party supplier.  Such costs are

3          estimated to be approximately $7,750 a day.  Please

4          note that this amount of $7,750 per day is an

5          approximate amount and shall be revised to reflect

6          the actual costs and out-of-pocket expenses of the

7          debtors.  In the event that the amount of such actual

8          costs and/or other out-of-pocket expenses shall be

9          materially in excess of the $7,750 per day, then as

10         soon as the debtors have knowledge of such amounts,

11         the debtors shall promptly notify CSC of such

12         additional costs and/or out-of-pocket expenses and

13         provide documentation supporting such costs and/or

14         out-of-pocket expenses.  CSC shall be authorized to

15         discontinued all or any portion of the services prior

16         to January 31, 2010.  In the event that CSC elects to

17         terminate all or any part of the services prior to

18         January 31, 2010, then after the expiration of two

19         days notice, the charges CSC owes for such terminated

20         services shall cease;

21         "(d) CSC further agrees that all amounts due to

22         Nortel for services performed for the period from

23         December 21, 2010 to the effective date of rejection

24         of the CSC agreement must be paid to Nortel within

25         ten days after receipt of invoice from Nortel.

Colloquy                                              159

1              Additionally, the current receivables balance must be

2              paid when due in accordance with the CSC agreement;

3              "(e) in accordance with the terms of the CSC

4              agreement, the debtors agree to cooperate in good

5              faith to transition CSC to a third party supplier

6              regardless of whether such third-party supplier is

7              VIE, Inc. or another supplier.  The debtors shall use

8              reasonable efforts to cause the performance of their

9              obligations under the CSC agreement, and

10             notwithstanding the foregoing, CSC acknowledges that

11             this resolution shall not in any way result in or

12             otherwise establish any post-petition administrative

13             obligations of the debtors."

14             JUDGE GROSS:  Well, I say this with great admiration,

15   Mr. Bromley.  Only a lawyer could have written that.

16             MR. BROMLEY:  In all honesty, Your Honor, I think

17   actually, five or six wrote it.

18             JUDGE GROSS:  I think that's what it -- I should have

19   said that.

20             MR. BROMLEY:  And -- and question whether the benefit

21   fits the effort, but --

22             JUDGE GROSS:  Well, I'm sure that CSC is satisfied

23   and grateful.

24             MR. BROMLEY:  I just want to confirm that I have read

25   the e-mail correctly.

Colloquy                                          160

1          JUDGE GROSS:  Yes.

2          MR. CATHELL:  Good afternoon, Your Honor.  Dale

3    Cathell.  I have Joe Huston with me on behalf of Computer

4    Science Corporation.

5          JUDGE GROSS:  Good afternoon.

6          MR. CATHELL:  Good afternoon.  And there were five or

7    six attorneys drafting that.  So you are correct, Your Honor,

8    and I do confirm what Mr. Bromley said, that he accurately

9    reflected the e-mail and the agreement that resolves our

10   objection.

11         JUDGE GROSS:  All right.  Thank you.  Thank you very

12   much.

13         MR. CATHELL:  Thank you, Your Honor.

14         JUDGE GROSS:  Good to see you.

15         MR. CATHELL:  Good seeing you too.

16         MR. BROMLEY:  If I can approach with the --

17         JUDGE GROSS:  Yes, please.  Yes.  Thank you.  I'll

18   sign these.

19         MR. BROMLEY:  I think Mr. Schwartz will be the

20   caboose.

21         JUDGE GROSS:  Mr. Schwartz, you began and now you

22   shall end.

23         MR. SCHWARTZ:  Thank you, Your Honor.  For the

24   record, Eric Schwartz of Morris, Nichols, Arsht & Tunnell.  I

25   know everyone is hungry.  So if I can approach with a form of

1   order, revised order for Mr. Ray's retention --

2           JUDGE GROSS:  Yes.

3           MR. SCHWARTZ:  -- and I'll take you through it.

4           JUDGE GROSS:  Yes.

5           MR. SCHWARTZ:  Thank you.

6           JUDGE GROSS:  And just make sure that I don't eat.

7   All right.  Thank you.  And I see that there --

8           MR. SCHWARTZ:  There are quite a few --

9           JUDGE GROSS:  Yes.

10          MR. SCHWARTZ:  -- formal comments from the U.S.

11  Trustee, and if I could briefly run through those?

12          JUDGE GROSS:  All right.  Please.

13          MR. SCHWARTZ:  Starting with paragraph 1A, this was

14  added, and it basically provides that the principle officer

15  will not act in any other capacity without court approval.

16          JUDGE GROSS:  Okay.

17          MR. SCHWARTZ:  Then on the next page, 1B, it says

18  that if he is going to take on any other executive positions,

19  that it will have to be done by motion.

20          JUDGE GROSS:  Understood.

21          MR. SCHWARTZ:  1C says that he will not serve as a

22  director prior to approval of any plan, and the only point I

23  want to make on that particular paragraph, Your Honor, is that

24  there was language we had in there, unless otherwise ordered by

25  the Court.  We took that out because the U.S. Trustee agreed

1    with us that we could take it out as long as there was no

2    prejudice to us or them that later on, we could seek to have

3    him the director by motion.  Obviously, they would have the

4    right to contest that if -- if they wanted to.

5              JUDGE GROSS:  Okay.

6              MR. SCHWARTZ:  Item 1D is an agreement by Mr. Ray to

7    submit reports of compensation, and that describes how the

8    reports will be submitted.  1E authorizes indemnification for

9    Mr. Ray like any other officer.  1F says that Mr. Ray will make

10   no investments for three years, and paragraph 4 talks about

11   certain disclosures that Mr. Ray will make with respect to any

12   facts that relate or bear upon any adverse interests he holds,

13   and that's the sum and substance of the changes.  I know there

14   are a lot more detail to it, but that's the high level.

15             JUDGE GROSS:  All right.  I am -- anyone wish to be

16   heard?  Mr. Tinker, I know you had a hand in this.

17             MR. TINKER:  Thank you, Your Honor.  Patrick Tinker

18   for the U.S. Trustee.  Just one comment with regards to the

19   provision where language is actually dropped.  We're talking

20   about removal of language, and -- and I forget what page it's

21   on, the second or third page, but it has to do with language

22   providing that the parties might seek later to come in and have

23   authority for Mr. Ray to become a director.

24             JUDGE GROSS:  Yes.

25             MR. TINKER:  And I just need to give you our spin on

1    that, if you would.  We -- we view this order as essentially

2    something that's entered, and if it's entered exactly this way,

3    our office doesn't pursue an objection under 327, commonly

4    called the J. Alix protocol, and our office actually has, if

5    you would, a form order which has various provisions designed

6    to insure that regardless of what the applications say, the end

7    result is compliance with the J. Alix protocol.

8                JUDGE GROSS:  Yes.

9                MR. TINKER:  And consequently, our position is that

10   much as with J. Alix, in a sense, it's a settlement.  You do it

11   this way, we won't raise the objection, and in essence, Nortel

12   and a lot of other debtors get the benefit of a deal that was

13   cut with -- with J. Alix and his various affiliates --

14               JUDGE GROSS:  Yes.

15               MR. TINKER:  -- back when all those entities --

16               JUDGE GROSS:  It's been a long time now.

17               MR. TINKER:  -- were J. Alix.

18               JUDGE GROSS:  Yeah.

19               MR. TINKER:  And it's changed, but all I would say,

20   Your Honor, is I don't have a problem with the order entered as

21   it stands.  Later, they can -- they can always file a motion

22   and come in.  At that point in time, you would probably find me

23   arguing that, you know, this is a settlement, you don't

24   reconsider it later, et cetera.  My hope, frankly, Your Honor,

25   is that there won't be a need for Mr. Ray to become the

1    director of a Nortel entity.  Maybe it's possible that they

2    would have that need, but I would think that Nortel could find

3    somebody to become a director.  So that's all I would say to

4    it, Your Honor.

5              JUDGE GROSS:  All right, Mr. Tinker.

6              MR. TINKER:  Thank you.

7              JUDGE GROSS:  I certainly understand the point.

8              MR. TINKER:  And I have no problem with the order.

9              JUDGE GROSS:  I certainly understand the point.

10             MR. SCHWARTZ:  And just so it's clear for the record,

11   that's a director prior to a plan being approved.

12             JUDGE GROSS:  Yes.

13             MR. SCHWARTZ:  That's what it says in the order.

14             JUDGE GROSS:  That I did -- and I think that's

15   certainly what Mr. Tinker was --

16             MR. SCHWARTZ:  Right.

17             JUDGE GROSS:  -- meaning to say.

18             MR. SCHWARTZ:  Nothing to add, Your Honor.  One other

19   item to clarify for the record, Your Honor, which is

20   Mr. Tinker's view that this is a settlement and --

21             JUDGE GROSS:  Oh.

22             MR. SCHWARTZ:  -- our view is that's his position.

23   Our position is all rights reserved, and we'll file what we

24   think is appropriate with respect to the director issue.  And

25   so my understanding coming here today was that this was -- we

Colloquy                                                    165

1   still would have the right to file a motion with regard to the

2   director issue.  I'm not sure we anticipate it, but that is

3   something -- a right we wanted to preserve.

4           JUDGE GROSS:  Well, I would say that -- just to keep

5   things simple, that the order is what it is, and Mr. Tinker and

6   his office reverse the right to argue that it was a settlement,

7   and you have the right to argue that it wasn't.

8           MR. SCHWARTZ:  Your Honor, we have nothing else for

9   today.

10          JUDGE GROSS:  All right.  Just one small matter,

11  Mr. Bromley.  You gave me two orders under number 8 but none

12  under 9, the 23rd rejection notice.

13          MR. BROMLEY:  I'm sorry about that, Your Honor.  The

14  -- the way that our procedures work under 9, I actually --

15          JUDGE GROSS:  You don't need an order.

16          MR. BROMLEY:  -- I don't need an order.

17          JUDGE GROSS:  That's right.  Thank you for reminding

18  me.  All right.  Any -- I'm signing the final order, which is

19  on the retention.  There we go.  Okay.

20          MR. BROMLEY:  Thank you very much, Your Honor, and we

21  thank you very much once again for all your patience and the

22  accommodation of the Court for, you know, what always ends up

23  being a little bit longer than we --

24          JUDGE GROSS:  That's quite all right.  It's a

25  pleasure.

Colloquy                                    166

1          MR. BROMLEY:  -- we anticipate.

2          JUDGE GROSS:  You might apologize to some lawyers on

3     the way out, but I certainly -- I understand.  This was -- this

4     was necessary.

5          MR. BROMLEY:  I have started every e-mail I've sent

6     in the past six months with I'm sorry it's taken so long to get

7     back to you.  So thank you very much, Your Honor, and good luck

8     to the Eagles as we --

9          JUDGE GROSS:  Thank you.  Now that you're not -- now

10    that you don't have a dog in that fight.

11         MR. BROMLEY:  Well, you know, an Eagles/Jets

12    Superbowl would be fine.

13         JUDGE GROSS:  That would be.  I don't think so

14    though, Mr. Bromley, I'm afraid.  From either side, I should

15    say.

16         MR. BROMLEY:  I forget which team was shut out last

17    weekend.

18         JUDGE GROSS:  Oh, now that you got your orders, you

19    can say those things.  We will stand in recess.

20                    (Court Adjourned)

21

1                          * * * * *

2                    C E R T I F I C A T I O N

3          I, Maureen Emmons, court approved transcriber,

4    certify that the foregoing is a correct transcript from the

5    official electronic sound recording of the proceedings in the

6    above-entitled matter.

7

8    _____        Date:

9    MAUREEN EMMONS

10   DIANA DOMAN TRANSCRIBING