1               UNITED STATES BANKRUPTCY COURT
                     DISTRICT OF DELAWARE

2

3   IN RE:                        )  Case No. 09-10138(KG)
                                  )  Chapter 11
4   NORTEL NETWORKS INC., *et al.*,  )
                                  )  Courtroom No. 3
5             Debtors.            )  824 Market Street
                                  )  Wilmington, Delaware 19801
6                                 )
                                  )
7                                 )  January 21, 2010
                                  )  11:00 A.M.
8

                    TRANSCRIPT OF HEARING
9              BEFORE HONORABLE KEVIN GROSS
               UNITED STATES BANKRUPTCY JUDGE

10

11  APPEARANCES:

12  For the Debtors:        Morris Nichols Arsht & Tunnell LLP
                            By:  ANN C. CORDO, ESQ.
13                               ERIC D. SCHWARTZ, ESQ.
                            1201 North Market Street, 18th Floor
14                          Wilmington, Delaware 19899-1347
                            (302) 658-9200
15
                            Cleary Gottlieb Steen & Hamilton LLP
16                          By:  JAMES BROMLEY, ESQ.
                                 SANJEET MALIK, ESQ.
17                               SALVATORE BIANCA, ESQ.
                            One Liberty Plaza
18                          New York, New York 10006
                            (212) 225-2000
19
    ECRO:                   JENNIFER PASIERB
20
    Transcription Service:  Antonio's Word Processing Services
21                          704 W. 14th Street
                            New Castle, Delaware  19720
22                          Telephone:  (302) 322-9419
                            E-Mail:  antonioswp@verizon.net
23

    Proceedings recorded by electronic sound recording;
24  transcript produced by transcription service.

25

```
 1  For Nortel Networks:       Nortel Networks, Inc.
                               By:    JOHN RAY, ESQ.
 2                                    CHRISTOPHER J. KEARNS, ESQ.

 3  For the Debtor,            Nortel Networks Inc.
    Nortel UK                  By:    ANNA VENTRESCA, ESQ.
 4  Administrator Leila Wong          LEILA WONG, ESQ.
                               (302) 351-9158
 5
    For the Debtor,            Herbert Smith
 6  Nortel UK:                 By:    THOMAS WALSH, ESQ.
                                      STEPHEN GALE, ESQ.
 7                                    MARIA COY, ESQ.
                               (302) 571-6710
 8
    For UK Administrator:      Ernst & Young LLP
 9                             By:    SIMON EDEL, ESQ.
                                      STEPHEN HARRISON, ESQ.
10                             (302) 571-6710

11  For UK Joint Admin.:       Young Conaway Stargatt & Taylor
                               By:    EDWIN HARRON, ESQ.
12                             The Brandywine Building
                               1000 West Street, 17th Floor
13                             Wilmington, Delaware 19801
                               (302) 571-6600
14
    For UK Joint Admin.:       Hughes Hubbard & Reed
15                             By:    DEREK ADLER, ESQ.
                               One Battery Park Plaza
16                             New York, New York 10004
                               (212) 837-6000
17
    For Interested Party,      Wilkie Farr & Gallagher LLP
18  Nortel Networks UK         By:    BRIAN O'CONNOR, ESQ.
    Pension Trust Ltd.:        787 Seventh Avenue
19                             New York, New York 10019
                               (212) 728-8000
20
    For Canadian Monitor:      Allen & Overy
21                             By:    KEN COLEMAN, ESQ.
                               1221 Avenue of the Americas
22                             New York, New York
                               (212) 610-6300
23
    For E&Y as Monitor:        Buchanan Ingersoll & Rooney
24                             By:    MARY CALOWAY, ESQ.
                               The Brandywine Building
25                             1000 West Street, Suite 1410
                               Wilmington, Delaware 19801
                               (302) 552-4200
```

```
 1   For the Committee:          Akin Gump Strauss Hauer & Feld LLP
                                 By:   FRED HODARA, ESQ.
 2                                     DAVID BOTTER, ESQ.
                                 One Bryant Park
 3                               New York, New York 10036
                                 (212) 872-1000
 4
                                 Richards Layton & Finger
 5                               By:   CHRIS SAMIS, ESQ.
                                 920 North King Street
 6                               Wilmington, Delaware 19801
                                 (302) 651-7700
 7
     For the Creditor,           Macquarie Bank
 8   Macquarie Bank:             By:   SUSAN S. CHEN, ESQ.
                                 125 West 55$^{th}$ Street
 9                               New York, New York 10019
                                 (212) 231-2386
10
     For the Creditor,           Curtis Mallet-Prevost, Colt, Mosle
11   FlexTronics:                By:   JAMES V. DREW, ESQ.
                                 101 Park Avenue
12                               New York, New York 10178
                                 (212) 696-6000
13
     For the Creditor,           Tricadia Capital
14   Tricidia:                   By:   STEPHEN GRISANTI, ESQ.
                                 780 3$^{rd}$ Avenue, Floor 29
15                               New York, New York 10017
                                 (602) 769-2334
16
     For the Creditor,           Milbank Tweed Hadley & McCloy
17   Bond Holders Group:         By:   THOMAS KRELLER, ESQ.
                                 601 South Figueroa Street, 30$^{th}$ Floor
18                               Los Angeles, California 90017
                                 (213) 892-4463
19
     Interested Party,           Barclays Capital, Inc.
20   Barclay's Capital, Inc.:    By:   OLIVIA MAURO, ESQ.
                                 200 Park Avenue
21                               New York, New York 10166
                                 (212) 412-6773
22
     For the Creditor,           Hondo Sen - In Pro Per
23   Hondo Sen:                  By:   HONDO SEN, ESQ.
                                 (203) 552-3528
24

25
```

```
1   In Propria Persona,        Cerberus Capital Management
    Jacob Zand:                By:    JACOB ZAND, ESQ.
2                              (646) 885-3188

3   For UST:                   United States Dept. of Justice
                               By:    WILLIAM RUSSELL, ESQ.
4                              844 King Street, Suite 2207
                               Wilmington, Delaware
5                              (302) 573-6491

6                              MATT FORD, ESQ.
                               SARAH JOHNSON, ESQ.
7                              ANDREW FRIEDMAN, ESQ.

8        Appearances by Video Conference:   (Canadian Court)

9                    JUSTICE GEOFFREY MORAWETZ

10                             OGILVY RENAULT LLP
                               By:  DERRICK C. TAY, ESQUIRE
11                                  JENNIFER STAM, ESQUIRE
                               Suite 3800
12                             Royal Bank Plaza, S. Tower
                               200 Bay Street, P.O. Box 84
13                             Toronto, Ontario M5J 2Z4

14                             DAVIES WARD PHILLIPS & VINEBERG LLP
15                             By:  ROBIN B. SCHWILL, ESQUIRE
                                    DAVID WARD, ESQ.
16                             44th Floor, 1 First Canadian Place
                               Toronto, Ontario M5X 1B2
17
                               FRASER MILNER CASGRAIN LLP
18                             By:  ALEX L. MACFARLANE, ESQUIRE
                               39th Floor, 1 First Canadian Place
19                             100 King Street West
                               Toronto, Ontario M5X 1B2
20

21                             By:   J. PASQUARIELLO, ESQ.
                                     F. MYERS, ESQ.
22

23

24

25
```

1                              INDEX

2                                                        Page

NOTICE OF AGENDA MATTERS:
3  On behalf of the Debtors, by Mr. Bromley                 7
   On behalf of the Joint Administrators, by Mr. Adler     23
4  On behalf of the Debtors, by Mr. Bromley                25
   On behalf of Canadian Counsel, by Mr. Schwill           26
5  On behalf of the Debtors, by Mr. Bromley                27
   On behalf of Official Committee, by Mr. Botter          37
6  On behalf of the Debtors, by Mr. Bromley                41
   On behalf of Nortel Networks, by Mr. Tay                43
7  On behalf of the Monitor, by Mr. Myers                  44
   On behalf of the Trustees of NNUK, by Mr. Ward          54
8  On behalf of Nortel Networks, by Mr. Tay                55
   On behalf of the Monitor, by Mr. Pasquariello           66
9  On behalf of the Trustees of NNUK, by Mr. Ward          72
   On behalf of Nortel Networks, by Mr. Tay                81
10 On behalf of the Debtors, by Mr. Bromley                86
   On behalf of the Debtors, by Mr. Bianca                 98

11

12 EXHIBITS:                              Marked Received

13 Proffer of Mr. John Ray                               36
   Proffer of Mr. Christopher Kearns                     41

14

15

16

17

18

19

20

21

22

23

24

25

1          THE CLERK:  Please rise.

2          THE COURT:  Good afternoon, everyone.  Please be

3   seated.  Good to see you all.  Mr. Schwartz.

4          MR. SCHWARTZ:  Good afternoon, Your Honor.

5          THE COURT:  We're waiting for Justice Morawetz to

6   come on.

7          MR. SCHWARTZ:  Thank you, Your Honor.

8          THE COURT:  We tried to time this, but it's not

9   always perfect.  I know we've got a number of matters that

10  are separate to us, and I'm going to suggest, I think Justice

11  Morawetz will too, that we begin with the Canadian Funding

12  Settlement.

13         MR. SCHWARTZ:  We were also going to suggest that

14  too, Your Honor.

15         THE COURT:  And then he has a number of matters, I

16  think, that are unique to his case so hopefully it will all

17  work out.  Good afternoon, Justice Morawetz.

18         JUSTICE MORAWETZ:  We are ready to proceed unless

19  things have changed, I think that argument will be starting

20  and the proceedings will be starting in your Court first.

21         THE COURT:  Thank you, sir.  Mr. Schwartz.

22         MR. SCHWARTZ:  Thank you, Your Honor's, and good

23  afternoon, Eric Schwartz Morris Nichols Arsht & Tunnell on

24  behalf of the Debtors.  We wanted to thank both Courts for

25  allowing the time for the parties to meet.  And the parties

1    have settled the main event, the funding matter.  And with

2    that, Your Honor, I will turn it over to my colleague Jim

3    Bromley of Cleary Gottlieb.

4            THE COURT:  Thank you.  Thank you, Mr. Schwartz.

5    Mr. Bromley.  Good afternoon.

6            MR. BROMLEY:  Good afternoon, Your Honor.  Thank you

7    very much and good afternoon, Mr. Justice Morawetz.  Thank

8    you both for accommodating us and I think we've used the time

9    for constructive purposes.

10           If I may for organizational purposes rearrange a bit

11   of this Court's agenda letter.  There are a number of

12   matters.  The ones that are view as only, we will take at the

13   end of the calendar.  And that would include the Debtors'

14   motion for the extension of the exclusivity periods.

15           THE COURT:  Yes.

16           MR. BROMLEY:  There are two matters that are

17   interrelated and one is a U.S. only matter; the other is the

18   Canadian funding agreement.  The first U.S. only matter is

19   the approval of the settlement with the Internal Revenue

20   Service.  As the two of those are interconnected and that the

21   evidence that we will proffer today relates to both, I would

22   propose to start with both of those at the same time.  And I

23   believe that the inclusion of a discussion with respect to

24   the IRS settlement will simply fold into the discussion of

25   the Canadian funding agreement.

1          THE COURT:  Very well.

2          MR. BROMLEY: And so the way that we would propose to

3   proceed then is I will give a summary of the information, the

4   background.  We will then also, I think, describe where we

5   stand with respect to the various objections that exist, at

6   least in the United States, and certainly one that exists in

7   Canada as well.  We will then proffer two witnesses today and

8   to give the evidentiary backup for the entry both into the

9   Canadian funding agreement from a U.S. perspective and entry

10  into the settlement agreement with the Internal Revenue

11  Service.

12          THE COURT:  Excellent.

13          MR. BROMLEY:  So just to start off then, Your

14  Honors, the Canadian funding agreement and the settlement

15  with the Internal Revenue Service comprise a milestone that

16  was very important for us collectively for the Nortel cases

17  to meet.  There was an objection filed, both in the United

18  States and in Canada, by the Joint Administrators of the EMEA

19  Debtors, the Debtors in Europe, Middle East, and Africa; 19

20  separate entities.  That objection which has been filed here

21  and a companion one filed in Canada, we believe, has been

22  resolved.  And before we get into the proffering of evidence,

23  I would propose to go through the order and show the proposed

24  additions.

25          I would note, however, that what we have done this

1  morning is file in the United States a short reply.

2         THE COURT:   Yes.

3         MR. BROMLEY:   And that short reply provided three

4  additional paragraphs that would be added to the U.S. order,

5  essentially reservations of rights.  And those reservations

6  of rights would be added under the proposed settlement with

7  one addition and on that basis.  The Joint Administrators

8  would withdraw their objections in both jurisdictions to the

9  Canadian funding agreement and to the establishment of an NNI

10  claim that is contained within the Canadian funding

11  agreement.  So that is the précis for where we go next.

12         The, but I did say that these were milestones, and I

13  think they are milestones.  We are just after one year into

14  the collective Nortel cases.  And as the Courts are well

15  aware, we have had set an asset sales; four have closed

16  accumulating over $2 billion dollars in cash in the black

17  boxes, we say; three remain pending; two have been signed and

18  waiting closing and remain on target; one, the Seavas

19  transaction remains subject to an auction which will take

20  place at the end of February.  There are additional assets

21  within the Nortel Universe that need to be examined and

22  monetized.  There are certain discreet assets, limited

23  business units, as well as the large intellectual property

24  portfolio of the Nortel entities.  So there is more work to

25  be done, certainly.  And in addition to closing the

1  transactions that remain open, there is a requirement under

2  the various transactions to provide transition services for

3  up to two years after the closing by the North American

4  Debtors.  And so, the continued provision of those services

5  is important to the Debtors both in the United States and

6  Canada in order to make sure that the values that have been

7  accomplished through the auction process are fully realized

8  and that the potential liabilities for non-performance under

9  the transition agreements are avoided.

10        When we're looking at the list of things to do and

11  we've been doing that a lot with the passage of the new year,

12  closing the deals and performing on the TSA's is certainly

13  one of them.  The review of the intellectual property is

14  another; the allocation of the purchase price proceeds that's

15  certainly another one to be addressed.  But the other two

16  that are out there is large items; one securing a reasonable

17  basis for the funding of NNL, the Canadian entity and the

18  Canadian applicants, as well as proceeding on the claims

19  resolution front to try to take some of the very large claims

20  that have been filed and reduce them as quickly as possible.

21        So what we have today here are two interrelated

22  matters before this Court and a related matter in the

23  Canadian Court with respect to the entry into what are known

24  as advanced pricing agreements with the taxing jurisdictions:

25  in the U.S. the Internal Revenue Service and in Canada the

1  Canadian Revenue Authority.

2         The proceeds allocation will certainly follow after

3  that but right now what we've done in connection with these

4  two matters is approach the resolution of a comprehensive, in

5  a comprehensive matter of a number of interrelated issues.

6  First and foremost under the Canadian funding agreement,

7  there will be, upon approval and satisfaction of the

8  conditions, the payment by the United States Debtors, in

9  particular NNI to NNL of an amount of approximately $190

10  million dollars.  In addition, there will be the

11  establishment of a claim in favor of the U.S. Debtors against

12  the Canadian Debtors against NNL in an amount in slightly in

13  excess of $2 billion dollars, $2,067,000,000.00.  That claim

14  is an important element, indeed, a critical element of the

15  relief that we're seeking today because the existence of

16  certain overpayments that had been made by the U.S. entity

17  NNI to NNL, specifically during the period 2001 to 2005, were

18  open issues that were related tax implications and they

19  needed to be wrapped up at once.  And so what we have been

20  able to do through the Canadian funding agreement is address

21  those two issues: one, provide funding under the Canadian

22  funding agreement of a $190 million dollars and; two,

23  establish this intercompany claim, a claim that will be

24  established and allowed in the Canadian proceedings without

25  right of offset or counter claim.  And in addition to that,

1  we will, we are seeking authority here in the United States

2  for the U.S. Debtors to enter into the related advanced

3  pricing agreement.  And there's a separate application in

4  Canada for the Canadian Debtors to enter into a similar

5  arrangement between the CRA and NNL.  What we are looking

6  for; therefore, is the approval of all of the relief because

7  it's all interrelated.  And the agreements require that the

8  various agreements be approved in the jurisdictions and all

9  of the conditions to funding and to the allowance be

10  satisfied before any can occur.  So there is an

11  interrelationship.

12        The approval of the funding is important from the

13  U.S. Debtors' perspective because it also resolves claims

14  that the Canadian Debtors have or potentially could have

15  against the U.S. estates for the provision of goods and

16  services in the post petition period.  You'll recall, Your

17  Honors, that in June we sought and obtained approval of the

18  Interim Funding and Settlement Agreement, the so-called IFSA,

19  which addressed those issues as they related to the U.S. and

20  Canadian estates for the first nine months of 2009.  Since,

21  and that basically arranged for funding from January 14th the

22  petition date to September 30th.

23        THE COURT:   Right.

24        MR. BROMLEY:  That provided for the payments of a

25  $187 million and those amounts were paid by the, by NNI to

1 NNL.  So when you take together the IFSA the Interim Funding

2 and Settlement Agreement and the final Canadian funding and

3 settlement agreement which we have before you both today, you

4 have a $187 plus a $190 million that will be paid in cash on

5 a post petition basis by the U.S. Debtors to the Canadian

6 Debtors.  And it represents the full and final satisfaction

7 of claims; claims that could be brought by the Canadian

8 estate for the provision of goods and services in the post

9 petition period.  And it is all set forth in great detail in

10 the motion and in the Canadian funding agreement.

11          With respect to the U.S. estates, avoiding those

12 claims and also formalizing the relationships between the

13 U.S. and Canadian estates on a going forward basis for the

14 rest of the case resolves other issues.  It gives certainty

15 that the funding concerns that the Canadian estates have will

16 be eliminated because the amount of money that is going to be

17 transferred is in the estimation of the Monitor, and the

18 Canadian Debtor is sufficient to carry them through the

19 conclusion of these proceedings.  So we will not be before

20 these Courts again looking for a payment by the U.S. estates

21 to the Canadian estates.

22          It also resolves certain pre-filing claims.  There

23 is a reconciliation built into this claim of amounts that

24 were due and owing by the Canadian estates under a pre-filing

25 revolving loan agreement, as well as the payments that were

1  due and owing by the U.S. estates to the Canadian estates for

2  certain goods and services different than the R&D Services,

3  actual purchases of goods on an intercompany basis.  So

4  there's been essentially a netting of the intercompany

5  accounts, as well as a recognition of this $2 billion dollar

6  income adjustment.

7      Now if I could for a moment turn to the Internal Revenue

8  Service because they are interrelated.  The Internal Revenue

9  Service as you know, Your Honor, filed in late August a claim

10 against these estates in the amount of, well in excess of $3

11 billion dollars.  And we have been before you already, Your

12 Honor, on an expedited basis with respect to the IRS claim.

13 We had mentioned that in connection with the Enterprise

14 transaction, the existence of the IRS claim created an

15 impediment to the closing.  And, indeed, a condition to

16 closing was that any potential follow on liability relating

17 to two non-debtor entities would have to be eliminated.  What

18 we did with the IRS in that circumstance was we filed an

19 objection to that proof of claim.  We entered into expedited

20 mediation, and we were able to come to a resolution with the

21 IRS that allowed the transaction to take place and, indeed,

22 the Enterprise deal did close on December 18th.  And the black

23 box, so to speak, has received nearly $900 million dollars.

24 There's certain other escrows that were established, as well

25 but we closed and got our money which was exactly what we

1  needed to do.  But, nevertheless, there still remained the

2  issue of an IRS claim.  That claim remained outstanding and

3  the objection had been adjourned.  The underlying basis for

4  that claim, as asserted, was that the, that there had been a

5  misreporting of income by the U.S. Debtors.  And that

6  misreporting of income under the $3 billion dollar claim

7  estimated that up to $7 and a half billion dollars of income

8  had been wrongly reported; that it should have been reported

9  in the U.S. and had been sent up to Canada.  What we have

10 been able to do in this circumstance is take the claim of the

11 IRS and reduce it substantially.  We've reduced it from over

12 $3 billion dollars to $37.5 million dollars.  And in

13 connection with the settlement with the IRS, we do seek

14 approval of that settlement.  We seek approval of that

15 settlement and payment of that $37 million dollars in cash.

16 I mention that in connection with the Canadian funding

17 agreement because if we do not get approval for the Canadian

18 funding agreement here and in Canada and if we do not get

19 approval for the advanced pricing agreement here in the

20 United States and the related one in Canada, none of this

21 happens.  It all is interdependent and falls apart.

22        Part and parcel of the $37 and half million dollar

23 reduction is also that we will enter into the advanced

24 pricing agreement.  Both Your Honors will have noted that we

25 have filed separate motions seeking to seal the actual

1  document, the actual advanced pricing agreement both the one

2  that is proposed to be signed here in the United States and

3  the one proposed to be signed in Canada.  It's worthwhile to

4  step back for a moment and say why that is necessary.  The

5  advanced pricing agreement is the product of certain

6  bilateral negotiations that take place between sovereign

7  nations: in this case, the United States and Canada.  There

8  are departments within the taxing authorities known as

9  competent authorities.  The competent authorities talk to

10 themselves.  They operate pursuant to treaty.  They are

11 responsible for policing these types of transfer pricing

12 arrangements that exist in multinational companies both to

13 make sure that income is recognized in appropriate

14 jurisdictions and taxed appropriately and for the benefit of

15 the taxpayers to make sure that there's not double taxation.

16 So one of the main issues that the APA's, as we call them,

17 are addressed here is that we are going to resolve an open

18 issue; an issue that has been open in a sense an audit basis

19 for about seven years.  And will allow us to stipulate to a

20 very specific number, to sign and deliver the APA both here

21 in the United States and in Canada, and to close that Chapter

22 as it relates to the taxing arrangements between the

23 jurisdictions.  So when I looked at the list of things that

24 we had to do claims reconciliation, obviously, was a very

25 important one, and the reduction and liquidation of an

1   enormous claim by the IRS for $37 and a half million dollars,

2   we think, is a very good thing for the U.S. Debtors; indeed a

3   very good thing for all of the Debtors.  So what we're

4   talking about here though ultimately is a recognition that

5   there is a relationship between the two matters; that one

6   wouldn't exist without the other.  We have testimony that

7   we'll put on through the principle officer of NNI John Ray

8   who was appointed in December, as well as Mr. Kearns who's

9   the financial advisor with Capstone Advisory to the

10  Creditor's Committee; both of whom participated in these

11  negotiations to be able to prove to the Court and to

12  establish the evidentiary record that these negotiations and

13  these settlements are reasonable and appropriate under the

14  circumstances. And that they meet the martin standards in

15  terms of risks of litigation and the like.  You will hear

16  through the proffers that the litigations that would have

17  resulted were it not for the settlements, both with respect

18  to the litigation of the IRS claim, as well as any potential

19  litigation of intercompany claims, would have been very

20  expensive, very time consuming, very complex.  They also

21  would have had an uncertain result.  And that the resolutions

22  that have been agreed to in these documents are within the

23  range of reasonableness, appropriate for the U.S. Debtors to

24  agree to them.  And, indeed, an element of that analysis is

25  that there was a *quid pro quo* that the resolution of the

1    issues as related to the taxing jurisdictions be addressed in

2    order to also address the issues relating to funding.  And

3    we're happy to report that after quite a lot of negotiations

4    and discussions that were happening simultaneously with the

5    immense pressure presented by the transactions, that these

6    negotiations which took place among the Monitor and the

7    Canadian Debtors, the U.S. Debtors, the Creditors Committee

8    and the Bond Holder Committee yielded, we think, a very fair

9    and reasonable result.

10          One other thing that we've been able to accomplish

11   is also that we have agreed to a funding, not funding or

12   sharing arrangement of certain costs that relate to what we

13   call deal costs; the things that we haven't quite been able

14   to figure out who's responsible for.  So what we will do, for

15   instance, is, you know, there are certain transactions which

16   say that audits need to be taking place.  And so in certain

17   circumstances, those payments to the auditors have been made

18   by the Canadian estates.  And there's a recognition that at

19   some point in time we'll have to spread that cost over.  As

20   between the U.S. and the Canadian estates, we have agreed

21   that with respect to that category of costs, for the time

22   being, we'll split them 50/50.  And once we agree to a

23   proceeds allocation whatever that proceeds allocation ends up

24   being, it will then be readjusted or trued up at the end of

25   the day.  That may seem like a slight issue in the scheme of

1  things, but believe me, Your Honor, it was important that we

2  all reach agreement on that.

3         So when we look at, you know, what we've

4  accomplished it's important to also look at what this allows

5  us to do going forward.  It allows there to be a focus on the

6  transactions that need to close; allows there to be a focus

7  on the realization of value out of the intellectual property,

8  the development of plans of reorganization or liquidation as

9  are appropriate; it allows the focus to be on the allocation

10  of the proceeds, all the things that are predicates to moving

11  forward to allow distributions to be made to creditors in

12  both the U.S. and Canada.  So those were all, we think,

13  laudatory things and we think that, at least from the U.S.

14  Debtors' perspective, that the parties should be

15  congratulated for going through the hard work and difficult

16  negotiations that were necessary to get to this point.  Is it

17  perfect in every way, I think the answer to that has to be

18  no.  But that's the nature of a settlement.  It's not

19  perfect, but it is certainly within the realm of

20  reasonableness from the U.S. Debtors' perspective.

21         So that is the highlight of how we think that, you

22  know, that the two motions relate to each other and fit

23  together.  The, there, the execution and delivery of the

24  APA's under the Internal Revenue Service settlement, you

25  know, as I said also dovetails with the execution and

1  delivery of another agreement in Canada.  I think I should go

2  back and say we did need to file those under seal because it

3  is the policy of both of the taxing authorities that those

4  agreements are not public.  They are kept private.  And that

5  it would be damaging to the policy and public policies

6  underlying the transfer pricing and collateral competent

7  authority regimes to have those disclosed publicly.  I should

8  say that we have shared them with the Committees.  They have

9  seen them.  They have been participants in them.  Obviously,

10  the taxing authorities know it.  The Monitor knows it.  And

11  we have filed them under seal with both Courts so that you'd

12  be able to see the substance of them.  They do require income

13  adjustments of $2 billion dollars.  One $2 billion dollars

14  more income recognized by the United States; $2 billion

15  dollars less income recognized by Canada.  And the, without

16  explanation as to how that number has been calculated.  It is

17  in terms of reaching the settlement under the Canada funding

18  agreement that was taken into account, but by no means was it

19  the driving force.  The fact is that the parties took into

20  account, at least from the U.S. perspective, the information

21  regarding the over payments in the 2001 to 2005 period and

22  found that the creation of the NNI claim in the amount of $2

23  billion dollars is of reasonable mid point and taking into

24  account all of the circumstances a reasonable settlement.

25            So that is by way background where we stand.  I

1   think it's worthwhile for a moment to focus on the

2   objections.  First of all, there are no objections now in the

3   United States.  We have done this with the Creditors

4   Committee and the Bond Holders Committee hand in glove.  We

5   have worked with them non-stop and, frankly, we wouldn't have

6   filed this motion if we weren't doing it without the support

7   of both of those Creditor constituencies.  We did receive an

8   objection; however, from the Joint Administrators.  That

9   objection was filed yesterday.  And we apologize for the late

10  timing, but we were trying to resolve any issues.  That

11  objection in the United States, at least, focused primarily

12  on the request to add certain language into the order in the

13  United States, reservation of rights.

14          THE COURT:  Yes.

15          MR. BROMLEY:  What we did in response to that was

16  craft our own version of those reservations of rights and

17  incorporated them into our reply.  And so when we got to

18  Court today, we found out that we had made a lot of progress.

19  And then, of course, we did spend two hours working on a

20  clause that I think has seven words.  And so the, it would be

21  worthwhile, I think, at this point before we put the evidence

22  on, Your Honor, just to focus on the additional language.

23          THE COURT:  And I do have the reply before me.

24          MR. BROMLEY:  Okay very good, Your Honor.  Just so I

25  know, I'm referring to the right paragraphs because we

1  actually renumbered the order itself.  So if Your Honor if

2  you look at the reply and the reservations that appear on

3  page 3.

4          THE COURT:  Yes.

5          MR. BROMLEY:  The second bullet point is where the

6  addition is.  So for the first bullet point, that is

7  acceptable.  For the second bullet point, we have one change.

8  The third bullet point is acceptable.  So if you look at the

9  second bullet point which begins with the words, "for greater

10  certainty."

11          THE COURT:  Yes.

12          MR. BROMLEY:  The second to last line begins, "or

13  more of the U.S. Debtors."  We would then insert the

14  following, "or the obligations of the U.S. Debtors, if any

15  (which the U.S. Debtors would dispute)."

16          THE COURT:  Okay.

17          MR. BROMLEY:  So, Your Honor, with that we, it is

18  our understanding that the, and we believe that that is, that

19  change is only required in the U.S. order.  So we would add

20  these three paragraphs into the U.S. order with that one

21  addendum into the second bullet point.

22          There would be added into the Canadian order

23  essentially three mirror image paragraphs that are adjusted

24  as necessary for the references to Canadian Debtors and

25  Canadian documents.  The proviso, however, that I just read

1  would not be added into the Canadian order.

2          THE COURT:  Right.

3          MR. BROMLEY:  Because this provides overfers to

4  obligations of the U.S. Debtors, does not refer to the

5  Canadian Debtors.  So it wouldn't apply and; therefore,

6  doesn't need to be added to the Canadian order.

7          It is our understanding based on that change that

8  the objection is now, once incorporated, is now withdrawn by

9  the Joint Administrators in both jurisdictions and that would

10 include any objection they may have to the establishment of

11 the NNI claim.  So I think at this point it would be

12 worthwhile if we could just hear confirmation from counsel

13 representing the Joint Administrators that that is the case.

14         THE COURT:  Thank you.

15         MR. ADLER:  Your Honor, it's Derek Adler from Hughes

16 Hubbard on behalf of the Joint Administrators.  I'm here *pro*

17 *hac vice*.  I am with my co-counsel Mr. Harron of Young

18 Conaway.

19         THE COURT:  Yes, welcome to you.  You certainly may

20 proceed.

21         MR. ADLER:  You've seen the objection that was filed

22 and so you know that the concerns that we had were that

23 certain aspects of the Canadian funding agreement could have

24 been read to be releasing potential claims that the UK

25 Administrators would have against the U.S. Debtors or the

1  Canadian Debtors or modifying certain agreements between the

2  parties and that entry of the NNI claim could also prejudice

3  the UK Administrators in various ways.  We have and we're

4  very grateful to Mr. Bromley and his team, the Committees and

5  so on for working with us to craft reservations of rights

6  that make it clear that there is no amendment intended to

7  these various multi-party agreements other than between the

8  two parties the U.S. and Canadian estates; that we're

9  preserving all of the rights of the UK Administrators to

10 pursue their claims under those agreements and the

11 obligations on the North American side; and that the entry of

12 the NNI claim the establishment of that claim will not

13 prejudice us.  That we're essentially strangers to that entry

14 and are preserving our rights to contest it and so far as it

15 affects us. So on the basis of these reservations of rights,

16 we are withdrawing our objection to the entry of the CFA and

17 the transactions therein, the settlement amount and the

18 establishment of the NNI claim.

19         THE COURT:  All right.

20         MR. ADLER:  Thank you, Your Honor.

21         THE COURT:  Thank you.  And I'm sure Mr. Bromley

22 thanks you.

23         MR. BROMLEY:  The one point I think we need to

24 clarify on the record is that the, there was a statement

25 there which I think was the right to contest the NNI claim I

1   think was used.  There is no right to contest the NNI claim.

2   This is when it's being established and the objection is to

3   that is made today and as I understand is being withdrawn.

4           THE COURT:  Mr. Adler.

5           MR. ADLER:  The reservation of rights speaks for

6   itself.  But it was to contest the issues that may affect the

7   UK Administrators in relation to that claim which I think is

8   clear.

9           MR. BROMLEY:  I think when you parse through the

10  reservation of rights I think there has been a concern raised

11  that the NNI claim or the facts underlying it might have an

12  impact through a claim made over against the EMEA Debtors.

13  And I think the issue is that the claim is there.  And any

14  rights that the immediate Debtors may have to dispute any

15  underlying facts and circumstances as it relates to them in

16  particular are preserved.  But they can't, at this point once

17  withdrawing this objection, contest the fact that the claim

18  exists and is allowed.

19          MR. ADLER:  I confirm that, Your Honor.

20          THE COURT:  All right, very well.

21          MR. BROMLEY:  I think while it may be going a little

22  bit out of order, it would be worthwhile at this point to

23  also hear from Canadian counsel to make sure that the

24  objection is also being withdrawn in Canada.

25          THE COURT:  Good.

1          MR. BROMLEY:  Simply because if it's not, then it

2   will affect the way that we proceed with the rest of the

3   hearing.

4          THE COURT:  Excellent.  Thank you, Mr. Bromley.

5   Justice Morawetz, I think did you hear Mr. Bromley's comment?

6          JUSTICE MORAWETZ:  Yes, we did, Judge Gross.  I'll

7   call on counsel here to confirm.  Mr. Schwill.

8          MR. SCHWAB:  Your Honor, I can confirm that.  It's

9   still subject to seeing the modified Canadian language but

10  it's the modified Canadian language as indicated by Mr.

11  Bromley parallels the reservation of rights language in the

12  U.S. then we would, we withdraw on our objection.  So we just

13  haven't seen the Canadian, the full Canadian language given

14  the amendments.

15         UNIDENTIFIED:  Your Honor, I think there might be

16  some confusion and I'll speak with Mr. Schwill, our

17  understanding was that the additional language is not

18  required in Canada.  So I'll speak with Mr. Schwill for one

19  minute.

20         JUSTICE MORAWETZ:  I will proceed on the assumption

21  that there's an agreement in principle here.

22         UNDENTIFIED:  There is, Your Honor.

23         JUSTICE MORAWETZ:  So as not to hold up the

24  proceedings.  Thank you.

25

1          THE COURT:  Mr. Bromley, I think we have the

2   statement you requested withdrawing the objection.

3          MR. BROMLEY:  Thank you very much, Your Honor, and

4   thank you from our colleagues representing the Joint

5   Administrators.

6          At this point, I think the typical way we proceed

7   now is to go into the evidence and then Mr. Tay [phonetic]

8   will take over in terms of argument under the Canadian

9   standards and I'd follow up with the U.S. standards.  And I

10  would like to introduce to the Court for the first time Mr.

11  John Ray who's present.  Mr. Ray, as you know, Your Honor,

12  because you signed the order has been appointed as the

13  principle officer of NNI.

14         THE COURT:  Yes.

15         MR. BROMLEY:  And we have him available for

16  testimony.  We don't understand that there's anyone who's

17  interested in cross examining so we will proceed by proffer

18  unless there's any objection.

19         THE COURT:  Any objection to a proffer here on

20  behalf of Mr. Ray?  Hearing none, you may proceed then, Mr.

21  Bromley.

22         MR. BROMLEY:  Thank you, Your Honor.

23         Mr. John Ray who's present in the Courtroom and

24  available to testify would testify if called that he is the

25  Senior Managing Director and sole member of Avidity Partners

1  LLC.  And that's since December 7th, 2009.  He has held the

2  position of principle officer for the U.S. Debtors or for

3  NNI, in particular.  Mr. Ray would also testify that he's had

4  broad experience with Chapter 11 Debtors serving in positions

5  of responsibility in with respect to companies such as ENRON,

6  Fruit of the Loom, Burlington Industries, Haslemere, National

7  Century Healthcare and Pakwest.  In particular with respect

8  to the ENRON matter, Mr. Ray would testify that he was the

9  responsible person for the winding down and collection of

10  substantial assets in connection with the ENRON matter and

11  implementing the distribution of proceeds under the ENRON

12  plan of reorganization.

13          He would also testify that he was retained after an

14  interview process where he met with members of the Creditors

15  Committee and representatives of the Bond Holders, as well as

16  the U.S. and Canadian Debtors and the Monitor.

17          Mr. Ray would testify that while in early December,

18  he was relatively new to the case.  The first material matter

19  in which he was involved was the Canadian funding agreement,

20  as well as the resolution of the Internal Revenue Service

21  settlement.  And that while certain negotiations took place

22  with respect to both matters before his arrival, he was

23  involved in, after his arrival, substantive negotiations and,

24  indeed, the execution of the Canadian funding agreement, as

25  well as substantive negotiations relating to the Internal

1  Revenue Service settlement.  Mr. Ray would testify that he

2  was not involved in the negotiations relating to the IFSA but

3  that he has been briefed since arrival as to the IFSA and its

4  import and its terms.  He would testify that he is familiar

5  with the agreement and has read it and that understands that

6  that document provided that funding would be provided by the

7  NNI to NNL through September 30th, 2009.  He would also

8  testify that since September 30, 2009, NNI has not provided

9  any funding to NNL or compensated it for goods and services

10 that have been received post petition.

11        He would testify that it is his understanding based

12 on conversations with the Monitor and company officials, that

13 the liquidity of the Canadian estate is in a state that

14 requires correction.  That the Canadian estate is in need of

15 funding and that present objections without funding would

16 have a crisis in the February timeframe.

17        He would testify as well that since his arrival,

18 he's understood that NNL and NNI have continued to work

19 together to accomplish the transactions that have been

20 negotiated to sign additional transactions and to work to

21 perform under the transition services agreement.  And that he

22 has had a large number of conversations and meetings and

23 conducted due diligence with respect to NNI, its relationship

24 with NNL, and including having meetings with representatives

25 of the Official Committee and the Bond Holders.

1          He would testify, if called, that he is aware that

2   in the context of negotiations over funding that NNL has

3   taken the position that NNI should reimburse NNL for services

4   that have been provided; that during the pre-filing period

5   the payment and reimbursement of costs and expenses took

6   place pursuant to a transfer pricing regime; a transfer

7   pricing regime which has been held in abeyance since the

8   filings.  And that he has been aware of and participated in a

9   number of discussions relating to whether there were means to

10  alleviate NNL's liquidity issues.  He would also testify, if

11  called, that NNL's liquidity is important to the U.S.

12  Debtors, as well as to the Nortel entities generally.  That

13  NNL provides certain corporate overhead, research and

14  development support to its affiliates throughout the world

15  including the U.S. Debtors.  And that those services are

16  going to be provided until the date of the last close of the

17  sale transactions; therefore, the continued provision of

18  those services is important to the realization of value for

19  Nortel generally and for the U.S. Debtors, in particular.

20  Also that under the transition services agreements that have

21  been executed in the transactions that have been approved and

22  are to be approved that both NNI and NNL are responsible for

23  the provision of transition services.  And that if NNL were

24  unable to provide those services, it would make the issues

25  for NNI difficult and, indeed, would put at risk certain

1 performance obligations under the transition services

2 agreements.

3         Also, he would testify that it is his understanding

4 that NNL is the owner in legal title of the vast majority of

5 the intellectual property in the Nortel world.  And that

6 while the issues as to the realization of intellectual

7 property value are still to be determined, the fact that the

8 legal title is held by NNL to such intellectual property

9 would make it difficult if NNL were to run out of money.

10        He would testify, if called, that he's familiar with

11 the background of the negotiations that took place with

12 respect to the Canadian funding agreement.  That the

13 negotiations involved representatives of the Monitor, the

14 Official Committee and their advisors, the Bond Holders Group

15 and their advisors, U.S. Counsel to the Debtors, and Canadian

16 Counsel to the Debtors.  He would testify that the

17 negotiations were in his view conducted at arm's length in

18 good faith.  They were lengthy; tedious, at times;

19 contentious, at times.  He would testify that the issues that

20 were being addressed, both with respect to the Canadian

21 funding, as well as the establishment of the NNI claim and

22 the issues relating to the taxing authorities, were very

23 complicated, very difficult to master, and, in his view, if

24 were not settled would result in complex and expensive

25 litigation.

1        In the context of the negotiations, he would testify

2   that there was a consensus that an overpayment had been made

3   by NNI to NNL during the 2001/2005 period and that the

4   discussions focused on the amount of that overpayment and how

5   to memorialize it.  And that there were arguments made in

6   both directions in terms of the size of the adjustment.  And

7   that when reaching the decision that the appropriate

8   adjustment was $2 billion dollars, that that was taking into

9   account the risks and rewards that would be presented by

10  litigation, as well as the potential downside of any failure

11  in such litigation.

12       He would testify, if called, that it was very

13  important, indeed essential, for the provision of funding

14  that the intercompany claim be established, allowed, and not

15  subject to setoff and subject to all of the terms and

16  conditions as required in the Canadian funding agreement.

17  That, in particular, the U.S. Creditors Committee made it

18  very clear that in their view there should be no funding

19  provided unless there was a satisfactory arrangement with

20  respect to the intercompany claim and the execution of the

21  advanced pricing agreements.

22       He would testify, if called, that if the Canadian

23  funding agreement is not approved that this would likely

24  result in two separate material litigations: one, with

25  respect to the IRS claim which he views as being an

1 expensive, complex, and costly, I mean risky process. One,

2 that he has substantial experience in dealing with in light

3 of his oversight of material litigation particularly in the

4 ENRON matter, as well as the litigation that would have to

5 be, that would result in terms of pursuing a related claim

6 against the Canadian Debtors for overpayments. That too

7 would be long, complex, costly. It would also put at risk

8 the transactions that have been negotiated and the returns

9 that are expected as a result of those transactions.

10        He would testify that based on his assessment that

11 the settlement of the IRS claim at a payment of $37.5 million

12 dollars and reducing that claim from $3 billion was an

13 appropriate exercise of the Debtors' business judgment and

14 was a good result under the circumstances. His view would be

15 that the Canadian funding agreement balancing the payments

16 that would be made to Canada, the elimination of claims that

17 the Canadian estates might have for the provision of goods

18 and services, as well as the establishment of the

19 intercompany claim represent a global compromise of many

20 complex issues but under the circumstances are fair and

21 reasonable and appropriate under the circumstances. In

22 particular with respect to the Canadian funding agreement, he

23 would mention that, testify that the $190.8 million dollars

24 would be paid in five installments subject to certain

25 adjustments, in particular, based on the timing of closing of

1    certain transactions.  That the claims being settled would

2    include claims for goods and services that have been provided

3    during the post petition period and pre-petition period by

4    NNL to NNI; that the, there would also be the recognition and

5    netting of the prepetition obligations as it related to the

6    intercompany revolving credit agreement. He would testify

7    that, among other things, the Canadian funding agreement

8    provides for an allocation of corporate costs for the period

9    covered by the agreement to be allocated on an initial basis

10   between NNL and NNI on a 50%/50% basis to be subject to a

11   true up after the determination of the allocation of purchase

12   price of proceeds.

13        He would testify that in recognizing that the $2

14   billion dollar income adjustment was appropriate that the

15   U.S. Debtors and its Creditor constituencies have taken into

16   account certain positions that have been taken prior to the

17   filing with respect to overpayments; certain potential risks

18   with respect to litigating the overpayment issue; and that in

19   light of the circumstances, that the $2 billion dollar claim

20   and related income adjustment that might, that would arise

21   under the APA was reasonable and appropriate under the

22   circumstances.

23        He would also testify that there is a reservation of

24   rights included in the agreement to bring other claims.

25   That, however, would if other claims would be brought open

1  the door for certain other things to be defenses and

2  counterclaims to be brought by the Canadian estates.  But

3  absent any additional claims brought by the U.S. estates that

4  under the Canadian funding agreement, the NNI claim is not

5  subject to any setoff or counterclaim as set forth in the

6  agreement.

7        He would also testify, if called, that the

8  constituents in this case, in particular, the Official

9  Committee and the Ad Hoc Bond Holder Committee have confirmed

10  their support to the agreement.  And, indeed, participated in

11  those negotiations.  He would testify as well that there were

12  benefits to the continued funding of the Canadian estates and

13  NNL in particular that the continued operation of NNL and its

14  participation in the sale processes was very important.  It's

15  continued participation under the transition services

16  agreements very important.  And the continued uninterrupted

17  use of the intellectual property as to which NNL holds legal

18  title is important as well.

19        Finally, Your Honor, as it is also set forth in the

20  Canadian funding agreement that the parties have agreed not

21  to take any steps to terminate the MRDA; the master R&D

22  agreement which assures that the circumstances relating to

23  the use of the intellectual property remains at the status

24  quo.  So, overall, Mr. Ray would testify that these matters

25  that are being settled both in the IRS settlement motion and

1   in the Canadian funding arrangement are reasonable under the

2   circumstances and, particularly, taking into account the

3   totality of the circumstances.  The risks of litigation on

4   multiple fronts were substantial; the costs related to that

5   litigation substantial; the timelines for the completion of

6   such litigation very long; and the risk to the transactions

7   substantial.  And that under the circumstances particularly

8   given the fact that all the parties were present,

9   participated in arm's length negotiations, and those

10  discussions being very vigorous at times, that the two

11  settlements are reasonable and appropriate under the

12  circumstances.

13          And that is the proffer that I would like to make

14  today for Mr. Ray.

15          THE COURT:  All right.

16          MR. BROMLEY:  If anyone has any questions, we're

17  certainly prepared to deal with those.

18          THE COURT:  Let me just confirm that no one wishes

19  to cross examine Mr. Ray?  All right, the proffer is admitted

20  then, Mr. Bromley.

21      (Proffer of Mr. John Ray received into evidence.)

22          MR. BROMLEY:  Thank you very much, Your Honor.  We

23  also have a proffer which I think should be a little shorter

24  that Mr. Botter will handle for Mr. Kearns from Capstone.

25          THE COURT:  Good, thank you.  Mr. Botter.

1          MR. BOTTER:  Good afternoon, Judge.

2          THE COURT:  Good afternoon.

3          MR. BOTTER:  Good afternoon, Mr. Justice Morawetz,

4   David Botter Akin Gump Strauss Hauer & Feld on behalf of the

5   Official Committee of Unsecured Creditors.  And as Mr.

6   Bromley has stated, I do have a brief proffer of Christopher

7   Kearns, Christopher J. Kearns.

8          Mr. Kearns would testify that he is employed by

9   Capstone Advisory Group LLC.  Mr. Kearns would testify that

10  he is an Executive Director and managing member of Capstone

11  Advisory Group LLC.  Mr. Kearns would testify that Capstone

12  is the financial advisor to the Unsecured Creditors Committee

13  in these cases.  And that Capstone has acted in that capacity

14  on behalf of the Creditors Committee since the Creditors

15  Committees, shortly after the Creditors Committee's

16  formation.  Mr. Kearns would testify that he is generally

17  aware of all matters in which Capstone is involved in

18  relation to the Nortel cases.  He would also testify that

19  Capstone personnel, as well as himself have had reasonable

20  access to Nortel personnel and to the personnel of the

21  Monitor throughout these proceedings many times at Nortel's

22  headquarters in Toronto.

23         Mr. Kearns would testify that he is familiar with

24  the transfer pricing agreement methodologies and history of

25  payments.  He would testify that he has reviewed NNI and

1  NNL's budgets and projections since the outset of these

2  cases.  Mr. Kearns would testify that he personally has

3  reviewed Nortel's cash flows and projected financials.  He

4  would testify that he is aware of the projection with respect

5  to Nortel's businesses, particularly with regard to the cash

6  needs of NNL through 2010.  He would testify further that it

7  is his understanding that NNL did not have enough cash to

8  continue to operate through 2010 as of September 30th, 2009.

9  He would testify that the company's current cash force, cash

10 forecast without the CFA funding, without the funding

11 provided pursuant to the Canadian funding agreement, that the

12 Canadian entities, the Canadian applicant entities will run

13 out of cash sometime in Q1 of 2010.

14       With respect to transfer pricing, Mr. Kearns would

15 testify that he is generally familiar with Nortel's transfer

16 pricing system and has a general understanding of the purpose

17 and design and historical payments there under.  He would

18 testify that he has been painfully aware of the claims for

19 goods and services, administrative obligations, and/or

20 asserted payments under the transfer pricing regime

21 throughout these proceedings.  He is also aware of the

22 discussions between various constituents in these proceedings

23 with respect to solving the NNL liquidity problem.

24       Mr. Kearns would testify that he is fully familiar

25

1  with the interim funding and settlement agreement, what we

2  have referred to as the IFSA in these cases.  Mr. Kearns

3  would testify that he was personally involved in the

4  negotiations regarding the IFSA.  Mr. Kearns would testify

5  that the negotiations regarding the IFSA were at arm's length

6  and were contentious and were quite time consuming.  In

7  general terms, Mr. Kearns would testify that the IFSA

8  provided for interim funding for NNL through 9/30/09.  Mr.

9  Kearns would further testify that he is completely familiar

10 with the final Canadian funding and settlement agreement and

11 was personally involved in the negotiations of the CFA.  Mr.

12 Kearns would testify that his understanding of the rationale

13 behind the CFA's settlement is that it was a resolution of

14 multiple issues.  He would testify that it was a resolution

15 of the funding needs of NNL and a solution to its liquidity

16 problems.  He would testify that it was a resolution of US

17 taxing authority claims and issues arising there from.  He

18 would further testify that it was also a readjustment of

19 income for a period of time and claims arising from such

20 readjustment.  He would testify that without the funding

21 provided under the CFA that NNL, again, would run out of cash

22 sometime in Q1 of 2010.  He would testify that the CFA was

23 heavily negotiated between multiple parties.  He would

24 testify that those negotiations proceeded on an arm's length

25 basis.  He would also testify that the settlement is in the

1  best interest of the U.S. Debtors' estates.

2         With respect to the IRS settlement, Mr. Kearns would

3  testify that Capstone provided general assistance in the U.S.

4  Debtors settlement with the IRS.  Mr. Kearns would testify

5  that either he or one of his deputies was personally involved

6  in the discussions surrounding the IRS settlement.  Mr.

7  Kearns would testify that with respect to that he was aware

8  that certain overpayments were made from the U.S. to Canada

9  on the transfer pricing agreements for the period between

10 2001 and 2005.  And he became aware of that through his

11 representation of the Unsecured Creditors Committee in these

12 cases.  Mr. Kearns would further testify that he became aware

13 that the U.S. and Canadian taxing authorities had determined

14 in their bilateral discussions that the magnitude of the

15 overpayment was $2 billion dollars.  Mr. Kearns would further

16 testify that given taxing authorities determination of the $2

17 billion dollar overpayment and the impact of such overpayment

18 on the U.S. Debtors' tax attributes that the grant of a $2

19 billion dollar claim for the benefit of the U.S. is

20 appropriate.

21        Finally, Mr. Kearns would testify that without the

22 settlement, as Mr. Ray has testified this afternoon, that we

23 would be involved, that the U.S. estates would be involved in

24 a very complex litigation that would be difficult, prolonged,

25 expensive involving open tax years for nearly eight years.

1 And that, therefore, that the settlement baked into the CFA

2 settlement is appropriate and in the best interest of the

3 U.S. Debtors.  With that, Your Honor, I would conclude Mr.

4 Kearns' proffer and ask if the Court or any of the parties

5 had any questions.

6         THE COURT:  I do not.  Does anyone else wish to

7 cross examine Mr. Kearns?  All right, Mr. Botter, thank you

8 that is admitted into evidence the proffer of Mr. Kearns'

9 testimony.

10     (Proffer of Christopher Kearns received into evidence.)

11         MR. BOTTER:  Thank you, Your Honor.

12         THE COURT:  Mr. Bromley, I believe we should now

13 turn to the Canadian Court.

14         MR. BROMLEY:  Yes, I just have two other points

15 which I wanted to raise.  Certainly, the documents speak for

16 themselves and they're lengthy.  I don't purport to read into

17 the record every single individual provision, but there are

18 two things that I think are important to mention.  One, with

19 respect to the Canadian funding agreement, one element of the

20 Canadian funding agreement is that there's a certain loan

21 agreement that was entered into on a post petition basis.  As

22 you will recall, Your Honor, the first day of the case we got

23 approval for a loan by NNI to NNL in the amount of $75

24 million dollars secured by a first charge on certain property

25 known as the Carling Facility.  That loan agreement had a

1 | natural termination date of December 31, 2009.  We were able

2 | to, under the first day orders, extend that and we extended

3 | it for a short period of time.  But what we are seeking as

4 | part of this motion is the authority to enter into a further

5 | extension of that agreement through 12/31/2010 and that can

6 | be extended without coming back to the Court under certain

7 | circumstances.  And I wanted to point that out in particular.

8 | In addition, Your Honor, with respect to the IRS

9 | settlement, we did undertake in the motion to file with the

10 | Court something that's known as a closing agreement.

11 | THE COURT:  Yes.

12 | MR. BROMLEY:  That closing agreement we had said we

13 | would file one day prior to the hearing.  We have filed that.

14 | We filed it indeed on Tuesday evening.  And we want to thank

15 | the IRS in particular for working very hard after the holiday

16 | weekend to get that done on Tuesday.  So that has been filed

17 | as well.  So I just wanted to point that out.  It's on the

18 | record.  We will be seeking authority as well not only to

19 | enter into the APA, but also to sign and deliver the closing

20 | agreement upon the satisfaction of all the conditions.

21 | THE COURT:  Understood.  Thank you, Mr. Bromley.

22 | MR. TAY:  Good afternoon, Your Honor.  Good

23 | afternoon, Judge Gross.

24 | THE COURT:  Good afternoon.

25 | MR. TAY:  As a starting point maybe I can just give

1  you a summary of where we're at in the Canadian process and

2  as you heard as far as the UK Administrators are concerned, I

3  think Mr. Schwill has now confirmed that it is done in the

4  Canada.  So that's no longer an issue.  I'm also happy to

5  report that with respect to the issues raised by the

6  representative counsel for the ex-employees that you held a

7  Chambers hearing about a day or two ago that that issue has

8  been resolved.  And as we've said before that, you know,

9  there is no desire or intention on the part of Nortel to

10  preempt relief, cut off people's benefits and that we are

11  working with the rep counsel to find a way to consensually

12  provide for these benefits for a reasonable period of time.

13  And we're working also with the various committees, etc. so

14  that we can reach consensual agreement as quickly as

15  possible, and we will get back to you hopefully in a short

16  period of time.  But wording has been agreed to for the

17  order, and I believe language for an endorsement which I

18  understand we'll deal with at the end of the process that

19  satisfies all the parties involved so there is no longer any

20  objection from the representative counsel.

21       And before I start my submissions, sorry, so I

22  believe the only remaining objection then is the objection

23  from the Trustees of the UK pension plan.  And I guess we'll

24  just have to deal with that objection, but I'm hoping that as

25  I deal with the issues in my main submission that I should be

1   able to address most of their concerns and we'll see what

2   they have left to say.  But before I start on that, I believe

3   the Monitor has a preliminary motion that it needs to bring

4   to your attention dealing with a confidential report to Your

5   Honor.  So I'll cede the floor to Mr. Myers.

6          JUSTICE MORAWETZ:  Mr. Myers, please proceed

7          MR. MYERS:  Thank you, Your Honor, if I can just

8   hand up a book of authorities and confidential report which

9   you may determine to read if you find favor on our

10  submissions.  I'll as if you can help me with the book of

11  authorities if any other counsel wants.

12         JUSTICE MORAWETZ:  So this is a different document

13  that the, that I have previously have received with the

14  request for sealing.  I have a confidential Appendix D to the

15  35th reports.  So this is another confidential supplement that

16  I've not seen, right?

17         MR. MYERS:  Correct, Your Honor.  This is your

18  Monitor from Cons and Young Inc seeks leave of the Court to

19  file with the Canadian Court only and seal under Section 137

20  of Ontario's Courts of Justice Act a supplemental 35th report

21  of the Monitor which deals with confidential aspects of the

22  settlement among the U.S. and Canadian estates involving the

23  agreement to quantify certain tax attributes and revenue

24  recognition among the estates and the tax authorities.  And

25  Your Honor knows that involves, among other things, $2

1   billion dollars of revenue being recognized in Canada.  And

2   the settlement effectively fixes an intercompany claim of

3   U.S. estate into the Canadian estate on this tax issue.  And

4   although there's one corporate group seeking a harmonious

5   realization and necessary cooperative cross border proceeding

6   on this issue on the settlement approval, we're really

7   dealing with the quantification of an intercompany claim

8   where each international entity and its creditors are

9   potentially adverse in interest.  And they're adverse in the

10  sense that if there's no settlement, they'll be litigation

11  which Mr. Bromley rightly classified as complex, uncertain,

12  and risky litigation between the Canadian and U.S. estates.

13  But Your Honor should understand that the issues between the

14  Canadian companies and the U.S. estates on the tax side have

15  an implication into the UK estate because to the extent that

16  Canadian revenue is being recognized and it's properly

17  referable to UK operations, Canada will have a claim into the

18  UK estate, into the UK administration.  There is, I

19  understand, no opposition from anyone in this Court to the

20  motion to seal including the UK administrators and the UK

21  pension trustee.  Although the pension trustee, as Mr. Tay

22  said, may be opposing the settlement itself but not the

23  sealing.  But, of course, to the extent that the settlement

24  has an implication whereby Canada is going to have a claimant

25  in the UK, the pension trustee as one of the larger if not

1  the largest creditor in the UK will then be adverse in

2  interest to the Canadian estate.

3       So in considering granting a sealing order, Your

4  Honor, not only are we not disclosing to any Creditor in

5  Canada, but we're certainly not thinking about filing a

6  document that would let into the Canada tent a potentially

7  adverse party in foreign litigation.  The Monitor, as you

8  know, is the Court's officer both under the statute under the

9  CCWA and under your initial Order and it's charged with the

10 duty to supervise and report on the Canadian proceedings.  It

11 is already recommending to the Court that Your Honor accept

12 the settlement to avoid the potential litigation with the

13 U.S.  There are many good and valid reasons for that, many of

14 which are already before you in the publicly filed 35th

15 report.  But if the settlement is not approved or if they run

16 into problems down the road and there were to be litigation

17 on the points, obviously it would prejudice the Canadian

18 companies and their Creditors in any litigation to disclose

19 to the adverse parties in that litigation the strategic and

20 business analysis of the case that supports the settlement of

21 the case at this time and supports the Monitor's

22 recommendation to the Court.  This is analogous to a sale

23 procedure where we don't disclose bidding analysis at a sale

24 approval motion for fear of a future need to re-engage in the

25 process we don't disclose where that will undermine the

1   integrity of a process that needs to be bounded by integrity.

2   And in this case, we're dealing with potential future claims

3   process and potential future litigation which must equally be

4   bounded by integrity.  And in my submission, it's appropriate

5   to take steps to ensure we don't undermine those litigation

6   processes by protecting the settlement and the settlement

7   analysis.

8        Your Monitor has information and analysis as to why

9   in its judgment the settlement is appropriate.  And it would

10   be deleterious, therefore, that in the phrase used by the

11   Supreme Court of Canada in the *Sierra* case to not only the

12   Canadian estate but all of its Creditors to disclose the

13   information and thereby prejudice the litigation.  I note

14   that its not unusual for the Court to seal Monitor's reports

15   in Section 10 of the General Regulation under the CCWA allows

16   for the sealing of Monitor's reports and parts thereof.  The

17   *Sierra* test is clearly the governing test and has been

18   applied as recently as December 23rd by Your Honor in this

19   case in dealing with *Flextronics* at a settlement if Your

20   Honor may recall.  But I do think it uses - -

21        JUSTICE MORAWETZ:  Well have any of those cases, Mr.

22   Myers, touched upon the direction that you want to go today

23   which is, am I to understand that this document has not been

24   seen by anyone other than the Monitor and its counsel?

25        MR. MYERS:  Correct.

1        JUSTICE MORAWETZ:  Now in any of those other cases

2  to which you have referred where the Court has granted

3  sealing, has there been similar circumstances?

4        MR. MYERS:  No there hasn't in any reported case.

5  You and I and many counsel in this room are familiar of cases

6  of Monitors meeting *ex parte* with the Court in any number of

7  different circumstances.  But, of course, there's never an

8  endorsement when that happens because there's no hearing.

9  But, of course, in this case and the motion before you right

10  now there is no opposition which in my submission will

11  alleviate much - -

12        JUSTICE MORAWETZ:  What am I to do with this

13  document?

14        MR. MYERS:  At an appropriate break in the

15  proceedings if there's, assuming there's a break before you

16  and Your Honor Judge Gross rule would hope you will read it

17  and utilize the information in it and to assist you in making

18  your determination.

19        JUSTICE MORAWETZ:  So then I have a situation where

20  the UK pension plan as I understand it is opposed to the

21  approval?  Presumably they will make some submissions.

22        MR. MYERS:  Presumably.

23        JUSTICE MORAWETZ:  And after hearing those

24  submissions and those of Mr. Tay and others, I'm supposed to

25  read this document and render some sort of determination

1  without making reference to anything in this document other

2  than I'm satisfied that, you know, it may support your

3  position.

4           MR. MYERS:  It's not different than my submission,

5  Your Honor, than in a sale approval motion when the Monitor,

6  the Receiver or Monitor's analysis of the bids is not shown

7  to people who may show up and oppose the bidding.  The

8  purpose of the seal is to protect the integrity of the

9  process.  In this case, there could perhaps have been people,

10 for example, the Debtor and the Committees who might wanted

11 to have seen the document but are content that it be sealed.

12 That non-opposition and our submission goes a long way to

13 assist, Your Honor.  That when the fact that someone who is

14 adverse in interest and potentially has the ability to

15 frustrate a process that must be bound by integrity that is a

16 future litigation between Canada and UK wants to see

17 something where it would be deleterious to the Canadian

18 Debtor to show it to them in my submission there's no basis.

19 There's no basis to do so.  In fact, the *Sierra* test is

20 readily satisfied and, in fact, again I hate to keep harping

21 on it, but they are not opposing the seal.

22           I thought it would be worthwhile though, Your Honor,

23 to spend a minute with the cross board of protocol because

24 it's perhaps unusual that we're sealing, filing a document up

25 here that's not being filed in the U.S.  And at tab two of

1  the book that I've handed you has the protocol in it.  And

2  just noting in passing paragraph 6C provides that the

3  protocol honors the independence and integrity of the Courts

4  on both sides of the border.  But the key paragraph that

5  applies is paragraph 12 and 12D in particular which is on

6  page 6 of the protocol which governs joint hearings.  And the

7  opening words of 12D, "the U.S. Court and the Canadian Court

8  may conduct joint hearings with respect to any cross border

9  matter or the interpretation or limitation of its protocol

10  where both U.S. Court and the Canadian Court consider such a

11  joint hearing to be necessary and advisable with respect to

12  any joint hearings unless other ordered", and I am going to

13  be asking to make an order otherwise, "the following

14  procedures will be followed."  One is the video link; two,

15  submissions or applications by any party that are to become

16  subject joint hearings of the Courts applicable pleading.

17  That submissions and applications shall be made or filed

18  initially only to the Court in which those parties appearing

19  or seeking relief promptly after the scheduling of any joint

20  hearing, the party submitting such pleadings to one Court

21  shall file courtesy copies with the other Court.  In any

22  event, the pleadings seeking relief from both Courts shall be

23  filed with both Courts.  That's pleadings that's request for

24  relief and submissions as distinct from evidence which is

25  dealt with in the next paragraph.  The notice is a motion.

1  And the fact, as I understand it, are filed on both sides of

2  the border, that is the pleadings.  Sub three provides that

3  any party intending to rely on written evidentiary materials

4  in support of a submission to the U.S. Court or the Canadian

5  Court in connection with any joint hearing or application

6  shall file or otherwise submit such materials to both Courts

7  in advance of the joint hearings.  To the fullest extent

8  possible, the evidentiary materials filed in each Court shall

9  be identical and shall be consistent with the procedural and

10 evidentiary rules and requirements of each Court.  So it's

11 the obligation to be identical as subject to the fullest

12 extent possible and it has to be consistent with procedural

13 and evidentiary rules.  And I need before finishing with

14 that, turn to paragraph 13 at the bottom of the page which

15 starts notwithstanding the terms of paragraph 12 above.  So

16 this paragraph trumps.  This protocol recognizes that the

17 U.S. Court and the Canadian Court are independent Courts.

18 Accordingly, although the Courts will seek to cooperate and

19 coordinate with each in good faith, each of the Courts shall

20 be entitled at all times to exercise its independent

21 jurisdiction and authority with respect to matters presented

22 to such Court and the conduct of parties appearing in such

23 matters.

24         So in our submission, the application of Section 137

25 of the Courts of Justice Act being a matter of the general

1  law of Ontario applicable to this proceeding is a matter of

2  the Court exercising its independent jurisdiction and

3  authority with respect to matters to be presented to the

4  Court and; therefore, falls within Section 13 which would

5  trump 12(3).  But in any event, we fixed 12(3) because the

6  requirement there is subject to the extent possible and

7  subject to evidentiary rules of which this is one.  And in

8  any event as I read to you the opening words of 12(d), the

9  Court may make an order to the contrary.  And what, in

10  effect, this is doing in our submission is adopting the

11  modified universalist approach of Canada in cross border

12  proceedings which is as Your Honor knows a pro cooperation

13  approach.  But, at the same time, an approach that does not

14  sacrifice the application of Canadian law to the Canadian

15  aspects of cross border proceedings.  For example today,

16  although the approval issue is before both Courts, the issues

17  before each Court are actually different.  The U.S. Court

18  Judge Gross is being asked to approve the settlement for the

19  U.S. estates and you're being asked to approve them in

20  Canada.  And while the facts are the same, we have opposite

21  sides of a lid coming together in the best spirit of

22  commonality.  But to move together, we and our colleagues in

23  the U.S. need to satisfy each Court that from opposite ends,

24  it's in the best interest of each end to then move together

25  into the mutual interest.  So we mean no disrespect to our

1  colleagues and Creditors abroad or to the U.S. Court to ask

2  this Court here in the exercise of its jurisdiction looking

3  only at the Canadian end of the spectrum before considering

4  the joint interest to apply Canadian law and Canadian

5  practice.

6          I have given Your Honor a Tab 3.  I don't think I

7  need to turn it up the whole decision by the Supreme Court of

8  Canada.  In paragraphs particularly 33, 53 and 80 confirm the

9  modified universalist approach in Canada in cross border and

10  solvency proceedings that our law, the application of

11  Canadian law will trump the desirability of cooperative

12  exercise of cross border proceedings.  And even the amended

13  provisions of the CCWA which are not enforced in this

14  proceeding, but they continue to modify universalist

15  approach.  And I can refer you to subsection 44(d) of the

16  CCWA amendments which provides that among the fundamental

17  purposes of the cross border integration is the maximization

18  of the property of the Canadian Debtor and Canadian estate.

19  And, of course, Your Honor is familiar as well with

20  subsection 61(2) of the new amendments that provide an

21  overall exception from any provision of the part four of the

22  international proceeding where the public policy of Canada

23  requires it.

24          So in all Your Honor in our submission, it's

25  completely appropriate in the unusual circumstance where we

1 have the joint hearing on a cross border settlement where you

2 have potential adversity on each side of the border.  It's

3 completely appropriate for the Monitor to advise the Canadian

4 Court of the effect of the motion on the Canadian estate.

5 And where its recommendations meet the *Sierra* test, as we

6 submit this case plainly does because of the potential

7 deleterious and obvious deleterious effect on future

8 litigation, that the Court should seal the record.  The

9 protocol allows this.  The approval of the settlement fosters

10 the goals of the CCAA.  And in that way protects the Canadian

11 estate while supporting the mutual interest which is the goal

12 of the international proceeding.  And as I said throughout

13 given that there's no opposition, I'm actually sort of taxed

14 you by taking so long but this does seem to be an issue that

15 hasn't been raised quite squarely before and thought it would

16 be well to do so subject to Your Honor's questions or any

17 other questions.

18        JUSTICE MORAWETZ:  Thank you.  In the finest

19 traditions of advocacy, are there any submissions that want

20 to follow that?  I'll specifically direct it to counsel for

21 the UK Administrator and also to the UK pension plan.

22        UNIDENTIFIED:  No submissions, Your Honor.

23        JUSTICE MORAWETZ:  Mr. Ward.

24        MR. WARD:  Yes good afternoon, Justice Morawetz,

25 and, Judge Gross.  We're not opposing the sealing of the

1  report.  If the information in the report is appropriately

2  confidential business and strategic information, it's clearly

3  not our issue.  Our issue is narrower.  Thank you.

4       JUSTICE MORAWETZ:  And is there any party that is

5  opposed to the sealing request?  Thank you, Mr. Tay.

6       MR. TAY:  Thank you.  I think the, we've looked at

7  this and then Mr. Myers, Your Honor, touched on I think the

8  right approach because we are looking at it and we have to

9  look at it, this Court has to look at it from the Canadian

10  perspective.  So we've heard from our friends across the

11  border as to why it makes sense from the U.S. perspective to

12  do this deal.  And I think it's important that we understand

13  and satisfy ourselves that this deal, in fact, makes sense

14  from the Canadian perspective.  And as I understand the

15  objections of the UK Trustees or the Trustees for the UK

16  pension plan, to put it very bluntly their objection seems to

17  be why are you selling out the Canadian estate by accepting a

18  $2 billion dollar claim in exchange for funding.  Couldn't

19  you find money somewhere else.  And I think this is part of

20  confusion that comes because although we're bringing all

21  these issues into one agreement, there are, in fact, two

22  distinct streams of issues that are being dealt with in this

23  one agreement.  And I think it behooves us to look at each of

24  these steams separately so that we can assess each of them

25  independently.

1        And the first stream of issues that this Canadian

2   funding agreement tries to deal with is a question of getting

3   the U.S. to pay their share of the costs to Canada.  And to

4   understand that in the context of that, and this may help my

5   friends who are acting for the Trustees, I'm going to beg

6   your indulgence in sort of going back to some very basic

7   things so that we remember where we came from, how we got

8   here, and to have the proper context in which to access this

9   funding requirement and this negotiated settlement.

10       So if you look at it prior to filing, what did this

11  company do. Because this is a highly integrated business with

12  significant distribution and R&D operations around the world,

13  they had to have some means of pooling their efforts so that

14  you get an efficiency.  And so what happened was they had

15  five main companies which include NNL, NNI, NNUK that dealt

16  with all the R&D for the most part, the R&D development;

17  these five companies were subject to the master R&D agreement

18  which I'll call the MRDA.  And part of the MRDA what it tries

19  to do is to allocate the profits, losses, costs that's

20  amongst those five companies.  The other Nortel companies

21  largely were distributor companies, sales condrids as it were

22  and they were allocated a certain profit under what we'll

23  call distribution agreements.  So this is the transfer

24  pricing arrangement that you keep hearing about in all these

25  hearings.  So prior to filing, this is how it happened.

1  There was a transfer pricing arrangement.  And that's how

2  costs were allocated.  And transfer pricing is an accepted

3  method for such allocation.  It's widely used by other multi-

4  national companies similar in structure to Nortel.  And

5  basically what it tries to do is to allocate the residual

6  profits and losses amongst main companies based on the

7  proportionate share of R&D activity conducted by or on behalf

8  of such companies and their affiliates.  And so you work that

9  out during the year and then there is a true up payment when

10 the true numbers come up at the end of the period.

11         Historically, Canada has always been the one that

12 incurred most of the costs because most of the R&D was done

13 here.  Most of the head office was here.  And so

14 traditionally, NNL was always a net recipient under this

15 transfer pricing arrangement.  So it would incur all these

16 costs, incur all these losses, and then at the end of the

17 year, pursuant to the transfer pricing agreements or

18 periodically throughout the year, they would get reimbursed

19 by the other Nortel entities.  And so we always had a

20 disproportionate amount of the costs versus the income and

21 this was a way to try and equalize that.

22         So what happened in filing.  Well the moment we

23 filed, everyone did what people normally do when you file

24 they ring fence the assets.  And so EMEA country stopped

25 paying DPA, U.S. stopped paying DPA.  So other than one

1  payment in January of 2009 of about $30 million from NNI to

2  NNL at that time once we filed, no more payments were made.

3  And so we were left with umreimbursed costs.  We were left

4  with an uncertain future as to how we were going to collect

5  this cost.  And that led to the negotiations, very difficult

6  negotiations that culminated in the IFSA.  And as you will

7  recall, with the IFSA we secured enough funding to take us

8  from filing to September 30th.  And under that agreement, the

9  U.S. agreed to pay us a $157 for the period in full

10  satisfaction of the period.  And that combined with the $30

11  that they had paid in January meant that we had from the U.S.

12  $187 million up to the period of September 30, 2009.  But as

13  we all know, September 30 came; September 30 went.  And we

14  had nothing between that period until today, hopefully, where

15  we have not had any reimbursement for this continued burn

16  that's being suffered in Canada.  But Canada has continued to

17  endure the burn in order to keep the whole thing alive, in

18  order to complete sales, in order to maximize realizations

19  for everybody.

20        And so as a result of these negotiations, we now

21  have a deal whereby we are going to get to cover us for the

22  U.S. share of funding from September 30 to the end of this

23  case a certain amount of money.  And now when you look at the

24  process going forward, it is saying well how do you figure

25  out what kind of money you need.  Well in the supplemental

1  report that you have from the Monitor, you will see that a

2  huge part of this funding really deals with the costs

3  incurred and the contribution to us as cost for the period of

4  Q1 2010.  It being anticipated that shortly thereafter most

5  of the businesses of Nortel would have been sold; therefore,

6  this burden would at least abate if not disappear.  And that

7  there should not be once you sold all the businesses and

8  downsized to basically the transition company and the

9  residual company, there should not be a huge cash burn going

10 forward.  Now when you look at the supplemental report you'll

11 see that if we were to calculate the amounts based on those

12 numbers owed to us by the U.S. for Q1 for that period, they

13 would owe us approximately $128 million dollars.  As part of

14 the settlement and in negotiation for a resolution of all

15 these different issues and for the getting rid of litigation

16 risk and everything else, we were able to negotiate a payment

17 to Canada from the U.S. of approximately $190 million dollars

18 which is significantly more than the numbers that you would

19 see just by crunching out the numbers under the MRDA.

20         So that's the one stream of what we're trying to do

21 today.  So in terms of the funding when you look at, you

22 know, is the funding that we're receiving from the U.S. a

23 fair number.  My submission to you is that yes it is a very

24 fair number.  Sure it's tied up in this whole resolution but

25 when you look at what we should be getting from the U.S. and

1   what we are getting from the U.S., it is a fair number.  So

2   Canada is not giving up anything in terms of seeking

3   contribution from the U.S. for this period going forward.

4   And the benefits that we get from it is that Canada now has

5   enough funding, if you approve this deal, till the end of

6   this case.  And so as Mr. Bromley said, we will not be back

7   cap in hand to the U.S. saying we need more money.

8            JUSTICE MORAWETZ:  Never say never.

9            MR. TAY:  Now let's go to the second stream of

10  what's happening here.  And that's why we must be careful

11  that we don't confuse the two streams.  So the second stream

12  of what's happening here is that when you use a complex TPA

13  arrangement as Nortel did, all around the world the taxing

14  authorities scrutinize these things.  And they scrutinize it

15  from different jurisdictions, each jurisdiction wanting to

16  make sure that they get their fair share of tax.  And so the

17  biggest concern you have when there is a dispute with these

18  taxing authorities is the risk for double taxation.  So to

19  put it very simply if you have $3 billion dollars of income

20  to allocate between Canada and the U.S. and we had given $2

21  billion to Canada and $1 billion to the U.S., the CRA may say

22  okay I'm going to tax you on that $2 billion.  The U.S. IRS

23  may say wait a minute you got one and I think you should have

24  two and I'm going to tax you on two.  So now you're being

25  taxed in the two jurisdictions for $4 billion dollars when in

1 reality, there was only $3 billion dollars of income.  And so

2 that is the uncertainty and that is the evil that we're

3 trying to deal with in dealing with the APA.  And so as Mr.

4 Bromley touched on the various taxing authorities have this

5 mechanism whereby you can settle such disputes by seeking

6 their help so that you can engage the tax authorities at that

7 level to come to a negotiated settlement and agreement as to

8 how they consider the total income should have been split for

9 the years in dispute.

10          This is not something that happened last week, last

11 month, last year.  This dispute goes back because it involves

12 the years 2001 to 2005.  This application, this joint request

13 from NNL and NNI was initiated March 15th, 2002.  We have been

14 wrestling with this uncertainty and the threat and risk of

15 double taxation for over seven years on this issue.  So it's

16 been seven years of making submissions, providing economic

17 analysis and other inputs to the tax authorities.  And when

18 we file, the tax authorities threatened, at least in Canada,

19 to say well I guess we don't have to do this anymore.  And we

20 had to impose on them and request that they continue this

21 process which we're grateful they did.  And as a result of

22 that very recently, the CRA and the IRS or the competent

23 authorities of the CRA and the IRS have agreed on a

24 resolution, have entered into a bilateral advanced pricing

25 agreement as between the two competent authorities.  And

1  pursuant to which, they have now issued in the case of Canada

2  from the CRA our APA.  And if we accept and sign that APA, we

3  have resolved the uncertainty of what tax claims are going to

4  be for those periods and we have resolved the issue of double

5  taxation.

6        And the APA's that resulted from this requires an

7  income adjustment for tax purposes.  And basically it says

8  that over those years, the U.S. overpaid Canada by $2 billion

9  dollars for tax purposes.  However, as part of the MRDA that

10 I talked about this potential of a negotiation and settlement

11 with the taxing authorities is specifically contemplated.

12 And basically what that agreement contemplates is that if

13 there is one of these adjustments, then the parties involved

14 need then to make a corresponding adjustment in the MRDA to

15 compensate for that.  So in coming to our willingness to

16 acknowledge the $2 billion dollar claim in favor of the U.S.

17 estate, all of these things were taken into consideration.

18 As I've said, it wasn't done blindly that just because the

19 Government says this is the number that should be the number.

20 We've been involved in this process for over seven years.  We

21 know the range of what it should be.  We know the range of

22 what it could be if we don't settle.  And we know all the

23 risks intended to not settle.  And so any idea that somehow

24 we sold out the Canadian estate and gave away a $2 billion

25 dollar claim just so that we could get some funding is both

1  naive and misplaced.

2       And so what we're asking for today is an approval of

3  the Canadian funding agreement which incorporates both these

4  streams and interrelates them.  And so I can understand some

5  of the confusion.  I can understand some of the misplaced

6  allegations.  But in reality, what's happening here is that

7  we have considered each stream of issues and have concluded

8  independently on each stream that it is the right thing to

9  do.  And as Mr. Bromley touched on at the beginning of his

10 address when you take into account, and talking of the

11 contribution from the U.S. right now, when you take into

12 account what they gave us under the IFSA a $187 million and

13 what we're getting here approximately a $190 million, the

14 U.S. estate would have contributed to the Canadian estate in

15 total close to $380 million for the length of these

16 proceedings.  We think that's a fair contribution which is

17 why we're willing to say we have no other claims against you

18 in that regard.  That is a fair contribution.  We accept it.

19      Similarly, with respect to the APA we want to accept

20 the APA with the tax authorities.  Had we not filed what

21 would have happened is the APA would have been issued, the

22 tax year would have had one of two choices take it or leave

23 it.  You take it, you get the certainty.  You leave it, and

24 all bets are off.  You leave it and the tax authorities can

25 do whatever they want on both sides of the border, and you

1  suffer the consequences.  And if there's double taxation,

2  there's double taxation because you have chosen to just take

3  a throw of the dice and just hope for the best.

4         So we want the authority to enter into this APA.  We

5  think it's a fair settlement.  It gives us freedom from

6  uncertainty.  It gives us freedom from double taxation.

7         THE COURT:  Sometimes they set a specific time limit

8  and they may have exceeded that.

9         MR. BROMLEY:  Is that per speaker?

10        THE COURT:  Perhaps, how do we get them on?  Why

11 don't we take a 10 minute recess.  And then we'll get them

12 back on and proceed.  I'm sorry.

13    (recess 2:30 to 2:40)

14        THE CLERK:  Please rise.

15        THE COURT:  We'll begin in a minute.  You may be

16 seated.  Thank you.

17        JUSTICE MORAWETZ:  Judge Gross, you're back on?

18        THE COURT:  We're back.

19        JUSTICE MORAWETZ:  Okay now notwithstanding that I

20 saw Mr. Tay unplug the transmission link I have determined

21 that it is not appropriate to hold him in contempt just for

22 that.

23        MR. TAY:  But I do apologize.  My make up was

24 melting.  I needed a few minutes. I'm almost done, Your

25 Honors.  So I think you've heard my submission with respect

1   to the two streams of what we're trying to do here.  Why the

2   company wants to do it, why we think it's highly justifiable.

3   And from legal perspective, I think that Your Honor can take

4   a lot of comfort from the fact that the Monitor was involved

5   for this process.  The Monitor was involved in the

6   negotiations.  The Monitor was involved in the evaluations.

7   And having been intimately involved in that whole process,

8   the Monitor is approving and recommending the approval of the

9   entering into of the CFA and of the APA's.  And I would

10  submit to Your Honor that the test here is the test set out

11  in *Soundair* and that you can take great comfort in the fact

12  that the Monitor has come up with a recommendation that you

13  have authority to rely on that unless there are extraordinary

14  circumstances for you to second guess or question that. And I

15  would submit to you that there's no evidence what so ever

16  that there are circumstances that should cause you to even

17  think about second guessing or questioning the recommendation

18  that the Monitor is putting forward to you.  And those are

19  subject to any questions you may have.  Those are my

20  submissions.

21          JUSTICE MORAWETZ:  Thank you.  Mr. Pasquariello, at

22  the outset just an administrative matter, the only version of

23  the supplement to the 35th report is the one that I received

24  electronically.  So I at some point, you will file one.

25          MR. PASQUARIELLO:  I can hand one up to Your Honor.

1    JUSTICE MORAWETZ:  Thank you.

2    MR. PASQUARIELLO:  Good afternoon, Your Honor, Judge

3    Gross.  Your Honor, before you today as Mr. Tay has indicated

4    for approval is a comprehensive funding and settlement

5    agreement.  And the Monitor has filed its 35th report and two

6    supplements, one public, one confidential in support of the

7    company's motion.  Your Honor, you may hear later about

8    issues from the Trustees of the UK pension plan and the UK

9    pension protection fund regarding claim lack of information

10   pertaining to the settlement agreement or tests for approving

11   the settlement agreement.  But in all of that, I wouldn't

12   want this Honorable Court to lose sight of the real driver

13   for why we're here today and the agreement before the Courts

14   which is approval of funding and the absolute necessary

15   funding of the Canadian estate.  We can't underscore enough,

16   Your Honor, what the Canadian Debtors have been able to

17   achieve with the agreement is grand in scale in my respectful

18   submission.  It provides funding of the Canadian estate for

19   the balance of these proceedings.  And I also submit that

20   this Honorable Court should be cognizant and take note of not

21   only what the UK Trustees will say in this regard, but in my

22   respectful submission what they won't say.  And what they

23   won't say, Your Honor, is kill the deal.  They won't say

24   don't approve the funding of the Canadian estates.  And what

25   they won't say is bankrupt these Canadian companies to the

1  detriment of all stakeholders, not only of the Canadian

2  estates but of the U.S. estates and even of the immediate

3  Debtors.  And that's, of course, given the importance of NNL

4  in the grand scheme of things in the Nortel global picture

5  and group of companies for the provision of services to

6  purchasers and also to complete the transactions going

7  forward.  And you've heard some of that evidence as proffered

8  on behalf of Mr. Ray in the United States, and I won't get

9  into that.  In my respectful submission, Your Honor, the UK

10  pension regulators is also not going to be saying here is the

11  funding we know you need.  And here's the funding we know

12  you've needed for months, and we know you've needed it for

13  months and we'll provide it to you, and we'll provide it on

14  otherwise better terms than the Canadian estate is now

15  accepting.  You're not going to hear that.

16          In short, Your Honor, the party objecting is not

17  going to be providing a credible or helpful solution to real

18  issues.  And the issues that are rooted not in the

19  theoretical or academic, but in the practical and in the

20  numbers and existing facts.  And I'd like to take Your Honor,

21  if I could, quickly through some of those facts that are

22  included in the Monitor's reports.  Mr. Tay indicated that

23  under the IFSA there is no funding beyond September 30th, 2009

24  and that is addressed again in the Monitor's report.  If I

25  could just ask Your Honor to flip in the 35th report and you

1  can start at paragraph 29.

2          JUSTICE MORAWETZ:   27 through to 31 I have reviewed

3  in detail.

4          MR. PASQUARIELLO:   If I can then ask, Your Honor,

5  having done so, to note that in paragraph 35 one of the

6  issues that my friends may raise in objecting is whether or

7  not there is a need for funding.  And paragraph 35 in the

8  Monitor's report makes it abundantly clear, Your Honor, that

9  absent the necessary funding, the infusion of cash that comes

10 out of this EFSA absent that during the forecast period,

11 there would be a deficiency of approximately $149 million

12 dollars.  So there could be no argument, Your Honor, that the

13 funding agreement is absolutely necessary and it's a major

14 urgent cash need for the Canadian estate is being satisfied.

15 Paragraph 36 of the Monitor's report, Your Honor, makes it

16 abundantly clear that the Monitor has been intricately

17 involved in the ongoing funding discussions and that these

18 have not just materialized over night.  And this isn't a deal

19 that's been cut on the back of a napkin with a bunch of

20 unsophisticated parties.  Paragraph 37 and onward, Your

21 Honor, the Monitor highlights some of the significant terms

22 of the CFSA.  I won't go into them in detail but simply to

23 highlight them in terms of the categories.  Beginning on page

24 16 under paragraph 37, the Monitor reports on the actual

25 amount of the funding being a $190.8 million dollars coming

1  from NNI to pay NNL.  And as Mr. Tay indicated that amount as

2  explained in the supplement to the 35th report, paragraph 9 of

3  that supplement - - I'm sorry paragraph 8 - - indicates that

4  that $190 based on the global settlement generally and for

5  the reasons of the giving and the taking within the

6  settlement is above and beyond what NNI would otherwise be

7  paid to NNL under the various transfer pricing agreements.

8  The Monitor's report was on Your Honor to touch on and to

9  explain the advanced pricing agreement and the related NNI

10 claim which gives rise to the $2 billion dollar claim being

11 accepted by the Canadian estate from NNI.  And Your Honor is

12 aware that that has been a live issue known to all the

13 stakeholders for some time.  It's been addressed in open

14 Court and in Chambers motions dealing with various matters

15 with respect to the CRA.  And it's an issue and a number that

16 the Canadian estate, the Monitor, and the stakeholders have

17 obviously played a lot of attention to.  It can't be taken

18 lightly.  It's a $2 billion dollar claim.  But it was a claim

19 that was ultimately accepted based on a number of

20 considerations of the Canadian Debtors.  And the Monitor, in

21 particular, analyzed in coming to the conclusion that it was

22 acceptable.

23      In paragraph 38 of the Monitor's report, Your Honor,

24 the Monitor explains the background with respect to the APA

25 process.  In paragraphs 39 in its public report, the Monitor

1  again explains that following extensive discussion and review

2  of the transfer pricing that the agreement has been reached

3  with respect to $2 billion dollar intercompany adjustment as

4  evidence of satisfaction of the overpayment.  Further in

5  paragraphs 40 and 41, the Monitor explains some of the

6  background and rationale for the $2 billion dollar claim.

7         On the basis of all of that in paragraphs 66 and 68,

8  the Monitor in its recommendations and conclusions supports

9  the applicant's request to enter into the CFSA and to have

10  this CFSA and the APA approved by this Honorable Court.  And

11  in paragraph 68, the Monitor indicates that it has reviewed

12  the amounts comprised in the NNI claim, the related transfer

13  pricing overpayment and the tax issues.  And on the basis of

14  all of that supports the applicant's request to establish the

15  $2 billion dollar claim.  Again, this is all in the Monitor's

16  public 35th report.

17         I respectfully submit, Your Honor, that based on

18  this information alone in the public record provided by the

19  Monitor that this is sufficient evidence for the approval and

20  relief sought over the objection of the UK pension protection

21  fund and reliance on the Monitor's confidential supplement is

22  not required.  However, if Your Honor were to resort to the

23  confidential report, I would point Your Honor to a couple of

24  paragraphs in particular.  I know Your Honor has not opened

25  it.  Perhaps if you could just simply make note of the

1  following: paragraphs 47 through to 57 and paragraph 62.

2          In summary then, Your Honor, what you have before

3  you I respectfully submit is a funding package for the

4  necessary ongoing funding of the Canadian estate which has

5  been the topic of discussion among the stakeholders for

6  months.  It includes a number of give and takes.  And,

7  importantly, it's been supported or not being opposed by the

8  main stakeholders in the U.S. and in Canada, the UCC, the

9  Bond Holders, the employee groups, EMEA are either in support

10 or not objecting in Canada.  And these parties, Your Honor,

11 are the main beneficiaries of the funding.  And, importantly,

12 are also the main bearers of the burden of the $2 billion

13 dollar claim.

14         Given all of that, Your Honor, the Monitor supports

15 the company's motion for approval of the requested relief and

16 will reserve comments subject to my friend's submission with

17 respect to their objection.  Thank you.

18         JUSTICE MORAWETZ:  Thank you.  Anybody else who

19 wishes to make submissions in support of the Nortel's motion

20 today?  Mr. MacFarlane.

21         MR. MACFARLANE:  Your Honor, Judge Gross, for the

22 Committee, the Committee fully supports the motion of the

23 applicants for approval of the CRA, APA, and the Canadian

24 funding agreements.

25         JUSTICE MORAWETZ:  Thank you.  Mr. Zitch.

1      MR. ZITCH:  Your Honor, Judge Gross, for the bonds,

2  we support the company's motion as well.  Thank you.

3      JUSTICE MORAWETZ:  Thank you.  Well, Mr. Ward, it's

4  over to you or to Ms. Grieve whoever is going to make the

5  presentation.

6      MR. WARD:  Thank you, Your Honor, and good afternoon

7  again, Judge Gross.  We act as indicated for the Trustees of

8  the northern and NUK pension plan.  And for Your Honor's

9  information that is a defined benefit pension plan involving

10  approximately 40,000 members and it's in a pension deficit

11  situation.  We have filed substantial claims with the

12  Canadian estate.  The magnitude would be close to a billion

13  dollars.

14      I want to preface the submissions I'm going to make

15  today by indicating that we're not here to criticize the

16  Monitor.  That is certainly not our intention to make.  I

17  would not like that the submissions be taken that way.  We

18  appreciate that this has been a difficult process; that

19  efforts have been made to resolve multi-lateral issues.  A

20  lot of time is being consumed in addressing them.  And

21  there's contingencies that have had to be estimated and

22  accessed to the best of Monitor's abilities.  And,

23  furthermore, there's confidentiality requirements as well

24  that have been pointed out to us.  And, furthermore, we're

25  not standing here having reached the conclusion that this

1  settlement agreement is necessarily improvident or

2  prejudicial to Creditors of the Canadian estates.  Quite

3  frankly, we don't know enough based on the publicly available

4  information to come to a conclusion one way or the other.

5        Coming into Court today, we shared many of the

6  concerns that were set out in the facts of the UK pension

7  administrators in terms of the adequacy of the evidence and

8  the information filed with the Canadian Court.  It's a very

9  significant settlement.  As Mr. Pasquariello pointed out, it

10 is a settlement of a grand scale and inevitably it will

11 affect the size of the CCAA estate available for distribution

12 to Canadian Creditors.  And it may affect the estate in ways

13 we don't know.  Now as counsel for the Trustees of the

14 pension plan, we have a duty to try to understand the

15 rationale and the basis for the deal or at least satisfy

16 ourselves based on evidence that that analysis has taken

17 place by others.  We are not asking for, as was suggested

18 recently, an explanation in minute detail, but we are looking

19 for a read in fair and reasonable opinion as to the benefits

20 and the merits of the settlement, the commercial

21 reasonableness of it to the Canadian estate and Creditors of

22 the Canadian estate.  Now the legal test for Court approval

23 as I'm sure Your Honor is aware is set out in a couple of

24 cases.  The *Ravelston* case is one which was filed by counsel

25 for the UK pension administrators.  There's one other case if

1  I could just hand up to Your Honor.

2         JUSTICE MORAWETZ:  I want you to go through

3  *Ravelston* at some point.

4         MR. WARD:  Perhaps I'll do that now then, Your

5  Honor.  The operative principle from *Ravelston* that I wanted

6  to, *Ravelston* is a decision of Justice Farley of the Ontario

7  Superior Court from August of 2005.  And the test for

8  approval of settlements that are contentious is, my reading

9  of the case set out as the Court having conducted its

10 analysis must be in a position to determine that the

11 settlement falls within the general range of acceptability on

12 a fair and commercially reasonable basis.  And you'll see

13 from paragraph 4 of the decision that was handed up that that

14 was Justice Farley's conclusion in the *Ravelston* case having

15 familiarized himself with the pros and cons of the litigation

16 positions that were before him in that case.

17        JUSTICE MORAWETZ:  So in the context of this case,

18 how is that to be applied?

19        MR. WARD:  It would be my submission that it would

20 fall upon Your Honor to be similarly satisfied that the test

21 is met on the basis of the evidence that is before you.  You

22 must be satisfied that based on whatever is before Your Honor

23 that it falls within the range of acceptability on a

24 commercial and reasonable basis.  We are not looking at what

25 is being served on us able to reach a conclusion on that.

1    JUSTICE MORAWETZ:  Well taking it further, Mr. Ward,

2  what is it that you're submission is specifically on this

3  point?  *Ravelston* as I understand it was a for approval of

4  settlement as between Ken West and a receiver.  On a certain

5  contract, I gather, had been entered into between Ken West

6  and Ravelston.  And before me today is a somewhat different

7  situation I would think.  And what concerns me is what I have

8  here is a comprehensive settlement involving a number of

9  parties in a number of jurisdictions with a number of laws in

10  Canada, a number of foreign laws.  And as I understand what

11  Justice Farley is getting at in *Ravelston* and I read it quite

12  carefully it was that it is the Court to be the expert in

13  that it's not the receiver at the top of, I think its

14  paragraph 3, to make a recommendation.  But rather it's the

15  Court as being the expert to make the determination.  Now

16  what I looked for is some sort of submission from you as to

17  how that's on the facts even generally applicable to the

18  predicament that this Court may find itself in.  And the

19  second whether you have further support for Justice Farley's

20  conclusions other than what you see here before me with all

21  respect for Justice Farley.  It's, I like you to address the

22  findings, his legal analysis to support that, the conclusion

23  that you're putting forth for me.

24    MR. WARD:  Well perhaps I could try to address the

25  second point first, Your Honor.  There was a second case that

1   I intended to hand up to Your Honor that sets out a test for

2   approval of a global settlement agreement.  It's the *Calpine*

3   *Canada Energy* case that I provided to counsel for the Monitor

4   and the Debtor.  May I pass that up?

5          JUSTICE MORAWETZ:  It's the one from Justice Romayne

6   [phonetic]?

7          MR. WARD:  Yes.

8          JUSTICE MORAWETZ:  Thank you.

9          MR. WARD:  In the *Calpine* case at paragraph 80, Your

10  Honor, which the one of the conclusions sets out the test as

11  Justice Romayne saw it as viewed against the test of whether

12  the global settlement agreement is fair, reasonable and

13  beneficial to Creditors as a whole.  And her conclusion was

14  that, the conclusion there was that it was.  In paragraph 81

15  further conclusion was that this particular settlement, the

16  global settlement while it does not guarantee full payment of

17  claims, it substantially reduces the risks of the goal, that

18  the goal will not be achieved.  Crucially, the GSA is

19  supported and recommended unequivocally by the Monitor who

20  was involved in the negotiations and who has analyzed its

21  terms thoroughly.  So the tests in the *Calpine* case and the

22  *Ravelston* case are similar to the extents that they are

23  proposing that there be analysis and consideration given to

24  by the Court to the commercial reasonableness of the test.

25  And I do not think that it's, and I'm not proposing that it

1   should be anymore complex than that.  And I appreciate an

2   attempt to address the first part of Your Honor's question

3   that this particular settlement, because it is multilateral,

4   has accounting aspects to it and legal aspects to it as well;

5   settlement of mixed accounting and legal issues.  And which

6   makes it particularly difficult settlement I would think for

7   Your Honor to conclude as fair and commercial reasonable

8   because it may not be determinable with any degree of

9   certainty today whether or not in the long run this was a

10   beneficial settlement for Creditors of the Canadian estate.

11          JUSTICE MORAWETZ:  Well can I rely on the report of

12   the Monitor?

13          MR. WARD:  Certainly to the extent that the report

14   of the Monitor assists yes by all means. I mean our concern

15   with respect to the 35th report of the Monitor is that it does

16   not address things that we would, as Creditors having access

17   to publicly available information, would hope that it would

18   report on.

19          JUSTICE MORAWETZ:  Well I guess I'll have to push a

20   little bit further on this, Mr. Ward.  I have in the 35th

21   report an unequivocal recommendation of the Monitor that Mr.

22   Pasquariello took you too.  What am I to do with that?  Is

23   that proper evidence before the Court that would allow me to

24   reach certain findings?

25          MR. WARD:  It could in certain circumstances.  I

1  think one of the challenges here is that the balance of the

2  Monitor's report at least the 35th report is descriptive of

3  the arrangement.  It's not analytic.  Now I don't know if the

4  answer is in paragraphs 47 to 57 of the sealed report that

5  has been urged on you to read and we won't know that ever.

6  But somebody has to undertake that sensitivity that analysis

7  as to, to confirm the Monitor's recommendation before it can

8  be accepted would be our submission.

9       JUSTICE MORAWETZ:  So at this point, just so I'm

10  clear, that having not read that and maybe I will and maybe I

11  won't but on what's before me I can't reach the conclusion?

12       MR. WARD:  If you trust the Monitor, I mean we've

13  heard things are being supplemented with oral submissions but

14  that's not evidence.  Perhaps just moving along, some of the

15  things that our clients would have hoped to have seen in a

16  report dealing with a grand settlement would be a more

17  concise explanation or description of the perceived

18  significant benefits to the Canadian estate.  I appreciate

19  that was commented on in Court today but I don't see it in

20  the materials that were filed.  We would have liked to have

21  seen some discussion in some reasonable level of detail as to

22  the process of negotiations leading up to the settlement

23  agreements that were reached.  What was more precise was the

24  Monitor's the nature and extent of their involvement, what

25  were their objectives going into the negotiations, and what

1  positions were taken that dictated that this deal be reached

2  as opposed to a range of other deals.

3          On that later point, we would have liked to have

4  seen or heard some indication that consideration was given to

5  alternative methods of addressing the Canadian funding

6  concerns.  And why these alternative means of doing so were

7  considered to either be unavailable or less attractive to the

8  Monitor.  And there would be a way, I would think, to do this

9  without disclosing confidential business and strategic

10 information but we don't see it been done.  We had hoped to

11 have seen a fuller discussion of the nature and the magnitude

12 of the NNL claim against NNI; that is being waived and the

13 rationale for the waiver of the claim.  Again it's described

14 in the affidavit and it's described in the 35th report of the

15 Monitor, but it's not advocated in any understandable sense

16 that allows Trustees of a foreign Creditor to satisfy

17 themselves that the analysis was undertaken.

18          Furthermore, we would have hoped to have seen some

19 analysis of how the Canadian funding and settlement agreement

20 might ultimately affect size of the Canadian estate that's

21 available for distribution because ultimately that's why

22 we're all here.  The opinion was put forward that it would

23 not significantly impact recoveries; that's one thing.  If

24 the opinion was put forward that it would dilute recoveries

25 then we would hope to see a justification for that.

1        JUSTICE MORAWETZ:  Does that not have to wait until

2   such time as there's been a resolution of the allocation

3   issue?

4        MR. WARD:  Presumably it does, but it doesn't mean

5   that it can't be averted - -

6        JUSTICE MORAWETZ:  How is, we've heard I don't know

7   how many motions, Mr. Ward, where the submissions and the

8   record have established that that is an extremely complex

9   issue that's going to involve a number of jurisdictions.  How

10  is any party at this stage to offer any type of comment as to

11  how that issue is going to be ultimately resolved so they're

12  in a position to identify what impact it will have on the

13  size of the estate?

14       MR. WARD:  Assuming that's the case, then it, people

15  could, we would not expect to see any conclusions, but we

16  would expect to see some indication that that was considered

17  and it was indeterminable.  There's no evidence that was

18  filed publicly and available to Creditors reading the 35th

19  report of the Monitor that was served on the service list on

20  Monday night at 10:00 p.m. that was considered. With respect

21  to timing concerns and this will conclude my remarks, we do

22  have a timing concern with the delivery of these materials.

23  The finding and settlement agreement was signed on December

24  23rd, last year which presumably would allow opportunity to

25  manage the reporting and the motions required to bring us to

1    today.  And, furthermore, as you'll note from the filing that

2    we made yesterday in Chambers, there were read in request for

3    this type of information that were delivered to counsel for

4    the Monitor.  And they were not satisfactorily addressed

5    which is why we're here today.  Subject to any questions,

6    those are my submissions.

7         JUSTICE MORAWETZ:  Well I do have one, what do you

8    want me to do?  The latest motion before the Court is to

9    approve.  I'm proceeding on the assumption that the

10   alternative is open not to approve.  But I want to hear

11   squarely from you as to what you want me and this Court to

12   do.

13        MR. WARD:  If Your Honor is satisfied that the legal

14   test for approval of the settlement agreement has been met

15   based on the confidential, the necessarily confidential

16   information that was filed before Your Honor and the publicly

17   available information, and Your Honor is satisfied that there

18   are no overriding process concerns which is the thrust of our

19   submission, then it should be approved.

20        JUSTICE MORAWETZ:  Thank you.  Mr. Tay.

21        MR. TAY:  Your Honor, I'll be very, very brief.  I

22   submit to you that there is more than ample evidence before

23   you to explain the necessity for the funding, to explain the

24   process that we have been through, to explain the meticulous

25   efforts taken by all involved in a very complex situation.

1    And I put it to Your Honor that you are also entitled to take

2    judicial notice of all of the various proceedings that have

3    gone on before including the IFSA and perhaps my friend Mr.

4    Ward is not either availed himself or is not aware of these

5    publicly filed materials from the various hearings before all

6    of which showed the difficulty of providing funding.  And

7    this is not a new theme.  This is not something that we

8    sprung on people yesterday.  This is something that we have

9    faced from day one of the proceedings.  So it's very easy to

10   come in and ask questions oh have you considered other forms

11   of financing.  Let's be real the evidence is clear.  The

12   evidence is fulsome before this Court in previous hearings

13   and in these hearings.  And it's, I think you've heard Mr.

14   Pasquariello say that even on the basis of the public report

15   that you don't even need to look at the confidential report

16   and you have sufficient basis and evidence before you to

17   approve this agreement.  I also refer to the case that Mr.

18   Ward brought up and I thank him for it because these thick

19   cases I usually don't read because they have too many words.

20   He did highlight paragraph 81 for me and I look at it and I

21   see a statement from the Judge that says crucially the GSA

22   the agreement is supported and recommended unequivocally by

23   the Monitor who was involved in the negotiations and who has

24   analyzed its terms thoroughly.  I think you should take the

25   same comfort from that.

1          Now as for allegations of process - -

2          JUSTICE MORAWETZ:  Before we leave *Calpine* my

3    recollection is that case was affirmed, was it not by the

4    Alberta Court of Appeal?  Leave to appeals tonight okay,

5    thank you.  Sorry, Mr. Tay.

6          MR. TAY:  No problem.  As to the question of

7    process, these allegations of, you know, the agreement was

8    signed on December 23rd.  We just got this late last night,

9    etc. etc.  As I tried to explain there are two streams here.

10   The funding agreement is one half of it.  The other half of

11   it was and is a condition of the agreement are the

12   arrangements with the various tax authorities.  Despite our

13   best efforts and with everyone working very hard, we didn't

14   get our APA until yesterday.  This is the real world that

15   we're living in, not the hypothetical world of what if and

16   should you have done this and should you have done that.  And

17   so I resent any allegations of, you know, people using the

18   process, abusing the process.  I think everybody in this room

19   who has been involved has worked extremely hard to try and

20   bring things as quickly as possible before the Court and to

21   give people as much not ice as is practicable.  A Canadian

22   process is always recognized.  There are extengencies beyond

23   our control and that these things happen, you know, and we

24   try and do the best that we can given the circumstances.

25          And, finally, I don't think we owe more explanation

1  to a party who has filed a claim that we have not yet dealt

2  with; that we intend to resist; and that is, frankly, adverse

3  in interest to the estate.  What we're trying to do is to

4  enhance the recoveries for everybody.  And if at the end of

5  the day they have a claim, they will benefit from our

6  efforts.  But it doesn't benefit anyone for someone who

7  either hasn't chosen to or hasn't taken the effort to

8  acquaint themselves with all the things that have happened

9  before these Courts to come up today and say well there's not

10 enough evidence and why don't you do this and why don't you

11 that.  I submit to you that you have all the evidence that

12 you need.  Thank you.

13        UNIDENTIFIED:  Your Honor, very briefly in reply.

14 We're of the view, Your Honor, that the *Ravelston* case is

15 distinguishable for some of the very reasons that Your Honor

16 highlighted the comprehensive nature of the settlement

17 agreement, the fact that the receiver a receiver is not

18 before you seeking approval.  But rather we still have, Mr.

19 Tay still has a client that stands and Debtors' companies are

20 here.  It's a Debtor company deal.  So on that basis alone

21 it's distinguishable.  If Your Honor were so inclined, the

22 *Ravelston* case also makes reference to the *Bakeman*

23 International case which we would say is more squarely

24 applicable in adopting the *Soundair* principles on approval by

25 a Court officer in that case related to an insurance

1  settlement.  But we think even more appropriate is the case

2  that Mr. Ward handed up, the *Calpine* case and I agree totally

3  with Mr. Tay's submission as it relates to paragraph 81 in

4  that this case is on all, square on all fours as it relates

5  to the settlement and to the Monitor's unequivocal

6  recommendation.

7        JUSTICE MORAWETZ:  Before you sit down, there are

8  still a variety of options open.  If after reviewing this

9  matter I come to a conclusion that this motion should be

10 granted without having to resort to the supplement, what do

11 you want me to do with it?

12       UNIDENTIFIED:  We would retract the filing of that

13 supplement, Your Honor.  We take it back from you.  Is that

14 all, Your Honor?

15       JUSTICE MORAWETZ:  Thank you.  Any further

16 submissions on this point?  Mr. Tay, what is next on your

17 agenda or Mr. Bromley's agenda before I - -

18       MR. TAY:  I think we're finished on this part.  And

19 I guess Mr. Bromley's next in terms of the arguments that he

20 needs to make in front of the, in the U.S. Court.

21       JUSTICE MORAWETZ:  For the approval?

22       MR. TAY:  For the approval.

23       JUSTICE MORAWETZ:  All right so I think, Judge

24 Gross, perhaps we should hear those arguments and then we may

25 consider what we have to do.

1          THE COURT:  Yes, sir.  Mr. Bromley.

2          MR. BROMLEY:  Thank you, Your Honor.  And we'll be

3   very brief.  The governing law in this circuit for the

4   approval of a settlement under Rule 9019 is in Ray Martin.

5   It sets forth four factors to evaluate the settlement, the

6   probability of success in litigation, the likely difficulty

7   in collection, the complexity of the litigation involved, the

8   expense, inconvenience and delay attending to it, and the

9   paramount interest of the Creditors.  We believe with respect

10  both to the settlement with the Internal Revenue Service and

11  the Canadian funding agreement that each of these factors is

12  satisfied and satisfied convincingly.  The issues in terms of

13  probability of success I think you have heard consistently on

14  both sides of the border that this litigation or the

15  litigations that would arise if these settlements were not

16  approved would be complex, expensive, lengthy and uncertain.

17  In the event that NNL is not provided with the funding that

18  is contemplated here, the difficulty in collecting any claim

19  against NNL would increase substantially.  So we think that,

20  indeed, what we are doing in part by providing the financing

21  is also helping to make sure that the collection on the claim

22  that is being created will be assured.

23          There's been ample evidence about the complexity of

24  the matters underlying these issues, the difficulty that

25  we've had in settling the matters, and we think that the

1  complexity of any subsequent litigation is clear. And,

2  finally, in terms of the paramount interest to the Creditors

3  as we've said, these matters have been negotiated hand in

4  glove with the Creditors Committees and the Bond Holder's

5  groups.  So the interest of Creditors have been represented

6  and represented very effectively throughout all of the

7  exercises that we've gone through.  So on that basis, Your

8  Honor, we believe that the *Martin* test is satisfied for both

9  motions and ask that the motions be granted.

10        THE COURT:  Thank you, Mr. Bromley.  Anyone else?

11  Mr. Botter?

12        MR. BOTTER:  Your Honor, the Creditors Committee

13  fully joins in on Mr. Bromley's statements and is fully

14  supportive of the global relief requested.

15        THE COURT:  Thank you.

16        MR. KRELLER:  Your Honor, Thomas Kreller of Millbank

17  Tweed on behalf of the Bond Holder Group.

18        THE COURT:  Yes, Mr. Kreller, good afternoon.

19        MR. KRELLER:  Good afternoon, Your Honor.  I would

20  just like to joint as well on behalf of Bond Holder Group

21  with the Debtors' request that the motions be approved.  We

22  participated actively in the process, and we believe both of

23  the settlements are appropriate to be approved.

24        THE COURT:  Thank you.  Justice Morawetz, I think

25  that concludes the arguments here.

1        JUSTICE MORAWETZ:  Thank you.  I will take a brief

2   recess.  The register will advise you when we're ready to

3   continue.  And I assume, Judge Gross, you'll have a similar

4   process to follow in your Court.

5        THE COURT:  Mr. Schwartz?

6        MR. SCHWARTZ:  Your Honor, if I may be excused.

7   Annie Cordo from our office is here.

8        THE COURT:  Ms. Cordo is a very capable replacement.

9        MR. SCHWARTZ:  Thank you.

10       THE COURT:  We'll stand in recess then until the

11   call of the court.  Thank you.

12      (Recess 3:25 to 3:36)

13       THE COURT:  Thank you, all.  Please be seated.

14   Justice Morawetz should be out momentarily.

15       JUSTICE MORAWETZ:  Mr. Tay, before we start I assume

16   that what has been dealt with so far is items A through D

17   even though it's a motion?

18       MR. TAY:  Yes and there'll be other items after

19   we're finished with the - -

20       JUSTICE MORAWETZ:  Yeah the NNI agreement extension

21   has not been dealt with yet, is that - -

22       MR. TAY:  Oh I'm sorry.  Yes I guess that's the, I

23   didn't address it but Mr. Bromley did and I guess our

24   submission to you would be that, you know, this makes sense

25   and that you approve it as part of the package.

1          JUSTICE MORAWETZ:  So it's A through E then that had

2   been dealt with?

3          MR. TAY:  Yes, thank you.

4          JUSTICE MORAWETZ:  The other items are Canadian

5   only?

6          MR. TAY:  Yes.

7          JUSTICE MORAWETZ:  Judge Gross, are you ready?

8          THE COURT:  Yes I am, Justice Morawetz, thank you.

9          JUSTICE MORAWETZ:  I think - -

10          THE COURT:  I will proceed.

11          JUSTICE MORAWETZ:  Do you wish me to start?  Because

12   mine is very brief or - -

13          THE COURT: Yes why don't you this time.  That would

14   be fine.

15          JUSTICE MORAWETZ:  Thank you.  The following is my

16   endorsement on today's motion so far.  The motion for relief

17   set out at subparagraph a) short service; b) approval of the

18   Canadian funding and agreement; c) approval of the CRA APA;

19   d) approval of the creation and the disallowance of the NNI

20   claim and approval of the NNI loan agreement extension is

21   granted.  Reasons will follow.  I also see no reason to deal

22   with the issues raised by the confidential reports supplied

23   by the Monitor today.

24          UNIDENTIFIED:  I'm sorry did you say disallowance?

25          JUSTICE MORAWETZ:  The approval approving the

1  creation and allowance of the NNI claim is subject.  Subject

2  to that, I think the reasons are clear.  I do wish to provide

3  separate and commentary on some of the more unique aspects

4  associated with the approval and that is why I will take the

5  time to do the reasons in the next few days.  Thank you.

6  Judge Gross, over to you.

7          THE COURT:  All right, thank you.  I have no

8  hesitation in approving the settlement before me pursuant to

9  Rule 9019.  The evidence presented by way of Mr. Ray's

10 proffer clearly establishes that there is a sound business

11 purpose for the settlement.  And that it was entered into in

12 good faith and at arm's length.  I will note the compromises

13 are favored and even when, and I'm not suggesting that this

14 is the case, but even when a settlement is at the lower range

15 of fairness, if you will, Courts are encouraged to endorse a

16 settlement.  And I do find that this settlement is fair,

17 reasonable, and in the best interest of the Debtors' estate.

18 As Mr. Bromley has already really I think analyzed the Myers

19 vs. Martin factors are clearly met in this case.  Not only

20 are, is the probability - - pardon me, I'm sorry.  Not only

21 are those factors met, but a greater impetus for approving

22 this settlement is the fact that the financial health of the

23 Canadian Debtors is critical to the Debtors' wellbeing here.

24 And the Court can certainly not ignore that fact.  Without

25 this settlement, the benefits or I should say the value of

1  the Debtors' estates, the United States Debtors' estates is

2  in jeopardy.  The Canadian Debtors will be able to continue

3  to perform vital functions which will benefit the Debtors'

4  estates such as providing corporate overhead and research,

5  continued transitioning services to purchasers, and the use

6  of the intellectual property which is obviously of great

7  significance to the Debtors' estates.  And I think for all of

8  those reasons, the settlement will be approved.  And, of

9  course, I should also add that further support for the

10  settlement is really I think the entire record of this case.

11  And I don't think that the Court can ignore that including

12  significantly what we heard earlier in connection with the

13  interim funding settlement agreement.  That is certainly of

14  great significance and further support for approval of the

15  settlement, as well as the fact that the constituencies, in

16  particular, the Creditors Committee and the Ad Hoc Bond

17  Holders Committee are in full support and participated in the

18  process.  So with that, I'm prepared to approve the

19  settlement.

20         Now the one question I suppose I had, Mr. Bromley,

21  for you is in effect I should also be approving in connection

22  with not only the Canadian funding agreement, but as well the

23  Internal Revenue Service settlement.

24         MR. BROMLEY:  Yes, Your Honor.

25         THE COURT:  And I should be addressing that as well.

1  And clearly, the Court knows full well what potential damage

2  the Debtor was facing, the Debtors were facing in connection

3  with the Internal Revenue Service claim.  And I full

4  recognize that when I scheduled it on an expedited basis how

5  we would have handled it on an expedited basis, we'll never

6  know and, fortunately, we'll never find out.  But it was

7  clear to me at that time that it was a matter that had to be

8  resolved promptly.  And I think it is to the credit of the

9  Debtors, as well as the Internal Revenue Service that the

10 matter was addressed promptly; that the parties did reach out

11 for mediation; that the mediation was successful; and that a

12 claim in excess of $3 billion has been resolved at slightly

13 in excess of $37 million dollars.  That in and of itself I

14 think requires very little commentary other than it is a

15 very, very favorable settlement for the Debtors.  So I will

16 approve that settlement as well.

17         MR. BROMLEY:  Thank you, Your Honor.

18         THE COURT:  Also by way of housekeeping by the way,

19 there were no objections so I am going to enter the orders on

20 the confidentiality the sealing of the related documents.

21         MR. BROMLEY:  I was going to ask that as well.

22 Thank you very much.

23         THE COURT:  Yes.

24         MR. BROMLEY:  And we have orders to hand up, Your

25 Honor.  We could also if there's anything more, I know you

1 have graciously pushed back other matters.  We have a couple

2 of other U.S. matters.  Maybe we can just keep the orders

3 until the very end and hand them all up at once.

4          THE COURT:  Okay.

5          MR. BROMLEY:  I don't think if there's anything more

6 on a joint hearing basis.

7          THE COURT:  Justice Morawetz, I think we've

8 completed our joint hearing.  I know you have at least one

9 other matter, if not more to attend to in Canada.  And we

10 have maybe a few more to attend to here in the United States.

11          JUSTICE MORAWETZ: Subject to one comment, I totally

12 agree.  I did overlook in my endorsements and notes at this

13 time that confidential Appendix D to the 35th report of the

14 Monitor is to be sealed.  Thank you, Judge Gross.

15          THE COURT:  Thank you and good day to you.  All

16 right take your time, Mr. Bromley.  It's been a, I'm sure, a

17 long few days for you and it's time to get organized for a

18 minute too.

19          MR. BROMLEY:  I wake up in the middle of the night

20 muttering Nortel I think.

21          THE COURT:  I had a colleague who had named all of

22 his dogs after his cases.  So maybe there will be a Nortel

23 dog somewhere in your future.

24          MR. BROMLEY:  I wouldn't want to have to kick the

25 dog.  Your Honor, we have a couple of, why don't I take care

1  of the orders that we've just dealt with and hand them up, is

2  that okay?

3         THE COURT:  That's fine.

4         MR. BROMLEY:  Okay.

5         THE COURT:  All right.  Oh I'm sorry, he's just

6  handing the orders up to me.  We can be off the record for

7  that.  Excellent.  Thank you, Mr. Bromley.  Whenever you're

8  ready, sir.

9         MR. BROMLEY:  Thank you very much. Before I move on

10  I would like to note for the record that my partner Ms.

11  Schweitzer had asked me to look for Mr. Tinker in the

12  Courtroom.  I just wanted the record to reflect that I've

13  never seen him at all during the day.

14         THE COURT:  No I did not either.

15         MR. BROMLEY:  Very good, thank you, for confirming

16  that.

17         THE COURT:  And I looked for him as well.

18         MR. BROMLEY:  Let's see, Your Honor.  What we have

19  on the agenda is what is often times a more contentious

20  matter, but I'm happy to say there's no objection which is

21  the Debtors' application to extend the exclusivity periods. I

22  don't need to go into much detail here.  I think the record

23  of the case is pretty clear that it's been complicated and

24  we've been making a lot of progress.  What we've done here

25  which is a little different than we've done in prior

1  application is move to extend the time basically for six

2  months.

3          THE COURT:  Yes.

4          MR. BROMLEY:  To the final extension time period.

5  So we're asking to move the time to file a plan to July 13th

6  and a time to solicit to September 13th.  And there are no

7  objections, Your Honor, to that.  One caveat there is a

8  Debtor that filed later.

9          THE COURT:  Yes.

10          MR. BROMLEY:  NN CALA Inc. so we're moving them out

11  to those dates, that entity out to those dates as well, but,

12  of course, we have additional time if we're not ready on the

13  NN CALA front by the July timeframe.

14          THE COURT:  Exactly.

15          MR. BROMLEY:  So unless Your Honor wants anymore

16  argument on that, I rest on the papers and say that we should

17  be able to enter that order.

18          THE COURT:  And there is no objection and I reviewed

19  the papers.  And as you clearly indicated, Mr. Bromley, we

20  all have knowledge of that complexity of the case, the

21  progress that's been made in resolving any number of

22  significant issues; very, very difficult issues.  The fact

23  that the extension is not only will not harm Creditors but

24  should really be a benefit to the Creditors.  I note that

25  there have been 6,000 proofs of claims filed in the case and

1  number of significant issues address the sales that have

2  taken place and will take place: the intercompany issues;

3  claims resolution; the Internal Revenue settlement; the

4  managing of real estate; lease rejections; the work that's

5  being done with the PBGC.  And the purpose of Section 1121 is

6  clearly to afford a Debtor a meaningful and reasonable

7  opportunity to negotiate with Creditors and propose and

8  confirm a consensual plan of reorganization and the extension

9  of exclusivity is necessary and appropriate to accomplish

10  that goal.  So with that, I am pleased to grant your motion

11  and sign the order.

12       MR. BROMLEY:  Thank you very much, Your Honor.  May

13  I approach?

14       THE COURT:  Yes.  Plus we enjoy having you here.

15       MR. BROMLEY:  Was there something going on in

16  Delaware?  We tried to get hotel rooms last night, everything

17  was booked up.

18       THE COURT:  You're the second group of litigants or

19  I should say hearing attorneys who have said that today.  I

20  don't know.  It's hard to believe.

21       MR. BROMLEY:  The next matter, Your Honor, is the

22  first item on the agenda which is the motion for setoff

23  related to CTDI.  That has been continued until February 3rd.

24  Then we have a, which is item number 5 on the agenda letter.

25  The first omnibus motion for an entry of an order approving

1  the assumption and assignment of certain additional executor

2  contracts pursuant to the sale of the Debtors MEN business.

3          THE COURT:  Yes.

4          MR. BROMLEY:  And authorizing the Debtors to file

5  information under seal.  We have filed the CNO.

6          THE COURT:  And I signed that order.

7          MR. BROMLEY:  And you've signed it.  Very good, Your

8  Honor; thank you very much.  Then, Your Honor, the last thing

9  we have on the agenda are three motions relating to claims

10  objections.  So and timely in the sense that we've, we were

11  just talking about exclusivity, we have started the process

12  of churning through the thousands of claims that have been

13  filed, and so today we have before you the first three

14  motions.  My colleague Mr. Bianca will be handling that.

15          THE COURT:  All right thank you, Mr. Bromley.

16          MR. BROMLEY:  Thank you very much, Your Honor.

17          THE COURT:  Yes.  Good afternoon, Mr. Bianca, good

18  to have you here.

19          MR. BIANCA:  Good afternoon, Your Honor, Salvatore

20  Bianca on behalf of the Debtors.  The remaining three items

21  on the agenda are as Mr. Bromley indicated the Debtors'

22  first, second, and third omnibus objections. I'll just run

23  through each of these as they appear on the agenda.

24          Agenda item two is the third omnibus claims

25  objections. As the agenda indicates, a CNO was filed and I

1  believe the order was entered.

2          THE COURT:  Yes.

3          MR. BIANCA:  Although this doesn't affect entry of

4  the order, I just wanted to bring to Your Honor's attention

5  that after the certificate of no objection was filed, we

6  received an informal response from one of the claimants.  The

7  claimant did not object to disallowance of the claim but

8  rather had questions as to the claims process in general and

9  why a third claim was filed was not included in our

10  objection.  We contacted the claimant and answered her

11  questions to her satisfaction and so no further, nothing else

12  needs to be done on that.

13          THE COURT:  All right.  Thank you for that report.

14          MR. BIANCA:  You're welcome.  Agenda items 8 and 9

15  are the first and second omnibus claims objection.  We

16  revised the orders to these objections to address various

17  formal and informal responses received by the claimants.  If

18  I may approach the bench to hand up a clean and black line

19  version.

20          THE COURT:  Yes, yes.  Thank you.

21          MR. BIANCA:  So I'll start with the first omnibus

22  objection as indicated on the agenda, three of the four

23  responses have been resolved by the revisions to the order.

24  These are the responses of Cash Wolfson, Teksystems and

25  Marketsource.  We spoke to each of the claimants and the

1 | revisions to the order resolved their responses.

2 |        THE COURT:  All right.

3 |        MR. BIANCA:  With respect to the response, the

4 | remaining response which is that of Palanivelu

5 | Venkatasubramaniam, we've made several attempts to contact

6 | the claimant, but our calls have not been returned.  In his

7 | response the claimant agreed that the amended claim should be

8 | disallowed, but requested that the amending claims survive.

9 | That's exactly what we're requesting in our motion and what's

10 | provided for in the order.  So we don't believe that any

11 | further revisions need to be made to the order.  And, of

12 | course, we're surviving the amending claim that's subject, of

13 | course, to our right to object to that claim.

14 |        THE COURT:  Of course.

15 |        MR. BIANCA:  And so accordingly, we would request

16 | that the Court enter the order as revised.

17 |        THE COURT:  All right, I am prepared to do so.

18 |        MR. BIANCA:  Thank you, Your Honor.

19 |        THE COURT:  I reviewed the matters and there appears

20 | to be good cause for the objections and those which have been

21 | resolved as well.

22 |        MR. BIANCA:  Thank you, Your Honor.  Moving onto the

23 | second omnibus objection this is our objection to 103

24 | duplicate claims. Again as the agenda indicates, we have

25 | resolved most, about three of the four responses by revising

1   the orders.  The response, the resolved responses are that of

2   Scott Binner and Khanh Diep.  We spoke to each of these

3   claimants and the revised order resolves their response.  For

4   the response of Sebastian Gaglione that one is moot.  We have

5   withdrawn our objection to the claim without prejudice and

6   that's also reflected in the order.

7           THE COURT:  Yes.

8           MR. BIANCA:  The final response is that of William

9   Gardener.  Mr. Gardener filed a letter with the Court.  We

10  spoke to the claimant and based on those discussions we

11  understand that he does not object to the disallowance of his

12  claim, but rather wanted to file something with the Court

13  indicating his reasoning for filing a claim against each of

14  the Debtors.

15          THE COURT:  Okay.

16          MR. BIANCA:  So we don't believe that anything needs

17  to be done to resolve that response as well.

18          THE COURT:  Very well.

19          MR. BIANCA:  And would request the Court enter the

20  proposed order.

21          THE COURT:  All right and as with the first omnibus

22  objection, I had reviewed the claims and there is good cause

23  for the objections and I am pleased to grant the motion.

24          MR. BIANCA:  Thank you, Your Honor.  I believe that

25  resolves all three of these objections and, more importantly,

1  the last of the items on the agenda.

2          THE COURT:  All right, is there anything else that

3  anyone wishes to be heard on?  Counsel, I greatly appreciate

4  the effort to resolve the issue relating to the settlement.

5  I know how much was required as far as give and take was

6  concerned.  And with that, I think we can stand in recess and

7  call it a good day.

8          MR. BROMLEY:  Thank you very much, Your Honor.

9      (Court Adjourned)

10

11                          CERTIFICATE

12

13  I certify that the foregoing is a correct transcript from the

14  electronic sound recording of the proceedings in the above-

15  entitled matter.

16  /s/Mary Zajaczkowski                    January 28, 2010
17  Mary Zajaczkowski, CET                        Date

18

19

20

21

22

23

24

25