**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

-------------------------------------------------------X
:
*In re*                                                    : Chapter 11
:
Nortel Networks Inc., *et al.*,[1]                          : Case No. 09-10138 (KG)
:
                                    Debtors.                : Jointly Administered
:
                                                           :
                                                           : **Hearing date:  March 3, 2010 2:00 PM (ET)
                                                           (PROPOSED)
                                                           Objections due:  February 24, 2010 4:00 PM (ET)
                                                           (PROPOSED)**
-------------------------------------------------------X

**DEBTORS' MOTION FOR ENTRY OF AN ORDER (A) APPROVING THE NORTEL
SPECIAL INCENTIVE PLAN; (B) AUTHORIZING CERTAIN PAYMENTS UNDER
THE KEY EMPLOYEE RETENTION PLAN AND KEY EXECUTIVE INCENTIVE
PLAN; AND (C) APPROVING CERTAIN EMPLOYMENT AGREEMENTS**

Nortel Networks Inc. ("NNI") and certain of its affiliates, as debtors and debtors in

possession, (collectively, the "Debtors"), hereby move this Court (the "Motion"), for the entry of

an order substantially in the form attached hereto as Exhibit A, pursuant to sections 363(b) of

title 11 of the United States Code (the "Bankruptcy Code"), authorizing the Debtors to (i)

implement the Nortel Special Incentive Plan (attached hereto as Exhibit B); (ii) make the

immediate payment of certain awards under the Key Employee Retention Plan and the Key

Executive Incentive Plan previously approved by this Court; and (iii) enter into individual

employment agreements with certain executives of the Debtors.  In support of this Motion, the

Debtors rely on the Declaration of John Dempsey (the "Dempsey Declaration"), a partner in the

---

[1]     The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's tax identification number,
are:  Nortel Networks Inc. (6332), Nortel Networks Capital Corporation (9620), Nortel Altsystems Inc. (9769),
Nortel Altsystems International Inc. (5596), Xros, Inc. (4181), Sonoma Systems (2073), Qtera Corporation (0251),
CoreTek, Inc. (5722), Nortel Networks Applications Management Solutions Inc. (2846), Nortel Networks Optical
Components Inc. (3545), Nortel Networks HPOCS Inc. (3546), Architel Systems (U.S.) Corporation (3826), Nortel
Networks International Inc. (0358), Northern Telecom International Inc. (6286), Nortel Networks Cable Solutions
Inc. (0567) and Nortel Networks (CALA) Inc. (4226).  Addresses for the Debtors can be found in the Debtors'
petitions, which are available at http://chapter11.epiqsystems.com/nortel.

firm of Mercer (US) Inc. ("Mercer"), attached hereto as Exhibit C. The Debtors have engaged in

extensive discussions regarding the relief requested in this Motion and related relief being sought

from the Canadian Court with the Canadian Debtors, the Monitor, the Committee, and the

Bondholder Group (all as defined below). The Canadian Debtors are seeking complementary

relief from the Canadian Court and the Monitor, the Committee, and the Bondholder Group do

not oppose the relief requested. In support of this Motion, the Debtors respectfully represent as

follows:

## Jurisdiction

1.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and

1334. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2). Venue is

proper pursuant to 28 U.S.C. §§ 1408 and 1409.

2.      The statutory basis for the relief requested herein is sections 363(b) of the

Bankruptcy Code.

## Background

**A.      Procedural History**

3.      On January 14, 2009 (the "Petition Date"), the Debtors, other than NN CALA

(defined below), filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code.

4.      The Debtors continue to operate their businesses and manage their properties as

debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

5.      On January 15, 2009, this Court entered an order of joint administration pursuant

to Bankruptcy Rule 1015(b) that provided for the joint administration of these cases and for

consolidation for procedural purposes only [D.I. 36].

6.      Also on the Petition Date, the Debtors' ultimate corporate parent Nortel Networks

Corporation ("NNC"), NNI's direct corporate parent Nortel Networks Limited ("NNL," and

together with NNC and their affiliates, including the Debtors, "Nortel"), and certain of their Canadian affiliates (collectively, the "Canadian Debtors")[2] filed an application with the Ontario Superior Court of Justice (the "Canadian Court") under the Companies' Creditors Arrangement Act (Canada) (the "CCAA"), seeking relief from their creditors (collectively, the "Canadian Proceedings"). The Canadian Debtors continue to manage their properties and operate their businesses under the supervision of the Canadian Court.

7.    On January 15, 2009, this Court entered an order of joint administration pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") that provided for the joint administration of these cases and for consolidation for procedural purposes only [D.I. 36].

8.    On January 14, 2009, the Canadian Court entered an order recognizing these chapter 11 proceedings as a foreign proceeding under section 18.6 of the CCAA. On February 27, 2009, based on a petition filed by Ernst & Young Inc., as court-appointed Monitor in the Canadian Proceedings and as foreign representative for the Canadian Debtors (the "Monitor"), this Court entered an order recognizing the Canadian Proceedings as foreign main proceedings under chapter 15 of the Bankruptcy Code.

9.    On January 14, 2009, the High Court of England and Wales placed nineteen of Nortel's European affiliates (collectively, the "EMEA Debtors")[3] into administration under the control of individuals from Ernst & Young LLC (collectively, the "Joint Administrators"). On

---

[2]    The Canadian Debtors include the following entities: NNC, NNL, Nortel Networks Technology Corporation, Nortel Networks Global Corporation and Nortel Networks International Corporation.

[3]    The EMEA Debtors include the following entities: Nortel Networks UK Limited, Nortel Networks S.A., Nortel Networks (Ireland) Limited, Nortel GmbH, Nortel Networks France S.A.S., Nortel Networks Oy, Nortel Networks Romania SRL, Nortel Networks AB, Nortel Networks N.V., Nortel Networks S.p.A., Nortel Networks B.V., Nortel Networks Polska Sp. z.o.o., Nortel Networks Hispania, S.A., Nortel Networks (Austria) GmbH, Nortel Networks, s.r.o., Nortel Networks Engineering Service Kft, Nortel Networks Portugal S.A., Nortel Networks Slovensko, s.r.o. and Nortel Networks International Finance & Holding B.V.

May 28, 2009, at the request of the Joint Administrators, the Commercial Court of Versailles,

France (the "French Court") (Docket No. 2009P00492) ordered the commencement of secondary

proceedings in respect of Nortel Networks S.A. ("NNSA"), which consist of liquidation

proceedings during which NNSA was originally authorized to continue to operate as a going

concern for an initial period of three months, which period was subsequently extended to

November 28, 2009.  In accordance with the European Union's Council Regulation (EC) No.

1346/2000 on Insolvency Proceedings, the English law proceedings (the "English Proceedings")

remain the main proceedings in respect of NNSA although a French administrator and a French

liquidator have been appointed and are in charge of the day-to-day affairs and continuing

business of NNSA in France.  On October 1, 2009, pursuant to a motion filed by the Joint

Administrators, the French Court approved an order to:  (i) suspend the liquidation operations

relating to the sale of the assets and/or businesses of NNSA for a renewable period of two

months; (ii) authorize the continuation of the business of NNSA so long as the liquidation

operations are suspended; and (iii) maintain the powers of the French Administrator and

Liquidator during the suspension period, except with respect to the sale of assets and/or

businesses of NNSA.  On November 30, 2009, the French Court extended the suspension of

liquidation for a further period of three months.  On June 26, 2009, this Court entered an order

recognizing the English Proceedings of Nortel Networks UK Limited ("NNUK") as foreign main

proceedings under chapter 15 of the Bankruptcy Code.[4]

> 10.     On January 26, 2009, the Office of the United States Trustee for the District of

Delaware (the "U.S. Trustee") appointed an Official Committee of Unsecured Creditors (the

---

[4]     Additionally, on January 18, 2009, certain Nortel affiliates, including Nortel Networks Israel (Sales and Marketing) Limited, filed an application with the Tel-Aviv-Jaffa District Court, pursuant to the Israeli Companies Law, 1999, and the regulations relating thereto for a stay of proceedings.  On January 19, 2009, the Israeli Court appointed Yaron Har-Zvi and Avi D. Pelossof as joint administrators of the Israeli Company under the Israeli Companies Law.

"Committee") pursuant to section 1102(a)(1) of the Bankruptcy Code [D.I.s 141, 142].  An ad hoc group of bondholders holding claims against certain of the Debtors and certain of the Canadian Debtors has also been organized (the "Bondholder Group").  No trustee or examiner has been appointed in the Debtors' cases.

11.      On July 14, 2009 (the "CALA Petition Date"), Nortel Networks (CALA) Inc. ("NN CALA" and a Debtor with NNI and the other Debtors), an affiliate of NNI, filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  On July 17, this Court entered orders approving the joint administration and consolidation of NN CALA's chapter 11 case with the other Debtors' chapter 11 cases for procedural proposes [D.I. 1098], and applying to NN CALA certain previously entered orders in the Debtors' chapter 11 cases [D.I. 1099].

**B.      Nortel's Corporate Structure and Business**

12.      Nortel is a group of technology companies that designs, develops and deploys communication products, systems and solutions to its customers around the globe.  Its principal assets include its employees, the intellectual property derived and maintained from its research and development activities, its customers and other significant contracts and agreements. Additional information regarding Nortel's corporate structure and business and the events leading to the chapter 11 cases is set forth in the Declaration of John Doolittle in Support of First Day Motions and Applications [D.I. 3] (the "First Day Declaration").

**C.      Case Milestones**

13.      On June 19, 2009, Nortel announced that it was advancing in discussions with external parties to sell its businesses and it would assess other restructuring alternatives for its businesses in the event it is unable to maximize value through sales.  To date, Nortel has closed (i) the sale of certain portions of its Layer 4-7 data portfolio to Radware Ltd. [D.I. 539]; (ii) the sale of substantially all of its CDMA business and LTE Access assets business to

Telefonaktiebolaget LM Ericsson (publ) [D.I. 1205] (the "CDMA Sale"); (iii) the sale of the assets of its Wireless Networks business associated with the development of Next Generation Packet Core network components to Hitachi Ltd. [D.I. 1760] (the "Next Generation Sale"); and (iv) the sale of substantially all of the assets of the Enterprise Solutions business globally, including the shares of Nortel Government Solutions Incorporated and DiamondWare Ltd. to Avaya Inc. [D.I. 1514] (the "ES Sale").  Nortel has also completed auction processes and obtained Court approval for the planned sale of substantially all the assets of its Optical Networking and Carrier Ethernet businesses associated with its Metro Ethernet Networks business unit [D.I. 2070] (the "MEN Sale"); as well as for the planned sale of substantially all of its GSM/GSM-R business [D.I. 2065] (the "GSM Sale").  In addition, approval has been obtained for the sale procedures relating to Nortel's CVAS business (the "CVAS Sale") (the foregoing, collectively, the "Sales Transactions").

14.    On August 4, 2009, this Court entered an order fixing September 30, 2009 at 4:00 PM (Eastern Time) as the general bar date for filing proofs of claim or interests [D.I. 1280].  On December 3, 2009 this Court entered an order fixing January 25, 2010 at 4:00 PM (Eastern Time) as the bar date for filing proofs of claim or interests against NN CALA [D.I. 2059].

## Relief Requested

15.    By this Motion, the Debtors seek entry of an order authorizing the Debtors to:  (i) implement the Nortel Special Incentive Plan, (ii) make the immediate payment of the Third Milestone Award under the Initial Plans to certain NBS Employees and the Corporate Group Employees (each as defined below); and (iii) enter into individual employment agreements with three key executives of the Debtors.

**Facts Relevant to the Motion**

**A.    Achievements and the Path Ahead**

16.    At the outset of the proceedings, the Debtors announced their intention to reassess their business strategy and consider restructuring opportunities with a view to emerging as a stronger enterprise.  In that regard, the Debtors took a number of steps to reduce costs and increase efficiencies within the enterprise.  In June 2009, following extensive discussions and consultation with outside advisors and stakeholders, the decision was made to change direction and pursue the sales of Nortel's various businesses.  Consequently, on June 19, 2009, in connection with the announcement that it had entered into a stalking horse agreement for the sale of substantially all of the assets related to its CDMA and LTE businesses, Nortel announced that it was advancing in discussions to sell its other businesses.

17.    On August 14, 2009, Nortel announced that it had reached a natural transition point resulting in a number of leadership changes and a new organizational structure designed to work towards the completion of the sales of its businesses and other restructuring activities.  The decision to pursue divestitures of the businesses was made after Nortel considered all of its restructuring efforts.  After considering its various options, Nortel considered the decision to pursue divestitures to be Nortel's best chance to maximize the value of its operations and to preserve as many jobs as possible.

18.    Throughout the proceedings, the Debtors, and Nortel generally, have worked diligently to maximize value for its various businesses and preserve customer and other relationships.  Since determining in June 2009 that selling Nortel's businesses was the best path forward, Nortel has generated over $2 billion in sales proceeds as a result of the completion of the CDMA Sale, the ES Sale, and the Next Generation Sale.  Each of these sales was completed through the "stalking horse"/ auction process.  As a result of auctions held for both the CDMA

7

Sale and the ES Sale, significant value was obtained from the sale of the assets.  Through the auction process, proceeds received to date have exceeded the original stalking horse price by approximately $900 million.  The auctions conducted for the MEN Sale and the GSM Sale resulted in anticipated gross sales proceeds exceeding the original stalking horse price by over $200 million.  This achievement, along with the increase in price achieved from the CDMA and ES Sales, has resulted in gross proceeds from the various sales of just under $3 billion.

19.    In addition to the substantial value that Nortel has realized from the sale of its assets, other significant benefits have been realized in the course of transitioning Nortel's businesses to purchasers.  The various sales have assisted in providing ongoing employment for many Nortel employees.  As a result of the CDMA Sale, the ES Sale and the Next Generation Sale as well as the anticipated completion of the MEN Sale, the GSM Sale and the CVAS Sale, Nortel has preserved approximately 13,000 jobs that may have been in significant jeopardy.  Moreover, customers have gained re-assurance that their contracts will continue to be serviced and many suppliers have benefited from the purchasers of Nortel's businesses becoming new ongoing customers.

20.    In addition to the foregoing, the Debtors have also accomplished, among other things, the following: (i) the establishment of a September 30, 2009 bar date for claims against the Debtors; (ii) the settlement of most of the claims of Nortel's largest supplier, Flextronics; and (iii) resolution of outstanding transfer pricing issues with U.S. and Canadian tax authorities for the taxation years 2001 through 2005 pursuant to two "advanced pricing agreements" entered into with the U.S. and Canadian tax authorities.

21.    Although there have been significant achievements in the past thirteen (13) months, there is still much to accomplish in the next two years.  For example, (i) there are still a

number of significant sales such as the MEN Sale, the GSM Sale and the CVAS Sale to be completed; (ii) Nortel will need to complete other sales processes, such as the LGN Joint Venture and Nortel's Passport business; (iii) Nortel will be obligated to perform transition services under most or all of its sales arrangements; (iv); a determination will need to be made regarding the best path forward to maximize value for Nortel's IP; and (v) resolution of claims pursuant to the claims reconciliation process.  As discussed below, the relief requested in this Motion is necessary to accomplish these tasks and preserve value to the Debtors' estates.

**B.**    **The Key Employee Retention Plan and the Key Executive Incentive Plan**

22.    On February 27, 2009, the Debtors filed the Debtors' Motion For An Order Seeking Approval Of Key Employee Retention Plan and Key Executive Incentive Plan, And Certain Other Related Relief [D.I. 389] (the "KEIP/KERP Motion").  By the KEIP/KERP Motion, the Debtors sought orders authorizing the Debtors and the Canadian Debtors to develop an incentive program for certain employees, which program consisted of an incentive plan for Nortel's key senior executives (the "KEIP") and a retention plan for Nortel's key non-insider employees (the "KERP," and together with the KEIP, the "Initial Plans").[5]  The Initial Plans were developed in coordination with the Canadian Debtors, Mercer, the Monitor and the Committee and were designed to incentivize certain employees (determined through a selection process to be critical to the Debtors' businesses) to maintain their employment with the Debtors and, in the case of the KEIP, to achieve certain specific performance results.  The Initial Plans

---

[5]    In addition, as described in paragraph 62 of the Debtors' first day motion for authorization to pay certain prepetition wages, salaries, and other compensation, certain employees are eligible to receive cash awards under the "Nortel Networks Limited Annual Incentive Plan" (the "AIP").  The AIP is an ordinary course of business compensation program, see In re Dana Corp., 358 B.R. 567, 580-81 (Bankr. S.D.N.Y. 2006), has been in place for several years, and is standard in the Debtors' industry.  The Debtors continued the AIP in 2009 and will continue the AIP in 2010.  The Debtors have consulted with the advisors to the Committee and the Bondholder Group with respect to target payouts and performance metrics relating to the 2010 AIP and will continue to do so for the duration of these proceedings.

were developed jointly with the Canadian Debtors, which sought complementary relief from the

Canadian Court to adopt and implement the Initial Plans.  The Debtors viewed and continue to

view a properly compensated and incentivized workforce as critical to achieving the goal of

maximizing the value of the Debtors' estates for the benefit of all stakeholders in the chapter 11

proceedings.

23.     On March 5, 2009, the Court entered the Order Authorizing Key Employee

Retention Plan and Key Executive Incentive Plan For Non-SLT Executives And Certain Other

Related Relief [D.I. 436], which authorized the implementation of the Initial Plans for

participants except for U.S. members of the Nortel Senior Leadership Team ("SLT").  On March

20, 2009, the Court entered the Order Authorizing Key Executive Incentive Plan For SLT

Executives [D.I. 511], which authorized the implementation of the KEIP with respect to U.S.

members of the SLT.  On March 6 and 20, 2009, the Canadian Court granted complementary

relief for Canadian participants in the Initial Plans.

24.     Awards under the KEIP and the KERP were tied to three milestones:  (a) the

achievement of North American objectives of Nortel's cost reduction plan (the "First

Milestone"); (b) the achievement of certain parameters that would result in a leaner or more

focused organization (the "Second Milestone"); and (c) the later of the confirmation of a plan of

reorganization in the United States or the confirmation by the Canadian Court of a plan or plans

of restructuring and/or arrangement in Canada (the "Third Milestone").

25.     Under the KEIP, 25% of each incentive award vested upon achievement of the

First Milestone, 25% vested upon achievement of the Second Milestone and 50% vests upon

achievement of the Third Milestone.  Under the KERP, 25% of each award vested upon the

earlier of June 30, 2009 or the achievement of the First Milestone; 25% vested upon the earlier of

December 31, 2009 or the achievement of the Second Milestone; and 50% vests upon the earlier

of June 30, 2010 or the achievement of the Third Milestone.  Generally, to receive an award, a

participant must be employed on the vesting date.  However, in certain circumstances, awards

may be accelerated and paid where employment is terminated in connection with a divestiture,[6]

involuntary termination without cause, or death.

26.     On July 2, 2009, the Compensation and Human Resources Committee of the

Boards of Directors of NNC and NNL, in consultation with the Monitor and advisors to the

Committee and the Bondholder Group**,** determined that the First Milestone under the Initial Plans

was achieved as of the close of business on June 26, 2009, and the first bonus award was

subsequently paid to eligible participants of the Initial Plans.  On November 13, 2009, the Boards

of Directors of NNC and NNL, in consultation with the Monitor and advisors to the Committee

and the Bondholder Group**,** determined that the Second Milestone under the Initial Plans was

achieved as of the closing of the sale of the CDMA business and LTE assets to

Telefonaktiebolaget LM Ericsson (Ericsson), and the second bonus award was subsequently paid

to eligible participants of the Initial Plans.  As discussed herein, the Debtors seek authorization to

make the immediate payment of awards related to the Third Milestone to NBS Employees and

Corporate Group Employees.

**C.     Nortel Business Services and the Corporate Group**

27.     Since the commencement of the Debtors' chapter 11 cases, Nortel has

transformed from a group of technology companies seeking to restructure into a new viable

entity into a group of companies focused primarily on (a) executing the highly complex sales

transactions, (b) realizing value from remaining assets, (c) addressing bankruptcy matters,

---

[6]     In connection with the CDMA and Enterprise divestitures, payments were accelerated for 118 employees of the Debtors and 98 employees of the Canadian Debtors

including winding down certain operations and functions, resolving claims, allocating purchase proceeds and preparing related plans, and (c) providing services to purchasers of its businesses.

28.     As described above, since March 2009 (the time when this Court approved the Initial Plans), the Debtors have entered into seven separate Sales Transactions, which taken together relate to a substantial majority of Nortel's operating businesses.[7]  Given the complexity of Nortel's corporate structure as well as the highly technical nature of the businesses, the Sale Transactions also proved to be very complex undertakings – both for the Nortel sellers and the purchasers of these businesses (collectively, the "Purchasers").

29.     An outgrowth of this complexity is the fact that most of the Sales Transactions and all of the major Sales Transactions include agreements known as Transition Services Agreements ("TSAs").  The TSAs require that the Nortel sellers, including the Debtors and the Canadian Debtors, continue to operate, on a contract basis, substantial elements of the day-to-day business functions relating to the divested businesses until such functions can be transferred to the relevant Purchaser.  Transition Services Agreements are common in the non-bankruptcy M&A world, particularly where the core transaction involves the carve-out of a business from a larger enterprise, as is the case here.  The TSAs vary in length, with the longest-lived expiring on December 31, 2011, and require substantial payments to be made by the Purchasers to cover the costs of the services provided.  Any material failure to perform under the TSAs will expose all of the Nortel parties thereto, including NNI, to substantial damages.  Therefore, it is essential to the Debtors that the TSAs be performed in accordance with their terms.

30.     In light of the Sales Transactions and the TSAs, the Debtors, working with the other Nortel sellers, including primarily with the Canadian Debtors, and in consultation with the

---

[7]    Efforts continue to sell Nortel's remaining operating businesses.

Monitor, the Committee and the Bondholder Group, have created an organizational structure that generally divides the remaining workforce into two main categories – Nortel Business Services ("NBS") and Nortel Finance and Corporate Services (the "Corporate Group" and together with NBS, the "Business Units").

31.     ***Nortel Business Services.***  NBS is not a specific corporate entity, but rather refers to a business unit structure within the Nortel companies charged primarily with performance under the TSAs.  NBS consists of 2,237 employees (917 employees in the U.S., 459 in Canada, and 861 in other jurisdictions).  In approximate terms, 41% of the NBS workforce are Debtor employees, 21% are Canadian Debtor employees and the remainder are employees of other Nortel entities around the world (the "NBS Employees").  NBS is led by two NNI employees, Christopher Ricaurte and Donald McKenna, whose employment arrangements are described in more detail below.

32.     The NBS Employees provide a wide range of services to the Purchasers on behalf of Nortel, including but not limited to:  (i) IT infrastructure services; (ii) IT applications services; (iii) research and development engineering services; and (iv) various business services, including order management and billing services, supply chain services, knowledge management services, finance services and real estate services.  These services will continue to be required as the Debtors continue the transition of control over the businesses involved in the Sales Transactions to the Purchasers over the next two years.

33.     Given the run-off nature of the TSAs, employees working within the NBS structure recognize that their jobs will disappear over the next two years as the obligations under the TSAs are satisfied between now and year-end 2011.  It is, therefore, essential that the NBS

employees be properly motivated and incentivized, and it is for this reason that the Debtors seek approval of the new compensation plan described in this Motion.

34.    ***The Corporate Group.***   The second workforce category is the Corporate Group, which is charged primarily with the continued provision of corporate overhead services to the Nortel companies and to the Debtors and Canadian Debtors, in particular.[8]  The Corporate Group consists of 166 employees (70 employees in the U.S., 75 in Canada, and 21 in other jurisdictions).  In approximate terms, 42% of the Corporate Group workforce are Debtor employees, 45% are Canadian Debtor employees and the remainder are employees of other Nortel entities around the world (the "Corporate Group Employees").  The Corporate Group is led by John Doolittle, an NNL employee who is also an officer of both NNL and NNI (as well as a board member of NNI).

35.    The Corporate Group is focused on a number of key actions including the completion of announced sales and the sale of remaining businesses and assets, as well as exploring strategic alternatives to maximize the value of Nortel's intellectual property portfolio. The Corporate Group is also responsible for bankruptcy matters including the claims reconciliation processes in both the U.S. and Canada, and planning towards conclusion of the Chapter 11 and CCAA cases.

36.    Maintaining a motivated and dedicated group of employees to carry out these tasks even as former colleagues gain new employment with the Purchasers or elsewhere is essential to ensuring the orderly and successful completion of the insolvency proceedings.  To incentivize the Corporate Group Employees to remain throughout this period despite the

---

[8]    While NBS's responsibilities relate primarily to the TSAs and the Corporate Group's responsibilities relates primarily to other tasks, certain TSA related tasks will be performed by Corporate Group Employees and certain non-TSA tasks will be performed by NBS Employees.

knowledge that, like the NBS Employees, their positions too are likely to be eliminated, the

Debtors seek approval of the new compensation plan described in this Motion.

**D.     The Nortel Special Incentive Plan**

37.     Given the importance of the NBS Employees and the Corporate Group

Employees to the smooth transition of Nortel's business lines to the Purchasers and the steady

continuation of Nortel's global insolvency proceedings, the Debtors, together with the Canadian

Debtors, have developed the Nortel Special Incentive Plan in coordination with Mercer, Nortel's

compensation consultant.  The Nortel Special Incentive Plan is designed to provide cash

incentive payments (the "Payments") to certain employees holding positions with NBS or the

Corporate Group (the "Plan Participants")[9] to encourage the achievement of certain performance

targets and other business goals important to the Debtors, including the continued maximization

of value, the successful conclusion of these chapter 11 cases, compliance with the Debtors'

obligations under the TSAs and the wind-down of various Nortel entities.

**(i)     Plan Participants and Payments**

38.     Plan Participants are selected in accordance with criteria approved by the Boards

of Directors of NNL and NNI (collectively, the "Boards") and developed in consultation with the

Monitor, the Committee, and the Bondholder Group.  Plan Participants employed within NBS

(the "NBS Plan Participants") will be identified as either "NBS Group A," "NBS Group B" or

"NBS Group C", based on each Plan Participant's Job Complexity Indicator and Job Family

Group.  Plan Participants employed within the Corporate Group (the "Corporate Plan

Participants") will be identified as either "Corporate Group A" or "Corporate Group B"

---

[9]     Certain employees domiciled in the Caribbean and Latin America (CALA) and Asia-Pacific (APAC) regions
will also be receiving payments in accordance with the terms of the Nortel Special Incentive Plan.

depending on each Plan Participant's Job Complexity Indicator and Job Family Group.[10]  The

number of Plan Participants employed by the Debtors and the Canadian Debtors is indicated in

the following table:

|  | NBS | Corporate | Total |
|---|---|---|---|
| **Debtors** | 842 | 24 | 866 |
| **Canadian Debtors** | 421 | 34 | 455 |
| **Rest of World** | 145 | 9 | 154 |
| **Total** | 1,408 | 67 | 1,475 |

39.     Under the terms of the Nortel Special Incentive Plan, each Plan Participant will be

eligible to receive a Payment in respect of each Plan Period (defined below) up to an amount (the

"Target Payment Amount") determined in accordance with criteria determined by the Boards, in

consultation with the Monitor, the Committee and the Bondholder Group.  Each Plan

Participant's Target Payment Amount will be comprised of a component conditioned upon

completion of the Plan Participant's role during the Plan Term in furthering the business

purposes of the Debtors in the relevant Plan Period (the "Completion Payment") and may also

include a component based on the achievement of specific performance metrics (the

"Performance Metrics") for the Plan Periods (the "Performance Payment," and together with the

Completion Payment, the "Payment Amounts").  Specifically:

a.  With respect to NBS Plan Participants in NBS Group A and NBS Group B,
two-thirds of the Target Payment Amount shall be allocated to the
Performance Payment and one-third shall be allocated to the Completion
Payment;

b.  With respect to NBS Plan Participants in NBS Group C, one-half of the Target
Performance Payment shall be allocated to the Performance Payment and one-
half shall be allocated to the Completion Payment; and

---

[10]    The Job Complexity Indicators (and Job Family Groups) included within each group are noted in Appendix A
to the Plan.

    c.   With respect to the Corporate Plan Participants, all of the Target Performance Payment shall be allocated to the Completion Payment.

Performance Metrics will be tied to, among other things, (i) net cash from operations of NBS, (ii) recovery of value from remaining assets, and (iii) service performance relating to the TSAs, measured in quality and timeliness.  The Performance Metrics will be subject to approval of the Boards, in consultation with the Monitor, the Committee and the Bondholder Group.

40.    The Boards retain the discretion to reduce (including to zero) the Performance Payments of any Plan Participant to the extent it is determined that the relevant entity did not meet target performance levels with respect to any particular Performance Metric.

41.    The Nortel Special Incentive Plan will have two periods (each, a "Plan Period"). The first Plan Period (the "First Plan Period") is January 1, 2010 to December 31, 2010.  The second Plan Period (the "Second Plan Period") is January 1, 2011 to December 31, 2011.  A Plan Participant is eligible to participate in the Second Plan Period only if such Plan Participant is actively employed by Nortel on January 1, 2011 and prior to that date has not received notice from his or her employer of an intention to terminate such Plan Participant's employment.

42.    With respect to each Plan Period, a Plan Participant's Performance Payment shall be determined by reference to the level of achievement in respect of Performance Metrics established to measure performance during such Plan Period.  A Performance Payment in respect of the First Plan Period is known as a "Year One Performance Payment."  A Performance Payment in respect of the Second Plan Period is known as a "Year Two Performance Payment." A Completion Payment in respect of the First Plan Period is known as a "Year One Completion

Payment."  A Completion Payment in respect of the Second Plan Period is known as a "Year

Two Completion Payment."[11]

43.     Separate from the Nortel Incentive Plan, the Debtors are seeking to enter into the

Employment Agreements discussed in Section E below.  Assuming that all Plan Participants

achieve their Target Payment Amount in each Plan Period, the Debtors and the Canadian

Debtors estimate that the aggregate payout under the Nortel Special Incentive Plan and the

special incentive payments under the Employment Agreements will be approximately $93

million, with approximately 90% of the cost being attributable to NBS Employees and 10%

attributable to Corporate Group Employees.  The Debtors believe that their aggregate payouts

under the Nortel Special Incentive Plan and the special incentive payments under the

Employment Agreements should not exceed $56 million.  The estimated aggregate payments

under the Nortel Special Incentive Plan and the special incentive payments under the

Employment Agreements are as follows:

|  | **NBS** | **Corporate** | **Total** |
|---|---|---|---|
| **Debtors** | $51,717,095 | $3,879,000 | $55,596,095 |
| **Canadian Debtors** | $23,241,751 | $4,572,211 | $27,813,962 |
| **Rest of World** | $8,131,804 | $810,583 | $8,942,387 |
| **Total** | $83,090,650 | $9,261,794 | $92,352,444 |

Approximately 98% of the payments attributable to NBS Employees under the Nortel Special

Incentive Plan and the special incentive payments under the Employment Agreements were built

into the pricing of the services to be provided under the TSAs.  As a result, 88% of the cost of

the Nortel Special Incentive Plan and the special incentive payments under the Employment

---

[11]     The Year One Performance Payments, the Year Two Performance Payments, the Year One Completion
Payments and the Year Two Completion Payments are collectively referred to as the "Plan Payments" and any
individual payment thereunder is a "Plan Payment."

Agreements is being passed through to the Purchasers.  The aggregate payments attributable to the Corporate Group Employees will be born by the Debtors (42%), the Canadian Debtors (49%) and other Nortel entities (9%).  Accordingly, after accounting for payments funded by the Purchasers through the TSAs, the total cost of the Nortel Special Incentive Plan and the special incentive payments under the Employment Agreements to the Debtors is expected to be approximately $7 million.[12]

### (ii)    Authorization to Make Adjustments and Additional Payments

44.    As part of this Motion, the Debtors seek authorization to add new participants to the Nortel Special Incentive Plan and to adjust Payments to Plan Participants to reflect changes in job responsibilities and employment terms.  Although the Debtors believe that the Nortel Special Incentive Plan will provide the Plan Participants with the appropriate incentives to remain with Nortel, some amount of attrition will continue to occur.  Modifications or additional payments may be necessary where the Debtors determine that, among other things, the terms of a Plan Participant's employment should be modified (including the extension of the term of employment) or new participants should be added to the Nortel Special Incentive Plan.  The addition of new participants and adjustments to Payments are not anticipated to result in the Nortel Special Incentive Plan exceeding its current estimated cost and no material changes will be made without first consulting with the Monitor, the Committee, and the Bondholder Group.

45.    In the event that it is necessary for Payments under the Nortel Special Incentive Plan to exceed the estimated cost described herein, the Debtors request authority to make additional Payments and/or increase Payments in an aggregate amount not to exceed $7 million (the "Additional Payments").  The Additional Payments by the Debtors will be made with the

---

[12]    This amount is derived as follows:  $55,596,095 (total cost attributable to Debtors) - $48,924,564 (88% of cost funded by purchasers) = $6,671,531.

consent of the Principal Officer of NNI (the "Principal Officer") and, prior to making any

Additional Payments, the Debtors will consult with the Committee and the Bondholder Group.

Similar relief will be requested by the Canadian Debtors.

**(iii)    Payment Process**

46.    Following completion of each Plan Period, in consultation with the Monitor, the

Committee and the Bondholder Group, the Boards will determine the amount to be paid to each

Plan Participant with respect to such Plan Participant's Performance Payment for such Plan

Period based on its determination regarding the level of achievement of the targets established

for the applicable Performance Metrics.

47.    Any portion of any Plan Payment payable upon completion of the First Plan

Period will be made to current Plan Participants in a lump sum cash payment as soon as

practicable following March 1, 2011, but in no event later than April 30, 2011.  Any portion of

any Plan Payment payable upon completion of the Second Plan Period will be made to current

Plan Participants in a lump sum cash payment as soon as practicable following March 1, 2012,

but in no event later than April 30, 2012.

48.    Each Plan Participant will be paid in the amounts and at the times set forth below

for the applicable Plan Participant "group" so long as such Plan Participant is either actively

employed or an inactive employee as a result of short- or long-term disability or other leave of

absence approved by the relevant employer on the date the Plan Payment is paid:

      a.    NBS Group A:

          (i)    100% of both the Year One Performance Payment and Year Two
               Performance Payment following the completion of the Second Plan
               Period;

          (ii)    50% of the Year One Completion Payment following the
               completion of the First Plan Period; and

        (iii)     50% of the Year One Completion Payment and 100% of the Year Two Completion Payment following the completion of the Second Plan Period.

b.      NBS Group B:

        (i)      100% of the Year One Performance Payment following the completion of the First Plan Period;

        (ii)     100% of the Year Two Performance Payment following the completion of the Second Plan Period; and

        (iii)     100% of both the Year One Completion Payment and the Year Two Completion Payment following the completion of the Second Plan Period.

c.      NBS Group C:

        (i)      100% of the Year One Performance Payment following completion of the First Plan Period;

        (ii)     100% of the Year Two Performance Payment following the completion of the Second Plan Period;

        (iii)     100% of the Year One Completion Payment following the completion of the First Plan Period; and

        (iv)     100% of the Year Two Completion Payment following the completion of the Second Plan Period.

d.      Corporate Group A:

        (i)      100% of both the Year One Completion Payment and Year Two Completion Payment following the completion of the Second Plan Period.

e.      Corporate Group B:

        (i)      50% of the Year One Completion Payment following the completion of the First Plan Period; and

        (ii)     50% of the Year One Completion Payment and 100% of the Year Two Completion Payment following the completion of the Second Plan Period.

### (iv)    Termination of Employment

49.    ***Voluntary Termination and Involuntary Termination for Cause***.  Upon the involuntary termination of employment of a Plan Participant for Cause (as defined in the Nortel Special Incentive Plan) or the voluntary termination of employment by a Plan Participant for any reason (other than a voluntary termination relating to a transfer, as described in paragraph 52 below), the right to any unpaid Payment of such Plan Participant (the "Unpaid Payments") will be forfeited on the date of such employment termination and such Plan Participant will have no further rights under the Nortel Special Incentive Plan.

50.    ***Involuntary Termination During First Plan Period***.  Except as stated to the contrary in a Plan Participant's participation letter, upon the involuntary termination of employment of a Plan Participant during the First Plan Period for reasons other than an involuntary termination for Cause, any Unpaid Payment that is a Year One Completion Payment generally will be accelerated and paid on the 90th day following the date of termination of employment (subject to certain exceptions for NBS Group A Plan Participants in order to comply with Section 409A of the Internal Revenue Code), provided that the Plan Participant has executed and not revoked a release of all claims with respect to the Nortel Special Incentive Plan.  Any Unpaid Payment that is a Year One Performance Payment will be paid at the same time as all other such Performance Payments are made to other Plan Participants in the same group who are actively employed on the relevant Payment Date, unless otherwise required by applicable law.  Such Plan Participants shall not be eligible for any portion of the Year Two Performance Payment or Year Two Completion Payment.

51.    ***Involuntary Termination During Second Plan Period***. Upon the involuntary termination of employment of a Plan Participant during the Second Plan Period for reasons other than an involuntary termination for cause, any Unpaid Payment that is a Completion Payment

22

generally will be accelerated and paid on the 90th day following the date of termination of employment (subject to certain exceptions for NBS Group A Plan Participants in order to comply with Section 409A of the Internal Revenue Code), provided that the Plan Participant has executed and not revoked a release of claims with respect to the Nortel Special Incentive Plan. Any Unpaid Payment that is a Performance Payment will be paid at the same time as all other such Performance Payments are made to other Plan Participants in the same group who are actively employed on the relevant Payment Date, unless otherwise required by applicable law.

52.    ***Termination Due to Transfer to a Purchaser.***  In the event that a Plan Participant's employment terminates as a result of such Plan Participant's transfer to a Purchaser or an employer to which Nortel services have been outsourced, such Plan Participant's termination shall be treated in accordance with paragraphs 50 and 51 above, underlined provided that both the appropriate Debtor and the Purchaser agree in advance in writing to such transfer and the effective date of such transfer.

### (v)    Discretionary Pool

53.    As part of the Nortel Special Incentive Plan, the Debtors and the Canadian Debtors have committed to a "discretionary pool" of a maximum of $20 million (the "Discretionary Pool") from which Plan Participants may receive additional payments. Qualification for payments from the Discretionary Pool will be based on additional performance metrics developed by the Debtors and the Canadian Debtors, in consultation with the Committee, the Bondholder Group and the Monitor.  These performance metrics will be tied to, among other things, creditor recoveries.  To the extent that the Debtors and/or the Canadian Debtors seek to make payments from the Discretionary Pool, further approvals will be sought from this Court and the Canadian Court.

E.    **The Employment Agreements**

54.    The Debtors' senior employees currently face a number of unique challenges and demands on their time and expertise due to Nortel's ongoing transformation.  Among other things, the senior employees are working in their respective business areas to effectuate a successful plan of reorganization and sale of business assets, while also, in most cases, performing all of their normal duties.  In addition, as a result of certain senior employees moving to Purchasers or leaving for other employment opportunities, certain employees have agreed to take on new substantial roles.  In particular, the Debtors have requested that these senior executives take on expanded roles and have approved new employment agreements with these three executives, Christopher Ricaurte, Donald McKenna, and John Veschi (the "Executives"), reflecting their new roles and responsibilities (the "Employment Agreements").[13]  The Debtors believe that the Employment Agreements are necessary to adequately compensate the Executives for their new roles and responsibilities that they will undertake as a result of Nortel's changed business and its restructuring efforts.

55.    The Monitor, the Committee and the Bondholder Group were consulted regarding the Employment Agreements and offered an opportunity to review and evaluate them.   After several weeks of good faith negotiations involving the Debtors, the Committee, the Bondholder Group, and the Principal Officer, the Employment Agreements were offered to the Executives.

---

[13]    The Employment Agreements have been provided to the Monitor, the Committee and the Bondholder Group and will be provided to the U.S. Trustee.

***Compensation and Employment Terms***[14]

56.    ***Christopher Ricaurte.***  Pursuant to his Employment Agreement, Mr. Ricaurte will continue to be employed by NNI and will serve as President of NBS compensated at a base salary of $600,000 calculated on a per annum basis and paid bi-weekly.  As a participant in the AIP, Mr. Ricaurte's annual AIP target award will be 100% of his base salary.  Mr. Ricaurte will also be eligible to receive a special incentive payment of up to $2,500,000 to be earned as follows:

(a)  $837,500 for the period of January 1, 2010 to December 31, 2010, based on the achievement of reasonable business performance objectives as determined by March 15, 2010 by the Principal Officer, in consultation with the Monitor, the Committee, the Bondholder Group (collectively, the "Group");

(b)  $837,500 for the period of January 1, 2011 to December 31, 2011, based on the achievement of reasonable business performance objectives as determined by March 15, 2011 by the Principal Officer, in consultation with the Group;

(c)  $206,250 subject to his continued employment with Nortel through December 31, 2010; and

(d)  $618,750 subject to his continued employment with Nortel through December 31, 2011.

As President of Nortel Business Services, Mr. Ricaurte leads the NBS global organization tasked with maximizing value and managing assets for the various estates while delivering quality and timely services associated with TSAs.  NBS has played a significant part in the successful divestiture of Nortel businesses and Mr. Ricaurte and his leadership team will continue their critical involvement in the sale of Nortel's remaining businesses.

57.    ***Donald McKenna.***  Pursuant to his Employment Agreement, Mr. McKenna will continue to be employed by NNI as Vice-President of Supply Chain Services and Real Estate

---

[14]    The summaries and descriptions of the terms and conditions of the Employment Agreements set forth in the Motion are intended solely for informational purposes to provide the Court and parties in interest with an overview of significant terms thereof and should only be relied upon as such.  The summaries and descriptions are qualified in their entirety by the Employment Agreement.  In the event there is a conflict between the Motion and the Employment Agreements, the Employment Agreements shall control in all respects.

compensated at a base salary of $475,000 calculated on a per annum basis and paid bi-weekly.

As a participant in the AIP, Mr. McKenna's annual target award will be 100% of his base salary.

Mr. McKenna will also be eligible to receive a special incentive payment of up to $1,600,000 to

be earned as follows:

> (a) $536,000 for the period of January 1, 2010 to December 31, 2010, based on the achievement of reasonable business performance objectives as determined by March 15, 2010 by the Principal Officer, in consultation with the Group
>
> (b) $536,000 for the period of January 1, 2011 to December 31, 2011, based on the achievement of reasonable business performance objectives as determined by March 15, 2011 by the Principal Officer, in consultation with the Group;
>
> (c) $132,000 subject to his continued employment with Nortel through December 31, 2010; and
>
> (d) $396,000 subject to his continued employment with Nortel through December 31, 2011.

As Vice President of Supply Chain Services and Real Estate, Mr. McKenna is focused on

ensuring day-one readiness for all Supply Chain Services processes for Nortel's remaining

divestitures.  Mr. McKenna and his organization maintain a support infrastructure to Purchasers

under the TSAs, including all global sourcing activities, supplier governance and compliance, the

stable delivery of repair services, order fulfillment and transportation management.  Mr.

McKenna will also focus on managing cost and inventory flow and the monetization of all

inventory and capital assets, including the selling and leasing of all real estate properties

throughout the wind-down and transfer of services.

58.    *John Veschi.*  Pursuant to his Employment Agreement, Mr. Veschi will continue

to be employed by NNI as Chief Intellectual Property Officer compensated at a base salary of

$340,000 calculated on a per annum basis and paid bi-weekly.  As a participant in the AIP, Mr.

Veschi's annual target award will be 75% of his base salary ($255,000).  Mr. Veschi will also be

eligible to receive a special incentive payment of up to $400,000 to be earned as follows:

26

(a) $134,000 for the period of January 1, 2010 to December 31, 2010, based on the achievement of reasonable business performance objectives as determined by March 15, 2010 by the Principal Officer, in consultation with the Group

(b) $134,000 for the period of January 1, 2011 to December 31, 2011, based on the achievement of reasonable business performance objectives as determined by March 15, 2011 by the Principal Officer, in consultation with the Group;

(c) $33,000 subject to his continued employment with Nortel through December 31, 2010; and

(d) $99,000 subject to his continued employment with Nortel through December 31, 2011.

As Chief IP Officer, John Veschi leads a multifunctional team equipped with technical, business and legal skills who drive the strategy to protect and leverage Nortel's intellectual property (IP). Already, Nortel's IP has played a critical role in ensuring the company received and will receive maximum returns for the divested businesses.  As there is a very significant amount of IP that has not been included as part of the business sales, Nortel holds on to a highly valuable asset in its IP portfolio.  Mr. Veschi will lead the effort to identify and quantify strategic options and implement the selected direction, so as to maximize the value to the estates.

59.    The Debtors believe that the compensation contemplated for the Executives is fair and reasonable in light of industry practice, market rates both in and out of chapter 11 proceedings and the scope of work to be performed.

**Basis for Relief**

60.    The Debtors seek authority pursuant to section 363(b) of the Bankruptcy Code to (i) implement the Nortel Special Incentive Plan; (ii) enter into the Employment Agreements; and (iii) make immediate payments to NBS Employees and Corporate Group Employees of awards related to the Third Milestone of the Initial Plans as set forth herein.  The Debtors submit that the relief requested is reasonable and necessary under the circumstances and justified.

**A.      The Nortel Special Incentive Plan and the Employment Agreements Satisfy the Standards of Section 363(b) of the Bankruptcy Code**

61.      Section 363(b)(1) of the Bankruptcy Code permits a debtor-in-possession to use property of the estate "other than in the ordinary course of business" after notice and a hearing. 11 U.S.C. § 363(b)(1).  Use of estate property outside the ordinary course of business may be authorized if the debtor demonstrates a "sound business purpose" for it.  See Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.), 722 F. 2d 1063, 1071 (2d Cir. 1983) ("The rule we adopt requires that a judge determining a 363(b) application expressly find from the evidence presented before him a good business reason to grant the application."); In re Delaware Hudson Ry. Co., 124 B.R. 169, 179 (Bankr. Del. 1991).

62.      Once a debtor articulates a valid business justification for a particular form of relief, the Court reviews the debtor's request under the "business judgment rule."  The business judgment rule "is a presumption that in making a business decision, the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action was in the best interests of the company."  Smith v. Van Gorkom, 488 A.2d 858, 872 (Del. 1985).  The business judgment rule has vitality in chapter 11 cases and shields a debtor's management from judicial second-guessing.  See Myers v. Martin (In re Martin), 91 F.3d 389, 395 (3d Cir. 1996) (citing Fulton State Bank v. Schipper (In re Schipper), 933 F.2d 513, 515 (7th Cir. 1991)); Dai-Ichi Kangyo Bank, Ltd. v.  Montgomery Ward Holding Corp. (In re Montgomery Ward Holding Corp.), 242 B.R. 147, 153 (D. Del. 1999).

**(i)      Implementing the Nortel Special Incentive Plan is in the Best Interests of the Debtors, Their Estates, and All Parties in Interest.**

63.      The payments contemplated under the Nortel Special Incentive Plan are appropriate to properly compensate and motivate the Debtors' necessary employees at this stage of the chapter 11 proceedings.  Particularly now, as many of the Debtors' valuable employees

28

have been or are being transferred to the Purchasers as part of the Sales Transactions or have otherwise left the Debtors for other employment, it is critical that the Debtors, and Nortel as a whole, continue to employ a skilled, dedicated workforce capable of carrying out the remaining tasks associated with Nortel's global insolvency proceedings.

64.    The Debtors strongly believe that without the Nortel Special Incentive Plan, the Plan Participants' morale will be impaired at the very time that their dedication and cooperation in completing Nortel's next steps are most critical.  Given that the Debtors are in the process of transferring services associated with their major businesses to the Purchasers and seeking to sell their remaining businesses, the Debtors are concerned that the failure to provide the incentives contemplated by the Nortel Special Incentive Plan will lead to necessary employees leaving their jobs to pursue long-term employment opportunities with more stable employers.  Given the limited prospects presented by the Debtors, the Nortel Special Incentive Plan has been designed to incentivize the Plan Participants to remain at their jobs through the successful transfer of the Debtors' business operations to the Purchasers and through the orderly and efficient conclusion of the global insolvency proceedings by providing them with appropriate security and compensation to address the uncertainty presented by the Debtors.  The Nortel Special Incentive Plan has also been designed to incentivize the Plan Participants to strive to make the business operations transfer as successful as possible and to maximize the value to be returned to the creditors of the Debtors at the conclusion of the chapter 11 cases.  The Debtors believe that the Nortel Special Incentive Plan will create a meaningful level of stability, morale and motivation in the workplace and will allow the Debtors' necessary employees to continue to effectively manage the Debtors' businesses and the transfer of those businesses that have been sold.

65.     If the Debtors were to experience significant attrition among the ranks of its necessary employees, the Debtors would be forced to fill positions with temporary employees who would lack the experience and knowledge base possessed by the necessary employees covered by the Nortel Special Incentive Plan.  Without that experience and knowledge, temporary employees would hinder the Debtors' operations.  Moreover, finding employees willing to fill those positions on a temporary basis, knowing that such positions are not permanent would be extremely difficult and, even if such temporary employees could be hired, training these new employees would present a significant drain on the resources of the Debtors and their current employees.

     **(ii)**      **The Employment Agreements Are in the Best Interests of the Debtors, Their Estates, and All Parties in Interest.**

66.     The Employment Agreements are necessary to adequately compensate the Executives for the new roles and responsibilities that they will undertake as a result of Nortel's changed business and its restructuring efforts.  The Debtors believe that the compensation contemplated for the Executives is fair and reasonable in light of industry practice, market rates both in and out of chapter 11 proceedings and the scope of work to be performed.  The role of the Executives is critical to (i) the day-to-day operational management of the Debtors' businesses, (ii) the Debtors' efforts to maximize recoveries for creditors of the Debtors, (iii) the Debtors' efforts to market and sell their remaining businesses and assets, and (iv) ultimately, vital to obtaining a favorable outcome in these chapter 11 cases.  The continued employment of the Executives will ensure that critical management functions related to the Debtors' bankruptcy cases and sale processes are effectively discharged.  Accordingly, the Debtors believe that the Employment Agreements reflect an exercise of the Debtors' sound business judgment.

67.     For these reasons, the Debtors submit that the implementation of the Nortel

Special Incentive Plan and the Employment Agreements are within the Debtors' sound business

judgment and is in the best interests of the Debtors, their estates and their creditors.

**B.      Immediate Payment of the Initial Plans' Third Milestone to the NBS and Corporate Group Employees Satisfies the Standards of Section 363(b) of the Bankruptcy Code**

68.     The Debtors request that the Court authorize the immediate vesting and related

payment of awards tied to the Third Milestone (the "Third Milestone Awards") to participants of

the Initial Plans employed by either NBS or the Corporate Group.[15]  As discussed below,

immediate payment of the Third Milestone Awards to eligible NBS and Corporate Group

Employees is necessary to (i) reflect that since the time the Initial Plans were designed, the

objective of the bankruptcy has changed from reorganizing the Debtors' businesses as they

existed on the Petition Date to an orderly disposition of operating businesses and maximizing the

value of residual assets, and (ii) ensure that employees in NBS and the Corporate Group are not

penalized for their continued efforts to benefit the estates.  Nortel estimates that the total cost of

paying the Third Milestone Awards to applicable NBS and Corporate Group Employees across

all entities is approximately $3.8 million.  The Debtors' portion of the aggregate payments of the

Third Milestone Awards is estimated to be approximately $2.01 million.

69.     ***Payment of the Third Milestone Awards is necessary to reflect changed***

***objectives.***  When the Initial Plans were drafted, the objective was a reorganization of Nortel and

emergence from bankruptcy as a going concern.  Accordingly, the Third Milestone was tied to

"the later of the confirmation by the US court of a plan of reorganization in the United States or

the confirmation by the Canadian court of a plan or plans of restructuring and/or arrangement in

Canada plan of reorganization."  However, following the announcements on June 19, 2009 that

---

[15]     This request excludes two executives within the Corporate Group.

Nortel was advancing in its discussions with external parties to sell its businesses, the key objective in the bankruptcy became the sale of Nortel's businesses.  The emphasis on motivating, incentivizing and retaining employees who could facilitate the sale of the businesses and other restructuring activities was reinforced with the announcement on August 10, 2009 that Nortel was at a natural transition point resulting in a number of leadership changes and a new organizational structure designed to work towards the completion of the sales of its businesses and other restructuring activities.

70.    Because the objective of Nortel's global insolvency proceedings became the orderly disposition of Nortel's businesses, the Third Milestone should be tied to the sales of Nortel's operating businesses rather than confirmation of a plan of reorganization.  As discussed above, due to the efforts of the participants for which payment of the Third Milestone Awards is sought, Nortel has sold a majority of its businesses through various sales.  Accordingly, it is necessary to pay the Third Milestone Awards to the NBS and Corporate Group Employees to fairly compensate them for their tireless efforts in achieving the critical objective of selling a majority of the company.

71.    ***Payment of the Third Milestone Award is necessary to avoid penalizing employees who continue to benefit the estates.***  Under the Initial Plans, the Third Milestone is accelerated for involuntarily terminated employees and those transferred as part of the business sales.  However, because the Initial Plans contemplated a reorganization of Nortel rather than the sale of its businesses, payments under the Third Milestone have not been made to the NBS and Corporate Group Employees.   These employees have worked towards and achieved the objective of selling a majority of the businesses.  Immediate payment of the Third Milestone

Award is necessary to avoid the inequity of penalizing the NBS and Corporate Group Employees for remaining with Nortel and continuing to work diligently to benefit the Debtors' estates.

72.     For the foregoing reasons, the Debtors believe that payment of the Third Milestone Award to the NBS and Corporate Group Employees is appropriate and in the best interests of the Debtors, their bankruptcy estates and all parties in interest.

**C.     The Nortel Special Incentive Plan Complies With Section 503(c) of the Bankruptcy Code**

73.     The Nortel Special Incentive Plan complies with section 503(c) of the Bankruptcy Code. Section 503(c) restricts transfers or payments by debtors for retention or severance and payments that are considered outside of the ordinary course and not justified by the facts and circumstances.[16]

74.     Sections 503(c)(1) and (c)(2) of the Bankruptcy Code are inapplicable to these circumstances. Section 503(c)(1) of the Bankruptcy Code limits payments to "insiders" to the extent such payments are made "for the purpose of inducing such person to remain with the debtor's business." 11 U.S.C. § 503(c)(1). Section 503(c)(2) of the Bankruptcy Code places restrictions on "severance payment[s]" to "insider[s]." 11 U.S.C. § 503(c)(2). Neither section 503(c)(1) nor 503(c)(2) of the Bankruptcy Code applies here because the Nortel Special Incentive Plan does not include retention payments or severance payments to insiders of the Debtors.

75.     Although the Nortel Special Incentive Plan may have some retentive aspects, the Nortel Special Incentive Plan is primarily an incentive plan designed to achieve the Debtors' desired performance goals in a timeframe that corresponds with the anticipated timeframe for the

---

[16]   Although the Canadian Debtors are not subject to Section 503(c)'s restrictions, the Nortel Special Incentive Plan has been structured in an attempt to treat employees in a substantially similar fashion across jurisdictions.

transition of business operations to the Purchasers and the conclusion of the insolvency proceedings.  See Global Home Prods. LLC, 369 B.R. 778, 785 (Bankr. D. Del. 2007) ("The entire analysis changes if a [] plan is not primarily motivated to retain personnel or is not in the nature of severance") (emphasis added); In re Nellson Nutraceutical, Inc., 369 B.R. 787, 802 (Bankr. D. Del. 2007) ("[A]lthough the modification of the [] bonus program has some retentive effect, it is for the primary purpose of motivating [the] employees and, thus, the limitations of section 503(c)(1) are not applicable."); In re Dana Corp., 358 B.R at 567, 571 (Bankr. S.D.N.Y. 2006) ("Dana II") ("[M]erely because a plan has some retentive effect does not mean that the plan, overall, is retentive rather than incentivizing in nature").

76.     Even if the Nortel Special Incentive Plan's treatment of NBS Employees and Corporate Employees were viewed separately, sections 503(c)(1) and (c)(2) of the Bankruptcy Code would still be inapplicable to these circumstances.  *First*, with respect to NBS Employees, the Nortel Special Incentive Plan is primarily an incentive plan.  For NBS Employees with a JCI of 5B, 6B, or 55, two-thirds of their Payments are performance-based.  For the remaining NBS Employees, half of their Payments are performance-based.  To the extent that the Payments to these remaining NBS Employees is not considered "primarily" incentive-based, the Debtors submit that none of these participants are insiders.  *Second*, although the Payments to the Corporate Group Employees are time-based, none of the Corporate Group Employees are insiders of the Debtors.  *Third*, neither the NBS Employees nor the Corporate Group Employees receive severance payments under the Nortel Special Incentive Plan.  Accordingly, the Nortel Special Incentive Plan does not include retention or severance payments to insiders of the Debtors.

77.    To the extent applicable, the Nortel Special Incentive Plan satisfies the requirements of section 503(c)(3) of the Bankruptcy Code.  Section 503(c)(3) of the Bankruptcy Code prohibits "transfers or obligations that are outside the ordinary course of business and not justified by the facts and circumstances of the case."  11 U.S.C. § 503(c)(3).  The Debtors submit that the Nortel Special Incentive Plan is justified by the "facts and circumstances" of this case and thus satisfies the applicable standards of section 503(c)(3) of the Bankruptcy Code.

78.    The standard for approval under the "facts and circumstances" test of section 503(c)(3) is similar to the business judgment standard for approval under section 363(b)(1) of the Bankruptcy Code. See, e.g., In re Nobex Corp., No. 05-20050 (MFW), 2006 WL 4063024, at *3 (Bankr. D. Del. Jan. 19, 2006) (section 503(c)(3) standard is that of the business judgment of the debtor); see also Dana II, 358 B.R. 567 at 576-77 (acknowledging the sound business judgment test as the standard of review for key employee incentive programs); In re Silicon Graphics, Inc., Case No. 06-10977 (BRL) (Bankr. S.D.N.Y. July 27, 2006) (approving employee incentive plan under business judgment standard pursuant to section 363 of the Bankruptcy Code); In re Movie Gallery, Inc., Case No. 07-33849 (DOT) (Bankr. E.D. Va. Feb. 29, 2008) (approving the debtor's key employee incentive plan under sections 363(b) and 503(c)(3)).

79.    Courts have examined certain factors to determine if incentive-based compensation programs are appropriate under section 503(c)(3). Among some of the factors on which courts have focused are:

    (a)    whether the plan is calculated to achieve the desired performance;

    (b)    whether the cost of the plan is reasonable within the context of the debtor's assets, liabilities, and earnings potential;

    (c)    whether the scope of the plan is fair and reasonable;

    (d)    whether the plan is consistent with industry standards;

(e)     whether the debtor engaged in due diligence related to the need for the plan, the employees that needed to be incentivized, and what types of plans are generally applicable in a particular industry; and

(f)     whether the debtor received independent counsel in performing due diligence and in creating and authorizing the incentive compensation.

See, e.g., In re Global Home Prods., LLC, 369 B.R. 778, 786 (Bankr. D. Del. 2007) (citing Dana II, 358 B.R. at 576-77).  Courts will balance the foregoing factors, and a debtor need not satisfy every factor to demonstrate that its proposed compensation structure should be approved.  See, e.g., Id. (holding that the debtors' performance-based compensation structure was a proper exercise of the debtors' business judgment even though, for instance, the debtors did not use a benefits consultant to structure the program).

80.     The Debtors submit that the overall cost of the Nortel Special Incentive Plan is reasonable because the plan will provide significant value to the Debtors' estate at a relatively small cost.  As stated above, the Purchasers of Nortel's businesses will fund 88% of the total payments under the Nortel Special Incentive Plan and the special incentive payments under the Employment Agreements.  In light of the size and complexity of the Debtors' businesses as well as the multitude of complex issues that have already arisen and will continue to arise in these bankruptcy cases, the Debtors submit that the amounts that they seek authority to pay as part of the Nortel Special Incentive Plan are reasonable and responsibly targeted.  Moreover, as set forth in greater detail in the Dempsey Declaration, the Nortel Special Incentive Plan is consistent with industry standards and was designed by Nortel's management, along with Mercer, an independent compensation consulting firm, after closely studying similar plans in high-tech industries and similar companies in circumstances similar to Nortel.  The Debtors, therefore, respectfully submit that the Nortel Special Incentive Plan satisfies all or nearly all of the factors considered by courts in approving such incentive schemes.

81.    The Nortel Special Incentive Plan is consistent with employee incentive plans approved in other chapter 11 cases.  See, e.g., In re Sharper Image Corp., No. 08-10322 (KG) (Bankr. D. Del. June 26, 2008) (approving incentive plan to employees and senior management for performance related to a wind-down process); In re American Home Mortgage Holdings, Inc., No. 07-11047 (CJS) (Bankr. D. Del. Nov. 28, 2007) (approving incentive plan to senior management for, among other things, performance related to wind-down process); In re New Century TRS Holdings, Inc., No. 07-10416 (KJC) (Bankr. D. Del. May 25, 2007) (approving sale-related incentive plan to senior management and retention and incentive pay to certain nonmanagement employees); In re Global Home Products, LLC, No. 06-10340 (JG) (Bankr. D. Del. May 30, 2006) (order authorizing payment of a one-time incentive bonus to certain management employees upon the closing of the going-concern sale); In re Nobex Corp., No. 05-20050 (MFW) (Bankr. D. Del. Jan. 19, 2006) (approving sale-based incentive compensation where plan participants' sale efforts would extend beyond their ordinary duties).

82.    For the foregoing reasons, the Debtors believe that approval of the Nortel Special Incentive Plan is appropriate and in the best interests of the Debtors, their bankruptcy estates and all parties in interest, and that the incentives proposed in the Nortel Special Incentive Plan are reasonable and necessary to motivate their critical employees to maximize the value of the Debtors' estates.

## Conclusion

83.    Throughout these chapter 11 cases, the Debtors have been focused on ensuring the best outcome for the greatest number of people including not only their creditors, but also their employees, customers and other stakeholders and they have done so in order to maximize the value of Nortel's estate to be distributed to its creditors.  As is clear from the above, the

breadth and complexity of the work to date and the remaining work for Nortel is significant in scope and requires specialized employees to bring the process to a successful conclusion.  The term of the Initial Plans will expire shortly as those plans were developed prior to the change in strategic direction announced last June.  The Plan Participants and the Executives were instrumental in the work completed to date and are essential to completing the remaining tasks including selling and transitioning assets, addressing claims and analyzing thousands of contracts.

84.    The Nortel Special Incentive Plan, the Employment Agreements, and the immediate payment of the Third Milestone Awards are fair and reasonable in the circumstances.  First, the loss of the Plan Participants and/or the Executives at this time would result in significant delays in achieving Nortel's objectives to maximize value to its creditor constituencies.  Second, the Nortel Special Incentive Plan and the Employment Agreements were developed in consultation with independent expert advisors, the Monitor, the Committee and the Bondholder Group.  Third, substantially all of the payments under the Nortel Special Incentive Plan and the special incentive payments under the Employment Agreements – approximately 88 percent – will be funded by the Purchasers of the businesses, as per the TSAs.  Finally, authorization of the immediate payment of the Third Milestone Award to NBS Employees and Corporate Group Employees reflects the changed circumstances of Nortel's restructuring and is appropriate and in the best interests of the Debtors.

## Notice

85.    Notice of the Motion has been given via hand delivery or first class mail to the (i) U.S. Trustee; (ii) counsel to the Committee; (iii) counsel to the Bondholder Group; and (iv) the general service list established in these chapter 11 cases.  The Debtors submit that under the circumstances no other or further notice is necessary.

38

## **No Prior Request**

86.    No prior request for the relief sought herein has been made to this or any other court.

*[Remainder of Page Intentionally Left Blank]*

WHEREFORE, the Debtors respectfully request that this Court (i) grant this Motion and the relief requested herein; (ii) enter the proposed order attached hereto; and (iii) grant such other and further relief as it deems just and proper.

Dated:  February 11, 2010
       Wilmington, Delaware

CLEARY GOTTLIEB STEEN & HAMILTON LLP

James L. Bromley *(admitted pro hac vice)*
Lisa M. Schweitzer *(admitted pro hac vice)*
One Liberty Plaza
New York, New York 10006
Telephone:  (212) 225-2000
Facsimile:  (212) 225-3999

- and -

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/ Ann C. Cordo*
Derek C. Abbott (No. 3376)
Eric D. Schwartz (No. 3134)
Ann C. Cordo (No. 4817)
Andrew R. Remming (No. 5120)
1201 North Market Street
P.O. Box 1347
Wilmington, Delaware 19801
Telephone:  (302) 658-9200
Facsimile: (302) 658-3989

*Counsel for the Debtors*
*and Debtors in Possession*