**EXHIBIT C**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

---------------------------------------------------------------X
:
*In re*                                                                       :    Chapter 11
:
Nortel Networks Inc., *et al.*,[1]                             :    Case No. 09-10138 (KG)
:
                              Debtors.         :    Jointly Administered
:
:
---------------------------------------------------------------X

**DECLARATION OF JOHN DEMPSEY IN SUPPORT OF DEBTORS' MOTION FOR ENTRY OF AN ORDER (A) APPROVING THE NORTEL SPECIAL INCENTIVE PLAN; (B) AUTHORIZING CERTAIN PAYMENTS UNDER THE KEY EMPLOYEE RETENTION PLAN AND KEY EXECUTIVE INCENTIVE PLAN; AND (C) APPROVING CERTAIN EMPLOYMENT AGREEMENTS**

      I, John Dempsey, declare under penalty of perjury as follows:

      1.      I am a Partner of Mercer (US) Inc. ("Mercer").  Mercer is a global leader in advising companies on management and employee incentive compensation programs.

      2.      I have been consulting for over 20 years, advising corporations undergoing major financial transitions including reorganizations, initial public offerings, leveraged buyouts and other acquisitions in matters relating to employment, employee benefits and executive compensation.  I design employment agreements, change of control agreements, annual and multi-year incentive programs and retention programs.  I joined Mercer in 1985 following my

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's tax identification number, are:  Nortel Networks Inc. (6332), Nortel Networks Capital Corporation (9620), Nortel Altsystems Inc. (9769), Nortel Altsystems International Inc. (5596), Xros, Inc. (4181), Sonoma Systems (2073), Qtera Corporation (0251), CoreTek, Inc. (5722), Nortel Networks Applications Management Solutions Inc. (2846), Nortel Networks Optical Components Inc. (3545), Nortel Networks HPOCS Inc. (3546), Architel Systems (U.S.) Corporation (3826), Nortel Networks International Inc. (0358), Northern Telecom International Inc. (6286), Nortel Networks Cable Solutions Inc. (0567) and Nortel Networks (CALA) Inc. (4226).  Addresses for the Debtors can be found in the Debtors' petitions, which are available at http://chapter11.epiqsystems.com/nortel.

graduation from Yale University where I obtained a Bachelor of Arts degree. In 1992, I obtained a Master Degree in Business Administration (MBA) from Ohio State University.

3. I have advised clients on compensation matters within the chapter 11 context, including Tribune Company, RH Donnelly, Caraustar Industries, CIT Group, Capmark Financial, FairPoint Communications, Inc., Aleris International, Inc., Stallion Oilfield Services Ltd., Georgia Gulf Corporation, Freedom Communications, Masonite International, Owens Corning, Kaiser Aluminum, Solutia, Dana Corporation, Oglebay Norton, Citation Corporation, Intermet Corporation, Venture Industries, Alterra, EaglePitcher, Allied Holdings, Mesaba Aviation, and FLAG Telecom. I have also worked on restructuring issues with Barrick Gold, Manulife, CareMark Rx, Archipelago and Sky Financial. I have provided expert testimony representing the debtor in the following chapter 11 cases: Nortel Networks, Tribune Company, Owens Corning, Dana Corporation, Citation Corporation, Intermet Corporation, Venture Industries and Allied Holdings.

4. I make this declaration in support of the Debtors' Motion For Entry of An Order (a) approving the Nortel Special Incentive Plan; (b) authorizing Certain Payments Under the Key Employee Retention Plan And Key Executive Incentive Plan; and (c) approving certain Employment Agreements (the "Motion").[2]

5. I am aware of the facts and circumstances relating to the Motion, and unless otherwise stated herein, I have personal knowledge of the facts set forth herein.

**A.  Background on the Nortel Special Incentive Plan**

6. Mercer has been engaged as Nortel's executive compensation consultant since 1998. Mercer has advised Nortel throughout its restructuring proceedings on compensation

---

[2] Capitalized terms used but not defined herein shall have the meaning ascribed to them in the Motion.

issues. In the initial stages of Nortel's insolvency proceedings in the United States and Canada, Mercer assisted Nortel in developing an incentive plan for Nortel's key senior executives (the "KEIP") and a retention plan for Nortel's key non-insider employees (the "KERP," and together with the KEIP, the "Initial Plans"). The Initial Plans were designed to incentivize certain employees determined through a complex selection process to be critical to Nortel's businesses to maintain their employment with Nortel and, in the case of the KEIP, to achieve restructuring goals that would allow Nortel to emerge from bankruptcy a more stable, stand-alone organization. The Initial Plans were approved by both the Bankruptcy Court and the Canadian Court in March 2009. To date the participants in the Initial Plans have achieved two of the three milestones envisioned under those plans, and the corresponding bonus awards have been paid to eligible participants of the Initial Plans.

7. While Nortel had expected to sell at least some portion of its business at the outset of the proceedings, the announcement of several major transactions, beginning in June 2009, reflected a significant shift in Nortel's business strategy. At this point, Nortel has undertaken numerous large-scale asset sale transactions, and as a result Nortel closed or is in the process of closing several major portions of its operations. Relatedly, Nortel has moved to a new organizational structure by which the remaining workforce is generally divided into two entities -- Nortel Business Services ("NBS") and Nortel Finance and Corporate Services (the "Corporate Group," and together with NBS, the "Business Units"). As part of this transition, the objective of the bankruptcy and the focus of employees has shifted from reorganizing the business and emerging as a stable organization to the execution of an orderly disposition of the operating units. This shift in the strategic objectives required management to reevaluate the employee incentive compensation arrangements.

8.      Nortel engaged Mercer in June 2009 to assist the company in creating the Nortel Special Incentive Plan to be a fair and market competitive compensation program aligned to these objectives.  Mercer understands that the main purpose of employees remaining with Nortel will be to complete the strategic goals of the restructuring and facilitate the completion of several critical goals related to the disposition of Nortel's businesses.  Employees of Nortel Business Services will primarily focus on maintaining the customer service and network performance levels during the sale and integration of businesses and providing the services required under various transition services agreements (the "TSAs") with buyers of Nortel's assets.  Employees of the Corporate Group will focus on maximizing the value distributable to creditors through the sale and the disposition of Nortel's remaining assets and facilitating the measurement and evaluation of all claims. The proposed Nortel Special Incentive Plan is designed to incentivize employees to achieve these objectives.

9.      In working with management to design the Nortel Special Incentive Plan, Mercer reviewed:  (1) the market competitiveness of the Nortel Special Incentive Plan award levels; (2) the market competitiveness of the resulting total direct compensation levels; (3) the prevalence and design of traditional compensation offered by employees in corporate wind-down scenarios; and (4) the terms of the executive employment agreements.  Additionally, I designed the Nortel Special Incentive Plan to comply with the 2005 amendments to the United States Bankruptcy Code, which mandate that supplemental compensation for corporate insiders be subject to performance-based achievements ("pay-for-performance") as opposed to simply requiring the insider to remain with the company through a fixed date ("pay-to-stay").

10.     Mercer has observed first-hand the serious attrition levels at Nortel.  Various senior executives, seen as critical to achieving the objectives outlined above, have voluntarily

departed Nortel in the past year. In Mercer's experience, there are eight key drivers of employee engagement.[3] The current situation at Nortel has effectively led to a loss of five of the eight critical factors that engage employees. Two of the eight drivers which are most notably lacking at Nortel are: (1) stability in senior management; and (2) job security comparable to that offered by other companies. The Nortel Special Incentive Plan is critical to re-establish employee engagement while simultaneously rewarding employees for incremental achievements necessary to drive the restructuring.

11.    Nortel's management, based on the advice of Mercer, decided to shift the compensation philosophy of Nortel largely to compensate for the loss of traditional drivers of employee engagement such as long-term job security. Additionally, Nortel management and Mercer considered the fact that employees remaining with Nortel will be effectively working themselves out of a job, with no promise of severance. This fact, among other things, led to the need for the development of the Nortel Special Incentive Plan. The Nortel Special Incentive Plan is necessary to Nortel engaging and incentivizing employees to preserve the value of the estate, contribute to an orderly and successful completion of the insolvency proceedings and, ensure compliance with the TSAs to fully realize the value anticipated to be earned from the various asset sales.

**B.    Identification of Plan Participants**

12.    The initial stages of designing the Nortel Special Incentive Plan involved determining the eligibility of each employee to participate in the plan and the award levels each employee would receive. I advised Nortel that all employees in the relevant Business Units

---

[3] These key drivers are: (1) Work gives employee a sense of accomplishment, (2) Managers demonstrate concern for well-being of employees, (3) Stable senior management, (4) Clear vision for the organization, (5) Job makes use of skills and abilities of employee, (6) Opportunity for continuous learning, (7) Job security as good as other companies can offer, (8) Paid fairly given employee performance and contribution to the organization

should be included in the Nortel Special Incentive Plan, in order that all employees would be incentivized to drive value, successfully execute the TSAs, and complete the restructuring. Additionally, I recommended that Nortel management conduct an assessment of each employee's criticality to the success of the restructuring and that each employee be assigned into one of three tiers according to management's determination of the employee's criticality (the "Tiers"). In assessing criticality and assigning employees to their respective Tiers, management considered the cost and the likelihood of finding a suitable replacement for such individual, the value of each employee's institutional knowledge, and the individual employee's past performance. Distinct from the individual employee criticality assessments, I further recommended specific award sizes appropriate for each Tier. The award sizes were then assigned to each employee according to each employee's level in the organization or "Job Complexity Indicator" ("JCI"), Job Family Group and the employee's assigned Tier.

13.    There are approximately 1,475 employees participating in the Nortel Special Incentive Plan (the "Plan Participants"): 1,408 participants in the Nortel Special Incentive Plan are employees of NBS, while 67 are employees in Corporate. In total, there are 866 plan participants that are employees of the Debtors. Payments under the Nortel Special Incentive Plan are based on a mix of achievement of specific performance metrics as well as time-based completion metrics depending on the individual's level and role within the organization. The vast majority of the Plan Participants will earn between 50% and 66% of their payments based on achievement of performance metrics, and less than 5% will receive 100% of their payments based solely on completion metrics. Individuals receiving payments based solely on completion metrics occupy roles where the setting of specific performance metrics is not possible due to the

need for flexibility in their assignments. No insiders of the Debtors will receive payments that are primarily based on completion metrics.

### C. Market Competitiveness of the Award Levels

14. Assuming that all Plan Participants achieve their maximum payment amount, the aggregate payout under the Nortel Special Incentive Plan and the special incentive payments under the Employment Agreements, defined in section E below, will be approximately $93 million, with approximately 90% of the cost being attributable to employees of NBS and 10% attributable to employees of the Corporate Group. Approximately 98% of the payments attributable to NBS Employees under the Nortel Special Incentive Plan and the special incentive payments under the Employment Agreements were built into the pricing of the services to be provided under the TSAs, as a result of which 88% of the aggregate cost of the Nortel Special Incentive Plan and the special incentive payments under the Employment Agreements is being passed through to the purchasers in those transactions. The aggregate payments attributable to the Corporate Group Employees will be born by the Debtors and the Canadian Debtors on a 42%/49% basis (the remaining amount is born by other Nortel entities).

15. In assessing the reasonableness of the payment levels associated with the Nortel Special Incentive Plan, I relied on incentive plans that have been approved by Bankruptcy Courts in a number of past chapter 11 cases. The companies for which these plans were approved reflect corporations that also pursued organized wind-down strategies as well as companies facing multi-jurisdictional issues, including: Circuit City, Capmark, Enron, Adelphia, Refco, and Lehman Brothers. My analysis relied predominantly on the average compensation of participants in the court-approved compensation plans, regardless of the size of the organization. My research has determined that the relevance of pre-filing revenues or total assets did not have a significant correlation with the size of the resulting compensation plans. In reviewing the

average annual payment sizes participants received, I found that the average annual payment, per employee, in Nortel's proposed Nortel Special Incentive Plan approximate the 25th percentile of observed case studies.

16. Additionally, I examined the cost of engaging outside professional advisors based on the cost of AP Services in General Motors residual bankrupt entity, Motors Liquidation Co. While the cost of outside advisors is not a direct comparison to employee compensation, it is important to consider the cost of replacement in the event that employees disengage. When comparing Nortel's senior employees to senior outside advisors and Nortel's lower-level employees to junior outside advisors, my analysis found that average total compensation of Nortel employees was substantially less than the cost of outside advisors. The cost of Nortel employee total compensation for lower level employees was approximately 25% of the cost of junior outside advisors, and senior employee total compensation was approximately 70% of the cost of senior outside advisors.

17. Based on my analysis of market compensation, the compensation proposed for Nortel employees as part of the Nortel Special Incentive Plan is reasonable, fair and competitive.

**D.     Prevalence and Design of Traditional Corporate Wind-Down Compensation**

18. In my experience, I have generally found that organizations pursuing a strategy involving the organized disposition of assets implement at least one form of supplemental compensation for employees, most commonly delivered in the form of severance. In 86% of the cases listed in Paragraph 15 above (including one additional case, BearingPoint), severance was generally provided to a subset of the employee population. In addition to severance, some organizations will provide additional pay in the form of retention and/or other performance-based compensation.

19. Additionally, in cases where the organizations had pre-existing supplemental compensation programs designed to drive the restructuring process that was expected to end in emergence from bankruptcy, these programs were either revised or replaced, to reflect the changing strategic objectives of the organization.

**E.    Terms of Executive Employment Agreements**

20. With respect to the three executive employees -- Christopher Ricaurte, Don McKenna and John Veschi (the "Executives") -- who have agreed to new employment agreements as described in the Motion (the "Employment Agreements"), I believe that the provisions of the employment agreements are both fair and reasonable in light of industry practice, market rates both in and out of chapter 11 proceedings and the scope of work to be performed. Mercer reviewed the Employment Agreements and found the provisions to be generally conservative relative to those found in typical, general industry employment contracts. The most conservative aspect of the employment agreements, relative to those Mercer has typically seen, is that no explicit provision exists providing executives severance or any other compensation, in either a Change-in-Control or Non-Change-in-Control scenario that results in the executives' termination of employment. Almost all traditional employment contracts provide for severance, and approximately half of Nortel's pre-bankruptcy telecommunications peer group include severance following Change-in-Control for two-to-three times compensation. The Employment Agreements are necessary to adequately compensate the Executives for their new and critical roles with respect to both the day-to-day operations of the business and the achievement of the goals associated with the conclusion of the insolvency proceedings.

**F.    Payment of the Third Milestone Award in the Initial Plans**

21. With respect to the immediate vesting and payment of the Third Milestone Award associated with the Initial Plans, estimated to cost approximately $3.8 million for Nortel overall

9

and approximately $2.01 million for the Debtors, I believe that payment of the Third Milestone Awards is both reasonable and necessary.[4] The Initial Plans were designed to motivate employees to complete the restructuring proceedings in anticipation of Nortel continuing to operate as a going concern following emergence from insolvency. Undoubtedly, over the past six months, Nortel's organizational objectives have shifted from reorganizing Nortel's businesses to an orderly disposition of the operating businesses and the maximization of value of the estates. Because the objective of Nortel's global insolvency proceedings became the orderly disposition of Nortel's businesses, the Third Milestone should be tied to the sale of Nortel's businesses rather than confirmation of a plan of reorganization. Accordingly, it is important that the Debtors pay the Third Milestone Awards to the NBS and Corporate Group Employees to fairly compensate them for achieving the critical objective of selling a majority of Nortel's businesses.

22. In further recognition of the changed objectives in Nortel's global insolvency proceedings, I believe that it is important to make a smooth transition from the Initial Plans to the implementation of the Nortel Special Incentive Plan that avoids any overlap between the two compensation schemes. The optimal way to achieve this smooth transition is to authorize the immediate payment of the Third Milestone Awards to the NBS and Corporate Group Employees.

23. Finally, payment of the Third Milestone Awards is necessary to avoid the inequity that would result from rewarding those participants in the Initial Plans who were terminated in 2009 or 2010 and therefore received their Third Milestone Award payment while withholding payment from the NBS and Corporate Group Employees who have continued their employment

---

[4] The Debtors are seeking authority to make immediate payment of the Third Milestone Award to NBS and Corporate Group employees, with the exception of two executives in the Corporate Group.

with Nortel and have not been paid the Third Milestone Award, which was tied to confirmation of a plan of reorganization.

## G. Conclusion

24. Nortel is a group of technology companies that designs, develops and deploys communication products, systems and solutions to its customers around the globe. From this point forward, Nortel employees will focus on executing sales transactions and ensuring the orderly transition of its operations to the buyers as well as maximizing the value of the estate for creditors while addressing other bankruptcy matters. To achieve these objectives, Nortel must engage its employees and motivate them to work diligently to achieve these aggressive goals, all the while realizing that they are effectively working themselves out of a job. As Mercer's analysis has revealed, Nortel is limited in its ability to engage employees outside of providing them supplemental compensation as other companies in similar chapter 11 cases have done.

25. Given the complexity and nature of Nortel's case and the fact that the purchasers of the Debtors' businesses will fund approximately 88% of the aggregate cost of both the Nortel Special Incentive Plan and the special incentive payments under the Employment Agreements, I believe that the use of a supplemental compensation program, the associated payment sizes, the resulting total compensation levels, and the terms of the employment contracts are market competitive, appropriate, and necessary to ensure that the transactions are successful and that the value of the Debtors' estates is maximized. Furthermore, authorization of the immediate payment of the remaining awards associated with the Initial Plans is appropriate and will aid in maximizing the value of the Debtors' estates.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct to the best of my knowledge, information and belief.

Dated: February 10, 2010

_____
        John Dempsey