IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| *In re*: | Chapter 11 |
| Nortel Networks Inc., *et al.*,[1] | Case No. 09-10138 (KG) |
| Debtors. | Jointly Administered |

## NOTICE OF FILING OF THIRTY-SEVENTH REPORT OF THE MONITOR OF THE CANADIAN NORTEL COMPANIES <u>IN THE CANADIAN PROCEEDINGS</u>

---

[1] The Debtors in the Chapter 11 Cases, along with the last four digits of each Debtor's tax identification number, are: Nortel Networks Inc. (6332); Nortel Networks Capital Corporation (9620); Nortel Altsystems Inc. (9769); Nortel Altsystems International Inc. (5596); Xros, Inc. (4181); Sonoma Systems (2073); Qtera Corporation (0251); CoreTek, Inc. (5722); Nortel Networks Applications Management Solutions Inc. (2846); Nortel Networks Optical Components Inc. (3545); Nortel Networks HPOCS Inc. (3546); Architel Systems (U.S.) Corporation (3826); Nortel Networks International Inc. (0358); Northern Telecom International Inc. (6286); Nortel Networks Cable Solutions Inc. (0567) and Nortel Networks (CALA) Inc. (4226).

**PLEASE TAKE NOTICE** that on February 12, 2010, Ernst & Young Inc., the Monitor and foreign representative of Nortel Networks Corporation and certain of its direct and indirect subsidiaries, Nortel Networks Limited, Nortel Networks Technology Corporation, Nortel Networks Global Corporation, and Nortel Networks International Corporation, in proceedings under Canada's *Companies' Creditors Arrangement Act*, R.S.C. 1985, c. C-36, as amended, pending before the Ontario Superior Court of Justice (Commercial List), by its undersigned counsel, filed, in the above-captioned cases, a copy of the Thirty-Seventh Report of the Monitor (the **"Thirty-Seventh Report"**), dated February 11, 2010. A copy of the Thirty-Seventh Report is annexed hereto as Exhibit A.

**PLEASE TAKE FURTHER NOTICE** that a copy of the Thirty-Seventh Report is also available on the Monitor's website, www.ey.com/ca/nortel or upon request to the Monitor's counsel.

Dated: Wilmington, Delaware
February 12, 2010

ALLEN & OVERY LLP

Ken Coleman
Lisa Kraidin
1221 Avenue of the Americas
New York, New York 10020
Telephone (212) 610-6300
Facsimile (212) 610-6399
ken.coleman@allenovery.com
lisa.kraidin@allenovery.com

-and-

BUCHANAN INGERSOLL & ROONEY

By: /s/ Mary F. Caloway
Mary F. Caloway (No. 3059)
Peter J. Duhig (No. 4024)
The Brandywine Building
1000 West Street, Suite 1410
Wilmington, Delaware 19801
Telephone (302) 552-4200
Facsimile (302) 552-4295
mary.caloway@bipc.com

Attorneys for Ernst & Young Inc., as Monitor
and Foreign Representative of the Canadian Nortel
Group

## EXHIBIT A

Court File No. 09-CL-7950

*ONTARIO*
**SUPERIOR COURT OF JUSTICE**
**(COMMERCIAL LIST)**

IN THE MATTER OF THE *COMPANIES' CREDITORS*
*ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF
COMPROMISE OR ARRANGEMENT OF
NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED,
NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS
INTERNATIONAL CORPORATION AND NORTEL NETWORKS
TECHNOLOGY CORPORATION

**THIRTY-SEVENTH REPORT OF THE MONITOR**
**DATED FEBRUARY 11, 2010**

**INTRODUCTION**

1.  On January 14, 2009 (the "Filing Date") Nortel Networks Corporation ("NNC" and collectively with all its subsidiaries "Nortel" or the "Company"), Nortel Networks Limited ("NNL"), Nortel Networks Technology Corporation, Nortel Networks International Corporation and Nortel Networks Global Corporation (collectively the "Applicants") filed for and obtained protection under the *Companies' Creditors Arrangement Act* ("CCAA"). Pursuant to the Order of this Honourable Court dated January 14, 2009, as amended and restated (the "Initial Order"). Ernst & Young Inc. was appointed as the Monitor of the Applicants (the "Monitor") in the CCAA proceedings. The stay of proceedings was extended to April 23, 2010 by this Honourable Court in its Order dated January 18, 2010.

2.  Nortel Networks Inc. ("NNI") and certain of its U.S. subsidiaries concurrently filed voluntary petitions under Chapter 11 of Title 11 of the U.S. Bankruptcy Code (the "Code") in the United States Bankruptcy Court for the District of Delaware (the U.S. Court") on January 14, 2009 (the "Chapter 11 Proceedings") (collectively the

1

"U.S. Debtors").    As required by U.S. law, an official unsecured creditors committee (the "Committee") was established in January, 2009.

3.    An ad hoc group of holders of bonds issued by NNL and NNC has been organized and is participating in these proceedings as well as the Chapter 11 Proceedings (the "Bondholder Group"). In addition, pursuant to Orders of this Honourable Court dated May 27, 2009 and July 22, 2009, representative counsel was appointed on behalf of the former employees of the Applicants and on behalf of the continuing employees of the Applicants, respectively. Each of these groups is participating in the CCAA proceedings.

4.    Nortel Networks (CALA) Inc. ("NN CALA") filed a voluntary petition under Chapter 11 of Title 11 of the Code in the U.S. Court on July 14, 2009.

5.    Nortel Networks UK Limited ("NNUK") and certain of its subsidiaries located in EMEA were granted administration orders (the "UK Administration Orders") by the High Court of England and Wales on January 14, 2009 (collectively the "EMEA Debtors"). The UK Administration Orders appointed Alan Bloom, Stephen Harris, Alan Hudson and Chris Hill of Ernst & Young LLP as administrators of the various EMEA Debtors, except for Ireland, to which David Hughes (Ernst & Young LLP Ireland) and Alan Bloom were appointed (collectively the "Joint Administrators"). On June 8, 2009, the Joint Administrators appointed in respect of NNUK filed a petition with the U.S. Court for recognition of the administration proceedings as they relate to NNUK (the "English Proceedings") under Chapter 15 of the Code. On June 26, 2009, the U.S. Court entered an order recognizing the English Proceedings as foreign main proceedings under Chapter 15 of the Code.

6.    On January 20, 2009, Nortel Networks Israel (Sales and Marketing) Limited and Nortel Communications Holdings (1997) Limited (together "NN Israel") were granted administration orders by the court in Israel (the "Israeli Administration Orders"). The Israeli Administration Orders appointed representatives of Ernst &

2

Young LLP in the UK and Israel as administrators of NN Israel and provided a stay of NN Israel's creditors which, subject to further orders of the Israeli Court, remains in effect during the administration.

7.      Subsequent to the Filing Date, Nortel Networks SA commenced secondary insolvency proceedings within the meaning of Article 27 of the European Union's Council Regulation (EC) No 1346/2000 on Insolvency Proceedings in the Republic of France pursuant to which a liquidator and an administrator have been appointed by the Versailles Commercial Court.

**PURPOSE**

8.      The purpose of this Thirty-Seventh report of the Monitor (the "Thirty-Seventh Report") is to provide this Honourable Court with information in connection with the following:

   a) the Nortel Special Incentive Plan;

   b) the Applicants' request for a court-ordered charge in the CCAA Proceedings relating to certain amounts payable pursuant to the Nortel Special Incentive Plan;

   c) the Applicants' request for a Reserve Pool (defined later in this Report);

   d) the Applicants' request with respect to timing of the payment of certain amounts relating to the 2009 KEIP and 2009 KERP (as defined later in this Report); and

   e) Applicants' request for the sealing of the Confidential Supplement to the Thirty-Seventh Report and attached appendices.

3

## TERMS OF REFERENCE

9. In preparing this Thirty-Seventh Report, the Monitor has relied upon unaudited financial information, the Company's books and records, financial information prepared by the Company and discussions with management of Nortel. The Monitor has not audited, reviewed or otherwise attempted to verify the accuracy or completeness of the information and accordingly, the Monitor expresses no opinion or other form of assurance on the information contained in this Thirty-Seventh Report.

10. Unless otherwise stated, all monetary amounts contained herein are expressed in US dollars.

11. Capitalized terms not defined in this Thirty-Seventh Report are as defined in the Affidavit of John Doolittle sworn on January 14, 2009 (the "Doolittle Affidavit"), the Pre-Filing Report, previous Reports of the Monitor or the Nortel Special Incentive Plan.

12. The Monitor has made various materials relating to the CCAA proceedings available on its website at www.ey.com/ca/nortel. The Monitor's website also contains a dynamic link to Epiq Bankruptcy LLC's website where materials relating to the voluntary proceedings under Chapter 11 of the Code are posted.

## GENERAL BACKGROUND AND APPLICANTS' ACHEIVMENTS

13. Since September 30, 2009, Nortel has conducted its global business through four reportable business unit segments: Wireline and Wireless Networks ("WN"), Metro Ethernet Networks ("MEN"), Carrier Voice Application Solutions ("CVAS") and LG Nortel Co. Ltd. ("LGN"). As of September 30, 2009, the Enterprise Solutions business was accounted for as a discontinued operation. The revenue and assets of each of the business units, except for LGN, are distributed among the multiple Nortel legal entities and joint ventures around the world.

*Applicants' Achievements to Date*

14. At the commencement of the CCAA proceedings, the Applicants announced their intention to assess their business strategy and consider restructuring opportunities with a view to emerging as a stronger company. As such, in the months following the Filing Date, the Applicants took numerous actions to reduce costs and realize efficiencies, including the following:

   a) significant headcount reductions totalling to date approximately 9,200 (37%) of the global workforce, including approximately 1,650 (28%) of the Canadian workforce, and cessation of certain payments to former employees;

   b) settlement of virtually all claims with Nortel's largest supplier, Flextronics as provided for by the following agreements:

      i. the Flextronics Amending Agreement dated January 13, 2009 (as defined in the Doolittle Affidavit) and approved by this Honourable Court on January 14, 2009. Pursuant to the Flextronics Amending Agreement, Flextronics agreed to continue to supply product to Nortel post-filing and NNL agreed to certain additional terms, including:

         a. to purchase certain Flextronics inventory in the total amount of $120 million payable in four instalments between January 14, 2009 and July 1, 2009;

         b. to submit purchase orders on a quarterly basis for certain other inventory; and

         c. to pay on a weekly basis for goods supplied during the immediately previous week;

5

    ii. a settlement agreement and side letter dated May 22, 2009, which clarified the interpretation of the Amending Agreement and other related matters. This settlement agreement and side letter were approved by this Honourable Court on June 16, 2009; and

    iii. a settlement and release agreement executed by Nortel and Flextronics on November 20, 2009. This settlement and release agreement was approved by this Honourable Court on December 2, 2009. The terms of this settlement and release agreement:

        a. provided a mechanism for the transfer of the supply relationship to parties purchasing certain business assets of Nortel;

        b. resolved the settlement of certain claims between Nortel and Flextronics, necessary to facilitate the sale of certain business assets of Nortel; and

        c. resolved certain other claims between the parties related to open pre-filing accounts receivable and payable;

c) termination, repudiation or rejection of redundant contracts and real property leases, including the Applicants' former corporate head office lease at 195 The West Mall and subsequent relocation to significantly smaller premises at 5945 Airport Road on or about December 1, 2009;

d) the sale of certain non-core assets, including:

    i. the Layer 4-7 business, which closed on April 1, 2009 for gross proceeds of approximately $18 million;

6

ii.  the assets associated with the development of Next Generation Packet Core network components on December 4, 2009 for gross proceeds of approximately $10 million;

iii.  the "Westwinds Facility" in Alberta, which closed on June 16, 2009 for gross proceeds of approximately CDN$87 million; and

iv.  the Strandherd Lands, near Ottawa, which closed December 17, 2009 for gross proceeds of approximately CDN$8 million; and

e)  the commencement of a sale process with respect to its shareholder interest in LGN, which sale process is still underway.

15.  In June 2009, the Applicants entered into the Interim Funding and Settlement Agreement (the "IFSA"), which was approved by this Honourable Court on June 29, 2009. The IFSA provided, among other things, funding to NNL from NNI for the period from the Filing Date through September 30, 2009. The funding satisfied any claims NNL may have had against NNI for reimbursement of corporate overhead and R&D costs, whether pursuant to the TPA or otherwise, incurred by NNL on behalf of NNI during such period. The total amount of such funding received was $187.4 million.

16.  On June 19, 2009, in conjunction with the announcement of the sale of substantially all of the assets of the CDMA/LTE Access business, Nortel also announced a significant change in its strategic direction, indicating it was proceeding with discussions with several parties to sell its other business units.

17.  To date, Nortel has closed the sale of the following business units:

a)  the CDMA/LTE Access business on November 13, 2009, resulting in approximately $1.13 billion of net proceeds, subject to final closing adjustments; and

7

b) the Enterprise Solutions business on December 18, 2009, resulting in approximately $900 million of net proceeds, subject to final closing adjustments.

18. Nortel also anticipates additional net proceeds, subject to closing adjustments, upon the closing of the following previously announced business unit sale transactions:

a) the MEN business which is expected to close in March 2010 for proceeds of approximately $769 million, including the take back of a convertible note due 2017;

b) the GSM/GSM-R business which is currently expected to close in March 2010 for proceeds of approximately $103 million; and

c) the CVAS business for proceeds of at least $180 million (after certain balance sheet and other adjustments estimated to reduce the gross proceeds by approximately $100 million) based on the current "Stalking Horse" bid. The scheduled bid deadline is February 23, 2010 and to the extent additional "qualified bids" are received, the auction is scheduled to take place on February 25, 2010.

19. As a result of the sales already closed or announced, approximately 13,000 Nortel employees have transferred or will be transferred to the buyers of these business units, including approximately 3,500 Canadian employees.

20. In August 2009, Nortel announced its President and Chief Executive Officer was stepping down and the complement of its board of directors for NNC and NNL would be reduced from nine to three. Nortel also announced several organizational changes, including the creation of Nortel Business Services ("NBS") and the Corporate Group ("CG") to transition and align its resources to focus on the divestiture of its businesses and other assets. NBS and CG are described in more detail later in this Report.

8

21. In order to facilitate their continued ability to operate and participate in global asset sales, Nortel has also restructured certain intercompany indebtedness of its Asia Pacific affiliates pursuant to the APAC Settlement approved by this Honourable Court on December 2, 2009.

22. In December 2009, the Applicants entered into the Canadian Funding and Settlement Agreement ("CFSA"), which was approved by this Honourable Court on January 21, 2010. The CFSA, which is described in more detail in the Thirty-Fifth Report, provides the Applicants with the funding necessary to continue operating throughout the remainder of the CCAA proceedings and to settle intercompany claims, including significant transfer pricing claims between the Applicants and the U.S. Debtors. The CFSA also provides NNL with further funding of $190.8 million from NNI.

23. The Applicants, along with the U.S. Debtors, also resolved significant outstanding transfer pricing issues with Canada Revenue Agency and United States Internal Revenue Service for the taxation years 2001 through 2005. This resulted in a $2 billion income adjustment between NNI and NNL, further details of which are provided in the Thirty-Fifth Report.

*Employee Matters*

24. Since the Filing Date, the Applicants also recognized the need to address current employee issues as well as the impact of the CCAA proceedings on former employees. The Applicants, in cooperation with the Monitor and other stakeholders, undertook the following initiatives:

   a) consensual appointments of employee representatives and representative counsel for the Applicants' former employees ("Former Employees") and employees on long term disability ("LTD Employees") on May 27, 2009 and July 30, 2009, respectively, as well as the appointment of representative counsel for the Applicants' current employees on July 22, 2009;

9

b) establishment of an employee hardship application process, approved by this Honourable Court on July 30, 2009, as described in more detail in the Sixteenth Report. The employee hardship application process has been extended twice since its initial implementation and is currently set to expire on April 23, 2010;

c) continuation of medical and dental benefits for pensioners;

d) continuation of benefits, including medical and dental benefits, for all LTD Employees;

e) ongoing contribution of current and special payments to the Applicants' registered pension plans;

f) payment of wages and benefits and the continuation of Nortel's annual incentive plan for current employees; and

g) establishment of a key employee retention plan ("2009 KERP") and a key executive incentive plan ("2009 KEIP") to incentivize those employees key to the restructuring to remain with the Applicants during the proceedings. The 2009 KERP and 2009 KEIP were approved by this Honourable Court on March 6, 2009 with the exception of one aspect of the 2009 KEIP, subsequently approved by this Honourable Court on March 20, 2009.

25.   On February 8, 2010, the Applicants announced they had reached an agreement with representatives of former and disabled Canadian employees on certain employment related matters, including the Applicant's registered pension plans and benefits for Canadian pensioners and LTD Employees ("Former Employee Settlement"). The Applicants and Monitor will be filing materials in due course for a motion seeking approval of the Former Employee Settlement.

10

*NBS and Corporate Group*

26. As previously indicated, Nortel created NBS and CG in August 2009.

*NBS*

27. NBS is a global business unit structure established to facilitate an orderly transition of business units sold to purchasers and the fulfillment of obligations pursuant to the related Asset Sales Agreements ("ASAs") and Transition Services Agreements ("TSAs").

28. NBS' mandate includes, but is not limited to, providing the following:

   a) IT infrastructure and applications services;

   b) research and development engineering services;

   c) human resource functions and transitional payroll services;

   d) order management and billing services;

   e) supply chain services, including inventory procurement on behalf of the purchasers;

   f) knowledge management services;

   g) finance, accounting and accounts receivable collection services; and

   h) real estate services.

29. These services will continue to be required as Nortel transitions the businesses to the purchasers over the next two years.

11

*NBS Leadership Change*

30. On February 3, 2010 Joseph Flanagan stepped down as President of NBS and Christopher Ricaurte succeeded him.

31. Mr. Ricaurte worked closely with Mr. Flanagan in establishing NBS and will provide the necessary leadership in negotiating TSAs with purchasers of the remaining business units and to continue providing effective delivery of services pursuant to the TSAs.

*Corporate Group*

32. CG's mandate is to focus on several key activities, including:

 a) completing the sale of the remaining significant business units (MEN, GSM, CVAS and Nortel's interest in LGN);

 b) initiating and completing the sale of remaining smaller business units and assets;

 c) exploring strategic alternatives for Nortel's remaining intellectual property;

 d) preparation of ongoing public reporting requirements;

 e) providing corporate administrative and management support to Nortel's affiliates on a global basis as Nortel provides transitional services and realizes upon its remaining assets;

 f) assisting in the creditor claims process, including the determination and resolution of compensation related claims;

 g) reconciling complex intercompany trade accounts and loans for establishing claims among the global entities and facilitating the repatriation of cash to the Applicants;

12

     h) developing a plan of arrangement; and

     i) implementing any court approved distributions to creditors.

33. Pursuant to the various ASAs and TSAs with the purchasers, approximately $140 million of the net proceeds from the sale of the various business units is currently or is anticipated to be held in escrow in relation to the provision of transition services and delivery of certain financial information. In order to maximize recovery of amounts held in escrow, NBS and CG need to retain the necessary resources and work cooperatively to successfully deliver the required transition services, financial statements and other deliverables to purchasers of the business units.

34. It is anticipated NBS and CG will continue to operate through the end of 2011 as obligations pursuant to the TSAs are fulfilled, remaining assets are realized, a plan of arrangement is developed and implemented and the remaining legal entities are ultimately wound-up.

THE NORTEL SPECIAL INCENTIVE PLAN

*Background and Projected Cost of the Nortel Special Incentive Plan*

35. The Applicants' 2009 KERP and 2009 KEIP are described in more detail in the Fourth Report.

36. The purpose of the 2009 KEIP and 2009 KERP was to incentivize key employees and encourage them to remain with Nortel during the restructuring period. The 2009 KEIP expires July 14, 2010 and the 2009 KERP on June 30, 2010.

37. Incentivizing and retaining the remaining employees is critical to the Applicants' ability to:

     a) complete their restructuring efforts, monetize remaining assets, develop strategic alternatives to maximize the value of Nortel's significant remaining

intellectual property portfolio, and complete and implement a plan of arrangement in a manner that maximizes the value of the Applicants' estates for the benefit of all stakeholders; and

b) perform for the duration of the TSAs entered into with purchasers of Nortel business units. Failure to perform by the Applicants pursuant to the TSAs could potentially expose them to liabilities or impair recoveries of certain amounts held in escrow pursuant to the APAs or TSAs, which would result in diminished returns to stakeholders.

38. The Nortel Special Incentive Plan has been designed by the Company to retain and incentivize the majority of remaining employees in NBS and CG as the 2009 KEIP and 2009 KERP expire and it continues with its divestiture and restructuring efforts and fulfillment of its obligations under the ASAs and TSAs.

39. The Nortel Special Incentive Plan is a global plan and is designed to provide cash incentive awards to certain employees of NNL, NNI and certain of their direct and indirect subsidiaries and affiliates.

40. The Nortel Special Incentive Plan does not include joint ventures or the EMEA filed entities as employees of the EMEA filed entities are subject to a separate time based key employee plan approved and implemented by the Joint Administrators.

41. As part of a joint hearing on March 3, 2010, the Applicants are seeking approval of the Nortel Special Incentive Plan by this Honourable Court for the Canadian participants and the Monitor understands the U.S. Debtors are seeking similar relief as well as approval of three employment agreements (the "Employment Agreements") that are separate and apart from the Nortel Special Incentive Plan from the U.S. Court.

42.  The Nortel Special Incentive Plan covers the majority of the employees in NBS and CG. Pursuant to the terms of the TSAs, NBS charges purchasers of the business units for services provided thereunder.

43.  Accordingly, it is anticipated that approximately 88% of the global aggregate cost of the Nortel Special Incentive Plan plus the special incentive payments under the Employment Agreements and approximately 80% of the cost of the Nortel Special Incentive Plan to the Applicants will be recovered from the purchasers.

44.  The rate of recovery of costs incurred pursuant to the Nortel Special Incentive Plan in Canada is lower than it is globally as Canada has a higher proportion of CG employees.

45.  The estimated unrecovered costs relating to the Applicants and the U.S. Debtors were reflected in the funding levels recently approved pursuant to the CFSA. These unrecovered costs have initially been split equally between the Applicants and the U.S. Debtors and in accordance with the CFSA will ultimately be trued-up based on relative proceed allocation between the Applicants and the U.S. Debtors.

46.  Globally, excluding EMEA and joint ventures, the Nortel Special Incentive Plan plus the Employment Agreements initially covers approximately 1,475 employees of the NBS and CG workforce, including 455 employees of the Applicants.

47.  The forecast aggregate cost of the Nortel Special Incentive Plan plus the special incentive payments under the Employment Agreements, assuming all plan participants achieve their Target Annual Payment Amount (as defined in the Nortel Special Incentive Plan) in each plan period, is approximately $93 million, prior to TSA recoveries from the purchasers. The forecast aggregate cost of the Nortel Special Incentive Plan relating to the Applicants is approximately $28 million prior to TSA recoveries ($16 million for 2010 and $12 million for 2011). Further details of the Nortel Special Incentive Plan as it relates to Canadian participants are provided in the Confidential Supplement to the Thirty-Seventh Report.

15

48. In developing the Nortel Special Incentive Plan, the Company consulted with Mercer (US) Inc. ("Mercer"), its compensation consultant. A document prepared by Mercer (the "Mercer Report"), outlining the proposed Nortel Special Incentive Plan and providing comparisons to certain market data has been attached to the Confidential Supplement to the Thirty-Seventh Report.

49. The Monitor will be filing a Confidential Supplement to the Thirty-Seventh Report that will include one or more confidential appendices containing certain specific financial information with respect to the Nortel Special Incentive Plan and individual compensation details of the Applicants' employees. This information is sensitive and confidential. The Applicants are requesting that the Confidential Supplement to the Thirty-Seventh Report and the confidential appendices thereto be sealed pending further Order of this Honourable Court.

50. Development of the Nortel Special Incentive Plan includes input from the Monitor, the Committee and the Bondholder Group.

*Significant Terms of the Nortel Special Incentive Plan*

51. A summary of the significant terms of the Nortel Special Incentive Plan is provided in the following sub-paragraphs. Reference should be made directly to the Nortel Special Incentive Plan, a copy of which is attached as Appendix "A" to this report, for a complete understanding of the terms governing the plan and for capitalized terms not otherwise defined herein.

*Participating Employees*

a) The potential Plan Participants have been selected in accordance with criteria approved by the Boards of Directors of NNL and NNI (the "Boards") and developed in consultation with the Monitor, the Committee, and the Bondholder Group;

16

b) Each employee selected for participation in the Nortel Special Incentive Plan will receive a letter (the "Payment Letter") setting forth the Target Annual Payment Amount (as defined below) he or she may be eligible to receive pursuant to the Nortel Special Incentive Plan with respect to each applicable Plan Period (as defined below) and requiring such employee be bound by the terms and conditions of the Nortel Special Incentive Plan;

c) Upon execution and timely return of the Payment Letter, such employee will become a Plan Participant;

d) Each Plan Participant will be assigned to a Group, based primarily on their Job Complexity Indicator and Job Family Group (job function);

*Annual Payment Amount*

e) Each Plan Participant will be eligible to receive a payment in respect of each Plan Period up to an amount (the "Target Annual Payment Amount") set forth in the Payment Letter and as determined pursuant to guidelines and criteria developed by the Boards, in consultation with the Monitor, the Committee and the Bondholder Group;

f) Each Plan Participant's Total Annual Payment Amount shall be comprised of a component conditioned upon the completion of the Plan Participant's role during the relevant Plan Period (the "Completion Payment") and depending on the Group, may also include a component based on specific performance metrics determined by the Boards, in consultation with the Monitor, the Committee and the Bondholder Group (the "Performance Payment");

g) Depending on the Group, the Performance Payment shall comprise either 0%, 50%, or 66% of the Target Annual Performance Amount;

17

*Nortel Special Incentive Plan Periods*

h) The Nortel Special Incentive Plan shall have two plan periods (each a "Plan Period"). The First Plan Period shall commence on January 1, 2010 and end on December 31, 2010. The Second Plan Period shall commence on January 1, 2011 and end on December 31, 2011;

i) Except as otherwise provided for in the applicable Payment Letter, a Plan Participant shall be eligible to participate in the Second Plan Period only if such Plan Participant is actively employed by the Company on January 1, 2011 and before that date has not received notice of the Company's intention to terminate such Plan Participant's employment;

*Payment Process*

j) With respect to each Plan Period, a Plan Participant's Performance Payment shall be determined by reference to the level of achievement in respect of "Performance Metrics" during such Plan Period. Performance Metrics will be established by the Boards, in consultation with the Monitor, the Committee and the Bondholder Group. The Performance Metrics will include (although may not be limited to): (a) NBS net cash from operations; (b) recovery value of leave behind assets in NBS; and (c) some performance against TSA measured in quantity and timeliness. A Performance Payment in respect of the First Plan Period is known as a "Year One Performance Payment" and a Performance Payment in respect of the Second Plan Period is known as a "Year Two Performance Payment". A Completion Payment in respect of the First Plan Period is known as a "Year One Completion Payment" and a Completion Payment in respect of the Second Plan Period is known as a "Year Two Completion Payment";

k) In no event, shall a Performance Payment exceed the applicable Target Performance Payment;

l)  Depending on the Plan Participant's Group, some or all of the Completion
    Payment or Performance Payment with respect to the First Plan Period may be
    deferred until the completion of the Second Plan Period;

m)  Any Payment payable upon completion of the First Plan Period shall be made
    in a lump sum cash payment as soon as practicable following March 1, 2011,
    but in no event shall be later than April 30, 2011;

n)  Any Payment payable upon completion of the Second Plan Period shall be
    made in a lump sum cash payment as soon as practicable following March 1,
    2012, but in no event shall be later than April 30, 2012;

*Termination of Employment*

o)  Upon involuntary termination of a Plan Participant by the Company for cause
    or voluntary termination of employment by a Plan Participant for any reason,
    the right to any unpaid Payment Amounts will be forfeited;

p)  Upon the involuntary termination of employment of a Plan Participant by the
    Company, during the First Plan Period, for reasons other than an involuntary
    termination for cause or due to the death of such Plan Participant, any unpaid
    Completion Payment with respect to the First Plan Period shall be accelerated
    and any unpaid Performance Payment with respect to the First Plan Period
    shall be paid at the same time as all other such Performance Payments are
    made. Such Plan Participant shall not be eligible for any portion of the
    Completion Payment or Target Performance Payment with respect to the
    Second Plan Period;

q)  Upon the involuntary termination of employment of a Plan Participant by the
    Company, during the Second Plan Period, for reasons other than an
    involuntary termination for cause or due to the death of such Plan Participant,
    any unpaid Completion Payment with respect to the First or Second Plan

19

Period shall be accelerated and any unpaid Performance Payment with respect to the First or Second Plan Period shall be paid at the same time as all other such Performance Payments are made;

r) Payments which are accelerated due to the involuntary termination of employment of a Plan Participant by the Company, for reasons other than an involuntary termination for cause, shall be paid on the 30th day following the date of termination provided that on or before such 30th day; (i) the terminated Plan Participant has executed and submitted to the Company a release of all claims related to the Nortel Special Incentive Plan; and (ii) any statutory period during which the terminated Plan Participant is entitled to revoke the Release has expired without any such revocation having occurred;

*Other Plan Terms and Provisions*

s) The Nortel Special Incentive Plan shall be effective as of January 1, 2010 and shall expire on June 30, 2012;

t) Participation in the Nortel Special Incentive Plan does not constitute a promise of employment for any period of time or to change a Plan Participant's employment status;

u) All payments pursuant to the Nortel Special Incentive Plan shall be subject to applicable taxes and standard employment and withholding and deductions as determined by the relevant Participating Employer;

v) Subject to applicable law, a Plan Participant's participation in the Nortel Special Incentive Plan, Target Annual Payment Amounts, Payment Amounts, and Payments are confidential and a Plan Participant may not disclose such information with any other person except a Plan Participant's spouse, accountant, financial advisor or attorney, all of whom must be informed by the Plan Participant not to further disclose such confidential information;

20

w) The Nortel Special Incentive Plan shall be governed by the laws of Ontario and the laws of Canada applicable therein;

x) The obligation under the Nortel Special Incentive Plan with respect to any specific Plan Participant shall be the several obligation of his or her Participating Employer and will not be a joint obligation of any other Company entity.

*Discretionary Pool*

52. The Applicants and the U.S Debtors have also committed to a "discretionary pool" up to a maximum of $20 million (the "Discretionary Pool") which is part of the Nortel Special Incentive Plan and from which Plan Participants may receive additional payments. The metrics for determining qualification will be with input from the Board, the Monitor, the Principal Officer, the Committee and the Bondholder' Group. The metrics will be tied to, among other things, creditor recoveries. To the extent that the Applicants and/or the U.S. Debtors determine they wish to make payments out of the Discretionary Pool, further approvals of this Honourable Court and the U.S. Court, as applicable, will be sought.

**RESERVE POOL**

53. Although the Applicants believe the Nortel Special Incentive Plan will provide the Plan Participants with the appropriate incentives to remain with Nortel, certain modifications or additional payments may be necessary where the Applicants and the Monitor determine that, among other things, the terms of a participant's employment should be modified (including the extension of the term of employment) or new participants should be added to the Nortel Special Incentive Plan to allow the Applicants to achieve their CG objectives and fulfill obligations under the various APAs and TSAs.

21

54. The Applicants are requesting authority to make additional payments or increase individual payments ("Additional Payments") to employees of the Applicants, with the consent of the Monitor, in an aggregate amount not to exceed CDN$3 million (the "Reserve Pool").

55. The Monitor concurs with the need for a Reserve Pool and believes the Applicants' request is reasonable in the circumstances.

## REQUEST FOR A COURT-ORDERED CHARGE FOR CERTAIN AMOUNTS PAYABLE UNDER THE PLAN

56. The Nortel Special Incentive Plan provides for deferral of the payment of certain amounts earned pursuant to the Nortel Special Incentive Plan.

57. As described above, the U.S. Debtors are also seeking an order to allow for the implementation of the Nortel Special Incentive Plan for certain employees of the U.S. Debtors. Pursuant to the Code, payments owing to the U.S. participants would be a post-filing administrative obligation in the Chapter 11 Proceedings having priority over general unsecured pre-filing claims.

58. The Applicants believe it is necessary to provide Canadian participants with a similar level of assurance with respect to amounts earned but unpaid pursuant to the Nortel Special Incentive Plan.

59. To provide the Nortel Special Incentive Plan participants with greater certainty of payment with respect to amounts determined to be payable to Nortel Special Incentive Plan participants pursuant to the Nortel Special Incentive Plan, subject to their continued employment until the applicable payment date but have not yet been paid (the "Covered Obligations"), the Applicants are requesting the establishment of a court-ordered charge, to a maximum of CDN$20 million (the "Nortel Special Incentive Plan Charge"). This charge would be subordinate to the Inter-Company

22

Charge (as defined in the Initial Order) and rank pari passu with a charge, if any, established by this Honourable Court with respect the Former Employee Settlement.

60. The Nortel Special Incentive Plan Charge would be automatically extinguished upon the Monitor filing a certificate with this Honourable Court confirming all of the Covered Obligations have been paid.

61. The Monitor concurs with the Applicants' view that there is a need for a Nortel Special Incentive Plan Charge in the current circumstances, given the extended period of time (greater than 1 year) certain amounts determined to be payable under the Nortel Special Incentive Plan will be outstanding.

## TIMING OF PAYMENT OF CERTAIN AMOUNTS UNDER THE 2009 KEIP AND 2009 KERP

62. As previously noted, this Honourable Court approved the Applicants' 2009 KERP and 2009 KEIP on March 6, 2009, with the exception of a portion of the 2009 KEIP subsequently approved by this Honourable Court on March 20, 2009.

63. The purpose of the 2009 KEIP and 2009 KERP was to incentivize key employees and encourage them to remain with Nortel during the restructuring period. At the time the 2009 KEIP was developed, Nortel's intent was to reorganize its business. The 2009 KEIP included three milestones. The third milestone was "the later of the confirmation by the U.S. Court of a plan of reorganization in the U.S. or the confirmation by this Honourable Court of a plan or plans of restructuring and/or arrangement in Canada."

64. In June 2009, in conjunction with the announcement of the sale of substantially all of the assets of the CDMA/LTE Access business, Nortel also announced it would be proceeding with the sale of its remaining businesses.

65. The 2009 KEIP provides for employees involuntarily terminated without cause, as a result of the sale or downsizing of a business unit or for employees who accept

23

employment and transfer to a buyer, to receive the full amount of their entitlement under the 2009 KEIP (including an acceleration of unvested milestones, e.g. the third milestone). This results in a potential inequity as remaining employees required by NBS and CG do not receive any payments in respect of the third 2009 KEIP milestone at that time.

66. To date, all 2009 KEIP participants have received payment for the achievement of the first and second milestones; however, only those 2009 KEIP participants who have transferred to purchasers of the various business units or have been terminated as a result of the sale of a business unit have received the third milestone payment. Similarly, only 2009 KERP participants who have transferred to purchasers of the various business units or have been involuntarily terminated without cause, as a result of the sale of a business unit, have received full payment of their 2009 KERP.

67. The 2009 KEIP expires July 14, 2010 at which time all unvested rights lapse. The 2009 KERP fully vests and expires June 30, 2010.

68. The Nortel Special Incentive Plan is intended to better align Nortel's current needs to completing the restructuring and provide services pursuant to the TSAs with the purchasers. It is to be effective from January 1, 2010 until the earlier of December 31, 2011 or the conclusion of the restructuring, which for the Nortel Special Incentive Plan Participants overlaps the 2009 KEIP and 2009 KERP.

69. The Applicants are seeking approval to make payment, forthwith, of the third 2009 KEIP milestone and remaining portion of the 2009 KERP for those eligible NBS and CG employees continuing to be employed by the Applicants (the "Third KEIP/KERP Payment"), subject to obtaining approval of this Honourable Court and similar relief being granted by the U.S. Court. A listing of the employees to receive the payments is attached to the Confidential Supplement to the Thirty-Seventh Report.

70. This will provide for the transition of employees under the proposed Nortel Special Incentive Plan, avoid overlap of the various plans, reduce inequities between the

24

terminated or transferred employees who have received payment of the 2009 KERP and third 2009 KEIP milestone and those employees continuing to have a key ongoing role with the Applicants during the remainder of the restructuring, who have not received any payment pursuant to the 2009 KERP or third 2009 KEIP milestone and eliminate the risk of any entitlement lapsing upon expiration of the 2009 KEIP.

71. The amount payable by the Applicants in respect of the Third KEIP/KERP Payment will be approximately $1.5 million.

## MONITOR'S ANALYSIS AND RECOMMENDATIONS

72. The Monitor is of the view the commitment and retention of remaining employees will be essential to the execution of obligations pursuant to the TSAs, the completion of the Applicants' restructuring, and the completion of a plan of arrangement.

73. The Monitor has reviewed the details of the Applicants' proposed Nortel Special Incentive Plan and Mercer's analysis and believes the proposed Nortel Special Incentive Plan provides reasonable compensation under the current circumstances.

74. Accordingly, the Monitor recommends this Honourable Court approve the Applicants' Nortel Special Incentive Plan, to permit the Applicants to appropriately incentivize their remaining employees by way of competitive compensation; thereby retaining these employees and preserving the core expertise, knowledge and experience required to perform pursuant to the TSAs and complete the Applicants' restructuring activities.

75. The Monitor supports the Applicants' request for the following:

   a) establishment of the Nortel Special Incentive Plan Charge, to a maximum of $20 million, which charge would be subordinate to the Inter-Company Charge (as defined in the Initial Order) and rank *pari passu* with a charge, if any,

25

established by this Honourable Court with respect the Former Employee Settlement;

b) approval of the Reserve Pool in the amount of CDN$3 million;

c) revised payment date of the Third KEIP/KERP Payment for the eligible NBS and CG employees in respect of the 2009 KERP and third milestone of the 2009 KEIP; and

d) Sealing of the Confidential Supplement to the Thirty-Seventh Report and the confidential appendices thereto pending further Order of this Honourable Court.

All of which is respectfully submitted this 11th day of February, 2010.

**ERNST & YOUNG INC.**
**In its capacity as Monitor of the Applicants**

Per:

Murray A. McDonald
President

26

APPENDIX "A"

Appendix A

### NORTEL SPECIAL INCENTIVE PLAN

#### I. PLAN OBJECTIVE

The Nortel Special Incentive Plan (the "Plan") is designed to provide cash incentive payments (the "Payments") to certain employees of Nortel Networks Inc. ("NNI"), Nortel Networks Limited ("NNL") and certain of their direct and indirect subsidiaries and affiliates participating in the Plan (each a "Participating Employer" and collectively, the "Company") in positions within Nortel Business Services ("NBS") or Nortel Finance and Corporate Services ("Corporate Group") to encourage the achievement of certain performance targets and other business goals important to the Company, including a successful conclusion of its proceedings under the Companies' Creditors Arrangement Act (Canada) and the US Bankruptcy Code (the "Proceedings"), compliance with its obligations under various transaction agreements and the wind down of various Company entities during the Plan Term (as defined below).

#### II. PARTICIPATING EMPLOYERS AND EMPLOYEES

(a) The Participating Employers and the employees of the Participating Employers who may participate in the Plan have been selected in accordance with criteria approved by the Boards of Directors of NNL and NNI (the "Board").

(b) Each employee of a Participating Employer selected for participation in the Plan shall receive a letter (each, a "Participation Letter") that sets forth the Target Payment Amount (as defined below) that he or she may be eligible to receive under the Plan with respect to each applicable Plan Period (as defined below) and requires such employee to be bound by the terms and conditions of the Plan, including any amendments thereto. Upon execution and timely return of the Participation Letter in accordance with its terms, such employee shall become a participant in the Plan (a "Plan Participant") and will be eligible to receive a Payment.

(c) As set forth on Appendix A, based on Job Complexity Indicator and Job Family Group, each Plan Participant employed by the Company in a position within NBS (an "NBS Plan Participant") will be identified as either "NBS Group A," "NBS Group B," or "NBS Group C" and each Plan Participant employed by the Company in a position within Corporate Group (a "Corporate Plan Participant") will be identified as either "Corporate Group A" or "Corporate Group B" (each of the foregoing, a "Plan Participant Group").

#### III. PAYMENT AMOUNTS

(a) Subject to Section IV(c) of the Plan, each Plan Participant will be eligible to receive a Payment in respect of each Plan Period up to an amount (the "Target Payment Amount") set forth in the Participation Letter determined in accordance with the criteria approved by the Board, pursuant to the guidelines established by the Board from time to time.

(b) Each Plan Participant's Target Payment Amount shall be comprised of a component conditioned upon completion of the Plan Participant's role during the Plan Term in furthering the business purposes of NBS and Corporate Group, as applicable, in the relevant Plan Period (the "Completion Payment") and may also include a component based upon the achievement of specific performance metrics established by the Board in its sole discretion (the "Performance Metrics") for the Plan Period (the "Performance Payment," and together with the Completion Payment, the "Payment Amounts"). With respect to NBS Plan Participants in NBS Group A and NBS Group B, two thirds of the Target Payment Amount shall be allocated to the Performance Payment and one third shall be allocated to the Completion Payment. With respect to NBS Plan Participants in NBS Group C, one half of the Target Payment Amount shall be allocated to the Performance Payment and one half shall be allocated to the Completion Payment. With respect to Corporate Plan Participants, all of the Target Payment Amount shall be allocated to the Completion Payment.

(c) In the event that, following the Effective Date (as defined below), a Plan Participant is reassigned to a different Plan Participant Group, including a Plan Participant employed within NBS who becomes employed within Corporate Group (or vice versa), the Board may in its discretion elect to modify the terms of the Payment for such Plan Participant. In the event that the Board elects to modify a Plan Participant's Target Payment Amount pursuant to this Section III(c), the affected Plan Participant shall receive an amended Participation Letter setting forth the terms of the new Payment that he or she may be eligible to receive under the Plan and any necessary reconciliation with respect to the terms of the prior Payment. Notwithstanding anything to the contrary in this Section III(c), any modification made to the terms of a Plan Participant's Payment pursuant to this Section III(c) shall be made in compliance with Section 409A (as defined below).

(d) In the event that the Board determines that certain additional performance metrics to be developed by the Board together with the Unsecured Creditors Committee, the Ad Hoc Bondholder group, Ernst & Young Inc. as the Monitor appointed under the Companies' Creditors Arrangement Act and the NNI Principal Officer (together, the "Group") have been achieved, the Board may (subject to the approval of the U.S. Bankruptcy Court for the District of Delaware, the Ontario Superior Court of Justice and other approvals which may be required, including by the Group) pay additional amounts under the Plan to any current or former Plan Participant(s) subject to such terms and conditions as may be established at such time; provided, however, that such additional bonus amounts will be permitted to be paid only to the extent that such amounts in the aggregate do not exceed US$20,000,000.

(e) Except as required by applicable law or the terms of Company benefit plans or programs, Payments will not be taken into account for purposes of Company benefits in which a Plan Participant may participate and will not be included in "eligible earnings" for purposes of capital accumulation and retirement plans offered in various jurisdictions by the Company. Where required, deductions will be made from the Payments paid in accordance with the specific capital accumulation and retirement plan in which the Plan Participant participates.

2

## IV. PLAN PERIODS

(a) The Plan shall have two periods (each a "Plan Period"). The "First Plan Period" shall commence on January 1, 2010 and end on December 31, 2010. The "Second Plan Period" shall commence on January 1, 2011 and end on December 31, 2011.

(b) With respect to each Plan Period, a Plan Participant's actual Performance Payment shall be determined by reference to the level of achievement, as determined by the Board, in respect of Performance Metrics established by the Board to measure relevant performance during such Plan Period. The target Performance Payment, as described in the Participation Letter, in respect of the First Plan Period shall be known as a "Year One Target Performance Payment." The actual amount to be paid following the applicable determination by the Board of the achieved performance level in respect of the Year One Target Performance Payment shall be known as the "Year One Actual Performance Payment." The target Performance Payment, as described in the Participation Letter, in respect of the Second Plan Period shall be known as a "Year Two Target Performance Payment." The actual amount to be paid following the applicable determination by the Board of the achieved performance level in respect of the Year Two Target Performance Payment shall be known as the "Year Two Actual Performance Payment." A Completion Payment in respect of the First Plan Period shall be known as a "Year One Completion Payment." A Completion Payment in respect of the Second Plan Period shall be known as a "Year Two Completion Payment."

(c) Except as otherwise provided in the applicable Participation Letter, a Plan Participant shall be eligible to participate in the Second Plan Period, and shall be eligible for a Year Two Completion Payment and, if applicable, a Year Two Actual Performance Payment, only if such Plan Participant is actively employed by the Company on January 1, 2011 and before that date has not received notice of the Company's intention to terminate such Plan Participant's employment.

## V. PAYMENT PROCESS

(a) Following completion of each Plan Period, the Board will determine the amount of the Year One Actual Performance Payment or Year Two Actual Performance Payment, as applicable, with respect to each Plan Participant based upon its determinations regarding the level of achievement by the relevant entity in respect of the targets established by the Board for the applicable Performance Metrics. In the event that the Board determines that the relevant entity's performance did not meet the target performance level established by the Board with respect to any particular Performance Metric(s), the Board may (but is not required to) decide in its sole discretion that an amount less than the Target Performance Payment (including zero) is appropriate with respect to the relevant Plan Period. In no event shall a Year One Actual Performance Payment or a Year Two Actual Performance Payment be in an amount in excess of the applicable Target Performance Payment. For the avoidance of doubt, any determination of performance related to the Performance Metrics required pursuant to the Plan shall be made in the sole discretion of the Board.

3

(b) Subject to Sections VII and X, payment of any portion of any Payment payable upon completion of the First Plan Period will be made in a lump sum cash payment as soon as practicable following March 1, 2011, but in no event later than April 30, 2011. Payment of any portion of any Payment payable upon completion of the Second Plan Period will be made in a lump sum cash payment as soon as practicable following March 1, 2012, but in no event later than April 30, 2012.

(c) Subject to Section VII, the Payment of each Plan Participant will be paid in the amounts and at the times set forth below for his or her applicable Plan Participant Group so long as, on the date the Payment is paid (the "Payment Date"), such Plan Participant is either (i) actively employed by a Participating Employer or (ii) an inactive employee of a Participating Employer as a result of short- or long-term disability or other leaves of absence approved by the relevant Participating Employer and not constituting a "separation from service" as defined in Section 409A ("Approved LOA"):

  (i)  NBS Group A:

    1. 100% of both the Year One Actual Performance Payment and Year Two Actual Performance Payment (as determined by the Board pursuant to Section V(a)) following the completion of the Second Plan Period;

    2. 50% of the Year One Completion Payment following the completion of the First Plan Period; and

    3. 50% of the Year One Completion Payment and 100% of the Year Two Completion Payment following the completion of the Second Plan Period.

  (ii) NBS Group B:

    1. 100% of the Year One Actual Performance Payment (as determined by the Board pursuant to Section V(a)) following the completion of the First Plan Payment;

    2. 100% of the Year Two Actual Performance Payment (as determined by the Board pursuant to Section V(a)) following the completion of the Second Plan Period; and

    3. 100% of both the Year One Completion Payment and Year Two Completion Payment following the completion of the Second Plan Period.

  (iii)NBS Group C:

    1. 100% of the Year One Actual Performance Payment (as determined by the Board pursuant to Section V(a)) following the completion of the First Plan Period;

4

      2. 100% of the Year Two Actual Performance Payment (as determined by the Board pursuant to Section V(a)) following the completion of the Second Plan Period;

      3. 100% of the Year One Completion Payment following the completion of the First Plan Period; and

      4. 100% of the Year Two Completion Payment following the completion of the Second Plan Period.

   (iv) Corporate Group A: 100% of both the Year One Completion Payment and Year Two Completion Payment following the completion of the Second Plan Period.

   (v) Corporate Group B:

      1. 50% of the Year One Completion Payment following the completion of the First Plan Period; and

      2. 50% of the Year One Completion Payment and 100% of the Year Two Completion Payment following the completion of the Second Plan Period.

(d) For purposes of the Plan, a Plan Participant will be considered to be "actively employed" on those days when he or she is classified as "active" on the applicable Participating Employer's payroll and has not experienced a "separation from service" as defined in Section 409A.

(e) If a Plan Participant is not actively employed by a Participating Employer on a Payment Date applicable to the Participant Group to which the Plan Participant is assigned as a result of an Approved LOA, any appropriate Payment Amounts related to that Payment Date will be made to such Plan Participant at the same time as all other Payment Amounts related to such Payment Date are made to other Plan Participants in the same Plan Participant Group who are actively employed on such Payment Date, unless otherwise required by applicable law.

(f) If a Plan Participant is actively employed by a Participating Employer or is on an Approved LOA on a Payment Date, and was not actively employed for the entire Plan Period(s) relating to any Payment Amounts to be paid on such Payment Date as a result of an Approved LOA, a portion of such Payment Amount will be paid to such Plan Participant on such Payment Date in an amount equal to such Payment Amount multiplied by a fraction the numerator of which is the number of calendar months during the relevant Plan Period in which the Plan Participant was actively employed for at least one day and the denominator of which is 12. Any unpaid portion of such Payment Amount will be forfeited and such Plan Participant will have no further rights under the Plan with respect to such forfeited portion.

(g) (i) If, at the Company's request, a Plan Participant transitions from regular full-time employment to regular part-time employment without a change in Plan Participant

5

Group, all aspects of such Plan Participant's participation in the Plan, including his or her Target Payment Amount, will remain unchanged.

(ii)    If, at a Plan Participant's request, a Plan Participant transitions from regular full-time employment to regular part-time employment without a change in Plan Participant Group, the dollar amount of any Payment Amount paid to such Plan Participant following such transition to regular part-time employment and attributable to portions of the Plan Period(s) occurring after such transition shall be reduced in proportion with the percentage of a regular full-time schedule that such Plan Participant works as a regular part-time employee.

(h) If an NBS Plan Participant transfers from one business division to another business division within NBS (*e.g.*, a move from IT to Supply Chain Operations) during a Plan Period, but does not change Plan Participant Groups, such NBS Plan Participant's Year One Actual Performance Payment (if the transfer occurs during the First Plan Period) or Year Two Actual Performance Payment (if the transfer occurs during the Second Plan Period), as applicable, shall be calculated on a pro-rata basis based on the number of months such NBS Plan Participant was employed in each division (such prorated award, the "Prorated Actual Performance Payment"). For the purposes of determining the Prorated Actual Performance Payment, an NBS Plan Participant will be considered to have been employed by a business division for any month during which he or she was employed by such division on the first business day of such month. The Prorated Actual Performance Payment will be determined based on the Performance Metrics applicable to each portion of the Prorated Actual Performance Payment and otherwise as described in Section V(a) of the Plan. Notwithstanding anything to the contrary herein, in no event shall an NBS Plan Participant's Prorated Actual Performance Payment exceed the amount of such NBS Plan Participant's applicable Year One Target Performance Payment or Year Two Target Performance Payment.

(i) Notwithstanding anything in the Plan to the contrary, if the Board, in its sole discretion, upon consideration of facts and circumstances determined by the Board to be relevant, concludes that a Plan Participant has committed intentional misconduct, as defined in the Policy Regarding Recoupment of Incentive Compensation relating to the forfeiture and/or recoupment of incentive compensation, the Plan Participant will forfeit any Unpaid Payments (as defined below) and/or reimburse his or her Participating Employer the amount of the Payment Amounts received, as determined by the Board.

## VI. PLAN ADMINISTRATION

The Board shall have full discretionary authority to administer the Plan, including discretionary authority to interpret and construe any and all provisions of the Plan.

## VII.    TERMINATION OF EMPLOYMENT

6

(a) Upon the involuntary termination of employment of a Plan Participant by the Company for Cause (as defined below) by a Participating Employer or voluntary termination of employment by a Plan Participant for any reason (other than a voluntary termination in connection with a Transfer (as defined below)), the right to any unpaid Payment Amount(s) (the "Unpaid Payments") of such Plan Participant will be forfeited on the date of such employment termination and such Plan Participant will have no further rights under the Plan.

(b) Except as stated to the contrary in a Plan Participant's Participation Letter, upon the involuntary termination of employment of a Plan Participant (other than a Plan Participant identified as NBS Group A (an "NBS Group A Plan Participant")) by the Company during the First Plan Period for reasons determined by the Board to be other than an involuntary termination for Cause, the following shall apply: (i) any Unpaid Payment that is a Year One Completion Payment will be accelerated and paid in accordance with Section VII(i) of the Plan and (ii) any Unpaid Payment that is a Year One Actual Performance Payment shall be paid at the same time as all other such Year One Actual Performance Payments are made to other Plan Participants in the same Plan Participant Group who are actively employed on the relevant Payment Date, unless otherwise required by applicable law. A Plan Participant whose employment is terminated in accordance with this Section VII(b) shall not be eligible for any portion of the Year Two Target Performance Payment or Year Two Completion Payment, as described in Section IV above.

(c) Subject to Section IV(c) of the Plan, upon the involuntary termination of employment of a Plan Participant (other than an NBS Group A Plan Participant) by the Company during the Second Plan Period for reasons determined by the Board to be other than an involuntary termination for Cause, the following shall apply: (i) any Unpaid Payments that are Completion Payments will be accelerated and paid in accordance with Section VII(i) of the Plan and (ii) any Unpaid Payments that are Year One Actual Performance Payments or Year Two Actual Performance Payments shall be paid at the same time as all other such Year One Actual Performance Payments and/or Year Two Actual Performance Payments are made to other Plan Participants in the same Plan Participant Group who are actively employed on the relevant Payment Date, unless otherwise required by applicable law.

(d) Upon the termination of employment of a Plan Participant during the First Plan Period due to such Plan Participant's death, any Unpaid Payments that are Year One Completion Payments or Year One Target Performance Payments will be accelerated and paid as soon as practicable, but no later than the 30th day following the date of termination of employment. Any Year One Target Performance Payments accelerated pursuant to this Section VII(d) shall be made in the amount set forth with respect to the Year One Target Performance Payments in such Plan Participant's Participation Letter. A Plan Participant whose employment is terminated in accordance with this Section VII(d) shall not be eligible for any portion of the Year Two Target Performance Payment or Year Two Completion Payment, as described in Section IV above.

7

(e) Subject to Section IV(c) of the Plan, upon the termination of a Plan Participant during the Second Plan Period due to such Plan Participant's death, any Unpaid Payments will be accelerated and paid as soon as practicable, but no later than the 30th day following the date of termination of employment. Any Performance Payments accelerated pursuant to this Section VII(e) shall be made based on the amount set forth with respect to the Year One Target Performance Payment and/or Year Two Target Performance Payment, as applicable, in such Plan Participant's Participation Letter.

(f) For the purposes of the Plan, "Cause" shall mean inappropriate actions or inactions, misconduct, breach of an agreement with the Company or unsatisfactory performance by a Plan Participant or cause (as "cause" is legally defined, if at all, in the relevant jurisdiction) as determined by the Board in its sole discretion.

(g) Subject to Section IV(c) of the Plan, upon the involuntary termination of employment of an NBS Group A Plan Participant by the Company for reasons determined by the Board to be other than an involuntary termination for Cause, or upon any termination of employment of an NBS Group A Plan Participant due to a Transfer, any Unpaid Payment that is a Year One Completion Payment (or, if such termination occurs during the Second Plan Period, any Unpaid Payment that is a Year One Completion Payment or a Year Two Completion Payment) or a Year One Actual Performance Payment will be accelerated and paid on (x) May 31, 2011, if such termination occurs on or before February 28, 2011 or (y) the 90th day following such termination if such termination occurs after February 28, 2011. If such termination occurs during the First Plan Period, such terminated NBS Group A Plan Participant shall not be eligible for any portion of the Year Two Target Performance Payment or Year Two Completion Payment, as described in Section IV above. If such termination occurs during the Second Plan Period, any Unpaid Payments that are Year Two Actual Performance Payments shall be paid at the same time as all other such Year Two Actual Performance Payments are made to other NBS Group A Plan Participants who are actively employed on the relevant Payment Date, unless otherwise required by applicable law. Any acceleration of the payment of any Unpaid Payment pursuant to this Section VII(g) shall be contingent upon the terminated Plan Participant executing and submitting to the Company a release in a form to be determined and provided by the Company (the "Release") of all claims related to the Plan. Any Unpaid Payment accelerated pursuant to this Section VII(g) shall paid on the date described above, provided that, on or before such payment date, (i) such terminated Plan Participant has executed and submitted to the Company the Release and (ii) any statutory period during which such terminated Plan Participant is entitled to revoke the Release has expired without any such revocation having occurred.

(h) In the event that a Plan Participant's (other than an NBS Group A Plan Participant) employment with the Company terminates as a result of such Plan Participant's transfer to a new employer not affiliated with the Company that purchased one or more of the Company's business units or to which Company services have been outsourced (each, a "New Employer"), such Plan Participant's employment termination shall be treated in accordance with Sections VII(b) and (c) above, as

8

applicable, <u>provided</u> that both the Company and the New Employer agree in advance in writing to such transfer and the effective date of such transfer (such transfer, a "<u>Transfer</u>").

(i)   Any acceleration of the payment of any Unpaid Payment pursuant to Section VII(b), (c) or (h) of the Plan) shall be contingent upon the terminated Plan Participant executing and submitting to the Company a Release of all claims related to the Plan and shall be paid on the 90th day following the date of such Plan Participant's termination of employment, <u>provided</u> that, on or before such 90th day, (i) such terminated Plan Participant has executed and submitted to the Company the Release and (ii) any statutory period during which such terminated Plan Participant is entitled to revoke the Release has expired without any such revocation having occurred.

## VIII.   EFFECTIVE DATE; TERMINATION DATE OF THE PLAN

The Plan shall be effective as of January 1, 2010 (the "<u>Effective Date</u>") and shall expire on June 30, 2012 (the "<u>Termination Date</u>") (such period, the "<u>Plan Term</u>"). All rights to Unpaid Payments shall lapse on the Termination Date. For the avoidance of doubt, no payments shall be made under the Plan in connection with any Payment Amount if such Payment Amount has not been paid prior to the Termination Date.

## IX. NO PROMISE OF CONTINUED EMPLOYMENT

The Plan and any Plan Participant's selection as a participant in the Plan does not, and is in no manner intended to constitute, a promise of employment for any period of time or to change a Plan Participant's employment status, if applicable, as an at will employee subject to employment termination at any time for any reason.

## X.  TAXES; SECTION 409A

(a)   All payments made pursuant to the Plan shall be subject to applicable taxes and standard withholding and deductions as determined by the relevant Participating Employer.  Neither the Company nor its officers or agents makes or has made any representation about the tax consequences of any payments made or offered to any Plan Participant under the Plan.

(b)   All payments under the Plan are designed to comply with the requirements of section 409A of the US Internal Revenue Code of 1986 and regulations promulgated thereunder ("<u>Section 409A</u>").  The Plan may be modified to the extent necessary to comply with all applicable requirements of, and to avoid the imposition of any additional tax, interest and penalties under, Section 409A in connection with the benefits and payments to be provided hereunder.  Each payment of a Payment Amount contemplated by the Plan will be treated as a separate payment for purposes of Section 409A.

(c)   Notwithstanding anything to the contrary contained in any other provision of the Plan, if a Plan Participant is a "specified employee" (as defined in Section 409A) at the time of his or her "separation from service" (as defined in Section 409A), then

9

any payment otherwise required to be made to such Plan Participant under the Plan on account of his or her separation from service, to the extent such payment (after taking into account all exclusions applicable to such payment under Section 409A) is properly treated as a "deferral of compensation" subject to Section 409A, shall not be made until the first business day after (i) the expiration of six months from the date of such Plan Participant's separation from service, or (ii) if earlier, the date of such Plan Participant's death (the "Delayed Payment Date"). On the Delayed Payment Date, there shall be paid to such Plan Participant or, if he or she has died, to such Plan Participant's estate, in a single cash lump sum, an amount equal to the aggregate amount of the payments delayed pursuant to the preceding sentence.

(d) Notwithstanding any other provision of this Plan, for the purposes of the Plan, the date of termination of employment of any Plan Participant shall be the date such Plan Participant has a "separation from service" as defined in Section 409A.

## XI. CONFIDENTIALITY

Subject to applicable law, a Plan Participant's participation in the Plan, Target Payment Amounts, Payment Amounts and Payments are confidential and a Plan Participant may not disclose, publicize or discuss his or her participation in the Plan, Target Payment Amounts, Payment Amounts or Payments with any current or former employee of the Company or any other person except a Plan Participant's spouse, accountant, financial advisor or attorney, who must be informed by the Plan Participant not to further disclose such confidential information. Notwithstanding the foregoing, the Company may disclose Participants' participation in the Plan, Target Payment Amounts, Payment Amounts and Payments as required under applicable law and as it deems necessary in the implementation and administration of the Plan and in the conduct of the Company's business.

## XII. SEVERABILITY

If any provision of the Plan is determined to be invalid or unenforceable, in whole or in part, this determination shall not affect any other provision of the Plan and the provision in question shall be modified as to be rendered enforceable in a manner consistent with the intent of the parties insofar as possible. Any waiver of or breach of any of the terms of the Plan shall not operate or be construed as a waiver of any other breach of such terms or conditions or of any other terms and conditions, nor shall any failure to enforce any provision hereof operate or be construed as a waiver of such provision or of any other provision.

## XIII. CHOICE OF LAW AND VENUE

The Plan shall be governed by the laws of Ontario and the laws of Canada applicable therein. With respect to any Plan Participant of a Participating Employer that is subject to the Proceedings, such Plan Participant and such Participating Employer will (a) irrevocably and unconditionally consent to the exclusive jurisdiction of the court in which such Participating Employer is subject to the Proceedings, (b) will irrevocably and

10

unconditionally waive any objection to the laying of venue of any action, suit or proceeding arising out of or related to the Plan or any Payment in such court and (c) will further irrevocably and unconditionally waive and agree not to plead or claim that any such action, suit or proceeding brought in such court has been brought in an inconvenient forum.

## XIV.   ENTIRE AGREEMENT AND AMENDMENT

This Plan document (together with the Participation Letters) constitutes the complete, final and exclusive embodiment of the terms and conditions of the Plan. Any amendments or modifications of the Plan must be authorized by the Board or a person specifically authorized by the Board to take action with respect to the Plan; provided, in each case, subject to any approvals which may be required in light of the Proceedings. Any agreement between any Plan Participant and the Company with regard to the Plan and its subject matter is hereby superseded.

## XV.   NO ASSIGNMENT

The rights of a Plan Participant or any other person to any payment or other benefits under the Plan may not be assigned, transferred, pledged or encumbered except by will or the laws of descent and distribution.

## XVI.   FUNDING

The Plan is an unfunded plan and any and all amounts payable to a Plan Participant under the Plan shall be paid from the general assets of his or her Participating Employer. The obligation under the Plan with respect to any specific Plan Participant shall be the several obligation of his or her Participating Employer and will not be a joint obligation of any other Company entity.

## APPENDIX A

| Plan Participant Group | Positions, Job Complexity Indicators and Job Family Groups Covered |
|---|---|
| NBS Group A | Positions within NBS with a Job Complexity Indicator of 55 |
| NBS Group B | Positions within NBS with a Job Complexity Indicator of 5 or 6 (Job Family Group B) |
| NBS Group C | Positions within NBS with a Job Complexity Indicator of 1-4 (Job Family Group B) or 1-6 (Job Family Group A) |
| Corporate Group A | Positions within Corporate Group with a Job Complexity Indicator of 55 |
| Corporate Group B | Positions within Corporate Group with a Job Complexity Indicator of 1-6 (Job Family Groups A and B) |

12

IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C. 1985, c.    Court File No: 09-CL-7950
C-36, AS AMENDED
AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL
NETWORKS CORPORATION et al.

| | |
|---|---|
| | *ONTARIO*<br>SUPERIOR COURT OF JUSTICE<br>(COMMERCIAL LIST) |
| | Proceeding commenced at Toronto |
| | THIRTY-SEVENTH REPORT<br>OF THE MONITOR<br>DATED FEBRUARY 11, 2010 |
| | **GOODMANS LLP**<br>Barristers & Solicitors<br>Bay Adelaide Centre<br>333 Bay St., Suite 3400<br>Toronto, ON  M5H2S7 |
| | Jay A. Carfagnini  (LSUC#: 222936)<br>Joseph Pasquariello (LSUC# 37389C)<br>Christopher G. Armstrong (LSUC# 55148B) |
| | Tel: 416.979.2211<br>Fax: 416.979.1234 |
| | Lawyers for the Monitor, Ernst & Young Inc. |