**EXHIBIT A**

Court File No. 09-CL-7950

*ONTARIO*
**SUPERIOR COURT OF JUSTICE**
**(COMMERCIAL LIST)**

IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,
**R.S.C. 1985, c. C-36, AS AMENDED**

**AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF
NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED,
NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS
INTERNATIONAL CORPORATION AND NORTEL NETWORKS TECHNOLOGY
CORPORATION**
APPLICATION UNDER THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,
**R.S.C. 1985, c. C-36, AS AMENDED**

**MOTION RECORD**
**Nortel Special Incentive Plan**
**(returnable March 3, 2010)**

February 11, 2010

**OGILVY RENAULT LLP**
Suite 3800
Royal Bank Plaza, South Tower
200 Bay Street
P.O. Box 84
Toronto Ontario  M5J 2Z4

Derrick Tay LSUC#: 21152A
Tel:  (416) 216-4832
Email: dtay@ogilvyrenault.com

Mario Forte  LSUC#: 27293F
Tel: (416) 216-4870
Email: mforte@ogilvyrenault.com

Jennifer Stam LSUC #46735J
Tel: (416) 216-2327
Email: jstam@ogilvyrenault.com
Fax: (416) 216-3930

Lawyers for the Applicants

# INDEX

*ONTARIO*
SUPERIOR COURT OF JUSTICE
(COMMERCIAL LIST)

IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,
R.S.C. 1985, c. C-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF
NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED,
NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS
INTERNATIONAL CORPORATION AND NORTEL NETWORKS TECHNOLOGY
CORPORATION

APPLICATION UNDER THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,
R.S.C. 1985, c. C-36, AS AMENDED

## INDEX

| TAB | DOCUMENT | PAGE |
|-----|----------|------|
| 1. | Notice of Motion returnable March 3, 2010 | 001 |
| 2. | Affidavit of Elena King, sworn February 11, 2010 | 028 |
| 3. | Draft Order | 055 |

# TAB 1

Court File No. 09-CL-7950

## *ONTARIO*
## SUPERIOR COURT OF JUSTICE
## (COMMERCIAL LIST)

### IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED

### AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL CORPORATION AND NORTEL NETWORKS TECHNOLOGY CORPORATION

### APPLICATION UNDER THE *COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED

### NOTICE OF MOTION
### (returnable March 3, 2010)

Nortel Networks Corporation ("NNC"), Nortel Networks Limited ("NNL"), Nortel Networks Technology Corporation, Nortel Networks International Corporation and Nortel Networks Global Corporation (collectively, the "Applicants") will make a motion to Justice Morawetz of the Commercial List court on **Wednesday, March 3, 2010 at 2pm**, or as soon after that time as the motion can be heard, at **393 University Avenue**, Toronto, Ontario.

PROPOSED METHOD OF HEARING: The motion is to be heard:

☐ in writing under subrule 37.12.1(1) because it is on consent or unopposed or made without notice;

☐ in writing as an opposed motion under subrule 37.12.1(4);

☒ orally.

THE MOTION IS FOR AN ORDER:

(a)     Abridging the time for service of the Notice of Motion, the Thirty-Seventh Report (the "Thirty-Seventh Report") of the Ernst & Young Inc., as monitor (the "Monitor") and the Motion Record in respect of this motion and dispensing with further service thereof;

- 2 -

(b)     Approving the Nortel Special Incentive Plan substantially in the form attached as an appendix to the Thirty-Seventh Report (the "Nortel Special Incentive Plan") and authorizing the Applicants to perform their respective obligations thereunder;

(c)     Granting a charge (the "Nortel Special Incentive Plan Charge") in favour of the participants in the Nortel Special Incentive Plan ("Plan Participants") on the Applicants' Property (as defined in the Initial Order) to secure payment of the amounts that have been determined to be payable to Plan Participants, subject to their continued employment until the applicable payment date (the "Covered Obligations"), which Nortel Special Incentive Plan Charge shall:

> (i)     not exceed an aggregate amount of twenty million dollars (CDN$20 million);
>
> (ii)    rank subordinate in priority to the Inter-company Charge (as defined in the Initial Order);
>
> (iii)   apply in these proceedings and in any subsequent bankruptcy or receivership; and
>
> (iv)    automatically terminate and be extinguished on the filing with this Honourable Court by the Monitor of a certificate certifying that the Covered Obligations have been paid by the Applicants;

(d)     Authorizing the Applicants to make additional payments which may be made to ongoing employees of the Applicants in the sole discretion of the Applicants (and with the consent of the Monitor) which payments shall total no more than an aggregate of CDN$3 million;

(e)     Approving the Third KEIP/KERP Payment pursuant to the 2009 Programs to those individuals listed on a confidential appendix to the supplement (the "Supplemental Report") to the Thirty-Seventh Report, notwithstanding the terms of the 2009 Programs, subject to similar relief being granted in the U.S. Court, and authorizing the Applicants to make the payments contemplated thereunder forthwith;

- 3 -

(f)     Sealing the Confidential Supplement (the "Supplemental Report") to the Thirty-Seventh Report including all appendices thereto pending further Order of this Court; and

(g)     Such further and other relief as counsel may request and this Honourable Court deem just.

THE GROUNDS FOR THE MOTION ARE:

**BACKGROUND**

(a)     References herein to "Nortel" are references to the global enterprise as a whole;

(b)     On January 14, 2009, this Court granted an initial order (subsequently amended and restated) (the "Initial Order");

(c)     Pursuant to the Initial Order, Ernst & Young Inc. was appointed as Monitor;

(d)     Also on January 14, 2009, certain of NNC's U.S. subsidiaries including Nortel Networks Inc. ("NNI") (the "Initial U.S. Debtors") made voluntary filings under Chapter 11 of the United States Bankruptcy Code (the "Code"). On the same date, this Honourable Court granted an Order pursuant to Section 18.6(4) of the CCAA recognizing the Chapter 11 cases in the U.S. as "foreign proceedings" in Canada and giving effect to the automatic stay under the Code in Canada;

(e)     On July 14, 2009, Nortel Networks (CALA) Inc. (together with the Initial U.S. Debtors, the "U.S. Debtors") made a voluntary filing with the U.S. Court under Chapter 11 of the Code;

**THE NORTEL SPECIAL INCENTIVE PLAN**

(f)     The Nortel Special Incentive Plan (the "Nortel Special Incentive Plan" or "New Plan") has been developed by Nortel (excluding the EMEA Debtors) in conjunction with the Mercer (US) Inc., the Monitor and a number of its significant stakeholders to provide incentive to many employees in Nortel Business Services ("NBS") or the Corporate

- 4 -

Group ("Corporate Group") who are not being transitioned as part of the sales transactions and who eventually work themselves out of a job;

(g)     The goal of the Nortel Special Incentive Plan is to retain the Plan Participants by providing them with a level of certainty and an incentive to continue to help Nortel accomplish its goals including the successful conclusion of these proceedings and the Chapter 11 proceedings and the compliance with Nortel's obligations under various transaction agreements and the wind down of various Nortel entities;

(h)     In designing the Nortel Special Incentive Plan, Plan Participants are selected in accordance with criteria approved by the Boards (as defined in the Nortel Special Incentive Plan) in consultation with the unsecured creditors committee of NNI (the "Committee") and the ad hoc bondholders' group (the "Bondholders' Committee") and the Monitor;

(i)     The "Plan Period" under the Nortel Special Incentive Plan extends through December 31, 2011;

(j)     There are a total of 1,475 Plan Participants including 455 employees of the Applicants;

(k)     Under the terms of the Nortel Special Incentive Plan, each Plan Participant will be eligible to receive one or more payments on the terms and at the times set out in the Nortel Special Incentive Plan;

(l)     The payout under the Nortel Special Incentive Plan will be approximately US$93 million however approximately 88% of that cost will be borne by the various purchasers under the sales transactions;

(m)     The Nortel Special Incentive Plan also contemplates a US$20 million "Discretionary Pool";

(n)     The Applicants are not seeking authorization to make any payments out of the Discretionary Pool and, to the extent that that any future payments would be made by the Applicants, the Applicants would seek further Court approval;

- 5 -

## THE RESERVE POOL

(o)     Although the Applicants believe that the Nortel Special Incentive Plan will provide the Plan Participants with the appropriate incentives to remain with Nortel for the period for which they are currently targeted to be retained, some amount of attrition will continue to occur;

(p)     Modifications to the Nortel Special Incentive Plan or additional payments under the Nortel Special Incentive Plan may be necessary where the Applicants and the Monitor determine that, among other things, the terms of a Plan Participant's employment should be modified or new participants should be added to the Nortel Special Incentive Plan which should not result in the Nortel Special Incentive Plan exceeding its current estimated cost;

(q)     The Applicants request authority to make, with the consent of the Monitor, additional payments ("Additional Payments") and increase payments in an aggregate amount not to exceed CDN$3 million (the "Reserve Pool") in the event such Additional Payments exceed the current estimated plan cost;

## THE NORTEL SPECIAL INCENTIVE PLAN CHARGE

(r)     As part of the terms of the Nortel Special Incentive Plan, the Applicants are seeking approval of the Nortel Special Incentive Plan Charge over their assets which would:

     (i)     Cover the Covered Obligations;

     (ii)    be for a maximum of CDN$20 million;

     (iii)   rank (i) subordinate to the "Inter-Company Charge" (as defined in the Initial Order), and (ii) *pari passu* with the charge to be established pursuant to the Employee Settlement; and

     (iv)    terminate automatically upon the Monitor filing a certificate confirming that the Covered Obligations have by paid by the Applicants;



- 6 -

(s)     The amounts that become due and payable under the Nortel Special Incentive Plan to employees of the U.S. Debtors will become post-petition administrative obligations in the U.S. proceedings and have priority over general unsecured claim;

(t)     The creation of the Nortel Special Incentive Plan Charge will provide similar levels of assurance to Plan Participants in Canada;

## THE THIRD KEIP/KERP PAYMENT

(u)     On March 6, 2009, this Honourable Court granted an Order approving a key executive incentive plan (the "KEIP") and a key employee retention plan (the "KERP") (collectively, the "2009 Programs");

(v)     Under the 2009 Programs, there were three (3) payments to be made based on the achievement of certain milestones, the third of which (the "Third KEIP/KERP Payment") was to be made on the completion of a plan or plans of arrangement in the U.S. and Canada and which was scheduled to be made on June 30, 2010;

(w)     An exception to both of the 2009 Programs was that for employees whose employment was terminated as a result of the closing of the Sales, payments would vest in those employees at the time of termination (provided that employees who had received offers from Purchasers accepted those offers and commenced employment with the Purchasers ("Divested Employees"));

(x)     Nortel has changed strategic direction and has sold or will be selling shortly a majority of its businesses through various Sales. Nortel has reached this critical point in its global restructuring due to the efforts of the participants for which relief regarding the immediate payment the Third KEIP/KERP Payment is sought;

(y)     Currently under the 2009 Programs, payment is made prior to the plan contemplated payment date for employees who are involuntarily terminated without cause under the KERP and Divested Employees with respect to the 2009 KEIP and the 2009 KERP. However, because the 2009 KEIP contemplated a reorganization of Nortel rather than the sale of its businesses, the trigger for payment to NBS Employees and Corporate

- 7 -

Group Employees participating in the 2009 KEIP has not technically been achieved. Similarly, the timing for payment under the 2009 KERP has meant that those employees who remain in NBS or the Corporate Group have not received a third payment under the 2009 KERP while others who have been or will be terminated as part of the Sales, have received earlier payment or will receive a payment upon the closing of a Sale. This has resulted in an inequity for those employees who have agreed to stay on to the completion of the proceedings and absent the immediate payment of the Third KEIP/KERP Payment, would result in penalizing the NBS and Corporate Group employees for remaining with Nortel and continuing to work tirelessly to benefit the Applicants' estates;

(z)     The Applicants are now asking that the Court to authorize the immediate payment of the Third KEIP/KERP Payment for those employees identified in a confidential appendix to the Supplemental Report who are NBS and Corporate Group employees;

**SEALING**

(aa)    The Supplemental Report contains certain specific financial information with respect to the Nortel Special Incentive Plan much of which is sensitive and confidential and, in some instances, constitutes individual compensation details;

(bb)    The Applicants are requesting that the Supplemental Report including all appendices thereto be sealed pending further Order of this Court;

**MISCELLANEOUS**

(cc)    The provisions of the CCAA;

(dd)    Such further and other grounds as counsel may advise and this Honourable Court permit;

THE FOLLOWING DOCUMENTARY EVIDENCE will be used at the hearing of the motion:

(a)     The King Affidavit;

(b)     The Thirty-Seventh Report;



- 8 -

(c)     The Supplemental Report; and

(d)     Such further and other relief as counsel may request and this Honourable Court deem
        just.

February 11, 2010                    **OGILVY RENAULT LLP**
                                     Suite 3800
                                     Royal Bank Plaza, South Tower
                                     200 Bay Street
                                     Toronto, Ontario  M5J 2Z4  CANADA

                                     **Derrick Tay LSUC#: 21152A**
                                     Tel:  (416) 216-4832
                                     Email: dtay@ogilvyrenault.com

                                     **Mario Forte  LSUC#: 27293F**
                                     Tel: (416) 216-4870
                                     Email: mforte@ogilvyrenault.com

                                     **Jennifer Stam LSUC #46735J**
                                     Tel: (416) 216-2327
                                     Email: jstam@ogilvyrenault.com

                                     Fax: (416) 216-3930
                                     Lawyers for the Applicants


TO:      Attached Service List

*q*

Court File No. 09-CL-7950

***ONTARIO***
**SUPERIOR COURT OF JUSTICE**
**(COMMERCIAL LIST)**

**IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,**
**R.S.C. 1985, c. c-36, AS AMENDED**

**AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF**
**NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL**
**NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL**
**CORPORATION AND NORTEL NETWORKS TECHNOLOGY CORPORATION**

**APPLICATION UNDER THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,**
**R.S.C. 1985, c. C-36, AS AMENDED**

**SERVICE LIST**

TO:     **OGILVY RENAULT LLP**
         Royal Bank Plaza, South Tower
         200 Bay Street, Suite 3800
         Toronto, Ontario M5J 2Z4

         Derrick Tay
         Mario Forte
         Jennifer Stam

         Email:    dtay@ogilvyrenault.com
                   mforte@ogilvyrenault.com
                   jstam@ogilvyrenault.com

         Tel:      416.216.4000
         Fax:      416.216.3930

         Lawyers for the Applicants

- 2 -

TO: **ERNST & YOUNG INC.**
Ernst & Young Tower
222 Bay Street, P.O. Box 251
Toronto, ON  M5K 1J7

Murray McDonald
Brent Beekenkamp

Email:   nortel.monitor@ca.ey.com

Tel:    416.943.3016
Fax:    416.943.3300

AND
TO:   **GOODMANS LLP**
Bay Adelaide Centre
333 Bay Street, Suite 3400
Toronto, ON  M5H 2S7

Jay Carfagnini
Joseph Pasquariello
Gail Rubenstein
Chris Armstrong

Email:   jcarfagnini@goodmans.ca
jpasquariello@goodmans.ca
grubenstein@goodmans.ca
carmstrong@goodmans.ca

Tel:    416.597.4107
Fax:    416.979.1234

Lawyers for the Monitor, Ernst & Young Inc.

AND
TO:   **OSLER HOSKIN AND HARCOURT LLP**
100 King Street West
1 First Canadian Place
Suite 6100
P.O. Box 50
Toronto, ON  M5X 1B8

Lyndon Barnes
Rupert Chartrand
Edward Sellers
Adam Hirsh

Email:   lbarnes@osler.com
rchartrand@osler.com
esellers@osler.com
ahirsh@osler.com

Tel:    416.362.2111
Fax:    416.862.6666

Lawyers for the Boards of Directors of
Nortel Networks Corporation and Nortel
Networks Limited

AND
TO:   **FASKEN MARTINEAU DUMOULIN LLP**
66 Wellington Street West
Toronto Dominion Bank Tower
P.O. Box 20, Suite 4200
Toronto, ON  M5K 1N6

Donald E. Milner
Aubrey Kauffman
Edmond Lamek
Jon Levin

Email:   dmilner@fasken.com
akauffman@fasken.com
elamek@fasken.com
jlevin@fasken.com

Tel:    416.868.3538
Fax:    416.364.7813

Lawyers for Export Development Canada

- 3 -

AND TO: **EXPORT DEVELOPMENT CANADA**
151 O'Connor Street
Ottawa, ON K1A 1K3

Jennifer Sullivan

Email:   jsullivan@edc.ca

Tel:     613.597.8651
Fax:     613.598.3113

AND TO: **THORNTON GROUT FINNIGAN LLP**
3200-100 Wellington Street West
Toronto-Dominion Centre, Canadian Pacific Tower
Toronto, ON M5K 1K7

Robert I. Thornton
Michael Barrack
Rachelle Moncur
Leanne M. Williams

Email:   rthornton@tgf.ca
         mbarrack@tgf.ca
         rmoncur@tgf.ca
         lwilliams@tgf.ca

Tel:     416.304.1616
Fax:     416.304.1313

Lawyers for Flextronics Telecom Systems Ltd.

AND TO: **McINNES COOPER**
Purdy's Wharf Tower II
1300 – 1969 Upper Water Street
Halifax, NS B3J 2V1

John Stringer, Q.C.
Stephen Kingston

Email:   john.stringer@mcinnescooper.com
         stephen.kingston@mcinnescooper.com

Tel:     902.425.6500
Fax:     902.425.6350

Lawyers for Convergys EMEA Limited

AND TO: **MILLER THOMSON LLP**
Scotia Plaza
40 King Street West, Suite 5800
P.O. Box 1011
Toronto, ON M5H 3S1

Jeffrey Carhart
Margaret Sims

Email:   jcarhart@millerthomson.com
         msims@millerthomson.com

Tel:     416.595.8615/8577
Fax:     416.595.8695

Lawyers for Toronto-Dominion Bank

AND TO: **CAW-CANADA**
Legal Department
205 Placer Court
Toronto, ON M2H 3H9

Barry E. Wadsworth
Lewis Gottheil

Email:   barry.wadsworth@caw.ca
         lewis.gottheil@caw.ca

Tel.:    416.495.3776
Fax:     416.495.3786

Lawyers for all active and retired Nortel employees represented by the CAW-Canada

AND TO: **BOUGHTON LAW CORPORATION**
Suite 700
595 Burrard Street
Vancouver, BC V7X 1S8

R. Hoops Harrison

Email:   hharrison@boughton.ca

Tel:     604.687.6789
Fax:     604.683.5317

Lawyers for Tonko Realty Advisors (BC) Ltd.

- 4 -

12

AND
TO:

**BORDEN LADNER GERVAIS LLP**
Scotia Plaza, 40 King Street West
Toronto, ON  M5H 3Y4

Michael J. MacNaughton
Roger Jaipargas
Sam P. Rappos

Email:   nmacnaughton@blgcanada.com
Tel:      416. 367.6646
Fax:     416. 682.2837

Email:   rjaipargas@blgcanada.com
Tel:      416.367.6266
Fax:     416.361.7067

Email:   srappos@blgcanada.com
Tel:      416.367.6033
Fax:     416.361.7306

Lawyers for Bell Canada

AND
TO:

**SISKINDS LLP**
680 Waterloo Street
London, ON  N6A 3V8

Raymond F. Leach
A. Dimitri Lascaris
Monique L. Radlein

Email:   ray.leach@siskinds.com
            dimitri.lascaris@siskinds.com
            monique.radlein@siskinds.com

Tel:      519.672.2121
Fax:     519.672.6065

Lawyers for Indiana Electrical Workers Pension
Trust Fund IBEW, Laborers Local 100 and 397
Pension Fund, and Bruce William Lapare

AND
TO:

**LANG MICHNER LLP**
Brookfield Place, Suite 2500
181 Bay Street
Toronto, ON  M5J 2T7

Leslie A. Wittlin
John Contini
Aaron Rousseau

Email:   lwittlin@langmichener.ca
Tel:      416.307.4087
Fax:     416.304.3855

Email   jcontini@langmichener.ca
Tel:      416.307.4148
Fax:     416.304.3767

Email   arousseau@langmichener.ca
Tel:      416.307.4081
Fax:     416.365.1719

Lawyers for ABN AMRO Bank N.V.

AND
TO:

**BENNETT JONES LLP**
1 First Canadian Place
Suite 3400
Toronto, ON  M5X 1A4

Kevin Zych
S. Richard Orzy
Gavin Finlayson

Email:   zychk@bennettjones.com
Tel:      416.777.5738
Fax:     416.863.1716

Email:   orzyr@bennettjones.com
Tel:      416.777.5737
Fax:     416.863.1716

Email:   finlaysong@bennettjones.com
Tel:      416.777.5762
Fax:     416.863.1716

Canadian Lawyers for The Informal Nortel
Noteholder Group

- 5 -

13

| | |
|---|---|
| AND TO: | **KOSKIE MINSKY**<br>20 Queen Street West<br>Suite 900<br>Toronto, ON  M5H 3R3 |

Mark Zigler
Susan Philpott
Demetrios Yiokaris
Andrea McKinnon

Email:  mzigler@kmlaw.ca
Tel:    416.595.2090
Fax:    416.204.2877

Email:  sphilpott@kmlaw.ca
Tel:    416.595.2104
Fax:    416.204.2882

Email:  dyiokaris@kmlaw.ca
Tel:    416.595.2130
Fax:    416.204.2810

Email:  amckinnon@kmlaw.ca
Tel:    416.595.2150
Fax:    416.204.2874

Lawyers for the Former Employees of Nortel

AND TO:    **MILLER THOMSON LLP**
Scotia Plaza
40 King Street West, Suite 5800
P.O. Box 1011
Toronto, ON  M5H 3S1

Jeffrey Carhart
Margaret Sims

Email:  jcarhart@millerthomson.com
Tel:    416.595.8615
Fax:    416.595.8695

Email   msims@millerthomson.com
Tel:    416.595.8577
Fax:    416.595.8695

Canadian Lawyers for Telmar Network
Technology, Inc. and Precision Communication
Services, Inc.

AND TO:    **MILLER THOMSON LLP**
Scotia Plaza
40 King Street West, Suite 5800
P.O. Box 1011
Toronto, ON  M5H 3S1

Jeffrey Carhart
Margaret Sims
James Klotz

Email:  jcarhart@millerthomson.com
Tel:    416.595.8615
Fax:    416.595.8695

Email:  msims@millerthomson.com
Tel:    416.595.8577
Fax:    416.595.8695

Email:  jmklotz@millerthomson.com
Tel:    416.595.4373
Fax:    416.595.8695

Lawyers for LG Electronics Inc.

AND TO:    **LG ELECTRONICS INC.**
11/F, LG Twin Towers (West)
20 Yeouido-dong, Yeongduengpo-gu
Seoul 150-721, Korea

Joseph Kim

Email:  joseph.kim@lge.com

Tel:    +82.2.3777.3171
Fax:    +82.2.3777.5345

- 6 -

14

AND
TO:

**CHAITONS LLP**
185 Sheppard Avenue West
Toronto, ON  M2N 1M9

Harvey G. Chaiton

Email:   harvey@chaitons.com

Tel:    416.218.1129
Fax:    416.218.1849

Lawyers for IBM Canada Limited

AND
TO:

**FRASER MILNER CASGRAIN LLP**
1 First Canadian Place
100 King Street West
Toronto, ON  M5X 1B2

R. Shayne Kukulowicz
Alex MacFarlane
Michael J. Wunder
Ryan Jacobs

Email:   Shayne.kukulowicz@fmc-law.com
         Alex.macfarlane@fmc-law.com
         Michael.wunder@fmc-law.com
         ryan.jacobs@fmc-law.com

Tel:    416.863.4511
Fax:    416.863.4592

Canadian Lawyers for the Official Committee of
Unsecured Creditors

AND
TO:

**PALIARE ROLAND ROSENBERG
ROTHSTEIN LLP**
Suite 501
250 University Avenue
Toronto, ON  M5H 3E5

Kenneth T. Rosenberg
Massimo (Max) Starnino
Lily Harmer
Tina Lie

Email:   ken.rosenberg@paliareroland.com
Tel:    416.646.4304
Fax:    416.646.4301

Email:   max.starnino@paliareroland.com
Tel:    416.646.7431
Fax:    416.646.4301

Email:   lily.harmer@paliareroland.com
Tel:    416.646.4326
Fax:    416.646.4301

Email:   tina.lie@paliareroland.com
Tel:    416.646.4332
Fax:    416.646.4301

Lawyers for the Superintendent of Financial
Services as Administrator of the Pension
Benefits Guarantee Fund

AND
TO:

**GOWLING LAFLEUR HENDERSON LLP**
Suite 1600, First Canadian Place
100 King Street West
Toronto, ON  M5X 1G5

E. Patrick Shea

Email:   patrick.shea@gowlings.com

Tel:    416.369.7399
Fax:    416.862.7661

Lawyers for Westcon Group

- 7 -

AND
TO:

**MINDEN GROSS LLP**
145 King Street West, Suite 2200
Toronto, ON M5H 4G2

Raymond M. Slattery
David T. Ullmann

Email:   rslattery@mindengross.com
         dullmann@mindengross.com
Tel:     416.369.4149
Fax:     416.864.9223

Lawyers for Verizon Communications Inc.

AND
TO:

**AIRD & BERLIS**
Brookfield Place
181 Bay Street, Suite 1800
Toronto, ON M5J 2T9

Harry Fogul
Peter K. Czegledy

Email:   hfogul@airdberlis.com
Tel:     416.865.7773
Fax:     416.863.1515

Email:   pczegledy@airdberlis.com
Tel:     416.865.7749
Fax:     416.863.1515

Lawyers for Microsoft Corporation

AND
TO:

**GARDINER ROBERTS LLP**
Suite 3100, Scotia Plaza
40 King Street West
Toronto, ON M5H 3Y2

Jonathan Wigley
Vern W. DaRe

Email:   jwigley@gardiner-roberts.com
Tel:     416.865.6655
Fax:     416.865.6636

Email:   vdare@gardiner-roberts.com
Tel:     416.865.6641
Fax:     416.865.6636

Lawyers for Andrew, LLC

AND
TO:

**AIRD & BERLIS LLP**
Barristers & Solicitors
Brookfield Place, P.O. Box 754
181 Bay Street, Suite 1800
Toronto, ON M5J 2T9

D. Robb English
Sanjeev P. R. Mitra

Email:   renglish@airdberlis.com
         smitra@airdberlis.com

Tel:     416.863.1500
Fax:     416.863.1515

Lawyers for Tata Consultancy Services Limited
and Tata America International Corporation

AND
TO:

**AIRD & BERLIS LLP**
Barristers & Solicitors
Brookfield Place, P.O. Box 754
181 Bay Street, Suite 1800
Toronto, ON M5J 2T9

Steven L. Graff
Ian E. Aversa

Email:   sgraff@airdberlis.com
Tel:     416.865.7726
Fax:     416.863.1515

Email:   iaversa@airdberlis.com
Tel:     416.865.3082
Fax:     416.863.1515

Canadian Lawyers for Tellabs, Inc.

AND
TO:

**ALEXANDER HOLBURN BEAUDIN &
LANG LLP**
Barristers and Solicitors
700 West Georgia Street
Suite 2700
Vancouver, British Columbia V7Y 1B8

Sharon M. Urquhart

Email:   surquhart@ahbl.ca
Tel:     604.484.1757
Fax:     604.484.1957

Lawyers for Algo Communication Products Ltd.

- 8 -

| | |
|---|---|
| AND TO: | **MILLER THOMSON LLP** |

AND
TO:

**MILLER THOMSON LLP**
Scotia Plaza
40 King Street, West, Suite 5800
P.O. Box 1011
Toronto, ON  M5H 3S1

Maurice Fleming

Email:   mfleming@millerthomson.com
Tel:      416.595.8686
Fax:     416.595.8695

Lawyers for Verint Americas Inc. and Verint
Systems, Inc.

AND
TO:

**DAVIS LLP**
1 First Canadian Place
Suite 5600
100 King Street West
Toronto, ON  M5X 1E2

Bruce Darlington
Jonathan Davis-Sydor

Email:   bdarlington@davis.ca
Tel:      416.365.3529
Fax:     416.369.5210

Email:   jdavissydor@davis.ca
Tel:      416.941.5397
Fax:     416.365.7886

Lawyers for Brookfield LePage Johnson Controls
Facility Management Services

AND
TO:

**McMILLAN LLP**
Brookfield Place, Suite 4400
181 Bay Street
Toronto, Ontario  M5J 2T3

Andrew F. Kent
Tushara Weerasooriya
Hilary E. Clarke

Email:   andrew.kent@mcmillan.ca
Tel:      416.865.7160
Fax:     416.865.7048

Email:   hilary.clarke@mcmillan.ca
Tel:      416.865.7286
Fax:     416.865.7048

Email:   tushara.weerasooriya@mcmillan.ca
Tel:      416.865.7262
Fax:     416.865.7048

Lawyers for Royal Bank of Canada

AND
TO:

**AIRD & BERLIS LLP**
Barristers & Solicitors
Brookfield Place, P.O. Box 754
181 Bay Street, Suite 1800
Toronto, ON  M5J 2T9

Steven L. Graff
Ian E. Aversa

Email:   sgraff@airdberlis.com
Tel:      416.865.7726
Fax:     416.863.1515

Email:   iaversa@airdberlis.com
Tel:      416.865.3082
Fax:     416.863.1515

Lawyers for Perot Systems Corporation

- 9 -

| | | | | |
|---|---|---|---|---|
| AND TO: | **McMILLAN LLP**<br>Brookfield Place, Suite 4400<br>181 Bay Street<br>Toronto, Ontario M5J 2T3 | | AND TO: | **CASSELS BROCK & BLACKWELL LLP**<br>40 King Street West,<br>Suite 2100<br>Toronto, Ontario M5H 3C2 |

**AND TO:**

**McMILLAN LLP**
Brookfield Place, Suite 4400
181 Bay Street
Toronto, Ontario M5J 2T3

Lawrence J. Crozier
Adam C. Maerov

Email:  lawrence.crozier@mcmillan.ca
Tel:  416.865.7178
Fax:  416.865.7048

Email:  adam.maerov@mcmillan.ca
Tel:  416.865.7285
Fax:  416.865.7048

Lawyers for Citibank

**AND TO:**

**CASSELS BROCK & BLACKWELL LLP**
40 King Street West,
Suite 2100
Toronto, Ontario M5H 3C2

Deborah S. Grieve

Email:  dgrieve@casselsbrock.com
Tel:  416.860.5219
Fax:  416.350.6923

Lawyers for Alvarion Ltd.

**AND TO:**

**BLANEY McMURTRY LLP**
Barristers and Solicitors
1500 – 2 Queen Street East
Toronto, Ontario M5C 3G5

Domenico Magisano

Email:  dmagisano@blaney.com
Tel:  416.593.2996
Fax:  416.593.5437

Lawyers for Expertech Network Installation Inc.

**AND TO:**

**GARDINER ROBERTS LLP**
Suite 3100, Scotia Plaza
40 King Street West
Toronto, ON M5H 3Y2

Jonathan Wigley
Vern W. DaRe

Email:  jwigley@gardiner-roberts.com
Tel:  416.865.6655
Fax:  416.865.6636

Email:  vdare@gardiner-roberts.com
Tel:  416.865.6641
Fax:  416.865.6636

Lawyers for Amphenol Corporation

**AND TO:**

**LANG MICHENER LLP**
Brookfield Place
Suite 2500, 181 Bay Street
P.O. Box 747
Toronto, Ontario M5J 2T7

Leslie Wittlin
Aaron Rousseau

Email:  lwittlin@langmichener.ca
Tel:  416.307.4087
Fax:  416.365.1719

Email:  arousseau@langmichener.ca
Tel:  416.307.4081
Fax:  416.365.1719

Lawyers for Right Management Inc.

**AND TO:**

**AIRD & BERLIS LLP**
Barristers & Solicitors
Brookfield Place, P.O. Box 754
181 Bay Street, Suite 1800
Toronto, Ontario M5J 2T9

Sanjeev P.R. Mitra
Sandra A. Vitorovich

Email:  smitra@airdberlis.com
svitorovich@airdberlis.com

Tel:  416.863.1500
Fax:  416.863.1515

Lawyers for Enbridge Gas Distribution Inc.

- 10 -

18

AND TO:
**NELLIGAN O'BRIEN PAYNE LLP**
Barristers and Solicitors
50 O'Connor Street
Suite 1500
Ottawa, Ontario  K1P 6L2

Janice B. Payne
Ainslie Benedict
Steven Levitt
Christopher Rootham

Email:    janice.payne@nelligan.ca
          ainslie.benedict@nelligan.ca
          steven.levitt@nelligan.ca
          christopher.rootham@nelligan.ca

Tel:    613.231.8245
Fax:    613.788.3655

Lawyers for the Steering Committee of Recently
Severed Canadian Nortel Employees

AND TO:
**CASSELS BROCK & BLACKWELL LLP**
2100 Scotia Plaza
40 King Street West
Toronto, Ontario  M5H 3C2

E. Bruce Leonard
Harvey Garman
Michael Casey

Email:    bleonard@casselsbrock.com
          hgarman@casselsbrock.com
          mcasey@casselsbrock.com

Tel:    416.860.6455
Fax:    416.640.3054

Lawyers for the UK Pension Protection Fund and
Nortel Networks UK Pension Trust Limited

AND TO:
**CALEYWRAY**
Labour/Employment Lawyers
1600-65 Queen Street West
Toronto, Ontario  M5H 2M5

Gail E. Misra

Email:    misrag@caleywray.com

Tel:    416.775.4680
Fax:    416.366.3293

Lawyers for the Communication, Energy and
Paperworkers Union of Canada

AND TO:
**MCFARLANE LEPSOE**
Barristers & Solicitors
70 Gloucester Street, Third Floor
Ottawa, Ontario  K2P 0A2

Paul K. Lepsoe

Email:    pklepsoe@mcfarlanelaw.com

Tel:    613.233.2679
Fax:    613.233.3774

Lawyers for Iron Mountain Canada Corporation
and Iron Mountain Information Management, Inc.

AND TO:
**COLBY, MONET DEMERS, DELAGE &
CREVIER LLP**
Tour McGill College
1501 McGill College Avenue
Suite 2900
Montreal, Quebec  H3A 3M8

David J. Dropsy

Email:    ddropsy@colby-monet.com
Tel:    514.284.3663
Fax:    514.284.1961

Lawyers for GFI INC., a division of Thomas &
Betts Manufacturing Inc.

AND TO:
**SCHNEIDER & GAGGINO**
375 Lakeshore Drive
Dorval, Quebec  H9S 2A5

Dan Goldstein
Marco Gaggino

Email:    dgoldstein@schneidergaggino.com
          mgaggino@schneidergaggino.com

Tel:    514.631.8787
Fax:    514.631.0220

Lawyers for the Teamsters Quebec Local 1999

- 11 -

| | |
|---|---|
| AND TO: | **NELLIGAN O'BRIEN PAYNE LLP**<br>Barristers and Solicitors<br>50 O'Connor Street<br>Suite 1500<br>Ottawa, Ontario  K1P 6L2<br><br>Janice B. Payne<br>Steven Levitt<br>Christopher Rootham<br><br>Email:  janice.payne@nelligan.ca<br>steven.levitt@nelligan.ca<br>christopher.rootham@nelligan.ca<br><br>Tel:  613.231.8245<br>Fax:  613.788.3655<br><br>Lawyers for the Steering Committee of Nortel Canadian Continuing Employees -- Post CCAA as at January 14, 2009 | AND TO: | **BAKER & McKENZIE LLP**<br>Brookfield Place, P.O. Box 874<br>181 Bay Street, Suite 2100<br>Toronto, Ontario  M5J 2T3<br><br>Chris Besant<br>Lydia Salvi<br><br>Email:  chris.besant@bakernet.com<br><br>Tel:  416.865.2318<br>Fax:  416.863.6275<br><br>Email:  lydia.salvi@bakernet.com<br><br>Tel:  416.865.6944<br>Fax:  416.863.6275<br><br>Lawyers for Jabil Circuit Inc. |

Laid out as two columns:

**AND TO:**  **NELLIGAN O'BRIEN PAYNE LLP**
Barristers and Solicitors
50 O'Connor Street
Suite 1500
Ottawa, Ontario  K1P 6L2

Janice B. Payne
Steven Levitt
Christopher Rootham

Email:  janice.payne@nelligan.ca
steven.levitt@nelligan.ca
christopher.rootham@nelligan.ca

Tel:  613.231.8245
Fax:  613.788.3655

Lawyers for the Steering Committee of Nortel Canadian Continuing Employees -- Post CCAA as at January 14, 2009

**AND TO:**  **BAKER & McKENZIE LLP**
Brookfield Place, P.O. Box 874
181 Bay Street, Suite 2100
Toronto, Ontario  M5J 2T3

Chris Besant
Lydia Salvi

Email:  chris.besant@bakernet.com

Tel:  416.865.2318
Fax:  416.863.6275

Email:  lydia.salvi@bakernet.com

Tel:  416.865.6944
Fax:  416.863.6275

Lawyers for Jabil Circuit Inc.

**AND TO:**  **BENNETT JONES LLP**
1 First Canadian Place
Suite 3400
Toronto, Ontario  M5X 1A4

Robyn M. Ryan Bell
Mark Laugesen

Email:  ryanbellr@bennettjones.com
laugesenm@bennettjones.com

Tel:  416.863.1200
Fax:  416.863.1716

Lawyers for Tel-e Connect Systems Ltd. and Tel-e Connect Systems (Toronto) Ltd.

**AND TO:**  **McCARTHY TETRAULT LLP**
Suite 5300, Toronto Dominion Bank Tower
Toronto, Ontario  M5K 1E6

Thomas G. Heintzman
Junior Sirivar

Email:  theintzm@mccarthy.ca
Tel:  416.601.7627
Fax:  416.868.0673

Email:  jsirivar@mccarthy.ca
Tel:  416.601.7750
Fax:  416.868.0673

Lawyers for Frank Andrew Dunn

**AND TO:**  **MINDEN GROSS LLP**
145 King Street West, Suite 2200
Toronto, Ontario  M5H 4G2

Timothy R. Dunn

Email:  tdunn@mindengross.com
Tel:  416.369.4335
Fax:  416.864.9223

Lawyers for 2748355 Canada Inc.

**AND TO:**  **EURODATA**
2574 Sheffield Road
Ottawa, Ontario  K1B 3V7

Nanci Shore

Email:  nanci@eurodata.ca
Tel:  613.745.0921
Fax:  613.745.1172

- 12 -

AND
TO:

**BALDWIN LAW PROFESSIONAL
CORPORATION**
54 Victoria Avenue
Belleville, Ontario K8N 5J2

Ian W. Brady

Email:  lbrady@baldwinlaw.ca
Tel:      613.771.9991
Fax:     613.771.9998

Lawyers for Sydney Street Properties Corp.

AND
TO:

**AIRD & BERLIS LLP**
Barristers & Solicitors
Brookfield Place, P.O. Box 754
181 Bay Street, Suite 1800
Toronto, ON  M5J 2T9

Steven L. Graff
Ian E. Aversa

Email:  sgraff@airdberlis.com
Tel:      416.865.7726
Fax:     416.863.1515

Email:  iaversa@airdberlis.com
Tel:      416.865.3082
Fax:     416.863.1515

Lawyers for Huawei Technologies Co. Ltd.

AND
TO:

**SHIBLEY RIGHTON LLP**
Barristers and Solicitors
250 University Avenue, Suite 700
Toronto, Ontario M5H 3E5

Arthur O. Jacques
Thomas McRae

Email:  arthur.jacques@shibleyrighton.com
Tel:      416.214.5213
Fax:     416.214.5413

Email :  thomas.mcrae@shibleyrighton.com
Tel :     416.214.5206
Fax :    416.214.5400

Co-Counsel for the Steering Committee of
Nortel Canadian Continuing Employees – Post
CCAA as at January 14, 2009

AND
TO:

**AETL TESTING, INC.**
130 Chaparral Court, Suite 250
Anaheim, California 92808

Cynthia R. Maher

Email:  cynthia.maher@ntscorp.com
Tel:      714.998.4351
Fax:     714.998.7142

Lawyers for AETL Testing, Inc.

AND
TO:

**SHIBLEY RIGHTON LLP**
Barristers and Solicitors
250 University Avenue, Suite 700
Toronto, Ontario M5H 3E5

Arthur O. Jacques
Thomas McRae

Email:  arthur.jacques@shibleyrighton.com
Tel:      416.214.5213
Fax:     416.214.5413

Email :  thomas.mcrae@shibleyrighton.com
Tel :     416.214.5206
Fax :    416.214.5400

Lawyers for The Recently Severed Canadian
Nortel Employees Committee

AND
TO:

**LAVERY, DE BILLY, LLP**
Barristers & Solicitors
Suite 2400, 600 de la Gauchetière West
Montreal, Quebec H3B 4L8

Jean-Yves Simard

Email :  jysimard@lavery.ca
Tel :     514.871.1522
Fax :    514.871.8977

Lawyers for Texas Landlords to Nortel Networks
Inc.

| | | | | |
|---|---|---|---|---|
| AND TO: | **NATIONAL TECHNICAL SYSTEMS** 130 Chaparral Ct., Suite 250 Anaheim, California, U.S.A. 92808 | | AND TO: | **GOWLING LAFLEUR HENDERSON LLP** Suite 1600, First Canadian Place 100 King Street West Toronto, ON  M5X 1G5 |

AND TO:    **NATIONAL TECHNICAL SYSTEMS**
130 Chaparral Ct., Suite 250
Anaheim, California, U.S.A.
92808

Cynthia Maher

Email: cynthia.maher@ntscorp.com
Tel:    714.998.4351

AND TO:    **GOWLING LAFLEUR HENDERSON LLP**
Suite 1600, First Canadian Place
100 King Street West
Toronto, ON  M5X 1G5

David F.W. Cohen

Email:    david.cohen@gowlings.com

Tel:     416.369.6667
Fax:    416.862.7661

Lawyers for General Electric Canada Equipment Finance G.P. and GE Capital Canada Leasing Services Inc.

AND TO:    **DAVIS LLP**
1 First Canadian Place
Suite 5600
100 King Street West
Toronto, ON  M5X 1E2

Bruce Darlington
Jonathan Davis-Sydor

Email:    bdarlington@davis.ca
Tel:     416.365.3529
Fax:    416.369.5210

Email:    jdavissydor@davis.ca
Tel:     416.941.5397
Fax:    416.365.7886

Lawyers for Computershare Trust Company of Canada

AND TO:    **DAVIES WARD PHILLIPS & VINEBERG LLP**
44th Floor
1 First Canadian Place
Toronto, ON  M5X 1B1

Robin B. Schwill
Matthew P. Gottlieb

Email:    rschwill@dwpv.com
Tel:     416.863.0900
Fax:    416.863.0871

Email:    mgottlieb@dwpv.com
Tel:     416.863.0900
Fax:    416.863.0871

Lawyers for Nortel Networks UK Limited (In Administration)

AND TO:    **LAX O'SULLIVAN SCOTT LLP**
Counsel
Suite 1920, 145 King Street West
Toronto, Ontario  M5H 1J8

Terrence O'Sullivan
Shaun F. Laubman

E-mail: tosullivan@counsel-toronto.com
Tel:     416.598.1744
Fax:    416.598.3730

Email:    slaubman@counsel-toronto.com
Tel:     416.598.1744
Fax:    416.598.3730

Lawyers for William A. Owens

AND TO:    **BAKER & McKENZIE LLP**
Brookfield Place, P.O. Box 874
181 Bay Street, Suite 2100
Toronto, Ontario  M5J 2T3

Lydia Salvi

Email:    lydia.salvi@bakernet.com

Tel:     416.865.6944
Fax:    416.863.6275

Lawyers for Wipro Limited

*22*

- 14 -

AND
TO:
**AIRD & BERLIS LLP**
Barristers & Solicitors
Brookfield Place, P.O. Box 754
181 Bay Street, Suite 1800
Toronto, ON  M5J 2T9

Steven L. Graff
Ian E. Aversa

Email:    sgraff@airdberlis.com
Tel:       416.865.7726
Fax:      416.863.1515

Email:    iaversa@airdberlis.com
Tel:       416.865.3082
Fax:      416.863.1515

Lawyers for the Current and Former Employees of
Nortel Networks Inc. who are or were Participants
in the Long-Term Investment Plan Sponsored by
Nortel Networks Inc.

AND
TO:
**McCARTHY TETRAULT LLP**
Suite 5300, TD Bank Tower
Toronto Dominion Centre
Toronto, Ontario  M5K 1E6

Heather Meredith

Email:    hmeredith@mccarthy.ca
Tel:       416.601.8342
Fax:      416.868.0673

Lawyers for Hitachi Communications
Technologies, Ltd.

AND
TO:
**TORYS LLP**
79 Wellington Street West, Suite 3000
Box 270, TD Centre
Toronto, Ontario  M5K 1N2

Scott Bomhof

Email:    sbomhof@torys.com
Tel:       416.865.7370
Fax:      416.865.7380

Lawyers for Nokia Siemens Networks B.V.

AND
TO:
**DEPARTMENT OF JUSTICE**
Ontario Regional Office
The Exchange Tower, Box 36
130 King Street W., Suite 3400
Toronto, Ontario  M5X 1K6

Diane Winters

Email:   dwinters@justice.gc.ca
Tel:      416.973.3172
Fax:      416.973.0810

- 15 -

AND
TO:

**BLAKE, CASSELS & GRAYDON LLP**
199 Bay Street, Suite 2800
Commerce Court West
Toronto, Ontario  M5L 1A9

Pamela Huff
Milly Chow
Hugh DesBrisay
Craig Thorburn

Email:  pamela.huff@blakes.com
Tel:     416.863.2958
Fax:     416.863.2653

Email:  milly.chow@blakes.com
Tel:     416.863.2594
Fax:     416.863.2653

Email:  hugh.desbrisay@blakes.com
Tel:     416.863.2426
Fax:     416.863.2653

Email:  craig.thorburn@blakes.com
Tel:     416.863.2965
Fax:     416.863.2653

Lawyers for MatlinPatterson Global Advisers LLC,
MatlinPatterson Global Opportunities Partners III
L.P. and MatlinPatterson Opportunities Partners
(Cayman) III L.P.

AND
TO:

**LANG MICHENER LLP**
Brookfield Place
181 Bay Street, Suite 2500
Toronto, Ontario, M5J 2T7

Sheryl E. Seigel

Email:  sseigel@langmichener.ca
Tel:     416.307.4063
Fax:     416.365.1719

Lawyers for The Bank of New York Mellon

AND
TO:

**BLAKE, CASSELS & GRAYDON LLP**
199 Bay Street, Suite 2800
Commerce Court West
Toronto, Ontario  M5L 1A9

Susan M. Grundy
Marc Flynn

Email:  susan.grundy@blakes.com
Tel:     416.863.2572
Fax:     416.863.2653

Email:  marc.flynn@blakes.com
Tel:     416.863.2685
Fax:     416.863.2653

Lawyers for Telefonaktiebolaget L M Ericsson
(publ)

AND
TO:

**McCARTHY TETRAULT LLP**
Suite 5300, Toronto Dominion Bank Tower
Toronto, Ontario  M5K 1E6

Kevin P. McElcheran
Ryan Stabile

Email:    kmcelcheran@mccarthy.ca
Tel:       416.601.7730
Fax:       416.868.0673

Email:    rstabile@mccarthy.ca
Tel:       416.601.8335
Fax:       416.868.0673

Lawyers for Avaya Inc.

- 16 -

AND TO:
**SACK GOLDBLATT MITCHELL LLP**
20 Dundas Street West
Suite 1100
Toronto, Ontario M5G 2G8

James McDonald
Darrell Brown

Email:   jmcdonald@sgmlaw.com
Tel:      416.979.6425
Fax:      416.591.7333

Email:   dbrown@sgmlaw.com
Tel:      416.979.4050
Fax:      416.591.7333

Lawyers for Edmund Fitzgerald

AND TO:
**STIKEMAN ELLIOTT LLP**
5300 Commerce Court West
199 Bay Street
Toronto, ON M5L 1B9

Ashley John Taylor

Email:   ataylor@stikeman.com
Tel:      416.869.5236
Fax:      416.947.0866

Lawyers for Ciena Corporation

AND TO:
**STIKEMAN ELLIOTT LLP**
5300 Commerce Court West
199 Bay Street
Toronto, ON M5L 1B9

Sean F. Dunphy

Email:   sdunphy@stikeman.com
Tel:      416.869.5662
Fax:      416.947.0866

Lawyers for GENBAND Inc.

AND TO:
**FOGLER, RUBINOFF LLP**
Barristers and Solicitors
Suite 1200
Toronto-Dominion Centre
95 Wellington Street West
Toronto, Ontario M5J 2Z9

Jeffrey K. Spiegelman

Email:   jspiegelman@foglers.com
Tel:      416.864.9700
Fax:      416.941.8852

Lawyers for Belden (Canada) Inc.

AND TO:
**STIKEMAN ELLIOTT LLP**
445 Park Avenue, 7th Floor
New York, NY 10022

Gordon Cameron
Ron Ferguson

Email:   gncameron@stikeman.com
Tel:      212.845.7464
Fax:      212.371.7087

Email:   rferguson@stikeman.com
Tel:      212.845.7477
Fax:      212.371.7087

Lawyers for GENBAND Inc.

- 17 -

## COURTESY COPIES:

AND
TO:

**LEWIS AND ROCA**
40 North Central Avenue
Phoenix, Arizona
USA 85004-4429

Scott K. Brown

Email:  sbrown@lrlaw.com

Tel:    602.262.5321
Fax:   602.734.3866

Lawyers for The Prudential Insurance
Company of America

AND
TO:

**CURTIS, MALLET-PREVOST, COLT &
MOSLE LLP**
101 Park Avenue
New York, New York 10178-0061

Steven J. Reisman
James V. Drew

E-mail:  sreisman@curtis.com
           jdrew@curtis.com

Tel:    212.696.6000
Fax:   212-697-1559

Lawyers for Flextronics International

AND
TO:

**AKIN GUMP STRAUSS HAUER &
FELD LLP**
One Bryant Park
New York, NY 10036

Fred S. Hodara

Email:  fhodara@akingump.com

Tel:    212.872.1000
Fax:   212.872.1002

U.S. Lawyers for the Official Committee of
Unsecured Creditors

AND
TO:

**MILBANK, TWEED, HADLEY
McCLOY LLP**
1 Chase Manhattan Plaza
New York, NY 10005

Dennis F. Dunne
Andrew M. Leblanc
Albert A. Pisa

Email:  DDunne@milbank.com
Tel:    212.530.5770
Fax:   212.530.5219

Email:  ALeblanc@milbank.com
Tel:    212.835.7574
Fax:   212.530.5219

Email:  APisa@milbank.com
Tel:    212.530.5319
Fax:   212.530.5219

U.S. Lawyers for The Informal Nortel
Noteholder Group

- 18 -

AND   **VEDDER PRICE P.C.**
TO:   1633 Broadway, 47th Floor
      New York, New York  10019

      Michael L. Schein

      Email:   mschein@vedderprice.com

      Tel:     212.407.6920
      Fax:     212.407.7799

      U.S. Lawyers for Telmar Network Technology,
      Inc. and Precision Communication Services, Inc.


AND   **MACLEOD DIXON LLP**
TO:   3700 Canterra Tower
      400, 3rd Avenue N.W.
      Calgary, Alberta  T2P 4H2

      Andrew Robertson
      Caylee M. Rieger

      Email :   andrew.robertson@macleoddixon.com
                caylee.rieger@macleoddixon.com

      Tel :     403.267.8222
      Fax :     403.264.5973

      Agent for Nelligan O'Brien Payne LLP, lawyers
      for the Steering Committee of Recently Severed
      Canadian Nortel Employees and lawyers for the
      Steering Committee of Nortel Canadian
      Continuing Employees – Post CCAA as at
      January 14, 2009


AND   **BRYAN CAVE LLP**
TO:   161 North Clark Street, Suite 4300
      Chicago, Illinois  60601

      Eric S. Prezant

      Email:   eric.prezant@bryancave.com
      Tel:     312.602.5033
      Fax:     312.602.5050

      U.S. Lawyers for Tellabs, Inc.

Court File No: 09-CL-7950

IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL
NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL NETWORKS
GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL CORPORATION AND
NORTEL NETWORKS TECHNOLOGY CORPORATION

---

*ONTARIO*
**SUPERIOR COURT OF JUSTICE**
**COMMERCIAL LIST**

Proceeding commenced at Toronto

---

**NOTICE OF MOTION**
**(returnable March 3, 2010)**

---

**OGILVY RENAULT LLP**
Suite 3800
Royal Bank Plaza, South Tower
200 Bay Street
Toronto, Ontario M5J 2Z4
CANADA

**Derrick Tay LSUC#: 21152A**
Tel: (416) 216-4832
Email: dtay@ogilvyrenault.com

**Mario Forte LSUC#: 27293F**
Tel: (416) 216-4870
Email: mforte@ogilvyrenault.com

**Jennifer Stam LSUC #46735J**
Tel: (416) 216-2327
Email: jstam@ogilvyrenault.com
Fax: (416) 216-3930

Lawyers for the Applicants

---

DOCSTOR: 1862025\2

27

**TAB 2**

Court File No: 09-CL-7950

***ONTARIO***
**SUPERIOR COURT OF JUSTICE**
**(COMMERCIAL LIST)**

**IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,**
**R.S.C. 1985, c. C-36, AS AMENDED**

**AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF**
**NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL**
**NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL**
**CORPORATION AND NORTEL NETWORKS TECHNOLOGY CORPORATION**

**APPLICATION UNDER THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,**
**R.S.C. 1985, c. C-36, AS AMENDED**

**AFFIDAVIT OF ELENA KING**
**(sworn February 11, 2010)**
**(Nortel Special Incentive Plan)**

I, Elena King, of the city of Toronto, in the Province of Ontario, MAKE OATH AND
SAY:

1.    I am the Senior Vice-President, Human Resources, of Nortel Networks Limited ("NNL")
and have held that position since November 2008.  As such, I have personal knowledge
of the matters to which I hereinafter depose in this Affidavit.  Where I do not possess
personal knowledge, I have stated the source of my information and, in all such cases,
believe it to be true.

2.    I swear this Affidavit in support of the motion to approve, among other things:

    (a)    the Nortel Special Incentive Plan (defined below) including approval of:

        (i)    NNL's performance of its obligations under the Nortel Special Incentive
Plan;

        (ii)   The establishment of a charge ranking subordinate to Inter-Company
Charge (as defined in the Initial Order, defined below) in respect of

- 2 -

amounts that have been determined to be payable to participants under the Nortel Special Incentive Plan, subject to their continued employment until the applicable payment date, up to a maximum amount of CDN$20 million (the "Nortel Special Incentive Plan Charge");

(b)     additional payments which may be made to ongoing employees of the Applicants in the sole discretion of the Applicants (and with the consent of the Monitor) which payments shall total no more than an aggregate of CDN$3 million;

(c)     the payment of the Third KEIP/KERP Payments (as defined below) under the 2009 KEIP and the 2009 KERP (as both terms are defined below) to those employees listed on confidential supplement to the Thirty-Seventh report (the "Supplemental Report") to the thirty-seventh report of the Monitor (the "Thirty-Seventh Report"), to be filed subject to similar relief being granted by the U.S. Court (defined below); and

(d)     sealing the Supplemental Report and all appendices thereto.

3.     References to "Nortel" herein are references to the global enterprise as a whole.

**BACKGROUND**

*Commencement of Proceedings*

4.     On January 14, 2009 (the "Filing Date"), Nortel Networks Corporation ("NNC"), NNL, Nortel Networks Technology Corporation, Nortel Networks Global Corporation and Nortel Networks International Corporation (collectively, the "Applicants") were granted protection under the *Companies' Creditors Arrangement Act*, R.S.C. 1985, c. C-36, as amended (the "CCAA") pursuant to an initial order (as subsequently amended and restated, the "Initial Order") of this Honourable Court and Ernst & Young Inc. was appointed as monitor (the "Monitor") in the CCAA proceedings.

5.     Also on January 14, 2009, certain of NNC's U.S. subsidiaries, including its principal U.S. operating subsidiary Nortel Networks Inc. ("NNI" and together with the other U.S. filing entities, the "Initial U.S. Debtors"), made voluntary filings in the United States



- 3 -

Bankruptcy Court for the District of Delaware (the "U.S. Court") under Chapter 11 of the United States Bankruptcy Code (the "Code"). On the same date, this Honourable Court granted an Order pursuant to Section 18.6(4) of the CCAA recognizing the Chapter 11 cases as "foreign proceedings" in Canada and giving effect in Canada to the automatic stay under the Code.

6.    Additionally, on January 15, 2009, Nortel Networks UK Limited ("NNUK") and certain subsidiaries of the Nortel group incorporated in Europe, the Middle East or Africa ("EMEA") each obtained an administration order for the appointment of administrators (the "Joint Administrators") from the High Court of England and Wales under the Insolvency Act 1986.

7.    On January 18, 2009, certain Nortel affiliates, including Nortel Networks Israel (Sales and Marketing) Limited, filed an application with the Tel-Aviv-Jaffa District Court, pursuant to the Israeli Companies Law, 1999, and the regulations relating thereto for a stay of proceedings. On January 19, 2009, the Israeli Court appointed Yaron Har-Zvi and Avi D. Pelossof as joint administrators (the "Joint Israeli Administrators") of the Israeli Company under the Israeli Companies Law.

8.    On February 27, 2009, the U.S. Court granted petitions recognizing these proceedings as "foreign main proceedings" pursuant to Chapter 15 of the Code.

9.    On May 28, 2009, the Commercial Court of Versailles, France (the "French Court") ordered the commencement of secondary insolvency proceedings in respect of Nortel Networks S.A. ("NNSA"), which consist of liquidation proceedings during which NNSA was originally authorized to continue to operate as a going concern for an initial period of three months which period was subsequently extended to November 28, 2009.   In accordance with the European Union's Council Regulation (EC) No. 1346/2000 on Insolvency Proceedings, the English law proceedings (the "English Proceedings") remain the main proceedings in respect of NNSA although a French administrator and a French liquidator have been appointed and are in charge of the day-to-day affairs and continuing business of NNSA in France.  On October 1, 2009, the French Court approved an order to (i) suspend the liquidation operation relating to the sale of the assets and/or businesses of NNSA for a renewable period of two months; (ii) authorize the continuation of the

- 4 -

business of NNSA so long as the liquidation operations are suspended; and (iii) maintain the powers of the French administrator and liquidator during that period except with respect to the sale of assets and/or businesses of NNSA. On November 30, 2009, the French Court approved an order to extend the aforementioned suspension for a further period of three months and authorized the continuation of the business of NNSA during that period.

10.     On June 8, 2009, the Joint Administrators appointed in respect of NNUK filed a petition with the U.S. Court for the recognition of the Administration Proceedings as they relate to NNUK (the "English Proceedings") under Chapter 15 of the Code. On June 26, 2009, the U.S. Court entered an order recognizing the English Proceedings as foreign main proceedings under Chapter 15 of the Code.

11.     On July 14, 2009, Nortel Networks (CALA) Inc. (together with the Initial U.S. Debtors, the "U.S. Debtors") made a voluntary filing with the U.S. Court under Chapter 11 of the Code.

12.     Further details regarding the background to these proceedings are set out in the affidavit sworn of John Doolittle January 14, 2009 (the "Initial Order Affidavit") previously filed in these proceedings and are therefore not repeated herein.

*Strategic Directions*

13.     At the outset of the proceedings, the Applicants announced their intention to reassess their business strategy and consider restructuring opportunities with a view to emerging as a stronger enterprise. In that regard, the Applicants took a number of steps to reduce costs and increase efficiencies within the enterprise which included the following:

(a)     the repudiation or rejection of redundant contracts, including real property leases;

(b)     significant headcount reductions, the termination of Nortel's equity plans and the Nortel Networks Corporation change in control plan;

(c)     the sale of certain non-core assets, including (i) including the sale of the Layer 4-7 business, which sale closed on April 1, 2009; (ii) including the sale of the

- 5 -

"Westwinds Facility" in Alberta, which sale closed on June 16, 2009 and (iii) the commencement of a sale process for its shareholder interest in its joint venture of LG Electronics Inc. (the "LGN Joint Venture"), which sale process is still underway;

(d)     the establishment of a key employee retention plan ("2009 KERP") and a key executive incentive plan ("2009 KEIP") to incentivise those employees key to the restructuring to remain with the Applicants during the proceedings which programs were approved by the Court on March 6, 2009 other than a portion of the 2009 KEIP, which was subsequently approved by this Court on March 20, 2009;

(e)     the approval of a separate retention plan in respect of the wind down of Nortel's Calgary facility on March 6, 2009; and

(f)     the appointment of representative counsel with respect to Former Employees and LTD Employees (as both terms are defined below) on May 27, 2009 and July 30, 2009 respectively as well as the appointment of representative counsel with respect to current employees on July 22, 2009.

14.     Despite those efforts, in June 2009, the decision was made to change direction and pursue the sales of Nortel's various businesses. Consequently, on June 19, 2009, in connection with the announcement that it had entered into a stalking horse agreement for the sale of substantially all of the assets related to its Code Division Multiple Access ("CDMA") and Long Term Evolution ("LTE") business, Nortel announced that it was advancing in its discussions with external parties to sell its other businesses in addition to the CDMA/LTE business (the "June 19 Announcement"). That decision followed extensive discussions and consultation with outside advisors and stakeholders, which discussions had been taking place since the inception of the proceedings.

15.     On August 14, 2009, Nortel announced that as a result of the June 19 Announcement and subsequent accomplishments, it had reached a natural transition point for certain matters and, as such, Nortel's President and Chief Executive Officer, Mike Zafirovski would be

- 6 -

stepping down, and the board of directors of NNC and NNL would be reduced from nine (9) to three (3) remaining directors.

16. In connection with the announcement on August 14, 2009, a number of organizational updates and changes were also announced including:

(a) confirmation of the Nortel business services group ("NBS") to support the transitional services and other operational requirements of the businesses;

(b) the establishment of a corporate group (the "Corporate Group") to be primarily responsible for the management of activities during the sales process as well as post-business disposition matters;

(c) the expansion of the Monitor's role in the CCAA proceedings; and

(d) the commencement of a process to identify a principal officer in the Chapter 11 Proceedings, which ultimately led to the appointment of John Ray as Principal Officer.

**MILESTONES ACHIEVED TO DATE**

*Divestiture Achievements*

17. As was set out in the affidavit of George Riedel sworn June 23, 2009, the decision to pursue divestitures of the businesses was made after Nortel considered all of its restructuring efforts. After considering its various options, Nortel considered the decision to pursue divestitures to be Nortel's best chance to maximize the value of its operations to preserve as many jobs as possible and continue businesses in Canada and the U.S.

18. Throughout the proceedings, the Applicants, and Nortel generally, have worked diligently to maximize value for its various businesses and preserve customer and other relationships. As has also been set out in previous affidavits sworn in these proceedings, since the June 19 Announcement, Nortel has generated over US$2 billion in sales proceeds as a result of the completion of:

- 7 -

(a)     the sale of substantially all of Nortel's CDMA/LTE assets to Telefonaktiebolaget LM Ericsson (publ) ("Ericsson"), which sale closed on November 13, 2009 (the "CDMA Sale");

(b)     the sale of Nortel's Enterprise Solutions business to Avaya Inc. which sale closed on December 18, 2009 (the "ES Sale"); and

(c)     the sale of the assets of Nortel's Wireless Networks business associated with the development of Next Generation Packet Core network components to Hitachi Inc. which sale closed on December 4, 2009 (the "Next Generation Sale").

19.     Each of these sales was completed through the "stalking horse"/ auction process. Auctions were held in respect of both the CDMA Sale and the ES Sale and, as a result of the auction, significant value was obtained for the sale of the assets. In fact, through the auction process, proceeds received to date have exceeded the original stalking horse price by approximately US$ 900 million.

20.     In addition to the sales that have been completed, additional M&A achievements include:

(a)     bidding procedures and a stalking horse agreement entered into with Ciena Corporation ("Ciena") for the sale of substantially all the assets of its Optical Networking and Carrier Ethernet businesses associated with its Metro Ethernet Networks business unit, which was subject to higher and better offers and subsequently led to the approval of an amended and restated sale agreement for the sale of that business to Ciena and anticipated to close in Q1 2010 (the "MEN Sale");

(b)     bidding procedures and an ultimate purchase agreement entered into with Ericsson for the sale of substantially all of Nortel's GSM/GSM-R business, which sale is anticipated to close in Q1 2010 (the "GSM Sale"); and



- 8 -

    (c)      bidding procedures and stalking horse agreement dated as of December 22, 2009 entered into with GENBAND Inc. for the sale of substantially all of Nortel's Carrier Voice Over IP and Application Solutions business (the "CVAS Sale").[1]

21.    The auctions conducted in respect of the MEN Sale and the GSM Sale have resulted in anticipated gross sales proceeds exceeding the original stalking horse price of over US$200 million.  This achievement, along with the increase in price achieved from the CDMA and ES Sales, has resulted in gross proceedings for the various sales of just under US$3 billion.

22.    With respect to the CVAS Sale, the scheduled bid deadline is February 23, 2010 and, to the extent that additional "qualified bids" are received, the auction is scheduled to take place on February 25, 2010.

23.    As set out above, Nortel has realized great value for the assets it has sold.  Significant other benefits have been realized in the course of transitioning Nortel's businesses to buyers, including:

    (a)      the various sales have assisted in providing ongoing employment for many Nortel employees.  In fact, as a result of the CDMA Sale, the ES Sale and the Next Generation Sale as well as the anticipated completion of the MEN Sale, the GSM Sale and the CVAS Sale, Nortel has been able to preserve approximately 13,000 jobs including approximately 3,500 those of Canadian employees, which jobs may otherwise have been in significant jeopardy;

    (b)      customers have had the re-assurance that they will continue to have their contracts serviced; and

    (c)      many suppliers will have ongoing customers in the buyers of the businesses.

---

[1] The CDMA Sale, the ES Sale, the Next Generation Sale, the MEN Sale, the GSM Sale and the CVAS Sale together with any other material sales of assets of Nortel shall be referred to collectively as the "Sales".  The buyers pursuant to the various Sales shall be referred to collectively as the "Purchasers".

- 9 -

*Funding*

24.    Since the commencement of the proceedings, the ongoing funding of the Applicants has needed to be addressed by the various estates. From the outset, it was recognized that the viability of NNL was critical to the success of Nortel in its efforts given the significant role it plays in the Nortel enterprise. In particular, NNL's role includes:

    (a)    corporate administrative and management support to its affiliates on a global basis;

    (b)    provision of transition services to fulfill contractual obligations to various purchasers of Nortel's global assets;

    (c)    ownership of substantially all of Nortel's intellectual property, which is licensed to its affiliates; and

    (d)    a significant portion of Nortel's R&D activity, which is necessary to support the ongoing business of Nortel, continues to be conducted by the Applicants.

25.    On June 9, 2009, the Applicants announced that it had entered into an interim funding and settlement agreement ("IFSA") with the U.S. Debtors and the EMEA Debtors, which provided for the settlement of certain funding issues: (a) with the U.S. Debtors through to September 30, 2009 (the "US Debtor Settlement Period"); and (b) with the EMEA Debtors through to December 31, 2009. As part of the settlement under IFSA, the Applicants received a payment from NNI of US$157 million (in addition to a US$30 million payment that had been made in January 2009).

26.    Upon the expiration of the US Debtor Settlement Period, the Applicants re-engaged in discussions with NNI as well as with the Monitor, the official committee of unsecured creditors of NNI (the "Committee") and the ad hoc bondholders' committee (the "Bondholders' Committee") for funding for the fourth quarter of 2009 and onward. As a result, on or about December 23, 2009, the Applicants and the U.S. Debtors entered into the Final Canadian Funding and Settlement Agreement (the "Canadian Funding Agreement"), which provides for the funding of the continuing work in Canada through the remainder of the creditor protection proceedings. The Canadian Funding Agreement

- 10 -

was approved by this Court as well as the U.S. Court on January 21, 2010. As a result of the Canadian Funding Agreement, NNL will receive further payments from NNI totaling US$190.8 million.

27.    The Canadian Funding Agreement provides for much needed funding to the Applicants through to the conclusion of the proceedings.

*Employee Matters*

28.    As was set out in the Initial Order Affidavit, Nortel's employees have been and are critical to its business.   Although employee reductions and the cessation of certain payments to former employees have been necessary during the course of the proceedings, the Applicants have recognized the need to address these issues during the course of their proceedings.    As such, the Applicants, in cooperation with the Monitor and other interested parties, have taken various steps to address the impact of the proceedings on current and former employees.  These efforts have included:

(a)    the consensual appointment of employee representatives and representative counsel of the Applicants' current employees, former employees ("Former Employees") and employees on long term disability ("LTD Employees");

(b)    the establishment of an employee hardship process in recognition of the fact that there may be cases in which former employees of one of the Applicants is experiencing financial hardship due to illness or healthcare costs, or due to ineligibility for pension or employment insurance benefits – this process has been extended twice since its initial implementation and is currently set to expire on April 23, 2010;

(c)    the continuation of medical and dental benefits for pensioners;

(d)    the continuation of benefits, including medical and dental benefits for all LTD Employees;

(e)    the ongoing contribution of current and special payments to the Applicants' registered pension plan; and

- 11 -

(f)     payment of wages, benefits and establishment of the 2009 Programs as well as continuation of Nortel's annual incentive plan for current employees.

29.     Most recently, the Applicants and the Monitor have concluded extensive discussions with counsel to the Former Employees and LTD Employees and the CAW-Canada as well as other interested parties to resolve certain issues related to pensioner benefits, the administration of the Applicants' registered pension plans and LTD Employee entitlements.    On February 8, 2010 the Applicants announced a settlement (the "Employee Settlement") in this regard and, on February 9, 2010 sought approval of a wide-ranging notice program for the announcement and disclosure of the Employee Settlement. I am aware that the proposed date for approval of this Court of the Employee Settlement is March 3, 2010.

*Other Achievements*

30.     In addition to the foregoing, the Applicants have also accomplished the following:

(a)     The establishment of a September 30, 2009 bar date for most claims against the Applicants and their current and former officers and directors;

(b)     The settlement of most claims with Nortel's largest supplier, Flextronics;

(c)     Entered into a restructuring agreement with its various affiliates in the Asia Pacific, which agreement was approved by this Court and the U.S. Court on December 2, 2009; and

(d)     Resolution of outstanding transfer pricing issues with Canadian and U.S. tax authorities for the taxation years 2001 through 2005 pursuant to two "advanced pricing agreements" entered into with the Canadian and U.S. tax authorities; and

(e)     the relocation of the Applicants' corporate head offices from 195 The West Mall to smaller premises at 5945 Airport Road, Suite 360 on or about December 1, 2009.

- 12 -

## ON GOING EFFORTS

31.   Although there have been significant achievements in the past thirteen (13) months, there is still much to accomplish in the next two years. For example,

(a)   there are still a number of significant sales such as the MEN Sale, the GSM Sale and the CVAS Sale to be completed;

(b)   Nortel will need to complete other sales processes, such as the LGN Joint Venture and Nortel's Passport business;

(c)   Nortel will be obligated to perform transition services under most or all of its sales arrangements;

(d)   a determination will need to be made regarding the best path forward to maximize value for Nortel's IP;

(e)   resolution of claims pursuant to the claims bar process that was approved by this Court on July 30, 2009;

(f)   establishment and resolution of compensation related claims to be developed with, among others, representative counsel to the Former Employees and LTD Employees; and

(g)   distribution of proceeds to creditors.

*Nortel Business Services*

32.   As discussed above, on August 14, 2009, Nortel announced the creation of a new Nortel unit "Nortel Business Services" or "NBS". Given the complexity of Nortel's corporate structure as well as the highly technical nature of the businesses, the Sales also proved to be very complex undertakings – both for the Nortel sellers and the Purchasers.

33.   An outgrowth of this complexity is the fact that all of the major Sales include agreements known as Transition Services Agreements ("TSAs"). The TSAs require that the Nortel sellers, including primarily the Applicants and the U.S. Debtors continue to operate, on a



contract basis, substantial elements of the day-to-day business functions relating to the divested businesses until such functions can be transferred to the relevant Purchaser. The TSAs vary in length but contemplate that services may last up through the end of 2011. They also require substantial payments to be made by the Purchasers to cover the costs of the services provided. Any material failure to perform under the TSAs will expose all of the Nortel parties thereto to substantial damages.

34.     In light of the Sales and the TSAs, the Applicants (working with U.S. Debtors, the Monitor and others) have created NBS. NBS is not a specific corporate entity, but rather refers to a business unit structure within the Nortel companies charged primarily with performance under the TSAs. In approximate terms, 21% of the NBS workforce are Applicant employees, 41% are U.S. Debtor employees and the remainder are employees of other Nortel entities around the world (the "NBS Employees").[2]

35.     NBS will operate throughout the transition services periods under the various Sales and provide vital services during this period. The primary mandates of NBS are to:

   (a)     Maintain customer service and network performance levels during the sale and integration of the various business lines; and

   (b)     Provide transition services to buyers pursuant to the terms of the various Sales.

36.     The NBS Employees provide a wide range of services to the Purchasers on behalf of Nortel, services designed to assist the Purchasers with transitioning into a position of being able to effectively run the acquired businesses, including but not limited to: (i) IT infrastructure services; (ii) IT applications services; (iii) research and development engineering services; and (iv) various business services, including order management and billing services, supply chain services, knowledge management services, finance services and real estate services. These services will continue to be required as Nortel continues the transition of control over the businesses involved in the Sales to the Purchasers over the next two years.

---

[2] NBS is led by an NNI employee, Christopher Ricaurte.

- 14 -

37.    NBS Employee positions will eventually be eliminated as a result of the Sales but are necessary to effectuate the smooth and orderly integration of the businesses being transferred pursuant to the Sales.

38.    Accordingly, Nortel has asked the NBS Employees to remain in their current employment as the transition services involved in the Sale Transactions are fully implemented.

*The Corporate Group*

39.    As set out above, also as part of the announcement on August 14, 2009, Nortel announced the creation of an ongoing "corporate group". The Corporate Group is charged primarily with the continued provision of corporate overhead services to the Nortel companies and to the Applicants and the U.S. Debtors, in particular.    In approximate terms,  45% of the Corporate Group workforce are Applicant employees, 42% are U.S. Debtor employees and the remainder are employees of other Nortel entities around the world (the "Corporate Group Employees").  The Corporate Group is led by John Doolittle, an NNL employee. The primary mandate of the Corporate Group is:

(a)    To maximize value distributed to creditors through the sale and disposition of Nortel's remaining assets; and

(b)    Facilitate measurement and evaluation of all claims.

40.    Nortel continues in its efforts to sell assets, reduce costs, preserve and maximize value for the estates, and ultimately conclude its global insolvency proceedings, it continues to require the services of the Corporate Group Employees who are dedicated to managing the day-to-day operations of the business in the context of the insolvency proceedings until their ultimate conclusion.

41.    As Nortel proceeds with divesting itself of its most substantial businesses, including the attendant transfer of thousands of employees to the Purchasers, the Corporate Group Employees continue to carry out the remaining business's essential day-to-day functions through the Corporate Group.    Maintaining a motivated and dedicated group of employees to carry out these tasks even as their former colleagues gain new employment

with the Purchasers or elsewhere is essential to ensuring the orderly and successful completion of the insolvency proceedings.

42.    Accordingly, Nortel has asked the Corporate Group Employees to remain in their current employment as the tasks necessary to continue and ultimately complete the insolvency proceedings and wind down the businesses are carried out.

## 2010/2011 EMPLOYEE ARRANGEMENTS

43.    A new incentive plan (the "Nortel Special Incentive Plan")[3] has been developed for 2010 and 2011. The Applicants are seeking approval of the Nortel Special Incentive Plan from this Court. I am aware that the U.S. Debtors are seeking similar relief as well as approval of three (3) employment agreements (the "Employment Agreements") that are separate and apart from the Nortel Special Incentive Plan from the U.S. Court.

44.    Under the Nortel Special Incentive Plan and the Employment Agreements, almost 88% of the overall cost of the Nortel Special Incentive Plan (and the special incentive amounts under the Employment Agreements) will be funded by the various Purchasers.  The Nortel Special Incentive Plan has been developed by Nortel (excluding the EMEA Debtors) in conjunction with the Mercer (US) Inc., the Monitor as well as a number of its significant stakeholders.  The Nortel Special Incentive Plan is designed to provide cash incentive payments (the "Payments") to certain employees other than those domiciled in Europe, Middle East and Africa or employed by the joint ventures holding positions with NBS or the Corporate Group (the "Plan Participants") to encourage the achievement of certain performance targets and other business goals important to the Applicants, including the successful conclusion of these proceedings and the Chapter 11 proceedings and the compliance with Nortel's obligations under various transaction agreements and the wind down of various Nortel entities.

45.    I am aware that the Monitor will be filing the Thirty-Seventh Report that contains a copy of as well as more detail with respect to the Nortel Special Incentive Plan. I understand that the Monitor will also be filing the Supplemental Report that will also contain one or

---

[3] Capitalized terms used in this section of my affidavit and not otherwise defined shall have the meaning given to them in the Nortel Special Incentive Plan .

- 16 -

more confidential appendices containing certain specific financial information with respect to the Nortel Special Incentive Plan. Much of this information is sensitive and confidential and, in some instances, constitutes individual compensation details. The Applicants are requesting that the Supplemental Report and the confidential appendices thereto be sealed pending further Order of this Court.

*Terms of Nortel Special Incentive Plan and Creation of the Nortel Special Incentive Plan Charge*

46.    The Nortel Special Incentive Plan sets out a process for the selection of Plan Participants. Plan Participants are selected in accordance with criteria approved by the Boards (as defined in the Nortel Special Incentive Plan) and developed in consultation with the Monitor, the Committee and the Bondholders' Committee. Plan Participants employed within NBS (the "NBS Plan Participants") will be identified as either "NBS Group A," "NBS Group B" or "NBS Group C", based on each Plan Participant's Nortel designated "Job Complexity Indicator". Plan Participants employed within the Corporate Group (the "Corporate Plan Participants") will be identified as either "Corporate Group A" or "Corporate Group B" depending on each Plan Participant's Job Complexity Indicator and "Job Family Group".

47.    There are a total of 1,475 Plan Participants including 455 employees (421 NBS Employees and 34 Corporate Group Employees) of the Applicants. I am aware that the Thirty-Seventh Report will contain further details regarding the Plan Participants.

48.    Under the terms of the Nortel Special Incentive Plan, each Plan Participant will be eligible to receive a Payment in respect of each Plan Period (defined below) up to an amount (the "Target Payment Amount") determined in accordance with criteria determined by the Board in consultation with the Monitor, the Committee and the Bondholders' Committee. Each Plan Participant's Payment will be comprised of a component conditioned upon completion of the Plan Participant's role from the commencement of the Nortel Special Incentive Plan through to June 30, 2012, being the end of the Nortel Special Incentive Plan (the "Plan Term") in furthering the business purposes of the Applicants in the relevant Plan Period (the "Completion Payment") and may also include a component based on the achievement of specific performance metrics

- 17 -

(the "Performance Metrics") for the Plan Periods (the "Performance Payment," and together with the Completion Payment, the "Payment Amounts"). Specifically:

(a)     With respect to NBS Plan Participants in NBS Group A and NBS Group B, two-thirds of the Target Payment Amount shall be allocated to the Performance Payment and one-third shall be allocated to the Completion Payment;

(b)     With respect to NBS Plan Participants in NBS Group C, one-half of the Target Payment Amount shall be allocated to the Performance Payment and one-half shall be allocated to the Completion Payment; and

(c)     With respect to the Corporate Plan Participants, all of the Target Payment Amount shall be allocated to the Completion Payment.

49.     The Boards will also retain the right to reduce (including to zero) the target Performance Payments of any Plan Participant to the extent it determines that the relevant entity did not meet target performance levels with respect to any particular Performance Metric.

50.     The Nortel Special Incentive Plan will have two periods (each, a "Plan Period"). The first Plan Period (the "First Plan Period") is January 1, 2010 to December 31, 2010. The second Plan Period (the "Second Plan Period") is January 1, 2011 to December 31, 2011. A Plan Participant is eligible to participate in the Second Plan Period only if such Plan Participant is actively employed by Nortel on January 1, 2011 and prior to that date has not received notice from his or her employer of an intention to terminate such Plan Participant's employment.

51.     With respect to each Plan Period, a Plan Participant's Performance Payment shall be determined by reference to the level of achievement in respect of "Performance Metrics" to measure performance during such Plan Period. Performance Metrics will be subject to approval by the Board in consultation with the Monitor, the Committee and the Bondholders' Committee. The Performance Metrics will include (although may not be limited to): (a) NBS net cash from operations; (b) recovery value of leave behind assets in NBS; and (c) some performance against TSA measured in quantity and timeliness.

52.   A Performance Payment in respect of the First Plan Period is known as a "Year One Performance Payment" A Performance Payment in respect of the Second Plan Period is known as a "Year Two Performance Payment" A Completion Payment in respect of the First Plan Period is known as a "Year One Completion Payment"  A Completion Payment in respect of the Second Plan Period is known as a "Year Two Completion Payment".

53.   Assuming that all Plan Participants achieve their Target Payment Amount in each Plan Period, the Applicants (and the U.S. Debtors) estimate that the aggregate payout under the Nortel Special Incentive Plan plus the Employment Agreements will be approximately US$93 million. The estimated aggregate payments are as follows:

|  | NBS | Corporate | Total |
|---|---|---|---|
| Applicants | US$51,717,095 | US$3,879,000 | US$55,596,095 |
| U.S. Debtors | US$23,241,751 | US$4,572,211 | US$27,813,962 |
| Rest of World | US$8,131,804 | US$810,583 | US$8,942,387 |
| Total | US$83,090,650 | $US9,261,794 | US$92,352,444 |

54.   As discussed above, the Purchasers will fund approximately 88% of the amounts under the Nortel Special Incentive Plan and the special incentive amounts under the Employment Agreements.   Further details regarding Purchasers' funding will be contained in the Thirty-Seventh Report.

55.   Following completion of each Plan Period, the Board in consultation with the Monitor, the Committee and the Bondholders' Committee will determine the amount to be paid to each Plan Participant with respect to such Plan Participant's Performance Payment for such Plan Period based on its determination regarding the level of achievement of the targets established by the Board for the applicable Performance Metrics.



- 19 -

56.    Any portion of any Payment payable upon completion of the First Plan Period will be made in a lump sum cash payment as soon as practicable following March 1, 2011, but in no event later than April 30, 2011.    Any portion of any Payment payable upon completion of the Second Plan Period will be made in a lump sum cash payment as soon as practicable following March 1, 2012, but in no event later than April 30, 2012.

57.    Each Plan Participant will be paid in the amounts and at the times set forth below for the applicable Plan Participant "group" so long as such Plan Participant is either actively employed or an inactive employee as a result of short- or long-term disability or other bona fide leaves of absence on the date the Payment is paid:

    (a)    NBS Group A:

        (i)    100% of both the Year One Performance Payment and Year Two Performance Payment following the completion of the Second Plan Period;

        (ii)    50% of the Year One Completion Payment following the completion of the First Plan Period; and

        (iii)    50% of the Year One Completion Payment and 100% of the Year Two Completion Payment following the completion of the Second Plan Period.

    (b)    NBS Group B:

        (i)    100% of the Year One Performance Payment following the completion of the First Plan Period;

        (ii)    100% of the Year Two Performance Payment following the completion of the Second Plan Period; and

        (iii)    100% of both the Year One Completion Payment and the Year Two Completion Payment following the completion of the Second Plan Period.

- 20 -

(c)     NBS Group C:

    (i)     100% of the Year One Performance Payment following completion of the First Plan Period;

    (ii)    100% of the Year Two Performance Payment following the completion of the Second Plan Period;

    (iii)   100% of the Year One Completion Payment following the completion of the First Plan Period; and

    (iv)    100% of the Year Two Completion Payment following the completion of the Second Plan Period.

(d)     Corporate Group A:

    (i)     100% of both the Year One Completion Payment and Year Two Completion Payment following the completion of the Second Plan Period.

(e)     Corporate Group B:

    (i)     50% of the Year One Completion Payment following the completion of the First Plan Period; and

    (ii)    50% of the Year One Completion Payment and 100% of the Year Two Completion Payment following the completion of the Second Plan Period.

58.   Additional terms of the Nortel Special Incentive Plan include:

(a)     *Voluntary Termination and Involuntary Termination for Cause.*   Upon the involuntary termination of employment of a Plan Participant for cause (as defined in the Nortel Special Incentive Plan) or the voluntary termination of employment by a Plan Participant for any reason, the right to any unpaid Payment of such Plan Participant (the "Unpaid Payments") will be forfeited on the date of such employment termination and such Plan Participant will have no further rights under the Nortel Special Incentive Plan.



- 21 -

(b) *Involuntary Termination For Reasons Other than Cause During First Plan Period.* Except as stated to the contrary in a Plan Participant's payment letter, upon the involuntary termination of employment of a Plan Participant during the First Plan Period for reasons other than an involuntary termination for cause, any Unpaid Payment that is a Year One Completion Payment will be accelerated and paid as soon as practicable, but no later than the 90th day following the date of termination of employment, provided that the Plan Participant has executed and not revoked a release of all claims with respect to the Nortel Special Incentive Plan. Any Unpaid Payment that is a Year One Performance Payment will be paid at the same time as all other such Performance Payments are made to other Plan Participants who are actively employed on the relevant Payment Date, unless otherwise required by applicable law. Such Plan Participants shall not be eligible for any portion of the Year Two Performance Payment or Year Two Completion Payment.

(c) *Involuntary Termination For Reasons Other than Cause During Second Plan Period.* Upon the involuntary termination of employment of a Plan Participant during the Second Plan Period for reasons other than an involuntary termination for cause, any Unpaid Payment that is a Completion Payment will be accelerated and paid as soon as practicable, but no later than the 90th day following the date of termination of employment, provided that the Plan Participant has executed and not revoked a release of all claims with respect to the Nortel Special Incentive Plan. Any Unpaid Payment that is a Performance Payment will be paid at the same time as all other such Performance Payments are made to other Plan Participants who are actively employed on the relevant Payment Date, unless otherwise required by applicable law.

(d) *Termination Due to Transfer to a Purchaser.* In the event that a Plan Participant's employment with Nortel terminates as a result of such Plan Participant's transfer to a Purchaser or an employer to which Nortel services have been outsourced, such Plan Participant's termination shall be treated in accordance with paragraphs (b) and (c) above, <u>provided</u> that both Nortel and the

49

- 22 -

Purchaser agree in advance in writing to such transfer and the effective date of such transfer.

(e)    *Discretionary Pool.* The Applicants and the U.S Debtors have also committed to a "discretionary pool" of a maximum of US$20 million (the "Discretionary Pool") which is part of the Nortel Special Incentive Plan and from which Plan Participants may receive additional payments. The metrics for determining qualification will be with input from the Board, the Monitor, the Principal Officer, the Committee and the Bondholders' Committee. Those metrics will be tied, among other things, to creditor recoveries. To the extent that the Applicants and/or the U.S. Debtors determine that they wish to make payments out of Discretionary Pool further Court approvals will be sought in Canada and the U.S.

*Reserve Pool*

59.    Although the Applicants believe that the Nortel Special Incentive Plan will provide the Plan Participants with the appropriate incentives to remain with Nortel, some amount of attrition will continue to occur. Modifications or additional payments may be necessary where the Applicants and the Monitor determine that, among other things, the terms of a participant's employment should be modified (including the extension of the term of employment) or new participants should be added to the Nortel Special Incentive Plan. The addition of new participants and adjustments to Payments should not result in the Nortel Special Incentive Plan exceeding its current estimated cost and no material changes will be made without the consent of the Monitor, the Committee and the Bondholders' Committee.

60.    In the event that it is necessary for Payments under the Nortel Special Incentive Plan to exceed the estimated cost described herein, the Debtors request authority to make additional Payments and/or increase Payments in an aggregate amount not to exceed CDN$3 million (the "Reserve Pool").[4] Any payment ("Additional Payments") made out of the Reserve Pool will only be made with the consent of the Monitor.

---

[4] The U.S. Debtors are seeking approval of a similar Reserve Pool up to a maximum of US$7 million.

- 23 -

*Nortel Special Incentive Plan Charge*

61.    As part of the terms of the Nortel Special Incentive Plan, the Applicants have agreed to seek approval of a charge (the "Nortel Special Incentive Plan Charge") over their assets. The Nortel Special Incentive Plan Charge would:

(a)    Cover amounts that have been determined to be payable to Plan Participants under the Nortel Special Incentive Plan, subject to their continued employment until the applicable payment date, but have not yet been paid (the "Covered Obligations");

(b)    be for a maximum of CDN$20 million;

(c)    rank (i) subordinate to the "Inter-Company Charge" (as defined in the Initial Order), and (ii) *pari passu* with the charge to be established pursuant to the Employee Settlement; and

(d)    terminate automatically upon the Monitor filing a certificate confirming that the Covered Obligations have by paid by the Applicants.

62.    I am advised by James Bromley of Cleary Gottlieb Steen & Hamilton LLP, U.S. counsel to the U.S. Debtors, that assuming the Nortel Special Incentive Plan is approved by the U.S. Court and implemented by the U.S. Debtors, amounts that may become due and owing thereunder to employees of the U.S. Debtors will become post-petition administrative obligations in the Chapter 11 proceedings having priority over general unsecured pre-petition claims. The creation of the Nortel Special Incentive Plan Charge is to provide similar levels of assurance to those participants in Canada.

*Timing for Payment of Third KEIP/KERP Payment*

63.    The Applicants are now asking that the Court authorize the immediate payment of the Third KEIP/KERP Payment for certain NBS Employees and Corporate Group Employees.

64.    As set out above, the 2009 KEIP and the 2009 KERP (collectively, the "2009 Programs") were established in March 2009. Under the 2009 KEIP, there were three (3) payments to be made based on the achievement of certain milestones. The first two milestones have

- 24 -

been achieved and payments have been made. The third milestone provided that such a payment (the "Third KEIP Payment") was to be made on the completion of a plan or plans of arrangement in the U.S. and Canada. The 2009 KERP contemplated three (3) payments which were primarily time based. As with the 2009 KEIP, the first two payments have been made. The third payment is currently scheduled to be made on June 30, 2010. An exception to both of the 2009 Programs was that for employees whose employment was terminated as a result of the closing of the Sales, payments would vest in those employees at the time of termination (provided that employees who had received offers from Purchasers accepted those offers and commenced employment with the Purchasers ("Divested Employees")).

65.    The third milestone under the 2009 KEIP and the timing for the third payment under the 2009 KERP were determined at a time when Nortel's still intended to reorganize and was prior to the June 19 Announcement. Appropriately, the third milestone was tied "the later of the confirmation by the US court of a plan of reorganization in the United States or the confirmation by the Canadian court of a plan or plans of restructuring and/or arrangement in Canada plan of reorganization". Corresponding timing considerations were given to the setting of the term of the 2009 KERP.

66.    However, following the June 19 Announcement, the key objective in the proceedings became the sale of Nortel's businesses. The emphasis on motivating, incentivizing and retaining employees who could facilitate the sale of the businesses and other restructuring activities was reinforced with the announcement on August 10, 2009 that Nortel was at a natural transition point resulting in a number of leadership changes and a new organizational structure designed to work towards the completion of the sales of its businesses and other restructuring activities.

67.    As discussed above, Nortel has sold or will be selling shortly a majority of its businesses through various Sales. Nortel has reached this critical point in its global restructuring due to the efforts of the participants for which relief regarding the immediate payment the Third KEIP/KERP Payment is sought.

68.    Currently under the 2009 Programs, payment is made prior to the plan contemplated payment date for employees who are involuntarily terminated without cause under the

62

- 25 -

KERP and Divested Employees with respect to the 2009 KEIP and the 2009 KERP. However, because the 2009 KEIP contemplated a reorganization of Nortel rather than the sale of its businesses, the trigger for payment to NBS Employees and Corporate Group Employees participating in the 2009 KEIP has not technically been achieved. Similarly, the timing for payment under the 2009 KERP has meant that those employees who remain in NBS or the Corporate Group have not received a third payment under the 2009 KERP while others who have been or will be terminated as part of the Sales, have received earlier payment or will receive a payment upon the closing of a Sale. This has resulted in an inequity for those employees who have agreed to stay on to the completion of the proceedings and absent the immediate payment of the Third KEIP/KERP Payment, would result in penalizing the NBS and Corporate Group employees for remaining with Nortel and continuing to work tirelessly to benefit the Applicants' estates.

**CONCLUSION**

69.     Throughout the proceedings, the Applicants have been focused on ensuring the best outcome for the greatest number of people including not only its creditors, but its employees, customers and other stakeholders and they have done so in order to maximize Nortel's estate to be distributed to its creditors. This work has been done in conjunction with the Applicants' (and the U.S. Debtors') advisors, the Monitor, the Joint Administrators, the Committee, the Bondholders' Committee, Representative Counsel and other stakeholders resulting in almost all matters and court orders concluded on a consensual basis.

70.     As is clear from the above, the breadth and complexity of the work to date and the remaining work for Nortel is significant in scope and requires specialized employees to bring the process to a successful conclusion. The term of the 2009 Programs will expire shortly as those plans were developed prior to the change in strategic direction announced last June.

71.     The employees being offered participation in the Nortel Special Incentive Plan were instrumental in the work completed to date and are essential to completing the remaining tasks including selling and transitioning assets, unwinding partnerships, addressing claims and analyzing thousands of contracts. The creation of the Nortel Special Incentive



- 26 -

Plan Charge provides the much needed certainty regarding the ultimate receipt of the payments provided for under the Nortel Special Incentive Plan.

72.    The loss of the Plan Participants at this time would likely result in significant delays in achieving Nortel's objectives to maximize value to its creditor constituencies. Further:

    (a)    The Nortel Special Incentive Plan was developed in consultation with, among others, the Monitor, the Committee and the Bondholder Committee; and

    (b)    Substantially all of the Nortel Special Incentive Plan – approximately 88 percent – will be funded by the purchasers of the businesses.

73.    The creation of the Nortel Special Incentive Plan Charge will provide certainty to the Plan Participants employed by the Applicants and ensure equal treatment as between those participants and the Plan Participants employed by the U.S. Debtors.  Further the Reserve Pool will allow the Applicants with the consent of the Monitor, to account for inevitable attrition and other changes in circumstances.  The Nortel Special Incentive Plan is fair and reasonable in the circumstances.

74.    The Applicants believe that revised payment date of the Third KEIP/KERP Payment for the Plan Participants is appropriate and in the best interests of the Applicants, and that the payments are reasonable and necessary to incentivize their employees required to maximize the value of the Applicants' estates.

SWORN BEFORE ME at the City of
Mississauga, in the Province of Ontario
on this 11th day of February, 2010.

_____
Commissioner for Taking Affidavits or
Notary Public
    Somantha Graff

_____
ELENA KING

Court File No: 09-CL-7950

IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL
NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL NETWORKS
GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL CORPORATION AND
NORTEL NETWORKS TECHNOLOGY CORPORATION

| | |
|---|---|
| | *ONTARIO*<br>**SUPERIOR COURT OF JUSTICE**<br>**(COMMERCIAL LIST)**<br><br>Proceeding commenced at Toronto |
| | **AFFIDAVIT OF ELENA KING**<br>**(sworn February 11, 2010)**<br>**(Nortel Special Incentive Plan)**<br><br>**OGILVY RENAULT LLP**<br>Suite 3800<br>Royal Bank Plaza, South Tower<br>200 Bay Street<br>P.O. Box 84<br>Toronto, Ontario  M5J 2Z4, Canada<br><br>**Derrick Tay LSUC#: 21152A**<br>Tel:  (416) 216-4832<br>Email: dtay@ogilvyrenault.com<br><br>**Mario Forte  LSUC#: 27293F**<br>Tel: (416) 216-4870<br>Email: mforte@ogilvyrenault.com<br><br>**Jennifer Stam LSUC #46735J**<br>Tel: (416) 216-2327<br>Email: jstam@ogilvyrenault.com<br>Fax: (416) 216-3930<br>Lawyers for the Applicants |

DOCSTOR: 1858705

# TAB 3



Court File No.: 09-CL-7950

*ONTARIO*
**SUPERIOR COURT OF JUSTICE**
**COMMERCIAL LIST**

| | | |
|---|---|---|
| THE HONOURABLE MR. | ) | WEDNESDAY, THE 3rd |
| | ) | |
| JUSTICE MORAWETZ | ) | DAY OF MARCH, 2010 |

**IN THE MATTER OF THE** *COMPANIES' CREDITORS ARRANGEMENT ACT,*
**R.S.C. 1985, c. C-36, AS AMENDED**

**AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF
NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED,
NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS
INTERNATIONAL CORPORATION AND NORTEL NETWORKS TECHNOLOGY
CORPORATION**

**APPLICATION UNDER THE** *COMPANIES' CREDITORS ARRANGEMENT ACT,*
**R.S.C. 1985, c. C-36, AS AMENDED**

**ORDER**

**THIS MOTION**, made by Nortel Networks Corporation, Nortel Networks Limited, Nortel Networks Technology Corporation, Nortel Networks Global Corporation and Nortel Networks International Corporation (collectively, the "Applicants") for the relief set out in the Applicants' Notice of Motion dated February 11, 2010 was heard this day at 393 University Avenue, Toronto, Ontario.

**ON READING** the affidavit of Elena King sworn February 11, 2010 (the "King Affidavit"), the Thirty-Seventh report of Ernst & Young Inc. dated February ●, 2010 (the

- 2 -

"Thirty-Seventh Report") in its capacity as monitor (the "Monitor"), the confidential supplement to the Thirty-Seventh Report (the "Supplemental Report") and on hearing submissions of counsel for the Applicants, the Monitor and those other parties present, no one appearing for any other person on the service list, although served as appears from the Affidavit of Service of Katie Legree sworn February 11, 2010, filed.

1.      **THIS COURT ORDERS** that the time for the service of the Notice of Motion, the Thirty-Seventh Report, and the Motion Record is hereby abridged and validated so that this Motion is properly returnable today and hereby dispenses with further service thereof.

2.      **THIS COURT ORDERS** that capitalized terms used herein and not otherwise defined shall have the meaning given to them in the King Affidavit.

3.      **THIS COURT ORDERS** that the Nortel Special Incentive Plan substantially in the form attached as Appendix "●" to the Thirty-Seventh Report is hereby approved and the Applicants are authorized to perform their respective obligations thereunder.   Notwithstanding the foregoing, the Applicants shall not be entitled to make any payments out of the Discretionary Pool without further Order of this Court.

4.      **THIS COURT ORDERS** that the Plan Participants shall be entitled to the benefit of and are hereby granted a charge (the "Nortel Special Incentive Plan Charge") on the Applicants' Property (as defined in the Initial Order) to secure payment of the amounts that have been determined to be payable to participants under the Nortel Special Incentive Plan, subject to their continued employment until the applicable payment date (the "Covered Obligations"), which Nortel Special Incentive Plan Charge shall:

      (a)      not exceed an aggregate amount of twenty million dollars (CDN$20 million);

- 3 -



(b)     rank subordinate in priority to the Inter-company Charge (as defined in the Initial Order);

(c)     apply in these proceedings and in any subsequent bankruptcy or receivership; and

(d)     automatically terminate and be extinguished on the filing with this Honourable Court by the Monitor of a certificate certifying that the Covered Obligations have been paid by the Applicants.

5.      **THIS COURT ORDERS** the Applicants' authority to make Additional Payments to ongoing employees of the Applicants from the Reserve Pool in the sole discretion of the Applicants with the consent of the Monitor as more particularly described in the King Affidavit and the Thirty-Seventh Report is hereby approved.

6.      **THIS COURT ORDERS** that subject to similar relief being granted in the U.S. Court, notwithstanding the terms of the 2009 Programs, the Third KEIP/KERP Payment pursuant to the 2009 Programs to those individuals listed on confidential appendix "●" to the Supplemental Report is hereby approved and the Applicants are authorized to make the payments contemplated thereunder forthwith.

7.      **THIS COURT ORDERS** that the Supplemental Report and all appendices thereto be and are hereby sealed pending further Order of this Court.

8.      **THIS COURT HEREBY REQUESTS** the aid and recognition of any court, tribunal, regulatory or administrative body having jurisdiction in Canada, the United States, the United Kingdom or elsewhere, to give effect to this Order and to assist the Applicants, the Monitor and their respective agents in carrying out the terms of this Order. All courts, tribunals, regulatory and administrative bodies are hereby respectfully requested to make such orders and to provide

- 4 -

such assistance to the Applicants and to the Monitor, as an officer of this Court, as may be necessary or desirable to give effect to this Order, to grant representative status to the Monitor in any foreign proceeding, or to assist the Applicants and the Monitor and their respective agents in carrying out the terms of this Order.

9.      **THIS COURT ORDERS** that each of the Applicants and the Monitor be at liberty and is hereby authorized and empowered to apply to any court, tribunal, regulatory or administrative body, wherever located, for the recognition of this Order and for assistance in carrying out the terms of this Order.

_____

Court File No: 09-CL-7950

IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL
NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL NETWORKS
GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL CORPORATION AND
NORTEL NETWORKS TECHNOLOGY CORPORATION

*ONTARIO*
SUPERIOR COURT OF JUSTICE
(COMMERCIAL LIST)

Proceeding commenced at Toronto

**ORDER**
**(Nortel Special Incentive Plan)**

**OGILVY RENAULT LLP**
Suite 3800
Royal Bank Plaza, South Tower
200 Bay Street
P.O. Box 84
Toronto, Ontario M5J 2Z4, Canada

**Derrick Tay** LSUC#: 21152A
Tel: (416) 216-4832
Email: dtay@ogilvyrenault.com

**Mario Forte** LSUC#: 27293F
Tel: (416) 216-4870
Email: mforte@ogilvyrenault.com

**Jennifer Stam** LSUC #46735J
Tel: (416) 216-2327
Email: jstam@ogilvyrenault.com
Fax: (416) 216-3930
Lawyers for the Applicants

DOCSTOR: 1861178\4

Court File No: 09-CL-7950

IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL
NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL NETWORKS
GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL CORPORATION AND
NORTEL NETWORKS TECHNOLOGY CORPORATION

*ONTARIO*
SUPERIOR COURT OF JUSTICE
(COMMERCIAL LIST)

Proceeding commenced at Toronto

**MOTION RECORD**
**Nortel Special Incentive Plan**
(returnable March 3, 2010)

**OGILVY RENAULT LLP**
Suite 3800
Royal Bank Plaza, South Tower
200 Bay Street
P.O. Box 84
Toronto, Ontario  M5J 2Z4

**Derrick Tay LSUC#: 21152A**
Tel:  (416) 216-4832
Email: dtay@ogilvyrenault.com

**Mario Forte  LSUC#: 27293F**
Tel: (416) 216-4870
Email: mforte@ogilvyrenault.com

**Jennifer Stam LSUC #46735J**
Tel: (416) 216-2327
Email: jstam@ogilvyrenault.com
Fax: (416) 216-3930

Lawyers for the Applicants