**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF DELAWARE**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x
                        :

| | |
|---|---|
| In re: | : Chapter 11 |
| | : |
| **NORTEL NETWORKS, INC.,** *et al.,* | : Case No. 09-10138 (KG) |
| | : (Jointly Administered) |
| Debtors. | : Hearing Date: March 2, 2010 |
| | : Objection Deadline: February 17, 2010 |
| | : Related Docket No. 2193 |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

**AT&T'S LIMITED OBJECTION TO DEBTORS' MOTION FOR ORDERS
(I)(A) AUTHORIZING DEBTORS' ENTRY INTO THE STALKING HORSE
AGREEMENT, (B) AUTHORIZING AND APPROVING THE BIDDING
PROCEDURES AND BID PROTECTIONS, (C) APPROVING PAYMENT
OF AN INCENTIVE FEE, (D) APPROVING THE NOTICE PROCEDURES AND
THE ASSUMPTION AND ASSIGNMENT PROCEDURES, (E) AUTHORIZING
THE FILING OF CERTAIN DOCUMENTS UNDER SEAL AND (F) SETTING A
DATE FOR THE SALE HEARING, AND (II) AUTHORIZING AND
APPROVING (A) THE SALE OF CERTAIN ASSETS OF DEBTORS' CARRIER
VOICE OVER IP AND APPLICATION SOLUTIONS BUSINESS FREE AND
CLEAR OF ALL LIENS, CLAIMS AND ENCUMBRANCES AND (B) THE
ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS**

AT&T Services, Inc. ("AT&T Services"), on its own behalf and as agent on behalf of

AT&T Corp. and its subsidiaries and affiliates (collectively, "AT&T"), hereby files this limited

objection (the "Objection") to the Debtors' Motion for Orders (I)(A) Authorizing Debtors' Entry

into the Stalking Horse Agreement, (B) Authorizing and Approving the Bidding Procedures and

Bid Protections, (C) Approving Payment of an Incentive Fee, (D) Approving the Notice

Procedures and the Assumption and Assignment Procedures, (E) Authorizing the Filing of

Certain Documents Under Seal and (F) Setting a Date for the Sale Hearing, and (II) Authorizing

and Approving (A) the Sale of Certain Assets of Debtors' Carrier Voice Over IP and Application

Solutions Business Free and Clear of All Liens, Claims and Encumbrances and (B) the

Assumption and Assignment of Certain Executory Contracts, dated December 23, 2009 (the "Sale Motion") and in support thereof states as follows:

## BACKGROUND

A.    *The AT&T Contracts*

1.    AT&T and the Debtors are parties to several contracts whereby AT&T purchases Nortel equipment and services for use in AT&T's telecommunications network, among other things (collectively, the "AT&T Contracts"). The AT&T Contracts include Master Agreement, No. 980332 (the "Master Agreement") and several supplemental agreements, attachments, modules, orders and other similar agreements entered into under the Master Agreement (the "Supplemental Agreements"). Specifically, the Debtors and AT&T are parties to, among others, the following Supplemental Agreements:

- Multi-Commitment and Purchase Agreement, No. 20080912.028.C and Amendment No. 1 to the agreement;

- AT&T – Nortel Switching Module Agreement No. 20081204.042.C and associated Appendices, Amendments and Supplements, including but not limited to, (i) Amendment 1, No. 20081204.042.A.001, (ii) Supplement 1, No. 20081204.042.S.001; and (iii) Amendment 1 to Supplement 1, No. 20081204.042.S.001.A.001 (collectively, "Switching Module Agreement No. 20081204.042");

- SBC Work Statement, No. 04034025, and associated Amendments and Supplements, including, but not limited to, (i) Amendment No. 04034025.A.002, (ii) Amendment No. 04034025.A.003, (iii) Supplemental Statement of Work (SOW), No. 0434025.S.001 (the "Work Statement Supplement"), and (iv) Amendment #1 to the

Work Statement Supplement, No. 04034025.S.001.A.001 (collectively, the "Work Statement, No. 04034025");

- Amendment No. 1 to the Master Agreement, No. 980332.A.001;

- Non-Disclosure – Reciprocal, No. 20071102.018.C, between Nortel and AT&T;

- 3-Way Nondisclosure Agreement, No. 20080922.052.C, between Insight Communications Company, L.P., Nortel and AT&T;

- Reciprocal Non-Disclosure Agreement, No. 20080514.015.C, between Nortel and AT&T;

- Trial Agreement, No. SLK0041 and associated Amendments, including, but not limited to, Amendment #1 and #2; and

- Notification letter, No. 20070919.019.

The above-listed Supplemental Agreements incorporate the Master Agreement. The Master Agreement and the related Supplemental Agreements are considered one integrated contract pursuant to their terms.

2.     Under the AT&T Contracts, the Debtors indemnify AT&T against, among other things, any damages or losses caused by the products, or as a result of claims for copyright infringement made by third parties against AT&T (collectively, the "Indemnification Provisions"). The Indemnification Provisions are essential to the AT&T Contracts because by using and/or reselling Nortel equipment to AT&T customers, AT&T, among other things, may expose itself to liability should a claim be asserted against AT&T on account of the Nortel equipment. In addition, under the AT&T Contracts, Nortel provides warranties for the Nortel equipment and is required to send technicians to service and upgrade Nortel products in addition to providing services related to the warranties on such products (collectively, the "Warranty

Provisions" and, together with the Indemnification Provisions, the "Indemnification/Warranty Provisions"). The Warranty Provisions are also essential to the AT&T Contracts because AT&T needs Nortel to provide these services for the Nortel equipment.

3.      In addition to the Indemnification/Warranty Provisions, there are other relevant provisions that are important to consider in the context of assuming and assigning the AT&T Contracts. For example, AT&T earns credits for the Nortel equipment that AT&T purchases under the AT&T Contracts. These credits can be used to, among other things, train AT&T employees to provide certain services on the Nortel equipment.

B.      *The Sale Motion and Assignment Notices*

4.      On December 23, 2009, the Debtors filed the Sale Motion. Pursuant to the Sale Motion, the Debtors propose to sell certain assets related to the Debtors' Carrier Voice Over IP and Application Solutions business (the "CVAS Business") to the successful bidder (the "Purchaser") established at an auction for the CVAS Business (the "Sale"). On December 22, 2009, the Debtors filed a proposed Asset Sale Agreement for the sale of substantially all of the assets of the CVAS Business (the "ASA") to GENBAND, Inc. (the "Stalking Horse Purchaser"). On January 8, 2010, the Court entered an order approving bidding procedures, setting the auction for February 25, 2010 (the "Auction") and the sale hearing for March 3, 2010 (the "Sale Hearing") and establishing the deadlines for parties to object to the Sale.

5.      In the Sale Motion, the Debtors seek to assume and assign certain executory contracts to the Purchaser pursuant to Section 365 of the Bankruptcy Code (the "Assigned Contracts"). However, the Purchaser is not assuming all liabilities under the Assigned Contracts, but rather, is only assuming the "Assumed Liabilities," which include, among other things, "liabilities arising after the Closing Date to the extent related to the operation of the CVAS

Business by the Stalking Horse Purchaser following the Closing… [and] liabilities arising from the performance of Assigned Contracts after the Closing Date….'" Sale Motion at p. 11. Thus, the ASA provides that the Purchaser shall assume and become responsible for, "all Liabilities arising from or in connection with the performance of the Assigned Contracts (or breach thereof)… after the Closing Date…." ASA at §2.1.3.

6.      Consistent with the Sale Motion and the ASA, the proposed order approving the Sale Motion (the "Proposed Order") provides that "[u]pon the Closing, the Purchaser shall be deemed to have assumed only the Assumed Liabilities." Proposed Order at p. 17. Although the Purchaser is not assuming all the liabilities arising from the executory contracts, the Proposed Order provides that, "[u]pon the entry of this Order… no other amounts will be owed by the Debtors, their estates or the Purchaser with respect to amounts first arising or accruing during, or attributable or related to, the period before Closing with respect to the Assumed and Assigned Contracts…" Id. at p. 14.

7.      Pursuant to the Notice of Debtors' Request for Authority to Assume and Assign Certain Contracts, dated January 13, 2010 (the "Assignment Notice"), the Debtors are seeking to assume and assign to the Purchaser certain AT&T Contracts and assert that no amounts are owed to cure such contracts. The AT&T Contracts listed in the Assignment Notice do not include all of the AT&T Contracts related to Nortel's CVAS Business. In addition, the Debtors have listed several Supplemental Agreements, but have failed to include the Master Agreement or the other Supplemental Agreements entered into under the Master Agreement.

8.      Specifically, the Debtors listed the following Supplemental Agreements that relate to and are integrated with the Master Agreement: (i) Services Work Statement No. 04034025 with Amendments #1-3 and Attachments 1-2, and (ii) Supplemental Statement of Work for

Supplemental Agreement No. 04034025.S.001. These two Supplemental Agreements appear to correspond with Work Statement, No. 04034025 contained in AT&T's list of Supplemental Agreements described in paragraph 2 of this Objection. The Debtors also list "Switching Module No. 03031410 with Amendment #1-9." However, this agreement has been superceded by Switching Module Agreement No. 20081204.042 which provides "[t]his Module replaces and supercedes Switching Module No. 03031410, as amended."[1] The Debtors have failed to include Switching Module Agreement No. 20081204.042 in the Assignment Notices. Finally, the Debtors list "LOA Proposal No. YEPR021105 to DMS 500 Products Sup." However, this agreement has also been superceded by Switching Module Agreement No. 20081204.042.

9.      In sum, the Debtors have failed to list the Master Agreement and several Supplemental Agreements related to the CVAS business including Supplemental Agreements that supercede the agreements contained in the Assignment Notices.

## OBJECTION

10.      AT&T files this objection to the extent that AT&T's rights under the Indemnification/Warranty Provisions along with all of the other contractual provisions are not assumed by the Purchaser. In particular, the ASA could be read to preclude AT&T from asserting a claim for indemnity against the Purchaser if such claim relates to events that occurred prior to the Closing Date (even if the claim was not asserted against AT&T until after the Closing Date). As discussed below, this is not permissible under Section 365, and the AT&T Contracts must be assumed and assigned in their entirety without limiting AT&T's rights under

---

[1] Switching Module Agreement No. 20081204.042 also replaces and supercedes, the following agreements related to the CVAS Business: "DMS-500 Agreement No. GPA011D.1.S.8 between Nortel and AT&T Corp., Purchase/License Agreement No. 100097 between BellSouth Long Distance, Inc. and Nortel Networks Inc., as amended, DMS-250 Switching Level Agreement No. LLJ276D between AT&T Corp. and Nortel, as amended, and Supplemental Agreement No. 7 for DMS 10 & 100F Products and Services, as amended, between Nortel and BellSouth Telecommunications Inc." These agreements should also be assumed and assigned to the extent that products were purchased under these agreements and there remains any obligations under agreements (or any obligations may arise under these agreements).

any of the contractual provisions, including the Indemnification/Warranty Provisions. In addition, the Purchaser must provide AT&T with adequate assurance of future performance that AT&T's bargained for rights will be protected and that the Purchaser has the necessary industry experience, product expertise and adequate financial resources.

11.    AT&T also objects to the extent that the Debtors are attempting to pick and choose certain AT&T Contracts without assuming the corresponding agreements entered thereunder with respect to the CVAS Business. The Master Agreement and the related Supplemental Agreements constitute single integrated agreements, which must be assumed and assigned in their entirety.[2]

A.    *The Purchaser Must Be Responsible under all Indemnification/Warranty Provisions*

12.    It is black letter law that a debtor assumes a contract under Section 365 of the Bankruptcy Code *cum onere*—with all of its benefits and burdens. NLRB v. Bildisco & Bildisco, 465 U.S. 513, 531 (1984); In re Fleming Cos., Inc., 499 F.3d 300, 308 (3d Cir. 2007). As stated by the Third Circuit,

> Section 365(f) requires a debtor to assume a contract subject to the benefits and burdens thereunder … 'The [debtor] … may not blow hot and cold. If he accepts the benefits he must adopt the burdens. He cannot accept one and reject the other'… The *cum onere* rule 'prevents the [bankruptcy] estate from avoiding obligations that are an integral part of an assumed agreement.'

Fleming, 499 F.3d at 308 (citations omitted). Similarly, a debtor seeking to assign a contract under Section 365 must also assign the contract in whole with all the benefits and burdens. Id. at 308 ("'[A]n assignment is intended to change only who performs an obligation, not the obligation to be performed.'" (citing Medtronic Ave., Inc. v. Advanced Cardiovascular Sys.,

---

[2] AT&T previously filed objections to Nortel's sale of its GSM/GSM-R Business to Telefonaktiebolaget LM Ericsson (publ), its Enterprise Business to Avaya, Inc. and its MEN Business to Ciena, Inc. based on Nortel's attempt to effect a partial assumption and assignment to the respective purchasers (the "AT&T Objections"). See Docket Nos. 2007, 1848 & 1432.

Inc., 247 F.3d 44, 60 (3d Cir. 2001)); see also In re Morande Enters., Inc., 335 B.R. 188, 192

(Bankr. M.D. Fla. 2005) ("The Debtor cannot assume and assign the contract in part, under either

§ 365 or the Florida Dealer Law, but must do so in whole, including the Location Provision."); In

re Cajun Elec. Power Co-Op., Inc., 230 B.R. 693, 710 (Bankr. M.D. La. 1999) ("The rule that an

executory contract must be assumed or assigned in toto has been recognized on several occasions

by the Fifth Circuit... an executory contract must be assumed or assigned in its entirety....").

      13.    Among the reasons that a contract must be assigned in its entirety under Section

365 is that the debtor will be relieved of its obligations under the contract pursuant to Section

365(k).  Therefore, the assignee must assume all the obligations so that the counterparty's rights

are protected.  The Third Circuit addressed the issue of whether a party can make a partial

assignment under Section 365 in American Flint Glass Workers Union v. Anchor Resolution

Corp., 197 F.3d 76 (3d Cir. 1999).  In American Flint, the debtor objected to proofs of claim

filed under collective bargaining agreements that had been assumed and assigned to the

purchaser of the debtor's assets.  The bankruptcy court found that the debtor was relieved of

liability under Section 365(k), and therefore, the claims could not be asserted against the debtor.

The Third Circuit reversed, holding that an assignment under Section 365 did not take place

because the contracts at issue were not assigned with all of the benefits and burdens:

> In the bankruptcy context, however, Code § 365(k) changes the common law rule
> by effecting a novation by operation of law whether or not the obligee consents to
> the substitution.... But consistent with the basic concept of a contract's
> assignment, under which every contractual assignee takes the entire bundle of
> rights *and* obligations under the contract, such a forced novation is dependent on
> just such a total undertaking by the assignee. Code § 365(k) (emphasis added)
> provides: Assignment by the trustee to an entity *of a contract* or lease assumed
> under this section relieves the trustee and the estate from any liability for any
> breach of such contract or lease occurring after such assignment.
>
> Where Congress uses legal terms that have "accumulated settled meaning" under
> common law, it must be presumed (unless of course the statute dictates otherwise)

that Congress meant to employ that established meaning…. Hence we construe the terms in Code § 365(k) to incorporate the general common law of assignments. In particular, we will follow the dominant consensus of common law jurisdictions, rather than the law of any particular jurisdiction….

That dominant consensus conforms to the clear meaning of the language involved: that an assignment of a contract as such involves a commitment by the assignee to perform all obligations under the contract, as well as to acquire all rights created by the contract.

Id. at 80-81 (finding the debtor was still liable because the contract was not assigned in its entirety); cf. In re Allegheny Health, 383 F.3d 169 (3d Cir. 2004) (union could not assert post-closing indemnification claim against buyer of assets because such assets were not assumed by the buyer and *union failed to object to the sale*). Thus, a debtor cannot assign a contract under Section 365 unless the assignee assumes all the obligations.

14. In this case, the Debtors are seeking to assume and assign the contracts under Section 365 and are seeking to be relieved of all liability after such assignment. However, the Purchaser is not taking the Assigned Contracts with all benefits and burdens, but rather, is seeking to limit its liabilities to the "Assumed Liabilities," i.e., liabilities related to post-closing performance. As the Third Circuit has made clear, this is not permissible under Section 365 of the Bankruptcy Code. In an analogous case, In re 1945 Route 23 Assocs., Inc., 2008 WL 2386296 (Bankr. D.N.J. 2008), the assignee of a lease argued that it was not responsible for pre-closing costs because, similar to the ASA in this case, the assignee was only responsible for post-closing costs under the asset purchase agreement. The court rejected the argument, reasoning:

The court is similarly not persuaded by Autobacs's construction of the pertinent provisions of the APA. Autobacs concedes that the Tozzo lease is an Assumed Agreement but then contends that the 2007 Corrected Cost Statement is not an Assumed Liability because much of the amount due under that cost statement accrued prior to the sale closing date (May 2, 2007). It contends that under the APA's definition of Assumed Liabilities, the obligation must both arise and relate to a period after the closing date. Further, it concludes that the following sentence in the definition clearly expresses Autobacs's intent not to assume liabilities like

those contained in the 2007 Corrected Cost Statement: "For avoidance of doubt, Assumed Liabilities excludes any Liability attributable to any act, occurrence or omission which occurred prior to Closing except as expressly assumed hereunder." Autobacs concludes from this that because it did not expressly assume the obligation to pay the cost statement, the obligation is expressly excluded. The flaw in Autobacs's argument is that under the APA Autobacs expressly assumed the Tozzo lease, and thereby expressly assumed all of its provisions, including the obligation to satisfy the payment of the 2007 Corrected Cost Statement. When R & S, and subsequently Autobacs, assumed the Tozzo lease, they assumed it in its entirety, accepting the burdens as well as the benefits. See In re Fleming Cos., Inc., 499 F.3d 300, 308 (3d Cir. 2007). Unquestionably then, the assumed obligation to pay the Corrected 2007 Cost Statement arises and relates to the period after the closing date because that is when the obligation came due.

Id., 2008 WL 2386296 at *7.

15.    Here, under the AT&T Contracts, AT&T has the right to assert claims for indemnity if claims are asserted against AT&T on account of Nortel products as well as warranty and service claims related to the Nortel equipment.  Pursuant to Section 365 of the Bankruptcy Code, the Purchaser takes the assignment subject to those rights.  As it currently stands, the ASA would appear to bar AT&T from asserting its bargained for rights, including indemnity rights, against the Purchaser if a claim based on pre-closing conduct is asserted against AT&T.  This is not permissible and, accordingly, the sale should not be approved unless the Purchaser also agrees to fully assume all pre-closing obligations including obligations arising under the Indemnification/Warranty Provisions contained in the AT&T Contracts.

B.    _There Is no Adequate Assurance of Future Performance_

16.    Absent assumption of all the obligations under the AT&T Contracts, including the Indemnification/Warranty Provisions, the Debtors must also provide adequate assurance of future performance under the AT&T Contracts.  Furthermore, in the event that the Stalking Horse Purchaser is not the successful bidder at the Auction, the Debtors must provide adequate assurance that the successful bidder assumes all liabilities _and_ has the telecommunications

industry experience needed to manufacture the goods and provide the required services to AT&T.

17.     To effectuate an assignment under the Bankruptcy Code, the Debtors must demonstrate adequate assurance of future performance.     Adequate assurance of future performance is an element of the assumption and assignment process, which must be met in addition to the curing of any defaults under an executory contract.  11 U.S.C. § 365(f)(2).  Even in the absence of a default under the contract, adequate assurance of future performance must be afforded before the trustee can assign an executory contract.  See In re E-Z Serve Convenience Stores, Inc., 289 B.R. 45, 52 (Bankr. M.D.N.C. 2003) (refusing to excise a right of first refusal from a lease agreement reasoning that, among other things, absent such provision the non-debtor party "will not receive the full benefit of its bargain and the Trustee cannot give adequate assurance of future performance").  Although not defined in the Bankruptcy Code, the phrase "adequate assurance of future performance," adopted from Section 2-609(1) of the Uniform Commercial Code, is intended to be given a "practical, pragmatic construction based upon the facts and circumstances of each case."  Cinicola v. Scharffenberger, 248 F.3d 110, 120 (3d Cir. Pa. 2001) (citations omitted).

18.     As discussed, Section 365(k) of the Bankruptcy Code relieves the trustee and the estate from any liability under a contract occurring after assignment.  As a result, adequate assurance is necessary to protect counter-parties to assumed and assigned contracts.  In re Washington Capital Aviation & Leasing, 156 B.R. 167, 175 & n.3 (Bankr. E.D. Va. 1993) (Section 365(k) alters the common law rule that the original obligor remains ultimately liable after assignment until discharged by performance, consent or otherwise.); see also In re Rickel Home Centers, Inc., 209 F.3d 291, 299 (3d Cir. 2000) (in the context of shopping center leases,

the court held that adequate assurance is "necessary to protect the rights of the non-debtor party to the contract or lease, because assignment relieves the trustee and the estate from liability arising from a post-assignment breach"), cert. denied, 531 U.S. 873 (2000).

19.     This protection includes and extends beyond ensuring that the assignee assumes all obligations under a contract.  The debtor must also demonstrate that the assignee will be able to perform under the assigned agreements.   Where the assignee does not have the proper facilities, industry experience or funding necessary to demonstrate that the assignee can adequately perform under an assigned contract, the court will deny the assignment.   In re Resource Technology, Corp., No. 08-C2425, 2008 U.S. Dist. LEXIS 91148, at *12 (N.D. Ill. Nov. 7, 2008) (affirming bankruptcy court's ruling that denied motion to assign after analyzing various factors, including "financial data submitted by the debtor or movant, the presence of a guarantee (though it is not required), industry out-looks, the nature and relationship of the parties, past dealings of the parties, and willingness of the parties to fund payments" and finding, among other things, that the assignee's funding was insufficient to allow the assignment); In re Barnhill's Buffet, Inc., 2008 Bankr. LEXIS 2675, at *10 (Bankr. M.D. Tenn. 2008) (court found that there was no adequate assurance because, among other things, the assignee had "no operating experience"); In re Washington Capital Aviation & Leasing, 156 B.R. 167, 175 (Bankr. E.D. Va. 1993) (indicating "doubtful financial outlook" of assignee warranted denying authorization of assumption and assignment of aircraft lease); see also In re Old South Coors, Inc., 27 B.R. 923, 926 (N.D. Miss. 1983) (Court found that there was adequate assurance stating, "[t]he aforementioned descriptions of the long and successful business experience and financial strength of each proposed assignee convince this court that the prospects for successful future business enterprise by each assignee meet all reasonable standards of adequate assurance of

future performance by each assignee"); In re Pioneer Ford Sales, Inc., 729 F.3d 27, 30 (1st Cir. 1984) (court found that assignee's industry experience weighed in favor of finding that there was adequate assurance but found that assignee's "track record" of financial loss precluded such a finding).

20.    Here, AT&T's indemnity claims based on events that occurred prior to the Sale could arise months or years after the Sale. If the ASA prevents AT&T from asserting these claims, AT&T would be left without its bargained for rights, resulting in the failure to provide adequate assurance of future performance. In short, the Debtors must provide adequate assurance that AT&T's bargained for rights will be protected, which means that the contracts, including the Indemnification/Warranty Provisions, must be assumed in their entirety in a seamless fashion. Furthermore, if the Stalking Horse Bidder is not the successful bidder at the Auction, AT&T also objects to the extent that such Purchaser is not able to demonstrate that it can perform under the AT&T contracts. The Debtors must demonstrate, among other things, that the Purchaser has the necessary industry experience, product expertise and adequate financial resources that would enable the Purchaser to meet the complicated and sophisticated obligations related to the goods and services (including maintenance and support) provided to AT&T under the AT&T Contracts.[3] Absent such showing, the Debtors cannot assign the AT&T Contracts.

C.    *The Master Agreement and the Related Supplemental Agreements Must Be Assumed in Their Entirety*

---

[3] AT&T has also sent a letter requesting adequate assurance information related to any qualified bidder as required by the Bidding Procedures. AT&T reserves the right to supplement this objection after the Auction and AT&T's review of the adequate assurance material.

21.    The Debtors cannot assume and assign certain Supplemental Agreements without assuming and assigning the Master Agreement and all underlying Supplemental Agreements related to the CVAS Business since the agreements constitute a single integrated transaction.[4]

22.    Where several separate "contracts" are in substance one agreement, Section 365 of the Bankruptcy Code similarly does not allow a debtor to "cherry pick" the "contracts," accepting certain ones, while rejecting others. In re Atl. Computer Sys., Inc., 173 B.R. 844, 849 (S.D.N.Y. 1994); see also In re Kopel, 232 B.R. 57, 65, n.4 (Bankr. E.D.N.Y. 1999) ("Where several documents are construed as one contract, the debtor must assume or reject them together."). The debtor must assume the entire package of contracts that comprise the overall agreement. Bankruptcy courts frequently have found that several contracts form one indivisible, integrated agreement and have refused to allow the debtor to split up the transaction by assuming the beneficial contracts and rejecting others under Section 365. See, e.g., In re Cole Bros., 137 B.R. 647, 651 (Bankr. W.D. Mich. 1992), rev'd on other grounds, 154 B.R. 689 (W.D. Mich. 1992); Braniff, Inc. v. GPA Group PLC (In re Braniff), 118 B.R. 819, 844 (Bankr. M.D. Fla. 1989); In re T & H Diner, Inc., 108 B.R. 448, 454 (Bankr. D.N.J. 1989); In re Ritchey, 84 B.R. 474, 476 (Bankr. N.D. Ohio 1988); Bistrian v. Easthampton Sand & Gravel Co., Inc. (In re Easthampton Sand & Gravel Co.), 25 B.R. 193, 199 (Bankr. E.D.N.Y. 1982).

23.    In determining whether *several* separate contracts in substance form one integrated agreement that must be assumed as a package under Section 365, bankruptcy courts look to the underlying state law, the contract itself, and the intent of the parties. In re Philip

---

[4] AT&T reserves its rights to further object to the extent that the Debtors and the Purchaser seek to "un-bundle" the AT&T Contracts as detailed in Section 5.14 of the ASA. Under that section, the Debtors and the Purchaser will use "reasonable best efforts" to un-bundle certain contracts and enter into arrangements with counter-parties to a contract by continuing under the existing contract or entering into a new contract. ASA at §5.14(a). Section 5.14(b) also allows the Debtors to subcontract portions of the Bundled Contracts to the Purchaser under certain conditions and subject to certain requirements. AT&T reserves its right to object with regard to the un-bundling of its contracts or with regard to other issues that may arise when the Debtors make their determination regarding the treatment of the AT&T Contracts.

<u>Servs. (Del.), Inc.</u>, 284 B.R. 541, 546 (Bankr. D. Del. 2002) ("Under general contract law, the parties' intentions determine whether two separately executed documents are in reality one agreement.").  In determining whether the agreements constitute one integrated agreement, state courts usually consider the following:

> Ultimately, the question is one of the intent of the parties, and the courts, in making this determination, consider all of the facts and circumstances surrounding the making of the agreements, including: (1) the nature and purpose of the various agreements, including whether they are contained in one instrument or multiple instruments and whether, if the latter, they were executed at the same time or at different times, and whether the initially executed agreement contemplated the later agreements; (2) whether the same consideration was paid for each of the promises contained in the agreements or whether the consideration for the various agreements was separate and distinct; and (3) whether the parties' obligations under the various agreements are interrelated or independent.

WILLISTON ON CONTRACTS, ASSUMPTION OR REJECTION OF CONTRACTS CONSISTING OF MORE THAN ONE AGREEMENT § 78:29, § 78:29 (2009).  Thus, in analyzing the parties' intentions, courts will look to the terms of the agreement.  For example, in <u>In re Beatriz Ready Mix, Inc.</u>, 2009 WL 255890 (Bankr. D.P.R. 2009) the court stated:

> Each document also states the parties intended that the three documents be considered complimentary and interrelated agreements, or components of the one single transaction, that is, the sale of the business

> \*       \*       \*

> We find the words used in the tie-in clauses in all three documents are clear. The contractual language expressing the parties' intent is not murky, or obscure. These expressions undoubtedly state the parties intended that the three documents complement each other, depicting the components of one single business transaction.

> \*       \*       \*

> Hence, we find the preponderance of the credible and admissible evidence here shows the tie-in clauses in the three documents demonstrate the parties' true and unequivocal intent once they reached a meeting of the minds. These tie-in clauses clearly show the three contracts express the true intent of the parties: that is, the documents are but components of a single, interdependent, unified business

transaction, and that the parties never intended us to consider the documents as three individual, separate, self-standing and severable contracts.

Id. at *4. Thus, where the terms of the contracts unambiguously demonstrate that the parties intend the contracts to be integrated into a single contract, the courts will find that the agreements should be treated as one contract. For example, where the parties' relationship is governed by a master agreement and subsequent agreements entered into under the master agreement and the parties intend such agreements to be integrated into a single agreement, courts will find the master agreement and subsequent agreements constitute a single integrated contract that must be assumed and assigned in its entirety. See, e.g., In re Atl. Computer Sys., 173 B.R. 844, 849 (S.D.N.Y. 1994) (court reversed bankruptcy court decision allowing Debtors to assume a Master Lease Agreement for computer equipment but not the subsequent leases entered into contemporaneously with the equipment schedules); see also In re Aneco Electrical Construction, 2005 WL 3750364 at *4 (M.D. Fla. 2005) ("[T]he Court finds that the Subcontract Agreement entered by the Debtor and Turner on November 25, 2002, constitutes a single, indivisible contract for electrical work at the Dulles International Airport, and that the subsequent Work Orders did not effect a severance of the contract into two separate and independent 'subcontracts.'").

24.    In this case, the parties' intentions are readily apparent through reference to the AT&T Contracts, which provide for the Supplemental Agreements referenced above to be integrated into the Master Agreement. For example, Switching Module Agreement No. 20081204.042 provides that "[t]his Module is hereby attached to and incorporates the terms and conditions of, and is made a part of, the AT&T-Nortel General Agreement No. 980332 ("General Agreement")." The agreement also provides that "[t]his Module, together with the General Agreement, all Orders placed pursuant hereto, and subordinate documents attached to or

referenced in this Module shall constitute the entire agreement between AT&T and Nortel with respect to the subject matter hereof." The intention of the parties is clear – the Supplemental Agreements are integrated into the Master Agreement, and as a result, the agreements with respect to the CVAS Business constitute a single integrated contract that must be assumed and assigned *cum onere*.

## CONCLUSION

WHEREFORE, for the reasons stated above, AT&T objects to the relief requested in the Sale Motion to the extent cited above and respectfully requests that it be denied, and that the Court grant such other and further relief as deemed just and proper.

Dated: February 17, 2010

**ASHBY & GEDDES, P.A.**

William P. Bowden (#2553)
Amanda M. Winfree (#4615)
500 Delaware Avenue, 8th Floor
P.O. Box 1150
Wilmington, Delaware 19899
Telephone: (302) 654-1888
Facsimile: (302) 654-2067

-and-

**FULBRIGHT & JAWORSKI L.L.P.**

David A. Rosenzweig
Mark C. Haut
666 Fifth Avenue
New York, New York 10103
Tel: (212) 318-3000
Fax: (212) 318-3400

*Co-Counsel for AT&T*