# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

```
------------------------------------------------------X
                                                      :
                                                      :      Chapter 11
                                                      :
In re                                                 :
                                                      :      Case No. 09-10138 (KG)
Nortel Networks Inc., et al., ¹                       :
                                                      :      Jointly Administered
                               Debtors.               :
                                                      :
                                                      :      Hearing Date: February 26, 2010 at 10:00 a.m.
                                                      :      (ET) (PROPOSED)
                                                      :      Objections Due: February 24, 2010 at 12:00 p.m.
                                                      :      (ET) (PROPOSED)
                                                      :
------------------------------------------------------X
```

## DEBTORS' MOTION FOR ENTRY OF
## AN ORDER ENFORCING THE AUTOMATIC STAY AGAINST
## CERTAIN CLAIMANTS WITH RESPECT TO THE UK PENSION PROCEEDINGS

Debtors Nortel Networks Inc. ("NNI") and certain of its affiliated debtors, as respective debtors and debtors in possession (the "U.S. Nortel Entities" or the "Debtors"), by and through their undersigned counsel, submit this motion (the "Motion") pursuant to sections 362(a)(1) and (a)(6) of title 11 of the United States Code (the "Bankruptcy Code") to enforce the automatic stay against claimants Nortel Networks UK Pension Trust Limited (as trustee of the Nortel Networks UK Pension Plan) (the "U.K. Pension Trustee") and The Board of the Pension Protection Fund (the "PPF") with respect to their participation in certain U.K. Administrative

---

¹         The debtors in these chapter 11 cases, along with the last four digits of each Debtor's tax identification number, are:  Nortel Networks Inc. (6332), Nortel Networks Capital Corporation (9620), Nortel Altsystems Inc. (9769), Nortel Altsystems International Inc. (5596), Xros, Inc. (4181), Sonoma Systems (2073), Qtera Corporation (0251), CoreTek, Inc. (5722), Nortel Networks Applications Management Solutions Inc. (2846), Nortel Networks Optical Components Inc. (3545), Nortel Networks HPOCS Inc. (3546), Architel Systems (U.S.) Corporation (3826), Nortel Networks International Inc. (0358), Northern Telecom International Inc. (6286), Nortel Networks Cable Solutions Inc. (0567) and Nortel Networks (CALA) Inc. (4226).  Addresses for the Debtors can be found in the Debtors' petitions, which are available at http://chapter11.epiqsystems.com/nortel.

Proceedings (as defined infra).  In support of this Motion, Debtors respectfully represent as follows:

## **RELIEF REQUESTED**

1.      By this Motion, the Debtors seek the entry of an order pursuant to sections 362(a)(1) and (a)(6) of the Bankruptcy Code, enforcing the automatic stay against two claimants that have submitted to the jurisdiction of the Court by filing proofs of claim, the U.K. Pension Trustee and the PPF (collectively the ("Claimants")), with respect to certain U.K. Administrative Proceedings (as defined infra) initiated by the U.K. Pensions Regulator ("TPR"), as such Proceedings relate to NNI and Nortel Networks (CALA) Inc. ("NN CALA"). The stated purpose of those Proceedings is to determine whether to issue a financial support direction ("FSD") against NNI, NN CALA, and the non-U.S. Nortel Entities that are identified by TPR as targets of the Proceeding, to establish a predicate for imposing financial responsibility on the targets for the statutory liability of Nortel Networks UK Limited ("NNUK") to the U.K. Pension Trustee under section 75 of the U.K. Pensions Act 1995.  The automatic stay under section 362(a), however, protects the Debtors from just such an adjudication of potential financial responsibility outside of this Court.  Accordingly, this Motion seeks to enforce the stay against the Claimants, which have submitted the U.K. Pension Claim to this Court, and to confirm that they are subject to sanctions if they participate in a proceeding that is void under section 362, including the FSD proceeding, any contribution notice ("CN") process (each as described infra), or any other proceedings that TPR may initiate in the future with respect to the NNUK Pension Plan (as defined infra) outside of this Court.

## JURISDICTION AND VENUE

2.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.  This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).  Venue over the Debtors' Chapter 11 cases and this Motion is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

3.      The statutory bases for the relief requested herein are sections 362(a)(1) and (a)(6) of the Bankruptcy Code and Rule 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

## BACKGROUND

### A.      Introduction

4.      On January 14, 2009 (the "Petition Date"), the Debtors (except for NN CALA, which filed on July 14, 2009) filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code.

5.      The Debtors continue to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

6.      Also on the Petition Date, the Debtors' ultimate corporate parent, Nortel Networks Corporation ("NNC"), NNI's direct corporate parent Nortel Networks Limited ("NNL," and together with NNC and their affiliates, including the Debtors, "Nortel"), and certain of their Canadian affiliates (collectively, the "Canadian Debtors")[2] filed an application with the Ontario Superior Court of Justice (the "Canadian Court") under the Companies'

---

[2]      The Canadian Debtors include the following entities: NNC, NNL, Nortel Networks Technology Corporation, Nortel Networks Global Corporation and Nortel Networks International Corporation.

Creditors Arrangement Act (Canada) (the "CCAA"), seeking relief from their creditors (collectively, the "Canadian Proceedings").

7.     The Canadian Debtors continue to manage their properties and operate their businesses under the supervision of the Canadian Court. Ernst & Young Inc., as court-appointed Monitor in the Canadian Proceedings and as foreign representative for the Canadian Debtors (the "Monitor"), has filed petitions in this Court for recognition of the Canadian Proceedings as foreign main proceedings under chapter 15 of the Bankruptcy Code. On January 14, 2009, the Canadian Court entered an order recognizing these chapter 11 proceedings as a foreign proceeding under section 18.6 of the CCAA. On February 27, 2009, this Court entered an order recognizing the Canadian Proceedings as foreign main proceedings under chapter 15 of the Bankruptcy Code.

8.     In addition, on January 14, 2009, after the filing by the U.S. Nortel Entities, the High Court of Justice in England placed nineteen of Nortel's European affiliates, including NNUK (collectively, the "EMEA Debtors")[3] into administration under the control of certain individuals from Ernst & Young LLC (collectively, the "Joint Administrators"). On June 8, 2009, NNUK filed petitions in this Court for recognition of the English insolvency proceedings as foreign main proceedings under chapter 15 of the Bankruptcy Code. In light of the need for coordination in the proceedings, on June 26, 2009, the Court entered an order

---

[3]     The EMEA Debtors include the following entities: NNUK, Nortel Networks S.A., Nortel Networks (Ireland) Limited, Nortel GmbH, Nortel Networks France S.A.S., Nortel Networks Oy, Nortel Networks Romania SRL, Nortel Networks AB, Nortel Networks N.V., Nortel Networks S.p.A., Nortel Networks B.V., Nortel Networks Polska Sp. z.o.o., Nortel Networks Hispania, S.A., Nortel Networks (Austria) GmbH, Nortel Networks, s.r.o., Nortel Networks Engineering Service Kft, Nortel Networks Portugal S.A., Nortel Networks Slovensko, s.r.o. and Nortel Networks International Finance & Holding B.V.

recognizing the English Proceedings as foreign main proceedings under chapter 15 of the Bankruptcy Code.

9.      On January 15, 2009, this Court entered an order of joint administration pursuant to Bankruptcy Rule 1015(b) that provided for the joint administration of these cases (other than that of NN CALA) and for consolidation for procedural purposes only.  In re Nortel Networks Inc., et al., No. 09-10138 (KG) (Bankr. D. Del. Jan. 15, 2009) (Ct. Dkt. No. 36).[4]

10.      On or about January 26, 2009, the Office of the United States Trustee for the District of Delaware (the "U.S. Trustee") appointed an Official Committee of Unsecured Creditors (the "Committee") pursuant to section 1102(a)(1) of the Bankruptcy Code (NNI Ct. Dkt. No. 141).[5]  An ad hoc group of bondholders holding claims against certain of the Debtors and certain of the Canadian Debtors has also been organized (the "Bondholder Group").  No trustee or examiner has been appointed in the Debtors' cases.

11.      On July 14, 2009 (the "CALA Petition Date"), NN CALA, an affiliate of NNI, filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  On July 17, the Court entered orders approving the joint administration and consolidation of NN CALA's chapter 11 case with the other Debtors' chapter 11 cases for procedural proposes (NNI Ct. Dkt. No.1098), and applying to NN CALA certain previously entered orders in the other Debtors' chapter 11 cases (NNI Ct. Dkt. No.1099).

---

[4] The Nortel Networks Inc. docket citations are referenced herein as "NNI Ct. Dkt. No. ___."

[5] The order appointing the Committee was amended on January 26, 2009 to reflect that Odyssey American Reinsurance Corporation had resigned from the Committee.  (NNI Ct. Dkt. No. 142).

B.     **Bar Date**

12.     On August 4, 2009, the Court entered the Order Establishing Deadlines for Filing Proofs of Claim and Approving Form and Manner of Notice Thereof  (the "Bar Date Order") (NNI Ct. Dkt. No. 1280).

13.     Pursuant to the procedures set forth in the Bar Date Order, with certain exceptions, all entities (including governmental units) that desired to assert a claim, as defined in section 101(5) of the Bankruptcy Code, against the Debtors (other than NN CALA) that arose prior to the Petition Date were required to file a proof of claim in writing so that it was received on or before September 30, 2009, at 4:00 p.m. (prevailing Eastern Time).

14.     On December 3, 2009, the Court entered the Order Establishing Deadlines for Filing Proofs of Claim Against Nortel Networks (CALA) Inc. and Approving Form and Manner of Notice Thereof (the "CALA Bar Date Order") (NNI Ct. Dkt. No. 2059).  Pursuant to the procedures set forth in the CALA Bar Date Order, with certain exceptions, all entities (including governmental units) that desired to assert a claim, as defined in section 101(5) of the Bankruptcy Code, against NN CALA that arose prior to the CALA Petition Date were required to file a proof of claim in writing so that it was received on or before January 25, 2010, at 4:00 p.m. (prevailing Eastern Time).

C.     **Asset Sales and Cross-Affiliate Allocation Issues**

15.     On June 9, 2009, to resolve, on an interim basis, certain allocation and post-petition cross-affiliate claims issues, pending the final allocation of the proceeds of the planned sales of their businesses, the Canadian Debtors, the U.S. Debtors, and the EMEA Debtors, including NNUK (by the Joint Administrators), entered into an Interim Funding and Settlement Agreement (the "IFSA").  The Court approved the IFSA on June 29, 2009.  Pursuant

to section 12 of the IFSA, the parties agreed that the proceeds of any sale of their material assets

(less taxes and costs) would be held in escrow until the parties either reached a consensual

allocation of the proceeds, or:

> "in the case where the Selling Debtors fail to reach agreement, determination by
> the relevant dispute resolver(s) under the terms of the Protocol … applicable to
> the Sale Proceeds . . .which Protocol shall provide binding procedures for the
> allocation of Sales Proceeds…."

(A copy of the IFSA is attached as Exhibit B to the Declaration of Lisa M. Schweitzer, dated

February 17, 2010 (the "Schweitzer Dec.").)  As per the escrow agreements entered into by the

parties, the proceeds of the sales that have been consummated thus far are being held in escrow

accounts located in the United States. (By way of example, a copy of the escrow agreement with

respect to the sale of substantially all of Nortel's CDMA business and LTE Access assets is

attached to the Schweitzer Dec. as Exhibit C.)

16.     In addition, all parties agreed that New York law would govern the IFSA,

and consented to the jurisdiction of the U.S. and Canadian courts for all legal proceedings

concerning the Agreement, other than proceedings against the U.K. Joint Administrators in their

personal capacities, which were required to be brought in the U.K. with U.K. law governing.

(IFSA ¶¶ 16-17.)

17.     On June 19, 2009, Nortel announced that it was advancing in discussions

with external parties to sell its businesses and it would assess other restructuring alternatives for

its businesses in the event it is unable to maximize value through sales.  To date, Nortel has

closed (i) the sale of certain portions of its Layer 4-7 data portfolio to Radware Ltd. (NNI Ct.

Dkt. No. 539); (ii) the sale of substantially all of its CDMA business and LTE Access assets to

Telefonaktiebolaget LM Ericsson (publ) (NNI Ct. Dkt. No. 1205); (iii) the sale of the assets of its

Wireless Networks business associated with the development of Next Generation Packet Core network components to Hitachi Ltd. (<u>NNI</u> Ct. Dkt. No.1760); and (iv) the sale of substantially all of the assets of the Enterprise Solutions business globally, including the shares of Nortel Government Solutions Incorporated and DiamondWare Ltd., to Avaya Inc. (<u>NNI</u> Ct. Dkt. No. 1514).  In addition, Nortel has completed auction processes and obtained Court approval for the planned sale of substantially all the assets of its Optical Networking and Carrier Ethernet businesses associated with its Metro Ethernet Networks business unit (<u>NNI</u> Ct. Dkt. No. 2070); as well as for the planned sale of substantially all of its GSM/GSM-R business (<u>NNI</u> Ct. Dkt. No. 2065).

**D.**     <u>**The NNUK Proof of Claim**</u>

18.     On September 30, 2009, NNUK, on behalf of itself, the Joint Administrators, and the other EMEA Debtors, filed proofs of claim against NNI and the other U.S. Debtors "in respect of any heretofore unknown, unliquidated, or unmatured claim or claims … against Nortel Networks Inc. or its affiliated debtors in these cases" (other than NN CALA). The proofs of claim are listed on the Debtors' claim log as claim numbers 5122-5136.  (A copy of the NNUK proof of claim against NNI is attached to the Schweitzer Dec. as <u>Exhibit A</u>.)

**E.**     <u>**The U.K. Pension Claim**</u>

19.     NNUK is the employer under the Nortel Networks U.K. Pension Plan (the "<u>NNUK Pension Plan</u>"), a defined benefit occupational final salary pension scheme. (Declaration of Richard Hitchcock, dated February 18, 2010 (the "<u>Hitchcock Dec.</u>") ¶ 5.4.)

20.     On both November 21, 2006 and December 21, 2007, NNL executed guarantees regarding the NNUK Pension Plan.  No U.S. Nortel Entity provided any guarantee with respect to the NNUK Pension Plan.

21.     The PPF is a U.K. statutory body established under the U.K. Pensions Act 2004 (the "U.K. Pensions Act").  NNUK's commencement of Administration proceedings in the U.K. led to the NNUK Pension Plan entering a PPF "assessment period" pursuant to the U.K. Pensions Act. (See Hitchcock Dec. ¶ 5.5; Exhibit A to the Declaration of John Ray, dated February 18, 2010 ("Ray Dec.")(as described in ¶ 23 infra).)  An "assessment period" means that the PPF is working with the U.K. Pension Trustee to determine the NNUK Pension Plan's funding position.[6]  To the best of the Debtors' understanding, the NNUK Pension Plan remains in an "assessment period."

22.     On or about September 30, 2009, the U.K. Pension Trustee and the PPF jointly filed proofs of claim against the U.S. Nortel Entities (with the exception of NN CALA, discussed infra at ¶ 23), which are listed on Debtors' claim log as claim numbers 5573-5587 (collectively, with the proof of claim filed against NN CALA discussed at ¶ 23 infra, the "U.K. Pension Claim").  (A copy of the U.K. Pension Trustee and PPF's proof of claim against NNI, which is representative of all of their proofs of claim, is attached to the Ray Dec. as Exhibit A.)

23.     On January 25, 2010 the U.K. Pension Trustee and PPF jointly filed a proof of claim against NN CALA, which is listed on Debtors' claim log as claim number 6979. (A copy of the proof of claim filed against NN CALA is attached as Exhibit B  to the Ray Dec.)

---

[6]     The PPF is a statutorily created compensation scheme designed to protect private sector defined benefit pension plan members whose employers become insolvent with unfunded liabilities in the pension plan.  The PPF "assessment period" commences on the day of appointment of the administrators of the plan employer, and ends when the plan shortfall has been valued, and, if eligible, the plan is either admitted to the PPF or wound-up outside the PPF.  (Hitchcock Dec. ¶¶ 5.5, 19-22.)

24.     The U.K. Pension Claim is based on allegations that (i) the NNUK

Pension Plan is under-funded by an estimated amount alternatively stated to be £2.1 billion or

$3.1 billion; and (ii) TPR may seek to require certain of the Debtors, as well as certain non-U.S.

Nortel entities, to provide financial support for the NNUK Pension Plan.

25.     According to the U.K. Pension Claim, by the time it was filed, TPR had

concluded that grounds existed to issue certain warning notices ("Warning Notices") and to seek

a FSD against certain members of the Nortel Group worldwide, including NNI and NN CALA,

as companies allegedly "connected with or associates of" NNUK, with respect to the allegation

that NNUK was "insufficiently resourced" on June 30, 2008, a date selected by TPR.  (See

Exhibit A to Ray Dec.)

26.     The U.K. Pension Claim also states that the indebtedness or liability of the

relevant U.S. Nortel Entities arose no later than the date on which NNUK was allegedly first

"insufficiently resourced," and therefore the liability had been incurred no later than TPR's

selected date, June 30, 2008.  The U.K. Pension Claim further asserts that no Warning Notice

had been issued pre-petition or indeed prior to the filing of the Claim.  Instead, as discussed

infra, TPR has only recently purported to issue a Warning Notices addressed, inter alia, to two

U.S. Nortel Entities, NNI and NN CALA. [7]

27.     In addition, the U.K. Pension Claim asserts that if a FSD is issued against

any of the U.S. Nortel Entities, such entity could then be instructed under the U.K. Pensions Act

to procure financial support for the NNUK Pension Plan, either alone or with other members of

the Nortel Group.  The U.K. Pension Claim further asserts that if a U.S. Nortel Entity receives a

_____
[7] The Warning Notice was issued prior to the filing of the U.K. Pension Claim against NN CALA.

FSD, but fails to put or keep in place financial support for the NNUK Pension Plan approved by

TPR, then TPR could also exercise its power to issue a CN, imposing on that U.S. Nortel Entity a

liability to pay a specific amount, which could be all or some portion of the deficit in the NNUK

Pension Plan.  (See Exhibit A to Ray Dec.)

## F.   The U.K. Pensions Act

28.     Under the U.K. Pensions Act, TPR has, in relation to a pension plan, a

stated pecuniary purpose:  to protect the plan benefits of members and to reduce the risk that

compensation would be required from the PPF.  (Hitchcock Dec. ¶ 41.)  Under the U.K. Pensions

Act, the PPF imposes a levy like a private insurance premium on eligible pension plans as one of

the ways of funding such compensation.

29.     In furtherance of that pecuniary purpose, TPR may conduct an

administrative process whereby it may issue, through TPR's Determinations Panel (the

"Determinations Panel"), a FSD under section 43 of the U.K. Pensions Act, if it believes that the

employer funding the pension plan (the "Employer")[8] is either (a) a service company, or (b)

"insufficiently resourced."[9]  (See Hitchcock Dec. ¶¶ 37-38, 50 & Schedule 2.)

30.     A FSD, which is preceded by a "Warning Notice," is a direction, issued to

certain persons following a decision of the Determinations Panel to issue it, to secure financial

---

[8]      Here, NNUK.

[9]      In deciding whether the Employer is  "insufficiently resourced," which is the claim with respect to NNUK here, the Panel must determine:  (1) whether at the "relevant time" the value of the Employer was less than 50% of the estimated section 75 debt of the pension plan (this debt is defined in section 75 of the U.K. Pensions Act of 1995 and is calculated by reference to the cost of securing all plan benefits under annuities purchased from an insurance company); and (2) whether at the relevant time there existed one or more connected and/or associated companies to the Employer whose individual or combined value was greater than the difference between the Employer's value and 50% of the estimated section 75 debt.  (U.K. Pensions Act, s. 44(3).) (See Hitchcock Dec. ¶ 37.5 & Schedule 2.)

support for a pension plan.  A FSD may only be issued against a person who is either the

Employer, or is  "connected and/or associated with" the employer (the "Non-Employers").  The

FSD specifies a certain time period during which the financial support is to be put in place, and

directs that this support is to continue for as long as the pension plan is in existence.  A FSD may

only be issued if the Determinations Panel believes that it is reasonable to do so.  (See Hitchcock

Dec. ¶¶ 37.3 – 37. 4, 50 & Schedule 2.)

       31.     In deciding whether it is reasonable to issue a FSD against a Non-

Employer, the Determinations Panel must consider such matters as it considers relevant,

including:  (a) the relationship between the Non-Employer and the Employer, including whether

the Non-Employer controlled the Employer; (b) the value of any benefits received directly or

indirectly by the Non-Employer from the Employer; (c) any connection or involvement of the

Non-Employer with the pension plan; and (d) the financial circumstances of the Non-Employer.

(Hitchcock Dec. ¶¶ 37.4, 50.)

       32.     If the Determinations Panel decides to issue a FSD, pursuant to section

45(2) of the U.K. Pensions Act, the financial support must take a form that TPR is satisfied is

reasonable under the circumstances, including any combination of the following arrangements:

(a) all Non-Employers who are members of the same corporate group as the Employer assuming

joint and several liability for the whole or part of the Employer's pension liabilities; and/or (b)

where there is a holding company for the Employer's corporate group, the holding company

assuming liabilities for the whole or part of the Employer's pension liabilities; and/or (c) any

other arrangement that meets the statutory requirements and provides financial resources to the

Employer's pension plan. (Hitchcock Dec. ¶ 37.6.)

33.     In addition to its ability to issue a FSD, where the target has not complied with the FSD, and TPR believes that it is reasonable to do so, it is authorized to issue a CN. (Hitchcock Dec. ¶ 43.)

34.     A CN states that the persons to whom it is issued are under a liability to pay to the trustee of the pension plan the sum specified therein. The CN may be for all or part of the amount by which the pension plan is under-funded (such amount is called the "section 75 debt," as discussed <u>supra</u>).  This amount is treated as a debt due to the trustee of the pension plan. (U.K. Pensions Act, s. 49(3).)  While TPR can exercise such powers as the trustee of the pension plan to recover the debt under the CN, during the assessment period (which the NNUK Pension Plan has been in since it entered administration proceedings), only the PPF may exercise the trustee's rights and powers. (Hitchcock Dec. ¶¶ 5.5, 46 & Schedule 2.)

35.     In determining whether it is reasonable to issue a CN, TPR must consider the reasonableness of imposing liability on the person to pay the sum specified in the notice.  In determining whether it is reasonable to issue a CN to a Non-Employer to whom a FSD has been issued, where it deems relevant, TPR must consider such matters as: (a) whether the Non-Employer has taken reasonable steps to secure compliance with the FSD; (b) the relationship the Non-Employer has or had with the Employer, including whether the Non-Employer controlled the Employer; (c) the value of any benefits received directly or indirectly by the Non-Employer from the Employer; (d) the relationship that the Non-Employer has or had with the parties to any arrangements put in place in accordance with the FSD (including whether the Non-Employer has or had control of those parties); (e) any connection or involvement which the Non-Employer has

13

or had with the Employer's pension plan; and (f) the financial circumstances of the Non-

Employer. (U.K. Pensions Act, s. 47(4); (Hitchcock Dec. ¶ 44 & Schedule 2).)

36.     If a party to whom a FSD or CN is issued disputes that issuance, it may

make a reference to the TPR Tribunal (the "Tribunal") within 28 days from the date of the

issuance.  The Tribunal will decide the appropriate action, if any, to take, including possibly

revoking, confirming, or varying the FSD or CN.  After receiving the Tribunal's decision, the

party may, with permission of the Tribunal or the U.K. Court of Appeal, appeal to the Court of

Appeal on a point of law arising from a decision of the Tribunal.  (U.K. Pensions Act, s.103;

Hitchcock Dec. ¶¶ 54-58.)

**G.      FSD Warning Notice Addressed to NNI and NN CALA**

37.     By letters dated January 13, 2010 and addressed to NNI and NN CALA

(along with certain non-U.S. Nortel entities), TPR purported to issue a Warning Notice initiating

an administrative proceeding regarding the alleged shortfall in the funding of the NNUK Pension

Plan (the "U.K. Administrative Proceedings"); the other U.S. Nortel Entities were not referred to

in the Warning Notice.[10]  The Warning Notice provides, in summary, that TPR believes it is

reasonable to issue a FSD against the addressees (the "Targets") and references certain

documents and witness statements as support for this determination, some of which, on

information and belief, were provided by NNUK, and others of which are publicly available

information.  It further provides, inter alia, that (i) the "relevant time" on which to measure the

NNUK Pension Plan's funding position for the purpose of deciding whether to issue a FSD is

---

[10]      Section 82 of the U.K. Pensions Act prohibits disclosure of "restricted information," which includes information obtained by TPR that is not publicly available from other sources, imposing criminal sanctions for a violation of the statute.  (Hitchcock Dec. ¶ 35.)  Debtors do not concede that the Warning Notice contains "restricted information"; out of an abundance of caution, however, they are not submitting the Warning Notice as an exhibit with the Motion.

June 30, 2008; and (ii) TPR believes it is reasonable to issue a FSD against the Targets,

including NNI and NN CALA, for various reasons including TPR's analysis of certain benefits

conveyed among affiliates.  The Warning Notice also reviews TPR's conclusion that benefits

provided by certain affiliates to certain other affiliates provides a basis for issuing a FSD.  (Ray

Dec. ¶ 10.)

38.    TPR has indicated that the Targets, as well as the U.K. Pension Trustee

and PPF, may respond in writing to the Warning Notice by midday on March 1, 2010, and that

the Determinations Panel will consider all responses.  (Ray Dec. ¶ 12.)

**H.    Canadian Debtors' Motion to Stay U.K. Administrative Proceedings**

39.    On February 17, 2010, the Monitor filed an application with the Canadian

Court seeking to stay the U.K. Administrative Proceedings on the ground that they violate the

stay imposed by the Initial Order issued by the Canadian Court.  That application is scheduled to

be heard on February 25, 2010. (A copy of that application and the supporting papers filed with

the Canadian Court, are attached to the Ray Dec. as Exhibit C.)

**BASIS FOR RELIEF**

**A.    The Court Should Enforce the Automatic Stay As Against the Claimants With
Respect to the U.K. Administrative Proceedings**

40.    Pursuant to 11 U.S.C. § 362(a)(1), a "judicial, administrative, or other

proceeding against the debtor that was or *could have been* commenced before the

commencement of the case under this title, or to recover a claim against the debtor that arose

before the commencement of the case under this title," is stayed. (Emphasis supplied.)  See, e.g.,

Constitution Bank v. Tubbs, 68 F.3d 685, 691 (3d Cir. 1995) ("[t]he automatic stay is of broad

scope, directing that 'all judicial actions against a debtor seeking recovery on a claim that were

or could have been brought before commencement of a bankruptcy case, are automatically stayed'") (citation omitted); In re: M. Frenville Co., 744 F.2d 332, 335 (3d Cir. 1984) ("[o]nly proceedings that could have been commenced or claims that arose before the filing of the bankruptcy petitions are automatically stayed"); In re: Spansion, Inc., 418 B.R. 84, 92 (Bankr. D. Del. 2009) ("the automatic stay applies . . . because the claims asserted . . . 'could have been brought' and were, in fact, brought, prepetition").  Pursuant to 11 U.S.C. § 362(a)(6), any acts to "assess" a claim that arose before the case commenced are similarly barred by the automatic stay. See, e.g., Glenshaw Glass Co. v. Ontario Grape Growers' Mktg. Bd., 67 F.3d 470, 477 (3d Cir. 1995) ("a voluntary Chapter 11 bankruptcy filing operates as a stay of 'any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate…[and] any act to collect, assess, or recover a claim against the debtor that arose before the commencement of [the case]…'"); In re: Solutia Inc., 379 B.R. 473, 485 n.8 (Bankr. S.D.N.Y. 2007) ("as used in Code § 362(a)(6) assess … can mean to simply determine the size or value of something").

      41.     Here, TPR has issued a Warning Notice to NNI and NN CALA, as well as a number of non-U.S. Nortel entities, triggering the U.K. Administrative Proceeding, on the basis of what is described in the NNUK Pension Claim as the "financial insufficiency" of NNUK to fully fund the NNUK Pension Plan as of *June 30, 2008*.  This date is some six months prior to the filing of NNI's Chapter 11 petition, and over a year before the filing of NN CALA's Chapter 11 petition.  Accordingly, the FSD proceeding, and any future proceedings by TPR or the Determinations Panel, *could have been commenced* prior to the filing of these Chapter 11 cases, and are subject to the automatic stay.  See 11 U.S.C. §§ 362(a)(1), (a)(6); see also ACandS, Inc.

v. Travelers Cas. and Surety Co., 435 F.3d 252, 260 (3d Cir. 2006);  Constitution Bank, 68 F.3d
at 693.

       42.     Moreover, the Claimants have submitted to this Court's jurisdiction by
filing proofs of claim against the Debtors, including NNI and NN CALA, and the subject of the
U.K. Pension Claim is the very subject of the U.K. Administrative Proceedings.  See Lagenkamp
v. Culp, 498 U.S. 42, 44 (1990) (stating that "by filing a claim against a bankruptcy estate the
creditor triggers the process of allowance and disallowance of claims, thereby subjecting himself
to the bankruptcy court's equitable power" (internal quotations deleted)); In re Nakash, 190 B.R.
763, 768 (Bankr. S.D.N.Y. 1996) (actions against debtor by receiver in Israel, who submitted to
the jurisdiction of the U.S. court by filing a proof of claim, violated automatic stay). Indeed, the
determination or liquidation of the U.K. Pension Claim constitutes a "core proceeding" under 28
U.S.C. § 157(b)(2)(B), which can only occur in this Court as part of the claims determination
process.

       43.     The courts have repeatedly recognized, in fact, that post-petition attempts
to assess, impose and/or liquidate a debt against a Chapter 11 debtor outside of the bankruptcy
court go to the essence of the Chapter 11 claims process, and are the very reason why there is an
automatic stay.  See, e.g., Maritime Elec. Co. v. United Jersey Bank, 959 F.2d 1194, 1207 (3d
Cir. 1991) (attempt to obtain a judgment against a debtor outside the bankruptcy court violates
the stay); In re Berman, 352 B.R. 533, 540 (Bankr. D. Mass. 2006) (the "automatic stay prevents
different proceedings in different courts," thus avoiding a "free-for-all" against the debtor).  To
allow such proceedings to occur elsewhere -- particularly where the Claimants have submitted
themselves and the U.K. Pension Claim to the jurisdiction of this Court -- would violate

fundamental bankruptcy principles and interfere with the administration of the estate.  See, e.g.,

In re Underwood, 98 F.3d 956, 961 (7th Cir. 1996) (holding that attempt by receiver appointed in

Nevis to gain control over debtor's property constituted a violation of the automatic stay, as it

"did imperil the orderly administration of the bankruptcy proceeding, and by doing so it posed an

indirect threat to the estate"). Given Claimants' submission of the U.K. Pension Claim to this

Court, the determination of their claims regarding the NNUK Pension Plan should occur in this

Court, and this Court alone.

44.    Accordingly, by this Motion, the Debtors seek to enforce the automatic

stay against the U.K. Pension Trustee and the PPF, so that in the absence of a violation of the

stay, all matters concerning NNI and NN CALA that relate to the NNUK Pension Plan, which

Claimants have placed before this Court by filing their proofs of claim, will be determined by

this Court.[11]

**B.    The Police Power Exception to the Automatic Stay Does Not Apply**

45.    There is no applicable exception to the automatic stay that would allow the

U.K. Pension Trustee and the PPF to participate in the U.K. Administrative Proceedings without

violating the stay.  In particular, the U.K. Administrative Proceedings do not constitute an

exercise of a governmental unit's police power that would exempt them from the automatic stay

by virtue of section 362(b)(4) of the Bankruptcy Code.[12]

---

[11]    To the extent claimants violate the automatic stay, their actions would be void and unenforceable against the Debtors.  See, e.g., ACandS, Inc., 435 F.3d at 260; Constitution Bank, 68 F.3d at 693.

[12]    Section 362(b)(4) provides, in pertinent part:  "The filing of a petition under section 301, 302, or 303 of this title, … does not operate as a stay: (4) under paragraph (1), (2), (3), or (6) of subsection (a) of this section, of the commencement or continuation of an action or proceeding by a governmental unit … to enforce such governmental unit's … police and regulatory power, including the enforcement of a judgment other than a money judgment, obtained in an action or proceeding by the governmental unit to enforce such governmental unit's … police or regulatory power."

46.    First, neither of the Claimants is a "governmental unit," within the meaning of that term under section 101(27) of the Bankruptcy Code.[13]  The U.K. Pension Trustee is a private party,[14] and the PPF, while defined as "a statutory body" in paragraph 1.4 of the U.K. Pension Claim, during an assessment period exercises the rights and powers of the U.K. Pension Trustee with respect to any debt owed to the Trustee by the Employer, or pursuant to a CN or otherwise, including any contingent debt or section 75 debt.  In this capacity, the PPF stands in the shoes of the Trustee, a private party. (See Exhibit A to the Ray Dec.; Hitchcock Dec. ¶ 22, 46.)

47.    Second, the U.K. Administrative Proceedings do not constitute an exercise of police power that would implicate the section 362(b)(4) exception.

48.    The courts in this Circuit and elsewhere have made it clear that this exception is to be "narrowly construed."  For example, in a recent decision in this District in which the court denied a state administrative agency's attempt to invoke section 362(b)(4) to pursue an action against a debtor to repay the agency for costs incurred in investigating and remedying alleged environmental violations, Judge Sontchi stated, quoting the legislative history:

> "This section is intended to be given a *narrow* construction in order to permit governmental units to pursue actions to protect the public health and safety and *not to apply to actions by governmental units to protect a pecuniary interest* in property of the debtor or property of the estate."    (Emphasis in original.)

---

[13]    Section 101(27) defines "governmental unit" to mean:  The "United States; State; Commonwealth; District; Territory; municipality; foreign state; department, agency, or instrumentality of the United States (but not a United States trustee while serving as a trustee in a case under this title), a State, a Commonwealth, a District, a Territory, a municipality, or a foreign state; or other foreign or domestic government") 11 U.S.C. § 101 (27).

[14]    Under the U.K. pension scheme, trustees act for the benefit of plan members and are fiduciaries of their pension plans, not governmental entities.  (See Hitchcock Dec. ¶¶ 16-17.)

In re Fairchild Corp., No. 09-10899 (CSS), 2009 Bankr. LEXIS 3815, at * 22 (Bankr. D. Del.

Dec. 1, 2009) (rejecting agency's contention that it was exercising police power where its action

was "akin to a private action by OCWD [the agency] to collect money damages").  See also

Missouri v. U.S. Bankr. Court, 647 F.2d 768, 776 (8th Cir. 1981) (denying state's contention that

section 362(b)(4) excepted from the stay its efforts to liquidate grain held in debtors'

warehouses; holding that "police or regulatory power" refers to the enforcement of state laws

affecting "health, welfare, morals, and safety, but not regulatory laws that directly conflict with

the control of the res or property by the bankruptcy court"); In re Nextwave Personal Comm.,

Inc., 244 B.R. 253, 274  (Bankr. S.D.N.Y. 2000) (FCC's retroactive cancellation of debtor's

broadband license as remedy for payment default did not impact public health or safety and was

thus not shielded by "narrow exception" to automatic stay under section 362(b)(4)).

49.    The courts' narrow interpretation of section 362(b)(4) is reflected in the

standards they apply in determining whether or not a governmental unit's action or proposed

action constitutes an exercise of its police power.  These standards are embodied in two objective

tests upon which the courts rely in considering a contention that the section 362(b)(4) exception

is applicable.  The first is referred to as the "pecuniary purpose" test; the second, the "public

policy test."  See, e.g., Fairchild Corp., 2009 Bankr. LEXIS 3815, at *22. The U.K.

Administrative Proceeding fails each of these tests by a wide margin.

50.    First, under the "pecuniary purpose" test, the issue is whether the

governmental action or proceeding relates primarily to the protection of the government's

pecuniary or financial interest in the debtor's property, as opposed to a matter of public safety or

welfare.  See, e.g., Missouri, 647 F.2d at 776 (denying section 362(b)(4) defense where plaintiff

sought to enforce state grain laws that "primarily relate to the protection of the pecuniary interest

in the debtors' property and not to matters of public safety and health"); <u>Fairchild Corp.</u>, 2009

Bankr. LEXIS 3815, at *15 (concluding that agency's action sought solely to promote its

pecuniary interest in being reimbursed for expenditures, and thus did not qualify as an exercise

of police or regulatory power); <u>Nextwave Personal Comm.</u>, 244 B.R. at 274 ("The FCC's action

is nothing other than a direct attempt to enforce its pecuniary interests"); <u>In re Chateaugay Corp.</u>,

115 B.R. 28, 33 (Bankr. S.D.N.Y. 1988) (claims under the False Claims Act served no public

purpose, and were intended merely to fix government's damages, and thus did not qualify as an

exercise of police or regulatory power).

        51.    As in these cases, the U.K. Administrative Proceedings fall far short of

passing the "pecuniary purpose" test.  The stated purpose of the Proceedings is to address an

alleged financial shortfall in a private pension plan, first by determining whether the Targets

should provide financial support to the U.K. Pension Trustee, and, then potentially by imposing

and fixing a claim against NNI and NN CALA through a CN.  This is purely an issue of

determining which, if any, entities, on an after-the-fact basis, should be financially responsible

for funding a pension shortfall.  It is clearly a pecuniary matter, and, notwithstanding the

importance of the financial matter to the private U.K. Pension Trustee, under the case law does

not qualify as a matter of public safety or welfare.  <u>See, e.g.</u>, <u>Brock v. Morysville Body Works</u>,

829 F.2d 383 (3rd Cir. 1987) (holding that an order to abate violations of health and safety

standards was enforceable by the Secretary of Labor under section 362(b)(4)'s exception to the

automatic stay); <u>Penn Terra v. Dep't of Envtl. Res.</u>, 733 F.2d 267 (3rd Cir. 1983) (police power

exception applicable to allow a state court to issue an injunction ordering debtor to clean up

environmental hazards); <u>see also</u> <u>In re: James (James v. Draper)</u>, 940 F.2d 46 (3rd Cir. 1991)

(civil forfeiture proceeding for alleged proceeds of drug sales falls within the police power exception to the automatic stay).

52.     Indeed, it is manifest in the provisions of the U.K. Pensions Act pursuant to which the U.K. Administrative Proceedings will be conducted, that the purpose of any such proceedings is to procure a pecuniary benefit to the trustee of an allegedly under-funded pension plan.  For example, with respect to a FSD proceeding, the Act provides that TPR can issue a FSD where the Employer is "insufficiently resourced" (s. 43(2)); that the FSD is a demand to "put in place financial support" (s. 43(3)); and that such support shall be with respect to the amount of "the liability that is or may become due from the employer to the trustees." (s. 45(2),(4); s. 50(2)).  Further, in the event the Targets do not comply with the FSD, TPR may issue a CN, which, unlike a FSD, is a collectible debt under U.K. law, "stating that the person is under a liability to pay to the trustees or managers of the scheme the sum specified in the notice" (s.47 (2), (3)), which sum "may be either the whole or a specified part of the shortfall sum [deficiency] in relation to the scheme." (s. 48 (1),(2)).  (See Hitchcock Dec. ¶¶ 41, 46-47 & Schedule 2.)

53.     The U.K. Administrative Proceedings also fail the "public policy test." The issue under this test is whether the governmental action is taken in furtherance of a matter of public policy, or instead is intended primarily to adjudicate private rights.  See, e.g., Fairchild Corp., 2009 Bankr. LEXIS 3815, at *15 (action akin to private action to collect money damages does not qualify as an exercise of police power under section 362(b)(4)); Spansion, 418 B.R. at 95 (administrative patent proceeding against debtors, prosecuted on behalf of the public by staff attorney of the U.S. International Trade Commission, was primarily an adjudication of private rights, only incidentally serving a public interest, and thus was not an exercise of police or regulatory power exempt from automatic stay); see also In re Qimonda AG, Case No. 09-14766

(Bankr. E.D. Va. Feb. 16, 2010) (patent proceeding before U.S. International Trade Commission was primarily intended to determine private rights, and was thus not an exercise of police power)[15]; In re: Corporacion de Servicios Medicos Hospitalarios de Fajardo, 60 B.R. 920, 932 (D. Puerto Rico 1986) (action on contract between Department of Health and debtor to operate hospital was not an action to protect health, safety, or welfare of public, was no different than an action by a private party, and thus violated automatic stay: "the mere fact that the Department of Health is involved" does not mean that the agency was exercising a "police or regulatory power *per se*"); In re Dan Hixson Chevrolet Co., 12 B.R. 917, 921 (Bankr. N.D. Tex. 1981) ("where the administrative agency is acting in a quasi-judicial capacity seeking to adjudicate private rights rather than effectuate public policy as defined by regulatory law the (b)(4) exception is inapplicable").

54.     Here, TPR seeks not to protect the "safety or welfare" of the public in the U.K., but rather to obtain financial support for the benefit of private parties -- the members of the NNUK Pension Plan, represented by the U.K. Pension Trustee -- and if that fails, to assert and liquidate a claim to the property of the Debtors, on the Trustee's behalf.  Any sum paid as a result of the U.K. Administrative Proceedings would not go to benefit the public, but would be used to reduce the section 75 debt owed by NNUK to the U.K. Pension Trustee.[16]  Indeed, it is that potential beneficiary who, together with the PPF, filed the proofs of claim in this Court to recover from the Debtors the same financial support that is the subject of the U.K. Administrative Proceedings.

---

[15]     A copy of the Qimonda decision is attached as Exhibit A hereto.

[16]     Under s. 50(6) of the U.K. Pensions Act, any sums paid to the trustees in respect of any debt due to them under a CN is treated as reducing the amount of the debt due from the employer under section 75.  (See Hitchcock Dec. ¶ 47.)

55.     The provisions of the U.K. Pensions Act underscore that the purpose of the FSD and CN proceedings is to vindicate the rights of private parties. The Act provides, <u>inter alia</u>, that a FSD is a demand that financial support be provided for the benefit of a <u>private pension plan</u> (s. 43(3))[17]; that in the event of non-compliance with the FSD, TPR can issue a CN requiring the payment of a specified sum that is "to be treated as a debt due from the person to <u>the trustees or managers of the scheme</u>" (s. 49(2), (3)); and that this debt can be enforced either directly by the trustees or by TPR on behalf of the trustees of the scheme (s. 49(4)) (emphasis supplied). (<u>See</u> Hitchcock Dec. ¶¶ 41, 46.)

56.     Moreover, the U.K. Pension Claim itself makes clear that the focus of the U.K. Administrative Proceedings is to procure a pecuniary benefit, for a private party -- the U.K. Pension Trustee -- not the "health, safety, or welfare" of the U.K. citizenry.  The Claim recites the process under the U.K. Pensions Act, from Warning Notice, to FSD, to CN, pursuant to which TPR will attempt to obtain financial support for the U.K. Pension Trustee, and failing that, attempt to impose and liquidate an enforceable debt, to be enforced by or on behalf of the Trustee, for an amount to be paid to the Trustee. (<u>See</u> Exhibit A to Ray Dec.) Accordingly, the FSD/CN proceedings do not constitute an exercise of a regulator's police powers within the meaning of section 362(b)(4), and are subject to the automatic stay.  <u>See, e.g.</u>, <u>Fairchild Corp.</u>, 2009 Bankr. LEXIS 3815, at *15; <u>Spansion</u>, 418 B.R. at 95; <u>Hixson Chevrolet Co.</u>, 12 B.R. at 921.

---

[17]     FSDs only apply in relation to "occupational pension schemes" (see s.  43(1)), which are defined by reference to the definition in s. 1 of the Pensions Schemes Act 1993.  (<u>See</u> Hitchcock Dec. ¶ 29.)

C.        The *Sea Containers* Decision Is Not to the Contrary

57.        Nor does the one decision in this District that involved a TPR administrative proceeding, In re: Sea Containers Ltd., No. 06-11156 (KJC), 2008 Bankr. LEXIS 2363 (Bankr. D. Del. Sept. 19, 2008), call for a different result than the Debtors seek here.  Sea Containers was presented to the bankruptcy court in a unique factual and procedural context and should not be followed on these facts insofar as the FSD proceedings are concerned.

58.        In Sea Containers, the Determinations Panel issued a FSD against a single debtor, on the basis of the following facts, which are sharply distinguishable from those presented here: (i) the U.S. debtor against which the FSD was sought was a U.K. chartered company which, together with its subsidiary, the plan sponsor, operated primarily out of the U.K; (ii) the debtor had a clear control relationship with the employer-affiliate; (iii) the debtor had substantial assets in the U.K; and (iv) the Determinations Panel held a hearing on the FSD request, without a motion by the U.S. debtor to invoke the protections of the automatic stay, and at which one of the two U.S. creditors' committees encouraged the Panel to issue a FSD so that the plan Trustee could rely on it to pursue their claims in the Chapter 11 proceedings.

59.        Following the issuance of the FSD, a settlement was entered into among the debtors, affiliates, one of the creditors' committees and the pension trustee, and was approved by TPR, granting the trustee an allowed claim in the bankruptcy case. The matter never reached the CN stage.  The case came before the court on a motion under Bankruptcy Rule 9019 for approval of the settlement.

60.        The court approved the settlement.  In so doing, it overruled a number of objections by the second creditors' committee, one of which was that the FSD proceeding had violated the automatic stay.  In this regard, the court did not treat the FSD as determinative but

only ruled that the FSD "should not be ignored as invalid," because it "provide[d] guidance as to the . . . pertinent considerations in valuing the Schemes' claims."  Id. at **26-27.  The court also relied on the fact that the Determinations Panel, as one would expect, did not view itself as being constrained by the automatic stay, not surprising given that the U.S. debtor had not sought an order of the bankruptcy court enforcing the stay in connection with the proceeding.

61.    In short, the court's ruling that the FSD proceeding did not violate the automatic stay was issued in an entirely different procedural context -- a Rule 9019 motion by the debtor to approve a settlement with TPR, where the debtor had not sought to invalidate the FSD -- and on entirely different facts.  To the extent the Sea Containers court found that a FSD was not an assertion of a claim, it was wrong.  A FSD is an assertion of a contingent claim under U.S. law, as is the proceeding that leads up to its issuance.  Moreover, unlike in Sea Containers, the Debtors and the creditors' representatives here object to the U.K. Administrative Proceeding, and dispute TPR's right to proceed against the Debtors in the absence of relief from the automatic stay.  Further, in contrast to Sea Containers, which involved only a FSD proceeding, here TPR is attempting to secure financial support for the benefit of the Plan Trustee through a FSD proceeding and, if necessary, a CN proceeding, which creates an enforceable debt.  Here, the U.K. Pension Trustee has already submitted to the jurisdiction of this Court for determination and liquidation contingent and unliquidated claims for the very same financial support TPR seeks to obtain for them in the U.K. Administrative Proceeding.  And here, unlike in Sea Containers, the Warning Notice makes plain that TPR is asserting a contingent claim, whereas in

<u>Sea Containers</u>, integral to the court's ruling that there was no stay violation was its

determination that there <u>was no</u> assertion of a claim. <u>Id.</u> at *26.[18]

62. Accordingly, <u>Sea Containers</u> is confined to its facts and is not controlling.

On the authority of cases such as <u>Fairchild Corp.</u>, 2009 Bankr. LEXIS 3815, at *15; <u>Spansion,

Inc.</u>, 418 B.R. at 95; and <u>Hixson Chevrolet Co.</u>, 12 B.R. at 921, the U.K. Administrative

Proceeding, which seeks pecuniary relief to benefit the private trustee of a private pension plan,

does not involve an exercise of the police power and is subject to the automatic stay.

**D.    The U.K. Pension Claim Should Await Resolution of the
       Allocation Proceeding Involving the U.S., Canadian, and U.K. Debtors**

63. The violation of the automatic stay posed by the U.K. Administrative

Proceeding is even more egregious because it goes to the heart of these cases.

64. As the Court is well aware, one of the overriding issues in these cases -- as

well as in the related insolvency proceedings in Canada and the U.K. -- is the allocation of the

billions of dollars in proceeds of the post-petition asset sales.  This allocation will determine the

amounts available for distribution to the creditors located in the various jurisdictions, in part

based on the factual issue of the respective contributions of the various Nortel entities to the

value of the assets sold. (Ray Dec. ¶14.)

---

[18]    There can be little doubt that the issuance of a CN against the Debtors, which under section 49(3) of the
U.K. Pensions Act imposes on the Target *a collectible debt* owed to the pension plan trustees, in a specified amount,
would violate the automatic stay and would thus be void and unenforceable against the Debtors.  <u>See, e.g.</u>, <u>ACandS</u>,
435 F.3d at 260 (action in violation of stay is void <u>ab initio</u>); <u>Constitution Bank</u>, 68 F.3d at 693 (same); <u>Maritime
Elec. Co. v. United Jersey Bank</u>, 959 F.2d at 1204  (same).  Indeed, even the court in the <u>Sea Containers</u> case
recognized that an attempt to "collect a debt or assert a claim" against a debtor, even by a regulator, involves
different automatic stay considerations than proceedings not involving the determination or liquidation of a claim.
2008 Bankr. LEXIS 2363, at *26.

65.     In recognition of this fundamental question, the U.S. Debtors, the Canadian Debtors, and the EMEA Debtors (including NNUK) entered into the IFSA (defined in paragraph 15 supra), dated June 9, 2009, pursuant to which they agreed, inter alia, (a) that all such sales proceeds will be held in escrow until the parties either agree on a consensual allocation, or, in the absence of such an agreement, obtain a binding determination on the allocation pursuant to an agreed upon allocation protocol; and (b) that they would negotiate in good faith to attempt to reach agreement on the terms that would govern the allocation protocol process. (IFSA §§ 12(b)-(c), Exhibit B to the Schweitzer Dec.)[19]

66.     In accordance with the IFSA, the parties have engaged in extensive negotiations regarding the terms of the allocation protocol.  The purpose of the protocol (called the Protocol For Resolving Disputes Concerning Allocation of Sale Proceeds) is to ensure a fair allocation, to be determined (absent a consensual agreement), in a single cross-jurisdictional forum. (Ray Dec. ¶ 16.)

67.     Based on the assertions in the U.K. Pension Claim, it appears that the Claimants seek to litigate, in the context of an administrative proceeding before a U.K. administrative body, whose sole focus is the financial protection of U.K. pension plan members and an insurance vehicle, the question of whether NNUK's contributions to the "global" Nortel business received inadequate financial recognition pre-filing so that now it is "reasonable" to impose financial responsibility on its affiliates. That issue, of course, overlaps with the issues in

---

[19]     The proceeds of the sales that have been consummated thus far have been deposited into escrow accounts located in the United States.  Moreover, as discussed in paragraph 16 supra, the IFSA and the escrow agreements provide that any disputes arising respectively thereunder shall be subject to the jurisdiction of the U.S. and Canadian courts (pursuant to the existing Cross-Border Protocol), and that the English courts shall have jurisdiction only over claims brought against the Joint Administrators in their personal capacities.  (IFSA § 16(b); see Exhibits B and C to the Schweitzer Dec.)

the allocation dispute. The question of whether and to what extent affiliates of NNUK should be responsible for NNUK's obligations is part and parcel of the entire cross-affiliate benefit and contribution issue and the allocation process.  (Ray Dec. ¶ 14.)

68.    Indeed, the resolution of the issues Claimants seek to litigate in the U.K. Administrative Proceedings may involve consideration of the same factors -- including Nortel's transfer pricing arrangements, Nortel's Master Research and Development Agreement, the value of certain research and development, ownership rights to Nortel's intellectual property, and individual corporate assets and revenues -- as those that may be significant to the allocation process.  (Ray Dec. ¶ 17.)

69.    The Nortel debtors in Canada, the U.S., and the U.K. have agreed that these issues must be resolved, on a global basis, in a single cross-jurisdictional forum.[20]  They should not be decided, even in part, by an administrative body in a single jurisdiction with a single constituency.

70.    Moreover, the very premise for the U.K. Administrative Proceeding is that NNUK does not have the resources to fund the NNUK Pension Plan, and one of the key elements in determining the "reasonableness" of imposing a FSD and a CN against a Non-Employer under the U.K. Pensions Act is the financial condition of the Non-Employer. (U.K. Pensions Act s. 42(5); s. 47(3); see Hitchcock Dec. ¶¶ 37, 44.)  Until the allocation procedure is completed, however, the financial condition of the Employer, NNUK, and the Non-Employers, including the Debtors, cannot be determined. (Ray Dec. ¶ 19.)

---

[20]    It would be an utter waste of estate resources, as the Debtors attempt to move forward to further maximize value to the creditor constituencies through asset sales and in developing a chapter 11 plan, for their essential personnel and professionals to be forced to litigate in the U.K. Administrative Proceeding the very issues that Claimants put before the Court by filing their proofs of claim, and to engage in a piecemeal determination of issues relevant to the allocation process that even NNUK has agreed should instead be resolved on a global basis in a single cross-jurisdictional forum. (See Ray Dec. ¶ 21.)

71.     Further, unless the allocation proceeding takes place first, the Debtors will be faced with the prospect of the offensive use of collateral estoppel against them in that proceeding or in this Court with respect to any of the overlapping factual issues that would have been determined in the U.K. Administrative Proceedings.

72.     Accordingly, an order should be entered enforcing the automatic stay, putting the Claimants on notice that any results of such Proceeding will be void in this Court and that they will be subject to possible sanctions should they proceed in violation of the stay.[21]

### NOTICE

73.     Notice of the Motion has been given via hand delivery or overnight mail to the (i) U.S. Trustee; (ii) counsel to the Committee; (iii) counsel to the Bondholder Group; (iv) the Joint Administrators; (v) counsel to the U.K. Pension Trustee/PPF; (vi) counsel to NNUK; and (v) the general service list established in these chapter 11 cases.  The Debtors submit that under the circumstances no other or further notice is necessary.

---

[21]     The Order the Debtors seek on this Motion includes a provision that "the Debtors are not subject to any stay in the implementation, enforcement or realization of the relief granted in this Order."  The purpose of this provision is to prevent the Claimants, upon entry of the Order, from filing an appeal, ignoring the automatic stay, and going forward with the U.K. Administrative Proceeding before the appeal is decided, thereby defeating the purpose of the Order enforcing the stay.  Under Bankruptcy Rule 8005, a party is only entitled to a stay pending appeal if it demonstrates, like a party seeking an injunction, inter alia, a probability of success on the merits, irreparable harm if the stay is denied, and the absence of harm to the appellee if the stay is granted.  See, e.g., In re Polaroid Corp., No. 02-1353 (JJF), 2004 U.S. Dist. LEXIS 1917, at *3 (D. Del. May 22, 2004); In re ANC Rental Corp., No. 02-154, et al. (GMS), 2002 U.S. Dist. LEXIS 9409, **6-7 (D. Del. Feb. 4, 2002).  Here, putting aside the Claimants' inability to demonstrate a likelihood of success on the merits, it is obvious that the balance of hardships tips entirely in the Debtors' favor.  A stay would allow the Claimants to proceed in the U.K. as though the automatic stay did not exist, forcing the Debtors either to waste the Estate's resources and participate even though it obtained a favorable ruling from this Court on the motion to enforce the stay, or take the risk that if it did not participate, and the District Court reversed, there would be a determination by the Determinations Panel that the Claimants would attempt to use in this Court to pursue the U.K. Pension Claim.  On the other hand, in the absence of a stay, the Claimants would suffer no harm because the only consequence would be a delay in the U.K. Administrative Proceeding, unless of course the Claimants were willing to risk violating the stay by going ahead in the U.K. in any event.

**NO PRIOR REQUEST**

74.     No prior request for the relief sought herein has been made to this or any other court.

**CONCLUSION**

WHEREFORE, the Debtors respectfully request that the Court grant the relief requested herein and such other and further relief as it deems proper.

Dated:  February 18, 2010
         Wilmington, Delaware

CLEARY GOTTLIEB STEEN & HAMILTON LLP

Deborah M. Buell (admitted *pro hac vice*)
James L. Bromley (admitted *pro hac vice*)
Lisa M. Schweitzer (admitted *pro hac vice*)
Neil P. Forrest
One Liberty Plaza
New York, New York 10006
Telephone:  (212) 225-2000
Facsimile:  (212) 225-3999

        - and -

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/ Ann C. Cordo*
Derek C. Abbott (No. 3376)
Eric D. Schwartz (No. 3134)
Ann C. Cordo (No. 4817)
Andrew R. Remming (No. 5120)
1201 North Market Street
P.O. Box 1347
Wilmington, Delaware 19801
Telephone:  (302) 658-9200
Facsimile: (302) 658-3989

*Counsel for the Debtors*
*and Debtors in Possession*