# Schweitzer
# Exhibit C

**ESCROW AGREEMENT**

**among**

**THE SELLERS**

**and**

**THE EMEA FILED ENTITIES**

**and**

**THE ESTATE FIDUCIARIES**

**and**

**JPMorgan Chase Bank, N.A., as Escrow Agent**

**dated as of November 11, 2009**

**ESCROW AGREEMENT** (this "Agreement"), dated as of November 11, 2009, by and among (i) Nortel Networks Corporation ("NNC"); (ii) Nortel Networks Limited ("NNL"); (iii) Nortel Networks Inc. ("NNI"); (iv) the companies set out in Schedule A (the "EMEA Filed Entities"), which are acting by Alan Robert Bloom, Stephen John Harris, Alan Michael Hudson and Christopher John Wilkinson Hill of Ernst & Young LLP (other than Nortel Networks (Ireland) Limited (In Administration) for which David Hughes of Ernst & Young Chartered Accountants and Alan Robert Bloom serve as joint administrators (collectively the "Joint Administrators")) who act as agents of the EMEA Filed Entities without any personal liability as set forth in Paragraph 20 below (the EMEA Filed Entities and collectively with NNC, NNL and NNI, the "Depositors"); (v) the Estate Fiduciaries (as defined below) with the exclusion from liability set forth in Paragraph 28; and (vi) JPMorgan Chase Bank, N.A., a national banking association organized and existing under the laws of the United States of America ("JPMorgan") and acting through its TS/Escrow Services Division and solely in its capacity as escrow agent under the Agreement, and any successors appointed pursuant to the terms hereof (JPMorgan in such capacity, the "Escrow Agent").

**WHEREAS,** on January 14, 2009 (the "Petition Date"), NNC, NNL and certain of their affiliates (collectively, the "Canadian Debtors") filed with the Ontario Superior Court of Justice (the "Canadian Court") an application for protection under the Companies' Creditors Arrangement Act (Canada) (the "CCAA") and were granted certain creditor protection pursuant to an order issued by the Canadian Court on the same date, which has been extended by further order of the Canadian Court (such proceedings, together with any other formal insolvency proceedings commenced in Canada in respect of any Depositor that is a Canadian debtor, the "Canadian Cases");

**WHEREAS,** NNI and certain of its affiliates (collectively, the "U.S. Debtors") are debtors-in-possession under the U.S. Bankruptcy Code, which commenced cases under Chapter 11 of the U.S. Bankruptcy Code on the Petition Date (except for Nortel Networks (CALA) Inc., which commenced its case under Chapter 11 of the U.S. Bankruptcy Code on July 14, 2009) by filing voluntary petitions for relief in the U.S. Bankruptcy Court for the District of Delaware (the "U.S. Bankruptcy Court") (the "U.S. Cases" and together with the Canadian Cases, the "Bankruptcy Cases");

**WHEREAS,** the Canadian Court has appointed Ernst & Young Inc. as Monitor in the Canadian Proceedings and as foreign representative for the Canadian Debtors (the "Monitor"), and the Office of the United States Trustee for the District of Delaware (the "U.S. Trustee") has appointed an Official Committee of Unsecured Creditors as representative for the creditors of the U.S. Debtors (the "Committee," and together with the Monitor, the "Estate Fiduciaries"), and in addition, and ad hoc group of bondholders holding claims against certain of the US Debtors and certain of the Canadian Debtors has also been organized (the "Bondholder Group");

**WHEREAS** on the Petition Date, the High Court of Justice in London, England (the "English Court") ordered that the EMEA Filed Entities be placed into administration under the English Insolvency Act 1986 (the "Insolvency Act") and Insolvency Rules 1986 (the "Insolvency Rules") and European Union's Council Regulation (EC) No 1346/2000 on Insolvency Proceedings (the "EC Regulation") and appointed the Joint Administrators (as appropriate) to manage the affairs, business and property of the EMEA Filed Entities;

1

**WHEREAS** on May 28, 2009, insolvency proceedings, in accordance with Article 3(3) of the EC Regulation ("Secondary Proceedings"), were opened by the Commercial Court of Versailles (the "French Court") in relation to NNSA in accordance with Article 27 of the EC Regulation pursuant to which the French Court appointed Maître Cosme Rogeau, 26, avenue Hoche, 78000 Versailles as the "Liquidateur Judiciaire" and Maître Franck Michel, partner of Selarl F. Michel – A. Miroitte – C. Gorins, 10 Allée Pierre de Coubertin, 7800 Versailles as the "Administrateur Judiciaire" of NNSA under Articles 641-1 et seq. of the French Commercial Code;

**WHEREAS,** NNC, NNL and NNI (collectively, the "Sellers") and Telefonaktiebolaget L M Ericsson (publ) (the "Buyer") have entered into that certain Asset Sale Agreement, dated as of July 24, 2009, as amended on October 30, 2009 and as may be further amended from time to time in accordance with its terms (the "Asset Sale Agreement", and terms not otherwise defined herein shall have the meaning given to them in the Asset Sale Agreement), whereby the Sellers have agreed to sell certain of their assets relating to the CDMA and LTE Access businesses to the Buyer;

**WHEREAS,** it is contemplated under Section 2.3.2 of the Asset Sale Agreement that at Closing the Buyer will deliver or cause to be delivered an amount, in immediately available funds, equal to the Estimated Purchase Price less the Good Faith Deposit, the Working Capital Escrow Amount and other amounts deducted by mutual agreement of the Sellers and the Buyer (subject to the consent of the Estate Fiduciaries and the Bondholder Group in accordance with clause 12.g of the IFSA (as defined below)) from the Estimated Purchase Price to be paid by the Buyer at Closing (the "Deposited Purchase Price") to the Sellers, and will deliver or cause to be delivered an amount, in immediately available funds, equal to the Working Capital Escrow Amount to Citibank N.A., in its capacity as escrow agent ("Citi") under that certain Escrow Agreement to be entered into at Closing (the "Working Capital Escrow Agreement") by and among the Sellers, Citi and the Buyer;

**WHEREAS,** it is contemplated under the Transition Services Agreement that at Closing the Sellers will deliver or cause to be delivered an amount in immediately available funds equal to $50,000,000 (the "TSA Escrow Amount") to Citi under that certain escrow agreement to be entered into at Closing by and among the Sellers, Citi and Ericsson Inc., a corporation organized under the laws of Delaware, pursuant to the Transition Services Agreement (the "TSA Escrow Agreement");

**WHEREAS,** the Closing is expected to occur in early November, 2009 and the Depositors desire to establish an account prior to Closing for the escrow of the Deposited Purchase Price pursuant to this Agreement, it being understood by the Depositors that this Agreement is subject to amendment in accordance with Paragraph 15(a) to, among other things, reflect further agreement among the Depositors as to the terms of the escrow of the Deposited Purchase Price;

**WHEREAS,** the Depositors and certain other parties (together, the "IFSA Parties") have entered into that certain agreement to address interim funding and the settlement of certain matters dated June 9, 2009 (the "IFSA"), pursuant to clause 12.c and clause 12.g of which, the IFSA Parties have agreed to negotiate in good faith a protocol for resolving disputes concerning the allocation of sale proceeds from sale transactions (the "Allocation Protocol"),

2

which shall provide binding procedures for the allocation of sales proceeds where the IFSA Parties are otherwise unable to reach agreement; and

**WHEREAS** the EMEA Filed Entities have agreed pursuant to clause 11 of the IFSA to enter into an Appropriate License Termination with respect to the licenses and rights granted by NNL to the EMEA Filed Entities under or pursuant to the Master Research and Development Agreement or any other internal agreement among entities of the Nortel group for the purposes of facilitating the entry into the Asset Sale Agreement, and in consideration of a right to an allocation to such Depositors of a portion of the Escrow Funds (as defined below). Upon the execution of the Appropriate License Termination the EMEA Filed Entities, pursuant to clause 11.d of the IFSA, shall be deemed to be a Selling Debtor (for the purposes of the IFSA) and shall be entitled to a portion of the Escrow Funds. Such Appropriate License Termination is in agreed form and has been executed by the EMEA Filed Entities (the "ALT");

**WHEREAS,** this Agreement will be approved by the Canadian Court and the U.S. Bankruptcy Court prior to Closing and the Depositors will, promptly after receiving such approval, provide the Escrow Agent with evidence of such approvals; and

**WHEREAS,** the Depositors wish to appoint JPMorgan as escrow agent and JPMorgan is willing to accept such appointment and to act as escrow agent, in each case upon the terms and conditions of the Agreement;

**NOW, THEREFORE,** for good and valuable consideration, the receipt and adequacy of which is hereby irrevocably acknowledged, the Depositors and the Escrow Agent hereto agree as follows:

1.      Appointment of Escrow Agent. The Depositors hereby jointly nominate, constitute and appoint the Escrow Agent as escrow agent to hold the Escrow Funds in the Escrow Account (as defined below) upon the terms and conditions set forth herein. The Escrow Agent hereby accepts such appointment and agrees that deposits to, and disbursements from, the Escrow Account, or applicable portions thereof, shall only be made in accordance with the terms and conditions of this Agreement.   The Escrow Agent hereby represents to each of the Depositors that it has the corporate power and legal authority to execute this Agreement and to perform its obligations hereunder. The Depositors and the Escrow Agent agree that any action specified in this Agreement as to be taken by all of the Depositors, acting jointly, shall be binding upon each of the Depositors and the Escrow Agent shall be entitled to act and rely upon any action taken by all of the Depositors, acting jointly, and to the extent required hereunder, the Estate Fiduciaries, as provided in this Agreement.

2.      Deposit of Escrow Property. Funds shall be deposited in the Escrow Account (as defined below) as follows:

(a)      At the Closing, the Sellers shall instruct the Buyer to deposit the Deposited Purchase Price, less the TSA Escrow Amount, with the Escrow Agent, in immediately available funds, in an account established with the Escrow Agent (the "Escrow Account") account number 507953312;

3

(b)     At the Closing, NNI shall deposit the Good Faith Deposit less $22,500,000 (which amount represents the aggregate reimbursement to NNI and NNL of the termination fee and expense reimbursement previously paid to Nokia Siemens Networks, B.V. by NNI and NNL, each of whom paid $11,250,000) with the Escrow Agent in immediately available funds in the Escrow Account and pay $11,250,000 to NNL;

(c)     After the Closing, the Sellers shall instruct the Buyer to deposit any purchase price adjustments to be paid to the Sellers under the Asset Sale Agreement with the Escrow Agent in the Escrow Account;

(d)     After the Closing, the Sellers shall instruct Citi to deposit any of the Working Capital Escrow Amount to be released to Sellers pursuant to the Working Capital Escrow Agreement with the Escrow Agent in the Escrow Account; and

(e)     After the Closing, the Sellers shall instruct Citi to deposit any of the TSA Escrow Amount to be released to the Sellers pursuant to the TSA Escrow Agreement with the Escrow Agent in the Escrow Account; provided, however, that if the Depositors (subject to the consent of the Estate Fiduciaries) have agreed to an allocation of the TSA Escrow Amount (or the amount thereof remaining at the time of release or such allocation has been determined pursuant to the Allocation Protocol), the Sellers shall instruct Citi to distribute the TSA Escrow Amount in accordance with such allocation;

(all funds deposited in accordance with sub-paragraphs (a)-(e) above collectively, the "Escrow Property").  The Escrow Property, plus all interest and other income thereon received by Escrow Agent, less any funds distributed or paid in accordance with this Agreement, is collectively referred to herein as "Escrow Funds").  The Escrow Agent shall provide written confirmation to the Depositors, and the Estate Fiduciaries and the Bondholder Group upon its receipt of any Escrow Property from the Buyer, Citi or otherwise.  Prior to the deposits in accordance with sub-paragraphs (a)-(e) above, there shall be no other funds in the Escrow Account.  The Escrow Property shall at all times, until disbursement as provided herein, remain segregated and separately identified by the Escrow Agent and shall not be commingled with the other assets held by the Escrow Agent.

3.     Investment of Escrow Funds.

(a)     Until otherwise jointly directed by all of the Depositors, the Escrow Agent shall invest the Escrow Funds in Permitted Investments only.  "Permitted Investments" means (1) United States Treasury obligations with maturities not in excess of one year, (2) money market funds invested solely in such United States Treasury obligations and (3) the JPMorgan Chase Bank Collateralized Money Market Deposit Account; provided, however, that in no event shall Permitted Investments include investments that are not eligible for the portfolio interest exemption or other similar exception to U.S. withholding tax. The Escrow Agent shall invest the Escrow Funds on the date of deposit so long as the relevant funds are received on or before 11:00 a.m. New York City time. Any written notice to remit payment received by the Escrow Agent after 11:00 a.m. New York City time shall be treated as if received on the following Business Day. For purposes of this Agreement, "Business Day" shall mean any day other than a Saturday, Sunday or any other day on which the Escrow Agent located at the notice address set forth on Schedule C is authorized or required by law or executive order to remain closed. In the absence

4

of joint written instruction from the Depositors and the Estate Fiduciaries, the Escrow Agent will invest the Escrow Funds in item (3) referenced above. The parties recognize and agree that the Escrow Agent will not provide supervision, recommendations or advice relating to either the investment of the Escrow Funds or the purchase, sale, retention or other disposition of any investment described herein. The Escrow Agent shall not have any liability for any loss sustained as a result of any investment in an investment made pursuant to the terms of this Agreement or as a result of any liquidation of any investment prior to its maturity or for the failure of the Depositors to give the Escrow Agent instructions to invest or reinvest the Escrow Funds.

(b)     Any investment direction contained herein may be executed through an affiliated broker-dealer of the Escrow Agent, which shall be entitled to such affiliated broker-dealer's usual and customary fee. Neither the Escrow Agent nor any of its affiliates assume any duty or liability for monitoring the investment rating of the investments.

(c)     The Escrow Agent shall have the right to liquidate investments as necessary to distribute Escrow Funds pursuant to <u>Paragraph 5</u>.

4.      <u>Ownership of Escrow Funds; Taxes</u>.

(a)     The Escrow Funds at all times are and shall be the exclusive property of the Depositors. Interest or other income earned on or with respect to the Escrow Funds shall, as of the end of each calendar year and to the extent required by law, be reported by Escrow Agent on Form 1099 or Form 1042-S as the income of Depositors or their Affiliates, based upon the disbursement of the Escrow Funds to Depositors or their Affiliates pursuant to <u>Paragraph 5</u> if such income was disbursed during such calendar year or, with respect to any Escrow Funds not disbursed during such calendar year, based upon each Depositor's pro rata share of such income, with each Depositor's pro rata share being deemed to be equal to such Depositor's interest allocation percentage as set forth on <u>Exhibit 1</u>. The Escrow Agent acknowledges and agrees that the interest percentages set forth on <u>Exhibit 1</u> are not indicative of the final allocation of the Escrow Funds and, accordingly, the Escrow Agent agrees to amend Form 1099 and Form 1042-S upon a joint written request from the Depositors and the Estate Fiduciaries, which request shall set forth the re-allocation of all interest and any other earnings on Escrow Funds previously reported on Form 1099 and Form 1042-S; provided, however, the Escrow Agent shall be permitted to rely at all times upon the interest percentages then set forth on <u>Exhibit 1</u> delivered to the Escrow Agent and otherwise the Escrow Agent shall be entitled to act upon the allocations and interest percentages as then set forth in <u>Exhibit 1</u> without liability to any Depositor, notwithstanding any subsequent amendment to <u>Exhibit 1</u> setting forth any new allocation or interest percentage. Any other tax returns required to be filed will be prepared and filed by the Depositors with the IRS and any other taxing authority as required by law, including but not limited to, any applicable reporting or withholding pursuant to the Foreign Investment in Real Property Tax Act ("FIRPTA"). The Depositors acknowledge and agree that the Escrow Agent shall have no responsibility for the preparation and/or filing of any tax return or any applicable FIRPTA reporting or withholding with respect to the Escrow Funds or any income earned by the Escrow Funds. Each Depositor further acknowledges and agrees that any taxes payable from the income earned by such Depositor on the investment of any sums held in the Escrow Funds shall be paid by such Depositor. All proceeds of the Escrow Funds shall be retained in the Escrow Account and reinvested from time to time by the Escrow Agent as provided in this Agreement. The Escrow Agent shall withhold any taxes required by law, including but not limited to required withholding in the absence of proper tax

documentation, and shall remit such taxes to the appropriate authorities. The parties hereby agree and acknowledge that the Escrow Agent has no ownership interest in the Escrow Funds but is serving solely as escrow holder having only possession thereof. This Paragraph 4 shall survive notwithstanding any termination of this Agreement or the resignation of the Escrow Agent. Each Depositor will provide the Escrow Agent with the appropriate form W-9 or W-8 either (x) if any of the Escrow Funds are to be disbursed to such Depositor prior to December 31, 2009, as a condition to such Depositor's receipt of such Escrow Funds from the Escrow Agent, prior to the Escrow Agent making such disbursement hereunder or (y) if none of the Escrow Funds are to be disbursed to such Depositor prior to December 31, 2009, on or before December 31, 2009. If W-8 or W-9 forms, validated by the Escrow Agent, have not been provided by all of the Depositors prior to December 31, 2009 the Escrow Agent shall report taxes on a disbursement basis in the year they are disbursed.

(b)     To the extent that the Escrow Agent becomes liable for the payment of any taxes in respect of income derived from the investment of the Escrow Funds, the Escrow Agent shall satisfy such liability to the extent possible from the Escrow Funds. The Depositors shall, jointly and severally, indemnify, defend and hold the Escrow Agent harmless from and against any tax, late payment, interest, penalty or other cost or expense that may be assessed against the Escrow Agent on or with respect to the Escrow Funds and the investment thereof unless such tax, late payment, interest, penalty or other expense was caused by the gross negligence or willful misconduct of the Escrow Agent. Any indemnification payments arising from the indemnification provided by this Paragraph 4(b) shall be initially satisfied out of the Escrow Funds to the extent available. The indemnification provided by this Paragraph 4(b) is in addition to the indemnification provided in Paragraph 9 and shall survive the resignation or removal of Escrow Agent and the termination of this Agreement.

5.     Distribution of Escrow Funds. The Depositors, the Estate Fiduciaries and the Escrow Agent hereby agree that, until the termination of the escrow established pursuant to this Agreement, the Escrow Agent shall hold the Escrow Funds and not disburse any amounts from the Escrow Account except in accordance with the following terms and conditions:

(a)     The Escrow Agent shall disburse to any person amounts from the Escrow Funds if and as so instructed pursuant to (i) a letter of direction jointly executed by the Depositors and the Estate Fiduciaries, a copy of which shall be provided by the Depositors to the Bondholder Group or (ii) where the Depositors have entered into the Allocation Protocol in accordance with clause 12 of the IFSA (the existence of the Allocation Protocol and the identity of the relevant dispute resolver(s) shall be set forth in a written notice jointly executed by the Depositors and delivered to the Escrow Agent), any Depositor's delivery to the Escrow Agent, with copies to the other Depositors, the Estate Fiduciaries and the Bondholder Group, of a duly authenticated copy of the binding decision made by the relevant dispute resolver(s) under that protocol regarding the allocation of sales proceeds (a "Decision") which is not stayed or subject to appeal, accompanied by a certificate from such Depositor certifying as to the finality of the Decision.

(b)     The Depositors understand and agree that no payments or reimbursements made pursuant to Section 6.1 of the Asset Sale Agreement in respect of Transfer Taxes shall constitute any part of the Deposited Purchase Price or the Escrow Funds, or shall be required to be paid by the Buyer into the Escrow Account. In the event, however, that Buyer or its Affiliates

6

make any payments with respect to Transfer Taxes that are payable to or intended for the benefit of one or more Sellers or any Affiliate or agent thereof pursuant to Section 6.1 of the Asset Sale Agreement but which are deposited into the Escrow Account (any such payment, "Misdirected Tax Payment"), then the applicable Depositor(s) shall have the right to request the release of such Misdirected Tax Payment by providing the Escrow Agent with a letter of direction executed by an Authorized Representative of such Depositor identifying the amount that is represented to be a Misdirected Tax Payment(s) and further directing the release of such Misdirected Tax Payment to the appropriate beneficiary in accordance with Paragraph 12 below. The requesting Depositor(s) shall (A) send a copy of·such letter of direction to each of the other Depositors, the Estate Fiduciaries and the Bondholder Group at the same time as such letter is sent to Escrow Agent and (B) attach thereto (i) supporting documentation evidencing the amount of the Transfer Taxes payable (it being understood that the Escrow Agent shall have no responsibility for verifying the accuracy, delivery or sufficiency of such supporting documentation) and (ii) a certification of an Authorized Representative of such Depositor that the amount requested by such Depositor represents amounts deposited into escrow that are payable to or intended for the benefit of such Depositor by the Buyer or its affiliates with respect to Transfer Taxes pursuant to the Asset Sale Agreement. The Escrow Agent shall, on the tenth (10th) day following receipt of such letter of direction, disburse to such Depositor the amounts requested therein; provided, however, that if Escrow Agent receives a notice of objection from one or more of the Depositors or an Estate Fiduciary prior to making such disbursement (but in no event later than 3:00 p.m. EST on such release date), the Escrow Agent shall not make such disbursement until Escrow Agent either (x) receives an order of a court of competent jurisdiction (as provided in Paragraph 21 below), which is not stayed or subject to appeal, instructing it to make such distribution or (y) the objecting Depositor(s) and/or Estate Fiduciary(ies) provide written notice to the Escrow Agent withdrawing such objection. Subject to the proviso to the preceding sentence, the Escrow Agent shall be entitled to act upon any such written letter of direction even if not countersigned by one or more of the other Depositors and/or Estate Fiduciary(ies).

(c)     The Escrow Agent shall have no responsibility or obligation for investigating or determining the validity or sufficiency of any matter asserted in a letter of direction or of any pending claim for entitlement to release of funds from the Escrow Account. The Escrow Agent shall have the right to withhold an amount equal to the amount due and owing to the Escrow Agent, plus any reasonable costs and expenses incurred by Escrow Agent in accordance with the terms of this Agreement in connection with the termination of the Escrow Account.

(d)     No Depositor shall submit to the Escrow Agent a certificate that falsely certifies to the finality of a Decision.

(e)     Any request for a distribution pursuant to this Paragraph 5 shall be accompanied by a completed Schedule B with respect to the Depositors participating in such distribution, unless a completed Schedule B with respect to such Depositor has previously been provided to the Escrow Agent (in which case the Schedule B to be provided to the Escrow Agent need only contain the requisite information with respect to the Depositors as to whom no previous Schedule B has been provided to the Escrow Agent). The Depositors shall comply with any request from another Depositor for information necessary for inclusion in Schedule B.

6.     Termination of Escrow Account. The Agreement shall terminate upon the distribution of all Escrow Funds from the Escrow Account established hereunder in accordance

with Paragraph 5 hereof, subject to the survival of provisions which expressly survive the termination of this Agreement; provided, however, that this Agreement shall not terminate until (i) all of the Working Capital Escrow Amount owing to the Sellers has been released from the Working Capital Escrow Account, deposited in the Escrow Account in accordance herewith and subsequently distributed hereunder, (ii) all of the TSA Escrow Amount owing to the Sellers has been released from the TSA Escrow Account, deposited in the Escrow Account in accordance herewith and subsequently distributed hereunder, unless such amount has been distributed upon release from the TSA Escrow Account in accordance with Paragraph 2(e), in which case the Sellers shall give the Escrow Agent notice thereof with copies to the other Depositors, the Estate Fiduciaries and the Bondholder Group and (iii) all other purchase price adjustment amounts owing to the Sellers under the terms of the Asset Sale Agreement have been deposited in the Escrow Account by the Buyer in accordance herewith and subsequently distributed hereunder; provided, further, that if the balance of the Escrow Account is zero prior to any such deposits, the Depositors shall give the Escrow Agent reasonable advance notice of expected deposits and the Escrow Agent shall keep the Escrow Account open.

7.      Method of Payment.  Any payments to be made hereunder shall be made by wire transfer in immediately available funds to the account of such party designated on Schedule B annexed hereto (collectively, the "Standing Settlement Instructions").  Any Depositor shall have the right, from time to time, to provide written notice to the Escrow Agent and the other Depositors updating its Standing Settlement Instructions, and the Escrow Agent shall thereafter use such revised Standing Settlement Instructions for purposes of any subsequent distributions to such Depositor pursuant to Paragraph 5 until such Standing Settlement Instructions have been further updated pursuant to this Paragraph 7.

The Depositors acknowledge that the Escrow Agent may rely upon all identifying information set forth in the Standing Settlement Instructions. The Escrow Agent and the Depositors agree that such Standing Settlement Instructions shall be effective as the funds transfer instructions of the Depositors, without requiring a verifying callback, whether or not authorized, if the Escrow Agent has previously authenticated such Standing Settlement Instructions with respect to such Depositor. The Depositors acknowledge that such Standing Settlement Instructions are a security procedure and are commercially reasonable.

8.      Monthly Reports.  The Escrow Agent shall, promptly following the end of each calendar month, provide monthly account statements to the Depositors with respect to the Escrow Account, with copies to the Estate Fiduciaries and the Bondholder Group.

9.      Liability of Escrow Agent.  The Escrow Agent's sole liability hereunder shall be to hold and invest the Escrow Funds and any moneys or other properties received with respect thereto, to make payments and distributions therefrom in accordance with the terms of this Agreement, and otherwise to discharge its obligations hereunder. It shall be under no obligation to institute or defend any action, suit or legal proceeding in connection herewith, or to take any other action likely to involve it in expense unless first indemnified to its satisfaction by the party or parties who desire that it undertake such action. The Escrow Agent may execute any of its powers and perform any of its duties hereunder directly or through agents or attorneys (and shall be liable only for the careful selection of any such agent or attorney) and may consult with counsel, accountants and other skilled persons to be selected and retained by it. The Escrow Agent shall not be liable for anything done, suffered or omitted by it in accordance with the

8

advice or opinion of any such counsel, accountants or other skilled persons. The Escrow Agent shall not be liable for any action taken or omitted by it in good faith except to the extent that a court of competent jurisdiction (as set forth in Paragraph 21 below) determines that the Escrow Agent's gross negligence or willful misconduct was the cause of any loss to any Depositor. The Escrow Agent may rely upon and shall not be liable for acting or refraining from acting upon any written notice, document, instruction or request furnished to it hereunder and reasonably believed by it to be genuine and to have been signed or presented by the proper party or parties without inquiry and without requiring substantiating evidence of any kind. The Escrow Agent shall be under no duty to inquire into or investigate the validity, accuracy or content of any such document, notice, instruction or request. The Escrow Agent shall have no duty to solicit any payments which may be due it or the Escrow Account, including, without limitation, the Escrow Property, nor shall the Escrow Agent have any duty or obligation to confirm or verify the accuracy or correctness of any amounts deposited with it hereunder. The Escrow Agent shall have no duty or obligation to make any calculations of any kind hereunder. In the event that the Escrow Agent shall be uncertain or believe there is some ambiguity as to its duties or rights hereunder or shall receive instructions, claims or demands from any party hereto which, in its opinion, conflict with any of the provisions of this Agreement, it shall be entitled to refrain from taking any action and its sole obligation shall be to keep safely all property held in escrow until it shall be given a direction in writing by the parties pursuant to Paragraph 5 which eliminates such ambiguity or uncertainty to the satisfaction of Escrow Agent or by a final and non-appealable order or judgment of a court of competent jurisdiction (as set forth in Paragraph 21 below).

Anything in this Agreement to the contrary notwithstanding, in no event shall the Escrow Agent be liable for special, indirect or consequential loss or damage or any kind whatsoever (including but not limited to lost profits), even if the Escrow Agent has been advised of the likelihood of such loss or damage and regardless of the form of action.

If any dispute should arise with respect to the payment or ownership or right of possession of the Escrow Funds, or any part thereof, at any time, that cannot be settled under other provisions hereof, the Escrow Agent is authorized to retain in its possession, without liability to anyone, all or any part of the Escrow Funds, as applicable, or the proceeds from any sale thereof until a distribution is requested in accordance with Paragraph 5(a).

The Depositors shall, jointly and severally, indemnify and hold harmless Escrow Agent and its affiliates and their respective successors, assigns, directors, agents and employees (the "Indemnitees") from all losses, costs, damages, claims, liabilities, penalties, judgments, settlements, litigation, investigations, and expenses (including, without limitation, the reasonable fees and expenses of outside counsel) (collectively "Losses") arising out of or in connection with (a) Escrow Agent's execution and performance of this Agreement, tax reporting or withholding, the enforcement by Escrow Agent of any of its rights or remedies under or in connection with this Agreement, or as may arise by reason of any act, omission or error of the Indemnitee, except in the case of any Indemnitee to the extent that such Losses are finally adjudicated by a court of competent jurisdiction (as set forth in Paragraph 21 below) to have been caused by the gross negligence or willful misconduct of such Indemnitee, or (b) its following any instructions or directions, whether joint or singular, from the parties, except to the extent that its following any such instruction or direction is expressly forbidden by the terms hereof. The parties hereto acknowledge that the foregoing indemnities shall survive the resignation, replacement or

9

removal of the Escrow Agent or the termination of this Agreement. Any indemnity payments to the Escrow Agent arising from the indemnification provided by this Paragraph 9 shall be initially satisfied from the Escrow Funds to the extent available. The indemnification provided by this Paragraph 9 is in addition to the indemnification provided in Paragraph 4(b) and shall survive the resignation or removal of the Escrow Agent and the termination of this Agreement.

The duties and responsibilities of the Escrow Agent hereunder shall be determined solely by the express provisions of this Agreement, which shall be deemed purely ministerial in nature, and no other or further duties or responsibilities shall be implied. The Escrow Agent shall not have any liability under, nor duty to inquire into, the terms and provisions of any agreement or instructions, including the Asset Sale Agreement, the IFSA and the Allocation Protocol, other than as outlined in this Agreement, nor shall the Escrow Agent be required to determine if any person or entity has complied with any such agreements, nor shall any additional obligations of the Escrow Agent be inferred from the terms of such agreements, even though reference thereto may be made in this Agreement. In the event of any conflict between the terms and provisions of this Agreement, those of the Asset Sale Agreement, any schedule or exhibit attached to the Asset Sale Agreement, the IFSA, the Allocation Protocol, or any other agreement among Depositors, or any of them, the terms and conditions of this Agreement shall control solely to the extent such conflict is with respect to the rights, duties, obligations and liabilities of the Escrow Agent.

10.     Compensation of Escrow Agent. The Depositors agree to pay the Escrow Agent a fee in the amount of $2,500 in the aggregate on the date hereof and on the anniversary of the date hereof each year thereafter as full compensation for its services hereunder; provided, however, that the Depositors further agree to reimburse the Escrow Agent all reasonable, documented out-of-pocket costs and out-of-pocket expenses, including reasonable attorneys' fees, suffered or incurred by the Escrow Agent in connection with the performance of its duties and obligations hereunder, including but not limited to any suit in interpleader brought by the Escrow Agent (which shall be brought only in a court of competent jurisdiction (as set forth in Paragraph 21 below). The Escrow Agent shall collect amounts due to it under this Paragraph 10 from the Escrow Account.

11.     Resignation or Removal of Escrow Agent. The Escrow Agent may resign as such following the giving of thirty (30) days' prior written notice to the other parties hereto and upon selection of a successor escrow agent pursuant to the provisions of this Agreement. Similarly, the Escrow Agent may be removed and replaced following the giving of thirty (30) days' prior written notice to the Escrow Agent by the Depositors and the Estate Fiduciaries. In either event the Escrow Agent shall then deliver the balance of the Escrow Funds then in its possession to a successor escrow agent as shall be appointed by the Depositors and the Estate Fiduciaries as evidenced by a written notice filed with the Escrow Agent and signed by the Depositors and the Estate Fiduciaries.

If the Depositors and the Estate Fiduciaries are unable to agree upon a successor or shall have failed to appoint a successor prior to the expiration of thirty (30) days following the date of notice of resignation or removal, the then-acting escrow agent may petition any court of competent jurisdiction (as set forth in Paragraph 21 below) for the appointment of a successor escrow agent or otherwise appropriate relief, and any such resulting appointment shall be binding upon all of the parties hereto. For the avoidance of doubt, the parties acknowledge that under no

10

circumstances shall any party be entitled to obtain a distribution from the Escrow Account as a result of the resignation of the Escrow Agent.

The successor escrow agent shall be a bank or trust company having its principal executive office in the United States and assets in excess of $5,000,000,000.

Upon acknowledgement by any successor escrow agent of the receipt of the then-remaining balance of the Escrow Funds the then-acting escrow agent shall be fully released and relieved of all duties, responsibilities and obligations under this Agreement.

Any corporation into which the Escrow Agent in its individual capacity may be merged or converted or with which it may be consolidated, or any corporation resulting from any merger, conversion or consolidation to which the Escrow Agent in its individual capacity shall be a party, or any corporation to which substantially all the corporate trust business of the Escrow Agent in its individual capacity may be transferred, shall be the Escrow Agent under this Agreement without further act.

12.    Notices. All communications hereunder shall be in writing and shall be deemed to be duly given and received:  (i) upon delivery, if delivered personally, or upon confirmed transmittal, if by facsimile; (ii) on the next Business Day if sent by overnight courier; or (iii) four (4) Business Days after mailing if mailed by prepaid registered mail, return receipt requested, to the appropriate notice address set forth in Schedule C or at such other address as any party hereto may have furnished to the other parties in writing by registered mail, return receipt requested.

Notwithstanding the above, in the case of communications delivered to the Escrow Agent pursuant to (i), (ii) or (iii) of this Paragraph 12, such communications shall be deemed to have been given on the date received by an officer of the Escrow Agent or any employee of the Escrow Agent who reports directly to any such officer at the above-referenced office.  In the event that the Escrow Agent, in its sole discretion, shall determine that an emergency exists, the Escrow Agent may use such other means of communication as the Escrow Agent deems appropriate.

In the event wire transfer instructions are given (other than in writing at the time of execution of this Agreement), whether in writing, by facsimile or otherwise, the Escrow Agent is authorized to seek confirmation of such instructions by telephone call-back to the person or persons designated on Schedule D hereto (each an "Authorized Representative" of the applicable Depositor), and the Escrow Agent may rely upon the confirmations of anyone purporting to be the person or persons so designated.  The persons and telephone numbers for call-backs may be changed only in writing actually received and acknowledged by the Escrow Agent, it being understood that each Depositor shall have the right to replace its Authorized Representative from time to time by providing written notice to the Escrow Agent, the other Depositors, the Estate Fiduciaries and the Bondholder Group or by providing a copy of a court order of a court of competent jurisdiction (as provided in Paragraph 21 below) to the Escrow Agent designating a successor Authorized Representative.  The Depositors acknowledge that such security procedure is commercially reasonable.

If at any time prior to the termination of this Agreement any of the Estate Fiduciaries is discharged, removed or dissolved, whether pursuant to an approved plan of

reorganization or liquidation by order of the Canadian Court, the U.S. Bankruptcy Court or otherwise, any Depositor or Estate Fiduciary may present to the Escrow Agent evidence of such discharge, removal or dissolution in the form of a court order or other officially certified document which upon receipt by the Escrow Agent shall constitute an effective amendment to this Agreement, and such Estate Fiduciary by operation of this Agreement, as amended, shall cease to be such for all purposes of this Agreement and the consent of such removed or dissolved Estate Fiduciary shall no longer be required for any purposes hereunder.  If such discharge, removal or dissolution provides for a successor to the duties and responsibilities of such removed or dissolved Estate Fiduciary, or a successor to the same or substantially similar duties and responsibilities of such removed or dissolved Estate Fiduciary (including, without limitation, a trustee in bankruptcy) is otherwise appointed, then the preceding sentence shall be of no effect with respect to such successor entity, the rights and responsibilities of such Estate Fiduciary hereunder shall pass automatically to such successor entity and such successor entity shall be deemed to be a party to this Agreement as if it were a signatory hereto.

If at any time prior to the termination of this Agreement any of the Depositors is liquidated or dissolved whether pursuant to an approved plan of reorganization of liquidation by order of the Canadian Court of U.S. Bankruptcy Court (or, in the case of the EMEA Filed Entities, such order court of competent jurisdiction or by operation of law), or otherwise any Depositor, or Estate Fiduciary (as the case may be) shall present to the Escrow Agent evidence of such dissolution or liquidation in the form of a court order or other officially certified document which upon receipt by the Escrow Agent shall constitute an effective amendment to this Agreement, and such dissolved or liquidated Depositor by operation of this Agreement, as so amended, shall cease to be such for all purposes of this Agreement, as amended, and the consent of such dissolved or liquidated Depositor shall no longer be required for any purposed hereunder.  If such dissolution or liquidation provides for a successor to such dissolved or liquidation, then such rights and responsibilities shall pass automatically to such successor entity.

The Depositors represent, warrant and covenant that each document, notice, instruction or request provided by such party to the Escrow Agent shall comply with applicable laws and regulations.  Where, however, the conflicting provisions of any such applicable law may be waived, they are hereby irrevocably waived by the Depositors to the fullest extent permitted by law, to the end that this Agreement shall be enforced as written.

13.    Counterparts.  This Agreement may be executed in any number of counterparts, each of which shall be deemed to be an original, but such counterparts shall constitute one and the same agreement.  Facsimile copies may be deemed originals for the purpose of this Agreement.

14.    Paragraph Headings.  The paragraph headings of this Agreement are for convenience of reference only and shall not be deemed to limit or affect any of the provisions hereof.

15.    Amendments; No Waivers.

(a)    Except for the resignation, removal or replacement of an Estate Fiduciary as set forth in Paragraph 12 or the liquidation or dissolution of a Depositor as set forth in Paragraph 12, any provision of this Agreement may be waived or amended if, and only if, such

12

amendment or waiver is in writing and is signed by the Depositors, the Estate Fiduciaries and the Escrow Agent (with a copy thereof to the Bondholder Group) and, if prior to the entry of a final decree closing all of the Bankruptcy Cases, such amendment or waiver is approved by both the U.S. Bankruptcy Court and the Canadian Court; provided, however, that (i) court approval shall not be required of any applicable court (whether the U.S. Bankruptcy Court or the Canadian Court) if a final decree closing the Bankruptcy Cases pending before such court shall have been entered by such court and (ii) court approval shall not be required of any court if final decrees terminating all Bankruptcy Cases shall have been entered by the U.S. Bankruptcy Court and the Canadian Court.

(b)    No failure by any party hereto to insist upon the strict performance of any covenant, duty, agreement or condition of this Agreement, or to exercise any right or remedy consequent upon a breach hereof, shall constitute a waiver of any such breach or any other covenant, duty, agreement or condition hereof.

16.    Entire Agreement; No Third Party Beneficiaries.  This Agreement (including any exhibits, schedules and amendments hereto) and (solely with respect to the Depositors that are parties thereto) the Asset Sale Agreement, the IFSA, the ALT and the Allocation Protocol to be entered into pursuant thereto (a) constitute the entire Agreement and understandings of the parties hereto and supersedes all prior agreements and understandings, both written and oral, among the parties hereto with respect to the subject matter hereof and (b) is not intended to confer upon any other Person any rights or remedies hereunder; provided, however, that the Joint Administrators shall be entitled to enforce and take the benefit of Paragraph 20 hereof.

17.    Governing Law.  Subject to Paragraph 20, this Agreement shall be governed by and construed in accordance with the Laws of the State of New York (without regard to the choice of law provisions thereof).

18.    Account Opening Information. To help the government fight the funding of terrorism and money laundering activities, Federal law requires all financial institutions to obtain, verify, and record information that identifies each person who opens an account. When an account is opened, Escrow Agent will ask for information that will allow it to identify relevant parties.

19.    Severability.  If any provision of this Agreement is determined by a court of competent jurisdiction (as set forth in Paragraph 21 below) to be prohibited or unenforceable by reason of any applicable law of a jurisdiction, then such provision shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions thereof, and any such prohibition or unenforceability in such jurisdiction shall not invalidate or render unenforceable such provisions in any other jurisdiction.

20.    Exclusion of Liability for the Joint Administrators.

(a)    The parties hereto agree that the Joint Administrators have negotiated this Agreement as agents for the EMEA Filed Entities to which they are appointed and that none of the Joint Administrators, their firm, partners, employees, advisers, representatives or agents shall incur any personal liability whatsoever whether on their own part or in respect of any failure on the part of any EMEA Filed Entity to observe, perform or comply with any of its obligations

under this Agreement or under or in relation to any associated arrangements or negotiations whether such liability would arise under Paragraph 99(4) of Schedule B1 to the Insolvency Act and/or Rule 2.67 of the Insolvency Rules or otherwise howsoever.

(b)    Notwithstanding anything in Paragraph 21, any claim, action or proceeding against the Joint Administrators in their personal capacities (and not as agents for any EMEA Filed Entities) under this Agreement shall be governed exclusively by English law and subject to the exclusive jurisdiction of the English Courts.

21.    JURISDICTION.  SUBJECT TO PARAGRAPH 20, EACH PARTY HEREBY IRREVOCABLY SUBMITS TO AND ACCEPTS FOR ITSELF AND ITS PROPERTIES, GENERALLY AND UNCONDITIONALLY TO THE EXCLUSIVE JURISDICTION OF AND SERVICE OF PROCESS PURSUANT TO THE RULES OF BOTH (I) THE U.S. BANKRUPTCY COURT FOR THE DISTRICT OF DELAWARE AND THE ONTARIO SUPERIOR COURT OF JUSTICE, IF BROUGHT PRIOR TO THE ENTRY OF A FINAL DECREE CLOSING THE BANKRUPTCY CASES INVOLVING THE RELEVANT DEPOSITORS PENDING BEFORE SUCH COURTS, INCLUDING THE AMENDED CROSS-BORDER PROTOCOL APPROVED BY THE U.S. BANKRUPTCY COURT FOR THE DISTRICT OF DELAWARE ON JUNE 29, 2009, AND BY THE ONTARIO SUPERIOR COURT OF JUSTICE ON JUNE 29, 2009, AND (II) THE FEDERAL COURTS IN THE SOUTHERN DISTRICT OF NEW YORK AND THE STATE COURTS OF THE STATE OF NEW YORK, COUNTY OF MANHATTAN (COLLECTIVELY, THE "NEW YORK COURTS"), IF BROUGHT AFTER ENTRY OF SUCH FINAL DECREE CLOSING SUCH BANKRUPTCY CASES, WAIVES ANY DEFENSE OF FORUM NON CONVENIENS AND AGREES TO BE BOUND BY ANY JUDGMENT RENDERED THEREBY ARISING UNDER OR OUT OF IN RESPECT OF OR IN CONNECTION WITH THIS AGREEMENT. EXCEPT AS PROVIDED IN THE FOREGOING NO PARTY HERETO SHALL INITIATE ANY LEGAL PROCEEDING ARISING UNDER OR OUT OF, IN RESPECT OF OR IN CONNECTION WITH THIS AGREEMENT IN ANY OTHER STATE OR FEDERAL COURT IN THE UNITED STATES OF AMERICA OR ANY COURT IN ANY OTHER COUNTRY. EACH PARTY FURTHER IRREVOCABLY DESIGNATES AND APPOINTS THE INDIVIDUAL IDENTIFIED PURSUANT TO PARAGRAPH 12 HEREOF (OR, IN THE CASE THAT A SUCCESSOR PERSON IS APPOINTED AS AUTHORIZED REPRESENTATIVE PURSUANT TO PARAGRAPH 12, SUCH SUCCESSOR PERSON) TO RECEIVE NOTICES ON ITS BEHALF, AS ITS AGENT TO RECEIVE ON ITS BEHALF SERVICE OF ALL PROCESS IN ANY SUCH ACTION BEFORE ANY BODY, SUCH SERVICE BEING HEREBY ACKNOWLEDGED TO BE EFFECTIVE AND BINDING SERVICE IN EVERY RESPECT. A COPY OF ANY SUCH PROCESS SO SERVED SHALL BE MAILED BY REGISTERED MAIL TO EACH PARTY AT ITS ADDRESS PROVIDED PURSUANT TO PARAGRAPH 12; PROVIDED THAT, UNLESS OTHERWISE PROVIDED BY APPLICABLE LAW, ANY FAILURE TO MAIL SUCH COPY SHALL NOT AFFECT THE VALIDITY OF THE SERVICE OF SUCH PROCESS.    IF ANY AGENT SO APPOINTED REFUSES TO ACCEPT SERVICE, THE DESIGNATING PARTY HEREBY AGREES THAT SERVICE OF PROCESS SUFFICIENT FOR PERSONAL JURISDICTION IN ANY ACTION AGAINST IT IN THE APPLICABLE JURISDICTION MAY BE MADE BY REGISTERED OR CERTIFIED MAIL, RETURN RECEIPT REQUESTED, TO ITS ADDRESS PROVIDED PURSUANT TO PARAGRAPH 12.   EACH PARTY HEREBY

14

ACKNOWLEDGES THAT SUCH SERVICE SHALL BE EFFECTIVE AND BINDING IN EVERY RESPECT.   NOTHING HEREIN SHALL AFFECT THE RIGHT TO SERVE PROCESS IN ANY OTHER MANNER PERMITTED BY LAW OR SHALL LIMIT THE RIGHT OF ANY PARTY TO BRING ANY ACTION OR PROCEEDING AGAINST THE OTHER PARTY IN ANY OTHER JURISDICTION. NOTWITHSTANDING ANYTHING IN THIS <u>PARAGRAPH 21</u> TO THE CONTRARY, ANY CLAIM, ACTION OR PROCEEDING SET FORTH IN <u>PARAGRAPH 20</u> SHALL BE BROUGHT <u>EXCLUSIVELY</u> IN THE ENGLISH COURTS.   FINALLY, REGARDLESS OF THE JURISDICTION OF THE APPLICABLE COURT, THE PARTIES FURTHER HEREBY WAIVE ANY RIGHT TO A TRIAL BY JURY WITH RESPECT TO ANY LAWSUIT OR JUDICIAL PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT.

22.   <u>Interpretation</u>.  As used in this Agreement (including all exhibits, schedules and amendments hereto), the masculine, feminine or neuter gender and the singular or plural number shall be deemed to include the others whenever the context so requires. References to Paragraphs and Articles refer to sections and articles of this Agreement, unless the context otherwise requires. Words such as "herein," "hereinafter," "hereof," "hereto," "hereby" and "hereunder," and words of like import, unless the context requires otherwise, refer to this Agreement. The captions contained herein are for convenience only and shall not control or affect the meaning or construction of any provision of this Agreement.

23.   <u>Compliance with Court Orders</u>.  In the event that any of the Escrow Funds shall be attached, garnished or levied upon by any court order, or the distribution or disbursement thereof shall be stayed or enjoined by an order of a court of competent jurisdiction (as set forth in <u>Paragraph 21</u> above), or any order, judgment or decree shall be made or entered by any court order affecting the property deposited under this Agreement, the Escrow Agent is hereby expressly authorized, in its sole discretion, to obey and comply with all writs, orders or decrees so entered or issued, which it is advised by legal counsel of its own choosing is binding upon it, whether with or without jurisdiction, and in the event that the Escrow Agent obeys or complies with any such writ, order or decree it shall not be liable to any of the parties hereto or to any other person, firm or corporation, by reason of such compliance notwithstanding such writ, order or decree be subsequently reversed, modified, annulled, set aside or vacated.

24.   <u>Force Majeure</u>.  In the event that any party or the Escrow Agent is unable to perform its obligations under the terms of this Agreement because of acts of God, strikes, equipment or transmission failure or damage reasonably beyond its control, or other cause reasonably beyond its control, the Escrow Agent shall not be liable for damages to the other parties for any damages resulting from such failure to perform otherwise from such causes. Performance under this Agreement shall resume when the Escrow Agent is able to perform substantially.

25.   <u>Patriot Act Disclosure</u>.  Section 326 of the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 (the "<u>USA PATRIOT Act</u>") requires the Escrow Agent to implement reasonable procedures to verify the identity of any person that opens a new account with it.  Accordingly, each Depositor acknowledges that Section 326 of the USA PATRIOT Act and the Escrow Agent's identity verification procedures require the Escrow Agent to obtain information which may be used to confirm such Depositor's identity including without limitation name, address and organizational

documents ("identifying information").  Each Depositor agrees to provide the Escrow Agent with and consent to the Escrow Agent obtaining from third parties any such identifying information with respect to it required as a condition of opening an account with or using any service provided by the Escrow Agent.

26.    Taxpayer Identification Numbers ("TIN").    Each Depositor will provide the Escrow Agent with its fully executed Internal Revenue Service ("IRS") Form W-8, or W-9 and/or other required documentation as set forth in Paragraph 4(a).  Each Depositor providing such documentation represents that its correct TIN assigned by the IRS, or any other taxing authority, shall be set forth in the delivered forms

27.    Allocation Protocol.    The Depositors and the Estate Fiduciaries agree and acknowledge that nothing in this Agreement shall prejudice any pre-existing rights or obligations of any of the Depositors and the Estate Fiduciaries to argue the appropriateness of any allocation of the Escrow Funds before a dispute resolver(s) appointed pursuant to the Allocation Protocol. Without limitation to the foregoing, the Depositors' Interest Allocation Percentages set forth on Exhibit 1 are not indicative of the final allocation of the Escrow Funds and shall not be presented by any of the Depositors and the Estate Fiduciaries in any of their submissions (whether in writing or orally) as to the appropriate allocation of the Escrow Funds before the dispute resolver(s) appointed pursuant to the Allocation Protocol.

28.    Exclusion of Liability for Estate Fiduciaries.  The Depositors and the Escrow Agent agree that (a) each of the Estate Fiduciaries has negotiated and is entering into this Agreement as a representative of its applicable creditor constituency for the purpose of benefiting from the rights being granted hereunder and to allow the Escrow Agent to be able to rely on any joint instructions signed by the Estate Fiduciaries and (b) none of the Estate Fiduciaries, their firms, members or affiliates of such parties and such parties respective partners, associates, employees, advisers, representatives or agents shall incur any liability whatsoever under this Agreement.

*[Remainder of Page Intentionally Left Blank]*

16

IN WITNESS WHEREOF, each of the parties hereto has caused this Agreement to be executed on the day and year first above written.

NORTEL NETWORKS LIMITED

By:_____
Name:  John Doolittle
Title:   Senior Vice-President, Finance and
Corporate Services

By:_____
Name:  Anna Ventresca
Title:    General Counsel – Corporate and
Corporate Secretary

NORTEL NETWORKS INC.

By:_____
Name:  Anna Ventresca
Title:   Chief Legal Officer

NORTEL NETWORKS CORPORATION

By:_____
Name:  John Doolittle
Title:   Senior Vice-President, Finance and
Corporate Services

By:_____
Name:  Anna Ventresca
Title:   General Counsel – Corporate and
Corporate Secretary

ESCROW AGENT

JPMorgan Chase Bank, N.A., as Escrow Agent

By:_____
Name:
Title:

ERNST & YOUNG INC. IN ITS CAPACITY
AS THE MONITOR OF NORTEL
NETWORKS CORPORATION ET AL.,
AND NOT IN ITS PERSONAL CAPACITY

By:_____
Name:
Title:

THE OFFICIAL COMMITTEE OF
UNSECURED CREDITORS OF NORTEL
NETWORKS INC., ET. AL.

By:  Flextronics Corporation, solely in its
capacity as Chair of the Committee and not in
its individual capacity,

By:_____
Name:  Timothy Burling
Title:   Vice President, Finance

Escrow Agreement

IN WITNESS WHEREOF, each of the parties hereto has caused this Agreement to be executed on the day and year first above written.

NORTEL NETWORKS LIMITED   NORTEL NETWORKS CORPORATION

By:_____  By:_____
Name:  George Riedel      Name: George Riedel
Title:   Chief Strategy Officer    Title:  Chief Strategy Officer

By:_____  By:_____
Name:  Anna Ventresca     Name:  Anna Ventresca
Title:   General Counsel – Corporate and Title:   General Counsel – Corporate and
Corporate Secretary      Corporate Secretary

NORTEL NETWORKS INC.    ESCROW AGENT

By:_____  JPMorgan Chase Bank, N.A., as Escrow Agent
Name:  Anna Vestresca
Title:   Chief Legal Officer    By:_____
           Name:  SAVERIO A. LUNETTA
           Title:   VICE PRESIDENT

ERNST & YOUNG INC. IN ITS CAPACITY THE OFFICIAL COMMITTEE OF
AS THE MONITOR OF NORTEL   UNSECURED CREDITORS OF NORTEL
NETWORKS CORPORATION ET AL.,  NETWORKS INC., ET. AL.
AND NOT IN ITS PERSONAL CAPACITY

           By:  Flextronics Corporation, solely in its
           capacity as Chair of the Committee and not in
           its individual capacity,

By:_____  By:_____
Name:          Name:  Timothy Burling
Title:          Title:   Vice President, Finance

IN WITNESS WHEREOF, each of the parties hereto has caused this Agreement to be executed on the day and year first above written.

NORTEL NETWORKS LIMITED

By:_____
Name:  John Doolittle
Title:   Senior Vice-President, Finance and Corporate Services

By:_____
Name:  Anna Ventresca
Title:   General Counsel – Corporate and Corporate Secretary

NORTEL NETWORKS INC.

By:_____
Name:  Anna Vestresca
Title:   Chief Legal Officer

NORTEL NETWORKS CORPORATION

By:_____
Name: John Doolittle
Title:   Senior Vice-President, Finance and Corporate Services

By:_____
Name:   Anna Ventresca
Title:   General Counsel – Corporate and Corporate Secretary

ESCROW AGENT

JPMorgan Chase Bank, N.A., as Escrow Agent

By:_____
Name:
Title:

ERNST & YOUNG INC. IN ITS CAPACITY AS THE MONITOR OF NORTEL NETWORKS CORPORATION ET AL., AND NOT IN ITS PERSONAL CAPACITY

By: _Sharon Hamilton_
Name:  Sharon  Hamilton
Title:  Senior  Vice-President

THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS OF NORTEL NETWORKS INC., ET. AL.

By: Flextronics Corporation, solely in its capacity as Chair of the Committee and not in its individual capacity,

By:_____
Name:  Timothy Burling
Title:   Vice President, Finance

Escrow Agreement

S-1

IN WITNESS WHEREOF, each of the parties hereto has caused this Agreement to be executed on the day and year first above written.

NORTEL NETWORKS LIMITED

By:_____
Name:  John Doolittle
Title:   Senior Vice-President, Finance and
Corporate Services


By:_____
Name:  Anna Ventresca
Title:   General Counsel – Corporate and
Corporate Secretary


NORTEL NETWORKS INC.

By:_____
Name:  Anna Vestresca
Title:   Chief Legal Officer




ERNST & YOUNG INC. IN ITS CAPACITY
AS THE MONITOR OF NORTEL
NETWORKS CORPORATION ET AL.,
AND NOT IN ITS PERSONAL CAPACITY




By:_____
Name:
Title:


NORTEL NETWORKS CORPORATION

By:_____
Name: John Doolittle
Title:  Senior Vice-President, Finance and
Corporate Services


By:_____
Name:  Anna Ventresca
Title:   General Counsel – Corporate and
Corporate Secretary


ESCROW AGENT

JPMorgan Chase Bank, N.A., as Escrow Agent


By:_____
Name:
Title:


THE OFFICIAL COMMITTEE OF
UNSECURED CREDITORS OF NORTEL
NETWORKS INC., ET. AL.

By:  Flextronics Corporation, solely in its
capacity as Chair of the Committee and not in
its individual capacity,

By:_____
Name:  Timothy Burling
Title:   Vice President, Finance


Exhibit 1

SIGNED for and on behalf of NORTEL          )
NETWORKS UK LIMITED (in                     )     Alan Bloom
administration) by ALAN BLOOM as Joint      )
Administrator (acting as agent and without  )
personal liability) in the presence of:

Witness signature

W. Graham                                   )
Name:   WILMA   GRAHAM                       )
Address: No.1 MORE LONDON PLACE, LONDON     )
                                    SE1 2AF )
SIGNED for and on behalf of NORTEL          )     Alan Bloom
NETWORKS NV (in administration) by          )
ALAN BLOOM as Joint Administrator (acting   )
as agent and without personal liability) in the )
presence of:

Witness signature

W. Graham                                   )
Name:   WILMA   GRAHAM                       )
Address: No.1 MORE   LONDON  PLACE,         )
        LONDON  SE1   2AF

Escrow Agreement

Error! Unknown document property                S-2                Error! Unknown document property name.
name.Error! Unknown document property
name.Error! Unknown document property

SIGNED for and on behalf of NORTEL )
NETWORKS SPA (in administration) by )
ALAN BLOOM as Joint Administrator (acting )
as agent and without personal liability) in the )
presence of:

Witness signature

Name: √ STUART DEACON )
Address: No. 1 MORE LONDON PLACE )
LONDON SE1 2AF
SIGNED for and on behalf of NORTEL )
NETWORKS BV (in administration) by )
ALAN BLOOM as Joint Administrator (acting )
as agent and without personal liability) in the )
presence of:

Witness signature

Name: STUART DEACON )
Address: No 1, MORE LONDON )
PLACE LONDON SE1 2AF )
SIGNED for and on behalf of NORTEL )
NETWORKS POLSKA SP Z.O.O. (in )
administration) by ALAN BLOOM as Joint )
Administrator (acting as agent and without )
personal liability) in the presence of:

Witness signature

Name: STUARS DEATON )
Address: No 1, MORE London )
PLACE, LONDON
SE1 2AF

Escrow Agreement

Error! Unknown document property
name.Error! Unknown document property
name.Error! Unknown document property

S-3

Error! Unknown document property name.

**SIGNED** for and on behalf of **NORTEL**
**NETWORKS HISPANIA SA** (in
administration) by **ALAN BLOOM** as Joint
Administrator (acting as agent and without
personal liability) in the presence of:

)
)
)
)

Alan Bloom

Witness signature

Name: WILMA GRAHAM
Address: NO. I MORE LONDON PLACE
         LONDON SE1 2AF

)
)
)

**SIGNED** for and on behalf of **NORTEL**
**NETWORKS (AUSTRIA) GMBH** (in
administration) by **ALAN BLOOM** as Joint
Administrator (acting as agent and without
personal liability) in the presence of:

)
)
)
)

Alan Bloom

Witness signature

Name: WILMA GRAHAM
Address: NO. I MORE LONDON PLACE
         LONDON SE1 2AF

)
)
)

**SIGNED** for and on behalf of **NORTEL**
**NETWORKS S.R.O** (in administration) by
**ALAN BLOOM** as Joint Administrator (acting
as agent and without personal liability) in the
presence of:

)
)
)
)

Alan Bloom

Witness signature

Name: WILMA GRAHAM
Address: NO. I MORE LONDON PLACE
         LONDON SE1 2AF

)
)
)

Escrow Agreement

Error! Unknown document property
name.Error! Unknown document property
name.Error! Unknown document property

S-4

Error! Unknown document property name.

SIGNED for and on behalf of **NORTEL** )
**NETWORKS ENGINEERING SERVICE** )
**KFT** (in administration) by **ALAN BLOOM** as )
Joint Administrator (acting as agent and without )
personal liability) in the presence of:

Witness signature

Name: STUART DEATON

Address: No. 1 MORE LONDON
PLACE, LONDON SE1 2AF

SIGNED for and on behalf of **NORTEL** )
**NETWORKS PORTUGAL SA** (in )
administration) by **ALAN BLOOM** as Joint )
Administrator (acting as agent and without )
personal liability) in the presence of:

Witness signature

Name: STUART DEATON

Address: No 1 MORE LONDON PLACE
LONDON SE1 2AF

SIGNED for and on behalf of **NORTEL** )
**NETWORKS SLOVENSKO S.R.O** (in )
administration) by **ALAN BLOOM** as Joint )
Administrator (acting as agent and without )
personal liability) in the presence of:

Witness signature

Name: STUART DEATON

Address: No 1 MORE LONDON
PLACE, LONDON SE1 2AF

Escrow Agreement

Error! Unknown document property
name.Error! Unknown document property
name.Error! Unknown document property

S-5

Error! Unknown document property name.

SIGNED for and on behalf of NORTEL )
NETWORKS ROMANIA SRL (in )
administration) by ALAN BLOOM as Joint )
Administrator (acting as agent and without )
personal liability) in the presence of:

Alan Bloom

Witness signature

Name: WILMA GRAHAM )
Address: NO. 1 MORE LONDON PLACE )
LONDON SE1 2AF )

SIGNED for and on behalf of NORTEL )
GMBH (in administration) by ALAN BLOOM )
as Joint Administrator (acting as agent and )
without personal liability) in the presence of: )

Alan Bloom

Witness signature

Name: WILMA GRAHAM )
Address: NO1 MORE LONDON PLACE )
LONDON SE1 2AF )

SIGNED for and on behalf of NORTEL )
NETWORKS OY (in administration) by )
ALAN BLOOM as Joint Administrator (acting )
as agent and without personal liability) in the )
presence of: )

Alan Bloom

Witness signature

Name: WILMA GRAHAM )
Address: NO1. MORE LONDON PLACE )
LONDON SE1 2AF )

Escrow Agreement

Error! Unknown document property
name.Error! Unknown document property
name.Error! Unknown document property    S-6    Error! Unknown document property name.

**SIGNED** for and on behalf of **NORTEL**　　　)
**NETWORKS AB** (in administration) by　　　　)
**ALAN BLOOM** as Joint Administrator (acting　)
as agent and without personal liability) in the　)
presence of:　　　　　　　　　　　　　　　)

Alan Bloom    Stephen Harris

Witness signature
............................................................)
Name: STUART DEACON　　　　　　　　)
Address: NO 1, MORE LONDON　　　　　)
PLACE, LONDON SE1 2AF　　　　　　　)

**SIGNED** for and on behalf of **NORTEL**　　　)
**NETWORKS INTERNATIONAL**　　　　　　)
**FINANCE & HOLDING BV** (in　　　　　　　)
administration) by **ALAN BLOOM** as Joint　　)
Administrator (acting as agent and without　　　)
personal liability) in the presence of:

Alan Bloom    Stephen Harris

Witness signature
............................................................)
Name: STUART DEACON　　　　　　　　)
Address: NO 1, MORE LONDON PLACE　　)
LONDON SE1 2AF

**SIGNED** for and on behalf of **NORTEL**　　　)
**NETWORKS FRANCE S.A.S** (in　　　　　　　)
administration) by **ALAN BLOOM** as Joint　　)
Administrator (acting as agent and without　　　)
personal liability) in the presence of:

Alan Bloom    Stephen Harris

Witness signature
............................................................)
Name: STUART DEACON　　　　　　　　)
Address: NO 1, MORE LONDON　　　　　)
PLACE, LONDON SE1 2AF

Escrow Agreement

Error! Unknown document property
name.Error! Unknown document property
name.Error! Unknown document property

S-7

Error! Unknown document property name.

SIGNED for and on behalf of **NORTEL**     )
**NETWORKS (IRELAND) LIMITED** (in     )
administration) by **ALAN BLOOM** as Joint     )
Administrator (acting as agent and without     )
personal liability) in the presence of:     )

Alan Bloom

Witness signature

.......................................................... )
Name:    NILMA    GRAHAM     )
Address:   NO. 1 MORE LONDON PLACE )
         LONDON   SE1   2AF

SIGNED for and on behalf of **NORTEL**     )
**NETWORKS SA** (in administration) by **ALAN**     )
**BLOOM** as Joint Administrator (acting as agent
and without personal liability) in the presence of:

Alan Bloom

    )
    )
    )

Witness signature

.......................................................... )
Name:    WILMA    GRAHAM     )
Address: NO 1 MORE LONDON SE1 2AF )

Escrow Agreement

Error! Unknown document property
name.Error! Unknown document property
name.Error! Unknown document property

S-8

Error! Unknown document property name.

## SCHEDULE A

### EMEA FILED ENTITIES

Nortel Networks UK Limited (In Administration)

Nortel Networks NV (In Administration)

Nortel Networks SpA (In Administration)

Nortel Networks BV (In Administration)

Nortel Networks Polska Sp Z.o.o (In Administration)

Nortel Networks Hispania SA (In Administration)

Nortel Networks (Austria) GmbH (In Administration)

Nortel Networks S.r.o (In Administration)

Nortel Networks Engineering Services Kft (In Administration)

Nortel Networks Portugal SA (In Administration)

Nortel Networks Slovensko S.r.o (In Administration)

Nortel Networks Romania Srl (In Administration)

Nortel GmbH (In Administration)

Nortel Networks Oy (In Administration)

Nortel Networks AB (In Administration)

Nortel Networks International Finance & Holding BV (In Administration)

Nortel Networks France S.A.S (In Administration)

Nortel Networks (Ireland) Limited (In Administration)

Nortel Networks SA (In Administration and Secondary Proceedings)

## SCHEDULE B

### STANDING SETTLEMENT INSTRUCTIONS

Nortel Networks Limited
Bank: Citibank, N.A.
ABA#: 021000089
SWIFT: CITIUS33
A/C#: 38545364

Nortel Networks Inc.
Bank: Citibank, N.A.
ABA#: 021000089
SWIFT: CITIUS33
A/C#: 30463444

Nortel Networks Corporation
Bank: Citibank, N.A.
ABA#: 021000089
SWIFT: CITIUS33
A/C#: 30428374

Nortel Networks UK Limited (In Administration)
Bank: tbc
ABA#:
SWIFT:
A/C#:

Nortel Networks NV (In Administration)
Bank: tbc
ABA#:
SWIFT:
A/C#:

Nortel Networks SpA (In Administration)
Bank: tbc
ABA#:
SWIFT:
A/C#:

Nortel Networks BV (In Administration)
Bank: tbc
ABA#:
SWIFT:
A/C#:

Nortel Networks Polska Sp Z.o.o (In Administration)

Bank: tbc
ABA#:
SWIFT:
A/C#:

Nortel Networks Hispania SA (In Administration)
Bank: tbc
ABA#:
SWIFT:
A/C#:

Nortel Networks (Austria) GmbH (In Administration)
Bank: tbc
ABA#:
SWIFT:
A/C#:

Nortel Networks S.r.o (In Administration)
Bank: tbc
ABA#:
SWIFT:
A/C#:

Nortel Networks Engineering Services Kft (In Administration)
Bank: tbc
ABA#:
SWIFT:
A/C#:

Nortel Networks Portugal SA (In Administration)
Bank: tbc
ABA#:
SWIFT:
A/C#:

Nortel Networks Slovensko S.r.o (In Administration)
Bank: tbc
ABA#:
SWIFT:
A/C#:

Nortel Networks Romania Srl (In Administration)
Bank: tbc
ABA#:
SWIFT:

Escrow Agreement

A/C#:

Nortel GmbH (In Administration)
Bank: tbc
ABA#:
SWIFT:
A/C#:

Nortel Networks Oy (In Administration)
Bank: tbc
ABA#:
SWIFT:
A/C#:

Nortel Networks AB (In Administration)
Bank: tbc
ABA#:
SWIFT:
A/C#:

Nortel Networks International Finance & Holding BV (In Administration)
Bank: tbc
ABA#:
SWIFT:
A/C#:

Nortel Networks France S.A.S (In Administration)
Bank: tbc
ABA#:
SWIFT:
A/C#:

Nortel Networks (Ireland) Limited (In Administration)
Bank: tbc
ABA#:
SWIFT:
A/C#:

Nortel Networks SA (In Administration and Secondary Proceedings)
Bank: tbc
ABA#:
SWIFT:
A/C#:

Escrow Agreement

## SCHEDULE C

## NOTICE ADDRESSES

<u>Depositors:</u>

| | |
|---|---|
| Nortel Networks Corporation, Nortel Networks Limited and Nortel Networks: | 195 The West Mall<br>Mailstop: TO505006<br>Toronto, Ontario<br>M9C 5K1 Canada<br>Attn: Anna Ventresca<br>Phone: 905.863.1204<br>Facsimile: 905.863.2057 |
| The EMEA Filed Entities: | c/o Herbert Smith LLP<br>Exchange House<br>Primrose Street<br>London<br>EC2A 2HS<br>United Kingdom<br>Attn: Stephen Gale and Kevin F Lloyd<br>Phone: +44 20 7374 8000<br>Facsimile: +44 20 7374 0888 |
| Escrow Agent: | JPMorgan Chase Bank, N.A.<br>TS / Escrow Services<br>4 New York Plaza, 21st Floor<br>New York, New York 10004<br>Attn: Andy Jacknick<br>Phone: 212.623. 0241<br>Facsimile: 212.623.6168 |

Estate Fiduciaries:

| | |
|---|---|
| The Official Committee of Unsecured Creditors in connection with the Chapter 11 cases of Nortel Networks Inc., et al. (Case No. 09-10138): | c/o Akin Gump Strauss Hauer & Feld LLP<br>One Bryant Park<br>New York, New York 10036<br>Attn: Fred S. Hodara, Stephen B. Kuhn, David H. Botter and Kenneth A. Davis<br>Phone: 212.872.1000<br>Facsimile: 212.872.1002 |
| Monitor: | Ernst & Young Inc.<br>Ernst & Young Tower<br>222 Bay Street, P. O. Box 251<br>Toronto, Ontario, Canada<br>M5K 1J7<br>Facsimile: (416) 943-3300<br>Attn: Murray A. McDonald |
| Bondholder Group: | c/o Milbank, Tweed, Hadley & McCloy LLP<br>1 Chase Manhattan Plaza<br>New York, New York 10005<br>Attn: Albert A. Pisa and Roland Hlawaty<br>Phone: 212.530.5000<br>Facsimile: 212.822.5735 |

2

SCHEDULE D

Telephone Number(s) for Call-Backs;
Person(s) Designated to Give and Confirm Funds Transfer Instructions; and Addresses

If to Nortel Networks Corporation:

| Name | Telephone Number | Signature Specimen |
|------|------------------|--------------------|
| John Marshall Doolittle | 905.863.6636 | |
| Name | Telephone Number | Signature Specimen |
| Anna Ventresca | 905.863.1204 | |
| Address | See Schedule C | |

If to Nortel Networks Limited:

| Name | Telephone Number | Signature Specimen |
|------|------------------|--------------------|
| John Marshall Doolittle | 905.863.6636 | |
| Name | Telephone Number | Signature Specimen |
| Anna Ventresca | 905.863.1204 | |
| Address | See Schedule C | |

If to Nortel Networks Inc.:

| Name | Telephone Number | Signature Specimen |
|------|------------------|--------------------|
| John Marshall Doolittle | 905.863.6636 | |
| Name | Telephone Number | Signature Specimen |

Schedule D-1

Anna Ventresca          905.863.1204          _A_V_____

Address                 See Schedule C

If to the EMEA Filed Entities (apart from Nortel Networks (Ireland) Limited):

| Name | Telephone Number | Signature Specimen |
|------|------------------|--------------------|
| Alan Bloom | +44 (0) 207 951 9898 | |

| Name | Telephone Number | Signature Specimen |
|------|------------------|--------------------|
| Stephen Harris | +44 (0) 207 951 9835 | |
| Address | See Schedule C | |

If to Nortel Networks (Ireland) Limited:

| Name | Telephone Number | Signature Specimen |
|------|------------------|--------------------|
| Alan Bloom | +44 (0) 207 951 9898 | |
| Name | Telephone Number | Signature Specimen |
| David Hughes | +353 1 221 2301 | |
| Address | c/o Herbert Smith LLP | |
| | Exchange House | |
| | Primrose Street | |
| | London | |
| | EC2A 2HS | |
| | Attn: Stephen Gale and | |
| | Kevin F Lloyd | |

Telephone call backs shall be made to all applicable Parties if joint instructions are required pursuant to the agreement. All funds transfer instructions must include the signature of the person(s) authorizing said funds transfer and must not be the same person confirming said transfer. Inasmuch as there is only one individual who can confirm and instruct, on behalf of a Party, wire transfers in accordance with the attached Escrow Agreement, the Escrow Agent shall call such individual to confirm any federal funds wire transfer payment order purportedly issued by such individual. Such individual's continued issuance of payment orders to the Escrow Agent on behalf of a Party and his confirmation in accordance with this procedure will constitute such Party's agreement (1) to the callback security procedure outlined herein and (2) that the security procedure outlined herein

Schedule D-2

| Anna Ventresca | 905.863.1204 | _____ |
| Address | See Schedule C | |

If to the EMEA Filed Entities (apart from Nortel Networks (Ireland) Limited):

| Name | Telephone Number | Signature Specimen |

| Alan Bloom | +44 (0) 207 951 9898 | |

| Name | Telephone Number | Signature Specimen |

| Stephen Harris | +44 (0) 207 951 9835 | |
| Address | See Schedule C | |

If to Nortel Networks (Ireland) Limited:

| Name | Telephone Number | Signature Specimen |
| Alan Bloom | +44 (0) 207 951 9898 | |

| Name | Telephone Number | Signature Specimen |
| David Hughes | +353 1 221 2301 | |

| Address | c/o Herbert Smith LLP |
| | Exchange House |
| | Primrose Street |
| | London |
| | EC2A 2HS |
| | Attn: Stephen Gale and |
| | Kevin F Lloyd |

Telephone call backs shall be made to all applicable Parties if joint instructions are required pursuant to the agreement. All funds transfer instructions must include the signature of the person(s) authorizing said funds transfer and must not be the same person confirming said transfer. Inasmuch as there is only one individual who can confirm and instruct, on behalf of a Party, wire transfers in accordance with the attached Escrow Agreement, the Escrow Agent shall call such individual to confirm any federal funds wire transfer payment order purportedly issued by such individual. Such individual's continued issuance of payment orders to the Escrow Agent on behalf of a Party and his confirmation in accordance with this procedure will constitute such Party's agreement (1) to the callback security procedure outlined herein and (2) that the security procedure outlined herein

Anna Ventresca   905.863.1204

Address    See <u>Schedule C</u>

If to the EMEA Filed Entities (apart from Nortel Networks (Ireland) Limited):

| <u>Name</u> | <u>Telephone Number</u> | <u>Signature Specimen</u> |
|---|---|---|
| Alan Bloom | +44 (0) 207 951 9898 | |

| <u>Name</u> | <u>Telephone Number</u> | <u>Signature Specimen</u> |
|---|---|---|
| Stephen Harris | +44 (0) 207 951 9835 | |
| Address | See <u>Schedule C</u> | |

If to Nortel Networks (Ireland) Limited:

| <u>Name</u> | <u>Telephone Number</u> | <u>Signature Specimen</u> |
|---|---|---|
| Alan Bloom | +44 (0) 207 951 9898 | |
| Name | Telephone Number | Signature Specimen |
| David Hughes | +353 1 221 2301 | |
| Address | c/o Herbert Smith LLP<br>Exchange House<br>Primrose Street<br>London<br>EC2A 2HS<br>Attn: Stephen Gale and<br>Kevin F Lloyd | |

Telephone call backs shall be made to all applicable Parties if joint instructions are required pursuant to the agreement. All funds transfer instructions must include the signature of the person(s) authorizing said funds transfer and must not be the same person confirming said transfer. Inasmuch as there is only one individual who can confirm and instruct, on behalf of a Party, wire transfers in accordance with the attached Escrow Agreement, the Escrow Agent shall call such individual to confirm any federal funds wire transfer payment order purportedly issued by such individual. Such individual's continued issuance of payment orders to the Escrow Agent on behalf of a Party and his confirmation in accordance with this procedure will constitute such Party's agreement (1) to the callback security procedure outlined herein and (2) that the security procedure outlined herein

Schedule D-2

constitutes a commercially reasonable method of verifying the authenticity of payment orders.  Moreover, such Party agrees to accept any risk associated with a deviation from the Escrow Agent's policy.

## EXHIBIT 1

### INTEREST ALLOCATION PERCENTAGES

|                             | Interest Allocation Percentage |
| --------------------------- | :----------------------------: |
| Nortel Networks Inc         | 0%                             |
| Nortel Networks Limited     | 100%                           |
| Nortel Networks Corporation | 0%                             |
| The EMEA Filed Entities     | 0%                             |

\*  The inclusion of the Interest Allocation Percentages set forth above does not constitute an admission of any Depositor that such Interest Allocation Percentage reflects the percentage of the proceeds to be received by any Depositor or any of its Respective Affiliates under the Asset Sale Agreement.   The Interest Allocation Percentages are the initial allocation percentages hereunder and are subject to amendment in accordance with Paragraph 15.   The Interest Allocation Percentages set forth above shall not be presented by any party hereto as being indicative of the final allocation of proceeds received by the Depositors under the Asset Sale Agreement.

Exhibit 1