IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| ------------------------------------------------------------X | : | |
| | : | Chapter 11 |
| *In re* | : | |
| | : | Case No. 09-10138 (KG) |
| Nortel Networks Inc., *et al.*,[1] | : | |
| | : | Jointly Administered |
| Debtors. | : | |
| | : | |
| | : | |
| ------------------------------------------------------------X | : | |

**DECLARATION OF JOHN RAY IN
SUPPORT OF DEBTORS' MOTION FOR ENTRY OF AN ORDER
ENFORCING THE AUTOMATIC STAY AGAINST CERTAIN
CLAIMANTS WITH RESPECT TO THE U.K. PENSION PROCEEDINGS**

I, John Ray, do hereby declare as follows:

1. On January 6, 2010, upon the motion of Debtors, I was appointed by this Court as Debtors' Principal Officer, *nunc pro tunc* to December 7, 2009. I am also Senior Managing Director and sole member of Avidity Partners, LLC. Except as otherwise noted, all facts set forth in this Declaration are based upon my personal knowledge, and information that I learned from reviewing relevant documents. If I were called upon to testify, I could and would testify competently to the facts set forth herein.

---

[1] The debtors in these chapter 11 cases, along with the last four digits of each Debtor's tax identification number, are: Nortel Networks Inc. (6332), Nortel Networks Capital Corporation (9620), Nortel Altsystems Inc. (9769), Nortel Altsystems International Inc. (5596), Xros, Inc. (4181), Sonoma Systems (2073), Qtera Corporation (0251), CoreTek, Inc. (5722), Nortel Networks Applications Management Solutions Inc. (2846), Nortel Networks Optical Components Inc. (3545), Nortel Networks HPOCS Inc. (3546), Architel Systems (U.S.) Corporation (3826), Nortel Networks International Inc. (0358), Northern Telecom International Inc. (6286), Nortel Networks Cable Solutions Inc. (0567) and Nortel Networks (CALA) Inc. (4226), (collectively the "U.S. Nortel Entities" or the "Debtors"). Addresses for the Debtors can be found in the Debtors' petitions, which are available at http://chapter11.epiqsystems.com/nortel.

2. I submit this Declaration in support of the Debtors' Motion[2] for entry of an order, pursuant to sections 362(a)(1) and (a)(6) of title 11 of the United States Code (the "Bankruptcy Code") enforcing the automatic stay against claimants the Trustee of the NNUK Pension Plan (the "U.K. Pension Trustee"), and the U.K. Pension Protection Fund (the "PPF" and, collectively with the U.K. Pension Trustee, "Claimants") with respect to their participation in certain Pension Administrative Proceedings in the U.K.

**The U.K. Pension Claim**

3. On or about September 30, 2009, the U.K. Pension Trustee and the Board of the PPF jointly filed proofs of claim against the U.S. Nortel Entities (with the exception of NN CALA), which are listed on Debtors' claim log as claim numbers 5573-5587 (collectively, the "U.K. Pension Claim").  A true and correct copy of the U.K. Pension Trustees and PPF's proof of claim against NNI, with exhibits, which I understand is representative of all of their proofs of claim, is attached hereto as Exhibit A.

4. On January 25, 2010 the U.K. Pension Trustees and PPF jointly filed a proof of claim against NN CALA, which is listed on Debtors' claim log as claim number 6979. A true and correct copy of the proof of claim filed against NN CALA, with exhibits, is included in Exhibit B hereto as part of the U.K. Pension Claim.

5. The U.K. Pension Claim is based on the allegation that the Nortel Networks U.K. Pension Plan (the "NNUK Pension Plan") is underfunded by an amount alternatively stated to be £2.1 billion or $3.1 billion.

---

[2] Capitalized terms not defined herein have the same meanings as in the Motion.

6. On both November 21, 2006 and December 21, 2007, Nortel Networks Limited ("NNL")[3] executed certain guarantees regarding the NNUK Pension Plan. No U.S. Nortel Entity provided any guarantee with respect to the U.K. Pension Plan.

7. The U.K. Pension Claim asserts that the U.K. pension regulator ("TPR") has concluded that NNUK was "insufficiently resourced" on June 30, 2008, a date selected by TPR, and that as of the date on which the Claim was filed, grounds existed to issue warning notices ("Warning Notices") and to seek a Financial Support Direction ("FSD") against certain members of Nortel Group affiliates worldwide, including the U.S. Nortel Entities, as companies that are allegedly "connected with or associates" of Nortel Networks U.K. Limited ("NNUK"). The Claim further asserts that no Warning Notice had been issued pre-petition or indeed prior to the filing of the U.K. Pension Claim. Instead, as discussed below, TPR has only recently purported to issue a Warning Notice addressed, inter alia, to two U.S. Debtors, NNI and NN CALA.

8. The U.K. Pension Claim also asserts that if a FSD is issued against any of the U.S. Nortel Entities, such entity could then be instructed under the U.K. Pension Act to procure financial support for the NNUK Pension Plan, either alone or with other members of the Nortel Group. The U.K. Pension Claim further asserts that if a U.S. Nortel Entity receives a FSD, but fails to put or keep in place financial support for the NNUK Pension Plan approved by TPR, then TPR could also exercise its power to issue a Contribution Notice ("CN"), imposing on that U.S. Nortel Entity a liability to pay a specific amount, which could be all or some portion of the NNUK Pension Plan under-funded obligations. I am informed that, as a matter of U.K. law

---

[3] Nortel Networks Corporation ("NNC"), NNI's direct corporate parent NNL (and together with NNC and their affiliates, including the Debtors, "Nortel") and certain of their Canadian affiliates (collectively, the "Canadian Debtors") filed an application with the Ontario Superior Court of Justice (the "Canadian Court") under the Companies' Creditors Arrangement Act (Canada) (the "CCAA"), seeking relief from their creditors (collectively, the "Canadian Proceedings").

3

under the Pensions Act, such amount could constitute an enforceable debt owed by the target of the CN to the U.K. Pension Trustee (without reference to issues of U.S. law). (See Declaration of Richard Hitchcock, dated February 18, 2010 (the "Hitchcock Dec." at ¶ 46.)

## THE U.K. ADMINISTRATIVE PROCEEDING

9. By letters dated January 13, 2010 and addressed to NNI and NN CALA (along with certain other non-U.S. Nortel entities, including, without limitation NNC and NNL, collectively (the "Targets")), TPR purported to issue a Warning Notice, pursuant to the U.K. Pensions Act 2004 (the "Pensions Act"), initiating an administrative proceeding regarding the alleged shortfall in the funding of the U.K. Pension Plan (the "U.K. Administrative Proceedings"). Such Proceedings are to be conducted by the Pensions Regulator's Determinations Panel (the "Determinations Panel"). The other U.S. Nortel Entities were not referred to in the Warning Notice.

10. The Warning Notice is more than 150 pages long, and is supported by voluminous documents and witness statements, certain of which on information and belief were provided by NNUK and others of which are publicly available information. It provides, inter alia, that (i) the "relevant time" on which to measure the U.K. Pension Plan's funding position for the purpose of deciding whether to issue an FSD is June 30, 2008; and (ii) TPR believes it is reasonable to issue a FSD against the Targets, including NNI and NN CALA, for various reasons including the TPR's analysis of certain benefits conveyed among affiliates. The Warning Notice also reviews TPR's conclusion that benefits provided by certain affiliates to certain other affiliates provides a basis for issuing a FSD.

11. I am informed that under the Pensions Act, there are various factors that TPR and the Determinations Panel considers in making the "reasonableness" determination.

(Hitchcock Dec. at ¶ 37.4.)  One is the extent to which the employer provided benefits to other affiliates.  Another is the general financial circumstances of the Targets.  (Hitchcock Dec. at ¶¶ 37.4.2, 37.4.4.)  Accordingly, among the key issues in any U.K. Administrative Proceeding would be an assessment of the benefits flowing among the various Nortel debtors (and presumably the compensation received for them), and the financial positions of the various Targets.

12.    TPR has indicated that the Targets, as well as the U.K. Pension Trustees and PPF, may respond in writing to the Warning Notice by midday on March 1, 2010, and the Determinations Panel will consider all responses.

**Canadian Monitor's Motion to Stay the U.K. Administrative Proceedings**

13.    On February 17, 2010, the Monitor filed an application with the Canadian Court seeking, inter alia, a declaration that the U.K. Administrative Proceedings would violate the stay imposed by the Initial Order entered by the Court pursuant to the CCAA, and that the U.K. Administrative Proceedings would be void and of no force or effect as against NNC and NNL in the Canadian Proceedings.  True and correct copies of that application and the supporting papers filed with the Canadian Court are attached hereto as Exhibit C.

**THE NEED FOR THE RELIEF SOUGHT ON THE MOTION**

**The Overlap With the Allocation Process**

14.    The issue to be determined in the U.K. Administrative Proceeding – whether and to what extent NNUK's contributions to the "global" Nortel business received inadequate financial recognition pre-filing so that now it is "reasonable" to impose financial responsibility on its affiliates – overlaps with one of the overriding issues in these cases, as well as in the related insolvency proceedings in Canada and the U.K.:  the allocation of the billions of dollars in proceeds of the post-petition sales of Nortel assets.  This allocation will be a key part

of the determination of the amounts available for distribution to the creditors located in the various jurisdictions, and will be based in part on the factual issue of the respective contributions of the various Nortel entities to the value of the assets sold.

15. In recognition of the integrality of the allocation issue to the ultimate resolution of the global Nortel bankruptcy and insolvency cases, the U.S. Debtors, the Canadian Debtors, and the EMEA Debtors[4], including NNUK, agreed, in the Interim Funding and Settlement Agreement (the "IFSA"), inter alia, (a) that all proceeds of sales of material assets of any Nortel debtor worldwide will be held in escrow until the parties either agree on a consensual allocation, or, in the absence of such an agreement, obtain a binding determination on the allocation pursuant to an agreed upon allocation protocol; and (b) that they would negotiate in good faith to attempt to reach agreement on the terms that would govern the allocation protocol process. IFSA §§ 12(b)-(c) attached to Declaration of Lisa M. Schweitzer dated February 17, 2010 as Exhibit B.

16. The parties have engaged in extensive negotiations regarding the terms of the allocation protocol. The purpose of the protocol, (called the Protocol For Resolving Disputes Concerning Allocation of Sale Proceeds), is to ensure a fair process for determining the allocation, to be determined (absent a consensual agreement), in a single cross-jurisdictional forum.

17. Resolution of the allocation issue may entail, among other things, reference by the contending parties to Nortel's transfer pricing arrangements, Nortel's Master Research and Development Agreement, the value of certain research and development, ownership rights to Nortel's intellectual property, individual corporate assets, and individual

---

[4] Nineteen of Nortel's European affiliates, including NNUK (collectively the "EMEA Debtors") are under administration under the control of certain individuals from Ernst & Young LLC.

corporate revenues. These issues overlap with the inter-affiliate benefit analysis raised in the U.K. Administration Proceedings.

18. In the absence of the Court enforcing the automatic stay, a U.K. administrative body, whose sole focus is the financial protection of U.K. pension plans and their insurance vehicle, will be permitted to determine factual issues – including the benefits received and conferred among affiliates -- that are not only central to the allocation process, but ones that NNUK has agreed must be resolved on a global basis in a single cross-jurisdictional forum. The U.S. Debtors should not be faced with the risk of collateral estoppel arising from litigation of the U.K. pension issues in advance of the allocation process.

19. In addition, I understand that one of the key elements in determining the "reasonableness" of imposing a FSD and CN against a Target is the Target's financial condition. (Hitchcock Dec. at ¶¶ 37.4.4, 44.6.) Until the allocation procedure is completed, however, the financial condition of the Debtors, as well as NNUK, whose alleged inability to fund its pension plan is the very reason for the U.K. Administrative Proceeding, cannot be determined.

**The Burden Imposed on the Debtors**

20. The breadth of the issues that TPR and U.K. Pension Claim have raised, and the very short timeframe it has provided for responses, would impose a substantial burden on the Debtors. In order to defend against TPR's broad allegations, the Debtors would have to engage in a substantial factual inquiry, going back many years and addressing complex issues such as the value of certain research and development, transfer pricing and affiliate relationships relating to pension oversight and legal and tax determinations. This inquiry will be detailed and complicated, requiring far longer than the limited period set forth in the Warning Notice as well as significant investment of time by Debtor personnel. Many of the fact issues -- such as transfer

pricing, ownership of intellectual property, internal research and development allocation and individual asset values -- may also relate to the allocation process.  Moreover, the Debtors will require expert testimony on a variety of these issues, which will require additional time and focus.

21. As the Debtors attempt to move forward to further maximize value to the creditor constituencies through asset sales and in developing a Chapter 11 plan, it would be a waste of the estate's resources for their essential personnel and professionals to be forced to litigate these complex issues on an expedited basis (particularly in a foreign jurisdiction) or before the allocation process resolved.  The drain on scarce management resources to respond to this significant dispute in this time frame would be excessively costly both in terms of expense and time commitment, to the detriment of these cases and the estates.

22. Accordingly, an order should be entered enforcing the automatic stay, putting the Claimants on notice that any results of such Proceeding will be void in this Court and that they will be subject to possible sanctions should they proceed in violation of the automatic stay.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on February 18, 2010

_____
John Ray