- 2 -

92

Fifth Report") in its capacity as monitor (the "Monitor"), the supplement to the Thirty-Fifth

Report (the "Supplemental Report"), the affidavit of Alan Bloom sworn January 20, 2010 and

the affidavit of Mary Carreiro sworn January 20, 2010 and on hearing submissions of counsel for

the Applicants, the Monitor and those other parties present,  no one appearing for any other

person on the service list, although served as appears from the Affidavit of Service of Katie

Legree sworn January 18, 2010, filed.

1.     **THIS COURT ORDERS** that the time for the service of the Notice of Motion, the

Thirty-Fifth Report, the Supplemental Report and the Motion Record is hereby abridged and

validated so that this Motion is properly returnable today and hereby dispenses with further

service thereof.

2.     **THIS COURT ORDERS** that capitalized terms used herein and not otherwise defined

shall have the meaning given to them in the Doolittle Affidavit or the Canadian Funding

Agreement, as the case may be.

*Final Canadian Funding and Settlement Agreement*

3.     **THIS COURT ORDERS** that the Final Canadian Funding and Settlement Agreement

including all schedules and annexes thereto, in the form and substance attached as Appendix "D"

to the Thirty-Fifth Report (the "Canadian Funding Agreement") be and is hereby approved in its

entirety and that the Applicants are hereby authorized and directed to comply with their

obligations thereunder.

4.     **THIS COURT ORDERS** pursuant to paragraph 4 of the Canadian Funding Agreement,

each of the Applicants shall indemnify, defend and hold harmless each of the U.S. Debtors from

and against any and all actions, suits, claims, proceedings, costs, damages, losses, liabilities,

judgments, amounts, fines, penalties, levies, compensations paid in settlement (provided (i) NNL, with the prior consent of the Monitor, which consent shall not be unreasonably withheld, has agreed in writing to such settlement or (ii) such settlement has been approved pursuant to a final order of this Court and/or the U.S. Court, as applicable), and expenses (including without limitation reasonable attorneys' fees and disbursements) resulting from a claim, demand, lawsuit, action or proceeding relating to, arising from or in connection with the matters set forth in Section 1 of the Canadian Funding Agreement, the Transfer Pricing Payments for the calculation period in the applicable Transfer Pricing Agreements in respect of the Settlement Period or the Covered Obligations.  The Applicants shall from time to time reserve reasonable amounts to provide for any such Indemifiable Claims all in accordance with the terms of the Canadian Funding Agreement.

5.    **THIS COURT ORDERS** that pursuant to paragraph 12 of the Canadian Funding Agreement, unless the U.S. Debtors assert an Additional NNI Claim, the Applicants and the Monitor waive any and all rights that may exist at law, in equity, or otherwise to assert any Claims against the U.S. Debtors relating to the period prior to the Filing Date.

6.    **THIS COURT ORDERS AND DECLARES** that:

(a)    nothing in this Order or the Canadian Funding Agreement shall be construed or operate to amend, modify, vary or change any of the rights or obligations of any entity or person that is not a party to the Canadian Funding Agreement, including without limitation, any of the EMEA Debtors (each, a "Non-Party"), under any contract that a Non-Party has entered into with any party to the Canadian Funding Agreement, including without limitation any of the Transfer Pricing Agreements, the IFSA and the Canadian GSPA;

(b)    for greater certainty and without limitation to sub-paragraph (a) above, the Canadian Funding Agreement, including without limitation Section 3 of the Canadian Funding Agreement, shall not be construed or operate to amend, modify, vary or change any of the rights or obligations of the EMEA Debtors to assert or prove any claim that any one or more of the EMEA Debtors may have against any one or more of the Applicants pursuant to the Transfer Pricing Agreements, the IFSA and the Canadian GSPA;

(c)    nothing in the Canadian Funding Agreement, this Order or in this Order's approval of the Canadian Funding Agreement or the NNI Claim shall be construed or operate to take away or preclude or in any way limit the right of any EMEA Debtor to dispute or defend against any claim that may be asserted against such EMEA Debtor arising out of or resulting from the NNI Claim; and

(d)    the entirety of the foregoing provisions in sub-paragraphs (a) to (c) above shall be subject to provisions of Paragraph 19 of this Order.

*CRA APA*

7.    **THIS COURT ORDERS** that the CRA APA be and is hereby approved and NNL is hereby authorized and directed to enter into and comply with its obligations thereunder.

*NNI Claim*

8.    **THIS COURT ORDERS** that the creation of the NNI Claim as defined and described in the Canadian Funding Agreement is hereby approved and the NNI Claim is hereby allowed in full against NNL with the priority attributed to it in the Canadian Funding Agreement in full and final settlement of any NNI TPA Claim, Revolver Claim (other than the portion of the Revolver

Claim that forms part of the NNI Claim) or Stayed TPA Claim (as each of those terms is defined in the Canadian Funding Agreement), and the NNI Claim shall not be subject to set off, off set, or deduction, in any inter-company claims process or otherwise, counterclaim, reduction, or challenge as to amount or validity.

9.      **THIS COURT ORDERS** that, pursuant to and in accordance with the terms of Section 11 of the Canadian Funding Agreement, the Monitor and the Applicants irrevocably waive any and all rights that may exist at law, in equity or otherwise to setoff against, assert any counterclaims with respect to the amount or validity of, or otherwise reduce the amount of, the NNI Claim in any way.

10.      **THIS COURT ORDERS** that the Remaining Revolver Claim shall be afforded the benefit and corresponding priority of the Inter-company Charge as that term is defined in the Third Amended and Restated Initial Order dated January 14, 2009 (the "Initial Order") relating to the Revolving Loan Agreement.

*Stay Period*

11.      **THIS COURT ORDERS** that the Stay Period, as defined in paragraph 14 of the Initial Order, is hereby extended to and including April 23, 2010.

*NNI Loan Agreement Extension*

12.      **THIS COURT ORDERS** that the NNI Loan Agreement Extension dated as of December 23, 2009 among Nortel Networks Inc. and the Applicants and attached as Appendix "E" to the Thirty-Fifth Report be and is hereby approved.

*GSPA Extension*

13.    **THIS COURT ORDERS** that the thirteenth extension deed dated January 15, 2010 to the Canadian GSPA is hereby approved.

*Employee Hardship Process*

14.    **THIS COURT ORDERS AND DECLARES** that the application period for receipt of employee hardship applications pursuant to the Employee Hardship Process be and is hereby extended to April 23, 2010 (the "Extension Date").

15.    **THIS COURT ORDERS** that the eligibility requirements in respect of the Employee Hardship Process as set out in the form attached as Appendix "F" be amended to reflect the Extension Date.

*Sealing*

16.    **THIS COURT ORDERS** that the confidential appendix "D" to the Thirty-Fifth Report be and are hereby sealed pending further Order of this Court.

*Miscellaneous*

17.    **THIS COURT ORDERS** that neither the issuance of this Order nor the terms of the Canadian Funding Agreement shall prevent the Court from determining any relief in respect of the Applicants' post March 31, 2010 ongoing funding of pension, health & disability benefits and severance pay, including a request for approval of an agreement in respect of such obligations as well as addressing the related pension obligations of the Applicants (collectively, a "Settlement") and this Court may grant such relief as it considers appropriate in the circumstances.

18.    **THIS COURT ORDERS AND DIRECTS** the Monitor to advise this Honourable Court with respect to the status of the negotiations of a Settlement on or prior to January 29, 2010.

19.    **THIS COURT ORDERS** that, notwithstanding:

    (a)    the pendency of these proceedings;

    (b)    any applications for a bankruptcy order now or hereafter issued pursuant to the *Bankruptcy and Insolvency Act* (Canada) in respect of any of the Applicants and any bankruptcy order issued pursuant to any such applications; and

    (c)    any assignment in bankruptcy made in respect of any of the Applicants;

the provisions of the Canadian Funding Agreement, the approval of the CRA APA and the creation and allowance of the NNI Claim in full against NNL shall be binding on all Persons (as defined in the Initial Order) including any trustee in bankruptcy, receiver, or receiver and manager that may be appointed in respect of any of the Applicants and shall not be void or voidable by the creditors of any of the Applicants, or any trustee, receiver, or receiver and manager appointed in respect of any of the Applicants, nor shall they constitute oppressive conduct nor constitute or be deemed to be a preference, fraudulent conveyance, transfer at undervalue, or other challengeable or voidable transaction under the *Bankruptcy and Insolvency Act* (Canada) or any other applicable federal or provincial legislation, nor shall it constitute oppressive or unfairly prejudicial conduct pursuant to any applicable federal or provincial legislation.

20.    **THIS COURT HEREBY REQUESTS** the aid and recognition of any court, tribunal, regulatory or administrative body having jurisdiction in Canada, the United States, the United Kingdom or elsewhere, to give effect to this Order and to assist the Applicants, the Monitor and

- 8 -

98

their respective agents in carrying out the terms of this Order.  All courts, tribunals, regulatory and administrative bodies are hereby respectfully requested to make such orders and to provide such assistance to the Applicants and to the Monitor, as an officer of this Court, as may be necessary or desirable to give effect to this Order, to grant representative status to the Monitor in any foreign proceeding, or to assist the Applicants and the Monitor and their respective agents in carrying out the terms of this Order.

21.    **THIS COURT ORDERS** that each of the Applicants and the Monitor be at liberty and is hereby authorized and empowered to apply to any court, tribunal, regulatory or administrative body, wherever located, for the recognition of this Order and for assistance in carrying out the terms of this Order.

ENTERED AT / INSCRIT À TORONTO
ON / BOOK NO:
LE / DANS LE REGISTRE NO.:

JAN 2 2 2010

PER / PAR:

99

Court File No: 09-CL-7950

IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL
NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL NETWORKS
GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL CORPORATION AND
NORTEL NETWORKS TECHNOLOGY CORPORATION

*ONTARIO*
SUPERIOR COURT OF JUSTICE
(COMMERCIAL LIST)

Proceeding commenced at Toronto

ORDER

**OGILVY RENAULT LLP**
Suite 3800
Royal Bank Plaza, South Tower
200 Bay Street
P.O. Box 84
Toronto, Ontario  M5J 2Z4, Canada

**Derrick Tay LSUC#: 21152A**
Tel: (416) 216-4832
Email: dtay@ogilvyrenault.com

**Mario Forte  LSUC#: 27293F**
Tel: (416) 216-4870
Email: mforte@ogilvyrenault.com

**Jennifer Stam LSUC #46735J**
Tel: (416) 216-2327
Email: jstam@ogilvyrenault.com
Fax: (416) 216-3930
Lawyers for the Applicants

# APPENDIX "C"

[Attached]

File No. 09-CL-7950

**ONTARIO**
**SUPERIOR COURT OF JUSTICE- COMMERCIAL LIST**

| | | |
|---|---|---|
| THE HONOURABLE MR. | ) | THURSDAY, THE 30TH |
| | ) | |
| JUSTICE MORAWETZ | ) | DAY OF JULY, 2009 |

IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,
R.S.C. 1985, c. C-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF
NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED,
NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS
INTERNATIONAL CORPORATION AND NORTEL NETWORKS
TECHNOLOGY CORPORATION (the "Applicants")

APPLICATION UNDER THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,
R.S.C. 1985, c. C-36, AS AMENDED

*AMENDED AND RESTATED*
**CLAIMS PROCEDURE ORDER**

THIS MOTION, made by the Applicants for an Order substantially in the form included in the Applicants' Motion Record was heard this day at 330 University Avenue, Toronto, Ontario.

ON READING the Applicants' Notice of Motion, the affidavit of John Doolittle sworn on July 24, 2009, the Sixteenth report of Ernst & Young Inc. (the "Monitor") dated July 24, 2009, and on hearing the submissions of counsel for the Applicants, the Monitor, and those other parties present, no one appearing for the other parties served with the Applicants' Motion Record, although duly served as appears from the affidavit of service of Marna McGeorge sworn July 24, 2009, filed:

- 2 -

101

## SERVICE

1.      THIS COURT ORDERS that the time for service of the Notice of Motion and the Motion

Record filed by the Applicants in support of this Motion be and it is hereby abridged such

that the Motion is properly returnable today.


## MONITOR'S ROLE

2.      THIS COURT ORDERS that the Monitor, in addition to its prescribed rights and

obligations under the CCAA (as hereinafter defined) and under the Third Amended and

Restated Initial Order of this Court dated January 14, 2009 (such Order, as further

supplemented, amended or varied from time to time, is referred to herein as the "Initial

Order"), is hereby directed and empowered to take such other actions and fulfill such

other roles as are authorized by this Order, and that in taking such other actions and in

fulfilling such other roles, the Monitor shall have the protections given to it in the Initial

Order and this Order, including without limitation the protections provided in paragraph

21 of this Order.


## DEFINITIONS

3.      The following terms shall have the following meanings ascribed thereto:

(a)     "Bond" means a bond, note or debenture issued pursuant to any of the Bondholder

Trust Indentures and any bonds, notes or debentures issued in substitution or

replacement thereof;

(b)     "Bondholder" means a registered or beneficial holder of a Bond;

(c)     "Bondholder Trustee" means a trustee in respect of any issue of Bonds, being The

Bank of New York Mellon with respect to the first three Bondholder Trust

- 3 -

102

Indentures identified in paragraph 3(d) below and Law Debenture Trust Company of New York with respect to the fourth of such Bondholder Trust Indentures;

(d)    "Bondholder Trust Indentures" means collectively (i) the Indenture dated as of March 28, 2007 governing the 1.75% Convertible Senior Notes due 2012 and the 2.125% Convertible Senior Notes due 2014 issued by Nortel Networks Corporation and guaranteed by Nortel Networks Limited and Nortel Networks Inc.; (ii) the Indenture dated as of July 5, 2006, as supplemented by the First Supplemental Indenture dated as of July 5, 2006, the Second Supplemental Indenture dated as of May 1, 2007, and the Third Supplemental Indenture dated as of May 28, 2008, governing the Floating Rate Senior Notes due 2011, the 10.125% Senior Notes due 2013 and the 10.750% Senior Notes due 2016 issued by Nortel Networks Limited and guaranteed by Nortel Networks Corporation and Nortel Networks Inc.; (iii) the Indenture dated as of November 30, 1988, governing the 6.875% Notes due 2023 issued by Northern Telecom Limited (now Nortel Networks Limited); and (iv) the Indenture dated as of February 15, 1996, governing the 7.875% Notes due 2026 issued by Northern Telecom Capital Corporation (now Nortel Networks Capital Corporation) and guaranteed by Northern Telecom Limited (now Nortel Networks Limited);

(e)    "Business Day" means a day, other than a Saturday or a Sunday, on which banks are generally open for business in Toronto, Ontario;

(f)    "CCAA" means *Companies' Creditors Arrangement Act*, R.S.C. 1985, c. C-36, as amended;

(g)    "Chapter 11 Cases" means the proceedings commenced by Nortel Networks Inc. and others in the United States Bankruptcy Court for the District of Delaware, lead case number 09-10138;

(h)    "Charges" means the Charges as defined in the Initial Order, <u>other than</u> the Directors' Charge, as defined in the Initial Order;

(i)    "Claim" means each of:

(i)    any right of any Person against the Applicants, or any of them, in connection with any indebtedness, liability or obligation of any kind of the Applicants, or any of them, whether liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, unsecured, present, future, known or unknown, by guarantee, surety or otherwise and whether or not such right is executory in nature, including the right or ability of any Person to advance a claim for contribution or indemnity or otherwise with respect to any matter, action, cause or chose in action, whether existing at present or commenced in the future, which indebtedness, liability or obligation (A) is based in whole or in part on facts existing prior to the Filing Date, (B) relates to a time period prior to the Filing Date, or (C) would have been a claim provable in bankruptcy had the Applicants become bankrupt on the Filing Date (each, a "Prefiling Claim", and collectively, the "Prefiling Claims"),

(ii)   any indebtedness, liability or obligation of any kind arising out of the restructuring, termination, repudiation or disclaimer of any lease, contract,

or other agreement or obligation on or after the Filing Date and whether such restructuring, termination, repudiation or disclaimer took place or takes place before or after the date of this Order (each, a "Restructuring Claim", and collectively, the "Restructuring Claims"); and

(iii)    any right of any Person against the Directors or Officers of the Applicants, or any of them, that relates to a Prefiling Claim or a Restructuring Claim for which the Directors or Officers of the Applicants are by law liable to pay in their capacity as Directors or Officers or in any other capacity, including without limitation, any capacity relating to the administration, management or oversight of any of the pension plans or employee benefit plans administered or sponsored by the Applicants or their subsidiaries (each, a "Director/Officer Claim", and collectively, the "Directors/Officers Claims"),

provided however, that "Claim" shall not include an Excluded Claim;

(j)    "Claims Bar Date" means the Prefiling Claims Bar Date or the Restructuring Claims Bar Date, as the case may be;

(k)    "Claims Resolution Order" has the meaning ascribed to that term in paragraph 17 of this Order;

(l)    "Compensation Claims" has the meaning ascribed to that term in paragraph 3(t)(iii) of this Order;

(m)    "Court" means the Ontario Superior Court of Justice (Commercial List);

105

(n)     "Creditor" means any Person having a Claim;

(o)     "Creditors' Guide to Completing the Proof of Claim form" means the guide to completing the Proof of Claim form, in substantially the form attached as Schedule "C" hereto;

(p)     "Creditors' Meeting" means the meeting or meetings of Creditors scheduled pursuant to further Order of this Court, or by a Plan if and when filed with this Court;

(q)     "Cross Border Claims Protocol" means a protocol for the resolution of cross-border claims filed in these CCAA proceedings and/or in the Chapter 11 Cases, once approved by the courts presiding in these CCAA proceedings and in the Chapter 11 Cases;

(r)     "Directors" means all current and former directors of the Applicants, and "Director" means any one of them;

(s)     "Directors/Officers Claim" has the meaning ascribed to that term in paragraph 3(i)(iii) of this Order;

(t)     "Excluded Claim" means the following claims, whether liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, unsecured, present, future, known or unknown:

    (i)     claims secured by any of the Charges;

    (ii)    inter-company claims , as between any of the Applicants (and any person appointed in respect of any of the Applicants), and as between any of the

Applicants and any of the Applicants' direct or indirect subsidiaries or affiliates (and any person appointed in respect of such subsidiaries or affiliates of the Applicants), including, for greater certainty, claims by such entities against the Directors and Officers, other than claims by any Joint Venture;

(iii)    claims of (A) any current or former employee of any of the Applicants, for amounts owing to him or her in his or her capacity as a current or former employee of any of the Applicants, including without limitation claims on account of wages, salaries, any other form of compensation (whether sales-based, incentive-based, deferred, retention-based, share-based, or otherwise), severance or termination pay, employee benefits (including, but not limited to, medical and similar benefits, disability benefits, relocation or mobility benefits, and benefits under employee assistance programs), pension and retirement benefits, vacation pay, and employee expenses, (B) any current or former employee of any of the Applicants arising from the administration, management or oversight of any of the pension plans or employee benefit plans administered or sponsored by the Applicants or their subsidiaries, and (C) any Director for compensation for acting as a Director, including without limitation fees, deferred share-based compensation, benefits and Director expenses (collectively, including employee and Director claims of the above nature, "Compensation Claims");

    (iv)    grievances under any collective agreements to which the Applicants, or any of them, are a party; and

    (v)    claims of any Director or Officer for indemnification and/or contribution arising from such Director's or Officer's service to any Applicant;

(u)    "Filing Date" means January 14, 2009, the date of the Initial Order;

(v)    "Initial Order" has the meaning ascribed to that term in paragraph 2 of this Order;

(w)    "Joint Venture" means each of Nortel Networks Netas Telekomunikasyon A.S., L-G Nortel Co. Ltd., Senyang Nortel Telecommunications Co. Ltd., Guangdong-Nortel Telecommunications Equipment Company Ltd., and Nortel Networks Communications Engineering Ltd.;

(x)    "Known Creditors" means:

    (i)    those Creditors which, to the knowledge of the Applicants and the Monitor, were owed monies by any Applicant as of the Filing Date and which monies remain unpaid in whole or in part;

    (ii)    any Person who commenced a legal proceeding against the Applicants, or any of them, which legal proceeding was commenced and served upon an Applicant prior to the Filing Date, and which legal proceeding is known to the Monitor;

    (iii)    any Person who is party to a lease, contract, or other agreement or obligation of any Applicant which was (to the knowledge of the Applicants and the Monitor) restructured, terminated, repudiated or

disclaimed by such Applicant between the Filing Date and the date of this Order; and

(iv)    any other Creditor actually known to the Applicants and the Monitor as of the date of this Order;

(y)    "Monitor" means Ernst & Young Inc. in its capacity as monitor pursuant to the Initial Order;

(z)    "Notice to Creditors" means the notice to Creditors for publication in substantially the form attached as Schedule "A" hereto;

(aa)    "Officers" means all current and former officers of the Applicants, and "Officer" means any one of them;

(bb)    "Person" includes any individual, partnership, joint venture, trust, corporation, unlimited liability company, unincorporated organization, government body or agency or instrumentality thereof, or any other juridical entity howsoever designated or constituted;

(cc)    "Plan" means any plan of compromise and arrangement by one or more of the Applicants, if and when filed and approved by this Court, as revised, amended, modified or supplemented from time to time in accordance with its terms;

(dd)    "Prefiling Claim" has the meaning ascribed to that term in paragraph 3(i)(i) of this Order;

(ee)    "Prefiling Claims Bar Date" means 4:00 p.m. (prevailing Eastern Time) on September 30, 2009;

(ff)   "Proof of Claim" means the form of Proof of Claim in substantially the form attached as Schedule "B" hereto;

(gg)   "Proof of Claim Document Package" means a document package that includes a copy of the Notice to Creditors, the Creditors' Guide to Completing the Proof of Claim form, a Proof of Claim, and such other materials as the Monitor may consider appropriate or desirable;

(hh)   "Proven Claim" means a Claim as finally determined, including for the purposes of voting and distribution under the Plan;

(ii)   "Restructuring Claim" has the meaning ascribed to that term in paragraph 3(i)(ii) of this Order; and

(jj)   "Restructuring Claims Bar Date" means, in respect of each Restructuring Claim and each Person having a Restructuring Claim, 4:00 p.m. (prevailing Eastern Time) on the later of (i) September 30, 2009, and (ii) the date that is 30 days after the date on which the Monitor sends a Proof of Claim Document Package to the Person with respect to a Restructuring Claim that arose or that may have arisen by virtue of the restructuring, termination, repudiation or disclaimer of any lease, contract, or other agreement or obligation on or after the Filing Date.

**NOTICE TO CREDITORS**

4.   THIS COURT ORDERS that:

(a)     the Monitor shall no later than five (5) days following the making of this Order, post a copy of the Proof of Claim Document Package on its website at "www.ey.com/ca/nortel";

(b)     the Monitor shall no later than five (5) days following the making of this Order, send on behalf of the Applicants to each Bondholder Trustee a copy of the Proof of Claim Document Package;

(c)     the Monitor shall no later than ten (10) days following the making of this Order, send on behalf of the Applicants to each of the Known Creditors (for which it has an address) a copy of the Proof of Claim Document Package, provided however that the Monitor is not required to send Proof of Claim Document Packages to Bondholders or to the current or former employees of any Applicant;

(d)     the Monitor shall cause to be published, on or before August 15, 2009, the Notice to Creditors in *The Globe and Mail* (National Edition) and *The Wall Street Journal* (national and global editions);

(e)     with respect to Restructuring Claims arising from the restructuring, termination, repudiation or disclaimer of any lease, contract, or other agreement or obligation, the Monitor shall send to the counterparty(ies) to such lease, contract, or other agreement or obligation a Proof of Claim Document Package no later than ten (10) days following the time that the Monitor becomes aware of the restructuring, termination, repudiation or disclaimer of any such lease, contract, or other agreement or obligation; and

- 12 -

111

(f)    the Monitor shall, provided such request is received by the Monitor prior to the applicable Claims Bar Date, deliver as soon as reasonably possible following receipt of a request therefor a copy of the Proof of Claim Document Package to any Person claiming to be a Creditor and requesting such material.

5.    THIS COURT ORDERS that neither the Applicants nor the Monitor are under any obligation to give notice to or deal with any Person other than the Creditor holding a Claim, and without limitation shall have no obligation to give notice to or deal with any Person having a security interest in the Claim (including the holder of a security interest created by way of a pledge or a security interest created by way of an assignment of the Claim), and such Persons shall be bound by any notices given to the Creditor and any steps taken in respect of such Claim in accordance with this Order.

6.    THIS COURT ORDERS that a separate process shall be established by further Order of this Court, to deal with Compensation Claims, and that this Order shall be without prejudice to any matter relating to any Compensation Claims now existing or arising in the future, and without prejudice to any claims that now exist or that may in the future exist against the Ontario Pension Benefits Guarantee Fund.

## CLAIMS BAR DATES

7.    THIS COURT ORDERS that Proofs of Claim with respect to (i) a Prefiling Claim, shall be filed with the Monitor on or before the Prefiling Claims Bar Date, (ii) a Restructuring Claim, shall be filed with the Monitor on or before the Restructuring Claims Bar Date, and (iii) a Directors/Officers Claim, shall be filed on or before the Prefiling Claims Bar Date, except to the extent that the Directors/Officers Claim relates to a Restructuring

Claim, in which case such Directors/Officers Claim shall be filed with the Monitor on or before the applicable Restructuring Claims Bar Date.

8.    THIS COURT ORDERS that any Creditor that does not file a Proof of Claim as provided for herein such that such Proof of Claim is received by the Monitor on or before the applicable Claims Bar Date (a) shall be and is hereby forever barred from making or enforcing any Claim against the Applicants, or any of them, or the Directors or Officers, or any of them; (b) shall not be entitled to vote at the Creditors' Meeting in respect of the Plan or to receive any distribution thereunder; and (c) shall not be entitled to any further notice in, and shall not be entitled to participate as a creditor in, these proceedings.

**PROOFS OF CLAIM**

9.    THIS COURT ORDERS that each Creditor shall file a separate Proof of Claim for each Applicant against whom it asserts a Claim and, if the Claim is also being asserted against the Directors or Officers of that Applicant, such Claim against those Directors or Officers shall be included in the same Proof of Claim.

10.    THIS COURT ORDERS that each Creditor shall include any and all Claims it asserts against an Applicant in a single Proof of Claim, provided however that where a Creditor has taken an assignment or transfer of a Claim after the Filing Date, that Creditor shall file a separate Proof of Claim for each such assigned or transferred Claim.

11.    THIS COURT ORDERS that where a Claim against any Applicant is based on that Applicant's guarantee of the repayment of a debt of another Applicant or the debt of any other Person, the Proof of Claim in respect of such Claim shall clearly state that it is based on such a guarantee, and that where any Applicant has guaranteed the repayment of

the debt of any other Applicant, a Proof of Claim in respect of that debt shall be filed against each such Applicant.

12.     THIS COURT ORDERS that if any Claim arose in a currency other than Canadian dollars, then the Creditor making the Claim shall complete its Proof of Claim indicating the amount of the Claim in such currency, rather than in Canadian dollars or any other currency.   The Monitor shall subsequently calculate the amount of such Claim in Canadian dollars, using the Reuters closing rate on January 13, 2009, without prejudice to the ability of the Applicants to utilize a different exchange rate in any Plan.

13.     THIS COURT ORDERS that each Bondholder Trustee is authorized and directed to file one or more Proofs of Claim on or before the Prefiling Claims Bar Date in respect of all of the Bonds for which such Bondholder Trustee acts, indicating the amount owing on an aggregate basis for each separate series of Bonds issued under each Bondholder Trust Indenture.   Notwithstanding any other provisions of this Order, Bondholders are not required to file individual Proofs of Claim in respect of Claims relating solely to the debt evidenced by their Bonds.   The Applicants and the Monitor may disregard any Proof of Claim filed by any individual Bondholder claiming the debt evidenced by the Bonds, or any of them, and such Proofs of Claims shall be ineffective for all purposes.   The process for determining each individual Bondholder's Claim for voting purposes with respect to the Plan will be established by further order of the Court.

14.     THIS COURT ORDERS that the Monitor may, where it is satisfied that a Claim has been adequately filed, waive strict compliance with the requirements of this Order as to completion and execution of Proofs of Claim.

**REVIEW OF PROOFS OF CLAIM**

15.   THIS COURT ORDERS that the Monitor, in consultation with the Applicants, shall review all Proofs of Claims that are filed on or before the applicable Claims Bar Date.  At any time, the Monitor or the Applicants may request additional information from a Creditor with respect to a Claim, and the Monitor may request that the Creditor file a revised Proof of Claim.

16.   THIS COURT ORDERS that a Claim shall not be a Proven Claim unless and until the Claim has been allowed or otherwise finally determined in accordance with the claims dispute and resolution procedures to be set out in the Claims Resolution Order and the Cross Border Claims Protocol.

**DETERMINATION OF PROVEN CLAIM**

17.   THIS COURT ORDERS that the Proven Claim of a Creditor shall be as allowed or as finally determined in accordance with the other forms and claim procedures to be authorized by further Order of this Court (the "Claims Resolution Order") and in the Cross Border Claims Protocol, provided however that no Claim may be allowed or may be established as a Proven Claim unless a Proof of Claim with respect to that Claim is filed in accordance with this Order, on or prior to the applicable Claims Bar Date.

**NOTICE OF TRANSFEREES**

18.   THIS COURT ORDERS that neither the Applicants nor the Monitor shall be obligated to give notice to or to otherwise deal with a transferee or assignee of a Claim as the Creditor in respect thereof unless and until (i) actual written notice of transfer or assignment, together with satisfactory evidence of such transfer or assignment, shall have been received by the Monitor, and (ii) the Monitor shall have acknowledged in writing such

transfer or assignment, and thereafter such transferee or assignee shall for the purposes hereof constitute the "Creditor" in respect of such Claim. Any such transferee or assignee of a Claim, and such Claim, shall be bound by any notices given or steps taken in respect of such Claim in accordance with this Order prior to the written acknowledgement by the Monitor of such transfer or assignment.

19.    THIS COURT ORDERS that if the holder of a Claim has transferred or assigned the whole of such Claim to more than one Person or part of such Claim to another Person or Persons, such transfer or assignment shall not create a separate Claim or Claims and such Claim shall continue to constitute and be dealt with as a single Claim notwithstanding such transfer or assignment, and the Applicants and the Monitor shall in each such case not be bound to acknowledge or recognize any such transfer or assignment and shall be entitled to give notices to and to otherwise deal with such Claim only as a whole and then only to and with the Person last holding such Claim in whole as the Creditor in respect of such Claim.   Provided that a transfer or assignment of the Claim has taken place in accordance with paragraph 18 of this Order and the Monitor has acknowledged in writing such transfer or assignment, the Person last holding such Claim in whole as the Creditor in respect of such Claim may by notice in writing to the Monitor direct that subsequent dealings in respect of such Claim, but only as a whole, shall be with a specified Person and, in such event, such Creditor, such transferee or assignee of the Claim and the whole of such Claim shall be bound by any notices given or steps taken in respect of such Claim by or with respect to such Person in accordance with this Order.

20.    THIS COURT ORDERS that the transferee or assignee of any Claim (i) shall take the Claim subject to the rights and obligations of the transferor/assignor of the Claim, and

subject to the rights of any Applicant against any such transferor or assignor, including any rights of set-off which any Applicant had against such transferor or assignor, and (ii) cannot use any transferred or assigned Claim to reduce any amount owing by the transferee or assignee to any Applicant, whether by way of set off, application, merger, consolidation or otherwise.

## PROTECTIONS FOR MONITOR

21.    THIS COURT ORDERS that (i) in carrying out the terms of this Order, the Monitor shall have all of the protections given to it by the CCAA and the Initial Order or as an officer of this Court, including the stay of proceedings in its favour, (ii) the Monitor shall incur no liability or obligation as a result of the carrying out of the provisions of this Order, (iii) the Monitor shall be entitled to rely on the books and records of the Applicants, and any information provided by the Applicants, all without independent investigation, and (iv) the Monitor shall not be liable for any claims or damages resulting from any errors or omissions in such books, records or information.

## DIRECTIONS

22.    THIS COURT ORDERS that any Applicant or the Monitor may, at any time, and with such notice as this Court may require, seek directions from the Court with respect to this Order and the Claims process set out herein, including the forms attached as Schedules hereto.

117

## SERVICE AND NOTICE

23.   THIS COURT ORDERS that the Monitor or the Applicants, as the case may be, are at

liberty to deliver the Proof of Claim Document Package, and any letters, notices or other

documents to Creditors or other interested Persons, by forwarding true copies thereof by

prepaid ordinary mail, courier, personal delivery or electronic or digital transmission to

such Persons at the address as last shown on the records of the Applicants and that any

such service or notice by courier, personal delivery or electronic or digital transmission

shall be deemed to be received on the next Business Day following the date of

forwarding thereof, or if sent by prepaid ordinary mail, on the fourth Business Day after

mailing.

24.   THIS COURT ORDERS that any notice or other communication (including, without

limitation, Proofs of Claim) to be given under this Order by a Creditor to the Monitor

shall be in writing in substantially the form, if any, provided for in this Order and will be

sufficiently given only if given by prepaid ordinary mail, courier, personal delivery or

electronic or digital transmission addressed to:

ERNST & YOUNG INC.
Court-appointed Monitor of Nortel Networks Corporation & others
222 Bay Street, Suite 1600
Toronto, Ontario
Canada M5K 1J7

Attention:     Nortel Claims
Telephone:    1-416-943-4439 or 1-866-942-7177
E-mail          nortel.monitor@ca.ey.com
Fax:            1-416-943-2808

Any such notice or other communication by a Creditor shall be deemed received only

upon actual receipt thereof during normal business hours on a Business Day.

**MISCELLANEOUS**

25.    THIS COURT ORDERS AND REQUESTS the aid and recognition of any court of any

judicial, regulatory or administrative body in any province or territory of Canada

(including the assistance of any court in Canada pursuant to Section 17 of the CCAA)

and any court or any judicial, regulatory or administrative body of the United States of

America, the United Kingdom, the French Republic, the State of Israel, and the Republic

119

of Korea, and of any other nation or state, to act in aid of and to be complementary to this

Court in carrying out the terms of this Order.

ENTERED AT / INSCRIT A TORONTO
ON / BOOK NO:
LE / DANS LE REGISTRE NO.:

OCT 0 7 2009

PER / PAR:  N

120

## SCHEDULE "A"

## NOTICE TO CREDITORS
### of NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL CORPORATION AND NORTEL NETWORKS TECHNOLOGY CORPORATION
(hereinafter referred to as the "Debtors")

**RE:    NOTICE OF CLAIMS PROCEDURE FOR THE DEBTORS PURSUANT TO THE** *COMPANIES' CREDITORS ARRANGEMENT ACT* **(the "CCAA")**

**PLEASE TAKE NOTICE** that this notice is being published pursuant to an Order of the Superior Court of Justice of Ontario made July 30, 2009 (the "Order"). Pursuant to the Order, Proof of Claim packages will be sent to creditors by mail, on or before August 15, 2009, if those creditors are known to the Debtors, and if the Debtors have a current address. Creditors may also obtain the Order and a Proof of Claim package from the website of Ernst & Young Inc., Court-appointed monitor of the Debtors, at "www.ey.com/ca/nortel", or by contacting the Monitor by telephone (1-416-943-4439 or 1-866-942-7177) or by fax (1-416-943-2808).

Proofs of Claim must be submitted to the Monitor for any claim against any Debtor, whether unliquidated, contingent or otherwise, or a claim against any current or former officer or director of the Debtors, or any of them, in each case where the claim (i) arose prior to January 14, 2009, or (ii) arose on or after January 14, 2009 as a result of the restructuring, termination, repudiation or disclaimer of any lease, contract, or other agreement or obligation. Please consult the Proof of Claim package for more details.

**Completed Proofs of Claim must be received by the Monitor by 4:00 p.m. (prevailing Eastern Time) on the applicable Claims Bar Date, as set out in the Order. The Claims Bar Date for most claims is SEPTEMBER 30, 2009. It is your responsibility to ensure that the Monitor receives your Proof of Claim by the applicable Claims Bar Date.**

**Certain Creditors are exempted from the requirement to file a Proof of Claim. Among those creditors who do not need to file a Proof of Claim are (i) current or former employees of the Debtors, for amounts owing to him or her in his or her capacity as a current or former employee of any of the Debtors, and (ii) individual bondholders in respect of Claims relating solely to the debt evidenced by their bonds. Please consult the Claims Procedure Order made on July 30, 2009 for details with respect to these and other exemptions.**

**PLEASE NOTE that these procedures apply ONLY to claims filed against the Debtors in the CCAA proceedings. Several of the Debtors' affiliates are subject to creditor protection proceedings in other jurisdictions, including in the United States. Separate proceedings and deadlines have been or will be established in those cases for the filing of claims. With respect to the U.S. proceedings, a general bar date of September 30, 2009 at 4:00 p.m. (prevailing Eastern Time) has been established by the U.S. Court. If you believe you have claims against the U.S. Debtors, any such claims must be filed in, and only in, the U.S.**

- 2 -

121

proceedings with the U.S. Debtors' claims agent. A list of the U.S. Debtors and procedures for filing such claims in the U.S. Proceedings can be found by going to the following internet link: www.chapter11.epiqsystems.com/nortel.

**CLAIMS WHICH ARE NOT RECEIVED BY THE APPLICABLE CLAIMS BAR DATE WILL BE BARRED AND EXTINGUISHED FOREVER.**

**DATED** at Toronto this ● day of ●, 2009.

122

## SCHEDULE "B"

### (form of Proof of Claim attached)

DOCSTOR: 1724621\14

- 2 -

123

## SCHEDULE "C"

## GUIDE TO COMPLETING THE PROOF OF CLAIM FORM

This Guide has been prepared to assist Creditors in filling out the Proof of Claim form with respect to the Debtors listed in Section 1, below. If you have any additional questions regarding completion of the Proof of Claim form, please consult the Monitor's website at www.ey.com/ca/nortel or contact the Monitor, whose contact information is shown below.

Additional copies of the Proof of Claim form may be found at the Monitor's website address noted above.

Please note that this is a guide only, and that in the event of any inconsistency between the terms of this guide and the terms of the Claims Procedure Order made on July 30, 2009, the terms of the Claims Procedure Order will govern.

**Section 1 – Name of Debtor:**
- A separate Proof of Claim form must be filed for each Debtor against whom a claim is being asserted.
- The following is a list of Debtor companies against whom a claim may be asserted in this claims process:
  - Nortel Networks Corporation
  - Nortel Networks Limited
  - Nortel Networks Global Corporation
  - Nortel Networks International Corporation
  - Nortel Networks Technology Corporation.
- Please note that these procedures apply ONLY to claims filed against the five Debtor companies listed above. Several of the Debtors' affiliates are subject to creditor protection proceedings in other jurisdictions, including in the United States. Separate proceedings and deadlines have been or will be established in those cases for the filing of claims. With respect to the U.S. proceedings, a general bar date of September 30, 2009 at 4:00 p.m. (prevailing Eastern Time) has been established by the U.S. Court. If you believe you have claims against the U.S. Debtors,[1] any such claims must be filed in, and only in, the U.S. proceedings with the U.S. Debtors' claims agent. Procedures for filing such claims in the U.S. Proceedings can be found by going to the following internet link: www.chapter11.epiqsystems.com/nortel.

---

[1] The U.S. Debtors are: Nortel Networks Inc.; Nortel Networks Capital Corporation; Nortel Altsystems Inc.; Nortel Altsystems International Inc.; Xros Inc.; Sonoma Systems; Qtera Corporation; CoreTek, Inc.; Nortel Networks Applications Management Solutions Inc.; Nortel Networks Optical Components Inc.; Nortel Networks HPOCS Inc.; Nortel Networks (CALA) Inc.; Architel Systems (U.S.) Corporation; Nortel Networks International Inc.; Northern Telecom International Inc.; and Nortel Networks Cable Solutions Inc.

- 3 -

124

## Section 2 – Original Creditor

- A separate Proof of Claim form must be filed by each legal entity or person asserting a claim against a Debtor listed in Section 1.
- The Creditor shall include any and all Claims it asserts against a single Debtor in a single Proof of Claim[2].
- The full legal name of the Creditor must be provided.
- If the Creditor operates under a different name, or names, please indicate this in a separate schedule in the supporting documentation.
- If the Claim has been assigned or transferred to another party, Section 3 must also be completed.
- Unless the Claim is assigned or transferred, all future correspondence, notices, etc. regarding the Claim will be directed to the address and contact indicated in this section.
- Certain Creditors are exempted from the requirement to file a Proof of Claim. Among those creditors who do not need to file a Proof of Claim are (i) current or former employees of the Debtors, for amounts owing to him or her in his or her capacity as a current or former employee of any of the Debtors, and (ii) individual bondholders in respect of Claims relating solely to the debt evidenced by their bonds. Please consult the Claims Procedure Order made on July 30, 2009 for details with respect to these and other exemptions.

## Section 3 – Assignee

- If the Creditor has assigned or otherwise transferred its Claim, then Section 3 must be completed.
- The full legal name of the Assignee must be provided.
- If the Assignee operates under a different name, or names, please indicate this in a separate schedule in the supporting documentation.
- If the Monitor is satisfied that an assignment or transfer has occurred, all future correspondence, notices, etc. regarding the Claim will be directed to the Assignee at the address and contact indicated in this section.

## Section 4 – Amount of Claim of Creditor against Debtor

- Indicate the amount the Debtor / Officer(s) or Director(s) was, and still is indebted to the Creditor

*Currency, Original Currency Amount*

- The amount of the Claim must be provided in the currency in which it arose.
- Indicate the appropriate currency in the Currency column.
- If the Claim is denominated in multiple currencies, use a separate line to indicate the Claim amount in each such currency. If there are insufficient lines to record these amounts, attach a separate schedule indicating the required information.

---

[2] Paragraph 10 of the Claims Procedure Order made on [DATE] provides that: "THIS COURT ORDERS that each Creditor shall include any and all Claims it asserts against an Applicant in a single Proof of Claim, provided however that where a Creditor has taken an assignment or transfer of a Claim after the Filing Date, that Creditor shall file a separate Proof of Claim for each such assigned or transferred Claim."

- 4 -

125

- Claims denominated in a currency other than Canadian dollars will be converted into Canadian dollars by the Monitor using the exchange rates set out in Appendix A.

*Secured*
- Check the Secured box ONLY if the Claim recorded on that line is secured. Do not check this box if your Claim is unsecured
- If the value of the collateral securing your Claim is less than the amount of your Claim, enter the shortfall portion on a separate line as an unsecured claim
- Evidence supporting the security you hold must be submitted with the Proof of Claim form. Provide full particulars of the nature of the security, including the date on which the security was given and the value you attribute to the collateral securing your Claim. Attach a copy of all related security documents.

*S. 136 Priority*
- Check this box ONLY if the amount of your Claim has a right to priority pursuant to Section 136 of the Bankruptcy and Insolvency Act (Canada) (the "BIA") or would be entitled to claim such a priority if this Proof of Claim were being filed in accordance the provisions of the BIA.
- If a priority claim is being asserted, please provide details as to the nature of the claim being asserted, and the basis for priority on which you rely.

*Restructuring*
- Check this box ONLY if the amount of the Claim against the Debtor arose out of the restructuring, termination, repudiation or disclaimer of a lease, contract, or other agreement or obligation on or after January 14, 2009.

*Officers and Directors*
- Check this box only if the Claim you are making is also being asserted against a current or former officer or director of the Debtor.
- You must identify the individual officer(s) or director(s) against whom you are asserting the Claim.

## Section 5 – Documentation
- Attach to the claim form all particulars of the Claim and supporting documentation, including amount, description of transaction(s) or agreement(s) giving rise to the Claim, name of any guarantor which has guaranteed the Claim[3], and amount of invoices, particulars of all credits, discounts, etc. claimed, description of the security, if any, granted by the debtor or any officer or director to the Creditor and estimated value of such security, and particulars of any restructuring claim.

## Section 6 – Certification
- The person signing the Proof of Claim form should

---

[3] If the guarantor is another of the Debtors listed in Section 1, or one of the U.S. Debtors, a Proof of Claim against that Debtor or U.S. Debtor, as the case may be, must also be filed in these Canadian Proceedings or (in the case of U.S. Debtors) in the U.S. proceedings.

- o  Be the Creditor, or authorized Representative of the Creditor.
- o  Have knowledge of all the circumstances connected with this Claim.
- By signing and submitting the Proof of Claim, the Creditor is asserting the claim against the Debtor and / or the indicated officer(s) or director(s)

### Section 7 – Filing of Claim

- This Proof of Claim **must be received** by the Monitor by no later than 4:00 p.m. (prevailing Eastern Time) on SEPTEMBER 30, 2009. Proofs of Claim should be send by prepaid ordinary mail, courier, personal delivery or electronic or digital transmission to the following address:

> Ernst & Young Inc.
> Court-appointed Monitor of Nortel Networks Corporation & others
> 222 Bay Street, Suite 1600
> Toronto, Ontario
> Canada M5K 1J7
> Attention:     Nortel Claims
>
> Telephone:    1-866.942-7177  or  416-943-4439
> E-mail:         Nortel.monitor@ca.ey.com
> Fax:            416-943-2808

**Failure to file your Proof of Claim so that it is received by the Monitor by 4:00 p.m., on the Claims Bar Date of September 30, 2009 will result in your claim being barred and you will be prevented from making or enforcing a Claim against the Debtor or any current or former officer or director of any of the Debtors. In addition, you shall not be entitled to further notice in and shall not be entitled to participate as a creditor in these proceedings.**

- 6 -

127

## Appendix A

Currency conversion factors
Source: Reuters, January 14, 2009

**This Appendix is for information only. You are to make your claim in the currency in which it arose. The Monitor will calculate all currency conversions.**

| | | CAD per unit of Currency |
|---|---|---|
| CAD | Canadian Dollar | 1 |
| USD | United States Dollar | 1.22025 |
| EUR | Euro | 1.6170753 |
| GBP | United Kingdom: Pnd Ster | 1.77741615 |
| JPY | Japan: Yen | 0.01362647 |

| | | | | | |
|---|---|---|---|---|---|
| AED | United Arab Emir.: Dirham | 0.33221709 | LTL | Lithuanian Litas | 0.46830925 |
| ARS | Argentine Peso | 0.35410621 | LVL | Latvian Lats | 2.29456567 |
| AUD | Australian Dollar | 0.82275356 | MAD | Moroccan Dirham | 0.14500201 |
| BBD | Barbados Dollar | 0.61319095 | MXN | Mexican Peso | 0.08842392 |
| BDT | Bangladeshi Taka | 0.01772331 | MYR | Malaysian Ringgit | 0.34156754 |
| BGN | Bulgaria: New Lev | 0.82683968 | NGN | Nigerian Naira | 0.00816494 |
| BOB | Bolivian Boliviano | 0.17345416 | NOK | Norwegian Krone | 0.17167276 |
| BRL | Brazilian Real | 0.52726527 | NZD | New Zealand Dollar | 0.6711375 |
| CHF | Swiss Franc | 1.09468915 | OMR | Oman: Rial Omani | 3.16980987 |
| CLP | Chilean Peso | 0.0019827 | PAB | Panama: Balb0A | 1.22025 |
| CNY | China: Yuan Renminbi | 0.17854268 | PEN | Peru: Nuevo Sol | 0.3889243 |
| COP | Colombian Peso | 0.00054867 | PGK | Papua New Guinea Kina | 0.4671117 |
| CRC | Costa Rican Colon | 0.00219273 | PHP | Philippine Peso | 0.02592415 |
| CZK | Czech Koruna | 0.06004872 | PKR | Pakistan Rupee | 0.015414 |
| DKK | Danish Krone | 0.21701242 | PLN | Poland: Zloty | 0.39077386 |
| DOP | Dominican Peso | 0.03444601 | PYG | Paraguay: Guarani | 0.0002498 |
| DZD | Algerian Dinar | 0.01682672 | QAR | Qatar: Qatari Rial | 0.33516446 |
| EEK | Estonian Kroon | 0.10334226 | RON | New Romania Leu | 0.37703348 |
| EGP | Egyptian Pound | 0.22086973 | RUB | Russian Ruble | 0.03847246 |
| FJD | Fiji Dollar | 0.67418812 | SAR | Saudi Arabia: Saudi Riyal | 0.32539566 |
| GTQ | Guatemala: Quetzal | 0.15495238 | SEK | Swedish Krona | 0.14788041 |
| HKD | Hong Kong Dollar | 0.15732068 | SGD | Singapore Dollar | 0.82052921 |
| HUF | Hungary: Forint | 0.00583154 | THB | Thailand: Baht | 0.03495417 |
| IDR | Indonesia: Rupiah | 0.00010993 | TND | Tunisian Dinar | 0.89144172 |
| ILS | Israel: Shekel | 0.31449742 | TRY | New Turkish Lira | 0.76914592 |
| INR | Indian Rupee | 0.02499872 | TTD | Trinidad & Tobago Dollar | 0.19524 |
| ISK | Iceland Krona | 0.00966994 | UAH | Ukraine: Hryvnia | 0.13945714 |
| JMD | Jamaican Dollar | 0.01515838 | UYU | Uruguay: Peso | 0.05016444 |
| JOD | Jordanian Dinar | 1.72084329 | VEF | Bolivar Fuerte | 0.56827178 |
| KPW | North Korean Won | 0.00853023 | VND | Vietnam: Dong | 0.00006981 |
| KRW | Republic Of Korea: Won | 0.00090543 | XCD | East Caribbean Dollar | 0.4587406 |
| KWD | Kuwaiti Dinar | 4.28157891 | ZAR | South Africa: Rand | 0.12249969 |
| LBP | Lebanese Pound | 0.00080945 | ZMK | Zambia: Kwacha | 0.00024601 |
| LKR | Sri Lanka Rupee | 0.01072276 | | | |

128

Court File No: 09-CL-7950

IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C. 1985, C. C-36, AS AMENDED
AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL CORPORATION AND NORTEL NETWORKS TECHNOLOGY CORPORATION
APPLICATION UNDER THE *COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C. 1985, C. C-36, AS AMENDED

---

*ONTARIO*
SUPERIOR COURT OF JUSTICE
(COMMERCIAL LIST)

Proceeding commenced at Toronto

---

CLAIMS PROCEDURE ORDER

---

**OGILVY RENAULT LLP**
Suite 3800
Royal Bank Plaza, South Tower
200 Bay Street
P.O. Box 84
Toronto, Ontario M5J 2Z4

**Derrick Tay LSUC#: 21152A**
Tel: (416) 216-4832
Email: dtay@ogilvyrenault.com

**Mario Forte LSUC#: 27293F**
Tel: (416) 216-4870
Email: mforte@ogilvyrenault.com

**Jennifer Stam LSUC #46735J**
Tel: (416) 216-2327
Email: jstam@ogilvyrenault.com

Fax: (416) 216-3930

Lawyers for the Applicants

# APPENDIX "D"

[Attached]

50

129

**EXECUTION VERSION**

## INTERIM FUNDING AND SETTLEMENT AGREEMENT

This agreement (the "<u>Agreement</u>") is entered into by and among Nortel Networks Limited ("<u>NNL</u>") and the other entities set forth in <u>Schedule 1</u> attached hereto, Nortel Networks Inc. ("<u>NNI</u>") and the other entities set forth in <u>Schedule 2</u> attached hereto, and the Joint Administrators (as defined below) and the entities set forth in <u>Schedule 3</u> attached hereto (the "<u>EMEA Debtors</u>"). The Joint Administrators, in their individual capacity, shall be party to this Agreement solely for the purposes of Section 17 and references to the Parties shall be construed accordingly.

WHEREAS, on January 14, 2009 (the "<u>Filing Date</u>"), Nortel Networks Corporation ("<u>NNC</u>"), NNL and certain of NNC's other Canadian affiliates included in <u>Schedule 1</u> (collectively, the "<u>Canadian Debtors</u>," and NNC and its debtor and non-debtor affiliates are sometimes referred to herein (including, without limitation, the EMEA Debtors), as the "<u>Nortel Group</u>"), commenced creditor protection proceedings before the Ontario Superior Court of Justice (Commercial List) (the "<u>Canadian Court</u>") under the Companies' Creditors Arrangement Act (Canada) (respectively, "<u>CCAA</u>" and the "<u>Canadian Proceedings</u>"), in connection with which Ernst & Young Inc. was appointed monitor (the "<u>Monitor</u>"); and

WHEREAS, on the Filing Date, NNI and certain of NNI's United States affiliates included in <u>Schedule 2</u> (collectively, the "<u>US Debtors</u>" and, together with the Canadian Debtors and the EMEA Debtors, the "<u>Debtors</u>") filed petitions in the United States Bankruptcy Court for the District of Delaware (the "<u>US Court</u>") under chapter 11 of title 11 of the United States Code (respectively, the "<u>Bankruptcy Code</u>," and the "<u>US Proceedings</u>"); and

WHEREAS, on the Filing Date, Nortel Networks UK Limited ("<u>NNUK</u>"), Nortel Networks (Ireland) Limited ("<u>NNIR</u>"), Nortel Networks S.A. ("<u>NNSA</u>") and certain of NNUK's affiliates in the Europe, Middle East and Africa ("<u>EMEA</u>") region, including those in <u>Schedule 3</u> attached hereto, commenced administration proceedings (the "<u>UK Proceedings</u>" and, together with the Canadian Proceedings and the US Proceedings, the "<u>Proceedings</u>") before the High Court of Justice in London, England (the "<u>UK Court</u>" and, together with the Canadian Court and the US Court, the "<u>Courts</u>"), represented by individuals from Ernst & Young LLP (the "<u>UK Administrator</u>"), and, in the case of NNIR only, Ernst & Young Chartered Accountants (the "<u>NNIR Administrator</u>"), serving as administrators in the UK Proceedings (the UK Administrator and the NNIR Administrator collectively, the "<u>Joint Administrators</u>"); and

WHEREAS, subsequent to the Filing Date, NNSA commenced secondary insolvency proceedings within the meaning of Article 27 of the European Union's Council Regulation (EC) No 1346/2000 on Insolvency Proceedings in the Republic of France pursuant to which a liquidator (the "<u>NNSA Liquidator</u>") and an administrator (the "<u>NNSA Administrator</u>") have been appointed by the Versailles Commercial Court (Docket No. 2009P00492) for NNSA; and

WHEREAS, prior to the Filing Date, certain members of the Nortel Group made quarterly payments (the "<u>Transfer Pricing Payments</u>") to other Nortel Group entities pursuant to a transfer pricing methodology ("<u>Transfer Pricing</u>") provided for in the Transfer Pricing Agreements, where "<u>Transfer Pricing Agreements</u>" means (i) the Master Research and Development Agreement dated as of December 22, 2004 (as amended by, and together with the

This is Exhibit.......A.........referred to in the
affidavit of....John Doolittle...........
sworn before me, this.....22nd.................
day of...June........................20.0.9.

.....J.J. Connelly  M. Dufty......
A COMMISSIONER FOR TAKING AFFIDAVITS

related understandings contained in, the documents listed in Annex A hereto, the "Master R&D Agreement") and (ii) certain distribution agreements, whether written or oral, between one or more Nortel Group entities, including without limitation the agreements listed in Annex B hereto and any other agreements similar to the agreements listed in Annex B hereto (as amended, supplemented or otherwise modified, the "Distribution Agreements"); and

WHEREAS, notwithstanding a US$30 million payment made by NNI to NNL in January, 2009 (the "January Payment"), certain members of the Nortel Group, including, in particular, NNL, have liquidity constraints; and

WHEREAS, it should be noted that no other payments similar to the January Payment have been made between or among the Nortel Group entities since the Filing Date; and

WHEREAS, each of the Parties hereto has concluded it is appropriate and in the best interest of each to enter into this Agreement pursuant to which, *inter alia*: (i) NNI, on behalf of itself and the other US Debtors, shall settle any claims of NNL for corporate overhead and research and development costs, whether pursuant to Transfer Pricing Agreements or otherwise, incurred by NNL for the benefit of the US Debtors which NNL has asserted or could assert (without admission by the US Debtors and subject to Section 20 of this Agreement) would have been reimbursed to NNL through Transfer Pricing Payments payable by the US Debtors to the Canadian Debtors during, or with respect to, the period after the Filing Date through and including September 30, 2009 (respectively, the "Canada/US Interim Period" and the "NNI Interim Obligations") and (ii) the EMEA Debtors shall among themselves and as between one or more EMEA Debtors, on the one hand, and one or more Canadian Debtors and/or US Debtors, on the other hand, settle amounts payable and anticipated to become payable as Transfer Pricing Payments as provided for herein for the period from the Filing Date to December 31, 2009 (the "EMEA Interim Period"), in all cases subject to the terms of this Agreement; and

WHEREAS, the Parties hereto intend this Agreement to constitute a full and final settlement of all matters set forth in this Agreement, whether arising during or related to the Canada/US Interim Period or the EMEA Interim Period, as applicable; and

WHEREAS, the Parties intend to continue to meet their respective obligations to make the monthly payments in respect of the inter-company trading of goods and services by Nortel Group entities (the "Inter-Company Trading Payments") pursuant to and during the effectiveness of the group supplier protocol agreements approved in the applicable Proceedings from time to time (the "GSPAs") or pursuant to and in accordance with court orders entered in the Canadian Proceedings and the US Proceedings ("Trading Orders"); and

WHEREAS, the Official Committee of Unsecured Creditors appointed in the US Proceedings (the "Creditors' Committee") and the steering committee members of the ad hoc group of bondholders that have executed confidentiality or non-disclosure agreements with NNL (the "Bondholders' Committee") have each agreed to support this Agreement.

52

131

NOW THEREFORE, THE PARTIES HEREBY AGREE THAT:

PART A – NNI FUNDING TO NNL; SETTLEMENT MATTERS

1. Funding.

   a. NNI shall pay to NNL a sum total of US$157 million (the "Total Payment"), payable in five equal installments of US$31.4 million in accordance with the schedule attached as Annex C hereto, subject to the following limitations:

      i. the first US$131 million of the Total Payment shall be paid on an indefeasible and permanent basis (the "Permanent Payment"); and

      ii. if it is determined, pursuant to a process to be agreed upon by NNL, NNI, the Creditors' Committee and the Bondholders' Committee, that the value of the NNI Interim Obligations is less than US$187 million (being the sum of the Total Payment and the January Payment), then any such portion thereof (being the difference between US$187 million and the value of the NNI Interim Obligations so determined) in excess of US$161 million (any such portion, the "Contingent Payment") shall be repaid by NNL to NNI on October 30, 2009.

   b. NNL's obligation to repay to NNI the Contingent Payment and interest, if any, thereon, shall be secured by a charge against all of the assets of the Canadian Debtors (the "Excess Funding Charge"), which charge shall be granted by order of the Canadian Court and shall rank *pari passu* with the existing court-ordered charge in favor of Export Development Canada (the "EDC Charge"); *provided, however,* that if the EDC Charge is extinguished, then in such case the Excess Funding Charge shall be a second-ranking charge in the Canadian Proceedings, subordinate only to the Administration Charge (and in the case of the Carling Facility, the Carling Facility Charges), and such Excess Funding Charge shall not rank *pari passu* with any other charge that exists or may be granted in the Canadian Proceedings. For the purposes of this provision, the terms "Administration Charge," "Carling Facility" and "Carling Facility Charges" shall have the same meaning as ascribed to each such term in the initial order granted by the Canadian Court on the Filing Date in the Canadian Proceedings, as amended and restated from time to time (the "Canadian Initial Order").

   c. Simple interest shall be payable on the Contingent Payment at the time of repayment at a rate of 10% per annum and shall accrue from the date of NNL's receipt of the Contingent Payment to, but not including, the date of repayment.

   d. Upon payment in full of the Contingent Payment and any accrued interest thereon, the Excess Funding Charge shall be automatically extinguished.

53

132

2. Use of Funds; Reporting.

    a. NNL has informed NNI, the Creditors' Committee and the Bondholders' Committee, that NNL intends to use the funds from the Total Payment for working capital and those other purposes as reflected in the 13 Week CF Forecast (as defined below) (the "Permitted Uses"). To the extent NNL seeks to use funds from the Total Payment for purposes other than the Permitted Uses, NNL must obtain the consent for such uses from NNI, the Creditors' Committee and the Bondholders' Committee.

    b. NNL and NNI shall continue to provide to the Creditors' Committee and the Bondholders' Committee, on a weekly basis, (i) rolling 13-week cash flow forecasts (each, a "13 Week CF Forecast"), and (ii) reports on actual weekly cash flow results. NNL further agrees to provide, to the extent not already provided in accordance with the foregoing sentence, each of NNI, the Creditors' Committee and the Bondholders' Committee with a cash flow schedule showing payments for the preceding monthly period and the use of proceeds from the Total Payment to the extent received by NNL, such schedule to be provided no later than the tenth day following the last day of each month commencing with the cash flow schedule for June 2009 and ending with the cash flow schedule for September 2009.

3. Maximum Payment; Full and Final Settlement. The sum of the Total Payment and the January Payment (being US$187 million) represents (A) the maximum payment that the US Debtors may or could owe in respect of the NNI Interim Obligations, (B) the maximum administrative claim (or such other applicable priority claim) that any of the Debtors (excluding the US Debtors) may have or could assert against one or more US Debtors in any Proceedings with respect to the NNI Interim Obligations, whether pursuant to Sections 503 and 507 of the Bankruptcy Code or otherwise, and (C) constitutes a full and final settlement of any and all NNI Interim Obligations. Each of NNL and the other Canadian Debtors hereby agrees to indemnify, defend and hold harmless each US Debtor from and against any and all actions, suits, claims, proceedings, costs, damages, losses, liabilities, judgments, amounts, fines, penalties, levies, compensations paid in settlement (provided NNL has agreed in writing to any such settlement or such settlement has been approved pursuant to a final court order), and expenses (including without limitation reasonable attorneys' fees and disbursements) resulting from a claim, demand, lawsuit, action or proceeding relating to, arising from or in connection with Transfer Pricing Payments for the calculation period in the applicable Transfer Pricing Agreements in respect of the Canada/US Interim Period.

4. Settlement of Motions. It is expressly understood that Part A of this Agreement is intended to constitute a full and final settlement of all of the matters set forth in Part A of this Agreement whether arising during, or related to, the Canada/US Interim Period, including, without limitation, any funding motions of the Canadian Debtors and the US Debtors scheduled to be heard by the Canadian Court and the US Court on June 29 and 30, 2009 or such later date or dates as might be agreed or ordered.

A
133

5. <u>True-up Obligations</u>. NNL agrees to use commercially reasonable efforts to recover from Nortel Group entities, other than the Debtors (collectively, "<u>Other Nortel Group Companies</u>"), Transfer Pricing Payments that are determined to be owed to the Canadian Debtors by Other Nortel Group Companies with respect to the Canada/US Interim Period (the "<u>ONGC Costs</u>"). Solely to the extent that the Canadian Debtors actually receive funds in respect of the ONGC Costs from the Other Nortel Group Companies in excess of the amounts provided in the Canadian Debtors' forecast, based on that certain March 2009 Financial Outlook dated April 14, 2009 previously furnished to the Parties, from the Other Nortel Group Companies that are payors, with respect to such ONGC Costs (the "<u>Excess Recoveries</u>"), and it is also determined, pursuant to the process referred to in Section 1.a.ii above, that the value of the NNI Interim Obligations is less than US$161 million (such difference, the "<u>Overage Amount</u>"), the Canadian Debtors shall, in addition to any payments made or required to be made in accordance with Section 1.a.ii. above, pay U.S. Pro Rata Excess Recoveries (as defined below) to NNI, on behalf of the US Debtors, in an aggregate amount no greater than the lesser of (i) the Overage Amount, and (ii) US$30 million (the "<u>Maximum Overage Repayment</u>") within 30 days of the date of determination thereof; *provided, however,* that some or all of such payment shall not be made to the extent that such payment would, in the reasonable and sole judgment of the Monitor, after consultation with the Creditors' Committee and the Bondholders' Committee, materially and adversely impact the liquidity position of NNL, based on a pro forma 13 Week CF Forecast (giving pro forma effect to such payment) prepared by NNL, with assistance from the Monitor, and provided in advance of such decision by the Monitor to the Creditors' Committee and the Bondholders' Committee (the "<u>NNL Liquidity Review Procedures</u>"). The unpaid balance, if any, of the Maximum Overage Repayment shall be carried forward and shall be payable out of future U.S. Pro Rata Excess Recoveries actually received by the Canadian Debtors from Other Nortel Group Companies that are payors, subject to the NNL Liquidity Review Procedures outlined above, until paid in full. For the purposes of this Section, "<u>U.S. Pro Rata Excess Recoveries</u>," as of any date of determination shall equal the product of (i) the Excess Recoveries as of such date of such determination (excluding any Excess Recoveries in respect of which NNI has been paid U.S. Pro Rata Excess Recoveries in accordance with this Section 5) and (ii) a fraction (x) the numerator of which shall equal US$161 million <u>minus</u> the Overage Amount and (y) the denominator of which shall equal the aggregate amount of Transfer Pricing Payments payable or paid to the Canadian Debtors by Nortel Group entities (excluding the Canadian Debtors) that are payors for the Canada/US Interim Period (rounded to four decimal points).

## PART B – EMEA SELF-FUNDING; SETTLEMENT MATTERS

6. <u>Administration; Funding</u>.

   a. NNUK is hereby irrevocably authorized to seek payment for its own account from other EMEA Debtors of Transfer Pricing Payments owed, or as such payments become due, under the relevant Transfer Pricing Agreements during, or with respect to, the EMEA Interim Period which would otherwise be made to or administered by NNL, in consideration of the full and final settlement set out in Section 8 below. Each of the EMEA Debtors hereby appoints NNUK as its agent

134

(without liability, including as to failure of any EMEA Debtor to make any Transfer Pricing Payment) to administer the collection and pro rata distribution of the Transfer Pricing Payments received, solely with respect to the EMEA Interim Period, as detailed on <u>Annex D</u> hereto. Each of the EMEA Debtors agrees that the payments set out in <u>Annex D</u> shall be made to NNUK in cleared funds and without set-off, in consideration of the matters set out in this Agreement, within 30 days of the date hereof, except as otherwise agreed between any EMEA Debtor and NNUK. To the extent that any EMEA Debtor breaches any obligation to make its Transfer Pricing Payment with respect to the EMEA Interim Period, only NNUK and none of NNL, NNI or any of their other affiliates shall have any claim against such defaulting EMEA Debtor for such payment and no EMEA Debtor shall have any claim against NNL, NNI or any of their affiliates (other than such EMEA Debtor) for such payment.

b.  Subject to the terms of this Agreement (including without limitation Sections 12.a. and 13.b. of this Agreement), NNL shall pay to NNUK the sum of US$10 million (the "<u>First Shortfall Payment</u>"), such amount to be paid out of the sale proceeds allocated to, and actually received by, NNL from the sale of assets entered into subsequent to the date hereof where the aggregate amount of one or more allocations of sale proceeds to NNL from such sale (after taking into account all purchase price adjustments, taxes and other transaction costs, and excluding the amount of any holdback or escrow for indemnification or otherwise) exceeds the amount previously communicated to the Joint Administrators by NNL in a letter dated the date hereof (with copies to the Monitor, the Creditors' Committee and the Bondholders' Committee) and such communication having been counter-signed by the Joint Administrators (such sale, a "<u>Material Asset Sale</u>"); *provided, however,* that some or all of such payment shall be subject to NNL Liquidity Review Procedures (in this case, however, the NNL Liquidity Review Procedures shall provide the UK Administrator with the same information and consultation rights as provided to the Creditors' Committee and the Bondholders' Committee under the procedures set forth in Section 5 of this Agreement and shall give pro forma effect to such payment and take into account any payments actually received by NNL in connection with such Material Asset Sale).

c.  Subject to the terms of this Agreement (including without limitation Sections 12.a. and 13.b. of this Agreement), NNL shall pay to NNUK the sum of US$10 million (the "<u>Second Shortfall Payment</u>" and together with the First Shortfall Payment, the "<u>Shortfall Payments</u>"), such amount to be paid out of the sale proceeds of a Material Asset Sale allocated to, and actually received by, NNL; *provided, however,* that some or all of such payment shall be subject to NNL Liquidity Review Procedures (modified as set forth in Section 6.b. above).

d.  The unpaid balance of the Shortfall Payments, if any, shall be carried forward and shall be paid in full or in part to NNUK on the earlier of the date or dates that, (i) in the reasonable and sole judgment of the Monitor, upon consultation with the Creditors' Committee and the Bondholders' Committee, after the

6

50

135

application of the NNL Liquidity Review Procedures (giving pro forma effect to such payment) such payment would not materially and adversely impact the liquidity position of NNL, and (ii) sale proceeds are allocated to, and actually received by, NNL from one or more subsequent Material Asset Sales, subject to the NNL Liquidity Review Procedures (giving pro forma effect to such payment and taking into account the payments actually received by NNL in connection with such Material Asset Sales), until paid in full. The obligation relating to the Shortfall Payments shall be an obligation of NNL only and of no other entity within the Nortel Group. Until the Shortfall Payments have been fully paid, NNL shall (i) promptly notify NNUK of the signing and closing of any Material Asset Sale, (ii) provide material information regarding such Material Asset Sale as may be reasonably requested by the UK Administrator, and (iii) upon actual receipt of sale proceeds from such Material Asset Sale, NNL shall promptly inform NNUK of the calculation and allocation of the sale proceeds from such Material Asset Sale to NNL. For the avoidance of doubt, any Shortfall Payments relating to any Material Asset Sale shall not be used as any basis for claiming that the purchase price allocation to NNUK in respect of such Material Asset Sale has been satisfied in whole or in part, and the Shortfall Payments shall not be excluded from the total amount of sale proceeds available for allocation to the relevant parties to such Material Asset Sale.

e.  NNL's obligation to make the Shortfall Payments shall be secured by a charge against all of the assets of the Canadian Debtors (the "Shortfall Charge"), which charge shall be granted by order of the Canadian Court and shall at all times rank *pari passu* with the Inter-company Charge (as defined in the Canadian Initial Order and as modified from time to time, including without limitation any modifications relating to the priority of such charge). Without prejudice to the previous sentence, NNUK hereby acknowledges that any current or future charges that have been, or may be, granted to the US Debtors in connection with any funding provided by the US Debtors to the Canadian Debtors may, or could, be senior to the Shortfall Charge, and consents to such charges being senior to the Shortfall Charge.

f.  The Canadian Debtors and the EMEA Debtors hereby confirm that the Shortfall Payments resulted from arm's length negotiations among such Parties.

g.  In the event of any breach of Section 12.a. in connection with the Subject Transaction by any EMEA Debtor, NNL's obligation to make any Shortfall Payments shall be automatically forfeited, and the Shortfall Payments shall not be payable pursuant to Sections 6.b. and 6.c. of this Agreement under any circumstances. In addition, in such circumstances the Shortfall Charge shall be automatically extinguished.

h.  The Canadian Debtors and the EMEA Debtors hereby confirm that the calculation of the payments set forth in Annex D resulted from arm's length negotiations among such Parties and are based on principles to fairly allocate profits and costs among the EMEA Debtors.

7

136

7. Covenants.

    a. [left intentionally blank].

    b. In respect of NNSA, the EMEA Debtors shall use commercially reasonable efforts to obtain (i) within 30 days of the date hereof, a letter from the NNSA Administrator and the NNSA Liquidator (to the extent legally required) authorizing the UK Administrator to bind NNSA to all provisions of this Agreement applicable to an EMEA Debtor, other than Sections 11.a., 11.b. and 12 of this Agreement, and (ii) within 45 days of the date hereof, a letter from the NNSA Administrator and the NNSA Liquidator (to the extent legally required) authorizing the UK Administrator to bind NNSA to Sections 11.a., 11.b. and 12 as applicable to an EMEA Debtor. The EMEA Debtors hereby agree to provide copies of such letters, upon receipt, to NNL (on behalf of the Canadian Debtors), NNI (on behalf of the US Debtors), the Creditors' Committee and the Bondholders' Committee.

8. Maximum Payment; Full and Final Settlement. Except with respect to the obligation of NNL to make the Shortfall Payments as herein provided, this Agreement shall constitute a full and final settlement of any and all Transfer Pricing Payments owing and that may, or could be, owing between (i) the EMEA Debtors *inter se*, and (ii) an EMEA Debtor, on the one hand, and a Canadian Debtor or a US Debtor, on the other hand, as Transfer Pricing Payments under the Transfer Pricing Agreements for all calculation periods or parts thereof within the EMEA Interim Period including, without limitation, any subsequent determination by any revenue authority with respect to the EMEA Interim Period giving rise to any subsequent liability to taxation of any Party hereto. Upon payment of the Shortfall Payments in full, the Shortfall Charge shall be automatically extinguished.

9. Settlement of Claims Between the US/Canadian Debtors and the EMEA Debtors. It is expressly understood that Part B of this Agreement is intended to constitute a full and final settlement of all of the matters between the US and Canadian Debtors, on the one hand, and the EMEA Debtors, on the other hand, set forth in Part B of this Agreement whether arising during, or related to, the EMEA Interim Period.

PART C – PROVISIONS OF GENERAL APPLICATION

10. Scope of this Agreement. The Parties hereto agree that:

    a. this Agreement is not, and shall not be deemed to be, an acknowledgement by any Party of the assumption, ratification, adoption or rejection of the Transfer Pricing Agreements or any other Transfer Pricing methodology employed by the Nortel Group or its individual members for any purpose nor shall it be determinative of, or have any impact whatsoever on, the allocation of proceeds to any Debtor from any sale of assets of the Nortel Group; and

    b. this Agreement shall not have any effect on any claims as to amounts owed or purported to be owed to or by any Party, either: (i) prior to the Filing Date, or (ii)

8

after the Canada/US Interim Period or the EMEA Interim Period, as applicable; *provided, however,* the Parties agree, except as specifically provided herein, that payments required hereunder shall be made in accordance with the terms hereof regardless of any actual or purported right of offset or other defense; and

c.  this Agreement shall not serve as the basis for any claim by any Party against any other Party in respect of Transfer Pricing or any other theory of cost reimbursement in respect of any period prior to or after the Canada/US Interim Period or the EMEA Interim Period, as applicable, or allocation of any sale proceeds, or any ownership of intellectual property; and

d.  each Party approves all payments to be made pursuant to this Agreement and all other matters contemplated hereby, to the extent that such Party is a creditor of the Party making such payment; and

e.  this Agreement is without prejudice to any provision of the Master R&D Agreement, except full and final settlement in relation to Transfer Pricing Payments with respect to the Canada/US Interim Period or the EMEA Interim Period, as applicable, as set out herein; and

f.  this Agreement is without prejudice to any Party's claims relating to Inter-Company Trading Payments, whether pursuant to the GSPAs or the Trading Orders; *provided, however,* that upon satisfaction of the Conditions, it is expressly understood and agreed that the GSPAs do not require, and shall be deemed not to have required, any Party to make Transfer Pricing Payments.

11. Relinquishment of Intellectual Property Licenses.

a.  Each of the US Debtors and the EMEA Debtors hereby agrees to enter into an Appropriate License Termination (as defined below) with respect to the licenses and rights granted by NNL to such Debtors under or pursuant to the provisions of the Master R&D Agreement (such licenses and rights, the "IP Licenses") for the purpose of facilitating, and in consideration of a right to an allocation, to be determined in accordance with this Section 11, to such Debtors of portions of the sale proceeds from, the sale of any material assets of any of the Canadian Debtors and/or the US Debtors to a third party (an "Asset Sale"); *provided, however,* that (x) in the case of the US Debtors, no Appropriate License Termination shall be effective without the prior written consent of the Creditors' Committee and the Bondholders' Committee (which consent in each case shall not be unreasonably withheld), and (y) in the case of the EMEA Debtors, Appropriate License Terminations shall be limited to only those Asset Sales where the project name of the referenced proposed transaction or/and the description of the scope of assets, businesses and technologies covered by such Asset Sales have been previously communicated to the Joint Administrators by NNL in a letter dated the date hereof (with copies to the Monitor, the Creditors' Committee and the Bondholders' Committee) and such communication having been counter-signed by the Joint Administrators.

9

59
138

b.  For the purposes of this Agreement, the term "Appropriate License Termination" means an agreement to be entered into between NNL, the US Debtors and the EMEA Debtors, providing, effective as of the date of closing of each Asset Sale, (i) for the termination of the IP Licenses (including the right to sublicense) with respect only to any intellectual property used in or related to the businesses or assets being sold in that Asset Sale (the "Transaction IP"); (ii) for the grant by NNL or for the procurement by NNL of the grant by the relevant purchaser of the Transaction IP, as applicable, of a non-exclusive license or sublicense, as applicable, to the EMEA Debtors permitting each such EMEA Debtor to use the Transaction IP to the extent necessary for such Debtor to continue, for the purposes of winding-down its business, the use of such Transaction IP (except for any Transaction IP that is used exclusively in or relates exclusively to the businesses or assets which are the subject of that Asset Sale), as such Transaction IP is being used by such Debtor as of the date of closing of such Asset Sale and only in connection with the types of products and services sold or provided by such Debtor as of that date, including to perform such Debtor's obligations under any customer contract or end user contract that is in existence as of the date of closing of such Asset Sale and is not assigned to the purchaser in such Asset Sale, solely as such contract and such obligations are in effect as of that date (the "Existing Customer Contract"), with the right to sublicense the Transaction IP to such customers (but not to any person or entity which is not a customer of such Debtor as of the date of closing of such Asset Sale) to the extent required under the applicable Existing Customer Contract; (iii) that the foregoing non-exclusive license shall terminate on the date of termination of the applicable Existing Customer Contract (except to the extent that such license remains in effect with respect to the performance of any other Existing Customer Contracts), it being understood that the term of the Existing Customer Contract shall not be extended or renewed beyond its scheduled expiry date except to the extent any automatic extension rights are in effect at the date of closing of such Asset Sale that may be exercised solely at the option of the other party to the relevant Existing Customer Contract without the consent of the Debtor party to such Contract; *provided, however,* that in the event of such automatic extension such Debtor shall be required to seek to terminate the Existing Customer Contract as soon as possible in accordance with the terms of such Existing Customer Contract; and (iv) that the Appropriate License Termination shall not affect the ownership rights that such Debtors and NNL may have to any intellectual property.  For the avoidance of doubt, the Appropriate License Termination will not be deemed to be or result in an expiry or termination of the Master R&D Agreement.

c.  The Parties hereby agree that, within a reasonable period of the date hereof, the Debtors shall negotiate in good faith and attempt to reach agreement on a timely basis on a sample form agreement to effectuate an Appropriate License Termination, such form to include more specific details as to the scope of "used in or related to", as used in clause (i) of the definition of the term "Appropriate License Termination."  In addition, the Parties hereby agree that such sample form agreement shall have additional provisions that the Parties deem appropriate and customary for such license termination agreements.

10

6C
139

    d.  Where any Debtor enters into any Appropriate License Termination in accordance with the provisions of this Section 11, such Debtor shall be deemed to be a Selling Debtor, and the proceeds of such Asset Sale shall be deemed to be Sale Proceeds, for the purposes of Sections 12.b. and 12.d., and Sections 12.b. and 12.d. shall apply accordingly.

12. Entry into Sale Transactions.

    a.  Each Debtor hereby agrees that its execution of definitive documentation with a purchaser (or, in the case of any auction, the successful bidder in any such auction) of, or closing of any sale of, material assets of any of the Debtors to which such Debtor (a "Selling Debtor") is proposed to be a party (each, a "Sale Transaction") shall not be conditioned upon such Selling Debtor reaching agreement with the other Selling Debtors regarding (A) allocation of the sale proceeds ("Sale Proceeds") from the relevant Sale Transaction or (B) the binding procedure for the allocation of Sale Proceeds from the relevant Sale Transaction.

    b.  Pending the distribution of the Sale Proceeds as described in the second sentence of this Section 12.b., the entire amount of the Sale Proceeds (less applicable transfer or value-added taxes and, to the extent agreed by the Selling Debtors, transaction costs) shall be deposited in an escrow account pursuant to an escrow agreement, the terms of which shall be negotiated and agreed by all Selling Debtors, in each case acting reasonably (the "Escrow Account"). In no case shall there be any distribution from the Escrow Account in advance of either (i) agreement of all of the Selling Debtors or (ii) in the case where the Selling Debtors fail to reach agreement, determination by the relevant dispute resolver(s) under the terms of the Protocol (as defined below) applicable to the Sale Proceeds, and subject in each case to payment of the agreed or determined amount of allocation of Sale Proceeds to all Selling Debtors.

    c.  Without derogating from the obligations provided in Section 12.a., the Debtors shall, as soon as reasonably practicable following the execution of this Agreement, negotiate in good faith and attempt to reach agreement on a timely basis on a protocol for resolving disputes concerning the allocation of Sale Proceeds from Sale Transactions (the "Interim Sales Protocol"), which Protocol shall provide binding procedures for the allocation of Sales Proceeds where the Selling Debtors in such Sale Transaction have been unable to reach agreement regarding such allocation.

    d.  The Selling Debtors shall, immediately following entry into any Sale Transaction, negotiate in good faith and on a timely basis to attempt to reach agreement regarding the allocation of the Sale Proceeds from such Sale Transaction within a reasonable period of time or as may be otherwise provided in the Interim Sales Protocol, failing which the Interim Sales Protocol shall apply to determine the allocation of the relevant Sale Proceeds.

ⓛ
140

e. Notwithstanding any other provision of this Section 12, (i) no Debtor shall be required to enter into a Sale Transaction so long as such Debtor reasonably determines, acting in good faith and after consultation with the other Parties to this Agreement, that such Sale Transaction is not in the best economic interests of its creditors generally, and (ii) it is expressly acknowledged by all Debtors that, in relation to any Sale Transaction, neither (A) any matter in the course of negotiation with any prospective purchaser, nor (B) any discussion of, or agreement in relation to, the sharing of liabilities relating to such Sale Transaction (which include severance and other restructuring costs of each Selling Debtor) and sharing of transaction costs relating to such Sale Transaction (which include break fees and indemnification escrow accounts) between the Selling Debtors shall constitute a breach of Section 12.a. of this Agreement.

f. Nothing in this Section 12 shall prejudice the rights of any Party, or otherwise constitute an amendment, modification or waiver of the rights of any Party, to seek its entitlement to Sale Proceeds from any Sale Transaction.

g. For the purposes of Sections 11.c. and 12.a. through 12.f. (inclusive):

   i. the US Debtors hereby agree that with respect to any of the matters referred to in such Sections as to which the agreement or determination of any of the US Debtors is required, the US Debtors shall include the Creditors' Committee and the Bondholders' Committee in any negotiations on such issues with the other Debtors or any related proceedings and any agreement or determination by the US Debtors shall require the prior consent of the Creditors' Committee and the Bondholders' Committee acting in good faith; and

   ii. the Canadian Debtors hereby agree that with respect to any of the matters referred to in such Sections as to which the agreement or determination of any of the Canadian Debtors is required, the Canadian Debtors shall include the Bondholders' Committee in any negotiations on such issues with the other Debtors or any related proceedings and any agreement or determination by the Canadian Debtors shall require the prior consent of the Bondholders' Committee acting in good faith and the Monitor.

13. Effectiveness.

a. No provision of this Agreement (other than as set forth in Section 13.f. of this Agreement) shall be effective until the satisfaction of the following conditions: (A) each of the US Court and the Canadian Court approving the entirety of this Agreement and all of the provisions hereof (the "North American Court Condition"), (B) the UK Court giving a direction (the "UK Court's Directions") that, if so sought, the Joint Administrators be at liberty to enter into this Agreement (the "UK Court Condition" and, together with the North American Court Condition, the "Court Approval Condition"); *provided, however,* the Joint Administrators may at their election waive the UK Court Condition, and (C) the

12

62
141

Canadian Court and the US Court approving amendments to the cross-border protocol previously approved by the US Court and the Canadian Court (as may be in effect from time to time, the "Cross-Border Protocol") that are mutually satisfactory to NNL (on behalf of the Canadian Debtors), NNI (on behalf of the US Debtors), the Monitor, the Creditors' Committee and the Bondholders' Committee (the "Cross-Border Protocol Condition", and together with the Court Approval Condition, the "Conditions").

b.  Upon satisfaction of each of the Conditions, all provisions of this Agreement, other than Sections 6.b., 6.c., 6.d., 6.e. and 6.f. of this Agreement, shall be effective as of the date of the satisfaction of the last Condition. Upon execution of the transaction documents relating to the Subject Transaction, Sections 6.b., 6.d., 6.e. and 6.f. of this Agreement shall be effective (except that the term "Shortfall Payments" as used in Sections 6.d., 6.e. and 6.f. shall mean only the First Shortfall Payment until Section 6.c. shall become effective). Upon agreement among the various sellers under the Subject Transaction and the Creditors' Committee and the Bondholders' Committee with regards to (A) the allocation of sale proceeds from the Subject Transaction or (B) the binding procedure for the allocation of sale proceeds from the Subject Transaction, Section 6.c. of this Agreement shall be effective. For the purposes of this Agreement, "Subject Transaction" means the first sale of any material assets of any one or more of the Debtors of each of (i) the Canadian Debtors, (ii) the US Debtors and (iii) the EMEA Debtors (excluding, for the avoidance of doubt, any sale where the involvement of the EMEA Debtors is solely limited to Appropriate License Terminations).

c.  Notwithstanding any of the foregoing, if (i) (x) the UK Court Condition is neither satisfied nor waived by the Joint Administrators in accordance with the terms of Section 13.a. and (y) the Canadian Court and the US Court approve this Agreement, and (ii) the Cross-Border Protocol Condition is fully satisfied, then Part A of this Agreement and those provisions of Part C applicable to Part A shall be effective with regards to the Canadian Debtors and the US Debtors.

d.  Each Party hereto shall:

   i.   use commercially reasonable efforts to satisfy the Conditions as soon as possible, taking into account the availability of the respective Courts to address the matters set forth in this Agreement;

   ii.  keep all other Parties, the Creditors' Committee and the Bondholders' Committee reasonably apprised of the progress of the satisfaction of the Conditions and provide such other information regarding the satisfaction of the Conditions as reasonably requested by other Parties; and

   iii. use commercially reasonable efforts to allow any other Party, the Creditors' Committee or the Bondholders' Committee which so requests in writing reasonable participation in connection with any proceedings in

13

142

any Court related to the satisfaction of the Conditions; *provided, however,* that no Canadian Debtor or US Debtor shall have any obligation to facilitate the participation by the Joint Administrators or the EMEA Debtors in any proceedings related to the satisfaction of the Cross-Border Protocol Condition; and *provided further* that the foregoing proviso shall not constitute an amendment, modification or waiver of rights of the Joint Administrators and the EMEA Debtors to participate in any court proceedings where they would be entitled to otherwise participate.

e. If the Joint Administrators elect to seek the UK Court's Directions, then the EMEA Debtors shall (A) use commercially reasonable efforts to obtain the UK Court's Directions as soon as possible, taking into account the availability of the UK Court, (B) keep all other Parties, the Creditors' Committee and the Bondholders' Committee reasonably apprised of the progress of the efforts to obtain UK Court's Directions and provide such other information regarding the efforts to obtain UK Court's Directions as reasonably requested by other Parties, and (C) use commercially reasonable efforts to allow any other Party, the Creditors' Committee or the Bondholders' Committee which so requests in writing reasonable participation in connection with any proceedings in the UK Court related to the UK Court's Directions.

f. Notwithstanding any of the foregoing, the following provisions of the Agreement shall be effective as of the date hereof: Sections 7.b., 11.c., 12.c., 12.g., 13.d, 13.e., 13.f.,15 – 19, and 21 – 23.

14. Term. This Agreement shall expire on December 31, 2009 (the "Expiration Date"). Upon termination, the Parties' rights and obligations, except in respect of the obligations under Sections 1, 2, 3, 4, 5, 6, 8, 9, 10, 11, 12, 14, 15, 16, 17, 20, 21 and 22 of this Agreement (but only to the extent that these provisions were effective in accordance with Section 13 of this Agreement prior to the Expiration Date) shall cease immediately but without prejudice to the rights and obligations of the Parties existing before termination.

15. Amendments. This Agreement may be amended, on no less than 10 Business Days' notice, only by means of a writing signed by all Parties, and approved by the Creditors' Committee and the Bondholders' Committee, which amendments, if material in the judgment of the Parties, must be approved by all of the Courts that initially approved this Agreement or gave directions in respect of this Agreement (in the case of the UK Court). For the purpose of this Section 15, "Business Day" shall mean a day that is not a Saturday, Sunday or national public holiday in Canada, the United States or the United Kingdom.

16. Governing Law and Jurisdiction.

a. This Agreement shall be governed exclusively by the laws of the State of New York without regard to the rules of conflict of laws of the State of New York or any other jurisdiction; *provided, however,* that Section 17 shall be governed exclusively by English law.

b. To the fullest extent permitted by applicable law, each Party (i) agrees to submit to the non-exclusive jurisdiction of the US and Canadian Courts (in a joint hearing conducted under the Cross-Border Protocol adopted by such Court, as it may be in effect from time to time), for purposes of all legal proceedings to the extent relating to the matters agreed in this Agreement (but not, for the avoidance of doubt, any Transfer Pricing Agreement matter generally), (ii) agrees that any claim, action or proceeding by such Party seeking any relief whatsoever to the extent relating to the matters agreed in this Agreement must be commenced in the US Court if such claim, action or proceeding would solely affect the US Debtors, the Canadian Court if such claim, action or proceeding would solely affect the Canadian Debtors, a joint hearing of both the Canadian and US Courts conducted under the Cross-Border Protocol if such claim, action or proceeding would affect the Canadian Debtors and the US Debtors or the EMEA Debtors and the English courts if such claim, action or proceeding would solely affect the EMEA Debtors, (iii) waives and agrees not to assert any objection that it may now or hereafter have to the laying of the venue of any such action brought in such a Court or any claim that any such action brought in such a Court has been brought in an inconvenient forum, (iv) agrees that mailing of process or other papers in connection with any such action or proceeding or any other manner as may be permitted by law shall be valid and sufficient service thereof, and (v) agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by applicable law; *provided, however*, that any claim, action or proceeding set forth in Section 17 of this Agreement shall be brought exclusively in the English courts.

17. No Personal Liability of the Joint Administrators.

a. The Parties agree that the Joint Administrators have negotiated and are entering into this Agreement as agents for the EMEA Debtors to which they are appointed and that none of the Joint Administrators, their firm, partners, employees, advisers, representatives or agents shall incur any personal liability whatsoever whether on their own part or in respect of any failure on the part of any Nortel Group company to observe, perform or comply with any of its obligations under this Agreement or under or in relation to any associated arrangements or negotiations.

b. The Joint Administrators are a Party to this Agreement: (i) as agents of certain of the respective EMEA Debtors of which they are administrators; and (ii) in their own capacities solely for taking the benefit of the statutory charges under Paragraph 99(3) of Schedule B1 of the United Kingdom Insolvency Act 1986 and enforcing the obligations of certain other Parties to this Agreement.

c. Notwithstanding anything in Section 16, any claim, action or proceeding against the Joint Administrators in their personal capacities (and not as agents for any EMEA Debtors) under this Agreement shall be governed exclusively by English law and subject to the exclusive jurisdiction of the English Courts.

15

65

144

18. Creditors' Committee and Bondholders' Committee Support.

    a. Written confirmation has been received from the Creditors' Committee confirming that the members of the Creditors' Committee, after thorough review and due deliberation of this Agreement, have voted, in compliance with the by-laws of the Creditors' Committee, in favor of supporting this Agreement and have granted permission to their advisors to file appropriate materials with the applicable Courts in support of the motions by the Debtors for Court approval of this Agreement.

    b. Written confirmation has been received from the counsel to the Bondholders' Committee confirming that the Bondholders' Committee has granted permission to its advisors to file appropriate materials with the applicable Courts in support of the motions by the Debtors for Court approval of this Agreement.

19. Representations and Warranties.

    a. Subject to satisfaction of the Court Approval Condition, each Party (but, for the avoidance of doubt, not the Joint Administrators in their personal capacities) hereby severally represents and warrants to each other that, as of the date hereof:

        i. it has the power and authority to enter into this Agreement and to carry out its obligations hereunder;

        ii. the execution of this Agreement, and the consummation of the transactions contemplated herein, have been authorized by all necessary approvals, and no other act or proceeding on its part is necessary to authorize the execution of this Agreement; and

        iii. this Agreement has been duly executed by it and constitutes its legal, valid and binding obligations.

    b. Other than entities in or related to the regions of Asia / Pacific, Central and South America, NNSA and Nortel Networks A.G., each Party hereby severally represents and warrants to each other Party that, to the best of such Party's knowledge based on due and reasonable inquiry, including of NNL, it is not party to any Transfer Pricing Agreement with any other Nortel Group entity other than as set forth in this Agreement.

20. Reservation of Rights. Nothing in this Agreement shall constitute an amendment, modification or waiver of rights of any Party (i) under any other agreement, including, without limitation, the GSPAs and the Transfer Pricing Agreements (except as expressly set forth in Sections 3 and 8 of this Agreement), applicable law or otherwise, including, without limitation, the right to object to the propriety of any payments made under or in connection with the Transfer Pricing Agreements or any offset arising therefrom or otherwise or (ii) with respect to any potential tax contingencies, assessments, rulings or agreements arising from Transfer Pricing Payments pursuant to the Transfer Pricing Agreements or any offset arising therefrom or otherwise; *provided, however, that the*

66
145

Parties waive any and all rights to object to or otherwise seek to amend or revisit (A) any payments made pursuant to this Agreement, except that (a) NNI and NNL do not waive their rights to the extent required to allow NNI to enforce its rights against NNL pursuant to Sections 1.a.ii. and 5 of this Agreement, and (b) NNUK does not waive its rights to the extent required to allow NNUK to enforce its rights against NNL pursuant to Section 6 of this Agreement, and (B) the January Payment. The use of the term Transfer Pricing Payment (or any similar term) or reference to the Transfer Pricing Agreements (or similar agreement) in this Agreement is for convenience only and shall have no evidentiary effect or be used by any of the Parties hereto in any proceeding to determine the pre-petition or post-petition validity, applicability, assumption, affirmation or ratification by any Party of the Transfer Pricing Agreements or any transfer pricing methodology provided in the Transfer Pricing Agreements.

21. <u>Counterparts.</u> This Agreement may be executed in separate counterparts (which may include counterparts delivered by facsimile transmission) and all of said counterparts taken together shall be deemed to be an original and shall be binding on the Party who signed the counterpart and all of which together shall constitute a single agreement.

22. <u>Severability</u>. In the event that any provision of this Agreement shall be illegal, invalid or unenforceable, such provision shall be construed by limiting it in such a way so as to render it legal, valid and enforceable to the maximum extent provided by applicable law, and the legality, validity and enforceability of the remaining provisions shall not in any way be affected or impaired by any illegality, invalidity or unenforceability of any provision. The Parties shall negotiate in good faith with respect to any provision to this Agreement found to be illegal, invalid or unenforceable, in order to agree on a substitute provision giving effect, to the maximum extent possible, to the original intent of such provision.

23. <u>Several Obligations</u>. Except as specifically set forth in this Agreement, the obligations of each Party hereunder are several, and not joint and several.

24. <u>Defunct Distributors' Covenant</u>. Each of the Debtors hereby covenants that such Debtor is not currently a party to, and shall not enter, into any arrangement pursuant to which any Transfer Pricing Payments may become payable to or by the following entities: Nortel Networks OY, Nortel Networks AB, or Nortel Networks Shannon Limited.

17

IN WITNESS WHEREOF, the Parties hereto have caused this Agreement to be duly executed and delivered as of this 9th day of June, 2009.

NORTEL NETWORKS CORPORATION

By _____
    Name: Paviter S. Binning
    Title:  Executive Vice-President,
    Chief Financial Officer and Chief
    Restructuring Officer

By _____
    Name: Tracy S. J. Connelly McGilley
    Title:   Assistant Secretary

NORTEL NETWORKS LIMITED

By _____
    Name: Paviter S. Binning
    Title:  Executive Vice-President,
    Chief Financial Officer and Chief
    Restructuring Officer

By _____
    Name: Tracy S. J. Connelly McGilley
    Title:  Assistant Secretary

NORTEL NETWORKS GLOBAL CORPORATION

By _____
    Name: Paviter S. Binning
    Title:  Director

By: _____
    Tracy S. J. Connelly McGilley
    Assistant Secretary

Signature page to Interim Funding
and Settlement Agreement

68

147

NORTEL NETWORKS INTERNATIONAL
CORPORATION

By _____
    Name: Paviter S. Binning
    Title: Director

By _____
    Tracy S. J. Connelly McGilley
    Assistant Secretary


NORTEL NETWORKS TECHNOLOGY
CORPORATION

By _____
    Name: Paviter S. Binning
    Title: Director

By: _____
    Name: Tracy S. J. Connelly McGilley
    Title:  Assistant Secretary


Signature page to Interim Funding
and Settlement Agreement

69

48

NORTEL NETWORKS INC.

By _____
 Name: John Doolittle
 Title: Vice President


ARCHITEL SYSTEMS (U.S.)
CORPORATION

By _____
 Name: John Doolittle
 Title: Vice President


CORETEK, INC.

By _____
 Name: John Doolittle
 Title: Vice President


NORTEL ALTSYSTEMS, INC.

By _____
 Name: John Doolittle
 Title: Vice President


NORTEL ALTSYSTEMS
INTERNATIONAL INC.

By _____
 Name: John Doolittle
 Title: Vice President


NORTEL NETWORKS APPLICATIONS
MANAGEMENT SOLUTIONS INC.

By _____
 Name: John Doolittle
 Title: Vice President


Signature page to Interim Funding
and Settlement Agreement

70

149

NORTEL NETWORKS CABLE
SOLUTIONS INC.

By _____
Name: John Doolittle
Title: Vice President

NORTEL NETWORKS CAPITAL
CORPORATION

By _____
Name: John Doolittle
Title: Vice President

NORTEL NETWORKS HPOCS INC.

By _____
Name: John Doolittle
Title: Vice President

NORTEL NETWORKS INTERNATIONAL
INC.

By _____
Name: John Doolittle
Title: Vice President

NORTEL NETWORKS OPTICAL
COMPONENTS INC.

By _____
Name: John Doolittle
Title: Vice President

NORTHERN TELECOM
INTERNATIONAL INC.

By _____
Name: John Doolittle
Title: Vice President

Signature page to Interim Funding
and Settlement Agreement

71
150

QTERA CORPORATION

By _____

Name: John Doolittle

Title: Vice President


SONOMA SYSTEMS

By _____

Name: John Doolittle

Title: Vice President


XROS, INC.

By _____

Name: John Doolittle

Title: Vice President

72
151

Signed by ALAN BLOOM on behalf of each
of the Joint Administrators of each of the
EMEA Debtors over which they have been
appointed, without personal liability as
provided in Section 17 of this Agreement
and solely for the purpose of obtaining the
benefit of the provisions of this Agreement
expressed to be conferred on or given to each
of the Joint Administrators

By _____

Name: _____

Title: _____

in the presence of _____

Witness Signature _____

Name:
Address: _____

SIGNED for and on behalf of NORTEL        )
NETWORKS UK LIMITED (IN                    )   ALAN BLOOM
ADMINISTRATION)                            )
by ALAN BLOOM as Joint Administrator       )
(acting as agent and without personal
liability) in the presence of:

Witness signature _____

Name: _____
Address: _____

73
152

SIGNED for and on behalf of NORTEL    )
NETWORKS (IRELAND) LIMITED    )    ALAN BLOOM
(IN ADMINISTRATION)    )
by ALAN BLOOM as Joint Administrator
(acting as agent and without personal
liability) in the presence of:

Witness signature    HELG MacNaph

Name: Helen MacNaughtan
Address: 1 mors London Pants    London S6),

SIGNED for and on behalf of NORTEL    )
NETWORKS NV (IN    )    ALAN BLOOM
ADMINISTRATION)    )
by ALAN BLOOM as Joint Administrator
(acting as agent and without personal
liability) in the presence of:

Witness signature    HELG MacNaphr

Name: Helen Macnaughtan
Address: 1 mors London Pents
London S6),

SIGNED for and on behalf of NORTEL    )
NETWORKS SPA (IN    )    ALAN BLOOM
ADMINISTRATION)    )
by ALAN BLOOM as Joint Administrator    )
(acting as agent and without personal
liability) in the presence of:

Witness signature    HELG MacNaphr

Name: Helen MacNaughtan
Address: 1 more London Pents
London S6)

74
153

SIGNED for and on behalf of NORTEL          )
NETWORKS BV (IN                            )    ALAN BLOOM
ADMINISTRATION)                            )
by ALAN BLOOM as Joint Administrator
(acting as agent and without personal
liability) in the presence of:

Witness signature

Name:
Address:

SIGNED for and on behalf of NORTEL          )
NETWORKS POLSKA SP Z.O.O. (IN              )    ALAN BLOOM
ADMINISTRATION)                            )
by ALAN BLOOM as Joint Administrator
(acting as agent and without personal
liability) in the presence of:

Witness signature

Name:
Address:

SIGNED for and on behalf of NORTEL          )
NETWORKS HISPANIA SA (IN                   )    ALAN BLOOM
ADMINISTRATION)                            )
by ALAN BLOOM as Joint Administrator
(acting as agent and without personal
liability) in the presence of:

Witness signature

Name:

75
154

10-08-2009  01:09    FRAN-RADISSON SAS STRAND HOTEL         +46              T-141  P.005/008  F-797

Address:    _(handwritten)_

**SIGNED** for and on behalf of **NORTEL**      )
**NETWORKS (AUSTRIA) GMBH (IN**                  )    **ALAN BLOOM**
**ADMINISTRATION)**                               )
by **ALAN BLOOM** as Joint Administrator          )
(acting as agent and without personal
liability) in the presence of:

Witness signature    _(handwritten)_

Name:    _(handwritten)_
Address:    _(handwritten)_


**SIGNED** for and on behalf of **NORTEL**      )
**NETWORKS SRO (IN**                              )    **ALAN BLOOM**
**ADMINISTRATION)**                               )
by **ALAN BLOOM** as Joint Administrator          )
(acting as agent and without personal
liability) in the presence of:

Witness signature    _(handwritten)_

Name:    _(handwritten)_
Address:    _(handwritten)_

76
155

SIGNED for and on behalf of NORTEL
NETWORKS ENGINEERING            )      ALAN BLOOM
SERVICES KFT (IN                )
ADMINISTRATION)                 )
by ALAN BLOOM as Joint Administrator
(acting as agent and without personal
liability) in the presence of:

Witness signature

Name:
Address:

SIGNED for and on behalf of NORTEL
NETWORKS PORTUGAL SA (IN        )      ALAN BLOOM
ADMINISTRATION)                 )
by ALAN BLOOM as Joint Administrator   )
(acting as agent and without personal
liability) in the presence of:

Witness signature

Name:
Address:

SIGNED for and on behalf of NORTEL
NETWORKS SLOVENSKO SRO (IN      )      ALAN BLOOM
ADMINISTRATION)                 )
by ALAN BLOOM as Joint Administrator   )
(acting as agent and without personal
liability) in the presence of:

Witness signature

77
156

Name: *Helen Mackington*
Address: *1 more London Place*
*London SE1.*

**SIGNED** for and on behalf of **NORTEL**
**NETWORKS ROMANIA SRL (IN**          )      **ALAN BLOOM**
**ADMINISTRATION)**                    )
by ALAN BLOOM as Joint Administrator   )
(acting as agent and without personal
liability) in the presence of:

Witness signature

Name: *Helen Mackington*
Address: *1 more London Place*
*London SE.*

**SIGNED** for and on behalf of **NORTEL**
**GMBH (IN ADMINISTRATION)**          )      **ALAN BLOOM**
by ALAN BLOOM as Joint Administrator   )
(acting as agent and without personal
liability) in the presence of:

Witness signature

Name: *Helen Mackington*
Address: *1 more London Place*
*London SE1.*

78
157

**SIGNED** for and on behalf of **NORTEL**
**NETWORKS OY (IN**
**ADMINISTRATION)**
by **ALAN BLOOM** as Joint Administrator
(acting as agent and without personal
liability) in the presence of:

)
)   **ALAN BLOOM**
)

Witness signature

Name:
Address:

**SIGNED** for and on behalf of **NORTEL**
**NETWORKS AB (IN**
**ADMINISTRATION)**
by **ALAN BLOOM** as Joint Administrator
(acting as agent and without personal
liability) in the presence of:

)
)   **ALAN BLOOM**
)

Witness signature

Name:
Address:

**SIGNED** for and on behalf of **NORTEL**
**NETWORKS INTERNATIONAL**
**FINANCE AND HOLDING BV (IN**
**ADMINISTRATION)**
by **ALAN BLOOM** as Joint Administrator
(acting as agent and without personal
liability) in the presence of:

)
)   **ALAN BLOOM**
)

Witness signature

Name:
Address:

79
158

SIGNED for and on behalf of NORTEL          )
NETWORKS FRANCE S.A.S. (IN                  )       ALAN BLOOM
ADMINISTRATION)                             )
by ALAN BLOOM as Joint Administrator        )
(acting as agent and without personal
liability) in the presence of:

Witness signature

Name:
Address:



159

**Schedule 1**

**Canadian Debtors**

Nortel Networks Corporation

Nortel Networks Limited

Nortel Networks Global Corporation

Nortel Networks International Corporation

Nortel Networks Technology Corporation

S-1

**Schedule 2**

**US Debtors**

Nortel Networks Inc.

Architel Systems (U.S.) Corporation

CoreTek, Inc.

Nortel Altsystems, Inc. (previously "Alteon WebSystems, Inc.")

Nortel Altsystems International Inc. (previously "Alteon WebSystems International, Inc.")

Nortel Networks Applications Management Solutions Inc.

Nortel Networks Cable Solutions Inc.

Nortel Networks Capital Corporation

Nortel Networks HPOCS Inc.

Nortel Networks International Inc.

Nortel Networks Optical Components Inc.

Northern Telecom International Inc.

Qtera Corporation

Sonoma Systems

Xros, Inc.

82
161

**Schedule 3**

**EMEA Debtors**

Nortel Networks UK Limited (In Administration)

Nortel Networks (Ireland) Limited (In Administration)

Nortel Networks NV (In Administration)

Nortel Networks SpA (In Administration)

Nortel Networks BV (In Administration)

Nortel Networks Polska Sp z.o.o. (In Administration)

Nortel Networks Hispania, SA (In Administration)

Nortel Networks (Austria) GmbH (In Administration)

Nortel Networks sro (In Administration)

Nortel Networks Engineering Services Kft (In Administration)

Nortel Networks Portugal SA (In Administration)

Nortel Networks Slovensko, sro (In Administration)

Nortel Networks Romania Srl (In Administration)

Nortel GmbH (In Administration)

Nortel Networks Oy (In Administration)

Nortel Networks AB (In Administration)

Nortel Networks International Finance & Holding BV (In Administration)

Nortel Networks France S.A.S. (In Administration)

162

**Annex A**

**Amendments to and Related Understandings Regarding
Master Research and Development Agreement
dated as of December 22, 2004 ("Master R&D Agreement")**

1.  Undated Addendum to Master R&D Agreement executed between October 2005 and June 2006.

2.  Agreement with Respect to Certain NN Technology effective as of December 30, 2006 (being the day before the closing date of the Share and Asset Sale Agreement between NNL and Alcatel-Lucent).

3.  Addendum to Master R&D Agreement dated December 14, 2007 with an effective date of January 1, 2006.

4.  Third Addendum to Master R&D Agreement with an effective date of January 1, 2006.

5.  Fourth Addendum to Master R&D Agreement with an effective date of December 31, 2008.

6.  Letter of acknowledgment dated January 14, 2009 from NNL to the Directors of NNUK, NNSA and NNIR and the UK Administrator.

7.  Release in Connection with Master R&D Agreement dated 1 January 2009.

8.  Memorandum of Understanding in Connection with Master R&D Agreement, undated with an effective date of 1 January 2006.

A-1

84
163

Annex B

**Distribution Agreements**

| Party | Date |
|---|---|
| Nortel Networks Limited ("NNL") and Nortel Networks N.V. | undated, effective as of 1 January 2001 |
| NNL and Nortel Networks S.p.A. | undated, effective as of 1 January 2002 (plus undated and unsigned Addendum, effective as of 1 January 2003) |
| NNL and Nortel Networks B.V. | dated 22 December 2003, effective as of 1 January 2001 |
| NNL and Nortel Networks Polska Sp. z. o. o. | undated, effective as of 1 January 2001 (letter of amendment executed in November 2003, effective as of 1 January 2001 plus Addendum executed in August 2005, effective as of 1 January 2003) |
| NNL and Nortel Networks Hispania, S.A. | undated, effective as of 1 January 2001 |
| NNL and Nortel Networks (Austria) GmbH | undated, effective as of 1 January 2001 |
| NNL and Nortel Networks, s.r.o. | dated 15 April 2003, effective as of 1 January 2001 |
| NNL and Nortel Networks Engineering Services Kft | undated, effective as of 1 January 2001 |
| NNL and Nortel Networks Portugal S.A. | undated, effective as of 1 January 2001 |
| NNL and Nortel Networks Slovensko, s.r.o. | undated, effective as of 1 January 2001 |
| NNL and Nortel Networks Romania SRL | executed 22 January 2004, effective 1 January 2003 |
| NNL and Nortel Networks AG | undated, effective 1 January 2001 |

B-1



Annex C

**Funding Schedule**

Payments pursuant to Section I.a. of this Agreement shall be paid in the following amounts and on the following dates (if the Conditions (other than the UK Court's Directions) are not satisfied by the payment dates set forth below, each such payment date shall be automatically postponed to one (1) business day after the date of satisfaction of such Conditions):

| | |
|---|---|
| June 10, 2009 | US$31,400,000.00 |
| June 15, 2009 | US$31,400,000.00 |
| July 31, 2009 | US$31,400,000.00 |
| August 31, 2009 | US$31,400,000.00 |
| September 30, 2009 | US$31,400,000.00 |
| **TOTAL** | **US$157,000,000.00** |

C-1

86
165

## Annex D

### Intra-EMEA Transfer Pricing Settlement Amounts

| EMEA Debtor | Amount payable US$m |
|---|---|
| [Nortel Networks S.A.][1] | [(4.80)] |
| Nortel Networks (Ireland) Limited | (20.84) |
| [Nortel Networks AG][1] | [(4.08)] |
| Nortel Networks Hispania SA | (1.72) |
| Nortel Networks Slovensko s.r.o | (0.52) |
| Nortel Networks Romania SRL | (0.19) |
| Nortel Networks Portugal S.A. | (1.50) |
| Nortel Networks Polska S.p.z.o.o | (8.22) |
| Nortel Networks B.V. | (17.99) |
| Nortel Networks S.p.A. | (2.73) |
| Nortel Networks Engineering Services Kft | (1.92) |
| Nortel Networks s.r.o | (2.79) |
| Nortel Networks N.V. | (6.43) |
| Nortel Networks Austria GmbH | (2.35) |

---

[1] To the extent it becomes a Party hereto.

D-1

166

| EMEA Debtor | Amount receivable US$m |
|---|---|
| Nortel Networks UK Limited | [4.80 (Nortel Networks S.A.)] [1] |
| | 20.84 (Nortel Networks (Ireland) Limited) |
| | [4.08 (Nortel Networks AG)] [1] |
| | 1.72 (Nortel Networks Hispania SA) |
| | 0.52 (Nortel Networks Slovensko s.r.o) |
| | 0.19 (Nortel Networks Romania SRL) |
| | 1.50 (Nortel Networks Portugal S.A.) |
| | 8.22 (Nortel Networks Polska S.p.z.o.o) |
| | 17.99 (Nortel Networks B.V.) |
| | 2.73 (Nortel Networks S.p.A.) |
| | 1.92 (Nortel Networks Engineering Services Kft) |
| | 2.79 (Nortel Networks s.r.o) |
| | 6.43 (Nortel Networks N.V.) |
| | 2.35 (Nortel Networks Austria GmbH) |

D-2

# APPENDIX "E"


[Attached]

167

# GUARANTEE

DATED 21 November 2006

BY

NORTEL NETWORKS LIMITED

FOR

NORTEL NETWORKS UK PENSION TRUST LIMITED
AS TRUSTEE OF THE NORTEL NETWORKS UK PENSION PLAN

CERTIFIED TO BE A TRUE AND COMPLETE
COPY OF THE ORIGINAL
DATED THIS 23rd DAY OF November 2006

Pinsent Masons...... Pinsent Masons.

**THIS GUARANTEE** is dated     21 November            2006    168

BETWEEN:

(1)     **Nortel Networks Limited** (a company registered in Canada with number 125147-3 and principal place of business at 195 The West Mall, Toronto, Ontario, M9C 5K1 ) (the "Guarantor"); and

(2)     **Nortel Networks UK Pension Trust Limited** (a company registered in England and Wales with number 2091890 whose registered office is at Maidenhead Office Park, Westacott Way, Littlewick Green, Maidenhead, Berkshire, SL6 3QH) as trustee of the Nortel Networks UK Pension Plan (the "Beneficiary").

IT IS AGREED as follows:

1.     **INTERPRETATION**

1.1     **Definitions**

In this Agreement:

**Agreement** means this Guarantee.

**Business Day** means a day (other than a Saturday or a Sunday) on which banks are open for general business in both (i) Toronto, Ontario, Canada and (ii) London, England.

**Company** means Nortel Networks UK Limited (registered in England and Wales with number 03937799) whose registered office is at Maidenhead Office Park, Westacott Way, Littlewick Green, Maidenhead, Berkshire, SL6 3QH.

**Demand** means a written demand made by the Beneficiary to the Guarantor in the form set out at Schedule 1 to this Agreement.

**Expiry Date** means the earlier of:

(a)     30 June 2012;

(b)     termination (in full or in part) of the Funding Agreement in the circumstances set out in clause 12 of the Funding Agreement; and

(c)     the payment in full of all Guaranteed Obligations.

**Funding Agreement** means the funding agreement made between the Company and the Beneficiary in respect of the Scheme dated on or about the date of this Agreement.

**Guaranteed Obligations** means the payment obligations and liabilities of the Company to the Beneficiary under or in connection with clauses 3.2, 3.3 and 4.2 of the Funding Agreement but, for the avoidance of doubt, not including obligations referred to in clauses 5 or 6 of the Funding Agreement.

**Insolvency Act** means the Insolvency Act 1986, an Act of Parliament of England & Wales.

**Material Adverse Effect** means a material adverse effect on:

(a)    the ability of the Guarantor to perform its payment obligations under this Agreement;

(b)    the validity or enforceability of this Agreement;

(c)    any right or remedy of the Beneficiaries under this Agreement.

**NNC** means Nortel Networks Corporation, a company registered in Canada with number 375438-3 with a principal place of business at The West Mall, Toronto, Ontario, M9C 5KL .

**Pensions Act** means the Pensions Act 2004, an Act of Parliament of England & Wales.

**Reservations** means:

(a)    the principle that equitable remedies are remedies which may be granted or refused at the discretion of the court and damages may be regarded as an adequate remedy;

(b)    the limitation on enforcement as a result of laws relating to bankruptcy, insolvency, liquidation, reorganisation, court schemes, moratoria, administration and other laws affecting the rights of creditors generally;

(c)    the statutory time-barring of claims;

(d)    defences of set off or counterclaim;

(e)    rules against penalties and similar principles;

(f)    the possibility that an undertaking to assume liability for, or indemnify a person against, non-payment of stamp duty may be void;

(g)    the fact that a court may refuse to give effect to a purported contractual obligation to pay costs imposed upon another person in respect of costs of an unsuccessful litigation brought against that person or may not award by way of costs all of the expenditure incurred by a successful litigant in proceedings brought before that court or that a court may stay proceedings if concurrent proceedings based on the same grounds and between the same parties have previously been brought before another court,

and any other reservations or qualifications of law contained in any legal opinion delivered to the Company, the Beneficiary or the Guarantor in respect of this Agreement.

**Scheme** means the Nortel Networks UK Pension Plan currently governed by the Consolidated Definitive Trust Deed and Rules made between the Company and the Beneficiary dated 21 August 2003 (as supplemented or amended from time to time).

**Seizure Event** has the meaning given to it in the Funding Agreement.

**Trigger Event** means the Company failing to pay any amount payable by it to the Beneficiary when contractually due pursuant to the terms of clauses 3.2, 3.3 and 4.2 of the Funding Agreement within a period of 10 Business Days following receipt of a written notification from the Beneficiary that such payment is overdue.

1.2    **Construction**

(a)    In this Guarantee, unless the contrary intention appears, a reference to:

170

(i)     **assets** includes present and future properties, revenues and rights of every description;

(ii)    an **authorisation** includes an authorisation, consent, approval, resolution, licence, exemption, filing, registration or notarisation;

(iii)   a **person** includes any individual, company, corporation, unincorporated association or body (including a partnership, trust, joint venture or consortium), government, state, agency, organisation or other entity whether or not having separate legal personality;

(iv)    a **regulation** includes any regulation, rule, official directive, request or guideline (whether or not having the force of law but, if not having the force of law, being of a type with which persons to which it applies are accustomed to comply) or any governmental, inter-governmental or supranational body, agency, department or regulatory, self-regulatory or other authority or organisation;

(v)     a **currency** is a reference to the lawful currency for the time being of the relevant country;

(vi)    a **provision of law** is a reference to that provision as extended, applied, amended or re-enacted and includes any subordinate legislation;

(vii)   a Clause, a Subclause or a Schedule is a reference to a clause or subclause of, or a schedule to, this Agreement;

(viii)  a party to this Agreement or any other person includes its successors in title, permitted assigns and permitted transferees; and

(ix)    a **time of day** is a reference to London time.

(b)     Unless the contrary intention appears, a reference to a **month** or **months** is a reference to a period starting on one day in a calendar month and ending on the numerically corresponding day in the next calendar month or the calendar month in which it is to end, except that:

(i)     if the numerically corresponding day is not a Business Day, the period will end on the next Business Day in that month (if there is one) or the preceding Business Day (if there is not);

(ii)    if there is no numerically corresponding day in that month, that period will end on the last Business Day in that month; and

(iii)   notwithstanding subparagraphs (i) and (ii) above, a period which commences on the last Business Day of a month will end on the last Business Day in the next month or the calendar month in which it is to end, as appropriate.

(c)     The headings in this Agreement do not affect its interpretation.

4

171

## 2. GUARANTEE

### 2.1 Guarantee

Subject at all times to Clauses 2.2 and 3.6, the Guarantor irrevocably and unconditionally guarantees to the Beneficiary punctual performance by the Company of the Guaranteed Obligations, when due, in the event that:

(a)    a Trigger Event occurs; and

(b)    a Demand is subsequently delivered to the Guarantor.

### 2.2 Limitations

(a)    The guarantee contained in this Agreement is given subject as follows:

(i)    any Demand made under this Agreement shall be addressed to the Guarantor and shall be delivered if given in person at or sent by registered delivery post, courier or fax to the address or fax number set out in clause 8.2 of this Agreement or such other address or fax number as may be notified in writing by the Guarantor to the Beneficiary from time to time by not less than 7 days' notice. A Demand served by fax shall only be deemed to be received by the Guarantor if the Beneficiary has obtained a successful delivery receipt for the transmission;

(ii)    no amendment of the Funding Agreement, or other agreement between the Company and the Beneficiary, shall have the effect of increasing the Guaranteed Obligations or accelerating the time for payment thereof, unless the Guarantor has agreed in writing to any such amendment and this Guarantee is amended accordingly;

(iii)    no Demand may be made under this Agreement after 11a.m. (London time) on the Expiry Date; and

(iv)    notwithstanding any other provision of this Agreement, in the event that the Company or any persons connected with or associated to it (as such terms are defined in sections 249 and 435 of the Insolvency Act) (which shall include, for the avoidance of doubt, the Guarantor, NNC and any of NNC's subsidiary companies and corporations) make any contributions to the Scheme under a contribution notice or financial support direction issued by the United Kingdom Pensions Regulator under the provisions of Part 1 Pensions Act, or otherwise, such contributions shall reduce the Guaranteed Obligations on a pound-for-pound basis.

### 2.3 Supporting indemnity

(a)    In addition to its guarantee under Clause 2.1 (and subject at all times to Clauses 2.2 and 3.6), the Guarantor indemnifies the Beneficiaries against any loss or liability properly suffered by the Beneficiaries if any of the Guarantor's payment obligations under the guarantee contained in Clause 2.1 become unenforceable, invalid or illegal.

(b)    The amount of the loss or liability under this indemnity will be equal to the amount the Beneficiaries would otherwise have been entitled to recover (including, but

172

without limitation, pursuant to clause 9 had such guarantee obligations not become unenforceable, invalid or illegal (as the case may be).

(c)  For the avoidance of doubt, nothing in this indemnity shall entitle the Beneficiaries to recover (i) any sum from the Guarantor that relates to a Guaranteed Obligation that has ceased to exist or (ii) any amount which the Company is not liable to pay as part of, or for failing to perform, the Guaranteed Obligations.

## 2.4   Continuing guarantee

This guarantee is a continuing guarantee and will extend to the ultimate balance of all sums payable by the Company in respect of its Guaranteed Obligations and shall continue in full force and effect until the Expiry Date.

## 2.5   Reinstatement

If any discharge or arrangement is made in whole or in part on the faith of any payment, security or other disposition which is avoided or must be restored on insolvency, liquidation or otherwise without limitation, the liability of the Guarantor under this Clause will continue as if the discharge or arrangement had not occurred.

## 2.6   Waiver of defences

Subject to Clauses 2.2 and 3.6, the obligations of the Guarantor under this Clause will not be affected by any act, omission or thing which, but for this provision, would reduce, release or prejudice any of its obligations under this Clause. This includes:

(a)  any time or waiver granted to, or composition with, any person;

(b)  any release of any person under the terms of any composition or arrangement (other than a release by the Beneficiary of the Company from its obligations under the Funding Agreement);

(c)  the taking, variation, compromise, exchange, renewal or release of, or refusal or neglect to perfect, take up or enforce, any rights against, or security over assets of, any person;

(d)  any non-presentation or non-observance of any formality or other requirement in respect of any instrument or any failure to realise the full value of any security (other than a failure to present a Demand as required by this Agreement);

(e)  any incapacity or lack of power, authority or legal personality of or dissolution or change in the members or status of any person;

(f)  any amendment (however fundamental) of the Funding Agreement **provided** that no such amendment shall have the effect of increasing the Guaranteed Obligations or accelerating the time for payment thereof unless the Guarantor has agreed in writing to any such amendment and this Guarantee is amended accordingly; or

(g)  any unenforceability, illegality, invalidity or non-provability of any Guaranteed Obligation due in any such case to the insolvency, bankruptcy, reorganisation, or liquidation of the Company.

**2.7    Subrogation/Non-competition**

Upon payment of any of the Guaranteed Obligations by or on behalf of the Guarantor, the Guarantor (or its nominee) shall thereupon be subrogated to the rights and benefits of the Beneficiary under the Funding Agreement provided that such subrogated rights of the Guarantor (or its nominee) shall be and remain subject and subordinate to the rights of the Beneficiary as provided in this Clause 2.7. Unless:

(a)    all amounts which may be or become payable by the Company to the Beneficiary pursuant to clauses 3 and 4 of the Funding Agreement have been irrevocably paid in full; or

(b)    the Beneficiary otherwise directs,

the Guarantor will not, during a period following the service of a Demand and only while the same Demand remains unsatisfied in full:

(i)     exercise any rights in the nature of subrogation with respect to any rights, security or moneys held, received or receivable by any Beneficiary (or any trustee or agent on its behalf);

(ii)    exercise any right of contribution or indemnity in respect of any payment made or moneys received on account of the Guarantor's liability under this Clause;

(iii)   claim, rank, prove or vote as a creditor of the Company or its estate in competition with the Beneficiary (or any trustee or agent on their behalf) **provided** however that subject to the final sentence of this Clause 2.7 the Guarantor shall not be prohibited from filing or proving any such claim to the extent (A) that the Guarantor would otherwise be barred from proving or asserting such claim later if application is not made during such period, and (B) the rights of the Guarantor under any such claim are, during such period, subordinate to the rights of the Beneficiary and any distribution received on account of any such claim during such period is held in trust for the benefit of the Beneficiary and transferred to the Beneficiary in accordance with the final sentence of this Clause 2.7; or

(iv)    receive, claim or have the benefit of any payment, distribution or security from or on account of the Company (except as provided in the immediately-preceding sub-clause), or exercise any right of set-off as against the Company.

The Guarantor must hold in trust for and immediately pay or transfer to the Beneficiary any payment or distribution or benefit of security received by it during such period contrary to this Clause or in accordance with any directions given by the Beneficiary under this Clause.

**3.    PAYMENTS**

**3.1    Due date for payments**

(a)    Any payment due from the Guarantor to the Beneficiary following the service of a Demand under this Agreement shall be due within 10 Business Days of the date of delivery of such Demand on the Guarantor by the Beneficiary.

(b)    For the avoidance of doubt, provided the requirements of Clause 2.1 of this Agreement have been satisfied when making a Demand and subject to Clause 3.6, it is not necessary for the Beneficiary to have taken court action against the Company to recover the Guaranteed Obligations before such Demand will become payable by the Guarantor.

174

## 3.2    Funds

Payments under this Agreement to the Beneficiary must be made for value on the due date at such times and in such manner as the Beneficiary may specify to the Guarantor in a Demand.

## 3.3    Currency

Any amount payable under this Agreement is payable in Sterling.

## 3.4    No set-off or counterclaim

All payments made by the Guarantor under this Agreement must be made without set-off or counterclaim.

## 3.5    Business Days

If a payment under this Agreement is due on a day which is not a Business Day, the due date for that payment will instead be the next Business Day in the same calendar month (if there is one) or the preceding Business Day (if there is not).

## 3.6    No Double Recovery or Greater Recovery

(a)    For the avoidance of doubt, nothing in this Agreement entitles the Beneficiary to recover from the Guarantor an amount of the Guaranteed Obligations which has been paid by the Company to the Beneficiary, except insofar as payment of the amount concerned by the Company is or is claimed to be, by reason of the operation of any law relating to insolvency, bankruptcy or reorganization, void, voidable, unenforceable, or is otherwise required to be disgorged.

(b)    For the avoidance of doubt, nothing in this Agreement entitles the Beneficiary to recover from the Guarantor any amount which the Company is not liable to pay as part of, or for failing to perform, the Guaranteed Obligations and any limitations on the Company's liability under the Funding Agreement will equally apply to the Guarantor's liability under this Agreement.

## 4.    REPRESENTATIONS AND UNDERTAKING

## 4.1    Representations

The representations set out in this Clause are made as of the date hereof by the Guarantor to the Beneficiary.

## 4.2    Status

The Guarantor is a corporation, duly incorporated and validly existing under the laws of Canada.

8

175

### 4.3    Powers and authority

The Guarantor has the power to enter into and perform, and has taken all necessary action to authorise the entry into and performance of, this Agreement and the transactions contemplated by this Agreement.

### 4.4    Legal validity

Subject to the Reservations, this Agreement is a legally binding obligation of the Guarantor, enforceable in accordance with its terms.

### 4.5    Non-conflict

The entry into and performance by the Guarantor of, and the transactions contemplated by, this Agreement do not conflict with:

(a)    any law or regulation applicable to the Guarantor; or

(b)    the Guarantor's constitutional documents; or

(c)    any agreement binding on the Guarantor to the extent that such conflict would result in a Material Adverse Effect.

### 4.6    No default

The Guarantor is not in default under any agreement binding on the Guarantor to an extent or in a manner which would result is a Material Adverse Effect.

### 4.7    Pari passu ranking

The Guarantor's payment obligations under this Agreement rank at least pari passu in right of payment with all its other present unsecured payment obligations, except for obligations mandatorily preferred by law.

### 4.8    Times for making representations

The representations set out in this Clause are made by the Guarantor on and as of the date of this Agreement.

### 4.9    Undertaking

The Guarantor undertakes with the Beneficiary that it shall not, in any contractual obligations it enters into in the future with its other unsecured creditors, agree to any explicit contractual term that ranks the Guarantor's payment obligations to such unsecured creditors ahead of the Guarantor's payment obligations under this Agreement, except for such obligations that must be mandatorily preferred by law.

### 5.    CHANGES TO THE PARTIES

(a)    The Guarantor may not assign or transfer any of its rights and obligations under this Agreement other than with the prior written consent of the Beneficiary.

(b)    The Beneficiary may not assign or transfer any of their rights and obligations under this Agreement other than with the prior written consent of the Guarantor save that the Beneficiary's rights under this Agreement may be transferred in their entirety, but

not in part, to any person or persons who may, from time to time and for the time being, be appointed as trustee or trustees of the Scheme pursuant to any appropriate trust deed, or pursuant to any statutory authority (such person being a "Successor Trustee"). The Beneficiary shall promptly thereafter give written notice to the Guarantor of the appointment of the Successor Trustee such notice to be signed by the Beneficiary and the Successor Trustee. With effect from the date of delivery of such notice, the Successor Trustee shall assume all the Beneficiary's rights and obligations under this Agreement and this Agreement shall be construed as if all references to the Beneficiary were replaced by references to the Successor Trustee. The obligations of the Guarantor under this Agreement shall remain unaltered by such transfer and replacement.

6.    SEVERABILITY

If a term of this Agreement is or becomes illegal, invalid or unenforceable in any jurisdiction, that shall not affect:

(a)    the legality, validity or enforceability in that jurisdiction of any other term of this Agreement; or

(b)    the legality, validity or enforceability in other jurisdictions of that or any other term of this Agreement.

7.    COUNTERPARTS

This Agreement may be executed in any number of counterparts and by the parties to it on separate counterparts. This has the same effect as if the signatures on the counterparts were on a single copy of this Agreement.

8.    NOTICES

8.1    In writing

(a)    Any communication in connection with this Agreement must be in writing and, unless otherwise stated, may be given in person, by post or fax.

(b)    Unless it is agreed to the contrary, any consent or agreement required under this Agreement must be given in writing.

8.2    Contact details

(a)    The contact details of the Guarantor for this purpose are:

Address:        Nortel Networks Limited
                MS T0503010
                195 The West Mall
                Toronto, Ontario, M9C 5K1
                Canada
Fax number:     +001 (905)-863-2486
Attention:      Treasurer.

With a copy to:

Address:        Nortel Networks Limited

10                                                                                    177

> MS T0503005
> 195 The West Mall
> Toronto, Ontario M9C 5K1
> Canada

Fax number:      +001 (905) 863-7386
Attention:       General Counsel - Corporate

(b)      The contact details of the Beneficiary are:

Address:         Nortel Networks UK Pension Trust Limited
                 Maidenhead Office Park
                 Westacott Way
                 Maidenhead
                 Berkshire
                 SL6 3QH

Fax number:      +44 (0)1628 432 872
E-mail:          louiseha@nortel.com
with a copy to clive.gilchrist@bestrustees.co.uk
Attention:       Louise Hammond – UK Pensions Manager

**8.3**   **Effectiveness**

(a)      Except as provided below, any Demand or communication in connection with this Agreement will be deemed to be delivered or given as follows:

    (i)      if delivered in person, at the time of delivery;

    (ii)     if posted, five days after being deposited in the post, postage prepaid, registered and with return receipt requested, in a correctly addressed envelope; and

    (iii)    if by fax, when received in legible form with transmission confirmed by a generated transmission receipt.

(b)      A communication given under paragraph (a) above but received on a non-working day or after business hours in the place of receipt will only be deemed to be given on the next working day in that place.

**9.**   **TAXES**

**9.1**   **General**

In this Clause:

**Tax** means any tax, levy, impost, duty or other charge or withholding of a similar nature (including any related penalty or interest).

**Tax Deduction** means a deduction or withholding for or on account of Tax from a payment under this Agreement.

**9.2    Tax gross-up**

(a)    If the Guarantor is aware that it must make a Tax Deduction (or that there is a change in the rate or the basis of a Tax Deduction), it must promptly notify the Beneficiary.

178

(b)    If:

(i)    a Tax Deduction is required by law to be made by the Guarantor or the Beneficiary; and

(ii)    such Tax Deduction would not have been required to be made if the relevant underlying payment was being made by the Company (and not the Guarantor),

then the amount of the payment due from the Guarantor will be increased to an amount which (after making the Tax Deduction) leaves an amount equal to the payment which would have been due if no Tax Deduction had been required.

(c)    If the Guarantor is required to make a Tax Deduction required by law, the Guarantor must make the Tax Deduction and must make any payment required in connection with that Tax Deduction within the time allowed by law.

(d)    Prior to 31 March of the calendar year following either a Tax Deduction or a payment required in connection with a Tax Deduction, the Guarantor must deliver to the Beneficiary evidence satisfactory to the Beneficiary (acting reasonably) that the Tax Deduction has been made or (as applicable) the appropriate payment has been paid to the relevant taxing authority.

9.3    If the Guarantor pays any such additional amount as is referred to in clause 9.2 in respect of any Tax Deduction and the Beneficiary determines that the Scheme has received a credit or refund for any Tax Deduction, the Beneficiary will (to the extent that it can do so without prejudice to the retention of such credit or refund and to the extent that it is not unlawful or contrary to any official regulation or directive for it to do so and **provided** that (i) no Seizure Event has occurred and is continuing in respect of the Parent, and (ii) no amount due and payable to the Beneficiary under either this Agreement or the Funding Agreement remains unpaid) reimburse the Guarantor with such amount (if any) as the Beneficiary determines will leave the Guarantor (after such reimbursement) in no better or worse position that it would have been in if the Guarantor had not been required to make such Tax Deduction.

**10.    LANGUAGE**

Any notice given in connection with this Agreement must be in English.

**11.    GOVERNING LAW**

This Agreement is governed by English law.

**12.    ENFORCEMENT**

**12.1    Jurisdiction**

(a)    The courts of England have exclusive jurisdiction to settle any dispute in connection this Agreement (including a dispute regarding the existence, validity or termination of this Agreement).

12

179

    (b)    The parties agree that the courts of England are the most appropriate and convenient courts to settle any such dispute and accordingly no party will argue to the contrary.

    (c)    This Clause is for the benefit of the Beneficiary only. As a result, to the extent permitted by law, a Beneficiary may take:

        (i)    proceedings in any other court; and

        (ii)    concurrent proceedings in any number of jurisdictions.

## 12.2    Waiver of immunity

The Guarantor irrevocably and unconditionally:

    (a)    agrees not to claim any immunity from proceedings brought by a Beneficiary against it in relation to this Agreement and to ensure that no such claim is made on its behalf;

    (b)    consents generally to the giving of any relief or the issue of any process in connection with those proceedings; and

    (c)    waives all rights of immunity in respect of it or its assets.

This Agreement has been entered into on the date stated at the beginning of this Agreement.

## SCHEDULE 1

130

## FORM OF DEMAND

To:    Nortel Networks Limited

**Guarantee in respect of the Nortel Networks UK Pension Plan dated [●] 2006 (the "Guarantee")**

We refer to the Guarantee.  Terms defined in the Guarantee shall bear the same meaning in this letter.

We certify that a Trigger Event has occurred.

We demand payment of the sum of £[●] (the **"Requested Amount"**) and confirm that the Requested Amount is equal to or less than the Guaranteed Obligations.

The Requested Amount should be made the following account:

Name: [●]

Bank: [●]

Account number: [●]

Sort Code: [●]


Yours faithfully


For and on behalf of
Nortel Networks UK Pension Trust Limited as trustee of the Nortel Networks UK Pension Plan

14

181

# SIGNATORIES

Guarantor

EXECUTED AS A DEED by                 )
NORTEL NETWORKS LIMITED     )
acting by                                          )

By: _____
Name: _____
Title: _____

and

By: _____
Name: _____
Title: _____

Beneficiary

EXECUTED as a deed by                )
NORTEL NETWORKS UK               )
PENSION TRUST LIMITED           )
acting by                                          )

Director          _Kenneth Rendeur._

Director/Secretary   _____

# APPENDIX "F"


[Attached]

182

# GUARANTEE

DATED *21 December* 2007

BY

NORTEL NETWORKS LIMITED

FOR

NORTEL NETWORKS UK PENSION TRUST LIMITED
AS TRUSTEE OF THE NORTEL NETWORKS UK PENSION PLAN

We hereby certify that this is a true
and accurate copy of the original
dated this *19* day of *FEBRUARY*
*Osborne Clarke*    *2008*
Osborne ?
2 Temple ?
Temple Quay
Bristol BS1 6EG

183

# CONTENTS

Clause

1................................................................................................Interpretation
2.....................................................................................................Guarantee
3......................................................................................................Payments
4...................................................................Representations and Undertaking
5..............................................................................Changes to the Parties
6................................................................................................Severability
7.............................................................................................Counterparts
8.......................................................................................................Notices
9...........................................................................................................Taxes
10.....................................................................................................Language
11..............................................................................................Governing law
12.............................................................................................Enforcement

Schedules

Form of Demand

Signatories

184

THIS GUARANTEE is dated *21 DECEMBER*                    2007

BETWEEN:

(1)    **Nortel Networks Limited** (a company registered in Canada with number 125147-3 and principal place of business at 195 The West Mall, Toronto, Ontario, M9C 5K1) (the "**Guarantor**"); and

(2)    **Nortel Networks UK Pension Trust Limited** (a company registered in England and Wales with number 2091890 whose registered office is at Maidenhead Office Park, Westacott Way, Maidenhead, Berkshire, SL6 3QH) as trustee of the Nortel Networks UK Pension Plan (the "**Beneficiary**").

**IT IS AGREED** as follows:

**1.    INTERPRETATION**

**1.1    Definitions**

In this Agreement:

**Agreement** means this Guarantee.

**Business Day** means a day (other than a Saturday or a Sunday) on which banks are open for general business in both (i) Toronto, Ontario, Canada and (ii) London, England.

**Buy Out Deficit** means the difference in the value of the Scheme's liabilities and assets measured in accordance with the Occupational Pension Schemes (Employer Debt) Regulations 2005 (UK Statutory Instrument No. 2005/678) and certified by the Scheme actuary.

**Company** means Nortel Networks UK Limited (registered in England and Wales with number 03937799) whose registered office is at Maidenhead Office Park, Westacott Way, Littlewick Green, Maidenhead, Berkshire, SL6 3QH.

**Demand** means a written demand made after the occurrence of an Insolvency Event by the Beneficiary to the Guarantor in the form set out at Schedule 1 to this Agreement.

**Expiry Date** means the earlier of

(a)    30 June 2012; or

(b)    the payment in full by the Company or the Guarantor of the Guaranteed Obligation.

**Guaranteed Obligation** means all obligations and liabilities of the Company to make payments to the Scheme upon or after the date of the occurrence of an Insolvency Event up to the lesser of:

(a) the sum of US$ 150 million (one hundred and fifty million US dollars), or,

(b) the amount of the Scheme's Buy Out Deficit reduced by clause 2.2 (a) (iv) and any amount actually or prospectively recoverable by the Beneficiary from the Company during the period of the Company's winding up, liquidation or dissolution as appropriate, the quantum of

such amount to be agreed between the Guarantor and the Beneficiary prior to the serving of a Demand.

**Insolvency Act** means the Insolvency Act 1986, an Act of Parliament of England & Wales.

**Insolvency Event** means ,

(a)     a court making a winding up order or an order for the dissolution or liquidation of the Company;

(b)     the Company being dissolved by virtue of or pursuant to any statutory provision or otherwise; or

(c)     the Company passing a resolution for its winding up

following and as a consequence of which the Scheme commences winding up without, for the avoidance of doubt, another body corporate whether before, in contemplation of or after the occurrence of such an event entering into an agreement with the Beneficiary and the Company or its liquidator to perform the obligations of the Company under the Scheme.

**Material Adverse Effect** means a material adverse effect on:

(a)     the ability of the Guarantor to perform its payment obligations under this Agreement;

(b)     the validity or enforceability of this Agreement;

(c)     any right or remedy of the Beneficiary under this Agreement.

**NNC** means Nortel Networks Corporation, a company registered in Canada with number 375438-3 with a principal place of business at The West Mall, Toronto, Ontario, M9C 5KL .

**Pensions Act** means the Pensions Act 2004, an Act of Parliament of England & Wales.

**Reservations** means:

(a)     the principle that equitable remedies are remedies which may be granted or refused at the discretion of the court and damages may be regarded as an adequate remedy;

(b)     the limitation on enforcement as a result of laws relating to bankruptcy, insolvency, liquidation, reorganisation, court schemes, moratoria, administration and other laws affecting the rights of creditors generally;

(c)     the statutory time-barring of claims;

(d)     defences of set off or counterclaim;

(e)     rules against penalties and similar principles;

(f)     the possibility that an undertaking to assume liability for, or indemnify a person against, non-payment of stamp duty may be void;

(g)     the fact that a court may refuse to give effect to a purported contractual obligation to pay costs imposed upon another person in respect of costs of an unsuccessful litigation brought against that person or may not award by way of costs all of the expenditure incurred by a successful litigant in proceedings brought before that court

or that a court may stay proceedings if concurrent proceedings based on the same grounds and between the same parties have previously been brought before another court,

and any other reservations or qualifications of law contained in any legal opinion delivered to the Company, the Beneficiary or the Guarantor in respect of this Agreement.

**Scheme** means the Nortel Networks UK Pension Plan currently governed by the Consolidated Definitive Trust Deed and Rules made between the Company and the Beneficiary dated 21 August 2003 (as supplemented or amended from time to time).

## 1.2 Construction

(a) In this Guarantee, unless the contrary intention appears, a reference to:

(i) **assets** includes present and future properties, revenues and rights of every description;

(ii) an **authorisation** includes an authorisation, consent, approval, resolution, licence, exemption, filing, registration or notarisation;

(iii) a **person** includes any individual, company, corporation, unincorporated association or body (including a partnership, trust, joint venture or consortium), government, state, agency, organisation or other entity whether or not having separate legal personality;

(iv) a **regulation** includes any regulation, rule, official directive, request or guideline (whether or not having the force of law but, if not having the force of law, being of a type with which persons to which it applies are accustomed to comply) or any governmental, inter-governmental or supranational body, agency, department or regulatory, self-regulatory or other authority or organisation;

(v) a **currency** is a reference to the lawful currency for the time being of the relevant country;

(vi) a **provision of law** is a reference to that provision as extended, applied, amended or re-enacted and includes any subordinate legislation;

(vii) a Clause, a Subclause or a Schedule is a reference to a clause or subclause of, or a schedule to, this Agreement;

(viii) a party to this Agreement or any other person includes its successors in title, permitted assigns and permitted transferees; and

(ix) a **time of day** is a reference to London time.

(b) Unless the contrary intention appears, a reference to a **month** or **months** is a reference to a period starting on one day in a calendar month and ending on the numerically corresponding day in the next calendar month or the calendar month in which it is to end, except that:

187

(i)     if the numerically corresponding day is not a Business Day, the period will end on the next Business Day in that month (if there is one) or the preceding Business Day (if there is not);

(ii)    if there is no numerically corresponding day in that month, that period will end on the last Business Day in that month; and

(iii)   notwithstanding subparagraphs (i) and (ii) above, a period which commences on the last Business Day of a month will end on the last Business Day in the next month or the calendar month in which it is to end, as appropriate.

(c)     The headings in this Agreement do not affect its interpretation.

## 2.     GUARANTEE

### 2.1    Guarantee

Subject at all times to Clauses 2.2 and 3.7, the Guarantor irrevocably and unconditionally guarantees to the Beneficiary the performance of the Guaranteed Obligation by the Company when due, upon receipt by the Guarantor of a Demand in accordance with Clause 3.1.

### 2.2    Limitations

(a)     The guarantee contained in this Agreement is given subject as follows:

(i)     any Demand made under this Agreement shall be addressed to the Guarantor and shall be delivered if given in person at or sent by registered delivery post, courier or fax to the address or fax number set out in Clause 8.2 of this Agreement or such other address or fax number as may be notified in writing by the Guarantor to the Beneficiary from time to time by not less than 7 days' notice. A Demand served by fax shall only be deemed to be received by the Guarantor if the Beneficiary has obtained a successful delivery receipt for the transmission;

(ii)    no amendment to this Agreement, nor the terms of any other agreement between the Company and the Beneficiary, shall have the effect of increasing the Guaranteed Obligation or accelerating the time for payment thereof, unless the Guarantor has agreed in writing to any such amendment and this Guarantee is amended accordingly;

(iii)   no Demand may be made under this Agreement after 11a.m. (London time) on the Expiry Date subject to sub-clause (v) below, and upon the Expiry Date if no Demand has been received by the Guarantor, the Guarantor shall have no further liability to the Beneficiary under this Agreement;

(iv)    in the event that the Company or any persons connected with or associated to it (as such terms are defined in sections 249 and 435 of the Insolvency Act) (which shall include, for the avoidance of doubt, the Guarantor, NNC and any of NNC's subsidiary companies and corporations) make any payments to the Scheme after the occurrence of an Insolvency Event under a contribution notice or financial support direction issued by the United Kingdom Pensions Regulator under the provisions of Part 1 Pensions Act, such payments due under any such contribution notice and financial support direction shall