# APPENDIX "O"

[Attached]

**ALLEN & OVERY** 230

**BY FAX & BY POST**

Herbert Smith LLP
Exchange House
Primrose Street
London EC2A 2HS

For the attention of Stephen Gale

Our ref          DSS/ANDD/0017242-0000008 LT:5315936.1

Allen & Overy LLP
One Bishops Square
London  E1 6AD  United Kingdom

Tel          +44 (0)20 3088 0000
Fax          +44 (0)20 3088 0088
Direct       +44 (0)20 3088 1489
andrew.denny@allenovery.com

12 February 2010

Dear Sirs

**Nortel Networks Corporation and Nortel Networks Limited**

We act for Ernst & Young Inc. in its capacity as monitor of Nortel Networks Corporation and Nortel Networks Limited (the "CCAA Debtors"). We understand that you act for the administrators of Nortel Networks UK Limited ("NNUK").

We refer to the letter dated 8 February 2010 (the "Letter") from our client's Canadian counsel, Goodmans LLP to the Pensions Regulator (the "Regulator") regarding the Warning Notice dated 11 January 2010 (the "Warning Notice") purportedly issued by the Regulator pursuant to sections 96(2) and 43(2) of the Pensions Act 2004 (the "Act") and addressed to various members of the Nortel Group. We understand that your client's Canadian counsel was provided with a copy of the Letter, but a further copy is enclosed in any event.

As foreshadowed in the Letter, our client proposes to bring a motion before the Ontario Superior Court of Justice (the "Ontario Court") on 25 February 2010 for, inter alia, an order authorising and directing the CCAA Debtors to refrain from participating in the proceedings contemplated by the Warning Notice and declaring that no recognition or legal effect whatsoever will be given in Canada to the outcome of any such proceedings. In the context of this motion, our client considers that it is not only necessary but appropriate and in the interests of justice that the Ontario Court be provided with a copy of the Warning Notice so that it has the full details of the arguments put forward by the Regulator and the matters on which it purports to rely. The Warning Notice will also be referred to in written submissions.

However, our client is aware of the restrictions placed on the disclosure of information obtained from the Regulator where that information constitutes "restricted information" within the definition in section 82 of the Act. It appears to our client that most if not all of the contents of the Warning Notice is information which was not "obtained" by the Regulator from any other person and/or is already publicly available, and is therefore not restricted information. Entirely without prejudice to this position, and out of an abundance of caution, our client seeks your client's consent to the disclosure to the Ontario Court of any restricted

Allen & Overy LLP is a limited liability partnership registered in England and Wales with registered number OC306763. It is regulated by the Solicitors Regulation Authority of England and Wales. The term partner is used to refer to a member of Allen & Overy LLP or an employee or consultant with equivalent standing and qualifications. A list of the members of Allen & Overy LLP and of the non-members who are designated as partners is open to inspection at its registered office, One Bishops Square, London E1 6AD.

Allen & Overy LLP or an affiliated undertaking has an office in each of: Abu Dhabi, Amsterdam, Antwerp, Bangkok, Beijing, Bratislava, Brussels, Bucharest (associated office), Budapest, Dubai, Düsseldorf, Frankfurt, Hamburg, Hong Kong, London, Luxembourg, Madrid, Mannheim, Milan, Moscow, Munich, New York, Paris, Prague, Riyadh (associated office), Rome, São Paulo, Shanghai, Singapore, Tokyo and Warsaw.

**ALLEN & OVERY**

231

information in the Warning Notice which relates to and/or was obtained from your client and which does not fall within any of the exceptions to the prohibitions on disclosure set out in the Act.

As our client is due to file supporting papers for its motion by Wednesday 17 February 2010, we would be grateful for your response by 5 pm on Tuesday 16 February 2010.

Yours faithfully

**Allen & Overy LLP**

Copy to:        The Pensions Regulator
                For the attention of Marcus Laughton

IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C. 1985, c.
C-36, AS AMENDED
AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL
NETWORKS CORPORATION et al.

Court File No: 09-CL-7950

*ONTARIO*
**SUPERIOR COURT OF JUSTICE**
**(COMMERCIAL LIST)**

Proceeding commenced at Toronto

**THIRTY-EIGHTH REPORT**
**OF THE MONITOR**
**DATED FEBRUARY 17, 2010**

**GOODMANS LLP**
Barristers & Solicitors
Bay Adelaide Centre
333 Bay St., Suite 3400
Toronto, Canada M5H 2S7

Jay A. Carfagnini (LSUC#: 222936)
Joseph Pasquariello (LSUC# 37389C)
Christopher G. Armstrong (LSUC# 55148B)

Tel: 416.979.2211
Fax: 416.979.1234

Lawyers for the Monitor, Ernst & Young Inc.

**TAB 3**

233

Court File No.  09-CL-7950

### ONTARIO
### SUPERIOR COURT OF JUSTICE
### (COMMERCIAL LIST)

**IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,
R.S.C. 1985, c. C-36, AS AMENDED**

**AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF
NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED,
NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS
INTERNATIONAL CORPORATION AND NORTEL NETWORKS TECHNOLOGY
CORPORATION  (collectively the "Applicants")**

**APPLICATION UNDER THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,
R.S.C. 1985, c. C-36, AS AMENDED**

### AFFIDAVIT OF ANNA VENTRESCA
### (sworn February 17, 2010)

I, Anna Ventresca, of the city of Hamilton, in the Province of Ontario, MAKE OATH
AND SAY:

1.      I am the General Counsel-Corporate and Corporate Secretary of Nortel Networks
Corporation ("NNC") and Nortel Networks Limited ("NNL") and have held this position since
August 2009.  From July, 2007 to July, 2009 I was the Assistant General Counsel – Corporate
and Assistant Secretary.  I am also the chief legal officer of Nortel Networks Inc. ("NNI") and
have held that position since September 11, 2009.  As such, I have personal knowledge of the
matters to which I hereinafter depose in this Affidavit.   Where I do not possess personal
knowledge, I have stated the source of my information and, in all such cases, believe it to be true.

2.      I swear this Affidavit in support of the motion brought by the Monitor[1] for advice and
directions regarding a warning notice issued by the United Kingdom's pensions regulator (a

---

[1] As hereinafter defined.

statutory body created by the *Pensions Act 2004* (U.K.), the "Pensions Regulator") during the Stay period.[2]

3.     In this affidavit I address:

    (a)     the background circumstances of the CCAA Proceedings[3];

    (b)     the recent successes and activities in implementing the Applicants' restructuring and value realization efforts;

    (c)     the next major anticipated tasks in the CCAA Proceedings;

    (d)     the fundamental issue facing the CCAA Proceedings – how to allocate value – and therefore assets – across the multi-jurisdictional insolvency estates;

    (e)     the recent attempt by the Pensions Regulator to circumvent the CCAA Proceedings and issues; and

    (f)     the harmful effects of the Pensions Regulator's proceedings on the CCAA Proceedings generally and the allocation process in particular.

4.     Ultimately, as a result of those facts, the Applicants agree with and support the relief sought by the Monitor.  The Pensions Regulator's activities put at risk critical aspects of the restructuring for the sole benefit of one group of potential creditors.

**BACKGROUND**

5.     Reference to "Nortel" herein shall be to the global enterprise as a whole.

6.     On January 14, 2009, this Honourable Court made an Initial Order granting a stay in the *Companies' Creditors Arrangement Act* ("CCAA") proceedings of the Applicants (the "CCAA

---

[2] As hereinafter defined.

[3] As hereinafter defined.

235

- 3 -

Proceedings") and appointing Ernst & Young Inc. as the monitor ("Monitor") in the CCAA Proceedings (the "Stay").

7.    Also on January 14, 2009, NNI and certain of its U.S. subsidiaries (the "U.S. Debtors") made voluntary filings under Chapter 11 of the United States Bankruptcy Code (the "Code"). On the same date, this Honourable Court granted an Order pursuant to Section 18.6(4) of the CCAA recognizing the Chapter 11 cases in the U.S. as "foreign proceedings" in Canada and giving effect to the automatic stay under the Code in Canada.

8.    Additionally, on January 15, 2009, Nortel Networks UK Limited ("NNUK") and certain subsidiaries of the Nortel group incorporated in Europe, the Middle East or Africa ("EMEA" and the "EMEA Debtors") each obtained an administration order for the appointment of administrators (the "Joint Administrators") from the High Court of England and Wales under the Insolvency Act 1986.

9.    On February 27, 2009, the United States Bankruptcy Court for the District of Delaware (the "U.S. Court") granted petitions recognizing these proceedings as "foreign main proceedings" pursuant to Chapter 15 of the Code.

10.    On May 28, 2009, the Commercial Court of Versailles, France (the "French Court") ordered the commencement of secondary insolvency proceedings in respect of Nortel Networks S.A. ("NNSA"), which consist of liquidation proceedings during which NNSA continued to operate as a going concern for an initial period of three months, which period was extended by the French Court. In accordance with the European Union's Insolvency Regulation, the English law proceedings remain the main proceedings in respect of NNSA.

11.    On June 8, 2009, the Joint Administrators appointed in respect of NNUK filed a petition with the U.S. Court for the recognition of the Administration Proceedings as they relate to NNUK under Chapter 15 of the Code. On June 26, 2009, the U.S. Court entered an order recognizing the English Proceedings as foreign main proceedings under Chapter 15 of the Code.

12.    On July 14, 2009, Nortel Networks (CALA) Inc. made a voluntary filing with the U.S. Court under Chapter 11 of the Code.

- 4 -

236

**STATUS OF NORTEL'S RESTRUCTURING**

13.    The Stay has allowed the Applicants to focus all of their available resources and efforts on  the restructuring and realization of asset value.  As a result, the Applicants, and Nortel generally, have been able to work diligently to maximize value for its various businesses and preserve customer and other relationships.  To that end, Nortel has generated over US$2 billion in sales proceeds as a result of the completion of:

(a)    the sale of substantially all of Nortel's CDMA/LTE assets to Telefonaktiebolaget LM Ericsson (publ), which sale closed on November 13, 2009 (the "CDMA Sale");

(b)    the sale of Nortel's Enterprise Solutions business to Avaya Inc. which sale closed on December 18, 2009 (the "ES Sale"); and

(c)    the sale of the assets of Nortel's Wireless Networks business associated with the development of Next Generation Packet Core network components to Hitachi Inc. which sale closed on December 4, 2009 (the "Next Generation Sale").

14.    The CDMA Sale and the ES Sale were completed through the "stalking horse"/auction process and auctions were held.  As a result of the auctions, significant value was obtained for the sale of the assets.

15.    In addition to the sales that have been completed, additional M&A achievements include:

(a)    bidding procedures and a stalking horse agreement entered into with Ciena Corporation ("Ciena") for the sale of substantially all the assets of its Optical Networking and Carrier Ethernet businesses associated with Nortel's Metro Ethernet Networks business unit, which was subject to higher and better offers and subsequently led to the approval of an amended and restated sale agreement for the sale of that business to Ciena, now anticipated to close in Q1 2010 (the "MEN Sale");

- 5 -

237

    (b)      bidding procedures and an ultimate purchase agreement entered into with Ericsson for the sale of substantially all of Nortel's GSM/GSM-R business, which sale is anticipated to close in Q1 2010 (the "GSM Sale"); and

    (c)      bidding procedures and stalking horse agreement dated as of December 22, 2009 entered into with GENBAND Inc. for the sale of substantially all of Nortel's Carrier Voice Over IP and Application Solutions business (the "CVAS Sale").[4]

16.    With respect to the CVAS Sale, the scheduled bid deadline is February 23, 2010. To the extent that additional "qualified bids" are received, the auction is scheduled to take place on February 25, 2010.

17.    In total, assuming all of these sales close, Nortel will have received just under US$3 billion in gross proceeds.

18.    Nortel has realized great value for the assets it has sold. Significant other benefits have been realized in the course of transitioning Nortel's businesses to buyers, including:

    (a)      providing ongoing employment for many Nortel employees;[5]

    (b)      providing reassurance to customers that they will continue to have their contracts serviced; and

    (c)      providing suppliers with ongoing customers in the buyers of the businesses.

---

[4] The CDMA Sale, the ES Sale, the Next Generation Sale, the MEN Sale, the GSM Sale and the CVAS Sale together with any other material sales of assets of Nortel shall be referred to collectively as the "Sales". The buyers pursuant to the various Sales shall be referred to collectively as the "Purchasers".

[5] As a result of the CDMA Sale, the ES Sale and the Next Generation Sale as well as the anticipated completion of the MEN Sale, the GSM Sale and the CVAS Sale, Nortel has been able to preserve approximately 13,000 jobs including approximately 3,500 Canadian employees, which jobs may otherwise have been in significant jeopardy.

## NORTEL'S CURRENT OPERATIONS

19.    There have been significant achievements in the past thirteen (13) months. Nevertheless, there is still much to accomplish. These tasks will require the Applicants' full attention. The Applicants must focus upon, among other things:

    (a)    completing and closing significant sales such as the MEN Sale, the GSM Sale and the CVAS Sale;

    (b)    advancement of other sales processes, such as the LGN Joint Venture and Nortel's Passport business;

    (c)    performing transitioning services set out under most or all of the sales arrangements;

    (d)    determining how to maximize value for Nortel's IP;

    (e)    resolving claims pursuant to the claims bar process approved by this Court on July 30, 2009;

    (f)    allocating proceeds among the estates, which is discussed in more detail below;

    (g)    establishing and resolving compensation related claims; and

    (h)    distributing proceeds to creditors.

20.    On August 10, 2009, Nortel announced the creation of the "Nortel Business Services" or "NBS" and the "Corporate Group". These units were created in order to address the important work that still needed to be completed to facilitate the transitioning of sold businesses and the continued operation of Nortel throughout the insolvency proceedings. The function of the NBS Group is to provide vital services during transition periods, including but not limited to:

    (a)    IT infrastructure services;

    (b)    IT applications services;

    (c)    research and development engineering services; and

(d)    various business services, including order management and billing services, supply chain services, knowledge management services, finance services and real estate services.

21.    The function of the Corporate Group is to provide corporate overhead services to the Nortel companies. This includes the facilitation of the measurement and evaluation of all claims in the claims processes. It also involves assisting in the sale and disposition of Nortel's remaining assets.

22.    To better conserve resources for creditors, these business functions are being performed with minimum or skeletal staffing levels. There have been significant lay-offs throughout the course of these CCAA Proceedings. In the circumstances, the Applicants' employees are already fully extended dealing with these important issues.

## ALLOCATION PROCESS AND DISPUTE

23.    Perhaps the most significant outstanding matters remaining to be determined relate to allocation. In June 2009, the Applicants, the U.S. Debtors and the EMEA Debtors entered into the Interim Funding and Settlement Agreement ("IFSA") which provided for a settlement of certain funding matters as between the Applicants and the U.S. Debtors through to the end of September 2009 and as between the Applicants and the EMEA Debtors, through to the end of December 2009.

24.    Under the terms of the IFSA the Applicants, the U.S. Debtors and the EMEA Debtors, including NNUK, also agreed, *inter alia*:

(a)    that all proceeds of sales of material assets of any Nortel debtor worldwide will be held in escrow until the parties either agree on a consensual allocation, or, in the absence of such an agreement, obtain a binding determination on the allocation pursuant to an agreed upon allocation protocol; and

(b)    that they would negotiate in good faith to attempt to reach agreement on the terms that would govern the allocation protocol process.

240

25.    As has been set out in previous affidavits of John Doolittle (including those sworn December 14, 2009 and January 18, 2010) as well as the Thirty-Fifth report of the Monitor, all of the sales proceeds as a result of the CDMA Sale, ES Sale and Next Generation Sale have been placed into escrow pending a resolution on allocation.    The Monitor's Thirty-Third Report relating to the MEN Sale also makes it clear that proceeds from that sale will be placed into escrow.  This is consistent with the provisions of IFSA as set out above.

26.    Further, the parties have engaged in extensive negotiations and are continuing to negotiate the terms of the protocol for adjudicating the allocation of proceeds.  The purpose of the protocol, (called the Protocol For Resolving Disputes Concerning Allocation of Sale Proceeds) (the "Allocation Protocol"), is to ensure a fair allocation, to be determined (absent a consensual agreement), in a single cross-jurisdictional forum.

27.    In general terms, the dispute over allocation (the "Allocation Dispute") arises from:

    (a)    Nortel's historical conduct of its operations through numerous corporations, each with separate geographical residences in the countries in which Nortel did business;

    (b)    The conduct of Nortel's operations along business, rather than geographical divisions; and

    (c)    The existence of different creditors (and insolvency proceedings) to the different Nortel corporations.

28.    As reflected by the negotiations referred to above, the IFSA contemplates the process for the division of the proceeds from Nortel's global asset sales to be:

    (a)    either on a consensual basis; or

    (b)    as determined by the process to be established under the Allocation Protocol.

Clearly, the division of proceeds is a complex matter, and may involve arguments with reference to a number of inter-estate financial matters. In the circumstances, one could expect reference by the contending parties, to, among other things:

- 9 -

241

(a)    Nortel's transfer pricing system;

(b)    Ownership of Nortel's intellectual property

(c)    Nortel's internal research and development allocation;

(d)    Individual corporate revenues; or

(e)    Individual corporate assets.

To be clear, the parameters of the debate and the positions of the parties have not as yet been fully determined. The prior description is intended simply to assist the Court, in the absence of pleadings, with the emerging outlines of the Allocation Dispute.

29.    However these questions are ultimately resolved, the Allocation Dispute contains the ultimate question at the heart of the Nortel insolvency proceedings and estates: how to divide the proceeds created by the global sales process among the various creditors of the different Nortel entities.

**NNUK PENSION SCHEME**

30.    In 1991, Northern Telecom PLC, a wholly owned subsidiary of Northern Telecom Limited (which in 1999 became NNC), acquired the shares of STC plc ("STC"), a company located in the United Kingdom, which had sponsored a defined benefit pension scheme for the benefit of its U.K. employees since 1949. NNUK added portions of STC to its existing UK operations. At this time, NNUK became the sponsor and participating employer of this pension plan, which subsequently became the NNUK pension plan (the "NNUK Plan"). Nortel Networks UK Pension Trust Limited (the "U.K. Pension Trustee"), was subsequently appointed as the trustee of the NNUK Plan

31.    In 2006, the U.K. Pension Trustee and NNUK held negotiations regarding a funding deficiency in the NNUK Plan. These negotiations ultimately resulted in NNUK and the U.K. Pension Trustee entering into certain arrangements regarding the funding of the NNUK Plan, including the payment of past service deficit contributions.

- 10 -

32.     At the request of the U.K. Pension Trustee and the Pensions Regulator, NNL provided a guarantee of certain of NNUK's obligations in relation to the NNUK Plan (the "Funding Guarantee"). A copy of the Funding Guarantee is attached hereto as Exhibit "A".

33.     In 2007, Nortel undertook a corporate reorganization which resulted in NNUK acquiring ownership of a number of Nortel's EMEA entities. As a part of this reorganization, and at the request of the U.K. Pension Trustee and the Pensions Regulator, NNL provided a second guarantee regarding certain of NNUK's obligations in relation to the NNUK Plan (the "Insolvency Guarantee"). A copy of the Insolvency Guarantee is attached hereto as Exhibit "B".

**CANADIAN CLAIMS PROCESS**

34.     On July 30, 2009, the claims procedure order was granted by this Honourable Court which provided for, *inter alia*, a claims bar date for pre-filing claims of September 30, 2009. A copy of this Order is attached hereto as Exhibit "C".

35.     On or about September 30, 2009, the U.K. Pension Trustee and the U.K. Pension Protection Fund ("PPF") a UK statutory body established under the *Pensions Act, 2004* jointly filed a proof of claim in the CCAA Proceedings against NNC (the "U.K. Pension Claim"). A copy of the U.K. Pension Claim, without exhibits, is attached hereto as Exhibit "D".

36.     The U.K. Pension Claim is based on the allegation that the NNUK Plan is under-funded by an amount alternatively stated to be £2.1 billion or US$3.1 billion.

37.     According to the U.K. Pension Claim, NNUK's commencement of Administration proceedings in the U.K. created an "insolvency event". In consequence, it is alleged that a statutory debt under section 75 of the U.K. *Pensions Act, 1995* will be owed to the NNUK Plan by NNUK, the plan sponsor, in respect of the deficit amount.

38.     The U.K. Pension Claim alleges that NNL's obligations with respect to the Funding Guarantee and the Insolvency Guarantee include:

    (a)     Past service deficit contributions payable in the period from April 6, 2008 to January 14, 2009 of allegedly £45M;

(b)     Past service deficit contributions due or accruing due in the period from January 14, 2009 to April 5, 2012 consisting of allegedly £445.25M;

(c)     Current service contributions for the period following January 14, 2009 allegedly in the amount of £5M to September 30, 2009 and all current service contributions subsequently due or accruing due under the Funding Agreement; and

(d)     Amounts payable under the Insolvency Guarantee limited to the lesser of:

  (i)     US$150M; and

  (ii)    the net amount of the U.K. Pension Plan's buy-out deficit.

39.    The U.K. Pension Claim further asserts that the Pensions Regulator has concluded that NNUK was "insufficiently resourced" on June 30, 2008 - a date selected by Pensions Regulator - and that as of the date on which the U.K. Pension Claim was filed, grounds existed to issue certain warning notices ("Warning Notices") and to seek a financial support direction ("Financial Support Direction" or "FSD") against NNL and NNC. As at that date, no Warning Notice or FSD had been issued.

40.    Finally, the U.K. Pension Claim goes on to assert that if NNL and/or NNC receives a Financial Support Direction, but fails to put or keep in place financial support for the NNUK Plan approved by the Pensions Regulator, then the Pensions Regulator could also exercise its power to issue a Contribution Notice ("Contribution Notice"), imposing on NNL and/or NNC a liability to pay a specific amount, which could be all or some portion of the NNUK Plan under-funded obligations.

**WARNING NOTICE FROM THE REGULATOR**

41.    On or about September 4, 2009, NNC received a letter from the Pensions Regulator. This letter purported to alert Nortel to the fact that the Pensions Regulator was considering issuing a warning notice pursuant to sections 96(2) and 43(2) of the *Pensions Act 2004*. A copy of the letter is attached hereto as Exhibit "E".

42.    On September 16, 2009, NNC sent a letter to the Pensions Regulator indicating that:

- 12 -

244

> ... there is a stay of proceedings under Canadian law in relation to NNC and certain of its subsidiaries, and by its order dated 30 July 2009 ( the "Claims Bar Order"), the Canadian Court has ordered that the bar date for submitting claims against NNC (and relevant subsidiaries) is 30 September 2009. All claims against NNC (and relevant subsidiaries) are being dealt with in accordance with the claims procedure for debtors pursuant to the Claims Bar Order and the *Companies Creditor's Arrangement Act.*
>
> As you can therefore appreciate, NNC is not in a position to enter into any correspondence with individual entities in respect of potential claims against NNC.

A copy of this letter is attached hereto as Exhibit "F".

43.     On November 11, 2009, the Pensions Regulator wrote to the Joint Administrator and indicates that:

> The Pensions Regulator will shortly be in a position to issue the appropriate warning notice under section 96 of the Pensions Act 2004.... As many if not all these Nortel entities are also in some form of insolvency process, we anticipate that the financial support sought will be simply the ability of the pension scheme to prove in the various insolvency estates as a creditor.

A copy of this letter is attached hereto as Exhibit "G".

44.     On January 13, 2010, NNL and NNC each received a letter, dated January 11, 2010, addressed to John Doolittle from the Pensions Regulator purporting to serve NNL and NNC in Canada with the Warning Notice pursuant to s. 303 of the *Pensions Act 2004.* Copies of these letters are attached hereto as Exhibits "H" and "I".

45.     The Warning Notice is more than 150 pages in length and includes nine binders of supporting documents. The supporting documents include financial statements, spreadsheets and witness statements sworn by seventeen former Nortel employees, some of whom left Nortel's employ more than 10 years ago.

46.     I have not attached a copy of the Warning Notice to my affidavit, nor has the Monitor attached a copy to its report. I understand that, under the applicable laws of England and Wales, public disclosure of the Warning Notice may constitute a criminal offence, subject to penal consequences. I further understand that U.K. counsel to the Monitor has requested confirmation

by the applicable entities that they do not object to disclosure of the Warning Notice. A copy of that letter is attached as Exhibit "J".

47.    At the present time, no response has been received. Accordingly, my evidence in reference to the Warning Notice paraphrases its contents, rather than extracting them directly.

48.    The Warning Notice indicates in relevant part that:

(a)    the Pensions Regulator believes that it is reasonable, within the meaning of the applicable legislation, to require various Nortel affiliates, including NNC and NNL, to put in place financial support for the occupational pension scheme of the company known as Nortel Networks UK Limited ("NNUK"); and

(b)    that NNUK has a deficit in its pension scheme of approximately £2.1 billion, for which such financial support will be required.

49.    The Warning Notice goes on to stipulate that NNC and NNL may make written representations, but that such submissions must be received by midday on Monday March 1, 2010.  If no representations are received by this date, according to the Warning Notice, the Determinations Panel will make its decision based on the information contained in the Warning Notice.

50.    On or about February 3, 2010, U.K. Counsel to NNC and NNL advised the Pensions Regulator that NNC and NNL were engaging in required consultations with stakeholders and would advise of their instructions in due course.  A copy of this letter is attached hereto as Exhibit "K".

51.    On or about February 8, 2010, the Monitor sent a letter to the Pensions Regulator indicating that it believed that the issuance of the Warning Notice was in direct contravention of the Stay.  A copy of the Monitor's letter is attached hereto as Exhibit "L".

52.    On or about February 9, 2010, the Pensions Regulator also advised NNC and NNL that if "Representations" were not received by March 1, 2010, the matter would be passed over to the "Determinations Panel" for directions regarding the running of the case.  I understand "Representations" to mean complete and detailed written submissions responding in detail on the

merits to the allegations and arguments set out in the Warning Notice. A copy of the Pension Regulator's email of February 9, 2010 is attached as Exhibit "M".

53.      On or about February 10, 2010, NNC and NNL, through their U.K. counsel, advised the Pensions Regulator that, given the Monitor's communication, NNC and NNL could not deliver "Representations" by March 1, 2010. A copy of this letter is attached hereto as Exhibit "N".

**EFFORTS REQUIRED TO DEFEND**

54.      The Pensions Regulator has made a plethora of allegations in the Warning Notice which touch almost all areas of Nortel's business and span from Nortel's first foray into the European market with the establishment of Bell Northern Research Limited, NNUK's predecessor company, until the commencement of these CCAA Proceedings. The Pensions Regulator attacks, among other things:

    (a)    The operation of the transfer pricing system;

    (b)    The operation of the NNUK pension scheme and the extent to which NNL and NNC exercised control over the NNUK pension scheme;

    (c)    NNUK's ability to resource the pension scheme;

    (d)    The credit given to NNUK for its relative contribution to Nortel's R&D;

    (e)    The credit given to NNUK for its performance of corporate functions; and

    (f)    A 2007 corporate reorganization of the EMEA entities.

55.      The allegations made by the Pensions Regulator are extremely broad. They cover a lengthy time span going back to the early 1990s. In order for NNL and NNC to respond to the Warning Notice, the Applicants will need to engage in a substantial factual inquiry, going back many years and addressing complex issues such as the value of certain research and development, transfer pricing and affiliate relationships relating to pension oversight and legal and tax determinations.

56.     In order to defend itself from these allegations, NNL and NNC will need to at a minimum draw on the following resources:

(a)     Finance and Treasury: to demonstrate that NNUK was over compensated for its contributions to Nortel through transfer pricing and costs allocation arrangements.

(b)     Research and Development: to demonstrate that the Pensions Regulator has mistakenly reported that NNUK was responsible for developing "more than its fair share" of Nortel's R&D and that the R&D developed by NNUK was no more valuable to Nortel than that developed by some other Nortel entities, including NNL.

(c)     Pensions: to demonstrate that the NNUK's pension scheme was operated with the requisite diligence and care.

(d)     Corporate: to demonstrate that NNUK was not responsible for any more of the corporate headquarters functions than it was compensated for.

(e)     Legal and Tax: to demonstrate that the EMEA reorganization was not conducted at the sole discretion and instruction of NNL and NNC.

57.     In addition, there are many difficult questions of valuations of, not only the UK Pension Plans, but also NNUK, NNL and NNC and Nortel's R&D which arise as a result of the test under the UK pensions legislation.  NNL and NNC will have to, and indeed already have, retained an expert to assist in responding to the numerous financial calculations allegedly relied upon by the Pensions Regulator in issuing the Warning Notice.

## OVERLAP WITH ALLOCATION PROCESS AND DRAIN ON RESOURCES

58.     The unilateral imposition of the Warning Notice claim and procedure has at least two severely prejudicial effects upon the Applicants:

(a)     overlap with the Allocation Dispute; and

(b)     drain on scarce management resources.

248

59.    The Allocation Dispute and the Warning Notice share numerous controversial factual issues, including:

    (a)    Nortel's transfer pricing system;

    (b)    the ownership of Nortel's intellectual property;

    (c)    Nortel's internal research and development allocation;

    (d)    the value of individual corporate revenues; and

    (e)    the value of individual corporate assets.

60.    If the Warning Notice process is permitted to proceed, NNC and NNL will be compelled to litigate these issues piecemeal, with undue focus on NNUK-specific questions, in the U.K., at the expense of the total Nortel picture.

61.    By way of example, the Warning Notice alleges that NNUK received insufficient credit for products created or informed by "NNUK" technological contributions.  The Applicants in fact believe the reverse to be true: that NNUK benefited significantly from or leveraged off of "NNL's" or "NNC's" technological contributions.

62.    Similarly, the Pensions Regulator claims that NNUK received insufficient credit for its contributions under the transfer pricing regime.  Again, the Applicants believe the case to be the converse: that NNUK was "over-compensated" for research and development spending versus benefits generated.

63.    For both these arguments, and without even exploring the merits of the contending positions, it is apparent to the Applicants that these debates are simply microcosms of a larger issue in the Allocation Dispute: what was the historical treatment of affiliate contributions under the transfer pricing scheme and how should it be applied to the asset realizations Nortel has achieved?

64.    These issues are just two examples of the kinds of important determinations which should be dealt with in the Allocation Dispute and not within a limited process which will examine only

249

one facet of the greater issues.  Moreover, litigation under the Warning Notice gives unfair priority to the Pension Regulator's perspective and issues, at the expense of the participants in the Allocation Dispute.  Likewise there may be more extensive discovery and other procedural protections available in the Allocation Protocol than before the U.K. tribunal.

65.    Of equal concern is the disproportionate effect of the Warning Notice on the Applicant's limited resources. Compared to the Allocation Dispute, the Warning Notice engages a more limited and less wholistic analysis. Nevertheless, given the quantum and breadth of the Warning Notice, it constitutes large scale litigation in and of itself.

66.    To deliver the forceful and comprehensive defence that the Applicants believe can be made to the Warning Notice is a significant undertaking. It will entail, among other things:

(a)    frequent and detailed consultation with U.K. legal advisors;

(b)    frequent and detailed consultation with U.K. financial advisors;

(c)    coordination and consultation with Canadian and U.S. legal advisors and financial advisors with knowledge of the underlying issues;

(d)    document searches and reviews;

(e)    witness meetings and preparation; and

(f)    comment and review upon lengthy legal submissions.

67.    These steps will require the attention of numerous employees across the functions noted above, such as finance, treasury, research and development, pensions, corporate, legal and tax. These employees will be needed both to develop the substantive response, and to provide management's instruction and supervision on the responding strategy. Given the issues involved, similar efforts may be required from the Monitor and its counsel. The substantial effort required will also be intensified by the Pension Regulator's narrow time frame for response.

68.    As the Applicants attempt to move forward to further maximize value to the creditor constituencies through asset sales and in developing a plan of arrangement, it would be a waste

- 18 -

250

of the Applicants' scarce resources for their essential personnel and professionals to be forced to litigate these complex issues on an expedited and truncated basis or before the Allocation Dispute is ultimately resolved.

69.     The breadth of the issues that the Pension Regulator has raised, the very short timeframe it has provided for responses, and the clear duplication with the Allocation Process would impose a substantial and inappropriate burden on the Applicants.

70.     Accordingly, an order should be entered for the relief sought by the Monitor to avoid these prejudicial effects.

SWORN BEFORE ME at the City of          )
Mississauga, in the Province of Ontario   )
on this 17th day of February, 2010.        )
                                           )
                                           )
_____           )          _____
Commissioner for Taking Affidavits or                        ANNA VENTRESCA
Notary Public

DONNA WOOLLETT, Notary Public, Regional Municipality of Peel,
limited to the attestation of instruments and the
taking of affidavits, for Nortel Networks Corporation
and its subsidiaries. Expires January 29, 2011.

# TAB A

This is Exhibit ........ A ............ referred to in the
affidavit of ...... Anna Ventresca ............
sworn before me, this
day of ........ February .......... 2010.

........ Donna Woollett ........
A COMMISSIONER FOR TAKING AFFIDAVITS

DONNA WOOLLETT, Notary Public, Regional Municipality of Peel,
limited to the attestation of instruments and the
taking of affidavits, for Nortel Networks Corporation
and its subsidiaries. Expires January 28, 2011.

## GUARANTEE

DATED                    2006

BY

NORTEL NETWORKS LIMITED

FOR

NORTEL NETWORKS UK PENSION TRUST LIMITED
AS TRUSTEE OF THE NORTEL NETWORKS UK PENSION PLAN

# CONTENTS

| Clause | | Page |
|---|---|---|
| 1. | Interpretation | 1 |
| 2. | Guarantee | 4 |
| 3. | Payments | 6 |
| 4. | Representations and Undertaking | 7 |
| 5. | Changes to the Parties | 8 |
| 6. | Severability | 9 |
| 7. | Counterparts | 9 |
| 8. | Notices | 9 |
| 9. | Taxes | 10 |
| 10. | Language | 11 |
| 11. | Governing law | 11 |
| 12. | Enforcement | 11 |

**Schedules**

| | | |
|---|---|---|
| 1. | Form of Demand | 9 |

Signatories ... 10

253

2

    (a)     the ability of the Guarantor to perform its payment obligations under this Agreement;

    (b)     the validity or enforceability of this Agreement;

    (c)     any right or remedy of the Beneficiaries under this Agreement;

**NNC** means Nortel Networks Corporation, a company registered in Canada with number 375438-3 with a principal place of business at The West Mall, Toronto, Ontario, M9Q 5KL.

**Pensions Act** means the Pensions Act 2004, an Act of Parliament of England & Wales.

**Reservations** means:

    (a)     the principle that equitable remedies are remedies which may be granted or refused at the discretion of the court and damages may be regarded as an adequate remedy;

    (b)     the limitation on enforcement as a result of laws relating to bankruptcy, insolvency, liquidation, reorganisation, court schemes, moratoria, administration and other laws affecting the rights of creditors generally;

    (c)     the statutory time-barring of claims;

    (d)     defences of set off or counterclaim;

    (e)     rules against penalties and similar principles;

    (f)     the possibility that an undertaking to assume liability for, or indemnify a person against, non-payment of stamp duty may be void;

    (g)     the fact that a court may refuse to give effect to a purported contractual obligation to pay costs imposed upon another person in respect of costs of an unsuccessful litigation brought against that person or may not award by way of costs all of the expenditure incurred by a successful litigant in proceedings brought before that court or that a court may stay proceedings if concurrent proceedings based on the same grounds and between the same parties have previously been brought before another court,

and any other reservations or qualifications of law contained in any legal opinion delivered to the Company, the Beneficiary or the Guarantor in respect of this Agreement.

**Scheme** means the Nortel Networks UK Pension Plan currently governed by the Consolidated Definitive Trust Deed and Rules made between the Company and the Beneficiary dated 21 August 2003 (as supplemented or amended from time to time).

**Seizure Event** has the meaning given to it in the Funding Agreement.

**Trigger Event** means the Company failing to pay any amount payable by it to the Beneficiary when contractually due pursuant to the terms of clauses 3.2, 3.3 and 4.2 of the Funding Agreement within a period of 10 Business Days following receipt of a written notification from the Beneficiary that such payment is overdue;

1.2    **Construction**

    (a)     In this Guarantee, unless the contrary intention appears, a reference to:

3

(i) assets includes present and future properties, revenues and rights of every description;

(ii) an authorisation includes an authorisation, consent, approval, resolution, licence, exemption, filing, registration or notarisation;

(iii) a person includes any individual, company, corporation, unincorporated association or body (including a partnership, trust, joint venture or consortium), government, state, agency, organisation or other entity whether or not having separate legal personality;

(iv) a regulation includes any regulation, rule, official directive, request or guideline (whether or not having the force of law but, if not having the force of law, being of a type with which persons to which it applies are accustomed to comply) or any governmental, inter-governmental or supranational body, agency, department or regulatory, self-regulatory or other authority or organisation;

(v) a currency is a reference to the lawful currency for the time being of the relevant country;

(vi) a provision of law is a reference to that provision, as extended, applied, amended or re-enacted and includes any subordinate legislation;

(vii) a Clause, a Subclause or a Schedule is a reference to a clause or subclause of, or a schedule to, this Agreement;

(viii) a party to this Agreement or any other person includes its successors in title, permitted assigns and permitted transferees; and

(ix) a time of day is a reference to London time.

(b) Unless the contrary intention appears, a reference to a month or months is a reference to a period starting on one day in a calendar month and ending on the numerically corresponding day in the next calendar month or the calendar month in which it is to end, except that:

(i) if the numerically corresponding day is not a Business Day, the period will end on the next Business Day in that month (if there is one) or the preceding Business Day (if there is not);

(ii) if there is no numerically corresponding day in that month, that period will end on the last Business Day in that month; and

(iii) notwithstanding subparagraphs (i) and (ii) above, a period which commences on the last Business Day of a month will end on the last Business Day in the next month or the calendar month in which it is to end, as appropriate.

(c) The headings in this Agreement do not affect its interpretation.

4

## 2. GUARANTEE

### 2.1 Guarantee

Subject at all times to Clauses 2.2 and 3.6, the Guarantor irrevocably and unconditionally guarantees to the Beneficiary punctual performance by the Company of the Guaranteed Obligations, when due, in the event that:

(a)    a Trigger Event occurs; and

(b)    a Demand is subsequently delivered to the Guarantor.

### 2.2 Limitations

(a)    The guarantee contained in this Agreement is given subject as follows:

(i)    any Demand made under this Agreement shall be addressed to the Guarantor and shall be delivered if given in person or sent by registered delivery post, courier or fax to the address or fax number set out in Clause 8.2 of this Agreement or such other address or fax number as may be notified in writing by the Guarantor to the Beneficiary from time to time by not less than 7 days' notice. A Demand served by fax shall only be deemed to be received by the Guarantor if the Beneficiary has obtained a successful delivery receipt for the transmission;

(ii)    no amendment of the Funding Agreement, or other agreement between the Company and the Beneficiary, shall have the effect of increasing the Guaranteed Obligations or accelerating the time for payment thereof unless the Guarantor has agreed in writing to any such amendment and this Guarantee is amended accordingly;

(iii)    no Demand may be made under this Agreement after 11am (London time) on the Expiry Date; and

(iv)    notwithstanding any other provision of this Agreement, in the event that the Company or any persons connected with or associated to it (as such terms are defined in sections 249 and 435 of the Insolvency Act) (which shall include, for the avoidance of doubt, the Guarantor, NNC and any of NNC's subsidiary companies and corporations) make any contributions to the Scheme under a contribution notice or financial support direction issued by the United Kingdom Pensions Regulator under the provisions of Part 1 Pensions Act, or otherwise, such contributions shall reduce the Guaranteed Obligations on a pound-for-pound basis.

### 2.3 Supporting Indemnity

(a)    In addition to its guarantee under Clause 2.1 (and subject at all times to Clauses 2.2 and 3.6), the Guarantor indemnifies the Beneficiaries against any loss or liability properly suffered by the Beneficiaries if any of the Guarantor's payment obligations under the guarantee contained in Clause 2.1 becomes unenforceable, invalid or illegal.

(b)    The amount of the loss or liability under this indemnity will be equal to the amount the Beneficiaries would otherwise have been entitled to recover (including, but

5

without limitation, pursuant to clause 9 had such guarantee obligations not become unenforceable, invalid or illegal (as the case may be).

(c)   For the avoidance of doubt, nothing in this indemnity shall entitle the Beneficiaries to recover (i) any sum from the Guarantor that relates to a Guaranteed Obligation that has ceased to exist or (ii) any amount which the Company is not liable to pay as part of, or for failing to perform, the Guaranteed Obligations.

**2.4   Continuing guarantee**

This guarantee is a continuing guarantee and will extend to the ultimate balance of all sums payable by the Company in respect of its Guaranteed Obligations and shall continue in full force and effect until the Expiry Date.

**2.5   Reinstatement**

If any discharge or arrangement is made in whole or in part on the faith of any payment, security or other disposition which is avoided or must be restored on insolvency, liquidation or otherwise without limitation, the liability of the Guarantor under this Clause will continue as if the discharge or arrangement had not occurred.

**2.6   Waiver of defences**

Subject to Clauses 2.2 and 3.6, the obligations of the Guarantor under this Clause will not be affected by any act, omission or thing which, but for this provision, would reduce, release or prejudice any of its obligations under this Clause. This includes:

(a)   any time or waiver granted to, or composition with, any person;

(b)   any release of any person under the terms of any composition or arrangement (other than a release by the Beneficiary of the Company) from its obligations under the Funding Agreement);

(c)   the taking, variation, compromise, exchange, renewal or release of, or refusal or neglect to perfect, take up or enforce, any rights against, or security over assets of, any person;

(d)   any non-presentation or non-observance of any formality or other requirement in respect of any instrument or any failure to realise the full value of any security (other than a failure to present a Demand as required by this Agreement);

(e)   any incapacity or lack of power, authority or legal personality of or dissolution or change in the members or status of any person;

(f)   any amendment (however fundamental) of the Funding Agreement provided that no such amendment shall have the effect of increasing the Guaranteed Obligations or accelerating the time for payment thereof unless the Guarantor has agreed in writing to any such amendment and this Guarantee is amended accordingly; or

(g)   any unenforceability, illegality, invalidity or non-provability of any Guaranteed Obligation due in any such case to the insolvency, bankruptcy, reorganisation or liquidation of the Company.

6

**2.7** **Subrogation/Non-competition**

Upon payment of any of the Guaranteed Obligations by or on behalf of the Guarantor, the Guarantor (or its nominee) shall thereupon be subrogated to the rights and benefits of the Beneficiary under the Funding Agreement provided that such subrogated rights of the Guarantor (or its nominee) shall be and remain subject and subordinate to the rights of the Beneficiary as provided in this Clause 2.7. Unless:

(a)    all amounts which may be or become payable by the Company to the Beneficiary pursuant to clauses 3 and 4 of the Funding Agreement have been irrevocably paid in full; or

(b)    the Beneficiary otherwise directs,

the Guarantor will not, during a period following the service of a Demand and only while the same Demand remains unsatisfied in full:

(i)    exercise any rights in the nature of subrogation with respect to any rights, security or moneys held, received or receivable by any Beneficiary (or any trustee or agent on its behalf);

(ii)    exercise any right of contribution or indemnity in respect of any payment made or moneys received on account of the Guarantor's liability under this Clause;

(iii)    claim, rank, prove or vote as a creditor of the Company or its estate in competition with the Beneficiary (or any trustee or agent on their behalf) provided however that, subject to the final sentence of this Clause 2.7 the Guarantor shall not be prohibited from filing or proving any such claim to the extent (A) that the Guarantor would otherwise be barred from proving or asserting such claim later if application is not made during such period, and (B) the rights of the Guarantor under any such claim are, during such period, subordinate to the rights of the Beneficiary and any distribution received on account of any such claim during such period is held in trust for the benefit of the Beneficiary and transferred to the Beneficiary in accordance with the final sentence of this Clause 2.7; or

(iv)    receive, claim or have the benefit of any payment, distribution or security from or on account of the Company (except as provided in the immediately-preceding sub-clause), or exercise any right of set-off as against the Company.

The Guarantor must hold in trust for and immediately pay or transfer to the Beneficiary any payment or distribution or benefit of security received by it during such period contrary to this Clause or in accordance with any directions given by the Beneficiary under this Clause.

**3.**    **PAYMENTS**

**3.1**    **Due date for payments**

(a)    Any payment due from the Guarantor to the Beneficiary following the service of a Demand under this Agreement shall be due within 10 Business Days of the date of delivery of such Demand on the Guarantor by the Beneficiary.

7

(b)    For the avoidance of doubt, provided the requirements of Clause 2.1 of this Agreement have been satisfied when making a Demand and subject to Clause 3.6, it is not necessary for the Beneficiary to have taken court action against the Company to recover the Guaranteed Obligations before such Demand will become payable by the Guarantor.

3.2    Funds

Payments under this Agreement to the Beneficiary must be made for value on the due date at such times and in such manner as the Beneficiary may specify to the Guarantor in a Demand.

3.3    Currency

Any amount payable under this Agreement is payable in Sterling.

3.4    No set-off or counterclaim

All payments made by the Guarantor under this Agreement must be made without set-off or counterclaim.

3.5    Business Days

If a payment under this Agreement is due on a day which is not a Business Day, the due date for that payment will instead be the next Business Day in the same calendar month (if there is one) or the preceding Business Day (if there is not).

3.6    No Double Recovery or Greater Recovery

(a)    For the avoidance of doubt, nothing in this Agreement entitles the Beneficiary to recover from the Guarantor an amount of the Guaranteed Obligations which has been paid by the Company to the Beneficiary, except insofar as payment of the amount concerned by the Company is or is claimed to be, by reason of the operation of any law relating to insolvency, bankruptcy or reorganization, void, voidable, unenforceable, or is otherwise required to be disgorged.

(b)    For the avoidance of doubt, nothing in this Agreement entitles the Beneficiary to recover from the Guarantor any amount which the Company is not liable to pay as part of, or for failing to perform, the Guaranteed Obligations and any limitations on the Company's liability under the Funding Agreement will equally apply to the Guarantor's liability under this Agreement.

4.    REPRESENTATIONS AND UNDERTAKING

4.1    Representations

The representations set out in this Clause are made as of the date hereof by the Guarantor to the Beneficiary.

4.2    Status

The Guarantor is a corporation, duly incorporated and validly existing under the laws of Canada.

8

**4.3    Powers and authority**

The Guarantor has the power to enter into and perform, and has taken all necessary action to authorise the entry into and performance of, this Agreement and the transactions contemplated by this Agreement.

**4.4    Legal validity**

Subject to the Reservations, this Agreement is a legally binding obligation of the Guarantor, enforceable in accordance with its terms.

**4.5    Non-conflict**

The entry into and performance by the Guarantor of, and the transactions contemplated by, this Agreement do not conflict with:

(a)    any law or regulation applicable to the Guarantor; or

(b)    the Guarantor's constitutional documents; or

(c)    any agreement binding on the Guarantor to the extent that such conflict would result in a Material Adverse Effect.

**4.6    No default**

The Guarantor is not in default under any agreement binding on the Guarantor to an extent or in a manner which would result in a Material Adverse Effect.

**4.7    Pari passu ranking**

The Guarantor's payment obligations under this Agreement rank at least pari passu in right of payment with all its other present unsecured payment obligations, except for obligations mandatorily preferred by law.

**4.8    Times for making representations**

The representations set out in this Clause are made by the Guarantor on and as of the date of this Agreement.

**4.9    Undertaking**

The Guarantor undertakes with the Beneficiary that it shall not, in any contractual obligations it enters into in the future with its other unsecured creditors, agree to any explicit contractual term that ranks the Guarantor's payment obligations to such unsecured creditors ahead of the Guarantor's payment obligations under this Agreement, except for such obligations that must be mandatorily preferred by law.

**5.    CHANGES TO THE PARTIES**

(a)    The Guarantor may not assign or transfer any of its rights and obligations under this Agreement other than with the prior written consent of the Beneficiary.

(b)    The Beneficiary may not assign or transfer any of their rights and obligations under this Agreement other than with the prior written consent of the Guarantor save that the Beneficiary's rights under this Agreement may be transferred in their entirety, but

not in part, to any person or persons who may, from time to time and for the time being, be appointed as trustee or trustees of the Scheme pursuant to any appropriate trust deed, or pursuant to any statutory authority (such person being a "Successor Trustee"). The Beneficiary shall promptly thereafter give written notice to the Guarantor of the appointment of the Successor Trustee such notice to be signed by the Beneficiary and the Successor Trustee. With effect from the date of delivery of such notice, the Successor Trustee shall assume all the Beneficiary's rights and obligations under this Agreement, and this Agreement shall be construed as if all references to the Beneficiary were replaced by references to the Successor Trustee. The obligations of the Guarantor under this Agreement shall remain unaltered by such transfer and replacement.

6.    **SEVERABILITY**

If a term of this Agreement is or becomes illegal, invalid or unenforceable in any jurisdiction, that shall not affect:

(a)    the legality, validity or enforceability in that jurisdiction of any other term of this Agreement; or

(b)    the legality, validity or enforceability in other jurisdictions of that or any other term of this Agreement.

7.    **COUNTERPARTS**

This Agreement may be executed in any number of counterparts and by the parties to it on separate counterparts. This has the same effect as if the signatures on the counterparts were on a single copy of this Agreement.

8.    **NOTICES**

8.1    In writing

(a)    Any communication in connection with this Agreement must be in writing and, unless otherwise stated, may be given in person, by post or fax.

(b)    Unless it is agreed to the contrary, any consent or agreement required under this Agreement must be given in writing.

8.2    Contact details

(a)    The contact details of the Guarantor for this purpose are:

Address:        Nortel Networks Limited
                MS T0503010
                195 The West Mall
                Toronto, Ontario, M9C 5K1
                Canada
Fax number:     +001 (905)-863-2486
Attention:      Treasurer

With a copy to:

Address:        Nortel Networks Limited

10

> MS T0303065
> 195 The West Mall
> Toronto, Ontario M9C 5K1
> Canada

Fax number:    +001 (905) 863-7386
Attention:     General Counsel - Corporate

(b)    The contact details of the Beneficiary are:

Address:       Nortel Networks UK Pension Trust Limited
               Maidenhead Office Park
               Westacott Way
               Maidenhead
               Berkshire
               SL6 3QH

Fax number:    +44 (0)1628 432 872
E-mail:        louiseha@nortel.com
               with a copy to clive.gilchrist@bestrustees.co.uk
Attention:     Louise Hammond – UK Pensions Manager

8.3    **Effectiveness**

(a)    Except as provided below, any Demand or communication in connection with this Agreement will be deemed to be delivered or given as follows:

(i)    if delivered in person, at the time of delivery;

(ii)   if posted, five days after being deposited in the post, postage prepaid, registered and with return receipt requested, in a correctly addressed envelope; and

(iii)  if by fax, when received in legible form with transmission confirmed by a generated transmission receipt.

(b)    A communication given under paragraph (a) above but received on a non-working day or after business hours in the place of receipt will only be deemed to be given on the next working day in that place.

9.     **TAXES**

9.1    **General**

In this Clause:

**Tax** means any tax, levy, impost, duty or other charge or withholding of a similar nature (including any related penalty or interest).

**Tax Deduction** means a deduction or withholding for or on account of Tax from a payment under this Agreement.

262

11

**9.2    Tax gross-up**

(a)    If the Guarantor is aware that it must make a Tax Deduction (or that there is a change in the rate or the basis of a Tax Deduction), it must promptly notify the Beneficiary.

(b)    If:

(i)    a Tax Deduction is required by law to be made by the Guarantor or the Beneficiary; and

(ii)    such Tax Deduction would not have been required to be made if the relevant underlying payment was being made by the Company (and not the Guarantor),

then the amount of the payment due from the Guarantor will be increased to an amount which (after making the Tax Deduction) leaves an amount equal to the payment which would have been due if no Tax Deduction had been required.

(c)    If the Guarantor is required to make a Tax Deduction required by law, the Guarantor must make the Tax Deduction and must make any payment required in connection with that Tax Deduction within the time allowed by law.

(d)    Prior to 31 March of the calendar year following either a Tax Deduction or a payment required in connection with a Tax Deduction, the Guarantor must deliver to the Beneficiary evidence satisfactory to the Beneficiary (acting reasonably) that the Tax Deduction has been made or (as applicable) the appropriate payment has been paid to the relevant taxing authority.

9.3    If the Guarantor pays any such additional amount as is referred to in clause 9.2 in respect of any Tax Deduction, and the Beneficiary determines that the Scheme has received a credit or refund for any Tax Deduction, the Beneficiary will (to the extent that it can do so without prejudice to the retention of such credit or refund and to the extent that it is not unlawful or contrary to any official regulation or directive for it to do so and provided that (i) no Seizure Event has occurred and is continuing in respect of the Parent, and (ii) no amount due and payable to the Beneficiary under either this Agreement or the Funding Agreement remains unpaid) reimburse the Guarantor with such amount (if any) as the Beneficiary determines will leave the Guarantor (after such reimbursement) in no better or worse position than it would have been in if the Guarantor had not been required to make such Tax Deduction.

**10.    LANGUAGE**

Any notice given in connection with this Agreement must be in English.

**11.    GOVERNING LAW**

This Agreement is governed by English law.

**12.    ENFORCEMENT**

**12.1    Jurisdiction**

(a)    The courts of England have exclusive jurisdiction to settle any dispute in connection with this Agreement (including a dispute regarding the existence, validity or termination of this Agreement).

12

(b)     The parties agree that the courts of England are the most appropriate and convenient courts to settle any such dispute and accordingly no party will argue to the contrary.

(c)     This Clause is for the benefit of the Beneficiary only. As a result, to the extent permitted by law, a Beneficiary may take:

   (i)     proceedings in any other court; and

   (ii)    concurrent proceedings in any number of jurisdictions.

12.2    Waiver of immunity

The Guarantor irrevocably and unconditionally:

(a)     agrees not to claim any immunity from proceedings brought by a Beneficiary against it in relation to this Agreement and to ensure that no such claim is made on its behalf;

(b)     consents generally to the giving of any relief or the issue of any process in connection with those proceedings; and

(c)     waives all rights of immunity in respect of it or its assets.

This Agreement has been entered into on the date stated at the beginning of this Agreement.

264

13

## SCHEDULE 1

## FORM OF DEMAND

To:    Nortel Networks Limited

Guarantee in respect of the Nortel Networks UK Pension Plan dated [•] 2006 (the "Guarantee")

We refer to the Guarantee. Terms defined in the Guarantee shall bear the same meaning in this letter.

We certify that a Trigger Event has occurred.

We demand payment of the sum of £[•] (the "Requested Amount") and confirm that the Requested Amount is equal to or less than the Guaranteed Obligations.

The Requested Amount should be made the following account:

Name: [•]

Bank: [•]

Account number: [•]

Sort Code: [•]

Yours faithfully

For and on behalf of
Nortel Networks UK Pension Trust Limited as trustee of the Nortel Networks UK Pension Plan.

265

14

## SIGNATORIES

**Guarantor**

EXECUTED AS A DEED by          )
NORTEL NETWORKS LIMITED   )
acting by                                         )

By: _____
Name: _____
Title: _____

and

By: _____
Name: _____
Title: _____

**Beneficiary**

EXECUTED as a deed by          )
NORTEL NETWORKS UK           )
PENSION TRUST LIMITED.       )
acting by                                          )


Director


Director/Secretary

266

Signatories

Executed as a Deed (but not    )
delivered until the date    )
appearing at the head of page 1)    )
on behalf of Nortel Networks    )
UK Limited acting by    )

Director

Director / Secretary

Executed as a Deed (but not    )
delivered until the date    )
appearing at the head of page 1)    )
on behalf of Nortel Networks    )
UK Pension Trust Limited    )
acting by    )

Director

Director / Secretary

267

Signatories

Executed as a Deed (but not
delivered until the date
appearing at the head of page 1)
on behalf of **Nortel Networks
UK Limited** acting by

)
)
)
)
)

*[signature]* William J. Lobatto

Director

Director / Secretary


Executed as a Deed (but not
delivered until the date
appearing at the head of page 1)
on behalf of **Nortel Networks
UK Pension Trust Limited**
acting by

)
)
)
)
)

Director

Director / Secretary

**TAB B**

268

This is Exhibit ........ B ........ referred to in the
affidavit of .. Anna Ventresca ..............
sworn before me, this ............. 19
day of ...... February .............. 20.10.

........ Donna Woollett ........
A COMMISSIONER FOR TAKING AFFIDAVITS

DONNA WOOLLETT, Notary Public, Regional Municipality of Peel,
limited to the attestation of instruments and the
taking of affidavits, for Nortel Networks Corporation
and its subsidiaries. Expires January 28, 2011.

# GUARANTEE

DATED 21 DECEMBER 2001

BY

NORTEL NETWORKS LIMITED

FOR

NORTEL NETWORKS UK PENSION TRUST LIMITED
AS TRUSTEE OF THE NORTEL NETWORKS UK PENSION PLAN

269

# CONTENTS

Clause

1. ........................................................................................................... Interpretation
2. ................................................................................................................... Guarantee
3. .................................................................................................................... Payments
4. ........................................................................... Representations and Undertaking
5. .......................................................................................... Changes to the Parties
6. ................................................................................................................ Severability
7. .............................................................................................................. Counterparts
8. ........................................................................................................................ Notices
9. ............................................................................................................................ Taxes
10. ..................................................................................................................... Language
11. ........................................................................................................... Governing law
12. ................................................................................................................ Enforcement

Schedules

Form of Demand

Signatories

THIS GUARANTEE is dated: *21 December*        2007

BETWEEN:

(1)    Nortel Networks Limited (a company registered in Canada with number 125147-3 and principal place of business at 195 The West Mall, Toronto, Ontario, M9C 5K1) (the "**Guarantor**"); and

(2)    Nortel Networks UK Pension Trust Limited (a company registered in England and Wales with number 2091898 whose registered office is at Maidenhead Office Park, Westacott Way, Maidenhead, Berkshire, SL6 3QH) as trustee of the Nortel Networks UK Pension Plan (the "**Beneficiary**").

IT IS AGREED as follows:

1.     **INTERPRETATION**

1.1    **Definitions**

In this Agreement:

**Agreement** means this Guarantee.

**Business Day** means a day (other than a Saturday or a Sunday) on which banks are open for general business in both (i) Toronto, Ontario, Canada and (ii) London, England.

**Buy Out Deficit** means the difference in the value of the Scheme's liabilities and assets measured in accordance with the Occupational Pension Schemes (Employer Debt) Regulations 2005 (UK Statutory Instrument No. 2005/678) and certified by the Scheme actuary.

**Company** means Nortel Networks UK Limited (registered in England and Wales with number 03937799) whose registered office is at Maidenhead Office Park, Westacott Way, Littlewick Green, Maidenhead, Berkshire, SL6 3QH.

**Demand** means a written demand made after the occurrence of an Insolvency Event by the Beneficiary to the Guarantor in the form set out at Schedule 1 to this Agreement.

**Expiry Date** means the earlier of:

(a)    30 June 2012; or

(b)    the payment in full by the Company or the Guarantor of the Guaranteed Obligation.

**Guaranteed Obligation** means all obligations and liabilities of the Company to make payments to the Scheme upon or after the date of the occurrence of an Insolvency Event up to the lesser of:

(a) the sum of US$ 150 million (one hundred and fifty million US dollars); or,

(b) the amount of the Scheme's Buy Out Deficit reduced by clause 2.2 (a) (iv) and any amount actually or prospectively recoverable by the Beneficiary from the Company during the period of the Company's winding up, liquidation or dissolution as appropriate; the quantum of

such amount to be agreed between the Guarantor and the Beneficiary prior to the serving of a Demand.

**Insolvency Act** means the Insolvency Act 1986, an Act of Parliament of England & Wales.

**Insolvency Event** means:

(a)  a court making a winding up order or an order for the dissolution or liquidation of the Company;

(b)  the Company being dissolved by virtue of or pursuant to any statutory provision or otherwise; or

(c)  the Company passing a resolution for its winding up

following and as a consequence of which the Scheme commences winding up without, for the avoidance of doubt, another body corporate whether before, in contemplation of or after the occurrence of such an event entering into an agreement with the Beneficiary and the Company or its liquidator to perform the obligations of the Company under the Scheme.

**Material Adverse Effect** means a material adverse effect on:

(a)  the ability of the Guarantor to perform its payment obligations under this Agreement;

(b)  the validity or enforceability of this Agreement;

(c)  any right or remedy of the Beneficiary under this Agreement.

**NNC** means Nortel Networks Corporation, a company registered in Canada with number 375438-3 with a principal place of business at The West Mall, Toronto, Ontario, M9C 5KL .

**Pensions Act** means the Pensions Act 2004, an Act of Parliament of England & Wales.

**Reservations** means:

(a)  the principle that equitable remedies are remedies which may be granted or refused at the discretion of the court and damages may be regarded as an adequate remedy;

(b)  the limitation on enforcement as a result of laws relating to bankruptcy, insolvency, liquidation, reorganisation, court schemes, moratoria, administration and other laws affecting the rights of creditors generally;

(c)  the statutory time-barring of claims;

(d)  defences of set off or counterclaim;

(e)  rules against penalties and similar principles;

(f)  the possibility that an undertaking to assume liability for, or indemnify a person against, non-payment of stamp duty may be void;

(g)  the fact that a court may refuse to give effect to a purported contractual obligation to pay costs imposed upon another person in respect of costs of an unsuccessful litigation brought against that person or may not award by way of costs all of the expenditure incurred by a successful litigant in proceedings brought before that court;

or that a court may stay proceedings if concurrent proceedings based on the same grounds and between the same parties have previously been brought before another court,

and any other reservations or qualifications of law contained in any legal opinion delivered to the Company, the Beneficiary or the Guarantor in respect of this Agreement.

Scheme means the Nortel Networks UK Pension Plan currently governed by the Consolidated Definitive Trust Deed and Rules made between the Company and the Beneficiary dated 21 August 2003 (as supplemented or amended from time to time).

1.2   Construction

(a)   In this Guarantee, unless the contrary intention appears, a reference to:

(i)   assets includes present and future properties, revenues and rights of every description;

(ii)   an authorisation includes an authorisation, consent, approval, resolution, licence, exemption, filing, registration or notarisation;

(iii)   a person includes any individual, company, corporation, unincorporated association or body (including a partnership, trust, joint venture or consortium), government, state, agency, organisation or other entity whether or not having separate legal personality;

(iv)   a regulation includes any regulation, rule, official directive, request or guideline (whether or not having the force of law but, if not having the force of law, being of a type with which persons to which it applies are accustomed to comply) of any governmental, inter-governmental or supranational body, agency, department or regulatory, self-regulatory or other authority or organisation;

(v)   a currency is a reference to the lawful currency for the time being of the relevant country;

(vi)   a provision of law is a reference to that provision as extended, applied, amended or re-enacted and includes any subordinate legislation;

(vii)   a Clause, a Subclause or a Schedule is a reference to a clause or subclause of, or a schedule to, this Agreement;

(viii)   a party to this Agreement or any other person includes its successors in title, permitted assigns and permitted transferees; and

(ix)   a time of day is a reference to London time.

(b)   Unless the contrary intention appears, a reference to a month or months is a reference to a period starting on one day in a calendar month and ending on the numerically corresponding day in the next calendar month or the calendar month in which it is to end, except that:

273

(i)     if the numerically corresponding day is not a Business Day, the period will end on the next Business Day in that month (if there is one) or the preceding Business Day (if there is not);

(ii)    if there is no numerically corresponding day in that month, that period will end on the last Business Day in that month; and

(iii)   notwithstanding subparagraphs (i) and (ii) above, a period which commences on the last Business Day of a month will end on the last Business Day in the next month or the calendar month in which it is to end, as appropriate.

(c)    The headings in this Agreement do not affect its interpretation.

## 2.   GUARANTEE

### 2.1   Guarantee

Subject at all times to Clauses 2.2 and 3.7, the Guarantor irrevocably and unconditionally guarantees to the Beneficiary the performance of the Guaranteed Obligation by the Company when due, upon receipt by the Guarantor of a Demand in accordance with Clause 3.1.

### 2.2   Limitations

(a)    The guarantee contained in this Agreement is given subject as follows:

(i)     any Demand made under this Agreement shall be addressed to the Guarantor and shall be delivered if given in person at or sent by registered delivery post, courier or fax to the address or fax number set out in Clause 8.2 of this Agreement or such other address or fax number as may be notified in writing by the Guarantor to the Beneficiary from time to time by not less than 7 days' notice. A Demand served by fax shall only be deemed to be received by the Guarantor if the Beneficiary has obtained a successful delivery receipt for the transmission;

(ii)    no amendment to this Agreement, nor the terms of any other agreement between the Company and the Beneficiary, shall have the effect of increasing the Guaranteed Obligation or accelerating the time for payment thereof, unless the Guarantor has agreed in writing to any such amendment and this Guarantee is amended accordingly;

(iii)   no Demand may be made under this Agreement after 11a.m. (London time) on the Expiry Date subject to sub-clause (v) below, and upon the Expiry Date if no Demand has been received by the Guarantor, the Guarantor shall have no further liability to the Beneficiary under this Agreement;

(iv)   in the event that the Company or any persons connected with or associated to it (as such terms are defined in sections 249 and 435 of the Insolvency Act) (which shall include, for the avoidance of doubt, the Guarantor, NNC and any of NNC's subsidiary companies and corporations) make any payments to the Scheme after the occurrence of an Insolvency Event under a contribution notice or financial support direction issued by the United Kingdom Pensions Regulator under the provisions of Part I Pensions Act, such payments due under any such contribution notice and financial support direction shall

reduce the Guaranteed Obligation on a pound-for-pound basis in the manner set out in the definition of Guaranteed Obligation;

(v)     this Agreement shall terminate forthwith with effect from the certification by the Scheme actuary that the Scheme does not have a Buy Out Deficit and upon such termination the Guarantor shall have no further liability to the Beneficiary under this Agreement.

2.3     **Supporting indemnity**

(a)     In addition to its guarantee under Clause 2.1 (and subject at all times to Clauses 2.2 and 3.7), the Guarantor indemnifies the Beneficiary against any loss or liability properly suffered by the Beneficiary if the Guarantor's payment obligation under the guarantee contained in Clause 2.1 become unenforceable, invalid or illegal.

(b)     The amount of the loss or liability under this indemnity will be equal to the amount the Beneficiary would otherwise have been entitled to recover (including, but without limitation, pursuant to Clause 5)) had such guarantee obligation not become unenforceable, invalid or illegal (as the case may be).

(c)     For the avoidance of doubt, nothing in this indemnity shall entitle the Beneficiary to recover (i) any sum from the Guarantor that relates to any part of the Guaranteed Obligation that has ceased to exist or (ii) any amount which the Company is not liable to pay as part of, or for failing to perform, the Guaranteed Obligation.

2.4     **Continuing guarantee**

This guarantee is a continuing guarantee and will extend to the ultimate balance of all sums payable by the Company in respect of the Guaranteed Obligation and shall continue in full force and effect until the Expiry Date.

2.5     **Reinstatement**

If any discharge or arrangement is made in whole or in part on the faith of any payment, security or other disposition which is avoided or must be restored on insolvency, liquidation or otherwise without limitation, the liability of the Guarantor under this Clause will continue as if the discharge or arrangement had not occurred.

2.6     **Waiver of defences**

Subject to Clauses 2.2 and 3.7, the obligations of the Guarantor under this Clause will not be affected by any act, omission or thing which, but for this provision, would reduce, release or prejudice any of its obligations under this Clause. This includes:

(a)     any time or waiver granted to, or composition with, any person;

(b)     any release of any person under the terms of any composition or arrangement;

(c)     the taking, variation, compromise, exchange, renewal or release of, or refusal or neglect to perfect, take up or enforce, any rights against, or security over assets of, any person;

(d)     any non-presentation or non-observance of any formality or other requirement in respect of any instrument or any failure to realise the full value of any security (other than a failure to present a Demand as required by this Agreement);

(e) any incapacity or lack of power, authority or legal personality of or dissolution or change in the members or status of any person; or

(f) any unenforceability, illegality, invalidity or non-provability of any part of the Guaranteed Obligation due in any such case to the insolvency, bankruptcy, reorganisation, or liquidation of the Company

2.7 Subrogation / Non-competition

Upon payment of any part of the Guaranteed Obligation by or on behalf of the Guarantor, the Guarantor (or its nominee) shall thereupon be subrogated to the rights and benefits of the Beneficiary in relation thereto provided that such subrogated rights of the Guarantor (or its nominee) shall be and remain subject and subordinate to the rights of the Beneficiary as provided in this Clause 2.7. Unless the Beneficiary otherwise directs, the Guarantor will not, during a period following the service of a Demand and only while the same Demand remains unsatisfied in full:

(i) exercise any rights in the nature of subrogation with respect to any rights, security or moneys held, received or receivable by the Beneficiary (or any trustee or agent on its behalf);

(ii) exercise any right of contribution or indemnity in respect of any payment made or moneys received on account of the Guarantor's liability under this Clause;

(iii) claim, rank, prove or vote as a creditor of the Company or its estate in competition with the Beneficiary (or any trustee or agent on their behalf) in respect of amounts paid or owing under this Agreement only provided however that subject to the final sentence of this Clause 2.7 the Guarantor shall not be prohibited from filing or proving any such claim to the extent (A) that the Guarantor would otherwise be barred from proving or asserting such claim later if application is not made during such period, and (B) the rights of the Guarantor under any such claim are, during such period, subordinate to the rights of the Beneficiary and any distribution received on account of any such claim during such period is held in trust for the benefit of the Beneficiary and transferred to the Beneficiary in accordance with the final sentence of this Clause 2.7; or

(iv) receive, claim, or have the benefit of any payment, distribution or security from or on account of the Company (except as provided in the immediately-preceding sub-clause), or exercise any right of set-off as against the Company, in each case in respect of amounts paid or owing under this Guarantee only.

The Guarantor must hold in trust for and immediately pay or transfer to the Beneficiary any payment or distribution or benefit of security received by it during such period contrary to this Clause or in accordance with any directions given by the Beneficiary under this Clause.

3. PAYMENTS

3.1 Establishment of the Guaranteed Obligation

(a) Upon the occurrence of an Insolvency Event, the Beneficiary shall forthwith instruct the Scheme actuary to calculate the Buy Out Deficit and notify the same in writing (the "Actuary's Certificate"). It is acknowledged by the Guarantor and the Beneficiary that it may take a number of months for the Scheme actuary to complete the relevant actuarial calculations to produce the Actuary's Certificate.

276

(b)     Once available, a copy of the Actuary's Certificate will be provided to the Guarantor together with such information on the actuarial methods and assumptions underlying the calculation of the Buy Out Deficit as the Scheme Actuary in his opinion considers sets out sufficient detail to enable the Guarantor (after taking such actuarial advice as it considers appropriate) to understand how the Buy Out Deficit was calculated.

(c)     The Guarantor may, within 15 Business Days of receipt of a copy of the Actuary's Certificate (after taking such actuarial advice as it considers appropriate) request from the Beneficiary any further information that it reasonably requires to facilitate its understanding of how the Buy Out deficit was calculated. The Beneficiary shall use reasonable endeavours to supply the further information requested to the Guarantor within 10 Business Days of receiving the request from the Guarantor.

(d)     Following the occurrence of the Insolvency Event, the Beneficiary may issue a Demand once:

        (i)     the Actuary's Certificate has been provided to the Guarantor in accordance with Clause 3.1 (b);

        (ii)    any further information requested has been supplied in accordance with Clause 3.1 (c); and

        (iii)   the Guarantor has confirmed in writing to the Beneficiary within 10 Business Days of receipt of any further information supplied under Clause 3.1 (c) (or if no such information has been requested by the Guarantor, within 15 Business Days of receipt of the Actuary's Certificate) that it does not believe that there is any manifest error or other legitimate ground on which the contents of the Actuary's Certificate should be challenged.

(e)     In the event that the Guarantor does not seek to dispute the Actuary's Certificate and, subject always to the maximum amount of the Guaranteed Obligation hereunder, any Demand made to the Guarantor requesting payment of an amount equal to or less than the amount certified in the Actuary's Certificate appended to such Demand shall be conclusive evidence (and admissible as such) of the Guarantor's liability to pay the Beneficiary and of the amount of the sum or sums which the Guarantor is liable to pay the Beneficiary.

3.2     Due date for payments

(a)     Any payment due from the Guarantor to the Beneficiary following the service of a Demand under this Agreement shall be due within 10 Business Days of the date of delivery of such Demand by the Guarantor from the Beneficiary.

(b)     For the avoidance of doubt, provided an Insolvency Event has occurred when making a Demand and subject to Clause 3.7, it is not necessary for the Beneficiary to have taken court action against the Company to recover the Guaranteed Obligations before such Demand will become payable by the Guarantor.

3.3     Funds

Payments under this Agreement to the Beneficiary must be made for value on the due date at such times and in such manner as the Beneficiary may specify to the Guarantor in a Demand.