TAB E

DOCSTOR: 1680120\1

326

**The Pensions
Regulator**

04 September 2009

**PRIVATE & CONFIDENTIAL**

**The Chief Restructuring Officer**
Nortel Networks Corporation
195 The West Mall
Toronto
Ontario
M9C 5K1
Canada

*Direct Line* +44 1273 627779
*Fax* +44 1273 627241
*Our Ref:* RAFT/PW/TM6409

Dear Sir

**Nortel Networks Corporation, Nortel Networks UK Limited and Nortel Networks
UK Pension Plan**

The Pensions Regulator (the **"Regulator"**) is currently considering issuing a warning
notice seeking a financial support direction (**"FSD"**) under s.43 of the Pensions Act
2004 (**"PA 04"**) against Nortel Networks Corporation (**"NNC"**) and other entities in the
Nortel group in relation to the deficit in the Nortel Networks UK Pension Plan (the
**"Plan"**).

Under s.43(2)(b) of PA 04, the Regulator may issue an FSD if it is of the opinion that the
employer in relation to a scheme is insufficiently resourced at a time determined by the
Regulator which falls under s.43(9) (the **"relevant time"**). The Regulator has chosen 30
June 2008 as the relevant time, this being the last quarter end date which occurs before
the exceptional stock market volatility experienced in the second half of 2008.

Under s.44(3) and (3A) of PA 04 (as amended by the Pensions Act 2008), taken
together with reg.6 of The Pensions Regulator (Financial Support Directions etc)
Regulations 2005 (the "FSD Regs"), an employer is insufficiently resourced if:

(1) the value of the resources of the employer (here Nortel Networks UK Limited -
    **"NNUK"**) is less than 50% of its statutory debt under s.75 of the Pensions Act
    1995 (the **"s.75 debt"**); and
(2) there is an associated or connected company the value of whose resources is
    not less than the difference between 50% of the s.75 debt and the value of the
    resources of the employer. For purposes of the calculation, NNC has been
    selected as the business associate of NNUK.

We consider that the test is satisfied here. We write to you in relation to matter (2)
above, the value of the resources of NNC. We have written in similar terms to the Joint
Administrators of NNUK in relation to matter (1). NNUK has decided not to carry out a

Napier House
Trafalgar Place
Brighton
BN1 4DW

| | |
|---|---|
| Customer support: | 0870 6063636 |
| Textphone: | 0870 2433123 |
| Fax: | 0870 2411144 |
| Email: | customersupport@thepensionsregulator.gov.uk |
| General office: | 01273 811800 |
| Website: | www.thepensionsregulator.gov.uk |
| E-learning: | www.trusteetoolkit.com |

This is Exhibit .......E........ referred to in the
affidavit of .....Anna Renasca....
sworn before me, this .............
day of ...February........, 20.10.

DONNA WOOLLETT, Notary Public, Regional Municipality of Peel,
limited to the attestation of instruments and the
taking of affidavits, for Nortel Networks Corporation
and its subsidiaries. Expires January 29, 2011.

Donna Woollett
A COMMISSIONER FOR TAKING AFFIDAVITS

# The Pensions Regulator

valuation or to comment or examine the calculation carried out. For the purposes of this letter, please take the value of NNUK's resources to be $924m as set out in the Appendix. We are currently attempting to obtain the information necessary for PricewaterhouseCoopers LLC ("PwC"), who have been instructed in this matter by the Plan's trustee, Nortel Network UK Pension Trust Limited (the "Trustee"), to perform a more accurate valuation of NNUK's resources, which they consider will give a lower figure than $924m. This should not delay your consideration of the calculation of the value of NNC's resources.

### NNUK's s.75 debt

Actuarial advisers to the Trustee together with the Trustee have advised that had a s.75 debt fallen due from NNUK as at 30 June 2008, the amount of the Plan's liabilities would have been approximately £3,387 million (excluding defined contribution liabilities). The most recent audited scheme accounts are as at 31 March 2008 and the net assets figure at that time is £1,610 million (excluding defined contribution assets). A deficit on the basis of the difference between these two values is £1,777 million. We understand that the Trustee is considering commissioning scheme accounts as at 30 June 2008 and if such accounts were obtained this is likely to increase the s.75 debt slightly. The Regulator has reviewed the basis of the calculation of the liabilities and considers the deficit figure of £1,777 million to be appropriate for use as the estimated s.75 debt for the purposes of s.44(5) PA 04.

### Calculation of the value of NNC's resources

Regulation 9 of the FSD Regs incorporates a 3-stage approach for valuing the resources of a business, as follows:

(1) the stage set out in reg.9(4) (for an employer) or 9(5) (for a business associate) - being net assets with pension scheme balances added back;
(2) the stage set out in reg.9(6) - being the result from stage (1) with fair value adjustments for assets and liabilities; and
(3) the stage set out in reg.9(7) - being the result from stage (2) with entity value differences applied.

In order to ascertain the value of the resources of NNC, we have considered calculations carried out by PwC. The approach adopted by PwC to valuing the resources of NNC is set out in the Appendix to this letter.

Napier House
Trafalgar Place
Brighton
BN1 4DW

Customer support:   0870.6063636
Textphone:          0870 2433123
Fax:                0870 2411144
Email:              customersupport@thepensionsregulator.gov.uk
General office:     01273 811800
Website:            www.thepensionsregulator.gov.uk
E-learning:         www.trusteetoolkit.com

**The Pensions Regulator** ☼

### Action required now.

The Regulator is informed that the bar date for submitting claims in NNC's CCAA proceedings is 30 September 2009, therefore we request an urgent response to this letter. Given that the figures derive from the share price of NNC — a listed company — we consider that you should be able to accomplish this. Please consider the calculation in the Appendix and confirm either that:

(i) you agree with the calculation and the resulting valuation of NNC's resources of $4,224 million (equivalent to £2,117 million using the £:$ spot rate at 30 June 2008 — source: www.oanda.com), or

(ii) you do not consider the calculation to be appropriate in which case please provide your alternative calculation together with supporting evidence.

Your response should be received by the Regulator, either by post or to the e-mail addresses below, as soon as possible, but **in any event no later than 3pm (UK time) on Friday 18 September 2009.**

Please contact me if you have any queries in relation to this request.

Yours sincerely

**Paul Williams**
**Risk and Funding Team**
email: paul.williams@thepensionsregulator.gov.uk
cc : TM6409@thepensionsregulator.gsi.gov.uk

| Napier House | Customer support: | 0870 6063636 |
| Trafalgar Place | Textphone: | 0870 2433123 |
| Brighton | Fax: | 0870 2411144 |
| BN1 4DW | Email: | customersupport@thepensionsregulator.gov.uk |
| | General office: | 01273 811800 |
| | Website: | www.thepensionsregulator.gov.uk |
| | E-learning: | www.trusteetoolkit.com |



The Pensions Regulator

<u>Appendix</u>

**Methodology adopted by PwC in determining the value of NNC's resources at 30 June 2008 for the purposes of the FSD Regs.**

PwC's methodology comprises 2 stages:

(i) Determine NNC's enterprise value by reference to its market capitalisation as at 30 June 2008,

(ii) Apply the adjustments set out below to give the value of NNC's resources

**Step (i): determine NNC's enterprise value**

To approximate the value of NNC's enterprise value (inclusive of NNUK) the following adjustments were made to NNC's market capitalisation as at 30 June 2008:

- A control premium of 30% was included to reflect the premium above market capitalisation if valuing the business as a whole. This figure is based on PwC's review of the evidence for premia paid in historic transactions in excess of $100 million from January 2008 to June 2009 from Mergerstat;
- The market value of NNC's external group debt was added back;
- The accounting value of group pension liabilities was added back;
- A deduction was made for estimated surplus cash (based on NNC's 30 June 2008 year-end cash less an estimate of its working capital requirement for 2009).

This gives a figure of $9,842 million for NNC's enterprise value.

| Enterprise Value of NNC at 30 June 2008 | $m | Source |
|---|---|---|
| NNC Market cap | 4,083 | Datastream |
| Adjustments to calculate NNC Enterprise Value | | |
| Add: Control premium of 30% | 1,225 | PwC estimate |
| Add: Market value of Group debt | 3,944 | Datastream |
| Add: Group accounting value of pensions and post-employment benefits obligations | 1,900 | Nortel Jan 08 SAP extracts |
| Deduct: Ext. Group Surplus Cash & Cash equivalents | (1,310) | PwC estimate |
| NNC Enterprise Value including control premium | 9,842 | |

**Step (ii): determine the value of NNC's resources**

To obtain the value of NNC's resources, the enterprise value was adjusted in the following manner:

- A deduction was made for the face value of NNC's debt (this makes the assumption that the full par value of the debt is redeemed),
- The accounting value of group pension liabilities was deducted,
- The accounting value of the relevant pension scheme related balances has been added back. These are the UK pension scheme balances contained in NNUK's audited accounts for the year to 31 December 2007. The pension scheme deficit balance is $393 million (£197 million converted at the £:$ spot rate at 31/12/2007 of 1.9973 – source: www.oanda.com)

| | | |
|---|---|---|
| Napier House | Customer support: | 0870 6063636 |
| Trafalgar Place | Textphone: | 0870 2433123 |
| Brighton | Fax: | 0870 2411144 |
| BN1 4DW | Email: | customersupport@thepensionsregulator.gov.uk |
| | General office: | 01273 811800 |
| | Website: | www.thepensionsregulator.gov.uk |
| | E-learning: | www.trusteetoolkit.com |

330

**The Pensions Regulator**※

- Related employer balances have been deducted. This is the NNUK value of resources at 30 June 2008, which PwC has calculated as $924m (being £463 million converted at the £:$ spot rate of 1.9954 at 30 June 2008 – source: www.oanda.com).

| Value of Resources of NNC at 30 Jun 08 | $m | Source |
|---|---|---|
| NNC Enterprise Value inc control premium | 9,842 | |
| Adjustments to calculate NNC Value of Resources | | |
| Deduct: Book value of Group debt | (4,497) | Jun 08 10Q |
| Deduct: Group accounting value of pensions and post-employment benefits obligations | (1,900) | Nortel Jun 08 SAP extracts |
| Add: Est. Group Surplus Cash | 1,310 | PwC analysis |
| NNC Equity Value | 4,755 | |
| Add: Accounting value of UK pension liability per Reference Accounts | 393 | NNUK 2007 Statutory Accounts |
| Deduct: NNUK value of resources | (924) | PwC analysis |
| NNC Value of Resources | 4,224 | |

This gives an adjusted entity fair value of NNC's resources as $4,224 million (equivalent to £2,117 million using £:$ spot rate 1.9954 at 30/06/08 – source: www.oanda.com).

**Summary - Valuation results:**

We consider that the relevant figures are as follows. We have included the calculations at stage 1 and stage 2, but the Regulator considers the stage 3 calculation to be the most accurate and therefore the most appropriate one:

| | Value of NNC's resources ($m)[1] | 50% of s.75 debt less the value of NNUK's resources ($m) | Value of NNC's resources (£m) | 50% of s.75 debt less the value of NNUK's resources (£m)[1] |
|---|---|---|---|---|
| Stage 1[2] | 1,573 | 850 | 788 | 426 |
| Stage 2[3] | 1,573 | 850 | 788 | 426 |
| Stage 3[4] | 4,224 | 850 | 2,117 | 426 |

---

1 Spot Rate (Source: www.oanda.com) £1 = $1.9973 at 31/12/2007 and £1 = $1.9954 at 30/06/2008.

2 Stage 1 - derived from Nortel Jun 08 10Q NNC balance sheet.

3 Stage 2 – PwC have not performed a revaluation of individual assets in NNC.

4 Stage 3 – Derived from the process detailed in this letter and appendix.

Napier House
Trafalgar Place
Brighton
BN1 4DW

Customer support:  0870 6063636
Textphone:  0870 2433123
Fax:  0870 2411144
Email:  customersupport@thepensionsregulator.gov.uk
General office:  01273 811800
Website:  www.thepensionsregulator.gov.uk
E-learning:  www.trusteetoolkit.com

# TAB F

331



**NORTEL**

PRIVATE AND CONFIDENTIAL

VIA EMAIL

September 16, 2009

FAO Paul Williams
Risk and Funding Team
The Pensions Regulator
Napier House
Trafalgar Place
Brighton
BN1 4DW

Reference RAFT/PW/TM6409

Dear Paul,

**Nortel Networks Corporation (NNC), Nortel Networks UK Limited and
Nortel Networks UK Pension Plan**

We refer to your letter of 4 September 2009. Thank you for your correspondence. However, we must at this stage, decline the opportunity to comment on the calculation you refer to in your letter, and also decline to provide an alternative valuation.

As you are aware, there is a stay of proceedings under Canadian law in relation to NNC and certain of its subsidiaries, and by its order dated 30 July 2009 (the "Claims Bar Order"), the Canadian Court has ordered that the bar date for submitting claims against NNC (and relevant subsidiaries) is 30 September 2009. All claims against NNC (and relevant subsidiaries) are being dealt with in accordance with the claims procedure for debtors pursuant to the Claims Bar Order and the *Companies' Creditors Arrangement Act.*

As you can therefore appreciate, NNC is not in a position to enter into any correspondence with individual entities in respect of potential claims against NNC.

If the Pensions Regulator or the trustees of the Nortel Networks UK Pension Plan believe they may have a claim against NNC, we would invite you to submit your Proof of Claim and it will be subject to review in accordance with the process referred to above.

Yours sincerely,

*Pavi Binning*

Pavi Binning

For and on behalf of Nortel Networks Corporation

Pavi Binning
Executive Vice President , Chief Financial Officer and Chief Restructuring Officer
Nortel
195 The West Mall, Toronto, ON   M9C 5K1  Canada
PH 905 863 1020 FX 905 863 2476  pbinning@nortel.com

This is Exhibit ......F...... referred to in the
affidavit of ...Anna Ventresca...
sworn before me, this ...17...
day of ...February... 20.10.

*Donna Woollett*
A COMMISSIONER FOR TAKING AFFIDAVITS

DONNA WOOLLETT, Notary Public, Regional Municipality of Peel,
limited to the attestation of instruments and the
taking of affidavits, for Nortel Networks Corporation
and its subsidiaries. Expires January 29, 2011.

# TAB G

332

**The Pensions Regulator**

11 November 2009

Direct Line: 01273 248450
Our Ref: TM5405/AL/SK

Mr Alan Hudson
Administrator
Ernst & Young LLP
1 More London Place
London SE1 2AF

Dear Sir

**Re: Nortel Networks UK Limited (in Administration) and associated Nortel EMEA entities (in Administration)**

As you are aware, the Pensions Regulator has been investigating whether there are grounds to seek the issue of a financial support direction ("FSD") against certain corporate entities in the Nortel group. Some of these corporate entities are those which have their centre of main interests in the UK and are those where you, Christopher Hill and Stephen Harris or, in respect of Nortel Networks Ireland Limited, you and David Hughes, have been appointed as administrators under order of the High Court. We set out below a list of the particular companies which are likely to be made the targets of the proposed warning notice in respect of which you are the administrator. I should add that this list does not of course encompass other overseas Nortel entities which are also likely to be targets. This letter only relates to those entities over which you have been appointed as administrator.

The Pensions Regulator will shortly be in a position to issue the appropriate warning notice under section 96 of the Pensions Act 2004. As you are aware from your role as administrator of Nortel Networks UK Limited (NNUK), there is a substantial deficit in the pension scheme and the purpose behind the issue of a warning notice is to ensure that other Nortel entities are obliged to provide "financial support" towards the pension scheme. As many if not all these Nortel entities are also in some form of insolvency process, we anticipate that the financial support sought will be simply the ability of the pension scheme to prove in the various insolvency estates as a creditor. This is of course very much in line with the way the Nortel group operated on a global basis. Moreover, as you are aware, the Nortel group deliberately operated a policy of not making sufficient contributions into the pension scheme which has led to the substantial deficit. Of course as administrator of NNUK, you will be given notice and be entitled to make such representations to the Determinations Panel as you, as administrator, consider appropriate.

Napier House      Customer support:  0870 6063636
Trafalgar Place    Textphone:        0870 2433123
Brighton           Fax:              0870 241144
BN1 4DW            Email:            customersupport@thepensionsregulator.gov.uk
                   General office:   01273 811800
                   Website:          www.thepensionsregulator.gov.uk
                   E-learning:       www.trusteetoolkit.com

This is Exhibit .........G......... referred to in the
affidavit of ...Anna Ventress...
Sworn before me, this ....17....
day of ...February......... 20.10.

...Donna Woollett...
A COMMISSIONER FOR TAKING AFFIDAVITS

DONNA WOOLLETT, Notary Public, Regional Municipality of Peel,
limited to the attestation of instruments and the
taking of affidavits, for Nortel Networks Corporation
and its subsidiaries. Expires January 29, 2011.

333

**The Pensions Regulator**

The purpose of this letter is to enable the Pensions Regulator to deal with the issue of paragraph 43(6) of Schedule B1 to the Insolvency Act 1986 ("Schedule B1"), under which the administrator can consent to "legal process" being issued against the company or companies in respect of which he has been appointed.

In our view, it is clear that the warning notice regime was intended to be used in relation to insolvent companies, and therefore paragraph 43(6) should not stand in the way of this.

Our analysis is that consent under paragraph 43(6) is not necessary, because we do not consider that either of the actions under consideration by the Pensions Regulator ("the Actions") constitute "legal process" within the meaning of paragraph 43(6) of Schedule B1. For clarity we set out what these Actions are, namely,

    (i)    the giving of notice to certain companies under the standard procedure of the Pensions Regulator pursuant to section 96 of the Pensions Act 2004 that a regulatory action is under consideration; and

    (ii)    the exercise of the power by the Pensions Regulator to issue a financial support direction under section 43 of the Act, such power being exercised by the Determinations Panel.

However we seek your consent for the avoidance of doubt, and in order to avoid the need to seek a declaration from the court that the Actions are not "legal process" within the meaning of paragraph 43(6) of Schedule B1 and / or permission from the court under paragraph 43(6)(b) of Schedule B1. We consider that in the event that the court determines that the Actions are indeed "legal process", the court would grant such permission given that the Actions do not impede the achievement of the purpose of the Administrations and are carried out in the exercise of the Pensions Regulator's statutory functions and in the public interest.

We should make clear at the outset that the granting of your consent will not prejudice your rights as regards the legal or factual case that will be set out in the notice to be issued pursuant to section 96 of the Pensions Act 2004, nor affect the determination by the Determinations Panel whether a financial support direction should be issued. It is irrelevant to that determination. We also make clear that we do not seek by the Actions to take any steps against the assets of a company in administration, nor to interfere with the operation of the relevant companies' administrations. For your assistance we set out below our analysis of this matter.

\\tpr-bdc01.bcs.opn.gov.uk\dataS\froe_dsd156222\Unkry_let_c1502123_v1a_20091110_bt_ind_v_nkation_s&y_re_consent_of_administrators__final_version.doc

| | | |
|---|---|---|
| Napier House | Customer support: | 0870 6063636 |
| Trafalgar Place | Textphone: | 0870 2455123 |
| Brighton | Fax: | 0870 2411144 |
| BN1 4DW | Email: | customersupport@thepensionsregulator.gov.uk |
| | General office: | 01273 811800 |
| | Website: | www.thepensionsregulator.gov.uk |
| | E-learning: | www.trusteetoolkit.com |

334

**The Pensions Regulator**

**Legal Process**

We do not consider the Actions to be legal processes that trigger the requirement for consent or permission under paragraph 43 of Schedule B1.

Sections 96 and 98 of the Pensions Act 2004 set out the two forms of procedure to be followed by the Pensions Regulator when it seeks to exercise a reserved regulatory function. Section 96 is concerned with the "standard procedure" and provides that the Pensions Regulator will give notice to such persons as appear to the Pensions Regulator to be directly affected by a regulatory action under consideration. That notice is defined as a "warning notice" in section 96(2)(a) of the Pensions Act 2004. It provides information to directly affected parties, including details of their right to refer a determination of the Determinations Panel to the Pensions Regulator Tribunal. A warning notice also sets out such information as is necessary to enable the Determinations Panel to make its determination whether to exercise the regulatory function in question, and to enable the party in question to make representations to the Determinations Panel. The giving of a warning notice is not legal process, but a means for the provision of information.

The determination of the Determinations Panel whether to issue a financial support direction is also not an action constituting legal process. The Determinations Panel is not an independent tribunal falling within the Tribunal, Courts and Enforcement Act 2007. It is an internal panel of the Pensions Regulator set up pursuant to sections 9 and 10 of the Pensions Act 2004. It may hold oral hearings as part of its procedure to determine whether the Pensions Regulator should issue a FSD, but such hearings are at the discretion of the Determinations Panel. The Determinations Panel does not have power to compel the attendance of witnesses nor to compel the production of documents. In short it is not a judicial body and the exercise of its function is not a judicial or "legal process" within the meaning of paragraph 43 of Schedule B1.

Determinations of the Determinations Panel are subject to referral to the Pensions Regulator Tribunal ("the Tribunal") (section 103 Pensions Act 2004). Any directly affected party may refer such a determination to the Tribunal. The Tribunal is not an internal panel of the Pensions Regulator but is a body set up pursuant to section 102 of the Pensions Act 2004. That section provides that the Lord Chancellor may by rules make such provision as he considers necessary or expedient in respect of the conduct of proceedings before the Tribunal. The Tribunal has the power to consider evidence that was not before the Determinations Panel and the power to summon witnesses and order the production of documents (paragraph 8 of Schedule 4 to the Pensions Act 2004). Its orders are enforced as orders of the court (section 103). The Tribunal is not limited to reviewing the decision of the Determinations Panel and in our view does not

\\gr\ddm01\kms.opin.gov.uk\ddm01\tpr_dd41583723A\dep_dm_21282122_v1c_2009\110_ltr_tsd_-_shalom_why_it_consent_of_administrator__final_version.doc

| | | |
|---|---|---|
| Napier House | Customer support: | 0870 6063636 |
| Trafalgar Place | Textphone: | 0870 2433123 |
| Brighton | Fax: | 0870 2411144 |
| BN1 4DW | Email: | customersupport@thepensionsregulator.gov.uk |
| | General office: | 01273 811800 |
| | Website: | www.thepensionsregulator.gov.uk |
| | E-learning: | www.trusteetoolkit.com |

335

**The Pensions Regulator**

exercise an appellate jurisdiction. Appeals from the Tribunal on a point of law will lie to the Court of Appeal.

For these reasons it is our settled view that the Actions are not "legal process" within the meaning of paragraph 43 of Schedule B1. The examples of legal process given in that paragraph comprise legal proceedings, execution, distress and diligence. The Actions are not directed against any property, nor are they legal proceedings in a court of law or a tribunal established under the Tribunal, Courts and Enforcement Act 2007. They are in fact the administrative operations of the Pensions Regulator as part of its "standard procedure" by which certain regulatory functions including the issue of a FSD are carried out.

### Permission of the Court

We trust that it will not be necessary to seek the leave of the court for the Actions to be taken. Should such an application be necessary we will rely principally on the facts that:

1. Neither of the Actions will impede the purpose of the relevant Administrations;
2. Neither of the Actions represent enforcement against or interference with assets of the companies affected, nor are they steps towards such a process;
3. Neither of the actions affect the principle that creditors in the administrations should be treated pari passu;
4. The aim of seeking a FSD is to protect both the benefits under an occupational pension scheme and the members of that scheme. This aim is in accordance with the Pensions Regulator's statutory objectives as set out by Parliament in paragraph 5 of the Pensions Act 2004 and is in the public interest.

We rely on these facts as the ground on which we consider your consent to the Actions should now be given.

### Companies

The companies in respect of which we seek leave are as follows:

Nortel GMBH
Nortel Networks NV
Nortel Networks S.P.A.
Nortel Networks BV
Nortel Networks Hispania SA
Nortel Networks Polska Sp Z.O.O.
Nortel Networks International Finance & Holdings BV

Napier House
Trafalgar Place
Brighton
BN1 4DW

| | |
|---|---|
| Customer support: | 0870 6063636 |
| Textphone: | 0870 2433123 |
| Fax: | 0870 2411144 |
| Email: | customersupport@thepensionsregulator.gov.uk |
| General office: | 01273 811800 |
| Website: | www.thepensionsregulator.gov.uk |
| E-learning: | www.trusteetoolkit.com |

336

**The Pensions Regulator**✸

Nortel Networks France SAS
Nortel Networks (Ireland) Limited
Nortel Networks SA

## Conclusion

We request a reply to this letter by 18 November 2009. Should you refuse to grant consent, we will require you to follow the guidance of the Court of Appeal in *Re Atlantic Computer Systems plc* [1992] 2 WLR 367 and give full reasons for that refusal.

If it is necessary for us to apply to court for permission we will do so on an expedited basis. In any such application we will need to deploy material obtained from you and others in the exercise of our functions. The disclosure of that material is restricted pursuant to section 82 of the Pensions Act 2004. It is our view that section 87(2)(d) will apply in this case and allow the application to be heard in open court. If you disagree with this interpretation please let us know.

We look forward to hearing from you.

Yours faithfully,

Marcus Laughton
Case Lawyer
Risk and Funding Team

Napier House          Customer support:    0870 6063636
Trafalgar Place       Textphone:           0870 2433123
Brighton              Fax:                 0870 2411144
BN1 4DW               Email:               customersupport@thepensionsregulator.gov.uk

                      General offices      01273 811800
                      Website:             www.thepensionsregulator.gov.uk
                      E-learning:          www.trusteetoolkit.com

**TAB H**

DOCSTOR: 1680120\1

337

13 January 2010

**The Pensions Regulator** ✻

**Private & Confidential**
Mr J Doolittle
Nortel Networks Limited
5945 Airport Road
Suite 360
Mississauga
Ontario, L4V 1RG

*Tel: 01273 648450*
*Our Ref:ML/TM6409 (SM)*

Dear Mr Doolittle

**NORTEL NETWORKS UK PENSION PLAN ("the scheme")**

Further to my letter of 17 December 2009, I enclose by way of service under s.303 of the Pensions Act 2004 ("the Act") a Warning Notice and nine bundles of supporting evidence further to s.96 of the Act. I should be grateful if you would acknowledge service shortly after you receive the enclosed documents.

Nortel Networks Limited has the right to make written Representations to the contents of the Warning Notice under s96 (2) (b) of the Act. I should be grateful if you would address these to Paul Williams, the case manager at Napier House, Trafalgar Place, Brighton, BN1 4DW to arrive by noon on Monday 1 March 2010 should you decide to do so.

Determinations are normally based on the Warning Notice and Representations so you should make sure your whole case is contained in your Representations and supporting documents. If no Representations are received by the date given in this letter the Regulator will make its decision based only on the information contained in the Warning Notice.

I should also be grateful if you would inform me as soon as is practical whether Nortel Networks Limited intends to request an oral hearing in relation to this matter.

Copies of the Warning Notice have also been sent to the Pension Protection Fund and the Trustees of the scheme as Directly Affected Parties.

Yours sincerely

**Marcus Laughton**
Case Lawyer
Risk and Funding Team

This is Exhibit ........ *H* ........ referred to in the
affidavit of ...... *Anna Ventresca* ......
sworn before me, this ...... *17* ......
day of ...... *February* ...... 20 *10*

...... *Donna Woollett* ......
A COMMISSIONER FOR TAKING AFFIDAVITS

DONNA WOOLLETT, Notary Public, Regional Municipality of Peel,
limited to the attestation of instruments and the
taking of affidavits, for Nortel Networks Corporation
and its subsidiaries. Expires January 29, 2011.

Napier House
Trafalgar Place
Brighton
BN1 4DW

Customer support: 0870 6063636
Textphone: 0870 2433123
Fax: 0870 2411144
Email: customersupport@thepensionsregulator.gov.uk
General office: 01273 811800
Website: www.thepensionsregulator.gov.uk
E-learning: www.trusteetoolkit.com

# TAB I

338

13 January 2010

**The Pensions Regulator**

**Private & Confidential**
Mr J Doolittle
Nortel Networks Corporation
5945 Airport Road
Suite 360
Mississauga
Ontario, L4V 1RG

*Tel: 01273 648450*
*Our Ref:ML/TM6409 (SM)*

Dear Mr Doolittle

**NORTEL NETWORKS UK PENSION PLAN ("the scheme")**

Further to my letter of 17 December 2009, I enclose by way of service under s.303 of
the Pensions Act 2004 ("the Act") a Warning Notice and nine bundles of supporting
evidence further to s.96 of the Act. I should be grateful if you would acknowledge
service shortly after you receive the enclosed documents.

Nortel Networks Corporation has the right to make written Representations to the
contents of the Warning Notice under s96 (2) (b) of the Act. I should be grateful if
you would address these to Paul Williams, the case manager at Napier House,
Trafalgar Place, Brighton, BN1 4DW to arrive by noon on Monday 1 March 2010
should you decide to do so.

Determinations are normally based on the Warning Notice and Representations so
you should make sure your whole case is contained in your Representations and
supporting documents. If no Representations are received by the date given in this
letter the Regulator will make its decision based only on the information contained in
the Warning Notice.

I should also be grateful if you would inform me as soon as is practical whether
Nortel Networks Corporation intends to request an oral hearing in relation to this
matter.

Copies of the Warning Notice have also been sent to the Pension Protection Fund
and the Trustees of the scheme as Directly Affected Parties.

Yours sincerely

**Marcus Laughton**
Case Lawyer
Risk and Funding Team

*This is Exhibit ......T...... referred to in the*
*affidavit of ......Anna Ventresca......*
*sworn before me, this ...17......*
*day of ......february...... 20.10...*

......Donna Woollett......
A COMMISSIONER FOR TAKING AFFIDAVITS

DONNA WOOLLETT, Notary Public, Regional Municipality of Peel,
limited to the attestation of instruments and the
taking of affidavits, for Nortel Networks Corporation
and its subsidiaries. Expires January 29, 2011.

| Napier House | Customer support: | 0870 6063636 |
|---|---|---|
| Trafalgar Place | Textphone | 0870 2433123 |
| Brighton | Fax: | 0870 2411144 |
| BN1 4DW | E-mail: | customersupport@thepensionsregulator.gov.uk |
| | General office: | 01273 811800 |
| | Website: | www.thepensionsregulator.gov.uk |
| | E learning: | www.trusteetoolkit.com |

# TAB J

339

# ALLEN & OVERY

**BY FAX & BY POST**

Herbert Smith LLP
Exchange House
Primrose Street
London EC2A 2HS

For the attention of Stephen Gale

Our ref       DSS/ANDD/0017242-0000008 LT:5315936.1

12 February 2010

Dear Sirs

**Allen & Overy LLP**
One Bishops Square
London E1 6AD United Kingdom

Tel         +44 (0)20 3088 0000
Fax        +44 (0)20 3088 0088
Direct     +44 (0)20 3088 1489
andrew.denny@allenovery.com

This is Exhibit ......J...... referred to in the
affidavit of ...Anna VenPesca......
sworn before me, this ........17........
day of ...February...... 2010.

......Donna Woollett......
DONNA WOOLLETT, Notary Public, Regional Municipality of Peel,
limited to the attestation of instruments and the
taking of affidavits, for Nortel Networks Corporation
and its subsidiaries. Expires January 29, 2011.

**Nortel Networks Corporation and Nortel Networks Limited**

We act for Ernst & Young Inc. in its capacity as monitor of Nortel Networks Corporation and Nortel Networks Limited (the "CCAA Debtors"). We understand that you act for the administrators of Nortel Networks UK Limited ("NNUK").

We refer to the letter dated 8 February 2010 (the "Letter") from our client's Canadian counsel, Goodmans LLP to the Pensions Regulator (the "Regulator") regarding the Warning Notice dated 11 January 2010 (the "Warning Notice") purportedly issued by the Regulator pursuant to sections 96(2) and 43(2) of the Pensions Act 2004 (the "Act") and addressed to various members of the Nortel Group. We understand that your client's Canadian counsel was provided with a copy of the Letter, but a further copy is enclosed in any event.

As foreshadowed in the Letter, our client proposes to bring a motion before the Ontario Superior Court of Justice (the "Ontario Court") on 25 February 2010 for, inter alia, an order authorising and directing the CCAA Debtors to refrain from participating in the proceedings contemplated by the Warning Notice and declaring that no recognition or legal effect whatsoever will be given in Canada to the outcome of any such proceedings. In the context of this motion, our client considers that it is not only necessary but appropriate and in the interests of justice that the Ontario Court be provided with a copy of the Warning Notice so that it has the full details of the arguments put forward by the Regulator and the matters on which it purports to rely. The Warning Notice will also be referred to in written submissions.

However, our client is aware of the restrictions placed on the disclosure of information obtained from the Regulator where that information constitutes "restricted information" within the definition in section 82 of the Act. It appears to our client that most if not all of the contents of the Warning Notice is information which was not "obtained" by the Regulator from any other person and/or is already publicly available, and is therefore not restricted information. Entirely without prejudice to this position, and out of an abundance of caution, our client seeks your client's consent to the disclosure to the Ontario Court of any restricted

Allen & Overy LLP is a limited liability partnership registered in England and Wales with registered number OC306763. It is regulated by the Solicitors Regulation Authority of England and Wales. The term partner is used to refer to a member of Allen & Overy LLP or an employee or consultant with equivalent standing and qualifications. A list of the members of Allen & Overy LLP and of the non-members who are designated as partners is open to inspection at its registered office, One Bishops Square, London E1 6AD.

Allen & Overy LLP or an affiliated undertaking has an office in each of: Abu Dhabi, Amsterdam, Antwerp, Bangkok, Beijing, Bratislava, Brussels, Bucharest (associated office), Budapest, Dubai, Düsseldorf, Frankfurt, Hamburg, Hong Kong, London, Luxembourg, Madrid, Mannheim, Milan, Moscow, Munich, New York, Paris, Prague, Riyadh (associated office), Rome, São Paulo, Shanghai, Singapore, Tokyo and Warsaw.

**ALLEN & OVERY**                340

information in the Warning Notice which relates to and/or was obtained from your client and which does not fall within any of the exceptions to the prohibitions on disclosure set out in the Act.

As our client is due to file supporting papers for its motion by Wednesday 17 February 2010, we would be grateful for your response by 5 pm on Tuesday 16 February 2010.

Yours faithfully

*Allen & Overy LLP*

Allen & Overy LLP

Copy to:        The Pensions Regulator
                For the attention of Marcus Laughton

**TAB K**

341

## FRESHFIELDS BRUCKHAUS DERINGER

The Pensions Regulator
Napier House
Trafalgar Place
Brighton
BN1 4DW

For the attention of Marcus Laughton

By Post & Fax

3 February 2010

Dear Sirs

LONDON
65 Fleet Street
London EC4Y 1HS
T +44 20 7936 4000
Direct T +44 20 7716 4065
F +44 20 7832 7001
Direct F +44 20 7108 4065
LDE No 23
E lynn.dunne@
freshfields.com
W freshfields.com

DOCID LON10408401/4
OUR REF NAG/LND/BM
YOUR REF TM6409
CLIENT MATTER NO. 153557-0001

DONNA WOOLLETT, Notary Public, Regional Municipality of
limited to the attestation of instruments and the
taking of affidavits, for Nortel Networks Corporation
and its subsidiaries. Expires January 29, 2011.

This is Exhibit ........K........ referred to in the
affidavit of ...Anna Ventura...
sworn before me, this .....17.....
day of ...February... 20 10.

........Donna Woollett........
A COMMISSIONER FOR TAKING AFFIDAVITS

**In the matter of Nortel Networks UK Pension Plan
And in the matter of The Pensions Act 2004**

We act for Nortel Networks Corporation (in CCCA proceedings) (*NNC*) and Nortel
Networks Limited (in CCCA proceedings) (*NNL*).

We refer to the warning notice dated 11 January 2010 and issued by the Pensions Regulator
(the *Warning Notice*) to, among other separate entities in the Nortel Group, NNC and NNL.
We also refer to your letters to NNC and NNL of 13 and 25 January 2010.

We are aware of the content of s.43(2) of the Pensions Act 2004. However, as you will
appreciate, NNC and NNL are both in an insolvency process and, prior to taking any step in
this matter, need to consult with their various stakeholders. This includes consideration of
applicable jurisdictional considerations in Canada, and this letter is without prejudice to their
rights in that regard. This process is ongoing and, once we have received instructions, we
will revert to you. We hope to be able to do so early next week but will endeavour to do so
earlier.

**The official legal services provider to the London 2012 Olympic and Paralympic Games**

Freshfields Bruckhaus Deringer LLP is a limited liability partnership registered in England and Wales with registered
number OC334789. It is regulated by the Solicitors Regulation Authority. For regulatory information (including information
relating to the provision of insurance mediation services) please refer to www.freshfields.com/support/legalnotice.

A list of the members (and of the non-members who are designated as partners) of Freshfields Bruckhaus Deringer LLP and
their qualifications is available for inspection at its registered office, 65 Fleet Street, London EC4Y 1HS. Any reference to a
partner means a member, or a consultant or employee with equivalent standing and qualifications, of Freshfields Bruckhaus
Deringer LLP or any of its affiliated firms or entities.

Abu Dhabi  Amsterdam  Bahrain  Barcelona  Beijing  Berlin  Brussels  Cologne  Dubai  Düsseldorf
Frankfurt am Main  Hamburg  Hanoi  Ho Chi Minh City  Hong Kong  London  Madrid  Milan
Moscow  Munich  New York  Paris  Rome  Shanghai  Tokyo  Vienna  Washington

**FRESHFIELDS BRUCKHAUS DERINGER**

342

2|2

In the meantime, should you require any further information please contact either Neil Golding (020 7832 7416) or Lynn Dunne (020 7716 4065.

Yours faithfully

*Freshfields Bruckhaus Deringer.*

**TAB L**

DOCSTOR: 1680120\1

343

# Goodmans

Barristers & Solicitors

Bay Adelaide Centre
333 Bay Street, Suite 3400
Toronto, Ontario M5H 2S7

Telephone: 416.979.2211
Facsimile: 416.979.1234
goodmans.ca

Direct Line: 416.597.4107
jcarfagnini@goodmans.ca

February 8, 2010

Our File No.: 083800

**By Fax**

The Pensions Regulator
Napier House
Trafalgar Place
Brighton
BN1 4DW

**For the Attention of Marcus Laughton:**

This is Exhibit ............*L*............ referred to in the
affidavit of ....*Anna Ventresca*....
sworn before me, this ....*17*....
day of ....*February*.... 20..*10*..

.....*Donna Woollett*.....
A COMMISSIONER FOR TAKING AFFIDAVITS

DONNA WOOLLETT, Notary Public, Regional Municipality of Peel,
limited to the attestation of instruments and the
taking of affidavits, for Nortel Networks Corporation
and its subsidiaries. Expires January 29, 2011.

Dear Sirs:

Re:    **Nortel Networks Corporation and Nortel Networks Limited**

We are the lawyers for Ernst & Young Inc. in its capacity as monitor of Nortel Networks Corporation and Nortel Networks Limited (the "CCAA Debtors"). Our client was appointed an officer of the Ontario Superior Court of Justice (the "Court") to serve as monitor of the CCAA Debtors (the "Monitor") by Order of the Honourable Mr. Justice Morawetz dated January 14, 2009 under the *Companies' Creditors Arrangement Act*, R.S.C. 1985, c.C-36, as amended (the "CCAA").

As you are aware, the CCAA Debtors are insolvent and have been the subject of proceedings under the CCAA since January 14, 2009. We enclose a copy of the Third Amended and Restated Initial Order under the CCAA dated January 14, 2009 which is currently in force in respect of the CCAA Debtors (the "Initial CCAA Order"). Paragraph 14 of this Order stays all legal proceedings against the CCAA Debtors, their property and businesses, unless such proceedings are commenced with the consent of either the CCAA Debtors or the Monitor or with leave of the Court. Paragraph 15 of the Initial CCAA Order stays and suspends the legal effect of "all rights and remedies" against the CCAA Debtors, their property and businesses unless such rights or remedies are exercised with the consent of either the CCAA Debtors or the Monitor or with leave of the Court.

We have been provided with a copy of a document dated January 11, 2010 styled:

The Pensions Regulator
Warning Notice
in the matter of Nortel Networks UK Pension Plan (the "Scheme")
and in the matter of
The Pensions Act 2004 (the "Act")

# Goodmans

In this document (the "Warning Notice"), the Pensions Regulator purports to give notice to the CCAA Debtors, among others, that under UK law, the Pensions Regulator seeks to require the CCAA Debtors to provide financial support for the pension plan of Nortel Networks UK Limited ("NNUK"). The Warning Notice states that it is delivered pursuant to sections 96(2) and 43(2) of the Act. It evidences the commencement of a proceeding that purports to determine liability of the CCAA Debtors and, to that end, indicates that the Pensions Regulator has purported to exercise various rights against the CCAA Debtors (including, without limiting the generality of the foregoing, the Pensions Regulator's right to deem certain values under Regulation 12 under the Act and the right to require a response from the CCAA Debtors by March 1, 2010). It is clear that both the intended purposes and the proposed effects of the Warning Notice are to commence legal proceedings against the CCAA Debtors and to exercise statutory rights against the CCAA Debtors so as to enable the Pensions Regulator to make determinations affecting the property of the CCAA Debtors. Moreover, under the provisions of the Act, the Pensions Regulator is required to provide notice of the proceeding to the CCAA Debtors. Neither the CCAA Debtors nor the Monitor has consented to the commencement of such proceedings or to the exercise of any such rights against the CCAA Debtors and their property. Nor has the Pensions Regulator sought leave of the Court to commence such proceedings or to exercise any such rights. It is therefore the Monitor's view that by delivering the Warning Notice to the CCAA Debtors, the Pensions Regulator has violated the stay provisions of paragraphs 14 and 15 of the Initial CCAA Order. The Warning Notice is thereby void and of no effect.

A stay of proceedings granted under the CCAA is intended to bring a debtor and all interested parties with legal interests in the debtor and its property under the purview of the supervising Court. This ensures that a fair and equitable process is put in place for the restructuring of the debtor's business in the interests of all stakeholders and in the public interest so as to prevent any individual interest from unfairly predominating. The stay also allows the supervising Court to ensure that there is a controlled stream of litigation against the debtor so that management is not unduly deflected from its Court-ordered tasks by any individual entity which seeks to impose its own agenda on the debtor contrary to the overriding interests of all. We note that by Orders dated July 30, 2009 and October 7, 2009 the Court has already provided for the implementation of a claims procedure by which all those who seek to make claims against the CCAA Debtors and their property can deliver proofs of claim and have their claims fairly adjudicated in an established process under the auspices of the Monitor that is supervised by the Court (the "CCAA Claims Procedure").

The substance of the claims in the Warning Notice is duplicative of claims that have already been filed in the CCAA Claims Procedure by Nortel Networks UK Pension Trust Limited and by U.K. Pension Protection Fund (collectively the "Trustees"). Therefore, (and without limiting the rights or defences of the Monitor and the CCAA Debtors in response to any such claims), the substance of the issues is already before the Court in Canada and will be dealt with at an appropriate time under the CCAA. By contrast, it appears that the Pensions Regulator has engaged in many months of efforts to prepare the Warning Notice and has chosen to deliver it now to create legal proceedings that provide insufficient notice to the CCAA Debtors and are to be held at a time when management is fully engaged in finalizing efforts to close asset sales and otherwise see to the transition of the businesses that are being conveyed here and abroad. This is the precise type of unilateral action that

# Goodmans

the CCAA controls in order to protect the interests of the general body of creditors and stakeholders, including creditors, employees and the public, all of whom have important interests in the successful implementation of Nortel's transitional activities. It would be prejudicial to the CCAA Debtors and all stakeholders were management to be deflected now from the implementation of Court-ordered sales and activities in order to respond to the unilateral actions of the Pensions Regulator.

Moreover, and more importantly, as you are also aware, the Court has approved a process for the negotiation of a protocol to govern the allocation of the proceeds of the sales of the various international businesses of the Nortel group of companies as amongst various jurisdictions in which different insolvency proceedings are being undertaken relating to those businesses (the "Allocation Protocol"). The Administrators of NNUK appointed by the High Court of Justice are fully engaged in these negotiations and are also advancing the same claims as are being asserted by the Pensions Regulator in the Warning Notice. Many of the very issues raised in the Warning Notice to potentially be resolved by the Pension Regulator's process are the same as those to be resolved as part of the Allocation Protocol in which the Administrators of NNUK are now participating. This is one of, if not the most important issue in each of these complex restructurings. It is apparent, therefore, that the actions of the Pensions Regulator may unfairly prejudice this very process.

In all, the delivery of the Warning Notice to the CCAA Debtors in Canada and the attempt to exercise rights against the CCAA Debtors is a breach of the Initial CCAA Order. Under the Initial CCAA Order and the doctrine of comity, that is shared by both Canada and the United Kingdom, the Pensions Regulator ought to have sought the consent of the CCAA Debtors or the Monitor or, failing that, leave of the Court prior to acting unilaterally to bring legal proceedings designed to have a significant and substantial effect on matters that are already before the Court. The Warning Notice and the proceedings which it contemplates would undermine the CCAA Claims Procedure and the Allocation Protocol negotiations. The substance of the issues has already been submitted to the Court for resolution by the Trustees with whom the Pensions Regulator shares an identity of interest. As such, the delivery of the Warning Notice by the Pensions Regulator also amounts to an abuse of the processes of the Court.

Accordingly, we are instructed to bring a motion before the Court on February 26, 2010 for, among other things, an Order authorizing and directing the CCAA Debtors to refrain from participating in the proceedings contemplated by the Warning Notice and declaring that no recognition or legal effect whatsoever will be given in Canada to the outcome of any such proceedings.

346

# Goodmans LLP

If the Pensions Regulator wishes to regularize its conduct by seeking leave of the Court to bring proceedings against the CCAA Debtors abroad, the Monitor would be prepared to engage in discussions to seek to harmonize the Pensions Regulators' goals with the CCAA process. The Monitor and the CCAA Debtors will oppose any effort to continue the proposed proceedings under the Warning Notice as currently constituted. As noted above, it may be that the proposed proceeding will be rendered wholly unnecessary by the outcome of existing processes within the CCAA. However, if such does not occur, then there certainly can be a discussion of the timing, scope and utility of proceedings if and when they become necessary and advisable.

Yours very truly,

GOODMANS LLP

J. A. Carfagnini
JAC/eg
enclosure

cc:     M. McDonald, President, Ernst & Young Inc.
        D. Tay, Ogilvy Renault
        N. Golding, Freshfields Bruckhaus Deringer
        A. Denny, Allen & Overy

\3812872

**TAB M**

This is Exhibit ......*M*...... referred to in the
affidavit of *Anna Ventresca*
sworn before me, this
day of *February* ..... 20*10*

DONNA WOOLLETT, Notary Public, Regional Municipality of Peel,
limited to the attestation of instruments and the
taking of affidavits, for Nortel Networks Corporation
and its subsidiaries. Expires January 29, 2011.

*Donna Woollett*
A COMMISSIONER FOR TAKING AFFIDAVITS

**From:** Laughton, Marcus [mailto:Marcus.Laughton@thepensionsregulator.gsi.gov.uk]
**Sent:** 09 February 2010 17:20
**To:** GOLDING, Neil (NAG); DUNNE, Lynn
**Cc:** Williams, Paul; Wilson, Philip
**Subject:** FW: Nortel Networks Corporation and Nortel Networks Limited

I should clarify that the case team address should be typed: TM6409@thepensionsregulator.gov.uk

**Marcus Laughton**
**Extension 8450**

**From:**  Laughton, Marcus
**Sent:**  09 February 2010 14:27
**To:**  'neil.golding@freshfields.com'; 'lynn.dunne@freshfields.com'
**Cc:**  Williams, Paul; Wilson, Philip
**Subject:**  Nortel Networks Corporation and Nortel Networks Limited

Dear Mr Golding/Ms Dunne,

Thank you for your letter of 3 February 2010 acknowledging receipt of my letter of 13 January 2010 plus
enclosures and my letter of 25 January 2010.

I note the comments made in your letter.

On a general note I should be grateful if you would email any further correspondence to the Regulator to avoid
delay where possible, making sure to copy the entire case team in. This may best be achieved by entering
TM6409 in the address box.

In terms of procedural matters going forward I should explain that if Representations are not received by 1 March
2010 the case team at the Regulator will pass the matter over to the Determinations Panel support team and the
Determinations Panel will draw up directions for the running of the case shortly afterwards.

Yours sincerely

**Marcus Laughton**
Lawyer
Risk and Funding Team
Direct Line 01273 648450
www.thepensionsregulator.gov.uk
www.trusteetoolkit.com (Free, online learning for trustees)
*The information we provide is for guidance only and should not be taken as a definitive interpretation of the law.*

17/02/2010

*********************************************************************

The Pensions Regulator's Trustee Toolkit is an e-learning programme designed to improve trustees' knowledge and understanding of pensions and trust law, scheme investment and scheme funding. Free and easy to use, sign up today at www.trusteetoolkit.com

This e-mail and the information contained in it may be privileged and/or confidential. It is for the intended addressee(s) only. The unauthorised use, disclosure or copying of this e-mail, or any information contained in it, is prohibited and could, in certain circumstances be a criminal offence.

If you are not an intended recipient, please notify customersupport@thepensionsregulator.gov.uk

All communications sent to or from The Pensions Regulator may be subject to recording and/or monitoring in accordance with relevant legislation.

Internet communications are not secure and therefore the Pensions Regulator does not accept responsibility for the contents of this message.

*********************************************************************

The original of this email was scanned for viruses by the Government Secure Intranet virus scanning service supplied by Cable&Wireless in partnership with MessageLabs. (CCTM Certificate Number 2009/09/0052.) On leaving the GSi this email was certified virus free.
Communications via the GSi may be automatically logged, monitored and/or recorded for legal purposes.

**Freshfields Bruckhaus Deringer LLP is the official legal services provider to the London 2012 Olympic and Paralympic Games**

This email is confidential and may be legally privileged. If you have received it in error, please notify us immediately and then delete it. Please do not copy it, disclose its contents or use it for any purpose.

Freshfields Bruckhaus Deringer LLP is a limited liability partnership registered in England and Wales with registered number OC334789. We are regulated by the Solicitors Regulation Authority and a list of our members (and of the non-members who are designated as partners) and their qualifications is available for inspection at our registered office, 65 Fleet Street, London EC4Y 1HS. Any reference to a partner means a member, or a consultant or employee with equivalent standing and qualifications, of Freshfields Bruckhaus Deringer LLP or any of its affiliated firms or entities. Please refer to www.freshfields.com/support/legalnotice for regulatory information (including in relation to the provision of insurance mediation services).

17/02/2010

# TAB N

349

# FRESHFIELDS BRUCKHAUS DERINGER

The Pensions Regulator
Napier House
Trafalgar Place
Brighton
BN1 4DW

For the attention of Marcus Laughton

By Email & Fax

LONDON
65 Fleet Street
London EC4Y 1HS
T +44 20 7936 4000
Direct T +44 20 7716 4065
F +44 20 7832 7001
Direct F +44 20 7108 4065
LDE No 23
E lynn.dunne@
freshfields.com
W freshfields.com

DOC ID LON10486947/2+
OUR REF NAG/LND/BM
YOUR REF TM6409
CLIENT MATTER NO. 153557-0001

10 February 2010

DONNA WOOLLETT, Notary Public, Regional Municipality of Peel,
limited to the attestation of instruments and the
taking of affidavits, for Nortel Networks Corporation
and its subsidiaries. Expires January 29, 2011.

This is Exhibit ........N........... referred to in the
affidavit of ...*Anna venVesca*............
sworn before me, this .....*7*.......
day of ...*February*............ 20..*10*.

Dear Sirs

........*Donna Woollett*..............
A COMMISSIONER FOR TAKING AFFIDAVITS

**In the matter of Nortel Networks UK Pension Plan**
**And in the matter of The Pensions Act 2004**

We refer to our letter of 3 February on behalf of Nortel Networks Corporation and Nortel
Network Limited (the *Companies*).

As we mentioned in that letter, the Companies were considering various jurisdictional
questions with the stakeholders in the Canadian insolvency proceeding. As you are aware,
that insolvency proceeding is subject to the supervision of the Superior Court of Justice of
the Province of Ontario (the *Canadian Court*) and the oversight of the monitor appointed by
the Canadian Court (the *Monitor*).

We understand that Goodmans LLP, on behalf of Ernst & Young Inc in its capacity as the
Monitor, have written to you in that regard to advise of certain jurisdictional concerns.
Among other things, the Monitor has taken the position that it will bring a motion before the
Canadian Court, on February 26, 2010 for an order "authorizing and directing the CCAA
Debtors [the Companies] to refrain from participating in the proceedings contemplated by
the Warning Notice."

The official legal services provider to the London 2012 Olympic and Paralympic Games

Freshfields Bruckhaus Deringer LLP is a limited liability partnership registered in England and Wales with registered
number OC334789. It is regulated by the Solicitors Regulation Authority. For regulatory information (including information
relating to the provision of insurance mediation services) please refer to www.freshfields.com/support/legalnotice.

A list of the members (and of the non-members who are designated as partners) of Freshfields Bruckhaus Deringer LLP and
their qualifications is available for inspection at its registered office, 65 Fleet Street, London EC4Y 1HS. Any reference to a
partner means a member, or a consultant or employee with equivalent standing and qualifications, of Freshfields Bruckhaus
Deringer LLP or any of its affiliated firms or entities.

Abu Dhabi  Amsterdam  Bahrain  Barcelona  Beijing  Berlin  Brussels  Cologne  Dubai  Düsseldorf
Frankfurt am Main  Hamburg  Hanoi  Ho Chi Minh City  Hong Kong  London  Madrid  Milan
Moscow  Munich  New York  Paris  Rome  Shanghai  Tokyo  Vienna  Washington

**FRESHFIELDS BRUCKHAUS DERINGER**

350

2|2

As you will appreciate, given the motion which will be before the Canadian Court, the Companies cannot engage in any substantive steps in the Warning Notice proceeding.  In the circumstances the Companies will be unable to deliver submissions by March 1, 2010, as you requested.

Yours faithfully

*Freshfields Bruckhaus Deringer LLP*

**TAB 4**

351

Court File No. 09-CL-7950

**ONTARIO
SUPERIOR COURT OF JUSTICE
(COMMERCIAL LIST)**

IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,
R.S.C. 1985, c. C-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF
NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED,
NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS
INTERNATIONAL CORPORATION AND NORTEL NETWORKS TECHNOLOGY
CORPORATION

APPLICATION UNDER THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,
R.S.C. 1985, c. C-36, AS AMENDED ("CCAA")

**AFFIDAVIT OF ROBIN KNOWLES C.B.E., Q.C.
(sworn February 17, 2010)**

I, **ROBIN KNOWLES C.B.E., Q.C.**, of the City of London, in the United Kingdom, **MAKE OATH AND SAY AS FOLLOWS:**

1.      I make this Affidavit with respect to issues of the applicable law of England & Wales and at the request of Freshfields Bruckhaus Deringer LLP ("Freshfields"). To the extent any of my knowledge herein is based upon information and belief, I have stated the source of that information and I believe such information to be true.

**Qualifications**

2.      I am a barrister and Queen's Counsel practising from Chambers at 3-4 South Square in Gray's Inn, London.  I am a member in good standing of the Bar of England & Wales and have practised law in England & Wales since 1984. I was appointed Queen's Counsel in 1999.

3.      I have practised and continue to practice regularly in the area of commercial, financial and corporate, including insolvency law. For more than 25 years, I have advised and represented clients in the fields of commercial, financial and corporate law, including the law of domestic and international banking and finance, company law (including insolvency), contract law, the law of professional negligence, commercial fraud, insurance law, and the public law, regulatory and employment law aspects of commercial law.  My practice includes advisory work, litigation, arbitration and mediation, both in England and in other countries. From time to time I am asked to provide legal opinions as to English law within my fields of specialisation for use in legal proceedings abroad.

4.      I am a former Chairman of the Commercial Bar Association of England & Wales, the professional association of the Commercial Bar of England & Wales (and a past Chairman of its North American Liaison Committee). I sit part time judicially, both as a Recorder of the Crown Court and as a Deputy High Court Judge (authorised to sit in the Chancery Division and the Queen's Bench Division).

5.      My part time commitments also include as a Consultant to the Qatar Financial Centre Civil and Commercial Court (headed by Lord Woolf, the former Lord Chief Justice of England & Wales) and the Qatar Financial Centre Regulatory Tribunal (headed by Sir William Blair, now a Judge of the Commercial Court of England & Wales). I have assisted in the preparation of successive editions of the UK Commercial Court Guide and also served as a member of the Aikens Working Party on the conduct of long commercial trials.  In 2009 I was appointed a Council Member of the Civil Justice Council of England & Wales, and I now chair one of its Committees.

6.      I have a long standing commitment to legal pro bono work. Among other positions I am the Chairman of the Bar Pro Bono Unit of England & Wales, a Trustee of LawWorks (the Solicitors Pro Bono Group for England & Wales) and the Chairman of the Advisory Board for

353

- 3 -

Advocates for International Development (one of the two main charities in England & Wales concerned with the coordination of international pro bono work). I have been a member of the National and the International Pro Bono Coordinating Committees of the Attorney General of England & Wales since the formation of those Committees. In 2006 I was awarded the CBE (made a Commander of the Order of the British Empire), for services to pro bono legal services.

7.      I have given speeches and lectured and taken part in seminars on the law, including on commercial, financial and corporate law, and more generally on the development of the law and legal practice. I am a Bencher of the Honourable Society of the Middle Temple, one of the four Inns of Court in England & Wales. With William Blair QC (now Sir William Blair) I was closely involved in the reform and reinstatement of the QC system in England & Wales. For each of the 4 years to 2008 I sat on the General Management Committee of the General Council of the Bar of England & Wales. I am an advocacy trainer of over 10 years experience with, variously, the Middle Temple, Gray's Inn and the South Eastern Circuit. I am a moderator on the Selection Boards for the Attorney General's Panel Counsel.

**Opinion sought**

8.      I have prepared this Affidavit at the request of Freshfields.

9.      I understand from Freshfields as follows:

(a)      The UK Pensions Regulator has issued a Warning Notice ("the Warning Notice") to Nortel Networks Ltd ("NNL") and Nortel Networks Corporation ("NNC").

(b)      NNL and NNC are under insolvency protection and the supervision of the Superior Court of Justice of Ontario ("the Canadian Court").

(c)      As part of that supervision and protection, the Canadian Court has issued an order staying all proceedings against NNL and NNC (the "Canadian Stay").

(d)     A motion is pending before the Canadian Court for a determination that the Warning Notice, and its service in Canada on NNL and NNC, constitutes a breach of the Canadian Stay.

10.    I have been asked on behalf of NNL and NNC to provide my opinion on the law of England & Wales in the event that the Canadian Court issues an order declaring the Warning Notice and the associated steps by the UK Pensions Regulator to be a breach of the Canadian Stay and restraining the UK Pensions Regulator from acting in breach of the Canadian Stay. Specifically I have been asked to provide my opinion on the question whether the English Court would recognise and enforce that order.

## Materials

11.    In order to further understand the context of the matter on which my opinion is requested, I have reviewed a copy of the following materials:

(a)     The Affidavit of John Doolittle sworn on 14 January 2009 in these proceedings before the Canadian Court.

(b)     The Third Amended and Restated Initial Order dated 14 January 2009 and made in these proceedings before the Canadian Court by the Honourable Mr Justice Morawetz ("the CCAA Order").

(c)     The Warning Notice (dated 11 January 2010 issued by the UK Pensions Regulator in the matter of Nortel Networks UK Pension Plan under case reference TM6409).

(d)     A letter dated 8 February 2010 from Goodmans LLP, as lawyers for Ernst & Young Inc in its capacity as monitor of NNC and NNL, to the UK Pensions Regulator.

355

- 5 -

12.    In this Affidavit I refer to the following legal materials from the UK that I have found of assistance in reaching my opinion:

     (a)    (UK) Insolvency Act 1986, sections 11, 130, 426, Schedule B1 ("the UK Insolvency Act")

     (b)    The Cross-Border Insolvency Regulations 2006 (SI 2006/1030)

     (c)    (UK) Pensions Act 2004, sections 5, 10, 43-45, 49, 100, 103, Schedule 2 ("the UK Pensions Act")

     (d)    The Pensions Regulator (Financial Support Directions etc) Regulations 2005 (SI No. 2188)

     (e)    The Pensions Regulator (Miscellaneous Amendment) Regulations 2009 (SI No. 617)

     (f)    The cases the names of which and citations for which are given in the body of this Affidavit.

13.    Copies of the UK legislation and regulations referred to are attached hereto as Exhibits "A", "B", "C", "D" and "E" to this Affidavit.

14.    I also refer in this Affidavit to the United Nations Commission on International Trade Law (UNCITRAL) Model Law on Cross-Border Insolvency.

15.    In reaching my opinion I have also considered the opinion of United States Bankruptcy Judge Kevin J Carey given in <u>Re Sea Containers et al</u>[1]. A copy of this decision is attached hereto as Exhibit "F".

---

[1] www.deb.uscourts.gov/Opinions/2008/seacontainers.06.11156.memorandum.order.pdf.

356

- 6 -

## Context

16.     From the materials referred to I would summarise my understanding of the context as follows, and I assume the accuracy of what follows for the purposes of reaching my opinion:

(a)     NNC and NNL are incorporated in Canada. Both were ordered and declared a "debtor company" to which the CCAA applied by the CCAA Order.

(b)     Nortel Networks UK Limited ("NNUK") is incorporated in England & Wales. It is in administration under the Insolvency Act 1986. NNC is its ultimate parent.

(c)     The Nortel Networks UK Pension Plan ("the Scheme") is the occupational pension scheme of NNUK.

(d)     The CCAA Order was sought to facilitate the reorganisation of the Nortel enterprise for the benefit of all creditors.

(e)     Paragraphs 14 and 15 of the CCAA Order provide that for the "Stay Period" (which I am instructed continues by reason of various Orders that have extended its duration):

> "no proceeding or enforcement process in any court or tribunal (each, a 'Proceeding') shall be commenced, or continued against or in respect of [among others, NNC or NNL] or the Monitor, or affecting the Business [as defined] or the Property [as defined], except with the written consent of the affected [among others, NNC or NNL] and the Monitor, or with leave of [the Canadian Court], and any and all Proceedings currently under way against or in respect of the affected [among others, NNC or NNL] or affecting the Business or the Property are hereby stayed and suspended pending further Order of this Court."

DOCSTOR: 1865228\1

"all rights and remedies of any individual, firm, corporation, governmental body or agency, or any other entities ... against or in respect of the [among others, NNC or NNL] or the Monitor, or affecting the Business or the Property, are hereby stayed and suspended except with the written consent of the affected [among others, NNC or NNL] and the Monitor, or leave of this Court, provided that nothing in this Order shall (i) empower [among others, NNC or NNL] to carry on any business which [they] are not lawfully entitled to carry on, (ii) exempt [among others, NNC and NNL] from compliance with statutory or regulatory provisions relating to health, safety or the environment, (iii) prevent the filing of any registration to preserve or perfect a security interest, or (iv) prevent the registration of a claim for lien."

(f)     Paragraph 51 of the CCAA Order provides as follows :

"THIS COURT HEREBY REQUESTS the aid and recognition of any court [or] regulatory ... body having jurisdiction in ... the United Kingdom ... to give effect to this Order and to assist [among others, NNC and NNL], the Monitor and their respective agents in carrying out the terms of this Order. All courts [and] regulatory ... bodies are hereby respectfully requested to make such orders and to provide such assistance to [among others, NNC and NNL] and to the Monitor, as an officer of this Court, as may be necessary or desirable to give effect to this Order ... or to assist [among others, NNC and NNL] and the Monitor and their respective agents in carrying out the terms of this Order."

(g)     Before issuing the Warning Notice the UK Pensions Regulator did not seek consent of NNC, NNL and the Monitor, or leave from the Canadian Court.

358

- 8 -

(h)     The Canadian Court has by Orders dated 30 July 2009 and 7 October 2009, according to Goodmans LLP, "provided for the implementation of a claims procedure by which all those who seek to make claims against [among others, NNC and NNL] and their property can deliver proofs of claim and have their claims fairly adjudicated in an established process under the auspices of the Monitor that is supervised by the [Canadian] Court (the "CCAA Claims Procedure")".

17.     I have also been asked to assume the following facts for the purposes of reaching my opinion:

(a)     The substance of the claims in the Warning Notice is duplicative of claims that have already been filed in the CCAA Claims Procedure by Nortel Networks UK Pension Trust Limited and by U.K. Pension Protection Fund (collectively the "Trustees") and therefore the substance of the issues is already before the Court in Canada and will be dealt with at an appropriate time under the CCAA.

(b)     The management of NNC and NNL, among others, is fully engaged in finalizing efforts to close asset sales and otherwise see to the transition of the business that are being conveyed in Canada and abroad and it would be prejudicial to the CCAA Debtors and all stakeholders were management to be deflected now from the implementation of Court-ordered sales and activities in order to respond to the unilateral actions of the UK Pensions Regulator.

(c)     To the knowledge of the UK Pensions Regulator, various Nortel estates are engaged in the negotiation of a protocol to govern the allocation of the proceeds of the sales of the various international businesses of the Nortel group of companies amongst various jurisdictions in which different insolvency proceedings are being undertaken relating to those businesses and the Administrators of NNUK appointed by the English High Court of Justice are fully engaged in these negotiations.

359

- 9 -

18.     The UK Pensions Act contemplates that a number of stages may follow the issue of a Warning Notice by the UK Pensions Regulator. At all stages the matter is concerned with the payment of money rather than any other subject of regulatory concern.


## Opinion

19.     As indicated, I am asked to provide my opinion on the law of England & Wales in the event that the Canadian Court issues an order declaring the Warning Notice and associated steps by the UK Pensions Regulator to be a breach of the Canadian Stay and restraining the UK Pensions Regulator from acting in breach of the Canadian Stay, and specifically on the question whether the English Court would recognise and enforce that order.

20.     The only opinion I can offer is that the position is both complex and uncertain. There is a matrix of issues involved, going to jurisdiction, to discretion, to the true nature of and limits of the Warning Notice procedure, and to some extent to the intentions of the UK Pensions Regulator.

21.     There are various procedural routes which could be invoked in the UK to assist the Canadian process.  It is certainly the case that the UK Pensions Regulator could oppose or challenge these procedures and it is likely that any challenge would be susceptible to review by the Court of Appeal.

22.     Let me begin first with jurisdiction. There is a longstanding recognition of the practical importance of a mechanism of stay in the insolvency context if there is to be an orderly insolvency process without waste of cost and distraction of effort. It is therefore unsurprising that there are a number of potential sources of jurisdiction under which the Courts of England & Wales might be asked to engage with the matter.

23.     It is convenient to start with The Cross-Border Insolvency Regulations 2006 which give effect to the UNCITRAL Model Law on Cross-Border Insolvency.

24.    Article 20 of the Model Law provides for an automatic stay in certain circumstances. Para 1(a) provides that upon recognition of a foreign main proceeding "commencement or continuation of individual actions or individual proceedings concerning the debtors assets, rights, obligations or liabilities is stayed".

25.    Where there is a stay under para 1(a), Article 20 para 2(a) limits the scope and effect of that stay, by providing that it "shall be ... the same in scope and effect as if the debtor ... in the case of a debtor other than an individual, had been made the subject of a winding-up order under the Insolvency Act 1986". This in turn is a reference to section 130 (2) of the UK Insolvency Act which provides that "[w]hen a winding-up order has been made ... no action or proceeding shall be proceeded with or commenced against the company or its property, except by leave of the court and subject to such terms as the court may impose."

26.    Article 20 para 4 provides certain exceptions from an automatic stay under para 1(a). Thus para 4(a) provides that para 1(a) "does not affect the right to ... commence individual actions or proceedings to the extent necessary to preserve a claim against the debtor". And para 4(b) provides that para 1(a) "does not affect the right to... commence or continue ... any action or proceedings by a person or body having regulatory ... functions of a public nature, being an action or proceedings brought in the exercise of those functions". The question whether para 4(a) might be relevant is considered further below. The question whether para 4(b) is relevant depends on whether the "regulatory functions" are "of a public nature" and whether what is involved is "an action or proceedings brought in the exercise of" such regulatory functions of a public nature.

27.    Where an automatic stay does not engage under Article 20, Article 21 in effect allows the Court to impose a stay in its discretion. Thus it allows the Court to grant "appropriate" relief "where necessary to protect the assets of the debtor or the interests of the creditors". This power expressly includes "staying the commencement or continuation of individual actions or individual proceedings concerning the debtor's assets, rights, obligations or liabilities, to the extent that they have not been stayed under paragraph 1(a) of article 20". It also expressly includes the grant of "any additional relief that may be available to a British insolvency officeholder under the law of Great Britain, including any relief provided under paragraph 43 of

DOCSTOR: 1865228\1

- 11 -

Schedule B1 to the [UK] Insolvency Act". That paragraph of Schedule B1 would enable a stay on "legal process (including legal proceedings, execution, distress and diligence)" being instituted or continued against the company or its property.[2]

28.    Not all steps taken by a regulatory authority will necessarily fall within the scope of the latter stay provisions. For example where a regulator, in its decision making process, is performing a broader public role than required of a judicial or quasi-judicial decision maker the stay may not be engaged (see Thomas Winsor v Special Railway Administrators [2002] EWCA (Civ) 955, a copy of which is attached hereto as Exhibit "G").

29.    Notwithstanding the terms of the Model Law, there is uncertainty whether the relief available to the English Court is limited to that available under English law. Although recognising that "there is an important issue as to the extent of [the English] Court's powers under the UNCITRAL model law" (Perpetual Trustee Co Ltd and Others v BNY Corporate Trustee Services Ltd [2009] EWHC 1912 (Ch), on several occasions the English Court has chosen to leave open the question whether the model law entitles the English Court to give effect to foreign law (see Perpetual at [62]-[63] and D/S Norden A/S v Samsun Logix Corporation [2009] EWHC 2304 (Ch) at [15] ff. and see David Rubin and Henry Lan v Eurofinance SA [2009] EWHC 2129 (Ch) where the Court refused to enforce a foreign judgment.) Copies of these decisions are attached hereto as Exhibits "H", "I" and "J".

30.    Of course even before the Model Law became relevant, examples can be found of the English Court being willing to assist an overseas insolvency process at common law, including by the use of interlocutory orders (for example see Banque Indosuez SA v Ferromet Resources Inc [1993] BCLC 112 at 117). But even recently the Privy Council has doubted whether under the common law the English Court would be entitled to give effect to foreign law: Cambridge

--------

[2] Article 25 of the Model Law further provides: "in matters referred to in paragraph 1 of article 1, the court may cooperate to the maximum extent possible with foreign courts or foreign representatives, either directly or through a British insolvency holder".

362

- 12 -

<u>Gas Transportation Corporation v Unsecured Creditors of Navigator Holdings plc</u> [2007] 1 AC 508, 518 at [22]. Copies of these decisions are attached hereto as Exhibits "K" and "L".

31.      A further potential source of jurisdiction is section 426 of the UK Insolvency Act 1986. This section allows the English Court, on request, to apply the "insolvency law" of certain overseas jurisdictions (of which Canada is one: see the Cooperation of Insolvency Courts (Designation of Relevant Countries and Territories) Order 1986). An important jurisdictional issue here will be whether the stay at paragraphs 14 and 15 of the CCAA Order is part of the "insolvency law" of Canada. If that jurisdictional issue, on which it would not be appropriate for me to express a conclusion[3], is answered affirmatively then the question would remain whether the English Court should apply Canadian insolvency law or English insolvency law.

32.      Having looked at the various sources of jurisdiction, I turn next to the question of the exercise of discretion. For present purposes the essential test can in my view be taken with some confidence from <u>New Cap Reinsurance Corp Ltd v HIH Casualty & General Insurance Ltd</u> [2002] 2 BCLC 228[4] (itself drawing on <u>Re Aro Ltd</u> [1980] Ch 196[5]): the Court will look "to do

---

[3] This involving a question on which the English Court might receive expert evidence of Canadian law, and then ask itself whether the Canadian law corresponded to the insolvency law of England & Wales: see <u>Hughes v Hannover</u> [1997] BCC 921 at 938C. A copy of this decision is attached hereto as Exhibit "M".

[4] See also <u>In re Atlantic Computers Systems plc</u> [1992] Ch 505. A copy of this decision is attached hereto as Exhibit "O".

[5] Further see generally in relation to section 426 (and for further observations in relation to the common law), <u>In re HIH Casualty and General Insurance Ltd</u> [2008] UKHL 21. A copy of this decision is attached hereto as Exhibit "Q".

363

what is right and fair in the circumstances of the particular case"[6].    Copies of these decisions are attached hereto as Exhibits "N" and "P".

33.    In the present case on the one side the duplication, unsuitable timing, and lack of need described by Goodmans LLP in their letter dated 8 February 2010 would in the eyes of an English Court likely tend in favour of the imposition of a stay and against any stay being lifted. So too would the request of the Canadian Court for the assistance of the English Court: see Hughes v Hannover (above) at 939. A copy of this decision is attached hereto as Exhibit "M".

34.    I have not seen a reply from the UK Pensions Regulator to the letter from Goodmans LLP, and so cannot be sure what points the UK Pensions Regulator would urge against the imposition of a stay and in favour of any stay being lifted. He may urge that it is desirable that he formulate the claim in question in the way he has done, and that his statutory role weighs in favour of his chosen course of action being permitted. He may not intend to take matters much beyond the Warning Notice stage, and may yet intend that there are sensible discussions to come to an agreed interim position that accommodates the concerns expressed by Goodmans LLP.

35.    One possibility is that the UK Pensions Regulator is concerned that the time within which he may invoke the material provisions of the UK Pensions Act cannot be tolled or postponed (even by agreement). This latter is another complex point, on which there is no current authority to my knowledge. Under the law of England & Wales, limitation periods are regularly tolled or extended, but in some cases the Courts have concluded that on the true construction of the particular legislation the time period set cannot be tolled by agreement (eg the decision of the (UK) Competition Appeals Tribunal in Emerson Electric Co, Valeo SA, Robert Bosch Gmbh, Visteon Corporation, Rockwell Corporation v Morgan Crucible 2007 CAT 28). A copy of this decision is attached hereto as Exhibit "R".

36.    Finally, I would add this. I am not clear why the UK Pensions Regulator would not regard himself as a 'regulatory body' within Paragraph 51 of the CCAA Order. In the event that

---

[6] New Cap Reinsurance at 233.

364

- 14 -

he is, it is the fact that he has been requested by the Canadian Court to provide assistance where that is necessary or desirable. I do not know what consideration may have been given by him to this judicial request, and with what outcome. Certainly I see no principle of English Law that would stand in the way of his giving proper consideration to a request of the Canadian Court.

SWORN BEFORE ME in London, in          )
England & Wales on this 17th day of      )
February, 2010.                          )
                                         )
_____         )
Commissioner for Taking Affidavits or
Notary Public

_____
**ROBIN KNOWLES C.B.E., Q.C.**

DOCSTOR: 1865228\1

- 15 -

365

Schedule "A"

| Exhibit | Legislation |
|---------|-------------|
| A. | (UK) Insolvency Act 1986, sections 11, 130, 426, Schedule B1 |
| B. | The Cross-Border Insolvency Regulations 2006 (SI 2006/1030) |
| C. | (UK) Pensions Act 2004, sections 5, 10, 43-45, 49, 100, 103, Schedule 2 |
| D. | The Pensions Regulator (Financial Support Directions etc) Regulations 2005 (SI No. 2188) |
| E. | The Pensions Regulator (Miscellaneous Amendment) Regulations 2009 (SI No. 617) |

Court File No: 09-CL-7950

IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL
NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL NETWORKS
GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL CORPORATION AND
NORTEL NETWORKS TECHNOLOGY CORPORATION

*ONTARIO*
**SUPERIOR COURT OF JUSTICE**
**COMMERCIAL LIST**

Proceeding commenced at Toronto

**AFFIDAVIT OF**
**ROBIN KNOWLES C.B.E., Q.C.**
**(sworn February 17, 2010)**

**OGILVY RENAULT LLP**
Suite 3800
Royal Bank Plaza, South Tower
200 Bay Street
Toronto, Ontario  M5J 2Z4

**Derrick Tay LSUC#: 21152A**
Tel: (416) 216-4832
Email: dtay@ogilvyrenault.com

**Mario Forte  LSUC#: 27293F**
Tel: (416) 216-4870
Email: mforte@ogilvyrenault.com

**Jennifer Stam LSUC #46735J**
Tel: (416) 216-2327
Email: jstam@ogilvyrenault.com
Fax: (416) 216-3930

Lawyers for the Applicants

DOCSTOR: 1865228\1

IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C. 1985, c.
C-36, AS AMENDED
AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL
NETWORKS CORPORATION et al.

*ONTARIO*
SUPERIOR COURT OF JUSTICE
(COMMERCIAL LIST)

Proceeding commenced at Toronto

MOTION RECORD
(Returnable February 25, 2010)

**GOODMANS LLP**
Barristers & Solicitors
Bay Adelaide Centre
333 Bay St., Suite 3400
Toronto, Canada M5H 2S7

Jay A. Carfagnini  (LSUC#: 222936)
Joseph Pasquariello (LSUC# 37389C)
Christopher G. Armstrong (LSUC# 55148B)

Tel: 416.979.2211
Fax: 416.979.1234

Lawyers for the Monitor, Ernst & Young Inc.