IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

---------------------------------------------------------------X
                                                               :
                                                               :    Chapter 11
*In re*                                                        :
                                                               :    Case No. 09-10138 (KG)
Nortel Networks Inc., *et al.*,[1]                             :
                                                               :    Jointly Administered
                        Debtors.                               :
                                                               :
                                                               :
---------------------------------------------------------------X


**DECLARATION OF RICHARD HITCHCOCK IN SUPPORT OF DEBTORS' MOTION FOR ENTRY OF AN ORDER TO ENFORCE THE AUTOMATIC STAY AGAINST CERTAIN CLAIMANTS WITH RESPECT TO THE U.K. PENSION PROCEEDINGS**

I, Richard Hitchcock, hereby declare as follows:

1.  Background and experience. My educational background and experience qualify me to address the Court on the pension laws of the U.K. I am a barrister called to the Bar in England and Wales and have practiced for some 20 years, for fifteen years of which I have acted as an adviser and advocate on matters concerning occupational pension schemes. During this time I have acted also as an expert witness and provided reports on UK pension scheme law for cases heard in Jersey, the Netherlands and Grand Cayman. Prior to being called to the Bar I received undergraduate and postgraduate degrees in Jurisprudence from Magdalen College, Oxford. Further details are set out in my *curriculum vitae* which is annexed to this Report at Schedule 1.

2.  I submit this declaration in support of the Debtors' Motion for Entry of an Order to Enforce the Automatic Stay Against Certain Claimants with Respect to the U.K. Pension Proceedings (the "Motion"). Except as otherwise indicated, all facts set forth in this declaration are based upon my personal knowledge, upon my opinion based on my experience and knowledge and upon the instructions that I have received from Linklaters LLP on behalf of the Debtors. I summarise my instructions in the course of my declaration.

---

[1] The debtors in these chapter 11 cases, along with the last four digits of each Debtor's tax identification number, are: Nortel Networks Inc. (6332), Nortel Networks Capital Corporation (9620), Nortel Altsystems Inc. (9769), Nortel Altsystems International Inc. (5596), Xros, Inc. (4181), Sonoma Systems (2073), Qtera Corporation (0251), CoreTek, Inc. (5722), Nortel Networks Applications Management Solutions Inc. (2846), Nortel Networks Optical Components Inc. (3545), Nortel Networks HPOCS Inc. (3546), Architel Systems (U.S.) Corporation (3826), Nortel Networks International Inc. (0358), Northern Telecom International Inc. (6286), Nortel Networks Cable Solutions Inc. (0567) and Nortel Networks (CALA) Inc. (4226), (collectively the "US Nortel Entities" or the "Debtors"). Addresses for the Debtors can be found in the Debtors' petitions, which are available at http://chapter11.epiqsystems.com/nortel.

3. I have been retained by the Debtors and am being compensated at a rate of £450 per hour (plus Value Added Tax (VAT)), which is the customary hourly rate I charge clients for my services. No part of my compensation for performing this work is contingent upon the results of my work or on the outcome of this Motion. I have not previously acted for the Debtors in any matter.

A. **Preliminary**

4. References in this declaration to "sections" are to sections in the Pensions Act 2004 ("PA 04") unless otherwise indicated.

5. From my Instructions (the background section of which I set out immediately below) I understand the circumstances in which the need for my evidence has arisen to be as follows:

   5.1. Linklaters LLP act for Nortel Networks Inc and other debtors and debtors in possession (the "Debtors") in Chapter 11 cases.

   5.2. On 14 January 2009, the Debtors filed voluntary petitions for relief under Chapter 11 of the US Bankruptcy Code (except for Nortel Networks (CALA) Inc ("NN CALA"), which filed on 14 July 2009).

   5.3. In addition, on 14 January 2009 after the filing by the U.S. Nortel entities, the High Court in England placed nineteen of Nortel's European affiliates, including Nortel Networks UK Limited ("NNUK"), into administration.

   5.4. The Nortel Networks UK Pension Plan, the ("Plan"), is a defined benefit occupational final salary pension scheme in the UK. NNUK is the Plan employer. The Plan has a substantial deficit.

   5.5. The Plan is currently in a Pension Protection Fund assessment period. The assessment period commenced after the appointment of the administrators of NNUK (as this was a qualifying insolvency event under section 121(3)(d) (see section 132(2)).

   5.6. On 4 August 2009, the US Bankruptcy Court entered an Order Establishing Deadlines for Filing Proofs of Claim and Approving Form and Manner of Notice Thereof (a "Bar Date Order"). Pursuant to the procedures set out in the Bar Date Order, with certain exceptions, all entities (including governmental units) that assert a claim, as defined in section 101(5) of the Bankruptcy Code, against the Debtors (other than NN CALA) that arose prior to the filing of the Chapter 11 petitions on the petition date, were required to file a proof of claim in writing so that it was received on or before 30 September 2009. On 3 December 2009, the US Bancruptcy Court established a Bar Date for NN CALA claims of 25 January 2010.

2

5.7. On or about 30 September 30 2009, the trustees of the Plan ("Trustees") and the Board of the PPF jointly filed proofs of claim against US Nortel entities (with the exception of NN CALA). The Trustees and PPF jointly filed a proof of claim against NN CALA on 25 January 2010.

5.8. The pension claim by the Trustees and PPF is based on the allegation that the Plan is under-funded by an amount alternatively estimated to be £2.1 billion or $3.1 billion ("Pension Claim").

5.9. The Pension Claim alleges that the US Nortel entities have a contingent liability and indebtedness to the Trustees and the PPF in accordance with their respective interests arising pursuant to UK pensions legislation. The claim is based on the potential exercise by the UK Pensions Regulator ("Regulator") of powers under the PA 04 to issue a financial support direction ("FSD") against relevant US Nortel entities and if they fail to put or keep in place financial support approved by the Regulator, the issue of a contribution notice ("CN").

5.10. By letters dated 13 January 2010 and addressed to NNI and NN CALA, the Regulator purported to issue a Warning Notice pursuant to sections 96(2) and 43(2), on the basis that the Regulator believes that is reasonable, within the meaning of section 43(5), to require the companies against whom the Warning Notice is issued to put in place financial support for the Plan.

**B.     Contents of this Declaration**

6.  In the paragraphs below, I explain the UK statutory regime relating to FSDs and CNs, and the powers of the Regulator to issue each of these. At various stages I refer to sections of UK legislation. All the legislative and regulatory material to which I refer are annexed to this Declaration at Schedule 2.

7.  The questions posed in my instructions are as follows. I am asked to

    7.1.  describe for the benefit of the US Bankruptcy Court, the relevant statutory regime and powers of the Regulator to issue FSDs and CNs. At paragraph 8 below, I set out a list of those individual matters that I am asked to include, amongst those which I consider likely to assist the US Bankruptcy Court; and

    7.2.  in describing the statutory scheme under paragraph 7.1 above, to comment on the purpose behind the power of the Regulator to issue a FSD and, if required, a CN and also who benefits from the exercise of those powers.

8.  The structure that I have adopted for this report is to address the second question in the course of explaining and describing the matters relevant under the first.

9.  Those particular matters to which my attention was directed in my instructions are set out in immediately below:

    9.1.  The PPF:

        9.1.1.  its main function and the effect of an assessment period (sections 132(2), 135;134(2), 138);

        9.1.2.  the ending of an assessment period (section 132(4)); and

        9.1.3.  the assumption of responsibility for pension schemes by the PPF (section 161(2)).

    9.2.  Statutory debt of the employer:

        9.2.1.  the primary sources of the "employer debt" laws in the UK (section 75 of the Pensions Act 1995 and the Occupational Pension Schemes (Employer Debt) Regulations 2005; and

        9.2.2.  the approach to calculation of the liability under the employer debt laws.

      9.2.3.   The Regulator and its functions: its statutory functions, main objectives and approach (sections 5 and 100).

9.3.   The powers of the Regulator to issue a FSD:

      9.3.1.   the requirements for the Regulator's powers to issue a FSD: sections 43(6), 43(2)(b),43(5)); and

      9.3.2.   the "insufficiently resourced" test and Regulation 12 of the Pensions Regulator (Financial Support Directions etc.) Regulations 2005 ("FSD Regs");

      9.3.3.   the meaning of financial support: (section 45 and Regulations 13 and 14 of the FSD Regs).

9.4.   The powers of the Regulator to issue a CN:

      9.4.1.   the requirements for the Regulator's powers to issue a CN notice under section 47 (including 47(4));

      9.4.2.   the effect of a CN in terms of liability (section 47(3));

      9.4.3.   the enforcement of the CN (sections 48 and 49(3)); and

      9.4.4.   the position of the PPF (sections 49(5), 49(6) and 137(2)).

9.5.   Relationship between employer debt and the CN: (sections 50(4), 50(6) and 50(7)).

9.6.   The process before the Regulator and its Determinations Panel ("DP")

      9.6.1.   DP establishment and composition (section 9);

      9.6.2.   the powers entrusted to the DP (sections 4(2)(b), 10 and Schedule 2 (paragraph 33 and 34);

      9.6.3.   the standard procedure under section 96(2); and

      9.6.4.   DP procedure (sections 93(3)) and the procedure published effective 28 July 2008;

9.7.   Reference to the Pensions Regulator Tribunal and further appeal:

      9.7.1.   the reference procedure under section 103 and paragraph 8 of Schedule 4 and The Pensions Regulator Tribunal Rules 2005 (SI 2005 No 690); and

    9.7.2.   requirements for an appeal to the Court of Appeal (section 104) and further appeal to Supreme Court.

9.8.   In addition, lest it is of assistance to the Court, I give brief consideration to the structure of UK occupational pension schemes like the Plan, and to the roles of the parties within that structure: a scheme's employer(s), its trustees and its members.

C. **UK Occupational Pension Schemes, ("OPS")**

10. OPS are provided by many UK employers as part of the package of benefits they offer to their employees. Although they are provided by employers, they are constituted under trust and are wholly separate from the assets and liabilities of the employers who contribute to them.

11. Many OPS, such as the Plan, offer employees the chance to accrue entitlement to pension on a "Defined Benefit" basis. This means that their pension entitlement is calculated according to a formula, usually based on length of service and their final, or career-average salary. This is to be contrasted with the other main type of OPS, often referred to as a "Defined Contribution" Scheme. There, an employer contributes to the scheme at a certain percentage of each member's salary, and the member may also contribute, and their pension entitlement when they retire depends upon how successfully those contributions have been invested.

12. It is for Defined Benefit schemes that the concept of there being a deficit (or a surplus) has meaning. Because it is not until a member comes to retire that the true extent of his or her pension entitlement can be known, funding on an ongoing basis is always a matter of estimation. Scheme trustees and employers take actuarial advice and this leads to a contribution rate, typically expressed as a percentage of the combined salaries of all members, which will be paid in order to fund the future cost of members' benefits.

13. Regular actuarial valuations of the assets and liabilities of a scheme allow that contribution rate to be adjusted if the cost of providing for the benefits being earned in the future has increased or decreased. Those valuations also allow the past service position, that is, the capacity of the assets to pay for the benefits already earned by members, to be reviewed. If this discloses a deficit, then on top of a contribution to fund ongoing, or future service, benefits, the scheme employer(s) will need to make additional contributions to amortise the deficit. Historically, this process was a matter of good practice and was usually provided for in the governing provisions of individual schemes. More recently, UK statute has required steps to be taken by trustees and employers to keep the funding level of OPS at a particular level.

14. Pausing at this stage, I should focus upon the three parties much mentioned above: the employer(s), the trustee(s) and the members. The employer or employers are responsible primarily for funding the benefits which members earn. It may be that members will also contribute towards those benefits, but in many OPS only the employer or employers pay contributions to the scheme.

15. It is established law in the UK that OPS members, who start out as the employees of the employer(s) of a particular OPS, earn their benefits. In other words, their benefits form part of the monetary consideration paid to which they are entitled for the service they provide. They have been characterised as deferred remuneration. Members accordingly have a right, enforceable

7

against the trustees of their scheme, to receive their benefits, which are of course delivered to them in the form of monthly or lump sum payments.

16. The trustees of a scheme are responsible for administering it according to its governing provisions, which are set out in the trust deed and rules which relate to the scheme in question, and according to the broader requirements of UK trust law and statute. Returning to the key issue of the provision of members' benefits, it is the trustees who are responsible for providing those benefits from the OPS. They will seek, with the actuarial advice referred to above and in consultation with the relevant employer or employers to ensure that sufficient monies are paid into their scheme to mean that it will be able to meet its liabilities as and when they fall due.

17. As part of that process, trustees are obliged regularly to assess the strength of the employer's covenant. What this means in practise is examining an employer's business, and its assets and liabilities, and judging whether that employer is likely to be able and to remain able to fund the level of contributions necessary to ensure that the PA04's Statutory Funding Objective is met[2]. This is essential because, as will have been apparent from the explanation given above, OPS are private arrangements. When I refer to the enforceable right of a member to receive his or her entitlement, that enforceability always depends upon the capacity of the scheme concerned to meet that entitlement and the employer concerned to contribute enough to enable the scheme to pay it.

18. Recently, since the coming into force of the PA04, there has been a safety net available for members in certain circumstances in the form of the PPF, which is a compensation scheme designed to protect the members of Defined Benefit OPS in circumstances where the scheme's sponsoring employer suffers a relevant insolvency event[3] and the scheme is in deficit. The PPF's assets (over and above the assets of scheme for which they assume responsibility) are formed from payment of a levy by all OPS who are capable of benefiting from the PPF, together with investments returns on those monies. Further consideration will be given to the PPF below, but it is worth noting that it is not subject to any guarantee from the UK government. It is the assets it receives from adopted OPS and the levy payments received from all potentially adoptable OPS that enable it to fulfil its purpose.

---

[2] The Statutory Funding Objective requires an OPS to have sufficient assets to cover its 'Technical Provisions'; essentially, the amount required, based on the calculation of the scheme's actuary, to provide for all the scheme's ...accrued, present and future benefit obligations.

[3] An insolvency event (broadly speaking, the employer goes into administration, receivership or liquidation – other than members' voluntary liquidation) that occurred on or after 6 April 2005, and in circumstances in which the winding up of the Scheme had not commenced prior to that date.

## D. THE PPF

19. It is worth explaining a little more about the PPF. Broadly speaking, the PPF offers two levels of compensation to the members of schemes for which it assumes responsibility. For individuals that have reached their scheme's normal pension age or, irrespective of age, are either already in receipt of survivors' pension or a pension on the grounds of ill health, the Pension Protection Fund will generally pay compensation to match 100% of their scheme entitlement. For the majority of people below their scheme's normal pension age the PPF will generally pay as compensation 90% of the level of their pension entitlement, although this is subject to a statutory cap.

20. Before the stage of offering any compensation is reached, schemes have to go through an assessment period of up to two years. This commences when the PPF has been given notice of an insolvency event occurring in relation to a scheme employer and the PPF has then validated that notice, at which point the scheme is deemed to have started the assessment period from the date of the insolvency event.

21. An assessment period is brought to an end by an actuary producing a valuation of the scheme's assets and liabilities pursuant to section 143. The purpose of this is to confirm whether or not the scheme can pay member benefits at or above PPF levels. If it can, the PPF will cease its involvement. If it cannot, the scheme will transfer to the PPF. It is at this stage that the PPF will assume responsibility for the scheme.

22. Although the trustees retain responsibility for paying benefits, during the assessment period, their rights and powers in relation to any debt due to them by the employer, whether by virtue of section 75 of the Pensions Act 1995 or otherwise, are exercisable by the Board of the PPF to the exclusion of the trustees or managers (section 137(2)).

23. I now turn to the UK statutory regime relating to FSDs and CNs, and the powers of the Regulator to issue each of these. It is logical I think to commence this with a general consideration of the Regulator. Before I do so, however, there is another concept that I think I can usefully explain. It is the statutory debt which can fall upon OPS employer's in prescribed circumstances. It is important in this context because it forms the basis for calculating both the extent to which financial support is necessary in an FSD, and the amount specified by way of contribution in a CN.

E.  **The Debt on the Employer**

24. The main provisions dealing with the statutory debt on the employer are set out in section 75 of the Pensions Act 1995 and in the Occupational Pension Schemes (Employer Debt) Regulations 2005, the ("Employer Debt Regs").

25. The effect of the statutory provisions, first of all, is to establish that a debt (payable by the employer to the trustees) will arise in certain circumstances if and to the extent that the scheme is in deficit on a 'buyout' basis.

26. By 'buyout' basis, I refer to an amount calculated by reference to the cost of purchasing contracts of annuity from an insurance company which will pay each of the member's benefits when they come into payment. This basis, which was not the original basis of calculation for an employer debt, is the only one which will guarantee that the member receives his or her full entitlement. Accordingly, the debt will be the difference between the realisable value of the assets and the cost of buying out all necessary benefits, plus the expenses incurred in winding up.

27. It is for the actuary advising the trustees to calculate the debt. Regulation 5 of the Employer Debt Regs prescribes the procedure for calculating the debt, and in particular requires the actuary to calculate and verify

    "The amount of the liabilities in respect of pensions and other benefits... on the assumption that they will be discharged by the purchase of annuities of the kind described in section 74(3)(c) of the 1995 Act (discharge of liabilities; annuity purchase) and for this purpose the actuary must estimate the cost of purchasing annuities."

28. Section 74 of the Pensions Act 1995 is headed 'Discharge of liabilities by insurance etc.' Sub-section (2) provides that a pension liability to or in respect of a member of the scheme is to be treated as discharged if the trustees of the scheme have provided for the discharge of the liability in one or more of the ways mentioned in subsection (3). Subsection 3(c) provides for discharge

    "By purchasing one or more annuities which satisfy prescribed requirements from one or more insurers , being companies willing to accept payment in respect of the member from the trustees..".

F.  **The Pensions Regulator**

29. The Regulator is the regulator of work-based, or occupational, pension schemes in the UK. It was brought into being by the PA04. The schemes within its remit include both Defined Benefit and Defined Contribution OPS, and it aims to provide services to the members, the trustees and the employers of those schemes.

30. The objectives of the Regulator are set out in sections 5 and 100. Under section 5 the Regulator is directed:

    30.1. to protect the benefits of members of work-based pension schemes;

    30.2. to promote good administration of work-based pension schemes; and

    30.3. to reduce the risk of situations arising that may lead to claims for compensation from the PPF.

31. As the Regulator says itself when commenting on its objectives on its website[4] (the primary means through which the Regulator communicates its policies and offers guidance to members, trustees and employers):

    "In order to meet these objectives, we concentrate our resources on schemes where we identify the greatest risk to the security of members' benefits. "

32. It can thus be seen that it is in ensuring the payment of those benefits, which individual scheme members have earned through working for their employer, that the Regulator concentrates most of its fire. This is important, because it demonstrates that the third objective set out above is a consequence of the first two. By seeking to ensure that members' benefits are properly funded for and paid by the OPS to which they belong, the Regulator reduces the likelihood that the PPF will be called upon. It is the focus, collectively, on individual member's financial rights, that protects the compensation scheme from unnecessary calls upon its assets.

33. Section 100 provides that when determining whether to exercise a regulatory function, and in exercising that function, the Regulator must take into account the interests of the generality of the members of the scheme in question, and also the interests of persons directly affected by the exercise of that function. For the avoidance of doubt, those persons include any person, described as the ("Target Person"), against whom it is proposed to exercise a regulatory function.

---

[4] www.thepensionsregulator.gov.uk

11

34. Where the Regulator wishes to initiate regulatory action, it commences the process by issuing a Warning Notice. A Warning Notice is a written statement identifying the Target Person or Persons against whom the exercise of a regulatory function is proposed and contains details of:

    34.1. the circumstances of the case and the details of the alleged breach or grounds for the application;

    34.2. evidence to support the allegation or application; and

    34.3. details of the specific power that the Regulator asks the Determinations Panel to consider using. The Determinations Panel and its procedures are considered in section I below.

35. A Target Person is usually given at least 14 days – in complex cases the period allowed may be considerably longer – in which to comment on and respond to the Warning Notice. In considering and researching its response to the Warning Notice, the Target Person needs to have regard to sections 82-87 which introduce the concept of restricted information (essentially, any information obtained by the Regulator in the course of exercising its regulatory functions about a person's business or other affairs). The Warning Notice may contain substantial amounts of restricted information, and care must be taken by the Target Person not to disclose it, as a criminal sanction lies behind the prohibition on its disclosure in PA04. In addition, in considering its response, the Target Person may feel that an oral hearing is required to enable it to present its defence most effectively. It has a right to ask the Determinations Panel to convene an oral hearing.

36. Turning now specifically to the powers relating to FSDs and CNs, I will start by considering FSDs.

### G. Financial Support Directions

37. The powers of the Regulator in relation to the issue of an FSD are contained in sections 43 to 45, and (insofar as is material on my instructions) Regulations 12 to 14 of the Pensions Regulator (Financial Support Directions etc.) Regulations 2005 ("FSD Regs"). They provide that:

    37.1. The Regulator may issue a FSD under this section in relation to a scheme if the Regulator is of the opinion that the employer is 'insufficiently resourced' (section 43(2));

    37.2. A FSD is a direction requiring the person or persons to whom it is issued to secure that 'financial support' for the scheme is put in place within a specified period and to ensure that the financial support or other financial support remains in place while the scheme is in existence (section 43(3)). Failure to conform to the terms of an FSD puts the person concerned at risk of being named on a CN under the procedures set at section 47 to 49. These are considered in the following section;

    37.3. The Regulator can only issue a FSD against a person if that person is either the OPS employer, or an individual associated with the employer (but not because of being employed by the employer), or a person other than an individual who is either connected with or an associate of the employer. In addition, the Regulator must consider that it is reasonable to impose the requirements of the direction on that person (section 43(5),(6)).

    37.4. In deciding whether or not it is reasonable to impose the requirements of the direction on the person concerned, there is a measure of discretion, but the Regulator is directed to have regard to such matters as it considers relevant including, where relevant, the following matters under section 43(7):

        37.4.1. the relationship which the person has or has had with the employer (including, where the employer is a company whether the person has or has had control of the employer);

        37.4.2. in the case of a person associated with or connected with the employer, the value of any benefits received directly or indirectly by that person from the employer;

        37.4.3. any connection or involvement which the person has or has had with the scheme;

        37.4.4. the financial circumstances of the person, and

        37.4.5. such other matters as may be prescribed[5].

---

[5] No additional matters have been prescribed.

37.5. The employer in relation to a scheme is 'insufficiently resourced' at the relevant time if—

    37.5.1. at that time the value of the resources of the employer[6] is less than the amount which is a prescribed percentage of the estimated section 75 debt[7] in relation to the scheme, and

    37.5.2. there is at that time a person or persons associated with or connected with the employer and the value at that time of that person's resources[6] is not less than the amount which is the difference between—

        (i)    the value of the resources of the employer, and

        (ii)   the amount which is the prescribed percentage of the estimated section 75 debt.

37.6. 'Financial Support' means one of the following arrangements:

    37.6.1. an arrangement whereby, when the employer is a member of a group of companies, all the members of the group are jointly and severally liable for the whole or part of the employer's pension liabilities in relation to the scheme;

    37.6.2. an arrangement whereby, when the employer is a member of a group of companies, a company which meets prescribed requirements and is the holding company of the group is liable for the whole or part of the employer's pension liabilities in relation to the scheme;

    37.6.3. an arrangement which meets prescribed requirements and whereby additional financial resources are provided to the scheme; and

    37.6.4. such other arrangements as may be prescribed.

37.7. Regulations 13 and 14 of the FSD Regs provide that the requirements prescribed for the purposes set out in paragraphs 37.6.3 and 37.6.4 above that that the party or parties in question consent to the jurisdiction of the courts of England and Wales, and where there is more than one party to the arrangement, those parties enter into a legally enforceable agreement.

---

[6] Reg 12 of the FSD Regs provides that the Regulator has power to deem the value of a person's resources where that person fails to supply the necessary information.

[7] Reg 6 of the FSD Regs provides that the prescribed percentage is 50 per cent.

38. From the detailed provisions explained above, it should be plain that the purpose of issuing an FSD is to ensure that there is in place support which will enhance the security of OPS members' benefits and, ultimately, ensure that they are paid. As I explained above in outlining the provisions relating to the debt on the employer provided for under section 75 Pensions Act 1995, using that 'buyout' measure as the basis for calculating the amount of support needed is the only basis which can realistically be said to be sufficient to guarantee, in so far as is possible, that members' benefits will be secure.

39. Although the use of the buyout measure means that the amount of financial support required or the amount specified in a CN will be higher than would have been the case had any other measure been applied, it remains a purely compensatory measure. It is designed only to give members that to which they are entitled as a matter of right. There is no element of penalty, no hint that either the FSD or the CN is to be used to discipline an errant employer or some associated or connected person.

40. It is also important to note that a FSD can be served not only against the scheme employer which provided the benefits of members concerned as part of the consideration for their service, but also against (for example) another company in that employer's group. In this respect the remit of a FSD goes further than a member could in enforcing his or her contractual rights, but only to the end of ensuring that the original benefit will be paid. Bringing other entities, individuals[8] or companies, who have been associated or connected with or have received financial benefit from the employer, or who have been connected or involved with the OPS concerned, increases the prospect of the member's pension entitlement being met.

41. This leads me to conclude that the purpose or primary purpose of the statutory scheme permitting the Regulator to issue FSDs is the protection and facilitation of scheme members' pension rights. It is, of course, the members who benefit financially from this because it is through the intervention of the Regulator that their deferred remuneration in the form of pension entitlement actually materialises. In a less immediate way it is also possible to discern benefit for the PPF, in the sense that the risk that it might have to assume responsibility for the scheme in question is reduced by the successful issuing and enforcement of a FSD or CN.

---

[8] Individuals can only be Target Persons when associated with an employer that is itself an individual.

H.  **Contribution Notices**

42. The powers of the Regulator relating to the issuing, effect and enforcement of a CN are set out in sections 47-49. These are respectively headed "Contribution notices where non-compliance with financial support direction"; "The sum specified in a section 47 contribution notice" and "Content and effect of a section 47 contribution notice".

43. Section 47 provides that the Regulator may issue a CN to any of the persons to whom the FSD was issued. The CN must state that the person is under a liability to pay to the trustees of the OPS concerned the sum specified in the notice. A CN cannot be issued under this section if the PPF has assumed responsibility for the OPS – in other words, following an assessment period, has decided to assume responsibility.

44. Before issuing a CN the Regulator must decide that it is reasonable to impose the stated liability on the person named. As was the case in relation to FSDs, there is a measure of discretion in determining what is or is not reasonable. The key criterion is relevance, but the Regulator is directed where relevant to take into account the following matters under section 47(4):

    44.1. whether the person has taken reasonable steps to secure compliance with the FSD;

    44.2. the relationship which the person has or has had with the employer (including, where the employer is a company, whether the person has or has had control of the employer;

    44.3. in the case of a person to whom the FSD was issued as a person connected with or associated with the employer, the value of any benefits received directly or indirectly by that person from the employer;

    44.4. the relationship which the person has or has had with the parties to any arrangements put in place in accordance with the FSD (including, where any of those parties is a company, whether the person has or has had control of that company);

    44.5. any connection or involvement which the person has or has had with the scheme;

    44.6. the financial circumstances of the person, and

    44.7. such other matters as may be prescribed[9].

45. Section 48 provides that the sum specified in a CN under section 47 may be either the whole or a specified part of the 'shortfall sum' in relation to the OPS. 'Shortfall sum' is defined as being either

---

[9] There are no additional prescribed factors.

the estimated amount of any debt on the employer under section 75 existing at the time of non compliance or, if there was no section 75 debt in existence, the amount which it is estimated by the Regulator to be the amount of the section 75 debt which would become due if section 75(2) applied and the time designated for the purposes of that section were the time of non-compliance.

46. Section 49 requires that the specified sum is to be paid, and that it is to be treated as a debt due from the person on whom the CN is served to the trustees of the scheme. The Regulator is empowered to recover the debt on behalf of the scheme's trustees, if necessary, by recourse to the court. However, during any PPF assessment period, the rights and powers of the trustees in relation to the debt are exercisable only by the Board of the PPF, who are bound to pay any monies which they receive to the trustees.

47. It is also necessary to consider elements of section 50, as these demonstrate the relationship between the employer debt and the CN where these coexist. The Regulator can direct trustees not to take steps to recover a section 75 debt pending the receipt of all sums due under the CN (section 50(4)). Any sums paid to the trustees of the Board of the PPF in response to a CN must be treated as reducing commensurately the amount of the section 75 debt (section 50(6)). Conversely, where a sum is paid to the trustees or to the Board of the PPF in respect of the debt due under section 75, the recipient of the CN may make an application under section 50(7) to the Regulator for a reduction in the amount of the sum specified in the CN.

48. I hope the explanation above gives sufficient explanation of how the Regulator's powers in relation to CN's function, how and where the PPF fits in material cases, and of the interplay between CN's and a section 75 debt. The key principle to bear in mind, as has been pointed out in relation to the section 75 debt procedure and the provisions relating to FSDs, is that the CN is aimed simply and solely at getting in sufficient monies to augment the existing assets of the scheme to a level which will mean that members benefit entitlements will be met. The Regulator's purpose does not go beyond ensuring those rights are capable of fulfilment. Such is plain not only from the compensatory nature of the basis for calculating the amount in the CN, but also from the provisions providing for adjustments to be made to either the section 75 debt or the amount specified in the CN where equivalent funds are delivered to the scheme from the alternate source.

I.  **Determinations Panel Procedure and Appeals**

49. The determination as to whether or not a FSD or a CN may properly be issued is not one for the Regulator to take, but for the Determinations Panel ("DP"). The DP is established under section 9. Its role, as set out in section 10, is not only to determine whether to exercise certain regulatory functions of the Regulator, but, if so determined, to exercise them.

50. Section 4(2)(b)(i) provides that only the DP can determine whether to exercise and, if so determined, to exercise the functions mentioned in Schedule 2, and paragraphs 33 and 34 of Schedule 2 list the power to issue a FSD under section 43 and the power to issue a CN under section 47.

51. The structure of the DP is also set out in section 9. Section 9(1) requires that the DP is made up of:

    51.1. a chairman (appointed by the Regulator) and

    51.2. at least six other persons (nominated by the chairman of the DP and then appointed by the Regulator).

52. Further provision about the DP is made in Schedule 1 to PA04, including provision as to the terms of appointment, tenure and remuneration of members and its procedure. The DP has power to determine its own procedure under section 93, and in June 2008 published a revised procedure effective from 28 July 2008. This sets out the procedures to be adopted for meetings of the DP, for deciding whether cases should follow either the standard or special (urgent) procedure, set out under sections 96 and 97 PA04. I note that the standard procedure is being used in this matter.

53. Provision is also made under the revised procedure for the DP to make determinations either on the basis of papers submitted to them or following an oral hearing. A person who is or may be directly affected by the potential exercise of a regulatory function is entitled to ask for an oral hearing, although it is within the discretion of the DP whether or not to grant that request.

54. Following an oral hearing the DP will cause a determination notice to be issued to all directly affected parties and will give reasons for their determination in writing. The determination notice will contain information about the right of a directly affected party to appeal, which takes the form of a reference to the Pensions Regulator Tribunal a determination of the DP. A directly affected party has 28 days from the date of the determination notice within which to make that reference to the Tribunal.

55. The Pensions Regulator Tribunal is the independent body set up to hear references on determinations. The Pensions Regulator Tribunal's Rules 2005 SI 2005/690 set out rules to be applied to all references to the Tribunal.

56. In essence the Tribunal takes a similar form to that of a UK civil court. It has wide powers: it may consider any evidence available to it in relation to the subject of the reference. This includes evidence that was not available at the time of the original determination.

57. The Tribunal will decide whether to confirm the determination and any order, notice or direction; vary or revoke the determination and any order, notice or direction; or the substitute a different determination, order, notice or direction.

58. There is the potential to seek permission to appeal from a decision of the Tribunal to the UK Court of Appeal on the basis of error of law only. An application for permission must first be made to the Tribunal and, if unsuccessful, a further application for permission can be made to the Court of Appeal.

I declare, under the penalty of perjury that the foregoing is true and correct.

Executed this 18th day of February, 2010
in London, England

_____
Richard Hitchcock