# APPENDIX "G"

[Attached]

199



Canadian CCAA Proof of Claim        re Nortel Networks Corporation and others        14856        Page 2 of 2

| 1  Name of Debtor (the "Debtor") |
|---|
| Debtor:  Nortel Networks Limited |

**2. Original Creditor Identification (the "Creditor")**

| Legal Name of Creditor | Name of Contact |
|---|---|
| Nortel Networks UK Pension Trust Limited ("Trustee") and<br>U.K. Pension Protection Fund ("PPF")                  Continued from Page 1 | PPF:  Richard Favier                                  Continued from Page 1 |

| Address | Phone #  (44) 020 8633 4940 |
|---|---|
| PPF: 17 Addiscombe Road | Fax #   (44) 020 8633 4910 |

| City | Prov/State | Postal/Zip code | Country | e-mail  Richard.favier@ppf.gsi.gov.uk |
|---|---|---|---|---|
| Croydon | Surrey | CR0 6SR | England | cc:  bleonard@casselsbrock.com |

**3  Assignee, if claim has been assigned**

| Full Legal Name of Assignee | Name of Contact |
|---|---|
| | |

| Address | Phone # |
|---|---|
| | Fax # |

| City | Prov/State | Postal/Zip code | e-mail |
|---|---|---|---|
| | | | |

**4  Amount of Claim**
The Debtor/Officer(s)/Director(s) was/were and still is/are indebted to the Creditor as follows:

| Claims will be recorded as "Unsecured" unless the "Secured" box is checked | | | (Check only if applicable) | | If you are making a claim against an Officer or Director check the box below, and list the Officer(s) and Director(s) against whom you assert your claim |
|---|---|---|---|---|---|
| Currency | Original Currency Amount | Secured | S. 136 Priority | Restructuring | |
| £ | | ☐ | ☐ | ☐ | ☐ |
| £ | | ☐ | ☐ | ☐ | ☐ |
| £ | | ☐ | ☐ | ☐ | ☐ |
| | | ☐ | ☐ | ☐ | ☐ |

**5  Documentation**
Provide all particulars of the Claim and supporting documentation, including amount, description of transaction(s) or agreement(s) giving rise to the Claim, name of any guarantor which has guaranteed the Claim, and amount of invoices, particulars of all credits, discounts, etc. claimed, description of the security, if any, granted by the affected Debtor to the Creditor and estimated value of such security, particulars of any restructuring claim.

See Schedule 'A' Attached

| 6  Certification |
|---|
| I hereby certify that:<br>• I am an authorized Representative of the Creditor.<br>• I have knowledge of all the circumstances connected with this Claim.<br>• The Creditor asserts this claim against the Debtor; and the Officer(s) and Director(s) as indicated above.<br>• Complete documentation in support of this claim is attached. |

Received
SEP 3 0 2009

| Signature | Name  Richard Favier |
|---|---|
| | Title |
| Dated | Signed at |

| 7  Filing of Claim | Ernst & Young Inc. |
|---|---|
| This Proof of Claim must be received by the Monitor by | 222 Bay St., P.O. Box 251 |

Legal*4477806.1
041691-00001

200

Schedule A

**Claimants:**
Nortel Networks UK Pension Trust Limited
(as trustee of the Nortel Networks UK Pension Plan)
Westacott Way
Maidenhead, Berkshire, England
SL6 3QH

    Attn: David Davies, Chairman
    Telephone: 44 78 0829 8794
    Fax: 44 207 667 7011
    Email: dwdavies826@btinternet.com

The Board of the Pension Protection Fund
Knollys House
17 Addiscombe Road
Croydon
Surrey, England
CRO 6SR

    Attn: Richard Favier, Senior Insolvency Advisor
    Telephone: 44 208 633 4940
    Fax:44 208 633 4910
    e-mail: Richard.Favier@ppf.gsi.gov.uk

**Courtesy copy to:**
Cassels Brock & Blackwell LLP
2100 Scotia Plaza
40 King Street West
Toronto, Ontario
M5H 3C2

    Attn: Bruce Leonard
    Telephone number: 416 869 5757
    Fax: (416) 640-3027
    e-mail: bleonard@casselsbrock.com

DAVID DAVIES
DEF TRUSTEES PLC

Per: _____
Date: PLEASE DO NOT DATE
Location: _____

Per: RICHARD FAVIER SENIOR INSOLVENCY ADVISER
Date: PLEASE DO NOT DATE
Location: _____

Legal*4481620.1

"The Claimant":    Nortel Networks UK Pension Trust Limited (the "Trustee") and the Board of the Pension Protection Fund ("the PPF") in accordance with their respective interests.

"The Debtor":    Nortel Networks Limited.

## Schedule A

The Debtor is liable and indebted to the Claimant under the two guarantees referred to below. The Debtor also has a contingent liability and indebtedness to the Trustee and the PPF in accordance with their respective interests arising pursuant to the Pensions Act 2004 and the Pensions Act 1995 (Acts of the UK Parliament) and all applicable UK Regulations (collectively, "UK Legislation", as a result of the matters set out below. See Appendix B (Schedule of Applicable Laws).

1.1    Nortel Networks UK Limited ("NNUK") has carried on business in the United Kingdom by itself and through its predecessors for over 18 years as part of the Nortel group of companies (the "Nortel Group") and for many years before that outside the Nortel Group. NNUK's predecessors established, and NNUK participated in, the occupational pension scheme known as the Nortel Networks UK Pension Plan (the "Plan"), in order to provide pensions and other benefits for their employees. The Trustee is the trustee of the Plan.

1.2    The Plan is a defined benefit arrangement pursuant to which employees of participating employers become entitled to pension benefits based on final salary and the employers agree to meet the balance of the cost of providing such benefits after taking into account the employees' own contributions. A copy of the current governing documentation for the Plan is appended hereto in Appendix A. The Plan now has over 40,000 present and potential (deferred) pensioners.

1.3    Messrs A. Bloom, A. Hudson, S. Harris and C. Hill of Ernst & Young LLP (hereinafter referred to as the "Administrators") were appointed as joint administrators of NNUK under Schedule B1 of the UK Insolvency Act 1986 on January 14, 2009 (hereinafter referred to as the "Administration").

1.4    Notice was given by the PPF (a statutory body established under the Pensions Act 2004) on March 30, 2009 to the Administrators confirming that the Plan was in an assessment period for the purposes of the Pensions Act 2004. See Appendix A. An assessment period is a period in which the PPF will work with the Trustee of the Plan so that a valuation of the Plan can be completed to determine the Plan's admittance into the PPF. This notice has been accepted by the Administrators in the Administration.

Legal*4489800:2

1.5 Under section 137 of the Pensions Act 2004, during an assessment period, the rights and powers of a trustee of a pension scheme in relation to any debt (including any contingent debt) due to them by the employer, whether by virtue of section 75 of the Pensions Act 1995 (an Act of the UK Parliament) or otherwise, are exercisable by the PPF. In addition, under section 49(5) of the Pensions Act 2004, the rights and powers of a trustee in relation to any debt due to it by virtue of a contribution notice issued pursuant to the process described below are exercisable by the PPF. A trustee retains the right to enforce claims and rights in respect of which the PPF does not have creditor rights. The whole of any amount paid in respect of such debts are ultimately payable to the Plan, whether it is the PPF or the Trustee who exercises the right or power to enforce the obligations.

2. LIABILITIES UNDER THE DEBTOR'S 2006 GUARANTEE (the "Funding Guarantee") -

2.1 To address the deficiency in the amount of the obligations of the Plan to the pensioners and employees covered by the Plan, NNUK entered in to a funding agreement with the Trustee dated November 21, 2006 with respect to its obligations under the Plan (the "Funding Agreement") a copy of which is appended hereto in Appendix A. Under the Funding Agreement, NNUK agreed to make contributions to eliminate the deficit in the Plan during a recovery period ending in April, 2012.

2.2 Under the Funding Agreement, NNUK was required to make past service deficit contributions between April 2008 and April 2012 in 16 equal quarterly instalments totalling the amount of the Plan deficit as valued for those purposes, until the deficit was reduced to zero subject to a minimum obligation to pay such contributions in an amount not less than the contributions payable by NNUK in accordance with the schedule of contributions under the UK Pensions Act 1995, a copy of which is appended hereto in Appendix A. The Claimant refers to these past service deficit contributions, howsoever calculated, as the "past service deficit contributions",

2.3 Under the Funding Agreement, NNUK also agreed to make contributions in respect of pension liabilities accruing as a result of the current service of Plan members.

2.4 To support the obligations of NNUK to the Trustee, the Debtor guaranteed payment of certain obligations of NNUK under the Funding Agreement in respect of the past service deficit contributions and current service contributions under a Guarantee made by the Debtor in favour of the Trustee dated November 21, 2006 (the "Funding Guarantee") a copy of which is appended hereto in Appendix A. The guaranteed obligations included those obligations referred to above.

2.5 Under the Funding Agreement, NNUK is obligated to the Claimant in respect of the past service deficit contributions. In relation to the past service deficit contributions payable in respect of the period April 2008 to April 2012, the Plan deficit was valued by

- 2 -

the Plan Actuary as being £548M. On that basis, under the Funding Agreement, NNUK was required to pay £34.25M per quarter into the Plan following April 6, 2008 as past service deficit contributions (i.e., 6.25% of the said deficit in each quarter for 16 quarters ending in April, 2012).

2.6     Accordingly, for the period from April 6, 2008 to January 14, 2009, the sum of £102.75M (3 quarterly payments of £34.25M per quarter) was due and payable in relation to past service deficit contributions. NNUK, however, paid only £57.75M following April 6, 2008 in respect of past service deficit contributions such that a balance of £45M was due and owing under the Funding Agreement and the Funding Guarantee in relation to past service deficit contributions as at January 14, 2009.

2.7     In addition to the Claimant's claim for £45M due and owing as at January 14, 2009, NNUK is insolvent and has failed to pay and is not able to pay the further past service deficit contributions required under the Funding Agreement during the period of the Funding Agreement. The Administrators have confirmed that they will not make the payments required under the Funding Agreement by letter dated September 18, 2009, a copy of which is appended in Appendix A. NNUK is therefore obligated and liable under the Funding Agreement in the aggregate amount of £445.25M (2 quarterly instalments of £34.25M which fell due on 4 April 2009 and 4 July 2009 which were not paid by NNUK and 11 further quarterly instalments of £34.25M each which NNUK is required to pay in the period up to April 5, 2012) for amounts payable under the Funding Agreement following January 14, 2009 and the Debtor is obligated and liable pursuant to the Funding Guarantee for such amounts.

2.8     Under the Funding Guarantee the Debtor also guaranteed the payment by NNUK of current service contributions required under the Funding Agreement. NNUK was required to pay current service contributions in quarterly instalments of £2.5M in the period following November 21, 2006 (but with effect from July 4, 2006) subject to a minimum obligation to pay such contributions in amounts not less than the contributions payable by NNUK in accordance with the schedule of contributions under the Pensions Act 1995.

2.9     The Claimant claims that NNUK has an ongoing liability to make current service contributions under the Funding Agreement up to and after January 14, 2009.

2.10    The Funding Agreement obligations guaranteed by the Debtor under the Funding Guarantee (the "Guaranteed Obligations") therefore include:

        (a)  Past service deficit contributions payable in the period from April 6, 2008 to January 14, 2009 totalling £102.75M less amounts actually received (£57.75M), being £45M.

204

(b) Past service deficit contributions due or accruing due in the period from January 14, 2009 to April 5, 2012 consisting of 13 quarterly payments of £34.25M each, for a total of £445.25M.

(c) Current service contributions for the period following January 14, 2009 in the amount of £5M (2 quarterly payments of £2.5M) to September 30, 2009 and all current service contributions subsequently due or accruing due under the Funding Agreement.

2.11    By written notification served on September, 15 2009, a copy of which is appended hereto in Appendix A, the Trustee notified NNUK through the Administrators that the obligations of NNUK under the Funding Agreement were due and owing and unpaid and required payment of the obligations to be made. Payment of such obligations of NNUK has not been made and, as confirmed by the Administrators, will not be made. The entire amounts referred to above are consequently obligations for which the Debtor is obligated and liable under the Funding Agreement and the Funding Guarantee.

2.12    The Funding Guarantee provides that the Debtor's liabilities under the Funding Guarantee become due and payable after:

(a) NNUK fails to pay any of the Guaranteed Obligations within 10 business days of receiving written notification that payment of such obligations is due; and

(b) the Trustee makes demand on the Debtor in accordance with the terms of the Funding Guarantee.

Following the notification served upon the Administrators (on behalf of NNUK), demand on the Debtor for payment under the Funding Guarantee of obligations guaranteed was made on the Debtor on September 30, 2009 and payment of such obligations was not made. The Debtor is consequently obligated to the Claimant for the entire amount of all of such guaranteed obligations.

2.13    The Debtor agreed in the Funding Guarantee that the Funding Guarantee would be governed by English law and that the Courts of England would have exclusive jurisdiction to settle any dispute in connection with the Funding Guarantee (including any disputes regarding the existence, validity or termination of the Funding Guarantee) and that the Courts of England were the most appropriate and convenient Courts to settle any such disputes and that it would not argue to the contrary. Under the Funding Guarantee, the Debtor irrevocably and unconditionally agreed, among other things, not to claim any immunity from proceedings brought by the Claimant and to ensure that no such claim would be made on its behalf and consented to the giving of any relief or the issue of any process in connection with such proceedings. The Claimant states that, under the terms of the Funding Guarantee, the Debtor is precluded from contending or asserting that the Courts of England do not have

- 4 -

exclusive jurisdiction to settle disputes in connection with the Funding Guarantee as provided therein and opposes and objects to any attempt by the Debtor to fail to comply with its obligations under the Funding Guarantee in that regard and respectfully submits that the Debtor be directed to comply with such obligations under the Funding Guarantee.

3.      LIABILITIES UNDER THE DEBTOR'S 2007 GUARANTEE (the "Insolvency Guarantee"): -

3.1      As a condition of a corporate restructuring in 2007, the Debtor gave a further guarantee on December 21, 2007 in favour of the Trustee as beneficiary (the "Insolvency Guarantee") a copy of which is appended hereto in Appendix A, by which it further guaranteed payment of the obligations of NNUK in connection with the Plan. Under the terms of the Insolvency Guarantee, the Debtor guaranteed in favour of the Trustee NNUK's obligations to make payments to the Plan upon or after an "Insolvency Event".

3.2      "Insolvency Event" is defined in the Insolvency Guarantee as, in summary:

         (a) a court order for the winding up or dissolution of NNUK;

         (b) NNUK being dissolved; or

         (c) NNUK passing a resolution for its winding up,

following which the Plan commences its winding up (without any other company agreeing with the Trustee to assume the performance of NNUK's obligations under the Plan). The Plan will either be wound up during the assessment period, or it will be treated as (a) having commenced winding-up as at the start of the assessment period pursuant to section 154 of the Pensions Act, 2004 or (b) having been wound up when the PPF assumes responsibility for the Plan pursuant to section 161(2) of the Pensions Act, 2004 at the end of the assessment period.

3.3      In summary, the amount payable under the Insolvency Guarantee is limited to the lesser of: (1) US$150M; and (2) the amount of the Plan's buy-out deficit (net of any payment made by an associated company under a Contribution Notice or Financial Support Direction issued by the Pensions Regulator under the Pensions Act 2004 and any amount recoverable by the Trustee from NNUK in NNUK's liquidation or dissolution).

Legal*4499660.1

206

3.4      The Claimant filed a Proof of Claim in the amount of £2.0B on or about March 9, 2009 with the Administrators which was accepted by the Administrators in the Administration proceedings for purposes of voting in connection with the Administration.

3.5      The amount of the Plan's buy-out deficit has been estimated to be over £2.1B as at the close of business on January 13, 2009. See Actuary letter dated September 29, 2009, a copy of which is appended hereto in Appendix A. The liabilities of the Debtor pursuant to the terms of the Insolvency Guarantee are consequently US$150M. The Claimant reasonably expects that an Insolvency Event is highly likely to occur within the next 12-18 months or earlier and that NNUK will be unable to pay guaranteed obligations far in excess of US$150M.

3.6      The Debtor agreed in the Insolvency Guarantee that the Insolvency Guarantee would be governed by English law and that the Courts of England would have exclusive jurisdiction to settle any dispute in connection with the Insolvency Guarantee (including any disputes regarding the existence, validity or termination of the Insolvency Guarantee) and that the Courts of England were the most appropriate and convenient Courts to settle any such disputes and that it would not argue, to the contrary. Under the Insolvency Guarantee, the Debtor irrevocably and unconditionally agreed among other things, not to claim any immunity from proceedings brought by the Claimant and to ensure that no such claim would be made on its behalf and consented to the giving of any relief or the issue of any process in connection with such proceedings. The Claimant states that, under the terms of the Insolvency Guarantee, the Debtor is precluded from contending or asserting that the Courts of England do not have exclusive jurisdiction to settle disputes in connection with the Insolvency Guarantee as provided therein and opposes and objects to any attempt by the Debtor to fail to comply with its obligations under the Insolvency Guarantee in that regard and respectfully submits that the Debtor be directed to comply with such obligations under the Insolvency Guarantee.

4.       LIABILITIES UNDER FINANCIAL SUPPORT DIRECTION PROCEEDINGS UNDER THE UK PENSIONS ACT 2004.

4.1      The Pensions Regulator in the United Kingdom ("the Regulator") has power under the Pensions Act 2004 to issue a financial support direction ("Financial Support Direction") to any company connected with or an associate of a company which is an employer in relation to a UK occupational pension scheme. A Financial Support Direction requires the company or companies to whom it is issued to secure that financial support for the pension scheme is put in place within the period specified by the Regulator and as approved by the Regulator, and that such support remains in place whilst the pension scheme is in existence.

- 6 -

4.2    The procedure for issuing a Financial Support Direction is that the Regulator reviews the background and circumstances relating to the pension plan. The Regulator, if it concludes that there are grounds to do so, then sets out the case for the issuance of a Financial Support Direction in a warning notice (the "Warning Notice"), which is sent to the named company or companies. The company or companies to whom the Warning Notice is addressed have the opportunity to make written representations as to the matters set out in the Warning Notice to the Regulator, and then all parties have the opportunity to make submissions at a hearing in front of the Determinations Panel of the Regulator, which must then decide whether it is appropriate under the Pensions Act 2004 and related laws and regulations to issue a Financial Support Direction.

4.3    The Plan is a UK occupational pension scheme. NNUK is the current employer in relation to the Plan. The Debtor, being part of the Nortel Group, is an associate of or connected with NNUK for the purposes of the Pensions Act 2004 and the Insolvency Act 1986.

4.4    The Plan has a funding deficit (as described more fully below). As is confirmed by the letter from the Regulator to the Trustee and the PPF (see Appendix A), the Regulator has investigated and is continuing to investigate the circumstances of this case. The Regulator, in the light of its investigation has concluded that grounds exist to issue Warning Notices and to seek a Financial Support Direction against one or more of the members of the Nortel Group, whose members expressly include the Debtor. See Schedule A to Letter in Appendix A.

4.5    A Financial Support Direction may be issued by the Regulator when the employer in relation to the Plan is insufficiently resourced within the meaning of Part 1 of the Pensions Act 2004 (and associated Regulations) at a time determined by the Regulator, which in this case was June 30, 2008, and the other statutory and regulatory requirements are satisfied. See Sections 43-44 of the Pensions Act 2004.

4.6    The Regulator considers that NNUK was insufficiently resourced within the meaning of the UK Legislation, because:

    4.6.1    the Regulator has determined the value of NNUK's resources (as defined in the UK Legislation) to be less than 50% of the "estimated section 75 debt" (see Section 2.7 below) of NNUK as at the date specified by the Regulator, namely June 30, 2008 - such estimated section 75 debt being (UK) £1.777 billion (see Appendix A); and

    4.6.2    Nortel Networks Corporation ("NNC"), which is and was the ultimate parent company of both NNUK and the Debtor, is an associate of NNUK for the purposes of the UK Legislation. The Regulator has determined the value of the resources of NNC to be not less than (and, indeed, more than) the

difference between the value of the resources of NNUK and 50% of NNUK's estimated section 75 debt (see Appendix A).

4.7    The section 75 debt under the Pensions Act 1995 is the amount which the Regulator estimates would become due from NNUK to the Trustee if the liability had been triggered on June 30, 2008.    The liability under section 75 is broadly equal to the deficiency in the funding of a pension scheme on a "buy-out" basis together with certain costs. For the purpose of calculating the "buy-out" amount, the assets of the Plan are compared to the amount required or estimated by the actuary for the Plan (the "Plan Actuary") to be required to "buy out" its liabilities by purchasing equivalent annuities from an authorised insurance company.

4.8    The Plan Actuary has estimated the section 75 debt of NNUK as of January 13, 2009 to be (UK) £2.1 billion. See Appendix A. The Administrators of NNUK have stated that an informal estimate of the section 75 debt of NNUK is (US) $3.1 billion. See Appendix A.

4.9    The issuance of a Financial Support Direction against the Debtor will require the Debtor either alone or together with other members of the Nortel Group to procure financial support for the Plan satisfactory to the Regulator.

4.10   Under the Pensions Act 2004, if the Debtor fails to put or keep in place financial support approved by the Regulator, the Regulator has power to issue a contribution notice ("Contribution Notice") imposing on the Debtor a liability to pay the sum specified in the notice, which may be in an amount equal to the whole of the debt that is or would be due by NNUK in relation to the Plan under section 75 of the Pensions Act 1995.

4.11   By virtue of section 49 of the Pensions Act 2004, the sum specified in such a Contribution Notice is to be treated as a debt due from the Debtor to the Trustee of the Plan.    As set out above, by virtue of section 49(5), during an assessment period the rights and powers of the Trustee in relation to the debt to the Trustee pursuant to said Contribution Notice are exercisable by the PPF.

4.12   The indebtedness or liability of the Debtor to the Claimant under the applicable laws and the Plan arose at the latest on the date on which NNUK was first insufficiently resourced within the meaning of Part 1 of the Pensions Act 2004.  The liability had therefore been incurred no later than June 30, 2008.

4.13   As summarized above, the process under the Pensions Act 2004 relating to the determination of any potential Financial Support Direction obligations of the Debtor and other entities in the Nortel Group is underway ("Financial Support Direction Proceedings"), and certain entities within the Nortel Group have received and responded to inquiries from the Regulator.  The responses to the Regulator's inquiries and any additional evidence that may be submitted and any submissions that may be

- 8 -

made by the Debtor or other affected entities within the Nortel Group will be considered by the Regulator's Determination Panel in reaching a determination of the Debtor's and the other members of the Nortel Groups' Financial Support Direction and other obligations.

5.    CLAIMS SUMMARY: -

5.1    The Claimant's claims against the Debtor consist of the aggregate of the liabilities of the Debtor pursuant to the Funding Guarantee, the Insolvency Guarantee and the Financial Support Direction Proceedings as follows:

5.2    Funding Guarantee: -

(a) Plan contributions due and unpaid under the Funding Agreement as at January 14, 2009 as referred to in Section 2.10(a) above in the amount of £45M, for which the Debtor is liable and obligated under the Funding Guarantee;

(b) Plan contributions referred to in Section 2.10(b) above due or accruing due from and after January 14, 2009 during the period ending April 5, 2012 in the amount of £445.25M, for which the Debtor is liable and obligated pursuant to the Funding Guarantee.

(c) Current service deficit contributions referred to in Section 2.10(c) above due or accruing due from and after January 14, 2009 for which the Debtor is liable and obligated pursuant to the Funding Guarantee.

5.3    Insolvency Guarantee: -

(a) The Plan Deficit is estimated to be £2.1B as at January 13, 2009. The obligations and liabilities of the Debtor under the Insolvency Guarantee are consequently US$150,000,000.

(b) The Administrators anticipate that NNUK will go into liquidation but because that NNUK has not yet gone into liquidation or been dissolved and the Plan has not commenced winding-up as at the date of the Claim, the Claimant's claim under the Insolvency Guarantee is a contingent claim but with a high likelihood of the contingencies occurring within the next 12 -18 months.

5.4    FSD Proceedings: -

(a) The amount to be determined to be owing to the Claimant pursuant to Financial Support Direction Proceedings undertaken pursuant to the provisions of the UK Pensions Act, 2004.

- 9 -

6.   TOTAL LIABILITIES OF DEBTOR TO CLAIMANT: -

The Claimant's claims against the Debtor in the aggregate are as follows:

(a)   Pursuant to the Funding Guarantee, the amount of £45M due and owing as at January 14, 2009 and the further amount of £445.25M for the balance of the period of the Funding Agreement to April 5, 2012 and current service deficit contributions due from and after January 14, 2009.

(b)   Pursuant to the Insolvency Guarantee, the amount of US $150M contingent on NNUK going into liquidation or dissolution and the Plan commencing a winding-up or being deemed to have been wound up;

(c)   The amount to be determined to be owing to the Claimant pursuant to Financial Support Direction Proceedings undertaken pursuant to the provisions of the UK Pensions Act, 2004.

7.   RESERVATION OF RIGHTS, ETC.

7.1   The Claimant reserves the right to (a) amend, clarify, modify, update or supplement this proof of claim at any time and in any respect, including without limitation to assert additional claims or additional grounds for its claim and/or to specify the amount of any contingent, unmatured or unliquidated claim as they become non-contingent, matured and/or liquidated; (b) adduce additional documents to support claims, as they may become available or as necessary.

7.2   To the extent that the Claimant is or may become entitled to any other rights (including, without limitation, defences or set-off) in law or in equity, the Claimant expressly preserves such rights.

7.3   By filing this proof of claim, the Claimant does not waive, but specifically preserves, all procedural and substantive defences to any claim that may be asserted by the Debtor, or by any receiver, trustee, creditor representative, liquidator or similar entity.

7.4   The Claimant is continuing to investigate the elements of the claims. This proof of claim is filed under the compulsion of an order which sets a final date for filing proofs of claim. Accordingly, this proof of claim is filed to protect the Claimant from potential forfeiture of any and all rights against the Debtor. The filing of this proof of claim shall not constitute (a) a waiver or release of the rights of the Claimant against the Debtor or any other person or property; (b) a waiver by the Claimant of its right to contest the jurisdiction of the Ontario Superior Court of Justice with respect to the subject matter of any claim; or (c) an election of remedies or choice of law.

- 10 -

**APPENDIX "H"**

[Attached]

211

**The Pensions Regulator**

04 September 2009

PRIVATE & CONFIDENTIAL

**The Chief Restructuring Officer**
Nortel Networks Corporation
195 The West Mall
Toronto
Ontario
M9C 5K1
Canada

*Direct Line* +44 1273 627779
*Fax* +44 1273 627241
*Our Ref:* RAFT/PW/TM8409

Dear Sir

**Nortel Networks Corporation, Nortel Networks UK Limited and Nortel Networks UK Pension Plan**

The Pensions Regulator (the **"Regulator"**) is currently considering issuing a warning notice seeking a financial support direction (**"FSD"**) under s.43 of the Pensions Act 2004 (**"PA 04"**) against Nortel Networks Corporation (**"NNC"**) and other entities in the Nortel group in relation to the deficit in the Nortel Networks UK Pension Plan (the **"Plan"**).

Under s.43(2)(b) of PA 04, the Regulator may issue an FSD if it is of the opinion that the employer in relation to a scheme is insufficiently resourced at a time determined by the Regulator which falls under s.43(9) (the **"relevant time"**). The Regulator has chosen 30 June 2008 as the relevant time, this being the last quarter end date which occurs before the exceptional stock market volatility experienced in the second half of 2008.

Under s.44(3) and (3A) of PA 04 (as amended by the Pensions Act 2008), taken together with reg.6 of The Pensions Regulator (Financial Support Directions etc) Regulations 2005 (the "**FSD Regs**"), an employer is insufficiently resourced if:

(1) the value of the resources of the employer (here Nortel Networks UK Limited - **"NNUK"**) is less than 50% of its statutory debt under s.75 of the Pensions Act 1995 (the **"s.75 debt"**); and

(2) there is an associated or connected company the value of whose resources is not less than the difference between 50% of the s.75 debt and the value of the resources of the employer. For purposes of the calculation, NNC has been selected as the business associate of NNUK.

We consider that the test is satisfied here. We write to you in relation to matter (2) above, the value of the resources of NNC. We have written in similar terms to the Joint Administrators of NNUK in relation to matter (1). NNUK has decided not to carry out a

| | | |
|---|---|---|
| Napier House | Customer support: | 0870 6063636 |
| Trafalgar Place | Textphone: | 0870 2433123 |
| Brighton | Fax: | 0870 2411144 |
| BN1 4DW | Email: | customersupport@thepensionsregulator.gov.uk |
| | General office: | 01273 811800 |
| | Website: | www.thepensionsregulator.gov.uk |
| | E-learning: | www.trusteetoolkit.com |

**The Pensions Regulator**

valuation or to comment or examine the calculation carried out. For the purposes of this letter, please take the value of NNUK's resources to be $924m as set out in the Appendix. We are currently attempting to obtain the information necessary for PricewaterhouseCoopers LLC ("PwC"), who have been instructed in this matter by the Plan's trustee, Nortel Networks UK Pension Trust Limited (the "Trustee"), to perform a more accurate valuation of NNUK's resources, which they consider will give a lower figure than $924m. This should not delay your consideration of the calculation of the value of NNC's resources.

### NNUK's s.75 debt

Actuarial advisers to the Trustee together with the Trustee have advised that had a s.75 debt fallen due from NNUK as at 30 June 2008, the amount of the Plan's liabilities would have been approximately £3,387 million (excluding defined contribution liabilities). The most recent audited scheme accounts are as at 31 March 2008 and the net assets figure at that time is £1,610 million (excluding defined contribution assets). A deficit on the basis of the difference between these two values is £1,777 million. We understand that the Trustee is considering commissioning scheme accounts as at 30 June 2008 and if such accounts were obtained this is likely to increase the s.75 debt slightly. The Regulator has reviewed the basis of the calculation of the liabilities and considers the deficit figure of £1,777 million to be appropriate for use as the estimated s.75 debt for the purposes of s.44(5) PA 04.

### Calculation of the value of NNC's resources

Regulation 9 of the FSD Regs incorporates a 3-stage approach for valuing the resources of a business, as follows:

(1) the stage set out in reg.9(4) (for an employer) or 9(5) (for a business associate) - being net assets with pension scheme balances added back;

(2) the stage set out in reg.9(6) - being the result from stage (1) with fair value adjustments for assets and liabilities; and

(3) the stage set out in reg.9(7) - being the result from stage (2) with entity value differences applied.

In order to ascertain the value of the resources of NNC, we have considered calculations carried out by PwC. The approach adopted by PwC to valuing the resources of NNC is set out in the Appendix to this letter.

Napier House
Trafalgar Place
Brighton
BN1 4DW

Customer support:    0870.6063636
Textphone:    0870 2433123
Fax:    0870 2411144
Email:    customersupport@thepensionsregulator.gov.uk
General office:    01273 811800
Website:    www.thepensionsregulator.gov.uk
E-learning:    www.trusteetoolkit.com

213

**The Pensions Regulator**

### Action required now.

The Regulator is informed that the bar date for submitting claims in NNC's CCAA proceedings is 30 September 2009, therefore we request an urgent response to this letter. Given that the figures derive from the share price of NNC – a listed company – we consider that you should be able to accomplish this. Please consider the calculation in the Appendix and confirm either that:

(i)     you agree with the calculation and the resulting valuation of NNC's resources of $4,224 million (equivalent to £2,117 million using the £:$ spot rate at 30 June 2008 – source: www.oanda.com), or

(ii)    you do not consider the calculation to be appropriate in which case please provide your alternative calculation together with supporting evidence.

Your response should be received by the Regulator, either by post or to the e-mail addresses below, as soon as possible, but in any event **no later than 3pm (UK time) on Friday 18 September 2009.**

Please contact me if you have any queries in relation to this request.

Yours sincerely

Paul Williams
Risk and Funding Team
email: paul.williams@thepensionsregulator.gov.uk
cc :    TM6409@thepensionsregulator.gsi.gov.uk

Napier House
Trafalgar Place
Brighton
BN1 4DW

| | |
|---|---|
| Customer support: | 0870 6063636 |
| Textphone: | 0870 2433123 |
| Fax: | 0870 2411144 |
| Email: | customersupport@thepensionsregulator.gov.uk |
| General office: | 01273 811800 |
| Website: | www.thepensionsregulator.gov.uk |
| E-learning: | www.trusteetoolkit.com |

214

**The Pensions Regulator**

### Appendix

**Methodology adopted by PwC in determining the value of NNC's resources at 30 June 2008 for the purposes of the FSD Regs.**

PwC's methodology comprises 2 stages:

(i) Determine NNC's enterprise value by reference to its market capitalisation as at 30 June 2008,
(ii) Apply the adjustments set out below to give the value of NNC's resources

**Step (i): determine NNC's enterprise value**

To approximate the value of NNC's enterprise value (inclusive of NNUK) the following adjustments were made to NNC's market capitalisation as at 30 June 2008:

- A control premium of 30% was included to reflect the premium above market capitalisation if valuing the business as a whole. This figure is based on PwC's review of the evidence for premia paid in historic transactions in excess of $100 million from January 2008 to June 2009 from Mergerstat;
- The market value of NNC's external group debt was added back;
- The accounting value of group pension liabilities was added back;
- A deduction was made for estimated surplus cash (based on NNC's 30 June 2008 year-end cash less an estimate of its working capital requirement for 2009).

This gives a figure of $9,842 million for NNC's enterprise value.

| Enterprise Value of NNC at 30 June 2008 | $m | Source |
|---|---|---|
| NNC Market cap | 4,063 | Datastream |
| Adjustments to calculate NNC Enterprise Value | | |
| Add: Control premium of 30% | 1,225 | PwC estimate |
| Add: Market value of Group debt | 3,644 | Datastream |
| Add: Group accounting value of pensions and post-employment benefits obligations. | 1,900 | Nortel Jun 08 8AP extracts |
| Deduct: Est. Group Surplus Cash & Cash equivalents | (1,810) | PwC estimate |
| NNC Enterprise Value including control premium | 9,842 | |

**Step (ii): determine the value of NNC's resources**

To obtain the value of NNC's resources, the enterprise value was adjusted in the following manner:

- A deduction was made for the face value of NNC's debt (this makes the assumption that the full par value of the debt is redeemed),
- The accounting value of group pension liabilities was deducted,
- The accounting value of the relevant pension scheme related balances has been added back. These are the UK pension scheme balances contained in NNUK's audited accounts for the year to 31 December 2007. The pension scheme deficit balance is $393 million (£197 million converted at the £:$ spot rate at 31/12/2007 of 1.9973 — source: www.oanda.com)

Napier House
Trafalgar Place
Brighton
BN1 4DW

| | |
|---|---|
| Customer support: | 0870 6063636 |
| Textphone: | 0870 2433123 |
| Fax: | 0870 2411144 |
| Email: | customersupport@thepensionsregulator.gov.uk |
| General office: | 01273 811800 |
| Website: | www.thepensionsregulator.gov.uk |
| E-learning: | www.trusteetoolkit.com |

215

**The Pensions Regulator**

- Related employer balances have been deducted. This is the NNUK value of resources at 30 June 2008, which PwC has calculated as $924m (being £463 million converted at the £:$ spot rate of 1.9954 at 30 June 2008 – source: www.oanda.com).

| Value of Resources of NNC at 30 Jun 08 | $m | Source |
|---|---|---|
| NNO Enterprise Value 'no control premium | 9,842 | |
| *Adjustments to calculate NNC Value of Resources* | | |
| Deduct: Book value of Group debt | (4,497) | Jun 08 10Q |
| Deduct: Group accounting value of pensions and post-employment benefits obligations | (1,900) | Nortel Jun 08 SAP extracts |
| Add: Est. Group Surplus Cash | 1,310 | PwC analysis |
| NNO Equity Value | 4,755 | |
| Add: Accounting value of UK pension liability per Reference Accounts | 393 | NNUK 2007 Statutory Accounts |
| Deduct: NNUK value of resources | (924) | PwC analysis |
| NNC Value of Resources | 4,224 | |

This gives an adjusted entity fair value of NNC's resources as $4,224 million (equivalent to £2,117 million using £:$ spot rate 1.9954 at 30/06/08 – source: www.oanda.com).

Summary - Valuation results:

We consider that the relevant figures are as follows. We have included the calculations at stage 1 and stage 2, but the Regulator considers the stage 3 calculation to be the most accurate and therefore the most appropriate one:

| | Value of NNC's resources ($m)[1] | 50% of s.75 debt less the value of NNUK's resources ($m) | Value of NNC's resources (£m) | 50% of s.75 debt less the value of NNUK's resources (£m) |
|---|---|---|---|---|
| Stage 1[2] | 1,573 | 850 | 788 | 426 |
| Stage 2[3] | 1,573 | 850 | 788 | 426 |
| Stage 3[4] | 4,224 | 850 | 2,117 | 426 |

---

1 Spot Rate (Source: www.oanda.com) £1 = $1.9973 at 31/12/2007 and £1 = $1.9954 at 30/06/2008.

2 Stage 1 - derived from Nortel Jun 08 10Q NNC balance sheet.

3 Stage 2 – PwC have not performed a revaluation of individual assets in NNC.

4 Stage 3 – Derived from the process detailed in this letter and appendix.

Napier House
Trafalgar Place
Brighton
BN1 4DW

Customer support: 0870 6063636
Textphone: 0870 2433123
Fax: 0870 2411144
Email: customersupport@thepensionsregulator.gov.uk
General office: 01273 811800
Website: www.thepensionsregulator.gov.uk
E-learning: www.trusteetoolkit.com

APPENDIX "I"

[Attached]



216

# N⊘RTEL

PRIVATE AND CONFIDENTIAL

VIA EMAIL

September 16, 2009

FAO Paul Williams
Risk and Funding Team
The Pensions Regulator
Napier House
Trafalgar Place
Brighton
BN1 4DW

Reference RAFT/PW/TM6409

Dear Paul,

**Nortel Networks Corporation (NNC), Nortel Networks UK Limited and
Nortel Networks UK Pension Plan**

We refer to your letter of 4 September 2009. Thank you for your correspondence. However, we must at this stage, decline the opportunity to comment on the calculation you refer to in your letter, and also decline to provide an alternative valuation.

As you are aware, there is a stay of proceedings under Canadian law in relation to NNC and certain of its subsidiaries, and by its order dated 30 July 2009 (the "Claims Bar Order"), the Canadian Court has ordered that the bar date for submitting claims against NNC (and relevant subsidiaries) is 30 September 2009. All claims against NNC (and relevant subsidiaries) are being dealt with in accordance with the claims procedure for debtors pursuant to the Claims Bar Order and the *Companies' Creditors Arrangement Act*.

As you can therefore appreciate, NNC is not in a position to enter into any correspondence with individual entities in respect of potential claims against NNC.

If the Pensions Regulator or the trustees of the Nortel Networks UK Pension Plan believe they may have a claim against NNC, we would invite you to submit your Proof of Claim and it will be subject to review in accordance with the process referred to above.

Yours sincerely,

Pavi Binning

For and on behalf of Nortel Networks Corporation

Pavi Binning
Executive Vice President , Chief Financial Officer and Chief Restructuring Officer
Nortel
195 The West Mall, Toronto, ON  M9C 5K1  Canada
PH 905 863 1020  FX  905 863 2478  pbinning@nortel.com

**APPENDIX "J"**

[Attached]

217

**The Pensions Regulator**

11 November 2009

Direct Line: 01273 648450
Our Ref: TM6409/ML/SK

Mr Alan Hudson
Administrator
Ernst & Young LLP
1 More London Place
London SE1 2AF

Dear Sir

**Re: Nortel Networks UK Limited (In Administration) and associated Nortel EMEA entities (In Administration)**

As you are aware, the Pensions Regulator has been investigating whether there are grounds to seek the issue of a financial support direction ("FSD") against certain corporate entities in the Nortel group. Some of these corporate entities are those which have their centre of main interests in the UK and are those where you, Christopher Hill and Stephen Harris or, in respect of Nortel Networks Ireland Limited, you and David Hughes, have been appointed as administrators under order of the High Court. We set out below a list of the particular companies which are likely to be made the targets of the proposed warning notice in respect of which you are the administrator. I should add that this list does not of course encompass other overseas Nortel entities which are also likely to be targets. This letter only relates to those entities over which you have been appointed as administrator.

The Pensions Regulator will shortly be in a position to issue the appropriate warning notice under section 96 of the Pensions Act 2004. As you are aware from your role as administrator of Nortel Networks UK Limited (NNUK), there is a substantial deficit in the pension scheme and the purpose behind the issue of a warning notice is to ensure that other Nortel entities are obliged to provide "financial support" towards the pension scheme. As many, if not all, these Nortel entities are also in some form of insolvency process, we anticipate that the financial support sought will be simply the ability of the pension scheme to prove in the various insolvency estates as a creditor. This is of course very much in line with the way the Nortel group operated on a global basis. Moreover, as you are aware, the Nortel group deliberately operated a policy of not making sufficient contributions into the pension scheme which has led to the substantial deficit. Of course as administrator of NNUK, you will be given notice and be entitled to make such representations to the Determinations Panel as you, as administrator, consider appropriate.

| | | |
|---|---|---|
| Napier House | Customer support: | 0870 6063636 |
| Trafalgar Place | Textphone: | 0870 2433123 |
| Brighton | Fax: | 0870 241114 |
| BN1 4DW | Email: | customersupport@thepensionsregulator.gov.uk |
| | General office: | 01273 811800 |
| | Website: | www.thepensionsregulator.gov.uk |
| | E-learning: | www.trusteetoolkit.com |

218

**The Pensions Regulator**

The purpose of this letter is to enable the Pensions Regulator to deal with the issue of paragraph 43(6) of Schedule B1 to the Insolvency Act 1986 ("Schedule B1"), under which the administrator can consent to "legal process" being issued against the company or companies in respect of which he has been appointed.

In our view, it is clear that the warning notice regime was intended to be used in relation to insolvent companies, and therefore paragraph 43 should not stand in the way of this.

Our analysis is that consent under paragraph 43(6) is not necessary, because we do not consider that either of the actions under consideration by the Pensions Regulator ("the Actions") constitute "legal process" within the meaning of paragraph 43(6) of Schedule B1. For clarity we set out what these Actions are, namely,

(i)     the giving of notice to certain companies under the standard procedure of the Pensions Regulator pursuant to section 96 of the Pensions Act 2004 that a regulatory action is under consideration; and

(ii)    the exercise of the power by the Pensions Regulator to issue a financial support direction under section 43 of the Act, such power being exercised by the Determinations Panel.

However we seek your consent for the avoidance of doubt, and in order to avoid the need to seek a declaration from the court that the Actions are not "legal process" within the meaning of paragraph 43(6) of Schedule B1, and / or permission from the court under paragraph 43(6)(b) of Schedule B1. We consider that in the event that the court determines that the Actions are indeed "legal process", the court would grant such permission given that the Actions do not impede the achievement of the purpose of the Administrations and are carried out in the exercise of the Pensions Regulator's statutory functions and in the public interest.

We should make clear at the outset that the granting of your consent will not prejudice your rights as regards the legal or factual case that will be set out in the notice to be issued pursuant to section 96 of the Pensions Act 2004, nor affect the determination by the Determinations Panel whether a financial support direction should be issued. It is irrelevant to that determination. We also make clear that we do not seek by the Actions to take any steps against the assets of a company in administration, nor to interfere with the operation of the relevant companies' administrations. For your assistance we set out below our analysis of this matter.

\\\\go-bdn01.bis.corp.gov.uk\demDi\tpr_disl\15621231\tpr_dis_s1562123_v1x_20091110_ltr_to_y_abodom_why_re_consent_of_admin\trust___final_version.doc
Napier House              Customer support:    0870 6063636
Trafalgar Place           Textphone:           0870 2433123
Brighton                  Fax:                 0870 2411144
BN1 4DW                   Email:               customersupport@thepensionsregulator.gov.uk
                          General office:      01273 811800
                          Website:             www.thepensionsregulator.gov.uk
                          E-learning:          www.trusteetoolkit.com

**The Pensions Regulator**

Page 3

## Legal Process

We do not consider the Actions to be legal processes that trigger the requirement for consent or permission under paragraph 43 of Schedule B1.

Sections 96 and 98 of the Pensions Act 2004 set out the two forms of procedure to be followed by the Pensions Regulator when it seeks to exercise a reserved regulatory function. Section 96 is concerned with the "standard procedure" and provides that the Pensions Regulator will give notice to such persons as appear to the Pensions Regulator to be directly affected by a regulatory action under consideration. That notice is defined as a "warning notice" in section 96(2)(a) of the Pensions Act 2004. It provides information to directly affected parties, including details of their right to refer a determination of the Determinations Panel to the Pensions Regulator Tribunal. A warning notice also sets out such information as is necessary to enable the Determinations Panel to make its determination whether to exercise the regulatory function in question, and to enable the party in question to make representations to the Determinations Panel. The giving of a warning notice is not legal process, but a means for the provision of information.

The determination of the Determinations Panel whether to issue a financial support direction is also not an action constituting legal process. The Determinations Panel is not an independent tribunal falling within the Tribunal, Courts and Enforcement Act 2007. It is an internal panel of the Pensions Regulator set up pursuant to sections 9 and 10 of the Pensions Act 2004. It may hold oral hearings as part of its procedure to determine whether the Pensions Regulator should issue a FSD, but such hearings are at the discretion of the Determinations Panel. The Determinations Panel does not have power to compel the attendance of witnesses nor to compel the production of documents. In short it is not a judicial body and the exercise of its function is not a judicial or "legal process" within the meaning of paragraph 43 of Schedule B1.

Determinations of the Determinations Panel are subject to referral to the Pensions Regulator Tribunal ("the Tribunal") (section 103 Pensions Act 2004). Any directly affected party may refer such a determination to the Tribunal. The Tribunal is not an internal panel of the Pensions Regulator but is a body set up pursuant to section 102 of the Pensions Act 2004. That section provides that the Lord Chancellor may by rules make such provision as he considers necessary or expedient in respect of the conduct of proceedings before the Tribunal. The Tribunal has the power to consider evidence that was not before the Determinations Panel and the power to summon witnesses and order the production of documents (paragraph 8 of Schedule 4 to the Pensions Act 2004). Its orders are enforced as orders of the court (section 103). The Tribunal is not limited to reviewing the decision of the Determinations Panel and in our view does not

| | | |
|---|---|---|
| Napier House | Customer support: | 0870 6063636 |
| Trafalgar Place | Textphone: | 0870 2433123 |
| Brighton | Fax: | 0870 2411144 |
| BN1 4DW | Email: | customersupport@thepensionsregulator.gov.uk |
| | General office: | 01273 811800 |
| | Website: | www.thepensionsregulator.gov.uk |
| | E-learning: | www.trusteetoolkit.com |

220

# The Pensions Regulator ❋

exercise an appellate jurisdiction. Appeals from the Tribunal on a point of law will lie to the Court of Appeal.

For these reasons it is our settled view that the Actions are not "legal process" within the meaning of paragraph 43 of Schedule B1. The examples of legal process given in that paragraph comprise legal proceedings, execution, distress and diligence. The Actions are not directed against any property, nor are they legal proceedings in a court of law or a tribunal established under the Tribunal, Courts and Enforcement Act 2007. They are in fact the administrative operations of the Pensions Regulator as part of its "standard procedure" by which certain regulatory functions including the issue of a FSD are carried out.

## Permission of the Court

We trust that it will not be necessary to seek the leave of the court for the Actions to be taken. Should such an application be necessary we will rely principally on the facts that:

1. Neither of the Actions will impede the purpose of the relevant Administrations;
2. Neither of the Actions represent enforcement against or interference with assets of the companies affected, nor are they steps towards such a process;
3. Neither of the actions affect the principle that creditors in the administrations should be treated pari passu;
4. The aim of seeking a FSD is to protect both the benefits under an occupational pension scheme and the members of that scheme. This aim is in accordance with the Pensions Regulator's statutory objectives as set out by Parliament in paragraph 5 of the Pensions Act 2004 and is in the public interest.

We rely on these facts as the ground on which we consider your consent to the Actions should now be given.

## Companies

The companies in respect of which we seek leave are as follows:

Nortel GMBH
Nortel Networks NV
Nortel Networks S.P.A
Nortel Networks BV
Nortel Networks Hispania SA
Nortel Networks Polska Sp Z.O.O.
Nortel Networks International Finance & Holdings BV

\\tpr-lsbs01\bis.gprs\prs\Workflow\WQ\_stds\154223\tdapc\_doc\_h\156123\_v1\_20091110\_fr\_sd\_-\_direction\_phy\_p\_consent\_of\_admin\_service\_\_final\_version.doc

| | | |
|---|---|---|
| Napier House | Customer support: | 0870 6063636 |
| Trafalgar Place | Textphone: | 0870 2433123 |
| Brighton | Fax: | 0870 2411144 |
| BN1 4DW | Email: | customersupport@thepensionsregulator.gov.uk |
| | General office: | 01273 811800 |
| | Website: | www.thepensionsregulator.gov.uk |
| | E-learning: | www.trusteetoolkit.com |

221

**The Pensions
Regulator**

Nortel Networks France SAS
Nortel Networks (Ireland) Limited
Nortel Networks SA

## Conclusion

We request a reply to this letter by 18 November 2009. Should you refuse to grant consent, we will require you to follow the guidance of the Court of Appeal In *Re Atlantic Computer Systems plc* [1992] 2 WLR 367 and give full reasons for that refusal.

If it is necessary for us to apply to court for permission we will do so on an expedited basis. In any such application we will need to deploy material obtained from you and others in the exercise of our functions. The disclosure of that material is restricted pursuant to section 82 of the Pensions Act 2004. It is our view that section 87(2)(d) will apply in this case and allow the application to be heard in open court. If you disagree with this interpretation please let us know.

We look forward to hearing from you.

Yours faithfully,

Marcus Laughton
Case Lawyer
Risk and Funding Team

Napier House | Customer support: | 0870 6063636
Trafalgar Place | Textphone: | 0870 2433123
Brighton | Fax: | 0870 2411144
BN1 4DW | Email: | customersupport@thepensionsregulator.gov.uk
| General office: | 01273 811800
| Website: | www.thepensionsregulator.gov.uk
| E-learning: | www.trusteetoolkit.com

# APPENDIX "K"

[Attached]

222

13 January 2010

**The Pensions·**
**Regulator**

**Private & Confidential**
Mr J Doolittle
Nortel Networks Limited
5945 Airport Road
Suite 360
Mississauga
Ontario, L4V 1RG

*Tel: 01273 648450*
*Our Ref:ML/TM6409 (SM)*

Dear Mr Doolittle

**NORTEL NETWORKS UK PENSION PLAN ("the scheme")**

Further to my letter of 17 December 2009, I enclose by way of service under s.303 of the Pensions Act 2004 ("the Act") a Warning Notice and nine bundles of supporting evidence further to s.96 of the Act. I should be grateful if you would acknowledge service shortly after you receive the enclosed documents.

Nortel Networks Limited has the right to make written Representations to the contents of the Warning Notice under s96 (2) (b) of the Act. I should be grateful if you would address these to Paul Williams, the case manager at Napier House, Trafalgar Place, Brighton, BN1 4DW to arrive by noon on Monday 1 March 2010 should you decide to do so.

Determinations are normally based on the Warning Notice and Representations so you should make sure your whole case is contained in your Representations and supporting documents. If no Representations are received by the date given in this letter the Regulator will make its decision based only on the information contained in the Warning Notice.

I should also be grateful if you would inform me as soon as is practical whether Nortel Networks Limited intends to request an oral hearing in relation to this matter.

Copies of the Warning Notice have also been sent to the Pension Protection Fund and the Trustees of the scheme as Directly Affected Parties.

Yours sincerely

**Marcus Laughton**
Case Lawyer
Risk and Funding Team

| | | |
|---|---|---|
| Napier House | Customer support: | 0870 6063636 |
| Trafalgar Place | Textphone: | 0870 2433123 |
| Brighton | Fax: | 0870 2411144 |
| BN1 4DW | Email: | customersupport@thepensionsregulator.gov.uk |
| | General office: | 01273 811800 |
| | Website: | www.thepensionsregulator.gov.uk |
| | E-learning: | www.trusteetoolkit.com |

223

**APPENDIX "L"**

[Attached]

13 January 2010

**The Pensions Regulator**

224

**Private & Confidential**
Mr J Doolittle
Nortel Networks Corporation
5945 Airport Road
Suite 360
Mississauga
Ontario, L4V 1RG

*Tel: 01273 648450*
*Our Ref:ML/TM6409 (SM)*

Dear Mr Doolittle

**NORTEL NETWORKS UK PENSION PLAN ("the scheme")**

Further to my letter of 17 December 2009, I enclose by way of service under s.303 of the Pensions Act 2004 ("the Act") a Warning Notice and nine bundles of supporting evidence further to s.96 of the Act. I should be grateful if you would acknowledge service shortly after you receive the enclosed documents.

Nortel Networks Corporation has the right to make written Representations to the contents of the Warning Notice under s96 (2) (b) of the Act. I should be grateful if you would address these to Paul Williams, the case manager at Napier House, Trafalgar Place, Brighton, BN1 4DW to arrive by noon on Monday 1 March 2010 should you decide to do so.

Determinations are normally based on the Warning Notice and Representations so you should make sure your whole case is contained in your Representations and supporting documents. If no Representations are received by the date given in this letter the Regulator will make its decision based only on the information contained in the Warning Notice.

I should also be grateful if you would inform me as soon as is practical whether Nortel Networks Corporation intends to request an oral hearing in relation to this matter.

Copies of the Warning Notice have also been sent to the Pension Protection Fund and the Trustees of the scheme as Directly Affected Parties.

Yours sincerely

**Marcus Laughton**
Case Lawyer
Risk and Funding Team

| Napier House | Customer support: | 0870 6063636 |
| Trafalgar Place | Textphone | 0870 2433123 |
| Brighton | Fax: | 0870 2411144 |
| BN1 4DW | Email: | customersupport@thepensionsregulator.gov.uk |
| | General office: | 01273 811800 |
| | Website: | www.thepensionsregulator.gov.uk |
| | E learning | www.trusteetoolkit.com |

# APPENDIX "M"

[Attached]

# Goodmans LLP

Barristers & Solicitors

Bay Adelaide Centre
333 Bay Street, Suite 3400
Toronto, Ontario M5H 2S7

Telephone: 416.979.2211
Facsimile: 416.979.1234
goodmans.ca

Direct Line: 416.597.4107
jcarfagnini@goodmans.ca

225

February 8, 2010

Our File No.: 083800

**By Fax**

The Pensions Regulator
Napier House
Trafalgar Place
Brighton
BN1 4DW

**For the Attention of Marcus Laughton:**

Dear Sirs:

Re:    **Nortel Networks Corporation and Nortel Networks Limited**

We are the lawyers for Ernst & Young Inc. in its capacity as monitor of Nortel Networks Corporation and Nortel Networks Limited (the "CCAA Debtors"). Our client was appointed an officer of the Ontario Superior Court of Justice (the "Court") to serve as monitor of the CCAA Debtors (the "Monitor") by Order of the Honourable Mr. Justice Morawetz dated January 14, 2009 under the *Companies' Creditors Arrangement Act*, R.S.C. 1985, c.C-36, as amended (the "CCAA").

As you are aware, the CCAA Debtors are insolvent and have been the subject of proceedings under the CCAA since January 14, 2009. We enclose a copy of the Third Amended and Restated Initial Order under the CCAA dated January 14, 2009 which is currently in force in respect of the CCAA Debtors (the "Initial CCAA Order"). Paragraph 14 of this Order stays all legal proceedings against the CCAA Debtors, their property and businesses, unless such proceedings are commenced with the consent of either the CCAA Debtors or the Monitor or with leave of the Court. Paragraph 15 of the Initial CCAA Order stays and suspends the legal effect of "all rights and remedies" against the CCAA Debtors, their property and businesses unless such rights or remedies are exercised with the consent of either the CCAA Debtors or the Monitor or with leave of the Court.

We have been provided with a copy of a document dated January 11, 2010 styled:

The Pensions Regulator
Warning Notice
in the matter of Nortel Networks UK Pension Plan (the "Scheme")
and in the matter of
The Pensions Act 2004 (the "Act")

226

# Goodmans LLP

In this document (the "Warning Notice"), the Pensions Regulator purports to give notice to the CCAA Debtors, among others, that under UK law, the Pensions Regulator seeks to require the CCAA Debtors to provide financial support for the pension plan of Nortel Networks UK Limited ("NNUK"). The Warning Notice states that it is delivered pursuant to sections 96(2) and 43(2) of the Act. It evidences the commencement of a proceeding that purports to determine liability of the CCAA Debtors and, to that end, indicates that the Pensions Regulator has purported to exercise various rights against the CCAA Debtors (including, without limiting the generality of the foregoing, the Pensions Regulator's right to deem certain values under Regulation 12 under the Act and the right to require a response from the CCAA Debtors by March 1, 2010). It is clear that both the intended purposes and the proposed effects of the Warning Notice are to commence legal proceedings against the CCAA Debtors and to exercise statutory rights against the CCAA Debtors so as to enable the Pensions Regulator to make determinations affecting the property of the CCAA Debtors. Moreover, under the provisions of the Act, the Pensions Regulator is required to provide notice of the proceeding to the CCAA Debtors. Neither the CCAA Debtors nor the Monitor has consented to the commencement of such proceedings or to the exercise of any such rights against the CCAA Debtors and their property. Nor has the Pensions Regulator sought leave of the Court to commence such proceedings or to exercise any such rights. It is therefore the Monitor's view that by delivering the Warning Notice to the CCAA Debtors, the Pensions Regulator has violated the stay provisions of paragraphs 14 and 15 of the Initial CCAA Order. The Warning Notice is thereby void and of no effect.

A stay of proceedings granted under the CCAA is intended to bring a debtor and all interested parties with legal interests in the debtor and its property under the purview of the supervising Court. This ensures that a fair and equitable process is put in place for the restructuring of the debtor's business in the interests of all stakeholders and in the public interest so as to prevent any individual interest from unfairly predominating. The stay also allows the supervising Court to ensure that there is a controlled stream of litigation against the debtor so that management is not unduly deflected from its Court-ordered tasks by any individual entity which seeks to impose its own agenda on the debtor contrary to the overriding interests of all. We note that by Orders dated July 30, 2009 and October 7, 2009 the Court has already provided for the implementation of a claims procedure by which all those who seek to make claims against the CCAA Debtors and their property can deliver proofs of claim and have their claims fairly adjudicated in an established process under the auspices of the Monitor that is supervised by the Court (the "CCAA Claims Procedure").

The substance of the claims in the Warning Notice is duplicative of claims that have already been filed in the CCAA Claims Procedure by Nortel Networks UK Pension Trust Limited and by U.K. Pension Protection Fund (collectively the "Trustees"). Therefore, (and without limiting the rights or defences of the Monitor and the CCAA Debtors in response to any such claims), the substance of the issues is already before the Court in Canada and will be dealt with at an appropriate time under the CCAA. By contrast, it appears that the Pensions Regulator has engaged in many months of efforts to prepare the Warning Notice and has chosen to deliver it now to create legal proceedings that provide insufficient notice to the CCAA Debtors and are to be held at a time when management is fully engaged in finalizing efforts to close asset sales and otherwise see to the transition of the businesses that are being conveyed here and abroad. This is the precise type of unilateral action that

# Goodmans<sup>LLP</sup>

the CCAA controls in order to protect the interests of the general body of creditors and stakeholders, including creditors, employees and the public, all of whom have important interests in the successful implementation of Nortel's transitional activities. It would be prejudicial to the CCAA Debtors and all stakeholders were management to be deflected now from the implementation of Court-ordered sales and activities in order to respond to the unilateral actions of the Pensions Regulator.

Moreover, and more importantly, as you are also aware, the Court has approved a process for the negotiation of a protocol to govern the allocation of the proceeds of the sales of the various international businesses of the Nortel group of companies as amongst various jurisdictions in which different insolvency proceedings are being undertaken relating to those businesses (the "Allocation Protocol"). The Administrators of NNUK appointed by the High Court of Justice are fully engaged in these negotiations and are also advancing the same claims as are being asserted by the Pensions Regulator in the Warning Notice. Many of the very issues raised in the Warning Notice to potentially be resolved by the Pension Regulator's process are the same as those to be resolved as part of the Allocation Protocol in which the Administrators of NNUK are now participating. This is one of, if not the most important issue in each of these complex restructurings. It is apparent, therefore, that the actions of the Pensions Regulator may unfairly prejudice this very process.

In all, the delivery of the Warning Notice to the CCAA Debtors in Canada and the attempt to exercise rights against the CCAA Debtors is a breach of the Initial CCAA Order. Under the Initial CCAA Order and the doctrine of comity, that is shared by both Canada and the United Kingdom, the Pensions Regulator ought to have sought the consent of the CCAA Debtors or the Monitor or, failing that, leave of the Court prior to acting unilaterally to bring legal proceedings designed to have a significant and substantial effect on matters that are already before the Court. The Warning Notice and the proceedings which it contemplates would undermine the CCAA Claims Procedure and the Allocation Protocol negotiations. The substance of the issues has already been submitted to the Court for resolution by the Trustees with whom the Pensions Regulator shares an identity of interest. As such, the delivery of the Warning Notice by the Pensions Regulator also amounts to an abuse of the processes of the Court.

Accordingly, we are instructed to bring a motion before the Court on February 26, 2010 for, among other things, an Order authorizing and directing the CCAA Debtors to refrain from participating in the proceedings contemplated by the Warning Notice and declaring that no recognition or legal effect whatsoever will be given in Canada to the outcome of any such proceedings.

# Goodmans LLP

228

If the Pensions Regulator wishes to regularize its conduct by seeking leave of the Court to bring proceedings against the CCAA Debtors abroad, the Monitor would be prepared to engage in discussions to seek to harmonize the Pensions Regulators' goals with the CCAA process. The Monitor and the CCAA Debtors will oppose any effort to continue the proposed proceedings under the Warning Notice as currently constituted. As noted above, it may be that the proposed proceeding will be rendered wholly unnecessary by the outcome of existing processes within the CCAA. However, if such does not occur, then there certainly can be a discussion of the timing, scope and utility of proceedings if and when they become necessary and advisable.

Yours very truly,

GOODMANS LLP

J. A. Carfagnini
JAC/eg
enclosure

cc:     M. McDonald, President, Ernst & Young Inc.
        D. Tay, Ogilvy Renault
        N. Golding, Freshfields Bruckhaus Deringer
        A. Denny, Allen & Overy

\5812872

# APPENDIX "N"

[Attached]

229

15 February 2010

**The Pensions Regulator**

**Private & Confidential**
Goodmans LLP
Bay Adelaide Centre
333 Bay Street
Suite 3400
Toronto
Ontario
M5H 2S7

Tel: 01273 648450
Fax: 01273 627241
Our Ref:ML/TM6409 (sm)

**By email**

Dear Sirs,

**Re: Nortel Networks Corporation and Nortel Networks Limited**

Thank you for your letter of 8 February 2010, and for setting out your concerns in relation to the Warning Notice dated 11 January 2010 issued by the Pensions Regulator.

We are aware that Nortel Networks Corporation and Nortel Networks Limited have been the subject of proceedings under the *Companies' Creditors Arrangement Act* (as amended) since 14 January 2009.

As you will appreciate, your letter sets out a number of detailed concerns in relation to the Pensions Regulator's actions under the Pensions Act 2004. We are preparing a response to those concerns and hope to be able to reply to your letter within the next seven days.

Should you require any further information in the meantime, please contact Marcus Laughton on 01273 648450.

Yours faithfully,

**Marcus Laughton**
Lawyer
Risk and Funding Team

Napier House
Trafalgar Place
Brighton
BN1 4DW

Customer support: 0870 6063636
Textphone: 0870 2433123
Fax: 0870 2411144
Email: customersupport@thepensionsregulator.gov.uk
General office: 01273 811800
Website: www.thepensionsregulator.gov.uk
E-learning: www.trusteetoolkit.com

# APPENDIX "O"

[Attached]

**ALLEN & OVERY**  230

**BY FAX & BY POST**

Herbert Smith LLP
Exchange House
Primrose Street
London EC2A 2HS

For the attention of Stephen Gale

Our ref         DSS/ANDD/0017242-0000008 LT:5315936.1

12 February 2010

Dear Sirs

Allen & Overy LLP
One Bishops Square
London E1 6AD United Kingdom

Tel        +44 (0)20 3088 0000
Fax       +44 (0)20 3088 0088
Direct    +44 (0)20 3088 1489
andrew.denny@allenovery.com

**Nortel Networks Corporation and Nortel Networks Limited**

We act for Ernst & Young Inc. in its capacity as monitor of Nortel Networks Corporation and Nortel Networks Limited (the "CCAA Debtors"). We understand that you act for the administrators of Nortel Networks UK Limited ("NNUK").

We refer to the letter dated 8 February 2010 (the "Letter") from our client's Canadian counsel, Goodmans LLP to the Pensions Regulator (the "Regulator") regarding the Warning Notice dated 11 January 2010 (the "Warning Notice") purportedly issued by the Regulator pursuant to sections 96(2) and 43(2) of the Pensions Act 2004 (the "Act") and addressed to various members of the Nortel Group. We understand that your client's Canadian counsel was provided with a copy of the Letter, but a further copy is enclosed in any event.

As foreshadowed in the Letter, our client proposes to bring a motion before the Ontario Superior Court of Justice (the "Ontario Court") on 25 February 2010 for, inter alia, an order authorising and directing the CCAA Debtors to refrain from participating in the proceedings contemplated by the Warning Notice and declaring that no recognition or legal effect whatsoever will be given in Canada to the outcome of any such proceedings. In the context of this motion, our client considers that it is not only necessary but appropriate and in the interests of justice that the Ontario Court be provided with a copy of the Warning Notice so that it has the full details of the arguments put forward by the Regulator and the matters on which it purports to rely. The Warning Notice will also be referred to in written submissions.

However, our client is aware of the restrictions placed on the disclosure of information obtained from the Regulator where that information constitutes "restricted information" within the definition in section 82 of the Act. It appears to our client that most if not all of the contents of the Warning Notice is information which was not "obtained" by the Regulator from any other person and/or is already publicly available, and is therefore not restricted information. Entirely without prejudice to this position, and out of an abundance of caution, our client seeks your client's consent to the disclosure to the Ontario Court of any restricted

Allen & Overy LLP is a limited liability partnership registered in England and Wales with registered number OC306763. It is regulated by the Solicitors Regulation Authority of England and Wales. The term partner is used to refer to a member of Allen & Overy LLP or an employee or consultant with equivalent standing and qualifications. A list of the members of Allen & Overy LLP and of the non-members who are designated as partners is open to inspection at its registered office, One Bishops Square, London E1 6AD.

Allen & Overy LLP or an affiliated undertaking has an office in each of: Abu Dhabi, Amsterdam, Antwerp, Bangkok, Beijing, Bratislava, Brussels, Bucharest (associated office), Budapest, Dubai, Düsseldorf, Frankfurt, Hamburg, Hong Kong, London, Luxembourg, Madrid, Mannheim, Milan, Moscow, Munich, New York, Paris, Prague, Riyadh (associated office), Rome, São Paulo, Shanghai, Singapore, Tokyo and Warsaw.

**ALLEN & OVERY**    231

information in the Warning Notice which relates to and/or was obtained from your client and which does not fall within any of the exceptions to the prohibitions on disclosure set out in the Act.

As our client is due to file supporting papers for its motion by Wednesday 17 February 2010, we would be grateful for your response by 5 pm on Tuesday 16 February 2010.

Yours faithfully

*Allen & Overy LLP*

**Allen & Overy LLP**

Copy to:      The Pensions Regulator
              For the attention of Marcus Laughton

232

IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C. 1985, c.    Court File No: 09-CL-7950
C-36, AS AMENDED
AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL
NETWORKS CORPORATION et al.

*ONTARIO*
SUPERIOR COURT OF JUSTICE
(COMMERCIAL LIST)

Proceeding commenced at Toronto

THIRTY-EIGHTH REPORT
OF THE MONITOR
DATED FEBRUARY 17, 2010

**GOODMANS LLP**
Barristers & Solicitors
Bay Adelaide Centre
333 Bay St., Suite 3400
Toronto, Canada M5H 2S7

Jay A. Carfagnini (LSUC# 222936)
Joseph Pasquariello (LSUC# 37389C)
Christopher G. Armstrong (LSUC# 55148B)

Tel: 416.979.2211
Fax: 416.979.1234

Lawyers for the Monitor, Ernst & Young Inc.