Court File No. 09-CL-7950

***ONTARIO***
**SUPERIOR COURT OF JUSTICE**
**(COMMERCIAL LIST)**

IN THE MATTER OF THE *COMPANIES' CREDITORS*
*ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF
COMPROMISE OR ARRANGEMENT OF
NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED,
NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS
INTERNATIONAL CORPORATION AND NORTEL NETWORKS
TECHNOLOGY CORPORATION

**THIRTY-NINTH REPORT OF THE MONITOR**
**DATED FEBRUARY 18, 2010**

# TABLE OF CONTENTS

Page

INTRODUCTION ................................................................................................ 1

PURPOSE ........................................................................................................... 3

TERMS OF REFERENCE ................................................................................. 5

BACKGROUND ................................................................................................. 6

General Background .......................................................................................... 6

Update on CCAA Proceedings .......................................................................... 6

Intermediate Steps to Assist in the Development of the Plan .......................... 10

SETTLEMENT PROCESS .............................................................................. 11

Appointment of Representatives ...................................................................... 11

Process Leading Up to Settlement ................................................................... 13

Update on Notice Process ................................................................................ 15

INFORMATION AND ANALYSIS CONCERNING THE SETTLEMENT .......... 18

Benefits ............................................................................................................ 19
   (1)    Background Concerning the HWT ....................................................... 19

   (2)    Payment of Benefits in the CCAA Proceedings .................................. 22

      (a) Pay-as-You-Go Payments ............................................................... 23
         (i)    Pensioner Medical and Dental .................................................. 23
         (ii)   LTD Medical and Dental and LTD Life ..................................... 23
         (iii) Survivor Transition Ben efits .................................................... 24
      (b) Formerly Funded by HWT But Pay-as-You-Go under the Settlement Agreement.... 24
         (i)    LTD Income .............................................................................. 24
         (ii)   Survivor Income Benefits.......................................................... 25
      (c) Funded by HWT ............................................................................. 25
         (i)    Retiree Life............................................................................... 25
   (3)    Provision of Benefits under Settlement Agreement.............................. 26

   (4)    Pension Plans ..................................................................................... 27

Termination Fund.............................................................................................. 32

Payments Charge ........................................................................................................ 34

Ranking of Claims and Releases............................................................................... 35

Retaining Resources Necessary to Continue Restructuring....................................... 38

Avoiding Litigation Costs........................................................................................... 39

Financial Capacity to Fulfil Terms of Settlement..................................................... 40

Implications Absent the Settlement ........................................................................... 41

Summary ..................................................................................................................... 41

RECOMMENDATION ............................................................................................... 43

Appendix A – January 6 Letter

Appendix B – Settlement Agreement

Appendix C – NRPC/CNELTD Press Releases

Appendix D – Nortel Press Release

Appendix E – HWT Trust Agreement

Appendix F – Valuation of Post-Employment Benefit Liabilities for Accounting Purposes as of December 31, 2008

Appendix G – Report on Non-Pension Post-Retirement Benefit Cost and Disclosure for the Fiscal Year Ending December 31, 2008

Appendix H – Unaudited, Internal HWT Financial Statements dated December 31, 2008

Court File No. 09-CL-7950

### *ONTARIO*
### SUPERIOR COURT OF JUSTICE
### (COMMERCIAL LIST)

### IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED

### AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL CORPORATION AND NORTEL NETWORKS TECHNOLOGY CORPORATION

### THIRTY-NINTH REPORT OF THE MONITOR
### DATED FEBRUARY 18, 2010

## INTRODUCTION

1.   On January 14, 2009 (the **"Filing Date"**) Nortel Networks Corporation (**"NNC"** and collectively with all its subsidiaries **"Nortel"** or the **"Company"**), Nortel Networks Limited (**"NNL"**), Nortel Networks Technology Corporation, Nortel Networks International Corporation and Nortel Networks Global Corporation (collectively the **"Applicants"**) filed for and obtained protection under the Companies' Creditors Arrangement Act (**"CCAA"**).  Pursuant to the Order of this Honourable Court dated January 14, 2009, as amended and restated (the **"Initial Order"**), Ernst & Young Inc. was appointed as the Monitor of the Applicants (the **"Monitor"**) in the CCAA proceedings.   The stay of proceedings was extended to April 23, 2010, by this Honourable Court in its Order dated January 21, 2010.

2.   Nortel Networks Inc. (**"NNI"**) and certain of its U.S. subsidiaries concurrently filed voluntary petitions under Chapter 11 of Title 11 of the U.S. Bankruptcy Code (the

- 2 -

"Code") in the United States Bankruptcy Court for the District of Delaware (the "**U.S. Court**") on January 14, 2009 (the "**Chapter 11 Proceedings**"). As required by U.S. law, an official unsecured creditors committee (the "**Committee**") was established in January, 2009.

3.  An ad hoc group of holders of bonds issued by NNL, NNC and Nortel Networks Capital Corporation has been organized and is participating in these proceedings as well as the Chapter 11 Proceedings (the "**Bondholder Group**"). In addition, pursuant to Orders of this Honourable Court dated May 27, 2009, July 22, 2009 and July 30, 2009, representative counsel was appointed on behalf of the former employees of the Applicants, the continuing employees of the Applicants and the LTD Beneficiaries, respectively, and each of these groups is participating in the CCAA proceedings (as described in further detail below).

4.  Nortel Networks (CALA) Inc. (together with NNI and certain of its subsidiaries that filed on January 14, 2009, the "**U.S. Debtors**") filed a voluntary petition under Chapter 11 of Title 11 of the Code in the U.S. Court on July 14, 2009.

5.  Nortel Networks UK Limited ("**NNUK**") and certain of its subsidiaries located in EMEA were granted Administration orders (the "**UK Administration Orders**") by the High Court of England and Wales on January 14, 2009 (collectively the "**EMEA Debtors**"). The UK Administration Orders appointed Alan Bloom, Stephen Harris, Alan Hudson and Chris Hill of Ernst & Young LLP as Administrators of the various EMEA Debtors, except for Ireland, to which David Hughes (Ernst & Young LLP Ireland) and Alan Bloom were appointed (collectively the "**Joint Administrators**"). On June 8, 2009, the

- 3 -

Joint Administrators appointed in respect of NNUK filed a petition with the U.S. Court for the recognition of the Administration Proceedings as they relate to NNUK (the **"English Proceedings"**) under Chapter 15 of the Code.  On June 26, 2009, the U.S. Court entered an order recognizing the English Proceedings as foreign main proceedings under Chapter 15 of the Code.

6.     On January 20, 2009, Nortel Networks Israel (Sales and Marketing) Limited and Nortel Communications Holdings (1997) Limited (together **"NN Israel"**) were granted Administration orders by the court in Israel (the **"Israeli Administration Orders"**).  The Israeli Administration Orders appointed representatives of Ernst & Young LLP in the UK and Israel as Administrators of NN Israel (the **"Joint Israeli Administrators"**) and provided a stay of NN Israel's creditors which, subject to further order of the Israeli Court, remains in effect during the Administration.

7.     Subsequent to the Filing Date, Nortel Networks SA commenced secondary insolvency proceedings within the meaning of Article 27 of the European Union's Council Regulation (EC) No 1346/2000 on Insolvency Proceedings in the Republic of France pursuant to which a liquidator and an administrator have been appointed by the Versailles Commercial Court.

**PURPOSE**

8.     The purpose of this Thirty-Ninth Report of the Monitor (**"Thirty-Ninth Report"**) is to provide this Honourable Court with:

- 4 -

(a)     information about the process leading up to the settlement (the **"Settlement"**) reached among the Applicants, the Monitor, the Former Employee Representatives (on their own behalf and on behalf of the parties they represent), the LTD Employee Representative (on her own behalf and on behalf of the parties she represents), the Former Employees' Representative Counsel, the LTD Beneficiaries' Representative Counsel and the CAW (the **"Settlement Parties"**) regarding certain issues related to, among other things, the Applicants' registered Pension Plans, certain employee benefits for Pensioners and LTD Beneficiaries among others (the **"Benefits"**) and certain employment related issues;

(b)     an update on the Settlement notice process approved by Order of this Honourable Court dated February 9, 2010 (the **"Notice Procedure Order"**);

(c)     information concerning the Benefits and the Applicants' Health and Welfare Trust (the **"HWT"**) to the extent relevant, including the manner and nature of payments, and the Applicants' Pension Plans;

(d)     an analysis of the Settlement and related documentation and the impact on applicable stakeholders;

(e)     information related to the Applicants' financial capacity to fulfil the terms of the Settlement; and

(f)     the Monitor's recommendation for approval of the Settlement and the making of the Settlement Approval Order in substantially the form as submitted by the Applicants (the "**Settlement Approval Order**").

9.      For the reasons set out in this Report, the Monitor believes that, overall, the Settlement Agreement and Settlement Approval Order represent a fair balancing of the interests of the Applicants' stakeholders and an important step in the implementation of the Applicants' restructuring, arrived at after extensive negotiations among the Applicants, the Monitor, the Representatives and other interested parties.

## TERMS OF REFERENCE

10.     In preparing this Thirty-Ninth Report, the Monitor has relied upon unaudited financial information, the Company's books and records, financial information prepared by the Company and discussions with management of Nortel.  The Monitor has not audited, reviewed or otherwise attempted to verify the accuracy or completeness of the information and, accordingly, the Monitor expresses no opinion or other form of assurance on the information contained in this Thirty-Ninth Report.

11.     Capitalized terms used herein (including in the preceding paragraphs) and not otherwise defined shall have the meanings given to them in the Monitor's Thirty-Sixth Report dated February 8, 2010 (the "**Thirty-Sixth Report**"), the Settlement Agreement and the Settlement Approval Order, which terms are reproduced on Schedule "A" hereto for ease of reference.

12.   Unless otherwise stated, all monetary amounts contained herein are expressed in Canadian dollars.

## BACKGROUND

### General Background

13.   Nortel is a technology company that designs, develops and deploys communication products, systems, and solutions to its carrier and enterprise customers around the globe. Its principal assets include its people, the intellectual property derived and maintained from its research and development activities, its customers and other significant contracts and agreements.

14.   Since September 30, 2009, Nortel has conducted its global business through four reportable business unit segments: Wireline and Wireless Networks, Metro Ethernet Networks, Carrier Voice Application Solutions, and LG Nortel Co. Ltd. ("**LGN**"). The revenue and assets of each of the business units, except for LGN, are distributed among the multiple Nortel legal entities and joint ventures around the world.

15.   The Monitor has made various materials relating to the CCAA proceedings available on its website at www.ey.com/ca/nortel. The Monitor's website also contains a dynamic link to Epiq Bankruptcy LLC's website where materials relating to the voluntary proceedings under Chapter 11 of the Code are posted.

### Update on CCAA Proceedings

16.   At the commencement of the CCAA proceedings, the Applicants announced their intention to assess their business strategy and consider restructuring opportunities with a

view to emerging as a stronger company. In the months following the Filing Date, the Applicants took numerous actions to reduce costs and realize efficiencies, including significant headcount reductions totalling to date approximately 9,200 (37%) of the global workforce, including approximately 1,650 (28%) of the Canadian workforce, and cessation of certain payments to former employees (including benefits under unregistered, unfunded, supplemental retirement plans and cessation of termination and severance payments).

17.     In June 2009, the Applicants entered into the Interim Funding and Settlement Agreement (the "IFSA"), which was approved by this Honourable Court on June 29, 2009. The IFSA provided, among other things, funding to NNL from NNI for the period from the Filing Date through September 30, 2009. The funding satisfied any claims NNL may have had against NNI for reimbursement of corporate overhead and R&D costs, whether pursuant to the transfer pricing agreement or otherwise, incurred by NNL on behalf of NNI during such period. The total amount of such funding received was US$187.4 million.

18.     On June 19, 2009, in conjunction with the announcement of the sale of substantially all of the assets of the CDMA/LTE Access business, Nortel also announced a significant change in its strategic direction, indicating it was proceeding with discussions with several parties to sell its other business units.

19.     Since its June announcement, Nortel has closed two (2) major sales resulting in gross proceeds of approximately US$2 billion and announced further sales which, if they close, will yield approximately US$1 billion of additional proceeds. As a result of the sales

- 8 -

already closed or announced, approximately 13,000 Nortel employees have been transferred or will be transferred to the buyers of these business units, including approximately 3,500 Canadian employees.    For further details on the Applicants' progress in the CCAA proceedings, please refer to the Monitor's Thirty-Seventh Report dated February 11, 2010 (the "**Thirty-Seventh Report**").

20.    In August 2009, Nortel announced several organizational changes, including the creation of Nortel Business Services ("**NBS**") and the Corporate Group ("**CG**") to transition and align its resources to focus on the divestiture of its businesses and other assets.  NBS is a business reporting unit, which was created to provide the services required under the Transition Services Agreements (the "**TSAs**") entered into with the buyers of business segments.    The CG was created to continue the implementation of the Applicants' restructuring strategy.

21.    It is anticipated that NBS and the CG will continue to operate through the remainder of 2010 and 2011 as obligations under the TSAs are fulfilled, remaining assets are realized, a plan of arrangement (a "**Plan**") is developed and implemented, and the remaining entities are ultimately wound-down. As recently announced, CG is focussed on a number of key actions, including the completion of announced sales and the sale of remaining businesses and assets, as well as exploring strategic alternatives to maximize the value of the Applicants' intellectual property.  The Applicants have advised that by the end of 2010, it is expected that NBS and CG will be the Applicants' only operating segments, with approximately 475 employees. Accordingly, the emergence of a 'continuing' Nortel with a sizeable workforce will not occur.

22.     In December 2009, the Applicants entered into the Canadian Funding and Settlement Agreement ("**CFSA**"), which was approved by this Honourable Court on January 21, 2010. The CFSA, which is described in more detail in the Monitor's Thirty-Fifth Report dated January 18, 2010 (the "**Thirty-Fifth Report**"), provides the Applicants with the funding necessary to continue operating throughout the remainder of the CCAA proceedings and to settle intercompany claims, including significant transfer pricing claims between the Applicants and the U.S. Debtors. The CFSA also provides NNL with further funding of US$190.8 million from NNI.

23.     Though Nortel has completed sales for a number of its businesses and continues to pursue sales of other businesses and non-core assets, it remains insolvent and subject to proceedings under the CCAA.    The extent of the Applicants' insolvency is highlighted by the claims that have already been filed in these proceedings pursuant to a Claims Procedure Order granted by this Honourable Court on June 30, 2009 (the "**Claims Procedure Order**").    As outlined in the Monitor's Twenty-Fifth Report dated October 25, 2009, approximately $27.9 billion of claims had been filed by the September 30, 2009 bar date established for certain claims.    These claims are still subject to a yet to be approved resolution procedure; however, they do not include claims in the following categories:

(a)     claims by directors and officers of the Applicants for indemnification and/or contribution arising from such directors' or officers' service to any Applicant;

(b)     employee compensation claims; and

(c)    inter-company claims (other than with Joint Ventures).

24.    Resolution of the claims filed pursuant to the Claims Procedure Order and initiation and completion of claim processes for claims excluded by that order are still required. Resolution of claims is one of the steps required to facilitate the Applicants' development of a Plan and to ultimately bring a conclusion to these insolvency proceedings.

25.    Claims resolution and the other activities of both NBS and the CG as outlined in the Thirty-Seventh Report, including the development of a Plan, are all dependent upon the Applicants having sufficient cash to support those activities.  The recently approved CFSA provides the Applicants with a funding base to pursue the development of a Plan.

## Intermediate Steps to Assist in the Development of the Plan

26.    With funding approved, the Applicants, with the assistance of the Monitor, identified several intermediate steps towards the development of a Plan, including the following:

(a)    the transition of benefits for employees currently working from existing benefit plans and administrative processes to a structure more appropriate for the reduced workforce;

(b)    the termination of unfunded or non-pension benefits for Pensioners, LTD Beneficiaries and Survivors (as subsequently defined) in an orderly manner, without undue disruption;

(c)    the transition of the Pension Plans;

(d)   the Court approved distribution of the corpus of the HWT to its beneficiaries entitled thereto, and preservation of the corpus to the extent possible, pending such distribution;

(e)   the achievement of greater certainty regarding the ranking of claims;

(f)   the retention of resources to assist in the restructuring; and

(g)   the avoidance of costs where possible, consistent with the Applicants' business strategy, including the avoidance of litigation, where possible.

27.   With these steps in mind, and as a result of the progress in the CCAA proceedings, the Applicants and the Monitor commenced the settlement discussions.

**SETTLEMENT PROCESS**

28.   A series of Court approved appointments of employee representatives and counsel established a framework that facilitated discussions among such representatives, the Applicants and the Monitor throughout the CCAA proceedings. The progress made in the CCAA proceedings, including the sale transactions and the approval of the CFSA, led to focussed discussions, a narrowing of issues, an expansion of the discussions to include certain other stakeholder groups, and ultimately, the Settlement Agreement.

**Appointment of Representatives**

29.   As set out in detail in the Monitor's Thirty-Sixth Report dated February 8, 2010 and the Affidavit of Elena King sworn February 18, 2010 (the **"King Affidavit"**), after a series of Court approved appointments, all but a very small number of individuals are represented

in these proceedings by Former Employees' Representative Counsel, LTD Beneficiaries' Representative Counsel, Continuing Employees' Representative Counsel or CAW Counsel and by Former Employees' Representatives, LTD Beneficiaries' Representative or Continuing Employees' Representatives (collectively, the **"Employee Representatives"**). The Court approved mandate for the Former Employees' Representatives and the LTD Beneficiaries' Representative expressly stated that they may represent their constituents for the purpose of settling or compromising their claims in the CCAA proceedings.

30.    The only individuals not represented by the above appointments are:

(a)    a former employee and a working employee who opted out of such representation; and

(b)    any former chief executive officer or chairman of the board of directors, any non-employee member of the board of directors, or such former employees or officers that are subject to investigation and charges by the Ontario Securities Commission or the United States Securities and Exchange Commission

((a) and (b) collectively referred to as the **"Individual Parties"**).

As described below, the Individual Parties were provided with notice of the Settlement and the opportunity to oppose the Settlement Approval Motion, if they so wish.

**Process Leading Up to Settlement**

31.    The Applicants and the Monitor have been engaged in discussions with Former Employees' Representative Counsel, LTD Beneficiaries Representative Counsel and the CAW with respect to the claims of their respective constituents since their appointment as representative counsel.  Those discussions intensified with the completion of certain sale transactions and the signing of the CFSA in December 2009.  By letter dated January 6, 2010 (the **"January 6 Letter"**), prior to the scheduled approval of the CFSA, Settlement Representative Counsel wrote to the Monitor and the Applicants expressing, on behalf of their clients, concerns with respect to:

(a)    whether and for how long current benefits would continue to be paid;

(b)    that the Pension Plans not be wound up immediately;

(c)    that the corpus of the HWT be preserved to the extent possible pending its Court approved distribution; and

(d)    that some minimum standards pay for severed employees be provided in addition to the current hardship program.

A copy of the January 6 Letter is attached to this Report as Appendix "A".

32.    On January 11, 2010, the Applicants and the Monitor met with Settlement Representative Counsel to better understand the concerns set out in the January 6 Letter.  The Monitor believed a multi-faceted agreement would be required to address these concerns. Accordingly, the Monitor and the Applicants initiated discussions with the Settlement

- 14 -

Representative Counsel, the CAW, the Superintendent of Financial Services in his capacity as administrator of the PBGF (the "**Superintendent**") and counsel to the Board, the Bondholder Group and the Committee with a view to developing a comprehensive settlement.

33.    Throughout January 2010, the parties engaged in extensive negotiations and exchanged numerous proposals. In addition, Continuing Employees' Representative Counsel were apprised of the settlement discussions.

34.    The numerous meetings, negotiations and proposals exchanged among affected parties culminated in the execution of a Settlement Agreement dated February 8, 2010 (the "**Settlement Agreement**") by the Applicants, the Monitor, Settlement Representative Counsel, Settlement Employee Representatives and the CAW (collectively, the "**Settlement Parties**"). Although significant progress had been made in resolving issues and agreeing on language with the Bondholder Group and the Committee, not all matters could be resolved, including the "No Preclusion Clause", discussed in paragraph 97 below.

35.    A copy of the Settlement Agreement is attached hereto as Appendix "B". The King Affidavit includes a summary of the Settlement Agreement; however, reference should be made directly to the Settlement Agreement for a complete understanding of its terms. Attached as Schedule "C" to the Settlement Agreement is a letter among the Applicants, the Monitor and the Superintendent (the "**Letter Agreement**"). Further details of the Letter Agreement are set out in the King Affidavit. A discussion of the Settlement Agreement follows, commencing at paragraph 41 of this Report.

**Update on Notice Process**

36.    Through an extensive notice and opposition process set out in the Notice Procedure Order granted by this Honourable Court on February 9, 2010, all parties affected by the Settlement Agreement were provided with notice of the Settlement, of the Settlement Approval Order and the option to oppose the Settlement Approval Motion, if they so wish.  Notice was provided to:

   (a)    the Individual Parties;

   (b)    the Former Employees (including pensioners, any person claiming an interest under or on behalf of former employees and pensioners and surviving spouses in receipt of an Applicant pension);

   (c)    the LTD Beneficiaries;

   (d)    the Unionized Employees;

   (e)    the Continuing Employees; and

   (f)    all provincial pension plan regulators and the federal pension plan regulator.

37.    As set out in the Thirty-Sixth Report, several preliminary steps occurred prior to the formal notice process set out in the Notice Procedure Order to provide affected parties with notice of the Settlement.  These preliminary steps included:

(a)     on February 3, 2010, Representative Counsel held a webinar, available to the constituents it represents and the Unionized Employees, for the purpose of providing such parties with advance notice of a forthcoming motion that would have an impact on their situation;

(b)     on February 8, 2010, Representative Counsel issued two press releases (in both English and French) regarding the Settlement and the holding of a webinar relating thereto, which press releases are attached to this Report as Appendix "C"; and

(c)     on February 8, 2010, the Applicants issued a press release (in both English and French) to announce the entering into of the Settlement, which press release is attached to this Report as Appendix "D".

38.     The Monitor has completed the following steps in accordance with the Notice Procedure Order to provide Affected Settlement Notice Parties with notice of the Settlement, including the Settlement Approval Order, and the option to oppose the Settlement Approval Motion, if they so wish:

(a)     on February 10, 2010, the Monitor posted a copy of a document package including the Notice Letter (in both English and French), Notice of Appearance (in both English and French), the Settlement Agreement and all Schedules thereto, the Thirty-Sixth Report and the Notice Procedure Order (collectively, the **"Settlement Document Package"**) on its website at **"www.ey.com/ca/nortel"**;

(b)     commencing February 12, 2010 through to February 16, 2010, the Monitor, on behalf of the Applicants, sent a copy of the Notice Letter to each of the Individual Parties, Former Employees, the LTD Beneficiaries, the Unionized Employees, the Continuing Employees and the provincial pension plan regulators (for which it has an address) in the manner described in the Thirty-Sixth Report and the Notice Procedure Order;

(c)     the Monitor caused to be published, each on February 16, 2010, an English version of the Notice Letter in the Toronto Star, The Globe and Mail (National Edition), the Ottawa Citizen, the London Free Press, the Montreal Gazette, the Calgary Herald, the Halifax Chronicle Herald, the Kingston Whig Standard, the Vancouver Sun and the Belleville Intelligencer and a French translation of the Notice Letter in La Presse and Le Droit; and

(d)     on February 9, 2010, the Monitor commenced using its toll free help line to respond to inquiries and information requests from Affected Settlement Notice Parties.

39.     Prior to the Settlement Approval Motion, the Monitor will provide notice to the Service List of Notices of Appearance it has received by the bar date of 10:30 a.m. on March 1, 2010, which have not subsequently been withdrawn.

40.     The Monitor will also provide copies of any Notices of Appearance not subsequently withdrawn to the Settlement Parties, counsel to the Committee, counsel to the Bondholder Group and Continuing Employees' Representative Counsel.

## INFORMATION AND ANALYSIS CONCERNING THE SETTLEMENT

41.     The Monitor believes that the Settlement Agreement represents a fair and reasonable conclusion of extensive negotiations among the Settlement Parties, the Superintendent and counsel to the Committee and the Bondholder Group in addressing the issues that will assist in the development of a Plan, as discussed in paragraph 26 above.

42.     Below is a summary of estimated payments the Applicants will make pursuant to the Settlement Agreement (capitalized terms used in the below table are as subsequently defined).

| Payment | Approximate Amount[1] |
|---|---|
| Pensioner M&D | $24.4 million[*] |
| LTD M&D and LTD Life | $3.0 million[*] |
| STBs | $2.8 million |
| LTD Income | $12.2 million |
| SIBs | $1.4 million |
| Pension Payments | $8.9 million |
| Termination Fund | $4.3 million |
| **Total** | **$57 million** |

43.     As set out in the above table, the Applicants will make payments under the Settlement Agreement in an aggregate approximate amount of up to $57 million. Of this amount, approximately $12.8 million was provided for in the Applicants' first quarter cash flows. Accordingly, the incremental cost to the Applicants beyond that previously budgeted and reflected in the first quarter cash flows is approximately $44.2 million.

---

[1] Where a range is indicated for these amounts in paragraphs 56 to 74 below, the high end of the range is used, consistent with the calculation of the Payments Charge.

[*] These respective amounts include the estimated amount of Pensioner M&D and the estimated amount of LTD M&D and LTD Life, respectively, to be incurred in 2010 and submitted in 2011 (prior to February 28, 2011).

44.     The orderly termination of benefits paid through the HWT facilitates the planning for the transition of the benefits of currently working employees, the retention of whom is an integral part of the restructuring.

**Benefits**

**(1)     Background Concerning the HWT**

45.     The Settlement Agreement does not provide for a distribution of the HWT.  Rather, the Settlement Agreement provides that the Settlement Parties will work towards a Court approved distribution of the HWT corpus in 2010 to its beneficiaries entitled thereto and the resolution of any issues necessarily incident to such distribution.  However, in order to understand the Settlement Agreement, it is necessary to have some basic background concerning the benefits being paid to Pensioners, LTD Beneficiaries and Survivors, and the role of the HWT therein.  The Monitor will provide more detailed information concerning the HWT and the benefits and their funding when the distribution motion is brought.

46.     The HWT was established by agreement dated January 1, 1980 between Northern Telecom Limited[2] and Montreal Trust Company (as trustee), and amended by agreement made as of June 1, 1994 (the **"Trust Agreement"**).  Nortel is the successor to Northern Telecom.  The current trustee of the HWT is The Northern Trust Company, Canada, appointed by deed dated December 1, 2005.  The Trust Agreement (and amendment thereto) is attached as Appendix "E" to this Report.

---

[2]     Article IX of the Trust Agreement provides that where the word "Corporation" is used in the agreement, it will be deemed to mean and shall include successors of Northern Telecom Limited and any other company with which Northern Telecom may have amalgamated.

47.    The Trust Agreement provides that the Applicants may designate certain of the following health and welfare plans, "or such other similar plan or plans as the Corporation may from time to time place in effect" as the Health and Welfare Plan: a health care plan, a management long term disability plan, a union long term disability plan, a management survivor income benefit plan, a management short term disability plan and a group life insurance plan. The Trust Agreement further provides that it is a health and welfare trust established to give effect to the Health and Welfare Plan. The HWT has been operated such that certain employee benefits have been paid by the HWT with trust assets, whereas other employee benefits have been funded by the Applicants on a pay-as-you-go basis, but paid through the HWT as an administrative matter.

48.    Nortel established the HWT as a tax-efficient vehicle for providing health and welfare benefits to employees and former employees of the Applicants, and sought and obtained a tax ruling from Revenue Canada. The Monitor has been advised by its counsel that Nortel was under no statutory or other legal obligation to establish or to fund a health and welfare trust and there is no regulation applicable to the HWT. Based on the Monitor's review to date, the HWT has never had sufficient assets in the trust to pay the present value of all the benefits for all the plans that are designated under it nor was it legally required to do so.

49.    The net assets of the HWT available for benefit payments at December 31, 2008 were approximately $123 million, of which approximately $37 million was represented by an amount "Due from Sponsoring Company". The Monitor has been advised by the

Applicants that this balance represents amounts due by the Applicants primarily related to benefit payments made to beneficiaries of the HWT prior to the Filing Date.

50.    Attached to this Report are certain documents relevant to the HWT:

    (a)    Appendix "F" - The Valuation of Post-Employment Benefit Liabilities for Accounting Purposes as at December 31, 2008, prepared by Mercer;

    (b)    Appendix "G" - The Report on Non-Pension Post-Retirement Benefit Cost and Disclosure for the Fiscal Year ending December 31, 2008, prepared by Mercer; and

    (c)    Appendix "H" - The unaudited, internal financial statements for the HWT, dated December 31, 2008.

51.    The majority of investments held in the HWT are of a long term nature.  Their market value as at December 31, 2009 was approximately $78 million.

52.    The HWT provides that the Applicants will pay fees or expenses related to the HWT. The Settlement Agreement provides that any fees or expenses incurred in connection with any dispute or litigation among the beneficiaries of the HWT concerning entitlement shall be paid out of the HWT corpus.  All other expenses related to the termination of the HWT shall be paid by the Applicants.

**(2)    Payment of Benefits in the CCAA Proceedings**

53.    Pursuant to the Initial Order, the Applicants are permitted (but not required) to pay, among other things, employee benefits (including employee medical and similar benefit plans).  The Applicants have been paying employee benefits including to Pensioners, LTD Beneficiaries and Survivors, since the commencement of the CCAA proceedings. The Applicants have continued to use the HWT in the CCAA proceedings as the most efficient, cost effective vehicle to provide for payment of benefits while the Applicants completed sale transactions and transitioned employees.

54.    In 2009, employee and pensioner benefits (excluding benefits for working employees and pension plan benefits) paid on a pay-as-you-go-basis by the Applicants primarily through the HWT as an administrative matter totalled approximately $22 million, with an additional approximate amount of $19.1 million being paid from the corpus of the HWT. Pursuant to the Settlement Agreement, in 2010, employee and pensioner benefits in the aggregate amount of between $35.4 million and $39.9 million will be paid by the Applicants on a pay-as-you-go basis primarily through the HWT as an administrative matter, with an additional approximate amount of $7.9 million being paid from the corpus of the HWT.

55.    A full discussion of the payments made on a pay-as-you-go basis and from the corpus of the HWT since the making of the Initial Order, including in 2010, will be included in a subsequent Monitor's report that will be filed once a motion for Court approval of the distribution of the HWT is brought.

*(a)*     ***Pay-as-You-Go Payments***

*(i)*     *Pensioner Medical and Dental*

56.     Medical and dental benefits for the Applicants' pensioners (**"Pensioner M&D"**) historically were paid on a pay-as-you-go basis by the Applicants through the HWT as an administrative matter, which has continued throughout the CCAA proceedings.

57.     The cost of the Pensioner M&D for 2009 was approximately $16.7 million. For 2010, the estimated cost of the Pensioner M&D is between $17.1 million and $20.9 million.

58.     Approximately 11,900 pensioners currently receive Pensioner M&D.

*(ii)*     *LTD Medical and Dental and LTD Life*

59.     Medical and dental benefits for the Applicants' employees in receipt of long term disability benefits (**"LTD M&D"**) were historically paid on a pay-as-you-go basis by the Applicants through the HWT as an administrative matter, which has continued throughout the CCAA proceedings.

60.     Life insurance premiums for the Applicants' employees in receipt of long-term disability benefits (**"LTD Life"**) were historically paid on a pay-as-you-go basis by the Applicants through the HWT as an administrative matter, which has continued throughout the CCAA proceedings.

61.     The cost of the LTD M&D and LTD Life for 2009 was approximately $2.5 million. For 2010, the estimated cost of the LTD M&D and LTD Life is between $2.1 million and $2.6 million.

62.     Approximately 400 employees (of whom approximately 150 are unionized, with approximately 100 of them being represented by the CAW, and approximately 250 are not unionized) are currently in receipt of LTD M&D and LTD Life.

(iii)    *Survivor Transition Benefits*

63.     Survivor transition benefits ("**STBs**") are income benefits for survivors of certain unionized former employees of the Applicants, payable for a five year period.  STBs were historically paid on a pay-as-you-go basis by the Applicants, which has continued throughout the CCAA proceedings.

64.     The cost of the STBs for 2009 was approximately $2.8 million.  For 2010, the estimated cost of the STBs is approximately $2.8 million.

65.     Approximately 308 survivors of former employees of the Applicants are currently in receipt of STBs.

**(b)     *Formerly Funded by HWT But Pay-as-You-Go under the Settlement Agreement***

(i)     *LTD Income*

66.     Income replacement benefits for employees of the Applicants in receipt of long term disability benefits ("**LTD Income**") were historically paid by the HWT from HWT assets, which has continued throughout the CCAA proceedings.

67.     The cost of the LTD Income benefits for 2009 was approximately $12 million.  For 2010, the estimated cost of the LTD Income benefits is between $12 million and $12.2 million.

68.    Approximately 400 employees are currently in receipt of LTD Income benefits.

(ii)    *Survivor Income Benefits*

69.    Survivor income benefits ("**SIBs**") are life-time income benefits for survivors of certain non-unionized employees of the Applicants. SIBs are no longer offered but continue to be paid to a group of surviving spouses.  SIBs were historically paid by the HWT from HWT assets, which has continued throughout the CCAA proceedings.

70.    The cost of the SIBs for 2009 was approximately $1.4 million.  For 2010, the estimated cost of the SIBs is approximately $1.4 million.

71.    Approximately 82 survivors of former employees of the Applicants are currently in receipt of SIBs (with all individuals in receipt of SIBs and STBs being referred to herein as "**Survivors**").

(c)    ***Funded by HWT***

(i)    *Retiree Life*

72.    Life insurance premiums for the Applicants' pensioners ("**Retiree Life**") were historically paid by the HWT from HWT assets, which has continued throughout the CCAA proceedings.

73.    The cost of the Retiree Life premiums for 2009 was approximately $5.7 million.  For 2010, the estimated cost of the Retiree Life premiums is approximately $7.9 million.

74.    Approximately 11,900 pensioners are currently covered by Retiree Life.

(3)     **Provision of Benefits under Settlement Agreement**

75.     As discussed above, through a series of Court approved sale transactions, many of the Applicants' operations have been sold.  As a result, the Applicants and the Monitor considered the transitioning of the currently working employee benefits from existing plans as a next step in the restructuring to assist in the development of a Plan.  It was timely therefore to consider termination of benefits for Pensioners, LTD Beneficiaries and Survivors, all of whom are not currently working for the Applicants.  Following discussions with, among others, Settlement Representative Counsel, the Applicants agreed as part of the Settlement that:

(a)     Pensioner M&D and LTD M&D will be funded solely from the Applicants' funds for the coverage period ending December 31, 2010 (the **"Medical and Dental Payments"**), provided that no Medical and Dental Payments claims submitted after February 28, 2011 shall be accepted, honoured or paid;

(b)     LTD Life will be funded solely from the Applicants' funds and Retiree Life will be paid from the corpus of the HWT until December 31, 2010; and

(c)     LTD Income, STBs and SIBs will be funded solely from the Applicants' funds in respect of the coverage period from January 1, 2010 to December 31, 2010 (the **"Income Payments"**).

76.     In the Monitor's view, the terms of the Settlement Agreement provide certainty to the Applicants and their stakeholders through establishing the date on which the Applicants will terminate payment of benefits to Pensioners, LTD Beneficiaries and Survivors,

facilitating the distribution of the HWT, provide advance notice of such termination and preserve the corpus of the HWT to the extent possible pending a Court approved distribution. The Settlement Agreement therefore also assists in an efficient transition of benefits for employees currently working, which will in turn assist in the development of a Plan.

### (4)  Pension Plans

77.    The Applicants provide pension benefits to their employees and former employees (and their survivors) through two registered pension plans, the Nortel Networks Limited Managerial and Non-Negotiated Pension Plan (the "**Salaried Plan**") and the Nortel Networks Negotiated Pension Plan (the "**Union Plan**"). The Pension Plans are registered under provincial pension benefits standards legislation.

78.    The Salaried Plan is a combination defined benefit and defined contribution pension plan. The Applicants amended the Salaried Plan several years ago to introduce a defined contribution component, which continues for active employees. The Union Plan is a defined benefit pension plan. Defined benefit pension plans provide that upon retirement plan members will receive a certain pension benefit and the plan sponsor is required to make sufficient contributions to the plan to pay such benefits. By contrast, defined contribution pension plans set out the amount that is required to be contributed to the plan, and the amount of pension a member will receive will depend entirely upon the contributions made and the return on same.

79.    The terms of the Initial Order permitted but did not require current service contributions and special payments to continue to be made to the Pension Plans. However, the

Applicants made current service and special payments contributions to the Pension Plans throughout 2009. Current service contributions (applicable to defined benefit only) totalled approximately $3.3 million for 2009. For 2010 (up to September 30, 2010), the Applicants will make current service contributions in the amount of $3.4 million to the Pension Plans.

80.    Special payments (applicable to defined benefit only) totalled approximately $22 million for 2009. For 2010 (up to March 31, 2010), special payments in the amount of $5.5 million will be made to the Pension Plans.

81.    The aggregate amount of current service contributions and special payments made to the Pension Plans throughout 2009 was approximately $25.3 million. Pursuant to the Settlement Agreement, the Applicants will make further current service contributions and special payments to the Pension Plans in 2010 in the aggregate amount of $8.9 million.

82.    The last actuarial valuation reports with respect to the Pension Plans were filed in September 2007 for the period ending December 31, 2006. The next actuarial valuation reports for the Pension Plans are not required to be filed under the *Pension Benefits Act* (the "PBA") until September 2010 for the period ending December 31, 2009. It is likely that a 2009 Valuation would indicate that the Pension Plans have significant deficits, requiring significantly increased special payments. Further, the Applicants as Administrator of the Pension Plans filed claims pursuant to the Claims Procedure Order in September, 2009 in respect of each of the Pension Plans, which have not yet been adjudicated or allowed, indicating an estimated total deficit of approximately $1.1 billion. Pursuant to the terms of the Settlement Agreement and the Settlement Approval Order:

(a)     the Applicants will not be required to make special payments after March 31, 2010;

(b)     the failure to make such payments and the claims in respect of the deficits will not result in any priority or trust under the PBA; and

(c)     any claims for payments or contributions to the Pension Plans in excess of the Pension Payments and any deficit claim, to the extent allowed, will rank on a *pari passu* basis with the claims of the ordinary unsecured creditors of the Applicants.

83.     The Applicants and the Monitor consider the transitioning of administration of the Pension Plans one of the next steps in the restructuring to assist in the development of a Plan as a result of the following factors:

(a)     through a series of Court approved sale transactions, many of the Applicants' operations have been sold;

(b)     approximately 13,000 Nortel employees have been transferred or will be transferred to the buyers of these business units, including 3,500 Canadian employees;

(c)     there is reduced staff to administer the Pension Plans;

(d)     the continuation of the Pension Plans and continued funding of the Pension Plans is not a viable option given Nortel's insolvency, the substantial reduction in operations and the size and complexity of the Pension Plans; and

(e)     an organized transition of the Pension Plans will maximize efficiencies and minimize costs thus, among other things, potentially reducing deficit claims.

84.     An option available to the Applicants was an immediate wind up of the Pension Plans. Following discussions with, among others, Settlement Representative Counsel, the Applicants agreed as part of the Settlement not to wind up the Pension Plans immediately. Instead, the Applicants agreed to:

(a)     continue to make contributions to the Pension Plans in the same manner as they have been doing over the course of the CCAA proceedings, through March 31, 2010, in the aggregate amount of $2,216,254 per month (the "**March Pension Payments**");

(b)     thereafter through to September 30, 2010, make only current service payments to the Pension Plans, in the aggregate amount of $379,837 per month (the "**September Pension Payments**", together with the March Pension Payments, the "**Pension Payments**"); and

(c)     cease to administer the Pension Plans on September 30, 2010 at 11:59 p.m.

85.     The Applicants and the Monitor are working on arrangements for continuing employees for the period commencing October 1, 2010.  In the meantime, the Applicants have advised the Monitor that they intend to continue to pay contributions in respect of the defined contribution component of the Salaried Plan, relating solely to those employees currently working and those LTD Beneficiaries who participate in the defined

contribution component of the Salaried Plan. In this regard, the Applicants are asking that, for greater certainty, it be clear in the Settlement Approval Order that the provisions of the Settlement Approval Order and the Settlement Agreement stipulating the Applicants' contributions to the Pension Plans apply only to the defined benefit component of the Salaried Plan.

86.     In the Monitor's view, the terms of the Settlement Agreement relating to the Pension Plans provide certainty to the Applicants and their stakeholders. The Settlement Agreement provides certainty through establishing:

    (a)    the date on which the Applicants will cease to administer the Pension Plans and make any further payments thereto;

    (b)    the type and exact amount of remaining payments that the Applicants will make to the Pension Plans;

    (c)    the consent of the Settlement Employee Representatives to the foregoing; and

    (d)    that, so long as the Applicants are the administrator of the Pension Plans, there will be no change to the plan terms of the Pension Plans without approval of the Court, and no change to the current asset mix or investment policies with respect to the Pension Plans other than at the request, and with the consent, of the Settlement Representative Counsel and the approval of the Court.

The Settlement Agreement therefore assists in an efficient transition of the Pension Plans, which will in turn assist in the development of a Plan.

**Termination Fund**

87.   In addition to the continued payment of employee and pensioner benefits and contributions to the Pension Plans for a period of time, the Applicants have also agreed as part of the Settlement to make payments to eligible former employees as an advance against their claims in the CCAA proceedings.

88.   Pursuant to the Settlement Agreement, the Applicants have agreed to create a pool of $4.3 million (inclusive of certain Representative Counsel's costs to a maximum of $100,000.00) (the "**Termination Fund**") as follows:

   (a)   the Termination Fund is for the benefit of those employees and former employees of the Applicants whose employment with the Applicants has been terminated or will be terminated prior to or on June 30, 2010 to whom amounts are or may become owing for termination or severance payments, who have not been offered employment with a purchaser of the Applicants' assets and who have not received or are not entitled to receive (i) a gross cumulative Annual Incentive Plan payment from and after October 1, 2009 of $3,000 or more; or (ii) a Key Employee Incentive Plan or Key Employee Retention Plan payment in 2009; or (iii) payment from any Court approved equivalent 2010 plan (the "**Eligible Employees**");

   (b)   Eligible Employees shall be paid a maximum of $3,000 (subject to applicable withholding taxes) from the Termination Fund (the "**Termination Payments**");

(c)     any Termination Payments shall be credited against allowed claims of such individuals, which claims shall be correspondingly reduced; and

(d)     to the extent that funds are unused in respect of terminations prior to or on June 30, 2010, or payment of Settlement Representative Counsel's costs referred to above, the Termination Fund may be used to make payments on account of terminations after June 30, 2010 or if such unused funds are to be used for another purpose, such purpose must be approved by the Court, on such basis as is agreed to between Representative Counsel and the Monitor.

89.     The Applicants have advised the Monitor that the Applicants will, to the extent possible, attempt to accommodate requests to roll over Termination Payments into registered retirement savings plans.

90.     In the Monitor's view, the establishment of the Termination Fund in the context of the Settlement Agreement is in the interests of both the Applicants and their stakeholders. Through the Termination Payments, Eligible Employees will receive a cash distribution subsequent to implementation of the Settlement; they do not need to wait until the implementation of a Plan to receive a cash payment. The Termination Payments will be credited against allowed claims of Eligible Employees. As part of the Settlement, Former Employees Representative Counsel will withdraw pending litigation in the Supreme Court of Canada seeking minimum standards severance payments. Litigation risk and cost to the Applicants and their creditors are therefore reduced.

**Payments Charge**

91.     The Settlement Agreement provides that the Pensioners, LTD Beneficiaries and Former Employees are entitled to the benefit of a charge on the Applicants' Property (as defined in the Initial Order) to secure payment of the Medical and Dental Payments, Income Payments, Termination Payments and Pension Payments (the **"Payments Charge"**) as follows:

(a)     the amount of the Payments Charge will not exceed an aggregate amount of $57 million;

(b)     the Payments Charge will rank subordinate in priority to the Inter-company Charge (as defined in the Initial Order);

(c)     the Payments Charge will apply in these proceedings and in any subsequent bankruptcy or receivership; and

(d)     the maximum amount secured by the Payments Charge will be reduced as the Medical and Dental Payments, Income Payments, Termination Payments and Pension Payments are made by an amount equal to each such payment made and the Payments Charge will be extinguished once the last such payment is made (as evidenced by a Monitor's certificate).

92.     As discussed below, the Applicants have sufficient funds to meet their payment obligations under the Settlement Agreement. However, in the Monitor's view, it is

appropriate in all the circumstances to give those entitled to payments under the Settlement Agreement the additional security provided by the Payments Charge.

**Ranking of Claims and Releases**

93.    Various provisions of the Settlement Agreement and the Settlement Approval Order, including those barring and releasing claims, establish the ranking of HWT Claims and Pension Claims as ordinary unsecured claims on a *pari passu* basis with the claims of ordinary unsecured creditors of the Applicants, thereby reducing uncertainty with respect to what will likely be significant claims against the Applicants.

94.    The terms of the Settlement Agreement and the Settlement Approval Order include the following provisions limiting and barring certain claims (please refer to the Settlement Agreement and the Settlement Approval Order for the full text of the barring provisions):

(a)    any Pension Claims made in the CCAA proceedings or any subsequent receivership, bankruptcy or any other proceedings concerning the Applicants or any Nortel Worldwide Entity or the Pension Plans shall, to the extent that they are allowed pursuant to any claims adjudication procedure established in such proceedings, rank as ordinary unsecured claims on a *pari passu* basis with the claims of ordinary unsecured creditors of the Applicants and shall not attract any lien or deemed trust status;

(b)    no person shall assert any Pension Claim other than as an ordinary unsecured claim ranking on a *pari passu* basis with the claims of ordinary unsecured creditors;

(c)     the portion of the proofs of claim already filed or subsequently filed by the Superintendent, as administrator of and on behalf of the PBGF, by the Applicants, by any Employee Claimants or any other person, asserting or advancing priority or preferential treatment of any kind be disallowed but only as to the claim for priority or preferential treatment[3];

(d)     any HWT Claims made in these proceedings or in any subsequent receivership, bankruptcy or any other proceedings concerning the Applicants, any Nortel Worldwide Entity or the HWT shall, to the extent they are allowed against the Applicants pursuant to any claims adjudication procedure established in such proceedings, rank as ordinary unsecured claims on a *pari passu* basis with the claims of ordinary unsecured creditors of the Applicants, and no part of any such HWT Claims shall rank as a preferential or priority claim or shall be the subject of a constructive trust or trust of any nature or kind; and

(e)     no person shall assert any HWT Claim other than as an ordinary unsecured claim ranking on a *pari passu* basis with the claims of ordinary unsecured creditors.

95.    By the terms of the Settlement Agreement and the Settlement Approval Order, the following releases are granted (please refer to the Settlement Agreement and the Settlement Approval Order for the full text of the releases):

---

[3] The provisions described in subparagraphs (a), (b) and (c) only apply to claims by the Superintendent on behalf of the PBGF and any administrator appointed by the Superintendent if: (a) the Pension Payments are made in accordance with the Settlement Agreement; and (b) no bankruptcy order is made with respect to the Applicants on or before September 30, 2010.

(a)     a release in favour of the Releasees, the CAW, the Representatives, the
Superintendent, as administrator of and on behalf of the PBGF,[4] and their legal
counsel and financial advisors and each of the heirs, executors, administrators,
legal representatives, successors and assigns of each of the foregoing from any
and all direct and indirect claims related to (i) the Pension Plans, and (ii) the
HWT, provided that nothing in the release shall release a director of the
Applicants from any matter referred to in subsection 5.1(2) of the CCAA or with
respect to fraud on the part of any Releasee, with respect to that Releasee only;
and

(b)     a release in favour of the Nortel Releasees from any and all direct and indirect
claims that the Pension Claims and the HWT Claims, or any part thereof, rank as
a preferential or priority claim over the claims of ordinary unsecured creditors of
the Applicants, as a trust (whether deemed or otherwise) or a lien or charge, or
under any other legal or equitable theory.

96.     By the terms of the Settlement Agreement, under no circumstances shall any CCAA Plan
of Arrangement in the Nortel proceedings be proposed or approved: (i) if it provides for
separate classification of any Pension HWT Claimants from ordinary unsecured creditors
of Nortel, including, without limitation, bondholders and Nortel Networks Inc.; or (ii) if
the Pension HWT Claimants and the other ordinary unsecured creditors of Nortel do not

---

[4] In the case of the Superintendent, as administrator of and on behalf of the PBGF, the release set out in the
Settlement Approval Order is only effective if the provisions of the Settlement Approval Order described in
subparagraphs 94(a)(b)(c) above apply (please refer to the previous footnote for a description of when such
provisions apply).

receive the same *pari passu* treatment of their allowed ordinary unsecured claims against Nortel pursuant to the Plan.

97.    In the event of a bankruptcy of the Applicants, notwithstanding any provision of the Settlement Agreement, if there is an amendment to any provision of the *Bankruptcy and Insolvency Act* that changes the current, relative priorities of the claims against the Applicants, no party is precluded by the Settlement Agreement from arguing the applicability or non-applicability of any such amendment in relation to any such claim (as found in both the Settlement Agreement and the Settlement Approval Order, the "**No Preclusion Clause**").

98.    In the Monitor's view, the Settlement Agreement and the Settlement Approval Order, including the provisions respecting the ranking of HWT Claims and Pension Claims as ordinary unsecured claims and the various releases, represent an important step in resolving issues related to claims and potential claims against the Applicants, which will assist in the development of a Plan.

**Retaining Resources Necessary to Continue Restructuring**

99.    Although the Applicants have made significant progress to date in the CCAA proceedings, there is still work to be done.  As set out in the Thirty-Seventh Report, the Monitor is of the view the commitment and retention of remaining employees will be essential to the execution of obligations pursuant to TSAs, the completion of the Applicants' restructuring (including assisting in sales of remaining assets) and the completion of a Plan.  Accordingly, the Monitor supported the Applicants' request for

approval of an employee incentive plan and for certain payments to be made under the Applicants' previously approved 2009 KEIP and 2009 KERP to participants thereunder.

100.   In recognition of the importance of retaining sufficient resources necessary to complete the restructuring for the benefit of the Applicants' stakeholders, as part of the Settlement the Representatives, on their own behalf and on behalf of those they represent (and the Superintendent, as part of the Letter Agreement), agreed not to oppose: (i) any employee incentive program, including any charge therefor, that is determined by the Monitor to be reasonable and necessary for the continued operation of the Applicants; and (ii) the creation of a trust with respect to claims or potential claims against persons who accept directorships of a Nortel Worldwide Entity in order to facilitate the restructuring, provided that certain conditions are met.

## Avoiding Litigation Costs

101.   Provisions of the Settlement Agreement and the Settlement Approval Order result in the release of certain rights and claims primarily concerning pension plan administration, HWT administration and priorities (see paragraphs 94 and 95 above). The Monitor understands that the releases were part of the settlement process necessary in order for the Representatives, on their own behalf and on behalf of those they represent, to achieve certainty of payment of employee benefits and pension benefits, an achievement that Settlement Representative Counsel expressed as important to their constituents in the process leading up to the Settlement.

102.   The release of certain claims and rights is an important step in the development of a Plan. The releases assist in claim determination and reduce the risk of litigation against the

Applicants and their directors (who benefit from a priority charge pursuant to the Initial Order); thereby reducing the risk that assets would be depleted in order to fund potentially significant litigation costs.

103.    The Monitor will not comment on the relative risks or potential success of any claims released as part of the Settlement; however, the Monitor is of the view that the releases represent a fair balancing of interests given the certainty achieved regarding employee benefits and the avoidance of potential litigation risks and costs and disruption to the development of a Plan.

## Financial Capacity to Fulfil Terms of Settlement

104.    On January 21, 2010, this Honourable Court issued an order approving the CFSA. The CFSA addresses the Applicants' liquidity requirements through the anticipated completion of transition services activities and plan development.

105.    The CFSA allows the Applicants some flexibility in their spending; however, the Applicants must have sufficient liquidity to meet their contractual obligations to provide transition services pursuant to the various business sales they have concluded and outlays related to their corporate activities. The Applicants have worked closely with the Monitor to analyze their financial capacity to fulfill the terms of the Settlement Agreement. The Monitor believes the liquidity provided by the CFSA is sufficient for the Applicants to fulfil the terms of the Settlement Agreement and carry on with their restructuring.

## Implications Absent the Settlement

106.   In the Monitor's view, absent the Settlement:

(a)   it would be difficult to achieve consensus on the continuation of company funding for: (a) benefits to individuals not actively engaged in the operation of the Applicants' businesses; and (b) pension payments;

(b)   there would be a greater risk of immediate termination of benefits to Pensioners, LTD Beneficiaries and Survivors, leading to greater hardship and disruption;

(c)   there would be a greater risk of litigation regarding pension claims and claims in respect of the HWT, leading to increased costs to the Applicants (and therefore the Applicants' creditors), uncertainty and potential disruption to the development of a Plan; and

(d)   the transition of benefits for currently working employees might be disrupted.

## Summary

107.   In total, the Settlement Agreement provides for payments of approximately $57 million in Benefits and Pension Plan contributions in 2010 and Termination Payments. Beneficiaries of the HWT, including Pensioners, LTD Beneficiaries and Survivors, maintain their rights in respect of the HWT. Further, all employee claims allowed against the Applicants are maintained as ordinary unsecured claims.

108.    The Settlement Agreement addresses certain issues, which include:

(a)    providing affected parties with certainty as to the time frame in which the unavoidable cessation of benefits and transfer of the Pension Plans will occur and advance notice of the transition by allowing for:

(i)    continuation of disability income benefits, medical, life and dental benefits for LTD Beneficiaries until December 31, 2010;

(ii)    continuation of medical, life and dental benefits to pensioners until December 31, 2010;

(iii)    continuation of survivor income and survivor transition income benefits until December 31, 2010;

(iv)    continuation of special payment contributions to the Pension Plans until March 31, 2010; and

(v)    continuation of current service funding of the Pension Plans until September 30, 2010;

(b)    preservation of the corpus of the HWT (for an anticipated distribution in 2010 of the HWT corpus to its beneficiaries entitled thereto);

(c)    provision to Eligible Employees of a cash payment to be credited against their allowed claims;

(d)    provision to parties receiving or entitled to receive employee and pensioner benefits, pension benefits and Termination Payments with a charge over the Applicants' property to secure such payments;

(e)    reduction of uncertainty with respect to what will likely be significant claims against the Applicants through the ranking of claims relating to the Pension Plans and the HWT as ordinary unsecured claims on a *pari passu* basis with the claims of the ordinary unsecured creditors of the Applicants; and

(f)    provision of transition without litigation (and the associated costs) on certain major issues relating to the Applicants' restructuring.

**RECOMMENDATION**

109.    The Monitor believes that, overall, the Settlement Agreement and Settlement Approval Order represent a fair balancing of the interests of the Applicants' stakeholders and an important step in the implementation of the Applicants' restructuring, arrived at after extensive negotiations among the Applicants, Monitor, Settlement Representative Counsel, Settlement Employee Representatives, CAW, Superintendent, and counsel to the Committee and the Bondholder Group. The Monitor recommends this Honourable Court approve the Settlement Agreement and grant the Settlement Approval Order on the terms and conditions substantially in the form as submitted by the Applicants.

- 44 -

All of which is respectfully submitted this 18th day of February, 2010.

**ERNST & YOUNG INC.**
In its capacity as Monitor of the Applicants

Per:

Murray A. McDonald
President