## SCHEDULE "C" TO SETTLEMENT AGREEMENT

### [ATTACHED]

# N⌀RTEL



February 8, 2010

Pension Benefits Guarantee Fund (Ontario)
c/o Financial Services Commission of Ontario
4th Floor
5160 Yonge Street
Toronto, ON
M2N 6L9

**Attention: K. David Gordon, Deputy Superintendent, Pensions**

Dear Sirs:

**Re:     Court File No. 09-CL-7950**
**In the Matter of the Companies' Creditors Arrangement Act and Nortel**
**Networks Corporation et al (Nortel")**

This letter sets out, among other things, the understanding among Nortel, the Monitor and the
Superintendent of Financial Services in his capacity as Administrator of the Pension Benefits
Guarantee Fund concerning the administration of Nortel's registered pension plans (the
"Pension Plans") and the transition of the Pension Plans to a new administrator, in order to
provide for an orderly, cost effective transition that will be in the best interests of the
members of the Pension Plans.

Defined terms used herein shall have the meaning given to them in the agreement made as of
the 8th day of February, 2010 a copy of which is attached hereto as Schedule "A" (the
"Settlement Agreement"):

1.    <u>Conditional Understanding:</u>  It is acknowledged that the terms of this letter are
conditional on (a) the Settlement Agreement having been fully executed and
delivered, and (b) the order of the Court approving the Settlement Agreement
having been issued and entered substantially in the form of the Order attached
as Schedule "B".

2.    <u>Pension Plan Administration:</u>  Nortel will continue to administer the Pension
Plans until September 30, 2010 at 11:59 p.m.  Neither Nortel nor the Monitor
will take any steps to initiate a wind up, in whole or in part, of the Pension
Plans with an effective date prior to October 1, 2010. So long as Nortel is the
administrator of the Pension Plans there will be no change to the current asset
mix, investment policies or the plan terms with respect to the Pension Plans
without the consent of the Representative Counsel and the approval of the
Court.

3.    <u>Pension Plan Transition:</u>  (a) Nortel will ensure that all books, records, data
and other information relating to the Pension Plans or beneficial to the



administration or winding-up of the Pension Plans are consolidated in Toronto, Ontario, Canada by no later than March 31, 2010; and (b) the Monitor and Nortel will take all reasonable steps, at the sole cost and expense of Nortel, to complete the orderly transfer of the administration of the Pension Plans to a new administrator appointed by the Superintendent effective October 1, 2010 (the "New Administrator").

4.  <u>Settlement Agreement and Settlement Approval Order:</u>  The Superintendent will not oppose the granting of an Order substantially in the form attached hereto as Schedule "B".

5.  <u>Employee Incentive and Director Charge Order:</u>  The Superintendent will not oppose the granting of a court order approving (a) any employee incentive program, including any charge therefor, that is determined by the Monitor to be reasonable and necessary for the continued operation of Nortel, or (b) the creation of a trust for persons who accept the directorship of Nortel worldwide subsidiaries in order to facilitate the restructuring, provided that: (i) such trust is approved and recommended by the Monitor; (ii) no part of the corpus of the trust may be used to pay bonuses or any other compensation to the directors; and (iii) any corpus of the trust remaining on the termination of the trust reverts to Nortel.

6.  <u>Directors:</u>  The Superintendent confirms that as of January 15, 2010, he is not aware of any claims against directors, officers or the Monitor, other than such claims as may arise as a result of the transfer of pension information and other records outside of Canada.

Please sign and return the copy of this letter attached.

Yours very truly,

attachments



Nortel Networks Corporation

Per: _____

Name  ANNA VENTRESCA
Title  General Counsel - Corporate
       and Corporate Secretary

Nortel Networks Limited

Per: _____

Name  ANNA VENTRESCA
Title  General Counsel - Corporate
       and Corporate Secretary

Nortel Networks Global Corporation

Per: _____

Name  Anna Ventresca
Title  Secretary

Nortel Networks International Corporation

Per: _____

Name  Anna Ventresca
Title  Secretary

Nortel Networks Technology Corporation

Per: _____

Name  Anna Ventresca
Title  Secretary

Nortel Networks Corporation

Per: _____

Name  JOHN DOOLITTLE
Title  Sr. Vice President, Finance and
       Corporate Services

Nortel Networks Limited

Per: _____

Name  JOHN DOOLITTLE
Title  Sr. Vice President, Finance and
       Corporate Services

Nortel Networks Global Corporation

Per: _____

Name  JOHN DOOLITTLE
Title  President

Nortel Networks International Corporation

Per: _____

Name  John Doolittle
Title  President



Ernst & Young Inc., solely in its capacity
as Monitor in the CCAA proceedings of
Nortel and not in its personal capacity

Per:

_____

Name
Title

Superintendent of Financial Services of
Ontario as administrator of the Pension
Benefits Guarantee Fund without personal
liability
Per:

_____

Name
Title



Ernst & Young Inc., solely in its capacity
as Monitor in the CCAA proceedings of
Nortel and not in its personal capacity

Per:

_____
Name
Title

Superintendent of Financial Services of
Ontario as administrator of the Pension
Benefits Guarantee Fund without personal
liability

Per: _____

Name   R. David Gordon
Title   Deputy Superintendent, Pensions

**APPENDIX C – NRPC/CNELTD PRESS RELEASES**



**NRPC** ⬩ **SRNC**
Nortel Retirees     Sauvegarde des Retraités
and former employees     et anciens employés
Protection Canada     de Nortel Canada

### NRPC Announces Negotiated Deal for its Constituency

#### Media Release: For release on February 08, 2010

OTTAWA: - As part of the negotiations following court approval of the final Canadian Funding Agreement, the NRPC (Nortel Retirees and former employees Protection Canada) announces that the Court-Appointed Representatives (Don Sproule, Michael Campbell, David Archibald- the Representatives) for the Former Employees, along with Susan Kennedy, the Court-Appointed Representative for the employees of Nortel on long term disability, and their counsel Koskie Minsky LLP, have reached a deal to ensure the continuation of benefits through 2010. The details of the Agreement, which is subject to court approval on March 3, 2010, will be available on the Monitor's website at www.ey.com/ca/Nortel. The agreement requires the payment by Nortel of an estimated $57 million through 2010. This means:

- for pensioners and their survivors, the continuation of medical, dental and life insurance benefits through 2010;

- for all defined benefit pension plan members, Nortel's continuation and current service funding of the pension plans until the end of September 2010;

- for eligible employees terminated without severance pay, a lump sum payment of up to $3000 as an advance against their claims under CCAA;

- for employees on long term disability, the continuation of disability income benefits and the continuation of medical, dental and life insurance benefits through to the end of 2010; and

- for those receiving survivor income and survivor transition benefits, the continuation of those payments through 2010.

With the exception of retiree life benefits, none of these payments will be made from the health and welfare trust assets.

The agreement also contains an acknowledgment that the claims of disabled, continuing and former employees and pensioners of Nortel are unsecured claims, and rank in equal priority with those of all other unsecured creditors, including the bondholders. If Nortel and its creditors later become subject to the *Bankruptcy and Insolvency Act*, this Agreement will not restrict us from arguing that the provisions of that Act will apply, including any priorities then in place.

Further, there is an agreement not to pursue claims based on the administration or funding of the pension plan or health and welfare trust against Nortel (in its capacity as administrator), the trustee of the health and welfare trust, and Nortel's directors. Claims for fraud, and misrepresentation against the directors, are expressly preserved. Finally, in recognition of the priority payments for terminated employees, the Representatives will abandon their litigation in the Supreme Court of

Canada seeking minimum standards severance payments. These priority payments will not eliminate severance claims against Nortel, but will reduce the amount an individual can claim.

Said Don Sproule: "Given that the Canadian Funding Agreement provided for payment of benefits only until March 31, 2010, and could have meant an immediate wind up of the pension plan, we believe we've negotiated a good deal, without giving up any of our strategic aims". The deal gives us:

- a priority cash distribution ahead of other Canadian creditors while at the same time not giving up our rights to claim preferred status under an amended BIA.

- time for the Ontario Government to implement the Ontario Pension Agency (OPA), which was a key recommendation (No.5-2) of the Ontario Expert Commission on Pensions. As opposed to the current wind-up process, the OPA could result in significantly higher pensioner payouts and at the same time a significantly lower PBGF expenditure.

- time for pensioners and others to start planning for the loss of health benefits at the end of 2010. To that end the NPRC along with the CNELTD has formed a joint committee to explore if there are feasible options for continuation of a very basic group health plan.

Based on dialogue with the Ontario Government, we expect that payments to pensioners will continue at 100% until September 30, 2010 at which time there will likely be a reduction in payments. How much they will be cut depends on the actions of the Ontario government on implementing the Ontario Pension Agency.

A letter describing the settlement will be sent to all pensioners, former employees and disabled employees of Nortel on or before February 16, 2010. A package containing further details of the Agreement will be available from the website of the Monitor at www.ey.com/ca/nortel or the website of Representative Counsel at www.kmlaw.ca by February 11th. The Representatives will hold a webinar, with an audio-only option for pensioners without internet access, on February 23, 2010 to explain the Agreement and its impact.

A motion before the CCAA judge to approve the Agreement has been scheduled for March 3, 2010. If you intend to appear and oppose the agreement in Court, a Notice of Appearance in the prescribed form, which will be available at www.ey.com/ca/Nortel, must be submitted to the Monitor and the Monitor's counsel as detailed on that document.

If you wish to oppose the Agreement, you must ensure that the Monitor receives your Notice of Appearance by 11:59 p.m. EST on February 24, 2010. If you wish to appear in court to oppose the Agreement, you must do so as an independent party at your own expense.

The NRPC legal committee and the Representatives fully support the Agreement as it reduces the uncertainty for our members regarding their pensions and benefits in 2010 and provides some advance compensation for terminated employees.

**For further information, please contact:**

**Don Sproule, NRPC  National Chair**
**613-266-9336          sproule.nrpc@gmail.com**

**Bernard Neuschwander, NRPC Chair Québéc Region**
**514-769-7593      bnmk@sympatico.ca**

**Francois Meunier, NRPC Chair Ottawa Region**
**613-825-5662      fmeunier@sympatico.ca**

**Tony Marsh, NRPC Media Relations**
**613-832-4817      tonymarsh@sympatico.ca**

**Anne Clark-Stewart, NRPC Media Relations**
**613-270-8022      leisurelodge@sympatico.ca**

**CNELTD Announces Negotiated Deal with Nortel and the Monitor**

**Media Release: For release on February 08, 2010**

Ottawa: – Following court approval of the final Canadian Funding Agreement, the Legal Steering Committee of the Canadian Nortel Employees on Long Term Disability (CNELTD) announces that the Court-Appointed Representative for Nortel's disabled employees, Susan Kennedy, along with the Court-Appointed Representatives of the pensioners and former employees of Nortel (Don Sproule, Michael Campbell, David Archibald) (the "Representatives"), and their counsel, Koskie Minsky LLP, have negotiated a deal to ensure the continuation of benefits through 2010. The details of the Agreement, which is subject to court approval, will be available on the Monitor's website at www.ey.com/ca/nortel. The Agreement requires the payment by Nortel of an estimated $57 million through 2010 to ensure:

- continuation of disability income benefits, medical, life and dental benefits  for disabled employees until December 31, 2010;

- for all defined benefit pension plan members, including those on long term disability, continuation and current service funding of the pension plans until the end of September, 2010;

- continuation of medical, life and dental benefits to pensioners until December 31, 2010;

- continuation of survivor income and survivor transition income benefits until December 31, 2010;

- a lump sum payment of up to $3,000 to eligible employees terminated without severance pay as an advance against their claims under CCAA, to a total maximum of $4.2 million;

With the exception of retiree life benefits, none of these payments will be made from the health and welfare trust assets.  The Agreement does not affect the discussions that are already underway to determine the allocation of the assets in the health and welfare trust, and we anticipate a resolution of the allocation of those trust assets prior to December 31, 2010.

The employment of disabled employees will be formally terminated effective December 31, 2010, but that will not diminish their right to make claims against Nortel in the insolvency proceedings.

According to Susan Kennedy, "The disabled employees were very worried about the possibility of losing their income and their health benefits when funding under the Canadian Funding Agreement was to end on March 31, 2010. The continuation of these benefits through 2010 is a welcome relief.

Among the many benefits of the deal, it gives us:

- a priority cash distribution ahead of other Canadian creditors, without giving up our rights to claim preferred creditor status if the BIA is amended, and without depleting the assets of the Health and Welfare Trust to pay our income benefits;

- a significant period of certainty and stability to plan for the future, and an opportunity to continue our work with the NRPC to explore ways to continue a very basic group health plan after December 31, 2010; and

- time for the Ontario Government to implement the Ontario Pension Agency (OPA), which could increase the value of our pensions.

We expect that the allocation of the assets in the Health and Welfare Trust during 2010 will provide disabled employees with a source of income while the rest of the claims process unfolds.

The Agreement also contains an acknowledgment that the claims of disabled, continuing and former employees and pensioners of Nortel are unsecured claims, and rank in equal priority with those of all other unsecured creditors, including the bondholders. If Nortel and its creditors later become subject to the *Bankruptcy and Insolvency Act*, this Agreement will not restrict us from arguing that the provisions of that Act will apply, including any priorities then in place.

Further, there is an agreement by the disabled employees, pensioners and former employees not to pursue claims based on the administration or funding of the pension plan or health and welfare trust against Nortel (in its capacity as administrator), the trustee of the health and welfare trust, and Nortel's directors. Claims for fraud, and misrepresentation against the directors, are expressly preserved. Finally, in recognition of the priority payments from the $4.2 million pool for terminated employees, the Representatives will abandon their litigation in the Supreme Court of Canada seeking minimum standards severance payments.

A letter describing the settlement will be sent to all disabled employees, pensioners and former employees of Nortel on or before February 16, 2010. A package containing further details of the Agreement will be available from the website of the Monitor at **www.ey.com/ca/nortel** or the website of Representative Counsel at www.kmlaw.ca by February 11, 2010. The Representatives will hold a webinar with an audio-only option for disabled employees without internet access on February 23 to explain the Agreement and its impact.

A motion before the CCAA judge to approve the Agreement has been scheduled for March 3, 2010. If you intend to appear and oppose the agreement in Court, a Notice of Appearance in the prescribed form, which will be available at **www.ey.com/ca/Nortel** on or before February 11, must be submitted to the Monitor and the Monitor's counsel as detailed on that document.

If you wish to oppose the Agreement, you must ensure that the Monitor receives your Notice of Appearance by 11:59 p.m. EST on February 24, 2010. If you wish to appear in court to oppose the Agreement, you must do so as an independent party at your own expense.

The CNELTD Legal Steering Committee and the Representative fully support the Agreement as it reduces the uncertainty for the disabled employees about their benefits in 2010 and gives them more time to prepare for their futures after Nortel's insolvency.

Media contacts:

Susan Kennedy 613-620-1708 (English)
Johanne Berube  613-523-8185  (French or English)
Kevin LeBlanc  613-820-9423 (French or English)

**APPENDIX D – NORTEL PRESS RELEASE**



SEND TO PRINTER

# NORTEL ENTERS INTO SETTLEMENT AGREEMENT WITH FORMER AND DISABLED CANADIAN EMPLOYEE REPRESENTATIVES

**February 8, 2010**

TORONTO, February 8, 2010 – Nortel* Networks Corporation [OTC: NRTLQ] today announced that it, Nortel Networks Limited and their Canadian subsidiaries that have filed for creditor protection under CCAA (collectively, Nortel), have reached an agreement on certain employment related matters regarding former Canadian Nortel employees, including Nortel's Canadian registered pension plans and benefits for Canadian pensioners and Nortel employees on long term disability (LTD).

Nortel entered into a Settlement Agreement with court-appointed representatives of its Canadian former employees, pensioners and LTD beneficiaries, the court-appointed representative counsel to such parties, Koskie Minsky LLP, the CAW Canada and Nortel's court-appointed Monitor. The Settlement Agreement is subject to, among other things, the approval of the Ontario Superior Court of Justice.

**RELATED LINKS**

Nortel Business and Financial Restructuring

**GET UPDATES**

Subscribe to the latest news and events from Nortel.>>

The Settlement Agreement provides that Nortel will continue to administer the Nortel Networks Negotiated Pension Plan and the Nortel Networks Limited Managerial and Non-Negotiated Pension Plan until September 30, 2010, at which point these pension plans will be transitioned, in accordance with the Ontario Pension Benefits Act, to a new administrator appointed by the Superintendent of Financial Services. Nortel and the Monitor will take all reasonable steps to complete the transfer of the administration of the pension plans to the new administrator. Nortel will continue to fund these pension plans consistent with the current service and special payments it has been making during the course of the CCAA proceedings through March 31, 2010, and thereafter will make current service payments until September 30, 2010.

For the remainder of 2010, Nortel will continue to pay medical and dental benefits to Nortel pensioners and survivors and Nortel LTD beneficiaries in accordance with the current benefit plan terms and conditions. Life insurance benefits will continue unchanged until December 31, 2010 and will continue to be funded consistent with 2009 funding. Further, Nortel will pay income benefits to the LTD beneficiaries and to those receiving survivor income benefits and survivor income transition benefits through December 31, 2010, which payments will be made directly by Nortel. The employment of the LTD beneficiaries will terminate on December 31, 2010. The parties have agreed to work toward a court-approved distribution, in 2010, of the assets of Nortel's Health and Welfare Trust, the vehicle through which Nortel generally has historically funded these benefits, with the exception noted above.

The Settlement Agreement also provides that Nortel will establish a fund of CDN$4.2 million for termination payments of up to CDN$3,000 per employee to be made to eligible terminated employees as an advance against their claims under CCAA.

"We are pleased to have come to a resolution on these important matters," said David Richardson, Chairman, Nortel. "We understand the need to provide clarity to former employees as well as several months of certainty that will allow beneficiaries to make alternate plans. The Board of Directors and Nortel's management team have been working diligently with its advisors and stakeholders to reach an agreement that is as fair as possible in the circumstances, and that will result in almost two years of medical, dental and LTD coverage, an unusually lengthy period of time for companies under CCAA. It is expected that in aggregate, for the period

from filing for creditor protection until the respective end dates announced today, Nortel will pay approximately CDN$100 million to the pension plans and towards benefits".

Under the Settlement Agreement, any claim made by any party in relation to the matters settled under the agreement will rank as ordinary unsecured claims under the CCAA proceedings.   A charge in the maximum amount of CDN$57 million on Nortel's assets will be established to secure the payments to be made by Nortel under the Settlement Agreement, which amount shall be reduced by the amount of payments made.

## About Nortel

For more information, visit Nortel on the Web at www.nortel.com . For the latest Nortel news, visit www.nortel.com/news .

Certain statements in this press release may contain words such as "could", "expects", "may", "should", "will", "anticipates", "believes", "intends", "estimates", "targets", "plans", "envisions", "seeks" and other similar language and are considered forward-looking statements or information under applicable securities laws. These statements are based on Nortel's current expectations, estimates, forecasts and projections about the operating environment, economies and markets in which Nortel operates. These statements are subject to important assumptions, risks and uncertainties that are difficult to predict, and the actual outcome may be materially different. Nortel's assumptions, although considered reasonable by Nortel at the date of this press release, may prove to be inaccurate and consequently Nortel's actual results could differ materially from the expectations set out herein.

Actual results or events could differ materially from those contemplated in forward-looking statements as a result of the following: (i) risks and uncertainties relating to the Creditor Protection Proceedings including: (a) risks associated with Nortel's ability to: stabilize the business and maximize the value of Nortel's businesses; obtain required approvals and successfully consummate pending and future divestitures; ability to satisfy transition services agreement obligations in connection with divestiture of operations; successfully conclude ongoing discussions for the sale of Nortel's other assets or businesses; develop, obtain required approvals for, and implement a court approved plan; resolve ongoing issues with creditors and other third parties whose interests may differ from Nortel's; generate cash from operations and maintain adequate cash on hand in each of its jurisdictions to fund operations within the jurisdiction during the Creditor Protection Proceedings; access the EDC Facility given the current discretionary nature of the facility, or arrange for alternative funding; if necessary. arrange for sufficient debtor-in-possession or other financing; continue to have cash management arrangements and obtain any further required approvals from the Canadian Monitor, the U.K. Administrators, the French Administrator, the Israeli Administrators. the U.S. Creditors' Committee, or other third parties; raise capital to satisfy claims, including Nortel's ability to sell assets to satisfy claims against Nortel; maintain R&D investments; realize full or fair value for any assets or business that are divested; utilize net operating loss carryforwards and certain other tax attributes in the future; avoid the substantive consolidation of NNI's assets and liabilities with those of one or more other U.S. Debtors; attract and retain customers or avoid reduction in, or delay or suspension of. customer orders as a result of the uncertainty caused by the Creditor Protection Proceedings; maintain market share, as competitors move to capitalize on customer concerns; operate Nortel's business effectively under the new organizational structure, and in consultation with the Canadian Monitor, and the U.S. Creditors' Committee and work effectively with the U.K. Administrators, French Administrator and Israeli Administrators in their respective administration of the EMEA businesses subject to the Creditor Protection Proceedings; continue as a going concern; actively and adequately communicate on and respond to events, media and rumors associated with the Creditor Protection Proceedings that could adversely affect Nortel's relationships with customers, suppliers, partners and employees; retain and incentivize key employees and attract new employees as may be needed; retain, or if necessary, replace major suppliers on acceptable terms and avoid disruptions in Nortel's supply chain; maintain current relationships with reseller partners, joint venture partners and strategic alliance partners; obtain court orders or approvals with respect to motions filed from time to time; resolve claims made against Nortel in connection with the Creditor Protection Proceedings for amounts not exceeding Nortel's recorded liabilities subject to compromise; prevent third parties from obtaining court orders or approvals that are contrary to Nortel's interests; reject, repudiate or terminate contracts; and (b) risks and uncertainties associated with: limitations on actions against any Debtor during the Creditor Protection Proceedings; the values, if any, that will be prescribed pursuant to any court approved plan to outstanding Nortel securities and, in particular, that Nortel does not expect that any value will be prescribed to the NNC common shares or the NNL preferred shares in any such plan; the delisting of NNC common shares from the NYSE; and the delisting of NNC common shares and NNL preferred shares from the TSX; and (ii) risks and uncertainties relating to Nortel's business including: the sustained economic downturn and volatile market conditions and resulting negative impact on Nortel's business, results of operations and financial position and its ability to accurately forecast its results and cash position; cautious capital spending by customers as a result of factors including current economic uncertainties; fluctuations in foreign currency exchange rates; any requirement to make larger contributions to defined benefit plans in the future; a high level of debt, arduous or restrictive terms and conditions related to accessing certain sources of funding; the sufficiency of workforce and cost reduction initiatives; any negative developments associated with Nortel's suppliers and contract manufacturers including Nortel's reliance on certain suppliers for key optical networking solutions components and on one supplier for most of its manufacturing and design functions; potential penalties, damages or cancelled customer contracts from failure to meet contractual obligations including delivery and installation deadlines and any defects or errors in Nortel's current or planned products; significant competition, competitive pricing practices, industry consolidation, rapidly changing technologies, evolving industry standards, frequent new product introductions and short product life cycles, and other trends and industry characteristics affecting the telecommunications industry; any material, adverse affects on Nortel's performance if its expectations regarding market demand for particular products prove to be wrong; potential higher operational and financial risks associated with Nortel's international operations; a failure to protect Nortel's intellectual property rights; any adverse legal judgments, fines, penalties or settlements related to any significant pending or future litigation actions; failure to maintain integrity of Nortel's information systems; changes in regulation of the Internet or other regulatory changes; and Nortel's potential inability to maintain an effective risk management strategy.

For additional information with respect to certain of these and other factors, see Nortel's Annual Report on Form 10-K, Quarterly Reports on Form 10-Q and other securities filings with the SEC. Unless otherwise required by applicable securities laws, Nortel disclaims any intention or obligation to update or revise any forward-looking statements as a result of new information, future events or otherwise.

Nortel

*Nortel, the Nortel logo and the Globemark are trademarks of Nortel Networks

**Contacts for Press and Analysts:**

Jamie Moody
972-684-7167
moodyjam@nortel.com

Additional Media & Analyst Contacts

Copyright © Nortel Networks 1999 - 2006. All Rights Reserved

**APPENDIX E – HWT TRUST AGREEMENT**

THIS AGREEMENT made as of the 1st day of January, 1980.

B E T W E E N:

NORTHERN TELECOM LIMITED,
a corporation incorporated under
the laws of Canada, and having
its Registered Office in the
City of Montreal, Province of
Quebec,

(hereinafter referred to as the
"Corporation")

A N D:

MONTREAL TRUST COMPANY,
a company incorporated pursuant
to the laws of Quebec and having
its Head Office at the City of
Montreal, therein,

(hereinafter referred to as the
"Trustee")

WHEREAS:

1.    The Corporation has established for the benefit of
certain of its employees and the employees of such affiliated or
subsidiary corporations as the Corporation may designate, certain
Health and Welfare plans, and such other similar plan or plans as
the Corporation may from time to time place in effect, as
follows:

a)    a Health Care Plan;

b)    a Management Long Term Disability Plan;

c)    a Union Long Term Disability Plan;

d)    a Management Survivor Income Benefits Plan;

e)    a Management Short Term Disability Plan;

2

1): **Group Life Insurance Plan**:

all of which are hereinafter collectively referred to as the "Health and Welfare Plan".

2. To give effect to the Health and Welfare Plan it is necessary to establish a trust fund to be known as the "Health and Welfare Trust".

Now therefore in consideration of the premises and the mutual covenants herein contained the Corporation and the Trustee, hereby covenant and agree as follows:

ARTICLE I - DEFINITIONS

1. The term "Trustee" shall mean the Trustee herein named its successors and assigns and shall include the person, legal entity or corporation to whom the Trustee may delegate such powers as are necessary for the sound and efficient administration of the Trust Fund.

2. The term "Benefits" as used herein shall mean payment benefits as determined under the Health and Welfare Plan.

3. The term "Eligibility Requirements" as used herein shall mean the rules, regulations and procedures established from time to time by the Corporation for determining the eligibility of employees for benefits.

4. The term "Employees" shall mean those active and retired employees of the Corporation and

3.

designated affiliated or subsidiary corporations
which have adopted the Health and Welfare Plan,
including dependents as defined in Schedule A, on
whose behalf contributions are or have been made
to the Trust Fund and who are eligible for
benefits under the Health and Welfare Plan.

5. The term "Employer's Contribution" as used herein
shall mean payments required to be made by the
Corporation and by designated affiliated or
subsidiary corporations to the Trust Fund to
enable the Trustee to discharge the obligations
arising under the Health and Welfare Plan.

6. The term "Trust Fund" as used herein shall mean
all of the assets of the Health and Welfare
Trust" including all funds received by way of
contributions from the Corporation and those of
its designated affiliated or subsidiary
corporations in accordance with the provisions of
the Health and Welfare Plan and of this Trust
Agreement, and all Employees' contributions
together with all profits, increments, and
earnings thereon.

ARTICLE II - TRUST FUND:

1. The Trust Fund is created for the purpose of
providing the Health and Welfare Plan benefits
for the benefit of the Employees.

2. All payments made to the Trustee from time to
time by the Corporation and designated affiliated
or subsidiary corporations and by the employees,
together with all profits, increments and

4

earnings thereon, shall be irrevocable and
constitute upon receipt by the Trustee, the Trust
Fund to be administered by the Trustee in
accordance with the terms of this Trust
Agreement, the Health and Welfare Benefit Plan
and the Eligibility Requirements.

3.    The Trustee shall from time to time, on the
written directions of an officer of the
Corporation so designated by its Board of
Directors, or failing such designation, by the
Secretary, of the Employees' Benefit Committee of
the Corporation, or a Plan Administrator
appointed by the Corporation, make payments out
of the Trust Fund to such persons, in such manner and
in such amounts as may be specified in such
directions to the Trustee.  In each instance, the
written directions shall be deemed to include a
certification to the Trustee that such directions
and the payments to be made pursuant thereto are
in accordance with the terms of the Health and
Welfare Plan, which certification shall con-
stitute full and complete protection to the
Trustee in complying with such directions.

ARTICLE III -- TRUSTEE

1.    The Trustee, who shall also be known as the
"Trustee of the Health and Welfare Trust", hereby
accepts the trust created by the Trust Agreement
and agrees to hold, invest, distribute and
administer the Trust Fund in accordance with the

2

terms and conditions of the Health and Welfare Plan and this Trust Agreement.

2.  The Trustee is authorized and empowered:

a)  To sell or otherwise dispose of any property held by it;

b)  To exercise all voting and other rights in respect of any stocks, bonds, properties or other investments held in the Trust Fund;

c)  To execute all documents of transfer and conveyances that may be necessary or appropriate to carry out the powers herein granted;

d)  To make payments out of the Trust Fund and to reimburse itself for disbursements incurred pursuant to the exercise of the authorities and powers herein set forth, unless paid by the Corporation;

e)  All monies, securities for money and other assets from time to time held by the Trustee may be in negotiable form or recorded or registered in the name of the Trustee or in the name of its nominee;

f)  When instructed to do so by the Corporation, to commence, maintain, defend, adjust and settle suits and legal proceedings and to represent the Trust Fund at any such suits or proceedings at law or otherwise for the enforcement or realization of any investment;

6

provided that the Trustee shall not be obliged or required to do so unless it has been first indemnified to its satisfaction against all expenses and liabilities sustained or anticipated by it, and the Corporation hereby agrees so to indemnify the Trustee.

g) In general, in the carrying out of its duties and responsibilities under the Trust Agreement to exercise the general powers accorded by law to trustees.

h) The Trustee shall hold, invest and reinvest the principal and income. The Trustee may keep the investments of the Trust Fund wholly or partly, in its principal office or in any one or more of its branches in any Province of Canada. Unless otherwise directed by the Corporation the Trustee shall make only such investments as comply with the limitations and restrictions imposed by applicable federal and provincial laws and regulations respecting the investments of trust funds.

Notwithstanding the foregoing, the Corporation may, at any time, or from time to time, direct the Trustee as to specific or general investment of the Trust Fund, and the Trustee shall comply with such directions.

Whenever the Trustee is required or authorized to take any action pursuant to the provisions of this paragraph upon the request, direction or authorization of the

/8

Corporation, such request, direction or authorization shall be a sufficient protection to the Trustee if contained in a writing signed by any person authorized by resolution of the Corporation's Board of Directors to sign such a writing.  The Corporation will indemnify and hold harmless the Trustee of and from any liability or expense incurred by it arising out of any payment out of or disposition of the Trust Fund made by the Trustee pursuant to any such request, direction or authorization of the Corporation;

i)   The Trustee may hold such part of the Trust Fund uninvested as the Trustee may deem advisable in the best interests of the Trust Fund for the proper administration thereof.

j)   The Trustee may keep such portion of the Trust Fund, as may from time to time be deemed by it to be in the best interests of the Trust Fund, on deposit in a chartered bank or Government Savings Bank in Canada at such rate of interest, if any, as may be allowed thereon, or on demand deposit at an agreed interest rate with any Trust Company (including the Trustee) then licensed under the laws of Canada or of any Province thereof to carry on business as such.

k)   Notwithstanding any other provision of this Agreement and subject to clause 2 (h) hereof, the Trustee will invest and reinvest all or such portion of the Trust Fund as the

B'

Corporation may from time to time direct in
writing in the Northern Telecom Group Trust
Fund established by the Company and the
Trustee pursuant to an Agreement made and
entered into as of the 1st day of January,
1980.

1)  (i)  the Trustee shall, in accordance with
        the written direction of the Corporation
        from time to time invest all or any part
        of the Trust Fund jointly with assets
        belonging to any other trust fund's
        maintained under a pension plan
        maintained with the Trustee by the
        Corporation or by any Corporation
        associated, subsidiary to or affiliated
        with the Corporation, and may jointly
        invest and reinvest on behalf of the
        Trust Fund and such other trust or
        trusts, allocating undivided shares or
        interests in such investments or
        reinvestments to the two or more trusts
        in accordance with their respective
        interests.    To facilitate the
        administration of such joint investments
        or reinvestments, the Trustee shall
        identify the undivided shares or
        interests by way of "units" which shall
        represent the undivided ownership
        interest of each participating trust
        fund in the jointly owned investments;

    (ii) the Trustee shall invest and reinvest
        all or any portion of the Trust Fund in
        accordance with the written direction of

9

the Company in any "Pooled Fund" which phrase shall mean in this Agreement any pooled trust fund maintained by the the Trustee or one of its associated or affiliated corporations licensed to do business in Canada as a Trustee. Such written direction shall specify that such portion of the Trust Fund to be invested in such Pooled Fund shall be invested as part of one particular section of the Pooled Fund or as parts of two or more sections of the Pooled Fund in such proportions as is set out in such direction, failing which specification the same shall be invested as part of one particular section of the Pooled Fund in such proportion as the Trustee deems advisable.

m) The Trustee may, with the consent of the Corporation, borrow money in such amounts and upon such terms and conditions as it shall deem advisable and pledge any securities or other property for the repayment of any such loan.

n) The expenses incurred by the Trustee in the performance of its duties, and such compensation to the Trustee as may be agreed upon in writing from time to time between the Corporation and the Trustee, shall be paid by the Corporation. All taxes of any and all kinds whatsoever that may be levied upon or in respect of the Trust Fund shall be paid

10

from or be the responsibility of the Trust
Fund.

o)  The Trustee shall not be liable for the
    making, retention, or sale, in good faith, of
    any investment or reinvestment made by it as
    herein provided, nor for any loss to or
    diminution of the Trust Fund, except due to
    the negligence, wilful misconduct or lack of
    good faith of the Trustee, its servants,
    agents or employees.

p)  The Trustee shall keep accurate and detailed
    accounts of all investments and transactions
    made by it pursuant to this Agreement and
    shall keep separate records for each of the
    separate Plans.  The accounts and records
    relating thereto shall be open to inspection
    at all reasonable times by any person
    designated by the Corporation.  Within ninety
    (90) days following the close of each fiscal
    year of the Trust Fund, or within ninety (90)
    days after the removal or resignation of the
    Trustee as provided for in paragraph (g)
    hereof, the Trustee shall file with the
    Corporation a statement setting forth all
    investments and cash transactions effected by
    it during such fiscal year or during the
    period from the close of the last fiscal year
    to the date of such removal or resignation.
    Upon the expiration of ninety (90) days after
    the date of filing such annual or other
    statement, but subject to the provisions of
    paragraph (q) hereof, the Trustee shall be
    released and discharged from all liability

11

and accountability to anyone with respect to
its acts and transactions during the period
covered by the statement. The Trustee shall
from time to time make such reports and
furnish such information concerning the trust
to the Corporation as the Corporation may in
writing request.

(q) The Trustee may be removed by the Corporation
at any time upon ninety (90) days notice in
writing to the Trustee. The Trustee may
resign at any time upon ninety (90) days
notice in writing to the Corporation. Upon
such removal or resignation of the Trustee,
the Corporation shall, within said ninety
(90) day period, appoint a successor trustee
or trustees who shall have the same powers
and duties as those conferred upon the
Trustee hereunder and, upon acceptance of
such appointment by the successor trustee or
trustees, the Trustee shall assign, transfer
and pay over to such successor trustee or
trustees the funds and properties and
accounts then constituting the Trust Fund.
The Trustee is authorized however, to reserve
such sum of money, as may at such time be
reasonably owing to it for payment of its
fees and expenses and any balance of such
reserve remaining after the payment of such
fees and expenses shall be paid over to the
successor trustee or trustees within thirty
(30) days after the date of such removal or
resignation.

(r) The Trustee shall not be bound to act in

12

accordance with any direction or request of
the Corporation or of its Board of Directors
until a duly authenticated copy of the
instrument or resolution containing such
direction or request shall have been
delivered to the Trustee, and the Trustee
shall be empowered to act upon and shall be
fully protected by the Corporation in acting
in accordance with any direction or request
of the Corporation upon receipt of any such
copy purporting to be authenticated and
believed by the Trustee to be genuine. Any
direction, request, certificate or other
instrument to be made or given by the
Corporation under any of the provisions
hereof shall, unless otherwise provided
herein, be deemed sufficiently authenticated
if certified by the Secretary or an Assistant
Secretary of the Corporation.

d) The Trustee may appoint a qualified person,
firm or corporation to act as administrator
of the Trust Fund to determine on a sound
actuarial basis the amounts of Employer's
contributions required in order to fund
adequately the Health and Welfare Plan and to
advise and carry out administrative pro-
cedures in accordance with the Health and
Welfare Plan and the Eligibility
Requirements.

ARTICLE IV - EMPLOYER's CONTRIBUTIONS

1. The Corporation and its designated affiliated or
subsidiary corporations agree to make Employer's

13

contributions to the Trust Fund in amounts sufficient to pay any claims which may be asserted against the Trust Fund as a result of the administration of the Health and Welfare Plan, and as may otherwise be required from time to time by the Trust for the purposes of the Health and Welfare Plan, as determined by the Trustee on a sound actuarial basis.

2.    The Trustee shall determine or cause to be determined, on a sound actuarial basis from time to time, and in any event, once every calendar year, the level of contributions to the Trust Fund necessary to fund adequately the Health and Welfare Plan.

3.    Subject to paragraphs (1) and (2) hereof, the Corporation and its designated affiliated or subsidiary corporations shall be responsible for the adequacy of the Trust Fund to meet and discharge any and all payments and liabilities under the Health and Welfare Plan.

ARTICLE V - NOTICES

1.    Any notice provided for herein to be given by one party to another shall be in writing and shall be effectively given if delivered personally or by telegram or prepaid registered mail addressed to the Trustee at:

Montreal Trust Company
Pension Trust Administration
Place Ville Marie
Montreal, Quebec   H3B 3L6

14

and if to the Corporation at:

Northern Telecom Limited
Box 458, Station A
Mississauga, Ontario L5A 3A2

Attention: Director, Corporate Compensations

Any notice so given shall be deemed to have been
given if delivered personally or given by prepaid
registered mail on the third business day
immediately following the date of mailing of such
notice.

## ARTICLE VI - AMENDMENT AND TERMINATION

1.  This Trust Agreement may be amended in any
respect from time to time by mutual agreement of
the Corporation and the Trustee except that no
amendment shall divert the Trust Fund or any part
thereof so constituted immediately prior to such
amendment to a purpose other than the provision
of benefits as herein defined.

2.  Upon sixty (60) days prior written notice to the
Trustee, the Corporation may terminate its
obligation to make Employer's contributions in
respect of benefits after the date of written
notice to the Trustee (hereinafter called the
"Notice of Termination"). Upon receipt of the
Notice of Termination the Trustee shall within
one hundred twenty (120) days determine and
satisfy all expenses, claims and obligations
arising under the terms of the Trust Agreement
and Health and Welfare Plan up to the date of the
Notice of Termination. The Trustee shall also

15

determine upon a sound actuarial basis, the
amount of money necessary to pay and satisfy all
future benefits and claims to be made under the
Plan in respect to benefits and claims up to the
date of the Notice of Termination.  The
Corporation and the designated affiliated or
subsidiary corporations shall be responsible to
pay to the Trustee sufficient funds to satisfy
all such expenses, claims and obligations, and
such future benefits and claims.  The final
accounts of the Trustee shall be examined and the
correctness thereof ascertained and certified by
the auditors appointed by the Trustee.  Any funds
remaining in the Trust Fund after the satisfac-
tion of all expenses, claims and obligations and
future benefits and claims, arising under the
terms of the Trust Agreement and the Health and
Welfare Plan shall revert to the Corporation.

ARTICLE VII.- GOVERNING LAW AND SEVERABILITY.

1.     This Trust Agreement and all amendments thereto
       shall be administered, construed and enforced in
       accordance with the laws of the Province of
       Ontario.

2.     If any provision of this Trust Agreement, the
       Health and Welfare Plan, the Eligibility
       Requirements or the rules and regulations made
       pursuant thereto, or any action taken in the
       administration of the funds of the Trust Fund or
       the Health and Welfare Plan are held to be
       illegal or invalid for any reason, such
       illegality or invalidity shall not affect the
       remaining portions of this Trust Agreement, the

16

Health and Welfare Plan, the Eligibility
Requirements, or the rules and regulations made
pursuant thereto unless such illegality or
invalidity prevents accomplishment of the
purposes of the trust hereby created. In the
event of any such holding, the parties will
immediately commence negotiations to remedy any
such defect.

## ARTICLE VIII - CLAIMS BY BENEFICIARIES

1.  No person entitled to benefits under the Plan
shall have any claim against the Trustee or the
Trust Fund except by or through the Corporation,
and the Corporation shall indemnify and save the
Trustee harmless from any such claim including
the costs of defense.

## ARTICLE IX - MISCELLANEOUS

1.  Wherever in this Agreement the word "Corporation"
is used, it shall be deemed to mean and shall
include the Corporation's successor and any other
Corporation with which the Corporation may have
amalgamated, whether under its present name or
any other name.

To the extent required by any federal or
Provincial law or regulation that are or might be
promulgated from time to time, the Corporation
shall be the administrator of the Plan and the
duties of the Corporation as such administrator
hereby are delegated to the Trustee to the extent
provided in this Agreement.

17

A copy of the Health and Welfare Plan initialled
by the Parties may be annexed to this Agreement
and may be amended from time to time and when so
annexed shall form part hereof, but no terms or
provisions of this Agreement shall be construed
or interpreted as imposing upon the Trustee any
obligation to see to the administration of or the
carrying out of any of the terms or provisions of
the Plan.

Any corporation resulting from any merger or
consolidation to which the Trustee may be a party
or succeeding to the trust business of the
Trustee, or to which substantially all the trust
assets of the Trustee may be transferred while
the Trustee continues to act as Trustee hereunder
shall be the successor to the Trustee hereunder
without any further act or formality with like
effect as if such successor trustee had origin-
ally been named trustee herein.

IN WITNESS WHEREOF, the parties have caused this
Agreement to be executed by their respective officers thereto
duly authorized and their corporate seals to be hereunto affixed
and attested as of this 1st day of January, 1980.

NORTHERN TELECOM LIMITED

Per: _____
        Vice President

Per: _____
        Secretary

MONTREAL TRUST COMPANY

Per: _____

Per: _____