IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

---------------------------------------------------------X
                                              :
*In re*                                       :    Chapter 11
                                              :    Case No. 09-10138 (KG)
Nortel Networks Inc., et al.,[1]              :    Jointly Administered
                                              :
                    Debtors                   :    **Hearing Date: Feb. 26, 2010 at 10:00 a.m. (ET)**
                                              :    **RE: D.I. 2441**
---------------------------------------------------------X

## JOINDER OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS TO THE DEBTORS' MOTION FOR ENTRY OF AN ORDER ENFORCING THE AUTOMATIC STAY AGAINST CERTAIN CLAIMANTS WITH RESPECT TO THE UK PENSION PROCEEDINGS

The Official Committee of Unsecured Creditors (the "Committee") of Nortel Networks Inc., et al. (the "Debtors" or, collectively, the "Company") submits this joinder (the "Joinder"), to the Debtors' Motion for Entry of an Order Enforcing the Automatic Stay Against Certain Claimants with Respect to the UK Pension Proceedings (the "Stay Motion").[2] In support of this Joinder, the Committee respectfully submits as follows:

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtors' tax identification number, are: Nortel Networks Inc. (6332); Nortel Networks Capital Corporation (9620); Nortel Altsystems Inc. (9769); Nortel Altsystems International Inc. (5596); Xros, Inc. (4181); Sonoma Systems (2073); Qtera Corporation (0251); Coretek, Inc. (5722); Nortel Networks Applications Management Solutions, Inc. (2846); Nortel Networks Optical Components, Inc. (3545); Nortel Networks HPOCS Inc. (3546); Architel Systems (U.S.) Corporation (3826); Nortel Networks International Inc. (0358); Northern Telecom International Inc. (6286); Nortel Networks Cable Solutions Inc. (0567); and Nortel Networks (CALA) Inc. (4226).

[2] Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Stay Motion.

RLF1 3541832v.1

I.    **BACKGROUND**

1.    On January 14, 2009, each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code (the "Chapter 11 Proceeding") in the United States Bankruptcy Court for the District of Delaware (the "Court").[3]

2.    The Debtors are operating their businesses and managing their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. On January 15, 2009, the Court entered an order for the joint administration of these cases pursuant to Bankruptcy Rule 1015(b) for procedural purposes only.

3.    On January 14, 2009, the Debtors' ultimate corporate parent, Nortel Networks Corporation, together with Nortel Networks Limited and certain of their Canadian affiliates (collectively, the "Canadian Debtors") commenced a proceeding before the Ontario Superior Court of Justice (the "Canadian Court") for a plan of compromise or arrangement under Canada's Companies' Creditors Arrangement Act. The Canadian Debtors continue to operate their businesses and manage their properties under the supervision of the Canadian Court and Ernst & Young Inc. as monitor.

4.    In addition, on January 14, 2009, after the filing by the Debtors, the High Court of Justice in England placed nineteen of Nortel's European affiliates (collectively, the "EMEA Debtors"),[4] including Nortel Networks UK Limited ("NNUK"), into administration under the

---

[3] On July 14, 2009, Debtor Nortel Networks (CALA) Inc. ("NN CALA") filed its voluntary petition for relief under chapter 11 of the Bankruptcy Code. On July 17, 2009, the Court entered orders approving the joint administration and consolidation of NN CALA's chapter 11 case with the other Debtors' chapter 11 cases for procedural purposes [D.I. 1098] and applying to NN CALA certain previously entered orders in the other Debtors' chapter 11 cases [D.I. 1099].

[4] The EMEA Debtors include the following entities: NNUK, Nortel Networks S.A.; Nortel Networks (Ireland) Limited; Nortel GmbH; Nortel Networks France S.A.S.; Nortel Networks Oy; Nortel Networks Romania SRL; Nortel Networks AB; Nortel Networks N.V.; Nortel Networks S.p.A.; Nortel Networks B.V.; Nortel Networks Polska Sp. z.o.o.; Nortel Networks Hispania, S.A.; Nortel Networks (Austria) GmbH; Nortel Networks, s.r.o.; Nortel Networks Engineering Service Kft; Nortel Networks Portugal S.A.; Nortel Networks Slovensko, s.r.o.; and Nortel Networks International Finance & Holding B.V.

control of certain individuals from Ernst & Young LLC. On June 8, 2009, NNUK filed petitions in this Court for recognition of the English insolvency proceedings (the "English Proceedings") as foreign main proceedings under chapter 15 of the Bankruptcy Code. In light of the need for coordination in the proceedings, on June 26, 2009, this Court entered an order recognizing the English Proceedings as foreign main proceedings under chapter 15 of the Bankruptcy Code.

5.  On January 15, 2009, this Court entered an order pursuant to Bankruptcy Rule 1015(b) that provided for the joint administration of these cases (other than that of NN CALA) and for consolidation for procedural purposes only. In re Nortel Networks Inc., et al., No. 09-10138 (KG) (Bankr. D. Del. Jan. 15, 2009) [D.I. 36].

6.  On January 22, 2009, pursuant to section 1102 of the Bankruptcy Code, the United States Trustee for the District of Delaware appointed the Committee. The Committee currently consists of four members.[5]

7.  On June 9, 2009, to resolve, on an interim basis, certain allocation and post-petition cross-affiliate claims issues, pending the final allocation of the proceeds of the planned sales of their businesses, the Debtors, the Canadian Debtors, and the EMEA Debtors, including NNUK (by the Joint Administrators), entered into an Interim Funding and Settlement Agreement (the "IFSA"). The Court approved the IFSA on June 29, 2009. Pursuant to Section 12 of the IFSA, the parties agreed that the proceeds of any sale of their material assets (less taxes and costs), would be held in escrow until the parties either reached a consensual allocation of the proceeds, or:

> "in the case where the Selling Debtors fail to reach agreement, determination by the relevant dispute resolver(s) under the terms of the Protocol … applicable to

---

[5] The Committee is currently comprised of the following entities: Flextronics Corporation (Chairperson); Law Debenture Trust Company of New York; Pension Benefit Guaranty Corporation; and The Bank of New York Mellon, as indenture trustee.

3

RLF1 3541832v.1

the Sale Proceeds . . .which Protocol shall provide binding procedures for the allocation of Sales Proceeds...."

8. As per the escrow agreements entered into by the parties, the proceeds of the sales that have been consummated thus far are being held in escrow accounts located in the United States. In addition, all parties agreed that New York law would govern the IFSA, and consented to the jurisdiction of the U.S. and Canadian courts for all legal proceedings concerning the IFSA, other than proceedings against the Joint Administrators in their personal capacities, which were required to be brought in the U.K. with U.K. law governing. (IFSA ¶¶ 16-17.) In accordance with the IFSA, the parties have engaged in extensive negotiations regarding the terms of an allocation protocol (the "Allocation Protocol") to govern the distribution of proceeds of the sales.

9. On September 30, 2009, NNUK, on behalf of itself, the Joint Administrators, and the other EMEA Debtors, filed proofs of claim against NNI and the other Debtors (the "NNUK Claim") "in respect of any heretofore unknown, unliquidated, or unmatured claim or claims ... against Nortel Networks Inc. or its affiliated debtors in these cases."

10. On September 30, 2009, the Nortel Networks UK Pension Trust Limited (as trustee of the Nortel Networks UK Pension Plan) (the "U.K. Pension Trustee") and the Board of the Pension Protection Fund (the "PPF," together with the U.K. Pension Trustee, the "Claimants") jointly filed proofs of claim against the Debtors[6] (collectively, the "U.K. Pension Claim").

11. The U.K. Pension Claim is based on allegations that (i) the NNUK Pension Plan is under-funded by an estimated amount alternatively stated to be £2.1 billion or $3.1 billion; and (ii) the U.K. Pensions Regulator ("TPR") may seek to require certain of the Debtors, as well as certain non-U.S. Nortel entities, to provide financial support for the NNUK Pension Plan.

---

[6] On January 25, 2010, the U.K. Pension Trustee and PPF jointly filed a proof of claim against NN CALA.

4

RLF1 3541832v.1

12.     By letters dated January 13, 2010, addressed to NNI and NN CALA (along with certain non-U.S. Nortel entities), TPR purported to issue a warning notice (the "Warning Notice") initiating an administrative proceeding regarding the alleged shortfall in the funding of the NNUK Pension Plan (the "U.K. Administrative Proceeding"). The Warning Notice provides, in summary, that TPR believes it is reasonable to issue a financial support direction (an "FSD") against the addressees (the "Targets") and references certain documents and witness statements as support for this determination. It further provides, inter alia, that (i) the "relevant time" on which to measure the NNUK Pension Plan's funding position for the purpose of deciding whether to issue an FSD is June 30, 2008; and (ii) TPR believes it is reasonable to issue an FSD against the Targets, including NNI and NN CALA, for various reasons including TPR's analysis of certain benefits conveyed among affiliates. The Warning Notice also reviews TPR's conclusion that benefits provided by certain affiliates to certain other affiliates provides a basis for issuing an FSD. (Ray Dec. ¶ 10)

13.     TPR has indicated that the Targets, as well as the U.K. Pension Trustee and PPF, may respond in writing to the Warning Notice by midday on March 1, 2010, and that TPR's Determinations Panel (the "Determinations Panel") will consider all responses. (Ray Dec. ¶ 12.)

14.     On February 18, 2010, the Debtors filed the Stay Motion [D.I. 2441], the Declaration of Lisa M. Schweitzer in Support of the Stay Motion [D.I. 2443], the Declaration of John Ray in Support of the Stay Motion (the "Ray Dec.") [D.I. 2444], and the Declaration of Richard Hitchcock in Support of the Stay Motion [D.I. 2445].

15.     On February 18, 2010, the Debtors also filed a Motion to Shorten Notice For Hearing of the Stay Motion [D.I. 2442], and that same day, the Court entered an order granting the relief requested therein [D.I. 2449], scheduling consideration of the Stay Motion for the

5

RLF1 3541832v.1

hearing to be held on February 26, 2010 at 10:00 a.m., and requiring that objections, if any, to the Stay Motion be filed and served by no later than February 24, 2010 at 12:00 p.m.

## II. JOINDER

### A. The Committee Joins in the Arguments Made by the Debtors in the Stay Motion.

16. Based on the facts available to the Committee, the Committee agrees with the arguments set forth in the Stay Motion and files this Joinder in support thereof.

### B. The U.S. Creditors Will Be Harmed Unless the Issue of the Relative Benefits Conferred Among the Debtors, Canadian Debtors, and the EMEA Debtors is Determined in a Single Unified Cross-Jurisdictional Forum, as Part of the Allocation Protocol Process.

17. The violation of the automatic stay that would result from the Claimants' participation in the U.K. Administrative Proceeding would be especially prejudicial to the U.S. creditors because it would lead to piecemeal litigation of issues that are integral to the Chapter 11 Proceeding in a foreign administrative proceeding, instead of the relative benefits conferred among the U.S., Canadian, and EMEA debtors being addressed all at once in a single forum, pursuant to the allocation process provided for in the Allocation Protocol.

18. As the Debtors note in the Stay Motion, the allocation of the proceeds of the Debtors' post-petition asset sales will determine the amounts available for distribution to creditors located in various jurisdictions, based on many factors, including, but not limited to, the factual issue of the respective contributions of the various Nortel entities to the value of the assets sold. (Stay Motion ¶ 64). Based upon the allegations contained in the U.K. Pension Claim and the Warning Notice, two key issues to be decided in determining the "reasonableness" of imposing an FSD against the Targets are (i) the financial condition of each of the Targets and (ii) the value of any direct or indirect benefit provided by NNUK to each of the Targets.

19. It will be impossible to meaningfully consider the financial condition of the Targets in the U.K. Administrative Proceeding prior to the determination of the allocation of the proceeds from the asset sales. The Nortel entities have already obtained billions of dollars in proceeds from such asset sales, and they anticipate obtaining hundreds of millions of dollars in additional proceeds from ongoing sales processes. The allocation of these substantial proceeds will be the primary determinant of the financial condition of the various Targets since such proceeds represent a substantial portion of the assets of the Targets.

20. The U.K. Administrative Proceeding will apparently focus on whether the Targets received a direct or indirect benefit from NNUK, but not on the totality of the complex interrelationships among all of the Nortel entities which will be considered in the allocation process. Moreover, in the U.K. Administrative Proceeding, the benefit issue, along with the financial condition of each of the Targets, would proceed before the Determinations Panel within a very short timeframe, which will not allow the Debtors to gather and analyze all of the relevant facts regarding transfer pricing, ownership of intellectual property, internal research and development allocation and individual asset values. (Ray Dec. ¶ 20).

21. In contrast, the allocation process pursuant to the Allocation Protocol will provide for thorough fact gathering and analysis and for consideration, negotiation, and, potentially, litigation of the relative benefits conferred among the Debtors, the Canadian Debtors, and the EMEA Debtors (including NNUK). The implementation of such a protocol will allow the issues among the various Nortel entities to be addressed in a single, unified cross-jurisdictional forum. Thus, the liquidation of the U.K. Pension Claim should await the conclusion of the allocation process pursuant to the Allocation Protocol.

22. Forcing the Debtors to litigate isolated issues separately in the U.K. Administrative Proceeding undermines the purpose of the Allocation Protocol and would force

7

the Debtors to litigate similar issues in multiple forums. Such multiple proceedings would create unnecessary, duplicative litigation expenses for the Debtors and their estates, distract the Debtors' focus from the Allocation Protocol proceedings, and result in issues which are critical to the outcome of the Chapter 11 Proceeding and to the creditors of these estates being adjudicated in a foreign administrative forum.

### C. The U.K. Pension Claim Should Be Adjudicated Pursuant to the Procedures Established by U.S. Courts.

23. By filing proofs of claim with this Court, the Claimants have submitted to this Court's jurisdiction to adjudicate the U.K. Pension Claim. In the event that an objection to the U.K. Pension Claim were to be filed by the Debtors, the Committee, or any other party in interest, such objection should be heard and determined by this Court and not in the U.K. Administrative Proceeding. To the extent that the U.K. Pension Claim is still contingent after the allocation process pursuant to the Allocation Protocol has concluded, the Bankruptcy Code provides for the estimation of contingent claims.[7]

---

[7] Pursuant to section 502(c) of the Bankruptcy Code, "any contingent or unliquidated claim, the fixing or liquidation of which, as the case may be, would unduly delay the administration of the case" shall be estimated for purposes of allowance. 11 U.S.C. §502(c). The Third Circuit has stated that, for purposes of estimation, bankruptcy judges are to use "whatever method is best suited to the particular contingencies at issue.... [W]here there is sufficient evidence on which to base a reasonable estimate of the claim, the bankruptcy judge should determine the value." *Bittner v. Borne Chemical Co., Inc.*, 691 F.2d 134, 135 (3d Cir. 1982).

### III.    CONCLUSION

24.    For all of the reasons contained in the Stay Motion and the foregoing reasons, the Committee respectfully requests that this Court (i) grant the relief requested in the Stay Motion, and (ii) grant the Committee such other and further relief as this Court deems just and proper.

Dated: February 24, 2010
New York, New York

Respectfully submitted,

By: _____
Mark D. Collins (No. 2981)
Christopher M. Samis (No. 4909)
Drew G. Sloan (No. 5069)
Richards, Layton & Finger, P.A.
One Rodney Square
920 North King Street
Wilmington, DE 19801
Tel.: (302) 651-7700

and

Fred S. Hodara (*pro hac vice*)
David H. Botter (*pro hac vice*)
Akin Gump Strauss Hauer & Feld LLP
One Bryant Park
New York, NY 10036
Tel.: (212) 872-1000

*Co-counsel to the Committee*

RLF1 3541832v.1