## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

```
-------------------------------------------------- x
In re:                                             :   Chapter 11
                                                   :
                                                   :   Case No. 09-10138 (KG)
Nortel Networks Inc., et al.,[1]                   :   (Jointly Administered)
                                                   :
                      Debtors.                     :   Re: Docket No. 2441
                                                   :
                                                   :   Hearing Date: February 26, 2010 at 10:00 a.m.
                                                   :   Objection Deadline: February 24, 2010 at 12:00 p.m.
-------------------------------------------------- x
```

## OBJECTION OF THE TRUSTEE OF NORTEL NETWORKS UK PENSION PLAN AND THE BOARD OF THE PENSION PROTECTION FUND TO DEBTORS' MOTION FOR ENTRY OF AN ORDER ENFORCING THE AUTOMATIC STAY AGAINST CERTAIN CLAIMANTS WITH RESPECT TO THE U.K. PENSION PROCEEDINGS

The Trustee (the "Trustee") of Nortel Networks UK Pension Plan (the "Plan") and the

Board of the Pension Protection Fund (the "PPF") hereby respectfully object to the Debtors'

Motion for Entry of an Order Enforcing the Automatic Stay Against Certain Claimants with

Respect to the U.K. Pension Proceedings (the "Motion"). In support of this objection, the

Trustee and the PPF, by and through their undersigned counsel, respectfully state as follows:

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's tax identification number, are: Nortel Networks Inc. (6332), Nortel Networks Capital Corporation (9620), Nortel Altsystems Inc. (9769), Nortel Altsystems International Inc. (5596), Xros, Inc. (4181), Sonoma Systems (2073), Qtera Corporation (0251), CoreTek, Inc. (5722), Nortel Networks Applications Management Solutions Inc. (2846), Nortel Networks Optical Components Inc. (3545), Nortel Networks HPOCS Inc. (3546), Architel Systems (U.S.) Corporation (3826), Nortel Networks International Inc. (0358), Northern Telecom International Inc. (6286), Nortel Networks Cable Solutions Inc. (0567) and Nortel Networks (CALA) Inc. (4226).

**PRELIMINARY STATEMENT**

1.        The Debtors ask this Court for extraordinary relief.  They ask that the Court –

through the guise of a stated motion to enforce section 362 of the Bankruptcy Code – enjoin the

Trustee of a pension plan established under and governed by English law and the PPF, a

statutorily-created fund established to provide compensation to members of underfunded pension

plans, from participating in statutorily-mandated proceedings (the "U.K. Regulatory Procedure")

commenced by the Pensions Regulator (the "Pensions Regulator").  The Pensions Regulator is a

U.K. governmental agency charged with regulating the operations and administration of

occupational pension schemes in the U.K.  As part of the U.K. Regulatory Procedure, the

Pensions Regulator will decide whether to exercise its "moral hazard" powers and issue a

direction to one or more of the Debtors requiring them to submit a proposal to the Pensions

Regulator with respect to the elimination of the Plan's funding deficit.  The extraordinary relief

sought by the Debtors, if granted, would emasculate that process.  The Debtors' Motion should

be denied for myriad reasons.

2.        First, the Trustee and the PPF have not violated – and do not intend to violate –

the automatic stay.  The proceedings before the Pensions Regulator will serve only to fix and

liquidate any claim the Trustee and the PPF may have against any of the Debtors.  The Trustee

and the PPF acknowledge that any such claim will be allowed or disallowed exclusively by this

Court.  It was for that reason that the Trustee and the PPF submitted to the jurisdiction of this

Court by filing their proofs of claim in these cases pursuant to the Bar Date Orders (as defined

below) entered by the Court.  The Trustee and the PPF recognize and acknowledge that they are

prohibited by the automatic stay from attempting to enforce their claims against the Debtors

outside these chapter 11 cases.

3.        Second, the U.K. Regulatory Procedure falls squarely within the regulatory/police

power exception to the automatic stay contained in section 362(b)(4) of the Bankruptcy Code. Chief Judge Carey so held in In re Sea Containers Ltd., No. 06-11156 (KJC), 2008 WL 4296562 (Bankr. D. Del. Sept. 19, 2008) and no principled reason exists to depart from that holding here. The U.K. Regulatory Procedure constitutes an exercise of the Pensions Regulator's statutory "moral hazard" powers, designed to ensure, among other things, that U.K. employers and their affiliates comply with their pension obligations under U.K. law. The Pensions Regulator's exercise of its "moral hazard" powers in this case is intended to provide a powerful deterrent to other U.K. employers and their affiliates from disregarding their pension obligations. The Trustee and the PPF's participation in these proceedings does nothing to alter the proceedings' status as an exercise of regulatory/police powers by a governmental agency of a foreign sovereign. As such, they are excepted from the reach of the automatic stay.

4.      Third, the relief sought by the Debtors – enjoining the Trustee and the PPF from participating in the proceedings before the Pensions Regulator with respect to any Nortel entity, even non-U.S. Debtors – would require that the Court extend the automatic stay by application of its equitable powers under section 105(a) of the Bankruptcy Code. The Debtors are not entitled to that relief, as it would be procedurally improper to do so on this Motion and because the Debtors have failed to make the requisite showing to obtain an injunction under Rule 7065 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

5.      Fourth, the relief sought by the Debtors would, if granted, amount to the equivalent of an anti-suit injunction, effectively enjoining the proceedings before the Pensions Regulator through the guise of an injunction enjoining the Trustee and the PPF's participation in those proceedings. Sound principles of comity counsel against issuance of such an extraordinary injunction.

6.      Fifth, the relief sought by the Debtors would, if granted, be antithetical to the objectives of the Bankruptcy Code.  Foreign creditors such as the Trustee and the PPF would be discouraged from submitting to the jurisdiction of a U.S. bankruptcy court by filing proofs of claim against debtors here, as doing so would expose them to sanctions for violating the automatic stay based on nothing more than their participation in a statutorily-mandated proceeding initiated by a foreign governmental agency, such as the proceedings before the Pensions Regulator.  Instead, they would be encouraged to avoid the U.S. bankruptcy courts wholesale and to go "rogue," obtaining whatever relief they can elsewhere and levying or executing on a debtor group's assets outside the U.S.  A more counterproductive result from a public policy perspective is difficult to imagine.

7.      Last, the Debtors' contention that the proceedings before the Pensions Regulator will somehow impact the process being negotiated to determine the appropriate allocation of the proceeds of asset sales among the U.S., Canadian and other Nortel entities is without merit.  Inasmuch as the process being negotiated – a process that may not be agreed upon at any time soon, if ever – concerns the allocation of assets, it is not at all clear that the Debtors' liabilities within the group, no less to third parties like the Trustee and the PPF, will be a subject of that process.  In any event, even if they were, the Trustee and the PPF's claims are direct claims against one or more of the U.S. Debtors.  They are not derivative claims to be asserted by and through the Plan's sponsoring employer, Nortel Networks UK Limited ("NNUK"), against the U.S. Debtors.  As a result, the sale proceeds allocation process has no bearing on the fixing and liquidating of the Trustee and the PPF's claims, which under English law can only be accomplished through the proceedings before the Pensions Regulator.

## BACKGROUND

A.    **The Debtors**

8.    On January 14, 2009 (the "Petition Date"), the Debtors (other than Nortel

Networks (CALA) Inc. ("NN CALA")), filed voluntary petitions for relief under chapter 11 of

the Bankruptcy Code.[2]  On January 15, 2009, this Court entered an order directing that the

above-captioned chapter 11 cases be jointly administered and consolidated for procedural

purposes. [D.I. 36].

9.    The filing of the Debtors' chapter 11 petitions was part of a coordinated global

restructuring process that was undertaken by numerous entities across the Nortel group of

companies.  On January 14, 2009, the Debtors' ultimate corporate parent Nortel Networks

Corporation ("NNC") and certain of its Canadian affiliates (collectively, the "Canadian

Debtors") filed applications with the Ontario Superior Court of Justice (the "Canadian Court")

under the Companies' Creditors Arrangement Act (Canada) (the "CCAA"), seeking relief from

their creditors (collectively, the "Canadian Proceedings").  The Canadian Debtors continue to

manage their properties and operate their businesses under the supervision of the Canadian

Court.  The Canadian Court issued an order on January 14, 2009 recognizing these chapter 11

proceedings as a "foreign proceeding" under section 18.6 of the CCAA.[3]

10.    Also on January 14, 2009, nineteen of the Debtors' European affiliates, including

NNUK, were each placed into administration by the High Court of Justice of England and Wales

---

[2]    NN CALA filed its chapter 11 petition on July 14, 2009.  On July 17, 2009, this Court entered orders
approving the joint administration and consolidation of NN CALA's chapter 11 case with the other
Debtors' chapter 11 cases for procedural purposes [D.I. 1098], and applying to NN CALA certain orders
previously entered in the Debtors' chapter 11 cases [D.I. 1099].

[3]    On February 27, 2009, this Court entered an order recognizing the Canadian Proceedings as foreign main
proceedings under chapter 15 of the Bankruptcy Code.  See In re Nortel Networks Corp., et al., Case No.
09-10164, D.I. No. 40 (Bankr. D. Del filed Jan. 14, 2009).

("Administration") pursuant to the U.K. Insolvency Act 1986 and the EC Regulation on

Insolvency Proceedings 2000 (the "U.K. Administrations"). On January 14, 2009, certain

individuals from Ernst & Young LLP were appointed to act as joint administrators (the "Joint

Administrators") in relation to the U.K. Administrations.[4]

11.    The Debtors continue to operate their businesses and manage their properties as

debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No trustee

or examiner has been appointed in the Debtors' cases.

12.    Pursuant to the Court's orders dated August 4, 2009 and December 3, 2009

(collectively, the "Bar Date Orders"), September 30, 2009 was set as the deadline for the filing

of proofs of claims against the Debtors (other than NN CALA), and January 25, 2010 for filing

proofs of claims against NN CALA. In compliance with the Bar Date Orders, the Trustee and

the PPF filed proofs of claim against each of the Debtors. (Declaration of David Wyndham

Davies ("Davies Decl.") executed February 24, 2010, ¶ 20.) The Trustee and the PPF also filed

proofs of claim in the Canadian Proceedings. (Id. ¶ 20.)

**B.    The Nortel Networks UK Pension Plan**

13.    The Plan is an occupational pension scheme established under and governed by

the laws of England and Wales. The Trustee is the trustee of the Plan. (Davies Decl. ¶ 2.) In

that capacity, the Trustee owes a fiduciary duty to the members of the Plan, which requires,

among other things, that the Trustee act in the best interests of the members and take steps to

ensure that the assets of the Plan are sufficient to meet the members' pension entitlements.

(Declaration of Robert Wallace Ham, QC ("Ham Decl.") executed February 24, 2010, ¶ 44;

---

[4]    On June 26, 2009, this Court entered an order recognizing the U.K. Administrations as foreign main
proceedings under chapter 15 of the Bankruptcy Code. See In re Nortel Networks UK Ltd., Case No. 09-
11972, D.I. No. 36 (Bankr. D. Del filed June 8, 2009).

Debtors' Mot. ¶ 46 n.14.)

14.    The Plan is a defined benefit pension scheme, pursuant to which employees of the sponsoring employer — here, NNUK — become entitled to pension benefits based on their final salary, with the employer agreeing to meet the balance of the cost of providing such pension benefits after taking into account the employees' own contributions.  (Davies Decl. ¶ 8.)

15.    The Plan currently has over 40,000 members, comprised of pensioners receiving payments and deferred members (i.e., members not yet in retirement).  (Id. ¶ 9.)

## C.    The U.K. Pensions Legislative And Regulatory Framework

16.    In their Motion, the Debtors describe various aspects of the legislative and regulatory framework that governs the operation and supervision of occupational pension schemes in the U.K., relying on a declaration by Richard Hitchcock, an English lawyer, executed on February 18, 2010 (the "Hitchcock Decl.").  For the most part, the Trustee and the PPF do not take issue with Mr. Hitchcock's summary of the U.K. pensions framework.  As a result, to avoid unnecessary repetition, the Trustee and the PPF limit their discussion herein to certain material aspects of the U.K. statutory regime that are either mischaracterized in, or omitted from, the Debtors' Motion.

### 1.    The Pensions Regulator And The Pension Protection Fund

17.    The Pensions Regulator was established under the U.K. Pensions Act of 2004 (the "Pensions Act 2004").  The Pensions Regulator is the governmental agency charged with the responsibility of regulating the operations and administration of occupational pension schemes in the U.K., such as the Plan.  (Hitchcock Decl. ¶¶ 29-30.)

18.    The objectives of the Pensions Regulator, as set forth in section 5 of the Pensions Act 2004, are to protect the benefits of members of occupational pension schemes, promote good administration of such pension schemes, and reduce the risk that claims for compensation are

made against the PPF. (Hitchcock Decl. ¶ 30.) In furtherance of those statutory objectives, and

to aid the Pensions Regulator in the exercise of its regulatory duties, the Pensions Act 2004

grants the Pensions Regulator, among other things, certain powers pursuant to which the Pension

Regulator may commence regulatory proceedings against employers and their corporate affiliates

to recover unfunded pension liabilities. (Ham Decl. ¶¶ 27-31.)

19.    The most glaring mischaracterization of the Pensions Regulator in the Debtors'

Motion is the notion that the Pensions Regulator's exercise of its statutory powers serves only a

"pecuniary purpose" for the benefit of private parties. (Debtors' Mot. ¶¶ 28-29.)[5] As is evident

from both the legislative history of the Pensions Act 2004 and the Pensions Regulator's own

policy statements and guidance, those powers are designed, among other things, to enable the

Pensions Regulator to remedy the "moral hazard" created by employers who use corporate

structures and business transactions as a means of avoiding their pension obligations, and thereby

ultimately passing off the burden of their liabilities onto the public "safety net" administered by

the PPF. (Ham Decl. ¶¶ 27-31.) In this regard, the Pensions Regulator's exercise of its powers

promotes the significant public policy of ensuring that pension schemes in the U.K. are properly

funded and maintained. Further, the Pensions Regulator's "moral hazard" powers have been

crafted to provide a powerful deterrent effect on employers and their affiliates who fail to

comply with their pension obligations. (Ham Decl. ¶ 10(4).)

20.    Given the Pensions Regulator's broad statutory authority to supervise the

operations and administration of occupational pension schemes in the U.K., pension scheme

trustees are required to provide information and periodic updates to the Pensions Regulator and

---

[5]    Tellingly, notwithstanding the Debtors' repeated incantations of the supposed "pecuniary purpose" of the
U.K. Regulatory Procedure, Mr. Hitchcock does not use that phrase even _once_ in his lengthy description of
the process.

to cooperate with the Pensions Regulator in relation to significant matters that affect the scheme. (See, e.g., sections 69, 70 and 72 of the Pensions Act 2004, attached as Exhibit A to the Ham Decl.; Ham Decl. ¶ 17.)

21.    As part of the overall framework introduced in the Pensions Act 2004, a statutory fund – the PPF – was established for the purposes of providing compensation to members of eligible defined benefit pension schemes in cases where the sponsoring employer has suffered a qualifying insolvency event and where the scheme's assets are insufficient to cover a specified level of compensation. (Declaration of Richard Favier ("Favier Decl.") executed February 24, 2010, ¶¶ 4-6). Contrary to the Debtors' assertion, the fact that the PPF is funded, in part, by levies imposed on eligible pension schemes does not make the PPF akin to a "private insurance" company (Debtors' Mot. ¶ 28), anymore than the Pension Benefit Guaranty Corporation (the "PBGC"), which is similarly funded, constitutes a private insurance company in the U.S. (See Favier Decl. ¶¶ 7-8.)[6]

**2.    The Assessment Period**

22.    As noted in the Debtors' Motion, NNUK's entry into Administration on January 14, 2009 triggered the start of an Assessment Period with respect to the Plan, during which the PPF will undertake an evaluation, with the assistance of the Trustee, to determine whether the Board should assume responsibility for the pension scheme. (Debtors' Mot. ¶ 21.)

23.    Upon commencement of the Assessment Period, the Pensions Act 2004 provides that the rights and powers of the Trustee in relation to any debt (including any contingent debt) due to the Trustee are exercisable by the PPF to the exclusion of the Trustee. (See, e.g., sections

---

[6]    As Chief Judge Carey observed in Sea Containers, discussed infra, "[t]he PPF serves functions similar, in part, to that of the Pension Benefit Guaranty Corporation in the United States." In re Sea Containers Ltd., No. 06-11156 (KJC), 2008 WL 4296562, at *2 n.4 (Bankr. D. Del. Sept. 19, 2008) (attached as Exhibit D to the Ham Decl.)

49(a)(5) and 137(2) of the Pensions Act 2004, Ham Decl. Ex. A; Favier Decl. ¶¶ 10-12.)

Further, during the Assessment Period, the PPF is statutorily empowered to direct the Trustee to

take certain steps to preserve or enhance the assets of the Plan.  (Section 134 of the Pensions Act

2004, Ham Decl. Ex. A; Ham Decl. ¶ 25; Favier Decl. ¶ 12.)

### 3.    Financial Support Directions

24.    Principal among the Pensions Regulator's "moral hazard" powers is the ability to

issue a Financial Support Direction to an entity that is associated or connected with an employer

in an underfunded pension scheme (a "Related Entity").  (Ham Decl. ¶¶ 7, 30.)  A Financial

Support Direction requires the Related Entity (or Related Entities) to submit a proposal to the

Pensions Regulator for its approval, which sets out how that entity intends to provide financial

support to eliminate the pension scheme's funding deficit and ensure that such financial support

remains in place while the pension scheme is in existence.  (Hitchcock Decl. ¶ 37.2.)

25.    A Financial Support Direction may be issued if certain statutory and other

requirements are met, including (i) the employer in relation to the pension plan is "insufficiently

resourced" (within the meaning of the Pensions Act 2004); (ii) the Related Entity is an associate

of, or is connected with, the employer; and (iii) issuance of a Financial Support Direction against

the Related Entity is reasonable in the circumstances.  (See section 43 of the Pensions Act 2004,

Ham Decl. Ex. A.)  Under the Pensions Act 2004, an employer may be considered "insufficiently

resourced" if, among other things, the value of its assets is less than 50% of its estimated

"section 75 debt" as at a "relevant time" specified by the Pensions Regulator.[7]  (Section 44(3) of

---

[7]        An employer's "section 75 debt" refers to a statutory debt due from an employer to a plan trustee upon the
occurrence of certain triggering events set forth in section 75 of the Pensions Act 1995 (the "Pensions Act
1995"), which include, among other things, entry into administration by the employer.  In such
circumstances, the employer's liability under section 75 (i.e., the "section 75 debt") is broadly equal to the
deficiency in the funding of the pension scheme as estimated by the scheme's actuary on a "buy-out" basis.
(Hitchcock Decl. ¶ 25.)  The deficiency on the "buy-out" basis represents the difference between the value

the Pensions Act 2004, Ham Decl. Ex. A.)

26.    The decision to issue a Financial Support Direction is made by the Determinations Panel, which is an independent committee established by the Pensions Regulator consisting of persons with legal, business and/or pensions knowledge and expertise who are appointed under terms that are approved by the U.K. Secretary of State.  (Ham Decl. ¶¶ 18, 38, 40; Hitchcock Decl. ¶¶ 49, 51-52.)  Although a committee of the Pensions Regulator, the Determinations Panel is separate from the Pensions Regulator in that it has separately appointed membership.  (Ham Decl. ¶¶ 18-19.)  In particular, members of the Determinations Panel cannot include (among others) any member or member of the staff of the Pensions Regulator or the PPF.  (Ham Decl. ¶¶ 18-19; section 9(5) of the Pensions Act 2004, attached as Exhibit A to the Ham Decl.)  Further, members of the Determinations Panel are not involved in the investigation of any potential enforcement actions brought by the Pensions Regulator.  (Ham Decl. ¶ 38.)

27.    The Pension Act 2004 enumerates various factors that the Determinations Panel may, in its discretion, consider when deciding whether it is reasonable to issue a Financial Support Direction.  (Hitchcock Decl. ¶ 37.4.)  These factors include the relationship between the employer and the person against whom the Financial Support Direction may be issued, the value of benefits received by that person from the employer (in the case of a Related Entity), and the financial circumstances of the person.  (Id.)

28.    A decision of the Determinations Panel may be referred to the Pensions Regulator Tribunal for a *de novo* review by any party affected by the decision, even if they did not submit representations to the Determinations Panel.  (Ham Decl. ¶ 47; Hitchcock Decl. ¶¶ 55-57.)

---

of the scheme's assets and the cost – estimated by the scheme's actuary – of securing the members' benefits through the purchase of annuities from an authorized insurance company.  (Id. ¶ 26.)

Thereafter, an appeal may be taken from a decision of the Pensions Regulator Tribunal, with leave to the Court of Appeal. (Ham Decl. ¶¶ 49, 53; Hitchcock Decl. ¶ 58.)

29.     If a Financial Support Direction is issued and the recipient fails to put or keep in place financial support in a form approved by the Pensions Regulator, the Determinations Panel may issue a non-compliance contribution notice ("Contribution Notice"), which imposes a statutory liability on the non-complying party to pay the sum specified in the Contribution Notice, which may be in an amount equal to the whole of the debt that is (or would be) due by the employer under section 75 of the Pension Act 1995. (Hitchcock Decl. ¶¶ 37.2, 45.) As in the case of a Financial Support Direction, the issuance of a Contribution Notice is preceded by a warning notice sent to the non-complying party, who is then permitted to make written and oral representations to the Determinations Panel as to why a Contribution Notice should not be issued. (Hitchcock Decl. ¶¶ 34-35.) A decision by the Determinations Panel to issue a Contribution Notice may be referred to the Pensions Regulator Tribunal for review in the first instance, and thereafter an appeal may be taken, with leave to the Court of Appeal.

**D.    The Trustee And The PPF's Claims**

30.     As of the Petition Date, the Plan had a substantial funding deficit as a result of NNUK's inability to meet its funding obligations to the Plan. (Davies Decl. ¶ 10.) Specifically, the Plan actuary has estimated the section 75 debt of NNUK (as of January 13, 2009) to be £2.1 billion. (See Letter from Watson Wyatt to Nortel Networks UK Pension Trust Limited, dated September 29, 2009, attached as Exhibit A to the Davies Decl.) Further, the Joint Administrators of NNUK have stated publicly that an informal estimate of NNUK's section 75 debt is in the region of $3.1 billion. (See Report of Joint Administrators, dated August 13, 2009, attached as Exhibit B to the Davies Decl.)

E.    **The Warning Notice**

31.    In the exercise of its statutory oversight authority, the Pensions Regulator commenced an investigation into the financial position of the Plan. On the basis of that investigation, the Pensions Regulator issued a warning notice dated January 11, 2010 (the "Warning Notice") particularizing the case for the issuance of Financial Support Directions against 29 Nortel entities, including two of the Debtors: Nortel Networks Inc. ("NNI") and NN CALA (collectively, the "U.S. Related Entities"). (Davies Decl. ¶25.) As set forth in a letter from the Pensions Regulator to the Trustee and the PPF, dated January 25, 2010 (attached as Exhibit A to the Declaration of Brian E. O'Connor ("O'Connor Decl.") executed February 24, 2010), a copy of the Warning Notice along with all supporting documentation was sent to each of the Nortel entities to whom it was addressed, including the U.S. Related Entities, on January 13, 2010. Copies of the Warning Notice were also sent to the Trustee and the PPF as directly affected parties. (Davies Decl. ¶ 25.)

32.    As provided in the Pension Act 2004 and the regulations promulgated thereunder, each of the Nortel entities who received the Warning Notice has the opportunity to submit written representations to the Determinations Panel as to whether a Financial Support Direction should be issued. (Hitchcock Decl. ¶ 35; Davies Decl. ¶ 26.) Those entities may also request to appear before the Determination Panel at an oral hearing to present their case. (Hitchcock Decl. ¶ 35.)

33.    Pursuant to the Pension Act 2004 and related regulations, the Determinations Panel's decision to issue a Financial Support Direction must occur within two years from the "relevant time" specified by the Pensions Regulator for purposes of the "insufficiently resourced" test described above. (Ham Decl. ¶ 35.) In this case, the Pensions Regulator designated June 30, 2008 as the "relevant time," and therefore any decision to issue a Financial

Support Direction must be made by the Determinations Panel on or before June 30, 2010. (Id.) There is no procedure provided under the U.K. pensions legislation for extending that statutory deadline. (Id. ¶ 62(3).)

34.   On February 5, 2010, the Joint Administrators notified the Pensions Regulator that they intend to submit written representations to the Determinations Panel and participate in any oral hearing on behalf of the 16 Nortel entities currently in the U.K. Administrations (collectively, the "EMEA Related Entities"). (See Letter from Joint Administrators to the Pensions Regulator, dated February 5, 2010, attached as Exhibit H to the Davies Decl.)[8]

## ARGUMENT

### A.   The U.K. Regulatory Procedure Does Not Violate The Automatic Stay.

35.   The Debtors argue in their Motion that the U.K. Regulatory Procedure is a violation of the automatic stay and request that this Court enjoin the Trustee and the PPF from participating in that process. The Debtors' Motion is flawed for several reasons.

36.   First, as Chief Judge Carey held in Sea Containers, the liquidation of the Trustee and the PPF's claims in the U.K. Regulatory Procedure does not constitute a violation of the automatic stay because that process is excepted from the stay under the regulatory power exception set forth in section 362(b)(4) of the Bankruptcy Code. The Debtors fail to provide any principled reason why the holdings in Sea Containers, and in numerous other cases applying the regulatory power exception in analogous domestic circumstances, do not apply here.

37.   Second, the Trustee and the PPF's participation in the U.K. Regulatory Procedure does not, and will not, violate the automatic stay because they have no intention of collecting or

---

[8]   On February 17, 2010, Ernst & Young Inc., in its capacity as Monitor in the Canadian Proceedings, filed an application with the Canadian Court seeking an order declaring that the U.K. Regulatory Procedure violates the stay imposed in the Canadian Proceedings. (Debtors' Mot. ¶ 39.) Oral argument on that application is currently scheduled for February 25, 2010. (Id.)

enforcing any debt against the U.S. Related Entities outside of this Court. The sole purpose of the proceedings before the Determinations Panel is to liquidate their claims in accordance with U.K. law. (See Letter from the Pensions Regulator, dated February 24, 2010, attached as Exhibit E to the O'Connor Decl., ¶¶ 3, 19.) Moreover, the Trustee and the PPF voluntarily submitted themselves to the jurisdiction of this Court by filing proofs of claim in these cases in compliance with the Bar Date Orders, and they fully recognize that, whatever the outcome of the U.K. Regulatory Procedure, this Court will determine whether their proofs of claim are allowed in these cases and, if so, in what amount. (Davies Decl. ¶¶ 18, 19.)

38.     Finally, inasmuch as the U.K. Regulatory Procedure, and the Trustee and the PPF's participation in it, does not violate the automatic stay, the Debtors' Motion should be seen for what it really is:  an extraordinary request that the Court extend the automatic stay under section 105(a) of the Bankruptcy Code by issuing what amounts to a *de facto* anti-suit injunction prohibiting the Trustee and the PPF from participating in the U.K. Regulatory Procedure.  As explained below, such extraordinary relief is both procedurally and substantively improper and, thus, should be denied.

**1.     The U.K. Regulatory Procedure Constitutes An Exercise Of The Pensions Regulator's Regulatory Power And Is Excepted From The Operation Of The Automatic Stay.**

39.     The pendency of the U.K. Regulatory Procedure, including proceedings which may result in issuance of Financial Support Directions against the U.S. Related Entities, does not constitute a violation of the automatic stay because such proceedings are excepted from the automatic stay under section 362(b)(4) of the Bankruptcy Code, which provides:

> [t]he filing of a petition under section 301, 302, or 303 of this title .
> . . does not operate as a stay -- (4) under paragraph (1), (2), (3), or
> (6) of subsection (a) of this section, of the commencement or
> continuation of an action or proceeding by a governmental unit . . .
> to enforce such governmental unit's or organization's police and

> regulatory power, including the enforcement of a judgment other
> than a money judgment, obtained in an action or proceeding by the
> governmental unit to enforce such governmental unit's or
> organization's police or regulatory power.

11 U.S.C. § 362(b)(4) (2009).[9]

40.    The legislative history of section 362(b)(4) of the Bankruptcy Code makes clear

Congress' intent in creating this exception: "[W]here a governmental unit is suing a debtor to

prevent or stop violation of fraud, environmental protection, consumer protection, safety, or

similar police or regulatory laws, or attempting to fix damages for violation of such a law, the

action or proceeding is not stayed under the automatic stay." S. Rep. No. 95-989, at 52 (1978)

(emphasis added). Further, as the Third Circuit has recognized, section 362(b)(4)'s police power

exception is to be "construed broadly," and there should be "no unnatural efforts . . . made to

limit its scope." Penn Terra Ltd. v. Dep't of Envtl. Res., 733 F.2d 267, 273 (3d Cir. 1984)

(emphasis added); In re W.R. Grace & Co., 412 B.R. 657, 663 (D. Del. 2009) (same); Pa.

Lawyers Fund for Client Sec. v. Baillie (In re Baillie), 368 B.R. 458, 466 (Bankr. W.D. Pa.

2007) (same).

41.    In determining the applicability of the regulatory power exception, courts

distinguish between acts designed to fix and liquidate a claim, and acts designed to collect or

enforce a claim once liquidated. Two interrelated tests – the "public policy" and the "pecuniary

purpose" tests – have evolved for assessing whether a governmental or regulatory proceeding

---

[9]    The Debtors do not dispute that the phrase "governmental unit" as defined in the Bankruptcy Code includes
an agency of a "foreign state" such as the Pensions Regulator. (Debtors' Mot. ¶ 46 n.14.) The Debtors'
argument that the regulatory exception does not apply because neither the Trustee nor the PPF is a
"governmental unit" is both incorrect and, in any event, irrelevant. In the Debtors' own words, the PPF is a
"statutory body" established under the Pensions Act 2004 and it does not lose that status simply because it
may be exercising, pursuant to its statutory mandate, the rights of the Trustee in relation to the pension
funding deficiency. In any event, as noted below, the Debtors concede that it is the Pensions Regulator
who initiated and is pursuing the U.K. Regulatory Procedure – not the Trustee and the PPF – and thus their
status is completely irrelevant. (See, e.g., Debtors' Mot. ¶ 1 (referring to the proceedings "initiated by the
U.K. Pensions Regulator"); id. ¶ 61 (disputing the "TPR's right to proceed against the Debtors")).

comes within the ambit of subsection 362(b)(4). McMullen v. Sevigny (In re McMullen), 386 F.3d 320, 325 (1st Cir. 2004). Where the regulatory proceeding is undertaken for the purpose of effectuating a public policy (as opposed to protecting the government's pecuniary interest), the regulatory power exception applies. See, e.g., U.S. v. Nicolet, Inc., 857 F.2d 202, 209-10 (3d Cir. 1988) (finding automatic stay not applicable to actions taken by governmental agency "in compliance with its explicit mandate under [applicable statutes]").

42.    Here, the actions of the Pensions Regulator in the U.K. Regulatory Procedure fall squarely within the regulatory power exception to the automatic stay provided by the Bankruptcy Code. As noted above, the initiation of the U.K. Regulatory Procedure by the Pensions Regulator is in furtherance of its statutory objectives, which include ensuring that pension schemes in the U.K. are properly funded and maintained and taking steps to remedy the "moral hazard" posed by employers and their affiliates who fail to comply with their pension obligations.

43.    That was the conclusion reached by Chief Judge Carey when considering this very issue in Sea Containers. There, the trustees of two U.K. pension schemes entered into a settlement with the debtors to resolve claims filed by the trustees relating to the schemes' funding deficits. Sea Containers, 2008 WL 4296562, at *1. Prior to the execution of the settlement, proceedings were commenced in the U.K. by the Pensions Regulator, which ultimately resulted in the issuance of Financial Support Directions against the debtors. Id. at *3-4. Objectors to the settlement, including the official committee of unsecured creditors for the parent company debtor, argued, among other things, that because the Financial Support Directions were issued in violation of the automatic stay, they were invalid, provided no basis for the trustees' claims against the debtors, and precluded the debtors from satisfying their burden

that the settlement was reasonable and should be approved under Rule 9019 of the Bankruptcy Rules. Id. at *8.[10]

44.     Chief Judge Carey rejected those arguments. Instead, he held that "the mere issuance of the [Financial Support Directions] does not violate the automatic stay" because the Pensions Regulator is "a statutorily created entity endeavoring to exercise its regulatory power" and the issuance of Financial Support Directions was the product of the Pensions Regulator "fulfilling its statutory objective of ensuring that pension schemes are properly funded and maintained." Sea Containers, 2008 WL 4296562, at *9. Significantly, as would be the case here, Chief Judge Carey noted that, notwithstanding the issuance of the Financial Support Directions, "it would ultimately be for this Court to approve any proposed funding arrangement." Id.

45.     The Debtors attempt to distinguish Sea Containers primarily by reference to the procedural posture in which Chief Judge Carey held that the U.K. Regulatory Procedure did not constitute a violation of the automatic stay:  a decision overruling objections to the debtors' settlement of the schemes' claims after issuance of Financial Support Directions.  (Debtors' Mot. ¶¶ 57-62.) Try as they might, however, the Debtors cannot point to any meaningful distinction between the substantive merits of the issue addressed in Sea Containers and the issue raised by their Motion.  Either the U.K. Regulatory Procedure violates the automatic stay or it does not. The answer to that question cannot depend on when in the regulatory process the issue is put before the Court.[11]

---

[10]     The creditors' committee also filed an earlier objection to the trustees' proofs of claim, raising, among other things, the same arguments.  See In re Sea Containers, Case No. 06-11156 (KJC), Docket No. 1008 (Sept. 17, 2007).

[11]     Moreover, it is clear from Chief Judge Carey's opinion that his conclusion did not turn on any of the supposedly distinguishing "facts" identified by the Debtors, including that the debtor in Sea Containers was

46.    The Debtors argument that "integral to the court's ruling that there was no stay violation was its determination that there <u>was no</u> assertion of a claim" takes the Court's language out of context. (Debtors' Mot. ¶ 61 (emphasis in original).) In reaching his conclusion that no stay violation had occurred, Chief Judge Carey noted that issuance of a Financial Support Direction "does not amount to an attempt to collect a debt or assert a claim" and that the Financial Support Direction "provide[d] guidance as to the needs of the Schemes and therefore the pertinent considerations in valuing the Schemes' claims." <u>Sea Containers</u>, 2008 WL 4296562, at *9. That finding is perfectly consistent with the U.K. Regulatory Procedure contemplated in the Warning Notice here and is not, as the Debtors contend, a basis of distinction.[12] As noted above, the Trustee and the PPF have no intention of collecting and enforcing any claim that may result from U.K. Regulatory Procedure against the U.S. Related Entities outside of these chapter 11 proceedings, and fully recognize that the allowance of their claims – and the weight accorded to any Financial Support Direction in "valuing" their claims – will be resolved by this Court at the appropriate time.

47.    Chief Judge Carey's ruling in <u>Sea Containers</u> is also consistent with decisions by numerous other courts, including the Third Circuit, which have held that regulatory actions taken by governmental authorities to liquidate or fix a claim against a debtor come within the ambit of section 362(b)(4) and do not constitute violations of the automatic stay. <u>See, e.g.</u>, <u>In re Mystic</u>

---

a "U.K. chartered company," that it had "substantial assets in the U.K." or that it had a "clear control relationship" with the plan sponsor. <u>Sea Containers</u>, 2008 WL 4296562, at *9.

[12]    As in these cases, the trustees of the pension schemes in <u>Sea Containers</u> filed proofs of claim in the debtors' chapter 11 cases. <u>Sea Containers</u>, 2008 WL 4296562, at *1. The Financial Support Directions issued in <u>Sea Containers</u> served to liquidate those claims in precisely the same way any Financial Support Direction issued by the Determinations Panel against NNI and/or NN CALA will here. To suggest that the trustees in <u>Sea Containers</u> were not asserting a "claim" based on the Financial Support Directions issued there is plainly wrong.

Tank Lines Corp., 544 F.3d 524, 527 (3d Cir. 2008) (section 362(b)(4) found applicable where

action by "government merely sought to reduce to judgment its claim" for costs incurred in

environmental clean-up); W.R. Grace & Co., 412 B.R. at 663 ("courts throughout [the Third]

Circuit have determined that efforts to fix a penalty constitute a valid exception [under] section

362(b)(4)").

48.    Indeed, such treatment is afforded to actions taken by the PBGC – the analogous

U.S. regulatory entity – in the context of proceedings under the Bankruptcy Code.  See 3-362

Collier on Bankruptcy ¶ 362.05 (15th ed. rev.) ("Postpetition actions by the PBGC, within the

scope of its authority under ERISA, are generally held to be excepted from the automatic stay.")

For example, the PBGC is permitted to initiate involuntary termination actions (and thereby

trigger termination liability under 29 U.S.C. § 1362) during the pendency of a bankruptcy

proceeding without running afoul of the automatic stay.  Congress made clear its intention to so

empower the PBGC by including a specific exception to the automatic stay in the Employment

Retirement Income Security Act of 1974 ("ERISA").  29 U.S.C. § 1342(e) (2008) (a PBGC

initiated plan termination action "may be filed notwithstanding the pendency in the same or any

court of any bankruptcy . . . proceeding").[13]

---

[13]    Recognizing an exception to the automatic stay for actions taken by the Pensions Regulator is also
consistent with U.K. insolvency law.  See, e.g., Re Railtrack plc (In Administration) (No. 2), [2002] EWCA
(Civ) 955, [33] (Eng.) (holding, in the context of a railway company in administration, that the
commencement of proceedings by the U.K. Rail Regulator in furtherance of its "statutory responsibilities"
and "supervisory role" was not stayed by the statutory moratorium and did not require prior permission of
the administrator or the court) (attached as Exhibit B to the O'Connor Decl.).  In a letter to the Pensions
Regulator dated November 25, 2009, the Joint Administrators of the EMEA Debtors confirmed that they
did not view the commencement of the U.K. Regulatory Procedure as being stayed by the statutory
moratorium.  (See Letter from Joint Administrators to Pensions Regulator dated November 25, 2009,
attached as Exhibit G to the Davies Decl.).

       Similarly, although recognition by a U.K. court of a foreign insolvency proceeding gives rise to a stay of
proceedings against the foreign debtor in the U.K., actions by a U.K. regulatory body taken in the exercise
of its regulatory functions are expressly exempted from the stay.  (See Art. 20(4)(b) of Schedule 1 of the
Cross-Border Insolvency Regulations 2006, attached as Exhibit C to the O'Connor Decl., (stay in respect of
foreign main proceeding does not apply to "any action or proceedings by a person or body having

49.    The Debtors' assertion that the U.K. Regulatory Procedure fails to meet the "pecuniary purpose" test is plainly wrong. (Debtors' Mot. ¶¶ 50-51.) As noted above, the focus of the "pecuniary purpose" test is whether the regulatory proceeding relates principally to the protection of the government's pecuniary interest as opposed to its interests in effectuating a public policy. See Nicolet, Inc., 857 F.2d at 209-10. Nowhere in the Motion do the Debtors even claim that the U.K. Regulatory Procedure is at all related to any pecuniary interest of the Pensions Regulator. To the contrary, the record makes clear, and the Debtors concede, that the purpose of the U.K. Regulatory Procedure is to fix a claim against a Related Entity in favor of the Trustee. (Ham Decl. ¶ 50; Debtors' Mot. ¶¶ 27, 34.)

50.    Moreover, as noted above, in commencing the U.K. Regulatory Procedure, the Pensions Regulator is manifestly effectuating an important public policy insofar as its statutory powers to issue Financial Support Directions serve a deterrent purpose in putting other employers (and their related entities) on notice that they must stand behind their pension obligations. (Ham Decl. ¶ 10(4).) That deterrent effect of the U.K. Regulatory Procedure is another factor that supports the applicability of the regulatory power exception in this case. See Nicolet, Inc., 857 F.2d at 210 (where the agency's statutory "mandate interjects a valuable deterrence element into the [regulatory] scheme," such "considerations make it plain that the present action falls within" the regulatory power exception to the automatic stay.)

51.    Likewise, there is no merit to the Debtors' argument that the U.K. Regulatory Procedure fails to satisfy the "public policy" test because the Trustee, on behalf of the Plan

---

regulatory, supervisory or investigative functions of a public nature, being an action or proceedings brought in the exercise of those functions"); see also Sea Containers, 2008 WL 4296562, at *9 n.11 (noting unchallenged testimony of debtors' English law expert that "under applicable English law, such pension-related, regulatory proceedings were exempt from the automatic stay and would not be enjoined by an English Court") (quotations and citations omitted)).

members, may benefit from the outcome of that process. (Debtors' Mot. ¶¶ 53-54.) Courts have routinely held that section 362(b)(4) of the Bankruptcy Code exempts regulatory actions even if the action may result in a benefit to a private party.

52.     For example, actions commenced by the Equal Employment Opportunity Commission ("EEOC") against a debtor have been held to fall within section 362(b)(4)'s exception, despite the fact that EEOC actions often benefit private individuals. See, e.g., EEOC v. Rath Packing Co., 787 F.2d 318 (8th Cir. 1986) (automatic stay provision did not bar the EEOC from maintaining suit for the entry of a money judgment for backpay in a Title VII action even though judgment would be in favor of employee); EEOC v. CTI Global Solutions, Inc., Civ. A. 09-2570, 2010 WL 334245, at *2 (D. Md. Jan. 25, 2010) (holding that the section 362(b)(4) exception applies to a Title VII action brought by the EEOC, even though the action sought back pay and injunctive relief, since the EEOC's primary purpose in bringing the action was to protect the public welfare and a secondary, pecuniary interest did not bring the case outside of the exception); Wheeling-Pittsburgh Steel Corp. v. Pa. Human Relations Comm'n (In re Wheeling-Pittsburgh Steel Corp.), 63 B.R. 641, 645 (Bankr. W.D. Pa. 1986) (same); see also In re Aerobox Composite Structures, LLC, No. 11-07-10138, 2008 WL 1733601, at *3 (Bankr. D.N.M. Apr. 10, 2008) (state labor division proceedings against employer are covered by section 362(b)(4) "despite the fact that the direct beneficiary of the process, when the resulting order includes a monetary award, is the complainant").

53.     Similarly, environmental claims prosecuted by the Environmental Protection Agency have also been held to fall under the government's regulatory powers, even though they may provide a benefit to a private individual. See, e.g., Nicolet, Inc., 857 F.2d at 209-10

(automatic stay did not bar government from seeking reimbursement for environmental clean-up based on regulatory power even though the clean-up benefited individuals).

54.    Nor do any of the authorities cited by the Debtors dictate a different result.  In In re Fairchild Corp., No. 09-10899 (CSS), 2009 Bankr. LEXIS 3815, at *6 (Bankr. D. Del. Dec. 1, 2009), the court held that the regulatory power exception was not applicable because the agency's lawsuit was merely a private action for reimbursement of costs associated with remediating a contamination, which the Court characterized as seeking "to recover money damages to fund [the agency]." Id. at *21-22.  In contrast, as noted above, the Pensions Regulator is not seeking to make a pecuniary recovery for itself.  Rather, the U.K. Regulatory Procedure was initiated by the Pensions Regulator to carry out its statutory oversight duties in connection with the significant funding deficiency in the Plan.

55.    The Debtors' reliance on In re Spansion, Inc., 418 B.R. 84, 95 (Bankr. D. Del. 2009), In re Qimonda AG, No. 09-14766-RGM (Bankr. E.D. Va. Feb. 16, 2010) and In re Dan Hixson Chevrolet Co., 12 B.R. 917, 921 (Bankr. N.D. Tex. 1981) is similarly misplaced.  In Spansion, Inc., the regulatory power exception was held to be inapplicable in the context of a patent infringement action before the United States International Trade Commission (the "ITC") because the "primary thrust" of the action, which was commenced by a private party against another private party, was the resolution of a private patent infringement dispute.  In re Spansion, Inc., 418 B.R. at 95.  The court's decision was also based on the fact that the ITC was not acting in its "enforcement capacity" in connection with the action and that the action "only incidentally" related to the ITC's interest in "preventing unfair competition." Id. In re Qimonda AG is inapposite for the exact same reasons.  See Debtors' Mot., Ex. A, Mem. Op. at 5, 11-12

(regulatory power exception inapplicable because private parties "controlled the litigation from the beginning" and there was "no significant public policy advanced by the ITC action").

56.    Similarly, Hixson involved an action commenced by a private party before the Texas Motor Vehicle Commission (the "Commission") seeking an adjudication of its contractual rights under a franchise agreement with the debtor. In re Dan Hixson Chevrolet Co., 12 B.R. at 919. Critical to the court's decision that the regulatory power exception did not apply was the fact that the action was not commenced by the Commission in furtherance of its enforcement powers and that no violations of the Motor Vehicle Code needed to be raised to adjudicate the matter. Id. at 921-22. In fact, the court noted that "[a] proceeding instituted by the Commission to investigate, to fix penalties, or to enjoin a dealer for violation of the false advertising prohibition would be a police or regulatory action clearly outside the operation of the automatic stay." Id. at 922.

57.    Here, unlike in Qimonda, Spansion and Hixson, the U.K. Regulatory Procedure was initiated, and is controlled, by the Pensions Regulator, a governmental agency, acting in furtherance of its express statutory mandate to regulate the operations and administration of occupational pension schemes in the U.K.. In sum, the U.K. Regulatory Procedure does not constitute a violation of the automatic stay, and the Debtors' Motion should be denied.

**2.    The Trustee And The PPF's Conduct Does Not, And Will Not, Violate The Automatic Stay.**

58.    Although the Debtors' Motion seeks an injunction prohibiting the Trustee and the PPF from participating in the U.K. Regulatory Procedure, the Debtors have not demonstrated – as a matter of law or fact – that any actions taken by either the Trustee or the PPF constitute a violation of the automatic stay. Courts have routinely found section 362(b)(4) of the Bankruptcy Code applicable even though a private party may have participated in the regulatory process.

See, e.g., Alpern v. Lieb, 11 F.3d 689, 690 (7th Cir. 1993) (holding that a proceeding on a Rule 11 sanctions motion was covered by the section 362(b)(4) exception to the automatic stay despite private party's participation in the proceeding).

59.    Moreover, as noted above, the Trustee and the PPF did not commence the U.K. Regulatory Procedure. (See supra ¶ 31.) It is the Pensions Regulator – not the Trustee and the PPF – who controls the process. (Davies Decl. ¶ 16; Favier Decl. ¶ 9; Ham Decl. ¶ 62(2)) Indeed, far from seeking to circumvent the authority of this Court, the Trustee and the PPF voluntarily submitted to the Court's jurisdiction by filing proofs of claim against the Debtors in compliance with the Bar Date Orders, which set forth an explanation of the basis for their claims, and also included a description of the U.K. Regulatory Procedure. Clearly, the Debtors have known of the Trustee and the PPF's claims, and the prospect of the issuance of Financial Support Directions, since at least September 2009. (Davies Decl. ¶ 24.) Put simply, none of this should be news to the Debtors.

60.    Inasmuch as the U.K. Regulatory Procedure is excepted from the operation of the automatic stay pursuant to the regulatory power exception, participation by the Trustee and the PPF in that process will also not constitute a stay violation. As previously noted, the purpose of the U.K. Regulatory Procedure is to liquidate the Trustee and the PPF's claims against various affiliates of NNUK, including the U.S. Related Entities. Regardless of the outcome of the U.K. Regulatory Procedure, the Trustee and the PPF have no intention of seeking to collect or enforce their claims against the U.S. Related Entities outside of this Court. (Davies Decl. ¶¶ 17, 18.) To the contrary, as already stated, the Trustee and the PPF acknowledge that the Court will decide whether any Financial Support Directions issued by the Determinations Panel should be

accorded deference in determining whether to allow their claims, and if allowed, to fix the amount. (Id.)

**3.     The Debtors' Motion Improperly Seeks An Extension Of The Automatic Stay.**

61.     As demonstrated above, the U.K. Regulatory Procedure (and the Trustee and the PPF's participation in that process) is excepted from the automatic stay pursuant to the regulatory power exception under section 362(b)(4) of the Bankruptcy Code.  Given the inapplicability of the automatic stay, what the Debtors' Motion is effectively seeking is for this Court to exercise its equitable powers under section 105(a) of the Bankruptcy Code and issue a *de facto* anti-suit injunction extending the scope of the automatic stay to prohibit the Trustee and the PPF from participating in the U.K. Regulatory Procedure.  As set forth below, such extraordinary relief would be manifestly improper in this case for several reasons – both procedural and substantive – and, accordingly, should be denied.

**a.     Injunctive Relief Is Neither Proper Nor Warranted In This Case.**

62.     As an initial matter, granting an injunction here would be procedurally improper because Rule 7001(7) provides that requests for injunctive or other equitable relief, outside of a plan, must be sought in the context of an adversary proceeding.  Fed. R. Bankr. P. 7001(7); MFS Telecom, Inc. v. Motorola, Inc. (In re Conxus Commc'ns), 262 B.R. 893, 899 (D. Del. 2001) (failure to file required adversary proceeding was "alone sufficient reason for the Bankruptcy Court to deny Motorola's request for an injunction."); In re Best Prods. Co., 203 B.R. 51, 54 (E.D. Va. 1996) (holding that because Bankruptcy Rule 7001(7) "plainly requires that any request for an injunction or other equitable relief must be sought in the context of an adversary proceeding," which debtor failed to file, court could not enjoin creditor from pursuing rights under state law).

63.    In any event, even if an adversary proceeding had been commenced, injunctive

relief against the Trustee and the PPF would not be warranted. "In order to obtain section 105(a)

injunctive relief, the debtor, in accordance with Bankruptcy Rule 7065 and Fed. R. Civ. P. 65,

has the burden of demonstrating to the court the following: substantial likelihood of success on

the merits, irreparable harm to the movant, harm to the movant outweighs harm to the

nonmovant, and injunctive relief would not violate public interest." In re Wedgewood Realty

Group, Ltd., 878 F.2d 693, 700-01 (3d Cir. 1989) (remanding case to require debtor to establish

grounds for injunctive relief pursuant to section 105(a) where automatic stay had lapsed and was

no longer applicable); Brennan v. Poritz (In re Brennan), 198 B.R. 445, 452 (D.N.J. 1996) ("In

determining whether to issue a § 105 stay, bankruptcy courts [ ] use this traditional four-pronged

analysis.").

64.    Here, the Debtors' conclusory allegations of distraction and burden because "their

essential personnel and professionals [would] be forced to litigate in the" U.K. Regulatory

Procedure are woefully insufficient to meet the standards for injunctive relief. (See Debtors'

Mot. at 29 n. 20; Declaration of John Ray ("Ray Decl.") executed February 18, 2010 ¶¶ 20-22).

See, e.g., Brennan, 198 B.R. at 453 (vacating injunction against state agency for failure to

establish irreparable harm because if "demands . . . placed on the debtor and his professionals . . .

were taken to constitute irreparable harm, the police powers exception to the automatic stay, 11

U.S.C. § 362(b), would be severely undermined, as in every bankruptcy proceeding a debtor will

be burdened by the time and expense of defending against a state regulatory action"); Swann

Gasoline Co. v. Amoco Oil Co. (In re Swann Gasoline Co.), 62 B.R. 13, 14 (E.D. Pa. 1986)

(injunction would not issue because the record did not contain sufficient evidence to support the

theory that officers' defense of civil action would significantly divert them from day-to-day operations and efforts to reorganize).

65.    The Debtors have failed to provide any evidentiary facts to support their contention that "essential personnel and professionals" who will be coordinating "asset sales and developing a chapter 11 plan" (Ray Decl. ¶ 21) are the same professionals who would be involved in addressing the issues raised in the U.K. Regulatory Procedure.  In fact, in the absence of any credible evidence to the contrary, there is sufficient reason to conclude that the personnel who would be responsible for collecting and analyzing the historical data needed for the U.K. Regulatory Procedure would <u>not</u> be the same individuals responsible for shopping the Debtors' remaining assets or formulating a plan to liquidate the estate under a chapter 11 plan.  See <u>CAE Indus. Ltd. v. Aerospace Holdings Co.</u>, 116 B.R. 31, 34 (S.D.N.Y. 1990) (in the absence of contrary evidence, court concluded claims against former corporate insider should have no substantive effect on reorganization effort, and therefore stay would not be extended); <u>Chase Manhattan Bank (Nat'l Ass'n) v. Third Eighty-Ninth Assocs. (In re Third Eighty-Ninth Assocs.)</u>, 138 B.R. 144, 148 (S.D.N.Y. 1992) (denying, in part, request for injunction where there was no evidence of managing director's responsibilities in relation to reorganization or potential impact of defending against action).[14]

66.    The conclusory assertion that participation in the U.K. Regulatory Procedure – specifically, preparing written representations and attendance at an oral hearing lasting a number of days (Ham Decl. ¶ 40) – will place insurmountable burdens on the Debtors and their advisors

---

[14]    Further, where, as here, the ultimate result of the bankruptcy case is liquidation, as opposed to reorganization, of the estate, less weight should be accorded to claims of potential distraction and delay. <u>See, e.g.</u>, <u>Diaconix Corp. v. Hamilton Bank (In re Diaconix Corp.)</u>, 69 B.R. 343, 346-347 (E.D. Pa. 1987) (debtors' assertions that enforcement of guaranty against officer would interfere with formulation of plan or potential for reorganization were unavailing because officer's efforts were devoted primarily toward liquidating assets).

is hardly credible given that the Debtors are represented by some of the largest law firms and financial advisers on both sides of the Atlantic. As recently disclosed on the docket of these cases, the Debtors retained, almost a month ago, Linklaters LLP, a "global law firm" with "one of the best-regarded and longest established pensions law practices in the U.K.," as U.K. counsel in connection with the U.K. Regulatory Procedure, as well as two English barristers, including a Queens' Counsel, who "specialize[ ] in pensions law and regulation[.]" (See Application For An Order Authorizing Employment And Retention Of Linklaters LLP *Nunc Pro Tunc* To January 26, 2010 As U.K. Counsel For The Debtors And Debtors In Possession, filed February 18, 2010, at 10-11 [D.I. 2446].)

67.    Further, if, as the Debtors claim, the issues raised by the U.K. Regulatory Procedure overlap so significantly with the issues in the allocation process (which have been the subject of negotiations since at least June 2009 (Ray Decl. ¶¶ 15-16)), their arguments about diversion and burden make even less sense given that they presumably are intimately familiar with those issues already and there would be no need for them "reinvent the wheel" in order to effectively participate in the U.K. Regulatory Procedure.

68.    In contrast, significant harm would result to the Trustee and the PPF if they were enjoined from participating in the U.K. Regulatory Procedure. As noted, the Trustee and the PPF have no control over the Pensions Regulator and its exercise of its statutory enforcement powers. (Davies Decl. ¶ 16; Favier Decl. ¶ 9.) As such, regardless of the outcome of this Motion, the U.K. Regulatory Procedure is likely to proceed, inasmuch as the proposed order sought by the Debtors does not seek to enjoin the Pensions Regulator. (Id.) However, the relief sought by the Debtors is broad enough to enjoin the Trustee and the PPF from participating in

the U.K. Regulatory Procedure even with respect to non-U.S. Related Entities.[15]  The prejudice

to the Trustee and the PPF if such an order were granted is obvious.  Neither would be allowed to

make any representations (oral or written) in support of the issuance of Financial Support

Directions against any Nortel entities and their ability to discharge their respective duties to

maximize recovery in respect of the Plan's $3.1 billion funding deficit would be materially

compromised, if not eliminated altogether.

69.     Even if the Court were to enjoin participation in the Trustee and the PPF's

participation in the U.K. Regulatory Procedure only with respect to the U.S. Related Entities,

such an order would still materially prejudice the Trustee and the PPF's rights.  The effect of

such an order for all practical purposes would be to nullify the U.K. Regulatory Procedure as to

the U.S. Related Entities, depriving the Trustee and the PPF of their ability to rely on any

Financial Support Direction issued by the Determinations Panel against the U.S. Related Entities

to liquidate their claims for purposes of the Debtors' cases.  Further, barring the Trustee and the

PPF from even referencing the U.S. Related Entities in their representations to the

Determinations Panel would render virtually impossible – or at the very least, severely hamper –

their ability to present their case as to the other Nortel entities given the level of

interconnectedness among the operations and finances of the various Nortel entities.  (See

Declaration of John Doolittle, Vice President of Nortel Networks Inc. In Support of Chapter 11

Petitions and First Day Motions, filed January 14, 2009, ¶ 26 [D.I. 3].)

---

[15]     See Debtors' Mot., Proposed Order at 3 ("to the extent that either of the U.K. Pension Trustee or the PPF participate in the U.K. Pension Proceedings, such participation will be in violation of the automatic stay and subject the participating persons or entities to sanctions under Section 362").  Nowhere in the Motion do the Debtors articulate any conceivable basis for precluding the Trustee and the PPF from participating in the U.K. Regulatory Procedure with respect to non-U.S. debtors.

70.     Delaying the Trustee and the PPF's participation in the U.K. Regulatory Procedure – as the Debtors suggest – until after the proposed allocation process is concluded would not be any less prejudicial.  There is no indication that the allocation protocol process will commence, much less be completed, anytime soon.  In contrast, as noted above, the U.K. Regulatory Procedure must be completed before June 30, 2010.  Thus, forcing the Trustee and the PPF to wait until after the allocation process has concluded effectively precludes their participation in the U.K. Regulatory Procedure altogether.

71.     Moreover, as discussed below, the merit and quantum of the Trustee and the PPF's claims cannot be an appropriate subject of the proposed allocation proceedings, as those proceedings will address the allocation of sale proceeds.  Even if intercompany claims may be considered in that process – which is itself far from clear – the Trustee and the PPF's claims are direct claims against NNI and NN CALA, not claims asserted derivatively against those entities through an intercompany claim of NNUK.  As such, these claims must be liquidated through the U.K. Regulatory Procedure by the Determinations Panel, as required by U.K. law, not indirectly and privately by the various Nortel estates themselves.

> **b.     This Court Should Refrain From Enjoining The Trustee And The PPF's From Participating In The U.K. Regulatory Procedure On The Grounds Of Comity.**

72.     Under well-established principles of comity, this Court should respect the U.K. Regulatory Procedure for determining whether a Financial Support Direction should issue against the U.S. Related Entities.  As described by the United States Supreme Court more than a century ago in Hilton v. Guyout, 159 U.S. 113, 164 (1895), comity is "the recognition which one nation allows within its territory to the legislative, executive, or judicial acts of another nation, having due regard both to international duty and convenience, and to the rights of its own citizens, or of other persons who are under the protections of its laws."  See also Phila. Gear

Corp. v. Phila. Gear de Mexico, S.A., 44 F.3d 187, 191 (3d Cir. 1994) ("[U]nder the principle of international comity, a domestic court normally will give effect to executive, legislative, and judicial acts of a foreign nation.") (citation and quotations omitted).

73.    Because the Debtors cannot ask this Court to enjoin the Pensions Regulator from proceeding with the U.K. Regulatory Procedure, they ask instead that the Court afford them the same relief through issuance of a *de facto* anti-suit injunction prohibiting the Trustee and the PPF from participating in that process. See Compagnie des Bauxites de Guinea v. Ins. Co. of N. Am., 651 F.2d 877, 887 (3d Cir. 1981) ("[T]here is no difference between addressing an injunction to the parties and addressing it to the foreign court itself . . . [e]njoining the parties necessarily affects the court and compromises the comity which the federal courts owe to courts of other jurisdictions") (citations and quotations omitted). The Third Circuit has made it clear that such relief is not only disfavored but also rarely granted because it is antithetical to the deference that should be afforded to foreign courts. See Stonington Partners, Inc. v. Lernout & Hauspie Speech Prods. N.V., 310 F.3d 118, 126-28 (3d Cir. 2002).

74.    In Stonington, the debtor commenced insolvency proceedings in both the United States and Belgium. Id. at 122. A creditor filed claims (arising from an allegedly fraudulent stock transaction) against the debtor in both bankruptcy proceedings, but sought to have its claims adjudicated in the Belgian insolvency proceedings because the U.S. bankruptcy court had previously concluded that those claims, if successful, would be subordinated to the status of equity interests. Id. at 122-23. No such subordination would occur under Belgian insolvency law. Id. The debtor sought a declaration that the treatment of the creditor's claims was subject to U.S. law. Id. at 124. The bankruptcy court granted the debtor's motion and also issued an

order enjoining the creditor from pursuing the issue of priority treatment of its claims in

Belgium, and the district court affirmed.  Id.

75.    On appeal, the Third Circuit reversed the bankruptcy court's injunction order.  Id.

at 129.  In reaching its decision, the Third Circuit expressed a "serious concern for comity" and

stated that it followed the "restrictive approach" in determining whether a court may enjoin a

foreign proceeding.  Id. at 126 (quotations and citation omitted).  Under that approach, a court

may only enter an anti-suit injunction "on the rare occasions when needed to protect jurisdiction

or an important public policy."  Id. at 127 (citation and quotations omitted).  The Third Circuit

also cautioned that this exception is narrowly construed by courts.  Id.

76.    Applying the restrictive approach to the facts, the Third Circuit found that there

was no indication that the purpose of the Belgian proceeding was to deprive the U.S. bankruptcy

court of its jurisdiction.  Id. at 128.  Moreover, the Third Circuit questioned whether a party who

seeks to enjoin a foreign proceeding to protect the integrity of the U.S. claims allowance process

would necessarily have a sufficient basis to warrant the drastic relief of enjoining a foreign

proceeding.  See id. at 128-29 ("Given that our case law unequivocally directs courts to exercise

restraint in enjoining foreign proceedings, we are skeptical as to whether an anti-suit injunction

can be found to be appropriate in these circumstances."); see also Gen. Elec. Co. v. Deutz AG,

270 F.3d 144, 160-62 (3d Cir. 2001) (determining that district court improperly granted

injunction preventing party from enforcing arbitration in a U.K. court because, in light of U.K.

court's deference to proceedings before U.S. court, this was "not an aggravated case that calls for

extraordinary intervention"); Compagnie des Bauxites de Guinea, 651 F.2d at 887 (reversing

injunction that prevented parties from initiating proceedings in the U.K. on the basis that, among

other things, duplication of issues between U.S. and U.K. actions "did not justify the breach of comity among the courts of separate sovereignties").

77.     As is clear from these Third Circuit decisions, there is no compelling reason why the Court should disregard principles of comity and enjoin the Trustee and the PPF from participating in a statutorily-mandated proceeding commenced by a foreign sovereign's regulatory agency.  Indeed, unlike the creditor in <u>Stonington</u>, a threat to the U.S. claim allowance process does not even exist here.  The Trustee and the PPF both recognize that their claims will be allowed or disallowed only in this Court.  Further, as in <u>Sea Containers</u>, in the event the Determinations Panel issues a Financial Support Direction, it will likely do so with consideration of these chapter 11 cases and, in particular, that the U.S. Related Entities will need to obtain the approval of this Court before they agree to submit any proposal to address the Plan's funding deficit. (Ham Decl. ¶¶ 58-60; <u>see also</u> Reasons of the Determinations Panel of the Pensions Regulator in Sea Containers, dated June 15, 2007, Ham Decl. Ex. D, ¶ 29 (recognizing that "the Chapter 11 issue is genuinely material" and that the Determinations Panel would "consider this issue in the context of whether or not it was reasonable" to issue an Financial Support Direction); Ham Decl. Ex. D, ¶ 31 (debtors failure to obtain bankruptcy court approval of any arrangement under an Financial Support Direction would be taken into account by Determinations Panel is deciding whether it was reasonable to issue a Contribution Notice).

78.     Accordingly, consistent with the Third Circuit's "serious concern for comity," this Court should refrain from enjoining the Trustee and the PPF's participation in the U.K. Regulatory Procedure.

        **c.**      **Enjoining The Trustee And The PPF's Participation In The U.K. Regulatory Procedure Would Establish An Egregious Precedent That Would Undermine, Rather Than Promote, The Goals Of The Bankruptcy Code.**

79.      If the Motion were granted, the Trustee would be presented with a Hobson's Choice:  participate in the U.K. Regulatory Procedure and risk sanctions for violating the automatic stay in the Bankruptcy Court, or refrain from participation in the U.K. Regulatory Procedure and jeopardize recovery of the Plan's significant funding deficiency.  (Davies Decl. ¶¶ 15, 30; Favier Decl. ¶ 15.)  Apart from the utterly untenable position such a ruling would put the Trustee in personally, it would be highly inimical – in fact, counterproductive – from a public policy perspective.  In the future, foreign creditors in a similar position would eschew submitting to the jurisdiction of U.S. bankruptcy courts and, instead, would go "rogue" and attempt to levy on and seize assets of a debtors group located outside the U.S., where those creditors would not be constrained by any orders of the U.S. bankruptcy courts.  Such a "free-for-all" scenario is exactly what the Bankruptcy Code seeks to avoid.  See, e.g., In re Aerovias Nacionales de Colombia S.A., 303 B.R. 1, 14 (S.D.N.Y. 2003) ("One of the most important purposes of bankruptcy is to prevent creditors from taking unjustified unilateral action that would deplete the estate to the detriment of other creditors.")

        **d.**      **Permitting The U.K. Regulatory Procedure To Proceed Is The Most Efficient Means Of Liquidating The Trustee And The PPF's Claims.**

80.      There is no dispute that the Trustee and the PPF's claims arise under U.K. law. (See Hitchcock Decl. ¶ 49.)  Under that law, the Determinations Panel is vested with the statutory authority to determine whether to issue a Financial Support Direction against any of the entities identified in the Warning Notice.  (Id. ¶¶ 34, 49.)  As noted, the Determinations Panel is an independent committee established by the Pensions Regulator and consists of persons with specialized pensions, business and legal knowledge.  (Ham Decl. ¶¶ 18, 38, 40.)  In deciding

whether to issue a Financial Support Direction, the Determinations Panel exercises considerable discretion. (See Hitchcock Decl. ¶ 37.4.)

81.    In short, the Determinations Panel is uniquely suited to decide whether a Financial Support Direction should be issued against any affiliates on NNUK on account of the Plan's funding deficiency, and allowing that process to proceed would be the most efficient means of liquidating the Trustee and the PPF's claims. For the same reasons, it would make no sense for this Court to attempt to replicate the Determination Panel's powers, expertise and discretion by undertaking itself to liquidate the Trustee and the PPF's claims.[16] See In re Rose Exterminator Co., 135 B.R. 637, 639 (Bankr. E.D. Mo 1992) (granting creditor relief from automatic stay to pursue claim in workers' compensation court because it was "the most efficient means of adjudicating this claim."); In re Mazama Timber Prods., Inc., 34 B.R. 556, 557 (Bankr. D. Ore. 1983) (granting relief from automatic stay so that state agency could resolve outstanding unemployment insurance issues because agency was "particularly well-suited to resolve the issues involved"). As noted, irrespective of whatever occurs before the Determinations Panel, this Court will have the final say as to whether the Trustee and the PPF's claims will be allowed and, if so, in what amount.

82.    Moreover, the regulatory process contemplated by the U.K. legislation involves a single proceeding at which the Determinations Panel will consider the written and oral representations made by all the affected parties and will make its determination as to whether Financial Support Directions should be issued. (Ham Decl. ¶¶ 36, 43.) As noted above, the Joint

---

[16]    Indeed, if this issue arose in the context of a proceeding before a domestic governmental agency, the doctrine of primary jurisdiction would counsel heavily in favor of deferring to the agency process. See U.S. v. Western Pac. R.R., 352 U.S. 59, 63-64 (1956) (recognizing that U.S. courts defer to the "primary jurisdiction" of an administrative agency "whenever enforcement of [a] claim requires the resolution of issues which ... have been placed within the special competence of an administrative body") (internal quotations omitted).

Administrator recently informed the Pensions Regulator that it will participate in the U.K.

Regulatory Procedure on behalf of the EMEA Related Entities, which include 16 out of the 29

entities identified in the Warning Notice. (Davies Decl. ¶ 23.)  In light of that, an order

prohibiting the Trustee and the PPF from participating in, and allowing the U.S. Related Entities

to ignore, the U.K. Regulatory Procedure would result in issues of potential liability under U.K.

law being resolved on a piecemeal basis in numerous jurisdictions outside of the U.K., which

would give rise to a very real risk of conflicting determinations against the various Nortel

affiliates, as well as increase the cost and length of the process

**B.      THE U.K. REGULATORY PROCEDURE WILL NOT INTERFERE WITH THE PROPOSED ALLOCATION PROCESS.**

83.      The Debtors' argument that the U.K. Regulatory Procedure "may" interfere with

allocation protocol (the "Allocation Process") should be rejected for several fundamental

reasons.  (See Debtors' Mot. ¶¶ 63-72.)

84.      First, as the Debtors admit, the Allocation Process, as currently contemplated, will

be used to determine the appropriate allocation of sale proceeds among the U.S., Canadian and

EMEA estates. (Debtors' Mot. ¶¶ 15, 64).  It is not a claims allowance process, and does not

propose to allocate proceeds on the basis of outstanding claims against the respective estates.

Second, the Debtors do not even contend that the Allocation Process will implicate any of the

issues involved in the U.K. Regulatory Procedure, but only that such issues "may" overlap.

(Debtors' Mot. ¶ 68.)  In any event, to the extent those issues, such as transfer pricing, research

and development and other arrangements, may be considered in arriving at an appropriate

proceeds allocation (Debtors' Mot. ¶ 68), credits or debits for those arrangements would be in

the nature of intercompany claims.  However, the Trustee and the PPF's claims are direct claims

arising under U.K. law against the U.S. Related Entities.  NNUK does not have a claim against

the U.S. Related Entities for the Plan's funding deficit. (Ham Decl. ¶ 62(1).)[17]  As a result, NNUK has no claim, intercompany or otherwise, against the U.S. Related Entities for the Plan's funding deficit that could be addressed in the Allocation Process.[18]  Moreover, even if these claims could be considered in the Allocation Process, and some amount of sale proceeds were allocated to NNUK as a result, the Trustee and the PPF's claims against the U.S. Related Entities would not be affected.  Rather, they would retain their claims against the U.S. Related Entities, with any recovery serving to reduce their claims against NNUK in the U.K. Administrations.

85.    Third, neither the Pensions Regulator nor the Trustee and the PPF are parties to the Allocation Process.  Unlike the Debtors, the creditors' committee or the *ad hoc* bondholder committee, they have no seat at the table.  Were the Court to grant the Debtors' Motion, it would have the effect of taking responsibility for fixing and liquidating the Trustee and the PPF's claims against the U.S. Related Entities from a U.K. regulatory body having statutorily-imposed criteria for exercising its powers, particularized expertise and substantial discretion, and substituting in its place as decision makers the potential targets of the U.K. Regulatory Procedure.  It's no wonder the Debtors would prefer that approach, as it is akin to letting the fox into the hen house.

---

[17]    Instead, the Pensions Act 2004 authorizes the Pensions Regulator, in the exercise of its "moral hazard powers," to affix a pension funding deficiency claim due from affiliates directly to the Trustee, and not the employer (*i.e.*, NNUK).  (See, e.g., section 49(3) of the Pensions Act 2004 (amount set forth in a Contribution Notice is treated as a debt due to the trustee of the pension plan).)

[18]    Further, there is no indication that either NNUK or NNI consider the Trustee and the PPF's claims to be intercompany claims that would be subject to the Allocation Process.  First, the proof of claim filed by NNUK in these proceedings makes no reference to its pension liabilities anywhere in its recitation of its potential claims against NNI.  (See Declaration of Lisa M. Schweitzer, executed February 17, 2010, Ex. A, Rider at 2).  Second, NNI's Schedules of Assets and Liabilities merely list an intercompany receivable from NNUK of $16,976,561.60 and an intercompany payable to NNUK of $12,050,130.44, neither of which, based on their respective sizes, could relate to the underfunded NNUK pension liabilities.  (See Nortel Networks Inc., Case No. 09-10138 Schedules of Assets and Liabilities (excerpts of which are attached as Exhibit D to the O'Connor Decl., Schedule B at 8, Schedule F at 401).

86.     Fourth, as mandated by U.K. legislation, the U.K. Regulatory Procedure must be completed no later than June 30, 2010. (Ham Decl. ¶¶ 35, 62(3).)  In contrast, there is no reason to believe the Allocation Process will begin any time in the near future, inasmuch as the parties have not even agreed upon a protocol for the Allocation Process, notwithstanding the fact that it has been under negotiation since at least June 2009.  (Ray Decl. ¶¶ 15-16.)  Delaying liquidation of the Trustee and the PPF's claims, therefore, would leave all of the parties involved with the substantial uncertainty surrounding one of the largest unliquidated claims asserted against the various Nortel estates.

87.     In contrast, allowing the U.K. Regulatory Procedure to proceed will achieve the ultimate goal of liquidating the U.S. Debtors' estates fairly and efficiently.[19]  If the Trustee and the PPF's claims are liquidated in the U.K. Regulatory Procedure, the parties to the Allocation Process can take the amount of the claims into consideration – to the extent it would be relevant, if at all – in allocating sale proceeds among the various Nortel entities.

## CONCLUSION

WHEREFORE, the Trustee and the PPF respectfully request that the Court deny the Motion in its entirety, and grant such other and further relief as may be just and proper.[20]

---

[19]     For similar reasons, even if the U.K. Regulatory Procedure proceeds without participation by the U.S. Related Entities, delaying resolution of the liability and amount of the Trustee and the PPF's claims could also have a far reaching impact on the insolvency proceedings of the other Nortel entities who do participate in the U.K. Regulatory Procedure, to the extent that those entities contend that their relative liability is contingent upon the a determination of the relative liability of all of the Nortel entities, including the U.S. Related Entities.

[20]     In the unlikely event the Court were to conclude that the regulatory power exception to the automatic stay is not applicable, the Trustee and the PPF reserve the right to file a motion, on an expedited basis, for an order granting relief from the automatic stay pursuant to section 362(d)(1) of the Bankruptcy Code.  For many of the reasons described herein, the Trustee and the PPF respectfully submit that, to the extent the automatic stay were appllicable, relief from the stay would be warranted because the significant prejudice the Trustee and the PPF would suffer if enjoined from discharging their duties to maximize recovery of the over $3 billion pension funding deficit would considerably outweigh the hardship, if any, to the Debtors resulting from allowing liquidation of the Trustee and the PPF's claims in the U.K. Regulatory Procedure.

Dated: Wilmington, Delaware
       February 24, 2010

                              BAYARD, P.A.

                              */s/ Justin R. Alberto*
                              Charlene D. Davis (No. 2336)
                              Justin R. Alberto (No. 5126)
                              222 Delaware Avenue, Suite 900
                              Wilmington, DE 19899
                              Tel: (302) 655-5000
                              Fax: (302) 658-6395

                                   -and-

                              WILLKIE FARR & GALLAGHER LLP
                              Marc Abrams
                              Brian E. O'Connor
                              Sameer Advani
                              787 Seventh Avenue
                              New York, New York 10019
                              Tel: (212) 728-8000
                              Fax: (212) 728-8111

                              *Counsel for the Trustee of Nortel Networks UK*
                              *Pension Plan and the Board of the Pension*
                              *Protection Fund*