**<u>EXHIBIT B</u>**

Case No: A3/2002/1128, Neutral Citation Number: [2002] EWCA Civ 955

IN THE SUPREME COURT OF JUDICATURE
IN THE COURT OF APPEAL (CIVIL DIVISION)
ON APPEAL FROM
THE HIGH COURT OF JUSTICE
CHANCERY DIVISION (The Vice-Chancellor)

Royal Courts of Justice
Strand,
London, WC2A 2LL

Wednesday 10th July, 2002

B e f o r e:

THE LORD CHIEF JUSTICE OF ENGLAND & WALES
AND
LORD JUSTICE WALLER
AND
LORD JUSTICE ROBERT WALKER

- - - - - - -

WINSOR

Appellant

- v -

SPECIAL RAILWAY ADMINISTRATORS OF RAILTRACK PLC

Respondents

- - - - - - - - -

(Transcript of the Handed Down Judgment of
Smith Bernal Reporting Limited, 190 Fleet Street
London EC4A 2AG
Tel No: 020 7421 4040, Fax No: 020 7831 8838
Official Shorthand Writers to the Court)

Mr Philip Sales and Mr Ben Hooper
(instructed by Treasury Solicitor) for the appellant
Mr Gabriel Moss QC and Mr Stephen Atherton
(instructed by Slaughter and May) for the respondents

J U D G M E N T
As Approved by the Court
Crown Copyright ©

Lord Woolf CJ:

INTRODUCTION

1.  This is an appeal by Thomas Winsor, the Rail Regulator, against the decision of the Vice-Chancellor of the 21 May 2002. The respondents are the joint Special Railway Administrators ("the Railway Administrators") of Railtrack Plc ("Railtrack") which is in railway administration.

2.  The Rail Regulator commenced these proceedings against the Railway Administrators to obtain a declaration that section 11(3)(d) of the Insolvency Act 1986 ("the 1986 Act"), as it applies to companies in railway administration by virtue of section 59(3) and schedule 6 of the Railways Act 1993 ("the 1993 Act"), does *not* cover the determination by the Rail Regulator of an application made under section 17 of the 1993 Act. The Vice-Chancellor decided that section 11(3)(d) of the 1986 Act did cover determinations of applications made under section 17 of the 1993 Act. He therefore made a declaration which, while otherwise in the terms which were sought by the Rail Regulator, omitted the critical word "not".

THE LEGISLATION

3.  Section 17 of the 1993 Act enables the Rail Regulator to direct Railtrack, and other "facility owners", to enter into an access contract granting permission to another party to use part of the track of the railways for the purposes of operating trains. For this purpose the Rail Regulator has to follow a set procedure and come to a determination before making a direction. It is this procedure and determination that is argued to be subject to section 11(3)(d) of the 1986 Act.

4.  In order to determine whether this argument is correct, it is helpful to start with the terms of section 11(3) of the 1986 Act as it applies to companies in railway administration. The terms of section 11(3) of the 1986 Act as modified by section 59(3) and schedule 6 of the 1993 Act are as follows:

> "(3) During the period for which an administration order is in force -
>
> > (a) no resolution may be passed or order made for the winding up of the company;
> >
> > (b) no administrative receiver of the company may be appointed;
> >
> > (c) no other steps may be taken to enforce any security over the company's property, or to repossess goods in the

company's possession under any hire-purchase agreement, except with the consent of the administrator or the leave of the court and subject (where the court gives leave) to such terms as the court may impose; and

(d) *no other proceedings* (reference to which shall include a reference to any proceedings under or for the purposes of sections 55 or 57A of the Railways Act 1993) *and no execution or other legal process may be commenced or continued,* and no distress may be levied, *against the company* or its property except with the consent of the administrator or the leave of the court and subject (where the court gives leave) to such terms as aforesaid." (Emphasis added.)

## OTHER PROCEEDINGS

5.  In his judgment in *Bristol Airport plc v Powdrille* [1990] Ch 744 at p. 765, Sir Nicolas Browne-Wilkinson V-C (in a different context involving section 88 of the Civil Aviation Act 1982) considered the proper approach to the meaning of the critical phrase "other proceedings" in section 11(3)(d). He said at:

"In my judgment the natural meaning of the words "no other proceedings ..... may be commenced or continued" is that the proceedings in question are either legal proceedings or quasi-legal proceedings such as arbitration. It is true that the word "proceedings" can, in certain contexts, refer to actions other than legal proceedings, e.g. proceedings of a meeting....

Further, the reference to the "commencement" and "continuation" of proceedings indicates that what Parliament had in mind was legal proceedings. The use of the word "proceedings" in the plural together with the words "commence" and "continue" are far more appropriate to legal proceedings (which are normally so described) than to the doing of some act of a more general nature. Again, it is clear that the draftsman when he wished to refer to some activity other than "proceedings" was well aware of the word "steps" which he used in section 11(3)(c).

The judge took the view that the words "other proceedings" covered:

"Every sort of step against the company, its contracts or its property, which may be taken, and the intention of Parliament by sec. 11 is to prevent all such, without the leave of the court or the consent of the Railway Administrators.""

> In my judgment, however anxious one may be not to thwart the statutory purpose of an administration, the judge's formulation must not be too wide. If the word "proceedings" has this wide meaning, all the other detailed prohibitions in section 11(3) would be unnecessary. Moreover such a construction would introduce great uncertainty as to what constituted commencement or continuation of proceedings.... In my judgment, the judge's view would produce an undesirable uncertainty which, in view of my construction of sec. 11(3)(c), it is unnecessary to introduce into the Act."

6.    Before this court, both Mr Philip Sales on behalf of the Rail Regulator and Mr Gabriel Moss QC for the Railway Administrators agreed that this Court was bound to follow the approach of Sir Nicolas Browne-Wilkinson and that, in particular, "no other proceedings" for present purposes is to be treated as applying to proceedings which are "either legal proceedings or quasi-legal proceedings such as arbitration"

7.    It is also relevant to refer to *In Re Rhondda Waste Disposal Ltd* [2001] Ch. 57 in which this Court considered whether section 11(3)(d) of the 1986 Act applied to a criminal prosecution. The Court decided that the section did apply to a criminal prosecution. Scott Baker J with whom Henry and Robert Walker LJ agreed said:

> "Having concluded that ejusdem generis has no place in the construction of these sections I turn to the natural meaning of the words. It seems to me that they have a plain and clear meaning. The words: "No other proceedings and no execution or other legal process may be commenced or continued..... against the company or its property" cover on their face all judicial and quasi judicial proceedings. There is no qualification to "other proceedings". The sections do not say "no other civil proceedings"; nor is there any reference to excluding any particular category of proceedings, eg criminal proceedings. The words used are entirely apt, submits Mr. Davies for the company, to include all judicial proceedings. There are other sections in the 1986 Act that specify offences by a company, eg. section 30. It is to be inferred that the draftsman intended that proceedings for such offences should fall under the umbrella of "other proceedings" in sections 10 and 11, otherwise they would have been expressly excluded."

8.    It has also been decided that the restrictions on proceedings contained in section 11(3)(d) apply to proceedings before an industrial tribunal (*Carr v British International Helicopters Ltd* [1994] 2 BCLC 474) and the adjudication process referred to in section 108 of the Housing Grants, Construction and Regeneration Act 1996 (*A.Straume (UK) Ltd v Bradlor Developments Ltd* [2000] BCC 333). It is not, however, necessary to examine those authorities in detail having regard to the agreement between the parties as

to the correctness of the approach of Sir Nicolas Browne-Wilkinson. It is sufficient to note that section 11(3)(d) applies to a wide category of legal or quasi-legal proceedings. None the less I emphasise that the other proceedings have to be "*against*" the company or its property.

9.    Mr Moss at one time appeared to be submitting that, on his argument, it was only to part of the proceedings or the actual determination to which section 11(3)(d) applied. To cover this possible submission the issue can be rephrased to ask whether any part of the process which results in a determination under section 17 and any direction which results from a determination that a direction should be given to Railtrack constitutes legal or quasi-proceedings as that phrase was used by Sir Nicolas Browne-Wilkinson in the *Bristol Airport* case.

## THE RAILWAY ADMINISTRATION ORDER

10.    It is also necessary to have in mind the nature and purpose of a Railway Administration Order. Section 59 of the 1993 Act as subsequently amended by the Transport Act 2000 states:

> "Railway administration orders, winding up and insolvency
>
> 59. (1) A "railway administration order" is an order of the court made in accordance with section 60, 61 or 62 below in relation to a protected railway company and directing that, during the period for which the order is in force, the affairs, business and property of the company shall be managed, by a person appointed by the court,-
>
>> (a) for the achievement of the purposes of such an order; and
>>
>> (b) in a manner which protects the respective interests of the members and creditors of the company.
>
> (2) The purposes of a railway administration order made in relation to any company shall be-
>
>> (a) the transfer to another company, or (as respects different parts of its undertaking) to two or more different companies, as a going concern, of so much of the company's undertaking as it is necessary to transfer in order to ensure that the relevant activities may be properly carried on; and
>>
>> (b) the carrying on of those relevant activities pending the making of the transfer.

(3) Schedule 6 to this Act shall have effect for applying provisions of the Insolvency Act 1986 where a railway administration order is made.

(4) Schedule 7 to this Act shall have effect for enabling provision to be made with respect to cases in which, in pursuance of a railway administration order, another company is to carry on all or any of the relevant activities of a protected railway company in place of that company.

(5) Without prejudice to paragraph 20 of Schedule 6 to this Act, the power conferred by section 411 of the Insolvency Act 1986 to make rules shall apply for the purpose of giving effect to the railway administration order provisions of this Act as it applies for the purpose of giving effect to Parts I to VII of that Act, but taking any reference in that section to those Parts as a reference to those provisions.

(6) For the purposes of this Part-

> (a) "protected railway company" means a company which is both a private sector operator and the holder of-

>> (i) a passenger licence; or

>> (ii) a network licence, a station licence or a light maintenance depot licence; and

> (b) the "relevant activities", in relation to a protected railway company,

> are -

>> (i) in the case of a company which is the holder of a passenger licence, the carriage of passengers by railway; or

>> (ii) in the case of a company which is the holder of a network licence, a station licence or a light maintenance depot licence, the management of a network, a station or a light maintenance depot, according to the description of licence in question.

(7) In this section-

> "business" and "property" have the same meaning as they have in the Insolvency Act 1986;

"the court", in the case of any protected railway company, means the court having jurisdiction to wind up the company;

"the railway administration order provisions of this Act" means this section, sections 60 to 65 below and Schedules 6 and 7 to this Act."

It is common ground that Railtrack is or was a protected railway company.

11.    As the Vice-Chancellor astutely points out in his judgment in the court below (paragraph 38), section 61 and section 62 of the 1993 Act (which inhibit both a compulsory and a voluntary winding-up until the Secretary of State has had an opportunity to place the company into railway administration), together with section 63 and section 64 (which enable financial assistance from the public purse to be made available to a company which is subject to a Railway Administration Order), indicate a "legislative preference" as to the method of dealing with a protected railway company liable to be made subject to a Railway Administration Order. The legislative preference is that the company should not be wound up and that all or part of its undertaking should be transferred to another company as a going concern, its relevant activities having been carried on in the interim. That is indeed the purpose identified in section 59 (1) and (2).

12.    The reason for the preference is obvious. It is because it is in the national interest that the railways should continue to function as effectively as possible, even if it is necessary for a railway company to be subject to a Railway Administration Order. The significance of this becomes clear when we examine the central role of the Rail Regulator in ensuring that the railway is run in a manner which accords with the interests of the public who wish to use railway services.

THE ROLE OF THE RAIL REGULATOR

13.    The 1993 Act privatised the previously nationalised railway network. It is indicative of the importance of the Rail Regulator within the whole process of running the privatised regime that it is the first section of the 1993 Act, section 1 (1), which requires the Secretary of State to appoint "an officer" to be known as the Rail Regulator. The method of privatisation in the 1993 Act involved the rail track throughout England, Wales and Scotland becoming vested in Railtrack and the other activities necessary for the operation of the railway network being conferred on a number of different operators. For this purpose the track, the trains, stations etc of the network are referred to as "railway assets" and the operator of any such assets requires either a licence or an exemption (sections 6-7 of the 1993 Act).

14.    In addition the operator, for example, of trains, needs the permission of the owners to the use of the different assets. It is for this reason that under sections 17 and 18 of the 1993 Act, the Rail Regulator has the power to give directions to a "facility owner" to enter into

an "access contract" with the facility owner giving permission to use the facility owner's rail facility.

15.    As a facility owner, such as Railtrack, can be a monopoly owner of a railway facility who could unfairly exploit its position, the 1993 Act contains provisions which enable the Rail Regulator to give directions under sections 17 and 18 of the 1993 Act in two different situations:

    i)    situations where the facility owner and the person seeking access are agreed upon terms of an access contract but those terms may not be in the public interest; and

    ii)    situations where the person seeking access and the facility owner are unable to agree the terms of the access contract.

16.    In giving directions, and in performing his other duties, the Rail Regulator is required by section 4 to exercise his powers in a way which furthers the national and public interest in having an efficient and effective railway system. Section 4 of the 1993 Act provides so far as is relevant as follows:

> "(1) The Regulator shall have a duty to exercise the functions assigned to him under or by virtue of this Part in the manner which he considers best calculated-
>
> (za)    to facilitate the furtherance by the [Strategic Rail Authority] of any strategies which it has formulated with respect to its purposes;
>
> (a)    to protect the interests of users of railway services;
>
> (b)    to promote the use of the railway network in Great Britain for the carriage of passengers and goods, and the development of that railway network, to the greatest extent that he considers economically practicable;
>
> (ba)    to contribute to the development of an integrated system of transport of passengers and goods;
>
> (bb)    to contribute to the achievement of sustainable development;
>
> (c)    to promote efficiency and economy on the part of persons providing railway services;
>
> (d)    to promote competition in the provision of railway services for the benefit of users of railway services;

(e)    to promote measures designed to facilitate the making by passengers of journeys which involve use of the services of more than one passenger service operator;

(f)    to impose on the operators of railway services the minimum restrictions which are consistent with the performance of his functions under this Part;

(g)    to enable persons providing railway services to plan the future of their business with a reasonable degree of assurance."

In addition sections 4(2), (3) and (5) provide:

"(2) Without prejudice to the generality of subsection (1)(a) above, the Regulator shall have a duty, in particular, to exercise the functions assigned or transferred to him under or by virtue of this Part in the manner which he considers is best calculated to protect-

(a)    the interests of users and potential users of services for the carriage of passengers by railway provided by a private sector operator otherwise than under a franchise agreement, in respect of-

(i)    the prices charged for travel by means of those services, and

(ii)    the quality of the service provided,

in cases where the circumstances appear to the Regulator to be such as to give rise, or be likely to give rise, to a monopoly situation in the passenger transport market; and

(b)    the interests of persons providing services for the carriage of passengers or goods by railway in their use of any railway facilities which are for the time being vested in a private sector operator, in respect of-

(i)    the prices charged for such use; and

(ii)    the quality of the service provided.

(3)    The Regulator shall be under a duty in exercising the functions assigned or transferred to him under or by virtue of this Part-

(a)    to take into account the need to protect all persons from dangers arising from the operation of railways, taking into account, in particular, any advice given to him in that behalf by the Health and Safety Executive; and

(b)    to have regard to the effect on the environment of activities connected with the provision of railway services.

...

(5)    The Regulator shall also be under a duty in exercising the functions assigned or transferred to him under this Part-

...

(b)    to act in a manner which he considers will not render it unduly difficult for persons who are holders of network licences to finance any activities or proposed activities of theirs in relation to which the Regulator has functions under or by virtue of this Part (whether or not the activities in question are, or are to be, carried on by those persons in their capacity as holders of such licences);

(c)    to have regard to the financial position of the [Strategic Rail Authority] in discharging its functions under this Part; and

(d)    to have regard to the ability of the Mayor of London, London Regional Transport and Transport for London to carry out the functions conferred or imposed on them by or under any enactment."

If there was any doubt of the fundamental nature of the Rail Regulator's role these provisions of section 4 make it clear.

17.    Where a facility owner and a train operating company have agreed the terms of an access contract, then unless the access contract is of a class or description specified in a general approval given by the Rail Regulator, the facility owner must pursuant to section 18 (5), submit the proposed contract to the Rail Regulator for his approval. He may then reject it, approve it, or approve it subject to modifications. In deciding which of these alternatives is the appropriate course to adopt the Rail Regulator has to comply with his section 4 responsibilities to which I have already referred. If the Rail Regulator decides that he should approve a proposed access contract, he issues directions to the facility owner requiring him to enter into the proposed access contract (section 18 (6)). It is then the duty of the facility owner to comply with the directions (section 144 (1)).

18.    If, taking account of his section 4 duties, the Rail Regulator concludes that he should approve a proposed access contract subject to modifications, he issues directions to the facility owner requiring him to enter into the proposed access contract as modified (see section 18(7)). If the facility owner objects to the modifications he is released from his duty to comply with the directions (section 18 (7)(c)(i)) and then the parties have either to agree a new contract which can be approved under section 18 or activate the section 17 procedure.

THE SECTION 17 PROCEDURE

19.    The section 17 procedure enables the Rail Regulator on the application of "any person" to give directions to a facility owner requiring him to enter into an access contract except in certain limited situations which are not relevant. Section 17(2) identifies the purposes for which directions may be given. They include obtaining from a facility owner whose railway facility is track, permission to use that track for the purpose of the operation of trains on that track.

20.    The Rail Regulator is not required to give directions and the directions which he does give may be different from those which the applicant for the directions sought. Because of this, while the facility owner is under a duty to comply with the directions, the applicant is not required to enter into the contract with the facility owner. However, if the applicant "fails to enter into an access contract on the terms required by the directions by the date specified in the directions" the facility owner is released from his duty to comply with the directions (see Schedule 4, paragraph 5(4)).

21.    The reading of section 17 and section 18 together with section 4 demonstrates that the Rail Regulator can have a separate agenda from that of the applicant or the facility owner when performing his section 17 and section 18 functions. That this is the position is emphasised by the fact that he also has a responsibility to "interested persons". "Interested persons" are defined in schedule 4 as being "any person whose consent is required by the facility owner as a result of an obligation or duty owed by the facility owner which arose after the coming into force of section 17 of this Act, before the facility owner may enter into the required access contract.". In many cases they would include operators who are in competition with the applicant. The Rail Regulator is under a duty to invite interested persons to make written representations to him and to take account of those representations in coming to his decision.

22.    The Vice-Chancellor accepted the submission of Mr Moss that he should attach importance to the procedure which is prescribed by schedule 4 of the 1993 Act for making applications under section 17. It is pointed out that there is a similarity between the procedure for making an application for directions and procedures associated with legal proceedings. Thus, under paragraph 2 of the schedule, there has to be a written application for directions. It is to contain particulars of the required rights, specifying the terms which the applicant proposes should be contained in the contract, including any representations which the applicant wishes to make with regard to the required rights or the terms to be contained in the proposed access contract. The Rail Regulator is required to send a copy of the application to the facility owner and to invite the facility owner to make written representations and then send a copy of any such representations to the applicant and invite him to make further written representations. The Rail Regulator has the power to invite further information, clarification or representation.

23.     There is also the procedure for involving any interested persons to which reference has already been made. The Rail Regulator is required to inform the applicant, the facility owner and any interested person of his decision (paragraph 5(1)). If he decides to give a direction, he has to specify its terms. He has also to give directions, where appropriate, to the applicant or the facility owner requiring him to pay compensation "of such amount as may be specified in the directions to such interested persons as may be so specified". Further, if directions are given to the facility owner and interested person, they are binding on them (paragraph 6).

24.     In view of these requirements, I accept that the procedure for obtaining a section 17 direction from the Rail Regulator has many of the qualities of a procedure which is associated with legal or quasi-legal proceedings. However, I attach less significance to this than was given to it in the court below. The procedure is designed to achieve fairness, but fairness is today a requirement of virtually all administrative decision making and can be a requirement of administrative processes which would never be classified as legal or quasi-legal or involving arbitration.

THE FACTS

25.     The background facts can now be dealt with very briefly as, after this dispute had arisen, the parties have come to an agreement as to the terms of the direction. However, the story starts with a Railway Administration Order in respect of Railtrack being made on the petition of the Secretary of State under section 60 of the 1986 Act on 7 October 2001 on the ground that Railtrack was likely to be unable to pay its debts. On 2 April 2002 the Railway Administrators produced a statement of their proposals for achieving the purpose of the order required by section 23 of the 1986 Act (as modified in its application to a Railway Administration Order).

26.     On 7 February 2002 EWS, a substantial freight train operator, applied to the Rail Regulator pursuant to section 17 for an access contract with Railtrack to replace the contract it had already which was due to expire on 31 May 2002. The application was duly served on Railtrack and representations were sent by the Railway Administrators to the Rail Regulator. The Railway Administrators objected to a number of the terms of the contract because it was their opinion that they would inhibit the achievement of the purposes of the Railway Administration Order. In that connection they then contended for the first time that section 11(3)(d) of the 1986 Act applied to the application made by EWS.

27.     By 25 April 2002 the Railway Administrators and EWS had resolved their differences and so informed the Rail Regulator. However, for understandable reasons, the Rail Regulator was still concerned to have the law clarified as to the applicability of section 11(3)(d) to the section 17 procedure and so the Rail Regulator commenced the proceedings which resulted in the order of the Vice-Chancellor which is now subject to appeal. Any declaration granted by the court in these circumstances is advisory, but it is

none the worse for that, if there is a genuine dispute which is sensible to have resolved. That is the position here.

CONCLUSIONS

28.   The extent of the differences between the parties is limited. If a direction is not complied with by a person to whom it is given, then under section 144 (2) of the 1993 Act, the direction is enforceable by the Rail Regulator by civil proceedings. Mr Sales, on behalf of the Rail Regulator accepts that, as is obviously the case, such proceedings would be subject to section 11(3)(d). Furthermore, it is accepted that the Railway Administrators, as officers of the court, are required to further the statutory purpose of the administration to transfer the undertaking to some other company as a going concern so as to ensure that relevant activities, including the carriage of passengers or the management of a network station, may be properly carried out. Here it is agreed that the observations of Lord Justice Nicholls in *Re Atlantic Computers Systems Plc* [1992] Ch. 505, 529 apply. Lord Justice Nicholls said:

> "An administrator is an officer of the court. He can be expected to make his decision speedily, so far as he can do so. He may be able at least to make an interim decision, such as agreeing to pay the current rents for the time being. The administrator should also make his decision responsibly. His power to give or withhold consent was not intended to be used as a bargaining counter in a negotiation in which the administrator has regard only to the interests of the unsecured creditors."

29.   None the less the Railway Administrators consider the protection provided by section 11(3)(d) in relation to section 17 applications is essential for the proper conduct of the administration. The Rail Regulator on the other hand considers that the need to obtain consent would be an unwarranted fetter on his powers.

30.   The reasons of the Vice-Chancellor for coming to his conclusion are set out succinctly in his judgment as follows:

> "41.   The conclusion I draw from these considerations is that it would be entirely consistent with the nature and purpose of a railway administration and with the functions and responsibilities of the special railway Administrators if the consent of the special railway Administrators or the leave of the Court is required for procedures prescribed by Railways Act which may affect the company or its property. The Railways Act provides for procedures in addition to those specifically mentioned in the modification of s.11(3)(d). Whether or not such procedures can be described as regulatory they are certainly similar to legal or quasi-legal or judicial proceedings.

42.    S.17 prescribes the process by which a person wishing to operate trains obtains the necessary permission to use the facilities needed for that purpose be they railtrack, stations or maintenance depots. The procedure is one which is susceptible both of commencement and continuation; it has some similarities with ordinary civil proceedings or arbitrations, though there are also differences. It may result in a direction which has an important impact on the management of the affairs, business and property of the company in railways administration which, by s.17 Insolvency Act as modified, is entrusted to the special railway Administrators. Indeed such a direction could frustrate the achievement of the statutory purpose. Accordingly, even though the Rail Regulator is subject to the duties imposed by s.4 and to judicial review and notwithstanding that some element of the procedure may be properly described as regulatory the nature of the s.17 procedure is entirely consistent with the need to obtain the consent of the special railway Administrators or the leave of the Court for its commencement or continuation.

43.    It was submitted on behalf of the Rail Regulator that it was sufficient protection of the functions and duties of the special railway Administrators if the process of enforcement prescribed by s.144 could, as he accepted, only be instituted with the consent of the special railway Administrators or the court. In my view the protection for the statutory purpose afforded by the application of s.11(3) as modified only to proceedings under s.144 would be insufficient. First, the s.17 procedure may give rise to substantial expenditure in time and money which is best avoided. Second, its conclusion gives rise to an obligation. It is true that the Rail Regulator may subsequently revoke the direction under s.144(3) but a successful applicant may already have invoked the obligation imposed on the facility owner by Schedule 4 para 6(1) in other contexts than enforcement proceedings under s.144. There is nothing unusual in a requirement for consent under s.11(3) at more than one stage. For example, it commonly happens that consent is sought and given to commencing negligence proceedings so that the claimant may obtain the benefit of the company's insurance cover but then refused if it is sought to enforce the resulting judgment against the company's assets.

44.    Given that it would be consistent with both the purpose of a railway administration and the nature of the s.17 procedure that consent should be required under s.11(3) as modified it is necessary also to consider the words used. Schedule 6 para 2(b) requires the words "other proceedings" to "include a reference to any proceedings under or for the purposes of" ss. 55 and 57A. Those sections provide for orders to be made at the conclusion of

out of court procedures which may well lead on to court proceedings properly so called. It is clear that the procedure down to the making of the order is not dissimilar to that prescribed by s.17. The word "include" may recognise that others of the same type are already included, as the special railway Administrators submit, or it may presuppose that they are not, as the Rail Regulator maintains.

45.    I prefer the first alternative. If the procedure prescribed by ss.55 and 57A leading up to the making of the orders of the Rail Regulator are to be treated as proceedings for the purposes of s.11(3) as modified I can see no rational basis for concluding that Parliament intended the s.17 procedure to be treated differently. Both prescribe a procedure which ends in a legal obligation. Both are subsequently enforceable by court proceedings which require separate consent under s.11(3). If "other proceedings.... against the company or its property" in s.11(3)(d) as modified does not include all proceedings analogous to those under or for the purposes of ss.55 and 57A then what is it which brings in the enforcement procedure provided for in s.144? The answer must lie in the generality of the words "other proceedings", but if the generality brings in s.144 I see no reason why, in the context of the Railways Act as a whole, it should exclude s.17.

46.    In conclusion I consider that the nature of both a railway administration and a s.17 application and the words used all indicate that Parliament intended the words "other proceedings..... against the company or its property" in s.11(3)(d) as modified to comprehend the s.17 procedure."

31.    Notwithstanding the clarity and persuasiveness of this reasoning, I have come firmly to a different conclusion. I strongly suspect that the reason why I take a different view from that of the Vice-Chancellor is that the Vice-Chancellor attaches less significance than I would to the regulatory nature of the section 17 procedure. To my mind, the fact that the Rail Regulator in determining an application has to take into account section 4 considerations which may be of little or no concern to the parties is wholly inconsistent with his role being likened to that of a judge or arbitrator. This is underlined by the Rail Regulator's power to reject an application under section 18 for a direction where the parties are agreed as to the terms of a proposed access contract. It is surprisingly not suggested that the section 18 procedure is subject to section 11(3)(d) yet the considerations which the Rail Regulator will have to take into account for an application under section 17 and 18 will be the same.

32.    Of course, if the issue before us is primarily to be determined with a view to safeguarding the administration, which is admittedly the purpose of section 11(3)(d) of the 1986 Act, sections 17 and 18 can be readily distinguished because section 18 only

applies where the Railway Administrators have agreed the terms of the contract and this would not happen if it is considered that the contract could interfere with the administration. However, while the desirability of not interfering with administration is relevant to the issue we have to determine, more important is the broader public interest role of the Rail Regulator which goes beyond the interests of even the administration of a rail company as important as Railtrack. The express purpose of the Railway Administration Order under section 59 (2) of the 1993 Act to ensure the transfer as a going concern of the railway company, even if this will result in the expenditure of public funds, is consistent with this, as is the fact that the Railway Administrators' role is not the same as that of other company administrators (although they have a concurrent duty to take into account the best interests of the creditors and members of a protected railway company).

33.     Notwithstanding the making of the Railway Administration Order, the Rail Regulator's role over the whole rail network and in relation to a company in administration remains the same. Because of his statutory responsibilities, the Rail Regulator is better placed to make an overall assessment of what is in the interests of the rail network than the Railway Administrators or even the court. I would regard it as surprising if his supervisory role relating to the running of the railway as a whole should be subject to the control of the administrator or (other than by way of judicial review) the court.

34.     Section 17 and section 18 are two different ways of achieving the same purpose, namely, the making of access contracts, the terms of which are subject to the approval and requirements thought necessary by the Rail Regulator. In the case of both section 17 and section 18, the Rail Regulator in coming to his decision, in relation to which he is required to make a direction, is performing a broader role than that required of a judicial or quasi-judicial decision-maker. Furthermore, even though the decision is not that selected either by the applicant or the facility owner (here respectively EWS and Railtrack) the decision is not reached as a result of a "legal process" "against the company" (here, against Railtrack).

35.     In my view, Mr Moss's submission that an application under section 17 of the 1993 Act is very much in the nature of, or analogous to, an arbitration is misconceived. It is inconceivable that an arbitrator would be in a position where he was required to take into account considerations which could be not be in the interests of the parties to the arbitration but third parties namely rail users. The fact that the Railway Administrators cannot misuse their powers to withhold their consent does not mean that Parliament could have intended them to have powers over the Rail Regulator. It is to turn the Rail Regulator's role on its head to make him subject to the consent of a body, namely the Railway Administrators, who it is his responsibility to regulate while the administration continues.

36.     While the relationship between section 17 and section 18 is inconsistent with the argument of the Railway Administrators, the position is different once the Rail Regulator has performed his function by making his direction. When it is known what his direction is,

then there is no difficulty in making his application for assistance of the court as to the enforcement of that direction by legal proceedings subject to section 11(3)(d).

37.    Unlike the Vice-Chancellor (paragraphs 44 and 45 of his judgment), I do regard it as significant that there is an express inclusion of a reference to section 55 and section 57A of the 1993 Act in section 11(3)(d). When the terms of those sections are examined, it is apparent that they are dealing with enforcement. The heading to that part of the Act is "Enforcement by the Regulator and the Authority". It is therefore appropriate that they should be treated in the same manner as section 144. It is not, however, so clear that they would be caught by section 11(3)(d).

38.    Finally, I refer to the decision of the Inner House in *Air Ecosse v Civil Aviation Authority anr* [1987] 3 BCC 492. That decision is not binding on us but, as the Vice-Chancellor acknowledges, the views of the members of the Court of Session are entitled to the greatest respect. However, he considered that the context being considered was very different from that with which we are at present concerned. That may be so, but that case did involve a similar conflict to that which exists here between the role of an administrator and the role of regulator. As a consequence of section 11(3)(d) of the 1986 Act, the Civil Aviation Authority, in that case, was in a similar position to the Rail Regulator, in relation to granting of air transport licences to a company in administration. Mr Sales recognises that parts of that decision have not been followed in this jurisdiction, but submits that the conclusion of the Inner House that it was unlikely that Parliament would have intended to limit the powers that it had conferred on the CAA by the terms of the 1986 Act is persuasive as to the proper approach to the issue here. I agree. The decision supports my approach to the present situation.

For these reasons I would allow the appeal and grant the declaration claimed by the Rail Regulator.

Lord Justice Waller :            I agree.

Lord Justice Robert Walker :            I also agree.

Order: Appeal allowed with costs of both actions to be paid as an expense of railway administration; agreed minute of order to be lodged with court; leave to appeal refused.

(Order does not form part of the approved judgment)