**EXHIBIT D**

**The Pensions Regulator** ✻

REASONS of the DETERMINATIONS PANEL of THE PENSIONS REGULATOR in relation to the Determination Notices issued on 15 June 2007 re: The Sea Containers 1983 Pension Scheme The Sea Containers 1990 Pension Scheme

The Pensions Regulator case references:

TM222 TM1495

1.    The Determinations Panel of the Pensions Regulator, ("the Panel"), convened an oral hearing which took place over two days, on 12 and 13 June 2007, in which the issues for determination were whether Financial Support Directions, ("FSDs") should be issued against Sea Containers Limited ("SCL"). The occupational pension schemes concerned were the Sea Containers 1983 Pension Scheme and the Sea Containers 1990 Pension Scheme, respectively the ("1983 Scheme") and the ("1990 Scheme"). Sea Containers Services Limited, ("SCSL"), is the Principal Employer of both schemes.

2.    The parties represented before us were the Pensions Regulator ("TPR") who appeared by counsel Miss Raquel Agnello; the trustees of the 1983 Scheme, who appeared by leading and junior counsel, Mr. Brian Green QC and Mr. Nicolas Stallworthy; the

trustees of the 1990 Scheme, who appeared by leading counsel
Mr. Robert Ham QC; and SCL, who appeared by leading counsel
Mr. Andrew Simmonds QC. Using the terminology of the Pensions
Act 2004 the ("2004 Act") SCL was the 'Target Person' and the
two sets of trustees had been identified by TPR in their Warning
Notices as 'Directly Affected Parties'.

3.    After the conclusion of the hearing the Panel took some time to
consider the evidence and submissions and then determined that
FSDs should be issued against SCL in respect of both schemes.

4.    We now set out our reasons for so determining. We start with a
synopsis of the relevant facts.

**The Facts**

5.    SCL is a company registered in Bermuda. Its core business, and
that of the Sea Containers Group, (the "Group"), is container
leasing. SCSL is wholly owned by SCL and is based in the United
Kingdom. SCSL was set up as a service company for the Group,
and in particular SCL, and effectively operated the container
leasing business. SCSL employed many of the Group's key central
management and its officers were based in London. This structure

permitted SCL to enjoy tax and other corporate advantages of being registered in Bermuda whilst having the headquarters of its container leasing business in London.

6.    On 18 August 1989 SCL entered into an agreement with SCSL which related to the services SCSL provided to the Group, (the "Services Agreement"). This formally documented the existing relationship between SCL and SCSL and provided, amongst other things, that:

"2.    SCSL's obligations

(a)    *SCSL will provide SCL with such of the Services[1] as SCL shall reasonably require at such times and for such periods as SCL shall reasonably specify. In consideration of the provision of Services by SCSL and/or of SCSL holding itself available to provide Services, SCL will pay to SCSL such proportion of the Cost of the Services[2] as SCSL shall determine by reference to the Services provided.*

(c)    *SCSL shall be entitled to charge SCL in respect of the Cost of the Services at such intervals (not less than monthly) as SCSL shall determine and shall be entitled to be paid in*

---

[1] Defined as "*all management administration, financial, accounting and other services which SCSL is able to supply to companies in the Group.*"
[2] Defined as "*the cost of providing Services to companies in the Group including but not limited to the cost of the remuneration and employee benefits of the employees including payments on termination of employment, however terminated, and all overheads.*"

advance if it shall so request. SCL shall pay to SCSL the amount charged to it promptly against presentation of the relevant invoice or statement.

(d)     If, for any reason whatsoever, any company in the Group[3] fails to pay or indemnify SCSL in respect of that proportion of the Cost of the Services which SCSL determines to charge to such company and/or avoids or seeks to avoid its liability to SCSL in respect thereof SCSL shall be entitled to recover from SCL that proportion of the amount which should have been paid by the defaulting company.

(e)     The obligation of SCL to pay, reimburse and indemnify SCSL in respect of the Cost of Services shall continue for so long as SCSL shall itself be under any obligation or liability in connection with the provision of Services, past, present and future, including but [not] limited to obligations to employees and former employees in respect of remuneration, pensions, termination payments or other employment benefits. "

7.     The unchallenged evidence before us was that it had always been the intention of SCL to stand behind the obligations of SCSL, its representative in the UK, and that this intention applied equally to SCSL's pension liabilities as it did to other liabilities. For many years SCL did, it appears, stand behind those liabilities. However,

---

[3] Defined as "SCL and all other companies which are subsidiaries (whether direct or indirect) or affiliates of SCL wherever incorporated".

SCL's notice to the 1983 trustees dated 8 June 2006 in which they purported to terminate their participation in and liability to contribute as a participating employer to the 1983 Scheme was taken by the 1983 trustees as signalling a sea change in their attitude.

8.      Fees for SCSL's services to the Group were charged to SCL and other relevant companies on a quarterly basis. The charges were calculated on a "costs plus" basis. The mark up applied was dictated by an agreement with HM Revenue and Customs. In essence, this was that SCSL would apply an uplift of 10% to its costs and charge "costs plus uplift" to the individual companies in the Group.

9.      Although SCSL charged out its services to the companies within the Group to whom it provided services, no actual payments for services were normally made and inter-company balances were set up. Flows of cash within the Group were tightly controlled, and cash was provided by SCL to SCSL to enable SCSL to meet its liabilities as they became due but SCSL did not hold surplus cash. As an example of the debt due from other group companies which could exist towards SCSL at any one time, the notes to the 2004

SCSL accounts show a debt of £17.953 million owed to SCSL by group companies.

10. Turning to the pension schemes, SCL was a participating employer of the 1983 Scheme from late 1989 to relatively recently, although the precise date on which it ceased to adhere to the 1983 Scheme is in dispute. SCL did not participate in the 1990 Scheme. However, for much of the life of the 1990 Scheme, senior officers of SCL served as its trustees. In their initial report to scheme members in 1991, the then trustees of the 1990 Scheme recorded that:

*"Sea Containers is committed to the future of the Scheme and believes strongly in the value of Occupational Pension Schemes in preference to Personal Pensions."*

11. The financial position of both schemes is now parlous. The most recent valuation of the deficit in the 1983 Scheme on a buy out basis (effective date 8 June 2006) is £105.4 million. The like valuation for the 1990 Scheme, with an effective date of 31 March 2006, shows a deficit of £17.6 million.

12. On 7 June 2006 TPR was contacted by solicitors acting on behalf of the trustees of the 1983 Scheme, expressing concern about the ability of the Group to support the 1983 Scheme.

13. On 13 July 2006, TPR asked SCL to provide assistance to TPR in carrying out its regulatory functions, and in particular to provide financial information. This was followed on 24 July 2006 by a meeting in which SCL outlined, without providing much detail, proposals for the financial restructuring of the Group.

14. On 29 September 2006 TPR wrote to SCL in the following terms:

"*As you will be aware, the trustees of the [1983 and 1990] schemes have contacted the Regulator in connection with their concerns about the financial position of the Sea Containers Group and the support for the schemes going forward. The Regulator has had various discussions with the trustees and also met with yourselves during the past few weeks in an attempt to clarify the position.*

*The Regulator understands that Sea Containers is currently working on a restructuring plan for the Group but that no detailed proposals have been made to the trustees of the schemes in relation to the schemes' combined outstanding debt of approximately £138m (based on recent estimates). This situation is of considerable concern to the Regulator.*

*This letter is to inform you that the Regulator is of the view that the principal employer of both schemes, [SCSL], is a "service company" under section 43(2)(a) of the Pensions Act 2004. Consequently, based on the information currently held, it is our view that the Sea Containers Group may be subject to a financial support direction under section 43 of the Pensions Act 2004. You may wish therefore to consider your position very carefully and take due note of the Regulator's powers."*

15.    SCL acknowledged this letter in a conference call held on 2 October 2006.

16.    On 15 October 2006, SCL, SCSL and another subsidiary of SCL filed for Chapter 11 protection in the United States Bankruptcy Court for the District of Delaware. An official committee of unsecured creditors of SCL was appointed on 27 October 2006, the ("SCL Committee"). On 23 January 2007 a second official committee of unsecured creditors of SCSL was formed, the ("SCSL Committee"). The trustees of both schemes are members of the SCSL Committee.

17.    Warning Notices in relation to each scheme were sent to SCL (via Sidley Austin, its then lawyers) on 19 October 2006.

8

Representations in response to these were received from both sets

of trustees. Subsequently, Amended Warning Notices, which

incorporated the Representations that had been received, were sent

out on 26 April 2007. The case in favour of issuing FSDs against

SCL remained the same between the two sets of Warning Notices.

18.    As was its right, SCL requested an oral hearing and the Panel

agreed to this request.

The arguments in relation to reasonableness

19.    The case in support of issuing FSDs was initially made by TPR in

Amended Warning Notices dated 26 April 2007. In the hearing,

submissions on behalf of TPR were considerably supplemented by

those made on behalf of the 1983 and 1990 trustees. Together,

these three parties argued in favour of issuing FSDs.

20.    Their case was based on SCSL being a 'service company' (section

43(2)(a) of the 2004 Act), and they also argued that SCL was

associated or connected with SCSL (section 43(6)(c)).

Mr. Simmonds, on behalf of SCL, expressly conceded these two

issues at the outset of the hearing. The fact that the schemes were

occupational pension schemes was never questioned. As a result,

the main focus of submissions in favour of the issuing of FSDs
(and, indeed, of those made in opposition) was on whether it was
reasonable to issue FSDs.

21.    The Panel cannot determine to issue an FSD unless it considers that
it is reasonable to impose the requirements of an FSD on SCL. In
deciding whether or not this is so, we are directed under Section
43(7) of the 2004 Act to have regard to such matters as we consider
relevant, including the matters specified in section 43(7)(a) to (e).
These are:

"*(a)    the relationship which the person has or has had with the
employer (including, where the employer is a company within the
meaning of subsection (11) of section 435 of the Insolvency Act
1986 (c.45), whether the person has or has had control of the
employer within the meaning of subsection (10) of that section,*

*(b)    in the case of a person falling within subsection (6)(b) or (c),
the value of any benefits received directly or indirectly by that
person from the employer,*

*(c)    any connection or involvement which the person has or has
had with the scheme,*

*(d)    the financial circumstances of the person, and*

10

(e)    *such other matters as may be prescribed.*

22.    We are also directed to take into account the matters set out in section 100 of the 2004 Act, that is (a) the interests of the generality of the members of the schemes and (b) the interests of anyone who appears to us to be directly affected by the exercise of the power.

23.    TPR and both sets of trustees provided detailed written submissions on the matters at 43(7)(a) to (d) and the 1983 trustees, in particular, supplemented these with thorough oral submissions. Although SCL opposed the issuing of FSDs throughout the hearing, the Panel understood that it did not challenge the case of TPR and the trustees in relation to sub-paragraphs (a), (c) and (d), but maintained a strong opposition to the case made by TPR under (b).

24.    Mr. Simmonds argued that there was no evidence that SCL derived benefit from SCSL. He said that there was no evidence that the 'costs plus' basis of payment was any less than the market rate. He pointed out that SCL gave consideration, pursuant to fulfilling its

obligations under the Services Agreement, for the services provided by SCSL. He also suggested that TPR's analysis of the cash sweep was one sided, failing to take into account SCL's provision of funds to SCSL to meet its ongoing costs.

25.  The Panel has taken full account of Mr. Simmonds' arguments in this respect but felt that there was a significant amount of evidence which pointed to 'benefits' being provided to SCL by SCSL (see 26 (2) below).

26.  It is the Panel's view that each of those prescribed factors points, in the circumstances of this case, in favour of issuing an FSD, in the case of each scheme, on the grounds that it would be reasonable to do so. In particular:

(1)  as to 43(7)(a): the unchallenged evidence was that SCSL was wholly owned by SCL and was controlled by it;

(2)  as to 43(7)(b): the Panel notes that the provision, and in particular the words "the value of any benefits received directly or indirectly by [SCL] from [SCSL]" are framed very widely. It was not suggested to the Panel that there

was any reason why it should construe the provision other than on the basis of its literal meaning. It appeared to the Panel that a literal construction of those words would permit it to take into account any of the following as examples of 'benefits' provided by SCSL to SCL:

(a)     SCL received the benefit of services from SCSL and did not, or did not usually, actually pay for these services. Instead, inter company balances were created which recorded the debt, but the arrangement was such that SCL did not have to make such debt good within any prescribed time. The notes to the SCSL accounts for the year ending 2004 show a debt owing by Group undertakings of £17.953 million; and

(b)     SCSL's function and position within the Group structure was designed to benefit the Group of which SCL was the ultimate parent. Under that structure SCL benefited from the favourable Bermudan tax regime while retaining (as was key in the container leasing business) a European trading base.

(3)    as to 43(7)(c): SCL was closely connected to both schemes. It adhered to the 1983 Scheme from 1989 until 2006 (as a participating employer). Senior executives of SCL were also trustees of the 1990 Scheme for much of its life. Scheme members worked for SCL and were connected to SCL through their service.

(4)    as to 43(7)(d): The unchallenged evidence was that SCL has substantial assets. Although this is not a factor which is raised under this paragraph, this is to be contrasted with the financial position of SCSL which is relatively poor. The evidence was not that SCSL had no assets at all, but such assets as it did have (principally in the form of the inter company balances within the Group) were subject to set off on the grounds of monies owed to SCL. It was not suggested by SCL that SCSL was in a position itself to meet the deficit in either the 1983 or the 1990 Schemes.

27.    In addition to the four prescribed matters in Section 47(3)(a) to (d); subsection (e) falls away because no further matters have been prescribed; the Panel considered a significant number of other

factors which were capable, we thought, of impacting upon the issue of reasonableness. Most of these were initially raised by SCL. While Mr. Simmonds did not maintain all the points originally put forward on behalf of SCL at the end of the hearing, in the light of the evidence that had been given, he did maintain a number of arguments in opposing the issuing of any FSDs.

*Chapter 11*

28.   Mr. Simmonds argued that the fact that SCL was in Chapter 11 bankruptcy was highly material to the question of reasonableness. He urged the Panel, first of all, not to issue FSDs because to do so would mean that SCL might be put in an impossible position in the event that the US Bankruptcy Court refused to approve either claims based on the FSDs or actual payments under the FSD arrangements. Arising from this, he suggested that the reasonable course, if FSDs had to be issued, would be to make them conditional upon approval by the US Bankruptcy Court.

29.   It was suggested on behalf of the trustees of the 1983 Scheme that the fact that SCL was in Chapter 11 bankruptcy was being used by SCL as a 'smokescreen'. However, we consider that on careful analysis the Chapter 11 issue is genuinely material. Accordingly,

15

the Panel felt that it was necessary to consider this issue in the context of whether or not it was reasonable to issue one or both FSDs.

30. We heard extensive evidence from two US Attorneys, Mr. Marc Abrams and Mr. David Agay, called by the trustees of the 1983 Scheme and SCL respectively. We were assisted by their evidence and felt that, for the most part, what was significant was the extent to which they agreed with each other on the material points. Taking into account, too, the submissions made by counsel in relation to this issue, the Panel considered that the following conclusions could be drawn:

(1)   the issuing of an FSD would not infringe the automatic stay which is a part of the protection provided to companies in Chapter 11 proceedings;

(2)   it would be preferable, from the point of view of each set of trustees looking to prove a claim in the Chapter 11 proceedings, to rely upon an FSD rather than the Services Agreement. Moreover, as Mr. Abrams made clear, the approach of the trustees would be to seek to rely upon both

an FSD (if issued) and the Services Agreement, the latter

being used to claim in respect of the liabilities of Group

companies other than SCL. We should add that it was also

made clear by Mr. Abrams that no duplicative claim would

be made;

(3)      it could not be guaranteed that the US Bankruptcy Court

would approve either a claim based upon an FSD or actual

payments under the FSD arrangements because (amongst

other things) one could not foresee the arguments which

would be raised against it. This meant that, were FSDs to

be issued against SCL, it might fail to implement

arrangements through no fault of its own;

(4)      it was equally true that it could not be suggested that a

claim based upon an FSD would not be approved by the

US Bankruptcy Court. Mr. Abrams' evidence was that it

was almost certain to be approved. Mr. Agay was

considerably less sure on that point;

(5)      an FSD would give the trustees a direct claim against SCL.

As such they would rank on an equal basis with the other

unsecured creditors of SCL;

(6)    it was inevitable that, to the extent that a claim based on an

FSD was successful, it would reduce the potential recovery

of other unsecured creditors of SCL;

(7)    if an FSD were issued, it would be possible to bring an

application to have the arrangements approved by the US

Bankruptcy Court within about 30 days. If the application

were contested in any serious way, it was plainly

foreseeable that a decision on the application would take

much longer than 30 days;

(8)    no application had been made for SCL's Chapter 11

proceedings to be recognised in the context of the UK

process;

(9)    the existence of a Bar Date (16 July 2007) is material only

if for other reasons the Panel concludes that it is reasonable

in all the circumstances to issue FSDs against SCL. In

other words, the Panel did not consider what, if anything,

to do as a result of the Bar Date until it had determined to

issue FSDs.

31.    On this basis, we cannot see that SCL can put its case any higher

than that it might not be able to get the approval of the US

Bankruptcy Court to a claim based on an FSD or to actual

payments under whatever financial arrangements SCL wished to

implement to meet its obligations under the FSD. However, the

2004 Act caters for such an eventuality, in the procedures which

relate to Contribution Notices. SCL would have the opportunity to

put before the Panel the reasons why it had not (yet) been able to

secure the approval of the US Bankruptcy Court. Whether or not,

on the facts then subsisting, a Panel would conclude that it was

reasonable to impose a Contribution Notice we cannot say. But the

point is that we would not, in determining in favour of issuing

FSDs against SCL, be putting SCL in an impossible position in the

way that Mr. Simmonds suggests.

32.    We should add that we consider it wrong to suggest, as

Mr. Simmonds appeared to do, that the provisions of the 2004 Act

which deal with FSDs and Contribution Notices do not apply in

cases of insolvency. We note, in this context, that it is specifically

provided that the jurisdiction is exercisable "at any time": see section 45(2)(a) and (b) of the 2004 Act. Moreover, it seems to the Panel that those provisions are likely to be of particular significance in insolvency situations.

*Prematurity*

33.    It was contended on behalf of SCL that TPR had acted prematurely in issuing Warning Notices, and that it would be similarly premature to issue FSDs now. The Panel understood Mr. Simmonds to rely upon the following matters in support of this argument:

(1)    as a matter of fact, more time should have been given to SCL to formulate proposals which then might be the subject of an application for clearance (as had happened in other cases which Mr. Simmonds suggested were comparable and which, he said, showed TPR acting in a more appropriate way);

(2)    no FSDs should be issued before the scope and validity of the Services Agreement had been established. The reason being that only then could it be said with any certainty

whether or not SCL had already provided financial support (within the meaning of section 45 of the 2004 Act) for SCSL's pension liabilities.

(3)     the Entity Priority Model, ( "the EPM"), demonstrated at least that it was unclear whether or not FSDs would benefit the members of the schemes. Until this had been established with clarity, no FSDs should be issued; and

(4)     the prospects of SCL making a successful application to the US Bankruptcy Court, which would be vigorously opposed by the SCL creditors, had not yet been assessed.

34.    The Panel did not consider that these arguments made good the argument on behalf of SCL that it would be premature to determine now to issue FSDs. In particular:

(1)     examination of the evidence which led up to the issuing of Warning Notices did not suggest that TPR had acted with inappropriate haste. Substantial time had been afforded to SCL to formulate proposals, and to explain to TPR its position (for example, through making a presentation

relating to the EPM). The evidence was that no proposal of any detail had been made, and nor had any application for clearance, nor had any intimation been given that such an application was forthcoming. The Panel did not accept that the issuing of Warning Notices destroyed SCL's bargaining position with the trustees of the schemes.

(2)     the argument relating to the scope and validity of the Services Agreement did not strike the Panel as an attractive one. There was no evidence that SCL had done anything to accelerate the process whereby those issues would be determined. There had been an eleventh hour approach from representatives of the unsecured creditors of SCL to attorneys acting for the trustees of the schemes in which an offer was made to accept the Services Agreement as valid and to acknowledge that 'pension benefits' under the schemes in respect of SCSL's employees amount to "Cost of the Services" as defined in the Services Agreement. However, that offer was made subject to a number of conditions, conditions which seemed to the Panel to be highly significant. Chief amongst these were the fact that no effort had been made to quantify 'pension benefits', a

point which would be of critical significance to the trustees of both schemes; the proviso that only if these Costs of the Services fell to be paid by SCL under Clause 2 of the Services Agreement would the schemes have an unsecured claim against SCL; the condition that the offer was subject to all rights of set-off to which SCL was allegedly entitled and, finally, the stipulation that rights in relation to '*all other related matters*' were reserved. Mr. Green characterised this as a 'non-offer'. The Panel considered that this was a fair description.

(3)    the Panel took a significant interest in the EPM. A general difficulty with placing too much reliance upon it was its overall nature. The information within it was not audited. It was simply a financial model, based on a series of assumptions, expressly acknowledged to be preliminary in nature and some aspects of which (for example, simultaneous realisation of assets across the Group and distribution through liquidators) plainly would not be borne out in practice. As the preamble to the EMP made clear, "actual outcomes may differ materially from those modelled". A major concern was that it did not deal with

the one scenario which should most obviously have been considered, that is, a scenario which assesses the position on the basis of the FSD being effective in relation to SCL together with the Services Agreement being effective to allow recovery in respect of the liabilities of Group companies other than SCL.

(4)    Mr. Agay (a witness for SCL) conceded in evidence that the trustees would not be worse off were they each to be armed with an FSD. We acknowledge that he did suggest that an FSD could worsen the bargaining position of each set of trustees, but we did not find this persuasive.

(5)    as we have already indicated, the Panel do not consider the risk that the US Bankruptcy Court might not approve a claim based upon an FSD to be a reason not to determine in favour of issuing FSDs in this case.

*Would the Trustees be better off with an FSD than proceeding on the basis of the Services Agreement?*

35.    Relying on the EPM, Mr. Simmonds contended that it could not be said with any certainty that the trustees would be better off if each

were to be armed with an FSD rather than proceeding on the basis

of the Services Agreement.  He also pointed to the offer, made by

Bingham McCutcheon on behalf of the SCL creditors committee

just prior to the hearing.

36.     The Panel reiterates the points made under paragraph 34(2) and (3)

above in relation to the EPM and the offer from Bingham

McCutcheon.

37.     In addition, the Panel accepted for the reasons explained in helpful

detail by Mr. Abrams in his evidence and reiterated by Mr. Green

in his closing submissions that a claim based upon the Services

Agreement would be considerably more vulnerable than a claim

based upon an FSD.

*Super priority*

38.     Mr. Simmonds raised the issue of super priority. He rightly pointed

out that TPR had, in previous cases, pointed out that it was not part

of its function to put scheme trustees in a position of 'super

priority' in relation to other creditors. He also pointed out, rightly

the Panel thought, that it would be wrong of this Panel to put the

trustees of either scheme in a position which was not consistent
with the *pari passu* treatment of creditors of SCL.

39.    It is the view of the Panel that determining to issue FSDs in this
case will not put the trustees of either scheme in a position of super
priority or preference. They will rank equally with the other
unsecured creditors of SCL. What an FSD will do, which is plainly
what Parliament intended, is to facilitate the trustees making a
proper claim against an entity against which it might otherwise not
be able to make any direct claim.

40.    As we explained in the context of the Chapter 11 issues in general,
it is in our view an inevitable consequence of issuing an FSD in
these circumstances (and assuming a successful claim made by the
trustees of either or both schemes) that the amount available for
other unsecured creditors of SCL would be reduced. The Panel
does not view this as a reason, in the circumstances of these
schemes and these cases, not to determine in favour of issuing
FSDs.

*SCL Creditors Committee*

41.   Mr. Simmonds stressed that a major difficulty with these cases was that the SCL creditors committee, which represents the unsecured creditors of SCL, was not present to make representations. We acknowledge that those creditors have an interest in the proceedings and in the issue of whether or not it would be reasonable to issue FSDs. As we understood Mr. Simmonds' case at the conclusion of the hearing, it did not matter whether they were viewed as directly affected parties or indirectly affected parties. Their interests should have been taken into account.

42.   The Panel felt whilst there was some force in this submission, in a general sense, their interests had been taken into account. Arguments against the issue of any FSDs were strongly made by Mr. Simmonds on behalf of SCL and the Panel can see no reason to suppose that the creditors' arguments would have been any more forceful than those raised on behalf of SCL.

43.   It is also right to say that the SCL creditors committee was told in a letter from TPR to Bingham McCutcheon, which is undated but appeared at pages 356-357 of the bundle relating to the 1983 Scheme, that if they did not agree with TPR's view that they were

not Directly Affected Parties then TPR *"may consider requesting the Determinations Panel to determine whether your clients are or are not Directly Affected Parties as a preliminary issue"*. No reply to that letter or such a request to the Panel was received.

*Consistency*

44.    Mr. Simmonds submitted that it was important for TPR to act consistently, and that, in these cases, TPR was not doing so. It appeared to the Panel that there was overlap here with SCL's arguments in relation to alleged premature action by TPR (or by this Panel). By reference to reported facts of other cases in which TPR became involved, in particular cases which culminated in clearance applications, Mr. Simmonds appeared to suggest that TPR should have stood back in this case and waited for SCL to put up proposals which might themselves be the subject of such an application.

45.    The Panel saw three flaws in association with this submission. First, the Panel was not satisfied that the details of the other cases to which Mr. Simmonds referred were necessarily accurate, or fully accurate. Inevitably those aspects of them that were presented in the reports to which Mr. Simmonds referred were themselves

selective and did not emanate from any official source. We do not

say this by way of criticism, but note that it was not at all clear how

reliable those details were as evidence of TPR's practice.

46.    Of more concern to the Panel was SCL's apparent assumption that

the approach of TPR in relation to clearance applications, and the

approach in the context of potential use of TPR's powers to issue

FSDs were one and the same thing. The evidence before the Panel

was that they are not, and are dealt with separately within TPR

itself.

47.    Finally, on this topic, the Panel reiterates its view that the evidence

does not show TPR acting with any undue haste. Contrary to the

evidence of Mr. Tilbrook, who said that he and his colleagues had

been surprised by the issue of Warning Notices by TPR, it was

clear that the issue of Warning Notices had been preceded by a

warning in correspondence that TPR was considering using its FSD

powers. It appeared to the Panel that TPR had spent considerable

time seeking to understand SCL's position and was keen

throughout to examine any proposals that it might make. The fact

is that SCL made no proposals which could be considered by TPR.

*Jurisdiction*

48.   The Panel did not understand the points originally made on behalf

of SCL, to the effect that there was impropriety in TPR issuing

Amended Warning Notices, to be maintained by the conclusion of

the hearing. In any event the Panel was unable to discern any

prejudice accruing to SCL (or, indeed, any party) as a result of the

issue of such Amended Warning Notices.

*Hansard*

49.   The Panel heard lengthy submissions on the assistance which

might or might not be gained by reference to Hansard, standing

committee minutes and the like. It appeared by the end of the

hearing that Mr. Simmonds only relied on such material in one

respect, that is, in relation to the meaning of 'non-compliance' in

section 47(1) of the 2004 Act.

50.   The Panel's view was that this phrase is not such as to fall within

the limited circumstances in which the courts have accepted that

Hansard and the like may be referred to as an aid to construction.

There is nothing ambiguous, obscure or absurd about the relevant

provision and it is our view that it must be taken to mean a failure

to comply for whatever reason, in particular, whether it is deliberate or involuntary. As we have pointed out previously, there is an opportunity for a person who is the potential target of a Contribution Notice to argue that it would be unreasonable to impose such a Notice, and provision is specifically made for consideration to be given to the reasons for non-compliance.

51.    In all the circumstances, therefore, the Panel considered that the grounds for making an FSD in the case of both the 1983 Scheme and the 1990 Scheme were well made out, and that it was reasonable in all the circumstances (and in both cases) to determine in favour of issuing those FSDs.

Signature:    *Olivia C. Dickson*

Name:            Olivia C. Dickson

Date:             .................25 June 2007.............................

**On behalf of the Determinations Panel of the Pensions Regulator**