**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

```
------------------------------------------------  x
In re:                                            :   Chapter 11
                                                  :
                                                  :   Case No. 09-10138 (KG)
Nortel Networks Inc., et al.,[1]                  :
                                                  :   Jointly Administered
                    Debtors.                      :
                                                  :
                                                  :
------------------------------------------------  x
```

## DECLARATION OF ROBERT WALLACE HAM, QC IN SUPPORT OF THE OBJECTION OF THE TRUSTEE OF NORTEL NETWORKS UK PLAN AND THE BOARD OF THE PENSION PROTECTION FUND TO DEBTORS' MOTION FOR ENTRY OF AN ORDER ENFORCING THE AUTOMATIC STAY AGAINST CERTAIN CLAIMANTS WITH RESPECT TO THE UK PENSION PROCEEDINGS

I, Robert Wallace Ham, Queen's Counsel, do hereby declare as follows:

1.     My address is 21 Belsize Park Gardens, London NW3 4JH (home) and

Wilberforce Chambers, 8 New Square, Lincoln's Inn, London, WC2A 3QP (professional

address).

2.     I submit this declaration in support of the Objection of the Trustee of Nortel

Networks UK Plan (the "Trustee") and the Board of the Pension Protection Fund (the "PPF")

to Debtors' Motion For Entry of an Order Enforcing the Automatic Stay Against Certain

Claimants with respect to the UK Pension Proceedings (the "Motion"). Unless otherwise

noted, the facts set forth in this declaration are based upon my personal knowledge, upon my

---

[1]     The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's tax identification number, are: Nortel Networks Inc. (6332), Nortel Networks Capital Corporation (9620), Nortel Altsystems Inc. (9769), Nortel Altsystems International Inc. (5596), Xros, Inc. (4181), Sonoma Systems (2073), Qtera Corporation (0251), CoreTek, Inc. (5722), Nortel Networks Applications Management Solutions Inc. (2846), Nortel Networks Optical Components Inc. (3545), Nortel Networks HPOCS Inc. (3546), Architel Systems (U.S.) Corporation (3826), Nortel Networks International Inc. (0358), Northern Telecom International Inc. (6286), Nortel Networks Cable Solutions Inc. (0567) and Nortel Networks (CALA) Inc. (4226).

opinion based on my experience or upon the instructions that I have received from Willkie Farr & Gallagher LLP on behalf of the Trustee and the PPF.

3.      I have been retained by the Trustee and PPF and am being compensated at a rate of £750 per hour, which is the customory hourly rate that I charge clients for my services.  My compensation does not depend or vary based upon the content of my opinions, the results of my work, or the outcome of Debtors' Motion.  I have not previously acted for the Trustee and/or the PPF in any matter save that I have advised the Board of the PPF in relation to the Fraud Compensation Fund.  That is a fund separate from the PPF administered by the Board whose purpose is sufficiently indicated by its name.

**Qualifications and experience**

4.      I was called to the Bar of England and Wales by the Middle Temple in 1973 and became a Queen's Counsel in 1994. After pupillage with Mr Donald Rattee (later Mr Justice Rattee), I have been in practice at the Chancery Bar in England since 1975 (except for about three years when I was engaged full time in a case in Bermuda).  I was appointed a Deputy High Court Judge in 2003 and elected a bencher (member of the governing body) of the Middle Temple in 2004.

5.      A major part of my practice relates to occupational pension schemes, and has done for many years.  I was one of the first barristers to join the Association of Pension Lawyers, when it was set up in 1984.  I was co-author of Tolleys' Pensions Handbook (described by the reviewer in British Pension Lawyer as "a great book").  I have appeared in many pensions cases, including the first cases to reach the Court of Appeal and House of Lords and the first (and to date only) contested financial support direction ("FSD") case.

**Instructions**

6.      I have been instructed by Willkie Farr & Gallagher LLP, counsel for the Trustee and the PPF, to make this declaration explaining the law and practice relating to FSDs. To the best of my knowledge and belief the contents of this declaration are true.

**Background to the 2004 Act**

7.      The power to issue an FSD was conferred on the Pensions Regulator (the "Regulator") by the Pensions Act 2004 (the "2004 Act"). (Excerpts of relevant provisions of the 2004 Act referred to in this declaration are attached hereto as Exhibit A.)

8.      Before the 2004 Act the main pensions legislation was contained in the Pension Schemes Act 1993, and the Pensions Act 1995 (the "1995 Act"). The main provisions of the 1995 Act came into effect in 1997. There was, however, soon dissatisfaction with the statutory regime governing occupational pension schemes and the 2004 Act was the culmination of several years consideration and consultation by the British Government.

9.      In June 2003, after a period of consultations initiated by the Department for Work and Pension and Inland Revenue with respect to certain proposals for pension reform, the U.K. Government published a White Paper entitled *Action on Occupational Pensions*. (Excerpts of the White Paper are attached hereto as Exhibit B.) The White Paper stated that:–

(1)      The Government had decided to "establish a compensation scheme known as the Pensions Protection Fund run by a statutory body, to protect private sector defined benefit scheme members whose firms become insolvent with unfunded liabilities in their pension scheme": see § 5.

(2)      A new pensions regulator ("the Pensions Regulator") would be brought into existence to replace the existing Occupational Pensions Regulatory Authority ("OPRA") and would, among other things, "be provided with a responsive and

proportionate regulatory "tool-kit", including powers to sanction, which will enable it to take a targeted and appropriate approach to breaches of pensions legislation and to other matters of conduct that pose a risk to members' benefits": see §21.

10.     This background makes it clear that:–

(1)     The 2004 Act came into existence as part of the Government's wider efforts to ensure improved protection of members' pension scheme benefits, particularly members of defined benefit schemes.

(2)     The creation of a fund of last resort was seen as essential to the proper protection of members' pension scheme benefits.

(3)     A new proactive regulator was seen as necessary to enhance the protection of members' benefits. This new regulator would be entrusted with the task of supervising, regulating and issuing codes of practice to guide pension scheme trustees.

(4)     The new regulator would need proper powers to carry out its task, including "anti-avoidance" powers, which would prevent an employer from seeking to avoid its responsibility to fund its pension scheme properly. The power to issue an FSD is one such power.

11.     Finally, the draft of the 2004 Act, the Pensions Bill, was laid before Parliament on 10 February 2004. This covered many of the areas on which the UK Government wished to legislate but a significant amount (78 sections) was added to the Bill by the time it finally received Royal Assent on 18 November 2004. Much of the debate in Parliament concerned the "anti-avoidance" powers and the need to tackle moral hazard, dealt with below.

**The 2004 Act**

12.     The Act established two new non-departmental public bodies:–

(1)     the Regulator which replaced OPRA; and

(2)     the Pension Protection Fund (the "PPF")

each of which is described briefly below.  Both the Regulator and the PPF fall within the field of interest of the Department of Work and Pensions.

**The Regulator**

13.     Part 1 of the 2004 Act establishes the Regulator.

14.     Under sections 2 and 3 of the 2004 Act the Regulator consists of a Chairman appointed by the Secretary of State and a minimum of five other Government-appointed members and a Chief Executive.  There are also a number of non-executive committee members who monitor the activities of the Regulator. Section 9 of the 2004 Act requires the Regulator to establish a "Determinations Panel" to which I refer further below.

15.     The Regulator is a new non-departmental public body created by the 2004 Act to replace OPRA. The Regulator took over OPRA's existing powers and has been given additional, new powers, such as the power to issue improvement notices or third party notices to remedy breaches, the ability to freeze a scheme to protect members' benefits or scheme assets whilst investigations by the Regulator take place, and to make orders in respect of transactions at an undervalue.  The additional powers also include the power to issue an FSD, which is conferred by section 43 of the 2004 Act as set out below.

16.     The functions of the Regulator are set out in section 4 of the 2004 Act and include the power to issue FSDs.  In exercising its functions, the main objectives of the Regulator set out in section 5 of the 2004 Act include not only the protection of benefits under occupational pension schemes and reducing the risk of situations arising which may lead to compensation being payable from the PPF but also the promotion of the good administration of such schemes.

17.     As stated in the Explanatory Notes to the 2004 Act (attached hereto as Exhibit

C) the Regulator aims to operate a targeted and proportionate regulatory regime, applying greater regulatory scrutiny where it considers benefits of members of occupational pensions schemes are most at risk. This approach is supported by increased powers to gather, retain and share information. The information gathered will be subject to analysis to help identify those schemes where members' benefits are more likely to be at risk. The 2004 Act provides the Regulator with an extensive range of powers to enable it to perform its functions effectively. These include, for example, the power to require persons to provide information and produce documents that are relevant to the exercise of the Regulator's functions under section 72 of the 2004 Act.

18.    As already indicated, the 2004 Act introduced the power to issue FSDs. This is one of the tools at the disposal of the Regulator to combat the moral hazard referred to below since it is a feature of pensions schemes that only the employer of the scheme (and not the companies in the employer's group in the absence of a covenant from them to that effect) is liable to fund the scheme. A committee established by but independent from the Regulator, known as the Determinations Panel exercises the Regulator's power to issue FSDs together with other reserved regulatory functions. The Determinations Panel consists of no fewer than six members and a Chairman. The Secretary of State appoints the Chairman, but he then nominates the other members of the Panel.

19.    The Determinations Panel is also entirely separate from the PPF: under section 9(5)(c) and (d) of the 2004 Act members of the Board of the PPF and its employees are ineligible to be members of the Panel. Like other public bodies it is subject to the rules of natural justice and must act fairly as a matter of administrative law.

**The PPF**

20.    Part 2 of the 2004 Act establishes the Board of the PPF whose primary function is to hold manage and apply the PPF. It is a statutory corporation constituted under

6

Section 107 of the 2004 Act. It is entirely a creature of statute and part of the statutory framework that the Government wished to introduce in the public interest by means of the 2004 Act.

21.     The Chairman of the Board of the PPF is appointed by the relevant Secretary of State, as were its other initial members: see Schedule 5 Part 1 to the 2004 Act. The PPF is required by statute to prepare an annual report to be sent to the minister and laid before the U.K. Parliament under Section 119 of the 2004 Act.

22.     Chapter 2 of Part 2 provides for the Board to assume responsibility for eligible schemes in certain circumstances. Very much simplifying complex provisions, in order to qualify for this protection there must be an insolvency event and the PPF must accept that the pension scheme is eligible for protection. The latter will be determined during what is known as an "assessment period". If, at the end of an assessment period, the value of the scheme assets are below the compensation levels offered by the PPF and a scheme rescue is not possible, the PPF will assume responsibility for the scheme and, upon a transfer of assets by the trustees of the scheme to the Board of the Pensions Protection Fund, the trustees will be discharged from their obligations arising under the scheme.

23.     The PPF is funded by a composite levy on schemes (this comprises an administration levy, an initial levy, a PPF Ombudsman levy and a pension protection levy). Although there is a scheme-based levy (determined by the number of members, earnings and liabilities of the scheme), the total amount levied on a particular scheme will be directly calculated by the level of risk that the scheme appears to represent.

24.     To assist in the exercise of its functions, the PPF has significant statutory powers, such as the power to search premises and to require information under sections 190–2); and failure to comply the PPF's actions in this regard may amount to a criminal offence under section 193 of the 2004 Act.

25.     The PPF has particular powers in relation to a pension scheme whilst it is in the PPF "assessment period" described above.  During this period, the PPF has the power, under section 134(2) of the 2004 Act, to give directions to the trustees of a scheme in respect of the instigation or conduct of legal proceedings and the incurring of expenditure.  That subsection provides that:–

"With a view to ensuring that the scheme's protected liabilities do not exceed its assets or, if they do exceed its assets, that the excess is kept to a minimum, the Board may give a relevant person in relation to the scheme directions regarding the exercise during that period of his powers in respect of –

      (a)    the investment of the scheme's assets,

      (b)    the incurring of expenditure,

      (c)    the instigation or conduct of legal proceedings, and

      (d)    such other matters as may be prescribed."

The trustees are relevant persons and are obliged to comply with such directions on pain of civil penalties being imposed if they fail to take reasonable steps to secure compliance with any such direction.

26.     During an assessment period, the rights and powers of the trustees of a scheme in relation to any debt due to them by the employer (including a section 75 debt, which is a statutory debt due from the employer to a trustee upon the occurrence of certain events set forth in section 75 of the 1995 Act) are exercisable by the PPF to the exclusion of the trustees: see section 137 of the 2004 Act.  Despite this it would appear that the trustee remains the legal owner of the debt during the assessment period.

**The Moral Hazard Provisions**

27.     One of the key areas of debate at the time of enacting the 2004 Act, was the issue of "moral hazard", a subject that occupied significant space in the White Paper:

"6.   Some respondents were concerned that introducing such a scheme [the PPF] could introduce an element of moral hazard.   We paid particular attention to this important concern in developing our proposals, learning lessons from the compensation scheme that has been running in the United States since the 1970s.

7.   There are two key risks.   The first is that the company could choose to fund to a low level, or the trustees hold a higher risk portfolio than appropriate, because of the existence of the compensation scheme…

8.   The second key risk is that there could be incentives for example for directors of a company or providers of finance to seek to wind up the company, in order to avoid the debt on the pension scheme …"

28.   The U.K. Government identified that the introduction of the PPF created issues of moral hazard or avoidance, and unless there were suitable safeguards, it might be possible for some unscrupulous employers to manipulate their affairs in such a way that scheme liabilities were effectively "dumped" onto the Pension Protection Fund.   As a consequence, the 2004 Act contains so-called "anti-avoidance" powers, which apply with effect from 27 April 2004.

29.   The legislative framework for the "anti-avoidance" powers is contained in sections 38–57 of the 2004 Act.   This has been supplemented by Regulations made under that Act and in particular the Pensions Regulator (Contribution Notices and Restoration Orders) Regulations 2005 and the Pensions Regulator (Financial Support Directions etc) Regulations 2005 (the "FSD Regulations").   The first group of sections deals with contribution notices where something has been done to avoid the section 75 debt.   This is followed in sections 43 & ff by the sections relating to the issue of FSDs.

30.   The power to issue an FSD is an important "anti-avoidance" power, which enables the Pensions Regulator to look through "the corporate veil" in relation to often complex group company structures. This reflects the importance attached by English law to the separate corporate personality of companies in the same group, none of which, in the usual case, will be liable for the debts or obligations of the others.   Thus, in the absence of an

express covenant, other companies in the employer's group have no obligation to help make good any deficiency in the employer's pension scheme. The FSD rules attempt to redress this fact if certain criteria are fulfilled.

31.    If the Regulator considers that an employer is failing to provide proper financial support for its pension scheme, an FSD will require the "target" person or persons named in it to put in place financial support for the scheme by a particular date and maintain such support until the scheme is wound up.  The "target" must be a person who is associated with or connected to the employer (concepts borrowed from insolvency law, and which include *e.g.* the employer's direct and indirect parent companies).  The definitions used in the relevant legislation are such that the "target" may, in the case of a company, be either an English or a foreign incorporated company.   There is absolutely nothing in the FSD legislation to suggest that it was specifically aimed at foreign, rather than English, companies. Quite the contrary: the legislation applies to any associated or connected company, regardless of where it is incorporated.  The FSD regime thus supplements, rather than supplants, the section 75 regime.  The liability to pay the section 75 debt remains with the employer.

32.    The relevant requirements for an FSD are set out in section 43 of the 2004 Act which section gives the Regulator power to issue a direction requiring that the recipient secure that appropriate financial support is put in place for an occupational pension scheme.

33.    Section 43(2) provides that the Regulator may issue an FSD if it is of the opinion that the employer in relation to the pension scheme is a service company or is insufficiently resourced (as defined in section 44) at "the relevant time". The relevant time is the time within a prescribed period, which ends with the determination by the Regulator to exercise the power to issue the financial support direction in question (see subsection (9)). This so-called "look-back" period is currently 24 months.

34.    The meaning of "insufficiently resourced" is to be found in section 44 and the

FSD Regulations.  An employer is "insufficiently resourced" if the value of its resources is less than the amount which is a set percentage (currently prescribed to be 50%) of the estimated section 75 debt which would become due from the employer if the scheme were to wind up, and there is a person who is connected with or an associate of the employer the value of whose resources is not less than the amount which is the difference between the value of the resources of the employer and the amount which is the set percentage of the estimated section 75 debt.  The FSD Regulations make complex provision for the performance of a number of calculations relating to, amongst other matters, the value of the resources of the employer.  The procedure under the FSD Regulations is involved and cannot readily be summarised.  However, I can say that the procedure under those Regulations gives an opportunity for the entities involved to perform certain of the calculations and to attempt to agree the figures with the Regulator.

35.    The effect of the so-called "look back period" is that, if on any given date the employer was "insufficiently resourced", the Determinations Panel has 24 months to issue an FSD by reference to the "insufficiently resourced" test being passed on that date.  I understand that in the present case the Regulator has chosen to perform the "insufficiently resourced" test as at 30 June 2008.  Therefore the Determinations Panel must make any Determination to issue an FSD by 30 June 2010 at the latest.

**The Procedure**

36.    The procedure for the issue of an FSD – or a contribution notice – is the standard procedure set out in section 96(1) of the 2004 Act which provides for:–

(a)    the giving of notice to such persons as it appears to the Regulator would be directly affected by the regulatory action under consideration (a "warning notice");

(b)    those persons to have an opportunity to make representations – this is a

mandatory part of the procedure and cannot be dispensed with;

      (c)    the consideration of any such representations and the determination whether to take the regulatory action under consideration;

      (d)    the giving of notice of the determination to such persons as appear to the Regulator to be directly affected by it (a "determination notice");

      (e)    the determination notice to contain details of the right of referral to the Pensions Regulator Tribunal;

      (f)    the form and further content of warning notices and determination notices and the manner in which they are to be given, and

      (g)    the time limits to be applied at any stage of the procedure.

37.    The purpose of the procedure is to comply with the requirements of natural justice, *i.e.* procedural fairness, sometimes referred to as due process. In the case of a warning notice relating to a possible FSD the directly affected parties will include the trustee of the scheme and the Board of the PPF. In my view the mandatory requirement to give the respondents to a warning notice the opportunity to make representations gives them a fair opportunity to put their case.

38.    As noted earlier, the Regulator's power to issue an FSD is exercised by its Determinations Panel. Although as a matter of corporate theory the Panel is – confusingly – an arm of the Regulator, in practice it is entirely independent, and its decisions are taken entirely independently of the regulatory arm of the Regulator. The procedure is designed to comply with the requirements of Article 6 of the European Convention on Human Rights, which protect the right to a fair trial by an independent tribunal. The Determinations Panel considers the warning notice and the representations made by the persons directly affected and upon consideration of the facts and matters will issue its determination notice, which may provide for the issue of an FSD. It is under a specific statutory obligation to consider the

representations of the persons directly affected by the FSD under consideration.

39.    It is the duty and practice of the Determinations Panel to look closely at the written representations of the parties. Sections 93 and 94 of the 2004 Act require the Panel to determine and publish the procedure it follows. It has done so, most recently in June 2008. It is open to the Determinations Panel to hold a hearing, and any directly affected person may ask it to do so, and to hear oral evidence, including cross-examination. The parties may be, and in my experience often are, represented by lawyers. The format of hearings before the Determinations Panel generally follows that used in court and other tribunal proceedings.

40.    But the procedure strives to be quick and efficient and in my experience it is reasonably successful in achieving those goals. Given the extensive amount of written evidence and submissions that are filed before the hearing, the duration of hearings is nearly always measured in days rather than weeks.   The procedure is assisted by the fact that the members of the Determinations Panel have considerable experience of the pensions industry and pensions law and is well versed in the subject of UK pension regulation.

41.    In my experience, it is usual for parties to substantial cases before the Determinations Panel to be represented by lawyers with particular expertise in pensions law. This is a complex area of the law involving a very substantial body of detailed legislation and subordinate legislation on which there is relatively little guidance in case-law.  Since British occupational pension schemes are generally constituted as trusts, the statutory framework is underpinned by the principles of equity historically developed by the Chancery courts in England. This area of the law is further complicated by the application of European Union law, which has had a significant effect on English pensions law.

42.    Cases involving UK pension schemes frequently require evidence and information from UK actuaries, who have particular expertise in the valuation of the assets and liabilities of UK pension schemes, another notoriously complicated and difficult subject.

43.    The FSD procedure is an integrated one and there is no provision in the 2004 Act for splitting that procedure between different "target" persons.  In other words, the legislation envisages that all "target" persons will be involved in the same procedure and the Determinations Panel will consider whether it is reasonable to issue an FSD having regard to all of the representations of all of the "target" persons in a single FSD.

44.    It is clear that, because the trustee and the PPF are directly affected parties, they will be served with a warning notice.  The trustee and the PPF clearly have a common interest in maximising recoveries for the members of the pension scheme. The FSD procedure does not require a trustee actually to participate in it, but the trustee will have a fiduciary duty to consider whether to do so.  In all the cases of which I am aware, the trustee has concluded that it was in the best interests of members to take part in the procedure and that the trustee's fiduciary duties therefore required it to participate.

45.    In my view, the statutory purpose behind the procedure set out in Sections 93 to 101 of the 2004 Act was to provide a reasonably swift and efficient way to resolve questions as to how the Regulator's regulatory functions (including the issue of an FSD) should be exercised.  This avoids uncertainty and ensures that regulatory decisions are taken reasonably expeditiously.  This is clearly one of the reasons why the power to issue an FSD is subject to the so-called "look back period" of 24 months (and, as originally enacted, only 12 months).  Parliament obviously intended that the affected persons should not have to wait a long time for an initial decision as to whether an FSD should be issued.  Thus, if the parties are content with the determination of the Determinations Panel, that is an end of the matter and finality is achieved reasonably quickly.

46.    However, if the parties are not content, then there is a right to refer the matter to an independent tribunal, known as the Pensions Regulator Tribunal ("the Tribunal").  The procedure before the Determinations Panel will in that event be merely the first stage in the

procedure for the issue of an FSD.  Under Sections 96(3) and 103(1) of the 2004 Act, any person who is directly affected by a determination of the Determinations Panel (such as a decision to issue an FSD) has a right to refer that determination to the Tribunal within 28 days.  The reference is made as of right and neither the Determinations Panel nor the Tribunal has any discretion to refuse to allow a reference.  The Tribunal is constituted under section 102 of the 2004 Act.  A reference to the Tribunal automatically prevents the exercise of the regulatory function that the Determinations Panel has determined to exercise: see section 96(5) of the 2004 Act.  Thus, if the Determinations Panel determined to exercise its power to issue an FSD, no FSD would in fact be issued if the matter were referred to the Tribunal within 28 days.  The Tribunal has power to extend the time limit for a reference.

47.    The Tribunal will determine the matter as a complete rehearing of the facts in issue, see section 103 of the 2004 Act, and may confirm, overturn or vary the original decision.  The Tribunal may consider any evidence relating to the subject matter of the reference, whether or not it was available to the Regulator at the material time.  In my view, in a substantial matter it is virtually inconceivable that the Tribunal would refuse to admit new evidence or to allow new arguments to be advanced by the parties to a reference to the Tribunal.  Due to the time constraints arising from the "look back period", it may well be that an initial decision by the Determinations Panel to issue an FSD has to be made within a fairly short period of time after the issue of a Warning Notice.  In such a situation, if a party were to complain that it did not have enough time to put in full representations at the Determinations Panel stage, I would expect the Tribunal to allow that party to advance its case and adduce new evidence *de novo* as if the whole matter were starting again.

48.    The Tribunal's procedure is governed by the Pensions Regulator Tribunal Rules 2005.  They confer much wider powers than those of the Determinations Panel, such as the power to summon witnesses and order disclosure of documents.  Those Rules make

detailed provision for the conduct of the reference in a manner akin to that found in ordinary English court proceedings. They clearly envisage a slower and more elaborate procedure than that adopted by the Determinations Panel. No time limits or "look back period" apply to a reference to the Tribunal. As with the Determinations Panel, the rules of natural justice and the duty to act fairly apply to the Tribunal.

49.    An appeal on a point of law from a decision of the Pensions Regulator Tribunal lies to the Court of Appeal of England and Wales.

50.    The outcome of the FSD procedure will result in either an issue of an FSD or not. If an FSD is issued, this is merely the first (albeit important) step taken by the Regulator in establishing a means by which the "target" person's liability to contribute to the scheme is crystallised and reduced to a quantified obligation. The "target" person may comply with the FSD. But in the event that an FSD is issued and is not complied with, the Regulator may issue a notice to any of the "target" persons to whom the FSD was issued that that person is under a liability to pay to the trustees of the scheme the sum specified in the notice.

51.    In a significant way, this procedure attempts to fulfil the public regulatory objective of protecting members' pension benefits and promoting good scheme administration. This is relevant not only to members of schemes in deficit. Members of financially healthy schemes rely on the Regulator and PPF to act so that the levy paid by their schemes to the PPF will be kept in check and at a level, which does not provoke a decision by their employer to close their scheme on account of cost.

52.    The British Government regards itself as having over-arching supervision of the regulatory and legal framework and has a "primary role in the Stewardship of the Pensions Regulator and the Board of the Pension Protection Fund". The Regulator, given its statutory objectives works closely with the PPF and the Government and I would add that as well as its remedial powers, the Regulator fulfils the important function of issuing Codes of

Practice and Guidance Notes of best practice for those involved in the pensions industry.

53.    Notwithstanding the strong association between the Regulator and the Government, the Determinations Panel and the Pensions Regulator Tribunal –the very bodies entrusted to make the decision as to the issue of FSDs and Contribution Notices – are independent of them and are entrusted to apply the law fairly and properly.  Their decisions are susceptible to appeal.

54.    The procedure itself, in my view, affords a "target" person a proper opportunity to make representations and be heard.  In practice and in my experience, the procedure does not place on the "target" persons the onerous obligations (such as those created by complex timetabling and unduly lengthy hearings) that often confront parties involved in litigation in the English Courts.

**Sea Containers**

55.    I should also bring to the Court's attention two decisions:–

•    the determinations of the Determinations Panel *In the matter of the Sea Containers 1983 and 1990 Pension Schemes*, case references TM222 and TM1495 (25 June 2007) (attached hereto as Exhibit D), and

•    the decision in the same matter of Kevin J Carey, Bankruptcy Judge of the US Bankruptcy Court in Delaware in *In re Sea Containers* (19 September 2008) (attached hereto as Exhibit E)

in relation to *the Sea Containers* case, in which I appeared before the Determinations Panel on behalf of the trustees of the 1990 Sea Containers Pension Scheme.  This is the first and indeed only decision of the Determinations Panel in relation to FSDs.  The case raises important points in relation to jurisdiction and parallel insolvency proceedings and demonstrates, in almost a model way, the pragmatic and sensible means by which parallel procedures (a determination by the U.K. Determinations Panel and U.S. Chapter 11

Bankruptcy proceedings) in this context have been dealt with by both the U.K. and U.S. tribunals.

56.      In the *Sea Containers* case, the Regulator issued an FSD to Sea Containers Limited ("SCL") as the "target" person.  SCL was incorporated in Bermuda.  The defined benefit schemes were based in the United Kingdom and were both recorded as being heavily in deficit.  The employer of the schemes was Sea Containers Services Limited, a company incorporated in England.  On the 15 October 2006 both SCL and Sea Containers Services Limited filed for Chapter 11 protection in the United States Bankruptcy Court for the District of Delaware.  On 19 October 2006, warning notices in relation to each scheme were sent to Sea Containers Limited.  The Determinations Panel considered the question whether FSDs should be issued.

57.      At the request of SCL there was an oral hearing that lasted two days with submissions from the Regulator, the trustees of the two schemes in question and SCL.  All parties were represented by counsel and there was cross-examination of witnesses.

58.      Significantly, the Determinations Panel decided the following:–

(1)      When considering whether it was reasonable to issue FSDs, the fact that Sea Containers Limited had filed for Chapter 11 protection was not a reason not to issue the FSDs.  The issuing of an FSD would not infringe the automatic stay which is part of the Chapter 11 protection.

(2)      That it could not be said with certainty that an FSD claim would be approved or indeed not approved by the US Bankruptcy Court.  This was not a reason not to issue FSDs because this scenario was regarded as being an eventuality that the 2004 Act had provided for by virtue of the two-stage procedure (FSD followed by Contribution Notice).  The views of the US Bankruptcy Court might be taken into account when the Pensions Regulator considered whether to issue a Contribution

Notice.  In any event, by issuing FSDs alone, Sea Containers Limited was not being put in an impossible position in so far as Chapter 11 protection was concerned.

(3)    It was material to note that the trustees of the schemes would be better placed in the Chapter 11 proceedings if they could rely on FSDs (as well as any other arguments at their disposal).  Clearly, no duplicative claim could be made.  In the *Sea Containers* case, it was acknowledged that SCL had entered into a service agreement with the service company that included a promise to indemnify the service company in relation to its pension liabilities and the trustees could not seek to recover both under the FSD and through the service company under that agreement.

(4)    The FSD would give the trustees a direct claim against Sea Containers Limited and "as such they would rank on an equal basis with the other unsecured creditors of Sea Containers Limited".  They would not be granted "super priority": §§38–39, pp 25–26.

59.    I respectfully agree with the reasoning and conclusions of the Determinations Panel in the *Sea Containers* case. I see no reason why a Panel considering the same issues in the future would depart from the decision in *Sea Containers*.  The decision clarifies several issues relating to FSDs and exhibits deference, consistent with principles of comity, to United States Chapter 11 protection.

60.    Moreover, the *Sea Containers* case illustrates the fact that the FSD procedure is not a way of attaching assets that operates outside the insolvency processes of foreign courts.  The Determinations Panel and the parties in *Sea Containers* understood that the FSD liability, once it had been quantified by the Panel's decision, would have to be subject to any claims allowance process of the foreign insolvency court.

61.    I should add for completeness, that the United States Bankruptcy Court in the *Sea Containers* case granted an order approving the settlement agreement that had been

reached by, among others, Sea Containers Limited, the Official Committee of Unsecured Creditors for Sea Containers Services Limited and the Scheme Trustees. I note that the Court stated that (at page *9 of the judgment):

(1)    The mere issuance of the FSDs does not violate the automatic stay granted in the Chapter 11 proceedings.

(2)    " … [T]he FSDs are issued by [the Pensions Regulator], a statutorily created entity endeavouring to exercise its regulatory power."

(3)    "Issuance of the FSDs, without more, does not amount to an attempt to collect a debt or assert a claim against the Debtors, but they do provide guidance as to the needs of the Schemes and therefore the pertinent considerations in valuing the Scheme's claims."

Those conclusions are, in my view, consistent with the decision of the Determinations Panel in *the Sea Containers* case and the FSD legislation.

### Specific points

62.    I have been asked to comment on some specific points:–

(1)    I am asked whether the issue of an FSD or the making of a contribution notice would confer on the employer any rights against other group companies. In my opinion, it would not.

(2)    I am asked whether trustees or the PPF could prevent the Regulator pursuing the issue of an FSD if they did not wish to do so. In my opinion, they clearly could not.

(3)    I am asked to comment on whether the 24-month "look back period" could be extended in any way. The legislation makes no provision for the period to be extended. It is in my view arguable that the parties could by contract validly undertake not to raise any arguments on the expiry of time. However, there are

counter-arguments and there can be no certainty that such argument is correct. In particular, it could be said with considerable force that there is a jurisdictional limitation on the Determinations Panel's exercise of the power to issue an FSD after the end of the "look back period". I do not think that the Regulator or any party to FSD proceedings could confidently rely on such a contract because there is a very real possibility that no such agreement could validly extend the time in which a determination to issue an FSD must be made.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on February 24, 2010.
London, England.

_____
ROBERT WALLACE HAM, QC

*5451486*