**EXHIBIT B**



# Simplicity, security and choice:
# Working and saving for retirement

## Action on
## occupational pensions

Presented to Parliament by
the Secretary of State for Work and Pensions
by Command of Her Majesty

June 2003

Cm 5835

# Chapter 2: Occupational pensions – improving member protection

**Chapter summary**

The Government will improve the security of pensions by:

- **introducing a Pensions Protection Fund** to guarantee members a specified minimum level of pension when the sponsoring employer becomes insolvent;

- **requiring solvent employers who choose to wind up their pension schemes to meet their pension promise in full;**

- **revising the priority order which applies on wind-up** to ensure the fairest possible sharing of assets;

- **extending some protection under the Transfer of Undertakings (Protection of Employment) regulations (TUPE)** to the pension schemes of workers in the private sector;

- helping people build up rights in short-stay jobs by introducing a **new approach to vesting**; and

- introducing a **requirement on employers to consult** before making changes to pension schemes to ensure changes are developed in partnership.

1. Partnership between employers, trade unions and employees is essential to ensure the tradition of occupational pension provision in the UK is maintained. It is important that employers and employees work together to define the type of pension provision that suits them best. This chapter explains how the Government intends to improve the security of pension scheme benefits and ensure much greater confidence that pensions that have been promised will be delivered. In the Pensions Green Paper, the Government proposed to improve the protection offered to members of pension schemes. Our aim was to give them greater confidence that they will benefit from their efforts to save, something which would encourage people to save more.

2.  One example that was submitted to us during the consultation process illustrates why we need to take action:

    *Mr A was employed by one employer for more than 20 years and expected to retire at the company retirement age of 62 with a pension of £14,750 a year. Unfortunately, the employer went into receivership, Mr A was made redundant and the pension scheme began winding up.*

    *If Mr A took his pension now at age 58 he would have four years less in the fund than expected. This reduces his entitlement to £12,200 a year. However, because the scheme is underfunded, he was told he could expect as little as 40 per cent of his entitlement with no increases to protect against inflation – thus receiving £4,880 a year, which is at least £7,000 less than he would have received if the scheme had been fully funded.*

## Protecting the consumer: securing accrued rights

3.  In the Green Paper, the Government highlighted the need to review the protection offered to scheme members as part of a reformed regulatory regime. We received more than 200 responses to the Green Paper relating to member protection on wind-up. We are keen to avoid increasing the total cost of pension provision and this approach has been widely welcomed.

4.  As proposed in the Green Paper, we will introduce measures to ensure that, should a defined benefit scheme wind up, members will have much greater confidence that they will receive the pension their employer promised them. We will legislate so that, where pension scheme assets are misappropriated, the calculation of compensation payable will no longer be based on the Minimum Funding Requirement, but instead reflect the value of the missing assets, which is usually higher. We will also introduce the further reforms outlined below.

### The Pensions Protection Fund – a new compensation arrangement for pension schemes in the case of insolvency

5.  **We will establish a compensation scheme known as the Pensions Protection Fund, run by a statutory body, to protect private sector defined benefit scheme members whose firms become insolvent with unfunded liabilities in their pension scheme.** This proposal was welcomed by many respondents.

    *   The National Consumer Council said: *"The [Department for Work and Pensions] should introduce a compulsory insurance scheme for occupational schemes to protect accrued rights to retirement income."*

    *   Age Concern said: *"In the case of insolvency we believe that serious consideration should be given to the introduction of an insurance system ... We believe that the increased cost to members may be an acceptable price for security."*

- Watson Wyatt, the actuarial consultants, remarked: *"We believe that there should be a public debate on whether some form of mutual insurance or central discontinuance fund could improve the security of pension scheme members. We accept that there are arguments for and against the various options. Nevertheless, the research that we have undertaken suggests that this sort of approach could be viable if it was limited to employers who became insolvent."*

6. Some respondents were concerned that introducing such a scheme could introduce an element of moral hazard. We paid particular attention to this important concern in developing our proposals, learning lessons from the compensation scheme that has been running in the United States since the 1970s.

7. There are two key risks. The first is that the company could choose to fund to a low level, or the trustees hold a higher risk portfolio than appropriate, because of the existence of the compensation scheme. In order to minimise this risk, we will ensure that pension schemes which are underfunded will pay a higher premium to the compensation fund compared with well-funded schemes. This risk-based premium will be on top of a flat-rate levy payable by all employers with defined benefit schemes other than those public service schemes where benefits are guaranteed by government. The risk-based premium will encourage good levels of funding.

8. The second key risk is that there could be incentives for example for directors of a company or providers of finance to seek to wind up the company, in order to avoid the debt on the pension scheme. We can minimise this risk by capping the salary which will be used to calculate any entitlement payable by the compensation scheme. Insolvency would still mean significant reputational risk for the controllers of the company and would also mean significant loss of pension for the high-earning decision makers. This will ensure that there is a built-in disincentive, particularly for Board members and other senior executives, to let the company go into insolvency.

9. It is important that we get the cap right. We want people to have much greater confidence in the pensions they have been promised. But we must not put unnecessary costs on good employers who choose to offer good pensions. And we need to tackle moral hazard, and guard against the Pensions Protection Fund producing unintended incentives. For the scheme to work properly, it must remain in the interests of scheme members and those who control the company for the fund to be managed prudently and for the company to stay in business and meet its pension obligations; and for there to be a reputational risk in insolvency. The fund will pay a maximum of 100 per cent of pensions in payment, and 90 per cent of the benefits of those still working. Over and above this, we believe there should be a cap on the maximum amount guaranteed by the Pensions Protection Fund equivalent to the pension expected by those on a final eligible salary of between £40,000 and £60,000. As we bring forward legislation to set up the Pensions Protection Fund we will take views from the Employer Task Force and others on the right level of the cap to achieve these aims.

### Full buy-out – ensuring the pension promise is met in the case of solvent employers

10. Currently, if a solvent employer winds up an underfunded defined benefit occupational pension scheme that they sponsor, non-pensioner members may receive Cash Equivalent Transfer Values (CETVs) which are too low to provide them with the pension they were expecting at retirement. The rights they have already accrued in the scheme can be cut drastically.

11. Companies that choose to wind up their schemes pass their investment risk on to non-pensioner members, as they transfer into money purchase arrangements. Moreover, because the actuarial assumptions underpinning the CETV calculation have become out of date, CETV levels are now providing less protection than was originally envisaged. Individuals are thus affected in two ways: they take on all the investment risk, and the transfer value they take from the scheme is too low.

12. One consequence of this is that someone who is still working when the scheme winds up can end up much worse off than someone of the same age who took early retirement. We are determined to tackle this injustice.

13. **The Government believes that a solvent employer who chooses to wind up a scheme should ensure that there are sufficient funds in the scheme to meet the full costs of the rights accrued by scheme members unless doing so would put the company itself at risk, in which case the trustees, exercising their fiduciary duties, can agree a lower amount.** We will introduce a full buy-out provision through regulations which we are consulting on as set out in the timetable in **Chapter 5**. Trustees may utilise these regulations so that they apply to schemes that are winding up on, or that start to wind up after, the date on which the draft regulations are issued.

14. In line with the full buy-out proposal **we will restrict the ability of companies to take money out of a scheme which is in surplus on its own funding basis, unless the scheme can meet its pension promise in full** – that is, it is funded to a level sufficient to allow full buy-out. Levels of contributions would continue to be subject to agreement between trustees and employers as at present.

### Changing the priority order – fairer sharing of assets

15. The statutory priority order sets out how the assets of a scheme that is winding up are to be applied towards meeting the scheme's liabilities for pensions and other benefits. At present, pensioner members are ranked higher than non-pensioners, and broadly speaking all non-pensioners rank equally. This has been criticised because it means that meeting the cost of pensions in payment and their indexation, especially for pensioners with a large income, can strip significant assets from the scheme before non-pensioners are even considered. And because non-pensioners are treated the same, irrespective of their age or length of time in the pension scheme, those approaching retirement age may be left with little or no pension.

16. Once the Pensions Protection Fund and full buy-out are in place, individuals in pension schemes will be able to have much more confidence that they will receive all or most of the pension they were expecting. However, in advance of the compensation scheme coming into effect, there may still be some people who are at risk of losing out significantly. And in rare cases, employers may not be able to meet the full buy-out requirement if they would be at risk of becoming insolvent by doing so. Therefore, **we are going to publish draft regulations which will ensure that, where there are insufficient assets to meet all liabilities, they are shared out as fairly as possible between active and pensioner scheme members**. We will be consulting on these draft regulations over summer 2003, and expect them to come into force in autumn 2003.

17. Our intention is that these regulations will mean that the degree of protection will reflect the length of time a member has been contributing to the scheme; that is, those who have contributed for the longest will receive the greatest protection. This will ensure the people most dependent on a particular pension for their retirement income will take priority. The changes will also give priority to the rights of non-pensioners over the future indexation of pensions in payment so that non-pensioners have a better chance of receiving the pension they were expecting.

18. Our proposals will improve the position of working-age people with defined benefit rights in the event of employer insolvency. Women are particularly disadvantaged by the fact that the current priority order favours pensioners over working-age people. Only 26 per cent of female pensioners have any occupational pension in their own right, compared to 64 per cent of men. Among working-age people, the gap is much smaller and has closed for women working full time. The changes we are proposing to the priority order, and the introduction of the Pensions Protection Fund, will mean that the rights of pensioners and working-age people will be treated more equally. Therefore, the proposals will have a significant favourable impact on women's future incomes in retirement.

## A new system of regulation

19. **We will introduce a new system of private pension regulation with a new Pensions Regulator built on the foundations laid by the Occupational Pensions Regulatory Authority (Opra).** The new Pensions Regulator will focus on tackling fraud, bad governance and poor administration, and will encourage best practice through an increased education and guidance role. Reporting arrangements will be rationalised so that the Pensions Regulator adopts a proportionate approach, ensuring members are protected, while reducing the regulatory burden on well-administered pension schemes. We have received considerable support for this proposal.

20. It is clear that although Opra is developing a more risk-focused approach, the current legal framework means that effort has been directed towards high volumes of relatively low value reports and breaches. This is not consistent with a risk-focused and proactive approach and must be addressed in the revised legislative structure.

21.  The new Pensions Regulator will:

- have statutory objectives that set a clear framework for its activity and provide an overarching definition of its functions;

- establish a high profile in the community it regulates;

- be provided with a responsive and proportionate regulatory 'tool kit', including powers to sanction, which will enable it to take a targeted and appropriate approach to breaches of pensions legislation and to other matters of conduct that pose a risk to members' benefits;

- work with the pensions industry to help improve standards in scheme administration; and

- encourage compliance with regulatory provisions by, for example, undertaking compliance visits and providing guidance and educational material.

22.  The aim of our approach is to create a Pensions Regulator that is able to tackle the areas of greatest risk, providing better protection to pension scheme members, and be a respected and authoritative force in the regulated community. Greater flexibility and proportionality will benefit both those the Pensions Regulator seeks to protect and those who provide and administer work-based pension schemes.

23.  One issue raised by a number of respondents is the relationship between the Financial Services Authority (FSA) and the new Pensions Regulator. We will ensure that the new Pensions Regulator and the FSA complement each other as set out in the Green Paper. This reflects many of the comments we received. For example, AEGON commented: *"We welcome the proposal for a new regulator separate from, but operating alongside and complementing, the FSA. We believe that this very much complements the proposed change in approach to pensions legislation."*

## Codes of Practice

24.  **In order to introduce the new regulatory approach, we will restructure and simplify pensions legislation.** In addition, we recognise the need to consolidate pensions legislation as soon as practicable, and will discuss this with the Law Commission, which has responsibility in this area. As part of this process, we will give the new Pensions Regulator the power to issue Codes of Practice. We consider that where the proposed new legislation can be expressed in high-level or simple terms, or has obligations which can be expressed in general terms, such as 'to achieve X within a reasonable time', the legislation can most effectively be supplemented with a Code of Practice. This will reduce the need to set out the detail in regulations.

25.  The Pensions Regulator could be given a duty to issue a Code of Practice in a particular area. Only breaches of the legislative obligation would be sanctionable, and the Code of Practice would not represent the law, but the Pensions Regulator's view of it. We intend that the Codes of Practice should have evidential value in proceedings where it will be determined whether a breach of the legislative provision had occurred, including decisions by the Pensions Ombudsman.

26. This approach was welcomed by respondents to the consultation, such as Prospect, who noted that: *"One possibility that should be considered alongside simplification of regulations is the introduction of a Code of Practice, of similar status to the ACAS codes, which would cover such issues as the proper conduct of trustee meetings, scheme dispute procedures, and good practice in scheme communication with members."*

### Better informed and better trained trustees

27. **We believe that legislation will ensure that trustees have the knowledge necessary for the responsible investment of the money held in pension funds on other people's behalf.** Some respondents were opposed to legislation, believing it either unnecessary or harmful. Others were more sympathetic, but felt that it was inappropriate to limit coverage to investment, since trustees require expertise across the full range of their responsibilities. Many commented on the need for well-trained trustees and for certainty in knowing what is required from trustees, while avoiding bureaucratic over-prescription.

28. We are persuaded by the argument that investment is not the only, nor always the most, important area of trustees' responsibilities. The legislation will therefore provide that trustees be required to be familiar with the issues or have relevant knowledge across the full range of their responsibilities. The Codes of Practice discussed above will provide guidance on how this legal requirement could be satisfied. These may cover relevant training, qualifications and experience, as well as relevant governance issues, which might include record keeping and skills audits.

## Helping people build up pension rights in a flexible economy

29. The Government recognises the anxieties that arise from the demands of an increasingly dynamic economy where companies are taken over and people move between jobs more frequently.

### Extending Transfer of Undertakings (Protection of Employment) regulations to private sector transfers

30. Over the last 18 months, the Government has been consulting on extending the Transfer of Undertakings (Protection of Employment) regulations (TUPE) to pensions. The Government's aim is to ensure that workers who already enjoy pensions contributions will not have them withdrawn by reason of a transfer, or because a company is taken over. In achieving this we want to make sure that we do not place an excessive burden on the new employer.

31. **The Government proposes a flexible and worthwhile provision for a contribution to a stakeholder pension. We envisage that this will consist of an obligation to match employee contributions up to a level of 6 per cent.** Moving forward with TUPE in this way will bolster confidence in pensions.

32. The responses to the Green Paper consultation suggest that this proposal will be welcomed both for the protection it will offer employees and because the majority of

businesses which already offer workers pensions on transfer would gain from a level playing field.

### Better protection for early leavers

33. At present, employees who leave an occupational pension scheme within a vesting period (which may be up to two years) do not build up any rights in the scheme. Instead, they are given a refund of their contributions. The Green Paper suggested that rights in all schemes should vest immediately, with the proviso that de minimis amounts could be transferred by the trustees to a stakeholder pension, providing members did not object.

34. In general those who supported immediate vesting did not support the transfer proposals. There were a number of concerns, not least the extra administrative burdens that would arise and the risk that these might prompt employers to introduce waiting periods, which would be a regressive step.

35. However, the Government believes it is important to enable more employees, and particularly those who change jobs frequently, to have the opportunity to start to build up a private pension when they leave an employment before their rights have vested in an occupational pension scheme. **We will therefore introduce an alternative approach under which employees who have been scheme members for at least three months but who leave during a vesting period, must be offered the choice of a refund of contributions, less tax, or a Cash Equivalent Transfer Value (CETV) which they must transfer out of the scheme to another occupational scheme or personal/stakeholder pension of their choice.** Opting for the latter will allow individuals to benefit from their employer's contribution and tax relief in order to build up their own pension savings. We have included below an illustrative case study.

Miss Jones, 29, has worked for a company for four and a half years, and has been a member of its defined benefit pension scheme for one and a half years. She now plans to leave the company.

In total, her own contributions to the scheme are valued at just over £1,000. However, the Cash Equivalent Transfer Value (CETV) is valued at almost £2,500. This is the total value of her company pension benefit to date, which is also funded by her employer.

Therefore, if she had had the option to take the CETV instead of just the value of her own contributions, she would have the whole £2,500, rather than just over £1,000, to put towards her pension.

36. As the Age Concern and Fawcett Society joint response to the Green Paper states: *"The current two year vesting period can be a major disadvantage to women who are more likely to leave a job before two years than men"*, while the Equal Opportunities Commission pointed out that: *"For some women, this may be the period in which they earn their highest incomes, prior to family formation. It is vitally important that they should have the best chance possible to start accumulating a pension at this stage in their lives."*

An opportunity to build up pension rights from each employment, where they have joined a pension scheme, will therefore have a proportionately greater impact on the overall level of women's private pension saving.

37.  The measures discussed so far in this chapter will strengthen the protection offered to those who are already members of pension schemes. Respondents to the consultation were clear that this on its own was not sufficient: that is, that there is also a need to ensure that people are able to join pension schemes, and take advantage of the provision their employers offer.

## Promoting pension scheme membership

38.  In light of the responses, we have decided **not to allow employers to make compulsory membership of their occupational scheme a condition of employment for all new members**. The Pickering report[1] recommended that employers should be allowed to make membership of their pension scheme a condition of employment where they contribute at least 4 per cent of pensionable pay. In the Green Paper, we were clear that it should be possible for members to opt out if, for example, they were already contributing to a stakeholder scheme, in order to allow people to continue to exercise an informed choice in this area.

39.  While the consultation showed some support for allowing compulsory membership with no opt-out, the majority of respondents opposed the proposal. For example, one insurer pointed out that employers currently have the option of automatically admitting members as a means of raising the take-up of scheme membership and felt that the compulsory route was unlikely to add significantly to this. As only a small minority of schemes would have taken up this option, we have focused our proposals on getting a far larger number of firms to introduce default membership, in order to achieve a bigger effect on pension saving, and preserve the individual's freedom to opt out of the scheme in the small number of cases where their circumstances make saving in an occupational pension unattractive.

40.  In place of this, we believe that there may be scope for the new Pensions Regulator to issue general guidance that employers should ordinarily include employees in their pension scheme unless they actively choose to opt out of it. The Employer Task Force will be considering why employees choose not to join good quality occupational pension schemes, and for the longer term, the issue of compulsory scheme membership may be something which the Pensions Commission will wish to examine as part of its agenda.

## Requirement to consult

41.  Our proposal to **introduce a requirement on employers to consult before making changes to pension schemes** has been widely welcomed. The Government believes this change is central to ensuring that future challenges in pensions are addressed in partnership. The main concerns have been: that any new requirement does not hinder business flexibility to make long-term commercial decisions; that it should cover significant

---

1 Alan Pickering, 2002, *A simpler way to better pensions – An independent report.*

**20** Simplicity, security and choice:
Working and saving for retirement

Action on occupational pensions

rather than minor changes and affected groups; and that we should recognise that there are already a range of consultation mechanisms in place. We are looking at the best means to achieve this alongside consideration of how to implement the EU Information and Consultation Directive. We plan to issue a consultation document on the implementation of the Directive during summer 2003.