## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

-------------------------------------------------------X
                                                       :
*In re*                                                :    Chapter 11
                                                       :
Nortel Networks Inc., *et al.*,[1]                     :    Case No. 09-10138 (KG)
                                                       :
                              Debtors.                 :    Jointly Administered
                                                       :
                                                       :
                                                       :    **Hearing date: March 3, 2010 at 2:00 p.m. (ET) (proposed)**
                                                       :    **Objections due: March 2, 2010 at 12:00 p.m. (ET)**
                                                       :    **(proposed)**
                                                       :
-------------------------------------------------------X

### DEBTORS' MOTION PURSUANT TO 11 U.S.C. § 105(a) AND § 363(b) FOR AN ORDER APPROVING THE METRO ETHERNET NETWORKS SIDE AGREEMENT AND GRANTING RELATED RELIEF

Nortel Networks Inc. ("NNI") and certain of its affiliates, as debtors and debtors in possession, (collectively, the "Debtors"), hereby move this Court (the "Motion"), for the entry of an order substantially in the form attached hereto as Exhibit A, approving that certain Metro Ethernet Networks Side Agreement substantially in the form attached hereto as Exhibit B (the "Side Agreement"), entered into by and among NNI, Nortel Networks Corporation ("NNC"), Nortel Networks Limited ("NNL" and, together with NNI and NNC, the "Main Sellers"), certain of their affiliates (together with the Main Sellers, the "Sellers"), the EMEA Sellers (as defined in the Side Agreement) and certain other Selling Parties (as defined in the Side Agreement), the Joint Administrators and the Joint Israeli Administrators (as each is defined below) and granting

---

[1]      The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's tax identification number, are:  Nortel Networks Inc. (6332), Nortel Networks Capital Corporation (9620), Nortel Altsystems Inc. (9769), Nortel Altsystems International Inc. (5596), Xros, Inc. (4181), Sonoma Systems (2073), Qtera Corporation (0251), CoreTek, Inc. (5722), Nortel Networks Applications Management Solutions Inc. (2846), Nortel Networks Optical Components Inc. (3545), Nortel Networks HPOCS Inc. (3546), Architel Systems (U.S.) Corporation (3826), Nortel Networks International Inc. (0358), Northern Telecom International Inc. (6286), Nortel Networks Cable Solutions Inc. (0567) and Nortel Networks (CALA) Inc. (4226).  Addresses for the Debtors can be found in the Debtors' petitions, which are available at http://chapter11.epiqsystems.com/nortel.

them such other and further relief as the Court deems just and proper.  In support of this Motion, the Debtors respectfully represent as follows:

<u>**Jurisdiction**</u>

1.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.  This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

2.      The statutory bases for the relief requested herein are sections 105(a) and 363(b) of title 11 of the United States Code (the "<u>Bankruptcy Code</u>").

<u>**Background**</u>

**A.      Procedural History**

3.      On January 14, 2009 (the "<u>Petition Date</u>"), the Debtors, other than NN CALA (defined below), filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code.

4.      The Debtors continue to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

5.      On January 15, 2009, this Court entered an order of joint administration pursuant to Federal Rule of Bankruptcy Procedure 1015(b) that provided for the joint administration of these cases and for consolidation for procedural purposes only [D.I. 36].

6.      Also on the Petition Date, the Debtors' ultimate corporate parent NNC, NNI's direct corporate parent NNL (together with NNC and their affiliates, including the Debtors, "<u>Nortel</u>"), and certain of their Canadian affiliates (collectively, the "<u>Canadian Debtors</u>")[2] filed an application with the Ontario Superior Court of Justice (the "<u>Canadian Court</u>") under the Companies' Creditors Arrangement Act (Canada) (the "<u>CCAA</u>"), seeking relief from their

---

[2]      The Canadian Debtors include the following entities:  NNC, NNL, Nortel Networks Technology Corporation, Nortel Networks Global Corporation and Nortel Networks International Corporation.

creditors (collectively, the "Canadian Proceedings").  The Canadian Debtors continue to manage their properties and operate their businesses under the supervision of the Canadian Court.

7.    On January 14, 2009, the Canadian Court entered an order recognizing these chapter 11 proceedings as a foreign proceeding under section 18.6 of the CCAA.  On February 27, 2009, based on a petition filed by Ernst & Young Inc., as court-appointed Monitor in the Canadian Proceedings and as foreign representative for the Canadian Debtors (the "Monitor"), this Court entered an order recognizing the Canadian Proceedings as foreign main proceedings under chapter 15 of the Bankruptcy Code.

8.    On January 14, 2009, the High Court of England and Wales placed nineteen of Nortel's European affiliates (collectively, the "EMEA Debtors")[3] into administration under the control of individuals from Ernst & Young LLC (collectively, the "Joint Administrators").  On May 28, 2009, at the request of the Joint Administrators, the Commercial Court of Versailles, France (the "French Court") (Docket No. 2009P00492) ordered the commencement of secondary proceedings in respect of Nortel Networks S.A. ("NNSA"), which consist of liquidation proceedings during which NNSA was originally authorized to continue to operate as a going concern for an initial period of three months, which period was subsequently extended to November 28, 2009.  In accordance with the European Union's Council Regulation (EC) No 1346/2000 on Insolvency Proceedings, the English law proceedings (the "English Proceedings") remain the main proceedings in respect of NNSA although a French administrator and a French liquidator have been appointed and are in charge of the day-to-day affairs and continuing

---

[3]    The EMEA Debtors include the following entities:  Nortel Networks UK Limited, Nortel Networks S.A., Nortel Networks (Ireland) Limited, Nortel GmbH, Nortel Networks France S.A.S., Nortel Networks Oy, Nortel Networks Romania SRL, Nortel Networks AB, Nortel Networks N.V., Nortel Networks S.p.A., Nortel Networks B.V., Nortel Networks Polska Sp. z.o.o., Nortel Networks Hispania, S.A., Nortel Networks (Austria) GmbH, Nortel Networks, s.r.o., Nortel Networks Engineering Service Kft, Nortel Networks Portugal S.A., Nortel Networks Slovensko, s.r.o. and Nortel Networks International Finance & Holding B.V.

business of NNSA in France.  On October 1, 2009, pursuant to a motion filed by the Joint

Administrators, the French Court approved an order to: (i) suspend the liquidation operations

relating to the sale of the assets and/or businesses of NNSA for a renewable period of two

months; (ii) authorize the continuation of the business of NNSA so long as the liquidation

operations are suspended; and (iii) maintain the powers of the French Administrator and

Liquidator during the suspension period, except with respect to the sale of assets and/or

businesses of NNSA.  On November 30, 2009, the French Court extended the suspension of

liquidation for a further period of three months.  On June 26, 2009, this Court entered an order

recognizing the English Proceedings of Nortel Networks UK Limited ("NNUK") as foreign main

proceedings under chapter 15 of the Bankruptcy Code.[4]

9.    On January 26, 2009, the Office of the United States Trustee for the District of

Delaware (the "U.S. Trustee") appointed an Official Committee of Unsecured Creditors (the

"Committee") pursuant to section 1102(a)(1) of the Bankruptcy Code [D.I.s 141, 142].  An ad

hoc group of bondholders holding claims against certain of the Debtors and certain of the

Canadian Debtors has also been organized (the "Bondholder Group").  No trustee or examiner

has been appointed in the Debtors' cases.

10.    On July 14, 2009 (the "CALA Petition Date"), Nortel Networks (CALA) Inc.

("NN CALA" and a Debtor with NNI and its affiliates), an affiliate of NNI, filed a voluntary

petition for relief under chapter 11 of the Bankruptcy Code.  On July 17, this Court entered

orders approving the joint administration and consolidation of NN CALA's chapter 11 case with

---

[4]    Additionally, on January 18, 2009, certain Nortel affiliates, including Nortel Networks Israel (Sales and Marketing) Limited, filed an application with the Tel-Aviv-Jaffa District Court, pursuant to the Israeli Companies Law, 1999, and the regulations relating thereto for a stay of proceedings.  On January 19, 2009, the Israeli Court appointed Yaron Har-Zvi and Avi D. Pelossof as joint administrators of the Israeli Company under the Israeli Companies Law (the "Joint Israeli Administrators").

the other Debtors' chapter 11 cases for procedural proposes [D.I. 1098], and applying to NN

CALA certain previously entered orders in the Debtors' chapter 11 cases [D.I. 1099].

**B.      Debtors' Corporate Structure and Business**

11.      Nortel is a technology company that designs, develops and deploys

communication products, systems and solutions to its customers around the globe.  Its principal

assets include its employees, the intellectual property derived and maintained from its research

and development activities, its customers and other significant contracts and agreements.

12.      Additional information regarding the Debtors' corporate structure and business

and the events leading to the chapter 11 cases is set forth in the Declaration of John Doolittle in

Support of First Day Motions and Applications [D.I. 3] (the "First Day Declaration").[5]

**C.      Case Milestones**

13.      On June 19, 2009, Nortel announced that it was advancing in discussions with

external parties to sell its businesses and it would assess other restructuring alternatives for its

businesses in the event it is unable to maximize value through sales.  To date, Nortel has closed

(i) the sale of certain portions of its Layer 4-7 data portfolio to Radware Ltd. [D.I. 539]; (ii) the

sale of substantially all of its CDMA business and LTE Access assets business to

Telefonaktiebolaget LM Ericsson (publ) [D.I. 1205]; (iii) the sale of the assets of its Wireless

Networks business associated with the development of Next Generation Packet Core network

components to Hitachi Ltd. [D.I. 1760]; and (iv) the sale of substantially all of the assets of the

Enterprise Solutions business globally, including the shares of Nortel Government Solutions

Incorporated and DiamondWare Ltd. to Avaya Inc. [D.I. 1514].  In addition, Nortel has

completed auction processes and obtained Court approval for the planned sale of substantially all

---

[5]      Capitalized terms used but not defined herein have the meanings ascribed to them in the First Day
Declaration.

the assets of its Optical Networking and Carrier Ethernet businesses associated with its Metro

Ethernet Networks business unit [D.I. 2070]; as well as for the planned sale of substantially all of

its GSM/GSM-R business [D.I. 2065].

14.     On August 4, 2009, this Court entered an order fixing September 30, 2009 at 4:00

PM (Eastern Time) as the general bar date for filing proofs of claim or interests [D.I. 1280].  On

December 3, 2009, this Court entered an order fixing January 25, 2010 at 4:00 PM (Eastern

Time) as the bar date for filing proofs of claim or interests against NN CALA [D.I. 2059].

**Relief Requested**

15.     By this Motion, the Debtors seek an order, pursuant to sections 105(a) and 363(b)

of the Bankruptcy Code, (a) approving the terms and conditions of the Side Agreement and (b)

granting related relief.

**Facts Relevant to this Motion**

**A.      The Interim Funding and Settlement Agreement**

16.     On June 9, 2009, the Debtors, the Canadian Debtors, the EMEA Debtors and the

Joint Administrators entered into an Interim Funding and Settlement Agreement (the "IFSA")[6]

governing certain intercompany matters, including the obligations of the parties to the IFSA to

(a) negotiate in good faith and attempt to reach agreement on a timely basis on a protocol (the

"Interim Sales Protocol") for resolving disputes concerning the allocation of Sale Proceeds (as

defined in the IFSA) from Sale Transactions (as defined in the IFSA), which Interim Sales

Protocol shall provide binding procedures for the allocation of Sale Proceeds where the relevant

parties in any such Sale Transaction have been unable to reach agreement regarding such

---

[6]     The summaries and descriptions of the terms and conditions of the IFSA set forth in the Motion are intended solely for informational purposes to provide the Court and parties in interest with an overview of significant terms thereof and should only be relied upon as such.  The summaries and descriptions are qualified in their entirety by the IFSA.  In the event there is a conflict between the Motion and the IFSA, the IFSA shall control in all respects.

allocation, and (b) following entry into any Sale Transaction, negotiate in good faith and on a timely basis to attempt to reach agreement regarding the allocation of the Sale Proceeds from such Sale Transaction within a reasonable period of time or as may be otherwise provided in the Interim Sales Protocol (failing which the Interim Sales Protocol shall apply to determine the allocation of the relevant Sale Proceeds).  On June 29, 2009, this Court entered an Order (A) Approving the Interim Funding and Settlement Agreement, and (B) Granting Related Relief [D.I. 993].

**B.     Sale of Nortel's Metro Ethernet Networks Business**

17.     Nortel's Metro Ethernet Networks business (the "MEN Business") includes optical networking, carrier Ethernet switching and multiservice switching products, delivering carrier-grade Ethernet transport capabilities for higher performance and lower cost for emerging video-intensive applications.  The MEN Business's optical networking portfolio includes the 40G Adaptive Optical Engine technology, which can quadruple network capacity while being deployable over any fiber, allowing service providers to reduce engineering and equipment expense and upgrade quickly and cost-effectively from 10G to 40G.  The MEN Business also is in the process of developing the industry's first optical technology that can deliver both 40G and 100G network capacity, enabling four times the network throughput immediately, while providing the foundation to simply and affordably increase capacity tenfold as required.

18.     On October 7, 2009, the Sellers and certain of their affiliates entered into an Asset Sale Agreement (the "Stalking Horse Agreement") for the sale of certain assets relating to the MEN Business by and among the Sellers, certain of their affiliates and Ciena Corporation ("Ciena"), subject to higher and better offers.  The Debtors conducted a bidding and auction process in accordance with the procedures approved by this Court.  At the conclusion of the auction that commenced on November 20, 2009, the final bid by Ciena (together with, and

including, any Designated Purchaser (as defined in the Sale Agreement), the "Purchaser"), was selected as the highest and best bid. On November 24, 2009, the Sellers and the Purchaser entered into the Amended and Restated Asset Sale Agreement (the "Sale Agreement"), which this Court subsequently authorized and approved by order entered December 3, 2009 [D.I. 2070] (the "Sale Order").

## C.    The Side Agreement

19.    In connection with the entry into the Sale Agreement, and pursuant to the framework set forth in the IFSA, the Debtors and certain other Nortel entities (collectively, the "Parties") negotiated the Side Agreement[7] substantially in the form attached hereto as Exhibit B, to address certain issues among the Sellers and the EMEA Sellers raised by their entry into the Sale Agreement.

20.    Certain terms of the Side Agreement are as follows:

- Efforts to Complete the Transaction. Each of the Parties shall use their reasonable best efforts to cooperate with each other and the Purchaser in order to complete the Transaction, including:

  - to inform the other Parties of matters relating to the Transaction and their Respective Sale Agreement, and to facilitate the process required to obtain certain regulatory approvals;

  - to defend all governmental actions challenging the Sale Agreements or the Transaction;

  - to promptly inform the other Parties of any material issue that may result in a breach by the Sellers or the EMEA Sellers under the Sale Agreements; and

  - to ensure that the Total Proceeds are deposited in the form and in the amount paid by the Purchaser, or, upon release from escrow, the applicable escrow agent, to the Distribution Agent.

---

[7]    Capitalized terms used in this section but not defined herein have the meanings ascribed to them in the Side Agreement. To the extent that there are inconsistencies between the description of the provisions of the Side Agreement contained in this Motion and the terms and conditions of the Side Agreement, the terms and conditions of the Side Agreement shall control.

- <u>Notice and Consultation</u>.  Each of NNL, NNI and NNUK and, to the extent applicable, the Joint Administrators and/or the Joint Israeli Administrators, shall provide to the others as much notice as possible and shall consult in good faith prior to (a) amending or waiving any material provision or right under their Respective Sale Agreement, or (b) consenting to commencement of any Secondary Proceedings in relation to any EMEA Seller or any bankruptcy proceedings relating to any Non-Debtor Seller.

- <u>Collection and Allocation of Total Proceeds</u>.  Any payments by the Purchaser to the Parties under the Sale Agreements or, upon release from escrow, any escrow agreements provided for in the Sale Agreements or the other Transaction Documents or the escrow amounts contemplated by the Real Estate Terms and Conditions shall be held in the Distribution Escrow Account.  These sale proceeds will be distributed to the Parties in accordance with the Interim Sales Protocol.

- <u>Allocation of Total Payments</u>.

  - The Sellers and the EMEA Sellers have agreed that in the event the Sale Agreements are terminated due to certain triggering events (as set forth in more detail in the Sale Agreements), the Parties will, to the extent due under, and subject to the terms of, the Sale Agreements, pay to the Purchaser a Termination Payment or the Break-Up Fee and Expense Reimbursement.

  - Under the Side Agreement, the Parties have agreed that each Party will initially bear its Initial Respective Percentage[8] of the Termination Payment or the Break-Up Fee and Expense Reimbursement.  The Parties have further agreed that each Party will ultimately bear its pro-rata share of the Termination Payment or the Break-Up Fee and Expense Reimbursement based on each Party's Agreed Respective Percentage.[9]

  - In addition, the Parties have agreed that if the payment of the Termination Payment or the Break-Up Fee and Expense Reimbursement is attributable to the actions or omissions of one or more Parties, then such breaching Parties will reimburse other non-breaching Parties, without set-off, for any Termination Payment or Break-Up Fee and Expense Reimbursement payments.

---

[8]      Initial Respective Percentage means one third (1/3) for NNI and its Respective Affiliates, one third (1/3) for NNC, NNL and its Respective Affiliates, and one third (1/3) for the EMEA Sellers and NNSA.

[9]      Agreed Respective Percentage means the percentage of Total Payments pertaining to each of the Parties and, with respect to NNI and NNL only, their respective Respective Affiliates, determined pursuant to the Allocation Rules.

- The Parties have also agreed that each Party will initially bear its Initial Respective Percentage and ultimately bear its Agreed Respective Percentage of other payments owed by the Parties, as set forth in more detail in the Side Agreement.

- The Parties have further agreed that if there's a reduction in purchase price arising from failure of a Party in respect of its obligations to achieve First Day Ready, no other Party shall seek to recover such amounts from that Party, provided that such Party has used commercially reasonable efforts to comply with such obligations.

- Indemnification of Distribution Agent. The Parties have agreed that the costs of any indemnification of the Distribution Agent shall be borne on a pro rata basis by each Party in accordance with its Agreed Respective Percentage. In addition, the Parties have agreed that if the costs of any such indemnification arise solely from the breach or fault of one or more Parties, then such breaching Parties shall bear the cost of such indemnification.

- Disposition of Convertible Notes.

  - Each Party to whom the Convertible Notes are being allocated or distributed pursuant to the Sale Agreements agrees that the Convertible Notes are part of the consideration payable for the sale of the Assets or the EMEA Assets. Such Parties also declare themselves to be the bare and passive trustee, agent and nominee of the other Parties with respect to any interest it may have in such Convertible Notes.

  - All Convertible Notes not sold or otherwise dealt with prior to Closing shall be delivered on Closing to the Distribution Agent.

  - An Investment Committee comprised of five members, with NNL and NNUK each designating two members and NNI designating one member, shall be constituted to facilitate decision-making with respect to the disposition of the Convertible Notes or the right to receive Convertible Notes.

  - The Investment Committee shall be authorized and directed to deal with the Convertible Notes on behalf of the Parties and to exercise and/or to enforce the rights of the Parties under the Convertible Notes, the indenture governing the Convertible Notes, and/or as holders of any Common Stock into which Convertible Notes have been converted. All decisions of the Investment Committee shall require the approval of at least one member designated by each of NNI, NNL and NNUK.

- The Investment Committee shall also be authorized and directed to take all steps necessary or appropriate to dispose of the Convertible Notes.

- The Parties agree that the costs of any indemnification or contribution given to persons in connection with the disposition of the Convertible Notes shall be borne on a pro rata basis by the Parties in accordance with their Agreed Respective Percentages. In addition, the Parties have agreed that if the costs of any such indemnification arise solely from the breach or fault of one or more Parties, then such breaching Parties shall bear the cost of such indemnification.

21.     In addition, the Side Agreement contemplates the appointment of a Distribution Escrow Agent, creation of a Distribution Escrow Account and execution of a Distribution Escrow Agreement for distribution of the proceeds of the Transaction and other payments to be made by the Purchaser to the Parties under or in relation to the Sale Agreement.  By this motion, the Debtors seek approval to enter into the Distribution Escrow Agreement by and between the Parties, the Committee, the Monitor and the Distribution Escrow Agent to the extent necessary on commercially reasonable terms.

**Basis for Relief**

22.     The relief requested in this Motion is authorized by sections 105(a) and 363(b) of the Bankruptcy Code.  Section 105(a) of the Bankruptcy Code provides that "[t]he court may issue any order . . . that is necessary or appropriate to carry out the provisions of this title."  11 U.S.C. § 105.  See In re Combustion Engineering, Inc., 391 F.3d 190, 236 (3d Cir. 2004) (noting that section 105(a) of the Bankruptcy Code "has been construed to give a bankruptcy court 'broad authority' to provide equitable relief appropriate to assure the orderly conduct of reorganization proceedings."); In re VII Holdings Co., 362 B.R. 663, 668 (Bankr. D. Del. 2007) (BLS) (noting that "[s]ection 105(a) bestows broad equitable powers on the Court.") (citing In re Combustion Engineering, Inc., 391 F.3d 190, 236 (3d Cir. 2004)).

23.    Section 363(b) of the Bankruptcy Code permits a debtor to use, sell or lease property of the estate outside of the ordinary course of business after notice and a hearing.  11 U.S.C.  § 363.  Section 363 applies when an agreement involves the disposition of the estate's assets in a way that ventures beyond an ordinary course transaction.  Myers v. Martin (In re Martin), 91 F.3d 389, 395 (3d Cir. 1996).

24.    The use or transfer of estate property under section 363 of the Bankruptcy Code must be supported by a sound business purpose.  Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.), 722 F.2d 1063, 1070-71 (2d Cir. 1983); In re Decora Indus., Inc., No. 00-4459, 2002 WL 32332749, at *2 (D. Del. May 20, 2002); Dai-Ichi Kangyo Bank, Ltd. v. Montgomery Ward Holding Corp. (In re Montgomery Ward Holding Corp.), 242 B.R. 147, 153 (D. Del. 1999); In re Delaware & Hudson Ry. Co., 124 B.R. 169, 176 (D. Del. 1991); Travelers Cas. & Sur. Co. v. Future Claimants Representative, No. 07-2785, 2008 WL 821088, at *4 (D.N.J. Mar. 25, 2008).  A court determining whether a sound business purpose justifies the transaction "should consider all salient factors pertaining to the proceeding and, accordingly, act to further the diverse interests of the debtor, creditors and equity holders, alike."  In re Montgomery Ward, 242 B.R. at 153-54 (quoting In re Lionel, 722 F.2d at 1071).  In addition, a debtor must show that the transaction has been proposed in good faith, that adequate and reasonable notice has been provided, and that it is receiving fair and reasonable value in exchange.  See In re Delaware & Hudson Ry. Co., 124 B.R. at 176; In re Decora Indus., Inc., 2002 WL 32332749, at *2.

25.    The Debtors respectfully submit that the Side Agreement meets each of the requirements under section 363 of the Bankruptcy Code.  The Side Agreement is supported by a sound business purpose because cooperation amongst the Sellers and the EMEA Sellers is

essential to maximizing value in connection with the sale of Nortel's MEN Business, particularly given the ongoing creditor protection proceedings in various jurisdictions.  The Debtors have agreed to enter into the Side Agreement in order to facilitate cooperation amongst the Parties in working towards completion of the Sale and to determine the allocation of the benefits and burdens of the Sale.

## Notice

26.      Notice of the Motion has been given via facsimile, electronic transmission, hand delivery or overnight mail to the (i) counsel to the Purchaser, (ii) U.S. Trustee; (iii) Monitor; (iv) counsel to the Committee; (v) counsel to the Bondholder Group; (vi) Department of Justice; (vii) counsel to the Joint Administrators; and (viii) general service list established in these chapter 11 cases.  The Debtors submit that under the circumstances no other or further notice is necessary.

## No Prior Request

27.      No prior request for the relief sought herein has been made to this or any other court.

WHEREFORE, the Debtors respectfully request that this Court (i) grant this Motion and the relief requested herein; (ii) enter the proposed order attached hereto; and (iii) grant such other and further relief as it deems just and proper.

[*Remainder of Page Intentionally Left Blank*]

Dated:  February ___, 2010
      Wilmington, Delaware

CLEARY GOTTLIEB STEEN & HAMILTON LLP

James L. Bromley (*admitted pro hac vice*)
Lisa M. Schweitzer (*admitted pro hac vice*)
One Liberty Plaza
New York, New York 10006
Telephone:  (212) 225-2000
Facsimile:  (212) 225-3999

- and -

MORRIS, NICHOLS, ARSHT & TUNNELL LLP


  /s/ Annie C. Cordo
Derek C. Abbott (No. 3376)
Eric D. Schwartz (No. 3134)
Ann C. Cordo (No. 4817)
Andrew R. Remming (No. 5120)
1201 North Market Street
P.O. Box 1347
Wilmington, Delaware 19801
Telephone:  (302) 658-9200
Facsimile: (302) 658-3989

*Counsel for the Debtors*
*and Debtors in Possession*