**EXHIBIT B**

**Form of Side Agreement**

## METRO ETHERNET NETWORKS SIDE AGREEMENT

This Metro Ethernet Networks Side Agreement (the "**Agreement**") is dated as of **[February ●]**, 2010, among (i) Nortel Networks Corporation, a corporation organized under the laws of Canada ("**NNC**"), (ii) Nortel Networks Limited, a corporation organized under the laws of Canada ("**NNL**" and, together with NNC, the "**Canadian Main Sellers**"), (iii) Nortel Networks Inc., a corporation organized under the laws of Delaware ("**NNI**" and, together with the Canadian Main Sellers, the "**Main Sellers**"), (iv) the Additional U.S. Debtors (as defined below) following receipt of the Additional Debtor Approval (as defined below) and the other affiliates of the Main Sellers listed in Schedule A hereto (collectively, the "**Other Sellers**" and, together with the Main Sellers, the "**Sellers**"), (v) the entities listed on Schedule B hereto (the "**EMEA Sellers**"), which in the case of the EMEA Debtors are acting by their joint administrators Alan Robert Bloom, Stephen John Harris, Alan Michael Hudson and Christopher John Wilkinson Hill of Ernst & Young LLP of 1 More London Place, London SE1 2AF (other than Nortel Networks (Ireland) Limited, for which David Hughes of Ernst & Young Chartered Accountants of Harcourt Centre, Harcourt Street, Dublin 2, Ireland and Alan Robert Bloom serve as Joint Administrators (collectively, the "**Joint Administrators**") who act as agents, for the EMEA Debtors without any personal liability whatsoever and, in the case of the Israeli Company (as defined below) are acting by their joint administrators Yaron Har-Zvi and Avi D. Pelossof (the "**Joint Israeli Administrators**") who act as agents of the Israeli Company without any personal liability whatsoever, (vi) Nortel Networks S.A. (In Administration) ("**NNSA**") acting by the NNSA Office Holders (as defined below), who act as agents for NNSA without any personal liability whatsoever (vii) each affiliate of the Main Sellers listed in Schedule C hereto to the extent such entity is deemed a "**Selling Debtor**" pursuant to Section 11.d of the IFSA (as defined below) (each such entity, a "**North American ALT Selling Debtor**"); (viii) each affiliate of the EMEA Sellers listed in Schedule D hereto to the extent such entity is deemed a "**Selling Debtor**" pursuant to Section 11.d of the IFSA (each such entity an "**EMEA ALT Selling Debtor**" and, together with the Sellers, the EMEA Sellers, NNSA and the North American ALT Selling Debtors, the "**Selling Parties**"); (ix) the Joint Administrators and (x) the Joint Israeli Administrators.  The Joint Administrators, in their individual capacity, shall be party to this Agreement solely for the purposes of Sections 2.1, 2.2, 2.3, 2.7, 4.1, 4.7, 4.8, 4.11 and 4.15.  The Joint Israeli Administrators, in their individual capacity, shall be party to this Agreement solely for the purposes of Sections 2.1, 2.2, 2.3, 2.7, 4.2, 4.7, 4.8, 4.11 and 4.15.

W I T N E S S E T H :

WHEREAS, on the Petition Date, the Canadian Debtors filed with the Canadian Court an application for protection under the CCAA and were granted certain initial creditor protection pursuant to an order issued by the Canadian Court on the same date, which also appointed Ernst & Young Inc. as "**Monitor**" in connection with the CCAA Cases and has been extended by further order of the Canadian Court from time to time, most recently on January 21, 2010, as the same may be amended and restated from time to time by the Canadian Court;

WHEREAS, the U.S. Debtors are debtors-in-possession under the U.S. Bankruptcy Code, which commenced cases under Chapter 11 of the U.S. Bankruptcy Code on the Petition Date by filing voluntary petitions for relief in the U.S. Bankruptcy Court for the District of Delaware;

WHEREAS, the EMEA Debtors on the Petition Date filed applications with the English Court pursuant to the Insolvency Act and the European Union's Council Regulation (EC) No 1346/2000 on Insolvency Proceedings and the English Court appointed the Joint Administrators under the Insolvency Act;

WHEREAS, The Israeli Court, on January 19, 2009, granted Nortel Networks Israel (Sales and Marketing) Limited (In Administration) (the "**Israeli** Company") with a stay of proceedings order and nominated the Joint Israeli Administrators as joint administrators of the Israeli Company.  On November 24, 2009, as part of such stay of proceedings, the Israeli Court approved a creditors' arrangement in connection with the Israeli Company, and further approved at a later date, the continuation of all relevant rights, duties and obligations of the Joint Israeli Administrators pursuant to such stay of proceedings order;

WHEREAS, while the administration proceedings in respect of NNSA under the Insolvency Act are continuing, subsequent to the Petition Date, NNSA commenced secondary insolvency proceedings within the meaning of Article 27 of the European Union's Council Regulation (EC) No 1346/2000 on Insolvency Proceedings in the Republic of France pursuant to which Cosme Rogeau was appointed liquidator and Franck Michel was appointed administrator (together, the "NNSA Office Holders") by the Versailles Commercial Court (Docket No. 2009P00492) for NNSA;

WHEREAS, the Non-Debtor Sellers and the EMEA Non-Debtor Sellers are not subject to any Bankruptcy Proceedings;

WHEREAS, on June 9, 2009, the U.S. Debtors, the Canadian Debtors, the EMEA Debtors and the Joint Administrators entered into an Interim Funding and Settlement Agreement (the "**IFSA**") governing certain intercompany matters, including the obligation of the parties thereto to (a) negotiate in good faith and attempt to reach agreement on a timely basis on a protocol (the "**Interim Sales Protocol**") for resolving disputes concerning the allocation of Sale Proceeds from Sale Transactions (each as defined in the IFSA), which Interim Sales Protocol shall provide binding procedures for the allocation of Sale Proceeds where the relevant parties in such Sale Transaction have been unable to reach agreement regarding such allocation, and (b) following entry into any Sale Transaction, negotiate in good faith and on a timely basis to attempt to reach agreement regarding the allocation of the Sale Proceeds from such Sale Transaction within a reasonable period of time or as may be otherwise provided in the Interim Sales Protocol (failing which the Interim Sales Protocol shall apply to determine the allocation of the relevant Sale Proceeds);

WHEREAS, the Sellers have, as of October 7, 2009, entered into an Asset Sale Agreement with Ciena Corporation (the "**Purchaser**") relating to the part of the Business owned and operated by the Sellers, amended such agreement on October 16, 2009, amended and restated such agreement on November 24, 2009 and further amended it on December 3, 2009 and on December 23, 2009 (as further amended from time to time in accordance with the terms thereto and this Agreement, the "**North American Agreement**");

WHEREAS, the Sellers intend to further amend the North American Agreement in order to enable their U.S. debtor affiliates CoreTek, Inc., Qtera Corporation and Xros, Inc. (collectively the "**Additional U.S. Debtors**") to join the North American Agreement as additional "**Other Sellers**" as such term is used in the North American Agreement and therefore

the Parties intend that, following execution thereof and approval of such amendment by the U.S Bankruptcy Court (the "**Additional Debtor Approval**"), each of the Additional U.S. Debtors shall join this Agreement and be deemed Other Sellers hereunder;

WHEREAS, the EMEA Sellers, the Joint Administrators and the Joint Israeli Administrators have, as of October 7, 2009, entered into an Asset Sale Agreement with the Purchaser relating to the part of the Business owned and operated by the EMEA Sellers, amended such agreement on October 20, 2009 and amended such agreement on November 24, 2009 and further amended it on December 16,2009 and on January 13, 2010 (as further amended from time to time in accordance with the terms thereto and this Agreement, the "**EMEA Agreement**" and, together with the North American Agreement, the "**Sale Agreements**");

WHEREAS, NNSA acceded to the IFSA on September 11, 2009 and, notwithstanding that NNSA is not a party to the Sale Agreements, NNSA is, pursuant to a letter dated September 28, 2009, a Selling Debtor under Section 12.a of the IFSA for the purposes of the Transaction (as defined below) and, as such, any reference in this Agreement to a Selling Party shall be construed as including NNSA.

WHEREAS, as soon as practicable after the execution of this Agreement, in accordance with Section 12.b of the IFSA, the Selling Parties (as defined below), the Monitor and the Committee will enter into an escrow agreement with the Distribution Agent (the "**Distribution Escrow Agreement**") governing, among other things, the Distribution Agent's collection, holding in escrow in an escrow account at the Distribution Agent (the "**Distribution Escrow Account**") and distribution to the Sellers, the EMEA Sellers, NNSA and any other party deemed to be a Selling Debtor pursuant to the IFSA (in accordance with the Allocation Rules) of the proceeds of the Transaction and other payments to be made by the Purchaser (or any Designated Purchaser or EMEA Designated Purchaser) to the Selling Parties under or in relation to the Sale Agreements;

WHEREAS, upon the execution of an Appropriate License Termination (as defined in the IFSA) each party listed on Schedule C and Schedule D hereto may, pursuant to Section 11.d of the IFSA, be deemed to be a "**Selling Debtor**" for the purposes of the IFSA and therefore be entitled to seek an allocation of a portion of the sales proceeds under the Sale Agreements to be determined in accordance with the IFSA and the Interim Sales Protocol and therefore it is the intention of the Parties that each such party following execution and delivery of an Appropriate License Termination in accordance with the IFSA be party to and bound by this Agreement to the extent such party seeks to be a party to or receive funds from the Distribution Escrow Agreement.

WHEREAS, for the purpose of facilitating the completion of the Transaction and maximizing the value arising therefrom for their respective stakeholders, the Parties intend to assume certain mutual cooperation and other covenants relating to the pursuit and completion of the sale of the Business (the "**Transaction**") pursuant to the Sale Agreements or otherwise, as well as govern certain other matters of common interest relating to the prospective Transaction, including certain matters relating to the allocation among the Parties of the benefits and burdens of the Transaction; and

WHEREAS the Sale Agreements provide that the consideration payable by the Purchaser may include, *inter alia,* $239,000,000 aggregate principal amount of the Purchaser's

Senior Notes due June 15, 2017 (together with related rights and securities, the "**Convertible Notes**") and the Selling Parties have previously expressed their intention that contemporaneously with the distribution of such Convertible Notes those of the Selling Parties which receive such Convertible Notes shall declare themselves as agent and nominee for the Selling Parties with respect to such Convertible Notes, including all proceeds therefrom, and the Selling Parties wish to set forth their mutual understanding and agreement as to how to deal with the Convertible Notes, and rights arising in respect thereof.

NOW, THEREFORE, in consideration of the respective covenants made herein, and of the mutual benefits to be derived hereby (the sufficiency of which are acknowledged), the Parties agree as follows:

ARTICLE I

INTERPRETATION

SECTION 1.1.  Definitions.

(a)    To the extent capitalized words used herein (including in the recitals hereof) are not defined in this Agreement, those words shall have the meanings given to them (i) in the North American Agreement or (ii) to the extent they are not defined in the North American Agreement, in the EMEA Agreement.

(b)    The following capitalized terms shall have the meanings set forth below:

(i)    "**Advisor Fees**" means any fees or other amounts paid or payable to (A) Lazard Frères & Co. in connection with the sale of the Business, (B) the Distribution Agent in accordance with the terms of the Distribution Escrow Agreement, (C) underwriters, selling agents or placement agents in connection with any proposed sale of the Convertible Notes, (D) the TSA Arbitrator, (E) the Escrow Agent, (F) the Independent Auditor, (G) the Accounting Arbitrator, (H) the Deposit Escrow Agent, and (I) any accounting arbitrator appointed in accordance with the terms of a Contract Manufacturing Inventory Agreement.

(ii)    "**Agreed Respective Percentage**" means the percentage of Total Payments pertaining to each of the Parties and, with respect to NNI and NNL only, their respective Respective Affiliates, determined pursuant to the Allocation Rules.

(iii)    "**Allocation Rules**" means the rules (expressed as percentages or otherwise) to be used to allocate among the Selling Parties and other parties, as may be applicable, the benefit of the Total Proceeds and the burden of the Total Payments, as such rules shall be agreed upon among the relevant Selling Parties pursuant to Section 12.d and Section 12.g of the IFSA or shall be otherwise determined in accordance with the binding procedures to be set forth in the Interim Sales Protocol pursuant to Section 12.c of the IFSA.

(iv)    "**Common Stock**" means the shares of common stock, par value $0.01 per share, of the Purchaser issued or issuable upon conversion of Convertible Notes.

(v)    "**Convertible Notes**" shall have the meaning given to that term in the recitals to this Agreement and references in this Agreement to Convertible Notes shall be deemed to include Demand Notes or Substituted Convertible Notes and, unless the context otherwise requires, the Common Stock.

(vi)    "**Dispute Resolver Retainer**" means any retainer paid or payable to one or more dispute resolvers appointed pursuant to the Interim Sales Protocol to determine the Allocation Rules to the extent related to the Transaction.

(vii)    "**Distribution Agent**" means JP Morgan Chase Bank, N.A. or such other Person appointed with the consent of each of NNL, NNI and NNUK, provided that consent to appoint such Person shall not be withheld unreasonably.

(viii)    "**EMEA Debtors**" means those entities listed in Schedule 3 of the EMEA Agreement, each party listed in Schedule D hereto that is an EMEA ALT Selling Debtor and NNSA.

(ix)    "**Initial Respective Percentage**" means one third (1/3) for NNI and its Respective Affiliates, one third (1/3) for NNC, NNL and its Respective Affiliates, and one third (1/3) for the EMEA Sellers and NNSA.

(x)    "**New Bankruptcy Proceedings**" means any voluntary or involuntary bankruptcy, insolvency, administration or similar judicial proceedings commenced after the date hereof.

(xi)    "**NNUK**" means Nortel Networks UK Limited.

(xii)    "**Party**" means (w) each of the Canadian Main Sellers and their Respective Affiliates, (x) each of NNI and its Respective Affiliates, (y) each of NNUK and its Respective Affiliates, and (z) for the purposes of Sections 2.1, 2.2, 2.3, 2.7, 4.1, 4.2, 4.7, 4.8, 4.11 and 4.15 only, the Joint Administrators and/or the Joint Israeli Administrators, as applicable and "**Parties**" shall have a corresponding meaning.

(xiii)    "**Respective Sale Agreement**" means (x) with respect to the Canadian Main Sellers, NNI and the Other Sellers, the North American Agreement, and (y) with respect to the EMEA Sellers, the EMEA Agreement.

(xiv)    "**Respective Affiliates**" means: (x) with respect to NNL, each Seller listed in Sections 11.15(a)(i) and (ii) of the Sellers Disclosure Schedule and each party listed in Part 1 of Schedule C hereto that is a North American ALT Selling Debtor; (y) with respect to NNI, all the other U.S. Debtors (including, without limitation, the Additional U.S. Debtors following receipt of the Additional Debtor Approval) and each Seller listed in Section 11.15(a)(iii) of the Sellers Disclosure Schedule and each party listed in Part 2 of Schedule C hereto

5

that is a North American ALT Selling Debtor; and (z) with respect to NNUK, all the other EMEA Sellers listed in Schedule B of this Agreement, each party listed in Schedule D hereto that is an EMEA ALT Selling Debtor and NNSA.

(xv)    "**Secondary Proceedings**" shall have the meaning attributed to such words in the EMEA Agreement.

(xvi)    "**Total Payments**" means the aggregate of (A) amounts paid or payable by the Selling Parties to the Purchaser (and any Designated Purchaser and EMEA Designated Purchaser) under the terms of the Sale Agreements as a termination payment payable pursuant to Section 2.1.7(d) of the North American Agreement (a "**Termination Payment**") or as a break-up fee and expense reimbursement under the EMEA Agreement or the North American Agreement (collectively, the "**Break-up Fee and Expense Reimbursement**"), (B) all amounts paid by the Selling Parties to third parties (a) to obtain intellectual property licenses and consents; and (b) to satisfy obligations arising from the failure to obtain such consents under intellectual property licenses, in each case in respect of intellectual property currently used by the Selling Parties but only to the extent directly connected to the obligation of the Selling Parties to deliver Services to the Purchaser under the Transition Services Agreement, (C) any amounts paid or payable by any Selling Party to third parties to satisfy the obligation to prepare, complete the audit of and deliver to the Purchaser the Audited Financial Statements, and to provide the other financial data and information required pursuant to Section 5.26 of the North American Agreement, (D) all Advisor Fees, (E) all amounts paid or payable by the Selling Parties in respect of the Dispute Resolver Retainer and (F) any Deficit Amount payable to the Purchaser to the extent the Deficit Amount exceeds the Working Capital Escrow Amount.

(xvii)    "**Total Proceeds**" means the aggregate amounts (A) paid by the Purchaser (and any Designated Purchaser and EMEA Designated Purchaser) to the Selling Parties under or in respect of the Sale Agreements, as Purchase Price, as the Deposit Amount, as an adjustment to the Purchase Price and as damages (including reverse termination payments, if any) and (B) paid to the Selling Parties under any escrow arrangement pursuant to which a portion of the Purchase Price or Deposit Amount has been placed in escrow, subject to Section 2.4(b) and including all interest or redemption or other payments or distributions in respect of the Convertible Notes and all proceeds from the sale or other disposition of the Convertible Notes including the sale or disposition of the right to receive the Convertible Notes, (and, in the event the Convertible Notes are not sold or otherwise disposed of, the Convertible Notes) but for greater certainty shall exclude any amounts not constituting a portion of the Purchase Price paid or payable by the Purchaser to one or more Selling Party to compensate such Selling Party for costs incurred or to be incurred by such Selling Party, as contemplated to be paid directly to such Selling Party in accordance with the terms of the relevant Sale Agreement or other Transaction Document.

(xviii)    "**Transaction**" means the sale of the Business to the Purchaser pursuant to the Sale Agreements (as amended from time to time).

SECTION 1.2.  Interpretation.

1.2.1.  Gender and Number.  Any reference in this Agreement to gender includes all genders and words importing the singular include the plural and vice versa.

1.2.2.  Certain Phrases and Calculation of Time.  In this Agreement (i) the words "including" and "includes" mean "including (or includes) without limitation", (ii) the terms "hereof," "herein," and "herewith" and words of similar import shall, unless otherwise stated, be construed to refer to this Agreement and not to any particular provision of this Agreement, and Section and Schedule references are to the Sections and Schedules to this Agreement unless otherwise specified, and (iii) in the computation of periods of time from a specified date to a later specified date, unless otherwise expressly stated, the word "from" means "from and including" and the words "to" and "until" each mean "to but excluding".  If the last day of any such period is not a Business Day, such period will end on the next Business Day.

When calculating the period of time "within" which, "prior to" or "following" which any act or event is required or permitted to be done, notice given or steps taken, the date which is the reference date in calculating such period is excluded from the calculation.  If the last day of any such period is not a Business Day, such period will end on the next Business Day.

1.2.3.  Headings, etc.  The inclusion of a table of contents, the division of this Agreement into Articles and Sections and the insertion of headings are for convenient reference only and are not to affect or be used in the construction or interpretation of this Agreement.

ARTICLE II

COVENANTS

SECTION 2.1.  Efforts to Complete the Transaction.

(a)      Subject to the requirements of any applicable Law, each of the Parties shall use their reasonable best efforts to take, or cause to be taken, all actions and to do, or cause to be done, and cooperate with each other and the Purchaser in good faith in order to do, all things necessary, proper or advisable under applicable Law to perform their obligations under their Respective Sale Agreement and consummate the transactions contemplated by the North American Agreement and the EMEA Agreement, as applicable, as soon as practicable in accordance with the provisions thereof and cause the fulfillment at the earliest practicable date of all of the conditions to the Purchaser's obligations to consummate the transactions contemplated by their Respective Sale Agreement.

(b)      The mutual efforts of the Parties pursuant to Section 2.1(a) shall include:

(i)      cooperating with the other Parties in good faith in any manner reasonably required to facilitate the consummation of the Transaction, including by sharing information to the extent necessary or opportune and keeping the other Parties informed of any matter of relevance relating to the Transaction and their Respective Sale Agreement;

(ii)    (A) defending all Actions by or before any Government Entity challenging the Sale Agreements or the consummation of the Transaction and (B) seeking rescission or repeal of any injunction, decree, ruling, order or other action of any Government Entity adversely affecting the ability of the Parties to consummate the Transaction;

(iii)    cooperating with the other Parties and the Purchaser in good faith in any manner reasonably required to facilitate the preparation and making of any filings with Government Entities required to seek and obtain the Regulatory Approvals;

(iv)    upon becoming aware of any material issue that may result in a breach by the Sellers or the EMEA Sellers under either Sale Agreement, promptly informing the other Parties of such potential breach and consulting with the other Parties with a view to ensuring that there is no breach of the relevant Sale Agreement and/or any breach is timely cured in accordance with the Sale Agreements; and

(v)    ensuring that the Total Proceeds are deposited in the form and in the amount paid by the Purchaser or, upon release from escrow, the applicable escrow agent, to the Distribution Agent in accordance with the terms hereof and the Distribution Escrow Agreement.

SECTION 2.2.  <u>Notice and Consultation</u>.

(a)    Each of NNL, NNI and NNUK and, to the extent applicable, the Joint Administrators and/or the Joint Israeli Administrators (together, the **"Primary Parties"**), shall provide to the others as much notice as possible, and in any case no less than five (5) Business Days written advance notice if possible, and shall consult in good faith with the other Primary Parties, prior to taking or agreeing to take, any of the following actions under their respective Sale Agreement:

(i)    subject to Section 2.3, amending any material provision of their Respective Sale Agreement;

(ii)    subject to Section 2.3, waiving any of their material rights or provisions under their Respective Sale Agreement;

(iii)    with respect to the EMEA Sellers only, consenting to the entry into, or requesting, promoting or instituting, any Secondary Proceedings in relation to any EMEA Seller; and

(iv)    with respect to the Main Sellers only, voluntarily commencing, or otherwise consenting to, any New Bankruptcy Proceedings relating to any Non-Debtor Seller.

(b)    If an EMEA Seller, after having acted in accordance with Section 2.2(a)(iii), resolves to enter into Secondary Proceedings and the Main Sellers have a right under the Law applicable to the Secondary Proceedings to appear at these Secondary Proceedings

(under any capacity whatsoever), that EMEA Seller shall facilitate the Main Sellers being heard at such Secondary Proceedings, to the maximum extent allowed by the Law applicable to them.

SECTION 2.3.  <u>No Termination or Material Amendments</u>.  No Party shall, without the prior written consent of the other Parties (such consent not to be unreasonably withheld, delayed or conditioned):

(a)     exercise any termination right pursuant to their Respective Sale Agreement (excluding the Main Sellers' right to terminate the North American Agreement under Section 10.1(b)(vi) of the North American Agreement and the right of the EMEA Sellers, the Joint Administrators and the Joint Israeli Administrators to terminate the EMEA Agreement under clause 15.4.6 of the EMEA Agreement) or otherwise agree with the Purchaser to terminate such Respective Sale Agreement;

(b)     with respect to the Main Sellers only, amend the provisions of Sections 2.2, 2.3, 10.2, and 10.3 and Articles VIII and IX of the North American Agreement;

(c)     with respect to the EMEA Sellers only, amend the provisions of Clauses 3, 4.1, 4.2, 4.3 and Clause 15 of the EMEA Agreement, and Schedule 8 to the EMEA Agreement; or

(d)     enter into any amendment to or waive any provision of its Respective Sale Agreement or any other Transaction Document to which such Party is a party that would cause a material detriment to any of the other Parties.

SECTION 2.4.  <u>Collection and Allocation of Total Proceeds</u>.

(a)     Subject to Sections 2.4(c), 2.4(d) and 2.4(e), in accordance with the provisions of Section 12.b of the IFSA, the Parties agree that any payment due by the Purchaser (and any Designated Purchaser and any EMEA Designated Purchaser) to the Selling Parties under the Sale Agreements or, upon release from escrow, any escrow agreements provided for in the Sale Agreements or the other Transaction Documents or the escrow amounts contemplated by the Real Estate Terms and Conditions (including without limitation the Escrow Amount, the Transition Services Escrow Amount and the Cure Cost Escrow Amount) that is included in the Total Proceeds shall be collected and held in escrow in the Distribution Escrow Account by the Distribution Agent (as agent for the Selling Parties), which will then allocate and distribute the Total Proceeds in accordance with the Allocation Rules and the Distribution Escrow Agreement provided, however, that any amounts owing under Section 2.5(b), Section 2.5(c), Section 2.10 or Section 3.3 hereof by any Selling Party (the "**Debtor Party**") to another Selling Party at the time of an intended distribution from the Distribution Escrow Account shall be paid out of the share of Total Proceeds otherwise payable to the Debtor Party.

(b)     The Parties agree and acknowledge that the Total Proceeds do not include amounts of or in respect of  "VAT" or  "Transfer Taxes" (each term as defined in the applicable Sale Agreement) paid or payable by the Purchaser or any Designated Purchaser or any EMEA Designated Purchaser or any affiliate of the Purchaser to the Sellers or the EMEA Sellers or the Joint Administrators or the Joint Israeli Administrators or pursuant to the terms of the Sale Agreements.  The Parties agree that it is not intended that such amounts of VAT or Transfer Taxes will be payable into the Distribution Escrow Account but, notwithstanding this

9

Agreement, where such amounts are paid into the Distribution Escrow Account, the Distribution Agent shall be instructed under the procedures in the Distribution Escrow Agreement to promptly pay such amounts to the Selling Parties or Joint Administrators or Joint Israeli Administrators (as relevant).

(c)      To the extent that there are funds available in the Distribution Escrow Account that are attributable to the sale of the Business, the obligation of the Selling Parties to make any payment that constitutes part of the Total Payments shall (subject to adjustment in accordance with Section 2.5) be satisfied by causing the Distribution Agent to pay the relevant amount out of the Distribution Escrow Account.

(d)      To the extent that any payment that constitutes part of the Total Payments cannot be satisfied by payment out of the Distribution Escrow Account, or are required to be paid prior to the Closing Date, any such amounts actually paid by any Selling Party to the Purchaser, Distribution Agent, or other Person, as applicable, shall be deducted from any subsequent amounts payable or paid into the Distribution Escrow Account under Section 2.4(a) and shall (subject to adjustment in accordance with Section 2.5) be paid directly to such Selling Party that made the relevant payment.

(e)      It is acknowledged and agreed that in determining how to allocate and distribute the Total Proceeds, except for the items constituting Total Payments (other than the Deficit Amount) and the other expenses, damages and liabilities specifically allocated herein, the Parties reserve all rights in respect of expenses, damages and all other liabilities incurred in connection with the performance of their obligations under or pursuant to the Sale Agreements and/or the Transaction Documents, including without limitation pursuant to the Transition Services Agreement, the Intellectual Property License Agreement, the Loaned Employee Agreement or the Trademark License Agreement, and in particular whether such expenses, damages and other liabilities should be deducted from the Total Proceeds, or otherwise considered in connection with a distribution to the Selling Parties.

SECTION 2.5.  <u>Allocation of Total Payments</u>.

(a)      Irrespective of the individual/joint payment obligations of each Selling Party or their Respective Affiliates *vis-à-vis* the Purchaser pursuant to the Sale Agreements or *vis-à-vis* the Distribution Agent pursuant to the Distribution Agreement (each of which shall be duly complied with by the relevant Selling Party in accordance with the terms thereof), the Parties agree that, among them, each Party (and, with respect to the Main Sellers, their respective Respective Affiliates) shall initially bear the Initial Respective Percentage and, when determined, shall ultimately bear the Agreed Respective Percentage of the Total Payments, subject to Section 2.5(b) and (c).

(b)      To the extent the Agreed Respective Percentage differs from the Initial Respective Percentage, any amount actually paid by a Party that constitutes part of the Total Payments shall be promptly (re)adjusted among the Parties so that each Party (and, with respect to the Main Sellers, their respective Respective Affiliates) ultimately bears a share of those Total Payments that corresponds to its Agreed Respective Percentage.  Except as set forth in Section 2.4(a), adjustment payments to be made among the Parties pursuant to the previous sentence shall be made without set off.

(c)     Notwithstanding Section 2.5(a), the Parties agree that, to the extent the event triggering the obligation of the Sellers and the EMEA Sellers to pay to the Purchaser the Termination Payment, the Break-Up Fee and the Expense Reimbursement under the Sale Agreements is attributable to the action or omission of one or more Parties only, such Parties shall be responsible, as among the Sellers and the EMEA Sellers, for the entire Termination Payment, the Break-Up Fee and the Expense Reimbursement actually paid by the Sellers and/or the EMEA Sellers (or, if applicable, the Distribution Agent on behalf of the Sellers and the EMEA Sellers) to the Purchaser under the Sale Agreements and shall therefore reimburse to the other Parties, without set-off, any such amount actually paid by them (or the Distribution Agent) to the Purchaser in respect of such Termination Payment, Break-Up Fee and Expense Reimbursement.  The Parties further agree that the breach of any representation or warranty made under the North American Agreement or the inability to provide any certification concerning the accuracy or completion of any representation, warranty or covenant, in respect of the EMEA Sellers or the EMEA Business, in each case under the North American Agreement, shall not constitute a matter attributable to the action or omission of any of the Main Sellers or the Other Sellers or the Joint Administrators, the Joint Israeli Administrators or the EMEA Sellers.

(d)     The Selling Parties agree that, to the extent that there is a reduction in the Purchase Price arising from a breach or other failure of a Selling Party in respect of its obligations to achieve First Day Ready, no other Selling Party shall seek to recover such amounts from the Selling Party or Selling Parties so in breach or at fault in any proceedings, before a dispute resolver to determine the final allocation of Sale Proceeds under the Interim Sales Protocol, or otherwise, provided that any such Selling Party so in breach or at fault has used commercially reasonable efforts to comply with such obligations.

SECTION 2.6.  Intentionally Deleted.

SECTION 2.7.  Irrevocable Offers under the EMEA Agreement.  In relation to paragraph 6 of Schedule 6 of the EMEA Agreement, the Reserved Territory Sellers and the Joint Administrators agree:

(a)     to commence and progress the information and consultation process in a timely manner; and

(b)     to deliver acceptance of Irrevocable Offers to the Purchaser as soon as possible after appropriate completion of each relevant consultation process.

SECTION 2.8.  Excluded Sellers.  The Parties hereby agree that if any Other Seller becomes an Excluded Other Seller, or any EMEA Seller becomes an EMEA Excluded Seller, the allocation of Total Proceeds that would otherwise have been payable to such Excluded Other Seller or EMEA Excluded Seller, if any, as determined pursuant to the Interim Sales Protocol shall not be reduced as a result of such Other Seller becoming an Excluded Other Seller or such EMEA Seller becoming an EMEA Excluded Seller, provided that such allocation of any Total Proceeds to such Excluded Other Seller or EMEA Excluded Seller, as applicable, shall be reduced as a result of the receipt of the proceeds, if any, by such Excluded Other Seller or EMEA Excluded Seller in respect of the sale or liquidation of the Assets of such Excluded Other Seller or the EMEA Assets of such EMEA Excluded Seller, provided, further that such payment shall

be made only after all of the Assets of such Excluded Other Seller or EMEA Excluded Seller have been sold to a *bona fide* third party purchaser or liquidated.

SECTION 2.9.  <u>Tax Cooperation</u>.  In the event that the preparation or filing of a Tax Return could reasonably be expected to require a Partial Allocation or a Selling Party is preparing any Partial Allocation with the Purchaser (whether by agreement or submission to the Accounting Arbitrator), the Selling Party responsible for filing such Tax Return or preparing such Partial Allocation shall provide notice to the other Selling Parties and shall consider in good faith any comments by the other Selling Parties with respect to such Tax Return and any Partial Allocation related thereto, <u>provided</u>, and for the avoidance of doubt, that the other Selling Parties shall not have a consent or veto right with respect to such Tax Returns or Partial Allocations related thereto.  It is understood that neither this Section 2.9 nor the exercise or failure to exercise of any rights or privileges provided herein shall, or be deemed to, determine, ratify, or adopt, or have any impact whatsoever on, the allocation of proceeds from the sale of the Business among the Selling Parties.

SECTION 2.10.  <u>Indemnification of Distribution Agent</u>.  The Selling Parties agree that the costs of any indemnification of the Distribution Agent pursuant to the Distribution Escrow Agreement shall be borne on a pro rata basis by the Selling Parties in accordance with their Agreed Respective Percentages and any Selling Party paying in excess of such pro rata share of the cost of such indemnification shall have rights of contribution vis-à-vis any Selling Party that has paid less than such pro rata share of such costs either directly to Distribution Agent or by payment to another Selling Party pursuant to this sentence; provided that if the costs of any such indemnification arise solely from a breach of the Distribution Escrow Agreement or other fault of a single Selling Party or Selling Parties, the Selling Party so in breach or at fault shall bear the cost of such indemnification and any Selling Party paying in excess of its share of the cost of such indemnification, after taking into account the breach or fault of the other Selling Parties, shall have rights of contribution vis-à-vis any Selling Party that has paid less than its share of such costs either directly to Distribution Agent or by payment to another Selling Party.

SECTION 2.11.  <u>Intentionally Deleted</u>.

ARTICLE III

DEALING WITH CONVERTIBLE NOTES OF PURCHASER

SECTION 3.1.  <u>Disposition of Convertible Notes.</u>

(a)     With respect to any portion of the consideration paid or payable by the Purchaser pursuant to the Sale Agreements that consists of Convertible Notes: (1) each Selling Party to whom such Convertible Notes are expressed to be allocated or distributed pursuant to the Sale Agreements agrees and acknowledges that the Convertible Notes are part of the consideration payable to such Selling Party for the sale of the Assets or EMEA Assets transferred by such Selling Party to the Purchaser or Designated Purchaser or EMEA Designated Purchaser (as appropriate), in accordance with Section 2.2.7(a) of the North American Agreement and, without prejudice to the foregoing, contemporaneously with the receipt of such Convertible Notes, such Selling Party declares itself to be the bare and passive trustee, agent and nominee of the other Sellers, the EMEA Sellers, NNSA, the Joint Administrators and the Joint Israeli Administrators with respect to any interest it may have in such Convertible Notes including any income or other proceeds therefrom; (2) in order to facilitate decision-making with respect to the disposition of such Convertible Notes or the right to receive Convertible Notes, the Parties will forthwith constitute a committee of five members with each of NNUK and NNL designating two members, and NNI designating one member (the "**Investment Committee**"), and each member of the Investment Committee a "**Representative**") and (3) such Convertible Notes to the extent not sold or otherwise dealt with prior to Closing, shall be delivered on Closing to the Distribution Agent, to be held and dealt with in accordance with the terms and conditions of the Distribution Escrow Agreement and subsequent instructions given by the Investment Committee relating to the disposition of such Convertible Notes.

(b)     The Investment Committee shall be authorized and directed to deal with the Convertible Notes on behalf of the Parties in accordance with the express terms of this Agreement and otherwise in their business judgment and to exercise and/or enforce the rights of the Parties under the Convertible Notes, the indenture governing the Convertible Notes, and/or as holders of any Common Stock into which Convertible Notes have been converted (including decisions with respect to any voting rights of holders of Convertible Notes or Common Stock, with respect to the exercise of conversion rights and with respect to any repurchase offers required under the terms of the Convertible Notes).  All decisions of the Investment Committee shall require the approval of (i) the Representative designated by NNI, and (ii) at least one Representative of each of NNL and NNUK.

(c)     The Investment Committee shall be authorized and directed to take all steps necessary or appropriate to sell or otherwise dispose of the Convertible Notes (or the right to receive the Convertible Notes) in accordance with, and subject to any limitations provided by, applicable Law and the applicable terms of the Sale Agreements.  In particular, among other things, the Investment Committee:

(i)     shall be directed to implement a plan of sale of the Convertible Notes (whether through an underwritten public offering, private sale, block trade, sale of the right to receive the Convertible Notes or otherwise) as promptly as commercially reasonable subject to market conditions but in any event with a

view to maximizing the proceeds of such a sale and guided by direction from the Selling Parties regarding their investment and restructuring objectives;

       (ii)     shall be authorized on behalf of the Selling Parties (1) to select and retain such underwriters and/or placement agents, accountants, counsel and other advisors as it deems necessary or desirable in connection with implementing a sale of the Convertible Notes, (2) to enter into related underwriting or purchase agreements (including provisions for the payment of underwriting discounts or commissions and/or placement fees and in respect of indemnification), and (3) to give instructions to the Distribution Agent on behalf of the Parties to release Convertible Notes from escrow for purposes of such sale;

       (iii)    in connection with any sale of the Convertible Notes, shall make provision for the delivery of the proceeds thereof to the Distribution Agent, to be held and dealt with in accordance with the terms and conditions of the Distribution Escrow Agreement;

       (iv)    shall make provision for the delivery to the Distribution Agent of any interest, redemption, repurchase or other cash payments or any Common Stock or other non-cash distributions received in respect of the Convertible Notes to be held and dealt with in accordance with the terms and conditions of the Distribution Escrow Agreement; and

       (v)     shall be authorized and directed on behalf of the Selling Parties to pay, or cause to be paid, the fees and expenses relating to any sale or other disposition of the Convertible Notes (which payments may be made out of the proceeds from the sale or other disposition of the Convertible Notes or from the Total Proceeds held by the Distribution Agent).

       (d)    For the purposes of this Section 3.1 of this Agreement only (1) each Seller listed in Sections 11.15(a)(i) and (ii) of the Sellers Disclosure Schedule and each party listed in Part 1 of Schedule C that is a North American ALT Selling Debtor hereby irrevocably appoints NNL as its representative; (2) each Seller listed in Section 11.15(a)(iii) of the Sellers Disclosure Schedule and each party listed in Part 2 of Schedule C that is a North American ALT Selling Debtor hereby irrevocably appoints NNI as its representative; and (3) each EMEA Seller listed in Schedule B of this Agreement, each party listed in Schedule D that is an EMEA ALT Selling Debtor and NNSA hereby irrevocably appoints NNUK as its representative and acknowledges and agrees that:

       (i)     each of NNUK, NNL and NNI shall expressly have the power to, in the name and on behalf of each of its Respective Affiliates and acting through its respective designated Representative(s) on the Investment Committee:

       (A)    take all decisions and carry out any actions required or desirable in connection with the Convertible Notes on behalf of the Parties in accordance with the express terms of this Agreement and otherwise in their business judgment, including to act through the Investment Committee to take any decision or carry out any action as permitted under Sections 3.1(a), (b) and (c) of this Agreement;

(B)    send and receive all notices or communications required or permitted thereby;

(C)    make any filings and seek any regulatory approvals, as may be necessary in connection with holding or disposing of the Convertible Share or, upon any conversion, any of the underlying common shares; and

(D)    consent to any amendment, waiver or modification of the Sale Agreements or the indenture governing the Convertible Notes relating to the sale or other disposition of the Convertible Notes; and

(ii)    no Parties shall without the prior written consent of each of NNL, NNI and NNUK consent, purport to consent or agree to consent to any amendment, waiver or modification of the Sale Agreements or the indenture governing the Convertible Notes relating to the sale or other disposition of the Convertible Notes.

(e)    Each Respective Affiliate shall indemnify its respective Representative and its respective representatives on the Investment Committee (as applicable) for, and hold it harmless against, any loss, liability or expense, including reasonable attorneys' fees, incurred by any Representative (or its designated member(s) of the Investment Committee) for serving in the capacity of Representative under this Section 3.1.

(f)    Subject to the Parties' disclosure obligations imposed by Law, the Parties shall cooperate with each other in the development and distribution of all public information disclosures and announcements relating to the Convertible Notes or the sale thereof and each Party shall furnish such information and documentation regarding itself as may be reasonably required in connection with any prospectus, placement memorandum or similar document relating to any such sale or in connection with any filings or regulatory approvals as may be necessary in connection with holding or disposing of the Convertible Notes.

SECTION 3.2.  Rights of The Committee, the Bondholder Group and the Monitor. Each of NNL, NNI and NNUK, the Committee, the Bondholder Group and the Monitor shall in good faith consult with each other concerning the plan of sale of the Convertible Notes proposed to be implemented by the Investment Committee and any material modification to such plan including, without limitation, the selection of lead underwriter or placement agent, underwriting commissions or discounts and/or placement fees proposed to be paid in connection with any proposed sale of the Convertible Notes.  In furtherance of the foregoing, one representative of each of the Committee, the Bondholder Group and the Monitor shall be entitled to participate as non-voting observers in any meetings of the Investment Committee and, except as would violate any confidentiality obligation owed to the Purchaser, receive any information delivered to the members of the Investment Committee with respect to matters related to the Convertible Note.

SECTION 3.3.  Indemnification.  The Selling Parties agree that the costs of any indemnification or contribution given by the Selling Parties to underwriters, selling or placement agents, initial purchasers, the issuer or other persons in connection with any sale or other disposition of the Convertible Notes shall be borne on a pro rata basis by the Selling Parties in accordance with their Agreed Respective Percentages and any Selling Party paying in excess of

such pro rata share of the costs of such indemnification or contribution shall have rights of contribution vis-à-vis any Selling Party that has paid less than such pro rata share of such costs either directly to the indemnified parties or by payment to another Selling Party pursuant to this sentence; provided that if the costs of any such indemnification or contribution arise solely from a breach of any obligation or other fault of a single Selling Party or Selling Parties, the Selling Party so in breach or at fault shall bear the costs of such indemnification or contribution and any Selling Party paying in excess of its share of the costs of such indemnification or contribution, after taking into account the breach or fault of the other Selling Parties, shall have rights of contribution vis-à-vis any Selling Party that has paid less than its share of such costs either directly to any third party or by payment to another Selling Party.

ARTICLE IV

MISCELLANEOUS

SECTION 4.1.  <u>Exclusion of Liability and Acknowledgments re Joint Administrators and Directors of EMEA Non-Debtor Sellers</u>.

(a)     The Parties agree that (i) the Joint Administrators have negotiated and are entering into this Agreement as agents for the EMEA Debtors to which they are appointed and that none of the Joint Administrators, their firm, partners, employees, advisers, representatives or agents shall incur any personal liability whatsoever whether on their own part or in respect of any failure on the part of any other Party to observe, perform or comply with any of its obligations under this Agreement or under or in relation to any associated arrangements or negotiations; and (ii) the directors of the EMEA Non-Debtor Sellers (as defined in the EMEA Agreement) shall not incur any personal liability whatsoever, in their capacity as such directors, in respect of the authorization, execution, delivery or performance of this Agreement, howsoever arising other than in respect of fraud by any such director.

(b)     The Joint Administrators are a party to this Agreement: (i) as agents of each of the respective EMEA Debtors of which they are administrators; and (ii) in their own capacities solely for (1) taking the benefit of the statutory charges under Paragraph 99(3) of Schedule B1 of the Insolvency Act, (2) obtaining the benefit of any provisions of this Agreement expressed to be conferred on them, (3) enforcing the obligations of the other Parties to this Agreement and (4) for the purposes of Sections 2.1, 2.2, 2.3, 2.7, 4.1,4.7, 4.8, 4.11 and 4.15.

(c)     Notwithstanding anything in Section 4.7, any claim, action or proceeding against the Joint Administrators arising from or related to (i) the personal liability of the Joint Administrators, their firm or partners, employees, advisers, representatives or agents, (ii) their qualification to act as insolvency practitioners in accordance with Part XIII of the Insolvency Act or (iii) their appointment as joint administrators of the EMEA Debtors and their remaining as current joint administrators thereof under this Agreement shall be governed exclusively by English law and subject to the exclusive jurisdiction of the English Courts.

(d)     The Parties agree that any breach of this Agreement by the Joint Administrators shall be deemed to be a breach by them in their capacities as administrators of the EMEA Debtors, and, in such a case, each Party hereto shall have the right to make claims and assert its rights hereunder, against the EMEA Debtors and their respective successors and assigns.

16

SECTION 4.2.    Exclusion of Liability and Acknowledgments re Joint Israeli Administrators.

(a)      The Parties agree that the Joint Israeli Administrators have negotiated and are entering into this Agreement as agents for the Israeli Company and that none of the Joint Israeli Administrators, their firm, partners, employees, advisers, representatives or agents shall incur any personal liability whatsoever whether on their own part or in respect of any failure on the part of any other Party to observe, perform or comply with any of its obligations under this Agreement or under or in relation to any associated arrangements or negotiations.

(b)      The Joint Israeli Administrators are a party to this Agreement: (i) as agents of the Israeli Company; and (ii) in their own capacities solely for (1) obtaining the benefit of any provisions of this Agreement expressed to be conferred on them, (2) enforcing the obligations of the other Parties to this Agreement and (3) for the purposes of Sections 2.1, 2.2, 2.3, 4.2, 4.7, 4.8, 4.11 and 4.15.

(c)      Notwithstanding anything in Section 4.7, any claim, action or proceeding against the Joint Israeli Administrators arising from or related to the personal liability of the Joint Israeli Administrators, their firm, partners, employees, advisers, representatives or agents, (and not as agents for any Israeli Company) under this Agreement shall be governed exclusively by Israeli law and subject to the exclusive jurisdiction of the Courts of Israel.

(d)      The Parties agree that any breach of this Agreement by the Joint Israeli Administrators shall be deemed to be a breach by them in their capacities as administrators of the Israeli Company, and, in such a case, each Party hereto shall have the right to make claims and assert its rights hereunder, against the Israeli Company and its respective successors and assigns.

SECTION 4.3.    Remedies.    No failure to exercise, and no delay in exercising, any right, remedy, power or privilege under this Agreement by any Party will operate as a waiver of such right, remedy, power or privilege, nor will any single or partial exercise of any right, remedy, power or privilege under this Agreement preclude any other or further exercise of such right, remedy, power or privilege or the exercise of any other right, remedy, power or privilege.

SECTION 4.4.    No Third Party Beneficiaries.    Except as provided in Section 4.5, this Agreement is for the sole benefit of the Parties and their permitted assigns and nothing herein, express or implied, is intended to or shall confer upon any other Person any legal or equitable right, benefit or remedy of any nature whatsoever under or by reason of this Agreement provided, however, that the Committee shall be a third party beneficiary of this Agreement entitled to take advantage of the benefits of this Agreement to NNI and the other U.S. Debtors party hereto only, to the fullest extent as if it were a signatory hereto and the directors of the EMEA Non Debtor Sellers shall be deemed third party beneficiaries of Section 4.1(a) hereof and shall be entitled to enforce and take advantage of the benefit thereof to its fullest extent as of a signatory hereto.

SECTION 4.5.    Consent to Amendments; Waivers.    No Party shall be deemed to have waived any provision of this Agreement unless such waiver is in writing, and then such waiver shall be limited to the circumstances set forth in such written waiver.  This Agreement, or any provision hereof, may be waived or amended, on no less than 5 days' notice, only by means of a writing signed by all Parties, and approved, in writing, by the Committee, the Bondholder

17

Group and the Monitor (each as defined in the U.S. Bidding Procedures Order), which amendments, if material in the judgment of the Parties, must be approved by each of the Courts that initially approved this Agreement.

SECTION 4.6.  <u>Successors</u>.  Except as otherwise expressly provided in this Agreement, all covenants and agreements set forth in this Agreement by or on behalf of the parties hereto will be binding upon and inure to the benefit of such parties and their respective successors.

SECTION 4.7.  <u>Governing Law; Submission to Jurisdiction; Waiver of Jury Trial</u>.

(a)    The Parties agree that this Agreement shall be governed exclusively by the laws of the State of New York without regard to the rules of conflict of laws of the State of New York or any other jurisdiction; provided, however, that Section 4.1 shall be governed exclusively by English law and Section 4.2 shall be governed exclusively by Israeli law.

(b)    To the fullest extent permitted by applicable Law, each Party (i) agrees to submit to the non-exclusive jurisdiction of the U.S. Bankruptcy Court and the Canadian Court (in a joint hearing conducted under the Cross-Border Protocol adopted by such courts, as it may be in effect from time to time), for purposes of all legal proceedings to the extent relating to the matters agreed in this Agreement, (ii) agrees that any claim, action or proceeding by such Party seeking any relief whatsoever to the extent relating to the matters agreed in this Agreement must be commenced in the US Bankruptcy Court if such claim, action or proceeding would solely affect NNI, the Canadian Court if such claim, action or proceeding would solely affect the Canadian Main Sellers or Nortel Networks Technology Corporation, the English courts if such claim, action or proceeding would solely affect the EMEA Sellers, or EMEA Debtors and the Israeli Court if such claim, action or proceeding would solely affect the Israeli Company, (iii) waives and agrees not to assert any objection that it may now or hereafter have to the laying of the venue of any such action brought in such a court or any claim that any such action brought in such a court has been brought in an inconvenient forum, (iv) agrees that mailing of process or other papers in connection with any such action or proceeding or any other manner as may be permitted by Law shall be valid and sufficient service thereof, and (v) agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by applicable Law; provided, however, that any claim, action or proceeding set forth in Section 4.1 shall be brought exclusively in the English courts and any claim, action or proceeding set forth in Section 4.2 shall be brought exclusively in the Israeli courts.

(c)    EACH PARTY HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION DIRECTLY OR INDIRECTLY ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS AGREEMENT OR ANY TRANSACTION OR MATTER CONTEMPLATED HEREBY.  EACH PARTY (I) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (II) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION 4.7.

SECTION 4.8.  <u>Notices</u>.  All demands, notices, communications and reports provided for in this Agreement shall be in writing and shall be either sent by facsimile transmission with confirmation to the number specified below or personally delivered or sent by reputable overnight courier service (delivery charges prepaid) to any Party at the address specified below, or at such address, to the attention of such other Person, and with such other copy, as the recipient Party has specified by prior written notice to the sending Party pursuant to the provisions of this Section 4.8.

**If to NNI and its Respective Affiliates:**
c/o Nortel Networks Inc.
Attention: Lynn C. Egan
      Assistant Secretary
Address: 220 Athens Way, Suite 300
      Nashville, Tennessee 37228
      U.S.A.
Facsimile No.: +1 615 432 4067

**With a copy to:**
Cleary Gottlieb Steen & Hamilton LLP
Attention: James L. Bromley and
      Lisa M. Schweitzer
Address: One Liberty Plaza
      New York, New York 10006
      U.S.A.
Facsimile No.: +1 212 225 3999

**If to the Canadian Sellers:**
c/o Nortel Networks Limited
Attention: Anna Ventresca
      Chief Legal Officer
Address: 5945 Airport Road, Suite 360
      Mississauga, Ontario L4V 1R9
      Canada
Facsimile No.: +1 905 863 8386

**With a copy to:**
Ogilvy Renault LLP
Attention: Michael Lang, Esq.
Address: Suite 3800
      Royal Bank Plaza, South Tower
      200 Bay Street, P.O. Box 84
      Toronto, Ontario M5J 2Z4
      Canada
Facsimile No.: +1 416 216 3930

**If to the EMEA Sellers:**
c/o Ernst & Young LLP
Attention: Alan Bloom
Address: One More London Place
      London SE1 2AF
      United Kingdom
Facsimile No.: +44 (0) 20 7951 1345

**With a copy to:**
Herbert Smith LLP
Attention: Gavin Davies and Ben Ward, Esq.
Address: Exchange House
      Primrose Street
      London EC2A 2HS
      United Kingdom
Facsimile No.: +44 (0) 20 7098 4878

**If to the Joint Israeli Administrators:**
Avi D. Pelossof
Zellermayer, Pelossof & Co.
The Rubenstein House
20 Lincoln Street
Tel Aviv
67131
Israel
Facsimile: +972 3 6255500

**If to the Joint Administrators**
c/o Ernst & Young LLP
Attention: Alan Bloom
Address: One More London Place
          London SE1 2AF
          United Kingdom
Facsimile No.: +44 (0) 20 7951 1345

**If to the Committee:**
Akin Gump Strauss Hauer & Feld LLP
Attention:  Fred S. Hodara and Stephen B.
Kuhn, Esq.
One Bryant Park
New York, New York 10036
U.S.A.
Facsimile:  +1 212 872 1002

**If to the Bondholder Group:**
Milbank, Tweed, Hadley & McCloy
Attention:  Albert A. Pisa and Roland Hlawaty,
Esq.
One Chase Manhattan Plaza
New York, New York, 10006
U.S.A.
Facsimile:  +1 212 822 5170

**If to the Monitor:**
Murray A. McDonald
Ernst & Young Inc.
Ernst & Young Tower
222 Bay Street, P. O. Box 251
Toronto, Ontario M5K 1J7
Canada
Facsimile: +1 416 943 3300

**With a copy to:**
Goodmans LLP
Attention:  Joseph Pasquariello
Bay Adelaide Centre
333 Bay Street, Suite 3400
Toronto, Ontario M5H 2S7
Canada
Facsimile: +1 416 979 1234

Any such demand, notice, communication or report shall be deemed to have been given pursuant to this Agreement when delivered personally, when confirmed if by facsimile transmission, or on the calendar day after deposit with a reputable overnight courier service, as applicable.

SECTION 4.9.  Counterparts.  The Parties may execute this Agreement in three or more counterparts (no one of which need contain the signatures of all Parties), each of which will be an original and all of which together will constitute one and the same instrument.

SECTION 4.10.  Severability.  If any provision, section, or part of this Agreement, or the application thereof under certain circumstances, is held invalid, illegal or incapable of being enforced in any jurisdiction, (i) as to such jurisdiction, the remainder of this Agreement or the application of such provision, section or part under other circumstances, and (ii) as for any other jurisdiction, any provision of this Agreement, shall not be affected and shall remain in full force and effect, unless, in each case, such invalidity, illegality or unenforceability in such jurisdiction materially impairs the ability of the Parties to consummate the transactions contemplated by this Agreement.  Upon such determination that any section or other provision is invalid, illegal or incapable of being enforced in such jurisdiction, the Parties shall negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties as closely as

possible in a mutually acceptable manner in order that the transactions contemplated hereby be consummated as originally contemplated to the greatest extent possible even in such jurisdiction.

SECTION 4.11.  Termination.  This Agreement will automatically terminate on the earliest of (a) consummation of the Closing and (b) termination of the Sale Agreements by either the Purchaser or the Selling Parties.  Upon termination, the Parties' rights and obligations under this Agreement, other than in respect of the obligations under Article III and Sections 2.4, 2.5, 2.7, 2.8, 2.9, 2.10, 4.1 through 4.16, each of which shall continue in full force and effect without limitation as to time, shall cease immediately but without prejudice to the rights and obligations of the Parties existing prior to the termination of the Agreement.

SECTION 4.12.  Obligations of the Parties.

(a)     The obligations of the Canadian Main Sellers and the other Canadian Debtors under this Agreement shall be joint and several.

(b)     The obligations of NNI and the other U.S. Debtors under this Agreement shall be joint and several.

(c)     The obligations of the EMEA Debtors under this Agreement shall be joint and several.

SECTION 4.13.  Effectiveness.

(a)     No provision of this Agreement (other than as set forth in Section 4.13(d)) shall be effective until each of the US Bankruptcy Court and the Canadian Court approves the entirety of this Agreement and all of the provisions hereof (the "**Court Approval Condition**").

(b)     All provisions of this Agreement shall be effective as of the date of the satisfaction of the Court Approval Condition.

(c)     Each Party hereto shall:

(i)     use commercially reasonable efforts to satisfy the Court Approval Condition as soon as possible, taking into account the availability of the respective Courts to address the matters set forth in this Agreement;

(ii)     keep all other Parties reasonably apprised of the progress of the satisfaction of the Court Approval Condition and provide such other information regarding the satisfaction of the Conditions as reasonably requested by other Parties; and

(iii)     use commercially reasonable efforts to allow any other Party, which so requests in writing reasonable participation in connection with any proceedings in any Court related to the satisfaction of the Court Approval Condition.

(d)     Notwithstanding any of the foregoing, the following provisions of the Agreement shall be effective as of the date hereof: Section 4.1 through Section 4.13 and Section 4.13(a), (b), (c) and (d).

(e)     No provision of this Agreement shall become effective so far as the Israeli Company is concerned until the Israeli Court approves this Agreement.  The Parties shall use their commercially reasonable efforts to cause the Israeli Company to obtain such approval.

SECTION 4.14.  Execution by certain Selling Parties.  The Parties hereby acknowledge that certain Selling Parties are not executing this Agreement as of the date hereof.  Subject to Section 4.13, this Agreement shall be binding on all parties that have executed this Agreement from the time of such execution, regardless of whether all Sellers and/or the North American ALT Selling Debtors and EMEA Selling Debtors have done so.  Between the date hereof and the Closing Date, (a) the Main Sellers hereby agree that they shall use their reasonable best efforts to cause (i) each Other Seller, and (ii) upon the Additional Debtor Approval, each Additional U.S. Debtor to, and (b) all the Parties agree that upon becoming a "**Selling Debtor**" pursuant to Section 11.d of the IFSA, each North American ALT Selling Debtor and each EMEA ALT Selling Debtor shall be permitted, to execute a counterpart to this Agreement as soon as practicable, agreeing to be bound as a Party under this Agreement.

SECTION 4.15.  Limitations of Remedies.  The Parties expressly agree that, other than with respect to Article III hereof, the sole and exclusive remedy of any Party (the "**Claiming Party**") against any other Party for a breach of this Agreement, the Sale Agreements or the other Transaction Documents where the Transaction is not completed shall be payment of damages to the Claiming Party in an amount not to exceed the amount, if any, of the Termination Payment or Break-Up Fee and Expense Reimbursement actually paid by the Claiming Party to the Purchaser or a Designated Purchaser under the Sale Agreements and, subject to Section 2.5(c) hereof, the liability of any Party shall not exceed, in the aggregate, the Total Payments.  For the avoidance of doubt, the Parties further agree that in no event shall any Party be entitled to equitable relief, including in the form of an injunction or injunctions or orders for specific performance, to prevent or remedy breaches of this Agreement, other than with respect to Article III, the Sale Agreements or the other Transaction Documents by any other Party.

SECTION 4.16.  Reservation of Rights.  The Parties hereby agree that, except as specifically set forth in Articles 2 and 3 hereof, nothing in this Agreement shall, or be deemed to, determine, ratify, or adopt, or have any impact whatsoever on, the allocation or distribution of proceeds from the sale of the Business among the Selling Parties.  Without limiting the generality of the foregoing, the Parties hereby agree that the Initial Respective Percentage among the Parties shall not in any way determine the final allocation or distribution of proceeds from the sale of the Business or otherwise bind the Parties in respect of the final allocation.

**[Remainder of this page intentionally left blank.  Signature pages follow.]**

IN WITNESS WHEREOF, the Parties have duly executed this Side Agreement as of the date first written above.

**NORTEL NETWORKS
CORPORATION**

By: _____
     Name:
     Title:

By: _____
     Name:
     Title:

**NORTEL NETWORKS LIMITED**

By: _____
     Name:
     Title:

_____
     Name:
     Title:

**NORTEL NETWORKS INC.**

By: _____
     Name:
     Title:

**SIGNED** for and on behalf of **Nortel Networks** )  ..............................................................
**UK Limited** (in administration) by Christopher ) Christopher Hill
Hill )
as Joint Administrator (acting as agent and )
without personal liability) in the presence of:

Witness signature

.............................................................. )
Name: Olivia Schofield )
Address: Herbert Smith LLP, Exchange Square, )
Primrose Street, London, EC2A 2HS, England.

**SIGNED** for and on behalf of **Nortel GmbH** )  ..............................................................
(in administration) by Christopher Hill ) Christopher Hill
 )
as Joint Administrator (acting as agent and )
without personal liability) in the presence of:

Witness signature

.............................................................. )
Name: Olivia Schofield )
Address: Herbert Smith LLP, Exchange Square, )
Primrose Street, London, EC2A 2HS, England.

**SIGNED** for and on behalf of **Nortel Networks** )  ..............................................................
**SpA** (in administration) by Christopher Hill ) Christopher Hill
 )
as Joint Administrator (acting as agent and )
without personal liability) in the presence of:

Witness signature

.............................................................. )
Name: Olivia Schofield )
Address: Herbert Smith LLP, Exchange Square, )
Primrose Street, London, EC2A 2HS, England.

**SIGNED** for and on behalf of **Nortel Networks**       )       ...........................................................................
**Hispania S.A.** (in administration) by                    )       Christopher Hill
Christopher Hill                                            )
as Joint Administrator (acting as agent and                )
without personal liability) in the presence of:

Witness signature

...........................................................       )
Name: Olivia Schofield                                     )
Address: Herbert Smith LLP, Exchange Square,               )
Primrose Street, London, EC2A 2HS, England.

**SIGNED** for and on behalf of **Nortel Networks**       )       ...........................................................................
**B.V.** (in administration) by Christopher Hill           )       Christopher Hill
                                                           )
as Joint Administrator (acting as agent and                )
without personal liability) in the presence of:

Witness signature

...........................................................       )
Name: Olivia Schofield                                     )
Address: Herbert Smith LLP, Exchange Square,               )
Primrose Street, London, EC2A 2HS, England.

**SIGNED** for and on behalf of **Nortel Networks**       )       ...........................................................................
**AB** (in administration) by Christopher Hill             )       Christopher Hill
                                                           )
as Joint Administrator (acting as agent and                )
without personal liability) in the presence of:

Witness signature

...........................................................       )
Name: Olivia Schofield                                     )
Address: Herbert Smith LLP, Exchange Square,               )
Primrose Street, London, EC2A 2HS, England.

**SIGNED** for and on behalf of **Nortel Networks**   )   ..........................................................................
**N.V.** (in administration) by Christopher Hill   )   Christopher Hill
   )
as Joint Administrator (acting as agent and   )
without personal liability) in the presence of:

Witness signature

..........................................................................   )
Name: Olivia Schofield   )
Address: Herbert Smith LLP, Exchange Square,   )
Primrose Street, London, EC2A 2HS, England.

**SIGNED** for and on behalf of **Nortel Networks**   )   ..........................................................................
**(Austria) GmbH** (in administration) by   )   Christopher Hill
Christopher Hill   )
as Joint Administrator (acting as agent and   )
without personal liability) in the presence of:

Witness signature

..........................................................................   )
Name: Olivia Schofield   )
Address: Herbert Smith LLP, Exchange Square,   )
Primrose Street, London, EC2A 2HS, England.

**SIGNED** for and on behalf of **Nortel Networks**   )   ..........................................................................
**Polska Sp. z.o.o.** (in administration) by   )   Christopher Hill
Christopher Hill   )
as Joint Administrator (acting as agent and   )
without personal liability) in the presence of:

Witness signature

..........................................................................   )
Name:   )
Address:   )

Signature Page – Side Agreement

**SIGNED** for and on behalf of **Nortel Networks** )    ...............................................................
**Portugal S.A.** (in administration) by )    Christopher Hill
Christopher Hill )
                                            )

as Joint Administrator (acting as agent and
without personal liability) in the presence of:


Witness signature

...........................................................    )
Name:                                            )
Address:                                         )


**SIGNED** for and on behalf of **Nortel Networks** )    ...............................................................
**s.r.o.** (in administration) by Christopher Hill )    Christopher Hill
                                            )

as Joint Administrator (acting as agent and )
without personal liability) in the presence of:


Witness signature

...........................................................    )
Name:                                            )
Address:                                         )


Signature Page – Side Agreement

**SIGNED** for and on behalf of **Nortel Networks**  )   .............................................................................

**France S.A.S.** (in administration) by Kerry  )   Kerry Trigg

Trigg acting as authorised representative for  )

                                      )

as Joint Administrator (acting as agent and  )

without personal liability) in the presence of:


Witness signature

.............................................................................  )

Name:  )

Address:  )

**SIGNED** for and on behalf of **Nortel Networks** )    ............................................................................

**(Ireland) Limited** (in administration) by David )    David Hughes

Hughes as Joint Administrator (acting as agent )

and without personal liability) in the presence )

of:

Witness signature

............................................................................ )

Name:                                                                       )

Address:                                                                    )

Signature Page – Side Agreement

**SIGNED** by John Freebairn                     )        ...........................................................................

duly authorised for and on behalf of **Nortel**     )        John Freebairn

**Networks (Northern Ireland) Limited** in the    )

presence of:                                     )


Witness signature

...........................................................................    )

Name:                                            )

Address:                                         )

**SIGNED** by Sergei Fishkin )  ...............................................................
duly authorised for and on behalf of **o.o.o.** )  Sergei Fishkin
**Nortel Networks** in the presence of: )

Witness signature

...............................................................  )
Name: )
Address: )

**SIGNED** by Sharon Rolston                    )        ............................................................................

duly authorised for and on behalf of **Nortel**        )        Sharon Rolston

**Networks AG** in the presence of:                    )


Witness signature

............................................................................        )

Name:                                                            )

Address:                                                         )

| | | |
|---|---|---|
| **SIGNED** for and on behalf of **Nortel Networks** | ) | |
| **Israel (Sales and Marketing) Limited** (in | ) | ............................................................................. |
| administration) by Yaron Har-Zvi and Avi D. | ) | Yaron Har-Zvi |
| Pelossof as Joint Israeli Administrators (acting | | |
| jointly and without personal liability) in | ) | ............................................................................. |
| connection with the Israeli Assets  and | ) | Avi D. Pelossof |
| Liabilities: | ) | |
| | ) | |
| | ) | |

Witness signature

.............................................................................    )
Name:    )
Address:    )

Signature Page – Side Agreement

**SIGNED** by Yaron Har-Zvi       )   ..............................................................

                                                       )   Yaron Har-Zvi

in his own capacity and on behalf of the Joint   )
Israeli Administrators without personal liability
and solely for the benefit of the provisions of
this Agreement expressed to be conferred on or
given to the Joint Israeli Administrators:

Witness signature

..............................................................   )
Name:   )
Address:   )

**SIGNED** by Avi D. Pelossof       )   ..............................................................

                                                       )   Avi D. Pelossof

in his own capacity and on behalf of the Joint   )
Israeli Administrators without personal liability
and solely for the benefit of the provisions of
this Agreement expressed to be conferred on or
given to the Joint Israeli Administrators:

Witness signature

..............................................................   )
Name:   )
Address:   )

**SIGNED** by Christopher Hill   ) ..............................................................

             ) Christopher Hill

in his own capacity and on behalf of the Joint )
Administrators without personal liability and
solely for the benefit of the provisions of this
Agreement expressed to be conferred on or
given to the Joint Administrators:

Witness signature

.............................................................. )
Name: Olivia Schofield        )
Address: Herbert Smith LLP, Exchange Square, )
Primrose Street, London, EC2A 2HS, England.

**SIGNED** for and on behalf of **NORTEL NETWORKS SA (IN ADMINISTRATION)**
by **COSME ROGEAU** as liquidator (acting as agent and without personal liability) and

)
)
)
)

…………………………………………..
Cosme Rogeau

by **FRANCK MICHEL** as administrator (acting as agent and without personal liability) in the presence of:

)
)
)
)

…………………………………………..
Franck Michel

Witness signature

…………………………………………………
Name:
Address:

**SCHEDULE A**
**OTHER SELLERS**

Nortel Networks Technology Corporation

Nortel Networks (CALA) Inc.

Nortel de Mexico S. de R.L de C.V.

Nortel Networks de Mexico S.A. de C.V

Nortel Networks de Guatemala Ltda

Nortel Networks de Argentina S.A.

Nortel Networks de Columbia S.A.

Nortel Networks Peru S.A.C.

Nortel Networks de Ecuador S.A.

Nortel Networks Kabushiki Kaisha

Nortel Networks (Asia) Limited

Nortel Networks Singapore Pte. Limited

Nortel Vietnam Limited

Nortel Networks (Thailand) Limited

Nortel Networks Malaysia Sdn. Bhd

Nortel Networks Australia Pty. Limited

Nortel Networks New Zealand Limited

Nortel Networks (China) Limited

Nortel Networks (Asia) Limited – Pakistan Branch

Nortel Networks Singapore Pte. Limited – Philippines Branch

Nortel Networks Telecommunications Equipment (Shanghai) Co. Limited

PT Nortel Networks Indonesia

**SCHEDULE B**
**EMEA SELLERS**

Nortel Networks UK Limited (In Administration)

Nortel GmbH (In Administration)

Nortel Networks SpA (In Administration)

Nortel Networks Hispania, S.A. (In Administration)

Nortel Networks B.V. (In Administration)

Nortel Networks AB (In Administration)

Nortel Networks N.V. (In Administration)

Nortel Networks (Austria) GmbH (In Administration)

Nortel Networks Polska Sp z.o.o. (In Administration)

Nortel Networks Portugal S.A. (In Administration)

Nortel Networks s.r.o (In Administration)

Nortel Networks France S.A.S. (In Administration)

Nortel Networks (Ireland) Limited (In Administration)

Nortel Networks (Northern Ireland) Limited

Nortel Networks o.o.o.

Nortel Networks AG


**The Israeli Company**

Nortel Networks Israel (Sales and Marketing) Limited (In Administration)

**SCHEDULE C**
**AFFILIATES OF MAIN SELLERS THAT**
**ARE DEEMED TO BE "SELLING DEBTORS"**

**Part 1**

Nil

**Part 2**

Architel Systems (U.S.) Corporation

Nortel Altsystems, Inc. (previously "Alteon WebSystems, Inc.")

Nortel Altsystems International Inc. (previously "Alteon WebSystems International, Inc.")

Nortel Networks Applications Management Solutions Inc.

Nortel Networks Cable Solutions Inc.

Nortel Networks Capital Corporation

Nortel Networks HPOCS Inc.

Nortel Networks International Inc.

Nortel Networks Optical Components Inc.

Northern Telecom International Inc.

Sonoma Systems

**SCHEDULE D**
**AFFILIATES OF THE EMEA SELLERS THAT**
**ARE DEEMED TO BE A "SELLING DEBTOR"**

Nortel Networks Engineering Services Kft (In Administration)

Nortel Networks Slovensko, sro (In Administration)

Nortel Networks Romania Srl (In Administration)

Nortel Networks Oy (In Administration)

Nortel Networks International Finance & Holding BV (In Administration)