Court File No: 09-CL-7950

IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL CORPORATION AND NORTEL NETWORKS TECHNOLOGY CORPORATION

*ONTARIO*
SUPERIOR COURT OF JUSTICE
(COMMERCIAL LIST)

Proceeding commenced at Toronto

AFFIDAVIT OF GEORGE RIEDEL
(sworn February 26, 2010)

OGILVY RENAULT LLP
Suite 3800
Royal Bank Plaza, South Tower
200 Bay Street
P.O. Box 84
Toronto, Ontario M5J 2Z4, Canada

Derrick Tay LSUC#: 21152A
Tel: (416) 216-4832
Email: dtay@ogilvyrenault.com

Mario Forte LSUC#: 27293F
Tel: (416) 216-4870
Email: mforte@ogilvyrenault.com

Jennifer Stam LSUC #46735J
Tel: (416) 216-2327
Email: jstam@ogilvyrenault.com
Fax: (416) 216-3930
Lawyers for the Applicants

DOCSTOR: 1881927\3

**TAB 3**

DOCSTOR: 1680120\1

$$\text{чЄ}$$

Court File No: 09-CL-7950

***ONTARIO***
**SUPERIOR COURT OF JUSTICE**
**(COMMERCIAL LIST)**

**IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,
R.S.C. 1985, c. C-36, AS AMENDED**

**AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF
NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL
NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL
CORPORATION AND NORTEL NETWORKS TECHNOLOGY CORPORATION**

**APPLICATION UNDER THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,
R.S.C. 1985, c. C-36, AS AMENDED**

**AFFIDAVIT OF GEORGE RIEDEL**
**(sworn December 23, 2009)**

I, George Riedel, of the city of Boston in the State of Massachusetts, MAKE OATH AND SAY:

1.      I am the Chief Strategy Officer of Nortel Networks Corporation ("NNC") and Nortel Networks Limited ("NNL") and have held those positions since February, 2006. As such, I have personal knowledge of the matters to which I hereinafter depose in this Affidavit. Where I do not possess personal knowledge, I have stated the source of my information and, in all such cases, believe it to be true.

2.      I swear this Affidavit in support of the motion to approve, among other things, the bidding procedures and an asset sale agreement dated as of December 22, 2009 (the "Stalking Horse Agreement") among NNC, NNL, Nortel Networks Inc. ("NNI") and certain other entities identified therein as sellers (together, the "Sellers") and GENBAND Inc., as purchaser ("GENBAND" or the "Stalking Horse Purchaser") for the sale (the "Sale") of certain assets of the Sellers' Carrier Voice Over IP and Application Solutions business (the "CVAS Business") as described therein (the "Assets") as a "stalking-horse" sale agreement as well as authorizing and directing NNC to pay an Incentive Fee to OEP (as such terms are defined below).

- 2 -

3.     A copy of the Stalking Horse Agreement (without exhibits or schedules) is or will be attached as an appendix to the thirty-fourth report (the "Thirty-Fourth Report") of the Monitor (as defined below) to be filed in connection with this motion.

4.     References to "Nortel" herein are references to the global enterprise of NNC, NNL, NNI and their respective affiliates as a whole.

5.     In connection with entering into the Stalking Horse Agreement, a corresponding asset sale agreement relating to the sale and purchase of the EMEA Assets (as defined in the EMEA Agreement) among certain of the EMEA Debtors (defined below) and their affiliates (the "EMEA Sellers"), the Joint Administrators (defined below), the Joint Israeli Administrators (defined below), and the Stalking Horse Purchaser dated December 23, 2009 (the "EMEA Agreement" and together with the Stalking Horse Agreement, the "Purchase Agreements").

6.     All dollar references are US$ unless otherwise indicated.

**BACKGROUND**

7.     On January 14, 2009 (the "Filing Date"), NNC, NNL, Nortel Networks Technology Corporation, Nortel Networks Global Corporation and Nortel Networks International Corporation (collectively, the "Applicants") were granted protection under the *Companies' Creditors Arrangement Act*, R.S.C. 1985, c. C-36, as amended (the "CCAA") pursuant to an initial order (as subsequently amended and restated, the "Initial Order") of this Honourable Court and Ernst & Young Inc. was appointed as monitor (the "Monitor") in the CCAA proceedings.

8.     Also on January 14, 2009, certain of NNC's U.S. subsidiaries, including its principal U.S. operating subsidiary NNI (together with the other U.S. filing entities, the "Initial U.S. Debtors"), made voluntary filings in the United States Bankruptcy Court for the District of Delaware (the "U.S. Court") under Chapter 11 of the United States Bankruptcy Code (the "Code"). On the same date, this Honourable Court granted an Order pursuant to Section 18.6(4) of the CCAA recognizing the Chapter 11 cases as "foreign proceedings" in Canada and giving effect in Canada to the automatic stay under the Code.

9.     Additionally, on January 15, 2009, Nortel Networks UK Limited ("NNUK") and certain subsidiaries of the Nortel group incorporated in Europe, the Middle East or Africa ("EMEA")

- 3 -

each obtained an administration order for the appointment of administrators (the "Joint Administrators") from the High Court of England and Wales under the Insolvency Act 1986.

10.    On January 18, 2009, certain Nortel affiliates, including Nortel Networks Israel (Sales and Marketing) Limited, filed an application with the Tel-Aviv-Jaffa District Court, pursuant to the Israeli Companies Law, 1999, and the regulations relating thereto for a stay of proceedings. On January 19, 2009, the Israeli Court appointed Yaron Har-Zvi and Avi D. Pelossof as joint administrators (the "Joint Israeli Administrators") of the Israeli Company under the Israeli Companies Law.

11.    On February 27, 2009, the U.S. Court granted petitions recognizing these proceedings as "foreign main proceedings" pursuant to Chapter 15 of the Code.

12.    On May 28, 2009, the Commercial Court of Versailles, France (the "French Court") ordered the commencement of secondary insolvency proceedings in respect of Nortel Networks S.A. ("NNSA"), which consist of liquidation proceedings during which NNSA was originally authorized to continue to operate as a going concern for an initial period of three months which period was subsequently extended to November 28, 2009.   In accordance with the European Union's Council Regulation (EC) No. 1346/2000 on Insolvency Proceedings, the English law proceedings (the "English Proceedings") remain the main proceedings in respect of NNSA although a French administrator and a French liquidator have been appointed and are in charge of the day-to-day affairs and continuing business of NNSA in France.  On October 1, 2009, the French Court approved an order to (i) suspend the liquidation operation relating to the sale of the assets and/or businesses of NNSA for a renewable period of two months; (ii) authorize the continuation of the business of NNSA so long as the liquidation operations are suspended; and (iii) maintain the powers of the French administrator and liquidator during that period except with respect to the sale of assets and/or businesses of NNSA.  On November 30, 2009, the French Court approved an order to extend the aforementioned suspension for a further period of three months and authorized the continuation of the business of NNSA during that period.

13.    On June 8, 2009, the Joint Administrators appointed in respect of NNUK filed a petition with the U.S. Court for the recognition of the Administration Proceedings as they relate to NNUK (the "English Proceedings") under Chapter 15 of the Code.  On June 26, 2009, the U.S.

6L

- 4 -

Court entered an order recognizing the English Proceedings as foreign main proceedings under Chapter 15 of the Code.

14.    On July 14, 2009, Nortel Networks (CALA) Inc. (together with the Initial U.S. Debtors, the "U.S. Debtors") made a voluntary filing with the U.S. Court under Chapter 11 of the Code.

15.    Further details regarding the background to these proceedings are set out in the affidavit of John Doolittle sworn January 14, 2009 (the "Initial Order Affidavit") previously filed in these proceedings and are therefore not repeated herein.

16.    The Applicants have previously obtained various relief related to the sale of certain other of their assets including:

(a)    The sale of certain portions of Nortel's Layer 4-7 Application Delivery Business, which sale closed on April 1, 2009;

(b)    The sale of NNL's real property known as the "Westwinds Facility" in Alberta, which sale closed on June 16, 2009;

(c)    A sale process for the divestiture of NNL's interest in its joint venture with LG Electronics Inc., which process is still underway;

(d)    Bidding procedures and a stalking horse agreement entered into with Nokia Siemens Networks B.V. for the sale of substantially all of Nortel's Code Division Multiple Access business and Long Term Evolution Access assets, which was subject to higher and better offers and which ultimately led to the approval of a sale agreement for the sale of such assets to Telefonaktiebolaget LM Ericsson (publ) ("Ericsson"), which sale closed on November 13, 2009;

(e)    Bidding procedures and a stalking horse agreement entered into with Avaya Inc. ("Avaya") for the sale of substantially all of the assets of Nortel's Enterprise Solutions business, which was subject to higher and better offers and subsequently led to the approval of an amended and restated sale agreement for the sale of that business to Avaya which sale closed on December 18, 2009;

- 5 -

(f)     A sales process and subsequent approval and vesting order for the sale of the assets of Nortel's Wireless Networks business associated with the development of Next Generation Packet Core network components to Hitachi Inc. which sale closed on December 4, 2009;

(g)     Bidding procedures and a stalking horse agreement entered into with Ciena Corporation ("Ciena") for the sale of substantially all the assets of its Optical Networking and Carrier Ethernet businesses associated with its Metro Ethernet Networks business unit, which was subject to higher and better offers and subsequently led to the approval of an amended and restated sale agreement for the sale of that business to Ciena and anticipated to close in Q1 2010; and

(h)     Bidding procedures and an ultimate purchase agreement entered into with Ericsson for the sale of substantially all of Nortel's GSM/GSM-R business, which sale is anticipated to close in Q1 2010.

## THE TRANSACTION

17.     Capitalized terms used in this section of my Affidavit not otherwise defined herein shall have the meanings given to them in the Stalking Horse Agreement.

*The CVAS Business*

18.     Nortel's CVAS Business provides telecom service providers with network solutions that help them improve operational efficiency, reduce costs, and generate new revenue through the deployment of multimedia applications and voice over internet protocol ("VoIP") solutions that enhance the communications experience for businesses and consumers.

19.     The CVAS Business specializes in deploying new VoIP networks for operators, in helping carriers transition their older voice infrastructure to state-of-the-art VoIP networks, and in delivering advanced multimedia offerings that unify and simplify communications for users.

20.     The CVAS Business unit sells VoIP platforms (such as softswitches and media gateways), TDM switching systems (for local, toll and long-distance deployments), and associated services (such as installation, technical support, repairs management). These and

- 6 -

other products from the CVAS portfolio are combined into solutions that address specific service provider requirements and opportunities, including: business voice and multimedia, consumer voice and multimedia, transit and multimedia interconnect, and class 5.

21.     Nortel's CVAS Business has a global presence -- with nearly 2,100 employees in North America, Europe, the Middle East, Africa, Caribbean, Latin America, Asia-Pacific -- and a worldwide customer base. Nortel's CVAS customers include many of the world's large carriers (including two-thirds of the top 20 service providers globally), leading regional operators, and major cable operators.

22.     Nortel's principal competitors include Alcatel-Lucent, Huawei Technologies, Nokia Siemens Networks, Ericsson, Sonus Networks, GENBAND, Broadsoft and MetaSwitch. Despite a challenging economic environment and increasing competition in the carrier VoIP market space, CVAS remains the number one carrier VoIP and softswitch market leader, a position Nortel has held for the past seven and half years according to industry analyst firm Dell'Oro Group.

*Previous Marketing Efforts*

23.     Nortel first began to explore a divestiture of the CVAS Business in April of 2009. With a strong customer base and industry-leading technology, the CVAS Business is considered a premium asset with a highly differentiated offering, making it attractive to potential purchasers.

24.     In connection with this initial effort, Nortel, in consultation with its financial advisors, approached approximately twenty five (25) parties likely to be interested and able to acquire the CVAS Business, including a mix of financial investors and strategic buyers. An information memorandum was provided to the eighteen (18) parties who had executed confidentiality agreements. Of those parties who subsequently submitted expressions of interest, Nortel conducted management presentations with the ten (10) entities it deemed able to consummate a transaction for the CVAS Business, and ultimately gave eight (8) companies access to an electronic data room containing confidential diligence materials regarding the CVAS Business.

25.     I am aware that the Thirty-Fourth Report will also include information regarding Nortel's sale efforts in this regard.



*The Stalking Horse Agreement*

26.    After extensive arms'-length, good faith negotiations among the Sellers, the EMEA Sellers and the Purchaser and their respective advisors, the Sellers and the EMEA Sellers have agreed, among other things, to convey the Assets to the Purchaser or certain other purchasers designated by the Purchaser all in accordance with the terms and conditions of the Purchase Agreements, subject to the approval of the transaction in a number of the jurisdictions in which the Sellers and EMEA Sellers are subject to insolvency proceedings.

27.    The Stalking Horse Agreement contemplates the sale of the Assets, subject to higher and/or better bids, on the following material terms:[1]

(a)    *Purchase Price.* At the Closing, the Stalking Horse Purchaser will pay to the Sellers and the EMEA Sellers, through their Distribution Agent, a base purchase price of $282 million in cash, subject to balance sheet and other adjustments currently estimated at approximately $100 million.

(b)    *Certain Fees.* As further described below, in certain circumstances the Sellers and the EMEA Sellers may be required to pay to the Stalking Horse Purchaser a Break-Up Fee, and/or an Expense Reimbursement.

(c)    *Good Faith Deposit.* On the date following the entry of the U.S. Bidding Procedures Order, the Stalking Horse Purchaser will deliver to the Escrow Agent for the Sellers a good faith deposit of 5% of the base Purchase Price, an estimated $14,100,000 in cash. The good faith deposit will be applied to the balance of the Purchase Price to be paid by the Stalking Horse Purchaser at Closing.

(d)    *Assets.* The Assets to be acquired by the Stalking Horse Purchaser include, among other things, certain (i) inventory and supplies, (ii) unbilled accounts receivable, (iii) equipment, (iv) contracts and certain bids made by the Sellers for a contract which could result in a contract after the Closing Date, (v) prepaid expenses, (vi) tangible embodiment of business information, (vii) intellectual property, (viii) rights under warranties, representations and guarantees by

---

[1]    The Applicants are not parties to the EMEA Agreement, and therefore this Motion does not discuss the terms and conditions of the EMEA Agreement.

- 8 -

suppliers, manufacturers and contractors and third parties related to the Assets, (ix) net insurance proceeds to be received in respect of equipment, and (x) tax records required by law to be transferred. The assets to be acquired by the Stalking Horse Purchaser exclude, among other things, certain cash and cash equivalents, accounts receivable (excluding receivables that are unbilled as of the Closing date), bank account balances and petty cash, and certain assets and rights (for example, the right to tax refunds, credits, or similar benefits, and rights under certain contracts (other than Assigned Contracts)) relating to the pre-closing period.

(e)    *Assigned Contracts.*    The Sellers agree to assign certain Seller Contracts, including customer contracts, to the Stalking Horse Purchaser, and to cooperate with the Stalking Horse Purchaser to assist in the transition of Bundled Contracts to the Stalking Horse Purchaser as they relate to the CVAS Business. The Sellers have agreed to pay the Cure Costs associated with the assignment of customer contracts.

(f)    *Assumed Liabilities.*    The liabilities to be assumed by the Stalking Horse Purchaser include, among others, (i) liabilities arising after the Closing Date to the extent related to the operation of the CVAS Business by the Stalking Horse Purchaser following the Closing, (ii) liabilities arising from the performance of Assigned Contracts after the Closing Date, (iii) certain liabilities relating to transferred intellectual property, (iv) certain tax liabilities, (v) certain warranty liabilities and (vi) certain liabilities related to employees and employee benefit plans and under employment laws.

(g)    *Sale Free and Clear.*    The Assets to be transferred by the Sellers will be transferred free and clear of all liens, claims and encumbrances, other than those expressly assumed by the Stalking Horse Purchaser or otherwise expressly permitted under the Stalking Horse Agreement.

(h)    *Avoidance Actions.*    The Sellers have covenanted not to commence avoidance actions under the United States Bankruptcy Code with respect to any assumed and assigned customer contracts.

- 9 -

(i)    *Ancillary Agreements.* Pursuant to the Stalking Horse Agreement, at or prior to the Closing, certain Sellers, certain EMEA Sellers and the Stalking Horse Purchaser will enter into, among others, the following ancillary agreements:

    (i)    *Transition Services Agreement.* At the Closing, NNL, NNC, NNI, NNUK, Nortel Networks (Ireland) Limited, certain of their affiliates and the Stalking Horse Purchaser will enter into one or more agreements under which NNL, NNC, NNI, NNUK, Nortel Networks (Ireland) Limited and their affiliates will agree to provide to the Stalking Horse Purchaser and its affiliates certain information technology, business transition and related services, commencing at the Closing and continuing for a period not to exceed eighteen (18) months.

    (ii)    *Intellectual Property License Agreement.* At the Closing, NNL, NNI, the EMEA Sellers (the "Nortel Parties") and the Stalking Horse Purchaser will enter into an intellectual property license agreement (the "IPLA") pursuant to which (i) the Nortel Parties will grant to the Stalking Horse Purchaser a non-exclusive license to certain intellectual property necessary for the commercialization of the products and the provision of services within a defined field of use, and (ii) the Nortel Parties will receive a license back to all intellectual property included in the Assets as necessary for use in their other businesses or to comply with terms of other divestitures. The IPLA licenses will be perpetual.

    (iii)    *Trademark License Agreement.* At the Closing, NNL and the Stalking Horse Purchaser will enter into a license agreement allowing the Stalking Horse Purchaser to use certain Nortel trademarks in connection with its sales of the Products for a limited period after the Closing.

    (iv)    *Loaned Employee Agreement.* At the Closing, Nortel and the Stalking Horse Purchaser will enter into an agreement under which certain employees of Nortel and its affiliates will be seconded to the Stalking Horse Purchaser to perform services for the Stalking Horse Purchaser for a

- 10 -

90-day period beginning on the Closing Date and certain visa employees will be seconded to the Stalking Horse Purchaser for a period of up to twelve months beginning on the Closing Date. Nortel will continue to pay all employment costs in respect of the Loaned Employees that relate to the period of the Loaned Employee Agreement, and the Stalking Horse Purchaser will provide for the payment of, or if not paid pursuant to the pre-funding mechanism in the Loaned Employee Agreement, promptly reimburse Nortel for, all such employment costs.

(v)    *Real Estate Terms and Conditions.* At the Closing, the Sellers and the Stalking Horse Purchaser will finalize the general terms to which the parties agree, which will govern the applicable leases, subleases or license agreements in respect of certain real property which the Sellers will lease, sublease or license to the Stalking Horse Purchaser (or an affiliate) from and after Closing.

(j)   *Restrictions on Solicitation of Competing Bids.* As set forth in section 5.29 of the Stalking Horse Agreement and subject to the terms and limitations therein, the Stalking Horse Agreement prohibits the Sellers from soliciting competing transactions or seeking relief inconsistent with the Stalking Horse Agreement from the date of execution of the Stalking Horse Agreement until the entry of the Bidding Procedures Order, and from the date of the conclusion of the Auction until the Closing Date or termination of the Stalking Horse Agreement.

(k)   *Closing Conditions:* In addition to certain other customary closing conditions, including conditions relating to bankruptcy court approvals, the obligation of the Stalking Horse Purchaser to close the sale is subject to the satisfaction of the performance in all material respects of all material covenants, obligations and agreements required to be performed by the Sellers on or before the Closing.

(l)   *Ongoing Covenants and Restrictions:* In addition to certain other customary postclosing obligations such as information-sharing and redirection of customers and payments, the Sellers have agreed to cooperate with the Stalking Horse Purchaser for an agreed period after Closing in relation to arrangements regarding

- 11 -

(i) Bundled Contracts, (ii) Assets which were not transferred at Closing due to bankruptcy proceedings commenced in other jurisdictions following execution of the Stalking Horse Agreement and (iii) Contracts for which required consents were not obtained prior to Closing.

(m)     *Post-Closing Access to Books and Records.*  For five (5) years after the Closing, and subject to its right to destroy such document upon sixty (60) days notice to the Sellers, the Purchaser must preserve pre-closing records to the extent related to the CVAS Business. The Purchaser and the Seller must preserve tax records through the end of the applicable statute of limitations period.  Through such periods the Sellers and the Purchaser, as applicable, shall, and/or shall cause the person holding such records to provide to the party requesting the records or its representative reasonable access to such records during normal business hours.

*Employees*

28.     As part of the Stalking Horse Agreement, the Purchaser has agreed to make offers to at least 1,638 Nortel employees associated with the CVAS Business.  The Stalking Horse Agreement provides that, subject to the terms of the Stalking Horse Agreement, within thirty (30) days following the granting of the U.S. Sale Order and the Canadian Approval and Vesting Order, the Purchaser shall notify the Sellers of certain Identified Employees to whom the Purchaser or a Designated Purchaser intends to provide a written offer of employment or notice of continued employment.  Promptly following Purchaser's notification to Seller of Identified Employees, but in any event no later than the time required to provide the Offer Consideration Period described in the Stalking Horse Agreement, the Purchaser shall, or shall cause a Designated Purchaser to, extend Offers to the Identified Employees.

*Break Up Fee and Expense Reimbursement*

29.     The Purchaser and its advisors have expended, and expect to continue to expend, considerable time, energy, and resources pursuing the purchase of the Assets and have engaged in extended good faith negotiations.  The Purchase Agreements are the culmination of these efforts.

- 12 -

30.     In recognition of this expenditure of time, energy, and resources, the Sellers and the EMEA Sellers, in accordance with Section 9.2 of the Stalking Horse Agreement and Section 15.5 of the EMEA Agreement and upon the termination events described therein, have agreed to pay the Stalking Horse Purchaser an aggregate fee of five million dollars and 00/100 ($5,000,000), which is equal to approximately two and eight-tenths percent (2.8%) of the estimated aggregate Purchase Price, after accounting for balance sheet and other adjustments currently estimated at approximately $100 million (to the extent payable by the Sellers, the "Break-Up Fee"). In accordance with Section 9.2 of the Stalking Horse Agreement and Section 15.5 of the EMEA Agreement and upon the termination events described therein, the Sellers and the EMEA Sellers also have agreed to pay Purchaser's reasonable and documented fees, out-of-pocket costs and expenses (including fees and expenses of the Stalking Horse Purchaser's advisors and notification and filing fees) in connection with the preparation, execution and performance of the Stalking Horse Agreement and the EMEA Agreement, which shall not exceed five million dollars and 00/100 ($5,000,000), which is equal to approximately two and eight-tenths percent (2.8%) of the estimated aggregate Purchase Price after accounting for balance sheet and other adjustments currently estimated at approximately $100 million (to the extent payable by the Sellers, the "Expense Reimbursement," and together with the Break-Up Fee, the "Bid Protections"). Under the Stalking Horse Agreement and the EMEA Agreement, two-thirds of the aggregate Bid Protections will be payable by the Sellers, including the Debtors that are Sellers, and the remaining one-third will be payable by the EMEA Sellers.

31.     I believe, based on my discussions with the Monitor, that the Thirty-Fourth Report will be providing more detail as to the circumstances in which the Bid Protections are payable.

32.     The Sellers have further agreed that their obligation to pay the Break-Up Fee and Expense Reimbursement shall survive termination of the Purchase Agreements.

*Incentive Fee*

33.     One Equity Partners III, L.P. ("OEP") is the largest single equity investor in GENBAND, currently holding approximately 35% of GENBAND's common stock. I believe that OEP's support of the proposed Sale, both as an equity holder and as a financial sponsor of the Sale is crucial to the Purchaser's ability to execute the Stalking Horse Agreement. OEP has provided a financing commitment letter that provides for payment of the Purchase Price by OEP.

- 13 -

34.    I am also aware that OEP also has been an active participant in other Nortel divestitures. Over the entire course of these proceedings, OEP has conducted extensive diligence with respect to multiple potential transactions. Most recently and notably, OEP was an equity sponsor of MEN Acquisition LLC in its submission of a bid and its participation at the auction of the MEN business.

35.    OEP has informed the Sellers and the EMEA Sellers that it has incurred significant un-reimbursed costs in connection with its pursuit of these various other transactions, and that it requires compensation for these costs as a condition to its financial sponsorship of the Stalking Horse Agreement.

36.    The Sellers and EMEA Sellers have agreed, subject to obtaining the required court approvals, to pay to OEP an incentive fee in connection with the execution of the Stalking Horse Agreement, to induce OEP's continued participation in the auction process. The incentive fee agreed to by the parties consists of a payment of $3,600,000, funded as $1.2 million by each of: (i) NNI, (ii) NNC/NNL, and (iii) NNUK, on their own behalf and on behalf of their respective affiliates (NNC's obligation to pay $1.2 million is referred to herein as the "Incentive Fee").

37.    NNC, NNL, NNI and NNUK and the Joint Administrators have executed a letter agreement that provides that the $3.6 million in incentive fee payments, including the Incentive Fee, would be subject to further allocation amongst the estates if the Sale or Alternate Transaction is consummated (the "Incentive Fee Letter").

38.    I am aware that a copy of the Incentive Fee Letter will be attached as an appendix to the Thirty-Fourth Report.

*The Sale and Bid Process*

39.    In connection with having entered into the Purchase Agreements and subject to approvals by the U.S. Court and this Honourable Court, Nortel will conduct an auction process for the sale of the Assets to ensure that the Sellers receive the maximum value for the Assets and the Sellers and the Purchaser have agreed that the Stalking Horse Agreement is subject to higher or better offers. It is anticipated that if the U.S. Bidding Procedures Order and the Canadian Sales Process

- 14 -

Orders are granted, Nortel will conduct an expedited sale process and follow the Bidding Procedures (as defined below) with a view to the ultimate conduct of an auction.

40.    An agreed upon set of bidding procedures (the "Bidding Procedures") have been developed, which provide for a process through which an interested party may become a "Qualified Bidder". I am aware that the Thirty-Fourth Report will attach and outline the proposed sale process and the Bidding Procedures in more detail. I have reviewed the Bidding Procedures and believe them to be fair in the circumstances.

*Sealing*

41.    I am aware that the Monitor has or will be filing confidential appendices to the Thirty-Fourth Report which contain the disclosure schedules and exhibits to the Stalking Horse Agreement. The disclosure schedules and exhibits contain sensitive competitive and, in some instances, employee information.

42.    I believe sealing this confidential appendices are appropriate in the circumstances.

**CONCLUSION**

43.    I believe that the Stalking Horse Agreement is the product of a vigorous, comprehensive and fair process. The proposed auction sale process for the CVAS Business, based on the Stalking Horse Agreement as a stalking horse bid, is the best way to preserve the business as a going concern and to maximize value and preserve jobs for the Applicants' employees.

44.    Based on the foregoing, I believe that the proposed transaction with the Purchaser represents the highest and best proposal available for the CVAS Business, subject to the receipt of a better bid through the auction process contemplated in this motion.

45.    The Stalking Horse Agreement requires an expeditious sale process and provides the Purchaser the right to terminate the Stalking Horse Agreement if certain milestones in the sale process are not timely met. For these reasons, the expeditious sale of the Assets is critical to the maximization of the value of the Applicants' assets and, in turn, to a recovery for the Applicants' estates.

- 15 -

46.     The agreement to pay the Incentive Fee to OEP is in recognition of OEP's good faith efforts to pursue the Sale and the value that it has provided to the Applicants through its participation in other transactions. OEP informed the Sellers that the provision of financing for GENBAND's entry into the Stalking Horse Agreement is dependent upon the payment of the Incentive Fee, which represents the fees and expenses OEP has incurred as an active participant in multiple Nortel sale processes, including the MEN auction.

47.     Without the Sellers' agreement to provide OEP with the Incentive Fee, the Stalking Horse Purchaser would not have undertaken efforts to research the value of the Assets or have entered into the Stalking Horse Agreement and will not continue to participate in the auction process, precluding the use of the Stalking Horse Agreement as the floor at a subsequent auction. Furthermore, time is of the essence in order to maximize the value that the Debtors can realize from the sale of the Assets, and the Stalking Horse Agreement represents the best opportunity to quickly realize value from the sale of the Assets.

SWORN BEFORE ME at the City of
Weston , in the State of
Massachusetts on this 23 day of
December, 2009.

_____
Commissioner for Taking Affidavits or
Notary Public



_____
George Riedel

MARK LOZIER
Notary Public
Commonwealth of Massachusetts
My Commission Expires
March 7, 2014

Court File No: 09-CL-7950

IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL CORPORATION AND NORTEL NETWORKS TECHNOLOGY CORPORATION

*ONTARIO*
**SUPERIOR COURT OF JUSTICE**
**(COMMERCIAL LIST)**

Proceeding commenced at Toronto

**AFFIDAVIT OF GEORGE RIEDEL**
(sworn December 23, 2009)

**OGILVY RENAULT LLP**
Suite 3800
Royal Bank Plaza, South Tower
200 Bay Street
P.O. Box 84
Toronto, Ontario  M5J 2Z4, Canada

**Derrick Tay LSUC#: 21152A**
Tel: (416) 216-4832
Email: dtay@ogilvyrenault.com

**Mario Forte  LSUC#: 27293F**
Tel: (416) 216-4870
Email: mforte@ogilvyrenault.com

**Jennifer Stam LSUC #46735J**
Tel: (416) 216-2327
Email: jstam@ogilvyrenault.com
Fax: (416) 216-3930
Lawyers for the Applicants

DOCSTOR: 1834943\3

# TAB 4



Court File No. 09-CL-7950

***ONTARIO***
**SUPERIOR COURT OF JUSTICE**
**(COMMERCIAL LIST)**

**IN THE MATTER OF THE *COMPANIES' CREDITORS***
***ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED**

**AND IN THE MATTER OF A PLAN OF**
**COMPROMISE OR ARRANGEMENT OF**
**NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED,**
**NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS**
**INTERNATIONAL CORPORATION AND NORTEL NETWORKS**
**TECHNOLOGY CORPORATION**

**THIRTY-FOURTH REPORT OF THE MONITOR**
**DATED JANUARY 3, 2010**

## INTRODUCTION

1.  On January 14, 2009 (the "Filing Date") Nortel Networks Corporation ("NNC" and collectively with all its subsidiaries "Nortel" or the "Company"), Nortel Networks Limited ("NNL"), Nortel Networks Technology Corporation, Nortel Networks International Corporation and Nortel Networks Global Corporation (collectively the "Applicants") filed for and obtained protection under the *Companies' Creditors Arrangement Act* ("CCAA"). Pursuant to the Order of this Honourable Court dated January 14, 2009, as amended and restated (the "Initial Order"), Ernst & Young Inc. was appointed as the Monitor of the Applicants (the "Monitor") in the CCAA proceedings. The stay of proceedings was extended to January 29, 2010, by this Honourable Court in its Order dated December 18, 2009.

2.  Nortel Networks Inc. ("NNI") and certain of its U.S. subsidiaries concurrently filed voluntary petitions under Chapter 11 of Title 11 of the U.S. Bankruptcy Code (the "Code") in the United States Bankruptcy Court for the District of Delaware (the "U.S. Court") on January 14, 2009 (the "Chapter 11 Proceedings"). As required by U.S. law, an official unsecured creditors committee (the "Committee") was established in January, 2009.

- 2 -

3.      An ad hoc group of holders of bonds issued by NNL, NNC and Nortel Networks Capital Corporation has been organized and is participating in these proceedings as well as the Chapter 11 Proceedings (the "Bondholder Group"). In addition, pursuant to Orders of this Honourable Court dated May 27, 2009, and July 22, 2009, representative counsel was appointed on behalf of the former employees of the Applicants and on behalf of the continuing employees of the Applicants, respectively, and each of these groups is participating in the CCAA proceedings.

4.      Nortel Networks (CALA) Inc. (together with NNI and certain of its subsidiaries that filed on January 14, 2009, the "U.S. Debtors") filed a voluntary petition under Chapter 11 of Title 11 of the Code in the U.S. Court on July 14, 2009.

5.      Nortel Networks UK Limited ("NNUK") and certain of its subsidiaries located in EMEA were granted Administration orders (the "UK Administration Orders") by the High Court of England and Wales on January 14, 2009 (collectively the "EMEA Debtors"). The UK Administration Orders appointed Alan Bloom, Stephen Harris, Alan Hudson and Chris Hill of Ernst & Young LLP as Administrators of the various EMEA Debtors, except for Ireland, to which David Hughes (Ernst & Young LLP Ireland) and Alan Bloom were appointed (collectively the "Joint Administrators"). On June 8, 2009, the Joint Administrators appointed in respect of NNUK filed a petition with the U.S. Court for the recognition of the Administration Proceedings as they relate to NNUK (the "English Proceedings") under Chapter 15 of the Code. On June 26, 2009, the U.S. Court entered an order recognizing the English Proceedings as foreign main proceedings under Chapter 15 of the Code.

6.      On January 20, 2009, Nortel Networks Israel (Sales and Marketing) Limited and Nortel Communications Holdings (1997) Limited (together "NN Israel") were granted Administration orders by the court in Israel (the "Israeli Administration Orders"). The Israeli Administration Orders appointed representatives of Ernst & Young LLP in the UK and Israel as Administrators of NN Israel (the "Joint Israeli Administrators") and provided a stay of NN Israel's creditors which, subject to further order of the Israeli Court, remains in effect during the Administration.

- 3 -

7.　Subsequent to the Filing Date, Nortel Networks SA commenced secondary insolvency proceedings within the meaning of Article 27 of the European Union's Council Regulation (EC) No 1346/2000 on Insolvency Proceedings in the Republic of France pursuant to which a liquidator and an administrator have been appointed by the Versailles Commercial Court.

## PURPOSE

8.　The purpose of this Thirty-Fourth Report of the Monitor (the "Thirty-Fourth Report") is to provide this Honourable Court with information regarding the Applicants' motion seeking:

- approval of an asset sale agreement dated December 22, 2009 (the "GENBAND Agreement"), amongst NNC, NNL and NNI (the "Main Sellers") and certain of their affiliates (the "Other Sellers" and, with the Main Sellers, the "Sellers"), and GENBAND Inc. ("GENBAND" or the "Purchaser") in respect of the sale of substantially all of the assets of Nortel's Carrier Voice and Application Solutions business (the "CVAS Business") as a "stalking horse" agreement;

- a sealing order in respect of the exhibits and the Sellers Disclosure Schedule to the GENBAND Agreement for the reasons set out below;

- approval of the Bidding Procedures (as defined below);

- approval of the terms and conditions of the Break-Up Fee and Expense Reimbursement (each as defined below); and

- an order authorizing and directing NNC to pay 1/3 of the Incentive Fee (as defined below) and approving the Incentive Fee Side Letter (as defined below),

and to provide the Monitor's support thereof.

- 4 -

**TERMS OF REFERENCE**

9.   In preparing this Thirty-Fourth Report, EYI has relied upon unaudited financial information, the Company's books and records, financial information prepared by the Company and discussions with the management of Nortel.   EYI has not audited, reviewed nor otherwise attempted to verify the accuracy or completeness of the information and, accordingly, EYI expresses no opinion or other form of assurance on the information contained in this Thirty-Fourth Report.

10.   Unless otherwise stated, all monetary amounts contained herein are expressed in U.S. dollars.

11.   Capitalized terms not defined in this Thirty-Fourth Report are as defined in the Affidavit of John Doolittle sworn on January 14, 2009 (the "Doolittle Affidavit"), the Pre-Filing Report, previous Reports of the Monitor, the GENBAND Agreement or the Bidding Procedures.

**GENERAL BACKGROUND**

12.   Nortel is a technology company that designs, develops and deploys communication products, systems, and solutions to its carrier and enterprise customers around the globe. Its principal assets include its people, the intellectual property derived and maintained from its research and development activities, its customers and other significant contracts and agreements.

13.   Since September 30, 2009, Nortel has conducted its global business through four reportable business unit segments: Wireline and Wireless Networks, Metro Ethernet Networks, Carrier Voice Application Solutions ("CVAS"), and LG Nortel Co. Ltd. ("LGN").   As of September 30, 2009, Nortel's Enterprise Solutions business unit has been accounted for as a discontinued operation.   The revenue and assets of each of the business units, except for LGN, are distributed among the multiple Nortel legal entities and joint ventures around the world.

- 5 -

14.    The Monitor has made various materials relating to the CCAA proceedings available on its website at www.ey.com/ca/nortel.  The Monitor's website also contains a dynamic link to Epiq Bankruptcy LLC's website where materials relating to the voluntary proceedings under Chapter 11 of the Code are posted.

## THE CARRIER VOICE AND APPLICATION SOLUTIONS BUSINESS

*Background*

15.    The CVAS Business is not operated through a dedicated legal entity or stand-alone division.  Generally, Nortel has one legal entity in each country in which it operates and sales of all Nortel products and services in that country are made through that single legal entity.  A more detailed description of this structure is set out in the Pre-Filing Report.

16.    The CVAS Business is composed of the carrier voice and application solutions segment of Nortel's former "Carrier Networks" business unit.  The CVAS Business encompasses both CVAS products and services.

17.    The CVAS Business delivers products and services principally to telecommunications services providers and multi-system operators that enables them to provide voice, data and multi-media telecommunications solutions to their end clients.  CVAS products are deployed at two-thirds of the top twenty telecommunications carriers globally.  Nortel is the leading global provider of CVAS products and services in its market segment.

18.    Principal competitors to the CVAS Business include Nokia Siemens Networks B.V., Alcatel-Lucent and Huawei Technologies Co., Ltd. as well as other companies that compete in certain niches within this market including BroadSoft, Inc., MetaSwitch and Sonus Networks, Inc.

19.    The CVAS Business operates approximately 774 deployment sites across approximately 48 countries.  It has a base of over 100 million voice over internet protocol ports shipped world-wide and 21 million internet protocol telephony lines shipped.  Fiscal 2008 revenues were over $870 million representing nearly 9% of Nortel's 2008 revenues.

- 6 -

20.   The CVAS Business had revenues in Canada in fiscal 2008 of approximately $115 million representing approximately 17% of Nortel's 2008 Canadian revenue.

21.   In addition, the Applicants have an interest in the intellectual property upon which the products of the CVAS Business are based. Generally speaking, the owner of the intellectual property in the Nortel group, which in most cases is NNL, licenses the intellectual property in question to various other Nortel legal entities around the world, in some cases on an exclusive basis and in other cases, on a non-exclusive basis. These Nortel entities in turn license the intellectual property related to the CVAS Business to customers in their respective geographic regions.

22.   The CVAS Business currently employs the equivalent of approximately 2,185 full time employees. This includes individuals directly involved in the CVAS Business as well as individuals in other Nortel functional areas and corporate departments that are dedicated to the CVAS Business. Of the 2,185 employees dedicated to the CVAS Business, approximately 592 are located in Canada. The majority of the Canadian employees perform research and development activities and, as a result, a significant percentage of the global CVAS Business's research and development expenditures are incurred by the Applicants. The majority of the remaining employees are located in the United States, the U.K. and China. Generally, these individuals are employed by the Nortel legal entity established in the country in which they work.

*Sale Process*

23.   In April, 2009, Nortel commenced efforts to market the CVAS Business. With the assistance of Lazard Frères & Co., the Company approached or was contacted by 25 buyers or buyer groups. As a result of those efforts, 19 parties indicated an interest in purchasing the CVAS Business and executed confidentiality agreements, and 18 of these parties were provided with a confidential information memorandum. Ten parties were provided access to additional confidential information relating to the CVAS Business via an electronic data room and 11 parties participated in management presentations commencing in May, 2009.

- 7 -

24.   Seven parties ultimately submitted expressions of interest with respect to acquiring the CVAS Business and the Company proceeded to engage in parallel negotiations with these parties.   These negotiations culminated with Nortel entering into the GENBAND Agreement as described below.

25.   The Monitor has had extensive involvement in the sale process including attending and participating in the management presentations and negotiations with prospective buyers described above, performing its own review of materials submitted by prospective purchasers (including the GENBAND Agreement) and providing input to the Company with respect to these matters.


**THE GENBAND AGREEMENT**

26.   On December 22, 2009, the Sellers entered into the GENBAND Agreement with the Purchaser.   Concurrently, the EMEA Sellers, the Joint Administrators and the Joint Israeli Administrators entered into a separate Asset Sale Agreement (the "EMEA ASA") with GENBAND dated December 23, 2009.   Collectively, the GENBAND Agreement and the EMEA ASA set forth the terms of the Sellers' and the EMEA Sellers' sale of the assets and certain associated liabilities of the CVAS Business to GENBAND.   The GENBAND Agreement (without exhibits or the Sellers Disclosure Schedule) is attached as Appendix "A" hereto.   A copy of the exhibits and the Sellers Disclosure Schedule to the GENBAND Agreement is attached as confidential Appendix "B" hereto.   As these exhibits and schedules contain sensitive competitive information and information with respect to employees, the Monitor requests that confidential Appendix "B" to this Thirty-Fourth Report be sealed by this Honourable Court.

27.   GENBAND is a leading worldwide supplier of next-generation internet protocol gateways, session border controllers and security solutions.   GENBAND's gateway solutions to enhance, secure and evolve communications networks are used by fixed and mobile network operators around the world.   GENBAND was founded in 1999 by venture capital firms and remains a private company.   Headquartered in Plano, Texas,

- 8 -

GENBAND operates research and development facilities in Texas, Massachusetts and China.

28.    A summary of the key provisions of the GENBAND Agreement is provided in the paragraphs that follow.    Reference should be made directly to the GENBAND Agreement, a copy of which is attached as Appendix "A" hereto, for a complete understanding of the terms governing the transactions.

*Assets*

29.    The assets of the Sellers relating to the CVAS Business being sold are as follows (collectively, the "Assets"):

- the Owned Inventory as of the Closing Date;

- the Unbilled Accounts Receivable as of the Closing Date;

- the Owned Equipment as of the Closing Date;

- the Assigned Contracts in force as of the Closing Date;

- the Prepaid Expenses as of the Closing Date;

- all rights of the Sellers as of the Closing Date under non-disclosure, confidentiality, non-compete or non-solicitation agreements that are Assigned Contracts;

- the tangible embodiments of the Business Information existing as of the Closing Date;

- the Transferred Intellectual Property as of the Closing Date, subject to license rights granted to NNL, NNI and each of the EMEA Sellers pursuant to the Intellectual Property License Agreement prior to the Closing Date, together with, amongst other things, all income, royalties, damages and payments due or payable after the Closing Date relating to the Transferred Intellectual Property and all

- 9 -

claims against Third Parties for infringement, misappropriation or other violation of law with respect to the Transferred Intellectual Property;

- all rights as of the Closing Date under all warranties, representations and guarantees made by suppliers, manufacturers and contractors to the extent related to the Assets described above;

- to the extent assignable, certain consents of Government Entities and pending applications therefor;

- certain rights that may be freely transferred arising from any bid made prior to the Closing Date by any Seller, which is capable of acceptance after the Closing Date and, if accepted, would result in a Customer Contract (any such bid a "Seller Bid");

- any net insurance proceeds in respect of Owned Equipment to the extent payable to the Purchaser pursuant to the terms of the GENBAND Agreement; and

- any Tax records required by law to be transferred.

30. The Assets to be acquired by the Purchaser exclude, among other things, cash and cash equivalents, accounts receivable (including intercompany receivables but excluding Unbilled Accounts Receivable), bank account balances and petty cash of the Sellers, certain rights and refunds (including Tax refunds) relating to the pre-Closing period, any rights under any contracts (other than the Assigned Contracts), shares of any person, and any assets owned by certain subsidiaries and joint ventures of the Sellers including those assets owned by LGN, Nortel Networks Netas Telekomunikasyon A.S. ("NN Turkey") or Guandong-Nortel Telecommunications Equipment Co. Ltd.

*Assumed Liabilities*

31. The Purchaser will assume the following liabilities:

- all liabilities of the CVAS Business arising after the Closing Date to the extent related to the operation of the CVAS Business by the Purchaser following the

74

- 10 -

Closing Date including all liabilities (i) with respect to the ownership and operation of the Assets; (ii) related to actions or claims brought against the CVAS Business; (iii) under Environmental Laws; (iv) under any product liability laws or similar laws concerning defective products manufactured or sold by the CVAS Business; and (v) under applicable laws in relation to telecommunications providers;

• all liabilities arising from or in connection with the performance (or breach) of the Assigned Contracts after the Closing Date and liabilities with respect to Cure Costs payable pursuant to the GENBAND Agreement (to the extent not payable by the Sellers thereunder), obligations to buy back from relevant resellers the products sold to resellers under Assigned Contracts and obligations under any warranty liabilities relating to CVAS products and services which have been supplied under any Assigned Contract;

• all liabilities resulting from any licensing assurances, declarations, agreements or undertakings relating to the Transferred Intellectual Property which the Sellers may have granted to third parties, solely to the extent that the terms of such licensing assurances, declarations, agreements or undertakings require assignees of the Transferred Intellectual Property to assume such liability and all liabilities resulting from the assurances, declarations and undertakings made to standard-setting bodies that are listed in the Sellers Disclosure Schedule;

• all liabilities for, or related to any obligation for, any Tax that the Purchaser bears pursuant to the GENBAND Agreement;

• except to the extent otherwise set forth in the GENBAND Agreement, all liabilities related to the Purchaser's: (i) employment or termination of employment (whether or not arising under or in respect of any Purchaser Employee Plan) of Transferred Employees or Transitional Employees after Closing; (ii) offers of employment or notice of continued employment to any Employees; (iii) decision to make or not make offers of employment to any Employee that violates applicable law; (iv) employment of any Employee whose

- 11 -

employment transfers by operation of Law; and (v) failure to satisfy its obligations with respect to the Employees, including the Transferred Employees and the Transitional Employees, as set out in the GENBAND Agreement;

- all liabilities that relate to or arise under any Purchaser Employee Plan;

- any obligation to provide continuation coverage pursuant to COBRA or any similar law under any Purchaser Employee Plan that is a "group health plan" (as defined in section 5000(b)(1) of the United States Internal Revenue Code of 1986, as amended) to Transferred Employees and Transitional Employees and/or their qualified beneficiaries who have a qualifying event on or after such Transferred Employees' or Transitional Employees' Effective Hire Date;

- certain other liabilities related to the Transferred Employees as set forth in the Sellers Disclosure Schedule;

- all liabilities related to the Transferred Employees and the Transitional Employees expressly assumed by the Purchaser as set out in the GENBAND Agreement;

- all liabilities related to the obligation to repurchase CVAS Business-related Inventory as specified in the Contract Manufacturing Inventory Agreements;

- all liabilities relating to executory supply purchase orders for products or services (other than materials to be delivered to a contract manufacturer) entered into by the Sellers in the ordinary course before Closing with a person (other than a contract manufacturer) who is a supplier of the CVAS Business as of the date hereof and under which products and/or services have not been delivered as of the Closing Date; and

- all liabilities related to a Seller Bid; and

- certain liabilities listed in the Sellers Disclosure Schedule.

- 12 -

*Purchase Price*

32.    The Purchase Price is $282,000,000 (the "Base Purchase Price"), as adjusted in the manner described below, plus the Purchaser's obligation to pay, perform and discharge the Assumed Liabilities and the EMEA Assumed Liabilities.

33.    At the Closing, the Purchaser shall deliver the Estimated Purchase Price (less the Good Faith Deposit and the various escrow amounts described below) to the Distribution Agent, as agent for the Sellers and the EMEA Sellers, being an amount equal to:

- the Base Purchase Price; plus

- the difference, which may be positive or negative, equal to the Estimated Adjusted Net Working Capital minus the Target Working Capital; minus

- the Estimated Aggregate EMEA Downward Adjustment (if any); minus

- the Estimated Aggregate Downward Adjustment (if any); minus

- the Estimated Deferred Profit Amount; minus

- the Estimated Closing Accrued Vacation Amount; minus

- the Estimated Specified Employee Liabilities Amount; minus

- the Estimated TFR Amount; minus

- the Estimated Excess ARD Employees Amount; minus

- the Estimated EMEA Holiday Downward Adjustment; minus

- the Estimated French Excess ARD Employees Amount; minus

- the Estimated Pre-Close Employment Payments Amount.

- 13 -

34.  The Monitor understands that the Purchase Price adjustments described above are currently estimated to result in a downward adjustment to the Purchase Price of approximately $100,000,000.

35.  The following amounts will be deducted from the Estimated Purchase Price to be delivered to the Sellers at Closing:

    (a)  the Good Faith Deposit, being an amount equal to five percent of the Base Purchase Price which shall be delivered by the Purchaser to the Escrow Agent on the Business Day following the entry of the U.S. Bidding Procedures Order;

    (b)  the Aggregate Escrow Amount, comprised of: (i) the Purchase Price Escrow Amount ($8,000,000); (ii) the TSA Escrow Amount ($10,000,000); (iii) the Tax Escrow Amount ($2,500,000); and (iv) the EMEA Tax Escrow Amount ($2,500,000), which will be delivered to the Escrow Agent; and

    (c)  the EMEA Deposit ($5,000,000), which will be delivered to the EMEA Escrow Agent.

*Post-Closing Purchase Price Adjustment*

36.  Within 95 days of Closing, the Purchaser shall deliver the Closing Statement to the Main Sellers and the EMEA Sellers, which shall contain the Purchaser's final calculation of the Adjusted Net Working Capital (including the underlying amounts used to calculate same) and the other purchase price adjustment amounts specified above in paragraph 33.

37.  The Final Purchase Price shall be equal to:

    • the Base Purchase Price; plus

    • the difference, which may be positive or negative, equal to the Closing Adjusted Net Working Capital minus the Target Working Capital; plus

    • the Closing Aggregate EMEA Upward Adjustment (if any); minus

    • the Closing Aggregate EMEA Downward Adjustment (if any); minus

- 14 -

- the Closing Aggregate Downward Adjustment (if any); minus

- the Closing Deferred Profit Amount; minus

- the Closing Excess ARD Employees Amount; minus

- the Closing TFR Amount; minus

- the Closing EMEA Holiday Downward Adjustment; minus

- the Closing French Excess ARD Employees Amount; minus

- the Closing Pre-Close Employment Payments Amount.

38.    The Main Sellers shall have 30 days from the date of receipt of the Closing Statement to notify the Purchaser of a disagreement with same. The Purchaser and the Main Sellers shall use commercially reasonable efforts to resolve any disagreements for a period of 15 days thereafter, after which the Accounting Arbitrator shall be appointed to resolve any remaining disagreements.

39.    If the Final Purchase Price is less than the Estimated Purchase Price, the Escrow Agent shall pay to the Purchaser the lesser of the excess of the Estimated Purchase Price over the Final Purchase Price and the Purchase Price Escrow Amount and the Sellers and the EMEA Sellers shall pay the amount of any such excess not paid by the Escrow Agent, provided that if the excess of the Estimated Purchase Price over the Final Purchase Price is less than the Escrow Amount, the Parties agree to cause the Escrow Agent to pay to the Distribution Agent, as distribution agent for the Sellers and the EMEA Sellers, the balance of the Purchase Price Escrow Amount, and provided further that in no event shall the Sellers and the EMEA Sellers, in the aggregate, have any obligation to pay any amounts under the GENBAND Agreement or the EMEA ASA in excess of the Base Purchase Price less the Purchase Price Escrow Amount.

40.    If the Final Purchase Price exceeds the Estimated Purchase Price, the Purchaser shall pay to the Distribution Agent the amount of such excess and the Escrow Agent shall pay the full Purchase Price Escrow Amount to the Distribution Agent.

- 15 -

*North American Tax Escrow*

41.   In the event that any tax authority shall make any claim against the Purchaser or its affiliates for any taxes that are Excluded Liabilities or have in its favour a lien on any of the Assets arising out of the non-payment of any taxes that are Excluded Liabilities ("Excluded Taxes"), the Purchaser shall be entitled to recover all losses arising out of or in connection with such Excluded Taxes from the Tax Escrow Amount, provided that the aggregate amount to be recovered in respect of such losses shall not exceed the Tax Escrow Amount. The Tax Escrow Amount is available as the sole and exclusive remedy to the Purchaser and any Designated Purchaser following the Closing in respect of any Excluded Liabilities or liabilities for non-payment of any Excluded Taxes that give rise to any Lien on any Assets in each case for jurisdictions identified by the Purchaser in a schedule to the ASA. Any remaining balance in the Tax Escrow Amount (less a reserve amount for claims for Excluded Taxes which have not yet been resolved) will be released to the Distribution Agent on the first Business Day after the first anniversary of the Closing Date.

*Employees*

42.   The Purchaser has committed to offer employment to a minimum of 1,638 Employees of the CVAS Business (the "Transferred Employees"), including all employees whose employment transfers by operation of Law, and all employees in the EMEA region whose employment is governed by the EMEA ASA, but excluding Transitional Employees. Except with respect to Union Employees, such Offers pursuant to the GENBAND Agreement shall, except to the extent otherwise required by Law, be for employment on terms and conditions that are substantially comparable to those terms and conditions of employment of similarly situated employees of the Purchaser and shall include: (i) (A) for each Employee (excluding Sales Employees), an annual base salary and annual target incentive that is equal to the current annual base salary and annual target incentive for such Employee; and (B) for each Sales Employee, an annual base salary plus annual target incentive equal in the aggregate to the current annual base salary plus annual target incentive for such Employee; provided that the annual base salary for each Sales

- 16 -

Employee shall not be less than 95% of the annual base salary for such Sales Employee; (ii) employment in a reasonably comparable position; and (iii) employment at a location reasonably near to the Employee's current location. Except as set forth in the Sellers Disclosure Schedule, the Purchaser shall provide Transferred Employees with benefits substantially comparable in the aggregate to their current benefits under Seller Employee Plans and shall recognize the service date of each Transferred Employee for all purposes including membership and entitlement to benefits under all relevant Purchaser Employee Plans, but not for purposes of benefit accrual, vesting or otherwise for determination of the amount or duration of benefits under any Purchaser Employee Plan that is a defined benefit pension plan or under an equity incentive plan. The Sellers shall be solely responsible for any required notice under the WARN Act or similar state or local laws with respect to terminations of employment of Employees other than Transferred Employees and Transitional Employees.

43.    With respect to Union Employees, as of the Closing Date the Purchaser will be bound by the terms and obligations of the Collective Labour Agreements with respect to the employment of Union Employees who are Transferred Employees.

44.    The Sellers shall retain any of the following Liabilities of the Sellers (the "Excluded Employee Liabilities"): (i) liabilities related to the Seller Employee Plans; (ii) any liability related to the KERP, the KEIP or any other retention plan; (iii) any obligation to provide continued coverage pursuant to COBRA under any Seller Employee Plan that is a "group health plan" to Employees with a qualifying event that occurs prior to such Employees' Effective Hire Date; and (iv) except as otherwise provided in the GENBAND Agreement, liabilities relating to any Employee's or a former employee's employment or termination of employment with any of the Sellers, including any severance or similar obligations.

45.    As of the Effective Hire Date, the Non-Union Employees who have any entitlement to defined benefits under the Nortel Networks Limited Managerial and Non-Negotiated Pension Plan or who participate in the defined contribution component of the Nortel Networks Limited Managerial and Non-Negotiated Pension Plan shall cease to participate

- 17 -

actively in such Seller Employee Plan. The Purchaser shall cause such Non-Union Employees who become Transferred Employees to participate in a defined contribution registered pension plan, which shall contain an employer contribution formula of at least 1% of the salary of such Transferred Employees, subject to any applicable tax law.

46.    As of the Effective Hire Date, the Union Employees who are accruing defined benefits under the Nortel Networks Negotiated Pension Plan shall cease to participate actively in such Seller Employee Plan. The Purchaser shall cause such Union Employees who become Transferred Employees to participate in a defined benefit registered pension plan unless otherwise agreed to with the relevant union.

47.    As of the Effective Hire Date, the Union Employees who participate in the defined contribution component of the Nortel Networks Negotiated Pension Plan shall cease to participate actively in such Seller Employee Plan. The Purchaser shall cause such Union Employees who become Transferred Employees to participate in a defined contribution registered pension plan unless otherwise agreed to with the relevant union.

*Assignment of Contracts*

48.    The Sellers will assign certain Customer Contracts pursuant to Section 365 of the Code or otherwise, as applicable, and will sublease or license premises leased under certain Real Estate Leases to the Purchaser upon Closing as specified in the Sellers Disclosure Schedule. The Parties shall use commercially reasonable efforts to obtain all consents required to permit the assignment to the Purchaser of the Assigned Contracts in force as of the Closing Date.

49.    The Purchaser and the Sellers shall, as applicable, use their reasonable best efforts to cause the counterparty to each Bundled Contract (i.e., Contracts that provide for the sale or provision of CVAS products or services and the sale or provision of other products or services of the Sellers) to amend such Bundled Contract so as to delete all obligations and Liabilities therefrom as they relate to the CVAS products and services and to enter into a new Contract (effective as of, and conditioned upon the occurrence of, the Closing) with the Purchaser which only relates to CVAS products and services.

- 18 -

*Cure Costs*

50.    To the extent that the assignment of any Customer Contract to the Purchaser entails the payment of any Cure Cost, the relevant Main Sellers shall pay such amounts directly to such counterparty. The Sellers shall not be responsible for any other Cure Costs.

*Additional Adverse Bankruptcy Proceedings*

51.    Prior to Closing, if any Seller that is a Non-Debtor Seller commences insolvency proceedings, any law or order comes into effect preventing the Seller from assigning the assets in its jurisdiction, or any entity is not deemed an Other Seller, the Main Sellers shall promptly notify the Purchaser of same and identify the Assets that are affected (the "Restricted Assets") and the Parties shall use their commercially reasonable efforts to cause the transfer of the Restricted Assets to the Purchaser, provided that if it becomes apparent to the Parties that the Restricted Assets cannot be assigned, such Restricted Assets shall automatically be deemed Excluded Assets, the applicable Seller shall be excused from delivering the Restricted Assets and the Purchaser shall be relieved from its rights and obligations to acquire such Restricted Assets or assume any Assumed Liabilities in respect thereof (the "Restricted Liabilities") and the Purchase Price shall be reduced by an amount equivalent to the Market Value of such Restricted Assets and Restricted Liabilities.   For a period of 180 days following the Closing, the Sellers and the Purchaser shall use commercially reasonable efforts to attempt to cause any Restricted Assets to be conveyed to the Purchaser.

*Exclusion of Sellers*

52.    At any time within 15 calendar days after the selection of the Purchaser as the Successful Bidder, the Purchaser may elect, without effect on the Purchase Price or the Purchaser's obligation to offer employment to a minimum number of employees, to exclude the assets and any related rights and liabilities of Nortel Networks (India) Private Limited from the transaction.

- 19 -

*Sale Free and Clear*

53.    The Assets to be transferred by the Sellers will be transferred free and clear of all liens, claims and interests, other than those expressly assumed by the Purchaser or otherwise expressly permitted under the GENBAND Agreement.

*Representations and Warranties or Covenants*

54.    The GENBAND Agreement contains a number of representations, warranties and covenants by the Main Sellers or the Sellers, as applicable, with respect to various matters including title to assets, sufficiency of assets, intellectual property, preparation of financial statements, status of litigation, compliance with laws, status of real property, environmental matters, employee matters and taxes. In addition, the GENBAND Agreement includes a number of covenants with respect to matters including pre-Closing cooperation and access to information, preparation and filings regarding antitrust and other Regulatory Approvals, preparation and delivery of certain financial statements of the CVAS Business, pre-Closing conduct of the Business, post-Closing assistance and maintenance of books and records, post-Closing arrangements with respect to certain non-assignable and/or Bundled Contracts, post-Closing assistance for litigation, negotiation and completion of Ancillary Agreements, and insurance and real estate matters including the sub-lease and lease of certain real property to the Purchaser.

*Survival of Representations and Warranties or Covenants*

55.    No representations, warranties, covenants, or agreements of the Sellers contained in the GENBAND Agreement shall survive beyond the Closing Date, except for certain specified covenants, and covenants that by their terms are to be satisfied after the Closing Date, which covenants will survive until satisfied in accordance with their terms.

*Termination Rights*

56.    The GENBAND Agreement may be terminated prior to Closing in a number of instances including:

- 20 -

- by mutual written consent of the Purchaser and the Main Sellers;

- by either the Purchaser or the Main Sellers:

  o if the U.S. Bidding Procedures Order and the Canadian Sales Process Order have not been entered within 30 days of the date of the GENBAND Agreement;

  o if the U.S. Sale Order and the Canadian Approval and Vesting Order have not been entered within 20 days after completion of the Auction;

  o upon entry of an order of the U.S. Bankruptcy Court or the Canadian Court approving an Alternative Transaction;

  o if a Government Entity in the U.S., Canada or the United Kingdom (other than a Bankruptcy Court) issues a Final Order prohibiting the transactions contemplated by the GENBAND Agreement and the EMEA ASA;

  o if the EMEA ASA is terminated in accordance with its terms;

  o if the Closing does not take place on or prior to June 30, 2010;

  o in the event of a material breach by the other Party of its representations, warranties, agreements or covenants set forth in the GENBAND Agreement, which breach would result in a failure to satisfy certain specified closing conditions which, if capable of being cured, is not cured within 25 days; or

  o upon the other Party's material breach of its obligation to close the transactions contemplated by the GENBAND Agreement at the Closing, which breach is not cured within five days.

- by the Purchaser:

$\mathcal{S}\mathcal{S}$

- 21 -

    o       upon the sale, transfer or disposal of any material portion of the CVAS Business or the Assets (other than as a going concern) in connection with the closure, liquidation or winding up of the CVAS Business;

    o       if the Auction does not conclude by 45 business days after the later of the entry of the U.S. Bidding Procedures Order or the Canadian Sales Process Order;

    o       if the Purchaser is not selected as the Successful Bidder or the Alternate Bidder; or

    o       upon withdrawal, revocation or alternation of the U.S. Bidding Procedures Order, the Canadian Sale Process Order, the U.S. Sale Order or the Canadian Approval and Vesting Order in a manner materially adverse to the Purchaser, or the Sellers' material failure to comply with the Bidding Procedures which, in either case, if capable of being cured, is not cured within ten days of Sellers' receipt of a written notice of such withdrawal, revocation, alteration or failure.

*Expense Reimbursement*

57.    Collectively, the GENBAND Agreement and the EMEA ASA provide for an aggregate expense reimbursement payable by the Sellers and the EMEA Sellers to the Purchaser in certain circumstances in respect of its reasonable and documented fees, out-of-pocket costs and expenses, to a maximum of $5,000,000 (the "Expense Reimbursement").

58.    The Sellers shall pay a cash fee of $3,333,333 (the "Seller Expense Reimbursement") to the Purchaser if:

    •    the GENBAND Agreement is terminated pursuant to its termination provisions except where such termination is: i) by mutual written consent; ii) due to the U.S. Bidding Procedures Order or the Canadian Sales Process Order not having been entered within 30 days of the date of the GENBAND Agreement; or (iii) as a result of a material breach by the Purchaser of the GENBAND Agreement or the

- 22 -

EMEA ASA which breach would result in a failure to satisfy certain conditions to Closing and which are not cured within 25 days; and

- other than with respect to termination as a result of: (i) the entry of an Order of the U.S. Bankruptcy Court or the Canadian Court approving an Alternative Transaction; (ii) the EMEA ASA being terminated in accordance with certain specified provisions thereof; or (iii) the Purchaser not being selected as the Successful Bidder or the Alternate Bidder, when the GENBAND Agreement is terminated, the Purchaser is not in breach of the GENBAND Agreement or the EMEA ASA, which breach would result in a failure to satisfy certain specified closing conditions.

### Break-Up Fee

59. The GENBAND Agreement and the EMEA ASA also provide for an aggregate break-up fee of $5,000,000 to be paid by the Sellers and the EMEA Sellers to the Purchaser in certain circumstances (the "Break-Up Fee").

60. The Sellers shall pay a cash fee of $3,333,333 (the "Seller Break-Up Fee") to the Purchaser if:

- the GENBAND Agreement is terminated as a result of: (i) the EMEA ASA being terminated in accordance with certain specified provisions thereof; (ii) the Sellers' material breach of their obligation to close the transactions contemplated by the GENBAND Agreement at Closing; (iii) a material breach of the Sellers' representations, warranties, agreements or covenants set forth in the GENBAND Agreement; or (iv) the sale, transfer or disposal of any material portion of the CVAS Business or the Assets (other than as a going concern) in connection with the closure, liquidation or winding up of the CVAS Business, and when the GENBAND Agreement is terminated the Purchaser is not in breach of the GENBAND Agreement or the EMEA ASA, which breach would result in a failure to satisfy the mutual Closing conditions or the Sellers' conditions to Closing; or

- 23 -

- the GENBAND Agreement is terminated as a result of: (A) (i) the U.S. Sale Order and the Canadian Approval and Vesting Order not being entered within 20 days after the completion of the Auction; (ii) the entry of an Order of the U.S. Bankruptcy Court or the Canadian Court approving an Alternative Transaction; (iii) the EMEA ASA being terminated in accordance with certain specified provisions thereof; (iv) the Auction not having concluded by 45 business days after the later of the entry of the U.S. Bidding Procedures Order or the Canadian Sales Process Order; or (v) the Purchaser not being selected as the Successful Bidder or the Alternate Bidder; (B) other than with respect to termination pursuant to the conditions specified in (ii), (iii) or (v), when the GENBAND Agreement is terminated the Purchaser is not in breach of the GENBAND Agreement or the EMEA ASA, which breach would result in a failure to satisfy the mutual Closing conditions or the Sellers' conditions to Closing; and (C) the Sellers consummate an Alternative Transaction within 12 months following the termination of the GENBAND Agreement.

*Incentive Fee*

61.    As an inducement to the Purchaser and to compensate One Equity Partners III, L.P. ("OEP"), an existing shareholder of the Purchaser, for its willingness to provide financing to the Purchaser for the proposed transactions under the GENBAND Agreement and the EMEA ASA, the Main Sellers and NNUK have agreed to pay a fee in the amount of $3,600,000 to OEP (the "Incentive Fee"). The Monitor understands that the Incentive Fee is intended to defray the cost of OEP having participated in various of Nortel's sales processes and that OEP has indicated that its financial sponsorship of the GENBAND Agreement is conditional upon receipt of the Incentive Fee. The Incentive Fee will be paid to OEP within five business days of the later of the date on which: (i) the U.S. Bidding Procedures Order is entered; and (ii) the Canadian Sales Process Order is entered. Pursuant to an Incentive Fee Side Agreement amongst the Main Sellers, NNUK and the Joint Administrators dated December 22, 2009 (the "Incentive Fee Side Agreement"), each of NNC/NNL, NNI and NNUK (and their respective Affiliates) have initially agreed to pay 1/3 of the Incentive Fee, provided that if the transactions

- 24 -

contemplated by the GENBAND Agreement/EMEA ASA are consummated or an Alternative Transaction is consummated, each of NNC/NNL, NNI and NNUK (and their respective Affiliates) shall ultimately bear a portion of the Incentive Fee equal to their percentage allocation of the sale proceeds of such transaction. A copy of the Incentive Fee Side Agreement is attached as Appendix "C" hereto.

*Limitation of Liability*

62.   Other than equitable relief to the extent permitted pursuant to the terms of the GENBAND Agreement, payment of the Seller Expense Reimbursement or the Seller Break-Up Fee shall be the sole and exclusive remedy of the Purchaser for any failure by the Sellers to consummate the transaction contemplated by, or for any pre-Closing breach of, the GENBAND Agreement.

*Standstill Period*

63.   From the date of the GENBAND Agreement to the entry of the U.S. Bidding Procedures Order and from the conclusion of the Auction to Closing or termination of the GENBAND Agreement, the Sellers and their affiliates are, amongst other things, prohibited from soliciting, initiating, encouraging, engaging in any discussions or negotiations, or furnishing any information with respect to an Alternative Transaction; participating or assisting in any effort or attempt to do or seek the foregoing; or, executing a letter of intent or agreement providing for such a transaction, provided however, that the Sellers shall not be prohibited from providing any person with the Bidding Procedures and related documents, answering questions about the Bidding Procedures or announcing the execution of the GENBAND Agreement or the Auction. Notwithstanding the foregoing, from the date of the GENBAND Agreement until the entry of the U.S. Bidding Procedures Order, the Sellers may provide continued access to written due diligence materials in an electronic data room to persons that have such access presently or that execute a confidentiality agreement in accordance with the Bidding Procedures within ten Business Days from the date of the GENBAND Agreement, provided, however, that the Sellers must provide the Purchaser at least equivalent access to all such written due diligence materials.

- 25 -

*Ancillary Agreements*

64.    On or before Closing, the Purchaser and the relevant Sellers and EMEA Sellers will enter into the following ancillary agreements:

- <u>Local Sales Arrangements</u> -- To the extent necessary to effect the Closing, the Sellers and the Purchaser shall enter into agreements or instruments providing for the sale, transfer, assignment or other conveyance of the Assets in accordance with local law and the assumption of Assumed Liabilities.

- <u>Intellectual Property License Agreement</u> - an intellectual property license agreement (the "IPLA") amongst NNL, NNI, the EMEA Sellers and the Purchaser pursuant to which NNL, NNI and the EMEA Sellers will grant to the Purchaser a non-exclusive, fully paid-up, perpetual and irrevocable license with respect to intellectual property which has not been assigned, to, among other things: (i) use, distribute and otherwise commercially exploit intellectual property, other than patents, used in connection with the CVAS Business; and (ii) under the patents associated with the CVAS Business, make, develop, use, support and otherwise dispose of products and services in connection therewith, in each case solely within a defined field of use. The licenses granted to the Purchaser under the IPLA include certain limited sublicensing rights and are not assignable except in certain limited circumstances.

- <u>Transition Services Agreement</u> -- an agreement between NNL, NNC, NNI, NNUK, NN Ireland, certain Other Sellers, the U.K. Administrators and the Purchaser pursuant to which the Sellers and their affiliates will agree to provide certain information technology, business transition and related services to the Purchaser for up to 18 months post-Closing. The final form of the Transition Services Agreement will set forth the fees to be paid by the Purchaser to the Sellers for these services as well as certain other terms that will regulate the provision of services thereunder. The agreed form of Transition Services Agreement sets out the general scope of transition services to be provided and the parties have agreed to negotiate in good faith to refine the description of the

transitional services to be provided in accordance with the terms and guidelines set forth in Exhibit 5.27. The parties have agreed to an arbitration procedure to resolve any disputes regarding, among other things, the services to be provided or the amount to be billed for such services. Pursuant to the GENBAND Agreement, the Purchaser and the TSA Sellers and the TSA EMEA Sellers or, if necessary, the TSA Arbitrator (as defined in Exhibit 5.27), shall determine, among other things, whether the information technology systems and business processes to be used in the performance of TSA services for the Purchaser are Closing Day Ready (as defined in Exhibit 5.27). To the extent that the TSA Arbitrator ultimately determines that Closing Day Ready was not achieved as of June 30, 2010, then the Sellers shall pay to the Purchaser an amount of $10,000,000.

- <u>Transitional Trademark License Agreement</u> – an agreement between NNL and the Purchaser granting a non-exclusive and royalty-free license to use certain trademarks that are currently used in the CVAS Business in connection with the CVAS products for a transitional period of 18 months, solely within the field of the CVAS Business. The licenses granted to the Purchaser under the Transitional Trademark License Agreement include certain limited sublicensing rights and are not assignable except in certain limited circumstances.

- <u>Loaned Employee Agreement</u> – an agreement between the relevant Sellers and the Purchaser pursuant to which certain employees of the Sellers that cannot be transferred to the Purchaser at Closing will be seconded to the Purchaser for a period of up to 90 days, and in certain cases up to twelve months. The Loaned Employees will remain on the payroll of the applicable Seller and will continue to participate in the Seller's pension and benefit plans. The Purchaser shall reimburse the Sellers for the cost of retaining the Loaned Employees, subject to certain exceptions.

- <u>Mutual Development and Support Agreements</u> – Agreements to address the interdependencies among current and former businesses of the Sellers as they relate to the CVAS Business.

- 27 -

- Subcontract Agreement – one or more agreements between the relevant Sellers and the Purchaser to be executed on or before Closing so as to pass through the benefits and burdens of the underlying Contract with customers as if the Purchaser were party thereto.

- Contract Manufacturing Inventory Agreements -- agreements between the Purchaser, the Sellers and certain Contract Manufacturers of the Sellers to sell Contract Manufacturer Inventories related to the CVAS Business to the Purchaser after closing.

- LGN Distribution Agreement – an agreement between LGN and the Purchaser with respect to the sale of certain CVAS products to LGN for resale in South Korea.

- NN Turkey Agreements – agreements to be entered into between NN Turkey and the Purchaser governing the distribution of certain CVAS products by NN Turkey, the provision of services by NN Turkey to the CVAS Business, and research and development activities of NN Turkey in connection with the CVAS Business.

- Real Estate Terms and Conditions - The Sellers and the Purchaser will finalize the general terms that will govern the applicable leases, subleases or license agreements in respect of certain real property which the Sellers will lease, sublease or license to the Purchaser.

**Closing**

65. Closing shall occur five Business Days after the date upon which all Closing conditions have been satisfied or waived, unless such date is sooner than April 30, 2010, in which case the Closing shall occur on April 30, 2010.

**Closing Conditions**

66. The Parties' obligation to effect the Closing is subject to the satisfaction of the following conditions:

- 28 -

- all Regulatory Approvals shall have been obtained and remain in force;

- there shall be in effect no law or order of any Court or other Governmental Entity in Canada, the U.S. or the United Kingdom, prohibiting the consummation of any of the transactions contemplated by the GENBAND Agreement or the EMEA ASA;

- the U.S. Bidding Procedures Order and the Canadian Sales Process Order shall have been entered and shall have become Final Orders;

- the U.S. Sale Order and the Canadian Approval and Vesting Order shall have been entered, shall not have been stayed and shall not be subject to appeal, stay, reversal or modification that poses a material challenge to such order as of the Closing Date;

- the satisfaction of conditions to closing under the EMEA ASA; and

- the simultaneous consummation of the transactions contemplated by the EMEA ASA.

67. The obligation of the Purchaser to close the sale is subject to satisfaction of the following conditions:

- each of the Sellers' representations and warranties (other than those set forth below) being true and correct, except for any failure that has not had, and would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect;

- each of the Sellers' representations and warranties set forth in Sections 4.1, 4.2, 4.3(a) and 4.15 of the GENBAND Agreement being true and correct in all material respects;

- each of the Sellers' material pre-Closing covenants, obligations and agreements pursuant to the GENBAND Agreement shall not have been breached in any material respect; and

- 29 -

- the failure to transfer the Restricted Assets (if any) would not reasonably be expected to be materially adverse to the operations, results of operations or financial condition of the CVAS Business taken as a whole.

## BIDDING PROCEDURES AND AUCTION PROCESS

68. Given that certain of the U.S. Debtors are parties to the GENBAND Agreement and given the desire to maximize value for the benefit of stakeholders in relation to the assets which are the subject of the GENBAND Agreement, Nortel has determined and has agreed with GENBAND that the GENBAND Agreement is subject to higher or better offers being obtained pursuant to a sale process under section 363 of the Code and that the GENBAND Agreement shall serve as a "stalking horse" bid pursuant to that process. The Assets may be sold in a single sale to a single purchaser or in parts to several purchasers.

69. A copy of the proposed bidding procedures is attached as Appendix "D" hereto (the "Bidding Procedures").

70. The GENBAND Agreement provides that the Sellers that are U.S. Debtors shall, as promptly as possible, file the U.S. Bidding Procedures and Sale Motion with the U.S. Court. This motion was filed with the U.S. Court on December 23, 2009. The GENBAND Agreement also provides that the Applicants shall, as promptly as possible and in any event no later than the date on which the U.S. Bidding Procedures Order is granted, file the Canadian Sales Process Order Motion with this Honourable Court. This motion was filed on December 29, 2009.

71. Pursuant to the GENBAND Agreement, the Sellers who are U.S. Debtors shall use their reasonable best efforts to cause the U.S. Court to schedule a hearing to consider the U.S. Bidding Procedures and Sale Motion and to enter the U.S. Bidding Procedures Order within 15 days of the filing of the U.S. Bidding Procedures and Sale Motion.

- 30 -

72.     The Monitor understands that the Applicants and the U.S. Debtors will seek approval of the Bidding Procedures at a videoconference joint hearing between this Honourable Court and the U.S. Court scheduled for January 6, 2010, conducted pursuant to the Cross-Border Insolvency Protocol previously approved by both Courts.

73.     The Bidding Procedures presently provide that all bids must be received by the Sellers not later than 4:00 p.m. (ET) on February 16, 2010, and that the Sellers will conduct an auction of the Assets on February 24, 2010, beginning at 9:00 a.m. (ET) (the "Auction")[1].

74.     Pursuant to the GENBAND Agreement, the Sellers who are U.S. Debtors shall request the U.S. Court to schedule a Sale Hearing on or prior to the fifth Business Day following the conclusion of the Auction and shall use their commercially reasonable efforts to cause the Sale Hearing to be heard on that date or the earliest date thereafter permitted by the U.S. Court's schedule. As promptly as practicable, but in no event later than the date on which the U.S. Sale Order is granted, the Canadian Debtors shall file a motion with this Honourable Court seeking that the Canadian Approval and Vesting Order be granted.

75.     The Monitor recognizes the expeditious nature of the proposed sale process. However, given the extensive process conducted to date and that there are likely to be a limited number of parties interested in acquiring the CVAS Business, the Monitor is supportive of the proposed sale process. In addition, Nortel has consulted with, among others, the Committee and the Bondholder Group regarding the Bidding Procedures and believes that these parties are supportive of the timing of this sale process.

76.     The key provisions of the Bidding Procedures are outlined in the paragraphs that follow.

***Bid Deadline***

77.     A Qualified Bidder (as defined below) that desires to make a bid will deliver written copies of its bid to: the Sellers, counsel and financial advisors to the Sellers, counsel and financial advisors to the Committee, counsel to the Bondholders' Committee, the

---

[1] The dates for the Bid Deadline and Auction discussed herein are premised on a March 3, 2010 Sale Hearing, in the event that the Sale Hearing cannot be set at an earlier date mutually convenient to both the U.S. Court and this Honourable Court.

- 31 -

Monitor, the U.K. Administrators and counsel to the U.K. Administrators (collectively, the "Notice Parties"), so as to be received not later than 4:00 p.m. (Eastern Time) on February 16, 2010 (the "Bid Deadline"). The Sellers, after consultation with the Creditors' Committee, the Bondholder Group and the Monitor, may, in accordance with the procedures set forth below under the heading "Reservation of Rights", extend the Bid Deadline once or successively, but they are not obligated to do so.

*Provisions Governing Qualifications of Bidders*

78.    Unless otherwise ordered by both the U.S. Court and this Honourable Court and accepted by the U.K. Administrators, for cause shown, or as otherwise determined by the Sellers, in consultation with the Committee, the Bondholder Group and the Monitor, in order to participate in the bidding process, each person (a "Potential Bidder"), other than GENBAND, must deliver (unless previously delivered) to the Notice Parties:

(a)    an executed confidentiality agreement (to be delivered prior to the distribution of any confidential information by the Sellers to a Potential Bidder) in form and substance satisfactory to the Sellers and on terms that are substantially similar to those contained in the confidentiality agreement executed by GENBAND;

(b)    current audited financial statements and latest unaudited financial statements or such other form of financial disclosure of the Potential Bidder or the entity who will guarantee the obligations of the Potential Bidder that will allow the Sellers and their financial advisors, in consultation with the Committee, the Bondholders' Committee and the Monitor, to make a reasonable determination as to the Potential Bidder's financial and other capabilities to consummate a purchase of the Assets; and

(c)    a preliminary (non-binding) written proposal regarding: (i) the purchase price range (including liabilities to be assumed by the Potential Bidder); (ii) any Assets expected to be excluded or any additional assets desired to be included; (iii) the structure and financing of the transaction (including, but not limited to, the sources of financing for the purchase price and all requisite financial assurance);