(44

- 32 -

      (iv) any anticipated corporate, stockholder, internal or regulatory approvals required to close the transaction and the anticipated time frame and any anticipated impediments for obtaining such approvals; (v) the proposed number of employees of the Sellers who will become employees of the Potential Bidder, and any proposed measures associated with their continued employment; and (vi) any conditions to closing that the Potential Bidder may wish to impose in addition to those set forth in the GENBAND Agreement and the EMEA ASA.

79.    A Potential Bidder that satisfies the above requirements, whose financial information and credit quality support or enhancement demonstrate in the Sellers' judgment the financial capability of the Potential Bidder to consummate the transaction, and who has submitted a reasonably competitive and realistic non-binding proposal, as described above, and who has executed a confidentiality agreement, as described above, and that the Sellers determine in their reasonable business judgement, after consultation with their counsel and financial advisors, the Committee, the Bondholder Group and the Monitor, is likely (based on availability of financing, experience and other considerations) to be able to consummate the transaction, will be deemed a "Qualified Bidder". The determination as to whether a Potential Bidder meets the requirements of a Qualified Bidder will be made as promptly as practicable and the Sellers will so notify the Potential Bidder. At the same time that the Sellers notify the Potential Bidder that it is a Qualified Bidder, the Sellers will allow the Qualified Bidder to begin or continue to conduct due diligence with respect to the Assets.

*Provisions Governing Qualified Bids*

80.    A bid submitted will be considered a Qualified Bid only if the bid is submitted by a Qualified Bidder and complies with all of the following (a "Qualified Bid"):

    (a)    the Qualified Bidder offers to purchase the Assets upon the terms and conditions substantially as set forth in the GENBAND Agreement and the EMEA ASA, or pursuant to alternate terms and conditions that the Sellers determine, after consultation with the Committee, the Bondholder Group and the Monitor, are no

less favourable than the terms and conditions of the GENBAND Agreement and the EMEA ASA;

(b)    the Qualified Bidder's offer is irrevocable until the selection of the Successful Bidder (as defined below) and, if applicable, the Alternate Bidder (as defined below), provided that if such bidder is selected as the Successful Bidder or the Alternative Bidder, its offer shall remain irrevocable until the earlier of (i) closing of the sale to the Successful Bidder or the Alternate Bidder, and (ii) (x) with respect to the Successful Bidder only, June 30, 2010 and (y) with respect to the Alternate Bidder only, the Alternate Bid Expiration Date (as defined below);

(c)    it includes a duly authorized and executed sale agreement, including the purchase price for the Assets expressed in U.S. Dollars, together with all exhibits, schedules thereto and ancillary agreements as well as copies of such materials marked to show those amendments and modifications to the GENBAND Agreement, the EMEA ASA, ancillary agreements and proposed orders to approve the sale by the U.S. Court, this Honourable Court and any other applicable court(s) whose approval may be required, as   proposed by the Qualified Bidder;

(d) .    it includes written evidence of a firm, irrevocable commitment for financing, or other evidence of ability to consummate the proposed transaction;

(e)    it is not conditioned on (i) the outcome of unperformed due diligence by the bidder and/or (ii) obtaining financing;

(f)    it fully discloses the identity of each entity that will be bidding for the Assets or otherwise sponsoring or participating in connection with such bid, and the complete terms of any such participation;

(g)    it has a value to the Sellers, in the Sellers' reasonable business judgment, after consultation with their financial advisors, the Committee, the Bondholder Group and the Monitor, that either individually or, when evaluated in conjunction with any other Qualified Bid for the Assets, is greater than or equal to the sum of the

- 34 -

value offered under the GENBAND Agreement and the EMEA ASA, plus (i) the amount of the Break-Up Fee and Expense Reimbursement, plus (ii) $4 million;

(h)     it includes an acknowledgement and representation with respect to the executory contracts and unexpired leases which the Qualified Bidder proposes to assume or not assume, the Qualified Bidder's proposal for the treatment of related cure costs and identifies any executory contract or unexpired lease the assumption and assignment of which is a condition to Closing;

(i)     it includes an acknowledgement and representation that the Qualified Bidder: (i) has had an opportunity to conduct all required due diligence regarding the Assets prior to making its offer; ii) has relied solely upon its own independent review, investigation and/or inspection of any documents and/or the Assets; (iii) has not relied upon any written or oral statements, representations, promises, warranties or guaranties whatsoever, except as expressly stated in its bid; and (iv) is not entitled to any expense reimbursement or break-up fee in connection with its bid;

(j)     it includes evidence of authorization and approval from the Qualified Bidder's board of directors (or comparable governing body);

(k)     it is accompanied by a good faith deposit in an amount equal to five percent of the Purchase Price;

(l)     it contains full details of the proposed number of employees of the Sellers (apportioned by jurisdiction) who will become employees of the Qualified Bidder and any proposed measures associated with their continued employment and identifies any pension liabilities and assets related to any employees currently covered under the Nortel Retirement Income Plan who will become employees of the Qualified Bidder that the Qualified Bidder intends to assume or purchase;

(m)     it includes evidence of the Qualified Bidder's ability to comply with Section 365 of the Code (to the extent applicable), including providing adequate assurance of such Qualified Bidder's ability to perform in the future the contracts and leases proposed to be assigned or subleased to the Potential Bidder;

- 35 -

(n)    it contains other information reasonably requested by the Sellers; and

(o)    it is received by the Bid Deadline.

81.    The Sellers will determine, in their reasonable business judgment, after consultation with the Committee, the Bondholder Group and the Monitor, whether to deem bids for the Assets that do not conform to one or more of the requirements specified in the Bidding Procedures to be Qualified Bids, provided that the Sellers may not waive substantial compliance with any items in paragraphs (d), (e), (f), (i)(iv), (j) or (o) in paragraph 80, above, without the consent of the Committee, the Bondholder Group and the Monitor, provided further that, with respect to paragraph (e) in paragraph 80, above, such consent shall not be unreasonably withheld in connection with any bid that would (i) otherwise fully satisfy the requirements of a Qualified Bid hereunder but for a de minimus failure to comply with those criteria; and (ii) such noncompliance is cured within 24 hours of the Bid Deadline. Notwithstanding the foregoing, the Purchaser will be deemed a Qualified Bidder and the GENBAND Agreement and the EMEA ASA will be deemed a Qualified Bid.

82.    The Sellers shall notify GENBAND and all Qualified Bidders in writing as to whether or not any bids constitute Qualified Bids on the day that the determination is made, provided that such notification shall be given no later than two Business Days following the expiration of the Bid Deadline. The Sellers shall provide the Purchaser with a copy of any Qualified Bid received by the Sellers on the day that the determination is made that such bid is a Qualified Bid but in no event later than two Business Days prior to the commencement of the Auction.

*Evaluation of Competing Bids*

83.    A Qualified Bid will be valued based upon several factors including, without limitation, items such as the purchase price and the net value provided by such bid, the claims likely to be created by such bid in relation to other bids, the counterparties to such transaction, the proposed revisions to the relevant transaction documents, the effect of the transaction on the value of the ongoing businesses of Sellers, other factors affecting the speed,

- 36 -

certainty and value of the transaction, the assets included or excluded from the bid, the estimated number of in-scope employees of the Sellers (apportioned by jurisdiction) to be offered post-closing employment by the Qualified Bidder and any proposed measures associated with their continued employment, the transition services required from the Sellers post-closing and any related restructuring costs, and the likelihood and timing of consummating such transaction, each as determined by the Sellers, in consultation with their advisors, the Committee, the Bondholder Group and the Monitor.

84.    If the Sellers do not receive any Qualified Bids other than the GENBAND Agreement and the EMEA ASA, the Auction shall be cancelled and the Sellers shall promptly proceed to complete the transactions contemplated by the terms of the GENBAND Agreement and the EMEA ASA, subject to obtaining the approval of the U.S. Court, this Honourable Court and any other applicable court.

*Auction Process*

85.    If the Sellers receive one or more Qualified Bids in addition to the GENBAND Agreement and the EMEA ASA, the Sellers will conduct the Auction of the Assets, upon notice to all Qualified Bidders who have submitted Qualified Bids, at 9:00 am ET on February 24, 2010, which Auction may be cancelled or adjourned, subject to the provisions under the heading "Reservation of Rights", below.

86.    The Auction shall run in accordance with the following procedures:

- •   only the Sellers, the Purchaser, the Committee, the Bondholder Group, the Monitor and the U.K. Administrators (and the advisors to each of the foregoing), any creditor of the U.S. Debtors or the Applicants and any other Qualified Bidder that has timely submitted a Qualified Bid, shall attend the Auction in person, and only the Purchaser and such other Qualified Bidders will be entitled to make any subsequent bids at the Auction;

- •   each Qualified Bidder shall be required to confirm that it has not engaged in any collusion with respect to the bidding or the transaction;

|(λ

- 37 -

- at least one business day prior to the Auction, each Qualified Bidder who has timely submitted a Qualified Bid must inform the Sellers whether it intends to attend the Auction;

- at least one business day prior to the Auction, the Sellers will provide copies of the Qualified Bid or combination of Qualified Bids which the Sellers believe, in their reasonable business judgment, after consultation with the Committee, the Bondholder Group and the Monitor, is the highest or otherwise best offer (the "Starting Bid") to the Purchaser and all other Qualified Bidders;

- all Qualified Bidders who have timely submitted Qualified Bids will be entitled to be present for all Subsequent Bids (as defined below) at the Auction with the understanding that the true identity of each Qualified Bidder at the Auction will be fully disclosed to all other Qualified Bidders at the Auction and that all material terms of each Subsequent Bid will be fully disclosed to all other bidders throughout the entire Auction;

- the Sellers, after consultation with their counsel and financial advisors, the Committee, the Bondholder Group and the Monitor, may employ and announce at the Auction additional procedural rules that are reasonable under the circumstances for conducting the Auction provided that such rules are (i) not inconsistent with the Bidding Procedures, the Code, or any order of the U.S. Court, this Honourable Court or any other applicable court entered in connection herewith, and (ii) disclosed to each Qualified Bidder at the Auction; and

- bidding at the Auction will begin with the Starting Bid and continue, in one or more rounds of bidding, so long as during each round at least one subsequent bid is submitted by a Qualified Bidder that improves upon such Qualified Bidder's immediately prior Qualified Bid (a "Subsequent Bid") and the Sellers determine, in consultation with their advisers, the Committee, the Bondholder Group and the Monitor, that such Subsequent Bid improves upon the Starting Bid or previous Leading Bid (as defined below). Each incremental bid at the Auction shall provide additional net value to the estate of at least $3 million, or such other

- 38 -

amount to be determined by the Sellers, in consultation with the Committee, the Bondholder Group and the Monitor. After each round of bidding, the Sellers shall announce the bid or combination of bids (and the value of such bid(s)) that it believes to be the highest or otherwise better offer (the "Leading Bid"). A round of bidding will conclude after each participating Qualified Bidder has had the opportunity to submit a Subsequent Bid with full knowledge of the Leading Bid.

*Selection of Successful Bid*

87.    Prior to the conclusion of the Auction, the Sellers, in consultation with their advisors, the Committee, the Bondholder Group and the Monitor, will (a) review each Qualified Bid and evaluate each Qualified Bid as set forth under the heading "Evaluation of Competing Bids", above, (b) identify the highest or otherwise best offer or offers for the Assets received at the Auction (the "Successful Bid" and the bidder making such bid, the "Successful Bidder"), and (c) communicate to GENBAND and the other Qualified Bidders the identity of the Successful Bidder, the Alternate Bidder (as defined below), if any, and the details of the Successful Bid and Alternate Bid (as defined below), if any. The determination of the Successful Bid and Alternate Bid at the conclusion of the Auction shall be final subject to approval by the U.S. Court and this Honourable Court.

88.    The Sellers will sell the Assets to the Successful Bidder pursuant to the terms of the Successful Bid (or, under certain circumstances described below, the Alternate Bidder) upon approval of such Successful Bid by the U.S. Court, this Honourable Court and any other applicable court(s) and approval and execution by the U.K. Administrators of the relevant Successful Bid transaction documents (or, under certain circumstances described below, the Alternate Bidder).

*Closing with Alternative Bidders*

89.    If the Sellers receive one or more additional Qualified Bid(s), then, at the Sale Hearing and at any other hearings of any other applicable court(s) to approve the entering into agreements with respect to the Successful Bid, the Sellers will seek approval of the Successful Bid, and, at the Sellers' election, the next highest or best Qualified Bid (the

- 39 -

"Alternate Bid," and such bidder, the "Alternate Bidder"). Following approval of the sale to the Successful Bidder, if the Successful Bidder fails to consummate the sale for any reason, then the Alternate Bid will be deemed to be the Successful Bid and the Sellers will be authorized, but not directed, to effectuate a sale to the Alternate Bidder subject to the terms of the Alternate Bid. The Alternate Bid shall remain open until the earlier of (a) March 20, 2010, or (b) the consummation of the sale to the Successful Bidder (the "Alternate Bid Expiration Date").

90.     Notwithstanding the foregoing, under no circumstance will the Purchaser be deemed the Alternate Bidder.

***Reservation of Rights***

91.     The Bidding Procedures are subject to the rights of the Sellers, in consultation with the Committee, the Bondholder Group and the Monitor, to: a) after each round of bidding at the Auction, determine which Qualified Bid, if any, is the highest or otherwise best offer; b) reject, at any time, any bid that is inadequate or insufficient, not in conformity with the requirements of the Code, the Bidding Procedures, any orders of this Honourable Court or any other applicable orders, contrary to the best interests of the Sellers, their estates and stakeholders, or contrary to the statutory duties or legal obligations of the U.K. Administrators; and c) except as otherwise expressly provided in the Bidding Procedures with respect to instances in which the consent of the Committee, the Bondholder Group, the Monitor or the Purchaser is required, modify the Bidding Procedures or impose at, or prior to the Auction, additional customary terms and conditions on the sale of the Assets.

92.     Notwithstanding any of the foregoing, the Sellers may not, without the prior written consent of the Committee, the Bondholder Group, the Monitor and the Purchaser, which consent may not be unreasonably withheld, (i) extend the Bid Deadline beyond seven calendar days after February 16, 2010, (ii) extend the deadlines in the last paragraph under the heading "Provisions Governing Qualified Bids", (iii) commence the Auction more than ten Business Days after the Bid Deadline, (iv) adjourn the Auction for more than three Business Days, or (v) subject to the availability of the U.S. Court and this Honourable Court, adjourn the Sale Hearing for more than three Business Days if the

\lefteqn{\text{ᒪᒣ}}

Auction has concluded. Each of the foregoing actions shall be made by the Sellers in consultation with the Committee, the Bondholder Group and the Monitor, and their respective advisors. Notwithstanding the foregoing, the Sellers may not, without the prior written consent of the Purchaser, impair or modify the Purchaser's rights and obligations under the GENBAND Agreement or the EMEA ASA or the Purchaser's right to credit the Break-Up Fee and the Expense Reimbursement as part of any subsequent bids (except as specifically set forth in the Bidding Procedures).

## ALLOCATION OF PROCEEDS OF SALE AMONGST NORTEL ENTITIES AND THE SIDE AGREEMENT

93.  As previously indicated, the CVAS Business is not operated through a dedicated legal entity or stand-alone division. The Applicants have, amongst other things, an interest in intellectual property of the CVAS Business which, in turn, is subject to various intercompany licensing agreements with other Nortel legal entities around the world, in some cases on an exclusive basis and in other cases, on a non-exclusive basis. Therefore, the task of allocating the sale proceeds stemming from a sale agreement amongst the various Nortel entities in the various jurisdictions is complex.

94.  As set out in the Fifteenth Report, the Applicants, U.S. Debtors, and certain of the EMEA entities, through the U.K. Administrators, entered into the Interim Funding and Settlement Agreement ("IFSA") which was approved by this Honourable Court on June 29, 2009. Pursuant to the IFSA, each of the Applicants, U.S. Debtors, and EMEA Debtors agreed that their execution of definitive documentation with a purchaser of any material Nortel assets shall not be conditional upon reaching an agreement regarding the allocation of the sale proceeds or binding procedures for the allocation of the sale proceeds. In addition, the parties agreed that in the absence of any agreement regarding the allocation of any sale proceeds, the proceeds shall be deposited in an escrow account and any distribution from the escrow account shall be contingent upon (i) the agreement of all of the Selling Debtors (as defined in the IFSA) or (ii) in the case where the Selling Debtors fail to reach an agreement, a determination of the allocation by the relevant

\\\\U^{5}

- 41 -

dispute resolvers. The parties to the IFSA agreed to negotiate in good faith and attempt to reach an agreement on a protocol for resolving disputes concerning the allocation of sales proceeds, including binding procedures for the allocation of sales proceeds where the Selling Debtors have been unable to reach an agreement regarding such allocation.

95.    As of the current date, no agreement has been reached regarding the allocation of any sales proceeds and the terms of a protocol with respect to the resolution of disputes in connection with the allocation of sale proceeds are still under discussion. Accordingly, the Monitor presently expects that the sale proceeds derived from the sale of the CVAS Business will be paid into an escrow account pursuant to the terms of an escrow agreement which the Applicants will seek approval of at a later date.

**MONITOR'S ANALYSIS AND RECOMMENDATIONS**

96.    The Monitor has reviewed Nortel's efforts to divest the CVAS Business and is of the view that the Applicants are acting in good faith to maximize value. As set out above, the Monitor has been advised that OEP's willingness to provide financial support to GENBAND in connection with this transaction is dependent on payment of the Incentive Fee. It is the Monitor's view that an expeditious sale of the CVAS Business is in the best interests of the Applicants and its stakeholders and therefore, the Monitor considers the payment of the Incentive Fee to OEP, along with the potential payment of the Seller Break-Up Fee and the Seller Expense Reimbursement to GENBAND as reasonable in the circumstances. Accordingly, the Monitor recommends approval of the GENBAND Agreement as a "stalking horse" bid and approval of the Bidding Procedures and Incentive Fee Side Letter as described above.

- 42 -

97.    For the reasons described at paragraph 26, above, the Monitor recommends that
       confidential Appendix "B" to this Thirty-Fourth Report be sealed by this Honourable
       Court.

All of which is respectfully submitted this 3rd day of January, 2010.

**ERNST & YOUNG INC.**
In its capacity as Monitor of the Applicants

Per:

Murray A. McDonald
President

Court File No: 09-CL-7950

IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C. 1985, c.
C-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL
NETWORKS CORPORATION *et al.*

*ONTARIO*
**SUPERIOR COURT OF JUSTICE**
**(COMMERCIAL LIST)**

Proceeding commenced at Toronto

**THIRTY-FOURTH REPORT**
**OF THE MONITOR**
**DATED JANUARY 3, 2010**

**GOODMANS LLP**
Barristers & Solicitors
Bay Adelaide Centre
333 Bay Street, Suite 3400
Toronto, ON  M5H 2S7

Jay A. Carfagnini  (LSUC#: 222936)
Joseph Pasquariello (LSUC# 37389C)
Christopher G. Armstrong (LSUC# 55148B)

Tel: 416.979.2211
Fax: 416.979.1234

Lawyers for the Monitor, Ernst & Young Inc.

# TAB 5

DOCSTOR: 1~2~0~1~6~9~2~7~2~1~4~1~6



Court File No.————; 09-CL-7950

### *ONTARIO*
### SUPERIOR COURT OF JUSTICE
### COMMERCIAL LIST

| | | |
|---|---|---|
| THE HONOURABLE MR. | ) | WEDNESDAY, THE 3ʳᵈ |
| | ) | |
| JUSTICE MORAWETZ | ) | DAY OF MARCH, 2010 |

| | | |
|---|---|---|
| ~~THE HONOURABLE~~ | ) | ~~DAY, THE   DAY~~ |
| | ) | |
| ~~JUSTICE~~ | ) | ~~OF          ,2007~~ |

~~B E T W E E N:~~

~~PLAINTIFF~~

~~Plaintiff~~

~~—and—~~

~~DEFENDANT~~

~~Defendant~~

#### IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED

#### AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL CORPORATION AND NORTEL NETWORKS TECHNOLOGY CORPORATION

#### APPLICATION UNDER THE *COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED

DOCSTOR: 1720169272\H6

2

## APPROVAL AND VESTING ORDER
## (CVAS)

THIS MOTION, made by ~~[RECEIVER'S NAME] in its capacity as the Court-appointed interim receiver and receiver (the "Receiver") of the undertaking, property and assets of [DEBTOR] (the "Debtor") for an order approving the sale transaction (the~~ "Nortel Networks Corporation ("NNC"), Nortel Networks Limited ("NNL"), Nortel Networks Technology Corporation, Nortel Networks Global Corporation and Nortel Networks International Corporation (collectively, the "Applicants") for the relief set out in the Applicants' Notice of Motion dated February 26, 2010 including, the approval of a transaction (the "Transaction") ~~contemplated by an agreement of purchase and sale (the "Sale Agreement") between the Receiver and [NAME OF PURCHASER] (the "Purchaser") made as of [DATE] and appended to the Report of the Receiver dated [DATE] (the "Report"), and vesting in the Purchaser the Debtor's right, title and interest in and to the assets described in the Sale Agreement (the "Purchased Assets"")~~ to sell Assets pursuant to an asset sale agreement dated as of December 22, 2009 (the "Sale Agreement") among NNC, NNL, Nortel Networks Inc. ("NNI") and certain other entities identified therein as sellers (together, the "Sellers") and GENBAND Inc., as purchaser ("GENBAND" or the "Purchaser") for the sale (the "Sale") of certain assets of the Sellers' Carrier Voice Over IP and Application Solutions business (the "CVAS Business") as described therein (the "Assets")~~,~~ was heard this day at ~~32~~30 University Avenue, Toronto, Ontario.

ON READING the affidavit of George Riedel sworn February 26, 2010 and the thirty-fourth report of Ernst & Young Inc. in its capacity as monitor (the "Monitor") dated January 3, 2010 and the fortieth report of the Monitor dated February ●, 2010 (the "Fortieth Report") and on hearing the submissions of counsel for the ~~Receiver, [NAMES OF OTHER PARTIES APPEARING]~~Applicant, the Monitor and those other parties present, no one appearing for any other person on the service list, although properly served as appears from the affidavit of [NAME]● sworn [DATE]● filed[1]:

---

[1] ~~This model order assumes that the time for service does not need to be abridged. The motion seeking a vesting order should be served on all persons having an economic interest in the Purchased Assets, unless circumstances warrant a different approach.~~

DOCSTOR: 1720169272\11\6

3

1.    THIS COURT ORDERS ~~that the time for the service of the Notice of Motion, the Fortieth Report and the Motion Record is hereby abridged so that this Motion is properly returnable today and hereby dispenses with further service thereof.~~

2.    THIS COURT ORDERS AND DECLARES that capitalized terms used herein and not otherwise defined shall have the meanings given to them in the Sale Agreement.

3.    THIS COURT ORDERS AND DECLARES that the Transaction is hereby approved, ~~and that the Sale Agreement is commercially reasonable and in the best interests of the Debtor and its stakeholders~~. The execution, delivery and performance of the Sale Agreement by the ~~Receiver²~~ Applicants is hereby authorized and approved, and the ~~Receiver is~~Applicants are hereby authorized and directed to take such additional steps and execute such additional documents as may be necessary or desirable for the completion of the Transaction and for the conveyance of the ~~Purchased~~ Assets to the Purchaser.

4.    ~~2.~~ THIS COURT ORDERS AND DECLARES that upon the delivery of a ~~Receiver~~Monitor's certificate to the Purchaser substantially in the form attached as Schedule "A" hereto (the "~~Receiver~~Monitor's Certificate"), all of the ~~Debtor's~~Applicants' right, title and interest in and to the ~~Purchased Assets described in the Sale Agreement [and listed on Schedule B hereto]³~~Assets shall vest absolutely in the Purchaser, or the Designated Purchaser (as such term is defined in the Sale Agreement) free and clear of and from any and all security interests (whether contractual, statutory, or otherwise), hypothecs, mortgages, trusts or deemed trusts (whether contractual, statutory, or otherwise), liens, executions, levies, charges, or other financial or monetary claims, whether or not they have attached or been perfected, registered or filed and whether secured, unsecured or otherwise (collectively, the "Claims"⁴) including, without limiting the generality of the foregoing: (i) any encumbrances or charges created by the Orders made in

_____

[2] ~~In some cases, the Debtor will be the vendor under the Sale Agreement, or otherwise actively involved in the Transaction. In those cases, care should be taken to ensure that this Order authorizes either or both of the Debtor and the Receiver to execute and deliver documents, and take other steps.~~

[3] ~~To allow this Order to be free-standing (and not require reference to the Court record and/or the Sale Agreement), it may be preferable that the Purchased Assets be specifically described in a Schedule.~~

[4] ~~The "Claims" being vested out may, in some cases, include ownership claims, where ownership is disputed and the dispute is brought to the attention of the Court. Such ownership claims would, in that case, still continue as against the net proceeds from the sale of the claimed asset. Similarly, other rights, titles or interests could also be vested out, if the Court is advised what rights are being affected, and the appropriate persons are served. It is the Subcommittee's view that a non-specific vesting out of "rights, titles and interests" is vague and therefore undesirable.~~

DOCSTOR: 1720169279\1\6

4

\\\

these proceedings including the Order of the Honourable Justice [NAME]Morawetz dated [DATE];January 14, 2009 (as amended and restated); and (ii) all charges, security interests or claims evidenced by registrations pursuant to the *Personal Property Security Act* (Ontario) or any other personal property registry system; and (iii) those Claims listed on Schedule C hereto (all of which are collectively referred to as the "Encumbrances", which term shall not include the permitted encumbrances, easements and restrictive covenants listed on Schedule D) and, forbut excluding Permitted Encumbrances (other than those specifically contemplated to be discharged by virtue of this Order) and Assumed Liabilities). For greater certainty, this Court orders that all of the Encumbrances affecting or relating to the Purchased Assets are hereby expunged and discharged as against the Purchased Assets.

3.    THIS COURT ORDERS that upon the registration in the Land Registry Office for the [Registry Division of {LOCATION} of a Transfer/Deed of Land in the form prescribed by the *Land Registration Reform Act* duly executed by the Receiver][Land Titles Division of {LOCATION} of an Application for Vesting Order in the form prescribed by the *Land Titles Act* and/or the *Land Registration Reform Act*][5], the Land Registrar is hereby directed to enter the Purchaser as the owner of the subject real property identified in Schedule B hereto (the "Real Property") in fee simple, and is hereby directed to delete and expunge from title to the Real Property all of the Claims listed in Schedule C hereto.

5.    4.THIS COURT ORDERS that for the purposes of determining the nature and priority of Claims, the net proceeds[6] from the sale of the Purchased Assets shall stand in the place and stead of the Purchased Assets, and that from and after the delivery of the ReceiverMonitor's Certificate all Claims and Encumbrances shall attach to the net proceeds from the sale of the Purchased Assets with the same priority as they had with respect to the Purchased Assets immediately prior to the sale[7], as if the Purchased Assets had not been sold and remained in the possession or control of the person having that possession or control immediately prior to the sale.

---

[5] Elect the language appropriate to the land registry system (Registry vs. Land Titles).
[6] The Report should identify the disposition costs and any other costs which should be paid from the gross sale proceeds, to arrive at "net proceeds".
[7] This provision crystallizes the date as of which the Claims will be determined. If a sale occurs early in the insolvency process, or potentially secured claimants may not have had the time or the ability to register or perfect proper claims prior to the sale, this provision may not be appropriate, and should be amended to remove this crystallization concept.

DOCSTOR: 1220169272\116



5

5.   ~~THIS COURT ORDERS AND DIRECTS the~~ Receiver ~~to file with the Court a copy of the Receiver's Certificate, forthwith after delivery thereof.~~

6.   THIS COURT ORDERS that~~, pursuant to clause 7(3)(c) of the Canada *Personal Information Protection and Electronic Documents Act*, the Receiver is authorized and permitted to disclose and transfer to the Purchaser all human resources and payroll information in the Company's records pertaining to the Debtor's past and current employees, including personal information of those employees listed on Schedule "●" to the Sale Agreement.  The Purchaser shall maintain and protect the privacy of such information and shall be entitled to use the personal information provided to it in a manner which is in all material respects identical to the prior use of such information by the Debtor.~~ all proceeds of the Transaction, subject to the price adjustments and the Purchaser's rights under the Sale Agreement and less applicable transfer or value added taxes incurred by the Sellers, shall be deposited into an Escrow Account (as defined in the Interim Funding and Settlement Agreement entered into on June 9, 2009 (the "IFA")) pursuant to an escrow agreement to be negotiated and agreed to by all of the Sellers and in accordance with Section 12.g of the IFA, and such proceeds shall not be distributed in advance of either (i) agreement by all of the Selling Debtors (as defined in the IFA) as to the distribution of such proceeds (in accordance with the IFA and subject to the requirements of Section 12.g of the IFA) or (ii) in the case where the Selling Debtors (as defined in the IFA) fail to reach such agreement, determination by the relevant dispute resolver(s) in accordance with the terms of the Interim Sales Protocol (as such term is defined in the IFA and subject to the requirements of Section 12.g of the IFA), which Interim Sales Protocol shall be approved by this Court,

7.   THIS COURT ORDERS AND ACKNOWLEDGES that the Applicants and the U.S. Debtors (together, the "North American Debtors") recognize that the provision of transition services by each of the North American Debtors under the transition services agreement[s] related to the sale of the CVAS Business and the sales of the other principal lines of Nortel's business are and will be provided by a business organization that operates on a cross-jurisdictional basis using personnel and assets of several of the North American Debtors, including, without limitation Nortel Networks Inc. and NNL.  In light of the foregoing and in order to address certain concerns raised by official committee of unsecured creditors of NNI (the "Committee") and the Monitor, the North American Debtors have agreed to allocate certain risks

DOCSTOR: 1720169279\116

6

and costs of providing such transition services, acting reasonably, including, without limitation, consent fees and segregation costs, sunset costs, indemnification claims and under-recoveries from the respective purchasers, in the same proportion as the "Sales Proceeds" of such sales to each of the North American Debtors are allocated   (as determined in accordance with the "Interim Sale Protocol" contemplated by the IFA or mutual agreement of the relevant "Selling Debtors" (as such terms are defined in the IFA)), and that the side agreement reflecting the foregoing shall be on such terms and conditions as the North American Debtors may agree not inconsistent with the foregoing, acting promptly and in good faith and subject to the consent of the Committee, the Bondholders' Committee (as defined in the IFA) and the Monitor.

8.    *THIS COURT ORDERS AND DIRECTS the* Monitor *to file with the Court a copy of the* Monitor*'s Certificate, forthwith after delivery thereof.*

9.    7. THIS COURT ORDERS that, notwithstanding:

   (a)    the pendency of these proceedings;

   (b)    any applications for a bankruptcy order now or hereafter issued pursuant to the *Bankruptcy and Insolvency Act* (Canada) in respect of any of the Debtor Applicants and any bankruptcy order issued pursuant to any such applications; and

   (c)    any assignment in bankruptcy made in respect of any of the Debtor Applicants;

the provisions of the Transaction Documents, the vesting of the Purchased Applicants' *right, title and interest in and to the* Assets in the Purchaser pursuant to this Order shall be binding on any trustee in bankruptcy that may be appointed in respect of any of the Debtor Applicants and shall not be void or voidable by creditors of the Debtor Applicants, nor shall it constitute nor oppressive conduct nor constitute or be deemed to be a settlement, fraudulent preference, assignment, fraudulent conveyance, transfer at undervalue, or other reviewable challengeable or voidable transaction under the *Bankruptcy and Insolvency Act* (Canada) or any other applicable federal or

DOCSTOR: 1720169272\1\6

7

provincial legislation, nor shall it constitute oppressive or unfairly prejudicial conduct pursuant to any applicable federal or provincial legislation.[8]

10.    8.~THIS COURT ORDERS AND DECLARES that the Transaction is exempt from the application of the *Bulk Sales Act* (Ontario).

11.    9.~THIS COURT HEREBY REQUESTS the aid and recognition of any court, tribunal, regulatory or administrative body having jurisdiction in Canada~or in, the United States, the United Kingdom or elsewhere, to give effect to this Order and to assist the Receiver and its Applicants, the Monitor and their respective agents in carrying out the terms of this Order. All courts, tribunals, regulatory and administrative bodies are hereby respectfully requested to make such orders and to provide such assistance to the Receiver Applicants and to the Monitor, as an officer of this Court, as may be necessary or desirable to give effect to this Order, to grant representative status to the Monitor in any foreign proceeding, or to assist the Receiver and its Applicants and the Monitor and their respective agents in carrying out the terms of this Order.

12.    THIS COURT ORDERS that each of the Applicants and the Monitor be at liberty and is hereby authorized and empowered to apply to any court, tribunal, regulatory or administrative body, wherever located, for the recognition of this Order and for assistance in carrying out the terms of this Order.

---

[8] Please note that an appeal is pending before the Ontario Court of Appeal (Impact Tool & Mould Inc. (Re), Court of Appeal file no. C47464), in which the appellant has challenged whether the Court can make the type of declaratory relief set out in this paragraph.

DOCSTOR: 1~~7201~~6927~~9~~\|~~1~~6



## Schedule A – Form of ~~Receiver~~Monitor's Certificate

Court File No.~~————————~~: 09-CL-7950

### *ONTARIO*
### SUPERIOR COURT OF JUSTICE
### COMMERCIAL LIST

~~B E T W E E N:~~

~~PLAINTIFF~~

~~Plaintiff~~

~~–and–~~

~~DEFENDANT~~

~~Defendant~~

IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT,*
R.S.C. 1985, c. C-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF
NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED,
NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS
INTERNATIONAL CORPORATION AND NORTEL NETWORKS TECHNOLOGY
CORPORATION

APPLICATION UNDER THE *COMPANIES' CREDITORS ARRANGEMENT ACT,*
R.S.C. 1985, c. C-36, AS AMENDED

~~RECEIVER~~MONITOR'S CERTIFICATE
(CVAS)

## RECITALS

A.      Pursuant to an Order of the Honourable ~~[NAME OF JUDGE]~~Justice Morawetz of the Ontario Superior Court of Justice (the "Court") dated ~~[DATE OF ORDER], [NAME OF RECEIVER] was~~ ~~appointed as the interim receiver and receiver (the "Receiver") of the undertaking, property and assets~~

DOCSTOR: 1720169272\416

-2-

of [DEBTOR] (the "Debtor") January 14, 2009 (as amended and restated), Nortel Networks Corporation ("NNC"), Nortel Networks Limited ("NNL"), Nortel Networks Global Corporation, Nortel Networks International Corporation and Nortel Networks Technology Corporation (collectively, the "Applicants") commenced proceedings pursuant to the *Companies' Creditors Arrangement Act* (Canada) and Ernst & Young Inc. was appointed as monitor (the "Monitor") in these proceedings.

B.    Pursuant to an Order of the Court dated [DATE]●, 2010, the Court approved the an asset sale transaction (the "Transaction") contemplated by an asset sale agreement of purchase and sale made dated as of [DATE OF AGREEMENT] (the "Sale Agreement") between the Receiver [Debtor] and [NAME OF PURCHASER] (the "Purchaser") December 22, 2009 (the "Sale Agreement") among NNC, NNL, Nortel Networks Inc. and certain other entities identified therein as sellers (together, the "Sellers") and GENBAND Inc., as purchaser ("GENBAND" or the "Purchaser") and provided for the vesting in the Purchaser or a Designated Purchaser of the Debtor's Applicants' right, title and interest in and to the Purchased Assets, which vesting is to be effective with respect to the Purchased Assets upon the delivery by the Receiver Monitor to the Purchaser of a certificate confirming receipt of confirmation from each of NNC, NNL and the Purchaser, as applicable, that: (i) the payment by the Purchaser of has paid the Purchase Price for the Purchased Assets as set out in the Sale Agreement; (ii) that the conditions to Closing as set out in section ● Article ● of the Sale Agreement have been satisfied or waived by the Receiver Sellers and/or the Purchaser, as applicable; and (iii) the Transaction has been completed to the satisfaction of the Receiver Applicants and the Purchaser.

C.    Unless otherwise indicated herein, terms with initial capitals have the meanings set out in the Sale Agreement.

THE RECEIVER MONITOR CERTIFIES the following:

1.    The NNC, NNL and the Purchaser have advised the Monitor that the Purchaser has paid and the Receiver [●] has received the Purchase Price payable for the Purchased Assets payable on the Closing Date pursuant to the terms of the Sale Agreement;

2.    The NNC, NNL and the Purchaser have advised the Monitor that the conditions to Closing as set out in section ● Article ● of the Sale Agreement have been satisfied or waived by the Receiver Applicants and/or the Purchaser, as applicable; and

DOCSTOR: 1720169279\16

-2-

3.    ~~The~~NNC, NNL and the Purchaser have advised the Monitor that the Transaction has been completed to the satisfaction of the ~~Receiver.~~Applicants; and

4.    The Purchaser has advised the Monitor that the Transaction ahs been completed to the satisfaction of the Purchaser.

This Certificate was delivered by the ~~Receiver~~Monitor at _____ [TIME] on _____ ~~[DATE]~~2010.

> ~~[NAME OF RECEIVER],~~ERNST & YOUNG INC. in its capacity as ~~Receiver of the undertaking, property and assets of [DEBTOR],~~monitor in the CCAA proceedings of Nortel Networks Corporation, et. al. and not in its personal capacity
>
> Per:    _____
>
>         Name:
>         Title:

DOCSTOR: 1729169572v1v5

IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL CORPORATION AND NORTEL NETWORKS TECHNOLOGY CORPORATION

Court File No: 09-CL-7950

*ONTARIO*
SUPERIOR COURT OF JUSTICE
(COMMERCIAL LIST)

Proceeding commenced at Toronto

APPROVAL AND VESTING ORDER
(CVAS)

OGILVY          RENAULT          LLP
Suite                              3800
Royal    Bank    Plaza,    South    Tower
200              Bay              Street
P.O.             Box                84
Toronto    Ontario        M5J       2Z4

Derrick    Tay      LSUC#:    21152A
Tel:              (416)        216-4832
Email:    dtay@ogilvyrenault.com

Jennifer    Stam      LSUC    #46735J
Tel:              (416)        216-2327
Email:    jstam@ogilvyrenault.com

Fax:              (416)        216-3930

Lawyers for the Applicants

Schedule B - Purchased Assets



Schedule C — Claims to be deleted and expunged from title to Real Property

DOCSTOR: 1701697704\6

120

Schedule D — Permitted Encumbrances, Easements and Restrictive Covenants
related to the Real Property

(unaffected by the Vesting Order)

DOCSTOR: 1791697#2#H6

# TAB 6

DOCSTOR: 1680120\1

Court File No.: 09-CL-7950

***ONTARIO***
**SUPERIOR COURT OF JUSTICE**
**COMMERCIAL LIST**

| | | |
|---|---|---|
| THE HONOURABLE MR. | ) | WEDNESDAY, THE 3rd |
| | ) | |
| JUSTICE MORAWETZ | ) | DAY OF MARCH, 2010 |

**IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,
R.S.C. 1985, c. C-36, AS AMENDED**

**AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF
NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED,
NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS
INTERNATIONAL CORPORATION AND NORTEL NETWORKS TECHNOLOGY
CORPORATION**

**APPLICATION UNDER THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,
R.S.C. 1985, c. C-36, AS AMENDED**

**APPROVAL AND VESTING ORDER
(CVAS)**

THIS MOTION, made by Nortel Networks Corporation ("NNC"), Nortel Networks
Limited ("NNL"), Nortel Networks Technology Corporation, Nortel Networks Global
Corporation and Nortel Networks International Corporation (collectively, the "Applicants") for
the relief set out in the Applicants' Notice of Motion dated February 26, 2010 including, the
approval of a transaction (the "Transaction") to sell Assets pursuant to an asset sale agreement
dated as of December 22, 2009 (the "Sale Agreement") among NNC, NNL, Nortel Networks Inc.
("NNI") and certain other entities identified therein as sellers (together, the "Sellers") and
GENBAND Inc., as purchaser ("GENBAND" or the "Purchaser") for the sale (the "Sale") of

- 2 -



certain assets of the Sellers' Carrier Voice Over IP and Application Solutions business (the "CVAS Business") as described therein (the "Assets") was heard this day at 393 University Avenue, Toronto, Ontario.

ON READING the affidavit of George Riedel sworn February 26, 2010 and the thirty-fourth report of Ernst & Young Inc. in its capacity as monitor (the "Monitor") dated January 3, 2010 and the fortieth report of the Monitor dated February ●, 2010 (the "Fortieth Report") and on hearing the submissions of counsel for the Applicant, the Monitor and those other parties present, no one appearing for any other person on the service list, although properly served as appears from the affidavit of ● sworn ● filed:

1.     THIS COURT ORDERS that the time for the service of the Notice of Motion, the Fortieth Report and the Motion Record is hereby abridged so that this Motion is properly returnable today and hereby dispenses with further service thereof.

2.     THIS COURT ORDERS AND DECLARES that capitalized terms used herein and not otherwise defined shall have the meanings given to them in the Sale Agreement.

3.     THIS COURT ORDERS AND DECLARES that the Transaction is hereby approved. The execution, delivery and performance of the Sale Agreement by the Applicants is hereby authorized and approved, and the Applicants are hereby authorized and directed to take such additional steps and execute such additional documents as may be necessary or desirable for the completion of the Transaction and for the conveyance of the Assets to the Purchaser.

4.     THIS COURT ORDERS AND DECLARES that upon the delivery of a Monitor's certificate to the Purchaser substantially in the form attached as Schedule "A" hereto (the "Monitor's Certificate"), all of the Applicants' right, title and interest in and to the Assets shall vest absolutely in the Purchaser or the Designated Purchaser (as such term is defined in the Sale Agreement) free and clear of and from any and all security interests (whether contractual, statutory, or otherwise), hypothecs, mortgages, trusts or deemed trusts (whether contractual, statutory, or otherwise), liens, executions, levies, charges, or other financial or monetary claims, whether or not they have attached or been perfected, registered or filed and whether secured, unsecured or otherwise (collectively, the "Claims") including, without limiting the generality of the foregoing: (i) any encumbrances or charges created by the Orders made in these proceedings

- 3 -



including the Order of the Honourable Justice Morawetz dated January 14, 2009 (as amended and restated); and (ii) all charges, security interests or claims evidenced by registrations pursuant to the *Personal Property Security Act* (Ontario) or any other personal property registry system (all of which are collectively referred to as the "Encumbrances", but excluding Permitted Encumbrances (other than those specifically contemplated to be discharged by virtue of this Order) and Assumed Liabilities). For greater certainty, this Court orders that all of the Encumbrances affecting or relating to the Assets are hereby expunged and discharged as against the Assets.

5.      THIS COURT ORDERS that for the purposes of determining the nature and priority of Claims, the net proceeds from the sale of the Assets shall stand in the place and stead of the Assets, and that from and after the delivery of the Monitor's Certificate all Claims and Encumbrances shall attach to the net proceeds from the sale of the Assets with the same priority as they had with respect to the Assets immediately prior to the sale, as if the Assets had not been sold and remained in the possession or control of the person having that possession or control immediately prior to the sale.

6.      THIS COURT ORDERS that all proceeds of the Transaction, subject to the price adjustments and the Purchaser's rights under the Sale Agreement and less applicable transfer or value added taxes incurred by the Sellers, shall be deposited into an Escrow Account (as defined in the Interim Funding and Settlement Agreement entered into on June 9, 2009 (the "IFA")) pursuant to an escrow agreement to be negotiated and agreed to by all of the Sellers and in accordance with Section 12.g of the IFA, and such proceeds shall not be distributed in advance of either (i) agreement by all of the Selling Debtors (as defined in the IFA) as to the distribution of such proceeds (in accordance with the IFA and subject to the requirements of Section 12.g of the IFA) or (ii) in the case where the Selling Debtors (as defined in the IFA) fail to reach such agreement, determination by the relevant dispute resolver(s) in accordance with the terms of the Interim Sales Protocol (as such term is defined in the IFA and subject to the requirements of Section 12.g of the IFA), which Interim Sales Protocol shall be approved by this Court.

7.      THIS COURT ORDERS AND ACKNOWLEDGES that the Applicants and the U.S. Debtors (together, the "North American Debtors") recognize that the provision of transition services by each of the North American Debtors under the transition services agreement[s]

- 4 -



related to the sale of the CVAS Business and the sales of the other principal lines of Nortel's business are and will be provided by a business organization that operates on a cross-jurisdictional basis using personnel and assets of several of the North American Debtors, including, without limitation Nortel Networks Inc. and NNL. In light of the foregoing and in order to address certain concerns raised by official committee of unsecured creditors of NNI (the "Committee") and the Monitor, the North American Debtors have agreed to allocate certain risks and costs of providing such transition services, acting reasonably, including, without limitation, consent fees and segregation costs, sunset costs, indemnification claims and under-recoveries from the respective purchasers, in the same proportion as the "Sales Proceeds" of such sales to each of the North American Debtors are allocated (as determined in accordance with the "Interim Sale Protocol" contemplated by the IFA or mutual agreement of the relevant "Selling Debtors" (as such terms are defined in the IFA)), and that the side agreement reflecting the foregoing shall be on such terms and conditions as the North American Debtors may agree not inconsistent with the foregoing, acting promptly and in good faith and subject to the consent of the Committee, the Bondholders' Committee (as defined in the IFA) and the Monitor.

8.      THIS COURT ORDERS AND DIRECTS the Monitor to file with the Court a copy of the Monitor's Certificate, forthwith after delivery thereof.

9.      THIS COURT ORDERS that, notwithstanding:

      (a)      the pendency of these proceedings;

      (b)      any applications for a bankruptcy order now or hereafter issued pursuant to the *Bankruptcy and Insolvency Act* (Canada) in respect of any of the Applicants and any bankruptcy order issued pursuant to any such applications; and

      (c)      any assignment in bankruptcy made in respect of any of the Applicants;

the provisions of the Transaction Documents, the vesting of the Applicants' right, title and interest in and to the Assets in the Purchaser pursuant to this Order shall be binding on any trustee in bankruptcy that may be appointed in respect of any of the Applicants and shall not be void or voidable by creditors of the Applicants, nor shall it constitute oppressive conduct nor

- 5 -



constitute or be deemed to be a preference, fraudulent conveyance, transfer at undervalue, or other challengeable or voidable transaction under the *Bankruptcy and Insolvency Act* (Canada) or any other applicable federal or provincial legislation, nor shall it constitute oppressive or unfairly prejudicial conduct pursuant to any applicable federal or provincial legislation.

10.    THIS COURT ORDERS AND DECLARES that the Transaction is exempt from the application of the *Bulk Sales Act* (Ontario).

11.    THIS COURT HEREBY REQUESTS the aid and recognition of any court, tribunal, regulatory or administrative body having jurisdiction in Canada, the United States, the United Kingdom or elsewhere, to give effect to this Order and to assist the Applicants, the Monitor and their respective agents in carrying out the terms of this Order. All courts, tribunals, regulatory and administrative bodies are hereby respectfully requested to make such orders and to provide such assistance to the Applicants and to the Monitor, as an officer of this Court, as may be necessary or desirable to give effect to this Order, to grant representative status to the Monitor in any foreign proceeding, or to assist the Applicants and the Monitor and their respective agents in carrying out the terms of this Order.

12.    THIS COURT ORDERS that each of the Applicants and the Monitor be at liberty and is hereby authorized and empowered to apply to any court, tribunal, regulatory or administrative body, wherever located, for the recognition of this Order and for assistance in carrying out the terms of this Order.

_____

Schedule A – Form of Monitor's Certificate

ᒥ之ⵡ

Court File No.:  09-CL-7950

*ONTARIO*
**SUPERIOR COURT OF JUSTICE**
**COMMERCIAL LIST**

IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,
R.S.C. 1985, c. C-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF
NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED,
NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS
INTERNATIONAL CORPORATION AND NORTEL NETWORKS TECHNOLOGY
CORPORATION

APPLICATION UNDER THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,
R.S.C. 1985, c. C-36, AS AMENDED

**MONITOR'S CERTIFICATE**
**(CVAS)**

**RECITALS**

A.     Pursuant to an Order of the Honourable Justice Morawetz of the Ontario Superior Court of
Justice (the "Court") dated January 14, 2009 (as amended and restated), Nortel Networks Corporation
("NNC"), Nortel Networks Limited ("NNL"), Nortel Networks Global Corporation, Nortel Networks
International Corporation and Nortel Networks Technology Corporation (collectively, the
"Applicants") commenced proceedings pursuant to the *Companies' Creditors Arrangement Act*
(Canada) and Ernst & Young Inc. was appointed as monitor (the "Monitor") in these proceedings.

B.     Pursuant to an Order of the Court dated ●, 2010, the Court approved an asset sale transaction
(the "Transaction") contemplated by an asset sale agreement dated as of December 22, 2009 (the "Sale
Agreement") among NNC, NNL, Nortel Networks Inc. and certain other entities identified therein as
sellers (together, the "Sellers") and GENBAND Inc., as purchaser ("GENBAND" or the "Purchaser")
and provided for the vesting in the Purchaser or a Designated Purchaser of the Applicants' right, title
and interest in and to the Assets, which vesting is to be effective with respect to the Assets upon the

delivery by the Monitor to the Purchaser of a certificate confirming receipt of confirmation from each of NNC, NNL and the Purchaser, as applicable, that: (i) the Purchaser has paid the Purchase Price for the Assets as set out in the Sale Agreement; (ii) that the conditions to Closing as set out in Article ● of the Sale Agreement have been satisfied or waived by the Sellers and/or the Purchaser, as applicable; and (iii) the Transaction has been completed to the satisfaction of the Applicants and the Purchaser.

C.      Unless otherwise indicated herein, terms with initial capitals have the meanings set out in the Sale Agreement.

THE MONITOR CERTIFIES the following:

1.      NNC, NNL and the Purchaser have advised the Monitor that the Purchaser has paid and [●] has received the Purchase Price payable for the Assets on the Closing Date pursuant to the terms of the Sale Agreement;

2.      NNC, NNL and the Purchaser have advised the Monitor that the conditions to Closing as set out in Article ● of the Sale Agreement have been satisfied or waived by the Applicants and/or the Purchaser, as applicable;

3.      NNC, NNL and the Purchaser have advised the Monitor that the Transaction has been completed to the satisfaction of the Applicants; and

4.      The Purchaser has advised the Monitor that the Transaction ahs been completed to the satisfaction of the Purchaser.

This Certificate was delivered by the Monitor at _____ [TIME] on _____ 2010.

> **ERNST & YOUNG INC. in its capacity as monitor  in the CCAA proceedings of Nortel Networks Corporation, et. al. and not in its personal capacity**
>
> Per:  _____
>
>             Name:
>             Title:

Court File No: 09-CL-7950

IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL CORPORATION AND NORTEL NETWORKS TECHNOLOGY CORPORATION

*ONTARIO*
SUPERIOR COURT OF JUSTICE
(COMMERCIAL LIST)

Proceeding commenced at Toronto

APPROVAL AND VESTING ORDER
(CVAS)

**OGILVY RENAULT LLP**
Suite 3800
Royal Bank Plaza, South Tower
200 Bay Street
P.O. Box 84
Toronto, Ontario  M5J 2Z4

**Derrick Tay LSUC#: 21152A**
Tel: (416) 216-4832
Email: dtay@ogilvyrenault.com

**Jennifer Stam LSUC #46735J**
Tel: (416) 216-2327
Email: jstam@ogilvyrenault.com

Fax: (416) 216-3930

Lawyers for the Applicants

DOCSTOR: 1721696\6

Court File No: 09-CL-7950

IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL
NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL NETWORKS
GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL CORPORATION AND
NORTEL NETWORKS TECHNOLOGY CORPORATION

*ONTARIO*
**SUPERIOR COURT OF JUSTICE**
**(COMMERCIAL LIST)**

Proceeding commenced at Toronto

**MOTION RECORD**
**Approval and Vesting Order**
**CVAS Business**
**(returnable March 3, 2010)**

**OGILVY RENAULT LLP**
Suite 3800
Royal Bank Plaza, South Tower
200 Bay Street
P.O. Box 84
Toronto, Ontario  M5J 2Z4

**Derrick Tay LSUC#: 21152A**
Tel: (416) 216-4832
Email: dtay@ogilvyrenault.com

**Jennifer Stam LSUC #46735J**
Tel: (416) 216-2327
Email: jstam@ogilvyrenault.com

Fax: (416) 216-3930

Lawyers for the Applicants