IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

------------------------------------------------------X
                                                      :   Chapter 11
*In re*                                               :
                                                      :   Case No. 09-10138 (KG)
Nortel Networks Inc., *et al.*,                       :
                                                      :   Jointly Administered
                                                      :
            Debtors.                                  :
                                                      :   RE:
                                                      :   Objection Deadline: March 2, 2010 at 12
                                                      :   noon.
------------------------------------------------------X

# OBJECTION OF THE AFFILIATES OF VERIZON COMMUNICATIONS INC. TO DEBTORS' MOTION FOR ORDER AUTHORIZING AND APPROVING THE SALE OF CERTAIN ASSETS OF DEBTORS' CARRIER VOICE OVER IP AND APPLICATION SOLUTIONS BUSINESS FREE AND CLEAR OF ALL LIENS, CLAIMS AND ENCUMBRANCES AND THE ASSUMPTION AND ASSIGNMENT OF <u>CERTAIN EXECUTORY CONTRACTS</u>

The affiliates of Verizon Communications Inc. (collectively, "Verizon")[1] hereby submit this Objection to the Debtors' Motion for Order Authorizing and Approving the Sale of Certain Assets of Debtors' Carrier Voice Over IP and Application Solutions ("CVAS") Business Free and Clear of All Liens, Claims and Encumbrances and the Assumption and Assignment of Certain Executory Contracts (the "Sale Motion"). In support of its Objection,[2] Verizon respectfully shows the Court as follows:

---

[1] The definition of Verizon includes, without limitation, all wholly-owned subsidiaries of Verizon Communications Inc. (including, without limitation, Verizon Services Corp., Verizon Network Integration Corp., Verizon Business Network Services Inc., Verizon Corporate Services Group Inc., Verizon Select Services Inc., MCI Communications, Inc. d/b/a Verizon Business Services and MCI Network Services, Inc., and the operating telephone company subsidiaries of Verizon Communications Inc.) and Cellco Partnership d/b/a Verizon Wireless.

[2] Verizon files this Objection solely with respect to the Sale Motion. Verizon reserves all of its rights with respect to all other matters that the Debtors may bring before this Court, including, without limitation, any other motions that the Debtors may file to sell assets or assume and assign contracts under sections 363 and/or 365 of the Bankruptcy Code.

**BACKGROUND FACTS**

1. In the Sale Motion, the Debtors seek approval of a transaction by which they propose to sell their CVAS business and related assets to a third-party purchaser, GENBAND, Inc. ("GENBAND").

2. Verizon affiliates comprise a major purchaser and reseller[3] of products and services in the Debtors' CVAS portfolio under six (6) executory contracts between Verizon and the Debtors: (a) the General Product Purchase Agreement for Softswitch and TDM Products and Services (C0404520) ("GPPA"); (b) the General Purchase Agreement (710-30912-2006) ("GPA"); (c) the Succession Products and Services Deployment Agreement (C0404529) ("SPSDA"); (d) the Global Master Purchase Agreement ("GMPA"); (e) the Policy Manager Deployment Agreement (MA-000797-2007) ("PMDA"); and (f) the Verizon Wireless General Purchase Terms ("VWGPT").

3. In addition to the products and services in the CVAS portfolio, however, Verizon also purchases other products from the Debtors under the GPPA, the GPA, the GMPA and the VWGPT that do not relate to the CVAS business and are not covered by the Sale Motion.

4. On or about January 15, 2010, the Debtors served two assumption and assignment notices on Verizon in connection with contracts purporting to relate to the proposed sale of their CVAS assets to GENBAND. One of these notices referenced the GPPA and the GMPA, while the other notice referenced a project-specific statement of work ("SOW") under the GMPA.

5. After subsequent discussions and informal exchanges of information between counsel for the parties, the Debtors acknowledged that the GPPA and the GMPA, along with the GPA and the VWGPT (collectively, the "Bundled Contracts"), are "bundled" contracts that

---

[3] Verizon is informed and believes that it is the Debtors' largest CVAS customer. In 2009, Verizon purchased approximately $75 Million in CVAS products and services from the Debtors in the United States alone.

govern a broader range of product lines, contractual relationships and other business assets than the Debtors propose to transfer to a purchaser in the Sale Motion. As such, and with respect to the transaction contemplated in the Sale Motion, the Bundled Contracts are not contracts that can be assumed and assigned *in toto* as section 365 of the Bankruptcy Code requires. The Debtors have therefore withdrawn their original assumption notice respecting the project-specific SOW under the GMPA, informed Verizon that they will withdraw their original assumption notice respecting the GPPA and the GMPA,[4] and agreed that all of the Bundled Contracts must effectively be "unbundled" and assigned to GENBAND by execution of a separate agreement by Verizon.

6. To date, however, the Debtors, GENBAND and Verizon have not reached an agreement to "unbundle" the Bundled Contracts. Shortly after the Sale Motion was filed in December of 2009, Verizon requested a conference with representatives of GENBAND (and, if desired, representatives of the Debtors as well) to discuss these issues and Verizon's various concerns about the proposed CVAS asset sale. These discussions were significantly delayed, however, because GENBAND contended that it needed consent from the Debtors in order to address these issues with Verizon, and the Debtors only recently granted that consent.

7. Representatives of GENBAND and the Debtors finally conferred with Verizon by telephone on February 15, 2010, and in the course of that discussion, indicated their intention to execute a simple "unbundling" and assignment agreement that effectively provides for GENBAND to "step into the shoes" of the Debtors with respect to all Verizon contracts relating to the CVAS business, and to assume all of the Debtor's obligations to Verizon under those contracts with no material conditions. On the following day, February 16, Verizon sent

---

[4] Counsel for the Debtors have indicated that their original assumption notice respecting the GPPA and the GMPA will be withdrawn on Tuesday, March 2, 2010, the same day on which Verizon is filing this Objection.

GENBAND a proposed form of unbundling and assignment letter to document this agreement. Despite numerous requests from Verizon, however, neither GENBAND nor the Debtors provided any response or comments on the proposed form of agreement until eight days later, and after the close of business, on February 24, 2010. Moreover, the proposed edits provided on February 24 were so extensive and material as to change the very framework of the document, and were fundamentally inconsistent with the agreement that the parties reached in principle on their February 15, 2010 telephone conference. On February 26, 2010, Verizon provided another revision of the unbundling and assignment letter to GENBAND, and Verizon has been available continuously ever since to bring the matter to conclusion. To date, however, neither GENBAND nor the Debtors have signed off on the most recent version of the unbundling and assignment letter.

8. As of the filing of this Objection, therefore, the parties have not reached an agreement to "unbundle" the Bundled Contracts.

9. On or about January 26, 2010, the Debtors also served Verizon with an additional assumption notice with respect to the PMDA. While the PMDA relates solely to products and services in the Debtors' CVAS portfolio, however, it was executed so as to permit Verizon to purchase specific "Camiant" hardware, software and related services pursuant to terms and conditions of the "bundled" GPPA. Most of the material terms of the PDMA are accordingly provided by express reference to and incorporation of the corresponding terms of the GPPA. The integration or "merger" clause of the PDMA also incorporates the terms of the GPPA, together with its own terms, as constituting the "entire agreement" between the parties with respect to the "Camiant" hardware, software and associated services covered by that agreement.

10. As of the filing of this Objection, the Debtors have never served an assumption

notice with respect to the SPSDA. Like the PMDA, the SPSDA relates solely to products and services in the Debtors' CVAS portfolio, but was negotiated by the parties together with the GPPA, and executed so as to permit Verizon to purchase specific "softswitch" hardware, software and associated services pursuant to the terms and conditions of the GPPA. Most of the material terms of the SPSDA are accordingly provided by express reference to and incorporation of the corresponding terms of the GPPA. The integration or "merger" clause of the SPSDA also incorporates the terms of the GPPA, together with its own terms, as constituting the "entire agreement" between the parties with respect to the "softswitch" hardware, software and related services covered by that agreement.

11. The Debtors also have not provided Verizon with adequate assurance of GENBAND's future performance of the PMDA or the SPSDA under section 365 of the Bankruptcy Code.

12. Accordingly, Verizon is compelled to file this objection to the Sale Motion. Verizon is willing to engage in further discussions with the Debtors and GENBAND. If and when an acceptable unbundling and assignment agreement is executed with respect to all contracts with Verizon that relate to the CVAS business, Verizon's various questions and concerns may be satisfied, and Verizon may elect to withdraw this Objection. If discussions with the Debtors and GENBAND do not become more productive in short order, however, Verizon's current concerns will remain unaddressed and further concerns may arise.

13. Verizon also has certain pre-petition setoff rights that it has asserted and expressly reserved at every step from the inception of this case. Apart from questions and concerns relating to the proposed sale of the CVAS business itself, Verizon's support for the Sale Motion will be conditioned upon either the full effectuation of Verizon's setoff rights in advance of the

closing of the sale or a further reservation of those rights that preserves Verizon's ability fully to effectuate such rights at a later date, notwithstanding a completed sale of the CVAS business. To date, however, the Debtors have not provided any definitive response to Verizon's concerns or stated conditions with respect to its setoff rights.

## GROUNDS FOR VERIZON'S OBJECTION

### A. The PMDA And The SPSDA Are Merged And Integrated With The Bundled GPPA, And Therefore Cannot Be Assumed And Assigned Pursuant To Section 365.

14. Verizon first objects to the Sale Motion to the extent that the Debtors seek therein to assume and assign the PMDA, and prospectively the SPSDA, to GENBAND pursuant to section 365 of the Bankruptcy Code. Each of the PMDA and the SPSDA was intended by the parties to operate in conjunction with the bundled GPPA, effectively operating as a single and unified agreement, and each by its terms is expressly merged and integrated into the GPPA. Consequently, the PMDA and the SPSDA cannot be assumed and assigned to GENBAND under section 365, but rather, and like the Bundled Contracts, can only be assigned to GENBAND under a separate agreement executed by Verizon.

15. Multiple agreements should be read and construed as a single, unified contract if such is consistent with the parties' mutual intention, *see, e.g.,* In re AbitibiBowater, Inc., 418 B.R. 815, 823 (Bankr. D. Del. 2009), as evidenced by, among other things, the "interrelatedness" of the two agreements, *see, e.g.*, In re Philip Services (Delaware), Inc., 284 B.R. 541, 546 (Bankr. D. Del. 2002), and an integration or "merger" clause in one agreement that expressly refers to and incorporates the other. AbitibiBowater, 418 B.R. at 826. *See also* Philip Services, 284 B.R. at 546.

16. In the present case, both the PMDA and the SPSDA were executed so as to permit Verizon to purchase specific CVAS hardware, software and associated services pursuant to the terms and conditions of the GPPA. Most of the material terms of the PMDA and the SPSDA are accordingly provided by express reference to and incorporation of the corresponding terms of the GPPA. The integration or "merger" clause in each of the PMDA and the SPSDA also incorporates the terms of the GPPA, together with its own terms, as constituting the "entire agreement" between the parties with respect to the specific CVAS hardware, software and related services covered by that agreement.

17. Accordingly, each of the PMDA and the SPSDA is expressly merged and integrated into the GPPA, operates with the GPPA to form a single, unified agreement, and – because the GPPA is one of the Bundled Agreements, as the Debtors readily concede – cannot be assumed and assigned to GENBAND pursuant to section 365, but rather must be assigned to GENBAND under a separate agreement executed by Verizon.

B. **Adequate Assurance of Future Performance By The Purchaser**

18. In the alternative, if the Court determines that the PMDA and the SPSDA are not integrated with the GPPA and thus required to be assigned by separate agreement with Verizon, but instead are separate contracts that can be assumed and assigned by the Debtors pursuant to section 365, then Verizon objects to the Sale Motion on the ground that the Debtors have not yet provided Verizon with adequate assurance of future performance by GENBAND as section 365 requires.

19. To effectuate an assignment under the Bankruptcy Code, the Debtors must demonstrate adequate assurance of future performance. Adequate assurance of future

performance is an element of the assumption and assignment process which must be met in addition to the curing of any defaults under an executory contract. 11 U.S.C. § 365(f)(2). Even in the absence of a default under the contract, adequate assurance of future performance must be afforded before the trustee can assign an executory contract. *See* In re E-Z Serve Convenience Stores, Inc., 289 B.R. 45, 52 (Bankr. M.D.N.C. 2003). Although not defined in the Bankruptcy Code, the phrase "adequate assurance of future performance," adopted from Section 2-609(1) of the Uniform Commercial Code, is intended to be given a "practical, pragmatic construction based upon the facts and circumstances of each case." Cinicola v. Scharffenberger, 248 F.3d 110, 120 (3d Cir. Pa. 2001) (citations omitted).

20. Verizon insists, and applicable bankruptcy law requires, that GENBAND be both willing and financially and technically able to perform all of the obligations that the Debtors have to Verizon under the applicable contracts, including, but not limited to, warranty, support and indemnification obligations.

21. Verizon requires adequate assurance of future performance of all of the contractual obligations that relate to the CVAS business, namely, express confirmation and acknowledgment that GENBAND will effectively "step into the shoes" of the Debtors, seamlessly and in all respects, as to the products, services and lines of business that it proposes to acquire in this transaction, and that it will thereafter have and perform all of the contractual duties and obligations to Verizon that the Debtors would have had if the transaction had never taken place.

22. Verizon is informed and concerned that GENBAND could be challenged by the scale of the Debtors' commitments to Verizon and other customers of its CVAS business. The Debtors and GENBAND also have not yet demonstrated that GENBAND is sufficiently

capitalized, or has or will have sufficient depth in experienced and capable management, to meet all the obligations owed under contracts with Verizon on a going-forward basis. The Debtors and GENBAND must provide proof sufficient to address these concerns, and adequate assurance that GENBAND can and will fully perform the contractual and other obligations that the Debtors propose to assign in connection with the proposed transaction.

23. Verizon further requires information concerning GENBAND's short-, medium- and long-term plans for the CVAS product lines that Verizon currently purchases from the Debtors, including, but not limited to, plans for product support, enhancement and development.

### C. Assumption and Assignment of Each Verizon Contract In Its Entirety

24. If the Court determines that the PMDA and the SPSDA are not integrated with their respective Bundled Contracts and required to be assigned by separate agreement with Verizon, but instead are separate contracts that can be assumed and assigned by the Debtors pursuant to section 365, then Verizon further objects to the Sale Motion on the ground that Verizon has not been provided with all of the required notices and information concerning assumption and assignment of those contracts.

25. First, the Debtors have not yet provided notice that they intend to assume and assign to GENBAND, and that GENBAND intends to accept the assignment of, both the PMDA *and* the SPSDA.

26. Second, the Debtors have not yet indicated whether they intend to assume and assign to GENBAND, and whether GENBAND intends to accept the assignment of, each of the PMDA and/or the SPSDA (and, for that matter, any other Verizon contracts relating to the CVAS business) in its entirety, and unchanged other than for the substitution of parties.

27. It is black letter law that a debtor assumes a contract under Section 365 of the Bankruptcy Code *cum onere* - with all of its benefits and obligations. 3 COLLIER ON BANKRUPTCY (15TH Ed. Rev. 2009) at ¶ 365.03[1] (an executory contract "may not be assumed in part," but rather must be assumed or rejected *cum onere*, including both benefits and obligations); NLRB v. Bildisco & Bildisco, 465 U.S. 513, 531 (1984); In re Fleming Cos., Inc., 499 F.3d 300, 308 (3d Cir. 2007). As stated by the Third Circuit,

> Section 365(f) requires a debtor to assume a contract subject to the benefits and burdens thereunder ... 'The [debtor] . . . may not blow hot and cold. If he accepts the benefits he must adopt the burdens. He cannot accept one and reject the other'.
> . . . The *cum onere* rule 'prevents the [bankruptcy] estate from avoiding obligations that are an integral part of an assumed agreement.'

Fleming, 499 F.3d at 308 (citations omitted).

28. Similarly, a debtor seeking to assign a contract under Section 365 must also assign the contract in whole with all the benefits and burdens. Id. at 308 ("an assignment is intended to change only who performs an obligation, not the obligation to be performed") (*citing* Medtronic Ave., Inc. v. Advanced Cardiovascular Sys., Inc., 247 F.3d 44, 60 (3d Cir. 2001)); *see also* In re Morande Enters., Inc., 335 B.R. 188, 192 (Bankr. M.D. Fla. 2005) ("The Debtor cannot assume and assign the contract in part, under either § 365 or the Florida Dealer Law, but must do so in whole, including the Location Provision"); In re Cajun Elec. Power Co-Op., Inc., 230 B.R. 693, 710 (Bankr. M.D. La. 1999) ("The rule that an executory contract must be assumed or assigned *in toto* has been recognized on several occasions by the Fifth Circuit .... an executory contract must be assumed or assigned in its entirety...").

29. Among the reasons that a contract must be assigned in its entirety under section 365 is that the debtor will be relieved of its obligations under the contract pursuant to section 365(k). Therefore, the assignee must assume all of the obligations so that the counterparty's

rights – including the right to have latent and/or prospective contract defaults cured in full – are protected. The Third Circuit addressed the issue of whether a party can make a partial assignment under Section 365 in American Flint Glass Workers Union v. Anchor Resolution Corp., 197 F.3d 76 (3d Cir. 1999). In American Flint, the debtor objected to proofs of claim filed under collective bargaining agreements that had been assumed and assigned to the purchaser of the debtor's assets. The bankruptcy court found that the debtor was relieved of liability under Section 365(k), and therefore, the claims could not be asserted against the debtor. The Third Circuit reversed, holding that an assignment under Section 365 did not take place because the contracts at issue were not assigned with all of the benefits and burdens:

> In the bankruptcy context, however, Code § 365(k) changes the common law rule by effecting a novation by operation of law whether or not the obligee consents to the substitution.... But consistent with the basic concept of a contract's assignment, under which every contractual assignee takes the entire bundle of rights and obligations under the contract, such a forced novation is dependent on just such a total undertaking by the assignee. Code § 365(k) (emphasis added) provides: Assignment by the trustee to an entity *of a contract* or lease assumed under this section relieves the trustee and the estate from any liability for any breach of such contract or lease occurring after such assignment.
>
> Where Congress uses legal terms that have "accumulated settled meaning" under common law, it must be presumed (unless of course the statute dictates otherwise) that Congress meant to employ that established meaning.... Hence we construe the terms in Code § 365(k) to incorporate the general common law of assignments. In particular, we will follow the dominant consensus of common law jurisdictions, rather than the law of any particular jurisdiction....
>
> That dominant consensus conforms to the clear meaning of the language involved: that an assignment of a contract as such involves a commitment by the assignee to perform all obligations under the contract, as well as to acquire all rights created by the contract.

Id. at 80-81 (finding the debtor was still liable because the contract was not assigned in its entirety). Thus, a debtor cannot assume and assign a contract under section 365, and thereafter be relieved of its obligations under the contract pursuant to section 365(k), unless the assignee

assumes *all* of those obligations.

30. In the present case, GENBAND must therefore be responsible for all obligations, duties and liabilities arising prior to, contemporaneous with or subsequent to the closing of the transaction with respect to the CVAS business, and shall have the same rights with respect to those businesses on and after the closing that the Debtors had with respect to such products under the PMDA and/or the SPSDA (or any other assigned Verizon contracts relating to the CVAS business) prior to the closing.

31. Moreover, where there is any inconsistency or conflict between the terms of the Asset Sale Agreement between the Debtors and GENBAND, and the terms of any Verizon contract that is being assumed by the Debtors and assigned to GENBAND -- for example, and without limitation, terms governing the scope and extent of such matters as warranty liabilities, most favored customer provisions, maintenance and other product support obligations, indemnification obligations, liability for intellectual property infringement claims, the benefits of any intellectual property rights or licenses that the Debtors have obtained from third-parties in connection with CVAS products and services, and other such obligations arising in the regular and ordinary course of business -- the terms of the assumed and assigned Verizon contract must control and be binding upon GENBAND, regardless of whether the obligation or liability to Verizon arose before or after the closing of the asset sale.[5]

32. In addition, any pricing thresholds, volume purchase or similar credits that have accrued to Verizon prior to the closing of the sale of the CVAS business must be honored and applied by GENBAND to Verizon payment obligations after the closing, just as the Debtors

---

[5] Given their very nature, at no point in time are the contractual obligations owed to Verizon in this regard completely or definitively satisfied. For this reason alone, and to the extent that assumption notices previously served by the Debtors with a "zero" cure amount have been intended to suggest otherwise, Verizon hereby objects.

would have been obligated to do if the sale had never occurred.  Such pricing thresholds, volume purchase and similar credits must also continue to apply after the closing for all purchases by Verizon.

33. In fact, the full and unconditional assumption and assignment of warranty, support, indemnification, pricing and similar obligations to the purchaser is necessary not only to satisfy the requirement that the Verizon contracts have been assumed, assigned and cured in full, but also to assure that Verizon is afforded adequate assurance of GENBAND's future performance under those contracts, all as required under section 365.  *See* In re E-Z Serve, 289 B.R. at 52 (refusing to excise a right of first refusal from a lease agreement reasoning that, among other things, absent such provision the non-debtor party "will not receive the full benefit of its bargain and the Trustee cannot give adequate assurance of future performance").

34. Finally, Verizon points out that none of the six operative contracts requires Verizon to buy any specific volume of CVAS products, or any such products at all, from the Debtors.  Accordingly, Verizon must hereby give notice that it will consider using alternative means of addressing its business needs, and exercise the right under those contracts to materially reduce, or even eliminate, the amount of business conducted thereunder, if (i) the separate unbundling and assignment agreement is not executed in a form acceptable to Verizon, or (ii) Verizon remains uncertain as to GENBAND's willingness and/or ability to perform all contractual obligations to Verizon in connection with that portfolio of products.

### D. Full Effectuation or Preservation of Verizon's Set-Off Rights

35. Finally, Verizon objects to the Sale Motion unless the Debtors either stipulate to the full effectuation of Verizon's pre-petition setoff rights in advance of the closing of the sale of

the CVAS businesses or agree, along with the ultimate purchaser, to a further reservation of those rights that preserves Verizon's ability fully to effectuate such rights at a later date.

**WHEREFORE**, Verizon respectfully requests that the Court (i) sustain Verizon's Objection; (ii) grant the Sale Motion only on the condition that all of Verizon's objections and concerns identified above are either satisfied in full or voluntarily withdrawn by Verizon; and (iii) grant Verizon such other and further relief as this Court may deem just and proper.

Dated: March 2, 2010　　　　　　　　　　　Respectfully submitted,

　　　　　　　　　　　　　　　　　　　　ARNALL GOLDEN GREGORY LLP
　　　　　　　　　　　　　　　　　　　　Darryl S. Laddin
　　　　　　　　　　　　　　　　　　　　Frank N. White
　　　　　　　　　　　　　　　　　　　　171 17th Street, N.W., Suite 2100
　　　　　　　　　　　　　　　　　　　　Atlanta, Georgia  30363
　　　　　　　　　　　　　　　　　　　　(404) 873-8500
　　　　　　　　　　　　　　　　　　　　dladdin@agg.com

　　　　　　　　　　　　　　　　　　　　-and-

　　　　　　　　　　　　　　　　　　　　SMITH, KATZENSTEIN & FURLOW LLP

　　　　　　　　　　　　　　　　　　　　/s/ Michael P. Migliore_____
　　　　　　　　　　　　　　　　　　　　Kathleen M. Miller, Esq. (Bar No. 2898)
　　　　　　　　　　　　　　　　　　　　Michael P. Migliore (Bar No. 4331)
　　　　　　　　　　　　　　　　　　　　800 Delaware Avenue, 10th Floor
　　　　　　　　　　　　　　　　　　　　P. O. Box 410
　　　　　　　　　　　　　　　　　　　　Wilmington, DE  19899
　　　　　　　　　　　　　　　　　　　　(302) 652-8405
　　　　　　　　　　　　　　　　　　　　kmiller@skfdelaware.com
　　　　　　　　　　　　　　　　　　　　mmigliore@skfdelaware.com

　　　　　　　　　　　　　　　　　　　　ATTORNEYS FOR VERIZON

**CERTIFICATE OF SERVICE**

I hereby certify that I caused to be served a copy of the foregoing OBJECTION OF THE AFFILIATES OF VERIZON COMMUNICATIONS INC. TO DEBTORS' MOTION FOR ORDER AUTHORIZING AND APPROVING THE SALE OF CERTAIN ASSETS OF DEBTORS' CARRIER VOICE OVER IP AND APPLICATION SOLUTIONS BUSINESS FREE AND CLEAR OF ALL LIENS, CLAIMS AND ENCUMBRANCES AND THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS by First Class Mail, and by fax as and where indicated below, addressed as follows:

Cleary Gottlieb Steen & Hamilton LLP
Attn: James L. Bromley
Lisa M. Schweitzer
1 Liberty Plaza
New York, NY 10006
Fax: (212) 225-3999

Morris, Nichols, Arsht & Tunnell LLP
Attn: Derek C. Abbott
1201 North Market Street
Wilmington, DE 19801
Fax: (302) 658-3989

Richards Layton & Finger PA
Attn: Christopher M. Samis
One Rodney Square
920 North King Street
Wilmington, DE 19801
Fax: (302) 778-7845

Akin Gump Strauss Hauer & Feld LLP
Attn: Fred S. Hodara
Stephen Kuhn
Kenneth Davis
One Bryant Park
New York, NY 10036
Fax: (212) 872-1002

Milbank, Tweed, Hadley & McCloy LLP
Attn: Roland Hlawaty
One Chase Manhattan Plaza
New York, NY 10005
Fax: (212) 822-5735

Latham & Watkins LLP
Attn: David S. Allinson
David Heller
885 Third Avenue
New York, NY 10022
Fax: (212) 751-4864

Office of the U.S. Trustee
Attn: Patrick Tinker
844 King Street, Suite 2207
Wilmington, DE 19801
Fax: (302) 573-6497

This 2nd day of March, 2010.

/s/ Michael P. Migliore
Michael P. Migliore (Bar No. 4331)

2749397v6