(d) other than as specifically set forth herein, any Liability relating to events or conditions occurring or existing in connection with, or arising out of, the Business as operated prior to the Closing Date, or the ownership, possession, use, operation or sale or other disposition prior to the Closing Date of the Assets (or any other assets, properties, rights or interests associated, at any time prior to the Closing Date, with the Business) including any liability with respect to Cure Costs payable by the Sellers pursuant to Section 2.1.7(b);

(e) other than as specifically set forth herein, litigation and related claims and Liabilities or any other claims against any Seller of any kind or nature whatsoever involving or relating to facts, events or circumstances arising or occurring prior to the Closing, no matter when raised (including Liability for breach, misfeasance or under any other theory relating to any Seller's conduct, performance or non-performance);

(f) all guarantees of Third Party obligations by the Sellers and reimbursement obligations to guarantors of the Sellers' obligations or under letters of credit;

(g) all accounts payable and trade payables of the Sellers, including intercompany payables (other than with respect to Assigned Contracts);

(h) all fees or commissions of any brokers, funds or investment banks in connection with the transactions contemplated by this Agreement and the other Transaction Documents based upon arrangements made by or on behalf of the Sellers or any of their Affiliates;

(i) all Excluded Employee Liabilities;

(j) all Liabilities for, or related to any obligation for, any Tax that the Sellers are required to bear under ARTICLE VI; for the avoidance of doubt, the Parties intend that no Purchaser or Designated Purchaser shall have any transferee or successor liability for any Tax that the Sellers bear under ARTICLE VI;

(k) all obligations to provide continuation coverage pursuant to COBRA or any similar Law to any Person who has been employed in the Business and who does not become a Transferred Employee or a Transitional Employee;

(l) except with respect to the Assumed Liabilities, all Liabilities or other obligations arising from Seller Employee Plans;

(m) any Liability of the Sellers or any ERISA Affiliate under Title IV of ERISA;

(n) any pension or retirement Liability of the Sellers or any ERISA Affiliate, which, for purposes of clarification, shall not include the Specified Employee Liabilities assumed by Purchaser pursuant to Section 2.1.3(i); and

(o) all Liabilities of Sellers arising under this Agreement and the Ancillary Agreements.

41

2.1.5.  Assumption and/or Assignment or Rejection of 365 Contracts and Assumption and Sublease and/or License of 365 Real Estate Leases.

(a) Section 2.1.5(a) of the Sellers Disclosure Schedule sets forth a list (the "**365 Customer Contract List**") of substantially all Customer Contracts of a U.S. Debtor that are Executory Contracts and were entered into before the Petition Date (Contracts that may be included on the 365 Customer Contract List, the "**365 Customer Contracts**"), which the relevant U.S. Debtor will, subject to Section 2.1.5(d), to the extent permitted by applicable Law, assume and assign to the Purchaser or a Designated Purchaser at Closing pursuant to section 365 of the U.S. Bankruptcy Code.

(b) Section 2.1.5(b) of the Sellers Disclosure Schedule sets forth a list (the "**365 Real Estate Lease List**") of all Real Estate Leases of a U.S. Debtor that previously have been assumed, pursuant to Section 365 of the U.S. Bankruptcy Code (the "**365 Real Estate Leases**"), and under which the Purchaser or a Designated Purchaser will enter into a Sublease to the extent permitted by, and in accordance with, the terms of the related 365 Real Estate Lease and applicable Law (the "**Assumed and Subleased Real Estate Leases**"), in accordance with and as provided by the terms of the RETC; and

(c) Section 2.1.5(c) of the Sellers Disclosure Schedule sets forth a list of all 365 Real Estate Leases under which the Purchaser or a Designated Purchaser has elected to have the relevant Seller enter into a License with the Purchaser or a Designated Purchaser to the extent permitted by, and in accordance with, the terms of the related 365 Real Estate Lease and applicable Law (the "**Licensed Real Estate Leases**") at Closing, in accordance with and as provided by the terms of the RETC.

(d) The Purchaser shall have until the Contract Designation Date, but not thereafter, to designate, by written notice to NNI, any 365 Customer Contracts listed on the 365 Customer Contract List (as supplemented and/or updated in accordance with Section 2.1.5(e)), that meet the Exclusion Criteria and which the Purchaser wishes to reject, which such 365 Customer Contracts shall be referred to as "**Excluded 365 Customer Contracts**" and shall not be Assigned Contracts hereunder.

(e) Prior to the Closing Date, the Sellers shall be entitled to update and/or supplement the 365 Customer Contract List from time to time by written notices to the Purchaser; provided, that within five (5) Business Days of Closing no update and/or supplement shall be permitted without Purchaser's prior written consent, and provided further that Sellers shall use commercially reasonable efforts to update the 365 Customer Contract List as soon as commercially practicable.  The Sellers shall use commercially reasonable efforts to make available to the Purchaser or the Purchaser's employees or representatives, complete unredacted copies of any Contract added to the 365 Customer Contract List no later than ten (10) Business Days after the date on which the Sellers add the Contract to the 365 Customer Contract List.

(f) The Contracts listed in the 365 Customer Contract List (as updated and/or supplemented pursuant to Section 2.1.5(e)) that are not Excluded 365 Customer Contracts are collectively referred to as the "**Assumed and Assigned Contracts.**"

(g) The U.S. Debtors shall seek the approval of the U.S. Bankruptcy Court to permit the assumption and assignment of the Assumed and Assigned Contracts as part of the U.S. Sale Order in accordance with Section 5.1.

2.1.6. <u>Assignment of Non-365 Contracts and Sublease or License of Non-365 Real Estate Leases</u>.

(a) Section 2.1.6(a) of the Sellers Disclosure Schedule sets forth a list (the "**Non-365 Customer Contract List**") of all Customer Contracts other than 365 Customer Contracts (Contracts that may be included on the Non-365 Customer Contract List, the "**Non-365 Customer Contracts**"), which the relevant Seller will, subject to Section 2.1.6(e), assign to the Purchaser or a Designated Purchaser at Closing.

(b) Section 2.1.6(b) of the Sellers Disclosure Schedule sets forth a list of Real Estate Leases other than 365 Real Estate Leases (the "**Non-365 Real Estate Leases**") under which the Purchaser has elected to have the relevant Seller enter into a Sublease with the Purchaser or a Designated Purchaser to the extent permitted by the terms of the related Non-365 Real Estate Lease and applicable Law (the "**Non-365 Subleased Real Estate Leases**"), in accordance with and subject to the terms of the relevant Lease, and in accordance with and as provided by the terms of the RETC;

(c) Section 2.1.6(c) of the Sellers Disclosure Schedule sets forth a list of Non-365 Real Estate Leases under which the Purchaser has elected to have the relevant Seller enter into a License with the Purchaser or a Designated Purchaser to the extent permitted by the terms of the related Non-365 Real Estate Lease and applicable Law (the "**Non-365 Licensed Real Estate Leases**") at Closing, in accordance with and subject to the terms of the relevant Lease, and in accordance with and as provided by the terms of the RETC.

(d) Any Non-365 Real Estate Lease under which the Purchaser has not elected to enter into a Sublease pursuant to Section 2.1.6(b), or under which the Purchaser has not elected to enter into a License pursuant to Section 2.1.6(c), shall be referred to as an "**Excluded Non-365 Contract**" and shall not be an Assigned Contract hereunder.

(e) The Purchaser shall have until the Contract Designation Date, but not thereafter, to designate, by written notice to NNI, any Non-365 Customer Contracts listed on the Non-365 Customer Contract List (as supplemented and/or updated in accordance with Section 2.1.6(f)), that meet the Exclusion Criteria and which the Purchaser wishes to reject, which such 365 Customer Contracts shall be referred to as "**Excluded Non-365 Customer Contracts**" and shall not be Assigned Contracts hereunder.

(f) Prior to the Closing Date, the Sellers shall be entitled to update and/or supplement the Non-365 Customer Contract List from time to time by written notices to the Purchaser; <u>provided</u>, that within five (5) Business Days of Closing no update and/or supplement shall be permitted without Purchaser's prior written consent, and <u>provided</u> <u>further</u> that Sellers shall use commercially reasonable efforts to update the Non-365 Customer Contract List as soon as commercially practicable. The Sellers shall use commercially reasonable efforts to make available to the Purchaser or the Purchaser's employees or

representatives, complete unredacted copies of any Contract added to the Non-365 Customer Contract List no later than ten (10) Business Days after the date on which the Sellers add the Contract to the Non-365 Customer Contract List.

(g) The Contracts listed in the Non-365 Customer Contract List (as updated and/or supplemented pursuant to Section 2.1.6(f)), that are not Excluded Non-365 Contracts are collectively referred to as the "**Designated Non-365 Contracts.**"

(h) Subject to Section 2.1.7(d), Section 2.1.10 and Section 5.13 and the receipt of any required Consent, all the Designated Non-365 Contracts in effect as of the Closing shall be assigned to the Purchaser or a Designated Purchaser at the Closing pursuant to Section 2.1.1(d).

2.1.7.   Cure Costs; Adequate Assurance; Efforts.

(a) To the extent that the assumption and assignment of any 365 Customer Contract entails the payment of any Cure Cost, NNI shall, or shall cause the relevant U.S. Debtor to, pay or otherwise provide for payment of such Cure Cost as required by the U.S. Bankruptcy Code and provided in the U.S. Sale Order.

(b) To the extent that assignment to the Purchaser or a Designated Purchaser of any Non-365 Customer Contract entails the payment of any Cure Cost, the relevant Main Sellers shall, or shall cause the relevant Seller to, pay such amounts directly to such counterparty in a manner agreed between such Main Seller or such relevant Seller, as applicable, and such counterparty or ordered by a court of competent jurisdiction.

(c) The Sellers shall not be responsible for any other Cure Costs in connection with any other Seller Contract other than as set forth immediately above.

(d) Prior to the hearing before the U.S. Bankruptcy Court to approve the assumption and assignment of the Assumed and Assigned Contracts, the Purchaser shall provide adequate assurance of its and the relevant Designated Purchasers' future performance under each Assumed and Assigned Contract to the parties thereto (other than the U.S. Debtors) in satisfaction of Section 365(f)(2)(B) of the U.S. Bankruptcy Code and to the extent required by the U.S. Sale Order.

(e) The Parties shall, and shall cause the Other Sellers and the Designated Purchasers, as applicable, to, use commercially reasonable efforts to obtain all Consents required to permit the assignment to the Purchaser (or, if specified by the Purchaser, a Designated Purchaser) of the Assigned Contracts in force as of the Closing Date; provided, however, that the Sellers shall be under no obligation to seek any such Consent prior to the completion of the Auction (as defined in the Bidding Procedures) or to compromise any right, asset or benefit or to expend any amount or incur any Liability or provide any other consideration in seeking such Consents; provided, further, that the failure to obtain any or all of such Consents shall not in itself entitle the Purchaser to terminate this Agreement or fail to complete the transactions contemplated hereby or entitle the Purchaser to any adjustment to the Purchase Price.

2.1.8. <u>Local Sale Agreements</u>.

(a) Subject to the terms and conditions hereof, to the extent necessary to effect the Closing on the terms hereof, the relevant Sellers shall, and the Purchaser shall, and shall cause the relevant Designated Purchasers to, enter into such agreements or instruments, including bills of sale and/or assignment and assumption agreements (the "**Local Sale Agreements**"), providing for (i) the sale, transfer, assignment or other conveyance to the Purchaser and relevant Designated Purchasers, in accordance with the requirements of applicable local Law, of any Assets located in the countries where such Local Sale Agreements are required, and (ii) the assumption by the Designated Purchasers of any Assumed Liability that the Purchaser intends to allocate to them. In the event of a conflict between this Agreement and the Local Sale Agreements, this Agreement shall prevail.

(b) At any time within fifteen (15) calendar days after the selection of the Purchaser as the Successful Bidder, the Purchaser may elect, by written notice to the Main Sellers, but without effect on the Purchase Price or Purchaser's obligation to offer employment to at least the number of Employees set out in Section 7.1.1(a), to designate as Excluded Assets all of the assets, interests and rights of Nortel Networks (India) Private Limited ("**NN India**"), whereupon such assets, interests and rights shall be Excluded Assets and any liabilities to the extent arising from or related to such assets, interests and rights shall be Excluded Liabilities, and NN India shall not be a Party to this Agreement, shall not be an Other Seller and shall have no rights or obligations hereunder, but shall remain bound by the provisions of Article X.

2.1.9. <u>EMEA Asset Sale Agreement</u>. None of the EMEA Sellers or the Joint Administrators shall assume, or be deemed to assume, any Liability whatsoever under this Agreement and nothing in this Agreement (except to the extent expressly incorporated into the EMEA Asset Sale Agreement) shall apply to, or govern, the sale, assignment, transfer, retention or assumption of assets, rights, properties or Liabilities of, or by, any EMEA Sellers or the Joint Administrators in any manner whatsoever. The only assets, rights, properties and Liabilities of the EMEA Sellers or Joint Administrators that are being sold, assigned or transferred to, and assumed by, the Purchaser or the EMEA Designated Purchasers, and the terms and conditions thereof, and representations with respect thereto, are solely as expressly set forth in the EMEA Asset Sale Agreement. Neither the Purchaser nor any Designated Purchaser shall be entitled to make any claim under this Agreement, or assert any right hereunder, against any Person other than the Sellers.

2.1.10. <u>Non-Assignable Assets</u>. Notwithstanding anything in this Agreement to the contrary, if a Consent of a Third Party (including a Government Entity) has not been obtained on or prior to Closing, then, unless such Consent is subsequently obtained, this Agreement shall not constitute an agreement to sell, transfer or assign, directly or indirectly, any Asset or any obligation or benefit arising thereunder if an attempted direct or indirect sale, transfer, lease, sublease or assignment thereof, without such Consent (in each case, after taking into account the effect of the U.S. Sale Order, the Canadian Approval and Vesting Order, and any other order of a court of competent jurisdiction), would constitute a breach, default, violation or other contravention of the rights of such Third Party or would be ineffective with respect to any party to a Contract concerning such Asset. For greater certainty, except as explicitly set forth in ARTICLE VIII, failure to obtain any such Consent shall not entitle the Purchaser to terminate

45

this Agreement or fail to complete the transactions contemplated hereby or entitle the Purchaser to any adjustment of the Purchase Price.

Section 2.2.    Purchase Price.

2.2.1.    Purchase Price.  Pursuant to the terms and subject to the conditions set forth in this Agreement, in consideration of the purchase, sale, assignment and conveyance of the Sellers' and EMEA Sellers' right, title and interest in, to and under the Assets and the EMEA Assets, respectively, pursuant to the terms hereof, and pursuant to the terms of the EMEA Asset Sale Agreement, respectively, and of the rights granted by certain Sellers and the EMEA Sellers under the Intellectual Property License Agreement and the Trademark License Agreement, the Purchaser, on its own behalf and as agent for the relevant Designated Purchasers, shall (x) assume and become obligated to pay, perform and discharge, when due, the Assumed Liabilities and the EMEA Assumed Liabilities and (y) subject to adjustment following the Closing in accordance with Section 2.2.3.2, pay to the Sellers and the EMEA Sellers in accordance with Section 2.4.2(b)(i), an amount of cash equal to two hundred eighty two million dollars ($282,000,000) (the "**Base Purchase Price**") as adjusted pursuant to this Agreement and as further adjusted pursuant to Clause 3, paragraphs 5, 6 and 7 of Schedule 6, and Schedule 7 of the EMEA Asset Sale Agreement (as so adjusted, the "**Purchase Price**").

2.2.2.    Estimated Purchase Price.

(a) For the purpose of determining the amount of cash to be paid as the Estimated Purchase Price by the Purchaser (on its own behalf and as agent for the Designated Purchasers) to the Distribution Agent as agent for the Sellers and the EMEA Sellers at the Closing pursuant to Section 2.4.2(b), at least three (3) Business Days prior to the Closing Date, the Main Sellers and the EMEA Sellers shall deliver to the Purchaser a statement prepared in good faith in accordance with the Nortel Accounting Principles and the terms hereof setting forth (i) the estimated Inventory Value as of the Closing (the "**Estimated Closing Inventory Value**"), (ii) the estimate of the Warranty Provision Amount as of the Closing (the "**Estimated Warranty Provision Amount**"), (iii) the estimated amount of the Unbilled Accounts Receivable Amount as of the Closing (the "**Estimated Unbilled Accounts Receivable Amount**"), (iv) the estimated Prepaid Expenses Amount as of the Closing (the "**Estimated Prepaid Expenses Amount**"), (v) the estimated Contractual Liabilities Amount as of the Closing (the "**Estimated Contractual Liabilities Amount**"), (vi) an estimate of the Royalty Liability Amount as of the Closing (the "**Estimated Royalty Liability Amount**"), (vii) an estimate of the Product Exposures Amount as of the Closing (the "**Estimated Product Exposures Amount**"), (viii) an estimate of the Adjusted Net Working Capital at Closing (the "**Estimated Adjusted Net Working Capital**"), (ix) an estimate of the Accrued Vacation Amount as of the Closing (the "**Estimated Closing Accrued Vacation Amount**"), (x) an estimate of the Specified Employee Liabilities Amount as of the Closing (the "**Estimated Specified Employee Liabilities Amount**"), (xi) an estimate of the Deferred Profit Amount as of the Closing (the "**Estimated Deferred Profit Amount**"), (xii) an estimate of the aggregate of all EMEA Downward Adjustments (the "**Estimated Aggregate EMEA Downward Adjustment**"), (xiii) an estimate of the aggregate of all Downward Adjustments (the "**Estimated Aggregate Downward Adjustment**"), (xiv) the Estimated Excess ARD Employees Amount, (xv) an estimate of the TFR Amount as of the Closing (the "**Estimated**

**TFR Amount**"), (xvi) an estimate of the EMEA Holiday Downward Adjustment as of the Closing (the "**Estimated EMEA Holiday Downward Adjustment**"), (xvii) the Estimated French Excess ARD Employees Amount, (xviii) an estimate of the Pre-Close Employment Payments Amount (the "**Estimated Pre-Close Employment Payments** Amount"), and (xix) the Estimated Purchase Price.

(b)    As used in this Agreement, "**Estimated Purchase Price**" means an amount equal to:

(i)    the Base Purchase Price; <u>plus</u>

(ii)    the difference, which may be positive or negative, equal to the Estimated Adjusted Net Working Capital <u>minus</u> Target Working Capital; <u>minus</u>

(iii)    the Estimated Aggregate EMEA Downward Adjustment (if any); <u>minus</u>

(iv)    the Estimated Aggregate Downward Adjustment (if any); <u>minus</u>

(v)    the Estimated Deferred Profit Amount; <u>minus</u>

(vi)    the Estimated Closing Accrued Vacation Amount; <u>minus</u>

(vii)    the Estimated Specified Employee Liabilities Amount; <u>minus</u>

(viii)    the Estimated TFR Amount, <u>minus</u>

(ix)    the Estimated Excess ARD Employees Amount, <u>minus</u>

(x)    the Estimated EMEA Holiday Downward Adjustment, <u>minus</u>

(xi)    the Estimated French Excess ARD Employees Amount, <u>minus</u>

(xii)    the Estimated Pre-Close Employment Payments Amount.

(c)    As used in this Agreement and shown in the attached Adjusted Net Working Capital Statement in Exhibit E, the "**Adjusted Net Working Capital**" means an amount equal to:

(i)    the Closing Inventory Value; <u>plus</u>

(ii)    the Unbilled Accounts Receivable Amount; <u>plus</u>

(iii)    the Prepaid Expenses Amount; <u>minus</u>

(iv)    the Contractual Liabilities Amount; <u>minus</u>

(v)    the Royalty Liability Amount; <u>minus</u>

      (vi)     the Warranty Provision Amount; <u>minus</u>

      (vii)    Product Exposures Amount.

## 2.2.3.  <u>Purchase Price Adjustment</u>.

### 2.2.3.1. <u>Closing Statement; Dispute Resolution</u>.

(a)  As promptly as practicable (and in any event within ninety-five (95) calendar days after the Closing), the Purchaser shall deliver to the Main Sellers and the EMEA Sellers a written statement (the "**Closing Statement**") that shall contain the Purchaser's final calculation of (i) the Inventory Value as of the Closing (the "**Closing Inventory Value**"), (ii) the Warranty Provision as of the Closing (the "**Closing Warranty Provision Amount**"), (iii) the Unbilled Accounts Receivable Amount as of the Closing (the "**Closing Unbilled Accounts Receivable Amount**"), (iv) the Prepaid Expenses Amount as of the Closing (the "**Closing Prepaid Expenses Amount**"), (v) the Contractual Liabilities Amount as of the Closing (the "**Closing Contractual Liabilities Amount**"), (vi) the Royalty Liability Amount as of the Closing (the "**Closing Royalty Liability Amount**"), (vii) the Product Exposures Amount as of the Closing (the "**Closing Product Exposures Amount**"), (viii) the Adjusted Net Working Capital as of the Closing (the "**Closing Adjusted Net Working Capital**"), (ix) the Accrued Vacation Amount as of the Closing (the "**Closing Accrued Vacation Amount**"), (x) the amount of the Specified Employee Liabilities as of the Closing (the "**Closing Specified Employee Liabilities Amount**"), (xi) the aggregate of all EMEA Downward Adjustments (the "**Closing Aggregate EMEA Downward Adjustment**"), (xii) the aggregate of all Downward Adjustments (the "**Closing Aggregate Downward Adjustment**"), (xiii) the Deferred Profit Amount as of the Closing (the "**Closing Deferred Profit Amount**"), (xiv) the Excess ARD Employees Amount as of the Closing (the **Closing Excess ARD Employees** Amount"); (xv) the TFR Amount as of the Closing (the "**Closing TFR Amount**"); (xvi) the EMEA Holiday Downward Adjustment as of the Closing (the "**Closing EMEA Holiday Downward Adjustment**"); (xvii) the French Excess ARD Employees Amount as of the Closing (the "**Closing French Excess ARD Employees Amount**"); (xviii) the Pre-Close Employment Payments as of the Closing Date (the "**Closing Pre-Close Employment Payments Amounts**"); and (xix) the final Purchase Price based on the foregoing which shall be equal to the Base Purchase Price; <u>plus</u> (a) the difference, which may be positive or negative, equal to the Closing Adjusted Net Working Capital <u>minus</u> the Target Working Capital; <u>plus</u> (b) the Closing Aggregate EMEA Upward Adjustment (if any); <u>minus</u> (c) the Closing Aggregate EMEA Downward Adjustment (if any); <u>minus</u> (d) the Closing Aggregate Downward Adjustment (if any); <u>minus</u> (e) the Closing Deferred Profit Amount; <u>minus</u> (f) the Closing Excess ARD Employees Amount; <u>minus</u> (g) the Closing TFR Amount; <u>minus</u> (h) the Closing EMEA Holiday Downward Adjustment; <u>minus</u> (i) the Closing French Excess ARD Employees Amount; <u>minus</u> (j) the Closing Pre-Close Employment Payments Amount (the Purchase Price, so adjusted as provided in this Section 2.2.3.1, the "**Final Purchase Price**"). The Closing Statement shall be prepared in accordance with the Nortel Accounting Principles and the terms hereof.

(b)  If the Main Sellers and the EMEA Sellers disagree with the determination of the Closing Statement, the Main Sellers and the EMEA Sellers shall notify the Purchaser of

such disagreement within thirty (30) days after delivery of the Closing Statement (such notice, the **"Disagreement Notice"**). The Disagreement Notice shall set forth, in reasonable detail, any disagreement with, and any requested adjustment to, the Closing Statement. If the Main Sellers and the EMEA Sellers fail to deliver the Disagreement Notice by the end of such thirty-(30-) day period, the Main Sellers and the EMEA Sellers shall be deemed to have accepted as final the Closing Statement delivered by the Purchaser. Matters included in the calculations in the Closing Statement to which the Main Sellers or the EMEA Sellers do not object in the Disagreement Notice shall be deemed accepted by the Main Sellers and the EMEA Sellers and shall not be subject to further dispute or review. Throughout the periods during which the Closing Statement is being prepared and any disputes that may arise under this Section 2.2.3.1(b) are being resolved, the Purchaser shall, promptly upon request, provide the Main Sellers, the EMEA Sellers and their respective accountants access to the books, records and personnel of the Business and all documents, schedules and workpapers used by the Purchaser in the preparation of the Closing Statement or that are otherwise reasonably necessary for the Main Sellers, the EMEA Sellers and their respective accountants to review the Closing Statement (other than any such documents, schedules and workpapers that are subject to attorney-client privilege; it being understood, however, that Purchaser and the Designated Purchasers shall cooperate in any reasonable efforts and requests that would enable otherwise required disclosure to the Main Sellers and the EMEA Sellers or their respective representatives to occur without so jeopardizing privilege). The Main Sellers, the EMEA Sellers and the Purchaser shall negotiate in good faith to resolve any disagreement with respect to the Closing Statement, and any resolution agreed to in writing by the Main Sellers, the EMEA Sellers and the Purchaser shall be final and binding upon the Parties.

(c) If the Main Sellers, the EMEA Sellers and the Purchaser are unable to resolve any disagreement as contemplated by Section 2.2.3.1(b) within fifteen (15) days after delivery of a Disagreement Notice by the Main Sellers and EMEA Sellers, the Independent Auditor shall serve as arbitrator (the **"Accounting Arbitrator"**) to resolve such disagreement. The Primary Parties and the Joint Administrators on behalf of the EMEA Sellers shall instruct the Accounting Arbitrator to consider only those items and amounts set forth in the Closing Statement as to which the Main Sellers, the EMEA Sellers and the Purchaser have not resolved their disagreement and to conduct such proceedings as it considers necessary to resolve such disagreement. The Main Sellers, the EMEA Sellers and the Purchaser shall use their commercially reasonable efforts to cause the Accounting Arbitrator to deliver to the Primary Parties and the Joint Administrators on behalf of the EMEA Sellers, as promptly as practicable (and in no event later than thirty (30) days after his or her appointment), a written report setting forth the resolution of any such disagreement determined in accordance with the terms of this Agreement. Such report and the Closing Statement, as adjusted thereby, shall be final and binding upon the Sellers, the EMEA Sellers, the Purchaser and any Designated Purchaser. In the event the Accounting Arbitrator concludes that the Purchaser was correct as to a majority (by aggregate dollar amount) of the disputed items, then the Sellers and the EMEA Sellers shall share the Accounting Arbitrator's fees, costs and expenses. In the event the Accounting Arbitrator concludes that the Main Sellers and EMEA Sellers were correct as to a majority (by aggregate dollar amount) of the disputed items, then the Purchaser shall pay the Accounting Arbitrator's fees, costs and expenses.

2.2.3.2. Purchase Price Adjustment.

(a) If the Final Purchase Price, as finally determined in accordance with this Section 2.2.3, is less than the Estimated Purchase Price, (A) the Parties shall cause the Escrow Agent to pay to the Purchaser the lesser of (x) the excess of the Estimated Purchase Price over the Final Purchase Price, or (y) the Escrow Amount, and (B) the Sellers and the EMEA Sellers shall pay the amount of any such excess not paid by the Escrow Agent pursuant to the preceding clause (A); provided, that in the event that the excess of the Estimated Purchase Price over the Final Purchase Price is less than the Escrow Amount, the Parties agree to cause the Escrow Agent to pay to the Distribution Agent the balance of the Escrow Amount; and provided further that in no event shall the Sellers and the EMEA Sellers, in the aggregate, have any obligations to pay any amounts hereunder or under the EMEA Asset Sale Agreement in excess of the Base Purchase Price less the Escrow Amount.

(b) If the Final Purchase Price, as finally determined in accordance with this Section 2.2.3, exceeds the Estimated Purchase Price, Purchaser shall pay to the Distribution Agent, as distribution agent for the Sellers and the EMEA Sellers, the amount by which the Final Purchase Price exceeds the Estimated Purchase Price and the Escrow Agent shall pay the full Escrow Amount to the Sellers.

(c) Any payment to be made by a Party under this Section 2.2.3.2 shall be by wire transfer of immediately available U.S. dollar funds to an account designated by the Party receiving payment, within (3) three Business Days after the final determination of the Final Purchase Price, plus interest on such amount, accrued from the Closing Date to the date of such payment at a rate per annum of three percent (3%). Such interest shall accrue from day to day.

2.2.4. Reserved

2.2.5. Good Faith Deposit.

(a) On the Business Day next following the entry of the Bidding Procedures Order, the Purchaser shall deliver to the Escrow Agent an amount in U.S. dollars equal to five percent (5%) of the Base Purchase Price in immediately available funds (such amount, together with the interest accrued thereon prior to the Closing, the "**Good Faith Deposit**").

(b) The Good Faith Deposit shall:

(i)    be applied to the Estimated Purchase Price to be paid by the Purchaser to the Distribution Agent (as agent of the Sellers and the EMEA Sellers) at Closing pursuant to Section 2.4.2(b); or

(ii)    become property of the Sellers and the EMEA Sellers in the event that this Agreement is terminated by the Main Sellers pursuant to Section 9.1(b)(vii) or Section 9.1(c)(i) or; or

(iii)    become property of the Sellers and the EMEA Sellers in the event that this Agreement is terminated by any Primary Party pursuant to Section 9.1(b)(v) in

the event that the EMEA Asset Sale Agreement is terminated by the EMEA Sellers pursuant to Clause 15.4.3 or Clause 15.4.4 of the EMEA Asset Sale Agreement; or

(iv)    be promptly returned by the Escrow Agent to the Purchaser if this Agreement is terminated for any other reason.

Section 2.3.    Escrow.

(a) On or prior to the date of the entry of the Bidding Procedures Order, each of NNC, NNI, NNL and NNUK and the Purchaser shall enter into the Escrow Agreement with the Escrow Agent so that the Escrow Agent may hold the Escrow Amount in order to secure the Good Faith Deposit and the payment by the Sellers or the EMEA Sellers, as appropriate, of amounts owed to the Purchaser pursuant to Section 2.2.3.1 as post-Closing purchase price adjustments.

(b) Each of NNC, NNI, NNL, NNUK and the Purchaser hereby undertake to promptly execute and deliver to the Escrow Agent, in accordance with the terms set forth in the Escrow Agreement, instructions to pay to the Distribution Agent, as agent for the Sellers and the EMEA Sellers, or the Purchaser, as applicable, funds from the escrow account established pursuant to the Escrow Agreement any time that such Person becomes entitled to such payment from the escrow account, including pursuant to Sections 2.2.5 or  2.2.3.2.

Section 2.4.    Closing.

2.4.1.    Closing Date.  The completion of the purchase and sale of the Assets and the assumption of the Assumed Liabilities (the "**Closing**") shall occur simultaneously with the closing of the transactions contemplated by the EMEA Asset Sale Agreement and shall take place at the offices of Cleary Gottlieb Steen & Hamilton LLP in New York, New York, commencing at 10:00 a.m. local time on the date which is five (5) Business Days after the day upon which all of the conditions set forth under ARTICLE VIII (other than conditions which by their nature are to be satisfied at the Closing, but subject to the waiver or fulfillment of those conditions) have been satisfied or, if permissible, waived by the Main Sellers and/or the Purchaser (as applicable), unless such date is sooner than April 30, 2010, in which case the Closing shall occur on April 30, 2010 and provided that such date may further extended pursuant to Section 5.27, or on such other place, date and time as shall be mutually agreed upon in writing by the Purchaser, the Main Sellers and the EMEA Sellers (the day on which the Closing takes place being the "**Closing Date**").

Legal title, equitable title and risk of loss with respect to the Assets will transfer to the Purchaser or the relevant Designated Purchaser, and the Assumed Liabilities will be assumed by the Purchaser and the relevant Designated Purchasers, at the Closing.

2.4.2.    Closing Actions and Deliveries.

At the Closing:

51

(a) the Sellers and the Purchaser shall, and the Purchaser shall cause the Designated Purchasers to, enter into the Ancillary Agreements to which it is contemplated that they will be parties, to the extent such agreements have not yet been entered into and subject to Section 5.23 and Section 5.27;

(b) the Purchaser shall deliver:

(i)    to (i) the Distribution Agent, as agent for the Sellers and the EMEA Sellers an amount equal to the Estimated Purchase Price, less the Good Faith Deposit, the Aggregate Escrow Amount and the EMEA Deposit, by wire transfer in immediately available funds to an account or accounts designated at least two (2) Business Days prior to the Closing Date by the Distribution Agent as agent for the Sellers and the EMEA Sellers in a written notice to the Purchaser; (ii) to the Escrow Agent, an amount equal to the Aggregate Escrow Amount; and (iii) to the EMEA Escrow Agent, an amount equal to the EMEA Deposit.

(ii)    to the Main Sellers and the TSA EMEA Sellers, as applicable, the Pre-Closing Segregation Costs (as defined in Exhibit 5.27) due under Section 5.27 (to the extent then due);

(iii)    executed counterparts of the Transition Services Agreement, the Intellectual Property License Agreement, the Real Estate Agreements, the Loaned Employee Agreement, and any other Ancillary Agreements that have been executed at such time;

(iv)    to the Main Sellers, a duly executed certificate of an executive officer of the Purchaser certifying the fulfillment of the conditions set forth in Section 8.2.

(c) NNI shall deliver or cause to be delivered:

(i)    an updated Section 4.11(b) of the Sellers Disclosure Schedule (if applicable), dated as of a date no earlier than three (3) days prior to the Closing;

(ii)    a duly executed certificate of an executive officer of NNI certifying the fulfillment of the conditions set forth in Section 8.3(a) and Section 8.3(b);

(iii)    executed counterparts of the Transition Services Agreement, the Intellectual Property License Agreement, the Trademark License Agreement and the Real Estate Agreements and any other Ancillary Agreements to which the Sellers are a party that have been executed at such time;

(iv)    copies of the U.S. Sale Order and the Canadian Approval and Vesting Order;

(v)    true and complete copies of the Closing Unaudited Financial Statements; and

(vi)   in the case of a Seller that is a "United States person" within the meaning of Section 7701 of the Code and applicable Treasury Regulations, a duly executed certificate dated as of the Closing Date and substantially in the form set forth in Treasury Regulations Section 1.1445-2(b)(2)(iv), sworn to under penalties of perjury, setting forth such Person's name, address and federal employer identification number and stating that such Person is not a "foreign person" within the meaning of Section 1445 of the Code.

(d)   each Party shall deliver, or cause to be delivered, to the other any other documents reasonably requested by such other Party in order to effect, or evidence the consummation of, the transactions contemplated herein.

Section 2.5.   Designated Purchaser(s).  The Purchaser shall be entitled to designate, in accordance with the terms and subject to the limitations set forth in this Section 2.5, one or more Affiliates to (i) purchase specified Assets (including specified Assigned Contracts), (ii) assume specified Assumed Liabilities, and/or (iii) employ certain Transferred Employees or Transitional Employees on and after the Closing Date (any such Affiliate of the Purchaser that shall be properly designated by the Purchaser in accordance with this clause, a "**Designated Purchaser**"); it being understood and agreed, however, that any such right of the Purchaser to designate a Designated Purchaser is conditioned upon (y) such Designated Purchaser being able to perform the applicable covenants under Section 2.1.7 and ARTICLE VII and demonstrate satisfaction of the applicable requirements of Section 365 of the U.S. Bankruptcy Code (to the extent applicable), including the provision of adequate assurance for future performance, with respect to the Assumed and Assigned Contracts, and (z) any such designation not creating any Liability (including any Liability relating to Taxes) for the Sellers or their Affiliates that would not have existed had the Purchaser purchased the Assets, assumed the Assumed Liabilities and/or employed the Transferred Employees or Transitional Employees, and which Liability is not fully reimbursed by or on behalf of the Purchaser.  No such designation shall relieve the Purchaser of any of its obligations hereunder.  Any breach hereof by a Designated Purchaser shall be deemed a breach by Purchaser.  The Purchaser and each Designated Purchaser shall be jointly and severally liable for any obligations assumed by any of them hereunder.  The above designation shall be made by the Purchaser by way of a written notice to be delivered to the Sellers as soon as reasonably practicable after the date hereof and in no event later than the thirtieth (30th) day prior to the Closing Date, which written notice shall contain appropriate information about the Designated Purchaser(s) and shall indicate which Assets, Assumed Liabilities and Transferred Employees or Transitional Employees the Purchaser intends such Designated Purchaser(s) to purchase, assume and/or employ, as applicable, hereunder and include a signed counterpart to this Agreement in a form acceptable to the Main Sellers, agreeing to be bound by the terms of this Agreement and authorizing the Purchaser to act as such Designated Purchaser(s)' agent for all purposes hereunder.

## ARTICLE III

## REPRESENTATIONS AND WARRANTIES OF THE PURCHASER

The Purchaser hereby represents and warrants to the Sellers as follows:

Section 3.1.   <u>Organization and Corporate Power</u>.

(a) The Purchaser is a corporation duly organized, validly existing and in good standing under the Laws of the State of Delaware. Each Designated Purchaser other than the Purchaser is duly organized, validly existing and in good standing under the Laws of the jurisdiction in which it is organized. The Purchaser has, and each Designated Purchasers will at Closing have, the requisite corporate power and authority to (i) enter into, deliver and perform its obligations pursuant to each of the Transaction Documents to which it is or will become a party and (ii) to own, lease and operate its assets and to carry on its business as it is now being conducted.

(b) The Purchaser is, and each Designated Purchasers is or will be at Closing, duly qualified or licensed to own or lease and operate its properties and assets (including the Assets), and is in good standing, in each jurisdiction in which its ownership of assets or operation of business requires it to so qualify or to be so licensed, except to the extent that the failure to be so qualified or licensed would not materially hinder, delay or impair the Purchaser's or any such Designated Purchaser's ability to carry out its obligations under, and to consummate the transactions contemplated by, this Agreement and the other Transaction Documents to which it is or will become a party.

Section 3.2.   <u>Authorization; Binding Effect; No Breach</u>.

(a) The execution, delivery and performance of each Transaction Document to which the Purchaser or any of the Designated Purchasers is, or at the Closing will be, a party have been or at Closing will be duly authorized by the Purchaser and the relevant Designated Purchasers, as applicable. This Agreement has been duly executed and delivered by the Purchaser, and the other Transaction Documents to which the Purchaser or any Designated Purchaser is, or on the Closing Date will become, a party have been or will be duly executed and delivered by the Purchaser and each Designated Purchaser party thereto. Assuming due authorization, execution and delivery by the relevant Sellers, each Transaction Document to which the Purchaser or any Designated Purchaser is, or at the Closing will be, a party constitutes, or upon execution thereof will constitute, a valid and binding obligation of the Purchaser or such Designated Purchaser, as applicable, enforceable against such Person in accordance with its respective terms.

(b) The execution, delivery and performance by each of the Purchaser and the Designated Purchasers of the Transaction Documents to which the Purchaser or such Designated Purchaser is, or on the Closing Date will be, a party do not and will not conflict with or result in a breach of the terms, conditions or provisions of, constitute a default under, result in a violation of, or require any Consent (other than the Regulatory Approvals) or other action by or declaration or notice to any Government Entity pursuant to (i) the articles, charter or by-laws of the Purchaser or the relevant Designated Purchaser, (ii) any Contract or other document to which the Purchaser or the relevant Designated Purchaser is a party or to which any of its assets is subject or (iii) any Laws to which the Purchaser, the relevant Designated Purchaser, or any of their assets is subject, except, in the case of (ii) and (iii) above, for such defaults, violations, actions and notifications that would not individually or in the aggregate

54

materially hinder, delay or impair the performance by the Purchaser or the Designated Purchasers of any of their obligations under the Transaction Documents.

Section 3.3.    Financing.

(a) The Purchaser has delivered to the Main Sellers and the Joint Administrators correct and complete copies of an executed commitment letter from One Equity Partners III, L.P. of even date herewith and addressed to the Purchaser, a copy of which is attached as Exhibit 3.3(a), pursuant to which One Equity Partners III, L.P. has committed to invest an amount equal to the Estimated Purchase Price in Purchaser for purposes of funding the transactions contemplated herein and under the EMEA Asset Sale Agreement and otherwise in connection with this agreement and the EMEA Asset Sale Agreement (the "**Financing**").

(b) As of the date hereof, the Financing Commitment in the form so delivered is valid and in full force and effect. The Financing Commitment has not been and prior to Closing, shall not be, withdrawn, terminated, assigned or otherwise amended or modified in any respect without the prior express written consent of the Main Sellers. Except as set forth in the Commitment Letter, there are no conditions precedent to the obligations of the Sponsor to provide the Financing, and there are no contractual contingencies or other provisions under any agreement (including any side letters) or any understanding or commitment relating to the transactions contemplated by this Agreement to which the Purchaser, the Sponsor or any of their respective Affiliates is a party that would permit any of the Sponsor to reduce the total amount of the Financing or impose any additional condition precedent to the availability of the Financing or limit the ability of the Purchaser to seek and obtain specific performance of the Sponsor's obligations thereunder. The aggregate proceeds of the Financing, as provided by the Financing Commitment, will, together with unrestricted cash that the Purchaser has available on the date hereof and will continue to have available at all times until the Closing (and will make available at Closing), provide financing sufficient to pay the Estimated Purchase Price, all other amounts to be paid or repaid by the Purchaser under this Agreement and the EMEA Asset Sale Agreement (whether payable on or after the Closing or in the event of termination of this Agreement), and all of the Purchaser's and its Affiliate's fees and expenses associated with the transactions contemplated in this Agreement and the EMEA Asset Sale Agreement. The Purchaser acknowledges and agrees that receipt of the aggregate (or any) proceeds of the Financing by the Purchaser is not a condition precedent to the Purchaser's obligation to consummate the transactions contemplated hereby.

Section 3.4.    Purchaser Financial Statements.

(a) Section 3.4(a) of the Purchaser Disclosure Schedule sets forth true and complete copies of the audited consolidated balance sheets of the Purchaser and its consolidated Subsidiaries as of December 31, 2008 and December 31, 2007 and the related consolidated audited statements of income, cash flows and statements of changes of stockholders' equity for the years then ended, accompanied by the reports thereon of the Purchasers' independent auditors (collectively referred to as the "**Purchaser Audited Financial Statements**"). The Purchaser Audited Financial Statements have been prepared based upon the financial books and records maintained by the Purchaser in accordance with GAAP, and fairly present in all material respects the consolidated financial position, results of operations, cash flows and stockholders'

equity of the Purchaser and its consolidated Subsidiaries as of their respective dates and for the respective periods indicated.

(b) Section 3.4(b) of the Purchaser Disclosure Schedule sets forth the unaudited consolidated balance sheets of Purchaser and its consolidated Subsidiaries as of November 30, 2009 and November 30, 2008 and the related consolidated unaudited statements of income, cash flows and statements of changes of stockholders' equity of Purchaser for the eleven (11) month periods ended on November 30, 2009 and November 30, 2008 (the "**Purchaser Unaudited Financial Statements**", and together with the Purchaser Audited Financial Statements, the "**Purchaser Financial Statements**"). Except as set forth in the Purchaser Unaudited Financial Statements, such Purchaser Unaudited Financial Statements were prepared based on the financial books and records maintained by the Purchaser, have been prepared in accordance with GAAP and fairly present in all material respects the consolidated financial position, results of operation, cash flows and stockholders' equity of the Purchaser and its consolidated Subsidiaries as of their respective dates and for the respective periods indicated.

Section 3.5.    Adequate Assurance of Future Performance.  To the extent required by any Bankruptcy Laws or other Laws, the Purchaser will be able to provide, at Closing or on such earlier date as is designated by the U.S. Bankruptcy Court, adequate assurance of its and/or the relevant Designated Purchasers' future performance under each Assumed and Assigned Contract to the parties thereto (other than the U.S. Debtors) in satisfaction of Section 365(f)(2)(B) of the U.S. Bankruptcy Code. The Purchaser acknowledges and agrees that, if it becomes necessary to provide an Assumed and Assigned Contract counterparty with additional assurances to satisfy the Purchaser's or a Designated Purchaser's obligations under Section 2.1.7, the Purchaser shall, and shall cause the relevant Designated Purchasers to, perform all actions and bear all such costs and expenses as may be necessary or advisable in connection with their obligations under Section 2.1.7 without recourse to any Seller.

Section 3.6.    Purchaser's Acknowledgments; Exclusivity of Representations and Warranties

(a) The Purchaser is experienced and sophisticated with respect to transactions of the type contemplated by the Transaction Documents.  In consultation with experienced counsel and advisors of its choice, the Purchaser has conducted its own independent review and analysis of the Business, the Assets, the EMEA Assets, the Assumed Liabilities and the EMEA Assumed Liabilities and the rights and obligations it is acquiring and assuming under this Agreement and the other Transaction Documents.  The Purchaser acknowledges that it and/or its representatives (including its outside counsel) have been permitted such access to the books and records, facilities, equipment, contracts and other properties and assets of the Business as it required to complete its review, and that it and its representatives have had an opportunity to meet with the officers and other employees of the Sellers, the EMEA Sellers and the Business to discuss the Business.

(b) The Purchaser acknowledges and agrees that:

(i)    except for the representations and warranties expressly set forth in ARTICLE IV herein, in the EMEA Asset Sale Agreement or in any Ancillary

Agreement, the Purchaser has not relied on any representation or warranty from the Sellers, the EMEA Sellers or any Affiliate of any such Person or any employee, officer, director, accountant, financial, legal or other representative of the Sellers or the EMEA Sellers or their respective Affiliates in determining whether to enter into this Agreement;

(ii)    except for the representations and warranties expressly set forth in ARTICLE IV herein, the EMEA Asset Sale Agreement or in any Ancillary Agreement, none of the Sellers, the EMEA Sellers, or any employee, officer, director, accountant, financial, legal or other representative of the Sellers, the EMEA Sellers or any Affiliate of any such Person has made any representation or warranty, express or implied, as to the Business (or the value or future thereof), the Assets or the EMEA Assets (including any implied representation or warranty as to the condition, merchantability, suitability or fitness for a particular purpose of any of the Assets or the EMEA Assets, including under the International Convention on Contracts for the Sale of Goods (Geneva Convention) and any other applicable sale of goods Laws), the Assumed Liabilities, the EMEA Assumed Liabilities, or any Affiliate of any such Person or the accuracy or completeness of any information regarding any of the foregoing that the Sellers, the EMEA Sellers or any other Person furnished or made available to the Purchaser and its representatives (including any projections, estimates, budgets, offering memoranda, management presentations or due diligence materials);

(iii)    no Seller, EMEA Seller or any other Person shall have or be subject to any liability to the Purchaser, any Designated Purchaser or any Affiliate or representative of the Purchaser or any Designated Purchaser resulting from the distribution to the Purchaser or any Designated Purchaser, or the Purchaser's or any Designated Purchaser's use, of the information referred to in Section 3.6(b)(ii);

(iv)    except for the representations and warranties expressly set forth in the Transaction Documents, subject to the terms of the Bankruptcy Consents, the Purchaser or any Designated Purchaser takes the Assets on an "as is" and "where is" basis;

(v)    the enforceability of this Agreement against the Sellers is subject to receipt of the Bankruptcy Consents; and

(vi)    notwithstanding anything to the contrary contained herein, the Purchaser's obligations to consummate the transactions contemplated by this Agreement are not conditioned or contingent in any way upon the receipt of financing from any Person.

(c) Without limiting the generality of the foregoing, PURCHASER ACKNOWLEDGES AND AGREES THAT, EXCEPT AS EXPRESSLY PROVIDED HEREIN OR IN THE OTHER TRANSACTION DOCUMENTS, THERE ARE NO EXPRESS OR IMPLIED WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE OR NONINFRINGEMENT (I) OF ANY ASSETS, INCLUDING WITH RESPECT TO THIRD PARTY INTELLECTUAL PROPERTY RIGHTS, OR (II) REGARDING THE SCOPE, VALIDITY OR ENFORCEABILITY OF ANY

TRANSFERRED INTELLECTUAL PROPERTY OR LICENSED INTELLECTUAL PROPERTY RIGHTS.

Section 3.7.    Brokers.  Except for fees and commissions that will be paid by the Purchaser, no broker, finder or investment banker is entitled to any brokerage, finder's or similar fee or commission in connection with the transactions contemplated by this Agreement and the other Transaction Documents based upon arrangements made by or on behalf of the Purchaser or any of its Affiliates.

## ARTICLE IV

## REPRESENTATIONS AND WARRANTIES OF THE SELLERS

Except (a) as set forth in the Sellers Disclosure Schedule or (b) to the extent relating to the Excluded Assets or the Excluded Liabilities each of the Main Sellers jointly and severally represents and warrants to the Purchaser as set forth in Sections 4.1 through 4.14 below:

Section 4.1.    Organization and Corporate Power.

(a) Each Seller is duly organized and validly existing under the Laws of the jurisdiction in which it is organized.  Subject to entry of the U.S. Bidding Procedures Order and the U.S. Sale Order in the case of the U.S. Debtors and the Canadian Sales Process Order and Canadian Approval and Vesting Order in the case of the Canadian Debtors and receipt of other Consents from the U.S. Bankruptcy Court and the Canadian Court in connection with the transactions contemplated hereby and in the other Transaction Documents (collectively, the "**Bankruptcy Consents**"), each of the Sellers has the requisite corporate power and authority to (i) enter into, deliver and perform its obligations pursuant to each of the Transaction Documents to which it is or will become a party and (ii) own, lease and operate its assets, including the Assets, as applicable, and to carry on the Business in the Ordinary Course.

(b) Each of the Sellers is duly qualified or licensed to do business and to own, lease and operate its assets, including the Assets, and to carry on the Business in the Ordinary Course, as applicable in each jurisdiction in which its ownership of property or conduct of business relating to the Business requires it to so qualify or to be so licensed, except to the extent that the failure to be so qualified or licensed would not have, or would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

Section 4.2.    Authorization; Binding Effect; No Breach.

(a) Subject to the receipt of the Bankruptcy Consents (i) the execution, delivery and performance by each Main Seller of the Transaction Documents to which such Main Seller is, or at the Closing will be, a party has been or at Closing will be duly authorized by such Main Seller and (ii) the execution, delivery and performance by each Other Seller of the Transaction Documents to which such Seller will be a party will have been duly authorized by such Other Seller by the time such Other Seller executes this Agreement.  Subject to receipt of the Bankruptcy Consents, and assuming due authorization, execution and delivery by the Purchaser and the Designated Purchasers parties thereto, the Transaction Documents to which

58

any Seller is or will be a party, will constitute, a legal, valid and binding obligation of such Seller, enforceable against it in accordance with its terms, subject to (in the case of Non-Debtor Sellers) applicable bankruptcy, insolvency, reorganization, moratorium or other Laws affecting creditors' rights generally and subject to general principles of equity, regardless of whether considered in a proceeding in equity or at Law.

(b) Subject to receipt of the Bankruptcy Consents and the Regulatory Approvals, the execution, delivery and performance by each Seller of the Transaction Documents to which such Seller is, or on the Closing Date will be, a party do not and will not conflict with or result in a breach of the terms, conditions or provisions of, constitute a default under, result in a violation of, result in the creation or imposition of any Lien upon any of the Assets, or (subject to the receipt of Consents in connection with the Assigned Contracts and any other Consents expressly provided for herein) require any Consent (other than the Regulatory Approvals and the Bankruptcy Consents) or other action by or declaration or notice to any Government Entity pursuant to (i) the articles, charter or by-laws of the relevant Sellers, (ii) any Material Contract or Inbound License Agreement that is an Assigned Contract to which the relevant Seller is a party or to which any of its or their assets are subject, (iii) any order of any Government Entity applicable to any Seller or by which any of their respective properties or Assets are bound or (iv) any Laws to which any of the Sellers, or any of the Assets are subject, except, in the case of (ii), (iii) or (iv) above, for such defaults, violations, actions and notifications that would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect (disregarding for these purposes the phrase "transactions contemplated hereby" in clause (e) of the definition of Material Adverse Effect).

Section 4.3.    Title to Tangible Assets; Sufficiency of Assets.

(a) Except for Permitted Encumbrances and Liens created by or through the Purchaser or the Designated Purchasers or any of their Affiliates, the Owned Inventory and the Owned Equipment is owned beneficially by one or more of the Sellers, free and clear of all Liens, and such Sellers have good and marketable title thereto.

(b) All tangible assets included in the Owned Equipment are in satisfactory operating condition for the uses to which they are being put, subject to ordinary wear and tear and ordinary maintenance requirements, except as would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

(c) Assuming the assignment or novation of all Seller Contracts to the Purchaser or a Designated Purchaser and the receipt of all Seller Consents, the Assets and the rights of, or to be acquired by, the Purchaser and/or the Designated Purchasers under this Agreement and the EMEA Asset Sale Agreement, together with the rights to be provided to the Purchaser and/or Designated Purchasers under the other Transaction Documents, considered together, include such assets, properties and rights of every type and description, whether real or personal (other than Intellectual Property, Overhead and Shared Services, non-exclusive supply Contracts of the Business, and the services of those Employees that will not be considered Transferred Employees for purposes of this Agreement and any services currently being provided to the Business as of the Closing Date that are offered to the Purchaser, but that the Purchaser elects not to receive under the Transition Services Agreement and other than the

59

real estate assets of the Business) as are necessary and sufficient to conduct the Business substantially in the manner conducted by the Sellers as of the date hereof (as such conduct may reasonably be modified as a result of the headcount restructuring plan previously disclosed to the Purchaser set forth in Section 4.3(c) of the Sellers Disclosure Schedule), except where the absence of such assets or rights would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

Section 4.4.    Material Contracts.

(a)  Section 4.4(a) of the Sellers Disclosure Schedule (divided into appropriate subsections) sets forth, as of the date hereof, a list of every Seller Contract and Bundled Contract (with respect to those portions relating to the CVAS Products or CVAS Services), but excluding (a) all licenses of Intellectual Property, all of which are addressed in Section 4.5 below and (b) all Leases, all of which are addressed by Section 4.9 below, other than purchase orders and invoices and any third-party or intercompany agreements related to Overhead and Shared Services, that:

(i)  in the most recent fiscal year of the Main Sellers resulted in, or is reasonably expected by its terms in the future to result in, (A) the payment of more than $5,000,000 per annum in the aggregate or (B) the receipt by the Business of more than $5,000,000 per annum in the aggregate, except any Contracts referred to in any other subsection of this Section 4.4(a);

(ii)  is a non-competition, exclusivity, or other agreement, that materially restricts the Business from directly or indirectly engaging in any business activity anywhere in the world (whether such agreement is exclusive by geography, product type or otherwise);

(iii)  is a material joint venture, partnership or alliance Contract, or other agreement that involves the sharing of profits, losses, costs or liabilities in respect of the Business, Assets or Assumed Liabilities;

(iv)  is a research and development Contract involving consideration or expenditures in excess of $2,500,000 in the most recent fiscal year or which is reasonably expected to involve consideration or expenditures of more than $2,500,000 per annum after the date hereof;

(v)  is a Contract involving the sale or distribution of the CVAS Products, valued at more than $2,500,000 in the most recent fiscal year or which is reasonably expected to be valued at more than $2,500,000 in the aggregate per annum after the date hereof;

(vi)  is a distribution Contract that contains any express inventory repurchase requirement (whether contingent or otherwise);

(vii)  relates to Indebtedness (including personal property leases) in excess of $1,000,000;

60

(viii)    has "take or pay" or "requirements" provisions committing the Seller party thereto to purchase goods or services in excess of $2,500,000 in 2009 or any calendar year thereafter;

(ix)    involves capital expenditures in excess of $2,500,000 after the date hereof;

(x)    requires the posting of a security deposit, letter of credit, performance bond or surety; or

(xi)    contains any material obligation secured by a Lien on any material Asset (other than by a Permitted Encumbrance or by any encumbrance that will be released prior to or on the Closing Date)

(all the above, collectively, the "**Material Contracts**").

(b) Complete copies (including all waivers and amendments) of all Material Contracts have been made available to certain of the Purchaser's representatives pursuant to the Clean Team Confidentiality Agreement.

Section 4.5.    Intellectual Property.

(a) The Transferred Intellectual Property, the EMEA Transferred Intellectual Property and the Licensed Intellectual Property include all the Intellectual Property owned at least in part by the Sellers and the EMEA Sellers that is used in the Business, including in connection with the CVAS Products or CVAS Services (including products in the Plan of Record), except with respect to any Intellectual Property used in connection with any Overhead and Shared Services (unless any such Intellectual Property is also used in the Business in a manner other than as Overhead and Shared Services).

(b) An accurate, true and complete list of all the Transferred Intellectual Property registered or applied for in the name of the Sellers or the EMEA Sellers is set forth in Section 4.5(b) of the Sellers Disclosure Schedule (the Intellectual Property disclosed in Section 4.5(b) of the Sellers Disclosure Schedule is collectively referred to as the "**Business Registered IP**"). The foregoing list of Business Registered IP includes: (a) for each issued Patent or Patent application, the Patent number or application serial number for each jurisdiction in which filed, and date issued and filed; (b) for each Trademark registration or application, the application serial number or registration number and the date of such registration or application, by country and state; and (c) for any domain names, the registration date and name of registry.

(c) The Transferred Intellectual Property, the EMEA Transferred Intellectual Property, the Licensed Intellectual Property and the Intellectual Property rights granted to the Sellers under the Cross-License Agreements and the Inbound License Agreements together include all the material Intellectual Property that, as of the date hereof, is used by the Sellers and the EMEA Sellers in connection with the conduct and operation of the Business, in each case except with respect to any Intellectual Property used in connection with any Overhead and

61

(d) To the Knowledge of the Sellers, neither the Transferred Intellectual Property nor the EMEA Transferred Intellectual Property is subject to any Liens other than Permitted Encumbrances and, to the Knowledge of the Sellers, except for Material Contracts referenced in Section 4.4(a)(ii), none of the Sellers or EMEA Sellers have entered into any contract or agreement containing a covenant not to compete with respect to the Transferred Intellectual Property or the EMEA Transferred Intellectual Property or otherwise limiting the Purchaser's ability to use any of the Transferred Intellectual Property or the EMEA Transferred Intellectual Property to conduct the Business, in each case, that would bind the Purchaser or an Affiliate of the Purchaser after the Closing. To the Knowledge of the Sellers, none of the Transferred Intellectual Property or EMEA Transferred Intellectual Property is subject to any outstanding order, judgment or stipulation restricting the use, transfer or exploitation thereof by the Sellers or the EMEA Sellers in any material respect.

(e) The Sellers have no Knowledge that any Third Party infringes upon, misappropriates, dilutes or otherwise violates the Transferred Intellectual Property or the EMEA Transferred Intellectual Property, and no Seller or EMEA Seller has brought or threatened to bring any claim alleging any of the foregoing during the past two (2) years (or earlier, if the claim is presently unresolved).

(f) With respect to the Transferred Intellectual Property and the EMEA Transferred Intellectual Property, the Sellers and/or the EMEA Sellers own all right, title, and interest in and to each such item of Intellectual Property. To the Knowledge of the Sellers, such rights, title and interest are sufficient for the Sellers and/or the EMEA Sellers to independently bring suit against a Third Party to enforce the issued patents, registered trademarks and registered service marks included in the Transferred Intellectual Property. With respect to the Licensed Intellectual Property (other than any Intellectual Property owned by a Third Party, but including, for the avoidance of doubt, any Intellectual Property assigned or transferred by the Sellers or the EMEA Sellers to a Third Party in connection with divestitures of the Nortel Retained Businesses by any Seller since the filing of the Bankruptcy Proceedings), to the Knowledge of the Sellers, the Sellers, the EMEA Sellers or Third Party purchasers of the Nortel Retained Businesses own right, title, and interest in and to each such item of Intellectual Property, and the Sellers and the EMEA Sellers collectively have sufficient rights to license such Intellectual Property as set forth in the Intellectual Property License Agreement and the Trademark License Agreement. The Parties acknowledge and agree that the foregoing sentence does not constitute, and shall not be construed as, a representation or warranty with respect to non-infringement or non-misappropriation of Intellectual Property.

(g) To the Knowledge of the Sellers, Section 4.5(g) of the Sellers Disclosure Schedule sets forth all Cross-License Agreements, indicating for each Cross-License Agreement, the title and the parties thereto, except to the extent a Cross-License Agreement prohibits disclosure of its existence without consent of the relevant Third Party, which consent the Sellers were unable to obtain, in which case it has been omitted from Section 4.5(g) of the Sellers Disclosure Schedule (an "**Omitted Cross-License Agreement**"), but the number of such Cross-License Agreements that have been omitted is set forth in Section 4.5(g) of the

Sellers Disclosure Schedule, and the Sellers shall use reasonable efforts to provide such other information as reasonably requested by the Purchaser regarding such Cross-License Agreements, the disclosure of which does not breach such prohibition. No royalties or other amounts are due or payable by or on behalf of Nortel under any such Omitted Cross-License Agreements, nor will any such royalties or other amounts be due or payable by Purchaser under any Omitted Cross-License Agreement in connection with entering into this Agreement. To the extent that any Cross-License Agreement referenced in Exhibit 5.4(c) or listed in Exhibit 5.4(d) contains a limitation on the number of times the relevant Seller may exercise any sublicense or spin off rights thereunder, as of the date hereof, the Sellers have not exercised such rights such number of times (nor have they exceeded such number).

(h) To the Knowledge of the Sellers, there has been no assertion or claim made in writing to the Sellers, the EMEA Sellers or any of their respective Affiliates during the past two (2) years preceding the date of this Agreement asserting invalidity, misuse or unenforceability of the Transferred Intellectual Property or the EMEA Transferred Intellectual Property or challenging the Sellers', the EMEA Sellers', or any of their respective Affiliates' right to use, right to transfer, or ownership of the Transferred Intellectual Property or the EMEA Transferred Intellectual Property; in each case, excluding any assertions or claims that would not reasonably be expected to result in any invalidity, unenforceability, loss or other material impairment of any rights or interest in the subject Intellectual Property.

(i) None of the Sellers has, and to the Knowledge of the Sellers, none of their Affiliates (nor any EMEA Seller or its Affiliates) has, received any written assertions during the past two (2) years preceding the date of this Agreement that (i) any Seller's, EMEA Seller's or any of their respective Affiliates' operation of the Business, including the use, performance, licensing, copying, distribution, sale, offer for sale, lease, manufacture, having made, importation, or any other exploitation of the CVAS Products sold by the Business or of the CVAS Services rendered by the Business infringes, misappropriates, dilutes or otherwise violates in any material respect any Intellectual Property right or moral right of any Third Party; or (ii) any of the Transferred Intellectual Property, EMEA Transferred Intellectual Property or Licensed Intellectual Property infringes, dilutes or otherwise violates in any material respect any Intellectual Property right or moral right of, or was misappropriated from, a Third Party.

(j) To the Knowledge of the Sellers, Section 4.5(j) of the Sellers Disclosure Schedule sets forth a list of all material Contracts (other than Cross-License Agreements) granting to the Sellers, the EMEA Sellers or any of their respective Affiliates any license under or to any Intellectual Property owned by a Third Party that is, as of the date hereof, incorporated into the CVAS Products, used in the provision of CVAS Services, or otherwise utilized by the Business in its operations in the ordinary course (collectively, the "**Inbound License Agreements**"), indicating for each Inbound License Agreement, the title and the parties thereto.

(k) To the Knowledge of the Sellers, Section 4.5(k) of the Sellers Disclosure Schedule sets forth a list of all Contracts (other than Cross-License Agreements) under which the Sellers grant a license to a Third Party under Transferred Patents where the predominant purpose of the Contract is the grant of a Patent license (collectively, the "**Outbound License**

63

**Agreements**"), indicating for each Outbound License Agreement the title and the parties thereto. To the Knowledge of the Sellers, no Seller has granted any exclusive license to any third party with respect to any Transferred Intellectual Property, nor, to the Knowledge of the Sellers, would the source code escrow arrangements described in Section 5.9(c) of the Sellers Disclosure Schedule reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect on the operation and conduct of the Business.

(l) To the Knowledge of the Sellers, there is no outstanding dispute or disagreement with respect to (i) any Outbound License Agreement or (ii) any Cross-License Agreement, in each case, that materially and adversely affects any of the Transferred Intellectual Property.

(m) To the Knowledge of the Sellers, each of the registrations for the Transferred Intellectual Property is valid and subsisting, except as would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect. The foregoing will not be construed as a warranty that any Patent, or any Trademark registration, will issue based on a Patent or Trademark application.

(n) To the Knowledge of the Sellers, there is no Action pending or allegation, claim or threat in writing that the Business as presently conducted infringes upon, misappropriates or otherwise violates in any material respect any Intellectual Property of any Third Party.

(o) To the Knowledge of the Sellers, Section 4.5(o) of the Sellers Disclosure Schedule sets forth a true, accurate and complete list of any Open Source Software used in each of the CVAS Products and identifies (i) the specific Open Source Software used; (ii) the specific Open Source Software version; and (iii) the CVAS Products or portions thereof into which such Open Source Software is incorporated. To the Knowledge of the Sellers, the Business is in full compliance with all license obligations associated with such Open Source Software, except as would not reasonably be expected to have, individually, or in the aggregate, a Material Adverse Affect.

(p) The Sellers (with respect to the Business) have used reasonable efforts to establish measures regarding data security. To the Knowledge of the Sellers, with respect to data security, the Business is in compliance with all the requirements of Law, except as would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

(q) Notwithstanding any provision herein to the contrary, this Section 4.5 consists of the sole representation and warranty in this Agreement regarding non-infringement, non-violation, and non-misappropriation of Intellectual Property.

Section 4.6.    Litigation. As of the date hereof, except for the Bankruptcy Proceedings, there is no Action pending or, to the Knowledge of the Sellers, threatened before any Government Entity against any Seller involving the Business (excluding the EMEA Business), the Assets or Assumed Liabilities, that would be material to the Business (excluding the EMEA Business) taken as a whole. As of the date hereof, except for the Bankruptcy Proceedings, there is no outstanding Order to which the Sellers are subject in respect of the

64

Business (excluding the EMEA Business) or the Assets only, and not any other business segments or assets of the Sellers, nor are any of the Sellers in default with respect to any such Order, in each case which materially affects or restricts the ownership of the Assets or Assumed Liabilities.

Section 4.7.    Financial Statements.

(a) Section 4.7(a) of the Sellers Disclosure Schedule sets forth true and complete copies of the audited balance sheets of the Business as of December 31, 2008 and December 31, 2007 and the related audited statements of income for the years then ended, accompanied by the reports thereon of the Sellers' independent auditors (collectively referred to as the "**Audited Financial Statements**"). The Audited Financial Statements have been prepared in accordance with GAAP, consistently applied, and fairly present in all material respects the consolidated financial position, results of operation and cash flows of the Business as of their respective dates and for the respective periods indicated.

(b) Section 4.7(b) of the Sellers Disclosure Schedule sets forth the unaudited management statements of certain assets and liabilities of the Business as of September 30, 2009 and the related unaudited management statements of income of the Business for the nine (9) month period ended on September 30, 2009 (the "**Unaudited Financial Statements**", and together with the Audited Financial Statements, the "**Financial Statements**"). Except as set forth in the Unaudited Financial Statements, such Unaudited Financial Statements were prepared based on the financial books and records maintained by the Sellers and the EMEA Sellers for the Business on the basis of the Nortel Accounting Principles and represent the Sellers' good faith estimate of the selected balance sheet accounts and income statements set forth therein for the Business, in each case as of the dates and for the periods presented therein. The Unaudited Financial Statements (a) have been prepared in accordance with the Nortel Accounting Principles, (b) include estimated costs that do not necessarily represent the costs that were actually allocated to the Business for the relevant periods (or that the Business will incur after the Closing), (c) include assets that have not been tested for impairment or otherwise adjusted for fair value, (d) reflect the estimated historical operation of the Business (including the Overhead and Shared Services and the Excluded Assets) for the periods specified therein and (e) do not represent the balance sheet accounts or the income statements that would have occurred if the Business had been operated by the Sellers as a "stand alone" entity.

(c) Section 4.7(c) of the Sellers Disclosure Schedule sets forth the unaudited management statements of income of the Business for the nine (9) month period ended on September 30, 2009 (the "**Unaudited Management Statements of Income**". Except as set forth in the Unaudited Management Statements of Income, such Unaudited Management Statements of Income were prepared based on the financial books and records maintained by the Sellers and the EMEA Sellers for the Business on the basis of the Nortel Accounting Principles and represent the Sellers' good faith estimate of the selected income statements set forth therein for the Business, in each case as of the dates and for the periods presented therein. The Unaudited Management Statements of Income (a) have been prepared in accordance with the Nortel Accounting Principles, (b) include estimated costs allocated to the Business for the relevant periods based on Nortel's allocation process, (c) reflect the estimated historical

65

operation of the Business (including the Overhead and Shared Services) for the periods specified therein and (d) do not represent the income statements that would have occurred if the Business had been operated by the Sellers as a "stand alone" entity.

(d) Except as set forth in Section 4.7(d) of the Sellers Disclosure Schedule, there are no Assumed Liabilities or EMEA Assumed Liabilities of a type that would be required to be included on a balance sheet of the Business prepared in accordance with GAAP (or reflected in the notes thereto) except Liabilities that (i) in the aggregate are set forth or reflected in the Financial Statements; (ii) have been incurred in the Ordinary Course since the date of the last balance sheet included in the Financial Statements; (iii) have been incurred in connection with this Agreement or the transactions contemplated hereby or (iv) Liabilities that may be satisfied by the payment of Cure Costs.

Section 4.8.    Compliance with Laws; Consents.

(a) No Seller is in violation of any applicable Law in connection with the Business (excluding the EMEA Business), except for violations that would not reasonably be expected to be material to the Business taken as a whole. None of the Sellers has received any written notice or written claims from any Government Entity within the twelve (12) months preceding the date hereof relating to any material non-compliance of the Business (excluding the EMEA Business) or the Assets with any applicable Law nor are there, based on the Knowledge of the Sellers, any such notice or claims threatened or pending, except where such claims would not reasonably be expected to be material to the Business taken as a whole.

(b) (i) All of the Consents of Government Entities necessary for, or otherwise material to, the conduct of the Business (excluding the EMEA Business) or the ownership of the Assets as conducted or owned, as applicable, on the date hereof, have been duly obtained and are in full force and effect and (ii) the relevant Sellers are in compliance with the terms of each of such Consents, in each case except for such violations that would not reasonably be expected to be material to the Business taken as a whole. None of the Sellers has received any written notice or written claims from any Government Entity relating to any material non-compliance of the Business (excluding the EMEA Business) or the Assets with such Consents nor are there, based on the Knowledge of the Sellers any such notice or claims threatened or pending, except where such claims would not reasonably be expected to be material to the Business taken as a whole.

Section 4.9.    Real Property.

(a) Section 4.9(a) of the Sellers Disclosure Schedule sets forth a list of all the properties owned in fee or ground leased by the Sellers in respect of which a real property lease or license between the applicable Seller and the Purchaser or one or more Designated Purchasers shall be entered into on Closing on terms set forth in the RETC (the "**Direct Lease Real Estate**"). With respect to the Direct Lease Real Estate, (i) a Seller has valid fee simple or leasehold title to such Direct Lease Real Estate, free and clear of all Liens except for Permitted Encumbrances, and (ii) other than the rights of Purchaser pursuant to this Agreement, there are no outstanding options, rights of first offer or rights of first refusal in favor of any other party to purchase such Direct Lease Real Estate or any portion thereof or interest therein.

66

(b) Section 4.9(b) of the Sellers Disclosure Schedule sets forth the address of each parcel of Leased Real Property, and a list of all Leases (including subleases where the relevant Seller is subtenant) for each such parcel of Leased Real Property (including the date and name of the parties to such Lease). Seller holds valid leasehold title to all of the Leased Real Property, in each case in accordance with the provisions of the applicable lease or sublease for such Leased Real Property and free of all Encumbrances (other than encumbrances affecting the underlying fee estate and Permitted Encumbrances). Each Lease is valid and binding on the Seller, and, to the Seller's Knowledge, on the other parties thereto, and is in full force and effect, in accordance with its terms, subject to applicable bankruptcy, insolvency, moratorium and similar laws affecting creditors' rights generally (including, without limitation, Seller's rights under the Bankruptcy Proceedings) and general principles of equity (regardless of whether enforcement is sought in a proceeding in equity or at law). Except for any such event resulting from the Bankruptcy Proceedings, Seller is not in default under any of the Leases and, to the Seller's Knowledge, no other party is in default, nor does any condition exist which with the passage of time would constitute a default under any of the Leases. No Seller has given written notice to any landlord claiming a default by such landlord under a Lease. No landlord under a Lease has notified a Seller or any of their Affiliates that it intends to terminate such Lease prior to its scheduled expiration. The Sellers have made available to Purchaser a true and complete copy of each such Lease where the relevant Seller is tenant or subtenant, as applicable, for the Leased Real Property.

(c) To the Knowledge of the Sellers, no Seller, as applicable, has received written notice from any Government Entity of any condemnation, expropriation or other proceeding in eminent domain, pending or threatened, affecting any parcel of Real Property used for the Business or interest therein that, to the extent it relates to such Real Property, could reasonably be expected to have a Material Adverse Effect.

(d) There are no written or oral subleases, licenses, concessions, occupancy agreements or other contractual obligations granting to any other Person the right of use or occupancy of any part of the Real Property which is occupied for purposes of the Business, or which will be occupied for purposes of the Business on or after Closing in accordance with the segregation, consolidation and demising plans contemplated by the RETC, save and except (i) those which would not have a Material Adverse Effect, and (ii) with respect to such rights retained by the Sellers or granted to the purchasers of other Nortel business segments which are co-located at such premises, the effect of which would not have a Material Adverse Effect.

Section 4.10.  Environmental Matters.

(a) The Business (excluding the EMEA Business) and the Assets are in compliance with Environmental Laws and have obtained and are in compliance with all Environmental Permits, except where failure to comply with Environmental Laws, or to obtain or comply with Environmental Permits, would not reasonably be expected to be material to the Business taken as a whole.

(b) There are no Actions relating to the Business (excluding the EMEA Business) or the Assets pending or, to the Knowledge of the Sellers, threatened against any of

67

the Sellers pursuant to Environmental Laws, in each case except those Actions that would not reasonably be expected to be material to the Business taken as a whole.

(c) Notwithstanding anything in this ARTICLE IV to the contrary, none of the representations and warranties in this ARTICLE IV other than this Section 4.10 shall relate to environmental matters.

Section 4.11.   Labor and Employee Benefits Matters.

(a) Section 4.11(a) of the Sellers Disclosure Schedule contains a true and complete list, by country, of (i) all material Seller Employee Plans and (ii) all employment agreements or other commitments for employment or engagement by the Sellers or their Affiliates with respect to Employees that deviate in any material respect from the standard form of offer letter for the applicable jurisdiction or provide for retention, severance or change in control payments or benefits to the Employees, excluding in each case Seller Employee Plans (collectively, the "**Special Arrangements**"). The Sellers have provided the Purchaser with a true and complete copy of the plan document or summary plan description of each material Seller Employee Plan and Special Arrangement or, if such plan document or summary plan description does not exist, an accurate written summary of the material terms of such Seller Employee Plan and Special Arrangement.

(b) The information contained in Section 4.11(b) of the Sellers Disclosure Schedule in respect of the Employees (the "**Employee Information**") is accurate in all material respects as of the date hereof, and sets forth with respect to each Employee (except where that is not permissible under applicable data privacy Laws): (i) unique identifier, (ii) service date, (iii) job title/position, (iv) annual base salary and annual target incentive, (v) work location, (vi) visa type, if any, and expiry date (vii) the applicable Collective Labor Agreement, if any, (viii) leave status, reason for the leave, the start date of the leave and expected return date, (ix) vacation accrual rate, (x) status as full-time or part-time, (xi) home country of residence, (xii) Job Complexity Indicator, (xiii) country of payroll, (xiv) sales indicator, (xv) Exempt/Non-Exempt status (for Employees in the United States only), (xvi) payment currency, (xvii) department/function to the extent applicable, (xviii) work schedule, (xix) whether such Employee has any individual agreement as to length of notice or severance payment required to terminate his or her employment other than as results by Law from the employment of an employee without an individual agreement as to notice or severance or a Seller Employee Plan as a result of which there could be a payment to such employee in excess of $50,000 in addition to such payment required by applicable Law or such Seller Employee Plan. Such information shall be updated in accordance with the requirements of Section 7.4(c).

(c) There has not been for a period of twenty-four (24) consecutive months prior to the date hereof, nor is there existent or, to the Knowledge of the Sellers, has been threatened, any strike, slowdown, lockout, picketing or work stoppage against the Sellers by or on behalf of the Employees.

(d) Section 4.11(d) of the Sellers Disclosure Schedule lists (i) all the Collective Labor Agreements in effect with respect to the Employees and, for those that have expired, whether notice to bargain has been given and the status of the bargaining process and (ii) any

material grievance pending under such Collective Labor Agreements. For a period of twenty-four (24) consecutive months prior to the date hereof, no petition has been filed or proceedings instituted by a union, works council, collective bargaining agent (including any unit clarification proceeding under the National Labor Relations Act or analogous law), employee or group of employees with any Government Entity seeking recognition of a collective bargaining agent with respect to any Employees, no voluntary recognition has been given by the Sellers or any Affiliates with respect to Employees, and, to the Sellers' Knowledge, no such organizational effort is currently being made or has been threatened by or on behalf of any union, employee, group of employees or collective bargaining agent to organize any Employees. The Sellers have provided the Purchaser with a true and complete copy of the Collective Labor Agreements listed in Section 4.11(d) of the Sellers Disclosure Schedule. To the Knowledge of Sellers, the execution of this Agreement and the consummation of the transactions contemplated by this Agreement will not result in any material breach or other violation of any Collective Labor Agreement set forth on Section 4.11(d) of the Sellers Disclosure Schedule.

(e) To the Knowledge of the Sellers, all of the Employees employed in the United States are either United States citizens or are legally entitled to work in the United States under the Immigration Reform and Control Act of 1986, as amended, other United States immigration Laws and the Laws related to the employment of non-United States citizens applicable in the state in which the Employees are employed. To the Knowledge of the Sellers, all Employees employed outside the United States are legally entitled to work in the country in which they are employed.

(f) There are no Seller Employee Plans that are multiemployer plans within the meaning of Section 3(37) or 4001(a)(3) of ERISA, and none of the Sellers or any of their ERISA Affiliates has, within the past six (6) years, ever maintained, contributed to or participated in, or been required to maintain, contribute to or participate in, any such multiemployer plans.

(g) There are no Transferred Employee Plans.

(h) To the Knowledge of the Sellers, no Employee who is an executive or manager of any Seller is a party to any confidentiality, noncompetition, proprietary rights or other such agreement with any Person other than such Seller which has a Material Adverse Effect on such executive or manager's ability to perform his applicable services to the Business. To the Knowledge of the Sellers, no Employee is in violation of any term of any employment contract, confidentiality, noncompetition or other proprietary rights agreement or any other contract relating (i) to the right of such Employee to be employed by, or provide services to, such Seller with respect to the Business or (ii) to the knowledge or use of trade secrets or proprietary information with respect to any such Employee's employment with the Sellers, in each case except for such violation as would not have, individually or in the aggregate, a Material Adverse Effect.

(i) None of the Sellers has, with respect to the Business (excluding the EMEA Business), any Liability to provide retiree welfare benefits to any Person for any reason, except

69

as may be required by COBRA, a Seller Employee Plan listed on Section 4.11(a) of the Sellers Disclosure Schedule, or applicable Law.

(j)  With respect to the Employees: (i) the Sellers are in compliance in all material respects with all applicable Laws relating to labor and employment, including but not limited to Laws relating to discrimination, disability, labor relations, hours of work, payment of wages and overtime wages, characterization of workers as employees or independent contractors, pay equity, immigration, workers compensation, working conditions, employee scheduling, occupational safety and health, family and medical leave, employment and reemployment of members of the uniformed services, employee terminations and mass layoffs; (ii) as of the date hereof, the Sellers have not incurred any Liability or obligation which remains unsatisfied under the WARN Act or any similar state or local Laws regarding the termination or layoff of such Employees (iii) the Sellers have not incurred, and no circumstances exist under which the Sellers would reasonably be expected to incur, any material liability arising from the misclassification of employees as exempt from the requirements of the Fair Labor Standards Act or analogous Laws or the misclassification of employees as independent contractors; and (iv) no arbitration, court decision or governmental order to which the Sellers are or would reasonably be expected to become a party or are subject to in any way limits or restricts any of the Sellers from relocating or closing any of the operations of such Seller.

(k)  Except as required under the terms of this Agreement, a Seller Employee Plan, a Special Arrangement or under applicable Law, neither the execution or delivery of this Agreement, shareholder approval of this Agreement nor the consummation of the transactions contemplated by this Agreement could reasonably, either alone or in conjunction with any other event (whether contingent or otherwise, including, without limitation, any termination of employment), (i) result in any severance or increase in severance pay upon any termination of employment after the date of this Agreement with respect to any Employee, or, (ii) result in, cause the accelerated vesting or delivery of, or materially increase the amount or value of, any payment or benefit to any Employee.

Section 4.12.  Taxes.

(a)  Subject to Section 4.12(i), the Sellers have timely filed with the appropriate Tax Authorities all material Tax Returns required to be filed with respect to the Assets and the Business (excluding the EMEA Business) and all such Tax Returns are true, correct and complete in all material respects.  Subject to Section 4.12(i), all material Taxes due and payable with respect to the Assets and the Business (excluding the EMEA Business) have been timely paid.

(b)  Subject to Section 4.12(i), no deficiency for material Taxes has been claimed, proposed or assessed by any Tax Authority against any Seller and there is no pending audit, examination or other proceeding or Action in respect of material Taxes, in each case relating to any Asset or the Business (excluding the EMEA Business).

(c)  Subject to Section 4.12(i), no Seller has entered into an agreement or waiver or been requested to enter into an agreement or waiver extending any statute of limitations

70