**EXHIBIT 3**

EXECUTION VERSION

## TRUST INDENTURE SIDE AGREEMENT

This TRUST INDENTURE SIDE AGREEMENT (the "**Agreement**"), entered on [●], 2010, between (i) Nortel Networks Limited, a corporation organized under the laws of Canada ("**NNL**") and (ii) Nortel Networks Inc., a corporation organized under the laws of the State of Delaware, United States ("**NNI**").

## RECITALS

**WHEREAS:**

A.    On January 14, 2009 (the "**Petition Date**"), Nortel Networks Corporation, a corporation organized under the laws of Canada ("**NNC**"), NNL and certain of NNC's other Canadian affiliates (collectively, the "**Canadian Debtors**") commenced creditor protection proceedings before the Ontario Superior Court of Justice (Commercial List) (the "**Canadian Court**") under the Companies' Creditors Arrangement Act (Canada) (together with any formal insolvency proceedings commenced in Canada in respect of any Canadian Debtor, the "**Canadian Proceedings**"), in connection with which Ernst & Young Inc. was appointed monitor (the "**Monitor**");

B.    On the Petition Date, NNI and certain of NNI's United States affiliates (collectively, the "**US Debtors**") filed petitions in the United States Bankruptcy Court for the District of Delaware (the "**US Court**") under chapter 11 of title 11 of the United States Code (respectively, the "**Bankruptcy Code**" and the "**US Proceedings**");

C.    On the Petition Date, Nortel Networks UK Limited, Nortel Networks (Ireland) Limited ("**NNIR**"), Nortel Networks S.A. and certain of Nortel Networks UK Limited's affiliates in the Europe, Middle East and Africa ("**EMEA**") region (collectively, the "**EMEA Debtors**"), commenced administration proceedings (the "**UK Proceedings**" and, together with the Canadian Proceedings, the US Proceedings and any other insolvency proceedings with respect to any other Nortel entity, the "**Creditor Protection Proceedings**") before the High Court of Justice in London, England, represented by individuals from Ernst & Young LLP and, in the case of NNIR only, Ernst & Young Chartered Accountants, serving as administrators in the UK Proceedings;

D.    On July 14, 2009, Nortel Networks (CALA) Inc. filed a petition in the US Court under chapter 11 of the Bankruptcy Code and became subject to the US Proceedings;

E.    Subsequent to the commencement of the Creditor Protection Proceedings, Nortel, in consultation with its various creditor constituencies, determined to divest its various businesses to third party buyers (each such divestment, a "**Global Sale**");

F.    In order to sell Nortel's businesses on a going concern basis and to maximize the recoveries of Nortel's creditors, it is important that all relevant Nortel entities, including those entities that have not filed for any creditor protection proceedings, participate in the Global Sales;

1

G.     Under the laws of various jurisdictions in which Nortel operates, the directors, officers and agents of the relevant Nortel entity may potentially become personally liable for Indemnified Claims (as defined below);

H.     In order to enable the Beneficiaries (as defined below) to serve as directors, officers or agents of certain non-filed Nortel entities as set forth in Exhibit A to the Trust Indenture (as defined below) (each such entity, a "**Cascade Subsidiary**") and to facilitate the participation of such Cascade Subsidiaries in the Global Sales and the orderly wind-down of such Cascade Subsidiaries upon completion of the relevant Global Sales (or in some cases, where such entity is dormant, to facilitate an orderly wind-down of such entity), NNL and NNI have entered into that certain Trust Indenture, dated as of the date hereof, by and among NNL, NNI and John T. Evans as Trustee (the "**Trust Indenture**");

I.     Under the Trust Indenture, NNL and NNI have (subject to the terms and conditions of the Trust Indenture) agreed to contribute the initial Trust Property as set forth in Exhibit B to the Trust Indenture (such contributions in the aggregate, the "**Initial Aggregate Contribution**");

J.     NNL and NNI each wish to adjust their respective obligations under the Trust Indenture in proportion to the amount of aggregate proceeds of sale allocated to the Canadian Debtors and the US Debtors, respectively, under the Sale Transactions (as defined in Section 2.2), and to the extent possible to recover reasonable amounts from such other Nortel entities as participate in the Global Sales;

K.     The Official Committee of Unsecured Creditors appointed in the US Proceedings (the "**Creditors' Committee**"), the members of the ad hoc group of bondholders that have executed confidentiality or non-disclosure agreements with NNL (the "**Bondholders Group**") and the Monitor have each agreed to support the entry by NNL and NNI into the Trust Indenture and this Agreement; and

L.     On ●, 2010, the Canadian Court and the US Court authorized NNL and NNI, respectively, to enter into the Trust Indenture and this Agreement (and, pursuant to Section 303 of the Delaware General Corporation Law, no further action by the shareholders or the directors of NNI is required).

NOW, THEREFORE, in consideration of the respective covenants made herein, and of the mutual benefits to be derived hereby (the sufficiency of which are acknowledged), the Parties agree as follows:

ARTICLE I

INTERPRETATION

SECTION 1.1.  Definitions

(a)     The following capitalized terms shall have the meanings set forth below:

2

**"Allocation Completion"** has the meaning ascribed to such term in Section 2.3 of this Agreement;

**"Bankruptcy Code"** has the meaning ascribed to such term in the recitals to this Agreement;

**"Beneficiary"** shall have the same meaning as ascribed to such term under the Trust Indenture;

**"Bondholders Group"** has the meaning ascribed to such term in the recitals to this Agreement;

**"Business Day"** means a day on which the banks are open for business (Saturdays, Sundays, statutory and civic holidays excluded) in (i) New York, New York, United States, and (ii) Toronto, Ontario, Canada;

**"Canadian Court"** has the meaning ascribed to such term in the recitals to this Agreement;

**"Canadian Debtors"** has the meaning ascribed to such term in the recitals to this Agreement;

**"Canadian Proceedings"** has the meaning ascribed to such term in the recitals to this Agreement;

**"Cascade Subsidiary"** has the meaning ascribed to such term in the recitals to this Agreement;

**"Creditor Protection Proceedings"** has the meaning ascribed to such term in the recitals to this Agreement;

**"Creditors' Committee"** has the meaning ascribed to such term in the recitals to this Agreement;

"**Cross-Border Protocol**" means that certain Cross-Border Insolvency Protocol approved by the US Court pursuant to Section 105(a) of the Bankruptcy Code in an order, dated January 15, 2009, and by the Canadian Court pursuant to an order, dated January 14, 2009, as amended or as amended and restated from time to time;

**"EMEA"** has the meaning ascribed to such term in the recitals to this Agreement;

**"EMEA Debtors"** has the meaning ascribed to such term in the recitals to this Agreement;

**"Global Sale"** has the meaning ascribed to such term in the recitals to this Agreement;

3

**"Governmental Authority"** means governments, regulatory authorities, governmental departments, agencies, commissions, bureaus, officials, ministers, Crown corporations, courts, bodies, boards, tribunals, or dispute settlement panels or other law, rule or regulation-making organizations or entities:

> (a)   having or purporting to have jurisdiction on behalf of any nation, province, territory, state or other geographic or political subdivision of any of them; or
>
> (b)   exercising or entitled or purporting to exercise any administrative, executive, judicial, legislative, policy, regulatory or taxing authority or power;

**"Indemnified Claim"** shall have the same meaning as ascribed to such term under the Trust Indenture;

**"Initial Aggregate Contribution"** has the meaning ascribed to such term in the recitals to this Agreement;

**"Law"** or **"Laws"** means applicable laws (including common law and civil law), statutes, by-laws, rules, regulations, Orders, ordinances, protocols, codes, guidelines, treaties, policies, notices, directions, decrees, judgments, awards or requirements, in each case of any Governmental Authority;

**"Monitor"** has the meaning ascribed to such term in the recitals to this Agreement;

**"NNC"** has the meaning ascribed to such term in the recitals to this Agreement;

**"NNI"** has the meaning ascribed to such term in the preamble to this Agreement;

**"NNIR"** has the meaning ascribed to such term in the recitals to this Agreement;

**"NNL"** has the meaning ascribed to such term in the preamble to this Agreement;

**"Nortel"** means NNC and its debtor and non-debtor affiliates;

**"Orders"** means orders, injunctions, judgments, administrative complaints, decrees, rulings, awards, assessments, directions, instructions, settlements, penalties or sanctions issued, filed or imposed by any Governmental Authority or arbitrator and includes remedial orders;

**"Party"** or **"Parties"** means individually or collectively, as the case may be, NNL and/or NNI and any other Nortel entities added as additional parties to this Agreement pursuant to Section 2.1 of this Agreement;

4

**"Person"** includes any individual, partnership, limited partnership, limited liability company, joint venture, syndicate, sole proprietorship, company or corporation with or without share capital, unincorporated association, trust, trustee, executor, administrator or other legal personal representative, Governmental Authority or organization or entity however designated or constituted;

**"Petition Date"** has the meaning ascribed to such term in the recitals to this Agreement;

**"Proceeding"** means any claim, action, suit, application, litigation, charge, complaint, prosecution, assessment, reassessment, inquiry, hearing or proceeding of any nature or kind whatsoever, whether civil, criminal, administrative or otherwise;

**"Refund Payment"** shall have the meaning ascribed to such term in Section 2.2 of this Agreement;

**"Relevant Court"** means (a) if a final decree closing the US Proceedings has not been entered and the Canadian Proceedings have not terminated, a joint hearing of the US Court and the Canadian Court under the Cross-Border Protocol, (b) if a final decree closing the US Proceedings has not been entered and the Canadian Proceedings have terminated, the US Court, (c) if a final decree closing the US Proceedings has been entered and the Canadian Proceedings have not terminated, the Canadian Court, or (d) if a final decree closing the US Proceedings has been entered and the Canadian Proceedings have terminated, the Canadian Court;

"**Relevant Parties**" means the Creditors' Committee, the Bondholders Group and the Monitor;

**"Trustee"** shall have the same meaning as ascribed to such term under the Trust Indenture;

**"Trust Contribution Amount"** has the meaning ascribed to such term in Section 2.2 of this Agreement;

**"Trust Indenture"** has the meaning ascribed to such term in the recitals to this Agreement;

**"Trust Property"** shall have the same meaning as ascribed to such term under the Trust Indenture;

**"UK Proceedings"** has the meaning ascribed to such term in the recitals to this Agreement;

**"US Debtors"** has the meaning ascribed to such term in the recitals to this Agreement;

[New York #2173733 v7]

"**US Court**" has the meaning ascribed to such term in the recitals to this Agreement; and

"**US Proceedings**" has the meaning ascribed to such term in the recitals to this Agreement.

(b)    <u>Gender and Number</u>.  Any reference in this Agreement to gender includes all genders and words importing the singular include the plural and vice versa.

(c)    <u>Certain Phrases and Calculation of Time</u>.  In this Agreement the words "including" and "includes" mean "including (or includes) without limitation", and the terms "hereof," "herein," and "herewith" and words of similar import shall, unless otherwise stated, be construed to refer to this Agreement and not to any particular provision of this Agreement, and Section and Schedule references are to the Sections and Schedules to this Agreement unless otherwise specified.

(d)    <u>Headings, etc</u>.  The division of this Agreement into Articles and Sections and the insertion of headings are for convenient reference only and are not to affect or be used in the construction or interpretation of this Agreement.

ARTICLE II

PAYMENTS

SECTION 2.1.  <u>Recovery of the Initial Aggregate Contribution</u>.  NNL and NNI hereby agree to use commercially reasonable efforts to recover from Nortel entities (other than the Canadian Debtors, the US Debtors and Nortel Networks S.A.) a reasonable portion of the Initial Aggregate Contribution (taking into account any repayment of the Trust Property to the Parties under Section 8.1 or Section 8.3 of the Trust Indenture) and, to the extent that other Nortel entities agree to participate in such cost-sharing, the Parties agree to negotiate in good faith to amend this Agreement and add such Nortel entities as additional parties to this Agreement.  NNL and NNI hereby agree that any amounts actually recovered from other Nortel entities pursuant to this Section 2.1 prior to the Allocation Completion will be shared by each such Party in an equal proportionate amount (50% each).

SECTION 2.2.  <u>Indemnity Trust Payments</u>.  Notwithstanding anything to the contrary in the Trust Indenture, the Parties hereby agree that the Trust Contribution Amount (as defined below) shall be borne by NNL and NNI on an overall weighted average basis in proportion to the amount of the aggregate sale proceeds allocated and distributed to, in the case of NNL, the Canadian Debtors (taken together) and, in the case of NNI, the US Debtors (taken together), respectively, from the Global Sales identified below (collectively, excluding any such Global Sale that fails to be consummated, the "**Sale Transactions**"):

    i.    the sale of substantially all of the CDMA business and LTE Access assets;

    ii.    the sale of the Enterprise Solutions business;

6

    iii.  the sale of the global Optical Networking and Carrier Ethernet businesses;

    iv.  the sale of substantially all of the global assets of the GSM/GSM-R business;

    v.  the sale of Carrier VoIP and Application Solutions business;

    vi.  the sale of the interest in LG Nortel; and

    vii.  the sale of the Passport business.

For the purposes of this Agreement, "**Trust Contribution Amount**" means the Initial Aggregate Contribution <u>minus</u> the aggregate amount of the Refund Payments, where "**Refund Payment**" means any repayment of the Trust Property to the Parties under Section 8.1 or Section 8.3 of the Trust Indenture received prior to the Allocation Completion or any amounts actually recovered by the Parties from other Nortel entities pursuant to Section 2.1 of this Agreement prior to the Allocation Completion.

SECTION 2.3.  <u>Adjustment of Trust Contribution Amount</u>.  Immediately upon final allocation and distribution of the sales proceeds of all of the Sale Transactions to the Canadian Debtors and the US Debtors (the "**Allocation Completion**"), the Parties, together with the Relevant Parties, shall calculate each Party's share of the Trust Contribution Amount in accordance with Section 2.2 of this Agreement.  Within five (5) Business Days of completion of such calculations, which calculations must be acceptable to each Relevant Party (in each case acting reasonably and in good faith), the appropriate Party shall make the necessary payment to the other Party such that each Party bears a portion of the Trust Contribution Amount as provided for in Section 2.2, <u>provided</u> that if the Parties and the Relevant Parties fail to reach mutual agreement with regards to such calculations, such dispute may be referred by any Party or any of the Relevant Parties to the Relevant Court.  Notwithstanding anything to the contrary in the Trust Indenture, any repayment of the Trust Property to the Parties under Section 8.1 or Section 8.3 of the Trust Indenture received subsequent to the Allocation Completion or any amounts recovered by the Parties from other Nortel Entities pursuant to Section 2.1 of this Agreement subsequent to the Allocation Completion shall be shared by NNL and NNI on an overall weighted average basis in proportion to the amount of the aggregate proceeds of sale allocated and distributed to, in the case of NNL, the Canadian Debtors (taken together) and, in the case of NNI, the US Debtors (taken together), respectively, from the Sale Transactions.

[New York #2173733 v7]

ARTICLE III

MISCELLANEOUS

SECTION 3.1.  <u>Governing Law</u>

(a)     This Agreement shall be governed and construed in accordance with the laws of the Province of Ontario and the laws of Canada applicable therein without regard to any rules of conflict of laws of the Province of Ontario or any other jurisdiction.

(b)     To the fullest extent permitted by applicable Law, each Party:  (i) agrees that any claim, action or proceeding by such Party seeking any relief whatsoever arising out of, or in connection with, this Agreement, or the matters contemplated hereby shall be brought only in the Relevant Court; (ii) agrees to submit to the jurisdiction of the Relevant Court pursuant to the preceding clause (i) for purposes of all legal proceedings arising out of, or in connection with, this Agreement or the matters contemplated hereby; (iii) waives and agrees not to assert any objection that it may now or hereafter have to the laying of the venue of such action brought in any such court or any claim that any such action brought in such court has been brought in an inconvenient forum; (iv) agrees that the mailing of process or other papers in connection with any such action or proceeding in the manner provided in Section 3.9 or any other manner as may be permitted by Law shall be valid and sufficient service thereof; and (v) agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in any other jurisdictions by suit on the judgment or in any other manner provided by applicable Law.

(c)     EACH PARTY HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION DIRECTLY OR INDIRECTLY ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS AGREEMENT OR ANY TRANSACTION OR MATTER CONTEMPLATED HEREBY.  EACH PARTY (I) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (II) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION 3.1.

SECTION 3.2.  <u>Assignment; Successors</u>.  Either Party may assign its rights and obligations under this Agreement with the prior written consent of the other Party, <u>provided</u> that no prior written consent of the other Party shall be required if the rights of a Party are transferred (x) to a liquidation trust established in connection with the relevant creditor protection proceedings, (y) in connection with the implementation of a plan of reorganization of such Party or (z) to a trustee in bankruptcy of such Party or receiver of such Party.  This Agreement shall be binding upon and enure to the benefit of the Parties and their respective heirs, estates, administrators, executors, legal personal representatives, successors and assigns.

8

SECTION 3.3.  <u>Consent to Amendments; Waivers</u>.

(a)      No waiver of any of the provisions of this Agreement shall be deemed to constitute a waiver of any other provision (whether or not similar), nor shall such waiver be binding unless executed in writing by the party to be bound by the waiver.

(b)      No failure on the part of any Party to exercise, and no delay in exercising any right under this Agreement shall operate as a waiver of such right, nor shall any single or partial exercise of any such right preclude any other or further exercise of such right or the exercise of any other right.

(c)      This Agreement, or any provision hereof, may be waived or amended, on no less than 5 days' notice, only by means of a writing signed by all Parties, and approved, in writing, by the Relevant Parties, which amendment, if material in the judgment of such parties, must be approved by each of the courts that initially approved this Agreement.

SECTION 3.4.  <u>Entire Agreement</u>.  This Agreement constitutes the entire agreement among the Parties with respect to the issues contemplated herein and supersedes all prior agreements, understandings, negotiations and discussions, whether oral or written, of such Parties. There are no conditions or other agreements, express or implied, collateral, statutory or otherwise, among the Parties in connection with the subject matter of this Agreement, except as specifically set forth herein, and the Parties have not relied and are not relying on any other information, discussion or understanding in entering into and completing the transactions contemplated by this Agreement.

SECTION 3.5.  <u>Severability</u>.  If any provision of this Agreement shall be determined by an arbitrator or any court of competent jurisdiction to be illegal, invalid or unenforceable, that provision will be severed from this Agreement and the remaining provisions shall remain in full force and effect. The Parties, together with the Relevant Parties, shall endeavor in good faith negotiations to replace the illegal, invalid or unenforceable provision with a valid provision which comes closest to the intention of the Parties underlying the illegal, invalid or unenforceable provision.

SECTION 3.6.  <u>Further Assurances</u>.  The Parties shall do or cause to be done all such acts and things and shall execute or cause to be executed all such documents, agreements and other instruments as may be reasonably necessary or desirable for the purpose of carrying out the provisions and intent of this Agreement.

SECTION 3.7.  <u>Counterpart Execution</u>.  This Agreement may be executed in any number of counterparts and may be delivered by facsimile or other electronic transmission and all such counterparts taken together shall be deemed to constitute one and the same instrument.

SECTION 3.8.  <u>Third Party Beneficiaries</u>.  Other than as explicitly set forth in this Agreement, this Agreement is not intended to confer any rights or remedies under or by reason of this Agreement on any persons other than the Parties and their respective successors and permitted assigns, nor is anything in this Agreement intended to relieve or discharge the obligation or liability of any third party to the Parties, nor shall any provision give any third party any right of subrogation or action against any Party to this Agreement, nor shall any provision

9

estop or otherwise limit the rights of the Parties to assert any claims, counterclaims or defenses against any third party, <u>provided</u> that each of the Creditors' Committee and the Bondholders Group shall be a third party beneficiary of this Agreement entitled to enforce and take advantage of the benefits of this Agreement to NNI only to their fullest extent as if it were a signatory hereto.

      SECTION 3.9.  <u>Notice</u>.  Any notice, direction or other communication provided for in this Agreement shall be in writing and given by delivering it or sending it via facsimile, or other similar form of recorded communication, during normal business hours, addressed:

      (a)     to NNL at:

Nortel Networks Limited
5945 Airport Road Suite 360
Mississauga, Ontario L4V 1R9
Canada

Attention:    Anna Ventresca, Esq.
Facsimile:    +1 905 863 2075

with a copy to:

Ogilvy Renault LLP
200 Bay Street
Suite 3800, P.O. Box 84
Royal Bank Plaza, South Tower
Toronto, Ontario M5J 2Z4
Canada

Attention:    Michael J. Lang, Esq. and Derrick Tay, Esq.
Facsimile:    +1 416 216 3930 / 216 4832

      (b)     to NNI at:

Nortel Networks Inc.
2221 Lakeside Boulevard
Richardson, Texas 75082
U.S.A.

Attention:    John Ray
Facsimile:    +1 972 684 2470

with a copy to:

Cleary Gottlieb Steen & Hamilton LLP
One Liberty Plaza
New York, New York 10006
U.S.A.

10

Attention:     Craig B. Brod, Esq. and James L. Bromley, Esq.
Facsimile:     +1 212 225 3999

Any such communication shall be deemed to have been validly and effectively given (i) if personally delivered, on the date of such delivery if such date is a Business Day and such delivery was made prior to 4:00 p.m. (Toronto time) and otherwise on the next Business Day, or (ii) if transmitted via facsimile, on the Business Day following the date of transmission. Any of the above parties may change his or its address for service from time to time by notice given in accordance with the foregoing and any subsequent notice shall be sent to such party at its changed address.

**[Remainder of this page intentionally left blank.  Signature pages follow.]**

11

IN WITNESS WHEREOF, the Parties have duly executed this Agreement as of the date first written above.

**NORTEL NETWORKS LIMITED**

By:_____
    Name:
    Title:


_____
    Name:
    Title:


**NORTEL NETWORKS INC.**

By:_____
    Name:
    Title: