**<u>Exhibit A</u>**

1

UNITED STATES BANKRUPTCY COURT

DISTRICT OF DELAWARE

Case No. 09-10138 (KG)

- - - - - - - - - - - - - - - - - - - -x

In the Matter of:


NORTEL NETWORKS INC, et al.,


           Debtors.


- - - - - - - - - - - - - - - - - - - -x


         U.S. Bankruptcy Court

         824 North Market Street

         Wilmington, Delaware


         February 26, 2010

         12:05 AM


B E F O R E:

HON. KEVIN GROSS

U.S. BANKRUPTCY JUDGE


ECR OPERATOR:  JENNIFER PASIERB

2

1

2   Debtors' Fourth Omnibus Motion For An Order (A) Approving The

3   Assumption And Assignment Of Certain Additional Executory

4   Contracts In Connection With The Sale Of The Debtors'

5   Enterprise Solutions Business And (B) Authorizing The Debtors

6   To File Information Under Seal

7

8   Debtors' Motion For An Order Approving A Compromise Of A

9   Controversy Between (I) Nortel Networks Inc., (II) Nortel

10  Networks Limited, III) Peacock Communications, ATSSC, Inc. And

11  (IV) John Peacock

12

13  Debtors' Motion For An Order Authorizing The Debtors To File

14  Under Seal The Unredacted Settlement Agreement Between (I)

15  Nortel Networks Inc., (II) Nortel Networks Limited, (III)

16  Peacock Communications, ATSSC, Inc. And (IV) John Peacock

17

18  Motion Of Communications Test Design, Inc. Pursuant To Section

19  362 And 553 Of The Bankruptcy Code For Relief From The

20  Automatic Stay To Effectuate A Set Off Of Pre-Petition Amounts

21  Owed By And Between Communication Test Design, Inc. And Debtors

22

23  Debtors' Application For Entry Of An Order Approving An

24  Amendment To The Terms Of Compensation Of Lazard Freres & Co.

25  LLC As Financial Advisor And Investment Banker To The Debtors

3

1

2  Application Of The Official Committee Of Unsecured Creditors

3  For An Order Approving An Expansion Of Scope Of Services And

4  Amendment To Terms Of Retention Of Jefferies & Company, Inc. As

5  Investment Banker To The Official Committee Of Unsecured

6  Creditors

7

8  Debtors' Fourth Omnibus Objection (Non-Substantive) To Certain

9  Claims Pursuant To 11 U.S.C. § 502, Fed. R. Bankr. 3007 And

10  Del. L.R. 3007-1 (Amended; Duplicate; Insufficient

11  Documentation)

12

13  Debtors' Motion To Add Certain Additional Debtors As Sellers In

14  The Sale Of The Debtors' Metro Ethernet Networks Business To

15  Ciena Corporation

16

17  Debtors' Motion For Entry Of An Order Enforcing The Automatic

18  Stay Against Certain Claimants With Respect To The U.K. Pension

19  Proceedings

20

21

22

23

24  Transcribed By:  Clara Rubin

25

4

1

2    A P P E A R A N C E S:

3    CLEARY GOTTLIEB STEEN & HAMILTON LLP

4         Attorneys for the Debtors and Debtor-in-Possession

5         One Liberty Plaza

6         New York, NY 10006

7

8    BY:   LISA M. SCHWEITZER, ESQ.

9          JAMES L. BROMLEY, ESQ.

10         NEIL P. FORREST, ESQ.

11         BRENDAN GIBBON, ESQ.

12         DEBORAH M. BUELL, ESQ.

13         DAVID OLIWENSTEIN, ESQ. (TELEPHONICALLY)

14

15

16   MORRIS, NICHOLS, ARSHT & TUNNELL LLP

17         Attorneys for the Debtors and Debtor-in-Possession

18         1201 North Market Street

19         18th Floor

20         Wilmington, DE 19899

21

22   BY:   DEREK C. ABBOTT, ESQ.

23         ANNIE C. CORDO, ESQ.

24

25

5

1    LINKLATERS LLP

2          Attorneys for the Debtors

3          One Silk Street

4          London EC2Y 8HQ

5

6    BY:   MARK BLYTH, ESQ. (VIA VIDEOCONFERENCE)

7          PARHAM KOUCHIKALI, ESQ. (VIA VIDEOCONFERENCE)

8

9    AKIN GUMP STRAUSS HAUER & FELD LLP

10         Attorneys for the Official Committee of Unsecured

11          Creditors

12         One Bryant Park

13         New York, NY 10036

14

15   BY:   LISA G. BECKERMAN, ESQ.

16         DAVID H. BOTTER, ESQ. (TELEPHONICALLY)

17

18   ALLEN & OVERY LLP

19         Attorneys for Ernst & Young, as Monitor and Foreign

20          Representative for the Canadian Nortel Entities

21         1221 Avenue of the Americas

22         New York, NY 10020

23

24   BY:   KEN COLEMAN, ESQ.

25         LISA KRAIDIN, ESQ. (TELEPHONICALLY)

6

1

2    BAYARD, P.A.

3         Attorneys for Nortel Networks UK Pension Plan Trustee and

4          Pension Protection Fund

5         222 Delaware Avenue, Suite 900

6         Wilmington, DE 19801

7

8    BY:   CHARLENE D. DAVIS, ESQ.

9

10   BUCHANAN INGERSOLL & ROONEY PC

11        Attorneys for Ernst & Young, as Monitor and Foreign

12         Representative for the Canadian Nortel Entities

13        The Brandywine Building

14        1000 West Street, Suite 1410

15        Wilmington, DE 19801

16

17   BY:   MARY F. CALOWAY, ESQ.

18

19   LOWENSTEIN SANDLER PC

20        Attorneys for Lead Plaintiffs in the Securities

21         Litigation

22        65 Livingston Avenue

23        Roseland, NJ 07068

24

25   BY:   MICHAEL S. ETKIN, ESQ.

7

1

2    RICHARDS LAYTON & FINGER, P.A.

3         Attorneys for the Official Committee of Unsecured

4          Creditors

5         One Rodney Square

6         920 North King Street

7         Wilmington, DE 19801

8

9    BY:   ANDREW C. IRGENS, ESQ.

10

11

12   SWARTZ CAMPBELL LLC

13        Attorneys for Communications Test Design, Inc.

14        1 S. Church Street

15        Suite 400

16        West Chester, PA 19382

17

18   BY:   JOHN A. WETZEL, ESQ.

19

20

21

22

23

24

25

8

1

2    WILLKIE FARR & GALLAGHER LLP

3         Attorneys for Nortel Networks UK Pension Plan Trustee and

4          Pension Protection Fund

5         787 Seventh Avenue

6         New York, NY 10019

7

8    BY:   BRIAN E. O'CONNOR, ESQ.

9          SAMEER ADVANI, ESQ.

10         ANDREW HANRAHAN, ESQ.

11         WESTON EGUCHI, ESQ. (TELEPHONICALLY)

12

13   HUGHES HUBBARD & REED LLP

14         Attorneys for The Joint Administrators of Nortel UK

15         One Battery Park Plaza

16         New York, NY 10004

17

18   BY:   MICHAEL LUSKIN, ESQ. (TELEPHONICALLY)

19

20   KIRKLAND & ELLIS LLP

21         Interested Party

22         300 North LaSalle

23         Chicago, IL 60654

24

25   BY:   JEFFREY ARMINGTON, ESQ. (TELEPHONICALLY)

9

1

2   LATHAM & WATKINS LLP

3        Attorneys for Ciena Capital

4        233 South Wacker Drive

5        Suite 5800

6        Chicago IL 60606

7

8   BY:   BRIAN L. GLASSBERG, ESQ. (TELEPHONICALLY)

9

10   MILBANK TWEED HADLEY & MCCLOY

11        Attorneys for the Bondholders Group

12        One Chase Manhattan Plaza

13        New York, NY 10005

14

15   BY:   JENNIFER P. HARRIS, ESQ. (TELEPHONICALLY)

16

17   MILBANK TWEED HADLEY & MCCLOY

18        Attorneys for the Bondholders Group

19        601 South Figueroa Street

20        30th Floor

21        Los Angeles, CA 90017

22

23   BY:   THOMAS R. KRELLER, ESQ. (TELEPHONICALLY)

24

25

10

1

2    PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

3         Interested Party

4         1285 Avenue of the Americas

5         New York, NY 10019

6

7    BY:   ARINA POPOVA, ESQ. (TELEPHONICALLY)

8

9    PEPPER HAMILTON LLP

10        Attorneys for Microvision, Inc.

11        Hercules Plaza, Suite 5100

12        1313 Market Street

13        Wilmington, DE 19899

14

15   BY:   EVELYN J. MELTZER, ESQ.

16

17   ARROWHAWK CAPITAL PARTNERS

18        Interested Party

19   BY:   ANDREW GU (TELEPHONICALLY)

20

21   BARCLAYS CAPITAL, INC.

22        Interested Party

23   BY:   OLIVIA MAURO (TELEPHONICALLY)

24

25

11

1

2   CARVAL INVESTORS

3        Interested Party

4   BY:   DAX ATKINSON (TELEPHONICALLY)

5

6   CEREBRUS CAPITAL MANAGEMENT

7        Interested Party

8   BY:   JACOB ZAND, IN PROPRIA PERSONA (TELEPHONICALLY)

9

10  CITI

11       Interested Party

12  BY:   REBECCA SONG (TELEPHONICALLY)

13

14  DE SHAW

15       Creditor

16  BY:   SARAH JOHNSON (TELEPHONICALLY)

17

18  DEUTSCHE BANK

19       Creditor

20  BY:   JAMES MACINNIS (TELEPHONICALLY)

21

22  DOW JONES & CO.

23       For Interested Party, Dow Jones News Wires

24  BY:   PEG BRICKLEY (TELEPHONICALLY)

25

12

1

2   FARALLON CAPITAL MANAGEMENT

3        Interested Party

4   BY:   MATTHEW FORD (TELEPHONICALLY)

5

6   HALCYON ASSET MANAGEMENT

7        Creditor

8   BY:   ANDREW G. FRIEDMAN (TELEPHONICALLY)

9

10  HERBERT SMITH

11       For Joint Administrators and Foreign Representatives for

12        Nortel Networks UK Ltd.

13  BY:   THOMAS WALSH (TELEPHONICALLY)

14        JOHN WHITEOAK (TELEPHONICALLY)

15

16  LINDEN ADVISORS, LP

17       Creditor

18  BY:   ANDY CHANG (TELEPHONICALLY)

19

20  MACQUARIE BANK

21       Creditor

22  BY:   SUSAN S. CHEN (TELEPHONICALLY)

23

24

25

13

1

2   MORGAN STANLEY

3        Interested Party

4   BY:   JAMES C. MARTIN (TELEPHONICALLY)

5

6   NORTEL NETWORKS, INC.

7        Debtors and Debtors-in-Possession

8   BY:   PAVI BINNING (TELEPHONICALLY)

9        ANNA VENTRESCA (TELEPHONICALLY)

10

11  OAK HILL ADVISORS

12       Creditor

13  BY:   GREGORY S. RUBIN (TELEPHONICALLY)

14

15  OGILVY RENAULT, LLP

16       Interested Party

17  BY:   SUZANNE WOOD (TELEPHONICALLY)

18

19  ONE EAST PARTNERS

20       For Interested Party Michael Adamski

21  BY:   TEJ ARORA (TELEPHONICALLY)

22

23  PSAM, LP

24       Interested Party

25  BY:   PHILLIP E. BROWN (TELEPHONICALLY)

14

1

2   SENATOR INVESTMENT GROUP

3        Interested Party

4   BY:   JAY BHARADWA (TELEPHONICALLY)

5

6   STRATEGIC VALUE PARTNERS

7        Creditor

8   BY:   ALAN CARR (TELEPHONICALLY)

9

10   SYMPHONY ASSETS MANAGEMENT

11        Interested Party

12   BY:   JAMES S. KIM, IN PROPRIA PERSONA (TELEPHONICALLY)

13

14   TRICADIA CAPITAL

15        Creditor

16   BY:   STEPHEN GRISANTI (TELEPHONICALLY)

17

18   WATERSHED ASSET MANAGEMENT, LLC

19        Interested Party

20   BY:   FAISAL AHMAD (TELEPHONICALLY)

21

22   RYAN POLISI, IN PROPRIA PERSONA (TELEPHONICALLY)

23

24   HONDO SEN, CREDITOR, IN PROPIA PERSONA (TELEPHONICALLY)

25

15

PROCEEDINGS

1

2      THE COURT:  Mr. Abbott.

3      MR. ABBOTT:  Good afternoon, Your Honor.

4      THE COURT:  I guess it is now, yes.

5      MR. ABBOTT:  Derek Abbott here on behalf of the U.S.

6  debtors in the Chapter 11 case, Your Honor.,.

7      THE COURT:  Yes.

8      MR. ABBOTT:  We have a number of items on the agenda,

9  only one of which, frankly, is, I think, going to take a lot of

10  the Court's time.  I just wanted to start with the first item,

11  Your Honor, which was the debtors' motion seeking final waiver

12  of the 345 requirements.

13      THE COURT:  Yes.

14      MR. ABBOTT:  Your Honor, we're adjourning that.  I

15  indicated to Mr. Tinker that we would adjourn that without a

16  date.  I wanted to just explain to the Court our rationale

17  there.

18      THE COURT:  Please.

19      MR. ABBOTT:  Your Honor may recall that early in the

20  case we had an interim waiver of 345, and we filed a motion to

21  make sure that that relief ultimately became final.  We entered

22  into a lot of discussions with the U.S. Trustee, which are

23  ongoing, Your Honor.

24      THE COURT:  Okay.

25      MR. ABBOTT:  And we've incrementally been, fairly

16

1    dramatically actually, reducing the risk profile of where these

2    funds are.  And what we wanted to try to do was get to an end

3    state that we could then explain to the U.S. Trustee, try to

4    get their acquiescence in what we will propose and, if not,

5    come back to the Court with much more limited issues than the

6    facts would have presented themselves had we litigated it

7    against them when filed.

8            So we've kept them in the loop and have been, again,

9    moving along a spectrum toward where they'd rather have us, and

10   we wanted to just continue that process.  And once we get an

11   end state in terms of where the funds have moved and are

12   settled, then we'll be back in front of the Court, either with

13   their agreement or with a much narrower discussion.

14           THE COURT:  And clearly that office has not been

15   pressing the issue, so I'm certainly satisfied with --

16           MR. ABBOTT:  That's true, Your Honor.

17           THE COURT:  -- with the adjournment.

18           MR. ABBOTT:  I will now turn it over to Ms.

19   Schweitzer, Your Honor, who will run through a number of items

20   on the agenda.

21           THE COURT:  All right.  Thank you.

22           MR. ABBOTT:  Thank you.

23           THE COURT:  Ms. Schweitzer, good afternoon now.

24           MS. SCHWEITZER:  Oh, there we go.  Good afternoon.

25           THE COURT:  You're back.  And Mr. Bromley, I might

17

1    say, has done a very nice job in your absence in this case.

2              MS. SCHWEITZER:  Oh, well, thank you.

3              We are -- I guess the first thing that was up was that

4    we have the uncontested matters that we had submitted under

5    certificates of no objection.

6              THE COURT:  I did sign those orders.

7              MS. SCHWEITZER:  Okay, so that takes care of item

8    number 2, 3, 4.

9              THE COURT:  Yes.

10             MS. SCHWEITZER:  And then on the uncontested matters

11   going forward, the first one is CTDI, which was a counterparty

12   to the debtors that had claims to and from the NNI.  And they

13   had brought a motion to effectuate a setoff of certain amounts.

14             THE COURT:  Yes.

15             MS. SCHWEITZER:  We have reached an agreement with

16   CTDI, and I can hand up a revised order with a blackline.

17             THE COURT:  Please --

18             MS. SCHWEITZER:  If I may approach?

19             THE COURT:  -- yes, Ms. Schweitzer, you certainly may.

20        (Pause)

21             MS. SCHWEITZER:  We have cooperated vigorously with

22   the counterparty, and as you'll see -- you can walk through the

23   blackline -- but it's pretty much a new order.  And to

24   summarize what the order does is it basically says that we've

25   come to the point of reconciling 7.1 million dollars of claims

18

1    on one side against 5.9 million dollars owed in the other

2    direction.

3           THE COURT:  Okay.

4           MS. SCHWEITZER:  And what we're agreeing is that

5    for -- with respect to those accounts payable, those can be set

6    off by CTDI on the one hand and NNI on the other hand.  And

7    there's a net difference owing from CTDI to NNI of 1.163

8    million dollars.

9           THE COURT:  Yes.

10          MS. SCHWEITZER:  And so CTDI will remit that net

11   difference to NNI following the entry of this order.

12          And then with respect to -- they had -- CTDI had filed

13   a proof of claim, so that proof of claim will be withdrawn. And

14   there are accounts payable that are still being reconciled

15   between the party and other claims between them, their

16   affiliates and other people.  And so what the order provides is

17   that CTDI can refile their proof of claim, just simply mend out

18   the parts that have been agreed on --

19          THE COURT:  Yes.

20          MS. SCHWEITZER:  -- and that everyone reserves their

21   rights with respect to every claim, other than the amounts

22   being settled, in both directions with the affiliates and

23   everything.  So it's just effectively a limited setoff order

24   for the claims that are enumerated.

25          THE COURT:  All right.

19

1        MS. SCHWEITZER:  CTDI's counsel is in the courtroom.

2        MR. WETZEL:  Good afternoon, Your Honor.

3        THE COURT:  Good afternoon.

4        MR. WETZEL:  John Wetzel on behalf of CTDI.

5        THE COURT:  Good to see you again.

6        MR. WETZEL:  Thank you.

7        MS. SCHWEITZER:  And --

8        THE COURT:  And in full agreement.

9        And --

10        MR. WETZEL:  Yes, that's correct.

11        THE COURT:  -- does anyone else wish to be heard?

12        MR. WETZEL:  No, I don't think so.

13        THE COURT:  Then I'm pleased to sign the order.

14        MS. SCHWEITZER:  Great.

15        THE COURT:  I certainly understand the appropriateness

16   of it, and the reservation of rights is certainly made

17   perfectly clear as well.

18        MS. SCHWEITZER:  Great.

19        MR. WETZEL:  Thank you, Your Honor.

20        THE COURT:  Thank you.

21        MS. SCHWEITZER:  Mr. Bromley will be handling the

22   Lazard motion, but if I could leave that to the end.

23        THE COURT:  Yes.

24        MS. SCHWEITZER:  That's the next one on the agenda.

25   And then after that is the Jefferies retention motion.

20

1          Lisa, are you handling --

2          MS. BECKERMAN:  Yeah, I can handle that.

3          MS. SCHWEITZER:  I'll cede the podium to Ms.

4    Beckerman, then.

5          THE COURT:  All right.

6          MS. SCHWEITZER:  Come on back.

7          THE COURT:  Ms. Beckerman, it's good to have you --

8          MS. BECKERMAN:  Thank you, Your Honor.

9          THE COURT:  -- in court today.

10          MS. BECKERMAN:  I don't know if it'll be a regular

11    occurrence, I doubt it, but it's nice to see you.

12          THE COURT:  Good to see you.

13          MS. BECKERMAN:  Your Honor, as you know that we had

14    received a limited informal objection from the U.S. Trustee,

15    which had asked for some clarifying language in the order,

16    making clear that the standard of review that they had with

17    respect to the original application was retained with respect

18    to the amended order that we're going to be presenting to Your

19    Honor

20          THE COURT:  Yes.

21          MS. BECKERMAN:  And we'd also been -- received a

22    limited objection from the debtors, which, as you may recall,

23    required and requested that our retention arrangements, then,

24    the amendments -- limited amendments that we were seeking with

25    respect to Jefferies retention arrangements not go forward

21

1    unless and until the issues with Lazard were resolved.  And as

2    Mr. Bromley, I think, is going to tell you soon, they were

3    resolved.

4            THE COURT:  Okay.

5            MS. BECKERMAN:  So that's why we're both going forward

6    here today.

7            And if I may approach, I have -- I have to apologize;

8    for some reason I have blacklines but no cleans (sic) of this

9    order.  So I would like to approach with a blackline for Your

10   Honor so you can see the changes, and I can answer any

11   questions you may have about the order.  And then as soon as

12   our clean actually arrives from my co-counsel's offices, we

13   will present it to you at a later point in the hearing --

14           THE COURT:  Of course.

15           MS. BECKERMAN:  -- if that's all right.

16           THE COURT:  That's fine, Ms. Beckerman.  Thank you.

17       (Pause)

18           MS. BECKERMAN:  Okay, so Your Honor can see on the

19   order, it just --

20           THE COURT:  Yes.

21           MS. BECKERMAN:  -- it's very -- it just clarifies a

22   few points; it makes it clear that the standards for review

23   with the original application and the original order still

24   apply --

25           THE COURT:  Right.

22

1       MS. BECKERMAN:  -- except with respect to making it

2   clear in the next paragraph that nothing is altering the U.S.

3   Trustee's rights and their standards of review, and that it

4   obviously extends the waiver of the information requirements on

5   the same terms and conditions in the original order.

6       THE COURT:  Right.

7       MS. BECKERMAN:  So I don't know if Your Honor has any

8   other questions about the application.

9       THE COURT:  No, it's very straightforward.  I don't

10  know if I need to first hear from Mr. Bromley on -- or Ms.

11  Schweitzer, excuse me, on the related application, but

12  otherwise it certainly is in order and I will be pleased to

13  grant it.

14      MS. BECKERMAN:  Okay, and, Your Honor, as I again

15  apologize, as soon as we have a clean I will present it to you

16  at some break that we'll have, I'm sure, later on in this

17  hearing that will be going on for a while.

18      THE COURT:  That will be fine.

19      MS. BECKERMAN:  Thank you.

20      THE COURT:  Thank you, Ms. Beckerman.

21      MS. SCHWEITZER:  We don't have an objection,

22  obviously --

23      THE COURT:  All right.

24      MS. SCHWEITZER:  -- to it being entered.

25      THE COURT:  Good.

23

1          MS. SCHWEITZER:  To go back to the agenda order, we're

2     on item -- agenda letter, we're on item number 8 of the letter,

3     which is the fourth omnibus claims objection.

4          THE COURT:  Yes.

5          MS. SCHWEITZER:  And for that one we do not have a

6     revised order.  There was one objection or answer filed by

7     Martin Apfel -- I'm sorry, Appell, A-p-p-e-l-l, to the claims

8     objection, and his claim -- his concern was simply that we --

9     he had filed one claim, the second claim -- are we going to

10    call the second claim late if that's a surviving claim.  So we

11    agreed that we'd represent on the record that the surviving

12    claim will not be counted as a late claim.

13         THE COURT:  Good.

14         MS. SCHWEITZER:  We reserve all other defenses to that

15    claim, but we won't object to it on the face of timeliness as

16    the surviving claim.  And with that, the original order can be

17    entered; I have a copy here to hand up if you'd like.

18         THE COURT:  That would be fine.  Thank you, Ms.

19    Schweitzer.

20         And does anyone else wish to be heard?

21       (No response)

22         THE COURT:  Okay, then I am prepared to grant the

23    relief.

24       (Pause)

25         THE COURT:  Do I need the exhibits, or is it clear

24

1    that those exhibits --

2              MS. SCHWEITZER:  I believe it's --

3              THE COURT:  -- are as attached to your --

4              MS. SCHWEITZER:  I believe it's as attached to the

5    motion.

6              THE COURT:  All right.  That's fine.

7              MS. SCHWEITZER:  Oh, go ahead.

8              THE COURT:  It came already, Ms. Beckerman?

9              MS. BECKERMAN:  It did.  It was quick.

10             THE COURT:  Very good.

11             MS. BECKERMAN:  Sorry.

12             THE COURT:  That's fine.

13             MS. BECKERMAN:  Thank you so much, Your Honor.

14             THE COURT:  Thank you.

15             MS. BECKERMAN:  I apologize profusely.

16             THE COURT:  No, not necessary.  I'm pleased to sign

17   it, and I'm pleased to sign the claims order as well.

18        (Pause)

19             THE COURT:  Okay.

20        (Pause)

21             THE COURT:  Signed.

22             MS. SCHWEITZER:  Great.  Thank you, Your Honor.  That

23   brings us to item 9 on the agenda letter, which is the motion

24   to add certain additional debtors in the MEN sale.

25             THE COURT:  Yes.

1          MS. SCHWEITZER:  And basically what happened, we had

2     filed the original MEN sale motion that applies to the debtors.

3     After the order was entered approving the sale, we realized

4     that certain of the patents that were listed on the -- in the

5     sale agreement actually were to a different debtor defendant as

6     owner.  Microvision is the only person who'd filed an

7     objection.  We've resolved that objection with Microvision.

8          They make a lot of statements in their objection

9     regarding the history of being involved or not being involved.

10    In light of the resolution of the objection, I won't go into

11    the he-said-she-said back-and-forth on that.  But the agreed

12    order, which I can present to you, provides that for the

13    avoidance of doubt, which was our intention all along --

14          THE COURT:  Yes.

15          MS. SCHWEITZER:  -- is that the patent is being sold

16    subject to the license agreement between -- its pronounced

17    "kyros", as licensor, and Microvision as the licensee, and that

18    to the extent that Microvision has rights under 365 and that

19    the royalty payments would be owed in fact to the debtors and

20    not the purchaser, and, with that, Microvision has agreed to

21    withdraw their objection.

22          So I can approach and hand up the order.

23          THE COURT:  Please.  Thank you, Ms. Schweitzer.

24          Ms. Meltzer.  Good afternoon to you.

25          MS. MELTZER:  Good afternoon, Your Honor.  Evelyn

26

1    Meltzer of Pepper Hamilton, on behalf of Microvision, Inc.  The

2    language in the order does resolve our objection, and we

3    withdraw it.

4           THE COURT:  All right.

5           MS. MELTZER:  Thank you.

6           THE COURT:  It avoids all of that, and I'm pleased to

7    sign the order.

8       (Pause)

9           THE COURT:  Signed.

10          MS. SCHWEITZER:  Great.  Thank you, Your Honor.  So

11   that brings us back to agenda item number 6, which is the

12   Lazard retention application --

13          THE COURT:  Yes.

14          MS. SCHWEITZER:  -- and then after that the pension

15   motion.  And I'll cede the podium to Mr. Bromley for those two

16   matters.

17          THE COURT:  All right.  Thank you, Ms. Schweitzer.

18          MS. SCHWEITZER:  Thank you, Your Honor.

19          THE COURT:  Mr. Bromley, good afternoon.

20          MR. BROMLEY:  Good afternoon.

21          THE COURT:  Good to see you.

22          MR. BROMLEY:  Good to see you, Your Honor.  Thank you

23   very much for having us.

24          The next item is the amended retention relating to the

25   investment bankers for the debtors, Lazard Freres & Company, or

27

1    as our British friends say it, Lazard.

2              THE COURT:  Okay.

3              MR. BROMLEY:  And it is, as Ms. Beckerman mentioned,

4    something that we wanted to take up together with the Jefferies

5    amendments.

6              Just by way of background, Your Honor, the form of the

7    order that I will hand up has been reviewed by all of the

8    relevant parties, by the two committees, the bonds and the UCC,

9    by the U.S. Trustee, by the Canadian debtors and the Canadian

10   monitor.  It's important to mention that because the fees that

11   Lazard are charging are not simply the responsibility of the

12   U.S. debtors but of all of the debtors around the world and are

13   being addressed as deal costs.

14             The reason that both the Jefferies and the Lazard

15   applications are here today, Your Honor, is that, as we've gone

16   through the past year, obviously more M&A activity, a lot more

17   M&A activity, took place than was ever contemplated --

18             THE COURT:  Yes.

19             MR. BROMLEY:  -- upon the filing.  And so when these

20   retention agreements were executed with the investment bankers,

21   they were done in the light of the traditional restructuring

22   context.  And in simple terms, what we've done here for both of

23   the investment bankers has increased the amount of compensation

24   that will be available.

25             With respect to -- and we think it's fair and

28

1   appropriate in both circumstances.  Certainly the Jefferies

2   folks, and Mr. Henkin is here today, have made a huge

3   contribution to the exercise in all the auctions, and we

4   certainly appreciate that.  And the Lazard folks have been

5   leading the charge across the board and around the world, and

6   so we certainly do think that they deserve more than they had

7   originally signed up for.  And I think it's a testament to the

8   agreement that everyone has reached that there's really no

9   substantial argument with that.

10          I would mention a couple of things with respect to

11  Lazard just for the record.  One of the remaining substantial

12  assets that we are trying to address is the great reservoir of

13  intellectual property that the Nortel entities own and control

14  around the world.  And so there is an increase in the

15  compensation that Lazard would be entitled to, but there also

16  is a cap that would be imposed with respect to that.  And so

17  that is contained within paragraph 5 of the revised order in

18  that the IP transaction fee will not, subject to the terms of

19  the order, exceed 5,125,000 dollars.

20          There's also reference to the fact that there are

21  certain transactions that Lazard would not be compensated for,

22  specifically relating to real estate, certain joint venture

23  assets; that's also set forth as well.  And that's subject to

24  the caveat that unless Lazard does get involved, there are

25  certain material assets, real estate assets, one in Richardson,

29

1    Texas and one outside of Ottawa, that we don't anticipate

2    Lazard will be involved in; but in the event that they do, they

3    would be entitled to a fee, but right now they would not.

4         So with that, Your Honor, those are the -- I can go

5    through each detail, but they are -- there are caveats to the

6    increased compensation, but generally speaking the -- both in

7    terms of Jefferies and Lazard, I think the constituents around

8    the world have been very happy with their services and are

9    comfortable in supporting the increase.

10        THE COURT:  All right.  Thank you, Mr. Bromley.

11        MR. BROMLEY:  And I do have for you both a clean and

12   marked copy.

13        THE COURT:  Thank you.

14        Anyone else wish to be heard?

15        MS. BECKERMAN:  We're supportive of the revised order,

16   Your Honor.

17        THE COURT:  Thank you, Ms. Beckerman.

18        MR. BROMLEY:  May I approach, Your Honor?

19        THE COURT:  Yes.  Thank you, Mr. Bromley.

20        Well, the concept in this court for professional fees

21   is fair and reasonable, and the Court is certainly not opposed

22   to adjustments when it appears that a -- an earlier structure

23   is unfair or does not fairly represent the efforts of a

24   professional, and I think that that is the case here.  And I am

25   therefore certainly going to approve the application for the

1    amendment and sign the order --

2         MR. BROMLEY:  Thank you very much, Your Honor.

3         THE COURT:  -- particularly given, again, the -- as

4    Mr. Bromley said, the consensus of, really, the interested

5    parties throughout the world.

6         MR. BROMLEY:  I think that Mr. Murray and Mr. Riedel

7    have thought that the next time around they're going to have an

8    appearance fee as well.

9         THE COURT:  Yes.

10        (Pause)

11        THE COURT:  All right, I've signed the order.

12        MR. BROMLEY:  Thank you very much, Your Honor.

13        And now, Your Honor, in terms of -- I actually have a

14   question for you in terms of process --

15        THE COURT:  Timing, yes.

16        MR. BROMLEY:  -- and timing.  We're obviously ready to

17   go to the main event and deal with our brethren in the U.K.  It

18   is 12:25 and I wanted to --

19        THE COURT:  And, I guess, 5:25 in the U.K. at this

20   point --

21        UNIDENTIFIED SPEAKER:  Right.

22        THE COURT:  -- probably.

23        MR. BROMLEY:  That's time for the pubs, I believe.

24        THE COURT:  That's right.  Well, we should give them,

25   maybe, time to go out to those pubs on a break.  But let me

31

1    hear what you propose too, because I'm not sure -- I know it's

2    going to be -- take some time, and we will have to, obviously,

3    recess at some point to allow people a chance to get something

4    to eat.

5          MR. BROMLEY:  Well, how much time do we have for me,

6    Your Honor, just so --

7          THE COURT:  As long as necessary.  I know those are

8    dangerous words, but --

9          MR. BROMLEY:  So I think we would rather just

10   proceed --

11         THE COURT:  All right.

12         MR. BROMLEY:  -- at this point, and then --

13         THE COURT:  All right.  Well, let me do this, though,

14   just for the benefit of at least the staff:  If we could take a

15   ten-minute recess and then proceed, I think that might be

16   helpful.

17         MR. BROMLEY:  Absolutely, Your Honor.

18         THE COURT:  All right.  Let's take a ten-minute

19   recess, and we'll be back.

20       (Recess from 12:23 p.m. until 12:37 p.m.)

21         THE CLERK:  Please rise.

22         THE COURT:  Thank you, and please be seated.  And

23   we're ready to proceed, I think, with the main event.

24       (Pause)

25         THE COURT:  Good afternoon.

32

1          MS. BUELL:  Good afternoon, Your Honor.  Deborah Buell

2    of Cleary Gottlieb.

3          THE COURT:  Good to see you again.

4          MS. BUELL:  And it's a pleasure to be here again.  And

5    as you see, we are bringing you another interesting issue.  And

6    before we get started, if I may, Your Honor, I think there are

7    a number of people both in the courtroom and on the video and

8    that we would like to make sure that the Court has been

9    introduced to.

10         And so at this time if the people in the U.K. can hear

11   me, if you could pull back to the shot of the room, I'll

12   introduce the various individuals who are sitting around the

13   conference table there.

14         THE COURT:  Thank you, Ms. Buell.  That would be fine.

15         MS. BUELL:  And we do appreciate the Court's

16   willingness to entertain the appearance of witnesses in this

17   format.  Obviously, it's a huge expense- and time-saving, I

18   think, for everyone involved.

19         THE COURT:  Yes.

20         MS. BUELL:  Well, we seem not to be pulling back.

21   So --

22         THE COURT:  They may have gone out for that -- to that

23   pub.

24         MS. BUELL:  I -- ah-hah, there they are.

25         THE COURT:  There they are.

1          MS. BUELL:  All right.  Very good.  Your Honor, I'll

2    ask the individuals to raise their hand, if they would, so that

3    they can -- you can associate a name and a face.  We have two

4    lawyers from Linklaters, who are the U.K. counsel to the

5    debtors; their application for retention is now pending.

6          THE COURT:  Yes.

7          MS. BUELL:  And that is Mark Blyth and Parham

8    Kouchikali.

9          Excuse me, Parham, for butchering your name.

10          All right.

11          MR. KOUCHIKALI:  That's fine.

12          THE COURT:  One gentleman's a little bit out of view

13    for me at the --

14          MS. BUELL:  Okay.

15          THE COURT:  -- at the head of the table.

16          All right.

17          MS. BUELL:  All right.  Thank you.

18          THE COURT:  Always -- okay.

19          MS. BUELL:  And then we also have present in the room

20    three of the declarants for the trustee, and those individuals

21    are Richard Twomey (ph.) --

22          THE COURT:  Mr. Twomey.

23          MS. BUELL:  I don't see them, but he's --

24          MR. TWOMEY:  Can you see me?

25          MS. BUELL:  All right.

34

1          THE COURT:  There he is.

2          MS. BUELL:  We see a hand.  We have Edward Sawyer.

3          THE COURT:  Mr. Sawyer.

4          MS. BUELL:  And we have Robert Ham, who is a Queen's

5     Counsel.

6          THE COURT:  Yes.  Welcome.

7          MS. BUELL:  And I failed to introduce Richard

8     Hitchcock, who is also a Queen's Council and who has submitted

9     a declaration in support of the motion on behalf of the

10    debtors.  We also have counsel -- U.K. counsel for the trustee

11    who is, I believe, also present in the room, from Pincert

12    (ph.).  I may have gotten those names confused.  Those

13    individuals are, I think, Richard Twomey and Edward Sawyer.

14         THE COURT:  Okay.

15         MS. BUELL:  And then the other declarants for the

16    trustees, David Davies and Richard Favier.

17         THE COURT:  Good evening to you.  I know it's evening

18    there.

19         UNIDENTIFIED SPEAKER:  Good evening.

20         THE COURT:  I can see the clock on the wall.

21         MS. BUELL:  Right.  And --

22         UNIDENTIFIED SPEAKER:  And it's getting dark.

23         MS. BUELL:  -- I believe that Delaware counsel on

24    behalf of the trustees wanted to introduce her co-counsel from

25    New York.

35

1          THE COURT:  Yes, please.

2          MS. DAVIS:  Good afternoon, Your Honor.  Charlene

3   Davis --

4          THE COURT:  Good afternoon, Ms. Davis.

5          MS. DAVIS:  -- with Bayard, appearing on behalf of the

6   trustee of Nortel Networks UK Pension Plan and Board of the

7   Pension Protection Fund.  At this time I'd like to introduce my

8   co-counsel from the law firm of Willkie Farr & Gallagher;

9   immediately next to me is Bryan O'Connor.

10          THE COURT:  Mr. O'Connor.

11          MS. DAVIS:  Seated next to him is Sameer Advani.  And

12   at the end of the table is Andrew Hanrahan.

13          Your Honor has entered orders approving the admission

14   pro hac vice of Mr. O'Connor and Mr. Advani, and we filed a

15   motion today for Mr. Hanrahan, so I would move his admission

16   orally at this time.

17          THE COURT:  That's fine, and that will be signed, of

18   course, in due course.

19          MS. DAVIS:  Thank you, Your Honor.

20          THE COURT:  You're certainly welcome to participate at

21   the hearing.

22          MR. HANRAHAN:  Thank you, Your Honor.

23          MR. O'CONNOR:  Thank you, Your Honor.  It's a pleasure

24   to be here.

25          THE COURT:  It's good to have you here.

36

1    MS. BUELL:  And finally, Your Honor, I should just

2    note for the record that we do have John Ray, the principal

3    officer for the debtors, who --

4         THE COURT:  Yes.

5         MS. BUELL:  -- submitted a declaration and is in the

6    courtroom, as well as Ms. Schweitzer, who also submitted a

7    declaration --

8         THE COURT:  Yes.

9         MS. BUELL:  -- in support of the motion.

10        I think that is it for the introductions.

11        THE COURT:  All right.

12        MS. BUELL:  And if I may suggest the following:  What

13   I'd like to do is make an opening statement, set the framework

14   for the issues that are raised in this motion and for the

15   evidence that will come.  I am assuming, then, that Mr.

16   O'Connor would like to make some opening statements; then we'll

17   move to the submission of evidence and some cross-examination.

18   The cross-examination that the debtors have of the three

19   declarants for the trustees will be relatively limited but, we

20   think, targeted and, we hope, helpful to the Court.  And then

21   if time permits and the Court's patience continues, I can

22   imagine that we will both have a few closing remarks that we'd

23   like to say after the submission of evidence.

24        THE COURT:  All right.

25        MS. BUELL:  This is a motion to enforce the stay

37

1    against two claimants who have filed proofs of claim in this

2    court and have submitted those claims to this Court's core

3    jurisdiction.  And the two claimants are the trustees of the

4    NNUK Pension Plan and the Pension P6rotection Fund.  They have

5    jointly filed proofs of claim against each of the U.S. debtors

6    based on the asserted underfunding of the NNUK Pension Plan and

7    the contingent liability of the U.S. debtors for contribution

8    or payment for that underfunding.

9         The trustees are, of course, the trustees of the

10   pension plan; that needs, I think, no real explanation.  The

11   PPF, as is set forth in the papers that have been submitted to

12   the Court, is a statutorily created but privately funded

13   insurance vehicle for occupational employment plans in the U.K.

14   And in the area of insurance, Your Honor, I think there is some

15   similarity between the PPF and the PBGC --

16        THE COURT:  That's what I thought.

17        MS. BUELL:  -- but that does not carry over in the

18   regulatory area where I think the two are distinct.

19        THE COURT:  Okay.

20        MS. BUELL:  Now, the proofs of claim which have been

21   filed by the trustees -- if I may, I'll refer to it as the

22   trustee proof of claim -- are asserted to be pre-petition,

23   contingent and unliquidated, but note that liability could be

24   as much as three billion dollars.  That makes the claim of the

25   trustees among the largest, if not the largest, claims filed in

38

these cases.

The trustees have also filed proofs of claim in the Canadian CCAA proceeding against the Canadian debtors, based on similar allegations.  There is also, in connection with the claim against NNL, however, a claim based on a guarantee -- or actually, I think, two guarantees, for a portion of the underfunding.

THE COURT:  Which we don't have here?

MS. BUELL:  We do not have a guarantee here --

THE COURT:  Right.

MS. BUELL:  -- Your Honor.

Now, Your Honor, why do these debtors need the Court to enforce a stay at this time?  And I think the answer is quite simple and to the debtors quite important:  Without enforcement of the stay, these claimants will proceed in the U.K. and, on the basis of a 150-page warning notice that has been delivered to the debtors by the regulator and that the debtors are to respond to in accordance with the regulator's view of the world but that this Court is not permitted to see because of confidentiality restrictions, which are apparently quite serious and the sanctions quite severe, the claimants will proceed to have their continent and unliquidated claims liquidated by the U.K. pension regulator, which is an administrative body whose primary focus is to see to it that U.K. pension claims are paid.  The claimants will then return

39

1    to this Court and argue that the post-petition quantification

2    of their contingent claim must be accepted by this Court

3    because of issue preclusion, either the debtors had the chance

4    to appear and state their case, failed to do so, so there's, in

5    effect, a default; or the debtors appear in the U.K.

6    proceeding, present their case, lose.  Either way, issue

7    preclusion.

8            There is the risk of what I'm calling the U.K. law

9    fait accompli, which is that this is a claim governed by U.K.

10   law and, once the regulator acts, that's the liability.  It is

11   a fait accompli.  And finally an argument in this claims

12   allowance process before this Court based on comity, that this

13   Court must accept the determinations of the regulator as a

14   matter of comity.

15           And it is to prevent that scenario, Your Honor, that

16   the debtors have made this motion to enforce the stay here and

17   now.  We're not waiting until the claims allowance process is

18   before us to raise these issues with the Court and to have

19   these serious issues addressed based on the arguments and the

20   evidence of both sides.

21           Now, to be clear, Your Honor, the debtors have not

22   sought to enforce the stay against the regulator.  That would

23   be another interesting issue, but the debtors don't like their

24   counsel to spend time on interesting issues unless they are

25   important to the outcome of these cases.  And it is our view

1    that what is important here is how the claimants who have filed

2    proofs of claim, who have submitted those to this Court,

3    whether their actions, both in the U.K. regulatory process and

4    in this claims process, are going to be governed by the

5    automatic stay.

6          And I think, you know, it's fair to say, Your Honor,

7    that with respect to the regulator, that the debtors assume

8    that the regulator will proceed as it thinks best, right, so

9    that as things stand today our claim is that the claimants

10   should be stayed from participating and should be stayed from

11   trying to argue issue preclusion of any sort as well as comity

12   arising from the actions of the regulator in the claims process

13   before this Court.

14         If there was ever a situation, Your Honor, where a

15   debtor needs the benefit of the automatic stay, this situation

16   presents that case.  What do we have here?  We have, one, an

17   adversarial process that has been commenced against the debtors

18   post-petition based on pre-petition allegations, the pre-

19   petition global relationship of the U.S. debtors and other

20   Nortel entities.  Two, it involves a huge claim.  Three, it

21   involves a huge claim which is massively complicated.  The

22   allegations extend over a decade about various transactions,

23   again, between these global affiliates.

24         The debtors have been summoned to respond to a 150-

25   page warning notice complaint and boxes of witness statements

1    and exhibits which the regulator has compiled over what can

2    only be many months of preparation, many months in which, I

3    think it's important to note, the regulator did not make direct

4    contact or seek any information from NNI or NN CALA or the

5    other U.S. debtors.

6          So the debtors are asked to do this and to do it in a

7    foreign country and in front of a panel whose mission it is to

8    protect the benefits paid under U.K. pension plans.  We think

9    it's quite clear that this process violates 362(a)(1) and

10   (a)(6) on their face.

11         Now, let me explain just a little bit about the U.K.

12   pension procedure, which is set forth in the papers of both

13   parties in some detail.

14         THE COURT:  Yes.

15         MS. BUELL:  As the Court will appreciate, today the

16   trustees have a claim against NNUK, which is the plan employer

17   or plan sponsor.  And then they also have, which is not

18   directly relevant to the issues, but for context, a claim

19   against NNL with respect to the guarantees.  They do not today

20   have a claim under the plan documents against any of the U.S.

21   debtors or indeed against other Nortel affiliates who were not

22   part of the plan sponsor corporate entities.

23         The regulator, as a matter of U.K. law, has the

24   ability under certain criteria to make a determination to

25   expand the right of the trustees to make funding claims against

42

1    other affiliates.

2              THE COURT:  Nonemployers --

3              MS. BUELL:  Correct, Your Honor --

4              THE COURT:  Yes, yes.

5              MS. BUELL:  -- nonemployers.

6              Now, importantly, Your Honor, the regulator cannot

7    assert that claim on its own behalf.  The regulator has the

8    responsibility of determining the scope of the private claim of

9    the trustee.  That's an important point, Your Honor, and you'll

10   hear more about that as this hearing goes on.

11             And how does the regulator come to this determination

12   of whether or not to have an expanded right for the trustees?

13   Well, obviously the TPR, as we call the -- the TPR is The

14   Pension Regulator -- gets involved somehow.  We don't know

15   exactly when the TPR got involved with the NNUK Pension Plan.

16   Obviously, the guarantees were a pre-petition matter that were

17   affected by NNL.  And we know that NNUK filed for insolvency in

18   January of '09.

19             So for some period of time the pension regulator has

20   collected information -- again, did not come directly to NNI or

21   NN CALA or the U.S. debtors for that information -- considers

22   that information and then decides whether or not to issue a

23   warning notice to affiliated entities not liable under the plan

24   documents but who are targets of this administrative

25   proceeding, potential targets for a financial support

1    directive.  And that happened in this case, Your Honor, in mid-

2    to late January.  The warning notice is dated January 11 and

3    was delivered sometime thereafter.

4         THE COURT:  And a response is due March 1st, as I

5    understand it?

6         MS. BUELL:  That's correct, Your Honor.

7         So in this case what we have, Your Honor, is the

8    regulator spending, you know, somewhere in the many months

9    maybe as much as a year after the NNUK insolvency to put

10   together this warning, which, as I said, we are unable to share

11   with the Court.  But for demonstrative purposes, we brought in

12   the boxes which contain the warning notice and the witness

13   statements and the exhibits that accompanied this warning

14   notice, so the Court can have some idea of what the debtors

15   have been asked to respond to.

16        On the table, in this binder we have the trustee proof

17   of claim in this case --

18        THE COURT:  Yes.

19        MS. BUELL:  -- against NNI.  There are many copies of

20   those against all the debtors.

21        In here we have binders after binder after binder of

22   materials sent by the regulator.

23        I won't take the Court's time to show you every one of

24   these boxes, but I'll represent that that's what they contain,

25   which go to the question of whether or not a financial support

44

1    directive should be issued against NNI and NN CALA.  And the

2    conclusion stated by the regulator in the warning notice is

3    that yes, the regulator, after this inquiry of some

4    undetermined period of time in the collection of these

5    materials, has determined that an FSD should issue.

6         And that moves it to the next stage of the process

7    where another part of the regulator, the determinations panel,

8    reviews both this large body of material which the regulator

9    has developed on its own timetable, any responses from the

10   targets, and responses from the trustees and the PPF.

11        Now, as the March 1 date notes, that's six weeks for a

12   response.  And six weeks on what is the largest potentially

13   most complicated claim under foreign law seems, I think, on its

14   face somewhat unreasonable.  But more important than the

15   schedule, Your Honor, is the fact that the substance of what

16   will be determined in this proceeding is being done for the

17   purpose of liquidating the claims before this Court.

18        The procedure is directly focused on the assessment of

19   liability and the quantification of that liability for the

20   benefit of the proofs of claim which the trustees have filed.

21   And that's demonstrated in the record, Your Honor, in a number

22   of places, but I want to draw your attention to two in these

23   remarks, and one is a letter from the pensions regulator to

24   NNI, just received on Wednesday -- so, very current -- and this

25   is attached to the declaration of Mr. O'Connor as Exhibit E.

45

1          THE COURT:  Okay.

2          MS. BUELL:  And if I may, I'd just like to refer to

3     it; I have a copy.

4          THE COURT:  Oh, yes, thank you, Ms. --

5          MS. BUELL:  Should I hand it up?

6          THE COURT:  Yes, please, Ms. Buell.  No permission

7     necessary.  Thank you.

8          MS. BUELL:  And I'm focusing for present purposes,

9     Your Honor, on paragraph 3(c) of the regulator's letter --

10          THE COURT:  Yes.

11          MS. BUELL:  -- where the regulator writes, "The

12     procedure now commenced will also result in quantification of

13     the amount of financial support that will be required.  We note

14     that the trustees of the NNUK pension scheme have lodged a

15     claim in the Chapter 11 proceedings of the debtors for this

16     financial support.  That claim will require quantification

17     under English law in the Chapter 11 proceedings that the order

18     sought and the first motion is made.  The debtors suggest no

19     alternative route by which the claims lodged by those trustees

20     can be quantified."  Well, Your Honor, actually I do have a few

21     ideas about that, but that's not the issue before us today.

22          And I also want to point the Court to -- I don't have

23     an extra copy, I'm sorry.  I'll just read this into the record,

24     the declaration of David Davies submitted in support of the

25     trustees' objection, and that is paragraph 32, which I think

46

1    makes it quite clear of the connection between this proceeding

2    and the proofs of claim.  And I'm reading the last sentence of

3    that paragraph, quote:  "The amount of liability established in

4    the U.K. regulatory procedure is simply intended to quantify

5    the liability of the affected Nortel-related entities for

6    purposes of the proofs of claim that have been submitted in

7    these Chapter 11 proceedings."

8         Your Honor, we think that this factual record supports

9    our position that this is a proceeding which contravenes both

10   362(a)(1) and (a)(6).  With all deference to the pension

11   regulator, it is not a neutral body.  Its objectives are set

12   out in Section 5 and Section 100 of the U.K. Pension Act and

13   lists those objectives as protecting member benefits and

14   reducing payouts by the PPF.  And that is exactly the objective

15   that the regulator is pursuing here, as its letter to the U.S.

16   debtors makes perfectly clear.

17        And so, of course, Your Honor, this all leads us, once

18   we have the background and a little bit of the procedural

19   understanding, to the real legal question of whether the

20   invocation of the police power somehow permits the claimants to

21   participate in this proceeding in the U.K. and to make the

22   kinds of arguments that we anticipate they will make in claims

23   allowance.

24        And the police power, of course, has two primary

25   tests:  One is the regulator pursuing a public or a private

1    interest; and, two, is it pursuing pecuniary or policy

2    interests, such as public safety, environmental, what have you.

3           I want to address these, and then I want to move to

4    the Sea Containers case, which of course you're also going to

5    hear a lot about today and, I think, quite rightfully so.

6           THE COURT:  Okay.

7           MS. BUELL:  But here there is no dispute that the

8    regulator is determining whether to expand the right of the

9    trustees against NNUK affiliates, such as NNI and NN CALA, who

10   otherwise have no funding responsibility for the U.K. pension

11   plan.

12          As I said before, this is not an independent right

13   that the regulator has to determine whether affiliates should

14   be responsible and then, as the regulator, to bring an action

15   and to seek remedies that may or may not be characterized as

16   police power.  Here it's quite clear that the regulator is

17   acting for the purpose of determining the scope of a private

18   claim, and that is the claim of the trustees.  It is the

19   private nature of that right, which is the consideration being

20   evaluated by the regulator, that takes it out of any type of

21   police power exception.

22          And again, Your Honor, if I could refer you this time

23   again to the regulator's letter.

24          THE COURT:  Yes.

25          MS. BUELL:  Paragraph 19 of that letter, the last

48

1     sentence, says, "It is not a process that targets assets but

2     will allow the debt due to the trustees of the NNUK pension

3     scheme from parties such as the debtors' to be ascertained and

4     quantified."

5          So again, Your Honor, I think, on the basis of this

6     record there's really no dispute that the regulator is focusing

7     on the claim of the trustees.  And there is, I believe, no

8     factual dispute that that is a claim of a private entity and

9     not an entity that has a public role.

10         Now, Your Honor, the regulator letter also makes

11    clear, in the debtors' view, that the U.K. proceeding is of

12    course about money, the fact that the TPR in this letter is

13    being clear that it's about the debt, which may or may not be

14    owed to the trustees, which is the issue at hand.

15         So that leads us to Sea Containers.

16         THE COURT:  Yes.

17         MS. BUELL:  And in thinking about Sea Containers, Your

18    Honor, I think that it is quite clear that what we have in this

19    case is the reverse or the flip side of Sea Containers, if you

20    will.  Sea Containers was a case where the question of the

21    relationship of the FSD to the Chapter 11 process came to the

22    bankruptcy court at the end of that process.  It came to the

23    Court after the debtor voluntarily appeared and participated in

24    the proceeding with respect to the FSD in the U.K.

25         And I think it's important to understand, Your Honor,

1    that there were reasons unique to that debtor for it doing so.

2    The -- you had a parent and then a sub, which is basically a

3    service company, right, which had substantial operations in

4    London.  The question was whether the trustees of the pension

5    plan of the service company had an expanded right via an FSD,

6    after this regulatory process, to claim against the parent

7    company's assets.

8            In that case, importantly, not only did you have this

9    much different connection with the U.K. because of the

10   operations of the service company sub, but the parent company

11   had actually been an employer under one of the pension plans at

12   issue until some period relatively shortly before the filing; I

13   think it was four to six months.  So you had a different

14   factual situation and, you know, I think, frankly, a different

15   factual predicate for the regulatory interest in those U.S.

16   debtors.

17           So the U.S. debtors participated voluntarily in the

18   FSD, and then a settlement was reached and the matter was

19   presented to the bankruptcy court as part of a 9019 resolution.

20   And in that case the Court said that the mere issuance of the

21   FSD did not violate the automatic stay.

22           So a couple of things, I think, are important, Your

23   Honor:  One, the debtor itself never invoked the protections of

24   the automatic stay.  The committee -- the creditors' committee

25   of the parent company did raise this argument, but raised it in

1    the 9019.  Neither the debtor nor the objecting committee ever

2    sought to enforce the stay while the regulatory proceeding was

3    ongoing.  It didn't seek to stay the regulator and didn't seek

4    to stay --

5              THE COURT:  The debtor.

6              MS. BUELL:  -- the trustee and the PPF.

7              THE COURT:  Right.

8              MS. BUELL:  Important reason, I think, why, Your

9    Honor, the regulatory process in Sea Containers took place

10   before the trustees filed their proof of claim in the

11   bankruptcy court.

12             So the question of whether the trustees had submitted

13   that claim to the jurisdiction of the bankruptcy court was not

14   presented in that case, was never questioned.

15             I think it's important, Your Honor, that Sea

16   Containers does not speak to the question that is before the

17   Court today, which is the question of whether the stay should

18   be enforced against these claimants who have filed their proof

19   of claim in this Court and now unquestionably and, I think,

20   without dispute on this record seek to participate in a

21   proceeding for the purpose of assessing liability under that

22   claim and quantifying that claim.  That is a very different

23   kettle of fish, Your Honor, particularly where you have the

24   debtors invoking the automatic stay from the get-go.

25             (Pause)

1          MS. BUELL:  I think, Your Honor, that there's just two

2     more points that I want to make before turning the podium to

3     Mr. O'Connor for his opening remarks, and one is the analogy

4     that the trustees drew in their papers to the PBGC, because it

5     certainly is the case that the PBGC, on a post-petition basis,

6     can terminate a pension plan without seeking leave of -- a

7     lifting of the automatic stay.  That is the case and it's right

8     in the ERISA statute.

9          THE COURT:  Right.

10         MS. BUELL:  That is not the situation that we have

11    here.  And indeed, you know, the process of terminating a

12    pension plan is not one that the regulator is purporting to

13    pursue here, or I'm not sure even could pursue termination in

14    the same way that we think about it.

15         What's also important is that the PBGC, while it has

16    the police power right to terminate a plan post-petition, is

17    not a post-petition free agent to do whatever it wishes.  The

18    case law is quite clear, for example, that the PBGC cannot

19    obtain a lien on a post-petition basis, and the process of the

20    PBGC presenting their claim in the bankruptcy court and having

21    that claim determined as to amount by the bankruptcy court is

22    well established.  So we think that the PBGC analogy actually

23    supports our position.

24         Now, Your Honor, there is a lot in the trustees'

25    papers saying that they're simply going to have this assessed

52

1   and quantified and then they are going to come back and submit

2   that claim to the claim allowance process.  But I think what's

3   very important, Your Honor -- I just wrote these on the pad for

4   emphasis --

5         THE COURT:  Be careful, because we may not pick you up

6   on the recording.  There is a handheld microphone, Ms. Buell,

7   if you'd like that.

8         MS. BUELL:  Oh, okay.

9         THE COURT:  Or you can use that, that's fine.

10        MS. BUELL:  In this technological age where we can --

11        THE COURT:  Yes.

12        MS. BUELL:  -- communicate with our friends in the

13  U.K. by video -- I just thought it was important to point out

14  that what is not addressed in the trustees' papers is what the

15  trustees think this Court would actually do in the clams

16  allowance process once the claim was assessed and quantified by

17  the pension regulator.  And the things that we are concerned

18  about, that this debtor is concerned about, Your Honor, is that

19  we would face issue preclusion either way if we participate, if

20  we don't participate; that we will be met with this argument

21  that assessment and quantification are a fait accompli because

22  under U.K. law, once the regulator speaks, that's it, the

23  regulator has spoken; and also that there would be an argument

24  of comity.

25        So our issue on this motion is that we don't think the

53

1    claimants, who have submitted to this Court's jurisdiction on

2    the exact subject which is now going to be determined in this

3    proceeding in the U.K., can benefit, can create a procedural

4    and substantive advantage for themselves in that proceeding and

5    come back and assert these things against the debtors in the

6    claims allowance process before this Court.

7            Finally, Your Honor, as I'm sure you noted in the

8    papers, we do make the point that the resolution of the U.K.

9    pension claim with the types of issues that it raises directly

10   overlap with the allocation of the sale proceeds, which is a

11   matter before this Court and the CCAA court.  And it is quite

12   clear, in the debtors' judgment, that when you look at the

13   factors that the regulator considers in determining whether or

14   not it's reasonable to issue a financial support directive, one

15   of those factors is the financial condition of the target.

16           Now, no one will know what the financial condition of

17   the target is until we know what portion of the allocation

18   belongs to NNI and NN CALA.  I think, even more fundamentally,

19   Your Honor, it's unclear how much financial support the NNUK

20   Pension Plan requires when it's unclear how much of the sale

21   proceeds NNUK itself will be entitled to.  So I think there is

22   a very important issue of putting the cart before the horse.

23   And with respect, Your Honor, I don't think that that is really

24   addressed in the trustee papers.

25           I think, Your Honor, that I'd like to let Mr. O'Connor

54

1    frame the issues from his perspective, but I just close at this

2    point by saying we think that the facts here are really clear;

3    they are largely undisputed.  We think that the regulatory

4    process is also clear; it's a regulatory process which affects

5    private claims in seeking to determine the sources of repayment

6    for those private claims.  That is not a public purpose, that

7    is a pecuniary purpose, and it addresses private rights.

8                  Thank you, Your Honor.

9                  THE COURT:  One quick question --

10                 MS. BUELL:  Yes.

11                 THE COURT:  -- for you, if I may, Ms. Buell.  I

12   believe that the Canadian Court had this issue before it

13   yesterday.

14                 MS. BUELL:  Yes.

15                 THE COURT:  Did the Court reach a decision?

16                 MS. BUELL:  My understanding is that the Court has

17   said that it will reach a decision by early Monday morning.

18   There was a question raised in that proceeding with respect to

19   this March 1 date, and my understanding is that even though the

20   EMEA debtors, the European affiliates of NNUK who are targets

21   as well, have requested that the regulator extend that March 1

22   date, that the feedback so far has been -- you know, they

23   haven't extended it yet.  I'm not saying they won't, but we

24   have this March 1 deadline, Your Honor, and there has been no

25   extension.  And I think that the CCAA Court was interested in

55

1    that, and if there was not an extension that the Court learned

2    of, then he was going to rule by Monday morning.

3              THE COURT:  Okay.  Thank you, Ms. Buell.

4              Mr. O'Connor.

5              MR. O'CONNOR:  Good afternoon again, Your Honor.

6              THE COURT:  Yes, sir.

7              MR. O'CONNOR:  You know, as I was sitting listening to

8    Ms. Buell argue, I was struck by a couple of things.  Number

9    one, this is clearly a complex issue.

10             THE COURT:  Yes.

11             MR. O'CONNOR:  It's a very important case, very

12   important for cross-border bankruptcies, insolvencies like

13   this, and it's something which I think certainly needs to be

14   carefully addressed.

15             The other thing I was struck by is I don't think we do

16   dispute a lot of the facts.  I don't think we do dispute the

17   law.  I think we do have different characterizations of the

18   process, and we do dispute the ultimate conclusions that the

19   debtors reach.  But there probably is far more in agreement

20   here than one might otherwise have anticipated.

21             THE COURT:  Yes.

22             MR. O'CONNOR:  Let me begin, Your Honor, by giving

23   just a bit of a background because I know even for people who

24   have lived with this, this is a little bit foreign, no pun

25   intended, and is probably -- would be important for me to give

56

1    you the perspective of the trustee and the PPF on the process.

2           As you know, the NNUK Pension Plan is an occupational

3    pension scheme.  There, again, is no dispute, it's governed by

4    the laws of England and Wales.  NNUK is the employer under the

5    plan.  NNUK, as Your Honor knows, was placed into

6    administration in the U.K. in January of 2009.  And the plan

7    has a funding deficit which has been estimated by the schemes

8    or plan's actuary of approximately three billion dollars.  I

9    don't think there is any dispute that the PPF is a statutory

10   corporation established under the U.K. Pensions Act of 2004.

11   The board, one of my clients, who runs or operates the PPF, and

12   upon NNUK's entry into administration that constituted a, what

13   they call a qualifying event under the Pensions Act of 2004

14   which triggered an assessment period during which the PPF is

15   required to investigate the circumstances of the plan and to

16   decide whether it should assume responsibility for compensating

17   members for their pension benefits up to certain specified

18   levels under the U.K. act.

19          Now, during the assessment period the rights of the

20   trustee are exercisable exclusively by the board.  And this is

21   in part why when the proofs of claim were filed here the PPF

22   filed a proof of claim as well as the trustee.  The board

23   actually has the power under U.K. law to direct the trustee to

24   take actions to maximize the member's recovery, and to provide

25   it with information about the status of the plan.  The failure

1    of which to provide that information actually constitutes a

2    criminal offense under the U.K. statute.

3         And let me just spend a couple of minutes just

4    describing the overall regulatory scheme of U.K. pension.  The

5    U.K. Pensions Act of 2004 created the pension's regulator, the

6    TPR, which you'll hear tremendous about.  I don't think there

7    is any dispute that the pension's regulator is a government

8    agency.  It's charged with regulating the operations and the

9    administration of occupational pension schemes, such as the

10   plan.  It's clear from the statute that the objective of the

11   pension's regulator is not solely to provide a pecuniary

12   recovery for pensioners who have underfunded pension plans.

13   Its goal is, among other things, to promote the good

14   administration of pension schemes.  It is true one of its

15   objectives is to reduce the risk that claims for compensation

16   are made on the PPF, and it also true that one of its goals is

17   to protect the member's benefits.  But one of the major, I

18   think, disagreements we have with the debtors, and there's a

19   difference of agreement I suppose in the declarations of our

20   U.K. experts, is whether or not the PP -- the pension's

21   regulator is exercising a regulatory power here.

22        And I think it's clear when you read Mr. Ham's

23   declaration, which I understand Mr. Ham will be cross-examined

24   later by the debtors, that one of the critical powers that the

25   pension regulators has is something that they call the moral

1    hazards power.  And that is designed to ensure that employers

2    like NNUK and related entities, like the other Nortel entities

3    in the Nortel group, satisfy their pension obligations under

4    the U.K. law.  And one of the primary goals of the pension's

5    regulator is to through the use of its moral hazard powers,

6    like the issuance of FSDs, or financial support direction,

7    which I'll get to in a moment, is to provide a deterrent to

8    other employers and related entities from disregarding their

9    pension obligations and leaving the fund substantially under

10   funded.

11          Now, a financial support direction, what is a

12   financial support direction?  Again, I don't think there's a

13   lot of disagreement among the parties as to what it is and how

14   it comes about.  As I indicated a principal moral hazard power

15   of the pension's regulator is to issue an FSD.  And FSD can be

16   issued to any entity that is associated or connected with an

17   employer that has an underfunded pension scheme or plan.  If an

18   FSD is issued it requires the related entity to submit a

19   proposal -- proposal to the pension's regulator setting out how

20   that entity intends to provide support -- financial support to

21   eliminate that deficit in the plan's funding.  It's clear that

22   the pension's regulator's issuance of an FSD power is part of

23   its enforcement function.  This comes about by the pension's

24   regulator first investigating a plan and determining whether

25   the employer for that plan is insufficiently resourced.  That's

1    a technical term of art under the Pensions Act.  Next it

2    determines whether there are any related entities, meaning,

3    again, entities that are associated with or connected with the

4    employer.  And then it looks to determine whether issuance of

5    an FSD to one of those related entities would be reasonable

6    under the circumstances.  It's a very broad criteria.

7           Now, under the Pensions Act of 2004 an employer is

8    deemed to be insufficiently resourced if the value of its

9    assets is less than fifty percent of something called the

10   Section 75 debt.  Now, Section 75 is not a section of the

11   Pensions Act of 2004, but an earlier act, the Pension Act of

12   1995.  And a Section 75 debt is triggered by the occurrence of

13   certain events, one of which is an insolvency event of the

14   employer for the plan.  Here and in the U.K. when it was placed

15   into administration that was an insolvency event and that

16   triggered a Section 75 debt that was due on the part of NNUK as

17   the employer to the plan.

18          The way that Section 75 debt is calculated, it's based

19   upon the plan's actuary's estimation of what it would cost to

20   go out at the time and to actually purchase annuities from

21   insurance companies in the market that would take over,

22   essentially, the plan and pay the member's entitlements as they

23   come due.

24          Now, in determining whether it's reasonable under the

25   circumstances to seek to issue an FSD the pension regulator

60

1    considers the following.  The value of benefits that have been

2    received by the related entity from the employer, and it also

3    considers the financial circumstances of the related entity.

4         Now, if the pension's regulator decides after its

5    investigation to seek an FSD it issues what you've already

6    heard about, a warning notice, which is what occurred in this

7    case.  The warning notice is essentially the case for the

8    issuance of the FSD as the pension's regulator sees it.

9         THE COURT:  It's a complaint, in effect.

10        MR. O'CONNOR:  It's a pleading, essentially.

11        THE COURT:  Yes.

12        MR. O'CONNOR:  It's a complaint.  And actually it's

13   more than that because it's the pleading but it's also as

14   supported by the evidence that the pension's regulator has

15   accumulated at that point.

16        THE COURT:  Okay.

17        MR. O'CONNOR:  So it's a bit more than --

18   substantially more than a complaint.

19        THE COURT:  All right.

20        MR. O'CONNOR:  Now, you've also heard about the

21   determinations panel.  The determinations panel is part of the

22   pension's regulator but it is an independent committee of the

23   pension's regulator.  It consists of members who were appointed

24   by the U.K. secretary of state.  And they are appointed because

25   they have particular legal business or pension experience,

61

1    expertise.

2         The determination panel has, as I mentioned a moment

3    ago, substantial discretion in determining whether to agree

4    with the pension's regulator and issue a financial direction,

5    because the same criteria that the pension's regulator uses to

6    decide whether to seek issuance of the FSD is essentially the

7    same criteria that the determinations panel looks at to decide

8    whether they would actually grant the request and issue the

9    FSD.

10        The process before the determinations panel fully

11   affords all effected parties with due process.  The recipients

12   of the warning notice are entitled to be represented by

13   counsel.  They're entitled to make written submissions or

14   representations outlining their defense of the case against the

15   pension's regulator why an FSD should not be issued.  They can

16   request an oral hearing before the determinations panel to

17   state their case.  They can present witnesses, they can cross-

18   examine witnesses.  And in the event that the determination

19   panel decides to issue an FSD there is a twenty-eight-day

20   automatic stay period in which any affected party, whether they

21   submitted representations or not, can take an appeal to another

22   part of the pension's regulator called the pension's regulator

23   tribunal, and that, then, is an appellate body that actually

24   conducts a de novo hearing on the issue.  At the conclusion of

25   that process if someone is still unhappy they can seek leave to

62

1    take an appeal to the Court of Appeal.

2        So I think it's fair to say that this is (A) a

3    government proceeding.  It's important to note I think for

4    purposes of the legal issue here that the FSD procedure is

5    commenced not by the trustee, not by the PPF, those proceedings

6    are commenced by the pension's regulator, the government

7    agency.  And that the purpose of those proceedings -- and,

8    again, I don't think we have a disagreement on this, is to

9    quantify, to fix, to liquidate that claim.

10        An important -- other important point I think here,

11   and, again, I don't think we disagree with the debtors on this,

12   is that the claim that the trust has that comes about as a

13   result of an FSD being issued, arises because of the issuance

14   of that FSD.  Without that FSD, the trust doesn't have the

15   ability to assert a claim against the other related parties.

16   It's as a result of the contingent claim that it has under the

17   Pensions Act becoming fixed and liquidated by the

18   determinations panel, that it then has a right to receive money

19   from any of the other related entities that were the subject of

20   the financial support direction.

21        Now, in our case, what happened here, is that the

22   trustee and the PPF, far from not wanting to participate in

23   this Court and to respect the provisions of the Bankruptcy

24   Code, they received the bar date notice and they filed proofs

25   of claim against each of the U.S. debtors in compliance with

1    the bar date orders.  They submitted to the jurisdiction of

2    this Court.  And those proofs of claim which are attached as an

3    exhibit to the Davies declaration attempt to set out and put

4    the world on notice of how the trustee and the PPF expected

5    this process to unfold.  They described the fact that they were

6    aware that the pension's regulator had commenced an

7    investigation of the plan, that in event that the pension's

8    regulator sought to issuance of an FSD, and in the event that

9    the determinations panel granted that FSD, that would be a

10   direction against one or more of the debtors, to submit a

11   proposal that was acceptable to the pension's regulator to

12   eliminate the plan's funding deficit.

13          Now, as you've seen from our papers, and I think from

14   Mr. Davies' declaration, the trustee and the PPF fully

15   understand that the financial support direction proceedings are

16   solely to fix and liquidate that claim.  They are not to

17   enforce that claim in any way.  They understand and they

18   acknowledge that whether those claims are ever allowed or

19   disallowed and they receive anything on them will be determined

20   by this Court as part of the claims allowance process.

21          They fully understand that they cannot take any result

22   of the FSD process and seek to enforce that someplace else

23   against Nortel entities outside the United States.  And I think

24   you'll also see, Your Honor, there is a letter from the

25   pension's regulator that is attached -- I think it's the same

64

1   letter that Ms. Buell referred you to before.

2          THE COURT:  Okay, yes.

3          MR. O'CONNOR:  The pension's regulator, again -- and

4   it's funny, we can quote from exactly the same paragraphs that

5   Ms. Buell directed you to, we just draw different conclusions

6   from them.  The pension's regulator acknowledges the same

7   thing; this is a liquidation proceeding it's not an enforcement

8   proceeding.  And the -- they understand again, and this is at

9   paragraph --

10         (Pause)

11         MR. O'CONNOR:  The pension's regulator says -- this is

12  paragraph 19.

13         THE COURT:  Yes.

14         MR. O'CONNOR:  "In summary, the process that the

15  regulators currently engaged in is a regulatory one involving

16  application of U.K. statutory provisions and regulatory

17  principles to the situation regarding NNUK."  It goes on.  It

18  is not a process that targets assets but will allow the debtor,

19  due to the trustees and the NNUK pension scheme from parties

20  such as the debtors, to be ascertained and quantified.

21         Now, again, it's funny that we each refer to the very

22  same language and we draw very different conclusions.  The

23  conclusions we draw is with complete deference to this Court,

24  as is appropriate, having filed proofs of claims and submitted

25  to the jurisdiction of this Court, the trustee and the PPF and

1  the pension's regulator all understand this is solely

2  quantification, liquidation of the claim, that claim has got to

3  be brought back here.  And what Your Honor does with it Your

4  Honor will do with it.  And I'll address towards the end some

5  of the questions about the issue preclusion comity and the fait

6  accompli that Ms. Buell referred to a moment ago.

7      Now, let me just turn briefly, if I can then, to the

8  legal argument.  Because one of the other things I think is

9  apparent is that although the debtors make a lot of arguments

10  the legal support that they cite is relatively sparse.  And I

11  think I hopefully will be able to persuade Your Honor that the

12  few authorities they do cite are inapposite.

13      So let's just talk for a moment again about the first

14  point.  Does this violate the automatic stay or does it not?

15  Well, I think the key to that is whether you believe that the

16  process before the pension's regulator is, in fact, a

17  regulatory or police power.  Because if it is, then it falls

18  squarely within the reach of 362(b)(4) and is accepted from the

19  operation of the automatic stay.

20      Now, we think, Your Honor, that it is quite clear that

21  this is a regulatory or police power exercised by the pension's

22  regulator.  To begin with as I mentioned earlier, this is not a

23  proceeding which was commenced by the trustee or the PPF, they

24  have no right to do that.  The only body that can initiate this

25  proceeding by issuance of the warning notice is the pension's

66

1    regulator, which is undoubtedly a governmental agency of Great

2    Britain.

3            The fact that the result of that process will benefit

4    the trustee and the PPF if an FSD is issued, if the debtors

5    agree to submit a proposal, if -- and we'll get to this in a

6    few moments with Sea Containers, if they got Your Honor's

7    approval to submit a proposal or as in Sea Containers the trust

8    and the debtors reached an agreement, the fact that that will

9    redound to the benefit of the pension plan members doesn't mean

10   that that is not an exercise of the pension regulator's

11   regulatory power.  Because, again, one of the primary goals of

12   that whole process is the exercise of the regulator's moral

13   hazard powers.  It has an obligation under that statute to be

14   the watchdog over the operation of pension schemes in the

15   United Kingdom and through the use of powers like the FSD to

16   provide a deterrent to ensure that other employers and their

17   related entities don't -- fail to satisfy their pension

18   obligations the way the Nortel entities did in this case,

19   leaving a pension plan underfunded by approximately three

20   billion dollars.

21           I will point out, Your Honor, that in the U.K. there

22   is a moratorium that comes into place, or comes into play, when

23   an insolvency proceeding is commenced, much like the automatic

24   stay under the Bankruptcy Code.  And I will point out that the

25   moratorium does not apply to the actions of the pension's

1   regulator in deciding whether to issue and obtain an FSD.  And,

2   in fact, if you look at the Davies Exhibit, and this is Exhibit

3   G, the administrators for the other Nortel entities, the EMEA

4   entities that are in insolvency proceedings in the U.K., have

5   acknowledged that the moratorium in the insolvency statute does

6   not have the effect of precluding the pension's regulator from

7   proceeding with its powers under the Pension Act.  So if we

8   were in the U.K. and if the debtors were to go to a court in

9   the U.K. and to ask that court to enforce the insolvency act

10  because they contended that the pension's regulator was not

11  exercising a regulatory power, they would lose.

12        Now, let's talk about Sea Containers for a moment.

13  Because we don't write on it clean slate there.  The

14  description that I think Ms. Buell gave you was, again, pretty

15  accurate, I don't have a lot to argue about with that, with a

16  couple of exceptions.

17        Throughout the case the official creditors' committee

18  for the parent was constantly objecting to the fact that they

19  thought this process was a violation of the automatic stay.  It

20  is true that they never, nor did the debtor, make a motion

21  prior to the issuance of the FSD to enforce the automatic stay.

22  But I frankly don't think that -- well, that's a distinction I

23  don't think it's a material distinction.  Because once the FSD

24  was issued and, again, the very same thing happened here, there

25  were proofs of claim filed by the trustee, and it's very much

68

1    like the proofs of claim here.  In fact, my firm represented

2    the committee for the trustees in that case.  The specified how

3    this process worked and that they were going to bring this FSD

4    back for the Court to consider, and the position that they took

5    with Chief Judge Carey was that this was simply a

6    quantification, a liquidation of the claim, it was not an

7    enforcement.  And it was up for Judge Carey to determine what

8    to do with that.  The official committee for the parent

9    objected vigorously to this whole process; to the settlement.

10   Contended that the settlement could not be approved because the

11   actions that took place before the pension's regulator and

12   determinations panel violated the stay and, therefore, the FSD

13   that was issued was null and void.  And I don't think it really

14   necessarily matters, in my mind, that I suppose you can say

15   well, did the debtor waive any rights.  But you look at 362,

16   362 says that you can't take certain actions.  It doesn't say

17   unless the debtors, you know, don't object to it.  And I think

18   there was a fair argument.  There were a lot of parties-in-

19   interest, this was a very large claim in the Sea Containers

20   case.

21        THE COURT:  Yes.

22        MR. O'CONNOR:  And if, in fact, that process violated

23   the stay.  I'm quite sure Judge Carey would have said, no,

24   we're not going to simply allow that claim and to agree to

25   approve the settlement.  And Judge Carey, in doing that, I

69

1    mean, again, his precise holding was that the pension's

2    regulator was exercising its regulatory police power when it

3    was conducting those proceedings.  I don't think, again, it

4    matters then whether the debtors objected to it or not.  His

5    holding was that was an exercise of the pension's regulatory

6    police power.  And he also concluded as Ms. Buell said, that

7    the issuance of the FSD did not constitute a violation of the

8    automatic stay because it was the pension's regulator

9    fulfilling its statutory objective.

10            The other thing I would say about this, Your Honor, is

11    that in the Sea Containers case, and this is reflected in Mr.

12    Ham's declaration.  Mr. Ham appeared before the pension's

13    regulator, representing one of the trustees for one of the

14    plans, there were two plans involved in that case.  This whole

15    issue was addressed with the pension regulator and the

16    determinations panel as well, as to the concern -- well, what

17    does the determinations panel do here?  If it issues an FSD

18    what do the debtors do with this FSD?  And one of the arguments

19    made by the debtors against the issuance of the FSD was that

20    they shouldn't be put in a position of having an FSD issued and

21    then be able to comply because they would not be able to do

22    that without coming back to the bankruptcy court.

23            And if you look at the decision of the determinations

24    panel, which is an exhibit to Mr. Ham's declaration, the

25    determinations panel fully understood that even if they issued

1    an FSD that before the debtors could come back and submit some

2    type of proposal as to how they would fund that plan's deficit

3    they would likely need to go to the bankruptcy court and get

4    approval to do that.  The determinations panel was

5    extraordinarily deferential, that it understood that although

6    it was issuing the FSD it would depend upon what the bankruptcy

7    court allowed the debtors to do as to how the debtors would

8    respond to that FSD.

9          Now, even if we didn't have Sea Containers, which is

10   obviously the most analogous situation, if we look at the

11   context of the stay issues in the domestic agency context, I

12   think there's a lot of support for the proposition that what's

13   happening before the determinations panel falls within

14   326(b)(4).  There are many cases under the Environmental

15   Protection Act, we've cited them in our brief, where there were

16   proceedings to reduce the judgment claims for costs incurred in

17   environmental cleanups and the courts have held that that falls

18   squarely within 362(b)(4), even though it results in a monetary

19   judgment.

20         There are many actions taken by the Equal Employment

21   Opportunity Commission in the context where they bring an

22   action.  They say that an employer violated an employee's

23   rights.  And the result of that is a money judgment for back

24   pay or some other reward from the employee.  And the Court's

25   have uniformly held that the fact that there's a judgment that

71

1    goes for the benefit of the employee doesn't change the fact

2    that the EEOC is exercising a regulatory police power in

3    commencing the action to begin with.

4         You've heard some discussion about the PBGC.  We

5    submit, again, Your Honor, try to come up with things that are

6    fairly analogous here, that the PBGC also has regulatory and

7    police power that it can exercise that fall within the

8    exception to the automatic stay.

9         Now, the cases that the debtors cite, and there are

10   only a few, and I think they are clearly inapposite on their

11   face.  This is the Fairchild case.  Now, the Fairchild case is

12   kind of an odd case, and I'm not sure I 100 percent agree with

13   the decision, I think it may be inconsistent with the Third

14   Circuit's opinion.  But, in any event, I can understand Judge

15   Sontchi, I think, as a I recall offered that opinion.

16        THE COURT:  Yes.

17        MR. O'CONNOR:  There was a government agency out in

18   California that had a very limited role.  It was to basically

19   test and safeguard water quality.  It didn't have any power,

20   though, to order someone to remediate or abate, that was in the

21   hands of a different California state agency.  And it had

22   brought an action to recover the costs of its own

23   investigation, it's own internal costs for having done that.

24   And, in fact, the action -- it hired a private law firm to do

25   it on a contingent fee basis.  And Judge Sontchi concluded

72

1     that, well, that was really more like trying to recover money

2     for your own budget, and it was not the type of an action

3     where -- like the EPA or the EEOC in the cases I've talked

4     about a moment ago, was going against a third party to stop

5     someone's action and made an -- incidentally, also, there would

6     be a benefit for some private party.  This was a benefit

7     entirely for the agency.

8          The next case, the Spansion case, again I think its

9     completely distinguishable.  That was an action commenced by a

10    private party against another private party in the U.S.

11    International Trade Commission.  And the court simply concluded

12    that the Trade Commission was not acting in its enforcement

13    capacity.  Now, really just adjudicating completely private

14    rights.  The In re Cromunda (ph.) case, again, I think is the

15    same situation the court found that this was really just a

16    proceeding between private parties, that they controlled the

17    litigation from start to finish, and that there was no

18    significant public policy issue at stake.

19          And, finally, the only other case they cite is the

20    Hickson case.  And this, again, was an action commenced by a

21    private party.  Again, remember, here the proceedings are

22    commenced by the pension's regulator, not by the trustee.  All

23    these cases that are being cited by the other side, this

24    Cromunda and Hickson and the Spansion case, are all actions

25    commenced by a private party.  And the court said it was not an

73

1    enforcement action, this was before the Motor Vehicle

2    Commission in -- I forget which state it was, but the court

3    said it wasn't an action to enforce the motor vehicle code.  If

4    it was, the court said, if it had been it would have been an

5    accepted -- from 362 -- under 362(b)(4).

6        So, in short, Your Honor, we think the law is pretty

7    clear that the actions -- the action commenced by the pension's

8    regulator is a government regulatory police power that is

9    accepted from the automatic stay.  Not only does Sea Containers

10   support that most analogously, but the law in the United States

11   involving domestic agency we think fully supports that as well.

12       I just want to -- I don't want to take up too much

13   time, I just want to make a couple of other arguments.  I know

14   we've set these out in our brief and I won't spend a lot of

15   time on it.  But because we believe that this is not a

16   violation of the automatic stay, if Your Honor were to grant

17   the relief that the debtors seek, which we think is

18   extraordinary relief, I think we'd have to be honest about it

19   and say they were asking you to extend the automatic stay under

20   Section 105 of the Bankruptcy Code.  And we think that would be

21   wrong for several reasons.

22       One, this is not the right procedural posture.  If

23   you're seeking to extend the automatic stay because it doesn't

24   cover this particular situation then you'd have to commence an

25   adversary proceeding.  You would have to satisfy your burden

74

1   under Rule 7065 of the Federal Bankruptcy Rules.  You'd have to

2   demonstrate the standards for injunctive relief, that you had a

3   substantial likelihood of success on the merits, irreparable

4   harm to the debtors, the harm to the debtors outweighed the

5   harm to the trustee, and that the injunctive relief would not

6   violate a public interest.  And let's submit, Your Honor, the

7   debtors are not attempt -- in fairness to them they didn't ask

8   you to do this, so they have not attempted and there's nothing

9   in the record that would support that relief.  I only submit to

10  Your Honor, that I think that's actually what the debtors are

11  asking you to do because the order would go far beyond what

12  they'd be entitled to under 362.

13          Now, in their submission they -- the debtors submit

14  the declaration of Mr. Ray, who I understand is here in the

15  courtroom.  And one of the things I think the purpose of that

16  declaration is, is to demonstrate that the debtors'

17  participation in the proceedings in the U.K. would be a great

18  distraction and would involve the personnel that should be

19  otherwise used in the sale process.  And I think if you look at

20  the cases that we cited, Your Honor, under the extension of 362

21  through Section 105 there are many cases in which debtors have

22  made that argument.  And the courts have been very specific

23  about wanting very concrete evidence as to is it the personnel

24  going to be the same personnel and how is it that the debtors

25  can't do both of these things at once.  And I think the

1    declaration that Mr. Ray has submitted is well deficient in

2    reaching the level of specificity that Court's would require to

3    grant the -- again, extraordinary relief of extending the stay.

4              Now, what's the prejudice to the trust and the PPF if

5    you were to grant this relief?  Well, there's a couple of

6    things here.  Again, this is a cause of action or a claim that

7    is a creature of U.K. statute.  You'll see in the declarations

8    that have been submitted that there is a statutory deadline by

9    which an FSD has got to issue.  That deadline is June 30th of

10   this year.  And if that FSD is not issued by that date, then it

11   is highly arguable that whatever contingent claim that the

12   trustee or the PPF have will not be able to be fixed or

13   liquidated, and I would assume that if we would here an

14   argument when we come to the claim disallowance process that

15   said sorry, that claim arose under U.K. law and it only exists

16   if you got an FSD, and you had to have an FSD issued by June

17   30th and it didn't, so you really don't have a -- you don't

18   have a fixed claim.

19             And that gets to another issue which I think I need --

20   I'm sure you'll think about this, but I'm puzzled as to how you

21   would do this.  The debtors don't really offer an alternative

22   to having this claim liquidated where we think it should be

23   liquidated.  But I suppose their argument would be well, don't

24   do anything in the U.K., come over here and we'll put on this

25   case before Your Honor and you'll decide, essentially, whether

1       this claim should be fixed and what amount.

2              And the problem I have with that is the following:  As

3       you've heard the determinations panel has a great deal of

4       discretion on fairly -- not specific criteria.  And Your Honor,

5       I think, would have to sit there and try to replicate if you

6       were to apply U.K. law, which I think you would have to,

7       because that's the basis under which the claim arises.  You

8       would have to try to put on your determinations panel hat and

9       decide whether or not looking at these criteria it was the

10      proper exercise of discretion for an FSD to be issued and in

11      what amount.  And I'm not sure what guidance that Your Honor

12      would look to to determine that.  Because to date there has

13      only been one FSD issued by the determinations panel, and that

14      was in the Sea Containers case.  And that, of course, resulted

15      in the way that we think the process should work and hopefully

16      would work here, negotiation between the interested parties and

17      a resolution of the claim to be presented to Your Honor

18      pursuant to 9019.  And anyone who wanted to object could

19      object, as happened in Sea Containers.  But because that was

20      resolved that way there was never any appeal to the Court of

21      Appeal.  So there is no judicial decision in the U.K. in which

22      a court has looked at and decided whether or not the exercise

23      of discretion by the pension's regulator was appropriate or

24      arbitrary.

25              So I'm not sure, even if Your Honor wanted to take

1    this task on, exactly how you would go about liquidating this

2    claim.  It seems to us that the far more logical and efficient

3    way to do this is to allow the claim to be liquidated as its

4    supposed to be in the U.K., and then the trustee will bring the

5    claim back and at that point Your Honor can decide what to do

6    with it.

7          So let me address for a moment the issues on issue

8    preclusion, comity and fait accompli.

9          THE COURT:  Yes.

10          MR. O'CONNOR:  There's no doubt, and we have to be

11    totally candid with you, Your Honor, that if they liquidate a

12    claim when we come back we'll like argue to Your Honor that

13    under principles of comity that you ought to defer to that

14    adjudication.  And we've looked at that, we're not prepared to

15    give you that argument today because it's not before you, but I

16    think the issue for you is you'd have to conclude whether or

17    not there was jurisdiction over the defendants or the targets

18    in the U.K.  Whether or not they were afforded the kinds of due

19    process that our motions at due process here in the United

20    States.  And the way I analyze this, we would come in, we'd

21    make the arguments as to why we think under all those factors

22    you should, under principles of comity, defer to that decision.

23          I'm sure Ms. Buell would stand up and if they could

24    persuade Your Honor that there was some reason why you should

25    not afford comity to that because there was no due process or

1   there was something that was fundamentally different than the

2   way the procedures would work here in the United States, if

3   they could persuade you of that Your Honor may well decide not

4   to afford it comity and decide to liquidate it some other way.

5       But that's not the issue before today.  That issue is

6   going to rise if and when -- it may never rise.  They may

7   decide not to issue an FSD.  But if they do issue an FSD the

8   trustee and the PPF have represented that they will do nothing

9   other than to bring that to Your Honor and seek Your Honor's

10  allowance or disallowance.  We can then have a nice argument

11  again about whether principles of comity require Your Honor to

12  defer -- or at least militate in favor of deference, or you

13  should ignore it because of some defect in the process that the

14  debtors are able to convince you of.

15      Finally, Your Honor, just two other quick points on

16  this.  Two other reasons -- three things.  Two reasons why we

17  think that this would be very -- it would be a very I think

18  egregious precedent if Your Honor were to grant the

19  extraordinary relief that the debtors are seeking here.  One of

20  those is that they acknowledge and Ms. Buell said this, that

21  they were careful not to seek to enjoin the pension's regulator

22  itself from proceeding.  Now, that's an interesting concession

23  in and of itself.  Because if they really think that the

24  automatic stay exception 362(b)(4) doesn't apply one would

25  think they may have attempted to do that.  But given the fact

1   that they may say to Your Honor, well, they didn't do that,

2   even though they think it doesn't apply because the principles

3   of comity, and Your Honor probably wouldn't want to issue an

4   order enjoining a U.K. government agency from fulfilling its

5   statutory objective, so they have a better idea.  We'll do it

6   the back door way, we'll have you issue what amounts to an

7   anti-suit injunction against the trustee, and the PPF from

8   participating in that proceeding.  And under the Stonington

9   opinion from the Third Circuit and many other cases, it's clear

10  that the Courts have said that you can't do indirectly what

11  you're not permitted to do directly.  And if under principles

12  of comity you shouldn't enjoin the pension's regulator, you

13  shouldn't effectively eviscerate that process by depriving the

14  trustee, trustee and the PPF from participating in it.

15          And think for a moment, Your Honor, of the untenable

16  position that really puts the trustee and the PPF in.  The

17  trustee has fiduciary obligations to the members.  If you look

18  at the affidavit -- declaration of Mr. Favier from the PPF he

19  says that the PPF would expect the trustee to participate in

20  the FSD proceeding.  Now, the trustee then having come over

21  here, submitted to the jurisdiction of the Court, tried to be

22  very upfront about what it intended to do as in Sea Containers,

23  liquidate the claim, bring it over here, have Your Honor allow

24  it or disallow it, now is faced with an order which says if you

25  go forward and participate in the FSD proceedings, which you

80

1    may conclude it's your fiduciary obligation to do, and, in

2    fact, which the PPF may direct you to do, you have to do that

3    at the peril of being in contempt of Your Honor's order and

4    having Your Honor then say anything that happens before the

5    pension's regulator is void and a nullity, and perhaps

6    subordinate the claim or do something else as a result of the

7    trustees' conduct.

8         So we think that you can't indirectly do what the

9    debtors have, I think, rightfully not asked you to do by

10   enjoining the pension's regulator directly.

11        And, finally, Your Honor, on this point from a public

12   policy perspective, we think this would be a very unfortunate

13   precedent.  The purpose of the Bankruptcy Code, the objective

14   of the Bankruptcy Code, is to bring all these disputes and the

15   liquidation, or at lest the allowance of these claims, in the

16   bankruptcy court.  Here, the trustees have submitted to the

17   jurisdiction of the Court, they understand that this is going

18   to happen here.  And if you were to enter this order, I think

19   any foreign creditor in the position of the trustee would have

20   to think twice about filing a proof of claim in the bankruptcy

21   court here and running the risk that they would be enjoined

22   from carrying out there legal obligations in the U.K..

23   Instead, they would sit back, take whatever action they could

24   outside the United States, go rogue, as they say, and try to

25   levy on assets someplace out the United States, rather than run

81

1    the risk of coming here and being enjoined.  So I think it

2    would be counterproductive, it would actually undermine the

3    objective, rather than promote the objectives of the code.

4          And, finally -- I know I've worn out my welcome, but,

5    finally, the last point I just want to make, Your Honor, is on

6    this allocation issue.

7          THE COURT:  Yes.

8          MR. O'CONNOR:  We don't see the allocation process as

9    really being implicated by what's happening in the U.K.  And I

10   say that for a couple of reasons.

11         First of all, as I understand it, this asset -- or the

12   allocation protocol, has been in the works since at least June.

13   People are negotiating and haven't reached an agreement, as I

14   understand it, on how this allocation process is going to work.

15   So it's not as if this is ready to go today.  Whereas, the

16   process before the U.K. has to conclude by the end of June.

17         Secondly, on its face, the allocation process is

18   designed to allocate the sale of the assets from the -- I'm

19   sorry, from the proceeds of the sale of assets.  There's

20   nothing in anything that I've seen, at least in the public

21   record, that suggests that part of this process is to allow or

22   disallow claims, even if that were to be permissible.

23         The other thing I think we have to think about is I

24   know the debtors make the argument but, well, wait a minute,

25   one of the things that they may think about, and you'll notice

82

1    in Mr. Ray's declaration, I think it's very carefully worded

2    that these issues might be implicated, they don't say they're

3    actually going to be addressed.  But one of the things that

4    might be addressed is transfer pricing, research and

5    development and other arrangements between the entities.  And

6    the reason why I don't think is really relevant is that the

7    claim that the trustee and the PPF have here is a claim that

8    arises from the FSD, and it's a claim directly against, if it's

9    allowed, NNI and NN CALA.  It is not a derivative claim that's

10   asserted by NNUK against NNI or NN CALA, it's a private claim.

11   So no matter what happens between the allocation of proceeds

12   between -- among the debtors, it's not going to change the fact

13   that there will be a direct claim if an FSD is granted.  That

14   now has been fixed and liquidated against NNI and NN CALA.

15   Now, that's not to say that there's any possibility to double

16   recovery, or this shouldn't be considered in the allocation

17   process.  It would seem to me the way this would work is

18   assuming an FSD were issued, assuming that we negotiated with

19   the debtors and we reached an agreement as we did in Sea

20   Containers, and there was an allowed claim in the U.S. cases

21   then certainly the amount of the recovery that the trust and

22   the PPF received on that claim would reduce the claim that they

23   have against NNUK as the employer for the deficiency.  And so

24   certainly that amount of recovery could be used as a credit for

25   any amount of -- or an equal amount of proceeds that were

83

1    otherwise going to be allocated to them under the allocation

2    process.

3            So it seems to us that they're putting the cart before

4    the horse.  We have a process now that will liquidate that

5    claim.  They can go ahead and do anything they want in the

6    process of the asset proceeds allocation, they will at least

7    have meant -- to know what that claim is.  And to the extent

8    that we reach agreement or otherwise you allow that claim, that

9    will be something which they can consider in terms of how much

10   in the way of assets proceeds should be allocated, if any, from

11   NNI or NN CALA to NNUK.

12           So we don't think that -- we don't think that the

13   process on the allocation in any way really implicates or the

14   process in the U.K. will interfere with that in any way.

15           And, Your Honor, I think I covered pretty much most of

16   the points, I'll save anything else if I missed it for our

17   closing statement.  Unless --

18           THE COURT:  There's one question from me.

19           MR. O'CONNOR:  Yes.

20           THE COURT:  And that's this, Mr. O'Connor.  I

21   appreciate your client's, certainly, preference to proceed with

22   the -- before the TPR, but is there anything to prevent your

23   clients from pursuing their claims in the first instance before

24   this Court?

25           MR. O'CONNOR:  Yes, I think there are.  Number 1 --

84

1          THE COURT:  That you have to an FSD issued first?

2          MR. O'CONNOR:  It would have to have an FSD issued

3    first, or else I think we would be subject to an argument from

4    the debtors that that was a contingent claim on the date that

5    we filed the proof of claim.  And the only way under U.K. law

6    that that became a fixed or liquidated claim, if, in fact, an

7    FSD was issued by the determinations panel, that's one issue.

8          And then the second issue, again, Your Honor, is the

9    one I posed for you before.  I'm really not quite sure how Your

10   Honor would liquidate that claim given the unique status of the

11   claim under the U.K. Pension Act, and their being as much

12   discretion placed in the hands of the determinations panel who

13   have particularized expertise in pensions and the other U.K.

14   legal matters.

15         You know, I would say, Your Honor, if we were not

16   talking about a U.K. agency, that if we were talking about a

17   United States agency, it would not be uncommon at all for the

18   bankruptcy court under the principles of primary

19   jurisdiction --

20         THE COURT:  Right.

21         MR. O'CONNOR:  -- to say let that agency, they're the

22   ones who know about this, let that agency liquidate that claim,

23   not enforce it, liquidate it.  And then bring the claim back to

24   me.  And then we'll consider:  (a) Is there something about the

25   amount of the claim, that it's a penalty or includes post-

1    petition interest, or something else that the Bankruptcy Code

2    doesn't allow, and then Your Honor would be free to do what you

3    would do with it.

4         But I look at this as like primary jurisdiction where

5    that is a very unique agency that's been tasked with an

6    objective that involves a fair amount of discretion.  And

7    there's no guidance in the U.K. case law to assist Your Honor

8    into how to exercise that discretion.

9         THE COURT:  All right, thank you, Mr. O'Connor.

10        MR. O'CONNOR:  Thank you.

11        THE COURT:  Ms. Buell, are you ready to present

12   evidence?

13        MS. BUELL:  Yes, Your Honor.

14        Your Honor, on behalf of the debtors I'd like to move

15   into evidence the three declarations that were submitted in

16   support of our motion.  And those are the declarations of Ms.

17   Schweitzer with exhibits, of Mr. Ray, with exhibits, and of Mr.

18   Hitchcock.

19        THE COURT:  Yes.

20        MS. BUELL:  I would also like to move into evidence a

21   letter that was sent by Linklaters, as U.K. counsel to the

22   debtors, to the pension's regulator, dated February 18, 2010.

23   It was sent with our motion papers and wasn't attached to them,

24   I provided Mr. O'Connor a copy.  Is there any objection?

25        MR. O'CONNOR:  No, I have no objection.

1        THE COURT:  Or to the declarations being admitted?

2        MR. O'CONNOR:  No objections to the declarations.

3        THE COURT:  All right, thank you, Mr. O'Connor.

4        MS. BUELL:  May I hand this --

5        THE COURT:  Please, yes, Ms. Buell.  And the letter

6    and the declarations then are admitted into evidence.

7        MS. BUELL:  Thank you.

8        THE COURT:  And I guess we ought to number them just

9    to be on the safe side.  We'll have Ms. Schweitzer as -- well,

10   why don't you state your preference, Ms. Buell, on the order.

11       MS. BUELL:  Ms. Schweitzer is definitely number 1 in

12   our book.

13       THE COURT:  Number 1.  And then Mr. Ray would be

14   number 2.

15       MS. BUELL:  2.

16       THE COURT:  And Mr. Hitchcock number 3.

17       MS. BUELL:  Hitchcock is 3.  Thank you.

18       THE COURT:  And the February 18th letter, number 4.

19       MS. BUELL:  Yes.

20       THE COURT:  All right.

21   (Declaration of Lisa Schweitzer was marked for identification

22   and hereby received into evidence as Debtors' Exhibit 1, as of

23   this date.)

24   (Declaration of John Ray was hereby marked for identification

25   and received into evidence as Debtors' Exhibit 2, as of this

1    date.)

2    (Declaration of Richard Hitchcock was hereby marked for

3    identification and received into evidence as Debtors' Exhibit

4    3, as of this date.)

5    (February 18th letter to the pension regulator was hereby

6    marked for identification and received as Debtors' Exhibit 4,

7    as of this date.)

8            MS. BUELL:  The point of the February 18th letter,

9    Your Honor, is just so that it's clear, that we did provide the

10   regulator with a copy of our motion letters saying that we

11   would certainly have no objection if they wish to appear on

12   this motion to counsel to discuss it.  It was just I thought

13   important for the Court to know that that had been extended to

14   the regulator.

15           THE COURT:  All right, thank you.

16           MR. O'CONNOR:  Your Honor, may I approach with this

17   number 4 sticker for --

18           THE COURT:  You've got -- yes, you may.  That would be

19   a large help, thank you.

20           MS. BUELL:  And our declarant, Mr. Hitchcock is

21   available via video.  Mr. Ray is in the courtroom.  So they're

22   available for cross-examination if counsel chooses.

23           THE COURT:  All right, thank you.

24           MR. O'CONNOR:  Your Honor, I think we would call Mr.

25   Ray to the stand.  We only have a few brief questions.

88

1        THE COURT:  Very well, Mr. Ray, if you'd come forward,

2    sir.

3        (Pause)

4        THE COURT:  Thank you, Mr. Ray.  If you'll just remain

5    standing while you're sworn.  You can step up into the witness

6    stand.  Thank you, sir.

7        THE CLERK:  State your full name for the record and

8    spell your last name.

9        THE WITNESS:  John J. Ray III.

10       (Witness duly sworn)

11       THE CLERK:  Please be seated.

12       THE COURT:  Thank you, Mr. Ray.

13       THE WITNESS:  Thank you.

14       THE COURT:  And Ms. Buell I think has handed Mr. Ray

15   his declaration, is that correct?

16       MR. O'CONNOR:  Yes, that's correct.

17       THE COURT:  Very well.

18       MR. O'CONNOR:  Good afternoon, Mr. Ray.  My name is

19   Brian O'Connor from Willkie Farr & Gallagher.  And as you've

20   heard I represent the trustee and the PPF in this matter.

21   CROSS-EXAMINATION

22   BY MR. O'CONNOR:

23   **Q.   Could I ask you to take a look at paragraph 15 of your**

24   **declaration?**

25   **A.   Okay.**

1  Q.    Okay.  Am I correct that the negotiations that you

2  described in paragraph 15 have not yet resulted in an agreement

3  among the parties?

4  A.    An agreement as to the allocation?

5  Q.    Yes.

6  A.    That's correct.

7  Q.    And you don't know today as you sit there, whether an

8  agreement will, in fact, ever be reached, do you?

9  A.    Yes, I do.

10  Q.    How do you know that?

11  A.    Because the parties are obligated to have discussions.

12  And in failing those obligations there's a protocol that is

13  part of the agreements between the parties under which there'll

14  be a binary determination of that allocation.

15  Q.    But I'm talking about the agreement among the parties.

16  You don't know whether or not an agreement will be reached.

17  You're saying that there may be a fallback that they'll go to

18  arbitration.  But as you sit here today you don't know whether

19  the parties will actually reach an agreement among themselves?

20  A.    With certainty, no.

21  Q.    Okay.  And even if they do you don't know when that will

22  be, do you?

23  A.    I would expect it to be as soon as possible.

24  Q.    Now, this process has been going on since at least June of

25  2009, am I correct?

1    A.    Well, actually, no.  I think it requires the Court to

2    understand some context rather than just simply pick those

3    dates.

4            THE COURT:  Please.

5    A.    The allocation protocol is just one part of an overall

6    process.  And the first thing that really had to happen, Your

7    Honor, is that the asset sales had to occur.  And through that

8    asset sale process things would be learned in that asset sale

9    process about what assets were sold, what buyers were willing

10   to pay for, et cetera, et cetera.  So that asset sale process,

11   as this Court is well aware, has been ongoing for many, many

12   months.  It's continuing, there are still asset sales to be

13   held.  And, of course, while all that was happening, you know,

14   there was discussions and there continues to be discussion,

15   both in terms of the allocation process and that is ongoing as

16   we speak.

17           MR. O'CONNOR:  Your Honor, I move to strike.

18   Q.    My question, Mr. Ray, was simply did the discussions about

19   the allocation process begin back in June of 2009, have they

20   been ongoing since at least that date?

21   A.    I don't recall exactly when the process began, because I

22   was not appointed to this Court at that time.

23   Q.    Now, you say -- let me also ask you to take a look at

24   paragraph 17.  You say in the first sentence, "Resolution of

25   the allocation issue may entail, among other things," then you

1   go on to discuss transfer pricing arrangements, research

2   development, and certain other things.

3        Now, as you sit here today, you don't know for a fact that

4   once the agreement is reached that that agreement will, in

5   fact, involve a resolution of issues concerning transfer

6   pricing or research development or the other items that you

7   mention in your declaration, do you?

8   A.   Yes, I do know with certainty that any discussion

9   regarding allocation will involve each and every one of the

10  things that are listed in that paragraph.

11  Q.   But you don't know what the parties are going to agree on?

12  A.   Uh --

13  Q.   Didn't you testify a moment ago that the parties haven't

14  reached agreement on the asset allocation protocol, so by

15  definition you can't say today, can you, that you know that

16  they will agree to consider those issues as part of that

17  protocol?

18  A.   With all due respect, counsel, that's not what that

19  paragraph is saying.  This is my declaration, I can tell you

20  what I think it says.

21  Q.   Okay, please do.

22  A.   Which is that resolution is going to require looking into

23  every one of these issues.  And I can tell you with certainty

24  because I'll be one of the parties at the table that I'm going

25  to be raising every one of these issues.

1    Q.    Yes.  My question, though, again, as you sit here today,

2    you don't know that the parties will agree as part of the

3    protocol to address those issues?  I know you think that

4    they're important, but you don't now, today, do you, that as

5    part of this protocol which is still being negotiated that the

6    end agreement will include a procedure that will involve each

7    of those items that you listed in paragraph 17?

8    A.    I don't -- I don't know what the allocation process will

9    dictate as a result.  But I know in order to achieve that

10   result we will have to address each and every one of these

11   categories.

12   Q.    Okay.  Have you ever seen the proof of claim that was

13   filed by the trustee and the PPF in this case?

14   A.    Yes, I have.

15   Q.    Okay.  When was the first time that you saw that?

16   A.    I think the first time I saw that would be in the last

17   thirty days.

18   Q.    Okay.  Do you know when it was filed?

19   A.    There was essentially two separate proofs of claim.

20   Q.    You're right, let me correct that, I stand corrected.

21   A.    Okay.

22   Q.    Let's talk about the NNI proof of claim, do you know when

23   the proof of claim by the trustee and the PPF were filed with

24   respect to NNI?

25   A.    I believe it was date-stamped September 29th of 2009.

93

1   Q.   Okay.  And is it your --

2        MR. O'CONNOR:  Let me strike that.

3   Q.   You say you don't think you've seen that proof of claim,

4   though, until within the last thirty days?

5   A.   That's correct.

6   Q.   Okay.  Without having seen the proof of claim did anyone

7   bring it to your attention that the proof of claim had been

8   filed and what the basis for the claim was?

9   A.   Well, I was appointed in these cases on January 7th --

10  Q.   Oh, okay.

11  A.   -- which explains part of the issue, counselor.

12  Q.   Okay.  I did not realize that.  What efforts are you aware

13  of, if any, that the debtors undertook to investigate the basis

14  for the proof of claim after it was filed in September of 2009?

15  A.   You're speaking to the U.S. debtors?

16  Q.   Yes.

17  A.   I'm not aware of any efforts.

18  Q.   Now, turn to paragraph 21, if you would.  There I take it

19  the gist of your declaration is that if the debtors were

20  required to participate in the process in the U.K. this would

21  materially impact their ability to continue with the asset sale

22  process they'd been undertaking, is that basically the gist?

23       MS. BUELL:  Objection to the form.

24  A.   I don't think that's the limit of the --

25       THE COURT:  Sustained.

94

1          MS. BUELL:  Thank you.

2          THE COURT:  I sus -- yes.

3    Q.   Why don't you tell me what you're attempting to tell the

4    Court in paragraph 21?

5    A.   Okay.  Well, it's essentially, Your Honor, what we think

6    is important to understand, you know, in terms of what this

7    process is about.  Is that I think we're really at the most

8    critical stage, you know, of the bankruptcy.  While the, you

9    know, certain asset sales have occurred, certain of those asset

10   sales are not closed at this point in time.  What is an unusual

11   part of these assets sales is the post-confirmation or post-

12   sale services that are required to be provided to the buyers

13   over a two-year period.  There yet remains asset sales to be

14   completed.  They're significant, including a substantial

15   portfolio of intellectual property which the debtors are highly

16   engaged in that process to determine the best process, to

17   maximize the value for those -- for creditors.

18        In addition to that, one has to consider all the other

19   myriad of things that the estate is doing, which this Court has

20   awareness of from, you know, the docket that's pending here.

21   But that has to be sort of viewed in light of what are the

22   resources right now of the overall estate.  And, in particular,

23   the U.S. debtors.

24        And it's helpful to perhaps understand that the U.S.

25   entity at this point, the employees that are in the U.S. entity

95

1    are almost completely dedicated to the -- what's called -- what

2    we refer to as the MBS organization, which is a service

3    organization that's based out of Raleigh, which sole mission at

4    this point would be to implement the transition services.  So

5    any services that the U.S. entity would need in terms of

6    resources that would have to be deployed to address the kinds

7    of matters that are being brought here by the trustee are the

8    typical parent company resources.  And those resources are by

9    and large employees that are in Canada.  The Canadian

10   employees.

11       It's helpful to understand that the number of employees

12   that Canada has at this point are approximately sixty employees

13   who have vast responsibilities related to finance, completion

14   of tax returns, dealing with asset sales, establishing the

15   basis under which the intellectual property rights are sold.

16   This is an extremely limited group of people that in my opinion

17   would hemorrhage, you know, at the risk of yet another task

18   that comes, frankly, at the eleventh hour.

19       So we think that, you know, essentially we got many, many

20   things to do on the asset sales, we're at a critical stage.  We

21   have very limited employees.  The U.S., itself, has really no

22   corporate staff, if you will, that would traditionally look at

23   such issues.  To the extent that Canada, those parties that are

24   involved in the proceedings in Canada, had to address these

25   issues on their own behalf, then there is certainly a question

96

1    of the access of the U.S. estate to those very same people who

2    are trying to minimize the liability for the Canadian estate.

3    So this is a major task involving very, what I call, scarce

4    resources in the context of a Chapter 11 proceeding.

5    Q.    Mr. Ray, have you made any estimate of how many

6    individuals and how many hours would be needed to undertake the

7    task of responding to the warning notice?

8    A.    No, I have not.

9    Q.    And am I correct that if the allocation process goes

10   forward, assuming they would reach an agreement as you said in

11   the near future, would not certain of the individuals have to

12   be devoted to the task of involvement in that allocation

13   process?

14   A.    I'm not clear about your question.

15   Q.    Yeah.  You said a moment ago that you thought that the

16   allocation process could be agreed upon in the near future.

17   And, therefore, the allocation process presumably would begin,

18   correct?

19   A.    Correct.

20   Q.    Okay.  And wouldn't a substantial number of people from

21   Nortel have to devote time to that allocation process to

22   address these issues that you've raised, like the transfer

23   pricing arrangements, the master research and development

24   agreement?

25         MS. BUELL:  I'm just going to object to the form, ask

1    for clarity on Nortel.  The U.S. entities --

2              MR. O'CONNOR:  I'll limit it to the U.S. entities for

3    the moment.

4    A.   Well, first of all, if you're talking about the U.S.

5    entities, the U.S. entities do not have substantial resources

6    to dedicate to any such processes.  That's one of the things,

7    you know, I've explained here today.  Any efforts made by the

8    U.S. debtors would, effectively, have to be made through its

9    corporate staff at the Canadian entity at this point.

10   Q.   Okay.  And I take it then that is it your view that if

11   this allocation process is agreed upon and it begins to

12   commence, that there will not be any participation by any of

13   the employees of the U.S. debtors in that process?

14   A.   There will be participation by myself, yes.

15   Q.   Okay.  But no one other than yourself?

16   A.   There will be some, you know, limited resources of one or

17   two of the U.S.-based employees.  But we have, you know,

18   certainly resource limitations in the U.S. that we are -- will

19   have to address with this Court at a later date.

20   Q.   And am I correct then that you would plan to utilize

21   employees from the Canadian debtors to be involved in that

22   allocation process, instead of employees from the U.S. debtors?

23   A.   Not on behalf of the U.S.

24   Q.   I'm sorry?

25             MS. BUELL:  Objection to the form.

1        THE COURT:  Yes, I'll sustain that objection.  I think

2    you can state it more clearly.

3        MR. O'CONNOR:  I understand, Your Honor.

4    Q.   Well, who would be abdicating the position of the U.S.

5    debtors during the allocation process?

6    A.   I'll be leading the effort.  Although, certainly, the U.S.

7    entity will be -- you know, in the future will look to retain

8    additional assistance in order to advocate its position should

9    we be in a position where we need to actually arbitrate the

10   matter.

11   Q.   Okay.  And you'll be leading the charge in that, would you

12   have any support, or are you going to do all the work yourself?

13   A.   Once, again, Your Honor, we'll have to -- you know, enlist

14   some outside help to assist the U.S. entities to respond to an

15   arbitration process.

16   Q.   Well, when you say outside help, do you mean from another

17   Nortel entity, or do you mean higher professionals?

18   A.   We'll have to retain additional professionals.

19   Q.   Okay.  So as you anticipate it if this allocation process

20   goes forward it's not going to require any involvement of

21   Nortel employees other than yourself, essentially?

22   A.   No, that's not what I said.

23   Q.   Okay.

24   A.   We will certainly draw on our resources to the extent that

25   they have knowledge about the other business that were sold,

99

1    we'll draw on those resources from the employees that are --

2    continue to be, you know, involved in the U.S. estate.  But

3    we'll need additional assistance from a financial point of view

4    to advocate our position.

5    Q.   And I take it that if the Court did not grant the relief

6    that the debtors seek today and the U.K. process goes forward

7    and the debtors decide to participate in that process, you

8    would draw upon the same people that you would draw upon in the

9    allocation process to address the warning notice, or do you

10   know?

11            MS. BUELL:  Objection to the form.

12            MR. O'CONNOR:  Sorry?

13            MS. BUELL:  I'm objecting to the question as a

14   hypothetical.

15            MR. O'CONNOR:  But that's a fair question.

16            THE COURT:  I'll overrule that objection.  I think --

17   A.   It would require me to speculate I guess as to how I would

18   staff something in the future that's not before me at this

19   point.  So --

20   Q.   So as you sit here today you haven't thought about who

21   would participate in the U.K. process in the event that the

22   Court doesn't grant the relief the debtors seek and the debtors

23   decide to participate in the process?

24   A.   From an external process, no, I have not completely

25   considered everyone that would have to be involved in that

**process.**

**Q. My question wasn't if you considered everybody. Have you considered anybody that would be involved in that process? Have you sat down and thought about what people from the company or outside sources would it be necessary to participate in that process if the debtors decide to do that process?**

**(Technical problem with audio)**

**MR. O'CONNOR: That was only one question.**

THE COURT: That's right.

**A. Yeah, I have not reached any conclusions about who to draw on for what purpose.**

**MR. O'CONNOR: I have no further questions, Your Honor.**

THE COURT: Thank you, Mr. O'Connor. Ms. Buell?

MS. BUELL: I have no questions, Your Honor.

THE COURT: I just want to make sure I understand certain facts, if I may, Mr. Ray. And that is among the American -- U.S. entities, roughly how many employees are there at this point?

THE WITNESS: I think there's roughly, and I'd have to go back and look at the head count.

THE COURT: Sure.

THE WITNESS: But we've got a couple of thousand employees that have been demoted to the transition services.

THE COURT: That's what I was going to ask. Of those

1    several thousand -- let me ask it this way.  How many are not

2    involved in the transition services?

3            THE WITNESS:  You know, virtually all of the employees

4    there -- there may be some lower level part staff that might be

5    helping with, you know, claims, that -- you know, AP levels,

6    very low level.  But virtually all of those services that are

7    in Raleigh are transition services that are intended to be

8    passed through to the buyers under the sale agreements that,

9    you know, we've established.

10           THE COURT:  Does it require their fulltime attention?

11   Their fulltime to be devoted to the transition services?

12           THE WITNESS:  Absolutely.  Your Honor, as you may be

13   aware, under the sale agreements there's certain future

14   liabilities that, you know, that under the sale agreements the

15   estate would be very harmed by if their full attention wasn't

16   dedicated to making sure the transition services were performed

17   without any complications.

18           THE COURT:  Okay, thank you.

19           MR. BROMLEY:  Your Honor, if I could just address that

20   point.  There is a -- there's a motion on for the 3rd, and it's

21   for the joint hearing.  This is for the approval of the Nortel

22   Special Incentive Program.

23           THE COURT:  Right.

24           MR. BROMLEY:  And that is -- that sets out in detail

25   the numbers of employees that are associated with the NBS group

102

1    and the corporate group.  And you'll see, I think, that the

2    numbers that are with the corporate group that are actually NNI

3    employees are well south of 100.  And of the ones who are

4    actually affiliated with exercises that are more associated

5    with corporate governance you're looking at probably ten

6    people.  It may be off by one or two, but we can certainly get

7    that information, we filed the motion, provided it all to Mr.

8    Tinker.  But just to let you know that that is already on the

9    docket and available and hopefully we'll have that before you

10   next week.

11        THE COURT:  All right, thank you.  Thank you.

12   Anything further?

13        MS. BUELL:  No, Your Honor.

14        THE COURT:  All right.  Thank you, Mr. Ray, you may

15   step down, sir.

16     (Witness excused)

17        THE WITNESS:  Thank you.

18        THE COURT:  And perhaps this would be a good chance

19   for just a short recess, if we may.  Say, ten-minute recess, if

20   that's satisfactory.

21        MS. BUELL:  Thank you, Your Honor.

22        MR. O'CONNOR:  Thank you, Your Honor.

23     (Recess from 2:35 p.m. until 2:51 p.m.)

24        THE CLERK:  Please rise.

25        THE COURT:  Thank you, and please be seated.  Ms.

1   Buell.

2          MS. BUELL:  Yes.  Mr. Hitchcock is our final declarant

3   and I believe Mr. O'Connor's going to have some cross-

4   examination.

5          THE COURT:  Very well, thank you.  Mr. Hitchcock, good

6   evening to you, sir.

7          THE WITNESS:  Good afternoon to you, Your Honor.

8          THE COURT:  And we'll have you sworn in to testify or

9   at least affirm, if that's all right with you.

10          THE WITNESS:  Fine.

11          THE CLERK:  Sir, if you can raise your right hand and

12   state your full name for the Court.

13          THE WITNESS:  Richard Guy Hitchcock.

14      (Witness duly affirmed)

15          MR. O'CONNOR:  Good evening, Mr. Hitchcock.  This is

16   Brian O'Connor on behalf of the trust and the PPF.  Can you

17   hear me okay?

18          THE WITNESS:  I hear you loud and clear, Mr. O'Connor.

19          MR. O'CONNOR:  Okay.  I only have a few questions

20   we'll try to be brief so you can all go home and go to bed.

21   CROSS-EXAMINATION (VIA VIDEOCONFERENCE)

22   BY MR. O'CONNOR:

23   **Q.  Mr. Hitchcock, you don't disagree do you, that in enacting**

24   **the Pension Act of 2004 one of the goals was to make the**

25   **pension's regulator more of a proactive regulator, do you?**

1    A.    Well, the pension's regulator didn't exist prior to that

2    act.

3    Q.    I mean, as compared to the predecessor?

4    A.    I agree that the powers -- I hope this answers the

5    question, given to the pension's regulator as enacted in the

6    2004 act were greater than those which existed for the previous

7    regulator.

8    Q.    Okay.  And would you agree with my characterization of

9    them as to have -- to make the pension's regulator to have a

10   more active role in regulating occupational pensions schemes?

11   A.    I think, certainly, one of the statutory objectives that

12   you, yourself, mentioned in your opening address, for example,

13   the promotion of the good administration of occupational

14   schemes, that was a, if you like, a proactive task which didn't

15   exist under the previously framed regulation.

16   Q.    And, you know, would you also agree with me that one of

17   the objections of the pension's regulator is to address what's

18   commonly called as the moral hazard of employers and their

19   related entities failing to comply with their pension

20   obligations?

21   A.    Well, the pension's regulator has four so-called statutory

22   objectives, that's not one of those.  It's right to say that in

23   the material which preceded the 2004 act the moral hazard,

24   i.e., the risk that employers or groups of companies might

25   organize their finances in a way so as to put the burden of

1    scheme funding on the to be created pensions protection fund,

2    rather than meeting those obligations themselves.  So a moral

3    hazard in that sense.  That was discussed.  And it's also right

4    to say that in terms of their particular powers that we're here

5    concerned with, or certainly, those that I've been asked to

6    consider, FSDs and CNs as I've called them in my declaration,

7    they exist to, amongst other things, to help avoid that

8    perceived risk.

9    Q.   And, Mr. Hitchcock, would you agree with me that besides

10   FSDs and CNs, which refer to contribution notices, would you

11   agree with me that the pension's regulator also has other

12   powers to meet its objective of promoting good administration

13   of pension schemes?

14   A.   I wouldn't characterize the powers to issue an FSD and

15   powers to issue a contribution measures on consequence of the

16   failure to put in -- place financial support powers which exist

17   to promote that particular objective.  But I agree -- I would

18   characterize those powers as existing primarily to protect the

19   benefits of members of occupational pension schemes.  But,

20   sure, the regulator does have other functions which perhaps

21   could better be described as assisting the idea of good

22   administration pension schemes.  For example, its obligation to

23   promote trustee knowledge and understanding for example.

24   Q.   Okay.  And am I correct that the pension's regulator has

25   powers to require I guess trusts to share -- plans to share

1    information with it?

2    A.   Yes.

3    Q.   Okay.  And that would be one type of power that would be

4    exercised by the pension's regulator to satisfy its statutory

5    objective of promoting good administration of pension schemes?

6    A.   Yes.

7    Q.   And would you agree with me that one of the objectives of

8    the pension regulator in issuing FSDs or contribution notices

9    would be to provide a deterrent to other employers and their

10   related entities from failing to comply with their pension

11   obligations?

12   A.   I think it's difficult to get that purpose from the

13   statutory language.  I think the purpose of the regulator in

14   issuing a financial support direction is to increase the

15   security of the benefits of the members of the occupational

16   pension scheme or schemes concerned, that is the benefits that

17   they have built up entitlement to through the consideration

18   that they provided through service to their employer.  And I

19   would say that the secondary measure of purpose is to make it

20   less likely that that scheme would ultimately fall into the

21   careful but welcoming arms of the PPF.

22   Q.   And would not agree with me that another objective would

23   be to hope that other employers and their related entities

24   would not act like the party who was the target of an FSD or a

25   contribution notice?

1   A.   Well, I can see that one would hope that in the sense that

2   whenever there's a penalty for any particular action in the

3   sense that, say in this case, whereas the trustees may have a

4   claim in respect of an underfunded pension scheme against the

5   employer or employees of that scheme, the regulator can push

6   that claim slightly further than could the trustees to, for

7   example, other companies within a particular group.  You can

8   see that such a power might make employers, themselves, more

9   willing to fund the burden of the pension scheme deficit rather

10  than allowing assets that would be used to fund that deficit to

11  go to other companies within the group.  But it seems to me if

12  that is in effect -- if that is an intended effect, then it's

13  very much a tertiary effect.

14  Q.   And assuming that effect --

15  A.   There's no evidence -- sorry, if I could just -- sorry.

16  I'm so sorry, Mr. O'Connor.

17  Q.   No --

18  A.   I stopped you -- you were -- I stopped -- a further

19  thought came to me rather late.  There's no evidence,

20  certainly, so far as I am aware that these powers have acted as

21  any form of deterrent.

22  Q.   Well, am I correct, am I not, that there's only been one

23  FSD issued to date, and that's in the Sea Containers case?

24  A.   That is correct.  Well, actually, there were two FSDs in

25  the Sea Containers case.

108

1    Q.   Oh, two FSDs, you're right, in the Sea Containers case.

2         And have there been any contribution notices issued to

3    your knowledge?

4    A.   Not the contribution notices of the type that had concern

5    with, no.

6    Q.   So you would agree with me there really isn't much of a

7    track record yet to demonstrate whether or not this is actually

8    having a deterring effect on other employers and their related

9    entities?

10   A.   It's true, certainly, that the two statistics, if you

11   like, that you've just mentioned, are certainly correct.  Of

12   course, much of regulated activity takes the form ultimately of

13   offering a clearance statement and there will be -- there

14   certainly have been circumstances in which the regulator has

15   considered moving for the issue of an FSD, but has been able to

16   negotiate with employers or groups of employers steps which

17   means the regulator ultimately doesn't -- doesn't take that

18   step.  And, so,  I think there are and have been factual

19   scenarios which might indicate that the sorts of problems that

20   FSDs have had to deal with are certainly still occurring.  But

21   those problems won't actually have led ultimately to the issue

22   of an FSD, but have been dealt with them in another way.

23   Q.   Are you familiar with the moratorium that exists in the

24   U.K. Insolvency Act with respect to taking types of action to

25   levy on a debtor's assets or insolvency -- or rather assets

109

1    **once they enter into administration?**

2            MS. BUELL:  Your Honor, I'm going to impose an

3    objection here.  It does go beyond the witness' declaration.

4            THE COURT:  Mr. O'Connor.

5            MR. O'CONNOR:  Correct, withdrawn.

6            THE COURT:  All right.

7            MR. O'CONNOR:  I have no further questions, Mr.

8    Hitchcock.

9            THE WITNESS:  Thank you.

10           THE COURT:  All right.

11           Ms. Buell?

12           MS. BUELL:  No questions, Your Honor.

13           THE COURT:  All right.

14           Anyone else?

15           Mr. Hitchcock, you are excused from further testimony,

16    sir, and we thank you.

17        (Witness excused)

18           MR. HITCHCOCK:  I'm grateful, and many thanks.

19           MS. BUELL:  Thank you, sir.

20           MR. O'CONNOR:  Yes, Your Honor, at this time, we would

21    ask the Court to move into evidence our declarations.

22           THE COURT:  Yes.

23           MR. O'CONNOR:  One, my declaration.

24           THE COURT:  Yes.

25           MR. O'CONNOR:  Mr. Richard Favier's, Mr. Robert Ham's

1    and Mr. David Davies, together with their exhibits.

2            THE COURT:  Any objection?

3            MS. BUELL:  The only white caveat would apply to the

4    debtors' exhibits as well as that to the extent that there are

5    letters, correspondence, included in the various exhibits,

6    those are coming in for the fact that they've been sent and not

7    for the truth of the matters asserted.

8            MR. O'CONNOR:  I agree that.  Most of those come in

9    for the fact that somebody was put on notice of something and I

10   agree.  It's not coming in for the substantive truth.

11           THE COURT:  All right.  Then certainly those

12   declarations and their exhibits are admitted.

13           MR. O'CONNOR:  Thank you, Your Honor.

14           THE COURT:  And we will call those -- what shall we --

15   what would you like to call those?

16           MR. O'CONNOR:  Oh, yes, sure.  We'll put my

17   declaration at Number 1.

18           THE COURT:  All right.

19           MR. O'CONNOR:  Mr. Davies' declaration as Number 2.

20           THE COURT:  Yes.

21           MR. O'CONNOR:  Mr. Favier's number 3 and Mr. Ham's as

22   number 4.

23           THE COURT:  And should we call those Defendant's or --

24           MR. ABBOTT:  Claimants', Your Honor.

25           THE COURT:  Claimants'.

1           MR. O'CONNOR:  Claimants'.  I think that --

2           THE COURT:  That's good.  I like that better.

3           MR. O'CONNOR:  -- I think I like claimants' better.

4    (Declaration of Brian O'Connor was hereby marked for

5    identification and received into evidence as Claimants' Exhibit

6    1, as of this date.)

7    (Declaration of David Davies was hereby marked for

8    identification and received into evidence as Claimants' Exhibit

9    2, as of this date.)

10   (Declaration of Richard Favier was hereby marked for

11   identification and received into evidence as Claimants' Exhibit

12   3, as of this date.)

13   (Declaration of Robert Ham was hereby marked for identification

14   and received into evidence as Claimaints' Exhibits 4. as of

15   this date.)

16          THE COURT:  Yes.  Thank you.

17          Thank you, Mr. Abbott.

18          Okay.

19          MS. BUELL:  Your Honor, the debtors will start with

20   the cross-examination of Mr. Davies.

21          THE COURT:  All right.  Mr. Davies.  Good evening or

22   afternoon, Mr. Davies.

23          MR. DAVIES:  Good evening, Your Honor.

24          THE COURT:  And we'll have you sworn to testify, sir,

25   or affirmed if you prefer.

1         MR. DAVIES:  Thank you very much.

2         THE COURT:  Affirmed, yes.

3         MR. DAVIES:  I prefer just -- happy to affirm.

4         THE COURT:  Yes.

5         THE CLERK:  Sir, if you could raise your right hand

6    and state your full name for the Court?

7         MR. DAVIES:  My full name is David Windham Davies.

8         (Witness duly affirmed)

9         THE CLERK:  Thank you.

10        THE COURT:  Thank you.

11   CROSS-EXAMINATION (VIA VIDEOCONFERENCE)

12   BY MS. BUELL:

13   Q.   Mr. Davies, my name is Debbie Buell and I represent the

14   debtors.  And thank you for appearing by video.  I'm sure it's

15   somewhat awkward, but we appreciate your effort to be here.

16   A.   Thank you, ma'am.

17   Q.   If the -- does the witness have a copy of his declaration

18   in front of him?

19   A.   I do.

20   Q.   All right.  Mr. Davies, let me refer you to paragraph 24

21   of your declaration where you state that the trustees filed

22   their proofs of claim on September 30, 2009, correct?

23   A.   That is correct.

24   Q.   And those proofs of claim were filed against all of the

25   U.S. debtors, is that correct, sir?

1    A.   Yes, it is.

2    Q.   The trustees filed a proof of claim against NN CALA last

3    month.  Do you recall that?

4    A.   Yes, I do because of the bar date.

5    Q.   Okay.  But the U.K. regulatory procedures, I believe you

6    refer to it in your declaration, targets only NNI and NN CALA

7    of the U.S. debtors, isn't that correct sir?

8    A.   I believe it is, yes.

9    Q.   Now, focusing on the trustees' proofs of claim, the issue

10   of whether there is any liability on the part of the U.S.

11   debtors to the trustees, has yet to be decided, is that

12   correct?

13   A.   I believe that is correct, yes, ma'am.

14   Q.   And the issue of the amount of lia -- the amount of

15   liability, if any, of the U.S. debtors to the trustees also has

16   yet to be decided, correct?

17   A.   That is correct.

18   Q.   And so, as of today, both the issue of liability and

19   quantification are open issues in the proofs of claim that the

20   trustees have filed in this court, is that correct?

21   A.   Yes, that would be a fair -- that would be a fair

22   conclusion

23   Q.   Okay.  Now, the U.K. regulatory procedure will assess the

24   liability, if any, of NNI and NN CALA for the underfunding of

25   the NNUK Pension Plan, is that correct?

114

1   A.   Could you repeat that?  I want to be sure --

2         MR. O'CONNOR:  Let me note my objection.  I'm not

3   quite sure where that question goes but to the extent it calls

4   for a legal conclusion, Mr. Davies is not a lawyer and I'm

5   happy to allow him to testify as to his understanding, if he

6   has one, but I do object to the extent it calls for a legal

7   conclusion.

8   Q.   Let me direct Mr. Davies to paragraph 17 of his

9   declaration, please.  And I'm focusing on the second sentence

10  where the declaration states, "The U.K. regulatory procedure

11  will simply assess and if sufficient grounds are found to

12  exist, quantify the statutory liabilities involved."  You see

13  that, sir?

14  A.   I do, ma'am.

15  Q.   And is that your testimony here today that the U.K.

16  regulatory procedure will assess and if there are sufficient

17  grounds quantify statutory liabilities of the U.S. debtors to

18  the trustees?

19  A.   I'm not sure.  You've added the U.S. debtors to that.  Let

20  me just --

21  Q.   Let me rephrase it --

22  A.   -- my unders --

23  Q.   I'll rephrase it, thank you.

24        Is it your testimony here today that the U.K. regulatory

25  procedure will assess and if sufficient grounds are found to

115

1   exist quantify the statutory liabilities of NNI and NN CALA to

2   the trustees?

3          MR. O'CONNOR:  Objection, Your Honor.  I think if

4   counsel will just qualify that with Mr. Davies' understanding

5   so that we don't get into him again purporting to be giving

6   legal conclusions.

7          MS. BUELL:  Well, it's -- if I may, Your Honor --

8          THE COURT:  Yes.

9          MS. BUELL:  -- it's a sentence in Mr. Davies'

10   declaration, so, I think it is his testimony and I think I'm

11   entitled to ask him if that's his testimony.

12          THE COURT:  I'll overrule the objection.

13          MS. BUELL:  Thank you.

14   A.   My understanding of what I've sworn to here is that it

15   will identify the total liabilities.  I don't think I'm

16   ascribing to any particular entity, the liability to each and

17   every one of those, but this is the total liabilities, I think.

18   Q.   And the quantification of liability in the U.K. regulatory

19   procedure is for the purpose of the trustees' proof of claim in

20   this proceeding.  Is that correct?

21   A.   I believe it helps to support the trustees' claim made in

22   September of '09, yes.

23   Q.   Now, staying with paragraph 17 of your declaration, Mr.

24   Davies, let me direct you to the -- I think it's the third

25   sentence which states, "It is not an exercise of rights that

1    will decide matters otherwise than before this Honorable Court

2    as debtors contend."  Do you see that sentence, sir?

3    A.    I do, ma'am.

4    Q.    The assessment of liability of NNI and NN CALA to the

5    trustees under the proof of claim filed by the trustees is an

6    issue before this Court.  Is that correct?

7    A.    I'm not sure if I understand the court procedure well

8    enough, but I think it sounds right that, yes, you are

9    concerned with the American companies or the U.S. companies

10   here, yes.  But I'm not sure I totally understood the question.

11   Q.    All right.  Well, your declaration says that the U.K.

12   regulatory proceeding is not an exercise of rights that will

13   decide matters that are otherwise before this Court.  And by

14   that I believe you refer to the bankruptcy court so --

15   A.    I certainly do, ma'am, yes.

16   Q.    -- building on that sentence, my question is do we agree

17   that the assessment of liability of NNI and NN CALA is an issue

18   that is before the bankruptcy court?

19   A.    Well, I'm assuming it is.  I believe that to be so but I

20   haven't seen what I would call fundamental proof of that, but

21   I'm assuming that's what we're -- in a sense what the legal

22   proceedings are leading to but I don't know the U.S. legal

23   process.

24   Q.    And is your answer the same with respect to the issue of

25   quantification of liability meaning do we agree that the issue

1    of the quantification of liability, if any, of NNI and NN CALA

2    is an issue that is before the bankruptcy court?

3    A.   There will have to be at some stage a way of ascribing the

4    liabilities to those entities.  Yes, that will ultimately, I

5    assume, be decided by the U.S. courts.

6    Q.   And, Mr. Davies, in your understanding, what effect, if

7    any, will the issuance of an FSD by the regulator against NNI

8    and NN CALA have on the issues before this Court?

9    A.   I hope, and I'm not sure of how the U.S. courts will react

10   to it, but it will give what I would call added legitimacy to

11   the trustees' claim given some support.  Because otherwise our

12   claim would look as a contingent claim and it would look a bit

13   thin.  This is now trying to identify the true liabilities and

14   whether they are justified.

15   Q.   And will the trustee argue -- excuse me, let me rephrase

16   that.

17        In the claims allowance process in the bankruptcy court,

18   will the trustees argue that the issuance of an FSD is

19   preclusive on the questions of liability and quantification of

20   that liability, if any, of the U.S. debtors to the trustees?

21        MR. O'CONNOR:  Your Honor, objection.  I think that's

22   an improper question.  You're asking the witness now to

23   speculate about what position the trust will take in the

24   future.  He's not a lawyer.  I don't think that's a question

25   that he should have to answer.

118

1          MS. BUELL:  Your Honor, I think this is a quite

2     important point.  We have this declaration which says that in

3     this witness' understanding, the U.K. regulatory proceeding

4     will not deal with matters otherwise than those before this

5     Court.  So, perhaps maybe rather than to question the witness,

6     Mr. O'Connor will agree that, in fact, the trustees, if an FSD

7     is issued, will or reserve the right to take the position in

8     the claims allowance process that the debtors are precluded

9     from re-litigating issues of liability or the amount of that

10     liability before this Court.

11          MR. O'CONNOR:  Your Honor, I'm happy to answer that

12     question.  As I said before, I certainly believe that if an FSD

13     is issued, we will likely be before Your Honor and we will ask

14     Your Honor to, under principals of comity, defer to that.  I

15     haven't actually thought through the issue preclusion and the

16     fait accompli point, but the bottom line is, yes, we will be

17     telling Your Honor that we don't think it's necessary for you

18     to re-litigate that claim.  Unless, you're persuaded by the

19     debtors' counsel that you should not respect it on the

20     principals of comity because of some fundamental defect in the

21     process.

22          MS. BUELL:  Your Honor, with that as part of the

23     factual record, I will move on with my questioning of

24     Mr. Davies.

25          THE COURT:  All right.  So, I take it the last

119

1    question is essentially withdrawn as to Mr. Davies, is that

2    correct?

3            MS. BUELL:  That's correct, Your Honor, in respect of

4    Mr. O'Connor's stipulation.

5            THE COURT:  Yes.

6    BY MS. BUELL:

7    Q.   Now, Mr. Davies --

8    A.   So, I --

9    Q.   -- you state --

10   A.   -- I thank you very much, ma'am.  I'm very grateful for

11   that.

12   Q.   We are happy to oblige, sir.

13        At paragraph 16 of your declaration you state that the

14   trustees have no right to control the pensions regulator, is

15   that correct?

16   A.   Yes, ma'am.  I certainly believe that.

17   Q.   And is it also the case that the trustees don't have the

18   power to tell the regulator to stop its administrative

19   procedure with respect to NNI or NN CALA?

20   A.   I think we could tell them to stop and I suspect they

21   would pay absolutely no heed to us whatsoever because we have

22   no authority.

23   Q.   Thank you.  Now, in your understanding of the process, if

24   the trustees do not participate in the U.K. regulatory

25   procedure, will that procedure continue in your absence?

120

1    A.    You're taking me into realms of speculation but I would

2    imagine the regulator, because of his duties, would feel

3    obliged to proceed in placing the trustees in -- well, in

4    various, embarrassing, very difficult place because we would

5    have members questioning -- well, maybe our sanity but also our

6    integrity because we could not -- we could not satisfy those

7    members because we would be frozen out and that would be rather

8    difficult for us all.

9    Q.    Now, as I understand the U.K. regulatory procedure --

10          MS. BUELL:   Let me withdraw that.

11   Q.    If the trustees participate in the U.K. regulatory

12   procedure, they will advocate in favor of an FSD to be entered

13   with respect to NNI and NN CALA among other targets.  Is that

14   correct?

15   A.    We are in the midst of preparing our response to the

16   warning notice because we have been given the warning notice in

17   the same way that the targets have.  It is one of the issues

18   that we will be debating.  I would suspect that we would go

19   along with the regulator's view because that's what this is.

20   It's the regulator's choice.  We would look at the case and say

21   whether we are comfortable with that case.

22   Q.    Well, the trustees would be criticized by the members if

23   they did not take steps to maximize recovery for those members,

24   is that right?

25          MR. O'CONNOR:   Your Honor, objection.  To the extent

121

1    that --

2    A.   Correct, ma'am.

3         MR. O'CONNOR:  -- to the extent that Mr. Davies has

4    said that the trustee is still considering what they will do, I

5    don't think it would be appropriate to question Mr. Davies on

6    the record as to what position they will take when they have

7    not taken that position yet.

8         MS. BUELL:  The question is simply whether the

9    trustees will be criticized if they don't take steps to

10   maximize discover -- to recovery.  And Mr. Davies does state in

11   his declaration that the trustees are concerned about such

12   criticism.

13        THE COURT:  All right.  I'll overrule the objections

14   the extent of that clarification so you may answer that.

15   A.   I think it's a -- thank you, Your Honor.  I think it's

16   a -- well, to the extent that the membership would understand

17   the process, and even if they didn't understand the process

18   they would likely criticize us if they saw us not doing what

19   they would regard as the utmost.  How they would identify that,

20   I don't know.

21   Q.   And if the trustees don't participate, your concern is

22   that the regulator might be less likely to issue an FSD against

23   NNI and NN CALA, correct?

24   A.   No, I don't think that is correct.  I think if we did not

25   participate, the regulator would decide to do what he wanted to

122

1    do and he might take note of what we said.  I think it

2    unlikely.

3    Q.   Now, in paragraph 22, Mr. Davies, you state -- let me make

4    sure I have this -- yes, that the U.K. regulatory procedure is

5    the best and most convenient way to resolve the issues

6    identified in the warning notice.  Is it also your view that

7    it's the best place to resolve the issues set forth in the

8    trustees' proof of claim?

9    A.   You'd better remind me of what you mean by the issues.  Do

10   you have anything specific in mind or are you talking about the

11   totality?  I'm sorry, I don't --

12   Q.   But the bona fides --

13   A.   -- I'm not sure I have the list of all the issues --

14   Q.   Okay.

15   A.   -- go on, sorry.

16   Q.   -- the bona fides of the trustees' claims against the U.S.

17   debtors.

18   A.   No, I believe the claim will actually be settled in the

19   U.S. courts.  I do believe, however, that the U.K. regulatory

20   process will give the trustees added confidence in pursuing its

21   claim for the U.S. courts.

22   Q.   And then in the next sentence, Mr. Davies, you refer to

23   the avoidance of delay and expense of having a multiplicity of

24   concurrent procedures in different jurisdictions that would

25   inevitably lead to conflicting findings of fact and

123

1    determinations of law.  Those conflicting or --

2              MS. BUELL:  Withdrawn.

3    Q.   Those multiplicity of concurrent procedures would affect

4    the trustees.  Is that correct?

5    A.   I think that's correct inasmuch as the trustees would have

6    to go to all these various jurisdictions, hire, forgive me in

7    this company, expensive lawyers to pursue claims which may or

8    may not be accepted and may get thrown out and the trustees

9    would, again, find themselves in a position of having to defend

10   its actions to its membership and seek approval, again, excuse

11   present company, from the PPF who rather control everything

12   that we spend.

13   Q.   And am I correct, Mr. Davies, that the multiplicity of

14   concurrent procedures that you refer to does not refer to the

15   U.S. debtors being faced with a multiplicity of concurrent

16   procedures?

17   A.   Sorry, slowly with that one, please.

18   Q.   Let me try again.

19   A.   I would assume --

20   Q.   I'll try it again.

21   A.   -- I would assume that that -- okay.

22   Q.   Yes.  Is it your testimony that the U.S. debtors will be

23   faced with a multiplicity of concurrent procedures if the U.K.

24   regulatory process does not move forward with your

25   participation?

1    A.    That does seem to be an inevitability, yes, without

2    participation.  So, again, I'm not sure what you mean by that.

3         If there was no FSD process, we would have to engage

4    around the globe in many different areas to try and work out

5    whether we could find some money to fund the significant

6    deficit that we have.  So, I guess I'm saying yes to your

7    question although it's not a very clear answer.

8    Q.    Well, let me just try one more time.

9         Do you have any reason to believe that the U.S. debtors,

10   I'm just focusing you on the U.S debtors, would face a

11   multiplicity of concurrent procedures outside the United

12   States?

13   A.    So, I am speculating.  I have no insights into how the

14   U.S. debtors will proceed with their case.  So I just don't

15   know how they determine what goes on.  All I would imagine was

16   that it would be a number of hearings around the world, and I'm

17   not sure whether the U.S. debtors would have attendance to that

18   or not.

19   Q.    Okay.  Thank you.

20   A.    I don't understand the process well enough I'm afraid.

21   Q.    Now, focusing on paragraph 28 of your declaration, sir,

22   you state in the first sentence that from a timing perspective

23   that you understand that the U.K. regulatory procedure that is

24   now underway must be completed by 30 June 2010 as a matter of

25   English law.  And, Mr. Davies, do you know why the proceeding

1    must be completed by June 30, 2010?

2    A.    Do I know why?  I have been advised why.  I haven't

3    actually gone back to the statutes and looked myself but I

4    think reading Mr. Ham's testimony, it talks about establishing

5    the comment of what the phrase of the date is.  But it's got to

6    be two years after the chosen date, and I've got to remember

7    where I've put chosen date, but that's my knowledge of why it's

8    a two-year period.

9    Q.    All right.  Well, I think that it is undisputed, Mr.

10   Davies, that the regulator has chosen June 30, 2008 as the

11   chosen date.  Do you know why the regulator chose that date?

12   A.    Ma'am, I'm afraid I don't.  I do know that he investigated

13   a number of dates but he chose that date and I'm not sure I

14   know why -- I don't know why he chose that date.

15   Q.    Now, the June 30, 2008 chosen date by the regulator, is

16   referenced in the trustees' proof of claim filed in this court.

17   Do you recall that, sir?

18   A.    Only -- yes.  Only to the extent that the regulator has

19   chosen that date, yes, sorry.

20   Q.    And the proof of claim that was filed by the trustees was

21   filed in September of last year, correct?

22   A.    Yes, ma'am.

23   Q.    So, the -- if the regulator has a two-year deadline after

24   the regulator's chosen date, the point at which the regulator

25   commences the warning notice process is an important factor in

1    assessing the amount of time before the FSD determination needs

2    to be made.  Do you agree with that?

3          MR. O'CONNOR:  Objection, Your Honor.  I don't even

4    understand the question, but this is an improper question of

5    this witness.  This witness is not a lawyer.  If counsel wants

6    to make an argument about that, that's fine.

7          MS. BUELL:  I'll be --

8          THE COURT:  I'll sustain that objection.

9          MS. BUELL:  All right. Your Honor.

10         THE COURT:  Yes, Mr. O'Connor.

11   Q.   Do you know why the regulator took three and half months

12   after the trustees learned that it had chosen June 30, 2008 to

13   issue the warning notices to the targets?

14   A.   No, ma'am, I don't.  I can only speculate and it is

15   speculation that this is an incredibly complex case and he had

16   to do a lot of digging and a lot of engineering of involved

17   people including trustees.

18   Q.   And it would be a complex case for the targets as well; do

19   you agree with that, sir?

20   A.   Yes, ma'am.

21         MS. BUELL:  I don't have anything else, Your Honor.

22         THE COURT:  All right.  Thank you, Ms. Buell.

23   Mr. O'Connor?

24         MR. O'CONNOR:  No redirect.

25         THE COURT:  All right.  Anyone else?

127

1          Mr. Davies, thank you for your testimony, sir, and you

2     may step down.

3          (Witness excused)

4          MR. DAVIES:  Thank you, Your Honor.

5          THE COURT:  Thank you.

6          MR. FORREST:  Afternoon, Your Honor, Neil Forrest from

7     Cleary, and we are going to be cross-examining Mr. Ham.

8          THE COURT:  All right.  Mr. Ham, you're up next.  I

9     will note I have a very brief conference call at 4 o'clock, so

10    we'll have to take a brief interruption at 4.

11         THE CLERK:  Sir, if you could raise your right hand

12    and state your full name for the Court?

13         MR. HAM:  Robert Wallace Ham.

14         (Witness duly affirmed)

15         THE CLERK:  Thank you.

16    CROSS-EXAMINATION (VIA VIDEOCONFERENCE)

17    BY MR. FORREST:

18    **Q.   Good afternoon, Mr. Ham.  Good evening, I should say.**

19    **A.   Hello.**

20    **Q.   Mr. Ham, do you have in front of you the declaration that**

21    **you submitted in this matter?**

22    **A.   Yes, I do.**

23    **Q.   Let me turn your attention to a section of this**

24    **declaration that you entitled the Moral Hazard Provisions,**

25    **begins with paragraph 27 on page 8.**

128

1    A.    Yep.

2    Q.    You see that?

3    A.    I have it.

4    Q.    And that heading, Moral Hazard Provisions, covers

5    paragraphs 27 through 35, is that right?

6    A.    Correct.

7    Q.    All of those nine paragraphs, is that right?

8    A.    That's correct, I'm sorry.

9    Q.    Now, you make reference in paragraph 29 to Sections 38 to

10   57 of the Pensions Act, you see that?

11   A.    Yes.

12   Q.    Are the words "moral hazard" contained in any of those

13   sections?

14   A.    No, they're not.

15   Q.    And there is a section of that statute that deals with the

16   objectives of the regulator, isn't there?

17   A.    There is indeed.

18   Q.    And that's Section 5, which you refer to in paragraph 16

19   of your declaration, isn't it?

20   A.    It's Section 5.

21   Q.    And if you would turn to Section 5, which is Exhibit A,

22   the statute.  You see that?

23   A.    Yes, I'm looking at that.

24   Q.    Entitled Regulator's Objectives, right?  Is that right?

25   A.    Yes.  Correct.

129

1    Q.   And under number 1, it says "The main objectives of the

2    regulator in exercising its functions are", you see that?

3    A.   Yes.

4    Q.   Do you see the words "moral hazard" anywhere in that

5    section about regulator's objectives?

6    A.   I don't see the words "moral hazard".  I thought I

7    answered that question in relation to the 38 to 57.  This is

8    the way --

9    Q.   Well, this is a different section.

10   A.   -- may I finish?

11   Q.   If you answer my question, yes.

12   A.   -- this is the way the matter is generally re --

13   Q.   Go ahead; sorry.

14   A.   -- yes, I'm sorry, you're breaking up a bit.  Could you

15   repeat the question?

16   Q.   Well, do you want me to repeat the question that you just

17   answered?

18   A.   I'm sorry, I can't --

19   Q.   I think you answered the question, so, let me move on.

20   A.   Could I just add that what I wanted to add?  The

21   expression "moral --

22        MR. FORREST:  Your Honor, I think he's answered the

23   question.  I think anything beyond this would be stricken as

24   nonresponsive.

25        THE COURT:  Well, let's hear ---

1          MR. O'CONNOR:  Your Honor, yes, I think the witness

2     should be allowed to answer his question.

3          THE COURT:  I think so.

4          MR. O'CONNOR:  And at the end of it, if you want to

5     move to strike and if the Court wants to --

6          THE COURT:  Exactly, yes.

7          MR. O'CONNOR:  -- then it can do it.

8          THE COURT:  One thing that might be helpful too, is

9     after a question is asked, just a brief pause because I think

10    the time delay between the two sites is causing a little bit of

11    a problem.

12    Q.   Proceed.

13    A.   I just wanted to say that the expression, moral hazard, is

14    one which is widely used in relation to these provisions and it

15    is moreover one which now has some judicial support in a case

16    last year decided by Mr. Justice Henderson, that's all.

17    Q.   Okay.  Thank you.  In looking at the main objectives set

18    forth in Section 5, am I correct that part A under Section 1

19    says, "To protect the benefits under occupational pension

20    schemes of -- or in respect of members of such schemes"?  Did I

21    read that correctly?

22    A.   You've read it correctly.

23    Q.   And if you go to the next item, Item B, doesn't that

24    also --

25    A.   That's a counterpart for personal as opposed to

131

1   occupational schemes.

2   Q.   Okay.  To protect the benefits of personal schemes is that

3   right?

4   A.   That's correct.

5   Q.   Okay.  Let me turn to a different subject and let me refer

6   to paragraph 38 of your declaration which appears on page 12.

7   A.   Yes.  I've got that.

8   Q.   Now, in that paragraph, you describe the determinations

9   panel, am I right?

10   A.   Yes, I describe the determinations panel, that's right.

11   Q.   And one of the things you say is that, "The panel is an

12   arm of the regulator but in practice it's entirely

13   independent".  Is that right?

14   A.   It's entirely independent, I say, of the regulatory arm of

15   the regulator.  The regulator has to, so to speak, two limbs.

16   One, the regulatory arm, the people who go out and investigate

17   and form -- in the situation we're concerned with formulate the

18   warning notice.  And then the people who look at the warning

19   notice, look at the responses, any other material which is

20   brought before them and determine whether or not to issue the

21   FSD.

22   Q.   So, the former section would be the section that

23   prosecutes the claim for an FSD, is that right?

24   A.   If you like.  I'm not sure whether I'd go with the word

25   "prosecute", but it gives the sense of it.

132

1   Q.   And the latter part of the regulator would be the panel

2   that would decide whether to issue the FSD is that right?

3   A.   It's the panel that makes the determination.

4   Q.   That makes the determination.

5        Now, am I right that the regulator is responsible for

6   paying the salary of the members of the determination's panel?

7   A.   I'm afraid I don't know the answer to that question.

8   Q.   Well, luckily, you have an exhibit that will tell us what

9   the answer is.

10  A.   Oh.

11  Q.   I'll turn you to -- I'll refer you to Exhibit C which is a

12  series of explanatory notes regarding the statute.  And if you

13  look at item 34, and tell me when you get there, see those

14  at --

15  A.   I've got it.

16  Q.   -- paragraph number 34?

17  A.   Yep.

18  Q.   And it says, "Paragraphs 14 to 16 allow the regulator to

19  remunerate members of the determinations panel at a level

20  determined by the Secretary of State", that's right.  Is that

21  right?

22  A.   Correct.  Yes.

23  Q.   And it then says they also "enable the regulator to pay at

24  levels determined by the Secretary of State allowances,

25  gratuities, or pensions to those who are or have been members

133

1    of the panel", is that right?

2    A.    Yes.

3    Q.    So, I'm correct that the investigative arm of the

4    regulator and the determination panel part of the regulator are

5    both being paid from the same place, right?

6    A.    Correct.

7    Q.    Thank you.

8          Let me turn your attention to another matter and that's

9    paragraph 44 of your declaration.

10   A.    Yes.

11   Q.    Now, in paragraph 44 there's a sentence that I just want

12   to make sure I understand.  It says, "The FSD procedure does

13   not require a trustee actually to participate in it, but the

14   trustee will have a fiduciary duty to consider whether to do

15   so."

16   A.    Yes, I read that.

17   Q.    Yes.  So, am I correct when I say that the FSD proceeding

18   can go forward in the absence of the trustee, correct?

19   A.    You are.

20   Q.    Thank you.

21   A.    The trustee has to get -- receive the warning notice but

22   if it decides that it's not appropriate for it to take any

23   further action, the process goes on.

24         In the case of an FSD, if it's issued at some stage the

25   trustee will either come -- necessarily become involved because

134

1    it has to be a participant in the agreement of the support

2    arrangements.

3    Q.    And that's because any recovery --

4    A.    It's -- it's --

5    Q.    -- excuse me, and that's because any recovery --

6    A.    Sorry.

7    Q.    -- from any of the targets would be paid to the trustees,

8    isn't that right?

9    A.    I think that question's slightly oversimplifies the

10   position.  The procedure is that you -- stage 1 leads up to the

11   issue of the FSD.

12        Stage 2, that creates an obligation on the recipient of

13   the FSD to agree financial support arrangements.  Those are

14   going to be support -- that's going to be support to the scheme

15   and it, therefore, has to involve the trustees because they are

16   the managers of the scheme.

17        Stage 3, if that doesn't happen or if there is

18   noncompliance with the arrangements which are being put in

19   place, is you may get the issue of a contribution notice.

20   Q.    Thank you.

21   A.    Is that clear?

22   Q.    Thank you.  But to be clear, a recovery from an FSD

23   process is paid to the trustee of the pension plan.

24   A.    It goes into the scheme, yes.

25   Q.    It goes into the scheme by payment to the trustees of the

135

1   scheme, is that right?

2   A.   Yes, that's right.

3   Q.   And the trustees are private parties, aren't they?  Let me

4   rephrase it.  Let me rephrase that, okay?

5   A.   Yes.

6   Q.   The trustees are not employed by the government, are they?

7   A.   They're not employed by the government.

8   Q.   And the plan of which they are trustees is not a

9   government plan, is it?

10   A.   Generally speaking, no.  In this case no, but generally

11   speaking, no.

12   Q.   Generally speaking.  (Pause)

13      Mr. Ham, when the determinations panel issues an FSD, does

14   the FSD contain a dollar amount?

15   A.   Could I --

16   Q.   Excuse me?  Do you not hear me?

17   A.   -- could I just correct you?  No, the panel doesn't issue

18   the FSD, it determines that an FSD should be issued and then I

19   think it goes back as an administrative act to some other part

20   of the regulator.  Mr. Hitchcock is nodding at that.

21   Q.   Well, if Mr. Hitchcock is nodding, I'm sure he's correct.

22      Mr. Ham, when an FSD is issued, does it contain a dollar

23   amount with respect to each target that's identified as being

24   required to provide financial support?

25   A.   In the only one that has ever -- I'm sorry -- the only

136

1    pair that have ever been issued in the sea containers case,

2    there were dollar amounts.  It's not clear to me that there

3    always have to be dollar amounts.

4    Q.    Is there any provision in the statute that requires that

5    there be dollar amounts in an FSD?

6    A.    Not in the FSD itself, but if the process goes forward as

7    I was describing, and ultimately you get to the point of a

8    contribution notice, that will necessarily have to have a -- it

9    will probably be a sterling rather than a dollar amount.

10   Q.    Excuse me.  That would be in the contribution notice?

11   A.    Yeah, that's right.

12   Q.    And in fact the statute -- the statute in the Section 49 I

13   believe, or is it 47, specifically --

14   A.    No --

15   Q.    Let me give you an opportunity to find it in Exhibit A.

16   A.    Yeah, I think you have to start probably with 45 which is

17   the meaning of financial support.

18   Q.    Well, let's just focus on your comment about the

19   contribution notice.

20   A.    Yeah.

21   Q.    And the dollar amount.

22   A.    It's 47.

23   Q.    49 --

24   A.    47(2).  You start --

25   Q.    Well, let's read --

137

1     A.    It's says that --

2     Q.    -- why don't we look first at 49, Content and Affect of

3     Section 47 Contribution Notice?

4     A.    Yeah.

5     Q.    And then you see there's a subsection (2)?

6     A.    Yes.

7     Q.    And it says "The contribution notice must" and (b) says,

8     "Specify the sum which the person has stated to be under a

9     liability to pay."  You see that?

10    A.    Yes.  And you get something very similar in 47(2).

11    Q.    Okay.  And that's with respect to contribution notice?  Is

12    there --

13    A.    Yes.

14    Q.    -- are there any similar provisions for FSDs?

15    A.    There isn't anything which is equivalent to that and I

16    think you have to look at the definition of financial support

17    which I was referring to to Section 45.

18    Q.    Okay.  Let's look at Section 45 and can you tell me what

19    subsection of Section 45 addresses the issue of whether there's

20    a dollar amount in the FSD?

21    A.    It doesn't specify that there has to be a dollar amount.

22    Q.    Now, let's turn to paragraph 50, 5-0, of your declaration,

23    please?  That's on page 16.

24    A.    Yeah.

25    Q.    Now, in that paragraph, you refer to the target person's

138

1   liability to contribute to the scheme being "crystallized and

2   reduced to a quantified obligation".  You see that?

3   A.   Yes.

4   Q.   And I don't see anything about a CN in that paragraph,

5   only an FSD.  Am I -- are you referring to a CN in that

6   paragraph?

7   A.   The last sentence I am.  I don't use the word

8   "contribution notice"; I just say "a notice".

9   Q.   But that's only in the event that the FSD is not complied

10  with, correct?

11  A.   That's correct.

12  Q.   So, am I correct that your use of the phrase "crystallized

13  and reduce to a quantified obligation" is not limited to a CN

14  but includes an FSD?

15  A.   Well, what I say is that an FSD is the first albeit

16  important step in establishing -- towards crystallization and

17  reduction to a quantified amount.

18  Q.   And was it your intent through those words to mean that

19  the FSD may be the document in which the liability is

20  crystallized and quantified or that that's limited to the CN?

21  A.   It may be.

22  Q.   Excuse me?

23  A.   It may be but it needn't be.  For example, one of the

24  things, as I'm sure you know, the panel has to consider is

25  reasonableness.  And it may be reasonable to require a

139

1    particular target to provide financial support up to, let us

2    say, a million dollars, whereas, it wouldn't be reasonable to

3    impose on it an obligation to provide financial support without

4    any such cap.  And that ties in with the requirement that in

5    assessing reasonableness, the panel has to look at the benefits

6    which have been received from -- by the target.  So, if the

7    targets received a benefit of a million dollars, it would be

8    sensible and I think possible for the FSD to, say, provide

9    financial support up to a million dollars.  It doesn't have to

10   be wholly unquantified.

11   Q.   And the reasonableness factors that you just referred to,

12   those are set forth in the Section 43(7) of the Pension Act, is

13   that right?

14   A.   It was set forth in -- let me check -- 43, yes.

15   Q.   That's 43(7), right?

16   A.   Correct.

17   Q.   And you were just referring to subsection (d), the value

18   of any benefits received directly or indirectly --

19   A.   That's right.

20   Q.   -- by that person, the target, from the employer?

21   A.   That's right.

22   Q.   Yes.  Okay.  And while we're looking at the statute, one

23   of the other factors, reasonableness factors, is the financial

24   circumstances of the target, is that right?

25   A.   Yes, that's correct.

140

1   Q.   So, the benefit received and the financial circumstances

2   are two of the -- two of the factors that are considered in

3   determining reasonableness.

4   A.   Two of the items that are on the, what I think of as the

5   check list of things that have to be looked at in relation to

6   reasonableness.

7   Q.   Thank you.  Now, let's take a look at paragraph 60 of your

8   declaration.

9   A.   Yes.

10  Q.   The last sentence in which you're describing the sea

11  containers, you say that once the FSD liability is quantified

12  by the panel's decision, it would have to be subject to the

13  claims allowance process of the foreign insolvency court, you

14  see that?

15  A.   I see that.

16  Q.   Okay.  Now, I'm trying to understand what you mean by

17  "would be subject to the claims allowance process".  So, answer

18  this question for me.  Does that mean that if the

19  determinations panel determined that it was reasonable to issue

20  an FSD against a certain target that that target could come

21  back to the foreign insolvency court, its insolvency court, and

22  tell the judge that it was not reasonable, it was unreasonable

23  and he should reject the determination made by the panel?

24  A.   I think that's assuming some knowledge about the allowance

25  process of the foreign insolvency court that I don't

141

1    necessarily have.  But what I was trying to say was that once

2    the liability had been quantified as it was in sea containers,

3    the quantified liability, then, had to be taken and processed,

4    if that's the right word, through the procedures of the

5    relevant insolvency court.

6    Q.   And what's the basis for that statement?  Is there

7    something in the Pensions Act that says that?

8    A.   The basis for that is it's a statement about what the

9    panel and the parties understood.  It's my recollection of what

10   we understood.

11   Q.   Well, you know, you have paragraph 58 in which you set

12   forth the significant determinations in your view that the

13   determination panel issued.  And then you also have some

14   determinations made later by the bankruptcy court.  But I don't

15   see the one you just referred to.  So, is it your testimony

16   that the understanding that you had from participating in sea

17   containers regarding what would happen to the determination

18   made by the panel when it was brought back to the U.S.

19   Bankruptcy Court was not one of the factors that you decided

20   was important enough to itemize in paragraph 58?

21   A.   I wasn't intending to be exhausted in paragraph 58.  I am

22   simply setting out in 60 my recollection of what the

23   understanding was at the time.

24   Q.   And that was your understanding at the time, is that

25   right?

142

1    A.    I think so, yes.

2         MR. FORREST:  Your Honor, we're getting very close to

3    4 o'clock.  I know you have to break.

4         THE COURT:  Yes, thank you.

5         MR. FORREST:  Should we break now?

6         THE COURT:  Thank you for bringing that to my

7    attention.

8         MR. FORREST:  I only have a few minutes left.  Should

9    we -- we can just break now and then pick up.

10        THE COURT:  All right.  Let's take a brief recess and

11   I'll come back as soon as I can.

12        MR. FORREST:  Thank you.

13        THE COURT:  Probably no more than ten minutes.  Thank

14   you.

15       (Recess from 3:58 p.m. to 4:20 p.m.)

16        THE CLERK:  All rise.

17        THE COURT:  Thank you all.  Please be seated.  All

18   right, Mr. Forrest, whenever you're ready.

19        MR. FORREST:  Thank you.  Just a few more questions,

20   Mr. Ham.

21   RESUMED CROSS-EXAMINATION (VIA VIDEOCONFERENCE)

22   BY MR. FORREST:

23   Q.   Mr. Ham, let's suppose that there's a FSD proceeding and

24   an FSD is issued.  And then shortly thereafter, the employer

25   receives a significant amount of money, so much money that it

1    would materially affect its ability to fund its plan.  In that

2    instance, would the FSD be undone?

3    A.    Immediately afterwards it could be undone because you

4    would have a reference to the Pensions Regulator Tribunal which

5    approaches the matter de novo.

6    Q.    But that requires that that occurs within twenty-eight

7    days of the determination by the determinations panel, correct?

8    A.    That's correct, yes.

9    Q.    So, if the employer wins the lottery on day twenty-nine,

10   at that point the FSD can't be undone, isn't that right?

11   A.    It can't be undone, but no consequences would flow from it

12   in terms of a lot -- you then have an obligation to put in

13   place financial support arrangements.  May I just look at the

14   statute please?

15        (Pause)

16   A.    I would imagine you could devise something which fell

17   within Section 45 involving money coming from the employer.

18   But supposing that no arrangements were put in place under

19   complying with Section 45, the next stage would be to consider

20   whether that should be a Section 47 contribution notice.  And

21   it wouldn't be reasonable, I would have thought, to issue such

22   a contribution notice where the need for the support had gone.

23   Q.    Well, what if the money -- what if the target had already

24   paid the money that it was required to pay?  Would the money be

25   paid back?

144

1    A.   It would have paid them -- I don't see basis for repaying

2    it.  Haven't given this slightly unrealistic scenario a great

3    deal of thought, but nothing occurs to me immediately.

4    Q.   Well, it may be more realistic than you think.

5         Let me just ask you one other thing, and that is regarding

6    sea containers, which you discuss in your declaration starting

7    with -- well, we'll focus on paragraph 58.

8    A.   Okay.

9    Q.   Now, I'm correct that sea containers is the only time that

10   the determinations panel has ruled on whether or not the

11   statutory requirements for an FSD have been met, is that right?

12   A.    I think that's right, yes.  I'm hesitating only because I

13   know of at least one other case where there was a settlement

14   and I'm not sure -- I can't now remember how that was given

15   effect to.  But it was the only contested case.

16   Q.   Only contested case and the only ruling issued by the

17   panel, right?

18   A.    On FSDs.

19   Q.   On FSDs, yes.

20   A.    Yeah.

21   Q.   Now, in paragraph 58, you list some of the items that the

22   determinations panel decided in sea containers.  Am I right?

23   A.    Yep.

24   Q.   And in 58, subparagraph (1), the last sentence says, "The

25   issuing of an FSD would not infringe the automatic stay which

145

1   is part of the Chapter 11 protection".

2   A.   Yes.

3   Q.   So, am I correct that that was decided by the

4   determinations panel?

5   A.   I think it pretty much became common ground during the

6   course of the hearing.  There was expert evidence from -- to

7   U.S. attorneys on this question.

8   Q.   And there was expert evidence from U.S. attorneys because

9   the members of the determinations panel aren't U.S. lawyers,

10  right?

11  A.   There was expert evidence because the target started off

12  by relying on the stay.

13  Q.   Mr. Ham, are the members of the determination panel U.S.

14  lawyers; any of them?

15  A.   They weren't on that occasion.

16  Q.   Well, to your knowledge, are they now?

17  A.   I'm not -- I think it unlikely, but I don't know.

18  Q.   Okay.  So, in that instance on the issue of --

19  A.   Can I just clarify?

20  Q.   Okay.

21  A.   The panel is, I can't remember how many people, say it's a

22  dozen, but they sit in subpanels, so to speak, of three or four

23  or five.

24  Q.   Thank you.  So, in the instance of sea containers, and I

25  know you were one of the lawyers in that case --

146

1   A.   Yeah.

2   Q.   -- on the issue of foreign law, which was U.S. bankruptcy

3   law, the panel heard testimony from experts on U.S. law, right?

4   A.   Right.

5   Q.   Just like in this U.S. courtroom today, we're hearing

6   testimony from you, an expert on U.K. law, right?

7   A.   Yeah.

8           MR. FORREST:  I have nothing else.  Thank you.

9           THE COURT:  All right.  Thank you, Mr. Forrest.

10          MR. FORREST:  Thank you.

11          THE COURT:  Mr. O'Connor, anything from you sir?

12          MR. O'CONNOR:  No redirect.

13          THE COURT:  All right.  Are you finished with the

14  witness, then, I assume?

15          MR. FORREST:  Yes.  Thank you, Mr. Ham.

16          THE COURT:  Mr. Ham, thank you very much, sir.

17          MR. HAM:  Thank you very much.

18          THE COURT:  Good evening to you and you may be

19  excused.

20      (Witness excused)

21          MR. HAM:  Good evening -- or good afternoon.

22          THE COURT:  Yes.  Well, it's getting to be evening

23  here too.

24          MR. HAM:  Okay.

25          MR. FORREST:  Your Honor, we'd like a very short cross

1    of Mr. Faver -- Favier?  Mr. Favier.

2         THE COURT:  Mr. Favier.  Good evening, sir, and thank

3    you for your patience.  This is Judge Gross speaking.  We will

4    now have you affirm your testimony.

5         THE CLERK:  Sir, if you could raise your right hand

6    and state your full name for the Court?

7         MR. FAVIER:  Richard Favier.

8       (Witness duly affirmed)

9         THE CLERK:  Thank you.

10   CROSS-EXAMINATION (VIA VIDEOCONFERENCE)

11   BY MR. FORREST:

12   Q.   Good evening, Mr. Favier.

13   A.   Good evening.

14   Q.   I'm correct that you're the senior insolvency advisor to

15   the Pension Protection Fund, is that right?

16   A.   That is correct but I am not a lawyer in case that's the

17   conclusion you come to.

18   Q.   No, that wasn't.  Just wanted to clarify what your

19   position was.

20   A.   Okay.

21   Q.   Thank you, though.

22        Now, am I correct that the PPF, if I could use the

23   acronym, is funded by levies on pension schemes, is that right?

24   A.   It is correct but it's a levy on every foreign benefit

25   pension scheme.  The government legislated that everybody had

148

1    to join the club.

2    Q.   Okay.  But the funding isn't provided by the government,

3    it's provided by the private pension schemes, is that right?

4    A.   That is correct.  It is not provided by the government.

5    Q.   Let me turn to the subject of the assessment period which

6    you discuss beginning in paragraph 10 of your declaration on

7    page 4 under the heading The Assessment Period for the Nortel

8    Networks U.K. Pension Plan.

9    A.   Yep.

10   Q.   Now, as a general matter during an assessment period, does

11   the board communicate with the pension's regulator regarding

12   the plan that's under his study?

13   A.   Not as a general rule.  The assessment that takes place is

14   off the liabilities in the scheme and the assets in the scheme.

15   That takes place with the trustees of the scheme -- of the

16   plan.  You call it the plan I think.

17   Q.   And am I right that during the assessment period, the

18   board exercises the rights and powers of the trustees of the

19   scheme in relation to any debt or contingent debt owed them by

20   the employer?

21   A.   That is correct.

22   Q.   And during the assessment period in this case, to your

23   knowledge is the board communicated with the regulator

24   regarding the scheme and the investigation that the PPF has

25   undertaken?

149

1    A.   The PPF hasn't undertaken any investigation with regards

2    to the potential FSD.  But it is true to say that we have been

3    in communication with the regulator because we were aware that

4    they were asking the trustees to do a substantial amount of

5    work from the point of view of provision of information which

6    was costing money and that takes assets out of the scheme, so

7    we were aware of that and we have been aware of what they've

8    been doing.  But we cannot influence what the regulator does.

9    They are their own person in the same way as we are our own

10   person.

11   Q.   But you can influence the trustee during the assessment

12   period, correct?

13   A.   We can influence the trustee in the sense that we can

14   issue the direction telling them to do something or not to do

15   something, yes.

16   Q.   So, for example, if the board decided that it didn't want

17   the trustee to spend the time and effort digging through

18   information going back ten years to respond to the regulator's

19   request, the board could have directed the trustee not to do

20   that, am I right?

21   A.   That is a very interesting question which actually I did

22   wonder about.  In a sense that you'd have one statutory go to

23   issuing instruction to another telling it not to comply with

24   the instruction from the regulator.  I expect yes in theory,

25   yes, we could do that.  I'm not quite sure what the outcome

150

1    would be.

2    Q.    But in this case the trustee provided the information, is

3    that right?

4    A.    They did.

5    Q.    Okay.

6          MR. FORREST:  I have nothing else for this witness,

7    thank you.

8          THE COURT:  Mr. O'Connor?

9          MR. O'CONNOR:  No, redirect, Your Honor.

10         THE COURT:  All right.

11         Mr. Favier, thank you, sir, and you may be excused.

12   And a good evening to you.

13        (Witness excused)

14         MR. FAVIER:  Thank you and good evening to you too.

15         THE COURT:  Thank you.  Ms. Buell?

16         MS. BUELL:  I believe this concludes the evidentiary

17   portion of the proceedings, Your Honor.

18         THE COURT:  All right.

19         MS. BUELL:  And if I might, I'll try to make some

20   closing remarks both to be responsive to Mr. O'Connor's

21   presentation and, of course, very importantly, to a question

22   that you put to Mr. O'Connor about the ability of the trustees

23   to proceed in this court to have their claim determined without

24   prejudice if the FSD either never issued because the regulator

25   didn't proceed without them or if it was issued but was not

1    given for us, in effect, by this Court.  And for that,

2    Mr. Bromley has developed some language which we'll read into

3    the record in order to help the Court to the extent that that

4    is helpful.  So, why don't we address that first and then I can

5    deal with some of the contentious issues that are still with

6    us.

7            THE COURT:  All right.  Very well, thank you.  Mr.

8    Bromley.

9            MR. BROMLEY:  thank you, Your Honor, and there were

10   maybe two other things I wanted to address as well.  One, is I

11   was able to look at the motion that we did file on the

12   employees, which is docket entry 2400, two thousand four

13   hundred; we're getting up there in the numbers.

14           The -- just to give you the information that's there,

15   the corporate group, and this is worldwide within all the

16   Nortel entities, 166 total employees.  Of that 166, 70, 7-0,

17   are in the U.S, 75 are in Canada, 21 outside of North America.

18           Of the seventy in the U.S., twenty-four of those

19   employees are part of the Nortel Special Incentive Program.

20   So, fifty-one are -- no, I'm sorry, so, the remainder are

21   less -- are not in the program meaning they're most likely

22   lesser employees in terms of salaries and the like.

23           Of the twenty-four, four of them are officers, three

24   of them are lawyers and one is a tax professional.  So, of the

25   individuals who arguably could be subject to 503(c) who are in

1    the corporate group and employed by NNI, the number is four.

2         There is one other person who is subject to an

3    employment agreement that is also part of the motion to be

4    considered on the third, he is the head of intellectual

5    property.

6         THE COURT:  Okay.

7         MR. BROMLEY:  So, a total of five people who would be

8    in more traditional management positions.

9         That contrasts, Your Honor, as to -- I went back and

10   looked at the Doolittle affidavit that was submitted at the

11   first day of the case.  On the petition date, there were 8,911

12   employees in the United States.  We didn't have that broken

13   down between corporate and noncorporate functions.  Okay.

14        THE COURT:  All right.  Thank you, Mr. Bromley.

15        MR. BROMLEY:  And that's all at docket entry 2400.

16        The -- just to follow up on Ms. Buell's point, Your

17   Honor, we did talk amongst ourselves on some of the issues that

18   were raised because in all honesty when you listen to the

19   argument, there are a couple of points that seem to come up.

20   In many respects, I kind of listen to it almost in reverse as a

21   motion to lift the stay rather than a motion to enforce the

22   stay which is frankly what I think it would have been if there

23   hadn't been the sea containers decision.  But the language that

24   we suggest is the following.  Which is that NNI and NN CALA,

25   the two targets, would agree that the claims of the PPF and the

153

1    scheme trustees would be addressed before the bankruptcy court

2    on a de novo basis and that the PPF and the scheme trustees

3    shall have the right to make all arguments to the bankruptcy

4    court that it could be made for the determinations panel.

5         That NNI and NN CALA would agree that would not object

6    to the claims of the PPF and the scheme trustees on the ground

7    that an FSD has not issued.  So, this addresses Mr. O'Connor's

8    point that he is concerned that in the event that the process

9    that has been accelerated by their own choice in the U.K.

10   somehow does not yield an FSD that that would somehow be held

11   against his clients.  And so, I think the point there is that

12   it would not and indeed that the process should happen here on

13   a de novo basis through the submission of the claims.

14        Also, in the event that an FSD does issue, it is the

15   position of NNI and NN CALA that the FSD should not be admitted

16   by the bankruptcy court as evidence of the existence of a

17   liability of any -- of either NN CALA or NNI or as to the

18   amount of any liability.  And so, when you take that -- those

19   three points into account, Your Honor, I think we address the

20   purported prejudice that might be suffered which is basically

21   that claims have been filed before Your Honor they should be

22   determined completely before Your Honor.  And the concern that

23   somehow the claims would be subject to an argument by the

24   debtors that because an FSD was not issued that somehow the

25   claims should be disallowed solely on that basis as something

154

1    that we would not be pursuing as a defense to the claims.  So,

2    we wanted to get that into the record, Your Honor.

3           THE COURT:  All right.  If I may just interrupt for

4    one moment?

5           MR. BROMLEY:  Um-hum.

6           THE COURT:  We need to get that video back because

7    apparently they were watching.

8           MS. BUELL:  It looks like it's coming.

9           THE COURT:  Here we go.  Oh, that's Mr. Bromley.

10   We're disconnected?

11          MS. BUELL:  They have been.  A couple of them have

12   popped up on our screen.

13          THE COURT:  Oh.

14          MR. BROMLEY:  There we go.

15        (Pause)

16          THE COURT:  Are they going to -- how do they do this

17   now?  Oh, okay.  There we are.

18          MS. BUELL:  We're back.

19          THE COURT:  Welcome back to our friends in the U.K.

20   Mr. Bromley, perhaps you would just repeat those --

21          MR. BROMLEY:  Sure.

22          THE COURT:  -- I guess, stipulations at this point.

23          MR. BROMLEY:  Happy to, Your Honor.  There were really

24   three points.

25          THE COURT:  Yes.

1          MR. BROMLEY:  The first point would be that the NNI

2     and NN CALA are prepared to agree that the claims that the PPF

3     and the scheme trustees shall be addressed before the

4     Bankruptcy Court on a de novo basis and that the PPF and the

5     scheme trustees would have the right to make all arguments to

6     the Bankruptcy Court that they could have made before the

7     determinations panel.

8          Furthermore, that NNI and NN CALA would agree that

9     they would not object to the claims of the PPF and the scheme

10    trustees on the ground that an FSD has not been issued.  As we

11    understand, one of the main concerns Mr. O'Connor expressed was

12    that this process needs to occur.  It needs to occur by June

13    30th --

14          THE COURT:  Right.

15          MR. BROMLEY:  -- because, of course, we've got the FSD

16    that has to come out, and without an FSD we can't make a claim,

17    and then you'd object to our claim.  We're trying to alleviate

18    that issue.  And that in the event an FSD does issue, that the

19    FSD shall not be admitted by the Bankruptcy Court as evidence

20    of the existence of any liability of NNI or NN CALA or as to

21    the amount of any liability.

22          So those are the three things that we think, I think,

23    address the issue, allow the claims to be addressed as they

24    should be here in this Court.  I think it's also worthwhile,

25    Your Honor, to mention that with respect to yesterday's hearing

1    up in Canada there was a great deal of discussion as well, a

2    great deal of discussion on issues very similar to many of the

3    ones that we've raised today, including the ones relating to

4    use of relatively scarce corporate resources.

5         THE COURT:  Yes.  Yes.

6         MR. BROMLEY:  And so, you know, it did strike me as I

7    was listening that it is appropriate and, I think, permitted

8    under the cross-border protocol for you and Justice Morawetz to

9    obviously discuss these issues, especially when taking into

10   account the sharing of the resources between NNI and NNL, two

11   targets, both of whom have shared resource, as has been the

12   case throughout the proceedings.  So I think with that, Your

13   Honor, I just wanted to fill in a couple of the corners, but

14   then turn over the crescendo to Ms. Buell.

15        THE COURT:  All right, Mr. Bromley.  Thank you.  All

16   right, Ms. Buell, you're the crescendo today.

17        MS. BUELL:  All right.  I will make it short and

18   sweet, I hope, Your Honor.  We've heard a lot this afternoon

19   from both sides, and I want to summarize my remarks in a couple

20   of categories.  One is the presentations on whether the

21   regulator is acting for a public purpose, whether that's the

22   primary action that the regulators pursue of the regulatory

23   procedure in respect of the FSD is fairly described as.  And I

24   think the evidence that's come before the Court is quite clear

25   that the regulator is directly acting with respect to a private

1    right, and that's the private right of the trustees.

2         This is not an incidental or tertiary repercussion of

3    the regulator's action.  It is based on the letter, based upon

4    the declaration and the testimony of Mr. Davies.  It is the

5    direct focus, purpose of that proceeding, and not only is it

6    focused on that private claim, but it's on the private claim

7    which is pending before this Court in the form of the proofs of

8    claim.

9         This is not a situation where the regulator has the

10   power to make a determination and then to assert that claim on

11   behalf of a broad representative group.  It is focused on the

12   trustees' rights, and it is pursuing those rights.

13        Now, we also heard about the phrase "moral hazards" as

14   it applies to the trustee or to the regulators' powers to issue

15   FSD and a contribution notice, and I would refer the Court, in

16   that regard, to the Hixon case, which we cited in our papers,

17   which, I think, has a very, very good description of the fact

18   that you often have regulatory bodies which, in some instances,

19   may be acting in a public manner and in other instances,

20   including the instance that was at issue in that case, were

21   acting with respect to the rights of the parties in front of

22   it.  And that, I think, is quite apt to what we have here.

23        It is true, as Mr. O'Connor pointed out, that we do

24   not have a case to cite to this Court which is exactly on

25   point.  We have the regulator, which is the prosecutor, and the

158

1    judicial body, the decider and the appellate court, we don't

2    have that structure.  But I think we do have, and we cited the

3    Court instances where bankruptcy courts have been asked to

4    determine whether when private rights are being adjudicated in

5    front of a regulatory body which has, unquestionably, a

6    specialized and legislatively granted focus, substantive focus,

7    whether that implicates the police power, and in those

8    instances the answer is no.

9         Now, I think it's also relevant, Your Honor, that the

10   FSD, as we heard during the cross-examination of the trustees'

11   legal expert, does not have to quantify a number.  And, in

12   fact, that's what we understood the process was, so we were

13   actually kind of interested and surprised at the presentation

14   and the objection which made crystal clear that here it's not

15   just an assessment of which affiliates should provide financial

16   support but a quantification of that financial support, even

17   though the statute does not clearly contemplate that at the FSD

18   level as opposed to the contribution notice.  And I think that

19   is of some relevance for the Court's consideration here.

20        I also -- I just wanted to point out, and, obviously,

21   counsel, we're all making argument here, but there was a

22   reference in counsel's presentation that Nortel left NNUK

23   unfunded, and, obviously, that is a question that goes to the

24   merits and, certainly, insofar as the U.S. debtors are

25   concerned, very much in dispute, Your Honor.

1          Now, in terms of some of the other case law, I think

2     we've talked enough about Sea Containers.  I didn't really hear

3     Mr. O'Connor disagree with what the case did procedurally.

4     Obviously he disagrees with the significance that we attach to

5     some of those procedural differences, but I do think that it is

6     really quite significant that the case did not address whether

7     the claimants were entitled to participate in a process that

8     would benefit them in terms of the claims allowance process.

9     That issue was never presented.

10         And it's also the case, Your Honor, that the filing of

11    the proof of claim only after the FSD was issued, I think,

12    sharpens the reason why that did not come up any earlier.

13         There was also a reference, and these cases are

14    obviously important to the EPA cases.  There are particularly

15    few in the Third Circuit that deal with police power and when

16    an agency can, on a post-petition basis, take a police power

17    claim to a monetary judgment without violating the stay.  Penn

18    Terra, Nicolet, and I think Mystic is a third one, those cases

19    certainly are important, but definitely addressing a situation

20    different than what we have here.  In each of those cases you

21    had the public authority which had the right to bring a claim

22    on behalf of the public or on its own behalf, right, as the

23    public representative and did so and sought injunctive type

24    relief as well as a monetary claim.  And the Third Circuit in

25    Nicolet was very clear on when that monetary claim can be made

1  part of the police power exception, and that's where the public

2  entity is attempting to fix damages for violation of a law,

3  right?  So that where a government unit is suing a debtor to

4  stop a violation of fraud, environmental protection, consumer

5  protection, safety or similar police or regulatory laws or is

6  attempting to fix damages for a violation of such law, in that

7  instance even a monetary issue can be taken to judgment within

8  the confines of the police power exception.

9       This is, of course, a very different situation.  There

10  is no legal, U.K. legal standard which today applies to govern

11  or applied pre-petition to govern how the U.S. entities dealt

12  with NNUK.  There is no, you know, you must give three percent

13  of your gross revenues to the pension obligations of your

14  sister affiliates.  There was no funding requirement and no

15  substantive provision which said this is how you shall conduct

16  yourself.  Instead, this is a situation where after the fact

17  the regulator has the right to determine whether preexisting

18  claims that the trustee has against the employer should be

19  broadened on an after the fact analytical basis.  This is not

20  an effort to attempt to fix damages for some prior violation of

21  law.  And, so, I think it's really quite distinguishable.

22       The other line of cases references were the EEOC

23  cases.  Again, you have the public authority, which is entitled

24  to bring a claim on behalf of the public.  There, I think it is

25  important to note that there are instances where there's a back

1    pay award, right?  Now, that back pay award, no question,

2    benefits private individuals, but the situation that we have

3    here is like saying that the EEOC is coming to the Court and

4    saying okay, we have an injunctive claim against this debtor,

5    we have a monetary claim for back pay against this debtor, and

6    we are asserting that an affiliate of that debtor is

7    responsible for paying the back pay award.  That is not the

8    analysis of the EEOC cases in terms of the police power.  And

9    that's what makes this case interesting, as many issues like

10   this are, but it's also clear that one, it's dealing with

11   money, right?  This claim is primarily about money, and this

12   claim is also about a private right.

13        We do think that the Fairchild, the Spansion, the

14   Hixon cases we cited, are on point.  I think we've dealt with

15   the question of what will happen in the claims allowance, Your

16   Honor.  I think the factual stipulation that we have with the

17   trustees makes that quite clear.

18        And, then, just finally, on the allocation matter.

19        THE COURT:  Yes.

20        MS. BUELL:  Again, I think we heard even the trustees'

21   expert make clear that one of the factors is this assessment of

22   the financial condition of the targets.  It's also, certainly,

23   the case that the financial condition of the employer is part

24   of that reasonableness, and for that reason we think that this

25   is absolutely, you know, in this court an issue which needs to

162

1    await progress on the allocation process.

2        I just want to make one final point before allowing

3    Mr. O'Connor to make his final remarks, and that is, Your

4    Honor, we do have this March 1 deadline.

5        THE COURT:  Yes.

6        MS. BUELL:  And I think that the debtors will be

7    sending a letter to the regulator reserving their rights with

8    respect to any deadline in that proceeding.  Obviously it may

9    be different if the Court is going to rule from the bench, but

10   I just want to make clear that the U.S. debtors do not submit

11   to the jurisdiction of the regulator but are also going to do

12   everything they can to preserve any procedural rights while

13   this situation is still unresolved.

14       THE COURT:  Well, I do intend to rule from the bench.

15   I will follow it with a writing.

16       MS. BUELL:  Okay.

17       THE COURT:  But I think that it's appropriate to rule

18   from the bench today, given the March 1st deadline.

19       MS. BUELL:  Thanks so much.

20       MR. O'CONNOR:  I should say -- well, okay.  I'm sorry.

21       MS. BUELL:  No, go ahead.

22       MR. O'CONNOR:  No, no, no.

23       MS. BUELL:  Do you want to --

24       MR. O'CONNOR:  No, no, no, no.  You go ahead.  I'll

25   finish up.

1          THE COURT:  You might as well hear from --

2          MR. O'CONNOR:  Yes.

3          THE COURT:  -- both antis first.

4          MR. O'CONNOR:  Might as well.

5          THE COURT:  Ms. Beckerman?

6          MS. BECKERMAN:  Thank you, Your Honor.  Lisa Beckerman

7    from Akin Gump on behalf of the creditors' committee.

8          THE COURT:  Yes.

9          MS. BECKERMAN:  Your Honor, we obviously filed a

10   joinder, so we joined in all of the debtors' arguments, but our

11   joinder did highlight a couple of points that I think are U.S.

12   creditor and creditor committee specific points that we want to

13   make sure that the Court, and, we know, will, of course,

14   consider.

15          I guess I'd start by saying that I know one of the

16   arguments that the trustees and the PPF has made in this case

17   is that the situation that we're facing puts them between a

18   rock and a hard place.  Unfortunately, I think it puts you

19   between a rock and a hard place as well, and this is a very

20   difficult decision.  I don't think anyone standing here today,

21   any of the parties that are involved in this argument, would

22   look at this as an easy ruling for you to make.

23          I think what I'd like to focus the Court on, though,

24   are sort of the alternatives, because I think either way

25   there's going to be prejudice to parties.  It's not going to be

164

1    a perfect solution, and, really, you have to think about what

2    we're trying to accomplish with the insolvency proceeding

3    here --

4            THE COURT:  Yes.

5            MS. BECKERMAN:  -- and weighing what the U.S. process

6    is supposed to be.

7            I think Ms. Buell's illustration was great, because

8    one of the things that we'd, obviously, highlighted in our

9    argument is a concern about well, what does allowance if the

10   Court doesn't enforce the stay and then the debtors have to

11   make a very tough decision about going over to participate in

12   the process, which, from our viewpoint, would likely mean that

13   they've submitted to jurisdiction in front of the

14   administrative body, and then arguing in front of that party,

15   and I'm going to address that in a minute, a little bit

16   further, and, then, having a decision ultimately made, and then

17   either deciding to appeal or not to appeal or going through

18   that process, and then ultimately coming back here.  What will

19   be left for you to decide?  If this were a proceeding that

20   didn't have the type of process that we've discussed throughout

21   here with rights of appeal and other things and wasn't before a

22   body in the United Kingdom, but, maybe, was a body in South

23   Yemen, we might have a little bit of a different discussion

24   here.  But I think what really happens is if the company goes

25   over and goes through this process it's obviously going to be

1    very difficult to come back and argue, after we participated

2    fully in that process, that this Court should just completely

3    ignore that.  And the question is if the debtors had to go over

4    today, or Monday, and start participating in the process, what

5    would that mean for the estate and what would it mean from the

6    resources perspective?  What would it mean from the information

7    that's available, and what would it mean for the process that

8    we have to go through in the allocation proceeding?

9         I think from the creditors' committee's perspective we

10   look at it as the trustees and the PPF filed the claim here.

11   You know, most claims get liquidated before the Bankruptcy

12   Court.  Obviously that sometimes happens that they get

13   liquidated in front of other bodies, but this is a huge claim,

14   as Ms. Buell accurately reflected.  It's obviously of critical

15   importance for the estate.  And the most important thing is

16   that it be, at the time that liability, if such exists, is

17   assessed, that all the information is both available and could

18   be available in the right way.

19        And, I think, unfortunately, standing here on March

20   1st, as Ms. Buell has appropriately argued and some of the

21   witnesses have testified to, including Mr. Ray, we have no idea

22   what amounts each of these estates are going to have.  And

23   that's true for the U.S. debtors, which is what we're here on,

24   but it's also true for many of the other potential targets.  So

25   absent the allocation process we, really, the determinations

1    panel or any other person trying to decide that now would

2    really be guessing.  Making it up.  Throwing darts.  Really,

3    not having a good idea about what that number would be.  And

4    that's one of, obviously, the key standards for determining

5    reasonableness.

6         THE COURT:  Yes.

7         MS. BECKERMAN:  Another standard for determining --

8         THE COURT:  And that was Mr. Forrest's point, I think.

9         MS. BECKERMAN:  Yes.  And it's correct, and it's very

10   disturbing, because it's the time that's driving that in some

11   ways, because if we've been through the allocation process yes,

12   we would all know that.  That would be a fact that whoever was

13   liquidating the claim would understand and could properly

14   assess, but right now that can't be.  And so it's really a

15   difficult process, if someone allows that process to go forward

16   now over in the U.K., for there to be a proper assessment of

17   that.

18        I think the second thing that is equally troubling is,

19   and I'm going to be very careful here because I'm very aware of

20   the sanctions on the warning notice, but, obviously, there's

21   some very specific things alleged in this giant pile of paper

22   and the warning notice.  And what that means is, really, three

23   things.  It means that the resources that Mr. Ray, in his

24   declaration, has testified about and the scarcity of those

25   resources would, obviously, have to be very much redirected to

1    responding in a very, very short time, and there's some very

2    specific allegations going back ten years, as I think Ms. Buell

3    indicated, at least, in them, and many of those same issues, at

4    least, issues about the benefit, direct or indirect benefit

5    that was received by NNI and NN CALA from NNUK, are issues and

6    facts and subject matters that are all going to have to be

7    addressed in the allocation process.

8         So in addition to Ms. Buell's concern, which is, of

9    course, clear about issue preclusion, comity, and fait

10   accompli, which we all agree with from the creditors' committee

11   side, we have a concern about both the ability to develop the

12   information in an appropriate period of time, the resources

13   that would need to be developed to do it, and, also, the

14   decisions that would be potentially made or the fact finding

15   that would be made in that process that might have either issue

16   or a claim type of preclusion issues in the allocation process,

17   and that is very concerning to us.

18        And I'd say on the scale of what's most concerning to

19   us we'd been most concerned about the fact that there's just

20   not sufficient time to put a proper case together.  And that's

21   no disrespect to anybody here.  People will work.  They'll do

22   what they have to do.  But to have a proper case they need all

23   that information.  A lot of that information was going to be

24   developed in the allocation process, which, then, argues,

25   again, for wanting to have that allocation process done before

168

1    this claim is liquidated.

2          And the only way that I can see that occurring,

3    because of the statutory problem, which I think is

4    appropriately alleged there, although it's of the regulators

5    own making, in part, because of the date they chose and the

6    delays they've made, and that's not any disrespect to the PPF

7    or the trustees, because they clearly don't control any of

8    that.

9          And I can't blame them.  They just find themselves, as

10   they said, in a rock and a hard place, and I understand that.

11   That's not their fault.  But the regulator has made decisions

12   that impact all of us, and the question is what is best and

13   what's the most prejudicial.  So I look at it as okay, on one

14   hand Your Honor could enforce the stay.  None of us control

15   what the regulator does.  But the claim could ultimately be

16   liquidated before Your Honor at an appropriate time, after

17   these appropriate proceedings have happened over the cross-

18   jurisdictional process on the allocations, so we know the

19   information, also with appropriate time to develop the

20   information necessary to deal with the facts that are alleged,

21   and, yes, that obviously means that something might be going on

22   in England, and it might end up having to be, you know, have to

23   occur here at a later point, but from the perspective of the

24   U.S. debtors and, also, just in respect of justice and having

25   the claim liquidated appropriately, in an appropriate manner,

1   that's clearly what's best from the estate's perspective and

2   the creditors' perspective.  And that's, again, not meant

3   disrespectfully to the U.K. administrative proceedings.  It's

4   just meant to where we are in this case, the facts that we find

5   ourselves under, these specific debtors as well as the law, of

6   course, that we've been talking about but whether, you know,

7   whatever is done here is going to have effects and to do

8   something that would be the least damaging, plus really be able

9   to appropriately evaluate all the factors under the U.K.

10  statute with all of the proper evidence, it does seem to us

11  that the best possible outcome would be to enforce the stay,

12  liquidate the claim at some other point down the road after the

13  allocation process, after all the information's been developed,

14  after the cross-border protocol has been implemented and people

15  know what's in Canada.  People know what's in the United States

16  and people know what they're --

17          Now, I understand that right now Your Honor's more

18  narrow decision is the issues under the 362(b)(4) exception.

19  And, obviously, you know, as Ms. Buell has appropriately noted,

20  one of the things that our statute does that I do think is

21  different than the U.K. statute that was cited to by Mr.

22  O'Connor in their moratorium is that we don't just give a

23  blanket pass to anything that's regulatory.  That's not, again,

24  meant disrespectfully to the U.K.  Everybody has different

25  laws.  They've obviously decided to allow their regulators to

1   have some broader authority in taking action.  Our Congress has

2   made it a somewhat narrower exception.  That was deliberate.

3   It requires that the Court inquire into the purpose and the

4   nature of what the regulator is trying to do.  It's not that

5   any action taken by a regulator, albeit for very good reasons

6   authorizing its, you know, going along with its authority or

7   its direction by its creator or the legislative history that it

8   was created under, our statute doesn't say that is enough.  Our

9   statute says you have to look and see what the purpose is here.

10  And I think, as Ms. Buell said, there's, unfortunately, no

11  perfect case on point here, but I think when you look at the

12  cases here and the purpose of what the regulatory proceeding

13  over there is trying to do, it's ultimately trying to come to a

14  dollar amount, if one is owed, that would then be paid over to

15  the trustees for the benefit of the beneficiaries.  And it's

16  not going to the public good.  It's not going to the government

17  as large.  It's not to, you know, staunch pollution that's

18  occurring and about to immediately infect the entire Delaware

19  River and the eight states that drink from it.  It's not, you

20  know, where the parties do that.  It's not enforcing racial

21  discrimination laws or something like that across our nation.

22  It's a pecuniary purpose.  And I think that when Your Honor

23  looks at the specifics of this and considers all the arguments

24  from the U.K. experts, that, hopefully, that's the way that

25  Your Honor will go.

1          Obviously, if Your Honor doesn't choose to enforce the

2     stay we'll all be stuck with a very difficult decision about

3     whether to participate or not participate, and I hope that Your

4     Honor will consider the interests of the creditors as a whole

5     in this process, the interests of wanting to have the claim

6     liquidated in an appropriate manner, with all of the evidence

7     and at an appropriate time and what deciding the other way

8     would mean for the estates and for a very, very large process

9     that would then, really, be outside the bounds of this Court

10    and requiring the debtors and, to some degree, of course, the

11    committee, potentially, to have to spend a lot of time dealing

12    with this issue on a very short period of time without proper

13    information and before a foreign body where we don't think that

14    that's the ideal timing and, really, ideal timing and

15    information process.

16          That's really where our concern is, so we would urge

17    Your Honor to grant the motion.  We'd urge Your Honor to

18    consider these issues that we've raised strongly, and know you

19    will, and I, as I said when I started, I know this isn't an

20    easy decision, and you're going to have to give it some

21    thought.

22          And, so, with that, we'd appreciate Your Honor's

23    attention and your consideration of the creditors' committee's

24    concerns.

25          THE COURT:  Thank you, Ms. Beckerman.

1       Mr. O'Connor?

2       MR. O'CONNOR:  Yes.  Thank you, Your Honor.  You know,

3   as I began my presentation earlier today I started by saying

4   that I thought this was a very important case, and I continue

5   to think that it is a very important case for the precedent

6   that it may set, whichever direction you choose to go.  I guess

7   I can't help disagreeing more strenuously than I do with the

8   debtors and with the creditors' committee about whether this

9   falls within the confines of the automatic stay.  I've heard a

10  lot of arguments that attempted to show how the pension's

11  regulators exercise of its powers somehow are only aimed here

12  at arriving at compensation for the plan members.  But I have a

13  very difficult time understanding how you distinguish that

14  situation from, particularly, the EEOC claims.  The EEOC

15  commences an action against an employer and says you

16  discriminated against somebody in employment, and you should

17  stop that, and/or rehire them or do have you and then they also

18  award back pay that goes directly to the employee.

19      Here there's no question that the plan beneficiaries

20  would benefit from this, but you would have to disregard

21  entirely the testimony of Mr. Ham and the statutory framework

22  in the U.K. about the whole reason why in 2004 the pension's

23  regulator was created because of a concern, a massive concern

24  about underfunding of pension schemes and the need for a

25  regulator to be able to take a proactive approach to ensuring

1    that that doesn't happen.  And one of the primary goals of the

2    regulator is to, again, provide that deterrent to employers and

3    related entities would disregard those obligations.

4         So I come back to the fact that it seems to me that

5    under the cases in the -- well, Sea Containers to begin with.

6    Let me just stop there for a moment.  I don't think there's any

7    merit to the distinction that the issue was not raised or no

8    one sought to enforce the stay before the debtors actually went

9    before the determinations panel.

10        As I said earlier, the official creditors' committee

11   for the parent, they objected to the settlement.  They objected

12   all along that this was a violation of the automatic stay.

13   While it's true they didn't seek relief, it seems to me that

14   Chief Judge Carey could not have approved the settlement if

15   those actions had violated the automatic stay.  And, to the

16   contrary, it doesn't matter whether the debtors participated.

17   There was the official committee of creditors, and I don't

18   remember where there other creditors as well who objected.  It

19   may have just been the official committee of creditors, but

20   they clearly objected, and if there was a basis for the Court

21   to conclude that they were correct, I don't think he could have

22   approved the 9019 whether the debtors participated or not.

23        So I think the distinction in Sea Containers is

24   without merit.  The timing of when that issue was raised, it

25   seems to me, makes no difference.  The conduct of the pension's

1  regulator, either in commencing the action, either violates the

2  automatic stay, or it falls within the 362(b)(4) exception, or

3  it doesn't.  So I don't think that's the basis to distinguish

4  it.

5         And, then, again, Your Honor, on the cases, as I said,

6  I think that the debtors are short on case law here.  They've

7  made valiant efforts to distinguish these other cases, but the

8  EPA cases, the EEOC cases, those are all cases in which yes,

9  there can be some private benefit, but there's also an attempt

10  to enforce a public purpose, which, I think, is what the

11  pension's regulator is attempting to do in the U.K. to ensure

12  that they don't have underfunded pension schemes to the

13  magnitude that they have with the NNUK.

14         So, you know, I think that if Your Honor were to

15  entertain some kind of relief here, I find it difficult to

16  characterize it as an enforcement of the stay.  I think if Your

17  Honor were inclined to do something like that, which we would

18  think you ought not, you would have to analyze this in the

19  context of a motion to --

20         THE COURT:  Extend.

21         MR. O'CONNOR:  -- extend the automatic stay under

22  Section 105.  And, Your Honor, one other point I should say

23  before I get to that, frankly, the biggest argument I've heard

24  for why Your Honor ought to apply the automatic stay here, and

25  this was the focus of Mr. Ray's declaration, and I understand

1    there's an issue here that there are some limited resources in

2    terms of how many individuals are left with this company, that

3    there are other things to do, but you can look at 362 long and

4    hard and there's no subdivision that says that actions get

5    stayed if the debtors don't have enough employees or are too

6    busy to address them.  That's just not grounds under the

7    automatic stay.

8         And I think that's the thrust.  And I understand Your

9    Honor is troubled here that there's a limited number of

10   resources here that have to address these issues.  But I would

11   submit that that can't be a basis for enforcing the automatic

12   stay if it otherwise doesn't apply, which we think it doesn't.

13   So then you're left with extending the automatic stay under

14   Section 105, and, again, Your Honor, number one, the procedural

15   posture of this is improper.  They haven't done that the right

16   way.  They haven't put on the necessary evidence they would

17   have to to establish their entitlement to an injunction under

18   7065.

19        And, again, then the next issue is the issue of

20   comity.  I think Your Honor has to take into consideration

21   carefully, which I'm sure you will, what the effect of a ruling

22   here would be to, essentially, enjoin this process before the

23   pension's regulator.  Now, I know they're careful to tell you

24   that they're not asking you to enjoin the regulator, but

25   effectively what they're doing is they want to say that

1    whatever happens before the regulator, number one, we can't

2    participate even though we may feel that we have fiduciary

3    obligations to do so and we may obtain a direction from the PPF

4    to do so.  What do we do then if the PPF says to us I want you

5    to participate and we say well, you're telling us to do it, but

6    the Court says in Delaware that we can't do it?  It's a very

7    difficult situation, and there are important principles of

8    comity here.  Essentially, what I heard the creditors'

9    committee's counsel say is well, you know, we don't really see

10   why this thing should be liquidated in the U.K.  We don't see

11   why it has to be done now.  We don't see why it has to be done

12   by the pension's regulator.  Let's just have it done when we

13   think it's a good time in the U.S.

14          Well, with all due respect, this is a claim that

15   arises exclusively under U.K. statutory law, and it's a claim

16   which under the U.K. statute is to be decided by the U.K.

17   regulatory body.  I still find it difficult to understand what

18   the argument is that the debtors can simply decide that they're

19   going to get together amongst themselves in some agreed upon

20   allocation process and somehow take away from the rights of the

21   trustee and the PPF the right to have their claim determined

22   under U.K. law by the body in the U.K. that's statutorily

23   appointed to determine that claim.

24          Now, I'm not saying, Your Honor, that I suppose Your

25   Honor couldn't try to duplicate that, but, again, I see real

1   problems with that.  You've heard a lot of testimony.  This is

2   a new act, the 2004 Act.  There's only been two FSDs issued.

3   They're both in the same case, the Sea Containers case, because

4   there are two different plans that were involved.

5          THE COURT:  Yes.

6          MR. O'CONNOR:  There is no case law on this in the

7   U.K., and for Your Honor, I don't know how Your Honor would sit

8   down and try to, if you're going to apply U.K. law, which I

9   would assume you would, because I don't know how you would

10  apply anything other than U.K. law to this, how you would be

11  able to liquidate that yourself.  It seems to me that the only

12  fair thing, the thing that we're entitled to, is to have that

13  claim liquidated under U.K. law by the body that was appointed

14  by the U.K. to liquidate that claim.

15         Now, again, what do we do with that claim?  We've been

16  quite candid with Your Honor and with the parties that we

17  understand that people may say if we come back with that claim

18  they're not going to tell Your Honor that you should disallow

19  it.  And, again, I think the approach on this is that we will

20  address that issue at the time.  We would certainly try to

21  convince Your Honor, and, again, I think principles of comity

22  that the Supreme Court has been talking about for at least a

23  hundred years would dictate that you give careful consideration

24  to what the U.K. process resulted in and barring your

25  conclusion that there was some fundamental irregularity or lack

1    of due process, I think Your Honor would probably have to think

2    hard about ignoring it.  But it's certainly an issue which if

3    the debtors' counsel could persuade you that there had been

4    some fundamental issue that made you believe that this did not

5    comport with notions of U.S. due process you would, I suppose,

6    be free to do that.

7            Now, I listened to the stipulation that was proposed,

8    and I appreciate the effort, but it's, obviously, not

9    acceptable to us for the most part.  Well, one obvious reason

10   is no matter what the debtors agree to any party-in-interest

11   could object, and that's a problem for us.  But that's not the

12   biggest problem.  The biggest problem is that what they really

13   want to do again is even if this process goes forward they want

14   the trustee and the PPF not even to be able to introduce into

15   evidence the determination of the panel.  But that's the panel

16   that's supposed to decide this claim under U.K. law with

17   discretion that that panel exercises.  I think we're entitled

18   to have that decided that way.  What you do with it, again, is

19   up to you at a later stage.

20           Your Honor, with respect to the testimony of Mr. Ray,

21   it seems pretty clear to me that whether this issue is decided

22   before the regulator or if somehow it's implicated in the

23   allocation process, that is going to require the same degree of

24   resources to be devoted.  If there's such an overlap, as the

25   debtors contend, then it's got to be that it will involve the

1    same degree of work and effort by the debtors in the U.K.

2    process versus the allocation process.

3         And, you know, as Mr. Ray testified, at this point

4    they've made no estimate of how much time would be involved,

5    who would be involved.  I think he was quite frank about saying

6    that probably he would be the main man and that beyond that

7    they'd have to go out and hire professionals to help.  And I

8    would submit, Your Honor, they could do that.  They could have

9    done that for any period of time.  This proof of claim has been

10   filed since September of last time, and it laid out in detail

11   the entire process, the fact that this warning notice was

12   likely to be issued, what the trustee and the PPF would do with

13   that, so to say at the last moment that no one has even

14   considered this, well, that's -- the trustee and the PPF

15   shouldn't be prejudiced by that.

16        With respect to the timing of this, I would point out

17   that in the letter that's attached as Exhibit E to my

18   declaration that Ms. Buell had referred Your Honor to earlier,

19   this is the letter from the pension's regulator to Linklaters

20   dated February 24.

21        THE COURT:  Yes.

22        MR. O'CONNOR:  In paragraph 15 the regulator notes

23   that the debtors have interpreted the March 1 date as a

24   deadline for all responses that can't be moved.  And the

25   regulator says that's not correct, and they've communicated

1   their -- the debtors have -- they've explained to the debtors

2   that.  And they say in paragraph 16 that the date for

3   representations can be extended.  Indeed, the regulator has

4   already extended the stay in this case since directly affected

5   parties are only entitled to twenty-eight days.

6          So, as a practical matter, Your Honor, I don't think

7   that is etched in stone, and to the extent that the debtors

8   want to ask the regulator for additional time I certainly

9   assume the regulator would take that into consideration,

10  particularly given the pendencies of the motions that the

11  Canadian debtors made and the U.S. debtors made before Your

12  Honor.

13         THE COURT:  But the June 30 date is written in stone.

14         MR. O'CONNOR:  The June 30 date is, as I understand

15  it, written in stone.  That's statutory.

16         THE COURT:  Yes.

17         MR. O'CONNOR:  And although Mr. Ham does say in his

18  declaration that, as I recall, that one might be able to

19  fashion an argument if all of the parties got together and

20  stipulated to that that they could do that, but there's no

21  authority for that, and you might run into a situation like a

22  notice of appeal that if it's not filed on time it's

23  jurisdictional, and what the parties stipulated to may not

24  carry any water.  So I think we have to regard, for the moment,

25  the June 30th date as a real date but not the date for the

181

1    representations.

2          And, again, Your Honor, I just, in closing, am very

3    concerned about the precedent that this would set as to how

4    foreign creditors would deal with bankruptcies in the U.S.  I

5    think the right way to do this is what the trustee and the PPF

6    attempted to do here, to file their proof of claim at a time

7    when they had a contingent claim, to make it clear that they

8    would pursue their rights in the U.K. to the extent that the

9    regulator commenced the proceeding, and if something happened

10   they would not try to enforce that.  They would bring that back

11   to the Court, and the Court would determine at that point in

12   time what to do with that.  That all seems to me to be not only

13   fair but something that the trustee and the PPF are entitled to

14   under U.K. law.

15         So I would close, Your Honor, respectfully, with

16   requesting that Your Honor deny the relief sought by the

17   debtors, because I don't think the conduct violates the

18   automatic stay, and they haven't made a case or even filed a

19   motion to extend it, which is, essentially, what I think

20   they're attempting to do.

21         Unless Your Honor has questions --

22         THE COURT:  I do not, Mr. O'Connor.

23         MR. O'CONNOR: -- I will close.

24         THE COURT:  I thank you.

25         MR. O'CONNOR:  Thank you.

182

1        THE COURT:  I've got a lot already to take into

2   consideration, and what I propose to do is, and I hate to hold

3   everyone here longer, but I do think this is something that

4   requires decision today, if not a full explanation at least a

5   ruling, and I'd like to go back and give it a little bit of

6   thought and a little bit of organization.  I think I'm talking

7   about, maybe, twenty or twenty-five minutes, and, hopefully,

8   that won't delay anybody getting home at a decent hour, but I

9   guess it's already an indecent hour for some who have to travel

10  out of town, so I'm just going to take my notes and some of the

11  documents and come up with a ruling that I think will,

12  hopefully, make sense.  Not everybody happy, but at least it

13  will advance things to a great extent.

14        MR. O'CONNOR:  Thank you, Your Honor.

15        THE COURT:  Thank you.  We'll stand in recess.  You

16  can find a cold drink somewhere or just relax for a few minutes

17  and we'll certainly give you ample notice before I come back

18  in.

19        MR. O'CONNOR:  Thank you.

20      (Recess from 5:27 p.m. until 5:56 p.m.)

21        THE CLERK:  Please rise.

22        THE COURT:  Thank you, everyone.  Please be seated.

23        Well, I know I haven't said a lot because I've been

24  listening very closely to the evidence and the arguments of

25  counsel, and this is always the tough part of the job, and

183

1    that's making a ruling, but I do think that a ruling at this

2    point is appropriate given the timing, and I will issue

3    something in writing explaining the ruling in greater detail.

4        But obviously we have a motion to enforce the

5    automatic stay pending before me involving the United Kingdom

6    regulatory proceedings, and I think it's certainly a

7    complicated legal issue, but, frankly, I don't think it's as

8    difficult for the Court to arrive at a decision to grant the

9    motion as might appear as first blush.  And I'm going to

10    primarily premise my ruling on the facts that the trustee and

11    the PPF are clearly subject to this Court's jurisdiction.

12    They've filed proofs of claim for their pending pre-petition

13    claim.  This is a claim which the Court, not easily but,

14    certainly, capably, can decide at the appropriate time.  And

15    also of significance to me is the fact that the outcome of the

16    pension issue is directly impacted by the allocation issues

17    which the parties are so vigorously trying to resolve.

18        The trustees and the PPF talked about comity, and the

19    Court is very sensitive to comity, but it really runs both

20    ways.  And it's a two-way street, and the debtors, in multiple

21    jurisdictions, are expending their limited resources to arrive

22    at a resolution of asset allocation.  And to some extent that

23    asset allocation puts the United Kingdom proceeding as the cart

24    before the horse, because the ultimate disposition of the

25    pension claim will require a reasonableness determination, and

1   that, in turn, requires a determination of the allocation

2   issues.

3          I also find that not to enforce the automatic stay

4   would result in a significant hardship, and hardship, I think,

5   I know that the claimants talked about the fact that resources

6   are not identified in the statute in Section 362, but, clearly,

7   hardship is something that Courts consider, and resources

8   directly impact whether or not a hardship and prejudice would

9   result to these debtors, and I find that it would.  We have

10  very limited resources, and it would require those resources to

11  be redirected away from the primary issue which the parties are

12  addressing, and that is the issue of allocation.

13         I'm also finding that the police power exception in

14  Section 362(b)(4) does not apply here.  Obviously the exception

15  is one which Courts are supposed to very narrowly apply.

16  Courts generally look to whether or not the impact relates to

17  health or welfare or morals or safety issues and not race or

18  property issues.  And, clearly, this is primarily a property

19  issue, so that the pecuniary purpose test and the public policy

20  tests both, I think, require the Court to deny the exception,

21  that the exception applies.

22         The language "moral hazard", which the Court has heard

23  much about, does not appear in the pension statute in the

24  United Kingdom, and I will note that in every case in which

25  creditors are unpaid there is a moral hazard, I suppose, and I

1    just don't think that that is the overriding concern of the

2    pension statute or the pension scheme in the United Kingdom.

3         The Sea Container case, which is certainly one that

4    the parties have discussed at great length.  You know,

5    bankruptcy decisions are often practically driven, and Chief

6    Judge Carey had before him a settlement which was arrived at

7    after the debtors had expended substantial resources and

8    settled a key issue in the case.  And to the extent that Chief

9    Judge Carey's ruling holds that proceeding with that claim in

10   the United Kingdom was not a stay violation is one where I

11   think I have to respectfully disagree with my colleague, my

12   learned colleague.  I believe that it was a stay violation, and

13   I will also say that I think in the context of the Sea

14   Container case the Court could readily have found that the

15   committee, which was objecting on the grounds that there was a

16   stay violation, had sat on its rights and that laches applied,

17   and here we don't have that situation.  We have quite the

18   reverse, and that is the debtors are act -- and the committee,

19   with the committee's support, are acting in a very proactive

20   effort to stave off a great drain, a potential drain on the

21   assets, on the resources of the debtor -- debtors, and I think

22   that to permit the regulatory proceeding to proceed would

23   greatly impact the ultimate reorganization of these debtors.

24        So, as I say, I know that that is a fairly succinct

25   ruling, but I am confident that I have arrived at an

186

1    appropriate and correct result and I will grant the motion and

2    enter the appropriate order.  I'd like to get that, if

3    possible, on the docket, given the March 1st deadline and then

4    issue something in greater detail to follow.

5            MR. O'CONNOR:  Your Honor --

6            THE COURT:  It was an excellent presentation from all

7    of the parties.

8            MR. O'CONNOR:  Thank you, Your Honor.  Just a

9    question.  As you'll see, we raised an issue in our brief.  The

10    proposed order that the debtors had drafted --

11            THE COURT:  Yes.

12            MR. O'CONNOR:  -- was so broad that it seemed to us

13    that it would purport to enjoin the trustees from appearing in

14    the U.K. proceeding even with respect to making representations

15    about non-U.S. debtors.  As you know, in that proceeding

16    they're going to be looking at the other EMEA debtors, the

17    Canadian debtors and the U.S. debtors, and if you looked at the

18    language I think it's broad enough to be read that way.  I

19    don't know if the debtors intended that or if they want to

20    clarify that, but I wouldn't think that even if Your Honor has

21    ruled that the trustees' participation with respect to the U.S.

22    debtors would constitute a stay violation, that that would

23    extend to their participation with respect to other non-U.S.

24    debtors.

25            THE COURT:  Thank you, Mr. O'Connor.  I appreciate

1    that, because, really, I had not focused on the precise

2    language in the order, and, perhaps, we can review that now.

3            MS. BUELL:  Yes, Your Honor.

4            THE COURT:  Yes, Ms. Buell.

5            MS. BUELL:  Focusing on paragraph 3 of the proposed

6    order, all right?

7            THE COURT:  Yes.

8            MS. BUELL:  Your Honor, I think we can add in

9    paragraph 3 "to the extent that either of the U.K. pension

10   trustee or the PPF participate in the U.K. pension proceedings

11   with respect to any U.S. debtor".  I'm sorry.  You don't have

12   it in front of you so -- sorry.

13           THE COURT:  No.  I'm --

14           MS. BUELL:  Let me --

15           THE COURT:  And we would put that at the end of the

16   first sentence, I assume.  Oh, it is one sentence.  I'm sorry.

17           MS. BUELL:  It's kind of a long sentence.

18           THE COURT:  Yes.

19           MS. BUELL:  Yes.  Comma, such participation --

20           THE COURT:  Yes.  There it is.

21           MS. BUELL:  Yes.  May I?

22           THE COURT:  Does that help, Mr. O'Connor?

23           MR. O'CONNOR:  Yes, that at least --

24           THE COURT:  Okay.

25           MR. O'CONNOR:  -- clarifies the scope of the order.

188

1        THE COURT:  Exactly, because there's nothing that I am

2   saying here, and, in fact, the debtors made no request that I

3   impose, as I don't think I could, any restrictions upon the

4   regulator.  The regulator will do as the regulator deems fit, I

5   suppose, but at least that language makes my ruling certainly

6   more concise.

7        MR. O'CONNOR:  And the other issue, Your Honor --

8        THE COURT:  Yes.

9        MR. O'CONNOR:  With all due respect, we have, unless

10  this gets extended, the potential of needing the trustee to

11  submit representations on that March 1st deadline.  I would ask

12  the Court to grant us a stay so that we can take an appeal if

13  the client seeks to do that, and we don't have the risk of

14  missing a deadline before we can get relief from the District

15  Court if the District Court is so inclined.  And I ask you

16  that, Your Honor, because if I don't ask Your Honor for that

17  request --

18        THE COURT:  I understand.

19        MR. O'CONNOR: -- the District Court is going to give

20  me a hard time about that.

21        THE COURT:  Well, I think that one of the purposes of

22  this ruling is to protect the debtor from the March 1st

23  deadline, and to the extent I would grant a stay it would

24  really, I think, remove that protection.

25        MR. O'CONNOR:  Your Honor, to a large degree it would.

189

1          THE COURT:  So I think I'm going to deny the request

2     for the stay.

3          MR. O'CONNOR:  Thank you, Your Honor.

4          THE COURT:  But, certainly, you've made it and the

5          MR. O'CONNOR:  Thank you.

6          MS. BUELL:  Thank you, Your Honor.  We're going to

7     look at paragraph 3 for just a couple of --

8          THE COURT:  Would you please --

9          MS. BUELL:  Yes.

10          THE COURT:  Would you please take --

11          MS. BUELL:  Yes.

12          THE COURT:  Yes.  Take your time.  I can either step

13     out and allow the parties to discuss it and come back in a few

14     minutes when you're ready for me.

15          MS. BUELL:  Yes, I think it'll take just a few

16     minutes.

17          THE COURT:  All right.

18          MS. BUELL:  Thank you, Your Honor.  I just want to

19     make sure that we --

20          THE COURT:  I will step out.  When you're ready for me

21     just let me know and I'll come back in.

22          MS. BUELL:  Thank you so much.

23          THE COURT:  You bet.

24     (Recess from 6:09 p.m. until 6:15 p.m.)

25          THE CLERK:  Please rise.

1    THE COURT:  And please be seated, and thank you.  Ms.

2  Buell?

3    MS. BUELL:  Your Honor, if I may?  We have conferred

4  among ourselves and with Mr. O'Connor, and we have a few

5  handwritten comments on paragraph 3 of the proposed order.  The

6  purpose of each proposed change is to clarify that the motion

7  is with respect to the trustee and the PPF --

8    THE COURT:  Yes.

9    MS. BUELL:  -- to the extent that the U.K. regulatory

10  proceedings address any U.S. debtor.

11    THE COURT:  Okay.

12    MS. BUELL:  If I may hand that up?

13    THE COURT:  Understood.  Yes.  Ms. Buell, thank you.

14    MS. BUELL:  Thank you.

15    THE COURT:  Mr. O'Connor, these changes meet, at least

16  as to form, with your requirements or request, I should say?

17    MR. O'CONNOR:  As to form, if not substance, Your

18  Honor.

19    THE COURT:  Yes.  Understood.  All right.  That's

20  fine.  I think that does help a great deal.  I will not be

21  sorry to see February leave.  It's been a tough month.  All

22  right.  I have signed the order.  We will get this docketed

23  today.

24    MS. BUELL:  Thank you so much, Your Honor.

25    THE COURT:  So that it will be in place before the

191

1    March 1st deadline.  Anything further?

2            MR. O'CONNOR:  I don't believe so.  Thank you, Your

3    Honor.

4            THE COURT:  Thank you.  Thank you.

5            IN UNISON:  Thank you, Your Honor.

6            THE COURT:  Thank you all.

7            And, Mr. Bromley, I'll see you next week.

8            MR. BROMLEY:  Yes.

9            THE COURT:  All right.  Good day, everyone.

10           MR. BROMLEY:  Yes, Your Honor.

11           THE COURT:  Mr. Abbott, Ms. Cordo and all, thank you.

12           MR. ABBOTT:  Thank you, Your Honor.

13           THE COURT:  Safe trip home.

14       (Proceedings concluded at 6:16 PM)

15

16

17

18

19

20

21

22

23

24

25

192

I N D E X

T E S T I M O N Y

| WITNESS | EXAM BY | PAGE | LINE |
|---------|---------|------|------|
| John J. Ray III | Mr. O'Connor | 88 | 23 |
| Richard Hitchock (via video) | Mr. O'Connor | 103 | 23 |
| David Davies (via video) | Ms. Buell | 112 | 13 |
| Robert Ham (via video) | Mr. Forrest | 127 | 18 |
| Richard Favier (via video) | Mr. Forrest | 147 | 12 |

E X H I B I T S

| PARTY | NO. | DESCRIPTION | ID. | EVID. |
|-------|-----|-------------|-----|-------|
| Debtors | 1 | Declaration of Lisa Schweitzer | 86 | 86 |
| Debtors | 2 | Declaration of John Raoy | 86 | 86 |
| Debtors | 3 | Declaration of Richard Hitchcock | 86 | 86 |
| Debtors | 4 | Feb. 18 letter to the pension regulator | 86 | 86 |
| Claimants | 1 | Declaration of Brian O'Connor | 111 | 111 |
| Claimants | 2 | Declaration of David Davies | 111 | 111 |
| Claimants | 3 | Declaration of Richard Favier | 111 | 111 |
| Claimants | 4 | Declaration of Robert Ham | 111 | 111 |

193

I N D E X (cont'd.)


R U L I N G S

DESCRIPTION                                      PAGE      LINE

Motion Of Communications Test Design, Inc.        19        13

Pursuant To Section 362 And 553 Of The

Bankruptcy Code For Relief From The

Automatic Stay To Effectuate A Set Off

Of Pre-Petition Amounts Owed By And

Between Communication Test Design, Inc.

And Debtors, Granted


Application Of The Official Committee             22        13

Of Unsecured Creditors For An Order

Approving An Expansion Of Scope Of

Services And Amendment To Terms Of

Retention Of Jefferies & Company, Inc.

As Investment Banker To The Official

Committee Of Unsecured Creditors, Granted

194

I N D E X (cont'd.)


R U L I N G S (cont'd.)

DESCRIPTION                                    PAGE      LINE

Debtors' Fourth Omnibus Motion For An           23        22

Order (A) Approving The Assumption And

Assignment Of Certain Additional Executory

Contracts In Connection With The Sale Of

The Debtors' Enterprise Solutions Business

And (B) Authorizing The Debtors To File

Information Under Seal, Granted


Debtors' Fourth Omnibus Objection               24        17

(Non-Substantive) To Certain Claims

Pursuant To 11 U.S.C. § 502, Fed. R.

Bankr. 3007 And Del. L.R. 3007-1

(Amended; Duplicate; Insufficient

Documentation), Granted


Debtors' Motion To Add Certain                  26         7

Additional Debtors As Sellers In The

Sale Of The Debtors' Metro Ethernet

Networks Business To Ciena Corporation,

Granted

195

I N D E X (cont'd.)


R U L I N G S (cont'd.)

| DESCRIPTION | PAGE | LINE |
|---|---|---|
| Debtors' Application For Entry Of An | 29 | 25 |
| Order Approving An Amendment To The Terms | | |
| Of Compensation Of Lazard Freres & Co. | | |
| LLC As Financial Advisor And Investment | | |
| Banker To The Debtors, Granted | | |
| | | |
| Debtors' Motion For Entry Of An Order | 186 | 1 |
| Enforcing The Automatic Stay Against | | |
| Certain Claimants With Respect To The | | |
| U.K. Pension Proceedings, Granted | | |

196

1

2                    C E R T I F I C A T I O N

3

4      I, Clara Rubin, certify that the foregoing transcript is a true

5      and accurate record of the proceedings.

6

7      _____

8      Clara Rubin

9      AAERT Certified Electronic Transcriber (CET**D-491)

10

11

12      Veritext

13      200 Old Country Road

14      Suite 580

15      Mineola, NY 11501

16

17      Date: March 4, 2010

18

19

20

21

22

23

24

25