**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

---------------------------------------------------------X
: Chapter 11
*In re* :
: Case No. 09-10138 (KG)
Nortel Networks Inc., *et al.*,[1] :
: Jointly Administered
Debtors. :
: **Hearing date: March 31, 2010 at 10:00 AM (ET)**
: **Objections due: March 24, 2010 at 4:00 PM (ET)**
:
:
--------------------------------------------------------- X

**DEBTORS' FIFTH OMNIBUS MOTION FOR AN ORDER (A) APPROVING THE
ASSUMPTION AND ASSIGNMENT OF CERTAIN ADDITIONAL
EXECUTORY CONTRACTS IN CONNECTION WITH THE SALE
OF THE DEBTORS' ENTERPRISE SOLUTIONS BUSINESS AND
(B) AUTHORIZING THE DEBTORS TO FILE INFORMATION UNDER SEAL**

*PARTIES RECEIVING THIS MOTION SHOULD LOCATE
THEIR NAMES AND CONTRACTS ON EXHIBIT B.*

Nortel Networks Inc. ("NNI") and certain of its affiliates, as debtors and debtors in possession (collectively, the "Debtors"), hereby move this Court (the "Motion") for the entry of an order substantially in the form attached hereto as Exhibit A, pursuant to sections 105, 107, 363 and 365 of title 11 of the United States Code (the "Bankruptcy Code"), Rules 2002, 6004, 6006 and 9018 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rule 9018-1 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules") (a) approving the assumption

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's tax identification number, are: Nortel Networks Inc. (6332), Nortel Networks Capital Corporation (9620), Nortel Altsystems Inc. (9769), Nortel Altsystems International Inc. (5596), Xros, Inc. (4181), Sonoma Systems (2073), Qtera Corporation (0251), CoreTek, Inc. (5722), Nortel Networks Applications Management Solutions Inc. (2846), Nortel Networks Optical Components Inc. (3545), Nortel Networks HPOCS Inc. (3546), Architel Systems (U.S.) Corporation (3826), Nortel Networks International Inc. (0358), Northern Telecom International Inc. (6286), Nortel Networks Cable Solutions Inc. (0567) and Nortel Networks (CALA) Inc. (4226). Addresses for the Debtors can be found in the Debtors' petitions, which are available at http://chapter11.epiqsystems.com/nortel.

and assignment of certain additional executory contracts in connection with the sale of certain assets of, and equity interests in, the Debtors' Enterprise Solutions Business to Avaya Inc. ("Avaya") as purchaser (together with its designees, the "Purchaser") in accordance with the terms and conditions of the Amended and Restated Asset and Share Sale Agreement entered into by the Debtors, certain of their affiliates, and the Purchaser dated September 14, 2009, as may be subsequently amended (the "Sale Agreement"); (b) authorizing the Debtors to file certain information under seal; and (c) granting them such other and further relief as the Court deems just and proper.  In support of this Motion, the Debtors respectfully represent as follows:

## Jurisdiction

1. The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.  This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

2. The statutory bases for the relief requested herein are sections 105, 107, 363 and 365 of the Bankruptcy Code, Rules 2002, 6004, 6006 and 9018 of the Bankruptcy Rules, and Rule 9018-1 of the Local Rules.

## Background

**A.     Procedural History**

3. On January 14, 2009 (the "Petition Date"), the Debtors, other than NN CALA (defined below), filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code.

4. The Debtors continue to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

5. On January 15, 2009, this Court entered an order of joint administration pursuant to Bankruptcy Rule 1015(b) that provided for the joint administration of these cases and for consolidation for procedural purposes only [D.I. 36].

6.      Also on the Petition Date, the Debtors' ultimate corporate parent Nortel Networks Corporation ("NNC"), NNI's direct corporate parent Nortel Networks Limited ("NNL," and together with NNC and their affiliates, including the Debtors, "Nortel"), and certain of their Canadian affiliates (collectively, the "Canadian Debtors")[2] filed an application with the Ontario Superior Court of Justice (the "Canadian Court") under the Companies' Creditors Arrangement Act (Canada) (the "CCAA"), seeking relief from their creditors (collectively, the "Canadian Proceedings"). The Canadian Debtors continue to manage their properties and operate their businesses under the supervision of the Canadian Court.

7.      On January 14, 2009, the Canadian Court entered an order recognizing these chapter 11 proceedings as a foreign proceeding under section 18.6 of the CCAA. On February 27, 2009, based on a petition filed by Ernst & Young Inc., as court-appointed Monitor in the Canadian Proceedings and as foreign representative for the Canadian Debtors (the "Monitor"), this Court entered an order recognizing the Canadian Proceedings as foreign main proceedings under chapter 15 of the Bankruptcy Code.

8.      On January 14, 2009, the High Court of England and Wales placed nineteen of Nortel's European affiliates (collectively, the "EMEA Debtors")[3] into administration under the control of individuals from Ernst & Young LLC (collectively, the "Joint Administrators"). On May 28, 2009, at the request of the Joint Administrators, the Commercial Court of Versailles, France (the "French Court") (Docket No. 2009P00492) ordered the commencement of secondary

---

[2]     The Canadian Debtors include the following entities: NNC, NNL, Nortel Networks Technology Corporation, Nortel Networks Global Corporation and Nortel Networks International Corporation.

[3]     The EMEA Debtors include the following entities: Nortel Networks UK Limited, Nortel Networks S.A., Nortel Networks (Ireland) Limited, Nortel GmbH, Nortel Networks France S.A.S., Nortel Networks Oy, Nortel Networks Romania SRL, Nortel Networks AB, Nortel Networks N.V., Nortel Networks S.p.A., Nortel Networks B.V., Nortel Networks Polska Sp. z.o.o., Nortel Networks Hispania, S.A., Nortel Networks (Austria) GmbH, Nortel Networks, s.r.o., Nortel Networks Engineering Service Kft, Nortel Networks Portugal S.A., Nortel Networks Slovensko, s.r.o. and Nortel Networks International Finance & Holding B.V.

proceedings in respect of Nortel Networks S.A. ("NNSA"), which consist of liquidation proceedings during which NNSA was originally authorized to continue to operate as a going concern for an initial period of three months, which period was subsequently extended to November 28, 2009. In accordance with the European Union's Council Regulation (EC) No 1346/2000 on Insolvency Proceedings, the English law proceedings (the "English Proceedings") remain the main proceedings in respect of NNSA although a French administrator and a French liquidator have been appointed and are in charge of the day-to-day affairs and continuing business of NNSA in France. On October 1, 2009, pursuant to a motion filed by the Joint Administrators, the French Court approved an order to: (i) suspend the liquidation operations relating to the sale of the assets and/or businesses of NNSA for a renewable period of two months; (ii) authorize the continuation of the business of NNSA so long as the liquidation operations are suspended; and (iii) maintain the powers of the French Administrator and Liquidator during the suspension period, except with respect to the sale of assets and/or businesses of NNSA. On February 26, 2010, the French Court extended the suspension of liquidation until the earlier of (i) May 31, 2010 or (ii) the filing with the French Court of a letter from Kapsch CarrierCom AG stating that its bid for the GSM//GSM-R assets of NNSA has become unconditional. On June 26, 2009, this Court entered an order recognizing the English Proceedings of Nortel Networks UK Limited ("NNUK") as foreign main proceedings under chapter 15 of the Bankruptcy Code.[4]

9.     On January 26, 2009, the Office of the United States Trustee for the District of

---

[4] Additionally, on January 18, 2009, certain Nortel affiliates, including Nortel Networks Israel (Sales and Marketing) Limited, filed an application with the Tel-Aviv-Jaffa District Court, pursuant to the Israeli Companies Law, 1999, and the regulations relating thereto for a stay of proceedings. On January 19, 2009, the Israeli Court appointed Yaron Har-Zvi and Avi D. Pelossof as joint administrators of the Israeli Company under the Israeli Companies Law (the "Joint Israeli Administrators").

4

Delaware (the "U.S. Trustee") appointed an Official Committee of Unsecured Creditors (the "Committee") pursuant to section 1102(a)(1) of the Bankruptcy Code [D.I.s 141, 142].  An ad hoc group of bondholders holding claims against certain of the Debtors and certain of the Canadian Debtors has also been organized (the "Bondholder Group").  No trustee or examiner has been appointed in the Debtors' cases.

10. On July 14, 2009 (the "CALA Petition Date"), Nortel Networks (CALA) Inc. ("NN CALA" and a Debtor with NNI and its affiliates), an affiliate of NNI, filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  On July 17, this Court entered orders approving the joint administration and consolidation of NN CALA's chapter 11 case with the other Debtors' chapter 11 cases for procedural proposes [D.I. 1098], and applying to NN CALA certain previously entered orders in the Debtors' chapter 11 cases [D.I. 1099].

**B.    Debtors' Corporate Structure and Business**

11. Nortel is a technology company that designs, develops and deploys communication products, systems and solutions to its customers around the globe.  Its principal assets include its employees, the intellectual property derived and maintained from its research and development activities, its customers and other significant contracts and agreements.

12. Additional information regarding the Debtors' corporate structure and business and the events leading to the chapter 11 cases is set forth in the Declaration of John Doolittle in Support of First Day Motions and Applications [D.I. 3] (the "First Day Declaration").

**C.    Case Milestones**

13. On June 19, 2009, Nortel announced that it was advancing in discussions with external parties to sell its businesses and it would assess other restructuring alternatives for its businesses in the event it is unable to maximize value through sales.  To date, Nortel has closed (i) the sale of certain portions of its Layer 4-7 data portfolio to Radware Ltd. [D.I. 539]; (ii) the

sale of substantially all of its CDMA business and LTE Access assets business to Telefonaktiebolaget LM Ericsson (publ) [D.I. 1205]; (iii) the sale of the assets of its Wireless Networks business associated with the development of Next Generation Packet Core network components to Hitachi Ltd. [D.I. 1760]; and (iv) the sale of substantially all of the assets of the Enterprise Solutions business globally, including the shares of Nortel Government Solutions Incorporated and DiamondWare Ltd. to Avaya [D.I. 1514].  In addition, Nortel has obtained Court approval for the planned sale of substantially all the assets of its Optical Networking and Carrier Ethernet businesses associated with its Metro Ethernet Networks business unit [D.I. 2070]; the planned sale of substantially all of its GSM/GSM-R business [D.I. 2065]; as well as the planned sale of certain assets of its Carrier Voice Over IP and Application Solutions business [D.I. 2632].

14.     On August 4, 2009, this Court entered an order fixing September 30, 2009 at 4:00 PM (Eastern Time) as the general bar date for filing proofs of claim or interests [D.I. 1280].  On December 3, 2009 this Court entered an order fixing January 25, 2010 at 4:00 PM (Eastern Time) as the bar date for filing proofs of claim or interests against NN CALA [D.I. 2059].

**D.    The Enterprise Business Solutions Sale**

15.     Nortel's Enterprise Solutions business unit provided solutions for addressing the communication needs of large and small businesses globally across a wide variety of industries by building new networks and transforming existing networks into more cost-effective, packet-based networks supporting data, voice and multimedia communications (the "Enterprise Solutions Business").  In particular, the Enterprise Solutions Business specialized in providing solutions that allow its customers to integrate and remove barriers between voice, email, conferencing, video and instant messaging technologies.  Nortel's Enterprise Solutions Business had a global presence with operations and customers in the United States, Canada, Central and

Latin America, Europe, the Middle East, Africa, and Asia.

16.     On July 20, 2009, the Debtors filed a Motion for Orders (I)(A) Authorizing Debtors' Entry into the Asset and Share Sale Agreement, (B) Authorizing and Approving the Bidding Procedures, (C) Authorizing and Approving a Break-Up Fee and Expense Reimbursement, (D) Approving the Notice Procedures, (E) Approving the Assumption and Assignment Procedures, (F) Authorizing the Filing of Certain Documents under Seal and (G) Setting a Date for the Sale Hearing, and (II) Authorizing and Approving (A) the Sale of Certain Assets of, and Equity Interests In, Debtors' Enterprise Solutions Business, (B) the Assumption and Assignment of Certain Contracts and Leases and (C) the Assumption and Sublease of Certain Leases [D.I. 1131] (the "Sale Motion").[5]  The Sale Motion sought approval of the sale of certain of the Debtors' assets and equity interests relating to the Debtors' Enterprise Solutions Business (the "Assets"), including the assumption and assignment of certain executory contracts to the Successful Bidder at auction, and the approval of certain bidding procedures (the "Bidding Procedures") in connection with the proposed sale.  Following a hearing on the Bidding Procedures, this Court entered an order on August 4, 2009 [D.I. 1278] (the "Sale Procedures Order"), approving the Bidding Procedures to govern the sale by NNI and certain of its affiliates (collectively, the "Sellers") of the Assets.

17.     In accordance with the Bidding Procedures, the Sellers conducted an auction that commenced on September 11, 2009 (the "Auction").  The Successful Bid (as defined in the Bidding Procedures) resulting from the Auction was the Sale Agreement, dated as of September 14, 2009 with Avaya as Purchaser (the "Successful Bid").

18.     On September 16, 2009, this Court entered an order approving the sale of the

---

[5]     Capitalized terms used but not defined herein shall have the meaning ascribed to them in the Sale Motion.

Assets to the Purchaser pursuant to the Successful Bid [D.I. 1514] (the "<u>Sale Order</u>").  The Canadian Court entered a corresponding order approving the sale in the Canadian Proceedings on the same day.  The sale of the Enterprise Solutions Business was consummated on December 18, 2009 (the "<u>Closing Date</u>").

## Relief Requested

19.     By this Motion, the Debtors seek an order (a) approving the assumption and assignment of certain additional executory contracts to the Purchaser pursuant to section 365 of the Bankruptcy Code; (b) authorizing the Debtors to file certain information under seal; and (c) granting such other relief as the Court deems just and proper.

## Facts Relevant to this Motion

20.     As part of the Sale Order, the Court authorized the Debtors under Bankruptcy Code section 365 to assume and assign the Assumed and Assigned Contracts to the Purchaser which assignment and sublease shall take place on and be effective as of the Closing or such later date as contemplated by the Sale Agreement.  The Assumed and Assigned Contracts were defined in the Sale Agreement to include certain executory contracts (including supplier and customer contracts) to which the Debtors were a party prior to the sale.

21.     On December 23, 2009, the Debtors filed the Debtors' Omnibus Motion For An Order (A) Approving the Assumption and Assignment of Certain Additional Executory Contracts in Connection with the Sale of the Debtors' Enterprise Solutions Business and (B) Authorizing the Debtors to File Information Under Seal [D.I. 2198].  On January 6, 2010, this Court entered an order granting that motion [D.I. 2248].

22.     On February 5, 2010, the Debtors filed the Debtors' Fourth Omnibus Motion For An Order (A) Approving the Assumption and Assignment of Certain Additional Executory Contracts in Connection with the Sale of the Debtors' Enterprise Solutions Business and (B)

Authorizing the Debtors to File Information Under Seal [D.I. 2388]. On February 26, 2010, this Court entered an order granting that motion [D.I. 2569].

23.     In recent weeks, the Debtors and the Purchaser became aware of a number of additional prepetition executory contracts that are related to the Assets (the "Additional Contracts"), the counterparties to which (the "Counterparties") have not been notified of the assumption and assignment of such contracts pursuant to the Assignment Procedures approved by the Court in the Sale Procedures Order. By this Motion, the Debtors seek permission to assume and assign the Additional Contracts effective as of the Closing Date.

24.     The Additional Contracts designated for assumption and assignment to the Purchaser consist of customer contracts related to the Assets to which the Debtors are a party, including reseller agreements and sales agreements. As with other customer contracts that were assumed and assigned in connection with the sale, the identity of the Counterparties constitutes an integral component of the Additional Contracts' value. Access to the list of Counterparties absent appropriate confidentiality restrictions would entail releasing valuable confidential information of critical value not only to the Purchaser of the Assets but also to the Debtors' other businesses, which share overlapping customer lists. Thus, publicly releasing the names of the Counterparties would have an immediate detrimental impact on the value of the Assets as well as other aspects of the Debtors' business. The Debtors will serve notice of this Motion on each of the Counterparties to the Additional Contracts, including a personalized schedule containing those contracts designated for assumption and assignment to which they are a Counterparty. The Debtors also are prepared to file a complete list under seal, and will provide a complete list of the Additional Contracts to the Office of the U.S. Trustee and counsel to the Committee and the Bondholder Group.

9

*Cure Amounts*

25.   To the extent necessary to consummate a sale of the Assets as contemplated by the Sale Motion, the Debtors shall pay the amount, if any, determined by the Debtors to be necessary to be paid to cure any existing default in accordance with section 365(b) and 365(f)(2) of the Bankruptcy Code (the "Cure Amount") promptly. To the best of the Debtors' knowledge, there are no Cure Amounts to be paid in association with the Additional Contracts.

*Adequate Assurance of Future Performance*

26.   The Debtors submit that the Purchaser is able to comply with section 365 of the Bankruptcy Code and to perform the obligations under the Additional Contracts. Avaya is a leader in enterprise communications systems, providing unified communications and contact center solutions to leading businesses and organizations worldwide. Avaya's combination of communications applications, software and services serves to help companies by integrating multiple forms of communications, including telephony, e-mail, instant messaging and video into their business practices. Avaya employs approximately 16,000 people worldwide, including 2,300 research and development professionals, and has more than 4,000 channel partners worldwide, including system integrators, service providers, value-added resellers and business partners that provide sales and service support. Avaya has achieved leadership positions in unified communications, including telephony systems, enterprise messaging, audio conferencing, hardware maintenance and software support services as well as contact center solutions. Additional information regarding Avaya is available on the Avaya website at www.avaya.com. A copy of the Sale Agreement is available at http://chapter11.epiqsystems.com/nortel. Given the Purchaser's industry experience and financial wherewithal, the Debtors submit that a showing of adequate assurance has been met.

*<u>Counterparty Objections</u>*

27. To the extent that any Counterparty wishes to object to any matter pertaining to the proposed assumption and assignment of the Additional Contracts, including without limitation the proposed Cure Amount and the adequate assurance of future performance by the Purchaser under the applicable Additional Contract, the Debtors propose that such Counterparty must file with this Court and serve a written objection on or before **4:00 p.m. (ET) on March 24, 2010**.

28. All Counterparty objections must specify the grounds for such objection, including stating the Counterparty's alleged Cure Amount (including, on a transaction by transaction basis, calculations and detail of specific charges and dates, and any other amounts receivable or payable supporting such alleged Cure Amount) if the Counterparty disagrees with the Debtors' proposed Cure Amount and any other defaults or termination events the Counterparty alleges must be cured to effect assignment of the Additional Contract.

29. To the extent that any Counterparty does not timely serve an objection as set forth above, such Counterparty will be (i) deemed to have consented to such Cure Amount, if any, and to the assumption and assignment of the applicable Additional Contract; (ii) bound to such corresponding Cure Amount, if any; (iii) deemed to have agreed that the Purchaser has provided adequate assurance of future performance within the meaning of Bankruptcy Code section 365(b)(1)(C); (iv) deemed to have agreed that all defaults under the Additional Contract arising or continuing prior to the effective date of the assignment have been cured as a result or precondition of the assignment, such that the Purchaser or the Debtors shall have no liability or obligation with respect to any default occurring or continuing prior to the assignment, and from and after the date of the assignment the Additional Contract shall remain in full force and effect

for the benefit of the Purchaser and the Counterparty in accordance with its terms; (v) deemed to have waived any right to terminate the Additional Contract or designate an early termination date under the applicable Additional Contract as a result of any default that occurred and/or was continuing prior to the assignment date; and (vi) deemed to have agreed that the terms of the Sale Order shall apply to the assumption and assignment of the applicable Additional Contract.

### *Reservation of Rights*

30. The Debtors' assumption and assignment of the Additional Contracts remains subject to Court approval. The Debtors reserve the right, in consultation with the Purchaser and subject to the Sale Agreement, to withdraw the designation of an Additional Contract for assumption and assignment prior to entry of an order approving the assumption and assignment of any Additional Contract.

31. The Purchaser shall have no rights in and to a particular Additional Contract until such time as the particular Additional Contract is assumed and assigned.

32. To the extent an objection to the assumption and assignment of an Additional Contract is not resolved prior to the date of a hearing on the relief sought in this Motion, including any objections related to cure, the Debtors, in consultation with the Purchaser, may elect to (i) not assume and assign such Additional Contract, or (ii) postpone the assumption and assignment of such Additional Contract until the resolution of such objection.

33. Bankruptcy Rule 6006(e) allows for the sale of multiple contracts in one motion upon authorization of the Court. The Debtors therefore request that the Court grant authorization to file an omnibus motion pursuant to Bankruptcy Rule 6006(f)(6).

34. Pursuant to Section 365(f) of the Bankruptcy Code, the Debtors seek authorization and approval to assume and assign the Additional Contracts to the Purchaser

notwithstanding any provision to the contrary in the Additional Contracts, or in applicable non-bankruptcy law, that prohibits, restricts, or conditions the assignment.

35. Upon assumption of the Additional Contracts by the Debtors and assignment to the Purchaser, the Additional Contracts shall be deemed valid and binding, in full force and effect in accordance with their terms, subject to the provisions of the Order.

## Basis for Relief

**A. The Assumption and Assignment of the Additional Assumed And Assigned Contracts Should Be Authorized**

36. Under Bankruptcy Code section 365(a), a debtor, "subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor." 11 U.S.C. § 365(a). Bankruptcy Code section 365(b)(1), in turn, codifies the requirements for assuming an executory contract of a debtor. This subsection provides:

> (b) (1) If there has been a default in an executory contract or unexpired lease of the debtor, the trustee may not assume such contract or lease unless, at the time of assumption of such contract or lease, the trustee -
>
> (A) cures, or provides adequate assurance that the trustee will promptly cure, such default . . . ;
>
> (B) compensates, or provides adequate assurance that the trustee will promptly compensate, a party other than the debtor to such contract or lease, for any actual pecuniary loss to such party resulting from such default; and
>
> (C) provides adequate assurance of future performance under such contract or lease.

11 U.S.C. § 365(b)(1). Section 365(f)(2) of the Bankruptcy Code provides, in pertinent part, that:

> The trustee may assign an executory contract or unexpired lease of the debtor only if --

13

>   (A) the trustee assumes such contract or lease in accordance with the provisions of this section; and
>
>   (B) adequate assurance of future performance by the assignee of such contract or lease is provided, whether or not there has been a default in such contract or lease.

11 U.S.C. § 365(f)(2).

37. The meaning of "adequate assurance of future performance" depends on the facts and circumstances of each case, but should be given "practical, pragmatic construction." EBG Midtown S. Corp. v. McLaren/Hart Envtl. Eng'g Corp. (In re Sanshoe Worldwide Corp.), 139 B.R. 585, 593 (S.D.N.Y. 1992); In re Prime Motor Inns Inc., 166 B.R. 993, 997 (Bankr. S.D. Fla. 1994); Carlisle Homes, Inc. v. Azzari (In re Carlisle Homes, Inc.), 103 B.R. 524, 538 (Bankr. D.N.J. 1988).

38. Among other things, adequate assurance may be provided by demonstrating the assignee's financial health and experience in managing the type of enterprise or property assigned. See, e.g., In re Bygaph, Inc., 56 B.R. 596, 605-06 (Bankr. S.D.N.Y. 1986) (finding adequate assurance of future performance present when prospective assignee of lease from debtor has financial resources and has expressed willingness to devote sufficient funding to business in order to give it strong likelihood of succeeding).

39. To the extent any defaults exist under any Additional Contract, any such default will be promptly cured or adequate assurance that such default will be cured will be provided prior to the assumption and assignment. If necessary, the Debtors will submit additional facts prior to or at the hearing on this Motion to show the financial credibility of the Purchaser and willingness and ability to perform under the Additional Contracts. The hearing will therefore provide the Court and other interested parties the opportunity to evaluate and, if necessary, challenge the ability of the Purchaser to provide adequate assurance of future performance under

the Additional Contracts, as required under section 365(b)(1)(C) of the Bankruptcy Code.

40.  In addition, the Debtors submit that it is an exercise of their sound business judgment to assume and assign the Additional Contracts to the Purchaser, and the assumption, assignment, and sale of the Additional Contracts to the Purchaser are in the best interests of the Debtors, their estates, their creditors, and all parties in interest.  The Additional Contracts being assigned to the Purchaser are an integral part of the Assets purchased by the Purchaser, and accordingly, such assumption, assignment, and sale of the Additional Contracts are reasonable and enhance the value of the Debtors' estates.  The Court should therefore authorize the Debtors to assume and assign the Additional Contracts as set forth herein.

**B.    Information Regarding the Debtors' Customers Is Confidential Commercial Information and Should Be Filed Under Seal**

41.  The Debtors propose to file the list of Additional Contracts to be assumed and assigned under seal.

42.  The relief requested by the Debtors is squarely authorized under the Bankruptcy Code.  Section 107(b) of the Bankruptcy Code provides bankruptcy courts with the power to issue orders to protect a party's confidential, commercial or proprietary information:

> On request of a party in interest, the bankruptcy court shall . . . protect an entity with respect to a trade secret or confidential research, development, or commercial information. . . .

11 U.S.C. § 107(b).

43.  Furthermore, Bankruptcy Rule 9018 defines the procedure by which a party may move for relief under section 107(b) of the Bankruptcy Code:

> On motion or on its own initiative, with or without notice, the court may make any order which justice requires . . . to protect the estate or any entity in respect of a trade secret or other confidential research, development, or commercial information . . . .

Fed. R. Bankr. P. 9018.

44. This Court has defined "commercial information" in the context of section 107(b) as follows:

> Commercial information is information which would result in 'an unfair advantage to competitors by providing them information as to the commercial operations of the debtor.'

In re Alterra Healthcare Corp., 353 B.R. 66, 75-76 (Bankr. D. Del. 2006) (citing In re Orion Pictures Corp., 21 F.3d 24, 27-28 (2d Cir. 1994)). This Court has also explained that section 107(b)'s exception to usual public disclosure mandated by section 107(a) is "intended to avoid 'affording an unfair advantage to competitors by providing them information as to the commercial operations of the debtor.'" In re MUMA Services Inc., 279 B.R. 478, 484 (Bankr. D. Del. 2002) (citing In re Itel Corp., 17 B.R. 942, 944 (B.A.P. 9th Cir. 1982)).

45. Since information related to the Additional Contracts is "commercial information" within the ambit of section 107, the Court should enter an order permitting the Debtors to file under seal all confidential information related to the Additional Contracts.

46. The identities of the Counterparties constitute confidential commercial information because they represent a significant aspect of the value of the Enterprise Solutions Business and the Assets. Access to the list of the Counterparties absent appropriate confidentiality restrictions would entail releasing confidential information of critical value not only to any prospective purchaser of the Additional Contracts but also to the Debtors' other businesses. Therefore, it is critical to the preservation of the value of the Debtors' estates that the Court allow for this confidential information to be filed under seal.

47. As such, the Debtors respectfully submit that the Court should permit the Debtors to file their certificate of service listing the names and addresses of such parties under seal.

**C.   Waiver of Automatic Fourteen-Day Stay Under Bankruptcy Rules 6004(h) and 6006(d)**

48.   Pursuant to Bankruptcy Rule 6004(h), unless the Court orders otherwise, all orders authorizing the sale of property pursuant to section 363 of the Bankruptcy Code are automatically stayed for fourteen days after entry of the order.  Similarly, under Bankruptcy Rule 6006(d), unless the Court orders otherwise, all orders authorizing the assignment of contracts are automatically stayed for fourteen days after entry of the order.  The purpose of Bankruptcy Rules 6004(h) and 6006(d) is to provide sufficient time for an objecting party to request a stay pending appeal before the order can be implemented.  See Advisory Committee Notes to Fed. R. Bankr. P. 6004(h); Advisory Committee Notes to Fed. R. Bankr. P. 6006(d).

49.   Although Bankruptcy Rules 6004(h) and 6006(d) and the Advisory Committee Notes are silent as to when a court should "order otherwise" and eliminate or reduce the stay period, commentators agree that the stay period should be eliminated to allow a sale or other transaction to close immediately where there has been no objection to the procedure.  See generally 10 Collier on Bankruptcy ¶ 6004.09 (15th ed. 1999).  Furthermore, if an objection is filed and overruled, and the objecting party informs the court of its intent to appeal, the stay may be reduced to the amount of time necessary to file such appeal.  Id.

50.   As described above, the sale of the Enterprise Solutions Business was consummated on December 18, 2009.  Due to operational challenges and the complexity inherent in integrating two businesses of this size and geographic scope, it is in the Debtors' interest for the assumption and assignment of the Additional Contracts to be effective as of the Closing Date.  Thus, waiver of any applicable stays is appropriate in this circumstance.

**Notice**

51.     Notice of the Motion has been given via facsimile, electronic transmission, hand delivery or overnight mail to (i) counsel to the Purchaser; (ii) the Counterparties; (iii) the U.S. Trustee; (iv) the Monitor; (v) counsel to the Committee; (vi) counsel to the Bondholder Group; and (vii) the general service list established in these chapter 11 cases pursuant to Bankruptcy Rule 2002.  The Debtors submit that under the circumstances no other or further notice is necessary.

**No Prior Request**

52.     No prior request for the relief sought herein has been made to this or any other court.

*[Remainder of Page Intentionally Left Blank]*

WHEREFORE, the Debtors respectfully request that this Court (i) grant this Motion and the relief requested herein; (ii) enter the proposed order attached hereto; and (iii) grant such other and further relief as it deems just and proper.

Dated: March 16, 2010
      Wilmington, Delaware

CLEARY GOTTLIEB STEEN & HAMILTON LLP

James L. Bromley (admitted *pro hac vice*)
Lisa M. Schweitzer (admitted *pro hac vice*)
One Liberty Plaza
New York, New York 10006
Telephone: (212) 225-2000
Facsimile: (212) 225-3999

- and -

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/ Ann C. Cordo*
Derek C. Abbott (No. 3376)
Eric D. Schwartz (No. 3134)
Ann C. Cordo (No. 4817)
Andrew R. Remming (No. 5120)
1201 North Market Street
P.O. Box 1347
Wilmington, Delaware 19801
Telephone: (302) 658-9200
Facsimile: (302) 658-3989

*Counsel for the Debtors
and Debtors in Possession*

3451575