## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

--------------------------------------------------------X
                                           :

| | |
|---|---|
| *In re* | Chapter 11 |
| | |
| Nortel Networks Inc., *et al.*,[1] | Case No. 09-10138 (KG) |
| | |
| Debtors. | Jointly Administered |
| | |
| | **Hearing date: March 31, 2010 at 10:00 a.m. (ET)** |
| | **Objections due: March 24, 2010 at 4:00 p.m. (ET)** |

--------------------------------------------------------X

### SUPPLEMENTAL APPLICATION FOR AN ORDER AUTHORIZING EMPLOYMENT AND RETENTION OF GLOBAL IP LAW GROUP, LLC *NUNC PRO TUNC* TO JANUARY 15, 2010 AS INTELLECTUAL PROPERTY CONSULTANT AND LEGAL ADVISORS TO THE DEBTORS AND DEBTORS IN POSSESSION

Nortel Networks Inc. ("NNI") and certain of its affiliates, as debtors and debtors in possession (collectively, the "Debtors"), hereby move this Court (the "Supplemental Application"), for the entry of an order substantially in the form attached hereto as Exhibit A, pursuant to sections 105, 327(a) and 328(a) of title 11 of the United States Code (the "Bankruptcy Code"), Rules 2014 and 2016 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and Rule 2014-1 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Bankruptcy Rules"), (i) supplementing the Court's order of November 20, 2009 authorizing the employment and retention of Global IP Law Group, LLC ("Global IP") as intellectual property consultant and

---

[1]       The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's tax identification number, are:  Nortel Networks Inc. (6332), Nortel Networks Capital Corporation (9620), Nortel Altsystems Inc. (9769), Nortel Altsystems International Inc. (5596), Xros, Inc. (4181), Sonoma Systems (2073), Qtera Corporation (0251), CoreTek, Inc. (5722), Nortel Networks Applications Management Solutions Inc. (2846), Nortel Networks Optical Components Inc. (3545), Nortel Networks HPOCS Inc. (3546), Architel Systems (U.S.) Corporation (3826), Nortel Networks International Inc. (0358), Northern Telecom International Inc. (6286), Nortel Networks Cable Solutions Inc. (0567) and Nortel Networks (CALA) Inc. (4226).  Addresses for the Debtors can be found in the Debtors' petitions, which are available at http://chapter11.epiqsystems.com/nortel.

legal advisors to the Debtors *nunc pro tunc* to October 13, 2009 (the "Retention Order") [D.I. 1928], (ii) approving the terms and conditions under which Global IP will be retained to provide additional intellectual property consulting services and legal advice, and be compensated in part at the expense of the Debtors' estates, and (iii) granting them such other and further relief as the Court deems just and proper.  In support of this Supplemental Application, the Debtors rely on the Second Supplemental Declaration of Steven G. Steger (the "Second Supplemental Steger Declaration"), attached hereto as Exhibit B.  In further support of this Supplemental Application, the Debtors respectfully represent as follows:

## Jurisdiction

1.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.  This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

2.      The statutory bases for the relief requested herein are sections 105, 327(a) and 328(a) of the Bankruptcy Code, as supplemented by Bankruptcy Rules 2014 and 2016 and Local Bankruptcy Rule 2014-1.

## Background

**A.      Procedural History**

3.      On January 14, 2009 (the "Petition Date"), the Debtors, other than NN CALA (defined below), filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code.

4.      The Debtors continue to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

5.      On January 15, 2009, this Court entered an order of joint administration pursuant to Bankruptcy Rule 1015(b) that provided for the joint administration of these cases and for consolidation for procedural purposes only [D.I. 36].

6.      Also on the Petition Date, the Debtors' ultimate corporate parent Nortel Networks Corporation ("NNC"), NNI's direct corporate parent Nortel Networks Limited ("NNL," and together with NNC and their affiliates, including the Debtors, "Nortel"), and certain of their Canadian affiliates (collectively, the "Canadian Debtors")[2] filed an application with the Ontario Superior Court of Justice (the "Canadian Court") under the Companies' Creditors Arrangement Act (Canada) (the "CCAA"), seeking relief from their creditors (collectively, the "Canadian Proceedings"). The Canadian Debtors continue to manage their properties and operate their businesses under the supervision of the Canadian Court.

7.      On January 14, 2009, the Canadian Court entered an order recognizing these chapter 11 proceedings as a foreign proceeding under section 18.6 of the CCAA. On February 27, 2009, based on a petition filed by Ernst & Young Inc., as court-appointed Monitor in the Canadian Proceedings and as foreign representative for the Canadian Debtors (the "Monitor"), this Court entered an order recognizing the Canadian Proceedings as foreign main proceedings under chapter 15 of the Bankruptcy Code.

8.      On January 14, 2009, the High Court of England and Wales placed nineteen of Nortel's European affiliates (collectively, the "EMEA Debtors")[3] into administration under the control of individuals from Ernst & Young LLC (collectively, the "Joint Administrators"). On May 28, 2009, at the request of the Joint Administrators, the Commercial Court of Versailles, France (the "French Court") (Docket No. 2009P00492) ordered the commencement of secondary

---

[2]      The Canadian Debtors include the following entities: NNC, NNL, Nortel Networks Technology Corporation, Nortel Networks Global Corporation and Nortel Networks International Corporation.

[3]      The EMEA Debtors include the following entities: Nortel Networks UK Limited, Nortel Networks S.A., Nortel Networks (Ireland) Limited, Nortel GmbH, Nortel Networks France S.A.S., Nortel Networks Oy, Nortel Networks Romania SRL, Nortel Networks AB, Nortel Networks N.V., Nortel Networks S.p.A., Nortel Networks B.V., Nortel Networks Polska Sp. z.o.o., Nortel Networks Hispania, S.A., Nortel Networks (Austria) GmbH, Nortel Networks, s.r.o., Nortel Networks Engineering Service Kft, Nortel Networks Portugal S.A., Nortel Networks Slovensko, s.r.o. and Nortel Networks International Finance & Holding B.V.

proceedings in respect of Nortel Networks S.A. ("NNSA"), which consist of liquidation

proceedings during which NNSA was originally authorized to continue to operate as a going

concern for an initial period of three months, which period was subsequently extended to

November 28, 2009.  In accordance with the European Union's Council Regulation (EC) No.

1346/2000 on Insolvency Proceedings, the English law proceedings (the "English Proceedings")

remain the main proceedings in respect of NNSA although a French administrator and a French

liquidator have been appointed and are in charge of the day-to-day affairs and continuing

business of NNSA in France.  On October 1, 2009, pursuant to a motion filed by the Joint

Administrators, the French Court approved an order to: (i) suspend the liquidation operations

relating to the sale of the assets and/or businesses of NNSA for a renewable period of two

months; (ii) authorize the continuation of the business of NNSA so long as the liquidation

operations are suspended; and (iii) maintain the powers of the French Administrator and

Liquidator during the suspension period, except with respect to the sale of assets and/or

businesses of NNSA.  On February 26, 2010, the French Court extended the suspension of

liquidation until the earlier of (i) May 31, 2010 or (ii) the filing with the French Court of a letter

from Kapsch CarrierCom AG stating that its bid for the GSM//GSM-R assets of NNSA has

become unconditional.  On June 26, 2009, this Court entered an order recognizing the English

Proceedings of Nortel Networks UK Limited ("NNUK") as foreign main proceedings under

chapter 15 of the Bankruptcy Code.[4]

       9.      On January 26, 2009, the Office of the United States Trustee for the District of

Delaware (the "U.S. Trustee") appointed an Official Committee of Unsecured Creditors (the

---

[4]       Additionally, on January 18, 2009, certain Nortel affiliates, including Nortel Networks Israel (Sales and
Marketing) Limited, filed an application with the Tel-Aviv-Jaffa District Court, pursuant to the Israeli Companies
Law, 1999, and the regulations relating thereto for a stay of proceedings.  On January 19, 2009, the Israeli Court
appointed Yaron Har-Zvi and Avi D. Pelossof as joint administrators of the Israeli Company under the Israeli
Companies Law (the "Joint Israeli Administrators").

"Committee") pursuant to section 1102(a)(1) of the Bankruptcy Code [D.I.s 141, 142].  An ad hoc group of bondholders holding claims against certain of the Debtors and certain of the Canadian Debtors has also been organized (the "Bondholder Group").  No trustee or examiner has been appointed in the Debtors' cases.

10.     On July 14, 2009 (the "CALA Petition Date"), Nortel Networks (CALA) Inc. ("NN CALA" and a Debtor with NNI and its affiliates), an affiliate of NNI, filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  On July 17, this Court entered orders approving the joint administration and consolidation of NN CALA's chapter 11 case with the other Debtors' chapter 11 cases for procedural proposes [D.I. 1098], and applying to NN CALA certain previously entered orders in the Debtors' chapter 11 cases [D.I. 1099].

**B.      Debtors' Corporate Structure and Business**

11.     Nortel is a technology company that designs, develops and deploys communication products, systems and solutions to its customers around the globe.  Its principal assets include its employees, the intellectual property derived and maintained from its research and development activities, its customers and other significant contracts and agreements.

12.     Additional information regarding the Debtors' corporate structure and business and the events leading to the chapter 11 cases is set forth in the Declaration of John Doolittle in Support of First Day Motions and Applications [D.I. 3] (the "First Day Declaration").[5]

**C.      Case Milestones**

13.     On June 19, 2009, Nortel announced that it was advancing in discussions with external parties to sell its businesses and it would assess other restructuring alternatives for its businesses in the event it is unable to maximize value through sales.  To date, Nortel has closed

---

[5]       Capitalized terms used but not defined herein have the meanings ascribed to them in the First Day Declaration and the Initial Application.

(i) the sale of certain portions of its Layer 4-7 data portfolio to Radware Ltd. [D.I. 539]; (ii) the sale of substantially all of its CDMA business and LTE Access assets business to Telefonaktiebolaget LM Ericsson (publ) [D.I. 1205]; (iii) the sale of the assets of its Wireless Networks business associated with the development of Next Generation Packet Core network components to Hitachi Ltd. [D.I. 1760]; and (iv) the sale of substantially all of the assets of the Enterprise Solutions business globally, including the shares of Nortel Government Solutions Incorporated and DiamondWare Ltd. to Avaya Inc. [D.I. 1514].  In addition, Nortel has obtained Court approval for the planned sale of substantially all the assets of its Optical Networking and Carrier Ethernet businesses associated with its Metro Ethernet Networks business unit [D.I. 2070]; the planned sale of substantially all of its GSM/GSM-R business [D.I. 2065]; as well as the planned sale of certain assets of its Carrier Voice Over IP and Application Solutions business [D.I. 2632].

14.    On August 4, 2009, this Court entered an order fixing September 30, 2009 at 4:00 PM (Eastern Time) as the general bar date for filing proofs of claim or interests [D.I. 1280].  On December 3, 2009 this Court entered an order fixing January 25, 2010 at 4:00 PM (Eastern Time) as the bar date for filing proofs of claim or interests against NN CALA [D.I. 2059].

## Relief Requested

15.    By this Supplemental Application, the Debtors seek entry of an order pursuant to sections 105, 327(a) and 328(a) of the Bankruptcy Code, Bankruptcy Rules 2014 and 2016 and Local Bankruptcy Rule 2014-1 (i) authorizing the employment and retention of Global IP as intellectual property consultant and legal advisors to the Debtors (as well as certain of their affiliates), to support and advise on the monetization of the Residual Patent Portfolio, *nunc pro tunc* to January 15, 2010, (ii) approving the terms and conditions under which Global IP will be retained and compensated in part at the expense of the Debtors' estates as contained in that

certain Proposal for Nortel Representation on a Time and Materials Basis dated as of January 15,

2010 (attached hereto as <u>Exhibit C</u>) (the "<u>Interim Services Agreement</u>"), and the Statement of

Work for Nortel Patent Analysis and Monetization dated as of March 12, 2010, (attached hereto

as <u>Exhibit D</u>) (the "<u>SOW</u>" and, together with the Interim Services Agreement and the MCA,[6] the

"<u>Supplemental Agreement</u>") and (iii) granting such other and further relief as the Court deems

just and proper.

### <u>Facts Relevant to this Motion</u>

16.    On October 30, 2009, the Debtors filed the Application for an Order Authorizing

Employment and Retention of Global IP Law Group, LLC *Nunc Pro Tunc* to October 13, 2009

as Intellectual Property Consultant to the Debtors and Debtors in Possession (the "<u>Initial</u>

<u>Application</u>") [D.I. 1796].

17.    On November 20, 2009, the Court entered the Retention Order, authorizing

Global IP to perform a preliminary market analysis of the Nortel Residual Patent Portfolio and to

make certain recommendations on monetization strategies.

18.    The Agreement outlined in the Initial Application contemplated three potential

phases of services with regard to the Residual Patent Portfolio.  The first phase involved asset

identification, ownership due diligence, and creation of a claims database, as well as performing

a preliminary market analysis and identifying the key segments of the Residual Patent Portfolio

Assets ("<u>Phase 1</u>").  The second phase was to involve developing business cases for each key

segment of the Residual Patent Portfolio ("<u>Phase 2</u>").  The third phase was to involve a valuation

analysis of the top segments of the Residual Patent Portfolio, development of strategic

---

[6]    Except as provided herein, all terms of the original retention, as outlined in the Initial Application and
approved in the Retention Order, will govern this supplemental retention.  Specifically, all provisions of the Master
Consulting Agreement by and between NNI, NNL, NNUK and NN Ireland on the one hand and Global IP on the
other, dated as of October 15, 2009 (the "<u>MCA</u>"), including the limited indemnification provisions contained
therein, remain in full force and effect.

alternatives for exploiting the Residual Patent Portfolio, and recommendation of a strategy to maximize the value of the entire Nortel Patent Portfolio and IP business ("Phase 3"). The Retention Order authorized Global IP's retention for Phase 1 only, on the understanding that the Debtors would propose retention for Phase 2 and Phase 3 at an appropriate later date.

19.    By the end of 2009, Global IP had completed the services included in Phase 1.

**Basis for Relief**

20.    Under section 327 of the Bankruptcy Code, a debtor-in-possession may employ one or more professionals that do not hold or represent an interest adverse to the estate and that are disinterested persons to assist the debtor-in-possession in carrying out its duties under the Bankruptcy Code.  11 U.S.C. § 327(a).

21.    Section 328 of the Bankruptcy Code provides, in pertinent part, that under section 327 of the Bankruptcy Code a professional may be employed "on any reasonable terms and conditions of employment, including on a retainer, on an hourly basis, on a fixed percentage fee basis, or on a contingent fee basis."  11 U.S.C. § 328(a).

22.    Bankruptcy Rule 2014 requires that an application for retention of a professional person include:

> [S]pecific facts showing the necessity for the employment, the name of the person to be employed, the reasons for the selection, the professional services to be rendered, any proposed arrangement for compensation, and, to the best of the applicant's knowledge, all of the person's connections with the debtor, creditors, any other party in interest, their respective attorneys and accountants, the United States trustee, or any person employed in the office of the United States trustee.

Fed. R. Bankr. P. 2014(a).  Local Rule 2014-1 further requires that "[a]ny entity seeking approval of employment of a professional person pursuant to 11 U.S.C. § 327 . . .  shall file with

the Court a motion, a supporting affidavit or verified statement of the professional person and a

proposed order for approval." Del. Bankr. L.R. 2014-1(a).

23.     By this Supplemental Application, the Debtors request that the Court approve the

employment and compensation arrangements with Global IP as set forth herein pursuant to

section 328(a) of the Bankruptcy Code.  These employment arrangements are beneficial to the

Debtors' estates and the compensation arrangements provide certainty and proper inducement for

Global IP to act expeditiously and prudently with respect to the matters for which it will be

employed.

24.     The Debtors also request approval of the employment of Global IP *nunc pro tunc*

to January 15, 2010.  Such relief is warranted by the extraordinary circumstances presented by

these cases.  The Third Circuit has identified "time pressure to begin service" and absence of

prejudice as factors favoring *nunc pro tunc* retention.  See In re Arkansas Co., 798 F.2d 645, 650

(3d Cir. 1986); see also In re Indian River Homes, Inc., 108 B.R. 46, 52 (D. Del. 1989), appeal

dismissed, 909 F.2d 1476 (3d Cir. 1990).  The complexity, intense activity and speed that have

characterized these cases have necessitated that the Debtors, Global IP, the Debtors' other

professionals and the advisors to the Committee and the Bondholders Group focus their

immediate attention on time-sensitive matters and promptly devote substantial resources to the

affairs of the Debtors pending submission and approval of this Supplemental Application.

## Selection of Global IP

25.     The initial selection of Global IP to evaluate the assets in Nortel's Residual Patent

Portfolio, and the best manner in which to maximize the value realized from the portfolio, is set

forth in the Initial Application.   The Debtors continue to believe that intellectual property

advisory services, including legal advice, are important to the Debtors' success in their Chapter

11 cases, as well as to the success of Nortel's global restructuring endeavors, and that valuation and monetization of the Residual Patent Portfolio cannot be effectuated without such services.

26.    The Debtors also believe Global IP is the firm best qualified to perform these services, both for the reasons set forth in the Application and because, after completing the services necessary to Phase 1, Global IP is best positioned to perform the services contemplated in Phase 2 and Phase 3.  No other intellectual property firm has, or would have, without the incurrence of additional expense and delay, the requisite knowledge of the Residual Patent Portfolio to efficiently advise the Debtors throughout the monetization process.

27.    Denial of the relief requested by the Debtors in this Supplemental Application would deprive the Debtors of the assistance of uniquely qualified advisors.

## Scope of Services

28.    On or about October 15, 2009, NNI, NNL, NNUK, and NN Ireland on the one hand (collectively, the "Nortel Retaining Entities") and Global IP on the other reached an agreement on the services sought from Global IP, and entered into the Agreement referenced in the Initial Application.

29.    Pursuant to the Agreement,[7] Global IP agreed to render consulting and advisory services to the Debtors and certain of their affiliates with respect to the Residual Patent Portfolio. From the outset, the Debtors contemplated three potential phases of services.  In Phase 1, Global IP identified assets, conducted due diligence on patent ownership, created a claims database, and performed a preliminary market analysis based on key segments of the Residual Patent Portfolio

---

[7]    The summaries of the Agreement and the Supplemental Agreement in this Supplemental Application are solely for the benefit of the Court and parties in interest.  To the extent that the summaries herein and the terms of the Agreement and the Supplemental Agreement are inconsistent, the terms of the Agreement and the Supplemental Agreement shall control.

Assets.  This court approved Global IP's retention to perform the services contemplated in Phase 1 on November 20, 2009, and Global IP completed those services by the end of 2009.

30.     On or about January 15, 2010, the Nortel Retaining Entities agreed to the terms of the Interim Agreement, which permitted Global IP to render legal and consulting services to Nortel on an hourly basis until the SOW took effect on February 1, 2010.  During that two-week period, among other things, Global IP advised Nortel on a variety of intellectual property issues relating to the sale of certain of Nortel's business units, and counseled Nortel as it prepared for Phases 2 and 3.

31.     Phase 2 and Phase 3, the primary retention requested by this Supplemental Application, will include, in consultation with the Nortel Retaining Entities, their advisors and representatives of the Committee and the Bondholders Group (together, the "IP Working Group"), providing the Debtors with the services outlined in the SOW, including but not limited to legal advice and counsel on monetization strategies, and ongoing assistance as the appropriate strategy is selected and effectuated, as well as any other services as are customary in an engagement of this type and as may be reasonably agreed upon by the Debtors and Global IP.

32.     It is necessary that the Debtors employ Global IP to render the foregoing professional services, including those services rendered under the Interim Agreement.  The Debtors believe that the services will not duplicate the services that other professionals will be providing the Debtors in these chapter 11 cases.  Specifically, Global IP will carry out unique functions and will use reasonable efforts to coordinate with the Debtors and other professionals retained in these cases to avoid the unnecessary duplication of services.

<strong>Professional Compensation and Employment Terms</strong>

33.     Global IP's decision to expand this engagement to advise and assist the Debtors is conditioned upon its ability to be retained in accordance with its customary terms and conditions

11

of employment and compensated for its services and reimbursed for the expenses it incurs in

accordance with its customary billing practices.

34.    The MSA provides that NNL will make all payments to Global IP due under the

Agreement, and that NNI, NNUK, and NN Ireland will reimburse NNL for their share of any

such costs, which share will be agreed separately among NNL, NNI, NNUK and NN Ireland.

35.    Prior to making any payment to NNL for NNI's share of the professional services

rendered and expenses incurred by Global IP in connection with these chapter 11 cases, NNI will

file a motion (a "Global IP Fee Motion") with the Court for approval of such costs, in

compliance with the applicable provisions of the Bankruptcy Code, the Bankruptcy Rules, the

Local Bankruptcy Rules and any other applicable procedures and orders of the Court and

consistent with the proposed compensation set forth in the Supplemental Agreement (the

"Supplemental Fee Structure").  Any Global IP Fee Motion will provide the Court with the same

level of detail as is customarily contained in a fee application filed pursuant to sections 330 and

331 of the Bankruptcy Code.

36.    In summary, the Supplemental Structure provides that NNL will pay Global IP

the following compensation to Global IP (with NNI to pay a share to be agreed between the

Nortel entities):

a.    For services rendered prior to February 1, 2010, a rate of four hundred dollars $400 per hour for each Global IP partner, a 20% discount off of Global IP's standard fees, with total fees not to exceed $75,000 without prior approval from NNL.[8]

b.    For services rendered on or after February 1, 2010, a fixed fee of $250,000 per month, with an initial four-month commitment to be extended month-to-month upon the consent of the IP Working Group.

---

[8]    Global IP's bill for services rendered in January totaled approximately $97,500, which was reduced to $75,000 pursuant to the cap set forth in the Interim Agreement.

       c.     NNL also will reimburse Global IP, at cost, for out-of-pocket expenses. All out-of-pocket expenses of Global IP in excess of the following estimates must be pre-approved by Nortel in writing before being incurred:

       (i)     Expenses in under the Interim Agreement were not to exceed $10,000.[9]

       (ii)     The travel and material budget for Phases 2 & 3 is estimated at $15,000 to $25,000 per month.

37.     As set forth in the Second Supplemental Steger Declaration, the Supplemental Fee Structure is reasonable and comparable to those generally charged by intellectual property firms of similar stature to Global IP and for comparable engagements, both in-and out-of-court. The Debtors believe, as does Global IP, that the Supplemental Fee Structure is in fact reasonable, market-based and designed to fairly compensate Global IP for its work and to cover fixed and routine overhead expenses.

38.     Global IP will maintain records in support of any actual, necessary costs and expenses incurred in connection with the rendering of its services in these chapter 11 cases. As Global IP's compensation for Phase 2 and Phase 3 will be calculated and paid at a fixed monthly rate rather than on an hourly basis, Global IP requests that it not be required to maintain time records for those services in accordance with United States Trustee Guidelines. Global IP will nonetheless maintain records (in summary format) of all services rendered for the Debtors including reasonably detailed descriptions of those services, the approximate time expended in providing those services and the individuals who provided those services, and NNI will present such records to the Court in any Global IP Fee Motion.

39.     Given the numerous issues which Global IP may be required to address in the performance of its services hereunder, Global IP's commitment to the variable level of time and

---

[9]    In January 2010, Global IP incurred reimbursable expenses totaling approximately $7,000.

effort necessary to address all such issues as they arise, and the market prices for Global IP's services for engagements of this nature, the Debtors believe that the Supplemental Fee Structure described above is reasonable under the standards set forth in section 328(a) of the Bankruptcy Code.

### Global IP's Disinterestedness

40.     To the best of the Debtors' knowledge, information and belief, and based and in reliance upon Global IP's review of its client files and records and the Second Supplemental Declaration:  (i) Global IP is a "disinterested person" within the meaning of section 101(14) of the Bankruptcy Code and as required by section 327(a) of the Bankruptcy Code and referenced by section 328(c) of the Bankruptcy Code and (ii) Global IP holds no interest materially adverse to the Debtors, their creditors and shareholders for the matters for which Global IP is to be employed.  As disclosed in the Second Supplemental Steger Declaration, Global IP has represented and may continue to represent various creditors and other parties in interest in these cases, but only in matters unrelated to the Debtors or these chapter 11 cases.

### No Duplication of Services

41.     The Debtors intend that the services of Global IP will compliment, not duplicate, the services to be rendered by other professionals retained in these chapter 11 cases.  Global IP understands that the Debtors have retained and may retain additional professionals during the term of the engagement and will work cooperatively with such professionals to integrate any respective work conducted by the professionals on behalf of the Debtors.

### Notice

42.     Notice of this Supplemental Application has been given via facsimile, electronic transmission, hand delivery or overnight mail to the (i) U.S. Trustee; (ii) counsel to the Committee; (iii) counsel to the Bondholder Group; and (iv) the general service list established in

14

these chapter 11 cases.  The Debtors submit that under the circumstances no other or further

notice is necessary.

### No Prior Request

43.     No prior request for the relief sought herein has been made to this or any other

court.

WHEREFORE, the Debtors respectfully request that this Court (i) grant this

Supplemental Application and the relief requested herein; (ii) enter the proposed order attached

hereto; and (iii) grant such other and further relief as it deems just and proper.

Dated:  March 16, 2010
       Wilmington, Delaware

CLEARY GOTTLIEB STEEN & HAMILTON LLP

James L. Bromley (admitted *pro hac vice*)
Lisa M. Schweitzer (admitted *pro hac vice*)
One Liberty Plaza
New York, New York 10006
Telephone:  (212) 225-2000
Facsimile:  (212) 225-3999

- and -

MORRIS, NICHOLS, ARSHT & TUNNELL LLP


*/s/ Ann C. Cordo*
Derek C. Abbott (No. 3376)
Eric D. Schwartz (No. 3134)
Ann C. Cordo (No. 4817)
Andrew R. Remming (No. 5120)
1201 North Market Street
P.O. Box 1347
Wilmington, Delaware 19801
Telephone:  (302) 658-9200
Facsimile: (302) 658-3989

*Counsel for the Debtors*
*and Debtors in Possession*