**Exhibit A**

**MEN DISTRIBUTION ESCROW AGREEMENT**

**among**

**NORTEL NETWORKS CORPORATION**

**NORTEL NETWORKS LIMITED**

**NORTEL NETWORKS INC.**

**and**

**THE OTHER ENTITIES IDENTIFIED HEREIN AS SELLERS**

**and**

**THE EMEA SELLERS AND CERTAIN OF THEIR AFFILIATES AS IDENTIFIED HEREIN**

**and**

**THE ISRAELI COMPANY**

**and**

**NORTEL NETWORKS S.A.**

**and**

**THE ESTATE FIDUCIARIES**

**and**

**JPMorgan Chase Bank, N.A., as Distribution Agent**

**dated as of March [19], 2010**

**This DISTRIBUTION ESCROW AGREEMENT** (this "**Agreement**"), dated as of March **[19]**, 2010, by and among (i) Nortel Networks Corporation, a corporation organized under the laws of Canada ("**NNC**"); (ii) Nortel Networks Limited, a corporation organized under the laws of Canada ("**NNL**"); (iii) Nortel Networks Inc., a corporation organized under the laws of Delaware ("**NNI**" and, together with NNC and NNL, the "**Main Sellers**"); (iv) the Additional U.S. Debtors (as defined below) and the other affiliates of the Main Sellers listed in Schedule A (collectively, the "**Other Sellers**" and, together with the Main Sellers, the "**Sellers**"); (v) the entities set out in Schedule B (the "**EMEA Sellers**"), which in the case of the EMEA Debtors (as defined below) are acting by their joint administrators Alan Robert Bloom, Stephen John Harris, Alan Michael Hudson and Christopher John Wilkinson Hill of Ernst & Young LLP (other than Nortel Networks (Ireland) Limited (In Administration) for which David Hughes of Ernst & Young Chartered Accountants and Alan Robert Bloom serve as joint administrators) (collectively the "**Joint Administrators**") who act as agents of the EMEA Debtors without any personal liability as set forth in Paragraph 20 below and, in the case of the Israeli Company (as defined below), is acting by its joint administrators Yaron Har-Zvi and Avi D. Pelossof (the "**Joint Israeli Administrators**") who act as agents of the Israeli Company without any personal liability as set forth in Paragraph 20 below; (vi) Nortel Networks S.A. (In Administration) ("**NNSA**") acting by the NNSA Office Holders (as defined below), who act as agents for NNSA without any personal liability as set forth in Paragraph 20 below; (vii) each affiliate of the Main Sellers listed in Schedule C (each such entity a "**North American ALT Selling Debtor**"); (viii) each affiliate of the EMEA Sellers listed in Schedule D (each such entity, an "**EMEA ALT Selling Debtor**" and, together with the Sellers, the EMEA Sellers, NNSA and the North American ALT Selling Debtors, the "**Depositors**"); (ix) the Estate Fiduciaries (as defined below) with the exclusion from liability set forth in Paragraph 28; and (x) JPMorgan Chase Bank, N.A., a national banking association organized and existing under the laws of the United States of America ("**JPMorgan**") and acting through its TS/Escrow Services Division and solely in its capacity as escrow and distribution agent under this Agreement, and any successors appointed pursuant to the terms hereof (JPMorgan in such capacity, the "**Distribution Agent**"). Capitalized terms used and not otherwise defined herein shall have the meaning given to them in the North American ASA (as defined below). In this Agreement the term "**EMEA Debtors**" means those entities listed in Schedule 3 of the EMEA ASA, each party listed in Schedule D hereto that is an EMEA ALT Selling Debtor and NNSA.

**WHEREAS**, on the Petition Date, NNC, NNL and certain of their affiliates (collectively, the "**Canadian Debtors**") filed with the Canadian Court an application for protection under the CCAA and were granted certain creditor protection pursuant to an order issued by the Canadian Court on the same date, which has been extended by further order of the Canadian Court (such proceedings, together with any other formal insolvency proceedings commenced in Canada in respect of any Depositor that is a Canadian Debtor, the "**Canadian Cases**");

**WHEREAS**, NNI and certain of its affiliates (collectively, the "**U.S. Debtors**") are debtors-in-possession under the U.S. Bankruptcy Code, which commenced cases under Chapter 11 of the U.S. Bankruptcy Code on the Petition Date by filing voluntary petitions for relief in the U.S. Bankruptcy Court for the District of Delaware (the "**U.S. Bankruptcy Court**") (the "**U.S. Cases**" and together with the Canadian Cases, the "**Bankruptcy Cases**");

1

**WHEREAS**, the Canadian Court has appointed Ernst & Young Inc. as Monitor in the Canadian Cases and as foreign representative for the Canadian Debtors (the "**Monitor**"), and the Office of the United States Trustee for the District of Delaware has appointed an Official Committee of Unsecured Creditors as representative for the creditors of the U.S. Debtors (the "**Committee**" and, together with the Monitor, the "**Estate Fiduciaries**"), and in addition, an *ad hoc* group of bondholders holding claims against certain of the US Debtors and certain of the Canadian Debtors has also been organized (the "**Bondholder Group**");

**WHEREAS**, on the Petition Date, the English Court ordered that the EMEA Debtors be placed into administration under the Insolvency Act and European Union's Council Regulation (EC) No 1346/2000 on Insolvency Proceedings (the "**EC Regulation**") and appointed the Joint Administrators (as appropriate) to manage the affairs, business and property of the EMEA Debtors;

**WHEREAS**, the Tel-Aviv-Jaffa District Court (the "**Israeli Court**"), on January 19, 2009, granted Nortel Networks Israel (Sales and Marketing) Limited (In Administration) (the "**Israeli Company**") with a stay of proceedings order and nominated the Joint Israeli Administrators as joint administrators of the Israeli Company and, on November 24, 2009, as part of such stay of proceedings, the Israeli Court approved a creditors' arrangement in connection with the Israeli Company, and further approved at a later date, the continuation of all relevant rights, duties and obligations of the Joint Israeli Administrators pursuant to such stay of proceedings order;

**WHEREAS**, while the administration proceedings in respect of NNSA under the Insolvency Act are continuing, subsequent to the Petition Date, NNSA commenced secondary insolvency proceedings within the meaning of Article 27 of the EC Regulation pursuant to which the Commercial Court of Versailles appointed a liquidator and an administrator (together, the "**NNSA Office Holders**") for NNSA;

**WHEREAS**, NNSA acceded to the IFSA (as defined below) on September 11, 2009 and, notwithstanding that NNSA is not a party to the Sale Agreements (as defined below), NNSA is, pursuant to a letter dated September 28, 2009, a Selling Debtor under the IFSA for the purposes of the Transaction (as defined in the Side Agreement) (as defined below) and, as such, any reference in this Agreement to a Depositor shall be construed as including NNSA;

**WHEREAS**, the Sellers and Ciena Corporation (the "**Purchaser**") have entered into that certain Asset Sale Agreement dated October 7, 2009, as amended October 16, 2009, and amended and restated on November 24, 2009 and further amended on December 3, 2009 and on December 23, 2009 (as the same may be further amended and/or restated from time to time in accordance with its terms, the "**North American ASA**"), whereby the Purchaser and/or certain Designated Purchasers will acquire certain assets and liabilities of the Business from the Sellers;

**WHEREAS**, the Sellers further amended the North American ASA, with approval of such amendment by the U.S. Bankruptcy Court, in order to enable their U.S. debtor affiliates CoreTek, Inc., Qtera Corporation and Xros, Inc. (collectively, the "**Additional U.S. Debtors**") to join the North American ASA;

2

**WHEREAS**, the EMEA Sellers, the Joint Administrators, the Joint Israeli Administrators and the Purchaser have entered into that certain Asset Sale Agreement dated as of October 7, 2009 and amended by a Deed of Amendment on each of October 20, 2009, November 24, 2009, December 16, 2009 and on January 13, 2010 (as the same may be further amended and/or restated from time to time in accordance with its terms, the "**EMEA ASA**" and, together with the North American ASA, the "**Sale Agreements**"), whereby the Purchaser and/or certain EMEA Designated Purchasers will acquire certain assets and liabilities of the Business from the EMEA Sellers;

**WHEREAS**, the Main Sellers, together with Nortel Networks UK Limited, a limited liability company organized under the laws of England ("**NNUK**"), the Purchaser and Citibank, N.A. ("**Citibank**") have entered into that certain Deposit Escrow Agreement, dated as of November 25, 2009 (as the same may be amended and/or and amended and restated from time to time in accordance with its terms, the "**Deposit Escrow Agreement**") pursuant to which Citibank was appointed as escrow agent to receive the Deposit Amount from the Purchaser pursuant to Section 5.37 of the North American ASA and to hold, administer and deliver such Deposit Amount as contemplated by the Deposit Escrow Agreement and the North American ASA;

**WHEREAS**, on November 25, 2009, pursuant to Section 5.37 of the North American ASA, the Purchaser delivered to Citibank cash in an amount of USD$38,450,000 (being the Deposit Amount);

**WHEREAS**, it is contemplated under Section 5.37 of the North American ASA that, at Closing, the Parties (as such term is defined in the North American ASA) and NNUK shall jointly instruct Citibank to disburse the Deposit Amount to the Distribution Agent;

**WHEREAS**, it is contemplated under the Real Estate Terms and Conditions that certain amounts will be paid into escrow at Closing (the "**RETC Escrow Amounts**") to be held in accordance with the terms thereof;

**WHEREAS**, the Sale Agreements provide that the consideration payable by the Purchaser may include, *inter alia*, $239,000,000 aggregate principal amount of the Purchaser's Senior Notes due June 15, 2017 (together with related rights and securities, the "**Convertible Notes**"), which Convertible Notes, and rights arising in respect thereof, shall be dealt with by the Depositors in accordance with the terms and conditions of the Side Agreement (as defined below);

**WHEREAS**, in order to facilitate decision-making with respect to the disposition of the Convertible Notes or the right to receive Convertible Notes, the Parties (as defined in the Side Agreement) will constitute a committee of five members with each of NNUK and NNL designating two members, and NNI designating one member (the "**Investment Committee**");

**WHEREAS**, on or prior to Closing, the Main Sellers, the EMEA Sellers or an authorized representative of the EMEA Sellers, the Purchaser and Citibank will, pursuant to Section 2.2.5(a) of the North American ASA, enter into an escrow agreement (the "**Transaction Escrow Agreement**") with respect to the deposit, investment and disbursement of certain escrow amounts (collectively, the "**Transaction Escrow Amounts**");

3

**WHEREAS**, it is contemplated under Section 2.3.2(b) of the North American ASA that, at Closing, the Purchaser will deliver or cause to be delivered to Citibank by wire transfer in immediately available funds an aggregate amount equal to the Transaction Escrow Amounts, to be held and disbursed in accordance with the Transaction Escrow Agreement, the North American ASA and the Carling Property Lease Agreements, as appropriate;

**WHEREAS**, it is contemplated under Section 2.3.2(b) of the North American ASA that, at Closing, the Purchaser shall (x) subject to adjustment in accordance with the Sale Agreements, deliver or cause to be delivered to the Distribution Agent as consideration for the collective transactions contemplated by the Sale Agreements an amount (the "**Deposited Purchase Price**"), by wire transfer in immediately available funds, equal to (a) the Base Cash Purchase Price, plus any additional cash component of the Purchase price payable pursuant to the exercise of the Cash Replacement Election and amounts directed by the Sellers pursuant to Section 4(a)(ii) of the Transition Services Agreement, less (b) the sum of (i) the Transaction Escrow Amounts; (ii) the RETC Escrow Amounts; and (iii) USD$117,000 to be paid directly by the Purchaser to Nortel Networks de Columbia S.A. (the amount referred to in this clause (b)(iii) referred to as the "**Nortel Columbia Local Sales Allocation**"), and (y) subject to the terms and conditions of the North American ASA and the Side Agreement (as defined below), deliver to the Distribution Agent, as agent of the Depositors, those Convertible Notes not sold or otherwise dealt with prior to Closing to be held and dealt with in accordance with the terms and conditions of this Agreement and subsequent instructions given by the Investment Committee relating to the disposition of such Convertible Notes;

**WHEREAS**, it is contemplated under Section 2.3.2(c) of the North American ASA, immediately following delivery of the amounts described in the two immediately preceding recitals above, the Sellers shall deliver or cause to be delivered to Citibank at Closing an amount equal to the Transition Services Escrow Amount to be held and disbursed in accordance with the Transaction Escrow Agreement, the North American ASA and the Transition Services Agreement;

**WHEREAS**, the Sellers, EMEA Sellers, NNSA, the Joint Administrators and the Joint Israeli Administrators have entered into that certain Metro Ethernet Networks Side Agreement dated as of February 26, 2010 (the "**Side Agreement**"), pursuant to which, in accordance with Section 12.b of the IFSA, the Selling Parties (as defined therein) agree to enter into an escrow agreement with the Distribution Agent governing, among other things, the Distribution Agent's collection, holding in escrow and distribution to the Depositors and any other party deemed to be a Selling Debtor pursuant to the IFSA (in accordance with the Allocation Rules (as defined in the Side Agreement)) of the proceeds of the Transaction (as defined therein) and other payments to be made by the Purchaser (or any Designated Purchaser or EMEA Designated Purchaser) to the Depositors under or in relation to the Sale Agreements and the formation of the Investment Committee to facilitate decision-making with respect to the disposition of any Convertible Notes or the right to receive Convertible Notes, if any;

**WHEREAS**, the Closing is expected to occur in March, 2010 and the Depositors desire to establish an account prior to Closing for the escrow of the Deposited Purchase Price pursuant to this Agreement, it being understood by the Depositors that this Agreement is subject to amendment in accordance with Paragraph 15(a) to, among other things, reflect further agreement among the Depositors as to the terms of the escrow of the Deposited Purchase Price;

4

WHEREAS, the Depositors and certain other parties (together, the "**IFSA Parties**") have entered into that certain agreement to address interim funding and the settlement of certain intercompany matters dated June 9, 2009 (the "**IFSA**"), pursuant to clause 12.c and clause 12.g of which, the IFSA Parties have agreed to negotiate in good faith a protocol for resolving disputes concerning the allocation of sale proceeds from sale transactions (the "**Allocation Protocol**"), which shall provide binding procedures for the allocation of sales proceeds where the IFSA Parties are otherwise unable to reach agreement;

WHEREAS, prior to Closing this Agreement will be approved by the Canadian Court and the U.S. Bankruptcy Court will authorize the U.S. Debtors to enter into an agreement with the Distribution Agent on terms and conditions reasonably satisfactory to the Estate Fiduciaries acting in good faith, and the Depositors will, promptly after receiving such approval and authorization, provide the Distribution Agent with evidence of such approval and authorization; and

WHEREAS, the Depositors wish to appoint JPMorgan as escrow and distribution agent and JPMorgan is willing to accept such appointment and to act as escrow and distribution agent, in each case upon the terms and conditions of the Agreement;

NOW, THEREFORE, for good and valuable consideration, the receipt and adequacy of which is hereby irrevocably acknowledged, the Depositors and the Distribution Agent hereto agree as follows:

1. <u>Appointment of Distribution Agent</u>.  The Depositors hereby jointly nominate, constitute and appoint the Distribution Agent as escrow and distribution agent to hold the Escrow Funds (as defined below) in the Distribution Account (as defined below) and the Deposited Notes (as defined below) upon the terms and conditions set forth herein.  The Distribution Agent hereby accepts such appointment and agrees that deposits to, and disbursements from, the Distribution Account (as defined below), or applicable portions thereof, and the release or disposition of the Deposited Notes, shall only be made in accordance with the terms and conditions of this Agreement.  The Distribution Agent hereby represents to each of the Depositors that it has the corporate power and legal authority to execute this Agreement and to perform its obligations hereunder.  The Depositors and the Distribution Agent agree that any action specified in this Agreement as to be taken by all of the Depositors, acting jointly, when taken by all of the Depositors, shall be binding upon each of the Depositors and the Distribution Agent shall be entitled to act and rely upon any action taken by all of the Depositors, acting jointly, and to the extent required hereunder, the Estate Fiduciaries, as provided in this Agreement.

2. <u>Deposit of Escrow Property</u>.  Funds and property shall be deposited in the Distribution Account (as defined below) as follows:

(a)  at Closing, the Sellers shall instruct the Purchaser to deposit the Deposited Purchase Price with the Distribution Agent, in immediately available funds, in an account established with the Distribution Agent being account number 865364574 (the "**Distribution Account**");

(b)     at Closing, the Parties (as such term is defined in the North American ASA) and NNUK shall cause Citibank to deposit all amounts of cash including actual earnings thereon then held by Citibank pursuant to the Deposit Escrow Agreement with the Distribution Agent, in immediately available funds, in the Distribution Account;

(c)     at Closing, subject to Section 2.4(d) of the Side Agreement and in accordance with Section 12.b of the IFSA, the Selling Parties shall instruct the Purchaser to deposit any payment due by the Purchaser (and any Designated Purchaser and any EMEA Designated Purchaser) to the Selling Parties under the Sale Agreements that is included in the Total Proceeds (as defined in the Side Agreement) with the Distribution Agent, in immediately available funds, in the Distribution Account; and

(d)     at Closing, the Sellers shall instruct the Purchaser to cause the account of the Distribution Agent with the Depositary (as defined in the Indenture) to be credited with beneficial ownership of the Convertible Notes and/or the Substituted Convertible Notes not sold or otherwise dealt with in accordance with the terms of the North American ASA and the Side Agreement (the "**Deposited Notes**");

(e)     after Closing, subject to Section 2.4(d) of the Side Agreement and in accordance with Section 12.b of the IFSA, all amounts released from escrow pursuant to any escrow agreements provided for in the Sale Agreements or the other Transaction Documents (including without limitation the Transaction Escrow Amounts) and the RETC Escrow Amounts that are included in the Total Proceeds (as defined in the Side Agreement), shall be deposited with the Distribution Agent, in immediately available funds, in the Distribution Account,

(all funds deposited in accordance with sub-paragraphs (a), (b), (c) and (e) above collectively, and together with all interest, sale or redemption proceeds and other income therefrom or from the Deposited Notes received by the Distribution Agent, less any funds distributed or paid in accordance with this Agreement, the "**Escrow Funds**"). The Escrow Funds, together with all Deposited Notes not yet otherwise disposed of in accordance with this Agreement, are collectively referred to herein as "**Escrow Property**".   The Distribution Agent shall provide written confirmation to the Depositors, the Estate Fiduciaries and the Bondholder Group upon its receipt of any Escrow Property from the Purchaser, any Designated Purchaser, Citibank or otherwise.  Prior to the deposits in accordance with sub-paragraphs (a)-(c) above, there shall be no other funds in the Distribution Account.  The Escrow Property shall at all times, until disbursement as provided herein, remain segregated and separately identified by the Distribution Agent and shall not be commingled with the other assets held by the Distribution Agent. Each of the Depositors, the Estate Fiduciaries and the Bondholder Group acknowledges and consents to the direct payment of the Nortel Columbia Local Sales Allocation to Nortel Networks de Columbia S.A.

3.     <u>Investment of Escrow Funds</u>.

(a)     Until otherwise jointly directed by all of the Depositors and the Estate Fiduciaries, the Distribution Agent shall invest the Escrow Funds in Permitted Investments only. "**Permitted Investments**" means (1) United States Treasury obligations with maturities not in excess of one year, (2) money market funds invested solely in such United States Treasury obligations and (3) the JPMorgan Chase Bank Collateralized Money Market Deposit Account;

6

provided, however, that in no event shall Permitted Investments include investments that are not eligible for the portfolio interest exemption or other similar exception to U.S. withholding tax. The Distribution Agent shall invest the Escrow Funds on the date of deposit so long as the relevant funds are received on or before 11:00 a.m. New York City time.  Any written notice to remit payment received by the Distribution Agent after 11:00 a.m. New York City time shall be treated as if received on the following Business Day.  For purposes of this Agreement, "**Business Day**" shall mean any day other than a Saturday, Sunday or any other day on which the Distribution Agent located at the notice address set forth on Schedule F is authorized or required by law or executive order to remain closed.  In the absence of a joint written instruction from the Depositors and the Estate Fiduciaries, the Distribution Agent will invest the Escrow Funds in item (3) referenced above.  The parties hereto recognize and agree that the Distribution Agent will not provide supervision, recommendations or advice relating to either the investment of the Escrow Funds or the purchase, sale, retention or other disposition of any investment described herein.  The Distribution Agent shall not have any liability for any loss sustained as a result of any investment made pursuant to the terms of this Agreement or as a result of any liquidation of any investment prior to its maturity or for the failure of the Depositors to give the Distribution Agent instructions to invest or reinvest the Escrow Funds.

(b)    Any investment direction contained herein may be executed through an affiliated broker-dealer of the Distribution Agent, which shall be entitled to such affiliated broker-dealer's usual and customary fee, except neither the Distribution Agent nor its affiliates shall be entitled to any fees for underwriting distributions of the Deposited Notes except as expressly authorized by the Investment Committee in a letter of direction delivered pursuant to Paragraph 5(b).  Neither the Distribution Agent nor any of its affiliates assume any duty or liability for monitoring the investment rating of the investments.

(c)    The Distribution Agent shall have the right to liquidate investments as necessary to distribute Escrow Funds pursuant to Paragraph 5.

4.    Ownership of Escrow Property; Taxes.

(a)    The Escrow Property at all times is and shall be the exclusive property of the Depositors.  Interest or other income earned on or with respect to the Escrow Property shall, as of the end of each calendar year and to the extent required by law, be reported by the Distribution Agent on Form 1099 or Form 1042-S as the income of Depositors or their affiliates, based upon the disbursement of the Escrow Property to Depositors or their affiliates pursuant to Paragraph 5 if such income was disbursed during such calendar year or, with respect to any Escrow Property not disbursed during such calendar year, based upon each Depositor's *pro rata* share of such income, with each Depositor's *pro rata* share being deemed to be equal to such Depositor's interest allocation percentage as set forth on Exhibit 1.  The Distribution Agent acknowledges and agrees that the interest percentages set forth on Exhibit 1 are not indicative of the final allocation of the Escrow Property and, accordingly, the Distribution Agent agrees to amend Form 1099 and Form 1042-S upon a joint written request from the Depositors and the Estate Fiduciaries, which request shall set forth the re-allocation of all interest and any other earnings on Escrow Property previously reported on Form 1099 and Form 1042-S; provided, however, that the Distribution Agent shall be permitted to rely at all times upon the interest percentages then set forth on Exhibit 1 delivered to the Distribution Agent and the Distribution Agent shall be entitled to act upon the allocations and interest percentages as then set forth in

7

Exhibit 1 without liability to any Depositor, notwithstanding any subsequent amendment to Exhibit 1 setting forth any new allocation or interest percentage.  Any other tax returns required to be filed will be prepared and filed by the Depositors with the IRS and any other taxing authority as required by law, including but not limited to, any applicable reporting or withholding pursuant to the Foreign Investment in Real Property Tax Act ("**FIRPTA**").  The Depositors acknowledge and agree that the Distribution Agent shall have no responsibility for the preparation and/or filing of any tax return or any applicable FIRPTA reporting or withholding with respect to the Escrow Property or any income earned by the Escrow Property. Each Depositor further acknowledges and agrees that any taxes payable from the income earned by such Depositor on the investment of any sums held in the Escrow Funds shall be paid by such Depositor.  All proceeds of the Escrow Property shall be retained in the Distribution Account and reinvested from time to time by the Distribution Agent as provided in this Agreement.  The Distribution Agent shall withhold any taxes required by law, including but not limited to required withholding in the absence of proper tax documentation, and shall remit such taxes to the appropriate authorities.  The parties hereto hereby agree and acknowledge that the Distribution Agent has no ownership interest in the Escrow Property but is serving solely as escrow holder having only possession thereof.  This Paragraph 4 shall survive notwithstanding any termination of this Agreement or the resignation of the Distribution Agent.  Each Depositor will provide the Distribution Agent with the appropriate form W-9 or W-8 either (x) if any of the Escrow Funds are to be disbursed to such Depositor prior to December 31, 2010, as a condition to such Depositor's receipt of such Escrow Funds from the Distribution Agent, prior to the Distribution Agent making such disbursement hereunder or (y) if none of the Escrow Funds are to be disbursed to such Depositor prior to December 31, 2010, on or before December 31, 2010. If W-8 or W-9 forms, validated by the Distribution Agent, have not been provided by all of the Depositors prior to December 31, 2010 the Distribution Agent shall report taxes on a disbursement basis in the year they are disbursed.

(b)    To the extent that the Distribution Agent becomes liable for the payment of any taxes in respect of income derived from the investment of the Escrow Funds, the Distribution Agent shall satisfy such liability to the extent possible from the Escrow Funds.  The Depositors shall, jointly and severally, indemnify, defend and hold the Distribution Agent harmless from and against any tax, late payment, interest, penalty or other cost or expense that may be assessed against the Distribution Agent on or with respect to the Escrow Property and the investment thereof unless such tax, late payment, interest, penalty or other expense was caused by the gross negligence or willful misconduct of the Distribution Agent.  Any indemnification payments arising from the indemnification provided by this Paragraph 4(b) shall be initially satisfied out of the Escrow Property to the extent available.  As among themselves, the Depositors agree that the costs of any such indemnification shall be borne on a *pro rata* basis by the Depositors in accordance with the percentage of the Escrow Property allocable to each of the Depositors pursuant to the Allocation Protocol or a letter of direction as described in clause (i) of Paragraph 5, and any Depositor or any of its Respective Affiliates paying in excess of its *pro rata* share of the cost of such indemnification shall have rights of contribution vis-à-vis any Depositor that has paid less than its *pro rata* share of such costs either directly to the Distribution Agent or by payment to another Depositor pursuant to this sentence; provided, that if the costs of any such indemnification arise from a breach of this Agreement or other fault of a Depositor, the Depositor(s) so in breach or at fault shall bear the cost of such indemnification and any Depositor paying in excess of its share of the cost of such indemnification, after taking into account the

breach or fault of the other Depositors, shall have rights of contribution vis-à-vis any Depositor that has paid less than its share of such costs either directly to the Distribution Agent or by payment to another Depositor. The indemnification provided by this Paragraph 4(b) is in addition to the indemnification provided in Paragraph 9 and shall survive the resignation or removal of the Distribution Agent and the termination of this Agreement.

5.     Distribution of Escrow Property.

The Depositors, the Estate Fiduciaries and the Distribution Agent hereby agree that, until the termination of the escrow established pursuant to this Agreement, the Distribution Agent shall hold the Escrow Property and not disburse any amounts from the Distribution Account or dispose of any Deposited Notes except in accordance with the following terms and conditions:

(a)     The Distribution Agent shall disburse to any person amounts from the Escrow Funds if and as so instructed pursuant to (i) a letter of direction jointly executed by the Depositors and the Estate Fiduciaries, a copy of which shall be provided by the Depositors to the Bondholder Group or (ii) where the Depositors have entered into the Allocation Protocol in accordance with clause 12 of the IFSA (the existence of the Allocation Protocol and the identity of the relevant dispute resolver(s) shall be set forth in a written notice jointly executed by the Depositors and delivered to the Distribution Agent), any Depositor's delivery to the Distribution Agent, with copies to the other Depositors, the Estate Fiduciaries and the Bondholder Group, of a duly authenticated copy of the binding decision made by the relevant dispute resolver(s) under that protocol regarding the allocation of the sales proceeds relating to the Business of the Depositors (a "**Decision**") which is not stayed or subject to appeal, accompanied by a certificate from such Depositor certifying as to the finality of the Decision; provided, however, that any amounts owing under Paragraph 4(b) or Paragraph 9 by any Depositor (a "**Debtor Depositor**") to any other Depositor at the time of an intended distribution from the Escrow Account shall be paid out of the share of the Escrow Funds otherwise payable to such Debtor Depositor.

(b)     The Distribution Agent shall deal with the Deposited Notes if and as so instructed pursuant to a letter of direction executed by the Investment Committee, a copy of which shall be provided by the Investment Committee to the Estate Fiduciaries and the Bondholder Group; provided, however, that all interest, sale or redemption proceeds and other income derived from the Deposited Notes shall remain subject to this Agreement including Paragraph 5(a) above.

(c)     The Depositors understand and agree that no payments or reimbursements made pursuant to Section 6.1 of the North American ASA in respect of Transfer Taxes or Section 11 of the EMEA ASA in respect of VAT and Transfer Taxes (as that term is defined in the EMEA ASA) shall constitute any part of the Deposited Purchase Price, the amount transferred from the Deposit Escrow Account (as that term is defined in the Deposit Escrow Agreement) (including any actual earnings thereon) or the Escrow Funds, or shall be required to be paid by the Purchaser into the Distribution Account. In the event, however, that Purchaser or its affiliates make any payments with respect to Transfer Taxes or VAT or Transfer Taxes (as that term is defined in the EMEA ASA), as applicable, that are payable to or intended for the benefit of one or more Sellers or any affiliate or agent thereof pursuant to Section 6.1 of the North American ASA or one or more EMEA Sellers or any affiliate or agent thereof pursuant to Section 11 of the EMEA ASA, but which are deposited into the Distribution Account (any such

9

payment, "**Misdirected Tax Payment**"), then the applicable Depositor(s) shall have the right to request the release of such Misdirected Tax Payment by providing the Distribution Agent with a letter of direction executed by an Authorized Representative of such Depositor identifying the amount that is represented to be a Misdirected Tax Payment(s) and further directing the release of such Misdirected Tax Payment to the appropriate beneficiary in accordance with Paragraph 12 below.  The requesting Depositor(s) shall (A) send a copy of such letter of direction to each of the other Depositors, the Estate Fiduciaries and the Bondholder Group at the same time as such letter is sent to the Distribution Agent and (B) attach thereto (i) supporting documentation evidencing the amount of the Transfer Taxes or VAT or Transfer Taxes (as that term is defined in the EMEA ASA), as applicable, payable (it being understood that the Distribution Agent shall have no responsibility for verifying the accuracy, delivery or sufficiency of such supporting documentation) and (ii) a certification of an Authorized Representative of such Depositor that the amount requested by such Depositor represents amounts deposited into escrow that are payable to or intended for the benefit of such Depositor by the Purchaser or its affiliates with respect to Transfer Taxes pursuant to the North American ASA or VAT or Transfer Taxes (as that term is defined in the EMEA ASA) pursuant to the EMEA ASA, as applicable.  The Distribution Agent shall on or as soon as reasonably practicable following the tenth (10th) day following receipt of such letter of direction, disburse to such Depositor the amounts requested therein; provided, however, that if the Distribution Agent receives a notice of objection from one or more of the Depositors or an Estate Fiduciary prior to making such disbursement (but in no event later than 3:00 p.m. EST on such release date), the Distribution Agent shall not make such disbursement until the Distribution Agent either (x) receives an order of a court of competent jurisdiction (as provided in Paragraph 21 below), which is not stayed or subject to appeal, instructing it to make such distribution or (y) the objecting Depositor(s) and/or Estate Fiduciary(ies) provide written notice to the Distribution Agent withdrawing such objection. Subject to the proviso to the preceding sentence, the Distribution Agent shall be entitled to act upon any such written letter of direction even if not countersigned by one or more of the other Depositors and/or Estate Fiduciary(ies).

(d)	The Distribution Agent shall have no responsibility or obligation for investigating or determining the validity or sufficiency of any matter asserted in a letter of direction or of any pending claim for entitlement to release of funds from the Distribution Account. The Distribution Agent shall have the right to withhold an amount equal to the amount due and owing to the Distribution Agent, plus any reasonable costs and expenses incurred by the Distribution Agent in accordance with the terms of this Agreement in connection with the termination of the Distribution Account.

(e)	No Depositor shall submit to the Distribution Agent a certificate that falsely certifies to the finality of a Decision.

(f)	Any request for a distribution pursuant to this Paragraph 5 shall be accompanied by a completed Schedule E with respect to the Depositors participating in such distribution, unless a completed Schedule E with respect to such Depositor has previously been provided to the Distribution Agent (in which case the Schedule E to be provided to the Distribution Agent need only contain the requisite information with respect to the Depositors as to whom no previous Schedule E has been provided to the Distribution Agent).  The Depositors

shall comply with any request from another Depositor for information necessary for inclusion in Schedule E.

(g)    The Depositors and the Estate Fiduciaries hereby agree that they shall cause the Distribution Agent to disburse amounts from the Distribution Account in accordance with the procedures set forth in this Paragraph 5 to satisfy (i) any obligations to make the Total Payments (as defined in the Side Agreement) in accordance with the terms of the Side Agreement; and (ii) the obligation of NNI to pay $250,000 to the Pension Benefit Guaranty Corporation at Closing.

6.    Termination of Distribution Account.    The Agreement shall terminate upon the later of the distribution of all Escrow Funds from the Distribution Account established hereunder in accordance with Paragraph 5 hereof and the disposition of all Deposited Notes and any proceeds thereof, subject to the survival of provisions which expressly survive the termination of this Agreement; provided, however, that this Agreement shall not terminate prior to the date on which the Depositors and the Estate Fiduciaries notify the Distribution Agent that (i) all purchase price adjustment amounts owing to the Sellers under the terms of the North American ASA and (ii) all amounts released from escrow pursuant to any escrow agreements provided for in the Sale Agreements or the other Transaction Documents (including without limitation the Transaction Escrow Amounts) and the RETC Escrow Amounts that are included in the total Proceeds (as defined in the Side Agreement), have been deposited in the Distribution Account by the Purchaser in accordance herewith and subsequently distributed hereunder.

7.    Method of Payment.  Any payments to be made hereunder shall be made by wire transfer in immediately available funds to the account of such party designated on Schedule E annexed hereto (collectively, the "**Standing Settlement Instructions**").  Any Depositor shall have the right, from time to time, to provide written notice to the Distribution Agent and the other Depositors updating its Standing Settlement Instructions, and the Distribution Agent shall thereafter use such revised Standing Settlement Instructions for purposes of any subsequent distributions to such Depositor pursuant to Paragraph 5 until such Standing Settlement Instructions have been further updated pursuant to this Paragraph 7.

The Depositors acknowledge that the Distribution Agent may rely upon all identifying information set forth in the Standing Settlement Instructions. The Distribution Agent and the Depositors agree that such Standing Settlement Instructions shall be effective as the funds transfer instructions of the Depositors, without requiring a verifying callback, whether or not authorized, if the Distribution Agent has previously authenticated such Standing Settlement Instructions with respect to such Depositor.  The Depositors acknowledge that such Standing Settlement Instructions are a security procedure and are commercially reasonable.

8.    Monthly Reports.    The Distribution Agent shall, promptly following the end of each calendar month, provide monthly account statements to the Depositors with respect to the Distribution Account and the Deposited Notes, with copies to the Estate Fiduciaries and the Bondholder Group.

9.    <u>Liability of Distribution Agent</u>.  The Distribution Agent's sole liability hereunder shall be to hold and invest the Escrow Property and any moneys or other properties received with respect thereto, to make payments and distributions therefrom in accordance with the terms of this Agreement, and otherwise to discharge its obligations hereunder.  It shall be under no obligation to institute or defend any action, suit or legal proceeding in connection herewith, or to take any other action likely to involve it in expense unless first indemnified to its satisfaction by the party or parties who desire that it undertake such action. The Distribution Agent may execute any of its powers and perform any of its duties hereunder directly or through agents or attorneys (and shall be liable only for the careful selection of any such agent or attorney) and may consult with counsel, accountants and other skilled persons to be selected and retained by it.  The Distribution Agent shall not be liable for anything done, suffered or omitted by it in accordance with the advice or opinion of any such counsel, accountants or other skilled persons.  The Distribution Agent shall not be liable for any action taken or omitted by it in good faith except to the extent that a court of competent jurisdiction (as set forth in <u>Paragraph 21</u> below) determines that the Distribution Agent's gross negligence or willful misconduct was the cause of any loss to any Depositor.  The Distribution Agent may rely upon and shall not be liable for acting or refraining from acting pursuant to any written notice, document, instruction or request furnished to it hereunder and reasonably believed by it to be genuine and to have been signed or presented by the proper party or parties without inquiry and without requiring substantiating evidence of any kind.  The Distribution Agent shall be under no duty to inquire into or investigate the validity, accuracy or content of any such document, notice, instruction or request. The Distribution Agent shall have no duty to solicit any payments which may be due to it or in connection with the Distribution Account, including, without limitation, the Escrow Property, nor shall the Distribution Agent have any duty or obligation to confirm or verify the accuracy or correctness of any amounts deposited with it hereunder.  The Distribution Agent shall have no duty or obligation to make any calculations of any kind hereunder.  In the event that the Distribution Agent shall be uncertain or believe there is some ambiguity as to its duties or rights hereunder or shall receive instructions, claims or demands from any party hereto which, in its opinion, conflict with any of the provisions of this Agreement, it shall be entitled to refrain from taking any action and its sole obligation shall be to keep safely all property held in escrow until it shall be given a direction in writing by the parties pursuant to <u>Paragraph 5</u> which eliminates such ambiguity or uncertainty to the satisfaction of the Distribution Agent or by a final and non-appealable order or judgment of a court of competent jurisdiction (as set forth in <u>Paragraph 21</u> below).

Anything in this Agreement to the contrary notwithstanding, in no event shall the Distribution Agent be liable for special, indirect or consequential loss or damage of any kind whatsoever (including but not limited to lost profits), even if the Distribution Agent has been advised of the likelihood of such loss or damage and regardless of the form of action.

If any dispute should arise with respect to the payment or ownership or right of possession of the Escrow Property, or any part thereof, at any time, that cannot be settled under other provisions hereof, the Distribution Agent is authorized to retain in its possession, without liability to anyone, all or any part of the Escrow Property, as applicable, or the proceeds from any sale thereof until a distribution is requested in accordance with <u>Paragraph 5</u>.

The Depositors shall, jointly and severally, indemnify and hold harmless the Distribution Agent and its affiliates and their respective successors, assigns, directors, agents and employees (the "**Indemnitees**") from all losses, costs, damages, claims, liabilities, penalties, judgments, settlements, litigation, investigations, and expenses (including, without limitation, the reasonable fees and expenses of outside counsel) (collectively, "**Losses**") arising out of or in connection with (a) the Distribution Agent's execution and performance of this Agreement, tax reporting or withholding, the enforcement by the Distribution Agent of any of its rights or remedies under or in connection with this Agreement, or as may arise by reason of any act, omission or error of the Indemnitee, except, in the case of any Indemnitee, to the extent that such Losses are finally adjudicated by a court of competent jurisdiction (as set forth in <u>Paragraph 21</u> below) to have been caused by the gross negligence or willful misconduct of such Indemnitee, or (b) its following any instructions or directions, whether joint or singular, from the parties, except to the extent that its following any such instruction or direction is expressly forbidden by the terms hereof.  The parties hereto acknowledge that the foregoing indemnities shall survive the resignation, replacement or removal of the Distribution Agent or the termination of this Agreement.  Any indemnity payments to the Distribution Agent arising from the indemnification provided by this <u>Paragraph 9</u> shall be initially satisfied from the Escrow Property to the extent available.  As among themselves, the Depositors agree that the costs of any such indemnification shall be borne on a *pro rata* basis by the Depositors in accordance with the percentage of the Escrow Property allocable to each of the Depositors pursuant to the Allocation Protocol or a letter of direction as described in clause (a) of <u>Paragraph 5</u>, and any Depositor or any of their Respective Affiliates paying in excess of its *pro rata* share of the cost of such indemnification shall have rights of contribution *vis-à-vis* any Depositor that has paid less than its *pro rata* share of such costs either directly to the Distribution Agent or by payment to another Depositor pursuant to this sentence; <u>provided</u>, that if the costs of any such indemnification arise from a breach of this Agreement or other fault of a Depositor, the Depositor(s) so in breach or at fault shall bear the cost of such indemnification and any Depositor paying in excess of its share of the cost of such indemnification, after taking into account the breach or fault of the other Depositors, shall have rights of contribution *vis-à-vis* any Depositor that has paid less than its share of such costs either directly to the Distribution Agent or by payment to another Depositor.  The indemnification provided by this <u>Paragraph 9</u> is in addition to the indemnification provided in <u>Paragraph 4(b)</u> and shall survive the resignation or removal of the Distribution Agent and the termination of this Agreement.

The duties and responsibilities of the Distribution Agent hereunder shall be determined solely by the express provisions of this Agreement, which shall be deemed purely ministerial in nature, and no other or further duties or responsibilities shall be implied.  The Distribution Agent shall not have any liability under, nor duty to inquire into, the terms and provisions of any agreement or instructions, including the Sale Agreements, the Side Agreement, the Transaction Documents, the Real Estate Terms and Conditions, the IFSA and the Allocation Protocol, other than as outlined in this Agreement, nor shall the Distribution Agent be required to

13

determine if any person or entity has complied with any such agreements, nor shall any additional obligations of the Distribution Agent be inferred from the terms of such agreements, even though reference thereto may be made in this Agreement.  In the event of any conflict between the terms and provisions of this Agreement, those of the Sale Agreements, any schedule or exhibit attached to the Sale Agreements, the Side Agreement, the Transaction Documents, the Real Estate Terms and Conditions, the IFSA, the Allocation Protocol, or any other agreement among Depositors, or any of them, the terms and conditions of this Agreement shall control solely to the extent such conflict is with respect to the rights, duties, obligations and liabilities of the Distribution Agent.

10.    Compensation of Distribution Agent.  The Depositors agree to reimburse the Distribution Agent all reasonable, documented out-of-pocket costs and out-of-pocket expenses, including reasonable attorneys' fees, suffered or incurred by the Distribution Agent in connection with the performance of its duties and obligations hereunder, including but not limited to any suit in interpleader brought by the Distribution Agent (which shall be brought only in a court of competent jurisdiction (as set forth in Paragraph 21 below)).  The Distribution Agent shall collect amounts due to it under this Paragraph 10 from the Distribution Account.

11.    Resignation or Removal of Distribution Agent.  The Distribution Agent may resign as such following the giving of thirty (30) days' prior written notice to the other parties hereto and upon selection of a successor escrow agent pursuant to the provisions of this Agreement.  Similarly, the Distribution Agent may be removed and replaced following the giving of thirty (30) days' prior written notice to the Distribution Agent by the Depositors and the Estate Fiduciaries.  In either event the Distribution Agent shall then deliver the balance of the Escrow Property then in its possession to a successor escrow agent as shall be appointed by the Depositors and the Estate Fiduciaries as evidenced by a written notice sent to the Distribution Agent and signed by the Depositors and the Estate Fiduciaries.

If the Depositors and the Estate Fiduciaries are unable to agree upon a successor or shall have failed to appoint a successor prior to the expiration of thirty (30) days following the date of notice of resignation or removal, the then-acting escrow agent may petition any court of competent jurisdiction (as set forth in Paragraph 21 below) for the appointment of a successor escrow agent or otherwise appropriate relief, and any such resulting appointment shall be binding upon all of the parties hereto. For the avoidance of doubt, the parties hereto acknowledge that under no circumstances shall any party hereto be entitled to obtain a distribution from the Distribution Account as a result of the resignation of the Distribution Agent.

The successor escrow agent shall be a bank or trust company having assets in excess of US$5,000,000,000.

Upon acknowledgement by any successor escrow agent of the receipt of the then-remaining balance of the Escrow Property, the then-acting escrow agent shall be fully released and relieved of all duties, responsibilities and obligations under this Agreement.

14

Any corporation into which the Distribution Agent in its individual capacity may be merged or converted or with which it may be consolidated, or any corporation resulting from any merger, conversion or consolidation to which the Distribution Agent in its individual capacity shall be a party, or any corporation to which substantially all the corporate trust business of the Distribution Agent in its individual capacity may be transferred, shall be the Distribution Agent under this Agreement without further act.

12. <u>Notices</u>. All communications hereunder shall be in writing and shall be deemed to be duly given and received: (i) upon delivery, if delivered personally, or upon confirmed transmittal, if by facsimile; (ii) on the next Business Day if sent by overnight courier; or (iii) four (4) Business Days after mailing if mailed by prepaid registered mail, return receipt requested, to the appropriate notice address set forth in <u>Schedule F</u> or at such other address as any party hereto may have furnished to the other parties hereto in writing by registered mail, return receipt requested.

Notwithstanding the above, in the case of communications delivered to the Distribution Agent pursuant to (i), (ii) or (iii) of this <u>Paragraph 12</u>, such communications shall be deemed to have been given on the date received by an officer of the Distribution Agent or any employee of the Distribution Agent who reports directly to any such officer at the above-referenced office. In the event that the Distribution Agent, in its sole discretion, shall determine that an emergency exists, the Distribution Agent may use such other means of communication as the Distribution Agent deems appropriate.

In the event wire transfer instructions are given (other than in writing at the time of execution of this Agreement), whether in writing, by facsimile or otherwise, the Distribution Agent is authorized to seek confirmation of such instructions by telephone call-back to the person or persons designated on <u>Schedule G</u> hereto (each an "**Authorized Representative**" of the applicable Depositor), and the Distribution Agent may rely upon the confirmations of anyone purporting to be the person or persons so designated. The persons and telephone numbers for call-backs may be changed only in writing actually received and acknowledged by the Distribution Agent, it being understood that each Depositor shall have the right to replace its Authorized Representative from time to time by providing written notice to the Distribution Agent, the other Depositors, the Estate Fiduciaries and the Bondholder Group or by providing a copy of a court order of a court of competent jurisdiction (as provided in <u>Paragraph 21</u> below) to the Distribution Agent designating a successor Authorized Representative. The Depositors acknowledge that such security procedure is commercially reasonable.

If, at any time prior to the termination of this Agreement, any of the Estate Fiduciaries is discharged, removed or dissolved, whether pursuant to an approved plan of reorganization or liquidation by order of the Canadian Court or U.S. Bankruptcy Court or otherwise, any Depositor or Estate Fiduciary may present to the Distribution Agent evidence of such discharge, removal or dissolution in the form of a court order or other officially certified document which upon receipt by the Distribution Agent shall constitute an effective amendment to this Agreement, and such Estate Fiduciary by operation of this Agreement, as amended, shall cease to be such for all purposes of this Agreement and the consent of such removed or dissolved Estate Fiduciary shall no longer be required for any purposes hereunder. If such discharge, removal or dissolution provides for a successor to the duties and responsibilities of such removed

15

or dissolved Estate Fiduciary, or a successor to the same or substantially similar duties and responsibilities of such removed or dissolved Estate Fiduciary (including, without limitation, a trustee in bankruptcy) is otherwise appointed, then the preceding sentence shall be of no effect with respect to such successor entity, the rights and responsibilities of such Estate Fiduciary hereunder shall pass automatically to such successor entity and such successor entity shall be deemed to be a party to this Agreement as if it were a signatory hereto.

If, at any time prior to the termination of this Agreement, any of the Depositors is liquidated or dissolved, whether pursuant to an approved plan of reorganization or liquidation by order of the Canadian Court or U.S. Bankruptcy Court (or, in the case of the EMEA Sellers, such order of a court of competent jurisdiction or by operation of law) or otherwise, any Depositor, or Estate Fiduciary (as the case may be) shall present to the Distribution Agent evidence of such dissolution or liquidation in the form of a court order or other officially certified document which upon receipt by the Distribution Agent shall constitute an effective amendment to this Agreement, and such dissolved or liquidated Depositor by operation of this Agreement, as so amended, shall cease to be such for all purposes of this Agreement, as amended, and the consent of such dissolved or liquidated Depositor shall no longer be required for any purposes hereunder. If such dissolution or liquidation provides for a successor to such dissolved or liquidated Depositor, then such rights and responsibilities shall pass automatically to such successor entity.

The Depositors represent, warrant and covenant that each document, notice, instruction or request provided by such party to the Distribution Agent shall comply with applicable laws and regulations. Where, however, the conflicting provisions of any such applicable law may be waived, they are hereby irrevocably waived by the Depositors to the fullest extent permitted by law, to the end that this Agreement shall be enforced as written.

13.    Counterparts. This Agreement may be executed in any number of counterparts, each of which shall be deemed to be an original, but such counterparts shall constitute one and the same agreement. Facsimile copies may be deemed originals for the purpose of this Agreement.

14.    Paragraph Headings. The paragraph headings of this Agreement are for convenience of reference only and shall not be deemed to limit or affect any of the provisions hereof.

15.    Amendments; No Waivers.

(a)    Except for the resignation, removal or replacement of an Estate Fiduciary as set forth in Paragraph 12 or the liquidation or dissolution of a Depositor as set forth in Paragraph 12, any provision of this Agreement may be waived or amended if, and only if, such amendment or waiver is in writing and is signed by the Depositors, the Estate Fiduciaries and the Distribution Agent (with a copy thereof to the Bondholder Group) and, if prior to the entry of a final decree closing the Bankruptcy Cases, such amendment or waiver is approved by both the U.S. Bankruptcy Court and the Canadian Court; provided, however, that (i) court approval shall not be required of any applicable court (whether the U.S. Bankruptcy Court or the Canadian Court) if a final decree closing the Bankruptcy Cases pending before such court shall have been entered by such court and (ii) court approval shall not be required of any court if final decrees

terminating the Bankruptcy Cases shall have been entered by the U.S. Bankruptcy Court and the Canadian Court.

(b)     No failure by any party hereto to insist upon the strict performance of any covenant, duty, agreement or condition of this Agreement, or to exercise any right or remedy consequent upon a breach hereof, shall constitute a waiver of any such breach or any other covenant, duty, agreement or condition hereof.

16.     <u>Entire Agreement; No Third Party Beneficiaries</u>.  This Agreement (including any exhibits, schedules and amendments hereto) and (solely with respect to the Depositors that are parties thereto) the North American ASA, the EMEA ASA, the Transition Services Agreement, the Side Agreement, the IFSA, the Appropriate License Termination (as defined in the IFSA), the Indenture and the Allocation Protocol to be entered into pursuant thereto (a) constitute the entire Agreement and understandings of the parties hereto and supersedes all prior agreements and understandings, both written and oral, among the parties hereto with respect to the subject matter hereof and (b) is not intended to confer upon any other Person any rights or remedies hereunder; <u>provided</u>, <u>however</u>, that the Joint Administrators and the Joint Israeli Administrators shall be entitled to enforce and take the benefit of <u>Paragraph 20</u> hereof.

17.     <u>Governing Law</u>.  Subject to <u>Paragraph 20</u>, this Agreement shall be governed by and construed in accordance with the Laws of the State of New York (without regard to the rules of conflict of laws of the State of New York or any other jurisdiction).

18.     <u>Account Opening Information</u>.  To help the government fight the funding of terrorism and money laundering activities, Federal law requires all financial institutions to obtain, verify, and record information that identifies each person who opens an account.   When an account is opened, the Distribution Agent will ask for information that will allow it to identify relevant parties.

19.     <u>Severability</u>.  If any provision of this Agreement is determined by a court of competent jurisdiction (as set forth in <u>Paragraph 21</u> below) to be prohibited or unenforceable by reason of any applicable law of a jurisdiction, then such provision shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions thereof, and any such prohibition or unenforceability in such jurisdiction shall not invalidate or render unenforceable such provisions in any other jurisdiction.

20.     <u>Exclusion of Liability for the Joint Administrators, the Joint Israeli Administrators and the NNSA Office Holders</u>.

(a)     Subject to Paragraph 20(b) below, the parties hereto agree that the Joint Administrators, the Joint Israeli Administrators and the NNSA Office Holders have negotiated this Agreement both in their respective capacities as administrators, in the case of the Joint Administrators, of the EMEA Debtors, in the case of the Joint Israeli Administrators, of the Israeli Company, and, in the case of the NNSA Office Holders, of NNSA, and for and on behalf

of, in the case of the Joint Administrators, the EMEA Debtors, in the case of the Joint Israeli Administrators, the Israeli Company, and, in the case of the NNSA Office Holders, NNSA, and that none of the Joint Administrators, the Joint Israeli Administrators, the NNSA Office Holders or their respective firm, partners, employees, advisers, representatives or agents shall incur any personal liability whatsoever whether on their own part or in respect of any failure on the part of any EMEA Debtor, NNSA, or the Israeli Company, as applicable, to observe, perform or comply with any of its obligations under this Agreement or under or in relation to any associated arrangements or negotiations whether such liability would arise under Paragraph 99(4) of Schedule B1 to the Insolvency Act, the Israeli Companies Law or otherwise howsoever.

(b)     Nothing in this Section 20 or any other provision of this Agreement shall prevent the Sellers or the Distribution Agent from bringing any action against the EMEA Debtors, NNSA, the Israeli Company, the Joint Administrators, the Joint Israeli Administrators or the NNSA Office Holders for fraud.

(c)     Notwithstanding anything in Paragraph 21, (i) any claim, action or proceeding against the Joint Administrators in their personal capacities (and not as agents for any EMEA Debtor) under this Agreement shall be governed exclusively by English law and subject to the exclusive jurisdiction of the English Courts; (ii) any claim, action or proceeding against the Joint Israeli Administrators (and not as agents for the Israeli Company) under this Agreement shall be governed exclusively by the laws of the State of Israel and subject to the exclusive jurisdiction of the Israeli Courts; and (iii) any claim, action or proceeding against the NNSA Office Holders in their personal capacities (and not as agents for NNSA) under this Agreement shall be governed by the laws of France and subject to the exclusive jurisdiction of the French courts.

21.     JURISDICTION.  SUBJECT TO PARAGRAPH 20, FOR ANY CLAIM, ACTION OR PROCEEDING ARISING UNDER OR OUT OF, IN RESPECT OF, OR IN CONNECTION WITH THIS AGREEMENT, EACH PARTY HERETO HEREBY IRREVOCABLY SUBMITS TO AND ACCEPTS FOR ITSELF AND ITS PROPERTIES, GENERALLY AND UNCONDITIONALLY TO THE EXCLUSIVE JURISDICTION OF AND SERVICE OF PROCESS PURSUANT TO THE RULES OF BOTH (I) THE U.S. BANKRUPTCY COURT AND THE CANADIAN COURT, IF SUCH CLAIM, ACTION OR PROCEEDING IS BROUGHT PRIOR TO THE ENTRY OF A FINAL DECREE CLOSING THE BANKRUPTCY CASES INVOLVING THE RELEVANT DEPOSITORS PENDING BEFORE SUCH COURTS, INCLUDING THAT CERTAIN CROSS-BORDER INSOLVENCY PROTOCOL APPROVED BY THE U.S. BANKRUPTCY COURT PURSUANT TO SECTION 105(a) OF THE BANKRUPTCY CODE IN AN ORDER DATED JANUARY 15, 2009 AND BY THE CANADIAN COURT PURSUANT TO AN ORDER DATED JANUARY 14, 2009, AS AMENDED OR AS AMENDED AND RESTATED FROM TIME TO TIME, AND (II) THE FEDERAL COURTS IN THE SOUTHERN DISTRICT OF NEW YORK AND THE STATE COURTS OF THE STATE OF NEW YORK, COUNTY OF NEW YORK (COLLECTIVELY, THE "NEW YORK COURTS"), IF BROUGHT AFTER ENTRY OF SUCH FINAL DECREE CLOSING SUCH BANKRUPTCY

CASES INVOLVING THE RELEVANT DEPOSITORS PENDING BEFORE THE US BANKRUPTCY COURT OR THE CANADIAN COURT, WAIVES ANY DEFENSE OF FORUM NON CONVENIENS AND AGREES TO BE BOUND BY ANY JUDGMENT RENDERED THEREBY ARISING UNDER OR OUT OF, IN RESPECT OF, OR IN CONNECTION WITH THIS AGREEMENT. EXCEPT AS PROVIDED IN THE FOREGOING NO PARTY HERETO SHALL INITIATE ANY CLAIM, ACTION OR PROCEEDING ARISING UNDER OR OUT OF, IN RESPECT OF, OR IN CONNECTION WITH THIS AGREEMENT IN ANY OTHER STATE OR FEDERAL COURT IN THE UNITED STATES OF AMERICA, CANADA OR ANY COURT IN ANY OTHER COUNTRY. EACH PARTY FURTHER IRREVOCABLY DESIGNATES AND APPOINTS THE INDIVIDUAL IDENTIFIED PURSUANT TO PARAGRAPH 12 HEREOF (OR, IN THE CASE THAT A SUCCESSOR PERSON IS APPOINTED AS AUTHORIZED REPRESENTATIVE PURSUANT TO PARAGRAPH 12, SUCH SUCCESSOR PERSON) TO RECEIVE NOTICES ON ITS BEHALF, AS ITS AGENT TO RECEIVE ON ITS BEHALF SERVICE OF ALL PROCESS IN ANY SUCH CLAIM, ACTION OR PROCEEDING BEFORE ANY BODY, SUCH SERVICE BEING HEREBY ACKNOWLEDGED TO BE EFFECTIVE AND BINDING SERVICE IN EVERY RESPECT. A COPY OF ANY SUCH PROCESS SO SERVED SHALL BE MAILED BY REGISTERED MAIL TO EACH PARTY AT ITS ADDRESS PROVIDED PURSUANT TO PARAGRAPH 12; PROVIDED THAT, UNLESS OTHERWISE PROVIDED BY APPLICABLE LAW, ANY FAILURE TO MAIL SUCH COPY SHALL NOT AFFECT THE VALIDITY OF THE SERVICE OF SUCH PROCESS. IF ANY AGENT SO APPOINTED REFUSES TO ACCEPT SERVICE, THE DESIGNATING PARTY HEREBY AGREES THAT SERVICE OF PROCESS SUFFICIENT FOR PERSONAL JURISDICTION IN ANY CLAIM, ACTION OR PROCEEDING AGAINST IT IN THE APPLICABLE JURISDICTION MAY BE MADE BY REGISTERED OR CERTIFIED MAIL, RETURN RECEIPT REQUESTED, TO ITS ADDRESS PROVIDED PURSUANT TO PARAGRAPH 12. EACH PARTY HEREBY ACKNOWLEDGES THAT SUCH SERVICE SHALL BE EFFECTIVE AND BINDING IN EVERY RESPECT. NOTHING HEREIN SHALL AFFECT THE RIGHT TO SERVE PROCESS IN ANY OTHER MANNER PERMITTED BY LAW OR SHALL LIMIT THE RIGHT OF ANY PARTY TO BRING ANY CLAIM, ACTION OR PROCEEDING AGAINST THE OTHER PARTY IN ANY OTHER JURISDICTION. NOTWITHSTANDING ANYTHING IN THIS PARAGRAPH 21 TO THE CONTRARY, ANY CLAIM, ACTION OR PROCEEDING SET FORTH IN PARAGRAPH 20 SHALL BE BROUGHT EXCLUSIVELY IN THE COURT CONTEMPLATED IN PARAGRAPH 20. FINALLY, REGARDLESS OF THE JURISDICTION OF THE APPLICABLE COURT, THE PARTIES FURTHER HEREBY WAIVE ANY RIGHT TO A TRIAL BY JURY WITH RESPECT TO ANY LAWSUIT OR JUDICIAL PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT.

22.    <u>Interpretation</u>.  As used in this Agreement (including all exhibits, schedules and amendments hereto), the masculine, feminine or neuter gender and the singular or plural number shall be deemed to include the others whenever the context so requires. References to Paragraphs and Articles refer to sections and articles of this Agreement, unless the context otherwise requires. Words such as "herein," "hereinafter," "hereof," "hereto," "hereby" and "hereunder," and words of like import, unless the context requires otherwise, refer to this Agreement. The captions contained herein are for convenience only and shall not control or affect the meaning or construction of any provision of this Agreement.

23.    <u>Compliance with Court Orders</u>.  In the event that any of the Escrow Property shall be attached, garnished or levied upon by any court order, or the distribution or disbursement thereof shall be stayed or enjoined by an order of a court of competent jurisdiction (as set forth in <u>Paragraph 21</u> above), or any order, judgment or decree shall be made or entered by any court order affecting the property deposited under this Agreement, the Distribution Agent is hereby expressly authorized, in its sole discretion, to obey and comply with all writs, orders or decrees so entered or issued, which it is advised by legal counsel of its own choosing is binding upon it, whether with or without jurisdiction, and in the event that the Distribution Agent obeys or complies with any such writ, order or decree it shall not be liable to any of the parties hereto or to any other person, firm or corporation, by reason of such compliance notwithstanding such writ, order or decree be subsequently reversed, modified, annulled, set aside or vacated.

24.    <u>Force Majeure</u>.   In the event that any party hereto or the Distribution Agent is unable to perform its obligations under the terms of this Agreement because of acts of God, strikes, equipment or transmission failure or damage reasonably beyond its control, or other cause reasonably beyond its control, the Distribution Agent shall not be liable for damages to the other parties for any damages resulting from such failure to perform otherwise from such causes.  Performance under this Agreement shall resume when the Distribution Agent is able to perform substantially.

25.    <u>Patriot Act Disclosure</u>.   Section 326 of the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 (the "**USA PATRIOT Act**") requires the Distribution Agent to implement reasonable procedures to verify the identity of any person that opens a new account with it.  Accordingly, each Depositor acknowledges that Section 326 of the USA PATRIOT Act and the Distribution Agent's identity verification procedures require the Distribution Agent to obtain information which may be used to confirm such Depositor's identity including without limitation name, address and organizational documents ("**Identifying Information**").  Each Depositor agrees to provide the Distribution Agent with and consent to the Distribution Agent obtaining from third parties any such Identifying Information with respect to it required as a condition of opening an account with or using any service provided by the Distribution Agent.

26.    <u>Taxpayer Identification Numbers ("**TIN**")</u>.  Each Depositor will provide the Distribution Agent with its fully executed Internal Revenue Service ("**IRS**") Form W-8, or W-9 and/or other required documentation as set forth in <u>Paragraph 4(a)</u>.  Each Depositor providing such documentation represents that its correct TIN assigned by the IRS, or any other taxing authority, shall be set forth in the delivered forms.

27.    <u>Allocation Protocol</u>.  The Depositors and the Estate Fiduciaries agree and acknowledge that nothing in this Agreement including, without limitation, <u>Paragraph 5(g)</u>, shall prejudice any pre-existing rights or obligations of any of the Depositors and the Estate Fiduciaries to argue the appropriateness of any allocation of the Escrow Property before a dispute resolver(s) appointed pursuant to the Allocation Protocol.  Without limitation to the foregoing, the Depositors' interest allocation percentages set forth on Exhibit 1 are not indicative of the final allocation of the Escrow Property and shall not be presented by any of the Depositors and the Estate Fiduciaries in any of their submissions (whether in writing or orally) as to the appropriate allocation of the Escrow Property before the dispute resolver(s) appointed pursuant to the Allocation Protocol.  Furthermore, the Depositors and the Estate Fiduciaries agree that (i) the Nortel Columbia Local Sales Allocation was agreed to solely for the purpose of complying with local law requirements and to facilitate the closing of the transactions contemplated by the North American ASA and the EMEA ASA and such allocation shall have no precedential impact on the allocation of the Escrow Property to any other Depositor or any other sales proceeds before a dispute resolver appointed pursuant to the Allocation Protocol and (ii) any consideration paid pursuant to or evidenced by any Local Sale Agreement (other than the Nortel Columbia Local Sales Allocation) or that certain MEN Argentina Side Agreement entered into on March **[19]**, 2010 were agreed to solely for the purpose of complying with local law requirements and to facilitate the closing of the transactions contemplated by the North American ASA and the EMEA ASA and such consideration shall have no precedential impact on the allocation of the Escrow Property to any Depositor of any sales proceeds before a dispute resolver appointed pursuant to the Allocation Protocol.

28.    <u>Exclusion of Liability for Estate Fiduciaries</u>.  The Depositors and the Distribution Agent agree that (a) each of the Estate Fiduciaries has negotiated and is entering into this Agreement as a representative of its applicable creditor constituency for the purpose of benefiting from the rights being granted hereunder and to allow the Distribution Agent to be able to rely on any joint instructions signed by the Estate Fiduciaries and (b) none of the Estate Fiduciaries, their firms, members or affiliates of such parties and such parties respective partners, associates, employees, advisers, representatives or agents shall incur any liability whatsoever under this Agreement.

IN WITNESS WHEREOF, each of the parties hereto has caused this Agreement to be executed on the day and year first above written.

NORTEL NETWORKS LIMITED                    NORTEL NETWORKS CORPORATION

By:_____        By:_____
Name:                                      Name:
Title:                                     Title:

By:_____        By:_____
Name:                                      Name:
Title:                                     Title:

NORTEL NETWORKS INC.                        DISTRIBUTION AGENT

By:_____            JPMorgan Chase Bank, N.A., as Distribution
Name:                                      Agent
Title:

                                           By:_____
                                           Name:
                                           Title:

ERNST & YOUNG INC. IN ITS CAPACITY          THE OFFICIAL COMMITTEE OF
AS THE MONITOR OF NORTEL                     UNSECURED CREDITORS OF NORTEL
NETWORKS CORPORATION ET AL.,                 NETWORKS INC., ET. AL.
AND NOT IN ITS PERSONAL CAPACITY
                                            By:  Flextronics Corporation, solely in its
                                            capacity as Chair of the Committee and not in
                                            its individual capacity,

By:_____            By:_____
Name:                                      Name:  Timothy Burling
Title:                                     Title:   Vice President, Finance

DOCSTOR: 1843462\14

**SIGNED** in the name and on behalf of **NORTEL NETWORKS TECHNOLOGY CORPORATION** by

NORTEL NETWORKS LIMITED, as Representative

By:_____
Name:
Title:

By:_____
Name:
Title:

**SIGNED** in the name and on behalf of **NORTEL NETWORKS DE COLOMBIA S.A.** by

NORTEL NETWORKS LIMITED, as Representative

By:_____
Name:
Title:

By:_____
Name:
Title:

**SIGNED** in the name and on behalf of **NORTEL NETWORKS DE MEXICO S.A. DE C.V.** by

NORTEL NETWORKS LIMITED, as Representative

By:_____
Name:
Title:

By:_____
Name:
Title:

**SIGNED** in the name and on behalf of **NORTEL DE MEXICO S. DE R.L. DE C.V.** by

NORTEL NETWORKS LIMITED, as Representative

By:_____
Name:
Title:

By:_____
Name:
Title:

**SIGNED** in the name and on behalf of **NORTEL NETWORKS PERU S.A.C.** by

NORTEL NETWORKS LIMITED, as Representative

By:_____
Name:
Title:

By:_____
Name:
Title:

**SIGNED** in the name and on behalf of **NORTEL NETWORKS AUSTRALIA PTY. LIMITED** by

NORTEL NETWORKS LIMITED, as Representative

By:_____
Name:
Title:

By:_____
Name:
Title:

**SIGNED** in the name and on behalf of **PT NORTEL NETWORKS INDONESIA** by

NORTEL NETWORKS LIMITED, as Representative

By:_____
Name:
Title:


By:_____
Name:
Title:


**SIGNED** in the name and on behalf of **NORTEL NETWORKS MALAYSIA SDN. BHD.** by

NORTEL NETWORKS LIMITED, as Representative

By:_____
Name:
Title:


By:_____
Name:
Title:


**SIGNED** in the name and on behalf of **NORTEL NETWORKS NEW ZEALAND LIMITED**
by

NORTEL NETWORKS LIMITED, as Representative

By:_____
Name:
Title:


By:_____
Name:
Title:

**SIGNED** in the name and on behalf of **NORTEL NETWORKS SINGAPORE PTE. LIMITED** by

NORTEL NETWORKS LIMITED, as Representative

By:_____
Name:
Title:

By:_____
Name:
Title:

**SIGNED** in the name and on behalf of **NORTEL NETWORKS SINGAPORE PTE. LIMITED** on behalf of **NORTEL NETWORKS SINGAPORE PTE. LIMITED – PHILIPPINES BRANCH** by

NORTEL NETWORKS LIMITED, as Representative

By:_____
Name:
Title:

By:_____
Name:
Title:

**SIGNED** in the name and on behalf of **NORTEL NETWORKS (ASIA) LIMITED** by

NORTEL NETWORKS LIMITED, as Representative

By:_____
Name:
Title:

By:_____
Name:
Title:

**SIGNED** in the name of and on behalf of **NORTEL NETWORKS (ASIA) LIMITED** on behalf of **NORTEL NETWORKS (ASIA) LIMITED – PAKISTAN BRANCH** by,

NORTEL NETWORKS LIMITED, as Representative

By:_____
Name:
Title:

By:_____
Name:
Title:

**SIGNED** in the name of and on behalf of **NORTEL NETWORKS (ASIA) LIMITED** on behalf of **NORTEL NETWORKS (ASIA) LIMITED – TAIWAN BRANCH** by,

NORTEL NETWORKS LIMITED, as Representative

By:_____
Name:
Title:

By:_____
Name:
Title:

**SIGNED** in the name and on behalf of **NORTEL NETWORKS (CHINA) LIMITED** by

NORTEL NETWORKS LIMITED, as Representative

By:_____
Name:
Title:

By:_____
Name:
Title:

**SIGNED** in the name and on behalf of **NORTEL NETWORKS (THAILAND) LIMITED** by

NORTEL NETWORKS LIMITED, as Representative

By:_____
Name:
Title:

By:_____
Name:
Title:

**SIGNED** in the name and on behalf of **NORTEL VIETNAM LIMITED** by

NORTEL NETWORKS LIMITED, as Representative

By:_____
Name:
Title:

By:_____
Name:
Title:

**SIGNED** in the name and on behalf of **NORTEL NETWORKS TELECOMMUNICATIONS EQUIPMENT (SHANGHAI) CO. LIMITED** by

NORTEL NETWORKS LIMITED, as Representative

By:_____
Name:
Title:

By:_____
Name:
Title:

**SIGNED** in the name and on behalf of **NORTEL NETWORKS DE ARGENTINA S.A.** by

NORTEL NETWORKS LIMITED, as Representative

By: _____
Name:
Title:

By: _____
Name:
Title:

**SIGNED** in the name and on behalf of **NORTEL NETWORKS DE ECUADOR S.A.** by

NORTEL NETWORKS LIMITED, as Representative

By: _____
Name:
Title:

By: _____
Name:
Title:

**SIGNED** in the name and on behalf of **SHENYANG NORTEL TELECOMMUNICATIONS CO., LTD.** by

NORTEL NETWORKS LIMITED, as Representative

By: _____
Name:
Title:

By: _____
Name:
Title:

**SIGNED** in the name and on behalf of **NORTEL NETWORKS DE GUATEMALA LTDA.** by

NORTEL NETWORKS INC., as Representative

By:_____
Name:
Title:

**SIGNED** in the name and on behalf of **NORTEL NETWORKS (CALA) INC.** by

NORTEL NETWORKS INC., as Representative

By:_____
Name:
Title:

**SIGNED** in the name and on behalf of **NORTEL TRINIDAD & TOBAGO LIMITED** by

NORTEL NETWORKS INC., as Representative

By:_____
Name:
Title:

**SIGNED** in the name and on behalf of **NORTEL NETWORKS KABUSHIKI KAISHA** by

NORTEL NETWORKS INC., as Representative

By:_____
Name:
Title:

**SIGNED** in the name and on behalf of **QTERA CORPORATION** by

NORTEL NETWORKS INC., as Representative


By:_____
Name:
Title:

**SIGNED** in the name and on behalf of **XROS, INC.** by

NORTEL NETWORKS CORPORATION, as Representative


By:_____
Name:
Title:


By:_____
Name:
Title:


**SIGNED** in the name and on behalf of **CORETEK, INC.** by

NORTEL NETWORKS CORPORATION, as Representative


By:_____
Name:
Title:


By:_____
Name:
Title:

**SIGNED** for and on behalf of **Nortel Networks**    )    ....................................................................
**UK Limited** (in administration) by Christopher    )    Christopher Hill
Hill    )
as Joint Administrator (acting as agent and    )
without personal liability) in the presence of:

Witness signature

....................................................................    )
Name: Emma Burnett    )
Address: Herbert Smith LLP, Exchange House,    )
London, EC2A 2HS, England


**SIGNED** for and on behalf of **Nortel GmbH**    )    ....................................................................
(in administration) by Christopher Hill    )    Christopher Hill
as Joint Administrator (acting as agent and    )
without personal liability) in the presence of:    )

Witness signature

....................................................................    )
Name: Emma Burnett    )
Address: Herbert Smith LLP, Exchange House,    )
London, EC2A 2HS, England

S-1

**SIGNED** for and on behalf of **Nortel Networks** )          ....................................................................
**SpA** (in administration) by Christopher Hill  )          Christopher Hill
as Joint Administrator (acting as agent and   )
without personal liability) in the presence of:  )


Witness signature

....................................................................  )
Name: Emma Burnett                   )
Address: Herbert Smith LLP, Exchange House,   )
London, EC2A 2HS, England

**SIGNED** for and on behalf of **Nortel Networks** )          ....................................................................
**Hispania S.A.** (in administration) by      )          Christopher Hill
Christopher Hill as Joint Administrator (acting  )
as agent and without personal liability) in the  )
presence of:                     )


Witness signature

....................................................................  )
Name: Emma Burnett                   )
Address: Herbert Smith LLP, Exchange House,   )
London, EC2A 2HS, England

**SIGNED** for and on behalf of **Nortel Networks** )          ....................................................................
**B.V.** (in administration) by Christopher Hill  )          Christopher Hill
as Joint Administrator (acting as agent and   )
without personal liability) in the presence of:  )


Witness signature

....................................................................  )
Name: Emma Burnett                   )
Address: Herbert Smith LLP, Exchange House,   )
London, EC2A 2HS, England

**SIGNED** for and on behalf of **Nortel Networks**          )          ..............................................................
**AB** (in administration) by Christopher Hill          )          Christopher Hill
as Joint Administrator (acting as agent and          )
without personal liability) in the presence of:          )


Witness signature

..............................................................          )
Name: Emma Burnett          )
Address: Herbert Smith LLP, Exchange House,          )
London, EC2A 2HS, England


**SIGNED** for and on behalf of **Nortel Networks**          )          ..............................................................
**N.V.** (in administration) by Christopher Hill          )          Christopher Hill
as Joint Administrator (acting as agent and          )
without personal liability) in the presence of:          )


Witness signature

..............................................................          )
Name:  Emma Burnett          )
Address: Herbert Smith LLP, Exchange House,          )
London, EC2A 2HS, England

**SIGNED** for and on behalf of **Nortel Networks**   )   ............................................................................
**(Austria) GmbH** (in administration) by   )   Christopher Hill
Christopher Hill as Joint Administrator (acting   )
as agent and without personal liability) in the   )
presence of:

Witness signature

............................................................................   )
Name:  Emma Burnett   )
Address: Herbert Smith LLP, Exchange House,   )
London, EC2A 2HS, England

**SIGNED** for and on behalf of **Nortel Networks**   )   ............................................................................
**Portugal S.A.** (in administration) by   )   Christopher Hill
Christopher Hill as Joint Administrator (acting   )
as agent and without personal liability) in the   )
presence of:

Witness signature

............................................................................   )
Name: Emma Burnett   )
Address: Herbert Smith LLP, Exchange House,   )
London, EC2A 2HS, England

**SIGNED** for and on behalf of **Nortel Networks** ) ...........................................................................
**s.r.o.** (in administration) by Christopher Hill ) Christopher Hill
)
as Joint Administrator (acting as agent and )
without personal liability) in the presence of:


Witness signature

...........................................................................  )
Name: Emma Burnett )
Address: Herbert Smith LLP, Exchange House, )
London, EC2A 2HS, England

**SIGNED** for and on behalf of **Nortel Networks**
**Polska Sp. z.o.o.** (in administration) by
Christopher Hill as Joint Administrator (acting
as agent and without personal liability) in the
presence of:

)
)
)
)

..............................................................
Christopher Hill

Witness signature

..............................................................
Name: Emma Burnett
Address: Herbert Smith LLP, Exchange House,
London, EC2A 2HS, England

)
)
)

**SIGNED** for and on behalf of **Nortel Networks**    )    ...........................................................................

**France S.A.S.** (in administration) by Kerry    )    Kerry Trigg

Trigg acting as authorised representative for    )

Christopher Hill as Joint Administrator (acting    )

as agent and without personal liability) in the    )

presence of:

Witness signature

...........................................................................    )

Name:    )

Address:    )

**SIGNED** outside of the Republic of Ireland for )          ...............................................................
and on behalf of **Nortel Networks (Ireland)**       )          Alan Bloom
**Limited** (in administration) by Alan Bloom in    )
the presence of:                                                      )          Location: London


Witness signature

...............................................................    )
Name: Emma Burnett                                       )
Address: Herbert Smith LLP, Exchange House,   )
London, EC2A 2HS, England

**SIGNED** by John Freebairn )   ..............................................................

duly authorised for and on behalf of **Nortel** )   John Freebairn

**Networks (Northern Ireland) Limited** in the )

presence of: )

Witness signature

..............................................................  )

Name: )

Address: )

**SIGNED** by                                      )        .............................................................................

duly authorised for and on behalf of **o.o.o.**    )

**Nortel Networks** in the presence of:            )


Witness signature

.............................................................    )

Name:                                              )

Address:                                           )

**SIGNED** by Sharon Rolston                )      .............................................................................

duly authorised for and on behalf of **Nortel**       )      Sharon Rolston

**Networks AG** in the presence of:        )

Witness signature

.............................................................        )

Name:                                       )

Address:                                    )

**SIGNED** for and on behalf of **Nortel Networks** )
**Israel (Sales and Marketing) Limited** (in )        .............................................................................
administration) by Yaron Har-Zvi and Avi D. )        Yaron Har-Zvi
Pelossof as Joint Israeli Administrators (acting
jointly and without personal liability) in )        .............................................................................
connection with the Israeli Assets  and )        Avi D. Pelossof
Liabilities: )
 )
 )


Witness signature

............................................................................. )
Name: )
Address: )

**SIGNED** by Christopher Hill                )      ..............................................................

                                                             )      Christopher Hill

in his own capacity and on behalf of the Joint    )
Administrators without personal liability and
solely for the benefit of the provisions of this
Agreement expressed to be conferred on or
given to the Joint Administrators:

Witness signature

..............................................................    )
Name: Emma Burnett                                )
Address: Herbert Smith LLP, Exchange House,    )
London, EC2A 2HS, England

**SIGNED** by Yaron Har-Zvi                )          ...........................................................................

                                                                      )          Yaron Har-Zvi

in his own capacity and on behalf of the Joint      )
Israeli Administrators without personal liability
and solely for the benefit of the provisions of
this Agreement expressed to be conferred on or
given to the Joint Israeli Administrators:

Witness signature

..............................................................................          )
Name:                                                                          )
Address:                                                                      )

**SIGNED** by Avi D. Pelossof                    )       ............................................................................

                                                )       Avi D. Pelossof

in his own capacity and on behalf of the Joint   )
Israeli Administrators without personal liability
and solely for the benefit of the provisions of
this Agreement expressed to be conferred on or
given to the Joint Israeli Administrators:

Witness signature

............................................................................       )
Name:                                            )
Address:                                         )

**SIGNED** for and on behalf of **NORTEL NETWORKS SA (IN ADMINISTRATION)** by **COSME ROGEAU** as liquidator (acting as agent and without personal liability) and

)
)
)
)

…………………………………………..
Cosme Rogeau

by **FRANCK MICHEL** as administrator (acting as agent and without personal liability) in the presence of:

)
)
)
)

…………………………………………..
Franck Michel

Witness signature

…………………………………………
Name:
Address:

**SCHEDULE A**
**OTHER SELLERS**

Nortel Networks Technology Corporation

Nortel Networks (CALA) Inc.

Nortel de Mexico S. de R.L. de C.V.

Nortel Networks de Mexico S.A. de C.V.

Nortel Networks de Guatemala Ltda

Nortel Networks de Argentina S.A.

Nortel Networks de Columbia S.A.

Nortel Networks Peru S.A.C.

Nortel Networks de Ecuador S.A.

Nortel Networks Kabushiki Kaisha

Nortel Networks (Asia) Limited

Nortel Networks Singapore Pte. Ltd

Nortel Vietnam Limited

Nortel Networks (Thailand) Limited

Nortel Networks Malaysia Sdn. Bhd

Nortel Networks Australia Pty. Limited

Nortel Networks New Zealand Limited

Nortel Networks (China) Limited

Nortel Networks (Asia) Limited – Pakistan Branch

Nortel Networks Singapore Pte. Ltd – Philippines Branch

Nortel Networks Telecommunications Equipment (Shanghai) Co. Limited

Nortel Trinidad and Tobago Limited

Nortel Networks (Asia) Limited – Taiwan Branch

PT Nortel Networks Indonesia

Qtera Corporation

CoreTek, Inc.

Xros, Inc.

DOCSTOR: 1843462\14

## SCHEDULE B

## EMEA SELLERS

Nortel Networks UK Limited (In Administration)

Nortel GmbH (In Administration)

Nortel Networks S.p.A. (In Administration)

Nortel Networks Hispania, S.A. (In Administration)

Nortel Networks B.V. (In Administration)

Nortel Networks AB (In Administration)

Nortel Networks N.V. (In Administration)

Nortel Networks (Austria) GmbH (In Administration)

Nortel Networks Polska Sp. z.o.o. (In Administration)

Nortel Networks Portugal S.A. (In Administration)

Nortel Networks s.r.o. (In Administration)

Nortel Networks France S.A.S. (In Administration)

Nortel Networks (Ireland) Limited (In Administration)

Nortel Networks (Northern Ireland) Limited

Nortel Networks o.o.o.

Nortel Networks A.G.


## ISRAELI COMPANY

Nortel Networks Israel (Sales and Marketing) Limited (In administration)

Schedule B

**SCHEDULE C**

**AFFILIATES OF MAIN SELLERS THAT
ARE DEEMED TO BE "SELLING DEBTORS"**

Architel Systems (U.S.) Corporation

Nortel Altsystems, Inc. (previously "Alteon WebSystems, Inc.")

Nortel Altsystems International Inc. (previously "Alteon WebSystems International, Inc.")

Nortel Networks Applications Management Solutions Inc.

Nortel Networks Cable Solutions Inc.

Nortel Networks Capital Corporation

Nortel Networks HPOCS Inc.

Nortel Networks International Inc.

Nortel Networks Optical Components Inc.

Northern Telecom International Inc.

Sonoma Systems

Schedule C

**SCHEDULE D**

**AFFILIATES OF THE EMEA SELLERS THAT
ARE DEEMED TO BE A "SELLING DEBTOR"**

Nortel Networks Engineering Services Kft (In Administration)

Nortel Networks Slovensko, sro (In Administration)

Nortel Networks Romania Srl (In Administration)

Nortel Networks Oy (In Administration)

Nortel Networks International Finance & Holding BV (In Administration)

Nortel Networks Optical Components Limited

Schedule D

**SCHEDULE E**

**STANDING SETTLEMENT INSTRUCTIONS**


Nortel Networks Limited
Bank: Citibank, N.A.
ABA#: 021000089
SWIFT: CITIUS33
A/C#: 38545364

Nortel Networks Inc.
Bank: Citibank, N.A.
ABA#: 021000089
SWIFT: CITIUS33
A/C#: 30463444

Nortel Networks Corporation
Bank: Citibank, N.A.
ABA#: 021000089
SWIFT: CITIUS33
A/C#: 30428374

Nortel Networks UK Limited (In Administration)
Bank: tbc
ABA#:
SWIFT:
A/C#:

Nortel GmbH (In Administration)
Bank: tbc
ABA#:
SWIFT:
A/C#:

Nortel Networks SpA (In Administration)
Bank: tbc
ABA#:
SWIFT:
A/C#:

DOCSTOR: 1843462\14

Nortel Hispania S.A. (In Administration)
Bank: tbc
ABA#:
SWIFT:
A/C#:

Nortel Networks B.V. (In Administration)
Bank: tbc
ABA#:
SWIFT:
A/C#:

Nortel Networks AB (In Administration)
Bank: tbc
ABA#:
SWIFT:
A/C#:

Nortel Networks N.V. (In Administration)
Bank: tbc
ABA#:
SWIFT:
A/C#:

Nortel Networks (Austria) GmbH. (In Administration)
Bank: tbc
ABA#:
SWIFT:
A/C#:

Nortel Networks Polska Sp z.o.o. (In Administration)
Bank: tbc
ABA#:
SWIFT:
A/C#:

Nortel Networks Portugal S.A. (In Administration)
Bank: tbc
ABA#:
SWIFT:
A/C#:

Nortel Networks s.r.o. (In Administration)
Bank: tbc
ABA#:
SWIFT:
A/C#:

Nortel Networks France S.A.S (In Administration)
Bank: tbc
ABA#:
SWIFT:
A/C#:

Nortel Networks (Ireland) Limited (In Administration)
Bank: tbc
ABA#:
SWIFT:
A/C#:

Nortel Networks Engineering Services Kft (In Administration)
Bank: tbc
ABA#:
SWIFT:
A/C#:

Nortel Networks Slovensko s.r.o. (In Administration)

Bank: tbc
ABA#:
SWIFT:
A/C#:

Nortel Networks Romania Srl (In Administration)
Bank: tbc
ABA#:
SWIFT:
A/C#:

Nortel Networks Oy (In Administration)
Bank: tbc
ABA#:
SWIFT:
A/C#:

Nortel Networks International Finance & Holding BV. (In Administration)

Bank: tbc
ABA#:
SWIFT:
A/C#:

Nortel Networks S.A. (In Administration)
Bank: tbc
ABA#:
SWIFT:
A/C#:

Nortel Networks (Northern Ireland) Limited
Bank: tbc
ABA#:
SWIFT:
A/C#:

o.o.o Nortel Networks
Bank: tbc
ABA#:
SWIFT:
A/C#:

Nortel Networks AG
Bank: tbc
ABA#:
SWIFT:
A/C#:

Nortel Networks Israel (Sales and Marketing) Limited
Bank: tbc
ABA#:
SWIFT:
A/C#:

## SCHEDULE F

## NOTICE ADDRESSES

**Depositors:**

| | |
|---|---|
| **NNC, NNL and the Other Sellers listed on Schedule A (other than Nortel Networks (CALA) Inc., Nortel Networks de Guatemala Ltda and Nortel Networks Kabushiki Kaisha or any other Respective Affiliate of NNI), the affiliates of the Main Sellers listed on Schedule C and any other Respective Affiliates of NNC or NNL:** | 5945 Airport Road<br>Suite 360<br>Mississauga, Ontario, Canada  L4V 1R9<br>Attn:  Anna Ventresca<br>Phone: 905.863.1204<br>Facsimile: 905.863.2057 |
| **NNI and Nortel Networks (CALA) Inc., Nortel Networks de Guatemala Ltda, Nortel Networks Kabushiki Kaisha or any other Respective Affiliates of NNI:** | Legal Department<br>220 Athens Way, Suite 300<br>Nashville, Tennessee, USA  37228<br>Attn:  Lynn C. Egan<br>Phone: 615.432.4289<br>Facsimile: 615.432.4067 |
| **The EMEA Sellers and the affiliates of the EMEA Sellers listed on Schedule D:** | c/o Herbert Smith LLP<br>Exchange House<br>Primrose Street<br>London<br>EC2A 2HS<br>United Kingdom<br>Attn: Stephen Gale and Kevin F Lloyd<br>Phone: +44 20 7374 8000<br>Facsimile: +44 20 7374 0888 |
| **NNSA:** | Etude Cosme Rogeau<br>Mandataire Judiciare<br>26 avenue Hoche<br>78000 Versailles (France)<br>Phone: +33 (1) 39 49 52 08<br>Facsimile: +33 (1) 39 49 44 63<br>(with a copy to Antoine Tchekhoff, FTPA<br>1 bis avenue Foch 75116 Paris (France)<br>Phone: +33 (1) 45 00 86 20<br>Facsimile: +33 (1) 45 00 85 81) |
| **The Israeli Company:** | Avi D. Pelossof<br>Zellermayer, Pelossof & Co. |

The Rubenstein House
20 Lincoln Street
Tel Aviv
67131
Israel
Facsimile:        +972 3 6255500

**Distribution Agent:**

JPMorgan Chase Bank, N.A.
TS / Escrow Services
4 New York Plaza, 21st Floor
New York, New York 10004
Attn:  Andy Jacknick
Phone: 212.623. 0241
Facsimile: 212.623.6168

**Estate Fiduciaries:**

**The Official Committee of Unsecured Creditors in connection with the Chapter 11 cases of Nortel Networks Inc., et al. (Case No. 09-10138):**

c/o Akin Gump Strauss Hauer & Feld LLP
One Bryant Park
New York, New York 10036
Attn:  Fred S. Hodara, Stephen B. Kuhn, David H. Botter and Kenneth A. Davis
Phone: 212.872.1000
Facsimile: 212.872.1002

**Monitor:**

Ernst & Young Inc.
Ernst & Young Tower
222 Bay Street, P. O. Box 251
Toronto, Ontario, Canada
M5K 1J7
Facsimile: (416) 943-3300
Attn: Murray A. McDonald

**Bondholder Group:**

c/o Milbank, Tweed, Hadley & McCloy LLP
1 Chase Manhattan Plaza
New York, New York 10005
Attn: Albert A. Pisa and Roland Hlawaty
Phone: 212.530.5000
Facsimile: 212.822.5735

DOCSTOR: 1843462\14

# SCHEDULE G

### Telephone Number(s) for Call-Backs;
### Person(s) Designated to Give and Confirm Funds Transfer Instructions; and Addresses

**If to NNC, NNL and the Other Sellers listed on <u>Schedule A</u> (other than Nortel Networks (CALA) Inc., Nortel Networks de Guatemala Ltda and Nortel Networks Kabushiki Kaisha or any other Respective Affiliate of NNI), the affiliates of the Main Sellers listed on <u>Schedule C</u> or any other Respective Affiliate of NNC or NNL:**

| <u>Name</u> | <u>Telephone Number</u> | <u>Signature Specimen</u> |
|---|---|---|
| John Marshall Doolittle | 905.863.6636 | _____ |

| <u>Name</u> | <u>Telephone Number</u> | <u>Signature Specimen</u> |
|---|---|---|
| Anna Ventresca | 905.863.1204 | _____ |
| Address | See <u>Schedule F</u> | |

**If to NNI, Nortel Networks (CALA) Inc., Nortel Networks de Guatemala Ltda and Nortel Networks Kabushiki Kaisha or any other Respective Affiliate of NNI:**

| <u>Name</u> | <u>Telephone Number</u> | <u>Signature Specimen</u> |
|---|---|---|
| John Ray | 239.331.4942 | _____ |

| <u>Name</u> | <u>Telephone Number</u> | <u>Signature Specimen</u> |
|---|---|---|
| Anna Ventresca | 905.863.1204 | _____ |
| Address | See <u>Schedule F</u> | |

**If to the EMEA Sellers (apart from Nortel Networks (Ireland) Limited) and the affiliates of the EMEA Sellers listed on <u>Schedule D</u>:**

| <u>Name</u> | <u>Telephone Number</u> | <u>Signature Specimen</u> |
|---|---|---|

DOCSTOR: 1843462\14

| Alan Bloom | +44 (0) 207 951 9898 | _____ |
| --- | --- | --- |
| Name | Telephone Number | Signature Specimen |
| Stephen Harris | +44 (0) 207 951 9835 | _____ |
| Address | See Schedule F | |

**If to Nortel Networks (Ireland) Limited:**

| Name | Telephone Number | Signature Specimen |
| --- | --- | --- |
| Alan Bloom | +44 (0) 207 951 9898 | _____ |
| Name | Telephone Number | Signature Specimen |
| David Hughes | +353 1 221 2301 | _____ |
| Address | c/o Herbert Smith LLP<br>Exchange House<br>Primrose Street<br>London<br>EC2A 2HS<br>Attn: Stephen Gale and<br>Kevin F Lloyd | |

**If to the Israeli Company:**

| Name | Telephone Number | Signature Specimen |
| --- | --- | --- |
| Yaron Har-Zvi | | _____ |
| Name | Telephone Number | Signature Specimen |
| Avi D. Pelossof | | _____ |
| Address | See Schedule F | |

Schedule G-2

**If to NNSA:**

| Name | Telephone Number | Signature Specimen |
|------|------------------|--------------------|
| Stephen Harris | | _____ |
| Address | See Schedule F | |

**If to the Estate Fiduciaries:**

The Official Committee of Unsecured Creditors in connection with the Chapter 11 cases of Nortel Networks Inc., et al. (Case No. 09-10138):

| Name | Telephone Number | Signature Specimen |
|------|------------------|--------------------|
| Timothy Burling, acting on behalf of Flextronics Corporation as Chair of the Official Committee of Unsecured Creditors and not in his personal capacity | | _____ |

| Name | Telephone Number | Signature Specimen |
|------|------------------|--------------------|
| Stephen R. Kuhn, Esq. acting on behalf of Akin Gump Strauss Hauer & Feld LLP, as counsel to the Official Committee of Unsecured Creditors and not in his personal capacity | (212) 872-1008 | _____ |

| Name | Telephone Number | Signature Specimen |
|------|------------------|--------------------|
| David H. Botter, Esq. acting on behalf of Akin Gump Strauss Hauer & Feld LLP, as counsel to the Official Committee of Unsecured Creditors and | (212) 872-1055 | _____ |

Schedule G-3

not in his personal capacity

Address                              See Schedule F

**Monitor:**

Name                              Telephone Number                    Signature Specimen


                                                                     _____

Name                              Telephone Number                    Signature Specimen


                                                                     _____

Address                              See Schedule F

Telephone call backs shall be made to all applicable Parties if joint instructions are required pursuant to the agreement. All funds transfer instructions must include the signature of the person(s) authorizing said funds transfer and must not be the same person confirming said transfer. Inasmuch as there is only one individual who can confirm and instruct, on behalf of a Party, wire transfers in accordance with the attached Escrow Agreement, the Distribution Agent shall call such individual to confirm any federal funds wire transfer payment order purportedly issued by such individual.  Such individual's continued issuance of payment orders to the Distribution Agent on behalf of a Party and his confirmation in accordance with this procedure will constitute such Party's agreement (1) to the callback security procedure outlined herein and (2) that the security procedure outlined herein constitutes a commercially reasonable method of verifying the authenticity of payment orders.  Moreover, such Party agrees to accept any risk associated with a deviation from the Distribution Agent's policy.

Schedule G-4

# EXHIBIT 1

## INTEREST ALLOCATION PERCENTAGES(*)

|  | Interest Allocation Percentage |
|---|---|
| NNI | 0% |
| NNL | 100% |
| NNC | 0% |
| Qtera Corporation | 0% |
| CoreTek, Inc. | 0% |
| Xros, Inc. | 0% |
| Nortel Networks Technology Corporation | 0% |
| Nortel Networks (CALA) Inc. | 0% |
| Nortel de Mexico, S. de R.L. de C.V. | 0% |
| Nortel Networks de Mexico, S.A. de C.V. | 0% |
| Nortel Networks de Guatemala Ltda. | 0% |
| Nortel Networks de Argentina S.A. | 0% |
| Nortel Networks de Columbia S.A. | 0% |
| Nortel Networks Peru S.A.C. | 0% |
| Nortel Networks de Ecuador S.A. | 0% |
| Nortel Networks Kabushiki Kaisha | 0% |
| Nortel Networks (Asia) Limited | 0% |
| Nortel Networks Singapore Pte. Limited | 0% |
| Nortel Vietnam Limited | 0% |
| Nortel Networks (Thailand) Ltd. | 0% |
| Nortel Networks Malaysia Sdn. Bhd. | 0% |

Exhibit 1

| | Interest Allocation Percentage |
|---|---|
| Nortel Networks Australia Pty Limited | 0% |
| Nortel Networks New Zealand Limited | 0% |
| Nortel Networks (China) Limited | 0% |
| Nortel Networks (Asia) Limited – Pakistan Branch | 0% |
| Nortel Networks Singapore Pte. Limited – Philippines Branch | 0% |
| Nortel Networks Telecommunications Equipment (Shanghai) Co., Ltd. | 0% |
| PT Nortel Networks Indonesia | 0% |
| The EMEA Sellers | 0% |
| The Israeli Company | 0% |
| NNSA | 0% |
| Affiliates of Main Sellers that are deemed to be "Selling Debtors" | 0% |
| Affiliates of the EMEA Sellers that are deemed to be a "Selling Debtor" | 0% |

\*   The inclusion of the interest allocation percentages set forth above does not constitute an admission of any Depositor that such interest allocation percentage reflects the percentage of the proceeds to be received by any Depositor or any of its Respective Affiliates under the North American ASA or EMEA ASA, as applicable.  The interest allocation percentages are the initial allocation percentages hereunder and are subject to amendment in accordance with Paragraph 15. The interest allocation percentages set forth above shall not be presented by any party hereto as being indicative of the final allocation of proceeds received by the Depositors under the North American ASA and EMEA ASA, as applicable.

Exhibit 1-2