**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

-------------------------------------------------------X
                                                       :
*In re*                                                :    Chapter 11
                                                       :
Nortel Networks Inc., *et al.*,[1]                     :    Case No. 09-10138 (KG)
                                                       :
                                 Debtors.              :    Jointly Administered
                                                       :
                                                       :    **Hearing date: April 14, 2010 10:00 a.m. (ET)**
                                                       :    **Objections due: April 7, 2010 4:00 p.m. (ET)**
                                                       :
-------------------------------------------------------X

**DEBTORS' MOTION FOR AN ORDER APPROVING THE**
**ENGAGEMENT OF GRANT THORNTON LLP *NUNC PRO TUNC***
**TO FEBRUARY 26, 2010 AS NEUTRAL TSA ARBITRATOR IN CONNECTION WITH**
**THE SALE OF CERTAIN METRO ETHERNET NETWORKS BUSINESS ASSETS**

Nortel Networks Inc. ("NNI") and certain of its affiliates, as debtors and debtors

in possession (the "Debtors"), hereby move this Court (the "Motion"), for the entry of an order

(the "Order") substantially in the form attached hereto as Exhibit A, pursuant to sections 105(a)

and 363(b) of title 11 of the United States Code (the "Bankruptcy Code"), approving the

engagement of Grant Thornton LLP ("Grant Thornton") *nunc pro tunc* to February 26, 2010 as

the Neutral TSA Arbitrator (as defined below) pursuant to the terms of the engagement

agreement between NNI, Nortel Networks Limited ("NNL"), Nortel Networks UK Limited

("NNUK"), Nortel Networks (Ireland) Limited ("NN Ireland", and together with NNI, NNL and

NNUK, the "Nortel Parties"), the Joint Administrators (as defined below), Ciena Corporation

and affiliates ("Ciena" and with the Nortel Parties and the Joint Administrators, the "Parties")

---

[1]     The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's tax identification
number, are:  Nortel Networks Inc. (6332), Nortel Networks Capital Corporation (9620), Nortel Altsystems Inc.
(9769), Nortel Altsystems International Inc. (5596), Xros, Inc. (4181), Sonoma Systems (2073), Qtera Corporation
(0251), CoreTek, Inc. (5722), Nortel Networks Applications Management Solutions Inc. (2846), Nortel Networks
Optical Components Inc. (3545), Nortel Networks HPOCS Inc. (3546), Architel Systems (U.S.) Corporation (3826),
Nortel Networks International Inc. (0358), Northern Telecom International Inc. (6286), Nortel Networks Cable
Solutions Inc. (0567) and Nortel Networks (CALA) Inc. (4226).  Addresses for the Debtors can be found in the
Debtors' petitions, which are available at http://chapter11.epiqsystems.com/nortel.

and Grant Thornton dated as of March 3, 2010 and attached hereto as Exhibit B (the "Engagement Agreement"); and granting such other and further relief as the Court deems just and proper.  In support of the Motion, the Debtors rely on the Declaration of Erik C. Lioy (the "Lioy Declaration"), attached hereto as Exhibit C.  In further support of this Motion, the Debtors respectfully represent as follows:

## Jurisdiction

1.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.  This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

2.      The statutory bases for the relief requested herein are sections 105(a) and 363(b) of the Bankruptcy Code.

## Background

**A.      Procedural History**

3.      On January 14, 2009 (the "Petition Date"), the Debtors, other than NN CALA (defined below), filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code.

4.      The Debtors continue to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

5.      On January 15, 2009, this Court entered an order of joint administration pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") that provided for the joint administration of these cases and for consolidation for procedural purposes only [D.I. 36].

6.      Also on the Petition Date, the Debtors' ultimate corporate parent Nortel Networks Corporation ("NNC"), NNI's direct corporate parent NNL (together with NNC and their affiliates, including the Debtors, "Nortel"), and certain of their Canadian affiliates (collectively,

the "Canadian Debtors")[2] filed an application with the Ontario Superior Court of Justice (the "Canadian Court") under the Companies' Creditors Arrangement Act (Canada) (the "CCAA"), seeking relief from their creditors (collectively, the "Canadian Proceedings").  The Canadian Debtors continue to manage their properties and operate their businesses under the supervision of the Canadian Court.

7.      On January 14, 2009, the Canadian Court entered an order recognizing these chapter 11 proceedings as a foreign proceeding under section 18.6 of the CCAA.  On February 27, 2009, based on a petition filed by Ernst & Young Inc., as court-appointed Monitor in the Canadian Proceedings and as foreign representative for the Canadian Debtors (the "Monitor"), this Court entered an order recognizing the Canadian Proceedings as foreign main proceedings under chapter 15 of the Bankruptcy Code.

8.      On January 14, 2009, the High Court of England and Wales placed nineteen of Nortel's European affiliates (collectively, the "EMEA Debtors")[3] into administration under the control of individuals from Ernst & Young LLC (collectively, the "Joint Administrators").  On May 28, 2009, at the request of the Joint Administrators, the Commercial Court of Versailles, France (the "French Court") (Docket No. 2009P00492) ordered the commencement of secondary proceedings in respect of Nortel Networks S.A. ("NNSA"), which consist of liquidation proceedings during which NNSA was originally authorized to continue to operate as a going concern for an initial period of three months, which period was subsequently extended to

---

[2]      The Canadian Debtors include the following entities:  NNC, NNL, Nortel Networks Technology Corporation, Nortel Networks Global Corporation and Nortel Networks International Corporation.

[3]      The EMEA Debtors include the following entities:  NNUK, Nortel Networks S.A., NN Ireland, Nortel GmbH, Nortel Networks France S.A.S., Nortel Networks Oy, Nortel Networks Romania SRL, Nortel Networks AB, Nortel Networks N.V., Nortel Networks S.p.A., Nortel Networks B.V., Nortel Networks Polska Sp. z.o.o., Nortel Networks Hispania, S.A., Nortel Networks (Austria) GmbH, Nortel Networks, s.r.o., Nortel Networks Engineering Service Kft, Nortel Networks Portugal S.A., Nortel Networks Slovensko, s.r.o. and Nortel Networks International Finance & Holding B.V.

November 28, 2009.  In accordance with the European Union's Council Regulation (EC) No. 1346/2000 on Insolvency Proceedings, the English law proceedings (the "English Proceedings") remain the main proceedings in respect of NNSA although a French administrator and a French liquidator have been appointed and are in charge of the day-to-day affairs and continuing business of NNSA in France.  On October 1, 2009, pursuant to a motion filed by the Joint Administrators, the French Court approved an order to: (i) suspend the liquidation operations relating to the sale of the assets and/or businesses of NNSA for a renewable period of two months; (ii) authorize the continuation of the business of NNSA so long as the liquidation operations are suspended; and (iii) maintain the powers of the French Administrator and Liquidator during the suspension period, except with respect to the sale of assets and/or businesses of NNSA.  On February 26, 2010, the French Court extended the suspension of liquidation until the earlier of (i) May 31, 2010 or (ii) the filing with the French Court of a letter from Kapsch CarrierCom AG stating that its bid for the GSM//GSM-R assets of NNSA has become unconditional.  On June 26, 2009, this Court entered an order recognizing the English Proceedings of NNUK as foreign main proceedings under chapter 15 of the Bankruptcy Code.[4]

9.    On January 26, 2009, the Office of the United States Trustee for the District of Delaware (the "U.S. Trustee") appointed an Official Committee of Unsecured Creditors (the "Committee") pursuant to section 1102(a)(1) of the Bankruptcy Code [D.I.s 141, 142].  An ad hoc group of bondholders holding claims against certain of the Debtors and certain of the Canadian Debtors has also been organized (the "Bondholder Group").  No trustee or examiner has been appointed in the Debtors' cases.

---

[4]    Additionally, on January 18, 2009, certain Nortel affiliates, including Nortel Networks Israel (Sales and Marketing) Limited, filed an application with the Tel-Aviv-Jaffa District Court, pursuant to the Israeli Companies Law, 1999, and the regulations relating thereto for a stay of proceedings.  On January 19, 2009, the Israeli Court appointed Yaron Har-Zvi and Avi D. Pelossof as joint administrators of the Israeli Company under the Israeli Companies Law (the "Joint Israeli Administrators").

10.     On July 14, 2009 (the "CALA Petition Date"), Nortel Networks (CALA) Inc. ("NN CALA" and a Debtor with NNI and its affiliates), an affiliate of NNI, filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  On July 17, this Court entered orders approving the joint administration and consolidation of NN CALA's chapter 11 case with the other Debtors' chapter 11 cases for procedural proposes [D.I. 1098], and applying to NN CALA certain previously entered orders in the Debtors' chapter 11 cases [D.I. 1099].

## B.     Debtors' Corporate Structure and Business

11.     Nortel is a technology company that designs, develops and deploys communication products, systems and solutions to its customers around the globe.  Its principal assets include its employees, the intellectual property derived and maintained from its research and development activities, its customers and other significant contracts and agreements.

12.     Additional information regarding the Debtors' corporate structure and business and the events leading to the chapter 11 cases is set forth in the Declaration of John Doolittle in Support of First Day Motions and Applications [D.I. 3].

## C.     Case Milestones

13.     On June 19, 2009, Nortel announced that it was advancing in discussions with external parties to sell its businesses and it would assess other restructuring alternatives for its businesses in the event it is unable to maximize value through sales.  To date, Nortel has closed (i) the sale of certain portions of its Layer 4-7 data portfolio to Radware Ltd. [D.I. 539]; (ii) the sale of substantially all of its CDMA business and LTE Access assets business to Telefonaktiebolaget LM Ericsson (publ) [D.I. 1205]; (iii) the sale of the assets of its Wireless Networks business associated with the development of Next Generation Packet Core network components to Hitachi Ltd. [D.I. 1760]; and (iv) the sale of substantially all of the assets of the Enterprise Solutions business globally, including the shares of Nortel Government Solutions

Incorporated and DiamondWare Ltd. to Avaya Inc. [D.I. 1514]. In addition, Nortel has completed auction processes and obtained Court approval for the planned sale of substantially all the assets of its Optical Networking and Carrier Ethernet businesses associated with its Metro Ethernet Networks business unit [D.I. 2070]; the planned sale of substantially all of its GSM/GSM-R business [D.I. 2065]; as well as the planned sale of certain assets of its Carrier Voice Over IP and Application Solutions business [D.I. 2632].

14.     On August 4, 2009, this Court entered an order fixing September 30, 2009 at 4:00 PM (Eastern Time) as the general bar date for filing proofs of claim or interests [D.I. 1280]. On December 3, 2009 this Court entered an order fixing January 25, 2010 at 4:00 PM (Eastern Time) as the bar date for filing proofs of claim or interests against NN CALA [D.I. 2059].

**D.     The Metro Ethernet Networks Business Sale**

15.     Nortel's Metro Ethernet Networks business (the "MEN Business") includes optical networking, carrier Ethernet switching and multiservice switching products, delivering carrier-grade Ethernet transport capabilities for higher performance and lower cost for emerging video-intensive applications. The MEN Business's optical networking portfolio includes the 40G Adaptive Optical Engine technology, which can quadruple network capacity while being deployable over any fiber, allowing service providers to reduce engineering and equipment expense and upgrade quickly and cost-effectively from 10G to 40G. The MEN Business also is in the process of developing the industry's first optical technology that can deliver both 40G and 100G network capacity, enabling four times the network throughput immediately, while providing the foundation to simply and affordably increase capacity tenfold as required.

16.     On October 7, 2009, the Debtors filed a Motion for Orders (I)(A) Authorizing Debtors' Entry into the Stalking Horse Asset Sale Agreement, (B) Authorizing and Approving

the Bidding Procedures and Bid Protections, (C) Approving the Notice Procedures and the Assumption and Assignment Procedures, (D) Authorizing the Filing of Certain Documents under Seal and (E) Setting a Date for the Sale Hearing, and (II) Authorizing and Approving (A) the Sale of Certain Assets of Debtors' Metro Ethernet Networks Business Free and Clear of All Liens, Claims and Encumbrances and (B) the Assumption and Assignment of Certain Executory Contracts [D.I. 1627] (the "Sale Motion") seeking approval of the sale of certain of the Debtors' assets relating to the Debtors' MEN Business (the "Assets") and the approval of certain bidding procedures (the "Bidding Procedures") in connection with the proposed sale.  Following a hearing on the Bidding Procedures, this Court entered the Bidding Procedures Order on October 16, 2009 approving the Bidding Procedures to govern the sale by NNI and certain of its affiliates (collectively, the "Sellers") of the Assets [D.I. 1685].  The Canadian Court entered a corresponding order approving the Bidding Procedures in the Canadian Proceedings on the same day.

17.    In accordance with the Bidding Procedures, the Sellers conducted an auction that commenced on November 20, 2009 (the "Auction").  The Successful Bid resulting from the Auction was the Amended and Restated Asset Sale Agreement (the "Sale Agreement") entered into by the Sellers and Ciena (together with, and including, any Designated Purchaser (as defined in the Sale Agreement), the "Purchaser"), dated as of November 24, 2009 (the "Successful Bid"). On December 3, 2009, this Court entered an order approving the sale of the Assets to Ciena pursuant to the Successful Bid [D.I. 2070] (the "Sale Order").  The Canadian Court entered a corresponding order approving the sale in the Canadian Proceedings on December 2, 2009.

## Relief Requested

18.    By this Motion, the Debtors seek an order pursuant to sections 105(a) and 363(b) of the Bankruptcy Code in connection with the sale of the Assets to (i) authorize NNI (along

with the other Parties) to enter into the Engagement Agreement to engage Grant Thornton as the Neutral TSA Arbitrator (as defined below), (ii) approve the terms of the Engagement Agreement and (iii) allow NNI to pay its portion of the Nortel Parties' share of Grant Thornton's compensation as set forth in the Engagement Agreement. A copy of the Engagement Agreement is attached hereto as <u>Exhibit B</u>.

### **<u>Facts Relevant to this Motion</u>**

19. As described above, this Court entered the Sale Order approving the sale of the Assets to the Purchaser pursuant to the terms of the Sale Agreement. The Sale Agreement is attached as Exhibit A to the Sale Order.

20. In connection with the sale of the Assets, as approved by the Court, at the date of closing certain Nortel entities, including the Nortel Parties (the "<u>TSA Sellers</u>") and the Purchaser will enter into a transition services agreement (the "<u>TSA</u>").[5] The TSA contemplates that the TSA Sellers shall provide to Ciena certain transition services related to the MEN Business after the date of closing, on the terms and subject to the conditions set forth in the TSA. The TSA serves to facilitate the orderly completion of the sale of the Assets and the transition of the business from Nortel to Ciena.

21. Pursuant to Section 5.28 of the Sellers Disclosure Schedule attached to the Sale Agreement (the "<u>Sellers Disclosure Schedule</u>"),[6] the TSA Sellers and the Purchaser agreed to select an impartial information technology consultancy firm independent of the TSA Sellers and the Purchaser and with the appropriate expertise in implementing transition services arrangements ancillary to mergers and acquisitions transactions involving sophisticated

---

[5]    The TSA was attached as Exhibit Q to the Sale Agreement, and was filed under seal pursuant to the Order Authorizing the Debtors to File Under Seal the Sellers Disclosure Schedule and Exhibits and Other Schedules Related to the Sale of Certain Assets of the Metro Ethernet Networks Business [D.I. 2078] (the "<u>Sealing Order</u>").

[6]    The Sellers Disclosure Schedule was filed under seal pursuant to the Sealing Order.

enterprise resource planning systems similar in scope and complexity to the systems required by the TSA (the "Neutral TSA Arbitrator").

22.       As set forth in the Sellers Disclosure Schedule, the Neutral TSA Arbitrator will resolve any disputes that may arise between the TSA Sellers and the Purchaser under the Sale Agreement with respect to transition services, including, without limitation, with respect to issues involving whether the TSA Sellers are First Day Ready.[7]

23.       The Parties have selected Grant Thornton as the Neutral TSA Arbitrator pursuant to the terms of the terms of the Engagement Agreement entered into between the Parties and Grant Thornton on March 3, 2010, subject in the case of NNI to approval by this Court.  Grant Thornton designated Erik C. Lioy, a partner in its Advisory Services branch, to serve as the arbitrator under the Engagement Agreement.

## Basis for Relief

24.       Together with the other Parties, NNI selected Grant Thornton as the Neutral TSA Arbitrator because a capable and experienced accounting and business advisory firm such as Grant Thornton, whose services include information technology services, has the experience and expertise in implementing transition services arrangements ancillary to mergers and acquisitions transactions involving sophisticated enterprise resource planning systems similar in scope and complexity to the systems required by the TSA, and the resources to serve as the Neutral TSA Arbitrator for the purpose of resolving any disputes as may arise under the Sale Agreement with respect to transition services.  Mr. Lioy has experience serving as an arbitrator in disputes arising from merger and acquisition transactions, including claims surrounding breaches of representations, warranties and purchase price adjustments.  Mr.Lioy also has experience leading

---

[7]       On March 12, 2010, Ciena notified NNC, NNL and NNI of its determination that First Day Ready had been achieved; however the Parties may wish to use Grant Thornton's services in the event other disputes were to arise with respect to transition services.

due diligence assignments on acquisition targets with integrated accounting and business processing systems, including the assessment of the ability of the systems to meet the business objectives of the purchaser after the contemplated transactions.  In addition, he has consulted with clients regarding the internal controls and functionality of their accounting and business processing systems.

25.    In addition, as required by the Sellers Disclosure Schedule and as described in the Engagement Agreement, Erik C. Lioy and Grant Thornton are both impartial and independent of the TSA Sellers and the Purchaser.  The Lioy Declaration, which is attached hereto as <u>Exhibit C</u>, sets forth any known potential conflicts.  Under the terms of the Sellers Disclosure Schedule and the Engagement Agreement, as described below, NNI will only be responsible for a portion of the Nortel Parties' share of Grant Thornton's compensation.

26.    Section 105(a) of the Bankruptcy Code provides this Court with the power to grant the relief requested herein by the Debtors.  Section 105(a) of the Bankruptcy Code states that a bankruptcy court "may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]."  11 U.S.C. § 105(a).  Under Section 105(a) of the Bankruptcy Code, the Court has broad equitable powers.  *See* <u>In re Combustion Engineering, Inc.</u>, 391 F.3d 190, 236 (3d Cir. 2004) (noting that section 105(a) of the Bankruptcy Code "has been construed to give a bankruptcy court 'broad authority' to provide equitable relief appropriate to assure the orderly conduct of reorganization proceedings."); <u>In re VII Holdings Co.</u>, 362 B.R. 663, 668 (Bankr. D. Del. 2007) (BLS) (noting that "[s]ection 105(a) bestows broad equitable powers on the Court.") (*citing* <u>In re Combustion Engineering, Inc.</u>, 391 F.3d 190, 236 (3d Cir. 2004)).

27.     Section 363(b) of the Bankruptcy Code permits a debtor to use, sell or lease property of the estate outside of the ordinary course of business after notice and a hearing.  11 U.S.C.  § 363.  Section 363 applies when an agreement involves the disposition of the estate's assets in a way that ventures beyond an ordinary course transaction.  Myers v. Martin (In re Martin), 91 F.3d 389, 395 (3d Cir. 1996).

28.     The use or transfer of estate property under section 363 of the Bankruptcy Code must be supported by a sound business purpose.  Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.), 722 F.2d 1063, 1070-71 (2d Cir. 1983); In re Decora Indus., Inc., No. 00-4459, 2002 WL 32332749, at *2 (D. Del. May 20, 2002); Dai-Ichi Kangyo Bank, Ltd. v. Montgomery Ward Holding Corp. (In re Montgomery Ward Holding Corp.), 242 B.R. 147, 153 (D. Del. 1999); In re Delaware & Hudson Ry. Co., 124 B.R. 169, 176 (D. Del. 1991); Travelers Cas. & Sur. Co. v. Future Claimants Representative, No. 07-2785, 2008 WL 821088, at *4 (D.N.J. Mar. 25, 2008).  A court determining whether a sound business purpose justifies the transaction "should consider all salient factors pertaining to the proceeding and, accordingly, act to further the diverse interests of the debtor, creditors and equity holders, alike."  In re Montgomery Ward, 242 B.R. at 153-54 (quoting In re Lionel, 722 F.2d at 1071).  In addition, a debtor must show that the transaction has been proposed in good faith, that adequate and reasonable notice has been provided, and that it is receiving fair and reasonable value in exchange.  See In re Delaware & Hudson Ry. Co., 124 B.R. at 176; In re Decora Indus., Inc., 2002 WL 32332749, at *2.

29.     The Neutral TSA Arbitrator's services are instrumental to resolving any disputes that could arise between the TSA Sellers and the Purchaser with regard to whether certain deadlines related to the sale of the Assets have been met.  The engagement of Grant Thornton as

the Neutral TSA Arbitrator is necessary to further the consummation of the sale of the Debtors'

Assets.  Accordingly, the Debtors submit that the relief requested herein is in the best interests of

the Debtors, their estates, their creditors and all other parties in interest.  Moreover, the costs of

the engagement, which are to be shared among the Parties, are justified by the need to have an

arbitrator available to resolve any potential disputes under the Sale Agreement.

30.    The Debtors also request approval of the engagement of Grant Thornton *nunc pro*

*tunc* to February 26, 2010.  Such relief is warranted by the extraordinary circumstances presented

by these cases.  The Third Circuit has identified "time pressure to begin service" and absence of

prejudice as factors favoring *nunc pro tunc* retention.  See In re Arkansas Co., 798 F.2d 645, 650

(3d Cir. 1986); see also In re Indian River Homes, Inc., 108 B.R. 46, 52 (D. Del. 1989), appeal

dismissed, 909 F.2d 1476 (3d Cir. 1990).  The complexity and intense activity surrounding the

sale of certain assets of the MEN Business demand that the Neutral TSA Arbitrator be engaged

and standing-by during the critical transition period, ready to dedicate its full time and attention

to resolution of the potential disputes the moment they arise, pending submission and approval of

this Motion.

### Selection of Grant Thornton and Scope of Services

31.    Grant Thornton is an accounting and business advisory firm that provides

information technology services, among other services, to companies.  Grant Thornton is the

United States member firm of Grant Thornton International Ltd., one of the six global audit, tax

and advisory organizations.  Each member firm is a separate and distinct legal entity and Grant

Thornton International Ltd. and its member firms are not a worldwide partnership.

32.    The Parties have selected Grant Thornton as the Neutral TSA Arbitrator to ensure

their success in completing the sale of the Assets and fulfilling their obligations under the TSA.

Grant Thornton has extensive experience and an excellent reputation in providing accounting

consultancy services in complex chapter 11 cases such as this one, including related to the

implementation of sophisticated transition services arrangements.  Moreover, the Debtors believe

that Grant Thornton is well qualified to perform the services with the neutrality required in this

instance.

33.    Pursuant to the Engagement Agreement,[8] Grant Thornton will assist the Parties in

resolving disputes relating to the performance of the Parties under the Sale Agreement with

respect to transition services.  The Parties may submit any disputes to Grant Thornton for

binding resolution.  Grant Thornton's potential responsibilities include, but are not limited to:

a.    Familiarizing itself with the Critical Systems and Testing Protocols (each as defined in the Sellers Disclosure Schedule), and such other information as it deems relevant to making a determination as to whether First Day Ready has been achieved;

b.    In case of a dispute concerning First Day Ready:

(i)    Meeting together with representatives of the Parties to review the Deficiency List (as defined in the Sellers Disclosure Schedule) and any operating data or other information which any Party wishes to present for consideration or which Grant Thornton deems pertinent to its determination of whether the TSA Sellers are First Day Ready;

(ii)    Discussing with the Parties the Testing Protocols as may be requested to enable understanding of the pertinent features thereof;

(iii)    If Grant Thornton deems it necessary, supervising a Test (as defined in the Sellers Disclosure Schedule), during which Grant Thornton and the Purchaser may be on-site if so requested by either;

---

[8]    The summary of the Engagement Agreement in this Motion is solely for the benefit of the Court and parties in interest.  To the extent that the summary and the terms of the Engagement Agreement are inconsistent, the terms of the Engagement Agreement shall control.  Capitalized terms not defined in this Motion shall have the meanings given them in the Engagement Agreement.

(iv) Reviewing the results together with the Parties, making a written determination concerning First Day Ready, and preparing a written report, including an explanation, with respect to its findings;

c. In the case of other disputes, meeting jointly with both the applicable TSA Sellers and Purchaser and reviewing all information provided by the Parties as well as other information Grant Thornton believes is relevant to its determination.

d. Making such other inquiries or requiring that either Party provide any information, data or test results which exist and are in a Party's or its agents' possession as Grant Thornton deems necessary to make its determinations.

### Grant Thornton's Disinterestedness

34. To the best of Debtors' knowledge, and except as set forth herein and as otherwise disclosed in the Lioy Declaration, attached hereto as Exhibit C, Grant Thornton has not represented, and does not have any connection with, the Debtors, their creditors, equity security holders or any other parties in interest in any matters relating to the Debtors and their estates.

35. As disclosed in the Lioy Declaration, Grant Thornton currently represents certain of the Debtors' creditors and other parties in interest in matters wholly unrelated to these proceedings. Specifically, as set forth in the Lioy Declaration and the Engagement Agreement, and as previously disclosed to the Parties, professionals from Grant Thornton's Mid-Atlantic Practice have previously and may in the future provide advisory services to Ciena in matters wholly unrelated to the scope of the Engagement Agreement. Grant Thornton has informed the Debtors of its ongoing representation of such entities, and the Debtors have consented to Grant Thornton's continued representation of these entities in matters unrelated to these proceedings. The Debtors believe that Grant Thornton's current and future representation of these entities will not in any way adversely affect its engagement as Neutral TSA Arbitrator.

36.      In addition, and as previously disclosed to the Parties, Grant Thornton's Columbia, South Carolina office provides services to Avidity Partners LLC, the firm of NNI's principal officer John Ray, related to trust tax returns for liquidating trusts administered by Mr. Ray or Avidity.

37.      As set forth in the Engagement Agreement, the partners, principals and employees of Grant Thornton who have provided services to either of the Parties since January 1, 2005 will not be assigned to assist Mr. Lioy in any dispute submitted pursuant to the Engagement Agreement.  Further, Mr. Lioy will not communicate the status of any dispute he is arbitrating to such Grant Thornton professionals.

38.      To the best of the Debtors' knowledge and as disclosed in the Lioy Declaration, Grant Thornton does not hold or represent any interest adverse to the Debtors or their estates, Grant Thornton is a "disinterested person" as that phrase is defined in section 101(14) of the Bankruptcy Code, as modified by section 1107(b) of the Bankruptcy Code, and the Debtors' selection of Grant Thornton is necessary and in the best interests of the Debtors and their estates.

39.      As discussed above in greater detail, due to the fact that many of the Nortel estates are involved in and impacted by the sale of the Assets, pursuant to the Engagement Agreement, Grant Thornton will be providing services not just to NNI but also to NNL, NNUK, NN Ireland and the Joint Administrators.  Further, in its capacity as Neutral TSA Arbitrator, Grant Thornton will also be serving the Purchaser.  The Debtors believe that Grant Thornton's provision of services to all of the Parties as Neutral TSA Arbitrator does not make Grant Thornton an interested party within the meaning of Section 101(14) of the Bankruptcy Code as Grant Thornton will not be representing the interest of any of the Parties in its role as Neutral TSA Arbitrator and will be compensated equally by all the Parties.  Further, as required by the

Sellers Disclosure Schedule and as set forth in the Engagement Agreement and the Lioy

Declaration, Mr. Lioy and Grant Thornton are both impartial and independent of the TSA Sellers

and the Purchaser.

40.     Grant Thornton will periodically review its files during the pendency of this

engagement to ensure that no conflicts or other disqualifying circumstances exist or arise.

### Professional Compensation and Employment Terms

41.     Pursuant to the Engagement Agreement and as contemplated in the Sellers

Disclosure Schedule, Ciena and the Nortel Parties are each responsible for fifty percent (50%) of

Grant Thornton's compensation and expense reimbursement, except in the event that a

subsequent Arbitral Review (as defined in the Sellers Disclosure Schedule) is needed with

respect to a First Day Ready dispute, in which case the non-prevailing party (either the Nortel

Parties or Ciena) shall pay Grant Thornton's fees and expenses for such Arbitral Review.  With

respect to the Nortel Parties' share, the Nortel Parties have agreed to further divide the fees and

expenses, with NNI, NNL, and together NNUK and NN Ireland each responsible for one-third of

the Nortel Parties' share.[9]

42.     In summary, the compensation as set forth in the Engagement Agreement (the

"Fee Structure") provides that the Parties are obligated to pay the following compensation to

Grant Thornton (with NNI to pay one-third of the total compensation owed by the Nortel

Parties):

        a.      A $100,000 (one hundred thousand dollars) flat fee in exchange for the
                services to be provided by Grant Thornton and in consideration of Grant
                Thornton's undertaking to remain on stand-by during the critical transition

---

[9]     The Nortel Parties also reserve their right to seek contribution or further allocation of these fees and expenses amongst themselves and their affiliates as set forth in the Metro Ethernet Networks Side Agreement that was filed with the Court as Exhibit B to Debtors' Motion Pursuant to 11 U.S.C. §105(a) and §363(b) for an Order Approving the Metro Ethernet Networks Side Agreement and Granting Related Relief [D.I. 2574], or through other separate agreement as may be appropriate.

period and to dedicate full time and attention to resolution of the potential disputes; and

b.     Compensation at Grant Thornton's standard hourly rates for professional services rendered from and after February 26, 2010.  Grant Thornton's applicable hourly rates are as follows:

      (i) Partners (including Erik C. Lioy)  $525

      (ii) Managers/Senior Managers     $350 – 475

      (iii) Associates/Senior Associates   $175 – 325

      (iv) Paraprofessionals          $100

c.     Reimbursement of reasonable expenses incurred in connection with this engagement, including but not limited to travel, report production, delivery services, photocopying and other costs incurred in providing the services.

43.     As set forth in the Engagement Agreement, if Grant Thornton's assignment has not concluded 90 days after the signing of the Engagement Agreement, Grant Thornton is entitled to submit an interim invoice for $100,000.  Otherwise, Grant Thornton shall present one final invoice at the conclusion of its engagement as Neutral TSA Arbitrator.

44.     The Parties and Grant Thornton agree, as per the terms of the Engagement Agreement, that the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") has jurisdiction over any controversy or claim arising out of or relating to NNI's compensation of Grant Thornton for services provided under the Engagement Agreement and further agree that any such controversies or claims shall be heard and determined by the Bankruptcy Court.  If for any reason the Bankruptcy Court fails to exercise jurisdiction over any controversy or claim arising out of or relating to NNI's compensation of Grant Thornton for services provided under the Engagement Agreement, the Parties and Grant Thornton agree such controversies or claims are subject to the jurisdiction of the state and federal courts of the state of

Delaware and further agree that any such controversies or claims shall be heard and determined in the state or federal courts in the state of Delaware.

45.    As set forth in the Lioy Declaration, the Fee Structure is reasonable and comparable to those generally charged by accounting consultancy firms of similar stature to Grant Thornton and for comparable engagements, both in- and out-of-court.  The Debtors believe, as does Grant Thornton, that the Fee Structure is in fact reasonable, market-based and designed to compensate fairly Grant Thornton for its work and to cover fixed and routine overhead expenses.

46.    Pursuant to the Engagement Agreement, the Parties also have agreed to indemnify and reimburse Grant Thornton and certain related persons in accordance with the indemnification provisions set forth in the Engagement Agreement.

47.    The indemnification and reimbursement provisions reflected in the Engagement Agreement are customary and reasonable terms of engagement for arbitrators such as Grant Thornton for proceedings both out of court and in chapter 11.  The terms of the Engagement Agreement, including indemnification provisions, were fully negotiated between the Parties and Grant Thornton at arm's-length and the Debtors respectfully submit that the Engagement Agreement, including the indemnification contained therein, is reasonable and in the best interests of the Debtors, their estates and their creditors.

48.    Accordingly, as part of this Motion, the Debtors request that the Court approve the indemnification granted under the Engagement Agreement, subject during the pendency of these Chapter 11 cases to the modifications in the proposed order attached hereto as Exhibit A and as set forth below:

      a.    Subject to the provisions of subparagraph (c) beneath, the Debtors are authorized to indemnify, and to provide reimbursement to, and shall

indemnify, and provide reimbursement to, Grant Thornton and its present and former partners, principals and employees in accordance with the Engagement Agreement for any claim arising from, related to, or in connection with the services provided for in the Engagement Agreement, but not for any claim arising from, related to, or in connection with Grant Thornton's postpetition performance of any other services unless such postpetition services and indemnification therefore are approved by the Court;

b.      Notwithstanding any indemnification provisions of the Engagement Agreement to the contrary, the Debtors shall have no obligation to indemnify Grant Thornton or provide reimbursement to Grant Thornton (i) for any claim or expense that is judicially determined (the determination having become final) to have arisen from Grant Thornton's bad faith, self-dealing, breach of fiduciary duty (if any), gross negligence, or willful misconduct, (ii) for a contractual dispute in which the Debtors allege the breach of Grant Thornton's contractual obligations unless the Court determines that indemnification or reimbursement would be permissible pursuant to In re United Artists Theatre Co., 315 F.3d 217 (3d Cir. 2003), or (iii) for any claim or expense that is settled prior to a judicial determination as to the exclusions set forth in clauses (i) and (ii) above, but determined by the Court, after notice and a hearing pursuant to subparagraph (c) beneath, to be a claim or expense for which Grant Thornton should not receive indemnity or reimbursement under the terms of the Engagement Agreement, as modified by this Order;

c.      If, before the earlier of (i) the entry of an order confirming a chapter 11 plan in these chapter 11 cases (that order having become final and no longer subject to appeal), and (ii) the entry of an order closing these chapter 11 cases, Grant Thornton believes that it is entitled to the payment of any amounts by the Debtors on account of the Debtors' indemnification and/or reimbursement obligations under the Engagement Agreement (as modified by this Order), including without limitation the advancement of defense costs, Grant Thornton must file an application therefor in this Court, and the Debtors may not pay any such amounts to Grant Thornton before the entry of an order by this Court approving the payment. This subparagraph (c) is intended only to specify the period of time during which the Court shall have jurisdiction over any request for compensation and expenses by Grant Thornton for indemnification or reimbursement and is not a provision limiting the duration of the Debtors' obligation to indemnify Grant Thornton.

49.     As set forth in the Engagement Agreement, the Parties also have agreed to exculpate Grant Thornton from actions or omissions taken or to be taken pursuant to the engagement as Neutral TSA Arbitrator, other than with respect to actions arising from Grant

19

Thornton's gross negligence, willful misconduct or fraud. Accordingly, the Debtors request that the Court approve the exculpation provisions as set forth in the Engagement Agreement.

50. To the best of Grant Thornton's knowledge, the Debtors did not make any payment to Grant Thornton during the 90-day period prior to the Petition Date. Grant Thornton did receive payments from Nortel Government Solutions, NNI's non-debtor subsidiary, during the 90-day period prior to the Petition Date.

51. No promises have been received by either Grant Thornton or any partner, principal or other employee thereof as to compensation or payment in connection with this engagement other than in accordance with the provisions of the Bankruptcy Code, the Bankruptcy Rules, the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware and orders of the Court. Grant Thornton has no other agreement with any other entity to share with such entity any compensation received by Grant Thornton in connection with this engagement.

## **Notice**

52. Notice of the Motion has been given via first class mail to the (i) U.S. Trustee; (ii) counsel to the Committee; (iii) counsel to the Bondholder Group; (iv) counsel to the Joint Administrators; (v) counsel to Ciena; (vi) counsel to Grant Thornton and (vii) general service list established in these chapter 11 cases. The Debtors submit that under the circumstances no other or further notice is necessary.

## **No Prior Request**

53. No prior request for the relief sought herein has been made to this or any other court.

WHEREFORE, the Debtors respectfully request that this Court (i) grant this Motion and the relief requested herein; (ii) enter the proposed order attached hereto; and (iii) grant such other and further relief as it deems just and proper.


Dated:  March 19, 2010          CLEARY GOTTLIEB STEEN & HAMILTON LLP
        Wilmington, Delaware

                                James L. Bromley (*admitted pro hac vice*)
                                Lisa M. Schweitzer (*admitted pro hac vice*)
                                One Liberty Plaza
                                New York, New York 10006
                                Telephone:  (212) 225-2000
                                Facsimile:  (212) 225-3999

                                   - and -

                                MORRIS, NICHOLS, ARSHT & TUNNELL LLP


                                   */s/ Alissa T. Gazze*
                                Derek C. Abbott (No. 3376)
                                Eric D. Schwartz (No. 3134)
                                Ann C. Cordo (No. 4817)
                                Alissa T. Gazze (No. 5338)
                                1201 North Market Street
                                P.O. Box 1347
                                Wilmington, Delaware 19801
                                Telephone:  (302) 658-9200
                                Facsimile: (302) 658-3989

                                *Counsel for the Debtors and Debtors in Possession*