**<u>EXHIBIT B</u>**

**Argentina Side Offer**

**EXECUTION VERSION**

Buenos Aires, March 19, 2010

Nortel Networks Limited
Nortel Networks International Corporation
Nortel Networks Inc.
EMEA Sellers
EMEA LTA Sellers
The Joint Administrators
The Joint Israeli Administrators


Ladies and Gentlemen:

According to our conversations, we hereby make the following offer (the "**Offer**") in connection with the payment of the portion of the Sale Proceeds (as defined below) payable by Ciena (as defined below) to Nortel Networks de Argentina S.A. ("**Nortel Argentina**") pursuant to the ASA (as defined below), which Offer shall be considered accepted by Nortel Networks Limited ("**NNL**"), Nortel Networks International Corporation ("**NNIC**"), Nortel Networks Inc. ("**NNI**"), all the entities listed on Exhibit A attached hereto (the "**EMEA Sellers**") and all the entities listed on Exhibit B attached hereto (the "**EMEA LTA Sellers**", and together with NNI, NNL and the EMEA Sellers the "**MEN Selling Parties**") which (i) in the case of the entities listed on Part A of Exhibit A (the "**EMEA Debtors**") and the entities listed on Part A of Exhibit B (other than NNSA (as defined below)) (collectively, including NNSA, the "**LTA EMEA Debtors**") are acting by their joint administrators Alan Robert Bloom, Stephen John Harris, Alan Michael Hudson and Christopher John Wilkinson Hill of Ernst & Young LLP of 1 More London Place, London SE1 2AF (other than Nortel Networks (Ireland) Limited, for which David Hughes of Ernst & Young Chartered Accountants of Harcourt Centre, Harcourt Street, Dublin 2, Ireland and Alan Robert Bloom serve as joint administrators) (collectively, the "**Joint Administrators**"), who act as agents, for the EMEA Debtors and LTA EMEA Debtors without any personal liability whatsoever; (ii) in the case of the Israeli Company (as defined below) are acting by their joint administrators Yaron Har-Zvi and Avi D. Pelossof (the "**Joint Israeli Administrators**") who act as agents of the Israeli Company without any personal liability whatsoever; (iii) Nortel Networks S.A. (in Administration) ("**NNSA**") acting by the NNSA Office Holders (as defined below)), who act as agents for NNSA without any personal liability whatsoever, the Joint Administrators and the Joint Israeli Administrators.  If the Joint Administrators and the Joint Israeli Administrators accept this Offer they shall become party to this Offer solely for the purposes of Sections 4 and 5, respectively, of this Offer. For the purposes of this Offer, Nortel Argentina, NNL, NNIC, NNI, each EMEA Seller and each EMEA LTA Seller may each be referred to as a "**Party**", and together as the "**Parties**", and "**Sale Proceeds**" means the sale proceeds payable by Ciena under the Sale Agreements (as defined below).


This Offer is being made based on the following facts:

1

On January 14, 2009 (the "**Petition Date**"), NNL, NNIC and certain of their affiliates (collectively, the "**Canadian Debtors**") filed with the Ontario Superior Court of Justice (the "**Canadian Court**") an application for protection under the Companies' Creditors Arrangement Act (Canada) (the "**CCAA**" and the cases commenced by such application, together with any formal insolvency proceedings commenced in Canada in respect of any Canadian Debtor, the "**CCAA Cases**") and were granted certain initial creditor protection pursuant to an order issued by the Canadian Court on the same date, which has been extended by further order of the Canadian Court;

NNI and certain of its affiliates (collectively, the "**U.S. Debtors**") are debtors-in-possession under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**"), which commenced cases under the Bankruptcy Code on the Petition Date (except for Nortel Networks (CALA) Inc., which commenced its case under the Bankruptcy Code on July 14, 2009) by filing voluntary petitions for relief in the U.S. Bankruptcy Court for the District of Delaware (the "**U.S. Bankruptcy Court**");

The Canadian Court has appointed Ernst & Young Inc. as Monitor in connection with the CCAA Cases (the "**Monitor**");

The Office of the United States Trustee for the District of Delaware has appointed an Official Committee of Unsecured Creditors as representative for the unsecured creditors of the U.S. Debtors (the "**Committee**") and, in addition, an ad hoc group of bondholders holding claims against certain of the US Debtors and certain of the Canadian Debtors has also been organized (the "**Bondholder Group**");

On the Petition Date, the EMEA Debtors and the LTA EMEA Debtors, including Nortel Networks UK Limited (in administration) ("**NNUK**", and, together with NNI, NNL, the Monitor, the Bondholder Group and the Committee, the "**Relevant Parties**"), filed applications with the English Court pursuant to the Insolvency Act 1986 (the "**Insolvency Act**") and the European Union's Council Regulation (EC) No 1346/2000 on Insolvency Proceedings and the English Court appointed the Joint Administrators under the Insolvency Act;

The Israeli Court, on January 19, 2009, granted Nortel Networks Israel (Sales and Marketing) Limited (In Administration) (the "**Israeli Company**") with a stay of proceedings order and nominated the Joint Israeli Administrators as joint administrators of the Israeli Company.  On November 24, 2009, as part of such stay of proceedings, the Israeli Court approved a creditors' arrangement in connection with the Israeli Company, and further approved at a later date, the continuation of all relevant rights, duties and obligations of the Joint Israeli Administrators pursuant to such stay of proceedings order;

While the administration proceedings in respect of NNSA under the Insolvency Act are continuing, subsequent to the Petition Date, NNSA commenced secondary insolvency proceedings within the meaning of Article 27 of the European Union's Council Regulation (EC) No 1346/2000 on Insolvency Proceedings in the Republic of France pursuant to which Cosme Rogeau was appointed liquidator and

2

Franck Michel was appointed administrator (together, the **"NNSA Office Holders"**) by the Versailles Commercial Court (Docket No. 2009P00492) for NNSA;

NNL, NNI and certain other debtor and non-debtor affiliates of NNL and NNI (collectively, the "**Sellers**") have, as of November 24, 2009, entered into an Amended and Restated Asset Sale Agreement with Ciena Corporation (and together with their affiliates and designees, "**Ciena**") relating to the part of the Business (as defined in the ASA) owned and operated by the Sellers (as amended from time to time, the "**ASA**");

As part of the transactions contemplated by the ASA, Nortel Argentina has agreed, *inter alia*, to sell certain of its assets relating to the Metro Ethernet Networks business ("**MEN**") located in Argentina to Ciena and Ciena has agreed to purchase those assets and assume certain liabilities relating to the MEN assets located in Argentina (the "**Transferred Argentina Assets and Liabilities**") pursuant to the ASA and that certain Argentina Offer, dated as of the date hereof (the "**Argentina Offer**");

The EMEA Sellers, the Joint Administrators and the Joint Israeli Administrators have, as of October 7, 2009, entered into an Asset Sale Agreement with Ciena relating to the part of the Business owned and operated by the EMEA Sellers, amended such agreement on October 20, 2009, and amended such agreement on November 24, 2009, and further amended it on December 16, 2009 and on January 13, 2010 (as further amended from time to time in accordance with the terms thereto and this Offer, the "**EMEA Agreement**" and, together with the ASA, the "**Sale Agreements**");

Subject to certain exceptions, the ASA does not prescribe the portion of the Sale Proceeds payable by Ciena thereunder to be allocated to each of the Sellers (including Nortel Argentina);

The allocation of the Sale Proceeds payable by Ciena under the Sale Agreements and the Argentina Offer among each of the Sellers (including Nortel Argentina), the EMEA Sellers and the EMEA LTA Sellers will be determined pursuant to the terms of that certain Interim Funding and Settlement Agreement, dated as of June 9, 2009 ("**IFSA**");

Nortel Argentina is making this Offer based on the agreement between the Parties that the amount of sales proceeds allocated to Nortel Argentina is not less than the minimum price to be determined in accordance with the applicable laws and regulations and accounting principles applicable to Nortel Argentina (the "**Applicable Procedures**"); and

In conjunction with the transactions contemplated by the Sale Agreements and the Argentina Offer, the Parties and certain of their affiliates have entered into that certain Metro Ethernet Networks Side Agreement dated February 26, 2010 (the "**MEN Side Agreement**") and that certain Distribution Escrow Agreement dated March 19, 2010 (the "**Distribution Escrow**") pursuant to which, *inter alia*, certain costs, expenses, damages, purchase price adjustments and other liabilities (the "**Transaction Costs**") are

to be allocated based in part on the allocation of Sales Proceeds, and the Parties intend that the payment of the allocated portion of the Sales Proceeds to Nortel Argentina shall be net of its allocable share of such Transaction Costs (such share, the "**Argentina Transaction Costs**").

This Offer is subject to the following terms and conditions:

1.     Adjustment Amount.

(a)     Conditioned upon the actual receipt by each Relevant Selling Party (as defined below) of Sale Proceeds (by way of payment out of the Distribution Escrow) for the sale of their respective MEN assets pursuant to the Sale Agreements or for release of their respective intellectual property rights, as the case may be, in the event that the Required Purchase Price exceeds the Allocated Purchase Price, each Relevant Selling Party shall pay to Nortel Argentina, as additional Sale Proceeds due to Nortel Argentina in respect of the sale of the Transferred Argentina Assets and Liabilities and the other transactions contemplated by the Sale Agreements and the Argentina Offer, such Relevant Selling Party's Agreed Respective Percentage (as defined below) of (A) the Required Purchase Price minus (B) the sum of the Allocated Purchase Price and the Argentina Transaction Costs (such aggregate amounts payable by the Relevant Selling Parties, the "**Adjustment Amount**"), provided that if the Adjustment Amount is negative, the parties hereby agree that the Adjustment Amount shall be deemed to be zero, where "**Allocated Purchase Price**" means the amount of Sale Proceeds allocated to Nortel Argentina for the Transferred Argentina Assets and Liabilities and the other transactions contemplated by the Sale Agreements and the Argentina Offer pursuant to the terms of the IFSA and in accordance with the terms of the ASA, and "**Required Purchase Price**" means the minimum amount of Sale Proceeds to be allocated to Nortel Argentina as consideration for the Transferred Argentina Assets and Liabilities in accordance with the Applicable Procedures.  Within fifteen (15) calendar days of the determination of the Adjustment Amount in accordance with Sections 1(a) and 1(b) of this Offer, each Relevant Selling Party shall pay to Nortel Argentina such Relevant Selling Party's Agreed Respective Percentage of the Adjustment Amount (if any), by wire transfer of immediately available funds to an account designated by Nortel Argentina.  The Parties hereby agree that (to the extent required by the Applicable Procedures and in full compliance with the terms as set forth in the Argentina Offer) the Required Purchase Price shall be determined, subject to Section 1(b) below, pursuant to a transfer pricing study conducted by the Buenos Aires office of an independent internationally recognized accounting firm retained by Nortel Argentina (the "**Initial Valuation Accounting Firm**"), at its own expense, (such amount, the "**Initial Valuation Amount**"), provided that Nortel Argentina hereby agrees that Nortel Argentina shall not retain the Initial Valuation Accounting Firm prior to five (5) calendar days following the earlier of (a) January 1, 2011 and (b) the final determination of the Allocated Purchase Price.  The Initial Valuation Accounting Firm shall be retained by Nortel Argentina with the prior consent of the Relevant Parties, which consent shall not be unreasonably withheld and a response to a request for consent shall be given within seven (7) calendar days after the receipt of such written request by Nortel Argentina (the "**Initial Approval Period**").  The failure to object to the designation of the Initial Valuation Accounting Firm during the Initial Approval Period shall be deemed to constitute an approval of such

4

designation by the Relevant Parties.  For the purposes of this Offer, "**Agreed Respective Percentage**" means, with respect to the Relevant Selling Parties, such Relevant Selling Party's Sale Proceeds Ratio multiplied by 100, where "**Sale Proceeds Ratio**" means, with respect to the Relevant Selling Parties, the ratio of the amount of Sale Proceeds paid that are allocated to the Canadian Debtors (in the case of NNL), the US Debtors (in the case of NNI), each EMEA Seller (in the case of each EMEA Seller), and to each EMEA LTA Seller (in the case of each EMEA LTA Seller), respectively, to the aggregate amount of Sale Proceeds paid to the MEN Selling Parties, and "**Relevant Selling Party**" means NNL, NNI, any EMEA Seller or any EMEA LTA Seller, provided that if an EMEA Seller or an EMEA LTA Seller is not allocated any Sale Proceeds in accordance with the terms of the IFSA, then such EMEA Seller or EMEA LTA Seller shall not be a Relevant Selling Party for the purposes of this Offer.

(b)    In the event that any of the Relevant Parties objects to the Initial Valuation Amount ("**Initial Valuation Objection**") within thirty (30) calendar days following receipt of notification of the Initial Valuation Amount from Nortel Argentina (which notification shall be accompanied by a copy of the Initial Valuation Accounting Firm's report), at the request of the objecting Relevant Party or Relevant Parties Nortel Argentina shall seek another transfer pricing study (in full compliance with the Applicable Procedures) to determine the Required Purchase Price (the "**Additional Valuation Amount**") from one (1) additional independent internationally recognized accounting firm (the "**Additional Valuation Accounting Firm**").  The objecting Relevant Party or Relevant Parties shall notify all the other Parties of the Initial Valuation Objection in accordance with Section 9 of this Offer.  The Additional Valuation Accounting Firm shall be retained by Nortel Argentina with the prior consent of the objecting Relevant Party or Relevant Parties, which consent shall not be unreasonably withheld and a response to a request for consent shall be given within seven (7) calendar days after the receipt of such written request by Nortel Argentina (the "**Additional Approval Period**").  The failure to object to the designation of the Additional Valuation Accounting Firm within the Additional Approval Period shall be deemed to constitute an approval of such designation by the objecting Relevant Party or Relevant Parties.  The Relevant Selling Parties shall bear all reasonable and documented costs and expenses of the Additional Valuation Accounting Firm incurred in its determination of the Additional Valuation Amount (the "**Additional Valuation Costs**") where each Relevant Selling Party shall be responsible for such Relevant Selling Party's Agreed Respective Percentage of the Additional Valuation Costs.  Upon determination of the Additional Valuation Amount, the Required Purchase Price shall equal the sum of the Initial Valuation Amount and the Additional Valuation Amount, divided by 2.

(c)    The Parties hereby agree that any payment by any Relevant Selling Party of its portion of the Adjustment Amount shall be considered to be a corresponding deduction in the amount of Sale Proceeds ultimately distributed to such Relevant Selling Party for the sale of its respective MEN assets pursuant to the Sale Agreements or for its release of its licensed intellectual property rights, as the case may be.

2.    Other Covenants.  In the event that subsequent to the payment of the Adjustment Amount Nortel Argentina pays one or more dividend payments (even if such

dividend is declared prior to the determination of the Adjustment Amount), distributions or other payments to NNL and/or NNIC (collectively, the "**Shareholders**") in their respective capacity as a shareholder of Nortel Argentina ("**Distributed Amounts**"), each Shareholder hereby agrees to pay each Relevant Selling Party (other than NNL) that ultimately receives an allocation of the Sale Proceeds under the Sale Agreements such Party's Agreed Respective Percentage of the after-tax amounts of such Distributed Amounts after receipt of the Distributed Amounts, <u>provided</u> that such payments to NNI, each EMEA Seller and each EMEA LTA Seller shall not in the aggregate exceed the portion of the Adjustment Amount paid by each such Party to Nortel Argentina in accordance with Section 1(a).  For greater certainty, the after-tax amount of such Distributed Amount shall be determined taking into account, *inter alia*, any withholding or deductions imposed by any relevant taxing authority in respect of the Distributed Amounts, any Canadian federal or provincial tax payable by the Shareholders or utilization of Canadian federal or provincial tax losses, credits or deductions by NNL as a result of receiving the Distributed Amounts, and any Canadian withholding tax payable by the Shareholders as a consequence of any payments made by the Shareholders to NNI, the EMEA Sellers and the EMEA LTA Sellers in accordance with this Section 2.

3.  <u>Effectiveness</u>.  No provision of this Offer shall be effective until each of the U.S. Bankruptcy Court and the Canadian Court approves the entirety of this Offer and all of the provisions hereof (the "**Court Approval Condition**").  All provisions of this Offer shall be effective as of the date of the satisfaction of the Court Approval Condition.  Each Party hereto shall (i) use commercially reasonable efforts to satisfy the Court Approval Condition as soon as possible, taking into account the availability of the respective courts to address the matters set forth in this Offer and (ii) keep all other Parties reasonably apprised of the progress of the satisfaction of the Court Approval Condition.

4.  <u>Exclusion of Liability and Acknowledgement re Joint Administrators and Directors of EMEA Non-Debtor Sellers</u>

(a)    The Parties agree that (i) the Joint Administrators have negotiated and if they accept this Offer shall become party to this Offer as agents for the EMEA Debtors and the LTA EMEA Debtors to which they are appointed and that none of the Joint Administrators, their firm, partners, employees, advisers, representatives or agents shall incur any personal liability whatsoever whether such liability would arise under Paragraph 99(4) of Schedule B1 of the Insolvency Act or otherwise howsoever, whether on their own part or in respect of any failure on the part of any other Party to observe, perform or comply with any of its obligations under this Offer or under or in relation to any associated arrangements or negotiations, and (ii) the directors of the entities listed on Part B of <u>Exhibit A</u> (collectively, the "**EMEA Non-Debtor Sellers**") and the entities listed on Part B of <u>Exhibit B</u> (collectively, the "**EMEA Non-Debtor LTA Sellers**") shall not incur any personal liability whatsoever, in their capacity as such directors, in respect of the authorization, execution, delivery or performance of this Offer, howsoever arising other than in respect of fraud by any such director.

(b)    If this Offer is accepted, the Joint Administrators would become party to this Offer:  (i) as agents for, and on behalf of, the EMEA Debtors and the LTA

EMEA Debtors (other than NNSA); and (ii) in their own capacities solely for (1) taking the benefit of the statutory charges under Paragraph 99(3) of Schedule B1 of the Insolvency Act, (2) obtaining the benefit of any provisions of this Offer expressed to be conferred on them and (3) enforcing the obligations of the other Parties to this Offer.

(c)     Notwithstanding anything to the contrary in Section 6 of this Offer, any claim, action or proceeding against the Joint Administrators arising from or related to (i) the personal liability of the Joint Administrators, their firm, partners, employees, advisors, representatives or agents, (ii) their qualification to act as insolvency practitioners in accordance with Part XIII of the Insolvency Act or (iii) their appointment as joint administrators of the EMEA Debtors and the LTA EMEA Debtors (other than NNSA) and their remaining as current joint administrators thereof under this Offer shall be governed exclusively by English law and subject to the exclusive jurisdiction of the English Courts.

(d)     The Parties agree that any breach of this Offer by the Joint Administrators shall be deemed to be a breach by them in their capacities as administrators of the EMEA Debtors and the LTA EMEA Debtors (other than NNSA), and, in such a case, each Party hereto shall have the right to make claims and assert its rights hereunder, against the EMEA Debtors, the LTA EMEA Debtors (other than NNSA) and their respective successors and assigns.

5. Exclusion of Liability and Acknowledgments re Joint Israeli Administrators.

(a)     The Parties agree that the Joint Israeli Administrators have negotiated and if they accept this Offer, shall become party to this Offer as agents for the Israeli Company and that none of the Joint Israeli Administrators, their firm, partners, employees, advisers, representatives or agents shall incur any personal liability whatsoever whether on their own part or in respect of any failure on the part of any other Party to observe, perform or comply with any of its obligations under this Offer or under or in relation to any associated arrangements or negotiations.

(b)     If this Offer is accepted, the Joint Israeli Administrators would become a party to this Offer:  (i) as agents of the Israeli Company; and (ii) in their own capacities solely for (1) obtaining the benefit of any provisions of this Offer expressed to be conferred on them and (2) enforcing the obligations of the other Parties to this Offer.

(c)     Notwithstanding anything in Section 6 of this Offer, any claim, action or proceeding against the Joint Israeli Administrators arising from or related to the personal liability of the Joint Israeli Administrators, their firm, partners, employees, advisers, representatives or agents, (and not as agents for any Israeli Company) under this Offer shall be governed exclusively by Israeli law and subject to the exclusive jurisdiction of the Courts of Israel.

(d)     The Parties agree that any breach of this Offer by the Joint Israeli Administrators shall be deemed to be a breach by them in their capacities as administrators of the Israeli Company, and, in such a case, each Party hereto shall have

the right to make claims and assert its rights hereunder, against the Israeli Company and its respective successors and assigns.

6.  <u>Governing Law</u>.  This Offer shall be governed exclusively by the laws of the State of New York without regard to the rules of conflict of laws of the State of New York or any other jurisdiction, <u>provided</u> that Section 4 shall be governed exclusively by English law and Section 5 shall be governed exclusively by Israeli law.

7.  <u>No Third Party Beneficiaries</u>.  Except as specifically set forth in this Offer, this Offer is for the sole benefit of the Parties and their permitted assigns and nothing herein, express or implied, is intended to or shall confer upon any other Person any legal or equitable right, benefit or remedy of any nature whatsoever under or by reason of this Offer, <u>provided</u> that each of the Committee and the Bondholder Group shall be a third party beneficiary of this Offer, entitled to take advantage of the benefits of this Offer to NNI, to the fullest extent as if it were a signatory hereto.

8.  <u>Consent to Amendments; Waivers</u>.  No Party shall be deemed to have waived any provision of this Offer unless such waiver is in writing, and then such waiver shall be limited to the circumstances set forth in such written waiver.  This Offer, or any provision hereof, may be waived or amended, on no less than five (5) calendar days' notice, only by means of a writing signed by all Parties, and approved, in writing, by the Committee, the Bondholder Group and the Monitor, which amendments, if material in the judgment of the Parties, must be approved by each of the Courts that initially approved this Offer. Nortel Argentina agrees that it shall not amend, waive or modify the Argentina Offer or any term thereof without the prior consent of each Relevant Party (such consent shall not be unreasonably withheld).

9.  <u>Notices</u>.  Any notice in this Offer that is required to be in writing shall be either sent by facsimile transmission, personal delivery, reputable overnight courier service or by electronic mail (in PDF format) to any Party at the address specified in the Argentina Offer or the MEN Side Agreement, as applicable, or at such address, to the attention of such other person, and with such other copy, as the recipient Party has specified by prior written notice to the sending Party pursuant to the provisions of this Section 9.

This Offer shall be considered accepted by each of NNL, NNI, NNIC, the EMEA Sellers, the EMEA LTA Sellers, the Joint Administrators and the Joint Israeli Administrators upon receipt by each such Party and unless a written notice of rejection is received by Nortel Argentina.

Nortel Networks de Argentina S.A.

By: _____

Name: Alberto Bernardo Cánaves
Title: Presidente

9

**Exhibit A**

**EMEA Sellers**

<u>**Part A – EMEA Debtors**</u>

Nortel Networks UK Limited (In Administration)

Nortel Networks (Ireland) Limited (In Administration)

Nortel Networks NV (In Administration)

Nortel Networks SpA (In Administration)

Nortel Networks BV (In Administration)

Nortel Networks Polska Sp z.o.o. (In Administration)

Nortel Networks Hispania, SA (In Administration)

Nortel Networks (Austria) GmbH (In Administration)

Nortel Networks sro (In Administration)

Nortel Networks Portugal SA (In Administration)

Nortel GmbH (In Administration)

Nortel Networks AB (In Administration)

Nortel Networks France S.A.S. (In Administration)


<u>**Part B – EMEA Non-Debtor Sellers**</u>

o.o.o. Nortel Networks

Nortel Networks AG

Nortel Networks (Northern Ireland) Limited


<u>**Part C The Israeli Company**</u>

Nortel Networks Israeli (Sales and Marketing ) Limited

**Exhibit B**

**EMEA LTA Sellers**

## Part A  LTA EMEA Debtors

Nortel Networks Engineering Services Kft (in Administration)

Nortel Networks Slovensko, sro (in Administration)

Nortel Networks Romania Srl (in Administration)

Nortel Networks Oy (in Administration)

Nortel Networks International Finance & Holding BV (in Administration)

Nortel Networks S.A. (in Administration)


## Part B  LTA EMEA Non-Debtor Sellers

Nortel Networks Optical Components Ltd.