**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

-------------------------------------------------------X
                                                    :
*In re*                                             :     Chapter 11
                                                    :
Nortel Networks Inc., *et al.*,[1]                  :     Case No. 09-10138 (KG)
                                                    :
                              Debtors.              :     Jointly Administered
                                                    :
                                                    :     **Hearing date: April 14, 2010, 10:00 a.m. (ET)**
                                                    :     **Objections due: April 7, 2010 12:00 p.m. (ET)**
-------------------------------------------------------X

**DEBTORS' MOTION FOR ENTRY OF AN ORDER PURSUANT TO
11 U.S.C. §§ 505 AND 105 DETERMINING CERTAIN TAX LIABILITIES**

Nortel Networks Inc. ("NNI") and certain of its affiliates, as debtors and debtors in

possession, (collectively, the "U.S. Debtors"), hereby move this Court (the "Motion"), for the

entry of an order substantially in the form attached hereto as Exhibit A, pursuant to sections

505(a) and 105(a) of title 11 of the United States Code (the "Bankruptcy Code"), determining

certain tax liabilities of the U.S. Debtors; and granting them such other and further relief as the

Court deems just and proper.  In support of this Motion, the U.S. Debtors respectfully represent

as follows:

**Jurisdiction**

1.     The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and

1334.  This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).  Venue is

proper pursuant to 28 U.S.C. §§ 1408 and 1409.

---

[1]     The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's tax identification number, are:  Nortel Networks Inc. (6332), Nortel Networks Capital Corporation (9620), Nortel Altsystems Inc. (9769), Nortel Altsystems International Inc. (5596), Xros, Inc. (4181), Sonoma Systems (2073), Qtera Corporation (0251), CoreTek, Inc. (5722), Nortel Networks Applications Management Solutions Inc. (2846), Nortel Networks Optical Components Inc. (3545), Nortel Networks HPOCS Inc. (3546), Architel Systems (U.S.) Corporation (3826), Nortel Networks International Inc. (0358), Northern Telecom International Inc. (6286), Nortel Networks Cable Solutions Inc. (0567) and Nortel Networks (CALA) Inc. (4226).  Addresses for the Debtors can be found in the Debtors' petitions, which are available at http://chapter11.epiqsystems.com/nortel.

2.      The statutory bases for the relief requested herein are sections 505(a) and 105(a) of the Bankruptcy Code.

**Background**

**A.      Procedural History**

3.      On January 14, 2009 (the "Petition Date"), the U.S. Debtors, other than NN CALA (defined below), filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code.

4.      The U.S. Debtors continue to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

5.      On January 15, 2009, this Court entered an order of joint administration pursuant to Bankruptcy Rule 1015(b) that provided for the joint administration of these cases and for consolidation for procedural purposes only [D.I. 36].

6.      Also on the Petition Date, the U.S. Debtors' ultimate corporate parent Nortel Networks Corporation ("NNC"), NNI's direct corporate parent Nortel Networks Limited ("NNL," and together with NNC and their affiliates, including the U.S. Debtors, "Nortel"), and certain of their Canadian affiliates (collectively, the "Canadian Debtors")[2] filed an application with the Ontario Superior Court of Justice (the "Canadian Court") under the Companies' Creditors Arrangement Act (Canada) (the "CCAA"), seeking relief from their creditors (collectively, the "Canadian Proceedings").  The Canadian Debtors continue to manage their properties and operate their businesses under the supervision of the Canadian Court.

7.      On January 14, 2009, the Canadian Court entered an order recognizing these chapter 11 proceedings as a foreign proceeding under section 18.6 of the CCAA.  On February

---

[2]      The Canadian Debtors include the following entities:  NNC, NNL, Nortel Networks Technology Corporation, Nortel Networks Global Corporation and Nortel Networks International Corporation.

27, 2009, based on a petition filed by Ernst & Young Inc., as court-appointed Monitor in the Canadian Proceedings and as foreign representative for the Canadian Debtors (the "Monitor"), this Court entered an order recognizing the Canadian Proceedings as foreign main proceedings under chapter 15 of the Bankruptcy Code.

8.      On January 14, 2009, the High Court of England and Wales placed nineteen of Nortel's European affiliates (collectively, the "EMEA Debtors")[3] into administration under the control of individuals from Ernst & Young LLC (collectively, the "Joint Administrators").  On May 28, 2009, at the request of the Joint Administrators, the Commercial Court of Versailles, France (the "French Court") (Docket No. 2009P00492) ordered the commencement of secondary proceedings in respect of Nortel Networks S.A. ("NNSA"), which consist of liquidation proceedings during which NNSA was originally authorized to continue to operate as a going concern for an initial period of three months, which period was subsequently extended to November 28, 2009.  In accordance with the European Union's Council Regulation (EC) No. 1346/2000 on Insolvency Proceedings, the English law proceedings (the "English Proceedings") remain the main proceedings in respect of NNSA although a French administrator and a French liquidator have been appointed and are in charge of the day-to-day affairs and continuing business of NNSA in France.  On October 1, 2009, pursuant to a motion filed by the Joint Administrators, the French Court approved an order to: (i) suspend the liquidation operations relating to the sale of the assets and/or businesses of NNSA for a renewable period of two months; (ii) authorize the continuation of the business of NNSA so long as the liquidation

---

[3]      The EMEA Debtors include the following entities:  Nortel Networks UK Limited, Nortel Networks S.A., Nortel Networks (Ireland) Limited, Nortel GmbH, Nortel Networks France S.A.S., Nortel Networks Oy, Nortel Networks Romania SRL, Nortel Networks AB, Nortel Networks N.V., Nortel Networks S.p.A., Nortel Networks B.V., Nortel Networks Polska Sp. z.o.o., Nortel Networks Hispania, S.A., Nortel Networks (Austria) GmbH, Nortel Networks, s.r.o., Nortel Networks Engineering Service Kft, Nortel Networks Portugal S.A., Nortel Networks Slovensko, s.r.o. and Nortel Networks International Finance & Holding B.V.

operations are suspended; and (iii) maintain the powers of the French Administrator and

Liquidator during the suspension period, except with respect to the sale of assets and/or

businesses of NNSA.  On February 26, 2010, the French Court extended the suspension of

liquidation until the earlier of (i) May 31, 2010 or (ii) the filing with the French Court of a letter

from Kapsch CarrierCom AG stating that its bid for the GSM//GSM-R assets of NNSA has

become unconditional.  On June 26, 2009, this Court entered an order recognizing the English

Proceedings of Nortel Networks UK Limited ("NNUK") as foreign main proceedings under

chapter 15 of the Bankruptcy Code.[4]

9.      On January 26, 2009, the Office of the United States Trustee for the District of

Delaware (the "U.S. Trustee") appointed an Official Committee of Unsecured Creditors (the

"Committee") pursuant to section 1102(a)(1) of the Bankruptcy Code [D.I.s 141, 142].  An ad

hoc group of bondholders holding claims against certain of the Debtors and certain of the

Canadian Debtors has also been organized (the "Bondholder Group").  No trustee or examiner

has been appointed in the U.S. Debtors' cases.

10.      On July 14, 2009 (the "CALA Petition Date"), Nortel Networks (CALA) Inc.

("NN CALA" and a U.S. Debtor with NNI and its affiliates), an affiliate of NNI, filed a

voluntary petition for relief under chapter 11 of the Bankruptcy Code.  On July 17, this Court

entered orders approving the joint administration and consolidation of NN CALA's chapter 11

case with the other U.S. Debtors' chapter 11 cases for procedural proposes [D.I. 1098], and

applying to NN CALA certain previously entered orders in the U.S. Debtors' chapter 11 cases

[D.I. 1099].

---

[4]      Additionally, on January 18, 2009, certain Nortel affiliates, including Nortel Networks Israel (Sales and
Marketing) Limited, filed an application with the Tel-Aviv-Jaffa District Court, pursuant to the Israeli Companies
Law, 1999, and the regulations relating thereto for a stay of proceedings.  On January 19, 2009, the Israeli Court
appointed Yaron Har-Zvi and Avi D. Pelossof as joint administrators of the Israeli Company under the Israeli
Companies Law (the "Joint Israeli Administrators").

B.      **Debtors' Corporate Structure and Business**

11.      Nortel is a technology company that designs, develops and deploys communication products, systems and solutions to its customers around the globe.  Its principal assets include its employees, the intellectual property derived and maintained from its research and development activities, its customers and other significant contracts and agreements.

12.      Additional information regarding the U.S. Debtors' corporate structure and business and the events leading to the chapter 11 cases is set forth in the Declaration of John Doolittle in Support of First Day Motions and Applications [D.I. 3] (the "First Day Declaration").

C.      **Case Milestones**

13.      On June 19, 2009, Nortel announced that it was advancing in discussions with external parties to sell its businesses and it would assess other restructuring alternatives for its businesses in the event it is unable to maximize value through sales.  Nortel has closed (i) the sale of certain portions of its Layer 4-7 data portfolio to Radware Ltd. [D.I. 539]; (ii) the sale of substantially all of its CDMA business and LTE Access assets to Telefonaktiebolaget LM Ericsson (publ) ("Ericsson") [D.I. 1205]; (iii) the sale of the assets of its Wireless Networks business associated with the development of Next Generation Packet Core network components to Hitachi Ltd. [D.I. 1760]; and (iv) the sale of substantially all of the assets of the Enterprise Solutions business globally, including the shares of Nortel Government Solutions Incorporated and DiamondWare Ltd. to Avaya Inc. [D.I. 1514] (collectively, the "2009 Transactions").  In addition, the sale to Ciena Corporation of substantially all the assets of Nortel's Optical Networking and Carrier Ethernet businesses associated with the Metro Ethernet Networks business unit closed on March 19, 2010 [D.I. 2070] and Nortel has obtained Court approval for the planned sale of substantially all of its GSM/GSM-R business to Ericsson and Kapsch

CarrierCom AG [D.I. 2065]; as well as the planned sale of certain assets of its Carrier Voice

Over IP and Application Solutions business to GENBAND Inc. [D.I. 2632].  Efforts continue to

be made with respect to the monetization of Nortel's remaining assets (any proceeds to be

received from the MEN transaction or other subsequent transactions that are subject to the same

sort of allocation as to which the 2009 Transactions are subject, the "Subsequent Transactions").

14.    On August 4, 2009, this Court entered an order fixing September 30, 2009 at 4:00

PM (Eastern Time) as the general bar date for filing proofs of claim or interests [D.I. 1280].  On

December 3, 2009 this Court entered an order fixing January 25, 2010 at 4:00 PM (Eastern

Time) as the bar date for filing proofs of claim or interests against NN CALA [D.I. 2059].

## Relief Requested

15.    By this Motion, the U.S. Debtors seek an order, pursuant to sections 505(a) and

105(a) of the Bankruptcy Code and well-established U.S federal tax law principles:  (i)

determining that the U.S. Debtors are not required to recognize any gain or loss from the 2009

Transactions or any Subsequent Transactions, or any interest earned on the sale proceeds

generated from the 2009 Transactions or any Subsequent Transactions while such proceeds are

held in escrow, in calculating, for the purposes of the United States or any political subdivision

thereof, the taxable income of the U.S. Debtors, including NNI and its consolidated group, for

the 2009 taxable year (or any future taxable year so long as such sale proceeds have not been

allocated on a final basis) on the grounds that such gain or loss cannot be determined until the

U.S. Debtors' shares of the proceeds from those transactions are known, and that the U.S.

Debtors may file their income tax returns for 2009 (and thereafter) accordingly, including,

without limitation, NNI's 2009 consolidated U.S. federal income tax return and income tax

returns filed in any political subdivision of the United States; (ii) determining that in any

estimation or filing required by a taxing authority of the United States or any political

subdivision thereof, the U.S. Debtors are not required to include taxable gains or losses from any divestiture that will occur or has occurred after December 31, 2009, or any interest earned on sale proceeds related to such divestitures while such proceeds are held in escrow, prior to the final allocation of the Sale Proceeds (as defined below); (iii) determining that, with respect to any tax return for transfer taxes filed in the United States or any political subdivision thereof relating to the 2009 Transactions or any Subsequent Transactions, the U.S. Debtors will not be subject to interest or penalties as a result of any amendments to such tax returns that may be required once the U.S. Debtors' share of proceeds from such transaction is known;[5] and (iv) granting the U.S. Debtors such other and further relief as this Court deems just and proper.

## Facts Relevant to this Motion

### A.    Sale Proceeds[6]

16.    One of the most important issues remaining in these cases – as well as in the related insolvency proceedings in Canada and the U.K. – is the allocation of proceeds from the post-petition asset sales among the various Nortel entities around the world.  The prospect of the allocation process allowed the Nortel businesses to be sold on a global going concern basis, thus maximizing the total value of those businesses.  The next step is the allocation of the proceeds generated, a process that will determine the amounts available for distribution to creditors in the various jurisdictions where creditor protection proceedings have been commenced and to creditors, and possibly equity holders, in the non-debtor jurisdictions.  The allocation will be based on numerous considerations, including the entitlement of the various Nortel entities to the value of the various assets sold or otherwise monetized.

---

[5]       The U.S. Debtors seek relief from failure to pay penalties and interest not just for transfer taxes, but for all federal, state and local taxes to the extent such penalties and interest arise as a result of the U.S. Debtors' treatment of gain or loss with respect to the Sale Proceeds (as defined below) on their tax returns.

[6]       For the purposes of this section, capitalized terms used but not defined shall have the meaning ascribed to them in the IFSA (as defined below).

17.    In recognition of the importance of the allocation process, the U.S. Debtors, the Canadian Debtors, and the EMEA Debtors (collectively, the "IFSA Parties") entered into the Interim Funding and Settlement Agreement (the "IFSA"), dated June 9, 2009 and approved by this Court on June 29, 2009 [D.I. 993], pursuant to which they agreed, inter alia, (a) that all proceeds from any sale of material assets of any of the Selling Debtors (the "Sale Proceeds") will be held in escrow until the parties either agree on a consensual allocation, or, in the absence of such an agreement, obtain a binding determination on the allocation pursuant to an agreed upon allocation protocol (the "Protocol"); and (b) that they would negotiate in good faith to attempt to reach agreement on the terms that would govern the allocation protocol process.  IFSA §§ 12(b)-(c).

18.    This arrangement was necessitated by the complicated structure of Nortel's businesses, which involve the development, licensing and maintenance of intangible intellectual property and the marketing of products and services based on that intellectual property across multiple jurisdictions.  The IFSA Parties realized that it would be challenging to come to an agreement as to the appropriate value to which each IFSA Party is entitled for the sale of its assets, including intellectual property rights and other intangible assets.  The decision to defer the determination of the purchase price allocation was therefore one of practical necessity, enabling Nortel to sell its businesses quickly for the highest possible consideration for the benefit of all its creditors, and to avoid a potentially contentious a fortiori dispute over the proper allocation of the proceeds.  Such a dispute would have crippled the sale processes, and quite possibly halted them indefinitely.

19.    As of the current date, no agreement has been reached regarding the allocation of the Sale Proceeds or the terms of a Protocol.  However in accordance with the IFSA, the IFSA

Parties continue to work actively and in good faith toward the development of a Protocol for the allocation of the Sale Proceeds.  Due to the varied interests of the numerous creditor constituencies of the IFSA Parties, and the difficulty in determining the appropriate portion of proceeds to be allocated to each party, negotiations in furtherance of the Protocol have been vigorous, and while a resolution has not yet been reached, substantial progress has been made. After a resolution is reached, the protocol must be submitted to this Court (as well as the Canadian and U.K. Courts) for approval.  As no Protocol has been agreed upon or approved at this time, the sale proceeds from the 2009 Transactions (the "2009 Sale Proceeds") and all additional Sale Proceeds will remain in escrow pursuant to the IFSA and will not be distributed to any of the IFSA Parties.[7]  For U.S. tax purposes, the U.S. Debtors are treating the escrows holding the 2009 Sale Proceeds and all additional Sale Proceeds as custodial arrangements.

**B.    Expectations of Tax Liability**

20.    Pursuant to sections 6012(a)(2) and 6072(b) of the Internal Revenue Code of 1986 as amended (the "Code"), the U.S. Debtors are required to file their 2009 federal income tax returns, including NNI's 2009 consolidated U.S. federal income tax return for itself and its affiliated group of corporations (the "2009 NNI Consolidated Return" and, together with the other 2009 federal income tax returns of the U.S. Debtors, the "2009 U.S. Tax Returns") on Form 1120 by March 15, 2010 unless an extension is requested.  The U.S. Debtors have filed applications on Form 7004 for an automatic six-month extension of the deadline to file the 2009 U.S. Tax Returns, and in accordance therewith, intends to file the 2009 U.S. Tax Returns on Form 1120 on or before September 15, 2010.  See I.R.C. § 6081(b); Treas. Reg. § 1.6081-3(a).

---

[7]    The proceeds of the closed transactions have been deposited into escrow accounts located in the United States.

The U.S. Debtors also have substantially similar filing obligations for state and local income tax purposes.

21.    Notwithstanding the automatic six-month filing extension for its federal income tax return described above, the U.S. Debtors were required to report on Form 7004 the amount of tax they expect they will owe on the 2009 U.S. Tax Returns by the original March 15 deadline, and pay at least ninety percent of such amount.  See Treas. Reg. §§ 1.6081-1(a), 1.6081-3(b); 2008 Instructions to Form 7004, at 1-2.  Unlike Form 1120, which requires the taxpayer to describe and provide certain supporting materials for its reported items of income, deduction, gain, loss and ultimate tax liability, the U.S. Debtors are only required to report their expected tax liability on Form 7004, without description or support, and therefore the U.S. Debtors have not yet been required to file a tax return or other document with a taxing authority that shows its methodology for calculating its tax liability.  As shown on applications of certain of the U.S. Debtors on Form 7004 filed by the March 15, 2010 deadline, and attached hereto as Exhibit B, the U.S. Debtors expect that their total U.S. federal income tax owed for 2009 will be zero dollars, due to net operating loss carryovers for U.S. federal income tax purposes that are sufficient in amount to offset all items of taxable income incurred by the U.S. Debtors in 2009.[8] However, because the U.S. Debtors are unable to make any determination of the amount of Sale Proceeds they will receive for the 2009 Transactions, they are likewise unable to estimate with any reasonable accuracy the amount of income taxes for which they would be liable or the amount of net operating loss carryovers and other tax attributes that would be available for the

---

[8]      Depending on whether the use of certain loss carryovers is necessary, NNI may or may not have a small alternative minimum tax liability.  Moreover, if NNI is forced to make assumptions regarding the allocation of the Sale Proceeds, under certain assumptions NNI may incur an income tax liability in 2009.  Until such time as the allocation of the Sale Proceeds is determined, NNI has no basis upon which to calculate its tax liability and distinguish between these alternatives.  For the avoidance of doubt, the U.S. Debtors request that this Court determine that the U.S. Debtors are not required to make any such assumptions prior to the final allocation of the Sale Proceeds.

2010 taxable year and subsequent years.  Thus, without the relief requested in this Motion, the

U.S. Debtors would be unable to provide an accurate estimate of their income tax liability at any

time before the allocation of the Sale Proceeds.  This will also be the case in the future so long as

no final allocation has been determined.

22.     Items of gain or loss attributable to the 2009 Sale Proceeds are not yet

determinable because certain parts of the transactions relating to the allocation of the Sale

Proceeds are still open.  As a result, as described in more detail in Section II, below, the U.S.

Debtors believe the "open transaction doctrine" of U.S. tax law applies to the 2009 Transactions

and will not recognize any gain or loss with respect to such proceeds in the U.S. Debtors'

calculation of their taxable income in 2009, including the 2009 NNI Consolidated Return.  By

this Motion, the U.S. Debtors seek a determination, pursuant to sections 505(a) and 105(a) of the

Bankruptcy Code and well-established U.S. federal tax law principles, confirming that the U.S.

Debtors are not required to recognize gain or loss with respect to any portion of the Sale

Proceeds or any interest earned on the Sale Proceeds while held in escrow in calculating taxable

income on the 2009 U.S. Tax Returns, the 2009 NNI Consolidated Return, any future returns, or

in any estimation or filing required by a taxing authority of the United States or any political

subdivision thereof until such time as the U.S. Debtors' portions of the Sale Proceeds are finally

allocated.

### Basis for Relief

### I.     THIS COURT HAS AUTHORITY PURSUANT TO SECTIONS 505 AND 105 OF THE BANKRUPTCY CODE TO DETERMINE THE AMOUNT OR LEGALITY OF ANY TAX

23.     Section 505(a) of the Bankruptcy Code provides, in pertinent part:

> [T]he court may determine the amount or legality of any tax, any fine or
> penalty relating to a tax, or any addition to tax, whether or not previously
> assessed, whether or not paid, and whether or not contested before and

11

adjudicated by a judicial or administrative tribunal of competent
jurisdiction.

11 U.S.C. § 505(a)(1).  Pursuant to section 505, "the court may determine the amount or legality

of any tax, a determination that obviously should bind the governmental unit . . . ."  Hoffman v.

Conn. Dep't of Income Maint., 492 U.S. 96, 102 (1989); see also In re Custom Distribution

Services Inc., 224 F.3d 235, 239 (3d Cir. 2000);  H & H Beverage Distribs. v. Dep't of Revenue,

850 F.2d 165, 166-67 (3d Cir. 1998); Quattrone Accountants, Inc. v. IRS, 895 F.2d 921, 923 (3d

Cir. 1990); In re Ribs-R-Us, Inc., 828 F.2d 199, 202 (3d Cir. 1987).  Section 505(a)(1) provides

the bankruptcy court with broad authority to determine a debtor's tax liability, restrained only by

section 505(a)(2).  Section 505(a)(2) contains only two exceptions to this broad authority:  (i)

where the amount or legality of the tax was contested before and adjudicated by a tribunal of

competent jurisdiction before the commencement of the bankruptcy proceeding; and (ii) where

the request is for a determination of the right of the estate to a tax refund before the earlier of (a)

120 days after the trustee requests such refund or (b) a determination of such request by the

governmental unit from which the refund is claimed.  See 11 U.S.C. § 505(a); see also In re

Venture Stores, Inc., 54 Fed. Appx. 721, 723 (3d Cir. 2002); In re Continental Airlines, Inc., 149

B.R. 76, 84 (D. Del. 1993); In re Curtis Papers, Inc., No. 03-46139, 2008 WL 2777277, at *2

(Bankr. D.N.J. July 17, 2008).  Neither exception is implicated here.  Apart from the two

exceptions set forth in section 505(a)(2), section 505(a)(1) provides for the determination of all

types of tax liabilities, including tax liabilities of chapter 11 debtors arising after the filing of the

bankruptcy petition and before the confirmation of a plan of reorganization or liquidation.  See In

re Schmidt, 205 B.R. 394, 398 (Bankr. N.D. Ill. 1997).

24.     The purpose of section 505(a) is two-fold:  (i) to allow "the prompt resolution of a

debtor's tax liability, where that liability has not been determined prior to the bankruptcy

proceeding, in the same forum addressing the debtor's overall financial condition;" and (ii) to "protect[] creditors from the dissipation of the estate's assets which could result if the debtor failed to challenge a prepetition assessment."  In re Penking Trust, 196 B.R. 389, 393 (Bankr. E.D. Tenn. 1996); see also In re Palij, 202 B.R. 27, 30 (Bankr. D.N.J. 1996).

25.    Section 105(a) of the Bankruptcy Code provides that "[t]he court may issue any order . . . that is necessary or appropriate to carry out the provisions of this title."  11 U.S.C. § 105.  Section 105 does not create substantive rights, but gives the bankruptcy court broad equitable power to issue orders in aid of other substantive sections of the Bankruptcy Code.  See In re Combustion Engineering, Inc., 391 F.3d 190, 236 (3d Cir. 2004).  When combined with section 505 of the Bankruptcy Code, section 105 allows bankruptcy courts to issue orders concerning tax liabilities that are necessary to administer a debtor's estate in an orderly and efficient manner and to achieve fairness in the bankruptcy proceedings.  See Kreidle v. Dept. of Treasury (In re Kreidle), 143 B.R. 941, 944-45 (D. Col. 1992) (finding under sections 505 and 105 that the IRS was equitably estopped from seeking additional income tax); see also In re Kaiser Aluminum Corp., 456 F.3d 328, 339-40 (3d Cir. 2006) (describing "great principles of equity" embodied in section 105).

26.    The U.S. Debtors respectfully request that this Court exercise the powers provided for in sections 505(a) and 105(a) to promptly determine under U.S. tax law that (i) items of gain or loss with respect to the 2009 Sale Proceeds, including with respect to interest earned on the 2009 Sale Proceeds while held in escrow, are not recognizable in determining items of taxable income for the U.S. Debtors, including for NNI's consolidated group for the 2009 taxable year, (ii) the U.S. Debtors properly have filed or may file the 2009 U.S. Tax Returns accordingly, including NNI's consolidated U.S. federal income tax return and tax returns

in any political subdivision of the United States, (iii) future Sale Proceeds, and any interest

earned thereon while held in escrow, are similarly not includible in determining taxable income

for purposes of any return, estimation or filing required by any taxing authority of the United

States or any political subdivision thereof prior to the final allocation of the Sale Proceeds, and

(iv) with respect to any tax return for transfer taxes filed in the United States or any political

subdivision thereof relating to the 2009 Transactions, the U.S. Debtors will not be subject to

interest or penalties[9] as a result of any amendments to such tax returns that may be required once

the U.S. Debtors' share of proceeds from such transaction is known.[10]  The prompt and proper

payment of taxes in a manner that will not prejudice the U.S. Debtors in negotiations regarding

the allocation of the Sale Proceeds is critical to the administration of the U.S. Debtors' estates.

**II.     U.S. TAX LAW PERMITS DEFERRAL OF ITEMS OF
GAIN AND LOSS FROM THE 2009 TRANSACTIONS
UNTIL FINAL ALLOCATION IS DETERMINED**

27.     U.S. federal income tax law requires that all taxpayers must pay taxes on an

annual basis on income from whatever source derived.  In certain circumstances, however, it is

impossible to ascertain the amount of income received by a taxpayer during a taxable year.

Thus, U.S. tax law has developed exceptions to the general rule that address situations such as

that of the U.S. Debtors in which, although the 2009 Transactions have closed and the overall

---

[9]     The U.S. Debtors seek relief from failure to pay penalties and interest not just for transfer taxes, but for all federal, state and local taxes to the extent such penalties and interest arise as a result of the U.S. Debtors' treatment of gain or loss with respect to the Sale Proceeds on their tax returns.

[10]     "In contrast to the normal rule that taxpayers must pay first and litigate later, section 505(a) expressly allows the bankruptcy court to determine a tax 'whether or not previously assessed, [and] whether or not paid . . . .'" In re Amoskeag Bank Shares, Inc., 239 B.R. 653, 659 (D.N.H. 1998).  In fact, although the Declaratory Judgment Act explicitly prohibits federal courts from issuing declaratory judgments regarding federal taxes, section 505 of the Bankruptcy Code is exempted from the prohibition.  See 28 U.S.C. § 2201.  Thus, section 505(a) has been used in several instances to determine the extent of a tax liability not yet assessed.  See In re Schwartz, 192 B.R. 90 (Bankr. D.N.J. 1996); In re Amoskeag Bank Shares, Inc., 239 B.R. 653 (D.N.H. 1998); In re Popa, 218 B.R. 420, 423-25 (Bankr. N.D. Ill. 1998); In re Kilen, 129 B.R. 538 (Bankr. N.D. Ill. 1991).  The present situation, particularly given the applicability of the open transaction doctrine, discussed in section II below, argues strongly for relief under section 505(a).

14

proceeds are known, the amount of proceeds ultimately allocated to the U.S. Debtors and subject to U.S. tax is unascertainable.  Until final allocation of the Sale Proceeds is determined, it is appropriate to apply these exceptions to the 2009 Transactions and any further sale transactions prior to agreement on the ultimate allocation of the Sale Proceeds.  Moreover, it would be inequitable, and result in unnecessary waste of the U.S. Debtors' assets, to require the U.S. Debtors to suffer potential penalties or be liable for interest if they do not, and are unable to, know at this time the income they will receive for the 2009 Transactions.

28.    One exception to the general rule that a taxpayer recognizes gain or loss on the sale of an asset in the year of the sale is the open transaction doctrine.  The Supreme Court first enunciated the judicially developed open transaction doctrine in 1931.  Burnet v. Logan, 283 U.S. 404 (1931).  The doctrine provides that in certain circumstances where the consideration received by a seller is unascertainable or incapable of valuation, a seller is not required to report taxable gain for the sale of an asset until the amount of sale proceeds it receives exceeds the seller's adjusted basis (for tax purposes) of the property sold.  Id.  According to the Supreme Court, a taxpayer "should not be charged with gain on pure conjecture unsupported by any foundation of ascertainable fact."  Id.

29.    Since Burnet, courts have applied the open transaction doctrine to situations where "an attempt . . . to attribute a certain value [to assets] . . . involves [the court] largely in guess-work," Pierce v. United States, 49 F.Supp. 324, 330 (Ct. Cl. 1943), or where "[a]pportionment with reasonable accuracy of the amount received not being possible . . . it can not be determined that [the taxpayer] has, in fact, realized gain in any amount."  Inaja Land Co., Ltd. v. Commissioner, 9 T.C. 727, 736 (1947).  In recent years, including as recently as 2008, courts have continued to recognize the open transaction doctrine in cases where it is not practical

to allocate tax basis among multiple items of property in a single sale.  See, e.g., Gladden v. Commissioner, 262 F.3d 851 (9th Cir. 2001) (recognizing that the open transaction doctrine may apply for the purposes of apportioning the cost basis of a land purchase to water rights); Fisher v. United States, 82 Fed. Cl. 780 (2008) (applying the open transaction doctrine to the demutualization of an insurance plan where mutual ownership rights were found not to be susceptible to valuation).

30.      The open transaction doctrine keys off of a fundamental principle in tax law that a taxpayer does not report income until it is able to determine what income it has received – a true common sense proposition.  This principle is invoked in numerous other situations.  For example, under the accrual method of tax accounting,[11] a taxpayer is required to include an amount in income only when "all the events have occurred which fix the right to receive such income *and the amount thereof can be determined with reasonable accuracy*."  Treas. Reg. 1.451-1(a) (emphasis added); see also Globe Corp. v. Commissioner, 20 T.C. 299 (1953) (holding that where an accrual-method taxpayer contracted to provide services for an amount of compensation to be determined by future negotiation with the counterparty, the taxpayer was not required to recognize taxable income until the negotiations were completed).  Moreover, in 2009, the Second Circuit allowed a taxpayer-seller to defer recognition of taxable income on his sale of property that was restrained in anticipation of forfeiture until proceeds from the sale were released from escrow on the taxpayer's behalf.  See Carione v. Commissioner, 104 A.F.T.R.2d 2009-7770 (2d Cir. 2009).  The situation facing the U.S. Debtors is squarely within the open transaction doctrine as they are unable to determine their share of the Sale Proceeds with any

---

[11]      As a U.S. corporation, NNI is required to report its taxes on the accrual method of accounting.  I.R.C. §§ 446(c)(2), 448(a)(1).

reasonable accuracy, and thus the amount of gain or loss from the sale transactions cannot be determined until there is a final determination of the allocation of the Sale Proceeds.

### III.    THE RELIEF REQUESTED IS SUPPORTED BY SECTIONS 505(A) AND 105(A) OF THE BANKRUPTCY CODE AND APPLICABLE U.S. TAX LAW

31.    Pursuant to sections 505(a) and 105(a) of the Bankruptcy Code and well-established U.S. tax law, the U.S. Debtors should not recognize the 2009 Sale Proceeds, any future Sale Proceeds in calculating their taxable income prior to the final allocation of such proceeds, or any interest earned on the Sale Proceeds while held in escrow.  Although the 2009 Transactions have closed and the overall proceeds from those transactions are known (with reasonable certainty, subject to certain adjustments), the proceeds have yet to be distributed among the various IFSA Parties (and across their various tax jurisdictions), and only a portion of the Sale Proceeds will be taxable in the United States.  Without knowing that portion, the sale prices actually received by the U.S. Debtors for each transaction cannot be determined.  Until that determination can be made, it is neither practicable nor possible for the U.S. Debtors to calculate their taxable gain or loss from the sale of their assets.

32.    A prompt determination of this Motion is necessary for the U.S. Debtors to properly report their taxable income or loss on their 2009 U.S. Tax Returns, including the 2009 NNI Consolidated Return.  As noted above, the U.S. Debtors were required to pay their total expected tax for 2009 by March 15, 2010 and the U.S. Debtors believe no expected tax is due in respect of the 2009 Transactions.  However, if the U.S. Debtors' reliance on the open transaction doctrine is later determined to be inappropriate, the taxing authorities could take the position that the U.S. Debtors have failed to correctly report and pay their taxes, leading to the potential attempted imposition by the taxing authorities of substantial penalties and interest.  The imposition of any such penalties and interest would result in unnecessary waste of the U.S.

Debtors' assets to the detriment of their stakeholders.  In light of the fact that any estimates of the allocation of Sale Proceeds made today would equate to guess-work, if gains from the 2009 Transactions were required to be included in the 2009 U.S. Tax Returns, the only way to avoid the risk of such penalties altogether would be to pay estimated taxes that are so high as to be in excess of any conceivable allocation to the U.S. Debtors.  This approach would both lead to likely overpayments and a need to seek repayment from multiple taxing authorities.  Moreover, this issue is not limited to the 2009 taxable year, but also requires prompt resolution because the U.S. Debtors must estimate their tax liability for 2010 and make payments in quarterly installments over the course of the 2010 calendar year, beginning on April 15, 2010.  See I.R.C. § 6655(c)(2).  The U.S. Debtors must be able to determine their 2009 taxable income in order to determine the amount of net operating loss carryovers that are available to offset tax liability for Sale Transactions that have closed or will close after December 31, 2009.

33.    Until the final allocation of the Sale Proceeds is determined, the amount to be allocated to the U.S. Debtors is both unknown and unknowable.  Indeed, the IFSA Parties have been engaging in extensive negotiations regarding the terms of a Protocol to determine such allocation.  The purpose of the Protocol is to ensure a fair allocation, to be determined (absent a consensual agreement), in a cross-jurisdictional forum.  Any forced estimation of such allocation present explicitly or implicitly on the 2009 NNI Consolidated Return, the 2009 U.S. Tax Returns, or on other estimations or filings required by the United States or a political subdivision thereof would be speculative in the extreme and potentially prejudicial if introduced in a proceeding as being determinative of the appropriate allocation of the Sale Proceeds.

34.    Furthermore, these circumstances create perverse incentives that are damaging to the estates and the creditors, as some or all of the IFSA Parties could have incentives to report

artificially high amounts of Sale Proceeds on their tax returns, and pay artificially high amounts of taxes. Not only will this result in a risk that the various Nortel entities might overpay their taxes in an attempt to avoid prejudicing the various creditor constituencies vis-à-vis one another, but for the U.S. Debtors, the disadvantage is acute because, unlike Debtors in other jurisdictions, the U.S. Debtors may not be able to offset all items of gain from all sale transactions and other income accrued prior to the resolution of these chapter 11 proceedings.

35.    In sum, the U.S. Debtors submit that this Court has the authority, pursuant to sections 505(a) and 105(a) of the Bankruptcy Code and U.S. tax law, to make the necessary determination that any portion of the Sale Proceeds that may be allocated to the U.S. Debtors, NNI or members of its consolidated group in the future, and any interest earned thereon while in escrow, is not currently includible in calculating items of income or loss on the 2009 U.S. Tax Returns, the 2009 NNI Consolidated Return or on any return, estimation or filing required by any taxing authority of the United States or a political subdivision thereof prior to the final allocation of the Sale Proceeds, and that no interest or penalties should be assessed as a result of any amendments to such filings for transfer taxes relating to the 2009 Transactions that may be required once the U.S. Debtors' share of the Sale Proceeds is known.[12]  Such determinations are appropriate and essential to prevent unnecessary harm to the U.S. Debtors' estates and reductions in the recoveries of their creditors.

### Notice

36.    Notice of the Motion has been given via first class mail, facsimile, electronic transmission, hand delivery or first class mail to the (i) U.S. Trustee; (ii) counsel to the Committee; (iii) counsel to the Bondholder Group; (iv) the Internal Revenue Service and other

---

[12]    The U.S. Debtors seek relief from failure to pay penalties and interest not just for transfer taxes, but for all federal, state and local taxes to the extent such penalties and interest arise as a result of the U.S. Debtors' treatment of gain or loss with respect to the Sale Proceeds on their tax returns.

relevant taxing authorities in the United States; and (v) the general service list established in these chapter 11 cases.  The Debtors submit that under the circumstances no other or further notice is necessary.

## **No Prior Request**

37.     No prior request for the relief sought herein has been made to this or any other court.

*[Remainder of Page Intentionally Left Blank]*

WHEREFORE, the Debtors respectfully request that this Court (i) grant this Motion and

the relief requested herein; (ii) enter the proposed order attached hereto; and (iii) grant such other

and further relief as it deems just and proper.

Dated:  March 26, 2010         CLEARY GOTTLIEB STEEN & HAMILTON LLP
            Wilmington, Delaware

James L. Bromley (admitted *pro hac vice*)
Lisa M. Schweitzer (admitted *pro hac vice*)
One Liberty Plaza
New York, New York 10006
Telephone:  (212) 225-2000
Facsimile:  (212) 225-3999

- and -

MORRIS, NICHOLS, ARSHT & TUNNELL LLP


*/s/ Ann C. Cordo*
Derek C. Abbott (No. 3376)
Eric D. Schwartz (No. 3134)
Ann C. Cordo (No. 4817)
Andrew R. Remming (No. 5120)
1201 North Market Street
P.O. Box 1347
Wilmington, Delaware 19801
Telephone:  (302) 658-9200
Facsimile: (302) 658-3989

*Counsel for the Debtors*
*and Debtors in Possession*