**Exhibit 2**

**(State Tax Amendment SOW)**



**ERNST & YOUNG**

Ernst & Young LLP
Suite 500
4130 ParkLake Avenue
Raleigh, North Carolina 27612-2299

Tel: +1 (919) 981-2800
Fax: +1 (919) 981-2997
www.ey.com

February 16, 2010

Nortel Networks, Inc.
c/o Luis Gonzales
Tecnoparque Eje 5 Norte 990
Edif F, PB
Col Santa Barbara
02310 Mexico DF

Statement of Work and Amending Agreement
APA Amended State Tax Returns

Dear Mr. Gonzales:

Thank you for choosing the US firm of Ernst & Young, LLP, a Delaware limited liability partnership, as your tax service provider. We are pleased to confirm the terms of our mutual agreement with respect to providing Nortel Networks, Inc and Subsidiaries[1] (collectively referred to herein as the "Client") with the services described in Schedule A. Schedule A also describes applicable pricing.

This document constitutes a Statement of Work and Amending Agreement (hereinafter "Statement of Work") as such term is used in the Master Services Agreement 05-178 dated as of January 1, 2007 (the "Global Tax MSA") signed by the Canadian firm of Ernst & Young LL) (an Ontario limited liability partnership) and Nortel Networks Limited (a corporation incorporated under the laws of Canada). All of the terms and conditions of the Global Tax MSA are hereby incorporated by reference into this Statement of Work and shall govern the services to be provided and our respective rights and obligations arising from this engagement.

All references to "E&Y" or "Contractor" in the Global Tax MSA as incorporated herein shall be deemed to refer solely to the Ernst and Young member firm issuing this Statement of Work. This Statement of Work shall create rights and obligations solely between (i) the Ernst & Young member firm issuing this Statement of Work and (ii) the Nortel entities referenced in the first paragraph above.

The parties agree that this Statement of Work and Amending Agreement does not constitute a formal modification or amendment of any provision of the Global Tax MSA other than as may be expressly stated herein and shall not constitute or give rise to the assumption or rejection of the Global Tax MSA.

---

[1] Please refer to Attachment B for a list of the consolidated members in Nortel Networks, Inc. & Subsidiaries.

COMPLIANCE/SOW(TSA)/020310
Nortel Networks Inc., & Subsidiaries
Page 1 of 19

Agreed:

*Ernst & Young LLP*

By: *James E Scott*

Name: James E Scott

Title: Partner

Nortel Networks, Inc., on behalf of itself and its subsidiaries

By: _____

Name: RANDAL S. IZZARD

Title: DIRECTOR, INDIRECT PROCUREMENT

**Schedule A**

**Scope of Services**

E&Y will provide the following tax compliance Services to Client:

E&Y will prepare the amended state and local income and franchise tax returns for Nortel Networks, Inc. & Subsidiaries ("Client") for the year(s) ended December 31, 2001, December 31, 2002, December 31, 2003, December 31, 2004, and December 31, 2005 for those jurisdictions as requested by the Client.

The specific services we will provide as part of this engagement include:

- Preparation of amended state and local income and franchise tax returns and carryback claims
- Preparation of supporting documentation accompanying such returns

The specific services we will not provide as part of this engagement include:

- EY will not initiate, identify or recommend any bankruptcy-specific calculations or adjustments related to the preparation of the amended pre-petition returns. EY will only populate any bankruptcy-related notations or adjustments that are prepared by the client and that we are so directed to include by the client.

- EY will not prepare a return cover letter, return disclosure or any return statements that address the bankruptcy impact and/or the pre-petition aspects of the amended returns. EY will only attach such bankruptcy-specific disclosures as prepared by the client and that we are so directed to include by the client.

- EY will not discuss the bankruptcy impact of the amended returns or any bankruptcy-related amended return issues with the tax jurisdictions. EY will, at the client's request, only discuss the non-bankruptcy tax analysis and calculations related to our return preparation services.

- At the request of Client, upon execution of a letter substantially in the form of Exhibit 1 attached hereto in respect of each tax year for which access to such workpapers is sought, E&Y will provide Client with copies of E&Y's final workpapers, in a format regularly maintained by E&Y, produced by E&Y for purposes of preparing computations in connection with the following services under this letter:

Upon written request, E&Y will assist Client with other tax compliance services, including preparation of additional returns for the current tax year, and extension requests and computation of estimated tax payments for subsequent tax years. However, these services are not covered under the fee quoted in this letter. We will be happy to discuss and provide fee estimates for such additional services, which would be invoiced separately and subject to all other terms and conditions of this Statement of Work and the above-referenced Agreement.

All client copies of the tax return(s) will be presented to Client in an electronic format.

## Out of Scope Services

This engagement does not include (1) an analysis of any shift in ownership of Client stock, (2) the preparation of statements required by Internal Revenue Code §§382 and 383, or (3) a determination of whether such code sections limit the amount of taxable income or tax that can be offset by net operating loss carryforwards, certain recognized built-in losses, certain excess credits, or net capital loss carryovers. The limitations under these provisions may have a material adverse impact on Client's tax liability. We will not prepare a return on which taxable income (or tax) is offset by such attributes unless an analysis is performed. If you would like E&Y to perform such an analysis, those services would be covered under a separate engagement letter. Please contact Jim Scott at 919-981-2886 if you would like to discuss additional services and fees associated with the analysis and reporting requirements under these rules.

This engagement does not include any advice or determinations regarding what expenses may be qualified research expenses under Internal Revenue Code §41 or comparable state statutes.

E&Y can assist Client with other tax services, including tax planning and representation before taxing authorities. However, these services are not covered under the fee quoted in this letter. We will be happy to discuss and provide fee estimates for such additional services, which would be billed separately.

## Responsibilities

Client shall make all management decisions and perform all management functions in connection with the Services under this Statement of Work. E&Y may assist Client in rendering management decisions or carrying out management functions in connection with the Services, including by providing advice, research material or recommendations, but E&Y will not make any such decisions or perform any such functions. In its sole discretion, E&Y may refuse to take any action to the extent it might be construed as a management decision or a management function.

Client accepts responsibility for the results of the Services. Client's approval of any Services shall not constitute a waiver of any of its rights under this Statement of Work. Client further agrees to establish and maintain internal controls in connection with the Services, including monitoring E&Y's performance under this Statement of Work.

Client shall designate an employee possessing the skill, knowledge and/or experience (but not necessarily the experience to perform the Services) to (1) oversee, (2) evaluate the effectiveness of, and (3) approve, the Services.

## Disclosure of reportable transactions

Treasury regulations require taxpayers to file disclosure statements relating to certain tax strategies/transactions that the Internal Revenue Service ("IRS") has identified as Listed Transactions or Transactions of Interest, any transaction that is substantially similar to a Listed Transaction or Transaction of Interest, and Other Reportable Transactions. The disclosure statements must be filed with the proper tax returns and also sent separately to the IRS. In addition, some states have enacted tax shelter legislation requiring taxpayers to file reportable

transaction disclosure statements with the appropriate state income and franchise tax returns. Failure to disclose properly any of these transactions/strategies in which Client directly or indirectly participated may result in the imposition of penalties.

During the process of gathering data to prepare Client's tax return(s), E&Y requires Client to complete a questionnaire about Listed Transactions, Transactions of Interest, and Other Reportable Transactions, which is attached to this Statement of Work. If there is a particular person other than you who should respond to such questionnaire on behalf of Client, please immediately provide to E&Y that person's name, position, and telephone number. E&Y shall not be liable for any penalties resulting from Client's failure to accurately and timely respond to the questionnaire or to file timely the required disclosure statement.

**Fees**

E&Y's fee for the Services will be based upon the time spent on the engagement for each individual, as adjusted annually during the term of this Statement of Work. The current relevant rates of personnel who may be involved in this engagement are as follows:

- Senior        $150

For time spent on the engagement as it relates to the review and signing of the income tax return, the current relevant rate of the individual (Manager level or above), as adjusted annually during the term of this Statement of Work, who may be involved will be $430 per hour. Client shall also pay all applicable taxes incurred in connection with the delivery of the Services or any Advice (except for taxes imposed on E&Y's income).

In addition, Client shall reimburse E&Y for direct expenses incurred in connection with the performance of the Services. Direct expenses include reasonable and customary out-of-pocket expenses for items such as travel, meals, accommodations and other expenses specifically related to this engagement.

E&Y will mail invoices to Client approximately 45 days before payment is due.

Any fee for the Services under this Statement of Work assumes that Client will timely provide, or cause to be provided, to E&Y all appropriate information and assistance, and that the scope and complexity of such Services are consistent with our prior discussions, as well as the description thereof above. If, during the term of this Statement of Work, E&Y determines that any additional work is necessary, whether at Client's request or because the complexity of the project increases, E&Y will promptly contact Client to discuss any adjustments to the scope of work or E&Y's fees.

**Other terms and conditions**

Client authorizes E&Y, its affiliates, and other members of the global Ernst & Young network, including those located outside the United States, to disclose Client's tax return information received or generated in connection with the Services described in this Statement of Work,

including prior year tax return information, to and among each other for the purpose of rendering the Services and to discuss and provide related services to you. You have the ability to request a more limited disclosure of tax return information than that described above. If, at any time, you would like us to narrow the scope of the information to be disclosed, please contact us in writing and we will limit any disclosures that have not yet occurred. You acknowledge that this consent will be valid for three years from the date this Statement of Work is signed by you below.

Please indicate Client's acceptance of these additional terms and conditions by executing this Statement of Work in the space provided below and return it to Jim Scott at your earliest convenience.

Thank you again for your selection of our firm.

Very truly yours,

Ernst & Young LLP

AGREED:

**Nortel Networks, Inc., on behalf of itself and its subsidiaries**

By:_____

Title:_____

Date: _____

Attachment

**Attachment A**

**Reportable Transaction Questionnaire**

FAILURE TO READ THIS CAREFULLY AND TIMELY PROVIDE AN ACCURATE RESPONSE COULD RESULT IN THE IMPOSITION OF PENALTIES BY THE IRS AND/OR STATE TAX AUTHORITIES FOR WHICH ERNST & YOUNG WILL NOT BE LIABLE

Treasury regulations require taxpayers to file disclosure statements relating to certain tax strategies/transactions that the Internal Revenue Service ("IRS") has identified as Listed Transactions or Transactions of Interest, any transaction that is substantially similar to a Listed Transaction or Transaction of Interest, and Other Reportable Transactions. The disclosure statements must be filed with the proper tax return and also sent separately to the IRS. Failure to disclose such transactions may result in the imposition of penalties and is likely to cause the IRS to request copies of your tax accrual work papers during an examination of your tax return. In addition, some states have enacted tax shelter legislation requiring taxpayers to file reportable transaction disclosure statements with the appropriate state income and franchise tax returns. Below is a summary of the current Listed Transactions and Transactions of Interest. You must answer the questions below for us to properly prepare your tax return(s). We may also need to contact you to determine whether you have participated in any additional Listed Transactions or Transactions of Interest identified before your tax return is filed.

Please read each of these Listed Transaction and Transaction of Interest summaries. If you want to receive copies of the relevant published guidance (see the underlined reference at the end of each description) or have any questions regarding a specific transaction, please contact Jim Scott at (919) 981-2886. After answering the questions, return the entire document by March 1, 2010 by mail or e-mail at 4130 ParkLake Avenue, Suite 500, Raleigh, NC 27612 or james.scott@ey.com. When answering the questions below, use the underlined term to identify that Listed Transaction or Transaction of Interest. Ernst & Young LLP ("E&Y") shall not be liable for any penalties resulting from your failure to accurately and timely respond to these questions or to timely file the required disclosure statements.

The summaries of the Listed Transactions identified by the IRS as of this date are as follows:

1. Lease Strips and Other Stripping Transactions: Transactions that allow one participant to realize rental or other income from property or service contracts and another participant or the same participant in a different tax year reports deductions related to that income. Identified in Notice 95-53 and Notice 2003-55.

2. 401K Accelerator: Transactions in which taxpayers claim deductions for contributions to a qualified cash or deferred arrangement or matching contributions to a defined contribution plan where the contributions are attributable to compensation earned by plan participants after the end of the taxable year. Identified in Rev. Rul. 90-105.

3. Multiple Employer Plans: Trust arrangements purported to qualify as multiple employer welfare benefit funds exempt from the limits of §§419 and 419A of the Internal Revenue Code. Identified in <u>Notice 95-34</u>. (See item #21 below regarding collectively-bargained welfare benefit funds.)

4. Contingent Installment Sales: Transactions involving contingent installment sales of securities by partnerships in order to accelerate and allocate income to a tax-indifferent partner, such as a tax-exempt entity or foreign person, and to allocate later losses to another partner. Identified as <u>ACM Transactions</u>.

5. Distributions from Charitable Remainder Trusts: Transactions involving distributions described in Treas. Reg. §1.643(a)-8 from charitable remainder trusts. This transaction uses a §664 charitable remainder trust to convert appreciated assets into cash, while avoiding the gain on the disposition of the assets. Identified in <u>Treas. Reg. §1.643(a)-8</u>.

6. LILOs: Transactions in which a taxpayer purports to lease property and then purports to immediately sublease it back to the lessor (that is, lease-in/lease-out or LILO transactions). Identified in <u>Rev. Rul. 99-14</u>.

7. Distribution of Encumbered Property: Transactions involving the distribution of encumbered property in which taxpayers claim tax losses for capital outlays that they have in fact recovered. Identified in <u>Notice 99-59</u>.

8. Fast-pay Arrangements: Transactions involving fast-pay arrangements as defined in Treas. Reg. §1.7701(l)-3(b) in which a corporation's outstanding stock is structured (in whole or in part) to return the stockholder's investment by distributions treated as dividends. Identified as <u>Fast-pay Arrangements</u>.

9. Counterbalancing Debt Instruments: Transactions involving the acquisition of two debt instruments the values of which are expected to change significantly at about the same time in opposite directions. Identified in <u>Rev. Rul. 2000-12</u>.

10. Artificially Inflated Tax Basis: Transactions generating losses resulting from artificially inflating the tax basis of partnership interests. Identified in <u>Notice 2000-44</u>.

11. Employee Stock Transfer: Transactions involving the purchase of a parent corporation's stock by a subsidiary, a subsequent transfer of the purchased parent stock from the subsidiary to the parent's employees, and the eventual liquidation or sale of the subsidiary. Identified in <u>Notice 2000-60</u>.

12. Guamanian Trusts: Transactions purporting to apply §935 to Guamanian trusts. Identified in <u>Notice 2000-61</u>.

13. Midco Transactions: A broad range of "routine" transactions that happen to include the acquisition, disposition, or movement of stock and assets. The typical Midco transaction is one in which a taxpayer desires to sell stock of a corporation and a buyer desires to purchase

the assets. These parties conduct the transaction through an intermediary, with the taxpayer selling the stock to the intermediary and the buyer then purchasing the assets from it and claiming a fair market value basis. The intermediary, having enabled the target corporation to not pay tax on the built-in gain in its assets, usually receives compensation for participating in the transaction. Notice 2008-111 clarifies Notice 2001-16 and supersedes Notice 2008-20.

14. Contingent Liability Transactions: Transactions involving a loss on the sale of stock acquired in a purported §351 transfer of a high basis asset to a corporation and the corporation's assumption of a liability that the transferor has not yet taken into account for federal income tax purposes. Identified in Notice 2001-17.

15. Basis Shifting on Stock Redemptions: Redemptions of stock in transactions not subject to U.S. tax in which the basis of the redeemed stock is purported to shift to a U.S. taxpayer. Identified in Notice 2001-45.

16. Inflated Tax Basis: Transactions in which the taxpayer as part of an acquisition of assets also assumes debt exceeding their fair market value. The taxpayer claims a higher basis due to the debt assumption. Upon sale of the assets, the taxpayer claims a loss for basis in excess of the fair market value of the assets. Identified in Notice 2002-21.

17. Notional Principal Contract: Transactions using a notional principal contract to claim deductions for periodic payments made by the taxpayer while disregarding the accrual of a right to receive offsetting payments in the future. Identified in Notice 2002-35.

18. Allocation of Straddle Gain or Loss: Transactions involving the creation of straddles in a common trust fund or pass-thru entity (i.e., partnership, S corporation, or grantor trust), with the allocation of gain to one party and loss to another party. Identified in Notice 2002-50, Notice 2002-65, and Notice 2003-54.

19. Prohibited Ownership of S-Corp Securities by ESOP: Transaction in which an S corporation and an associated ESOP, which was formed on or before March 14, 2001, is subsequently transferred and the ESOP claims the benefit of a delayed effective date under IRC §409(p). As a result of the delayed effective date, the earnings of the S corporation are not currently taxed. Identified in Rev. Rul. 2003-6. (See item #26 below regarding S corporation ESOPs involving synthetic equity.)

20. Offshore Deferred Compensation Arrangements: Transactions involving an individual taxpayer who purportedly resigns from his or her current employer or professional corporation and enters an employment contract with an offshore employment leasing company. The offshore leasing company leases the individual's services back to the original employer, typically using one or more intermediaries. The participants claim tax benefits in the form of reduced or avoided individual and corporate income and employment taxes. Identified in Notice 2003-22.

21. Collectively-Bargained Welfare Benefit Funds: Trust arrangements purporting to qualify as collectively-bargained welfare benefit funds exempt from the limits of §§419 and 419A of

the Internal Revenue Code. Identified in <u>Notice 2003-24</u>. (See item #3 above regarding multiple employer plans.)

22. Transfers of Compensatory Stock Options to Related Persons: Transactions involving an individual, generally an employee, who has been granted a nonstatutory compensatory stock option, and transfers that option to a related person. The individual does not claim compensation income when the related person exercises the stock option or, in cases where the related person pays for the option with a note or other deferred payment, the individual does not claim compensation income until receiving the deferred payments. Identified in <u>Notice 2003-47</u>.

23. Contested Liability Trusts: Transactions involving transfers to a trust to provide for the satisfaction of contested liabilities in an attempt to accelerate deductions for the contested liabilities under §461(f) of the Internal Revenue Code. Identified in <u>Notice 2003-77</u>.

24. Offsetting Foreign Currency Option Contracts: Transactions in which a taxpayer claims a loss upon the assignment of a §1256 foreign currency option contract to a charity but fails to report the recognition of gain when the taxpayer's obligation under an offsetting non-section 1256 foreign currency option contract terminates. Identified in <u>Notice 2003-81</u>.

25. Roth IRA Contributions: Transactions designed to avoid the statutory limits on contributions to a Roth IRA contained in §408A using a corporation, substantially all the shares of which are owned or acquired by the Roth IRA. Identified in <u>Notice 2004-8</u>.

26. S corporation ESOP Involving Synthetic Equity: Transaction involving an S corporation that is at least 50% owned by an ESOP, designed to avoid current taxation of the S corporation's profits generated by the business activities of a specific individual or individuals. The profits are accumulated and held for the benefit of the individual(s) in a qualified subchapter S subsidiary (QSub) or similar entity (such as a limited liability company), the profits are not paid to the individual(s) as compensation within 2½ months after the end of the year in which earned, and the individual or individuals have rights to acquire stock or similar interests equal to 50% or more of the fair market value of the QSub. Identified in <u>Rev. Rul. 2004-4</u>. (See item #19 above, also involving S corporation ESOPs.)

27. Pension Plans Involving Excessive Life Insurance: Transactions involving a qualified pension plan that includes life insurance contracts on the life of a participant in the plan with a face amount that exceeds the participant's death benefit under the plan by more than $100,000. Upon the death of the covered employee, the life insurance contract proceeds exceeding the death benefit are applied to the premiums under the plan for other participants. Identified in <u>Rev. Rul. 2004-20</u>.

28. Foreign Tax Credit Intermediary Transactions: Transactions in which, pursuant to a prearranged plan, a domestic corporation purports to acquire stock in a foreign target corporation and makes an election under §338 before selling all or substantially all of the target corporation's assets in a transaction that triggers foreign tax on built-in gains that are

not subject to U.S. tax. The domestic corporation claims foreign tax credits generated with respect to the foreign income tax imposed on the asset sale. Identified in <u>Notice 2004-20</u>.

29. S Corporation Nonvoting Stock Issued to Tax Exempt Organization: Transactions in which S corporation shareholders attempt to transfer the incidence of taxation on S corporation income by donating S corporation nonvoting stock to an exempt organization, while retaining the economic benefits associated with that stock (through warrants issued to the S corporation shareholders that would dilute the shares of nonvoting stock held by the exempt organization or agreements to repurchase the nonvoting stock from the exempt organization at a value that is substantially reduced by reason of the warrants). Identified in <u>Notice 2004-30</u>.

30. Intercompany Financing Through Partnerships Using Guaranteed Payments: Transactions in which a corporation that is exempt from US federal income tax, such as a foreign corporation, provides financing to a domestic subsidiary by investing in the preferred stock of the subsidiary through a partnership in an attempt to convert interest payments that would not be currently deductible under §163(j) into deductible payments. The foreign corporation's return on investment is structured as a guaranteed payment by the partnership, most of which is allocated to, and deducted by, another domestic subsidiary that is a partner in the partnership. In some cases, the guaranteed payments are made to a partner that is unrelated to the foreign corporation and the partnership's obligations to make the guaranteed payments are assured by the foreign corporation or a related party. Identified in <u>Notice 2004-31</u>.

31. SILOs: Transactions in which a taxpayer/lessor enters into a purported sale-leaseback arrangement with a tax-indifferent person (such as a foreign entity, a domestic tax exempt organization or government, or a company in a net operating loss position or other tax neutral situation) as lessee in which substantially all of the tax-indifferent person's future rental payment obligations and purchase option rights are economically defeased/nullified and the taxpayer's risk of loss from a decline, and opportunity for profit from an increase, in the value of the leased property are substantially limited, and there is an obligation on the lessee to provide to the lessor a service contract arrangement or contingent residual value insurance in the event that the lessee purchase option right is not exercised. These leases are frequently referred to as "lease-to-service contracts" or "QTE leases." Identified in <u>Notice 2005-13</u>.

32. Loss Importation Transactions: Transactions in which a taxpayer acquires control of a foreign entity treated as a corporation for U.S. tax purposes, and uses the foreign entity's off-setting positions with respect to foreign currency or other property for the purpose of importing losses, but not corresponding gains. Gain is not imported because the taxpayer causes the foreign entity to close out the gain position while the foreign entity is still treated as a foreign corporation. The taxpayer enters into a new offsetting position to lock in the unrealized loss on the loss position and eliminate further economic risk. The taxpayer then imports the unrealized loss into the U.S., typically by making a check-the-box election with respect to the foreign entity and then closing out the loss position. It may also import the assets of the foreign entity into the U.S. in another type of carryover basis transaction such as a reorganization described in section 368(a). The taxpayer must make the check-the-box election or otherwise dispose of the stock of the foreign entity within 30 days of acquiring it,

so that the foreign entity will not qualify as a CFC and the gain it recognizes will not be taxable under subpart F. Identified in Notice 2007-57.

33. Welfare Benefit Funds Utilizing Cash Value Life Insurance Policies: Trust arrangements purporting to provide employees welfare benefits in the form of cash value life insurance policies. In these arrangements the employer claims deductions for its contributions to the trust per the premium amounts paid, but the employee/policy owners include little if any in corresponding income. These arrangements may involve either a taxable trust or a tax-exempt trust. Identified in Notice 2007-83.

34. Distressed Asset Trust: Transactions in which trusts are used to shift built-in losses in distressed assets that have been transferred into such trusts by a tax-indifferent party to a beneficiary who is a U.S. taxpayer. The distressed assets are then written off by the U.S. taxpayer under §166 or sold with the U.S. taxpayer claiming a deduction under §165, even though the U.S. taxpayer has not incurred an economic loss. Identified in Notice 2008-34.

The summaries of the Transactions of Interest identified by the IRS as of this date are as follows:

1. Contribution of a Successor Member Interest to a Charity: A transaction in which a taxpayer acquires a successor interest in an LLC or similar entity that directly or indirectly holds real property, transfers the rights more than one year after the acquisition to a charity described in section 170(c) of the Internal Revenue Code, and claims a charitable contribution deduction that is significantly higher than the amount that the taxpayer paid to acquire the rights. Identified in Notice 2007-72.

2. Toggling Grantor Trusts: Transactions in which grantor creates and funds a grantor trust with four options with values that are expected to move inversely in relation to at least one of the other options. The grantor then gives a unitrust interest to a beneficiary while retaining a noncontingent remainder interest and the power to reacquire trust property at a specified future date by substituting other property of equivalent value. Through a series of successive transactions involving the sale of the remainder interest to an unrelated buyer for an amount substantially equal to the fair market value of the options contributed to the trust, the "activation" of the substitution power on its effective date, the close-out of the "loss options," and the sale of the unitrust interest to the unrelated buyer, the grantor trust status of the trust is purportedly "toggled off" and "toggled on." The grantor claims a tax loss attributable to the close-out of the loss options even though the grantor has not suffered an equivalent economic loss. A variation of the transaction described above involves an initial contribution of liquid assets instead of options, and a subsequent substitution of appreciated property for the liquid assets. This variation is designed to enable the grantor to avoid the recognition of gain upon the disposition of the appreciated assets. Identified in Notice 2007-73.

3. Potential for Avoidance of Tax through Sale of Charitable Remainder Trust Interests: Transactions involving the sale or other disposition of all interests in a charitable remainder trust (subsequent to the contribution of appreciated assets to the trust but after their sale by the trust). The grantor or other noncharitable claims an increased basis in the annuity or unitrust interest sold based upon the tax basis of assets within the trust (rather than with

reference to the tax basis of assets transferred to the trust) thereby recognizing little, if any, gain from such sale or other disposition of the unitrust or annuity interest. Identified in Notice 2008-99.

4. Use of Domestic Partnership with CFC Partner(s) to Avoid Taxable Subpart F Inclusions: Transactions involving a U.S. taxpayer owning at least one CFC which is a partner in a domestic partnership (the other partner(s) may or may not also be CFCs). The domestic partnership owns a CFC Opco that earns income of a type which is subpart F income. The U.S. taxpayer claims that the subpart F income of the CFC Opco is not subpart F income in the hands of the CFC partner (or the partner's US owner) because of the interposition of the domestic partnership. Identified in Notice 2009-7.

In addition to the above Listed Transactions, the California FTB has separately identified the following tax strategies/transactions as Listed Transactions:

1. Real Estate Investment Trust (REIT) Consent Dividends: Transactions in which a REIT takes a deduction for a consent dividend but the REIT's owners do not report the consent dividend as income. Identified in Cal. FTB-Legal Department, Chief Counsel Announcement 2003-1.

2. Wholly Owned or Controlled Regulated Investment Company (RIC): Transactions in which a corporation forms a wholly owned or controlled entity that registers as a RIC and the parent corporation transfers to the RIC some of its income producing assets. The RIC claims the dividends paid deduction under IRC §852 and the parent corporation claims an intercompany dividend received deduction under the California tax code. Thus, no California income or franchise tax is paid on the income earned by the income producing assets contributed to the RIC. Identified in Cal. FTB-Legal Department, Chief Counsel Announcement 2003-1.

In addition to the above, the State of Colorado has separately identified the following tax strategies/transactions as Listed Transactions:

3. Captive Real Estate Investment Trust (REIT): Transactions between a captive REIT and its more than 50% beneficial owner. A captive REIT is defined as a REIT in which shares or beneficial interests are not regularly traded on an established securities market and of which more than 50% of the voting power or value of the beneficial interest or shares are owned or controlled directly, indirectly, or constructively, by a single entity that is: (1) treated as an association taxable as a corporation under the Internal Revenue Code; and (2) not exempt from federal income tax under IRC §501(a). For these purposes, an "association taxable as a corporation" does not include any REIT other than a captive REIT, any qualified REIT subsidiary other than a qualified REIT subsidiary of a captive REIT, any listed Australian property trust, or a qualified foreign entity. Identified in Colorado Revised Statutes 39-22-652 and 39-22-503(2).

4. Captive Regulated Investment Company (RIC): Transactions between a captive RIC and its more than 50% beneficial owner. A captive RIC is defined as a RIC in which shares or beneficial interests are not regularly traded on an established securities market and of which more than 50% of the voting power or value of the beneficial interest or shares are owned or

controlled directly, indirectly, or constructively, by a single entity that is: (1) treated as an association taxable as a corporation under the IRC; and (2) not exempt from federal income tax under IRC section 501(a). Voting stock in a RIC that is held in a segregated asset account of a life insurance corporation (IRC §817) is not taken into account in determining whether the RIC is captive. Identified in <u>Colorado Revised Statutes 39-22-652 and 39-22-501(2)</u>.

In addition to the above Listed Transactions, the New York State Department of Taxation and Finance has separately identified the following tax strategy/transaction as a Listed Transaction:

5. Certain Charitable Contribution Deductions: A transaction involving the purchase of a remainder interest in real property by a newly formed pass-through entity, which after holding the remainder interest for one year, contributes it to an exempt organization thereby meeting the federal requirements for computing the charitable contribution deduction based on the fair market value of the remainder interest. The remainder interest is appraised using an income approach that takes into consideration the amount of lease payments remaining on the long term lease resulting in a value of the remainder interest substantially higher then what the pass-through entity paid for it. Following the contribution, the pass-through entity is dissolved, allowing its members/partners to claim a pro-rata share of the charitable contribution deduction. Identified in <u>New York State Department of Taxation and Finance- Office of Tax Policy Analysis Technical Service Division TSB-M-07.</u>

Answer the following questions with regard to advice provided by or transactions recommended by anyone other than E&Y.

CALIFORNIA, COLORADO, ILLINOIS, MINNESOTA, NEW YORK, AND UTAH TAXPAYERS: ANSWER EACH OF THE QUESTIONS BELOW WITH RESPECT TO THE RELEVANT TRANSACTION'S IMPACT ON YOUR CALIFORNIA, COLORADO, ILLINOIS, MINNESOTA, NEW YORK, AND/OR UTAH INCOME AND FRANCHISE TAXES AS WELL AS FEDERAL INCOME TAXES. If two or more corporations are filing a combined return for purposes of California, Colorado, Illinois, Minnesota, New York, and/or Utah income or franchise tax, please provide responses to the questions below for all members of the combined reporting group.

Taxpayer(s): **Nortel Networks, Inc.** (the "Company")

1. Since February 28, 2000, has the Company participated in any transaction that might be considered similar to any of the Listed Transactions summarized above?

    No_____ Yes_____ I am not certain, please provide me with more detail about the transaction(s) identified as: _____

    If yes, identify the Listed Transaction(s) summarized above that may be similar to the one(s) the Company participated in: _____

2. Since November 2, 2006, has the Company participated in any transaction that might be considered similar to any of the Transactions of Interest summarized above?

No_____ Yes_____ I am not certain, please provide me with more detail about the transaction(s) identified as: _____

If yes, identify the Transaction(s) of Interest summarized above that may be similar to the one(s) the Company participated in: _____

3. After December 31, 2002, did the Company enter into a transaction or receive tax advice regarding a tax position or transaction from *anyone* that made a statement or provided information regarding tax consequences (including statements indicating the transaction was tax-free or had no tax consequences) and who asked the Company to enter into a confidentiality agreement or in any other way attempted to limit the Company's ability to disclose information regarding the structure or tax aspects of the transaction or the tax advice?

   No_____ Yes_____

4. After December 31, 2002, did the Company enter into a transaction or receive tax advice regarding a tax position or transaction for which the Company (or a related party) has some form of contractual protection against the possibility that part or all of the intended tax consequences will not be sustained (e.g., a fee that is contingent on the tax benefits realized from the transaction or position, or an agreement to get back fees or receive payments if the tax benefits are not sustained)?

   No_____ Yes_____

5. For this question, check the type of "entity" the Company is characterized as for tax purposes (C corporation, S corporation, partnership, or trust) and answer the question(s) that follows the status. For purposes of the reportable transaction disclosure requirements, a section 165 loss includes an amount deductible pursuant to a provision that treats a transaction as a sale or other disposition, or otherwise results in a deduction under section 165. A section 165 loss includes, for example, a loss resulting from a sale or exchange of a partnership interest under section 741 and a loss resulting from a section 988 transaction.

   a. _____Corporations (other than S corporations) and Partnerships that have only C corporations as partners: After December 31, 2002, has the Company directly or indirectly entered into a transaction that results in or is reasonably expected to result in a tax loss under §165 (other than from casualty or involuntary conversion) of at least $10 million in any single taxable year or $20 million in any combination of taxable years?

      No_____ Yes_____

   b. _____S corporations and all other Partnerships: After December 31, 2002, has the Company directly or indirectly entered into a transaction that results in or is reasonably expected to result in a tax loss under §165 (other than from casualty or involuntary conversion) of at least $2 million in any single taxable year or $4 million in any combination of taxable years?

COMPLIANCE/SOW(TSA)/020310
Nortel Networks Inc., & Subsidiaries
Page 15 of 19

No_____ Yes_____

    c. _____Trusts: After December 31, 2002, has the Company directly or indirectly entered into a transaction that results in or is reasonably expected to result in a tax loss under §165 (other than from casualty or involuntary conversion) of at least $2 million in any single taxable year ($50,000 in any single year if the loss arises with respect to a §988 foreign currency transaction) or $4 million in any combination of taxable years?

    No_____ Yes_____

6. After December 31, 2002, did the Company enter into any transaction in which it held an asset for 45 days or less and that generated a tax credit exceeding $250,000?

    No_____ Yes_____

If you answered "yes" to any of the questions listed above, please describe in detail each item and/or transaction that lead to the "yes" response. Please be sure to include names of all promoters, advisors and other parties to any transaction, the tax years it affects, and the amount and tax effect expected each year.


**Nortel Networks, Inc., on behalf of itself and its subsidiaries**


By:_____

Title:_____

Date:_____

**Attachment B**

Nortel Networks, Inc. & Subsidiaries Consolidated Group Members (U.S. Only):

- Nortel Networks, Inc. (Parent)
- Nortel Networks (CALA), Inc.
- Nortel Networks India International, Inc.
- Nortel networks Optical Components, Inc.
- Nortel Networks HPOCS, Inc.
- Nortel Government Solutions, Inc.
- Integrated Information Technology Corporation
- AC Technologies, Inc.
- Qtera Corporation
- Nortel Networks International, Inc.
- Nortel Networks Cable Solutions, Inc.
- Nortel Networks Capital Corporation
- Northern Telecom International, Inc.
- Nortel Ventures LLC
- DiamondWare Ltd.

Exhibit 1: Workpaper Acknowledgement

February 16, 2010

Nortel Networks, Inc.
c/o Luis Gonzales
Tecnoparque Eje 5 Norte 990
Edif F, PB
Col Santa Barbara
02310 Mexico DF

Dear Mr. Gonzales:

Nortel Networks, Inc. ("Client") has asked Ernst & Young LLP ("E&Y") to provide copies of its final amended state income and franchise tax return workpapers (collectively, the "Workpapers") to Client only for (a) its internal use or (b) submission solely to taxing authorities for purposes of responding to inquiries in connection with the examination of Client's tax returns or positions.

Client acknowledges that E&Y created the Workpapers solely for purposes of preparing its computations in connection with its tax compliance services for Client pursuant to the Agreement, dated February 16, 2010, between Client and E&Y (the "Agreement"). Client further acknowledges that (a) information contained in the Workpapers may have been based upon estimates and assumptions that were made at the time the Workpapers were prepared because complete and accurate information was not available to E&Y at that time; (b) such estimates and assumptions were discussed with and approved by Client; (c) the bases for these estimates and assumptions have likely changed since the Workpapers were prepared; and (d) the Workpapers have not been updated by E&Y to reflect information that may have become available subsequent to their preparation. Furthermore, in preparing the Workpapers, E&Y relied on information and representations provided by Client and its representatives that were not independently verified by E&Y at the time the Workpapers were created. As a result, E&Y may not have identified irregularities or errors if they occurred. Moreover, E&Y, in its exercise of professional judgment, may have assessed tax issues in a different manner than Client might have assessed the same issues. The Workpapers are not a substitute for any other inquiries or procedures that Client should undertake for the purpose of satisfying itself with respect to Client's tax situation, nor may the Workpapers or the information contained therein be suitable for such purpose or any other purposes of Client.

Client acknowledges and agrees that the Workpapers and all copies thereof provided to Client pursuant to this letter and the Agreement are and shall remain the sole property of E&Y. Client will use the Workpapers and the information contained therein only for the purposes set forth above.

Except as permitted by this letter or as otherwise required by applicable law or legal process, Client may not disclose, orally or in writing, any of the Workpapers or the information contained

therein, in whole or in part, without the prior written consent of E&Y. Client shall advise E&Y promptly if it receives any subpoena, service or other court order for access to the Workpapers or for information contained therein.

Please confirm Client's agreement with the foregoing by signing and dating the enclosed copy of this letter and returning it to Jim Scott.

Very truly yours,

*Ernst & Young LLP*

Ernst & Young LLP

Accepted and agreed

**Nortel Networks, Inc., on behalf of itself and its subsidiaries**

By: _____

Title: _____

Date: _____