1

UNITED STATES BANKRUPTCY COURT

DISTRICT OF DELAWARE

Case No. 09-10138-kg

- - - - - - - - - - - - - - - - - - - -x

In the Matter of:


NORTEL NETWORKS, INC., ET AL.,


        Debtors.


- - - - - - - - - - - - - - - - - - - -x


                United States Bankruptcy Court

                824 Market Street

                Wilmington, Delaware


                March 3, 2010

                2:24 PM


B E F O R E:

HON. KEVIN GROSS

U.S. BANKRUPTCY JUDGE


ECR OPERATOR:  JENNIFER PASIERB

2

1

2   HEARING re Debtors' motion for entry of an order a) approving

3   the Nortel special incentive plan; b) authorizing certain

4   payments under the key employee retention plan and key

5   executive incentive plan; and c) approving certain employment

6   agreements.

7

8   HEARING re Debtors' motion pursuant to 11 U.S.C. Sections

9   105(a) and 363(b) for an order approving the Metro Ethernet

10   Networks side agreement and granting related relief.

11

12   HEARING re Debtors' motion for orders:  I) a) Authorizing

13   debtors' entry into the stalking-horse agreement,

14   b) authorizing and approving the bidding procedures and bid

15   protections, c) approving payment of an incentive fee,

16   d) approving the notice procedures and the assumption and

17   assignment procedures, e) authorizing the filing of certain

18   documents under seal, and f) setting a date for the sale

19   hearing; and II) authorizing and approving:  a) the sale of

20   certain assets of debtors' carrier voice over IP and

21   application solutions business free and clear of all liens,

22   claims and encumbrances, and b) the assumption and assignment

23   of certain executory contracts.

24

25

3

1

2   HEARING re Debtors' fifth omnibus objection (substantive) to

3   certain claims, pursuant to 11 U.S.C. Sections 502, Fed. R.

4   Bankr. P. 3007, and Del. L.R. 3007-1.

5

6   HEARING re Debtors' sixth omnibus objection (substantive) to

7   certain claims, pursuant to 11 U.S.C. Sections 502, Fed. R.

8   Bankr. P. 3007, and Del. L.R. 3007-1.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25   Transcribed by:  Penina Wolicki

4

1

2    A P P E A R A N C E S :

3

4    DEREK C. ABBOTT, ESQ.

5    ALISSA T. GAZZE, ESQ.

6    MORRIS, NICHOLS, ARSHT & TUNNELL, LLP

7    REPRESENTING:  DEBTORS

8

9    JAMES L. BROMLEY, ESQ.

10   LISA M. SCHWEITZER, ESQ.

11   SALVATORE BIANCA, ESQ.

12   CLEARY GOTTLIEB STEEN & HAMILTON, LLP

13   REPRESENTING:  DEBTORS

14

15   THOMAS PATRICK TINKER, ESQ.

16   U.S. DEPARTMENT OF JUSTICE

17   OFFICE OF THE U.S. TRUSTEE

18

19   J. KLEIN, ESQ.

20   WERB & SULLIVAN

21   REPRESENTING:  NOKIA

22

23   DARRYL LADDIN, ESQ.

24   ARNALL, GOLDEN & GREGORY, LLP

25   REPRESENTING:  VERIZON

5

1

2    IRA LEVEE, ESQ.

3    LOWENSTEIN SANDLER

4    REPRESENTING:  LEAD PLAINTIFFS - SEC LITIGATION

5

6    MONA PARIKH, ESQ.

7    BUCHANAN INGERSOLL

8    REPRESENTING:  ERNST & YOUNG AS MONITOR

9

10   LISA KRAIDIN, ESQ.

11   ALLEN & OVERY

12   REPRESENTING:  ERNST & YOUNG AS MONITOR

13

14   MICHAEL LASTOWSKI, ESQ.

15   DUANE MORRIS

16   REPRESENTING:  GENBAND

17

18   JUDITH ROSS, ESQ.

19   BAKER BOTTS

20   REPRESENTING:  GENBAND

21

22   MARK VERAVELE (SIC), ESQ.

23   LATHAM & WATKINS

24   REPRESENTING:  ONE EQUITY PARTNERS VII

25

6

DAVID BOTTER ESQ.

BRAD KAHN, ESQ.

AKIN GUMP STRAUSS HAUER & FELD LLP

REPRESENTING:  CREDITORS' COMMITTEE

DREW SLOAN, ESQ.

RICHARDS LAYTON & FINGER, P.A.

REPRESENTING:  CREDITORS' COMMITTEE

JAIME LUTON, ESQ.

YOUNG CONAWAY STARGATT & TAYLOR

REPRESENTING:  UK PLAN ADMINISTRATOR

DAVID ROSENZWEIG, ESQ.

FULBRIGHT & JAWORSKI (SIC)

REPRESENTING:  AT&T

ZEKE ALLINSON, ESQ.

SULLIVAN HAZELTINE ALLINSON LLC

REPRESENTING:  MOTOROLA

KIMBERLY LAWSON, ESQ.

REED SMITH

REPRESENTING:  QWEST

7

1

2  AMISH DOSHI, ESQ. (TELEPHONICALLY)

3  DAY PITNEY, LLP

4  REPRESENTING:  ORACLE USA INC.

5

6  THOMAS R. KRELLER, ESQ. (TELEPHONICALLY)

7  MILBANK, TWEED, HADLEY & MCCLOY

8  REPRESENTING:  BONDHOLDERS GROUP

9

10  ALSO PRESENT:

11  VICENTE MURRELL (TELEPHONICALLY), PENSION BENEFIT GUARANTY

12      CORPORATION

13  MICHAEL MURRAY, LAZARD

14  JOHN DEMPSEY, MERCER INC.

15

16

17

18  CANADIAN COUNSEL:

19  DERRICK C. TAY, ESQ.

20  JENNIFER STAM, ESQ.

21  SUZANNE WOOD, ESQ.

22  OGILVY RENAULT

23  REPRESENTING:  NORTEL NETWORKS CORPORATION

24

25

8

1

2   BARRY W. WADSWORTH, ESQ.

3   CAW-CANADA

4

5   ARTURO JACQUES, ESQ.

6   NCCE

7

8   M. STARNINO, ESQ.

9   REPRESENTING:  SUPERINTENDENT OF FINANCIAL SERVICES AS

10       ADMINISTRATOR OF PBGC

11

12   KEVIN J. ZYCH, ESQ.

13   REPRESENTING:  INTERNATIONAL NORTEL ADMINISTRATION

14

15   SEAN DUNPHY, ESQ.

16   STIKEMAN ELLIOTT, LLP

17   REPRESENTING:  GENBAND

18

19   ALEX MACFARLANE, ESQ.

20   FRASNER MILNER CASGRAIN

21   REPRESENTING:  THE OFFICIAL COMMITTEE

22

23

24

25

9

1

2    JAY CARFAGNINI, ESQ.

3    CHRIS ARMSTRONG, ESQ.

4    GOODMANS LLP

5    REPRESENTING:  MONITOR, ERNST & YOUNG

6

7    ADAM HIRSCH, ESQ.

8    REPRESENTING:  BOARD OF DIRECTORS OF NNL AND NNC

9

10   ROBIN B. SCHWILL, ESQ.

11   DAVIES WARD PHILLIPS & VINEBERG LLP

12   REPRESENTING:  NORTEL NETWORKS UK LTD.

13

14   MARK ZIGLER, ESQ.

15   REPRESENTING: FORMER NORTEL EMPLOYEES

16

17

18

19

20

21

22

23

24

25

10

1                    P R O C E E D I N G S

2          THE CLERK:  All rise.

3          THE COURT:  Thank you, everyone.  Please be seated.

4          Mr. Abbott, good afternoon.

5          MR. ABBOTT:  Good afternoon, Your Honor.  Derek Abbott

6    here on behalf of the Chapter 11 Nortel debtors.

7          THE COURT:  Yes.

8          MR. ABBOTT:  And this is the time set for the joint

9    hearing.  Your Honor, I have a proposal on how we proceed.  I

10   guess Mr. Justice Morawetz hasn't yet taken the bench, so.

11         THE COURT:  Oh, I'm sorry.  Let's --

12         MR. ABBOTT:  Perhaps we should --

13         THE COURT:  I know that he would like us to take the

14   lead.

15         MR. ABBOTT:  Okay.

16         THE COURT:  If that helps on it.

17         MR. ABBOTT:  Well, Your Honor, I was just going to

18   say, we can certainly run through, I think -- if you look at

19   our agenda, Your Honor, the first three items were submitted on

20   certificate, and --

21         THE COURT:  I have signed those orders.

22         MR. ABBOTT:  -- terrific, Your Honor.  What we would

23   propose to do, Your Honor, is to go slightly out of order and

24   start with the CVAS sale.  Obviously, we couldn't do that until

25   Justice Morawetz has joined us, I don't think.

1       THE COURT:  No.

2       MR. ABBOTT:  But that's how we would choose to

3  proceed, unless Your Honor would like to do that differently.

4       THE COURT:  No, that's fine.  That makes sense.

5       MR. ABBOTT:  Well, then, I will cede the podium to Ms.

6  Schweitzer once Justice Morawetz joins us, I guess.

7       THE COURT:  Yes.  We'll wait.

8       MR. ABBOTT:  Thank you, Your Honor.

9       CANADIAN CLERK:  Order.  All rise.  This court

10  resumes.  Please be seated.

11     (Pause)

12       JUSTICE MORAWETZ:  Judge Gross.

13       THE COURT:  Justice Morawetz, good afternoon to you.

14  And it has been proposed that we --

15       JUSTICE MORAWETZ:  And good afternoon.

16       THE COURT:  -- proceed first with the CVAS sale, and

17  subject to your approval, that is what we will do.

18       JUSTICE MORAWETZ:  That's fine with me.  And we'll

19  start CVAS in Delaware.

20       THE COURT:  All right.

21       Ms. Schweitzer, good afternoon.

22       MS. SCHWEITZER:  Good afternoon, Your Honor, Mr.

23  Justice Morawetz.  We're here today for the final approval of

24  the sale of assets of the CVAS or carrier voice over IT and

25  applications solutions business.  And when we've come in front

12

1    of you now, on our seventh or eighth sale, and each sale has

2    been different, you've heard stories of the sun setting past

3    the Statue of Liberty as auctions ended and coffee or champagne

4    at the end and all this.  And the uniqueness of this one,

5    obviously, is that we have a stalking-horse bidder that we were

6    so wildly successful on our first round at getting the price in

7    with the right bidder, that we wound up not having an auction.

8             THE COURT:  Yes.

9             MS. SCHWEITZER:  Which we don't view as a defeat, we

10   view it, in fact, as a confirmation of the fact that we had a

11   very vigorous process, which you heard all about last time, as

12   far as the number of people we worked with before the signing

13   of the stalking-horse deal and the vigorous negotiations that

14   got us to that point.  So we look at this as a validation of

15   our process, and we're very excited to come before you today

16   for final approval.

17            As you remember that we were in front of you on the

18   six earlier, you had approved the bidding procedures.  You

19   heard about the complexities.  In fact, we had two other

20   potential bidders show up and do further diligence and take a

21   look at the business, but ultimately no qualified bids came in.

22            And so today with us, in furtherance of the hearing,

23   we have Mr. George Riedel, who is the chief strategy officer,

24   who is probably looking for his per diem appearance fees at

25   this point.

13

1        THE COURT:  Yes.

2        MS. SCHWEITZER:  And what we thought is, we can -- we

3   have some objections to the sale -- not really to the sale

4   itself, so much as to specific contract issues.

5        THE COURT:  Yes.

6        MS. SCHWEITZER:  There's one to the sale.  But what we

7   are going to propose to do is to allow our Canadian colleagues

8   to speak to the Court in Canada to address the Court, and then

9   to turn over to a proffer of testimony here, and then address

10  the objections at the end, if that's all right with you?

11       THE COURT:  That is acceptable to me.

12       MS. SCHWEITZER:  Okay.

13       THE COURT:  Thank you, Ms. Schweitzer.

14       MS. SCHWEITZER:  Sure.  So I cede to Canada.

15       THE COURT:  All right.

16       JUSTICE MORAWETZ:  Ms. Stam?

17       MS. STAM:  Good afternoon, Your Honor, Judge Gross.

18       THE COURT:  Good afternoon.

19       MS. STAM:  I will be brief in our submissions.  Ms.

20  Schweitzer already covered the highlights of the motion, and

21  before Your Honor is the motion record as well as the fortieth

22  report which set out the process that was undertaken after the

23  bidding procedures were approved on January 6th.

24       The CVAS sale, like all of the other sales, is

25  important for the applicants and Nortel as a whole, and for the

1    applicants in particular, because of the 2,200 employees that

2    are associated with this business, almost 600 of them are

3    Canadian employees and the -- finding a safe haven for these

4    jobs is an important part of these processes.  And we succeeded

5    in doing that.  The transaction provides for the purchaser to

6    take over 1,600 of the Nortel employees, which we anticipate

7    will include approximately 400 jobs in Canada.

8         Notwithstanding the entry of the bidding procedures

9    order and the subsequent marketing efforts that were undertaken

10   that are outlined both in Mr. Riedel's affidavit and the

11   fortieth report, as Ms. Schweitzer indicated, although there

12   was -- there were parties who did due diligence, we did not

13   receive any offers, and similarly did not receive any

14   indication that further trying would result in an offer.  And

15   the monitor was involved in that process, and his view is

16   covered in his fortieth report.

17        I don't believe there are any objections today.  Mr.

18   Dunphy is here on behalf of the purchaser in Canada.  Your

19   Honor asked that we go through specific references to Soundair

20   and Crown Trust in the bidding procedures motion, and I can do

21   that either now or after evidence has been proffered, and

22   address however the --

23        JUSTICE MORAWETZ:  I --

24        MS. STAM:  -- Court prefers --

25        JUSTICE MORAWETZ:  You just want to make about a

15

1    fifteen second submission --

2            MS. STAM:  Sure.

3            JUSTICE MORAWETZ:  -- that's fine for me.

4            MS. STAM:  Well, Your Honor is familiar with the test

5    set out in Soundair and Crown Trust.  Quickly, whether

6    sufficient efforts have been made to get the best price; the

7    interests of all parties have been considered; the efficacy and

8    integrity of the process; and whether there has been fairness

9    in the working out of the process.  We would submit that the

10   process has been carried out and efforts have been made to

11   achieve the best price, and the best price has been obtained,

12   as was evident by the entering into of the stalking-horse

13   agreement and the subsequent auction process, which did not

14   yield any further bids; and that further marketing efforts are

15   unlikely to lead to a greater value for this group of assets,

16   and that therefore, the test -- Soundair test has been met.

17           Your Honor, subject to any questions, those are my

18   submissions.

19           JUSTICE MORAWETZ:  Thank you.

20           Anything from the monitor's standpoint?  Mr.

21   Carfagnini?

22           MR. CARFAGNINI:  Good morning, Your Honor, Judge

23   Gross.  Jay Carfagnini for the monitor.  Your Honor, you've got

24   the monitor's fortieth report, which deals with this matter.

25   The monitor -- the part I would specifically refer you to

16

1   paragraph 27 that the monitor notes that in its view, the

2   company's efforts to market CVAS were comprehensive and

3   conducted in accordance with the bidding procedures.  And in

4   light of no bids being received, the monitor is of the view

5   that this represents the best transaction available, and

6   therefore recommends it.  It's very simple.  And subject to any

7   other submissions, that's all I have.

8           JUSTICE MORAWETZ:  Thank you.  Any other party wishes

9   to make submissions on the CVAS motion?

10          Judge Gross, there's no further submissions in Canada.

11  Over to Delaware.

12          THE COURT:  Thank you.

13          Ms. Schwietzer.

14          MS. SCHWEITZER:  Thank you, Your Honor.  So as I said,

15  Mr. Riedel is present in the courtroom.  Given the nature of

16  the objections at hand, and the fact that there was not an

17  auction, and therefore we're recommending approval of the same

18  deal that we had had extensive testimony on, what I propose to

19  do is rely, in part, on the prior testimony that was provided

20  by Mr. Murray and Riedel at the prior -- the first hearing, and

21  to offer an additional proffer from Mr. Riedel as the chief

22  strategy officer of Nortel for the supplemental facts.  So if

23  that's all right, I'd proceed by way of proffer.

24          THE COURT:  Does anyone object?  All right, it

25  certainly is acceptable, Ms. Schweitzer, please.

17

1          MS. SCHWEITZER:  Thank you, Your Honor.  So as was

2     extensively testified to at the prior hearing, Mr. Riedel had

3     given his background and the history of the CVAS -- the nature

4     of the CVAS business, the history of the shopping of the

5     business, and the efforts that ultimately led to the approval

6     of CVAS as a stalking-horse bidder and why they were selected

7     in terms of their -- I'm sorry -- selection of Genband as the

8     stalking-horse bidder in the stalking-horse contract, and why

9     they were selected in terms of their wherewithal and in terms

10    of the contract being the highest and best offer available at

11    that time.

12          The bidding procedures were approved by a hearing

13    January 6th.  And if called to testify, Mr. Riedel would

14    testify that after the bidding procedure hearing and entry of

15    that order, that three additional parties were approached in

16    order to see if they had interest in the sale.  And two

17    entities had -- that were approached, in fact, expressed some

18    interest in doing further diligence, and qualified themselves

19    as qualified bidders.

20          Those two entities came at different times, but they

21    also asked to be able to work together.  And we consented to

22    them working together to formulate a potential qualified bid,

23    obviously in consultation with the monitor, the committee, the

24    bondholders, the administrator and all the other estates, as

25    required.

1      Mr. Riedel would testify that there were meetings,

2  discussions and hard work done with those potential bidders.

3  But after those efforts, at the time that the qualified bid

4  deadline passed on February 23rd, that no further qualified

5  bids were submitted for the assets, so that it was the obvious

6  choice to go ahead with our original stalking-horse bidder.

7      In terms of value, there was extensive testimony

8  earlier, and Mr. Riedel would again reiterate his conclusion,

9  that in the debtors' eyes, that the successful bid from Genband

10  does constitute the highest and best offer received for the

11  CVAS business.  It maximizes the value of the debtors' estates,

12  and it is still the debtors' choice that it's the right time to

13  sell the assets rather than try to reorganize these assets.

14      Mr. Riedel also would testify that the sale process

15  and all discussions with potential bidders were at arm's

16  length, certainly were vigorous, as you had heard, and that

17  Genband is certainly not an insider of Nortel, nor were any of

18  the teams that were negotiating on Genband's behalf insiders to

19  Nortel.

20      In terms of the successful ASA that's being sought for

21  approval today, Mr. Riedel would testify that he believes it's

22  in the best interest of the debtors and their creditors to

23  pursue this deal and to work towards closing of this deal.  And

24  he would also testify, as an aside, that there are certain

25  schedules and exhibits that were put under seal in connection

19

1    with the sale, and that he continues to believe that those are

2    confidential and sensitive commercial information that need to

3    be sealed in order to preserve value for the debtors and not

4    prejudice their creditors.

5         In terms of adequate assurances, Mr. Riedel would

6    testify that in his opinion, Genband has the wherewithal, both

7    from the financial and operational perspectives, to perform

8    under Nortel's executory contracts that it is assuming,

9    primarily customer contracts.  And then he would also testify

10   that the synergies between the two companies will likely result

11   in a smooth transition for customers and suppliers who have

12   these contracts that are moving over.

13        And with that, I would rely on, again, the prior

14   proffers and the supplemental proffers, unless anyone has an

15   interest in cross examining Mr. Riedel.

16        THE COURT:  Does anyone wish to cross examine Mr.

17   Riedel?

18        MR. LADDIN:  Your Honor, if I could have a moment?

19        THE COURT:  You may.

20    (Pause)

21        MS. SCHWEITZER:  So, Your Honor, I've just consulted

22   with Mr. Darryl Laddin, who's counsel to Verizon.  As Mr.

23   Laddin properly pointed out, that while I don't believe he had

24   an interest in cross examining Mr. Riedel, that there are

25   certain objections filed by counterparties to contracts --

1          THE COURT:  Yes.

2          MS. SCHWEITZER:  -- and to the extent that those

3    objections are being adjourned, obviously their right to

4    request cross examination or further evidence of adequate

5    assurances or anything related to their contracts is preserved

6    along with those contract objections.  And we can walk through

7    the objections now.  But if that satisfies Mr. Laddin?

8          MR. LADDIN:  That's fine, Your Honor.  We can discuss

9    this as of the adjournment.

10         MS. SCHWEITZER:  Right.  I'm going to go through them

11   now.  I just want to close off the proffer, if I could?

12         MR. LADDIN:  That's fine.

13         THE COURT:  All right.  Hearing no interest in cross

14   examining Mr. Riedel, who is in the courtroom, the proffer is

15   admitted into evidence.

16   (Proffer of Mr. Riedel was hereby received into evidence, as of

17   this date.)

18         MS. SCHWEITZER:  Thank you, Your Honor.

19         THE COURT:  Thank you.

20         MS. SCHWEITZER:  So, Your Honor, if I may approach?

21   As Mr. Laddin has pointed out, that there were certain sale

22   objections that had been resolved, and that there's other

23   miscellaneous updating of the order.  So we have a revised

24   order that we can hand up.

25         THE COURT:  Yes.  Thank you.

1        MS. SCHWEITZER:  Okay.  So I've handed Your Honor

2   clean and black-lined copies of the revised order approving the

3   CVAS sale.  And it's -- as you'll see when you turn through it

4   that the front half is merely revisions to account for the fact

5   that there was no auction --

6        THE COURT:  Right.

7        MS. SCHWEITZER:  -- and that Genband is the successful

8   bidder.  And then if you would turn to the back of the order

9   starting on the new paragraph 41, on page 24 --

10        THE COURT:  Yes.

11        MS. SCHWEITZER:  -- I can walk you through the

12   objections that have been resolved.

13        THE COURT:  Okay, good.

14        Mr. Laddin?

15        MR. LADDIN:  Could counsel have a copy of that?

16        MS. SCHWEITZER:  Sure.  Another copy for Mr. Laddin.

17   Yours isn't going to be on here, but I'll put it on the record.

18   We'll --

19        MR. LADDIN:  We'll deal with that when we get there.

20        MS. SCHWEITZER:  Yes.  So if we start on paragraph 41,

21   Motorola had a customer -- or has a customer contract with

22   Verizon.  And -- I'm sorry?  In paragraph 41 there's a

23   provision in here regarding the fact that we're confirming that

24   we're not assuming and assigning that contract pursuant to 365,

25   and reserving certain rights in the event that we were later to

22

1    seek such an assignment.  And that, I believe, resolves the

2    objection of Motorola.  I believe their counsel is present in

3    the courtroom.

4            THE COURT:  Mr. Allinson, good afternoon.

5            MR. ALLINSON:  Good afternoon, Your Honor and Mr.

6    Justice Morawetz.  This language at paragraph 41 does resolve

7    the objection of Motorola, which is at docket number 2437.

8            THE COURT:  All right. Thank you.

9            MR. ALLINSON:  Thank you.

10            THE COURT:  Thank you for confirming that.

11            MS. SCHWEITZER:  And then on the next page, on

12    paragraph 42, Open System Solution Inc. had actually not filed

13    an objection.  They had informally approached the debtors prior

14    to the objection deadline, but did not file an objection prior

15    to the objection deadline.  Nevertheless, we agreed to put in

16    protective language to them to the extent of paragraph 42,

17    which I can't say resolves their objection, because there is

18    none, but I believe satisfies -- they signed off on this

19    language and are certainly happy that it's in there.  I'm not

20    sure if they're present today.

21            THE COURT:  No.

22            MS. SCHWEITZER:  It would appear not.  And that's

23    paragraph 42.  Paragraph 43 addresses the contracts with AT&T

24    Services and certain of its affiliates.  Certain of those

25    contracts were noticed for assumption and assignment, pursuant

1  to Section 365.  And the debtors, Genband and AT&T are still in

2  discussion regarding the assignment of those contracts.  And so

3  for purposes of this hearing, we decided that we would just --

4  we filed a motion or notice to assume these contracts.  They

5  filed an objection.  And as it sets forth in paragraph 43, that

6  we would adjourn the objection and the motion as it relates

7  solely to the assignment of those contracts, to the hearing

8  date -- the next omnibus hearing date, which is March 17th,

9  with the hope that we can resolve an arrangement before that.

10  But at least we have a marker in time, if we can't.

11         THE COURT:  Yes.

12         MS. SCHWEITZER:  And obviously all rights and -- as it

13  says here -- and to the extent that it says here that any

14  defenses or issues raised in their objection with respect to

15  the assignment of those contracts are hereby preserved.

16         And with respect to Verizon, Verizon similarly has

17  customer contracts with the debtor.  Certain of those were

18  noticed for assignment pursuant to Section 365.  And we, right

19  prior to walking in here, got pretty close but not completely

20  there on resolving the assignment of those contracts as well as

21  certain accession agreements for other contracts that need to

22  be unbundled.

23         THE COURT:  Yes.

24         MS. SCHWEITZER:  And without the sordid history and

25  all the details of the intricacies of doing that, it's been

24

1    vigorous negotiations.  We're down to about two issues, and we

2    hope to have that done soon.  We've been working literally

3    around the clock and intend to continue to do so to get it

4    done.

5         In the interim, we do have to deal with the hearing

6    today.  So Verizon's counsel has agreed that we could give them

7    the AT&T treatment that we would add a paragraph to the sale

8    order that provides the same rights with respect to the debtors

9    and Verizon, and literally uses the same language as the

10   paragraph 43 does for AT&T with one additional sentence added

11   for Verizon at the end of that, which would say:  Furthermore,

12   nothing in this order shall be deemed to waive, release or

13   extinguish any valid claim with respect to setoff that Verizon

14   may have against the debtors.

15        And so with that, we can have someone try and return

16   the order and get it back to the Court by the end of the day.

17   But we would just add that one more paragraph in, and after

18   that, work vigorously.  I know Mr. Laddin also expressed an

19   interest in possibly having an earlier hearing date.  We'd use

20   the next omnibus hearing date.  And of course, we're going to

21   work as closely as we can to get to a resolution, or if we had

22   to, to get the dispute in front of the Court in a timely

23   manner.  But I'll let Mr. Laddin address the Court.

24        THE COURT:  All right.

25        Mr. Laddin, good afternoon.

25

1          MR. LADDIN:  Good afternoon, Your Honor.  It's a

2    pleasure to be before Your Honor again.

3          THE COURT:  Good to have you here.

4          MR. LADDIN:  Your Honor, Ms. Schweitzer is correct.

5    We have been working around the clock to try to get this done.

6    Frankly, we began working on this right after the motion was

7    filed in the hopes that we would be able to report an agreement

8    to the Court.  We are still very hopeful, given the fact that

9    there's only two open issues at this point.

10         We are willing to adjourn the hearing with the hope

11   that we will get this done in the next day or so.  We would --

12   as Mr. Schweitzer said, all of the objections and arguments

13   that we could have made today will be preserved for the

14   subsequent hearing.  And the language in the order will make

15   that clear.  I hope that that hearing isn't necessary.  In the

16   event that for some odd reason it is, I'd like to just take

17   literally two minutes or less to tell the Court about what the

18   issues are without arguing or asking the Court to decide

19   anything.

20         THE COURT:  Of course, I did read your objection, so I

21   have a good sense, but I certainly will give you that time.

22         MR. LADDIN:  Thank you, Your Honor.  In short order,

23   Verizon's objection relates to six interrelated documents or

24   six contracts, as Ms. Schweitzer noted.  A number of those are

25   what we call --

1        THE COURT:  Bundled.

2        MR. LADDIN:  -- bundled contracts.  The Court is quite

3   familiar with that term --

4        THE COURT:  Yes.

5        MR. LADDIN:  -- at this point.  I think the parties

6   have all agreed that four of the six are bundled contracts.

7   The other two, there's not yet agreement on whether they're

8   bundled contracts or not bundled contracts.  There were

9   multiple assignment notices that were served.  There's only one

10  assignment notice that is outstanding at this point -- 365

11  assignment notice -- and that is with respect to a policy

12  manager deployment agreement.  The debtor has also indicated

13  that they may serve another assignment notice with respect to

14  the succession products and services deployment agreement.  So

15  those would be the two contracts that the debtor contends are

16  Section 365 contracts.

17       Broadly speaking, there are four basic parts of our

18  objection, as the Court is aware.  First, as an initial matter,

19  we don't believe that the two so-called 365 contracts are in

20  fact assignable under Section 365.  We think they're an

21  integrated part of the other contracts, and therefore they

22  can't be assigned, since they're part of a bundled contract.

23  There may also be issues with respect to whether other products

24  are sold under either of those two agreements, which would make

25  them a bundled contract.

1          Secondly, we have an adequate assurance of future

2     performance objection that has two parts.  One relates to the

3     performance of Genband and its ability to perform.  And the

4     second is more of a legal issue, in that to show adequate

5     assurance of future performance, one needs to assume all of the

6     duties, obligations, and liabilities, regardless of when they

7     arose, before or after the closing or the effective date of the

8     sale.  And with respect to Section 365 itself, we also argue

9     that under Section 365, one has to assume all duties,

10    obligations and liabilities, obviously, in order to get -- for

11    the debtor to get their release under Section 365(k).

12          And finally, what is being taken care of in this order

13    is the setoff.

14          So with that, I appreciate Your Honor hearing me --

15          THE COURT:  Yes.

16          MR. LADDIN:  --- and I hope we can get this resolved.

17    Thank you.

18          THE COURT:  All right.  Thank you, Mr. Laddin.

19          Ms. Schweitzer, you do not have to respond to Mr.

20    Laddin's non-argument.

21          MS. SCHWEITZER:  Well, thank you Your Honor.  I was

22    about to say, we'll take the we didn't affirm or deny, but we

23    all understand that we'll either work it out or have a fun

24    discussion another day, so.

25          THE COURT:  Exactly.

28

1        MS. SCHWEITZER:  Fair enough.  So with that -- as

2   noted, that we agree that we're all going to try and do this as

3   quick as we can, and that his objection is preserved with

4   respect to the assignment of their contracts --

5        THE COURT:  Yes.

6        MS. SCHWEITZER:  -- as we just discussed on the

7   record.

8        To turn back to the sale order.  The paragraph 44

9   resolves the objection of another counterparty to contracts,

10   which is SNMP Research International, where again, they wanted

11   comfort that their contracts are not being assigned under 365,

12   and that we would comply with applicable law or the terms of

13   the contract in the event that we were to seek a later

14   assignment or sublicense.  And I believe this language, we have

15   gotten confirmation that satisfies their objection.  I don't

16   remember if they're present today or on the phone.  It seem --

17   I've been told I can represent that they're signed off, so.

18        THE COURT:  Okay.

19        MS. SCHWEITZER:  And then paragraph 45 addresses an

20   objection filed by Oracle, which again, has licensed software

21   to the debtors.  And this language, again, confirms that we're

22   not assuming and assigning those software licenses pursuant to

23   Section 365; and if we later do assign any contracts or

24   licenses, that we're going to do so in accordance to the terms

25   of that contract license and applicable law.  And again, I

1    believe that resolves the objection of Oracle.

2          MR. DOSHI:  Good afternoon, Your Honor.  For the

3    record, this is Amish Doshi with Day Pitney on behalf of Oracle

4    America Inc..  Counsel is correct.  We agree that with the

5    inclusion of this language, the objection is resolved, and we

6    thank the Court for allowing the opportunity to participate by

7    phone.

8          THE COURT:  All right, Mr. Doshi.  Good to hear from

9    you.  And I appreciate your confirming the resolution of your

10   objection.

11         MR. DOSHI:  Thank you.  May I be excused, Your Honor?

12         THE COURT:  Yes, you may.

13         MR. DOSHI:  Thank you.

14         MS. SCHWEITZER:  The next objection that's been

15   resolved is that of ZSF Research Gateway Trust and ZSF Research

16   Network Trust, which filed a limited objection and reservation

17   of rights.  They're a landlord.  And they again were concerned

18   about assignment of their property.  We've represented to those

19   landlords that their leases are not being assumed and assigned

20   in connection with this sale or that the sale order is not

21   doing that; and they, therefore, were comfortable and said that

22   if we represent that, that they will withdraw their objection.

23         THE COURT:  All right.  Anyone here or on the

24   telephone representing the landlord?  All right.

25         MS. SCHWEITZER:  So I believe that takes us down to

1    two unresolved objections, that of Qwest and that of the lead

2    plaintiffs in the Lucescu securities litigation.  I'll take the

3    Qwest objection first.

4         THE COURT:  All right.

5         MS. SCHWEITZER:  With respect to the Qwest objection,

6    Qwest, again, has a contract or a couple of contracts -- I

7    can't remember -- but we've noticed the assumption and

8    assignment of contracts with Qwest pursuant to Section 365, and

9    these in fact, we are seeking assumption and assignment

10   pursuant to Section 365.

11        Qwest had very, I think, narrow and specific concerns,

12   which is simply that they want to make sure -- they said that

13   there's -- as part of the assumption and assignment, we noticed

14   that there was a zero cure amount for the contract.  And their

15   concern is what happens if cure comes up between now and the

16   date of closing.  And they want to make sure their rights under

17   365 are not compromised under this sale order.

18        And what we had offered to Qwest is to say that, look,

19   you know, we have zero cure to date.  We haven't gotten any

20   information that that number is wrong.  If there is cure that

21   arose between now and closing, that of course that they would

22   have a right to assert a further claim for cure, but only for

23   new cure.  They can't keep preserving hidden cure -- this is

24   the cure hearing here, as part of an assumption and assignment

25   hearing -- and that if they -- and it's their burden,

31

1     certainly, to show that there's additional cure that they think

2     may exist.  And we're willing to, of course, allow them to do

3     so.

4           What we had proposed as a mechanic is that they would

5     be required to notify the debtors in writing of any such

6     supplemental cure within ten days prior to the closing, and

7     then we would cure that prior to closing, where we would always

8     have the right to either adjourn, withdraw -- you know, adjourn

9     a hearing or the actual assignment, or withdraw the request for

10    assumption and assignment if we couldn't work out the cure in

11    addition to just our general right to pull the contract off

12    prior to closing.

13          THE COURT:  Right.

14          MS. SCHWEITZER:  But we thought that was a mechanic

15    that just broke it down, because we do view that cure is

16    something that is -- you know, people always make the arguments

17    if I do know or I don't know or there might be something I

18    don't know.  But the plain fact is, the law requires us to

19    state what we think are known defaults and monetary defaults.

20    And we think that those are zero.  In their motion, they don't

21    suggest otherwise or put in any other evidence that there's

22    other than zero cure due today.

23          And that with respect to cure going forward, I think

24    that there were discussions between the parties, and I won't

25    get into them obviously as a binding admission by anyone, but

1    the concern was preservation of claims before and after

2    effective dates, and effectively what I would view as advisory

3    opinions on what rights are and aren't being preserved.  I

4    think that the order, to the extent that it says that your

5    contracts are being assumed and assigned pursuant to Section

6    365, and if it had a supplemental mechanic that made them more

7    comfortable for any cure that could arise between now and

8    closing as new cure, we're happy to put that in, and to say,

9    you know, notwithstanding anything else in the order, that your

10   contracts are being assumed pursuant to Section 365; that if

11   there's new cure that arises between today and closing, that

12   you'll get that notice period that you have to let us know

13   about it; and that our right to litigate that -- and if we

14   can't agree, to pull your contract off is -- we think that

15   adequately addresses their objection as consistent with the

16   law.  And it's consistent with the issues raised in their

17   objection.  But I'll certainly allow Qwest's lawyer to state

18   what their concerns are.

19          THE COURT:  Thank you, Ms. Schweitzer.

20          MS. LAWSON:  Good afternoon, Your Honor.  Kimberly

21   Lawson from Reed Smith --

22          THE COURT:  Ms. Lawson.

23          MS. LAWSON:  -- on behalf of Qwest.  Your Honor, the

24   proposal sounds, actually, very appealing at first, but there's

25   another issue behind it, which is, this is not a simple

1    contract where a lease arise -- a lease payment arises or a

2    contract payment arises on a regular basis, and we can predict

3    what that will be.  This contract includes indemnification

4    provisions for such things as patent infringements,

5    intellectual property violations, etcetera.

6         So our point is, we know that right now we have

7    knowledge that there is no violation.  However, let's say

8    tomorrow or ten days from now, or two days before closing,

9    there is a patent infringement claim made by a customer of

10   Nortel's.  Three months down the road they're going to sue

11   Qwest.  Qwest is then going to seek indemnification from the

12   contract party to this contract, whether that be the purchase

13   or the debtor.

14        What the sale order is seeking to do is cut that off

15   and say nobody's responsible, because it wasn't raised in a

16   cure, so the debtor's cut off from any liability for that.  And

17   the purchaser's not assuming it, so you can't go after them.

18   Which leaves Qwest holding the bag.  Which is really not a true

19   assignment of a contract.  And the Bankruptcy Code requires a

20   complete assignment of all obligations and all rights.  Because

21   what it's doing is it's a statutory novation, essentially.

22   It's forcing Qwest to allow its contract to be assumed and

23   assigned regardless of whether it wants it to be assumed and

24   assigned, and regardless of whether the contract allows it to

25   be assumed and assigned.

34

1      So that is our issue.  There's a gap in coverage that

2   could expose Qwest to liability, and it will cut off every

3   other party's liability on there.  So even though they're

4   proposing, okay, you can give us notice if you know about it,

5   that's great if we know about it.  The problem is, there's

6   obligations under this lease we may not know about.  So if you

7   go the case law in the Third Circuit, starting with Italian

8   Cook and going all the way up to Allegheny, they all say you're

9   doing a true novation, a true assignment of the entire

10  contract, the only way to do that, somebody has to be liable.

11  And the purchaser here should be liable for those come up.

12      Yes, for what we know about, we're okay with that.

13  It's what happens when we don't know and we can't know.  And

14  that is our narrow main issue here.  And we don't think it can

15  be assumed and assigned without someone having that liability.

16      THE COURT:  Thank you, Ms. Lawson.

17      Ms. Schweitzer, when do we anticipate closing on the

18  sale?

19      MS. SCHWEITZER:  The contract provides that closing

20  would not occur prior to April 30th.

21      THE COURT:  Okay.

22      MS. SCHWEITZER:  So it would be in about a month --

23  two months or so.

24      THE COURT:  Okay.

25      MS. SCHWEITZER:  And, Your Honor, just to address the

1   counsel's concern, one thing that we proposed, and we're,

2   again, happy to propose and happy to state on the record, is

3   that with respect to Qwest, that we're happy to give them

4   standalone language to make clear that we're not trying to put

5   sneaky little tricks in the sale order, and to read to you the

6   language we offered, is that:  "The assumed and assigned

7   contracts," which is a defined term in the sale agreement, "to

8   which Qwest Communications Company LLC or its predecessor in

9   interest or affiliates," which we collectively call Qwest, "is

10  a counterparty," which would be the Qwest contracts, "to the

11  extent that the Qwest contracts are being assumed and assigned

12  under Section 365 of the Bankruptcy Code and Qwest -- that if

13  they are being assumed and assigned, Qwest and purchaser shall

14  have all the rights, duties and obligations with respect to

15  each other, with respect to the Qwest contracts, provided --

16  with respect to any contract assumed and assigned under Section

17  365 of the Bankruptcy Code."  So --

18          THE COURT:  This is in addition to the other language

19  that you had previously read relating to --

20          MS. SCHWEITZER:  And then --

21          THE COURT:  -- ten days' notice?

22          MS. SCHWEITZER:  -- it goes on, right.  And then it

23  would go on to say that there's no cure amount due or owed

24  under the Qwest contracts through -- we picked -- February

25  28th, 2010 --

1          THE COURT:  Okay.

2          MS. SCHWEITZER:  -- to avoid the sneakiness in the

3    last day; and that nothing in the order would relieve us from

4    our obligation to cure defaults arising from March 1, 2010 to

5    the closing, for the contracts to which Qwest is a

6    counterparty, provided that they have to give us the notice

7    of -- in writing, of any defaults, at least ten calendar days

8    prior to the date of closing.  And if the cure amounts are

9    asserted, the debtors retain the rights to elect not to assume

10   and assign the respective contract, to postpone the assumption

11   and assignment until the dispute is resolved.  And nothing in

12   the paragraph would limit anyone's right to withdraw the

13   request for assumption and assignment of any or all the Qwest

14   contracts, at any time prior to closing.

15         But we specifically, to address that specific concern

16   of prejudging what the law said, we were willing to give to

17   Qwest standalone language to say that with respect to the

18   purchaser, they get all the rights, duties and obligations that

19   they have under Section 365 of the Bankruptcy Code; so that we

20   don't have to prelitigate an issue which, as she says, she

21   doesn't know if today it could come up.  It might not come up.

22   We don't know exactly what would come up.  We don't even know

23   if anyone would agree.

24         But I think anything beyond an affirmation of the

25   contracts being assumed and assigned pursuant to Section 365,

1    and your rights are what they are under Section 365, would seem

2    inappropriate at this stage, given that there's no live dispute

3    before the Court on what those claims would be.

4         THE COURT:  Well, I think what Qwest would say is your

5    language on whatever rights they have under Section 365 remain.

6    The problem is the notice period.  Because if you are giving --

7    if you're going to provide cure up to closing, but they have to

8    give notice ten days before closing, there is created this ten-

9    day gap period.

10        MS. SCHWEITZER:  Right.  I mean, we're fine to say

11   that they can give us the notice on closing, and then at that

12   point we'll decide whether we're going to delay the closing for

13   that.  I mean, the ten days was just offered for a point of

14   that it's not simultaneous with the closing.  But we're fine to

15   work out a mechanic that says they'll give it to us one day

16   before closing and that -- I can consult with purchaser

17   counsel, if they're willing to say that the cure period would

18   be a final cure finding for, you know, five days, ten days

19   before closing.  I can consult with purchaser if you'd like.

20   But I think that that's a secondary mechanic, in a way.  But

21   I'm happy to talk to purchaser if that would be acceptable, if

22   we could speak at the back end.

23        THE COURT:  Does that help, Ms. Lawson?

24        MS. LAWSON:  I think it helps some.  We had

25   proposed --

38

1          THE COURT:  Cure notice up closing?

2          MS. LAWSON:  -- and I think some of that helps -- you

3    know, to the extent -- I think it can only go, if we do notice,

4    it can only go up to the date that we give notice, obviously.

5    There's ten days interim, but we can't know that.

6          THE COURT:  Right.

7          MS. LAWSON:  There's a second mechanic which is, we

8    need to know when closing is.  Because we can't be required to

9    do something ten days before without receiving notification of

10   when the closing is.

11          But the other language to be acceptable -- we had

12   responded with counter language which was rejected by the

13   purchaser.  So the only thing we wanted to clarify is in the

14   language at the beginning about all rights and duties and

15   obligations.  We wanted to include language that said "whether

16   it arose prior to or after the closing."  And so we wanted that

17   language in, and just a clarification that 365(k) -- the

18   debtors' rights under 365(k) are not affected by anything else

19   in the order.  Those were really the main proposals -- we had

20   one other proposal which we're willing to not pursue -- that

21   were rejected.

22          THE COURT:  Well, I think you are entitled to the

23   language that your rights are not affected.  I don't know that

24   the purchaser has to expound upon the code section.  I don't

25   think that should be necessary here.  And perhaps we could have

1    an agreement from the debtors and the purchasers, or whichever

2    party, that you would be given forty-eight hours' notice of a

3    closing.  Is that something that would doable, Ms. Schweitzer,

4    mechanically?

5        MS. SCHWEITZER:  Your Honor, we just talked to the

6    purchaser, and they're willing to say that the -- that they can

7    give us notice any time prior to closing, so that there's no

8    gap, and that as long as they give us, as of the date of

9    closing, we'll make a determination on that date to either

10   delay the assignment or to pay it, or maybe to zero at that

11   point.

12       THE COURT:  Right.  And I think that the only concern

13   that Qwest still has is to make certain that they have notice

14   of the closing so they can provide whatever notice as of that

15   time.

16       MS. SCHWEITZER:  Right.  I'm sure we can give them

17   forty-eight hours of notice of intended closing, where they'd

18   understand it's not before April 30th.

19       THE COURT:  Ms. Lawson, does that help?

20       MS. LAWSON:  That does, Your Honor.

21       THE COURT:  All right.  And as far as the other

22   language, is that now acceptable as well?

23       MS. LAWSON:  At this point -- what other language.

24   That's what we already had.

25       MS. SCHWEITZER:  The language that we already sent.  So

40

1    it's that it's 365.  That we'll add in that the -- that Qwest

2    will notify the debtors in writing of defaults prior to the

3    date of closing.  And then he's saying, with respect to the

4    mechanic that everyone's rights to withdraw contracts --

5         MS. LAWSON:  Right.  The only other issue is we did

6    want the provision in there about the -- our rights not being

7    affected by 365(k), that nothing's being expanded beyond what

8    is authorized under 365(k).

9         THE COURT:  I think you're entitled to that language.

10        MS. SCHWEITZER:  Okay.  That it's not being expanded

11   or lessened under 365(k).

12        THE COURT:  Fine.  That's fine, yes.

13        MS. LAWSON:  Yes.

14        MS. SCHWEITZER:  Okay.  So we'll -- I'll have someone

15   work out in the back, and again, we'll have it added into the

16   order, if that is acceptable?

17        THE COURT:  All right.  Thank you, Ms. Lawson.  Thank

18   you, Ms. Schweitzer.

19        MS. LAWSON:  Thank you, Your Honor.

20        MS. SCHWEITZER:  Your Honor, I believe that brings us

21   to the --

22        THE COURT:  To the lead plaintiffs.

23        MS. SCHWEITZER:  -- the lead plaintiffs, correct.

24        THE COURT:  Yes.

25        MS. SCHWEITZER:  And this was the objection filed by

41

1    Lucescu as the lead plaintiffs, seeking the adoption of a

2    document protocol as a condition to approval of the sale.  And

3    as you heard before, they're enamored by the fact that in the

4    past they've gotten statements on the record with respect to

5    what's happening in the U.S. with respect to the sales.

6        We now are a little farther along in where we've been

7    with the Lucescu plaintiffs, where they've confirmed not a week

8    ago on the record, in a different -- in the Chapter 15 case,

9    that they have no claims against the United States; they filed

10   no claims against the United States; they haven't sued the

11   United States debtors; and they, in fact, haven't even sued

12   officers and directors of the United States debtors, they've

13   sued officers of the Canadian affiliates.

14       Today the Lucescu plaintiffs come before the U.S.

15   debtors seeking these documents production or document

16   preservation protocols, but again, didn't go to Canada, didn't

17   file joint notices, and are seeking no relief with respect to

18   the Canadian debtors.  And to reiterate a theme that we heard

19   in the Chapter 15 earlier today, I think this is just simply a

20   back-door effort to do something maybe because they like

21   Delaware or it's easier.  You can get there by train instead of

22   plane or whatever it is; or hoping that the Canadian debtors

23   will be affected by the number of whatever document protocol

24   would be put in place here.

25       But quite frankly, given the fact that they aren't

42

1    asserting claims against the debtors, and this would, at best,

2    be a third-party document request for some unspecified

3    documents, that it's a little overbroad and inappropriate at

4    this stage to come to the U.S. Court and ask the U.S. debtors

5    to condition their sale efforts and the closing of the sale on

6    the adoption of any protocol or any representation as to what's

7    happening with the documents.

8            The documents are where they are.  They're with us.

9    They're with the -- if they're transferred, they're transferred

10   to the purchaser.  And they in fact quote the language of the

11   provisions --

12           THE COURT:  Yes.

13           MS. SCHWEITZER:  -- in the sale order -- in the sale

14   agreement that addressed that.  So with that, we would

15   respectfully request that the Court deny their request for

16   release in the terms of the adoption of a protocol or any

17   protection against the U.S. debtors, as at best, a third-party,

18   potential source of documents.

19           THE COURT:  All right.  Thank you, Ms. Schweitzer.

20           Mr. Levee?

21           MR. LEVEE:  Thank you, Your Honor.  For the record,

22   Ira Levee, Lowenstein Sandler for the lead plaintiffs.

23           Your Honor is familiar with our argument.  We've made

24   it previously in connection with sales in the Chapter 11, and

25   in the past, the debtors have agreed that -- or represented

43

1    that they weren't transferring any original documents, and

2    would only retain copies.  We were looking for a similar

3    representation with respect to this sale.

4         And the fact that the Chapter 11 debtor isn't a

5    defendant in the securities litigation, I don't think is that

6    important a distinction, because we're bound by the PSLRA stay

7    which prevents discovery, and we cannot take discovery without

8    getting leave from the district court.  And we'd have to come

9    to this Court also to get stay relief.  And it would just seem

10   like that should be unnecessary if we could get a simple

11   representation, like we have in the other cases, that there are

12   no original documents being transferred, or if they are, that

13   copies are being retained by the debtors.

14        What's interesting is, in the asset sale agreement,

15   the Section 522, which talks about preservation, says that both

16   the purchaser and the seller will preserve the documents for

17   five years.  And that's fine.  But there's also a provision

18   that provides for the destruction of documents upon notice.

19   But notice is only given to the other party.  If the parties

20   would agree to give notice to lead plaintiffs before the

21   destruction of any documents, so that if it's appropriate at

22   that time, and we are still bound by the PSLRA stay, we can get

23   that relief, because then we can demonstrate to the district

24   court that there are circumstances that require us to serve

25   discovery, that's a different story.  But we don't have that

1    representation.

2         That means documents may be destroyed without knowing

3    what documents they are.  And the documents are not specified.

4    They're very ambiguous, the description in the asset purchase

5    agreement.  Lead plaintiffs would be severely prejudiced if

6    they're not able to get this discovery.  And just because it

7    doesn't deal with the defendants in the securities litigation

8    doesn't mean that these documents aren't relevant to the

9    securities litigation.

10        So I would ask that a representation be made similar

11   to the other sales or at the very least, we be given notice

12   before any documents are destroyed, with an opportunity to be

13   heard and an opportunity to file an objection to the

14   destruction.

15        THE COURT:  Thank you, Mr. Levee.

16        MR. LEVEE:  Thank you, Your Honor.

17        THE COURT:  Thank you.

18        Ms. Schweitzer.

19        MS. SCHWEITZER:  Your Honor, as a fact matter, the

20   section that he's referring to is Section 522, which is quoted

21   at length in his --

22        THE COURT:  Yes.

23        MS. SCHWEITZER:  -- quoted verbatim.  And the document

24   destruction he's talking about, which is potential document

25   destruction, it would be triggered on the fifth anniversary of

1    the closing date.  So that would be 2015.  And if we're before

2    Your Honor in 2015 talking about document discovery in this

3    case, I guess we're -- it would be a pleasure from my side, of

4    course, but other people in the room might not be so happy if

5    we're still litigating these issues at that point.

6         But that said, in all seriousness, I think the issue,

7    of course, is the scope of their request is that all documents

8    be preserved --

9         THE COURT:  Right.

10        MS. SCHWEITZER:  -- that of course it would be

11   expensive for them to follow a procedural path to get third-

12   party discovery.  But in balance, there's a burden -- a

13   balancing of different burdens and costs.  And here, they make

14   a request that the debtors start copying all documents that are

15   ever transferred or create some paper trail as to every last

16   document without limitation that relate to the sale, when

17   that's thousands and thousands of documents; and they're either

18   with us or the purchaser, and there's no express provisions in

19   here for document destruction -- I'm not saying that I'm making

20   a representation as to preservation or not preservation -- but

21   there's no risk of destruction he's specifically pointing to as

22   a basis that he needs emergent relief for a finite set of

23   documents.

24        And so on that, the balancing of the costs and the

25   benefits and the need, I think tips heavily in favor of the

46

1    debtors in denying -- in asking you to deny their objection.

2              THE COURT:  Thank you, Ms. Schweitzer.

3              MR. LEVEE:  Just one last thing.

4              THE COURT:  Yes, Mr. Levee.

5              MR. LEVEE:  I'm not sure I understood something.  And

6    correct me if I'm wrong.  Did you say that the destruction

7    provision doesn't come into effect until the five years,

8    because that's not exactly how I read it.  But if that's the

9    case then that --

10             THE COURT:  Then that --

11             MR. LEVEE:  -- may help things.

12             THE COURT:  -- yes.

13             MR. LEVEE:  I just thought it said on sixty days'

14   notice.  I didn't know that it didn't -- I didn't read it to

15   say that they couldn't do that until after the five year

16   period.

17             MS. SCHWEITZER:  I apologize, Your Honor.  I might

18   have -- it's in -- the general provisions are preservation and

19   their right to claim.  Now, I'm going to have to consult -- I

20   apologize.  I had read this as one way, and I'm now fearful

21   that my corporate colleagues are going to look at me and maybe

22   disagree.

23             Hold on.  Let me consult.

24             THE COURT:  Yes.

25             MS. SCHWEITZER:  I apologize, Your Honor.  My

47

1   impression -- I do -- I apologize.  I had read it wrong.  I'm

2   being corrected by my colleagues.  It is on sixty days' notice

3   that they may give -- for the documents specified in there,

4   they can, on sixty days' notice, if the debtors don't want the

5   documents and the purchasers don't want the documents, that

6   they could destroy those documents related to the business.

7        But the one thing is, is that the plaintiffs have not

8   made a showing that those are the documents that they would

9   need or even given us a list of the documents that they would

10  need.  So that to ask for notice of those -- destruction of

11  those documents, that we have to loop them into every last

12  document that, again, could be destroyed, rather than would be

13  destroyed, again, creates a burden to us, when we don't have

14  any scope as to what they would even be looking for, and again,

15  we're not a party to the litigation.

16       MR. LEVEE:  Not to beat a dead horse, but we can't

17  even determine what documents they have, subject to the PSLRA

18  discovery stay.

19       THE COURT:  Well, I think, under these circumstances,

20  it's very little burden to the debtor to provide notice to the

21  lead plaintiffs, if documents are going to be destroyed -- just

22  the destruction of documents is somewhat outside of the normal

23  ordinary course, and certainly, I think, would prejudice the

24  plaintiffs in the securities litigation.  And I think a simple

25  notice to them is appropriate under these circumstances.

48

1      Ms. Schweitzer?

2      MS. SCHWEITZER:  Your Honor, that's fine, if that's

3  your ruling.  The only clarification I would make on behalf of

4  all the affiliates around the world is that the provision that

5  he's referring to is the sellers' and we'll provide this notice

6  and there's -- you know, it's a provision because it's a joint

7  agreement.

8      THE COURT:  Yes.

9      MS. SCHWEITZER:  And so your ruling is only with

10  respect to the U.S. debtors.  It's not binding any affiliates

11  or any other -- it's only the U.S. sellers.

12      THE COURT:  That's correct.

13      MS. SCHWEITZER:  Okay.

14      THE COURT:  Thank you for -- yes, that clarification

15  is appropriate.

16      MR. LEVEE:  So if I understand correctly, the U.S.

17  debtors have to give notice prior to destruction of any

18  documents?

19      THE COURT:  That's right.

20      MS. SCHWEITZER:  Well, excuse me.  Pursuant to this

21  provision --

22      THE COURT:  Yes.

23      MS. SCHWEITZER:  -- that if we're giving this -- it's

24  only with respect to 5.22 of the sale agreement, that if the

25  U.S. debtors deliver a notice to the purchaser pursuant to 5.22

1      that we have to give a copy of that to the plaintiff's counsel.

2            THE COURT:  That is correct.  I am not going to impose

3      any document preservation requirements or program on the

4      debtors, but at least that notice, it seems to me, is

5      unobtrusive enough upon the debtors that it's appropriate here.

6            MR. LEVEE:  And it's my understanding that the debtors

7      are still subject to, I believe it's Section 554 on destruction

8      or abandonment of property of the estate, so any other

9      documents that may deem that they wish to destroy, they'd have

10     to get permission from the Court.

11           MS. SCHWEITZER:  Your Honor, again, this falls into

12     advisory opinion of with respect to what the rest of the law

13     is, and I think it's beyond the scope of what's before the

14     Court.

15           THE COURT:  I would agree with that, Ms. Schweitzer,

16     under these circumstances, yes.

17           MR. LEVEE:  Thank you, Your Honor.

18           THE COURT:  Thank you, Mr. Levee.

19           MS. SCHWEITZER:  So Your Honor, I believe that has

20     addressed all the objections filed to the sale.  And with that,

21     we have, in our original motion, set forth the legal basis for

22     the relief we're seeking today which, of course, again, is the

23     approval of the sale to Genband pursuant to the asset sale

24     agreement that was filed with the Court in December.  We think

25     on a legal basis based on the proffer of Mr. Riedel, we've made

212-267-6868                                              516-608-2400

1    the showings necessary for the sale and that there's a

2    necessity to the sale, this is the highest and best offer out

3    there.  And Genband is an appropriate buyer.  And so without

4    belaboring the legal showing which we've all done very well

5    doing before you in the past, and that we have sufficient

6    evidence put on the record to support, we would therefore seek

7    approval of the motion and approval of the sale to Genband.

8          And I would just note, I guess, rather -- to the

9    extent Your Honor, of course, has to consult with Canada first,

10   in case they want to speak on the record and have further

11   arguments up there, and to the extent that Your Honor would be

12   inclined to grant the order, we still do need to clean up the

13   sale order so we could hand that up.  But I don't want to, of

14   course, predetermine the outcome here.

15         THE COURT:  All right, before I turn to Justice

16   Morawetz, does anyone else wish to be heard?  All right.

17         Justice Morawetz, are we prepared to proceed or would

18   you like to consult on this?

19         JUSTICE MORAWETZ:  Judge Gross, I think there's nobody

20   indicating they wish to speak further, and I think we're

21   certainly ready to proceed here, but in this case, we will

22   award you the gold medal and you can start.

23         THE COURT:  You know it's -- I'm -- I don't know what

24   to say, now, Justice Morawetz.  But congratulations.

25         MS. SCHWEITZER:  We already won the medal account.  Do

1    we need another?

2         THE COURT:  Congratulations to Canada on the wonderful

3    hockey victory.  We'll get you in four years.  And Ms.

4    Schweitzer has promised this case won't still be going on in

5    four years.

6         JUSTICE MORAWETZ:  Well, at least --

7         THE COURT:  Yes, sir.

8         I was starting to say that I am prepared to approve

9    the sale based upon the findings and the legal conclusions

10   already set forth in the order and subject to the resolution of

11   the objections as further set forth on the record and in the

12   proposed order.  And I will sign the order when it's amended to

13   reflect some of the matters we've discussed here and presented.

14        MS. SCHWEITZER:  Thank you, Your Honor.

15        JUSTICE MORAWETZ:  And Ms. Stam, do you have a form of

16   order for me?

17        MS. STAM:  Yes, I do, Your Honor.  I'm handing up two

18   copies.  It's unchanged from the version that was in the motion

19   record.

20        JUSTICE MORAWETZ:  Thank you.  I promise Ms. Stam to

21   do oral reasons at the break so we do not interrupt the joint

22   hearing any further.  The record is endorsed for now that the

23   sale is approved and the order is signed and the form

24   presented.

25        MS. STAM:  Thank you, Your Honor.

1          THE COURT:  One down and a few to go.

2          MS. SCHWEITZER:  Your Honor, the next motion up for

3   the joint hearing is the KEIP/KERP motion.

4          THE COURT:  Okay.

5          MS. SCHWEITZER:  And I'm going to cede the podium to

6   Mr. Bromley on that one.

7          THE COURT:  All right.

8          MS. SCHWEITZER:  Thank you.

9          THE COURT:  Thank you, Ms. Schweitzer.  Mr. Bromley,

10  first from me in the baseball and now from Mr. Justice Morawetz

11  in hockey.  I'm telling you.

12         MR. BROMLEY:  Well, all I know, Your Honor, is that I

13  go to a hockey arena that has three Stanley Cup banners hanging

14  from it.  And there's a Mr. Brodeur who's the goalie.

15         THE COURT:  Yes.

16         MR. BROMLEY:  But anyway.  Congratulations.

17         THE COURT:  Yes.

18         MR. BROMLEY:  Great show on Sunday night.

19         I would like to move on to the incentive -- the Nortel

20  Special Incentive Plan which is set up for joint hearing today.

21         THE COURT:  Yes.

22         MR. BROMLEY:  Now, you'll note that the word

23  "incentive" is there.  And so my incentive is to try to

24  minimize as much as possible the need for cross-examination, to

25  make sure that the information that we've submitted in the

53

1    declaration of Mr. Dempsey is sufficient, and to that end, we

2    have been having substantial conversations with Mr. Tinker over

3    the past --

4              THE COURT:  And I think the only objection is from the

5    Office of the U.S. Trustee.

6              MR. BROMLEY:  That's correct, Your Honor.  So if I

7    would, Your Honor, I'll try to both -- first summarize the

8    program, give a little bit of background about where we are,

9    and why things are changed from a year ago, and then try to

10   address the issues that have been raised by Mr. Tinker.  We

11   have Mr. Dempsey from Mercer in the room, and he's prepared to

12   testify.

13             I think in large part, based on the conversations that

14   we've had with Mr. Tinker over the last two days, we think we

15   have been able to put together enough information that we can

16   put on in proffer that we do not need to actually have him --

17   Mr. Dempsey up for cross-examination, but let me get everything

18   out that we've discussed.  And then Mr. Tinker can confirm

19   that.

20             THE COURT:  All right.

21             MR. BROMLEY:  And I should say, let -- with so many

22   things that we've been doing over the past couple of months,

23   it's worthwhile looking it back a year.  Indeed, it's almost a

24   year to the day that we were before both Courts -- it was on

25   the 5th of March of 2009 -- to seek approval of a program for

54

1  the retention and incentivization of employees around the

2  world, in particular in the United States and Canada.  That

3  motion was filed on shortened notice on the 27th of February in

4  2009 and we have two orders approving it.  Your Honor may

5  recall that there was an SLT, as we called it, the senior

6  leadership team.

7         THE COURT:  Yes.

8         MR. BROMLEY:  Eight individuals.  Those individuals

9  were accepted out of the order that was approved on the 5th of

10  March, and then there was a subsequent joint hearing on the

11  20th of March, and the program for the senior leadership team

12  was approved at that hearing.

13         THE COURT:  Exactly.

14         MR. BROMLEY:  Last year, with the creditors' committee

15  as a new group and the bondholders as a new group, we spent a

16  lot of time with them trying to make sure that by the time we

17  brought the motion to both Courts, that we had the support of

18  both organizations, and we were successful in that last year.

19  And I'm happy to say that we have used the same process here,

20  this year, and we're happy to say that both the bond group and

21  the UCC are very much in favor, as well as the monitor, as

22  well, although I'll let Mr. Tay and Mr. Carfagnini make those

23  statements later.

24         If you go back a year, where were we?  We were at a

25  point in time where the companies had filed for Chapter 11 and

1    CCAA and relief in the UK.  The hope, certainly the goal was

2    reorganization.  No public announcements had been made about

3    one sale, let alone multiple sales.

4                THE COURT:  Right.

5                MR. BROMLEY:  But you recall, Your Honor, at the time,

6    that we had set up three milestones.  One was the achievement

7    of certain cost reduction goals.  The second was the

8    achievement of certain parameters related to the creation of a

9    more lean organization.  And that, I think we had a bit of

10   debate on the record as to exactly what that meant, but you

11   will recall, Your Honor, that that was, in effect, shorthand

12   for pursuing a sale transaction.  And the third milestone was

13   the confirmation of plan or plans in the U.S. and Canada for

14   reorganization.

15               The first and second milestones under that plan that

16   we had approved last year were achieved, and the payments

17   relating to both of those have been paid out.

18               THE COURT:  Which were twenty-five percent each, as I

19   recall.

20               MR. BROMLEY:  That's correct, Your Honor.

21               THE COURT:  Yes, of the incentive amount.

22               MR. BROMLEY:  And just to refresh your recollection,

23   Your Honor, last year, the plan as filed represented about five

24   percent of the total employees at Nortel worldwide, just about

25   a thousand people with -- a thousand people in the United

56

1    States, I should say, 92 who were part of the KEIP that had

2    been structured to comply with Section 503(c), and 880 that

3    were part of a KERP, a retention program, so that there was a

4    total of -- I'm sorry, worldwide, it was a total of 972.  The

5    U.S. was 499.  And so what we had done last year was put this

6    in place.  We have paid out now for all of the employees who

7    were eligible at the time the first and second milestones, so

8    fifty percent of the payments.

9           The third trigger, confirmation, had a toggle in it,

10   so to speak, which was it was the earlier of confirmation or

11   the transfer of that employee to a purchaser.  And that was an

12   acceleration of the payment that was due.

13          THE COURT:  Right.

14          MR. BROMLEY:  And so at this point in time, we have,

15   for all of those employees who are subject to the plans and who

16   transferred over to purchasers accelerated their payments.  So

17   we are in an odd situation in that the folks who are still here

18   in Nortel in the United States or Nortel in Canada, they have

19   not yet been paid their third milestone.  Yet the vast majority

20   of their colleagues who are eligible for that milestone were

21   paid because their payment was accelerated upon the transaction

22   sale being accomplished.  And certainly other, particularly

23   with the MEN transaction scheduled to close very soon and the

24   CVAS transaction scheduled to close as well, as we've already

25   discussed today, even more individuals will leave the employ of

57

1    the U.S. and Canadian debtors and be entitled to the

2    acceleration of their third milestone.

3         So part of the relief we are seeking today, Your

4    Honor, is for those who are remaining behind who would be part

5    of that program to have their third milestone from last year's

6    plan accelerated.  The total cost of accelerating is, for the

7    U.S. debtors, is approximately three million dollars.

8         THE COURT:  Yes.

9         MR. BROMLEY:  A little bit more.  And we have

10   discussed with Mr. Tinker and given him information in response

11   to his inquiries that the individuals who could be

12   categorized -- and we're not admitting that they are, but could

13   be categorized as insiders for 503(c) purposes, they would

14   receive less than one million dollars, so that is one of the

15   representations we wanted to make on the record.  So in terms

16   of the acceleration, Your Honor, we do believe it's fair and

17   appropriate that the few individuals who are remaining behind

18   who are essential to making sure that the companies are

19   operated in an appropriate fashion to achieve the sale proceeds

20   that we are so happy to have been able to sign up to, and also

21   to perform under the transition services agreements, which I'll

22   get to in a minute, we think it only fair that they also be

23   able to get their third milestone.  And so -- and we do think

24   that from a U.S. debtor perspective, the amount that we're

25   talking about is relatively little, and with respect to the

58

1    U.S. and Canada, I think that the total amount is a little bit

2    over 3.8 million dollars.  So for those who are in the zone of

3    greatest concern for the U.S. trustee and Congress under

4    503(c), the amount would be, we think, less than one million

5    dollars, and we're ready to make that representation and,

6    indeed, will do so.

7          That kind of, if the Court is prepared to grant that

8    relief, would, in effect, wrap up our program from last year.

9    And so then the question obviously becomes what do we do going

10   forward?  Both Your Honor and Justice Morawetz will recall that

11   when we filed these cases, Nortel, around the world, had in

12   excess of 25,000 employees, nearly 9,000 in the United States

13   alone, and the sale transactions that we've been able to

14   accomplish will transfer over 13,000 of those 25,000 employees,

15   which we think, on a worldwide basis, is a fantastic result in

16   terms of the human toll that bankruptcies often visit on

17   individuals.

18         But by the same token, there is a need to recognize

19   that we're not finished.  We do have substantial obligations

20   that are required to be performed over the next two years.  The

21   transition services agreements which have not gotten quite the

22   press that the sale transactions have gotten are embedded in

23   every single one of the transactions that have been approved.

24   And they require a very substantial performance of services by

25   the remaining employees at Nortel both in the U.S. and in

1    Canada.  And it is important not just to recognize that we have

2    contractual obligations to perform those services, but that if

3    we do not perform those services and perform them well, that

4    the estates in the U.S. and Canada, in particular, will suffer

5    substantial damages.  There are certain damage caps in the

6    transition services agreements, and some arguments that perhaps

7    those caps might be exceeded in certain circumstances.  But

8    it's fair to say that the debtors here, in the U.S. and in

9    Canada are going to receive hundreds of millions of dollars in

10   payments from the purchasers, not to make money, but to make

11   sure that the businesses that we've sold will be able to be

12   performed by the purchasers, and the benefit of the bargain

13   will be obtained.

14        I think it's important to note that we have already

15   commenced performance under the two largest TSAs.  The CDMA

16   transaction closed in November, and the -- probably the most

17   complicated one -- the Enterprise transaction closed in

18   December.  And the transition of substantial portions of the

19   systems from Nortel over to our purchasers has been

20   accomplished.

21        But these are enormous tasks to integrate these

22   systems, and that's why the transition services agreements need

23   to remain in place.  And when you look at the tasks at hand,

24   it's important to keep in mind how the U.S. debtors and the

25   Canadian debtors, along with the other -- the EMEA debtors, but

1    primarily the U.S. and Canadian estates have focused on this

2    prospect.  What we've done is taken the remaining organization

3    and divided it by name into two pieces:  NBS, Nortel Business

4    Systems, and the Corporate Group.

5           THE COURT:  Right.

6           MR. BROMLEY:  In many respects, the transition

7    services obligations reside with NBS, but these are not -- NBS

8    itself is not a geographic entity, it's not a legal entity.  It

9    is spread out around the world, primarily between the U.S. and

10   Canada.  The Corporate Group, as well, much smaller in size,

11   nevertheless is also spread across geographies and is also

12   charged with very substantial roles going forward, especially

13   in terms of dealing with the issues that are necessary to wrap

14   up these cases.  And when we say wrap up these cases, we're not

15   talking about that with any intent to try to downplay the work

16   that folks need to do, because, remember, in order to get the

17   money out the door that we have assembled, right, we've got to

18   look at claims on a worldwide basis, we've got to reconcile

19   those claims, we've got to figure out which estate's got the

20   money, we've got to make sure that the money is able to be

21   assembled and distributed as quickly as possible, and that

22   doesn't happen overnight.  Indeed, it's a mind-boggling

23   exercise in many respects.  And so the Corporate Group at

24   Nortel both in the U.S. and Canada is charged with the lion's

25   share of tasks relating to that exercise.

1        So in one respect, NBS is the one minding the shop,

2    making sure that the transition services agreements are going

3    to be performed and performed appropriately, that damages are

4    not going to be accumulated as a result of defaults, and at the

5    same time, the Corporate Group is working to make sure that the

6    monies that we accumulated are able to go out the door as

7    quickly as possible to those who deserve it.

8        So what we had to do is then figure out, in this

9    environment, where folks are literally working themselves out

10   of jobs in multiple jurisdictions, how do you incentivize

11   people to stay?  And so -- not just stay, but to do their job

12   and to do their job well.  And it's not a -- it's not an

13   insubstantial exercise.  I did mention earlier that last year,

14   we had the senior leadership team.  There were eight

15   individuals at the top of the Nortel organization; five of

16   those individuals have left.  So we are not talking about

17   hypotheticals, here.  We are talking about very real issues.

18   And Mr. Dempsey, who's present in the courtroom, would testify,

19   if called, on this point that all throughout this process, we

20   have seen the highest qualified people at Nortel being able to

21   leave to good jobs and to leave quickly.  And so in a real

22   sense, we're not only relying on the economic consideration

23   that we're going to be trying to provide in this program to

24   people, but also a sense of duty to the organization.  And we

25   want to make sure that the folks that are recognizing that duty

1    and, in a sense, doing the right thing, often at great personal

2    sacrifice, are compensated.  It is a shame, frankly, that many

3    of these individuals are criticized in many respects, but in --

4    because when a company goes bankrupt, there's a tendency to

5    blame people for the things that have gone wrong.  And I can

6    say quite personally that the folks that we're working with

7    right now are doing their level best to make sure that not only

8    do we recover the most money possible but to get it out as

9    quickly as possible to those who deserve it.

10        But we cannot be standing here today without taking

11   account of the personal issues that these individuals face.  If

12   you were looking at your job path and sitting there saying,

13   well, what should I do in two years, very few people would say

14   I should work on a job for two years and then have none at the

15   end of those two years and then have -- recognize that people

16   need to have a real economic incentive in order to remain.  And

17   so what we've tried to do here by putting this plan together is

18   to include all of the constituents in putting it together to

19   make sure that they are all fully vested in it and supportive

20   of it, but also make sure that we have built in, to the

21   greatest degree possible, an architecture that respects the

22   U.S. system and the Canadian system at the same time.  And so

23   let me describe a little bit of what we've put together.

24        We have, within the Nortel Business Services unit, a

25   total of 2,237 employees.  About forty percent of this

63

1    workforce are employed by the debtors; twenty-one percent are

2    employed by the Canadian debtors, and the remainder are with

3    Nortel entities around the world.   NBS is led by two Nortel

4    Networks, Inc. or U.S. employees:   Christopher Ricaurte and Don

5    McKenna.

6              THE COURT:  Yes.

7              MR. BROMLEY:  Mr. Ricaurte and Mr. McKenna are also

8    the subject of certain relief in this motion.  We are seeking

9    to enter into specific employment agreements with them, so they

10   are not part of the incentive program.  They have their own

11   contracts.  It's important to step back for a moment and say

12   why.  Mr. Ricaurte and Mr. McKenna are very highly qualified

13   executives who worked very hard in the Nortel supply chain, and

14   indeed, two of the individuals most responsible for the smooth

15   transition of the two businesses that we've already been able

16   to sell and certainly responsible for the others to come.  But

17   they also reported to somebody, somebody who was one of the

18   eight that left -- five that left from the senior leadership

19   team.  We don't have backup for these men, Your Honor, quite

20   simply.  Having lost their former boss, Mr. Flanagan, we need

21   to retain Mr. Ricaurte and Mr. McKenna.  We don't have any

22   choice.  These are not the sort of jobs that people can simply

23   walk in the door and take over; these are the sorts of jobs

24   that require a history of knowing how the operation works.

25   We've described in many hearings how complicated the supply

1    chain is and the billing systems are, and simply sitting and

2    hearing Mr. Laddin who's left describe anything in this case

3    would indicate the level of complexity that our contracts

4    involve.  And to have Mr. Ricaurte and Mr. McKenna take over

5    the leadership of Nortel Business Services has required that

6    they completely revamp the job description that they had signed

7    on to.  And so the two employment agreements for those two

8    gentlemen, we believe are completely new and different from

9    what we had originally intended and what they had originally

10   intended.  And when you're looking at what NBS does, it's, in

11   many respects, the transition of IT systems.

12           THE COURT:  Right.

13           MR. BROMLEY:  Making sure that the IT systems in terms

14   of supply lines and billing and R&D and support and service are

15   all going to be transitioned effectively and efficiently,

16   because after all, if a Nortel customer -- former Nortel

17   customer calls in and says my Nortel phone isn't working, an

18   Avaya truck has to go out and fix it.  And that is not an easy

19   task.  I know getting a Verizon truck to come to my house to

20   fix anything is a task, and they haven't had a transaction like

21   this.  And given the money that I pay them, I would expect to

22   come a little quicker.  But it is complicated around the world.

23   This is not just happening in our neighborhood; it's happening

24   everywhere.  And for these services to be delivered on a

25   seamless basis in accordance with the transition services

1    agreements is an immense task.  And so what we have are, of the

2    NBS employees, 917 in the U.S., 459 in Canada, 861 in other

3    jurisdictions; it's important that we have Mr. Ricaurte and Mr.

4    McKenna, important in manners that will be difficult to

5    replicate.

6         The Corporate Group is a little smaller, but no less

7    important in its own way.  As you heard last week, the

8    Corporate Group is a little bit the opposite of the NBS group.

9    The NBS group is more heavily weighted towards the United

10   States where the majority of customers were, and the Corporate

11   Group is more heavily weighted towards Canada, although not

12   entirely so.  But in light of the fact that the headquarters'

13   functions had traditionally been in Toronto.  So there are 166

14   employees in the Corporate Group:  70 in the U.S., 75 in

15   Canada, and 21 in other jurisdictions.  And the Corporate Group

16   is lead by John Doolittle who is an NNI -- I'm sorry, an NNL

17   employee and an officer of NNL and NNI, as well as a member of

18   the NNI board.  Mr. Doolittle submitted the first day

19   declaration.

20        The Corporate Group is focused on a number of key

21   functions including the completion of the sales, exploring

22   strategic alternatives with respect to the intellectual

23   property portfolio, but running the tax returns, making sure

24   that the books and records are being filed, the audited

25   financials are accomplished, and oversight of the claims

1    reconciliation process, working very closely with Mr. Ray, the

2    principal officer, in respect of the NNI issues.

3           It's a smaller group of people, and indeed, as --

4    whenever we sit down and say that X or Y needs to be

5    accomplished, we're often also saying that we don't have enough

6    people to do it.

7           So what was developed with the active participation of

8    the monitor, the U.S. debtors, the Canadian debtors, the

9    creditors' committee, the bondholder group and their financial

10   advisors for this was the two employment agreements for Mr.

11   Ricaurte and Mr. McKenna, a third employment agreement for Mr.

12   Veschi; Mr. Veschi is a NNI employee and the chief intellectual

13   property officer at Nortel, and therefore, very important in

14   terms of his role looking at the maximization of value out of

15   the intellectual property portfolio, and also the creation of

16   what we're calling the NSIP, the Nortel Special Incentive Plan.

17          The plan itself is going to cover a total of 1475

18   employees.  That is about sixty percent of the employees that

19   we will have going forward after the sales are accomplished.

20   Now, the first program covered five percent of the population,

21   and the new program covers sixty percent of the population.  I

22   think it's fair to say that because the population is that much

23   smaller than it once was, the number of key individuals within

24   the program, obviously, would go up.  And so on the one hand,

25   1,000 people out of 25,000 a year ago, versus 1,400 out of

1    2,500 this year, it's really a reflection of the fact that what

2    we have here is a program which requires people to work

3    themselves out of a job.  But I think it's important to note,

4    however, that a very rigorous program of selection went into

5    this.  We are not simply including every single employee in the

6    U.S. and Canada or around the world.  And the selection of the

7    individuals in this program was undertaken very carefully with

8    the same group of constituents that went into not just setting

9    the framework, the dollars and the like, but also the actual

10   selection of the individuals.

11          Now, when you look at this, we've set it up in a

12   couple of different ways.  First, the corporate side, there are

13   four individuals who are NNI individuals who arguably could be

14   considered to be insiders.  Now, we don't consider them to be

15   insiders; we don't consider them to be officers with the

16   ability to direct policy or driving corporate decision-making.

17   Those within the corporate group that fit that category are NNL

18   or Canadian employees, and so the corporate program is a KERP,

19   it is a retention program.  We do believe that there's

20   incentives in it and based in it, but right now, what we're

21   looking at is a program which is based off of remaining through

22   a specific date.  So of that group, only four individuals are

23   U.S. employees who would be arguably within the insider

24   definition for 503(c) purposes.  Of those individuals, three of

25   them are lawyers and one is a tax professional.  So the reason

1    that they're arguably within that category is more about where

2    their salary is, rather than their functionality within the

3    organization.  And we've discussed this with Mr. Tinker, and I

4    think he understands the arguments in that with respect to

5    those individuals.

6          For NBS it's a little different, all right?  And if

7    you look at NBS there's two things that are going on here.  One

8    is there are two-thirds of the amounts that would be paid, our

9    amounts that we are describing in the motion papers as

10   performance based.  One-third we're referring to as time based.

11   And, it's important to note that we're not, by saying time

12   based, agreeing with any position that those payments are

13   payments that are retention payments and therefore outside of

14   the scope of 503(c).  Indeed, we think that they have important

15   incentive elements in it.

16         But, if you look at it, we think two-thirds clearly

17   are incentive based.  We think the case law refers to primarily

18   incentive based in terms of the standard for approval.  But we

19   also believe that the time based, or completion payments, are

20   also performance and are incentive based as well.  And I'll go

21   through our additional proffer on that point in a moment.

22         I think it's important to note, though, that when

23   looking at the NBS organization, eighty-eight percent of the

24   cost of the programs is covered under the transition services

25   agreements.  Now, what does that mean?  Well, it means when we

1    were sitting around putting together the transition services

2    agreements and sketching out the cost that we would have to

3    charge to our purchasers to deliver these services, it was very

4    high on everyone's agenda to take note that it would be

5    difficult to retain employees to continue to provide these

6    services.  And that they would have to have a special incentive

7    to remain through the period under the transition services.

8    And so at the time that we negotiated these transition services

9    agreements with Ericsson, with Avaya, with Genband we built

10   into those cost estimates the idea that we would be paying this

11   type of program.

12        And so eighty-eight percent of the cost of that

13   program is built in and fully recoverable from our purchasers.

14   And so I think that is an important philosophical perspective.

15   We always anticipated we'd have to pay people to stay, and

16   therefore we went out and said to our purchasers, you're going

17   to have to pay for that.  We didn't have a hundred percent

18   recovery of that cost, but eighty-eight percent, we believe, is

19   pretty good.

20        So, what we're trying to -- so what -- that's one

21   element of it, the other element is that with respect to the

22   completion payments, we're looking for two things on the NBS

23   group; that you have certain performance metrics, what I'll

24   describe in a moment, for two-thirds of the payments.  But for

25   one-third of the payment you need to be there at the end of the

70

1      first year and at the end of the second year.

2            Now if I simply stop there I could see how Mr. Tinker

3      would say oh, that's a stay bonus, it's a layup.  It's an open

4      net goal.  It's -- the fact of the matter is, though, Your

5      Honor, it's not that.  It's much more like being a pilot of an

6      airplane, right?  The completion here is the landing, right?

7      We cannot start performance under these transition services

8      agreements unless we're prepared to finish performance.

9            And so it is very important that people be there at

10     the end of year one and at the end of year two.  And so we

11     think it only appropriate that an element of this program

12     compensate them for it.  And we very consciously chose to put

13     two-thirds of the weight into the performance -- traditional

14     performance metrics and one-third into the idea that you would

15     be there as of a specific date.

16           But we have also talked about additional metrics, that

17     I'll read into the record through a proffer in a moment, that

18     we believe also demonstrate that those payments which would

19     come on the completion both of year one and year two are within

20     the realm of 503(c) and therefore should be approved.

21           It's also, I think, important to note the number of

22     insiders that would be covered by 503(c), that are within the

23     NBS organization, is five.  So it's 5 individuals out of 842

24     employees, and those individuals are folks who are, excuse me,

25     holding titles like chief information officer, leader of North

1    American services operations, leader of application services,

2    leader of employee relations and mergers and acquisitions, and

3    a leader of financial services and financial planning and

4    analysis.  These are clearly people who are important to the

5    organization, but you'll also note that they're not people

6    whose names are president and CEO.

7         So with that as a framework, Your Honor, we believe

8    that what we've constructed here is a -- like so many things in

9    this case, a sui generis but well thought out response to a set

10   of issues that we've just, frankly, never come across before.

11   But nevertheless, we think it's well thought out, we think it's

12   well supported, and we think it's appropriate under the

13   circumstances.

14        With that as kind of an overview, and I know it's a

15   bit lengthy, I would like to just make a couple of comments

16   with respect to Mr. Dempsey's declaration and make an

17   additional proffer that will hopefully satisfy Mr. Tinker.

18   The -- and let me just get a couple of things out of the way,

19   because I wanted to make representations that Mr. Tinker had

20   asked us to make.

21        I have already stated that with respect to the

22   acceleration of the third milestone, payments to insiders --

23   arguable insiders would not accept one million dollars.

24        THE COURT:  Right.

25        MR. BROMLEY:  The aggregate amount that would be paid

72

1    under the special incentive program, to possible insiders,

2    would not exceed three million dollars.  So that is leaving

3    aside the three individuals who get the employment agreements,

4    these are U.S. insiders -- or arguably U.S. insiders, under the

5    incentive program.  Both NBS and corporate would not exceed

6    three million.

7         There's also, within the program, a concept of a

8    reserve, which is a way of saying that we understand that folks

9    are going to leave, and we understand that we may have to go

10   out and hire other people.  We may have to promote people and

11   give them a little bit more to incentivize them to stay around

12   and to step up and do additional tasks.  And so we use the

13   defined term "additional payments" in the motion papers.

14        I would note that the -- this is not going to be the

15   rat pack sitting around the table deciding who to pay money to.

16   This is -- well, maybe it is the rat pack, but a ragtag

17   batch -- but it is, certainly, a group of people who are very,

18   very focused on making sure that we don't spend more than we

19   need to, making sure that we spend it on the right things and

20   on the right people.  And so, additional payments are not going

21   to be made unless there is a clear agreement amongst the --

22   U.S. debtors, the Canadian debtors, the official committee, the

23   bondholder committee and the monitor.

24        That being said, we have made the representation to

25   Mr. Tinker that those additional payments, and the reserve

73

1    we've set up is seven million dollars, would not exceed two

2    million in terms of payments to U.S. insiders.  Now in the

3    event that it turns out that there is a crisis that requires us

4    to go above that amount, we would certainly tell Mr. Tinker

5    that and give him the opportunity to come back to you if he

6    found that to be an issue.  But we feel confident, at this

7    point, that we should be able to manage it.

8            I think those were three separate representations that

9    we were going to make to Mr. Tinker.  It's also worthwhile to

10   note that the plan that we have filed with the Court had a

11   couple -- we've made a couple of minor changes to it, and I

12   will add that up -- hand that up to Your Honor in a moment.

13   But just to summarize, what we have done is we have changed the

14   timing of certain payments, and these include the shortening

15   for the timing of acceleration payments upon involuntary

16   termination without cause or upon a transfer.  What we had said

17   earlier, in the original draft of the plan, was that it would

18   be made on the ninetieth day.  We've now agreed that they would

19   be made on the thirtieth day.

20           There are a couple of other minor changes, and I have

21   it here, Your Honor, if I could hand it up.

22           THE COURT:  Please, yes.

23           MR. BROMLEY:  Thank you.

24           THE COURT:  Thank you, Mr. Bromley.  Okay.

25           MR. BROMLEY:  And I am informed, Your Honor, that the

1    monitor has filed the amended plan with Justice Morawetz.

2          THE COURT:  Okay.

3          MR. BROMLEY:  The -- if I could them move on, Your

4    Honor, to -- oh, and there's one other thing I wanted to hand

5    up.

6          Do you have the Mercer report?

7          Your Honor, I have a copy of a document which is in

8    many respects almost identical to the document that you saw

9    last year.  We did not file it under seal; we handed it to you

10   during the hearing, you took a look at it, I think you then put

11   it under your desk for three weeks and handed it back to me

12   three weeks later.  We had provided this document, obviously,

13   to our constituents and also to Mr. Tinker.  It would be -- I'd

14   be happy to give it to you under the same circumstances today,

15   if that's okay with you.

16         THE COURT:  That would be fine.

17         MR. BROMLEY:  Okay, thank you.

18         THE COURT:  Please, thank you, Mr. Bromley.  Thank

19   you.  Yes.

20         UNIDENTIFIED SPEAKER:  Goes to us?

21         THE COURT:  Yes, it does.

22         MR. BROMLEY:  So, Your Honor, that is a deck, that had

23   been put together under the direction of Mr. Dempsey, that had

24   been used to support the approval of the program, both before

25   the Nortel board of directors for Mr. Ray, as principal

1    officer, and I believe the same deck was provided to the two

2    committees in their consideration.  The -- and as I said, we've

3    also given it to Mr. Tinker, it does contain certain

4    confidential information about individuals, and therefore we

5    did not file it.  I would note that the monitor has filed it

6    under seal in Canada.

7         Your Honor, with respect to the Dempsey declaration,

8    we're -- we'd like to rely on that and rather than put Mr.

9    Dempsey on the stand, although we reserve the right, depending

10   on what Mr. Tinker says, to do so.  We believe it sets forth a

11   very strong basis on which to support the plan.  I believe I've

12   summarized it in my remarks here.  But there's certain

13   additional information that we wanted to put into the record

14   based on our conversations with Mr. Tinker.

15        So, Mr. Dempsey is a partner in the firm of Mercer,

16   Inc.  They are one of the leading experts and advisors in the

17   area of executive compensation and particularly expert in the

18   area of compensation matters in Chapter 11 and distress

19   situations.  They've been retained by Nortel for many years and

20   have provided them with advice, both inside and outside, of

21   bankruptcy, both in the United States and in Canada.

22        What we are looking at, in terms or the NBS

23   performance metrics for the two-thirds of the payments, and

24   also the performance metrics that are listed in the employment

25   agreements, they are -- there are three statements:  That the

1    performance metrics would be based on net cash from operations

2    of NBS, the recovery of value from remaining assets and the

3    service performance relating to the TSAs, measured in quality

4    and timeliness.  Mr. Tinker had asked for additional

5    information to try to give a greater -- for context to those

6    three points.  And, if called, Mr. Dempsey would testify as

7    follows:  That with respect to the net cash from operations of

8    NBS the issues that have been considered, and will be

9    considered in establishing the metrics, include maximizing cash

10    recovery from purchasers, monitoring the timing and amounts of

11    payments, reconciling payment disputes promptly, minimizing

12    cash outlays to vendors and third parties, identifying less

13    expensive options and alternatives for inputs that nonetheless

14    satisfy performance obligations under the transition services

15    agreements and reducing cash exposure in the event of

16    performance defaults; focusing on minimizing defaults and

17    anticipating potential defaults.

18        In terms of recovery of value from remaining assets;

19    that would include identifying assets not essential to the

20    performance of TSA services, developing and implementing

21    processes for the sale, or otherwise a value enhancing

22    disposition of such assets, and replacing high value, high cost

23    assets with lower value, lower cost assets while maintaining

24    performance levels in accordance with the transition services

25    agreements.  And in terms of service performance relating to

1    the TSAs; establishing quality performance criteria and

2    communicating those criteria to all relevant employees and

3    clearly identifying timelines for the delivery of services,

4    confirming those timelines with purchasers, and communicating

5    them to the relevant employees.

6         These precise targets and goals have not yet been

7    fully documented; they are still being discussed.  And the

8    process for development, Mr. Dempsey would testify, to date has

9    been, and will continue to be, a rigorous negotiation process

10   involving the monitor, the UCC, the bondholder group and their

11   financial advisors.

12        He would also testify that each party just listed has

13   been deeply involved in every aspect of the program from the

14   beginning, and it is his view that they're involvement will

15   ensure that the performance targets are appropriately set to

16   incentivize employees.

17        Moving on, Your Honor, to the completion payments; the

18   one-third element.

19        THE COURT:  Yes.

20        MR. BROMLEY:  The plan itself now defines completion

21   payments as each plan participant's target payment amount shall

22   be comprised of a component conditioned upon completion of the

23   plan participant's role during the plan term and furthering the

24   business purposes of NBS in the corporate group as applicable

25   in the relevant plan period.

1    If called to testify, Mr. Dempsey would testify that

2    the delivery of services under each of the transition services

3    agreements, through the final date of each transition service

4    agreement, is a requirement of that agreement that each NBS

5    plan participant has been identified by Nortel, through the

6    process described as above, as being critical to the delivery

7    of such services and that the total number of remaining

8    employees after the sales are completed will be 2,237, with the

9    total number of NBS participants at 1,408; 842 of which will be

10   in the U.S., which is sixty-two percent of NBS employees being

11   participants in the special incentive program.

12    He would testify that the selection of those employees

13   was a joint effort by the debtors in the U.S. and Canada, the

14   monitor, the UCC, and the bond group, and that of the 842

15   participants in the U.S. only 4 are insiders, in his view,

16   under the criteria of 503(c).

17    He would also testify that the NBS participants in the

18   special incentive program, each of which has already been

19   determined to be critical to the delivery of services under the

20   TSAs, will receive their completion payments so long as they

21   have properly performed their tasks and their roles as of the

22   date the completion payments are due.  And that the

23   determination of qualification for such payments will be made

24   with respect to a process that will involve the same group that

25   determined membership in the group; meaning that the parameters

79

1    for performance will be determined by the U.S. debtors, the

2    Canadian debtors, the monitor, the UCC, and the bonds.

3          So in that -- with those additional points on the

4    proffer, Your Honor, I believe that we have satisfied all of

5    the requests that Mr. Tinker has made.  And on that basis I

6    would both move the admission of the declaration of Mr. Dempsey

7    into evidence, and pending Mr. Tinker's confirmation that he

8    doesn't have any questions for Mr. Dempsey, also stand on that

9    proffer.

10         THE COURT:  All right.  Does anyone wish to cross-

11   examine Mr. Dempsey?

12         MR. TINKER:  The United States Trustee, Your Honor,

13   Patrick Tinker, I have no questions for cross.

14         THE COURT:  All right, anyone else?  Then we can

15   dispense with Mr. Dempsey and admit the proffer into evidence.

16   (Mr. Dempsey's Proffer was hereby received into evidence, as of

17   this date.)

18         MR. BROMLEY:  Thank you very much, Your Honor.

19         THE COURT:  You bet.

20         JUSTICE MORAWETZ:  Judge Gross?

21         THE COURT:  Yes.

22         JUSTICE MORAWETZ:  Perhaps this might be an

23   appropriate time to take a five-minute comfort break for court

24   staff and others.

25         THE COURT:  I think you're absolutely right, and Mr.

80

1    Bromley, is this an appropriate time, we'll just take a short

2    break?

3              MR. BROMLEY:  If I could just, before I forget --

4              THE COURT:  Yes.

5              MR. BROMLEY:  -- 'cause I know I will.  Not only

6    admit -- ask to admit the proffer, but also the declaration as

7    well.

8              THE COURT:  I'm sorry.  Is that acceptable as well,

9    Mr. Mr. Tinker?  Yes, thank you Mr. Bromley, it is also

10   admitted, because --

11   (Mr. Dempsey's Declaration was hereby received into evidence,

12   as of this date.)

13             MR. BROMLEY:  Okay.

14             THE COURT:  -- we're relying heavily upon that as

15   well.

16             MR. BROMLEY:  Thank you very much, Your Honor.  May I

17   also ask that Mr. Dempsey then be excused and allowed -- be

18   allowed to fly back to Chicago?

19             THE COURT:  Mr. Tinker?  Anyone else?  Absolutely.

20             MR. BROMLEY:  Okay.

21             THE COURT:  A safe trip home.  Thank you.

22             MR. MURRELL:  Your Honor, may I be excused?

23             THE COURT:  And this is, I'm sorry?

24             MR. MURRELL:  This is Vicente Matias Murrell on behalf

25   of the Pension Benefit Guaranty Corporation.

81

 1            THE COURT:  You may be, sir.

 2            MR. MURRELL:  Thank you, Your Honor.

 3            THE COURT:  Yes.

 4            MR. BROMLEY:  Can we take a ten-minute break?

 5            THE COURT:  It's time for the break.  Let's make it --

 6    let's make it ten minutes --

 7            MR. BROMLEY:  Ten.

 8            THE COURT:  -- because we have a number of people, it

 9    could take a little longer than the five.

10            MR. BROMLEY:  Thank you very much, Your Honor.

11            THE CLERK:  All rise.

12        (Recess from 4:05 p.m. to 4:20 p.m.)

13            THE CLERK:  Please rise.

14            THE COURT:  Thank you, everyone, please be seated.

15    Justice Morawetz, excuse my delay.

16            JUSTICE MORAWETZ:  No problem at all, sir.

17            THE COURT:  Mr. Bromley.

18            MR. BROMLEY:  Back on the record, thank you, Judge

19    Gross --

20            THE COURT:  Yes.

21            MR. BROMLEY:  -- Justice Morawetz.  Before I cede the

22    podium to Mr. Tinker, which I'm going to do in a moment, I just

23    wanted to make a correction of one thing that I said in the

24    proffer --

25            THE COURT:  Yes.

1          MR. BROMLEY:  -- which was that with respect to the

2     acceleration under the other -- the old program, I think I may

3     have said that the cost for the U.S. was about three million --

4          THE COURT:  Yes.

5          MR. BROMLEY:  -- it's actually -- the overall cost for

6     U.S. and Canada is approximately three million.  The U.S. cost

7     of that approximately two million in the U.S.; insider cost

8     approximately one million.

9          THE COURT:  Okay.

10         MR. BROMLEY:  Just to clarify that.

11         THE COURT:  Thank you.

12         MR. BROMLEY:  And now I'll cede to my colleague from

13    the U.S. Trustee's office.

14         THE COURT:  Thank you, Mr. Bromley.

15         Good afternoon, Mr. Tinker.

16         MR. TINKER:  Good afternoon, Patrick Tinker appearing

17    on behalf of the United States Trustee.  Your Honor, Mr.

18    Bromley indicated that he had had a number of communications

19    with myself and the U.S. Trustee's office, that is certainly

20    true.  I appreciate very much the cooperation and the extent of

21    cooperation shown by debtors' counsel and Mercer in responding

22    to my concerns.

23         Your Honor, when we had those communications, and they

24    extended over several days -- what I'm trying to do is resolve

25    my concerns, but I'm also trying to ensure that Your Honor has

1   as good of a record as possible upon which to make a

2   determination.

3        THE COURT:  And I appreciate that; I recognize that.

4        MR. TINKER:  And as a result of those communications

5   we've not really addressed -- I'm sorry, we've not really

6   resolved my concerns, but hopefully the record is improved as a

7   result.

8        So, what I'd like to do is turn to my objections, and

9   I'll be pretty brief.  I would stand on the objection as filed.

10       THE COURT:  Yes.

11       MR. TINKER:  With regards to the third milestone, I

12   indicated that this is not simply an acceleration; it's really

13   a removal of the milestone.  In essence, the third payment

14   becomes a fait accompli, the criteria is.  And that's my

15   concern there.

16       With regards to the special incentive plan, the first

17   point I make in the objection, Your Honor, is that this is a

18   very large amount.  For the U.S. debtors we're talking about

19   fifty-five million dollars.  Now that number is -- although

20   it's large, the amount that's applicable to insiders is, of

21   course, much smaller.  And I make that point simply because the

22   large portion of it is governed by the business judgment rule

23   and while it's large, I understand that Your Honor's going to

24   make that determination into that kind of a standard.  With

25   regards to the insiders, though, my concern is that the

1    requirements under 503(c) are different.  And that's because we

2    have a statute that specifically applies and sets forth certain

3    standards.

4         And so, what we have now, as far as the record, is a

5    proffer with regards to what the amounts going to insiders in

6    the various different scenarios, and I appreciate the fact that

7    we've come to that point, and that it's now a part of the

8    official record.  Your Honor, with regards to the amounts,

9    we're talking about four or five million dollars, and in my

10   view that is still a very significant amount, particularly when

11   we're talking about a sum going to a smaller number of

12   insiders.  So it is not inconsequential at all, in my view.

13        Debtor's counsel has argued that, well, about

14   eighty -- eighty-eight percent of that is covered, if you will,

15   by the pricing under the transition services agreements.  And

16   my response to that argument is that really the debtors still

17   are paying those sums, and I don't see how that is really any

18   different from any situation where you are pricing your

19   services or your product.  Presumably you always do that, or

20   you try to do that; you try to have the pricing fixed in such a

21   way that it will cover all of your anticipated costs.  So that,

22   in my view, that's not really a justification for it.

23        THE COURT:  If you don't you wind up in this court.

24        MR. TINKER:  That's right.

25        THE COURT:  Yes.

85

1        MR. TINKER:  And hopefully they're doing a good job of

2    that, right now, and you won't have administrative expenses

3    accruing that can't get, you know, paid --

4        THE COURT:  Right.

5        MR. TINKER:  -- and that's not the situation here.

6    But as justification for the plan, I have a problem with that.

7    With regards to the metrics, though -- that's where most of my

8    communications with Mr. Bromley and his firm were directed.

9    The metrics now, as supplemented by way of the proffer, are a

10   good bit more detailed that they were in the motion.

11       In the motion we find a phrase like "completion

12   payment", and you can't tell by looking at the court file what

13   on earth that means.  I think Mr. Bromley has considerably

14   expanded on that.  I still have a problem with it, and that's

15   because normally when we address these plans, under 503(c), we

16   have a metric, or a payment criteria, which is fixed.  And

17   people can look at it, and anybody can understand, and the

18   Court can determine that, you know, this goal is something that

19   people will work for, it will be applied, and you can see the

20   incentive aspect of it.

21       The problem we have here is that unlike an EBITDA

22   goal, or a goal that's tied to, you know, amount of sale

23   proceeds, or something like this, these payment criteria are,

24   to some degree, still in flux.  There's been a proffer with

25   regards to the way in which those criteria will be fleshed out,

86

1    but they are not determined in any kind of specific way, like a

2    monetary target would be.  And that's my concern, and I

3    understand that this case is different in some ways.  But

4    that's my concern is that we don't have, even right now,

5    criteria which are -- or fits in some kind of a final way.

6    They are yet to be determined to some degree.

7            Nonetheless, Your Honor, if you were to agree with the

8    debtors that this kind of relief should be granted, I would

9    request, Your Honor, that the order approving -- that the

10   payment arrangement approves such payments consistent with the

11   payment criteria set forth in the motion, but also those

12   payment criteria as further described in the evidentiary

13   proffer at this hearing, because the motion's just much too

14   broad.  I would urge Your Honor to impose more limitation on

15   those payment criteria by reference to the proffer here today.

16           And with that I would close my argument unless you

17   have questions, Your Honor.

18           THE COURT:  I don't, I appreciate your position, Mr.

19   Tinker, and your argument as well.  Thank you.

20           MR. TINKER:  Thank you, Your Honor.

21           THE COURT:  Mr. Botter, good afternoon.

22           MR. BOTTER:  Good afternoon, Your Honor, Mr. Justice

23   Morawetz, good afternoon to you as well.  I'll be very brief.

24   As with almost every material aspect of these cases, we have

25   worked very closely with the U.S. debtors, the Canadian

1    debtors, the monitor, and the bondholders to work out programs

2    that will maximize value for all constituents.  And we still --

3    as with all of these material discussions, or almost all of

4    these material discussions, they were quite constructive, and

5    we worked together to build an appropriate plan.

6          And I think we have built an appropriate plan for this

7    case.  And as Mr. Bromley had said, this case is sui generis,

8    in many different respects, and this would be one of those

9    respects.  You can't really use the cookie cutter approach with

10   respect to building a plan for a liquidation that encompasses

11   the continuation of these very complex transition services.

12         THE COURT:  Yes.

13         MR. BOTTER:  And I think we've done our best to build

14   a plan that takes into account the complexity here and the

15   value that is being added by these employees who, as Mr.

16   Bromley said, are working themselves out of a job.

17         The one comment that I can make in addition to the

18   fact that this is the right plan for this case, and to address

19   one of the issues that Mr. Tinker's concerned about, is we will

20   continue to work very closely, and constructively, with all of

21   the major constituents to determine, in fact, what people will

22   be getting under these programs.

23         Certainly, everything that's been done on a material

24   basis for the most part has been passed through us and will

25   continue to be so.  And, as I said, I think, you know, to the

1    extent that Mr. Tinker has concerns, we have a very vigilant

2    group of parties who are watching every penny that is moving

3    out of the system.  With that, Your Honor, the creditors'

4    committee supports entry of this order.

5         THE COURT:  Thank you, sir, thank you.

6         MR. KRELLER: Your Honor, Tom Kreller at Milbank on

7    behalf of the bondholder group.  Is this an appropriate time

8    for --

9         THE COURT:  It is, yes, it is indeed.

10        MR. KRELLER:  Thank you, Your Honor.  I'll be brief as

11   well, and really to mirror Mr. Botter's comments; the

12   bondholder group has been intimately involved in the

13   discussions over these plans as well.  The debtors, as they

14   have throughout the cases, have reached out and engaged with

15   our group on these plans.  There's been significant back and

16   forth, the issues that we've had and raised have been addressed

17   to our satisfaction.  We believe, too, that this is the right

18   plan, crafted in a unique situation, to really try to align the

19   interests here, to see this case through to the end.  And, Your

20   Honor, with that in mind, we strongly support the plans as

21   proposed and the granting of the motion.

22        THE COURT:  All right, Mr. Kreller, thank you.  Anyone

23   else?  Mr. Bromley, anything further from you?

24        MR. BROMLEY:  Nothing further from me, Your Honor,

25   although I would respond to a couple of Mr. Tinker's points,

1    though I would like to also give our colleagues in Canada an

2    opportunity to make their submissions as well.

3            THE COURT:  All right.

4            MR. BROMLEY:  So, I'm happy to talk about Mr. Tinker's

5    concerns right now, or wait till those submissions.  It's up to

6    you and --

7            THE COURT:  Why don't we do it now --

8            MR. BROMLEY:  Okay.

9            THE COURT:  -- and then we can turn things over to

10   Justice Morawetz in his courtroom.

11           MR. BROMLEY:  Excellent.  Well, I certainly take -- to

12   heart Mr. Tinker's concerns and both for the protection of the

13   record as well as the mandate that his office has.  I think

14   that there's a couple of points that I just would like to

15   mention.

16           The eighty-eight percent recapture that we've tried to

17   negotiate, as I said, Your Honor, was very intentional.  And I

18   think -- I hear what Mr. Tinker's saying although I don't know

19   that I fully appreciate any way that we could have done it

20   differently.  We knew that we'd have to pay amounts like this,

21   to employees, to keep them around.  We sat down with our

22   counterparties and we said you have to pay for these costs.

23   And we were able to recapture eighty-eight percent of them.

24           So, when we look at these numbers I think it's

25   important to recognize that, you know, fifty-five million

1   dollars, eighty-eight percent of that is being paid by

2   companies with the names of Ericsson, Avaya and Genband, and

3   the like.  And we think that is appropriate, both in order to

4   consider the plan as proposed but also appropriate in terms of

5   the business judgment that went into approving this.

6        The concern that Mr. Tinker also raised about the

7   metrics being not fixed yet to the greatest degree of

8   specificity, I think the one point that I would make there,

9   Your Honor, is to go back to what exactly we're trying to do

10  here.  It is relatively easy to say if my EBITDA is two percent

11  greater than last year's EBITDA, then we've succeeded.  But

12  when you walk in every day, do your job and walk out and lock

13  the door and the building doesn't fall down, it's not quite the

14  same.  And what we're trying to do here is not make money;

15  we're trying to perform appropriately and avoid potential

16  liabilities.

17       And so -- and we believe that we've done that very,

18  very well, so far.  We have transitioned the two most

19  complicated parts of the business very successfully, and we

20  think we're well on our way to accomplishing that.  And if you

21  listen -- if you look carefully at the metrics that we have

22  described, it is difficult to say we're going to identify

23  assets that we should sell and then put a particular value on

24  that and say, if you don't sell X dollars worth of assets by --

25  in so many months, that you haven't satisfied your performance

1    metrics.

2         So, I think to echo both Mr. Kreller and Mr. Botter,

3    we're doing our best in a difficult situation.  We think that

4    the performance is a relative term, and has to be taken into

5    account in terms of what we have in front of us.  And we have

6    tried very hard to do that.  So with that, Your Honor, I think

7    those are the only responses I have to Mr. Tinker and would

8    cede the podium to Canada.

9         THE COURT:  All right.  Thank you, Mr. Bromley.

10        Mr. Justice Morawetz, we have completed the

11   presentations in this court and I now turn the matter over to

12   you.

13        JUSTICE MORAWETZ:  Thank you, Judge Gross, and Mr.

14   Tay, please proceed.

15        MR. TAY:  Good afternoon, Mr. Justice Morawetz, and

16   Judge Gross.

17        THE COURT:  Mr. Tay.

18        MR. TAY:  Some of the more special moments I've had in

19   this case was when Mr. Bromley went to find time in his busy

20   schedule to take me aside and explain patiently to me that he's

21   much more eloquent than I am, and I think he's proven it today.

22   So I don't have a heck of a lot to add.

23        Let me just make a couple of very brief points from

24   the Canadian perspective.  There is a typo in the Canadian

25   affidavit, just to get the record straight, in tab 2 of our

92

1    materials.  In Ms. King's affidavit, on page 18, paragraph 53,

2    you'll see a table there.

3         JUSTICE MORAWETZ:  Yes.

4         MR. TAY:  And where it says "applicants" that really

5    should be the U.S. debtors, and "U.S. debtors" should be

6    "applicants".  So, the numbers attributable to the U.S. estate

7    for this program would be the 55.5, and to Canada the 27.8

8    million.

9         The second thing I'd like to draw to your attention is

10   the fact that we are asking, in the Canadian order, a charge

11   that will, in essence, put the Canadian employees on the same

12   footing as the U.S. employees.  As you know, there's no

13   difference in our system for pre and post obligations; they're

14   all unsecured.  And, whereas in the U.S., the people who are

15   entitled to this program get, as I said, a post filing

16   administration priority, and so in order to put the employees

17   in the same basis, we're asking for a charge in the amount

18   of -- maximum of twenty-five million, so that these amounts are

19   protected.

20        Now as for the concerns that were expressed by the

21   U.S. Trustee, I think the comfort you can take in Canada is

22   that whatever these metrics are going to be, they will have to

23   be normally approved by the Canadian applicants, but also by

24   the monitor.  And I think you can take great comfort in that as

25   well.  And I don't believe that this -- sorry, Ms. Stam

93

1    confesses that she misinformed me, it's twenty million.  Not to

2    put the blame on anyone.

3          JUSTICE MORAWETZ:  It's part of the charity.

4          MR. TAY:  For the church, yes.  I've lost my train of

5    thought, sorry.

6          The -- I don't believe that there's anyone objecting

7    to the motion today.  I think the -- there is rep counsel --

8    the rep counsel may want to tie this into the incomplete

9    hearing that you heard this morning.  And I will respond to

10   that, if I am capable.

11         JUSTICE MORAWETZ:  Mr. Carfagnini, anything to add?

12         MR. CARFAGNINI:  You Honor, just very briefly, on

13   behalf of the Canadian monitor, you have the monitor's thirty

14   settlements report as well as the supplement.

15         JUSTICE MORAWETZ:  I have a confidential supplement

16   and confidential Appendices C and D --

17         MR. CARFAGNINI:  Correct.

18         JUSTICE MORAWETZ:  -- to the supplement.

19         MR. CARFAGNINI:  Correct, and the -- applicants are

20   seeking to have those sealed in accordance with Sierra.  Now,

21   just two very brief points.  In paragraph 37 of the monitor's

22   report, the monitor is of the view that incentivizing to retain

23   these employees is critical to the ongoing success of this

24   reorganization.  Paragraph 39, that this incentive plan is

25   global in nature, I think also bears pointing out.  And,

94

1    finally, you can take comfort, I think, Your Honor, from the

2    fact that the monitor has been intimately involved in this

3    process, as it has all through.

4         Bearing that in mind, the monitor's recommendations

5    are contained to paragraphs 72 to 75 of its report.  It views

6    the commitment as essential; it views it as reasonable, and

7    supports the request.  And subject to any specific questions

8    you have, those are my comments.

9         JUSTICE MORAWETZ:  Thank you.  Mr. Zigler?

10        MR. ZIGLER:  Thank you, Your Honor, and Judge Gross.

11   We were before Your Honor this morning on an appeal that my

12   clients agreed that they would support the monitor's

13   recommendation on this incentive program as part of an overall

14   protection that pertained to extending things like employee

15   health benefits for the rest -- and retiree health benefits for

16   the rest of the year.  We don't resolve from our agreement;

17   however the integrity of the process of the agreement and my

18   respectful submission would require that Your Honor not make a

19   determination on this motion until the other one was -- at a

20   minimum, is dealt with.  I think the -- both the integrity of

21   the process and simply the -- if nothing else, the optics

22   seemed, to my submission, unseemly to leave employee --

23   retirees' health benefits hanging while we're dealing with

24   incentive programs.

25        I don't think there's any prejudice to the employees

1  who'd be affected by the incentive programs by waiting until

2  after disposition of your motion tomorrow.  Those are my

3  submissions.

4          JUSTICE MORAWETZ:  Mr. Wadsworth?

5          MR. WADSWORTH:  Just simply as a sort of me too.  The

6  CLU Canada and the retirees that we represent also work with

7  the same position that, one of the integral aspects of the

8  agreement that was reached between the parties, that subject to

9  the motion of this morning, and has yet to conclude.  Not that

10  we believe that anybody's going to put a hockey stick between

11  our skates, but to ensure that all is fair, reasonable and

12  equitable, that the relief requested here not be granted until

13  such time that that motion, that will be hopefully completed

14  tomorrow, is heard.

15          JUSTICE MORAWETZ:  Is the request to not get a ruling

16  on this motion until the other one has been determined, or just

17  until argument has been completed?  Because I do not know, at

18  this stage, obviously, when it's going to conclude tomorrow,

19  and when a ruling will be forthcoming.

20          MR. ZYCH:  Kevin Zych, Your Honor.  I think it's very

21  reasonable and has to be completed.

22          MR. WADSWORTH:  I believe that's reasonable, Your

23  Honor.

24          JUSTICE MORAWETZ:  Okay, thank you.

25          MR. WADSWORTH:  Thank you, Your Honor.

96

1      JUSTICE MORAWETZ:  Anybody else wishing to make

2  comment before Mr. Tay?

3      Mr. Tay?

4      MR. TAY:  Just in reply.  As Your Honor knows, we

5  heard it this morning, everyone tried to get it done in time,

6  but there's a lot we heard.  You have said it's going to get

7  done tomorrow.  The facts of this morning's hearing and the

8  facts of this hearing are completely separate.  There are

9  employees who have been hanging out for a long time, who know

10  that this is being heard today, and I think we'll send a very

11  bad message if we don't bring this to conclusion.  There are

12  press releases that need to be put out, one way or the other,

13  because we are a public company.  The fact's not going to

14  change; they're not holding either Mr. Wadsworth or Mr. Zigler

15  to supporting this motion for the record.  For this motion

16  stands on itself and that I don't think this Court has set on

17  any reason why this motion should not be granted now.  And

18  tomorrow will be tomorrow, and you will decide what you decide.

19      JUSTICE MORAWETZ:  Okay, any further?  All right,

20  well, Judge Gross has suggested we take a ten-minute recess at

21  this point.

22      THE COURT:  Yes, sir, we'll stand in recess for ten

23  minutes.

24      JUSTICE MORAWETZ:  Thank you.

25      THE COURT:  Thank you, everyone.

1          THE CLERK:  All rise.

2     (Recess from 4:43 p.m. to 4:52 p.m.)

3          THE CLERK:  Please rise.

4          THE COURT:  Thank you, everyone.  Please be seated.

5          CANADIAN CLERK:  Order.  All rise.  This court

6     resumes.  Be seated.

7          JUSTICE MORAWETZ:  Judge Gross, would you like me to

8     start?

9          THE COURT:  Yes, sir.

10          JUSTICE MORAWETZ:  Okay, thank you.  I've certainly

11     taken into consideration, Mr. Zigler and Mr. Wadsworth, your

12     requests.  I will reserve this matter; the endorsement will be

13     delivered at the conclusion of arguments tomorrow on the

14     settlement motion in court 6-1.  And I believe Judge Gross has

15     certainly communicated he's aware of that timetable.  And over

16     to you, sir.

17          THE COURT:  Thank you, and in deference to our

18     Canadian colleagues, and in particular Justice Morawetz, I,

19     too, will defer ruling until tomorrow so as to not

20     inconvenience the parties.  It will be perfectly acceptable,

21     particularly for out-of-town counsel, but for all counsel, for

22     that matter, if you wish to participate by telephone for the

23     ruling, which I think will be fairly brief.  You're welcome to

24     come into the courtroom or participate by telephone.  The only

25     difficulty, I think, logistics-wise, is that we're not certain

1    exactly what time that will be.  I don't know if we want to set

2    a time, Justice Morawetz or if that's overly optimistic so the

3    parties know when to call or appear.

4         JUSTICE MORAWETZ:  Well, I think it is subject to your

5    view, Judge Gross.  It's not going to be an official joint

6    hearing; it's just really going to be reasons delivered in two

7    courts.  My expectation is that it will be around 4 p.m.

8    tomorrow afternoon.

9         THE COURT:  All right, so that's what time we'll set

10   for our hearing.  It's not a joint hearing, I recognize.  But I

11   don't want us to be necessarily ruling at different times,

12   so -- and I think on this one --

13        Yes, Mr. Abbott?

14        MR. ABBOTT:  Your Honor, Derek Abbott for the U.S.

15   debtors.  If possible, Your Honor, given your indication that

16   telephone participation would be acceptable, I wonder if we

17   could just set a teleconference at 4 o'clock, and either we can

18   distribute a number or we can use CourtCall as the Court wishes

19   to have that ruling read, rather than bringing folks in for the

20   hearing or even suggesting it.

21        THE COURT:  Yes, I think --

22        MR. ABBOTT:  That way, we've got some greater

23   flexibility if the time moves.

24        THE COURT:  Exactly.  Let's use CourtCall which works

25   well with, I think, counsel if there's a delay, and we can set

1    that up for 4 p.m.  And if there's a delay in Canada, we can

2    obviously make an adjustment.

3           JUSTICE MORAWETZ:  Thank you, I believe that's it for

4    this afternoon.

5           THE COURT:  Do we have any other joint issues?  I

6    don't think so, but -- no.  Justice Morawetz -- oh, forgive me.

7    Mr. Abbott.

8           MR. ABBOTT:  No, Your Honor.  We don't have any other

9    joint issues.  Thank you, Mr. Justice Morawetz.  We do have

10   some remaining U.S. --

11          THE COURT:  Understood.

12          MR. ABBOTT:  -- issues to deal with on the agenda.

13          THE COURT:  Oh, yes, I know that well.  And well,

14   thank you and good evening to all of you in Canada, and we will

15   obviously speak tomorrow, Justice Morawetz.

16          JUSTICE MORAWETZ:  Thank you.

17          THE COURT:  Good evening.

18          JUSTICE MORAWETZ:  Okay, just before everybody breaks

19   out for the evening, we can terminate that phone.  Okay.

20          THE COURT:  Ms. Schweitzer, you're back.

21          MS. SCHWEITZER:  Good afternoon.

22          THE COURT:  Yes.

23          MS. SCHWEITZER:  I guess it will be good evening

24   pretty soon, but we'll work on staying in the afternoon, right?

25          THE COURT:  Yes.

1        MS. SCHWEITZER:  In an effort of deja vu all over

2   again, in trying to get the sale order typed up, Qwest counsel

3   and we heard different things with respect to the language that

4   was approved by Your Honor.

5        THE COURT:  Okay.

6        MS. SCHWEITZER:  Specifically that the language that

7   we had offered was that the -- it's with regard to their rights

8   being preserved under Section 365.

9        THE COURT:  Right.

10        MS. SCHWEITZER:  And the statement that I had read was

11   that the contracts are being -- to which they are party are

12   being assumed and assigned under Section 365 of the Bankruptcy

13   Code, and Qwest and purchaser shall have all the rights,

14   duties, obligations with respect to each other, with respect to

15   these Qwest contracts, that are provided with respect to

16   contract assigned under Section 365 of the Bankruptcy Code.

17   They had wanted additional language in there to say that these

18   rights and dues and obligations, whether arising before or

19   after the closing, and I had thought that that was struck.

20        THE COURT:  That was not -- yes, that language was not

21   language that I was requiring.

22        UNIDENTIFIED SPEAKER:  Okay, Your Honor.  Thank you.

23        THE COURT:  Thank you.

24        MS. SCHWEITZER:  Thank you for the clarification.

25        THE COURT:  Yes.

1      MS. SCHWEITZER:  So we'll -- I believe the order is

2  final, then, and we'll have it handed up -- if you can't sign

3  it tonight, that's perfectly okay, but we'll get it --

4      THE COURT:  I'll be here for a while, so --

5      MS. SCHWEITZER:  So either tonight or tomorrow

6  morning, it can get brought up.

7      THE COURT:  If it's after the hearing, Mr. Abbott can

8  always e-mail it to me, or someone from your office, Mr.

9  Abbott.

10     MR. ABBOTT:  Yes, sir, Your Honor.

11     MS. SCHWEITZER:  So then, Your Honor, my understanding

12 is that to go through -- back to the agenda --

13     THE COURT:  Yes.

14     MS. SCHWEITZER:  -- that we -- for the uncontested

15 matters that were submitted with certificates of no objection

16 that I believe all those orders have been entered, now.

17     THE COURT:  Yes, and they should be on the docket,

18 too.

19     MS. SCHWEITZER:  Right.  So that's items 1, 2, and 3

20 on the agenda.  Item 4 on the agenda is the special incentive

21 plan motion that we just went through.  And then item 5 on the

22 agenda is the MEN side letter -- motion to approve the MEN side

23 letter.

24     THE COURT:  Yes.

25     MS. SCHWEITZER:  And in the interest of time and

1    knowing that many of these things are better left cut short

2    rather than prolonged, that as you will recall, we approved the

3    sale of the MEN business to Ciena.  And this side letter, like

4    previous side letters that Your Honor has seen before, deals

5    with the inter-estate issues regarding deal costs and how to

6    distribute proceeds and also reaffirm certain -- just how the

7    estates are going to work together in handing out the money and

8    in attributing deal costs that come out of the sale.  So the

9    terms are set forth, obviously, in the side letter that's

10    attached to the motion.  The motion walks through them in more

11    detail.

12          THE COURT:  Yes.

13          MS. SCHWEITZER:  There's been no opposition filed.

14    The creditors' committee filed a limited reservation of rights

15    with respect to the motion, and the reservation of rights --

16    and I'll certainly let them address it -- goes into how certain

17    parties, specifically NNSA, the French affiliate, are described

18    in the recitals to the side letter, and specifically whether

19    they're a selling debtor --

20          THE COURT:  Yes.

21          MS. SCHWEITZER:  -- or deemed selling debtor as

22    defined under the IFSA.  The concern, I think, from our point

23    of view is we're not really asking the Court to rule on their

24    status under the IFSA.  That's a recital and we're not really

25    referencing them.  And the debtors didn't intend in signing

1    this to expand or lessen anyone's rights but merely incorporate

2    a reference from another document.  So we're not asking for a

3    ruling but we cer -- and I don't think the committee's asking

4    for it not to be entered, though, obviously, their reservation

5    of rights is perfectly acceptable that anything they want to

6    argue down the road or we may want to argue down the road is

7    preserved.  And I don't think that's an impediment to having

8    this approved today, but I'll defer to Mr. Botter.

9              THE COURT:  What's interesting about the committee's

10   argument is if you're right, you didn't have to be consulted,

11   and if you're wrong, then you did.  But -- Mr. Botter, yes,

12   sir.

13             MR. BOTTER:  Well, Your Honor, you know, consistency

14   was never our forte.

15             Excuse me, Your Honor.  David Botter for the official

16   committee.

17             THE COURT:  Yes, sir.

18             MR. BOTTER:  And Ms. Schweitz --

19             UNIDENTIFIED SPEAKER:  You should have saved that for

20   Mr. Tay while he was still on the line.

21             MR. BOTTER:  I, actually, I didn't really want him to

22   go.

23             THE COURT:  I know.

24             MR. BOTTER:  So often I like to see him.  Your Honor,

25   Ms. Schweitzer has really described it perfectly.

1          THE COURT:  Yes.

2          MR. BOTTER:  We really wanted to, for the purposes of

3     the record, lay a stake in the ground that we will argue at

4     some point in time that parties are entitled to assert certain

5     rights to proceeds, and that's based upon the party's level of

6     participation in the business and the sale.  And to the extent

7     that even though it was contained in a recital, it's something

8     that we are obviously quite cognizant of, and that is what

9     parties may ultimately argue in terms of the allocation, or the

10    appropriate allocation down the road, and we just wanted to be

11    crystal clear as to what our view of this party's participation

12    in this particular transaction was.  That's all.  Thank you,

13    Your Honor.

14         THE COURT:  I certainly understood that, Mr. Botter,

15    and yes.

16         Good evening.

17         MS. LUTON:  Good afternoon. Jaime Luton of Young

18    Conaway Stargatt & Taylor on behalf of the joint administrators

19    and the EMEA debtors.

20         THE COURT:  Yes.

21         MS. LUTON:  While we understand that the committee's

22    position is that they're just reserving their rights, we just

23    wanted to state on the record that we do maintain our position

24    that NNSA is a selling debtor, and that we understand that this

25    will go towards the allocation negotiations.

1        THE COURT:  All right.  Thank you.  Anything further,

2   Ms. Schweitzer, on this?

3        MS. SCHWEITZER:  Nope, with that, I believe everyone's

4   reserved their rights.

5        THE COURT:  I think so, and I certainly -- I do

6   appreciate and understand the parties' positions with respect

7   to the, if you will, the status of NNSA, and there's no need

8   for me to say any more other than I will enter the order

9   because I think it's certainly appropriate to do so.

10       MS. SCHWEITZER:  Thank you, Your Honor.  So that takes

11  care of agenda item number 5.  Number 6 is the CVAS sale which

12  we've already done.

13       THE COURT:  Right.

14       MS. SCHWEITZER:  And then number 7 and 8 are two last

15  claims objection -- omnibus claims objection motion -- or, I'm

16  sorry, claims objections, which I'll cede the podium to my

17  colleague, Mr. Bianca.

18       THE COURT:  All right, thank you.  Welcome back, Mr.

19  Bianca.  Good to see you again.

20       MR. BIANCA:  Likewise, Your Honor.  Salvatore Bianca

21  on behalf of the debtors.  The last two items on the agenda, as

22  Ms. Schweitzer just mentioned, are items 7 and 8, the debtors'

23  fifth and sixth omnibus claim objections.  Given the lateness

24  of the hour, I'm happy to say that I'll be brief.

25       Just by way of background, these omnibus objections

1   address the problem of claimants incorrectly filing redundant

2   claims on both the general proof of claim form and the Section

3   503(b)(9) claim form.

4        THE COURT:  Yes.

5        MR. BIANCA:  As Your Honor may recall, the bar date

6   notice package included both claim forms, so some of these

7   claimants, out of an abundance of caution, filed the same claim

8   on both forms.

9        THE COURT:  And probably against a number of entities.

10       MR. BIANCA:  Correct.

11       THE COURT:  Perhaps.

12       MR. BIANCA:  That is indeed the case.  And but for the

13  fact that these claims were filed on the different forms, we

14  would have objected to these as duplicate claims, except for

15  the fact that the 503(b)(9) claim has a different priority than

16  a -- the amount asserted in the general proof of claim form.

17       THE COURT:  Absolutely.

18       MR. BIANCA:  So in these objections, we're seeking to

19  disallow the 503(b)(9) claims and survive the corresponding

20  non-503(b)(9) claim.  And based on a review of the claims and

21  Nortel's books and records, the debtors are not aware of any

22  relationship of the claimants as a seller of goods, so we have

23  confirmed that there is, in fact, no 503(b)(9) claim.  And we

24  took the further step with these two omnibus objections of

25  confirming that the claimants are actually either current or

107

1    former employees of the debtors.

2            THE COURT:  Okay.

3            MR. BIANCA:  So they provided services, not goods.

4            With respect to the fifth omnibus objection, we

5    received three formal responses.  Two of these responses, the

6    response by Lee Derry and Frank Gallardo, have already been

7    resolved.  Indeed, the response of Lee Derry is interesting

8    because it was actually a very -- extremely thoughtful thank

9    you letter in response to our objection, recognizing that there

10   was confusion about the claim forms, and --

11           THE COURT:  Yes.

12           MR. BIANCA:  -- thanking us for addressing the issue.

13   The one response that has not been resolved is that of Manfred

14   Bischoff.  In his response, the claimant asserts that he should

15   be allowed a 503(b)(9) claim because he believes that his

16   services should be considered goods for purposes of Section

17   503(b)(9).  You know, the claimant doesn't provide any support

18   for this position, and as we've cited in the objection, the

19   case law is well established that services are not goods for

20   purposes of 503(b)(9).

21           THE COURT:  Of course.

22           MR. BIANCA:  So we would ask that the Court enter the

23   order disallowing the claims in the fifth omnibus objection.

24           THE COURT:  All right.  Is Mr. Bischoff or any

25   representative here or on the telephone?

1      All right, I don't hear anyone, and I am fully

2   satisfied that the objection is appropriate and I will disallow

3   Mr. Bischoff's Section 503(b)(9) claim.

4      MR. BIANCA:  Thank you, Your Honor.  And then moving

5   on to the sixth omnibus objection, we received three formal

6   responses to that objection after reaching out to the claimants

7   and explaining the bases for our objection and indicating that

8   the non-503(b)(9) claim would still survive after this

9   objection.  But we reserved our rights to object to those

10   claims on other grounds.  Each of these responses have been

11   resolved.

12      THE COURT:  Oh, okay.  Excellent.

13      MR. BIANCA:  And accordingly, we request that the

14   Court enter the order granting the sixth omnibus objection, as

15   well.

16      THE COURT:  And I will do so.

17      MR. BIANCA:  Thank you, Your Honor.

18      THE COURT:  The objections to claims are well founded.

19      MR. BIANCA:  Thank you, Your Honor.

20      THE COURT:  Thank you.

21      MR. BIANCA:  I believe that is the last two items on

22   the agenda.

23      MS. SCHWEITZER:  Yup.  Go ahead.  We're all in a rush

24   to say good night, Your Honor.

25      THE COURT:  I don't blame you.  It's been a long day

1    for all of you, I'm sure.

2            MS. SCHWEITZER:  Like you.

3            THE COURT:  So I need a few orders, I guess, from you.

4    I need the claims orders, 7 and 8, items 7 and 8.  I need the

5    sale order which will come at some point.

6            MS. SCHWEITZER:  Um-hum.

7            THE COURT:  It may not be ready.  Yes, Mr. Bianca, you

8    certainly may approach.

9            MR. BIANCA:  If I may approach?

10            THE COURT:  Please, please.  And I need the side

11    letter order.

12            MS. SCHWEITZER:  Yes, oh, okay.  The side --

13            Your Honor?

14            THE COURT:  Yes, Ms. Schweitzer, please.  Thank you.

15    And if the order on the sale gets here by, say, 6:30 or so,

16    I'll be able to get it docketed tonight.

17            MS. SCHWEITZER:  Great, thank you.

18            THE COURT:  Otherwise, it will be docketed first thing

19    in the morning.

20            MS. SCHWEITZER:  Thank you, Your Honor.  I get a

21    thumbs up, so it should be on its way.

22            THE COURT:  Oh, good.

23            MS. SCHWEITZER:  Although that's lawyer time, so, you

24    know.

25            THE COURT:  Lawyers don't think there's anything left

1   to be done until, you know, once they've dictated it all,

2   and --

3           MS. SCHWEITZER:  Exactly.  So with that, I believe we

4   have completed the agenda for the evening.  We thank you for

5   providing the afternoon for us.

6           THE COURT:  Absolutely.  Thank you, counsel.  Yes,

7   anything further, Mr. Bromley, on tomorrow?

8           MR. BROMLEY:  On the off-chance, Your Honor, that you

9   may be inclined to enter an order in respect of the retention

10  program, we have cleared additional language in the order with

11  Mr. Tinker.

12          THE COURT:  Oh, fine.

13          MR. BROMLEY:  So, perhaps if we could -- we'll

14  circulate that in the morning --

15          THE COURT:  Yes.

16          MR. BROMLEY:  -- and send it to your chambers.

17          THE COURT:  That would be excellent.  Let's do that.

18  And I don't want anyone to read any issue on my part as to

19  delay.  I was prepared to rule, but I just thought that -- I

20  knew that Justice Morawetz has some different issues in his

21  court, and -- not relating to the retention program, but to

22  other matters, and asked if we couldn't delay in ruling.  And I

23  certainly didn't want to refuse him.

24          MR. BROMLEY:  We appreciate that, Your Honor.  Just

25  thought it might make sense to send a form of order around.

111

1          THE COURT:  I think it would.

2          MR. BROMLEY:  Okay, thank you.

3          THE COURT:  All right, everyone.  We will stand in

4    recess, and thank you.  And good evening and a safe trip home

5    and some rest.

6          IN UNISON:  Thank you, Your Honor.

7       (Proceedings concluded at 5:10 p.m.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

112

1

2                              I N D E X

3                          E X H I B I T S

4    DEBTOR'S

5                      DESCRIPTION          PAGE

6                      Proffer of          20

7                      Mr. Riedel

8                      Mr. Dempsey's       79

9                      Proffer

10                     Mr. Dempsey's       80

11                     Declaration

12

13                          RULINGS

14                     Page      Line

15   Sale to Genband approved   51      8

16   with agreed upon

17   amendments

18   MEN Side Agreement and     105     8

19   Related Relief Granted

20   Debtors' Fifth Omnibus     108     2

21   Objection(Substantive)

22   to Certain Claims Granted

23   Debtors' Sixth Omnibus     108     16

24   Objection (Substantive)

25   To Certain Claims Granted

113

1

2                          C E R T I F I C A T I O N

3

4        I, Penina Wolicki, certify that the foregoing transcript is a

5        true and accurate record of the proceedings.

6

7        _____

8        Penina Wolicki

9

10       Veritext

11       200 Old Country Road

12       Suite 580

13       Mineola, NY 11501

14

15       Date:   March 10, 2010

16

17

18

19

20

21

22

23

24

25