IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| NORTEL NETWORKS, INC., et al.[1], | ) | Case No. 09-10138 (KG) |
|  | ) | (Jointly Administered) |
| Debtors. | ) |  |
|  | ) | **Hearing Date: May 19, 2010, at 2:00 p.m.** |
|  | ) | **Objection Deadline: May 5, 2010 at 4:00 p.m.** |

## MOTION OF ACS CABLE SYSTEMS, INC. FOR ALLOWANCE AND IMMEDIATE PAYMENT OF ADMINISTRATIVE CLAIM

Pursuant to 11 U.S.C. § 503(b), ACS Cable Systems, Inc., on behalf of itself and its affiliate Alaska Communications Systems Holdings, Inc. (collectively, "ACS") submits this motion (the "Motion") requesting allowance and immediate payment as an administrative expense of its claim for refund of $1,105,055.50 that ACS paid to Debtor Nortel Networks, Inc. ("NNI") after NNI's bankruptcy filing. In support of the Motion, ACS respectfully states as follows:

## PRELIMINARY STATEMENT

Following its bankruptcy filing, NNI as debtor-in-possession represented to ACS its intent to perform under a contract with ACS under which ACS was NNI's customer. As a result of those express representations plus NNI's post-petition efforts to perform, ACS then paid $1,105,055.50 post-petition to NNI on that contract. However, NNI ultimately failed to deliver compliant goods and services. The limited goods and services NNI did provide were inadequate and never became fully operational, and did not meet the contract specifications. After ACS gave notice of NNI's material post-petition breach, NNI rejected the contract under 11 U.S.C. § 365.

---

[1]     The Chapter 11 Debtors are:  Nortel Networks Inc., Nortel Networks Capital Corporation, Alteon WebSystems, Inc., Alteon WebSystems International, Inc., Xros, Inc., Sonoma Systems, Qtera Corporation, CoreTek, Inc., Nortel Networks Applications Management Solutions Inc., Nortel Networks Optical Components Inc., Nortel Networks HPOCS Inc., Architel Systems (U.S.) Corporation, Nortel Networks International Inc., Northern Telecom International Inc. and Nortel Networks Cable Solutions. Inc.

The NNI bankruptcy estate benefited by its receipt during the post-petition pre-rejection period of ACS's cash, for which NNI provided no consideration to ACS.  Just as a supplier which provides service to the debtor in the post-petition pre-rejection period is entitled to an administrative claim for the value of post-petition services used by the debtor, ACS as a customer is entitled to an administrative claim for the cash it paid to the debtor during the post-petition pre-rejection period for which it received no consideration in return from the debtor.  There is no doubt that NNI used that cash received post-petition in its reorganization efforts.

In addition to an administrative claim for refund of its post-petition payments, ACS should be allowed a non-priority claim for its remaining damages relating to the Debtor's rejection of the contract.  11 U.S.C. § 365(g).  This includes refund of an additional $1,105,055.50 that ACS paid to NNI pre-petition, plus the increased costs ACS incurred or will incur in obtaining from an alternate vendor or self-provisioning the contracted-for goods and services NNI failed to provide.[2]

In the end, ACS paid a total of $2,210,111 to NNI, suffered other damages, and received no consideration from NNI in exchange.  While not all of ACS's damages are entitled to administrative priority, the $1,105,055.50 that ACS paid to NNI after receiving NNI's post-petition representations that NNI would continue to perform the contract is entitled to that priority.

## FACTS GIVING RISE TO CLAIM

### a.   The Parties

1.     ACS and its affiliates are providers of a range of telecommunications services. ACS's telecommunications network is centered in Alaska and the Pacific Northwest.  Debtor NNI is a supplier of equipment and services to the telecommunications industry.   NNI and its affiliates

---

[2]     ACS reserves the right to claim administrative priority for specific additional damage items that satisfy the standard for granting that priority.

filed for bankruptcy protection on January 14, 2009 and continue to operate their businesses as debtors-in-possession in these jointly-administered Chapter 11 bankruptcy cases.

### b. The NOC Contract

2.    In August, 2008, NNI contracted with ACS to supply ACS with hardware, software, licenses, support, expertise, personnel, and premises necessary to provide ACS with a wholly-outsourced Network Operation Center ("NOC") in Raleigh North Carolina run exclusively by NNI's personnel, using NNI's equipment, on NNI's premises. This agreement, the "August, 2008 Network Managed Services Supplement to the Purchase and Licensed Agreement dated January 7, 2004," is referred to herein as the "NOC Contract."[3]

3.    A NOC is a control room linked electronically to the telecommunications network that permits the monitoring of the network and responses to faults that arise in the operation of the network. The purposes of establishing an additional Raleigh NOC included, but were not limited to: (a) providing a dual "mirror" NOC, which would provide redundancy to the existing NOC that ACS maintained in Anchorage, Alaska, and be a critical piece of infrastructure that is required to keep the network operating or return it to function, in the event of a natural disaster or man-made event impacting the Anchorage NOC (b) increasing efficiency by reducing ACS's staffing of the Anchorage NOC, as NNI's staff in the Raleigh "NOC" could respond to any network problems that might occur, (c) putting in place state-of-the art hardware and software for network monitoring and "fault management", and (d) having access to personnel with expertise, skills, and training not normally available to a small telecommunications provider. Because NNI provided similar NOC

---

[3]    A copy of this voluminous contract is being supplied to the Debtor's counsel concurrently with this filing and will be supplied to the Court upon request. Because the NOC Contract between ACS Cable Systems, Inc. and NNI was a "Supplement" to the 2004 Purchase and License Agreement between Alaska Communications Systems Holdings, Inc. and NNI, this motion is filed by ACS Cable Systems, Inc., on behalf of itself and its affiliate, Alaska Communications Systems Holdings, Inc.

services to other telecommunications providers in NNI's Raleigh NOC, NNI could achieve great efficiencies of scale for these services.

### c.    Timeframes for Performance and Payments under the NOC Contract

4.      The NOC Contract had a five-year duration and was signed in August, 2008.   The NOC Contract required ACS to pay $2,210,111 per year for the first three years of the Contract and $1,955,709 per year for the final two years.   The NOC Contract required NNI to build and test the outsourced mirror NOC capacity in the first seven months of the contract (August 8, 2008 to March 7, 2009, later extended to June, 2009) and then operate it and maintain it for the final four years and five months of the contract (March 7, 2009 to August 7, 2014).[4]   Because the NOC contract called for payments ratably throughout the life of the contract, but NNI was not required to get the NOC up and running immediately, the contract involved a significant element of pre-payment by ACS for goods and services to be subsequently delivered by NNI.

### d.    NNI Files for Bankruptcy and Induces Post-Petition Payments by ACS.

5.      After the signing of the NOC contract in August, 2008, but before NNI filed for bankruptcy on January 14, 2009, ACS made quarterly payments of $552,572.75 each on October 21, 2008 and December 8, 2008, as called for by the NOC Contract.

6.      After filing for Chapter 11 reorganization on January 14, 2009, NNI represented to ACS that Debtor would continue to perform under the NOC Contract, on which NNI was just beginning to work. NNI had not yet delivered any goods or services under the contract.

7.      Craig Stein, NNI's Vice President US Regions, wrote to ACS on the petition date, January 14, 2009, informing ACS of NNI's bankruptcy filing and explaining that "day-to-day operations are expected to continue without interruption. <u>We will continue to … honor our</u>

---

[4]       *See* NOC Contract Annex 1, Scope of Work and Service Description, Section 9 (definitions of "Establishment Phase," "Full Operations Date," and "Parallel Operations Phase").

<u>commitments to do you</u> …. <u>Our current Engineering, Installation, and PM [Product Maintenance]</u> <u>activities for you will continue.</u>" (Emphasis added).[5]    In February, 2009, NNI as debtor-in-possession and ACS amended the NOC Contract, further confirming that NNI intended to continue to perform:

> Except as specifically modified by this Amendment No. 1, the Agreement, as amended, and the Supplement in all other respects shall continue in full force and effect.[6]

NNI continued attempts to perform through the spring and summer of 2009. It assigned personnel to the contract and provided weekly progress updates to ACS. Based on NNI's actions and its post-petition representations of intent to perform, ACS made two more quarterly payments to NNI of $552,572.75 each. ACS made these payments on March 17, 2009 and July 1, 2009, bringing total payments by ACS, pre-petition and post-petition, to $2,210,111.

### e.  NNI's Failure to Perform the NOC Contract

8.    NNI did not get substantial quantities of the necessary services operational until the May - June, 2009 time period.   This was several months after its bankruptcy filing.  However, despite providing some elements in that timeframe, NNI failed to get the dual NOC function to work.

9.    To achieve the fundamental objective of an outsourced NOC in Raleigh that would mirror ACS's NOC in Anchorage, it was absolutely essential that NNI install equipment and software in both NOCs so that instantaneous complete communication between the two NOCs was achieved.  All information available to the Anchorage NOC concerning the ACS Alaska network had to be instantaneously available and viewable in Raleigh.  All communications from the

---

[5]    A copy of NNI's January 14, 2009 email to ACS is supplied as Exhibit A to this Motion.

[6]    A copy of the amendment to the NOC Contract is supplied as Exhibit B to this Motion.

Raleigh NOC had to be received at the Anchorage NOC, either instantaneously or in a very short timeframe, so that they could be evaluated and implemented in ACS's Alaska-based network.

10.    Although NNI provided some hardware and software to the Anchorage NOC and may have installed hardware and software at its premises in Raleigh, many necessary functionalities, including the fault management system, never became fully operational. "Faults" or "troubles" in the ACS statewide Alaska network were not properly identified by the Raleigh NOC, so that ACS could not rely on the fault management communication system between the dual NOCs that NNI contracted to provide. As a result, NNI did not provide a NOC in Raleigh successfully mirroring the NOC in Anchorage because NNI's work was defective and offered little or no value.    Multiple system outages occurred during the short period of time in which NNI attempted to put the dual NOC function into operation. For example, the July 24, 2009 INMC Status Report records 15 hours of unplanned system outages between June 2, 2009 and July 14, 2009, exceeding the allowable outages under the NOC Contract's Service Level Agreement.

11.    Because of the non-functional nature of the non-operational system provided by NNI, ACS was forced to go back to the prior method of using ACS personnel to manually monitor the network in Anchorage. In short, NNI completely failed to provide the contracted-for benefit – an outsourced NOC in Raleigh mirroring the ACS Anchorage NOC. The hardware and software provided by NNI to ACS in NNI's unsuccessful attempt to perform had no significant scrap value, and ACS later destroyed the software at NNI's request. ACS is working to find an alternative vendor to supply some or all of the services that NNI contracted to provide but failed to provide.

### f.  ACS's Notice of Breach and NNI's Contract Rejection.

12.    On September 23, 2009 ACS delivered a detailed letter to NNI that NNI was in material breach of the NOC Contract.[7]  NNI did not deny the material breach in its response letter dated September 30, 2009.   Instead, Nortel explained in its response letter that it was "reviewing the matters raised in your letter" and "does not concede the accuracy of any of your assertions …."[8]  Rather than attempting to cure the material breach, NNI on October 13, 2009 rejected the contract pursuant to 11 U.S.C. § 365 through filing a Notice of Rejection (ECF Doc. 1661).[9]

## DISCUSSION

13.    ACS is entitled under 11 U.S.C. § 503(b) to an administrative claim for the $1,105,055.50 it paid to NNI during the post-petition pre-rejection period.   These cash payments by ACS to NNI were transactions benefiting the bankruptcy estate induced by NNI as debtor-in-possession.

14.    Section 503(b)(1) accords administrative priority to claims arising from "the actual, necessary costs and expenses of preserving the estate." 11 U.S.C. § 503(b)(1).  The section applies to all types of transactions with the debtor-in-possession, not just to claims arising from the claimant's furnishing of goods and services. See 11 U.S.C.§ 503(b)(1) (granting priority to actual and necessary expenses of preserving estate "including" a list of example transactions); 11 U.S.C. § 102(3) ("The words 'include' and 'including' are not limiting"); In re Maghazeh, 315 B.R. 650, 654 (Bankr. E.D.N.Y. 2004) ("The list enumerated in 11 U.S.C. § 503(b) is not exclusive"); In re Metro Transp. and Health Referral, Inc., 165 B.R. 832, 833 (Bankr. N.D. Oh. 1994); 4 Collier on

---

[7]    ACS's September 23, 2009 letter is supplied as Exhibit C to this Motion

[8]    See NNI September 30, 2009 Response Letter, Exhibit D to this Motion.

[9]    The Notice of Rejection was immediately effective that day pursuant to the Court's Order establishing contract rejection procedures (ECF Doc. 510). ACS filed a Reservation of Rights on October 26, 2009 (ECF Doc. 1724).

Bankruptcy ¶503.05[1] at 503-23 (15th rev. ed. 2008) (the examples listed in § 503 "cannot be considered an exhaustive list of all of the types of claims that are entitled to administrative priority ….").[10]

15.     The two elements of an administrative claim are (1) a transaction with the debtor-in-possession, (2) in which the claimant furnishes consideration which benefits the bankruptcy estate. *In re Hayes Lemmerz Int., Inc.*, 340 B.R. 461, 472 (Bankr. D. Del. 2006).

16.     These same two elements apply to administrative claims arising during the post-petition pre-rejection period under executory contracts later rejected under 11 U.S.C. § 365:

> If the debtor-in-possession elects to continue to receive benefits from the other party to an executory contract pending a decision to reject or assume the contract, the debtor-in-possession is obligated to pay for [their] reasonable value …

*N.L.R.B. v. Bildisco & Bildisco*, 465 U.S. 513, 531 (1984)[11]; *Hayes Lemmerz Int., 340 B.R. at 467*, 472; *Matter of Continental Airlines, Inc.*, 140 B.R. 520, 526 (Bankr. Del. 1992); *In re Patient Education Media,* 221 B.R. 97, 101 (Bankr. S.D.N.Y. 1998).

17.     These elements are satisfied here.

**a.     <u>Transaction with Debtor-in-Possession</u>**

18.     During the post-petition pre-rejection period, NNI as debtor-in-possession took multiple steps to induce ACS to continue to do business with it. Specifically, NNI (a) represented directly to ACS in writing that it would perform the NOC contract despite filing for bankruptcy, explaining that "we will honor our commitments to you,"[12] (c) signed a post-petition amendment to the NOC Contract in which it agreed that the NOC Contract "continue[d] in full force and

---

[10]     ACS reserves the right to rely on § 503(b) generally, not just § 503(b)(1), although § 503(b)(1) is sufficient to support a grant of administrative priority here.

[11]     *Bildisco* concerned a contract for the provision of services to the debtor-in-possession, which the Court noted in connection with the quoted passage, but there is no reason to believe that the happenstance of whether the debtor-in-possession was customer or supplier somehow limited the principle stated by the Court.

[12]     January 14, 2009 email from Craig Stein, Nortel VP US Regions, to ACS (Exhibit A to this Motion).

effect,"[13] (d) continued to assign personnel to the project and try to perform the contract all the way to September, 2009, although it unfortunately never did successfully perform, and (e) demanded and received post-petition payment from ACS.  Thus, ACS's post-petition payments were transactions with the debtor-in-possession.

**b.**    **Benefit to Debtor-in-Possession**

19.    The money ACS paid post-petition benefited NNI as debtor-in-possession by supplying it with funds to use in the reorganization efforts.  The money went into NNI's bank account.

20.    While ACS does not know whether the NOC Contract was profitable to NNI, establishing the "benefit" necessary for administrative priority does not require showing that the debtor profited from the transaction, just that the debtor in some way used the post-petition consideration that the claimant furnished. *Patient Education Media,* 221 B.R. at 103 ("profit is not the test of 'benefit' under Section 503(b)(1)(A)"); *Continental Air Lines, Inc.,* 146 B.R. at 527 (claimant need not show that consideration "was put to the highest and best use" by the debtor). Undoubtedly NNI in one way or another used in its reorganization efforts the cash that ACS paid to it post-petition.

21.    Granting administrative priority to customer claims for refunds of post-petition pre-rejection payments is necessary to promote the reorganization or sale of Chapter 11 debtors, just as granting administrative priority to suppliers of goods and services during the post-petition pre-rejection period is necessary to motivate suppliers to furnish debtors with goods and services:

> Without [administrative priority], efforts to reorganize would be hampered by the necessity of advance payment for all goods and services supplied to the estate, since presumably no creditor would willingly assume the status of a non-priority creditor to a debtor undergoing reorganization.

---

[13]    *See* February, 2009 contract amendment (Exhibit B to this Motion).

*In re Jartran*, 732 F.2d 584, 586 (7th Cir. 1984); *In re American Home Mortg. Holdings, Inc.*, 411 B.R. 169, 180 (Bankr. D. Del. 2008)(citing *Jartran*). To continue operating in bankruptcy, the debtor absolutely must have customers who pay it money. Significant customers are unlikely to "willingly assume the status of a non-priority creditor to a debtor undergoing reorganization." *Jartran*, 732 F.2d at 586. The availability of administrative priority for potential refund claims motivates customers to risk buying from a Chapter 11 debtor by providing reasonable assurance a refund of post-petition payments will be available if the debtor delivers defective goods and services. Critically, that assurance is self-executing. No bankruptcy court pre-approval is necessary to support a subsequent administrative claim. A debtor operating on a nationwide basis with hundreds or thousands of significant customers could not hope to reorganize if each significant customer, before making any post-petition payments to the debtor, filed a motion for immediate assumption or rejection of their contract, or simply halted payments until the debtor posted a performance bond or letter of credit securing potential refund liability.

22.    As explained above, to the extent NNI provided any goods and services to ACS under the NOC Contract, it provided them in a defective non-contractually-compliant manner and the paramount NOC mirroring capacity never became functional. At the end of the day, NNI furnished no consideration to ACS in the form of goods and services, but retains ACS's money. So NNI must instead return the money ACS paid to it post-petition through allowance of an administrative claim.[14] NNI elected to "continue to receive benefits from the other party to an

---

[14]    Contract provisions violated by NNI include but are not limited to: NOC Contract § 3.1.1 ("During the Term, Nortel shall perform the managed network services, tasks, functions and responsibilities, as described in this Supplement ("Services")); § 3.4 ("Nortel shall perform the Services in accordance with the Performance Standards, including the Services Levels, under this Supplement at all times during the Term."); § 5.1 ("Except where this Supplement specifically provides otherwise, Nortel shall provide sufficient assets and resources (including Personnel, hardware, and software) necessary for Nortel to provide the Services ...."); § 8 ("Nortel shall be responsible for performing the obligations and complying with the requirements set for in Annex 1 (Statement of Work) ...."); § 10.1 ("Nortel represents and warrants that it shall: (a) provides the Services in a professional and workmanlike manner, and

executory contract pending a decision to reject or assume the contract," and so "is obligated to pay for [their] reasonable value ..." *Bildisco & Bildisco*, 465 U.S. at 531.[15]

23.    ACS has satisfied the elements necessary to establish administrative priority.

**c.    The Court Should Direct Immediate Payment of the Administrative Claim**

24.    The Court should allow this administrative claim and direct that NNI immediately pay it. There is no reason to delay payment until NNI confirms a plan of reorganization. NNI is continuing to operate, is administratively solvent, and has ample funds to pay this administrative claim now. ACS understands that NNI is generally paying its post-petition suppliers on a current basis. There is no reason to prefer supplier claims over customer refund claims.

25.    This Motion is without prejudice to Proof of Claim No. 6135, in which ACS asserts as a non-priority claim a request for refund of the additional $1,105,055.50 that ACS paid to NNI in the pre-petition period and other substantial damages incurred by ACS as a result of NNI's rejection of the NOC contract, as well as any and all other rights, claims and defenses that ACS may assert, all of which are expressly reserved.

## CONCLUSION

WHEREFORE, ACS respectfully requests entry of an order, substantially in the form attached hereto, granting ACS an allowed administrative claim for the $1,105,055.50 that ACS paid to NNI in the post-petition pre-rejection period and directing NNI to immediately pay that amount to ACS, and for such additional relief as the Court deems appropriate.

---

(b) provides the Services with the promptness and diligence and in accordance with the practices and professional standards recognized by the profession and industry ....")

[15]    *Bildisco* involved a contract for the provision of services to the debtor. The same rationale equally applies to refund liability arising from the purchase of services from the debtor.

Dated:  April 12, 2010                    Respectfully submitted,


                                          ASHBY & GEDDES, P.A.

                                          Gregory A. Taylor (#4008)
                                          Benjamin W. Keenan (#4724)
                                          500 Delaware Avenue, 8th Floor
                                          P.O. Box 1150
                                          Wilmington, Delaware 19899
                                          Telephone: (302) 654-1888
                                          Facsimile: (302) 654-2067
                                          gtaylor@ashby-geddes.com
                                          bkeenan@ashby-geddes.com

                                          -and-

                                          BIRCH, HORTON, BITTNER
                                          & CHEROT, P.C.

                                          James H. Lister (admitted pro hac vice)
                                          1155 Connecticut Ave., N.W., Suite 1200
                                          Washington, D.C.  20036
                                          Telephone: (202) 862-8368
                                          Facsimile: (202) 659-1027
                                          jlister@dc.bhb.com

                                          Co-counsel for ACS Cable Systems, Inc.