## EXHIBIT A

Court File No. 09-CL-7950

*ONTARIO*
**SUPERIOR COURT OF JUSTICE**
**(COMMERCIAL LIST)**

IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,
R.S.C. 1985, c. C-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF
NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED,
NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS
INTERNATIONAL CORPORATION AND NORTEL NETWORKS TECHNOLOGY
CORPORATION
APPLICATION UNDER THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,
R.S.C. 1985, c. C-36, AS AMENDED

**MOTION RECORD**
**(returnable April 14, 2010)**

April 8, 2010

**OGILVY RENAULT LLP**
Suite 3800
Royal Bank Plaza, South Tower
200 Bay Street
P.O. Box 84
Toronto Ontario  M5J 2Z4

**Derrick Tay LSUC#: 21152A**
Tel:  (416) 216-4832
Email: dtay@ogilvyrenault.com

**Jennifer Stam LSUC #46735J**
Tel: (416) 216-2327
Email: jstam@ogilvyrenault.com
Fax: (416) 216-3930

Lawyers for the Applicants

# INDEX

*ONTARIO*
**SUPERIOR COURT OF JUSTICE**
**(COMMERCIAL LIST)**

**IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,
R.S.C. 1985, c. C-36, AS AMENDED**

**AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF
NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED,
NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS
INTERNATIONAL CORPORATION AND NORTEL NETWORKS TECHNOLOGY
CORPORATION**

**APPLICATION UNDER THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,
R.S.C. 1985, c. C-36, AS AMENDED**

## INDEX

| TAB | DOCUMENT | PAGE |
|-----|----------|------|
| 1. | Notice of Motion returnable April 14, 2010 | 001 |
| 2. | Affidavit of Anna Ventresca, sworn April 7, 2010 | 030 |
| 3. | Affidavit of George Riedel, sworn April 8, 2010 | 041 |
| 4. | Draft Order | 082 |
| 5. | Fourth Amended and Restated Initial Order | 087 |
| 6. | Blackline of Fourth Amended and Restated Initial Order to the Third Amended and Restated Initial Order | 135 |

**TAB 1**

Court File No.  09-CL-7950

*ONTARIO*
**SUPERIOR COURT OF JUSTICE**
**(COMMERCIAL LIST)**

**IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,
R.S.C. 1985, c. C-36, AS AMENDED**

**AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF
NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED,
NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS
INTERNATIONAL CORPORATION AND NORTEL NETWORKS TECHNOLOGY
CORPORATION**

**APPLICATION UNDER THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,
R.S.C. 1985, c. C-36, AS AMENDED**

**NOTICE OF MOTION
(returnable April 14, 2010)**

Nortel Networks Corporation ("NNC"), Nortel Networks Limited ("NNL"), Nortel
Networks Technology Corporation, Nortel Networks International Corporation and Nortel
Networks Global Corporation (collectively, the "Applicants") will make a motion to Justice
Morawetz of the Commercial List court on **Wednesday, April 14, 2010 at 10:00 a.m.**, or as
soon after that time as the motion can be heard, at **330 University Avenue**, Toronto, Ontario.

PROPOSED METHOD OF HEARING: The motion is to be heard:

☐ in writing under subrule 37.12.1(1) because it is on consent or unopposed or made without
notice;

☐ in writing as an opposed motion under subrule 37.12.1(4);

☒ orally.

THE MOTION IS FOR AN ORDER:

(a) Approving the engagement letter dated March 3, 2010 (the "Engagement Agreement")
regarding the Grant Thornton LLP ("Grant Thornton") engagement, substantially in the
form attached as Exhibit "A" to the Riedel Affidavit (defined below), among Nortel

Networks Inc. ("NNI"), NNL, Nortel Networks UK Limited ("NNUK"), Nortel Networks (Ireland) Limited ("NN Ireland", and together with NNI, NNL and NNUK, the "Nortel Parties"), the Joint Administrators (defined below), Ciena Corporation and its affiliates ("Ciena" and with the Nortel Parties and the Joint Administrators, the "Parties") and Grant Thornton;

(b)      Approving an offer dated March 19, 2010 (the "Argentina Side Offer") made by Nortel Networks de Argentina S.A. ("Nortel Argentina") to, among others, NNL in connection with the sale of certain Argentine assets related to Nortel's Metro Ethernet Networks business (the "MEN Business") between Ciena and Nortel Argentina (the "MEN Sale"), pursuant to a Sale Agreement (as defined below);

(c)      Extending the Stay Period (as defined in the Initial Order, defined below) to July 22, 2010;

(d)      Extending the Employee Hardship Process (defined below) to July 22, 2010;

(e)      Approving of the Fourteenth Extension of the Canadian GSPA (as both terms are defined in the below); and

(f)      Amending and restating the Initial Order to reflect the amendments contemplated by the following orders of this court:

(i)      order approving the Canadian Funding and Settlement Agreement granted on January 21, 2010;

(ii)     order approving the Nortel Special Incentive Plan granted on March 8, 2010;

(iii)    order approving the Amended and Restated Employee Settlement Agreement granted on March 31, 2010; and

(iv)     order approving the reduction of the Directors' Charge granted on March 31, 2010.

THE GROUNDS FOR THE MOTION ARE:

## BACKGROUND

(a)     References to "Nortel" herein are references to the global enterprise as a whole;

(b)     On January 14, 2009, NNC, NNL, Nortel Networks Technology Corporation, Nortel Networks International Corporation and Nortel Networks Global Corporation (collectively, the "Applicants") were granted protection under the *Companies' Creditors Arrangement Act*, R.S.C. 1985, c. C-36, as amended (the "CCAA") pursuant to an initial order of this Honourable Court and Ernst & Young Inc. was appointed as monitor (the "Monitor") in the CCAA proceedings;

(c)     Also on January 14, 2009, certain of NNC's United States ("U.S.") subsidiaries, including its principal U.S. operating subsidiary NNI (together with the other U.S. filing entities, the "Initial U.S. Debtors"), made voluntary filings in the U.S. Bankruptcy Court for the District of Delaware (the "U.S. Court") under Chapter 11 of the U.S. Bankruptcy Code (the "Code").  On the same date, this Ontario Superior Court of Justice, Commercial List granted an Order pursuant to Subsection 18.6(4) of the CCAA recognizing the Chapter 11 cases as "foreign proceedings" in Canada and giving effect in Canada to the automatic stay under the Code;

(d)     Additionally, on January 15, 2009, NNUK and certain subsidiaries of Nortel incorporated in Europe, the Middle East or Africa ("EMEA") each obtained an administration order (the "Administration Proceedings") for the appointment of administrators (the "Joint Administrators") from the High Court of England and Wales under the *Insolvency Act 1986*;

(e)     On January 18, 2009, certain Nortel affiliates, including Nortel Networks Israel (Sales and Marketing) Limited (the "Israeli Company"), filed an application with the Tel-Aviv-Jaffa District Court, (the "Israeli Court") pursuant to the *Israeli Companies Law, 1999*, and the regulations relating thereto for a stay of proceedings. On January 19, 2009, the Israeli Court appointed Yaron Har-Zvi and Avi D. Pelossof as joint



administrators (the "Joint Israeli Administrators") of the Israeli Company under the *Israeli Companies Law, 1999*;

(f)     On February 27, 2009, the U.S. Court granted petitions recognizing these proceedings as "foreign main proceedings" pursuant to Chapter 15 of the Code;

(g)     On May 28, 2009, the Commercial Court of Versailles, France (the "French Court") ordered the commencement of secondary insolvency proceedings in respect of Nortel Networks S.A. ("NNSA"), which consist of liquidation proceedings during which NNSA was originally authorized to continue to operate as a going concern for an initial period of three months which period was subsequently extended to November 28, 2009. In accordance with the European Union's Council Regulation (EC) No. 1346/2000 on Insolvency Proceedings, the English law proceedings (the "English Proceedings") remain the main proceedings in respect of NNSA although a French administrator and a French liquidator have been appointed and are in charge of the day-to-day affairs and continuing business of NNSA in France;

(h)     The French Court approved an order to (i) suspend the liquidation operation relating to the sale of the assets and/or business of NNSA for a renewal period of two months, currently extending until the earlier of May 31, 2010 or the filing by Kapsch CarrierCom AG with the French Court of a letter stating that its bid for the GSM/GSM-R assets of NNSA has become unconditional; (ii) authorize the continuation of the business of NNSA so long as the liquidation operations are suspended; and (iii) maintain the powers of the French administrator and liquidator during that period except with respect to the sale of assets and/or businesses of NNSA;

(i)     On June 8, 2009, the Joint Administrators appointed in respect of NNUK filed a petition with the U.S. Court for the recognition of the Administration Proceedings as they relate to NNUK and the English Proceedings under Chapter 15 of the Code. On June 26, 2009, the U.S. Court entered an order recognizing the English Proceedings as foreign main proceedings under Chapter 15 of the Code;

(j)     On July 14, 2009, Nortel Networks (CALA) Inc. (together with the Initial U.S. Debtors, the "U.S. Debtors") made a voluntary filing with the U.S. Court under Chapter 11 of the Code;

(k)     On March 10, 2010, Nortel Networks Telecomunicacoes do Brasil Ltda filed for voluntary bankruptcy proceedings.  The Brazilian court issued an order and appointed a bankruptcy trustee on March 30, 2010;

## THE METRO ETHERNET NETWORKS SALE

*Engagement of Grant Thornton*

(l)     Capitalized terms used in this section and not otherwise defined shall have the meaning given to them in the Engagement Agreement;

(m)     In connection with the sale of the Assets, the Nortel Parties and certain of their affiliates (the "TSA Sellers") and the Purchaser (as defined in the Sale Agreement) entered into a transition services agreement dated March 19, 2010 (the "TSA");As part of the terms of the TSA, the TSA Sellers and the Purchaser agreed to appoint a neutral TSA arbitrator (the "Neutral TSA Arbitrator");

(n)     The Parties have jointly selected Grant Thornton as the Neutral TSA Arbitrator pursuant to the terms of the Engagement Agreement, subject in the case of NNL, to approval by this Court;

(o)     Pursuant to the Engagement Agreement, Grant Thornton will be providing services not just to NNL but also to NNI, NNUK, NN Ireland, the Joint Administrators and Ciena. Grant Thornton will not be representing the interests of any of the Parties in its role as Neutral TSA Arbitrator and, as set forth below, will be compensated equally by the Nortel Parties and Ciena;

(p)     Pursuant to the Engagement Agreement and as contemplated in the Sellers Disclosure Schedule, Ciena and the Nortel Parties are each responsible for fifty percent (50%) of Grant Thornton's compensation and expense reimbursement, except in the event that a subsequent Arbitral Review (as defined in the Sellers Disclosure Schedule) is needed

with respect to a First Day Ready dispute, in which case the non-prevailing party (either the Nortel Parties or Ciena) shall pay Grant Thornton's fees and expenses for such Arbitral Review;

*The Argentina Side Offer*

(q)     Capitalized terms used in this section and not otherwise defined have the meanings ascribed to them in the Argentina Side Offer;

(r)     In furtherance of the MEN Sale and in consideration of certain local law requirements, Nortel Argentina negotiated the Argentina Side Offer with NNL, NNI, NNIC, the EMEA Sellers, the EMEA LTA Sellers, the Joint Administrators and the Joint Israeli Administrators to address the amount of Sale Proceeds to be allocated to Nortel Argentina in connection with the MEN Sale.  This agreement is embodied in the Argentina Side Offer dated March 19, 2010, extended by Nortel Argentina to the above listed persons;

(s)     The Argentina Side Offer provides that, among other things, NNL, NNI, the EMEA Sellers and the EMEA LTA Sellers will pay the difference between the consideration that Nortel Argentina must receive in consideration for the Transferred Argentina Assets and Liabilities under the applicable laws and accounting principles applicable to Nortel Argentina (the "Required Purchase Price"), and the consideration allocated to Nortel Argentina in accordance with the terms of the IFSA (the "Allocated Purchase Price");

(t)     The Applicants believe that the Allocated Purchase Price represents an accurate value of the Transferred Argentina Assets and Liabilities. However, the laws of Argentina require a more elaborate valuation process that may ultimately require a greater portion of the total Sale Proceeds to be allocated to Nortel Argentina;

(u)     The parties to the Argentina Side Offer have agreed that, to the extent that a greater portion of the total proceeds of the sale must be allocated to Nortel Argentina under applicable laws and accounting principles applicable to Nortel Argentina, the excess above Allocated Purchase Price should be borne equally by NNL, NNI, the EMEA



Sellers and the EMEA LTA Sellers. The Argentina Side Offer documents and provides a mechanism to effectuate this agreement;

## ON GOING EFFORTS AND EXTENSION OF THE STAY PERIOD

(v)     The Applicants and Nortel generally have and continue to work diligently and in good faith on their stated restructuring efforts;

(w)     As the Applicants continue to work to complete the transactions as well as resolve claims and carry out their other restructuring efforts, they continue to need the protection of this Court;

(x)     As such, the Applicants are requesting an extension of the Stay Period (as defined in the Initial Order) to July 22, 2010;

(y)     The Forty-Third Report of the Monitor (the "Forty-Third Report") will contain updated cash flow information with respect to the Applicants for the period March 28, 2010 to July 31, 2010;

## GROUP SUPPLIER PROTOCOL AGREEMENT

(z)     As set out above, upon filing under these CCAA Proceeding and in the U.S. Chapter 11 cases, Nortel entered into two group supplier protocol agreements; one between the Applicants and the Joint Administrators (the "Canadian GSPA") and the other between U.S. Debtors and the Joint Administrators (the "US GSPA");

(aa)    Pursuant to previous orders of this Court, extensions of the Canadian GSPA have been previously approved, up to and including a thirteenth. The thirteenth extension expired March 31, 2010;

(bb)    The Applicants have entered into and seek approval of the fourteenth extension of the Canadian GSPA, which extension was completed by way of the fourteenth extension deed dated April 1, 2010 (the "Fourteenth Extension");



(cc)     As a result of the Fourteenth Extension, the Canadian GSPA has been extended to April 30, 2010;

## EMPLOYEE HARDSHIP PROCESS

(dd)     Pursuant to an Order of this Court made on July 30, 2009, an employee hardship process (the "Employee Hardship Process") was approved in recognition of the fact that there may be cases in which former employees of one of the Applicants is experiencing financial hardship due to illness or healthcare costs, or due to ineligibility for pension or employment insurance benefits;

(ee)     The original expiration of the Employee Hardship Process was November 30, 2009. Pursuant to an Order of this Court made on January 21, 2010, the period for receipt of employee hardship applications was extended to April 23, 2010;

(ff)     The Forty-Third Report will provide details as to the remaining funds available in the Employee Hardship Process;

## MISCELLANEOUS

(gg)     The provisions of the CCAA; and

(hh)     Such further and other grounds as counsel may advise and this Honourable Court permit;

THE FOLLOWING DOCUMENTARY EVIDENCE will be used at the hearing of the motion:

(a)     the affidavit of George Riedel sworn April 8, 2010 (the "Riedel Affidavit");

(b)     the affidavit of Anna Ventresca sworn April 7, 2010;

(c)     The Forty-Third Report, to be filed separately; and

(d)     such further and other relief as counsel may request and this Honourable Court deems just.

- 9 -

April 8, 2010

**OGILVY RENAULT LLP**
Suite 3800
Royal Bank Plaza, South Tower
200 Bay Street
Toronto, Ontario  M5J 2Z4  CANADA

**Derrick Tay LSUC#: 21152A**
Tel:  (416) 216-4832
Email: dtay@ogilvyrenault.com

**Jennifer Stam LSUC #46735J**
Tel: (416) 216-2327
Email: jstam@ogilvyrenault.com

Fax: (416) 216-3930
Lawyers for the Applicants

TO:        Attached Service List



Court File No.  09-CL-7950

*ONTARIO*
**SUPERIOR COURT OF JUSTICE**
**(COMMERCIAL LIST)**

IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,
R.S.C. 1985, c. c-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF
NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL
NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL
CORPORATION AND NORTEL NETWORKS TECHNOLOGY CORPORATION

APPLICATION UNDER THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,
R.S.C. 1985, c. C-36, AS AMENDED

### SERVICE LIST

TO:      **OGILVY RENAULT LLP**
         Royal Bank Plaza, South Tower
         200 Bay Street, Suite 3800
         Toronto, Ontario M5J 2Z4

         Derrick Tay
         Mario Forte
         Jennifer Stam

         Email:    dtay@ogilvyrenault.com
                   mforte@ogilvyrenault.com
                   jstam@ogilvyrenault.com

         Tel:      416.216.4000
         Fax:      416.216.3930

         Lawyers for the Applicants

- 2 -

TO:   **ERNST & YOUNG INC.**
      Ernst & Young Tower
      222 Bay Street, P.O. Box 251
      Toronto, ON M5K 1J7

      Murray McDonald
      Brent Beekenkamp

      Email:   nortel.monitor@ca.ey.com

      Tel:    416.943.3016
      Fax:    416.943.3300

AND   **GOODMANS LLP**
TO:   Bay Adelaide Centre
      333 Bay Street, Suite 3400
      Toronto, ON M5H 2S7

      Jay Carfagnini
      Joseph Pasquariello
      Gail Rubenstein
      Chris Armstrong

      Email:   jcarfagnini@goodmans.ca
               jpasquariello@goodmans.ca
               grubenstein@goodmans.ca
               carmstrong@goodmans.ca

      Tel:    416.597.4107
      Fax:    416.979.1234

      Lawyers for the Monitor, Ernst & Young Inc.

AND   **OSLER HOSKIN AND HARCOURT**
TO:   **LLP**
      100 King Street West
      1 First Canadian Place
      Suite 6100
      P.O. Box 50
      Toronto, ON M5X 1B8

      Lyndon Barnes
      Rupert Chartrand
      Edward Sellers
      Adam Hirsh

      Email:   lbarnes@osler.com
               rchartrand@osler.com
               esellers@osler.com
               ahirsh@osler.com

      Tel:    416.362.2111
      Fax:    416.862.6666

      Lawyers for the Boards of Directors of
      Nortel Networks Corporation and Nortel
      Networks Limited

AND   **FASKEN MARTINEAU DUMOULIN LLP**
TO:   66 Wellington Street West
      Toronto Dominion Bank Tower
      P.O. Box 20, Suite 4200
      Toronto, ON M5K 1N6

      Donald E. Milner
      Aubrey Kauffman
      Edmond Lamek
      Jon Levin

      Email:   dmilner@fasken.com
               akauffman@fasken.com
               elamek@fasken.com
               jlevin@fasken.com

      Tel:    416.868.3538
      Fax:    416.364.7813

      Lawyers for Export Development Canada

AND TO: **EXPORT DEVELOPMENT CANADA**
151 O'Connor Street
Ottawa, ON  K1A 1K3

Jennifer Sullivan

Email:  jsullivan@edc.ca

Tel:    613.597.8651
Fax:    613.598.3113

AND TO: **THORNTON GROUT FINNIGAN LLP**
3200-100 Wellington Street West
Toronto-Dominion Centre, Canadian Pacific Tower
Toronto, ON  M5K 1K7

Robert I. Thornton
Michael Barrack
Rachelle Moncur
Leanne M. Williams

Email:  rthornton@tgf.ca
         mbarrack@tgf.ca
         rmoncur@tgf.ca
         lwilliams@tgf.ca

Tel:    416.304.1616
Fax:    416.304.1313

Lawyers for Flextronics Telecom Systems Ltd.

AND TO: **McINNES COOPER**
Purdy's Wharf Tower II
1300 – 1969 Upper Water Street
Halifax, NS  B3J 2V1

John Stringer, Q.C.
Stephen Kingston

Email:  john.stringer@mcinnescooper.com
         stephen.kingston@mcinnescooper.com

Tel:    902.425.6500
Fax:    902.425.6350

Lawyers for Convergys EMEA Limited

AND TO: **MILLER THOMSON LLP**
Scotia Plaza
40 King Street West, Suite 5800
P.O. Box 1011
Toronto, ON  M5H 3S1

Jeffrey Carhart
Margaret Sims

Email:  jcarhart@millerthomson.com
         msims@millerthomson.com

Tel:    416.595.8615/8577
Fax:    416.595.8695

Lawyers for Toronto-Dominion Bank

AND TO: **CAW-CANADA**
Legal Department
205 Placer Court
Toronto, ON M2H 3H9

Barry E. Wadsworth
Lewis Gottheil

Email:  barry.wadsworth@caw.ca
         lewis.gottheil@caw.ca

Tel.:   416.495.3776
Fax:    416.495.3786

Lawyers for all active and retired Nortel employees represented by the CAW-Canada

AND TO: **BOUGHTON LAW CORPORATION**
Suite 700
595 Burrard Street
Vancouver, BC  V7X 1S8

R. Hoops Harrison

Email:  hharrison@boughton.ca

Tel:    604.687.6789
Fax:    604.683.5317

Lawyers for Tonko Realty Advisors (BC) Ltd., in its capacity as duly authorized agent for Holdings 1506 Enterprises Ltd.

| | |
|---|---|
| AND TO: | **BORDEN LADNER GERVAIS LLP** |

Scotia Plaza, 40 King Street West
Toronto, ON  M5H 3Y4

Michael J. MacNaughton
Roger Jaipargas
Sam P. Rappos

Email:    mmacnaughton@blgcanada.com
Tel:       416. 367.6646
Fax:      416. 682.2837

Email:    rjaipargas@blgcanada.com
Tel:       416.367.6266
Fax:      416.361.7067

Email:    srappos@blgcanada.com
Tel:       416.367.6033
Fax:      416.361.7306

Lawyers for Bell Canada

AND TO:    **SISKINDS LLP**

680 Waterloo Street
London, ON  N6A 3V8

Raymond F. Leach
A. Dimitri Lascaris
Monique L. Radlein

Email:    ray.leach@siskinds.com
            dimitri.lascaris@siskinds.com
            monique.radlein@siskinds.com

Tel:       519.672.2121
Fax:      519.672.6065

Lawyers for Indiana Electrical Workers Pension
Trust Fund IBEW, Laborers Local 100 and 397
Pension Fund, and Bruce William Lapare

AND TO:    **LANG MICHNER LLP**

Brookfield Place, Suite 2500
181 Bay Street
Toronto, ON  M5J 2T7

Leslie A. Wittlin
John Contini
Aaron Rousseau

Email:    lwittlin@langmichener.ca
Tel:       416.307.4087
Fax:      416.304.3855

Email     jcontini@langmichener.ca
Tel:       416.307.4148
Fax:      416.304.3767

Email     arousseau@langmichener.ca
Tel:       416.307.4081
Fax:      416.365.1719

Lawyers for ABN AMRO Bank N.V.

AND TO:    **BENNETT JONES LLP**

1 First Canadian Place
Suite 3400
Toronto, ON  M5X 1A4

Kevin Zych
S. Richard Orzy
Gavin Finlayson

Email:    zychk@bennettjones.com
Tel:       416.777.5738
Fax:      416.863.1716

Email:    orzyr@bennettjones.com
Tel:       416.777.5737
Fax:      416.863.1716

Email:    finlaysong@bennettjones.com
Tel:       416.777.5762
Fax:      416.863.1716

Canadian Lawyers for The Informal Nortel
Noteholder Group

AND TO:

**KOSKIE MINSKY**
20 Queen Street West
Suite 900
Toronto, ON  M5H 3R3

Mark Zigler
Susan Philpott
Demetrios Yiokaris
Andrea McKinnon

Email:   mzigler@kmlaw.ca
Tel:     416.595.2090
Fax:     416.204.2877

Email:   sphilpott@kmlaw.ca
Tel:     416.595.2104
Fax:     416.204.2882

Email:   dyiokaris@kmlaw.ca
Tel:     416.595.2130
Fax:     416.204.2810

Email:   amckinnon@kmlaw.ca
Tel:     416.595.2150
Fax:     416.204.2874

Lawyers for the Former Employees of Nortel

AND TO:

**MILLER THOMSON LLP**
Scotia Plaza
40 King Street West, Suite 5800
P.O. Box 1011
Toronto, ON  M5H 3S1

Jeffrey Carhart
Margaret Sims

Email:   jcarhart@millerthomson.com
Tel:     416.595.8615
Fax:     416.595.8695

Email    msims@millerthomson.com
Tel:     416.595.8577
Fax:     416.595.8695

Canadian Lawyers for Telmar Network
Technology, Inc. and Precision Communication
Services, Inc.

AND TO:

**MILLER THOMSON LLP**
Scotia Plaza
40 King Street West, Suite 5800
P.O. Box 1011
Toronto, ON  M5H 3S1

Jeffrey Carhart
Margaret Sims
James Klotz

Email:   jcarhart@millerthomson.com
Tel:     416.595.8615
Fax:     416.595.8695

Email:   msims@millerthomson.com
Tel:     416.595.8577
Fax:     416.595.8695

Email:   jmklotz@millerthomson.com
Tel:     416.595.4373
Fax:     416.595.8695

Lawyers for LG Electronics Inc.

AND TO:

**LG ELECTRONICS INC.**
11/F, LG Twin Towers (West)
20 Yeouido-dong, Yeongduengpo-gu
Seoul 150-721, Korea

Joseph Kim

Email:   joseph.kim@lge.com

Tel:     +82.2.3777.3171
Fax:     +82.2.3777.5345

AND
TO:

**CHAITONS LLP**
185 Sheppard Avenue West
Toronto, ON  M2N 1M9

Harvey G. Chaiton

Email:    harvey@chaitons.com

Tel:      416.218.1129
Fax:      416.218.1849

Lawyers for IBM Canada Limited

AND
TO:

**FRASER MILNER CASGRAIN LLP**
1 First Canadian Place
100 King Street West
Toronto, ON  M5X 1B2

R. Shayne Kukulowicz
Alex MacFarlane
Michael J. Wunder
Ryan Jacobs

Email:    Shayne.kukulowicz@fmc-law.com
          Alex.macfarlane@fmc-law.com
          Michael.wunder@fmc-law.com
          ryan.jacobs@fmc-law.com

Tel:      416.863.4511
Fax:      416.863.4592

Canadian Lawyers for the Official Committee of
Unsecured Creditors

AND
TO:

**PALIARE ROLAND ROSENBERG
ROTHSTEIN LLP**
Suite 501
250 University Avenue
Toronto, ON  M5H 3E5

Kenneth T. Rosenberg
Massimo (Max) Starnino
Lily Harmer
Tina Lie

Email:    ken.rosenberg@paliareroland.com
Tel:      416.646.4304
Fax:      416.646.4301

Email:    max.starnino@paliareroland.com
Tel:      416.646.7431
Fax:      416.646.4301

Email:    lily.harmer@paliareroland.com
Tel:      416.646.4326
Fax:      416.646.4301

Email:    tina.lie@paliareroland.com
Tel:      416.646.4332
Fax:      416.646.4301

Lawyers for the Superintendent of Financial
Services as Administrator of the Pension
Benefits Guarantee Fund

AND
TO:

**GOWLING LAFLEUR HENDERSON LLP**
Suite 1600, First Canadian Place
100 King Street West
Toronto, ON  M5X 1G5

E. Patrick Shea

Email:    patrick.shea@gowlings.com

Tel:      416.369.7399
Fax:      416.862.7661

Lawyers for Westcon Group

10

AND
TO:      **MINDEN GROSS LLP**
         145 King Street West, Suite 2200
         Toronto, ON  M5H 4G2

         Raymond M. Slattery
         David T. Ullmann

         Email:   rslattery@mindengross.com
                  dullmann@mindengross.com
         Tel:     416.369.4149
         Fax:     416.864.9223

         Lawyers for Verizon Communications Inc.

AND
TO:      **GARDINER ROBERTS LLP**
         Suite 3100, Scotia Plaza
         40 King Street West
         Toronto, ON  M5H 3Y2

         Jonathan Wigley
         Vern W. DaRe

         Email:   jwigley@gardiner-roberts.com
         Tel:     416.865.6655
         Fax:     416.865.6636

         Email:   vdare@gardiner-roberts.com
         Tel:     416.865.6641
         Fax:     416.865.6636

         Lawyers for Andrew, LLC

AND
TO:      **AIRD & BERLIS LLP**
         Barristers & Solicitors
         Brookfield Place, P.O. Box 754
         181 Bay Street, Suite 1800
         Toronto, ON  M5J 2T9

         Steven L. Graff
         Ian E. Aversa

         Email:   sgraff@airdberlis.com
         Tel:     416.865.7726
         Fax:     416.863.1515

         Email:   iaversa@airdberlis.com
         Tel:     416.865.3082
         Fax:     416.863.1515

         Canadian Lawyers for Tellabs, Inc.

AND
TO:      **AIRD & BERLIS**
         Brookfield Place
         181 Bay Street, Suite 1800
         Toronto, ON  M5J 2T9

         Harry Fogul
         Peter K. Czegledy

         Email:   hfogul@airdberlis.com
         Tel:     416.865.7773
         Fax:     416.863.1515

         Email:   pczegledy@airdberlis.com
         Tel:     416.865.7749
         Fax:     416.863.1515

         Lawyers for Microsoft Corporation

AND
TO:      **AIRD & BERLIS LLP**
         Barristers & Solicitors
         Brookfield Place, P.O. Box 754
         181 Bay Street, Suite 1800
         Toronto, ON  M5J 2T9

         D. Robb English
         Sanjeev P. R. Mitra

         Email:   renglish@airdberlis.com
                  smitra@airdberlis.com

         Tel:     416.863.1500
         Fax:     416.863.1515

         Lawyers for Tata Consultancy Services Limited
         and Tata America International Corporation

AND
TO:      **ALEXANDER HOLBURN BEAUDIN &
         LANG LLP**
         Barristers and Solicitors
         700 West Georgia Street
         Suite 2700
         Vancouver, British Columbia  V7Y 1B8

         Sharon M. Urquhart

         Email:   surquhart@ahbl.ca
         Tel:     604.484.1757
         Fax:     604.484.1957

         Lawyers for Algo Communication Products Ltd.

17

AND
TO:
**MILLER THOMSON LLP**
Scotia Plaza
40 King Street, West, Suite 5800
P.O. Box 1011
Toronto, ON  M5H 3S1

Maurice Fleming

Email:   mfleming@millerthomson.com
Tel:      416.595.8686
Fax:      416.595.8695

Lawyers for Verint Americas Inc. and Verint
Systems, Inc.

AND
TO:
**McMILLAN LLP**
Brookfield Place, Suite 4400
181 Bay Street
Toronto, Ontario  M5J 2T3

Andrew F. Kent
Tushara Weerasooriya
Hilary E. Clarke

Email:   andrew.kent@mcmillan.ca
Tel:      416.865.7160
Fax:      416.865.7048

Email:   hilary.clarke@mcmillan.ca
Tel:      416.865.7286
Fax:      416.865.7048

Email:   tushara.weerasooriya@mcmillan.ca
Tel:      416.865.7262
Fax:      416.865.7048

Lawyers for Royal Bank of Canada

AND
TO:
**DAVIS LLP**
1 First Canadian Place
Suite 5600
100 King Street West
Toronto, ON  M5X 1E2

Bruce Darlington
Jonathan Davis-Sydor

Email:   bdarlington@davis.ca
Tel:      416.365.3529
Fax:      416.369.5210

Email:   jdavissydor@davis.ca
Tel:      416.941.5397
Fax:      416.365.7886

Lawyers for Brookfield LePage Johnson Controls
Facility Management Services

AND
TO:
**AIRD & BERLIS LLP**
Barristers & Solicitors
Brookfield Place, P.O. Box 754
181 Bay Street, Suite 1800
Toronto, ON  M5J 2T9

Steven L. Graff
Ian E. Aversa

Email:   sgraff@airdberlis.com
Tel:      416.865.7726
Fax:      416.863.1515

Email:   iaversa@airdberlis.com
Tel:      416.865.3082
Fax:      416.863.1515

Lawyers for Perot Systems Corporation

AND TO:

**McMILLAN LLP**
Brookfield Place, Suite 4400
181 Bay Street
Toronto, Ontario  M5J 2T3

Lawrence J. Crozier
Adam C. Maerov

Email:   lawrence.crozier@mcmillan.ca
Tel:     416.865.7178
Fax:     416.865.7048

Email:   adam.maerov@mcmillan.ca
Tel:     416.865.7285
Fax:     416.865.7048

Lawyers for Citibank

AND TO:

**BLANEY McMURTRY LLP**
Barristers and Solicitors
1500 – 2 Queen Street East
Toronto, Ontario  M5C 3G5

Domenico Magisano

Email:   dmagisano@blaney.com
Tel:     416.593.2996
Fax:     416.593.5437

Lawyers for Expertech Network Installation Inc.

AND TO:

**LANG MICHENER LLP**
Brookfield Place
Suite 2500, 181 Bay Street
P.O. Box 747
Toronto, Ontario  M5J 2T7

Leslie Wittlin
Aaron Rousseau

Email:   lwittlin@langmichener.ca
Tel:     416.307.4087
Fax:     416.365.1719

Email:   arousseau@langmichener.ca
Tel:     416.307.4081
Fax:     416.365.1719

Lawyers for Right Management Inc.

AND TO:

**CASSELS BROCK & BLACKWELL LLP**
40 King Street West,
Suite 2100
Toronto, Ontario  M5H 3C2

Deborah S. Grieve

Email:   dgrieve@casselsbrock.com
Tel:     416.860.5219
Fax:     416.350.6923

Lawyers for Alvarion Ltd.

AND TO:

**GARDINER ROBERTS LLP**
Suite 3100, Scotia Plaza
40 King Street West
Toronto, ON  M5H 3Y2

Jonathan Wigley
Vern W. DaRe

Email:   jwigley@gardiner-roberts.com
Tel:     416.865.6655
Fax:     416.865.6636

Email:   vdare@gardiner-roberts.com
Tel:     416.865.6641
Fax:     416.865.6636

Lawyers for Amphenol Corporation

AND TO:

**AIRD & BERLIS LLP**
Barristers & Solicitors
Brookfield Place, P.O. Box 754
181 Bay Street, Suite 1800
Toronto, Ontario  M5J 2T9

Sanjeev P.R. Mitra
Sandra A. Vitorovich

Email:   smitra@airdberlis.com
         svitorovich@airdberlis.com

Tel:     416.863.1500
Fax:     416.863.1515

Lawyers for Enbridge Gas Distribution Inc.

| | |
|---|---|
| **AND TO:** | **NELLIGAN O'BRIEN PAYNE LLP**<br>Barristers and Solicitors<br>50 O'Connor Street<br>Suite 1500<br>Ottawa, Ontario  K1P 6L2 |

AND TO: **NELLIGAN O'BRIEN PAYNE LLP**
Barristers and Solicitors
50 O'Connor Street
Suite 1500
Ottawa, Ontario  K1P 6L2

Janice B. Payne
Ainslie Benedict
Steven Levitt
Christopher Rootham

Email:   janice.payne@nelligan.ca
ainslie.benedict@nelligan.ca
steven.levitt@nelligan.ca
christopher.rootham@nelligan.ca

Tel:   613.231.8245
Fax:   613.788.3655

Lawyers for the Steering Committee of Recently Severed Canadian Nortel Employees

AND TO: **CALEYWRAY**
Labour/Employment Lawyers
1600-65 Queen Street West
Toronto, Ontario  M5H 2M5

Gail E. Misra

Email:   misrag@caleywray.com

Tel:   416.775.4680
Fax:   416.366.3293

Lawyers for the Communication, Energy and Paperworkers Union of Canada

AND TO: **COLBY, MONET DEMERS, DELAGE & CREVIER LLP**
Tour McGill College
1501 McGill College Avenue
Suite 2900
Montreal, Quebec  H3A 3M8

David J. Dropsy

Email:   ddropsy@colby-monet.com
Tel:   514.284.3663
Fax:   514.284.1961

Lawyers for GFI INC., a division of Thomas & Betts Manufacturing Inc.

AND TO: **CASSELS BROCK & BLACKWELL LLP**
2100 Scotia Plaza
40 King Street West
Toronto, Ontario  M5H 3C2

E. Bruce Leonard
Harvey Garman
Michael Casey

Email:   bleonard@casselsbrock.com
hgarman@casselsbrock.com
mcasey@casselsbrock.com

Tel:   416.860.6455
Fax:   416.640.3054

Lawyers for the UK Pension Protection Fund and Nortel Networks UK Pension Trust Limited

AND TO: **MCFARLANE LEPSOE**
Barristers & Solicitors
70 Gloucester Street, Third Floor
Ottawa, Ontario  K2P 0A2

Paul K. Lepsoe

Email:   pklepsoe@mcfarlanelaw.com

Tel:   613.233.2679
Fax:   613.233.3774

Lawyers for Iron Mountain Canada Corporation and Iron Mountain Information Management, Inc.

AND TO: **SCHNEIDER & GAGGINO**
375 Lakeshore Drive
Dorval, Quebec  H9S 2A5

Dan Goldstein
Marco Gaggino

Email:   dgoldstein@schneidergaggino.com
mgaggino@schneidergaggino.com

Tel:   514.631.8787
Fax:   514.631.0220

Lawyers for the Teamsters Quebec Local 1999

AND TO: **NELLIGAN O'BRIEN PAYNE LLP**
Barristers and Solicitors
50 O'Connor Street
Suite 1500
Ottawa, Ontario  K1P 6L2

Janice B. Payne
Steven Levitt
Christopher Rootham

Email:   janice.payne@nelligan.ca
         steven.levitt@nelligan.ca
         christopher.rootham@nelligan.ca

Tel:    613.231.8245
Fax:    613.788.3655

Lawyers for the Steering Committee of Nortel
Canadian Continuing Employees – Post CCAA
as at January 14, 2009

AND TO: **BENNETT JONES LLP**
1 First Canadian Place
Suite 3400
Toronto, Ontario  M5X 1A4

Robyn M. Ryan Bell
Mark Laugesen

Email:   ryanbellr@bennettjones.com
         laugesenm@bennettjones.com

Tel:    416.863.1200
Fax:    416.863.1716

Lawyers for Tel-e Connect Systems Ltd. and
Tel-e Connect Systems (Toronto) Ltd.

AND TO: **MINDEN GROSS LLP**
145 King Street West, Suite 2200
Toronto, Ontario  M5H 4G2

Timothy R. Dunn

Email:   tdunn@mindengross.com
Tel:    416.369.4335
Fax:    416.864.9223

Lawyers for 2748355 Canada Inc.

AND TO: **BAKER & McKENZIE LLP**
Brookfield Place, P.O. Box 874
181 Bay Street, Suite 2100
Toronto, Ontario  M5J 2T3

Chris Besant
Lydia Salvi

Email:   chris.besant@bakernet.com

Tel:    416.865.2318
Fax:    416.863.6275

Email:   lydia.salvi@bakernet.com

Tel:    416.865.6944
Fax:    416.863.6275

Lawyers for Jabil Circuit Inc.

AND TO: **McCARTHY TETRAULT LLP**
Suite 5300, Toronto Dominion Bank Tower
Toronto, Ontario  M5K 1E6

Thomas G. Heintzman
Junior Sirivar

Email:   theintzm@mccarthy.ca
Tel:    416.601.7627
Fax:    416.868.0673

Email:   jsirivar@mccarthy.ca
Tel:    416.601.7750
Fax:    416.868.0673

Lawyers for Frank Andrew Dunn

AND TO: **EURODATA**
2574 Sheffield Road
Ottawa, Ontario  K1B 3V7

Nanci Shore

Email:   nanci@eurodata.ca
Tel:    613.745.0921
Fax:    613.745.1172

AND
TO:

**BALDWIN LAW PROFESSIONAL
CORPORATION**
54 Victoria Avenue
Belleville, Ontario K8N 5J2

Ian W. Brady

Email:  lbrady@baldwinlaw.ca
Tel:     613.771.9991
Fax:    613.771.9998

Lawyers for Sydney Street Properties Corp.

AND
TO:

**AIRD & BERLIS LLP**
Barristers & Solicitors
Brookfield Place, P.O. Box 754
181 Bay Street, Suite 1800
Toronto, ON  M5J 2T9

Steven L. Graff
Ian E. Aversa

Email:  sgraff@airdberlis.com
Tel:     416.865.7726
Fax:    416.863.1515

Email:  iaversa@airdberlis.com
Tel:     416.865.3082
Fax:    416.863.1515

Lawyers for Huawei Technologies Co. Ltd.

AND
TO:

**SHIBLEY RIGHTON LLP**
Barristers and Solicitors
250 University Avenue, Suite 700
Toronto, Ontario M5H 3E5

Arthur O. Jacques
Thomas McRae

Email:  arthur.jacques@shibleyrighton.com
Tel:     416.214.5213
Fax:    416.214.5413

Email :  thomas.mcrae@shibleyrighton.com
Tel :    416.214.5206
Fax :    416.214.5400

Co-Counsel for the Steering Committee of
Nortel Canadian Continuing Employees – Post
CCAA as at January 14, 2009

AND
TO:

**AETL TESTING, INC.**
130 Chaparral Court, Suite 250
Anaheim, California 92808

Cynthia R. Maher

Email:  cynthia.maher@ntscorp.com
Tel:     714.998.4351
Fax:    714.998.7142

Lawyers for AETL Testing, Inc.

AND
TO:

**SHIBLEY RIGHTON LLP**
Barristers and Solicitors
250 University Avenue, Suite 700
Toronto, Ontario M5H 3E5

Arthur O. Jacques
Thomas McRae

Email:  arthur.jacques@shibleyrighton.com
Tel:     416.214.5213
Fax:    416.214.5413

Email :  thomas.mcrae@shibleyrighton.com
Tel :    416.214.5206
Fax :    416.214.5400

Lawyers for The Recently Severed Canadian
Nortel Employees Committee

AND
TO:

**LAVERY, DE BILLY, LLP**
Barristers & Solicitors
Suite 2400, 600 de la Gauchetière West
Montreal, Quebec H3B 4L8

Jean-Yves Simard

Email :  jysimard@lavery.ca
Tel :    514.871.1522
Fax :    514.871.8977

Lawyers for Texas Landlords to Nortel Networks
Inc.

22

- 13 -

AND TO:

**NATIONAL TECHNICAL SYSTEMS**
130 Chaparral Ct., Suite 250
Anaheim, California, U.S.A.
92808

Cynthia Maher

Email:  cynthia.maher@nt scorp.com
Tel:    714.998.4351

AND TO:

**GOWLING LAFLEUR HENDERSON LLP**
Suite 1600, First Canadian Place
100 King Street West
Toronto, ON  M5X 1G5

David F.W. Cohen

Email:  david.cohen@gowlings.com

Tel:    416.369.6667
Fax:    416.862.7661

Lawyers for General Electric Canada Equipment Finance G.P. and GE Capital Canada Leasing Services Inc.

AND TO:

**DAVIS LLP**
1 First Canadian Place
Suite 5600
100 King Street West
Toronto, ON  M5X 1E2

Bruce Darlington
Jonathan Davis-Sydor

Email:  bdarlington@davis.ca
Tel:    416.365.3529
Fax:    416.369.5210

Email:  jdavissydor@davis.ca
Tel:    416.941.5397
Fax:    416.365.7886

Lawyers for Computershare Trust Company of Canada

AND TO:

**DAVIES WARD PHILLIPS & VINEBERG LLP**
44th Floor
1 First Canadian Place
Toronto, ON  M5X 1B1

Robin B. Schwill
Matthew P. Gottlieb

Email:  rschwill@dwpv.com
Tel:    416.863.0900
Fax:    416.863.0871

Email:  mgottlieb@dwpv.com
Tel:    416.863.0900
Fax:    416.863.0871

Lawyers for Nortel Networks UK Limited (In Administration)

AND TO:

**LAX O'SULLIVAN SCOTT LLP**
Counsel
Suite 1920, 145 King Street West
Toronto, Ontario  M5H 1J8

Terrence O'Sullivan
Shaun F. Laubman

E-mail:  tosullivan@counsel-toronto.com
Tel:     416.598.1744
Fax:     416.598.3730

Email:   slaubman@counsel-toronto.com
Tel:     416.598.1744
Fax:     416.598.3730

Lawyers for William A. Owens

AND TO:

**BAKER & McKENZIE LLP**
Brookfield Place, P.O. Box 874
181 Bay Street, Suite 2100
Toronto, Ontario  M5J 2T3

Lydia Salvi

Email:  lydia.salvi@bakernet.com

Tel:    416.865.6944
Fax:    416.863.6275

Lawyers for Wipro Limited

| | | | | |
|---|---|---|---|---|
| AND<br>TO: | **AIRD & BERLIS LLP**<br>Barristers & Solicitors<br>Brookfield Place, P.O. Box 754<br>181 Bay Street, Suite 1800<br>Toronto, ON  M5J 2T9 | | AND<br>TO: | **McCARTHY TETRAULT LLP**<br>Suite 5300, TD Bank Tower<br>Toronto Dominion Centre<br>Toronto, Ontario  M5K 1E6 |

AND
TO:

**AIRD & BERLIS LLP**
Barristers & Solicitors
Brookfield Place, P.O. Box 754
181 Bay Street, Suite 1800
Toronto, ON  M5J 2T9

Steven L. Graff
Ian E. Aversa

Email:    sgraff@airdberlis.com
Tel:       416.865.7726
Fax:      416.863.1515

Email:    iaversa@airdberlis.com
Tel:       416.865.3082
Fax:      416.863.1515

Lawyers for the Current and Former Employees of
Nortel Networks Inc. who are or were Participants
in the Long-Term Investment Plan Sponsored by
Nortel Networks Inc.

AND
TO:

**TORYS LLP**
79 Wellington Street West, Suite 3000
Box 270, TD Centre
Toronto, Ontario  M5K 1N2

Scott Bomhof

Email:    sbomhof@torys.com
Tel:       416.865.7370
Fax:      416.865.7380

Lawyers for Nokia Siemens Networks B.V.

AND
TO:

**McCARTHY TETRAULT LLP**
Suite 5300, TD Bank Tower
Toronto Dominion Centre
Toronto, Ontario  M5K 1E6

Heather Meredith

Email:    hmeredith@mccarthy.ca
Tel:       416.601.8342
Fax:      416.868.0673

Lawyers for Hitachi Communications
Technologies, Ltd.

AND
TO:

**DEPARTMENT OF JUSTICE**
Ontario Regional Office
The Exchange Tower, Box 36
130 King Street W., Suite 3400
Toronto, Ontario  M5X 1K6

Diane Winters

Email:    dwinters@justice.gc.ca
Tel:       416.973.3172
Fax:      416.973.0810

AND
TO:

**BLAKE, CASSELS & GRAYDON LLP**
199 Bay Street, Suite 2800
Commerce Court West
Toronto, Ontario M5L 1A9

Pamela Huff
Milly Chow
Hugh DesBrisay
Craig Thorburn

Email:  pamela.huff@blakes.com
Tel:     416.863.2958
Fax:    416.863.2653

Email:  milly.chow@blakes.com
Tel:     416.863.2594
Fax:    416.863.2653

Email:  hugh.desbrisay@blakes.com
Tel:     416.863.2426
Fax:    416.863.2653

Email:  craig.thorburn@blakes.com
Tel:     416.863.2965
Fax:    416.863.2653

Lawyers for MatlinPatterson Global Advisers LLC,
MatlinPatterson Global Opportunities Partners III
L.P. and MatlinPatterson Opportunities Partners
(Cayman) III L.P.

AND
TO:

**LANG MICHENER LLP**
Brookfield Place
181 Bay Street, Suite 2500
Toronto, Ontario, M5J 2T7

Sheryl E. Seigel

Email:  sseigel@langmichener.ca
Tel:     416.307.4063
Fax:    416.365.1719

Lawyers for The Bank of New York Mellon

AND
TO:

**BLAKE, CASSELS & GRAYDON LLP**
199 Bay Street, Suite 2800
Commerce Court West
Toronto, Ontario M5L 1A9

Susan M. Grundy
Marc Flynn

Email:  susan.grundy@blakes.com
Tel:     416.863.2572
Fax:    416.863.2653

Email:  marc.flynn@blakes.com
Tel:     416.863.2685
Fax:    416.863.2653

Lawyers for Telefonaktiebolaget L M Ericsson
(publ)

AND
TO:

**McCARTHY TETRAULT LLP**
Suite 5300, Toronto Dominion Bank Tower
Toronto, Ontario M5K 1E6

Kevin P. McElcheran
Ryan Stabile

Email:  kmcelcheran@mccarthy.ca
Tel:     416.601.7730
Fax:    416.868.0673

Email:  rstabile@mccarthy.ca
Tel:     416.601.8335
Fax:    416.868.0673

Lawyers for Avaya Inc.

25

AND
TO:

**SACK GOLDBLATT MITCHELL LLP**
20 Dundas Street West
Suite 1100
Toronto, Ontario  M5G 2G8

James McDonald
Darrell Brown

Email:  jmcdonald@sgmlaw.com
Tel:    416.979.6425
Fax:    416.591.7333

Email:  dbrown@sgmlaw.com
Tel:    416.979.4050
Fax:    416.591.7333

Lawyers for Edmund Fitzgerald

AND
TO:

**STIKEMAN ELLIOTT LLP**
5300 Commerce Court West
199 Bay Street
Toronto, ON  M5L 1B9

Ashley John Taylor

Email:  ataylor@stikeman.com
Tel:    416.869.5236
Fax:    416.947.0866

Lawyers for Ciena Corporation

AND
TO:

**STIKEMAN ELLIOTT LLP**
5300 Commerce Court West
199 Bay Street
Toronto, ON  M5L 1B9

Sean F. Dunphy

Email:  sdunphy@stikeman.com
Tel:    416.869.5662
Fax:    416.947.0866

Lawyers for GENBAND Inc.

AND
TO:

**FOGLER, RUBINOFF LLP**
Barristers and Solicitors
Suite 1200
Toronto-Dominion Centre
95 Wellington Street West
Toronto, Ontario  M5J 2Z9

Jeffrey K. Spiegelman

Email:  jspiegelman@foglers.com
Tel:    416.864.9700
Fax:    416.941.8852

Lawyers for Belden (Canada) Inc.

AND
TO:

**STIKEMAN ELLIOTT LLP**
445 Park Avenue, 7th Floor
New York, NY  10022

Gordon Cameron
Ron Ferguson

Email:  gncameron@stikeman.com
Tel:    212.845.7464
Fax:    212.371.7087

Email:  rferguson@stikeman.com
Tel:    212.845.7477
Fax:    212.371.7087

Lawyers for GENBAND Inc.

AND
TO:

**BORDEN LADNER GERVAIS LLP**
Barristers and Solicitors
Scotia Plaza, Suite 4400
40 King Street West
Toronto, ON  M4H 3Y4

John D. Marshall
Craig J. Hill

Email:  jmarshall@blgcanada.com
Tel:    416.367.6024
Fax:    416.361.2763

Email:  chill@blgcanada.com
Tel:    416.367.6156
Fax:    416.631.7301

Lawyers for the U.K. Pensions Regulator

26

<table>
<tr>
<td>AND<br>TO:</td>
<td><strong>VINCENT DAGENAIS GIBSON LLP/s.r.l</strong><br>Barristers and Solicitors<br>600-325 Dalhousie Street<br>Ottawa, ON K1N 7G2</td>
<td>AND<br>TO:</td>
<td><strong>BLAKE, CASSELS & GRAYDON</strong><br>Box 25, Commerce Court West<br>199 Bay Street, Suite 2800<br>Toronto, Ontario M5L 1A9</td>
</tr>
</table>

AND **VINCENT DAGENAIS GIBSON LLP/s.r.l**
TO: Barristers and Solicitors
600-325 Dalhousie Street
Ottawa, ON K1N 7G2

Thomas Wallis

E-mail: thomas.wallis@vdg.ca
Tel: 613.241.2701
Fax: 613.241.2599

Lawyers for La Regie des Rentes du Quebec


AND **BLAKE, CASSELS & GRAYDON**
TO: Box 25, Commerce Court West
199 Bay Street, Suite 2800
Toronto, Ontario M5L 1A9

Pamela J. Huff
J. Jeremy Forgie

Email: pamela.huff@blakes.com
Tel: 416.863.2958
Fax: 416.863.2653

Email: jeremy.forgie@blakes.com
Tel: 416.863.3888
Fax: 416.863.2653

Lawyers for The Northern Trust Company,
Canada


AND **ROCHON GENOVA LLP**
TO: 121 Richmond Street West
Suite 900
Toronto, ON M5H 2K1

Joel P. Rochon

Email: jrochon@rochongenova.com
Tel: 416.363.1867
Fax: 416.363.0263

Lawyers for the Opposing LTD Employees

27

## COURTESY COPIES:

| AND<br>TO: | **LEWIS AND ROCA**<br>40 North Central Avenue<br>Phoenix, Arizona<br>USA 85004-4429 | AND<br>TO: | **AKIN GUMP STRAUSS HAUER &<br>FELD LLP**<br>One Bryant Park<br>New York, NY 10036 |
|---|---|---|---|

AND
TO:

**LEWIS AND ROCA**
40 North Central Avenue
Phoenix, Arizona
USA 85004-4429

Scott K. Brown

Email:   sbrown@lrlaw.com

Tel:      602.262.5321
Fax:     602.734.3866

Lawyers for The Prudential Insurance
Company of America

AND
TO:

**CURTIS, MALLET-PREVOST, COLT &
MOSLE LLP**
101 Park Avenue
New York, New York 10178-0061

Steven J. Reisman
James V. Drew

E-mail:  sreisman@curtis.com
            jdrew@curtis.com

Tel:      212.696.6000
Fax:     212-697-1559

Lawyers for Flextronics International

AND
TO:

**AKIN GUMP STRAUSS HAUER &
FELD LLP**
One Bryant Park
New York, NY 10036

Fred S. Hodara

Email:   fhodara@akingump.com

Tel:      212.872.1000
Fax:     212.872.1002

U.S. Lawyers for the Official Committee of
Unsecured Creditors

AND
TO:

**MILBANK, TWEED, HADLEY
McCLOY LLP**
1 Chase Manhattan Plaza
New York, NY 10005

Dennis F. Dunne
Andrew M. Leblanc
Albert A. Pisa

Email:   DDunne@milbank.com
Tel:      212.530.5770
Fax:     212.530.5219

Email:   ALeblanc@milbank.com
Tel:      212.835.7574
Fax:     212.530.5219

Email:   APisa@milbank.com
Tel:      212.530.5319
Fax:     212.530.5219

U.S. Lawyers for The Informal Nortel
Noteholder Group

AND **VEDDER PRICE P.C.**
TO: 1633 Broadway, 47th Floor
New York, New York 10019

Michael L. Schein

Email: mschein@vedderprice.com

Tel: 212.407.6920
Fax: 212.407.7799

U.S. Lawyers for Telmar Network Technology,
Inc. and Precision Communication Services, Inc.

AND **MACLEOD DIXON LLP**
TO: 3700 Canterra Tower
400, 3rd Avenue N.W.
Calgary, Alberta T2P 4H2

Andrew Robertson
Caylee M. Rieger

Email : andrew.robertson@macleoddixon.com
caylee.rieger@macleoddixon.com

Tel : 403.267.8222
Fax : 403.264.5973

Agent for Nelligan O'Brien Payne LLP, lawyers
for the Steering Committee of Recently Severed
Canadian Nortel Employees and lawyers for the
Steering Committee of Nortel Canadian
Continuing Employees – Post CCAA as at
January 14, 2009

AND **BRYAN CAVE LLP**
TO: 161 North Clark Street, Suite 4300
Chicago, Illinois 60601

Eric S. Prezant

Email: eric.prezant@bryancave.com
Tel: 312.602.5033
Fax: 312.602.5050

U.S. Lawyers for Tellabs, Inc.

Court File No: 09-CL-7950

IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL CORPORATION AND NORTEL NETWORKS TECHNOLOGY CORPORATION

*ONTARIO*
**SUPERIOR COURT OF JUSTICE**
**COMMERCIAL LIST**

Proceeding commenced at Toronto

**NOTICE OF MOTION**
**(returnable April 14, 2010)**

**OGILVY RENAULT LLP**
Suite 3800
Royal Bank Plaza, South Tower
200 Bay Street
Toronto, Ontario  M5J 2Z4
CANADA

**Derrick Tay LSUC#: 21152A**
Tel: (416) 216-4832
Email: dtay@ogilvyrenault.com

**Jennifer Stam LSUC #46735J**
Tel: (416) 216-2327
Email: jstam@ogilvyrenault.com
Fax: (416) 216-3930

Lawyers for the Applicants

DOCSTOR: 1913806\2

**TAB 2**

Court File No: 09-CL-7950

***ONTARIO***
**SUPERIOR COURT OF JUSTICE**
**(COMMERCIAL LIST)**

**IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,
R.S.C. 1985, c. C-36, AS AMENDED**

**AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF
NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL
NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL
CORPORATION AND NORTEL NETWORKS TECHNOLOGY CORPORATION**

**APPLICATION UNDER THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,
R.S.C. 1985, c. C-36, AS AMENDED**

**AFFIDAVIT OF ANNA VENTRESCA**
**(sworn April 7, 2010)**

I, Anna Ventresca, of the City of Hamilton, in the Province of Ontario, MAKE OATH
AND SAY:

1.   I am the General Counsel-Corporate and Corporate Secretary of Nortel Networks
     Corporation ("NNC") and Nortel Networks Limited ("NNL") and have held this position
     since August 2009. From July, 2007 to July, 2009 I was the Assistant General Counsel –
     Corporate and Assistant Secretary. I am also the chief legal officer of Nortel Networks
     Inc. ("NNI") and have held that position since September 11, 2009. As such, I have
     personal knowledge of the matters to which I hereinafter depose in this Affidavit. Where
     I do not possess personal knowledge, I have stated the source of my information and, in
     all such cases, believe it to be true.

2.   I swear this Affidavit in support of the motion seeking:

     (a)   An extension of the Stay Period (as defined in the Initial Order, defined below) to
           July 22, 2010;

     (b)   An extension of the Employee Hardship Process (defined below) to July 22, 2010;
           and

- 2 -

(c)     The approval of the Fourteenth Extension of the Canadian GSPA (as both terms
are defined below).

3.     All dollar references are US$ unless otherwise indicated.  All references to "Nortel"
herein are references to the enterprise as a whole.

**BACKGROUND**

4.     On January 14, 2009 (the "Filing Date"), NNC, NNL, Nortel Networks Technology
Corporation, Nortel Networks Global Corporation and Nortel Networks International
Corporation (collectively, the "Applicants") were granted protection under the
*Companies' Creditors Arrangement Act*, R.S.C. 1985, c. C-36, as amended (the
"CCAA") pursuant to an initial order (as subsequently amended and restated, the "Initial
Order") of this Honourable Court and Ernst & Young Inc. was appointed as monitor (the
"Monitor") in the CCAA proceedings.

5.     Also on January 14, 2009, certain of NNC's U.S. subsidiaries, including its principal U.S.
operating subsidiary NNI (together with the other U.S. filing entities, the "Initial U.S.
Debtors"), made voluntary filings in the United States Bankruptcy Court for the District
of Delaware (the "U.S. Court") under Chapter 11 of the United States Bankruptcy Code
(the "Code").  On the same date, this Honourable Court granted an Order pursuant to
Section 18.6(4) of the CCAA recognizing the Chapter 11 cases as "foreign proceedings"
in Canada and giving effect in Canada to the automatic stay under the Code.

6.     Additionally, on January 15, 2009, NNUK and certain subsidiaries (the "EMEA
Debtors") of the Nortel group incorporated in Europe, the Middle East or Africa
("EMEA") each obtained an administration order for the appointment of administrators
(the "Joint Administrators") from the High Court of England and Wales under the
Insolvency Act 1986.

7.     On February 27, 2009, the U.S. Court granted petitions recognizing these proceedings as
"foreign main proceedings" pursuant to Chapter 15 of the Code.

32

- 3 -

8.    On May 28, 2009, the Commercial Court of Versailles, France (the "French Court") ordered the commencement of secondary insolvency proceedings in respect of Nortel Networks S.A. ("NNSA"), which consist of liquidation proceedings during which NNSA was originally authorized to continue to operate as a going concern for an initial period of three months which period was subsequently extended to November 28, 2009.   In accordance with the European Union's Council Regulation (EC) No 1346/2000 on Insolvency Proceedings, the English law proceedings remain the main proceedings in respect of NNSA although a French administrator and a French liquidator have been appointed and are in charge of the day-to-day affairs and continuing business of NNSA in France.

9.    The French Court approved an order to (i) suspend the liquidation operation relating to the sale of the assets and/or business of NNSA for a renewal period of two months, currently extending until the earlier of May 31, 2010 or the filing by Kapsch CarrierCom AG ("Kapsch") with the French Court of a letter stating that its bid for the GSM/GSM-R assets of NNSA has become unconditional; (ii) authorize the continuation of the business of NNSA so long as the liquidation operations are suspended; and (iii) maintain the powers of the French administrator and liquidator during that period except with respect to the sale of assets and/or businesses of NNSA.

10.    On January 18, 2009, certain Nortel affiliates, including Nortel Networks Israel (Sales and Marketing) Limited, filed an application with the Tel-Aviv-Jaffa District Court, pursuant to the Israeli Companies Law, 1999, and the regulations relating thereto for a stay of proceedings. On January 19, 2009, the Israeli Court appointed Yaron Har-Zvi and Avi D. Pelossof as joint administrators of the Israeli Company under the Israeli Companies Law.

11.    On June 8, 2009, the Joint Administrators appointed in respect of NNUK filed a petition with the U.S. Court for the recognition of the Administration Proceedings as they relate to NNUK (the "English Proceedings") under Chapter 15 of the Code.  On June 26, 2009, the U.S. Court entered an order recognizing the English Proceedings as foreign main proceedings under Chapter 15 of the Code.

- 4 -

12.     On July 14, 2009, Nortel Networks (CALA) Inc. (together with the Initial U.S. Debtors, the "U.S. Debtors") made a voluntary filing with the U.S. Court under Chapter 11 of the Code.

13.     On March 10, 2010, Nortel Networks Telecomunicacoes do Brasil Ltda filed for voluntary bankruptcy proceedings. The Brazilian court issued an order and appointed a bankruptcy trustee on March 30, 2010.

14.     Further details regarding the background to these proceedings are set out in the affidavit of John Doolittle sworn January 14, 2009 (the "Initial Order Affidavit") previously filed in these proceedings and are therefore not repeated herein.

## UPDATE ON THE CCAA PROCEEDINGS

*Divestitures*

15.     Throughout the proceedings, the Applicants, and Nortel generally, have worked diligently to maximize value for its various businesses and preserve customer and other relationships. As has also been set out in previous affidavits sworn in these proceedings, Nortel has generated over US$3 billion in sales proceeds as a result of the completion of multiple sales, including:

    (a)     the sale of certain portions of its Layer 4-7 data portfolio to Radware Ltd., which sale closed on March 31, 2009;

    (b)     the sale of substantially all of Nortel's CDMA/LTE assets to Telefonaktiebolaget LM Ericsson (publ) ("Ericsson"), which sale closed on November 13, 2009;

    (c)     the sale of Nortel's Enterprise Solutions business to Avaya Inc. which sale closed on December 18, 2009;

    (d)     the sale of the assets of Nortel's Wireless Networks business associated with the development of Next Generation Packet Core network components to Hitachi Inc. which sale closed on December 4, 2009;

- 5 -

(e)     the sale of substantially all the assets of Nortel's Optical Networking and Carrier Ethernet businesses associated with its Metro Ethernet Networks business unit to Ciena Corporation on March 19, 2010; and

(f)     the sale of substantially all of Nortel's GSM/GSM-R business to Ericsson and Kapsch, which sale closed on March 31, 2010.

16.     The Applicants have also obtained an approval and vesting order approving an asset sale agreement dated as of December 22, 2009 entered into with GENBAND Inc. for the sale of substantially all of Nortel's Carrier Voice Over IP and Application Solutions business (the "CVAS Sale"). Similar relief has been granted in the U.S. proceedings and the sale is expected to close prior to the end of Q2 2010.

*Funding*

17.     From the outset of the proceedings, it was recognized that the viability of NNL was critical to the success of Nortel in its efforts given the significant role it plays in the Nortel enterprise.

18.     On June 9, 2009, the Applicants announced that it had entered into an interim funding and settlement agreement ("IFSA") with the U.S. Debtors and the EMEA Debtors, which provided for the settlement of certain funding issues: (a) with the U.S. Debtors through to September 30, 2009 (the "US Debtor Settlement Period"); and (b) with the EMEA Debtors through to December 31, 2009. As part of the settlement under IFSA, the Applicants received a payment from NNI of $157 million (in addition to a $30 million payment that had been made in January 2009).

19.     The Applicants and the U.S. Debtors subsequently entered into the Final Canadian Funding and Settlement Agreement (the "Canadian Funding Agreement"), which provides for the funding of the continuing work in Canada through the remainder of the creditor protection proceedings. The Canadian Funding Agreement was approved by this Court as well as the U.S. Court on January 21, 2010. As a result of the Canadian Funding Agreement, NNL has or will receive further payments from NNI totaling $190.8 million.

- 6 -

20.     The Canadian Funding Agreement provides for much needed funding to the Applicants
through to the conclusion of the proceedings.

*Employee Matters*

21.     Since the commencement of the proceedings, the Applicants, in cooperation with the
Monitor and other interested parties, have taken various steps in recognition of the impact
of the proceedings on current and former employees.

22.     Recently, the Applicants sought approval of the Nortel Special Incentive Plan to incent
employees who the Applicants need to remain with Nortel for up to the next two (2)
years. The motion for approval of the Nortel Special Incentive Plan was brought as a
joint hearing with the U.S. Debtors and heard on March 3, 2010. The Nortel Special
Incentive Plan was approved by the U.S. Court on March 3, 2010 and by this Court on
March 8, 2010.

23.     The Applicants also recently entered into an amended and restated settlement agreement
after extensive discussions with counsel to the former employees and employees on long
term disability (the "LTD Employees") and the CAW-Canada as well as other interested
parties to resolve certain issues related to, among other things, former employee benefits,
the administration of the Applicants' registered pension plans and LTD Employee
entitlements. The motion for approval of the original settlement agreement followed a
court-approved wide-ranging notice program for the announcement and disclosure of the
settlement. The first motion was heard over a three (3) day period starting March 3,
2010. On March 26, 2010, this Court issued reasons which did not approve the original
settlement agreement and more specifically expressed concern about one particular clause
of the original settlement agreement, namely the "H.2" clause. Over the following three
days, the Applicants worked with Representative Counsel and the CAW to enter into an
amended and restated employee settlement agreement dated as of March 30, 2010 (the
"Amended and Restated Settlement Agreement") in which the "H.2" clause was removed
but which otherwise remained the same. The Applicants brought a motion for and
obtained the approval of this Court for the Amended and Restated Settlement Agreement
on March 31, 2010.

- 7 -

*Other Achievements*

24.    In addition to the foregoing, the Applicants have also accomplished the following:

(a)    The establishment of a September 30, 2009 bar date for most claims against the Applicants and their current and former officers and directors;

(b)    The settlement of most claims with Nortel's largest supplier, Flextronics;

(c)    Entered into a restructuring agreement with its various affiliates in the Asia Pacific, which agreement was approved by this Court and the U.S. Court on December 2, 2009;

(d)    Resolution of outstanding transfer pricing issues with Canadian and U.S. tax authorities for the taxation years 2001 through 2005 pursuant to two "advanced pricing agreements" entered into with the Canadian and U.S. tax authorities;

(e)    The relocation of the Applicants' corporate head offices from 195 The West Mall to smaller premises at 5945 Airport Road, Suite 360 on or about December 1, 2009;

(f)    Obtained an Order nullifying, for the purposes of these proceedings, the regulatory determination process in the United Kingdom with respect to the pension claim filed by the UK pension trustee and pension protection fund against various of the Applicants;

(g)    Implemented a cascade of directors for many of Nortel's non-filed entities for the purpose of facilitating the sales and other restructuring matters; and

(h)    Reduced the Directors' Charge (as defined in the Initial Order) from CAN$90 million to CAN$45 million and obtained a Court ordered cap with respect to director liability for post-filing claims covered by the Directors' Charge.

- 8 -

## ON GOING EFFORTS AND EXTENSION OF THE STAY PERIOD

25.  Although there have been significant achievements, there is still much to accomplish. For example:

   (a)  there is at least one (1) significant sale, namely the CVAS Sale, to be completed;

   (b)  Nortel will need to complete other sales processes, such as the LGN Joint Venture and Nortel's Passport business;

   (c)  Nortel will be obligated to perform transition services under most or all of its sales arrangements;

   (d)  a determination will need to be made regarding the best path forward to maximize value for Nortel's IP;

   (e)  resolution of claims pursuant to the claims bar process that was approved by this Court on July 30, 2009;

   (f)  establishment and resolution of compensation related claims process to be developed with, among others, representative counsel to the Former Employees and LTD Employees;

   (g)  Court approved distribution process for the corpus of the Nortel Health and Welfare Trust; and

   (h)  allocation and distribution of proceeds to creditors.

26.  The Applicants and Nortel generally have and continue to work diligently and in good faith on their stated restructuring efforts.

27.  I am aware that the Forty-Third Report will contain updated cash flow information with respect to the Applicants for the period March 28, 2010 to July 31, 2010.

28.  As the Applicants continue to work to complete these transactions as well as resolve claims and carry out their other restructuring efforts, they continue to need the protection

- 9 -

of this Court. As such, the Applicants are requesting an extension of the Stay Period (as defined in the Initial Order) to July 22, 2010.

## GROUP SUPPLIER PROTOCOL AGREEMENT

29.     As set out above, upon filing under these CCAA Proceeding and in the U.S. Chapter 11 cases, Nortel entered into two group supplier protocol agreements; one between the Applicants and the Joint Administrators (the "Canadian GSPA") and the other between U.S. Debtors and the Joint Administrators (the "US GSPA").

30.     Pursuant to previous orders of this Court, extensions of the Canadian GSPA have been previously approved, up to and including a thirteenth. The thirteenth extension expired March 31, 2010.

31.     The Applicants have entered into and seek approval of the fourteenth extension of the Canadian GSPA, which extension was completed by way of the fourteenth extension deed dated April 1, 2010 (the "Fourteenth Extension").

32.     As a result of the Fourteenth Extension, the Canadian GSPA has been extended to April 30, 2010. A similar extension has been entered into to extend the US GSPA.

## EMPLOYEE HARDSHIP PROCESS

33.     Pursuant to an Order of this Court made on July 30, 2009, an employee hardship process (the "Employee Hardship Process") was approved in recognition of the fact that there may be cases in which former employees of one of the Applicants is experiencing financial hardship due to illness or healthcare costs, or due to ineligibility for pension or employment insurance benefits.

34.     The maximum amount that was made available for the Employee Hardship Process was CAN$750,000. Any hardship payments made will be considered advances against future distributions on account of the ultimate claims of these former employees.

35.     The original expiration of the Employee Hardship Process was November 30, 2009. Pursuant to an Order of this Court made on January 21, 2010, the period for receipt of employee hardship applications was extended to April 23, 2010.

- 10 -

36.    I am aware that the Forty-Third Report will provide details as to the remaining funds available in the Employee Hardship Process.  As there will continue to be terminations and the potential for hardship, the Applicants are requesting that the period for receipt of hardship applications be extended to July 22, 2010, and that the document "Eligibility Requirements and Procedure with Respect to Hardship Payment Applications", attached as an appendix to the Forty-Third Report be amended accordingly.

SWORN BEFORE ME at the City of Mississauga, in the Province of Ontario on this 7th day of April 2010.

_____
Commissioner for Taking Affidavits or Notary Public

DONNA WOOLLETT, Notary Public, Regional Municipality of Peel, limited to the attestation of instruments and the taking of affidavits, for Nortel Networks Corporation and its subsidiaries. Expires January 29, 2011.

_____
Anna Ventresca

Court File No: 09-CL-7950

IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL CORPORATION AND NORTEL NETWORKS TECHNOLOGY CORPORATION

*ONTARIO*
SUPERIOR COURT OF JUSTICE
(COMMERCIAL LIST)

Proceeding commenced at Toronto

AFFIDAVIT OF ANNA VENTRESCA
(sworn April 7, 2010)

OGILVY RENAULT LLP
Suite 3800
Royal Bank Plaza, South Tower
200 Bay Street
P.O. Box 84
Toronto, Ontario M5J 2Z4, Canada

Derrick Tay LSUC#: 21152A
Tel: (416) 216-4832
Email: dtay@ogilvyrenault.com

Jennifer Stam LSUC #46735J
Tel: (416) 216-2327
Email: jstam@ogilvyrenault.com
Fax: (416) 216-3930
Lawyers for the Applicants

DOCSTOR: 1914733\1

**TAB 3**

41

Court File No: 09-CL-7950

### *ONTARIO*
### SUPERIOR COURT OF JUSTICE
### (COMMERCIAL LIST)

### IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED

### AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL CORPORATION AND NORTEL NETWORKS TECHNOLOGY CORPORATION

### APPLICATION UNDER THE *COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED

### AFFIDAVIT OF GEORGE RIEDEL
### (sworn, April 8, 2010)

I, George Riedel, of the city of Boston in the State of Massachusetts, MAKE OATH AND SAY:

1.      I am the Chief Strategy Officer of Nortel Networks Corporation ("NNC") and Nortel Networks Limited ("NNL") and have held those positions since February, 2006. As such, I have personal knowledge of the matters to which I hereinafter depose in this Affidavit. Where I do not possess personal knowledge, I have stated the source of my information and, in all such cases, believe it to be true.

2.      I swear this Affidavit in support of the motion for:

(a)      an order approving the engagement of Grant Thornton LLP ("Grant Thornton") as Neutral TSA Arbitrator (as defined below) pursuant to the terms of the engagement agreement dated as of March 3, 2010 (the "Engagement Agreement") between Nortel Networks Inc. ("NNI"), NNL, Nortel Networks UK Limited ("NNUK"), Nortel Networks (Ireland) Limited ("NN Ireland", and together with NNI, NNL and NNUK, the "Nortel Parties"), the Joint Administrators (as defined below), Ciena Corporation and its affiliates ("Ciena" and with the Nortel Parties and the Joint Administrators, the "Parties") and Grant Thornton; and

(b)     an order approving an offer dated March 19, 2010 (the "Argentina Side Offer") made by Nortel Networks de Argentina S.A. ("Nortel Argentina") to, among others, NNL in connection with the sale of certain Argentine assets related to Nortel's Metro Ethernet Networks business (the "MEN Business") between Ciena and Nortel Argentina.

Copies of the Engagement Agreement and the Argentina Side Offer are attached as Exhibits "A" and "B" respectively.

3.     References to "Nortel" herein are references to the global enterprise as a whole.

4.     All dollar references are US$ unless otherwise indicated.

## BACKGROUND

5.     On January 14, 2009, NNC, NNL, Nortel Networks Technology Corporation, Nortel Networks International Corporation and Nortel Networks Global Corporation (collectively, the "Applicants") were granted protection under the *Companies' Creditors Arrangement Act*, R.S.C. 1985, c. C-36, as amended (the "CCAA") pursuant to an initial order of this Honourable Court and Ernst & Young Inc. was appointed as monitor in the CCAA proceedings.

6.     Also on January 14, 2009, certain of NNC's United States ("U.S.") subsidiaries, including its principal U.S. operating subsidiary NNI (together with the other U.S. filing entities, the "Initial U.S. Debtors"), made voluntary filings in the U.S. Bankruptcy Court for the District of Delaware (the "U.S. Court") under Chapter 11 of the U.S. Bankruptcy Code (the "Code"). On the same date, this Ontario Superior Court of Justice, Commercial List granted an Order pursuant to Subsection 18.6(4) of the CCAA recognizing the Chapter 11 cases as "foreign proceedings" in Canada and giving effect in Canada to the automatic stay under the Code.

7.     Additionally, on January 15, 2009, NNUK and certain subsidiaries of Nortel incorporated in Europe, the Middle East or Africa ("EMEA") each obtained an administration order (the "Administration Proceedings") for the appointment of administrators (the "Joint Administrators") from the High Court of England and Wales under the *Insolvency Act 1986*.

- 3 -

8.      On January 18, 2009, certain Nortel affiliates, including Nortel Networks Israel (Sales and Marketing) Limited (the "Israeli Company"), filed an application with the Tel-Aviv-Jaffa District Court, (the "Israeli Court") pursuant to the *Israeli Companies Law, 1999*, and the regulations relating thereto for a stay of proceedings. On January 19, 2009, the Israeli Court appointed Yaron Har-Zvi and Avi D. Pelossof as joint administrators (the "Joint Israeli Administrators") of the Israeli Company under the *Israeli Companies Law, 1999*.

9.      On February 27, 2009, the U.S. Court granted petitions recognizing these proceedings as "foreign main proceedings" pursuant to Chapter 15 of the Code.

10.     On May 28, 2009, the Commercial Court of Versailles, France (the "French Court") ordered the commencement of secondary insolvency proceedings in respect of Nortel Networks S.A. ("NNSA"), which consist of liquidation proceedings during which NNSA was originally authorized to continue to operate as a going concern for an initial period of three months which period was subsequently extended to November 28, 2009.    In accordance with the European Union's Council Regulation (EC) No. 1346/2000 on Insolvency Proceedings, the English law proceedings (the "English Proceedings") remain the main proceedings in respect of NNSA although a French administrator and a French liquidator have been appointed and are in charge of the day-to-day affairs and continuing business of NNSA in France.

11.     The French Court approved an order to (i) suspend the liquidation operation relating to the sale of the assets and/or business of NNSA for a renewal period of two months, currently extending until the earlier of May 31, 2010 or the filing by Kapsch CarrierCom AG with the French Court of a letter stating that its bid for the GSM/GSM-R assets of NNSA has become unconditional; (ii) authorize the continuation of the business of NNSA so long as the liquidation operations are suspended; and (iii) maintain the powers of the French administrator and liquidator during that period except with respect to the sale of assets and/or businesses of NNSA.

12.     On June 8, 2009, the Joint Administrators appointed in respect of NNUK filed a petition with the U.S. Court for the recognition of the Administration Proceedings as they relate to NNUK and the English Proceedings under Chapter 15 of the Code. On June 26, 2009, the U.S. Court entered an order recognizing the English Proceedings as foreign main proceedings under Chapter 15 of the Code.

- 4 -

13.    On July 14, 2009, Nortel Networks (CALA) Inc. (together with the Initial U.S. Debtors, the "U.S. Debtors") made a voluntary filing with the U.S. Court under Chapter 11 of the Code.

14.    On March 10, 2010, Nortel Networks Telecomunicacoes do Brasil Ltda filed for voluntary bankruptcy proceedings.   The Brazilian court issued an order and appointed a bankruptcy trustee on March 30, 2010.

15.    Further details regarding the background to these proceedings are set out in my affidavit sworn November 25, 2009 (the "November 25 Affidavit") and the affidavit of John Doolittle sworn January 14, 2009 and are therefore not repeated herein.

## METRO ETHERNET NETWORKS SALE

16.    On December 2, 2009, this Court entered an order approving the sale of substantially all of the Applicants' assets (the "Assets") related to the MEN Business (the "MEN Sale") to Ciena pursuant to an amended and restated sale agreement dated as of November 24, 2009 (as amended, the "Sale Agreement") between, *inter alia*, NNC, NNL, NNI and Ciena. The U.S. Court entered a corresponding order approving the sale in the U.S. proceedings on December 3, 2009. The sale of the Assets closed on March 19, 2010.

### *The Transition Services Agreement*

17.    In connection with the sale of the Assets, the Nortel Parties and certain of their affiliates (the "TSA Sellers") and the Purchaser (as defined in the Sale Agreement) entered into a transition services agreement dated March 19, 2010 (the "TSA"). The TSA contemplates that the TSA Sellers shall provide to Ciena certain transition services related to the MEN Business, on the terms and subject to the conditions set forth in the TSA. The TSA serves to facilitate the orderly completion of the sale of the Assets and the transition of the MEN Business from Nortel to Ciena.

18.    Pursuant to Section 5.28 of the Sellers Disclosure Schedule attached to the Sale Agreement (the "Sellers Disclosure Schedule"),[1] the TSA Sellers and the Purchaser agreed to select an impartial information technology consultancy firm independent of the TSA Sellers and

---

[1]    The Sellers Disclosure Schedule was filed under seal pursuant to the Sealing Order.

- 5 -

the Purchaser and with the appropriate expertise in implementing transition services arrangements ancillary to mergers and acquisitions transactions involving sophisticated enterprise resource planning systems similar in scope and complexity to the systems required by the TSA (the "Neutral TSA Arbitrator").

19.     As set forth in the Sellers Disclosure Schedule, the Neutral TSA Arbitrator will resolve any disputes that may arise between the TSA Sellers and the Purchaser under the Sale Agreement with respect to transition services and the negotiation of the TSA.

*Engagement of Grant Thornton*[2]

20.     The Parties jointly selected Grant Thornton as the Neutral TSA Arbitrator pursuant to the terms of the Engagement Agreement, subject in the case of NNL, to approval by this Court. Grant Thornton designated Eric C. Lioy, a partner in its Advisory Services branch, to serve as the arbitrator under the Engagement Agreement.

21.     Pursuant to the Engagement Agreement, Grant Thornton will assist the Parties in resolving any disputes that may arise relating to the performance of the parties under the Sale Agreement with respect to transition services and the negotiation of the TSA. The Parties may submit any such disputes to Grant Thornton for binding resolution. Grant Thornton's potential responsibilities include, but are not limited to:

   a.   familiarizing itself with the Critical Systems and Testing Protocols (each as defined in the Sellers Disclosure Schedule), and such other information as it deems relevant to making a determination as to whether First Day Ready has been achieved;

   b.   in the case of other disputes, meeting jointly with both the applicable TSA Sellers and Purchaser and reviewing all information provided by the Parties as well as other information Grant Thornton believes is relevant to its determination; and

   c.   making such other inquiries or requiring that a party provide any information, data or test results which exist and are in such a party's or its agent's possession as Grant Thornton deems necessary to make its determinations.

---

[2]     Capitalized terms used in this section and not otherwise defined shall have the meaning given to them in the Engagement Agreement.

- 6 -

22.     Pursuant to the Engagement Agreement, Grant Thornton will be providing services not just to NNL but also to NNI, NNUK, NN Ireland, the Joint Administrators and Ciena. Grant Thornton will not be representing the interests of any of the Parties in its role as Neutral TSA Arbitrator and, as set forth below, will be compensated equally by the Nortel Parties and Ciena.

23.     Pursuant to the Engagement Agreement and as contemplated in the Sellers Disclosure Schedule, Ciena and the Nortel Parties are each responsible for fifty percent (50%) of Grant Thornton's compensation and expense reimbursement, except in the event that a subsequent Arbitral Review (as defined in the Sellers Disclosure Schedule) is needed with respect to a First Day Ready dispute, in which case the non-prevailing party (either the Nortel Parties or Ciena) shall pay Grant Thornton's fees and expenses for such Arbitral Review. With respect to the Nortel Parties' share, the Nortel Parties have agreed to further divide the fees and expenses, with NNL, NNI, and together NNUK and NN Ireland each responsible for one-third of the Nortel Parties' share.[3]

24.     As set forth in the Engagement Agreement, if Grant Thornton's assignment has not concluded 90 days after the signing of the Engagement Agreement, Grant Thornton is entitled to submit an interim invoice for $100,000. Otherwise, Grant Thornton shall present one final invoice at the conclusion of its engagement as Neutral TSA Arbitrator.

*The Argentina Side Offer*[4]

25.     In furtherance of the MEN Sale and in consideration of certain local law requirements, Nortel Argentina negotiated the Argentina Side Offer with NNL, NNI, NNIC, the EMEA Sellers, the EMEA LTA Sellers, the Joint Administrators and the Joint Israeli Administrators to address the amount of Sale Proceeds to be allocated to Nortel Argentina in connection with the MEN Sale. This agreement is embodied in the Argentina Side Offer dated March 19, 2010, extended by Nortel Argentina to the above listed persons.

---

[3]     The Nortel Parties also reserve their right to seek contribution or further allocation of these fees and expenses amongst themselves and their affiliates as set forth in the Metro Ethernet Networks Side Agreement that was filed with the Court as Exhibit "A" to the Affidavit of George Ridel contained in the Applicants' Motion Record, dated March 2, 2010, or through other separate agreement as may be appropriate.

[4]     Capitalized terms used in this section and not otherwise defined have the meanings ascribed to them in the Argentina Side Offer.

47

- 7 -

26.    The Argentina Side Offer provides that, among other things, NNL, NNI, the EMEA Sellers and the EMEA LTA Sellers will pay the difference between the consideration that Nortel Argentina must receive in consideration for the Transferred Argentina Assets and Liabilities under the applicable laws and accounting principles applicable to Nortel Argentina (the "Required Purchase Price"), and the consideration allocated to Nortel Argentina in accordance with the terms of the IFSA (the "Allocated Purchase Price").    To the extent the Required Purchase is greater than the Allocated Purchase Price, NNL, NNI, the EMEA Sellers and the EMEA LTA Sellers will pay the difference between the two amounts, less transaction costs (the "Adjustment Amount").

27.    The Applicants believe that the Allocated Purchase Price represents an accurate value of the Transferred Argentina Assets and Liabilities. However, the laws of Argentina require a more elaborate valuation process that may ultimately require a greater portion of the total Sale Proceeds to be allocated to Nortel Argentina.

28.    The parties to the Argentina Side Offer have agreed that, to the extent that a greater portion of the total proceeds of the sale must be allocated to Nortel Argentina under applicable laws and accounting principles applicable to Nortel Argentina, the excess above Allocated Purchase Price should be borne equally by NNL, NNI, the EMEA Sellers and the EMEA LTA Sellers.    The Argentina Side Offer documents and provides a mechanism to effectuate this agreement.

29.    The main terms of the Argentina Side Offer are as follows:

(a)    *Payment of the Adjustment Amount*:  Each selling party shall pay its pro rata share of the Adjustment Amount based on the proportion of the Sale Proceeds allocated to such party (in the case of NNL and NNI, this pro rata share will be determined by taking into account Sale Proceeds allocated to the Applicants and the U.S. Debtors, respectively).

(b)    *Determination of the Required Purchase Price*:  To the extent required by Applicable Procedures, the Required Purchase Price will be determined by a transfer pricing study performed by the Buenos Aires office of an independent internationally recognized accounting firm retained at the expense of Nortel

48

- 8 -

Argentina and with the approval of NNL, NNI, NNUK, the Monitor, the Committee and the Bondholder Group (the "Relevant Parties"). If one of Relevant Parties objects to the valuation performed within thirty (30) days of the receipt of the transfer pricing report, Nortel Argentina will retain one (1) additional internationally recognized accounting firm at the expense of the Relevant Selling Parties and the Required Purchase Price will be the average of the valuations of the two accounting firms.

(c)     *Corresponding Deduction in Sale Proceeds*:  Any payment made by any Relevant Selling Party of its portion of the Adjustment Amount will be considered to be a corresponding deduction in the amount of Sale Proceeds allocated to such Relevant Selling Party for the sale of the MEN Business.

(d)     *Distribution of Dividends*:  In the event that subsequent to the payment of the Adjustment Amount, Nortel Argentina makes one or more dividend payments, distributions or other payments to NNL or NNIC in their respective capacity as shareholders of Nortel Argentina ("Distributed Amounts"), NNL and NNIC agree to pay to each Relevant Selling Party (other than NNL) such Party's Agreed Respective Percentage of the after-tax amounts of the Distributed Amounts. The payments made to each Relevant Selling Party (other than NNL) of the Distributed Amounts shall not in the aggregate exceed the portion of the Adjustment Amount by each such Relevant Selling Party to Nortel Argentina.

**CONCLUSION**

30.     The engagement of Grant Thornton *nunc pro tunc* to February 26, 2010 as Neutral TSA Arbitrator as set out in the Engagement Agreement has been negotiated in good faith and at arms' length and I believe represents a positive step forward towards maximizing value for all interested parties.

31.     The Neutral TSA Arbitrator's services are instrumental to resolving any disputes that could arise between the TSA Sellers and the Purchaser with regard to whether certain deadlines

related to the sale of the Assets have been met.  The engagement of Grant Thornton as the Neutral TSA Arbitrator is necessary to further the consummation of the sale of the Assets.

32.    The Argentina Side Offer was required in order to facilitate the sale of those assets as part of the overall MEN Sale.  I believe that it was necessary to maximize value for the MEN Business generally and is fair and reasonable in the circumstances.

SWORN BEFORE ME at the City of Boston, in the State of Massachusetts on this ⟋8⟍ day of April, 2010.



_____
Commissioner for Taking Affidavits or Notary Public

George Riedel

MARK LOZIER
Notary Public
Commonwealth of Massachusetts
My Commission Expires
March 7, 2014

# TAB A



 **GrantThornton**

This is Exhibit ........*A*........... referred to in the
affidavit of ... *George Rieder* ...
sworn before me, this ........*3*................
day of ..... *April* ................................... 20*16*

.................................................
A COMMISSIONER FOR TAKING AFFIDAVITS

March 3, 2010

Audit • Tax • Advisory

**Grant Thornton LLP**
201 S. College St., Suite 2500
Charlotte, NC 28244

T 704.632.3500
F 704.334.7701
www.GrantThornton.com

Mr. James P. Donley
Vice President Transitional Services
Ciena Corporation
1201 Winterson Road
Linthicum, MD  21090

Mr. Randy Solski
Information & Technology M&A
Nortel Networks Limited
195 The West Mall
Toronto, Ontario  M9C 5K1

Mr. John Doolittle
Director and President
Nortel Networks Inc.
195 The West Mall
Toronto, Ontario M9C 5K1

The Joint Administrators
Nortel Networks UK Limited (in administration)
C/O
1 More London Place
London, SE1 2AF
United Kingdom

The Joint Administrators
Nortel Networks (Ireland) Limited (in administration)
C/O Ernst & Young LLP
1 More London Place
London, SE1 2AF
United Kingdom

*Re: Appointment of Neutral Arbitrator pursuant to the Asset Sale Agreement By and  Among Nortel
Networks Inc., Nortel Networks Limited, and Affiliates and Ciena Corporation and Affiliates*

Dear Mr. Donley & Mr. Solski:

This letter and Attachment A (collectively, the "Agreement"), documents the understanding
between and among Nortel Networks Inc. ("NNI"), Nortel Networks Limited ("NNL"), and
Nortel Networks U.K. Limited (in administration) ("NNUK" ) and Nortel Networks (Ireland)
Limited (in administration) ("NN Ireland") (for which both NNUK and NN Ireland are acting
by their Joint Administrators (defined below), who act as agents of NNUK and NN Ireland
only and without personal liability whatsoever (NNI, NNL, NNUK and NN Ireland together,



"Nortel"), the Joint Administrators and Ciena Corporation and Affiliates "Ciena"; (collectively
the "Parties", or "you"), and Grant Thornton LLP ("Grant Thornton LLP", "we" or "us") for
certain arbitration services and related accounting consultation services, reports and other
deliverables defined below (the "Services"). The Services relate to the appointment nunc pro
tunc to February 26, 2010, of Mr. Erik C. Lioy of Grant Thornton LLP as an arbitrator with
respect to such future disputes arising from that certain Asset Sale Agreement referenced below
as you may submit to us pursuant to such agreement.

All defined terms shall have the meanings ascribed to them in this letter and in Attachment A.

### Bankruptcy Court Approval

On January 14, 2009 (the "Petition Date"), NNI and certain of its affiliates (collectively, the
"Debtors") filed in the United States Bankruptcy Court for the District of Delaware (the
"Bankruptcy Court") voluntary petitions for relief under chapter 11 of title 11 of the United
States Code (the "Bankruptcy Code"). On the Petition Date NNL and certain of its affiliates
filed with the Ontario Superior Court of Justice (the "Canadian Court") an application for
protection under the Companies' Creditors Arrangement Act (the "Canadian Insolvency
Proceedings") and were granted certain initial credit protection pursuant to an order issued by
the Canadian Court on the same date, which order also appointed Ernst & Young Inc. as
monitor in connection with the Canadian Insolvency Proceedings. Also on the Petition Date,
NNUK, NN Ireland and certain of Nortel's European affiliates filed applications with the
English High Court pursuant to the Insolvency Act 1986 and the European Union's Council
Regulation number 1346/2000 of 29 May 2000 on Insolvency Proceedings, and the English
High Court appointed (in the case of NNUK) Alan Robert Bloom, Stephen John Harris, Alan
Michael Hudson and Christopher John Wilkinson Hill of Ernst & Young LLP of 1 More
London Place, London SE1 2AF and (in the case of NN Ireland) David Hughes of Ernst &
Young Chartered Accountants of Harcourt Centre, Harcourt Street, Dublin 2, Ireland and Alan
Robert Bloom, to serve as joint administrators of NNUK and NN Ireland (as appropriate),
who act as agents of the NNUK and NN Ireland only and without any personal liability
whatsoever (the "Joint Administrators"). This Agreement, and Grant Thornton LLP's
obligations and responsibilities relating to this Agreement are expressly subject to and
conditioned upon approval by the Bankruptcy Court and the Canadian Court of the Agreement
in its entirety. In the event that the Bankruptcy Court and the Canadian Court approve the
Agreement but delete or hold unenforceable certain provisions thereof, Grant Thornton LLP
in its sole discretion may accept the Agreement as modified, or may terminate the Agreement
as set forth above, all without prejudice to its other rights and remedies. In the event that Grant
Thornton LLP elects to terminate this engagement, then, promptly upon Grant Thornton
LLP's request, the parties hereby agree to withdraw or amend any motion filed with such courts
seeking approval of the terms of the Agreement.

 **Grant**Thornton



### Scope of Services

We understand that pursuant to the Asset Sale Agreement by and among Nortel Networks Inc., Nortel Networks Limited, Nortel Networks Corporation and Affiliates and Ciena Corporation and Affiliates (the "ASA"), the Parties have agreed to name Mr. Lioy of Grant Thornton LLP, an accounting and business advisory firm, including information technology services, to serve as the neutral arbitrator described in the ASA, and specifically Section 5.28 of the Sellers' Disclosure Schedule to the ASA entitled "Covenants in respect of Transition Services," for the purpose of resolving certain disputes between the Parties, including, without limitation, with respect to issues involving whether the "TSA Sellers" are "First Day Ready" as further defined and described in, and subject to, the terms of the ASA.

As required by the ASA, Mr. Lioy and Grant Thornton LLP are both impartial and independent of the "Purchaser" and the TSA Sellers. In accepting the appointment as neutral arbitrator, Grant Thornton LLP believe that it has the necessary experience in implementing transition services arrangements ancillary to M&A transactions, and that involve sophisticated enterprise resource planning systems that are similar in scope and complexity to the systems at issue. Mr. Lioy and Grant Thornton LLP will maintain neutrality in the context of any dispute. Depending on the nature of any dispute submitted to Mr. Lioy, he may consult with other Grant Thornton LLP partners, principals or employees with applicable subject matter expertise.

As further defined and described in, and subject to, the terms of the ASA, Mr. Lioy, as neutral arbitrator, will, among other things:

    a) Familiarize himself with the "Critical Systems," the "Testing Protocols," and such other information as he deems relevant to making a determination as to whether "First Day Ready" has been achieved;

    b) In case of a dispute concerning "First Day Ready":

        (i) Meet together with representatives of the TSA Sellers and Purchaser to review the "Deficiency List" and any operating data or other information which either Party wishes to present for consideration or which Mr. Lioy deems pertinent to his determination of whether the TSA Sellers are First Day Ready;

        (ii) Discuss with the Parties the "Testing Protocols" as may be requested to enable understanding of the pertinent features thereof;

        (iii) If he deems it necessary, supervise a "Test," during which he and the Purchaser may be "on-site" if so requested by either;

        (iv) Review the results together with the Parties, make a written determination concerning First Day Ready, and prepare a written report, including an explanation, with respect to his findings;



c) In the case of other disputes, meet jointly with both the applicable TSA Sellers and Purchaser and review all information provided by the Parties as well as other information he believes is relevant to his determination.

d) Make such other inquires or require that either Party provide any information, data or test results which exist and are in a Party's or its agents' possession as he deems necessary to make his determinations.

The Parties understand that the decision of the arbitrator regarding the matters submitted to him by the Parties shall be final and binding on the Parties as per the terms of this Agreement upon delivery of his written opinion. His report, including summaries, schedules and working papers of any kind generated in connection with the Services, shall not be used or disseminated for any other purpose without our prior written consent except as may be required by law or legal process or in connection with litigation arising hereunder.

The Parties understand and acknowledge that Grant Thornton LLP is not a party to the ASA, and nothing contained herein will change that. You understand and agree that Mr. Lioy's interpretation and application of terms of the ASA will be based on his judgment and on his expertise as an accountant and business advisor. In reaching his decision, Mr. Lioy will review all information the Parties wish to present to him for consideration, and any other information he deems relevant.   He will not consider or evaluate any legal precedent, case law, statutes or other administrative regulations in reaching his decision. He will report his findings, including an explanation, in a written report.  If he determines, in his professional judgment, that there are insufficient facts available to reach a conclusion he will so advise you and provide a reasonable opportunity for the Parties to provide such information. Regardless of whether such information is forthcoming, the Parties agree that after the opportunity to submit such information has passed, Mr. Lioy will make his decision on the basis of the information that is available to him in accordance with Clause 5.28(m)(ii) of the Disclosure Schedule to the ASA.

Our Services will be undertaken in accordance with the Statement on Standards for Consulting Services promulgated by the American Institute of Certified Public Accountants. Accordingly, the Services do not constitute a rendering by Grant Thornton LLP or its partners or staff of any legal advice, nor do they include the compilation, review or audit of financial statements. Because our Services are limited in nature and scope, they cannot be relied upon to discover all documents and other information or provide all analyses that may be of importance in this matter. Neither Party involved in the Agreement, nor any parent, subsidiary or party related to them, will hold us responsible for any loss or liability which may result from the non-discovery of any matters which might have an influence on this matter.

As set forth in the declaration of Erik C. Lioy in support of NNI's motion seeking Bankruptcy Court Approval of the terms of the Agreement, we have undertaken a relationship check on the names the Debtors supplied to us. We have not undertaken any process to identify any other relationships we might have with the Parties. No relationship has come to our attention which, in our view, constitutes a conflict of interest or which would inhibit our ability to objectively provide assistance in this matter.

 **Grant**Thornton

The Parties acknowledge and agree that (1) they are aware that Grant Thornton LLP may have provided, is currently providing, and/or may in the future provide professional services to the Parties or their counsels in matters wholly unrelated to the scope of this Agreement, (2) they are aware that any counsel engaged by either of the Parties in connection with this matter, or in the ordinary course of their business, may have in the past, or currently, or may in the future, represent or oppose Grant Thornton LLP and/or its affiliates and/or its personnel in matters unrelated to this engagement, or may have engaged Grant Thornton LLP to provide services. As previously disclosed to the Parties, professionals from Grant Thornton LLP's Mid-Atlantic Practice have previously and are currently providing advisory services to Ciena Corporation in matters wholly unrelated to the scope of this Agreement.

Partners, principals and employees of Grant Thornton LLP who have provided services to either of the Parties since January 1, 2005, (the "Designated Professionals") will not be assigned to assist Mr. Lioy in any dispute submitted pursuant to this agreement. Further, Mr. Lioy will not communicate the status of any dispute he is arbitrating to the Designated Professionals.

The Parties agree that the relationships discussed above and any relationships disclosed in the Declaration do not adversely affect our impartiality and that the procedures for separating the Designated Professionals from the team(s) supporting Mr. Lioy are adequate. If a dispute submitted to us involves a new party, we will conduct an additional relationship search when such dispute is submitted, evaluate the results and communicate to you our findings. We reserve the right to resign from this engagement once ninety (90) days have elapsed from the date of this Agreement (and at any time thereafter) if, in our sole determination, any conflicts or other situations arise or become known to us from existing matters that, in our judgment, would impair our objectivity or our ability to continue to perform or provide the Services.

Grant Thornton LLP shall be obligated only for the Services described in this Agreement and only for changes in such scope that are set forth in writing and duly executed by the Parties hereto. Further, Grant Thornton LLP's obligation shall not extend to any subsequent periods for which we are not engaged. We are under no obligation to update our work, respond to questions or requests for clarification, or to other queries regarding our report or findings.

In addition to any confidentiality arrangement that may be agreed as part of the arbitration or as may be required by the ASA, Grant Thornton LLP agrees that all communications between Grant Thornton LLP's personnel on this engagement and the Parties, as well as any materials or information developed or received by us pursuant to this Agreement (collectively, the "confidential information") will be treated by Grant Thornton LLP as confidential as to any party (a "third party") other than the Parties and will not be used by Grant Thornton LLP except in the performance of its duties hereunder. At any time, upon request of any Party, we shall return to that Party information provided to us by such Party, on any media, provided that Grant Thornton LLP may retain copies of confidential information that, in its judgment, it is required to retain in accordance with applicable professional standards, laws and regulations. Accordingly, we agree, except as required by applicable law, regulation, or court or governmental order or process, not to disclose confidential information. If access to any of the materials in our possession relating to this Agreement is sought by a third party, we will promptly notify you of such action, tender to you our defense in connection with the response

 **Grant** Thornton

to such a request and cooperate with you concerning the response thereto. Upon signing, this Agreement supersedes the Nondisclosure Agreement between the Parties and Grant Thornton LLP dated January 11, 2010.

### Exculpation

Based on the nature of the arbitration and other professional services outlined in the Agreement, and concerns Grant Thornton LLP has in having final and binding decision-making authority, the Parties agree to exculpate Grant Thornton LLP from actions or omissions taken or to be taken pursuant to this engagement, other than with respect to actions arising from their gross negligence, willful misconduct, or fraud, which exculpation shall be specifically approved by any court order approving the terms of this Agreement. Such exculpation of Grant Thornton LLP is in addition to the other protections afforded Grant Thornton LLP in this Agreement and Attachment A.

### Fees

The hourly rates charged by Grant Thornton LLP for the Services provided by its personnel differ based upon, among other things, each professional's level of experience, and types of Services being provided. In the ordinary course of business, Grant Thornton LLP periodically revises its hourly rates to reflect promotions and other changes in personnel responsibilities, increases in experience, and increases in the cost of doing business. The next rate change is expected to occur on or about March 2011. Changes in regular hourly rates will be noted on the invoices for the first time period in which the revised rates become effective.

In exchange for the Services summarized previously and in consideration of Grant Thornton LLP's undertaking to remain on stand-by for this critical period and to dedicate full time and attention to resolution of the arbitration issues, Grant Thornton LLP will be entitled to (a) a fee of $100,000.00 and (b) compensation at its standard hourly rates for professional services rendered from and after February 26, 2010. The professional fees shall be calculated by multiplying the actual hours expended providing the agreed-upon Services by the standard hourly billing rates for the specific personnel involved. At present, Grant Thornton LLP's applicable hourly rates by classification are as follows:

| | |
|---|---|
| Partners (including Erik C. Lioy) | $525 |
| Managers/Senior Managers | $350-475 |
| Associates/Senior Associates | $175-325 |
| Paraprofessionals | $100 |

If the assignment has not concluded 90 days after signing of the Agreement, Grant Thornton LLP shall be entitled to submit an invoice for $100,000.00, with payment of that bill to be made promptly and in any event within five (5) business days by the Parties in accordance with their allocated responsibility for such fee. In addition to professional fees, Grant Thornton LLP will be entitled to reimbursement of reasonable expenses incurred in connection with this engagement, including but not limited to travel, report production, delivery services, photocopying and other costs incurred in providing the Services.



The $100,000 fee shall be allocated equally between Nortel and Ciena. Nortel's $50,000 share of that fee will be further allocated in equal one third shares between NNL, NNI and, together, NNUK and NN (Ireland). The allocation of Grant Thornton LLP's compensation at its standard hourly rates for professional services rendered and reimbursement of reasonable expenses, as set forth above, as between the Sellers on the one hand and the Purchaser on the other shall be in accordance with section 5.28(l)(vii) of the Disclosure Schedule to the ASA. To the extent such costs and fees are allocated among the Parties, each Party is responsible to pay its corresponding share of the fees, without any joint liability for the fees due from the other Party. In the event Nortel is liable for the fees, NNL, NNI and, together, NNUK and NN (Ireland) will each be responsible for one third of Nortel's share. Except as set forth above, Grant Thornton LLP shall present one final bill at the conclusion of the project with payment of that bill to be made promptly and in any event within five (5) business days.

NNL, NNI, and NNUK and NN (Ireland) also reserve their right to seek contribution or further allocation of these fees and expenses amongst themselves and their affiliates as set forth in the Metro Ethernet Networks Side Agreement (the "Side Agreement") that was filed with the Bankruptcy Court on February 26, 2010 as Exhibit B to the Debtors' Motion Pursuant to 11 U.S.C. 105(a) and 363(b) for an Order Approving the Metro Ethernet Networks Side Agreement and Granting Related Relief, and with the Canadian court on March 2, 2010 as Tab A to the Metro Ethernet Networks Motion Records or through other separate agreements as may be applicable. Further allocation or contribution of Nortel's share of such fees and expenses amongst NNL, NNI, NNUK and NN Ireland and their affiliates as set forth in the Side Agreement will in no way impact the Parties' responsibility to timely satisfy Grant Thornton's final bill at the conclusion of the project pursuant to the terms set forth in the proceeding paragraph.

Payment of our fees is not contingent on the outcome of this matter. Because of the nature of this type of engagement, we may invest a considerable amount of time before generating a report or other deliverable. We may stop work should you jointly request or settle. In the event we stop work, you agree to pay our fees and expenses for all Services performed through the date work is stopped, whether or not we have produced any deliverables.

**Limitation of Liability and Indemnification**
With respect to the Services, the liability of Grant Thornton LLP and its present and former partners, principals and employees and including, specifically, Erik C. Lioy for any claim by anyone, save and except for awards based on gross negligence, willful misconduct and fraud, shall not exceed the fees it receives hereunder for the portion of the work giving rise to such liability, nor shall Grant Thornton LLP and its present and former partners, principals and employees, including, specifically, Erik C. Lioy, be liable for any special, consequential, incidental or exemplary damages or loss (or any lost profits, taxes, interest, tax penalties, savings or business opportunity). In addition, we will have no liability to the Parties, or any third party by reason of any action taken or omitted by us in good faith relating to our Services.

The Parties shall (severally and not jointly) indemnify, hold harmless, and defend Grant Thornton LLP and its affiliates and its present and former partners, principals and employees and including, specifically, Erik C. Lioy (collectively, the "Indemnitees") from and against all



claims, liabilities, losses, demands, fees, expenses, damages and costs (including defense costs) associated with any third-party claim arising from or relating to (i) misrepresentations by the Parties or (ii) false or incomplete information provided to Grant Thornton LLP in the performance of its Services, provided that the parties to this Agreement shall agree that the Parties' aggregate liability under the Indemnities shall be capped at $60,000,000. The Parties shall pay damages and expenses as incurred, including reasonable legal fees and disbursements of counsel and the costs of Grant Thornton LLP's professional time (Grant Thornton LLP's professional time will be reimbursed at Grant Thornton LLP's rates in effect when such future time is required), relating to or arising out of the engagement, including any legal proceeding in which an Indemnitee may be required or agree to participate but in which it is not a party. The Indemnitees may, but are not required to, engage separate counsel of their choice in connection with any of the matters to which this indemnification agreement relates. The terms of this paragraph and the preceding paragraph shall apply regardless of the nature of any claim asserted (including but not limited to contract, statute, tort, strict liability or any form of negligence, whether of Parties, Grant Thornton LLP, or others, except for Grant Thornton LLP's gross negligence, willful misconduct, or fraud) and whether or not Grant Thornton LLP was advised of the possibility of the damage or loss asserted, but such terms shall not apply to the extent finally determined to be contrary to any applicable law. Such terms shall also continue to apply after any termination of this Agreement and during any dispute between the Parties.

For the avoidance of doubt, (but without prejudice to the other terms of this Agreement) the Parties hereby agree that the terms of this section do not, in and of themselves, provide that Grant Thornton LLP is under any obligation to indemnify, nor become liable or responsible for, any actions, proceedings, claims, demands, costs, expenses, damages, compensation, fines, penalties or other liabilities against the Joint Administrators or the directors of Nortel.

Notwithstanding that this Agreement shall have been signed by the Joint Administrators in their capacities as joint administrators of NNUK and NN Ireland for and on behalf of NNUK and NN Ireland respectively (as appropriate) and also in their personal capacities, the parties to this Agreement expressly agree and declare that no personal liability under or in connection with this Agreement shall fall on the Joint Administrators or their respective firm, partners, employees, agents, advisers or representatives whether such personal liability would arise under paragraph 99(4) of schedule B1 to the Insolvency Act 1986 or otherwise.

The Joint Administrators are party to this Agreement in their personal capacities only for the purpose of receiving the benefit of this section (Limitation of Liability and Indemnification) and the exclusions, limitations, undertakings, covenants and indemnities in their favour contained in this section. Each party to this Agreement acknowledges and agrees that in the negotiation and the completion of this Agreement the Joint Administrators are acting only as agents for and on behalf of NNUK, and NN Ireland (as appropriate), and without any personal liability whatsoever.

Each party to this Agreement further acknowledges that it has entered into this Agreement without reliance on any warranties or representations made by the Joint Administrators or their firms, partners, employees, agents, advisors or representatives and (save in respect of fraud, fraudulent misrepresentation or fraudulent misstatement) it shall not have any remedy in

 **Grant**Thornton



respect of any misrepresentation or untrue statement by such persons made by or on behalf of any other party to this Agreement.

The parties to this Agreement expressly agree and declare that no personal liability under or in connection with this Agreement shall fall on any Nortel directors at the date hereof and from time to time howsoever such personal liability should arise.

**Timetable and Protocol**
Once notified of a dispute and after reading and considering the initial information to be provided by the Parties and correspondence between the Parties regarding the areas of dispute, Grant Thornton LLP will propose a timetable and protocol for the submission of information. Grant Thornton LLP will use commercially reasonable effort to complete its services and render its report within the seven (7) day period set forth in the ASA; however, Grant Thornton LLP cannot provide absolute assurance that it will be able to meet that deadline.

All information in connection with any dispute submitted for arbitration shall be forwarded to the arbitrator by overnight courier or e-mail at the following address:

Mr. Erik C. Lioy
Grant Thornton LLP
201 South College Street, Suite 2500
Charlotte, NC 28244
Erik.Lioy@gt.com

Information sent from Mr. James P. Donley will be forwarded by overnight courier or e-mailed to:

Mr. Randy Solski
Information & Technology M&A
Nortel Networks Limited
195 The West Mall
Toronto, Ontario M9C 5K1
solski@nortel.com

and

Mr. Alan Bloom, Mr. Stephen Harris
Ernst & Young LLP
1 More London Place
London, SE1 2AF
United Kingdom
abloom@uk.ey.com, sharris@uk.ey.com



With a copy to:

Mr. Peter Newell
Ogilvy Renault LLP
Suite 3800
Royal Bank Plaza, South Tower
200 Bay Street, P. O. Box 84
Toronto, Ontario  M5J 2Z4
pnewell@ogilvyrenault.com

and

Mr. Daniel S. Sternberg
Cleary Gottlieb Steen & Hamilton LLP
One Liberty Plaza
New York, NY 10006
dsternberg@cgsh.com

and

Nortel Networks Inc.
Legal Department
220 Athens Way, Suite 300
Nashville, Tennessee  37228
Attention:  Lynn C. Egan
            Assistant Secretary
Facsimile:  +1-615-432-4067

and

Nortel Networks Inc.
Legal Department
220 Athens Way, Suite 300
Nashville, Tennessee  37228
Attention:  Robert Fishman
            Senior Counsel
Facsimile:  +1-347-427-3815 & +1-615-432-4067

**Grant**Thornton

and

Mr. Gavin Davies, Mr. Alan Montgomery, Mr. Nick Elverston
Herbert Smith LLP
Exchange House
Primrose Street
London, EC2A 2HS
United Kingdom
gavin.davies@herbertsmith.com, alan.montgomery@herbertsmith.com,
nick.elverston@herbertsmith.com

Information sent from Mr. Randy Solski will be forwarded by overnight courier or e-mailed to:

Mr. James P. Donley
Vice President Transitional Services
Ciena Corporation
1201 Winterson Road
Linthicum, MD 21090
jdonley@ciena.com

and

Alan Bloom, Stephen Harris
Ernst & Young LLP
1 More London Place
London, SE1 2AF
United Kingdom
abloom@uk.ey.com, sharris@uk.ey.com

With a copy to:

Mr. Kevin Boyle
Latham & Watkins LLP
555 Eleventh Street, N.W.
Suite 1000
Washington, D.C.  20004-1304
U.S.A.
kevin.boyle@lw.com

**Grant**Thornton

and

Gavin Davies, Alan Montgomery, Nick Elverston
Herbert Smith LLP
Exchange House
Primrose Street
London, EC2A 2HS
United Kingdom
gavin.davies@herbertsmith.com, alan.montgomery@herbertsmith.com,
nick.elverston@herbertsmith.com

Information sent from the Joint Administrators on behalf of NNUK or NN Ireland will be
forwarded by overnight courier or e-mailed to Mr. Randy Solski and Mr. James P. Donley and
copied to each of the above persons (except the Ernst & Young LLP and Herbert Smith LLP
addressees), all at the above addresses.

We understand that each of you wishes to be included in any e-mail or other communication
we might have with any of you in connection with any dispute that arises. We understand that
each Party has agreed to supply to the other Party a copy of all submissions made to Grant
Thornton LLP in connection with any proceeding undertaken in connection with our
engagement. If we receive an e-mail from either Party who neglects to copy the other Party, we
will forward it to that Party's designee.

**Other Matters**

All Services will be rendered under the supervision of by qualified and suitably experienced
staff in accordance with the terms and conditions set forth herein. Grant Thornton LLP makes
no other representation or warranty regarding the Services; in particular, and without limitation
of the foregoing, any express or implied warranties arising by custom or usage in the
profession, and warranties arising by operation of law are expressly disclaimed.

The Parties understand that Mr. Lioy or Grant Thornton LLP may decide to seek advice from
legal counsel, including, without limitation, Grant Thornton LLP internal counsel if he in his
sole discretion deems such advice to be necessary as he works on this engagement. The Parties
agree to pay the reasonable fees and out of pocket expenses of outside counsel for Grant
Thornton LLP and Mr. Lioy incurred in connection with the negotiation and documentation of
this Agreement, any amendments thereto, and the implementation and management of the
engagement through the bankruptcy process.

2010-03-03 23:01          LIOY    7049485438 >>                                                P 1/1



 **Grant Thornton**

Mr. James P. Dooley
Mr. Kinple Saddo
March 5, 2010
Page 3 Vol 15

All payments made by the Parties to Grant Thornton LLP shall be payable upon receipt of invoice via wire transfer to Grant Thornton LLP's bank account, as follows:

| Receiving Bank: | Harris, N.A. | |
|---|---|---|
| Receiving Account: | ABA | 071 000 288 |
| | SWIFT CODE | HATRUS44 |
| | BANK ADDRESS | 111 West Mongroe Street |
| | | Chicago IL, 60690 |
| | ACCT | 2750602 |
| | BENEFICIARY | Grant Thornton LLP |

The Parties agree that Mr. Lioy and Grant Thornton LLP are entitled to rely on any document signature, notice, request, representation, confirmation, or other advice believed by him to be genuine, and he may assume that any person purporting to act on behalf of the Parties has been authorized to do so.

This Agreement sets forth the entire understanding between and among the Parties and Grant Thornton LLP regarding the Services and supersedes all prior and contemporaneous agreements, arrangements and communications and may not be modified or amended except by the mutual written agreement of the Parties and Grant Thornton LLP. If any portion of this Agreement is held invalid, it is agreed that such invalidity shall not affect any of the remaining portions.

Please confirm your acceptance of this Agreement (including Attachment A, which is an integral part of the Agreement) by signing below and returning a signed copy, retaining a copy for yourself. If we do not receive the signed Agreement within 30 days from the date of this Agreement, this offer to perform services will be withdrawn and terminated. In any event, our engagement terminates two years from the date hereof, unless we are then actively serving as arbitrator for a dispute that has arisen, in which case our services under this Agreement will terminate upon issuance of our report in connection with that dispute. We appreciate the opportunity to serve you.

Very truly yours,

**GRANT THORNTON LLP**

Erik C. Lioy
Partner

Enclosure

63

 **GrantThornton**

Accepted and Agreed:
For and on behalf of Nortel Networks UK Limited (in administration)
as Joint Administrator (acting as agent and without personal liability)

Date: 03.03.10

(Insert Title) Alan Bloom, Joint Administrator

Accepted and Agreed:
For and on behalf of Nortel Networks (Ireland) Limited (in administration)
as Joint Administrator (acting as agent and without personal liability)

Date: 03.03.10

(Insert Title) Alan Bloom, Joint Administrator

Accepted and Agreed:
SIGNED by

Date: 03.03.10

(Insert Title) Alan Bloom, Joint Administrator

in his own capacity and on behalf of the Joint Administrators without personal liability and
solely for the benefit of the provisions of this Agreement expressed to be conferred on or given
to the Joint Administrators.

**Accepted and Agreed:**
Nortel Networks Inc.

Per: _____

Name: John Doolittle
Title:   President

Date:    03.03.10

**Accepted and Agreed:**
Nortel Networks Limited

Per: _____

Name: Paviter S. Binning
Title:   Executive Vice-President, Chief Financial
Officer and Chief Restructuring Officer

Date:    03.03.10

Per: _____

Name: John Doolittle
Title:   Senior Vice-President, Finance and
Corporate Services

Date:    03.03.10

*[Signatures continue on the following page]*

65

 **Grant**Thornton

**Accepted and Agreed:**
**Nortel Networks Inc.**

Date:

**Accepted and Agreed:**
**Nortel Networks Limited**

Date:

**Accepted and Agreed:**
**Ciena Corporation** James P. Daly

(Insert Title) *VP - Transitional / Services*

Date:  3/3/2010

*lolo*

● Grant Thornton

**Attachment A – Additional Terms**

The terms in this Attachment A apply to the Agreement dated March XX, 2010 for the
Services to be provided to Nortel Networks Inc., Nortel Networks Limited and Nortel
Networks UK Limited (in administration), ("NNUK") and Nortel Networks (Ireland) Limited
(in administration) ("NN Ireland") who are acting by their joint administrators (in the case of
NNUK, being Alan Robert Bloom, Stephen John Harris, Alan Michael Hudson and
Christopher John Wilkinson Hill of Ernst & Young LLP of 1 More London Place, London
SE1 2AF) and (in the case of NN Ireland, being David Hughes of Ernst & Young Chartered
Accountants of Harcourt Centre, Harcourt Street, Dublin 2, Ireland and Alan Robert Bloom),
who act as agents of the NNUK and NN Ireland only and without any personal liability
whatsoever (the "Joint Administrators"), the Joint Administrators and Ciena Corporation and
Affiliates "Ciena"; (collectively, the "Parties" or "you") and Grant Thornton LLP ("Grant
Thornton LLP", "we" or "us") for certain services, relating to the appointment of Grant
Thornton LLP as arbitrator pursuant to section 5.28 of the Sellers' Disclosure Schedule to the
ASA. Any capitalized terms herein that are undefined shall have the meaning assigned to them
elsewhere in the Agreement.

1. **Ability to Perform.** None of the parties to this Agreement shall be liable for any delay
   or failure in performance due to circumstances beyond its reasonable control. However,
   it is possible that because of an event of force majeure, we, acting reasonably, may
   determine that we cannot complete our Services. If, in our professional judgment, such
   circumstances exist, we may resign from this engagement prior to completion without
   incurring any liability to you. In addition, Grant Thornton LLP reserves the right to in
   whole or in part decline to perform Services if information comes to our attention
   indicating that performing any Services would cause us to be in violation of applicable
   law, regulations or standards or in a conflict of interest, or to suffer damages to our
   reputation.

2. **Standards of Performance.** The parties acknowledge that this engagement will involve
   analysis, judgment and other performance from time to time in a context where the
   participation of the parties or others is necessary, where answers often are not certain or
   verifiable in advance and where facts and available information change with time.
   Accordingly, evaluation of Grant Thornton LLP's Services shall be based solely on its
   substantial conformance with any standards or specifications expressly set forth in this
   Agreement and all applicable professional standards. Unless the parties agree otherwise,
   in writing, Grant Thornton LLP shall have no responsibility to update any of its work
   after its completion.

3. **Successors and Affiliates.**

   a) Except to the extent expressly provided hereto to the contrary, no third-party
      beneficiaries are intended under this Agreement.

   b) This Agreement is binding on each party hereto and on each of its successors,
      assigns, heirs, legatees and legal representatives.



**Grant Thornton**

    c) None of the Parties to this Agreement, including Grant Thornton LLP, shall assign any rights, obligations or claims relating to this Agreement, without the prior written consent of the others, which consent shall not be unreasonably withheld, provided that any Party, including Grant Thornton LLP, may, without such consent, assign this Agreement and its rights, obligations, and claims hereunder to an affiliate or in connection with the transfer or sale of all or substantially all of its business, or in the event of its reorganization, reclassification, merger, consolidation, change in control or comparable transaction.

4.   **Electronic Communications.** The parties may need to electronically transmit information to each other and to other entities engaged by any of the parties. However, e-mail is not a secure means of communication, and thus confidentiality could be compromised. Parties agree to the use of e-mail and other electronic methods to transmit and receive information, including confidential information, between the parties and between Grant Thornton LLP and outside specialists or other entities engaged by Grant Thornton LLP or the Parties. We shall not be liable for any loss, damage, expense, inconvenience, or harm resulting from the loss, delay, interception, corruption, or alteration of any electronic communication due to any reason beyond our reasonable control.

5.   **Outsourcing to Third-Parties.** Grant Thornton LLP is the U.S. member firm of Grant Thornton International ("GTI"), a global organization of member firms in over 100 countries. From time to time, the partners and staff of the member firms may assist in the professional services being rendered. Member firms are not members of one international partnership or otherwise legal partners with each other. There is no common ownership, control, governance, or agency relationship between member firms. Parties agree that information provided by the Parties may be disclosed to a member firm or a third-party service provider, including other accounting firms that may not be members of GTI, solely for purposes of performing our professional services, provided that Grant Thornton LLP obtains prior written consent from the Client whose information is disclosed to a member firm or a third-party service provider, and such member firm or third-party service provider, as applicable, agrees in writing, prior to receiving such information, to keep such information confidential and not to disclose any of such information to any other third party, except as required by applicable law, regulation, or court or governmental order or process, and provided further that prior to utilizing such member firm or third-party service provider, Grant Thornton LLP will conduct a conflicts and relationship check with respect to such entities in accordance with its standard procedures.

6.   **Hiring of Personnel.** When we lose a valued member of our engagement team, we incur significant expenses in hiring and training replacements. Accordingly, during the term of this engagement and for a period of one (1) year after the Services are completed, the Parties agree not to solicit, directly or indirectly, or hire any of our personnel who participate in this engagement without our express written consent. If this provision is violated, the Parties will pay Grant Thornton LLP a fee equal to the hired





person's annual salary in effect at the time of the violation to reimburse the costs of hiring and training replacement personnel.

7. **General.**

a) Each party is an independent contractor with respect to the other and shall not be construed as having a trustee, joint venture, agency or fiduciary relationship.

b) Except as set forth in section 7(c) below, any controversy or claim arising out of or relating to the terms and conditions of Nortel's employment a of Grant Thornton as arbitrator pursuant to the Agreement shall first be submitted to voluntary mediation. A mediator will be selected by agreement of the parties, or if the parties cannot agree a mediator acceptable to all parties will be appointed by the American Arbitration Association. The mediation will proceed in accordance with the customary practice of mediation. In the unlikely event that such differences cannot be resolved by mediation, the parties recognize that the matter will probably involve complex business issues that would be decided most equitably by a judge hearing the evidence without a jury. Accordingly, the parties agree to waive any right to a trial by jury in any action, proceeding or counterclaim arising out of or relating to the terms and conditions of Nortel's employment and compensation of Grant Thornton as arbitrator pursuant to the Agreement. For the avoidance of doubt, the Parties agree that the terms of this section do not apply to any controversy or claim arising out of or relating to the Services, including any decision of Grant Thornton as arbitrator regarding the matters submitted by the Parties.

c) The parties agree that the Bankruptcy Court has jurisdiction over any controversy or claim arising out of or relating to Nortel Network Inc.'s compensation of Grant Thornton LLP for the Services provided under the terms of the Agreement and further agree that any such controversies or claims shall be heard and determined by the Bankruptcy Court. If for any reason the Bankruptcy Court fails to exercise jurisdiction over any controversy or claim arising out of or relating to Nortel Network Inc.'s compensation of Grant Thornton LLP, the parties agree such controversies or claims are subject to the jurisdiction of the state and federal courts of the state of Delaware and further agree that any such controversies or claims shall be heard and determined in the state or federal courts in the state of Delaware.

d) Subject to the following paragraph, this Agreement, including its formation and the parties' respective rights and duties, and all disputes that might arise from or in connection with this Agreement or its subject matter shall be governed by and construed in accordance with the laws of New York, without giving effect to conflicts of laws or rules.

e) The parties to this Agreement agree that the personal liability provisions of the Joint Administrators under this Agreement are governed by English law and the

69

 Grant Thornton

English courts shall have exclusive jurisdiction to deal with any matter, question or dispute arising out of or in connection with any question of liability of the Joint Administrators in their personal capacity under this Agreement, and the parties agree to the exclusive jurisdiction of the English courts in relation to such matters and waive any objection to the English courts on the grounds that they are an inconvenient or inappropriate forum to settle any such matter, question or dispute.

**TAB B**

**EXECUTION VERSION**

Buenos Aires, March 19, 2010

Nortel Networks Limited
Nortel Networks International Corporation
Nortel Networks Inc.
EMEA Sellers
EMEA LTA Sellers
The Joint Administrators
The Joint Israeli Administrators

*This is Exhibit .......B............ referred to in the affidavit of ....George Riedel......*
*sworn before me, this ........8........*
*day of ........April............ 20.1.0*

*A COMMISSIONER FOR TAKING AFFIDAVITS*

Ladies and Gentlemen:

According to our conversations, we hereby make the following offer (the "**Offer**") in connection with the payment of the portion of the Sale Proceeds (as defined below) payable by Ciena (as defined below) to Nortel Networks de Argentina S.A. ("**Nortel Argentina**") pursuant to the ASA (as defined below), which Offer shall be considered accepted by Nortel Networks Limited ("**NNL**"), Nortel Networks International Corporation ("**NNIC**"), Nortel Networks Inc. ("**NNI**"), all the entities listed on Exhibit A attached hereto (the "**EMEA Sellers**") and all the entities listed on Exhibit B attached hereto (the "**EMEA LTA Sellers**", and together with NNI, NNL and the EMEA Sellers the "**MEN Selling Parties**") which (i) in the case of the entities listed on Part A of Exhibit A (the "**EMEA Debtors**") and the entities listed on Part A of Exhibit B (other than NNSA (as defined below)) (collectively, including NNSA, the "**LTA EMEA Debtors**") are acting by their joint administrators Alan Robert Bloom, Stephen John Harris, Alan Michael Hudson and Christopher John Wilkinson Hill of Ernst & Young LLP of 1 More London Place, London SE1 2AF (other than Nortel Networks (Ireland) Limited, for which David Hughes of Ernst & Young Chartered Accountants of Harcourt Centre, Harcourt Street, Dublin 2, Ireland and Alan Robert Bloom serve as joint administrators) (collectively, the "**Joint Administrators**"), who act as agents, for the EMEA Debtors and LTA EMEA Debtors without any personal liability whatsoever; (ii) in the case of the Israeli Company (as defined below) are acting by their joint administrators Yaron Har-Zvi and Avi D. Pelossof (the "**Joint Israeli Administrators**") who act as agents of the Israeli Company without any personal liability whatsoever; (iii) Nortel Networks S.A. (in Administration) ("**NNSA**") acting by the NNSA Office Holders (as defined below)), who act as agents for NNSA without any personal liability whatsoever, the Joint Administrators and the Joint Israeli Administrators. If the Joint Administrators and the Joint Israeli Administrators accept this Offer they shall become party to this Offer solely for the purposes of Sections 4 and 5, respectively, of this Offer. For the purposes of this Offer, Nortel Argentina, NNL, NNIC, NNI, each EMEA Seller and each EMEA LTA Seller may each be referred to as a "**Party**", and together as the "**Parties**", and "**Sale Proceeds**" means the sale proceeds payable by Ciena under the Sale Agreements (as defined below).

This Offer is being made based on the following facts:

1

7l

On January 14, 2009 (the "**Petition Date**"), NNL, NNIC and certain of their affiliates (collectively, the "**Canadian Debtors**") filed with the Ontario Superior Court of Justice (the "**Canadian Court**") an application for protection under the Companies' Creditors Arrangement Act (Canada) (the "**CCAA**" and the cases commenced by such application, together with any formal insolvency proceedings commenced in Canada in respect of any Canadian Debtor, the "**CCAA Cases**") and were granted certain initial creditor protection pursuant to an order issued by the Canadian Court on the same date, which has been extended by further order of the Canadian Court;

NNI and certain of its affiliates (collectively, the "**U.S. Debtors**") are debtors-in-possession under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**"), which commenced cases under the Bankruptcy Code on the Petition Date (except for Nortel Networks (CALA) Inc., which commenced its case under the Bankruptcy Code on July 14, 2009) by filing voluntary petitions for relief in the U.S. Bankruptcy Court for the District of Delaware (the "**U.S. Bankruptcy Court**");

The Canadian Court has appointed Ernst & Young Inc. as Monitor in connection with the CCAA Cases (the "**Monitor**");

The Office of the United States Trustee for the District of Delaware has appointed an Official Committee of Unsecured Creditors as representative for the unsecured creditors of the U.S. Debtors (the "**Committee**") and, in addition, an ad hoc group of bondholders holding claims against certain of the US Debtors and certain of the Canadian Debtors has also been organized (the "**Bondholder Group**");

On the Petition Date, the EMEA Debtors and the LTA EMEA Debtors, including Nortel Networks UK Limited (in administration) ("**NNUK**", and, together with NNI, NNL, the Monitor, the Bondholder Group and the Committee, the "**Relevant Parties**"), filed applications with the English Court pursuant to the Insolvency Act 1986 (the "**Insolvency Act**") and the European Union's Council Regulation (EC) No 1346/2000 on Insolvency Proceedings and the English Court appointed the Joint Administrators under the Insolvency Act;

The Israeli Court, on January 19, 2009, granted Nortel Networks Israel (Sales and Marketing) Limited (In Administration) (the "**Israeli Company**") with a stay of proceedings order and nominated the Joint Israeli Administrators as joint administrators of the Israeli Company. On November 24, 2009, as part of such stay of proceedings, the Israeli Court approved a creditors' arrangement in connection with the Israeli Company, and further approved at a later date, the continuation of all relevant rights, duties and obligations of the Joint Israeli Administrators pursuant to such stay of proceedings order;

While the administration proceedings in respect of NNSA under the Insolvency Act are continuing, subsequent to the Petition Date, NNSA commenced secondary insolvency proceedings within the meaning of Article 27 of the European Union's Council Regulation (EC) No 1346/2000 on Insolvency Proceedings in the Republic of France pursuant to which Cosme Rogeau was appointed liquidator and

2

Franck Michel was appointed administrator (together, the **"NNSA Office Holders"**) by the Versailles Commercial Court (Docket No. 2009P00492) for NNSA;

NNL, NNI and certain other debtor and non-debtor affiliates of NNL and NNI (collectively, the **"Sellers"**) have, as of November 24, 2009, entered into an Amended and Restated Asset Sale Agreement with Ciena Corporation (and together with their affiliates and designees, **"Ciena"**) relating to the part of the Business (as defined in the ASA) owned and operated by the Sellers (as amended from time to time, the **"ASA"**);

As part of the transactions contemplated by the ASA, Nortel Argentina has agreed, *inter alia*, to sell certain of its assets relating to the Metro Ethernet Networks business ("**MEN**") located in Argentina to Ciena and Ciena has agreed to purchase those assets and assume certain liabilities relating to the MEN assets located in Argentina (the "**Transferred Argentina Assets and Liabilities**") pursuant to the ASA and that certain Argentina Offer, dated as of the date hereof (the "**Argentina Offer**");

The EMEA Sellers, the Joint Administrators and the Joint Israeli Administrators have, as of October 7, 2009, entered into an Asset Sale Agreement with Ciena relating to the part of the Business owned and operated by the EMEA Sellers, amended such agreement on October 20, 2009, and amended such agreement on November 24, 2009, and further amended it on December 16, 2009 and on January 13, 2010 (as further amended from time to time in accordance with the terms thereto and this Offer, the "**EMEA Agreement**" and, together with the ASA, the "**Sale Agreements**");

Subject to certain exceptions, the ASA does not prescribe the portion of the Sale Proceeds payable by Ciena thereunder to be allocated to each of the Sellers (including Nortel Argentina);

The allocation of the Sale Proceeds payable by Ciena under the Sale Agreements and the Argentina Offer among each of the Sellers (including Nortel Argentina), the EMEA Sellers and the EMEA LTA Sellers will be determined pursuant to the terms of that certain Interim Funding and Settlement Agreement, dated as of June 9, 2009 ("**IFSA**");

Nortel Argentina is making this Offer based on the agreement between the Parties that the amount of sales proceeds allocated to Nortel Argentina is not less than the minimum price to be determined in accordance with the applicable laws and regulations and accounting principles applicable to Nortel Argentina (the "**Applicable Procedures**"); and

In conjunction with the transactions contemplated by the Sale Agreements and the Argentina Offer, the Parties and certain of their affiliates have entered into that certain Metro Ethernet Networks Side Agreement dated February 26, 2010 (the "**MEN Side Agreement**") and that certain Distribution Escrow Agreement dated March 19, 2010 (the "**Distribution Escrow**") pursuant to which, *inter alia*, certain costs, expenses, damages, purchase price adjustments and other liabilities (the "**Transaction Costs**") are

3

to be allocated based in part on the allocation of Sales Proceeds, and the Parties intend that the payment of the allocated portion of the Sales Proceeds to Nortel Argentina shall be net of its allocable share of such Transaction Costs (such share, the "**Argentina Transaction Costs**").

This Offer is subject to the following terms and conditions:

1.  Adjustment Amount.
    (a)   Conditioned upon the actual receipt by each Relevant Selling Party (as defined below) of Sale Proceeds (by way of payment out of the Distribution Escrow) for the sale of their respective MEN assets pursuant to the Sale Agreements or for release of their respective intellectual property rights, as the case may be, in the event that the Required Purchase Price exceeds the Allocated Purchase Price, each Relevant Selling Party shall pay to Nortel Argentina, as additional Sale Proceeds due to Nortel Argentina in respect of the sale of the Transferred Argentina Assets and Liabilities and the other transactions contemplated by the Sale Agreements and the Argentina Offer, such Relevant Selling Party's Agreed Respective Percentage (as defined below) of (A) the Required Purchase Price minus (B) the sum of the Allocated Purchase Price and the Argentina Transaction Costs (such aggregate amounts payable by the Relevant Selling Parties, the "**Adjustment Amount**"), provided that if the Adjustment Amount is negative, the parties hereby agree that the Adjustment Amount shall be deemed to be zero, where "**Allocated Purchase Price**" means the amount of Sale Proceeds allocated to Nortel Argentina for the Transferred Argentina Assets and Liabilities and the other transactions contemplated by the Sale Agreements and the Argentina Offer pursuant to the terms of the IFSA and in accordance with the terms of the ASA, and "**Required Purchase Price**" means the minimum amount of Sale Proceeds to be allocated to Nortel Argentina as consideration for the Transferred Argentina Assets and Liabilities in accordance with the Applicable Procedures. Within fifteen (15) calendar days of the determination of the Adjustment Amount in accordance with Sections 1(a) and 1(b) of this Offer, each Relevant Selling Party shall pay to Nortel Argentina such Relevant Selling Party's Agreed Respective Percentage of the Adjustment Amount (if any), by wire transfer of immediately available funds to an account designated by Nortel Argentina. The Parties hereby agree that (to the extent required by the Applicable Procedures and in full compliance with the terms as set forth in the Argentina Offer) the Required Purchase Price shall be determined, subject to Section 1(b) below, pursuant to a transfer pricing study conducted by the Buenos Aires office of an independent internationally recognized accounting firm retained by Nortel Argentina (the "**Initial Valuation Accounting Firm**"), at its own expense, (such amount, the "**Initial Valuation Amount**"), provided that Nortel Argentina hereby agrees that Nortel Argentina shall not retain the Initial Valuation Accounting Firm prior to five (5) calendar days following the earlier of (a) January 1, 2011 and (b) the final determination of the Allocated Purchase Price. The Initial Valuation Accounting Firm shall be retained by Nortel Argentina with the prior consent of the Relevant Parties, which consent shall not be unreasonably withheld and a response to a request for consent shall be given within seven (7) calendar days after the receipt of such written request by Nortel Argentina (the "**Initial Approval Period**"). The failure to object to the designation of the Initial Valuation Accounting Firm during the Initial Approval Period shall be deemed to constitute an approval of such

4



designation by the Relevant Parties. For the purposes of this Offer, "**Agreed Respective Percentage**" means, with respect to the Relevant Selling Parties, such Relevant Selling Party's Sale Proceeds Ratio multiplied by 100, where "**Sale Proceeds Ratio**" means, with respect to the Relevant Selling Parties, the ratio of the amount of Sale Proceeds paid that are allocated to the Canadian Debtors (in the case of NNL), the US Debtors (in the case of NNI), each EMEA Seller (in the case of each EMEA Seller), and to each EMEA LTA Seller (in the case of each EMEA LTA Seller), respectively, to the aggregate amount of Sale Proceeds paid to the MEN Selling Parties, and "**Relevant Selling Party**" means NNL, NNI, any EMEA Seller or any EMEA LTA Seller, provided that if an EMEA Seller or an EMEA LTA Seller is not allocated any Sale Proceeds in accordance with the terms of the IFSA, then such EMEA Seller or EMEA LTA Seller shall not be a Relevant Selling Party for the purposes of this Offer.

(b)    In the event that any of the Relevant Parties objects to the Initial Valuation Amount ("**Initial Valuation Objection**") within thirty (30) calendar days following receipt of notification of the Initial Valuation Amount from Nortel Argentina (which notification shall be accompanied by a copy of the Initial Valuation Accounting Firm's report), at the request of the objecting Relevant Party or Relevant Parties Nortel Argentina shall seek another transfer pricing study (in full compliance with the Applicable Procedures) to determine the Required Purchase Price (the "**Additional Valuation Amount**") from one (1) additional independent internationally recognized accounting firm (the "**Additional Valuation Accounting Firm**"). The objecting Relevant Party or Relevant Parties shall notify all the other Parties of the Initial Valuation Objection in accordance with Section 9 of this Offer. The Additional Valuation Accounting Firm shall be retained by Nortel Argentina with the prior consent of the objecting Relevant Party or Relevant Parties, which consent shall not be unreasonably withheld and a response to a request for consent shall be given within seven (7) calendar days after the receipt of such written request by Nortel Argentina (the "**Additional Approval Period**"). The failure to object to the designation of the Additional Valuation Accounting Firm within the Additional Approval Period shall be deemed to constitute an approval of such designation by the objecting Relevant Party or Relevant Parties. The Relevant Selling Parties shall bear all reasonable and documented costs and expenses of the Additional Valuation Accounting Firm incurred in its determination of the Additional Valuation Amount (the "**Additional Valuation Costs**") where each Relevant Selling Party shall be responsible for such Relevant Selling Party's Agreed Respective Percentage of the Additional Valuation Costs. Upon determination of the Additional Valuation Amount, the Required Purchase Price shall equal the sum of the Initial Valuation Amount and the Additional Valuation Amount, divided by 2.

(c)    The Parties hereby agree that any payment by any Relevant Selling Party of its portion of the Adjustment Amount shall be considered to be a corresponding deduction in the amount of Sale Proceeds ultimately distributed to such Relevant Selling Party for the sale of its respective MEN assets pursuant to the Sale Agreements or for its release of its licensed intellectual property rights, as the case may be.

2. Other Covenants. In the event that subsequent to the payment of the Adjustment Amount Nortel Argentina pays one or more dividend payments (even if such



dividend is declared prior to the determination of the Adjustment Amount), distributions or other payments to NNL and/or NNIC (collectively, the "**Shareholders**") in their respective capacity as a shareholder of Nortel Argentina ("**Distributed Amounts**"), each Shareholder hereby agrees to pay each Relevant Selling Party (other than NNL) that ultimately receives an allocation of the Sale Proceeds under the Sale Agreements such Party's Agreed Respective Percentage of the after-tax amounts of such Distributed Amounts after receipt of the Distributed Amounts, provided that such payments to NNI, each EMEA Seller and each EMEA LTA Seller shall not in the aggregate exceed the portion of the Adjustment Amount paid by each such Party to Nortel Argentina in accordance with Section 1(a). For greater certainty, the after-tax amount of such Distributed Amount shall be determined taking into account, *inter alia*, any withholding or deductions imposed by any relevant taxing authority in respect of the Distributed Amounts, any Canadian federal or provincial tax payable by the Shareholders or utilization of Canadian federal or provincial tax losses, credits or deductions by NNL as a result of receiving the Distributed Amounts, and any Canadian withholding tax payable by the Shareholders as a consequence of any payments made by the Shareholders to NNI, the EMEA Sellers and the EMEA LTA Sellers in accordance with this Section 2.

3. Effectiveness. No provision of this Offer shall be effective until each of the U.S. Bankruptcy Court and the Canadian Court approves the entirety of this Offer and all of the provisions hereof (the "**Court Approval Condition**"). All provisions of this Offer shall be effective as of the date of the satisfaction of the Court Approval Condition. Each Party hereto shall (i) use commercially reasonable efforts to satisfy the Court Approval Condition as soon as possible, taking into account the availability of the respective courts to address the matters set forth in this Offer and (ii) keep all other Parties reasonably apprised of the progress of the satisfaction of the Court Approval Condition.

4. Exclusion of Liability and Acknowledgement re Joint Administrators and Directors of EMEA Non-Debtor Sellers

(a)     The Parties agree that (i) the Joint Administrators have negotiated and if they accept this Offer shall become party to this Offer as agents for the EMEA Debtors and the LTA EMEA Debtors to which they are appointed and that none of the Joint Administrators, their firm, partners, employees, advisers, representatives or agents shall incur any personal liability whatsoever whether such liability would arise under Paragraph 99(4) of Schedule B1 of the Insolvency Act or otherwise howsoever, whether on their own part or in respect of any failure on the part of any other Party to observe, perform or comply with any of its obligations under this Offer or under or in relation to any associated arrangements or negotiations, and (ii) the directors of the entities listed on Part B of Exhibit A (collectively, the "**EMEA Non-Debtor Sellers**") and the entities listed on Part B of Exhibit B (collectively, the "**EMEA Non-Debtor LTA Sellers**") shall not incur any personal liability whatsoever, in their capacity as such directors, in respect of the authorization, execution, delivery or performance of this Offer, howsoever arising other than in respect of fraud by any such director.

(b)     If this Offer is accepted, the Joint Administrators would become party to this Offer: (i) as agents for, and on behalf of, the EMEA Debtors and the LTA

EMEA Debtors (other than NNSA); and (ii) in their own capacities solely for (1) taking the benefit of the statutory charges under Paragraph 99(3) of Schedule B1 of the Insolvency Act, (2) obtaining the benefit of any provisions of this Offer expressed to be conferred on them and (3) enforcing the obligations of the other Parties to this Offer.

(c)     Notwithstanding anything to the contrary in Section 6 of this Offer, any claim, action or proceeding against the Joint Administrators arising from or related to (i) the personal liability of the Joint Administrators, their firm, partners, employees, advisors, representatives or agents, (ii) their qualification to act as insolvency practitioners in accordance with Part XIII of the Insolvency Act or (iii) their appointment as joint administrators of the EMEA Debtors and the LTA EMEA Debtors (other than NNSA) and their remaining as current joint administrators thereof under this Offer shall be governed exclusively by English law and subject to the exclusive jurisdiction of the English Courts.

(d)     The Parties agree that any breach of this Offer by the Joint Administrators shall be deemed to be a breach by them in their capacities as administrators of the EMEA Debtors and the LTA EMEA Debtors (other than NNSA), and, in such a case, each Party hereto shall have the right to make claims and assert its rights hereunder, against the EMEA Debtors, the LTA EMEA Debtors (other than NNSA) and their respective successors and assigns.

5. Exclusion of Liability and Acknowledgments re Joint Israeli Administrators.

(a)     The Parties agree that the Joint Israeli Administrators have negotiated and if they accept this Offer, shall become party to this Offer as agents for the Israeli Company and that none of the Joint Israeli Administrators, their firm, partners, employees, advisers, representatives or agents shall incur any personal liability whatsoever whether on their own part or in respect of any failure on the part of any other Party to observe, perform or comply with any of its obligations under this Offer or under or in relation to any associated arrangements or negotiations.

(b)     If this Offer is accepted, the Joint Israeli Administrators would become a party to this Offer: (i) as agents of the Israeli Company; and (ii) in their own capacities solely for (1) obtaining the benefit of any provisions of this Offer expressed to be conferred on them and (2) enforcing the obligations of the other Parties to this Offer.

(c)     Notwithstanding anything in Section 6 of this Offer, any claim, action or proceeding against the Joint Israeli Administrators arising from or related to the personal liability of the Joint Israeli Administrators, their firm, partners, employees, advisers, representatives or agents, (and not as agents for any Israeli Company) under this Offer shall be governed exclusively by Israeli law and subject to the exclusive jurisdiction of the Courts of Israel.

(d)     The Parties agree that any breach of this Offer by the Joint Israeli Administrators shall be deemed to be a breach by them in their capacities as administrators of the Israeli Company, and, in such a case, each Party hereto shall have

7