# EXHIBIT A

Court File No.  09-CL-7950

## SUPERIOR COURT OF JUSTICE
## (COMMERCIAL LIST)

### IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED

### AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL CORPORATION AND NORTEL NETWORKS TECHNOLOGY CORPORATION

### FORTY-SECOND REPORT OF THE MONITOR DATED MARCH 30, 2010

## INTRODUCTION

1.       On January 14, 2009 (the "**Filing Date**") Nortel Networks Corporation ("**NNC**" and collectively with all its subsidiaries "**Nortel**" or the "**Company**"), Nortel Networks Limited ("**NNL**"), Nortel Networks Technology Corporation, Nortel Networks International Corporation and Nortel Networks Global Corporation (collectively the "**Applicants**") filed for and obtained protection under the Companies' Creditors Arrangement Act ("**CCAA**").  Pursuant to the Order of this Honourable Court dated January 14, 2009, as amended and restated (the "**Initial Order**"), Ernst & Young Inc. was appointed as the Monitor of the Applicants (the "**Monitor**") in the CCAA proceedings.   The stay of proceedings was extended to April 23, 2010, by this Honourable Court in its Order dated January 21, 2010.

2.       Nortel Networks Inc. ("**NNI**") and certain of its U.S. subsidiaries concurrently filed voluntary petitions under Chapter 11 of Title 11 of the U.S. Bankruptcy Code (the

- 2 -

"**Code**") in the United States Bankruptcy Court for the District of Delaware (the "**U.S. Court**") on January 14, 2009 (the "**Chapter 11 Proceedings**"). As required by U.S. law, an official unsecured creditors committee (the "**Committee**") was established in January, 2009.

3.       An ad hoc group of holders of bonds issued by NNL, NNC and Nortel Networks Capital Corporation has been organized and is participating in these proceedings as well as the Chapter 11 Proceedings (the "**Bondholder Group**"). In addition, pursuant to Orders of this Honourable Court dated May 27, 2009, July 22, 2009 and July 30, 2009, representative counsel was appointed on behalf of the former employees of the Applicants, the continuing employees of the Applicants and the LTD Beneficiaries, respectively, and each of these groups is participating in the CCAA proceedings.

4.       Nortel Networks (CALA) Inc. (together with NNI and certain of its subsidiaries that filed on January 14, 2009, the "**U.S. Debtors**") filed a voluntary petition under Chapter 11 of Title 11 of the Code in the U.S. Court on July 14, 2009.

5.       Nortel Networks UK Limited ("**NNUK**") and certain of its subsidiaries located in EMEA were granted Administration orders (the "**UK Administration Orders**") by the High Court of England and Wales on January 14, 2009 (collectively the "**EMEA Debtors**"). The UK Administration Orders appointed Alan Bloom, Stephen Harris, Alan Hudson and Chris Hill of Ernst & Young LLP as Administrators of the various EMEA Debtors, except for Ireland, to which David Hughes (Ernst & Young LLP Ireland) and Alan Bloom were appointed (collectively the "**Joint Administrators**"). On June 8, 2009, the Joint Administrators appointed in respect of NNUK filed a petition with the U.S. Court

- 3 -

for the recognition of the Administration Proceedings as they relate to NNUK (the "**English Proceedings**") under Chapter 15 of the Code.  On June 26, 2009, the U.S. Court entered an order recognizing the English Proceedings as foreign main proceedings under Chapter 15 of the Code.

6.    On January 20, 2009, Nortel Networks Israel (Sales and Marketing) Limited and Nortel Communications Holdings (1997) Limited (together "**NN Israel**") were granted Administration orders by the court in Israel (the "**Israeli Administration Orders**").  The Israeli Administration Orders appointed representatives of Ernst & Young LLP in the UK and Israel as Administrators of NN Israel (the "**Joint Israeli Administrators**") and provided a stay of NN Israel's creditors which, subject to further order of the Israeli Court, remains in effect during the Administration.

7.    Subsequent to the Filing Date, Nortel Networks SA commenced secondary insolvency proceedings within the meaning of Article 27 of the European Union's Council Regulation (EC) No 1346/2000 on Insolvency Proceedings in the Republic of France pursuant to which a liquidator and an administrator have been appointed by the Versailles Commercial Court.

**PURPOSE**

8.    The purpose of this Forty-Second Report of the Monitor ("**Forty-Second Report**") is to provide this Honourable Court with:

       (a)    information about the entering into of an amended and restated settlement agreement dated as of March 30, 2010 (the "**Amended and Restated Settlement**

- 4 -

**Agreement**") among the Applicants, the Monitor, the Former Employee Representatives (on their own behalf and on behalf of the parties they represent), the LTD Employee Representative (on her own behalf and on behalf of the parties she represents), the Former Employees' Representative Counsel, the LTD Beneficiaries' Representative Counsel and the CAW (the "**Settlement Parties**") following issuance of this Honourable Court's reasons released March 26, 2010; and

(b)     the Monitor's recommendation for approval of the Amended and Restated Settlement Agreement and the making of the Settlement Approval Order in substantially the form as submitted by the Applicants and attached at Tab 5 of the within motion record (the "**Settlement Approval Order**").

## TERMS OF REFERENCE

9.      In preparing this Forty-Second Report, the Monitor has relied upon unaudited financial information, the Company's books and records, financial information prepared by the Company and discussions with management of Nortel.  The Monitor has not audited, reviewed or otherwise attempted to verify the accuracy or completeness of the information and, accordingly, the Monitor expresses no opinion or other form of assurance on the information contained in this Forty-Second Report.

10.     Capitalized terms used herein (including in the preceding paragraphs) and not otherwise defined shall have the meanings given to them in the Monitor's Thirty-Ninth Report

- 5 -

dated February 18, 2010 (the "**Thirty-Ninth Report**"), the Amended and Restated Settlement Agreement and the Settlement Approval Order.

11.     Unless otherwise stated, all monetary amounts contained herein are expressed in Canadian dollars.

## BACKGROUND

12.     Reference should be made to the Thirty-Ninth Report for a discussion of, among other things: (a) the CCAA proceedings; (b) the events and process leading up to a February 2010 settlement among the Settlement Parties with respect to, among other things, the Applicants' registered Pension Plans, certain employee benefits for Pensioners and LTD Beneficiaries among others and certain employment related issues (the "**Settlement**"); and (c) information and analysis concerning the Settlement.

13.     As set out in the Thirty-Ninth Report, following numerous meetings, negotiations and exchange of proposals relating to the above issues, the Settlement Parties executed a Settlement Agreement dated February 8, 2010 (the "**Settlement Agreement**"). As set out in the Thirty-Ninth Report, although significant progress had been made in resolving issues and agreeing on language with the Bondholder Group and the Committee, not all matters could be resolved, including the "No Preclusion Clause" (or "Clause H.2"), discussed in paragraph 97 of the Thirty-Ninth Report. Clause H.2 provided that, if there is a subsequent amendment to the *Bankruptcy and Insolvency Act* that changes the current, relative priorities of the claims against Nortel, no party is precluded by the

- 6 -

Settlement Agreement from arguing the applicability or non-applicability of any such amendment in relation to any such claim.

14. A copy of the Settlement Agreement was attached as Appendix "B" to the Thirty-Ninth Report. Attached as Schedule "C" to the Settlement Agreement was a letter agreement entered into among the Applicants, the Monitor and the Superintendent, pursuant to which the Superintendent (on certain conditions set out therein) agreed not to oppose the granting of an Order substantially in the form attached to the Settlement Agreement.

15. The motion for approval of the Settlement Agreement and for an Order, among other things, approving same, was heard by this Honourable Court over the course of a three-day hearing commencing March 3, 2010.  On March 26, 2010, this Honourable Court released its decision and reasons with respect to the motion (the "**March 26 Reasons**"), and found the elements of the Settlement Agreement reasonable and acceptable, other than Clause H.2. This Honourable Court found that Clause H.2 was unacceptable and rendered the Settlement Agreement flawed such that the Settlement Agreement could not be approved. A copy of the March 26 Reasons are attached hereto as Appendix "A".

16. Following the issuance of the March 26 Reasons and taking into account the March 26 Reasons, the Settlement Parties entered into the Amended and Restated Settlement Agreement, which agreement is identical to the Settlement Agreement except that Clause H.2 has been deleted therefrom and the Schedules to the Settlement Agreement have been updated to take into account the deletion of Clause H.2. As the remaining terms of the Settlement Agreement have not been amended, the information and analysis as set out in

the Thirty-Ninth Report continues to be applicable to the Amended and Restated Settlement Agreement.

## AMENDED AND RESTATED SETTLEMENT AGREEMENT

17.     A copy of the Amended and Restated Settlement Agreement is attached hereto as Appendix "B". Attached as Schedule "C" to the Amended and Restated Settlement Agreement is a letter agreement entered into among the Applicants, the Monitor and the Superintendent, pursuant to which the Superintendent (on certain conditions set out therein) agrees not to oppose the granting of the Settlement Approval Order.

18.     The Amended and Restated Settlement Agreement takes into account the March 26 Reasons, which are summarized below.

## March 26 Reasons

19.     In its March 26 Reasons, this Honourable Court found, among other things, the following:

(a)     the Former Employees' Representatives and the LTD Representative (collectively, the "**Settlement Employee Representatives**") and Settlement Representative Counsel have the authority to represent the Former Employees and the LTD Beneficiaries for purposes of entering into the Settlement Agreement on their behalf;

(b)     Unionized Employees continue to be represented by the CAW;

- 8 -

(c)     Representative Counsel have represented their constituents' interests in accordance with their mandate;

(d)     the Monitor has undertaken a comprehensive notice process and has given the opportunity for any affected person to file Notices of Appearance and appear before the Court;

(e)     the notice process was properly implemented by the Monitor;

(f)     the Court has jurisdiction to approve transactions, including settlements, in the course of overseeing proceedings during a CCAA stay period and prior to any plan of arrangement being proposed to creditors;

(g)     there was opposition from certain constituents primarily on two aspects of the proposed Settlement Agreement, namely: (i) opposing LTD employees took exception to the inclusion of third party releases; and (ii) the Committee and the Bondholder Group took exception to the inclusion of Clause H.2;

(h)     the third party releases: (i) are necessary and connected to a resolution of claims against the Applicants; (ii) benefit creditors generally as they reduce the risk of litigation against the applicants and their directors, protect the Applicants against potential contribution claims and indemnity claims by certain parties, including directors, officers and the HWT Trustee and reduce the risk of delay caused by potentially complex litigation and associated depletion of assets to fund potentially significant litigation costs; and (iii) are not overly broad or offensive to

- 9 -

public policy as the claims being released specifically relate to the subject matter of the Settlement Agreement and the parties granting the release receive consideration in the form of both immediate compensation and the maintenance of their rights in respect of the distribution of claims;

(i)     three other provisions of the Settlement Agreement the Bondholder Group submitted were unreasonable and unfair were either resolved at the hearing (binding nature of the Settlement Approval Order on the Superintendent in all of his capacities), not unreasonable or unfair (potential liability for pension claims if a bankruptcy order is made prior to October 1, 2010) or represent a reasonable compromise in the circumstances (payments made to employees to be credited against employees' claims made rather than from future distributions or not to be credited at all); and

(j)     Clause H.2 results in a flawed agreement that could not be approved.

**Amended and Restated Settlement Agreement**

20.     The March 26 Reasons summarized the Applicants' position and noted that, in the absence of approval of the Settlement Agreement or some other agreement, a cessation of benefits will occur on March 31, 2010.

21.     As a result of the pending cessation of benefits on March 31, 2010 and taking into account the March 26 Reasons, the Settlement Parties immediately entered into discussions with respect to an amended settlement agreement that would not include Clause H.2.

- 10 -

22.     Following these discussions, the Settlement Parties entered into the Amended and Restated Settlement Agreement.

23.     The Monitor supports the Applicants bringing the within motion for approval of the Amended and Restated Settlement Agreement and for the granting of the Settlement Approval Order on an urgent basis and therefore on abridged notice as a result of the following factors:

(a)     the pending cessation of benefits on March 31, 2010 in the absence of approval of the Amended and Restated Settlement Agreement;

(b)     the March 26 Reasons, which found that the Monitor undertook a comprehensive notice process, gave the opportunity for any affected person to file a Notice of Appearance and appear before the Court and properly implemented the notice process;

(c)     the Amended and Restated Settlement Agreement is identical to the Settlement Agreement except that Clause H.2 has been deleted therefrom and the Schedules to the Settlement Agreement have been updated to take into account the deletion of Clause H.2; and

(d)     the Service List, Rochon Genova LLP (as counsel to the Opposing LTD Employees) and the Superintendent of Financial Services (as the pension regulator for the Province of Ontario) were served with notice of the approval

- 11 -

motion as soon as possible following the entering into of the Amended and Restated Settlement Agreement.

## RECOMMENDATION

24.     The Monitor believes the Amended and Restated Settlement Agreement and the Settlement Approval Order take into account the March 26 Reasons and, for the reasons set out herein and in the Thirty-Ninth Report, represent a fair balancing of the interests of the Applicants' stakeholders.     The Monitor believes the Amended and Restated Settlement Agreement represents an important step in the implementation of the Applicants' restructuring, which has been arrived at after extensive negotiations.     The Monitor recommends this Honourable Court approve the Amended and Restated Settlement Agreement and grant the Settlement Approval Order on the terms and conditions substantially in the form as submitted by the Applicants.

All of which is respectfully submitted this 30th day of March, 2010.

**ERNST & YOUNG INC.**
In its capacity as Monitor of the Applicants

Per:

Murray A. McDonald
President

\5830467

**APPENDIX A – MARCH 26 REASONS**



ONTARIO

# SUPERIOR COURT OF JUSTICE
## COUR SUPÉRIEURE DE JUSTICE

*361 University Avenue*
*Toronto, ON  M5G 1T3*

*Telephone: (416) 327-5284  Fax: (416) 327-5417*

# FAX COVER SHEET

**Date: March 26, 2010**

| **TO:** | **FAX NO.:** |
|---|---|
| Jennifer Stam | 416-216-3930 |
| Chris Armstrong | 416-979-1234 |

**FROM:**        The Honourable Mr. Justice Morawetz

**TOTAL PAGES (INCLUDING COVER PAGE):**   18

**MESSAGE:**        Endorsement:  Nortel Networks Corporation #09-CL-7950

**PLEASE ENSURE THAT COPIES ARE GIVEN TO THE SERVICE LIST PER JUSTICE MORAWETZ'S INSTRUCTIONS.**

*The Information contained in this facsimile message is confidential information.  If the person actually receiving this facsimile or any other reader of the facsimile is not the named recipient or the employee or agent responsible to deliver it to the named recipient, any use, dissemination, distribution, or copying of the communication is strictly prohibited  If you have received this communication in error, please immediately notify us by telephone and return the original message to us at the above address*

**Original will NOT follow.  If you do not receive all pages, please telephone us immediately at the above number.**

MAR-26-2010  16:02      JUGDES ADMIN RM 170            416 327 5417    P.002/018

**CITATION:** Nortel Networks Corporation (Re), 2010 ONSC 1708
**COURT FILE NO.:** 09-CL-7950
**DATE:** 20100326

## SUPERIOR COURT OF JUSTICE – ONTARIO

## (COMMERCIAL LIST)

**RE:**     IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL CORPORATION AND NORTEL NETWORKS TECHNOLOGY CORPORATION, Applicants

**BEFORE:**   MORAWETZ J.

**COUNSEL:**   Derrick Tay, Jennifer Stam and Suzanne Wood, for the Applicants

Lyndon Barnes and Adam Hirsh, for the Nortel Directors

Benjamin Zarnett, Gale Rubenstein, C. Armstrong and Melaney Wagner, for Ernst & Young Inc., Monitor

Arthur O. Jacques, for the Nortel Canada Current Employees

Deborah McPhail, for the Superintendent of Financial Services (non-PBGF)

Mark Zigler and Susan Philpott, for the Former and Long-Term Disability Employees

Ken Rosenberg and M. Starnino, for the Superintendent of Financial Services in its capacity as Administrator of the Pension Benefit Guarantee Fund

S. Richard Orzy and Richard B. Swan, for the Informal Nortel Noteholder Group

Alex MacFarlane and Mark Dunsmuir, for the Unsecured Creditors' Committee of Nortel Networks Inc.

Leanne Williams, for Flextronics Inc.

Barry Wadsworth, for the CAW-Canada

Pamela Huff, for the Northern Trust Company, Canada

Joel P. Rochon and Sakie Tambakos, for the Opposing Former and Long-Term Disability Employees

- Page 2 -

Robin B. Schwill, for the Nortel Networks UK Limited (In Administration)

Sorin Gabriel Radulescu, In Person

Guy Martin, In Person, on behalf of Marie Josee Perrault

Peter Burns, In Person

Stan and Barbara Arnelien, In Person

**HEARD:**    MARCH 3, 4, 5, 2010

## ENDORSEMENT

## INTRODUCTION

[1]    On January 14, 2009, Nortel Networks Corporation ("NNC"), Nortel Networks Limited "(NNL"), Nortel Networks Global Corporation, Nortel Networks International Corporation and Nortel Networks Technology Corporation (collectively, the "Applicants") were granted a stay of proceedings pursuant to the *Companies' Creditors Arrangement Act* ("CCAA") and Ernst & Young Inc. was appointed as Monitor.

[2]    The Applicants have historically operated a number of pension, benefit and other plans (both funded and unfunded) for their employees and pensioners, including:

   (i)    Pension benefits through two registered pension plans, the Nortel Networks Limited Managerial and Non-Negotiated Pension Plan and the Nortel Networks Negotiated Pension Plan (the "Pension Plans"); and

   (ii)    Medical, dental, life insurance, long-term disability and survivor income and transition benefits paid, except for survivor termination benefits, through Nortel's Health and Welfare Trust (the "HWT").

[3]    Since the CCAA filing, the Applicants have continued to provide medical, dental and other benefits, through the HWT, to pensioners and employees on long-term disability ("Former and LTD Employees") and active employees ("HWT Payments") and have continued all current service contributions and special payments to the Pension Plans ("Pension Payments").

[4]    Pension Payments and HWT Payments made by the Applicants to the Former and LTD Employees while under CCAA protection are largely discretionary. As a result of Nortel's insolvency and the significant reduction in the size of Nortel's operations, the unfortunate reality is that, at some point, cessation of such payments is inevitable. The Applicants have attempted to address this situation by entering into a settlement agreement (the "Settlement Agreement") dated as of February 8, 2010, among the Applicants, the Monitor, the Former Employees' Representatives (on their own behalf and on behalf of the parties they represent), the LTD

- Page 3 -

Representative (on her own behalf and on behalf of the parties she represents), Representative Settlement Counsel and the CAW-Canada (the "Settlement Parties").

[5]     The Applicants have brought this motion for approval of the Settlement Agreement. From the standpoint of the Applicants, the purpose of the Settlement Agreement is to provide for a smooth transition for the termination of Pension Payments and HWT Payments.   The Applicants take the position that the Settlement Agreement represents the best efforts of the Settlement Parties to negotiate an agreement and is consistent with the spirit and purpose of the CCAA.

[6]     The essential terms of the Settlement Agreement are as follows:

(a) until December 31, 2010, medical, dental and life insurance benefits will be funded on a pay-as-you-go basis to the Former and LTD Employees;

(b) until December 31, 2010, LTD Employees and those entitled to receive survivor income benefits will receive income benefits on a pay-as-you-go basis;

(c) the Applicants will continue to make current service payments and special payments to the Pension Plans in the same manner as they have been doing over the course of the proceedings under the CCAA, through to March 31, 2010, in the aggregate amount of $2,216,254 per month and that thereafter and through to September 30, 2010, the Applicants shall make only current service payments to the Pension Plans, in the aggregate amount of $379,837 per month;

(d) any allowable pension claims, in these or subsequent proceedings, concerning any Nortel Worldwide Entity, including the Applicants, shall rank *pari passu* with ordinary, unsecured creditors of Nortel, and no part of any such HWT claims shall rank as a preferential or priority claim or shall be the subject of a constructive trust or trust of any nature or kind;

(e) proofs of claim asserting priority already filed by any of the Settlement Parties, or the Superintendent on behalf of the Pension Benefits Guarantee Fund are disallowed in regard to the claim for priority;

(f) any allowable HWT claims made in these or subsequent proceedings shall rank *pari passu* with ordinary unsecured creditors of Nortel;

(g) the Settlement Agreement does not extinguish the claims of the Former and LTD Employees;

(h) Nortel and, *inter alia*, its successors, advisors, directors and officers, are released from all future claims regarding Pension Plans and the HWT, provided that nothing in the release shall release a director of the Applicants from any matter referred to in subsection 5.1(2) of the CCAA or with respect to fraud on the part of any Releasee, with respect to that Releasee only;

- Page 4 -

(i) upon the expiry of all appeals and rights of appeal in respect thereof, Representative Settlement Counsel will withdraw their application for leave to appeal the decision of the Court of Appeal, dated November 26, 2009, to the Supreme Court of Canada on a with prejudice basis; [1]

(j) a CCAA plan of arrangement in the Nortel proceedings will not be proposed or approved if that plan does not treat the Pension and HWT claimants *pari passu* to the other ordinary, unsecured creditors ("Clause H.1"); and

(k) if there is a subsequent amendment to the *Bankruptcy and Insolvency Act* ("BIA") that "changes the current, relative priorities of the claims against Nortel, no party is precluded by this Settlement Agreement from arguing the applicability" of that amendment to the claims ceded in this Agreement ("Clause H.2").

[7]    The Settlement Agreement does *not* relate to a distribution of the HWT as the Settlement Parties have agreed to work towards developing a Court-approved distribution of the HWT corpus in 2010.

[8]    The Applicants' motion is supported by the Settlement Parties and by the Board of Directors of Nortel.

[9]    The Official Committee of Unsecured Creditors of Nortel Networks Inc. ("UCC"), the informal Nortel Noteholder Group (the "Noteholders"), and a group of 37 LTD Employees (the "Opposing LTD Employees") oppose the Settlement Agreement.

[10]    The UCC and Noteholders oppose the Settlement Agreement, principally as a result of the inclusion of Clause H.2.

[11]    The Opposing LTD Employees oppose the Settlement Agreement, principally as a result of the inclusion of the third party releases referenced in [6h] above.

---

[1] On March 25, 2010, the Supreme Court of Canada released the following: *Donald Sproule et al. v. Nortel Networks Corporation et al.* (Ont.) (Civil) (By Leave) (33491) (The motions for directions and to expedite the application for leave to appeal are dismissed. The application for leave to appeal is dismissed with no order as to costs./La requête en vue d'obtenir des directives et la requête visant à accélérer la procédure de demande d'autorisation d'appel sont rejetées. La demande d'autorisation d'appel est rejetée; aucune ordonnance n'est rendue concernant les dépens.): <http://scc.lexum.umontreal.ca/en/news_release/2010/10-03-25.3a/10-03-25.3a.html>

- Page 5 -

## THE FACTS

### A.    Status of Nortel's Restructuring

[12]    Although it was originally hoped that the Applicants would be able to restructure their business, in June 2009 the decision was made to change direction and pursue sales of Nortel's various businesses.

[13]    In response to Nortel's change in strategic direction and the impending sales, Nortel announced on August 14, 2009 a number of organizational updates and changes including the creation of groups to support transitional services and management during the sales process.

[14]    Since June 2009, Nortel has closed two major sales and announced a third.  As a result of those transactions, approximately 13,000 Nortel employees have been or will be transferred to purchaser companies.  That includes approximately 3,500 Canadian employees.

[15]    Due to the ongoing sales of Nortel's business units and the streamlining of Nortel's operations, it is expected that by the close of 2010, the Applicants' workforce will be reduced to only 475 employees.  There is a need to wind-down and rationalize benefits and pension processes.

[16]    Given Nortel's insolvency, the significant reduction in Nortel's operations and the complexity and size of the Pension Plans, both Nortel and the Monitor believe that the continuation and funding of the Pension Plans and continued funding of medical, dental and other benefits is not a viable option.

### B.    The Settlement Agreement

[17]    On February 8, 2010 the Applicants announced that a settlement had been reached on issues related to the Pension Plans, and the HWT and certain employment related issues.

[18]    Recognizing the importance of providing notice to those who will be impacted by the Settlement Agreement, including the Former Employees, the LTD Employees, unionized employees, continuing employees and the provincial pension plan regulators ("Affected Parties"), Nortel brought a motion to this Court seeking the approval of an extensive notice and opposition process.

[19]    On February 9, 2010, this Court approved the notice program for the announcement and disclosure of the Settlement (the "Notice Order").

[20]    As more fully described in the Monitor's Thirty-Sixth, Thirty-Ninth and Thirty-Ninth Supplementary Reports, the Settlement Parties have taken a number of steps to notify the Affected Parties about the Settlement.

[21]    In addition to the Settlement Agreement, the Applicants, the Monitor and the Superintendent, in his capacity as administrator of the Pension Benefits Guarantee Fund, entered

- Page 6 -

into a letter agreement on February 8, 2010, with respect to certain matters pertaining to the Pension Plans (the "Letter Agreement").

[22]   The Letter Agreement provides that the Superintendent will not oppose an order approving the Settlement Agreement ("Settlement Approval Order"). Additionally, the Monitor and the Applicants will take steps to complete an orderly transfer of the Pension Plans to a new administrator to be appointed by the Superintendent effective October 1, 2010. Finally, the Superintendent will not oppose any employee incentive program that the Monitor deems reasonable and necessary or the creation of a trust with respect to claims or potential claims against persons who accept directorships of a Nortel Worldwide Entity in order to facilitate the restructuring.

## POSITIONS OF THE PARTIES ON THE SETTLEMENT AGREEMENT

### The Applicants

[23]   The Applicants take the position that the Settlement is fair and reasonable and balances the interests of the parties and other affected constituencies equitably. In this regard, counsel submits that the Settlement:

> (a)   eliminates uncertainty about the continuation and termination of benefits to pensioners, LTD Employees and survivors, thereby reducing hardship and disruption;

> (b)   eliminates the risk of costly and protracted litigation regarding Pension Claims and HWT Claims, leading to reduced costs, uncertainty and potential disruption to the development of a Plan;

> (c)   prevents disruption in the transition of benefits for current employees;

> (d)   provides early payments to terminated employees in respect of their termination and severance claims where such employees would otherwise have had to wait for the completion of a claims process and distribution out of the estates;

> (e)   assists with the commitment and retention of remaining employees essential to complete the Applicants' restructuring; and

> (f)   does not eliminate Pension Claims or HWT Claims against the Applicants, but maintains their quantum and validity as ordinary and unsecured claims.

[24]   Alternatively, absent the approval of the Settlement Agreement, counsel to the Applicants submits that the Applicants are not required to honour such benefits or make such payments and such benefits could cease immediately. This would cause undue hardship to beneficiaries and increased uncertainty for the Applicants and other stakeholders.

- Page 7 -

[25]    The Applicants state that a central objective in the Settlement Agreement is to allow the Former and LTD Employees to transition to other sources of support.

[26]    In the absence of the approval of the Settlement Agreement or some other agreement, a cessation of benefits will occur on March 31, 2010 which would have an immediate negative impact on Former and LTD Employees.  The Applicants submit that extending payments to the end of 2010 is the best available option to allow recipients to order their affairs.

[27]    Counsel to the Applicants submits that the Settlement Agreement brings Nortel closer to finalizing a plan of arrangement, which is consistent with the sprit and purpose of the CCAA. The Settlement Agreement resolves uncertainties associated with the outstanding Former and LTD Employee claims.  The Settlement Agreement balances certainty with clarity, removing litigation risk over priority of claims, which properly balances the interests of the parties, including both creditors and debtors.

[28]    Regarding the priority of claims going forward, the Applicants submit that because a deemed trust, such as the HWT, is not enforceable in bankruptcy, the Former and LTD Employees are by default *pari passu* with other unsecured creditors.

[29]    In response to the Noteholders' concern that bankruptcy prior to October 2010 would create pension liabilities on the estate, the Applicants committed that they would not voluntarily enter into bankruptcy proceedings prior to October 2010.  Further, counsel to the Applicants submits the court determines whether a bankruptcy order should be made if involuntary proceedings are commenced.

[30]    Further, counsel to the Applicants submits that the court has the jurisdiction to release third parties under a Settlement Agreement where the releases (1) are connected to a resolution of the debtor's claims, (2) will benefit creditors generally and (3) are not overly broad or offensive to public policy.  See *Re Metcalfe & Mansfield Alternative Investments II Corp.* (2008), 92 O.R. (3d) 513 (C.A.), [*Metcalfe*] at para. 71, leave to appeal refused, [2008] S.C.C.A. No. 337 and *Re Grace* [2008] O.J. No. 4208 (S.C.J.) [*Grace 2008*] at para. 60.

[31]    The Applicants submit that a settlement of the type put forward should be approved if it is consistent with the spirit and purpose of the CCAA and is fair and reasonable in all the circumstances. Elements of fairness and reasonableness include balancing the interests of parties, including any objecting creditor or creditors, equitably (although not necessarily equally); and ensuring that the agreement is beneficial to the debtor and its stakeholders generally, as per *Re Air Canada*, [2003] OJ. No. 5319 (S.C.J.) [*Air Canada*]. The Applicants assert that this test is met.

**The Monitor**

[32]    The Monitor supports the Settlement Agreement, submitting that it is necessary to allow the Applicants to wind down operations and to develop a plan of arrangement. The Monitor submits that the Settlement Agreement provides certainty, and does so with input from employee stakeholders. These stakeholders are represented by Employee Representatives as mandated by the court and these Employee Representatives were given the authority to approve such settlements on behalf of their constituents.

- Page 8 -

[33]   The Monitor submits that Clause H.2 was bargained for, and that the employees did give up rights in order to have that clause in the Settlement Agreement; particularly, it asserts that Clause H.1 is the counterpoint to Clause H.2. In this regard, the Settlement Agreement is fair and reasonable.

[34]   The Monitor asserts that the court may either (1) approve the Settlement Agreement, (2) not approve the Settlement Agreement, or (3) not approve the Settlement Agreement but provide practical comments on the applicability of Clause H.2.

**Former and LTD Employees**

[35]   The Former Employees' Representatives' constituents number an estimated 19,458 people. The LTD Employees number an estimated 350 people between the LTD Employee's Representative and the CAW-Canada, less the 37 people in the Opposing LTD Employee group.

[36]   Representative Counsel to the Former and LTD Employees acknowledges that Nortel is insolvent, and that much uncertainty and risk comes from insolvency. They urge that the Settlement Agreement be considered within the scope of this reality. The alternative to the Settlement Agreement is costly litigation and significant uncertainty.

[37]   Representative Counsel submits that the Settlement Agreement is fair and reasonable for all creditors, but especially the represented employees. Counsel notes that employees under Nortel are unique creditors under these proceedings, as they are not sophisticated creditors and their personal welfare depends on receiving distributions from Nortel. The Former and LTD Employees assert that this is the best agreement they could have negotiated.

[38]   Representative Counsel submits that bargaining away of the right to litigate against directors and officers of the corporation, as well as the trustee of the HWT, are examples of the concessions that have been made. They also point to the giving up of the right to make priority claims upon distribution of Nortel's estate and the HWT, although the claim itself is not extinguished. In exchange, the Former and LTD Employees will receive guaranteed coverage until the end of 2010. The Former and LTD Employees submit that having money in hand today is better than uncertainty going forward, and that, on balance, this Settlement Agreement is fair and reasonable.

[39]   In response to allegations that third party releases unacceptably compromise employees' rights, Representative Counsel accepts that this was a concession, but submits that it was satisfactory because the claims given up are risky, costly and very uncertain. The releases do not go beyond s. 5.1(2) of the CCAA, which disallows releases relating to misrepresentations and wrongful or oppressive conduct by directors. Releases as to deemed trust claims are also very uncertain and were acceptably given up in exchange for other considerations.

[40]   The Former and LTD Employees submit that the inclusion of Clause H.2 was essential to their approval of the Settlement Agreement. They characterize Clause H.2 as a no prejudice clause to protect the employees by not releasing any future potential benefit. Removing Clause H.2 from the Settlement Agreement would be not the approval of an agreement, but rather the creation of an entirely new Settlement Agreement. Counsel submits that without Clause H.2, the Former and LTD Employees would not be signatories.

- Page 9 -

## CAW

[41]   The CAW supports the Settlement Agreement. It characterizes the agreement as Nortel's recognition that it has a moral and legal obligation to its employees, whose rights are limited by the laws in this country. The Settlement Agreement temporarily alleviates the stress and uncertainty its constituents feel over the winding up of their benefits and is satisfied with this result.

[42]   The CAW notes that some members feel they were not properly apprised of the facts, but all available information has been disclosed, and the concessions made by the employee groups were not made lightly.

## Board of Directors

[43]   The Board of Directors of Nortel supports the Settlement Agreement on the basis that it is a practical resolution with compromises on both sides.

## Opposing LTD Employees

[44]   Mr. Rochon appeared as counsel for the Opposing LTD Employees, notwithstanding that these individuals did not opt out of having Representative Counsel or were represented by the CAW. The submissions of the Opposing LTD Employees were compelling and the court extends it appreciation to Mr. Rochon and his team in co-ordinating the representatives of this group.

[45]   The Opposing LTD Employees put forward the position that the cessation of their benefits will lead to extreme hardship. Counsel submits that the Settlement Agreement conflicts with the spirit and purpose of the CCAA because the LTD Employees are giving up legal rights in relation to a $100 million shortfall of benefits. They urge the court to consider the unique circumstances of the LTD Employees as they are the people hardest hit by the cessation of benefits.

[46]   The Opposing LTD Employees assert that the HWT is a true trust, and submit that breaches of that trust create liabilities and that the claim should not be released. Specifically, they point to a $37 million shortfall in the HWT that they should be able to pursue.

[47]   Regarding the third party releases, the Opposing LTD Employees assert that Nortel is attempting to avoid the distraction of third party litigation, rather than look out for the best interests of the Former and LTD Employees. The Opposing LTD Employees urge the court not to release the only individuals the Former and LTD Employees can hold accountable for any breaches of trust. Counsel submits that Nortel has a common law duty to fund the HWT, which the Former and LTD Employees should be allowed to pursue.

[48]   Counsel asserts that allowing these releases (a) is not necessary and essential to the restructuring of the debtor, (b) does not relate to the insolvency process, (c) is not required for the success of the Settlement Agreement, (d) does not meet the requirement that each party contribute to the plan in a material way and (e) is overly broad and therefore not fair and reasonable.

- Page 10 -

[49]    Finally, the Opposing LTD Employees oppose the *pari passu* treatment they will be subjected to under the Settlement Agreement, as they have a true trust which should grant them priority in the distribution process.  Counsel was not able to provide legal authority for such a submission.

[50]    A number of Opposing LTD Employees made in person submissions.  They do not share the view that Nortel will act in their best interests, nor do they feel that the Employee Representatives or Representative Counsel have acted in their best interests.  They shared feelings of uncertainty, helplessness and despair. There is affidavit evidence that certain individuals will be unable to support themselves once their benefits run out, and they will not have time to order their affairs. They expressed frustration and disappointment in the CCAA process.

## UCC

[51]    The UCC was appointed as the representative for creditors in the U.S. Chapter 11 proceedings. It represents creditors who have significant claims against the Applicants.  The UCC opposes the motion, based on the inclusion of Clause H.2, but otherwise the UCC supports the Settlement Agreement.

[52]    Clause H.2, the UCC submits, removes the essential element of finality that a settlement agreement is supposed to include. The UCC characterizes Clause H.2 as a take back provision; if activated, the Former and LTD Employees have compromised nothing, to the detriment of other unsecured creditors. A reservation of rights removes the finality of the Settlement Agreement.

[53]    The UCC claims it, not Nortel, bears the risk of Clause H.2. As the largest unsecured creditor, counsel submits that a future change to the BIA could subsume the UCC's claim to the Former and LTD Employees and the UCC could end up with nothing at all, depending on Nortel's asset sales.

## Noteholders

[54]    The Noteholders are significant creditors of the Applicants.  The Noteholders oppose the settlement because of Clause H.2, for substantially the same reasons as the UCC.

[55]    Counsel to the Noteholders submits that the inclusion of H.2 is prejudicial to the non-employee unsecured creditors, including the Noteholders.  Counsel submits that the effect of the Settlement Agreement is to elevate the Former and LTD Employees, providing them a payout of $57 million over nine months while everyone else continues to wait, and preserves their rights in the event the laws are amended in future. Counsel to the Noteholders submits that the Noteholders forego millions of dollars while remaining exposed to future claims.

[56]    The Noteholders assert that a proper settlement agreement must have two elements: a real compromise, and resolution of the matters in contention. In this case, counsel submits that there is no resolution because there is no finality in that Clause H.2 creates ambiguity about the future. The very object of a Settlement Agreement, assert the Noteholders, is to avoid litigation by withdrawing claims, which this agreement does not do.

- Page 11 -

### Superintendent

[57]  The Superintendent does not oppose the relief sought, but this position is based on the form of the Settlement Agreement that is before the Court.

### Northern Trust

[58]  Northern Trust, the trustee of the pension plans and HWT, takes no position on the Settlement Agreement as it takes instructions from Nortel. Northern Trust indicates that an oversight left its name off the third party release and asks for an amendment to include it as a party released by the Settlement Agreement.

### LAW AND ANALYSIS

### A.    Representation and Notice Were Proper

[59]  It is well settled that the Former Employees' Representatives and the LTD Representative (collectively, the "Settlement Employee Representatives") and Representative Counsel have the authority to represent the Former Employees and the LTD Beneficiaries for purposes of entering into the Settlement Agreement on their behalf: *see Grace 2008, supra* at para 32.

[60]  The court appointed the Settlement Employee Representatives and the Representative Settlement Counsel. These appointment orders have not been varied or appealed. Unionized employees continue to be represented by the CAW. The Orders appointing the Settlement Employee Representatives expressly gave them authority to represent their constituencies "for the purpose of settling or compromising claims" in these Proceedings. Former Employees and LTD Employees were given the right to opt out of their representation by Representative Settlement Counsel. After provision of notice, only one former employee and one active employee exercised the opt-out right.

### B.    Effect of the Settlement Approval Order

[61]  In addition to the binding effect of the Settlement Agreement, many additional parties will be bound and affected by the Settlement Approval Order. Counsel to the Applicants submits that the binding nature of the Settlement Approval Order on all affected parties is a crucial element to the Settlement itself. In order to ensure all Affected Parties had notice, the Applicants obtained court approval of their proposed notice program.

[62]  Even absent such extensive noticing, virtually all employees of the Applicants are represented in these proceedings. In addition to the representative authority of the Settlement Employee Representatives and Representative Counsel as noted above, Orders were made authorizing a Nortel Canada Continuing Employees' Representative and Nortel Canada Continuing Employees' Representative Counsel to represent the interests of continuing employees on this motion.

[63]  I previously indicated that "the overriding objective of appointing representative counsel for employees is to ensure that the employees have representation in the CCAA process": *Re*

- Page 12 -

*Nortel Networks Corp.,* [2009] O.J. No. 2529 at para 16. I am satisfied that this objective has been achieved.

[64]    The Record establishes that the Monitor has undertaken a comprehensive notice process which has included such notice to not only the Former Employees, the LTD Employees, the unionized employees and the continuing employees but also the provincial pension regulators and has given the opportunity for any affected person to file Notices of Appearance and appear before this court on this motion.

[65]    I am satisfied that the notice process was properly implemented by the Monitor.

[66]    I am satisfied that Representative Counsel has represented their constituents' interests in accordance with their mandate, specifically, in connection with the negotiation of the Settlement Agreement and the draft Settlement Approval Order and appearance on this Motion. There have been intense discussions, correspondence and negotiations among Representative Counsel, the Monitor, the Applicants, the Superintendent, counsel to the Board of the Applicants, the Noteholder Group and the Committee with a view to developing a comprehensive settlement. NCCE's Representative Counsel have been apprised of the settlement discussions and served with notice of this Motion. Representatives have held Webinar sessions and published press releases to inform their constituents about the Settlement Agreement and this Motion.

C.    **Jurisdiction to Approve the Settlement Agreement**

[67]    The CCAA is a flexible statute that is skeletal in nature. It has been described as a "sketch, an outline, a supporting framework for the resolution of corporate insolvencies in the public interest". *Re Nortel,* [2009] O.J. No. 3169 (S.C.J.) at paras. 28-29, citing *Metcalfe, supra,* at paras. 44 and 61.

[68]    Three sources for the court's authority to approve pre-plan agreements have been recognized:

    (a)    the power of the court to impose terms and conditions on the granting of a stay under s. 11(4) of the CCAA;

    (b)    the power of the court to make an order "on such terms as it may impose" pursuant to s. 11(4) of the CCAA; and

    (c)    the inherent jurisdiction of the court to "fill in the gaps" of the CCAA in order to give effect to its objects: see *Re Nortel,* [2009] O.J. No. 3169 (S.C.J.) at para. 30, citing *Re Canadian Red Cross Society,* [1998] O.J. No. 3306 (Gen. Div.) [*Canadian Red Cross*] at para. 43; *Metcalfe, supra* at para. 44.

[69]    In *Re Stelco Inc.,* (2005), 78 O.R. (3d) 254 (C.A.), the Ontario Court of Appeal considered the court's jurisdiction under the CCAA to approve agreements, determining at para. 14 that it is not limited to preserving the *status quo.* Further, agreements made prior to the

- Page 13 -

finalization of a plan or compromise are valid orders for the court to approve: *Grace 2008, supra* at para. 34.

[70]   In these proceedings, this court has confirmed its jurisdiction to approve major transactions, including settlement agreements, during the stay period defined in the Initial Order and prior to the proposal of any plan of compromise or arrangement: see, for example, *Re Nortel*, [2009] O.J. No. 5582 (S.C.J.); *Re Nortel* [2009] O.J. 5582 (S.C.J.) and *Re Nortel*, 2010 ONSC 1096 (S.C.J.).

[71]   I am satisfied that this court has jurisdiction to approve transactions, including settlements, in the course of overseeing proceedings during a CCAA stay period and prior to any plan of arrangement being proposed to creditors: see *Re Calpine Canada Energy Ltd.*, [2007] A.J. No. 917 (C.A.) [*Calpine*] at para. 23, affirming [2007] A.J. No. 923 (Q.B.); *Canadian Red Cross, supra*; *Air Canada, supra*; *Grace 2008, supra*, and *Re Grace Canada* [2010] O.J. No. 62 (S.C.J.) [*Grace 2010*], leave to appeal to the C.A. refused February 19, 2010; *Re Nortel*, 2010 ONSC 1096 (S.C.J.).

**D.     Should the Settlement Agreement Be Approved?**

[72]   Having been satisfied that this court has the jurisdiction to approve the Settlement Agreement, I must consider whether the Settlement Agreement *should* be approved.

[73]   A Settlement Agreement can be approved if it is consistent with the spirit and purpose of the CCAA and is fair and reasonable in all circumstances. What makes a settlement agreement fair and reasonable is its balancing of the interests of all parties; its equitable treatment of the parties, including creditors who are not signatories to a settlement agreement; and its benefit to the Applicant and its stakeholders generally.

*i)  Sprit and Purpose*

[74]   The CCAA is a flexible instrument; part of its purpose is to allow debtors to balance the conflicting interests of stakeholders. The Former and LTD Employees are significant creditors and have a unique interest in the settlement of their claims. This Settlement Agreement brings these creditors closer to ultimate settlement while accommodating their special circumstances. It is consistent with the spirit and purpose of the CCAA.

*ii)  Balancing of Parties' Interests*

[75]   There is no doubt that the Settlement Agreement is comprehensive and that it has support from a number of constituents when considered in its totality.

[76]   There is, however, opposition from certain constituents on two aspects of the proposed Settlement Agreement:  (1) the Opposing LTD Employees take exception to the inclusion of the third party releases; (2) the UCC and Noteholder Groups take exception to the inclusion of Clause H.2.

- Page 14 -

### Third Party Releases

[77]    Representative Counsel, after examining documentation pertaining to the Pension Plans and HWT, advised the Former Employees' Representatives and Disabled Employees' Representative that claims against directors of Nortel for failing to properly fund the Pension Plans were unlikely to succeed. Further, Representative Counsel advised that claims against directors or others named in the Third Party Releases to fund the Pension Plans were risky and could take years to resolve, perhaps unsuccessfully. This assisted the Former Employees' Representatives and the Disabled Employees' Representative in agreeing to the Third Party Releases.

[78]    The conclusions reached and the recommendations made by both the Monitor and Representative Counsel are consistent. They have been arrived at after considerable study of the issues and, in my view, it is appropriate to give significant weight to their positions.

[79]    In *Grace 2008, supra,* and *Grace 2010, supra,* I indicated that a Settlement Agreement entered into with Representative Counsel that contains third party releases is fair and reasonable where the releases are necessary and connected to a resolution of claims against the debtor, will benefit creditors generally and are not overly broad or offensive to public policy.

[80]    In this particular case, I am satisfied that the releases are necessary and connected to a resolution of claims against the Applicants.

[81]    The releases benefit creditors generally as they reduces the risk of litigation against the Applicants and their directors, protect the Applicants against potential contribution claims and indemnity claims by certain parties, including directors, officers and the HWT Trustee; and reduce the risk of delay caused by potentially complex litigation and associated depletion of assets to fund potentially significant litigation costs.

[82]    Further, in my view, the releases are not overly broad or offensive to public policy. The claims being released specifically relate to the subject matter of the Settlement Agreement. The parties granting the release receive consideration in the form of both immediate compensation and the maintenance of their rights in respect to the distribution of claims.

### Clause H.2

[83]    The second aspect of the Settlement Agreement that is opposed is the provision known as Clause H.2. Clause H.2 provides that, in the event of a bankruptcy of the Applicants, and notwithstanding any provision of the Settlement Agreement, if there are any amendments to the BIA that change the current, relative priorities of the claims against the Applicants, no party is precluded from arguing the applicability or non-applicability of any such amendment in relation to any such claim.

[84]    The Noteholders and UCC assert that Clause H.2 causes the Settlement Agreement to not be a "settlement" in the true and proper sense of that term due to a lack of certainty and finality. They emphasize that Clause H.2 has the effect of undercutting the essential compromises of the Settlement Agreement in imposing an unfair risk on the non-employee creditors of NNL, including NNI, after substantial consideration has been paid to the employees.

- Page 15 -

[85]    This position is, in my view, well founded. The inclusion of the Clause H.2 creates, rather than eliminates, uncertainty. It creates the potential for a fundamental alteration of the Settlement Agreement.

[86]    The effect of the Settlement Agreement is to give the Former and LTD Employees preferred treatment for certain claims, notwithstanding that priority is not provided for in the statute nor has it been recognized in case law. In exchange for this enhanced treatment, the Former Employees and LTD Beneficiaries have made certain concessions.

[87]    The Former and LTD Employees recognize that substantially all of these concessions could be clawed back through Clause H.2. Specifically, they acknowledge that future Pension and HWT Claims will rank *pari passu* with the claims of other ordinary unsecured creditors, but then go on to say that should the BIA be amended, they may assert once again a priority claim.

[88]    Clause H.2 results in an agreement that does not provide certainty and does not provide finality of a fundamental priority issue.

[89]    The Settlement Parties, as well as the Noteholders and the UCC, recognize that there are benefits associated with resolving a number of employee-related issues, but the practical effect of Clause H.2 is that the issue is not fully resolved. In my view, Clause H.2 is somewhat inequitable from the standpoint of the other unsecured creditors of the Applicants. If the creditors are to be bound by the Settlement Agreement, they are entitled to know, with certainty and finality, the effect of the Settlement Agreement.

[90]    It is not, in my view, reasonable to require creditors to, in effect, make concessions in favour of the Former and LTD Employees today, and be subject to the uncertainty of unknown legislation in the future.

[91]    One of the fundamental purposes of the CCAA is to facilitate a process for a compromise of debt. A compromise needs certainty and finality. Clause H.2 does not accomplish this objective. The inclusion of Clause H.2 does not recognize that at some point settlement negotiations cease and parties bound by the settlement have to accept the outcome. A comprehensive settlement of claims in the magnitude and complexity contemplated by the Settlement Agreement should not provide an opportunity to re-trade the deal after the fact.

[92]    The Settlement Agreement should be fair and reasonable in all the circumstances. It should balance the interests of the Settlement Parties and other affected constituencies equitably and should be beneficial to the Applicants and their stakeholders generally.

[93]    It seems to me that Clause H.2 fails to recognize the interests of the other creditors of the Applicants. These creditors have claims that rank equally with the claims of the Former Employees and LTD Employees. Each have unsecured claims against the Applicants. The Settlement Agreement provides for a transfer of funds to the benefit of the Former Employees and LTD Employees at the expense of the remaining creditors. The establishment of the Payments Charge crystallized this agreed upon preference, but Clause H.2 has the effect of not providing any certainty of outcome to the remaining creditors.

[94]    I do not consider Clause H.2 to be fair and reasonable in the circumstances.

- Page 16 -

[95]    In light of this conclusion, the Settlement Agreement cannot be approved in its current form.

[96]    Counsel to the Noteholder Group also made submissions that three other provisions of the Settlement Agreement were unreasonable and unfair, namely:

> (i)    ongoing exposure to potential liability for pension claims if a bankruptcy order is made before October 1, 2010;

> (ii)    provisions allowing payments made to employees to be credited against employees' claims made, rather than from future distributions or not to be credited at all; and

> (iii)    lack of clarity as to whether the proposed order is binding on the Superintendent in all of his capacities under the *Pension Benefits Act* and other applicable law, and not merely in his capacity as Administrator on behalf of the Pension Benefits Guarantee Fund.

[97]    The third concern was resolved at the hearing with the acknowledgement by counsel to the Superintendent that the proposed order would be binding on the Superintendent in all of his capacities.

[98]    With respect to the concern regarding the potential liability for pension claims if a bankruptcy order is made prior to October 1, 2010, counsel for the Applicants undertook that the Applicants would not take any steps to file a voluntary assignment into bankruptcy prior to October 1, 2010.  Although such acknowledgment does not bind creditors from commencing involuntary bankruptcy proceedings during this time period, the granting of any bankruptcy order is preceded by a court hearing.  The Noteholders would be in a position to make submissions on this point, if so advised.  This concern of the Noteholders is not one that would cause me to conclude that the Settlement Agreement was unreasonable and unfair.

[99]    Finally, the Noteholder Group raised concerns with respect to the provision which would allow payments made to employees to be credited against employees' claims made, rather than from future distributions, or not to be credited at all.  I do not view this provision as being unreasonable and unfair.  Rather, it is a term of the Settlement Agreement that has been negotiated by the Settlement Parties.  I do note that the proposed treatment with respect to any payments does provide certainty and finality and, in my view, represents a reasonable compromise in the circumstances.

## DISPOSITION

[100]    I recognize that the proposed Settlement Agreement was arrived at after hard-fought and lengthy negotiations.  There are many positive aspects of the Settlement Agreement.  I have no doubt that the parties to the Settlement Agreement consider that it represents the best agreement achievable under the circumstances.  However, it is my conclusion that the inclusion of Clause H.2 results in a flawed agreement that cannot be approved.

- Page 17 -

[101]   I am mindful of the submission of counsel to the Former and LTD Employees that if the Settlement Agreement were approved, with Clause H.2 excluded, this would substantively alter the Settlement Agreement and would, in effect, be a creation of a settlement and not the approval of one.

[102]   In addition, counsel to the Superintendent indicated that the approval of the Superintendent was limited to the proposed Settlement Agreement and would not constitute approval of any altered agreement.

[103]   In *Grace 2008, supra*, I commented that a line-by-line analysis was inappropriate and that approval of a settlement agreement was to be undertaken in its entirety or not at all, at para. 74. A similar position was taken by the New Brunswick Court of Queen's Bench in *Wandlyn Inns Limited (Re)* (1992) 15 C.B.R. (3d) 316. I see no reason or basis to deviate from this position.

[104]   Accordingly, the motion is dismissed.

[105]   In view of the timing of the timing of the release of this decision and the functional funding deadline of March 31, 2010, the court will make every effort to accommodate the parties if further directions are required.

[106]   Finally, I would like to express my appreciation to all counsel and in person parties for the quality of written and oral submissions.

MORAWETZ J.

**Date:**   March 26, 2010

**APPENDIX B – AMENDED AND RESTATED SETTLEMENT AGREEMENT**

# AMENDED AND RESTATED SETTLEMENT AGREEMENT

**THIS AGREEMENT** made as of the 30th day of March, 2010

**AMONG :**

> **NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL NETWORKS TECHNOLOGY CORPORATION, NORTEL NETWORKS INTERNATIONAL CORPORATION, NORTEL NETWORKS GLOBAL CORPORATION**
>
> (collectively, "**Nortel**" and individually a "**Nortel Entity**")
>
> - and –
>
> **ERNST & YOUNG INC.,** solely in its capacity as monitor in the CCAA proceedings of Nortel and not in its personal capacity
>
> (the "**Monitor**")
>
> - and -
>
> **DONALD SPROULE, DAVID ARCHIBALD and MICHAEL CAMPBELL**, court appointed representatives of the Nortel Former Employees (as hereinafter defined)
>
> (the "**Former Employees Representatives**")
>
> - and -
>
> **SUE KENNEDY**, court appointed representative of the Represented LTD Beneficiaries (as hereinafter defined)
>
> (the "**LTD Representative**")
>
> - and -
>
> **KOSKIE MINSKY LLP,** court appointed counsel to the Former Employees of Nortel and the Represented LTD Beneficiaries
>
> ("**Representative Counsel**")

- 2 -

- and -

**NATIONAL AUTOMOBILE, AEROSPACE, TRANSPORTATION AND GENERAL WORKERS UNION OF CANADA** (CAW-Canada) and its Locals 27, 1525, 1530, 1837, 1839, 1905 and/or 1915 and George Borosh et al.

(**"CAW"**)

## A. *RECITALS*

**WHEREAS** Nortel filed for and obtained protection under the *Companies' Creditors Arrangement Act* (**"CCAA"**) by order of the Ontario Superior Court of Justice (Commercial List) (the "**Court**") dated January 14, 2009, as amended and restated (the "**Initial Order**");

**AND WHEREAS** by Order of the Court dated May 27, 2009, the Former Employees Representatives were appointed representatives of all former employees, including pensioners, of Nortel or any person claiming an interest under or on behalf of such former employees or pensioners and surviving spouses in receipt of a Nortel pension, or group or class of them, other than (a) those represented by counsel to the CAW, and (b) those who elected pursuant to the requirements of such Order not to be bound by such Order (the individuals in respect of whom the Former Employees Representatives were appointed pursuant to such Order, are referred to herein as the "**Nortel Former Employees**");

**AND WHEREAS** certain employees and former employees of Nortel are represented by counsel to the CAW;

**AND WHEREAS** by Order of the Court dated July 30, 2009, the LTD Representative was appointed representative of those employees of Nortel who are currently not working due to an injury, illness or medical condition in respect of which they are receiving or entitled to receive disability income benefits by or through Nortel, and who may assert an existing or future claim for payment, reimbursement or coverage arising in connection with their employment with Nortel or termination thereof, a pension or benefit plan sponsored by Nortel, including in relation to medical, dental, long-term or short-term disability benefits, life insurance or any other benefit, obligation or payment to which such person (or others who may be entitled to claim under or through such person) may be entitled from or through Nortel , other than (a) those individuals who are currently employed and whose benefit or other payments, as described above, arise directly or inferentially out of a collective agreement between any Nortel Entity and the CAW, and (b) those individuals who elected pursuant to the requirements of such Order not to be bound by such Order (the individuals in respect of whom the LTD Representative was appointed pursuant to such Order are referred to herein as the "**Represented LTD Beneficiaries**");

**AND WHEREAS** Representative Counsel was appointed as counsel to the Nortel Former Employees and the Represented LTD Beneficiaries by Court orders dated May 27, 2009 and dated July 30, 2009, respectively, for the purpose of, among other things, settling or compromising the claims of the individuals they represent;

**AND WHEREAS** the parties to this Settlement Agreement (the **"Parties"**) have reached an agreement for the benefit of Nortel and all of its stakeholders, as well as the Official Committee of Unsecured Creditors of Nortel Networks Inc. and certain of its affiliates in the chapter 11 proceedings before the U.S. Bankruptcy Court for the District of Delaware (the **"UCC"**) and the Informal Nortel Noteholder Group (the **"Bondholder Committee"**) regarding certain issues related to, among other things, Nortel's Pension Plans, HWT (both as defined below) and certain employment related issues (collectively, the **"Settlement"**); and

**NOW THEREFORE** for value received (the receipt and sufficiency of which are hereby acknowledged), the Parties agree as follows:

**B.    BENEFITS AND EMPLOYEES**

1.    For the remainder of 2010, Nortel shall continue in accordance with current practice to pay medical and dental benefits and life insurance benefits to Nortel pensioners and their beneficiaries and survivors, whether or not represented by Representative Counsel, and for greater certainty, including without limitation all of the individuals referenced in paragraphs (a) and (b) of the second recital above (collectively, the **"Pensioners"**) and the Nortel employees receiving or who become entitled during 2010 to receive long term disability benefits, whether or not represented by Representative Counsel, and for greater certainty, including without limitation all of the individuals referenced in paragraphs (a) and (b) of the fourth recital above (collectively, the **"LTD Beneficiaries"**) in accordance with the current benefit plan terms and conditions. The Pensioners and the LTD Beneficiaries shall be referred to collectively as the **"M&D Beneficiaries"**. Medical and dental benefits to be paid to the M&D Beneficiaries shall be funded solely from Nortel's funds on a "pay as you go basis" in respect of benefits for the coverage period ending December 31, 2010 (the **"Medical and Dental Payments"**), provided that no Medical and Dental Payments claims submitted after February 28, 2011 shall be accepted, honoured or paid. Life insurance benefits to the M&D Beneficiaries shall continue unchanged until December 31, 2010 and shall be funded in the same manner as for 2009 (the **"Life Insurance Benefits"**). For greater certainty, no Medical and Dental Payments or Life Insurance Benefits shall be paid by Nortel for any benefit coverage period following December 31, 2010.

2.    Nortel shall pay income benefits to the LTD Beneficiaries and to those people receiving or who become entitled during 2010 to receive survivor income benefits and survivor transition benefits under Nortel benefit plans (as such plans exist at the date of this Settlement Agreement) solely from Nortel funds on a "pay as you

- 4 -

go basis" for benefits in respect of the coverage period from January 1, 2010 to December 31, 2010 (the "**Income Payments**"). For greater certainty, no Income Payments shall be paid by Nortel for the benefit coverage period following December 31, 2010.

3.     Upon the satisfaction of all of the conditions in paragraph I.1 of this Settlement Agreement, Nortel shall create a pool of $4.3 million (inclusive of Representative Counsel's costs in respect of the motion for leave to appeal referred to in paragraph B.4 below to a maximum of $100,000.00, based on documented and reasonable fees and disbursements) (the "**Termination Fund**") to be set aside for employees and former employees of Nortel whose employment has been terminated or is terminated prior to or on June 30, 2010 to whom amounts are or may become owing for termination or severance payments, who have not been offered employment with a purchaser of Nortel's assets and who have not received or are not entitled to receive (i) gross cumulative Annual Incentive Plan payments from and after October 1, 2009 of $3,000.00 or more; or (ii) a Key Employee Incentive Plan or Key Employee Retention Plan payment in 2009; or (iii) payment from any Court approved equivalent 2010 plan. Each such individual shall be paid a maximum of $3,000.00 (subject to applicable withholding taxes) from the Termination Fund (the "**Termination Payments**"). Any Termination Payments paid to such individuals shall be credited against allowed claims of such individuals and such claims shall be correspondingly reduced. To the extent that funds are unused in respect of terminations prior to or on June 30, 2010, or payment of Representative Counsel's costs referred to above, the Termination Fund may be used to make payments on account of terminations after June 30, 2010. If such unused funds are to be used for another purpose, such purpose shall be approved by the Court, on such basis as is agreed to between Representative Counsel and the Monitor.

4.     Upon the issuance of an order by the Court approving this Settlement Agreement in its entirety, including all schedules thereto, and upon the expiry of all appeals and rights of appeal in respect thereof (the "**Final Approval Order**"), Representative Counsel shall promptly withdraw their application for leave to appeal the decision of the Court of Appeal, dated November 26, 2009, to the Supreme Court of Canada (the "**Leave Application**") on a with prejudice basis. No claim for costs in respect of the Leave Application shall be made by or against Nortel, or any creditor participants (including the UCC and the Bondholder Committee).

5.     The employment of the LTD Beneficiaries shall terminate on December 31, 2010. However, such termination shall not affect in any manner any rights the LTD Beneficiaries or anyone claiming through them may have, either under a collective agreement, at common law or pursuant to any statute in relation to ordinary unsecured claims against Nortel arising out of their employment or termination thereof, including but not limited to claims for future lost long term

- 5 -

disability or income continuation benefits, pension benefits or pension benefit accruals, and medical, dental and life insurance benefits, nor should affect in any manner their ability to participate in any program of benefits for which they are eligible that is established as a successor to the plans in which they currently participate. For greater certainty, such claims, to the extent they are allowed as claims against Nortel pursuant to any claims adjudication procedure established in these proceedings, shall rank as ordinary unsecured claims on a *pari passu* basis with the claims of the ordinary unsecured creditors of Nortel. Nothing in this paragraph will affect the rights of the LTD Beneficiaries to make claims in respect of the HWT (as defined below).

## C.   HEALTH AND WELFARE TRUST

1.  <u>Resolution:</u> The Parties will work towards a Court approved distribution of the Health and Welfare Trust ("**HWT**") corpus in 2010 to its beneficiaries entitled thereto and the resolution of any issues necessarily incident thereto. For greater certainty, nothing in this Settlement Agreement affects the determination on any basis whatsoever of the entitlement of any beneficiary to a distribution from the corpus of the HWT. Any fees or expenses incurred in connection with any dispute or litigation among the beneficiaries of the HWT concerning entitlement (including without limitation all legal, actuarial and other fees and expenses of the trustee of the HWT and other service providers of the HWT) shall not be paid by Nortel, but shall be paid by the HWT corpus. For greater certainty, such fees or expenses shall not include those of the Monitor and incurred by Nortel in connection with any motion for termination of the HWT or for directions with respect to the HWT, which shall be paid by Nortel.

2.  <u>Ranking:</u> The CAW, Representative Counsel, the LTD Representative and the Former Employee Representatives (the "**Representatives**") agree, on behalf of those they represent and on their own behalf, that in respect of any funding deficit in the HWT or any HWT related claims (the "**HWT Claims**"), in these proceedings or in any subsequent receivership or bankruptcy proceedings, or in any other proceedings, or in any other forum whatsoever concerning Nortel, any of the entities listed in Schedule "A" (collectively the "**Nortel Worldwide Entities**" and individually, a "**Nortel Worldwide Entity**") or the HWT, they shall not advance, assert or make any claim that any HWT Claims are entitled to any priority or preferential treatment over ordinary unsecured claims, including without limitation that they rank as priority claims against Nortel or any Nortel Worldwide Entity, or are the subject of a constructive trust or trust of any nature or kind in respect of the property and assets of Nortel or any Nortel Worldwide Entity, nor shall they take any action or support any party, person or entity, directly or indirectly, who advances, asserts or makes such claims, and such claims, to the extent allowed against Nortel pursuant to any claims adjudication procedure established in these proceedings, shall rank as ordinary unsecured

- 6 -

claims on a *pari passu* basis with the claims of the ordinary unsecured creditors of Nortel.

## D.    REGISTERED PENSION PLANS

1.    <u>Administration:</u>    Nortel shall continue to administer the Nortel Networks Negotiated Pension Plan (Registration No. 08587766) and the Nortel Networks Limited Managerial and Non-Negotiated Pension Plan (Registration No. 0342048) (collectively, the "**Pension Plans**") until 11:59 p.m. on September 30, 2010. For greater certainty, Nortel Networks Limited shall remain the administrator (as defined in the *Pension Benefits Act*) of the Pension Plans until 11:59 p.m. on September 30, 2010. Neither Nortel nor the Monitor will take any steps to initiate a wind up, in whole or in part, of the Pension Plans with an effective date prior to September 30, 2010 at 11:59 p.m. Nortel shall cease to administer the Pension Plans on September 30, 2010 at 11:59 p.m. and thereafter shall have no further responsibility or liability for administration thereof (including any windup). So long as Nortel continues to administer the Pension Plans, there shall be no change whatsoever to the plan terms of the Pension Plans without the approval of the Court, and no change to the current asset mix or investment policies with respect to the Pension Plans other than at the request, and with the consent, of the Representative Counsel and the approval of the Court.

2.    <u>Payments:</u> Nortel shall continue to make contributions to the Pension Plans in the same manner as it has been doing over the course of the proceedings, under the CCAA, through to March 31, 2010, and for greater certainty, shall continue to make all current service payments and special payments related to the Pension Plans through that date in accordance with the last actuarial valuation for the Pension Plans filed with the Financial Services Commission of Ontario in the aggregate amount of $2,216,254.00 per month (the "**March Pension Payments**"). Thereafter and through to September 30, 2010, Nortel shall make only current service payments to the Pension Plans in the aggregate amount of $379,837.00 per month (the "**September Pension Payments**"). For greater certainty, Nortel shall not make any special payment contributions to the Pension Plans after March 31, 2010. The March Pension Payments and the September Pension Payments shall be referred to collectively as the "**Pension Payments**". Nortel shall not make any payments or contributions whatsoever to the Pension Plans after September 30, 2010, except in respect of any claims in respect of the Pension Plans allowed against Nortel (which claims shall rank on a *pari passu* basis with the claims of the ordinary unsecured creditors of Nortel) pursuant to any claims adjudication procedure established in these proceedings. Neither Nortel, nor any Nortel Worldwide Entity shall have any obligation or liability regarding any contributions, fees, indemnities, charges or costs of any kind in respect of the administration of the Pension Plans after September 30, 2010. For greater certainty, nothing in this paragraph affects any obligation or liability of Nortel regarding any contributions, fees, indemnities, charges or costs of any kind in

respect of the administration of the Pension Plans before 11:59 p.m. on September 30, 2010.

3.    Transition:  With the assistance of the Monitor, Nortel shall use reasonable efforts to cause all books, records, data and other information relating to the Pension Plans or beneficial to the administration or winding-up of the Pension Plans in the possession or control of Nortel to be consolidated in Toronto, Ontario, Canada by no later than March 31, 2010.  The Monitor and Nortel shall take all reasonable steps, at the sole cost and expense of Nortel, to complete the orderly transfer of the records of administration of the Pension Plans to a new administrator appointed by the Superintendent of Financial Services (the "**Superintendent**"), on September 30, 2010 (the "**New Administrator**").  Any non-compliance or allegation of non-compliance by Nortel or the Monitor under this paragraph D.3 shall have no effect on the enforceability or effectiveness of any other provision of this Agreement.

**E.    RANKING OF PENSION CLAIMS**

1.    The Representatives agree on behalf of the members of the Pension Plans their and beneficiaries and surviving spouses who are entitled to benefits from the Pension Plans and whom they represent and on their own behalf (collectively, the "**Pension Claimants**") that in respect of any claim for payment of or damages related to any solvency or wind up deficiencies, unfunded liabilities, or unpaid or accrued contributions (including, for greater certainty, any special payments whatsoever), any liability regarding the Pension Benefits Guarantee Fund (the "**PBGF**") or any obligation of or claim arising against any person with respect to the Pension Plans or the administration thereof (the "**Pension Claims**"):  (a) no Pension Claims shall enjoy any priority in any manner over the claims of ordinary unsecured creditors made against Nortel; (b) the Pension Claimants hereby waive, and shall not directly or indirectly assert, advance, re-assert or re-file any claims or initiate any legal proceedings or actions of any nature or kind in these proceedings or in any subsequent receivership or bankruptcy proceedings, or in any other proceedings, or in any other forum whatsoever concerning Nortel or any Nortel Worldwide Entity or the Pension Plans, that the Pension Claims or any part thereof rank as a priority claim over the claims of ordinary unsecured creditors, as a trust (whether deemed or otherwise) or a lien or charge (hereinafter referred to as a "**lien**"), or under any other legal or equitable theory; and (c) the Pension Claimants shall not support, directly or indirectly, any application, claim or action by Nortel, in its capacity as administrator of the Pension Plans, the New Administrator, any successor administrator howsoever appointed, the Superintendent, as the administrator of and on behalf of the PBGF, or any other person or entity, to directly or indirectly assert, advance, re-assert or re-file any claims or initiate any legal proceedings or actions of any nature or kind in these proceedings or in any subsequent receivership or bankruptcy proceedings, or in any other proceedings, or in any other forum whatsoever concerning Nortel or any