**<u>EXHIBIT A</u>**

Court File No. 09-CL-7950

*ONTARIO*
**SUPERIOR COURT OF JUSTICE**
**(COMMERCIAL LIST)**

**IN THE MATTER OF THE *COMPANIES' CREDITORS***
***ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED**

**AND IN THE MATTER OF A PLAN OF**
**COMPROMISE OR ARRANGEMENT OF**
**NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED,**
**NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS**
**INTERNATIONAL CORPORATION AND NORTEL NETWORKS**
**TECHNOLOGY CORPORATION**

**FORTY-THIRD REPORT OF THE MONITOR**
**DATED APRIL 9, 2010**

**INTRODUCTION**

1.  On January 14, 2009 (the "Filing Date"), Nortel Networks Corporation ("NNC" and
    collectively with all its subsidiaries "Nortel" or the "Company"), Nortel Networks
    Limited ("NNL"), Nortel Networks Technology Corporation, Nortel Networks
    International Corporation and Nortel Networks Global Corporation (collectively the
    "Applicants") filed for and obtained protection under the *Companies' Creditors*
    *Arrangement Act* ("CCAA"). Pursuant to the Order of this Honourable Court dated
    January 14, 2009, as amended and restated (the "Initial Order"), Ernst & Young Inc.
    was appointed as the Monitor of the Applicants (the "Monitor") in the CCAA
    proceedings. The stay of proceedings was extended to April 23, 2010 by this
    Honourable Court in its Order dated January 21, 2010.

2.  Nortel Networks Inc. ("NNI") and certain of its U.S. subsidiaries concurrently filed
    voluntary petitions under Chapter 11 of Title 11 of the U.S. Bankruptcy Code (the
    "Code") in the United States Bankruptcy Court for the District of Delaware (the
    "U.S. Court") on January 14, 2009 (the "Chapter 11 Proceedings"). As required by

1

U.S. law, an official unsecured creditors committee (the "Committee") was established in January, 2009.

3.  An ad hoc group of holders of bonds issued by NNL and NNC has been organized and is participating in these proceedings as well as the Chapter 11 Proceedings (the "Bondholder Group").  In addition, pursuant to Orders of this Honourable Court dated May 27, 2009 and July 22, 2009, representative counsel was appointed on behalf of the former employees of the Applicants and on behalf of the continuing employees of the Applicants, respectively. Each of these groups is participating in the CCAA proceedings.

4.  Nortel Networks (CALA) Inc. ("NN CALA" and together with NNI and certain of its subsidiaries that filed on January 14, 2009, the "U.S. Debtors") filed a voluntary petition under Chapter 11 of Title 11 of the Code in the U.S. Court on July 14, 2009.

5.  Nortel Networks UK Limited ("NNUK") and certain of its subsidiaries located in EMEA were granted administration orders (the "UK Administration Orders") by the High Court of England and Wales on January 14, 2009 (collectively the "EMEA Debtors").  The UK Administration Orders appointed Alan Bloom, Stephen Harris, Alan Hudson and Chris Hill of Ernst & Young LLP as administrators of the various EMEA Debtors, except for Ireland, to which David Hughes (Ernst & Young LLP Ireland) and Alan Bloom were appointed (collectively the "Joint  Administrators"). On June 8, 2009, the Joint Administrators appointed in respect of NNUK filed a petition with the U.S. Court for recognition of the administration proceedings as they relate to NNUK (the "English Proceedings") under Chapter 15 of the Code. On June 26, 2009, the U.S. Court entered an order recognizing the English Proceedings as foreign main proceedings under Chapter 15 of the Code.

6.  Subsequent to the filing date, Nortel Networks SA commenced secondary insolvency proceedings within the meaning of Article 27 of the European Union's Council Regulation (EC) No 1346/2000 on Insolvency Proceedings in the Republic

of France pursuant to which a liquidator and an administrator have been appointed by the Versailles Commercial Court.

7.   Subsequent to the filing date, certain other Nortel subsidiaries have filed for creditor protection in the local jurisdiction in which they are located.

## PURPOSE

8.   The purpose of this forty-third report of the Monitor (the "Forty-Third Report") is to report to this Honourable Court on the following matters:

   a)  consolidated cash position and liquidity as at March 27, 2010;

   b)  actual receipts and disbursements from January 3, 2010 to March 27, 2010;

   c)  cash flow forecast for the period from March 28, 2010 to July 22, 2010;

   d)  current status of the Group Supplier Protocol Agreement ("GSPA");

   e)  employee settlement status;

   f)  status of Health and Welfare Trust;

   g)  progress on restructuring;

   h)  status of foreign proceedings; and

   i)  Applicants' request for an extension of the stay of proceedings until July 22, 2010.

## TERMS OF REFERENCE

9.   In preparing this Forty-Third Report, the Monitor has relied upon unaudited financial information, the Company's books and records, financial information prepared by the Company and discussions with management of Nortel.   The Monitor has not audited, reviewed or otherwise attempted to verify the accuracy or

3

completeness of the information and accordingly, the Monitor expresses no opinion or other form of assurance on the information contained in this Forty-Third Report.

10. Unless otherwise stated, all monetary amounts contained herein are expressed in U.S. dollars.

11. Capitalized terms not defined in this Forty-Third Report are as defined in the Affidavit of John Doolittle sworn on January 14, 2009, the Pre-Filing Report or previous reports of the Monitor.

12. The Monitor has made various materials relating to the CCAA proceedings available on its website at www.ey.com/ca/nortel. The Monitor's website also contains a dynamic link to Epiq Bankruptcy LLC's website where materials relating to the Chapter 11 Proceedings are posted.

**CONSOLIDATED CASH POSITION AND LIQUIDITY AS AT MARCH 27, 2010**

13. At March 27, 2010, Nortel's consolidated cash balance was approximately $5.6 billion including $2.8 billion of total treasury cash. Nortel's consolidated cash balance is held globally in various Nortel entities and joint ventures and in escrow accounts which contain the sale proceeds of the various asset and business divestitures Nortel has completed since the Filing Date. The following is an overview of Nortel's consolidated cash position as at March 27, 2010:

| Region | Gross Cash | Restricted | Unavaliable (JV's and Other Items) | Available Cash |
|---|---|---|---|---|
| NNL | 214 | (32) | (8) | 174 |
| Other Canada | 37 | (25) | - | 12 |
| NNI | 800 | (35) | - | 765 |
| NNI - Reserve MMF (ST/LT) | - | - | - | - |
| Other US (excluding NN CALA) | 2 | - | - | 2 |
| **North America** | 1,053 | (92) | (8) | 953 |
| NN UK Limited | 351 | (30) | - | 321 |
| Other EMEA Filed Entities | 389 | (7) | - | 382 |
| JV - Netas | 63 | - | (63) | - |
| EMEA non-filed entities | 22 | - | - | 22 |
| **UK/Europe** | 825 | (37) | (63) | 725 |
| Greater China | 180 | (10) | - | 170 |
| Other ASIA PAC (excl JVs) | 276 | (1) | - | 275 |
| LG Nortel | 192 | - | (192) | - |
| Other JVs | 113 | - | (113) | - |
| **ASIA** | 761 | (11) | (305) | 445 |
| NN CALA | 83 | - | - | 83 |
| Other CALA filed entities | 24 | - | (24) | - |
| CALA non-filed entities | 47 | - | - | 47 |
| **CALA** | 154 | - | (24) | 130 |
| **Total Treasury Cash** | **2,793** | **(140)** | **(400)** | **2,253** |
| **Divestiture Proceeds** | 2,769 | (2,769) | - | - |
| **Total Cash** | **5,562** | **(2,909)** | **(400)** | **2,253** |

14. As at March 27, 2010, North America had cash available for operations and post-filing inter-company settlements of approximately $953 million compared to a gross cash position of approximately $1.1 billion. Of the $953 million, approximately $186 million is held by Canadian entities and approximately $767 million is held by U.S. entities.

15. None of the Applicants' Restricted Cash and Unavailable Cash is readily available to them.  The Applicants' Restricted Cash relates primarily to: (i) $15 million of cash collateral posted by the Applicants in support of non-EDC performance bonds and letter of credit facilities; (ii) $11 million held in the D&O Trust as detailed in the Pre-Filing Report; (iii) $10 million held in escrow related to the settlement of the Global Class Action; (iv) $8 million in support of EDC performance bonds issued in exotic foreign currencies; (v) $5 million of cash collateral posted with EDC in support of post filing performance bonding; (vi) $4 million held in relation to benefits paid through the Health and Welfare Trust (the "HWT"); (vii) $2 million held in escrow in respect of a certain real estate lease; and (viii) other escrowed amounts in support of the Applicants operations.  The Unavailable Cash of $8 million relates to the proceeds from the sale of the Strandherd Lands.

16. As at March 27, 2010, NNI's Restricted Cash relates primarily to: (i) a deposit of $10 million held by NNI in respect of the sale of the GSM/GSM-R assets; (ii) $2 million of cash collateral posted by NNI in support of non-EDC performance bonds and letter of credit facilities; (iii) $1 million held in escrow for the benefit of utility providers in accordance with the First Day Order; (iv) $11 million held in trust related to a payment to Flextronics pursuant to the Flextronics Settlement and Release Agreement; and (v) other escrowed amounts in support of NNI's operations.

17. The U.K. Administrators on behalf of NNUK and the other EMEA Debtors had available cash for operations and post-filing inter-company settlements of approximately $703 million.  The EMEA non-filed entities had available cash of approximately $22 million which is expected to be used primarily to fund their in-country operations and inter-company settlements.

18. NETAS, a joint venture of which Nortel owns a 53% interest, had approximately $63 million of cash of which approximately $33 million represents Nortel's proportionate share.  Nortel believes these funds will continue to be used to fund NETAS's operations.

6

19. Nortel entities in the APAC region have approximately $445 million of available cash for operations and inter-company settlements.  As a result of the regulatory regime in the People's Republic of China, the funds in Greater China of approximately $170 million are generally only available to fund operations within Greater China and inter-company settlements.  LGN and other joint ventures of which Nortel is a participant held approximately $305 million of cash of which $156 million represents Nortel's proportionate share.  Nortel believes these funds will continue to be used to fund the joint ventures' operations.  Repatriation of these funds requires approval of the respective joint venture partners.

20. As at March 27, 2010, NN CALA's available cash was $83 million.  On March 10, 2010, Nortel Networks Telecomunicacoes do Brasil Ltda. ("NN Brazil") filed for bankruptcy protection.  As of March 27, 2010, NN Brazil had a gross cash balance of $24 million; however, these funds have been classified as unavailable cash as NN Brazil is no longer participating in the Nortel global restructuring and is under the control of a Brazilian bankruptcy trustee.  The CALA non-filed entities held approximately $47 million of available cash which is expected to be used to fund their in-country operations and inter-company settlements.

21. As at March 27, 2010, divesture proceeds of approximately $2.8 billion were being held in escrow by JPMorgan Chase Bank, N.A. until an agreement is reached regarding allocation of these proceeds to various Nortel legal entities, including NNL.  Divestiture proceeds held in escrow relate to: (i) $1,045 million in proceeds from the sale of CDMA / LTE Access assets; (ii) $18 million in proceeds from the sale of the Layer 4-7 Business; (iii) $10 million in proceeds from the sale of the Next Generation Packet Core business; (iv) $899 million in proceeds from the sale of Enterprise assets; and (v) $627 million in proceeds from the sale of the Optical Networking and Carrier Ethernet ("MEN") business .

22. On March 31. 2010, the GSM/GSM-R asset sale closed (as further described in paragraph 46 herein) and divestiture proceeds of $94 million were placed into escrow with JPMorgan Chase Bank, N.A.

23. In addition to the above divestiture proceeds:

   a)  a further $50 million of divestiture proceeds relating to the sale of CDMA / LTE Access assets are being held in escrow by CitiBank.  These divestiture proceeds are being held in support of the related Transition Service Agreement (the "TSA");

   b)  a further $35.6 million of divestiture proceeds relating to the sale of Enterprise assets are being held in escrow by Wells Fargo Bank.  These divestiture proceeds include $30 million being held in support of the finalization of purchase price adjustments and $5.6 million being held subject to the resolution of certain succession tax liabilities in France;

   c)  a further $85 million of divestiture proceeds relating to the sale of MEN assets are being held in escrow by Citibank.  These divestiture proceeds include: (i) $30 million being held in support of the related TSA; (ii) $34 million being held in support of the lease agreement with Ciena in respect of the Carling facility; and (iii) $21 million being held in support of potential succession tax, working capital and other adjustments; and

   d)  a further $24 million of divestiture proceeds relating to the sale of the GSM/GSM-R assets is being held in escrow by Citibank.  These divestiture proceeds are being held in support of the related TSAs.

24. The consolidated cash position balance presented above does not reflect a $14 million good faith deposit received from Genband Inc. with respect to the sale of the CVAS assets.

**ACTUAL RECEIPTS AND DISBURSEMENTS FROM JANUARY 3, 2010 TO MARCH 27, 2010**

25. The Applicants' actual consolidated net cash inflow for the period January 3, 2010 to March 27, 2010, was $99.6 million. A summary of the actual receipts and disbursements as compared to the forecast filed with the Thirty-Fifth Report (the "Thirty-Fifth Report Forecast") is attached at Appendix "A".

26. Actual net cash flow exceeded forecast by $39.1 million. Significant items contributing to this positive variance were as follows:

    a) a favourable timing variance of $4.3 million with respect to the collection of accounts receivable primarily as a result of expedited collections on MEN customer billings;

    b) a favourable permanent variance of $2.1 million with respect to other receipts primarily as a result of a $1.5 million release in cash collateral posted with EDC in support of certain post-filing performance bonding;

    c) an unfavourable variance of $5.6 million with respect to the TSA recoveries from buyers primarily as a result of the following:

        i. $1.5 unfavourable permanent variance due to lower than projected billings for the CDMA / LTE Access and Enterprise TSAs; and

        ii. $4.1 unfavourable timing variance as amounts originally forecasted to be received in Q1 2010 were retimed into Q2 2010;

    d) an unfavourable permanent variance of $12.1 million with respect to payroll and accounts payable reimbursement from the buyers of the CDMA/LTE Access assets and Enterprise business. This was fully offset by a favourable permanent variance of $12.1 million with respect to the actual spend on payroll and accounts payable on behalf of those buyers;

9

e) a favourable net variance of approximately $47.9 million with respect to inter-company receipts and disbursements primarily as a result of the following:

    i. $14.6 million favourable timing variance as a result of a dividend received from GDNT as regulatory approval for the repatriation of these funds was received earlier than initially forecasted;

    ii. $16.0 million favourable timing variance primarily as a result of inter-company receipts from NNI exceeding forecast as certain unmatched invoices were resolved and settled earlier than originally forecast;

    iii. $5.9 million favourable permanent variance as a result of lower than forecast inventory purchases from NNI;

    iv. $6.1 million favourable timing variance as net intercompany recoveries from the APAC region were settled earlier than originally forecast; and

    v. $3.0 million favourable permanent variance as a result of lower than forecast payments on account of outsourced intercompany research and development.;

f) a favourable variance of $4.8 million with respect to payroll primarily as a result of the following:

    i. favourable timing variance of $9.3 million as Q4 AIP that was originally forecast to be paid in Q1 2010 was reforecast to be paid during the week ending April 17, 2010;

    ii. favourable permanent variance of approximately $3.0 million on account of payroll savings as the MEN business divestiture closed on March 19, 2010. The Thirty Fifth Report Forecast assumed the MEN

business divestiture would not close within the Thirty Fifth Report Forecast period; and

   iii.   unfavourable timing variance of approximately $9.0 million as the accrued vacation pay for employees migrating as part of the MEN business divestiture was paid earlier than originally forecast;

g) a negative permanent variance of $5.9 million with respect to inventory disbursements as actual spend levels were higher than forecast run-rates; and

h) a negative timing variance of $8.1 million with respect to non-inventory purchases primarily as a result of the payment of year-end audit related fees of approximately $4.0 million earlier than forecast.

27. Restricted Cash was lower than forecast by approximately $1.5 million primarily as a result of a release of cash collateral posted with EDC in support of post-filing performance bonding.

28. Funding from the U.S. Debtors, in the amount of $178.5 million, was received by the Applicants pursuant to the Final Canadian Funding and Settlement Agreement during the period.

**CASH FLOW FORECAST FOR THE PERIOD MARCH 28, 2010 TO JULY 31, 2010**

29. The Applicants, with the assistance of the Monitor, have prepared an updated 18-week cash flow forecast for the period March 28, 2010 to July 31, 2010 (the "March 28 Forecast" and the "Forecast Period", respectively).  A copy of the March 28 Forecast is attached as Appendix "B".

30. As at March 28, 2010, the Applicants have Available Cash balances of approximately $186.4 million, excluding Restricted Cash and Unavailable Cash of approximately $64.8 million.

11

31.  Based on the March 28 Forecast, it is anticipated the Applicants will have total receipts of $157.4 million (including receipts in respect of the CFSA of $13.3 million) and total disbursements of $221.1 million resulting in a net cash outflow of $63.7 million during the Forecast Period.

32.  During the Forecast Period, it is assumed NNL does not make any additional draws pursuant to the NNI Loan Agreement (as herein defined) beyond the $75 million drawn prior to February 1, 2009.   The most recent cash payment in respect of accrued interest occurred in March 2010 and the term of the NNI Loan is extended to December 31, 2010.

33.  The significant assumptions used in preparing the March 28 Forecast include the following:

   a)  remittances from NNI will total $13.3 million pursuant to the CFSA;

   b)  receipts and disbursements reflect the closing (or anticipated closing) of the following divestitures on the dates noted: (i) the CDMA business/LTE Access assets (which closed on November 13, 2009); (ii) Enterprise Solutions business (which closed on December 18, 2009); (iii) MEN business (which closed March 19, 2010); (iv) the GSM/GSM-R assets (which closed March 31, 2010); and (v) the CVAS business (which is anticipated to close in May 2010);

   c)  monthly billings for transition services provided by the Applicants pursuant to the respective TSAs to buyers of the various Nortel assets and businesses are invoiced on an average 45 day billing cycle and subject to 30 day payment terms.

   d)  accounts payable disbursements relating to the CDMA /LTE Access assets continue to be administered by Nortel subsequent to closing of this sale transaction. During this transition period and in accordance with the relevant

12

asset purchase agreement, Ericsson will pre-fund these expenses to Nortel resulting in no material working capital impact. The administration of accounts payable disbursements is assumed to continue throughout the Forecast Period;

e)  sale proceeds from the CDMA /LTE Access assets, Enterprise business, MEN business and GSM/GSM-R asset sale transactions and from the pending sale of the other business unit transactions continue to be held or are paid into escrow and are not reflected in the March 28 Forecast;

f)  accounts receivable collections, including collection of residual accounts receivable not acquired by the purchasers as part of the divestiture of the business units, is consistent with revenue forecasts and historic customer collection experience that has been estimated by the Applicants' collection group;

g)  all disbursements are made assuming pre-filing amounts owed to suppliers are stayed and post-filing amounts are paid on significantly reduced credit terms as a result of the CCAA proceedings;

h)  inter-company trade accounts for post-filing transactions continue to settle on a cash basis between the Applicants, U.S. Debtors, EMEA Debtors and other Nortel entities.  Inter-company pre-filing trade accounts and loans between the Applicants and all other Nortel filed and non-filed entities are stayed;

i)  payroll includes payment of estimated KEIP/KERP amounts and Q4 2009 AIP;

j)  pursuant to the terms of the Amended and Restated Employee Settlement (as defined herein), pension funding with respect to the registered defined benefit and defined contribution plans will continue only for current service payments

13

after March 31 2010.  Funding for non-registered pension or other retirement plans is stayed;

k)  funding for the HWT will be in accordance with the Amended and Restated Employee Settlement;

l)  all interest payments relating to the Company's pre-filing indebtedness are stayed and interest with respect to the post-filing NNI Loan continues to accrue;

m)  any payments from the CAD $4.2 million Termination Fund pursuant to the terms of the Amended and Restated Employee Settlement are assumed not to occur within the Forecast Period; and

n)  pursuant to the Cascade Trust Indenture, NNL and NNI were each required to fund $17.5 million to the trust created thereunder.  The obligations will be satisfied by the direct transfer of these amounts to the trustee from the CDMA/LTE Access asset sales proceeds escrow account.  Accordingly, the transaction as it relates to NNL is not reflected in the March 28 Forecast.

34.  Based on an analysis prepared by the Monitor, it appears NNL has sufficient cash resources to fund operations through July 22, 2010.

**CURRENT STATUS OF GSPA**

35.  Since the Filing Date, Nortel entities have continued to purchase goods and services from one another on a basis consistent with the operation of the business prior to these proceedings. Post-filing transactions between the U.S. Debtors and the Applicants are pursuant to court orders entered in the CCAA proceedings (e.g. the Initial Order) and the Chapter 11 Proceedings and/or in accordance with the Code (together, the "Trading Orders"). Trade between the EMEA Debtors and the

Applicants is pursuant to the GSPA. The GSPA has continued to be extended by the parties, substantially in the same form as the initial GSPA.

36. The purpose of the Trading Orders and GSPA is to ensure goods and services purchased after the Filing Date are paid in full without any set off, deduction, withholding, counter-claim or payment netting with respect to amounts owed as between the Nortel parties prior to the Filing Date. In addition, the Trading Orders and GSPA set out the requirement for the Applicants to secure any unpaid amounts for post-filing purchases owing to the U.S. Debtors or EMEA Debtors by way of a charge on the assets of the Applicants (the "Inter-Company Charge").

37. The Applicants have previously sought and obtained approval of the first to thirteenth extensions to the GPSA.

38. The Applicants are seeking this Honourable Court's approval of the fourteenth extension of the GSPA. The fourteenth extension of the GSPA expires on April 30, 2010. A copy of the fourteenth extension of the GSPA is attached as Appendix "C". The Monitor supports the Applicants' request for approval of the fourteenth extension of the GSPA.

**EMPLOYEE SETTLEMENT STATUS**

39. Reference should be made to the Thirty-Ninth Report and the Forty-Second Report for a discussion of:

   a) the events and process leading up to a February 2010 settlement among the parties to the settlement agreement (the "Settlement Parties") with respect to, among other things the Applicants' registered Pension Plans, certain employee benefits for former employees, Pensioner and LTD Beneficiaries and certain employment related issues (the "Settlement Agreement");

   b) information and analysis considering the Settlement Agreement;

c) this Honourable Court's dismissal of the motion for approval of the Settlement Agreement, including the reasons for the dismissal; and

d) the events leading up to a March 30, 2010 amended settlement with the Settlement Parties with respect to the Applicants' registered Pension Plans, certain employee benefits for Pensioner and LTD Beneficiaries and certain employment related issues (the "Amended and Restated Settlement Agreement").

40. On March 31, 2010, this Honourable Court issued an order approving the Amended and Restated Settlement Agreement which, but for the exclusion of "Clause H2", is unchanged from the terms of the Settlement Agreement.

**HEALTH AND WELFARE TRUST STATUS**

41. The HWT, as further described in the Thirty-Ninth Report, has continued to operate since the inception of the CCAA proceedings. The Amended and Restated Settlement Agreement provides for the Settlement Parties to work towards both a Court approved distribution of the HWT corpus to its beneficiaries and the resolution of any issues relating thereto during 2010. The Monitor is working with the appropriate parties to assemble information relevant to the distribution motion in respect of the HWT which will be made publically available in conjunction with that motion. The Applicants have advised they intend to reimburse the HWT for LTD and SIB income benefits paid by the HWT subsequent to January 1, 2010.

42. In contemplation of the distribution of the HWT, the Applicants have advised the Monitor they are exploring opportunities for an alternative process for providing on-going benefits to their continuing employees without using the HWT.

43. The Amended and Restated Settlement Agreement and the establishment of an alternative process to provide benefits for continuing employees are important steps in advancing the Applicants' restructuring activities.

16

**PROGRESS ON RESTRUCTURING**

44.    Nortel continues to assess a range of restructuring alternatives, in consultation with their legal and financial advisors, with respect to the sale of its remaining assets while at the same time exploring other options in the event it cannot maximize value through a sales transaction.

**Divestiture Activities**

***MEN Business Sale***

45.    The sale of the MEN business was approved by this Honourable Court on December 2, 2009 and by the U.S. Court on December 3, 2009.  The sale transaction closed on March 19, 2010 generating proceeds in the amount of $712 million which are being held in escrow as discussed in paragraphs 21 and 23(c) above. The escrow agreement governing the escrow of the MEN sale proceeds was approved by this Honourable Court on March 15, 2010. On March 4, 2010, this Honourable Court approved the MEN Side Agreement among certain of the Applicants and various other Nortel entities that, among other things, governs the allocation of certain transaction and other costs related to the MEN transaction among the various Nortel entities.

***GSM/GSM-R Asset Sale***

46.    The sale of certain North American and rest of world assets related to the GSM/GSM-R business was approved by this Honourable Court and the U.S. Court on December 2, 2009.  The sale transactions closed on March 31, 2010 generating total proceeds in the amount of approximately $118 million, including consideration of closing adjustments, which are being held in various escrow accounts.  Of this amount, $24 million represents TSA related holdbacks.

47.    On March 30, 2010, this Honourable Court granted an Order authorizing the Applicants to enter into one or more escrow agreements concerning the GSM/GSM-

17

R sale proceeds on terms and conditions reasonably satisfactory to the Monitor. On March 31, 2010, certain of the Applicants, various other Nortel entities, the Monitor, the Committee and JPMorgan Chase Bank, N.A. entered into an escrow agreement in respect of the GSM/GSM-R sale proceeds, the terms of which are substantially similar to the escrow agreements entered into in connection with the other sale transactions.   Attached hereto as Appendix "D" is a copy of the GSM/GSM-R escrow agreement.   Also on March 31, 2010, certain of the Applicants and various other Nortel entities entered into the GSM Side Agreement that, among other things, governs the allocation of certain transaction costs related to the GSM/GSM-R transaction among the various Nortel entities.  The GSM/GSM-R Side Agreement is subject to the approval of both this Honourable Court and the U.S. Court. The Monitor understands that Applicants will be bringing a motion to have the GSM/GSM-R Side Agreement in due course.

### *CVAS Business Sale*

48.   On March 3, 2010, both this Honourable Court and the U.S. Court approved an asset sale agreement for the sale of substantially all of the CVAS business assets to Genband Inc.   Further details can be found in the Thirty-Fourth Report and the Fortieth Report.   It is anticipated the sale transaction will close during the second quarter of 2010.

### *Realization of Remaining Assets*

49. Nortel continues to make progress towards maximizing proceeds of realization on its residual assets.  The Corporate Group remains focused on facilitating the closing of currently announced business unit sales as well as the sale of Nortel's residual businesses and assets, including the Passport businesses and Nortel's interest in the LGN and GDNT joint ventures.   In addition, the Corporate Group is exploring the strategic alternatives available to best optimize the value of Nortel's remaining intellectual property.

**Status of Other Restructuring Activities**

*Appeal of June 18, 2009 Order*

50.  On November 26, 2009, the Court of Appeal for Ontario dismissed the appeals of the CAW-Canada and the former employees of the Applicants relating to an order of this Honourable Court dated June 18, 2009 addressing termination and severance pay as well as payments under various retirement benefit plans.  On December 23, 2009, the former employees filed an application for leave to appeal the decision to the Supreme Court of Canada.

51.  On March 25, 2010, the Supreme Court of Canada dismissed the application for leave to appeal the judgment of the Court of Appeal for Ontario dated November 26, 2009 as well as motions for directions and to expedite the application for leave to appeal.  A copy of the Supreme Court of Canada's judgement is attached as Appendix "E" to this Forty-Third Report.

*Appeal by UK Pension Regulator*

52.  On February 25, 2010, the Monitor brought a motion before this Honourable Court requesting relief with respect to proceedings commenced by the Pensions Regulator (United Kingdom) against NNC and NNL.  Additional information relating to this matter can be found in the Thirty-Eighth Report.

53.  On February 26, 2010, the relevant motion record was endorsed granting the relief requested by the Monitor in paragraphs (a), (b) and (d) of the Notice of Motion. Notices of Motion for Leave to Appeal this Honourable Court's decision have been filed with the Ontario Court of Appeal by the Pensions Regulator (United Kingdom), and by the Nortel Networks UK Pension Trust Limited and The Board of the UK Pension Protection Fund.

*Employee hardship application process*

54. On July 30, 2009, an order was issued by this Honourable Court approving an employee hardship application process (the "Employee Hardship Order") as more fully described in the Sixteenth Report and the Affidavit of John Doolittle dated July 24, 2009.

55. On January 21, 2010, this Honourable Court approved the Applicants' request to extend the Application Period until April 23, 2010 and to amend the eligibility requirements in respect of the Employee Hardship Process to reflect the extended date.

56. The Monitor is continuing to administer the hardship payment application process and report thereon to the relevant representative counsel. There currently remains available CAD $650,000 of the original CAD $750,000 provided pursuant to the Employee Hardship Order. Applications continue to be received from former employees of the Applicants asserting financial hardship resulting from illness, healthcare costs or ineligibility for pension or employment insurance benefits.

57. While those individuals awarded hardship payments should also have claims against the Applicants in the CCAA proceedings, it is not anticipated that any distributions under a plan of compromise or arrangement will occur in the near term. Accordingly, the Monitor supports the Applicants' request that the Application Period be extended until and including July 22, 2010 and that Eligibility Requirements and the Procedure With Respect To Hardship Payment Applications be amended accordingly. A copy of the amended Eligibility Requirements and the Procedure With Respect To Hardship Payment Applications is attached as Appendix "F" to this Forty-Third Report.

*Public Reporting*

58. As part of Nortel's ongoing cost reduction activities, NNC, NNL, NNI and Nortel Networks Capital Corporation each filed notifications under the U.S. Securities Exchange Act of 1934 (the "Act") indicating they had less than 300 holders of each of their respective series of debt securities and related guarantees thereby de-registering these securities under the Act. Furthermore, NNL de-registered its common stock under the Act, and thus NNL is no longer a U.S. registrant and is relieved of its U.S. securities laws filings including periodic reports on Forms 10-K, 10-Q and 8-K. NNL remains a reporting issuer under applicable Canadian securities laws and NNC continues to be a reporting issuer under both Canadian and U.S. securities laws, albeit with less rigorous reporting requirements.

*Pension Plan Transition*

59. Pursuant to the terms of the Amended and Restated Settlement Agreement, the Applicants have made all required special payments on account of past service benefits for the period ending March 31, 2010 and will continue to make monthly payments of approximately CAD $380,000 on account of current service until September 30, 2010.

60. Also pursuant to the Amended and Restated Settlement Agreement administration of both the Nortel Networks Managerial and Non-Negotiated Pension Plan and Nortel Networks Negotiated Pension Plan will be transferred to an administrator appointed by the Superintendent of Financial Services for Ontario effective as of October 1, 2010. The Applicants, with the assistance of the Monitor, have undertaken to facilitate the transfer of the administration of these pension plans in an orderly fashion. Transition activities to date have focused primarily on the physical consolidation of pension records in Toronto. Nortel and the Monitor meet with representatives of FSCO periodically to review progress with respect to the transition.

*Employee Matters*

61. On March 8, 2010, this Honourable Court granted an order approving the Nortel Special Incentive Plan, authorizing certain payments under the Key Employee Retention Plan and Key Executive Incentive Plan and granting a charge, subject to certain conditions, on the Applicants' Property as security for the payment of amounts owing pursuant to the Nortel Special Incentive Plan.

*Nortel Networks Telecomunicacoes do Brasil Ltda*

62. On March 10, 2010, NN Brazil filed for voluntary bankruptcy proceedings. The Brazilian court issued an order and appointed a bankruptcy trustee on March 30, 2010.

*April 3, 2010 Order*

63. On April 3, 2010, this Honourable Court issued an order approving the Applicants' motion with respect to the following:

   a) a reduction in amount of the Directors and Officers ("D&O") charge granted pursuant to the provisions of the Initial Order from CAD $90 million to CAD $45 million;

   b) capping permitted proven claims against the Applicants' directors and officers in respect of certain D&O liabilities; and

   c) the Applicants entering into:

      i. a trust indenture in conjunction with NNI establishing an indemnification trust in the amount of $35 million for the benefit of certain directors, officers and/or agents of certain non-filed direct or indirect subsidiaries of NNL; and

ii. a related side agreement governing the ultimate allocation of the amounts contributed to the trust by each of NNL and NNI.

**STATUS OF FOREIGN PROCEEDINGS**

*Chapter 11*

64. The following is a summary of the court orders that have been issued and the financial information that has been filed in the U.S. Chapter 11 proceedings since the last update provided in the Monitor's Thirty-Fifth Report:

a) On January 21, 2010, the U.S. Debtors obtained orders:

i. approving the settlement stipulation between Nortel Networks Inc. ("NNI") and the Internal Revenue Service (the "IRS") and authorizing the U.S. Debtors' entry into the Advance Pricing Agreement with the IRS; and

ii. extending the exclusivity period during which the U.S. Debtors may file a Chapter 11 plan and solicit acceptances thereof;

b) On January 26, 2010, the U.S. Debtors obtained an order approving the Final Canadian Funding and Settlement Agreement;

c) On February 26, 2010, the U.S. Bankruptcy Court entered orders:

i. adding certain additional debtors as sellers in the sale of the MEN business to Ciena Corporation; and

ii. enforcing and applying the automatic stay against Nortel Networks U.K. Pension Trust Limited (as Trustee of the Nortel Networks U.K. Pension Plan) (the "U.K. Pension Trustee") and the Board of the Pension Protection Fund (the "PPF") with respect to certain U.K.

pension proceedings commenced by the Pensions Regulator (United Kingdom);

d) On March 3, 2010, the U.S. Debtors obtained an order approving the U.S. Debtors' entry into the MEN Side Agreement;

e) On March 4, 2010, the U.S. Debtors obtained orders:

    i. authorizing and approving the sale by the U.S. Debtors of certain assets of the CVAS Business to GENBAND Inc.; and

    ii. approving the Nortel Special Incentive Plan, authorizing certain payments under the Key Employee Retention Plan and Key Executive Incentive Plan and approving certain employment agreements;

f) On March 10, 2010, the U.S. Debtors obtained an order approving the U.S. Debtors' entry into a stipulation with the Pension Benefit Guaranty Corporation (the "PBGC");

g) On March 18, 2010, the U.S. Bankruptcy Court entered an order denying the motion of the U.K. Pension Trustee and the PPF for certification for immediate appeal to the U.S. Court of Appeals for the Third Circuit;

h) On March 26, 2010, the U.S. Debtors filed the Debtor-in-Possession Monthly Operating Report for the period of November 29, 2009 through December 31, 2009;

i) On March 29, 2010, the U.S. Debtors obtained orders:

    i. approving the U.S. Debtors' entry into a stipulation with the PBGC; and

    ii. granting the U.S. Debtors additional time to file reports of financial information;

24

j) On March 31, 2010, the U.S. Debtors obtained an order authorizing and approving NNI's entry into the Cascading Directors' Trust Indenture and the related Side Agreement;

k) On April 1, 2010, the U.S. Debtors filed the Debtor-in-Possession Monthly Operating Report for the period of January 1, 2010 through January 31, 2010; and

l) In addition, the U.S. Debtors obtained orders granting several omnibus objections to claims, amending and supplementing certain professional retention agreements, and approving certain sales, setoffs and settlements of claims with various counterparties.

***Chapter 15***

65. The Monitor has continued to file with the U.S. Bankruptcy Court and serve on required parties notices of each of its reports to this Honourable Court.

66. The following is a summary of the filings in the chapter 15 proceedings since the last update provided in the Monitor's Thirty-Fifth Report:

a) On January 15, 2010, the lead plaintiffs (the "Lead Plaintiffs") in an action styled *David Lucescu, individually and on behalf of all others similarly situated v. Mike Zafirovski, et al*., No. 09 Civ. 04691 (SAS), commenced against Mike Zafirovski and Pavi Binning (the "Defendants") and pending in the U.S. District Court for the Southern District of New York (the "Litigation"), filed a motion in the U.S. Bankruptcy Court seeking a modification of the stay to permit them to serve a document preservation subpoena on NNC and to proceed with the Litigation. The Monitor filed an objection to the motion and a hearing on the Lead Plaintiff's motion was held on February 26, 2010. The U.S. Bankruptcy Court denied the Lead Plaintiffs' motion on several grounds including, in particular, the fact that Nortel is in the

midst of a complex restructuring and would be prejudiced if the Litigation were permitted to proceed at this juncture.  On March 12, 2010, the Lead Plaintiffs filed a notice of appeal with the U.S. Bankruptcy Court.  Two weeks later, on March 26, 2010, the Lead Plaintiffs filed a designation of items to be included in the record and statement of issues to be presented on appeal.  The Monitor has 14 days from March 26, 2010 to file a counter-designation;

b)  On March 3, 2010, the U.S. Bankruptcy Court recognized and enforced the Approval and Vesting Orders for the sale of certain GSM/GSM-R assets and MEN business overruling Lead Plaintiffs' limited objections.  The Lead Plaintiffs had objected to the recognition and enforcement of the Approval and Vesting Orders on the basis they failed to provide for the preservation of books and records that might be relevant in the Litigation.  At the hearing, the Monitor argued the Lead Plaintiffs' objections should have been brought before this Honourable Court at the time the Approval and Vesting Orders were sought by the Applicants and not in the ancillary cases pending in the U.S. Bankruptcy Court; and

c)  On April 6, 2010, the Monitor, as foreign representative of the Applicants, filed a motion with the U.S. Bankruptcy Court to enforce the order approving the Final Canadian Finding and Settlement Agreement.  A hearing on the motion is scheduled for April 29, 2010.

*NNSA*

67.  NNSA acceded to the sixth and seventh deed to the GSPA, pursuant to a deed of accession dated June 17, 2009 and has become a party to each subsequent extension up to and including the fourteenth extension of the GSPA. NNSA has reserved a right to terminate participation in the GSPA on five days prior notice.

26

**REQUEST FOR AN EXTENSION TO THE STAY OF PROCEEDINGS**

68.  The Stay Period presently expires on April 23, 2010.  The Applicants are seeking a 90 day extension of the Stay Period up to and including July 22, 2010.

**MONITOR'S ANALYSIS AND RECOMMENDATIONS**

69.  The Monitor has assisted and continues to assist the Applicants in their efforts to review operations and assess a range of restructuring alternatives in consultation with their legal and financial advisors.  The Monitor believes the Applicants are working diligently and in good faith and continue to progress towards the development of a Plan.

70.  For the reasons outlined in this report, the Monitor supports the Applicants' request for the following:

   a)  an extension of the stay up to and including July 22, 2010;

   b)  approval of the fourteenth extension of the GSPA; and

   c)  extension of the Application Period for the Hardship Payment Application process up to and including July 22, 2010 and that the Eligibility Requirements and the Procedure With Respect To Hardship Payment Applications be amended accordingly.

All of which is respectfully submitted this 9th day of April, 2010.

**ERNST & YOUNG INC.**
**In its capacity as Monitor of the Applicants**

Per:
Murray A. McDonald
President

27

**Nortel Networks - March 27, 2010**
**CCAA Applicants**
**Forecast Cash Flow - Variances**
USD (Millions)

|  | Forecast | Actuals | Variances |
|---|---|---|---|
| Start of period | 03-Jan-10 | 03-Jan-10 | 03-Jan-10 |
| End of period | 27-Mar-10 | 27-Mar-10 | 27-Mar-10 |

## 1 . Receipts & Disbursements

**Receipts**

| | Forecast | Actuals | Variances |
|---|---|---|---|
| Collection of Accounts Receivable | 73.4 | 77.7 | 4.3 |
| Other Receipts | - | 2.1 | 2.1 |
| TSA Recoveries from Buyer | 14.3 | 8.7 | (5.6) |
| Payroll & AP reimbursement from Buyers | 33.6 | 21.5 | (12.1) |
| Intercompany Receipts | 16.0 | 55.0 | 39.0 |
| Intercompany Receipts - CFSA | 178.5 | 178.5 | - |
| **Total Receipts** | 315.8 | 343.5 | 27.7 |

**Disbursements**

| | Forecast | Actuals | Variances |
|---|---|---|---|
| Payroll (Gross) | 75.0 | 70.2 | 4.8 |
| Benefits | 16.1 | 16.2 | (0.0) |
| Pension | 6.3 | 7.2 | (0.8) |
| Inventory Purchases | 2.4 | 8.3 | (5.9) |
| Non-Inventory Purchases | 63.2 | 71.3 | (8.1) |
| Payroll & AP payments on behalf of Buyers | 33.6 | 21.5 | 12.1 |
| Intercompany Disbursements | 41.1 | 32.2 | 8.9 |
| Restructuring Costs | 17.4 | 17.0 | 0.4 |
| **Total Disbursements** | 255.2 | 243.9 | 11.3 |
| **Net Cash Flow** | 60.6 | 99.6 | 39.1 |
| FX Impact | - | (0.3) | (0.3) |
| **Opening Available Cash Balance** | 87.1 | 87.1 | - |
| **Closing Available Cash Balance** | 147.7 | 186.4 | 38.7 |
| Unavailable Cash | 8.0 | 8.0 | 0.0 |
| **Total Cash** | 155.7 | 194.4 | 38.8 |
| Restricted Cash | 58.3 | 56.8 | (1.5) |
| **Total Cash + Restricted Cash** | 214.0 | 251.2 | 37.3 |

APPENDIX B

## Nortel Networks – March 28, 2010
### CCAA Applicants
### Forecast Cash Flow
USD ($Millions)

**1. Receipts & Disbursements**

| | Apr‑2010 | | | | May 2010 | | | | | Jun 2010 | | | | Jul 2010 | | | | | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Start of period** | 29‑Mar | 05‑Apr | 12‑Apr | 19‑Apr | 26‑Apr | 03‑May | 10‑May | 17‑May | 24‑May | 31‑May | 07‑Jun | 14‑Jun | 21‑Jun | 28‑Jun | 05‑Jul | 12‑Jul | 19‑Jul | 26‑Jul | 29‑Mar |
| **End of period** | 04‑Apr | 11‑Apr | 18‑Apr | 25‑Apr | 02‑May | 09‑May | 16‑May | 23‑May | 30‑May | 06‑Jun | 13‑Jun | 20‑Jun | 27‑Jun | 04‑Jul | 11‑Jul | 18‑Jul | 25‑Jul | 31‑Jul | 31‑Jul |
| **Receipts** | | | | | | | | | | | | | | | | | | | |
| Collection of Accounts Receivable | 3.3 | 4.8 | 2.6 | 3.1 | 4.4 | – | – | 1.3 | 1.3 | 1.3 | 1.3 | 1.3 | 1.3 | 0.5 | 0.8 | – | 1.7 | 0.7 | 31.9 |
| Other Receipts | 2.0 | – | 5.5 | 1.0 | – | – | – | 2.4 | – | – | – | – | – | – | 6.2 | – | 2.8 | 2.8 | 38.5 |
| TSA Recoveries from Buyers | (0.0) | 2.8 | 2.8 | 2.8 | 4.2 | – | 2.8 | 2.8 | 2.8 | 2.8 | 2.8 | 2.8 | 6.2 | 2.8 | 2.8 | – | 2.8 | 2.8 | 50.4 |
| Payroll & A/P reimbursement from Buyers | 4.9 | 4.2 | 3.9 | 1.5 | – | 2.8 | 0.0 | 0.0 | 2.5 | 2.5 | 0.0 | 0.0 | 0.1 | 0.1 | 0.1 | – | 2.8 | 2.8 | 23.3 |
| Intercompany Receipts | 13.3 | – | – | – | – | – | – | – | – | – | – | – | – | – | – | – | – | – | 13.3 |
| Intercompany Receipts – CFSA | – | – | – | – | – | – | – | – | – | – | – | – | – | – | – | – | – | – | |
| **Total Receipts** | 23.5 | 11.8 | 10.7 | 10.7 | 13.4 | 8.4 | – | 6.4 | 4.1 | 4.1 | 6.9 | 4.1 | 4.1 | 9.6 | 3.7 | – | 7.3 | 3.5 | 157.4 |
| **Disbursements** | | | | | | | | | | | | | | | | | | | |
| Payroll (Gross) | 3.1 | 0.0 | 9.3 | 1.1 | 5.6 | 3.1 | – | 4.6 | 0.6 | 4.7 | 2.0 | 2.2 | 0.3 | 2.3 | 0.3 | 4.4 | 0.3 | 2.2 | 48.2 |
| Benefits | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.4 | – | 0.1 | – | 2.0 | – | 0.3 | – | 0.3 | – | 0.3 | 4.5 | 0.3 | 29.8 |
| Pension | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | – | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.4 | 0.1 | 0.1 | 0.1 | 0.1 | 1.5 |
| Inventory Purchases | 2.1 | 2.4 | 3.2 | 3.2 | 3.8 | 3.8 | – | 3.8 | 2.8 | 2.8 | 3.2 | 3.2 | 3.2 | 3.2 | 2.0 | 2.0 | 2.0 | 2.0 | 2.0 |
| Non‑Inventory Purchases | 3.2 | 2.8 | 2.8 | 2.8 | 2.8 | 2.9 | – | 2.8 | 2.8 | 2.8 | 2.8 | 2.8 | 2.8 | 2.8 | 2.8 | 2.8 | 2.8 | 2.8 | 55.8 |
| Payroll & A/P payments on behalf of Buyers | 0.4 | 0.0 | 0.4 | 0.9 | 0.9 | 0.5 | – | 0.5 | 0.0 | (0.0) | (0.0) | 0.7 | (0.0) | (0.0) | 2.8 | 0.0 | 0.0 | 0.0 | 50.4 |
| Intercompany Disbursements | – | 1.0 | 1.0 | 1.0 | 1.0 | 1.0 | – | 1.0 | 1.0 | 1.0 | 1.0 | 1.0 | 1.0 | 1.4 | 0.6 | 0.6 | 0.6 | 0.6 | 18.2 |
| Restructuring Costs | – | 1.0 | 1.0 | 1.0 | 1.0 | 1.0 | – | 1.0 | 1.0 | 1.0 | 1.0 | 1.0 | 1.0 | 1.0 | 0.6 | 0.6 | 0.6 | 0.6 | 15.2 |
| **Total Disbursements** | 15.0 | (8.4)? | 19.0 | 16.4 | 17.9 | 21.1 | – | 12.8 | 8.2 | 8.2 | 9.6 | 7.8 | 10.5 | 7.9 | 9.4 | 5.4 | 5.5 | 8.0 | 221.1 |
| **Net Cash Flow** | 8.6 | 6.2 | (8.4) | (5.7) | (4.6) | (12.6) | – | (6.4) | (4.1) | (4.1) | (2.8) | (3.8) | (6.4) | (5.7) | (5.4) | 1.8 | (4.5) | (6.5) | (63.7) |
| **Opening Available Cash Balance** | 186.4 | 201.4 | 207.6 | 199.2 | 193.5 | 189.0 | 176.3 | 169.9 | 165.8 | 155.5 | 152.6 | 149.8 | 146.0 | 139.6 | 141.3 | 135.6 | 130.2 | 132.0 | 186.4 |
| **Closing Available Cash Balance** | 201.4 | 207.6 | 199.2 | 193.5 | 189.0 | 176.3 | 169.9 | 165.8 | 155.5 | 152.6 | 149.8 | 146.0 | 139.6 | 141.3 | 135.6 | 130.2 | 132.0 | 127.5 | 122.7 |
| Unavailable Cash | 8.0 | 8.0 | 8.0 | 8.0 | 8.0 | 8.0 | 8.0 | 8.0 | 8.0 | 8.0 | 8.0 | 8.0 | 8.0 | 8.0 | 8.0 | 8.0 | 8.0 | 8.0 | 8.0 |
| **Total Cash** | 209.3 | 215.6 | 207.2 | 201.5 | 197.0 | 184.3 | 177.9 | 173.8 | 163.5 | 160.6 | 157.8 | 154.0 | 147.6 | 149.3 | 143.6 | 138.2 | 140.0 | 135.5 | 130.7 |
| Restricted Cash | 56.8 | 56.8 | 56.8 | 56.8 | 56.8 | 56.8 | 56.8 | 56.8 | 56.8 | 56.8 | 56.8 | 56.8 | 56.8 | 56.8 | 56.8 | 56.8 | 56.8 | 56.8 | 56.8 |
| **Total Cash + Restricted Cash** | 266.1 | 272.4 | 264.0 | 258.3 | 253.8 | 241.1 | 234.7 | 230.6 | 220.3 | 217.4 | 217.4 | 210.8 | 204.4 | 206.1 | 200.4 | 195.0 | 196.8 | 192.3 | 187.5 |

*APPENDIX "C"*

### FOURTEENTH EXTENSION DEED

### INTERIM NORTEL GROUP SUPPLIER PROTOCOL AGREEMENT

This Deed is dated ~~March~~ *1 APRIL* 2010 and made between:

(1)    The Canadian Nortel Group companies listed in part one of Schedule 1 (the "**Canadian Companies**");

(2)    the EMEA Nortel Group companies listed in part two of Schedule 1 (the "**EMEA Companies In Administration**");

(3)    Alan Robert Bloom, Christopher John Wilkinson Hill, Stephen John Harris, and Alan Michael Hudson as joint administrators of the EMEA Companies in Administration other than Nortel Networks (Ireland) Limited and in the case of Nortel Networks (Ireland) Limited Alan Robert Bloom and David Martin Hughes as joint administrators of that company, each of Ernst & Young LLP ("**Administrators**"); and

(4)    Nortel Networks SA ("**NNSA**"), represented by Maître Franck Michel, as administrator, and Maître Cosme Rogeau, as liquidator.

## 1.    BACKGROUND

1.1    The Parties are party to the interim Nortel Group Supplier Protocol Agreement dated 14 January 2009, as extended by the Extension Deed dated 10 February 2009, the Second Extension Deed dated 12 March 2009, the Third Extension Deed dated 14 April 2009, the Fourth Extension Deed dated 21 April 2009, the Fifth Extension Deed dated 5 May 2009, the Sixth Extension Deed dated 5 June 2009, the Seventh Extension Deed dated 11 June 2009, the Eighth Extension Deed dated 9 July 2009, the Ninth Extension Deed dated 9 September 2009, the Tenth Extension Deed dated 9 October 2009, the Eleventh Extension Deed dated 9 November 2009, the Twelfth Extension Deed dated 9 December 2009 and the Thirteenth Extension Deed dated 14 January 2010 ("**Agreement**").

1.2    The Parties entered into the Agreement in recognition of the global nature of the Nortel Group business and in order to ensure that, for the period immediately following the Filing Date, Canadian Companies could continue to trade with the EMEA Companies in Administration and be paid in full for goods and services provided during the period of the Agreement.

1.3    Pursuant to clause 3 of the Thirteenth Extension Deed dated 14 January 2010, the Agreement shall terminate, unless otherwise extended by the Parties with the consent of the Monitor in writing before such date, at 11.59pm (Toronto time) on Wednesday 31 March 2010.

1.4    The Parties have now agreed to further extend the term of the Agreement in accordance with the terms of this fourteenth extension deed ("**Fourteenth Extension Deed**").

1.5    On 28 May 2009 secondary liquidation proceedings were opened in France in relation to NNSA ("**Secondary Proceedings**") and the administration proceedings in respect of NNSA under the United Kingdom Insolvency Act 1986 are continuing. On commencement of the Secondary Proceedings, NNSA was permitted to continue to trade for an initial period of three months by order of the French Court. On 20 August 2009, the French Court ordered that NNSA may continue to trade for a further three month period, effective from 28 August 2009. On October 1, 2009, the French Court approved an order to (i) suspend the liquidation

operations relating to the sale of the assets and/or businesses of NNSA for a renewable period of two months; (ii) authorize the continuation of the business of NNSA so long as the liquidation operations are suspended; and (iii) maintain the powers of the French Administrator and French Liquidator during the suspension period, except with respect to the sale of assets and/or businesses of NNSA. On November 30, 2009, the French Court renewed the aforementioned suspension of the liquidation operations for a further period of three months. NNSA acceded to and became a party to the Sixth and Seventh Extension Deeds pursuant to a deed of accession dated 17 June 2009.

## 2.    DEFINITIONS AND CONSTRUCTION

2.1    The provisions of clause 2 (*Definitions and Construction*) of the interim Nortel Group Supplier Protocol Agreement dated 14 January 2009 shall also apply to this Fourteenth Extension Deed but references to parties, clauses and schedules are to parties, clauses and schedules of this Fourteenth Extension Deed unless otherwise specified.

## 3.    EXTENSION OF AGREEMENT

In consideration of the arrangements under the Agreement continuing, the Parties agree that with effect on and from the date of this Fourteenth Extension Deed the Agreement shall be extended such that the Agreement shall terminate, unless otherwise extended by the Parties in writing before such date, at 11.59pm (Toronto time) on Friday 30 April 2010.

## 4.    NNSA

4.1    In relation to NNSA, any Post Filing Goods and Services Payments in respect of an order for Goods and Services delivered or made on or after the date of opening of Secondary Proceedings will not be payable as an expense of the administration of NNSA under the UK Insolvency Act 1986, but shall in accordance with and subject to French law, be payable only from the assets of NNSA which are subject to the Secondary Proceedings.

4.2    The Parties acknowledge that NNSA reserves its right to terminate its participation in this Fourteenth Extension Deed and the Agreement upon five (5) business days prior written notice to the other parties to this Fourteenth Extension Deed.

4.3    The Parties agree that the Agreement and this Fourteenth Extension Deed shall be interpreted *vis a vis* NNSA only by reference to the plain reading of such documents and shall under no circumstances be interpreted as an implied acceptance by NNSA of any matter that is not expressly set forth in such documents.

## 5.    MONITOR CONSENT

By executing the consent attached to this Fourteenth Extension Deed, the Monitor consents to the extension of the Agreement in accordance with clause 3 of this Deed.

## 6.    CONTINUATION

6.1    This Fourteenth Extension Deed is supplemental to, and shall be construed as one with, the Agreement.

6.2    Except as extended by the terms of this Fourteenth Extension Deed, the Agreement will remain in full force and effect and any reference in the Agreement to the Agreement or to any

provision of the Agreement will be construed as a reference to the Agreement, or that provision, as extended by this Fourteenth Extension Deed.

## 7.    NO PERSONAL LIABILITY OF THE ADMINISTRATORS

7.1    The Parties agree that the Administrators have negotiated and are entering into this Fourteenth Extension Deed as agents for the companies to which they are appointed and that none of the Administrators, their firm, partners, employees, advisers, representatives or agents shall incur any personal liability whatsoever, whether on their own part or in respect of any failure on the part of any Nortel Group company to observe, perform or comply with any of its obligations under this Fourteenth Extension Deed or under or in relation to any associated arrangements or negotiations.

7.2    The Administrators are a party to this Fourteenth Extension Deed:

7.2.1    as agents of each of the respective EMEA Companies in Administration of which they are administrators; and

7.2.2    in their own capacities solely for taking the benefit of the statutory charges under Paragraph 99(3) of Schedule B1 of the Insolvency Act 1986 and enforcing the obligations of the Canadian Companies under this Fourteenth Extension Deed.

7.3    In exercising their rights under, or giving effect to the arrangements contemplated in, the Fourteenth Extension Deed and the Agreement, it is acknowledged that the Administrators are required to act in the best interests of the creditors of the EMEA Company in Administration to which they have been appointed.  Therefore nothing in this Fourteenth Extension Deed or the Agreement shall operate so as to derogate from, restrict or prevent the Administrators from complying with their statutory duties or legal obligations in relation to the exercise of their powers, duties or functions as administrators of the EMEA Companies in Administration under the UK Insolvency Act 1986 or any other applicable legislation or statutory instrument as they see fit, acting in good faith.

## 8.    COUNTERPARTS

This Fourteenth Extension Deed may be executed in any number of counterparts, and this has the same effect as if the signatures on the counterparts were on a single copy of this Fourteenth Extension Deed.

## 9.    GOVERNING LAW

This Fourteenth Extension Deed shall be governed by and construed in accordance with English law.

## 10.    EFFECTIVENESS

The Parties agree that this Fourteenth Extension Deed shall be binding on each Party that has executed this Fourteenth Extension Deed from the time of such execution, regardless of whether all Parties have done so. The Parties agree that should any Party execute a counterpart of this Fourteenth Extension Deed after the date hereof, such Party shall be bound by this Fourteenth Extension Deed and this Fourteenth shall be deemed to be effective in respect of such Party from the date stated at the beginning of this Fourteenth Extension Deed.

This Fourteenth Extension Deed has been entered into on the date stated at the beginning of this Fourteenth Extension Deed.

**IN WITNESS** whereof this **DEED** has been executed by the parties hereto.

Schedule I

Part One: The Canadian Companies

1. Nortel Networks Limited

2. Nortel Networks Corporation

3. Nortel Networks Technology Corporation

4. Nortel Networks Global Corporation

5. Nortel Networks International Corporation

**Schedule 1**

**Part Two: The EMEA Companies in Administration**

1.  Nortel Networks UK Limited

2.  Nortel GmbH (Germany)

3.  Nortel Networks (Ireland) Limited (Ireland)

4.  Nortel Networks N.V. (Belgium)

5.  Nortel Networks S.p.A. (Italy)

6.  Nortel Networks B.V. (Netherlands)

7.  Nortel Networks Polska Sp. z o.o. (Poland)

8.  Nortel Networks Hispania, S.A. (Spain)

9.  Nortel Networks International Finance & Holding B.V. (Netherlands)

10.  Nortel Networks (Austria) GmbH (Austria)

11.  Nortel Networks, s.r.o. (Czech Republic)

12.  Nortel Networks Engineering Service Kft. (Hungary)

13.  Nortel Networks Portugal S.A. (Portugal)

14.  Nortel Networks Slovensko, s.r.o. (Slovakia)

15.  Nortel Networks France S.A.S (France)

16.  Nortel Networks Oy (Finland)

17.  Nortel Networks Romania SRL (Romania)

18.  Nortel Networks AB (Sweden)

**EXECUTED AS A DEED BY EACH OF THE CANADIAN COMPANIES**

**NOTEL NETWORKS CORPORATION**

Signature

John Doolittle
Name of signatory

Senior Vice President, Corporate Services
and Chief Financial Officer
Title

Signature

Anna Ventresca
Name of signatory

General Counsel – Corporate
and Corporate Secretary
Title

**NORTEL NETWORKS LIMITED**

Signature

John Doolittle
Name of signatory

Senior Vice President, Corporate Services
and Chief Financial Officer
Title

Signature

Anna Ventresca
Name of signatory

General Counsel – Corporate
and Corporate Secretary
Title

**NORTEL NETWORKS TECHNOLOGY
CORPORATION**

Signature

Anna Ventresca
Name of signatory

Secretary
Title

**NORTEL NETWORKS INTERNATIONAL
CORPORATION**

Signature

Anna Ventresca
Name of signatory

Secretary
Title

Signature

Clarke Glaspell
Name of signatory

Treasurer
Title

**NORTEL NETWORKS GLOBAL
CORPORATION**

_____
Signature

Anna Ventresca
_____
Name of signatory

Secretary
_____
Title

_____
Signature

Clarke Glaspell
_____
Name of signatory

Controller
_____
Title

**EMEA Companies in Administration**

UK

EXECUTED AS A DEED )
for and on behalf of )
Nortel Networks UK Limited )
(in administration) )
By ALAN BLOOM )
as joint administrator )
(acting as agent and without personal )
liability) in the presence of: )
)
Signature of witness )            Signature of administrator
)
............W. Graham............ )    .....................................
)
Name of witness )
(in BLOCK CAPITALS) )
............William Graham..... )
)
Address of witness )
)
.......................................... )
1 More London Place )
.......................................... )
SE1 2AF

**GERMANY**

| | |
|---|---|
| **EXECUTED AS A DEED** | ) |
| **for and on behalf of** | ) |
| **Nortel GmbH    (in administration)** | ) |
| **By**  ALAN BLOOM | ) |
| **as joint administrator** | ) |
| **(acting as agent and without personal** | ) |
| **liability) in the presence of:** | ) |
| | ) |
| | ) |
| **Signature of witness** | ) |
| | ) **Signature of administrator** |
| W. Graham | ) |
| ..................................................... | ) .............................................. |
| | ) |
| **Name of witness** | ) |
| **(in BLOCK CAPITALS)** | ) |
| | ) |
| WILMA  GRAHAM | ) |
| ..................................................... | |
| | ) |
| **Address of witness** | ) |
| EJ ERNST & YOUNG LLP | |
| 1 More London Place | ) |
| London | |
| SE1 2AF | ) |

**BELGIUM**

| | |
|---|---|
| **EXECUTED AS A DEED** | ) |
| **for and on behalf of** | ) |
| **Nortel Networks N.V.    (in administration)** | ) |
| **By**  ALAN BLOOM | ) |
| **as joint administrator** | ) |
| **(acting as agent and without personal** | ) |
| **liability) in the presence of:** | ) |
| | ) |
| | ) |
| **Signature of witness** | ) |
| | ) **Signature of administrator** |
| W. Graham | ) |
| ..................................................... | ) .............................................. |
| | ) |
| **Name of witness** | ) |
| **(in BLOCK CAPITALS)** | ) |
| | ) |
| WILMA  GRAHAM | ) |
| ..................................................... | |
| | ) |
| **Address of witness** | ) |
| EJ ERNST & YOUNG LLP | |
| 1 More London Place | ) |
| London | |
| SE1 2AF | ) |
| | ) |
| ..................................................... | ) |

**ITALY**

EXECUTED AS A DEED                              )
for and on behalf of                            )
Nortel Networks S.p.A. (in administration)      )
by ALAN BLOOM                                   )
as joint administrator                          )
(acting as agent and without personal           )
liability) in the presence of:                  )
                                                )
                                                )
Signature of witness                            )         Signature of administrator
                                                )
........ W. Graham ........                      )         ........................
                                                )
Name of witness                                 )
(in BLOCK CAPITALS)                             )
                                                )
........ WILMA  GRAHAM ........                  )
                                                )
Address of witness                              )
                                                )
........ ERNST & YOUNG LLP ........              )
       1 More London Place                      )
       London                                   )
........ SE1 2AF ........                        )


**NETHERLANDS**

EXECUTED AS A DEED                              )
for and on behalf of                            )
Nortel Networks B.V.   (in administration)      )
by ALAN BLOOM                                   )
as joint administrator                          )
(acting as agent and without personal           )
liability) in the presence of:                  )
                                                )
                                                )
Signature of witness                            )         Signature of administrator
                                                )
........ W. Graham ........                      )         ........................
                                                )
Name of witness                                 )
(in BLOCK CAPITALS)                             )
                                                )
........ WILMA  GRAHAM ........                  )
                                                )
Address of witness                              )
                                                )
........ ERNST & YOUNG LLP ........              )
       1 More London Place                      )
       London                                   )
........ SE1 2AF ........                        )

**POLAND**

EXECUTED AS A DEED                    )
for and on behalf of                  )
Nortel Networks Polska Sp. Z o.o.     )
(in administration)                   )
by ALAN BLOOM                         )
as joint administrator                )
(acting as agent and without personal )
liability) in the presence of:        )
                                      )
                                      )
Signature of witness                  )        Signature of administrator
                                      )
..........................................        ...............................................
                                      )
Name of witness                       )
(in BLOCK CAPITALS)                   )
                                      )
...........WILMA GRAHAM..........        )

Address of witness                    )
                                      )
..................................................        )
                                      )
...............................................        )

**SPAIN**

EXECUTED AS A DEED                    )
for and on behalf of                  )
Nortel Networks Hispania, S.A.        )
(in administration)                   )
By ALAN BLOOM                         )
as joint administrator                )
(acting as agent and without personal )
liability) in the presence of:        )
                                      )
                                      )
Signature of witness                  )        Signature of administrator
                                      )
..........................................        ...............................................
                                      )
Name of witness                       )
(in BLOCK CAPITALS)                   )
                                      )
...........WILMA GRAHAM..........        )

Address of witness                    )
                                      )
..................................................        )
                                      )
...............................................        )

**NETHERLANDS**

EXECUTED AS A DEED )
for and on behalf of )
Nortel Networks International Finance )
& Holding B.V. (in administration) )
by ALAN BLOOM )
as joint administrator )
(acting as agent and without personal )
liability) in the presence of: )
)
)
Signature of witness )        Signature of administrator
)
.............. *W. Graham* ............ )    .................................................
)
Name of witness )
(in BLOCK CAPITALS) )
)
.......... *WILMA GRAHAM* ...... )
)
Address of witness )
)
.................................................... )
.................................................... )

**AUSTRIA**

EXECUTED AS A DEED )
for and on behalf of )
Nortel Networks (Austria) GmbH )
(in administration) )
By ALAN BLOOM )
as joint administrator )
(acting as agent and without personal )
liability) in the presence of: )
)
)
Signature of witness )        Signature of administrator
)
.............. *W. Graham* ............ )    .................................................
)
Name of witness )
(in BLOCK CAPITALS) )
)
.......... *WILMA GRAHAM* ...... )
)
Address of witness )
)
.................................................... )
.................................................... )

**CZECH REPUBLIC**

EXECUTED AS A DEED                                )
for and on behalf of                              )
Nortel Networks, s.r.o.  (in administration)      )
By ALAN BLOOM                                     )
as joint administrator                            )
(acting as agent and without personal             )
liability) in the presence of:                    )
                                                  )
                                                  )
Signature of witness                              )        Signature of administrator
                                                  )
.......... *W. Graham* ...............             )        .............. ~~~~~~~~~~
                                                  )
Name of witness                                   )
(in BLOCK CAPITALS)                               )
                                                  )
.......... *WILMA GRAHAM* .........               )

Address of witness                                )

.......... ERNST & YOUNG LLP                      )
           1 More London Place
           London                                 )
.......... SE1 2AF .....................           )

**HUNGARY**

EXECUTED AS A DEED                                )
for and on behalf of                              )
Nortel Networks Engineering Service Kft.          )
(in administration)                               )
By ALAN BLOOM                                     )
as joint administrator                            )
(acting as agent and without personal             )
liability) in the presence of:                    )
                                                  )
                                                  )
Signature of witness                              )        Signature of administrator
                                                  )
.......... *W. Graham* ...............             )        .............. ~~~~~~~~~~
                                                  )
Name of witness                                   )
(in BLOCK CAPITALS)                               )
                                                  )
.......... *WILMA GRAHAM* .........               )

Address of witness                                )

.......... .................                      )

.......... .................                      )

**PORTUGAL**

| | |
|---|---|
| **EXECUTED AS A DEED** | ) |
| **for and on behalf of** | ) |
| **Nortel Networks Portugal S.A.** | ) |
| **(in administration)** | ) |
| **By** ALAN BLOOM | ) |
| **as joint administrator** | ) |
| **(acting as agent and without personal** | ) |
| **liability) in the presence of:** | ) |
| | ) |
| | ) |

Signature of witness                    )    Signature of administrator

.......... W. Graham ..........          )    ..........................

Name of witness                         )
(in BLOCK CAPITALS)                      )

.......... WILMA GRAHAM ..........       )

Address of witness                      )

.......... ERNST & YOUNG LLP ..........  )
1 More London
London                                   )
SE1 2AF

**SLOVAKIA**

| | |
|---|---|
| **EXECUTED AS A DEED** | ) |
| **for and on behalf of** | ) |
| **Nortel Networks Slovensko, s.r.o.** | ) |
| **(in administration)** | ) |
| **By** ALAN BLOOM | ) |
| **as joint administrator** | ) |
| **(acting as agent and without personal** | ) |
| **liability) in the presence of:** | ) |
| | ) |
| | ) |

Signature of witness                    )    Signature of administrator

.......... W. Graham ..........          )    ..........................

Name of witness                         )
(in BLOCK CAPITALS)                      )

.......... WILMA GRAHAM ..........       )

Address of witness                      )

.......... ERNST & YOUNG LLP ..........  )
1 More London Place
London                                   )
SE1 2AF

FRANCE

**EXECUTED AS A DEED**                                )
for and on behalf of                                      )
**Nortel Networks France S.A.S**              )
(in administration)                                        )
By ALAN BLOOM                                       )
as joint administrator                                  )
(acting as agent and without personal      )
liability) in the presence of:                        )
                                                                     )
                                                                     )
Signature of witness                                   )          Signature of administrator
                                                                     )
.......... *W. Galam* ...................          )          ....................... *[signature]* ............
                                                                     )
**Name of witness**                                   )
**(in BLOCK CAPITALS)**                       )
                                                                     )
.......... WILMA GRAHAM .........          )

**Address of witness**                              )

.......... ERNST & YOUNG LLP .........   )
          1 More London Place
.......... London .........................            )
          SE1 2AF

FINLAND

**EXECUTED AS A DEED**                                )
for and on behalf of                                      )
**Nortel Networks Oy**    (in administration)  )
By ALAN BLOOM                                       )
as joint administrator                                  )
(acting as agent and without personal      )
liability) in the presence of:                        )
                                                                     )
                                                                     )
Signature of witness                                   )          Signature of administrator
                                                                     )
.......... *W. Galam* ...................          )          ....................... *[signature]* ............
                                                                     )
**Name of witness**                                   )
**(in BLOCK CAPITALS)**                       )
                                                                     )
.......... WILMA GRAHAM .........          )

**Address of witness**                              )

.......... ERNST & YOUNG LLP .........   )
          1 More London Place
.......... London .........................            )
          SE1 2AF

ROMANIA

EXECUTED AS A DEED                      )
for and on behalf of                    )
Nortel Networks Romania SRL             )
(in administration)                     )
By ALAN BLOOM                           )
as joint administrator                  )
(acting as agent and without personal   )
liability) in the presence of:          )
                                        )
                                        )
Signature of witness                    )    Signature of administrator
                                        )
............W. Graham............        )    ...................................
                                        )
Name of witness                         )
(in BLOCK CAPITALS)                     )
                                        )
............WILMA GRAHAM.........        )

Address of witness                      )

............ERNST & YOUNG LLP            )
............1 MORE LONDON PLACE          )
............London..................    )
............SE1 2AF                      )

SWEDEN

EXECUTED AS A DEED                      )
for and on behalf of                    )
Nortel Networks AB     (in administration)  )
By ALAN BLOOM                           )
as joint administrator                  )
(acting as agent and without personal   )
liability) in the presence of:          )
                                        )
                                        )
Signature of witness                    )    Signature of administrator
                                        )
............W. Graham............        )    ...................................
                                        )
Name of witness                         )
(in BLOCK CAPITALS)                     )
                                        )
............WILMA GRAHAM.........        )

Address of witness                      )

............ERNST & YOUNG LLP            )
............1 More London Place          )
............SE1 2AF                      )

**IRELAND**

**EXECUTED AS A DEED**                                )
**for and on behalf of**                                )
**Nortel Networks (Ireland) Limited**                   )
**(in administration)**                                 )
**by  ALAN BLOOM**                                      )
**as joint administrator**                              )
**(acting as agent and without personal**              )
**liability) in the presence of:**                      )
                                                        )
                                                        )
**Signature of witness**                                )        **Signature of administrator**
                                                        )
............... W. Salam...............                  )        .........................................
                                                        )
**Name of witness**                                     )
**(in BLOCK CAPITALS)**                                 )
                                                        )
............ WILLIAM  GRAHAM ....                        )
                                                        )
**Address of witness**                                  )
                                                        )
............................................            )
        1 More London Place                             )
............ London ...........................         )
        SE1 2AF                                          )
............................................            )

Executed as a **DEED** by **ALAN ROBERT**
**BLOOM** in his own capacity without
personal liability and solely for the
purpose of obtaining the benefit of the
provisions of this deed expressed
to be conferred on the Administrators

.......................................
Signature

Title: JOINT ADMINISTRATOR

in the presence of:

Signature of witness
...............

Name of witness

**(in BLOCK CAPITALS)**

...... WILMA GRAHAM ......

Address of witness
............ ERNST & YOUNG LLP
............ 1 More London Place
............ London
............ SE1 2AF ...............

..........................................
..........................................

**Executed as a DEED on behalf of CHRISTOPHER**
**JOHN WILKINSON HILL in his own capacity**
**without personal liability and solely**
**for the purpose of obtaining the**
**benefit of the provisions of this**
**deed expressed to be conferred**
**on the Administrators by his attorney** *ALAN BLOOM*

..........................................................
Signature

Title:  JOINT ADMINISTRATOR

in the presence of:

Signature of witness
............ *W. Graham* ...............

Name of witness

**(in BLOCK CAPITALS)**

.......... *WILMA GRAHAM*

Address of witness

..........................................................
..........................................................
..........................................................
..........................................................

Executed as a **DEED** on behalf of **STEPHEN JOHN
HARRIS** in his own capacity
without personal liability and solely
for the purpose of obtaining the
benefit of the provisions of this
deed expressed to be conferred
on the Administrators by his attorney ALAN BLOOM

....................................................
Signature

Title:  JOINT ADMINISTRATOR

in the presence of:

Signature of witness
............. W. Gahan ........................

Name of witness

**(in BLOCK CAPITALS)**

............ WILMA   GRAHAM ............

Address of witness

............. Ernst & Young LLP
1 More London Place
............. London
SE1 2AF ..................................

....................................................

....................................................

**Executed as a DEED on behalf of ALAN MICHAEL**
**HUDSON in his own capacity without**
**personal liability and solely for the**
**purpose of obtaining the benefit of**
**the provisions of this deed**
**expressed to be conferred on the**
**Administrators by his attorney**  ALAN BLOOM

.........................................

Signature

Title:  JOINT ADMINISTRATOR

in the presence of:

Signature of witness

.............. W. Graham ..................

Name of witness

(in BLOCK CAPITALS)

............. WILMA   GRAHAM....

Address of witness

.....................................................

.....................................................

.....................................................

.....................................................

Executed as a **DEED** on behalf of **DAVID
MARTIN HUGHES** in his own capacity
without personal liability and
solely for the purpose of
obtaining the benefit of the
provisions of this deed
expressed to be conferred on the
Administrators by his attorney    ALAN BLOOM

.........................................
Signature

Title:  JOINT ADMINISTRATOR

in the presence of:

Signature of witness
............ W. Graham .............

Name of witness

**(in BLOCK CAPITALS)**

.......... WILMA GRAHAM .....

Address of witness
.................................................
.................................................
.................................................
.................................................

Nortel Networks S.A.

EXECUTED AS A DEED                )
for and on behalf of              )
Nortel Networks S.A.              )
(in administration)               )
by Maître Franck Michel           )      Signature of administrator
as administrator                  )
(acting as agent and without personal  )
liability):                       )

and Maître Cosme Rogeau, ,        )
as liquidator                     )
                                  )      Signature of liquidator
                                  )
                                  )

in the presence of:

Signature of witness              )

                                  )

Name of witness                   )
(in BLOCK CAPITALS)               )
RAJEEV  SHARMA  ROLEX             )

Address of witness                )
FTPA  1 bis  avenue Foch,         )
75116  PARIS  (FRANCE)            )

**CONSENT OF MONITOR**

Ernst & Young Inc., as Monitor under the Companies' Creditors Arrangement Act to the Canadian Companies, consents to the extension of the Agreement in accordance with this Fourteenth Extension Deed.

**Ernst & Young Inc., in its capacity as Monitor in the CCAA proceedings and not in its personal capacity**

Name: Murray McDonald

Title: President

APPENDIX "D"

EXECUTION VERSION

GSM/GSM-R DISTRIBUTION ESCROW AGREEMENT

among

NORTEL NETWORKS CORPORATION
NORTEL NETWORKS LIMITED
NORTEL NETWORKS INC.

and

THE OTHER ENTITIES IDENTIFIED HEREIN AS SELLERS

and

THE EMEA SELLERS AS IDENTIFIED HEREIN

and

NORTEL NETWORKS S.A.

and

NORTEL NETWORKS (ASIA) Limited

and

THE ENTITIES IDENTIFIED HEREIN AS NORTH AMERICAN ALT SELLING
DEBTORS

and

THE ENTITIES IDENTIFIED HEREIN AS EMEA ALT SELLING DEBTORS

and

THE ESTATE FIDUCIARIES

and

JPMorgan Chase Bank, N.A., as Distribution Agent

dated as of March 31, 2010

This **GSM/GSM-R** DISTRIBUTION ESCROW AGREEMENT (the "**Agreement**"), dated as of March 31, 2010, by and among

(i)     Nortel Networks Corporation, a corporation organized under the laws of Canada ("**NNC**");

(ii)     Nortel Networks Limited, a corporation organized under the laws of Canada ("**NNL**");

(iii)     Nortel Networks Inc., a corporation organized under the laws of Delaware ("**NNI**" and, together with NNC and NNL, the "**Main Sellers**");

(iv)     the affiliates of the Main Sellers listed in Schedule A (the "**Other Sellers**" and, together with the Main Sellers, the "**Sellers**");

(v)     the entities set out in Schedule B (the "**EMEA Sellers**"), which in the case of the EMEA Debtors (as defined below) are acting by their joint administrators Alan Robert Bloom, Stephen John Harris, Alan Michael Hudson and Christopher John Wilkinson Hill of Ernst & Young LLP (other than Nortel Networks (Ireland) Limited (In Administration) for which David Hughes of Ernst & Young Chartered Accountants and Alan Robert Bloom serve as joint administrators) (collectively the "**Joint Administrators**") who act as agents of the EMEA Debtors without any personal liability as set forth in Paragraph 20 below;

(vi)     Nortel Networks S.A. (In Administration) ("**NNSA**") acting by the French Office Holders (as defined below), who act as agents for NNSA without any personal liability as set forth in Paragraph 20 below;

(vii)     Nortel Networks (Asia) Limited, a company incorporated under the laws of Hong Kong ("**NN Asia**");

(viii) each affiliate of the Main Sellers listed in Schedule C (each such entity, a "**North American ALT Selling Debtor**");

(viii)     each affiliate of the EMEA Sellers listed in Schedule D (each such entity, an "**EMEA ALT Selling Debtor**" and, together with the Sellers, the EMEA Sellers, NNSA, NN Asia and the North American ALT Selling Debtors, the "**Depositors**");

(ix)     the Estate Fiduciaries (as defined below) with the exclusion from liability set forth in Paragraph 28(a); and

(x)     JPMorgan Chase Bank, N.A., a national banking association organized and existing under the laws of the United States of America ("**JPMorgan**") and acting through its TS/Escrow Services Division and solely in its capacity as escrow and distribution agent under this Agreement, and any successors appointed pursuant to the terms hereof (JPMorgan in such capacity, the "**Distribution Agent**").

Capitalized terms used and not otherwise defined herein shall have the meaning given to them in the North American ASA (as defined below).  In this Agreement, the term

1

"**EMEA Debtors**" means those entities listed in Schedule 3 of the EMEA ASA and each party listed in <u>Schedule D</u> hereto that is an EMEA ALT Selling Debtor.

        **WHEREAS**, on January 14, 2009 (the "**Petition Date**"), NNC, NNL and certain of their affiliates (collectively, the "**Canadian Debtors**") filed with the Ontario Superior Court of Justice (the "**Canadian Court**") an application for protection under the Companies' Creditors Arrangement Act (Canada) (the "**CCAA**") and were granted certain creditor protection pursuant to an order issued by the Canadian Court on the same date, which has been extended by further order of the Canadian Court (such proceedings, together with any other formal insolvency proceedings commenced in Canada in respect of any Depositor that is a Canadian Debtor, the "**Canadian Cases**");

        **WHEREAS**, NNI and certain of its affiliates (collectively, the "**U.S. Debtors**") are debtors-in-possession under Title 11 of the United States Code (the "**U.S. Bankruptcy Code**"), which commenced cases under Chapter 11 of the U.S. Bankruptcy Code on the Petition Date (except for Nortel Networks (CALA) Inc., which commenced its case under Chapter 11 of the U.S. Bankruptcy Code on July 14, 2009) by filing voluntary petitions for relief in the U.S. Bankruptcy Court for the District of Delaware (the "**U.S. Bankruptcy Court**") (the "**U.S. Cases**" and together with the Canadian Cases, the "**Bankruptcy Cases**");

        **WHEREAS**, the Canadian Court has appointed Ernst & Young Inc. as Monitor in the Canadian Cases and as foreign representative for the Canadian Debtors (the "**Monitor**"), and the Office of the United States Trustee for the District of Delaware has appointed an Official Committee of Unsecured Creditors as representative for the unsecured creditors of the U.S. Debtors (the "**Committee**" and, together with the Monitor, the "**Estate Fiduciaries**"), and in addition, an *ad hoc* group of bondholders holding claims against certain of the U.S. Debtors and certain of the Canadian Debtors has also been organized (the "**Bondholder Group**");

        **WHEREAS**, on the Petition Date, the High Court of Justice in London, England (the "**English Court**") ordered that the EMEA Debtors be placed into administration under the English Insolvency Act 1986, as amended (the "**Insolvency Act**") and European Union's Council Regulation (EC) No. 1346/2000 on Insolvency Proceedings (the "**EC Regulation**") and appointed the Joint Administrators (as appropriate) to manage the affairs, business and property of the EMEA Debtors;

        **WHEREAS**, while the administration proceedings in respect of NNSA under the Insolvency Act are continuing, subsequent to the Petition Date, NNSA commenced secondary insolvency proceedings within the meaning of Article 27 of the EC Regulation pursuant to which the Commercial Court of Versailles (the "**French Court**") appointed Maître Cosme Rogeau, 26, avenue Hoche, 78000 Versailles as the "Liquidateur Judiciaire" and Maître Franck Michel, partner of Selarl F. Michel – A. Miroitte – C. Gorins, 10 Allée Pierre de Coubertin, 78000 Versailles as the "Administrateur Judiciaire" of NNSA under Articles 641-1 et seq. of the French Commercial Code (together, the "**French Office Holders**");

        **WHEREAS**, NNSA acceded to the IFSA on September 11, 2009 and, notwithstanding that NNSA is not a party to the Sale Agreements, NNSA has executed and delivered an Appropriate License Termination in accordance with the IFSA and is also subject to the NNSA Irrevocable Offer (as defined below) which has been approved by the French Court

on March 30, 2010, and is deemed to be a "Selling Debtor" under the IFSA for the purposes of this Sale Transaction (as defined therein) and, as such, any reference in this Agreement to a Selling Party shall be construed to include NNSA;

**WHEREAS,** the Sellers and Telefonaktiebolaget L M Ericsson (publ) (the "**Purchaser**") have entered into that certain Asset Sale Agreement, dated as of November 24, 2009 (as amended and restated on the date hereof and as may be further amended and/or restated from time to time in accordance with its terms, the "**North American ASA**"), whereby the Purchaser and/or certain Designated Purchasers will acquire substantially all of the assets related to the GSM business segment of the Sellers;

**WHEREAS,** the EMEA Sellers, the Joint Administrators, and Kapsch CarrierCom AG (the "**EMEA Purchaser**") have entered into that certain Asset Sale Agreement dated as of November 24, 2009 (as amended and restated on March 8, 2010 and on the date hereof and as may be further amended and/or restated from time to time in accordance with its terms, the "**EMEA ASA**" and, together with the North American ASA, the "**Sale Agreements**"), whereby the EMEA Purchaser and/or certain EMEA Designated Purchasers will acquire substantially all of the assets related to the GSM business segment of the EMEA Sellers;

**WHEREAS,** on March 3, 2010, and in accordance with Clause 7.1 of the EMEA ASA, the EMEA Purchaser made an irrevocable offer to the French Office Holders to purchase the NNSA Business (as subsequently amended and/or supplemented on March 22 and March 24, 2010, the "**NNSA Irrevocable Offer**");

**WHEREAS,** on November 16, 2009, the Purchaser delivered to Citibank, N.A. ("**Citibank**") cash in a non-interest bearing account (the "**Good Faith Deposit Escrow Account**") in an amount of USD 5,000,000 (the "**Ericsson Good Faith Deposit**");

**WHEREAS,** on November 13, 2009, the EMEA Purchaser delivered to Citibank cash in the Good Faith Deposit Escrow Account in an amount of USD 4,999,975 (the "**Kapsch Good Faith Deposit**");

**WHEREAS,** it is contemplated under Section 2.3.2(d) of the North American ASA that, at Closing, NNL, NNI and NNUK shall cause Citibank to deliver to the Distribution Agent the Ericsson Good Faith Deposit by wire transfer in immediately available funds to an account designated by the Distribution Agent;

**WHEREAS,** it is contemplated under Clause 3.1.3 of the EMEA ASA that, at Closing, the EMEA Purchaser shall direct Citibank to release to the Distribution Agent the Kapsch Good Faith Deposit together with all interest earned on such amount as at Closing;

**WHEREAS,** it is contemplated under Section 27 of the Transition Services Agreement and Section 2.3.2(c)(iii) of the North American ASA that, at Closing, the Purchaser will deliver or cause to be delivered on behalf of the Sellers to Citibank by wire transfer in immediately available funds the TSA Escrow Amount to be held pursuant to the terms of the escrow agreement contemplated thereby (the "**NA TSA Escrow Agreement**");

WHEREAS, it is contemplated under Clause 3.1.4 of the EMEA ASA that, at Closing, the EMEA Purchaser will deposit the sum of US$ 12 million into an account with Citibank (the "**EMEA TSA Escrow Amount**") to be held pursuant to the terms of the escrow agreement contemplated thereby (the "**EMEA TSA Escrow Agreement**");

WHEREAS, it is contemplated under Sections 2.3.2(c)(i) and 5.30 of the North American ASA that, at Closing, the Purchaser shall deliver to the Distribution Agent an amount (the "**Ericsson Deposited Purchase Price**"), by wire transfer in immediately available funds, equal to USD 68,142,449.00 representing (a) the Estimated Purchase Price minus (b) the sum of (i) the Ericsson Good Faith Deposit and (ii) the TSA Escrow Amount;

WHEREAS, it is contemplated under Clause 3.1.2 of the EMEA ASA that, at Closing, the EMEA Purchaser shall pay to the Distribution Agent an amount (the "**Kapsch Deposited Purchase Price**", and collectively with the Ericsson Deposited Purchase Price, the "**Deposited Purchase Price**"), equal to USD 16,000,025.00 representing (a) the Purchase Price (as defined under the EMEA ASA) minus (b) the sum of (i) the EMEA TSA Escrow Amount and (ii) the Kapsch Good Faith Deposit, together with all interest earned on such amount as at Closing; as adjusted pursuant to the EMEA ASA;

WHEREAS, the Sellers, the EMEA Sellers, the Joint Administrators, NNSA, the French Office Holders, the North American ALT Selling Debtors and the EMEA ALT Selling Debtors have entered into that certain GSM/GSM-R Side Agreement, dated as of March 31, 2010 (the "**Side Agreement**"), pursuant to which, in accordance with Section 12.b of the IFSA, the Selling Parties (as defined therein) agree to enter into an escrow agreement with the Distribution Agent governing, among other things, the Distribution Agent's collection, holding in escrow and distribution to the Depositors and any other party deemed to be a Selling Debtor pursuant to the IFSA (in accordance with the Allocation Rules (as defined in the Side Agreement)) of the proceeds of the Transaction (as defined therein) and other payments to be made by the Purchaser and the EMEA Purchaser (or any Designated Purchaser or EMEA Designated Purchaser) to the Depositors under or in relation to the Sale Agreements;

WHEREAS, the Closing is expected to occur on March 31, 2010 and the Depositors desire to establish an account prior to Closing for the escrow of the Deposited Purchase Price and the amounts of cash in the Good Faith Deposit Escrow Account pursuant to this Agreement, it being understood by the Depositors that this Agreement is subject to amendment in accordance with Paragraph 15(a) to, among other things, reflect further agreement among the Depositors as to the terms of the escrow of the Deposited Purchase Price;

WHEREAS, the Depositors and certain other parties (together, the "**IFSA Parties**") have entered into that certain agreement to address interim funding and the settlement of certain intercompany matters dated June 9, 2009 (the "**IFSA**"), pursuant to clause 12.c and clause 12.g of which, the IFSA Parties have agreed to negotiate in good faith a protocol for resolving disputes concerning the allocation of sale proceeds from sale transactions (the "**Allocation Protocol**"), which shall provide binding procedures for the allocation of sales proceeds where the IFSA Parties in accordance with the terms of the IFSA are otherwise unable to reach agreement;

4

**WHEREAS**, on December 2, 2009, the U.S. Sale Order authorized the U.S. Debtors to enter into an escrow agreement, on terms and conditions reasonably satisfactory to the Committee and the Monitor acting in good faith, with an escrow agent to establish an escrow account without further order of the U.S. Bankruptcy Court.

**WHEREAS**, on March 30, 2010, the Canadian Court authorized NNC, NNL, Nortel Networks Technology Corporation, Nortel Networks Global Corporation and Nortel Networks International Corporation to enter into one or more distribution escrow agreements on terms and conditions reasonably satisfactory to the Monitor, with one or more escrow agent, without further order from the Canadian Court; and

**WHEREAS,** the Depositors wish to appoint JPMorgan as escrow and distribution agent and JPMorgan is willing to accept such appointment and to act as escrow and distribution agent, in each case upon the terms and conditions of the Agreement.

**NOW, THEREFORE**, for good and valuable consideration, the receipt and adequacy of which is hereby irrevocably acknowledged, the Depositors and the Distribution Agent hereto agree as follows:

    1.    <u>Appointment of Distribution Agent</u>.  The Depositors hereby jointly nominate, constitute and appoint the Distribution Agent as escrow and distribution agent to hold the Escrow Property (as defined below) in the Distribution Account (as defined below) upon the terms and conditions set forth herein.  The Distribution Agent hereby accepts such appointment and agrees that deposits to, and disbursements from, the Distribution Account, or applicable portions thereof, shall only be made in accordance with the terms and conditions of this Agreement.  The Distribution Agent hereby represents to each of the Depositors that it has the corporate power and legal authority to execute this Agreement and to perform its obligations hereunder.  The Depositors and the Distribution Agent agree that any action specified in this Agreement as to be taken by all of the Depositors, acting jointly, when taken by all of the Depositors shall be binding upon each of the Depositors and the Distribution Agent shall be entitled to act and rely upon any action taken by all of the Depositors, acting jointly, and to the extent required hereunder, the Estate Fiduciaries, as provided in this Agreement.

    2.    <u>Deposit of Escrow Property</u>.   Funds and property shall be deposited in the Distribution Account (as defined below) as follows:

(a)    At the Closing:

    (i)    the Sellers shall instruct the Purchaser to deposit the Ericsson Deposited Purchase Price with the Distribution Agent, in immediately available funds, in an account established with the Distribution Agent being account number 865364897 (ABA: 021000021 and SWIFT: CHASUS33) (the "**Distribution Account**");

(ii)    the EMEA Sellers shall instruct the EMEA Purchaser to deposit the Kapsch Deposited Purchase Price with the Distribution Agent, in immediately available funds, in the Distribution Account;

(iii)    NNL, NNI and NNUK shall cause Citibank to deposit the Ericsson Good Faith Deposit with the Distribution Agent, in immediately available funds, in the Distribution Account;

(iv)    NNL, NNI and NNUK shall cause Citibank to deposit the Kapsch Good Faith Deposit with the Distribution Agent, in immediately available funds, in the Distribution Account; and

(v)    subject to Section 2.4(d) of the Side Agreement and in accordance with Section 12.b of the IFSA, the Selling Parties shall instruct the Purchaser and the EMEA Purchaser to deposit any payment due by the Purchaser or the EMEA Purchaser (and any Designated Purchaser and any EMEA Designated Purchaser) to the Selling Parties under the Sale Agreements that is included in the Total Proceeds (as defined in the Side Agreement) with the Distribution Agent, in immediately available funds, in the Distribution Account.

(b)    After the Closing:

(i)    the Sellers shall instruct the Purchaser to deposit, or to cause to be deposited, any purchase price adjustments to be paid to the Sellers under the North American ASA with the Distribution Agent, in immediately available funds, in the Distribution Account;

(ii)    the EMEA Sellers shall instruct the EMEA Purchaser to deposit, or to cause to be deposited, any purchase price adjustments to be paid to the EMEA Sellers under the EMEA ASA with the Distribution Agent, in immediately available funds, in the Distribution Account; and

(iii)    subject to Section 2.4(d) of the Side Agreement and in accordance with Section 12.b of the IFSA, all amounts released from escrow pursuant to any escrow agreements provided for in the Sale Agreements or the other Transaction Documents, including without limitation the NA TSA Escrow Agreement and the EMEA TSA Escrow Agreement, shall be deposited with the Distribution Agent, in immediately available funds, in the Distribution Account.

(all funds deposited in accordance with sub-paragraphs (a) and (b) above collectively, the "**Escrow Funds**"). The Escrow Funds together with the Permitted Investments (as defined below) and all interest and other income therefrom received by the Distribution Agent, less any funds distributed or paid in accordance with this Agreement are collectively referred to herein as

6

"**Escrow Property**". The Distribution Agent shall provide written confirmation to the Depositors, the Estate Fiduciaries and the Bondholder Group upon its receipt of any Escrow Funds from the Purchaser, the EMEA Purchaser, any Designated Purchaser, any EMEA Designated Purchaser, Citibank or otherwise. Prior to the deposits in accordance with sub-paragraphs (a) and (b) above, there shall be no other funds in the Distribution Account. The Escrow Property shall at all times, until disbursement as provided herein, remain segregated and separately identified by the Distribution Agent and shall not be commingled with the other assets held by the Distribution Agent. Each of the Depositors, the Estate Fiduciaries and the Bondholder Group acknowledges and consents to the direct payment by the Purchaser (or a Designated Purchaser) of the China Purchase Amount to Nortel Networks (China) Limited.

3.    Investment of Escrow Funds.

(a)    Until otherwise jointly directed by all of the Depositors and the Estate Fiduciaries, the Distribution Agent shall invest the Escrow Funds in Permitted Investments only. "**Permitted Investments**" means (1) United States Treasury obligations with maturities not in excess of one year, (2) money market funds invested solely in such United States Treasury obligations and (3) the JPMorgan Chase Bank Collateralized Money Market Deposit Account; provided, however, that in no event shall Permitted Investments include investments that are not eligible for the portfolio interest exemption or other similar exception to U.S. withholding tax. The Distribution Agent shall invest the Escrow Funds on the date of deposit so long as the relevant funds are received on or before 11:00 a.m. New York City time. Any written notice to remit payment received by the Distribution Agent after 11:00 a.m. New York City time shall be treated as if received on the following Business Day. For purposes of this Agreement, "**Business Day**" shall mean any day other than a Saturday, Sunday or any other day on which the Distribution Agent located at the notice address set forth on Schedule F is authorized or required by law or executive order to remain closed. In the absence of joint written instruction from the Depositors and the Estate Fiduciaries, the Distribution Agent will invest the Escrow Funds in item (3) referenced above. The parties hereto recognize and agree that the Distribution Agent will not provide supervision, recommendations or advice relating to either the investment of the Escrow Funds or the purchase, sale, retention or other disposition of any investment described herein. The Distribution Agent shall not have any liability for any loss sustained as a result of any investment in an investment made pursuant to the terms of this Agreement or as a result of any liquidation of any investment prior to its maturity or for the failure of the Depositors to give the Distribution Agent instructions to invest or reinvest the Escrow Funds.

(b)    Any investment direction contained herein may be executed through an affiliated broker-dealer of the Distribution Agent, which shall be entitled to such affiliated broker-dealer's usual and customary fee. Neither the Distribution Agent nor any of its affiliates assume any duty or liability for monitoring the investment rating of the investments.

(c)    The Distribution Agent shall have the right to liquidate investments as necessary to distribute Escrow Property pursuant to Paragraph 5.

4.    Ownership of Escrow Property; Taxes.

(a)    The Escrow Property at all times is and shall be the exclusive property of the Depositors. Interest or other income earned on or with respect to the Escrow Property shall,

7

as of the end of each calendar year and to the extent required by law, be reported by the Distribution Agent on Form 1099 or Form 1042-S as the income of Depositors or their affiliates, based upon the disbursement of the Escrow Property to Depositors or their affiliates pursuant to Paragraph 5 if such income was disbursed during such calendar year or, with respect to any Escrow Property not disbursed during such calendar year, based upon each Depositor's pro rata share of such income, with each Depositor's pro rata share being deemed to be equal to such Depositor's interest allocation percentage as set forth on Exhibit 1. The Distribution Agent acknowledges and agrees that the interest percentages set forth on Exhibit 1 are not indicative of the final allocation of the Escrow Property and, accordingly, the Distribution Agent agrees to amend Form 1099 and Form 1042-S upon a joint written request from the Depositors and the Estate Fiduciaries, which request shall set forth the re-allocation of all interest and any other earnings on Escrow Property previously reported on Form 1099 and Form 1042-S; provided, however, that the Distribution Agent shall be permitted to rely at all times upon the interest percentages then set forth on Exhibit 1 delivered to the Distribution Agent and the Distribution Agent shall be entitled to act upon the allocations and interest percentages as then set forth in Exhibit 1 without liability to any Depositor, notwithstanding any subsequent amendment to Exhibit 1 setting forth any new allocation or interest percentage. Any other tax returns required to be filed will be prepared and filed by the Depositors with the IRS and any other taxing authority as required by law, including but not limited to, any applicable reporting or withholding pursuant to the Foreign Investment in Real Property Tax Act ("**FIRPTA**"). The Depositors acknowledge and agree that the Distribution Agent shall have no responsibility for the preparation and/or filing of any tax return or any applicable FIRPTA reporting or withholding with respect to the Escrow Property or any income earned by the Escrow Property. Each Depositor further acknowledges and agrees that any taxes payable from the income earned by such Depositor on the investment of any sums held in the Escrow Property shall be paid by such Depositor. All proceeds of the Escrow Property shall be retained in the Distribution Account and reinvested from time to time by the Distribution Agent as provided in this Agreement. The Distribution Agent shall withhold any taxes required by law, including but not limited to required withholding in the absence of proper tax documentation, and shall remit such taxes to the appropriate authorities. The parties hereto hereby agree and acknowledge that the Distribution Agent has no ownership interest in the Escrow Property but is serving solely as escrow holder having only possession thereof. This Paragraph 4 shall survive notwithstanding any termination of this Agreement or the resignation of the Distribution Agent. Each Depositor will provide the Distribution Agent with the appropriate form W-9 or W-8 either (x) if any of the Escrow Property are to be disbursed to such Depositor prior to December 31, 2010, as a condition to such Depositor's receipt of such Escrow Property from the Distribution Agent, prior to the Distribution Agent making such disbursement hereunder or (y) if none of the Escrow Property is to be disbursed to such Depositor prior to December 31, 2010, on or before December 31, 2010. If W-8 or W-9 forms, validated by the Distribution Agent, have not been provided by all of the Depositors prior to December 31, 2010 the Distribution Agent shall report taxes on a disbursement basis in the year they are disbursed.

(b)     To the extent that the Distribution Agent becomes liable for the payment of any taxes in respect of income derived from the investment of the Escrow Funds, the Distribution Agent shall satisfy such liability to the extent possible from the Escrow Property. The Depositors shall, jointly and severally, indemnify, defend and hold the Distribution Agent harmless from and against any tax, late payment, interest, penalty or other cost or expense that

may be assessed against the Distribution Agent on or with respect to the Escrow Property and the investment thereof unless such tax, late payment, interest, penalty or other expense was caused by the gross negligence or willful misconduct of the Distribution Agent. Any indemnification payments arising from the indemnification provided by this Paragraph 4(b) shall be initially satisfied out of the Escrow Property to the extent available. As among themselves, the Depositors agree that the costs of any such indemnification shall be borne on a pro rata basis by the Depositors in accordance with the percentage of the Escrow Property allocable to each of the Depositors pursuant to the Allocation Protocol or a letter of direction as described in clause (a) of Paragraph 5, and any Depositor or any of its Respective Affiliates paying in excess of its pro rata share of the cost of such indemnification shall have rights of contribution vis-à-vis any Depositor that has paid less than its pro rata share of such costs either directly to the Distribution Agent or by payment to another Depositor pursuant to this sentence; provided, that if the costs of any such indemnification arise from a breach of this Agreement or other fault of a Depositor, the Depositor(s) so in breach or at fault shall bear the cost of such indemnification and any Depositor paying in excess of its share of the cost of such indemnification, after taking into account the breach or fault of the other Depositors, shall have rights of contribution vis-à-vis any Depositor that has paid less than its share of such costs either directly to the Distribution Agent or by payment to another Depositor. The indemnification provided by this Paragraph 4(b) is in addition to the indemnification provided in Paragraph 9 and shall survive the resignation or removal of the Distribution Agent and the termination of this Agreement.

5. Distribution of Escrow Property. The Depositors, the Estate Fiduciaries and the Distribution Agent hereby agree that, until the termination of the escrow established pursuant to this Agreement, the Distribution Agent shall hold the Escrow Property and not disburse any amounts from the Distribution Account except in accordance with the following terms and conditions:

(a) The Distribution Agent shall disburse to any person amounts from the Escrow Property if and as so instructed pursuant to (i) a letter of direction jointly executed by the Depositors and the Estate Fiduciaries, a copy of which shall be provided by the Depositors to the Bondholder Group or (ii) where the Depositors have entered into the Allocation Protocol in accordance with clause 12 of the IFSA (the existence of the Allocation Protocol and the identity of the relevant dispute resolver(s) shall be set forth in a written notice jointly executed by the Depositors and delivered to the Distribution Agent), any Depositor's delivery to the Distribution Agent, with copies to the other Depositors, the Estate Fiduciaries and the Bondholder Group, of a duly authenticated copy of the binding decision made by the relevant dispute resolver(s) under that protocol regarding the allocation of the sales proceeds relating to the GSM/GSM-R business of the Depositors (a "**Decision**") which is not stayed or subject to appeal, accompanied by a certificate from such Depositor certifying as to the finality of the Decision; provided, however, that any amounts owing under Paragraph 4(b) or Paragraph 9 by any Depositor (a "**Debtor Depositor**") to any other Depositor at the time of an intended distribution from the Escrow Account shall be paid out of the share of the Escrow Property otherwise payable to such Debtor Depositor.

(b) The Depositors understand and agree that no payments or reimbursements made pursuant to Section 6.1 of the North American ASA in respect of Transfer Taxes or Clause 11 of the EMEA ASA in respect of VAT and Transfer Taxes (as that term is defined in

9

the EMEA ASA) shall constitute any part of the Deposited Purchase Price, the amount transferred from the Good Faith Deposit Escrow Account (including any actual earnings thereon) or the Escrow Property, or shall be required to be paid by the Purchaser into the Distribution Account. In the event, however, that the Purchaser, the EMEA Purchaser or their affiliates make any payments with respect to Transfer Taxes or VAT or Transfer Taxes (as that term is defined in the EMEA ASA), as applicable, that are payable to or intended for the benefit of one or more Sellers or any affiliate or agent thereof pursuant to Section 6.1 of the North American ASA or one or more EMEA Sellers or any affiliate or agent thereof pursuant to Clause 11 of the EMEA ASA, but which are deposited into the Distribution Account (any such payment, "**Misdirected Tax Payment**"), then the applicable Depositor(s) shall have the right to request the release of such Misdirected Tax Payment by providing the Distribution Agent with a letter of direction executed by an Authorized Representative of such Depositor identifying the amount that is represented to be a Misdirected Tax Payment(s) and further directing the release of such Misdirected Tax Payment to the appropriate beneficiary in accordance with Paragraph 12 below. The requesting Depositor(s) shall (A) send a copy of such letter of direction to each of the other Depositors, the Estate Fiduciaries and the Bondholder Group at the same time as such letter is sent to the Distribution Agent and (B) attach thereto (i) supporting documentation evidencing the amount of the Transfer Taxes or VAT or Transfer Taxes (as that term is defined in the EMEA ASA), as applicable, payable (it being understood that the Distribution Agent shall have no responsibility for verifying the accuracy, delivery or sufficiency of such supporting documentation) and (ii) a certification of an Authorized Representative of such Depositor that the amount requested by such Depositor represents amounts deposited into escrow that are payable to or intended for the benefit of such Depositor by the Purchaser or its affiliates with respect to Transfer Taxes pursuant to the North American ASA or VAT or Transfer Taxes (as that term is defined in the EMEA ASA) pursuant to the EMEA ASA, as applicable. The Distribution Agent shall on or as soon as reasonably practicable following the tenth (10th) day following receipt of such letter of direction, disburse to such Depositor the amounts requested therein; provided, however, that if the Distribution Agent receives a notice of objection from one or more of the Depositors or an Estate Fiduciary prior to making such disbursement (but in no event later than 3:00 p.m. EST on such release date), the Distribution Agent shall not make such disbursement until the Distribution Agent either (x) receives an order of a court of competent jurisdiction (as provided in Paragraph 21 below), which is not stayed or subject to appeal, instructing it to make such distribution or (y) the objecting Depositor(s) and/or Estate Fiduciary(ies) provide written notice to the Distribution Agent withdrawing such objection. Subject to the proviso to the preceding sentence, the Distribution Agent shall be entitled to act upon any such written letter of direction even if not countersigned by one or more of the other Depositors and/or Estate Fiduciary(ies).

(c)    The Distribution Agent shall have no responsibility or obligation for investigating or determining the validity or sufficiency of any matter asserted in a letter of direction or of any pending claim for entitlement to release of funds from the Distribution Account. The Distribution Agent shall have the right to withhold an amount equal to the amount due and owing to the Distribution Agent, plus any reasonable costs and expenses incurred by Distribution Agent in accordance with the terms of this Agreement in connection with the termination of the Distribution Account.

(d)     No Depositor shall submit to the Distribution Agent a certificate that falsely certifies to the finality of a Decision.

(e)     Any request for a distribution pursuant to this Paragraph 5 shall be accompanied by a completed Schedule E with respect to the Depositors participating in such distribution, unless a completed Schedule E with respect to such Depositor has previously been provided to the Distribution Agent (in which case the Schedule E to be provided to the Distribution Agent need only contain the requisite information with respect to the Depositors as to whom no previous Schedule E has been provided to the Distribution Agent). The Depositors shall comply with any request from another Depositor for information necessary for inclusion in Schedule E.

(f)     The Depositors and the Estate Fiduciaries hereby agree that they shall cause the Distribution Agent to disburse amounts from the Distribution Account in accordance with the procedures set forth in this Paragraph 5 to satisfy (i) any obligations to make the Total Payments (as defined in the Side Agreement) in accordance with the terms of the Side Agreement; and (ii) the obligation of NNI to pay USD 100,000 to the Pension Benefit Guaranty Corporation at Closing.

6.     Termination of Distribution Account.     The Agreement shall terminate upon the distribution of all Escrow Property from the Distribution Account established hereunder in accordance with Paragraph 5 hereof, subject to the survival of provisions which expressly survive the termination of this Agreement; provided, however, that this Agreement shall not terminate prior to the date on which the Depositors and the Estate Fiduciaries notify the Distribution Agent that (i) all purchase price adjustment amounts owing to the Sellers under the terms of the North American ASA have been deposited in the Distribution Account by the Purchaser, (ii) all purchase price adjustment amounts owing to the EMEA Sellers under the terms of the EMEA ASA have been deposited in the Distribution Account by the EMEA Purchaser, and (iii) all amounts released from escrow pursuant to any escrow agreements provided for in the Sale Agreements or the other Transaction Documents have been deposited in the Distribution Account by the Purchaser and the EMEA Purchaser in accordance herewith and subsequently distributed as provided hereunder.

7.     Method of Payment. Any payments to be made hereunder shall be made by wire transfer in immediately available funds to the account of such party designated on Schedule E annexed hereto (collectively, the "Standing Settlement Instructions"). Any Depositor shall have the right, from time to time, to provide written notice to the Distribution Agent and the other Depositors updating its Standing Settlement Instructions, and the Distribution Agent shall thereafter use such revised Standing Settlement Instructions for purposes of any subsequent distributions to such Depositor pursuant to Paragraph 5 until such Standing Settlement Instructions have been further updated pursuant to this Paragraph 7.

The Depositors acknowledge that the Distribution Agent may rely upon all identifying information set forth in the Standing Settlement Instructions. The Distribution Agent and the Depositors agree that such Standing Settlement Instructions shall be effective as the

11

funds transfer instructions of the Depositors, without requiring a verifying callback, whether or not authorized, if the Distribution Agent has previously authenticated such Standing Settlement Instructions with respect to such Depositor. The Depositors acknowledge that such Standing Settlement Instructions are a security procedure and are commercially reasonable.

8. Monthly Reports. The Distribution Agent shall, promptly following the end of each calendar month, provide monthly account statements to the Depositors with respect to the Distribution Account, with copies to the Estate Fiduciaries and the Bondholder Group.

9. Liability of Distribution Agent. The Distribution Agent's sole liability hereunder shall be to hold and invest the Escrow Property and any moneys or other properties received with respect thereto, to make payments and distributions therefrom in accordance with the terms of this Agreement, and otherwise to discharge its obligations hereunder. It shall be under no obligation to institute or defend any action, suit or legal proceeding in connection herewith, or to take any other action likely to involve it in expense unless first indemnified to its satisfaction by the party or parties who desire that it undertake such action. The Distribution Agent may execute any of its powers and perform any of its duties hereunder directly or through agents or attorneys (and shall be liable only for the careful selection of any such agent or attorney) and may consult with counsel, accountants and other skilled persons to be selected and retained by it. The Distribution Agent shall not be liable for anything done, suffered or omitted by it in accordance with the advice or opinion of any such counsel, accountants or other skilled persons. The Distribution Agent shall not be liable for any action taken or omitted by it in good faith except to the extent that a court of competent jurisdiction (as set forth in Paragraph 21 below) determines that the Distribution Agent's gross negligence or willful misconduct was the cause of any loss to any Depositor. The Distribution Agent may rely upon and shall not be liable for acting or refraining from acting pursuant to any written notice, document, instruction or request furnished to it hereunder and reasonably believed by it to be genuine and to have been signed or presented by the proper party or parties without inquiry and without requiring substantiating evidence of any kind. The Distribution Agent shall be under no duty to inquire into or investigate the validity, accuracy or content of any such document, notice, instruction or request. The Distribution Agent shall have no duty to solicit any payments which may be due to it or in connection with the Distribution Account, including, without limitation, the Escrow Property, nor shall the Distribution Agent have any duty or obligation to confirm or verify the accuracy or correctness of any amounts deposited with it hereunder. The Distribution Agent shall have no duty or obligation to make any calculations of any kind hereunder. In the event that the Distribution Agent shall be uncertain or believe there is some ambiguity as to its duties or rights hereunder or shall receive instructions, claims or demands from any party hereto which, in its opinion, conflict with any of the provisions of this Agreement, it shall be entitled to refrain from taking any action and its sole obligation shall be to keep safely all property held in escrow until it shall be given a direction in writing by the parties pursuant to Paragraph 5 which eliminates such

12

ambiguity or uncertainty to the satisfaction of the Distribution Agent or by a final and non-appealable order or judgment of a court of competent jurisdiction (as set forth in Paragraph 21 below).

Anything in this Agreement to the contrary notwithstanding, in no event shall the Distribution Agent be liable for special, indirect or consequential loss or damage of any kind whatsoever (including but not limited to lost profits), even if the Distribution Agent has been advised of the likelihood of such loss or damage and regardless of the form of action.

If any dispute should arise with respect to the payment or ownership or right of possession of the Escrow Property, or any part thereof, at any time, that cannot be settled under other provisions hereof, the Distribution Agent is authorized to retain in its possession, without liability to anyone, all or any part of the Escrow Property, as applicable, or the proceeds from any sale thereof until a distribution is requested in accordance with Paragraph 5.

The Depositors shall, jointly and severally, indemnify and hold harmless the Distribution Agent and its affiliates and their respective successors, assigns, directors, agents and employees (the "Indemnitees") from all losses, costs, damages, claims, liabilities, penalties, judgments, settlements, litigation, investigations, and expenses (including, without limitation, the reasonable fees and expenses of outside counsel) (collectively, "Losses") arising out of or in connection with (a) the Distribution Agent's execution and performance of this Agreement, tax reporting or withholding, the enforcement by the Distribution Agent of any of its rights or remedies under or in connection with this Agreement, or as may arise by reason of any act, omission or error of the Indemnitee, except, in the case of any Indemnitee, to the extent that such Losses are finally adjudicated by a court of competent jurisdiction (as set forth in Paragraph 21 below) to have been caused by the gross negligence or willful misconduct of such Indemnitee, or (b) its following any instructions or directions, whether joint or singular, from the parties, except to the extent that its following any such instruction or direction is expressly forbidden by the terms hereof. The parties hereto acknowledge that the foregoing indemnities shall survive the resignation, replacement or removal of the Distribution Agent or the termination of this Agreement. Any indemnity payments to the Distribution Agent arising from the indemnification provided by this Paragraph 9 shall be initially satisfied from the Escrow Property to the extent available. As among themselves, the Depositors agree that the costs of any such indemnification shall be borne on a pro rata basis by the Depositors in accordance with the percentage of the Escrow Property allocable to each of the Depositors pursuant to the Allocation Protocol or a letter of direction as described in clause (a) of Paragraph 5, and any Depositor or any of their Respective Affiliates paying in excess of its pro rata share of the cost of such indemnification shall have rights of contribution vis-à-vis any Depositor that has paid less than its pro rata share of such costs either directly to the Distribution Agent or by payment to another Depositor pursuant to this sentence; provided, that if the costs of any such indemnification arise from a breach of this Agreement or other fault of a Depositor, the Depositor(s) so in breach or at fault shall bear the cost of such indemnification and any Depositor paying in excess of its share of the cost of such indemnification, after taking into account the breach or fault of the other Depositors, shall have rights of contribution vis-à-vis any Depositor that has paid less than its share of such costs either directly to the Distribution Agent or by payment to another Depositor. The indemnification provided by this Paragraph 9 is in addition to the indemnification provided in

13

Paragraph 4(b) and shall survive the resignation or removal of the Distribution Agent and the termination of this Agreement.

The duties and responsibilities of the Distribution Agent hereunder shall be determined solely by the express provisions of this Agreement, which shall be deemed purely ministerial in nature, and no other or further duties or responsibilities shall be implied. The Distribution Agent shall not have any liability under, nor duty to inquire into, the terms and provisions of any agreement or instructions, including the Sale Agreements, the Side Agreement, the Transaction Documents, the IFSA and the Allocation Protocol, other than as outlined in this Agreement, nor shall the Distribution Agent be required to determine if any person or entity has complied with any such agreements, nor shall any additional obligations of the Distribution Agent be inferred from the terms of such agreements, even though reference thereto may be made in this Agreement. In the event of any conflict between the terms and provisions of this Agreement, those of the Sale Agreements, any schedule or exhibit attached to the Sale Agreements, the Side Agreement, the Transaction Documents, the IFSA, the Allocation Protocol, or any other agreement among Depositors, or any of them, the terms and conditions of this Agreement shall control solely to the extent such conflict is with respect to the rights, duties, obligations and liabilities of the Distribution Agent.

10.    [Reserved].

11.    Resignation or Removal of Distribution Agent. The Distribution Agent may resign as such following the giving of thirty (30) days' prior written notice to the other parties hereto and upon selection of a successor escrow agent pursuant to the provisions of this Agreement. Similarly, the Distribution Agent may be removed and replaced following the giving of thirty (30) days' prior written notice to the Distribution Agent by the Depositors and the Estate Fiduciaries. In either event the Distribution Agent shall then deliver the balance of the Escrow Property then in its possession to a successor escrow agent as shall be appointed by the Depositors and the Estate Fiduciaries as evidenced by a written notice sent to the Distribution Agent and signed by the Depositors and the Estate Fiduciaries.

If the Depositors and the Estate Fiduciaries are unable to agree upon a successor or shall have failed to appoint a successor prior to the expiration of thirty (30) days following the date of notice of resignation or removal, the then-acting escrow agent may petition any court of competent jurisdiction (as set forth in Paragraph 21 below) for the appointment of a successor escrow agent or otherwise appropriate relief, and any such resulting appointment shall be binding upon all of the parties hereto. For the avoidance of doubt, the parties hereto acknowledge that under no circumstances shall any party hereto be entitled to obtain a distribution from the Distribution Account as a result of the resignation of the Distribution Agent.

The successor escrow agent shall be a bank or trust company having assets in excess of USD5,000,000,000.

Upon acknowledgement by any successor escrow agent of the receipt of the then-remaining balance of the Escrow Property, the then-acting escrow agent shall be fully released and relieved of all duties, responsibilities and obligations under this Agreement.

14

Any corporation into which the Distribution Agent in its individual capacity may be merged or converted or with which it may be consolidated, or any corporation resulting from any merger, conversion or consolidation to which the Distribution Agent in its individual capacity shall be a party, or any corporation to which substantially all the corporate trust business of the Distribution Agent in its individual capacity may be transferred, shall be the Distribution Agent under this Agreement without further act.

12.    Notices.  All communications hereunder shall be in writing and shall be deemed to be duly given and received:  (i) upon delivery, if delivered personally, or upon confirmed transmittal, if by facsimile; (ii) on the next Business Day if sent by overnight courier; or (iii) four (4) Business Days after mailing if mailed by prepaid registered mail, return receipt requested, to the appropriate notice address set forth in Schedule F or at such other address as any party hereto may have furnished to the other parties hereto in writing by registered mail, return receipt requested.

Notwithstanding the above, in the case of communications delivered to the Distribution Agent pursuant to (i), (ii) or (iii) of this Paragraph 12, such communications shall be deemed to have been given on the date received by an officer of the Distribution Agent or any employee of the Distribution Agent who reports directly to any such officer at the above-referenced office. In the event that the Distribution Agent, in its sole discretion, shall determine that an emergency exists, the Distribution Agent may use such other means of communication as the Distribution Agent deems appropriate.

In the event wire transfer instructions are given (other than in writing at the time of execution of this Agreement), whether in writing, by facsimile or otherwise, the Distribution Agent is authorized to seek confirmation of such instructions by telephone call-back to the person or persons designated on Schedule G hereto (each an "**Authorized Representative**" of the applicable Depositor), and the Distribution Agent may rely upon the confirmations of anyone purporting to be the person or persons so designated. The persons and telephone numbers for call-backs may be changed only in writing actually received and acknowledged by the Distribution Agent, it being understood that each Depositor shall have the right to replace its Authorized Representative from time to time by providing written notice to the Distribution Agent, the other Depositors, the Estate Fiduciaries and the Bondholder Group or by providing a copy of a court order of a court of competent jurisdiction (as provided in Paragraph 21 below) to the Distribution Agent designating a successor Authorized Representative. The Depositors acknowledge that such security procedure is commercially reasonable.

If, at any time prior to the termination of this Agreement, any of the Estate Fiduciaries is discharged, removed or dissolved, whether pursuant to an approved plan of reorganization or liquidation by order of the Canadian Court or U.S. Bankruptcy Court or otherwise, any Depositor or Estate Fiduciary may present to the Distribution Agent evidence of such discharge, removal or dissolution in the form of a court order or other officially certified document which upon receipt by the Distribution Agent shall constitute an effective amendment to this Agreement, and such Estate Fiduciary by operation of this Agreement, as amended, shall cease to be such for all purposes of this Agreement and the consent of such removed or dissolved Estate Fiduciary shall no longer be required for any purposes hereunder. If such discharge, removal or dissolution provides for a successor to the duties and responsibilities of such removed

15

or dissolved Estate Fiduciary, or a successor to the same or substantially similar duties and responsibilities of such removed or dissolved Estate Fiduciary (including, without limitation, a trustee in bankruptcy) is otherwise appointed, then the preceding sentence shall be of no effect with respect to such successor entity, the rights and responsibilities of such Estate Fiduciary hereunder shall pass automatically to such successor entity and such successor entity shall be deemed to be a party to this Agreement as if it were a signatory hereto.

If, at any time prior to the termination of this Agreement, any of the Depositors is liquidated or dissolved, whether pursuant to an approved plan of reorganization or liquidation by order of the Canadian Court or U.S. Bankruptcy Court (or, in the case of the EMEA Sellers, such order of a court of competent jurisdiction or by operation of law) or otherwise, any Depositor, or Estate Fiduciary (as the case may be) shall present to the Distribution Agent evidence of such dissolution or liquidation in the form of a court order or other officially certified document which upon receipt by the Distribution Agent shall constitute an effective amendment to this Agreement, and such dissolved or liquidated Depositor by operation of this Agreement, as so amended, shall cease to be such for all purposes of this Agreement, as amended, and the consent of such dissolved or liquidated Depositor shall no longer be required for any purposes hereunder. If such dissolution or liquidation provides for a successor to such dissolved or liquidated Depositor, then such rights and responsibilities shall pass automatically to such successor entity.

The Depositors represent, warrant and covenant that each document, notice, instruction or request provided by such party to the Distribution Agent shall comply with applicable laws and regulations. Where, however, the conflicting provisions of any such applicable law may be waived, they are hereby irrevocably waived by the Depositors to the fullest extent permitted by law, to the end that this Agreement shall be enforced as written.

13.    Counterparts. This Agreement may be executed in any number of counterparts, each of which shall be deemed to be an original, but such counterparts shall constitute one and the same agreement. Facsimile copies may be deemed originals for the purpose of this Agreement.

14.    Paragraph Headings. The paragraph headings of this Agreement are for convenience of reference only and shall not be deemed to limit or affect any of the provisions hereof.

15.    Amendments; No Waivers.

(a)    Except for the resignation, removal or replacement of an Estate Fiduciary as set forth in Paragraph 12 or the liquidation or dissolution of a Depositor as set forth in Paragraph 12, any provision of this Agreement may be waived or amended if, and only if, such amendment or waiver is in writing and is signed by the Depositors, the Estate Fiduciaries and the Distribution Agent (with a copy thereof to the Bondholder Group) and, if prior to the entry of a final decree closing the Bankruptcy Cases, such amendment or waiver is approved by both the U.S. Bankruptcy Court and the Canadian Court; provided, however, that (i) court approval shall not be required of any applicable court (whether the U.S. Bankruptcy Court or the Canadian Court) if a final decree closing the Bankruptcy Cases pending before such court shall have been entered by such court and (ii) court approval shall not be required of any court if final decrees

16

terminating the Bankruptcy Cases shall have been entered by the U.S. Bankruptcy Court and the Canadian Court.

      (b)    No failure by any party hereto to insist upon the strict performance of any covenant, duty, agreement or condition of this Agreement, or to exercise any right or remedy consequent upon a breach hereof, shall constitute a waiver of any such breach or any other covenant, duty, agreement or condition hereof.

      16.    <u>Entire Agreement; No Third Party Beneficiaries</u>. This Agreement (including any exhibits, schedules and amendments hereto) and (solely with respect to the Depositors that are parties thereto) the North American ASA, the EMEA ASA, the Transition Services Agreement, the EMEA TSA, the Side Agreement, the IFSA, the Appropriate License Termination (as defined in the IFSA) and the Allocation Protocol to be entered into pursuant thereto (a) constitute the entire Agreement and understandings of the parties hereto and supersedes all prior agreements and understandings, both written and oral, among the parties hereto with respect to the subject matter hereof and (b) is not intended to confer upon any other Person any rights or remedies hereunder; <u>provided, however</u>, that the Joint Administrators shall be entitled to enforce and take the benefit of <u>Paragraph 20</u> hereof.

      17.    <u>Governing Law</u>. Subject to <u>Paragraph 20</u>, this Agreement shall be governed by and construed in accordance with the Laws of the State of New York (without regard to the rules of conflict of laws of the State of New York or any other jurisdiction).

      18.    <u>Account Opening Information</u>. To help the government fight the funding of terrorism and money laundering activities, Federal law requires all financial institutions to obtain, verify, and record information that identifies each person who opens an account. When an account is opened, the Distribution Agent will ask for information that will allow it to identify relevant parties.

      19.    <u>Severability</u>. If any provision of this Agreement is determined by a court of competent jurisdiction (as set forth in <u>Paragraph 21</u> below) to be prohibited or unenforceable by reason of any applicable law of a jurisdiction, then such provision shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions thereof, and any such prohibition or unenforceability in such jurisdiction shall not invalidate or render unenforceable such provisions in any other jurisdiction.

      20.    <u>Exclusion of Liability for the Joint Administrators and the French Office Holders</u>.

      (a)    Subject to Paragraph 20(c) below, the parties hereto agree that the Joint Administrators have negotiated this Agreement both in their capacities as administrators of the EMEA Debtors and for and on behalf of the EMEA Debtors and that none of the Joint Administrators or their respective firm, partners, employees, advisers, representatives or agents shall incur any personal liability whatsoever whether on their own

part or in respect of any failure on the part of any EMEA Debtor to observe, perform or comply with any of its obligations under this Agreement or under or in relation to any associated arrangements or negotiations whether such liability would arise under Paragraph 99(4) of Schedule B1 to the Insolvency Act or otherwise howsoever.

(b)     Subject to Paragraph 20(c) below, the parties hereto agree that the French Office Holders have negotiated this Agreement for and on behalf of NNSA, and that none of the French Office Holders or their respective firm, partners, employees, advisers, representatives or agents shall incur any personal liability whatsoever whether on their own part or in respect of any failure on the part of NNSA to observe, perform or comply with any of its obligations under this Agreement or under or in relation to any associated arrangements or negotiations whether such liability would arise under applicable laws or otherwise howsoever.

(c)     Nothing in this Section 20 or any other provision of this Agreement shall prevent the Sellers or the Distribution Agent from bringing any action against the EMEA Debtors, NNSA, the French Office Holders or the Joint Administrators for fraud.

Notwithstanding anything in Paragraph 21, (i) any claim, action or proceeding against the Joint Administrators in their personal capacities (and not as agents for any EMEA Debtor or NNSA) under this Agreement shall be governed exclusively by English law and subject to the exclusive jurisdiction of the English Courts; and (ii) any claim, action or proceeding against the French Office Holders in their personal capacities (and not as agents for NNSA) under this Agreement shall be governed by the laws of France and subject to the exclusive jurisdiction of the French courts.

21.     JURISDICTION.  SUBJECT TO PARAGRAPH 20, FOR ANY CLAIM, ACTION OR PROCEEDING ARISING UNDER OR OUT OF, IN RESPECT OF, OR IN CONNECTION WITH THIS AGREEMENT, EACH PARTY HEREBY IRREVOCABLY SUBMITS TO AND ACCEPTS FOR ITSELF AND ITS PROPERTIES, GENERALLY AND UNCONDITIONALLY TO THE EXCLUSIVE JURISDICTION OF AND SERVICE OF PROCESS PURSUANT TO THE RULES OF BOTH (I) THE U.S. BANKRUPTCY COURT AND THE CANADIAN COURT, IF SUCH CLAIM, ACTION OR PROCEEDING IS BROUGHT PRIOR TO THE ENTRY OF A FINAL DECREE CLOSING THE BANKRUPTCY CASES INVOLVING THE RELEVANT DEPOSITORS PENDING BEFORE SUCH COURTS, INCLUDING THAT CERTAIN CROSS-BORDER INSOLVENCY PROTOCOL APPROVED BY THE U.S. BANKRUPTCY COURT PURSUANT TO SECTION 105(a) OF THE BANKRUPTCY CODE IN AN ORDER DATED JANUARY 15, 2009, AND BY THE CANADIAN COURT PURSUANT TO AN ORDER DATED JANUARY 14, 2009, AS AMENDED OR AS AMENDED AND RESTATED FROM TIME TO TIME, AND (II) THE FEDERAL COURTS IN THE SOUTHERN DISTRICT OF NEW YORK AND THE STATE COURTS OF THE STATE OF NEW YORK, COUNTY OF NEW YORK (COLLECTIVELY, THE "NEW YORK COURTS"), IF BROUGHT AFTER ENTRY OF SUCH FINAL DECREE CLOSING SUCH BANKRUPTCY CASES INVOLVING THE

18

RELEVANT DEPOSITORS PENDING BEFORE THE U.S. BANKRUPTCY COURT OR THE CANADIAN COURT, WAIVES ANY DEFENSE OF FORUM NON CONVENIENS AND AGREES TO BE BOUND BY ANY JUDGMENT RENDERED THEREBY ARISING UNDER OR OUT OF, IN RESPECT OF, OR IN CONNECTION WITH THIS AGREEMENT. EXCEPT AS PROVIDED IN THE FOREGOING NO PARTY HERETO SHALL INITIATE ANY CLAIM, ACTION OR PROCEEDING ARISING UNDER OR OUT OF, IN RESPECT OF, OR IN CONNECTION WITH THIS AGREEMENT IN ANY OTHER STATE OR FEDERAL COURT IN THE UNITED STATES OF AMERICA, CANADA OR ANY COURT IN ANY OTHER COUNTRY. EACH PARTY FURTHER IRREVOCABLY DESIGNATES AND APPOINTS THE INDIVIDUAL IDENTIFIED PURSUANT TO PARAGRAPH 12 HEREOF (OR, IN THE CASE THAT A SUCCESSOR PERSON IS APPOINTED AS AUTHORIZED REPRESENTATIVE PURSUANT TO PARAGRAPH 12, SUCH SUCCESSOR PERSON) TO RECEIVE NOTICES ON ITS BEHALF, AS ITS AGENT TO RECEIVE ON ITS BEHALF SERVICE OF ALL PROCESS IN ANY SUCH CLAIM, ACTION OR PROCEEDING BEFORE ANY BODY, SUCH SERVICE BEING HEREBY ACKNOWLEDGED TO BE EFFECTIVE AND BINDING SERVICE IN EVERY RESPECT. A COPY OF ANY SUCH PROCESS SO SERVED SHALL BE MAILED BY REGISTERED MAIL TO EACH PARTY AT ITS ADDRESS PROVIDED PURSUANT TO PARAGRAPH 12; PROVIDED THAT, UNLESS OTHERWISE PROVIDED BY APPLICABLE LAW, ANY FAILURE TO MAIL SUCH COPY SHALL NOT AFFECT THE VALIDITY OF THE SERVICE OF SUCH PROCESS. IF ANY AGENT SO APPOINTED REFUSES TO ACCEPT SERVICE, THE DESIGNATING PARTY HEREBY AGREES THAT SERVICE OF PROCESS SUFFICIENT FOR PERSONAL JURISDICTION IN ANY CLAIM, ACTION OR PROCEEDING AGAINST IT IN THE APPLICABLE JURISDICTION MAY BE MADE BY REGISTERED OR CERTIFIED MAIL, RETURN RECEIPT REQUESTED, TO ITS ADDRESS PROVIDED PURSUANT TO PARAGRAPH 12. EACH PARTY HEREBY ACKNOWLEDGES THAT SUCH SERVICE SHALL BE EFFECTIVE AND BINDING IN EVERY RESPECT. NOTHING HEREIN SHALL AFFECT THE RIGHT TO SERVE PROCESS IN ANY OTHER MANNER PERMITTED BY LAW OR SHALL LIMIT THE RIGHT OF ANY PARTY TO BRING ANY CLAIM, ACTION OR PROCEEDING AGAINST THE OTHER PARTY IN ANY OTHER JURISDICTION. NOTWITHSTANDING ANYTHING IN THIS PARAGRAPH 21 TO THE CONTRARY, ANY CLAIM, ACTION OR PROCEEDING SET FORTH IN PARAGRAPH 20 SHALL BE BROUGHT EXCLUSIVELY IN THE COURTS CONTEMPLATED IN PARAGRAPH 20. FINALLY, REGARDLESS OF THE JURISDICTION OF THE APPLICABLE COURT, THE PARTIES FURTHER HEREBY WAIVE ANY RIGHT TO A TRIAL BY JURY WITH RESPECT TO ANY LAWSUIT OR JUDICIAL PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT.

22.    Interpretation. As used in this Agreement (including all exhibits, schedules and amendments hereto), the masculine, feminine or neuter gender and

the singular or plural number shall be deemed to include the others whenever the context so requires. References to Paragraphs and Articles refer to sections and articles of this Agreement, unless the context otherwise requires. Words such as "herein," "hereinafter," "hereof," "hereto," "hereby" and "hereunder," and words of like import, unless the context requires otherwise, refer to this Agreement. The captions contained herein are for convenience only and shall not control or affect the meaning or construction of any provision of this Agreement.

23.    Compliance with Court Orders.   In the event that any of the Escrow Property shall be attached, garnished or levied upon by any court order, or the distribution or disbursement thereof shall be stayed or enjoined by an order of a court of competent jurisdiction (as set forth in Paragraph 21 above), or any order, judgment or decree shall be made or entered by any court order affecting the property deposited under this Agreement, the Distribution Agent is hereby expressly authorized, in its sole discretion, to obey and comply with all writs, orders or decrees so entered or issued, which it is advised by legal counsel of its own choosing is binding upon it, whether with or without jurisdiction, and in the event that the Distribution Agent obeys or complies with any such writ, order or decree it shall not be liable to any of the parties hereto or to any other person, firm or corporation, by reason of such compliance notwithstanding such writ, order or decree be subsequently reversed, modified, annulled, set aside or vacated.

24.    Force Majeure.   In the event that any party hereto or the Distribution Agent is unable to perform its obligations under the terms of this Agreement because of acts of God, strikes, equipment or transmission failure or damage reasonably beyond its control, or other cause reasonably beyond its control, the Distribution Agent shall not be liable for damages to the other parties for any damages resulting from such failure to perform otherwise from such causes. Performance under this Agreement shall resume when the Distribution Agent is able to perform substantially.

25.    Patriot Act Disclosure.   Section 326 of the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 (the "**USA PATRIOT Act**") requires the Distribution Agent to implement reasonable procedures to verify the identity of any person that opens a new account with it. Accordingly, each Depositor acknowledges that Section 326 of the USA PATRIOT Act and the Distribution Agent's identity verification procedures require the Distribution Agent to obtain information which may be used to confirm such Depositor's identity including without limitation name, address and organizational documents ("**Identifying Information**"). Each Depositor agrees to provide the Distribution Agent with and consent to the Distribution Agent obtaining from third parties any such Identifying Information with respect to it required as a condition of opening an account with or using any service provided by the Distribution Agent.

26.    Taxpayer Identification Numbers ("**TIN**").   Each Depositor will provide the Distribution Agent with its fully executed Internal Revenue Service ("**IRS**") Form W-8, or W-9 and/or other required documentation as set forth in

Paragraph 4(a). Each Depositor providing such documentation represents that its correct TIN assigned by the IRS, or any other taxing authority, shall be set forth in the delivered forms.

27.    Allocation Protocol. The Depositors and the Estate Fiduciaries agree and acknowledge that nothing in this Agreement including, without limitation, Paragraph 5(f), shall prejudice any pre-existing rights or obligations of any of the Depositors and the Estate Fiduciaries to argue the appropriateness of any allocation of the Escrow Property before a dispute resolver(s) appointed pursuant to the Allocation Protocol. Without limitation to the foregoing, the Depositors' interest allocation percentages set forth on Exhibit 1 are not indicative of the final allocation of the Escrow Property and shall not be presented by any of the Depositors and the Estate Fiduciaries in any of their submissions (whether in writing or orally) as to the appropriate allocation of the Escrow Property before the dispute resolver(s) appointed pursuant to the Allocation Protocol. Furthermore, the Depositors and the Estate Fiduciaries agree that (i) the China Purchase Amount agreed to solely for the purpose of complying with local law requirements and to facilitate the closing of the transactions contemplated by the North American ASA and the EMEA ASA and such allocation shall have no precedential impact on the allocation of the Escrow Property to any other Depositor or any other sales proceeds before a dispute resolver appointed pursuant to the Allocation Protocol and (ii) any consideration paid pursuant to or evidenced by any Local Sale Agreement or any agreement or instrument, including bills of sale and/or assignment or assumption agreements providing for (x) the sale, transfer, assignment or other conveyance to the EMEA Purchaser and relevant EMEA Designated Purchasers, in accordance with the requirements of local Law, of any EMEA Assets located in countries where such local sale agreements are required or desirable; and (y) the assumption by the EMEA Designated Purchasers of any EMEA Assumed Liabilities that the EMEA Purchaser intends to allocate to them (other than the China Purchase Amount) was agreed to solely for the purpose of complying with local law requirements and to facilitate the closing of the transactions contemplated by the North American ASA the EMEA ASA and the NNSA Irrevocable Offer and such consideration shall have no precedential impact on the allocation of the Escrow Property to any Depositor of any sales proceeds before a dispute resolver appointed pursuant to the Allocation Protocol.

28.    Exclusion of Liability for Estate Fiduciaries. The Depositors and the Distribution Agent agree that (a) each of the Estate Fiduciaries has negotiated and is entering into this Agreement as a representative of its applicable creditor constituency for the purpose of benefiting from the rights being granted hereunder and to allow the Distribution Agent to be able to rely on any joint instructions signed by the Estate Fiduciaries and (b) none of the Estate Fiduciaries, their firms, members or affiliates of such parties and such parties respective partners, associates, employees, advisers, representatives or agents shall incur any liability whatsoever under this Agreement.

21

*[Signature Pages follow]*

GSM/GSM-R Escrow Agreement

IN WITNESS WHEREOF, each of the parties hereto has caused this Agreement to be executed on the day and year first above written.

NORTEL NETWORKS LIMITED

By:_____
Name:  John Doolittle
Title:  Senior Vice-President, Corporate
Services and Chief Financial Officer

By:_____
Name:  Clarke Glaspell
Title:  Controller

NORTEL NETWORKS INC.

By:_____
Name:  Lynn C. Egan
Title:  Secretary

NORTEL NETWORKS CORPORATION

By:_____
Name:  John Doolittle
Title:  Senior Vice-President, Corporate
Services and Chief Financial Officer

By:_____
Name:  Clarke Glaspell
Title:  Controller

DISTRIBUTION AGENT

JPMorgan Chase Bank, N.A., as Distribution
Agent

By:_____
Name:
Title:

ERNST & YOUNG INC. IN ITS CAPACITY
AS THE MONITOR OF NORTEL
NETWORKS CORPORATION ET AL.,
AND NOT IN ITS PERSONAL CAPACITY

By:_____
Name:
Title:

THE OFFICIAL COMMITTEE OF
UNSECURED CREDITORS OF NORTEL
NETWORKS INC., ET. AL.

By: Flextronics Corporation, solely in its
capacity as Chair of the Committee and not in
its individual capacity

By:_____
Name:  Timothy Burling
Title:  Vice President, Finance

GSM/GSM-R Escrow Agreement

IN WITNESS WHEREOF, each of the parties hereto has caused this Agreement to be executed on the day and year first above written.

NORTEL NETWORKS LIMITED

By: _____
Name:  John Doolittle
Title:   Senior Vice-President, Corporate Services and Chief Financial Officer

By: _____
Name:  Clarke Glaspell
Title:   Controller


NORTEL NETWORKS INC.

By: _____
Name:  Lynn Egan
Title:   Secretary


NORTEL NETWORKS CORPORATION

By: _____
Name:  John Doolittle
Title:   Senior Vice-President, Corporate Services and Chief Financial Officer

By: _____
Name:  Clarke Glaspell
Title:   Controller


DISTRIBUTION AGENT

JPMorgan Chase Bank, N.A., as Distribution Agent


By: _____
Name:
Title:


ERNST & YOUNG INC. IN ITS CAPACITY AS THE MONITOR OF NORTEL NETWORKS CORPORATION ET AL., AND NOT IN ITS PERSONAL CAPACITY




By: _____
Name:
Title:


THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS OF NORTEL NETWORKS INC., ET. AL.

By:  Flextronics Corporation, solely in its capacity as Chair of the Committee and not in its individual capacity


By: _____
Name:  Timothy Burling
Title:   Vice President, Finance


S-1

DISTRIBUTION AGENT

JPMorgan Chase Bank, N.A., as Distribution
Agent

By: _____

Name:        SAVERIO A. LUNETTA

Title:        VICE PRESIDENT

Signature Page to Distribution Escrow Agreement

ERNST & YOUNG INC. IN ITS CAPACITY
AS THE MONITOR OF NORTEL
NETWORKS CORPORATION ET AL.,
AND NOT IN ITS PERSONAL CAPACITY


By: _____
Name:  Sharon  Hamilton
Title:  Senior  Vice - President

Signature Page to Distribution Escrow Agreement

IN WITNESS WHEREOF, each of the parties hereto has caused this Agreement to be executed on the day and year first above written.

NORTEL NETWORKS LIMITED

By:_____
Name:  John Doolittle
Title:   Senior Vice-President, Finance and
Corporate Services

By:_____
Name:  Anna Ventresca
Title:   General Counsel – Corporate and
Corporate Secretary

NORTEL NETWORKS INC.

By:_____
Name:  Anna Vestresca
Title:   Chief Legal Officer

NORTEL NETWORKS CORPORATION

By:_____
Name:  John Doolittle
Title:   Senior Vice-President, Finance and
Corporate Services

By:_____
Name:  Anna Ventresca
Title:   General Counsel – Corporate and
Corporate Secretary

DISTRIBUTION AGENT

JPMorgan Chase Bank, N.A., as Distribution
Agent

By:_____
Name:
Title:

ERNST & YOUNG INC. IN ITS CAPACITY
AS THE MONITOR OF NORTEL
NETWORKS CORPORATION ET AL.,
AND NOT IN ITS PERSONAL CAPACITY

By:_____
Name:
Title:

THE OFFICIAL COMMITTEE OF
UNSECURED CREDITORS OF NORTEL
NETWORKS INC., ET. AL.

By:  Flextronics Corporation, solely in its
capacity as Chair of the Committee and not in
its individual capacity

By:_____
Name:  Timothy Burling
Title:   Vice President, Finance

GSM/GSM-R Escrow Agreement

**SIGNED** in the name and on behalf of **NORTEL NETWORKS TECHNOLOGY CORPORATION** by

NORTEL NETWORKS LIMITED, as Representative

By:_____

Name: John Doolittle

Title:  Senior Vice-President, Corporate Services and Chief Financial Officer

By:_____

Name:  Clarke Glaspell

Title:  Controller

**SIGNED** in the name and on behalf of **NORTEL DE MÉXICO, S. DE R.L. DE C.V.** by

NORTEL NETWORKS LIMITED, as Representative

By:_____

Name: John Doolittle

Title:  Senior Vice-President, Corporate Services and Chief Financial Officer

By:_____

Name:  Clarke Glaspell

Title:  Controller

S-2

GSM/GSM-R Escrow Agreement

**SIGNED** in the name and on behalf of **NORTEL NETWORKS (CHINA) LIMITED** by

NORTEL NETWORKS LIMITED, as Representative

By: _____
Name:  John Doolittle
Title:    Senior Vice-President, Corporate Services
and Chief Financial Officer

By: _____
Name:  Clarke Glaspell
Title:   Controller

**SIGNED** in the name and on behalf of **NORTEL NETWORKS GLOBAL CORPORATION** by

NORTEL NETWORKS LIMITED, as Representative

By: _____
Name:  John Doolittle
Title:    Senior Vice-President, Corporate Services
and Chief Financial Officer

By: _____
Name:  Clarke Glaspell
Title:   Controller

ARCHITEL SYSTEMS (U.S.)
CORPORATION

By _____
    Name: John Doolittle
    Title:  President

CORETEK, INC.

By _____
    Name: John Doolittle
    Title:  President

NORTEL ALTSYSTEMS INC.

By _____
    Name: John Doolittle
    Title:  President

NORTEL ALTSYSTEMS
INTERNATIONAL INC.

By _____
    Name: John Doolittle
    Title:  President

[Signature Page to Distribution Escrow Agreement]

NORTEL NETWORKS APPLICATIONS
MANAGEMENT SOLUTIONS INC.

By _____
    Name: John Doolittle
    Title: President

NORTEL NETWORKS CABLE
SOLUTIONS INC.

By _____
    Name: John Doolittle
    Title: Vice-President

NORTEL NETWORKS CAPITAL
CORPORATION

By _____
    Name: John Doolittle
    Title: President

NORTEL NETWORKS HPOCS INC.

By _____
    Name: John Doolittle
    Title: President

[Signature Page to Distribution Escrow Agreement]

NORTEL NETWORKS INTERNATIONAL
INC.

By _____
    Name: John Doolittle
    Title: President

NORTEL NETWORKS OPTICAL
COMPONENTS INC.

By _____
    Name: John Doolittle
    Title: President

NORTHERN TELECOM
INTERNATIONAL INC.

By _____
    Name: John Doolittle
    Title: President

QTERA CORPORATION

By _____
    Name: John Doolittle
    Title: President

[Signature Page to Distribution Escrow Agreement]

SONOMA SYSTEMS

By _____
    Name: John Doolittle
    Title:  President and Treasurer

XROS, INC.

By _____
    Name: John Doolittle
    Title:  President

GSM/GSM-R Escrow Agreement

**SIGNED** in the name and on behalf of **NORTEL NETWORKS (ASIA) LIMITED** by

NORTEL NETWORKS LIMITED, as Representative

By:_____
Name:  John Doolittle
Title:   Senior Vice-President, Corporate
Services and Chief Financial Officer

By:_____
Name:  Clarke Glaspell
Title:    Controller

S-4

**SIGNED** for and on behalf of **Nortel Networks**
**UK Limited** (in administration) by Stephen
Harris as Joint Administrator (acting as agent
and without personal liability) in the presence
of:

)
)
)
)

.......................................
Stephen Harris

Witness signature

.......................................
Name: Emilia Law
Address: Herbert Smith LLP, Exchange House,
Primrose Street, London EC2A 2HS

)
)
)

**SIGNED** for and on behalf of **Nortel GmbH**
(in administration) by Stephen Harris as Joint
Administrator (acting as agent and without
personal liability) in the presence of:

)
)
)
)

.......................................
Stephen Harris

Witness signature

.......................................
Name: Emilia Law
Address: Herbert Smith LLP, Exchange House,
Primrose Street, London EC2A 2HS

)
)
)

**SIGNED** for and on behalf of **Nortel Networks**
**SpA** (in administration) by Stephen Harris as
Joint Administrator (acting as agent and without
personal liability) in the presence of:

)
)
)
)

.......................................
Stephen Harris

Witness signature

.......................................
Name: Emilia Law
Address: Herbert Smith LLP, Exchange House,
Primrose Street, London EC2A 2HS

)
)
)

Signature Page to Distribution Escrow Agreement

**SIGNED** for and on behalf of **Nortel Networks**  )
**Hispania S.A.** (in administration) by Stephen  )
Harris as Joint Administrator (acting as agent  )
and without personal liability) in the presence  )
of:

Stephen Harris

Witness signature

.................................................  )
Name: Olivia Schofield  )

Address: Herbert Smith LLP, Exchange House,  )
Primrose Street, London EC2A 2HS

**SIGNED** for and on behalf of **Nortel Networks**  )
**B.V.** (in administration) by Stephen Harris as  )
Joint Administrator (acting as agent and without  )
personal liability) in the presence of:  )

Stephen Harris

Witness signature

.................................................  )
Name: Olivia Schofield  )

Address: Herbert Smith LLP, Exchange House,  )
Primrose Street, London EC2A 2HS

Signature Page to Distribution Escrow Agreement

**SIGNED** for and on behalf of **Nortel Networks** )
**N.V.** (in administration) by Stephen Harris as )
Joint Administrator (acting as agent and without )
personal liability) in the presence of: )

Stephen Harris

Witness signature

Name: Olivia Schofield )

Address: Herbert Smith LLP, Exchange House, )
Primrose Street, London EC2A 2HS

**SIGNED** for and on behalf of **Nortel Networks** )
**(Austria) GmbH** (in administration) by )
Stephen Harris as Joint Administrator (acting as )
agent and without personal liability) in the )
presence of: )

Stephen Harris

Witness signature

Name: Olivia Schofield )

Address: Herbert Smith LLP, Exchange House,
Primrose Street, London EC2A 2HS

Signature Page to Distribution Escrow Agreement

**SIGNED** for and on behalf of **Nortel Networks** )
**Polska Sp. z.o.o.** (in administration) by Stephen )
Harris as Joint Administrator (acting as agent )
and without personal liability) in the presence )
of: )

.......................................................
Stephen Harris

Witness signature

.......................................................
Name: Olivia Schofield )

Address: Herbert Smith LLP, Exchange House, )
Primrose Street, London EC2A 2HS

**SIGNED** for and on behalf of **Nortel Networks** )
**s.r.o.** (in administration) by Stephen Harris as )
Joint Administrator (acting as agent and without )
personal liability) in the presence of: )

.......................................................
Stephen Harris

Witness signature

.......................................................
Name: Olivia Schofield )

Address: Herbert Smith LLP, Exchange House, )
Primrose Street, London EC2A 2HS

Signature Page to Distribution Escrow Agreement

**SIGNED** for and on behalf of **Nortel Networks Engineering Service kft** (in administration) by Stephen Harris as Joint Administrator (acting as agent and without personal liability) in the presence of:

)
)
)
)

..............................................................
Stephen Harris

Witness signature

.............. O. Schofield ..............
Name: Olivia Schofield

)
)

Address: Herbert Smith LLP, Exchange House, Primrose Street, London EC2A 2HS

)

**SIGNED** for and on behalf of **Nortel Networks Slovensko s.r.o.** (in administration) by Stephen Harris as Joint Administrator (acting as agent and without personal liability) in the presence of:

)
)
)
)

..............................................................
Stephen Harris

Witness signature

.............. O. Schofield ..............
Name: Olivia Schofield

)
)

Address: Herbert Smith LLP, Exchange House, Primrose Street, London EC2A 2HS

)

Signature Page to Distribution Escrow Agreement

**SIGNED** for and on behalf of **Nortel Networks**    )
**Romania Srl** (in administration) by Stephen    )        Stephen Harris
Harris as Joint Administrator (acting as agent    )
and without personal liability) in the presence    )
of:

Witness signature

..............................................................    )
Name: Olivia Schofield    )

Address: Herbert Smith LLP, Exchange House,    )
Primrose Street, London EC2A 2HS

Signature Page to Distribution Escrow Agreement

**SIGNED** for and on behalf of **Nortel**                )    .................................................
**Networks OY** (in administration)                      )    Stephen Harris
by Stephen Harris as Joint Administrator (acting        )
as agent and without personal liability) in the         )
presence of:

Witness signature
Name: Emilia Law
Address: Herbert Smith LLP, Exchange House,
Primrose Street, London EC2A 2HS

Signature Page to Distribution Escrow Agreement

SIGNED for and on behalf of **Nortel**
**Networks AB** (in administration)  )
by Stephen Harris as Joint Administrator (acting  )
as agent and without personal liability) in the  )
presence of:  )

Stephen Harris

Witness signature
Name: Emilia Law
Address: Herbert Smith LLP, Exchange House,
Primrose Street, London EC2A 2HS

SIGNED for and on behalf of **Nortel**  )
**Networks International Finance & Holding**  )
**BV** (in administration)  )
by Stephen Harris as Joint Administrator (acting  )
as agent and without personal liability) in the  )
presence of:

Stephen Harris

Witness signature
Name: Emilia Law
Address: Herbert Smith LLP, Exchange House,
Primrose Street, London EC2A 2HS

SIGNED for and on behalf of **Nortel**  )
**Networks Portugal SA** (in administration)  )
by Stephen Harris as Joint Administrator (acting  )
as agent and without personal liability) in the  )
presence of:

Stephen Harris

Witness signature
Name: Emilia Law
Address: Herbert Smith LLP, Exchange House,
Primrose Street, London EC2A 2HS

Signature Page to Distribution Escrow Agreement

**SIGNED** for and on behalf of Nortel Networks )
France S.A.S. (in administration) by Kerry )
Trigg acting as authorised representative for )
Stephen Harris as Joint Administrator (acting as )
agent and without personal liability) in the )
presence of: )

.................................................................

Kerry Trigg


Witness signature

.............................................................. )

Name:    SHARON  PERLMUTTER

Address:        ERNST & YOUNG LLP
                1 More London Place
                London
                SE1 2AF


Signature Page to Distribution Escrow Agreement

SIGNED by Alan Bloom

in his own capacity and on behalf of the Joint
Administrators without personal liability and
solely for the benefit of the provisions of this
Agreement expressed to be conferred on or
given to the Joint Administrators:

)
)
)

.................................................................
Alan Bloom

Witness signature

.................................................................
Name:    TRACEY REAP
Address:

)
)
)

**ᴇꀤ ERNST & YOUNG LLP**
**1 More London Place**
**London**
**SE1 2AF**

Signature Page to Distribution Escrow Agreement

**SIGNED** by Sharon Rolston     )

duly authorised for and on behalf of Nortel ) Sharon Rolston

Networks AG in the presence of;   )


Witness signature

Name: B.SCHERWATH      )

Address: c/o NORTEL NETWORKS UK LTD.
     WESTACOTT WAY
     MAIDENHEAD
     SL6 0AT
     UK

Signature Page to Distribution Escrow Agreement

**SIGNED** by John Freebairn                    )
duly authorised for and on behalf of Nortel      )
Networks (Northern Ireland) Limited in the       )    John Freebairn
presence of:                                     )


Witness signature

Name:   TINA McAULEY
Address:  10 KNOCKAGH HEIGHTS
          CARRICKFERGUS
          BT38 8QZ

Signature Page to Distribution Escrow Agreement

SIGNED by Maria Stanko )
duly authorised for and on behalf of o.o.o. ) Maria Stanko
Nortel Networks in the presence of: )

Witness signature

Name: Maxim Deyneka
Address: Russia, Moscow,
    13-70, Dubninskaya str.

Signature Page to Distribution Escrow Agreement

Signed by **MAÎTRE COSME ROGEAU**, acting in the capacity of *Liquidateur Judiciaire* of NNSA, without personal liability as provided in Article Three of this Agreement and solely for the purpose of obtaining the benefit of the provisions of this Agreement expressed to be conferred on or given to the French Liquidator.

By _____

Name: Maître Cosme Rogeau
Title: *Liquidateur Judiciaire*

In the presence of:

Witness signature

Name: Nicolas Gricourt
Address: 10 Allee P. de Coubertin
78 00F Versailles

SIGNED for and on behalf of NORTEL    )
NETWORKS SA (IN    )
ADMINISTRATION)    )    **MAÎTRE COSME ROGEAU**
    )
by **MAÎTRE COSME ROGEAU** as    )
*Liquidateur Judiciaire* (acting as agent and    )
without personal liability) in the presence    )
of:

Witness signature

Name: Nicolas Gricourt
Address: 10 Allee P. de Coubertin
78 00F Versailles

Signature Page to Distribution Escrow Agreement

## SCHEDULE A

## OTHER SELLERS

Nortel Networks Technology Corporation

Nortel Networks Global Corporation

Nortel de México, S. de R.L. de C.V.

Nortel Networks (China) Limited

**SCHEDULE B**

**EMEA Sellers**

Nortel Networks UK Limited

Nortel Networks (Ireland) Limited

Nortel GmbH

Nortel Networks SpA

Nortel Networks Hispania SA

Nortel Networks B.V.

o.o.o. Nortel Networks

Nortel Networks AG

Nortel Networks N.V.

Nortel Networks (Austria) GmbH

Nortel Networks Polska Sp. z.o.o.

Nortel Networks Engineering Services kft

Nortel Networks Slovensko s.r.o.

Nortel Networks (Northern Ireland) Limited

Nortel Networks France SAS

Nortel Networks Romania Srl

Nortel Networks s.r.o.

**SCHEDULE C**
**AFFILIATES OF MAIN SELLERS THAT**
**ARE DEEMED TO BE "SELLING DEBTORS"**

Architel Systems (U.S.) Corporation

CoreTek, Inc.

Nortel Altsystems, Inc. (previously "Alteon WebSystems, Inc.")

Nortel Altsystems International Inc. (previously "Alteon WebSystems International, Inc.")

Nortel Networks Applications Management Solutions Inc.

Nortel Networks Cable Solutions Inc.

Nortel Networks Capital Corporation

Nortel Networks HPOCS Inc.

Nortel Networks International Inc.

Nortel Networks Optical Components Inc.

Northern Telecom International Inc.

Qtera Corporation

Sonoma Systems

Xros, Inc.

**SCHEDULE D**
**AFFILIATES OF THE EMEA SELLERS THAT**
**ARE DEEMED TO BE A "SELLING DEBTOR"**

Nortel Networks Oy (In Administration)

Nortel Networks AB (In Administration)

Nortel Networks International Finance & Holding BV (In Administration)

Nortel Networks Portugal SA (In Administration)

**SCHEDULE E**

**STANDING SETTLEMENT INSTRUCTIONS**


Nortel Networks Limited
Bank: Citibank, N.A.
ABA#: 021000089
SWIFT: CITIUS33
A/C#: 38545364

Nortel Networks Inc.
Bank: Citibank, N.A.
ABA#: 021000089
SWIFT: CITIUS33
A/C#: 30463444

Nortel Networks Corporation
Bank: Citibank, N.A.
ABA#: 021000089
SWIFT: CITIUS33
A/C#: 30428374

Nortel Networks Technology Corporation
Bank: tbc
ABA#:
SWIFT:
A/C#:

Nortel Networks Global Corporation
Bank: tbc
ABA#:
SWIFT:
A/C#:

Nortel de México, S. de R.L. de C.V.
Bank: tbc
ABA#:
SWIFT:
A/C#:

Nortel Networks (China) Limited
Bank: tbc
ABA#:
SWIFT:
A/C#:

Nortel Networks (Asia) Limited
Bank: tbc
ABA#:
SWIFT:
A/C#:

Nortel Networks UK Limited
Bank: tbc
ABA#:
SWIFT:
A/C#:

Nortel Networks (Ireland) Limited
Bank: tbc
ABA#:
SWIFT:
A/C#:

Nortel GmbH
Bank: tbc
ABA#:
SWIFT:
A/C#:

Nortel Networks France SAS
Bank: tbc
ABA#:
SWIFT:
A/C#:

Nortel Networks SpA
Bank: tbc
ABA#:
SWIFT:
A/C#:

Nortel Networks Hispania SA
Bank: tbc
ABA#:
SWIFT:
A/C#:

Nortel Networks B.V.
Bank: tbc
ABA#:

SWIFT:
A/C#:

o.o.o. Nortel Networks
Bank: tbc
ABA#:
SWIFT:
A/C#:

Nortel Networks (Northern Ireland) Limited
Bank: tbc
ABA#:
SWIFT:
A/C#:

Nortel Networks AG
Bank: tbc
ABA#:
SWIFT:
A/C#:

Nortel Networks N.V.
Bank: tbc
ABA#:
SWIFT:
A/C#:

Nortel Networks (Austria) GmbH
Bank: tbc
ABA#:
SWIFT:
A/C#:

Nortel Networks Polska Sp. z.o.o.
Bank: tbc
ABA#:
SWIFT:
A/C#:

Nortel Networks s.r.o.
Bank: tbc
ABA#:
SWIFT:
A/C#:

Nortel Networks Romania srl
Bank: tbc
ABA#:
SWIFT:
A/C#:

Nortel Networks Engineering Services kft
Bank: tbc
ABA#:
SWIFT:
A/C#:

Nortel Networks Slovensko s.r.o.
Bank: tbc
ABA#:
SWIFT:
A/C#:

Nortel Networks SA
Bank: tbc
ABA#:
SWIFT:
A/C#:

Architel Systems (U.S.) Corporation
Bank: tbc
ABA#:
SWIFT:
A/C#:

CoreTek, Inc.
Bank: tbc
ABA#:
SWIFT:
A/C#:

Nortel Altsystems, Inc.
Bank: tbc
ABA#:
SWIFT:
A/C#:

Nortel Altsystems International Inc.
Bank: tbc
ABA#:
SWIFT:

Schedule F-2

A/C#:

Nortel Networks Applications Management Solutions Inc.
Bank: tbc
ABA#:
SWIFT:
A/C#:

Nortel Networks Cable Solutions Inc.
Bank: tbc
ABA#:
SWIFT:
A/C#:

Nortel Networks Capital Corporation Inc.
Bank: tbc
ABA#:
SWIFT:
A/C#:

Nortel Networks HPOCS Inc.
Bank: tbc
ABA#:
SWIFT:
A/C#:

Nortel Networks International Inc.
Bank: tbc
ABA#:
SWIFT:
A/C#:

Nortel Networks Optical Components Inc.
Bank: tbc
ABA#:
SWIFT:
A/C#:

Northern Telecom International Inc.
Bank: tbc
ABA#:
SWIFT:
A/C#:

Qtera Corporation
Bank: tbc

Schedule F-2

ABA#:
SWIFT:
A/C#:

Sonoma Systems
Bank: tbc
ABA#:
SWIFT:
A/C#:

Xros, Inc.
Bank: tbc
ABA#:
SWIFT:
A/C#:

Nortel Networks Oy
Bank: tbc
ABA#:
SWIFT:
A/C#:

Nortel Networks AB
Bank: tbc
ABA#:
SWIFT:
A/C#:

Nortel Networks International Finance & Holding BV
Bank: tbc
ABA#:
SWIFT:
A/C#:

Nortel Networks Portugal SA
Bank: tbc
ABA#:
SWIFT:
A/C#:

## SCHEDULE F

## NOTICE ADDRESSES

<u>Depositors</u>:

| | |
|---|---|
| NNC, NNL, NNI, NN Asia, the Other Sellers listed on <u>Schedule</u> A and the Affiliates of the Main Sellers listed on <u>Schedule C</u>: | 5945 Airport Road<br>Suite 360<br>Mississauga, Ontario, Canada  L4V 1R9<br>Attn:  Anna Ventresca<br>Phone: 905.863.1204<br>Facsimile: 905.863.2057 |
| The EMEA Sellers listed on <u>Schedule B</u> and the Affiliates of the EMEA Sellers listed on <u>Schedule D</u>: | c/o Herbert Smith LLP<br>Exchange House<br>Primrose Street<br>London<br>EC2A 2HS<br>United Kingdom<br>Attn: Stephen Gale and Kevin F Lloyd<br>Phone: +44 20 7374 8000<br>Facsimile: +44 20 7374 0888 |
| Distribution Agent: | JPMorgan Chase Bank, N.A.<br>TS / Escrow Services<br>4 New York Plaza, 21st Floor<br>New York, New York 10004<br>Attn:  Andy Jacknick<br>Phone: 212.623. 0241<br>Facsimile: 212.623.6168 |
| Estate Fiduciaries: | |
| The Official Committee of Unsecured Creditors in connection with the Chapter 11 cases of Nortel Networks Inc., et al. (Case No. 09-10138): | c/o Akin Gump Strauss Hauer & Feld LLP<br>One Bryant Park<br>New York, New York 10036<br>Attn:  Fred S. Hodara, Stephen B. Kuhn, David H. Botter and Kenneth A. Davis<br>Phone: 212.872.1000<br>Facsimile: 212.872.1002 |
| Monitor: | Ernst & Young Inc.<br>Ernst & Young Tower<br>222 Bay Street, P. O. Box 251<br>Toronto, Ontario, Canada |

M5K 1J7
Facsimile: (416) 943-3300
Attn: Murray A. McDonald

Bondholder Group:                    c/o Milbank, Tweed, Hadley & McCloy LLP
                                      1 Chase Manhattan Plaza
                                      New York, New York 10005
                                      Attn: Albert A. Pisa and Roland Hlawaty
                                      Phone: 212.530.5000
                                      Facsimile: 212.822.5735

**SCHEDULE G**

**Telephone Number(s) for Call-Backs;**
**Person(s) Designated to Give and Confirm Funds Transfer Instructions; and Addresses**

If to NNC, NNL, NN Asia, the Other Sellers listed on <u>Schedule A</u> and the Affiliates of the Main Sellers listed on <u>Schedule C</u>:

| <u>Name</u> | <u>Telephone Number</u> | <u>Signature Specimen</u> |
|---|---|---|
| John Marshall Doolittle | 905.863.6636 | |
| <u>Name</u> | <u>Telephone Number</u> | <u>Signature Specimen</u> |
| Anna Ventresca | 905.863.1204 | |
| Address | See <u>Schedule C</u> | |

If to NNI:

| <u>Name</u> | <u>Telephone Number</u> | <u>Signature Specimen</u> |
|---|---|---|
| Anna Ventresca | 905.863.1204 | |
| Address | See <u>Schedule C</u> | |

If to the EMEA Filed Entities (apart from Nortel Networks (Ireland) Limited) and the EMEA Non-Filed Entities:

| Name | Telephone Number | Signature Specimen |
|------|------------------|--------------------|
| Alan Bloom | +44 (0) 207 951 9898 | _____ |

| Name | Telephone Number | Signature Specimen |
|------|------------------|--------------------|
| Stephen Harris | +44 (0) 207 951 9835 | |
| Address | See Schedule C | |

If to Nortel Networks (Ireland) Limited:

| Name | Telephone Number | Signature Specimen |
|------|------------------|--------------------|
| Alan Bloom | +44 (0) 207 951 9898 | _____ |

| Name | Telephone Number | Signature Specimen |
|------|------------------|--------------------|
| David Hughes | +353 1 221 2301 | _____ |
| Address | c/o Herbert Smith LLP Exchange House Primrose Street London EC2A 2HS Attn: Stephen Gale and Kevin F Lloyd | |

Schedule G-2

| Name | Telephone Number | Signature Specimen |
|------|------------------|--------------------|
| Stephen Harris | +44 (0) 207 951 9835 | |
| Address | See Schedule C | |

If to Nortel Networks (Ireland) Limited:

| Name | Telephone Number | Signature Specimen |
|------|------------------|--------------------|
| Alan Bloom | +44 (0) 207 951 9898 | |

| Name | Telephone Number | Signature Specimen |
|------|------------------|--------------------|
| David Hughes | +353 1 221 2301 | |
| Address | c/o Herbert Smith LLP<br>Exchange House<br>Primrose Street<br>London<br>EC2A 2HS<br>Attn: Stephen Gale and<br>Kevin F Lloyd | |

Telephone call backs shall be made to all applicable Parties if joint instructions are required pursuant to the agreement. All funds transfer instructions must include the signature of the person(s) authorizing said funds transfer and must not be the same person confirming said transfer. Inasmuch as there is only one individual who can confirm and instruct, on behalf of a Party, wire transfers in accordance with the attached Escrow Agreement, the Distribution Agent shall call such individual to confirm any federal funds wire transfer payment order purportedly issued by such individual.  Such individual's continued issuance of payment orders to the Distribution Agent on behalf of a Party and his confirmation in accordance with this procedure will constitute such Party's agreement (1) to the callback security procedure outlined herein and (2) that the security procedure outlined herein constitutes a commercially reasonable method of verifying the authenticity of payment orders.  Moreover, such Party agrees to accept any risk associated with a deviation from the Distribution Agent's policy.

Schedule G-2

**If to the Estate
Fiduciaries:**

The Official Committee of
Unsecured Creditors in
connection with the
Chapter 11 cases of Nortel
Networks Inc., et al. (Case
No. 09-10138):

| Name | Telephone Number | Signature Specimen |
|---|---|---|
| Timothy Burling, acting on behalf of Flextronics Corporation as Chair of the Official Committee of Unsecured Creditors and not in his personal capacity | (408) 218-0608 | *Timothy S. Burling* |

| Name | Telephone Number | Signature Specimen |
|---|---|---|
| Sarah Link Schultz acting on behalf of Akin Gump Strauss Hauer & Feld LLP, as counsel to the Official Committee of Unsecured Creditors and not in her personal capacity | (214) 969-4367 | |

| Name | Telephone Number | Signature Specimen |
|---|---|---|
| David H. Botter, Esq. acting on behalf of Akin Gump Strauss Hauer & Feld LLP, as counsel to the Official Committee of Unsecured Creditors and not in his personal capacity | (212) 872-1055 | |

Address                                See Schedule F

Schedule G-3

**If to the Estate
Fiduciaries:**

The Official Committee of
Unsecured Creditors in
connection with the
Chapter 11 cases of Nortel
Networks Inc., et al. (Case
No. 09-10138);

Name                        Telephone Number              Signature Specimen

Timothy Burling, acting on
behalf of Flextronics
Corporation as Chair of the
Official Committee of
Unsecured Creditors and
not in his personal capacity

Name                        Telephone Number              Signature Specimen

Sarah Link Schultz acting        (214) 969-4367
on behalf of Akin Gump
Strauss Hauer & Feld LLP,
as counsel to the Official
Committee of Unsecured
Creditors and not in her
personal capacity

Name                        Telephone Number              Signature Specimen

David H. Botter, Esq.            (212) 872-1055
acting on behalf of Akin
Gump Strauss Hauer &
Feld LLP, as counsel to the
Official Committee of
Unsecured Creditors and
not in his personal capacity

Address                     See Schedule F

Schedule G-3

**If to the Monitor:**

| Name | Telephone Number | Signature Specimen |
|---|---|---|
| Sharon Hamilton | 416-943-2153 | |

| Name | Telephone Number | Signature Specimen |
|---|---|---|
| Murray McDonald | 416-943-3016 | |
| Address | See Schedule F | |

Telephone call backs shall be made to all applicable Parties if joint instructions are required pursuant to the agreement. All funds transfer instructions must include the signature of the person(s) authorizing said funds transfer and must not be the same person confirming said transfer. Inasmuch as there is only one individual who can confirm and instruct, on behalf of a Party, wire transfers in accordance with the attached Escrow Agreement, the Distribution Agent shall call such individual to confirm any federal funds wire transfer payment order purportedly issued by such individual. Such individual's continued issuance of payment orders to the Distribution Agent on behalf of a Party and his confirmation in accordance with this procedure will constitute such Party's agreement (1) to the callback security procedure outlined herein and (2) that the security procedure outlined herein constitutes a commercially reasonable method of verifying the authenticity of payment orders. Moreover, such Party agrees to accept any risk associated with a deviation from the Distribution Agent's policy.

Schedule G-4

# EXHIBIT 1

## INTEREST ALLOCATION PERCENTAGES(*)

|  | Interest Allocation Percentage |
|---|---|
| NNI | 0% |
| NNL | 100% |
| NNC | 0% |
| Other Sellers | 0% |
| North American ALT Selling Debtor | 0% |
| Nortel Networks (Asia) Limited | 0% |
| The EMEA Filed Entities | 0% |
| The EMEA Non-Filed Entities | 0% |

* The inclusion of the interest allocation percentages set forth above does not constitute an admission of any Depositor that such interest allocation percentage reflects the percentage of the proceeds to be received by any Depositor or any of its Respective Affiliates under the North American ASA or EMEA ASA, as applicable. The interest allocation percentages are the initial allocation percentages hereunder and are subject to amendment in accordance with Paragraph 15. The interest allocation percentages set forth above shall not be presented by any party hereto as being indicative of the final allocation of proceeds received by the Depositors under the North American ASA and EMEA ASA, as applicable.

Exhibit 1

APPENDIX "E"



Supreme Court of Canada          Cour suprême du Canada



No. 33491

March 25, 2010

Coram:  Binnie, Fish and Charron JJ.

**BETWEEN:**

Donald Sproule, David D. Archibald and
Michael Campbell on their own behalf and
on behalf of Former Employees of Nortel
Networks Corporation, Nortel Networks
Limited, Nortel Networks Global
Corporation, Nortel Networks International
Corporation and Nortel Networks
Technology Corporation

Applicants

- and -

Nortel Networks Corporation, Nortel
Networks Limited, Nortel Networks Global
Corporation, Nortel Networks International
Corporation, Nortel Networks Technology
Corporation, Board of Directors of Nortel
Networks Corporation and Nortel Networks
Limited, Informal Nortel Noteholder Group,
Official Committee of Unsecured Creditors
and Ernst & Young Inc. in its capacity as
Monitor

Respondents

Le 25 mars 2010

Coram : Les juges Binnie, Fish et Charron

**ENTRE :**

Donald Sproule, David D. Archibald and
Michael Campbell on their own behalf and
on behalf of Former Employees of Nortel
Networks Corporation, Nortel Networks
Limited, Nortel Networks Global
Corporation, Nortel Networks International
Corporation et Nortel Networks Technology
Corporation

Demandeurs

- et -

Nortel Networks Corporation, Nortel
Networks Limited, Nortel Networks Global
Corporation, Nortel Networks International
Corporation, Nortel Networks Technology
Corporation, Board of Directors of Nortel
Networks Corporation and Nortel Networks
Limited, Informal Nortel Noteholder Group,
Official Committee of Unsecured Creditors
et Ernst & Young Inc. in its capacity as
Monitor

Intimés

- 2 -

No. 33491

| JUDGMENT | JUGEMENT |
|---|---|
| The motions for directions and to expedite the application for leave to appeal are dismissed. The application for leave to appeal from the judgment of the Court of Appeal for Ontario, Number C50986, 2009 ONCA 833, dated November 26, 2009, is dismissed with no order as to costs. | La requête en vue d'obtenir des directives et la requête visant à accélérer la procédure de demande d'autorisation d'appel sont rejetées. La demande d'autorisation d'appel à l'encontre de l'arrêt de la Cour d'appel de l'Ontario, numéro C50986, 2009 ONCA 833, daté du 26 novembre 2009, est rejetée; aucune ordonnance n'est rendue concernant les dépens. |

J.S.C.C.
J.C.S.C.

Appendix "F"

**Eligibility Requirements and Procedure with Respect to Hardship Payment Applications**

1. **Eligibility –** A former employee would be eligible for hardship payments if he or she is resident in Canada and has no available source of income, being all monies receivable by the former employee including, without limitation, employment income such as wages, salary or bonuses, consulting income, or pension or disability payments or income replacement payments ("Income"), or Income of a spouse, as of the date of the application and has no reasonable expectation of being in receipt of Income during the Application Period (referred to below) and:

   a. The former employee is unable to work due to illness or is incurring costs in excess of 25% of his or her EI payments as a result of treatment for illness or healthcare costs, or as a result of the illness of a family member who is dependent on the former employee for support; or

   b. During the Application Period the former employee is not receiving a Nortel pension or employment insurance (EI) as a result of ineligibility for EI or exhaustion of EI benefits, and demonstrates some other significant hardship in dealing with financial obligations.

2. **Application Process –** Notice of the application process will be posted on the Monitor's website and the website of the Nortel Retiree Protection Committee (NRPC) in a form approved by the Court. An applicant would be required to complete an application form (to be approved by the Court) to be submitted to a person designated by the Monitor. The person so designated would be expected to deal with completed applications within 14 to 21 days and to make an initial determination to approve or reject the application. The first payment will proceed within seven business days subject to the payment parameters set out below. If not approved, the application is to be reviewed by an informal committee and the applicant will be given the right to be heard by the committee. The committee will be composed of one company appointee, one appointee of the Monitor and one appointee chosen by the NRPC, who will be compensated for his time on an hourly basis. A further appeal may be brought to the Court or an officer of the Court designated by the presiding judge, costs to be determined by the Court on the application.

3. **Payment Parameters –** Any successful applicant may be approved for a maximum payment of up to 8 weeks salary based on a maximum weekly salary of up to $1,200 per week payable in monthly instalments. The hardship committee will also have discretion to approve additional amounts in cases of medical and other emergencies in an amount up to $2,500.

4. **Application Period –** From the date of court approval to July 22, 2010.

5. **Miscellaneous**

   a. Hardship Payments are advances against distributions on claims, and will be deducted from any payments on claims that may be allowed in the ultimate claims process in these proceedings.

   b. The Monitor shall report to the Court on or before July 22, 2010 with respect to the processing and administration of hardship payment applications.

   c. The aggregate maximum amount available for hardship payments on applications approved during the Application Period is $750,000.

Court File No: 09-CL-7950

IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL NETWORKS CORPORATION *et al.*

*ONTARIO*
**SUPERIOR COURT OF JUSTICE**
**(COMMERCIAL LIST)**

Proceeding commenced at Toronto

**FORTY-THIRD REPORT OF THE MONITOR**
**DATED APRIL 9, 2010**

**GOODMANS LLP**
Barristers & Solicitors
Bay Adelaide Centre
333 Bay Street, Suite 3400
Toronto, ON  M5H 2S7

Jay A. Carfagnini  (LSUC#: 222936)
Joseph Pasquariello (LSUC# 37389C)
Christopher G. Armstrong (LSUC# 55148B)

Tel: 416.979.2211
Fax: 416.979.1234

Lawyers for the Monitor, Ernst & Young Inc.

\5834715