1            IN THE UNITED STATES BANKRUPTCY COURT

2                 FOR THE DISTRICT OF DELAWARE

3  IN RE:                     :
                              : Chapter 11
4  NORTEL NETWORKS INC., et al.,  :
                              : Case No. 09-10138 (KG)
5       Debtors.             :
   . . . . . . . . . . . . . . . .

6
                         Wilmington, Delaware
7                        September 30, 2009
                            10:02 a.m.
8
                       TRANSCRIPT OF HEARING
9            BEFORE THE HONORABLE KEVIN GROSS
              UNITED STATES BANKRUPTCY JUDGE
10
   APPEARANCES:
11
   For the Debtors:          Deborah Buell, Esquire
12                           Lisa M. Schweitzer, Esquire
                             Melissa Durkee, Esquire
13                           Cleary, Gottlieb, Steen & Hamilton,
                             LLP
14
                             Derek C. Abbott, Esquire
15                           Ann C. Cordo, Esquire
                             Morris, Nichols, Arsht & Tunnell,
16                           LLP

17  For the Committee:        Kenneth Davis, Esquire
                             James Chou, Esquire
18                           Akin, Gump, Strauss, Hauer & Feld,
                             LLP
19
                             Chris Samis, Esquire
20                           Richards, Layton & Finger

21  For U.S. Trustee:         Patrick Tinker, Esquire
                             U.S. Trustee's Office
22
   For Avaya:                Anne Pak, Esquire
23                           Ropes & Gray, LLP

24  For the IRS:              Jan Geht, Esquire
                             U.S. Department of Justice
25

2

| 1 | For U.K. Plan Administrator: | Jaime Luton, Esquire Young, Conaway, Stargatt & Taylor |
| 2 | | |
| 3 | For Jeffries & Co.: | Christopher Simon, Esquire Cross & Simon, LLC |
| 4 | VIA TELEPHONE: | |
| 5 | For Silver Lake: | Mark Bane, Esquire Ropes & Gray, LLP |
| 6 | | |
| 7 | For Ernst & Young: | Amelie Baudot, Esquire Allen & Overy, LLP |
| 8 | | Joanne Lee, Esquire Foley & Lardner, LLP |
| 9 | | |
| 10 | For the Official Committee of Unsecured Creditors: | Fred Hodara, Esquire David Butler, Esquire Abid Qureshi, Esquire |
| 11 | | Akin, Gump, Strauss, Hauer & Feld |
| 12 | For Monarch Alternative Capital: | Robert Burns, Esquire Monarch Alternative Capital, LP |
| 13 | | |
| 14 | For Crowell & Moring: | Matthew Cheney, Esquire Crowell & Moring, LLP |
| 15 | For True Partners Consulting: | Robert Clarke, Esquire True Partners Consulting |
| 16 | | |
| 17 | For Shearman & Sterling: | Terrence Gilroy, Esquire Shearman & Sterling |
| 18 | For Tricidia: | Stephan Grisanti, Creditor Tricidia Captial |
| 19 | | |
| 20 | For Freeborn & Partners: | Aaron Hammer, Esquire Freeborn & Partners |
| 21 | For DE Shaw: | Sarah Johnson, Creditor DE Shaw |
| 22 | | |
| 23 | For Verizon Communications, Inc.: | Darryl Laddin, Esquire Arnall, Golden, Gregory, LLP |
| 24 | For Financial Advisor Lazard: | Colin H. Keenan, Esquire Lazard, Freres & Company |
| 25 | | |

3

```
1    For the Debtors:        Stanley W. Jozefiak
                             True Partners Consulting
2
                             Jim Lukenda, Esquire
3                            Huron Consulting Group, LLC

4                            Rene E. Thorne, Esquire
                             Jackson & Lewis
5
     For Frasier, Milner &   Alex MacFarlane, Esquire
6    Casgrain:               Michael Wunder, Esquire
                             Fraiser, Milner & Casgrain
7
     For Jacob Zand:         Jacob Zand
8                            Jacob Zand, In pro per

9    For Anixter:            Jon Vigano, Esquire
                             Schiff, Hardin, LLP
10
     For Flextronics:        Steven J. Reisman, Esquire
11                           Curtis, Mallet-Prevost, Colt, Mosel,
                             LLP
12
     Court Recorder:         Jennifer Pasierb
13
     Transcription Service:  Perfect Pages Transcription, Inc.
14                           18 Tuckerton Road
                             Shamong, NJ 08088
15                           www.perfecttranscripts.com
                             (609) 654-8880
16
     Proceedings recorded by electronic sound recording;
17   transcript produced by transcription service.

18

19

20

21

22

23

24

25
```

4

1        (Call to order of the Court.)

2            THE COURT:  Good morning, everyone.  Thank you, and

3    please be seated.  Mr. Abbott, good morning.

4            MR. ABBOTT:  Good morning, Your Honor.  Derek Abbott

5    here on behalf of the Debtors.  Your Honor, I realize we have

6    a relatively short time today.  Most of the Agenda has either

7    been adjourned or is not contested.

8            THE COURT:  Yes.

9            MR. ABBOTT:  Your Honor, we have a number of

10   professionals that have dialed in on the phone for the fee at

11   matter, I wondered if just out of courtesy to them, we might

12   be able to take the Fee Applications first.

13           THE COURT:  Yes.  That's makes a lot of sense, Mr.

14   Abbott.

15           MR. ABBOTT:  And, Your Honor, they were -- the list

16   of the pending Fee Applications was attached at Exhibit A of

17   the Agenda Letter, Your Honor.  And I'm not sure if Your Honor

18   has specific questions or how you want to address those.  The

19   professionals, I think for the most part, are on the phone and

20   available.

21           THE COURT:  Well, usually I get a chance to review

22   them well enough in advance to indicate if I have any

23   questions or concerns.  This time, I only completed through a

24   few last evening, and I can say that I found them in order,

25   and I don't have questions or comments.  I'm prepared to grant

5

1   them.  I recognize they're substantial, but I think that the

2   case reflects the amount of work and the quality of the work

3   that's been performed, so I am pleased to grant the Fee

4   Applications.

5       I would like to do one thing though, and that's this,

6   some of the Applications came in in Canadian dollars and in

7   pounds, and I think what I'm going to do is prepare an Order

8   with some kind of protocol so that the professional applicants

9   themselves will do those conversions for us and have some sort

10  of a date certain for the conversions, so that, you know, we

11  are not playing arbitrage with Professional Fees.

12          MR. ABBOTT:  Your Honor, that makes perfect sense.

13  I guess a question, would that be an Order that you're going

14  to prospectively --

15          THE COURT:  Yes.

16          MR. ABBOTT:  -- for filing the Fee Applications and

17  then --

18          THE COURT:  That's right.

19          MR. ABBOTT:  -- because I believe we've got some

20  Orders prepared that reflect the amounts submitted.

21          THE COURT:  Yes.  And that will be in the future.

22  It was just necessary for us, of course, to do the

23  conversions, so that we understood where we were in --

24          MR. ABBOTT:  And obviously we don't want to burden

25  the Court.

6

1          THE COURT:  -- you know, in term of dollars.

2          MR. ABBOTT:  So we'll make it clear to the

3    professionals as well that --

4          THE COURT:  Okay.

5          MR. ABBOTT:  -- they ought to be ready to do that.

6          THE COURT:  Absolutely.

7          MR. ABBOTT:  Thank you, Your Honor.

8          THE COURT:  You're very welcome.

9          MR. ABBOTT:  May I approach, Your Honor?

10          THE COURT:  Yes.

11       (Counsel approaches.)

12          THE COURT:  Thank you.  Thanks, Mr. Abbott.

13          MR. ABBOTT:  Your Honor, I wanted to point out a

14    couple of footnotes in the chart at the back, Your Honor.

15    Footnote 2 references the Lazard expense retainer.

16          THE COURT:  Yes.

17          MR. ABBOTT:  And it just explains how these -- the

18    numbers work and jive to make that effective.  The other item,

19    footnote number 3 on that first chart, Exhibit A, references

20    some expense amounts for Mercer that had been held back from

21    the prior interim period, but are now being added back to this

22    Order because the matters have been resolved on an interim

23    basis with the U.S. Trustee's Office subject to their final

24    objection.

25          THE COURT:  Of course.  And that always holds true.

1      MR. ABBOTT:  Thank you, Your Honor.  At this point,

2  we should probably get back to the main Agenda after Your

3  Honor has had a chance to review that and I'll cede the podium

4  to Ms. Schweitzer when that time comes.

5      THE COURT:  Well, I'm going to assume that all the

6  numbers in the chart are the same as they were in the

7  Applications, and I'm going to sign the Order and give

8  permission to anyone who's on the phone who wishes to hangup

9  because their fees have been addressed, to do so.

10      MR. ABBOTT:  Thank you, Your Honor.

11      THE COURT:  A mass exodus.

12      MR. HODARA:  Your Honor, this is Fred Hodara.  May I

13  be heard for a moment?

14      THE COURT:  You may.  Good morning, Mr. Hodara.

15      MR. HODARA:  Good morning, and thank you so much for

16  letting us participate telephonically.  I don't know how much

17  the Court was advised about why so many of the useful basis

18  and subsets are not in your courtroom today, but we are having

19  a productive morning at the offices of Cleary, Gottlieb on

20  some very fundamental case issues.

21      We have just dialed in a moment ago, so it sounded as

22  though, perhaps, all of the fees have been put in front of

23  Your Honor and we are done, but we weren't sure here in the

24  Cleary, Gottlieb conference room.

25      THE COURT:  Yes.  I have indicated that I didn't

8

1    have any questions or comments on the Fee Applications and

2    that I am prepared to sign the Order.

3            MR. HODARA:  Well, it sounds like we dialed in at

4    just the right moment.

5            THE COURT:  I think so.

6            MR. HODARA:  And then, with your permission, we'll

7    drop off and go back to our conference room.

8            THE COURT:  All right.  Do some productive work up

9    there.

10           MR. HODARA:  Thank you.

11           THE COURT:  Thank you, Mr. Hodara.  Good day to you.

12           MR. HODARA:  Good day.

13           THE COURT:  Ms. Schweitzer, welcome back.

14           MS. SCHWEITZER:  Good morning, Your Honor.

15           THE COURT:  Good morning.

16           MS. SCHWEITZER:  I'm the sole Cleary person holding

17   out here at the podium while everyone else is up in New York,

18   so here we are.

19           There are three things on the Agenda, in addition to the

20   Fee Application.  There was a Motion for Authorization and

21   Approval of the Stipulation with Global Knowledge Networks --

22           THE COURT:  Yes.

23           MS. SCHWEITZER:  -- that a Certificate of No

24   Objection was filed yesterday.  We haven't checked the Docket

25   this morning.

Perfect Pages Transcription & Reporting, Inc.
(609) 654-8880

9

1          THE COURT:  I did sign that.

2          MS. SCHWEITZER:  Okay.  Then we won't need to go

3     into further detail on that, so thank you.

4       The second thing that's up today is another Sale Motion,

5     which --

6          THE COURT:  Yes.

7          MS. SCHWEITZER:  -- we're pleased to present.  We're

8     obviously very happy with our prior successes in coming off of

9     two quite large successes.  As we've said in other

10    Applications before the Court, the Debtors have been pursuing

11    different divestiture opportunities, and the Motion that we

12    filed today, which is D.I. 1525, is the Motion for the sale

13    procedures to -- for the sale of the Next Generation Packet

14    Core Network Components.

15         THE COURT:  Yes.

16         MS. SCHWEITZER:  And just for those of us that speak

17    plain English and not telephone technology, this is the

18    equipment that connects the cell phones, your iPods to the

19    internet.

20         THE COURT:  Okay.

21         MS. SCHWEITZER:  It's a server computer equipment

22    that would connect that technology.  And right now, this is

23    the next generation type development.  It's a -- there aren't

24    active customers.  There's not an active business in place,

25    but there is a non-patent IP, namely software, and that there

1  are employees in the U.S. that are assigned to do research and

2  development, and then there's certain related fixed assets

3  that would be for sale.  The Debtors have explored the

4  opportunity to sell this to various counterparties as

5  indicated in the Motion.  They've actually approached nine

6  people before approving the -- proposing the sale procedures

7  and since then have reached out to an additional 26 potential

8  purchasers who are the -- a body of people who have expressed

9  interest in the assets over the last 6 months.  So the sale

10  process is on the way subject to, of course, having it

11  approved.

12      We did not notice this pursuant to a joint protocol.  It

13  falls under the thresholds for doing joint hearings but, in

14  fact, the Motion -- an equivalent Motion was presented in

15  Canada yesterday.

16          THE COURT:  Okay.

17          MS. SCHWEITZER:  And the Canadian Court, Justice

18  Morawetz, approved it subject, of course, to entry of an Order

19  in the U.S. that would align the two -- the auction process

20  since the sellers are the Canadian Debtors and the U.S.

21  Debtors together through one auction process.

22      So, I can go through in more detail, if you'd like,

23  regarding the auction process itself.  The bidding procedures

24  are set forth in the Motion where the highlights here are that

25  there was no stalking-horse purchaser at this time.

1          THE COURT:  Yes.

2          MS. SCHWEITZER:  We do have potential interested

3     parties, but we are blessed with not having to pay break-up

4     fees, and at the same time being able to negotiate with

5     (indiscernible).  And we're doing what we would describe as

6     more of a Canadian style auction where there won't be a room

7     where everyone joins for one day, or in our case maybe four

8     days in a row, to do a live auction, but there is an active

9     solicitation process followed by a bid deadline that's now

10    proposed of October 16th, and then there would be a selection

11    of the successful bidder as a result of that auction where the

12    Debtors have the right to engage with people after the

13    submission of bids to refine points or to further negotiate

14    with anyone at their discretion.  And the -- we would propose

15    to have the sale to the successful bidder heard at the October

16    28th hearing, which is already an omnibus hearing.

17          THE COURT:  Yes.

18          MS. SCHWEITZER:  And bidders would be required to

19    put down a good-faith deposit of the greater of 5 percent of

20    $1 million.  There's a form of Asset Sale Agreement or

21    Transaction Agreement, I think it's titled, that attached to

22    the Motion itself, and the expectation is that bidders would

23    bid against that form of Agreement.  There could also be

24    Ancillary Agreements, IP License Agreements and Transition

25    Services Agreements that people would bid on, but we expect

12

1  that people will be able to and should bid against the form of

2  Asset Sale Agreement or Transaction Agreement that's proposed.

3      Obviously, the Debtors intend to consult with the

4  Monitor, the Committee and the Bondholder Group in, you know,

5  connection with the solicitation of bids in determining who

6  would be the highest and best offer.  And the Debtors also,

7  since there is no stalking-horse bidder, think that now is the

8  right time to sell the assets due to -- to be able to realize

9  from customer relationships and not have to spend more money

10  on technology research and development at this point, but on

11  the other hand, do reserve their right, of course, to withdraw

12  or adjourn any part of the auction process if they're not

13  satisfied with the bids that do come in.  So we have that

14  optionality.

15      We have in the courtroom today, Mr. Hyacinth DeAlmeida,

16  who is the leader of corporate business development in Nortel

17  Networks Inc., or NNI, and Mr. DeAlmeida, you will know from

18  M&A in-house person who lead the CDMA sale as well.

19          THE COURT:  Yes.

20          MS. SCHWEITZER:  So we are happy to say, we stand

21  behind him in his ability to bring in a good sale process.

22  And he's available -- he had submitted a Declaration in

23  support of the sale and the sale process and the Motion sought

24  today, but he is also available for testimony.  It's unopposed

25  and we could proffer further information regarding the sale,

1  the need for the sale, although it's reflected in the Motion.

2  So at this point, I would ask for guidance on what more

3  information I can provide for you in support of the sale or if

4  you'd like me to go through a full proffer, or just rely on

5  the Declaration.

6          THE COURT:  No.  I think you can rely on the

7  Declaration, absent of any objections to our doing so.

8      (No verbal response.)

9          THE COURT:  And hearing no objections, I will admit

10  that Declaration into evidence in support of your Motion.

11          MS. SCHWEITZER:  Okay.  Well, on that, we would rest

12  on the Motion papers and offer to -- the bidding procedure

13  part of the Order for approval today.  The things that we'd be

14  approving is the auction process itself and the notice

15  procedures.

16          THE COURT:  Yes.

17          MS. SCHWEITZER:  And that we have a slight black

18  line, which I can hand up for the Order.

19          THE COURT:  Okay.

20      (Counsel complies.)

21          THE COURT:  Thank you.  Thank you, Ms. Schweitzer.

22      (Pause in proceedings.)

23          MS. SCHWEITZER:  We'll just give Annie one minute to

24  hand out copies.

25          THE COURT:  Sure.

14

1          MS. SCHWEITZER:  Oh, great.  Thank you.  So the two

2    changes are in paragraph 6 with regard to how we're selling --

3    serving notice of the sale.  It had -- the original Order had

4    proposed that we would give notice by first-class mail and we

5    had added in fax or electronic transmission, mainly to address

6    the need to serve other potentially interested parties that we

7    could have the option to serve them by electronic means.

8        And then the second thing is just a typographical error

9    in paragraph 7 on a defined term changing the sale procedure

10   to sale.

11         THE COURT:  Yes.

12         MS. SCHWEITZER:  Other than that, the substance of

13   the relief is the same, so we would, therefore, submit a

14   request to have the Motion granted --

15         THE COURT:  All right.

16         MS. SCHWEITZER:  -- for the bidding procedures

17   today.

18         THE COURT:  All right.  Ms. Schweitzer, thank you.

19   Anyone else which to be heard on this?

20       (No verbal response.)

21         THE COURT:  Well, the procedures are certainly

22   acceptable to the Court, and I think that the dates suggested

23   are certainly suitable here under these circumstances, a

24   little more time than we often have in this case because of

25   the nature, I think, of the assets being sold.  And I will

1    approve the -- I'll grant the Motion and sign the Order.

2            MS. SCHWEITZER:  Thank you, Your Honor.  With that,

3    I'll turn over -- the last thing on the Agenda is the status

4    conference on the IRS claim.

5            THE COURT:  Yes.

6            MS. SCHWEITZER:  And my partner, Debbie Buell is

7    handling that --

8            THE COURT:  Thank you.

9            MS. SCHWEITZER:  -- so I'll cede the podium.

10           THE COURT:  All right.  Thank you very much, Ms.

11   Schweitzer.

12           MS. SCHWEITZER:  Thank you, Your Honor.

13           THE COURT:  Good morning.

14           MS. BUELL:  Good morning, Your Honor.  Debbie Buell,

15   Cleary, Gottlieb, Steen & Hamilton, LLP.  And this is a status

16   conference on our claim objection to the IRS claim, which is

17   currently set for hearing on October 13th, and there are a few

18   topics that I think we can usefully report on today.

19       First, with respect to discussions with the IRS,

20   unfortunately there, Your Honor, I don't have any good news

21   that I can report.  We have not had the opportunity to have

22   direct discussions with the IRS, either to understand the

23   basis for a claim that, frankly, we think is wildly inflated

24   and not understandable based on the information available to

25   us, nor have we had an opportunity to speak directly to the

16

1    IRS with respect to an offer made to the IRS in an attempt to

2    deal with the timing issue on the IRS's, you know, perceived

3    need for protection for their legal and economic position.  We

4    feel we've made an offer that would fully protect the IRS,

5    that has been rejected.

6         We appreciate, very much, the efforts of counsel and Mr.

7    Geht, who's here today, particularly in the last 24 hours to

8    attempt to get a dialogue moving, so we are still hopeful, and

9    we are still very much interested in doing so, but as of right

10   now, our understanding is that the IRS thinks that the best

11   way to proceed in terms of the timing for the Avaya

12   transaction is to file NGS and DiamondWare notwithstanding

13   what we think will be a potential significant loss of value to

14   the estates if that is done.  We don't think that makes sense

15   for a major Government agency to be insisting on the filing of

16   a major Government contractor.  We are very interested in

17   exploring that, and we're hopeful that we will be able to get

18   that dialogue going.

19        Today is the date for the discovery that the Court

20   Ordered, and Mr. Geht has made clear that we are getting

21   documents today.  He's been very cooperative about getting

22   them to us, in both New York and Washington, where we have

23   teams of people ready to dive in and try to understand the

24   volume and the content of those documents as soon as possible.

25   We will also be getting the names of the IRS representatives

1  with knowledge of the claim, and we hope that whether it is

2  through the form of an expedited deposition or more

3  preferably, through a one-on-one dialogue about the claim,

4  that that contact will be helpful to us as well.

5      So that's where we are on discovery, but in terms of the

6  merits, Your Honor, we have gotten some additional information

7  since we were before you on the 16th.  And that information

8  really does continue to strengthen our view that this claims

9  objection is well founded, and it also informs our view that

10  the claims objection is not really that complicated

11  notwithstanding that this is obviously a complicated topic and

12  obviously some very, very big numbers at stake.

13      The base for our information is the Motion to Withdraw,

14  which the IRS filed last week seeking to withdraw the

15  reference on the claims objection on the ground that even

16  though it is a core proceeding, that is acknowledged --

17          THE COURT:  Okay.  I was going to ask whether there

18  was any concern.  I didn't think so, but I appreciate that.

19          MS. BUELL:  Yes.  That was one of the filings that

20  the IRS made --

21          THE COURT:  Yes.

22          MS. BUELL:  -- to clarify that point.  So the basis

23  for the Motion for Mandatory Withdraw is that there is a legal

24  issue of first impression or unsettled impression of a statute

25  other than Title 11.

1    You know, today's not the day for argument on that, Your

2  Honor.  We feel very confident that this is not a case of

3  legal interpretation.  It's a question of application of

4  well-established IRS law and positions, as indicated in one of

5  the exhibits to their Motion to Withdraw.

6    But with respect to the claim itself, what we have been

7  able to discern from the exhibits to the Motion to Withdraw is

8  that the IRS has added to NNI's taxable income an adjustment,

9  an increase, of $7.5 billion.  That's a big number, but it's

10  actually possible in going through their exhibits, to

11  understand the components of that.  Three point three billion

12  has been added by the IRS on the basis of eliminating, in

13  total, any adjustment on transfer pricing.  Now, obviously,

14  Your Honor, we think that is an unfounded position.  Exhibit

15  108 to the IRS's Motion, is a 2006 position paper by the IRS

16  which makes perfectly clear that the IRS accepts transfer

17  pricing as a certain methodology, so the idea that this claim

18  is founded in part on a total disallowance of transfer

19  pricing, we think is manifestively -- manifestly

20  objectionable.

21    Another big aspect of the 7.5 relates to 2.4 billion in

22  restructuring costs, which for the first time we learned when

23  we looked at the Motion to Withdraw, that the IRS was going to

24  take issue notwithstanding years of discussion with the IRS on

25  various aspects of Nortel's tax issues.  This, we think, we

1   have a clear legal position because the statue of limitations

2   has run out on that issue, Your Honor.  There is a tolling

3   with respect to the transfer pricing issues, which have been,

4   as all the papers that you've seen indicate a long-running

5   item of discussion between Nortel and the IRS, but not on

6   these restructuring costs and so we feel very confident about

7   that.  There is 1.6 billion adjustment based on vendor

8   financing.  That also is a manifest error since, I think, the

9   number that NNI used on its tax returns was 369 million, so

10  even if you were going to disallow the whole thing, which we

11  think there would be no basis for, there's a huge

12  overstatement of that adjustment that has nothing to do with

13  the NNI tax return, and indeed, it's more than the worldwide

14  organization adjusted on that item.  And then there's about

15  $262 million of increase to this adjustment, which we think is

16  just a mathematical error,  they double counted and put it in

17  twice.

18       So, that's where we are today, Your Honor.  We obviously

19  have to get into these documents.  We have to understand

20  whether our understanding, based on what we know, is in fact,

21  oversimplified, right.  We want to understand that, and that

22  is our purpose, but we think that we are engaged in a process

23  that will quickly clarify for us whether, in fact, our view of

24  this claim objection is valid, assuming it is valid, we think

25  it's a straight-forward claims objection.  And, Your Honor, we

20

1  also think that it does raise the question of whether this

2  claim was filed in good faith.  Obviously, the timing and the

3  previous history to this filing leads one to a superficial

4  view that the IRS was seeking to file this, we believe

5  inflated claim, to put leverage on the Debtors at the time of

6  the auction and is seeking to enforce that leverage at a

7  critical time when we're seeking to move to closing.  The

8  issues are still very much open and obviously we hope to come

9  to a common sense resolution of them.

10         THE COURT:  All right.  Thank you, Ms. Buell.  Mr.

11  Geht, welcome.  Good morning.

12         MR. GEHT:  Good morning, Your Honor.  I'm glad to be

13  here in person this time.

14         THE COURT:  It's good to have you here.  Thank you.

15         MR. GEHT:  If I could ask to take matters in a bit

16  of an order, we do need Your Honor to sign the Order

17  designating it as a core determination --

18         THE COURT:  And I will do so now, Mr. Geht.

19  Absolutely.  I wanted to wait for the hearing to see whether

20  that was contested or not.

21         MR. GEHT:  It's my understanding then that at that

22  point, the clerk of this Court will forward all the necessary

23  information to the District Court.

24         THE COURT:  That's right.

25         MR. GEHT:  And we were not sure whether or not this

1    Court has a standing policy on what happens to matters that

2    are subject to a pending Motion to Withdraw the reference.

3    We've had informal discussions with AUSA's and we understand

4    there -- at one point, there were some practices.  We're not

5    sure if they're still in place or no longer in place.

6          THE COURT:  Well, I don't know of any practices

7    other than -- it's my position, that until the reference is

8    withdrawn, that it's my case and I will continue to oversee

9    the matter.  I know that on some occasions, the District Court

10   is actually, even when it's withdrawn the reference, required

11   or requested that the Bankruptcy Court attend to the pre-trial

12   matters until it's ready for trial, then it goes to the

13   District Court.  I'm not sure what they would do in this case,

14   but as far as I'm concerned, I am your Judge at least until I

15   hear otherwise.

16         MR. GEHT:  Thank you.  With that in mind, I will

17   then continue.  And let me address the topics in the same

18   order that Ms. Buell addressed them.

19       With respect to the discussions with the IRS, it's true

20   that there was an offer made to the IRS, but it was contingent

21   on -- there was certain information that the IRS was seeking

22   and we were told that we would not be receiving that

23   information.  Accordingly, we actually have dropped in the

24   mail a document request, which I'll cover at the end of my

25   Motion, but effectively, the refusal to provide that

1   information makes it fairly difficult for the Internal Revenue

2   Service to evaluate the quality of the offer.  And it was --

3   I'm not sure if it's both sides digging into the ground or

4   not, but it's one of those, we won't start talking until we

5   have this information, well, we won't start talking until you

6   tell us whether or not you will talk even if we don't give the

7   information, which is not really conducive to a conversation.

8        I had had a chance to speak with Ms. Buell and Mr.

9   Bromley, and I do understand their concern that mathematically

10  the claim may not be properly calculated.  They raised this

11  issue yesterday, and I volunteered that I'd be more than happy

12  to sit down with them and have service personnel available to

13  make sure that mathematically, if there is double counting or

14  if there are things that are clearly improperly included, that

15  that would be reflected in the Proof of Claim, but it is my

16  understanding that whether or not the claim is 3 billion, 2

17  billion, 1 billion, or 500 million, in no way will effect

18  Avaya's willingness to take the purchaser.  So what I have

19  expressed to them is if they believe these mathematical errors

20  would actually drop our claim to zero, it's a discussion worth

21  having.  If we're talking about the merits of the U.S.

22  position, then we're back to square one, namely our view that

23  this is a fairly complicated issue.

24       With respect to discovery, I will provide Ms. Buell with

25  the names of the witnesses, and I'm certainly open to the

1    discussion as to whether or not it needs to be a formal or

2    informal discussion.  With documents, as I think represented

3    to the Court, the document request sought ten years worth of

4    documents.  We -- if I may describe the process, which we

5    undertook to attempt to comply with that Order, is we

6    proceeded in two directions.

7        The first one was to make it clear that we could explain

8    to the Court and to the Debtors, at least the basis for how

9    the claim was calculated, which is what we hoped was achieved

10   fairly quickly by the exhibits to our Motion to Withdraw.

11   Whatever people think of the merits of that claim, that is how

12   the numbers were calculated.  At the same time, we endeavored

13   to collect all the documents that are related to tax years

14   1998 through 2008.  We have produced today about 2,000 pages.

15   Those are the documents from the Offices of the APA in

16   Washington, D.C.  They're the ones who negotiate with Canada.

17   We have not produced all of their documents.  We are still

18   reviewing them for privilege.

19       I hope Your Honor can appreciate that when you have

20   competent authorities of one country and another country

21   negotiating with each going back and forth, there is serious

22   issues of deliberative process involved, and so we're still

23   working on that end.  We're trying to turn it around as

24   quickly as we can.  We -- as Your Honor is probably aware, we

25   don't have the same recourse that private law firms do, but

1    we're trying.

2       And then there's also the universe of the examine team

3    files, so these would be the folks on the ground in North

4    Carolina.  Those documents, because, well frankly, Nortel has

5    been losing money for so long, we're archived because there

6    have been net operating losses for the last many years, all of

7    which I would note happened, included in the spread sheet we

8    believe.  So those have been received by the APA folks in D.C.

9    and they're reviewing them right now.  And we plan on

10   continuing making rolling productions as the documents become

11   available.

12      The next topic, I suppose, is the merits, and since it

13   was prefaced with saying this belongs in District Court, I'm

14   not sure if Your Honor would like me to address -- at least

15   I'll take the opportunity to briefly address them.

16          THE COURT:  Well, I don't know for purposes of what

17   I had understood it was largely a -- through the status

18   conference at this point, that I need to get into the merits

19   very, very heavily.  I suspect that you refute the statements

20   made on the record by Nortel relating to what the IRS has or

21   hasn't done.

22          MR. GEHT:  And, if perhaps, I could make it very

23   quickly.

24          THE COURT:  Yes, please.

25          MR. GEHT:  The income tax deductions are a matter of

1  legislative grace and the question is not whether or not the

2  IRS can prove that the Debtors improperly took deductions, but

3  the burden is on the tax payers to establish that they're

4  entitled to those deductions.  To that end, we have prepared a

5  first set of request to Debtors for production of documents,

6  which we served contemporaneously with our responses I don't

7  believe that counsel had had it.  I will read right now, into

8  the record, it's a fairly simple --

9          MS. BUELL:  May I have a copy?

10          MR. GEHT:  Yes.

11          THE COURT:  So, Ms. Buell, this has not yet been

12  served upon you?

13          MS. BUELL:  Apparently it's in the process.  I have

14  not seen it yet.

15          THE COURT:  Okay.  All right.  Thank you.

16          MR. GEHT:  Your Honor, I will be glad to read it

17  into the record because it's a very simple one.  All documents

18  that relate to the taxable years 1998 through 2008.  I realize

19  it is an extremely broad document request and it is meant to

20  effectively ask Your Honor to put some parameters around what

21  it is that Your Honor expects the Internal Revenue Service to

22  produce with respect to those ten years, and we think that

23  it's only fair that the Debtors be obligated to produce

24  documents within the same parameters.  And we have asked the

25  Debtors for an October 5th deadline given their expedited

1    schedules that they had asked Your Honor to approve two weeks

2    ago before we had an opportunity to even review the Motion.

3    So I understand there will be an objection to the scope of

4    that request.

5             THE COURT:  I'm sure.

6             MR. GEHT:  But, once again, I think as I made it

7    fairly clear two weeks ago, the second document request that

8    the Debtors served on the Internal Revenue Service effectively

9    asks for all documents relating from 1998 to 2008, and I

10   believe Your Honor had told us to try to, in good faith,

11   attempt to comply with that request reserving for the judgment

12   until today.  And I'm not sure if Your Honor has any questions

13   for me.  If you'd like to hear from the Debtors first on the

14   scope issue.

15            THE COURT:  Well, why don't I.  You know, it seems

16   to me certainly that under the circumstances, reciprocity is

17   appropriate.  I don't know whether the Debtors will take the

18   position that they, in effect, already produced all of the

19   documents to the Internal Revenue Service through these years,

20   but I'll be pleased to hear from Ms. Buell.  Thank you, Mr.

21   Geht.

22            MS. BUELL:  Thank you, Your Honor.

23            THE COURT:  And I realize you've just been handed

24   the document.

25            MS. BUELL:  Exactly.  And, of course, it's a little

1    surprising that I'm just hearing about this now given the

2    expedited nature of this.  You know, I do think that the IRS

3    is approaching this in a way to try to maximize both

4    litigation and negotiating leverage, but that being as it is,

5    Your Honor, I certainly would like to discuss with my client,

6    understand what it is we've already provided, how it is that

7    we could seek to reciprocate to the IRS based on what we're

8    seeing from their production today.  So I think what I would

9    suggest, if I may, Your Honor, is that we be given three days

10   to put in a document objection and response, but, you know, in

11   that response, we understand that we've come to the Court and

12   asked for expedition, you know.  As a strategic matter, I

13   don't think it will serve us well to say that we're not going

14   to give the IRS anything as part of our objection, and so I'd

15   like to just undertake to work with the client and figure out

16   what we can do in a short time frame and try to keep this on

17   track.

18        THE COURT:  All right.  I think that's certainly

19   acceptable.  You know, I think in an expedited proceeding

20   there this -- potentially as complex as this, the only way

21   it's going to work with the party is if the parties actually

22   sit down with one another and discuss the categories of

23   documents and what is really necessary.  And I'm just

24   wondering if we shouldn't have a discovery conference, either

25   with me or in the first instance, among the parties, you know,

1   even in advance of a response to their discovery.

2           MS. BUELL:  Yes, Your Honor.  I think we would be

3   very open to that.  I think that makes a lot of sense.  If I

4   -- well, perhaps the best way is just to try to set one and

5   then the parties will accommodate to that, I think.

6           THE COURT:  Try to -- would you like me to set one?

7   Is that what --

8           MS. BUELL:  I think that --

9           THE COURT:  -- you think that's going --

10          MS. BUELL:  I think that would be --

11          THE COURT:  -- necessary --

12          MS. BUELL:  Yes.

13          THE COURT:  -- here?  Because --

14          MS. BUELL:  Thank you.

15          THE COURT:  -- it sounds like the --

16          MS. BUELL:  Scheduling is difficult.

17          THE COURT:  Yes.  The lines of communication are not

18  exactly wide open here, so I think that we ought to -- do you

19  -- would you want to do it here or in your offices?

20          MS. BUELL:  I think our offices and we're happy to

21  do it telephonically --

22          THE COURT:  Okay.

23          MS. BUELL:  -- to be able to, you know, limit the

24  burden on the IRS.

25          THE COURT:  Then let's do this.  Let's -- I'm going

1   to instruct you to have a discovery conference by telephone

2   tomorrow at noon and then we will have -- we'll follow that up

3   with a telephone conference with me at 5:00 p.m., so at least

4   I'll have a sense of how things are progressing and what, if

5   any, role I need to play in seeing that the discovery is

6   moving along as it should.

7           MR. BUELL:  Thank you, Your Honor.

8           THE COURT:  And if someone will just provide me with

9   a call-in telephone number, then I'll get on that call and

10  hopefully things will be headed in the right direction, but if

11  not, then we'll turn them around.

12          MS. BUELL:  I appreciate it.

13          THE COURT:  Okay.  Thank you, Ms. Buell.  Mr. Geht.

14          MR. GEHT:  Your Honor, just one last thing.  As I'm

15  probably going be doing for the duration of this issue until

16  October 13th, we'll ask the Court to reconsider its earlier

17  decision to have a trial on October 13th on the $3 billion

18  claim.

19          THE COURT:  Well, I don't know that in the context

20  of this case that the Debtors are in a position, nor do I

21  think they should be in a position, to delay matters for what

22  was really, I think, a surprise to them and with the -- an

23  exceptionally significant impact upon the cases.  Now, I

24  realize that October 13th could be a very difficult and very

25  long day, but I'm not going to reconsider that trial date.

1   I'm going to hold to that trial date of October 13th.

2          MR. GEHT:  Thank you, Your Honor.

3          THE COURT:  And I realize, I will have to be very

4   involved in scheduling and conferences and making certain that

5   things go forward in as organized a fashion as we can, and I

6   know it's a monumental task for everyone, including the Court,

7   but I think it is necessary under these circumstances.

8          MR. GEHT:  And I take it that Your Honor has

9   considered our Motion to Withdraw even though it wasn't

10   directed --

11          THE COURT:  Yes.

12          MR. GEHT:  -- to this Court.

13          THE COURT:  Yes, I did.

14          MR. GEHT:  And so you are aware of the complexities

15   of the issues involved?

16          THE COURT:  I am.  Yes, I am.

17          MR. GEHT:  Thank you, Your Honor.

18          THE COURT:  Thank you, Mr. Geht.  Good morning.

19          MS. PAK:  Good morning, Your Honor.  Ann Pak of

20   Ropes & Gray on behalf of Avaya, Inc. --

21          THE COURT:  Yes.

22          MS. PAK:  -- the successful bidder at the Enterprise

23   Solutions auction.  I understand, Your Honor, this is a

24   conference on the status of discovery, but I would just like

25   to inform the Court on what our position is, what Avaya,

31

1   Inc.'s position is with respect to the IRS claim.

2           THE COURT:  Yes, please.

3           MR. PAK:  And just by way of background, and I know

4   Your Honor knows this, but, you know, the assets to be sold to

5   Avaya include the stock of two Non-Debtor entities, Nortel

6   Government Solutions and DiamondWare.  And as a condition to

7   closing, we've required that the stock of these entities be

8   delivered free and clear of this $3 billion tax liability and

9   reasonably so.  I can't imagine any buyer who's willing to

10  purchase this with a $3 billion liability carried with it.

11      But I just want to address something that was mentioned

12  by IRS's counsel at the sale hearing, which is, why not just

13  file these two entities into bankruptcy.  It's, you know, a

14  pretty common way of transferring assets free and clear, and

15  then there would be no need to litigate the $3 billion claim

16  so quickly.  Well, we believe it's not so simple, and I know

17  this was stated by Clearly at the sale hearing, but I think it

18  bears repeating.

19      You know, the Debtors kept these two entities out of

20  bankruptcy intentionally and for very valid reasons that we

21  agree with.  And a bankruptcy filing of these entities, we

22  believe, would seriously put at risk the value of these

23  companies to Avaya and to any purchaser for that matter.  It

24  would also, of course, impose delay and expense associated

25  with Chapter 11, which in this case we think is purely

1    superfluous.  We do think there is a logical and efficient

2    solution to this, and I know that proposal has been made, but

3    we're at a complete loss why that offer was rejected because

4    we believe it protected the IRS procedurally and economically.

5        We just want to submit to the Court that we believe that

6    the IRS is being a little unreasonable here and that it

7    unnecessarily subjects these two companies to a reduction in

8    value.  And from Avaya's perspective, it is absolutely

9    critical that these companies be kept out of bankruptcy.

10           THE COURT:  And I can understand that.

11           MR. PAK:  Thank you, Your Honor.

12           THE COURT:  Thank you.  Thank you, Ms. Pak.  I

13   appreciate it.

14           MS. BUELL:  Thank you for your time and patience on

15   this, Your Honor.  Obviously, we want our buyer to be happy.

16   Obviously, we also think we've dealt with this potential

17   contingency and the Purchase Agreement, and we are continuing

18   to try to resolve this in the best fashion possible.

19           THE COURT:  And perhaps we can also add to the

20   conference call tomorrow, the issues regarding what, if you

21   will, protection, adequate protection or whatever you want to

22   call it, the Internal Revenue Service would need, so that

23   perhaps we can move forward and not have the time pressure

24   placed upon everyone with a trial on October 13th.  And what

25   may or may not be, and I don't know, I suspect the Debtors

1    will be able to present it as a less complicated matter than

2    the Internal Revenue Service sees it, but to the extent that

3    we can avoid rushing to a trial, I think that's in everyone's

4    interest.

5          MS. BUELL:  Thank you, Your Honor.

6          THE COURT:  Thank you.  So, Mr. Geht, perhaps you'll

7    be in a position to discuss with those at the Internal Revenue

8    Service who you report to a proposal and either reconsider it

9    or suggest a counterproposal.

10         MR. GEHT:  Your Honor, I was going to refrain from

11   commenting on the good faith of the Internal Revenue Service

12   during the negotiations, but since this appears to come back,

13   I will just tell you now, without getting into the -- it

14   appears that one of the problems in this case is that Nortel

15   isn't -- can't negotiate as Nortel alone, and that they have a

16   lot of constituencies.  We keep getting offers that are

17   contingent on other things happening with no guarantee that

18   those things will happen.  It makes for a very difficult

19   evaluation of the process, and I think that as we get closer

20   to October 13th or if Your Honor would even -- appropriate -- a

21   little earlier, it might be worth actually having the parties

22   sit down with a neutral mediator and try to understand whether

23   or not there can be a resolution because our discussion is

24   covered by 408.  We come in and everyone says we're being

25   unreasonable.  I can't tell you why -- what we're doing.

34

1        THE COURT:  I understand.

2        MR. GEHT:  I'd like to be able to present it to

3  someone that would be a neutral mediator and would not be

4  impacted at a trial.

5        THE COURT:  Well, let's add that to the discussion

6  tomorrow as well because I would not really, on my own, at

7  this -- I could certainly determine who to suggest, but

8  perhaps the parties will have someone to suggest who could do

9  that, and I think that would be useful.

10        MR. GEHT:  Thank you, Your Honor.

11        THE COURT:  All right.  Thank you very much.  Mr.

12  Geht, Ms. Buell, and everyone, so we will talk tomorrow at 5

13  o'clock, and not only will we be discussing discovery issues,

14  but the proposal and perhaps a mediator who could bring, you

15  know, a little bit of, oh, common ground into the picture.

16        MR. ABBOTT:  Your Honor, just to make things easier.

17  We seem to have all the masses gathered here.

18        THE COURT:  Yes.

19        MR. ABBOTT:  And I'm not -- obviously not everybody

20  in the room will need to be on this --

21        THE COURT:  No.

22        MR. ABBOTT:  -- call at 5:00.

23        THE COURT:  That's for certain.

24        MR. ABBOTT:  But I just thought it might make sense

25  for me, while we're all here, to just give everyone a dial-in

1  number that they can use now --

2          THE COURT:  Oh, fine.  Yes, please.

3          MR. ABBOTT:  -- if that would work?

4          THE COURT:  You bet.

5          MR. ABBOTT:  Your Honor, it would be 1-877-434-2295.

6  The code would be 302-351-9357 pound.

7          THE COURT:  Excellent.  Thank you, Mr. Abbott.  I

8  think that's helpful.  And obviously, I would only want the

9  parties to this dispute, which would include, of course, the

10  Committee, the Office of the United States Trustee and other

11  -- Avaya, to participate in the call.  It's not open, you

12  know, I don't want this open to all Creditors in the case.

13          MR. ABBOTT:  I understand, Your Honor.

14          THE COURT:  I don't think that's necessary.  And I

15  think we can perhaps make some progress with this call.  And I

16  appreciate it.  Thank you.

17          MR. ABBOTT:  Your Honor, I think that concludes the

18  matters scheduled for today.  We appreciate the Court's time.

19          THE COURT:  My pleasure.  All right, counsel.  Good

20  day to everyone, and we'll stand in recess.

21      (Court adjourned at 10:46 a.m.)

22

23

24

25

36

<u>CERTIFICATE</u>

1

2            I certify that the foregoing is a correct transcript

3    from the electronic sound recording of the proceedings in the

4    above-entitled matter.

5

6     _/s/April J. Foga_____          October 2, 2009
      April J. Foga, CET, CCR, CRCR
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25