## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

-------------------------------------------------------X
                                                    :
*In re*                                             :        Chapter 11
                                                    :
Nortel Networks Inc., *et al.*,[1]                  :        Case No. 09-10138 (KG)
                                                    :
                              Debtors.              :        Jointly Administered
                                                    :
                                                    :        **Hearing date: May 5, 2010 at 10:00 a.m. (ET) (proposed)**
                                                    :        **Objections due: April 28, 2010 at 4:00 p.m. (ET) (proposed)**
-------------------------------------------------------X

## DEBTORS' MOTION FOR ENTRY OF AN ORDER AUTHORIZING (A) THE DEBTORS' ENTRY INTO AN EMPLOYMENT AGREEMENT AND (B) PAYMENT OF AN AWARD UNDER NORTEL'S KEY EXECUTIVE INCENTIVE PLAN

Nortel Networks Inc. ("NNI") and certain of its affiliates, as debtors and debtors in possession, (collectively, the "Debtors"), hereby move this Court (the "Motion"), for the entry of an order substantially in the form attached hereto as Exhibit A, pursuant to section 363(b) of the title 11 of the United States Code (the "Bankruptcy Code"), authorizing the Debtors (a) to enter into an employment agreement with George Riedel as Chief Strategy Officer and President-Business Units of Nortel (the "Employment Agreement");[2] and (b) to make payment of the remaining award under Nortel's Key Executive Incentive Plan to Mr. Riedel.  In support of this Motion, the Debtors respectfully represent as follows:

---

[1]        The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's tax identification number, are:  Nortel Networks Inc. (6332), Nortel Networks Capital Corporation (9620), Nortel Altsystems Inc. (9769), Nortel Altsystems International Inc. (5596), Xros, Inc. (4181), Sonoma Systems (2073), Qtera Corporation (0251), CoreTek, Inc. (5722), Nortel Networks Applications Management Solutions Inc. (2846), Nortel Networks Optical Components Inc. (3545), Nortel Networks HPOCS Inc. (3546), Architel Systems (U.S.) Corporation (3826), Nortel Networks International Inc. (0358), Northern Telecom International Inc. (6286), Nortel Networks Cable Solutions Inc. (0567) and Nortel Networks (CALA) Inc. (4226).  Addresses for the Debtors can be found in the Debtors' petitions, which are available at http://chapter11.epiqsystems.com/nortel.

[2]        The Employment Agreement has been provided to the Monitor, the Committee and the Bondholder Group (as each is defined below) and will be provided to the U.S. Trustee.

**Jurisdiction**

1.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and

1334.  This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).  Venue is

proper pursuant to 28 U.S.C. §§ 1408 and 1409.

2.      The statutory basis for the relief requested herein is section 363(b) of the

Bankruptcy Code.

**Background**

**A.      Procedural History**

3.      On January 14, 2009 (the "Petition Date"), the Debtors, other than Nortel

Networks (CALA) Inc. ("NN CALA"), filed voluntary petitions for relief under chapter 11 of the

Bankruptcy Code.

4.      The Debtors continue to operate their businesses and manage their properties as

debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

5.      On January 15, 2009, this Court entered an order of joint administration pursuant

to Bankruptcy Rule 1015(b) that provided for the joint administration of these cases and for

consolidation for procedural purposes only [D.I. 36].

6.      Also on the Petition Date, the Debtors' ultimate corporate parent Nortel Networks

Corporation ("NNC"), NNI's direct corporate parent Nortel Networks Limited ("NNL," and

together with NNC and their affiliates, including the Debtors, "Nortel"), and certain of their

Canadian affiliates (collectively, the "Canadian Debtors")[3] filed an application with the Ontario

Superior Court of Justice (the "Canadian Court") under the Companies' Creditors Arrangement

Act (Canada) (the "CCAA"), seeking relief from their creditors (collectively, the "Canadian

---

[3]      The Canadian Debtors include the following entities:  NNC, NNL, Nortel Networks Technology
Corporation, Nortel Networks Global Corporation and Nortel Networks International Corporation.

Proceedings"). The Canadian Debtors continue to manage their properties and operate their businesses under the supervision of the Canadian Court.

7.     On January 14, 2009, the Canadian Court entered an order recognizing these chapter 11 proceedings as a foreign proceeding under section 18.6 of the CCAA. On February 27, 2009, based on a petition filed by Ernst & Young Inc., as court-appointed Monitor in the Canadian Proceedings and as foreign representative for the Canadian Debtors (the "Monitor"), this Court entered an order recognizing the Canadian Proceedings as foreign main proceedings under chapter 15 of the Bankruptcy Code.

8.     On January 14, 2009, the High Court of England and Wales placed nineteen of Nortel's European affiliates (collectively, the "EMEA Debtors")[4] into administration under the control of individuals from Ernst & Young LLC (collectively, the "Joint Administrators"). On May 28, 2009, at the request of the Joint Administrators, the Commercial Court of Versailles, France (the "French Court") (Docket No. 2009P00492) ordered the commencement of secondary proceedings in respect of Nortel Networks S.A. ("NNSA"), which consist of liquidation proceedings during which NNSA was originally authorized to continue to operate as a going concern for an initial period of three months, which period was subsequently extended to November 28, 2009. In accordance with the European Union's Council Regulation (EC) No. 1346/2000 on Insolvency Proceedings, the English law proceedings (the "English Proceedings") remain the main proceedings in respect of NNSA although a French administrator and a French liquidator have been appointed and are in charge of the day-to-day affairs and continuing

---

[4]     The EMEA Debtors include the following entities: Nortel Networks UK Limited, Nortel Networks S.A., Nortel Networks (Ireland) Limited, Nortel GmbH, Nortel Networks France S.A.S., Nortel Networks Oy, Nortel Networks Romania SRL, Nortel Networks AB, Nortel Networks N.V., Nortel Networks S.p.A., Nortel Networks B.V., Nortel Networks Polska Sp. z.o.o., Nortel Networks Hispania, S.A., Nortel Networks (Austria) GmbH, Nortel Networks, s.r.o., Nortel Networks Engineering Service Kft, Nortel Networks Portugal S.A., Nortel Networks Slovensko, s.r.o. and Nortel Networks International Finance & Holding B.V.

business of NNSA in France.  On October 1, 2009, pursuant to a motion filed by the Joint

Administrators, the French Court approved an order to: (i) suspend the liquidation operations

relating to the sale of the assets and/or businesses of NNSA for a renewable period of two

months; (ii) authorize the continuation of the business of NNSA so long as the liquidation

operations are suspended; and (iii) maintain the powers of the French Administrator and

Liquidator during the suspension period, except with respect to the sale of assets and/or

businesses of NNSA.  On February 26, 2010, the French Court extended the suspension of

liquidation until the earlier of (i) May 31, 2010 or (ii) the filing with the French Court of a letter

from Kapsch CarrierCom AG stating that its bid for the GSM//GSM-R assets of NNSA has

become unconditional.  On June 26, 2009, this Court entered an order recognizing the English

Proceedings of Nortel Networks UK Limited ("NNUK") as foreign main proceedings under

chapter 15 of the Bankruptcy Code.[5]

9.     On January 26, 2009, the Office of the United States Trustee for the District of

Delaware (the "U.S. Trustee") appointed an Official Committee of Unsecured Creditors (the

"Committee") pursuant to section 1102(a)(1) of the Bankruptcy Code [D.I.s 141, 142].  An ad

hoc group of bondholders holding claims against certain of the Debtors and certain of the

Canadian Debtors has also been organized (the "Bondholder Group").  No trustee or examiner

has been appointed in the Debtors' cases.

10.     On July 14, 2009 (the "CALA Petition Date"), Nortel Networks (CALA) Inc.

("NN CALA" and a Debtor with NNI and its affiliates), an affiliate of NNI, filed a voluntary

petition for relief under chapter 11 of the Bankruptcy Code.  On July 17, this Court entered

---

[5]     Additionally, on January 18, 2009, certain Nortel affiliates, including Nortel Networks Israel (Sales and Marketing) Limited, filed an application with the Tel-Aviv-Jaffa District Court, pursuant to the Israeli Companies Law, 1999, and the regulations relating thereto for a stay of proceedings.  On January 19, 2009, the Israeli Court appointed Yaron Har-Zvi and Avi D. Pelossof as joint administrators of the Israeli Company under the Israeli Companies Law (the "Joint Israeli Administrators").

orders approving the joint administration and consolidation of NN CALA's chapter 11 case with the other Debtors' chapter 11 cases for procedural proposes [D.I. 1098], and applying to NN CALA certain previously entered orders in the Debtors' chapter 11 cases [D.I. 1099].

**B.      Debtors' Corporate Structure and Business**

11.      Nortel is a technology company that designs, develops and deploys communication products, systems and solutions to its customers around the globe.  Its principal assets include its employees, the intellectual property derived and maintained from its research and development activities, its customers and other significant contracts and agreements.

12.      Additional information regarding the Debtors' corporate structure and business and the events leading to the chapter 11 cases is set forth in the Declaration of John Doolittle in Support of First Day Motions and Applications [D.I. 3].

**C.      Case Milestones**

13.      On June 19, 2009, Nortel announced that it was advancing in discussions with external parties to sell its businesses and it would assess other restructuring alternatives for its businesses in the event it is unable to maximize value through sales.  To date, Nortel has closed (i) the sale of certain portions of its Layer 4-7 data portfolio to Radware Ltd. [D.I. 539]; (ii) the sale of substantially all of its CDMA business and LTE Access assets to Telefonaktiebolaget LM Ericsson (publ) ("Ericsson") [D.I. 1205]; (iii) the sale of the assets of its Wireless Networks business associated with the development of Next Generation Packet Core network components to Hitachi Ltd. [D.I. 1760]; (iv) the sale of substantially all of the assets of the Enterprise Solutions business globally, including the shares of Nortel Government Solutions Incorporated and DiamondWare Ltd. to Avaya Inc. [D.I. 1514]; (v) the sale of substantially all the assets of its Optical Networking and Carrier Ethernet businesses associated with its Metro Ethernet Networks business unit to Ciena Corporation [D.I. 2070]; and (vi) the sale of substantially all of its

GSM/GSM-R business to Ericsson and Kapsch CarrierCom AG [D.I. 2065]. In addition, Nortel

has obtained Court approval for the planned sale of certain assets of its Carrier Voice Over IP

and Application Solutions business to GENBAND Inc. [D.I. 2632]. Efforts continue to be made

with respect to the monetization of Nortel's remaining assets.

      14.     On August 4, 2009, this Court entered an order fixing September 30, 2009 at 4:00

PM (Eastern Time) as the general bar date for filing proofs of claim or interests [D.I. 1280]. On

December 3, 2009 this Court entered an order fixing January 25, 2010 at 4:00 PM (Eastern

Time) as the bar date for filing proofs of claim or interests against NN CALA [D.I. 2059].

**Relief Requested**

      15.     By this Motion, the Debtors seek an order authorizing the Debtors (a) to enter into

the Employment Agreement; and (b) to make payment of the remaining award under Nortel's

Key Executive Incentive Plan to Mr. Riedel.

**Facts Relevant to this Motion**

**A.**     **The Nortel Special Incentive Plan and the Related Executive Agreements**

      16.     On February 11, 2010, the Debtors filed the Debtors' Motion For Entry of An

Order (A) Approving The Nortel Special Incentive Plan; (B) Authorizing Certain Payments

Under The Key Employee Retention Plan And Key Executive Incentive Plan; And (C)

Approving Certain Employment Agreements [D.I. 2400] (the "Incentive Plan Motion"). In the

Incentive Plan Motion, the Debtors sought authority to implement the Nortel Special Incentive

Plan, which is designed to provide cash incentive payments to certain Nortel employees to

encourage the achievement of certain performance targets and business goals that are critical to

maximizing the value of the Debtors' estates. The Debtors also sought authorization to make

immediate payment of awards related to the Third Milestone (as defined in the Incentive Plan

6

Motion)[6] as part of their initial Key Employee Retention Plan (the "KERP") and Key Executive

Incentive Plan (the "KEIP", and together with the KERP, the "Initial Plans") to all Nortel

Business Services ("NBS") and Nortel Finance and Corporate Services (the "Corporate Group")[7]

employees, except for two executives within the Corporate Group who were expressly excluded

from the Debtors' request.  In addition, the Debtors sought approval of their entry into employee

agreements with three senior executives of NNI – Christopher Ricaurte, Donald McKenna and

John Veschi – which, as described more fully in the Incentive Plan Motion, reflected the

executives' substantial new roles and responsibilities within NNI as a result of Nortel's changed

business and its restructuring.  The Court entered an order approving the Incentive Plan Motion

on March 4, 2010 [D.I. 2639] (the "Incentive Plan Order").

17.     Mr. Riedel is not a participant in the Nortel Special Incentive Plan and was one of

the two Corporate Group executives excluded from the Debtors' request to make immediate

payment of the Third Milestone Award.

**B.      The Riedel Employment Agreement**

18.     Mr. Riedel has held the position of Chief Strategy Officer of Nortel since

February 2006.  As Chief Strategy Officer, Mr. Riedel's job responsibilities included the

oversight of corporate strategy, mergers and acquisitions, business development, strategic

partnerships and the investment of money into new businesses.  Since the Petition Date, Mr.

Riedel has had a critical role in overseeing the successful sale and auction of numerous of the

Debtors' operating businesses, including specifically the CDMA and LTE business, Enterprise

Solutions Business Metro Ethernet Networks business and GSM/GSM-R business.  Mr. Riedel

---

[6]       The Third Milestone Award was tied to the later of the confirmation of a plan of reorganization in the United States or the confirmation by the Canadian Court of a plan or plans of restructuring and/or arrangement in Canada.

[7]       The structure of NBS and the Corporate Group is discussed in greater detail in the Incentive Plan Motion and is incorporated herein as if set forth in its entirety.

has participated in and overseen the negotiation of the terms of the asset sales with the interested parties, the selection of the stalking-horse bidders and the selection of the successful bidders at auction.  Mr. Riedel's efforts have contributed materially to Nortel generating over $2.6 billion in sale proceeds to date.

19.     Despite these substantial achievements, there remains much to accomplish, including the closing of the sale of the Debtors' Carrier VoIP and Application Solutions business (the "CVAS Business") in the second quarter of 2010.  Additionally, efforts are continuing to sell Nortel's remaining businesses, including the Multi-Service Switch (formerly known as "Passport") business (the "Passport Business") and the LG-Nortel Co., Ltd. joint venture (the "LG-Nortel Business").  Furthermore, substantial work continues toward reaching a strategic decision to maximize the value of Nortel's highly valuable intellectual property portfolio.  On all of these issues, Mr. Riedel's contributions have been and will continue to be critical, especially in regard to Nortel's intellectual property portfolio.

20.     At the time the Incentive Plan Motion was filed, it was anticipated that Mr. Riedel would leave the active Nortel workforce on March 31, 2010.  However, in light of the remaining challenges facing the Debtors, it is necessary to ensure Mr. Riedel's ongoing, active engagement in order to best maximize value for the various estates.  Accordingly, the Debtors seek to enter into the Employment Agreement to compensate Mr. Riedel adequately for his new role and the new responsibilities that he will undertake as a result of Nortel's changed business and restructuring efforts.  The Monitor, the Committee and the Bondholder Group were consulted regarding the terms of the Employment Agreement.  After several weeks of good faith negotiations involving the Debtors, the Committee, the Bondholder Group, the Principal Officer

of NNI (the "Principal Officer"), the Canadian Debtors and the Monitor, the Employment

Agreement was offered to Mr. Riedel, with the strong support of all other than the Committee.

21.    Under the Employment Agreement, Mr. Riedel's new position will be that of

Chief Strategy Officer and President-Business Units.  In this capacity, Mr. Riedel will report

directly to the Boards of Directors of NNC and NNL, the Monitor and the Principal Officer.

Nortel's CVAS Business, Passport Business, and LG-Nortel Business will report to Mr. Riedel,

as will Nortel's intellectual property team, all of which are new responsibilities.

22.    The key terms of the Employment Agreement are as follows:[8]

a.    ***Annual Compensation.***  Mr. Riedel will be compensated at a base salary
of $600,000 calculated on a per annum basis and paid bi-weekly.

b.    ***Annual Incentive Plan.***  As a participant in the Nortel Networks Limited
Annual Incentive Plan (the "AIP"), Mr. Riedel's annual AIP target award
will be 100% of his base salary.

c.    ***Special Incentive Payments.***  Mr. Riedel will be eligible to receive a
special incentive payment of up to $3,470,000 (the "Special Incentive
Payments") to be earned as follows:

(i)    $600,000 to be earned upon the occurrence of certain
metrics relating to Nortel's intellectual property assets, as
determined by the Principal Officer and the Monitor, in
consultation with the Committee and the Bondholder
Group; and

(ii)    Up to $2,870,000 to be earned upon Nortel's realization of
certain minimum amounts for Nortel's intellectual property
assets.  The terms by which such realization will be
calculated will be governed by the Employment Agreement
and agreed upon by Mr. Riedel, the Principal Officer and
the Monitor, in consultation with the Committee and the
Bondholder Group.

---

[8]    The summaries and descriptions of the terms and conditions of the Employment Agreement set forth in the
Motion are intended solely for informational purposes to provide the Court and parties in interest with an overview
of significant terms thereof and should only be relied upon as such.  The summaries and descriptions are qualified in
their entirety by the Employment Agreement.  In the event there is a conflict between the Motion and the
Employment Agreement, the Employment Agreement shall control in all respects.

Provided that the conditions stated above have been satisfied, the Special Incentive Payments will be made on or after January 1, 2011, but no later than March 15, 2012.  In the event that the conditions in (i) or (ii) above are not satisfied prior to March 15, 2012, Mr. Riedel will forfeit any unpaid portion of the Special Incentive Payments at that time.  In the event that Mr. Riedel is terminated for cause (as defined in the Employment Agreement) or voluntarily terminates his employment with NNI prior to the Termination Date or Extended Termination Date (as each is defined below), he will forfeit the right to receive any portion of the Special Incentive Payments.

d. **_Term._**  Mr. Riedel's employment shall terminate on January 1, 2011 (the "Termination Date"), provided that Mr. Riedel, the Principal Officer and the Monitor, in consultation with the Committee and the Bondholder Group, may agree to continue Mr. Riedel's employment beyond the Termination Date on terms and conditions that may be agreed upon at such time (such agreed upon date, the "Extended Termination Date").  Termination of Mr. Riedel's employment on or after the Termination Date (including but not limited to the Extended Termination Date) other than for cause will not affect Mr. Riedel's eligibility to receive the Special Incentive Payments on the terms described above.

Mr. Riedel will be employed by NNI, and the compensation under the Employment Agreement will be paid by NNI.[9]

## C.    Payment of the Third Milestone Award to Mr. Riedel

23.    As part of the Employment Agreement, the Debtors also propose to make payment to Mr. Riedel of an award related to the Third Milestone of the KEIP by no later than June 30, 2010.  As described above, in the Incentive Plan Order, this Court granted the Debtors the authority to make the immediate payment of the Third Milestone Award with respect to participants in the Initial Plans employed by NBS or the Corporate Group except for two executives within the Corporate Group who were expressly excluded from the Debtors' request.

---

[9]    In light of Mr. Riedel's extraordinary contributions to the sale of substantially all of Nortel's operating businesses over the past year, the Boards of Directors of NNC and NNL have additionally decided to pay Mr. Riedel a discretionary award of $1,000,000, which will be paid by NNL.  A portion of the cost of this discretionary award as well as the amounts paid to Mr. Riedel under the Employment Agreement are subject to subsequent allocation among the U.S. and Canadian estates.  The Debtors and the Canadian Debtors each reserve the right to seek contribution relating to such allocation from other affiliates.

<u>See</u> Incentive Plan Motion at 31, n.15.  Mr. Riedel was one of the excluded executives because,

at the time the Incentive Plan Motion was filed, it was anticipated that Mr. Riedel's active

employment with Nortel would end on March 31, 2010 as a result of asset sales and subsequent

restructuring of the Debtors, which would trigger payment of the Third Milestone Award at that

time.  However, as Mr. Riedel will now continue his employment with Nortel for the remainder

of 2010 in his new role and responsibilities, the Debtors believe that it is appropriate to make

payment of the Third Milestone Award to Mr. Riedel.  As described more fully in the Incentive

Plan Motion, in light of the evolving objectives of Nortel's global insolvency proceedings and in

order to avoid the inequity of penalizing Mr. Riedel for continuing to work diligently to benefit

the Debtors' estates, the Debtors believe that the payment of the award related to the Third

Milestone to Mr. Riedel at this time is appropriate and in the Debtors' best interests.  For the

same reasons that the Court granted the Debtors the authority to pay the Third Milestone Award

in the Incentive Plan Order, the Court should grant the relief requested here.

**<u>Basis for Relief</u>**

**A.      The Employment Agreement Satisfies the Standards of Section 363(b) of the
Bankruptcy Code**

24.      The Debtors seek authority pursuant to section 363(b) of the Bankruptcy Code to

enter into the Employment Agreement.  The Debtors submit that the relief requested is

reasonable and necessary under the circumstances and justified.

25.      Section 363(b)(1) of the Bankruptcy Code permits a debtor-in-possession to use

property of the estate "other than in the ordinary course of business" after notice and a hearing.

11 U.S.C. § 363(b)(1).  Use of estate property outside the ordinary course of business may be

authorized if the debtor demonstrates a "sound business purpose" for it.  <u>See</u> <u>Comm. of Equity

Sec. Holders v. Lionel Corp. (In re Lionel Corp.)</u>, 722 F. 2d 1063, 1071 (2d Cir. 1983) ("The rule

11

we adopt requires that a judge determining a 363(b) application expressly find from the evidence presented before him a good business reason to grant the application."); In re Delaware Hudson Ry. Co., 124 B.R. 169, 179 (Bankr. Del. 1991).

26.     Once a debtor articulates a valid business justification for a particular form of relief, the Court reviews the debtor's request under the "business judgment rule."  The business judgment rule "is a presumption that in making a business decision, the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action was in the best interests of the company."  Smith v. Van Gorkom, 488 A.2d 858, 872 (Del. 1985).   The business judgment rule has vitality in chapter 11 cases and shields a debtor's management from judicial second-guessing.  See Myers v. Martin (In re Martin), 91 F.3d 389, 395 (3d Cir. 1996) (citing Fulton State Bank v. Schipper (In re Schipper), 933 F.2d 513, 515 (7th Cir. 1991)); Dai-Ichi Kangyo Bank, Ltd. v.  Montgomery Ward Holding Corp. (In re Montgomery Ward Holding Corp.), 242 B.R. 147, 153 (D. Del. 1999).

27.     The Employment Agreement is necessary to compensate Mr. Riedel adequately for the new role and responsibilities he will undertake as a result of Nortel's changed business and ongoing restructuring efforts, particularly in respect of its efforts to monetize its IP assets. The Debtors believe that the compensation contemplated for Mr. Riedel is fair and reasonable in light of industry practice, market rates both in and out of chapter 11 proceedings and the scope of work to be performed.  Mr. Riedel's role is critical to the ongoing sale processes, specifically with respect to (i) the day-to-day management of the work related to the various asset sales, (ii) negotiating with counterparties regarding the sale transactions, (iii) selecting the stalking-horse bidders and the successful bidders at auction.  These contributions, and the corresponding value

they add to the businesses being sold are ultimately vital to maximizing the value of the Debtors'

estates and obtaining a favorable outcome in these chapter 11 cases.

28.     Moreover, Mr. Riedel is critical to the Debtors' ability to navigate the complex

issues surrounding a strategic decision with respect to Nortel's IP portfolio.  Mr. Riedel's

relationships and credibility with potential counterparties based on his work on the sale

transactions are unparalleled within Nortel, and the Debtors believe that his leadership in

determining and implementing the best strategy to monetize Nortel's IP assets will be critical.

29.     The relief sought herein is being sought on an expedited basis (along with a

request for a very limited shortening of notice) because of the importance to the Debtors of the

continued engagement of Mr. Riedel.  As noted above, Mr. Riedel intended to leave the active

Nortel workforce on March 31, 2010.  He has remained, however, at the request of the Debtors,

the Canadian Debtors and the Monitor, while the terms of his new engagement have been

negotiated and finalized.  At the same time, Pavi Binning, the former CFO and Chief

Restructuring Officer of NNL, left his positions following the closing of the sale of the Debtors'

Metro Ethernet Networks business, increasing the importance of reaching agreement on new

terms for Mr. Riedel's employment.  For these reasons, timely approval of the Employment

Agreement is critical in order to maintain continuity and stability within Nortel's strategic

leadership and to sustain momentum in respect of the monetization of the Debtors' remaining

assets.

30.     The continued employment of Mr. Riedel will ensure that these critical functions

related to the Debtors' bankruptcy cases and sale processes are effectively discharged.  For these

reasons, the Debtors submit that entry into the Employment Agreement is within the Debtors'

sound business judgment and is in the best interests of the Debtors, their estates and their

creditors.

**B.        The Employment Agreement Complies With Section 503(c) of the Bankruptcy Code**

31.      The Employment Agreement complies with section 503(c) of the Bankruptcy

Code.  Section 503(c) restricts transfers or payments by debtors for retention or severance and

payments that are considered outside of the ordinary course and not justified by the facts and

circumstances.

32.      Sections 503(c)(1) and (c)(2) of the Bankruptcy Code are inapplicable to these

circumstances.  Section 503(c)(1) of the Bankruptcy Code limits payments to "insiders" to the

extent such payments are made "for the purpose of inducing such person to remain with the

debtor's business."  11 U.S.C. § 503(c)(1).  Section 503(c)(2) of the Bankruptcy Code places

restrictions on "severance payment[s]" to "insider[s]."  11 U.S.C. § 503(c)(2).  Although Mr.

Riedel may be considered an insider of the Debtors, neither section 503(c)(1) nor 503(c)(2) of

the Bankruptcy Code applies here because the Employment Agreement does not include

retention or severance payments.  Mr. Riedel's compensation under the Employment Agreement

is comprised of a salary and incentive payments that are tied to the achievement of performance

metrics, and therefore the Employment Agreement is not in the nature of a retention agreement.

33.      To the extent applicable, the Employment Agreement satisfies the requirements of

section 503(c)(3) of the Bankruptcy Code.  Section 503(c)(3) of the Bankruptcy Code prohibits

"transfers or obligations that are outside the ordinary course of business and not justified by the

facts and circumstances of the case."  11 U.S.C. § 503(c)(3).  The Debtors submit that the

Employment Agreement is justified by the "facts and circumstances" of this case and thus

satisfies the applicable standards of section 503(c)(3) of the Bankruptcy Code.

34.     The standard for approval under the "facts and circumstances" test of section

503(c)(3) is similar to the business judgment standard for approval under section 363(b)(1) of the

Bankruptcy Code. See, e.g., In re Nobex Corp., No. 05-20050 (MFW), 2006 WL 4063024, at *3

(Bankr. D. Del. Jan. 19, 2006) (section 503(c)(3) standard is that of the business judgment of the

debtor); see also Dana II, 358 B.R. 567 at 576-77 (acknowledging the sound business judgment

test as the standard of review for key employee incentive programs); In re Silicon Graphics, Inc.,

Case No. 06-10977 (BRL) (Bankr. S.D.N.Y. July 27, 2006) (approving employee incentive plan

under business judgment standard pursuant to section 363 of the Bankruptcy Code); In re Movie

Gallery, Inc., Case No. 07-33849 (DOT) (Bankr. E.D. Va. Feb. 29, 2008) (approving the debtor's

key employee incentive plan under sections 363(b) and 503(c)(3)).

35.     The Debtors submit that the cost of the Employment Agreement is reasonable

because Mr. Riedel's employment will provide significant value to the Debtors' estates at a

relatively small cost.  The Debtors believe the value contributed by Mr. Riedel to the ultimate

purchase price of the various businesses and IP assets being sold far exceeds the compensation

that Mr. Riedel is eligible to earn under the Employment Agreement.  Moreover, Mercer (US)

Inc., Nortel's compensation consultant, has concluded that the compensation contemplated in the

Employment Agreement is fair and reasonable in light of industry practice, market rates both in

and out of chapter 11 proceedings and the scope of work to be performed.  For these reasons, and

in light of the complexity of the sale transactions and strategic decisions that Mr. Riedel

oversees, the Debtors submit that the amounts they seek authority to pay as part of the

Employment Agreement are reasonable and responsibly targeted.

36.     For the foregoing reasons, the Debtors believe that approval of the Employment

Agreement is appropriate and in the best interests of the Debtors, their bankruptcy estates and all

parties in interest, and that the incentives proposed in the Employment Agreement are reasonable and necessary to maximize the value of the Debtors' estates.

## Notice

37.     Notice of the Motion has been given via hand delivery or overnight mail to the (i) U.S. Trustee; (ii) counsel to the Committee; (iii) counsel to the Bondholder Group; and (iv) the general service list established in these chapter 11 cases.  The Debtors submit that under the circumstances no other or further notice is necessary.

## No Prior Request

38.     No prior request for the relief sought herein has been made to this or any other court.


*[Remainder of Page Intentionally Left Blank]*

WHEREFORE, the Debtors respectfully request that this Court (i) grant this Motion and the relief requested herein; (ii) enter the proposed order attached hereto; and (iii) grant such other and further relief as it deems just and proper.

Dated:  April 16, 2010
         Wilmington, Delaware

CLEARY GOTTLIEB STEEN & HAMILTON LLP

James L. Bromley (admitted *pro hac vice*)
Lisa M. Schweitzer (admitted *pro hac vice*)
One Liberty Plaza
New York, New York 10006
Telephone:  (212) 225-2000
Facsimile:  (212) 225-3999

- and -

MORRIS, NICHOLS, ARSHT & TUNNELL LLP


*/s/ Ann C. Cordo*
Derek C. Abbott (No. 3376)
Eric D. Schwartz (No. 3134)
Ann C. Cordo (No. 4817)
Andrew R. Remming (No. 5120)
1201 North Market Street
P.O. Box 1347
Wilmington, Delaware 19801
Telephone:  (302) 658-9200
Facsimile: (302) 658-3989

*Counsel for the Debtors*
*and Debtors in Possession*