**EXHIBIT A**

#1017916-v1

Court File No. 09-CL-7950

**ONTARIO**
**SUPERIOR COURT OF JUSTICE**
**(COMMERCIAL LIST)**

**IN THE MATTER OF THE *COMPANIES' CREDITORS'***
***ARRANGEMENT ACT*, R.S.C.1985, c.C-36, AS AMENDED**

**AND IN THE MATTER OF A PLAN OF**
**COMPROMISE OR ARRANGEMENT OF**
**NORTEL NETWORKS CORPORATION, NORTEL NETWORKS**
**LIMITED, NORTEL NETWORKS GLOBAL CORPORATION, NORTEL**
**NETWORKS INTERNATIONAL CORPORATION AND NORTEL**
**NETWORKS TECHNOLOGY CORPORATION (the "Applicants")**

**FORTY-FOURTH REPORT OF THE MONITOR**
**DATED APRIL 29, 2010**

**INTRODUCTION**

1.　On January 14, 2009 (the "Filing Date"), Nortel Networks Corporation ("NNC" and collectively with all of its subsidiaries, "Nortel" or the "Company"), Nortel Networks Limited ("NNL"), Nortel Networks Technology Corporation, Nortel Networks International Corporation and Nortel Networks Global Corporation (collectively, the "Applicants") filed for and obtained protection under the *Companies' Creditors' Arrangement Act* ("CCAA"). Pursuant to the Order of this Honourable Court dated January 14, 2009, as amended and restated (the "Initial Order"), Ernst & Young Inc. ("EYI") was appointed as the Monitor of the Applicants (the "Monitor") in the CCAA proceedings. The stay of proceedings was extended to July 22, 2010, by this Honourable Court in its Order dated April 14, 2010.

2.　Nortel Networks Inc. ("NNI") and certain of its U.S. subsidiaries concurrently filed voluntary petitions under Chapter 11 of Title 11 of the U.S. Bankruptcy Code (the "Code") in the United States Bankruptcy Court for the District of Delaware (the "U.S. Court") on January 14, 2009 (the "Chapter 11 Proceedings"). As required by U.S. law, an

official unsecured creditors committee (the "Committee") was established in January, 2009.

3.     An ad hoc group of holders of bonds issued by NNL ,NNC and Nortel Networks Capital Corporation has been organized and is participating in these proceedings as well as the Chapter 11 proceedings (the "Bondholder Group"). In addition, pursuant to Orders of this Honourable Court dated May 27, 2009 and July 22, 2009, respectively, representative counsel was appointed on behalf of the former employees of the Applicants and on behalf of the continuing employees of the Applicants and each of these groups is participating in the CCAA proceedings.

4.     Nortel Networks (CALA) Inc. (together with NNI and certain of its subsidiaries that filed on January 14, 2009, the "U.S. Debtors") filed a voluntary petition under Chapter 11 of Title 11 of the Code in the U.S. Court on July 14, 2009.

5.     Nortel Networks UK Limited ("NNUK") and certain of its subsidiaries located in EMEA (together the "EMEA Debtors") were granted Administration orders (the "U.K. Administration Orders") by the English High Court on January 14, 2009. The U.K. Administration Orders appointed Alan Bloom, Stephen Harris, Alan Hudson and Chris Hill of Ernst & Young LLP as Administrators of the various EMEA Debtors, except fot Ireland, to which David Hughes (Ernst & Young LLP Ireland) and Alan Bloom were appointed (collectively the "UK Administrators"). On June 8, 2009, the UK Administrators appointed in respect of NNUK filed a petition with the U.S. Court for the recognition of the Administration Proceedings as they relate to NNUK (the "English Proceedings") under Chapter 15 of the Code. On June 26, 2009, the U.S. Court entered an Order recognizing the English Proceedings as foreign main proceedings under Chapter 15 of the Code.

6.     On January 26, 2009, Nortel Networks Israel (Sales and Marketing) Limited and Nortel Communications Holdings (1997) Limited (together "NN Israel") were granted Administration orders by the court in Israel (the "Israeli Administration Orders"). The Israeli Administration Orders appointed representatives of Ernst & Young LLP in the U.K. and Israel as Administrators of NN Israel and provided a stay of NN Israel's

creditors which, subject the further orders of the Israeli Court, remains in effect during the Administration.

7.    Subsequent to the Filing Date, Nortel Networks SA commenced secondary insolvency proceedings within the meaning of Article 27 of the European Union's Council Regulation (EC) No 1346/2000 on Insolvency Proceedings in the Republic of France pursuant to which a liquidator and an administrator have been appointed by the Versailles Commercial Court.

8.    Subsequent to the Filing Date, certain other Nortel subsidiaries have filed for creditor protection or bankruptcy proceedings in the local jurisdiction in which they are located.


**PURPOSE**

9.    The purpose of this Forty-Fourth Report of the Monitor (the "Forty-Fourth Report") is to provide information regarding, and the Monitor's support for, the Applicants' motion seeking approval of the transactions contemplated by:

- a share purchase agreement dated April 21, 2010 (the "LGN Sale Agreement"), amongst NNL and Telefonaktiebolaget LM Ericsson (Publ) ("Ericsson") in respect of the sale of NNL's shares of LG-Nortel Co. Ltd. ("LGN"); and

- a termination agreement dated April 21, 2010 (the "Termination Agreement") between LG Electronics Inc. ("LGE"), NNL and Nortel Networks Korea Limited ("NN Korea"); and

to provide an update on certain matters relating to the CCAA proceedings.


**TERMS OF REFERENCE**

10.    In preparing this Forty-Fourth Report, EYI has relied upon unaudited financial information, the Company's books and records, financial information prepared by the

3

Company, and discussions with management of Nortel. EYI has not audited, reviewed or otherwise attempted to verify the accuracy or completeness of the information and, accordingly, EYI expresses no opinion or other form of assurance on the information contained in this Forty-Fourth Report.

11.    Unless otherwise stated, all monetary amounts contained herein are expressed in U.S. dollars.

12.    Capitalized terms not defined in this Forty-Fourth Report are as defined in the Affidavit of John Doolittle sworn on January 14, 2009 (the "Doolittle Affidavit"), the Pre-Filing Report, previous Reports of the Monitor or the LGN Sale Agreement.


**GENERAL BACKGROUND**

13.    As indicated in the Twelfth Report, dated May 28, 2009, a copy of which, excluding certain appendices, is attached as Appendix "A" hereto, LGN is a joint venture company located in South Korea that was incorporated in 2005 in connection with a joint venture agreement dated August 17, 2005 (the "JVA") between NNL and LGE.

14.    NNL owns two shares of the contingent voting preferred stock and 50% plus one of the outstanding common shares of LGN with the balance being held by LGE. NNL and LGE entered into the JVA as a means to combine Nortel's South Korean wireline, wireless and enterprise distribution businesses with LGE's telecommunications infrastructure and enterprise equipment businesses.

15.    LGN has two reportable business lines: Carrier Networks and Enterprise Solutions. LGN is South Korea's leading wireless equipment provider and one of the leading wireline, optical and enterprise equipment providers. It also conducts significant research and development, particularly in the areas of next generation wireless technology solutions. LGN's head office is located in Seoul, South Korea and it employs approximately 1,300 people.

16.     As noted in the Twelfth Report, shortly after the commencement of NNL's CCAA proceedings, NNL engaged in discussions with LGE regarding the impact of the CCAA proceedings on LGN and determined that NNL should explore the divestiture of its interest in LGN.

17.     Accordingly, NNL and LGE, with the assistance of the Monitor, negotiated the LG-Nortel Joint Venture Sale Process Protocol Agreement dated May 27, 2009 (the "Protocol") which was approved by this Honourable Court on June 1, 2009. A copy of the Protocol is attached as Appendix "A" to the Twelfth Report.


**THE PROTOCOL**

18.     The main provisions of the Protocol included the following:

- The Monitor would oversee the Sale Process (as defined in the Protocol);

- Goldman Sachs & Co. and Goldman Sachs (Asia) L.L.C. ("Goldman") would be retained as the financial advisor in connection with the Sale Process;

- Negotiations with potential purchasers would be led by NNL and Goldman in conjunction with the Monitor and LGE as it deemed necessary;

- Any negotiations with potential purchasers concerning an amendment to the JVA or any new joint venture agreement required would be led by LGE;

- Shares of LGN would be made available for sale with bids seeking a greater percentage of shares viewed more favourably; and

- The Sale Process would be conducted in accordance with the steps outlined in the Protocol.

## THE SALE PROCESS

19.    In accordance with the Protocol, in or around June 2009, Goldman, with input from NNL, LGE and the Monitor, prepared a list of potential buyers for NNL's shares of LGN. The list consisted of 36 parties comprised of 6 potential strategic buyers, 24 potential financial buyers based in Asia and 6 potential financial buyers based in North America or Europe.

20.    Representatives of Goldman contacted each party on the list to inform them of the Sale Process and enquire as to their level of interest. Based on the results of those initial enquiries, a teaser letter containing a general overview of LGN's business was forwarded to 27 parties that expressed an interest in the opportunity. In addition to the teaser letter, a Non-Disclosure Agreement ("NDA") was also forwarded to each party. The NDA was executed by 21 parties which were then provided an Offering Memorandum containing the following:

- An executive overview;

- An overview of the industry;

- An overview of LGN;

- Summary financial information; and

- Details of LGN's product portfolios.

21.    A process letter was also sent to each of the 21 potential bidders providing for a deadline for receipt of Expressions of Interest of August 18, 2009 which was subsequently extended to August 20, 2009, and requesting the following information from each potential bidder:

- The desired percentage interest in LGN and the cash consideration for such interest in US dollars;

- Details of the methodology and any assumptions underpinning the consideration payable for the interest;

- An overview of the bidder;

- A summary of the strategic rationale for wanting to acquire LGN;

- The expected sources for financing the transaction;

- The level of senior executive or Board of Director support for the transaction within the bidder's organization;

- An indication of the approvals that would be required to close the transaction;

- A list of any material conditions that would need to be satisfied by the bidder;

- A description of the potential bidder's due diligence requirements;

- Any material items that would affect their indicative offer; and

- Contact information of the person leading the transaction for the bidder.

22.    Four expressions of interest were received by August 20, 2009. The expressions of interest were reviewed and analyzed by the Monitor, NNL, LGE and Goldman. All four of the potential bidders were invited to proceed to a second round bidding process.

23.    During the second round bidding process, potential bidders were provided with:

- Access to an electronic data room which was populated with more detailed financial information;

- A full day presentation for each bidder group conducted by the senior management team of LGN which presentations occurred between September 10 and 23, 2009; and

- An opportunity for the bidders to seek additional information from management and conduct additional meetings with LGN management.

24. The second round bidders were each provided with a draft Share Purchase Agreement ("SPA") and new joint venture agreement (the "New JVA") and were asked to submit their second round bids in the form of a clean and black lined version of the SPA and the New JVA in forms that the bidder would be prepared to execute as binding agreements.

25. During the second round bidding process, two of the potential bidders requested NNL's consent to permit them to act as a team in submitting a single joint bid. This consent was granted.

26. The deadline for submission of second round bids was initially set at October 30, 2009 but extended to November 30, 2009 as a result of feedback from the potential bidders. As of the bid deadline, 3 bids were received (two from single bidders and one from the team of two parties submitting a joint bid). These bids were reviewed in detail by the Monitor, NNL, LGE and Goldman. As a result of this review, it was determined that further clarification was required with respect to all of the bids before a successful bidder could be chosen. In addition, several of the bidders requested the disclosure and/or production of additional information from LGN management prior to making any revisions to their bids.

27. As a result, subsequent information was prepared by LGN management and provided to all of the potential bidders. The potential bidders were also given the opportunity to participate in additional calls and meetings with LGN management. Concurrently, Goldman, along with NNL, the Monitor and LGE conducted a series of follow up discussions with each of the bidders to clarify their understanding of some of the terms of the bids and to provide feedback on the bids as submitted. A deadline of December 15, 2009 was established for the submission of third round bids. Prior to the third round bid deadline, the bidders were advised that this would be the final round of bids and that NNL would be selecting one bid in respect of which to proceed to negotiate a definitive agreement.

28.   On December 15, 2009, a third round of bids was received from all of the bidders. These bids were reviewed in detail by the Monitor, NNL, LGE and Goldman. While still in the process of reviewing these bids, the parties received notification from two of the bidders that these bidders wished to further revise their bids. These further revised bids were taken into account in the evaluation of the bids conducted by the Monitor, NNL, LGE and Goldman. This evaluation considered the factors set out in the Protocol for the evaluation of bids including the estimated proceeds to be generated for the stakeholders of NNL, the financial capability of the bidders, the extent of mark-ups to the draft SPA and New JVA provided to the bidders, an assessment of closing risk and timing and the views of LGE as the existing and go-forward joint venture partner As a result of this evaluation, NNL, LGE, Goldman and the Monitor determined in late December 2009, that, of the three bids, the bid received from Ericsson would be selected as the bid in respect of which NNL would attempt to negotiate a definitive agreement.

29.   Shortly thereafter, NNL and LGE entered into an exclusivity agreement with Ericsson for the period to January 31, 2010 during which the parties would, in good faith, attempt to negotiate and execute definitive agreements. This exclusivity agreement was extended several times with the last extension being to April 19, 2010.

30.   During the exclusivity period, NNL and Goldman, in conjunction with the Monitor, conducted negotiations with Ericsson in respect of the LGN Sale Agreement. LGE participated in many of these discussions. Separately, LGE conducted negotiations with Ericsson in respect of the New JVA.

31.   During the exclusivity period, an unsolicited revised bid was received from one of the other bidders. After reviewing the bid, NNL, in conjunction with the Monitor determined that it could not engage in discussions with the bidder given the exclusivity arrangement with Ericsson and informed the bidder accordingly. In addition, NNL, LGE, Goldman and the Monitor determined that the appropriate course of action was to continue negotiations with Ericsson in respect of a definitive agreement.

32.    These negotiations culminated in NNL and Ericsson entering into the LGN Sale Agreement as described below. It is the Monitor's understanding that LGE and Ericsson also entered into the New JVA at the same time.

33.    Throughout the Sale Process, NNL's stakeholders including representatives of the Committee, the Bondholder Group, the Superintendent of Financial Services in its capacity as the administrator of the Pension Benefit Guarantee Fund and the former employees were kept updated as to the progress of the Sale Process and provided with analyses of the bids submitted after each round of bidding, including the terms of the unsolicited bid, as well as drafts of the LGN Sale Agreement.

**THE LGN SALE AGREEMENT**

34.    On April 21, 2010, NNL and Ericsson entered into the LGN Sale Agreement. The LGN Agreement (without exhibits, schedules and annexes) is attached as Appendix "B" to this Forty-Fourth Report. A copy of the exhibits, schedules and annexes is attached as confidential Appendix "C" hereto. As these exhibits, schedules and annexes contain sensitive competitive financial information and information with respect to the New JVA, the Applicants and the Monitor are requesting that confidential Appendix "C" to this Forty-Fourth Report be sealed by this Honourable Court.

35.    A summary of the key terms of the LGN Sale Agreement is provided in the subparagraphs that follow:

- Ericsson will purchase 100% of NNL's shares of LGN (the "Purchased Shares");

- The preliminary purchase price for the Purchased Shares is $242,000,000 which is subject to adjustment as described below;

- The Purchased Shares are to be transferred free and clear of all liens and encumbrances;

- Within 30 days of closing, Ericsson shall cause LGN management to calculate the Closing Net Aggregate Liquidity which is defined as Total Reported Current Assets less Total Reported Current Liabilities (excluding certain specified balance sheet items) as of the date of closing. If the Closing Net Aggregate Liquidity is greater than the Reference Net Aggregate Liquidity, as set out in the LGN Sale Agreement, Ericsson will pay to NNL an amount equal to the difference. If Closing Net Aggregate Liquidity is less than the Reference Net Aggregate Liquidity, NNL shall pay to Ericsson an amount equal to the difference.

36.    Ericsson's obligations to consummate the transactions contemplated by the LGN Sale Agreement is subject to the following conditions:

- Each of the representations and warranties of NNL shall be true and correct as of the date of execution and as of the date of closing;

- NNL shall have performed and complied in all material respects with its covenants, obligations, conditions, and agreements contained in the LGN Sale Agreement that are required to be performed and complied with prior to closing;

- NNL shall have obtained and delivered evidence satisfactory to Ericsson that all material consents, approvals, authorizations or other actions or filings required to be obtained from Governmental Authorities on or before closing have been obtained, and Ericsson shall have obtained, anti-trust clearance in each jurisdiction which is required to be obtained or made;

- All consents under certain identified Key Material Agreements shall have been obtained;

- Ericsson shall have received certified copies of corporate resolutions authorizing the execution, delivery and performance of the LGN Sale Agreement and the other transaction documents;

- The waiver of the right of first refusal and co-sale rights of LGE under the JVA shall have become effective;

11

- The closing conditions under the New JVA between LGE and Ericsson shall have been satisfied or waived;

- The Bankruptcy Consents, including the Canadian Approval and Vesting Order, shall have been granted; and

- There shall be in effect no law, order, injunction, decree or judgment in Sweden, Canada or South Korea prohibiting the consummation of the transactions contemplated by the LGN Sale Agreement or proceedings pending seeking such prohibition.

37.    The LGN Sale Agreement may be terminated as follows:

- By mutual written consent of NNL and Ericsson;

- By either NNL or Ericsson if a permanent injunction or order of a Governmental Authority preventing the consummation of the transaction becomes final and non-appealable;

- By either NNL or Ericsson if any of the conditions to closing become impossible to fulfill (other than through failure of the party seeking to terminate the LGN Sale Agreement to comply with its obligations) and such condition is not waived;

- By either NNL or Ericsson in the event of a material breach by the other party of its representations, warranties, agreements or covenants set forth in the LGN Sale Agreement, and such breach shall be incapable of cure or has not been cured within ten business days, provided that a party shall not be entitled to terminate the LGN Sale Agreement pursuant to this clause where its own breach has been the cause of the event or condition giving rise to a right to terminate;

- By either NNL or Ericsson if closing has not occurred by August 31, 2010 other than if such failure to close has been caused by a party's breach of the LGN Sale Agreement or the inability to close is due to pending anti-trust clearance of this transaction; and

- By either NNL or Ericsson if anti-trust clearance of this transaction is not obtained within 5 months of the date of the LGN Sale Agreement.

38.    Except as otherwise specifically provided, any dispute arising out of or in connection with the LGN Sale Agreement shall be resolved by final and binding arbitration in Toronto.

39.    The Monitor expects that the transactions contemplated by the LGN Sale Agreement will close in late June or July 2010.


**TERMINATION AGREEMENT**

40.    In connection with the execution of the LGN Sale Agreement, NNL and LGE determined that they should enter into an agreement setting forth the terms and conditions upon which: i) the JVA will be terminated; ii) LGE will waive certain rights it has with respect to the sale by NNL of the Purchased Shares thus permitting the transfer of the Purchased Shares to Ericsson pursuant to the LGN Sale Agreement; and iii) certain existing Nortel and LGE ancillary agreements related to the LGN joint venture will be terminated or amended.  Accordingly, on April 21, 2010, NNL, NN Korea and LGE entered into the Termination Agreement.  The Termination Agreement is attached as Appendix "D" to this Forty-Fourth Report.

41.    A summary of the key terms of the Termination Agreement is provided in the subparagraphs that follow.

42.    Pursuant to the Termination Agreement, upon closing of the transactions contemplated by the LGN Sale Agreement:

- LGE will waive all rights that it may have under the JVA with respect to the transfer of the Purchased Shares from NNL to Ericsson;

- The JVA will be terminated, except for certain provisions of the JVA which, by their terms, survive termination as set forth in the Termination Agreement;

13

- Certain NNL and LGE ancillary agreements will be terminated or amended. These include:

(i)     Master Development Services Agreement dated November 3, 2005 between NNL and LGN and SOW-1 relating thereto pursuant to which LGN performs services in connection with designated design and development projects for NNL;

(ii)    Contract Manufacturing Services Agreement between NNL and LGN pursuant to which LGN agreed to provide product manufacturing services to NNL;

(iii)   LGN to Parents Intellectual Property License Agreement dated November 3, 2005 pursuant to which LGN provided a non-exclusive, non-assignable and non-sublicenseable license of its intellectual property to NNL and its affiliates. It is the Monitor's understanding that this intellectual property was not actually used by Nortel in conducting its business;

(iv)    NNL to LGN Intellectual Property License Agreement dated November 3, 2005 between NNL pursuant to which NNL provided a non-exclusive, non-assignable and non-sublicenseable license of certain of its intellectual property to LGN. The Monitor has been advised by LGN that this intellectual property was not actually used by LGN in conducting its business;

(v)     Nortel to LGN Transition Services Agreement dated between NNL and LGN pursuant to which NNL agreed to provide certain transitional services to LGN subsequent to the formation of the joint venture. It is the Monitor's understanding that these services are no longer required by LGN;

(vi)    Master Purchase and Sale Agreement dated December 8, 2006 between NNL and LGN pursuant to which NNL produces certain of LGN's products;

(vii)   Mutual Development Agreement dated January 1, 2009 between NNL and LGN and SOW-1 relating thereto pursuant to which NNL performs services in connection with designated design and development projects for LGN;

(viii)  NNL Sale Agreement dated October, 2005 among NNL, NN Korea, LGE and LGN pursuant to which NN Korea sold certain assets and goodwill of its business to, and had certain associated liabilities assumed by, LGN;

(ix)    Employee Secondment Agreement dated November 3, 2005 between NNL and LGN pursuant to which NNL agreed to provide the services of certain

ex-patriate employees to LGN and LGN agreed to reimburse NNL for the related costs;

(x)    LGE Sale and Contribution Agreement dated October 26, 2005 among NNL, LGE and LGN pursuant to which LGE sold and contributed in kind certain assets and goodwill of its business to, and had certain associated liabilities assumed by, LGN;

(xi)    Closing Agreement dated November 3, 2005 among NNL, NNK, LGE and LGN pursuant to which the parties agreed to proceed with the closing under the LGE Sale and Contribution Agreement and the NNL Sale Agreement and to identify additional post-closing obligations of each of the parties; and

(xii)    Letter Agreement dated August 17, 2005 between NNL and LGE pursuant to which the parties agreed on certain employment matters involving certain R&D employees of LGN and other matters relating to LGN.

- Accounts receivable and accounts payable outstanding between or among LGE, NNL and LGN pursuant to the terminated agreements are to be paid in the normal course pursuant to the terminated agreements, consistent with the procedures currently followed, subject only to the fact that any amounts which are considered a pre-filing claim under the CCAA proceedings are to be settled in accordance with the claims procedures established under these proceedings;

- NNL and NN Korea agree to release LGE and LGN from any liabilities arising out of or relating to the JVA or the terminated ancillary agreements, as the case may be; and

- LGE agrees to release NNL, NN Korea and LGN from any liabilities arising out of or relating to the JVA or the terminated ancillary agreements, as the case may be.

## PROCEEDS OF SALE FROM THE LGN SALE AGREEMENT

43.    NNL shall deposit the net sale proceeds (the "Sale Proceeds") received in connection with the closing of the LGN Sale Agreement into a single purpose NNL bank account to

be established prior to such closing, which bank account shall hold only the Sale Proceeds and interest earned thereon. The funds in such account shall not be used to fund ongoing operations, or for any purpose other than distribution to creditors generally, without the prior approval of this Honourable Court.

## LGN CAPITAL REDUCTION

44.    On April 21, 2010, prior to the execution of the LGN Sale Agreement, the Board of Directors of LGN authorized and declared a capital reduction resulting in a payout to its current shareholders in the amount of 200 billion Korean won (or approximately Cdn $181 million at the current rate of exchange). NNL expects that its portion of the payment, of approximately $90 million, will be received prior to closing of the transaction contemplated by the LGN Sale Agreement. As with dividends previously received from LGN, this payment will be treated as available cash to NNL.

## OTHER MATTERS

### *Leave to Appeal the Settlement Approval Order*

45.    A notice of motion for leave to appeal this Honourable Court's Settlement Approval Order dated March 31, 2010, in respect of that certain amended and restated employee settlement agreement dated March 30, 2010 (the "Amended and Restated Settlement Agreement"), has been served by counsel for certain long-term disability beneficiaries. Employee benefit payments (which do not include Termination Payments (as defined in the Amended and Restated Settlement Agreement)) and current service pension plan contributions are being made. Further court directions may be sought concerning, among other things, if benefit payments should be credited against distributions or otherwise in the event an appeal of the Settlement Approval Order is successful.

*Proceedings Commenced by the U.K. Pensions Regulator*

46.    On February 25, 2010, the Monitor brought a motion before this Honourable Court requesting relief with respect to proceedings commenced by the U.K. Pensions Regulator against NNC and NNL. Additional information relating to this matter can be found in the Monitor's Thirty-Eighth Report.

47.    On February 26, 2010, the relevant motion record was endorsed granting the relief requested by the Monitor in paragraphs (a), (b) and (d) of the Notice of Motion and an Order was granted reflecting same.

48.    Notices of Motion for Leave to Appeal this Honourable Court's Order were filed with the Ontario Court of Appeal by the U.K. Pensions Regulator, and by the Nortel Networks UK Pension Trust Limited and The Board of the UK Pension Protection Fund. The U.K. Pensions Regulator also brought a motion to expedite its appeal and to consolidate the hearing of the leave motion with the hearing of the appeal. This motion was heard on April 23, 2010. On the same day, the Honourable Justice Blair of the Ontario Court of Appeal denied the U.K. Pensions Regulator's motion for consolidation but ordered an expedited schedule for leave to appeal such that the leave motion will be considered by the Ontario Court of Appeal during the week of May 10, 2010. In light of Justice Blair's endorsement, the Nortel Networks UK Pension Trust Limited and The Board of the UK Pension Protection Fund have indicated they intend to seek an Order from the Ontario Court of Appeal such that their leave to appeal motion will be heard on the same schedule.

49.    In addition, a notice of motion has been served by the Nortel Networks UK Pension Trust Limited and The Board of the UK Pension Protection Fund seeking, among other things, an order lifting the stay granted in the Initial Order. Further to a 9:30 appointment before this Honourable Court on April 28, 2010, the hearing of this motion was set down for May 31, 2010.

## MONITOR'S ANALYSIS AND RECOMMENDATIONS

50.     The Monitor is of the view that NNL's efforts to market its shares of LGN were comprehensive and conducted in accordance with the Protocol approved by this Honourable Court. As a result, the Monitor is of the view that the LGN Sale Agreement represents the best transaction available for the sale of NNL's shares of LGN. Accordingly the Monitor recommends that this Honourable Court grant an Order authorizing the Applicants to complete the transactions contemplated by the LGN Sale Agreement and Termination Agreement and vesting all of NNL's right, title and interest in the LGN shares in Ericsson.

51.     For the reasons described at paragraph 34, above, the Monitor recommends that confidential Appendix "C" to this Forty-Fourth Report be sealed by this Honourable Court.

All of which is respectively submitted this 29th day of April 2010.

**ERNST & YOUNG INC.**
In its capacity as Monitor of the Applicants

Murray A. McDonald
President

**APPENDIX "A"**

**[ATTACHED]**

Court File No. 09-CL-7950

**ONTARIO**
**SUPERIOR COURT OF JUSTICE**
**(COMMERCIAL LIST)**

**IN THE MATTER OF THE *COMPANIES' CREDITORS***
***ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED**

**AND IN THE MATTER OF A PLAN OF**
**COMPROMISE OR ARRANGEMENT OF**
**NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL**
**NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL**
**CORPORATION AND NORTEL NETWORKS TECHNOLOGY CORPORATION (the**
**"Applicants")**

**TWELFTH REPORT OF THE MONITOR**
**DATED MAY 28, 2009**

## INTRODUCTION

1. On January 14, 2009, Nortel Networks Corporation ("NNC" and collectively with all its
   subsidiaries, "Nortel" or "Company"), Nortel Networks Limited ("NNL"), Nortel Networks
   Technology Corporation ("NNTC"), Nortel Networks International Corporation ("NNIC")
   and Nortel Networks Global Corporation ("NNGC") filed for and obtained protection under
   the *Companies' Creditors Arrangement Act* ("CCAA"). Pursuant to the Order of this
   Honourable Court dated January 14, 2009, as amended and restated (the "Initial Order"),
   Ernst & Young Inc. ("EYI") was appointed as the Monitor of the Applicants (the "Monitor")
   in the CCAA proceeding.

## PURPOSE

2. The purpose of this Twelfth Report of the Monitor (the "Twelfth Report") is to provide
   support for the Company's motion with respect to approval to conduct a sales process (the

"Sales Process") to market its interest in LG-Nortel Co. Ltd. (the "Joint Venture") and the Company's related engagement of Goldman, Sachs & Co ("Goldman") as its financial advisor.

## TERMS OF REFERENCE

3.  In preparing this Report, EYI has relied upon unaudited financial information, the Company's books and records, financial information prepared by the Company and discussions with management of Nortel. EYI has not audited, reviewed, or otherwise attempted to verify the accuracy or completeness of the information and, accordingly, EYI expresses no opinion or other form of assurance on the information contained in this Twelfth Report.

4.  Unless otherwise stated, all monetary amounts contained herein are expressed in Canadian dollars.

5.  Capitalized terms not defined in this Report are as defined in the Affidavit of John Doolittle sworn on January 14, 2009 (the "Doolittle Affidavit"), the Pre-Filing Report or previous Reports of the Monitor.

## GENERAL BACKGROUND

6.  Nortel is a technology company that designs, develops and deploys communication products, systems, and solutions to its carrier and enterprise customers around the globe. Its principal assets include its people, the intellectual property derived and maintained from its R&D activities, its customers and other significant contracts and agreements.

2

**LG-NORTEL CO. LTD**

7. The Joint Venture is a South Korean company incorporated in 2005 further to a joint venture agreement (the "JVA") dated August 17, 2005 between NNL and LG Electronics Inc. ("LGE").

8. NNL owns 50% plus one of the outstanding common shares of the Joint Venture. LGE owns the balance of the outstanding common shares.

9. NNL and LGE entered into the JVA as a means to combine Nortel's Korean wireline, wireless and enterprise distribution businesses with LGE's telecommunications infrastructure and enterprise equipment businesses.

10. Currently, the Joint Venture business includes two business segments: Carrier Networks and Enterprise Solutions. The Joint Venture business is South Korea's leading wireless equipment provider and one of the leading wireline, optical and enterprise equipment providers. It also conducts significant research and development, particularly in the areas of next generation wireless technology solutions. The Joint Venture is headquartered in Seoul, South Korea and has approximately 1,300 employees.

11. Shortly after the commencement of NNL's CCAA proceedings, NNL and LGE engaged in discussions regarding the impact of the CCAA proceedings on the Joint Venture. As a result of these discussions, NNL determined that it should explore the possible divesture of its interest in the Joint Venture.

12. After further discussions, NNL and LGE determined that a sale process designed to consider the respective interests of both shareholders and flexible enough to preserve the option for LGE to choose to add, or not to add, its interest in the Joint Venture to the sales transaction was appropriate. Accordingly, NNL and LGE, with the assistance of the Monitor, negotiated and entered into the LG-Nortel Joint Venture Sales Process Protocol Agreement dated May 27, 2009 (the "Protocol"). A copy of the Protocol is attached at Appendix A.

3

**THE PROTOCOL**

13. The Protocol is based on the following key principles:

- Value maximization for NNL, LGE and the Joint Venture;

- Protection of Joint Venture customer interests;

- Protection of Joint Venture employee interests; and

- Recognition that time is of the essence.

14. The key terms of the Protocol include the following:

- The Monitor will supervise, facilitate and oversee the Sales Process;

- NNL and the Monitor together shall lead the sales efforts with LGE participating as it deems necessary. Negotiations with potential buyers will be led by NNL and Goldman in conjunction with the Monitor, with LGE participating as it so desires. Negotiations with potential buyers with respect to any required amendments to the JVA, or with respect to any new joint venture agreement that may be required, will be led by LGE;

- Shares of the Joint Venture will be made available for sale with bids for a greater percentage of shares viewed more favourably;

- If a buyer desires LGE to remain as a partner in the Joint Venture, LGE is willing to consider that structure, under appropriate terms as determined by LGE;

- Nortel with the concurrence of the Monitor reserves the right to reject any or all of the final bids received. LGE reserves the right to reject any or all of the final bids received ;

- NNL, in consultation with LGE and the Monitor, has engaged a) Goldman to act as financial advisor; b) Kim & Chang, a South Korean law firm, to act as legal counsel;

4

c) KPMG to assist in financial statement preparation and due diligence support; and d) Ernst & Young LLP to prepare a sell-side diligence report; and

- NNL will pay the fees of the advisors set out above, subject to reimbursement from LGE for its proportionate share of such fees in the event that all or part of LGE's interest in the Joint Venture is sold as a part of the Sale Process.

15. The Sale Process contemplates the following steps to be undertaken:

- NNL, LGE and the Monitor, with input from Goldman, will jointly agree on a list of potential buyers to be contacted. The parties will attempt to ensure the list is robust enough to ensure a competitive process.

- Goldman will contact all of the potential buyers on the list and provide them with a "Teaser Memorandum" and non-disclosure agreement ("NDA").

- Interested parties that execute the NDA will receive a more detailed offering memorandum and access to a limited electronic data room;

- Based on the above, interested parties will be asked to submit a non-binding bid by a specified deadline. Currently, NNL expects that this deadline will be in July, 2009, however it may be subject to change.

- NNL, LGE and the Monitor will evaluate the preliminary bids based on the ability of the potential buyers to complete due diligence on a timely basis as well as on the buyer selection criteria set out in the Protocol. Based on this evaluation, a limited number of these bidders will be invited to continue to the second phase of the Sales Process;

- Bidders invited to continue to the second phase will be provided with a management presentation and access to an expanded electronic data room, as well as a draft purchase and sale agreement and other key ancillary agreements;

- A deadline will be established for bidders to provide a revised bid along with their mark-up of the purchase and sale agreement and related documents; and

5

- NNL, LGE and the Monitor will review the bids and select one or more parties with which to negotiate a definitive agreement, such agreement to be conditional upon this Honourable Court's approval.

## ENGAGEMENT OF GOLDMAN

16. As set out above, NNL has engaged Goldman to act as financial advisor in connection with the Sale Process pursuant to an engagement letter dated May 27, 2009 (the "Goldman Engagement Letter"). A redacted copy of the Goldman Engagement Letter is attached at Appendix B. An unredacted copy of the Goldman Engagement Letter will be provided to this Honourable Court for its review. The redactions made are in connection with the relationship between the aggregate consideration paid in connection with the transaction and the calculation of the fee payable to Goldman. It is the Monitor's view that the redactions are necessary as such sensitive information could have a detrimental impact on the bids submitted pursuant to the Sales Process.

17. The key terms of the Goldman Engagement Letter are as follows:

a) Goldman will be paid a fee for its services calculated on the basis of the aggregate consideration paid in connection with a Sales Process transaction. If there is no such transaction, there will be no such fee payable;

b) Goldman will be entitled to reimbursement of its reasonable expenses regardless of whether a Sales Process transaction is completed;

c) NNL shall provide an unsecured indemnity to Goldman for any legal and other expenses or any losses, claim damages or liabilities incurred in connection with the performance of its services pursuant to the Goldman Engagement Letter;

d) Goldman shall be granted a court-ordered charge, ranking *pari passu* with the Administration Charge, on the proceeds of sale of any of NNL's interest in the Joint Venture or, any distributions of proceeds from the Joint Venture to NNL, in connection with a transaction resulting from the Sales Process as security for its fees

6

and expenses other than those amounts arising in connection with the indemnity described above;

e) The Goldman Engagement Letter is conditional upon this Honourable Court issuing an order (the "Goldman Claims Bar Order") declaring that save and except for any liability or obligation arising out of the gross negligence or wilful misconduct of Goldman in performing its services pursuant to the Goldman Engagement Letter, Goldman, along with its affiliates, partners, directors, employees, agents and controlling persons shall have no liability to any person including a) potential purchasers who participate in the Sales Process; b) the Joint Venture or the Applicants; c) LGE and its shareholders but only to the extent provided in an exculpation letter dated as of May 27, 2009 as between LGE and Goldman; or d) any creditors or shareholders of the Applicants;

f) NNL or the Monitor will seek recognition of the Goldman Claims Bar Order as described above, in the United States of America pursuant to Chapter 15 of the U.S. Bankruptcy Code and in the Republic of Korea pursuant to its insolvency laws and will make reasonable best efforts to obtain such recognition; and

g) NNL shall require any potential purchaser that wishes to participate in the sales transaction to acknowledge in writing that Goldman shall not have any liability to such bidder and that it is bound by the provisions of the Goldman Claims Bar Order.

## MONITOR'S ANALYSIS AND RECOMMENDATIONS

18. The Sales Process described above and set out in the Protocol are designed to provide a commercially reasonable approach for NNL and LGE to work together with a view to permitting NNL to attempt to maximize value for its interest in the Joint Venture. The Monitor will have an extensive role in the Sales Process.

19. The Goldman Engagement Letter was agreed upon after extensive negotiation between Goldman and NNL and while it requires certain protections to be provided to Goldman by

7

this Honourable Court, the Monitor is of the view that such protections are reasonable in the circumstances.

20. Accordingly, the Monitor recommends that the Applicants' motion for approval of the Sales Process and the Goldman Engagement Letter be approved by this Honourable Court.

All of which is respectfully submitted this 28th day of May 2009.

**ERNST & YOUNG INC.**
**In its capacity as Monitor of the Applicants**

Per:

Murray A. McDonald
President

8

APPENDIX A

## LG-NORTEL JOINT VENTURE SALE PROCESS PROTOCOL AGREEMENT

**RECITALS:**

Whereas:

A. LG Electronics Inc., of Korea ("LGE"), and Nortel Networks Limited, of Canada ("Nortel"), are parties to a joint venture agreement dated August 17, 2005 (the "JVA").

B. The JVA governs a joint venture ("JV") which has carried on a technology business from Korea.

C. The business of the JV is profitable and is a valuable asset of LGE and Nortel.

D. Nortel filed for protection with the Ontario Superior Court of Justice (the "Ontario Court") pursuant to, among other things, the *Companies' Creditors Arrangement Act* ("CCAA") on January 14, 2009, as part of a series of international insolvency proceedings by Nortel and other members of Nortel's group of companies.

E. Among other things, pursuant to the CCAA proceedings, Ernst & Young Inc. (the "Monitor") has been appointed as the Monitor of Nortel.

F. Each of LGE and Nortel have an interest in the JV.

G. LGE and Nortel have had extensive discussions about the situation facing the JV and the options that are realistically available to the parties in the circumstances. Those discussions have included careful consideration of the following five options, each in accordance with the JVA:

   (i)   continuing to operate the JV in its current form;

   (ii)  LGE buying Nortel's stake in the JV;

   (iii) Nortel buying LGE's stake in the JV;

   (iv)  soliciting a third party to buy some or all of Nortel's stake and/or LGE's stake; and

   (v)   liquidating the JV.

H. Under the circumstances, LGE and Nortel wish to pursue a process designed to realize the maximum possible value for the JV on a consensual basis.

I. Accordingly, the sale process set out herein which has been agreed upon represents a flexible, commercially reasonable approach to realizing on such maximum value.

J. In particular, the sale process is designed to preserve the possibility of certain broad options with consideration of the respective interests of the parties.

K. Accordingly, among other things, the sale process preserves LGE's rights to approve any sale transaction with respect to the JV.

3490540.1

L. The sales process also preserves LGE's right to choose to add, or not to add, its interest in the JV to any sales transaction.

M. The sale process is also designed to reflect certain fundamental concerns which respect the fact that, among other things, the JV does not belong exclusively to Nortel, provided however that: (i) the Monitor shall play a critical role in the sale process at all stages; and (ii) any final sale transaction shall be subject to the approval of the Ontario Court on the recommendation of the Monitor.

For good and valuable consideration, the receipt and adequacy of which is acknowledged by each of LGE and Nortel, the parties agree as follows:

## ARTICLE 1 - INTRODUCTION

1.0  The recitals are true and accurate in all respects.

1.1  In order to ensure that the sale process successfully identifies the best possible buyer(s), among other things:

(a) Nortel and the Monitor shall lead the sales efforts with LGE participation as LGE deems necessary.

(b) Each of Nortel and LGE shall devote all time and attention necessary to pursue the sale process in a timely manner. Without limitation, each of Nortel and LGE and/or their respective advisors shall be entitled to participate in any meetings with the Financial Advisor, Accounting Advisors (defined below), Legal Counsel, and any other professional advisors who may be retained as part of the Sale Process (including all meetings necessary to finalize the sales documentation in form satisfactory to LGE and Nortel).

## ARTICLE 2 - KEY SALE PRINCIPLES

2.0.  The following are the key principles of the sale process:

(a)   value maximization for Nortel, LGE and the JV;

(b)   protection of JV customer interests;

(c)   protection of JV employee interests; and

(d)   time is of the essence.

## ARTICLE 3 - OTHER SALE CONSIDERATIONS

3.0.  The following are other considerations of the sale process:

(a)   Shares in the JV are available for sale with bids for higher stake amounts viewed more favourably.

3490540.1

(b)   If a buyer desires LGE as a partner in the JV, LGE is willing to consider that structure, under appropriate terms as determined by LGE.


## ARTICLE 4 - SUPERVISION AND REPORTING

4.0   Subject to the over-riding provisions of this agreement:

(a)   The Monitor will supervise, facilitate and oversee the process undertaken by Nortel and LGE and their respective advisors, all in accordance with the full terms of this agreement (the "Sale Process") to find a buyer for the interest(s) in the JV. Subject to, and in accordance with this agreement, LGE is to be kept informed on all material aspects throughout the Sale Process and work in conjunction with Nortel, as may be required.

(b)   Ontario Court approval for the sale process will be obtained prior to its commencement. Subject to Section 12.1, Nortel and LGE shall agree on the terms of the motion materials and other public communications, including press releases, with respect to this sale process.

(c)   At the conclusion of the Process, Nortel will bring forward a motion seeking final approval of the ultimate proposed transaction. The Monitor will provide a report to the Ontario Court including a detailed summary as to how the Process was conducted, information with respect to the resulting transaction and the Monitor's recommendation with respect to that transaction.

(d)   Nortel's motion materials and the Monitor's report will include a copy of the purchase and sale agreement executed between Nortel, LGE and the buyer as well as any related ancillary agreements, subject to any reasonable confidentiality considerations as may be applicable.


## ARTICLE 5 - STAKEHOLDER REPORTING

5.0   Subject to the over-riding provisions of this agreement:

(a)   Subject to subsection 5.0(b) and the balance of the terms of this agreement, Nortel and the Monitor may provide periodic updates, as appropriate, to significant stakeholder groups which have executed confidentiality agreements (the "Stakeholders") including:

   (i) The Unsecured Creditors Committee ("UCC");

   (ii) The Ad-Hoc Bondholders Committee; and

   (iii) The Ontario Government.

(b)   Prior to sharing any confidential information related to this Sale Process, Nortel shall require each Stakeholder (other than the Ontario Government and the members of the UCC who shall be bound by the confidentiality provisions of the UCC by-laws) and their

3490540.1

advisors that wish to obtain information related to this process to sign a further confidentiality agreement on substantially the same terms and conditions as previously executed by such Stakeholder, which agreement shall be in favour of LGE.

(c)    LGE and/ or its advisors shall be entitled to participate in any calls or meetings with the Stakeholders scheduled in advance which are specifically contemplated to discuss the proposed sale process and any potential sale transaction.

(d)    During the periodic updates provided to the Stakeholders, Nortel and the Monitor will respect any potential buyers' desire for confidentiality.

## ARTICLE 6 - SELECTION OF ADVISORS

6.0   Subject to the over-riding provisions of this agreement:

**Financial Advisor**

(a)  Nortel, LGE and the Monitor confirm that they have interviewed potential financial advisors including Morgan Stanley, Deutsche Bank and Goldman Sachs and have selected Goldman Sachs as the Financial Advisor.

(b)   Nortel, in conjunction with the Monitor, will direct the Financial Advisor, provided that LGE will participate and shall be entitled to provide input into the Sale Process as contemplated in this agreement; without limitation, LGE shall receive regular updates from the Financial Advisor.

(c)   Nortel may also seek the input of Lazard, Nortel's overall restructuring advisor, throughout the process, with LGE to be kept informed throughout the Sale Process.

**Legal Counsel**

(d)   LGE acknowledges that Nortel has selected Kim & Chang, the JV's current legal counsel, as Legal Counsel to assist on this transaction, subject to the reporting and other terms and obligations of this agreement.

(e)   The Legal Counsel will have responsibility for drafting of all purchase and sale related agreements, for review and approval by Ogilvy Renault LLP (counsel to Nortel) and LGE's legal advisor(s).

(f)   Nortel, in conjunction with the Monitor, will direct the Legal Counsel, but the Legal Counsel shall be authorized by Nortel to communicate with LGE's legal advisor(s) throughout the Sale Process.

**Accounting**

(g)   Financial Statement Preparation and Diligence Support - LGE acknowledges that Nortel has agreed to engage KPMG (the local auditors of the JV), subject to the reporting and other terms and obligations of this agreement.

(h)  Sell-side Diligence Book - LGE acknowledges that Nortel has agreed to engage Ernst & Young (Canada and Seoul) (together with KPMG, the "Accounting Advisors") subject to the reporting and other terms and obligations of this agreement.

**Engagement of and Costs related to Advisors**

(i)   Subject to subsection 6.0(k), Nortel will engage and pay the fees of all advisors.

(j)   If there is no resulting sale of shares or if only Nortel's interest in the JV is sold, LGE will have no responsibility for any fees incurred.

(k)  If there is a sale of all or part of LGE's interest in the JV as a result of the sale process contemplated in this agreement, each of Nortel and LGE will pay their respective proportionate shares of amount of the professional fees incurred in order to achieve that sale. Professional fees will include the fees of the Financial Advisor, Legal Counsel and Accounting Advisors along with any other professional advisors who may be retained as part of the process, but, for greater certainty, shall not include the fees of Ogilvy Renault, Miller Thomson, Lazard or the Monitor and Nortel and LGE shall be required to bear their own costs including the costs of their own legal and related advisors.

The amount that LGE will pay in those circumstances shall be calculated as follows: JV percentage sold by LGE as the numerator and JV percentage sold by both parties as the denominator.

(l)   LGE confirms that it has reviewed the engagement letters with the Accounting Advisors, Legal Counsel and the Financial Advisor.

## ARTICLE 7 - IDENTIFICATION OF POTENTIAL BUYERS

7.0  Subject to the over-riding provisions of this agreement, Nortel, LGE and the Monitor will jointly agree upon a preliminary buyer list with input from the Financial Advisor. The parties will attempt to develop a robust list that helps ensure a competitive process.

## ARTICLE 8 - THE SALE PROCESS

8.0  Subject to the over-riding provisions of this agreement:

**Preparation Phase**

(a)  Nortel will work with the JV management team to prepare a "Teaser Memorandum," draft NDA and communications package.  The Monitor and LGE shall be entitled to review and provide input into these materials as they shall each deem appropriate.  LGE shall approve the form and substance of such documents prior to their circulation, such approval not to be unreasonably withheld or unduly delayed.

**Phase I**

3490540.1

(b)    The Financial Advisor will contact all of the parties on the final potential buyer list and provide them with a copy of the Teaser Memorandum and form of NDA, subject to LGE's approval.

(c)    Interested parties that execute the NDA will receive an offering memorandum and will receive access to a limited Electronic Data Room. LGE has the right to approve any material modifications to the form of NDA or any other essential documents relating to the sale process.

(d)    Based on the above, potential interested buyers will be asked to submit a non-binding bid.

(e)    Nortel, LGE and the Monitor will evaluate the preliminary bids based on the ability of the potential buyers to complete due diligence on a timely basis as well as on the buyer selection criteria noted below.

(f)    Given that all parties recognize the need to complete a transaction as quickly as possible, the number of parties invited to participate in Phase II of the Sale Process will be limited in number and will be jointly selected by the Monitor, Nortel and LGE.

(g)    Nortel and the Monitor will review the preliminary bids and their analysis of the bids with LGE and, thereafter (in conjunction with LGE, as contemplated in this agreement) the Stakeholders prior to finalizing any decisions with respect to which parties will be invited to participate in Phase II.

**Phase II**

(h)    Bidders invited to participate in Phase II will be provided with a management presentation and full Electronic Data Room access. In addition, these buyers will also receive a draft purchase and sale agreement, revised JVA, if required, and other key ancillary agreements.

(i)    A deadline will be established for bidders to provide a revised bid along with their mark-up of the purchase and sale agreement and related documents. Revised bids are to be submitted to the Financial Advisor and the Monitor with copies to Nortel and LGE.

(j)    Nortel, LGE and the Monitor will review the bids and jointly select one or more parties with which the parties will proceed to negotiate a definitive agreement.

(k)    Subject to Section 5(c), Nortel and the Monitor will also go over the bids with the Stakeholders prior to finalizing any decision with respect to selecting one or more parties to negotiate a definitive agreement with.

(l)    Negotiations with potential buyers will be led by Nortel and the Financial Advisor in conjunction with the Monitor. Nortel and the Financial Advisor shall keep LGE apprised of the negotiations so that LGE may participate in all negotiations as it so desires.

(m)    If the proposed transaction is to result in LGE maintaining some interest in the JV, LGE shall lead negotiations with the potential buyer with respect to any amendments to

the JV agreement, or execution of a new JV agreement, as may be required.  Nortel and the Monitor shall be kept apprised of the status of these negotiations.

(n)   Once a definitive agreement is executed, the conditional transaction will be publicly announced and Nortel will proceed to seek final approval from the Ontario Court.

**Post-Execution Phase**

(o)   To the extent local regulatory approval is required, the buyer will be responsible for obtaining such approval and LGE shall reasonably support or facilitate such approval process.

**General**

(p)   In addition to such consent rights as LGE may have above, Nortel agrees to provide copies of all material documents to LGE in advance of such materials being sent to buyers or any other third party(-ies) not a party to this agreement (other than the Financial Advisor, the Accounting Advisor and the Monitor) for LGE's approval (such approval not to be unreasonably withheld or unduly delayed) and to provide to LGE all other materials sent to buyers contemporaneously with such delivery or as soon as reasonably practicable thereafter.

(q)   To the extent reasonably practicable in the circumstances, LGE will be included in all communications with the Financial Advisor, Accounting Advisors, Legal Counsel, and any other professional advisors who may be retained as part of the Sale Process, whether in-person, via phone or email. For the avoidance of doubt, LGE should be copied on all emails between such advisors and Nortel, and LGE should be notified in advance (to the extent reasonably possible in the circumstances) whenever there are discussions over the phone or in person between such advisors and Nortel.

(r)   The Monitor will be present at all meetings, conference calls and discussions between Nortel, LGE, or the Financial Advisor and potential buyers.

(s)   During the process, LGE and Nortel will retain current rights under the Joint Venture Agreement each of them may currently have but each commits to act in good faith, and acknowledges that this process shall be without prejudice, will not impact nor will any of the information gathered in this process be used by, either party except for the purposes set out herein, including without limitation, as a basis for determination or argument in the context of any other dealings or negotiations between them.

## ARTICLE 9 - BUYER SELECTION

9.0   Subject to the over-riding provisions of this agreement:

(a)   Nortel, with the concurrence of the Monitor, reserves the right to reject any or all of the final bids received. LGE reserves the right to reject any or all of the final bids received.

(b)   Final bids will be evaluated by Nortel, LGE and the Monitor.

3490540.1

(c) Both Nortel and LGE agree that in the course of their respective evaluation of bids, they will each consider relevant factors, which may include the following:

(i) Technology

- Ability to resolve issues relating to installed ALU UMTS base stations, including continued servicing, via access to supply agreements, alliances and licenses (LTE, etc.)

- Buyer's technology value proposition and credible plan for the JV to access future technology/product (especially LTE)

(ii) Bid

- Valuation

- Portion of Nortel and LGE's current share interest to be purchased

- Ability of the buyer to fund the investment

- Form of Purchase Agreement close to the form provided to potential buyers

(iii) Other

- Management/cultural fit with LGE, including Asia experience (assuming LGE remains in JV)

- Strength of future vision: Not to result in negative perceptions from customers, employees and stakeholders (e.g., widespread layoffs due to restructuring)

- Lock-up period

- No put option

- Closing risk / timing

(iv) Nortel, LGE and the Monitor have agreed that the importance of any of the individual factors set out above will be determined in the context of evaluating actual bids.


## ARTICLE 10 - REQUIRED CLOSING CONDITIONS

10.0 Subject to the over-riding provisions of this agreement:

(a) Ontario Court approval will be required before any definitive agreement can become binding.

(b) As necessary, buyer(s) must enter into a new Joint Venture Agreement with LGE.

3490540.1

(c)  LG Corp. approval to be obtained if the buyer will continue to retain the LG brand.

(d)  Key technology and/or licensing agreements will be entered into, as required.

## ARTICLE 11 - MILESTONES

11.0  Subject to the over-riding provisions of this agreement, the parties anticipate that the process will follow the following stages:

(a)  Nortel / LGE / Monitor Agreement on Process

(b)  Ontario Court Approval of Process

(c)  Potential buyers Contacted

(d)  Preliminary Non-Binding Deadline

(e)  Selection of Bidders to Move to Phase II

(f)  Phase II Due Diligence Period

(g)  Final Bids Due

(h)  Final Bids Evaluated & Selection Made

(i)  Negotiations re Definitive Agreement

(j)  Execution of Definitive Agreement

(k)  Ontario Court Approval of Agreement

(l)  Closing of Transaction

## ARTICLE 12 - GENERAL

12.0  This agreement contains the entire agreement between the parties hereto with respect to the Sale Process described herein and supersedes and cancels all prior discussions and / or agreements, including, but not limited to, all proposals, representations, written or oral, with respect thereto, provided however, that none of the parties' rights under the JVA shall be affected by this agreement, and provided that this agreement may be amended only by further written agreement executed by the parties.

12.1  The parties agree that they shall work cooperatively to respond to any media or regulatory inquiries made of either one or both of them. Unless time constraints make it impossible to do so, the parties agree to consult with each other before making any response, oral or written, to any media or regulatory inquiries in order to ensure the delivery of a single accurate response to any such inquiry.

3490540.1

12.2 This Agreement shall be governed by the laws of New York. Subject to the CCAA proceedings, the parties agree to resolve any disputes arising out of this agreement in accordance with the JVA.


Dated this 27th day of May, 2009.

NORTEL NETWORKS LIMITED

Per: _____

Name: Paul Binning

Title: CFO

Per: _____

Name: GORDON DAVIES

Title: CHIEF LEGAL OFFICER +
CORPORATE SECRETARY

3490540.1

LG ELECTRONICS INC.

Per: _____

Name: _____

Title: _____

Per: _____

Name: DAVID S. KIM

Title: VICE PRESIDENT, STRATEGY + BUSINESS DEVELOPMENT

3491162.1

Acknowledged and agreed to this 27th day of May, 2009

**ERNST & YOUNG INC.,** in its role as the Monitor in Nortel's CCAA proceedings and not in its personal capacity

Per: _____Sharon Hamilt_____

    Name: _Sharon Hamilton_

    Title: _Senior Vice-President_

Per: _____

    Name:

    Title:

3490540.1

Court File No: 09-CL-7950

IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL NETWORKS CORPORATION *et al.*

---

*ONTARIO*
SUPERIOR COURT OF JUSTICE
(COMMERCIAL LIST)

Proceeding commenced at Toronto

---

TWELFTH REPORT OF THE MONITOR
DATED MAY 28, 2009

---

GOODMANS LLP
Barristers & Solicitors
250 Yonge Street, Suite 2400
Toronto, Canada  M5B 2M6

Jay A. Carfagnini (LSUC# 222936)
Joseph Pasquariello (LSUC# 37389C)
Christopher G. Armstrong (LSUC# 55148B)

Tel: 416.979.2211
Fax: 416.979.1234

Lawyers for the Monitor, Ernst & Young Inc.

\5726305

APPENDIX "B"

[ATTACHED]

SHARE PURCHASE AGREEMENT

by and between

NORTEL NETWORKS LIMITED

and

TELEFONAKTIEBOLAGET LM ERICSSON (PUBL)

Relating To Shares of Capital Stock

of

LG-NORTEL CO. LTD.

April 21, 2010

## TABLE OF CONTENTS

Page

**ARTICLE 1 - DEFINITIONS/INTERPRETATION** .................................................. 2
1.1    General.......................................................................................................... 2
1.2    Definitions.................................................................................................... 2
**ARTICLE 2 - SALE AND PURCHASE** .................................................................... 7
2.1    Sale and Purchase....................................................................................... 7
2.2    Purchase Price............................................................................................. 8
2.3    Post-Closing Adjustment........................................................................... 8
2.4    Closing ........................................................................................................ 10
2.5    Closing Deliveries ..................................................................................... 10
**ARTICLE 3 - REPRESENTATIONS AND WARRANTIES OF NNL**...................... 11
3.1    Due Incorporation ..................................................................................... 11
3.2    Authority..................................................................................................... 11
3.3    No Conflict.................................................................................................. 11
3.4    Governmental Approvals ......................................................................... 12
3.5    Capitalization; Due Incorporation of the Company ........................... 12
3.6    Purchased Shares....................................................................................... 13
3.7    Actions ........................................................................................................ 13
3.8    No Other Representations ........................................................................ 13
**ARTICLE 4 - REPRESENTATIONS AND WARRANTIES OF PURCHASER**....... 13
4.1    Due Incorporation ..................................................................................... 13
4.2    Authority..................................................................................................... 14
4.3    No Conflict.................................................................................................. 14
4.4    Governmental Approvals ......................................................................... 14
4.5    Actions ........................................................................................................ 15
4.6    Financial Capability .................................................................................. 15
4.7    Investment Intent ...................................................................................... 15
**ARTICLE 5 - CONDITIONS TO CLOSING** ......................................................... 15
5.1    Conditions to Obligations of Purchaser ................................................ 15
5.2    Conditions to Obligations of NNL.......................................................... 16
**ARTICLE 6 – COVENANTS** .................................................................................. 17
6.1    Conduct of Business.................................................................................. 17
6.2    Access to Information ............................................................................... 18
6.3    Canadian Bankruptcy Actions ............................................................... 19
6.4    Regulatory Approvals............................................................................... 20
6.5    Third-Party Consents................................................................................ 21
6.6    Disclosure Schedules................................................................................ 21
6.7    Confidentiality ........................................................................................... 21
6.8    Notice of Breach......................................................................................... 22
6.9    Transaction Taxes ...................................................................................... 22
6.10   Further Assurances.................................................................................... 23
6.11   Ancillary Agreements ............................................................................... 23
6.12   Seconded Officers and Employees ......................................................... 23
6.13   Exclusivity................................................................................................... 23
**ARTICLE 7 - TERMINATION; EFFECT OF TERMINATION**............................. 24
7.1    Termination................................................................................................. 24
7.2    Effect of Termination ................................................................................ 25
**ARTICLE 8 - GENERAL PROVISIONS**................................................................ 25

| | | |
|---|---|---|
| 8.1 | Entire Agreement; Amendments; Waiver | 25 |
| 8.2 | Survival of Representations and Warranties | 26 |
| 8.3 | Successors and Assigns; Benefit | 26 |
| 8.4 | Costs/Expenses | 26 |
| 8.5 | Notices | 26 |
| 8.6 | Severability | 27 |
| 8.7 | Execution in Counterparts | 27 |
| 8.8 | Arbitration | 28 |
| 8.9 | English Language | 28 |
| 8.10 | Governing Law; Consent to Jurisdiction | 28 |
| 8.11 | No Presumption; Drafting | 28 |
| 8.12 | Time of Essence | 28 |
| 8.13 | LGE as Third-Party Beneficiary | 29 |

## EXHIBITS

| | |
|---|---|
| Exhibit-A | Canadian Approval and Vesting Order |
| Exhibit-B | NNL Knowledge |
| Exhibit-C | Purchaser Knowledge |
| Exhibit-D | Reference Net Aggregate Liquidity |
| Exhibit-E | Reference Balance Sheet |

## SCHEDULES

Schedule 6.4(a)  Governmental Approvals
Schedule 6.9(c)  Capital Gains Tax and STT
NNL Disclosure Schedule
Purchaser Disclosure Schedule

## ANNEXES

| | |
|---|---|
| Annex-1 | Closing Conditions in New Joint Venture Agreement |
| Annex-2 | NNL Ancillary Agreements |



## SHARE PURCHASE AGREEMENT

**This Share Purchase Agreement** (this "**Agreement**") is entered into on April 21, 2010, by and between Nortel Networks Limited, a company duly organized and existing under the laws of Canada and having its principal office at 5945 Airport Road, Suite 360, Mississauga, Ontario, Canada L4V1R9 ("**NNL**"), and Telefonaktiebolaget LM Ericsson (publ), a company duly organized and existing under the laws of Sweden and having its principal office at SE-164 83 Stockholm, Sweden ("**Purchaser**").

## RECITALS

**WHEREAS**, on November 3, 2005, NNL and LG Electronics Inc., a corporation duly incorporated and existing under the laws of Korea with its principal place of business at 20 Yeouido-dong, Yongdeungpo-gu, Seoul, Korea ("**LGE**") became joint venture partners of LG-Nortel Co. Ltd., a corporation duly organized and existing under the laws of the Republic of Korea (the "**Company**") pursuant to the joint venture agreement between NNL and LGE dated August 17, 2005, as amended on December 19, 2006 (the "**Joint Venture Agreement**");

**WHEREAS**, on January 14, 2009, NNL and certain of its Affiliates filed with the Ontario Superior Court of Justice (the "**Canadian Court**") an application for protection under the *Companies' Creditors Arrangement Act* (the "**Canadian Insolvency Proceeding**") and were granted certain initial creditor protection pursuant to an order issued by the Canadian Court on the same date;

**WHEREAS**, on January 14, 2009, NNL and certain of its Affiliates filed with the United States Bankruptcy Court for the District of Delaware for recognition of the Canadian Insolvency Proceeding pursuant to Chapter 15 of Title 11 of the United States Code.  On February 27, 2009, the United States Bankruptcy Court for the District of Delaware granted recognition as requested;

**WHEREAS**, on June 1, 2009, the Canadian Court granted the order with respect to the process for the sale of shares of the Company by NNL (the "**Canadian Sales Process Order**") as contemplated herein;

**WHEREAS**, as of the date hereof, NNL is the record owner of 118,001 shares of common stock and 2 shares of the contingent voting preferred stock (the shares owned by NNL, and as may be adjusted as provided in Section 2.1, collectively, the "**Purchased Shares**") of the Company, and desires to sell the Purchased Shares to Purchaser pursuant to the terms and conditions set forth herein;

**WHEREAS**, Purchaser desires to purchase and accept from NNL the Purchased Shares pursuant to the terms and conditions and for the consideration set forth herein;

**WHEREAS**, concurrently with the execution of this Agreement, Purchaser and LGE are entering into a joint venture agreement (the "**New Joint Venture Agreement**") relating to the Company; and

**WHEREAS**, concurrently with the execution of this Agreement, LGE and NNL, are entering into a termination agreement (the **"Termination Agreement"**) relating to, among other things, the termination of the Joint Venture Agreement (as defined herein).

## ARTICLE 1 - DEFINITIONS/INTERPRETATION

### 1.1    General

The words "hereof", "herein", and "hereunder" and words of like import used in this Agreement shall refer to this Agreement as a whole and not to any particular provision of this Agreement. Whenever the words "include", "includes", or "including" are used in this Agreement, they shall be deemed to be followed by the words "without limitation", whether or not they are in fact followed by those words or words of like import. References to any Person include the successors and permitted assigns of that Person. Any references from or through any date mean, unless otherwise specified, from and including such date or through and including such date, respectively. Any reference to "days" means calendar days unless Business Days are expressly specified. If any action under this Agreement is required to be done or taken on a day that is not a Business Day, then such action shall be required to be done or taken not on such day but on the first succeeding Business Day thereafter. References to one gender include all genders and references to the singular include the plural and vice versa. All Recitals, Exhibits and Disclosure Schedules annexed hereto or referred to herein are hereby incorporated in and made a part of this Agreement as if set forth in full herein. The Table of Contents and the headings of Articles and Sections hereof are provided for convenience only and are not to serve as a basis for interpretation or construction, and shall not constitute a part of this Agreement. Unless otherwise specifically indicated, any reference to a statute in this Agreement refers to that statute and to the regulations made under that statute as in force from time to time.

### 1.2    Definitions

In this Agreement, except as otherwise expressly provided or unless the context clearly requires otherwise, the following terms shall have the respective meanings given to them below:

**"Accounting Arbitrator"** has the meaning ascribed to it in Section 3.4(c).

**"Action"** means any litigation, action, suit, charge, binding arbitration, tax audit or other legal, administrative or judicial proceeding.

**"Affiliate"** means, with respect to any Person, any other Person who (at the time when the determination is to be made), directly or indirectly through one or more intermediaries, Controls, is Controlled by, or is under common Control with, the specified Person.

**"Agreement"** has the meaning ascribed to it in the Preamble.

**"Bankruptcy Consents"** means the Canadian Sales Process Order and entry of the Canadian Approval and Vesting Order and receipt of other consents, approval or



authorization from the Canadian Court, in connection with the transactions contemplated hereby and in the Transaction Documents to which NNL is or will be a party.

"**Business Day**" means a day which is not a Saturday, a Sunday or a day on which commercial banks located in Seoul, Korea, Toronto, Ontario Canada and/or Stockholm, Sweden are authorized or required by any applicable Law or other governmental action to be closed.

"**Canadian Approval and Vesting Order**" means an order of the Canadian Court substantially in the form attached hereto as Exhibit-A approving this Agreement and the transactions contemplated herein, such order to be in form and substance satisfactory to each of Purchaser, NNL and the Monitor, acting reasonably.

"**Canadian Approval and Vesting Order Motion**" has the meaning ascribed to it in Section 6.3(a).

"**Canadian Court**" has the meaning ascribed to it in the second Recital.

"**Canadian Insolvency Proceeding**" has the meaning ascribed to it in the second Recital.

"**Canadian Sales Process Order**" has the meaning ascribed to it in the fourth Recital.

"**Capital Gains Tax**" means the Taxes with respect to the capital gains, if any, of NNL arising from the sale of the Purchased Shares hereunder, pursuant to the *Corporate Income Tax Law* of Korea, and the Canada-Korea Tax Treaty, and which Purchaser may be required to withhold from NNL, as applicable.

"**Closing**" has the meaning ascribed to it in Section 2.4.

"**Closing Date**" has the meaning ascribed to it in Section 2.4.

"**Closing Statement**" has the meaning ascribed to it in Section 2.3(a).

"**Closing Net Aggregate Liquidity**" shall mean Total Reported Current Assets less Total Reported Current Liabilities (presented in accordance with US GAAP), excluding Short-Term investments, current portion of deferred cost of sales, current portion of deferred income tax assets (net of any valuation allowance), current portion of deferred revenue balances, income taxes payable, and current portion of deferred income tax liabilities, as of the Closing Date. If the Closing Date is the next Business Day following the last day of a calendar month pursuant to Section 2.4(ii) below, the Closing Net Aggregate Liquidity shall be calculated as of the last day of the calendar month preceding the Closing Date. Any amounts to be converted shall be converted pursuant to the Exchange Rate.

"**Confidentiality Agreement**" has the meaning ascribed to it in Section 6.7(a).

"**Company**" has the meaning ascribed to it in the first Recital.

"**Contract**" means any binding contract, license agreement, instrument, lease, ground lease or commitment.

"**Control**" (including, with correlative meanings, the terms "**Controlling**", "**Controlled by**" and "**under common Control with**") means, as to a Person, the power to direct or



3

cause the direction of the management and policies of such Person, whether through the ownership of voting securities or similar ownership interests, by contract or otherwise.

"**Disagreement Notice**" has the meaning ascribed to it in Section 2.3(b).

"**Disclosure Schedules**" means, with respect to any party, the disclosure schedules of such party dated as of the date hereof delivered by such party to the other applicable parties and which forms a part of this Agreement.

"**Exchange Rate**" shall mean the USD/Korean Won exchange rate as identified in the Reference Balance Sheet, which shall be 1:1,150.

"**FTC Clearance**" means the antitrust clearance under the Monopoly Regulation and Fair Trade Law of Korea or Laws of any other jurisdiction which is required to be obtained or made by Purchaser on or before the Closing in connection with the transactions contemplated by this Agreement.

"**Governmental Authority**" means any government, state or political subdivision thereof, national or supranational body, court, tribunal or any person or body exercising executive, legislative, judicial, regulatory or administrative functions on behalf of any of them and includes all relevant securities commissions, stock exchange authorities, foreign exchange authorities, foreign investment authorities and similar entities or authorities of an applicable jurisdiction.

"**Governmental Approval**" means any approval, consent, authorization, permit, or licence required by any Governmental Authority.

"**Governmental Order**" means any order, writ, judgment, injunction, decree, stipulation, determination or award entered by or with any Governmental Authority.

"**ICC**" means the International Chamber of Commerce.

"**Joint Venture Agreement**" has the meaning ascribed to it in the first Recital

"**Key Material Agreements**" means the Contracts between the Company and the customers of the carrier network business of the Company which generate 75% of the total revenue as of December 31, 2009 of the carrier network business of the Company.

"**Knowledge**" means, with reference to NNL, the actual knowledge of those Persons listed in Exhibit-B, and with reference to Purchaser, the actual knowledge of those Persons listed in Exhibit-C.

"**Korea**" means the Republic of Korea.

"**Law**" means any federal, territorial, state, provincial, local or municipal statute, law, common law, ordinance, rule, regulation, order, writ, injunction, directive, judgment, decree or policy or guideline having the force of law of Canada, Korea, Sweden or any other applicable jurisdiction.

"**LGE**" has the meaning ascribed to it in the Preamble.

"**LGE Waiver**" has the meaning ascribed to it in Section 5.1(f).



4

"**Lien**" means any and all liens, including but not limited to, claims, mortgages, charges, liens (whether contractual, statutory or otherwise), security interests, assignments or other similar encumbrances.

"**Material Adverse Effect**" means with respect to any Person any circumstance, state of fact, event, change or effect (each an "**Effect**") that, individually or in the aggregate with all other Effects, (a) is or would reasonably be materially adverse to the business, operations, assets, liabilities, results of operations or financial condition of such Person, taken as a whole, or (b) prevents or would reasonably be expected to prevent the ability of such Person to perform its obligations under this Agreement, but excluding, for purposes of clauses (a) and (b), (i) Effects resulting from changes in general economic or financial conditions in the relevant jurisdictions, (ii) Effects arising from the execution or delivery of this Agreement or the transactions contemplated herein or the public announcement thereof, (iii) Effects that result from any action required to be taken pursuant to this Agreement or any action taken pursuant to the written request or with the prior written consent of a party hereto (who is not such Person itself), (iv) Effects relating to general changes in the industries and markets in which the Company operates, (v) Effects relating to changes in Law, generally accepted accounting principles or official interpretations of the foregoing, and (vi) Effects relating to the pendency of the Canadian Insolvency Proceeding and any action approved by, or motion made before, the Canadian Court, it being understood, for the avoidance of doubt, that the failure of the Company to achieve internal or external financial forecasts or projections, by itself, will not constitute a Material Adverse Effect; provided, that, with respect to clauses (i), (iv), and (v) any such Effect shall be included to the extent such Effect has a materially disproportionate effect on the Person, taken as a whole, as compared to other industry participants.

"**Material Agreements**" means the Key Material Agreements and the following contracts and agreements (whether written or oral): (a) all contracts or agreements that provide for payment or receipt by the Company of more than ten (10) million United States dollars per year or more than fifty (50) million United States dollars during the life of the respective contract, including any such contracts and agreements with customers or suppliers; (b) all contracts and agreements relating to indebtedness for borrowed money or to secure the obligations or liabilities of a third party which the Company has entered into; provided such indebtedness, obligations or liabilities exceed ten (10) million United States dollars (c) all contracts and agreements that limit the ability of the Company to compete in any line of business or with any Person or in any geographic area; (d) all material joint venture or partnership agreements; (e) contracts pursuant to which the Company leases any real property; (f) agreements relating to the acquisition or disposition of a business (whether by merger, sale of stock, sale of assets or otherwise) in a transaction which requires approval by the Company's Board of Directors in accordance with the provisions under the Company's Regulation Governing Board of Directors for the Company to enter into transactions; (g) any contract which, if terminated prior to its current expiration date, would have a Material Adverse Effect on the Company; and (h) any other contracts or agreements that require approval by the Company's Board of Directors in accordance with the provisions under the Company's Regulation Governing Board of Directors for the Company to enter into transactions.

"**Monitor**" means Ernst & Young Inc., in its capacity as the Canadian Court-appointed Monitor in connection with the Canadian Insolvency Proceeding.

**"New Joint Venture Agreement"** has the meaning ascribed to it in the seventh Recital.

**"NNL"** has the meaning ascribed to it in the Preamble.

**"Notice"** has the meaning ascribed to it in Section 8.5(a).

**"Objecting Party"** has the meaning ascribed to it in Section 2.3(b).

**"Permitted Encumbrances"** means (i) statutory Liens for Taxes, assessments or other governmental charges or levies that are not yet due or payable, or for Taxes the validity of which are being contested in good faith by appropriate proceedings or that may thereafter be paid without penalty; and (ii) any Liens imposed by any bankruptcy court that are to be discharged at the Closing pursuant to the terms of the Canadian Approval and Vesting Order.

**"Person"** means an individual, a partnership, a corporation, an association, a limited or unlimited liability company, a joint stock company, a trust, a joint venture, an unincorporated organization or other legal entity.

**"Post-Closing Adjustment Amount"** means an amount equal to (i) the number of Purchased Shares, divided by (ii) the total number of shares of common stock and preferred stock of the Company issued and outstanding as of the Closing Date, multiplied by (iii) the Post-Closing Aggregate Liquidity Adjustment.

**"Post-Closing Aggregate Liquidity Adjustment"** has the meaning ascribed to it in Section 2.3(c).

**"Preliminary Purchase Price"** has the meaning ascribed to it in Section 2.2.

**"Purchase Price"** has the meaning ascribed to it in Section 2.2.

**"Purchased Shares"** has the meaning ascribed to it in the fifth Recital subject to repurchase in accordance with Section 2.1.

**"Purchaser"** has the meaning ascribed to it in the Preamble.

**"Reference Net Aggregate Liquidity"** means the Total Reported Current Assets less Total Reported Current Liabilities (presented in accordance with US GAAP), excluding Short-Term investments, current portion of deferred cost of sales, current portion of deferred income tax assets (net of any valuation allowance), current portion of deferred revenue balances, income taxes payable, and current portion of deferred income tax liabilities, as of the Reference Balance Sheet Date, as prepared by the Company and attached hereto as Exhibit-D.

**"Reference Balance Sheet"** means the estimated balance sheet of the Company as of the Reference Balance Sheet Date, a copy of which is attached hereto as Exhibit-E.

**"Reference Balance Sheet Date"** means June 30, 2010.

**"Short-Term"** means less than a period of 12 months.

"**STT**" means the securities transaction tax imposed on NNL pursuant to the Securities Transaction Tax Law of Korea in connection with the sale of the Purchased Shares and which Purchaser may be required to withhold from NNL.

"**Tax**" means (i) any domestic or foreign federal, state, local, provincial, territorial or municipal taxes or other impositions by any Governmental Authority, including net income, gross income, individual income, capital, value added, goods and services, gross receipts, sales, use, ad valorem, business rates, transfer, franchise, profits, business, environmental, real property, personal property, service, service use, withholding, payroll, employment, unemployment, severance, occupation, social security, excise, stamp, stamp duty reserve, and customs taxes and impositions, and all other taxes, fees, duties, assessments, deductions, withholdings or charges of the same or of a similar nature, however denominated, together with any interest and penalties, additions to tax or additional amounts imposed or assessed with respect thereto, and (ii) any obligation to pay Taxes of a third party, whether by contract, as a result of transferee or successor liability, as a result of being a member of an affiliated, consolidated, combined or unitary group for any period or otherwise.

"**Tax Authority**" means any Governmental Authority of Korea, Canada, Sweden or any other country with responsibility for, and competent to impose, collect or administer, any form of Tax.

"**Termination Agreement**" has the meaning ascribed to it in the eighth Recital.

"**Total Reported Current Assets**" means the aggregate of cash and cash equivalents, Short-Term investments, accounts receivable (net of the allowance for doubtful accounts), inventories (net of the allowance for obsolescence, slow moving and/or excess and obsolete inventory), current portion of deferred cost of sales, current portion of deferred income tax assets (net of any valuation allowance), prepaid expenses, and other current assets.

"**Total Reported Current Liabilities**" means the aggregate of bank loans and related interest payable (including accrued interest) balances, trade and other accounts payable, payroll and benefit related liabilities, current portion of contractual liabilities, current portion of deferred revenue, current portion of warranty reserves, other current accrued liabilities, income taxes payable, and current portion of deferred income tax liabilities.

"**Transaction Documents**" means the Termination Agreement.

"**USD**" means the currency of the United States of America.

"**US GAAP**" means generally accepted accounting principles of the United States of America, applied on a consistent basis.


## ARTICLE 2 - SALE AND PURCHASE


2.1     **Sale and Purchase**

Subject to the terms and conditions of this Agreement, at the Closing, NNL shall sell, transfer and deliver to Purchaser, and Purchaser shall purchase and accept from NNL,



the Purchased Shares, free and clear of all Liens. Prior to the Closing, the parties acknowledge and agree that the Company may, upon obtaining prior written consent from Purchaser, which consent shall not be unreasonably withheld, repurchase certain shares of capital stock held by NNL and LGE as of the date hereof in exchange for a cash distribution, to the extent permitted under the applicable Law. In such case, at the Closing, NNL shall transfer to Purchaser all of the shares of capital stock of the Company that NNL owns as of the Closing Date, provided that NNL's total shareholding in the Company shall remain 50% plus one share upon completion of such repurchase by the Company.

**2.2   Purchase Price**

Subject to Sections 2.3 and 2.5, Purchaser shall pay to NNL an amount in cash equal to USD 242,000,000 (the "**Preliminary Purchase Price**") plus or minus the Post-Closing Adjustment Amount (as so adjusted the "**Purchase Price**").

**2.3   Post-Closing Adjustment**

(a)   Closing Statement.  As promptly as practicable (and in any event within thirty (30) days after the Closing), Purchaser shall, in its capacity as a shareholder of the Company, use commercially reasonable efforts to cause the Company to calculate the Closing Net Aggregate Liquidity, which shall be based on the balance sheet of the Company dated as of the Closing Date (or if the Closing Date is the next Business Day following the last day of a calendar month pursuant to Section 2.4(ii) below, as of the last day of the calendar month preceding the Closing Date) prepared in accordance with US GAAP as consistently applied by the Company and cause the Company to deliver to NNL and Purchaser a written statement thereof (the "**Closing Statement**"), including the breakdown of items considered for calculation and the basis of such calculation in reasonable detail.

(b)   Disagreement Notice.  NNL, on the one hand, and Purchaser, on the other hand, shall be granted a thirty (30) day period to review the Closing Statement. In the event NNL, on the one hand, or the Purchaser, on the other hand, disagrees with the calculations in the Closing Statement, the party objecting to the calculation (the "**Objecting Party**") may, within such thirty (30) days after receipt of the Closing Statement, deliver to the other party a notice disagreeing with such calculations (the "**Disagreement Notice**"). The Disagreement Notice shall set forth, in reasonable detail, any disagreement with, and any requested adjustment to, the Closing Statement. If no party delivers the Disagreement Notice by the end of such thirty (30) days period, or if all parties deliver written confirmation of each of their respective acceptance of the Closing Statement within such thirty (30) days period, all of the parties shall be deemed to have accepted as final the Closing Statement delivered by the Company under Section 2.3(a) above. Throughout the periods during which the Closing Statement is being prepared and any disputes that may arise under this Section 2.3(b) are being resolved, Purchaser shall, in its capacity as a shareholder of the Company, promptly upon request by NNL or Purchaser, cause the Company to provide NNL and Purchaser and their respective representatives reasonable access to the information, books, records and personnel of the Company as may have been relied on by the Company in the preparation of the Closing Statement; provided that nothing herein shall require the Company (i) to incur any third- party costs to satisfy the Company's foregoing obligation and (ii) to disclose any information to any party hereto if such information disclosure would jeopardize any attorney-client or legal privilege or contravene any applicable Law, fiduciary duty or agreement, it being understood, that Purchaser shall



use its commercially reasonable efforts, in its capacity as a shareholder of the Company, to cause the Company to cooperate in any reasonable efforts and to request for waivers that would enable otherwise required disclosure to NNL and Purchaser or their respective representatives to occur without so jeopardizing privilege or contravening such Law, duty or agreement. The parties hereto shall negotiate in good faith to resolve any disagreement with respect to the Closing Statement, and any resolution agreed to in writing by the parties hereto shall be final and binding upon the parties hereto.

(c)     Dispute Resolution. If NNL, on the one hand, and Purchaser, on the other hand, are unable to resolve any disagreement as contemplated by Section 2.3(b) within thirty (30) days after delivery of a Disagreement Notice by any party hereto, the parties hereto shall jointly select an auditing firm of international reputation to serve as arbitrator (the "**Accounting Arbitrator**") to resolve such disagreement. The parties hereto shall instruct the Accounting Arbitrator to consider only those items and amounts set forth in the Closing Statement as to which the parties hereto have not resolved their disagreement and to conduct such hearings as it considers necessary to resolve such disagreement. The parties hereto shall use their reasonable efforts to cause the Accounting Arbitrator to deliver to each of the parties hereto as promptly as practicable (and in no event later than thirty (30) days after its appointment), a written report setting forth the resolution of any such disagreement determined in accordance with the terms of this Agreement. Such resolution shall be final and binding upon the parties hereto and the difference between the Reference Net Aggregate Liquidity and the Closing Net Aggregate Liquidity as determined pursuant to Sections 2.3(b) and (c), as the case may be, shall be deemed the "**Post-Closing Aggregate Liquidity Adjustment**" for the purpose of this Agreement. In the event the Accounting Arbitrator concludes that Purchaser was correct as to a majority (by monetary amount) of the disputed items, then NNL shall pay the Accounting Arbitrator's fees, costs and expenses. In the event the Accounting Arbitrator concludes that NNL was correct as to a majority (by monetary amount) of the disputed items, then Purchaser shall pay the Accounting Arbitrator's fees, costs and expenses.

(d)     Purchase Price Adjustment.

(i)     If the Closing Net Aggregate Liquidity is greater than the Reference Net Aggregate Liquidity, Purchaser shall pay to NNL the Post-Closing Adjustment Amount; and

(ii)     If the Closing Net Aggregate Liquidity is less than the Reference Net Aggregate Liquidity, NNL shall pay to Purchaser the Post-Closing Adjustment Amount.

In the case of either (i) or (ii) above, each of NNL and Purchaser, as applicable, shall transfer the relevant amount (less the applicable Capital Gains Tax and STT) in immediately available USD funds to an account designated by the Party that is entitled to receive payment, within (3) three Business Days after the final determination of Closing Net Aggregate Liquidity. For the avoidance of doubt, in case (ii) above, NNL shall pay the relevant amount to Purchaser less the amount of Capital Gains Tax and STT withheld on the Closing Date based on the Preliminary Purchase Price which corresponds to the Post-Closing Adjustment Amount.



**2.4    Closing**

The closing of the sale and purchase of the Purchased Shares (the "**Closing**") shall take place at a location to be notified by NNL to Purchaser, at 10:00 a.m. (local time) (i) on the last day of a calendar month following the satisfaction or waiver of the conditions set out in Section 5.1 and Section 5.2, other than conditions to be satisfied at the Closing, but subject to the waiver or fulfilment of these conditions, if such last day of a calendar month is a Business Day, (ii) if such last day of a calendar month is a non-Business Day, on the next Business Day following such last day of a calendar month, or (iii) at such other time or date as may be agreed upon by all parties. The date on which the Closing occurs is herein referred to as the "**Closing Date.**"

**2.5    Closing Deliveries**

(a)    Purchaser Deliveries. Purchaser shall deliver to NNL, at or prior to the Closing, each of the following:

(i)    Certificate, dated as of the Closing Date, in form and substance to the reasonable satisfaction of NNL, executed on behalf of Purchaser by a duly authorized officer of Purchaser, but without personal liability of the officer, to the effect that each of the conditions set forth in Section 5.2 has been satisfied; and

(ii)    Preliminary Purchase Price, less the applicable Capital Gains Tax and STT for the Purchased Shares, by wire transfer in immediately available funds to the account designated by NNL at least three Business Days prior to the Closing Date.

(b)    NNL Deliveries. NNL shall deliver to Purchaser, at or prior to the Closing, each of the following:

(i)    Certificate, dated as of the Closing Date, in form and substance to the reasonable satisfaction of Purchaser, executed on behalf of NNL by a duly authorized officer of NNL, but without personal liability of the officer, to the effect that each of the conditions set forth in Section 5.1 has been satisfied;

(ii)    Share certificates representing all of the Purchased Shares in the name of Purchaser;

(iii)    Certified copy of the register of shareholders of the Company evidencing the registration of Purchaser as a shareholder of the Company holding the Purchased Shares; and

(iv)    Written resignations of certain members of the board of directors of the Company as nominated by NNL under the Joint Venture Agreement and designated by Purchaser, each such resignation to be effective as of the Closing Date.

## ARTICLE 3 - REPRESENTATIONS AND WARRANTIES OF NNL

NNL represents and warrants to Purchaser, subject to the express exceptions set forth herein and in the NNL Disclosure Schedules, that each of the following representations and warranties of NNL shall be true and correct on and as of the date hereof and on and as of the Closing Date as though such representations and warranties were made on and as of such date (except for representations and warranties which address matters only as to a specified date, which representations and warranties shall be true and correct with respect to such specified date).

### 3.1    Due Incorporation

NNL is a corporation duly organized and validly existing under the laws of Canada.

### 3.2    Authority

(a)    Subject to the receipt of the Bankruptcy Consents, NNL has the requisite corporate power and corporate authority to enter into, deliver and perform its obligations pursuant to this Agreement and each of the Transaction Documents to which it is or will become a party.

(b)    Subject to the receipt of the Bankruptcy Consents, the execution, delivery and performance by NNL of this Agreement and the Transaction Documents to which NNL is or will be a party, has been duly authorized by all necessary corporate action on the part of NNL. Subject to receipt of the Bankruptcy Consents and assuming the due authorization, execution and delivery by Purchaser, this Agreement constitutes, and upon execution and delivery, the Transaction Documents to which NNL is or will be a party, will constitute, legal, valid and binding obligations of NNL, enforceable against NNL in accordance with their respective terms, subject to the effect, if any, of (i) the Canadian Insolvency Proceeding, (ii) applicable Laws relating to bankruptcy, reorganization, insolvency, moratorium, fraudulent conveyance or preferential transfers, and other similar laws affecting the rights of creditors generally, and (iii) as to enforceability, principles of equity (regardless whether such enforceability is considered a proceeding in equity or at law), including rules of Law governing specific performance, injunctive relief and other equitable remedies.

### 3.3    No Conflict

Except as set forth in Section 3.3 of the NNL Disclosure Schedules and except as may result from any facts or circumstances relating to Purchaser or its Affiliates, the execution, delivery and performance by NNL of this Agreement and the Transaction Documents to which NNL is or will be a party and the consummation by NNL of the transactions contemplated herein and therein will not conflict with, or result in any violation of or default under (with or without notice or lapse of time, or both), or give rise to a right of termination, cancellation or acceleration of any obligation or loss of any benefit under, or require any consents, approvals or authorizations from any Person (other than the Bankruptcy Consents) under the terms, conditions or provisions of (i) any Law or Governmental Order to which NNL or its Affiliates is subject or by which they are bound or (ii) NNL's charter or



bylaws or other equivalent organizational documents except, in the case of clause (i), for such defaults, violations, actions and notifications have not had or that would not, and would not reasonably be expected to, individually or in the aggregate, have a Material Adverse Effect on NNL.

**3.4        Governmental Approvals**

No material consent, approval, authorization or other action by, or any material filings with or notifications to, any Governmental Authority is or will be necessary for the valid execution, delivery and performance by NNL of this Agreement and the Transaction Documents to which NNL is or will be a party or the consummation by NNL of the transactions contemplated herein and therein, except (a) the Governmental Approvals set forth in Section 3.4 of the NNL Disclosure Schedules, (b) where such failure to obtain such consent, approval, authorization or action or to make such filing or notification would not prevent the consummation by NNL of the transactions contemplated by, or the performance by NNL of any of its material obligations under, this Agreement and the Transaction Documents to which NNL is or will be a party, or (c) as may be necessary as a result of any facts or circumstances relating to Purchaser or its Affiliates.

**3.5        Capitalization; Due Incorporation of the Company**

(a)        As of the date hereof, the authorized capital stock of the Company consists of 2,000,006 shares, with a par value of 5,000 Korean Won per share, of which 236,000 shares of common stock and 4 shares of contingent voting preferred stock are issued and outstanding.

(b)        Upon consummation of the transactions contemplated by this Agreement, no Person will have any right to acquire shares or options, warrants or other rights to purchase shares or other equity securities of the Company, from the Company or, to the Knowledge of NNL, from any shareholder, other than statutory pre-emptive rights. There are no rights or Contracts to which the Company is a party or by which the Company is bound obligating the Company to repurchase or redeem, or cause to be repurchased or redeemed, any shares, or options, warrants or other rights to purchase shares, or other equity securities of the Company, or obligating the Company to grant, extend, accelerate the vesting and/or repurchase rights of, change the price or terms of, or otherwise amend or enter into any such option, warrant, call, right or Contract. Upon the consummation of the transactions contemplated hereby, there will be no Contracts relating to voting, purchase or sale of any shares between or among the Company and any of its shareholders.

(c)        No bonds, debentures, notes or other indebtedness of the Company (i) having the right to vote on any matters on which shareholders may vote (or which is convertible into, or exchangeable for, securities having such right) or (ii) the value of which is any way based upon or derived from capital or voting shares of the Company, is issued or outstanding as of the date hereof and as of the Closing Date.

(d)        The Company is a corporation duly organized and validly existing under the laws of Korea. The Company is qualified to do business and to own and operate its assets as now conducted in each jurisdiction in which its ownership of property or conduct of business requires it to so qualify, except where such failure would not, and would not reasonably be expected to, individually or in the aggregate, have a Material Adverse Effect on the Company.



**3.6     Purchased Shares**

The Purchased Shares are owned by NNL, beneficially and of record, free and clear of any Lien other than Permitted Encumbrances, and are duly authorized, validly issued, fully paid and non-assessable.  Subject to the receipt of the Bankruptcy Consents, NNL has the right, power and authority to sell and deliver the Purchased Shares to Purchaser.  Upon delivery of and payment for the Purchased Shares as provided herein, NNL will convey to Purchaser good and valid title thereto, free and clear of any Lien.

**3.7     Actions**

Other than the Canadian Insolvency Proceeding, there is no pending or, to the Knowledge of NNL, threatened Action against NNL that challenges or seeks to prevent, enjoin or materially delay consummation of the transactions contemplated by this Agreement.

**3.8     No Other Representations**

EXCEPT FOR THE REPRESENTATIONS AND WARRANTIES CONTAINED IN THIS ARTICLE 3 (AS MODIFIED BY THE NNL DISCLOSURE SCHEDULES)) AND IN THE TRANSACTION DOCUMENTS, NNL MAKES NO OTHER EXPRESS OR IMPLIED REPRESENTATION OR WARRANTY WITH RESPECT TO NNL, THE PURCHASED SHARES, THE COMPANY, THE RESPECTIVE BUSINESS OF NNL OR THE COMPANY OR THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT, AND ANY OTHER RIGHTS OR OBLIGATIONS TO BE TRANSFERRED HEREUNDER OR PURSUANT HERETO, AND NNL DISCLAIMS ANY OTHER REPRESENTATIONS OR WARRANTIES, WHETHER MADE BY NNL OR ANY OF ITS AFFILIATES, OFFICERS, DIRECTORS, EMPLOYEES, AGENTS OR REPRESENTATIVES.     EXCEPT     FOR     THE     REPRESENTATIONS     AND WARRANTIES CONTAINED IN THIS ARTICLE 3 (AS MODIFIED BY THE NNL DISCLOSURE SCHEDULES) OR IN THE TRANSACTION DOCUMENTS, NNL HEREBY DISCLAIMS ALL LIABILITY AND RESPONSIBILITY FOR ANY REPRESENTATION, WARRANTY, PROJECTION, FORECAST, STATEMENT, OR INFORMATION MADE, COMMUNICATED, OR FURNISHED (ORALLY OR IN WRITING) TO PURCHASER OR ITS AFFILIATES OR REPRESENTATIVES.


**ARTICLE 4 - REPRESENTATIONS AND WARRANTIES OF PURCHASER**

Purchaser hereby represents and warrants to NNL, subject to the express exceptions set forth herein and in Purchaser Disclosure Schedules, that each of the following representations and warranties of Purchaser shall be true and correct on and as of the date hereof and on and as of the Closing Date as though such representations and warranties were made on and as of such date (except for representations and warranties which address matters only as to a specified date, which representations and warranties shall be true and correct with respect to such specified date).

**4.1     Due Incorporation**

Purchaser is a corporation duly organized and validly existing under the laws of Sweden.

**4.2    Authority**

(a)    Purchaser has the requisite corporate power and corporate authority to enter into, deliver and perform its obligations pursuant to this Agreement and the Transaction Documents to which it is or will become a party.

(b)    The execution, delivery and performance by Purchaser of this Agreement and the Transaction Documents to which Purchaser is or will be a party, has been duly authorized by all necessary corporate action on the part of Purchaser. Assuming the due authorization, execution and delivery by NNL, this Agreement constitutes, and upon execution and delivery, the Transaction Documents to which Purchaser is or will be a party, will constitute, legal, valid and binding obligations of Purchaser, enforceable against Purchaser in accordance with their respective terms, subject to the effect, if any, of (i) applicable Laws relating to bankruptcy, reorganization, insolvency, moratorium, fraudulent conveyance or preferential transfer and other similar laws affecting the rights of creditors generally and (ii) as to enforceability, principles of equity (regardless whether such enforceability is considered a proceeding in equity or at law), including rules of Law governing specific performance, injunctive relief and other equitable remedies.

**4.3    No Conflict**

Except as set forth in Section 4.3 of the Purchaser Disclosure Schedules and except as may result from any facts or circumstances relating to NNL or its Affiliates, the execution, delivery and performance by Purchaser of this Agreement and the Transaction Documents to which Purchaser is or will be a party and the consummation by Purchaser of the transactions contemplated herein and therein will not conflict with, or result in any violation of or default under (with or without notice or lapse of time, or both), or give rise to a right of termination, cancellation or acceleration of any obligation or loss of any benefit under, or require any consents, approvals or authorizations from any Person under the terms, conditions or provisions of (i) any Law or Governmental Order to which Purchaser or its Affiliates is subject or by which they are bound or (ii) Purchaser's charter or bylaws or other equivalent organizational documents, except, in the case of clause (i), for such defaults, violations, actions and notifications have not had or that would not, and would not reasonably be expected to, individually or in the aggregate, have a Material Adverse Effect on the Purchaser.

**4.4    Governmental Approvals**

No material consent, approval, authorization or other action by, or any material filings with or notifications to, any Governmental Authority is or will be necessary for the valid execution, delivery and performance by Purchaser of this Agreement and the Transaction Documents to which Purchaser is or will be a party or the consummation by Purchaser of the transactions contemplated herein and therein, except (a) the Governmental Approvals set forth in Section 4.4 of the Purchaser Disclosure Schedules, (b) where such failure to obtain such consent, approval, authorization or action or to make such filing or notification would not prevent the consummation by Purchaser of the transactions contemplated by, or the performance by Purchaser of any of its material obligations under this Agreement and the Transaction Documents to which Purchaser is or will be a party, or (c) as may be necessary as a result of any facts or circumstances relating to NNL or its Affiliates.



**4.5**     **Actions**

There is no pending or, to the Knowledge of Purchaser, threatened Action against Purchaser that challenges or seeks to prevent, enjoin or materially delay consummation of the transactions contemplated by this Agreement.

**4.6**     **Financial Capability**

Purchaser has, as of the date hereof, and will have as of the Closing (i) sufficient immediately available funds for purposes of funding the transactions contemplated herein and any other amount due hereunder or in respect hereof, including the full amount of the Purchase Price and any expenses incurred by Purchaser in connection with the transactions contemplated by this Agreement, and (ii) the resources and capabilities (financial or otherwise) to perform its obligations hereunder. Purchaser has not, as of the date hereof, and will not have, as of the Closing Date, incurred any obligation, commitment, restriction or liability of any kind, which would materially impair or adversely affect such resources and capabilities necessary for the funding of the transactions contemplated herein. Notwithstanding anything to the contrary herein, Purchaser's obligations to consummate the transactions contemplated by this Agreement are not conditioned or contingent in any way upon the receipt of financing from any Person.

**4.7**     **Investment Intent**

Purchaser is acquiring the Purchased Shares as an investment for its own account and not with a view to the distribution thereof.

## ARTICLE 5 - CONDITIONS TO CLOSING

**5.1**     **Conditions to Obligations of Purchaser**

The obligations of Purchaser to consummate the transactions contemplated hereby shall be subject to the fulfilment at or prior to the Closing of each of the following conditions, any of which may be waived, in writing, by Purchaser:

(a)     Each of the representations and warranties of NNL set forth in Article 3 hereof shall be true and correct on and as of the date hereof and on and as of the Closing Date as though such representations and warranties were made on and as of such date (except for representations and warranties which address matters only as to a specified date, which representations and warranties shall be true and correct with respect to such specified date).

(b)     NNL shall have performed and complied in all material respects with its covenants, obligations, conditions and agreements contained in this Agreement that are required to be performed and complied with by NNL on or before the Closing.

(c)     NNL shall have obtained and delivered evidence reasonably satisfactory to Purchaser to demonstrate that all material consents, approvals, authorizations or other action by, and any material filings with or notifications to, any Governmental Authority



required to be obtained or made by NNL on or before the Closing in connection with the transactions contemplated by this Agreement, including, in the case of NNL, the Bankruptcy Consents and the share transfer report under the Foreign Investment Promotion Law of Korea, have been obtained or made, as the case may be, and Purchaser shall have obtained the FTC Clearance.

(d)     All consents under the Key Material Agreements as required under Section 6.5 shall have been obtained.

(e)     Purchaser shall have received certified copies of corporate resolutions of NNL authorizing the execution, delivery and performance of this Agreement and the Transaction Documents.

(f)     The waiver of the right of first refusal and co-sale right granted to LGE under the Joint Venture Agreement (the "**LGE Waiver**"), which is contemplated in the Termination Agreement, shall have become effective.

(g)     The closing conditions under the New Joint Venture Agreement as identified in Annex-1 shall have been satisfied or waived.

(h)     Purchaser shall have received each of the items described in Section 2.5(b) on or before the Closing.

(i)     There shall be in effect no Law, order, injunction, decree or judgment of any court or other Governmental Authority in Sweden, Canada or Korea prohibiting the consummation of the transactions contemplated hereby, and there shall not be any proceedings pending by any Governmental Authority in Sweden, Canada or Korea seeking such prohibition.

## 5.2     Conditions to Obligations of NNL

The obligations of NNL to consummate the transactions contemplated hereby shall be subject to the fulfilment at or prior to the Closing of each of the following conditions, any of which may be waived, in writing, by NNL:

(a)     Each of the representations and warranties of Purchaser set forth in Article 4 hereof shall be true and correct on and as of the date hereof and on and as of the Closing Date as though such representations and warranties were made on and as of such date (except for representations and warranties which address matters only as to a specified date, which representations and warranties shall be true and correct with respect to such specified date).

(b)     Purchaser shall have performed and complied in all material respects with all covenants, obligations, conditions and agreements contained in this Agreement that are required to be performed and complied with by Purchaser on or before the Closing.

(c)     Purchaser shall have obtained and delivered evidence reasonably satisfactory to NNL to demonstrate that all material consents, approvals, authorizations or other action by, and any material filings with or notifications to, any Governmental Authority required to be obtained or made by Purchaser on or before the Closing in



connection with the transactions contemplated by this Agreement, including the FTC Clearance.

(d)　　NNL shall have received certified copies of corporate resolutions of Purchaser authorizing the execution, delivery and performance of this Agreement and the Transaction Documents.

(e)　　NNL shall have received each of the items described in Section 2.5(a) on or before the Closing.

(f)　　There shall be in effect no Law, order, injunction, decree or judgment of any court or other Governmental Authority in Sweden, Canada or Korea prohibiting the consummation of the transactions contemplated hereby, and there shall not be any proceedings pending by any Governmental Authority in Sweden, Canada or Korea seeking such prohibition.

(g)　　The closing conditions under the New Joint Venture Agreement as identified in Annex-1 shall have been satisfied or waived.

(h)　　The transactions contemplated by the Termination Agreement shall have been consummated.

(i)　　The Bankruptcy Consents shall have been obtained.


## ARTICLE 6 – COVENANTS

### 6.1　　Conduct of Business

With the exceptions of any actions which are necessary for consummation of the transactions contemplated herein or in the new Joint Venture Agreement, from the date hereof through the Closing Date, unless prior written consent of Purchaser is obtained (which consent shall not be unreasonably withheld or delayed), NNL, in its capacity as a shareholder of the Company, shall use its commercially reasonable efforts consistent with normal business practice for a shareholder, to ensure that the Company shall:

(a)　　conduct its operations according to its ordinary and usual course of business and consistent with past practice;

(b)　　not (i) amend the articles of incorporation or bylaws or other equivalent organizational documents of the Company, (ii) change the number of authorized or issued shares of the Company, (iii) issue new or additional shares of the Company, (iv) directly or indirectly redeem, purchase or otherwise acquire any of the shares of the Company or effect a split, reclassification or other change in or of any of the shares of the Company, (v) declare, set aside or pay any dividend or other distribution with respect to the shares of the Company, and (vi) sell or grant any options to purchase the shares of the Company; provided that for subsections (iv) and (v), the Company shall be permitted to repurchase certain shares of capital stock held by NNL and LGE as of the date hereof in exchange for a cash distribution as provided in Section 2.1 above upon obtaining consent of Purchaser;



(c)      not (i) make any material changes to the compensation or benefits payable to the officers and employees of the Company, (ii) dismiss any officer or employee of the Company, except to the extent such dismissal is required due to a violation of business ethics or applicable Laws, or (iii) engage or appoint any senior executives;

(d)      not, to the extent not within the ordinary course of business, (i) make any purchases, sales or transfers of any material assets, (ii) enter into any material leases, contracts, loan agreements, share purchase agreements or commitments, (iii) incur any material capital expenditure, (iv) grant any Liens on any material assets, (v) terminate any Material Agreement (other than the Joint Venture Agreement and any ancillary agreements to be terminated pursuant to the Termination Agreement), (vi) carry out any material structural alteration or addition to, or materially effecting any change of use of any property, (vii) agree any new rent or fee payable under any lease, tenancy or licence which is material to the Company, and (viii) apply for any planning permission or implement any planning permission already obtained but not implemented;

(e)      not (i) take steps to procure payment by any debtor generally in advance of the date on which book and other debts are usually payable in accordance with the standard terms of business of the Company or (if different) the period extended to any particular debtor in which to make payment and (ii) delay making payment to any trade creditors generally beyond the date on which payment of the relevant trade debt should be paid in accordance with credit period authorised by the relevant creditors (or (if different) the period extended by creditors in which to make payment);

(f)      procure that all existing insurance policies remain in force in accordance with their respective terms and conditions and in all material respects on the same terms and similar level of cover prevailing at the date of this Agreement; and

(g)      not make any material changes in the Company's accounting practices or procedures.

**6.2      Access to Information**

(a)      Prior to the Closing Date, NNL shall, in its capacity as a shareholder of the Company, cause the Company, upon reasonable advance notice from Purchaser and during regular business hours, to permit Purchaser and its officers, employees and authorized agents, accountants, counsel, and representatives, whose identification has been notified by Purchaser to NNL and the Company in advance, to examine the books, records and financial condition of the Company and to have reasonable access to the offices, properties, plants, other facilities of the Company and to those officers, directors, employees, agents, accountants and counsel of the Company who have any knowledge relating to the Company or its business, and shall use its commercially reasonable efforts  in its capacity as a shareholder of the Company to cause the Company to furnish to the officers, employees and authorized agents, accountants, counsel, and representatives of Purchaser, whose identification has been notified by Purchaser to NNL and the Company in advance, such additional financial and operating data and other information regarding the assets, properties and goodwill of the Company and its business as Purchaser may from time to time reasonably request. Any such examination and access shall be conducted at reasonable times and under reasonable circumstances, and NNL shall use its commercially reasonable



efforts in its capacity as a shareholder of the Company to cause the Company to cooperate fully therein.

(b)  Notwithstanding anything in this Agreement to the contrary, NNL shall not be required, prior to the Closing, to disclose, or cause or seek to cause the disclosure of, to Purchaser or its Affiliates (or provide access to any properties, books or records of the Company or any of its Affiliates that would reasonably be expected to result in the disclosure to such persons or others of) any confidential information relating to trade secrets, proprietary know-how, processes or patent, trademark, trade name, service mark or copyright applications or product development, or pricing and marketing plans, any information prohibited from disclosure pursuant to Contract (to which the Company is a party) or Law, nor shall NNL be required to permit or cause or seek to cause others to permit Purchaser or its Affiliates to have access to or to copy or remove from the properties of the Company or any of its Affiliates any documents, drawings or other materials that might reveal any such confidential information.

## 6.3    Canadian Bankruptcy Actions

(a)  As promptly as practicable, and subject to its rights and obligations set forth in the Canadian Sales Process Order, NNL shall file with the Canadian Court one or more motions (the "**Canadian Approval and Vesting Order Motion**") seeking to obtain entry of the Canadian Approval and Vesting Order.

(b)  Purchaser and NNL shall cooperate with filing and prosecuting the Canadian Approval and Vesting Order Motion and in obtaining entry of the Canadian Approval and Vesting Order, and NNL shall deliver to Purchaser prior to filing, and as early in advance as is practicable to permit adequate and reasonable time for Purchaser and its counsel to review and comment, copies of all proposed pleadings, motions, notices, statements, applications, reports and other material papers to be filed by NNL in connection with such motions and relief requested therein and any challenges thereto.

(c)  If the Canadian Approval and Vesting Order or any other order of the Canadian Court relating to this Agreement shall be appealed by any Person (or a motion for rehearing, re-argument or stay shall be filed with respect thereto), NNL agrees to, and to cause its Affiliates to take all reasonable steps and use its commercially reasonable efforts, including incurring reasonable expenses, to defend against such appeal or motion, and Purchaser agrees to use commercially reasonable efforts to cooperate in such efforts. Each of NNL and Purchaser hereby agrees to take all reasonable steps, and use its commercially reasonable efforts, to obtain an expedited resolution of such appeal; provided, however, that, subject to the conditions set forth herein, nothing in this Section shall preclude the parties from consummating the transactions contemplated hereby if the Canadian Approval and Vesting Order shall have been entered and shall not have been stayed, modified, revised or amended.

(d)  NNL undertakes to Purchaser to notify Purchaser in writing, before the Closing, as soon as possible (but in any event within three (3) Business Days) after becoming aware of (i) any change, revision, modification, supplementation, cancellation, or revocation of the Canadian Sales Process Order, (ii) the entry of the Canadian Approval and Vesting Order and receipt of other consents, approval or authorization from the Canadian Court, in connection with the transactions contemplated hereby and in the Transaction



Documents to which NNL is or will be a party, and (iii) any pleadings, motions, notices, statements, applications, reports and other material papers which have been filed by any creditor of NNL and/or its Affiliates in connection with the Canadian Approval and Vesting Order, or the execution, delivery, or performance of this Agreement or the Transaction Documents to which NNL is a party, or the consummation of the transactions contemplated hereby.

(e)     Each party shall bear its own costs and expenses that may be incurred in connection with the activities and obligations described in this Section 6.3.

## 6.4    Regulatory Approvals

(a)     Subject to the terms and conditions set forth in this Agreement and the Confidentiality Agreement, each of the parties shall take promptly, or cause to be taken, all actions, and to do promptly, or cause to be done, and to assist and cooperate with the other parties in doing all things necessary, proper or advisable under applicable Laws to obtain all necessary consents, approvals, authorizations or other actions by the Governmental Authorities, or making any filing with or notification to the Governmental Authorities, including the FTC Clearance and the making of all necessary filings and the taking of all steps as may be necessary to obtain an approval or waiver from, or to avoid an action or proceeding by, any Governmental Authorities, including those identified in Schedule 6.4(a) attached hereto.

(b)     For purposes of Section 6.4(a) above, any action, assistance and/or cooperation shall include any measures, regardless of the costs involved, that may be required to avoid or eliminate any impediments to, or facilitate, obtaining the consents, approvals, authorizations from any Governmental Authority or to make any material filings with or notifications to any Governmental Authority or to satisfy or accept any conditions that may be imposed by the Governmental Authorities on such consent, authorization, approval, filing or notification, unless otherwise expressly agreed to in writing by the parties hereto; provided that (i) any action, assistance and/or cooperation as to NNL shall be subject to and pursuant to the Canadian Insolvency Proceeding, (ii) any action, assistance and/or cooperation by the Company that will or is reasonably likely to alter the Company's structure, business, product lines, practices, capitalization or operations shall be subject to LGE's prior written consent, which consent shall not be unreasonably withheld or delayed, (iii) any reasonable costs that may be incurred by the Company directly in connection with any action, assistance and/or cooperation by the Company that will or is reasonably likely to alter the Company's structure, business, product lines, practices, capitalization or operations for which the Company seeks reimbursement from NNL shall be subject to NNL's prior written consent, which consent shall not be unreasonably withheld or delayed, (iv) any reasonable costs that may be incurred by the Company directly in connection with any action, assistance and/or cooperation by the Company that will or is reasonably likely to alter the Company's structure, business, product lines, practices, capitalization or operations for which the Company seeks reimbursement from Purchaser shall be subject to Purchaser' prior written consent, which consent shall not be unreasonably withheld or delayed, and (v) any third-party costs incurred by the Company to assist in obtaining the consents, approvals, authorizations, filings and notifications as described herein shall be reimbursed by NNL or Purchaser, as the case may be, only to the extent such costs have been specifically approved by NNL or Purchaser, as the case may be.



### 6.5    Third-Party Consents

At or prior to the Closing, NNL shall use its commercially reasonable efforts in its capacity as a shareholder of the Company to cause the Company to obtain any consents, approvals or authorizations from a third party under the Material Agreements that is necessary or required to complete the transactions contemplated herein, on terms reasonably satisfactory to Purchaser. At or prior to the Closing, NNL shall cause the Company to obtain any and all consents, approvals or authorizations under the Key Material Agreements that is necessary or required to complete the transactions contemplated herein, on terms reasonably satisfactory to Purchaser. For the avoidance of doubt, the parties hereto agree that (i) obtaining the foregoing consents, approvals or authorizations (other than the Key Material Agreements and the LGE Waiver) shall not be a condition precedent to the Closing and (ii) the Company shall not be required to pay consideration or take on obligations outside the terms and conditions of the Material Agreements in effect as of the date hereof; provided that if the Company chooses to pay such consideration or take on such obligations, prior written consent from NNL and Purchaser shall be required.

### 6.6    Disclosure Schedules

The respective representations and warranties made by NNL and Purchaser in Article 3 and Article 4, respectively, are qualified by the facts and circumstances disclosed in the NNL Disclosure Schedules and the Purchaser Disclosure Schedules, respectively.

### 6.7    Confidentiality

(a)    NNL and Purchaser acknowledge that they have previously executed a non-disclosure agreement dated July 31, 2009 (the "**Confidentiality Agreement**"), which shall continue in full force and effect (and the confidentiality obligations thereunder shall be binding upon Purchaser and its Affiliates, officers, directors, employees and representatives as if parties thereto) in accordance with its terms; provided that upon Closing, the Confidentiality Agreement shall terminate. If, for any reason, the Closing does not occur, the Confidentiality Agreement shall continue in full force and effect in accordance with its terms.

(b)    After the date hereof, each of NNL and Purchaser shall treat as strictly confidential and not disclose or use any information received or obtained in connection with or as a result of entering into this Agreement (or any other agreement entered into pursuant to this Agreement) which relates to the negotiations relating to this Agreement (and any such other agreements).

(c)    This Section 6.7 shall not prohibit disclosure or use of any information if and to the extent:

(i)    the disclosure or use is required by applicable Law, any Governmental Authority or any applicable stock exchange;

(ii)    the disclosure or use is required for any judicial proceedings arising out of this Agreement or any other agreement entered into under or pursuant to this Agreement, including in order to obtain the Bankruptcy Consents, or the disclosure is made to a Tax Authority in connection with the Tax affairs of the disclosing party;

21

(iii)     the disclosure is made to professional advisers of any of the parties; provided that the disclosing party shall have advised its professional advisers of the confidential nature of the information and the terms and conditions of the Confidentiality Agreement and of this Section 6.7 and the disclosing party agrees to be responsible for any breach of the Confidentiality Agreement or Section 6.7 hereof by its professional advisers;

(iv)     the information is or becomes publicly available (other than by breach of the Confidentiality Agreement or of this Agreement); or

(v)     as disclosed to the Unsecured Creditors Committee, the Ad-Hoc Bondholders Committee, the Monitor, the Government of Ontario and the Court-appointed Counsel to the Former Employees of NNL.

provided, however, that prior to disclosure or use of any information pursuant to Section 6.7(c)(i) or (ii), the party concerned shall promptly notify and consult with the other parties to which the confidential information relates, of such requirement with a view to providing such other party with the opportunity to (x) contest such disclosure or use or (y) otherwise to consult and agree on the timing and content of such disclosure or use.

(d)     Promptly following the date hereof, the parties agree that a press release shall be issued regarding the execution of this Agreement, and the parties shall agree on, and submit for LGE's consent, which consent shall not be unreasonably withheld, the contents of such press release prior to its issuance.  Following the issuance of such initial press release, none of NNL or Purchaser shall make any press release or other public announcement concerning the transactions contemplated by this Agreement, except as may be required by applicable Law or the rules of an applicable stock exchange, without the prior written consent of the other party and LGE, which consent shall not be unreasonably withheld.  If it is determined that disclosure is required by applicable Law or the rules of an applicable stock exchange, the disclosing party shall send notice to the other party, accompanied by the text of the proposed disclosure, as far in advance as practicable, so that the other party may comment on the proposed disclosure and make reasonable revisions thereto.

## 6.8     Notice of Breach

Each party shall give the other parties prompt notice of any event, condition or circumstance occurring from the date hereof through the Closing Date that would constitute a material breach of any representation, warranty, covenant or other agreement of such party contained in this Agreement.

## 6.9     Transaction Taxes

(a)     Each party hereto shall be responsible for the payment of any and all Tax for which it may be liable under the Laws of each applicable jurisdiction.

(b)     Notwithstanding the foregoing, Purchaser will withhold, to the extent required by the Laws of Korea, any and all Capital Gains Tax payable on the Purchase Price and STT payable on the Purchase Price for timely payment and discharge of any such or related Tax liability with the relevant Tax Authority of Korea.  Purchaser shall promptly



furnish NNL a copy of the receipts of the payments of such Tax as issued by the applicable Tax Authorities.

(c)    All sums payable under this Agreement shall be free and clear of any deductions, withholdings, set-offs or counterclaims of any Tax, except for the withholding of the Capital Gains Tax and STT, as may be applicable to NNL.  The amount of Capital Gains Tax and STT on the Preliminary Purchase Price which is agreed between the parties hereto is set forth in Schedule 6.9(c) attached hereto.

## 6.10    Further Assurances

Subject to Section 6.4, prior to the Closing, upon the terms and subject to the conditions of this Agreement, each party shall use its respective commercially reasonable efforts to take, or cause to be taken, all actions and to do, or cause to be done, and cooperate with each other in order to do, all things necessary, proper or advisable under applicable Law to consummate the transactions contemplated by this Agreement as soon as practicable and cause the fulfilment at the earliest practicable date of all of the conditions to the other parties' obligations to consummate the transactions contemplated by this Agreement, including using their respective commercially reasonable efforts in connection with: (i) the preparation and filing of all forms, registrations and notices required to be filed to consummate the Closing and the taking of such actions as are necessary to obtain any requisite consent, approval or authorization, or to make any requisite filing or notification; provided, that subject to Section 6.4, neither NNL nor Purchaser shall be obligated to make any requisite filing or notification (other than filing and payment of application fees to Governmental Authorities), (ii) defending all lawsuits and other proceedings by or before any Governmental Authority challenging this Agreement or the consummation of the Closing, and (iii) causing to be lifted or rescinded any injunction, decree, ruling, order or other action of any Governmental Authority that would prohibit, prevent, restrict or materially delay consummation of the transactions contemplated by this Agreement.

## 6.11    Ancillary Agreements

NNL shall use its commercially reasonable efforts to enter into, or shall use its commercially reasonably efforts to cause its Affiliates to enter into, amendments to the existing ancillary agreements between NNL and the Company as listed in Annex-2 at or prior to the Closing.

## 6.12    Seconded Officers and Employees

On or prior to the Closing Date, the Parties shall work together to agree on a post-closing plan and mechanism on whether and how to retain, relocate, discharge, or provide other arrangements to the officers and employees of the Company who have been seconded from NNL.

## 6.13    Exclusivity

During the period from the date hereof and continuing until the Closing Date, NNL shall not (directly or indirectly) (i) enter into or participate in discussions or negotiations in connection with any proposed sale of the shares of the Company, or any of them, or of the business or any part of the business of the Company to any Person except Purchaser or LGE, or (ii) solicit or encourage any Person other than Purchaser to make any proposal or offer

