with regard to the shares or assets of the Company or entertain any such proposal or offer from any other Person (whether solicited or not) or (iii) enter into any agreement or arrangement with any Person (other than Purchaser or LGE) with respect to any such proposal or offer or (iv) give or make available any information to any Person other than LGE (not being information publicly available) relating to the Company for the purposes of facilitating any of the foregoing or otherwise than in the ordinary course of business.

## ARTICLE 7 - TERMINATION; EFFECT OF TERMINATION

### 7.1    Termination

This Agreement may be terminated prior to the Closing as follows:

(a)    by mutual written consent of Purchaser and NNL;

(b)    by any party if any permanent injunction or other order of a Governmental Authority preventing the consummation of the transactions contemplated herein has become final and nonappealable;

(c)    by any party if any of the conditions precedent set out in Article 5 is or becomes impossible to fulfil (other than through the failure of the party seeking to terminate the Agreement to comply with its obligations under this Agreement) and such condition is not waived;

(d)    by Purchaser, if NNL shall have breached, in any material respect, any of its respective representations, warranties, covenants or other obligations under this Agreement and such breach shall be incapable of cure or has not been cured within ten Business Days following the giving of written notice of such breach by Purchaser to NNL; provided, however, that the right to terminate this Agreement pursuant to this Section 7.1(d) shall not be available to Purchaser where a breach of this Agreement by Purchaser has been the cause of, or has resulted in, the event or condition giving rise to a right to terminate this Agreement pursuant to such clause;

(e)    by NNL, if Purchaser shall have breached, in any material respect, any of its respective representations, warranties, covenants or other obligations under this Agreement and such breach shall be incapable of cure or has not been cured within ten Business Days following the giving of written notice of such breach by NNL to Purchaser; provided, however, that the right to terminate this Agreement pursuant to this Section 7.1(e) shall not be available to NNL where a breach of this Agreement by NNL has been the cause of, or has resulted in, the event or condition giving rise to a right to terminate this Agreement pursuant to such clause;

(f)    by any of Purchaser or NNL, if the Closing shall not have been consummated on or before August 31, 2010; provided, however, that the right to terminate this Agreement pursuant to this Section 7.1(f) shall not be available (x) to any party whose breach of any provision of this Agreement results in the failure of the Closing to be consummated by such time or (y) if the inability to consummate the Closing is due to a



pending FTC Clearance review of the transactions contemplated under this Agreement by the relevant Governmental Authorities as provided in this Agreement; or

(g)     by either party, if the FTC Clearance is not obtained within 5 months after the date hereof.

## 7.2     Effect of Termination

Upon termination of this Agreement in accordance with Section 7.1, except for the provisions of Articles 1 and 8 and Sections 6.7, and 7.2, which shall survive termination, this Agreement shall become void and have no effect and no party to this Agreement shall have any liability to any of the other party or its respective successors and permitted assigns, officers, directors, partners, members, shareholders, representatives, agents and employees; provided, however, that nothing herein shall relieve any party from liability as a result of (i) failure to perform its obligations pursuant to Section 6.7 or (ii) any breach of this Agreement by gross negligence or wilful action or inaction of such party or failure by gross negligence or wilful action or inaction of such party to perform its obligations under this Agreement. Notwithstanding any such termination, the provisions of the Confidentiality Agreement shall continue in full force and effect; provided that notwithstanding the term of the Confidentiality Agreement as set forth therein, the obligations under the Confidentiality Agreement shall continue to be in effect until the second anniversary of the termination of this Agreement.


## ARTICLE 8 - GENERAL PROVISIONS


## 8.1     Entire Agreement; Amendments; Waiver

(a)     This Agreement (when executed and delivered), the Transaction Documents, the Exhibits, the NNL Disclosure Schedules, the Purchaser Disclosure Schedules and the other schedules referred to herein and the Confidentiality Agreement contain the entire understanding of the parties hereto with regard to the subject matter contained herein or therein, and supersede all prior agreements, understandings or intents between the parties hereto with respect to such subject matter.

(b)     No amendment, modification or waiver of this Agreement shall be binding or effective for any purpose unless it is made in writing signed by the party against whom enforcement of such amendment, modification or waiver is sought.  No course of dealing between the parties hereto shall be deemed to modify, amend or discharge any provision or term of this Agreement.

(c)     No delay by any party to this Agreement in the exercise of any of its rights or remedies shall operate as a waiver thereof, and no single or partial exercise by any party hereto of any such right or remedy shall preclude any other or further exercise thereof.  A waiver of any right or remedy on any one occasion shall not be construed as a bar to or waiver of any such right or remedy on any other occasion.



**8.2    Survival of Representations and Warranties**

No representations or warranties, covenants or agreements in this Agreement or in any certificate or other writing delivered pursuant hereto or in connection herewith shall survive the Closing Date, except for covenants and agreements that by their terms are to be satisfied after the Closing Date, which shall include the confidentiality obligation under Section 6.7(b) above, which covenants and agreements shall survive until satisfied in accordance with their terms.

**8.3    Successors and Assigns; Benefit**

(a)     The rights of any party under this Agreement shall not be assignable by such party without the written consent of the other party, which consent shall not be unreasonably withheld, delayed or conditioned; provided, however, that (i) NNL may assign or transfer this Agreement as may be required pursuant to the Canadian Insolvency Proceeding, and (ii) Purchaser may, without the consent of the other party, assign any or all of its rights and delegate or transfer any or all of its obligations under this Agreement to any of its Affiliates, provided Purchaser shall remain jointly and severally liable with any such Affiliate.  Any attempted assignment in violation of this Section 8.3 shall be void.

(b)     Unless otherwise provided in this Agreement, this Agreement is for the sole benefit of the parties hereto and their permitted assigns and successors and nothing in this Agreement, express or implied, shall give or be construed to give to any Person, other than the parties hereto and such permitted assigns and successors, any legal or equitable rights hereunder.

**8.4    Costs/Expenses**

Except as otherwise specifically provided herein, all fees and expenses incurred in connection with this Agreement and the Transaction Documents and the transactions contemplated hereby and thereby shall be paid by the party incurring such fees and expenses, including all fees and expenses of agents, representatives, investment bankers, financial advisors, counsel and accountants, whether or not the Closing has occurred or this Agreement is terminated.

**8.5    Notices**

(a)     Any notice or other communication in connection with this Agreement (each, a "**Notice**") shall be in writing and delivered by hand, e-mail, facsimile, pre-paid first class post or courier using an internationally recognized courier company.

(b)     Notice to NNL shall be sent to the following address, or such other person or address as NNL may notify Purchaser from time to time:

> 5945 Airport Road, Suite 360
> Mississauga, Ontario, Canada L4V1R9
> Attention:  Anna Ventresca, General Counsel & Corporate Secretary
> Facsimile: +1-905-863-7386

> **With copies (that shall not constitute notice) to:**

> Ogilvy Renault LLP

Suite 3800, Royal Bank Plaza, South Tower
200 Bay Street, P.O. Box 84
Toronto, Ontario, Canada M5J 2Z4
Attention: Michael Lang
Facsimile: 416-216-3930

**and**

Kim & Chang
Seyang Building
223 Naeja-dong
Jongno-gu, Seoul
Korea
Attention: Dong Youn Kim
              Frank Shyn
Facsimile: +822-737-9091

(c)    Notice to Purchaser shall be sent to the following address, or such other person or address as Purchaser may notify to NNL from time to time:

Telefonaktiebolaget LM Ericsson
SE-164 83, Stockholm, Sweden
Attention: Per Oscarsson
Facsimile: +46 70 610 6262

**With copies (that shall not constitute notice) to:**

Ericsson AB
SE-164 83, Stockholm, Sweden
Attention: Per Hoffman
Facsimile: +46 8713 0039

(d)    Notice shall be effective upon receipt and shall be deemed to have been received either (i) five (5) Business Days after posting, if delivered by pre-paid first class post, or (ii) at the time of delivery, if delivered by hand, e-mail, facsimile or courier.

## 8.6    Severability

In the event that any provision of this Agreement, or the application thereof, becomes or is declared by a court of competent jurisdiction to be invalid, void or otherwise unenforceable, the remainder of this Agreement shall continue in full force and effect and shall be interpreted so as reasonably to effect the intent of the parties hereto. The parties hereto shall use all reasonable efforts to replace such invalid, void or otherwise unenforceable provision of this Agreement with a valid and enforceable provision that shall achieve, to the extent possible, the economic, business or other purposes of such void or unenforceable provision.

## 8.7    Execution in Counterparts

This Agreement may be executed in one or more counterparts, each of which shall be considered an original instrument, but all of which shall be considered one and the same agreement, and shall become binding when one or more counterparts have been signed by each of the parties hereto and delivered to each of the other parties hereto.



**8.8    Arbitration**

Except as otherwise specifically provided herein, and except for claims for a preliminary injunction, temporary restraining order or other temporary relief, any dispute arising out of or in connection with this Agreement, including a dispute as to the validity or existence of this Agreement and/or this Section 8.8, shall be resolved by final and binding arbitration in Toronto, Ontario, Canada conducted in English by three arbitrators pursuant to the rules of the ICC, save that, unless all the parties agree otherwise:

(a)    the third arbitrator, who shall act as chairman of the tribunal, shall be chosen by one arbitrator appointed by NNL and the other arbitrator appointed by Purchaser. If the third arbitrator is not chosen and nominated to the ICC for appointment within 30 days of the date of confirmation by the ICC of the later of the two party-appointed arbitrators to be confirmed, he shall be chosen by the ICC;

(b)    no arbitrator shall be of the same nationality as any party; and

(c)    the tribunal shall have the authority to award any remedy or relief in accordance with the terms of this Agreement, including a declaratory judgment, specific performance of any obligation created under this Agreement or an injunction.

**8.9    English Language**

This Agreement is made only in the English language. In the event of any conflict between the English language version of this Agreement and any translation hereof, the English language version shall prevail.

**8.10    Governing Law; Consent to Jurisdiction**

(a)    This Agreement shall be governed by and construed in accordance with the laws of the Province of Ontario, Canada.

(b)    Subject to Section 8.8, each of NNL and Purchaser hereby irrevocably and unconditionally agrees to submit to the non-exclusive jurisdiction of the courts of the Province of Ontario, Canada for preliminary injunction, temporary restraining order or other temporary relief and further agree to submit to the non-exclusive jurisdiction of such courts of the Province of Ontario, Canada for the enforcement of any arbitral award rendered under this Agreement.

**8.11    No Presumption; Drafting**

The parties hereto are sophisticated and have been represented by lawyers who have carefully negotiated the provisions hereof. As a consequence, the parties do not intend that the presumptions of any Laws relating to the interpretation of contracts against the drafter of any particular clause should be applied to this Agreement and therefore waive the effects of such Laws.

**8.12    Time of Essence**

Time is of the essence in this Agreement.



**8.13    LGE as Third-Party Beneficiary**

LGE shall be an express third-party beneficiary of Sections 2.3(b), 6.4(b), 6.5 and 6.7(d) and shall be entitled to enforce its provisions directly or indirectly on behalf of the Company.

**(Signature Page Follows)**



IN WITNESS WHEREOF, the parties have caused this Agreement to be duly executed by respective duly authorized representatives as of the date first above written.

**NORTEL NETWORKS LIMITED**

By: _____

    Name:    John Doolittle
    Title:    Senior Vice-President,
              Corporate Services and Chief
              Financial Officer

By: _____

    Name:    Anna Ventresca
    Title:    General Counsel-Corporate
              and Corporate Secretary

**TELEFONAKTIEBOLAGET LM
ERICSSON (PUBL)**

By: _____

    Name:    Mats H. Olsson
    Title:    Head of Region China & North
              East Asia and Senior Vice
              President

IN WITNESS WHEREOF, the parties have caused this Agreement to be duly executed by respective duly authorized representatives as of the date first above written.

**NORTEL NETWORKS LIMITED**

By: _____

    Name:  John Doolittle
    Title:   Senior Vice-President,
           Corporate Services and Chief
           Financial Officer


By: _____

    Name:  Anna Ventresca
    Title:   General Counsel-Corporate
           and Corporate Secretary


**TELEFONAKTIEBOLAGET LM ERICSSON (PUBL)**

By: _____

    Name:
    Title:

# APPENDIX "C"

## [CONFIDENTIAL]

## APPENDIX "D"

### [ATTACHED]

Execution Copy

# TERMINATION AGREEMENT

by and among

## LG ELECTRONICS INC.,

## NORTEL NETWORKS LIMITED

and

## NORTEL NETWORKS KOREA LIMITED

**Table of Contents**

Page

**ARTICLE I DEFINITIONS**......................................................................................... 2

**ARTICLE II TERMINATION AND AMENDMENT** ................................................ 4

    2.1   Waivers of Certain Rights Under the Existing JV Agreement .................. 4
    2.2   Termination of the Existing JV Agreement ............................................. 4
    2.3   Termination of Certain Nortel Ancillary Agreements ............................. 4
    2.4   Amendment of Certain Nortel Ancillary Agreements ............................. 5
    2.5   Termination of Certain LGE Ancillary Agreements ............................... 5
    2.6   Settlement Payments .............................................................................. 5
    2.7   Execution of Termination Accession Agreement by the JVC .................. 5
    2.8   Release of Liabilities .............................................................................. 6
    2.9   Non-Solicitation by Nortel ..................................................................... 6

**ARTICLE III TRANSACTION CLOSING; CLOSING CONDITIONS** ................ 6

    3.1   Closing Date .......................................................................................... 6
    3.2   Closing Deliveries ................................................................................. 7
    3.3   Conditions to the Parties' Obligations. .................................................. 7

**ARTICLE IV TERMINATION** ................................................................................. 8

    4.1   Termination. ........................................................................................... 8
    4.2   Effect of Termination ............................................................................. 8

**ARTICLE V OTHER AGREEMENTS** ..................................................................... 8

    5.1   Non Waiver and Other Remedies ........................................................... 8
    5.2   Unenforceable Terms ............................................................................. 9
    5.3   Force Majeure ........................................................................................ 9
    5.4   Governmental Approval ......................................................................... 9
    5.5   Dispute Resolution ................................................................................. 9
    5.6   Assignability ........................................................................................ 10
    5.7   Expenses and Enforcement Costs ......................................................... 10
    5.8   Governing Law ..................................................................................... 10
    5.9   Language and Counterparts ................................................................... 10
    5.10  Entire Agreement ................................................................................. 10

**ARTICLE VI NOTICE** ........................................................................................... 11

    6.1   Method ................................................................................................. 11
    6.2   Receipt ................................................................................................. 12
    6.3   Change ................................................................................................. 12

**ARTICLE VII CONFIDENTIALITY; PUBLICITY** ............................................. 12

    7.1   Confidentiality ..................................................................................... 12
    7.2   Public Statements ................................................................................. 13

# TERMINATION AGREEMENT

This **TERMINATION AGREEMENT** (this "Agreement") is made and entered into this 21st day of April, 2010, by and among: LG Electronics Inc., a corporation duly incorporated and existing under the laws of Korea with its principal place of business at 20 Yeouido-dong, Yongdeungpo-gu, Seoul, Korea (hereinafter referred to as "LGE"), Nortel Networks Limited, a corporation duly incorporated and existing under the laws of Canada with its principal place of business at 5945 Airport Road, Suite 360, Mississauga, Ontario, Canada L4V1R9 (hereinafter referred to as "Nortel") and Nortel Networks Korea Limited, a corporation duly incorporated and existing under the laws of Korea with its principal place of business at 16th Floor, Haesung-2 Building, 942-10, Daechi 3-dong, Kangnam-ku, Seoul, Korea (hereinafter referred to as "NNK"). Each of LGE, Nortel, and NNK may hereinafter be referred to from time to time as a "Party" in its individual capacity and as "Parties" collectively.

**WHEREAS**, LGE and Nortel are parties to that certain Joint Venture Agreement, dated as of August 17, 2005 (the "Existing JV Agreement"), pursuant to which LGE and Nortel established a joint venture company known as LG-Nortel Co. Ltd. (the "JVC");

**WHEREAS**, in connection with the formation and operation of the JVC, (a) Nortel, NNK and/or certain of their Affiliates entered into agreements with (i) the JVC, (ii) LGE and (iii) both the JVC and LGE, which are set forth on Schedule I of this Agreement (such agreements are referred to as "Nortel Ancillary Agreements") and (b) LGE and/or certain of its Affiliates entered into agreements with (i) the JVC, (ii) Nortel, (iii) NNK, and (iv) all of the JVC, Nortel and NNK (such agreements are referred to as "LGE Ancillary Agreements");

**WHEREAS**, pursuant to that certain Share Purchase Agreement (the "SPA"), as of the date hereof, Telefonaktiebolaget LM Ericsson (publ), a corporation duly incorporated and existing under the laws of Sweden, with its principal place of business at SE-164 83 Stockholm, Sweden ("Ericsson"), has agreed to purchase from Nortel, and Nortel has agreed to sell to Ericsson, all of the Shares (as defined herein) owned by Nortel (the "Nortel JVC Shares");

**WHEREAS**, concurrently with the execution of this Agreement, LGE and Ericsson are entering into a Joint Venture Agreement (the "New JV Agreement") relating to the JVC;

**WHEREAS**, the closing of the transactions contemplated by the New JV Agreement is subject to, among other things, the closing of the transactions contemplated by this Agreement; and

**WHEREAS**, LGE, Nortel and NNK desire to enter into this Agreement to set forth the terms and conditions upon which, among other things, (i) the Existing JV Agreement will be terminated, (ii) LGE will consent to the transfer of the Nortel JVC Shares to Ericsson pursuant to the terms of the SPA, (iii) certain Nortel Ancillary Agreements will be either amended or terminated, as set forth herein and (iv) certain LGE Ancillary Agreements will be terminated, as set forth herein.

        **NOW, THEREFORE**, in consideration of the premises and mutual covenants contained herein, the Parties agree as follows:

## ARTICLE I
## DEFINITIONS

        "**Affiliate**" means, with respect to any specified Person, any other Person who or that, directly or indirectly through one or more intermediaries, controls, is controlled by or is under common control with such specified Person, where "control" means the direct or indirect power to direct the management and policies of the controlled Person through ownership of voting shares, by contract or otherwise.  As for LGE, in addition to those Persons that qualify as an Affiliate of LGE based on the above definition, the affiliates of LGE as designated by the Fair Trade Commission of Korea under the FTL from time to time will be deemed to be the Affiliates of LGE so long as such designation remains effective.

        "**Agreement**" has the meaning set forth in the Preamble.

        "**Amended Nortel Agreements**" has the meaning set forth in Section 2.4.

        "**Approvals**" means any approval, authorization, consent, qualification, permit, license, orders, permission, registration, certificates, variances or any waiver of any of the foregoing, obtained or required to be obtained from, or any notice, statement or other communication required to be filed with or delivered to, any Governmental Authority or any other Person.

        "**Canadian Insolvency Proceeding**" means the proceeding arising from the application for protection under the Companies' Creditors Arrangement Act (Canada) commenced by Nortel and certain of its Affiliates in the Ontario Superior Court of Justice on January 14, 2009 and the order of such court granting certain initial creditor protection on such date and the ancillary proceedings pursuant to Chapter 15 of the U.S. Bankruptcy Code and any other ancillary proceedings to such U.S. or Canadian proceedings.

        "**Closing Date**" has the meaning set forth in Section 3.1.

        "**Common Shares**" means shares of common stock, par value KRW 5,000 per share, of the JVC.

        "**Ericsson**" has the meaning specified in the third Recital.

        "**Existing JV Agreement**" has the meaning set forth in the first Recital.

        "**FTL**" means the Monopoly Regulation and Fair Trade Law of Korea and the rules and regulations thereunder, each as may be amended from time to time.

        "**Governmental Approvals**" means any Approval obtained from, filed with or delivered to, or required to be obtained from, filed with or delivered to, any Governmental Authority.

        "**Governmental Authority**" means any Korean, United States, Canadian or other foreign, federal, state, provincial or local governmental, regulatory or administrative authority, agency or commission or any court, tribunal, or judicial or arbitral body.

"**Governmental Order**" means any order, writ, judgment, injunction, decree, stipulation, determination or award entered by or with any Governmental Authority.

"**ICC**" has the meaning set forth in Section 5.5.

"**JVC**" has the meaning set forth in the first Recital.

"**JVC IP Agreement**" has the meaning set forth in Section 2.3(b).

"**LGE**" has the meaning set forth in the Preamble.

"**LGE Ancillary Agreements**" has the meaning set forth in the second Recital.

"**LGE Waiver**" has the meaning set forth in Section 2.1.

"**Law**" means any federal, territorial, state, provincial, local or municipal statute, law, common law, ordinance, rule, regulation, order, writ, injunction, directive, judgment, decree or policy or guideline having the force of law in Canada, Korea, or any other applicable jurisdiction.

"**Losses**" means losses, liabilities, damages, deficiencies, demands, claims, actions, judgments or causes of action, assessments, costs or expenses (including bonds, interest, penalties and reasonable attorneys' fees and disbursements).

"**New JV Agreement**" has the meaning specified in the fourth Recital.

"**NNK**" has the meaning set forth in the Preamble.

"**Nortel**" has the meaning set forth in the Preamble.

"**Nortel Ancillary Agreements**" has the meaning set forth in the second Recital.

"**Nortel JVC shares**" has the meaning set forth in the third Recital.

"**Party**" or "**Parties**" has the meaning set forth in the Preamble.

"**Person**" means any natural person, general or limited partnership, corporation, limited liability company, firm, association, trust, joint venture or other legal entity.

"**Preferred Shares**" means non-voting, non-participating and non-cumulative shares of preferred stock, par value KRW 5,000 per share, of the JVC.

"**Secondment Agreement**" means the Employee Secondment Agreement dated November 3, 2005 between Nortel and the JVC.

"**Share(s)**" means the Common Shares and the Preferred Shares.

"**SPA**" has the meaning set forth in the third Recital.

"**Terminated Agreements**" means the Terminated LGE Agreements and the Terminated Nortel Agreements.

"**Terminated LGE Agreements**" means the LGE Ancillary Agreements set forth on Schedule II to this Agreement.

"**Terminated Nortel Agreements**" means the Nortel Ancillary Agreements set forth on Schedule III to this Agreement.

"**Termination Accession Agreement**" has the meaning set forth in Section 2.7.

"**Transaction Closing**" has the meaning set forth in Section 3.1.

## ARTICLE II
## TERMINATION AND AMENDMENT

**2.1    Waivers of Certain Rights Under the Existing JV Agreement**. Subject to the satisfaction or waiver of all of the conditions to the Transaction Closing set forth in Sections 3.3, 3.4 and 3.5, LGE agrees to unconditionally waive, effective upon execution of this Agreement, all rights it may have pursuant to Sections 9.1, 9.2, and 9.4 of the Existing JV Agreement with respect to the transfer of the Nortel JVC Shares from Nortel to Ericsson pursuant to the terms of the SPA (the "LGE Waiver"); provided that, in the event the closing as contemplated under the SPA does not occur or the SPA is duly terminated, the LGE Waiver shall no longer be effective and LGE shall retain all rights LGE may have pursuant to Sections 9.1, 9.2 and 9.4 of the Existing JV Agreement.

**2.2    Termination of the Existing JV Agreement**. Subject to the satisfaction or waiver of all of the conditions to the Transaction Closing set forth in Sections 3.3, 3.4 and 3.5, pursuant to Section 18.1 of the Existing JV Agreement, the Existing JV Agreement shall, effective immediately upon the Transaction Closing, be terminated and be of no further force or effect, except that, for the avoidance of doubt, in accordance with Section 19.6 of the Existing JV Agreement, the provisions of Articles 30, 31, 32, 33 and 35 of the Existing JV Agreement shall survive the termination.    The Parties agree that, notwithstanding any provision of the Existing JV Agreement to the contrary, Articles 19, 20, 21 and 27 of the Existing JV Agreement, and all of the obligations of the Parties and their respective Affiliates set forth therein, shall, effective immediately upon the Transaction Closing, be terminated and be of no further force or effect. For the avoidance of doubt, effective as of and following the Transaction Closing, the Parties and their respective Affiliates shall have no further obligations with respect to the non-competition provisions set forth in Article 21 of the Existing JV Agreement.

**2.3    Termination of Certain Nortel Ancillary Agreements**.

(a)    Subject to the satisfaction or waiver of all of the conditions to the Transaction Closing set forth in Sections 3.3, 3.4 and 3.5, the Parties agree that, notwithstanding any provision of any Terminated Nortel Agreement to the contrary, the Terminated Nortel Agreements, and all of the obligations of the Parties and their respective Affiliates set forth therein, shall, effective immediately upon the Transaction Closing, be terminated and be of no further force or effect.

(b)    With respect to the JVC to Parents Intellectual Property License Agreement dated November 3, 2005 among Nortel, LGE and the JVC (the "JVC IP Agreement"), which is identified as a Terminated Nortel Agreement, subject to the satisfaction or waiver of all of

4

the conditions to the Transaction Closing set forth in Sections 3.3, 3.4 and 3.5, the Parties agree that, notwithstanding any provision of the JVC IP Agreement to the contrary, the Parties hereby amend such agreement to (i) remove Nortel as a party to such agreement, (ii) terminate all of the obligations of Nortel and its Affiliates under such agreement so that such obligations shall be of no further force or effect as to Nortel and its Affiliates, and (iii) terminate all of the obligations of LGE and the JVC (and their respective Affiliates) to Nortel and its Affiliates under such agreement so that such obligations shall be of no further force or effect as to LGE and the JVC (and their respective Affiliates). The JVC IP Agreement, as so amended, shall continue in full force and effect as between LGE and the JVC. The foregoing amendment shall be effective immediately upon the Transaction Closing.

(c)     Notwithstanding Section 2.3(a), the Parties acknowledge and agree that Nortel and the JVC are currently discussing whether the Secondment Agreement should be amended. Prior to the Transaction Closing, should Nortel and the JVC determine that the Secondment Agreement will be amended as opposed to terminated as is agreed herein, the Parties shall negotiate in good faith and enter into such amendments or modifications to the Secondment Agreement, this Agreement or the Schedules attached hereto that are necessary, which amendments or modifications shall be subject to LGE's consent, not to be unreasonably withheld or delayed.

**2.4     Amendment of Certain Nortel Ancillary Agreements**.   Subject to the satisfaction or waiver of all of the conditions to the Transaction Closing set forth in Section 3.3, 3.4 and 3.5, the Nortel Ancillary Agreements set forth on Schedule IV to this Agreement (the "Amended Nortel Agreements") shall, effective immediately upon the Transaction Closing, be amended and restated as agreed to by the respective parties thereto and consented to by LGE, which consent shall not be unreasonably withheld or delayed.

**2.5     Termination of Certain LGE Ancillary Agreements**.   Subject to the satisfaction or waiver of all of the conditions to the Transaction Closing set forth in Sections 3.3, 3.4 and 3.5, the Parties agree that, notwithstanding any provision of any Terminated LGE Agreement to the contrary, the Terminated LGE Agreements, and all of the obligations of the Parties and their respective Affiliates set forth therein, shall, effective immediately upon the Transaction Closing, be terminated and be of no further force or effect.

**2.6     Settlement Payments**. Subject to Section 2.3(b), all accounts receivable and accounts payable outstanding between or among LGE, Nortel and the JVC under the Terminated LGE Agreements and the Terminated Nortel Agreements shall be paid in the normal course pursuant to the Terminated LGE Agreements and Terminated Nortel Agreements, as the case may be, consistent with the procedures currently followed by LGE, Nortel and the JVC, as the case may be as if such agreements had not been terminated, subject only to the fact that the Parties acknowledge and agree that any such amounts which are properly subject to a pre-filing claim under the Canadian Insolvency Proceeding, which claim was submitted by the JVC on September 21, 2009, shall be settled in accordance with the procedures for such a pre-filing claim which have been or will be established under the Canadian Insolvency Proceeding.

**2.7     Execution of Termination Accession Agreement by the JVC**. Promptly after the execution of this Agreement, LGE and Nortel shall cause the JVC to enter into a Termination Accession Agreement (the "Termination Accession Agreement"), substantially in the form attached hereto as Schedule V, such that the JVC shall be bound by and enjoy the benefits of the terms of this Agreement as if this Agreement were entered into by and among

LGE, Nortel, NNK and the JVC. For the avoidance of doubt, without the express written consent of each Party, no term or condition set forth herein, including the Schedules and Exhibits, shall be amended, revised, supplemented or otherwise modified at the time of entering into the Termination Accession Agreement.

**2.8** **Release of Liabilities**.

(a)     Subject to Section 2.6 and the satisfaction or waiver of all of the conditions to the Transaction Closing set forth in Sections 3.3 and 3.5, Nortel and/or NNK agree to, effective upon the Transaction Closing, irrevocably and unconditionally release, waive and forever discharge LGE and the JVC, each of their Affiliates, and their respective directors, officers, employees and representatives from any and all Losses arising out of or relating to the Existing JV Agreement, the Terminated LGE Agreements or the Terminated Nortel Agreements, as the case may be.

(b)     Subject to Section 2.6 and the satisfaction or waiver of all of the conditions to the Transaction Closing set forth in Sections 3.3 and 3.4, LGE agrees to, effective upon the Transaction Closing, irrevocably and unconditionally release, waive and forever discharge Nortel, NNK and the JVC, each of their Affiliates, and their respective directors, officers, employees and representatives from any and all Losses arising out of or relating to the Existing JV Agreement, the Terminated LGE Agreements or the Terminated Nortel Agreements, as the case may be.

(c)     Subject to Section 2.6 and the satisfaction or waiver of all of the conditions to the Transaction Closing set forth in Section 3.3, the JVC agrees to, effective upon the Transaction Closing, irrevocably and unconditionally release, waive and forever discharge Nortel, NNK and LGE, each of their Affiliates, and their respective directors, officers, employees and representatives from any and all Losses arising out of or relating to the Existing JV Agreement, the Terminated LGE Agreements or the Terminated Nortel Agreements, as the case may be.

**2.9** **Non-Solicitation by Nortel**. In consideration of LGE's entry into this Agreement and performance of its obligations hereunder, including the grant of the LGE Waiver pursuant to Section 2.1, Nortel and NNK agree that, for a period of twelve (12) months following the Transaction Closing, they shall not, and shall cause their Affiliates not to, directly or indirectly, solicit the services, as employee, consultant or otherwise, of any employee of the JVC or any of its subsidiaries; provided, however, that the foregoing shall not apply with respect to any general advertisement that is not specifically targeted at any such person or the JVC.

## ARTICLE III
## TRANSACTION CLOSING; CLOSING CONDITIONS

**3.1** **Closing Date**. Following the satisfaction or waiver of all of the conditions set forth in Sections 3.3, 3.4 and 3.5, the closing of the transactions contemplated hereby (the "Transaction Closing") shall take place concurrently with the transfer of the Nortel JVC Shares from Nortel to Ericsson at a location to be notified by Nortel to Ericsson, which location shall be separately notified by Nortel to LGE  or on such other date as may be mutually agreed upon by the Parties. The date on which the Transaction Closing occurs is referred to herein as the "Closing Date."

### 3.2 Closing Deliveries.

(a)    LGE Deliveries to Nortel and NNK.  LGE shall deliver to Nortel and NNK, as applicable, at or prior to the Transaction Closing, each of the following:

(i)    duly executed counterparts to each of the Amended Nortel Agreements to which LGE or any of its Affiliates (other than the JVC) is or will be a party; and

(ii)    a duly executed Termination Accession Agreement.

(b)    Nortel and NNK Deliveries to LGE.  Nortel and NNK, as applicable, shall deliver to LGE, at or prior to the Transaction Closing, each of the following:

(i)    duly executed counterparts to each of the Amended Nortel Agreements to which Nortel or any of its Affiliates (other than the JVC) is or will be a party;

(ii)    a duly executed Termination Accession Agreement; and

(iii)    a copy of duly executed resignation letters from each of the members of the board of directors of the JVC as nominated by Nortel under the Existing JV Agreement and designated by Ericsson as set forth in the SPA.

### 3.3 Conditions to the Parties' Obligations.  The respective obligations of each Party to consummate the transactions contemplated by this Agreement are subject to the fulfillment or waiver of all of the following conditions on or prior to the Closing Date:

(a)    the transfer of the Nortel JVC Shares from Nortel to Ericsson pursuant to the SPA shall have occurred;

(b)    the closing deliveries of the other Parties contemplated by Section 3.2 shall have been made;

(c)    all Governmental Approvals necessary for the consummation of the transactions contemplated hereby shall have been obtained and any applicable waiting period in relation thereto shall have expired, including the approval of this Agreement in connection with the Canadian Insolvency Proceeding; and

(d)    no Law or Governmental Order shall have been enacted, entered, promulgated or enforced by any Governmental Authority with jurisdiction over the transactions contemplated hereby that prohibits, restrains, enjoins or restricts the consummation of the transactions contemplated hereby, which has not been withdrawn or terminated.

### 3.4 Condition to LGE's Obligations.  In addition to the conditions set forth in Section 3.3, the obligations of LGE to consummate the transactions contemplated by this Agreement shall be conditioned upon there having been no amendment or modification to, or waiver of any rights or obligations under, the SPA without the prior written consent of LGE, which consent shall not be unreasonably withheld or delayed.

### 3.5 Condition to Nortel's Obligations.  In addition to the conditions set forth in Section 3.3, the obligations of Nortel to consummate the transactions contemplated by this Agreement shall be conditioned upon there having been no amendment or modification to, or waiver of any rights or obligations under, the provisions in the New Joint Venture Agreement

7

which are referenced in the Annex 1 to the SPA without the prior written consent of Nortel, which consent shall not be unreasonably withheld or delayed.

## ARTICLE IV
## TERMINATION

**4.1** **Termination.** This Agreement may be terminated at any time prior to the Transaction Closing as follows:

(a)    by mutual written consent of Nortel, NNK and LGE;

(b)    by Nortel, NNK or LGE, if any permanent injunction or other order of a Governmental Authority preventing the consummation of the transactions contemplated herein has become final and nonappealable;

(c)    by Nortel, NNK or LGE, if the Transaction Closing shall not have been consummated on or before August 31, 2010; provided, however, that the right to terminate this Agreement pursuant to this Section 4.1(c) shall not be available (x) to any party whose breach of any provision of this Agreement results in the failure of the Transaction Closing to be consummated by such time or (y) if the inability to consummate the Transaction Closing is due to a pending antitrust clearance review of the transactions contemplated under this Agreement by the relevant Governmental Authorities as provided in this Agreement;

(d)    by Nortel, NNK or LGE, if the SPA has been terminated pursuant to the terms and conditions thereof.

**4.2** **Effect of Termination**. Upon termination of this Agreement in accordance with Section 4.1, except for the provisions of Sections 4.2, 5.5, 5.7, 5.8 and 5.9, and Articles I, VI, and VII, which shall survive termination, this Agreement shall become void and have no effect and no Party shall have any liability to the other Parties or their respective successors and permitted assigns, officers, directors, partners, members, shareholders, representatives, agents and employees; provided, however, that nothing herein shall relieve any Party from liability as a result of any willful breach of this Agreement by such Party or willful failure by such Party to perform its obligations under this Agreement.

## ARTICLE V
## OTHER AGREEMENTS

**5.1** **Non Waiver and Other Remedies**.

(a)    Failure of any Party to insist upon the strict and punctual performance of any provision hereof shall not constitute waiver of or estoppel against asserting the right to require such performance, nor shall a waiver or estoppel in one case constitute a waiver or estoppel with respect to a later breach whether of similar nature or otherwise.

(b)    Nothing in this Agreement shall prevent a Party from seeking and obtaining injunctive or other equitable relief (including a temporary restraining order, a temporary injunction or a permanent injunction) against any other Party, such Party's agents, assigns or successors for a breach or threatened breach of this Agreement and without the necessity of proving actual monetary loss. It is expressly understood among the Parties that this injunctive or other equitable relief shall not be the exclusive remedy for any breach of this

Agreement and the non-breaching Party shall be entitled to seek any other relief or remedy that either may have by contract, statute, law or otherwise for any breach hereof.

**5.2    Unenforceable Terms**.  If any term or provision of this Agreement is for any reason found invalid, illegal or unenforceable in any respect, such invalidity, illegality or unenforceability shall not affect the validity of any remaining portion, which shall remain in full force and effect as if the invalid portion was never a part of this Agreement when it was executed.  If the severance of any such part of this Agreement materially affects any rights or obligations of the Parties hereunder, the Parties will negotiate in good faith to amend this Agreement in a manner satisfactory to the Parties.

**5.3    Force Majeure**.  The failure or delay of any Party to perform any obligation under this Agreement solely by reason of acts of God, acts of government (except as otherwise enumerated herein), riots, wars, strikes, lockouts, accidents in transportation or other causes beyond its control shall not be deemed to be a breach of this Agreement; provided, however, that the Party so prevented from complying herewith shall continue to take all actions within its power to comply as fully as possible herewith.  Except where the nature of the event shall prevent it from doing so, the Party suffering such force majeure shall notify the other Parties in writing within fourteen (14) days after the occurrence of such force majeure and shall in every instance, to the extent it is capable of doing so, use its reasonable best efforts to remove or remedy such cause with all reasonable dispatch.

**5.4    Governmental Approval**.  The Parties shall undertake reasonable best efforts to obtain any required Governmental Approval of this Agreement.  Each Party shall apprise the other Parties of any and all actions it plans to take with the Governmental Authorities in advance of the proposed action, and shall take no action to which the other Party reasonably objects.  If such Governmental Approval is conditioned upon changes in the terms and conditions of this Agreement, such changes shall be effective only if accompanied by a formal amendment hereto executed by all Parties.  No provision of this Agreement shall be construed to require any Party to enter into any such amendment. Each Party shall provide the other Parties with copies of all correspondence and documents transmitted to and received from the Governmental Authorities relating to such Governmental Approval.

**5.5    Dispute Resolution**.  Except for claims for a preliminary injunction, temporary restraining order or other temporary relief, any dispute arising out of or in connection with this Agreement, including a dispute as to the validity or existence of this Agreement and/or this Section 5.5, shall be resolved by final and binding arbitration in New York, New York conducted in English by three arbitrators pursuant to the rules of the International Chamber of Commerce (the "ICC"), save that, unless each of the Parties agrees otherwise:

(a)    the third arbitrator, who shall act as chairman of the tribunal, shall be chosen by the two arbitrators appointed by or on behalf of the Parties.  If the third arbitrator is not chosen and nominated to the ICC for appointment within 30 days of the date of confirmation by the ICC of the later of the two party-appointed arbitrators to be confirmed, he or she shall be chosen by the ICC;

(b)    no arbitrator shall be of the same nationality as any Party; and

(c)     the tribunal shall have the authority to award any remedy or relief in accordance with the terms of this Agreement, including a declaratory judgment, specific performance of any obligation created under this Agreement or an injunction.

   5.6     **Assignability**.  This Agreement and each and every covenant, term and condition hereof shall be binding upon and inure to the benefit of the Parties hereto and their respective successors and assigns, but neither this Agreement nor any rights hereunder shall be assignable directly or indirectly by any Party hereto without the prior written consent of the other Parties.  Any attempted assignment in violation of this Section 5.6 shall be void.

   5.7     **Expenses and Enforcement Costs**.  Each Party shall pay its own expenses and costs incurred in connection with the preparation and implementation of this Agreement, including the fees and expenses of their respective accountants and legal counsel, regardless of whether the transactions contemplated hereby shall be consummated.

   5.8     **Governing Law**.  This Agreement shall be governed by, construed and enforced in accordance with the Laws of the state of New York, U.S.A., without regard to its conflict of law principles.

   5.9     **Language and Counterparts**.

   (a)     The Parties acknowledge that the content of this Agreement, the Amended Nortel Agreements and the schedules attached hereto or thereto should be accurate and complete and in English.  In that regard, if any schedule attached hereto or to any of the Ancillary Agreements are in Korean, the Party making disclosures on such schedules shall be obligated to translate such schedules into English and provide a full and complete disclosure of the schedules in summary form, as the case may be, and deliver them to the other Parties unless otherwise expressly agreed to by the Parties by no later than 10 days prior to the Transaction Closing Date.  For the avoidance of doubt, any translated schedules or full and complete disclosure of the schedules, as the case may be, pursuant to this Section 5.9 shall contain the same information set forth in the schedules attached hereto or thereto.  In the event of any conflict between English version and any translation of this Agreement, the Ancillary Agreements and attached schedules hereto and thereto, the English version shall prevail.

   (b)     This Agreement may be executed in multiple counterparts, each of which shall be deemed to be an original, and all of which together shall constitute one and the same document.

   5.10     **Entire Agreement**.  This Agreement shall, as of the date of execution hereof, supersede all previous representations, understandings or agreements, oral or written, among the Parties with respect to the subject matter hereof, and together with the exhibits and attachments hereto and the agreements and documents contemplated hereby, contains the entire understanding of the Parties as to the terms and conditions of their relationship.  Terms included herein may not be contradicted by evidence of any prior oral or written agreement or of a contemporaneous oral or written agreement.  No changes, alterations or modifications hereto shall be effective unless in writing and signed by authorized representatives of the Parties and, if required, upon Governmental Approval.

## ARTICLE VI
## NOTICE

**6.1    Method.**   Any notices given hereunder shall be in writing and shall be served by hand at, by overnight courier to, by facsimile transmission to, or by certified mail, prepaid post, return receipt requested to, the following addresses and numbers:

To LGE:

Attn:  CFO
12th Fl. LG Twin Towers (WEST Tower)
20 Yeouido-dong, Yeongdeungpo-gu,
Seoul, 150-721, Korea
Fax No: +82-2-3777-5304

with a copy, which does not constitute notice to:

Attn:  General Counsel
12th Fl. LG Twin Towers (WEST Tower)
20 Yeouido-dong, Yeongdeungpo-gu,
Seoul, 150-721, Korea
Fax No: +82-2-3777-5345

To Nortel:

Attn:  Anna Ventresca, General Counsel & Corporate Secretary

5945 Airport Road, Suite 360
Mississauga, Ontario, Canada L4V1R9
Canada
Fax No: 905 863 7386

with a copy, which does not constitute notice, to:

Ogilvy Renault LLP
Suite 3800, Royal Bank Plaza, South Tower
200 Bay Street, P.O. Box 84
Toronto, Ontario, Canada M5J 2Z4
Attention:  Michael Lang
Facsimile:  416-216-3930

**and**

Kim & Chang
Seyang Building
223 Naeja-dong
Jongno-gu, Seoul
Korea
Attention: Dong Youn Kim
Frank Shyn

11

Facsimile: +822-737-9091

To NNK:

Attn:  Representative Director

16th Floor, Haesung-2 Building
942-10, Daechi 3-dong
Kangnam-ku, Seoul
Korea
Facsimile:

**6.2    Receipt**.  All such notices, requests, claims, demands and other communications shall be deemed to have been given or received (i) upon receipt if personally delivered; (ii) on the second (2nd) days following posting if by overnight courier service; (iii) at the time of transmission (with confirmation of transmission having been received) if by facsimile; and (iv) on the sixth (6th) days after mailing if by registered or certified mail (postage prepaid, return receipt requested).

**6.3    Change**.  Any Party may, by seven (7) days' written notice served to the aforesaid addresses of the other Parties, change the address or facsimile number for service referred to above.

## ARTICLE VII
## CONFIDENTIALITY; PUBLICITY

**7.1    Confidentiality**.

(a)    At all times after the date hereof, unless agreed by the Parties, Nortel and NNK shall, and shall cause its successors and Affiliates and representatives to keep confidential all data, trade secrets, proprietary secrets and any other confidential information ("Confidential Information") regarding the business of each of LGE and the JVC as may have been disclosed to Nortel and NNK by LGE or the JVC, as the case may be, and not disclose such Confidential Information to any party (other than to Ericsson to the extent necessary to (i) comply with the terms of the SPA or (ii) consummate the transactions contemplated by the SPA), except with the express written consent of LGE or the JVC, as the case may be, which consent shall not be unreasonably withheld or delayed, or as required by Law, order or legal process; provided that in connection with the Canadian Insolvency Proceeding, Nortel may disclose financial information about the JVC to Ernst & Young Inc., in its role as monitor in the Canadian Insolvency Proceeding (the "Monitor"), the Unsecured Creditors Committee, the Ad-Hoc Bondholders Committee, the Government of Ontario, Canada and the Court-appointed Counsel to the Former Employees of Nortel (as such defined terms are used in the Sale Process Protocol Agreement, dated as of May 27, 2009, among Nortel, LGE and the Monitor) and their representatives or as may otherwise be required pursuant to the Canadian Insolvency Proceeding, in each case to the extent necessary for matters relating to the transactions contemplated under the SPA; provided, further, that prior to any such disclosure of any financial information about the JVC, Nortel shall inform and consult with LGE regarding the disclosure.    Confidential Information shall not be deemed to include information (i) that is or becomes generally available to the public other than by breach of these confidentiality obligations by Nortel or NNK or (ii) is developed after the Transaction Closing by or on behalf of Nortel or NNK or any of their respective Affiliates without

12

reliance on Confidential Information regarding the business of LGE or of the JVC acquired prior to the Transaction Closing. In the event Nortel or NNK or any of its successors, Affiliates or representatives thereof is required by applicable Law or Governmental Order to disclose any such Confidential Information, Nortel or NNK, as the case may be, shall promptly notify each of LGE and the JVC in writing so that a protective order and/or other measure to prevent or limit the production or disclosure of such confidential information can timely be sought.

(b)     At all times after the date hereof, unless agreed by the Parties, LGE and the JVC shall, and shall cause their successors and Affiliates and representatives to, keep confidential the Confidential Information regarding the business of Nortel and NNK as may have been disclosed to LGE or the JVC by Nortel or NNK, as the case may be, and not disclose such Confidential Information to any other party, except with the express written consent of Nortel or NNK, as the case may be, which consent shall not be unreasonably withheld or delayed, or as required by Law, order or legal process. Confidential Information shall not be deemed to include information (i) that is or becomes generally available to the public other than by breach of these confidentiality obligations by LGE or the JVC or (ii) is developed after the Transaction Closing by or on behalf of LGE or the JVC or any of their respective Affiliates without reliance on Confidential Information regarding the business of Nortel or NNK acquired prior to the Transaction Closing. In the event LGE or the JVC or any of their successors, Affiliates or representatives thereof is required by applicable Law or Governmental Order to disclose any such Confidential Information, LGE or the JVC, as the case may be, shall promptly notify each of Nortel and NNK in writing so that a protective order and/or other measure to prevent or limit the production or disclosure of such confidential information can timely be sought.

7.2     **Public Statements**. Promptly following the date hereof, the Parties agree that a press release shall be issued regarding the execution of this Agreement, and the Parties shall agree on the contents of such press release prior to its issuance. Following the issuance of such initial press release, none of LGE, Nortel, or NNK shall make any press release or other public announcement concerning the transactions contemplated by this Agreement, except as may be required by applicable Law (including, for greater certainty, any obligations under any Bankruptcy Laws) or the rules of an applicable stock exchange, without the prior written consent of the other Party, which consent shall not be unreasonably withheld. If it is determined that disclosure is required by applicable Law or the rules of an applicable stock exchange, the disclosing Party shall send notice to the other Parties, accompanied by the text of the proposed disclosure, as far in advance as practicable, so that the other Parties may comment on the proposed disclosure and make reasonable revisions thereto.

[Remainder of page intentionally left blank; signature page follows.]

IN WITNESS WHEREOF, the authorized representatives of the Parties have executed this Agreement as of the date first written above.

LG ELECTRONICS INC.

By:_____
    Name:
    Title:

NORTEL NETWORKS LIMITED

By:_____
    Name: John Doolittle
    Title: Senior Vice-President, Corporate
    Services and Chief Financial Officer

By:_____
    Name: Anna Ventresca
    Title: General Counsel-Corporate and
    Corporate Secretary

NORTEL NETWORKS KOREA LIMITED

By:_____
    Name: Andrew John Grant
    Title: Representative Director

*Signature Page to Termination Agreement*

IN WITNESS WHEREOF, the authorized representatives of the Parties have executed this Agreement as of the date first written above.

**LG ELECTRONICS INC.**

By:_____
    Name:
    Title:

**NORTEL NETWORKS LIMITED**

By:_____
    Name: John Doolittle
    Title: Senior Vice-President, Corporate
    Services and Chief Financial Officer

By:_____
    Name: Anna Ventresca
    Title: General Counsel-Corporate and
    Corporate Secretary

**NORTEL NETWORKS KOREA
LIMITED**

By:_____
    Name: Andrew John Grant
    Title:  Representative Director

*Signature Page to Termination Agreement*

IN WITNESS WHEREOF, the authorized representatives of the Parties have executed this Agreement as of the date first written above.

**LG ELECTRONICS INC.**

By:_____
   Name:
   Title:

**NORTEL NETWORKS LIMITED**

By:_____
   Name: John Doolittle
   Title: Senior Vice-President, Corporate
   Services and Chief Financial Officer

By:_____
   Name: Anna Ventresca
   Title: General Counsel-Corporate and
   Corporate Secretary

**NORTEL NETWORKS KOREA
LIMITED**

By:_____
   Name: Andrew John Grant
   Title: Representative Director

*Signature Page to Termination Agreement*

**Schedule I    Nortel Ancillary Agreements**

1. Master Development Services Agreement dated November 3, 2005 between Nortel and the JVC and SOW-1 relating thereto
2. Contract Manufacturing Services Agreement between Nortel and the JVC
3. JVC to Parents Intellectual Property License Agreement dated November 3, 2005 among Nortel, LGE and the JVC
4. Nortel to JVC Intellectual Property License Agreement dated November 3, 2005 between Nortel and the JVC
5. Nortel to JVC Transition Services Agreement between Nortel and the JVC
6. Master Purchase and Sale Agreement dated December 8, 2006 between Nortel and the JVC
7. Mutual Development Agreement dated January 1, 2009 between Nortel and the JVC and SOW-1 related thereto
8. Amended and Restated Distribution Agreement dated November, 2008 between Nortel Networks (Asia) Limited and the JVC
9. Secondment Agreement
10. Trademark License Agreement dated November 3, 2005 between Nortel and the JVC
11. Nortel Sale Agreement dated October, 2005 among Nortel, NNK, LGE and the JVC

### Schedule II    Terminated LGE Agreements

1. LGE Sale and Contribution Agreement dated October 26, 2005, among LGE, Nortel and the JVC
2. Closing Agreement dated  November 3, 2005 among LGE, Nortel, NNK and the JVC
3. Letter Agreement dated August 17, 2005 between LGE and Nortel

## Schedule III  Terminated Nortel Agreements

1.  Master Development Services Agreement dated November 3, 2005 between Nortel and the JVC and SOW-1 relating thereto
2.  Contract Manufacturing Services Agreement between Nortel and the JVC
3.  JVC to Parents Intellectual Property License Agreement dated November 3, 2005 among Nortel, LGE and the JVC
4.  Nortel to JVC Intellectual Property License Agreement dated November 3, 2005 between Nortel and the JVC
5.  Nortel to JVC Transition Services Agreement between Nortel and the JVC
6.  Master Purchase and Sale Agreement dated December 8, 2006 between Nortel and the JVC
7.  Mutual Development Agreement dated January 1, 2009 between Nortel and the JVC and SOW-1 relating thereto
8.  Nortel Sale Agreement dated October, 2005 among Nortel, NNK, LGE and the JVC
9.  Secondment Agreement

**Schedule IV    Amended Nortel Agreements**

1.    Trademark License Agreement dated November 3, 2005 between Nortel and the JVC

**Schedule V**    **Form of Termination Accession Agreement**

## TERMINATION ACCESSION AGREEMENT

**THIS TERMINATION ACCESSION AGREEMENT** (this "Agreement") is entered into as of this [_____] day of [_____], 2010 by and among:

**LG Electronics Inc.**, a corporation duly incorporated and existing under the laws of Korea with its principal place of business at 20 Yeouido-dong, Yongdeungpo-gu, Seoul, Korea (hereinafter referred to as "LGE");

**Nortel Networks Limited**, a corporation duly incorporated and existing under the laws of Canada with its principal place of business at 5945 Airport Road, Suite 360, Mississauga, Ontario, Canada L4V1R9 (hereinafter referred to as "Nortel");

**Nortel Networks Korea Limited**, a corporation duly incorporated and existing under the laws of Korea with its principal place of business at 16th Floor, Haesung-2 Building, 942-10, Daechi 3-dong, Kangnam-ku, Seoul, Korea (hereinafter referred to as "NNK"); and

**LG-Nortel Co. Ltd.**, a corporation duly incorporated and existing under the laws of Korea with its principal place of business at 7th, 8th Floor, GS Kangnam Tower, 679, Yeoksam-dong, Kangnam-gu, Seoul, Korea (hereinafter referred to as the "JVC").

LGE, Nortel, NNK and the JVC may hereinafter be referred to from time to time as a "Party" in their individual capacities and as "Parties" collectively.

### WITNESSETH:

**WHEREAS**, on August 17, 2005, LGE and Nortel entered into a Joint Venture Agreement (the "Joint Venture Agreement") to set forth the terms and conditions regarding the JVC, including the management and administration of the JVC and other related transactions;

**WHEREAS**, on April [__], 2010, LGE, Nortel and NNK entered into a Termination Agreement (the "Termination Agreement") in order to, among other things, terminate the Joint Venture Agreement; and

**WHEREAS**, pursuant to Section 2.7 of the Termination Agreement, LGE and Nortel agreed to cause the JVC to enter into this Agreement as set forth herein.

**NOW, THEREFORE**, in consideration of the premises and mutual covenants contained herein, the Parties agree as follows:

1.    **Definitions**

Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Termination Agreement.

2.    **Accession**

The JVC hereby confirms and acknowledges that the JVC has been supplied with a copy of the Termination Agreement and agrees to be bound by and enjoy the benefits of the terms and conditions set forth in the Termination Agreement as if the JVC had been a party, together with LGE, Nortel and NNK, to the Termination Agreement at the time of its

execution. Other than the JVC's accession to the Termination Agreement, the Parties acknowledge that there are no other amendments, revisions, supplements or other modifications to the terms and conditions set forth in the Termination Agreement, including the schedules and exhibits thereto, and that such terms and conditions remain in full force and effect.

**3.     Transaction Closing**

At or prior to the Transaction Closing, the JVC shall deliver to LGE, Nortel and NNK, as applicable, duly executed counterparts to each of the Amended Nortel Agreements to which the JVC is or will be a party.

**4.     Termination Agreement**

This Agreement shall be governed and construed in accordance with the terms and conditions of the Termination Agreement.

**5.     Effective Date**

This Agreement shall become effective upon execution hereof.

**6.     Notice**

Any notices given to the JVC under the Termination Agreement shall be in writing and shall be served by hand at, by overnight courier to, by facsimile transmission to, or by certified mail, prepaid post, return receipt requested to, the following addresses and numbers:

> Attn:  Representative Directors
> 7th, 8th Floor, GS Kangnam Tower
> 679 Yeoksam-dong
> Kangnam-gu, Seoul
> Korea
> Attention: Head Legal Counsel and Corporate Secretary
> Fax. No.: +82-2-2005-2263

*[remainder of page left intentionally blank]*

2

IN WITNESS WHEREOF, the authorized representatives of the Parties have executed this Agreement as of the date first written above.

**LG ELECTRONICS INC.**

By:_____
Name:
Title:

**NORTEL NETWORKS LIMITED**

By:_____
Name:
Title:

**NORTEL NETWORKS KOREA LIMITED**

By:_____
Name:
Title:

**LG-NORTEL CO. LTD.**

By:_____
Name:
Title:

Court File No: 09-CL-7950

IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL NETWORKS CORPORATION *et al.*

---

*ONTARIO*
**SUPERIOR COURT OF JUSTICE**
**(COMMERCIAL LIST)**

Proceeding commenced at Toronto

---

**FORTY-FOURTH REPORT OF THE MONITOR DATED APRIL 29, 2010**

---

**GOODMANS LLP**
Barristers & Solicitors
Bay Adelaide Centre
333 Bay Street, Suite 3400
Toronto, ON M5H 2S7

Jay A. Carfagnini (LSUC#: 222936)
Joseph Pasquariello (LSUC# 37389C)
Christopher G. Armstrong (LSUC# 55148B)

Tel: 416.979.2211
Fax: 416.979.1234

Lawyers for the Monitor, Ernst & Young Inc.

5842065