## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

-------------------------------------------------------X

*In re*

Nortel Networks Inc., *et al.*,[1]

                   Debtors.

-------------------------------------------------------X

Chapter 11

Case No. 09-10138 (KG)

Jointly Administered

**Hearing date: May 19, 2010 at 2:00 p.m. (ET)**
**(Proposed)**
**Objections due: May 17, 2010 at 12 :00 p.m. (ET)**
**(Proposed)**

## DEBTORS' MOTION FOR AN ORDER (I) AUTHORIZING THE SALE OF CERTAIN ASSETS OF DEBTORS' GSM/GSM-R BUSINESS FREE AND CLEAR OF ALL LIENS, CLAIMS AND ENCUMBRANCES; (II) AUTHORIZING AND APPROVING THE ASSET SALE AGREEMENT; (III) AUTHORIZING AND APPROVING THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS; AND (IV) AUTHORIZING THE FILING OF CERTAIN DOCUMENTS UNDER SEAL

Nortel Networks Inc. ("NNI") and certain of its affiliates, as debtors and debtors in

possession (collectively, the "Debtors"), hereby move this Court (the "Motion") for the entry of

an order pursuant to sections 105, 107(b)(1), 363 and 365 of title 11 of the United States Code

(the "Bankruptcy Code"), Rules 2002, 6004, 6006, 9014 and 9018 of the Federal Rules of

Bankruptcy Procedure (the "Bankruptcy Rules"), and Rules 6004-1 and 9018-1 of the Local

Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the

District of Delaware (the "Local Rules") (i) authorizing the sale of certain residual assets of the

---

[1]      The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's tax identification number, are:  Nortel Networks Inc. (6332), Nortel Networks Capital Corporation (9620), Nortel Altsystems Inc. (9769), Nortel Altsystems International Inc. (5596), Xros, Inc. (4181), Sonoma Systems (2073), Qtera Corporation (0251), CoreTek, Inc. (5722), Nortel Networks Applications Management Solutions Inc. (2846), Nortel Networks Optical Components Inc. (3545), Nortel Networks HPOCS Inc. (3546), Architel Systems (U.S.) Corporation (3826), Nortel Networks International Inc. (0358), Northern Telecom International Inc. (6286), Nortel Networks Cable Solutions Inc. (0567) and Nortel Networks (CALA) Inc. (4226).  Addresses for the Debtors can be found in the Debtors' petitions, which are available at http://chapter11.epiqsystems.com/nortel.

Debtors' GSM/GSM-R Business (the "Purchased Assets") free and clear of all liens, claims and encumbrances pursuant to section 363 of the Bankruptcy Code, (ii) authorizing and approving that certain asset sale agreement dated as of May 11, 2010 among Nortel Networks Limited ("NNL"), NNI, Nortel Networks (CALA) Inc. ("NN CALA", together with NNL, NNI and certain other entities identified therein as sellers, the "Sellers") and Telefonaktiebolaget L M Ericsson (publ) (together with any Designated Purchaser, "Ericsson" or the "Purchaser") for the sale of the Assets (as defined below) as described therein (the "Agreement")[2], (iii) authorizing and approving the assumption and assignment of the Assumed and Assigned Contracts (as defined below, and together with the Purchased Assets and other contracts as described in the Agreement, the "Assets"), and (iv) authorizing the Debtors to file certain documents under seal. In support of this Motion, the Debtors respectfully represent as follows:

### Jurisdiction

1.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.  This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

2.      The statutory bases for the relief requested herein are sections 105, 107(b)(1), 363 and 365 of the Bankruptcy Code, Rules 2002, 6004, 6006, 9014 and 9018 of the Bankruptcy Rules, and Rules 6004-1 and 9018-1 of the Local Rules.

### Background

**A.      Procedural History**

3.      On January 14, 2009 (the "Petition Date"), the Debtors, other than NN CALA, filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code.

---

[2]      Capitalized terms used but not defined herein have the meanings ascribed to them in the Agreement.

4.      The Debtors continue to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

5.      On January 15, 2009, this Court entered an order of joint administration pursuant to Bankruptcy Rule 1015(b) that provided for the joint administration of these cases and for consolidation for procedural purposes only [D.I. 36].

6.      Also on the Petition Date, the Debtors' ultimate corporate parent Nortel Networks Corporation ("NNC"), NNI's direct corporate parent NNL (NNL, together with NNC and their affiliates, including the Debtors, "Nortel"), and certain of their Canadian affiliates (collectively, the "Canadian Debtors")[3] filed an application with the Ontario Superior Court of Justice (the "Canadian Court") under the Companies' Creditors Arrangement Act (Canada) (the "CCAA"), seeking relief from their creditors (collectively, the "Canadian Proceedings").  The Canadian Debtors continue to manage their properties and operate their businesses under the supervision of the Canadian Court.

7.      On January 14, 2009, the Canadian Court entered an order recognizing these chapter 11 proceedings as a foreign proceeding under section 18.6 of the CCAA.  On February 27, 2009, based on a petition filed by Ernst & Young Inc., as court-appointed Monitor in the Canadian Proceedings and as foreign representative for the Canadian Debtors (the "Monitor"), this Court entered an order recognizing the Canadian Proceedings as foreign main proceedings under chapter 15 of the Bankruptcy Code.

8.      On January 14, 2009, the High Court of England and Wales placed nineteen of Nortel's European affiliates (collectively, the "EMEA Debtors")[4] into administration under the

---

[3]      The Canadian Debtors include the following entities:  NNC, NNL, Nortel Networks Technology Corporation, Nortel Networks Global Corporation and Nortel Networks International Corporation.
[4]      The EMEA Debtors include the following entities:  Nortel Networks UK Limited, Nortel Networks S.A., Nortel Networks (Ireland) Limited, Nortel GmbH, Nortel Networks France S.A.S., Nortel Networks Oy, Nortel Networks Romania SRL, Nortel Networks AB, Nortel Networks N.V., Nortel Networks S.p.A., Nortel Networks B.V., Nortel Networks Polska Sp. z.o.o., Nortel Networks Hispania, S.A., Nortel Networks (Austria) GmbH, Nortel

control of individuals from Ernst & Young LLC (collectively, the "Joint Administrators").  On

May 28, 2009, at the request of the Joint Administrators, the Commercial Court of Versailles,

France (the "French Court") (Docket No. 2009P00492) ordered the commencement of secondary

proceedings in respect of Nortel Networks S.A. ("NNSA"), which consist of liquidation

proceedings during which NNSA was originally authorized to continue to operate as a going

concern for an initial period of three months, which period was subsequently extended to

November 28, 2009.  In accordance with the European Union's Council Regulation (EC) No.

1346/2000 on Insolvency Proceedings, the English law proceedings (the "English Proceedings")

remain the main proceedings in respect of NNSA although a French administrator and a French

liquidator have been appointed and are in charge of the day-to-day affairs and continuing

business of NNSA in France.  On October 1, 2009, pursuant to a motion filed by the Joint

Administrators, the French Court approved an order to: (i) suspend the liquidation operations

relating to the sale of the assets and/or businesses of NNSA for a renewable period of two

months; (ii) authorize the continuation of the business of NNSA so long as the liquidation

operations are suspended; and (iii) maintain the powers of the French Administrator and

Liquidator during the suspension period, except with respect to the sale of assets and/or

businesses of NNSA.  On March 25, 2010, the French Court ended the suspension of the

liquidation operations.  On June 26, 2009, this Court entered an order recognizing the English

Proceedings of Nortel Networks UK Limited ("NNUK") as foreign main proceedings under

chapter 15 of the Bankruptcy Code.[5]

---

Networks, s.r.o., Nortel Networks Engineering Service Kft, Nortel Networks Portugal S.A., Nortel Networks
Slovensko, s.r.o. and Nortel Networks International Finance & Holding B.V.
[5]        Additionally, on January 18, 2009, certain Nortel affiliates, including Nortel Networks Israel (Sales and
Marketing) Limited, filed an application with the Tel-Aviv-Jaffa District Court, pursuant to the Israeli Companies
Law, 1999, and the regulations relating thereto for a stay of proceedings.  On January 19, 2009, the Israeli Court
appointed Yaron Har-Zvi and Avi D. Pelossof as joint administrators of the Israeli Company under the Israeli
Companies Law (the "Joint Israeli Administrators").

9.      On January 26, 2009, the Office of the United States Trustee for the District of Delaware (the "U.S. Trustee") appointed an Official Committee of Unsecured Creditors (the "Committee") pursuant to section 1102(a)(1) of the Bankruptcy Code [D.I.s 141, 142]. An ad hoc group of bondholders holding claims against certain of the Debtors and certain of the Canadian Debtors has also been organized (the "Bondholder Group"). No trustee or examiner has been appointed in the Debtors' cases.

10.     On July 14, 2009 (the "CALA Petition Date"), NN CALA (a Debtor with NNI and its affiliates), an affiliate of NNI, filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. On July 17, this Court entered orders approving the joint administration and consolidation of NN CALA's chapter 11 case with the other Debtors' chapter 11 cases for procedural proposes [D.I. 1098], and applying to NN CALA certain previously entered orders in the Debtors' chapter 11 cases [D.I. 1099]. From time to time, other Nortel affiliates have sought and may seek relief through the commencement of creditor protection or other insolvency or dissolution proceedings around the world.

**B.      Debtors' Corporate Structure and Business**

11.     Nortel is a technology company that historically designed, developed and deployed communication products, systems and solutions to its customers around the globe. Its principal assets include its employees, the intellectual property derived and maintained from its research and development activities, its customers and other significant contracts and agreements.

12.     Additional information regarding the Debtors' corporate structure and business and the events leading to the chapter 11 cases is set forth in the Declaration of John Doolittle in Support of First Day Motions and Applications [D.I. 3] (the "First Day Declaration").

C.      **Case Milestones**

13.     On June 19, 2009, Nortel announced that it was advancing in discussions with external parties to sell its businesses and it would assess other restructuring alternatives for its businesses in the event it is unable to maximize value through sales.  To date, Nortel has closed (i) the sale of certain portions of its Layer 4-7 data portfolio to Radware Ltd. [D.I. 539]; (ii) the sale of substantially all of its CDMA business and LTE Access assets to Ericsson [D.I. 1205]; (iii) the sale of the assets of its Wireless Networks business associated with the development of Next Generation Packet Core network components to Hitachi Ltd. [D.I. 1760]; (iv) the sale of substantially all of the assets of the Enterprise Solutions business globally, including the shares of Nortel Government Solutions Incorporated and DiamondWare Ltd. to Avaya Inc. [D.I. 1514]; (v) the sale of substantially all the assets of its Optical Networking and Carrier Ethernet businesses associated with its Metro Ethernet Networks business unit to Ciena Corporation [D.I. 2070]; and (vi) the sale of substantially all of its GSM/GSM-R business to Ericsson and Kapsch CarrierCom AG ("Kapsch") [D.I. 2065].  In addition, Nortel has obtained Court approval for the planned sale of certain assets of its Carrier Voice Over IP and Application Solutions business to GENBAND Inc. [D.I. 2632].  Efforts continue to be made with respect to the monetization of Nortel's remaining assets.

14.     On August 4, 2009, this Court entered an order fixing September 30, 2009 at 4:00 PM (Eastern Time) as the general bar date for filing proofs of claim or interests [D.I. 1280].  On December 3, 2009 this Court entered an order fixing January 25, 2010 at 4:00 PM (Eastern Time) as the bar date for filing proofs of claim or interests against NN CALA [D.I. 2059].

### Relief Requested

15.     By this Motion, the Debtors seek an order:  (i) authorizing the sale of the Assets free and clear of all liens, claims and encumbrances, (ii) authorizing and approving the

Agreement, (iii) authorizing and approving the assumption and assignment of certain executory

contracts, (iv) authorizing the Debtors to file certain documents under seal, and (vi) granting

them such relief as the Court deems just and proper.

## Facts Relevant to this Motion

### A.    The Retained GSM/GSM-R Business

16.    Global System for Mobile communications ("GSM") is a widely deployed

wireless technology standard for mobile phone networks.  Also based on GSM technology is a

variant of GSM for Railways, which provides a secure communications system for railways

operators.  Prior to the closing of the sale of Nortel's North American and European GSM/GSM-

R Business (as defined below) to Ericsson and Kapsch on March 31, 2010 (the "GSM/GSM-R

March 31st Sale"), Nortel was a supplier of GSM networks to operators globally and worked

with such operators to implement various GSM products.  In this regard, Nortel developed,

manufactured, tested, sold and supplied GSM access and core infrastructure, services and

solutions (such activities collectively, the "GSM/GSM-R Business").

17.    Ericsson bought the North American portion of the GSM/GSM-R Business in the

GSM/GSM-R March 31st Sale, but did not acquire certain contracts and associated assets in the

Asian and Caribbean and Latin American regions at that time.  As more fully set forth in the

Agreement, the proposed sale (the "Sale") would transfer Nortel's Caribbean and Latin

American GSM/GSM-R Business to Ericsson, which is currently operating the remainder of the

North American business.  The assets to be transferred to the Purchaser include, among other

things: certain residual customer contracts with NN CALA, including certain prepetition

executory contracts with NN CALA (the "Assumed and Assigned Contracts"), certain residual

contracts with non-debtor entities including NNL, Nortel Networks de Argentina S.A., Nortel

Networks de Guatemala Ltda ("NN Guatemala"), Nortel Networks del Paraguay S.A. and Nortel

Networks del Uruguay S.A. and certain inventory owned by NN CALA, NN Guatemala, NNI and certain other Sellers (collectively, the "Retained GSM/GSM-R Business"). The Agreement also contemplates that certain Nortel employees currently employed by NN CALA, NN Guatemala and certain other Sellers will transition to the Purchaser.

18.     Nortel evaluated the market for the Retained GSM/GSM-R Business prior to determining that the proposed sale to the Purchaser provides the highest or otherwise best value that may be realized for the Assets. In connection with this effort, Nortel approached approximately ten parties likely to be interested and able to acquire the Assets, including a mix of financial investors and strategic buyers. An information memorandum was provided to the eight parties who executed confidentiality agreements, of which parties, six requested and received management presentations and were granted access to an electronic data room containing confidential diligence materials regarding the Assets. Three parties subsequently submitted expressions of interest, and Nortel then engaged in negotiations with two counterparties regarding potential agreements to sell the Retained GSM/GSM-R Business.

19.     The Debtors believe that the consideration set forth in the Agreement represents the highest or otherwise best offer available for the Assets, that further marketing the Assets would not yield a better offer, and that further delays may cause the Debtors to lose the deal they have with Purchaser. Having recently purchased the North American portion of the GSM/GSM-R Business, the Purchaser is uniquely situated to take on the Debtors' existing customer obligations under the residual customer contracts, which will in turn minimize the Debtors' and their affiliates' liability exposure under those contracts. While another bidder offered a slightly higher purchase price for the Retained GSM/GSM-R Business, Nortel concluded that the other terms and conditions would have been less favorable and there was a greater execution risk with that counterparty

8

**B.    Asset Sale Agreement[6]**

20.    After arm's-length, good faith negotiations among the Sellers and the Purchaser and their respective advisors, the Sellers have agreed, among other things, to convey the Purchased Assets and assume and assign the Assumed and Assigned Contracts to the Purchaser in accordance with the terms and conditions of the Agreement, subject to this Court's and the Canadian Court's approval of the Sale. The Agreement contemplates the sale of the Assets on the following material terms:

- Purchase Price. At the Closing, the Purchaser will pay to the Sellers a base purchase price of $ 2 million (subject to adjustment). (Agreement § 2.2.)

- No Good Faith Deposit. The Purchase Price will be paid in full at Closing. No good faith deposit will be made.

- Assets. The assets to be acquired by the Purchaser include, among other things, certain (i) inventory and supplies, (ii) desktops and laptops used by the Transferred Employees, (iii) Assigned Contracts in force as of the Closing Date, (iv) copies of the Business Information, and (v) contracts and certain bids made by the Sellers for a contract which could result in a contract after the Closing Date. The assets to be acquired by the Purchaser exclude, among other things, certain cash and cash equivalents, accounts receivable, bank account balances and petty cash, and certain assets and rights (for example, the right to tax refunds, credits, or similar benefits, and rights under certain contracts (other than Assigned Contracts)) relating to the pre-closing period. (Agreement §§ 2.1.1 and 2.1.2.)

- Assigned Contracts. The Sellers agree to assign certain Contracts, including customer contracts, to the Purchaser, and to cooperate with the Purchaser to assist in the transition of Bundled Contracts to the Purchaser as they relate to the Assets. The Sellers have agreed to pay the Cure Costs associated with the assignment of the Assigned Contracts. (Agreement §§ 2.1.5, 2.1.6, and 2.1.7.)

- Assumed Liabilities. The liabilities to be assumed by the Purchaser include, among others, (i) liabilities arising after the Closing Date to the extent related to the operation of the Assets by the Purchaser following the Closing, (ii) liabilities arising from the performance of Assigned Contracts after the Closing Date, (iii) certain tax liabilities, (v) certain warranty liabilities and (vi) certain liabilities related to employees and employee benefit plans and under employment laws. (Agreement § 2.1.3.)

---

[6]    To the extent that there are inconsistencies between any summary description of the Agreement contained herein and the terms and conditions of the Agreement, the terms and conditions of the Agreement shall control.

- <u>Sale Free and Clear</u>.  The Assets to be transferred by the Sellers will be transferred free and clear of all liens, claims and encumbrances, other than those expressly assumed by the Purchaser or otherwise expressly permitted under the Agreement. (Agreement § 2.1.1.)

- <u>Closing Conditions</u>.  In addition to certain other customary closing conditions, including conditions relating to approvals by this Court and the Canadian Court, the obligation of the Purchaser to close the sale is subject to the satisfaction of the performance in all material respects of all material covenants, obligations and agreements required to be performed by the Sellers on or before the Closing. (Agreement §§ 8.1 and 8.3.)

- <u>Ongoing Covenants and Restrictions</u>. In addition to certain other customary postclosing obligations such as information-sharing and redirection of customers and payments, the Sellers have agreed to cooperate with the Purchaser for an agreed period after Closing in relation to arrangements regarding (i) Bundled Contracts, and (ii) Assets which are not transferred at Closing due to bankruptcy proceedings commenced in other jurisdictions following execution of the Agreement. (Agreement §§ 5.10 and 5.11.)

- <u>Avoidance Actions</u>. Under the Agreement, the Purchaser will acquire avoidance and recovery actions that the Sellers have against any counterparty to a 365 Contract arising out of or relating to the Assigned Contracts that are actually assigned to the Purchaser. (Agreement § 2.1.1(e).)

- <u>Restrictions on Solicitation of Competing Bids and No Auction</u>.  As the Debtors have thoroughly marketed the Assets and believe that the value of the Assets will further deteriorate if further marketing efforts are pursued, no further public auction is contemplated for the Assets.[7] Under the Agreement the Debtors shall not solicit bids for the sale of any part of the Business. (Agreement § 5.6(g).)

- <u>Post-Closing Access to Books and Records</u>.  For three (3) years after the Closing, and subject to its existing documentation retention policies, the Purchaser must preserve pre-closing records to the extent related to the Assets. The Purchaser and the Sellers must preserve tax records through the end of the applicable statute of limitations period.  Through such periods the Sellers and the Purchaser, as applicable, shall, and/or shall cause the person holding such records to provide to the party requesting the records or its representative reasonable access to such records during normal business hours.  (Agreement §§ 5.18 and 6.5.)

- <u>Certain Ancillary Agreements</u>.  The Agreement contemplates the execution of (i) a Letter Agreement under which certain of the parties to the ancillary agreements executed in connection with the GSM/GSM-R March 31st Sale acknowledge a

---

[7]    Given the purchase price of the Assets, the Debtors believe they would be authorized to sell the Assets (other than the Assumed and Assigned Contracts) pursuant to the *Order Approving Debtors' Motion for Authorization and Approval of Procedures for the Sale or Abandonment of De Minimis Assets* [D.I. 322].  The Debtors are seeking this Court's approval of the Sale to facilitate the assumption and assignment of the Assumed and Assigned Contracts under section 365 of the Bankruptcy Code.

willingness to support the Assets sold under this Sale, (ii) Local Sale Agreements, (iii) a GSM Supply Agreement Amendment, (iv) an Amended and Restated IPLA and (v) a Loaned Employee Agreement that will govern the relationship between the Debtors and the Purchaser with respect to Transferred Employees that are Visa Employees, if any. (Agreement § 5.19.)

**C.     The Assumption and Assignment of Contracts and the Filing of Certain Documents under Seal**

21.     To facilitate and effect the sale of the Assets, the Debtors seek authorization to assume certain prepetition executory contracts of the Debtors related to the Purchased Assets, and to assign such contracts to the Purchaser.

22.     Included in the Assumed and Assigned Contracts designated for assumption and assignment to the Purchaser are contracts between the Debtors and their customers (the "Customer Contracts"). The identity of the counterparties to the Customer Contracts (the "Customer Counterparties") constitutes an integral component of the Assumed and Assigned Contracts' value. Access to the list of Customer Counterparties absent appropriate confidentiality restrictions would entail releasing valuable confidential information of critical value not only to the Purchaser of the Assets but also to the Debtors' remaining business, which share overlapping customer lists. Thus, publicly releasing the names of the Customer Counterparties would have a detrimental impact on the value of the Assets as well as other aspects of the Debtors' business.

23.     The Debtors will serve notice of this Motion on each of the counterparties to the Assumed and Assigned Contracts, including a personalized schedule identifying each of the Assumed and Assigned Contracts substantially in the form attached hereto as Exhibit C.

24.     Bankruptcy Rule 6006(e) allows for the sale of multiple contracts in one motion upon authorization of the Court or if all executory contracts are to be assumed and assigned to the same assignee. The Debtors therefore request that the Court grant authorization to file an omnibus motion pursuant to Bankruptcy Rule 6006(f)(6).

### *Cure Amounts*

25.     To the extent necessary to consummate the Sale, the Debtors shall pay the amounts, if any, necessary to be paid to cure any existing defaults under the Assumed and Assigned Contracts in accordance with section 365(b) and 365(f)(2) of the Bankruptcy Code (the "Cure Amount") promptly.  To the best of the Debtors' knowledge, there are no Cure Amounts to be paid under the Assumed and Assigned Contracts.

### *Adequate Assurance of Future Performance*

26.     The Debtors submit that the Purchaser is able to comply with section 365 of the Bankruptcy Code and to perform the obligations under the Assumed and Assigned Contracts. Ericsson is a Swedish company founded in 1876, with its headquarters in Stockholm, Sweden and its stock is listed on OMX NASDAQ, Stockholm and NASDAQ New York.  Ericsson is the world's leading provider of technology and services to telecom operators.  Ericsson is the leader in 2G, 3G and 4G mobile technologies, provides support for networks with over 1 billion subscribers and has a leading position in managed services.  Ericsson's portfolio comprises of mobile and fixed network infrastructure, telecom services, software, broadband and multimedia solutions for operators, enterprises and the media industry.  Ericsson is advancing its vision "to be the prime driver in an all-communicating world" through innovation, technology, and sustainable business solutions.  In 2008, Ericsson had approximately 75,000 employees working in 175 countries and generated revenue of SEK 209 billion (USD 32.2 billion).  Additional information regarding Ericsson is available from the Annual Report of Ericsson for the fiscal year ended December 31, 2008 as filed with the Securities and Exchange Commission on Form 20-F, and on the Ericsson website at http://www.ericsson.com.  Moreover, given the Purchaser's industry experience and financial wherewithal, especially in light of its recent purchase of substantially all of the assets of the North American portion of the GSM/GSM-R Business in the

GSM/GSM-R March 31st Sale, the Debtors submit that a showing of adequate assurance has been met.

27.    Any counterparty will be deemed to have received adequate assurance of future performance as required by section 365 of the Bankruptcy Code if the Debtors, after payment of any Cure Amounts, would no longer have any payment or delivery obligations under the relevant Assumed and Assigned Contract.

### *Counterparty Objections*

28.    Any counterparty that wishes to object to the assumption and assignment of an Assumed and Assigned Contract must comply with the procedures outlined in this Counterparty Objections section of the Motion (the "Counterparty Objection Procedures").

29.    To the extent that any counterparty wishes to object to any matter pertaining to the proposed assumption and assignment of the Assumed and Assigned Contracts, including without limitation the proposed Cure Amount and the adequate assurance of future performance by the Purchaser under the applicable Assumed and Assigned Contract, such counterparty must file with this Court and serve a written objection by no later than **12:00 p.m. (ET) on May 17, 2010** on (a) counsel to the Debtors:  Cleary Gottlieb Steen & Hamilton LLP, One Liberty Plaza, New York, New York 10006, Facsimile:  (212) 225-3999 (Attention:  James L. Bromley and Lisa M. Schweitzer) and Morris, Nichols, Arsht & Tunnell LLP, 1201 North Market Street, Wilmington, Delaware 19801, Fax:  (302) 658-3989 (Attention:  Derek C. Abbott); (b) counsel to the Purchaser:  Paul, Weiss, Rifkind, Wharton & Garrison LLP, 1285 Avenue of the Americas, New York, New York 10019, Fax: (212) 757-3990 (Attention:  Stephen J. Shimshak and Marilyn Sobel), (c) counsel to the Committee:  Akin Gump Strauss Hauer & Feld LLP, One Bryant Park, New York, New York 10036, Fax:  (212) 872-1002 (Attention:  Fred Hodara, Stephen Kuhn and Kenneth Davis) and Richards, Layton & Finger, P.A., One Rodney Square,

920 North King Street, Wilmington, Delaware 19801 (Attention: Christopher M. Samis), (d)

counsel to the Bondholder Group: Milbank, Tweed, Hadley & McCloy, One Chase Manhattan

Plaza, New York, New York 10006, Fax: (212) 822-5735 (Attention: Roland Hlawaty) and (e)

the Office of the United States Trustee, 844 King Street, Suite 2207, Wilmington, Delaware

19801, Fax: (302) 573-6497 (Attention: Mark Kenney).

30.    All counterparty objections must specify the grounds for such objection, including

stating the counterparty's alleged Cure Amount (including, on a transaction by transaction basis,

calculations and detail of specific charges and dates, and any other amounts receivable or

payable supporting such alleged Cure Amount) if the counterparty disagrees with the Debtors'

proposed Cure Amount and any other defaults or termination events the counterparty alleges

must be cured to effect assignment of the Assumed and Assigned Contract.

31.    To the extent that any counterparty does not timely serve an objection as set forth

above, such counterparty will be (i) deemed to have consented to the Cure Amount set forth on

Exhibit C to this Motion (as Exhibit C may be amended from time to time pursuant to the

procedures set forth below), if any, and to the assumption and assignment of the applicable

Assumed and Assigned Contract; (ii) bound to such corresponding Cure Amount, if any; (iii)

deemed to have agreed that the Purchaser has provided adequate assurance of future performance

within the meaning of Bankruptcy Code sections 365(b)(1)(C) and 365(f)(2)(B); (iv) deemed to

have agreed that all defaults under the Assumed and Assigned Contract arising or continuing

prior to the effective date of the assignment have been cured as a result or precondition of the

assignment, such that the Purchaser or the Debtors shall have no liability or obligation with

respect to any default occurring or continuing prior to the assignment, and from and after the

date of the assignment the Assumed and Assigned Contract shall remain in full force and effect

for the benefit of the Purchaser and the counterparty in accordance with its terms; (v) deemed to

have waived any right to terminate the Assumed and Assigned Contract or designate an early

termination date under the applicable Assumed and Assigned Contract as a result of any default

that occurred and/or was continuing prior to the assignment date; and (vi) deemed to have agreed

that the terms of the order granting this Motion shall apply to the assumption and assignment of

the applicable Assumed and Assigned Contract.

### *Reservation of Rights*

32.    The Debtors' assumption and assignment of the Assumed and Assigned Contracts

is subject to Court approval and consummation of the Sale of the Assets to the Purchaser.  The

Debtors shall be deemed to have assumed each of the Assumed and Assigned Contracts and

assigned such contracts to the Purchaser as of the date of and effective only upon the Closing

Date of the Agreement.  Absent such closing, the Assumed and Assigned Contracts shall be

deemed neither assumed nor assigned and shall in all respects be subject to subsequent

assumption or rejection by the Debtors under the Bankruptcy Code.

33.    The Purchaser shall have no rights in and to a particular Assumed and Assigned

Contract until such time as the particular Assumed and Assigned Contract is assumed and

assigned pursuant to this Motion.

34.    In the event objections to the assumption and assignment of certain contracts are

not resolved prior to Closing, including objections related to Cure Amounts, the Debtors, in

consultation with the Purchaser, may elect to (i) not assume such Assumed and Assigned

Contracts, or (ii) postpone the assumption of such Assumed and Assigned Contracts until the

resolution of such objections.  Any Cure Amounts outstanding on the Closing Date shall be paid

to the appropriate counterparty as a condition subsequent to such assumption and assignment of

the relevant Assumed and Assigned Contracts.

35.     The Debtors reserve and do not waive the right to amend, supplement, withdraw or otherwise modify the information contained in Exhibit C with respect to any particular Assumed and Assigned Contract.

### Supplemental Contract Procedures

36.     If at any time, whether before or after Closing, the Debtors identify additional prepetition executory contracts to be assumed and assigned to the Purchaser as Assumed and Assigned Contracts (each a "Supplemental Assumed and Assigned Contract"), the Debtors shall serve this Motion (including an individualized Exhibit C listing such Supplemental Assumed and Assigned Contract by first class mail, postage prepaid, facsimile, electronic transmission, hand delivery or overnight mail on the counterparty to such contract (and its attorney, if known) at the last known address available to the Debtors by no later than ten (10) calendar days before the proposed effective date of the assignment.

37.     Unless the counterparty or any other entity properly files an objection to the assumption and assignment of a Supplemental Assumed and Assigned Contract in accordance with the Counterparty Objection Procedures within ten (10) calendar days of the date of the service of the Motion on such counterparty, the Debtors may assume and assign the Supplemental Assumed and Assigned Contract, subject to the occurrence of the Closing, without further order or notice of hearing.  If an objection is filed and served in accordance with the Counterparty Objection Procedures within ten (10) calendar days of the date of the service of the Motion on such counterparty, and the objection cannot be resolved consensually, then the Debtors will schedule a hearing to consider the objection on the next scheduled omnibus hearing date.

38.     If the list of Assumed and Assigned Contracts subject to this Motion changes, the Debtors shall file an amended Exhibit C listing the Assumed and Assigned Contracts with the

16

Court within ten (10) days of Closing and with successive changes to the list of Assumed and

Assigned Contracts thereafter.

39.    To facilitate the assumption and assignment of the Assumed and Assigned

Contracts, the Debtors further request that the Court find the anti-assignment provisions of the

Assumed and Assigned Contracts, if any, to be unenforceable under section 365(f) of the

Bankruptcy Code.[8]

**D.    Sale Free and Clear of All Liens, Claims and Interests**

40.    Except as otherwise expressly set forth in the Agreement, the Debtors have agreed

to sell, transfer and assign pursuant to sections 363 and 365 of the Bankruptcy Code, the

Debtors' right, title and interest in the Assets, free and clear of any and all interests, including

(without limitation) (i) any and all liens, including any lien (statutory or otherwise), mortgage,

pledge, security interest, charge, right of first refusal, hypothecation, encumbrance, easement,

encroachment, right-of-way, restrictive covenant on real property, real property license, lease or

conditional sale arrangement (collectively, the "Liens"), and (ii) any and all debts, liabilities and

obligations, whether accrued or fixed, direct or indirect, liquidated or unliquidated, absolute or

contingent, matured or unmatured, determinable or undeterminable, known or unknown,

including those arising under any Law or Action and those arising under any Contract or

otherwise, including any Tax liability (collectively, the "Liabilities" and together with the Liens,

the "Interests"), with such Interests to attach to the sale proceeds in the same validity, extent and

---

[8]    Section 365(f)(1) provides in part that, "notwithstanding a provision in an executory contract or unexpired lease of the debtor, or in applicable law, that prohibits, restricts, or conditions the assignment of such contract or lease, the trustee may assign such contract or lease . . ." 11 U.S.C. § 365(f)(1). Section 365(f)(3) further provides that "Notwithstanding a provision in an executory contract or unexpired lease of the debtor, or in applicable law that terminates or modifies, or permits a party other than the debtor to terminate or modify, such contract or lease or a right or obligation under such contract or lease on account of an assignment of such contract or lease, such contract, lease, right, or obligation may not be terminated or modified under such provision because of the assumption or assignment of such contract or lease by the trustee." 11 U.S.C. § 365(f)(3).

priority as existed with respect to the Assets immediately prior to the Sale, subject to any rights, claims and defenses of the Debtors and other parties in interest.

41.     The Debtors seek a finding by the Court that upon the Closing, and except as otherwise expressly provided in the Agreement, the Purchaser shall not be liable for any Claims against, and Interests and obligations of, the Debtors or any of the Debtors' predecessors or affiliates.  The Debtors further seek a finding by the Court that as of the Closing, subject to the provisions of the U.S. Sale Order, the Purchaser shall succeed to the entirety of the Debtors' rights and obligations in the Assumed and Assigned Contracts first arising and attributable to the time period occurring on or after the Closing and shall have all rights thereunder.

42.     The Debtors further request that (i) all defaults (monetary and non-monetary) under the Assumed and Assigned Contracts through the Closing shall be deemed cured, (ii) no other amounts will be owed by the Debtors, their estates or the Purchaser with respect to amounts first arising or accruing during, or attributable or related to, the period prior to Closing and (iii) any and all persons or entities shall be forever barred and estopped from asserting a claim against the Debtors, their estates, or the Purchaser that any additional amounts are due or defaults exist under the Assumed and Assigned Contracts that arose or accrued, or relate to or are attributable to the period prior to the Closing.

E.      **Canadian Proceedings**

43.     The Sellers will submit the sale of the Assets for approval by the Canadian Court. The Debtors may seek recognition of the Orders of this Court approving the Sale in the Canadian Court.

<u>Basis for Relief</u>

**A.     Sale of the Assets Is a Product of the Debtors' Reasonable Business Judgment**

44.     Section 363(b)(1) of the Bankruptcy Code provides:  "[t]he Trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate."  Section 105(a) of the Bankruptcy Code provides in relevant part:  "The Court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title."

45.     Virtually all courts have held that approval of a proposed sale of assets of a debtor under section 363 of the Bankruptcy Code outside the ordinary course of business and prior to the confirmation of a plan of reorganization is appropriate if a court finds that the transaction represents a reasonable business judgment on the part of the trustee or debtor-in-possession.  <u>See</u> <u>In re Abbotts Dairies of Pa.</u>, 788 F.2d 143 (3d Cir. 1986); <u>In re Delaware & Hudson Ry. Co.</u>, 124 B.R. 169, 176 (D. Del. 1991) (holding that the following non-exclusive list of factors may be considered by a court in determining whether there is a sound business purpose for an asset sale: "the proportionate value of the asset to the estate as a whole; the amount of elapsed time since the filing; the effect of the proposed disposition of [sic] the future plan of reorganization; the amount of proceeds to be obtained from the sale versus appraised values of the property; and whether the asset is decreasing or increasing in value"); <u>In re Stroud Ford, Inc.</u>, 164 B.R. 730, 732 (Bankr. M.D. Pa 1993); <u>Titusville Country Club v. Pennbank (In re Titusville Country Club)</u>, 128 B.R. 396, 399 (Bankr. W.D. Pa. 1991); <u>In re Industrial Valley Refrigeration & Air Conditioning Supplies Inc.</u>, 77 B.R. 15, 21 (Bankr. E.D. Pa. 1987); <u>In re Lionel Corp.</u>, 722 F.2d 1063 (2d Cir. 1983); <u>Stephens Indus., Inc. v. McClung</u>, 789 F.2d 386, 391 (6th Cir. 1986); <u>In re Ionosphere Clubs, Inc.</u>, 100 B.R. 670, 675 (Bankr. S.D.N.Y. 1989); <u>In re Phoenix Steel Corp.</u>, 82 B.R. 334, 335-36 (Bankr. D. Del. 1987) (stating that the elements necessary for approval of a

section 363 sale in a chapter 11 case are "that the proposed sale is fair and equitable, that there is

a good business reason for completing the sale and the transaction is in good faith").

46.    The "sound business reason" test requires a trustee or debtor-in-possession to

establish four elements:  (1) that a sound business purpose justifies the sale of assets outside the

ordinary course of business; (2) that accurate and reasonable notice has been provided to

interested persons; (3) that the trustee or the debtor-in-possession has obtained a fair and

reasonable price; and (4) good faith.  In re Titusville Country Club, 128 B.R. at 399; In re

Sovereign Estates, Ltd., 104 B.R. 702, 704 (Bankr. E.D. Pa. 1989); Phoenix Steel Corp., 82 B.R.

at 335-36; see also Stephens Indus., 789 F.2d at 390; In re Lionel Corp., 722 F.2d at 1071.[9]

47.    The sale of the Debtors' Assets meets the "sound business reason" test.  Sound

business purposes justify the sale.  The Debtors believe that a prompt sale of the Assets presents

the best opportunity to realize the maximum value of the Assets for distribution to the Debtors'

estates and their creditors.  The Debtors further believe that the benefit to their creditors will be

adversely affected absent an immediate sale, especially in light of the decrease in the value of the

Assets since the GSM/GSM-R March 31st Sale.  See In re Lionel Corp., 722 F.2d at 1071 (of

factors for court to evaluate on motion under section 363(b), "most important perhaps, [is]

whether the asset is increasing or decreasing in value").  Notice of this Motion will be provided

to interested parties in accordance with the requirements of the Bankruptcy Code, the

Bankruptcy Rules, the Local Rules and applicable Court orders as appropriate under the

circumstances.  Finally, as described above and below, the Debtors believe that they obtained the

highest or otherwise best value for the assets through their solicitation efforts and their arm's-

length and good faith negotiations with the Purchaser.

---

[9]    Lionel's "sound business purpose test" replaces an older rule that held that sales of substantially all of a
debtor's assets prior to the confirmation of a plan of reorganization could only be made in emergencies, i.e. when
the assets to be sold were "wasting" or perishable.  Lionel, 722 F.2d at 1071.

48.     As set forth above, the Debtors have demonstrated compelling and sound business justifications for authorizing the sale of the Assets.  Given that the Purchaser has already purchased the Debtors' North American GSM/GSM-R Business pursuant to the GSM/GSM-R March 31st Sale, the proposed sale of the Assets to the Purchaser represents an opportunity to maximize the value of the Debtors' estates and minimize the residual exposure under the Assigned Contracts proposed to be transferred in the Sale.

**B.      The Purchaser Should be Granted the Protection of Bankruptcy Code Section 363(m)**

49.     The Debtors maintain that the Purchaser is entitled to the protections afforded by Bankruptcy Code section 363(m).

50.     Specifically, Bankruptcy Code section 363(m) provides that:

> [t]he reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease of property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal.

11 U.S.C. § 363(m).

51.     While the Bankruptcy Code does not define "good faith," the Third Circuit in In re Abbotts Dairies of Pennsylvania, Inc., 788 F.2d 143 (3d Cir. 1986) has held that:

> [t]he requirement that a purchaser act in good faith . . . speaks to the integrity of his conduct in the course of the sale proceedings.  Typically, the misconduct that would destroy a purchaser's good faith status at a judicial sale involves fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders.

788 F.2d at 147 (citations omitted); see generally Marin v. Coated Sales, Inc., (In re Coated Sales, Inc.), Case No. 89-3704 (KMW), 1990 WL 212899 (S.D.N.Y. Dec. 13, 1990) (holding that party, to show lack of good faith, must demonstrate "fraud, collusion, or an attempt to take grossly unfair advantage of other bidders"); see also In re Sasson Jeans, Inc., 90 B.R. 608, 610

(S.D.N.Y. 1988) (quoting In re Bel Air Assocs., Ltd., 706 F.2d 301, 305 (10th Cir. 1983)); In re

Pisces Leasing Corp., 66 B.R. 671, 673 (E.D.N.Y. 1986) (examining facts of each case,

concentrating on "integrity of [an actor's] conduct during the sale proceedings" (quoting In re

Rock Indus. Mach. Corp., 572 F.2d 1195, 1198 (7th Cir. 1978)).

52.     Over the last weeks and months, the Debtors have spent a considerable amount of

time and resources negotiating the Agreement at arm's length, with give and take on both sides.

Under the circumstances, this Court should find that the Purchaser is entitled to all of the

protections of Bankruptcy Code section 363(m).

**C.     The Agreement is Not the Subject of Collusive Bidding Under Bankruptcy Code
         Section 363(n)**

53.     As set forth above, the Debtors negotiated with the Purchaser at arm's length and

in good faith regarding the sale of the Assets.  Moreover, the Debtors do not believe that any

such sale will be the result of collusion or other bad faith between bidders or that the sale price

under the Agreement has been or will be controlled by an agreement between potential or actual

bidders within the meaning of Bankruptcy Code section 363(n).

**D.     Privacy Ombudsman**

54.     Under section 363(b)(1) of the Bankruptcy Code, if the sale of a consumer

customer list containing personal information relating to individual persons is inconsistent with

the Debtors' consumer privacy policy, section 332 governs the appointment of a consumer

privacy ombudsman.  11 U.S.C. § 363(b)(1).  Here, none of the Debtors' customers that are

subject to the sale of the Assets are individuals, and the Debtors do not have a consumer privacy

policy, so section 363(b)(1) does not apply, and a consumer privacy ombudsman is not required.

**E.     Sale of the Assets Should Be Free and Clear of Liens, Claims and Interests**

55.     Pursuant to section 363(f) of the Bankruptcy Code, the Debtors seek authority to

sell and transfer the Debtors' right, interest and title in the Assets to the Purchaser free and clear

of all Claims and Interests, except as set forth in the Agreement, with such Claims and Interests

to attach to the proceeds of the sale of the Assets, subject to any rights and defenses of the

Debtors and other parties in interest with respect thereto.  Section 363(f) of the Bankruptcy Code

provides, in pertinent part:

> The trustee may sell property under subsection (b) or (c) of this
> section free and clear of any interest in such property of an entity
> other than the estate, only if –
>
> (1)      applicable nonbankruptcy law permits sale of such property
> free and clear of such interest;
>
> (2)      such entity consents;
>
> (3)      such interest is a lien and the price at which such property
> is to be sold is greater than the aggregate value of all liens on such
> property;
>
> (4)      such interest is in bona fide dispute; or
>
> (5)      such entity could be compelled, in a legal or equitable
> proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f).  See also In re Elliot, 94 B.R. 343, 345 (E.D. Pa. 1988) (holding that section

363(f) written in disjunctive; court may approve sale "free and clear" provided at least one of the

requirements is met).

56.      With respect to each creditor asserting an Interest, one or more of the standards

set forth in Bankruptcy Code § 363(f)(1)-(5) has been satisfied.  Those holders of Claims and

Interests who did not object or who withdrew their objections to the Sale or the Motion are

deemed to have consented to the Motion and Sale pursuant to Bankruptcy Code § 363(f)(2).  The

Debtors submit that the holders of Claims and Interests who do object will fall within one or

more of the other subsections of Bankruptcy Code section 363(f).

57.      A sale free and clear of Claims and Interests is necessary to maximize the value of

the Assets.  The Purchaser would not have entered into the Agreement and would not

consummate the Sale if the sale of the Assets to the Purchaser were not free and clear of all

Claims and Interests, or if the Purchaser would, or in the future could, be liable for any such

Claim or Interest.  A sale of the Assets other than one free and clear of all Claims and Interests

would yield substantially less value for the Debtors' estates, with less certainty than the proposed

Sale.  Therefore, the Sale contemplated by the Agreement is in the best interests of the Debtors,

their estates and creditors, and all other parties in interest.  A sale free and clear of Claims and

Interests is particularly appropriate under the circumstances because any lien or claim in, to or

against the Debtors' right, interest and title in the Assets that exists immediately prior to the

closing of any sales will attach to the sale proceeds allocated to the Debtors with the same

validity, priority, force and effect as existed with respect to the Assets at such time, subject to the

rights and defenses of the Debtors or any party in interest.  The Debtors submit that holders of

Claims and Interests, if any, will be adequately protected by the availability of the proceeds of

the sale to satisfy their Claims and Interests.

**F.    The Assumption and Assignment of the Assumed and Assigned Contracts Should Be Authorized**

58.    Under Bankruptcy Code section 365(a), a debtor, "subject to the court's approval,

may assume or reject any executory contract or unexpired lease of the debtor." 11 U.S.C.

§ 365(a).  Bankruptcy Code section 365(b)(1), in turn, codifies the requirements for assuming an

executory contract of a debtor.  This subsection provides:

> (b) (1)      If there has been a default in an executory
> contract or unexpired lease of the debtor, the trustee may not
> assume such contract or lease unless, at the time of assumption of
> such contract or lease, the trustee -
>
>> (A)     cures, or provides adequate assurance that
>> the trustee will promptly cure, such default . . . ;
>>
>> (B)     compensates, or provides adequate
>> assurance that the trustee will promptly compensate, a party
>> other than the debtor to such contract or lease, for any

24

actual pecuniary loss to such party resulting from such
default; and

       (C)     provides adequate assurance of future
performance under such contract or lease.

11 U.S.C. § 365(b)(1).  Section 365(f)(2) of the Bankruptcy Code provides, in pertinent part,

that:

The trustee may assign an executory contract or unexpired lease of
the debtor only if --

       (A)     the trustee assumes such contract or lease in
accordance with the provisions of this section; and

       (B)     adequate assurance of future performance by
the assignee of such contract or lease is provided, whether
or not there has been a default in such contract or lease.

11 U.S.C. § 365(f)(2).

59.    The meaning of "adequate assurance of future performance" depends on the facts

and circumstances of each case, but should be given "practical, pragmatic construction." EBG

Midtown S. Corp. v. McLaren/Hart Envtl. Eng'g Corp. (In re Sanshoe Worldwide Corp.), 139

B.R. 585, 593 (S.D.N.Y. 1992).

60.    Among other things, adequate assurance may be provided by demonstrating the

assignee's financial health and experience in managing the type of enterprise or property

assigned.  See, e.g., In re Bygaph, Inc., 56 B.R. 596, 605-06 (Bankr. S.D.N.Y. 1986) (finding

adequate assurance of future performance present when prospective assignee of lease from

debtor has financial resources and has expressed willingness to devote sufficient funding to

business in order to give it strong likelihood of succeeding).  In this case, the Purchaser is

uniquely qualified in this respect since it recently acquired the North American portion of the

Debtors' GSM/GSM-R Business.

61.     To the extent any defaults exist under any Assumed and Assigned Contracts, any such default will be promptly cured or adequate assurance that such default will be cured will be provided prior to the assumption and assignment.  If necessary, the Purchaser will submit facts prior to or at the hearing on this Motion to show the financial credibility of the Purchaser and Purchaser's willingness and ability to perform under the Assumed and Assigned Contracts.  The hearing on this Motion will therefore provide the Court and other interested parties the opportunity to evaluate and, if necessary, challenge the ability of the Purchaser to provide adequate assurance of future performance under the Assumed and Assigned Contracts, as required under section 365(b)(1)(C) of the Bankruptcy Code.

62.     In addition, the Debtors submit that it is an exercise of their sound business judgment to assume and assign the Assumed and Assigned Contracts to the Purchaser, and that the assumption, assignment, and sale of the Assumed and Assigned Contracts is in the best interests of the Debtors, their estates, their creditors, and all parties in interest.  The Assumed and Assigned Contracts being assigned to the Purchaser are the principal asset being purchased by the Purchaser, and accordingly, such assumption, assignment, and sale of Assumed and Assigned Contracts are reasonable and enhance the value of the Debtors' estates.  The Court should therefore authorize the Debtors to assume and assign the Assumed and Assigned Contracts as set forth herein.

## G.     Information Regarding the Debtors' Customers Is Confidential Commercial Information and Should Be Filed Under Seal

63.     The Debtors propose to file the lists of Customer Contracts to be assumed and assigned under seal and to serve individualized notices of the assignment to the relevant Counterparties.

64.     The relief requested by the Debtors is squarely authorized under the Bankruptcy

Code.  Section 107(b) of the Bankruptcy Code provides bankruptcy courts with the power to

issue orders to protect a party's confidential, commercial or proprietary information:

> On request of a party in interest, the bankruptcy court shall . . .
> protect an entity with respect to a trade secret or confidential
> research, development, or commercial information. . . .

11 U.S.C. § 107(b).

65.     Furthermore, Bankruptcy Rule 9018 defines the procedure by which a party may

move for relief under section 107(b) of the Bankruptcy Code:

> On motion or on its own initiative, with or without notice, the court
> may make any order which justice requires . . . to protect the estate
> or any entity in respect of a trade secret or other confidential
> research, development, or commercial information . . . .

Fed. R. Bankr. P. 9018.

66.     This Court has defined "commercial information" in the context of section 107(b)

as follows:

> Commercial information is information which would result in 'an
> unfair advantage to competitors by providing them information as
> to the commercial operations of the debtor.'

In re Alterra Healthcare Corp., 353 B.R. 66, 75-76 (Bankr. D. Del. 2006) (citing In re Orion

Pictures Corp., 21 F.3d 24, 27-28 (2d Cir. 1994)).  This Court has also explained that section

107(b)'s exception to usual public disclosure mandated by section 107(a) is "intended to avoid

'affording an unfair advantage to competitors by providing them information as to the

commercial operations of the debtor.'"  In re MUMA Services Inc., 279 B.R. 478, 484 (Bankr.

D. Del. 2002) (citing In re Itel Corp., 17 B.R. 942, 944 (B.A.P. 9th Cir. 1982)).

67.     Since information related to the Customer Contracts is "commercial information"

within the ambit of section 107, the Court should enter an order permitting the Debtors to file

under seal all confidential information related to the Customer Contracts.

68.     The identities of Customer Counterparties constitute confidential commercial

information because they represent a significant aspect of the value of the Assets.  Access to the

list of Customer Counterparties absent appropriate confidentiality restrictions would entail

releasing confidential information of critical value not only to any prospective purchaser of the

Customer Contracts but also to the Debtors' other businesses.  Therefore, it is critical to the

preservation of the value of the Debtors' estate that the Court allow for this confidential

information to be filed under seal.

69.     As such, the Debtors respectfully submit that the Court permit the Debtors to file

documents listing the names and addresses of such parties, including certificates of service and

Exhibit C to this Motion, under seal.

**H.      Filing of Schedules Under Seal**

70.     The Debtors respectfully submit that it is appropriate to allow the disclosure

schedules and all exhibits and schedules to the Agreement (the "Schedules") be filed under seal.

The Schedules contain substantial sensitive commercial information concerning the Debtors'

business, including identifying information of the Debtors' employees.  Disclosure of this

confidential commercial information would be damaging to the Debtors and the Purchaser if it is

disclosed to their competitors.  The filing of the Schedules to the Agreement under seal is in the

best interests of the Debtors and their estates, creditors, and interest holders and all other parties

in interest herein.

**I.      Waiver of Automatic Fourteen-Day Stay Under Bankruptcy Rules 6004(h) and
          6006(d)**

71.     Pursuant to Bankruptcy Rule 6004(h), unless the Court orders otherwise, all

orders authorizing the sale of property pursuant to section 363 of the Bankruptcy Code are

automatically stayed for fourteen days after entry of the order.  Similarly, under Bankruptcy Rule

6006(d), unless the Court orders otherwise, all orders authorizing the assignment of contracts or

unexpired leases are automatically stayed for fourteen days after entry of the order. The purpose of Bankruptcy Rules 6004(h) and 6006(d) is to provide sufficient time for an objecting party to request a stay pending appeal before the order can be implemented. See Advisory Committee Notes to Fed. R. Bankr. P. 6004(h); Advisory Committee Notes to Fed. R. Bankr. P. 6006(d).

72.     Although Bankruptcy Rules 6004(h) and 6006(d) and the Advisory Committee Notes are silent as to when a court should "order otherwise" and eliminate or reduce the 14-day stay period, commentators agree that the 14-day stay period should be eliminated to allow a sale or other transaction to close immediately where there has been no objection to the procedure. See generally 10 Collier on Bankruptcy ¶ 6004.09 (15th ed. 1999). Furthermore, if an objection is filed and overruled, and the objecting party informs the court of its intent to appeal, the stay may be reduced to the amount of time necessary to file such appeal. Id.

73.     Pursuant to the Agreement, and because of the potentially diminishing value of the Assets, the Debtors must close this sale promptly after all closing conditions have been met or waived. Thus, waiver of any applicable stays is appropriate in this circumstance.

## Notice

74.     Notice of the Motion has be given via first-class mail, facsimile, electronic transmission, hand delivery or overnight mail to (i) counsel to the Purchaser; (ii) the Office of the U.S. Trustee; (iii) the Monitor; (iv) counsel to the Committee; (v) counsel to the Bondholder Group; (vi) the non-debtor parties to the Assumed and Assigned Contracts; (vii) all taxing authorities or recording offices which have a reasonably known interest in the relief requested, (viii) all United States federal, state, and local regulatory authorities with jurisdiction over the Debtors, (ix) each of the entities that had received an invitation from the Sellers to acquire the Assets, (x) all entities reasonably known by the Debtors to have asserted a lien against the Assets, and (xi) the general service list established in these chapter 11 cases pursuant to

Bankruptcy Rule 2002. The Debtors submit that under the circumstances no other or further notice is necessary.

**No Prior Request**

75.    No prior request for the relief sought herein has been made to this or any other court.

WHEREFORE, the Debtors respectfully request that this Court (i) grant this Motion and the relief requested herein; (ii) enter the proposed order attached hereto; and (iii) grant such other and further relief as it deems just and proper.

Dated: May 11, 2010  
      Wilmington, Delaware

CLEARY GOTTLIEB STEEN & HAMILTON LLP

James L. Bromley (admitted *pro hac vice*)  
Lisa M. Schweitzer (admitted *pro hac vice*)  
One Liberty Plaza  
New York, New York 10006  
Telephone:  (212) 225-2000  
Facsimile:  (212) 225-3999

- and -

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

Derek C. Abbott (No. 3376)  
Eric D. Schwartz (No. 3134)  
Ann C. Cordo (No. 4817)  
Andrew R. Remming (No. 5120)  
1201 North Market Street  
P.O. Box 1347  
Wilmington, Delaware 19801  
Telephone:  (302) 658-9200  
Facsimile: (302) 658-3989

*Counsel for the Debtors and Debtors in Possession*