## Exhibit A

**Asset Sale Agreement**

*Execution Version*

# ASSET SALE AGREEMENT

BY AND AMONG

## NORTEL NETWORKS LIMITED,

## NORTEL NETWORKS INC.,

## NORTEL NETWORKS (CALA) INC.

AND

## THE OTHER ENTITIES IDENTIFIED HEREIN AS SELLERS

AND

## TELEFONAKTIEBOLAGET L M ERICSSON (PUBL)

## DATED AS OF MAY 11, 2010

# TABLE OF CONTENTS

Page

ARTICLE I
INTERPRETATION

Section 1.1.  Definitions ................................................................................................ 2

Section 1.2.  Cross-References ..................................................................................... 13

Section 1.3.  Interpretation .......................................................................................... 14

ARTICLE II
PURCHASE AND SALE OF ASSETS

Section 2.1.  Purchase and Sale ................................................................................... 16

Section 2.2.  Purchase Price ........................................................................................ 22

Section 2.3.  Closing .................................................................................................... 22

Section 2.4.  Designated Purchaser(s) ........................................................................ 23

ARTICLE III
REPRESENTATIONS AND WARRANTIES OF THE PURCHASER

Section 3.1.  Organization and Corporate Power ........................................................ 24

Section 3.2.  Authorization; Binding Effect; No Breach ............................................ 24

Section 3.3.  Financing ................................................................................................. 25

Section 3.4.  Adequate Assurance of Future Performance ......................................... 25

Section 3.5.  Purchaser's Acknowledgments; Exclusivity of Representations and
Warranties ............................................................................................... 26

Section 3.6.  Brokers .................................................................................................... 26

ARTICLE IV
REPRESENTATIONS AND WARRANTIES OF THE SELLERS

Section 4.1.  Organization and Corporate Power ........................................................ 26

Section 4.2.  Authorization; Binding Effect; No Breach; No Litigation .................... 27

Section 4.3.  Labor and Employee Benefits Matters .................................................. 28

Section 4.4.  Contracts ................................................................................................. 29

Section 4.5.  Brokers .................................................................................................... 30

Section 4.6.  Title to Tangible Assets .......................................................................... 30

Section 4.7.  Compliance with Laws; Consents .......................................................... 31

Section 4.8.  Tax. ......................................................................................................... 31

Section 4.9.  Representations and Warranties by the Other Sellers ............................ 31

i

# TABLE OF CONTENTS

## ARTICLE V
### COVENANTS AND OTHER AGREEMENTS

| | | |
|---|---|---|
| Section 5.1. | Bankruptcy Actions | 32 |
| Section 5.2. | Consultation; Notification | 33 |
| Section 5.3. | Pre-Closing Cooperation | 34 |
| Section 5.4. | Public Announcements | 35 |
| Section 5.5. | Further Actions | 35 |
| Section 5.6. | Conduct of Business | 35 |
| Section 5.7. | Transaction Expenses | 37 |
| Section 5.8. | Confidentiality | 37 |
| Section 5.9. | Certain Payments or Instruments Received from Third Parties | 38 |
| Section 5.10. | Non-Assignable Contracts | 38 |
| Section 5.11. | Bundled Contracts | 40 |
| Section 5.12. | Post-Closing Assistance for Litigation | 41 |
| Section 5.13. | Delivery of Assets | 41 |
| Section 5.14. | Termination of Overhead and Shared Services | 41 |
| Section 5.15. | Financing | 42 |
| Section 5.16. | Guarantees and Other Credit Support of the Business | 42 |
| Section 5.17. | Use of Trademarks | 42 |
| Section 5.18. | Maintenance of Books and Records | 42 |
| Section 5.19. | Certain Ancillary Agreements | 43 |
| Section 5.20. | Casualty | 43 |
| Section 5.21. | Affiliates | 43 |
| Section 5.22. | Pre-Closing Access to Information | 43 |
| Section 5.23. | Insurance Matters | 44 |
| Section 5.24. | Sellers' Accessible Information; Cooperation | 45 |
| Section 5.25. | Disclosure Schedules and Certain Information | 45 |
| Section 5.26. | Inbound License Agreements | 46 |

## ARTICLE VI
### TAX MATTERS

| | | |
|---|---|---|
| Section 6.1. | Transfer Taxes | 46 |

ii

# TABLE OF CONTENTS

| | | |
|---|---|---|
| Section 6.2. | Withholding Taxes | 47 |
| Section 6.3. | Tax Characterization of Payments Under This Agreement | 47 |
| Section 6.4. | Apportionment of Taxes | 47 |
| Section 6.5. | Tax Records | 48 |
| Section 6.6. | Tax Returns | 48 |
| Section 6.7. | Purchase Price Allocation | 49 |

ARTICLE VII
EMPLOYMENT MATTERS

| | | |
|---|---|---|
| Section 7.1. | Employment Obligations | 50 |
| Section 7.2. | Other Employee Covenants | 53 |
| Section 7.3. | Excluded Employee Liabilities | 54 |
| Section 7.4. | Sole Benefit of Sellers and Purchaser | 55 |

ARTICLE VIII
CONDITIONS TO THE CLOSING

| | | |
|---|---|---|
| Section 8.1. | Conditions to Each Party's Obligation | 56 |
| Section 8.2. | Conditions to Sellers' Obligation | 56 |
| Section 8.3. | Conditions to Purchaser's Obligation | 57 |

ARTICLE IX
TERMINATION

| | | |
|---|---|---|
| Section 9.1. | Termination | 57 |
| Section 9.2. | Effects of Termination | 58 |

ARTICLE X
MISCELLANEOUS

| | | |
|---|---|---|
| Section 10.1. | No Survival of Representations and Warranties or Covenants | 59 |
| Section 10.2. | Remedies | 59 |
| Section 10.3. | No Third Party Beneficiaries | 59 |
| Section 10.4. | Consent to Amendments; Waivers | 59 |
| Section 10.5. | Successors and Assigns | 59 |
| Section 10.6. | Governing Law; Submission to Jurisdiction; Waiver of Jury Trial | 60 |
| Section 10.7. | Notices | 61 |
| Section 10.8. | Exhibits; Sellers Disclosure Schedule | 62 |
| Section 10.9. | Counterparts | 63 |

# TABLE OF CONTENTS

| | | |
|---|---|---|
| Section 10.10. | No Presumption | 63 |
| Section 10.11. | Severability | 63 |
| Section 10.12. | Headings | 63 |
| Section 10.13. | Entire Agreement | 63 |
| Section 10.14. | Availability of Equitable Relief | 64 |
| Section 10.15. | Bulk Sales Laws | 64 |
| Section 10.16. | Main Sellers as Representative of Other Sellers | 64 |
| Section 10.17. | Execution by Other Sellers | 65 |

# EXHIBITS

Exhibit A – Other Sellers

Exhibit B – Non-Debtor Sellers

Exhibit C – Loaned Employee Agreement

Exhibit D – Letter Agreement

Exhibit E – GSM Supply Agreement Amendment

Exhibit F – Amended and Restated IPLA

## ASSET SALE AGREEMENT

This Asset Sale Agreement is dated as of May 11, 2010, among Nortel Networks Limited, a corporation organized under the laws of Canada ("**NNL**"), Nortel Networks Inc., a corporation organized under the laws of Delaware ("**NNI**"), Nortel Networks (CALA) Inc. a corporation organized under the laws of Florida ("**CALA**" and, together with NNL and NNI, the "**Main Sellers**"), the Affiliates (as defined below) of NNL and CALA listed in Exhibit A hereto (the "**Other Sellers**" and, together with the Main Sellers, the "**Sellers**") and Telefonaktiebolaget L M Ericsson (publ), a corporation organized under the laws of Sweden (the "**Purchaser**").

### W I T N E S S E T H:

WHEREAS, the Sellers beneficially own and operate the Business (as defined below);

WHEREAS, on the Petition Date, NNL and certain of its Canadian affiliates filed with the Canadian Court (as defined below) an application for protection under the Companies' Creditors Arrangement Act (the "**CCAA**") (the proceedings commenced by such application, the "**CCAA Cases**") and were granted certain initial creditor protection pursuant to an order issued by the Canadian Court on the same date, which also appointed Ernst & Young Inc. as "**Monitor**" in connection with the CCAA Cases, as such order has been and may be extended, amended and restated from time to time by the Canadian Court;

WHEREAS, NNI and CALA are debtors-in-possession under the U.S. Bankruptcy Code (as defined below) having commenced cases under Chapter 11 of the U.S. Bankruptcy Code on the Petition Date by filing voluntary petitions for relief in the U.S. Bankruptcy Court for the District of Delaware (the "**Chapter 11 Cases**");

WHEREAS, the Other Sellers listed in Exhibit B hereto (the "**Non-Debtor Sellers**") are not subject to any Bankruptcy Proceedings (as defined below) as of the date hereof;

WHEREAS, the Sellers have agreed to transfer to the Purchaser and/or the Designated Purchasers (as defined below), and the Purchaser has agreed to purchase and assume, and cause the Designated Purchasers to purchase and assume, including, to the extent applicable, pursuant to Sections 363 and 365 of the U.S. Bankruptcy Code, the Assets and the Assumed Liabilities (each as defined below) from the Sellers, upon the terms and conditions set forth hereinafter;

WHEREAS, the Parties (as defined below) acknowledge and agree that the purchase by the Purchaser (and the Designated Purchasers, if any) of the Assets (as defined below) and the assumption by the Purchaser and the Designated Purchasers of the Assumed Liabilities (as defined below) are being made at arm's length and in good faith and without intent to hinder, delay or defraud creditors of the Sellers and their Affiliates; and

WHEREAS, in addition, at the Closing, the Purchaser and the relevant Sellers contemplated to be parties thereto will, and will cause their respective Affiliates contemplated to be parties thereto to, enter into the following ancillary agreements:  (i) the Local Sale Agreements, (ii) the Letter Agreement, (iii) the GSM Supply Agreement Amendment, (iv) the

Amended and Restated IPLA and (v), if any Transferred Employees are Visa Employees, the Loaned Employee Agreement (together, the "**Ancillary Agreements**").

NOW, THEREFORE, in consideration of the respective covenants, representations and warranties made herein, and of the mutual benefits to be derived hereby (the sufficiency of which is acknowledged), the Parties agree as follows:

## ARTICLE I

## INTERPRETATION

Section 1.1.    <u>Definitions</u>.  Capitalized terms used but not otherwise defined herein shall have the meanings set forth below:

"**Accrued Vacation Amount**" means, at any given time, the amount of compensation with respect to the accrued and unused vacation hours that is due and owing to the Transferred Employees from their respective employer.

"**Action**" means any litigation, action, suit, charge, binding arbitration, Tax audit or other legal, administrative, regulatory or judicial proceeding.

"**Acquired Actions**" means any avoidance or recovery actions as used under Section 542, 543, 544, 545, 546, 547, 548 or 550 of the Bankruptcy Code or the equivalent provisions or recovery under other applicable Laws that the Sellers have against any counterparty to a 365 Contract arising out of or relating to the Assigned Contracts that are actually assigned to the Purchaser or a Designated Purchaser hereunder.

"**Affiliate**" means, as to any Person, any other Person that directly or indirectly through one or more intermediaries Controls, or is under common Control with, or is Controlled by, such Person; <u>provided</u>, that neither Nortel Networks UK Limited or any Subsidiary of Nortel Networks UK Limited shall be deemed an Affiliate of any Seller.

"**Agreement**" means this Asset Sale Agreement, the Sellers Disclosure Schedule and all Exhibits and Schedules attached hereto and thereto and all amendments hereto and thereto made in accordance with Section 10.4.

"**Amended and Restated IPLA**" means that certain Amended and Restated Intellectual Property License Agreement between NNL, on the one hand, and the Purchaser and/or any of its Affiliates named therein, on the other hand, to be executed and delivered by the parties thereto at the Closing substantially in the form attached hereto as Exhibit F.

"**Assigned Contracts**" means all 365 Contracts and Non-365 Contracts except Non-Assigned Contracts.

"**Bankruptcy Court**" means the U.S. Bankruptcy Court, the Canadian Court or any other court before which Bankruptcy Proceedings are filed.

2

"**Bankruptcy Laws**" means the U.S. Bankruptcy Code, the CCAA and the other applicable bankruptcy, insolvency, administration or similar Laws of any jurisdiction where Bankruptcy Proceedings are held.

"**Bankruptcy Proceedings**" means the Chapter 11 Cases, the CCAA Cases and any proceedings thereunder, as well as any other voluntary or involuntary bankruptcy, insolvency, administration, liquidation or similar judicial proceedings concerning any of the Sellers.

"**Business**" means the GSM infrastructure and solutions business of the Sellers solely as it relates to the performance of (i) the Assigned Contracts or (ii) any portions of a Bundled Contract relating exclusively to the Products and Services, in each case as conducted as of the Closing Date, but excluding, in each case, (i) Excluded Products and Services, as defined in the GSM Agreement and (ii) Overhead and Shared Services.

"**Business Day**" means a day on which the banks are opened for business (Saturdays, Sundays, statutory and civic holidays excluded) in (i) New York, New York, United States, (ii) Toronto, Ontario, Canada and (iii) Stockholm, Sweden.

"**Canadian Court**" means the Ontario Superior Court of Justice.

"**Claim**" has the meaning set forth in Section 101(5) of the U.S. Bankruptcy Code.

"**COBRA**" means the continuation coverage required by Section 4980B of the Code or any similar Law.

"**Code**" means the United States Internal Revenue Code of 1986, as amended.

"**Collective Labor Agreement**" means any written agreement that a Seller or any of its Affiliates has entered into with any union, works council or collective bargaining agent with respect to terms and conditions of employment of the employees of such Seller or its Affiliates.

"**Confidentiality Agreement**" means the confidentiality agreement between Purchaser and the other parties listed therein dated March 4, 2010.

"**Consent**" means any approval, authorization, consent, order, license, permission, permit, qualification, exemption or waiver by any Government Entity or other Third Party.

"**Contract**" means any binding contract, agreement, subcontract, purchase order, work order, sales order, indenture, note, bond, instrument, lease, mortgage, ground lease, commitment, covenant or undertaking.

"**Control**", including, with its correlative meanings, "Controlled by" and "under common Control with", means, in connection with a given Person, the possession, directly or indirectly, or as trustee or executor, of the power to either (i) elect more than fifty percent (50%) of the directors of such Person or (ii) direct or cause the direction of the management and

3

policies of such Person, whether through the ownership of securities, contract, credit arrangement or otherwise.

"**Cross-Border Protocol**" means that certain Cross-Border Insolvency Protocol approved by the U.S. Bankruptcy Court pursuant to Section 105(a) of the U.S. Bankruptcy Code in an order dated January 15, 2009 and by the Canadian Court pursuant to an order, dated January 14, 2009, as the same may be amended from time to time.

"**Cure Cost**" means (i) any amounts required by Section 365(b)(1) of the U.S. Bankruptcy Code to cure any defaults by the relevant U.S. Debtor under a 365 Contract and to pay any actual pecuniary losses that have resulted from such defaults under such 365 Contract, and (ii) with respect to any Non-365 Contract, any amounts required to cure any defaults and to pay any actual pecuniary losses under such Contract in respect of the period prior to the Closing Date that are required by the counterparty thereto to be paid in order for such Non-365 Contract to be assigned.

"**Distribution Agent**" means a distribution agent to be appointed by the Sellers prior to the Closing Date.

"**Effective Hire Date**" means the day on which the employment of an Employee commences or continues with the Purchaser or its Affiliates as provided in this Agreement.

"**Employee**" means any employee of the Sellers engaged in the Business, as listed in Section 4.3(b) of the Sellers Disclosure Schedule.

"**Employee Information**" has the meaning set forth in Section 4.3(b).

"**Employee Records**" means books, records, files, or other documentation, whether in electronic or other form, with respect to Employees.

"**Employee Transfer Date**" means, with respect to each jurisdiction where Employees will become Transferred Employees in accordance with this Agreement, 12:01 a.m. local time in such jurisdiction on the day immediately following the Closing Date.

"**ERISA**" means the Employee Retirement Income Security Act of 1974, as amended.

"**ERISA Affiliate Liability**" means any obligation, liability, or expense of any Seller which arises under or relates to any Seller Employee Plan that is subject to Title IV of ERISA, Section 302 of ERISA, Section 412 of the Code, COBRA or any other statute or regulation that imposes liability on a so-called "controlled group" basis with or without reference to any provision of Section 414 of the Code or Section 4001 of ERISA, including by reason of any Seller's affiliation with any of its ERISA Affiliates or the Purchaser being deemed a successor to any ERISA Affiliate of any Seller.

"**Final Order**" means an order of any Bankruptcy Court or other court of competent jurisdiction (i) as to which no appeal, notice of appeal, motion to amend or make additional findings of fact, motion to alter or amend judgment, motion for rehearing or motion

4

for new trial has been timely filed by any party (other than the Purchaser) or, if any of the foregoing has been timely filed, it has been disposed of in a manner that upholds and affirms the subject order in all material respects without the possibility for further appeal or rehearing thereon; (ii) as to which the time for instituting or filing an appeal, motion for rehearing or motion for new trial shall have expired; and (iii) as to which no stay is in effect; provided, however, that, with respect to an order issued by the U.S. Bankruptcy Court, the filing or pendency of a motion under Federal Rule of Bankruptcy Procedure 9024 or Federal Rule of Civil Procedure 60 shall not cause an order not to be deemed a "Final Order" unless such motion shall be filed within fourteen (14) days of the entry of the order at issue.

"**GAAP**" means the United States generally accepted accounting principles.

"**Government Entity**" means any U.S., Canadian, supranational, foreign, domestic, federal, territorial, provincial, state, municipal or local governmental authority, quasi-governmental authority, instrumentality, court, government or self-regulatory organization, commission, tribunal, arbitral body or organization or any regulatory, administrative or other agency, or any political or other subdivision, department or branch of any of the foregoing.

"**GSM**" means Global System for Mobile communications.

"**GSM Agreement**" means that certain Asset Sale Agreement, dated as of November 24, 2009 and as amended, modified, supplemented or restated from time to time, by and among Nortel Networks Corporation, Nortel Networks Inc., Nortel Networks Limited and certain other affiliated entities named therein, and the Purchaser.

"**GSM Supply Agreement Amendment**" means that certain Amendment No. 1 to GSM Products and Services Supply Agreement between Nortel Networks Inc., on the one hand, and the Purchaser and/or any Designated Purchasers, on the other hand, to be executed and delivered by the parties thereto at the Closing substantially in the form attached hereto as Exhibit E.

"**Inactive Employees**" means Employees on a Seller-approved leave of absence who are expected to return and actually return to work within the relevant time period set out below.  An Employee shall be an Inactive Employee for purposes hereof only if such individual is absent as a result of military service, pregnancy or parental leave, disability leave, medical leave, jury duty or any leave provided under applicable Law and, in the case of leaves provided under applicable Law, is expected to return to work and actually returns to work in the time permitted for such leave under applicable Law and, for any other leave, is expected to return to work and actually returns to work in accordance with the terms of such leave but not longer than ninety (90) days following the Closing Date.

"**Indebtedness**" of any Person means at any date, without duplication, all obligations of such Person to the extent incurred for the Business (i) for indebtedness for borrowed money (including any unpaid principal, premium and accrued and unpaid interest or fees), (ii) for indebtedness evidenced by bonds, debentures, notes or similar instruments, (iii) in respect of leases whether or not capitalized in accordance with the Nortel Accounting Principles under which such Person is the lessee, (iv) in respect of letters of credit issued for the account of

5

such Person (to the extent drawn), (v) in respect of guarantees of the obligations of other Persons of the type referred to in clauses (i) through (iv) above and (vi) any termination fees, prepayment penalties, "breakage" cost or similar payments associated with the repayment or default under any of the Indebtedness referred to in items (i) and (ii) above.

"**Intellectual Property**" means all intellectual and industrial property rights and any and all forms of protection having equivalent or similar effect anywhere in the world as recognized under the Laws of all countries and jurisdictions, whether registered or unregistered and including applications for the registration or grant of any such rights, including rights in or to any of the following: (a) Trademarks; (b) Patents; (c) works of authorship; (d) mask works; (e) trade secrets, know-how and confidential technical or business information; (f) Software; (g) databases; and (h) industrial designs.

"**Inventory**" means any inventories of raw materials, manufactured and purchased parts, works in process, packaging, stores and supplies, unassigned finished goods inventories (which are finished goods not yet assigned to a specific customer order) and merchandise.

"**KERP**" means the Nortel Networks Corporation Key Employee Retention Plan approved by the U.S. Bankruptcy Court in the District of Delaware on March 5, 2009, and approved by the Canadian Court on March 6, 2009, as the same may be amended, modified, supplemented or replaced from time to time.

"**Knowledge**" or "**aware of**" or "**notice of**" or a similar phrase means, with reference to the Sellers, the actual knowledge of those Persons listed on Section 1.1(a) of the Sellers Disclosure Schedule.

"**Law**" means any U.S., Canadian, foreign, supranational, domestic, federal, territorial, state, provincial, local or municipal statute, law, common law, ordinance, rule, regulation, judicial, administrative or other order, writ, injunction, directive, judgment, decree or policy or guideline having the force of law.

"**Letter Agreement**" means the letter agreement by and among Nortel Networks Corporation, Nortel Networks Inc., Nortel Networks Limited and certain other affiliated entities named therein, and the Purchaser, that the parties hereto will cause to be executed and delivered by the parties thereto at the Closing substantially in the form attached hereto as Exhibit D.

"**Liabilities**" means debts, liabilities and obligations, whether accrued or fixed, direct or indirect, liquidated or unliquidated, absolute or contingent, matured or unmatured or determined or undeterminable, known or unknown, including those arising under any Law or Action and those arising under any Contract or otherwise, including any Tax liability.

"**Lien**" means any lien (statutory or otherwise), mortgage, pledge, security interest, charge, right of first refusal, hypothecation, encumbrance, easement, encroachment, right-of-way, restrictive covenant on real property, real property license, prior claim, lease or conditional sale arrangement.

6

"**Loaned Employee Agreement**" means the agreement with respect to Transferred Employees who are Visa Employees between the applicable Sellers, on the one hand, and the Purchaser and/or any Designated Purchasers, on the other hand, to be executed and delivered on or before the Closing substantially in the form attached hereto as Exhibit C.

"**Losses**" means all losses, damages, Liabilities, deficiencies, interest, awards, judgments, fines, penalties and reasonable and documented out-of-pocket costs and expenses (including reasonable attorneys' fees and disbursements and the costs of litigation, including reasonable amount paid in investigation, defense or settlement of an Action).

"**Material Adverse Effect**" means any circumstance, state of fact, event, change or effect (each an "**Effect**") that, individually or in the aggregate with all other Effects, (a) is or could reasonably be materially adverse to the business, operations, assets, liabilities, results of operations or financial condition of the Business, taken as a whole, or (b) prevents or could reasonably be expected to prevent the ability of the Sellers to perform their material obligations under this Agreement or the timely consummation of the transactions contemplated by this Agreement, but excluding, for purposes of clauses (a) and (b), (i) Effects resulting from changes in general economic conditions in the United States, Canada, South America or Latin America, (ii) Effects arising from the execution or delivery of this Agreement or the Transactions or the public announcement thereof, (iii) Effects that result from any action required to be taken pursuant to this Agreement or any action taken pursuant to the written request or with the prior written consent of the Purchaser, (iv) Effects relating to the industries and markets in which the Business operates, (v) Effects relating to changes in Law, generally accepted accounting principles or official interpretations of the foregoing, (vi) Effects relating to or including the attrition of customers prior to the Closing Date, or (vii) Effects relating to the pendency of the Bankruptcy Proceedings and any action approved by, or motion made before, the Bankruptcy Courts; it being understood that the failure of the Business to achieve internal or external financial forecasts or projections, by itself, will not constitute a Material Adverse Effect; provided, that, with respect to clauses (i), (iv), and (v), any such Effect shall be included to the extent such Effect has a materially disproportionate effect on the Business, taken as a whole, as compared to other industry participants.

"**Non-Assigned Contract**" means a Non-Assignable Contract as to which all applicable Consents to assignment have not been granted prior to the Closing Date.

"**Non-Solicitation Period**" means the twenty-four (24) month period immediately following March 31, 2010.

"**Nortel Accounting Principles**" means the accounting principles employed by Nortel in the Business, as set forth in Section 1.1(b) of the Sellers Disclosure Schedule.

"**Order**" means any decision, judgment, order, writ, injunction, decree, award or determination of any Government Entity.

"**Ordinary Course**" means the ordinary course of the Business consistent with recent past practice since the filing of the Bankruptcy Proceedings, as such practice may be modified from time to time to the extent necessary to reflect the Bankruptcy Proceedings and as

such practice may be modified from time to time to reflect the separation of the Business from the other businesses of the Sellers in a manner consistent with the terms hereof.

"**Overhead and Shared Services**" means corporate or shared services provided to or in support of the Business that are general corporate or other overhead services or provided to both (i) the Business and (ii) other businesses or business segments of any Seller, including travel and entertainment services, temporary labor services, office supplies services (including copiers and faxes), personal telecommunications services, computer hardware and software services, fleet services, energy/utilities services, procurement and supply arrangements, research and development, treasury services, public relations, legal, compliance and risk management services (including workers' compensation), payroll services, sales and marketing support services, information technology and telecommunications services, accounting services, tax services, human resources and employee relations management services, employee benefits services, credit, collections and accounts payable services, logistics services, property management services, environmental support services and customs and excise services, in each case including services relating to the provision of access to information, operating and reporting systems and databases and including all hardware and software or other Intellectual Property necessary for or used in connection therewith.

"**Owned Net Inventory**" means all of the Inventory listed on Section 1.1(c) of the Sellers Disclosure Schedule, as adjusted up to the Closing Date in the Ordinary Course, an estimate as of the Closing Date of which shall be delivered by the Sellers to the Purchaser two (2) Business Days prior to the Closing Date.

"**Party**" or "**Parties**" means individually or collectively, as the case may be, the Sellers and the Purchaser.

"**Patents**" means all national and multinational statutory invention registrations, invention disclosures, patents, utility models, patent applications, provisional patent applications, including all reissues, divisions, continuations, continuations-in-part, extensions and re-examinations thereof, and all rights therein provided by multinational treaties or conventions.

"**Permitted Encumbrances**" means (i) statutory Liens for Taxes or governmental assessments, charges or claims the payment of which is not yet due, or if due, for Taxes the validity of which is being contested in good faith by appropriate proceedings and for which adequate reserves have been established to the extent required by GAAP, other than Liens that may be discharged at Closing pursuant to the terms of the U.S. Sale Order; (ii) mechanics', carriers', workers', repairers', landlords', warehouses and similar Liens arising or incurred in the Ordinary Course for sums not yet delinquent or overdue or which are being contested in good faith by appropriate proceedings and for which adequate reserves have been established to the extent required by GAAP; (iii) any Liens imposed by any Bankruptcy Court in connection with the Bankruptcy Proceedings that are to be discharged at Closing pursuant to the terms of the Canadian Approval and Vesting Order or the U.S. Sale Order; and (iv) present or future zoning, entitlement, building and land use regulations, customary covenants, defects of title, easements, rights of way, restrictions and other similar charges or encumbrances which do not impair in any material respect the use or value of the related assets in the Business as currently conducted.

"**Person**" means an individual, a partnership, a corporation, an association, a limited or unlimited liability company, a joint stock company, a trust, a joint venture, an unincorporated organization or other legal entity or Government Entity.

"**Petition Date**" means January 14, 2009, except with respect to CALA where it means July 14, 2009.

"**Pre-Closing Taxable Period**" means any Taxable period ending on or prior to the Closing Date.

"**Primary Party**" means (i) the Main Sellers, on the one hand, and (ii) the Purchaser, on the other hand.

"**Products**" has the meaning assigned to such term in the GSM Agreement.

"**Purchaser Employee Plan**" means any "employee benefit plan" within the meaning of Section 3(3) of ERISA and any other employee benefit plan or agreement, including any profit sharing plan, savings plan, bonus plan, performance awards plan, incentive compensation plan, deferred compensation plan, stock purchase plan, stock option plan, vacation plan, leave of absence plan, employee assistance plan, automobile leasing/subsidy/allowance plan, expense reimbursement plan, meal allowance plan, redundancy or severance plan or agreement, termination or retirement indemnity plan, relocation plan, family support plan, pension plan, supplemental pension plan, retirement plan, early or ill health retirement plan, retirement savings plan, post-retirement plan, medical, health, hospitalization or life insurance plan, disability plan, sick leave plan, retention plan, education assistance plan, expatriate assistance plan, compensation arrangement, including any base salary arrangement, overtime, on-call or call-in policy, death benefit plan, or any other similar plan, program, arrangement or policy that is maintained or otherwise contributed to, or required to be maintained or contributed to, by or on behalf of the Purchaser or any of its Subsidiaries or Affiliates with respect to their employees employed in those countries where they will employ Transferred Employees pursuant to this Agreement.

"**Representatives**" means as to any Person, the attorneys, accountants, consultants, financial advisors and other similar representatives and agents of such Person.

"**Seller Employee Plan**" means (i) any "employee benefit plan" within the meaning of Section 3(3) of ERISA and any other employee benefit plan or agreement including any employee agreement other than immaterial employment agreements, profit sharing plan, savings plan, bonus plan, performance awards plan, incentive compensation plan, deferred compensation plan, stock purchase plan, stock option plan, vacation plan, leave of absence plan, employee assistance plan, automobile leasing/subsidy/allowance plan, expense reimbursement plan, meal allowance plan, redundancy or severance plan or agreement, relocation plan, family support plan, pension plan, supplemental pension plan, retirement plan, retirement savings plan, post retirement plan, medical, health, hospitalization or life insurance plan, disability plan, sick leave plan, retention plan, education assistance plan, expatriate assistance plan, compensation arrangement, including any base salary arrangement, overtime, on-call or call-in policy, death benefit plan, or any other similar plan, program, arrangement or policy under which the Sellers

9

or any of their Subsidiaries or Affiliates have any Liabilities, or that is maintained or otherwise contributed to, or required to be maintained or contributed to, by or on behalf of the Sellers or any of their Subsidiaries or Affiliates with respect to Employees, or former employees of the Business, or pursuant to which payments are made, or benefits are provided to, or an entitlement to payments or benefits may arise with respect to any Employees or former employees of the Business (or any spouses, dependants or beneficiaries of any such individuals) and (ii) any other employee benefit plan with respect to which the Purchaser or any of its Affiliates could have any Liability as a result of the Sellers or any of their Subsidiaries or Affiliates maintaining such plan prior to the Closing Date.

"**Sellers Disclosure Schedule**" means the disclosure schedule delivered by the Sellers to the Purchaser on the date hereof.

"**Seller Insurance Policies**" means all current or previous insurance policies of the Sellers and their Affiliates, including all environmental, directors' and officers' Liability, fiduciary Liability, employed lawyers, property and casualty flood, ocean marine, contaminated products insurance policies and all other insurance policies or programs arranged or otherwise provided or made available by the Sellers or their Affiliates that cover (or covered) any of the Assets at any time prior to the Closing.

"**Services**" has the meaning assigned to such term in the GSM Agreement.

"**Software**" means any and all (i) computer programs, whether in source code or object code, (ii) computerized databases and compilations, and (iii) documentation, compilation tools, development tools and support tools associated with (i) and /or (ii).

"**Subsidiary**" of any Person means any Person Controlled by such first Person.

"**Tax**" means (a) any domestic or foreign federal, state, local, provincial, territorial or municipal taxes or other impositions by or on behalf of any Government Entity, including the following taxes and impositions: net income, gross income, individual income, capital, value added, goods and services, harmonized sales, gross receipts, sales, use, *ad valorem*, business rates, transfer, franchise, profits, business, environmental, real property, personal property, service, service use, withholding, payroll, employment, unemployment, severance, occupation, social security, excise, stamp, stamp duty reserve, customs, and all other taxes, fees, duties, assessments, deductions, withholdings or charges of the same or of a similar nature, however denominated, together with any interest and penalties, additions to tax or additional amounts imposed or assessed with respect thereto, and (b) any obligation to pay Taxes of a Third Party, whether by contract, as a result of transferee or successor liability, as a result of being a member of an affiliated, consolidated, combined or unitary group for any period or otherwise.

"**Tax Authority**" means any local, municipal, governmental, state, provincial, territorial, federal, including any U.S., Canadian or other fiscal, customs or excise authority, body or officials (or any entity or individual acting on behalf of such authority, body or officials) anywhere in the world with responsibility for, and competent to impose, collect or administer, any form of Tax.

10

"**Tax Returns**" means all returns, reports (including elections, declarations, disclosures, schedules, estimates and information returns) and other information filed or required to be filed with any Tax Authority relating to Taxes, including any amendments thereto.

"**Third Party**" means any Person that is neither a Party nor an Affiliate of a Party.

"**Trademarks**" means, together with the goodwill associated therewith, all trademarks, service marks, trade dress, logos, distinguishing guises and indicia, trade names, corporate names, business names, domain names, whether or not registered, and all common law rights, and registrations, applications for registration and renewals thereof, including, without limitation, all marks registered in the trademark offices of any nation throughout the world, and all rights therein provided by multinational treaties or conventions.

"**Transaction Documents**" means this Agreement, the Ancillary Agreements and all other ancillary agreements to be entered into, or documentation delivered by, any Party and/or any Designated Purchaser pursuant to this Agreement or any Local Sale Agreement.

"**Transfer Tax Returns**" has the meaning set forth in Section 6.6(a).

"**Transfer Taxes**" means all goods and services, harmonized sales, sales, excise, use, transfer, gross receipts, documentary, filing, recordation, value-added, stamp, stamp duty reserve, and all other similar Taxes, duties or other like charges, however denominated (including any real property transfer Taxes and conveyance and recording fees), together with interest, penalties and additional amounts imposed with respect thereto.

"**Transferred Employee**" means (i) Employees who accept an offer of employment by, and commence employment with, the Purchaser or a Designated Purchaser in accordance with the terms of Section 7.1 and (ii) those Employees whose employment transfers by operation of Law.

"**Transferred Employee Plan**" means any Seller Employee Plan that is transferred (or the Liabilities of which are transferred) to the Purchaser or Designated Purchaser by operation of Law, but excluding the Specified Employee Liabilities.

"**Transition Services Agreement**" means that certain Transition Services Agreement, dated as of March 31, 2010, and as amended, modified, supplemented or restated from time to time, by and among Nortel Networks Corporation, Nortel Networks Inc., NNL and certain other affiliated entities named therein, and the Purchaser.

"**U.S. Bankruptcy Code**" means Title 11 of the United States Code.

"**U.S. Bankruptcy Court**" means the United States Bankruptcy Court for the District of Delaware.

"**U.S. Bankruptcy Rules**" means the U.S. Federal Rules of Bankruptcy Procedure.

"**U.S. Debtors**" means NNI and CALA.

"**U.S. Sale Motion**" has the meaning set forth in Section 5.1(a).

"**U.S. Sale Order**" means the sale order of the U.S. Bankruptcy Court approving the sale of the Assets to the Purchaser (or a Designated Purchaser) and the assignment by CALA to, and assumption thereof by, the Purchaser (or a Designated Purchaser) of the 365 Contracts and the Assumed Liabilities pursuant to Sections 105, 363 and 365 of the U.S. Bankruptcy Code in form and substance reasonably satisfactory to the Sellers and the Purchaser and consistent herewith.

"**Visa Employees**" means Employees (other than Employees whose employment transfers by operation of Law) who are identified as having a visa or permit in Section 4.3(b) of the Sellers Disclosure Schedule and whose employment with Purchaser or a Designated Purchaser cannot commence until the required visa or permit for a transfer of employment to Purchaser or a Designated Purchaser (with respect to such Employee) is obtained.  An Employee shall be a Visa Employee for purposes hereof only if such Employee receives and accepts an employment offer from Purchaser as provided in Section 7.1 and has an Effective Hire Date that occurs within twelve (12) months following the Closing Date.

"**WARN Act**" means the Worker Adjustment and Retraining Notification Act of 1989, as amended, or any similar Law requiring notice to employees in the event of a plant closing or mass layoff.

Section 1.2.    Cross-References.  Each of the following terms shall have the meaning specified in the Section of this Agreement set forth opposite such term:

| Term | Section |
| --- | --- |
| Ancillary Agreements | Recitals |
| Assets | 2.1.1 |
| Assumed Liabilities | 2.1.3 |
| Bankruptcy Consents | 4.1(a) |
| Bidder Confidentiality Agreement | 5.8(b) |
| Bundled Contract | 5.11 |
| Business Information | 2.1.1(d) |
| CALA | Preamble |
| Canadian Approval and Vesting Order | 5.1(c) |
| Canadian Approval and Vesting Order Motion | 5.1(c) |
| CCAA | Recitals |
| CCAA Cases | Recitals |
| Chapter 11 Cases | Recitals |
| Closing | 2.3.1 |
| Closing Date | 2.3.1 |
| Confirmed Designated Purchaser | 2.4 |
| Designated Purchaser | 2.4 |
| Employee Information | 4.3(b) |
| Excluded Assets | 2.1.2 |
| Excluded Employee Liabilities | 7.3 |
| Excluded Liabilities | 2.1.4 |
| Inbound RF Software Licenses | 5.26(a) |

13

| | |
|---|---|
| Local Sale Agreements | 2.1.8 |
| Main Sellers | Preamble |
| Monitor | Recitals |
| New York Courts | 10.6(b) |
| Non-Assignable Contracts | 5.10(a) |
| Non-Assignable Customer Contract | 5.10(c) |
| Non-Assignable Customer Contracts Indemnitees | 5.10(c) |
| Non-Assignable Customer Counterparty | 5.10(c) |
| Non-Assignable Period | 5.10(c) |
| Non-Debtor Sellers | Recitals |
| Non-365 Contracts | 2.1.6 |
| Other Sellers | Preamble |
| Partial Allocation | 6.7(b) |
| Purchase Price | 2.2.1 |
| Purchaser | Preamble |
| Seller Bid | 2.1.1(g) |
| Seller Indemnitees | 5.8(b) |
| Sellers | Preamble |
| Sellers' Trademarks | 5.17 |
| Specified Employee Liabilities | 2.1.4(g) |
| Straddle Period | 6.4(b) |
| 365 Contracts | 2.1.5(a) |

Section 1.3.    Interpretation.

1.3.1.    Gender and Number.  Any reference in this Agreement to gender includes all genders and words importing the singular include the plural and vice versa.

14

1.3.2.   <u>Certain Phrases and Calculation of Time</u>.  In this Agreement (i) the words "including" and "includes" mean "including (or includes) without limitation", (ii) the terms "hereof," "herein," and "herewith" and words of similar import shall, unless otherwise stated, be construed to refer to this Agreement and not to any particular provision of this Agreement, and Article, Section, paragraph, Exhibit and Schedule references are to the Articles, Sections, paragraphs, Exhibits and Schedules to this Agreement unless otherwise specified, and (iii) in the computation of periods of time from a specified date to a later specified date, unless otherwise expressly stated, the word "from" means "from and including" and the words "to" and "until" each mean "to but excluding", and (iv) in determining whether an asset is "exclusively" used in connection with the Business, incidental, de minimis or casual uses outside the Business shall not be considered.  If the last day of any such period is not a Business Day, such period will end on the next Business Day.

When calculating the period of time "within" which, "prior to" or "following" which any act or event is required or permitted to be done, notice given or steps taken, the date which is the reference date in calculating such period is excluded from the calculation.  If the last day of any such period is not a Business Day, such period will end on the next Business Day.

The reference to any "list" set forth in the Sellers Disclosure Schedule shall mean a list that is complete and accurate, taking into account that disclosure in one section of the Sellers Disclosure Schedule of any facts or circumstances shall be deemed an adequate response and disclosure of such facts and circumstances with respect to any other representations and warranties by Seller calling for disclosure of such information whether or not such disclosure is specifically associated with it or purports to respond to one or more of such other representations or warranties if it is reasonably apparent on the face of the Sellers Disclosure Schedule that such disclosure is applicable.

1.3.3.   <u>Headings, etc.</u>  The inclusion of a table of contents, the division of this Agreement into Articles and Sections and the insertion of headings are for convenient reference only and are not to affect or be used in the construction or interpretation of this Agreement.

1.3.4.   <u>Currency</u>.  All monetary amounts in this Agreement, unless otherwise specifically indicated, are stated in United States currency.  All calculations and estimates to be performed or undertaken, unless otherwise specifically indicated, are to be expressed in United States currency.  All payments required under this Agreement shall be paid in United States currency in immediately available funds, unless otherwise specifically indicated herein.  Where another currency is to be converted into United States currency it shall be converted on the basis of the exchange rate published in the Wall Street Journal (National Edition) for the day in question.

1.3.5.   <u>Statutory References</u>.  Unless otherwise specifically indicated, any reference to a statute in this Agreement refers to that statute and to the regulations made under that statute as in force from time to time.

## ARTICLE II

## PURCHASE AND SALE OF ASSETS

Section 2.1.    Purchase and Sale.

2.1.1.    Assets.  Subject to the terms and conditions of this Agreement, at the Closing, the Purchaser shall, and shall cause the relevant Designated Purchasers to, purchase or accept assignment and assume from the relevant Sellers, and each Seller shall sell, transfer or assign to the Purchaser or the relevant Designated Purchasers, all of such Seller's right, title and interest in and to the following assets (such assets, the "**Assets**") (x) in the case of Assets that are transferred or assigned by the U.S. Debtors, free and clear of all Liens and Claims (other than Permitted Encumbrances and Liens created by or through the Purchaser, the Designated Purchasers or any of their Affiliates) pursuant to Sections 363 and 365 of the U.S. Bankruptcy Code, (y) in the case of Assets that are transferred or assigned by NNL, free and clear of all Liens (other than Permitted Encumbrances and Liens created by or through the Purchaser, the Designated Purchasers or any of their Affiliates) pursuant to the Canadian Approval and Vesting Order, when granted, and (z) in the case of Assets that are transferred or assigned by the Other Sellers, free and clear of all Liens (other than Permitted Encumbrances and Liens created by or through the Purchaser, the Designated Purchasers or any of their Affiliates):

(a) the Owned Net Inventory as of the Closing Date;

(b) the desk tops and lap tops used exclusively by the Transferred Employees;

(c) the Assigned Contracts in force as of the Closing Date;

(d) copies of all books, records, files, ledgers, documentation, sales literature or similar information existing as of the Closing Date and in the possession or under control of the Sellers and that, in each case, relates directly to the Business (the "**Business Information**"), subject to Section 2.1.2(h);

(e) all rights as of the Closing (i) under all warranties, representations and guarantees made by suppliers, manufacturers and contractors to the extent related to the Assigned Contracts, and (ii) with respect to Acquired Actions;

(f) to the extent freely assignable under applicable Law, all Consents of Government Entities exclusively pertaining to the Business (the "**Seller Consents**"),

(g) all rights that may be freely transferred as of the Closing Date arising from or in connection with any bid, proposal, offer or quotation which, if accepted, would result in the award of a Contract with a customer (each, a "**Seller Bid**"), each as set forth in Section 2.1.1(g) of the Sellers Disclosure Schedule, which, subject to the prior written consent of the Purchaser, the Sellers shall be entitled to update and/or supplement from time to time prior to the Closing; and

(h) the assets set forth on Section 2.1.1(h) of the Sellers Disclosure Schedule.

16

2.1.2.  Excluded Assets.  Notwithstanding anything in this Section 2.1 or elsewhere in this Agreement or in any of the Transaction Documents to the contrary, nothing herein shall be deemed to sell, transfer, assign or convey (or require Sellers to do any of the foregoing as to) the following assets to the Purchaser or any Designated Purchaser, and the Sellers shall retain all of their respective rights, title and interests in and to, and the Purchaser and the Designated Purchasers shall have no rights with respect to, the rights, title and interests of the Sellers in and to any of  (x) the respective assets of the Sellers (other than the Assets), and (y) the following assets ((x) and (y), collectively, the "**Excluded Assets**"):

(a)  cash and cash equivalents, accounts receivable (including intercompany receivables, bank account balances and all petty cash of the Sellers;

(b)  any refunds due from, or payments due on, claims with the insurers of any of the Sellers in respect of Losses arising prior to the Closing Date (except as provided in Section 5.20);

(c)  all rights to Tax refunds, credits or similar benefits relating to the Assets or the Business allocable to a Pre-Closing Taxable Period or to the portion of a Straddle Period ending on and including the Closing Date;

(d)  all claims, causes of action and rights of Sellers or any Subsidiary thereof to the extent relating to any Excluded Liabilities or to any Liabilities for which Sellers are responsible under this Agreement (including rights of set-off, rights to refunds and rights of recoupment from or against any Third Party but excluding any Acquired Actions);

(e)  any security deposits made by or on behalf of the Sellers (including those relating to Assigned Contracts);

(f)  any rights of the Sellers under any Non-Assigned Contract (except as provided for in Section 5.10);

(g)  the minute books, stock ledgers and Tax records of the Sellers;

(h)  (i) any books, records, files, documentation or sales literature other than the Business Information (subject to clauses (ii) and (iii) below of this subsection), (ii) the Employee Records other than those required to be delivered to the Purchaser pursuant to Article VII, and (iii) such portion of the Business Information, that the Sellers are required by Law (including Laws relating to privilege or privacy, but subject to any exemption from those Laws included in the U.S. Sale Order or the Canadian Approval and Vesting Order) or by any agreement with a Third Party to retain and/or not to disclose (provided that copies of such information shall be provided to the Purchaser and to the extent permitted by applicable Law or such agreement);

(i)  any rights to (A) any Intellectual Property of any of the Sellers (including Sellers' names) or any Affiliates of any of the Sellers or (B) Intellectual Property owned by a Third Party, except to the extent licensed under an Assigned Contract;

(j)  all rights of the Sellers under this Agreement and the Transaction Documents;

17

(k) all of the rights and claims of the U.S. Debtors available to the U.S. Debtors under the U.S. Bankruptcy Code, of whatever kind or nature, as set forth in Sections 544 through 551, inclusive, 553, 558 and any other applicable provisions of the U.S. Bankruptcy Code, and any related claims and actions arising under such Sections by operation of Law or otherwise, including any and all proceeds of the foregoing but excluding the Acquired Actions;

(l) all records containing personal communications or notes related to the negotiations in connection with the sale of the Assets to the Purchaser and the Designated Purchasers that were not shared with the Purchaser;

(m) all stock or other equity interests in any Person;

(n) any freehold or leasehold interest in any real estate; and

(o) all Seller Employee Plans, and any related assets or insurance policies.

2.1.3. <u>Assumed Liabilities</u>. On the terms and subject to the conditions set forth in this Agreement, at the Closing, the Purchaser shall, and shall cause the relevant Designated Purchasers to, assume and become responsible for, and perform, discharge and pay when due, solely the following Liabilities (the "**Assumed Liabilities**"):

(a) all Liabilities arising on or after the Closing Date to the extent related to the conduct, operation or ownership of the Assets after the Closing Date, including (i) all such Liabilities with respect to the ownership, exploitation and operation of the Assets incurred on or after the Closing Date and (ii) all such Liabilities related to Actions or claims brought against the Assets arising from events occurring after the Closing Date;

(b) all Liabilities arising from or in connection with the performance of the Assigned Contracts after the Closing Date or any arrangements entered into pursuant to Section 5.10 or 5.11 on or after the Closing Date;

(c) any obligations under any warranty Liabilities relating to Products and Services which have been supplied under any Assigned Contract, but excluding any Cure Costs, all of which are payable by Sellers pursuant to Section 2.1.7;

(d) the obligation to post any deposits, bonds or other security in replacement of security posted under any Assigned Contract pursuant to Section 5.16;

(e) all Liabilities for, or related to any obligation for, any Tax that the Purchaser or any Designated Purchaser bears under ARTICLE VI;

(f) all obligations of the Sellers under any warranty Liabilities relating to Products and Services which have been supplied by the Purchaser or any Designated Purchaser under any Non-Assignable Contract the benefit and burden of which has been transferred to the Purchaser in accordance with Section 5.10;

(g) except to the extent otherwise expressly set forth in ARTICLE VII, all Liabilities related to or arising from any of the following: (i) the Purchaser's or any Designated

18

Purchasers' (or any of their Affiliates') employment or termination of employment (whether or not arising under or in respect of any Purchaser Employee Plan) of Transferred Employees arising after the Closing Date; (ii) the Purchaser's or relevant Designated Purchasers' (or any of their Affiliates') offer of employment or notice of continued employment, as applicable, to any Employee pursuant to the terms of Section 7.1 (including any violation of Law in connection therewith);

(h) all Liabilities relating to or arising from or in connection with any Purchaser Employee Plan;

(i) any obligation to provide continuation coverage pursuant to COBRA or any similar Law under any Purchaser Employee Plan that is a "group health plan" (as defined in Section 5000(b)(1) of the Code) to Transferred Employees and/or their qualified beneficiaries with respect to a qualifying event that occurs on or after such Transferred Employees' Effective Hire Date;

(j) all Liabilities related to Transferred Employees expressly assumed by Purchaser or a Designated Purchaser as set out in ARTICLE VII;

(k) all Liabilities related to a Seller Bid arising on or after the Closing Date;

(l) all other Liabilities listed in Section 2.1.3(l) of the Sellers Disclosure Schedule; and

(m) with respect to any Products and Services supplied under any Bundled Contract with a customer of a Seller prior to the Closing Date that is amended in accordance with Section 5.11, (i) any obligations under any warranty liabilities relating to such Products and Services, but excluding any Cure Costs, all of which are payable by the Sellers pursuant to Section 2.1.7; (ii) any Liabilities arising from or in connection with any non-cash incentives relating to Products and Services supplied under such Bundled Contract; and (iii) Liabilities arising from the requirement to provide maintenance services in connection with such Products.

2.1.4. <u>Excluded Liabilities</u>. Except as expressly provided in Section 2.1.3, neither the Purchaser nor the Designated Purchasers, as applicable, shall assume or be deemed to have assumed any Liabilities of the Sellers or their Affiliates other than the Assumed Liabilities (collectively, the "**Excluded Liabilities**"). Without limiting the generality of the foregoing, Excluded Liabilities include:

(a) all Indebtedness of the Sellers and their Affiliates;

(b) all Liabilities arising out of the Contracts that are not Assigned Contracts (including Liabilities arising out of that portion of any arrangement entered into pursuant to Section 5.11 for which Sellers are responsible by the terms thereof);

(c) all accounts payable and trade payables of the Sellers, including intercompany payables;

(d) all fees or commissions of any brokers, funds or investment banks in connection with the transactions contemplated by this Agreement and the other Transaction Documents based upon arrangements made by or on behalf of the Sellers or any of their Affiliates;

(e) all Cure Costs;

(f) all Liabilities for, or related to any obligation for, any Tax that is not expressly assumed by the Purchaser or any of the Designated Purchasers pursuant to ARTICLE VI (including, for the avoidance of doubt, any income or gross receipts Tax imposed on any of the Sellers);

(g) the Accrued Vacation Amount as of the Closing Date (the "**Specified Employee Liabilities**");

(h) all Excluded Employee Liabilities; and

(i) all Liabilities of the Sellers arising under this Agreement and the Ancillary Agreements.

2.1.5.    Assumption and Assignment of 365 Contracts.

(a) At Closing, CALA will assume and assign to the Purchaser or a Designated Purchaser all Contracts set forth on Section 2.1.5(a) of the Sellers Disclosure Schedule, which Contracts (i) are "executory contracts" for the purposes of the U.S. Bankruptcy Code, and (ii) were entered into prior to the Petition Date (all such Contracts, the "**365 Contracts**").

(b) Prior to the Closing Date, the Purchaser or the Main Sellers shall be entitled to update and/or supplement Section 2.1.5(a) of the Sellers Disclosure Schedule, provided that no update and/or supplement shall be permitted without the other Primary Party's prior written consent.

(c) CALA shall seek the approval of the U.S. Bankruptcy Court to permit the assumption and assignment of all the 365 Contracts in accordance with Section 5.1.

2.1.6.    Assignment of Non-365 Contracts.

(a) At Closing, the Sellers will assign to the Purchaser or a Designated Purchaser all Contracts set forth on Section 2.1.6(a) of the Sellers Disclosure Schedule (all such Contracts, the "**Non-365 Contracts**").

(b) Prior to the Closing Date, the Purchaser or the Main Sellers shall be entitled to update and/or supplement Section 2.1.6(a) of the Sellers Disclosure Schedule, provided that no update and/or supplement shall be permitted without the other Primary Party's prior written consent.

(c) Subject to Section 2.1.8, Section 5.10 and the receipt of any required Consent, all Non-365 Contracts in effect as of Closing shall be assigned to the Purchaser or a Designated Purchaser pursuant to Section 2.1.1(c).

2.1.7.   Cure Costs; Adequate Assurance; Efforts

(a) To the extent that assumption and assignment of any 365 Contract entails the payment of any Cure Cost, CALA shall, or shall cause the relevant U.S. Debtor to, if applicable, pay or otherwise provide for payment of such Cure Cost as required by the U.S. Bankruptcy Code and provided in the U.S. Sale Order or such separate order of the U.S. Bankruptcy Court approving and authorizing the assumption and assignment of such 365 Contract.

(b) To the extent that assignment to the Purchaser or a Designated Purchaser of any Non-365 Contract entails the payment of any Cure Cost, the relevant Main Seller shall, or shall cause the relevant Seller to, pay such amounts directly to such counterparty in a manner agreed between such Main Seller or such relevant Seller, as applicable, and such counterparty or ordered by a court of competent jurisdiction.

(c) The Purchaser shall not be responsible for any Cure Costs in connection with any Contract.

(d) Prior to the hearing before the U.S. Bankruptcy Court to approve the assumption and assignment of the 365 Contracts, the Purchaser shall provide, as necessary, adequate assurance of its and the relevant Designated Purchasers' future performance under each 365 Contract to the parties thereto (other than the U.S. Debtors) in satisfaction of Section 365(f)(2)(B) of the U.S. Bankruptcy Code and to the extent required by the U.S. Sale Order or separate order of the U.S. Bankruptcy Court approving and authorizing the assumption and assignment of the 365 Contracts.

(e) The Sellers shall use reasonable best efforts, both before and after Closing, to obtain all Consents in form and substance reasonably satisfactory to the Purchaser required to permit the assignment to the Purchaser (or, if specified by the Purchaser, a Designated Purchaser) of the Assigned Contracts in force as of the Closing Date and the Purchaser shall reasonably cooperate with Sellers to the extent necessary to obtain the same; provided, however, that the Sellers shall be under no obligation to compromise any right, asset or benefit or to expend any amount or incur any Liability in seeking such Consents (other than the payment of Cure Costs pursuant to this Section 2.1.7) and provided further that the failure to obtain any or all of such Consents shall not in itself entitle the Purchaser to terminate this Agreement or fail to complete the transactions contemplated hereby or entitle the Purchaser to any adjustment to the Purchase Price.

2.1.8.   Local Sale Agreements.  Subject to the terms and conditions hereof, if reasonably requested in writing by the Purchaser to effect the Closing on the terms hereof, the relevant Sellers shall, and the Purchaser shall, and shall cause the relevant Designated Purchasers to, enter into such agreements or instruments, including bills of sale and/or assignment and assumption agreements (the "**Local Sale Agreements**"), providing for (i) the sale, transfer, assignment or other conveyance to the Purchaser and relevant Designated Purchasers, in

21

accordance with the requirements of applicable local Law, of any Assets located in countries where such Local Sale Agreements are required, and (ii) the assumption by the Designated Purchasers of any Assumed Liability that the Purchaser intends to allocate to them.  In the event of a conflict between this Agreement and the Local Sale Agreement, this Agreement shall prevail.

Section 2.2.    Purchase Price.  Pursuant to the terms and subject to the conditions set forth in this Agreement, including Section 2.2 of the Sellers Disclosure Schedule, in consideration of the sale, transfer and assignment of the Assets pursuant to the terms hereof, the Purchaser, on its own behalf and as agent for the relevant Designated Purchasers, shall at the Closing (x) assume and become obligated to pay, perform and discharge, when due, the Assumed Liabilities and (y) pay to the Distribution Agent an amount of cash equal to two million dollars ($2,000,000), (as such amount is adjusted pursuant to Section 2.2 of the Sellers Disclosure Schedule, the "**Purchase Price**").

Section 2.3.    Closing.

2.3.1.    Closing Date.  The completion of the purchase and sale of the Assets and the assumption of the Assumed Liabilities (the "**Closing**") shall take place at the offices of Cleary Gottlieb Steen & Hamilton LLP in New York, New York, commencing at 10:00 a.m. local time on the date which is five (5) Business Days after the day upon which all of the conditions set forth under ARTICLE VIII (other than conditions to be satisfied at the Closing, but subject to the waiver or fulfillment of those conditions) have been satisfied or, if permissible, waived by the Main Sellers and/or the Purchaser (as applicable), or on such other place, date and time as shall be mutually agreed upon in writing by the Purchaser and the Main Sellers (the day on which the Closing takes place being the "**Closing Date**").

Subject to the terms and conditions of this Agreement, legal title, equitable title and risk of Loss with respect to the Assets will transfer to the Purchaser or the relevant Designated Purchaser, and the Assumed Liabilities will be assumed by the Purchaser and the relevant Designated Purchasers, at the Closing.

2.3.2.    Closing Actions and Deliveries.  At the Closing:

(a) the Sellers and the Purchaser shall, and shall cause their respective Affiliates to, enter into, (i) the Ancillary Agreements to which it is contemplated that they will be parties, to the extent such agreements have not yet been entered into and (ii) instruments of assignment and assumption effecting the transfer of the Assets from the Sellers to the Purchaser or the Designated Purchaser(s), as applicable;

(b) the Purchaser shall deliver:

(i)    to the Distribution Agent, an amount equal to the Purchase Price, by wire transfer in immediately available funds to an account or accounts designated at least two (2) Business Days prior to the Closing Date by the Main Sellers in a written notice to the Purchaser; and

22

(ii)    to the Main Sellers, a duly executed certificate of an executive officer of the Purchaser certifying the fulfillment of the conditions set forth in Section 8.2.

(c) the Sellers shall deliver or cause to be delivered:

(i)    an updated Section 4.3(b) of the Sellers Disclosure Schedule (if applicable), dated as of a date no earlier than three (3) days prior to the Closing;

(ii)    with respect to each Seller that is a "United States person" within the meaning of Section 7701 of the Code and applicable Treasury Regulations, a duly executed certificate of non-foreign status in accordance with Section 1445 of the Code and applicable Treasury Regulations; and

(iii)    a duly executed certificate of an executive officer of NNL, NNI and CALA certifying the fulfillment of the conditions set forth in Section 8.3.

(d) each Party shall deliver, or cause to be delivered, to the other any other documents reasonably requested by such other Party in order to effect, or evidence the consummation of, the transactions contemplated herein.

Section 2.4.    Designated Purchaser(s). The Purchaser shall be entitled to designate, in accordance with the terms and subject to the limitations set forth in this Section 2.4, one or more Affiliates of the Purchaser to (i) purchase specified Assets (including specified Assigned Contracts), (ii) assume specified Assumed Liabilities, and/or (iii) employ Transferred Employees on and after the Closing Date (any Affiliate of the Purchaser that shall be properly designated by the Purchaser in accordance with this clause, a "**Designated Purchaser**"); it being understood and agreed, however, that any such right of the Purchaser to designate a Designated Purchaser is conditioned upon (x) such Designated Purchaser being able to perform the applicable covenants under Section 2.1.7 and ARTICLE VII and demonstrate satisfaction of the applicable requirements of Section 365 of the U.S. Bankruptcy Code (to the extent applicable), including the provision of adequate assurance for future performance, with respect to the 365 Contracts and (y) any such designation not creating any Liability (including any Liability relating to Taxes) for the Sellers or their Affiliates that would not have existed had the Purchaser purchased the relevant Assets and/or employed the relevant Transferred Employees; provided, further, however, that the Sellers acknowledge and agree that each of Ericsson Inc., Ericsson Canada Inc., or Ericsson AB (each, a "**Confirmed Designated Purchaser**") shall be deemed to satisfy the foregoing conditions and may be a Designated Purchaser.   If the designation of a Confirmed Designated Purchaser creates any Liability relating to Taxes for the Sellers or their Affiliates that would not have existed had the Purchaser purchased the relevant Assets, the Purchaser or the Designated Purchasers shall, notwithstanding anything to the contrary in Article VI, pay such additional amounts to the Sellers such that the total amount received by the applicable Sellers, after reducing such amount by the additional Liability relating to Taxes for the Sellers or their Affiliates created by the designation of such Confirmed Designated Purchaser, will equal the full amount such Seller would have received from the Purchaser had the designation not been made. No such designation shall relieve the Purchaser of any of its obligations hereunder and any breach hereof by a Designated Purchaser shall be deemed a breach by Purchaser.   Except if the

Designated Purchaser is a Confirmed Designated Purchaser, the Purchaser and each Designated Purchaser shall be jointly and severally liable for any obligations delegated or assigned to or assumed by any of them hereunder.

(b) The above designation shall be made by the Purchaser by way of a written notice to be delivered to the Sellers as soon as reasonably practicable after the date hereof and in no event later than the fifteenth (15) day prior to the Closing, which written notice shall (i) for any Designated Purchasers other than the Confirmed Designated Purchasers, contain appropriate information about the Designated Purchaser(s), (ii) indicate which Assets, Assumed Liabilities and Transferred Employees the Purchaser intends such Designated Purchaser(s) to purchase, assume and/or employ, as applicable, hereunder and (iii) include a signed counterpart to this Agreement in a form acceptable to the Main Sellers, agreeing to be bound by the terms of this Agreement as Designated Purchaser(s) and authorizing the Purchaser to act as such Designated Purchaser(s)' agent for all purposes hereunder.

## ARTICLE III

## REPRESENTATIONS AND WARRANTIES OF THE PURCHASER

The Purchaser hereby represents and warrants to the Sellers as follows:

Section 3.1.    <u>Organization and Corporate Power</u>.

(a) The Purchaser is a corporation duly organized, validly existing and in good standing under the Laws of Sweden. Each of the Purchaser and the Designated Purchasers has the requisite corporate power and authority to (i) enter into, deliver and perform its obligations pursuant to each of the Transaction Documents to which it is or will become a party and (ii) to own, lease and operate its assets and to carry on its business as it is now being conducted.

(b) Each of Purchaser and the Designated Purchasers is duly qualified or licensed to own or lease and operate its properties and assets (including the Assets), and is in good standing, in each jurisdiction in which its ownership of assets or operation of business requires it to so qualify or to be so licensed, except to the extent that the failure to be so qualified or licensed would not materially hinder, delay or impair the Purchaser's or any such Designated Purchaser's ability to carry out its obligations under, and to consummate the transactions contemplated by, this Agreement and the Ancillary Agreements to which it is or will become a party.

Section 3.2.    <u>Authorization; Binding Effect; No Breach</u>.

(a) The execution, delivery and performance of each Transaction Document to which the Purchaser or any of the Designated Purchasers is a party have been duly authorized by the Purchaser and the relevant Designated Purchasers, as applicable. This Agreement has been duly executed and delivered by the Purchaser, and the other Transaction Documents to which the Purchaser or any Designated Purchaser is, or on the Closing Date will become, a party have been or will be duly executed and delivered by the Purchaser and each Designated Purchaser party thereto. Assuming due authorization, execution and delivery by the relevant Sellers, each Transaction Document to which the Purchaser or any Designated Purchaser is a party constitutes,

24

or upon execution thereof will constitute, a valid and binding obligation of the Purchaser or such Designated Purchaser, as applicable, enforceable against such Person in accordance with its respective terms, except as such enforceability is limited by bankruptcy, insolvency, reorganization, moratorium or other Laws affecting creditors' rights generally and subject to general principles of equity, regardless of whether considered in a proceeding in equity or at Law.

(b) The execution, delivery and performance by each of the Purchaser and the Designated Purchasers of the Transaction Documents to which the Purchaser or such Designated Purchaser is, or on the Closing Date will be, a party do not and will not conflict with or result in a breach of the terms, conditions or provisions of, constitute a default under, result in a violation of, give to any Person any right of termination, amendment, modification, acceleration or cancellation or any preemptive right or right to the payment of any penalty under, or require any Consent or other action by or declaration or notice to any Government Entity pursuant to (i) the articles, charter or by-laws of the Purchaser or the relevant Designated Purchaser, (ii) any material Contract to which the Purchaser or the relevant Designated Purchaser is a party or to which any of its assets is subject or (iii) any Laws to which the Purchaser, the relevant Designated Purchaser, or any of their assets is subject, except, in the case of (ii) and (iii) above, for such defaults, violations, actions and notifications that have not materially hindered, delayed or impaired, and would not reasonably be expected to, individually or in the aggregate, materially hinder, delay or impair, the performance by the Purchaser or the Designated Purchasers of any of their obligations under the Transaction Documents.

Section 3.3.    <u>Financing</u>.  The Purchaser has, as of the date hereof, and will have as of the Closing (i) sufficient funds available for purposes of funding the transactions contemplated herein and paying any other amount due hereunder or in respect hereof and (ii) the resources and capabilities (financial or otherwise) to perform its obligations hereunder.  The Purchaser has not, as of the date hereof, and will not have as of the Closing, incurred any obligation, commitment, restriction or liability of any kind, which would materially impair or adversely affect such resources and capabilities.  Notwithstanding anything to the contrary herein, the Purchaser's obligations to consummate the transactions contemplated by this Agreement are not conditioned or contingent in any way upon the receipt of financing from any Person.

Section 3.4.    <u>Adequate Assurance of Future Performance</u>.  To the extent required by any Bankruptcy Laws or other Laws, the Purchaser will be able to provide, at Closing or on such earlier date as is designated by the U.S. Bankruptcy Court, adequate assurance of its and/or the relevant Designated Purchasers' future performance under each 365 Contract to the parties thereto (other than the U.S. Debtors) in satisfaction of Section 365(f)(2)(B) of the U.S. Bankruptcy Code, and no other or further assurance will be necessary thereunder with respect to any 365 Contract.

Section 3.5.  Purchaser's Acknowledgments; Exclusivity of Representations and Warranties.

(a) The Purchaser acknowledges and agrees that:

(i)  except for the representations and warranties expressly set forth herein or in any Ancillary Agreement, the Purchaser has not relied on any representation or warranty from the Sellers or any Affiliate of the Sellers or any employee, officer, director, accountant, financial, legal or other representative of the Sellers or their Affiliates in determining whether to enter into this Agreement;

(ii)  except for the representations and warranties expressly set forth in herein or in any Ancillary Agreement, none of the Sellers or any employee, officer, director, accountant, financial, legal or other representative of the Sellers, or any Affiliate of any such Person has made any representation or warranty, express or implied, as to the Business (or the value or future thereof), the Assets, (including any implied representation or warranty as to the condition, merchantability, suitability or fitness for a particular purpose of any of the Assets), the Assumed Liabilities or the accuracy or completeness of any information regarding any of the foregoing that the Sellers or any other Person furnished or made available to the Purchaser and its Representatives (including any projections, estimates, budgets, offering memoranda, management presentations or due diligence materials); and

(iii)  the enforceability of this Agreement against the Sellers is subject to receipt of the Bankruptcy Consents.

Section 3.6.  Brokers.  Except for fees and commissions that will be paid by the Purchaser, no broker, finder or investment banker is entitled to any brokerage, finder's or similar fee or commission in connection with the transactions contemplated by this Agreement and the other Transaction Documents based upon arrangements made by or on behalf of the Purchaser or any of its Affiliates.

## ARTICLE IV

## REPRESENTATIONS AND WARRANTIES OF THE SELLERS

Except (a) as set forth in the Sellers Disclosure Schedule, (b) as expressly contemplated by this Agreement or (c) to the extent relating to the Excluded Assets or the Excluded Liabilities, each of the Main Sellers represents and warrants to the Purchaser as set forth in this ARTICLE IV:

Section 4.1.  Organization and Corporate Power.

(a) Each Seller is duly organized, validly existing and in good standing under the Laws of the jurisdiction in which it is organized.  Subject to entry of the U.S. Sale Order in the case of the U.S. Debtors and the Canadian Approval and Vesting Order in the case of NNL and receipt of other Consents from the U.S. Bankruptcy Court and the Canadian Court in connection with the transactions contemplated hereby and in the other Transaction Documents (collectively,

26

the "**Bankruptcy Consents**"), each of the Sellers has the requisite corporate power and authority to (i) enter into, deliver and perform its obligations pursuant to each of the Transaction Documents to which it is or will become a party and (ii) own, lease and operate its assets, including the Assets, as applicable, and to carry on the Business as it is now being conducted.

(b) Each of the Sellers is duly qualified or licensed to do business and to own, lease and operate its assets, including the Assets, and to carry on the Business as it is currently being conducted, and is in good standing, as applicable in each jurisdiction in which its ownership of property or conduct of business relating to the Business requires it to so qualify or to be so licensed, except to the extent that the failure to be so qualified, licensed or in good standing would not have, or would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

Section 4.2.    Authorization; Binding Effect; No Breach; No Litigation.

(a) Subject to the receipt of the Bankruptcy Consents (i) the execution, delivery and performance by the Main Sellers of the Transaction Documents to which such Main Seller is, or at the Closing will be, a party has been or at Closing will be duly authorized by such Main Seller and (ii) the execution, delivery and performance by each Other Seller of the Transaction Documents to which such Seller will be a party will have been duly authorized by such Other Seller by the time such Other Seller executes this Agreement.  Subject to receipt of the Bankruptcy Consents, and assuming due authorization, execution and delivery by the Purchaser and the Designated Purchasers parties thereto, the Transaction Documents to which any Seller is or will be a party, will constitute, a legal, valid and binding obligation of such Seller, enforceable against it in accordance with its terms, subject to (in the case of Non-Debtor Sellers) applicable bankruptcy, insolvency, reorganization, moratorium or other Laws affecting creditors' rights generally and subject to general principles of equity, regardless of whether considered in a proceeding in equity or at Law.

(b) Subject to receipt of the Bankruptcy Consents, the execution, delivery and performance by each Seller of the Transaction Documents to which such Seller is, or on the Closing Date will be, a party do not and will not conflict with or result in a breach of the terms, conditions or provisions of, constitute a default under, result in a violation of, result in the creation or imposition of any Lien upon any of the Assets, or (subject to the receipt of Consents in connection with the Assigned Contracts and any other Consents expressly provided for herein) require any Consent (other than the Bankruptcy Consents) or other action by or declaration or notice to any Government Entity pursuant to (i) the articles, charter or by-laws of the relevant Sellers, (ii) any Assigned Contract, (iii) any order of any Government Entity applicable to any Seller or by which any of their respective properties or Assets are bound or (iv) any Laws to which any of the Sellers, or any of the Assets are subject, except, in the case of (ii), (iii) and (iv) above, for such defaults, violations, actions and notifications that would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

(c) As of the date hereof, except for the Bankruptcy Proceedings, there is no Action pending or, to the Knowledge of the Sellers, threatened in writing before any Government Entity against any Seller involving the Business or the Assets, that would be reasonably expected to result in, individually or in the aggregate, a Material Adverse Effect.  As of the date hereof,

27

except for Orders and settlements entered in connection with the Bankruptcy Proceedings, there is no Order or settlement to which Sellers are subject that directly and materially affects or restricts the ownership of the Assets, Assumed Liabilities or the Business, and no Action is pending or, to the Knowledge of Sellers, threatened against the Sellers that questions the validity of this Agreement or the Transaction Documents or any action taken or to be taken by the Sellers in connection with this Agreement or the Transaction Documents.

Section 4.3.    Labor and Employee Benefits Matters.

(a) Section 4.3(a) of the Sellers Disclosure Schedule contains a list of all material Seller Employee Plans.  The Sellers have provided the Purchaser with a true and complete copy of the plan document or summary plan description of each material Seller Employee Plan or, if such plan document or summary plan description does not exist, an accurate written summary of such material Seller Employee Plan.

(b) The information contained in Section 4.3(b) of the Sellers Disclosure Schedule in respect of the Employees (the "**Employee Information**") is accurate in all material respects as of the date hereof, and sets forth with respect to each Employee (except where that is not permissible under applicable data privacy Laws): (i) unique identifier, (ii) service date, (iii) position, (iv) annual base salary and annual target incentive, (v) work location, (vi) visa type, if any, (vii) vacation accrual rate, (viii) status as full-time or part-time, (ix) telecommuter arrangement, if any, and (x) status as an Inactive Employee and expected date of return to work, if known.

(c) There has not been for a period of twelve (12) consecutive months prior to the date hereof, nor is there existent or, to the Sellers' Knowledge, has been threatened in writing, any strike, slowdown, lockout, picketing or work stoppage against the Sellers by or on behalf of the Employees.

(d) There are no Collective Labor Agreements in effect with respect to the Employees.  For a period of twelve (12) consecutive months prior to the date hereof, no petition has been filed or proceedings instituted by a union, works council, collective bargaining agent, employee or group of employees with any Government Entity seeking recognition of a collective bargaining agent with respect to any Employees, no voluntary recognition has been given by the Sellers or any Affiliate, and, to the Sellers' Knowledge, no such organizational effort is currently being made or has been threatened in writing by or on behalf of any union, employee, group of employees or collective bargaining agent to organize any Employees.

(e) Except as set forth in Section 4.3 (e) of the Sellers Disclosure Schedule, with respect to the Employees, the Sellers and their Affiliates are in material compliance with all applicable Laws respecting employment and employment practices, including, without limitation, all Laws respecting terms and conditions of employment, health and safety, wages and hours, child labor, immigration, employment discrimination, disability rights or benefits, equal opportunity, plant closures and layoffs, affirmative action, workers' compensation, labor relations, employee leave issues and unemployment insurance.