**EXHIBIT B**

EXECUTION VERSION

## GSM/GSM-R SIDE AGREEMENT

This GSM/GSM-R SIDE AGREEMENT (the "**Agreement**") is dated as of March March 31, 2010, among (i) Nortel Networks Corporation, a corporation organized under the laws of Canada ("**NNC**"); (ii) Nortel Networks Limited, a corporation organized under the laws of Canada ("**NNL**" and, together with NNC, the "**Canadian Main Sellers**"); (iii) Nortel Networks Inc., a corporation organized under the laws of Delaware ("**NNI**" and, together with the Canadian Main Sellers, the "**Main Sellers**"); (iv) the affiliates of the Main Sellers listed in Schedule A hereto (the "**Other Sellers**" and, together with the Main Sellers, the "**Sellers**"); (v) the entities listed on Schedule B hereto (the "**EMEA Sellers**"), which in the case of the EMEA Debtors are acting by their joint administrators Alan Robert Bloom, Stephen John Harris, Alan Michael Hudson and Christopher John Wilkinson Hill of Ernst & Young LLP of 1 More London Place, London SE1 2AF (other than Nortel Networks (Ireland) Limited, for which David Hughes of Ernst & Young Chartered Accountants of Harcourt Centre, Harcourt Street, Dublin 2, Ireland and Alan Robert Bloom serve as joint administrators) (collectively, the "**Joint Administrators**") who act as agents for the EMEA Debtors without any personal liability whatsoever; (vi) Nortel Networks S.A. (In Administration) ("**NNSA**"), a corporation incorporated under the laws of France, represented by Maître Cosme Rogeau, 26, avenue Hoche, 78000 Versailles as the "Liquidateur Judiciaire" and Maître Franck Michel, partner of Selarl F. Michel – A. Miroitte – C. Gorins, 10 Allée Pierre de Coubertin, 78000 Versailles as the "Administrateur Judiciaire" (together, the "**French Office Holders**"), who act as agents for NNSA without any personal liability whatsoever; (vii) each affiliate of the Main Sellers listed in Schedule C hereto to the extent such entity is deemed a "Selling Debtor" pursuant to Section 11.d of the IFSA (as defined below) (each such entity, a "**North American ALT Selling Debtor**"); (viii) each affiliate of the EMEA Sellers listed in Schedule D hereto to the extent such entity is deemed a "Selling Debtor" pursuant to Section 11.d of the IFSA (each such entity an "**EMEA ALT Selling Debtor**" and, together with the Sellers, the EMEA Sellers, NNSA and the North American ALT Selling Debtors, the "**Selling Parties**"), and (ix) the Joint Administrators.

The Joint Administrators, in their individual capacity, shall be party to this Agreement solely for the purposes of Sections 2.1, 2.2, 2.3, 2.6, 3.1, 3.6, 3.7, 3.10 and 3.14.

### W I T N E S S E T H :

WHEREAS, on the Petition Date, the Canadian Debtors filed with the Canadian Court an application for protection under the CCAA and were granted certain initial creditor protection pursuant to an order issued by the Canadian Court on the same date, which also appointed Ernst & Young Inc. as "**Monitor**" in connection with the CCAA Cases and has been extended by further order of the Canadian Court from time to time, most recently on January 21, 2010, as the same may be amended and restated from time to time by the Canadian Court;

WHEREAS, the U.S. Debtors are debtors-in-possession under the U.S. Bankruptcy Code, which commenced cases under Chapter 11 of the U.S. Bankruptcy Code on the Petition Date by filing voluntary petitions for relief in the U.S. Bankruptcy Court for the District of Delaware;

WHEREAS, the EMEA Debtors on the Petition Date filed applications with the

English Court pursuant to the Insolvency Act and the EC Regulation and the English Court appointed the Joint Administrators under the Insolvency Act;

WHEREAS, while the administration proceedings in respect of NNSA under the Insolvency Act are continuing, subsequent to the Petition Date, NNSA commenced secondary insolvency proceedings within the meaning of Article 27 of the EC Regulation in the Republic of France pursuant to which the French Office Holders were appointed by the Versailles Commercial Court (Docket No. 2009P00492) for NNSA;

WHEREAS, the authorization to have NNSA continue to operate the NNSA Business is in full force and effect as of the date of this Agreement;

WHEREAS, the Non-Debtor Sellers and the EMEA Non-Debtor Sellers are not subject to any Bankruptcy Proceedings;

WHEREAS, on June 9, 2009, the U.S. Debtors, the Canadian Debtors, the EMEA Debtors and the Joint Administrators entered into an Interim Funding and Settlement Agreement (as may be amended from time to time in accordance with its terms, the "**IFSA**") governing certain intercompany matters, including the obligation of the parties thereto to (a) negotiate in good faith and attempt to reach agreement on a timely basis on a protocol (the "**Interim Sales Protocol**") for resolving disputes concerning the allocation of Sale Proceeds from Sale Transactions (each as defined in the IFSA), which Interim Sales Protocol shall provide binding procedures for the allocation of Sale Proceeds where the relevant parties in such Sale Transaction have been unable to reach agreement regarding such allocation, and (b) following entry into any Sale Transaction, negotiate in good faith and on a timely basis to attempt to reach agreement regarding the allocation of the Sale Proceeds from such Sale Transaction within a reasonable period of time or as may be otherwise provided in the Interim Sales Protocol (failing which the Interim Sales Protocol shall apply to determine the allocation of the relevant Sale Proceeds);

WHEREAS, the Sellers have, as of November 24, 2009, entered into an Asset Sale Agreement with Telefonaktiebolaget L M Ericsson (publ), a corporation organized under the laws of Sweden (the "**Purchaser**") relating to the Business owned and operated by the Sellers, as amended on the date hereof, and as may be further amended in accordance with its terms and this Agreement (the "**North American Agreement**");

WHEREAS, the EMEA Sellers and the Joint Administrators have entered into an Asset Sale Agreement, dated November 24, 2009, with Kapsch CarrierCom AG, an incorporated company organized under the laws of Austria, as amended and restated on March 8, 2010, as amended on the date hereof, and as may be further amended in accordance with its terms and this Agreement (the "**EMEA Purchaser**") relating to the EMEA Business owned and operated by the EMEA Sellers (the "**EMEA Agreement**" and, together with the North American Agreement, the "**Sale Agreements**");

WHEREAS, on March 3, 2010, and in accordance with Clause 7.1 of the EMEA Agreement, the EMEA Purchaser made an irrevocable offer to the French Office Holders to purchase the NNSA Business (as subsequently amended and/or supplemented on March 22 and March 24, 2010, the "**NNSA Irrevocable Offer**");

WHEREAS, NNSA acceded to the IFSA on September 11, 2009 and, notwithstanding that NNSA is not a party to the Sale Agreements, NNSA has executed and delivered an Appropriate License Termination in accordance with the IFSA and is also subject to the NNSA Irrevocable Offer which has been approved by the Versailles Commercial Court on March 30, 2010, and is deemed to be a "Selling Debtor" under the IFSA for the purposes of this Sale Transaction (as defined in the IFSA) and, as such, any reference in this Agreement to a Selling Party shall be construed as including NNSA;

WHEREAS, as soon as practicable after the execution of this Agreement, in accordance with Section 12.b and 12.g of the IFSA, the Selling Parties, the Monitor and the Committee (as defined in the U.S. Bidding Procedures Order) will enter into an escrow agreement with the Distribution Agent (the "**Distribution Escrow Agreement**") governing, among other things, the Distribution Agent's collection, holding in escrow in an escrow account at the Distribution Agent (the "**Distribution Escrow Account**") and distribution to the Sellers, the EMEA Sellers, NNSA and any other party deemed to be a Selling Debtor pursuant to the IFSA (in accordance with the Allocation Rules) of the Total Proceeds and other payments to be made by the Purchaser or the EMEA Purchaser (or any Designated Purchaser or EMEA Designated Purchaser) to the Selling Parties under or in relation to the Sale Agreements;

WHEREAS, upon the execution of an Appropriate License Termination (as defined in the IFSA) each party listed on Schedule C and Schedule D hereto may, pursuant to Section 11.d of the IFSA, be deemed to be a "**Selling Debtor**" for the purposes of the IFSA and therefore be entitled to seek an allocation of a portion of the sales proceeds under the Sale Agreements to be determined in accordance with the IFSA and the Interim Sales Protocol and therefore it is the intention of the Parties that each such party following execution and delivery of an Appropriate License Termination in accordance with the IFSA be party to and bound by this Agreement to the extent such party seeks to be a party to or receive funds from the Distribution Escrow Agreement; and

WHEREAS, for the purpose of facilitating the completion of the Transaction and maximizing the value arising therefrom for their respective stakeholders, the Parties intend to assume certain mutual cooperation and other covenants relating to the pursuit and completion of the Transaction pursuant to the Sale Agreements or otherwise, as well as govern certain other matters of common interest relating to the prospective Transaction, including certain matters relating to the allocation among the Parties of the benefits and burdens of the Transaction.

NOW, THEREFORE, in consideration of the respective covenants made herein, and of the mutual benefits to be derived hereby (the sufficiency of which are acknowledged), the Parties hereto agree as follows:

ARTICLE I

INTERPRETATION

SECTION 1.1. Definitions.

(a)    To the extent capitalized words used herein (including in the recitals hereof) are not defined in this Agreement, those words shall have the meanings given to them (i) in the

3

North American Agreement, (ii) to the extent they are not defined in the North American Agreement, in the EMEA Agreement, or (iii) to the extent they are not defined in the Sale Agreements, the TSAs (as defined below).

(b)      The following capitalized terms shall have the meanings set forth below:

(i)      "**Advisor Fees**" means any fees or other amounts paid or payable to (A) Lazard Frères & Co. in connection with the Transaction, (B) the Escrow Agent(s) contemplated by the North American Agreement and the EMEA Agreement, (C) the Independent Auditor(s) contemplated by the North American Agreement, (D) the Qualified Arbitrator in accordance with the terms of the North American Agreement, (E) the TSA Arbitrator (as that term is defined in Clause 10.42(h) of the EMEA Agreement), and (F) any firm appointed in accordance with Clause 1 of Schedule 7 or Clause 3.3 of Schedule 9 of the EMEA Agreement.

(ii)      "**Agreed Respective Percentage**" means the percentage of Total Payments pertaining to each of the Parties, and with respect to NNI and NNL only, their respective Respective Affiliates, determined pursuant to the Allocation Rules.

(iii)      "**Allocation Rules**" means the rules (expressed as percentages or otherwise) to be used to allocate among the Selling Parties and other parties, as may be applicable, the benefit of the Total Proceeds and the burden of the Total Payments, as such rules shall be agreed upon among the relevant Selling Parties pursuant to Sections 12.d and 12.g of the IFSA or shall be otherwise determined in accordance with the binding procedures to be set forth in the Interim Sales Protocol pursuant to Section 12.c of the IFSA.

(iv)      "**Dispute Resolver Retainer**" means any retainer paid or payable to one or more dispute resolvers appointed pursuant to the Interim Sales Protocol to determine the Allocation Rules to the extent related to the Transaction.

(v)      "**Distribution Agent**" means JP Morgan Chase Bank, N.A., or such other Person appointed with the consent of each of NNL, NNI and NNUK, provided that consent to appoint such Person shall not be withheld unreasonably.

(vi)      "**EMEA Debtors**" means those entities listed in Schedule 3 of the EMEA Agreement, each party listed in Schedule D hereto that is an EMEA ALT Selling Debtor and NNSA.

(vii)      "**Initial Respective Percentage**" means one third (1/3) for NNI and its Respective Affiliates, one third (1/3) for NNC, NNL and its Respective Affiliates, and one third (1/3) for the EMEA Sellers and NNSA.

(viii)      "**New Bankruptcy Proceedings**" means any voluntary or involuntary bankruptcy, insolvency, administration or similar judicial proceedings commenced after the date hereof.

(ix)      "**NNUK**" means Nortel Networks UK Limited.

(x)    "**Party**" means (A) NNC, (B) each of NNL and its Respective Affiliates, (C) each of NNI and its Respective Affiliates, (D) each of NNUK and its Respective Affiliates, and (E) for the purposes of Sections 2.1, 2.2, 2.3, 2.6, 3.1, 3.6, 3.7, 3.10 and 3.14 only, the Joint Administrators and "Parties" shall have a corresponding meaning.

(xi)    "**Respective Sale Agreement**" means (A) with respect to the Sellers, the North American Agreement and (B) with respect to the EMEA Sellers, the EMEA Agreement.

(xii)    "**Respective Affiliates**" means (A) with respect to NNL, each Seller listed in Section 10.16(a)(ii) of the Sellers Disclosure Schedule, (B) with respect to NNI, all the other U.S. Debtors, each Seller listed in Section 10.16(a)(iii) of the Sellers Disclosure Schedule, and each party listed on Schedule C hereto that is a North American ALT Selling Debtor, and (C) with respect to NNUK, all the other EMEA Sellers listed in Schedule B of this Agreement and each party listed in Schedule D hereto that is an EMEA ALT Selling Debtor and NNSA.

(xiii)    "**Secondary Proceedings**" shall have the meaning attributed to such words in the EMEA Agreement.

(A)    "**Total Payments**" means the aggregate of (A) all Advisor Fees, (B) all amounts paid or payable by the Selling Parties in respect of the Dispute Resolver Retainer, (C) all amounts paid or payable to the Purchaser and/or the EMEA Purchaser under Section 2.2.3.2 of the North American Agreement and Clauses 3.3.1 or 3.3.3 of the EMEA Agreement (as applicable), (D) all amounts paid or payable by the Selling Parties to satisfy the obligation to prepare, complete the audit of and deliver to the Purchaser the audited Financial Statements and the unaudited Financial Statements, and to provide the other financial data and information required pursuant to Sections 5.23(b) of the North American Agreement unless such costs are ultimately reimbursed by the Purchaser, (E) the China Purchase Amount and all amounts paid and payable by the Selling Parties under the China Purchase Agreement, and (F) all amounts paid or payable to the EMEA Purchaser (or any EMEA Designated Purchaser) under paragraph 4.9 of Schedule 5 of the EMEA Agreement (as applicable).

(xiv)    "**Total Proceeds**" means the aggregate amounts (A) paid by the Purchaser or the EMEA Purchaser (or any Designated Purchaser or any EMEA Designated Purchaser) to the Selling Parties under or in respect of the Sale Agreements as Purchase Price (as defined in the North American Agreement and the EMEA Agreement, as applicable), Good Faith Deposit (as defined in the North American Agreement and the EMEA Agreement, as applicable) and purchase price adjustments, and any damages, and (B) paid to the Selling Parties under any escrow arrangement pursuant to which a portion of the Purchase Price (as defined in the North American Agreement and the EMEA Agreement, as applicable) or Good Faith Deposit (as defined in the North American Agreement and the EMEA Agreement, as applicable) has been placed in escrow, but for greater certainty shall exclude any amounts not constituting a portion of the Purchase Price (as defined in

the North American Agreement and the EMEA Agreement, as applicable) paid or payable by the Purchaser or the EMEA Purchaser (or any Designated Purchaser or any EMEA Designated Purchaser) to one or more Selling Party to compensate such Selling Party for costs incurred or to be incurred by such Selling Party, as contemplated to be paid directly to such Selling Party in accordance with the terms of the North American Agreement, the EMEA Agreement or other Transaction Documents, as applicable, in each case subject to Section 2.4(b).

(xv) "**Transaction**" means the sale of the Business to the Purchaser and the sale of the EMEA Business and the NNSA Business to the EMEA Purchaser pursuant to the Respective Sale Agreements (as each may be amended from time to time in accordance with such Agreement) and the NNSA Irrevocable Offer.

(xvi) "**Transaction Documents**" means the Transaction Documents (as the term is defined under the North American Agreement) and the Transaction Documents (as the term is defined under the EMEA Agreement).

(xvii) "**TSA**" means the Transition Services Agreement.

(xviii) "**TSAs**" means the TSA and the EMEA TSA.

SECTION 1.2.  Interpretation.

1.2.1.  Gender and Number.  Any reference in this Agreement to gender includes all genders and words importing the singular include the plural and vice versa.

1.2.2.  Certain Phrases and Calculation of Time.  In this Agreement (i) the words "including" and "includes" mean "including (or includes) without limitation", (ii) the terms "hereof," "herein," and "herewith" and words of similar import shall, unless otherwise stated, be construed to refer to this Agreement and not to any particular provision of this Agreement, and Section and Schedule references are to the Sections and Schedules to this Agreement unless otherwise specified, and (iii) in the computation of periods of time from a specified date to a later specified date, unless otherwise expressly stated, the word "from" means "from and including" and the words "to" and "until" each mean "to but excluding".  If the last day of any such period is not a Business Day, such period will end on the next Business Day.

When calculating the period of time "within" which, "prior to" or "following" which any act or event is required or permitted to be done, notice given or steps taken, the date which is the reference date in calculating such period is excluded from the calculation.  If the last day of any such period is not a Business Day, such period will end on the next Business Day.

1.2.3.  Headings, etc.  The division of this Agreement into Articles and Sections and the insertion of headings are for convenient reference only and are not to affect or be used in the construction or interpretation of this Agreement.

ARTICLE II

COVENANTS

SECTION 2.1. <u>Efforts to Complete the Transaction</u>.

(a)    Subject to the requirements of any applicable Law, each of the Parties shall use their reasonable best efforts to take, or cause to be taken, all actions and to do, or cause to be done, and cooperate with each other, the Purchaser and the EMEA Purchaser (and any Designated Purchaser or any EMEA Designated Purchaser) in good faith in order to do, all things necessary, proper or advisable under applicable Law to perform their obligations under their Respective Sale Agreement and consummate the transactions contemplated by the Sale Agreements, as soon as practicable in accordance with the provisions thereof and cause the fulfillment at the earliest practicable date of all of the conditions to the Purchaser's and EMEA Purchaser's obligations to consummate the transactions contemplated by their Respective Sale Agreement.

(b)    The mutual efforts of the Parties pursuant to this Section 2.1(a) shall include:

(i)    cooperating with the other Parties in good faith in any manner reasonably required to facilitate the consummation of the Transaction, including by sharing information to the extent necessary or opportune and keeping the other Parties informed of any matter of relevance relating to the Transaction and their Respective Sale Agreement, and without in any way limiting the foregoing, keeping the other Parties informed in respect of, and allowing the other Parties to participate in, any discussions with the EMEA Purchaser regarding the terms of the NNSA Irrevocable Offer and the sale of the NNSA Business;

(ii)    (A) defending all Actions by or before any Government Entity challenging the Sale Agreements or the consummation of the Transaction and (B) seeking rescission or repeal of any injunction, decree, ruling, order or other action of any Government Entity adversely affecting the ability of the Parties to consummate the Transaction;

(iii)    cooperating with the other Parties, the Purchaser and the EMEA Purchaser in good faith in any manner reasonably required to facilitate the preparation and making of any filings with Government Entities required to seek and obtain the Regulatory Approvals;

(iv)    upon becoming aware of any material issue that may result in a breach by the Sellers, the EMEA Sellers under either Sale Agreement, promptly informing the other Parties of such potential breach and consulting with the other Parties with a view to ensuring that there is no breach of the Respective Sale Agreement and/or any breach is timely cured in accordance with the Respective Sale Agreement; and

(v)    ensuring that the Total Proceeds are deposited in the form and in the amount paid by the Purchaser and the EMEA Purchaser or, upon release from

7

escrow, the applicable escrow agent, to the Distribution Agent in accordance with the terms hereof and the Distribution Escrow Agreement.

SECTION 2.2. <u>Notice and Consultation</u>.

(a) Each of NNL, NNI and NNUK, and, to the extent applicable, the Joint Administrators (together, the "**Primary Parties**"), shall provide to the others as much notice as possible, and in any case no less than five (5) Business Days written advance notice if possible, and shall consult in good faith with the other Primary Parties, prior to taking or agreeing to take, any of the following actions under their Respective Sale Agreement:

 (i) subject to Section 2.3, amending any material provision of their Respective Sale Agreement;

 (ii) subject to Section 2.3, waiving any of their material rights or provisions under their Respective Sale Agreement;

 (iii) with respect to the EMEA Sellers only, consenting to the entry into, or requesting, promoting or instituting, any Secondary Proceedings in relation to any EMEA Seller;

 (iv) with respect to the Main Sellers only, voluntarily commencing, or otherwise consenting to, any New Bankruptcy Proceedings relating to any Non-Debtor Seller; and

 (v) delivering or otherwise consenting to the amount reflected in any Closing Statements, Disagreement Notice or any settlement of a dispute regarding the matters contained therein or the Determination of Net Market Value contemplated by Clause 2 of Schedule 7 to the EMEA Agreement.

(b) If an EMEA Seller, after having acted in accordance with Section 2.2(a)(iii), resolves to enter into Secondary Proceedings and the Main Sellers have a right under the Law applicable to the Secondary Proceedings to appear at these Secondary Proceedings (under any capacity whatsoever), that EMEA Seller shall facilitate the Main Sellers being heard at such Secondary Proceedings, to the maximum extent allowed by the Law applicable to them.

SECTION 2.3. <u>No Termination or Material Amendments</u>. No Party shall, without the prior written consent of the other Parties (such consent not to be unreasonably withheld, delayed or conditioned):

(a) exercise any termination right pursuant to their Respective Sale Agreement (excluding the Main Sellers' right to terminate the North American Agreement under Sections 9.1(b)(ii), 9.1(b)(iii), and 9.1(b)(iv) of the North American Agreement and the Joint Administrators' right to terminate the EMEA Agreement under Clauses 15.4.2(B), 15.4.2(C) and 15.4.2(D) of the EMEA Agreement) or otherwise agree with the Purchaser or the EMEA Purchaser to terminate such Respective Sale Agreement;

(b) with respect to the Main Sellers only, amend the provisions of Sections 2.2, 2.3, 5.26 and 10.14 and Articles VIII and IX of the North American Agreement;

8

(c)     with respect to the EMEA Sellers only, amend the provisions of Clause 3, 4.1, 4.2, 4.3 and 15 of the EMEA Agreement, or Schedule 7 and 9 to the EMEA Agreement; or

(d)     enter into any amendment to or waive any provision of its Respective Sale Agreement or any other Transaction Document to which such Party is a party that would cause a material detriment to any of the other Parties.

SECTION 2.4.  Collection and Allocation of Total Proceeds.

(a)     Subject to Sections 2.4(c), 2.4(d) and 2.4(e), in accordance with the provisions of Section 12.b of the IFSA, the Parties agree that any payment due by the Purchaser and the EMEA Purchaser (and any Designated Purchaser and any EMEA Designated Purchaser) to the Selling Parties under the Sale Agreements or, upon release from escrow, any escrow agreement provided for in the Sale Agreements or the Transaction Documents (including the TSA Escrow Amount under the North American Agreement and the TSA Escrow Amount under the EMEA Agreement),  that is included in the Total Proceeds shall be collected and held in escrow in the Distribution Escrow Account by the Distribution Agent (as agent for the Selling Parties), which will then allocate and distribute the Total Proceeds, in accordance with the Allocation Rules, this Agreement, and the Distribution Escrow Agreement, provided, however, that any amounts owed under Section 2.5(b) and Section 2.8 hereof by any Selling Party (the "**Debtor Party**") to another Selling Party at the time of an intended distribution from the Distribution Escrow Account shall be paid out of the share of Total Proceeds otherwise payable to the Debtor Party.

(b)     The Parties agree and acknowledge that the Total Proceeds do not include amounts of or in respect of "VAT" or "Transfer Taxes" (each term as defined in the Respective Sale Agreement) paid or payable by the Purchaser or the EMEA Purchaser or any Designated Purchaser or any EMEA Designated Purchaser or any affiliate of the Purchaser or the EMEA Purchaser to the Sellers or the EMEA Sellers or the Joint Administrators pursuant to the terms of the Sale Agreements.  The Parties agree that it is not intended that such amounts of VAT or Transfer Taxes will be payable into the Distribution Escrow Account but, notwithstanding this Agreement, where such amounts are paid into the Distribution Escrow Account, the Distribution Agent shall be instructed under the procedures in the Distribution Escrow Agreement to promptly pay such amounts to the Selling Parties or the Joint Administrators (as relevant).

(c)     To the extent that there are funds available in the Distribution Escrow Account that are attributable to the sale of the Business, the EMEA Business or the NNSA Business, the obligation of the Selling Parties to make any payment that constitutes part of the Total Payments shall (subject to adjustment in accordance with Section 2.5) be satisfied by causing the Distribution Agent to pay the relevant amount out of the Distribution Escrow Account.

(d)     To the extent that any payment that constitutes part of the Total Payments cannot be satisfied by payment out of the Distribution Escrow Account, or are required to be paid prior to the Closing Date, any such amounts actually paid by any Selling Party to the Purchaser, the EMEA Purchaser, the Distribution Agent, or any other Person, as applicable, shall be deducted from any subsequent amounts payable or paid into the Distribution Escrow Account under Section 2.4(a) and shall (subject to adjustment in accordance with Section 2.5) be paid directly to such Selling Party that made the relevant payment.

9

(e)     It is acknowledged and agreed that in determining how to allocate and distribute the Total Proceeds, except for the items constituting Total Payments (other than Clause C and F of such term) and the other expenses, damages and liabilities specifically allocated herein, the Parties reserve all rights in respect of expenses, damages and all other liabilities incurred in connection with the performance of their obligations under or pursuant to the Sale Agreements and/or the Transaction Documents and any amount paid or payable by NNI to the Pension Benefit Corporation pursuant to the Stipulation Among the Debtors, Certain Affiliates and Pension Benefit Guaranty Corporation [D.I. 2784], and in particular whether such expenses, damages and other liabilities, should be deducted from the Total Proceeds, or otherwise considered in connection with a distribution to the Selling Parties.

SECTION 2.5.  Allocation of Total Payments.

(a)     Irrespective of the individual/joint payment obligations of each Selling Party or their Respective Affiliates vis-à-vis the Purchaser or the EMEA Purchaser pursuant to the Sale Agreements or vis-à-vis the Distribution Agent pursuant to the Distribution Agreement (each of which shall be duly complied with by the relevant Selling Party in accordance with the terms thereof), the Parties agree that, among them, each Party (and, with respect to the Main Sellers, their respective Respective Affiliates) shall initially bear the Initial Respective Percentage and, when determined, shall ultimately bear the Agreed Respective Percentage of the Total Payments, subject to Section 2.5(b).

(b)     To the extent the Agreed Respective Percentage differs from the Initial Respective Percentage, any amount actually paid by a Party that constitutes part of the Total Payments shall be promptly (re)adjusted among the Parties so that each Party (and, with respect to the Main Sellers, their respective Respective Affiliates) ultimately bears a share of those Total Payments that corresponds to its Agreed Respective Percentage.  Except as set forth in Section 2.4(a), adjustment payments to be made among the Parties pursuant to the previous sentence shall be made without set-off.

SECTION 2.6.  Irrevocable Offers under the EMEA Agreement.  In relation to paragraph 5 of Schedule 5 of the EMEA Agreement, the Reserved Territory Sellers and the Joint Administrators agree:

(a)     to commence and progress the information and consultation process in a timely manner; and

(b)     to deliver acceptance of Irrevocable Offers to the EMEA Purchaser as soon as possible after appropriate completion of each relevant consultation process.

SECTION 2.7.  Tax Cooperation.  In the event that the preparation or filing of a Tax Return could reasonably be expected to require a Partial Allocation or a Selling Party is preparing any Partial Allocation with the Purchaser or the EMEA Purchaser (whether by agreement or submission to the Accounting Arbitrator), the Selling Party responsible for filing such Tax Return or preparing such Partial Allocation shall provide notice to the other Selling Parties and shall consider in good faith any comments by the other Selling Parties with respect to such Tax Return and any Partial Allocation related thereto, provided, and for the avoidance of doubt, that the other Selling Parties shall not have a consent or veto right with respect to such Tax

Returns or Partial Allocations related thereto. It is understood that neither this Section 2.8 nor the exercise or failure to exercise of any rights or privileges provided herein shall, or be deemed to, determine, ratify, or adopt, or have any impact whatsoever on, the allocation of proceeds from the sale of the Business, the EMEA Business and the NNSA Business among the Selling Parties.

SECTION 2.8.  <u>Indemnification of Distribution Agent and Escrow Agents</u>. The Selling Parties agree that the costs of any indemnification of the Distribution Agent and the Escrow Agents respectively pursuant to the Distribution Escrow Agreement and the escrow agreements under the Sale Agreements and the TSAs shall be borne on a pro rata basis by the Selling Parties in accordance with their Agreed Respective Percentages and any Selling Party paying in excess of such pro rata share of the cost of such indemnification shall have rights of contribution vis-à-vis any Selling Party that has paid less than such pro rata share of such costs either directly to Distribution Agent or by payment to another Selling Party pursuant to this sentence; <u>provided</u> that if the costs of any such indemnification arise solely from a breach of the Distribution Escrow Agreement or the escrow agreements under the Sale Agreements and the TSAs or other fault of a single Selling Party or Selling Parties, the Selling Party so in breach or at fault shall bear the cost of such indemnification and any Selling Party paying in excess of its share of the cost of such indemnification, after taking into account the breach or fault of the other Selling Parties, shall have rights of contribution vis-à-vis any Selling Party that has paid less than its share of such costs either directly to Distribution Agent or the Escrow Agents or by payment to another Selling Party.

ARTICLE III

MISCELLANEOUS

SECTION 3.1.  <u>Exclusion of Liability and Acknowledgments re Joint Administrators and Directors of EMEA Non-Debtor Sellers</u>.

(a)    The Parties agree that (i) the Joint Administrators have negotiated and are entering into this Agreement as agents for the EMEA Debtors to which they are appointed and that none of the Joint Administrators, their firm, partners, employees, advisers, representatives or agents shall incur any personal liability whatsoever whether on their own part or in respect of any failure on the part of any other Party to observe, perform or comply with any of its obligations under this Agreement or under or in relation to any associated arrangements or negotiations; and (ii) the directors of the EMEA Non-Debtor Sellers (as defined in the EMEA Agreement) shall not incur any personal liability whatsoever, in their capacity as such directors, in respect of the authorization, execution, delivery or performance of this Agreement, howsoever arising other than in respect of fraud by any such director.

(b)    The Joint Administrators are a party to this Agreement: (i) as agents of each of the respective EMEA Debtors of which they are administrators; and (ii) in their own capacities solely for (1) taking the benefit of the statutory charges under Paragraph 99(3) of Schedule B1 of the Insolvency Act, (2) obtaining the benefit of any provisions of this Agreement expressed to be conferred on them, (3) enforcing the obligations of the other Parties to this Agreement and (4) for the purposes of Sections 2.1, 2.2, 2.3, 2.6, 3.1, 3.6, 3.7, 3.10 and 3.14.

(c)    Notwithstanding anything in Section 3.6, any claim, action or proceeding

11

against the Joint Administrators arising from or related to (i) the personal liability of the Joint Administrators, their firm, partners, employees, advisers, representatives or agents, (ii) their qualification to act as insolvency practitioners in accordance with Part XIII of the Insolvency Act or (iii) their appointment as joint administrators of the EMEA Debtors and their remaining as current joint administrators thereof under this Agreement shall be governed exclusively by English law and subject to the exclusive jurisdiction of the English Courts.

(d)     The Parties agree that any breach of this Agreement by the Joint Administrators shall be deemed to be a breach by them in their capacities as administrators of the EMEA Debtors, and, in such a case, each Party hereto shall have the right to make claims and assert its rights hereunder, against the EMEA Debtors and their respective successors and assigns.

(e)     The Parties agree that the French Office Holders are entering into this Agreement as agents for NNSA to which they are appointed and that none of the French Office Holders, their firm, partners, employees, advisers, representatives or agents shall incur any personal liability whatsoever whether on their own part or in respect of any failure on the part of any other Party to observe, perform or comply with any of its obligations under this Agreement or under or in relation to any associated arrangements of negotiations.

(f)     Notwithstanding anything in Section 3.6, any claim, action or proceeding against the French Office Holders arising from or related to (i) the personal liability of the French Office Holders, their firm, partners, employees, advisers, representatives or agents or (ii) their appointment as French Office Holders of NNSA shall be governed exclusively by French law and subject to the exclusive jurisdiction of the French Courts.

SECTION 3.2.  <u>Remedies</u>.  No failure to exercise, and no delay in exercising, any right, remedy, power or privilege under this Agreement by any Party will operate as a waiver of such right, remedy, power or privilege, nor will any single or partial exercise of any right, remedy, power or privilege under this Agreement preclude any other or further exercise of such right, remedy, power or privilege or the exercise of any other right, remedy, power or privilege.

SECTION 3.3.  <u>No Third Party Beneficiaries</u>.  Except as provided in Section 3.4, this Agreement is for the sole benefit of the Parties and their permitted assigns and nothing herein, express or implied, is intended to or shall confer upon any other Person any legal or equitable right, benefit or remedy of any nature whatsoever under or by reason of this Agreement <u>provided, however</u>, that the Committee shall be a third party beneficiary of this Agreement entitled to take advantage of the benefits of this Agreement to NNI and the other U.S. Debtors party hereto only, to the fullest extent as if it were a signatory hereto and the directors of the EMEA Non Debtor Sellers shall be deemed third party beneficiaries of Section 3.1(a) hereof and shall be entitled to enforce and take advantage of the benefit thereof to its fullest extent as of a signatory hereto.

SECTION 3.4.  <u>Consent to Amendments; Waivers</u>.  No Party shall be deemed to have waived any provision of this Agreement unless such waiver is in writing, and then such waiver shall be limited to the circumstances set forth in such written waiver.  This Agreement, or any provision hereof, may be waived or amended, on no less than 5 days' notice, only by means of a writing signed by all Parties, and approved, in writing, by the Committee, the Bondholder Group (as defined in the U.S. Bidding Procedures Order) and the Monitor, which amendments, if material in the judgment of the Parties, must be approved by the Canadian Court and the U.S. Bankruptcy

Court.

SECTION 3.5. Successors. Except as otherwise expressly provided in this Agreement, all covenants and agreements set forth in this Agreement by or on behalf of the parties hereto will be binding upon and inure to the benefit of such parties and their respective successors.

SECTION 3.6. Governing Law; Submission to Jurisdiction; Waiver of Jury Trial.

(a)    The Parties agree that this Agreement shall be governed exclusively by the laws of the State of New York without regard to the rules of conflict of laws of the State of New York or any other jurisdiction; provided, however, that Section 3.1 shall be governed exclusively by English law.

(b)    To the fullest extent permitted by applicable Law, each Party (i) agrees to submit to the non-exclusive jurisdiction of the U.S. Bankruptcy Court and the Canadian Court (in a joint hearing conducted under the Cross-Border Protocol adopted by such courts, as it may be in effect from time to time), for purposes of all legal proceedings to the extent relating to the matters agreed in this Agreement, (ii) agrees that any claim, action or proceeding by such Party seeking any relief whatsoever to the extent relating to the matters agreed in this Agreement must be brought in the U.S. Bankruptcy Court if such claim, action, or proceeding would solely affect NNI, the Canadian Court if such claim, action, or proceeding would solely affect the Canadian Main Sellers, Nortel Networks Technology Corporation or Nortel Networks Global Corporation, or the English Court if such claim, action or proceeding would solely affect the EMEA Sellers or EMEA Debtors, (iii) waives and agrees not to assert any objection that it may now or hereafter have to the laying of the venue of any such action brought in such a court or any claim that any such action brought in such a court has been brought in an inconvenient forum, (iv) agrees that mailing of process or other papers in connection with any such action or proceeding or any other manner as may be permitted by Law shall be valid and sufficient service thereof, and (v) agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by applicable Law; provided, however, that any claim, action or proceeding set forth in Section 3.1 shall be brought exclusively in the English Courts.

(c)    EACH PARTY HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION DIRECTLY OR INDIRECTLY ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS AGREEMENT OR ANY TRANSACTION OR MATTER CONTEMPLATED HEREBY. EACH PARTY (I) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (II) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION 3.6.

SECTION 3.7. Notices. All demands, notices, communications and reports provided for in this Agreement shall be in writing and shall be either sent by facsimile transmission with confirmation to the number specified below or personally delivered or sent by reputable

overnight courier service (delivery charges prepaid) to any Party at the address specified below, or at such address, to the attention of such other Person, and with such other copy, as the recipient Party has specified by prior written notice to the sending Party pursuant to the provisions of this Section 3.7.

**If to NNI and its Respective Affiliates:**
c/o Nortel Networks Inc.
Attention: Anna Ventresca
Address: 220 Athens Way, Suite 300
   Nashville, Tennessee 37228
   U.S.A.
Facsimile No.: +1 615 432 4067

**With a copy to:**
Cleary Gottlieb Steen & Hamilton LLP
Attention: James L. Bromley and
   Lisa M. Schweitzer
Address: One Liberty Plaza
   New York, New York 10006
   U.S.A.
Facsimile No.: +1 212 225 3999

**If to the Canadian Main Sellers and their Respective Affiliates:**
c/o Nortel Networks Limited
Attention: Anna Ventresca
Address: 5945 Airport Road, Suite 360
   Mississauga, Ontario L4V 1R9
   Canada
Facsimile No.: +1 905 863 2057

**With a copy to:**
Ogilvy Renault LLP
Attention: Michael Lang, Esq.
Address: Suite 3800
   Royal Bank Plaza, South Tower
   200 Bay Street, P.O. Box 84
   Toronto, Ontario M5J 2Z4
   Canada
Facsimile No.: +1 416 216 3930

**If to the EMEA Sellers and their Respective Affiliates:**
c/o Ernst & Young LLP
Attention: Alan Bloom
Address: One More London Place
   London SE1 2AF
   United Kingdom
Facsimile No.: +44 (0) 20 7951 1345
Telephone No.: +44 (0) 20 7951 9898

**With a copy to:**
Herbert Smith LLP
Attention: Gareth Roberts and Alan Montgomery, Esq.
Address: Exchange House
   Primrose Street
   London EC2A 2HS
   United Kingdom
Facsimile No.: +44 (0) 20 7098 4878
Telephone No.: +44 (0) 20 7466 2878

**If to the Joint Administrators**
c/o Ernst & Young LLP
Attention: Alan Bloom
Address: One More London Place
   London SE1 2AF
   United Kingdom
Facsimile No.: +44 (0) 20 7951 1345
Telephone No.: +44 (0) 20 7951 9898

**If to the Committee:**
Akin Gump Strauss Hauer & Feld LLP
Attention:  Fred S. Hodara and Stephen B. Kuhn, Esq.
One Bryant Park
New York, New York 10036, U.S.A.
Facsimile:  +1212 872-1002

14

**If to the Bondholder Group:**
Milbank, Tweed, Hadley & McCloy
Attention:  Roland Hlawaty, Esq.
One Chase Manhattan Plaza
New York, New York, 10006, U.S.A.
Facsimile:  +1212 822-5170

| | |
|---|---|
| **If to the Monitor:**<br>Murray A. McDonald<br>Ernst & Young Inc.<br>Ernst & Young Tower<br>222 Bay Street, P. O. Box 251<br>Toronto, ON M5K 1J7<br>Canada<br>Facsimile:  +1416 943-3300 | **With a copy to:**<br>Goodmans LLP<br>Attention: J. Pasquariello<br>Bay Adelaide Centre<br>333 Bay Street, Suite 3400<br>Toronto, Ontario M5H 2S7<br>Canada<br>Facsimile: +416 979 1234 |
| **If to NNSA:**<br>c/o AJ Associés<br>Attention: Franck Michel<br>Address: 10, allée Pierre de Coubertin, 78000<br>Versailles, France<br>Facsimile No.: + 33 1 39 50 87 52 | **With a copy to:**<br>Foucaud, Tchekhoff, Pochet & Associés<br>Attention: Antoine Tchekhoff & Edouard Fabre<br>Address: 1bis, avenue Foch, 75116 Paris, France<br>Facsimile No.: + 33 1 45 00 08 19 |
| **If to the French Administrator**<br>c/o AJ Associés<br>Attention: Franck Michel<br>Address: 10, allée Pierre de Coubertin, 78000<br>Versailles, France<br>Facsimile No.: + 33 1 39 50 87 52 | **With a copy to:**<br>Foucaud, Tchekhoff, Pochet & Associés<br>Attention: Antoine Tchekhoff & Edouard Fabre<br>Address: 1bis, avenue Foch, 75116 Paris, France<br>Facsimile No.: + 33 1 45 00 08 19 |
| **If to the French Liquidator**<br>Attention: Cosme Rogeau<br>Address: 26 avenue Hoche, 78000 Versailles,<br>France<br>Facsimile No.: + 33 1 39 49 44 63 | **With a copy to:**<br>Foucaud, Tchekhoff, Pochet & Associés<br>Attention: Antoine Tchekhoff & Edouard Fabre<br>Address: 1bis, avenue Foch, 75116 Paris, France<br>Facsimile No.: + 33 1 45 00 08 19 |

Any such demand, notice, communication or report shall be deemed to have been given pursuant to this Agreement when delivered personally, when confirmed if by facsimile transmission, or on the calendar day after deposit with a reputable overnight courier service, as applicable.

SECTION 3.8.  Counterparts.  The Parties may execute this Agreement in three or more counterparts (no one of which need contain the signatures of all Parties), each of which will be an original and all of which together will constitute one and the same instrument.

SECTION 3.9.  Severability.  If any provision, section, or part of this Agreement, or the application thereof under certain circumstances, is held invalid, illegal or incapable of being enforced in any jurisdiction, (i) as to such jurisdiction, the remainder of this Agreement or the application of such provision, section or part under other circumstances, and (ii) as for any other

15

jurisdiction, any provision of this Agreement, shall not be affected and shall remain in full force and effect, unless, in each case, such invalidity, illegality or unenforceability in such jurisdiction materially impairs the ability of the Parties to consummate the transactions contemplated by this Agreement. Upon such determination that any section or other provision is invalid, illegal or incapable of being enforced in such jurisdiction, the Parties shall negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties as closely as possible in a mutually acceptable manner in order that the transactions contemplated hereby be consummated as originally contemplated to the greatest extent possible even in such jurisdiction.

SECTION 3.10.  Termination.  This Agreement will automatically terminate on the earliest of (a) consummation of the Closing, and (b) termination of the Sale Agreements by either the Purchaser or the EMEA Purchaser or the Selling Parties.  Upon termination, the Parties' rights and obligations under this Agreement, other than in respect of the obligations under Sections 2.1(v), 2.2(v), 2.3(b), 2.3(c), 2.3(d), 2.4, 2.5, 2.6, 2.7, 2.8 and 3.1 through 3.15 each of which shall continue in full force and effect without limitation as to time, shall cease immediately but without prejudice to the rights and obligations of the Parties existing prior to the termination of the Agreement.

SECTION 3.11.  Obligations of the Parties.

(a)     The obligations of the Canadian Main Sellers and the other Canadian Debtors under this Agreement shall be joint and several.

(b)     The obligations of NNI and the other U.S. Debtors under this Agreement shall be joint and several.

(c)     The obligations of the EMEA Debtors under this Agreement shall be joint and several.

SECTION 3.12.   Effectiveness.

(a)     No provision of this Agreement (other than as set forth in Section 3.12(d)) shall be effective until each of the U.S. Bankruptcy Court and the Canadian Court approves the entirety of this Agreement and all of the provisions hereof (the "**Court Approval Condition**").

(b)     All provisions of this Agreement shall be effective as of the date of the satisfaction of the Court Approval Condition.

(c)     Each Party hereto shall:

(i)     use commercially reasonable efforts to satisfy the Court Approval Condition as soon as possible, taking into account the availability of the respective Courts to address the matters set forth in this Agreement;

(ii)     keep all other Parties reasonably apprised of the progress of the satisfaction of the Court Approval Condition and provide such other information regarding the satisfaction of the Conditions as reasonably requested by other Parties; and

16

(iii)    use commercially reasonable efforts to allow any other Party, which so requests in writing reasonable participation in connection with any proceedings in any Court related to the satisfaction of the Court Approval Condition.

(d)    Notwithstanding any of the foregoing, the following provisions of the Agreement shall be effective as of the date hereof: Sections 3.1 through 3.12 and Section 3.12(b), (c) and (d).

SECTION 3.13.    Execution by certain Selling Parties.  The Parties hereby acknowledge that certain Selling Parties are not executing this Agreement as of the date hereof. Subject to Section 3.12, this Agreement shall be binding on all parties that have executed this Agreement from the time of such execution, regardless of whether all Selling Parties have done so. Between the date hereof and the Closing Date, the Main Sellers hereby agree that they shall use their reasonable best efforts to cause each Other Seller that is not a signatory to this Agreement as of the date hereof to execute a counterpart to this Agreement as soon as practicable, agreeing to be bound as a Party under this Agreement.  The Parties agree that upon becoming a "Selling Debtor" pursuant to Section 11.d of the IFSA, each North American ALT Selling Debtor and each EMEA ALT Selling Debtor shall be permitted to execute a counterpart to this Agreement agreeing to be bound as a Party under this Agreement.

SECTION 3.14.    Limitations of Remedies.  The Parties agree that in no event shall any Party be entitled to equitable relief, including in the form of an injunction or injunctions or orders for specific performance, to prevent or remedy breaches of this Agreement, the Sale Agreements or the other Transaction Documents by any other Party.

SECTION 3.15.    Reservation of Rights.  The Parties hereby agree that, except as specifically set forth in Article II hereof, nothing in this Agreement shall, or be deemed to, determine, ratify, or adopt, or have any impact whatsoever on, the allocation or distribution of proceeds from the sale of the Business, the EMEA Business or the NNSA Business among the Selling Parties.  Without limiting the generality of the foregoing, the Parties hereby agree that the Initial Respective Percentage among the Parties shall not in any way determine the final allocation or distribution of proceeds from the sale of the Business, the EMEA Business or the NNSA Business or otherwise bind the Parties in respect of the final allocation.

**[Remainder of this page intentionally left blank.  Signature pages follow.]**

17

IN WITNESS WHEREOF, each of the parties hereto has caused this Agreement to be executed on the day and year first above written.

NORTEL NETWORKS LIMITED

By: _____
Name:  John Doolittle
Title:    SVP, Corporate Services and
Chief Financial Officer

By: _____
Name:  Anna Ventresca
Title:    General Counsel-Corporate and
Corporate Secretary

[Signature Page to GSM/GSM-R Side Agreement]

NORTEL NETWORKS CORPORATION

By:_____

Name: John Doolittle

Title:   SVP, Corporate Services and
Chief Financial Officer


By:_____

Name:  Anna Ventresca

Title:   General Counsel-Corporate and
Corporate Secretary

[Signature Page to GSM/GSM-R Side Agreement]

NORTEL NETWORKS INC.

By:_____
Name:  Anna Ventresca
Title:    Chief Legal Officer

NORTEL NETWORKS TECHNOLOGY CORPORATION

By:_____

Name:  Anna Ventresca

Title:    Secretary

[Signature Page to GSM/GSM-R Side Agreement]

NORTEL NETWORKS GLOBAL CORPORATION

By:_____

Name: John Doolittle

Title:   President


By:_____

Name:  Anna Ventresca

Title:   Secretary

NORTEL NETWORKS (CHINA) LIMITED

By:_____

Name:  John Doolittle

Title:    Chairman and Legal Representative

NORTEL NETWORKS (ASIA) LIMITED

By:
Name: John Doolittle
Title:    Chairman and Legal Representative

NORTEL DE MEXICO, S. DE R.L. DE C.V.

By: _____

Name:  LIBARDO ANDRES RAMIREZ GRACIA

Title:  ATTORNEY-IN-FACT

ARCHITEL SYSTEMS (U.S.)
CORPORATION

By _____
   Name: John Doolittle
   Title: President

CORETEK, INC.

By _____
   Name: John Doolittle
   Title: President

NORTEL ALTSYSTEMS INC.

By _____
   Name: John Doolittle
   Title: President

NORTEL ALTSYSTEMS
INTERNATIONAL INC.

By _____
   Name: John Doolittle
   Title: President

NORTEL NETWORKS APPLICATIONS
MANAGEMENT SOLUTIONS INC.

By _____
    Name: John Doolittle
    Title:  President

NORTEL NETWORKS CABLE
SOLUTIONS INC.

By _____
    Name: John Doolittle
    Title:  Vice-President

NORTEL NETWORKS CAPITAL
CORPORATION

By _____
    Name: John Doolittle
    Title:  President

NORTEL NETWORKS HPOCS INC.

By _____
    Name: John Doolittle
    Title:  President

[Signature Page to GSM/GSM-R Side Agreement]

NORTEL NETWORKS INTERNATIONAL
INC.

By _____
    Name: John Doolittle
    Title: President

NORTEL NETWORKS OPTICAL
COMPONENTS INC.

By _____
    Name: John Doolittle
    Title: President

NORTHERN TELECOM
INTERNATIONAL INC.

By _____
    Name: John Doolittle
    Title: President

QTERA CORPORATION

By _____
    Name: John Doolittle
    Title: President

[Signature Page to GSM/GSM-R Side Agreement]

SONOMA SYSTEMS

By _____
    Name: John Doolittle
    Title: President and Treasurer

XROS, INC.

By _____
    Name: John Doolittle
    Title: President

**SIGNED** for and on behalf of **Nortel Networks UK Limited** (in administration) by Stephen Harris as Joint Administrator (acting as agent and without personal liability) in the presence of:

)
)
)
)

........................................................

Stephen Harris

Witness signature

........................................................

Name: Olivia Schofield
Address: Herbert Smith LLP, Exchange House, Primrose Street, London EC2A 2HS

)
)
)

**SIGNED** for and on behalf of **Nortel GmbH** (in administration) by Stephen Harris as Joint Administrator (acting as agent and without personal liability) in the presence of:

)
)
)
)

........................................................

Stephen Harris

Witness signature

........................................................

Name: Olivia Schofield
Address: Herbert Smith LLP, Exchange House, Primrose Street, London EC2A 2HS

)
)

Signature Page to GSM/GSM-R Side Agreement

SIGNED for and on behalf of **Nortel Networks**
**SpA** (in administration) by Stephen Harris as
Joint Administrator (acting as agent and without
personal liability) in the presence of:

)
)
)
)

.................................................
Stephen Harris

Witness signature

.................................................
Name: Olivia Schofield
Address: Herbert Smith LLP, Exchange House,
Primrose Street, London EC2A 2HS

)
)
)

SIGNED for and on behalf of **Nortel Networks**
**Hispania S.A.** (in administration) by Stephen
Harris as Joint Administrator (acting as agent
and without personal liability) in the presence of:

)
)
)
)

.................................................
Stephen Harris

Witness signature

.................................................
Name: Olivia Schofield
Address: Herbert Smith LLP, Exchange House,
Primrose Street, London EC2A 2HS

)
)
)

SIGNED for and on behalf of **Nortel Networks**
**B.V.** (in administration) by Stephen Harris as
Joint Administrator (acting as agent and without
personal liability) in the presence of:

)
)
)
)

.................................................
Stephen Harris

Witness signature

.................................................
Name: Olivia Schofield
Address: Herbert Smith LLP, Exchange House,
Primrose Street, London EC2A 2HS

)
)
)

Signature Page to GSM/GSM-R Side Agreement

**SIGNED** for and on behalf of **Nortel Networks** )
**N.V.** (in administration) by Stephen Harris as )
Joint Administrator (acting as agent and without )
personal liability) in the presence of: )

Stephen Harris

Witness signature

Name: Olivia Schofield )
Address: Herbert Smith LLP, Exchange House,
Primrose Street, London EC2A 2HS

**SIGNED** for and on behalf of **Nortel Networks** )
**(Austria) GmbH** (in administration) by Stephen )
Harris as Joint Administrator (acting as agent )
and without personal liability) in the presence of: )

Stephen Harris

Witness signature

Name: Olivia Schofield )
Address: Herbert Smith LLP, Exchange House,
Primrose Street, London EC2A 2HS

**SIGNED** for and on behalf of **Nortel Networks** )
**Polska Sp. z.o.o.** (in administration) by Stephen )
Harris as Joint Administrator (acting as agent )
and without personal liability) in the presence of: )

Stephen Harris

Witness signature

Name: Olivia Schofield )
Address: Herbert Smith LLP, Exchange House, )
Primrose Street, London EC2A 2HS

Signature Page to GSM/GSM-R Side Agreement

**SIGNED** for and on behalf of **Nortel Networks** )
**s.r.o.** (in administration) by Stephen Harris as )
Joint Administrator (acting as agent and without )
personal liability) in the presence of: )

Stephen Harris

Witness signature

Name: Olivia Schofield
Address: Herbert Smith LLP, Exchange House,
Primrose Street, London EC2A 2HS

**SIGNED** for and on behalf of **Nortel Networks** )
**Engineering Service kft** (in administration) by )
Stephen Harris as Joint Administrator (acting as )
agent and without personal liability) in the )
presence of: )

Stephen Harris

Witness signature

Name: Olivia Schofield
Address: Herbert Smith LLP, Exchange House,
Primrose Street, London EC2A 2HS

**SIGNED** for and on behalf of **Nortel Networks** )
**Slovensko s.r.o.** (in administration) by Stephen )
Harris as Joint Administrator (acting as agent )
and without personal liability) in the presence of: )

Stephen Harris

Witness signature

Name: Olivia Schofield
Address: Herbert Smith LLP, Exchange House,
Primrose Street, London EC2A 2HS

Signature Page to GSM/GSM-R Side Agreement

**SIGNED** for and on behalf of **Nortel Networks** )
**Romania Srl** (in administration) by Stephen )      .................................................
Harris as Joint Administrator (acting as agent )      Stephen Harris
and without personal liability) in the presence of: )


Witness signature

.................................................... )
Name: Olivia Schofield )
Address: Herbert Smith LLP, Exchange House, )
Primrose Street, London EC2A 2HS

Signature Page to GSM/GSM-R Side Agreement

SIGNED by Maria Stanko )
duly authorised for and on behalf of o.o.o. )
Nortel Networks in the presence of: )         Maria Stanko

Witness signature

Name: Maxim Deyneka
Address: Russia, Moscow,
13-70, Dubninskaya str.

Signature Page to GSM/GSM-R Side Agreement

SIGNED for and on behalf of **Nortel Networks**  )
**France S.A.S.** (in administration) by Kerry   )    _Kerry Trigg_
Trigg acting as authorised representative for    )    Kerry Trigg
Stephen Harris as Joint Administrator (acting as )
agent and without personal liability) in the     )
presence of:                                      )


Witness signature

........................._T Allen_.........................    )
Name:  TERESA ALLEN                               )
Address:                                          )

**EY ERNST & YOUNG LLP**
**1 More London Place**
**London**
**SE1 2AF**

SIGNED by Sharon Rolston
duly authorised for and on behalf of **Nortel**
**Networks AG** in the presence of:

)
)
)

Sharon Rolston

Witness signature

_B. Scherwath_

Name:   B. SCHERWATH

Address: c/o NORTEL NETWORKS UK LTD

WESTACOTT WAY

MAIDENHEAD

SL6   OAT

UK

)
)
)

Signature Page to GSM/GSM-R Side Agreement

**SIGNED** by Alan Bloom

in his own capacity and on behalf of the Joint
Administrators without personal liability and
solely for the benefit of the provisions of this
Agreement expressed to be conferred on or
given to the Joint Administrators:

)
)
)

.................................................................
Alan Bloom

Witness signature
.................................................................
Name:    TRACEY READ
Address:    Ernst & Young LLP
1 More London Place
London
SE1 2AF

)
)
)
)

Signature Page to GSM/GSM-R Side Agreement

**SIGNED** by John Freebairn                          )          ..................................................
duly authorised for and on behalf of **Nortel**       )          John Freebairn
**Networks (Northern Ireland) Limited** in the        )
presence of:                                          )


Witness signature

...................................................   )
Name:        TINA MCAULEY                              )
Address:     10 KNOCKAGH HEIGHTS
             CARRICKFERGUS
             BT38 8QZ

Signature Page to GSM/GSM-R Side Agreement

**SIGNED** for and on behalf of **Nortel Networks** )
**(Ireland) Limited** (in administration) by David )
Hughes as Joint Administrator (acting as agent )
and without personal liability) in the presence of: )

David Hughes

Witness signature

Name:        NIALL J COVENEY )
Address:     c/o ERNST + YOUNG, )
             HARCOURT CENTRE, )
             HARCOURT STREET,
             DUBLIN 2

SIGNED for and on behalf of NORTEL  )
NETWORKS SA (IN  )      Cosme Rogeau
ADMINISTRATION)  )
by COSME ROGEAU as liquidator (acting  )
as agent and without personal liability) and

by FRANCK MICHEL as administrator  )
(acting as agent and without personal  )      Franck Michel
liability) in the presence of:  )
  )

Witness signature

Name:    Nicolas Gricourt
Address:
         10 Allee P. de Coubertin
         78007 Versailles.

**Schedule A – Other Sellers**

Nortel Networks Technology Corporation

Nortel Networks de Mexico, S. DE R.L. DE C.V.

Nortel Networks (Asia) Limited

Nortel Networks (China) Limited

Nortel Networks Global Corporation

**Schedule B – EMEA Sellers**

Nortel Networks UK Limited (In Administration)

Nortel Networks (Ireland) Limited (In Administration)

Nortel GmbH (In Administration)

Nortel Networks SpA (In Administration)

Nortel Networks Hispania, S.A. (In Administration)

Nortel Networks B.V. (In Administration)

o.o.o. Nortel Networks

Nortel Networks AG

Nortel Networks N.V. (In Administration)

Nortel Networks (Austria) GmbH (In Administration)

Nortel Networks Polska Sp z.o.o. (In Administration)

Nortel Networks Engineering Service kft (In Administration)

Nortel Networks Slovensko s.r.o. (In Administration)

Nortel Networks (Northern Ireland) Limited

Nortel Networks France S.A.S. (In Administration)

Nortel Networks Romania Srl (In Administration)

Nortel Networks s.r.o.

## Schedule C – North American ALT Selling Debtors

Architel Systems (U.S.) Corporation

CoreTek, Inc.

Nortel Altsystems, Inc. (previously "Alteon WebSystems, Inc.")

Nortel Altsystems International Inc. (previously "Alteon WebSystems International, Inc.")

Nortel Networks Applications Management Solutions Inc.

Nortel Networks Cable Solutions Inc.

Nortel Networks Capital Corporation

Nortel Networks HPOCS Inc.

Nortel Networks International Inc.

Nortel Networks Optical Components Inc.

Northern Telecom International Inc.

Qtera Corporation

Sonoma Systems

Xros, Inc.

**Schedule D – EMEA ALT Selling Debtors**

Nortel Networks Oy (In Administration)

Nortel Networks AB (In Administration)

Nortel Networks International Finance & Holding BV (In Administration)

Nortel Networks Portugal SA (In Administration)