## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

------------------------------------------------------------X

*In re*                                        :

Nortel Networks Inc., *et al.*,[1]             :

       Debtors.          :

------------------------------------------------------------X

Chapter 11

Case No. 09-10138 (KG)

Jointly Administered

**Hearing date: May 19, 2010 at 2:00 PM (ET) (proposed)**
**Objections due: May 17, 2010 at 12:00 PM (ET) (proposed)**

## DEBTORS' MOTION PURSUANT TO 11 U.S.C. §§ 105(a) AND 363(b) FOR ENTRY OF AN ORDER APPROVING THE CVAS SIDE AGREEMENT AND GRANTING RELATED RELIEF

Nortel Networks Inc. ("NNI") and certain of its affiliates, as debtors and debtors in possession, (collectively, the "Debtors") hereby move this Court (the "Motion") for the entry of an order, substantially in the form attached hereto as Exhibit A, approving that certain CVAS Side Agreement substantially in the form attached hereto as Exhibit B (the "Side Agreement"), to be entered into by and among NNI, Nortel Networks Corporation ("NNC"), Nortel Networks Limited ("NNL", and, together with NNI and NNC, the "Main Sellers"), certain of their affiliates (together with the Main Sellers, the "Sellers"), the EMEA Sellers (as defined in the Side Agreement), certain other Selling Parties (as defined in the Side Agreement), the Joint Administrators and the Joint Israeli Administrators (each as defined below); and granting them

---

[1]  The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's tax identification number, are:  Nortel Networks Inc. (6332), Nortel Networks Capital Corporation (9620), Nortel Altsystems Inc. (9769), Nortel Altsystems International Inc. (5596), Xros, Inc. (4181), Sonoma Systems (2073), Qtera Corporation (0251), CoreTek, Inc. (5722), Nortel Networks Applications Management Solutions Inc. (2846), Nortel Networks Optical Components Inc. (3545), Nortel Networks HPOCS Inc. (3546), Architel Systems (U.S.) Corporation (3826), Nortel Networks International Inc. (0358), Northern Telecom International Inc. (6286), Nortel Networks Cable

such other and further relief as the Court deems just and proper.  In support of this Motion, the Debtors respectfully represent as follows:

## Jurisdiction

1.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.  This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

2.      The statutory bases for the relief requested herein are sections 105(a) and 363(b) of title 11 of the United States Code (the "Bankruptcy Code").

## Background

### A.      Procedural History

3.      On January 14, 2009 (the "Petition Date"), the Debtors, other than NN CALA (defined below), filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code.

4.      The Debtors continue to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

5.      On January 15, 2009, this Court entered an order of joint administration pursuant to Federal Rule of Bankruptcy Procedure 1015(b) that provided for the joint administration of these cases and for consolidation for procedural purposes only [D.I. 36].

6.      Also on the Petition Date, the Debtors' ultimate corporate parent NNC, NNI's direct corporate parent NNL (together with NNC and their affiliates, including the Debtors, "Nortel"), and certain of their Canadian affiliates (collectively, the "Canadian Debtors")[2] filed an application with the Ontario Superior Court of Justice (the "Canadian Court") under the

---

Solutions Inc. (0567) and Nortel Networks (CALA) Inc. (4226).  Addresses for the Debtors can be found in the Debtors' petitions, which are available at http://chapter11.epiqsystems.com/nortel.

[2]      The Canadian Debtors include the following entities:  NNC, NNL, Nortel Networks Technology Corporation, Nortel Networks Global Corporation and Nortel Networks International Corporation.

Companies' Creditors Arrangement Act (Canada) (the "CCAA"), seeking relief from their creditors (collectively, the "Canadian Proceedings"). The Canadian Debtors continue to manage their properties and operate their businesses under the supervision of the Canadian Court.

7.      On January 14, 2009, the Canadian Court entered an order recognizing these chapter 11 proceedings as a foreign proceeding under section 18.6 of the CCAA. On February 27, 2009, based on a petition filed by Ernst & Young Inc., as court-appointed Monitor in the Canadian Proceedings and as foreign representative for the Canadian Debtors (the "Monitor"), this Court entered an order recognizing the Canadian Proceedings as foreign main proceedings under chapter 15 of the Bankruptcy Code.

8.      On January 14, 2009, the High Court of England and Wales placed nineteen of Nortel's European affiliates (collectively, the "EMEA Debtors")[3] into administration under the control of individuals from Ernst & Young LLC (collectively, the "Joint Administrators"). On May 28, 2009, at the request of the Joint Administrators, the Commercial Court of Versailles, France (the "French Court") (Docket No. 2009P00492) ordered the commencement of secondary proceedings in respect of Nortel Networks S.A. ("NNSA"), which consist of liquidation proceedings during which NNSA was originally authorized to continue to operate as a going concern for an initial period of three months, which period was subsequently extended to November 28, 2009. In accordance with the European Union's Council Regulation (EC) No 1346/2000 on Insolvency Proceedings, the English law proceedings (the "English Proceedings") remain the main proceedings in respect of NNSA although a French administrator and a French

---

[3]      The EMEA Debtors include the following entities: Nortel Networks UK Limited, Nortel Networks S.A., Nortel Networks (Ireland) Limited, Nortel GmbH, Nortel Networks France S.A.S., Nortel Networks Oy, Nortel Networks Romania SRL, Nortel Networks AB, Nortel Networks N.V., Nortel Networks S.p.A., Nortel Networks B.V., Nortel Networks Polska Sp. z.o.o., Nortel Networks Hispania, S.A., Nortel Networks (Austria) GmbH, Nortel Networks, s.r.o., Nortel Networks Engineering Service Kft, Nortel Networks Portugal S.A., Nortel Networks Slovensko, s.r.o. and Nortel Networks International Finance & Holding B.V.

liquidator have been appointed and are in charge of the day-to-day affairs and continuing business of NNSA in France. On October 1, 2009, pursuant to a motion filed by the Joint Administrators, the French Court approved an order to: (i) suspend the liquidation operations relating to the sale of the assets and/or businesses of NNSA for a renewable period of two months; (ii) authorize the continuation of the business of NNSA so long as the liquidation operations are suspended; and (iii) maintain the powers of the French Administrator and Liquidator during the suspension period, except with respect to the sale of assets and/or businesses of NNSA. On March 25, 2010, the French Court ended the suspension of the liquidation operations. On June 26, 2009, this Court entered an order recognizing the English Proceedings of Nortel Networks UK Limited ("NNUK") as foreign main proceedings under chapter 15 of the Bankruptcy Code. [4]

9. On January 26, 2009, the Office of the United States Trustee for the District of Delaware (the "U.S. Trustee") appointed an Official Committee of Unsecured Creditors (the "Committee") pursuant to section 1102(a)(1) of the Bankruptcy Code [D.I.s 141, 142]. An ad hoc group of bondholders holding claims against certain of the Debtors and certain of the Canadian Debtors has also been organized (the "Bondholder Group"). No trustee or examiner has been appointed in the Debtors' cases.

10. On July 14, 2009 (the "CALA Petition Date"), Nortel Networks (CALA) Inc. ("NN CALA" and a Debtor with NNI and its affiliates), an affiliate of NNI, filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. On July 17, this Court entered orders approving the joint administration and consolidation of NN CALA's chapter 11 case with

---

[4] Additionally, on January 18, 2009, certain Nortel affiliates, including Nortel Networks Israel (Sales and Marketing) Limited, filed an application with the Tel-Aviv-Jaffa District Court, pursuant to the Israeli Companies Law, 1999, and the regulations relating thereto for a stay of proceedings. On January 19, 2009, the Israeli Court

the other Debtors' chapter 11 cases for procedural proposes [D.I. 1098], and applying to NN

CALA certain previously entered orders in the Debtors' chapter 11 cases [D.I. 1099]. From time

to time, other Nortel affiliates have sought and may seek relief through the commencement of

creditor protection or other insolvency or dissolution proceedings around the world.

B.    **Debtors' Corporate Structure and Business**

11.    Nortel is a technology company that historically designed, developed and

deployed communication products, systems and solutions to its customers around the globe. Its

principal assets include its employees, the intellectual property derived and maintained from its

research and development activities, its customers and other significant contracts and

agreements.

12.    Additional information regarding the Debtors' corporate structure and business

and the events leading to the chapter 11 cases is set forth in the Declaration of John Doolittle in

Support of First Day Motions and Applications [D.I. 3] (the "First Day Declaration").

C.    **Case Milestones**

13.    On June 19, 2009, Nortel announced that it was advancing in discussions with

external parties to sell its businesses and it would assess other restructuring alternatives for its

businesses in the event it is unable to maximize value through sales. To date, Nortel has closed

(i) the sale of certain portions of its Layer 4-7 data portfolio to Radware Ltd. [D.I. 539]; (ii) the

sale of substantially all of its CDMA business and LTE Access assets to Telefonaktiebolaget LM

Ericsson (publ) ("Ericsson") [D.I. 1205]; (iii) the sale of the assets of its Wireless Networks

business associated with the development of Next Generation Packet Core network components

to Hitachi Ltd. [D.I. 1760]; (iv) the sale of substantially all of the assets of the Enterprise

---

appointed Yaron Har-Zvi and Avi D. Pelossof as joint administrators of the Israeli Company under the Israeli
Companies Law (the "Joint Israeli Administrators").

Solutions business globally, including the shares of Nortel Government Solutions Incorporated and DiamondWare Ltd. to Avaya Inc. [D.I. 1514]; (v) the sale of substantially all the assets of its Optical Networking and Carrier Ethernet businesses associated with its Metro Ethernet Networks business unit to Ciena Corporation [D.I. 2070]; and (vi) the sale of substantially all of its GSM/GSM-R business to Ericsson and Kapsch CarrierCom AG [D.I. 2065].  In addition, Nortel has obtained Court approval for the planned sale of certain assets of its Carrier Voice Over IP and Application Solutions business to GENBAND Inc. [D.I. 2632].  Efforts continue to be made with respect to the realization of value from Nortel's remaining assets.

14.    On August 4, 2009, this Court entered an order fixing September 30, 2009 at 4:00 PM (Eastern Time) as the general bar date for filing proofs of claim or interests [D.I. 1280].  On December 3, 2009, this Court entered an order fixing January 25, 2010 at 4:00 PM (Eastern Time) as the bar date for filing proofs of claim or interests against NN CALA [D.I. 2059].

## Relief Requested

15.    By this Motion, the Debtors seek an order, pursuant to sections 105(a) and 363(b) of the Bankruptcy Code, (a) approving the terms and conditions of the Side Agreement, and (b) granting such related relief as the Court deems just and appropriate.

## Facts Relevant to this Motion

**A.    The Interim Funding and Settlement Agreement**

16.    On June 9, 2009, the Debtors, the Canadian Debtors, the EMEA Debtors and the Joint Administrators entered into an Interim Funding and Settlement Agreement (the "IFSA")[5] governing certain intercompany matters, including the obligations of the parties to the IFSA to

---

[5]    The summaries and descriptions of the terms and conditions of the IFSA set forth in the Motion are intended solely for informational purposes to provide the Court and parties in interest with an overview of significant terms thereof and should only be relied upon as such.  The summaries and descriptions are qualified in

(a) negotiate in good faith and attempt to reach agreement on a timely basis on a protocol (the "Interim Sales Protocol") for resolving disputes concerning the allocation of Sale Proceeds (as defined in the IFSA) from Sale Transactions (as defined in the IFSA), which Interim Sales Protocol shall provide binding procedures for the allocation of Sale Proceeds where the relevant parties in any such Sale Transaction have been unable to reach agreement regarding such allocation, and (b) following entry into any Sale Transaction, negotiate in good faith and on a timely basis to attempt to reach agreement regarding the allocation of the Sale Proceeds from such Sale Transaction within a reasonable period of time or as may be otherwise provided in the Interim Sales Protocol (failing which the Interim Sales Protocol shall apply to determine the allocation of the relevant Sale Proceeds). On June 29, 2009, this Court entered an Order (A) Approving the Interim Funding and Settlement Agreement, and (B) Granting Related Relief [D.I. 993].

**B.    Sale of Nortel's CVAS Business**

17.    Nortel's Carrier Voice Over IP and Application Solutions Business (the "CVAS Business") provides telecom service providers with network solutions that help them improve operational efficiency, reduce costs, and generate new revenue through the deployment of multimedia applications and voice over internet protocol ("VoIP") solutions that enhance the communications experience for businesses and consumers. The CVAS Business specializes in deploying new VoIP networks for operators, in helping carriers transition their older voice infrastructure to state-of-the-art VoIP networks, and in delivering advanced multimedia offerings that unify and simplify communications for users.

---

their entirety by the IFSA. In the event there is a conflict between the Motion and the IFSA, the IFSA shall control in all respects.

18.     On December 22, 2009, the Sellers and certain of their affiliates entered into an

Asset Sale Agreement (the "North American Sale Agreement") for the sale of certain assets

relating to the CVAS Business by and among the Sellers, certain of their affiliates and

GENBAND Inc. ("GENBAND", and together with, and including, any Designated Purchaser (as

defined in the Sale Agreement), the "Purchaser").  On December 23, 2009, the EMEA Sellers,

the Joint Administrators and the Joint Israeli Administrators entered into a parallel asset sale

agreement with the Purchaser relating to certain assets of the CVAS Business owned by the

EMEA Sellers and NNSA (the "EMEA Sale Agreement" and, together with the North American

Sale Agreement, the "Sale Agreements").  On March 3, 2010, this Court and the Canadian Court

approved the sale of assets related to the CVAS Business pursuant to the North American Sale

Agreement to the Purchaser (this Court's order approving such sale, [D.I. 2632]).

**C.      The Side Agreement**

19.     In connection with the entry into the Sale Agreements, the Debtors and certain

other Nortel entities (collectively, the "Parties") negotiated the Side Agreement[6] substantially in

the form attached hereto as Exhibit B, to address certain issues among the Selling Parties raised

by their entry into the Sale Agreements.

20.     Certain terms of the Side Agreement are as follows:

- Efforts to Complete the Transaction.  Each of the Parties shall use their
  reasonable best efforts to cooperate with each other and the Purchaser in order
  to complete the Transaction, including:

  o  informing the other Parties of matters relating to the Transaction and
     their Respective Sale Agreement;

  o  facilitating the process required to obtain certain regulatory approvals;

---

[6]     Capitalized terms used in this section but not defined herein have the meanings ascribed to them in the Side
Agreement.  To the extent that there are inconsistencies between the description of the provisions of the Side
Agreement contained in this Motion and the terms and conditions of the Side Agreement, the terms and conditions
of the Side Agreement shall control.

   o  defending all governmental actions challenging the Sale Agreements
      or the Transaction;

   o  promptly informing the other Parties of any material issue that may
      result in a breach by the Sellers or the EMEA Sellers under the Sale
      Agreements; and

   o  ensuring that the Total Proceeds are deposited in the form and in the
      amount paid by the Purchaser and the EMEA Purchaser, or, upon
      release from escrow, the applicable escrow agent, to the Distribution
      Agent.

- Notice and Consultation.  Each of NNL, NNI and NNUK and, to the extent
  applicable, the Joint Administrators and/or the Joint Israeli Administrators,
  shall provide to the others as much notice as possible and shall consult in good
  faith prior to (a) amending or waiving any material provision or right under
  their Respective Sale Agreement, (b) consenting to commencement of any
  Secondary Proceedings in relation to any EMEA Seller or any bankruptcy
  proceedings relating to any Non-Debtor Seller or (c) delivering or otherwise
  consenting to the amount reflected in any Closing Statements, Disagreement
  Notice or any settlement regarding the matters contained therein or the
  Determination of Net Market Value.

- No Termination or Material Amendments.  The Parties agree not to exercise
  certain termination rights under the Sale Agreements or amend certain
  provisions of the Sale Agreements without the prior written consent of the
  other Parties (not to be unreasonably withheld, delayed or conditioned).

- Collection and Allocation of Total Proceeds.  Any payments by the Purchaser
  to the Parties under the Sale Agreements or, upon release from escrow, any
  escrow agreements provided for in the Sale Agreements or the Transaction
  Documents, that is included in the Total Proceeds shall be collected and held
  in escrow in the Distribution Escrow Account by the Distribution Escrow
  Agent.  These sale proceeds will be distributed to the Parties in accordance
  with the IFSA.

- Allocation of Total Payments.  The Parties have agreed that each Party will
  initially bear its Initial Respective Percentage[7] and ultimately bear its Agreed
  Respective Percentage of the Total Payments, as set forth in more details in
  the Side Agreement.

---

[7]    Initial Respective Percentage means one third (1/3) for NNI and its Respective Affiliates, one third (1/3) for
NNC, NNL and its Respective Affiliates, and one third (1/3) for the EMEA Sellers and NNSA.

- Tax Cooperation. In the event that the preparation of a Tax Return could reasonably be expected to require a Partial Allocation or in the event that a Selling Party is preparing any Partial Allocation with the Purchaser, the Selling Party responsible for filing such Tax Return shall provide notice to the other Selling Parties of such Tax Return or Partial Allocation. The notifying Party shall be required to consider any comments in good faith. The noticed Parties will not have a consent or veto right with regards to such Tax Return or Partial Allocation. This provision shall not or shall not be deemed to determine, ratify or adopt or have any impact whatsoever on the allocation of the proceeds.

- Indemnification of the Distribution Agent and Escrow Agents. The Parties have agreed that the costs of any indemnification of the Distribution Agent, the Escrow Agent or the EMEA Escrow Agent under the Distribution Escrow Agreement and the escrow agreements under the Sale Agreements and the TSA shall be borne on a pro rata basis by each Selling Party in accordance with its Agreed Respective Percentage. In addition, the Parties have agreed that if the costs of any such indemnification arise solely from the breach or fault of one or more Parties, then such breaching Parties shall bear the cost of such indemnification.

### Basis for Relief

21.     The relief requested in this Motion is authorized by sections 105(a) and 363(b) of the Bankruptcy Code. Section 105(a) of the Bankruptcy Code provides that "[t]he court may issue any order . . . that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105. See In re Combustion Engineering, Inc., 391 F.3d 190, 236 (3d Cir. 2004) (noting that section 105(a) of the Bankruptcy Code "has been construed to give a bankruptcy court 'broad authority' to provide equitable relief appropriate to assure the orderly conduct of reorganization proceedings."); In re VII Holdings Co., 362 B.R. 663, 668 (Bankr. D. Del. 2007) (BLS) (noting that "[s]ection 105(a) bestows broad equitable powers on the Court.") (citing In re Combustion Engineering, Inc., 391 F.3d 190, 236 (3d Cir. 2004)).

22.     Section 363(b) of the Bankruptcy Code permits a debtor to use, sell or lease property of the estate outside of the ordinary course of business after notice and a hearing. 11

U.S.C. § 363. Section 363 applies when an agreement involves the disposition of the estate's assets in a way that ventures beyond an ordinary course transaction. <u>Myers v. Martin (In re Martin)</u>, 91 F.3d 389, 395 (3d Cir. 1996).

23.     The use or transfer of estate property under section 363 of the Bankruptcy Code must be supported by a sound business purpose. <u>Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)</u>, 722 F.2d 1063, 1070-71 (2d Cir. 1983); <u>In re Decora Indus., Inc.</u>, No. 00-4459, 2002 WL 32332749, at *2 (D. Del. May 20, 2002); <u>Dai-Ichi Kangyo Bank, Ltd. v. Montgomery Ward Holding Corp. (In re Montgomery Ward Holding Corp.)</u>, 242 B.R. 147, 153 (D. Del. 1999); <u>In re Delaware & Hudson Ry. Co.</u>, 124 B.R. 169, 176 (D. Del. 1991); <u>Travelers Cas. & Sur. Co. v. Future Claimants Representative</u>, No. 07-2785, 2008 WL 821088, at *4 (D.N.J. Mar. 25, 2008). A court determining whether a sound business purpose justifies the transaction "should consider all salient factors pertaining to the proceeding and, accordingly, act to further the diverse interests of the debtor, creditors and equity holders, alike." <u>In re Montgomery Ward</u>, 242 B.R. at 153-54 (quoting <u>In re Lionel</u>, 722 F.2d at 1071). In addition, a debtor must show that the transaction has been proposed in good faith, that adequate and reasonable notice has been provided, and that it is receiving fair and reasonable value in exchange. <u>See In re Delaware & Hudson Ry. Co.</u>, 124 B.R. at 176; <u>In re Decora Indus., Inc.</u>, 2002 WL 32332749, at *2.

24.     The Debtors respectfully submit that the Side Agreement meets each of the requirements under section 363 of the Bankruptcy Code. The Side Agreement is supported by a sound business purpose because cooperation amongst the Sellers and the EMEA Sellers is essential to maximizing value in connection with the sale of Nortel's CVAS Business, particularly given the ongoing creditor protection proceedings in various jurisdictions. The

11

Debtors intend to enter into the Side Agreement in order to facilitate cooperation amongst the Parties in working towards completion of the sale to GENBAND and to determine the allocation of the benefits and burdens of the transaction.

## Notice

25.    Notice of the Motion has been given via facsimile, electronic transmission, hand delivery or overnight mail to the (i) counsel to the Purchaser, (ii) U.S. Trustee; (iii) Monitor (iv) counsel to the Committee; (v) counsel to the Bondholder Group; (vi) Department of Justice; (vii) counsel to the Joint Administrators; (viii) counsel to the Joint Israeli Administrators; and (ix) general service list established in these chapter 11 cases.  The Debtors submit that under the circumstances no other or further notice is necessary.

## No Prior Request

26.    No prior request for the relief sought herein has been made to this or any other court.

*[Remainder of Page Intentionally Left Blank]*

WHEREFORE, the Debtors respectfully request that this Court (i) grant this Motion and the relief requested herein; (ii) enter the proposed order attached hereto; and (iii) grant such other and further relief as it deems just and proper.

Dated:  May 12, 2010          CLEARY GOTTLIEB STEEN & HAMILTON LLP
      Wilmington, Delaware

                                James L. Bromley (admitted *pro hac vice*)
                                Lisa M. Schweitzer (admitted *pro hac vice*)
                                One Liberty Plaza
                                New York, New York 10006
                                Telephone:  (212) 225-2000
                                Facsimile:  (212) 225-3999

                                      - and -

                                MORRIS, NICHOLS, ARSHT & TUNNELL LLP

                                _____

                                Derek C. Abbott (No. 3376)
                                Eric D. Schwartz (No. 3134)
                                Ann C. Cordo (No. 4817)
                                Alissa T. Gazze (No. 5338)
                                1201 North Market Street
                                P.O. Box 1347
                                Wilmington, Delaware 19801
                                Telephone:  (302) 658-9200
                                Facsimile: (302) 658-3989

                                *Counsel for the Debtors*
                                *and Debtors in Possession*