IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| NORTEL NETWORKS INC., <u>et al.</u>,[1] | Case No. 09-10138 (KG) |
| Debtors. | Jointly Administered |
| | Ref to Docket No. 2962 |

## <u>AFFIDAVIT OF SERVICE</u>

STATE OF NEW YORK    )
                     ) ss.:
COUNTY OF NEW YORK   )

SENA SENGUN, being duly sworn, deposes and says:

1. I am employed as a Noticing Coordinator by Epiq Bankruptcy Solutions, LLC, located at 757 Third Avenue, New York, New York 10017.  I am over the age of eighteen years and am not a party to the above-captioned action

2. On May 11, 2010, I caused to be served the:

    a. "Notice of Debtors' Motion for an Order (I) Authorizing the Sale of Certain Assets of Debtors' GSM/GSM-R Business Free and Clear of All Liens, Claims and Encumbrances; (II) Authorizing and Approving the Asset Sale Agreement; (III) Authorizing and Approving the Assumption and Assignment of Certain Executory Contracts; and (IV) Authorizing the Filing of Certain Documents Under Seal," dated May 11, 2010, to which is attached the "Debtors' Motion for an Order (I) Authorizing the Sale of Certain Assets of Debtors' GSM/GSM-R Business Free and Clear of All Liens, Claims and Encumbrances; (II) Authorizing and Approving the Asset Sale Agreement; (III) Authorizing and Approving the Assumption and Assignment of Certain Executory Contracts; and (IV) Authorizing the Filing of Certain Documents Under Seal," dated May 11, 2010 [Docket No. 2962], (the "Sale Motion"), and

    b. a Personalized version of the "Debtors' Motion for an Order (I) Authorizing the Sale of Certain Assets of Debtors' GSM/GSM-R Business Free and Clear of All Liens, Claims and Encumbrances; (II) Authorizing and Approving the Asset Sale Agreement; (III) Authorizing and Approving the Assumption and Assignment of Certain Executory Contracts; and (IV) Authorizing the Filing of Certain Documents

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Nortel Networks Inc. (6332), Nortel Networks Capital Corporation (9620), Nortel Altsystems, Inc. (9769), Nortel Altsystems International, Inc. (5596) Xros, Inc. (4181), Sonoma Systems (2073), Qtera Corporation (0251), CoreTek, Inc. (5722), Nortel Networks Applications Management Solutions Inc. (2846), Nortel Networks Optical Components Inc. (3545), Nortel Networks HPOCS Inc. (3546), Architel Systems (U.S.) Corporation (3826), Nortel Networks International Inc. (0358), Northern Telecom International Inc. (6286), Nortel Networks Cable Solutions Inc. (0567) and Nortel Networks (CALA) Inc. (4226).  Addresses for the Debtors can be found in the Debtors' petitions, which are available at http://chapter11.epiqsystems.com/nortel.

Under Seal," dated May 11, 2010 [Docket No. 2962], a sample of which is annexed hereto as Exhibit A, consisting of the following:

    i.    a personalized "Schedule C," related Docket No. 2962,

    ii.    the "Notice of Debtors' Motion for an Order (I) Authorizing the Sale of Certain Assets of Debtors' GSM/GSM-R Business Free and Clear of All Liens, Claims and Encumbrances; (II) Authorizing and Approving the Asset Sale Agreement; (III) Authorizing and Approving the Assumption and Assignment of Certain Executory Contracts; and (IV) Authorizing the Filing of Certain Documents Under Seal," dated May 11, 2010, related Docket No. 2962, and

    iii.    Debtors' Motion for an Order (I) Authorizing the Sale of Certain Assets of Debtors' GSM/GSM-R Business Free and Clear of All Liens, Claims and Encumbrances; (II) Authorizing and Approving the Asset Sale Agreement; (III) Authorizing and Approving the Assumption and Assignment of Certain Executory Contracts; and (IV) Authorizing the Filing of Certain Documents Under Seal," dated May 11, 2010, related Docket No. 2962, (collectively the "Personalized Sale Motion"),

by causing true and correct copies of the:

    a.    Sale Motion, to be enclosed securely in separate postage pre-paid envelopes and delivered via first class mail to those parties listed on the annexed Exhibit B, and

    b.    Sale Motion, to be enclosed securely in separate postage pre-paid envelopes and delivered via overnight mail to those parties listed on the annexed Exhibit C, and

    c.    Personalized Sale Motion, to be enclosed securely in separate postage pre-paid envelopes and delivered via overnight mail to those parties listed on the annexed Exhibit D.

3.    All envelopes utilized in the service of the foregoing contained the following legend: "LEGAL DOCUMENTS ENCLOSED. PLEASE DIRECT TO ATTENTION OF ADDRESSEE, PRESIDENT OR LEGAL DEPARTMENT."

_____
Sena Sengun

Sworn to before me this
17th day of May, 2010.

_____
Notary Public

SIDNEY J. GARABATO
NOTARY PUBLIC, STATE OF NEW YORK
No. 01GA6218946
Qualified in New York County
Commission Expires March 15, 2014

- 2 -

**EXHIBIT A**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

--------------------------------------------------------X

|  |  |  |
|---|---|---|
| *In re* | : | Chapter 11 |
|  | : |  |
| NORTEL NETWORKS INC., *et al.*,[1] | : | Case No. 09-10138 (KG) |
|  | : |  |
| Debtors. | : | Jointly Administered |
|  | : |  |

Hearing date: May 19, 2010 at 2:00 p.m. (ET) (Proposed)
Objections due: May 17, 2010 at 12:00 PM (ET) (Proposed)

--------------------------------------------------------X

### NOTICE OF DEBTORS' MOTION FOR AN ORDER (I) AUTHORIZING THE SALE OF CERTAIN ASSETS OF DEBTORS' GSM/GSM-R BUSINESS FREE AND CLEAR OF ALL LIENS, CLAIMS AND ENCUMBRANCES; (II) AUTHORIZING AND APPROVING THE ASSET SALE AGREEMENT; (III) AUTHORIZING AND APPROVING THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS; AND (IV) AUTHORIZING THE FILING OF CERTAIN DOCUMENTS UNDER SEAL

PLEASE TAKE NOTICE that the debtors and debtors-in-possession (collectively, the "Debtors") in the above-captioned cases, have today filed the attached **Debtors' Motion For An Order (I) Authorizing The Sale Of Certain Assets Of Debtors' GSM/GSM-R Business Free And Clear Of All Liens, Claims And Encumbrances; (II) Authorizing And Approving The Asset Sale Agreement; (III) Authorizing And Approving The Assumption And Assignment Of Certain Executory Contracts; And (IV) Authorizing The Filing Of Certain Documents Under Seal** (the "Motion")[2].

PLEASE TAKE FURTHER NOTICE THAT:

- **CONTRACT COUNTERPARTIES RECEIVING THIS MOTION SHOULD CHECK FOR THEIR NAMES AND CONTRACTS ON EXHIBIT C TO**

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's tax identification number, are: Nortel Networks Inc. (6332), Nortel Networks Capital Corporation (9620), Nortel Altsystems Inc. (9769), Nortel Altsystems International Inc. (5596), Xros, Inc. (4181), Sonoma Systems (2073), Qtera Corporation (0251), CoreTek, Inc. (5722), Nortel Networks Applications Management Solutions Inc. (2846), Nortel Networks Optical Components Inc. (3545), Nortel Networks HPOCS Inc. (3546), Architel Systems (U.S.) Corporation (3826), Nortel Networks International Inc. (0358), Northern Telecom International Inc. (6286), Nortel Networks Cable Solutions Inc. (0567) and Nortel Networks (CALA) Inc. (4226). Addresses for the Debtors can be found in the Debtors' petitions, which are available at http://chapter11.epiqsystems.com/nortel.

[2] Capitalized terms used, but not defined herein have the meaning ascribed to them in the Motion.

**THE MOTION TO DETERMINE WHETHER CONTRACTS TO WHICH THEY ARE A PARTY ARE PROPOSED TO BE ASSUMED AND ASSIGNED TO THE PURCHASER PURSUANT TO THE SALE.**

- **PLEASE READ THIS MOTION CAREFULLY AS YOUR RIGHTS MAY BE AFFECTED BY THIS MOTION.**

PLEASE TAKE FURTHER NOTICE that any party wishing to oppose the entry of an order approving the Motion must file a response or objection ("Objection") if any, to the Motion with the Clerk of the United States Bankruptcy Court for the District of Delaware, 824 Market Street, 3rd Floor, Wilmington, Delaware 19801 on or before **May 17, 2010 at 12:00 p.m. (Eastern Time) (Proposed)** (the "Proposed Objection Deadline").

At the same time, you must serve such Objection on (a) counsel to the Debtors: Cleary Gottlieb Steen & Hamilton LLP, One Liberty Plaza, New York, New York 10006, Facsimile: (212) 225-3999 (Attention: James L. Bromley and Lisa M. Schweitzer) and Morris, Nichols, Arsht & Tunnell LLP, 1201 North Market Street, Wilmington, Delaware 19801, Fax: (302) 658-3989 (Attention: Derek C. Abbott); (b) counsel to the Purchaser: Paul, Weiss, Rifkind, Wharton & Garrison LLP, 1285 Avenue of the Americas, New York, New York 10019, Fax: (212) 757-3990 (Attention: Stephen J. Shimshak and Marilyn Sobel), (c) counsel to the Committee: Akin Gump Strauss Hauer & Feld LLP, One Bryant Park, New York, New York 10036, Fax: (212) 872-1002 (Attention: Fred Hodara, Stephen Kuhn and Kenneth Davis) and Richards, Layton & Finger, P.A., One Rodney Square, 920 North King Street, Wilmington, Delaware 19801 (Attention: Christopher M. Samis), (d) counsel to the Bondholder Group: Milbank, Tweed, Hadley & McCloy, One Chase Manhattan Plaza, New York, New York 10006, Fax: (212) 822-5735 (Attention: Roland Hlawaty) and (e) the Office of the United States Trustee, 844 King Street, Suite 2207, Wilmington, Delaware 19801, Fax: (302) 573-6497 (Attention: Mark Kenney), so as to be received by the Proposed Objection Deadline.

PLEASE TAKE FURTHER NOTICE THAT A HEARING ON THE MOTION WILL BE HELD ON **MAY 19, 2010 AT 2:00 P.M. (EASTERN TIME) (PROPOSED)** BEFORE THE HONORABLE KEVIN GROSS AT THE UNITED STATES BANKRUPTCY COURT FOR THE DISTRICT OF DELAWARE, 824 MARKET STREET, 6TH FLOOR, COURTROOM #3, WILMINGTON, DELAWARE 19801. ONLY PARTIES WHO HAVE FILED A TIMELY OBJECTION WILL BE HEARD AT THE HEARING.

IF YOU FAIL TO RESPOND IN ACCORDANCE WITH THIS NOTICE, THE COURT MAY GRANT THE RELIEF REQUESTED IN THE MOTION WITHOUT FURTHER NOTICE OR HEARING.

Dated: May 11, 2010
      Wilmington, Delaware

CLEARY GOTTLIEB STEEN & HAMILTON LLP

James L. Bromley (*admitted pro hac vice*)
Lisa M. Schweitzer (*admitted pro hac vice*)
One Liberty Plaza
New York, New York 10006
Telephone:  (212) 225-2000
Facsimile:  (212) 225-3999

- and -

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

Derek C. Abbott (No. 3376)
Eric D. Schwartz (No. 3134)
Ann C. Cordo (No. 4817)
Andrew R. Remming (No. 5120)
1201 North Market Street
P.O. Box 1347
Wilmington, Delaware 19801
Telephone:  (302) 658-9200
Facsimile:  (302) 658-3989

*Counsel for the Debtors and Debtors in Possession*

3

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

------------------------------------------------------------X
          :
          :     Chapter 11
*In re*          :
          :     Case No. 09-10138 (KG)
Nortel Networks Inc., *et al.*,[1]    :
          :     Jointly Administered
      Debtors.    :
          :     **Hearing date: May 19, 2010 at 2:00 p.m. (ET)**
          :     **(Proposed)**
          :     **Objections due: May 17, 2010 at 12 :00 p.m. (ET)**
          :     **(Proposed)**
          :
------------------------------------------------------------X

## DEBTORS' MOTION FOR AN ORDER (I) AUTHORIZING THE SALE OF CERTAIN ASSETS OF DEBTORS' GSM/GSM-R BUSINESS FREE AND CLEAR OF ALL LIENS, CLAIMS AND ENCUMBRANCES; (II) AUTHORIZING AND APPROVING THE ASSET SALE AGREEMENT; (III) AUTHORIZING AND APPROVING THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS; AND (IV) AUTHORIZING THE FILING OF CERTAIN DOCUMENTS UNDER SEAL

Nortel Networks Inc. ("NNI") and certain of its affiliates, as debtors and debtors in

possession (collectively, the "Debtors"), hereby move this Court (the "Motion") for the entry of

an order pursuant to sections 105, 107(b)(1), 363 and 365 of title 11 of the United States Code

(the "Bankruptcy Code"), Rules 2002, 6004, 6006, 9014 and 9018 of the Federal Rules of

Bankruptcy Procedure (the "Bankruptcy Rules"), and Rules 6004-1 and 9018-1 of the Local

Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the

District of Delaware (the "Local Rules") (i) authorizing the sale of certain residual assets of the

---

[1]      The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's tax identification number, are: Nortel Networks Inc. (6332), Nortel Networks Capital Corporation (9620), Nortel Altsystems Inc. (9769), Nortel Altsystems International Inc. (5596), Xros, Inc. (4181), Sonoma Systems (2073), Qtera Corporation (0251), CoreTek, Inc. (5722), Nortel Networks Applications Management Solutions Inc. (2846), Nortel Networks Optical Components Inc. (3545), Nortel Networks HPOCS Inc. (3546), Architel Systems (U.S.) Corporation (3826), Nortel Networks International Inc. (0358), Northern Telecom International Inc. (6286), Nortel Networks Cable Solutions Inc. (0567) and Nortel Networks (CALA) Inc. (4226). Addresses for the Debtors can be found in the Debtors' petitions, which are available at http://chapter11.epiqsystems.com/nortel.

Debtors' GSM/GSM-R Business (the "Purchased Assets") free and clear of all liens, claims and encumbrances pursuant to section 363 of the Bankruptcy Code, (ii) authorizing and approving that certain asset sale agreement dated as of May 11, 2010 among Nortel Networks Limited ("NNL"), NNI, Nortel Networks (CALA) Inc. ("NN CALA", together with NNL, NNI and certain other entities identified therein as sellers, the "Sellers") and Telefonaktiebolaget L M Ericsson (publ) (together with any Designated Purchaser, "Ericsson" or the "Purchaser") for the sale of the Assets (as defined below) as described therein (the "Agreement")[2], (iii) authorizing and approving the assumption and assignment of the Assumed and Assigned Contracts (as defined below, and together with the Purchased Assets and other contracts as described in the Agreement, the "Assets"), and (iv) authorizing the Debtors to file certain documents under seal. In support of this Motion, the Debtors respectfully represent as follows:

## Jurisdiction

1.    The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.  This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

2.    The statutory bases for the relief requested herein are sections 105, 107(b)(1), 363 and 365 of the Bankruptcy Code, Rules 2002, 6004, 6006, 9014 and 9018 of the Bankruptcy Rules, and Rules 6004-1 and 9018-1 of the Local Rules.

## Background

### A.    Procedural History

3.    On January 14, 2009 (the "Petition Date"), the Debtors, other than NN CALA, filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code.

---

[2]      Capitalized terms used but not defined herein have the meanings ascribed to them in the Agreement.

4.      The Debtors continue to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

5.      On January 15, 2009, this Court entered an order of joint administration pursuant to Bankruptcy Rule 1015(b) that provided for the joint administration of these cases and for consolidation for procedural purposes only [D.I. 36].

6.      Also on the Petition Date, the Debtors' ultimate corporate parent Nortel Networks Corporation ("NNC"), NNI's direct corporate parent NNL (NNL, together with NNC and their affiliates, including the Debtors, "Nortel"), and certain of their Canadian affiliates (collectively, the "Canadian Debtors")[3] filed an application with the Ontario Superior Court of Justice (the "Canadian Court") under the Companies' Creditors Arrangement Act (Canada) (the "CCAA"), seeking relief from their creditors (collectively, the "Canadian Proceedings"). The Canadian Debtors continue to manage their properties and operate their businesses under the supervision of the Canadian Court.

7.      On January 14, 2009, the Canadian Court entered an order recognizing these chapter 11 proceedings as a foreign proceeding under section 18.6 of the CCAA. On February 27, 2009, based on a petition filed by Ernst & Young Inc., as court-appointed Monitor in the Canadian Proceedings and as foreign representative for the Canadian Debtors (the "Monitor"), this Court entered an order recognizing the Canadian Proceedings as foreign main proceedings under chapter 15 of the Bankruptcy Code.

8.      On January 14, 2009, the High Court of England and Wales placed nineteen of Nortel's European affiliates (collectively, the "EMEA Debtors")[4] into administration under the

---

[3]      The Canadian Debtors include the following entities: NNC, NNL, Nortel Networks Technology Corporation, Nortel Networks Global Corporation and Nortel Networks International Corporation.
[4]      The EMEA Debtors include the following entities: Nortel Networks UK Limited, Nortel Networks S.A., Nortel Networks (Ireland) Limited, Nortel GmbH, Nortel Networks France S.A.S., Nortel Networks Oy, Nortel Networks Romania SRL, Nortel Networks AB, Nortel Networks N.V., Nortel Networks S.p.A., Nortel Networks B.V., Nortel Networks Polska Sp. z.o.o., Nortel Networks Hispania, S.A., Nortel Networks (Austria) GmbH, Nortel

control of individuals from Ernst & Young LLC (collectively, the "Joint Administrators").  On

May 28, 2009, at the request of the Joint Administrators, the Commercial Court of Versailles,

France (the "French Court") (Docket No. 2009P00492) ordered the commencement of secondary

proceedings in respect of Nortel Networks S.A. ("NNSA"), which consist of liquidation

proceedings during which NNSA was originally authorized to continue to operate as a going

concern for an initial period of three months, which period was subsequently extended to

November 28, 2009.  In accordance with the European Union's Council Regulation (EC) No.

1346/2000 on Insolvency Proceedings, the English law proceedings (the "English Proceedings")

remain the main proceedings in respect of NNSA although a French administrator and a French

liquidator have been appointed and are in charge of the day-to-day affairs and continuing

business of NNSA in France.  On October 1, 2009, pursuant to a motion filed by the Joint

Administrators, the French Court approved an order to: (i) suspend the liquidation operations

relating to the sale of the assets and/or businesses of NNSA for a renewable period of two

months; (ii) authorize the continuation of the business of NNSA so long as the liquidation

operations are suspended; and (iii) maintain the powers of the French Administrator and

Liquidator during the suspension period, except with respect to the sale of assets and/or

businesses of NNSA.  On March 25, 2010, the French Court ended the suspension of the

liquidation operations.  On June 26, 2009, this Court entered an order recognizing the English

Proceedings of Nortel Networks UK Limited ("NNUK") as foreign main proceedings under

chapter 15 of the Bankruptcy Code.[5]

---

Networks, s.r.o., Nortel Networks Engineering Service Kft, Nortel Networks Portugal S.A., Nortel Networks
Slovensko, s.r.o. and Nortel Networks International Finance & Holding B.V.
[5]       Additionally, on January 18, 2009, certain Nortel affiliates, including Nortel Networks Israel (Sales and
Marketing) Limited, filed an application with the Tel-Aviv-Jaffa District Court, pursuant to the Israeli Companies
Law, 1999, and the regulations relating thereto for a stay of proceedings.  On January 19, 2009, the Israeli Court
appointed Yaron Har-Zvi and Avi D. Pelossof as joint administrators of the Israeli Company under the Israeli
Companies Law (the "Joint Israeli Administrators").

9.      On January 26, 2009, the Office of the United States Trustee for the District of Delaware (the "U.S. Trustee") appointed an Official Committee of Unsecured Creditors (the "Committee") pursuant to section 1102(a)(1) of the Bankruptcy Code [D.I.s 141, 142]. An ad hoc group of bondholders holding claims against certain of the Debtors and certain of the Canadian Debtors has also been organized (the "Bondholder Group"). No trustee or examiner has been appointed in the Debtors' cases.

10.     On July 14, 2009 (the "CALA Petition Date"), NN CALA (a Debtor with NNI and its affiliates), an affiliate of NNI, filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. On July 17, this Court entered orders approving the joint administration and consolidation of NN CALA's chapter 11 case with the other Debtors' chapter 11 cases for procedural proposes [D.I. 1098], and applying to NN CALA certain previously entered orders in the Debtors' chapter 11 cases [D.I. 1099]. From time to time, other Nortel affiliates have sought and may seek relief through the commencement of creditor protection or other insolvency or dissolution proceedings around the world.

**B.      Debtors' Corporate Structure and Business**

11.     Nortel is a technology company that historically designed, developed and deployed communication products, systems and solutions to its customers around the globe. Its principal assets include its employees, the intellectual property derived and maintained from its research and development activities, its customers and other significant contracts and agreements.

12.     Additional information regarding the Debtors' corporate structure and business and the events leading to the chapter 11 cases is set forth in the Declaration of John Doolittle in Support of First Day Motions and Applications [D.I. 3] (the "First Day Declaration").

C.    **Case Milestones**

13.    On June 19, 2009, Nortel announced that it was advancing in discussions with external parties to sell its businesses and it would assess other restructuring alternatives for its businesses in the event it is unable to maximize value through sales. To date, Nortel has closed (i) the sale of certain portions of its Layer 4-7 data portfolio to Radware Ltd. [D.I. 539]; (ii) the sale of substantially all of its CDMA business and LTE Access assets to Ericsson [D.I. 1205]; (iii) the sale of the assets of its Wireless Networks business associated with the development of Next Generation Packet Core network components to Hitachi Ltd. [D.I. 1760]; (iv) the sale of substantially all of the assets of the Enterprise Solutions business globally, including the shares of Nortel Government Solutions Incorporated and DiamondWare Ltd. to Avaya Inc. [D.I. 1514]; (v) the sale of substantially all the assets of its Optical Networking and Carrier Ethernet businesses associated with its Metro Ethernet Networks business unit to Ciena Corporation [D.I. 2070]; and (vi) the sale of substantially all of its GSM/GSM-R business to Ericsson and Kapsch CarrierCom AG ("Kapsch") [D.I. 2065]. In addition, Nortel has obtained Court approval for the planned sale of certain assets of its Carrier Voice Over IP and Application Solutions business to GENBAND Inc. [D.I. 2632]. Efforts continue to be made with respect to the monetization of Nortel's remaining assets.

14.    On August 4, 2009, this Court entered an order fixing September 30, 2009 at 4:00 PM (Eastern Time) as the general bar date for filing proofs of claim or interests [D.I. 1280]. On December 3, 2009 this Court entered an order fixing January 25, 2010 at 4:00 PM (Eastern Time) as the bar date for filing proofs of claim or interests against NN CALA [D.I. 2059].

**Relief Requested**

15.    By this Motion, the Debtors seek an order: (i) authorizing the sale of the Assets free and clear of all liens, claims and encumbrances, (ii) authorizing and approving the

6

Agreement, (iii) authorizing and approving the assumption and assignment of certain executory

contracts, (iv) authorizing the Debtors to file certain documents under seal, and (vi) granting

them such relief as the Court deems just and proper.

## Facts Relevant to this Motion

### A.    The Retained GSM/GSM-R Business

16.    Global System for Mobile communications ("GSM") is a widely deployed

wireless technology standard for mobile phone networks.  Also based on GSM technology is a

variant of GSM for Railways, which provides a secure communications system for railways

operators.  Prior to the closing of the sale of Nortel's North American and European GSM/GSM-

R Business (as defined below) to Ericsson and Kapsch on March 31, 2010 (the "GSM/GSM-R

March 31st Sale"), Nortel was a supplier of GSM networks to operators globally and worked

with such operators to implement various GSM products.  In this regard, Nortel developed,

manufactured, tested, sold and supplied GSM access and core infrastructure, services and

solutions (such activities collectively, the "GSM/GSM-R Business").

17.    Ericsson bought the North American portion of the GSM/GSM-R Business in the

GSM/GSM-R March 31st Sale, but did not acquire certain contracts and associated assets in the

Asian and Caribbean and Latin American regions at that time.  As more fully set forth in the

Agreement, the proposed sale (the "Sale") would transfer Nortel's Caribbean and Latin

American GSM/GSM-R Business to Ericsson, which is currently operating the remainder of the

North American business.  The assets to be transferred to the Purchaser include, among other

things: certain residual customer contracts with NN CALA, including certain prepetition

executory contracts with NN CALA (the "Assumed and Assigned Contracts"), certain residual

contracts with non-debtor entities including NNL, Nortel Networks de Argentina S.A., Nortel

Networks de Guatemala Ltda ("NN Guatemala"), Nortel Networks del Paraguay S.A. and Nortel

7

Networks del Uruguay S.A. and certain inventory owned by NN CALA, NN Guatemala, NNI and certain other Sellers (collectively, the "Retained GSM/GSM-R Business"). The Agreement also contemplates that certain Nortel employees currently employed by NN CALA, NN Guatemala and certain other Sellers will transition to the Purchaser.

18.    Nortel evaluated the market for the Retained GSM/GSM-R Business prior to determining that the proposed sale to the Purchaser provides the highest or otherwise best value that may be realized for the Assets. In connection with this effort, Nortel approached approximately ten parties likely to be interested and able to acquire the Assets, including a mix of financial investors and strategic buyers. An information memorandum was provided to the eight parties who executed confidentiality agreements, of which parties, six requested and received management presentations and were granted access to an electronic data room containing confidential diligence materials regarding the Assets. Three parties subsequently submitted expressions of interest, and Nortel then engaged in negotiations with two counterparties regarding potential agreements to sell the Retained GSM/GSM-R Business.

19.    The Debtors believe that the consideration set forth in the Agreement represents the highest or otherwise best offer available for the Assets, that further marketing the Assets would not yield a better offer, and that further delays may cause the Debtors to lose the deal they have with Purchaser. Having recently purchased the North American portion of the GSM/GSM-R Business, the Purchaser is uniquely situated to take on the Debtors' existing customer obligations under the residual customer contracts, which will in turn minimize the Debtors' and their affiliates' liability exposure under those contracts. While another bidder offered a slightly higher purchase price for the Retained GSM/GSM-R Business, Nortel concluded that the other terms and conditions would have been less favorable and there was a greater execution risk with that counterparty

B.    **Asset Sale Agreement**[6]

20.    After arm's-length, good faith negotiations among the Sellers and the Purchaser and their respective advisors, the Sellers have agreed, among other things, to convey the Purchased Assets and assume and assign the Assumed and Assigned Contracts to the Purchaser in accordance with the terms and conditions of the Agreement, subject to this Court's and the Canadian Court's approval of the Sale.  The Agreement contemplates the sale of the Assets on the following material terms:

- <u>Purchase Price</u>.  At the Closing, the Purchaser will pay to the Sellers a base purchase price of $ 2 million (subject to adjustment).  (Agreement § 2.2.)

- <u>No Good Faith Deposit</u>.  The Purchase Price will be paid in full at Closing.  No good faith deposit will be made.

- <u>Assets</u>.  The assets to be acquired by the Purchaser include, among other things, certain (i) inventory and supplies, (ii) desktops and laptops used by the Transferred Employees, (iii) Assigned Contracts in force as of the Closing Date, (iv) copies of the Business Information, and (v) contracts and certain bids made by the Sellers for a contract which could result in a contract after the Closing Date.  The assets to be acquired by the Purchaser exclude, among other things, certain cash and cash equivalents, accounts receivable, bank account balances and petty cash, and certain assets and rights (for example, the right to tax refunds, credits, or similar benefits, and rights under certain contracts (other than Assigned Contracts)) relating to the pre-closing period.  (Agreement §§ 2.1.1 and 2.1.2.)

- <u>Assigned Contracts</u>.  The Sellers agree to assign certain Contracts, including customer contracts, to the Purchaser, and to cooperate with the Purchaser to assist in the transition of Bundled Contracts to the Purchaser as they relate to the Assets.  The Sellers have agreed to pay the Cure Costs associated with the assignment of the Assigned Contracts.  (Agreement §§ 2.1.5, 2.1.6, and 2.1.7.)

- <u>Assumed Liabilities</u>.  The liabilities to be assumed by the Purchaser include, among others, (i) liabilities arising after the Closing Date to the extent related to the operation of the Assets by the Purchaser following the Closing, (ii) liabilities arising from the performance of Assigned Contracts after the Closing Date, (iii) certain tax liabilities, (v) certain warranty liabilities and (vi) certain liabilities related to employees and employee benefit plans and under employment laws.  (Agreement § 2.1.3.)

---

[6]    To the extent that there are inconsistencies between any summary description of the Agreement contained herein and the terms and conditions of the Agreement, the terms and conditions of the Agreement shall control.

- <u>Sale Free and Clear</u>.  The Assets to be transferred by the Sellers will be transferred free and clear of all liens, claims and encumbrances, other than those expressly assumed by the Purchaser or otherwise expressly permitted under the Agreement. (Agreement § 2.1.1.)

- <u>Closing Conditions</u>.  In addition to certain other customary closing conditions, including conditions relating to approvals by this Court and the Canadian Court, the obligation of the Purchaser to close the sale is subject to the satisfaction of the performance in all material respects of all material covenants, obligations and agreements required to be performed by the Sellers on or before the Closing. (Agreement §§ 8.1 and 8.3.)

- <u>Ongoing Covenants and Restrictions</u>. In addition to certain other customary postclosing obligations such as information-sharing and redirection of customers and payments, the Sellers have agreed to cooperate with the Purchaser for an agreed period after Closing in relation to arrangements regarding (i) Bundled Contracts, and (ii) Assets which are not transferred at Closing due to bankruptcy proceedings commenced in other jurisdictions following execution of the Agreement. (Agreement §§ 5.10 and 5.11.)

- <u>Avoidance Actions</u>. Under the Agreement, the Purchaser will acquire avoidance and recovery actions that the Sellers have against any counterparty to a 365 Contract arising out of or relating to the Assigned Contracts that are actually assigned to the Purchaser. (Agreement § 2.1.1(e).)

- <u>Restrictions on Solicitation of Competing Bids and No Auction</u>.  As the Debtors have thoroughly marketed the Assets and believe that the value of the Assets will further deteriorate if further marketing efforts are pursued, no further public auction is contemplated for the Assets.[7] Under the Agreement the Debtors shall not solicit bids for the sale of any part of the Business. (Agreement § 5.6(g).)

- <u>Post-Closing Access to Books and Records</u>.  For three (3) years after the Closing, and subject to its existing documentation retention policies, the Purchaser must preserve pre-closing records to the extent related to the Assets. The Purchaser and the Sellers must preserve tax records through the end of the applicable statute of limitations period.  Through such periods the Sellers and the Purchaser, as applicable, shall, and/or shall cause the person holding such records to provide to the party requesting the records or its representative reasonable access to such records during normal business hours.  (Agreement §§ 5.18 and 6.5.)

- <u>Certain Ancillary Agreements</u>.  The Agreement contemplates the execution of (i) a Letter Agreement under which certain of the parties to the ancillary agreements executed in connection with the GSM/GSM-R March 31st Sale acknowledge a

---

[7]        Given the purchase price of the Assets, the Debtors believe they would be authorized to sell the Assets (other than the Assumed and Assigned Contracts) pursuant to the *Order Approving Debtors' Motion for Authorization and Approval of Procedures for the Sale or Abandonment of De Minimis Assets* [D.I. 322].  The Debtors are seeking this Court's approval of the Sale to facilitate the assumption and assignment of the Assumed and Assigned Contracts under section 365 of the Bankruptcy Code.

willingness to support the Assets sold under this Sale, (ii) Local Sale Agreements, (iii) a GSM Supply Agreement Amendment, (iv) an Amended and Restated IPLA and (v) a Loaned Employee Agreement that will govern the relationship between the Debtors and the Purchaser with respect to Transferred Employees that are Visa Employees, if any. (Agreement § 5.19.)

**C.    The Assumption and Assignment of Contracts and the Filing of Certain Documents under Seal**

21.    To facilitate and effect the sale of the Assets, the Debtors seek authorization to assume certain prepetition executory contracts of the Debtors related to the Purchased Assets, and to assign such contracts to the Purchaser.

22.    Included in the Assumed and Assigned Contracts designated for assumption and assignment to the Purchaser are contracts between the Debtors and their customers (the "Customer Contracts"). The identity of the counterparties to the Customer Contracts (the "Customer Counterparties") constitutes an integral component of the Assumed and Assigned Contracts' value. Access to the list of Customer Counterparties absent appropriate confidentiality restrictions would entail releasing valuable confidential information of critical value not only to the Purchaser of the Assets but also to the Debtors' remaining business, which share overlapping customer lists. Thus, publicly releasing the names of the Customer Counterparties would have a detrimental impact on the value of the Assets as well as other aspects of the Debtors' business.

23.    The Debtors will serve notice of this Motion on each of the counterparties to the Assumed and Assigned Contracts, including a personalized schedule identifying each of the Assumed and Assigned Contracts substantially in the form attached hereto as Exhibit C.

24.    Bankruptcy Rule 6006(e) allows for the sale of multiple contracts in one motion upon authorization of the Court or if all executory contracts are to be assumed and assigned to the same assignee. The Debtors therefore request that the Court grant authorization to file an omnibus motion pursuant to Bankruptcy Rule 6006(f)(6).

### Cure Amounts

25.    To the extent necessary to consummate the Sale, the Debtors shall pay the

amounts, if any, necessary to be paid to cure any existing defaults under the Assumed and

Assigned Contracts in accordance with section 365(b) and 365(f)(2) of the Bankruptcy Code (the

"Cure Amount") promptly.  To the best of the Debtors' knowledge, there are no Cure Amounts

to be paid under the Assumed and Assigned Contracts.

### Adequate Assurance of Future Performance

26.    The Debtors submit that the Purchaser is able to comply with section 365 of the

Bankruptcy Code and to perform the obligations under the Assumed and Assigned Contracts.

Ericsson is a Swedish company founded in 1876, with its headquarters in Stockholm, Sweden

and its stock is listed on OMX NASDAQ, Stockholm and NASDAQ New York.  Ericsson is the

world's leading provider of technology and services to telecom operators.  Ericsson is the leader

in 2G, 3G and 4G mobile technologies, provides support for networks with over 1 billion

subscribers and has a leading position in managed services.  Ericsson's portfolio comprises of

mobile and fixed network infrastructure, telecom services, software, broadband and multimedia

solutions for operators, enterprises and the media industry.  Ericsson is advancing its vision "to

be the prime driver in an all-communicating world" through innovation, technology, and

sustainable business solutions.  In 2008, Ericsson had approximately 75,000 employees working

in 175 countries and generated revenue of SEK 209 billion (USD 32.2 billion).  Additional

information regarding Ericsson is available from the Annual Report of Ericsson for the fiscal

year ended December 31, 2008 as filed with the Securities and Exchange Commission on Form

20-F, and on the Ericsson website at http://www.ericsson.com.  Moreover, given the Purchaser's

industry experience and financial wherewithal, especially in light of its recent purchase of

substantially all of the assets of the North American portion of the GSM/GSM-R Business in the

GSM/GSM-R March 31st Sale, the Debtors submit that a showing of adequate assurance has been met.

27.     Any counterparty will be deemed to have received adequate assurance of future performance as required by section 365 of the Bankruptcy Code if the Debtors, after payment of any Cure Amounts, would no longer have any payment or delivery obligations under the relevant Assumed and Assigned Contract.

### Counterparty Objections

28.     Any counterparty that wishes to object to the assumption and assignment of an Assumed and Assigned Contract must comply with the procedures outlined in this Counterparty Objections section of the Motion (the "Counterparty Objection Procedures").

29.     To the extent that any counterparty wishes to object to any matter pertaining to the proposed assumption and assignment of the Assumed and Assigned Contracts, including without limitation the proposed Cure Amount and the adequate assurance of future performance by the Purchaser under the applicable Assumed and Assigned Contract, such counterparty must file with this Court and serve a written objection by no later than **12:00 p.m. (ET) on May 17, 2010** on (a) counsel to the Debtors:  Cleary Gottlieb Steen & Hamilton LLP, One Liberty Plaza, New York, New York 10006, Facsimile:  (212) 225-3999 (Attention:  James L. Bromley and Lisa M. Schweitzer) and Morris, Nichols, Arsht & Tunnell LLP, 1201 North Market Street, Wilmington, Delaware 19801, Fax:  (302) 658-3989 (Attention:  Derek C. Abbott); (b) counsel to the Purchaser:  Paul, Weiss, Rifkind, Wharton & Garrison LLP, 1285 Avenue of the Americas, New York, New York 10019, Fax: (212) 757-3990 (Attention:  Stephen J. Shimshak and Marilyn Sobel), (c) counsel to the Committee:  Akin Gump Strauss Hauer & Feld LLP, One Bryant Park, New York, New York 10036, Fax:  (212) 872-1002 (Attention:  Fred Hodara, Stephen Kuhn and Kenneth Davis) and Richards, Layton & Finger, P.A., One Rodney Square,

920 North King Street, Wilmington, Delaware 19801 (Attention: Christopher M. Samis), (d)

counsel to the Bondholder Group: Milbank, Tweed, Hadley & McCloy, One Chase Manhattan

Plaza, New York, New York 10006, Fax: (212) 822-5735 (Attention: Roland Hlawaty) and (e)

the Office of the United States Trustee, 844 King Street, Suite 2207, Wilmington, Delaware

19801, Fax: (302) 573-6497 (Attention: Mark Kenney).

30.    All counterparty objections must specify the grounds for such objection, including

stating the counterparty's alleged Cure Amount (including, on a transaction by transaction basis,

calculations and detail of specific charges and dates, and any other amounts receivable or

payable supporting such alleged Cure Amount) if the counterparty disagrees with the Debtors'

proposed Cure Amount and any other defaults or termination events the counterparty alleges

must be cured to effect assignment of the Assumed and Assigned Contract.

31.    To the extent that any counterparty does not timely serve an objection as set forth

above, such counterparty will be (i) deemed to have consented to the Cure Amount set forth on

Exhibit C to this Motion (as Exhibit C may be amended from time to time pursuant to the

procedures set forth below), if any, and to the assumption and assignment of the applicable

Assumed and Assigned Contract; (ii) bound to such corresponding Cure Amount, if any; (iii)

deemed to have agreed that the Purchaser has provided adequate assurance of future performance

within the meaning of Bankruptcy Code sections 365(b)(1)(C) and 365(f)(2)(B); (iv) deemed to

have agreed that all defaults under the Assumed and Assigned Contract arising or continuing

prior to the effective date of the assignment have been cured as a result or precondition of the

assignment, such that the Purchaser or the Debtors shall have no liability or obligation with

respect to any default occurring or continuing prior to the assignment, and from and after the

date of the assignment the Assumed and Assigned Contract shall remain in full force and effect

for the benefit of the Purchaser and the counterparty in accordance with its terms; (v) deemed to

14

have waived any right to terminate the Assumed and Assigned Contract or designate an early termination date under the applicable Assumed and Assigned Contract as a result of any default that occurred and/or was continuing prior to the assignment date; and (vi) deemed to have agreed that the terms of the order granting this Motion shall apply to the assumption and assignment of the applicable Assumed and Assigned Contract.

### *Reservation of Rights*

32.    The Debtors' assumption and assignment of the Assumed and Assigned Contracts is subject to Court approval and consummation of the Sale of the Assets to the Purchaser.  The Debtors shall be deemed to have assumed each of the Assumed and Assigned Contracts and assigned such contracts to the Purchaser as of the date of and effective only upon the Closing Date of the Agreement.  Absent such closing, the Assumed and Assigned Contracts shall be deemed neither assumed nor assigned and shall in all respects be subject to subsequent assumption or rejection by the Debtors under the Bankruptcy Code.

33.    The Purchaser shall have no rights in and to a particular Assumed and Assigned Contract until such time as the particular Assumed and Assigned Contract is assumed and assigned pursuant to this Motion.

34.    In the event objections to the assumption and assignment of certain contracts are not resolved prior to Closing, including objections related to Cure Amounts, the Debtors, in consultation with the Purchaser, may elect to (i) not assume such Assumed and Assigned Contracts, or (ii) postpone the assumption of such Assumed and Assigned Contracts until the resolution of such objections.  Any Cure Amounts outstanding on the Closing Date shall be paid to the appropriate counterparty as a condition subsequent to such assumption and assignment of the relevant Assumed and Assigned Contracts.

35.    The Debtors reserve and do not waive the right to amend, supplement, withdraw or otherwise modify the information contained in Exhibit C with respect to any particular Assumed and Assigned Contract.

### *Supplemental Contract Procedures*

36.    If at any time, whether before or after Closing, the Debtors identify additional prepetition executory contracts to be assumed and assigned to the Purchaser as Assumed and Assigned Contracts (each a "Supplemental Assumed and Assigned Contract"), the Debtors shall serve this Motion (including an individualized Exhibit C listing such Supplemental Assumed and Assigned Contract by first class mail, postage prepaid, facsimile, electronic transmission, hand delivery or overnight mail on the counterparty to such contract (and its attorney, if known) at the last known address available to the Debtors by no later than ten (10) calendar days before the proposed effective date of the assignment.

37.    Unless the counterparty or any other entity properly files an objection to the assumption and assignment of a Supplemental Assumed and Assigned Contract in accordance with the Counterparty Objection Procedures within ten (10) calendar days of the date of the service of the Motion on such counterparty, the Debtors may assume and assign the Supplemental Assumed and Assigned Contract, subject to the occurrence of the Closing, without further order or notice of hearing.  If an objection is filed and served in accordance with the Counterparty Objection Procedures within ten (10) calendar days of the date of the service of the Motion on such counterparty, and the objection cannot be resolved consensually, then the Debtors will schedule a hearing to consider the objection on the next scheduled omnibus hearing date.

38.    If the list of Assumed and Assigned Contracts subject to this Motion changes, the Debtors shall file an amended Exhibit C listing the Assumed and Assigned Contracts with the

Court within ten (10) days of Closing and with successive changes to the list of Assumed and Assigned Contracts thereafter.

39.    To facilitate the assumption and assignment of the Assumed and Assigned Contracts, the Debtors further request that the Court find the anti-assignment provisions of the Assumed and Assigned Contracts, if any, to be unenforceable under section 365(f) of the Bankruptcy Code.[8]

**D.    Sale Free and Clear of All Liens, Claims and Interests**

40.    Except as otherwise expressly set forth in the Agreement, the Debtors have agreed to sell, transfer and assign pursuant to sections 363 and 365 of the Bankruptcy Code, the Debtors' right, title and interest in the Assets, free and clear of any and all interests, including (without limitation) (i) any and all liens, including any lien (statutory or otherwise), mortgage, pledge, security interest, charge, right of first refusal, hypothecation, encumbrance, easement, encroachment, right-of-way, restrictive covenant on real property, real property license, lease or conditional sale arrangement (collectively, the "Liens"), and (ii) any and all debts, liabilities and obligations, whether accrued or fixed, direct or indirect, liquidated or unliquidated, absolute or contingent, matured or unmatured, determinable or undeterminable, known or unknown, including those arising under any Law or Action and those arising under any Contract or otherwise, including any Tax liability (collectively, the "Liabilities" and together with the Liens, the "Interests"), with such Interests to attach to the sale proceeds in the same validity, extent and

---

[8]    Section 365(f)(1) provides in part that, "notwithstanding a provision in an executory contract or unexpired lease of the debtor, or in applicable law, that prohibits, restricts, or conditions the assignment of such contract or lease, the trustee may assign such contract or lease . . ." 11 U.S.C. § 365(f)(1).  Section 365(f)(3) further provides that "Notwithstanding a provision in an executory contract or unexpired lease of the debtor, or in applicable law that terminates or modifies, or permits a party other than the debtor to terminate or modify, such contract or lease or a right or obligation under such contract or lease on account of an assignment of such contract or lease, such contract, lease, right, or obligation may not be terminated or modified under such provision because of the assumption or assignment of such contract or lease by the trustee." 11 U.S.C. § 365(f)(3).

17

priority as existed with respect to the Assets immediately prior to the Sale, subject to any rights, claims and defenses of the Debtors and other parties in interest.

41.     The Debtors seek a finding by the Court that upon the Closing, and except as otherwise expressly provided in the Agreement, the Purchaser shall not be liable for any Claims against, and Interests and obligations of, the Debtors or any of the Debtors' predecessors or affiliates.  The Debtors further seek a finding by the Court that as of the Closing, subject to the provisions of the U.S. Sale Order, the Purchaser shall succeed to the entirety of the Debtors' rights and obligations in the Assumed and Assigned Contracts first arising and attributable to the time period occurring on or after the Closing and shall have all rights thereunder.

42.     The Debtors further request that (i) all defaults (monetary and non-monetary) under the Assumed and Assigned Contracts through the Closing shall be deemed cured, (ii) no other amounts will be owed by the Debtors, their estates or the Purchaser with respect to amounts first arising or accruing during, or attributable or related to, the period prior to Closing and (iii) any and all persons or entities shall be forever barred and estopped from asserting a claim against the Debtors, their estates, or the Purchaser that any additional amounts are due or defaults exist under the Assumed and Assigned Contracts that arose or accrued, or relate to or are attributable to the period prior to the Closing.

**E.     Canadian Proceedings**

43.     The Sellers will submit the sale of the Assets for approval by the Canadian Court. The Debtors may seek recognition of the Orders of this Court approving the Sale in the Canadian Court.

<u>Basis for Relief</u>

**A.    Sale of the Assets Is a Product of the Debtors' Reasonable Business Judgment**

44.    Section 363(b)(1) of the Bankruptcy Code provides:  "[t]he Trustee, after notice

and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of

the estate." Section 105(a) of the Bankruptcy Code provides in relevant part:  "The Court may

issue any order, process, or judgment that is necessary or appropriate to carry out the provisions

of this title."

45.    Virtually all courts have held that approval of a proposed sale of assets of a debtor

under section 363 of the Bankruptcy Code outside the ordinary course of business and prior to

the confirmation of a plan of reorganization is appropriate if a court finds that the transaction

represents a reasonable business judgment on the part of the trustee or debtor-in-possession.  <u>See</u>

<u>In re Abbotts Dairies of Pa.</u>, 788 F.2d 143 (3d Cir. 1986); <u>In re Delaware & Hudson Ry. Co.</u>, 124

B.R. 169, 176 (D. Del. 1991) (holding that the following non-exclusive list of factors may be

considered by a court in determining whether there is a sound business purpose for an asset sale:

"the proportionate value of the asset to the estate as a whole; the amount of elapsed time since

the filing; the effect of the proposed disposition of [sic] the future plan of reorganization; the

amount of proceeds to be obtained from the sale versus appraised values of the property; and

whether the asset is decreasing or increasing in value"); <u>In re Stroud Ford, Inc.</u>, 164 B.R. 730,

732 (Bankr. M.D. Pa 1993); <u>Titusville Country Club v. Pennbank (In re Titusville Country</u>

<u>Club)</u>, 128 B.R. 396, 399 (Bankr. W.D. Pa. 1991); <u>In re Industrial Valley Refrigeration & Air</u>

<u>Conditioning Supplies Inc.</u>, 77 B.R. 15, 21 (Bankr. E.D. Pa. 1987); <u>In re Lionel Corp.</u>, 722 F.2d

1063 (2d Cir. 1983); <u>Stephens Indus., Inc. v. McClung</u>, 789 F.2d 386, 391 (6th Cir. 1986); <u>In re</u>

<u>Ionosphere Clubs, Inc.</u>, 100 B.R. 670, 675 (Bankr. S.D.N.Y. 1989); <u>In re Phoenix Steel Corp.</u>, 82

B.R. 334, 335-36 (Bankr. D. Del. 1987) (stating that the elements necessary for approval of a

section 363 sale in a chapter 11 case are "that the proposed sale is fair and equitable, that there is a good business reason for completing the sale and the transaction is in good faith").

46.     The "sound business reason" test requires a trustee or debtor-in-possession to establish four elements: (1) that a sound business purpose justifies the sale of assets outside the ordinary course of business; (2) that accurate and reasonable notice has been provided to interested persons; (3) that the trustee or the debtor-in-possession has obtained a fair and reasonable price; and (4) good faith. In re Titusville Country Club, 128 B.R. at 399; In re Sovereign Estates, Ltd., 104 B.R. 702, 704 (Bankr. E.D. Pa. 1989); Phoenix Steel Corp., 82 B.R. at 335-36; see also Stephens Indus., 789 F.2d at 390; In re Lionel Corp., 722 F.2d at 1071.[9]

47.     The sale of the Debtors' Assets meets the "sound business reason" test. Sound business purposes justify the sale. The Debtors believe that a prompt sale of the Assets presents the best opportunity to realize the maximum value of the Assets for distribution to the Debtors' estates and their creditors. The Debtors further believe that the benefit to their creditors will be adversely affected absent an immediate sale, especially in light of the decrease in the value of the Assets since the GSM/GSM-R March 31st Sale. See In re Lionel Corp., 722 F.2d at 1071 (of factors for court to evaluate on motion under section 363(b), "most important perhaps, [is] whether the asset is increasing or decreasing in value"). Notice of this Motion will be provided to interested parties in accordance with the requirements of the Bankruptcy Code, the Bankruptcy Rules, the Local Rules and applicable Court orders as appropriate under the circumstances. Finally, as described above and below, the Debtors believe that they obtained the highest or otherwise best value for the assets through their solicitation efforts and their arm's-length and good faith negotiations with the Purchaser.

---

[9]     Lionel's "sound business purpose test" replaces an older rule that held that sales of substantially all of a debtor's assets prior to the confirmation of a plan of reorganization could only be made in emergencies, i.e. when the assets to be sold were "wasting" or perishable. Lionel, 722 F.2d at 1071.

48.     As set forth above, the Debtors have demonstrated compelling and sound business justifications for authorizing the sale of the Assets.  Given that the Purchaser has already purchased the Debtors' North American GSM/GSM-R Business pursuant to the GSM/GSM-R March 31st Sale, the proposed sale of the Assets to the Purchaser represents an opportunity to maximize the value of the Debtors' estates and minimize the residual exposure under the Assigned Contracts proposed to be transferred in the Sale.

**B.      The Purchaser Should be Granted the Protection of Bankruptcy Code Section 363(m)**

49.     The Debtors maintain that the Purchaser is entitled to the protections afforded by Bankruptcy Code section 363(m).

50.     Specifically, Bankruptcy Code section 363(m) provides that:

> [t]he reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease of property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal.

11 U.S.C. § 363(m).

51.     While the Bankruptcy Code does not define "good faith," the Third Circuit in In re Abbotts Dairies of Pennsylvania, Inc., 788 F.2d 143 (3d Cir. 1986) has held that:

> [t]he requirement that a purchaser act in good faith . . . speaks to the integrity of his conduct in the course of the sale proceedings.  Typically, the misconduct that would destroy a purchaser's good faith status at a judicial sale involves fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders.

788 F.2d at 147 (citations omitted); see generally Marin v. Coated Sales, Inc., (In re Coated Sales, Inc.), Case No. 89-3704 (KMW), 1990 WL 212899 (S.D.N.Y. Dec. 13, 1990) (holding that party, to show lack of good faith, must demonstrate "fraud, collusion, or an attempt to take grossly unfair advantage of other bidders"); see also In re Sasson Jeans, Inc., 90 B.R. 608, 610

21

(S.D.N.Y. 1988) (quoting In re Bel Air Assocs., Ltd., 706 F.2d 301, 305 (10th Cir. 1983)); In re

Pisces Leasing Corp., 66 B.R. 671, 673 (E.D.N.Y. 1986) (examining facts of each case,

concentrating on "integrity of [an actor's] conduct during the sale proceedings" (quoting In re

Rock Indus. Mach. Corp., 572 F.2d 1195, 1198 (7th Cir. 1978)).

      52.     Over the last weeks and months, the Debtors have spent a considerable amount of

time and resources negotiating the Agreement at arm's length, with give and take on both sides.

Under the circumstances, this Court should find that the Purchaser is entitled to all of the

protections of Bankruptcy Code section 363(m).

**C.      The Agreement is Not the Subject of Collusive Bidding Under Bankruptcy Code Section 363(n)**

      53.     As set forth above, the Debtors negotiated with the Purchaser at arm's length and

in good faith regarding the sale of the Assets.  Moreover, the Debtors do not believe that any

such sale will be the result of collusion or other bad faith between bidders or that the sale price

under the Agreement has been or will be controlled by an agreement between potential or actual

bidders within the meaning of Bankruptcy Code section 363(n).

**D.      Privacy Ombudsman**

      54.     Under section 363(b)(1) of the Bankruptcy Code, if the sale of a consumer

customer list containing personal information relating to individual persons is inconsistent with

the Debtors' consumer privacy policy, section 332 governs the appointment of a consumer

privacy ombudsman.  11 U.S.C. § 363(b)(1).  Here, none of the Debtors' customers that are

subject to the sale of the Assets are individuals, and the Debtors do not have a consumer privacy

policy, so section 363(b)(1) does not apply, and a consumer privacy ombudsman is not required.

**E.      Sale of the Assets Should Be Free and Clear of Liens, Claims and Interests**

      55.     Pursuant to section 363(f) of the Bankruptcy Code, the Debtors seek authority to

sell and transfer the Debtors' right, interest and title in the Assets to the Purchaser free and clear

of all Claims and Interests, except as set forth in the Agreement, with such Claims and Interests

to attach to the proceeds of the sale of the Assets, subject to any rights and defenses of the

Debtors and other parties in interest with respect thereto.  Section 363(f) of the Bankruptcy Code

provides, in pertinent part:

> The trustee may sell property under subsection (b) or (c) of this
> section free and clear of any interest in such property of an entity
> other than the estate, only if –
>
> (1)     applicable nonbankruptcy law permits sale of such property
> free and clear of such interest;
>
> (2)     such entity consents;
>
> (3)     such interest is a lien and the price at which such property
> is to be sold is greater than the aggregate value of all liens on such
> property;
>
> (4)     such interest is in bona fide dispute; or
>
> (5)     such entity could be compelled, in a legal or equitable
> proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f).  See also In re Elliot, 94 B.R. 343, 345 (E.D. Pa. 1988) (holding that section

363(f) written in disjunctive; court may approve sale "free and clear" provided at least one of the

requirements is met).

56.     With respect to each creditor asserting an Interest, one or more of the standards

set forth in Bankruptcy Code § 363(f)(1)-(5) has been satisfied.  Those holders of Claims and

Interests who did not object or who withdrew their objections to the Sale or the Motion are

deemed to have consented to the Motion and Sale pursuant to Bankruptcy Code § 363(f)(2).  The

Debtors submit that the holders of Claims and Interests who do object will fall within one or

more of the other subsections of Bankruptcy Code section 363(f).

57.     A sale free and clear of Claims and Interests is necessary to maximize the value of

the Assets.  The Purchaser would not have entered into the Agreement and would not

consummate the Sale if the sale of the Assets to the Purchaser were not free and clear of all

Claims and Interests, or if the Purchaser would, or in the future could, be liable for any such

Claim or Interest.  A sale of the Assets other than one free and clear of all Claims and Interests

would yield substantially less value for the Debtors' estates, with less certainty than the proposed

Sale.  Therefore, the Sale contemplated by the Agreement is in the best interests of the Debtors,

their estates and creditors, and all other parties in interest.  A sale free and clear of Claims and

Interests is particularly appropriate under the circumstances because any lien or claim in, to or

against the Debtors' right, interest and title in the Assets that exists immediately prior to the

closing of any sales will attach to the sale proceeds allocated to the Debtors with the same

validity, priority, force and effect as existed with respect to the Assets at such time, subject to the

rights and defenses of the Debtors or any party in interest.  The Debtors submit that holders of

Claims and Interests, if any, will be adequately protected by the availability of the proceeds of

the sale to satisfy their Claims and Interests.

**F.    The Assumption and Assignment of the Assumed and Assigned Contracts Should Be Authorized**

58.    Under Bankruptcy Code section 365(a), a debtor, "subject to the court's approval,

may assume or reject any executory contract or unexpired lease of the debtor." 11 U.S.C.

§ 365(a).  Bankruptcy Code section 365(b)(1), in turn, codifies the requirements for assuming an

executory contract of a debtor.  This subsection provides:

> (b) (1)    If there has been a default in an executory
> contract or unexpired lease of the debtor, the trustee may not
> assume such contract or lease unless, at the time of assumption of
> such contract or lease, the trustee -

> > (A)    cures, or provides adequate assurance that
> > the trustee will promptly cure, such default . . . ;

> > (B)    compensates, or provides adequate
> > assurance that the trustee will promptly compensate, a party
> > other than the debtor to such contract or lease, for any

24

actual pecuniary loss to such party resulting from such
default; and

(C)     provides adequate assurance of future
performance under such contract or lease.

11 U.S.C. § 365(b)(1).  Section 365(f)(2) of the Bankruptcy Code provides, in pertinent part,

that:

The trustee may assign an executory contract or unexpired lease of
the debtor only if --

(A)     the trustee assumes such contract or lease in
accordance with the provisions of this section; and

(B)     adequate assurance of future performance by
the assignee of such contract or lease is provided, whether
or not there has been a default in such contract or lease.

11 U.S.C. § 365(f)(2).

59.     The meaning of "adequate assurance of future performance" depends on the facts

and circumstances of each case, but should be given "practical, pragmatic construction." EBG

Midtown S. Corp. v. McLaren/Hart Envtl. Eng'g Corp. (In re Sanshoe Worldwide Corp.), 139

B.R. 585, 593 (S.D.N.Y. 1992).

60.     Among other things, adequate assurance may be provided by demonstrating the

assignee's financial health and experience in managing the type of enterprise or property

assigned. See, e.g., In re Bygaph, Inc., 56 B.R. 596, 605-06 (Bankr. S.D.N.Y. 1986) (finding

adequate assurance of future performance present when prospective assignee of lease from

debtor has financial resources and has expressed willingness to devote sufficient funding to

business in order to give it strong likelihood of succeeding).  In this case, the Purchaser is

uniquely qualified in this respect since it recently acquired the North American portion of the

Debtors' GSM/GSM-R Business.

61.     To the extent any defaults exist under any Assumed and Assigned Contracts, any such default will be promptly cured or adequate assurance that such default will be cured will be provided prior to the assumption and assignment.  If necessary, the Purchaser will submit facts prior to or at the hearing on this Motion to show the financial credibility of the Purchaser and Purchaser's willingness and ability to perform under the Assumed and Assigned Contracts.  The hearing on this Motion will therefore provide the Court and other interested parties the opportunity to evaluate and, if necessary, challenge the ability of the Purchaser to provide adequate assurance of future performance under the Assumed and Assigned Contracts, as required under section 365(b)(1)(C) of the Bankruptcy Code.

62.     In addition, the Debtors submit that it is an exercise of their sound business judgment to assume and assign the Assumed and Assigned Contracts to the Purchaser, and that the assumption, assignment, and sale of the Assumed and Assigned Contracts is in the best interests of the Debtors, their estates, their creditors, and all parties in interest.  The Assumed and Assigned Contracts being assigned to the Purchaser are the principal asset being purchased by the Purchaser, and accordingly, such assumption, assignment, and sale of Assumed and Assigned Contracts are reasonable and enhance the value of the Debtors' estates.  The Court should therefore authorize the Debtors to assume and assign the Assumed and Assigned Contracts as set forth herein.

G.      **Information Regarding the Debtors' Customers Is Confidential Commercial Information and Should Be Filed Under Seal**

63.     The Debtors propose to file the lists of Customer Contracts to be assumed and assigned under seal and to serve individualized notices of the assignment to the relevant Counterparties.

64.     The relief requested by the Debtors is squarely authorized under the Bankruptcy

Code.  Section 107(b) of the Bankruptcy Code provides bankruptcy courts with the power to

issue orders to protect a party's confidential, commercial or proprietary information:

> On request of a party in interest, the bankruptcy court shall . . .
> protect an entity with respect to a trade secret or confidential
> research, development, or commercial information. . . .

11 U.S.C. § 107(b).

65.     Furthermore, Bankruptcy Rule 9018 defines the procedure by which a party may

move for relief under section 107(b) of the Bankruptcy Code:

> On motion or on its own initiative, with or without notice, the court
> may make any order which justice requires . . . to protect the estate
> or any entity in respect of a trade secret or other confidential
> research, development, or commercial information . . . .

Fed. R. Bankr. P. 9018.

66.     This Court has defined "commercial information" in the context of section 107(b)

as follows:

> Commercial information is information which would result in 'an
> unfair advantage to competitors by providing them information as
> to the commercial operations of the debtor.'

In re Alterra Healthcare Corp., 353 B.R. 66, 75-76 (Bankr. D. Del. 2006) (citing In re Orion

Pictures Corp., 21 F.3d 24, 27-28 (2d Cir. 1994)).  This Court has also explained that section

107(b)'s exception to usual public disclosure mandated by section 107(a) is "intended to avoid

'affording an unfair advantage to competitors by providing them information as to the

commercial operations of the debtor.'"  In re MUMA Services Inc., 279 B.R. 478, 484 (Bankr.

D. Del. 2002) (citing In re Itel Corp., 17 B.R. 942, 944 (B.A.P. 9th Cir. 1982)).

67.     Since information related to the Customer Contracts is "commercial information"

within the ambit of section 107, the Court should enter an order permitting the Debtors to file

under seal all confidential information related to the Customer Contracts.

68.     The identities of Customer Counterparties constitute confidential commercial information because they represent a significant aspect of the value of the Assets.  Access to the list of Customer Counterparties absent appropriate confidentiality restrictions would entail releasing confidential information of critical value not only to any prospective purchaser of the Customer Contracts but also to the Debtors' other businesses.  Therefore, it is critical to the preservation of the value of the Debtors' estate that the Court allow for this confidential information to be filed under seal.

69.     As such, the Debtors respectfully submit that the Court permit the Debtors to file documents listing the names and addresses of such parties, including certificates of service and Exhibit C to this Motion, under seal.

**H.     Filing of Schedules Under Seal**

70.     The Debtors respectfully submit that it is appropriate to allow the disclosure schedules and all exhibits and schedules to the Agreement (the "Schedules") be filed under seal. The Schedules contain substantial sensitive commercial information concerning the Debtors' business, including identifying information of the Debtors' employees.  Disclosure of this confidential commercial information would be damaging to the Debtors and the Purchaser if it is disclosed to their competitors.  The filing of the Schedules to the Agreement under seal is in the best interests of the Debtors and their estates, creditors, and interest holders and all other parties in interest herein.

**I.     Waiver of Automatic Fourteen-Day Stay Under Bankruptcy Rules 6004(h) and 6006(d)**

71.     Pursuant to Bankruptcy Rule 6004(h), unless the Court orders otherwise, all orders authorizing the sale of property pursuant to section 363 of the Bankruptcy Code are automatically stayed for fourteen days after entry of the order.  Similarly, under Bankruptcy Rule 6006(d), unless the Court orders otherwise, all orders authorizing the assignment of contracts or

unexpired leases are automatically stayed for fourteen days after entry of the order.  The purpose

of Bankruptcy Rules 6004(h) and 6006(d) is to provide sufficient time for an objecting party to

request a stay pending appeal before the order can be implemented.  See Advisory Committee

Notes to Fed. R. Bankr. P. 6004(h); Advisory Committee Notes to Fed. R. Bankr. P. 6006(d).

72.    Although Bankruptcy Rules 6004(h) and 6006(d) and the Advisory Committee

Notes are silent as to when a court should "order otherwise" and eliminate or reduce the 14-day

stay period, commentators agree that the 14-day stay period should be eliminated to allow a sale

or other transaction to close immediately where there has been no objection to the procedure.

See generally 10 Collier on Bankruptcy ¶ 6004.09 (15th ed. 1999).  Furthermore, if an objection

is filed and overruled, and the objecting party informs the court of its intent to appeal, the stay

may be reduced to the amount of time necessary to file such appeal.  Id.

73.    Pursuant to the Agreement, and because of the potentially diminishing value of

the Assets, the Debtors must close this sale promptly after all closing conditions have been met

or waived.  Thus, waiver of any applicable stays is appropriate in this circumstance.

**Notice**

74.    Notice of the Motion has be given via first-class mail, facsimile, electronic

transmission, hand delivery or overnight mail to (i) counsel to the Purchaser; (ii) the Office of

the U.S. Trustee; (iii) the Monitor; (iv) counsel to the Committee; (v) counsel to the Bondholder

Group; (vi) the non-debtor parties to the Assumed and Assigned Contracts; (vii) all taxing

authorities or recording offices which have a reasonably known interest in the relief requested,

(viii) all United States federal, state, and local regulatory authorities with jurisdiction over the

Debtors, (ix) each of the entities that had received an invitation from the Sellers to acquire the

Assets, (x) all entities reasonably known by the Debtors to have asserted a lien against the

Assets, and (xi) the general service list established in these chapter 11 cases pursuant to

29

Bankruptcy Rule 2002.  The Debtors submit that under the circumstances no other or further notice is necessary.

### No Prior Request

75.    No prior request for the relief sought herein has been made to this or any other court.

WHEREFORE, the Debtors respectfully request that this Court (i) grant this Motion and the relief requested herein; (ii) enter the proposed order attached hereto; and (iii) grant such other and further relief as it deems just and proper.

Dated: May 11, 2010     CLEARY GOTTLIEB STEEN & HAMILTON LLP
    Wilmington, Delaware

           James L. Bromley (admitted *pro hac vice*)
           Lisa M. Schweitzer (admitted *pro hac vice*)
           One Liberty Plaza
           New York, New York 10006
           Telephone:  (212) 225-2000
           Facsimile:  (212) 225-3999

            - and -

           MORRIS, NICHOLS, ARSHT & TUNNELL LLP

           Derek C. Abbott (No. 3376)
           Eric D. Schwartz (No. 3134)
           Ann C. Cordo (No. 4817)
           Andrew R. Remming (No. 5120)
           1201 North Market Street
           P.O. Box 1347
           Wilmington, Delaware 19801
           Telephone:  (302) 658-9200
           Facsimile: (302) 658-3989

           *Counsel for the Debtors and Debtors in Possession*

## Exhibit A

Asset Sale Agreement

*Execution Version*

# ASSET SALE AGREEMENT


BY AND AMONG


## NORTEL NETWORKS LIMITED,


## NORTEL NETWORKS INC.,


## NORTEL NETWORKS (CALA) INC.


AND


## THE OTHER ENTITIES IDENTIFIED HEREIN AS SELLERS


AND


## TELEFONAKTIEBOLAGET L M ERICSSON (PUBL)


## DATED AS OF MAY 11, 2010

# TABLE OF CONTENTS

Page

### ARTICLE I
### INTERPRETATION

| | | |
|---|---|---|
| Section 1.1. | Definitions | 2 |
| Section 1.2. | Cross-References | 13 |
| Section 1.3. | Interpretation | 14 |

### ARTICLE II
### PURCHASE AND SALE OF ASSETS

| | | |
|---|---|---|
| Section 2.1. | Purchase and Sale | 16 |
| Section 2.2. | Purchase Price | 22 |
| Section 2.3. | Closing | 22 |
| Section 2.4. | Designated Purchaser(s) | 23 |

### ARTICLE III
### REPRESENTATIONS AND WARRANTIES OF THE PURCHASER

| | | |
|---|---|---|
| Section 3.1. | Organization and Corporate Power | 24 |
| Section 3.2. | Authorization; Binding Effect; No Breach | 24 |
| Section 3.3. | Financing | 25 |
| Section 3.4. | Adequate Assurance of Future Performance | 25 |
| Section 3.5. | Purchaser's Acknowledgments; Exclusivity of Representations and Warranties | 26 |
| Section 3.6. | Brokers | 26 |

### ARTICLE IV
### REPRESENTATIONS AND WARRANTIES OF THE SELLERS

| | | |
|---|---|---|
| Section 4.1. | Organization and Corporate Power | 26 |
| Section 4.2. | Authorization; Binding Effect; No Breach; No Litigation | 27 |
| Section 4.3. | Labor and Employee Benefits Matters | 28 |
| Section 4.4. | Contracts | 29 |
| Section 4.5. | Brokers | 30 |
| Section 4.6. | Title to Tangible Assets | 30 |
| Section 4.7. | Compliance with Laws; Consents | 31 |
| Section 4.8. | Tax. | 31 |
| Section 4.9. | Representations and Warranties by the Other Sellers | 31 |

i

# TABLE OF CONTENTS

## ARTICLE V
### COVENANTS AND OTHER AGREEMENTS

| | | |
|---|---|---|
| Section 5.1. | Bankruptcy Actions | 32 |
| Section 5.2. | Consultation; Notification | 33 |
| Section 5.3. | Pre-Closing Cooperation | 34 |
| Section 5.4. | Public Announcements | 35 |
| Section 5.5. | Further Actions | 35 |
| Section 5.6. | Conduct of Business | 35 |
| Section 5.7. | Transaction Expenses | 37 |
| Section 5.8. | Confidentiality | 37 |
| Section 5.9. | Certain Payments or Instruments Received from Third Parties | 38 |
| Section 5.10. | Non-Assignable Contracts | 38 |
| Section 5.11. | Bundled Contracts | 40 |
| Section 5.12. | Post-Closing Assistance for Litigation | 41 |
| Section 5.13. | Delivery of Assets | 41 |
| Section 5.14. | Termination of Overhead and Shared Services | 41 |
| Section 5.15. | Financing | 42 |
| Section 5.16. | Guarantees and Other Credit Support of the Business | 42 |
| Section 5.17. | Use of Trademarks | 42 |
| Section 5.18. | Maintenance of Books and Records | 42 |
| Section 5.19. | Certain Ancillary Agreements | 43 |
| Section 5.20. | Casualty | 43 |
| Section 5.21. | Affiliates | 43 |
| Section 5.22. | Pre-Closing Access to Information | 43 |
| Section 5.23. | Insurance Matters | 44 |
| Section 5.24. | Sellers' Accessible Information; Cooperation | 45 |
| Section 5.25. | Disclosure Schedules and Certain Information | 45 |
| Section 5.26. | Inbound License Agreements | 46 |

## ARTICLE VI
### TAX MATTERS

| | | |
|---|---|---|
| Section 6.1. | Transfer Taxes | 46 |

ii

# TABLE OF CONTENTS

Section 6.2.      Withholding Taxes................................................................................ 47

Section 6.3.      Tax Characterization of Payments Under This Agreement ........................... 47

Section 6.4.      Apportionment of Taxes ........................................................................ 47

Section 6.5.      Tax Records ........................................................................................ 48

Section 6.6.      Tax Returns ........................................................................................ 48

Section 6.7.      Purchase Price Allocation ..................................................................... 49

## ARTICLE VII
### EMPLOYMENT MATTERS

Section 7.1.      Employment Obligations ....................................................................... 50

Section 7.2.      Other Employee Covenants ................................................................... 53

Section 7.3.      Excluded Employee Liabilities .............................................................. 54

Section 7.4.      Sole Benefit of Sellers and Purchaser .................................................... 55

## ARTICLE VIII
### CONDITIONS TO THE CLOSING

Section 8.1.      Conditions to Each Party's Obligation .................................................. 56

Section 8.2.      Conditions to Sellers' Obligation.......................................................... 56

Section 8.3.      Conditions to Purchaser's Obligation .................................................... 57

## ARTICLE IX
### TERMINATION

Section 9.1.      Termination........................................................................................ 57

Section 9.2.      Effects of Termination ......................................................................... 58

## ARTICLE X
### MISCELLANEOUS

Section 10.1.     No Survival of Representations and Warranties or Covenants..................... 59

Section 10.2.     Remedies............................................................................................ 59

Section 10.3.     No Third Party Beneficiaries ................................................................ 59

Section 10.4.     Consent to Amendments; Waivers......................................................... 59

Section 10.5.     Successors and Assigns........................................................................ 59

Section 10.6.     Governing Law; Submission to Jurisdiction; Waiver of Jury Trial.............. 60

Section 10.7.     Notices.............................................................................................. 61

Section 10.8.     Exhibits; Sellers Disclosure Schedule .................................................... 62

Section 10.9.     Counterparts....................................................................................... 63

iii

## TABLE OF CONTENTS

Section 10.10.    No Presumption ............................................................................ 63

Section 10.11.    Severability .................................................................................. 63

Section 10.12.    Headings ...................................................................................... 63

Section 10.13.    Entire Agreement ......................................................................... 63

Section 10.14.    Availability of Equitable Relief .................................................... 64

Section 10.15.    Bulk Sales Laws ........................................................................... 64

Section 10.16.    Main Sellers as Representative of Other Sellers ........................... 64

Section 10.17.    Execution by Other Sellers .......................................................... 65

## EXHIBITS

Exhibit A – Other Sellers

Exhibit B – Non-Debtor Sellers

Exhibit C – Loaned Employee Agreement

Exhibit D – Letter Agreement

Exhibit E – GSM Supply Agreement Amendment

Exhibit F – Amended and Restated IPLA

## ASSET SALE AGREEMENT

This Asset Sale Agreement is dated as of May 11, 2010, among Nortel Networks Limited, a corporation organized under the laws of Canada ("**NNL**"), Nortel Networks Inc., a corporation organized under the laws of Delaware ("**NNI**"), Nortel Networks (CALA) Inc. a corporation organized under the laws of Florida ("**CALA**" and, together with NNL and NNI, the "**Main Sellers**"), the Affiliates (as defined below) of NNL and CALA listed in Exhibit A hereto (the "**Other Sellers**" and, together with the Main Sellers, the "**Sellers**") and Telefonaktiebolaget L M Ericsson (publ), a corporation organized under the laws of Sweden (the "**Purchaser**").

## W I T N E S S E T H:

WHEREAS, the Sellers beneficially own and operate the Business (as defined below);

WHEREAS, on the Petition Date, NNL and certain of its Canadian affiliates filed with the Canadian Court (as defined below) an application for protection under the Companies' Creditors Arrangement Act (the "**CCAA**") (the proceedings commenced by such application, the "**CCAA Cases**") and were granted certain initial creditor protection pursuant to an order issued by the Canadian Court on the same date, which also appointed Ernst & Young Inc. as "**Monitor**" in connection with the CCAA Cases, as such order has been and may be extended, amended and restated from time to time by the Canadian Court;

WHEREAS, NNI and CALA are debtors-in-possession under the U.S. Bankruptcy Code (as defined below) having commenced cases under Chapter 11 of the U.S. Bankruptcy Code on the Petition Date by filing voluntary petitions for relief in the U.S. Bankruptcy Court for the District of Delaware (the "**Chapter 11 Cases**");

WHEREAS, the Other Sellers listed in Exhibit B hereto (the "**Non-Debtor Sellers**") are not subject to any Bankruptcy Proceedings (as defined below) as of the date hereof;

WHEREAS, the Sellers have agreed to transfer to the Purchaser and/or the Designated Purchasers (as defined below), and the Purchaser has agreed to purchase and assume, and cause the Designated Purchasers to purchase and assume, including, to the extent applicable, pursuant to Sections 363 and 365 of the U.S. Bankruptcy Code, the Assets and the Assumed Liabilities (each as defined below) from the Sellers, upon the terms and conditions set forth hereinafter;

WHEREAS, the Parties (as defined below) acknowledge and agree that the purchase by the Purchaser (and the Designated Purchasers, if any) of the Assets (as defined below) and the assumption by the Purchaser and the Designated Purchasers of the Assumed Liabilities (as defined below) are being made at arm's length and in good faith and without intent to hinder, delay or defraud creditors of the Sellers and their Affiliates; and

WHEREAS, in addition, at the Closing, the Purchaser and the relevant Sellers contemplated to be parties thereto will, and will cause their respective Affiliates contemplated to be parties thereto to, enter into the following ancillary agreements:  (i) the Local Sale Agreements, (ii) the Letter Agreement, (iii) the GSM Supply Agreement Amendment, (iv) the

Amended and Restated IPLA and (v), if any Transferred Employees are Visa Employees, the Loaned Employee Agreement (together, the "**Ancillary Agreements**").

NOW, THEREFORE, in consideration of the respective covenants, representations and warranties made herein, and of the mutual benefits to be derived hereby (the sufficiency of which is acknowledged), the Parties agree as follows:

## ARTICLE I

## INTERPRETATION

Section 1.1.    <u>Definitions</u>.  Capitalized terms used but not otherwise defined herein shall have the meanings set forth below:

"**Accrued Vacation Amount**" means, at any given time, the amount of compensation with respect to the accrued and unused vacation hours that is due and owing to the Transferred Employees from their respective employer.

"**Action**" means any litigation, action, suit, charge, binding arbitration, Tax audit or other legal, administrative, regulatory or judicial proceeding.

"**Acquired Actions**" means any avoidance or recovery actions as used under Section 542, 543, 544, 545, 546, 547, 548 or 550 of the Bankruptcy Code or the equivalent provisions or recovery under other applicable Laws that the Sellers have against any counterparty to a 365 Contract arising out of or relating to the Assigned Contracts that are actually assigned to the Purchaser or a Designated Purchaser hereunder.

"**Affiliate**" means, as to any Person, any other Person that directly or indirectly through one or more intermediaries Controls, or is under common Control with, or is Controlled by, such Person; provided, that neither Nortel Networks UK Limited or any Subsidiary of Nortel Networks UK Limited shall be deemed an Affiliate of any Seller.

"**Agreement**" means this Asset Sale Agreement, the Sellers Disclosure Schedule and all Exhibits and Schedules attached hereto and thereto and all amendments hereto and thereto made in accordance with Section 10.4.

"**Amended and Restated IPLA**" means that certain Amended and Restated Intellectual Property License Agreement between NNL, on the one hand, and the Purchaser and/or any of its Affiliates named therein, on the other hand, to be executed and delivered by the parties thereto at the Closing substantially in the form attached hereto as Exhibit F.

"**Assigned Contracts**" means all 365 Contracts and Non-365 Contracts except Non-Assigned Contracts.

"**Bankruptcy Court**" means the U.S. Bankruptcy Court, the Canadian Court or any other court before which Bankruptcy Proceedings are filed.

2

"**Bankruptcy Laws**" means the U.S. Bankruptcy Code, the CCAA and the other applicable bankruptcy, insolvency, administration or similar Laws of any jurisdiction where Bankruptcy Proceedings are held.

"**Bankruptcy Proceedings**" means the Chapter 11 Cases, the CCAA Cases and any proceedings thereunder, as well as any other voluntary or involuntary bankruptcy, insolvency, administration, liquidation or similar judicial proceedings concerning any of the Sellers.

"**Business**" means the GSM infrastructure and solutions business of the Sellers solely as it relates to the performance of (i) the Assigned Contracts or (ii) any portions of a Bundled Contract relating exclusively to the Products and Services, in each case as conducted as of the Closing Date, but excluding, in each case, (i) Excluded Products and Services, as defined in the GSM Agreement and (ii) Overhead and Shared Services.

"**Business Day**" means a day on which the banks are opened for business (Saturdays, Sundays, statutory and civic holidays excluded) in (i) New York, New York, United States, (ii) Toronto, Ontario, Canada and (iii) Stockholm, Sweden.

"**Canadian Court**" means the Ontario Superior Court of Justice.

"**Claim**" has the meaning set forth in Section 101(5) of the U.S. Bankruptcy Code.

"**COBRA**" means the continuation coverage required by Section 4980B of the Code or any similar Law.

"**Code**" means the United States Internal Revenue Code of 1986, as amended.

"**Collective Labor Agreement**" means any written agreement that a Seller or any of its Affiliates has entered into with any union, works council or collective bargaining agent with respect to terms and conditions of employment of the employees of such Seller or its Affiliates.

"**Confidentiality Agreement**" means the confidentiality agreement between Purchaser and the other parties listed therein dated March 4, 2010.

"**Consent**" means any approval, authorization, consent, order, license, permission, permit, qualification, exemption or waiver by any Government Entity or other Third Party.

"**Contract**" means any binding contract, agreement, subcontract, purchase order, work order, sales order, indenture, note, bond, instrument, lease, mortgage, ground lease, commitment, covenant or undertaking.

"**Control**", including, with its correlative meanings, "Controlled by" and "under common Control with", means, in connection with a given Person, the possession, directly or indirectly, or as trustee or executor, of the power to either (i) elect more than fifty percent (50%) of the directors of such Person or (ii) direct or cause the direction of the management and

3

policies of such Person, whether through the ownership of securities, contract, credit arrangement or otherwise.

"**Cross-Border Protocol**" means that certain Cross-Border Insolvency Protocol approved by the U.S. Bankruptcy Court pursuant to Section 105(a) of the U.S. Bankruptcy Code in an order dated January 15, 2009 and by the Canadian Court pursuant to an order, dated January 14, 2009, as the same may be amended from time to time.

"**Cure Cost**" means (i) any amounts required by Section 365(b)(1) of the U.S. Bankruptcy Code to cure any defaults by the relevant U.S. Debtor under a 365 Contract and to pay any actual pecuniary losses that have resulted from such defaults under such 365 Contract, and (ii) with respect to any Non-365 Contract, any amounts required to cure any defaults and to pay any actual pecuniary losses under such Contract in respect of the period prior to the Closing Date that are required by the counterparty thereto to be paid in order for such Non-365 Contract to be assigned.

"**Distribution Agent**" means a distribution agent to be appointed by the Sellers prior to the Closing Date.

"**Effective Hire Date**" means the day on which the employment of an Employee commences or continues with the Purchaser or its Affiliates as provided in this Agreement.

"**Employee**" means any employee of the Sellers engaged in the Business, as listed in Section 4.3(b) of the Sellers Disclosure Schedule.

"**Employee Information**" has the meaning set forth in Section 4.3(b).

"**Employee Records**" means books, records, files, or other documentation, whether in electronic or other form, with respect to Employees.

"**Employee Transfer Date**" means, with respect to each jurisdiction where Employees will become Transferred Employees in accordance with this Agreement, 12:01 a.m. local time in such jurisdiction on the day immediately following the Closing Date.

"**ERISA**" means the Employee Retirement Income Security Act of 1974, as amended.

"**ERISA Affiliate Liability**" means any obligation, liability, or expense of any Seller which arises under or relates to any Seller Employee Plan that is subject to Title IV of ERISA, Section 302 of ERISA, Section 412 of the Code, COBRA or any other statute or regulation that imposes liability on a so-called "controlled group" basis with or without reference to any provision of Section 414 of the Code or Section 4001 of ERISA, including by reason of any Seller's affiliation with any of its ERISA Affiliates or the Purchaser being deemed a successor to any ERISA Affiliate of any Seller.

"**Final Order**" means an order of any Bankruptcy Court or other court of competent jurisdiction (i) as to which no appeal, notice of appeal, motion to amend or make additional findings of fact, motion to alter or amend judgment, motion for rehearing or motion

4

for new trial has been timely filed by any party (other than the Purchaser) or, if any of the foregoing has been timely filed, it has been disposed of in a manner that upholds and affirms the subject order in all material respects without the possibility for further appeal or rehearing thereon; (ii) as to which the time for instituting or filing an appeal, motion for rehearing or motion for new trial shall have expired; and (iii) as to which no stay is in effect; provided, however, that, with respect to an order issued by the U.S. Bankruptcy Court, the filing or pendency of a motion under Federal Rule of Bankruptcy Procedure 9024 or Federal Rule of Civil Procedure 60 shall not cause an order not to be deemed a "Final Order" unless such motion shall be filed within fourteen (14) days of the entry of the order at issue.

"**GAAP**" means the United States generally accepted accounting principles.

"**Government Entity**" means any U.S., Canadian, supranational, foreign, domestic, federal, territorial, provincial, state, municipal or local governmental authority, quasi-governmental authority, instrumentality, court, government or self-regulatory organization, commission, tribunal, arbitral body or organization or any regulatory, administrative or other agency, or any political or other subdivision, department or branch of any of the foregoing.

"**GSM**" means Global System for Mobile communications.

"**GSM Agreement**" means that certain Asset Sale Agreement, dated as of November 24, 2009 and as amended, modified, supplemented or restated from time to time, by and among Nortel Networks Corporation, Nortel Networks Inc., Nortel Networks Limited and certain other affiliated entities named therein, and the Purchaser.

"**GSM Supply Agreement Amendment**" means that certain Amendment No. 1 to GSM Products and Services Supply Agreement between Nortel Networks Inc., on the one hand, and the Purchaser and/or any Designated Purchasers, on the other hand, to be executed and delivered by the parties thereto at the Closing substantially in the form attached hereto as Exhibit E.

"**Inactive Employees**" means Employees on a Seller-approved leave of absence who are expected to return and actually return to work within the relevant time period set out below. An Employee shall be an Inactive Employee for purposes hereof only if such individual is absent as a result of military service, pregnancy or parental leave, disability leave, medical leave, jury duty or any leave provided under applicable Law and, in the case of leaves provided under applicable Law, is expected to return to work and actually returns to work in the time permitted for such leave under applicable Law and, for any other leave, is expected to return to work and actually returns to work in accordance with the terms of such leave but not longer than ninety (90) days following the Closing Date.

"**Indebtedness**" of any Person means at any date, without duplication, all obligations of such Person to the extent incurred for the Business (i) for indebtedness for borrowed money (including any unpaid principal, premium and accrued and unpaid interest or fees), (ii) for indebtedness evidenced by bonds, debentures, notes or similar instruments, (iii) in respect of leases whether or not capitalized in accordance with the Nortel Accounting Principles under which such Person is the lessee, (iv) in respect of letters of credit issued for the account of

5

such Person (to the extent drawn), (v) in respect of guarantees of the obligations of other Persons of the type referred to in clauses (i) through (iv) above and (vi) any termination fees, prepayment penalties, "breakage" cost or similar payments associated with the repayment or default under any of the Indebtedness referred to in items (i) and (ii) above.

"**Intellectual Property**" means all intellectual and industrial property rights and any and all forms of protection having equivalent or similar effect anywhere in the world as recognized under the Laws of all countries and jurisdictions, whether registered or unregistered and including applications for the registration or grant of any such rights, including rights in or to any of the following: (a) Trademarks; (b) Patents; (c) works of authorship; (d) mask works; (e) trade secrets, know-how and confidential technical or business information; (f) Software; (g) databases; and (h) industrial designs.

"**Inventory**" means any inventories of raw materials, manufactured and purchased parts, works in process, packaging, stores and supplies, unassigned finished goods inventories (which are finished goods not yet assigned to a specific customer order) and merchandise.

"**KERP**" means the Nortel Networks Corporation Key Employee Retention Plan approved by the U.S. Bankruptcy Court in the District of Delaware on March 5, 2009, and approved by the Canadian Court on March 6, 2009, as the same may be amended, modified, supplemented or replaced from time to time.

"**Knowledge**" or "**aware of**" or "**notice of**" or a similar phrase means, with reference to the Sellers, the actual knowledge of those Persons listed on Section 1.1(a) of the Sellers Disclosure Schedule.

"**Law**" means any U.S., Canadian, foreign, supranational, domestic, federal, territorial, state, provincial, local or municipal statute, law, common law, ordinance, rule, regulation, judicial, administrative or other order, writ, injunction, directive, judgment, decree or policy or guideline having the force of law.

"**Letter Agreement**" means the letter agreement by and among Nortel Networks Corporation, Nortel Networks Inc., Nortel Networks Limited and certain other affiliated entities named therein, and the Purchaser, that the parties hereto will cause to be executed and delivered by the parties thereto at the Closing substantially in the form attached hereto as Exhibit D.

"**Liabilities**" means debts, liabilities and obligations, whether accrued or fixed, direct or indirect, liquidated or unliquidated, absolute or contingent, matured or unmatured or determined or undeterminable, known or unknown, including those arising under any Law or Action and those arising under any Contract or otherwise, including any Tax liability.

"**Lien**" means any lien (statutory or otherwise), mortgage, pledge, security interest, charge, right of first refusal, hypothecation, encumbrance, easement, encroachment, right-of-way, restrictive covenant on real property, real property license, prior claim, lease or conditional sale arrangement.

6

"**Loaned Employee Agreement**" means the agreement with respect to Transferred Employees who are Visa Employees between the applicable Sellers, on the one hand, and the Purchaser and/or any Designated Purchasers, on the other hand, to be executed and delivered on or before the Closing substantially in the form attached hereto as Exhibit C.

"**Losses**" means all losses, damages, Liabilities, deficiencies, interest, awards, judgments, fines, penalties and reasonable and documented out-of-pocket costs and expenses (including reasonable attorneys' fees and disbursements and the costs of litigation, including reasonable amount paid in investigation, defense or settlement of an Action).

"**Material Adverse Effect**" means any circumstance, state of fact, event, change or effect (each an "**Effect**") that, individually or in the aggregate with all other Effects, (a) is or could reasonably be materially adverse to the business, operations, assets, liabilities, results of operations or financial condition of the Business, taken as a whole, or (b) prevents or could reasonably be expected to prevent the ability of the Sellers to perform their material obligations under this Agreement or the timely consummation of the transactions contemplated by this Agreement, but excluding, for purposes of clauses (a) and (b), (i) Effects resulting from changes in general economic conditions in the United States,  Canada, South America or Latin America, (ii) Effects arising from the execution or delivery of this Agreement or the Transactions or the public announcement thereof, (iii) Effects that result from any action required to be taken pursuant to this Agreement or any action taken pursuant to the written request or with the prior written consent of the Purchaser, (iv) Effects relating to the industries and markets in which the Business operates, (v) Effects relating to changes in Law, generally accepted accounting principles or official interpretations of the foregoing, (vi) Effects relating to or including the attrition of customers prior to the Closing Date, or (vii) Effects relating to the pendency of the Bankruptcy Proceedings and any action approved by, or motion made before, the Bankruptcy Courts; it being understood that the failure of the Business to achieve internal or external financial forecasts or projections, by itself, will not constitute a Material Adverse Effect; provided, that, with respect to clauses (i), (iv), and (v), any such Effect shall be included to the extent such Effect has a materially disproportionate effect on the Business, taken as a whole, as compared to other industry participants.

"**Non-Assigned Contract**" means a Non-Assignable Contract as to which all applicable Consents to assignment have not been granted prior to the Closing Date.

"**Non-Solicitation Period**" means the twenty-four (24) month period immediately following March 31, 2010.

"**Nortel Accounting Principles**" means the accounting principles employed by Nortel in the Business, as set forth in Section 1.1(b) of the Sellers Disclosure Schedule.

"**Order**" means any decision, judgment, order, writ, injunction, decree, award or determination of any Government Entity.

"**Ordinary Course**" means the ordinary course of the Business consistent with recent past practice since the filing of the Bankruptcy Proceedings, as such practice may be modified from time to time to the extent necessary to reflect the Bankruptcy Proceedings and as

7

such practice may be modified from time to time to reflect the separation of the Business from the other businesses of the Sellers in a manner consistent with the terms hereof.

"**Overhead and Shared Services**" means corporate or shared services provided to or in support of the Business that are general corporate or other overhead services or provided to both (i) the Business and (ii) other businesses or business segments of any Seller, including travel and entertainment services, temporary labor services, office supplies services (including copiers and faxes), personal telecommunications services, computer hardware and software services, fleet services, energy/utilities services, procurement and supply arrangements, research and development, treasury services, public relations, legal, compliance and risk management services (including workers' compensation), payroll services, sales and marketing support services, information technology and telecommunications services, accounting services, tax services, human resources and employee relations management services, employee benefits services, credit, collections and accounts payable services, logistics services, property management services, environmental support services and customs and excise services, in each case including services relating to the provision of access to information, operating and reporting systems and databases and including all hardware and software or other Intellectual Property necessary for or used in connection therewith.

"**Owned Net Inventory**" means all of the Inventory listed on Section 1.1(c) of the Sellers Disclosure Schedule, as adjusted up to the Closing Date in the Ordinary Course, an estimate as of the Closing Date of which shall be delivered by the Sellers to the Purchaser two (2) Business Days prior to the Closing Date.

"**Party**" or "**Parties**" means individually or collectively, as the case may be, the Sellers and the Purchaser.

"**Patents**" means all national and multinational statutory invention registrations, invention disclosures, patents, utility models, patent applications, provisional patent applications, including all reissues, divisions, continuations, continuations-in-part, extensions and re-examinations thereof, and all rights therein provided by multinational treaties or conventions.

"**Permitted Encumbrances**" means (i) statutory Liens for Taxes or governmental assessments, charges or claims the payment of which is not yet due, or if due, for Taxes the validity of which is being contested in good faith by appropriate proceedings and for which adequate reserves have been established to the extent required by GAAP, other than Liens that may be discharged at Closing pursuant to the terms of the U.S. Sale Order; (ii) mechanics', carriers', workers', repairers', landlords', warehouses and similar Liens arising or incurred in the Ordinary Course for sums not yet delinquent or overdue or which are being contested in good faith by appropriate proceedings and for which adequate reserves have been established to the extent required by GAAP; (iii) any Liens imposed by any Bankruptcy Court in connection with the Bankruptcy Proceedings that are to be discharged at Closing pursuant to the terms of the Canadian Approval and Vesting Order or the U.S. Sale Order; and (iv) present or future zoning, entitlement, building and land use regulations, customary covenants, defects of title, easements, rights of way, restrictions and other similar charges or encumbrances which do not impair in any material respect the use or value of the related assets in the Business as currently conducted.

"**Person**" means an individual, a partnership, a corporation, an association, a limited or unlimited liability company, a joint stock company, a trust, a joint venture, an unincorporated organization or other legal entity or Government Entity.

"**Petition Date**" means January 14, 2009, except with respect to CALA where it means July 14, 2009.

"**Pre-Closing Taxable Period**" means any Taxable period ending on or prior to the Closing Date.

"**Primary Party**" means (i) the Main Sellers, on the one hand, and (ii) the Purchaser, on the other hand.

"**Products**" has the meaning assigned to such term in the GSM Agreement.

"**Purchaser Employee Plan**" means any "employee benefit plan" within the meaning of Section 3(3) of ERISA and any other employee benefit plan or agreement, including any profit sharing plan, savings plan, bonus plan, performance awards plan, incentive compensation plan, deferred compensation plan, stock purchase plan, stock option plan, vacation plan, leave of absence plan, employee assistance plan, automobile leasing/subsidy/allowance plan, expense reimbursement plan, meal allowance plan, redundancy or severance plan or agreement, termination or retirement indemnity plan, relocation plan, family support plan, pension plan, supplemental pension plan, retirement plan, early or ill health retirement plan, retirement savings plan, post-retirement plan, medical, health, hospitalization or life insurance plan, disability plan, sick leave plan, retention plan, education assistance plan, expatriate assistance plan, compensation arrangement, including any base salary arrangement, overtime, on-call or call-in policy, death benefit plan, or any other similar plan, program, arrangement or policy that is maintained or otherwise contributed to, or required to be maintained or contributed to, by or on behalf of the Purchaser or any of its Subsidiaries or Affiliates with respect to their employees employed in those countries where they will employ Transferred Employees pursuant to this Agreement.

"**Representatives**" means as to any Person, the attorneys, accountants, consultants, financial advisors and other similar representatives and agents of such Person.

"**Seller Employee Plan**" means (i) any "employee benefit plan" within the meaning of Section 3(3) of ERISA and any other employee benefit plan or agreement including any employee agreement other than immaterial employment agreements, profit sharing plan, savings plan, bonus plan, performance awards plan, incentive compensation plan, deferred compensation plan, stock purchase plan, stock option plan, vacation plan, leave of absence plan, employee assistance plan, automobile leasing/subsidy/allowance plan, expense reimbursement plan, meal allowance plan, redundancy or severance plan or agreement, relocation plan, family support plan, pension plan, supplemental pension plan, retirement plan, retirement savings plan, post retirement plan, medical, health, hospitalization or life insurance plan, disability plan, sick leave plan, retention plan, education assistance plan, expatriate assistance plan, compensation arrangement, including any base salary arrangement, overtime, on-call or call-in policy, death benefit plan, or any other similar plan, program, arrangement or policy under which the Sellers

9

or any of their Subsidiaries or Affiliates have any Liabilities, or that is maintained or otherwise contributed to, or required to be maintained or contributed to, by or on behalf of the Sellers or any of their Subsidiaries or Affiliates with respect to Employees, or former employees of the Business, or pursuant to which payments are made, or benefits are provided to, or an entitlement to payments or benefits may arise with respect to any Employees or former employees of the Business (or any spouses, dependants or beneficiaries of any such individuals) and (ii) any other employee benefit plan with respect to which the Purchaser or any of its Affiliates could have any Liability as a result of the Sellers or any of their Subsidiaries or Affiliates maintaining such plan prior to the Closing Date.

"**Sellers Disclosure Schedule**" means the disclosure schedule delivered by the Sellers to the Purchaser on the date hereof.

"**Seller Insurance Policies**" means all current or previous insurance policies of the Sellers and their Affiliates, including all environmental, directors' and officers' Liability, fiduciary Liability, employed lawyers, property and casualty flood, ocean marine, contaminated products insurance policies and all other insurance policies or programs arranged or otherwise provided or made available by the Sellers or their Affiliates that cover (or covered) any of the Assets at any time prior to the Closing.

"**Services**" has the meaning assigned to such term in the GSM Agreement.

"**Software**" means any and all (i) computer programs, whether in source code or object code, (ii) computerized databases and compilations, and (iii) documentation, compilation tools, development tools and support tools associated with (i) and /or (ii).

"**Subsidiary**" of any Person means any Person Controlled by such first Person.

"**Tax**" means (a) any domestic or foreign federal, state, local, provincial, territorial or municipal taxes or other impositions by or on behalf of any Government Entity, including the following taxes and impositions: net income, gross income, individual income, capital, value added, goods and services, harmonized sales, gross receipts, sales, use, *ad valorem*, business rates, transfer, franchise, profits, business, environmental, real property, personal property, service, service use, withholding, payroll, employment, unemployment, severance, occupation, social security, excise, stamp, stamp duty reserve, customs, and all other taxes, fees, duties, assessments, deductions, withholdings or charges of the same or of a similar nature, however denominated, together with any interest and penalties, additions to tax or additional amounts imposed or assessed with respect thereto, and (b) any obligation to pay Taxes of a Third Party, whether by contract, as a result of transferee or successor liability, as a result of being a member of an affiliated, consolidated, combined or unitary group for any period or otherwise.

"**Tax Authority**" means any local, municipal, governmental, state, provincial, territorial, federal, including any U.S., Canadian or other fiscal, customs or excise authority, body or officials (or any entity or individual acting on behalf of such authority, body or officials) anywhere in the world with responsibility for, and competent to impose, collect or administer, any form of Tax.

10

"**Tax Returns**" means all returns, reports (including elections, declarations, disclosures, schedules, estimates and information returns) and other information filed or required to be filed with any Tax Authority relating to Taxes, including any amendments thereto.

"**Third Party**" means any Person that is neither a Party nor an Affiliate of a Party.

"**Trademarks**" means, together with the goodwill associated therewith, all trademarks, service marks, trade dress, logos, distinguishing guises and indicia, trade names, corporate names, business names, domain names, whether or not registered, and all common law rights, and registrations, applications for registration and renewals thereof, including, without limitation, all marks registered in the trademark offices of any nation throughout the world, and all rights therein provided by multinational treaties or conventions.

"**Transaction Documents**" means this Agreement, the Ancillary Agreements and all other ancillary agreements to be entered into, or documentation delivered by, any Party and/or any Designated Purchaser pursuant to this Agreement or any Local Sale Agreement.

"**Transfer Tax Returns**" has the meaning set forth in Section 6.6(a).

"**Transfer Taxes**" means all goods and services, harmonized sales, sales, excise, use, transfer, gross receipts, documentary, filing, recordation, value-added, stamp, stamp duty reserve, and all other similar Taxes, duties or other like charges, however denominated (including any real property transfer Taxes and conveyance and recording fees), together with interest, penalties and additional amounts imposed with respect thereto.

"**Transferred Employee**" means (i) Employees who accept an offer of employment by, and commence employment with, the Purchaser or a Designated Purchaser in accordance with the terms of Section 7.1 and (ii) those Employees whose employment transfers by operation of Law.

"**Transferred Employee Plan**" means any Seller Employee Plan that is transferred (or the Liabilities of which are transferred) to the Purchaser or Designated Purchaser by operation of Law, but excluding the Specified Employee Liabilities.

"**Transition Services Agreement**" means that certain Transition Services Agreement, dated as of March 31, 2010, and as amended, modified, supplemented or restated from time to time, by and among Nortel Networks Corporation, Nortel Networks Inc., NNL and certain other affiliated entities named therein, and the Purchaser.

"**U.S. Bankruptcy Code**" means Title 11 of the United States Code.

"**U.S. Bankruptcy Court**" means the United States Bankruptcy Court for the District of Delaware.

"**U.S. Bankruptcy Rules**" means the U.S. Federal Rules of Bankruptcy Procedure.

11

"**U.S. Debtors**" means NNI and CALA.

"**U.S. Sale Motion**" has the meaning set forth in Section 5.1(a).

"**U.S. Sale Order**" means the sale order of the U.S. Bankruptcy Court approving the sale of the Assets to the Purchaser (or a Designated Purchaser) and the assignment by CALA to, and assumption thereof by, the Purchaser (or a Designated Purchaser) of the 365 Contracts and the Assumed Liabilities pursuant to Sections 105, 363 and 365 of the U.S. Bankruptcy Code in form and substance reasonably satisfactory to the Sellers and the Purchaser and consistent herewith.

"**Visa Employees**" means Employees (other than Employees whose employment transfers by operation of Law) who are identified as having a visa or permit in Section 4.3(b) of the Sellers Disclosure Schedule and whose employment with Purchaser or a Designated Purchaser cannot commence until the required visa or permit for a transfer of employment to Purchaser or a Designated Purchaser (with respect to such Employee) is obtained.  An Employee shall be a Visa Employee for purposes hereof only if such Employee receives and accepts an employment offer from Purchaser as provided in Section 7.1 and has an Effective Hire Date that occurs within twelve (12) months following the Closing Date.

"**WARN Act**" means the Worker Adjustment and Retraining Notification Act of 1989, as amended, or any similar Law requiring notice to employees in the event of a plant closing or mass layoff.

12

Section 1.2.    Cross-References.  Each of the following terms shall have the meaning specified in the Section of this Agreement set forth opposite such term:

| Term | Section |
|------|---------|
| Ancillary Agreements | Recitals |
| Assets | 2.1.1 |
| Assumed Liabilities | 2.1.3 |
| Bankruptcy Consents | 4.1(a) |
| Bidder Confidentiality Agreement | 5.8(b) |
| Bundled Contract | 5.11 |
| Business Information | 2.1.1(d) |
| CALA | Preamble |
| Canadian Approval and Vesting Order | 5.1(c) |
| Canadian Approval and Vesting Order Motion | 5.1(c) |
| CCAA | Recitals |
| CCAA Cases | Recitals |
| Chapter 11 Cases | Recitals |
| Closing | 2.3.1 |
| Closing Date | 2.3.1 |
| Confirmed Designated Purchaser | 2.4 |
| Designated Purchaser | 2.4 |
| Employee Information | 4.3(b) |
| Excluded Assets | 2.1.2 |
| Excluded Employee Liabilities | 7.3 |
| Excluded Liabilities | 2.1.4 |
| Inbound RF Software Licenses | 5.26(a) |

13

| | |
|---|---|
| Local Sale Agreements | 2.1.8 |
| Main Sellers | Preamble |
| Monitor | Recitals |
| New York Courts | 10.6(b) |
| Non-Assignable Contracts | 5.10(a) |
| Non-Assignable Customer Contract | 5.10(c) |
| Non-Assignable Customer Contracts Indemnitees | 5.10(c) |
| Non-Assignable Customer Counterparty | 5.10(c) |
| Non-Assignable Period | 5.10(c) |
| Non-Debtor Sellers | Recitals |
| Non-365 Contracts | 2.1.6 |
| Other Sellers | Preamble |
| Partial Allocation | 6.7(b) |
| Purchase Price | 2.2.1 |
| Purchaser | Preamble |
| Seller Bid | 2.1.1(g) |
| Seller Indemnitees | 5.8(b) |
| Sellers | Preamble |
| Sellers' Trademarks | 5.17 |
| Specified Employee Liabilities | 2.1.4(g) |
| Straddle Period | 6.4(b) |
| 365 Contracts | 2.1.5(a) |

Section 1.3.    Interpretation.

1.3.1.    Gender and Number.  Any reference in this Agreement to gender includes all genders and words importing the singular include the plural and vice versa.

14

1.3.2.   <u>Certain Phrases and Calculation of Time</u>.  In this Agreement (i) the words "including" and "includes" mean "including (or includes) without limitation", (ii) the terms "hereof," "herein," and "herewith" and words of similar import shall, unless otherwise stated, be construed to refer to this Agreement and not to any particular provision of this Agreement, and Article, Section, paragraph, Exhibit and Schedule references are to the Articles, Sections, paragraphs, Exhibits and Schedules to this Agreement unless otherwise specified, and (iii) in the computation of periods of time from a specified date to a later specified date, unless otherwise expressly stated, the word "from" means "from and including" and the words "to" and "until" each mean "to but excluding", and (iv) in determining whether an asset is "exclusively" used in connection with the Business, incidental, de minimis or casual uses outside the Business shall not be considered.  If the last day of any such period is not a Business Day, such period will end on the next Business Day.

When calculating the period of time "within" which, "prior to" or "following" which any act or event is required or permitted to be done, notice given or steps taken, the date which is the reference date in calculating such period is excluded from the calculation.  If the last day of any such period is not a Business Day, such period will end on the next Business Day.

The reference to any "list" set forth in the Sellers Disclosure Schedule shall mean a list that is complete and accurate, taking into account that disclosure in one section of the Sellers Disclosure Schedule of any facts or circumstances shall be deemed an adequate response and disclosure of such facts and circumstances with respect to any other representations and warranties by Seller calling for disclosure of such information whether or not such disclosure is specifically associated with it or purports to respond to one or more of such other representations or warranties if it is reasonably apparent on the face of the Sellers Disclosure Schedule that such disclosure is applicable.

1.3.3.   <u>Headings, etc.</u>  The inclusion of a table of contents, the division of this Agreement into Articles and Sections and the insertion of headings are for convenient reference only and are not to affect or be used in the construction or interpretation of this Agreement.

1.3.4.   <u>Currency</u>.  All monetary amounts in this Agreement, unless otherwise specifically indicated, are stated in United States currency.  All calculations and estimates to be performed or undertaken, unless otherwise specifically indicated, are to be expressed in United States currency.  All payments required under this Agreement shall be paid in United States currency in immediately available funds, unless otherwise specifically indicated herein.  Where another currency is to be converted into United States currency it shall be converted on the basis of the exchange rate published in the Wall Street Journal (National Edition) for the day in question.

1.3.5.   <u>Statutory References</u>.  Unless otherwise specifically indicated, any reference to a statute in this Agreement refers to that statute and to the regulations made under that statute as in force from time to time.

## ARTICLE II

## PURCHASE AND SALE OF ASSETS

Section 2.1.    <u>Purchase and Sale</u>.

2.1.1.    <u>Assets</u>.    Subject to the terms and conditions of this Agreement, at the Closing, the Purchaser shall, and shall cause the relevant Designated Purchasers to, purchase or accept assignment and assume from the relevant Sellers, and each Seller shall sell, transfer or assign to the Purchaser or the relevant Designated Purchasers, all of such Seller's right, title and interest in and to the following assets (such assets, the "**Assets**") (x) in the case of Assets that are transferred or assigned by the U.S. Debtors, free and clear of all Liens and Claims (other than Permitted Encumbrances and Liens created by or through the Purchaser, the Designated Purchasers or any of their Affiliates) pursuant to Sections 363 and 365 of the U.S. Bankruptcy Code, (y) in the case of Assets that are transferred or assigned by NNL, free and clear of all Liens (other than Permitted Encumbrances and Liens created by or through the Purchaser, the Designated Purchasers or any of their Affiliates) pursuant to the Canadian Approval and Vesting Order, when granted, and (z) in the case of Assets that are transferred or assigned by the Other Sellers, free and clear of all Liens (other than Permitted Encumbrances and Liens created by or through the Purchaser, the Designated Purchasers or any of their Affiliates):

(a)    the Owned Net Inventory as of the Closing Date;

(b)    the desk tops and lap tops used exclusively by the Transferred Employees;

(c)    the Assigned Contracts in force as of the Closing Date;

(d)    copies of all books, records, files, ledgers, documentation, sales literature or similar information existing as of the Closing Date and in the possession or under control of the Sellers and that, in each case, relates directly to the Business (the "**Business Information**"), subject to Section 2.1.2(h);

(e)    all rights as of the Closing (i) under all warranties, representations and guarantees made by suppliers, manufacturers and contractors to the extent related to the Assigned Contracts, and (ii) with respect to Acquired Actions;

(f)    to the extent freely assignable under applicable Law, all Consents of Government Entities exclusively pertaining to the Business (the "**Seller Consents**"),

(g)    all rights that may be freely transferred as of the Closing Date arising from or in connection with any bid, proposal, offer or quotation which, if accepted, would result in the award of a Contract with a customer (each, a "**Seller Bid**"), each as set forth in Section 2.1.1(g) of the Sellers Disclosure Schedule, which, subject to the prior written consent of the Purchaser, the Sellers shall be entitled to update and/or supplement from time to time prior to the Closing; and

(h)    the assets set forth on Section 2.1.1(h) of the Sellers Disclosure Schedule.

16

2.1.2.  Excluded Assets.  Notwithstanding anything in this Section 2.1 or elsewhere in this Agreement or in any of the Transaction Documents to the contrary, nothing herein shall be deemed to sell, transfer, assign or convey (or require Sellers to do any of the foregoing as to) the following assets to the Purchaser or any Designated Purchaser, and the Sellers shall retain all of their respective rights, title and interests in and to, and the Purchaser and the Designated Purchasers shall have no rights with respect to, the rights, title and interests of the Sellers in and to any of  (x) the respective assets of the Sellers (other than the Assets), and (y) the following assets ((x) and (y), collectively, the "**Excluded Assets**"):

(a)  cash and cash equivalents, accounts receivable (including intercompany receivables, bank account balances and all petty cash of the Sellers;

(b)  any refunds due from, or payments due on, claims with the insurers of any of the Sellers in respect of Losses arising prior to the Closing Date (except as provided in Section 5.20);

(c)  all rights to Tax refunds, credits or similar benefits relating to the Assets or the Business allocable to a Pre-Closing Taxable Period or to the portion of a Straddle Period ending on and including the Closing Date;

(d)  all claims, causes of action and rights of Sellers or any Subsidiary thereof to the extent relating to any Excluded Liabilities or to any Liabilities for which Sellers are responsible under this Agreement (including rights of set-off, rights to refunds and rights of recoupment from or against any Third Party but excluding any Acquired Actions);

(e)  any security deposits made by or on behalf of the Sellers (including those relating to Assigned Contracts);

(f)  any rights of the Sellers under any Non-Assigned Contract (except as provided for in Section 5.10);

(g)  the minute books, stock ledgers and Tax records of the Sellers;

(h)  (i) any books, records, files, documentation or sales literature other than the Business Information (subject to clauses (ii) and (iii) below of this subsection), (ii) the Employee Records other than those required to be delivered to the Purchaser pursuant to Article VII, and (iii) such portion of the Business Information, that the Sellers are required by Law (including Laws relating to privilege or privacy, but subject to any exemption from those Laws included in the U.S. Sale Order or the Canadian Approval and Vesting Order) or by any agreement with a Third Party to retain and/or not to disclose (provided that copies of such information shall be provided to the Purchaser and to the extent permitted by applicable Law or such agreement);

(i)  any rights to (A) any Intellectual Property of any of the Sellers (including Sellers' names) or any Affiliates of any of the Sellers or (B) Intellectual Property owned by a Third Party, except to the extent licensed under an Assigned Contract;

(j)  all rights of the Sellers under this Agreement and the Transaction Documents;

17

(k) all of the rights and claims of the U.S. Debtors available to the U.S. Debtors under the U.S. Bankruptcy Code, of whatever kind or nature, as set forth in Sections 544 through 551, inclusive, 553, 558 and any other applicable provisions of the U.S. Bankruptcy Code, and any related claims and actions arising under such Sections by operation of Law or otherwise, including any and all proceeds of the foregoing but excluding the Acquired Actions;

(l) all records containing personal communications or notes related to the negotiations in connection with the sale of the Assets to the Purchaser and the Designated Purchasers that were not shared with the Purchaser;

(m) all stock or other equity interests in any Person;

(n) any freehold or leasehold interest in any real estate; and

(o) all Seller Employee Plans, and any related assets or insurance policies.

2.1.3.   Assumed Liabilities.  On the terms and subject to the conditions set forth in this Agreement, at the Closing, the Purchaser shall, and shall cause the relevant Designated Purchasers to, assume and become responsible for, and perform, discharge and pay when due, solely the following Liabilities (the "**Assumed Liabilities**"):

(a) all Liabilities arising on or after the Closing Date to the extent related to the conduct, operation or ownership of the Assets after the Closing Date, including (i) all such Liabilities with respect to the ownership, exploitation and operation of the Assets incurred on or after the Closing Date and (ii) all such Liabilities related to Actions or claims brought against the Assets arising from events occurring after the Closing Date;

(b) all Liabilities arising from or in connection with the performance of the Assigned Contracts after the Closing Date or any arrangements entered into pursuant to Section 5.10 or 5.11 on or after the Closing Date;

(c) any obligations under any warranty Liabilities relating to Products and Services which have been supplied under any Assigned Contract, but excluding any Cure Costs, all of which are payable by Sellers pursuant to Section 2.1.7;

(d) the obligation to post any deposits, bonds or other security in replacement of security posted under any Assigned Contract pursuant to Section 5.16;

(e) all Liabilities for, or related to any obligation for, any Tax that the Purchaser or any Designated Purchaser bears under ARTICLE VI;

(f) all obligations of the Sellers under any warranty Liabilities relating to Products and Services which have been supplied by the Purchaser or any Designated Purchaser under any Non-Assignable Contract the benefit and burden of which has been transferred to the Purchaser in accordance with Section 5.10;

(g) except to the extent otherwise expressly set forth in ARTICLE VII, all Liabilities related to or arising from any of the following: (i) the Purchaser's or any Designated

18

Purchasers' (or any of their Affiliates') employment or termination of employment (whether or not arising under or in respect of any Purchaser Employee Plan) of Transferred Employees arising after the Closing Date; (ii) the Purchaser's or relevant Designated Purchasers' (or any of their Affiliates') offer of employment or notice of continued employment, as applicable, to any Employee pursuant to the terms of Section 7.1 (including any violation of Law in connection therewith);

(h) all Liabilities relating to or arising from or in connection with any Purchaser Employee Plan;

(i) any obligation to provide continuation coverage pursuant to COBRA or any similar Law under any Purchaser Employee Plan that is a "group health plan" (as defined in Section 5000(b)(1) of the Code) to Transferred Employees and/or their qualified beneficiaries with respect to a qualifying event that occurs on or after such Transferred Employees' Effective Hire Date;

(j) all Liabilities related to Transferred Employees expressly assumed by Purchaser or a Designated Purchaser as set out in ARTICLE VII;

(k) all Liabilities related to a Seller Bid arising on or after the Closing Date;

(l) all other Liabilities listed in Section 2.1.3(l) of the Sellers Disclosure Schedule; and

(m) with respect to any Products and Services supplied under any Bundled Contract with a customer of a Seller prior to the Closing Date that is amended in accordance with Section 5.11, (i) any obligations under any warranty liabilities relating to such Products and Services, but excluding any Cure Costs, all of which are payable by the Sellers pursuant to Section 2.1.7; (ii) any Liabilities arising from or in connection with any non-cash incentives relating to Products and Services supplied under such Bundled Contract; and (iii) Liabilities arising from the requirement to provide maintenance services in connection with such Products.

2.1.4.  Excluded Liabilities.  Except as expressly provided in Section 2.1.3, neither the Purchaser nor the Designated Purchasers, as applicable, shall assume or be deemed to have assumed any Liabilities of the Sellers or their Affiliates other than the Assumed Liabilities (collectively, the "**Excluded Liabilities**").  Without limiting the generality of the foregoing, Excluded Liabilities include:

(a) all Indebtedness of the Sellers and their Affiliates;

(b) all Liabilities arising out of the Contracts that are not Assigned Contracts (including Liabilities arising out of that portion of any arrangement entered into pursuant to Section 5.11 for which Sellers are responsible by the terms thereof);

(c) all accounts payable and trade payables of the Sellers, including intercompany payables;

19

(d) all fees or commissions of any brokers, funds or investment banks in connection with the transactions contemplated by this Agreement and the other Transaction Documents based upon arrangements made by or on behalf of the Sellers or any of their Affiliates;

(e) all Cure Costs;

(f) all Liabilities for, or related to any obligation for, any Tax that is not expressly assumed by the Purchaser or any of the Designated Purchasers pursuant to ARTICLE VI (including, for the avoidance of doubt, any income or gross receipts Tax imposed on any of the Sellers);

(g) the Accrued Vacation Amount as of the Closing Date (the "**Specified Employee Liabilities**");

(h) all Excluded Employee Liabilities; and

(i) all Liabilities of the Sellers arising under this Agreement and the Ancillary Agreements.

2.1.5.   Assumption and Assignment of 365 Contracts.

(a) At Closing, CALA will assume and assign to the Purchaser or a Designated Purchaser all Contracts set forth on Section 2.1.5(a) of the Sellers Disclosure Schedule, which Contracts (i) are "executory contracts" for the purposes of the U.S. Bankruptcy Code, and (ii) were entered into prior to the Petition Date (all such Contracts, the "**365 Contracts**").

(b) Prior to the Closing Date, the Purchaser or the Main Sellers shall be entitled to update and/or supplement Section 2.1.5(a) of the Sellers Disclosure Schedule, provided that no update and/or supplement shall be permitted without the other Primary Party's prior written consent.

(c) CALA shall seek the approval of the U.S. Bankruptcy Court to permit the assumption and assignment of all the 365 Contracts in accordance with Section 5.1.

2.1.6.   Assignment of Non-365 Contracts.

(a) At Closing, the Sellers will assign to the Purchaser or a Designated Purchaser all Contracts set forth on Section 2.1.6(a) of the Sellers Disclosure Schedule (all such Contracts, the "**Non-365 Contracts**").

(b) Prior to the Closing Date, the Purchaser or the Main Sellers shall be entitled to update and/or supplement Section 2.1.6(a) of the Sellers Disclosure Schedule, provided that no update and/or supplement shall be permitted without the other Primary Party's prior written consent.

(c) Subject to Section 2.1.8, Section 5.10 and the receipt of any required Consent, all Non-365 Contracts in effect as of Closing shall be assigned to the Purchaser or a Designated Purchaser pursuant to Section 2.1.1(c).

2.1.7.  Cure Costs; Adequate Assurance; Efforts

(a) To the extent that assumption and assignment of any 365 Contract entails the payment of any Cure Cost, CALA shall, or shall cause the relevant U.S. Debtor to, if applicable, pay or otherwise provide for payment of such Cure Cost as required by the U.S. Bankruptcy Code and provided in the U.S. Sale Order or such separate order of the U.S. Bankruptcy Court approving and authorizing the assumption and assignment of such 365 Contract.

(b) To the extent that assignment to the Purchaser or a Designated Purchaser of any Non-365 Contract entails the payment of any Cure Cost, the relevant Main Seller shall, or shall cause the relevant Seller to, pay such amounts directly to such counterparty in a manner agreed between such Main Seller or such relevant Seller, as applicable, and such counterparty or ordered by a court of competent jurisdiction.

(c) The Purchaser shall not be responsible for any Cure Costs in connection with any Contract.

(d) Prior to the hearing before the U.S. Bankruptcy Court to approve the assumption and assignment of the 365 Contracts, the Purchaser shall provide, as necessary, adequate assurance of its and the relevant Designated Purchasers' future performance under each 365 Contract to the parties thereto (other than the U.S. Debtors) in satisfaction of Section 365(f)(2)(B) of the U.S. Bankruptcy Code and to the extent required by the U.S. Sale Order or separate order of the U.S. Bankruptcy Court approving and authorizing the assumption and assignment of the 365 Contracts.

(e) The Sellers shall use reasonable best efforts, both before and after Closing, to obtain all Consents in form and substance reasonably satisfactory to the Purchaser required to permit the assignment to the Purchaser (or, if specified by the Purchaser, a Designated Purchaser) of the Assigned Contracts in force as of the Closing Date and the Purchaser shall reasonably cooperate with Sellers to the extent necessary to obtain the same; provided, however, that the Sellers shall be under no obligation to compromise any right, asset or benefit or to expend any amount or incur any Liability in seeking such Consents (other than the payment of Cure Costs pursuant to this Section 2.1.7) and provided further that the failure to obtain any or all of such Consents shall not in itself entitle the Purchaser to terminate this Agreement or fail to complete the transactions contemplated hereby or entitle the Purchaser to any adjustment to the Purchase Price.

2.1.8.  Local Sale Agreements.  Subject to the terms and conditions hereof, if reasonably requested in writing by the Purchaser to effect the Closing on the terms hereof, the relevant Sellers shall, and the Purchaser shall, and shall cause the relevant Designated Purchasers to, enter into such agreements or instruments, including bills of sale and/or assignment and assumption agreements (the "**Local Sale Agreements**"), providing for (i) the sale, transfer, assignment or other conveyance to the Purchaser and relevant Designated Purchasers, in

21

accordance with the requirements of applicable local Law, of any Assets located in countries where such Local Sale Agreements are required, and (ii) the assumption by the Designated Purchasers of any Assumed Liability that the Purchaser intends to allocate to them. In the event of a conflict between this Agreement and the Local Sale Agreement, this Agreement shall prevail.

Section 2.2.    Purchase Price. Pursuant to the terms and subject to the conditions set forth in this Agreement, including Section 2.2 of the Sellers Disclosure Schedule, in consideration of the sale, transfer and assignment of the Assets pursuant to the terms hereof, the Purchaser, on its own behalf and as agent for the relevant Designated Purchasers, shall at the Closing (x) assume and become obligated to pay, perform and discharge, when due, the Assumed Liabilities and (y) pay to the Distribution Agent an amount of cash equal to two million dollars ($2,000,000), (as such amount is adjusted pursuant to Section 2.2 of the Sellers Disclosure Schedule, the "**Purchase Price**").

Section 2.3.    Closing.

2.3.1.    Closing Date. The completion of the purchase and sale of the Assets and the assumption of the Assumed Liabilities (the "**Closing**") shall take place at the offices of Cleary Gottlieb Steen & Hamilton LLP in New York, New York, commencing at 10:00 a.m. local time on the date which is five (5) Business Days after the day upon which all of the conditions set forth under ARTICLE VIII (other than conditions to be satisfied at the Closing, but subject to the waiver or fulfillment of those conditions) have been satisfied or, if permissible, waived by the Main Sellers and/or the Purchaser (as applicable), or on such other place, date and time as shall be mutually agreed upon in writing by the Purchaser and the Main Sellers (the day on which the Closing takes place being the "**Closing Date**").

Subject to the terms and conditions of this Agreement, legal title, equitable title and risk of Loss with respect to the Assets will transfer to the Purchaser or the relevant Designated Purchaser, and the Assumed Liabilities will be assumed by the Purchaser and the relevant Designated Purchasers, at the Closing.

2.3.2.    Closing Actions and Deliveries. At the Closing:

(a) the Sellers and the Purchaser shall, and shall cause their respective Affiliates to, enter into, (i) the Ancillary Agreements to which it is contemplated that they will be parties, to the extent such agreements have not yet been entered into and (ii) instruments of assignment and assumption effecting the transfer of the Assets from the Sellers to the Purchaser or the Designated Purchaser(s), as applicable;

(b) the Purchaser shall deliver:

(i)    to the Distribution Agent, an amount equal to the Purchase Price, by wire transfer in immediately available funds to an account or accounts designated at least two (2) Business Days prior to the Closing Date by the Main Sellers in a written notice to the Purchaser; and

22

(ii)     to the Main Sellers, a duly executed certificate of an executive officer of the Purchaser certifying the fulfillment of the conditions set forth in Section 8.2.

(c) the Sellers shall deliver or cause to be delivered:

(i)     an updated Section 4.3(b) of the Sellers Disclosure Schedule (if applicable), dated as of a date no earlier than three (3) days prior to the Closing;

(ii)     with respect to each Seller that is a "United States person" within the meaning of Section 7701 of the Code and applicable Treasury Regulations, a duly executed certificate of non-foreign status in accordance with Section 1445 of the Code and applicable Treasury Regulations; and

(iii)     a duly executed certificate of an executive officer of NNL, NNI and CALA certifying the fulfillment of the conditions set forth in Section 8.3.

(d) each Party shall deliver, or cause to be delivered, to the other any other documents reasonably requested by such other Party in order to effect, or evidence the consummation of, the transactions contemplated herein.

Section 2.4.    Designated Purchaser(s). The Purchaser shall be entitled to designate, in accordance with the terms and subject to the limitations set forth in this Section 2.4, one or more Affiliates of the Purchaser to (i) purchase specified Assets (including specified Assigned Contracts), (ii) assume specified Assumed Liabilities, and/or (iii) employ Transferred Employees on and after the Closing Date (any Affiliate of the Purchaser that shall be properly designated by the Purchaser in accordance with this clause, a "**Designated Purchaser**"); it being understood and agreed, however, that any such right of the Purchaser to designate a Designated Purchaser is conditioned upon (x) such Designated Purchaser being able to perform the applicable covenants under Section 2.1.7 and ARTICLE VII and demonstrate satisfaction of the applicable requirements of Section 365 of the U.S. Bankruptcy Code (to the extent applicable), including the provision of adequate assurance for future performance, with respect to the 365 Contracts and (y) any such designation not creating any Liability (including any Liability relating to Taxes) for the Sellers or their Affiliates that would not have existed had the Purchaser purchased the relevant Assets and/or employed the relevant Transferred Employees; provided, further, however, that the Sellers acknowledge and agree that each of Ericsson Inc., Ericsson Canada Inc., or Ericsson AB (each, a "**Confirmed Designated Purchaser**") shall be deemed to satisfy the foregoing conditions and may be a Designated Purchaser.   If the designation of a Confirmed Designated Purchaser creates any Liability relating to Taxes for the Sellers or their Affiliates that would not have existed had the Purchaser purchased the relevant Assets, the Purchaser or the Designated Purchasers shall, notwithstanding anything to the contrary in Article VI, pay such additional amounts to the Sellers such that the total amount received by the applicable Sellers, after reducing such amount by the additional Liability relating to Taxes for the Sellers or their Affiliates created by the designation of such Confirmed Designated Purchaser, will equal the full amount such Seller would have received from the Purchaser had the designation not been made. No such designation shall relieve the Purchaser of any of its obligations hereunder and any breach hereof by a Designated Purchaser shall be deemed a breach by Purchaser.   Except if the

23

Designated Purchaser is a Confirmed Designated Purchaser, the Purchaser and each Designated Purchaser shall be jointly and severally liable for any obligations delegated or assigned to or assumed by any of them hereunder.

(b) The above designation shall be made by the Purchaser by way of a written notice to be delivered to the Sellers as soon as reasonably practicable after the date hereof and in no event later than the fifteenth (15) day prior to the Closing, which written notice shall (i) for any Designated Purchasers other than the Confirmed Designated Purchasers, contain appropriate information about the Designated Purchaser(s), (ii) indicate which Assets, Assumed Liabilities and Transferred Employees the Purchaser intends such Designated Purchaser(s) to purchase, assume and/or employ, as applicable, hereunder and (iii) include a signed counterpart to this Agreement in a form acceptable to the Main Sellers, agreeing to be bound by the terms of this Agreement as Designated Purchaser(s) and authorizing the Purchaser to act as such Designated Purchaser(s)' agent for all purposes hereunder.

## ARTICLE III

## REPRESENTATIONS AND WARRANTIES OF THE PURCHASER

The Purchaser hereby represents and warrants to the Sellers as follows:

Section 3.1.    <u>Organization and Corporate Power</u>.

(a) The Purchaser is a corporation duly organized, validly existing and in good standing under the Laws of Sweden. Each of the Purchaser and the Designated Purchasers has the requisite corporate power and authority to (i) enter into, deliver and perform its obligations pursuant to each of the Transaction Documents to which it is or will become a party and (ii) to own, lease and operate its assets and to carry on its business as it is now being conducted.

(b) Each of Purchaser and the Designated Purchasers is duly qualified or licensed to own or lease and operate its properties and assets (including the Assets), and is in good standing, in each jurisdiction in which its ownership of assets or operation of business requires it to so qualify or to be so licensed, except to the extent that the failure to be so qualified or licensed would not materially hinder, delay or impair the Purchaser's or any such Designated Purchaser's ability to carry out its obligations under, and to consummate the transactions contemplated by, this Agreement and the Ancillary Agreements to which it is or will become a party.

Section 3.2.    <u>Authorization; Binding Effect; No Breach</u>.

(a) The execution, delivery and performance of each Transaction Document to which the Purchaser or any of the Designated Purchasers is a party have been duly authorized by the Purchaser and the relevant Designated Purchasers, as applicable. This Agreement has been duly executed and delivered by the Purchaser, and the other Transaction Documents to which the Purchaser or any Designated Purchaser is, or on the Closing Date will become, a party have been or will be duly executed and delivered by the Purchaser and each Designated Purchaser party thereto. Assuming due authorization, execution and delivery by the relevant Sellers, each Transaction Document to which the Purchaser or any Designated Purchaser is a party constitutes,

24

or upon execution thereof will constitute, a valid and binding obligation of the Purchaser or such Designated Purchaser, as applicable, enforceable against such Person in accordance with its respective terms, except as such enforceability is limited by bankruptcy, insolvency, reorganization, moratorium or other Laws affecting creditors' rights generally and subject to general principles of equity, regardless of whether considered in a proceeding in equity or at Law.

(b) The execution, delivery and performance by each of the Purchaser and the Designated Purchasers of the Transaction Documents to which the Purchaser or such Designated Purchaser is, or on the Closing Date will be, a party do not and will not conflict with or result in a breach of the terms, conditions or provisions of, constitute a default under, result in a violation of, give to any Person any right of termination, amendment, modification, acceleration or cancellation or any preemptive right or right to the payment of any penalty under, or require any Consent or other action by or declaration or notice to any Government Entity pursuant to (i) the articles, charter or by-laws of the Purchaser or the relevant Designated Purchaser, (ii) any material Contract to which the Purchaser or the relevant Designated Purchaser is a party or to which any of its assets is subject or (iii) any Laws to which the Purchaser, the relevant Designated Purchaser, or any of their assets is subject, except, in the case of (ii) and (iii) above, for such defaults, violations, actions and notifications that have not materially hindered, delayed or impaired, and would not reasonably be expected to, individually or in the aggregate, materially hinder, delay or impair, the performance by the Purchaser or the Designated Purchasers of any of their obligations under the Transaction Documents.

Section 3.3.    Financing.  The Purchaser has, as of the date hereof, and will have as of the Closing (i) sufficient funds available for purposes of funding the transactions contemplated herein and paying any other amount due hereunder or in respect hereof and (ii) the resources and capabilities (financial or otherwise) to perform its obligations hereunder.  The Purchaser has not, as of the date hereof, and will not have as of the Closing, incurred any obligation, commitment, restriction or liability of any kind, which would materially impair or adversely affect such resources and capabilities.  Notwithstanding anything to the contrary herein, the Purchaser's obligations to consummate the transactions contemplated by this Agreement are not conditioned or contingent in any way upon the receipt of financing from any Person.

Section 3.4.    Adequate Assurance of Future Performance.  To the extent required by any Bankruptcy Laws or other Laws, the Purchaser will be able to provide, at Closing or on such earlier date as is designated by the U.S. Bankruptcy Court, adequate assurance of its and/or the relevant Designated Purchasers' future performance under each 365 Contract to the parties thereto (other than the U.S. Debtors) in satisfaction of Section 365(f)(2)(B) of the U.S. Bankruptcy Code, and no other or further assurance will be necessary thereunder with respect to any 365 Contract.

Section 3.5.    Purchaser's Acknowledgments; Exclusivity of Representations and Warranties.

(a) The Purchaser acknowledges and agrees that:

(i)    except for the representations and warranties expressly set forth herein or in any Ancillary Agreement, the Purchaser has not relied on any representation or warranty from the Sellers or any Affiliate of the Sellers or any employee, officer, director, accountant, financial, legal or other representative of the Sellers or their Affiliates in determining whether to enter into this Agreement;

(ii)    except for the representations and warranties expressly set forth in herein or in any Ancillary Agreement, none of the Sellers or any employee, officer, director, accountant, financial, legal or other representative of the Sellers, or any Affiliate of any such Person has made any representation or warranty, express or implied, as to the Business (or the value or future thereof), the Assets, (including any implied representation or warranty as to the condition, merchantability, suitability or fitness for a particular purpose of any of the Assets), the Assumed Liabilities or the accuracy or completeness of any information regarding any of the foregoing that the Sellers or any other Person furnished or made available to the Purchaser and its Representatives (including any projections, estimates, budgets, offering memoranda, management presentations or due diligence materials); and

(iii)    the enforceability of this Agreement against the Sellers is subject to receipt of the Bankruptcy Consents.

Section 3.6.    Brokers.  Except for fees and commissions that will be paid by the Purchaser, no broker, finder or investment banker is entitled to any brokerage, finder's or similar fee or commission in connection with the transactions contemplated by this Agreement and the other Transaction Documents based upon arrangements made by or on behalf of the Purchaser or any of its Affiliates.

## ARTICLE IV

## REPRESENTATIONS AND WARRANTIES OF THE SELLERS

Except (a) as set forth in the Sellers Disclosure Schedule, (b) as expressly contemplated by this Agreement or (c) to the extent relating to the Excluded Assets or the Excluded Liabilities, each of the Main Sellers represents and warrants to the Purchaser as set forth in this ARTICLE IV:

Section 4.1.    Organization and Corporate Power.

(a) Each Seller is duly organized, validly existing and in good standing under the Laws of the jurisdiction in which it is organized.  Subject to entry of the U.S. Sale Order in the case of the U.S. Debtors and the Canadian Approval and Vesting Order in the case of NNL and receipt of other Consents from the U.S. Bankruptcy Court and the Canadian Court in connection with the transactions contemplated hereby and in the other Transaction Documents (collectively,

26