Bankruptcy Court entered as of the date hereof, or (v) relates solely to Excluded Assets or Excluded Liabilities, the Sellers shall and shall cause their respective Affiliates to (A) (i) for a period of 30 days after the date of this Agreement, conduct the Business and maintain the level of operations at an adequate level, all in the Ordinary Course; provided that the Sellers may reduce headcount to the extent such reduction does not adversely affect the Sellers' ability to perform its obligations under the Assigned Contracts and the GSM infrastructure and solutions portions of the Bundled Contracts or this Agreement and (ii) after the 30-day period referred to in the preceding clause (i), conduct the Business and maintain the level of operations at an adequate level, except that the Sellers and their respective Affiliates shall be entitled to conduct the Business and maintain the level of operations at a level commensurate with the number of Transferred Employees, it being acknowledged and agreed that such level is "adequate" so long as there is no material adverse effect on the performance by the Sellers and their respective Affiliates under the Assigned Contracts and the GSM infrastructure and solutions portions of the Bundled Contracts and (B) abstain from any of the following actions:

(a) sell, lease or dispose of the Assets, in any single transaction or series of related transactions, other than sale of Inventory in the Ordinary Course, or enter into any exclusive agreement that would restrict the Business or the Assets after the Closing in any material respect;

(b) incur any Lien on any Assets, other than Liens that will be discharged at or prior to Closing and Permitted Encumbrances;

(c) increase the rate of cash compensation or other fringe, incentive, equity incentive, pension, welfare or other employee benefits paid or payable to the Transferred Employees, other than increases required by applicable Law, Contracts or Seller Employee Plans in effect as of the date hereof (including pursuant to the KERP or any annual incentive plan), or as otherwise approved by the Bankruptcy Court from time to time, or increases in the Ordinary Course that apply to substantially all similarly situated employees (including the Transferred Employees) of the Sellers or the applicable Affiliates of the Sellers;

(d) enter into, adopt, amend or modify any Collective Labor Agreement affecting Employees, except as required by applicable Law;

(e) voluntarily terminate, waive any right under, or amend in any material respect any Assigned Contract or Bundled Contract;

(f) waive, release, assign, settle or compromise any material claim, litigation or arbitration relating to the Business to the extent that such waiver, release, assignment, settlement or compromise imposes any binding obligation, whether contingent or realized, on the Business that will bind the Purchaser and/or any of the Designated Purchasers after the Closing Date and is materially adverse to the Business;

(g) solicit bids for the sale, transfer or other disposition, directly or indirectly, including through an asset sale, stock sale, merger, amalgamation, plan of arrangement or other similar transaction of any part of the Business;

36

(h) take any action to terminate the employment of any Employee whom the Purchaser has notified the Sellers in writing that will receive an offer of employment from Purchaser or a Designated Purchaser pursuant to this Agreement (other than termination for cause); or

(i) authorize, or commit or agree to take, any of the foregoing actions.

Section 5.7.    Transaction Expenses.  Except as otherwise provided in this Agreement or the Ancillary Agreements, each of the Purchaser and the Sellers shall bear its own costs and expenses (including brokerage commissions, finders' fees or similar compensation, and legal fees and expenses) incurred in connection with this Agreement, the other Transaction Documents and the transactions contemplated hereby and thereby.

Section 5.8.    Confidentiality.  The Parties acknowledge that the Confidentiality Agreement remains in full force and effect in accordance with its terms, which are incorporated herein by reference, and the Parties agree to be bound thereby in the same manner and to the same extent as if the terms had been set forth herein in full, except that the Sellers shall be at liberty to disclose the terms of this Agreement to any court or to any liquidator or in connection with any auction process approved by the Bankruptcy Court and show appropriate figures in their administration records, accounts and returns; provided, that after the Closing Date, the Purchaser's confidentiality obligations under this Section 5.8 and the Confidentiality Agreement with respect to information and data relating to the Business and / or the Assets shall terminate. Any Business Information or copies thereof retained by the Sellers pursuant to Section 5.18(c) shall be deemed to constitute "Evaluation Material" as such term is defined under the Confidentiality Agreement and, from and after the Closing Date, the Sellers shall treat such Business Information on the same terms and conditions applicable to the Purchaser's treatment of "Evaluation Material" as such term is defined under the Confidentiality Agreement.

(b) It is acknowledged by Purchaser and the Sellers that, from the Petition Date, in the course of attempting to sell the Assets and/or the Business, one or more of the Sellers have entered into several confidentiality agreements with Third Parties in respect of information relating to the Assets and/or the Business (all of such confidentiality agreements entered into by all of the Sellers, the "**Bidder Confidentiality Agreements**") and has disclosed such information to certain of those Third Parties. Each of the Sellers agrees that, after the Closing, such Seller shall, and shall cause its Affiliates to, take all reasonable actions at Purchaser's cost to enforce their respective rights in respect of the Assets and/or the Business under such Bidder Confidentiality Agreements, to the extent such Bidder Confidentiality Agreements are not Assigned Contracts, including by appointing Purchaser, as its agent and representative in respect of confidential information relating to the Business and/or Assets and all rights and interests in and under each such Bidder Confidentiality Agreement with respect to such confidential information, including, without limitation, the right to enforce any Bidder Confidentiality Agreement with respect to such confidential information and bring any action against any Third Party to such Bidder Confidentiality Agreement with respect to the confidential information, which the Purchaser may enforce in the name and on behalf of such Seller, to the extent permitted by Law and the terms of each such Bidder Confidentiality Agreement; provided that any amounts recovered or any expenses incurred following the Closing Date either by the Purchaser or by the Sellers in enforcing any such Bidder Confidentiality Agreement shall accrue

37

to the benefit of or be for the account of Purchaser; provided, further, to the extent such appointment is effective, that Purchaser shall defend, indemnify and hold each of the Sellers and each of their respective officers, directors, employees, representatives, administrators and agents (the "**Seller Indemnitees**") harmless from and against any and all costs, losses, damages (including reasonable attorneys' fees), claims, suits, proceedings or liabilities incurred by any such Seller Indemnitees arising or resulting from the appointment of Purchaser as agent and representative to any of the Bidder Confidentiality Agreements as contemplated herein or as a result of Purchaser's exercise of its rights hereunder related to any Bidder Confidentiality Agreement.

Section 5.9.    <u>Certain Payments or Instruments Received from Third Parties</u>. To the extent that, after the Closing Date, (a) the Purchaser and/or any Designated Purchaser receives any payment or instrument that is for the account of a Seller according to the terms of any Transaction Document or relates primarily to any business or business segment of the Sellers other than the Business, the Purchaser shall, and shall cause the Designated Purchasers to, promptly deliver such amount or instrument to the relevant Seller, and (b) any of the Sellers receives any payment that is for the account of the Purchaser, any of the Designated Purchasers according to the terms of any Transaction Document or relates primarily to the Business, the Sellers shall, and shall cause the other Sellers to, promptly deliver such amount or instrument to the Purchaser or the relevant Designated Purchaser, as applicable. All amounts due and payable under this Section 5.9 shall be due and payable by the applicable Party in immediately available funds, by wire transfer to the account designated in writing by the relevant Party. Notwithstanding the foregoing, each Party hereby undertakes to use its reasonable efforts to direct or forward all bills, invoices or like instruments to the appropriate Party.

Section 5.10.  <u>Non-Assignable Contracts</u>.

(a) To the extent that any Assigned Contract or any Seller Consent to be transferred to the Purchaser under this Agreement is not capable of being assigned under Section 365 of the U.S. Bankruptcy Code (or, if inapplicable, pursuant to other applicable Laws or the terms of such Contract or Consent) to the Purchaser or a Designated Purchaser at the Closing (i) without the Consent of the issuer thereof or the other party thereto or any Third Party (including a Government Entity) and such Consent cannot be obtained pursuant to Section 2.1.7 or (ii) without the Sellers' and their Affiliates' compromising any right, asset or benefit or expending any amount or incurring any Liability or providing any other consideration other than as provided in Section 2.1.7 (collectively, the "**Non-Assignable Contracts**"), this Agreement will not constitute an assignment thereof, or an attempted assignment, unless and until any such Consent is obtained, including any Consents obtained following Closing; <u>provided</u>, <u>however</u>, that the Sellers will use their reasonable efforts to cooperate with the Purchaser in any commercially reasonable arrangement to provide the Purchaser the same interest, benefits and rights under any such Non-Assignable Contracts as the applicable Seller had immediately prior to the Closing (including paying Cure Costs in order to obtain such Consent). If, and only for so long as, the arrangements described in the immediately preceding sentence are made such that Purchaser has obtained the same interest, benefits and rights under any such Non-Assignable Contracts, then, as between the Sellers and the Purchaser (or the relevant Designated Purchaser), such Non-Assignable Contracts shall be deemed to be assigned and the Purchaser (or the relevant Designated Purchaser) shall perform all obligations and covenants thereunder. Notwithstanding

the foregoing sentences, nothing in this Section 5.10 shall require any Seller to renew, modify or amend any Non-Assignable Contract once it has expired.   The Parties acknowledge that the fact that any Contract constitutes a Non-Assignable Contract by itself shall not (i) constitute a breach of any covenant hereunder, (ii) entitle Purchaser to terminate this Agreement or (iii) result in any reduction of the Purchase Price payable hereunder.  Any Non-Assignable Contract assigned pursuant to the terms of this Section 5.10 shall, when assigned, constitute an Assigned Contract hereunder from and after such date.

(b)  For the purposes of this Agreement (including Section 5.10(a) and all representations and warranties of the Sellers contained herein), the relevant Sellers shall be deemed to have obtained all required Consents in respect of the assignment of any 365 Contract if, and to the extent that, pursuant to the U.S. Sale Order or any separate order of the U.S. Bankruptcy Court approving and authorizing the assumption and assignment of the 365 Contracts, the Sellers are authorized to assume and assign to the Purchaser or a Designated Purchasers such Contract pursuant to Section 365 of the U.S. Bankruptcy Code and any applicable Cure Cost has been satisfied as provided in Section 2.1.7.

(c)  If, after the Closing, the Purchaser or the relevant Designated Purchaser receives a purchase order on account of any Non-Assignable Contract that is a contract between a Seller and a customer of such Seller (each, a "**Non-Assignable Customer Contract**" and the customer counterparty thereto a "**Non-Assignable Customer Counterparty**"), Purchaser or the relevant Designated Purchaser shall request that such Non-Assignable Customer Counterparty consent in writing to the assignment of such Non-Assignable Customer Contract to Purchaser or the relevant Designated Purchaser. For the period in which such consent is not forthcoming (the "**Non-Assignable Period**"), Purchaser or the relevant Designated Purchaser shall process such purchase order and Seller shall provide the Purchaser or the relevant Designated Purchaser with the interest, benefits and rights under such Non-Assignable Customer Contract in accordance with Section 5.13(a); provided, however, that Seller's obligation to provide Purchaser or the relevant Designated Purchaser with the interest, benefits and rights under such Non-Assignable Customer Contract will terminate upon the earliest of (i) the effective date of such consent, (ii) the effective date of any direct agreement between Purchaser (or the relevant Designated Purchaser) and such Non-Assignable Customer Counterparty or (iii) in accordance with Section 5.13(a); provided further, however, that Purchaser and the relevant Designated Purchaser agree to indemnify, defend and hold Sellers and each Seller's respective directors, officers and personnel (collectively, the "**Non-Assignable Customer Contracts Indemnitees**") harmless from and against any and all losses, costs, damages, expenses and liabilities whatsoever (including reasonable legal fees) which may be suffered or incurred by any Non-Assignable Customer Contracts Indemnitee arising out of claims made by a Non-Assignable Customer Counterparty relating to Seller's providing Purchaser and/or the relevant Designated Purchaser with the interests, benefits and rights under the relevant Non-Assignable Customer Contract during the Non-Assignable Period. Sellers and Purchaser acknowledge and agree that Bundled Contracts for which the arrangements mentioned in Section 5.11(a) could not be entered into prior to the Closing Date shall be handled in the same manner as Non-Assignable Contracts are handled under this Section 5.10(c).

Section 5.11.    Bundled Contracts.

(a) Each of the Purchaser and the Sellers shall, and the Purchaser shall, and shall cause any relevant Designated Purchaser, as applicable, to use its reasonable efforts to, prior to the Closing Date, enter into arrangements with the counterparty to each Contract of a Seller that involves the sale or provision of Products and/or Services to a customer of the Business and the sale or provision of other products and/or services of the Sellers or their Affiliates and is listed in Section 5.11 of the Sellers Disclosure Schedule (a "**Bundled Contract**"), to amend such Bundled Contract so as to delete all obligations and Liabilities therefrom as they relate to the Products and the Services and enter into a new Contract (effective as of, and conditioned upon the occurrence of, the Closing) with the applicable customer and which only relates to Products and Services on substantially the same terms and conditions as are in effect for the sale or provision of Products and/or Services under the Bundled Contracts or as otherwise acceptable to the Purchaser, in which event such new Contract shall be deemed to be an Assigned Contract. Seller shall generally be responsible for all administrative costs, fees and expenses connected with the amendment of a Bundled Contract and entry into a new Contract to replace a Bundled Contract as provided in the preceding sentence (other than the costs, fees and expenses of Purchaser or any counsel to Purchaser); provided, however, that the Sellers shall be under no obligation to compromise any right, asset or benefit in obtaining such arrangements and the failure to enter into such arrangements with respect to any Bundled Contract shall not, entitle the Purchaser to terminate this Agreement, not to complete the transactions contemplated hereby or reduce the Purchase Price payable hereunder. In the event Sellers' efforts do not result in the separation of a Bundled Contract, then Purchaser and Sellers shall cooperate in good faith to enter into reasonable arrangements to provide the Purchaser or Designated Purchaser, as applicable, the same interest, benefits, rights and obligations under such Bundled Contract, only to the extent relating to the Business.

(b) For those Bundled Contracts for which the arrangements mentioned in Section 5.11(a) could not be entered into prior to the Closing Date, the Sellers shall either: (i) continue to use their reasonable efforts to facilitate the entry by the Purchaser or the relevant Designated Purchaser and the other party to each such Bundled Contract into a new Contract that only relates to Products and/or Services on substantially the same terms and conditions as are in effect for the sale or provision of Products and/or Services under the Bundled Contracts or as otherwise acceptable to the Purchaser and/or (ii) use their reasonable best efforts to cooperate with the Purchaser in any commercially reasonable arrangement to provide the Purchaser or Designated Purchaser, as applicable, the same interest, benefits and rights under any such Bundled Contract only to the extent relating to Products and/or Services as the applicable Seller had immediately prior to the Closing, including using its reasonable efforts to ensure that the benefits and burdens of such Bundled Contract are passed through to the Purchaser; provided that (A) nothing in this Section 5.11 shall require the Sellers to renew any Bundled Contract once it has expired, (B) the Sellers shall have the right, any time after December 31, 2010, to exercise any right to reject and/or terminate any Bundled Contract, and (C) the Sellers shall be under no obligation to compromise any right, asset or benefit or to incur any Liability in order to comply with its obligations under this sentence. Notwithstanding the foregoing, the Sellers shall not take any action to terminate or reject any Bundled Contract, or take any action or fail to take any action that would permit the other party to any Bundled Contract to terminate such Bundled Contract, in each case, prior to December 31, 2010.

(c) Prior to the Closing Date, the Purchaser or the Main Sellers shall be entitled to update and/or supplement the list of Bundled Contracts from time to time by written notices to the other Primary Party; provided, that no update and/or supplement shall be permitted without the other Primary Party's prior written consent.

Section 5.12.   Post-Closing Assistance for Litigation.

(a) After the Closing, the Purchaser shall, upon the request of the Sellers, and at the Sellers' cost (including reimbursement of out of pocket expenses of the Purchaser and the Designated Purchasers and payment of a reasonable *per diem* to the Purchaser or a Designated Purchaser which *per diem* shall be based on the total compensation of the affected Transferred Employees at the time), require the Transferred Employees to make themselves reasonably available at reasonable times and cooperate in all reasonable respects with the Sellers and their Affiliates in the preparation for, and defense of, any lawsuit, arbitration or other Action (whether disclosed or not disclosed in the Sellers Disclosure Schedule) filed or claimed against the Sellers or any of their Affiliates or any of the respective agents, directors, officers and employees of the Sellers and their Affiliates, whether currently pending or asserted in the future, concerning the operation or conduct of the Business prior to the Closing Date; provided, however, that the obligations of the Purchaser hereunder shall only extend to the Transferred Employees who remain employed by the Purchaser or a Designated Purchaser as of the date of the Seller's request and shall not apply to former employees no longer employed by the Purchaser or a Designated Purchaser as of such date and shall not require Purchaser or a Designated Purchaser to continue the employment of any such employee.

(b) After the Closing, the Sellers shall, upon the request of the Purchaser, and at the Purchaser's cost (including reimbursement of out of pocket expenses of the Sellers and payment of a reasonable *per diem* to the Sellers which *per diem* shall be based on the total compensation of the affected employees of the Sellers at the time), require their employees that were not Transferred Employees to make themselves reasonably available and cooperate in all reasonable respects with the Purchaser and the Designated Purchasers and their Affiliates in the preparation for, and defense of, any lawsuit, arbitration or other Action filed or claimed against the Purchaser, any of the Designated Purchasers, any of their Affiliates or any of the respective agents, directors, officers and employees of any of the foregoing, whether currently pending or asserted in the future, concerning the operation or conduct of the Business prior to the Closing Date; provided, however, that the obligations of the Sellers hereunder shall only extend to the employees of such Sellers or Sellers' Affiliates as of the date of Purchaser's request and shall not apply to former employees no longer employed by such Sellers or Seller's Affiliates as of such date and shall not require Sellers or Seller's Affiliates to continue the employment of any such employee.

Section 5.13.   Delivery of Assets.   The Purchaser shall, and shall cause the relevant Designated Purchasers to, within ninety (90) days after the Closing Date, relocate all tangible Assets and Purchaser's activities from all premises owned or leased by the Sellers or their Affiliates after the Closing.

Section 5.14.   Termination of Overhead and Shared Services.   The Purchaser acknowledges and agrees that, except as otherwise expressly provided in the Transition Services

Agreement, effective as of the Closing Date (i) all Overhead and Shared Services provided to the Business shall cease and (ii) the Sellers or their Affiliates shall have no further obligation to provide any Overhead and Shared Services to the Business.

Section 5.15.  Financing.  Notwithstanding anything to the contrary set forth herein, the Purchaser acknowledges and agrees that (i) its obligations to consummate the transactions contemplated by this Agreement are not conditioned or contingent in any way upon receipt of any financing from any other Person, and (ii) failure to consummate the transactions contemplated herein as a result of the failure to obtain financing shall constitute a breach of this Agreement by the Purchaser (including its obligations pursuant to Section 2.3).

Section 5.16.  Guarantees and Other Credit Support of the Business.  Following the Closing, the Purchaser shall, or shall cause the applicable Designated Purchasers to cooperate with the Sellers to procure the return and/or release by the applicable counterparty, as soon as reasonably practicable of any security deposit, performance bond or surety posted by, any Seller or any of its Affiliates in connection with any Assigned Contracts, including where required by the applicable counterparty, offering to post such security deposits on terms and conditions no less favorable than offered to such Seller by such counterparty.

Section 5.17.  Use of Trademarks.  As of the Closing Date, neither the Purchaser nor any Designated Purchaser shall have the right to use the name "Nortel" or any other Trademarks owned by the Sellers or any of their Affiliates or any other Trademark employing the word "Nortel" or any confusingly similar Trademarks to any of the foregoing (collectively, the **"Sellers' Trademarks"**).

Section 5.18.  Maintenance of Books and Records.  After the Closing, the Purchaser shall, and shall cause the Designated Purchasers to, preserve, until at least the greater of the third (3rd) anniversary of the Closing Date or as otherwise provided in Purchaser's applicable document retention policies, all pre-Closing Date records to the extent relating to the Business possessed or to be possessed by such Person.  After the Closing Date and up until at least the third (3rd) anniversary of the Closing Date, upon any reasonable advance notice and during regular business hours, the Purchaser shall, and/or shall cause the Person holding such records to, (a) provide to the Sellers or their representatives reasonable access to such records during normal business hours and (b) permit the Sellers or their representatives to make copies of such records; provided, however, that (A) any such access shall be conducted at Sellers' expense, in accordance with Law (including any applicable antitrust or similar Laws and Bankruptcy Law), under the supervision of the Purchaser's personnel and in such a manner as to maintain confidentiality and not to interfere with the normal operations of the businesses of the Purchaser and its Affiliates, and (B) the Purchaser will not be required to provide to the Sellers access to or copies of any Tax Records or Employee Records where prohibited by applicable Laws.

(b) Notwithstanding anything contained in this Agreement or any other agreement between the Purchaser and the Sellers executed on or prior to the date hereof, the Purchaser shall not have any obligation to make available to the Sellers or its Representatives, or provide the Sellers or its Representatives with (i) any income Tax Return or any combined or consolidated Tax Return filed by the Purchaser or any of its Affiliates or predecessors, or any related material, or (ii) more generally, any information if making such information available would

(A) jeopardize any attorney-client or other legal privilege or (B) potentially cause the Purchaser to be found in contravention of any applicable Law or contravene any fiduciary duty or agreement (including any confidentiality agreement to which the Purchaser or any of its Affiliates is a party), it being understood that the Purchaser shall cooperate in any reasonable efforts and requests for waivers that would enable otherwise required disclosure to the Sellers to occur without so jeopardizing privilege or contravening such Law, duty or agreement.

(c) In addition to the above, the Sellers shall have the right to retain, following the Closing, copies of any book, record, literature, list and any other written or recorded information constituting Business Information or any Employee Records to which the Sellers in good faith determine they are reasonably likely to need access for bona fide Tax, financial or legal purposes.

Section 5.19.   Certain Ancillary Agreements.   The Primary Parties shall, and shall cause their respective Affiliates to, promptly after the date hereof, negotiate, finalize, execute and deliver the Ancillary Agreements to which it is contemplated they (or such of their Affiliates) will be parties prior to or simultaneously with the Closing.

Section 5.20.   Casualty.   At Closing the Sellers shall assign to the Purchaser or Designated Purchaser, as applicable, and the Purchaser or such Designated Purchaser shall be entitled to receive the benefits of, any and all claims and proceeds the Sellers may have with respect to any casualty insurance policies with respect to any Assets which related to a casualty occurring after the date of this Agreement but prior to the Closing, and the Purchaser shall have the right to proceed against any insurance company to recover any such items and will have the right prior to the Closing to participate in all negotiations and discussions regarding the adjustment and settlement of any insurance claims with respect to any property or group of properties having a value in excess of $500,000.  The Sellers shall promptly after learning of the same notify Purchaser in writing of the occurrence of any casualty or similar event with respect to any of the Assets.

Section 5.21.   Affiliates.   The Sellers shall cause their respective Affiliates that are not Parties to this Agreement to comply with the terms and conditions of this Agreement that impose obligations on such Affiliates as the context requires to carry out the provisions of this Agreement and give effect to the transactions contemplated herein.

Section 5.22.   Pre-Closing Access to Information.

(a) Prior to the Closing, the Main Sellers shall, and shall cause their Subsidiaries to, (i) give the Purchaser and its authorized Representatives, upon reasonable advance notice and during regular business hours, reasonable access to all books, records, personnel, officers, advisors, agents, bankers and other Representatives and other facilities and properties of the Business, (ii) permit the Purchaser and its Representatives to make such copies and inspections thereof, upon reasonable advance notice and during regular business hours, as the Purchaser may reasonably request and (iii) furnish the Purchaser with such unaudited financial and operating data and other information with respect to the Business as is regularly prepared in the Ordinary Course that the Purchaser may from time to time reasonably request; provided, however, that (A) any such access by the Purchaser shall be conducted at Purchaser's own expense, in

43

accordance with Law, at a reasonable time, under the supervision of the Sellers' personnel and in such a manner as to maintain confidentiality and not to interfere with the normal operations of the businesses of the Sellers and their Affiliates, and (B) the Sellers will not be required to provide to the Purchaser access to or copies of any Employee Records unless consented to by such Employee.

(b) Notwithstanding anything contained in this Agreement or any other agreement between the Purchaser and the Sellers executed on or prior to the date hereof, the Sellers shall not have any obligation to make available to the Purchaser or its Representatives, or provide the Purchaser or its Representatives with, (i) any income Tax Return or any combined or consolidated Tax Return filed by the Sellers or any of their Affiliates or predecessors, or any related material, or (ii) more generally, any information if making such information available would (A) jeopardize any attorney-client or other legal privilege or (B) potentially cause the Sellers to be found in contravention of any applicable Law or contravene any fiduciary duty or agreement (including any confidentiality agreement to which the Sellers or any of their Affiliates are a party), it being understood that the Sellers shall cooperate in any reasonable efforts and requests for waivers that would enable otherwise required disclosure to the Purchaser to occur without so jeopardizing privilege or contravening such Law, duty or agreement.

Section 5.23.  Insurance Matters.

(a) The Purchaser acknowledges and agrees that coverage of the Assets under the Seller Insurance Policies shall cease as of the Closing Date and the Assets will be deleted in all respects as insured (or additional insured, as the case may be) under all Seller Insurance Policies. Notwithstanding anything herein to the contrary, the Sellers shall retain any rights to, including any right to any proceeds received in respect of, any claim pending as of the date hereof or made after the date hereof under any Seller Insurance Policy.

(b) If after the Closing Date the Purchaser or the Sellers (or any of their respective Affiliates) reasonably require any information regarding claim data or other information pertaining to a claim or an occurrence reasonably likely to give rise to a claim (including any pre-Closing claims under the Seller Insurance Policies that are to be covered under the retrospective component of the new insurance policy) in order to give notice to or make filings with insurance carriers or claims adjustors or administrators or to adjust, administer or otherwise manage a claim, then the Sellers or the Purchaser, as the case may be, shall cause such information to be supplied to the other (or their designee), to the extent such information is in their possession and control or can be reasonably obtained by the Sellers or the Purchaser (or their respective Affiliates), as applicable, promptly upon a written request therefore. If the Purchaser desires access to, and utilization of, claims data or information maintained by an insurance company or other Third Party in respect of any claim (including any pre-Closing claims under any Seller Insurance Policies that are covered under the retrospective component of the new insurance policies), the Purchaser shall be exclusively responsible for acquiring from such insurance company or Third Party, at the Purchaser's sole cost and expense, the rights necessary to permit them to obtain access to and utilization of such claims data or information, provided that Sellers and their Affiliates shall reasonably cooperate with Purchaser's efforts. If any Third Party requires the consent of the Sellers or any of their Affiliates to the disclosure of such information, such consent shall not be unreasonably withheld.

44

Section 5.24.  <u>Sellers' Accessible Information; Cooperation</u>.

(a)    After the Closing, the Purchaser shall have the right to reasonably request from the Main Sellers copies of all books, records, files, documentation and sales literature in the possession or under control of the Sellers and held or used in the Business (other than Employee Records where prohibited by applicable Law or Tax Records), to which the Purchaser in good faith determines it needs access for *bona fide* business or legal purposes.  The Sellers shall, or cause their respective Affiliates to, provide such copies to the Purchaser (at the Purchaser's expense) as soon as reasonably practicable, provided that the Sellers shall be allowed to redact any such requested document in order to delete any information and data relating to business segments of any such Seller and its respective Affiliates not included in the Business; <u>provided further</u>, that nothing herein shall require the Sellers to disclose any information to the Purchaser if such disclosure would jeopardize any attorney-client or other legal privilege or contravene any applicable Law, fiduciary duty or agreement, it being understood that the Sellers shall cooperate in any reasonable efforts and requests for waivers that would enable otherwise required disclosure to the Purchaser to occur without so jeopardizing privilege or contravening such Law, duty or agreement.

(b)    Purchaser and the Sellers shall reasonably cooperate, and shall cause their respective Affiliates, officers, employees, agents, auditors and other Representatives to reasonably cooperate in preparing and auditing, as applicable, at Purchaser's expense, any financial statements that the Purchaser may request in connection with its future financing requirements, such financial statements to be compliant with any applicable regulations and stock exchange rules regarding financial statements of businesses acquired or to be acquired.

Section 5.25.  <u>Disclosure Schedules and Certain Information</u>.

(a)    The Sellers shall use reasonable efforts to submit to the Purchaser, as promptly as reasonably practicable, written updates to the Sellers Disclosure Schedule in respect of ARTICLE IV disclosing any events or developments that occurred or any information learned between the date of this Agreement and the Closing Date that reflect any matters hereafter arising which, if existing, occurring or known to the Sellers at the date hereof, would have been required to be set forth or described in the Sellers Disclosure Schedule in relation to ARTICLE IV; <u>provided</u>, that such updates shall be disregarded for purposes of determining whether or not the condition contained in Section 8.3(a) has been fulfilled.

(b)    The Sellers shall give prompt notice to the Purchaser, and the Purchaser shall give prompt notice to the Sellers, upon obtaining knowledge of the occurrence or non-occurrence of any event that, individually or in the aggregate, would make the timely satisfaction of the conditions set forth in ARTICLE VIII impossible or unlikely.

(c)    The delivery of any update or notice pursuant to this Section 5.25 shall not cure any breach of any representation or warranty requiring disclosure of such matter or otherwise limit or affect the remedies available hereunder to any party receiving such notice. This Section 5.25 shall not constitute a covenant or agreement for purposes of ARTICLE VIII or ARTICLE IX.

Section 5.26.    Inbound License Agreements.

(a)    Each of the Purchaser and the Sellers shall, and the Purchaser shall cause any relevant Designated Purchaser and the Sellers shall cause any Affiliate to, use reasonable efforts and work cooperatively in good faith to facilitate the Purchaser's negotiation with the licensor under any license to use radio frequency software tools and/or applications owned by a Third Party that is, as of the date hereof, used in the Business (collectively, the "**Inbound RF Software Licenses**") to obtain rights for the Purchaser or a Designated Purchaser to use the Intellectual Property that is licensed under that Inbound RF Software License, or, if that negotiation is unsuccessful, the Sellers shall use reasonable efforts to provide the same interests, benefits and rights under such Inbound RF Software License in each case, as reasonably necessary to effectively sell the Products and provide the Services from and after Closing, including in the case of the Sellers requesting consent to the grant of these rights from the relevant third party; provided, however, that the Sellers shall be under no obligation to compromise any right, asset or benefit (including relinquishment of rights relating to the Nortel Retained Businesses or the Nortel Retained GSM Businesses, each as defined in the Amended and Restated Intellectual Property License Agreement) or to expend any amount or incur any Liability or provide any other consideration in complying with their obligations under this Section 5.26(a).

(b)    Further, each of the Sellers shall, and shall cause any Affiliate to, use reasonable efforts and work cooperatively with the Purchaser in good faith to ensure that each Inbound RF Software License entered into on or after the date hereof provides for such Inbound RF Software License to be freely assigned to the Purchaser or any Designated Purchaser at Closing without the need for the Purchaser or any Designated Purchaser to expend any amount or incur any Liability or provide any other consideration in connection with any such assignment; provided, however, that the Sellers shall be under no obligation to compromise any right, asset or benefit (including relinquishment of rights relating to the Nortel Retained Businesses or the Nortel Retained GSM Businesses, each as defined in the Amended and Restated Intellectual Property License Agreement) or to expend any amount or incur any Liability or provide any other consideration in complying with their obligations under this Section 5.26(b).

# ARTICLE VI

# TAX MATTERS

Section 6.1.    Transfer Taxes.

(a) The Parties agree that the Purchase Price is exclusive of any Transfer Taxes. The Purchaser shall (on behalf of itself and the Designated Purchasers) promptly pay directly to the appropriate Tax Authority all applicable Transfer Taxes that may be imposed upon or payable or collectible or incurred in connection with this Agreement or the transactions contemplated herein, or that may be imposed upon or payable or collectible or incurred in connection with the execution of any other Transaction Document; provided, that if any such

Transfer Taxes are required to be collected, remitted or paid by a Seller or any Subsidiary, Affiliate, representative or agent thereof, such Transfer Taxes shall be paid by the Purchaser to such Seller, Subsidiary, Affiliate or agent, as applicable, at the Closing or thereafter, as requested of or by the applicable Seller. For the avoidance of doubt, Purchaser shall remain liable in respect of any Transfer Taxes regardless of the date that the Assets are removed from the premises of a Seller or any Seller's supplier. All other Closing expenses will be paid by the Party incurring such expenses. Upon request from a Seller, the Purchaser shall provide to such Seller an original receipt (or such other evidence as shall be reasonably satisfactory to such Seller) evidencing the payment of Transfer Taxes by the Purchaser to the applicable Tax Authority under this Section 6.1(a).

(b) The Purchaser or any Designated Purchaser, as the case may be, shall provide the Sellers prior to Closing with an appropriate certificate of exemption, election and/or other document or evidence to support any reasonable exemption or reduction in respect of Transfer Taxes claimed by the Purchaser or such Designated Purchaser, as the case may be. All Parties shall make reasonable efforts to cooperate to the extent necessary to obtain any such exemption or reduction.

Section 6.2.    Withholding Taxes. The Purchaser and the Designated Purchasers shall be entitled to deduct and withhold from the Purchase Price such amounts as the Purchaser or Designated Purchasers, as the case may be, are required to deduct and withhold under the Code, or any provision of federal, state, provincial, local or foreign Tax Law, with respect to the making of such payment and shall remit any amount so withheld to the appropriate Government Entity in accordance with applicable Law. To the extent such amounts are so withheld by the Purchaser or a Designated Purchaser, as the case may be, such withheld amounts shall be treated for all purposes of this Agreement and any other Transaction Document as having been paid to the relevant Seller in respect of whom such deduction and withholding was made by such Purchaser or Designated Purchaser. None of the Parties is aware of any obligation to deduct and withhold any amounts from the Purchase Price under the Code, or any provision of federal, state, provincial, local or foreign Tax Law, with respect to the making of such payment. If any of the Parties learns of any such obligation on or prior to the Closing Date, then (i) in the case of a Seller, such Seller shall promptly provide reasonable notice of such obligation to the Purchaser, and (ii) in the case of the Purchaser, the Purchaser shall promptly provide reasonable notice of such obligation to the Sellers. In the event that a Tax withholding obligation arises with respect to payment of the Purchase Price, the Parties shall cooperate in good faith to minimize the amounts that the Purchaser or Designated Purchasers, as the case may be, are required to deduct and withhold.

Section 6.3.    Tax Characterization of Payments Under This Agreement. The Sellers and the Purchaser agree to treat all payments made either to or for the benefit of the other Party under this Agreement (other than payment of the Estimated Purchase Price and any interest payments) as adjustments to the Purchase Price for Tax purposes and that such treatment shall govern for purposes hereof to the extent permitted under applicable Tax Law.

Section 6.4.    Apportionment of Taxes.

(a) Except as otherwise provided in this ARTICLE VI, (i) the Main Sellers shall and shall cause the Other Sellers, as the case may be, to bear all Taxes of any kind relating to the Assets or the conduct or operation of the Business for all Tax periods or portions thereof ending on or before the Closing Date and (ii) the Purchaser shall and shall cause the Designated Purchasers to bear all Taxes relating to the Assets or the conduct or operation of the Business for all Tax periods or portions thereof beginning after the Closing Date.

(b) For purposes of this Agreement, any Taxes (excluding, for the avoidance of doubt, any income or gross receipts Taxes) for a "**Straddle Period**" (a Tax period that includes, but does not end on, the Closing Date) shall be apportioned between the Sellers, on the one hand, and the Purchaser and the Designated Purchasers, on the other hand, based on the portion of the period ending on and including the Closing Date and the portion of the period beginning after the Closing Date, respectively. The amount of Taxes shall be allocated between portions of a Straddle Period in the following manner: (i) in the case of a Tax imposed in respect of property (excluding, for the avoidance of doubt, any income or gross receipts Tax) and that applies ratably to a Straddle Period, the amount of Tax allocable to a portion of the Straddle Period shall be the total amount of such Tax for the period in question multiplied by a fraction, the numerator of which is the total number of days in such portion of such Straddle Period and the denominator of which is the total number of days in such Straddle Period, and (ii) in the case of sales, value-added and similar transaction-based Taxes (other than Transfer Taxes allocated under Section 6.1), such Taxes shall be allocated to the portion of the Straddle Period in which the relevant transaction occurred.

Section 6.5.    Tax Records.

(a) Notwithstanding the provisions of Section 5.18, (i) after the Closing Date, the Purchaser and the Designated Purchasers, on the one hand, and the Sellers, on the other hand, will make available to the other, as reasonably requested, and to any Tax Authority, all information, records or documents relating to liability for Taxes with respect to the Assets, the Assumed Liabilities, or the Business for all periods prior to or including the Closing Date (including Straddle Periods), and will preserve such information, records or documents until the expiration of any applicable statute of limitations or extensions thereof, and (ii) in the event that one party needs access to records in the possession of a second party relating to any of the Assets, the Assumed Liabilities or the Business for purposes of preparing Tax Returns or complying with any Tax audit request, subpoena or other investigative demand by any Tax Authority, or for any other legitimate Tax-related purpose not injurious to the second party, the second party will allow representatives of the other party access to such records during regular business hours at the second party's place of business for the sole purpose of obtaining information for use as aforesaid and will permit such other party to make extracts and copies thereof as may be necessary or convenient. The obligation to cooperate pursuant to this Section 6.5 shall terminate at the time the relevant applicable statute of limitations expires (giving effect to any extension thereof).

(b) The Purchaser shall have no obligation to provide any access under this provision unless the Main Sellers pay all the Purchaser's reasonable expenses in connection with

48

the foregoing provisions, including a reasonable per diem rate for access to former employees of the Sellers, as the case may be (based on the total compensation of the employee at the time access is provided).

(c)  The Sellers shall have no obligation to provide any access under this provision unless the Purchaser pays all of the Sellers' reasonable expenses in connection with the foregoing provisions, including a reasonable per diem rate for access to employees of the Sellers (based on the total compensation of the employee at the time access is provided).

Section 6.6.    Tax Returns.

(a)  The Sellers shall be responsible for the preparation and timely filing (taking into account any extensions received from the relevant Tax Authorities) of all Tax Returns in respect of the Assets or the Business, for all Pre-Closing Taxable Periods (other than any Tax Returns with respect to Transfer Taxes ("**Transfer Tax Returns**") described below in Section 6.6(b)). Such Tax Returns shall be true, correct and complete in all material respects. Except as otherwise provided in this Agreement, all Taxes indicated as due and payable on such Tax Returns shall be paid by (or shall be caused to be paid by) Sellers as and when required by Law.

(b)  Each Transfer Tax Return with respect to Transfer Taxes imposed in respect of this Agreement and the transactions contemplated herein or in respect of the execution of any other Transaction Document shall be prepared and timely filed by the Party that customarily has primary responsibility for filing such Transfer Tax Return pursuant to the applicable Tax Laws. Any Transfer Tax Returns prepared by the Sellers pursuant to this Section 6.6(b) shall be made available to the Purchaser at least five (5) Business Days before such Tax Returns are due to be filed. The Purchaser shall pay to the Sellers any amount of Transfer Taxes payable in respect of Transfer Tax Returns to be filed by the Sellers pursuant to this Section 6.6(b) at least one (1) Business Day before such Transfer Tax becomes due and payable.

(c)  The Purchaser or a Designated Purchaser shall be responsible for the preparation and timely filing (taking into account any extensions received from the relevant Tax Authorities) of all Tax Returns with respect to the Assets or the Business for all Straddle Periods. Such Tax Returns shall be true, correct and complete in all material respects. All Taxes indicated as due and payable on such Tax Returns shall be paid by (or shall be caused to be paid by) the Purchaser or a Designated Purchaser as and when required by Law.

(d)  The Sellers shall be entitled to review and comment on any Tax Return (other than a Transfer Tax Return described in Section 6.6(b) or any Tax Return relating to income or gross receipts Taxes of the Purchaser) prepared by the Purchaser for any Straddle Period before any such Tax Return is filed. The Purchaser shall submit a draft of any such Tax Return to the Sellers at least thirty (30) days before the date such Tax Return is required to be filed with the relevant Tax Authority. The Sellers shall have ten (10) days after the date of receipt thereof to submit to the Purchaser, in writing, the Sellers' written comments with respect to such Tax Return. The Purchaser shall notify the Sellers within five (5) days after receipt of such comments of (a) the extent, if any, to which the Purchaser accepts such comments and will file such Tax Return in accordance therewith and (b) the extent, if any, to which the Purchaser rejects

such comments. To the extent the Purchaser rejects the comments of the Sellers, the Purchaser and the Sellers promptly shall negotiate in good faith to resolve their disagreements.

(e) Notwithstanding any contrary provision in this ARTICLE VI, each Seller shall pay to the Purchaser the amount of its liability for Taxes shown to be due on any Tax Return for a Straddle Period at least three (3) Business Days prior to the due date thereof, giving effect to valid extensions.

(f) Notwithstanding any contrary provision in this Article VI, the Sellers shall not be entitled to any Tax-related information, including any Tax Return, that includes assets or operations of the Purchaser or any of its Affiliates in addition to the Assets; provided, however, that the Purchaser shall provide the Sellers with a copy of a pro forma Tax Return relating solely to the Assets for any Straddle Period.

Section 6.7.    Purchase Price Allocation.

(a) Except as otherwise required by applicable Law, the Parties shall (i) first allocate to the tangible Assets a portion of the Purchase Price (and, to the extent properly taken into account under the applicable Tax Laws, the Assumed Liabilities), equal to the net book value of such Assets as of the Closing Date and (ii) then allocate the balance of the Purchase Price to the intangible Assets.

(b) To the extent necessary to file Transfer Tax Returns, the Parties shall negotiate in good faith to determine an allocation of the Purchase Price (and, to the extent properly taken into account under the applicable Tax Laws, the Assumed Liabilities) among the Assets in accordance with the principles of Section 1060 of the Code and the Treasury regulations promulgated thereunder and other applicable Tax Laws, which allocation shall be subject to the principles of Section 6.7(a) (such allocation, a "**Partial Allocation**"); provided, however, that if a different Partial Allocation is required by a Government Entity (including for this purpose an allocation required, approved or authorized pursuant to a Bankruptcy Proceeding), then the Partial Allocation shall be modified as necessary to be consistent with the required allocation (but in all cases shall be subject to the principles of Section 6.7(a). The Parties agree (i) to be bound by the final Partial Allocation accepted by the Parties (as modified to be consistent with the allocation required by a Government Entity, as described above), and (ii) to act in accordance with the allocations contained in such final Partial Allocation for all purposes relating to Transfer Taxes (including the preparation, filing and audit of any Transfer Tax Returns).

## ARTICLE VII

## EMPLOYMENT MATTERS

Section 7.1.    Employment Obligations.

7.1.1.    Employment Terms.

(a) Promptly following the later of the granting of the U.S. Sale Order and the Canadian Approval and Vesting Order, the Purchaser shall, or shall cause a Designated

50

Purchaser to, extend a written offer of employment to Employees as set forth on Section 7.1 of the Sellers Disclosure Schedule, such offer being contingent (x) in each case, in the discretion of the Purchaser, on such Employee passing a background check and, if such Employee is located in the United States, drug screening, in all cases, to the extent permitted and consistent with applicable Law and (y) in the case of Inactive Employees, upon their return to active status (other than Employees set forth on Section 7.1 of the Sellers Disclosure Schedule whose employment transfers automatically by operation of Law to the Purchaser or a Designated Purchaser). The Sellers shall have the right to review any offer of employment made pursuant to this Section 7.1 prior to it being sent to any Employee. Such offer of employment shall provide for an employee consideration period of at least one week, or such longer period as required by applicable Law. Such offers (and, with respect to Employees whose employment transfers by operation of Law, such continued employment) shall be consistent with the requirements of applicable Law and on terms and conditions no less favorable, in the aggregate, than those the Employees currently have, but subject to certain adjustments to conform to the Purchaser's standard employment policies where legally possible.

(b) The Sellers shall provide the Purchaser or a Designated Purchaser with such additional information as the Purchaser may reasonably require in order to comply with its obligations under this ARTICLE VII. Notwithstanding anything to the contrary contained herein, as a condition to the transfer of employment (except as prohibited by applicable Law), the Purchaser or Designated Purchaser may require Employees to provide evidence that they are legally permitted to be employed by the Purchaser or a Designated Purchaser, as required by applicable Law.

(c) Any Employee who accepts such offer of employment and commences employment with the Purchaser or a Designated Purchaser, and any Employee whose employment transfers by operation of Law, shall be deemed to be a Transferred Employee for all purposes of this Agreement. Inactive Employees who accept such offer shall remain employed by the relevant Seller until the first (1st) Business Day immediately following the date the Inactive Employee is released to return to active employment in accordance with Sellers' leave policies. The Purchaser or a Designated Purchaser shall use reasonable efforts from the date hereof until the Closing Date to obtain, at its cost, such visas or permits as are required for it to employ Visa Employees. Visa Employees shall remain employed by the relevant Seller following the Closing Date under the terms and conditions of the Loaned Employee Agreement. The Effective Hire Date for Employees is (a) the Employee Transfer Date for those Employees other than Inactive Employees and Visa Employees, (b) 12:01 a.m. on the first Business Day following the release to return to active employment from leave for all Inactive Employees and (c) the date specified in the Loaned Employee Agreement with respect to Visa Employees.

(d) For the twelve (12) month period following the Closing Date (or for such shorter period as a Transferred Employee remains employed by Purchaser or a Designated Purchaser), such Transferred Employee, subject to applicable Law, shall be employed on terms and conditions of employment not materially less favorable, in the aggregate, than the terms and conditions of employment provided such Employees immediately prior to the Closing, subject, following the Effective Hire Date, to certain adjustments to conform to the Purchaser's standard employment policies where legally possible; provided, however, that, subject to the terms of the Loaned Employee Agreement, neither this Section 7.1 nor Section 7.2 restricts the right of the

Sellers, the Purchaser or a Designated Purchaser to terminate the employment of any Transferred Employee after the Closing; provided, further, that, following the Effective Hire Date, except as provided in Section 7.4, nothing shall prohibit the Purchaser or any Designated Purchaser from amending or terminating, in whole or in part, any Purchaser Employee Plan or from making changes to such terms and conditions of employment that are generally applicable and broadly based across the Purchaser's or Designated Purchaser's employee population; and provided, further, that for purposes of clarity the Purchaser shall not be required to offer in any offer made pursuant to this ARTICLE VII any (i) equity, (ii) retiree medical or other retiree welfare arrangement or (iii) defined benefit pension plan, in each case, unless required by applicable Law.

    7.1.2    Employee Benefits.

        (a)    The Purchaser or a Designated Purchaser shall, and shall cause its relevant Affiliates to, recognize the service date of each Transferred Employee as set out in the Employee Information for all purposes, including membership, vesting, benefit accrual and entitlement to benefits under the relevant Purchaser Employee Plans, but not for purposes of benefit accrual under any Purchaser Employee Plan that is a defined benefit pension plan, except as otherwise provided herein, or to the extent that such crediting would result in duplication of benefits.

        (b)    After the date hereof, the Sellers and the Purchaser shall cooperate promptly and in good faith in preparing the transition of the Transferred Employees, as applicable, from coverage under the Seller Employee Plans to coverage under the Purchaser Employee Plans effective as of the Transferred Employee's Effective Hire Date.

        (c)    Without limiting the generality of the foregoing, the Purchaser shall, or shall cause its relevant Affiliates to, provide the following benefits to Transferred Employees:

        (i)    The Sellers shall pay the amount of compensation with respect to the accrued and unused vacation hours that is due and owing to the Transferred Employees up to their Effective Hire Date, to such Transferred Employees by the date required under applicable Law. The Purchaser will, and will cause the relevant Designated Purchasers to, make reasonable efforts to accommodate requests for unpaid time off of such Transferred Employees until such time as they accrue sufficient paid time off under the Purchaser Employee Plans to address their vacation plans.

        (ii)    The Sellers shall pay each Transferred Employee, the amount of any accrued and unused vacation as of the Closing within five days after the Closing, or earlier if required by Law.

        (iii)    Each Transferred Employee (and their eligible dependents, as applicable), shall be eligible, effective as of the relevant Effective Hire Date, to participate in and accrue benefits under the Purchaser Employee Plans that the Purchaser (or, as applicable, a Designated Purchaser) extends to similarly situated employees of the Purchaser (or the applicable Designated Purchaser) subject to the terms of the Purchaser Employee Plans. With respect to each Transferred Employee (and their eligible dependents, as applicable), the Purchaser or the relevant Purchaser's Affiliates shall

cause such plans to (i) waive any eligibility periods, evidence of insurability or pre-existing condition limitations to the extent such limitations no longer apply to such Transferred Employees under the comparable corresponding Seller Employee Plan and (ii) honor any deductibles, co-payments, co-insurance or out-of-pocket expenses paid or incurred by such employees, including with respect to their dependents, under comparable Seller Employee Plans during the Purchaser Employee Plan year in which the relevant Effective Hire Date occurs, provided that such employee provides an explanation of benefits or similar documentation of such expenses paid or incurred to the Purchaser or its Affiliates which is reasonably satisfactory to Purchaser.

(e) The Sellers shall be solely responsible for any required notice under the WARN Act with respect to terminations of employment of Employees that occur on or prior to the Closing Date provided that the Purchaser or Designated Purchaser, as applicable, has satisfied its obligations as set out in this Article VII. Purchaser shall be solely responsible for any required notice under the WARN Act with respect to terminations of employment of Transferred Employees that occur after the Closing Date

Section 7.2.    Other Employee Covenants.

(a)    After the date hereof, and subject to each Party's disclosure obligations imposed by Law or by Government Entities and each Party's obligations hereunder, neither the Purchaser, the Sellers nor any of their respective Affiliates shall issue any announcement or communication to their respective employees or the Employees, prior to consultation with, and the approval of, the other Party (not to be unreasonably withheld or delayed) with respect to this Agreement or any of the transactions contemplated hereby. If requested, the Parties shall reasonably cooperate with the Sellers in respect of the development and distribution of any announcement and communication to the employees of the Sellers, including Employees, with respect to this Agreement or any of the transactions contemplated hereby.

(b)    Prior to the Effective Hire Date (for Transferred Employees) and before and after the Closing Date for all other Employees, the Purchaser undertakes to keep the Employee Information in confidence including taking the following actions:

(i)    the Purchaser shall, and shall cause the Designated Purchasers to, restrict the disclosure of the Employee Information only to such of its employees, agents and advisors as is reasonably necessary for the purposes of complying with its obligations pursuant to this Agreement;

(ii)    the Employee Information shall not be disclosed to any other Person other than those set forth in Section 7.2(b)(i) above (including, for the avoidance of doubt, any other employee of the Purchaser or any Designated Purchaser or other Affiliate of the Purchaser) without the consent of CALA, such consent not to be unreasonably withheld;

(iii)    the Employee Information shall not be used except for the purposes of complying with the obligations of the Purchaser and the Designated

Purchasers pursuant to this Agreement and shall be returned to the Sellers or destroyed, at the Sellers' election, if this Agreement is terminated; and

        (iv)     the Purchaser shall, and shall cause the Designated Purchasers to, comply with such additional obligations as may be reasonably required in any particular jurisdiction to comply with any applicable data privacy Laws.

        (c)     As soon as practicable, but in no event later than thirty (30) days following the Closing Date, except to the extent prohibited by applicable data privacy Laws and subject to consent by such Employee in his or her written offer of employment, or as otherwise required by Law, the Sellers shall provide the Purchaser or the Designated Purchaser with (i) certain mutually agreed HR and Payroll SAP employee data as stored in the Sellers' SAP system with respect to each Transferred Employee and (ii) the Employee Records (or a copy thereof) of Transferred Employees in jurisdictions where required by applicable Law. The Purchaser and the Sellers shall cooperate with each other to provide for an orderly transition of the Transferred Employees from the Sellers to the Purchaser or the Designated Purchasers, as applicable, and to minimize the disruption to the respective businesses of the Parties resulting from the transactions contemplated hereby.

        (d)     During the Non-Solicitation Period, the Sellers shall not, without the advance written consent of Purchaser, either directly or indirectly solicit for employment or hire any Transferred Employee unless the employment of such Transferred Employee is involuntarily terminated without cause by the Purchaser or Designated Purchaser prior to such action by the Sellers; provided, however, that nothing in this Section 7.2(d) shall prevent the Sellers from (i) conducting generalized employment searches, including placing *bona fide* public advertisements, that are not specifically targeted at such Transferred Employees or (ii) hiring such Transferred Employees identified through such employment searches

        (e)     During the Non-Solicitation Period, Purchaser and the Designated Purchasers shall not, without the Seller's advance written consent or as expressly permitted by this Agreement, either directly or indirectly solicit for employment or hire (i) any of the employees of the Sellers, unless the employment of such employee (excluding any employee described in (ii) or (iii) below) is involuntarily terminated without cause by the Sellers prior to such action by the Purchaser or the Designated Purchasers, (ii) any Employees who have rejected the employment offer of Purchaser or Designated Purchasers or objected to their transfer of employment to Purchaser or Designated Purchasers pursuant to this Agreement or (iii) any Employees to whom the Purchaser or any Designated Purchaser have not made an employment offer or provided the opportunity for continued employment; provided, however, that nothing in this Section 7.2(e) shall prevent the Purchaser or the Designated Purchasers from (x) conducting generalized employment searches, including placing bona fide public advertisements, that are not specifically targeted at such employees or former employees of the Sellers or (y) hiring such employees or former employees of the Sellers identified through such employment searches; and, provided further that with respect to any Employee described in (ii) or (iii) above who becomes employed with the Purchaser or a Designated Purchaser other than through operation of Law during the Non-Solicitation Period, the Purchaser or the Designated Purchaser, as applicable, shall be required to reimburse the Sellers, if applicable, for any notice of termination

payment (including under the WARN Act) and/or severance payments, in either case, to the extent thereto timely paid, by Sellers to such Employee.

(f)      During the Non-Solicitation Period, neither Party shall, except as specifically set out in this Agreement or without the other Parties' written consent or as expressly permitted by this Agreement, either directly or indirectly solicit for employment or hire any of the employees with whom the Party has had personal contact, or who became known to the Party in the course of its negotiation of the transactions contemplated hereby; provided that nothing in this Section 7.2(f) shall restrict or preclude the Party, without such consent, from employing any employee Party who (x) contacts such Party directly at his or her own initiative without any direct or indirect solicitation by or encouragement from such party, (y) responds to a mass media solicitation or advertisement consistent with such Party's past practices, as applicable, that is not directed at  the employees, or (z) is contacted by a third party executive search firm or employment agency, so long the Party did not provide guidance as to such employee to the third party firm or agency.

Section 7.3.    Excluded Employee Liabilities.

Except for the Assumed Liabilities and except as otherwise specifically provided in the Loaned Employee Agreement, the Sellers shall retain, and none of the Purchaser or the Designated Purchasers shall assume or be deemed to have assumed, any Liabilities of the Sellers or their Affiliates relating to Employees other than the Assumed Liabilities (the "**Excluded Employee Liabilities**").  The Excluded Employee Liabilities shall include, but not be limited to, the following:

(a) the Sellers' or any of their Affiliates' obligations to contribute to, make payments with respect to or provide benefits under any Seller Employee Plan (including, for the avoidance of doubt, any arrangement that provides severance-type benefits) except with respect to the Transferred Employee Plans;

(b) any Liability with respect to the KERP or any other Seller retention plan, program or arrangement in effect as of the Closing Date that provides benefits to any Transferred Employee;

(c) any obligation to provide continuation coverage pursuant to COBRA under any Seller Employee Plan that is a "group health plan" (as defined in Section 5000(b)(1) of the Code) to the Transferred Employees and/or their qualified beneficiaries with respect to a COBRA qualifying event that occurs prior to such Employees' Employee Transfer Date;

(d) Liabilities resulting from any Action (i) with respect to any Employee relating to his/her employment or termination of employment with any of the Sellers, or (ii) with respect to an applicant with respect to potential employment with any of the Sellers in the Business; and

(e) any Liabilities relating to the Employees or any former employees employed in the Business by the Sellers (with respect only to such employee's employment with the Sellers), including payments or entitlements that Sellers or any of their Affiliates may owe or have promised to pay to any current or former Employee (whether or not becoming a Transferred Employee prior to or in connection with the Closing, (including any Employee who does not

55

accept an offer of employment with the Purchaser or a Designated Purchaser)), including wages, other remuneration, vacation, holiday, bonus, severance pay (statutory or otherwise), commission, post-employment medical or life obligations, pension contributions or benefits, Taxes, ERISA Affiliate Liability, any obligation, liability or expense relating to any employment agreement or contract, any former Collective Labor Agreement, the employment practices of Sellers or any of their Affiliates prior to the Closing Date and any other liability, payment or obligations related to current or former Employees, including any WARN Act Liabilities relating to actions of the Sellers arising on or prior to the Closing Date, any workers compensation, labor, social welfare or similar Law, if any, including any such Liabilities arising out of or resulting from the Closing and/or the consummation of the transactions contemplated by this Agreement, other than any Assumed Liabilities and other than with respect to liabilities incurred after the Closing Date under Purchaser Employee Plans by Transferred Employees who are terminated by Purchaser or a Designated Purchaser after the Closing Date.

Section 7.4.    <u>Sole Benefit of Sellers and Purchaser</u>.

The terms and provisions of this ARTICLE VII are for the sole benefit of the Sellers and the Purchaser. Nothing contained herein, express or implied (i) shall be construed to establish, amend, or modify any Seller Employee Plan, any Purchaser Employee Plan, or any other benefit plan, program, agreement or arrangement, (ii) shall alter or limit the ability of the Purchaser, the Sellers, or any of their respective Affiliates to amend, modify or terminate any Seller Employee Plan, any Purchaser Employee Plan (other than as provided in Section 7.4), or any other benefit or employment plan, program, agreement or arrangement after the Closing Date, (iii) is intended to confer or shall confer upon any current or former employee any right to employment or continued employment, or constitute or create an employment agreement with any Transferred Employees, or (iv) is intended to confer or shall confer upon any individual or any legal representative of any individual (including employees, retirees, or dependents or beneficiaries of employees or retirees and including collective bargaining agents or representatives) any right as a third-party beneficiary of this Agreement.

## ARTICLE VIII

## CONDITIONS TO THE CLOSING

Section 8.1.    <u>Conditions to Each Party's Obligation</u>.  The Parties' obligation to effect, and, as to the Purchaser, to cause the relevant Designated Purchasers to effect, the Closing is subject to the satisfaction or the express written waiver of the Primary Parties, at or prior to the Closing, of the following conditions:

(a) <u>No Injunctions or Restraints</u>.  There shall be in effect no Law, order, injunction, decree or judgment of any court or other Government Entity in the U.S. or Canada prohibiting the consummation of the transactions contemplated hereby and there shall not be any proceedings pending by any Government Entity in the U.S. or Canada seeking such prohibition.

(b) <u>U.S. Sale Order and Canadian Approval and Vesting Order</u>.  The U.S. Sale Order and the Canadian Approval and Vesting Order (i) shall have been entered in a form reasonably satisfactory to the Sellers and Purchaser and consistent herewith and (ii) shall have

become Final Orders, provided, that, this condition under Section 8.1(b)(ii) may be waived by the Purchaser in its sole discretion.

Section 8.2.    Conditions to Sellers' Obligation.  The Sellers' obligation to effect the Closing shall be subject to the fulfillment (or express written waiver by the Main Sellers), at or prior to the Closing, of each of the following conditions:

(a) No Breach of Representations and Warranties.

(i)    Each of the representations and warranties set forth in ARTICLE III (other than those referred to in clause (ii) below), disregarding all materiality and material adverse effect qualifications contained therein, shall be true and correct (x) as if restated on and as of the Closing Date or (y) if made as of a date specified therein, as of such date, except, in each case, for any failure to be true and correct that, individually or together with other such failures, has not had, and would not reasonably be expected to have, a material adverse effect on the ability of the Purchaser to consummate the transactions contemplated by this Agreement and the Ancillary Agreements.

(ii)    Each of the representations and warranties set forth in Sections 3.1, 3.2 and 3.3, disregarding all materiality and material adverse effect qualifications contained therein, shall be true and correct in all material respects (x) as if restated on and as of the Closing Date or (y) if made as of a date specified therein, as of such date.

(b) No Breach of Covenants.  The covenants, obligations and agreements contained in this Agreement to be performed or complied with by the Purchaser or the Designated Purchasers on or before the Closing shall not have been breached in any material respect.

Section 8.3.    Conditions to Purchaser's Obligation.  The Purchaser's obligation to effect, and to cause the relevant Designated Purchasers to effect, the Closing shall be subject to the fulfillment (or express written waiver by the Purchaser), at or prior to the Closing, of each of the following conditions:

(a) No Breach of Representations and Warranties.

(i)    Each of the representations and warranties set forth in ARTICLE IV (other than those referred to in clause (ii) below), disregarding all materiality and Material Adverse Effect qualifications contained therein, shall be true and correct (x) as if restated on and as of the Closing Date or (y) if made as of a date specified therein, as of such date, except, in each case, for any failure to be true and correct that has not had, and would not reasonably be expected to have, a Material Adverse Effect.

(ii)    Each of the representations and warranties set forth in Sections 4.1, 4.2, 4.6 and 4.9, disregarding all materiality and Material Adverse Effect qualifications contained therein, shall be true and correct in all material respects (x) as if restated on and as of the Closing Date or (y) if made as of a date specified therein, as of such date.

57

(b) <u>No Breach of Covenants</u>. The covenants, obligations and agreements contained in this Agreement to be performed or complied with by the Sellers on or before the Closing shall not have been breached in any material respect.

(c) <u>Certificates</u>. The Sellers shall have delivered to the Purchaser duly executed certificates as set forth in 2.3.2(c)(ii)

## ARTICLE IX

## TERMINATION

Section 9.1.    <u>Termination</u>. This Agreement may be terminated at any time prior to the Closing:

(a) by mutual written consent of the Primary Parties;

(b) by either the Main Sellers or the Purchaser, upon written notice to the other:

(i)    if the U.S. Sale Order and the Canadian Approval and Vesting Order are not entered within thirty (30) days after the signing hereof;

(ii)    if the Closing does not take place within one-hundred and eighty (180) days from the date of this Agreement.

(c) (i) by the Main Sellers in the event of a material breach by the Purchaser of the Purchaser's representations, warranties, agreements or covenants set forth in this Agreement, which breach would result in a failure to satisfy the conditions to Closing set forth in Sections 8.1(b), or 8.2 or (ii) by the Purchaser in the event of a material breach by the Sellers of the Sellers' representations, warranties, agreements or covenants set forth in this Agreement, which breach would result in a failure to satisfy the conditions to Closing set forth in Sections 8.1(b) or 8.3, as applicable, and, in each case in respect of (i) and (ii) above, which, if capable of being cured, is not cured within forty-five (45) days from receipt of a written notice from the non-breaching Party;

(d) by the Purchaser in the event the Sellers fail to consummate the Closing in breach of Section 2.3, within five (5) Business Days of written demand by the Purchaser to consummate the Closing; or

(e) by the Purchaser, if any of the Sellers withdraw or seek authority to withdraw the U.S. Sale Motion, or publicly announce any stand alone plan of reorganization or liquidation (or support any such plan filed by any other Person) in respect of the Business that seeks relief that is inconsistent with the U.S. Sale Motion;

<u>provided</u>, <u>however</u>, that the right to terminate this Agreement pursuant to Section 9.1(b)(i), Section 9.1(b)(ii), Section 9.1(c) and Section 9.1(d) shall not be available to any Party whose breach hereof has been the cause of, or has resulted in, the event or condition purportedly giving rise to a right to terminate this Agreement under such clauses.

Section 9.2.    Effects of Termination.  If this Agreement is terminated pursuant to Section 9.1:

(a)  all further obligations of the Parties under or pursuant to this Agreement shall terminate without further liability of any Party to the other except for the provisions of (i) Section 5.4 (Public Announcements), (ii) Section 5.7 (Transaction Expenses), (iii) Section 5.8 (Confidentiality), (iv) Section 7.2 (Other Employee Covenants), (v) Section 9.1 (Termination), (vi) Section 9.2 (Effects of Termination) and (vii) ARTICLE X (Miscellaneous); provided, that neither the termination of this Agreement nor anything in this Section 9.2 shall relieve any Party from liability for any breach of this Agreement occurring before the termination hereof and thereof;

(b)  except as required by applicable Law, the Purchaser shall promptly return to the Sellers or destroy all documents, work papers and other material of any of the Sellers relating to the transactions contemplated hereby, whether so obtained before or after the execution hereof; and

(c)  the provisions of the Confidentiality Agreement shall continue in full force and effect.

## ARTICLE X

## MISCELLANEOUS

Section 10.1.  No Survival of Representations and Warranties or Covenants.  No representations or warranties, covenants or agreements in this Agreement or in any instrument delivered pursuant to this Agreement shall survive beyond the Closing Date, except for covenants and agreements that by their terms are to be satisfied after the Closing Date, which covenants and agreements shall survive until satisfied in accordance with their terms.

Section 10.2.  Remedies.  No failure to exercise nor any delay in exercising, on the part of any Party, any right or remedy under this Agreement or the documents referred to in this Agreement shall operate as a waiver thereof, nor shall any single or partial exercise of any right or remedy prevent any further or other exercise thereof or the exercise of any other right or remedy.  To the maximum extent permitted by applicable Law: (i) no waiver that may be given by a Party hereto shall be applicable except in the specific instance for which it is given; and (ii) no notice to or demand on one Party shall be deemed to be a waiver of any right of the party giving such notice or demand to take further action without notice or demand.  The rights and remedies provided in this Agreement are cumulative and not exclusive of any rights or remedies provided by Law.

Section 10.3.  No Third Party Beneficiaries.  This Agreement is for the sole benefit of the Parties and their permitted assigns and nothing herein, express or implied, is intended to or shall confer upon any other Person any legal or equitable right, benefit or remedy of any nature whatsoever under or by reason of this Agreement.

Section 10.4.  Consent to Amendments; Waivers.  No Party shall be deemed to have waived any provision of this Agreement or any of the other Transaction Documents unless such

waiver is in writing, and then such waiver shall be limited to the circumstances set forth in such written waiver. This Agreement and the Ancillary Agreements shall not be amended, altered or qualified except by an instrument in writing signed by all the parties hereto or thereto, as the case may be.

Section 10.5. <u>Successors and Assigns</u>. Except as otherwise expressly provided in this Agreement, all representations, warranties, covenants and agreements set forth in this Agreement or any of the Ancillary Agreements by or on behalf of the parties hereto or thereto will be binding upon and inure to the benefit of such parties and their respective successors and permitted assigns. Neither this Agreement nor any of the rights, interests or obligations hereunder may be assigned by any Party without the prior written consent of the Main Sellers in case of an assignment by Purchaser or Purchaser in case of an assignment by any Seller, which consent may be withheld in such party's sole discretion, except for the following assignment which shall not require consent (i) assignment to an Affiliate of a Party (provided (A) that except as otherwise provided in Section 2.4, such Party remains liable jointly and severally with its assignee Affiliate for the assigned obligations to the other Parties and (B) any such assignment by Purchaser complies with Section 2.4 if applicable), (ii) assignment by NNI to a succeeding entity following such entity's emergence from Chapter 11, (iii) assignment by CALA to a succeeding entity following such entity's emergence from Chapter 11, and (iv) assignment by NNL pursuant to any plan of arrangement approved by the Canadian Court, which will not require the consent of the Purchaser.

Section 10.6. <u>Governing Law; Submission to Jurisdiction; Waiver of Jury Trial</u>.

(a) Any questions, claims, disputes, remedies or Actions arising from or related to this Agreement, and any relief or remedies sought by any Parties, shall be governed exclusively by the laws of the State of New York applicable to contracts made and to be performed in that State and without regard to the rules of conflict of laws of any other jurisdiction.

(b) To the fullest extent permitted by applicable Law, each Party: (i) agrees that any claim, action, proceeding by such Party seeking any relief whatsoever arising out of, or in connection with, this Agreement, or the transactions contemplated hereby shall be brought only in (a) either the U.S. Bankruptcy Court, if brought prior to the entry of a final decree closing the Chapter 11 Cases, or the Canadian Court, if brought prior to the termination of the CCAA Cases, <u>provided</u> that if (X) a final decree closing the Chapter 11 Cases has not been entered and (Y) the CCAA Cases have not terminated, the U.S. Debtors or NNL may, in accordance with the Cross-Border Protocol, move the U.S. Bankruptcy Court or the Canadian Court, as case may be, to hold a joint hearing of the U.S. Bankruptcy Court and the Canadian Court to determine the appropriate jurisdiction for such claim, action or proceeding, and (b) in the Federal Courts in the Southern District of New York and the state courts of the State of New York, County of New York, located in Manhattan (collectively, the "**New York Courts**") and the Canadian Court, if brought after entry of a final decree closing the Chapter 11 Cases and termination of the CCAA Cases, and shall not be brought, in each case, in any other court in the United States of America, Canada or any court in any other country; (ii) agrees to submit to the jurisdiction of the U.S. Bankruptcy Court, the Canadian Court, and the New York Courts, as applicable, pursuant to the preceding clauses (a) and (b) for purposes of all legal proceedings arising out of, or in connection with, this Agreement or the transactions contemplated hereby; (iii) waives and agrees not to

assert any objection that it may now or hereafter have to the laying of the venue of such Action brought in any such court or any claim that any such Action brought in such court has been brought in an inconvenient forum; (iv) agrees that the mailing of process or other papers in connection with any such Action or proceeding in the manner provided in Section 10.7 or any other manner as may be permitted by Law shall be valid and sufficient service thereof; and (v) agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in any other jurisdictions by suit on the judgment or in any other manner provided by applicable Law.

(c) EACH PARTY HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION DIRECTLY OR INDIRECTLY ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS AGREEMENT, ANY ANCILLARY AGREEMENT OR ANY TRANSACTION CONTEMPLATED HEREBY OR THEREBY. EACH PARTY (I) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (II) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT AND THE ANCILLARY AGREEMENTS, AS APPLICABLE, BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION 10.6.

Section 10.7.  Notices.  All demands, notices, communications and reports provided for in this Agreement shall be in writing and shall be either sent by facsimile transmission with confirmation to the number specified below or personally delivered or sent by reputable overnight courier service (delivery charges prepaid) to any Party at the address specified below, or at such address, to the attention of such other Person, and with such other copy, as the recipient Party has specified by prior written notice to the sending Party pursuant to the provisions of this Section 10.7.

If to the Purchaser to:

Telefonaktiebolaget L M Ericsson (PUBL)
Torshamnsgatan 23
Kista
Stockholm
Sweden
Attention:  Per Oscarsson
Attention:  Carl Olof Blomqvist
Facsimile:  +46-8-18-4085

With copies (that shall not constitute notice) to:

Paul, Weiss, Rifkind, Wharton & Garrison LLP
1285 Avenue of the Americas
New York New York, USA 10019-6064

61

Attention:  Stephen J. Shimshak
Attention:  Marilyn Sobel
Facsimile:  +1-212-373-3990

If to the Main Sellers or the Sellers, to:

Nortel Networks Limited
195 The West Mall Mailstop:  T0503006
Toronto, Ontario, Canada  M9C 5K1
Attention:  Anna Ventresca
            Chief Legal Officer & Corporate Secretary
Facsimile:  +1-905-863-7386

Nortel Networks (CALA) Inc.
Legal Department
220 Athens Way, Suite 300
Nashville, Tennessee, USA  37228
Attention:      Lynn C. Egan
                Secretary
Facsimile:      +1-615-432-4413

With copies (that shall not constitute notice) to:

Nortel Networks (CALA) Inc.
5270 Sycamore Avenue
Bronx, New York 10471
Attention:      Robert Fishman
                Senior Counsel


and

Cleary Gottlieb Steen & Hamilton LLP
One Liberty Plaza
New York, New York, USA 10006
Attention:      Lisa Schweitzer
Facsimile:      +1-212-225-3999

Ogilvy Renault LLP
200 Bay Street
Suite 3800, P.O. Box 84
Royal Bank Plaza, South Tower
Toronto, Ontario M5J 2Z4
Canada
Attention: Michael J. Lang
Facsimile: + 1-416-216-3930

62

Any such demand, notice, communication or report shall be deemed to have been given pursuant to this Agreement when delivered personally, when confirmed if by facsimile transmission, or on the second calendar day after deposit with a reputable overnight courier service, as applicable.

Section 10.8.    Exhibits; Sellers Disclosure Schedule.

(a)  The Sellers Disclosure Schedule and the Exhibits attached hereto constitute a part of this Agreement and are incorporated into this Agreement for all purposes as if fully set forth herein.

(b)  For purposes of the representations and warranties of the Sellers contained in this Agreement, disclosure in any section of the Sellers Disclosure Schedule of any facts or circumstances shall be deemed to be adequate response and disclosure of such facts or circumstances with respect to all representations or warranties by the Sellers calling for disclosure of such information, whether or not such disclosure is specifically associated with or purports to respond to one or more of such representations or warranties, if it is reasonably apparent from the Sellers Disclosure Schedule that such disclosure is applicable. The inclusion of any information in any section of the Sellers Disclosure Schedule or other document delivered by the Sellers pursuant to this Agreement shall not be deemed to be an admission or evidence of the materiality of such item, nor shall it establish a standard of materiality for any purpose whatsoever.

Section 10.9.    Counterparts.  The Parties may execute this Agreement in two or more counterparts (no one of which need contain the signatures of all Parties), each of which will be an original and all of which together will constitute one and the same instrument. Delivery of an executed counterpart of a signature page to this Agreement by facsimile or other electronic means shall be effective as delivery of a manually executed counterpart of this Agreement.

Section 10.10. No Presumption.  The Parties agree that this Agreement was negotiated fairly between them at arm's length and that the final terms of this Agreement are the product of the Parties' negotiations. Each Party represents and warrants that it has sought and received experienced legal counsel of its own choosing with regard to the contents of this Agreement and the rights and obligations affected hereby. The Parties agree that this Agreement shall be deemed to have been jointly and equally drafted by them, and that the provisions of this Agreement therefore should not be construed against a Party on the grounds that such Party drafted or was more responsible for drafting the provisions.

Section 10.11. Severability.  If any provision, clause, or part of this Agreement, or the application thereof under certain circumstances, is held invalid, illegal or incapable of being enforced in any jurisdiction, (i) as to such jurisdiction, the remainder of this Agreement or the application of such provision, clause or part under other circumstances, and (ii) as for any other jurisdiction, all provisions of this Agreement, shall not be affected and shall remain in full force and effect, unless, in each case, such invalidity, illegality or unenforceability in such jurisdiction materially impairs the ability of the Parties to consummate the transactions contemplated by this Agreement. Upon such determination that any clause or other provision is invalid, illegal or incapable of being enforced in such jurisdiction, the Parties shall negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties as closely as possible in a

63

mutually acceptable manner in order that the transactions contemplated hereby be consummated as originally contemplated to the greatest extent possible even in such jurisdiction.

Section 10.12. <u>Headings</u>. The headings used in this Agreement are for the purpose of reference only and shall not affect the meaning or interpretation of any provision of this Agreement.

Section 10.13. <u>Entire Agreement</u>. This Agreement, the other Transaction Documents and the Confidentiality Agreement set forth the entire understanding of the Parties relating to the subject matter thereof, and all prior or contemporaneous understandings, agreements, representations and warranties, whether written or oral, are superseded by this Agreement, the other Transaction Documents and the Confidentiality Agreement, and all such prior or contemporaneous understandings, agreements, representations and warranties are hereby terminated. In the event of any irreconcilable conflict between this Agreement and any of the other Transaction Documents or the Confidentiality Agreement, the provisions of this Agreement shall prevail, regardless of the fact that certain other Transaction Documents, such as the Local Sale Agreement, may be subject to different governing Laws.

Section 10.14. <u>Availability of Equitable Relief</u>. The Parties agree that irreparable damage would occur in the event that any of the provisions of this Agreement were not performed in accordance with their specific terms or were otherwise breached. Accordingly, subject to the limitations set forth in this Section 10.14, each of the Parties shall be entitled to equitable relief to prevent or remedy breaches of this Agreement, without the proof of actual damages, including in the form of an injunction or injunctions or orders for specific performance in respect of such breaches. Each Party agrees to waive any requirement for the security or posting of any bond in connection with any such equitable remedy. Each Party further agrees that the only permitted objection that it may raise in response to any action for equitable relief is that it contests the existence of a breach or threatened breach of the provisions of this Agreement. It is acknowledged and agreed that under no circumstances shall any Party be liable for punitive damages or indirect, special, incidental, or consequential damages arising out of or in connection with this Agreement or the transactions contemplated hereby or any breach or alleged breach of any of the terms hereof, including damages alleged as a result of tortious conduct.

Section 10.15. <u>Bulk Sales Laws</u>. Subject to the entry of the U.S. Sale Order and the Canadian Approval and Vesting Order, each Party waives compliance by the other Party with any applicable bulk sales Law.

Section 10.16. <u>Main Sellers as Representative of Other Sellers</u>.

(a) For all purposes of this Agreement:

(i)    each Other Seller listed in Section 10.16(a) of the Sellers Disclosure Schedule hereby irrevocably appoints CALA as its representative; and

(ii)    each Other Seller listed in Section 10.16(a)(ii) of the Sellers Disclosure Schedule hereby irrevocably appoints NNL as its representative.

64

(b) Pursuant to Section 10.16(a), each of CALA and NNL shall expressly have the power to, in the name and on behalf of each Other Seller, (i) take all decisions and carry out any actions required or desirable in connection with this Agreement, (ii) send and receive all notices and other communications required or permitted hereby, and (iii) consent to any amendment, waivers and modifications hereof.

(c) For the purposes of this Agreement, "**Respective Affiliates**" means: (i) with respect to CALA, each Other Seller listed in Section 10.16(a)(i) of the Sellers Disclosure Schedule and (ii) with respect to NNL, each Other Seller listed in Section 10.16(a)(ii) of the Sellers Disclosure Schedule.

(d) Each Respective Affiliate shall indemnify the Main Seller that acts as representative of such Respective Affiliate for, and hold it harmless against, any loss, liability or expense, including reasonable attorneys' fees, incurred by such Main Seller without gross negligence, bad faith or willful misconduct, for serving in the capacity of representative of such Respective Affiliate hereunder.

Section 10.17. <u>Execution by Other Sellers</u>. The Purchaser hereby acknowledges that the Other Sellers are not executing this Agreement as of the date hereof. This Agreement shall be binding on all parties that have executed this Agreement from the time of such execution, regardless of whether all Sellers have done so. Between the date hereof and the Closing Date, the Main Sellers hereby agree that it shall cause each Other Seller to execute a counterpart to this Agreement no later than the day prior to the Closing Date, agreeing to be bound as a Seller under this Agreement and authorizing CALA or NNL, as applicable, to act as its representative under Section 10.16 hereof.

**[Remainder of this page intentionally left blank.  Signature page follows.]**

65

IN WITNESS WHEREOF, the Parties have duly executed this Asset Sale Agreement as of the date first written above.

Telefonaktiebolaget L M Ericsson (publ)

By: _____
    Name: Per Oscarsson
    Title: Global Head of Mergers & Acquisitions

By: _____
    Name: Martin Backman
    Title: Group Legal Counsel

Nortel Networks Limited

By: _____
    Name:
    Title:

By: _____
    Name:
    Title:

Nortel Networks (CALA) Inc.

By: _____
    Name:
    Title:

[ASA Signature Page]

IN WITNESS WHEREOF, the Parties have duly executed this Asset Sale Agreement as of the date first written above.

**Telefonaktiebolaget L M Ericsson (publ)**

By: _____
    Name:
    Title:

By: _____
    Name:
    Title:

**Nortel Networks Limited**

By: _____
    Name: John Doolittle
    Title:  Senior Vice-President, Corporate
    Services and Chief Financial Officer

By: _____
    Name: Clarke Glaspell
    Title:  Controller

**Nortel Networks (CALA) Inc.**

By: _____
    Name: Christopher Ricaurte
    Title:  President and Controller

By: _____
    Name: Lynn Egan
    Title:  Secretary

[ASA Signature Page]

IN WITNESS WHEREOF, the Parties have duly executed this Asset Sale Agreement as of the date first written above.

**Telefonaktiebolaget L M Ericsson (publ)**

By: _____
    Name:
    Title:

By: _____
    Name:
    Title:

**Nortel Networks Limited**

By: _____
    Name: John Doolittle
    Title:  Senior Vice-President, Corporate
    Services and Chief Financial Officer

By: _____
    Name: Clarke Glaspell
    Title:  Controller

**Nortel Networks (CALA) Inc.**

By: _____
    Name: Christopher Ricaurte
    Title:  President and Controller

By: _____
    Name: Lynn Egan
    Title:  Secretary

[ASA Signature Page]

IN WITNESS WHEREOF, the Parties have duly executed this Asset Sale Agreement as of the date first written above.

Nortel Networks Inc.

By: _____
    Name:  Anna Ventresca
    Title:    Chief Legal Officer

[Asset Sale Agreement Signature Page]

APPENDIX "B"

[CONFIDENTIAL]

Court File No: 09-CL-7950

IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL NETWORKS CORPORATION *et al.*

*ONTARIO*
**SUPERIOR COURT OF JUSTICE**
**(COMMERCIAL LIST)**

Proceeding commenced at Toronto

**FORTY-FIFTH REPORT OF THE MONITOR**
**DATED MAY 14, 2010**

**GOODMANS LLP**
Barristers & Solicitors
Bay Adelaide Centre
333 Bay Street, Suite 3400
Toronto, ON  M5H 2S7

Jay A. Carfagnini (LSUC#: 222936)
Joseph Pasquariello (LSUC# 37389C)
Christopher G. Armstrong (LSUC# 55148B)

Tel: 416.979.2211
Fax: 416.979.1234

Lawyers for the Monitor, Ernst & Young Inc.

\5847686