## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

-------------------------------------------------------X
                          :

*In re*                              :

Nortel Networks Inc., *et al.*, [1]    :

               Debtors.     :

                          :

                          :
-------------------------------------------------------X

Chapter 11

Case No. 09-10138 (KG)

Jointly Administered

## DECLARATION OF CHRIS PACZYNSKI IN
## SUPPORT OF DEBTORS' MOTION FOR ENTRY OF AN ORDER
## ENFORCING THE AUTOMATIC STAY AGAINST CERTAIN AFFILIATES OF
## VERIZON COMMUNICATIONS INC.

I, Chris Paczynski, do hereby declare as follows:

1.      I am the Global Customer Credit Manager for Nortel Networks Corporation and

its affiliates and subsidiaries (collectively, "Nortel"), a position that I have held since January

2010. I have served in various capacities in the Nortel Global Credit Management Group for

approximately four years. In my current position, I am responsible for managing Nortel's global

legacy accounts receivable portfolio from a customer credit perspective. I also provide credit

management services to the various purchasers of Nortel's former business units, as specified

under the service agreements particular to each transaction. Except as otherwise noted, all facts

---

[1]      The debtors in these chapter 11 cases, along with the last four digits of each Debtor's tax identification number, are: Nortel Networks Inc. (6332), Nortel Networks Capital Corporation (9620), Nortel Altsystems Inc. (9769), Nortel Altsystems International Inc. (5596), Xros, Inc. (4181), Sonoma Systems (2073), Qtera Corporation (0251), CoreTek, Inc. (5722), Nortel Networks Applications Management Solutions Inc. (2846), Nortel Networks Optical Components Inc. (3545), Nortel Networks HPOCS Inc. (3546), Architel Systems (U.S.) Corporation (3826), Nortel Networks International Inc. (0358), Northern Telecom International Inc. (6286), Nortel Networks Cable Solutions Inc. (0567) and Nortel Networks (CALA) Inc. (4226), (collectively the "Debtors"). Addresses for the Debtors can be found in the Debtors' petitions, which are available at http://dm.epiq11.com/nortel.

set forth in this Declaration are based upon my personal knowledge or information that I learned

from reviewing relevant documents. If I were called upon to testify, I could and would testify

competently to the facts set forth herein.

2.      I submit this Declaration in support of the Debtors' Motion for Entry of an Order

Enforcing the Automatic Stay against Certain Affiliates of Verizon Communications Inc. (the

"Motion"), [2] including Verizon Business Purchasing LLC ("VBP"), Verizon Select Services Inc.

("VSSI"), Verizon Network Integration Corp. ("VNI"), and Verizon Service Corp. ("VSC" and

together with the other Verizon entities, "Verizon").

## Verizon Withholds Payment of Amounts Due to NNI

3.      Nortel regularly sells a wide variety of telecommunications products and services

to Verizon, both for Verizon's own use and for resale by Verizon. The payment terms for these

sales vary by transaction. If the transaction is for a sale of merchandise, Nortel generally sends

an invoice to Verizon along with the merchandise sold. If the transaction is for services, a

separate contract usually governs how and when Nortel sends invoices to Verizon. For both

types of transactions, Verizon generally delivers payment to Nortel via wire transfer. Payment

deadlines are particular to each transaction.

4.      From my review of Nortel's records kept in the normal course of business, I

understand that on or about January 20, 2009, Verizon informed Nortel's North American

Accounts Receivable department that, at the direction of Verizon's attorneys, a hold had been

placed on payments due and owing from Verizon Wireless Network Procurement LP ("VWNP")

to Nortel Networks Inc. ("NNI"). At the time, the outstanding amount owed by VWNP to NNI

was in excess of $137,000,000, of which more than $72,000,000 was past due.

---

[2]      Capitalized terms not defined herein have the same meanings as in the Motion.

2

5.     I understand that on February 5, 2009, the Court entered an order in NNI's bankruptcy proceedings concerning NNI's pre-bankruptcy obligations to its customers.  During the first week of February 2009, VWNP ceased the withholding and resumed making payments to NNI in the normal course of business.

6.     Between February of 2009 and March of 2010, Verizon continued to make payments to NNI on invoices Verizon received from NNI in the normal course of business.

**Certain Verizon Affiliates Again Withhold Payment of Amounts Due to NNI**

7.     On April 21, 2010, I received an email from my manager, Michael Doty, informing me that VSSI and VBP had failed to pay Nortel invoices (the "Doty Email").  The email forwarded correspondence between employees in Nortel's accounts receivable department and Verizon's accounts payable department beginning April 19, 2010 regarding that failure to pay.  In his email, Mr. Doty asked me to explore the reason for the withholding of payment by certain Verizon affiliates.  Attached hereto as **Exhibit A** is a true and correct copy of the Doty Email, including a chain of email correspondences that was forwarded as part of the email.

8.     Based on the forwarded correspondence, as well as my review of Nortel's records kept in the normal course of business, I discovered that no wire transfers of amounts due and owing to NNI had been received from VBP since March 31, 2010, from VSSI since April 6, 2010, from VNI since March 4, 2010, or from VSC since February 16, 2010.  I also learned from the forwarded correspondence that a Verizon employee, Vicki Marvin, had stated to a Nortel employee, Jaya Das, that "Nortel invoices are not paying due to Verizon's attorneys request. Invoices are on hold."  I further learned that Louis H. Parras, a Verizon employee, had indicated in an email to Ms. Das that questions concerning the withholding of payment should be directed to Bill Cummings, another Verizon employee.

9.    The next day, April 22, 2010, I had a telephone conversation with Mr. Cummings. To my knowledge, no other person participated in that conversation.

10.    During our telephone conversation, Mr. Cummings confirmed my understanding that Verizon was deliberately withholding payments due and owing to Nortel by certain Verizon affiliates. He stated that the reason for the withholding was Nortel's failure to resolve two disputed pre-bankruptcy matters included in a proof of claim Verizon had filed against NNI in NNI's bankruptcy proceedings. Attached hereto as **Exhibit B** is a true and correct copy of the proof of claim filed by "the Affiliates of Verizon Communications Inc." against NNI on September 30, 2009 (the "Proof of Claim"), together with its attachment.

11.    Mr. Cummings described the first matter in the Proof of Claim as a claim for products sold and services rendered by various Verizon affiliates to NNI in the amount of approximately $500,000. He described the second matter in the Proof of Claim as a telecommunications project on which NNI and Verizon had collaborated for the benefit of a Verizon customer, Hewitt Associates LLC. He did not state the amount Verizon sought to recover from NNI with regard to the second matter. Mr. Cummings further advised me that Verizon was withholding payment on invoices currently due and owing to NNI in order to set off those amounts against the amounts Verizon sought to recover from NNI in the Proof of Claim.

12.    From reviewing the Proof of Claim, I understand that the products and services Verizon sold to NNI to which Mr. Cummings referred were sold by several different Verizon entities, including MCI Communications Services Inc., MCI International Inc., Verizon California Inc., Verizon Delaware Inc., Verizon Florida LLC, Verizon Maryland Inc., Verizon New England Inc., Verison New Jersey Inc., Verizon New York Inc., Verizon North Inc., Verizon Northwest Inc., Verizon Pennsylvania Inc., Verizon South Inc., Verizon Virginia Inc.,

4

and Cellco Partnership d/b/a Verizon Wireless.  Also from reviewing the Proof of Claim, I understand that the telecommunications project to which Mr. Cummings referred relates to a Nortel switch that VSSI had purchased from NNI.

13.    Mr. Cummings then stated that since we had now discussed the disputed matters, he would instruct Verizon's accounts payable department to release some of the payments due and owing to NNI from Verizon.  Based on my conversation with Mr. Cummings, however, I understood that Verizon would continue to withhold payment in an aggregate amount at least in excess of the amount of the first part of its claim, approximately $500,000.  Mr. Cummings did not identify the precise amount of payment Verizon intended to withhold.

### Subsequent Contact with Mr. Cummings

14.    On May 17, 2010, I had another phone conversation with Mr. Cummings.  To my knowledge, no other person participated in that telephone call.

15.    During our conversation, we discussed the total amount of payment subject to withholding by certain Verizon entities.  When I stated that I understood the total amount to be in excess of $8 million, Mr. Cummings expressed surprise.  He stated that he would be willing to send over a list of the invoices on which Verizon is withholding payment, provided that I agree that the information would be kept confidential and subject to a "settlement privilege."  He also asked me to send to him a list of the invoices for which Nortel believes Verizon has withheld payment.

16.    With regard to the Trade Claims, Mr. Cummings stated that he thought discussions between business people could result in resolution of the claims.  I stated that Nortel had prepared a spreadsheet showing Nortel's position on the Trade Claims.  Mr. Cummings asked me whether I could provide this spreadsheet to him, and I told him I would consider it.

5

17.     With regard to the VSSI Switch Claim, I stated to Mr. Cummings that my understanding was that Hewitt's main complaint arose from a problem in Verizon's network rather than Nortel's hardware, and that testing had confirmed this problem in Verizon's network. Mr. Cummings expressed surprise, and said that he would be interested in seeing the test results. I told Mr. Cummings I would consult internally on the testing issue and get back to him.

18.     During our conversation, Mr. Cummings also stated that he would send me an email confirming our discussion and requesting written confirmation that I would agree to exchange information with him on a confidential basis.

19.     The next day, on May 18, 2010, Mr. Cummings sent me a follow-up email. While the email confirmed Mr. Cummings' request for invoices and the spreadsheet, it also included a substantial amount of legal subject matter, referring, for instance, to the payments being withheld "pending resolution of [Verizon's] setoff rights as ordered by the court last year and also a resolution of the problems involved in a Hewitt Associates' joint project, between our companies." It further included a statement in bold for my acceptance stating that I should "**agree to accept** [copies of invoices on which Verizon was withholding payment] **under settlement discussion privilege**." Attached hereto as **Exhibit C** is a true and correct copy of Mr. Cummings' email dated May 18, 2010.

20.     I responded to Mr. Cummings' email the next day, May 19, 2010. I expressed surprise at the legal nature of Mr. Cummings' email, but indicated that I nevertheless wished to continue discussions with him. I attached to my email a list of invoices on which I understood Verizon entities to be withholding payment and asked Mr. Cummings to confirm whether this was accurate. I also attached the spreadsheet I had mentioned to Mr. Cummings during our phone conversation, which sets forth Nortel's position on the Trade Claims. Finally, I stated that

6

with regard to the testing done for the Hewitt project, my understanding was that Verizon itself had performed the tests that uncovered the problem causing Hewitt's main complaint, and suggested that Mr. Cummings obtain the records from the Verizon business people who worked on the Hewitt project. Attached hereto as **Exhibit D** is a true and correct copy of my email to Mr. Cummings dated May 19, 2010, together with its attachments.

21.     I understand that NNI's legal counsel sent an email to counsel for Verizon on May 20, 2010, demanding that the withheld payments be released and wired to NNI for receipt by 3:00 p.m. on May 21, 2010, and informing Verizon's counsel that if Verizon failed to release the withheld payments, NNI would take legal action regarding Verizon's withholding of payments. Attached hereto as **Exhibit E** is what I understand to be a true and correct copy of that email.

22.     On the morning of May 21, 2010, I received an email from Mr. Cummings that he had sent to me the previous evening.  While Mr. Cummings stated in his email that he would review the attachments I had sent to him and would get back to me as soon as possible, he said nothing about Verizon's withholding of payment.  In response, I sent an email to Mr. Cummings alerting him to the fact that Nortel's attorneys had demanded the release of the funds Verizon was withholding by 3:00 p.m. on May 21, 2010, and that Nortel's attorneys planned to take legal action that day if the funds were not released by that time. Attached hereto as **Exhibit F** is a true and correct copy of Mr. Cummings' email dated May 20, 2010. Attached hereto as **Exhibit G** is a true and correct copy of my response email dated May 21, 2010.

23.     I understand that at 2:48 p.m. on May 21, 2010, Verizon's legal counsel sent an email to counsel for NNI in response to NNI's counsel's email of May 20, 2010.  In the email, Verizon's counsel made no commitment to release the funds Verizon was withholding from

7

NNI. I also understand that in response, NNI's counsel sent an email to Verizon's counsel later

that day, in which NNI's counsel expressed a willingness to discuss consensual resolution of the

issues, but further stated that he was willing to have this Court decide the issues that NNI and

Verizon are unable to resolve consensually. Attached hereto as Exhibit H is what I understand to

be a true and correct copy of Verizon's legal counsel's email of May 21, 2010. Attached hereto

as Exhibit I is what I understand to be a true and correct copy of NNI's legal counsel's response

to that email.

### Amounts Withheld By VBP, VSSI, VNI, and VSC

24.     As of the May 20, 2010 date of an aging report prepared by Nortel's North

American Accounts Receivable department regarding invoices sent by NNI to VBP (the "VBP

Aging Report"), VBP is withholding a total of $9,229,985.72 from NNI, which amount consists

of the aggregate of the amounts listed in 132 undisputed invoices issued by NNI to VBP for the

goods delivered and/or services rendered after Nortel's bankruptcy filing. The payment due date

for $6,040,651.43 of the total amount billed has passed, and accordingly, as of the date of the

VBP Aging Report, $6,040,651.43 is past due and owing from VBP to NNI. Attached hereto as

**Exhibit J** is a true and correct copy of the VBP Aging Report, which identifies these invoices,

all of which are undisputed, and all of which were issued after January 14, 2009.[3] None of these

invoices were due at the time of Nortel's bankruptcy filing. Attached hereto as **Exhibit K** are

---

[3]     The VBP Aging Report also identifies the $63,291.53 aggregate amount billed by NNI to VBP in old
invoices for which VBP has not sent a formal notice of dispute to Nortel, but for which Nortel believes a dispute
may exist because of the length of time that has elapsed since payment became due on these invoices. The Report
further identifies $279,460.51 in "customer credits" available to VBP to apply as payment towards an invoice in lieu
of cash, which VBP has not yet employed. For simplicity's sake, the $9,229,985.72 withholding figure does not
include these items and simply represents the aggregate of the amounts billed to VBP by NNI in outstanding,
unpaid, undisputed invoices.

true and correct copies of two such NNI invoices to VBP, which are representative of all of the
invoices on which VBP is withholding payment.

25.    As of the May 20, 2010 date of an aging report prepared by Nortel's North
American Accounts Receivable department regarding invoices sent by NNI to VSSI (the "VSSI
Aging Report"), VSSI is withholding a total of $614,233.50 from NNI, which amount consists of
the aggregate of the amounts listed in 27 undisputed invoices issued by NNI to VSSI for the
goods delivered and/or services rendered after Nortel's bankruptcy filing.  The payment due date
for $600,647.02 of the total amount billed has passed, and accordingly, as of the date of the VSSI
Aging Report, $600,647.02 is past due and owing from VSSI to NNI.  Attached hereto as
**Exhibit L** is a true and correct copy of the VSSI Aging Report, which identifies these invoices,
all of which are undisputed, and all of which were issued after January 14, 2009.[4]  None of these
invoices were due at the time of Nortel's bankruptcy filing.  Attached hereto as **Exhibit M** are
true and correct copies of two such NNI invoices to VSSI, which are representative of all of the
invoices on which VSSI is withholding payment.

26.    As of the May 20, 2010 date of an aging report prepared by Nortel's North
American Accounts Receivable department regarding invoices sent by NNI to VNI (the "VNI
Aging Report"), VNI has failed to pay $153,405.49 due and owing to NNI.  This amount consists
of the total of one unpaid, overdue invoice from NNI to VNI for the goods delivered and/or
services rendered after Nortel's bankruptcy filing.  Attached hereto as **Exhibit N** is a true and

---

[4]    Like the VBP Aging Report, the VSSI Aging report also identifies an aggregate amount billed by NNI to
VSSI in old invoices for which VSSI has not sent a formal notice of dispute to Nortel, but for which Nortel believes
a dispute may exist because of the length of time that has elapsed since payment became due on these invoices.  This
amount is $12,759.  The Report further identifies $97,640.11 in "customer credits" available to VSSI to apply as
payment towards an invoice in lieu of cash, which VSSI has not yet employed.  For simplicity's sake, the
$614,233.50 withholding figure does not include these items and simply represents the aggregate of the amounts
billed to VSSI by NNI in outstanding, unpaid, undisputed invoices.

correct copy of the VNI Aging Report, which identifies this invoice, which is undisputed, and which was issued after January 14, 2009. It was not due at the time of Nortel's bankruptcy filing. Attached hereto as **Exhibit O** is a true and correct copy of the unpaid, overdue NNI invoice to VNI on which VNI is withholding payment.

27.    As of the May 20, 2010 date of an aging report prepared by Nortel's North American Accounts Receivable department regarding invoices sent by NNI to VSC (the "VSC Aging Report"), VSC is withholding a total of $381,459.90 from NNI, which amount consists of the aggregate of the amounts listed in 4 undisputed invoices issued by NNI to VSC for the goods delivered and/or services rendered after Nortel's bankruptcy filing. The payment due date for $334,428.90 of the total amount billed has passed, and accordingly, as of the date of the VSC Aging Report, $334,428.90 is past due and owing from VSC to NNI. Attached hereto as **Exhibit P** is a true and correct copy of the VSC Aging Report, which identifies these invoices, all of which are undisputed, and all of which were issued after January 14, 2009. None of these invoices were due at the time of Nortel's bankruptcy filing. Attached hereto as **Exhibit Q** are true and correct copies of two such NNI invoices to VSC, which are representative of all of the unpaid, overdue VSC invoices on which VSC is withholding payment.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on May 21, 2010

Chris Paczynski