# EXHIBIT A

## FORM OF CVAS SIDE AGREEMENT

This CVAS SIDE AGREEMENT (the "**Agreement**") is dated as of May [•], 2010, among (i) Nortel Networks Corporation, a corporation organized under the laws of Canada ("**NNC**"); (ii) Nortel Networks Limited, a corporation organized under the laws of Canada ("**NNL**" and, together with NNC, the "**Canadian Main Sellers**"); (iii) Nortel Networks Inc., a corporation organized under the laws of Delaware ("**NNI**" and, together with the Canadian Main Sellers, the "**Main Sellers**"); (iv) the affiliates of the Main Sellers listed in Schedule A hereto (the "**Other Sellers**" and, together with the Main Sellers, the "**Sellers**"); (v) the entities listed on Schedule B hereto (the "**EMEA Sellers**"), which in the case of the EMEA Debtors are acting by their joint administrators Alan Robert Bloom, Stephen John Harris, Alan Michael Hudson and Christopher John Wilkinson Hill of Ernst & Young LLP of 1 More London Place, London SE1 2AF (other than Nortel Networks (Ireland) Limited (in administration), for which David Hughes of Ernst & Young Chartered Accountants of Harcourt Centre, Harcourt Street, Dublin 2, Ireland and Alan Robert Bloom serve as joint administrators) (collectively, the "**Joint Administrators**") who act as agents, for the EMEA Debtors without any personal liability whatsoever and, in the case of the Israeli Company (as defined below) is acting by its joint administrators Yaron Har-Zvi and Avi D. Pelossof (the "**Joint Israeli Administrators**") who act as agents of the Israeli Company without any personal liability whatsoever; (vi) Nortel Networks S.A. (in administration) ("**NNSA**") acting by the French Liquidator (as defined below), who acts as agent for NNSA without any personal liability whatsoever (NNSA, the Sellers and the EMEA Sellers being, together, the "**Selling Parties**"); (vii) the Joint Administrators; and (viii) the Joint Israeli Administrators.

The Joint Administrators, in their individual capacity, shall be party to this Agreement solely for the purposes of Sections 2.1, 2.2, 2.3, 2.6, 3.1, 3.2, 3.3, 3.4, 3.5, 3.6, 3.7, 3.8, 3.9, 3.10, 3.11 and 3.15. The Joint Israeli Administrators, in their individual capacity, shall be party to this Agreement solely for the purposes of Sections 2.1, 2.2, 2.3, 2.6, 3.1, 3.2, 3.3, 3.4, 3.5, 3.6, 3.7, 3.8, 3.9, 3.10, 3.11 and 3.15.

### W I T N E S S E T H:

WHEREAS, on the Petition Date, the Canadian Debtors filed with the Canadian Court an application for protection under the CCAA and were granted certain initial creditor protection pursuant to an order issued by the Canadian Court on the same date, which also appointed Ernst & Young Inc. as "**Monitor**" in connection with the CCAA Cases and has been extended by further order of the Canadian Court from time to time and most recently on April 14, 2010, as the same may be amended and restated from time to time by the Canadian Court;

WHEREAS, the U.S. Debtors are debtors-in-possession under the U.S. Bankruptcy Code, which commenced cases under Chapter 11 of the U.S. Bankruptcy Code on the Petition Date by filing voluntary petitions for relief in the U.S. Bankruptcy Court for the District of Delaware;

WHEREAS, the EMEA Debtors on the Petition Date filed applications with the English Court pursuant to the Insolvency Act and the EC Regulation and the English Court

appointed the Joint Administrators on the Petition Date as joint administrators of each of the relevant EMEA Debtors under the Insolvency Act;

WHEREAS, the Israeli Court, on January 19, 2009, granted Nortel Networks Israel (Sales and Marketing) Limited (in administration) (the "**Israeli Company**") with a stay of proceedings order and nominated the Joint Israeli Administrators as joint administrators of the Israeli Company. On November 24, 2009, as part of such stay of proceedings, the Israeli Court approved a creditors' arrangement in connection with the Israeli Company, and further approved at a later date, the continuation of all relevant rights, duties and obligations of the Joint Israeli Administrators pursuant to such stay of proceedings order;

WHEREAS, while the administration proceedings in respect of NNSA, being main proceedings pursuant to Article 3(1) of the EC Regulation and under the Insolvency Act are continuing, subsequent to the Petition Date, NNSA commenced secondary insolvency proceedings within the meaning of Article 27 of the EC Regulation in the Republic of France pursuant to which Maître Cosme Rogeau was appointed *Liquidateur Judiciaire* of NNSA (the "**French Liquidator**") by the French Court (Docket No. 2009P00492) and is assisted, for the purpose hereof, by Maître Franck Michel, *Mandataire ad hoc* of NNSA (together, the "**NNSA Office Holders**");

WHEREAS, the Non-Debtor Sellers and the EMEA Non-Debtor Sellers are not subject to any Bankruptcy Proceedings;

WHEREAS, on June 9, 2009, the U.S. Debtors, the Canadian Debtors, the EMEA Debtors and the Joint Administrators entered into an Interim Funding and Settlement Agreement (as may be amended from time to time in accordance with its terms, the "**IFSA**") governing certain intercompany matters, including the obligation of the parties thereto to (a) negotiate in good faith and attempt to reach agreement on a timely basis on a protocol (the "**Interim Sales Protocol**") for resolving disputes concerning the allocation of Sale Proceeds from Sale Transactions (each as defined in the IFSA), which Interim Sales Protocol shall provide binding procedures for the allocation of Sale Proceeds where the relevant parties in such Sale Transaction have been unable to reach agreement regarding such allocation, and (b) following entry into any Sale Transaction, negotiate in good faith and on a timely basis to attempt to reach agreement regarding the allocation of the Sale Proceeds from such Sale Transaction within a reasonable period of time or as may be otherwise provided in the Interim Sales Protocol (failing which the Interim Sales Protocol shall apply to determine the allocation of the relevant Sale Proceeds);

WHEREAS, the Sellers have, as of December 22, 2009, entered into an Asset Sale Agreement with GENBAND Inc. (the "**Purchaser**") relating to the part of the Business owned and operated by the Sellers, and as may be further amended in accordance with its terms and this Agreement (the "**North American Agreement**");

WHEREAS, the EMEA Sellers, the Joint Administrators and the Joint Israeli Administrators have, on December 23, 2009, entered into an Asset Sale Agreement with the Purchaser relating to the part of the Business owned and operated by the EMEA Sellers, and as may be further amended in accordance with its terms and this Agreement (the "**EMEA Agreement**" and, together with the North American Agreement, the "**Sale Agreements**");

WHEREAS, NNSA entered into an Accession and Amendment Agreement relating to the IFSA dated September 11, 2009, under which NNSA acceded to the IFSA;

WHEREAS, on April 23, 2010, under Clause 7.1 of the EMEA Agreement and a supplemental letter dated January 24, 2010, between the EMEA Sellers, the Joint Administrators, the Joint Israeli Administrators and the Purchaser, the Purchaser caused GENBAND Telecommunications (France) SARL to make the NNSA Irrevocable Offer to the NNSA Office Holders, and, following authorization of the French Court, GENBAND Telecommunications (France) SARL and the French Liquidator will enter into the NNSA Assets Transfer Agreement in fulfillment of the NNSA Irrevocable Offer (together, the "**NNSA Documentation**"). NNSA is a "Selling Debtor" under the IFSA for the purposes of this Transaction (as defined below), and, as such, any reference in this Agreement to a Selling Party shall be construed as including NNSA;

WHEREAS, as soon as practicable after the execution of this Agreement, in accordance with Section 12.b of the IFSA, the Selling Parties (as defined below), the Monitor and the Committee (as defined in the U.S. Bidding Procedures Order) will enter into an escrow agreement with the Distribution Agent (the "**Distribution Escrow Agreement**") governing, among other things, the Distribution Agent's collection, holding in escrow in an escrow account at the Distribution Agent (the "**Distribution Escrow Account**") and distribution to the Sellers, the EMEA Sellers, NNSA, and any other party deemed to be a Selling Debtor pursuant to the IFSA (in accordance with the Allocation Rules) of the Total Proceeds of the Transaction and other payments to be made by the Purchaser (or any Designated Purchaser or EMEA Designated Purchaser) to the Selling Parties under or in relation to the Sale Agreements and the NNSA Documentation; and

WHEREAS, for the purpose of facilitating the completion of the Transaction and maximizing the value arising therefrom for their respective stakeholders, the Parties intend to assume certain mutual cooperation and other covenants relating to the pursuit and completion of the sale of the Business and the sale of the NNSA Assets (the "**Transaction**") pursuant to the Sale Agreements and the NNSA Documentation or otherwise, as well as govern certain other matters of common interest relating to the prospective Transaction, including certain matters relating to the allocation among the Parties of the benefits and burdens of the Transaction.

NOW, THEREFORE, in consideration of the respective covenants made herein, and of the mutual benefits to be derived hereby (the sufficiency of which are acknowledged), the Parties hereto agree as follows:

## ARTICLE I

## INTERPRETATION

### SECTION 1.1. Definitions.

(a)    To the extent capitalized words used herein (including in the recitals hereof) are not defined in this Agreement, those words shall have the meanings given to them (i) in the North American Agreement (including Exhibit 5.27 thereof), (ii) to the extent they are not

3

defined in the North American Agreement, in the EMEA Agreement, or (iii) to the extent they are not defined in the Sale Agreements, the TSA.

(b)     The following capitalized terms shall have the meanings set forth below:

(i)     "**Advisor Fees**" means any fees or other amounts paid or payable to (A) Lazard Frères & Co. in connection with the Transaction, (B) the Distribution Agent in accordance with the terms of the Distribution Escrow Agreement, (C) the Escrow Agent (in its capacity as agent for the various escrows contemplated by the Sale Agreements and the TSA), (D) the EMEA Escrow Agent, (E) the Independent Auditor, (F) the Accounting Arbitrator appointed in accordance with the Sale Agreements and the Contract Manufacturing Inventory Agreement, and (G) the TSA Arbitrator.

(ii)     "**Agreed Respective Percentage**" means the percentage of Total Payments pertaining to each of the Parties and, with respect to NNI and NNL only, their respective Respective Affiliates, determined pursuant to the Allocation Rules.

(iii)     "**Allocation Rules**" means the rules (expressed as percentages or otherwise) to be used to allocate among the Selling Parties and other parties, as may be applicable, the benefit of the Total Proceeds and the burden of the Total Payments, as such rules shall be agreed upon among the relevant Selling Parties pursuant to Section 12.d and Section 12.g of the IFSA or shall be otherwise determined in accordance with the binding procedures to be set forth in the Interim Sales Protocol pursuant to Section 12.c of the IFSA.

(iv)     "**Dispute Resolver Retainer**" means any retainer paid or payable to one or more dispute resolvers appointed pursuant to the Interim Sales Protocol to determine the Allocation Rules, to the extent related to the Transaction.

(v)     "**Distribution Agent**" means JP Morgan Chase Bank, N.A. or such other Person appointed with the consent of each of NNL, NNI and NNUK, provided that consent to appoint such Person shall not be withheld unreasonably.

(vi)     "**EMEA Debtors**" means those entities listed in Schedule 3 of the EMEA Agreement and NNSA.

(vii)     "**Initial Respective Percentage**" means one third (1/3) for NNI and its Respective Affiliates, one third (1/3) for NNC, NNL and its Respective Affiliates, and one third (1/3) for the EMEA Sellers and NNSA.

(viii)     "**New Bankruptcy Proceedings**" means any voluntary or involuntary bankruptcy, insolvency, administration or similar judicial proceedings commenced after the date hereof.

(ix)     "**NNUK**" means Nortel Networks UK Limited (in administration).

(x)    "**Party**" means (A) each of the Canadian Main Sellers and their Respective Affiliates, (B) each of NNI and its Respective Affiliates, (C) each of NNUK and its Respective Affiliates, and (D) for the purposes of Sections 2.1, 2.2, 2.3, 2.6, 3.1, 3.2, 3.3, 3.4, 3.5, 3.6, 3.7, 3.8, 3.9, 3.10, 3.11 and 3.15 only, the Joint Administrators and for the purposes of Sections 2.1, 2.2, 2.3, 2.6, 3.1, 3.2, 3.3, 3.4, 3.5, 3.6, 3.7, 3.8, 3.9, 3.10, 3.11 and 3.15 only the Joint Israeli Administrators, and "**Parties**" shall have a corresponding meaning.

(xi)    "**Respective Sale Agreement**" means (A) with respect to the Canadian Main Sellers, NNI and the Other Sellers, the North American Agreement, (B) with respect to the EMEA Sellers, the EMEA Agreement, and (C) with respect to NNSA, the NNSA Documentation.

(xii)    "**Respective Affiliates**" means (A) with respect to NNL, each Seller listed in Section 10.15(a)(ii) of the Sellers Disclosure Schedule; (B) with respect to NNI, each Seller listed in Section 10.15(a)(iii) of the Sellers Disclosure Schedule; and (C) with respect to NNUK, all the other EMEA Sellers listed in Schedule B of this Agreement and NNSA.

(xiii)    "**Secondary Proceedings**" shall have the meaning attributed to such words in the EMEA Agreement.

(xiv)    "**Total Payments**" means the aggregate of:

(A) all amounts paid or payable by the Selling Parties to the Purchaser (and any Designated Purchaser and EMEA Designated Purchaser) as a break-up fee and/or expense reimbursement under the North American Agreement or the EMEA Agreement (collectively, the "**Break-Up Fee and Expense Reimbursement**");

(B) all amounts paid or payable by the Selling Parties to third parties (1) to obtain intellectual property licenses and consents; (2) to satisfy obligations arising from the failure to obtain such consents under intellectual property licenses, in each case in respect of intellectual property currently used by the Selling Parties but only to the extent directly connected to the obligation of the Selling Parties to deliver Services to the Purchaser under the TSA; and (3) to satisfy the obligation to prepare and deliver to the Purchaser the Closing Unaudited Financial Statements and prepare, complete the audit of and deliver to the Purchaser the Closing Audited Financial Statements pursuant to Sections 5.24 and 5.25 of the North American Agreement;

(C) all amounts paid or payable by the Selling Parties as Advisor Fees;

(D) all amounts paid by the Selling Parties to One Equity Partners III under the U.S. Bidding Procedures Order, the Canadian Sales Process Order and the Incentive Fee Side Agreement;

(E) all amounts paid or payable to the Purchaser under section 2.2.3.2 of the North American Agreement;

(F) all amounts paid or payable by the Selling Parties in respect of the Dispute Resolver Retainer; and

(G) the amount of $10,000,000 paid or payable by the Sellers to the Purchaser if the TSA Arbitrator determines that the Closing Day Ready (as defined in Exhibit 5.27 to the North American Sale Agreement) has not been achieved.

(xv)    "**Total Proceeds**" means the aggregate amounts (A) paid by the Purchaser (and any Designated Purchaser and EMEA Designated Purchaser) to the Selling Parties under or in respect of the Sale Agreements and the NNSA Documentation as Purchase Price, Good Faith Deposit, Purchase Price adjustments, and damages, and (B) paid to the Selling Parties under any escrow arrangement pursuant to which a portion of the Purchase Price or Good Faith Deposit has been placed in escrow, but for greater certainty shall exclude any amounts not constituting a portion of the Purchase Price paid or payable by the Purchaser (or any Designated Purchaser or EMEA Designated Purchaser) to one or more Selling Party to compensate such Selling Party for costs incurred or to be incurred by such Selling Party, as contemplated to be paid directly to such Selling Party in accordance with the terms of the relevant Sale Agreement or other Transaction Document.

(xvi)    "**TSA**" means the Transition Services Agreement.

SECTION 1.2. Interpretation.

1.2.1. Gender and Number. Any reference in this Agreement to gender includes all genders and words importing the singular include the plural and vice versa.

1.2.2. Certain Phrases and Calculation of Time. In this Agreement (i) the words "including" and "includes" mean "including (or includes) without limitation", (ii) the terms "hereof," "herein," and "herewith" and words of similar import shall, unless otherwise stated, be construed to refer to this Agreement and not to any particular provision of this Agreement, and Section and Schedule references are to the Sections and Schedules to this Agreement unless otherwise specified, and (iii) in the computation of periods of time from a specified date to a later specified date, unless otherwise expressly stated, the word "from" means "from and including" and the words "to" and "until" each mean "to but excluding". If the last day of any such period is not a Business Day, such period will end on the next Business Day.

When calculating the period of time "within" which, "prior to" or "following" which any act or event is required or permitted to be done, notice given or steps taken, the date which is the reference date in calculating such period is excluded from the calculation. If the last day of any such period is not a Business Day, such period will end on the next Business Day.

1.2.3. Headings, etc. The division of this Agreement into Articles and Sections and the insertion of headings are for convenient reference only and are not to affect or be used in the construction or interpretation of this Agreement.

## ARTICLE II

## COVENANTS

### SECTION 2.1. Efforts to Complete the Transaction.

(a)     Subject to the requirements of any applicable Law, each of the Parties shall use their reasonable best efforts to take, or cause to be taken, all actions and to do, or cause to be done, and cooperate with each other and the Purchaser in good faith in order to do all things necessary, proper or advisable under applicable Law to perform their obligations under their Respective Sale Agreement and consummate the transactions contemplated by the Sale Agreements and the NNSA Documentation, as applicable, as soon as practicable in accordance with the provisions thereof and cause the fulfillment at the earliest practicable date of all of the conditions to the Purchaser's obligations to consummate the transactions contemplated by their Respective Sale Agreement.

(b)     The mutual efforts of the Parties pursuant to this Section 2.1(a) shall include:

(i)     cooperating with the other Parties in good faith in any manner reasonably required to facilitate the consummation of the Transaction, including by sharing information to the extent necessary or opportune and keeping the other Parties informed of any matter of relevance relating to the Transaction and their Respective Sale Agreement and, without in any way limiting the foregoing, keeping the other Parties informed in respect of, and allowing the other Parties to participate in, any discussions with the Purchaser or any EMEA Designated Purchaser regarding the terms of the NNSA Documentation and the sale of the NNSA Assets;

(ii)     (A) defending all Actions by or before any Government Entity challenging the Sale Agreements, the NNSA Documentation or the consummation of the Transaction and (B) seeking rescission or repeal of any injunction, decree, ruling, order or other action of any Government Entity adversely affecting the ability of the Parties to consummate the Transaction;

(iii)     cooperating with the other Parties and the Purchaser in good faith in any manner reasonably required to facilitate the preparation and making of any

7

filings with Government Entities required to seek and obtain the Regulatory Approvals;

(iv)    upon becoming aware of any material issue that may result in a breach by the Sellers, the EMEA Sellers or NNSA under either Sale Agreement or the NNSA Documentation, promptly informing the other Parties of such potential breach and consulting with the other Parties with a view to ensuring that there is no breach of the relevant Sale Agreement or NNSA Documentation and/or any breach is timely cured in accordance with the Sale Agreements or the NNSA Documentation; and

(v)    ensuring that the Total Proceeds are deposited in the form and in the amount paid by the Purchaser (and any Designated Purchaser or EMEA Designated Purchaser) or, upon release from escrow, the applicable escrow agent, to the Distribution Agent in accordance with the terms hereof and the Distribution Escrow Agreement.

SECTION 2.2. Notice and Consultation.

(a)    Each of NNL, NNI and NNUK and, to the extent applicable, the Joint Administrators and/or the Joint Israeli Administrators (together, the **"Primary Parties"**), shall provide to the others as much notice as possible, and in any case no less than five (5) Business Days written advance notice if possible, and shall consult in good faith with the other Primary Parties, prior to taking or agreeing to take, any of the following actions under their Respective Sale Agreement:

(i)    subject to Section 2.3, amending any material provision of their Respective Sale Agreement;

(ii)    subject to Section 2.3, waiving any of their material rights or provisions under their Respective Sale Agreement;

(iii)    with respect to the EMEA Sellers only, consenting to the entry into, or requesting, promoting or instituting, any Secondary Proceedings in relation to any EMEA Seller;

(iv)    with respect to the Main Sellers only, voluntarily commencing, or otherwise consenting to, any New Bankruptcy Proceedings relating to any Non-Debtor Seller; and

(v)    delivering or otherwise consenting to the amount reflected in any Closing Statements, Disagreement Notice or any settlement of a dispute regarding the matters contained therein or the determination of Net Market Value contemplated by Schedule 7 to the EMEA Agreement.

(b)    If an EMEA Seller, after having acted in accordance with Section 2.2(a)(iii), resolves to enter into Secondary Proceedings and the Main Sellers have a right under

the Law applicable to the Secondary Proceedings to appear at these Secondary Proceedings (under any capacity whatsoever), that EMEA Seller shall, as far as is reasonably practicable, facilitate the Main Sellers being heard at such Secondary Proceedings, to the maximum extent allowed by the Law applicable to them.

SECTION 2.3.  No Termination or Material Amendments.  No Party shall, without the prior written consent of the other Parties (such consent not to be unreasonably withheld, delayed or conditioned):

(a)    exercise any termination right pursuant to their Respective Sale Agreement (excluding the Main Sellers' right to terminate the North American Agreement under Sections 9.1(b)(iv), 9.1(b)(v), 9.1(b)(vi) or 9.1(b)(vii) of the North American Agreement and the Joint Administrators' right to terminate the EMEA Agreement under Clauses 15.4.2(D), 15.4.2(E), 15.4.2(F) or 15.4.2(G) of the EMEA Agreement) or otherwise agree with the Purchaser to terminate such Respective Sale Agreement;

(b)    with respect to the Main Sellers only, amend the definition of "Market Value" (or other defined terms used in the same definition), the provisions of Sections 2.2, 2.4, Article VIII or Article IX of the North American Agreement;

(c)    with respect to the EMEA Sellers only, amend the provisions of Clauses 3, 4.1, 4.2, 4.3 and 15 of the EMEA Agreement or Schedule 7 to the EMEA Agreement; or

(d)    enter into any amendment to or waive any provision of its Respective Sale Agreement or any other Transaction Document to which such Party is a party that would cause a material detriment to any of the other Parties.

SECTION 2.4.  Collection and Allocation of Total Proceeds.

(a)    Subject to Section 2.4(c), Section 2.4(d) and Section 2.4(e), in accordance with the provisions of Section 12.b of the IFSA, the Parties agree that any payment due by the Purchaser (and any Designated Purchaser and any EMEA Designated Purchaser) to the Selling Parties under the Sale Agreements or the NNSA Documentation, or, upon release from escrow, any escrow agreements provided for in the Sale Agreements or the Transaction Documents (including, without limitation, the Aggregate Escrow Amount and the TSA Escrow Amount) that is included in the Total Proceeds shall be collected and held in escrow in the Distribution Escrow Account by the Distribution Agent (as agent for the Selling Parties), which will then allocate and distribute the Total Proceeds in accordance with the Allocation Rules, this Agreement and the Distribution Escrow Agreement, provided, however, that any amounts owing under Section 2.5(b) and Section 2.5(c) hereof by any Selling Party (the "**Debtor Party**") to another Selling Party at the time of an intended distribution from the Distribution Escrow Account shall be paid out of the share of Total Proceeds otherwise payable to the Debtor Party.

(b)    The Parties agree and acknowledge that the Total Proceeds do not include amounts of or in respect of "VAT" or "Transfer Taxes" (each term as defined in the relevant Respective Sale Agreement) paid or payable by the Purchaser or any Designated Purchaser or any EMEA Designated Purchaser or any affiliate of the Purchaser to the Sellers or the EMEA

9

Sellers or the Joint Administrators or the Joint Israeli Administrators pursuant to the terms of the Sale Agreements. The Parties agree that it is not intended that such amounts of VAT or Transfer Taxes will be payable into the Distribution Escrow Account but, notwithstanding this Agreement, where such amounts are paid into the Distribution Escrow Account, the Distribution Agent shall be instructed under the procedures in the Distribution Escrow Agreement to promptly pay such amounts to the Selling Parties or the Joint Administrators or the Joint Israeli Administrators (as relevant).

(c)     To the extent that there are funds available in the Distribution Escrow Account that are attributable to the Transaction, the obligation of the Selling Parties to make any payment that constitutes part of the Total Payments shall (subject to adjustment in accordance with Section 2.5) be satisfied by causing the Distribution Agent to pay the relevant amount out of the Distribution Escrow Account.

(d)     To the extent that any payment that constitutes part of the Total Payments cannot be satisfied by payment out of the Distribution Escrow Account or is required to be paid prior to the Closing Date, any such amounts actually paid by any Selling Party to the Purchaser, the Distribution Agent, or any other Person, as applicable, shall be deducted from any subsequent amounts payable or paid into the Distribution Escrow Account under Section 2.4(a) and shall (subject to adjustment in accordance with Section 2.5) be paid directly to such Selling Party that made the relevant payment.

(e)     It is acknowledged and agreed that, in determining how to allocate and distribute the Total Proceeds, except for the items constituting Total Payments (other than Clause E of such term) and the other expenses, damages and liabilities specifically allocated herein, the Parties reserve all rights in respect of expenses, damages, and all other liabilities, incurred in connection with the performance of their obligations under or pursuant to the Sale Agreements and the NNSA Documentation and/or the Transaction Documents and any amount paid or payable by NNI to the Pension Benefit Guaranty Corporation pursuant to the Stipulation Among the Debtors, Certain Affiliates and Pension Benefit Guaranty Corporation [D.I. 2784], and, in particular, whether such expenses, damages and other liabilities should be deducted from the Total Proceeds, or otherwise considered in connection with a distribution to the Selling Parties.

SECTION 2.5. <u>Allocation of Total Payments</u>.

(a)     Irrespective of the individual/joint payment obligations of each Selling Party or their Respective Affiliates vis-à-vis the Purchaser pursuant to the Sale Agreements or the NNSA Documentation or vis-à-vis the Distribution Agent pursuant to the Distribution Agreement (each of which shall be duly complied with by the relevant Selling Party in accordance with the terms thereof), the Parties agree that, among them, each Party (and, with respect to the Main Sellers, their respective Respective Affiliates) shall initially bear the Initial Respective Percentage and, when determined in accordance with the Allocation Rules, shall ultimately bear the Agreed Respective Percentage of the Total Payments, subject to Section 2.5(b) and (c).

(b)     To the extent the Agreed Respective Percentage differs from the Initial Respective Percentage, any amount actually paid by a Party that constitutes part of the Total

Payments shall be promptly (re)adjusted among the Parties so that each Party (and, with respect to the Main Sellers, their respective Respective Affiliates) ultimately bears a share of those Total Payments that corresponds to its Agreed Respective Percentage. Except as set forth in Section 2.4(a), adjustment payments to be made among the Parties pursuant to the previous sentence shall be made without set off.

(c)     Notwithstanding Section 2.5(a), the Parties agree that, to the extent the event triggering the obligation of the Sellers and the EMEA Sellers to pay to the Purchaser the Break-Up Fee and the Expense Reimbursement under the Sale Agreements is attributable to the action or omission of one or more Parties only, such Parties shall be responsible, as among the Sellers and the EMEA Sellers, for the entire Break-Up Fee and the Expense Reimbursement actually paid by the Sellers and/or the EMEA Sellers (or, if applicable, the Distribution Agent on behalf of the Sellers and the EMEA Sellers) to the Purchaser under the Sale Agreements and shall therefore reimburse to the other Parties, without set-off, any such amount actually paid by them (or the Distribution Agent) to the Purchaser in respect of such Break-Up Fee and Expense Reimbursement. The Parties further agree that the breach of any representation or warranty made under the North American Agreement or the inability to provide any certification concerning the accuracy or completion of any representation, warranty or covenant, in respect of the EMEA Sellers or any aspect of the Business of the EMEA Sellers and NNSA, in each case under the North American Agreement, shall not constitute a matter attributable to the action or omission of any of the Main Sellers or the Other Sellers or the Joint Administrators, the Joint Israeli Administrators, the NNSA Office Holders, NNSA or the EMEA Sellers.

(d)     The Selling Parties agree that, in the event that the Sellers pay the Purchaser an amount of $10,000,000 arising from the determination by the TSA Arbitrator that Closing Day Ready was not achieved, no other Selling Party shall seek to recover such amounts from the Selling Party or Selling Parties in breach or at fault in any proceedings, before a dispute resolver to determine the final allocation of Sale Proceeds under the Interim Sales Protocol, or otherwise, provided that any such Selling Party so in breach or at fault has used commercially reasonable efforts to comply with such obligations.

SECTION 2.6. Irrevocable Offers under the EMEA Agreement. In relation to paragraph 5 of Schedule 6 of the EMEA Agreement, the Reserved Territory Sellers (as such term is defined in clause 1.1 of Schedule 6 of the EMEA Agreement) and the Joint Administrators agree:

(a)     to commence and progress the information and consultation process in a timely manner; and

(b)     to deliver acceptance of Irrevocable Offers to the Purchaser as soon as possible after appropriate completion of each relevant consultation process.

SECTION 2.7. Tax Cooperation.

(a)     In the event that the preparation or filing of a Tax Return could reasonably be expected to require a Partial Allocation or a Selling Party is preparing any Partial Allocation with the Purchaser (whether by agreement or submission to the Accounting Arbitrator), the

11

Selling Party responsible for filing such Tax Return or preparing such Partial Allocation shall provide notice to the other Selling Parties and shall consider in good faith any comments by the other Selling Parties with respect to such Tax Return and any Partial Allocation related thereto, provided, and for the avoidance of doubt, that the other Selling Parties shall not have a consent or veto right with respect to such Tax Returns or Partial Allocations related thereto. It is understood that neither this Section 2.7 nor the exercise or failure to exercise of any rights or privileges provided herein shall, or be deemed to, determine, ratify, or adopt, or have any impact whatsoever on, the allocation of proceeds from the Transaction among the Selling Parties.

(b)    In the event that the Purchaser prepares or files a Tax Return in respect of withholding taxes, or obtains or makes any valuation calculation ("**Valuation**") in connection with preparing such Tax Return, that requires an allocation of the proceeds from the Transaction, such Tax Return, Valuation, and any information contained therein shall not, or shall not be deemed to, determine, ratify, adopt or have any impact whatsoever on the allocation of proceeds from the Transaction among the Selling Parties.

SECTION 2.8.  Indemnification of Distribution Agent, Escrow Agent and EMEA Escrow Agent.  The Selling Parties agree that the costs of any indemnification of the Distribution Agent, Escrow Agent and EMEA Escrow Agent pursuant to the Distribution Escrow Agreement and the escrow agreements under the Sale Agreements and the TSA shall be borne on a pro rata basis by the Selling Parties in accordance with their Agreed Respective Percentages and any Selling Party paying in excess of such pro rata share of the cost of such indemnification shall have rights of contribution vis-à-vis any Selling Party that has paid less than such pro rata share of such costs either directly to Distribution Agent, Escrow Agent or EMEA Escrow Agent or by payment to another Selling Party pursuant to this sentence; provided that if the costs of any such indemnification arise solely from a breach of the Distribution Escrow Agreement or the escrow agreements under the Sale Agreements and the TSA or other fault of a single Selling Party or Selling Parties, the Selling Party so in breach or at fault shall bear the cost of such indemnification and any Selling Party paying in excess of its share of the cost of such indemnification, after taking into account the breach or fault of the other Selling Parties, shall have rights of contribution vis-à-vis any Selling Party that has paid less than its share of such costs either directly to Distribution Agent, Escrow Agent or EMEA Escrow Agent or by payment to another Selling Party.

## ARTICLE III

## MISCELLANEOUS

SECTION 3.1.  Exclusion of Liability and Acknowledgments re Joint Administrators, NNSA Office Holders and Directors of EMEA Non-Debtor Sellers.

(a)    The Parties agree that (i) the Joint Administrators have negotiated and are entering into this Agreement as agents for the EMEA Debtors to which they are appointed and that none of the Joint Administrators, their firm, partners, employees, advisers, representatives or agents shall incur any personal liability whatsoever whether on their own part or in respect of any failure on the part of any other Party to observe, perform or comply with any of its obligations under this Agreement or under or in relation to any associated arrangements or

12

negotiations, and (ii) the directors of the EMEA Non-Debtor Sellers shall not incur any personal liability whatsoever, in their capacity as such directors, in respect of the authorization, execution, delivery or performance of this Agreement, howsoever arising other than in respect of fraud by any such director.

(b) The Joint Administrators are a party to this Agreement: (i) as agents of each of the respective EMEA Debtors of which they are administrators; and (ii) in their own capacities solely for (1) taking the benefit of the statutory charges under Paragraph 99(3) of Schedule B1 of the Insolvency Act, (2) obtaining the benefit of any provisions of this Agreement expressed to be conferred on them, (3) enforcing the obligations of the other Parties to this Agreement and (4) for the purposes of Sections 2.1, 2.2, 2.3, 2.6, 3.1, 3.2, 3.3, 3.4, 3.5, 3.6, 3.7, 3.8, 3.9, 3.10, 3.11 and 3.15.

(c) Notwithstanding anything in Section 3.7, any claim, action or proceeding against the Joint Administrators arising from or related to (i) the personal liability of the Joint Administrators, their firm or partners, employees, advisers, representatives or agents, (ii) their qualification to act as insolvency practitioners in accordance with Part XIII of the Insolvency Act or (iii) their appointment as joint administrators of the relevant EMEA Debtors and their remaining as current joint administrators thereof under this Agreement shall be governed exclusively by English law and subject to the exclusive jurisdiction of the English Courts.

(d) The Parties agree that any breach of this Agreement by the Joint Administrators shall be deemed to be a breach by them in their capacities as administrators of the relevant EMEA Debtors, and, in such a case, each Party hereto shall only have the right to make claims and assert its rights hereunder, against the relevant EMEA Debtors and their respective successors and assigns.

(e) The Parties agree that the French Liquidator is entering into this Agreement as agent for NNSA to which he is appointed and that none of the NNSA Office Holders, their firm, partners, employees, advisers, representatives or agents shall incur any personal liability whatsoever whether on their own or in respect of any failure on the part of any other Party to observe, perform or comply with any of its obligations under this Agreement or under or in relation to any associated arrangements or negotiations.

(f) Notwithstanding anything in Section 3.7, any claim, action or proceeding against the NNSA Office Holders arising from or related to (i) the personal liability of the NNSA Office Holders, their firms, partners, employees, advisers, representatives or agents or (ii) their appointment as Liquidateur Judiciaire and Mandataire ad'hoc of NNSA shall be governed exclusively by French law and subject to the exclusive jurisdiction of the French Courts.

SECTION 3.2. Exclusion of Liability and Acknowledgments re Joint Israeli Administrators.

(a) The Parties agree that the Joint Israeli Administrators have negotiated and are entering into this Agreement as agents for the Israeli Company and that none of the Joint Israeli Administrators, their firm, partners, employees, advisers, representatives or agents shall incur any personal liability whatsoever whether on their own part or in respect of any failure on

13

the part of any other Party to observe, perform or comply with any of its obligations under this Agreement or under or in relation to any associated arrangements or negotiations.

(b)     The Joint Israeli Administrators are a party to this Agreement: (i) as agents of the Israeli Company; and (ii) in their own capacities solely for (1) obtaining the benefit of any provisions of this Agreement expressed to be conferred on them, (2) enforcing the obligations of the other Parties to this Agreement and (3) for the purposes of Sections 2.1, 2.2, 2.3, 2.6, 3.1, 3.2, 3.3, 3.4, 3.5, 3.6, 3.7, 3.8, 3.9, 3.10, 3.11 and 3.15.

(c)     Notwithstanding anything in Section 3.7, any claim, action or proceeding against the Joint Israeli Administrators arising from or related to the personal liability of the Joint Israeli Administrators, their firm, partners, employees, advisers, representatives or agents (and not as agents for any Israeli Company) under this Agreement shall be governed exclusively by Israeli law and subject to the exclusive jurisdiction of the Courts of Israel.

(d)     The Parties agree that any breach of this Agreement by the Joint Israeli Administrators shall be deemed to be a breach by them in their capacities as administrators of the Israeli Company, and, in such a case, each Party hereto shall only have the right to make claims and assert its rights hereunder against the Israeli Company and its respective successors and assigns.

SECTION 3.3. Remedies. No failure to exercise, and no delay in exercising, any right, remedy, power or privilege under this Agreement by any Party will operate as a waiver of such right, remedy, power or privilege, nor will any single or partial exercise of any right, remedy, power or privilege under this Agreement preclude any other or further exercise of such right, remedy, power or privilege or the exercise of any other right, remedy, power or privilege.

SECTION 3.4. No Third-Party Beneficiaries. Except as provided in Section 3.5, this Agreement is for the sole benefit of the Parties and their permitted assigns and nothing herein, express or implied, is intended to or shall confer upon any other Person any legal or equitable right, benefit or remedy of any nature whatsoever under or by reason of this Agreement, provided, however, that the Committee shall be a third party beneficiary of this Agreement entitled to take advantage of the benefits of this Agreement to NNI and the other U.S. Debtors party hereto only, to the fullest extent as if it were a signatory hereto and the directors of the EMEA Non Debtor Sellers shall be deemed third party beneficiaries of Section 3.1(a) hereof and shall be entitled to enforce and take advantage of the benefit thereof to its fullest extent as of a signatory hereto.

SECTION 3.5. Consent to Amendments; Waivers. No Party shall be deemed to have waived any provision of this Agreement unless such waiver is in writing, and then such waiver shall be limited to the circumstances set forth in such written waiver. This Agreement, or any provision hereof, may be waived or amended, on no less than 5 days' notice, only by means of a writing signed by all Parties, and approved, in writing, by the Committee, the Bondholder Group (as defined in the U.S. Bidding Procedures Order) and the Monitor, which amendments, if material in the judgment of the Parties, must be approved by each of the Courts that initially approved this Agreement.

SECTION 3.6.  Successors.  Except as otherwise expressly provided in this
Agreement, all covenants and agreements set forth in this Agreement by or on behalf of the
parties hereto will be binding upon and inure to the benefit of such parties and their respective
successors.

SECTION 3.7.  Governing Law; Submission to Jurisdiction; Waiver of Jury Trial.

(a)     The Parties agree that this Agreement shall be governed exclusively by the
laws of the State of New York without regard to the rules of conflict of laws of the State of New
York or any other jurisdiction; provided, however, that Section 3.1 shall be governed exclusively
by English law and Section 3.2 shall be governed exclusively by Israeli law.

(b)     To the fullest extent permitted by Law, each Party (i) agrees to submit to
the non-exclusive jurisdiction of the U.S. Bankruptcy Court and the Canadian Court (in a joint
hearing conducted under the Cross-Border Protocol adopted by such courts, as it may be in effect
from time to time), for purposes of all legal proceedings to the extent relating to the matters
agreed in this Agreement, (ii) agrees that any claim, action or proceeding by such Party seeking
any relief whatsoever to the extent relating to the matters agreed in this Agreement must be
commenced in the U.S. Bankruptcy Court if such claim, action, or proceeding would solely
affect NNI, the Canadian Court if such claim, action, or proceeding would solely affect the
Canadian Main Sellers or Nortel Networks Technology Corporation, the English Court if such
claim, action or proceeding would solely affect the EMEA Sellers or the EMEA Debtors and the
Israeli Court if such claim, action or proceeding would solely affect the Israeli Company, (iii)
waives and agrees not to assert any objection that it may now or hereafter have to the laying of
the venue of any such claim, action or proceeding brought in such a court or any claim that any
such claim, action or proceeding brought in such a court has been brought in an inconvenient
forum, (iv) agrees that mailing of process or other papers in connection with any such claim,
action or proceeding or any other manner as may be permitted by Law shall be valid and
sufficient service thereof, and (v) agrees that a final judgment in any such claim, action or
proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the
judgment or in any other manner provided by Law; provided, however, that any claim, action or
proceeding set forth in Section 3.1 shall be brought exclusively in the English courts and any
claim, action or proceeding set forth in Section 3.2 shall be brought exclusively in the Israeli
courts.

(c)     EACH PARTY HEREBY WAIVES, TO THE FULLEST EXTENT
PERMITTED BY LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT
OF ANY LITIGATION DIRECTLY OR INDIRECTLY ARISING OUT OF, UNDER OR IN
CONNECTION WITH THIS AGREEMENT OR ANY TRANSACTION OR MATTER
CONTEMPLATED HEREBY.  EACH PARTY (I) CERTIFIES THAT NO
REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS
REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD
NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER
AND (II) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE
BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS,
THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION 3.7.

SECTION 3.8. <u>Notices</u>. All demands, notices, communications and reports provided for in this Agreement shall be in writing and shall be either sent by facsimile transmission with confirmation to the number specified below or personally delivered or sent by reputable overnight courier service (delivery charges prepaid) to any Party at the address specified below, or at such address, to the attention of such other Person, and with such other copy, as the recipient Party has specified by prior written notice to the sending Party pursuant to the provisions of this Section 3.8.

**If to NNI and its Respective Affiliates:**
c/o Nortel Networks Inc.
Attention: Lynn C. Egan, Assistant Secretary
Address: 220 Athens Way, Suite 300
        Nashville, Tennessee 37228
        U.S.A.
Facsimile No.: +1 615 432 4067

**With a copy to:**
Cleary Gottlieb Steen & Hamilton LLP
Attention: James L. Bromley, Esq. and Lisa M. Schweitzer, Esq.
Address: One Liberty Plaza
        New York, New York 10006
        U.S.A.
Facsimile No.: +1 212 225 3999

**If to the Canadian Main Sellers and their Respective Affiliates:**
c/o Nortel Networks Limited
        Attention: Anna Ventresca
        Chief Legal Officer
Address: 5945 Airport Road, Suite 360
        Mississauga, Ontario L4V1R9
        Canada
Facsimile No.: +1-905 863 8386

**With a copy to:**
Ogilvy Renault LLP
Attention: Michael Lang, Esq.
Address: Suite 3800
        Royal Bank Plaza, South Tower
        200 Bay Street, P.O. Box 84
        Toronto, Ontario M5J 2Z4
        Canada
Facsimile No.: +1 416 216 3930

**If to the EMEA Sellers:**
c/o Ernst & Young LLP
Attention: Alan Bloom
Address: One More London Place
        London SE1 2AF
        United Kingdom
Facsimile No.: +44 (0) 20 7951 1345

**With a copy to:**
Herbert Smith LLP
Attention: Alex Kay and Alan Montgomery, Esq.
Address: Exchange House
        Primrose Street
        London EC2A 2HS
        United Kingdom
Facsimile No.: +44 (0) 20 7098 4447/4618

**If to the Joint Israeli Administrators:**
Avi D. Pelossof
Zellermayer, Pelossof & Co.
The Rubenstein House
20 Lincoln Street
Tel Aviv
67131
Israel

**If to the Joint Administrators**
c/o Ernst & Young LLP
Attention: Alan Bloom
Address: One More London Place
        London SE1 2AF
        United Kingdom
Facsimile No.: +44 (0) 20 7951 1345

16

Facsimile: +972 3 6255500

**If to the Committee:**
Akin Gump Strauss Hauer & Feld LLP
Attention: Fred S. Hodara and Stephen B.
Kuhn, Esq.
One Bryant Park
New York, New York 10036
U.S.A.
Facsimile: +1 212 872 1002

**If to the Monitor:**
Murray A. McDonald
Ernst & Young Inc.
Ernst & Young Tower
222 Bay Street, P. O. Box 251
Toronto, Ontario M5K 1J7
Canada
Facsimile: +1 416 943 3300

**If to NNSA:**
c/o AJ Associés
Attention: Franck Michel
Address: 10, allée Pierre de Coubertin, 78000
Versailles, France
Facsimile No.: + 33 1 39 50 87 52

**If to the *Administrateur Judiciaire and
Mandataire ad hoc***
c/o AJ Associés
Attention: Franck Michel
Address: 10, allée Pierre de Coubertin, 78000
Versailles, France
Facsimile No.: + 33 1 39 50 87 52

**If to the *Liquidateur Judiciaire***
Attention: Cosme Rogeau
Address: 26 avenue Hoche, 78000 Versailles,
France
Facsimile No.: + 33 1 39 49 44 63

**If to the Bondholder Group:**
Milbank, Tweed, Hadley & McCloy
Attention: Roland Hlawaty, Esq.
One Chase Manhattan Plaza
New York, New York 10006
U.S.A.
Facsimile: +1 212 822 5170

**With a copy to:**
Goodmans LLP
Attention: Joseph Pasquariello
Bay Adelaide Centre
333 Bay Street, Suite 3400
Toronto, Ontario M5H 2S7
Canada
Facsimile: +1 416 979 1234

**With a copy to:**
Foucaud, Tchekhoff, Pochet & Associés
Attention: Antoine Tchekhoff & Edouard
Fabre
Address: 1bis, avenue Foch, 75116 Paris,
France
Facsimile No.: + 33 1 45 00 08 19

**With a copy to:**

Foucaud, Tchekhoff, Pochet & Associés
Attention: Antoine Tchekhoff & Edouard
Fabre
Address: 1bis, avenue Foch, 75116 Paris,
France
Facsimile No.: + 33 1 45 00 08 19

**With a copy to:**
Foucaud, Tchekhoff, Pochet & Associés
Attention: Antoine Tchekhoff & Edouard
Fabre
Address: 1bis, avenue Foch, 75116 Paris,
France
Facsimile No.: + 33 1 45 00 08 19

17

Any such demand, notice, communication or report shall be deemed to have been given pursuant to this Agreement when delivered personally, when confirmed if by facsimile transmission, or on the calendar day after deposit with a reputable overnight courier service, as applicable.

SECTION 3.9. Counterparts. The Parties may execute this Agreement in three or more counterparts (no one of which need contain the signatures of all Parties), each of which will be an original and all of which together will constitute one and the same instrument.

SECTION 3.10. Severability. If any provision, section, or part of this Agreement, or the application thereof under certain circumstances, is held invalid, illegal or incapable of being enforced in any jurisdiction, (i) as to such jurisdiction, the remainder of this Agreement or the application of such provision, section or part under other circumstances, and (ii) as for any other jurisdiction, any provision of this Agreement, shall not be affected and shall remain in full force and effect, unless, in each case, such invalidity, illegality or unenforceability in such jurisdiction materially impairs the ability of the Parties to consummate the transactions contemplated by this Agreement. Upon such determination that any section or other provision is invalid, illegal or incapable of being enforced in such jurisdiction, the Parties shall negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties as closely as possible in a mutually acceptable manner in order that the transactions contemplated hereby be consummated as originally contemplated to the greatest extent possible even in such jurisdiction.

SECTION 3.11. Termination. This Agreement will automatically terminate on the earliest of (a) consummation of the Closing, and (b) termination of the North American Agreement or the EMEA Agreement by either the Purchaser or the Selling Parties. Upon termination, the Parties' rights and obligations under this Agreement, other than in respect of the obligations under Sections 2.1(b)(v), 2.2(a)(v), 2.3(b), 2.3(c), 2.3(d), 2.4, 2.5, 2.6, 2.7, 2.8, and 3.1 through 3.16, each of which shall continue in full force and effect without limitation as to time, shall cease immediately but without prejudice to the rights and obligations of the Parties existing prior to the termination of the Agreement.

SECTION 3.12. Obligations of the Parties.

(a)    The obligations of the Canadian Main Sellers and the other Canadian Debtors under this Agreement shall be joint and several.

(b)    The obligations of NNI and the other U.S. Debtors under this Agreement shall be joint and several.

(c)    The obligations of the EMEA Debtors under this Agreement shall be joint and several.

SECTION 3.13. Effectiveness.

(a)    No provision of this Agreement (other than as set forth in Section 3.13(d)) shall be effective until each of the U.S. Bankruptcy Court and the Canadian Court approves the entirety of this Agreement and all of the provisions hereof (the "**Court Approval Condition**").

(b)     All provisions of this Agreement shall be effective as of the date of the satisfaction of the Court Approval Condition.

(c)     Each Party hereto shall:

(i)     use commercially reasonable efforts to satisfy the Court Approval Condition as soon as possible, taking into account the availability of the respective Courts to address the matters set forth in this Agreement;

(ii)     keep all other Parties reasonably apprised of the progress of the satisfaction of the Court Approval Condition and provide such other information regarding the satisfaction of the Conditions as reasonably requested by other Parties; and

(iii)     use commercially reasonable efforts to allow any other Party, which so requests in writing reasonable participation in connection with any proceedings in any Court related to the satisfaction of the Court Approval Condition.

(d)     Notwithstanding any of the foregoing, the following provisions of this Agreement shall be effective as of the date hereof: Sections 3.1 through 3.13.

SECTION 3.14.     Execution by certain Selling Parties. The Parties hereby acknowledge that certain Selling Parties are not executing this Agreement as of the date hereof. Subject to Section 3.13, this Agreement shall be binding on all parties that have executed this Agreement from the time of such execution, regardless of whether all Sellers and/or EMEA Selling Debtors have done so. Between the date hereof and the Closing Date, the Main Sellers hereby agree that they shall use their reasonable best efforts to cause each Other Seller to execute a counterpart to this Agreement as soon as practicable, agreeing to be bound as a Party under this Agreement.

SECTION 3.15.     Limitations of Remedies. The Parties expressly agree that the sole and exclusive remedy of any Party (the "**Claiming Party**") against any other Party for a breach of this Agreement, the Sale Agreements, the NNSA Documentation or the other Transaction Documents where the Transaction is not completed shall be payment of damages to the Claiming Party in an amount not to exceed the amount, if any, of the Break-Up Fee and/or Expense Reimbursement actually paid by the Claiming Party to the Purchaser or a Designated Purchaser or an EMEA Designated Purchaser under the Sale Agreements and, the liability of any Party shall not exceed, in the aggregate, the Total Payments. For the avoidance of doubt, the Parties further agree that in no event shall any Party be entitled to equitable relief, including in the form of an injunction or injunctions or orders for specific performance, to prevent or remedy breaches of this Agreement, the Sale Agreements, the NNSA Documentation or the other Transaction Documents by any other Party.

SECTION 3.16.     Reservation of Rights. The Parties hereby agree that, except as specifically set forth in Article II hereof, nothing in this Agreement shall, or be deemed to, determine, ratify, or adopt, or have any impact whatsoever on, the allocation or distribution of

19

proceeds from the Transaction among the Selling Parties. Without limiting the generality of the foregoing, the Parties hereby agree that the Initial Respective Percentage among the Parties shall not in any way determine the final allocation or distribution of proceeds from the Transaction or otherwise bind the Parties in respect of the final allocation.

**[Remainder of this page intentionally left blank.  Signature pages follow.]**

IN WITNESS WHEREOF, the Parties have duly executed this Side Agreement as of the date first written above.

**Nortel Networks Corporation**

By:_____
    Name:
    Title:

By:_____
    Name:
    Title:

**Nortel Networks Limited**

By:_____
    Name:
    Title:

_____
    Name:
    Title:

**Nortel Networks Inc.**

By:_____
    Name:
    Title:

**Nortel Networks Technology Corporation**

By:_____

    Name:

    Title:


By:_____

    Name:

    Title:


**Nortel Networks De Mexico, S.A. DE C.V.**

By:_____

    Name:

    Title:


By:_____

    Name:

    Title:


**Nortel Networks De Mexico, S. DE R.L. DE C.V.**

By:_____

    Name:

    Title:


By:_____

    Name:

    Title:

**Nortel Networks Peru S.A.C.**

By:_____

    Name:

    Title:


By:_____

    Name:

    Title:


**Nortel Networks Australia PTY**

By:_____

    Name:

    Title:


By:_____

    Name:

    Title:


**Nortel Networks (India) Private Limited**

By:_____

    Name:

    Title:


By:_____

    Name:

    Title:

**PT Nortel Networks Indonesia**

By:_____
    Name:
    Title:

By:_____
    Name:
    Title:

**Nortel Networks Malaysia SDN. BHD.**

By:_____
    Name:
    Title:

By:_____
    Name:
    Title:

**Nortel Networks New Zealand Limited**

By:_____
    Name:
    Title:

By:_____
    Name:
    Title:

**Nortel Networks Singapore PTE Limited**

By:_____

    Name:

    Title:


By:_____

    Name:

    Title:


**Nortel Networks (Asia) Limited**

By:_____

    Name:

    Title:


By:_____

    Name:

    Title:


**Nortel Networks (China) Limited**

By:_____

    Name:

    Title:


By:_____

    Name:

    Title:

**Nortel Networks (Thailand) Ltd.**

By:_____
    Name:
    Title:


By:_____
    Name:
    Title:


**Nortel Vietnam Limited**

By:_____
    Name:
    Title:


By:_____
    Name:
    Title:


**Nortel Networks De Argentina S.A.**

By:_____
    Name:
    Title:


By:_____
    Name:
    Title:

**Nortel Networks International Inc.**

By:_____

    Name:
    Title:

**Nortel Networks (CALA) Inc.**

By:_____

    Name:
    Title:

**Nortel Networks Kabushiki Kaisha**

By:_____

    Name:
    Title:

**Nortel Networks De Guatemala, LTDA.**

By:_____

    Name:
    Title:

**SIGNED** for and on behalf of **Nortel Networks** )  ............................................................
**UK Limited** (in administration) by Christopher )  Christopher Hill
Hill )
as Joint Administrator (acting as agent and )
without personal liability) in the presence of:

Witness signature

............................................................ )
Name: )
Address: )

**SIGNED** for and on behalf of **Nortel GmbH** )  ............................................................
(in administration) by Christopher Hill )  Christopher Hill
)
as Joint Administrator (acting as agent and )
without personal liability) in the presence of:                            - - -

Witness signature

............................................................ )
Name: )
Address: )

**SIGNED** for and on behalf of **Nortel Networks** )  ............................................................
**SpA** (in administration) by Christopher Hill )  Christopher Hill
)
as Joint Administrator (acting as agent and )
without personal liability) in the presence of:

Witness signature

............................................................ )
Name: )
Address: )

Signature Page – CVAS Side Agreement

| | | |
|---|---|---|
| **SIGNED** for and on behalf of **Nortel Networks** **Hispania S.A.** (in administration) by Christopher Hill as Joint Administrator (acting as agent and without personal liability) in the presence of: | ) ) ) ) | ........................................................... Christopher Hill |

Witness signature

| | | |
|---|---|---|
| ........................................................... Name: Address: | ) ) ) | |

| | | |
|---|---|---|
| **SIGNED** for and on behalf of **Nortel Networks** **B.V.** (in administration) by Christopher Hill as Joint Administrator (acting as agent and without personal liability) in the presence of: | ) ) ) ) | ........................................................... Christopher Hill |

Witness signature

| | | |
|---|---|---|
| ........................................................... Name: Address: | ) ) ) | |

| | | |
|---|---|---|
| **SIGNED** for and on behalf of **Nortel Networks** **N.V.** (in administration) by Christopher Hill as Joint Administrator (acting as agent and without personal liability) in the presence of: | ) ) ) ) | ........................................................... Christopher Hill |

Witness signature

| | | |
|---|---|---|
| ........................................................... Name: Address: | ) ) ) | |

Signature Page – CVAS Side Agreement

**SIGNED** for and on behalf of **Nortel Networks** ) .............................................................
**(Austria) GmbH** (in administration) by ) Christopher Hill
Christopher Hill )
as Joint Administrator (acting as agent and )
without personal liability) in the presence of:

Witness signature

............................................................. )
Name: )
Address: )

**SIGNED** for and on behalf of **Nortel Networks** ) .............................................................
**Polska Sp. z.o.o.** (in administration) by ) Christopher Hill
Christopher Hill )
as Joint Administrator (acting as agent and )
without personal liability) in the presence of:

Witness signature

............................................................. )
Name: )
Address: )

**SIGNED** for and on behalf of **Nortel Networks** ) .............................................................
**Portugal S.A.** (in administration) by ) Christopher Hill
Christopher Hill )
as Joint Administrator (acting as agent and )
without personal liability) in the presence of:

Witness signature

............................................................. )
Name: )
Address: )

Signature Page – CVAS Side Agreement

**SIGNED** for and on behalf of **Nortel Networks**
**AB** (in administration) by
Christopher Hill
as Joint Administrator (acting as agent and
without personal liability) in the presence of:

)
)
)
)

..........................................................................
Christopher Hill

Witness signature

..........................................................................
Name:
Address:

)
)
)

**SIGNED** for and on behalf of **Nortel Networks**
**Slovensko s.r.o.** (in administration) by
Christopher Hill as Joint Administrator (acting
as agent and without personal liability) in the
presence of:

)
)
)
)

..........................................................................
Christopher Hill

Witness signature

..........................................................................
Name:
Address:

)
)
)

**SIGNED** for and on behalf of **Nortel Networks**
**s.r.o.** (in administration) by Christopher Hill as
Joint Administrator (acting as agent and without
personal liability) in the presence of:

)
)
)
)

..........................................................................
Christopher Hill

Witness signature

..........................................................................
Name:
Address:

)
)
)

Signature Page – CVAS Side Agreement

**SIGNED** for and on behalf of **Nortel Networks**　)　.............................................................................

**Romania s.r.l.** (in administration) by　)　Christopher Hill

Christopher Hill as Joint Administrator (acting　)

as agent and without personal liability) in the　)

presence of:

Witness signature

.............................................................................　)

Name:　)

Address:　)

**SIGNED** for and on behalf of **Nortel Networks**    )    ..............................................................
**France S.A.S.** (in administration) by Kerry    )    Kerry Trigg
Trigg acting as authorised representative for    )
Christopher Hill    )
as Joint Administrator (acting as agent and    )
without personal liability) in the presence of:

Witness signature

..............................................................    )
Name:    )
Address:    )

**SIGNED** outside of the Republic of Ireland for )  .............................................................................
and on behalf of **Nortel Networks (Ireland)** )  Andrew Dann
**Limited** (in administration) by Andrew Dann )
acting as authorised representative for )  Location:
David Hughes as Joint Administrator (acting as
agent and without personal liability) in the
presence of:


Witness signature


.............................................................................  )
Name:                                                                    )
Address:                                                                 )

**SIGNED** by Richard Banbury      )   ........................................................................

duly authorised for and on behalf of **o.o.o.**   )   Richard Banbury

**Nortel Networks** in the presence of:   )

Witness signature

............................................................................   )

Name:   )

Address:   )

**SIGNED** by Sharon Rolston       )    ..............................................................................

duly authorised for and on behalf of **Nortel**    )    Sharon Rolston

**Networks AG** in the presence of:    )

Witness signature

..............................................................................    )

Name:    )

Address:    )

**SIGNED** for and on behalf of **Nortel Networks**   )
**Israel (Sales and Marketing) Limited** (in   )   ...............................................................
administration) by Yaron Har-Zvi and Avi D.   )   Yaron Har-Zvi
Pelossof as Joint Israeli Administrators (acting
jointly and without personal liability) in   )   ...............................................................
connection with the Israeli Assets  and   )   Avi D. Pelossof
Liabilities:   )
   )
   )


Witness signature


...............................................................   )
Name:   )
Address:   )

**SIGNED** by Alan Bloom )

) Alan Bloom

in his own capacity and on behalf of the Joint )
Administrators without personal liability and
solely for the benefit of the provisions of this
Agreement expressed to be conferred on or
given to the Joint Administrators:


Witness signature

.............................................................................. )
Name: )
Address: )

**SIGNED** by Yaron Har-Zvi                                )      ..............................................................................
                                                           )      Yaron Har-Zvi
in his own capacity and on behalf of the Joint            )
Israeli Administrators without personal liability
and solely for the benefit of the provisions of
this Agreement expressed to be conferred on or
given to the Joint Israeli Administrators:

Witness signature

..............................................................................  )
Name:                                                      )
Address:                                                   )

**SIGNED** by Avi D. Pelossof                              )      ..............................................................................
                                                           )      Avi D. Pelossof
in his own capacity and on behalf of the Joint            )
Israeli Administrators without personal liability
and solely for the benefit of the provisions of
this Agreement expressed to be conferred on or
given to the Joint Israeli Administrators:

Witness signature

..............................................................................  )
Name:                                                      )
Address:                                                   )

SIGNED for and on behalf of **NORTEL**    )    …………………………………………..
**NETWORKS SA (IN ADMINISTRATION)**   )    Maître Cosme Rogeau
by **MAÎTRE COSME ROGEAU** as      )
*Liquidateur Judiciaire* (acting as agent and   )
without personal liability) and

Witness signature

…………………………………………………
Name:
Address:

## Schedule A – Other Sellers *

Nortel Networks Technology Corporation
Nortel Networks (CALA) Inc.
Nortel Networks de Argentina, S.A.
Nortel Networks de Mexico, S.A. de C.V.
Nortel de México, S. de R.L. de C.V.
Nortel Networks Peru S.A.C.
Nortel Networks International Inc.
Nortel Networks Australia Pty Limited
Nortel Networks (India) Private Limited
Nortel Networks Japan (in Japan, Nortel Networks Kabushiki Kaisha)
Nortel Networks Malaysia Sdn. Bhd.
Nortel Networks New Zealand Limited
Nortel Networks Singapore Pte. Ltd.
Nortel Networks (Thailand) Ltd.
Nortel Networks (Asia) Limited (except the Pakistan branch which is excluded)
Nortel Networks (China) Limited
PT Nortel Networks Indonesia
Nortel Networks de Guatemala, Ltda.
Nortel Vietnam Limited


*To further clarify, the Egyptian branch of Nortel Networks, Inc. shall not be included as a Main
Seller or an Other Seller.

## Schedule B – EMEA Sellers

Nortel Networks UK Limited (in administration)
Nortel Networks (Austria) GmbH (in administration)
Nortel Networks S.p.A. (in administration)
Nortel Networks N.V. (in administration)
Nortel Networks (Polska) Sp. z.o.o. (in administration)
Nortel GmbH (in administration)
Nortel Networks B.V. (in administration)
Nortel Networks Portugal S.A. (in administration)
Nortel Networks AB (in administration)
Nortel Networks Hispania S.A. (in administration)
Nortel Networks (Ireland) Limited (in administration)
Nortel Networks France S.A.S (in administration)
Nortel Networks A.G.
Nortel Networks o.o.o.
Nortel Networks Slovensko s.r.o. (in administration)
Nortel Networks s.r.o (in administration)
Nortel Networks Romania s.r.l. (in administration)


**The Israeli Company**

Nortel Networks Israel (Sales and Marketing) Limited (in administration)