**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

|  |  |
|---|---|
| *In re*: | Chapter 11 |
| Nortel Networks Inc., *et al.*,[1] | Case No. 09-10138 (KG) |
| Debtors. | Jointly Administered |

**NOTICE OF FILING OF FORTY-SEVENTH REPORT OF THE
MONITOR OF THE CANADIAN NORTEL COMPANIES
<u>IN THE CANADIAN PROCEEDINGS</u>**

---

[1] The Debtors in the Chapter 11 Cases, along with the last four digits of each Debtor's tax identification number, are: Nortel Networks Inc. (6332); Nortel Networks Capital Corporation (9620); Nortel Altsystems Inc. (9769); Nortel Altsystems International Inc. (5596); Xros, Inc. (4181); Sonoma Systems (2073); Qtera Corporation (0251); CoreTek, Inc. (5722); Nortel Networks Applications Management Solutions Inc. (2846); Nortel Networks Optical Components Inc. (3545); Nortel Networks HPOCS Inc. (3546); Architel Systems (U.S.) Corporation (3826); Nortel Networks International Inc. (0358); Northern Telecom International Inc. (6286); Nortel Networks Cable Solutions Inc. (0567) and Nortel Networks (CALA) Inc. (4226).

PLEASE TAKE NOTICE that on June 24, 2010, Ernst & Young Inc., the Monitor and foreign representative of Nortel Networks Corporation and certain of its direct and indirect subsidiaries, Nortel Networks Limited, Nortel Networks Technology Corporation, Nortel Networks Global Corporation, and Nortel Networks International Corporation, in proceedings under Canada's *Companies' Creditors Arrangement Act*, R.S.C. 1985, c. C-36, as amended, pending before the Ontario Superior Court of Justice (Commercial List), by its undersigned counsel, filed, in the above-captioned cases, a copy of the Forty-Seventh Report of the Monitor (the "**Forty-Seventh Report**"), dated May 17, 2010.  A copy of the Forty-Seventh Report is annexed hereto as <u>Exhibit A</u>.

PLEASE TAKE FURTHER NOTICE that a copy of the Forty-Seventh Report is also available on the Monitor's website, www.ey.com/ca/nortel or upon request to the Monitor's counsel.

Dated: June 24, 2010
      Wilmington, Delaware

**ALLEN & OVERY LLP**

Ken Coleman
Lisa Kraidin
1221 Avenue of the Americas
New York, New York  10020
Telephone (212) 610-6300
Facsimile (212) 610-6399
Email:   ken.coleman@allenovery.com
          lisa.kraidin@allenovery.com

-and-

**BUCHANAN INGERSOLL & ROONEY**

By: <u>/s/ Mona A. Parikh</u>
Mary F. Caloway (No. 3059)
Mona A. Parikh (No. 4901)
The Brandywine Building
1000 West Street, Suite 1410
Wilmington, Delaware 19801
Telephone (302) 552-4200
Facsimile (302) 552-4295
Email:   mary.caloway@bipc.com
          mona.parikh@bipc.com

*Attorneys for Ernst & Young Inc., as Monitor and Foreign Representative of the Canadian Nortel Group*

**<u>EXHIBIT A</u>**

Court File No. 09-CL-7950

*ONTARIO*
**SUPERIOR COURT OF JUSTICE**
**(COMMERCIAL LIST)**

**IN THE MATTER OF THE *COMPANIES' CREDITORS'***
***ARRANGEMENT ACT*, R.S.C.1985, c.C-36, AS AMENDED**

**AND IN THE MATTER OF A PLAN OF**
**COMPROMISE OR ARRANGEMENT OF**
**NORTEL NETWORKS CORPORATION, NORTEL NETWORKS**
**LIMITED, NORTEL NETWORKS GLOBAL CORPORATION, NORTEL**
**NETWORKS INTERNATIONAL CORPORATION AND NORTEL**
**NETWORKS TECHNOLOGY CORPORATION (the "Applicants")**

**FORTY-SEVENTH REPORT OF THE MONITOR**
**DATED MAY 17, 2010**

## INTRODUCTION

1.  On January 14, 2009 (the "Filing Date"), Nortel Networks Corporation ("NNC" and collectively with all of its subsidiaries, "Nortel" or the "Company"), Nortel Networks Limited ("NNL"), Nortel Networks Technology Corporation, Nortel Networks International Corporation and Nortel Networks Global Corporation (collectively, the "Applicants") filed for and obtained protection under the *Companies' Creditors Arrangement Act* ("CC AA"). Pursuant to the Order of this Honourable Court dated January 14, 2009, as amended and restated (the "Initial Order"), Ernst & Young Inc. ("EYI") was appointed as the Monitor of the Applicants (the "Monitor") in the CCAA proceedings. The stay of proceedings was extended to July 22, 2010, by this Honourable Court in its Order dated April 14, 2010.

2.  Also on the Filing Date, Nortel Networks Inc. ("NNI") and certain of its U.S. subsidiaries concurrently filed voluntary petitions under Chapter 11 of the United States Bankruptcy Code (the "Code") in the United States Bankruptcy Court for the District of Delaware (the "U.S. Court") (the "Chapter 11 Proceedings"). Nortel Networks (CALA) Inc. filed a voluntary petition under the Code on July 14, 2009. (Nortel Networks (CALA) Inc., NNI

and those of its subsidiaries that filed the Chapter 11 Proceedings on the Filing Date, are referred to collectively as the "U.S. Debtors").

3.      As required by U.S. law, an official committee of unsecured creditors of the U.S. Debtors (the "Committee") was established in January, 2009. Also, an ad hoc group of holders of bonds issued by NNL, NNC and Nortel Networks Capital Corporation has been organized and is participating in these proceedings as well as the Chapter 11 Proceedings (the "Bondholder Group"). In addition, pursuant to Orders of this Honourable Court dated May 27, 2009 and July 22, 2009, respectively, representative counsel was appointed on behalf of the former employees of the Applicants and on behalf of the continuing employees of the Applicants and each of these groups is participating in the CCAA proceedings.

4.      Nortel Networks UK Limited ("NNUK") and certain of its subsidiaries located in EMEA (together the "EMEA Debtors") were granted Administration orders (the "U.K. Administration Orders") by the English High Court on January 14, 2009. The U.K. Administration Orders appointed Alan Bloom, Stephen Harris, Alan Hudson and Chris Hill of Ernst & Young LLP as Administrators of the various EMEA Debtors, except for Ireland, to which David Hughes (Ernst & Young LLP Ireland) and Alan Bloom were appointed (collectively the "UK Administrators"). On June 8, 2009, the UK Administrators appointed in respect of NNUK filed a petition with the U.S. Court for the recognition of the Administration Proceedings as they relate to NNUK under Chapter 15 of the Code. On June 26, 2009, the U.S. Court entered an Order recognizing the English Proceedings as foreign main proceedings under Chapter 15 of the Code.

5.      On January 26, 2009, Nortel Networks Israel (Sales and Marketing) Limited and Nortel Communications Holdings (1997) Limited (together "NN Israel") were granted Administration orders by the court in Israel (the "Israeli Administration Orders"). The Israeli Administration Orders appointed representatives of Ernst & Young LLP in the U.K. and Israel as Administrators of NN Israel and provided a stay of NN Israel's creditors which, subject the further orders of the Israeli Court, remains in effect during the Administration.

6.      Subsequent to the Filing Date, Nortel Networks SA commenced secondary insolvency proceedings within the meaning of Article 27 of the European Union's Council Regulation (EC) No 1346/2000 on Insolvency Proceedings in the Republic of France pursuant to which a liquidator and an administrator have been appointed by the Versailles Commercial Court.

7.      Subsequent to the Filing Date, certain other Nortel subsidiaries have filed for creditor protection or bankruptcy proceedings in the local jurisdiction in which they are located.

**PURPOSE**

8.      The purpose of this Forty-Seventh Report of the Monitor (the "Forty-Seventh Report") is to provide the Monitor's evidence and recommendation on the motion brought by Nortel Networks UK Pension Trust Limited (the "Trustee") and the Board of the Pension Protection Fund (the "PPF") seeking, *inter alia*, to lift the stay of proceedings granted to the Applicants in the Initial Order to allow the FSD Proceeding (as defined below) to "go forward as permitted proceedings" such that the FSD Proceeding shall not be null and void in Canada.

**TERMS OF REFERENCE**

9.      In preparing this Forty-Seventh Report, EYI has relied upon unaudited financial information, the Company's books and records, financial information prepared by the Company and discussions with management of Nortel. EYI has not audited, reviewed or otherwise attempted to verify the accuracy or completeness of the information and, accordingly, EYI expresses no opinion or other form of assurance on the information contained in this Forty-Seventh Report.

10.     Unless otherwise stated, all monetary amounts contained herein are expressed in U.S. dollars.

11.  Capitalized terms not defined in this Forty-Seventh Report are as defined in the Thirty-Eighth Report of the Monitor or other previous reports of the Monitor.


**GENERAL BACKGROUND**

12.  On January 11, 2010, The Pensions Regular (United Kingdom) (the "UKPR") served a document on NNC and NNL at their offices in Mississauga, Ontario styled: "Warning Notice In the matter of NORTEL NETWORKS UK PENSION PLAN ("the Scheme") And in the matter of THE PENSIONS ACT 2004 (the "Act")" (the "Warning Notice").

13.  As detailed in the Thirty-Eighth Report of the Monitor dated February 17, 2010, a copy of which (excluding appendices) is attached as Appendix "A" hereto, the service of the Warning Notice commenced proceedings (the "FSD Proceeding") against NNC and NNL that could culminate in the issuance of a "financial support direction" ("FSD") and other process against NNC and/or NNL making them liable under UK law to contribute up to approximately £2.1 billion toward the deficit in the pension plan maintained by NNUK (the "NNUK Pension Plan"). As such, an FSD, if issued, would create an unsecured liability on the part of NNC and/or NNL.

14.  The Monitor understands the claim of the NNUK Pension Plan against NNUK represents the most significant claim in NNUK's administration proceedings.

15.  In light of the service of the Warning Notice by the UKPR, on February 25, 2010, the Monitor brought a motion seeking various relief, including an Order that the service of the Warning Notice by the UKPR on NNC and NNL and the commencement or continuation of the FSD Proceeding against NNC and NNL amounted to breaches of the stay of proceedings provided for in the Initial Order. On February 26, 2010, the Honourable Justice Morawetz granted certain of the relief requested by the Monitor and an Order (the "February 26 Order") was subsequently entered which provides, in part, as follows:

2. **THIS COURT ORDERS** that the purported exercise of rights by the sending of the Warning Notice by [the UKPR] to NNL and NNC in Canada and the commencement or continuation of proceedings against NNL and NNC in Canada by [the UKPR] under The Pensions Act 2004 (U.K.) amount to breaches of paragraphs 14 and 15 of the [Initial Order].

3. **THIS COURT ORDERS** that for the purposes of these proceedings all acts taken by [the UKPR] in the purported exercise of rights and in commencing any proceedings against any of the Applicants, without the consent of those Applicants and the Monitor or without leave of this Court having been first obtained, are null and void and shall be given no force or effect in these proceedings, nor otherwise recognized as creating or forming the basis of any valid or enforceable rights, remedies or claims against the Applicants or any of their assets, property or undertakings in Canada.

16. The UKPR, supported by the Trustee and the PPF, sought leave to appeal the February 26 Order, which leave was granted by the Ontario Court of Appeal on May 10, 2010. The Ontario Court of Appeal is scheduled to hear the appeal on June 16, 2010.

17. On April 19, 2010, the Trustee and the PPF brought the motion described above at paragraph 8.

**THE TRUSTEE'S AND THE PPF'S LIFT STAY MOTION**

*Present Circumstances of the Restructuring*

18. Although considerable progress has been made in the Applicants' restructuring, the Applicants' employees and professionals are currently engaged in a number of significant projects required to carry out and complete the various Court-approved transactions and other matters necessary to implement the winding down of their businesses under the supervision of the Monitor and the Court, including the following:

a) Nortel's business services division ("NBS") is engaged in providing transition services to the respective purchasers of Nortel's CDMA/LTE Access, Enterprise, Metro Ethernet Networks, GSM/GSM-R, Layer 4-7 and Next Generation Packet Core businesses. The performance by Nortel of its obligations under the various transition services agreements is crucial to ensure that Nortel receives the full

amount of sale proceeds payable in respect of the various Court-approved sale transactions. Furthermore, NBS is in the process of ensuring it will be ready to provide transition services to the purchaser of the CVAS business;

b)     Completing the sale of Nortel's CVAS business for expected sale proceeds of approximately $182 million, which closing is expected to occur on or about May 31, 2010;

c)     Closing the sale of NNL's interest in the LG-Nortel joint venture in late June or early July 2010, which sale is expected to yield proceeds of approximately $242 million in addition to a dividend to NNL of approximately $90 million;

d)     Implementing a strategy for the divestiture or value maximization of Nortel's remaining assets, including its Passport-15 business, extensive patent portfolio and NNL's interest in the GDNT joint venture;

e)     Implementing a strategy for the divestiture of Nortel's Carling campus located in Ottawa, Ontario;

f)     Establishing a distribution process for the corpus of the Nortel Health and Welfare Trust;

g)     Effecting the transition of certain of the registered pension plans sponsored by the Applicants to an administrator to be appointed by the Financial Services Commission of Ontario;

h)     Negotiating and arranging a pension plan for continuing employees of the Applicants for the period commencing October 1, 2010;

i)     Reviewing and reconciling claims filed with the Monitor under the Claims Procedure Order dated June 30, 2009 (as amended and restated the "Claims Procedure Order") and formulating a claims resolution process to be presented to the Court for approval in due course;

j)    Continuing discussions with representatives of Nortel's former employees and other interested stakeholders to finalize a claims process for Compensation Claims; and

k)    Negotiating the global allocation of the sale proceeds of the various business divestitures amongst the Nortel entities here and abroad, which is discussed in greater detail below.

19.    Taken together, the successful completion of these tasks will have a significant impact on the success of the winding down strategy being carried out under the supervision of the Court. It is the Monitor's view that success includes not only maximizing the funds that are ultimately available to be distributed to the Applicants' creditors, but also includes the appropriate and respectful treatment of people affected by the winding down of Nortel's operations. In view of Nortel's constrained financial and human resources at this time, it is vital that the remaining employees of the Applicants and the Applicants' advisors remain focused on carrying out their duties in an orderly and prioritized fashion to deal with urgent needs in the interests of all stakeholders. Nortel must remain on task in fulfilling real time objectives rather than being distracted by other matters prematurely - especially ones that are less time sensitive and would serve to benefit only one group of stakeholders.

20.    The Monitor noted in the Thirty-Eighth Report that, "given the breadth of the allegations contained in the Warning Notice, the Applicants would be required to direct significant resources from a number of different groups to respond to the Warning Notice". The Monitor affirms its view that the degree of involvement required of the Applicants and their advisors to respond meaningfully to expedited, multi-billion dollar litigation in the FSD Proceeding at this time would be extremely prejudicial to the Applicants' ongoing restructuring efforts and the successful completion and implementation of the urgent matters facing the Applicants as listed above.

*The Claims Process*

21.    The Claims Procedure Order established claims bar dates for Prefiling Claims and Restructuring Claims (each as defined in the Claims Procedure Order). The claims bar date for Prefiling Claims was September 30, 2009.

22.    On or about September 30, 2009, the Trustee and the PPF filed proofs of claim against each of the Applicants, which included a claim "...in the amount to be determined to be owing to [the Trustee and the PPF] pursuant to the [FSD Proceeding]..."

23.    As previously reported to this Honourable Court, approximately 921 proofs of claim for Prefiling Claims totalling in excess of CDN$27 billion were filed against the Applicants prior to the claims bar date.[1] The complexity of Nortel's operations has resulted in a significant number of duplicate or overlapping claims that the Applicants and the Monitor continue to review. In addition, the Applicants and the Monitor continue to reconcile the claims filed as against the Applicants' books and records.

24.    The Applicants are not yet in a position to implement a claims resolution process and, as such, no creditor of the Applicants is in a position to know that its claim has been "resolved" or "accepted".[2]

25.    The purpose of implementing the claims process is to provide a central forum for resolving all claims against the Applicants in an organized, efficient and fair manner that respects the rights of all stakeholders while minimizing prejudice to other aspects of the Applicants' restructuring. Allowing one creditor to pursue a claim outside this process (whether to determine liability, quantify liability or otherwise), in addition to prejudicing the ongoing restructuring efforts by distracting the Applicants from their urgent tasks, is contrary to the rationale for implementing the claims process in the context of these CCAA proceedings as a means of controlling the stream of litigation against the Applicants and otherwise providing a forum for the fair, efficient and timely resolution of all claims against the Applicants.

---

[1] As previously noted, these claims do not include Compensation Claims. Additional claims have been filed subsequent to the claims bar date.
[2] The Monitor anticipates that the Applicants will be seeking this Honourable Court's approval of a claims resolution order in the near term.

26.    The Monitor observes that the UKPR, the party prosecuting the FSD Proceeding, has not sought leave from this Honourable Court to lift the stay notwithstanding this Honourable Court's finding that the service of the Warning Notice in Canada and the commencement or continuation of proceedings against NNC and NNL in Canada are acts in breach of the Initial Order. The UKPR has continued to prosecute the FSD Proceeding, including scheduling a hearing to begin on June 2, 2010, without the involvement of NNC, NNL or NNI (among others).  As such, it is clear the UKPR has not expressed contrition for its breaches of the Initial Order and is continuing to assert its process in a manner that is outside of the supervision of this Honourable Court. In the circumstances, it is inappropriate for parties who are before this Court to ask the Court to exercise its discretion in favour of a person who does not accept the obligation to comply with the Orders of this Court as the Court will have no assurance that the UKPR will be amenable to the ongoing supervision of the Court if the relief requested by the Trustee and the PPF is granted.  Rather, it can be expected that the UKPR, which is statute bound to protect the NNUK Pension Plan and to reduce the risk that compensation will be payable from the PPF, will continue to act unilaterally and in its own perceived best interest without regard to the jurisdiction of this Honourable Court and despite findings that this Court may make concerning the best interests of the Applicants' stakeholders generally both here and abroad.

### Sale Proceeds Allocation

27.    As a component of determining the liability, if any, of NNC and NNL in relation to the funding deficit in the NNUK Pension Plan, the Monitor understands the UKPR will attempt to demonstrate that NNUK was in effect "underfunded" relative to its contribution to the global Nortel enterprise and that such underfunding led, in turn, to the underfunding of the NNUK Pension Plan. To establish this, the UKPR seeks to have determinations made in the FSD Proceeding regarding, among other things, the operation of Nortel's transfer pricing system, the credit given to NNUK for its relative contribution to Nortel's global R&D, and the impact of a 2007 corporate reorganization of certain of the EMEA entities.

28.   As previously reported to this Honourable Court, these very issues are at the heart of negotiations regarding the allocation of the sale proceeds of the various business divestitures. Both this Honourable Court and the U.S. Court have recognized this process. The Applicants, the Monitor, the U.S. Debtors, the Joint Administrators and certain of their respective constituents continue to negotiate the allocation of the sale proceeds and the settlement of intercompany claims.

29.   The Applicants' entitlement to a portion of the approximately $3 billion of sale proceeds and the resolution of intercompany claims will have a significant impact on the ultimate recovery to creditors of the Applicants. The Applicants and the Monitor are participating in that process to effectively advocate the Canadian position in regard to Nortel's transfer pricing regime and the relative contribution of the various Nortel entities to the value of the divested Nortel business units. The Applicants and the Monitor are negotiating with the U.S. Debtors, the Committee and the UK Administrators, among others, in a multi-national process designed to try to create a level playing field. The Monitor is of the view that regardless of whether they may have pensions expertise, the Determinations Panel in the FSD Proceeding is not a fair or appropriate forum for the determination of such multi-national business issues and it is apparent the findings of the Determinations Panel will be used to prejudice the Applicants' position in the allocation process to the detriment of all of the Applicants' stakeholders.

30.   While the Trustee and PPF assert that the FSD Proceeding is a convenient forum to determine the worldwide liability of the Nortel group concerning the NNUK Pension Plan, many of the Nortel entities served with the Warning Notice have already indicated they will not be participating in the FSD Proceeding.

31.   In addition, it is clear from the Warning Notice that a central focus of the FSD Proceeding will be the role of NNL and, in particular, NNC, the ultimate parent company of the Nortel group, in light of the UKPR's allegations that the decisions made by NNC and NNL led to the funding deficiency of the NNUK Pension Plan. In short, the FSD Proceeding is designed to determine and quantify the liability of two of the Applicants in

- 11 -

relation to pending claims, which is precisely what the claims process has been established by this Honourable Court to do.

32.   There is neither need for nor convenience to allowing matters which are already being dealt with pursuant to Orders made in these proceedings and on a global basis to be dealt with by a single administrative tribunal that professes a statutory and fiduciary obligation to maximize recovery for the creditors of its domestic jurisdiction. It is apparent that the FSD Proceeding is designed to give the Trustee and the PPF a "leg-up" in the claims process established by this Honourable Court and in the allocation process recognized by this Court and the U.S. Court.

33.   As noted by the Honourable Judge Gross in his Memorandum of Opinion dated March 9, 2010, until the allocation procedure is complete, the relative financial condition of the various Nortel entities, including NNC, NNL and NNUK, simply cannot be determined. In holding that the automatic stay under Chapter 11 applied to the FSD Proceeding, Judge Gross held:

> The Court is satisfied that the [Trustee and the PPF] seek to litigate, in the context of an administrative proceeding before a U.K. administrative body whose sole focus is the financial protection of U.K. pension plan members and an insurance vehicle [the PPF], the question of whether NNUK's contributions to the "global" Nortel business received inadequate financial recognition pre-filing so that now it is "reasonable" to impose financial responsibility on its affiliates. That issue overlaps heavily with the issues in the allocation dispute. The question of whether and to what extent affiliates of NNUK should be responsible for NNUK's obligations is part and parcel of the entire cross-affiliate benefit and contribution issue and the allocation process.

> Indeed, the resolution of the issues [the Trustee and PPF] seek to litigate in the U.K. Proceedings may involve consideration of the same factors -- including Nortel's transfer pricing arrangements, Nortel's Master Research and Development Agreement, the value of certain research and development, ownership rights to Nortel's intellectual property, and individual corporate assets and revenues -- as those that may be significant to the allocation process.

> The Nortel debtors in Canada, the U.S., and the U.K. have agreed that these issues must be resolved, on a global basis, in a single cross-jurisdictional

forum. They should not be decided, even in part, by an administrative body in a single jurisdiction with a single constituency.

34.     Finally, the Monitor understands that the Trustee and the PPF have expressed concern regarding the June 30, 2010, date which is the statutory deadline for the issuance of an FSD under the Warning Notice. The approaching deadline flows from the unilateral determinations of the UKPR. First, it chose that its "review date" for the purposes of the FSD Proceeding would be June 30, 2008, rather than a later or more relevant date, i.e. the Filing Date. Then, it chose to withhold service of the Warning Notice until more than 19 of the available 24 month period for issuing an FSD had already elapsed. Finally, it chose to proceed without seeking to lift the stay in the Initial Order or the automatic stay in the U.S. in order to deal with the alleged prejudice of its statutory time limit in an orderly manner that respects the jurisdiction and processes of this Honourable Court and the U.S. Court. Both Courts have already recognized that contingent claims have been filed in each of their respective claims processes. The assessment of the validity and quantum of these claims as filed is a matter that can and should wait for the carrying out of the claims resolution aspects of the claims processes. The extent to which the timing of the various actions of the parties affects the validity and quantum of the claims as filed will be determined at that time.

## MONITOR'S ANALYSIS AND RECOMMENDATIONS

35.     The Monitor is of the view that this Honourable Court should not grant the relief requested by the Trustee and the PPF for the following reasons:

a)      It is imperative that the Applicants be permitted to focus on their continued restructuring efforts for the benefit of all stakeholders and participation in the FSD Proceeding would constitute a distraction that would be highly prejudicial to the restructuring process as approved by and supervised by this Honourable Court;

b)      This Honourable Court has established the claims process as a forum for resolving the claims filed against the Applicants. The determination of the Trustee's and the

- 13 -

PPF's claim as it relates to the FSD Proceeding will be made in the context of such claims process. As such, it is neither just nor convenient for the FSD Proceeding to determine or quantify the liability of NNC or NNL and permitting such a determination would undermine the rationale for implementing the claims process; and

c)    The findings made by the Determinations Panel could be used to undermine the process for the allocation of the sale proceeds of the various Nortel business unit divestitures recognized by this Honourable Court and agreed to by the Applicants, the U.S. Debtors and the UK Administrators.

All of which is respectfully submitted this 17th day of May, 2010.

**ERNST & YOUNG INC.**
In its capacity as Monitor of the Applicants

Murray A. McDonald
President
\5846451

APPENDIX "A"

[ATTACHED]

Court File No. 09-CL-7950    28

*ONTARIO*
SUPERIOR COURT OF JUSTICE
(COMMERCIAL LIST)

IN THE MATTER OF THE *COMPANIES' CREDITORS
ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF
COMPROMISE OR ARRANGEMENT OF
NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED,
NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS
INTERNATIONAL CORPORATION AND NORTEL NETWORKS
TECHNOLOGY CORPORATION

THIRTY-EIGHTH REPORT OF THE MONITOR
DATED FEBRUARY 17, 2010

## INTRODUCTION

1.  On January 14, 2009 (the "**Filing Date**") Nortel Networks Corporation ("**NNC**" and collectively with all its subsidiaries "**Nortel**" or the "**Company**"), Nortel Networks Limited ("**NNL**"), Nortel Networks Technology Corporation, Nortel Networks International Corporation and Nortel Networks Global Corporation (collectively the "**Applicants**") filed for and obtained protection under the *Companies' Creditors Arrangement Act* ("**CCAA**"). Pursuant to the Order of this Honourable Court dated January 14, 2009, as amended and restated (the "**Initial Order**"), Ernst & Young Inc. was appointed as the Monitor of the Applicants (the "**Monitor**") in the CCAA proceedings. The stay of proceedings was extended to April 23, 2010, by this Honourable Court in its Order dated January 21, 2010.

2.  Nortel Networks Inc. ("**NNI**") and certain of its U.S. subsidiaries concurrently filed voluntary petitions under Chapter 11 of Title 11 of the U.S. Bankruptcy Code (the "**Code**") in the United States Bankruptcy Court for the District of Delaware (the "**U.S. Court**") on January 14, 2009 (the "**Chapter 11 Proceedings**"). As required by U.S. law, an official unsecured creditors committee (the "**Committee**") was established in January, 2009.

29

3.    An ad hoc group of holders of bonds issued by NNL, NNC and Nortel Networks Capital Corporation has been organized and is participating in these proceedings as well as the Chapter 11 Proceedings (the "**Bondholder Group**"). In addition, pursuant to Orders of this Honourable Court dated May 27, 2009, and July 22, 2009, representative counsel was appointed on behalf of the former employees of the Applicants and on behalf of the continuing employees of the Applicants, respectively, and each of these groups is participating in the CCAA proceedings.

4.    Nortel Networks (CALA) Inc. (together with NNI and certain of its subsidiaries that filed on January 14, 2009, the "**U.S. Debtors**") filed a voluntary petition under Chapter 11 of Title 11 of the Code in the U.S. Court on July 14, 2009.

5.    Nortel Networks UK Limited ("**NNUK**") and certain of its subsidiaries located in EMEA were granted Administration orders (the "**U.K. Administration Orders**") by the High Court of England and Wales on January 14, 2009 (collectively the "**EMEA Debtors**"). The U.K. Administration Orders appointed Alan Bloom, Stephen Harris, Alan Hudson and Chris Hill of Ernst & Young LLP as Administrators of the various EMEA Debtors, except for Ireland, to which David Hughes (Ernst & Young LLP Ireland) and Alan Bloom were appointed (collectively the "**Joint Administrators**"). On June 8, 2009, the Joint Administrators appointed in respect of NNUK filed a petition with the U.S. Court for the recognition of the Administration Proceedings as they relate to NNUK (the "**English Proceedings**") under Chapter 15 of the Code. On June 26, 2009, the U.S. Court entered an order recognizing the English Proceedings as foreign main proceedings under Chapter 15 of the Code.

6.    On January 20, 2009, Nortel Networks Israel (Sales and Marketing) Limited and Nortel Communications Holdings (1997) Limited (together "**NN Israel**") were granted Administration orders by the court in Israel (the "**Israeli Administration Orders**"). The Israeli Administration Orders appointed representatives of Ernst & Young LLP in the U.K. and Israel as Administrators of NN Israel (the "**Joint Israeli Administrators**") and provided a stay of NN Israel's creditors which, subject to further order of the Israeli Court, remains in effect during the Administration.

30

7.   Subsequent to the Filing Date, Nortel Networks SA commenced secondary insolvency proceedings within the meaning of Article 27 of the European Union's Council Regulation (EC) No 1346/2000 on Insolvency Proceedings in the Republic of France pursuant to which a liquidator and an administrator have been appointed by the Versailles Commercial Court.

**PURPOSE**

8.   The purpose of this Thirty-Eighth Report (the **"Thirty-Eighth Report"**) is to provide an overview of the proceedings commenced by The Pensions Regulator (United Kingdom) against NNC and NNL and to provide support for the Monitor's motion seeking the relief outlined in the Notice of Motion.

**TERMS OF REFERENCE**

9.   In preparing this Thirty-Eighth Report, the Monitor has relied upon unaudited financial information, the Company's books and records, financial information prepared by the Company and discussions with management of Nortel. The Monitor has not audited, reviewed or otherwise attempted to verify the accuracy or completeness of the information and accordingly, the Monitor expresses no opinion or other form of assurance on the information contained in this Thirty-Eighth Report.

10.  Unless otherwise stated, all monetary amounts contained herein are expressed in U.S. dollars.

11.  Capitalized terms not defined in this Thirty-Eighth Report are as defined in the Affidavit of John Doolittle sworn on January 14, 2009 (the "Doolittle Affidavit") or previous reports of the Monitor.

12.  The Monitor has made various materials relating to the CCAA proceedings available on its website at www.ey.com/ca/nortel. The Monitor's website also contains a dynamic link to Epiq Bankruptcy LLC's website where materials relating to the Chapter 11 Proceedings are posted.

- 4 -

31

**OVERVIEW OF THE PENSIONS REGULATOR'S PROCEEDING**

13.    On January 11, 2010, The Pensions Regulator issued a document to NNC and NNL
       styled: "Warning Notice In the matter of NORTEL NETWORKS UK PENSION PLAN
       ("the Scheme") And in the matter of THE PENSIONS ACT 2004 (the "Act")" (the
       **"Warning Notice"**).

14.    The Warning Notice is a pleading required under *The Pensions Act 2004* (U.K.) (the
       **"U.K. Statute"**) that commences a proceeding enabling The Pensions Regulator to make
       "financial support direction" (**"FSD"**) orders pursuant to the U.K. Statute so as to cause
       affiliates of NNUK to become liable to contribute up to approximately £2.1 billion
       toward the deficit in the pension plan maintained by NNUK (the **"NNUK Pension
       Plan"**).

15.    The Warning Notice has also been issued against, amongst other Nortel entities, NNI and
       Nortel Networks (CALA) Inc. The Monitor understands the U.S. Debtors are bringing a
       motion in the Chapter 11 Proceedings seeking relief similar in nature to the relief being
       sought by the Monitor in the within motion.

16.    In the Warning Notice, The Pensions Regulator purported to exercise rights against NNC
       and NNL under the U.K. Statute including, without limitation, the commencement of
       proceedings and the purported right to deem certain facts under Regulation 12 of the U.K.
       Statute.

17.    The ultimate result of the Warning Notice proceeding could be the issuance of an FSD
       and contribution notice (**"CN"**) against NNC and/or NNL that would purport to hold one
       or both of them liable for all or a portion of the funding deficiency in the NNUK Pension
       Plan.

18.    Further details regarding the Warning Notice as well as the circumstances surrounding it
       are provided below at paragraphs 44 to 65.

- 5 -

32

## OVERVIEW OF PROCEEDINGS TO DATE

### *The Initial Order and Stay*

19.    As noted above at paragraph 1, on January 14, 2009, this Honourable Court granted the Initial Order that, amongst other things, stayed all proceedings against the Applicants and stayed the rights and remedies of all persons against or in respect of the Applicants, or their business or property:

> 14. THIS COURT ORDERS that until and including February 13, 2009 or such later date as this Court may order (the "Stay Period"), no proceeding or enforcement process in any court or tribunal (each, a "Proceeding") shall be commenced, or continued against or in respect of any of the Applicants or the Monitor, or affecting the Business or the Property, except with the written consent of the affected Applicant and the Monitor, or with leave of this Court, and any and all Proceedings currently under way against or in respect of the affected Applicant or affecting the Business or the Property are hereby stayed and suspended pending further Order of this Court.

> 15. THIS COURT ORDERS that during the Stay Period, all rights and remedies of any individual, firm, corporation, governmental body or agency, or any other entities (all of the foregoing, collectively being "Persons" and each being a "Person") against or in respect of the Applicants or the Monitor, or affecting the Business or the Property, are hereby stayed and suspended except with the written consent of the affected Applicant and the Monitor, or leave of this Court, provided that nothing in this Order shall (i) empower the Applicants to carry on any business which the Applicants are not lawfully entitled to carry on, (ii) exempt the Applicants from compliance with statutory or regulatory provisions relating to health, safety or the environment, (iii) prevent the filing of any registration to preserve or perfect a security interest, or (iv) prevent the registration of a claim for lien.

20.    The stay period provided for in the Initial Order has been extended by numerous subsequent Orders of this Honourable Court, most recently until April 23, 2010, pursuant to an Order dated January 21, 2010. Copies of the Initial Order and the most recent stay extension order are attached as Appendices "A" and "B", respectively.

### *Claims Process*

21.    On July 30, 2009, this Honourable Court granted a Claims Procedure Order (as amended and restated, the "**Claims Procedure Order**") that, amongst other things, established claims bar dates for Prefiling Claims and Restructuring Claims (each as defined in the

33

Claims Procedure Order). The claims bar date for Prefiling Claims was September 30, 2009. A copy of the Claims Procedure Order is attached as Appendix "C" hereto.

22.     On or about September 30, 2009, the Nortel Networks UK Pension Trust Limited (the "**Trustee**"), the trustee of the NNUK Pension Plan, and the U.K. Protection Pension Fund (the "**PPF**")[1] filed proofs of claim against each of the Applicants. These proofs of claim are discussed in greater detail below beginning at paragraph 40.

23.     The Applicants have recently begun discussions on a cross-border claims protocol with the U.S. Debtors which, in conjunction with a claims resolution order, will form the basis for resolving the Prefiling Claims and Restructuring Claims filed against the Applicants.

*Sales Processes and Allocation Protocol*

24.     As this Honourable Court knows, Nortel has been auctioning off its various global businesses as a means of preserving those businesses as going concerns and maximizing value for its global creditors. To date, these auctions have resulted in expected sale proceeds to Nortel of approximately $3 billion.

25.     The task of allocating the sale proceeds from the sales of these businesses amongst the various Nortel entities worldwide is complex as the businesses are not operated through dedicated legal entities or stand-alone divisions.

26.     As set out in the Fifteenth Report, the Applicants, the U.S. Debtors, and certain of the EMEA entities, through the Joint Administrators, entered into the Interim Funding and Settlement Agreement ("**IFSA**") which was approved by this Honourable Court on June 29, 2009. A copy of the IFSA is attached as Appendix "D" hereto. Pursuant to the IFSA, each of the Applicants, the U.S. Debtors and the EMEA Debtors agreed that the proceeds shall be deposited in an escrow account and any distribution from the escrow account shall be contingent upon (i) the agreement of the relevant parties, or (ii) in the case where

---

[1] The PPF is a corporation established pursuant to the U.K. Statute that administers a statutory fund that provides compensation to members of defined benefit pension plans in the U.K. where there is a qualifying insolvency event and insufficient assets in the plan to provide benefits of the same amount as the compensation which the PPF would provide.

- 7 -

34

the parties fail to reach an agreement, a determination of the allocation by the relevant dispute resolvers.

27.     In accordance with the IFSA, the sale proceeds received by Nortel in connection with the CDMA/LTE Access, Enterprise, Layer 4-7 and Next Generation Packet Core businesses have been placed into escrow and the sale proceeds from the MEN transaction, the GSM/GSM-R transaction and the CVAS transaction will also be placed into escrow.

28.     The parties to the IFSA have also agreed to negotiate in good faith in an attempt to reach agreement on a protocol (the "**Allocation Protocol**") for resolving disputes concerning the allocation of sales proceeds where the parties have been unable to reach an agreement regarding such allocation.

29.     Subsequent to the execution of the IFSA, the relevant parties have been negotiating the terms of the Allocation Protocol in good faith and considerable progress on the terms of the Allocation Protocol has been made. In addition, the relevant entities have begun submitting preliminary requests for information in connection with their efforts to agree on an allocation and on the terms of the Allocation Protocol.

30.     As noted above, NNUK, through the Joint Administrators, is a party to the IFSA and will be one of the parties to the Allocation Protocol. The Monitor expects that, as part of the allocation negotiations and, if necessary, the dispute resolution process envisioned under the draft Allocation Protocol, parties are likely to assert claims based on pre-filing contributions and other factors, which claims are likely to be contested.

*Present Circumstances of the Restructuring*

31.     As detailed at paragraphs 14 to 34 of the Thirty-Seventh Report, the Applicants have made considerable strides in implementing their restructuring strategy; however, a number of crucial steps remain, including, amongst other things:

        (a)     closing the sale of the MEN business for sale proceeds valued at approximately $769 million;

- 8 -

(b)     closing the sale of GSM/GSM-R business for proceeds of approximately $103 million;

(c)     completing the sale of the CVAS business, including conducting an auction scheduled for February 25, 2010;

(d)     selecting a purchaser for NNL's interest in the LG-Nortel joint venture and closing such transaction;

(e)     ensuring the smooth transition of the above businesses, as well as the CDMA/LTE Access and Enterprise businesses, to their respective purchasers in accordance with the various transition services agreements that Nortel has entered into or will enter into;

(f)     implementing a strategy for the divestiture or value maximization of Nortel's remaining assets, including its Passport-15 business and extensive patent portfolio;

(g)     finalizing a claims resolution order and cross-border claims protocol, as well as establishing a claims process for Compensation Claims (as defined in the Claims Procedure Order);

(h)     finalizing the Allocation Protocol and allocating sale proceeds; and

(i)     distributing the Applicants' assets to their creditors.

32.     In sum, while significant progress has been made in the Applicants' restructuring to date, there remains many crucial tasks to be completed in the coming months that require the full attention of the Applicants.

33.     It is imperative that the Applicants' management and advisors be permitted to stay focused on the remaining divestitures and the other tasks described above for the benefit of all stakeholders.

## THE NNUK PENSION PLAN CLAIMS[2]

34.    As noted above, NNUK is a direct subsidiary of NNL and is subject to administration proceedings in the United Kingdom.

35.    In 1991, Northern Telecom PLC, a wholly owned subsidiary of Northern Telecom Limited (which in 1999 became NNC), acquired the shares of STC plc ("**STC**"), a public company headquartered in the United Kingdom. STC had sponsored a defined benefit pension scheme for the benefit of its U.K. employees since 1949. Upon the acquisition of STC, NNUK became the sponsor and participating employer of this pension plan, which subsequently became the NNUK Pension Plan.

36.    The Monitor understands that in 2006 the Trustee and NNUK entered into negotiations regarding a funding deficiency in the NNUK Pension Plan. These negotiations ultimately resulted in NNUK and the Trustee entering into certain arrangements regarding the funding of the NNUK Pension Plan, including the payment of past service deficit contributions and current service contributions.

37.    At the request of the Trustee, NNL provided a guarantee dated November 21, 2006, in favour of the Trustee (the "**Guarantee**") of certain of NNUK's obligations in relation to the NNUK Pension Plan, including NNUK's obligation to make the past service deficit contributions described above in paragraph 36. A copy of the Guarantee is attached as Appendix "E" hereto. NNL's obligations under the Guarantee are triggered by NNUK's failure to, amongst other things, make the past service deficit contributions. The Monitor understands that NNUK has failed to make certain of the past service deficit contributions. The proof of claim filed by the Trustee and the PPF against NNL claims £495.25 million (or approximately CAD$880 million converted at the exchange rate approved in the Claims Procedure Order) on account of the Guarantee.

38.    In 2007, again at the request of the Trustee, NNL provided a second guarantee in favour

---

[2] The descriptions of the Trustee's and/or the PPF's potential claims contained in this Thirty-Eighth Report are for informational purposes only and shall in no way constitute admission or acceptance of all or a portion of the proofs of claim filed by the Trustee and the PPF.

- 10 -

of the Trustee dated December 21, 2007 (the "**Insolvency Guarantee**"), a copy of which is attached as Appendix "F" hereto. The Insolvency Guarantee is triggered by an Insolvency Event (as defined in the Insolvency Guarantee) occurring in connection with NNUK. The amount of the Insolvency Guarantee is limited to a maximum of $150 million.

39.     The Monitor understands that NNL's decision to provide the Guarantee and the Insolvency Guarantee were the result of extensive negotiations amongst the Trustee, NNUK and NNC/NNL in respect of the NNUK Pension Plan. The Monitor further understands that The Pensions Regulator was aware of these negotiations as well as the terms of the Guarantee and the Insolvency Guarantee.

40.     On September 30, 2009, the Trustee and the PPF filed the proofs of claim referenced above at paragraph 22. A copy of a portion of the proof of claim filed by the Trustee and the PPF against NNL is attached as Appendix "G" hereto.[3]

41.     In addition to describing the claims the Trustee and the PPF make against NNL in relation to the Funding Guarantee and the Insolvency Guarantee, the proof of claim purports to make a claim, "...in the amount to be determined to be owing to [the Trustee and the PPF] pursuant to the Financial Support Direction Proceedings undertaken pursuant to the provisions of the [U.K. Statute]", which claim is discussed in greater detail below.

42.     NNUK, through the Joint Administrators, has also filed proofs of claim against each of the Applicants in the claims process, which proofs of claim purport to be, "in respect of any heretofore unknown, unliquidated, or unmatured claim or claims..."[4]

43.     In addition, on September 30, 2009, the Trustee served a demand letter on NNL in Canada for payment under the Guarantee.

---

[3] As the proof of claim is well over a 1000 pages long, most of the appendices thereto, being copies of the relevant agreements, correspondence and U.K. statutory provisions (many of which are already attached as Appendices to this Thirty-Seventh Report) are omitted.

[4] The Monitor notes that the Claims Procedure Order designated intercompany claims as "Excluded Claims".

THE WARNING NOTICE

### *Financial Support Directions*

44.  The Monitor understands that, pursuant to the U.K. Statute, The Pensions Regulator has a mandate to protect the plan benefits of members of certain U.K. pension plans and to reduce the risk that compensation would be required from the PPF to honour those benefits.

45.  In furtherance of that objective, the U.K. Statute gives authority to The Pensions Regulator to issue an FSD pursuant to Section 43 of the U.K. Statute where the employer funding the pension plan is either (a) a service company, or (b) "insufficiently resourced".

46.  An FSD, which is preceded by a Warning Notice, is a direction issued by the determinations panel of The Pensions Regulator to secure financial support for a pension plan. An FSD: (i) may only be issued against a person who is either the employer, or is "connected and/or associated with" the employer, regardless of where such entity is situate; (ii) specifies a certain time period during which the financial support is to be put in place, and directs that this support is to continue for as long as the pension plan is in existence; and (iii) may only be issued against a non-employer if the determinations panel of The Pensions Regulator believes it is reasonable to do so.

47.  In deciding whether it is reasonable to issue an FSD against a non-employer, the determinations panel considers certain factors it regards as relevant, including: (a) the relationship between the non-employer and the employer, including whether the non-employer controlled the employer; (b) the value of any benefits received directly or indirectly by the non-employer from the employer; (c) any connection or involvement of the non-employer with the pension plan; (d) the financial circumstances of the non-employer; and (e) such other matters as may be prescribed.

48.  If the determinations panel decides to issue an FSD, the financial support may take a form reasonable under the circumstances, including any combination of the following: (a) instructing all non-employers who are members of the same corporate group as the

- 12 -

39

employer to assume joint and several liability for the whole or part of the employer's pension liabilities; (b) where there is a holding company for the employer's corporate group, instructing the holding company to assume liabilities for the whole or part of the employer's pension liabilities; and/or (c) any other arrangement that meets the statutory requirements and provides financial resources to the employer's pension plan. An arrangement is prescribed for these purposes if the parties consent to the jurisdiction of the courts of England and Wales and enter into a legally enforceable agreement.

49.    In addition to its ability to issue an FSD, The Pensions Regulator may issue a CN when it believes: (i) that the target has not complied with the FSD (such that the pension plan remains not fully supported financially); and (ii) it is reasonable to do so.

50.    The persons to whom a CN is issued are under a liability to pay to the trustee of the pension plan the sum specified in the CN. The CN may be for all or part of the amount by which the pension plan is under-funded. This amount is treated as a debt due to the trustee of the pension plan. While The Pensions Regulator can generally exercise the powers of the trustee of the pension plan to recover such debt during an assessment period (which the NNUK Pension Plan has been in since NNUK entered administration proceedings), only the PPF may exercise the trustee's rights and powers.

51.    In determining whether it is reasonable to issue a CN, The Pensions Regulator must consider both the reasonableness of issuing a CN to a particular person and the reasonableness of the sum specified in the notice. The Pensions Regulator must also have regard for such matters as it considers relevant, including, with respect to a non-employer: (a) whether the non-employer has taken reasonable steps to procure financial support for the pension plan; (b) the relationship the non-employer has or had with the employer, including whether the non-employer controlled the employer; (c) the value of any benefits received directly or indirectly by the non-employer from the employer; (d) the relationship that the non-employer has or had with the parties to any arrangements put in place in accordance with the FSD (including whether the non-employer has or had control of those parties); (e) any connection or involvement which the non-employer has or had with the employer's pension plan; (f) the financial circumstances of the non-employer; and (g) such other matters as may be prescribed.

- 13 -

40

### Service of the Warning Notice

52.    On September 4, 2009, NNC received a letter from The Pensions Regulator purporting to alert the Applicants to the fact that The Pensions Regulator was considering issuing a warning notice pursuant to sections 96(2) and 43(2) of the U.K. Statute. A copy of this letter is attached hereto as Appendix "H".

53.    On September 16, 2009, NNC sent a letter to The Pensions Regulator indicating that:

> ... there is a stay of proceedings under Canadian law in relation to NNC and certain of its subsidiaries, and by [the Claims Procedure Order], the Canadian Court has ordered that the bar date for submitting claims against NNC (and relevant subsidiaries) is 30 September 2009. All claims against NNC (and relevant subsidiaries) are being dealt with in accordance with the claims procedure for debtors pursuant to [the Claims Procedure Order] and the [CCAA].

> As you can therefore appreciate, NNC is not in a position to enter into any correspondence with individual entities in respect of potential claims against NNC.

A copy of this letter is attached hereto as Appendix "I".

54.    On November 11, 2009, The Pensions Regulator wrote to the Joint Administrators. A copy of this letter is attached hereto as Appendix "J". This letter stated in part:

> The Pensions Regulator will shortly be in a position to issue the appropriate warning notice under section 96 of the [U.K. Statute] [...]. As many if not all these Nortel entities are also in some form of insolvency process, we anticipate that the financial support sought will be simply the ability of the pension scheme to prove in the various insolvency estates as a creditor.

55.    On January 13, 2010, NNL and NNC each received a copy of a letter addressed to John Doolittle from The Pensions Regulator purporting to serve NNL and NNC in Canada with the Warning Notice pursuant to Section 303 of the U.K. Statute. Copies of these letters are attached hereto as Appendices "K" and "L".

41

56.    The Warning Notice is more than 150 pages in length and includes nine binders of supporting documents. The supporting documents include financial documents, spreadsheets and witness statements sworn by former Nortel employees.

57.    The Warning Notice, in paragraph 1, states:

> This is a Warning Notice issued by the [The Pensions Regulator] against the above named target companies which are part of the Nortel Group. It is issued pursuant to sections 96(2) and 43(2) of the [U.K. Statute]. [The Pensions Regulator] believes that it is reasonable, within the meaning of section 43(5) of the [U.K. Statute], to require the companies against whom this Warning Notice is issued to put in place financial support for the [NNUK Pension Plan]. NNUK entered administration on 14 January 2009 with a deficit in its pension scheme of some £2.1 billion. This Warning Notice is also being sent to the [Trustee and the PPF] as Directly Affected Parties.

58.    The Warning Notice purports to require written representations from NNC and NNL by no later than midday on March 1, 2010, failing which the determinations panel of The Pensions Regulator will make its decisions based on the information contained in the Warning Notice.

59.    On February 9, 2010, the Monitor sent a letter to The Pensions Regulator indicating the issuance of the Warning Notice was in direct contravention of the stay of proceedings granted by this Honourable Court pursuant to the Initial Order and that the Monitor would bring the within motion to, amongst other things, enforce the stay. A copy of the Monitor's letter is attached hereto as Appendix "M". In a letter dated February 15, 2010, The Pensions Regulator replied that they were preparing a response to the Monitor's letter and hoped to be able to reply within the next seven days. A copy of The Pensions Regulator's letter is attached as Appendix "N".

*Implications of the Warning Notice*

60.    Section 82 of the U.K. Statute prevents any person from disclosing information that has been obtained by The Pensions Regulator in the exercise of its functions and is not already publicly available ("**Restricted Information**"). The Monitor is of the view that the Warning Notice does not contain Restricted Information as the majority of its contents were either not obtained by The Pensions Regulator from another person, or, in

- 15 -

42

the case of information which appears to have been obtained from NNUK, are already publicly available. However, without prejudice to this position and out of an abundance of caution, the Monitor has written to the U.K. Administrators seeking their consent to the disclosure to this Honourable Court of any Restricted Information obtained from and/or relating to NNUK. A copy of this letter is attached as Appendix "O" hereto. To date, no response has been received. Accordingly, the Monitor has elected not to file a copy of the Warning Notice with this Honourable Court at this point in time.

61.    The Monitor is able to report that the theory of liability advanced in the Warning Notice is prefaced on The Pensions Regulator's views of, amongst other things:

(a)    the operation of Nortel's transfer pricing system;

(b)    the operation of the NNUK Pension Plan;

(c)    NNUK's ability to resource the pension scheme;

(d)    the credit given to NNUK for its relative contribution to Nortel's R&D;

(e)    the credit given to NNUK for its performance of corporate functions; and

(f)    a 2007 corporate reorganization of the EMEA entities.

62.    The Monitor expects certain of these issues – most notably Nortel's transfer pricing system – will be at the heart of negotiations regarding the allocation of the sale proceeds of the various business divestitures and, failing the consensual resolution of such allocation, the dispute resolution process contemplated by the draft Allocation Protocol. Accordingly, the commencement of proceedings by The Pensions Regulator that would purport to make findings in respect of such matters threatens the sanctity of the allocation process that both this Honourable Court and the U.S. Court have approved, and the Joint Administrators have agreed to.

63.    Moreover, such proceedings are neither necessary nor permissible where this Honourable Court has already established a claims process for resolving claims against the Applicants. Furthermore, the entities with the ultimate economic interest in the

- 16 -

43

proceedings commenced by The Pensions Regulator, being the Trustee and the PPF, have filed claims in the claims process that are, in part, the same claim that the determinations board of The Pensions Regulator would pass judgment on.

64.     In addition, allowing the FSD proceedings to continue in the face of the stay would distract the Applicants' management from the ongoing restructuring efforts as outlined above at paragraph 31. Given the breadth of the allegations contained in the Warning Notice, the Applicants would be required to direct significant resources from a number of different groups to respond to the Warning Notice. The Monitor is of the view that having to direct the Applicants' human resources in this manner would be extremely prejudicial to their ongoing restructuring efforts.

65.     Finally, the Monitor also notes there are significant issues with respect to the merits of The Pensions Regulator's position as outlined in the Warning Notice, as well as whether any order that The Pensions Regulator may decide to make will amount to a recognized claim under the CCAA in any event.

**MONITOR'S RECOMMENDATION**

66.     The Monitor is of the view that:

(a)     the service of the Warning Notice on NNC and NNL; and

(b)     the commencement of proceedings by The Pensions Regulator,

are violations of the stay granted by this Honourable Court in the Initial Order.

67.     The Monitor is also of the view that the proceedings commenced by The Pensions Regulator seek to circumvent both the claims process established by this Honourable Court as well as the allocation process approved by this Honourable Court, both of which are fundamental to the successful resolution of these CCAA proceedings, and, in the case of the Allocation Protocol, has been agreed to by the relevant parties, including the Joint Administrators, as the means by which the various Nortel worldwide entities will resolve the complex matter of allocating the sale proceeds from the various business divestitures.

- 17 -

44

68.    In light of the foregoing, the Monitor respectfully requests that this Honourable Court grant an Order:

(a)    declaring that the purported exercise of rights and the commencement of proceedings against NNC and NNL by The Pensions Regulator under the U.K. Statute amount to breaches of paragraphs 14 and 15 of the Initial Order;

(b)    authorizing, directing and requiring the Applicants and the Monitor to refrain from participating in any proceedings commenced by The Pensions Regulator in breach of the Initial Order; and

(c)    declaring that for the purposes of these proceedings all acts taken by The Pensions Regulator in the purported exercise of rights and in commencing any proceedings against any of the Applicants, without the consent of those Applicants and the Monitor or without leave of this Court having been first obtained, are null and void and shall be given no force or effect in these proceedings nor otherwise recognized as creating or forming the basis of any valid or enforceable rights, remedies or claims against the Applicants or any of their assets, property or undertakings in Canada.

All of which is respectfully submitted this 17th day of February, 2010.

**ERNST & YOUNG INC.**
In its capacity as Monitor of the Applicants

**Per:**

Murray A. McDonald
President

Court File No: 09-CL-7950

IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL NETWORKS CORPORATION *et al.*

*ONTARIO*
**SUPERIOR COURT OF JUSTICE**
**(COMMERCIAL LIST)**

Proceeding commenced at Toronto

**FORTY-SEVENTH REPORT OF THE MONITOR**
**DATED MAY 17, 2010**

**GOODMANS LLP**
Barristers & Solicitors
Bay Adelaide Centre
333 Bay Street, Suite 3400
Toronto, ON  M5H 2S7

Jay A. Carfagnini (LSUC#: 222936)
Joseph Pasquariello (LSUC# 37389C)
Christopher G. Armstrong (LSUC# 55148B)

Tel: 416.979.2211
Fax: 416.979.1234

Lawyers for the Monitor, Ernst & Young Inc.

5848129