## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| *In re*: | Chapter 11 |
| Nortel Networks Inc., *et al.*,[1] | Case No. 09-10138 (KG) |
| Debtors. | Jointly Administered |

## NOTICE OF FILING OF FORTY-NINTH REPORT OF THE
## MONITOR OF THE CANADIAN NORTEL COMPANIES
## <u>IN THE CANADIAN PROCEEDINGS</u>

---

[1] The Debtors in the Chapter 11 Cases, along with the last four digits of each Debtor's tax identification number, are: Nortel Networks Inc. (6332); Nortel Networks Capital Corporation (9620); Nortel Altsystems Inc. (9769); Nortel Altsystems International Inc. (5596); Xros, Inc. (4181); Sonoma Systems (2073); Qtera Corporation (0251); CoreTek, Inc. (5722); Nortel Networks Applications Management Solutions Inc. (2846); Nortel Networks Optical Components Inc. (3545); Nortel Networks HPOCS Inc. (3546); Architel Systems (U.S.) Corporation (3826); Nortel Networks International Inc. (0358); Northern Telecom International Inc. (6286); Nortel Networks Cable Solutions Inc. (0567) and Nortel Networks (CALA) Inc. (4226).

**PLEASE TAKE NOTICE** that on June 24, 2010, Ernst & Young Inc., the Monitor and foreign representative of Nortel Networks Corporation and certain of its direct and indirect subsidiaries, Nortel Networks Limited, Nortel Networks Technology Corporation, Nortel Networks Global Corporation, and Nortel Networks International Corporation, in proceedings under Canada's *Companies' Creditors Arrangement Act*, R.S.C. 1985, c. C-36, as amended, pending before the Ontario Superior Court of Justice (Commercial List), by its undersigned counsel, filed, in the above-captioned cases, a copy of the Forty-Ninth Report of the Monitor (the "**Forty-Ninth Report**"), dated June 22, 2010.  A copy of the Forty-Ninth Report is annexed hereto as <u>Exhibit A</u>.

**PLEASE TAKE FURTHER NOTICE** that a copy of the Forty-Ninth Report is also available on the Monitor's website, www.ey.com/ca/nortel or upon request to the Monitor's counsel.

Dated: June 24, 2010
      Wilmington, Delaware

**ALLEN & OVERY LLP**

Ken Coleman
Lisa Kraidin
1221 Avenue of the Americas
New York, New York  10020
Telephone (212) 610-6300
Facsimile (212) 610-6399
Email:  ken.coleman@allenovery.com
       lisa.kraidin@allenovery.com

-and-

**BUCHANAN INGERSOLL & ROONEY**

By: <u>/s/ Mona A. Parikh</u>
Mary F. Caloway (No. 3059)
Mona A. Parikh (No. 4901)
The Brandywine Building
1000 West Street, Suite 1410
Wilmington, Delaware 19801
Telephone (302) 552-4200
Facsimile (302) 552-4295
Email:  mary.caloway@bipc.com
      mona.parikh@bipc.com

*Attorneys for Ernst & Young Inc., as Monitor and Foreign Representative of the Canadian Nortel Group*

**<u>EXHIBIT A</u>**

Court File No. 09-CL-7950

***ONTARIO***
**SUPERIOR COURT OF JUSTICE**
**(COMMERCIAL LIST)**

**IN THE MATTER OF THE *COMPANIES' CREDITORS
ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED**

**AND IN THE MATTER OF A PLAN OF
COMPROMISE OR ARRANGEMENT OF
NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED,
NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS
INTERNATIONAL CORPORATION AND NORTEL NETWORKS
TECHNOLOGY CORPORATION**

**FORTY-NINTH REPORT OF THE MONITOR
DATED JUNE 22, 2010**

**INTRODUCTION**

1.  On January 14, 2009 (the "Filing Date"), Nortel Networks Corporation ("NNC" and
    collectively with all its subsidiaries "Nortel" or the "Company"), Nortel Networks
    Limited ("NNL"), Nortel Networks Technology Corporation ("NNTC"), Nortel
    Networks International Corporation and Nortel Networks Global Corporation
    (collectively the "Applicants") filed for and obtained protection under the
    *Companies' Creditors Arrangement Act* ("CCAA").  Pursuant to the Order of this
    Honourable Court dated January 14, 2009, as amended and restated (the "Initial
    Order"), Ernst & Young Inc. was appointed as the Monitor of the Applicants (the
    "Monitor") in the CCAA proceedings.  The stay of proceedings was extended to
    July 22, 2010 by this Honourable Court in its Order dated April 14, 2010.

2.  Nortel Networks Inc. ("NNI") and certain of its U.S. subsidiaries concurrently filed
    voluntary petitions under Chapter 11 of the U.S. Bankruptcy Code (the "Code") in
    the United States Bankruptcy Court for the District of Delaware (the "U.S. Court")

on January 14, 2009 (the "Chapter 11 Proceedings"). As required by U.S. law, an official committee of unsecured creditors (the "Committee") was established in January, 2009.

3.   An ad hoc group of holders of bonds issued by NNL, NNC and Nortel Networks Capital Corporation has been organized and is participating in these proceedings as well as the Chapter 11 Proceedings (the "Bondholder Group"). In addition, pursuant to Orders of this Honourable Court dated May 27, 2009 and July 22, 2009, respectively, representative counsel was appointed on behalf of the former employees of the Applicants and on behalf of the continuing employees of the Applicants, and each of these groups is participating in the CCAA proceedings.

4.   Nortel Networks (CALA) Inc. ("NN CALA" and together with NNI and certain of its subsidiaries that filed on January 14, 2009, the "U.S. Debtors") filed a voluntary petition under Chapter 11 of the Code in the U.S. Court on July 14, 2009.

5.   Nortel Networks UK Limited ("NNUK") and certain of its subsidiaries located in EMEA were granted administration orders (the "UK Administration Orders") by the High Court of England and Wales on January 14, 2009 (collectively the "EMEA Debtors"). The UK Administration Orders appointed Alan Bloom, Stephen Harris, Alan Hudson and Chris Hill of Ernst & Young LLP as administrators of the various EMEA Debtors, except for Ireland, to which David Hughes (Ernst & Young LLP Ireland) and Alan Bloom were appointed (collectively the "Joint Administrators"). On June 8, 2009, the Joint Administrators appointed in respect of NNUK filed a petition with the U.S. Court for recognition of the administration proceedings as they relate to NNUK (the "English Proceedings") under Chapter 15 of the Code. On June 26, 2009, the U.S. Court entered an order recognizing the English Proceedings as foreign main proceedings under Chapter 15 of the Code.

6.   Subsequent to the filing date, Nortel Networks SA commenced secondary insolvency proceedings within the meaning of Article 27 of the European Union's

2

Council Regulation (EC) No 1346/2000 on Insolvency Proceedings in the Republic of France pursuant to which a liquidator and an administrator have been appointed by the Versailles Commercial Court.

7.    Subsequent to the Filing Date, certain other Nortel subsidiaries have filed for creditor protection in the local jurisdiction in which they are located.

**PURPOSE**

8.    The purpose of this Forty-Ninth Report of the Monitor (the "Forty-Ninth Report") is to provide information regarding the Applicants' motion seeking approval of a sale of NNL's and NNTC's assets related to the wireless backhaul and multi-hop digital repeater/relay research and development program (the "Relay Program") pursuant to an Asset Sale Agreement dated June 17, 2010 (the "ASA"), amongst NNL and NNTC (collectively, the "Vendors") and 7522312 Canada Inc. (the "Purchaser") and certain other transaction documents (collectively, the "Successful Bid"), and to provide the Monitor's support thereof.

**TERMS OF REFERENCE**

9.    In preparing this Forty-Ninth Report, the Monitor has relied upon unaudited financial information, the Company's books and records, financial information prepared by the Company and discussions with management of Nortel. The Monitor has not audited, reviewed or otherwise attempted to verify the accuracy or completeness of the information and accordingly, the Monitor expresses no opinion or other form of assurance on the information contained in this Forty-Ninth Report.

10.    Unless otherwise stated, all monetary amounts contained herein are expressed in U.S. dollars.

3

11.  Capitalized terms not defined in this Forty-Ninth Report are as defined in the Affidavit of John Doolittle sworn on January 14, 2009, the ASA, the Pre-Filing Report or previous reports of the Monitor.

12.  The Monitor has made various materials relating to the CCAA proceedings available on its website at www.ey.com/ca/nortel.  The Monitor's website also contains a dynamic link to Epiq Bankruptcy LLC's website where materials relating to the Chapter 11 Proceedings are posted.

**GENERAL BACKGROUND**

13.  The Relay Program is an aspect of NNL's and NNTC's research and development efforts that focused on developing Intelligent Digital Repeaters that enhance wireless networks with increased coverage at lower deployment costs.

14.  In late 2008, Nortel made the decision to discontinue the Relay Program and instead began to investigate the possibility of a venture-backed spinout or sale of the Relay Program.

15.  At that time, Nortel had preliminary discussions with a number of venture capital firms canvassing them for potential interest in the Relay Program. There was limited interest from these potential buyers.

16.  Due to the fact that the Relay Program is comprised of early stage technology with limited documentation and would require specialized knowledge and resources for further development, Nortel believes that the universe of potential buyers for this asset is very limited.

17.  In April, 2009, Relay Technologies Inc. submitted an initial Letter of Intent. A former Nortel executive, who was involved in the Relay Program, was one of the principals of Relay Technologies Inc.

4

18.  In September, 2009, Relay IQ, Inc. ("Relay IQ"), an entity related to Relay Technologies Inc., submitted a proposal to the Monitor with several options to purchase certain assets of the Relay Program, including certain patents and patent filings.

19.  In October, 2009, Relay IQ and Nortel began negotiating the terms of a potential divestment of certain prototype fixed assets and non-patent IP related to the Relay Program.

20.  In February, 2010, the principals of Relay IQ independently decided to discontinue their efforts to acquire the Relay Program assets.

21.  In March, 2010, the venture capital investors that were backing Relay IQ contacted Nortel directly indicating their interest to continue with the potential acquisition of the Relay Program through a new entity for which they were recruiting a new management team.

22.  In April, 2010, the venture capital investors confirmed their desire to acquire certain prototype fixed assets and non-patent IP related to the Relay Program, substantially as previously negotiated with Relay IQ, and ultimately entered into the ASA with the Vendors in June, 2010.


**THE ASSET SALE AGREEMENT**

23.  On June 17, 2010, the Vendors and the Purchaser entered into the ASA. The ASA is attached as Appendix "A" hereto.  A copy of the schedules to the ASA and the form of the IPLA (as defined below) are attached as confidential Appendix "B" hereto. As these schedules and the IPLA contain sensitive competitive information, the Monitor requests that confidential Appendix "B" to this Forty-Ninth Report be sealed by this Honourable Court.

24. A summary of the key provisions of the ASA is provided in the paragraphs that follow. Reference should be made directly to the ASA for a complete understanding of the terms governing the transaction.

*Purchase Price*

25. The Purchase Price is US $600,000 cash plus applicable transfer taxes thereon.

*Assets*

26. The assets being sold are limited to NNL's and NNTC's right, title and interest in certain design and test documents directly related to the Relay Program, together with the Nortel owned non-patent IP contained or embodied within those assets (the "Assigned IP"), and some prototypes and test equipment (collectively the "Assets).

27. The Assets will be purchased on an "as is, where is" basis as they shall exist on the Closing Date.

*Assumed Liabilities*

28. There is no business associated with the Assets, and therefore the Purchaser is not assuming any liabilities of the Vendors.

*Employees*

29. There are no employees associated with the Assets, and therefore there are no employees transferring to the Purchaser.

*Intellectual Property License Agreement*

30. NNL and the Purchaser will enter into an Intellectual Property License Agreement (the "IPLA") providing the Purchaser with a perpetual, non-exclusive, fully paid-up license to certain non-patent intellectual property (software) associated with the Relay Program.

6

*License Termination Agreement*

31.  Closing is conditional upon the execution of a License Termination Agreement ("LTA") amongst the Vendors and various other international Nortel entities confirming, amongst other things, the termination of their respective licenses in respect of the Assigned IP and the intellectual property licensed pursuant to the IPLA, but only to the extent necessary to facilitate the sale contemplated by the ASA.

32.  The French liquidator has advised that it is not willing to sign the LTA without an agreement that Nortel Networks SA will receive a pre-determined allocation of proceeds with respect to this transaction. Therefore, the current draft of the LTA does not contemplate execution by the French liquidator or Nortel Networks SA and the Purchaser has agreed to proceed with the transaction on this basis.

*Representations and Warranties*

33.  The ASA includes limited and customary representations and warranties, including corporate existence and authorization to enter into the transaction.

*Termination*

34.  The ASA is said to be void and of no force and effect in the event that the LTA is not fully executed within ninety (90) days of the execution of the ASA.

*Closing*

35.  Closing shall occur on the date which is three Business Days after the day when all of the following are true (i) the approval and vesting order has been issued in connection with the ASA, and (ii) the LTA has been fully executed and delivered to the Vendors, or such other date as agreed to in writing between the parties to the ASA.

7

**APPROVAL AND VESTING ORDER AND OTHER CLOSING CONDITIONS**

36.    The Assets to be transferred by NNL and NNTC pursuant to the ASA are to be transferred free and clear of all liens, claims and encumbrances of any kind but subject to any and all licenses granted and encumbrances entered into under the Assigned IP prior to the Closing Date. Accordingly, the Applicants are seeking an order of this Honourable Court vesting in the Purchaser all of the Applicants' right, title and interest in the Assets as defined in the ASA.

**ALLOCATION OF SALE PROCEEDS**

37.    The net sale proceeds will be placed in a segregated NNL bank account established to hold such proceeds and will not be allocated, distributed or otherwise used in advance of either (a) agreement of all of the Applicants and the U.S. Filed Entities (as such term is defined in the LTA) as to the distribution of such proceeds (subject to the prior consent of the Committee and the steering committee members of the Bondholder Group that have executed confidentiality or non-disclosure agreements with NNL acting in good faith) or (b) upon orders of this Honourable Court and the U.S. Bankruptcy Court after notice and a joint hearing.

**MONITOR'S ANALYSIS AND RECOMMENDATIONS**

38.    The Monitor is satisfied that the Purchase Price for the Assets constitutes fair and reasonable consideration for such assets and therefore the Monitor recommends that this Honourable Court approve the Applicants' motion authorizing the Applicants to complete the transaction contemplated by the ASA and vesting all of NNL's and NNTC's right, title and interest in the Assets to the Purchaser.

8

39. For the reasons described in paragraph 23, the Monitor recommends that confidential Appendix "B" to this Forty-Ninth Report be sealed by this Honourable Court.

All of which is respectfully submitted this 22nd day of June, 2010.

**ERNST & YOUNG INC.**
**In its capacity as Monitor of the Applicants**


Per:
Murray A. McDonald
President

9

APPENDIX "A"

[ATTACHED]

*EXECUTION VERSION*

**NORTEL NETWORKS LIMITED,** and

**NORTEL NETWORKS TECHNOLOGY CORPORATION**

collectively as Vendors

and

**7522312 CANADA INC.**

as Purchaser

**ASSET SALE AGREEMENT**

JUNE 17 , 2010

DOCSTOR: 1931334\3A

## ASSET SALE AGREEMENT

**THIS AGREEMENT** is dated as of _____, 2010 **NORTEL NETWORKS LIMITED** and **NORTEL NETWORKS TECHNOLOGY CORPORATION** (collectively "**Vendors**"), as vendors, and 7522312 Canada Inc. a corporation incorporated under the laws of Canada, as purchaser ("**Purchaser**").

**WHEREAS**:

A.    One or more of the Vendors carries on the Program (as defined below)

B.    The Vendors have agreed to sell to the Purchaser and the Purchaser has agreed to purchase from the Vendors, all of the right, title and interest of the Vendors in and to the Purchased Assets, to enable the Purchaser to carry on the Program, all upon the terms and conditions of this Agreement.

    **NOW THEREFORE THIS AGREEMENT WITNESSES THAT** in consideration of the mutual covenants and agreements contained in this Agreement and other valuable consideration, the receipt and sufficiency of which are hereby acknowledged by the parties, the parties agree as follows:

### ARTICLE 1
### INTERPRETATION

**Section 1.1    Defined Terms.**

    As used in this Agreement, the following words and terms have the following meanings:

    "**Agreement**" means this asset sale agreement and all schedules and all instruments in amendment or confirmation of it, and the expressions "**Article**" and "**Section**" followed by a number mean and refer to the specified Article or Section of this Agreement.

    "**Assigned IP**" means the documents listed on Schedule "A" and all copyrights, trade secrets, know-how and confidential information owned as of the Closing Date by any Vendor contained or embodied in such documents, but notwithstanding the foregoing excluding any and all Patents or claims of Patents or rights in or to Patents (as "Patents" is defined by the Intellectual Property License Agreement) of Vendor or its Affiliates whether or not contained in any such document or reduced to practice.

    "**Business Day**" means any day of the year, other than a Saturday, Sunday or any day on which Canadian chartered banks are required or authorized to close in Toronto, Ontario.

    "**Closing**" means the completion of the purchase and sale transaction contemplated in this Agreement.

    "**Closing Date**" means the date that is the third (3rd) Business Day after the day when all of the following are true (i) the Vesting Order has been issued, and (ii) a License

- 2 -

Termination Agreement relating to Assigned IP has been fully executed and delivered to the Vendors, or such other date as agreed to in writing between the parties hereto.

**"Court"** means the Ontario Superior Court of Justice (Commercial List) and any other court having jurisdiction over the Vendors in this matter.

**"Governmental Entity"** means any: (i) federal, provincial, municipal, local or other governmental or public department, court, commission, board, bureau, agency, authority or instrumentality, domestic or foreign, including any police department, fire department, health department and building department, (ii) any subdivision, agent, commission, board or authority of any of the foregoing, or (iii) any quasi-governmental or private body exercising any regulatory, expropriation or taxing authority under or for the account of any of the foregoing.

**"including"** or **"includes"** means **"including (or includes) without limitation"**.

**"Intellectual Property License Agreement"** means an agreement between Nortel Networks Limited and the Purchaser concerning certain software intellectual property associated with the Program licensed by Nortel Networks Limited to the Purchaser.

**"License Termination Agreement"** means an agreement between the Vendors and various other international Nortel entities confirming, amongst other things, the termination of their respective licenses in respect of the intellectual property licensed pursuant to the Intellectual Property License Agreement.

**"Person"** includes an individual, partnership, corporation, trust, joint venture or other entity in any capacity and any Governmental Entity.

**"Program"** means the research, development and analysis activities of the Vendor as of the date of this Agreement associated with the following relay wireless backhaul: (A) a relay backhaul module (based on Design Art System On a Chip (SOC)) and (B) a relay WiMAX access module (based on the Picochip SOC). "Program" does not include any products and/or services provided by, or any of the business activities of any businesses or business segments of the Vendor or any of its affiliates.

**"Purchase Price"** has the meaning specified in Section 3.1.

**"Purchased Assets"** means, the Assigned IP and the Tangible Assets.

**"Purchaser"** means 7522312 Canada Inc.

**"Records Custodian"** means Deloitte & Touche LLP or in case such firm is unable to carry out its duties for whatever reason, such other auditing firm of international reputation that is acceptable to each of the Purchaser and the Vendor, each acting reasonably.

**"Restricted Technical Records"** means the Livelink database or any other similar database containing only all necessary documents with respect to the technical aspects of

- 3 -

the expenditures of either of the Vendors, in their respective 2002 and subsequent taxation years.

"**Tangible Assets**" means the items listed as tangible assets in Schedule "A".

"**Transfer Taxes**" means all goods and services, sales, excise, use, transfer, gross receipts, documentary, filing, recordation, value-added, stamp, stamp duty reserve, and all other similar taxes, duties or other like charges, however denominated (including any real property transfer taxes and conveyance and recording fees), together with interest, penalties and additional amounts imposed with respect thereto.

"**Vendors**" means collectively Nortel Networks Limited and Nortel Networks Technology Corporation.

"**Vesting Order**" means an order of the Court that approves this Agreement and any amendments hereto, and finally and unconditionally approves the sale of the Purchased Assets to the Purchaser and vests all right, title and interest, if any, of the Vendors in the Purchased Assets to the Purchaser, free and clear of any and all liens, security interests, charges or other encumbrances, in form and content satisfactory to the Purchaser.

**Section 1.2    Gender and Number.**

Any reference in this Agreement to gender shall include all genders, and words importing the singular number only shall include the plural and vice versa.

**Section 1.3    Headings, etc.**

The division of this Agreement into Articles, Sections and other subdivisions and the insertion of headings are for convenience of reference only and shall not affect or be utilized in the construction or interpretation of this Agreement.

**Section 1.4    Currency.**

Except where otherwise noted, all references in this Agreement to dollars are expressed in United States currency.

**Section 1.5    Severability.**

Any Article, Section or other subdivision of this Agreement or any other provision of this Agreement which is, or becomes, illegal, invalid or unenforceable shall be severed from this Agreement and be ineffective to the extent of such illegality, invalidity or unenforceability and shall not affect or impair the remaining provisions hereof or thereof.

**Section 1.6    Entire Agreement.**

This Agreement, together with any other documents to be delivered pursuant hereto, constitutes the entire agreement between the parties hereto pertaining to the subject matter hereof and supersedes all prior and intermediate agreements, understandings, negotiations and

- 4 -

discussions, whether oral or written, of the said parties.  There are no representations, warranties, conditions or other agreements, express or implied, statutory or otherwise, between the parties in connection with the subject matter of this Agreement, except as specifically set forth herein.  If there is any conflict or inconsistency between the provisions of this Agreement and the provisions of any ancillary agreement, the provisions of this Agreement shall govern.

**Section 1.7     Amendments.**

This Agreement may only be amended, modified or supplemented by a written agreement signed by the parties hereto.

**Section 1.8     Waiver.**

No waiver of any of the provisions of this Agreement shall be deemed to constitute a waiver of any other provision (whether or not similar), nor shall such waiver constitute a waiver or continuing waiver unless otherwise expressly provided in writing duly executed by the party to be bound thereby.

**Section 1.9     Governing Law.**

This Agreement shall be governed by and interpreted and enforced in accordance with the laws of the Province of Ontario and the laws of Canada applicable therein.

**Section 1.10   Incorporation of Schedules.**

The following are the schedules attached to and incorporated in this Agreement:

| | | |
|---|---|---|
| Schedule A | - | Purchased Assets |
| Schedule B | - | Allocation of Purchase Price |

**ARTICLE 2**
**PURCHASE AND SALE**

**Section 2.1     Purchase of Purchased Assets.**

Subject to the terms and conditions of this Agreement, the Vendors, agree to sell, assign, convey and transfer to the Purchaser, and the Purchaser agrees to purchase from the Vendors, on the Closing Date, all of the right, title and interest of each of the Vendors in and to the Purchased Assets subject to any and all licenses granted or encumbrances entered into under any Assigned IP prior to the Closing Date.

**Section 2.2     As is, Where is.**

The Purchaser acknowledges that the Purchased Assets will be purchased on an **"as is, where is"** basis as they shall exist on the Closing Date.  The Purchaser further acknowledges that it has inspected the Purchased Assets and is relying entirely upon its own investigations and inspections of the Purchased Assets in proceeding with the transactions contemplated hereunder and has satisfied itself with regard to the condition, title and ownership of the Purchased Assets. Without limiting the foregoing, the Purchaser acknowledges that there are no representations,

- 5 -

warranties, terms, conditions, understandings or collateral agreements, express or implied, statutory or otherwise, with respect to the Purchased Assets, including without limitation with respect to title, ownership, validity, non-infringement, non-misappropriation, merchantability, fitness for purpose, enforceability, sufficiency, accuracy or completeness of any Assigned IP, or in respect of any other matter or thing whatsoever unless and except as expressly stated herein. The Purchaser further acknowledges that all written and oral information (including analyses, financial information and projections, compilations and studies) obtained by the Purchaser from either of the Vendors or any of its directors, officers, employees, professional consultants or advisors with respect to the Purchased Assets or otherwise relating to the transactions contemplated in this Agreement has been obtained for the convenience of the Purchaser only and is not warranted to be accurate or complete. Without limiting the generality of the foregoing, any and all conditions, warranties or representations expressed or implied pursuant to the *Sale of Goods Act* (Ontario) or similar legislation do not apply hereto and have been expressly disclaimed and waived by the Purchaser.

## ARTICLE 3
## PURCHASE PRICE

**Section 3.1    Purchase Price.**

The purchase price payable by the Purchaser to the Vendors for the Purchased Assets shall be SIX HUNDRED THOUSAND US DOLLARS (US$600,000) (the **"Purchase Price"**), plus applicable Transfer Taxes thereon.

**Section 3.2    Payment of Purchase Price.**

The Purchase Price shall be satisfied by the payment on Closing by the Purchaser to the Vendors, or as the Vendors otherwise direct, by way of wire transfer in the full amount of the Purchase Price.

**Section 3.3    Allocation of Purchase Price.**

The Purchase Price shall be allocated among the Purchased Assets in accordance with Schedule "B" hereof, and all tax returns and reporting shall be completed in accordance with such allocation.

## ARTICLE 4
## REPRESENTATIONS AND WARRANTIES

**Section 4.1    Representations and Warranties of the Vendors.**

Each Vendor represents and warrants to the Purchaser, as follows and acknowledges that the Purchaser is relying on such representations and warranties in connection with the transactions contemplated by this Agreement:

(a)    <u>Incorporation and Organization.</u> Nortel Networks Limited is a corporation incorporated and existing under the laws of Canada. Nortel Networks Technology Corporation is a corporation formed under the laws of Nova Scotia.

- 6 -

(b) <u>Authority of the Vendor.</u> Each Vendor has all necessary authority to enter into this Agreement and all other documents contemplated herein to which it is or will be a party, to perform its obligations hereunder and thereunder, to carry out the transactions contemplated hereby and thereby, and to convey all right, title and interest of such Vendor in and to the Purchased Assets as contemplated hereby.

(c) <u>Validity of the Agreement.</u> This Agreement is duly and validly executed and delivered by the Vendors and constitutes a legal, valid and binding obligation of the Vendors, enforceable against them in accordance with the terms hereof.

(d) <u>Residence.</u> The Vendors are not, and as of the Closing Date the Vendors will not be, non-residents of Canada within the meaning of Section 116 of the *Income Tax Act* (Canada).

(e) <u>Vesting Order.</u> As of the Closing Date, the Vesting Order shall have been issued, and shall not have been stayed, varied, or vacated.

## Section 4.2    Representations and Warranties of the Purchaser.

The Purchaser hereby represents and warrants to each of the Vendors as follows and acknowledges that each of the Vendors is relying on such representations and warranties in connection with the transactions contemplated by this Agreement:

(a) <u>Incorporation and Organization.</u> The Purchaser is a corporation incorporated and existing under the laws of Canada.

(b) <u>Authority of the Purchaser.</u> The Purchaser has the full corporate power and authority to enter into this Agreement and all other documents contemplated hereunder to which the Purchaser is or will be a party, to perform its obligations hereunder and thereunder and to carry out the transactions contemplated hereby and thereby.

(c) <u>Authorization.</u> The entering into of this Agreement and all other documents contemplated hereunder to which the Purchaser is or will be a party and the consummation of the transactions contemplated hereby and thereby have been duly authorized by all requisite corporate action. No approval or consent of any regulatory authority is required for the Purchaser to enter into this Agreement or to complete the purchase and sale contemplated herein.

(d) <u>Validity of Agreement.</u> This Agreement and all other documents contemplated hereunder to which the Purchaser is a party have been duly and validly executed and delivered by the Purchaser and constitute legal valid and binding obligations of the Purchaser enforceable in accordance with the terms hereof or thereof.

(e) <u>Vesting Order.</u> As of the Closing Date, the Vesting Order shall been issued, and shall not have been stayed, varied, or vacated.

- 7 -

### Section 4.3    Survival.

None of the representations, warranties and covenants contained in this Agreement shall survive the Closing and the consummation of the transactions contemplated hereunder except for those set out in Section 6.7.

### ARTICLE 5
### CONDITIONS

### Section 5.1    Conditions for the Purchaser.

The obligation of the Purchaser to complete the transactions contemplated by this Agreement is subject to fulfilment of each of the following conditions on or before the Closing, each of which is included for the exclusive benefit of the Purchaser and may be waived by the Purchaser in whole or in part:

(a)     <u>Representations and Warranties.</u>  The representations and warranties of the Vendors shall be true and accurate in all material respects as at Closing with the same force and effect as if made at and as of such time.

(b)     <u>Fulfilment of Vendors Covenants.</u>  All the terms, covenants and conditions of this Agreement to be complied with or performed by the Vendors at or before Closing shall have been complied with or performed in all material respects, including the deliveries set out in Section 6.2, and the Vendors shall not be in material breach of any agreement or covenant on its part contained in this Agreement.

(c)     <u>Actions or Proceedings.</u>  No order shall have been issued and no action or proceeding shall have been commenced or threatened by any Person to enjoin, restrict or prohibit the purchase and sale of the Purchased Assets contemplated hereby.

### Section 5.2    Conditions for the Vendor.

The obligation of the Vendors to complete the transactions contemplated by this Agreement is subject to fulfilment of each of the following conditions on the date stated for fulfilment thereof, each of which is acknowledged to be for the exclusive benefit of the Vendors and may be waived by the Vendors in whole or in part:

(a)     <u>Representations and Warranties.</u>  The representations and warranties of the Purchaser shall be true and accurate in all material respects as at Closing with the same force and effect as if made at and as of such time.

(b)     <u>Fulfilment of Purchaser's Covenants.</u>  All the terms, covenants and conditions of this Agreement to be complied with or performed by the Purchaser at or before Closing shall have been complied with or performed in all material respects, including the deliveries set out in Section 6.3, and the Purchaser shall not be in

- 8 -

material breach of any agreement or covenant on its part contained in this Agreement.

(c)    <u>Actions or Proceedings.</u>  No order shall have been issued and no action or proceeding shall have been commenced or threatened by any Person to enjoin, restrict or prohibit the purchase and sale of the Purchased Assets contemplated hereby.

**Section 5.3    Non-Satisfaction of Conditions.**

If any condition set out in Section 5.1 or Section 5.2 is not satisfied or performed prior to the time specified therefor, the party for whose benefit the condition is inserted may:

(a)    in writing, waive compliance with the condition in whole or in part in its sole discretion by notice to the other party and without prejudice to any of its rights of termination in the event of non-fulfilment of any other condition in whole or in part; or

(b)    elect to terminate this Agreement, in which case neither party shall be under any further obligation to the other to complete the transactions of purchase and sale contemplated by this Agreement.

**Section 5.4    Termination on Account of Failure to Obtain License Termination Agreement**

To the extent that a fully executed License Termination Agreement is not obtained within ninety (90) days of the execution of this agreement, this agreement shall be void and of no force or effect.

**ARTICLE 6
CLOSING**

**Section 6.1    Time and Place of Closing.**

The completion of the transactions contemplated by this Agreement shall take place on the Closing Date at 11 a.m. EST at the offices of Ogilvy Renault LLP, Suite 3800, Royal Bank Plaza, South Tower, 200 Bay Street, P.O. Box 84, Toronto, Ontario, M5J 2Z4, or at such other place as may be agreed upon between the parties hereto.

**Section 6.2    Vendor's Deliveries on Closing.**

At or before the Closing, upon fulfilment by the Purchaser of all the conditions herein in favour of the Vendors which have not been waived in writing by the Vendors, the Vendors shall deliver or execute, as the case may be, the following, each of which shall be in form and substance satisfactory to the Purchaser, acting reasonably:

- 9 -

    (a)    all such documentation required to transfer to the Purchaser the Purchased Assets including an executed general conveyance, conveying title to the Purchased Assets to the Purchaser; and

    (b)    an executed Intellectual Property License Agreement.

**Section 6.3**    **Purchaser's Deliveries on Closing.**

At or before the Closing, upon fulfilment by the Vendor of all the conditions herein in favour of the Purchaser which have not been waived by the Purchaser, the Purchaser shall deliver or execute, as the case may be, the following, each of which shall be in form and substance satisfactory to both of the Vendors, acting reasonably:

    (a)    the Purchase Price in accordance with Section 3.2, as directed by the Vendors;

    (b)    such further and other documentation as is referred to in this Agreement, or as the Vendors may reasonably require to give effect to this Agreement;

    (c)    an executed general conveyance; and

    (d)    an executed Intellectual Property License Agreement.

**Section 6.4**    **Possession of Assets.**

On Closing the Purchaser shall, at its own cost and expense, take, or make arrangements satisfactory to the Vendors to take, possession of the Purchased Assets where situate at the time of Closing. The Purchaser acknowledges that the Vendors have no obligation to deliver possession of any Purchased Assets to the Purchaser.

**Section 6.5**    **Insurance Matters.**

Any property, liability and other insurance maintained by the Vendors shall not be transferred as of the Closing Date, but shall remain the responsibility of the Vendors until Closing. The Purchaser shall be responsible for placing its own property, liability and other insurance coverage with respect to the Purchased Assets in respect of the period from and after Closing.

**Section 6.6**    **Sales and Transfer Taxes**

The Purchaser shall pay directly to Vendors all Transfer Taxes associated with the transactions contemplated by this Agreement. The Purchaser shall indemnify both of the Vendors for any amounts for which such Vendor may become liable as a result of any failure by the Purchaser to pay any of such Transfer Taxes which are payable by the Purchaser in respect of the purchase of the Purchased Assets. The Purchaser shall be entitled to provide the Vendors with evidence that the Purchaser is an exempt purchaser, in whole or in part, for purposes of relevant taxing legislation and, upon provision of such evidence satisfactory to Vendors, shall not be required to pay such Transfer Taxes on Closing.

- 10 -

**Section 6.7    Records**

(a)    After the Closing Date, the Purchaser and Vendors, will make available to the other, as reasonably requested, and to any tax authority, all information, records or documents relating to liability for Transfer Taxes with respect to the Purchased Assets or the Program for all periods prior to or including the Closing Date and will preserve such information, records or documents until the expiration of any applicable statute of limitations or extensions thereof, and (ii) in the event that one party needs access to records in the possession of a second party relating to any of the Purchased Assets or the Program for purposes of preparing tax returns or complying with any request of any tax authority, or for any other legitimate tax-related purpose not injurious to the second party, the second party will allow representatives of the other party access to such records during regular business hours at the second party's place of business for the sole purpose of obtaining information for use as aforesaid and will permit such other party to make extracts and copies thereof as may be necessary or convenient.  The obligation to cooperate pursuant to this Section 6.7 (a) shall terminate at the time the relevant applicable statute of limitations expires (giving effect to any extension thereof).

(b)    On or prior to Closing Date, the Vendors may cause copies of Restricted Technical Records to be placed into escrow with the Records Custodian, who shall hold such Restricted Technical Records for ten (10) years in accordance with an escrow agreement between each of the Vendors and the Records Custodian.  The escrow agreement will provide for access to the copies of the Restricted Technical Records only by the relevant Canadian tax authority or by tax advisors of any purchaser of the scientific research and experimental development tax credits of the Vendors under the Income Tax Act (Canada), and only if such advisors have executed an appropriate confidentiality agreement in form satisfactory to the Purchaser.  The access permitted by the escrow agreement shall be only for the limited purpose of defending any audit, claim or action by any Canadian tax authority in respect of the characterization of expenditures by the either of the Vendors as qualified expenditures on scientific research and experimental development for purposes of the applicable provisions of the Income Tax Act (Canada).

**ARTICLE 7**
**MISCELLANEOUS**

**Section 7.1    Third Party Beneficiaries.**

Each party hereto intends that this Agreement shall not benefit or create any right or cause of action in or on behalf of any Person other than the parties hereto and their successors and permitted assigns, and no Person, other than the parties hereto and their successors and their permitted assigns shall be entitled to rely on the provisions hereof in any action, suit, proceeding, hearing or other forum.

**Section 7.2    Notices.**

Any notice, direction or other instrument required or permitted to be given hereunder shall be in writing and given by delivering or sending it by telecopy or other similar form of communication addressed:

(a)    to the Purchaser at:

- 11 -

7522312 Canada Inc.
800-515 Legget Drive
Kanata, Ontario
Canada K2K 3G4

Attention: Carleton (Mickey) Miller, Chief Executive Officer
Phone: 214-862-7154

With a copy to:

LaBarge Weinstein Professional Corporation
515 Legget Drive, Suite 800
Kanata, Ontario
Canada K2K 3G4

Attention: Michael Dunleavy
Phone: 613-599-9600 extension 268
Facsimile: 613-599-0018

(b)     to the Vendors at:

Nortel Networks Limited
5945 Airport Road
Suite 360
Mississauga, L4V 1R9
Attention:  Anna Ventresca, General Counsel and Corporate Secretary
Facsimile:  +1-905-863-7386

Nortel Networks Technology Corporation
5945 Airport Road
Suite 360
Mississauga, L4V 1R9
Attention:  Anna Ventresca, Secretary
Facsimile:  +1-905-863-7386

with a copy to:

| | | | | | | |
|---|---|---|---|---|---|---|
| Ogilvy Renault LLP | | Telephone: | | | 416-216.3939 | |
| Suite 3800, Royal Bank Plaza, | | Telecopier: | | | 416-216.3930 | |
| South | | | | | | Tower |
| 200 | Bay | Street, | | P.O. | Box | 84 |
| Toronto, ON  M5J 2Z4 | | | | | | |

Attention:  Michael Lang

- 12 -

Any such notice, direction or other instrument given as aforesaid shall be deemed to have been effectively given if sent by telecopier or other similar form of telecommunications, on the next Business Day following such transmission or, if delivered, to have been received on the date of such delivery. Either party may change its address for service from time to time by notice given in accordance with the foregoing and any subsequent notice shall be sent to the party at its changed address.

### Section 7.3   Further Assurances.

Each of the parties hereto, upon the request of the other party hereto, whether before or after the Closing, shall do, execute, acknowledge and deliver or cause to be done, executed, acknowledged or delivered, all such further acts, deeds, documents, assignments, transfers, conveyances and assurances, as may be reasonably necessary or desirable to effect complete consummation of the objects of and the transactions contemplated by this Agreement; provided, however, that nothing herein shall require the Vendors to seek, obtain, or bear any cost with respect to:  (i) consents to the assignments of any contracts, including leases (ii) consents or agreements by any Person to the sale, conveyance and transfer of the Purchased Assets, or (iii) any other documents or agreements with third parties.

### Section 7.4   Use of "Nortel" name and Trademarks

As of the Closing Date, the Purchaser shall not have any license or right to use the name "Nortel" or any other trademarks owned by any Vendor or any of its affiliates or any other trademark employing the word "Nortel" or any confusingly similar trademarks to any of the foregoing.  For the avoidance of doubt, Purchaser may not use "Nortel" as a trademark or in connection with any product or service.

### Section 7.5   Enurement.

This Agreement shall enure to the benefit of and be binding upon the parties and their successors and permitted assigns.

### Section 7.6   Assignment.

Neither this Agreement nor any of the rights or obligations under this Agreement shall be assignable in whole or in part by the Vendors or the Purchaser without the prior written consent of the other party.

### Section 7.7   Time.

Time shall be of the essence of this Agreement.

### Section 7.8   Counterparts and Faxes or PDFs.

This Agreement may be executed in one or more counterparts (including counterparts executed by facsimile or PDF or similar electronic means, which shall be deemed to constitute originals), each of which shall be deemed an original and all of which, taken together, shall constitute one and the same instrument.

**IN WITNESS WHEREOF** this Agreement has been executed by the parties as of the date first above written.

PURCHASER:

**7522312 CANADA INC.**

By: _____
     Name: JOSEPH PATALEAMO
     Title: DIRECTOR

**VENDORS:**

**NORTEL NETWORKS LIMITED**

Per: _____
     Name:
     Title:

Per: _____
     Name:
     Title:

**NORTEL NETWORKS TECHNOLOGY CORPORATION**

Per: _____
     Name:
     Title:

Per: _____
     Name:
     Title:

- 13 -

**IN WITNESS WHEREOF** this Agreement has been executed by the parties as of the date first above written.

PURCHASER:

**7522312 CANADA INC.**

By: _____

    Name:

    Title:

VENDORS:

**NORTEL NETWORKS LIMITED**

Per: _____

    Name:  Clarke Glaspell

    Title:   Controller

Per: _____

    Name: George Riedel

    Title:   Chief Strategy Officer and
    President, Business Units

**NORTEL NETWORKS TECHNOLOGY
CORPORATION**

Per: _____

    Name:  Clarke Glaspell

    Title:   President and Controller

- 13 -

**IN WITNESS WHEREOF** this Agreement has been executed by the parties as of the date first above written.

PURCHASER:

**7522312 CANADA INC.**

By: _____

     Name:

     Title:

VENDORS:

**NORTEL NETWORKS LIMITED**

Per: _____

     Name: Clarke Glaspell

     Title:  Controller

Per: _____

     Name: George Riedel

     Title:  Chief Strategy Officer and President, Business Units

**NORTEL NETWORKS TECHNOLOGY CORPORATION**

Per: _____

     Name: Clarke Glaspell

     Title:  President and Controller

# APPENDIX "B"

## [CONFIDENTIAL]

Court File No: 09-CL-7950

IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL NETWORKS CORPORATION *et al.*

---

*ONTARIO*
**SUPERIOR COURT OF JUSTICE**
**(COMMERCIAL LIST)**

Proceeding commenced at Toronto

---

**FORTY-NINTH REPORT OF THE MONITOR**
**DATED JUNE 22, 2010**

---

**GOODMANS LLP**
Barristers & Solicitors
Bay Adelaide Centre
333 Bay Street, Suite 3400
Toronto, ON  M5H 2S7

Jay A. Carfagnini  (LSUC# 222936)
Joseph Pasquariello (LSUC# 37389C)
Christopher G. Armstrong (LSUC# 55148B)

Tel: 416.979.2211
Fax: 416.979.1234

Lawyers for the Monitor, Ernst & Young Inc.

5860378