## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

---------------------------------------------------------- X
                                     :

*In re*                                  :    Chapter 11
                                   :

Nortel Networks Inc., *et al.*,[1]       :    Case No. 09-10138 (KG)
                                   :

                       Debtors.     :    Jointly Administered
                                   :
                                   :    **Hearing date: July 16, 2010 at 10:00am (ET)**
                                   :    **Objections due: July 9, 2010 at 4:00pm (ET)**

---------------------------------------------------------- X

## DEBTORS' MOTION FOR ENTRY OF AN ORDER
## ENFORCING THE ORDER AUTHORIZING THE SALE
## OF CERTAIN ASSETS OF, AND EQUITY INTERESTS IN,
## THE DEBTORS' ENTERPRISE SOLUTIONS BUSINESS, AND
## DIRECTING THE RELEASE OF CERTAIN ESCROWED FUNDS

Nortel Networks Inc. ("NNI") and certain of its affiliates, as debtors and debtors in possession, (collectively, the "Debtors"), hereby move this Court (the "Motion"), pursuant to sections 105(a) and 363 of title 11 of the United States Code (the "Bankruptcy Code") for the entry of an order substantially in the form attached hereto as Exhibit A, enforcing the *Order Authorizing and Approving (A) The Sale Of Certain Assets Of, And Equity Interests In, Debtors' Enterprise Solutions Business, (B) The Assumption And Assignment Of Certain Contracts And Leases And (C) The Assumption And Sublease Of Certain Leases* (the "Sale Order") [D.I. 1514] against Avaya Inc., directing the release of $19,184,300 plus accumulated interest currently held in escrow by escrow agent, Wells Fargo Bank, National Association ("Wells Fargo"), pursuant to

---

[1]     The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's tax identification number, are: Nortel Networks Inc. (6332), Nortel Networks Capital Corporation (9620), Nortel Altsystems Inc. (9769), Nortel Altsystems International Inc. (5596), Xros, Inc. (4181), Sonoma Systems (2073), Qtera Corporation (0251), CoreTek, Inc. (5722), Nortel Networks Applications Management Solutions Inc. (2846), Nortel Networks Optical Components Inc. (3545), Nortel Networks HPOCS Inc. (3546), Architel Systems (U.S.) Corporation (3826), Nortel Networks International Inc. (0358), Northern Telecom International Inc. (6286), Nortel Networks Cable Solutions Inc. (0567) and Nortel Networks (CALA) Inc. (4226). Addresses for the Debtors can be found in the Debtors' petitions, which are available at http://dm.epiq11.com/nortel.

the Amended and Restated Escrow Agreement dated as of September 14, 2009 by and among

Wells Fargo, NNI, Nortel Networks Limited, Nortel Networks UK Limited and Avaya Inc. (the

"Escrow Agreement"), and granting them such other and further relief as the Court deems just

and proper.  In support of this Motion, the Debtors respectfully represent as follows:

<u>**Preliminary Statement**</u>

1.    By this Motion, the Debtors seek to enforce the Sale Agreement (as

defined below) governing the sale of their Enterprise Solutions Business to Avaya Inc. (the

"Purchaser").  In particular, the Purchaser delivered an April 19, 2010 post-closing Disagreement

Notice (the "Disagreement Notice") to the Main Sellers and the EMEA Sellers (each as those

terms are defined in the Sale Agreement, and together, the "Sellers") challenging the Sellers'

calculation of the purchase price adjustment required under the Sale Agreement.    The

Disagreement Notice seeks a downward adjustment of the purchase price by approximately $22

million based on the Purchaser's claim that the Sellers' management of certain excess inventory

has not been proven to be reasonable, and the Purchaser refuses to release a portion of certain

escrowed sale proceeds based, in large part, on this claim.

2.    The Purchaser's purported dispute regarding the Sellers' calculation of the

inventory value directly contravenes the Sale Agreement, which provides discrete and clear

standards for calculating purchase price adjustments and specifically provides the methods to

value excess inventory delivered to the Purchaser.    Such standards and the relevant Sale

Agreement provisions do not permit the Purchaser to raise other extraneous arguments, such as

its purported dispute contained in the Disagreement Notice.    The Purchaser has refused to

abandon its arguments, and, in order to both prevent the further expenditure of time and

resources to defend against the Purchaser's unfounded claim and to ensure the dispute is not

improperly referred to an Accounting Arbitrator, the Debtors are compelled to seek an order

from this Court that enforces the terms of the Sale Order and affirms that, under the terms of the

Sale Agreement, the Purchaser has not raised a valid dispute in the Disagreement Notice related

to the Sellers' calculation of the value of its excess inventory.  The Debtors also seek the

immediate release of the funds held in escrow that are not subject to a valid dispute.

### Jurisdiction

3.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157

and 1334.  This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).  Venue

is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

4.      The statutory bases for the relief requested herein are sections 105(a) and

363 of the Bankruptcy Code.

### Background

**A.      Procedural History**

5.      On January 14, 2009 (the "Petition Date"), the Debtors, other than NN

CALA (defined below), filed voluntary petitions for relief under chapter 11 of the Bankruptcy

Code.

6.      The Debtors continue to operate their businesses and manage their

properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy

Code.

7.      On January 15, 2009, this Court entered an order of joint administration

pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy

Rules") that provided for the joint administration of these cases and for consolidation for

procedural purposes only [D.I. 36].

8.      Also on the Petition Date, the Debtors' ultimate corporate parent Nortel

Networks Corporation ("NNC"), NNI's direct corporate parent Nortel Networks Limited

("NNL," and together with NNC and their affiliates, including the Debtors, "Nortel"), and certain of their Canadian affiliates (collectively, the "Canadian Debtors")[2] filed an application with the Ontario Superior Court of Justice (the "Canadian Court") under the Companies' Creditors Arrangement Act (Canada) (the "CCAA"), seeking relief from their creditors (collectively, the "Canadian Proceedings"). The Canadian Debtors continue to manage their properties and operate their businesses under the supervision of the Canadian Court.

9.     On January 14, 2009, the Canadian Court entered an order recognizing these chapter 11 proceedings as a foreign proceeding under section 18.6 of the CCAA. On February 27, 2009, based on a petition filed by Ernst & Young Inc., as court-appointed Monitor in the Canadian Proceedings and as foreign representative for the Canadian Debtors (the "Monitor"), this Court entered an order recognizing the Canadian Proceedings as foreign main proceedings under chapter 15 of the Bankruptcy Code.

10.     On January 14, 2009, the High Court of England and Wales placed nineteen of Nortel's European affiliates (collectively, the "EMEA Debtors")[3] into administration under the control of individuals from Ernst & Young LLC (collectively, the "Joint Administrators"). On May 28, 2009, at the request of the Joint Administrators, the Commercial Court of Versailles, France (the "French Court") (Docket No. 2009P00492) ordered the commencement of secondary proceedings in respect of Nortel Networks S.A. ("NNSA"), which consist of liquidation proceedings during which NNSA was originally authorized to continue to

---

[2]     The Canadian Debtors include the following entities: NNC, NNL, Nortel Networks Technology Corporation, Nortel Networks Global Corporation and Nortel Networks International Corporation.

[3]     The EMEA Debtors include the following entities: Nortel Networks UK Limited, Nortel Networks S.A., Nortel Networks (Ireland) Limited, Nortel GmbH, Nortel Networks France S.A.S., Nortel Networks Oy, Nortel Networks Romania SRL, Nortel Networks AB, Nortel Networks N.V., Nortel Networks S.p.A., Nortel Networks B.V., Nortel Networks Polska Sp. z.o.o., Nortel Networks Hispania, S.A., Nortel Networks (Austria) GmbH, Nortel Networks, s.r.o., Nortel Networks Engineering Service Kft, Nortel Networks Portugal S.A., Nortel Networks Slovensko, s.r.o. and Nortel Networks International Finance & Holding B.V.

operate as a going concern for an initial period of three months, which period was subsequently extended to November 28, 2009.  In accordance with the European Union's Council Regulation (EC) No. 1346/2000 on Insolvency Proceedings, the English law proceedings (the "English Proceedings") remain the main proceedings in respect of NNSA, although a French administrator and a French liquidator have been appointed and are in charge of the day-to-day affairs and continuing business of NNSA in France.  On October 1, 2009, pursuant to a motion filed by the Joint Administrators, the French Court approved an order to: (i) suspend the liquidation operations relating to the sale of the assets and/or businesses of NNSA for a renewable period of two months; (ii) authorize the continuation of the business of NNSA so long as the liquidation operations are suspended; and (iii) maintain the powers of the French Administrator and Liquidator during the suspension period, except with respect to the sale of assets and/or businesses of NNSA.  On March 25, 2010, the French Court ended the suspension of the liquidation operations.  On June 26, 2009, this Court entered an order recognizing the English Proceedings of Nortel Networks UK Limited ("NNUK") as foreign main proceedings under chapter 15 of the Bankruptcy Code.[4]

11.    On January 26, 2009, the Office of the United States Trustee for the District of Delaware (the "U.S. Trustee") appointed an Official Committee of Unsecured Creditors (the "Committee") pursuant to section 1102(a)(1) of the Bankruptcy Code [D.I.s 141, 142].  An ad hoc group of bondholders holding claims against certain of the Debtors and certain of the Canadian Debtors has also been organized (the "Bondholder Group").  No trustee or examiner has been appointed in the Debtors' cases.

---

[4]    Additionally, on January 18, 2009, certain Nortel affiliates, including Nortel Networks Israel (Sales and Marketing) Limited, filed an application with the Tel-Aviv-Jaffa District Court, pursuant to the Israeli Companies Law, 1999, and the regulations relating thereto for a stay of proceedings.  On January 19, 2009, the Israeli Court appointed Yaron Har-Zvi and Avi D. Pelossof as joint administrators of the Israeli Company under the Israeli Companies Law (the "Joint Israeli Administrators").

12.     On July 14, 2009 (the "CALA Petition Date"), Nortel Networks (CALA) Inc. ("NN CALA" and a Debtor with NNI and its affiliates), an affiliate of NNI, filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  On July 17, 2009 this Court entered orders approving the joint administration and consolidation of NN CALA's chapter 11 case with the other Debtors' chapter 11 cases for procedural proposes [D.I. 1098], and applying to NN CALA certain previously entered orders in the Debtors' chapter 11 cases [D.I. 1099].  From time to time, other Nortel affiliates have sought and may seek relief through the commencement of creditor protection or other insolvency or dissolution proceedings around the world.

## B.     Debtors' Corporate Structure and Business

13.     Nortel is a technology company that historically designed, developed and deployed communication products, systems and solutions to its customers around the globe.  Its principal assets include its employees, the intellectual property derived and maintained from its research and development activities, its customers and other significant contracts and agreements.

14.     Additional information regarding the Debtors' corporate structure and business and the events leading to the chapter 11 cases is set forth in the Declaration of John Doolittle in Support of First Day Motions and Applications [D.I. 3] (the "First Day Declaration").

## C.     Case Milestones

15.     On June 19, 2009, Nortel announced that it was advancing in discussions with external parties to sell its businesses and it would assess other restructuring alternatives for its businesses in the event it is unable to maximize value through sales.  To date, Nortel has closed (i) the sale of certain portions of its Layer 4-7 data portfolio to Radware Ltd. [D.I. 539]; (ii) the sale of substantially all of its CDMA business and LTE Access assets to

Telefonaktiebolaget LM Ericsson (publ) ("Ericsson") [D.I. 1205]; (iii) the sale of the assets of its Wireless Networks business associated with the development of Next Generation Packet Core network components to Hitachi Ltd. [D.I. 1760]; (iv) the sale of substantially all of the assets of the Enterprise Solutions business globally, including the shares of Nortel Government Solutions Incorporated and DiamondWare Ltd. to Avaya Inc. [D.I. 1514]; (v) the sale of substantially all the assets of its Optical Networking and Carrier Ethernet businesses associated with its Metro Ethernet Networks business unit to Ciena Corporation [D.I. 2070]; (vi) the sale of substantially all of its GSM/GSM-R business to Ericsson and Kapsch CarrierCom AG [D.I. 2065]; and (vii) the sale of certain assets of its Carrier Voice Over IP and Application Solutions business to GENBAND Inc. [D.I. 2632]. Efforts continue to be made with respect to the realization of value from Nortel's remaining assets.

16. On August 4, 2009, this Court entered an order fixing September 30, 2009 at 4:00 PM (Eastern Time) as the general bar date for filing proofs of claim or interests [D.I. 1280]. On December 2, 2009 this Court entered an order fixing January 25, 2010 at 4:00 PM (Eastern Time) as the bar date for filing proofs of claim or interests against NN CALA [D.I. 2059].

**Relief Requested**

17. By this Motion, the Debtors seek an order enforcing the Sale Order against the Purchaser and affirming that the Purchaser's purported challenge to the Sellers' calculation of the Closing Inventory Amount contravenes the Sale Agreement (as defined below) and may neither be raised as a valid basis for delivering a Disagreement Notice nor submitted to an Accounting Arbitrator under the terms of the Sale Agreement. Given the lack of a legitimate dispute as to the Sellers' entitlement to a significant portion of the escrowed funds, the Debtors also seek the release of $19,184,300 plus accumulated interest currently held in escrow by Wells

Fargo in accordance with section 4 of the Escrow Agreement and such other relief as the Court may deem just and proper.

### Facts Relevant to this Motion

**A.    The Sale of the Debtors' Enterprise Solutions Business to the Purchaser**

18.    The relief sought in this Motion relates to Nortel's sale of assets related to its Enterprise Business (as defined below) to the Purchaser.  Specifically, on July 20, 2009, the Debtors filed the *Debtors' Motion For Orders (I)(A) Authorizing The Debtors' Entry Into The Asset And Share Sale Agreement, (B) Authorizing And Approving The Bidding Procedures, (C) Authorizing And Approving A Break-Up Fee And Expense Reimbursement, (D) Approving The Notice Procedures, (E) Approving The Assumption And Assignment Procedures, (F) Authorizing The Filing Of Certain Documents Under Seal, And (G) Setting A Date For The Sale Hearing, And (II) Authorizing And Approving (A) The Sale Of Certain Assets Of, And Equity Interests In, Debtors' Enterprise Solutions Business, (B) The Assumption And Assignment Of Certain Contracts And Leases And (C) The Assumption And Sublease Of Certain Leases* [D.I. 1131] (the "Enterprise Sale Motion") seeking approval of the sale of substantially all of the assets, including the stock of certain subsidiaries of the Debtors, relating to Nortel's Enterprise Solutions Business (the "Enterprise Business") to the Purchaser pursuant to a stalking-horse purchase agreement (the "Stalking Horse Agreement"), subject to the receipt of a higher and better offer at auction.

19.    Following the Court's approval of the bidding procedures by order dated August 4, 2009 [D.I. 1278], and an auction at which the Purchaser emerged as the successful bidder, the Court approved the sale of the Enterprise Business to the Purchaser pursuant to the Amended and Restated Asset and Share Sale Agreement dated as of September 14, 2009, by and

among the Sellers and the Purchaser (the "Sale Agreement")[5] by order dated September 16, 2009 [D.I. 1514].  The Canadian Court likewise approved both the bidding procedures by order dated August 4, 2009 and the sale of the Enterprise Business to the Purchaser pursuant to the Sale Agreement by order dated September 16, 2009.  The sale of the Enterprise Business to the Purchaser closed on December 18, 2009 (the "Closing").

20.    In connection with the sale of the Enterprise Business, Wells Fargo, NNI, NNL, NNUK and the Purchaser entered into the Escrow Agreement, dated as of September 14, 2009.  The Escrow Account was established, with Wells Fargo as escrow agent, to hold the Escrow Amount, which amount consists of, among other things, a Purchase Price Adjustment Escrow Amount of US $30 million that relates to certain potential post-closing purchase price adjustments that could be made pursuant to section 2.2.3 of the Sale Agreement.  Under section 4 of the Escrow Agreement, funds may be released from escrow either by delivery of a joint written instruction by NNI, NNL, NNUK and the Purchaser to Wells Fargo directing the release of funds or by a final, non-appealable court order directing the release of funds.

**B.    The Closing Statement and Calculation of the Purchase Price Adjustment**

21.    On February 16, 2010, as contemplated by and in accordance with section 2.2.3.1(a) of the Sale Agreement, the Sellers delivered to the Purchaser a written closing statement (the "Closing Statement"), a copy of which is attached hereto as Exhibit B, that contained their calculation of certain post-closing purchase price adjustments provided for under the Sale Agreement.  The Closing Statement provided for a net purchase price adjustment in

---

[5]    Capitalized terms used but not defined herein shall have the meaning ascribed to them in the Sale Agreement.

favor of the Purchaser in the amount of $4,878,700,[6] which amount included, among other things, a calculated Closing Inventory Adjustment of $11,700,000.

22.     The standards for calculating a purchase price adjustment under the Sale Agreement, and particularly the Closing Inventory Adjustment, are set forth in the Sale Agreement.   Section 2.2.3.1(a) of the Sale Agreement generally provides that the Closing Statement shall be prepared in accordance with the "Calculation Principles" and the terms of the Sale Agreement itself.  The Calculation Principles to be applied include "the Nortel Accounting Principles, to the extent applicable to the determination of the Inventory Value, the Net Debt, the Companies Net Working Capital and the EMEA Downward Adjustment, and the other accounting principles, methodologies and policies for the determination of Inventory Value, the Net Debt, the Companies Working Capital and the EMEA Downward Adjustment, set forth in Section 1.1(c) of the Sellers' Disclosure Schedule."  Sale Agreement, p. 11 (defining Calculation Principles).

23.     The Sale Agreement provides further guidance on the calculation of the Closing Inventory Adjustment in connection with a post-closing purchase price adjustment.  The Closing Inventory Adjustment consists of a potential downward purchase price adjustment calculated based on the actual value of each of three types of inventory – data inventory, spares and services inventory, and voice inventory – delivered by the Sellers to the Purchaser at Closing.  See Sale Agreement, p. 12 (defining Closing Inventory Adjustment).  For each of these three categories, the determination of the adjustment amount is driven by a calculation of the

---

[6]     Subsequently, on April 16, 2010, the Sellers delivered to the Purchaser a revised Closing Statement that provided for a net purchase price adjustment in favor of the Purchaser in the amount of $3,928,700 (the "Revised Closing Statement").  The Revised Closing Statement accounted for reductions in the purchase price adjustment amount that could only have come to the Sellers' attention after they had delivered the Closing Statement.  A copy of the Revised Closing Statement is attached hereto as Exhibit C.

"Inventory Value" of the inventory delivered at Closing, which is compared to benchmark dollar amounts set forth in the Sale Agreement.  See id.

24.    The Sale Agreement provides specific guidance on the methodology to be used to calculate the Inventory Value for each category of inventory in connection with the preparation of the Closing Statement.  Under the Sale Agreement, the Inventory Value consists of:

> the book value, net of all applicable reserves and provisions, of the Owned Inventory and the EMEA Owned Inventory **calculated in accordance with the Nortel Accounting Principles, and the Calculation Principles** and the revenue assumptions presented in the Sellers Forecast set forth in Section 1.1(d)(ii) of the Sellers Disclosure Schedule.

Sale Agreement, p. 26 (definition of Inventory Value) (emphasis added).  In short, the amount of the Closing Inventory Adjustment is determined through the valuation of the inventory delivered to the Purchaser based on the application of the Nortel Accounting Principles, as mandated both directly in the definition of Inventory Value and the incorporation of these principles into the Calculation Principles that must be applied for these purposes.

## C.    Purchaser's Non-compliance with the Sale Agreement in Calculating the Purchase Price Adjustment

25.    Notwithstanding the clear directives provided by the Sale Agreement, the Purchaser has asserted a dispute with the Sellers regarding the calculation of the Closing Inventory Adjustment that falls outside of, and therefore directly contravenes, the terms of the Sale Agreement.

26.    Following the Sellers' delivery of the Closing Statement, the Purchaser delivered a Disagreement Notice to the Sellers on April 19, 2010 that disputed, among other things, the Sellers' calculation of the Closing Inventory Amount.  In the Disagreement Notice, a copy of which is attached hereto as Exhibit D, the Purchaser asserted that the Sellers owe the

Purchaser $34,294,700 plus interest on account of various purchase price adjustments, or a further downward adjustment of the purchase price of $29,416,000 as compared to the Sellers' calculations in the Closing Statement.

27.    The Purchaser's Disagreement Notice enumerated eight "Adjustment Items" that accounted for its disagreement with the calculations in the Closing Statement.[7]  The most significant Adjustment Item, Adjustment Item #A1, sought an additional $22,076,000 downward adjustment of the purchase price based on a purported dispute regarding the Closing Inventory Amount.    The Purchaser's stated basis for the claimed adjustment amount was described as "Decrease Inventory for unreasonable mitigation plans."  By this Adjustment Item, the Purchaser objected to the Sellers' valuation of certain "excess inventory" transferred to the Purchaser on account of purported "unreasonable mitigation plans," where the Purchaser claimed that it "ha[d] not received documentation of mitigation plans that is sufficiently detailed to allow independent verification that the plans are reasonable."  See Disagreement Notice, Schedule A.

28.    In essence, the Purchaser sought a greater write-down in the value of the inventory delivered by the Sellers at Closing based on a dispute as to the Sellers' valuation of certain excess inventory delivered to the Purchaser.  In the ordinary course of business, Nortel orders and maintains a stock of inventory in order to be able to satisfy its anticipated customers' needs.  If Nortel's actual need for the inventory is less than its forecasted needs, under certain circumstances it will designate the extra inventory as "excess inventory" or, depending on the nature of the extra inventory and potential customer needs, even as "obsolete inventory."  For certain contract manufacturers and other suppliers that provide goods to Nortel, Nortel may be

---

[7]    Of the eight Adjustment Items in the Disagreement Notice, two (Adjustments #A1 and #A2), were designated "Inventory Adjustment Items," three (Adjustments #B1, #B2 and #B3) were designated "Companies Net Working Capital Adjustment Items," and three (Adjustments #C1, #C2 and #C3) were designated "Retirement Obligation Amount Adjustment Items."

contractually required to purchase excess and obsolete inventory from the suppliers if its forecasted needs exceed its actual orders placed with the supplier over a defined period of time. In order to mitigate losses that otherwise could result from the build up of excess and obsolete inventory, Nortel has historically followed mitigation plans (the "Mitigation Plans"), which consist of internal operational guidelines and practices that provide for the use of such inventory in future orders or other projects in order to mitigate losses.

29.      The Purchaser's challenge to the Sellers' valuation of the excess inventory delivered to the Purchaser is not based on whether Nortel employed the Mitigation Plans or whether the Sellers' valuation appropriately accounted for those Mitigation Plans, but rather whether the Mitigation Plans themselves were "reasonable." The Purchaser's asserted basis for challenging the Sellers' calculation of the Closing Inventory Amount does not comply with the manner in which excess inventory is accounted for under the Sale Agreement. The Sale Agreement directs the parties to look to the Nortel Accounting Guidelines in valuing inventory. The Nortel Accounting Guidelines, in turn, provide the manner in which inventory value should be adjusted to account for excess and obsolete inventory. Specifically, Accounting Guideline No. 1004, a copy of which is attached hereto as Exhibit E, describes how and under what circumstances Nortel's Mitigation Plans are to be applied in calculating the value of excess and obsolete inventory. It is beyond dispute that Accounting Guideline No. 1004 governs the write down of excess inventory for these purposes, as the description of "Inventory Value" in Sellers Disclosure Schedule 1.1(c) under the Sale Agreement specifically states that the principles espoused therein are further defined in certain Nortel Accounting Guidelines, including "AG 1004 – Excess and Obsolete Inventory Provision." The Purchaser has not suggested it is unaware of the existence or applicability of Nortel Accounting Guideline No. 1004, which was

13

made available to the Purchaser during the period in which it conducted diligence and negotiated with the Sellers prior to signing the Stalking Horse Agreement.

30.     Nortel Accounting Guideline No. 1004, which was specifically referenced in Sellers Disclosure Schedule 1.1(c), governs the calculation of the Inventory Value both directly as a Nortel Accounting Principle and as a Calculation Principle under the Sale Agreement.  Moreover, there is no question that the Purchaser agreed in section 2.2.3.1(a) to the use of the Calculation Principles, including Nortel Accounting Guideline No. 1004, in the preparation of the Closing Statement and the calculation of the inventory-based purchase price adjustments.  The Sale Agreement does not provide for any further adjustment to the Inventory Value depending on whether the Purchaser considers Nortel's management of its excess inventory to be "reasonable"; it merely permits an adjustment to the net book value of such inventory based on the application of Nortel's accounting standards, including those standards governing the valuation of excess inventory.  Accordingly, the Purchaser has not raised a valid dispute in its Adjustment Item #A1 of the Disagreement Notice.

**D.     The Purchaser's Continued Refusal to Comply with the Sale Agreement**

31.     Following the delivery of the Disagreement Notice, representatives of the Sellers and the Purchaser engaged in discussions seeking to resolve the issues raised in the Disagreement Notice.  Although these discussions led to the eventual resolution of certain other Adjustment Items in the Disagreement Notice, during the course of these discussions it became ever more apparent that the Purchaser's purported disagreement with the "reasonableness" of the Nortel's Mitigation Plans as expressed in Adjustment Item #A1 was inconsistent with the Sale Agreement valuation methodologies and the Purchaser's obligation to accept the inventory delivered by the Sellers at closing – including any excess inventory – subject only to adjustments

14

in inventory value pursuant to the Calculation Principles, including Nortel Accounting Guideline No. 1004, in the preparation of the Closing Statement.

32.     In a letter dated May 21, 2010 (the "May 21 Letter"), a copy of which is attached hereto as Exhibit F, the Main Sellers, in consultation with the EMEA Sellers, formally notified the Purchaser that the issues raised by Adjustment Item #A1 may not be raised in a Disagreement Notice and therefore are not susceptible to continued dispute or resolution by an Accounting Arbitrator.[8]     Nevertheless, in the interest of avoiding the need to seek court intervention to resolve the issue, the Main Sellers included with the May 21 Letter documentary support for the Mitigation Plans used by the Sellers with respect to excess and obsolete inventory.

33.     Notwithstanding the Main Sellers' explanation of their position and provision of additional documents, the Purchaser continued to press its position, as well as its continued dispute with certain other adjustments, in a response letter dated June 11, 2010 (the "June 11 Letter"), a copy of which is attached hereto as Exhibit G.  Notwithstanding the absence of a valid dispute, the Purchaser claimed a need for more time to review information and prepare a "comprehensive report" on the issue.[9]

34.     Frustrated with the Purchaser's response, by way of a letter dated June 14, 2010, (the "June 14 Letter"), a copy of which is attached hereto as Exhibit H, the Main Sellers, in consultation with the EMEA Sellers, reiterated their position from the May 21 Letter and once again requested written confirmation regarding the Adjustment Items subject to resolution as well as a response as to the Adjustment Items that remain unresolved.  Regarding Adjustment

---

[8]     By contrast, the Sellers have indicated their willingness to refer the remaining disputed purchase price adjustments to an Accounting Arbitrator to the extent not resolved with the Purchaser.

[9]     The Purchaser also took the position in the June 11 Letter that the Sellers were not permitted to revise the Closing Statement under the Sale Agreement.

Item #A1, the Main Sellers requested that the Purchaser provide its "comprehensive response" by June 18, 2010 in the interest of expediting resolution of the issue so that those funds currently held in the Escrow Account that are no longer in dispute could be released to the Distribution Agent.   The Main Sellers also attached to the June 14 Letter instructions to Wells Fargo, executed by NNI, NNL and NNUK, to release $18,731,300 from the Escrow Account for amounts deemed no longer in dispute and requested that the Purchaser execute the instructions and deliver them to Wells Fargo as soon as possible.   The Purchaser refused to do so (other than to confirm the resolution of certain other Adjustment Items from the Disagreement Notice),[10] and again asserted a claimed need for more time to develop a response.   See Purchaser's Letter dated June 18, 2010 (the "June 18 Letter"), a copy of which is attached hereto as Exhibit I.   In light of the Purchaser's continued unwillingness to abandon its purported dispute with the calculation of the Closing Inventory Amount and in order to avoid further wasteful expenditures of this unfounded dispute, the Debtors are compelled to seek intervention of the Court to enforce the terms of the Sale Agreement, as approved by the Sale Order.

### Argument

**A.**   **The Court Retained Exclusive Jurisdiction Over the Dispute with the Purchaser and Has Broad Authority to Enforce the Terms of the Sale Order**

35.   Pursuant to the Sale Order, this Court retains, "exclusive jurisdiction to interpret, construe, implement, and enforce the terms and provisions of, and to resolve any and all disputes that may arise under and in connection with this Order, all amendments thereto, and any waivers or consents thereunder. . . ."   Sale Order, at ¶ 18 (emphasis added).

36. Similarly, section 10.6(b) of the Sale Agreement states that "[t]o the fullest extent permitted by applicable Law, each Party (i) agrees that any claim, action by such Party for

---

[10]      The Purchaser agreed to withdraw Adjustment Items #C2 and #C3 in exchange for the Sellers' agreement with the Purchaser's position on Adjustment Items #B2 and #B3.

any relief whatsoever arising out of, or in connection with, this Agreement, or the transactions contemplated hereby shall be brought only in (A) the U.S. Bankruptcy Court, if brought prior to the entry of a final decree closing the Chapter 11 cases, or the Canadian Court, if brought prior to the termination of the CCAA Cases" where the U.S. Bankruptcy Court means "the U.S. Bankruptcy Court for the District of Delaware." Sale Agreement, p. 184.[11]

37. Section 105(a) of the Bankruptcy Code additionally provides that the Court "may issue any order, process or judgment that is necessary or appropriate to carry out the provisions [of the Bankruptcy Code]," 11 U.S.C. § 105(a), and bankruptcy courts, based on the reference of the inherent power of the district court contained in section 157(c) of title 28 of the United States Code and on the broad statutory grant of equitable powers in section 105 of the Bankruptcy Code, have the inherent authority to enforce compliance with their lawful orders, to the extent such power is not restricted by statute. See, e.g., In re WorldCorp., Inc., 252 B.R. 890, 897 (Bankr. D. Del. 2000) (compelling party to make payment in accordance with agreement that was previously approved by court order); United States Lines, Inc. v. GAC Marine Fuels Ltd. (In re McLean Indus.), 68 B.R. 690, 695-97 (Bankr. S.D.N.Y. 1986); Johns-Manville Sales Corp. v. Doan (In re Johns-Manville Corp.), 26 B.R. 919, 924 (Bankr. S.D.N.Y. 1983); Baer v. Bowser (In re Jones), Case No. 97-41205-7, 2003 Bankr. LEXIS 2056, at *15 (Bankr. D. Kan. Nov. 10, 2003) ("[T]he Court can think of no better use of its equity power under § 105 than to issue an order that compels compliance with a previous order."); JMF Acquisitions Co. v. Boccella (In re Edgehill Nursing Home, Inc.), 68 B.R. 413, 415-16 (Bankr. E.D. Pa. 1986).

---

[11] The Debtors have been informed that the Main Sellers who are Canadian Debtors are contemplating seeking similar relief from the Canadian Court.

38.     Accordingly, for these reasons, this Court has the authority, and has indeed specifically reserved its jurisdiction, to interpret and enforce the Sale Order and the terms of the Sale Agreement and the Escrow Agreement.

**B.     The Purchaser Improperly Challenged the Use of Nortel's Accounting Principles in the Disagreement Notice**

39.     By section 2.2.3.1(a) of the Sale Agreement, the Sellers and the Purchaser expressly agreed that the calculation of purchase price adjustments in the Closing Statement was to be performed "in accordance with the Calculation Principles," which by definition included Nortel Accounting Guideline No. 1004 governing mitigation for excess and obsolete inventory. The definitions guiding the calculation of the Closing Inventory Adjustment similarly mandate the application of Accounting Guideline No. 1004 to calculate excess inventory and associated mitigation adjustments.  Now, however, the Purchaser purports by the Disagreement Notice to read the use of the Calculation Principles out of the Sale Agreement by questioning the entirety of more than $22 million worth of inventory subject to mitigation on the basis that Nortel's Mitigation Plans – which specifically govern under Nortel's Accounting Guidelines – were somehow "unreasonable."

40.     Having agreed in section 2.2.3.1(a) of the Sale Agreement that the calculation of the purchase price adjustments in the Sellers' Closing Statement would be based on the Calculation Principles, including Nortel Accounting Guideline No. 1004, the Purchaser cannot now question the Sellers' reliance on those principles in calculating the purchase price adjustments for purposes of their Closing Statement.  As the Sale Agreement makes clear, the proper use of a Disagreement Notice is to identify those calculations in the Closing Statement with which the Purchaser legitimately disagrees.  The Disagreement Notice was never intended,

and cannot now be used, as a means to dispute or renegotiate the suitability of the Calculation Principles for calculating the purchase price adjustments in the first instance.

41.     The Purchaser's position, and its purported need for more time to develop a "comprehensive response" are even less well founded at this stage, given that over six months have passed since the Closing and that the Purchaser both is in possession of the books and records of the Enterprise Business and employs many of the individuals who were responsible, prior to Closing, for the management of Nortel's inventory and its implementation of its management plans.  In any event, the passage of further time will not change the fact that the Purchaser has not raised a basis for disputing the valuation of inventory that could even arguably serve as the ground for a legitimate dispute.

**C.      The Reasonableness of Nortel's Mitigation Plans is Not A Subject That Can Be Properly Brought Before an Accounting Arbitrator**

42.     Because the Purchaser's manufactured dispute clearly contravenes the terms of the Sale Agreement, the Court may enforce the terms of the Sale Agreement and direct the release of escrowed funds in excess of other disputed amounts, without the need for the parties' resort to the use of an Accounting Arbitrator on this issue.

43.     Section 2.2.3.1(c) of the Sale Agreement provides for the use of an Accounting Arbitrator if the Sellers and the Purchaser "are unable to resolve any disagreement **as contemplated by Section 2.2.3.1(b)** [of the Sale Agreement] within fourteen (14) days after delivery of a Disagreement Notice," (emphasis added).  The Accounting Arbitrator's authority is clearly proscribed to only resolve disputes appropriately raised under the Sale Agreement's purchase price adjustment procedures.  The Debtors did not agree to delegate to the Accounting Arbitrator the power to consider other arguments or to rewrite the terms of the Sale Agreement,

as the Purchaser now seeks to do, and the Debtors should not be required to expend further time or resources rebutting arguments that lack even arguable merit under the Sale Agreement.

**D.    The Release of the Escrow Funds**

44.    As the parties have resolved Adjustments #B2, #B3, #C2 and #C3 to the Disagreement Notice pursuant to the June 18 Letter, and as Adjustment #A1 may not properly be resolved by an Accounting Arbitrator, the only amounts that are subject to even arguable dispute in calculating the final purchase price adjustment amount are items #A2, #B1 and #C1 of the Disagreement Notice, which total $5,921,000.  As set forth in section 2.2.3.1(c) of the Sale Agreement, the Accounting Arbitrator's decision with respect to each item "shall be the amount claimed by the Main Sellers and the EMEA Sellers, the amount claimed by the Purchaser, or an amount between the amount claimed by the Main Sellers and the EMEA Sellers and the amount claimed by the Purchaser."  Accordingly, the maximum purchase price adjustment to be paid to the Purchaser is $10,815,700, equal to (i) $5,921,000, the remaining disputed amounts, plus (ii) $3,928,700, the amount of the Sellers' proposed purchase price adjustment contained in their Revised Closing Statement, plus (iii) $966,000, the amount of Adjustments #B2 and #B3, which the Sellers have conceded.

45.    As the currently escrowed Purchase Price Adjustment Escrow Amount exceeds the maximum purchase price adjustment by $19,184,300, there is no basis for the continued reserve of those excess amounts.  However, the Purchaser has refused to execute joint instructions to Wells Fargo to release the excess funds.  Accordingly, to the extent the Court determines the Purchaser has not raised a legitimate dispute with respect to the calculation of the Closing Inventory Amount, the Debtors respectfully request that the Court direct the Purchaser to execute instructions to Wells Fargo to release to the Distribution Agent (as defined in the Escrow Agreement) those amounts currently held in escrow in excess of $10,815,700, or $19,184,300,

and to find that Wells Fargo is authorized to release such amounts under the terms of the Sale Agreement.

46.    As the Court is aware, the Sellers are in the process of negotiating how to properly allocate the proceeds of the numerous asset dispositions undertaken in the course of Nortel's global insolvency proceedings.  In doing so, the Debtors, their estates and their creditors will benefit from having as accurate an estimate of the funds to be allocated from each asset disposition as is reasonably possible.  Given the Purchaser's recalcitrance on these issues, the Debtors also want to avoid the risk that they could later need to seek further Court intervention to secure the release of the escrowed funds.  In this instance, where only a fractional portion of a $30 million escrow fund remains reasonably in dispute, and where the Accounting Arbitrator appointed to resolve that dispute is contractually constrained as to the maximum amount which he is entitled to award to either party, it is in the interests of the Debtors' estates that the excess funds in escrow be released to the Distribution Agent in connection with the other relief sought in this Motion.

47.    The Debtors further seek a waiver of any stay of the effectiveness of the order approving this Motion that otherwise could apply under Bankruptcy Rule 6004(h), which states that, "[a]n order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise," such that the undisputed amounts held in escrow may be released upon the entry of the order.

### Notice

48.    Notice of the Motion has been given via first class mail to (i) the U.S. Trustee; (ii) counsel to the Committee; (iii) counsel to the Bondholder Group; (iv) counsel to the Purchaser; (v) Wells Fargo Bank, National Association, as escrow agent and (vi) the general

service list established in these chapter 11 cases.    The Debtors submit that under the circumstances no other or further notice is necessary.

### No Prior Request

49.    No prior request for the relief sought herein has been made to this or any other court.

WHEREFORE, the Debtors respectfully request that this Court (i) grant this Motion and the relief requested herein; (ii) enter the proposed order attached hereto; and (iii) grant such other and further relief as it deems just and proper.

Dated:  June 25, 2010
        Wilmington, Delaware

CLEARY GOTTLIEB STEEN & HAMILTON LLP

James L. Bromley (admitted *pro hac vice*)
Lisa M. Schweitzer (admitted *pro hac vice*)
One Liberty Plaza
New York, New York 10006
Telephone:  (212) 225-2000
Facsimile:  (212) 225-3999

- and -

MORRIS, NICHOLS, ARSHT & TUNNELL LLP


   */s/ Andrew R. Remming*
Derek C. Abbott (No. 3376)
Eric D. Schwartz (No. 3134)
Ann C. Cordo (No. 4817)
Andrew R. Remming (No. 5120)
1201 North Market Street
P.O. Box 1347
Wilmington, Delaware 19801
Telephone:  (302) 658-9200
Facsimile: (302) 658-3989

*Counsel for the Debtors
and Debtors in Possession*