**EXHIBIT F**

# NORTEL

May 21, 2010

Avaya Inc.
211 Mount Airy Road
Basking Ridge, NJ 07920-2332
United States
Attention:  Pamela F. Craven, Chief Administrative Officer
            Frank J. Mahr, Corporate Counsel & Corporate Secretary
Facsimile: +1-908-953-3902

Ladies and Gentlemen:

Reference is made to the Amended and Restated Asset and Share Sale Agreement, dated as of September 14, 2009 (as amended, the "Agreement"), by and among Nortel Networks Corporation, a Canadian corporation ("NNC"), Nortel Networks Limited, a Canadian corporation ("NNL"), Nortel Networks Inc., a Delaware corporation ("NNI" and together with NNC and NNL, the "Main Sellers") and the Other Sellers (as defined therein), and Avaya Inc., a Delaware corporation (the "Purchaser"), as well as to the Disagreement Notice delivered by the Purchaser on April 19, 2010 (the "Avaya Disagreement Notice"). Capitalized terms used and not otherwise defined herein shall have the meanings given to such terms in the Agreement.

As an initial matter, please note that the Main Sellers believe that the issues raised by the Purchaser in that portion of the Avaya Disagreement Notice titled "Adjustment #A1" may not be raised in a Disagreement Notice and are not susceptible to resolution by an Accounting Arbitrator under the terms of the Agreement. Sections 2.2.3.1(b) and (c) of the Agreement address fully all issues that may be raised in a Disagreement Notice and contemplate only the resolution of disagreements relating to the application of mitigation plans to inventory. Questions about the reasonableness of the Main Sellers' mitigation plans simply are not within the contemplation of those subsections, or any other provision, of the Agreement.

Indeed, Purchaser had lengthy and unprecedented access to Main Sellers' management and a comprehensive database of information relating to the purchased business. Included among this information were the mitigation plans and supporting documentation, such as the Nortel Accounting Guidelines and the Calculation Principles set forth in section 1.1(c) of the Sellers Disclosure Statement. Moreover, Purchaser had complete access to the Main Sellers' employees who were responsible for the development and implementation of the mitigation plans. At no point during the course of the negotiation of the Agreement -- which lasted months

1

and involved a hotly contested auction -- did the Purchaser question or debate the appropriateness of the Main Sellers' mitigation plans.

Nevertheless, and without prejudice to the foregoing, attached please find documentation providing additional detail about the mitigation plans used by the Main Sellers with respect to excess and obsolete inventory. The Main Sellers are providing these materials to the Purchaser with the expectation that they will resolve all of the Purchaser's questions. As the materials attached demonstrate, the vast majority of the inventory transferred to the Purchaser at closing that was subject to mitigation is supported either by documented mitigation plans in the possession of the Main Sellers or by documentation in the possession of individuals now employed by the Purchaser. Moreover, the materials demonstrate that the Main Sellers applied the mitigation plans in a manner and at a level consistent with their practice in the eight quarters preceding the closing. In the event Purchaser is not satisfied with this information, and continues to demand resolution by an Accounting Arbitrator, the Main Sellers do not agree that sections 2.2.3.1(b) and (c) apply and will seek relief from the U.S. and Canadian Courts to enforce the Agreement.

With respect to that portion of the Avaya Disagreement Notice titled "Adjustment #A2," the Main Sellers have enclosed documentation that the Main Sellers believe satisfies the Purchaser's concerns regarding the Main Sellers' demand forecast assumptions. However, to the extent Purchaser is not satisfied, the Main Sellers are prepared to proceed to resolution by an Accounting Arbitrator on this issue.

With respect to that portion of the Avaya Disagreement Notice titled "Adjustment #B1," the Main Sellers disagree that the restructuring provision related to the NGS leased properties account in the amount of $2,396,000 should be included in the Closing Companies Net Working Capital. The Target Closing Companies Net Working Capital of $16.1M was set after significant diligence and discussion, and at no time did the Purchaser identify the restructuring provision related to the NGS leased properties as a balance sheet account to be included in the Target Closing Companies Net Working Capital.

With respect to that portion of the Avaya Disagreement Notice titled "Adjustment #C1," the Main Sellers have engaged with the Purchaser regarding the Italian TFR credit, and the Main Sellers understand that the Purchaser is currently considering whether to accept the transfer of the TFR credit and withdraw Adjustment #C1.

With respect to the other Adjustment Items in the Avaya Disagreement Notice, pursuant to the discussions between the Main Sellers and the Purchaser, the Main Sellers propose to: (i) accept Purchaser's proposed Adjustments #B2 and #B3; and (ii) recognize Purchaser's withdrawal of Adjustments #C2 and #C3. The Main Sellers' acceptance of Adjustments #B2 and #B3 is conditioned upon Purchaser's confirmation, in writing, of its withdrawal of Adjustments #C2 and #C3.

The Main Sellers reserve all of their rights under the Agreement with respect to the Avaya Disagreement Notice. The Main Sellers also note that the Avaya Disagreement Notice does not take into account the revisions to the Closing Statement sent by the Main Sellers and the EMEA Sellers on April 16, 2010.

Very truly yours,

Christopher Ricaurte
President, Nortel Business Services

cc: Ropes & Gray LLP
   One International Place
   Boston, MA 02110
   United States
   Attention:   Alfred Rose
                Howard Glazer
   Facsimile: +1-617-951-7050