EXHIBIT A

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

---------------------------------------------------------X
                                                         :
                                                         :   Chapter 11
*In re*                                                  :
                                                         :   Case No. 09-10138 (KG)
NORTEL NETWORKS INC., *et al.*,[1]                       :
                                                         :   Jointly Administered
                    Debtors.                             :
                                                         :   **Hearing date: July 16, 2010 at 10:00 AM (ET)**
                                                         :   **Objections due: July 6, 2010 at 4:00 PM (ET)**
                                                         :
---------------------------------------------------------X

### NOTICE OF DEBTORS' MOTION FOR ENTRY OF AN ORDER AUTHORIZING DEBTORS TO TERMINATE CERTAIN RETIREE AND LONG-TERM DISABILITY PLANS

PLEASE TAKE NOTICE that the debtors and debtors-in-possession (collectively, the "Debtors") in the above-captioned cases, have today filed the attached **Debtors' Motion For Entry Of An Order Authorizing Debtors To Terminate Certain Retiree And Long Term Disability Plans** ("Motion").

PLEASE TAKE FURTHER NOTICE that any party wishing to oppose the entry of an order approving the Motion must file a response or objection ("Objection") if any, to the Motion with the Clerk of the United States Bankruptcy Court for the District of Delaware, 824 Market Street, 3rd Floor, Wilmington, Delaware 19801 on or before **July 6, 2010 at 4:00 p.m. (Eastern Time)** (the "Objection Deadline").

At the same time, you must serve such Objection on counsel for the Debtors so as to be received by the Objection Deadline.

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's tax identification number, are: Nortel Networks Inc. (6332), Nortel Networks Capital Corporation (9620), Nortel Altsystems Inc. (9769), Nortel Altsystems International Inc. (5596), Xros, Inc. (4181), Sonoma Systems (2073), Qtera Corporation (0251), CoreTek, Inc. (5722), Nortel Networks Applications Management Solutions Inc. (2846), Nortel Networks Optical Components Inc. (3545), Nortel Networks HPOCS Inc. (3546), Architel Systems (U.S.) Corporation (3826), Nortel Networks International Inc. (0358), Northern Telecom International Inc. (6286), Nortel Networks Cable Solutions Inc. (0567) and Nortel Networks (CALA) Inc. (4226). Addresses for the Debtors can be found in the Debtors' petitions, which are available at http://chapter11.epiqsystems.com/nortel.

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

------------------------------------------------X
:
*In re*                                          :    Chapter 11
:
Nortel Networks Inc., *et al.*,[1]               :    Case No. 09-10138 (KG)
:
          Debtors.  :    Jointly Administered
:
:    Hearing date: July 16, 2010 at 10:00 a.m. (ET)
:    Objections due: July 6, 2010 at 4:00 p.m. (ET)
------------------------------------------------X

### DEBTORS' MOTION FOR ENTRY OF AN ORDER
### AUTHORIZING DEBTORS TO TERMINATE
### CERTAIN RETIREE AND LONG-TERM DISABILITY PLANS

Nortel Networks Inc. ("NNI") and certain of its affiliates, as debtors and debtors in possession (collectively, the "Debtors"), hereby move this Court (the "Motion"), for the entry of an order substantially in the form attached hereto as Exhibit A, pursuant to sections 105(a), 363(b) and 1108 of title 11 of the United States Code (the "Bankruptcy Code"), authorizing the Debtors to terminate, effective August 31, 2010, the following benefit plans: (i) the Nortel Networks Inc. Retiree Medical Plan, (ii) the Nortel Networks Inc. Retiree Life Insurance and Long-Term Care Plan, and (iii) the Nortel Networks Inc. Long-Term Disability Plan. In support of this Motion, the Debtors respectfully represent as follows:

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's tax identification number, are: Nortel Networks Inc. (6332), Nortel Networks Capital Corporation (9620), Nortel Altsystems Inc. (9769), Nortel Altsystems International Inc. (5596), Xros, Inc. (4181), Sonoma Systems (2073), Qtera Corporation (0251), CoreTek, Inc. (5722), Nortel Networks Applications Management Solutions Inc. (2846), Nortel Networks Optical Components Inc. (3545), Nortel Networks HPOCS Inc. (3546), Architel Systems (U.S.) Corporation (3826), Nortel Networks International Inc. (0358), Northern Telecom International Inc. (6286), Nortel Networks Cable Solutions Inc. (0567) and Nortel Networks (CALA) Inc. (4226). Addresses for the Debtors can be found in the Debtors' petitions, which are available at http://chapter11.epiqsystems.com/nortel.

## Jurisdiction

1. The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2). Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

2. The statutory bases for the relief requested herein are sections 105(a), 363(b) and 1108 of chapter 11 of title 11 of the United States Code (the "Bankruptcy Code").

## Background

**A. Procedural History**

3. On January 14, 2009 (the "Petition Date"), the Debtors, other than NN CALA (defined below), filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code.

4. The Debtors continue to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

5. On January 15, 2009, this Court entered an order of joint administration pursuant to Bankruptcy Rule 1015(b) that provided for the joint administration of these cases and for consolidation for procedural purposes only [D.I. 36].

6. Also on the Petition Date, the Debtors' ultimate corporate parent Nortel Networks Corporation ("NNC"), NNI's direct corporate parent Nortel Networks Limited ("NNL," and together with NNC and their affiliates, including the Debtors, "Nortel"), and certain of their Canadian affiliates (collectively, the "Canadian Debtors")[2] filed an application with the Ontario Superior Court of Justice (the "Canadian Court") under the Companies' Creditors Arrangement Act (Canada) (the "CCAA"), seeking relief from their creditors (collectively, the "Canadian

---

[2] The Canadian Debtors include the following entities: NNC, NNL, Nortel Networks Technology Corporation, Nortel Networks Global Corporation and Nortel Networks International Corporation.

2

Proceedings"). The Canadian Debtors continue to manage their properties and operate their businesses under the supervision of the Canadian Court.

7. On January 14, 2009, the Canadian Court entered an order recognizing these chapter 11 proceedings as a foreign proceeding under section 18.6 of the CCAA. On February 27, 2009, based on a petition filed by Ernst & Young Inc., as court-appointed Monitor in the Canadian Proceedings and as foreign representative for the Canadian Debtors (the "Monitor"), this Court entered an order recognizing the Canadian Proceedings as foreign main proceedings under chapter 15 of the Bankruptcy Code.

8. On January 14, 2009, the High Court of England and Wales placed nineteen of Nortel's European affiliates (collectively, the "EMEA Debtors")[3] into administration under the control of individuals from Ernst & Young LLC (collectively, the "Joint Administrators"). On May 28, 2009, at the request of the Joint Administrators, the Commercial Court of Versailles, France (the "French Court") (Docket No. 2009P00492) ordered the commencement of secondary proceedings in respect of Nortel Networks S.A. ("NNSA"), which consist of liquidation proceedings during which NNSA was originally authorized to continue to operate as a going concern for an initial period of three months, which period was subsequently extended to November 28, 2009. In accordance with the European Union's Council Regulation (EC) No. 1346/2000 on Insolvency Proceedings, the English law proceedings (the "English Proceedings") remain the main proceedings in respect of NNSA although a French administrator and a French liquidator have been appointed and are in charge of the day-to-day affairs and continuing

---

[3] The EMEA Debtors include the following entities: Nortel Networks UK Limited, Nortel Networks S.A., Nortel Networks (Ireland) Limited, Nortel GmbH, Nortel Networks France S.A.S., Nortel Networks Oy, Nortel Networks Romania SRL, Nortel Networks AB, Nortel Networks N.V., Nortel Networks S.p.A., Nortel Networks B.V., Nortel Networks Polska Sp. z.o.o., Nortel Networks Hispania, S.A., Nortel Networks (Austria) GmbH, Nortel Networks, s.r.o., Nortel Networks Engineering Service Kft, Nortel Networks Portugal S.A., Nortel Networks Slovensko, s.r.o. and Nortel Networks International Finance & Holding B.V.

3

business of NNSA in France. On October 1, 2009, pursuant to a motion filed by the Joint Administrators, the French Court approved an order to: (i) suspend the liquidation operations relating to the sale of the assets and/or businesses of NNSA for a renewable period of two months; (ii) authorize the continuation of the business of NNSA so long as the liquidation operations are suspended; and (iii) maintain the powers of the French Administrator and Liquidator during the suspension period, except with respect to the sale of assets and/or businesses of NNSA. On February 26, 2010, the French Court extended the suspension of liquidation until the earlier of (i) May 31, 2010 or (ii) the filing with the French Court of a letter from Kapsch CarrierCom AG stating that its bid for the GSM//GSM-R assets of NNSA has become unconditional. On June 26, 2009, this Court entered an order recognizing the English Proceedings of Nortel Networks UK Limited ("NNUK") as foreign main proceedings under chapter 15 of the Bankruptcy Code.[4]

9. On January 26, 2009, the Office of the United States Trustee for the District of Delaware (the "U.S. Trustee") appointed an Official Committee of Unsecured Creditors (the "Committee") pursuant to section 1102(a)(1) of the Bankruptcy Code [D.I.s 141, 142]. An ad hoc group of bondholders holding claims against certain of the Debtors and certain of the Canadian Debtors has also been organized (the "Bondholder Group"). No trustee or examiner has been appointed in the Debtors' cases.

10. On July 14, 2009 (the "CALA Petition Date"), Nortel Networks (CALA) Inc. ("NN CALA" and a Debtor with NNI and its affiliates), an affiliate of NNI, filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. On July 17, this Court entered

---

[4] Additionally, on January 18, 2009, certain Nortel affiliates, including Nortel Networks Israel (Sales and Marketing) Limited, filed an application with the Tel-Aviv-Jaffa District Court, pursuant to the Israeli Companies Law, 1999, and the regulations relating thereto for a stay of proceedings. On January 19, 2009, the Israeli Court appointed Yaron Har-Zvi and Avi D. Pelossof as joint administrators of the Israeli Company under the Israeli Companies Law (the "Joint Israeli Administrators").

4

orders approving the joint administration and consolidation of NN CALA's chapter 11 case with the other Debtors' chapter 11 cases for procedural proposes [D.I. 1098], and applying to NN CALA certain previously entered orders in the Debtors' chapter 11 cases [D.I. 1099].

**B.    Debtors' Corporate Structure and Business**

11.    Nortel is a technology company that historically designed, developed and deployed communication products, systems and solutions to its customers around the globe. Its principal assets include its employees, the intellectual property derived and maintained from its research and development activities, its customers and other significant contracts and agreements.

12.    Additional information regarding the Debtors' corporate structure and business and the events leading to the chapter 11 cases is set forth in the Declaration of John Doolittle in Support of First Day Motions and Applications [D.I. 3] (the "First Day Declaration").[5]

**C.    Case Milestones**

13.    On June 19, 2009, Nortel announced that it was advancing in discussions with external parties to sell its businesses and it would assess other restructuring alternatives for its businesses in the event it is unable to maximize value through sales. To date, Nortel has closed (i) the sale of certain portions of its Layer 4-7 data portfolio to Radware Ltd. [D.I. 539]; (ii) the sale of substantially all of its CDMA business and LTE Access assets to Telefonaktiebolaget LM Ericsson (publ) ("Ericsson") [D.I. 1205]; (iii) the sale of the assets of its Wireless Networks business associated with the development of Next Generation Packet Core network components to Hitachi Ltd. [D.I. 1760]; (iv) the sale of substantially all of the assets of the Enterprise Solutions business globally, including the shares of Nortel Government Solutions Incorporated

---

[5]    Capitalized terms used but not defined herein have the meanings ascribed to them in the First Day Declaration.

5

and DiamondWare Ltd. to Avaya Inc. [D.I. 1514]; (v) the sale of substantially all the assets of its Optical Networking and Carrier Ethernet businesses associated with its Metro Ethernet Networks business unit to Ciena Corporation [D.I. 2070]; and (vi) the sale of substantially all of its GSM/GSM-R business to Ericsson and Kapsch CarrierCom AG [D.I. 2065]. In addition, Nortel has obtained Court approval for the planned sale of certain assets of its Carrier Voice Over IP and Application Solutions business to GENBAND Inc. [D.I. 2632]. Efforts continue to be made with respect to the monetization of Nortel's remaining assets.

14. On August 4, 2009, this Court entered an order fixing September 30, 2009 at 4:00 PM (Eastern Time) as the general bar date for filing proofs of claim or interests [D.I. 1280]. On December 3, 2009 this Court entered an order fixing January 25, 2010 at 4:00 PM (Eastern Time) as the bar date for filing proofs of claim or interests against NN CALA [D.I. 2059].

### Facts Relevant to this Motion

15. The Debtors historically have provided a number of benefits to their active employees and retirees through benefit plans, including the Nortel Networks Inc. Retiree Medical Plan and the Nortel Networks Inc. Retiree Life Insurance and Long-Term Care Plan (together, the "Retiree Welfare Plans")[6] and the Nortel Networks Inc. Long-Term Disability Plan (the "LTD Plan").[7] During the course of these chapter 11 cases, the Debtors have continued to provide benefits under the Retiree Welfare Plans and the LTD Plan, including as authorized by

---

[6] The Nortel Networks Retiree Medical Plan and the Nortel Networks Retiree Life Insurance and Long-Term Care Plan are included in a single plan document referred to as the "Retiree Welfare Plan."

[7] Although the Retiree Welfare Plans and the LTD Plan are sponsored by NNI, the Board of Directors of NNI authorized certain of its subsidiaries and affiliates to provide benefits to their employees under the plans. See 2010 Retiree Medical Plan Summary Plan Description, p. 104 (defining "Employers" as "Nortel Networks Inc. and subsidiaries of, or other companies related to, Nortel Networks Inc. (NNI), that have been authorized by the Board of Directors of NNI to provide coverage for their employees under the Retiree Medical Plan and have adopted the Retiree Medical Plan."); 2010 Retiree Life Insurance and Long-Term Care Plan Summary Plan Description, p. 37 (defining "Employer" as "Nortel Networks Inc. (NNI) and any of its Affiliates."); 2010 LTD Plan Summary Plan Description, p. 32 (defining "Affiliates" as "Subsidiaries of, or other companies related to, Nortel Networks Inc. (NNI), that have been authorized by the Board of Directors of NNI to provide coverage for their employees under the Company's Long-Term Disability Plan and have adopted those programs.").

this Court's January 15, 2009 Order Authorizing, But Not Directing, Debtors to Pay Certain Prepetition (I) Wages, Salaries and Other Compensation, (II) Reimbursable Expenses, and (III) Medical, Retirement and Similar Benefits [D.I. 59]. The Debtors, however, have always retained the right under each of the plan documents and summary plan descriptions to unilaterally modify or terminate the Retiree Welfare Plans and the LTD Plan at any time.

16.     Under the Retiree Welfare Plans, the Debtors provide employer-paid post-employment medical benefits for current retirees, their spouses, surviving spouses, domestic partners and dependents and term life insurance coverage and long-term care expense coverage for current retirees.[8] The Retiree Welfare Plans have no assets and are funded on a pay-as-you-go basis. Currently, 4,019 individuals are participants in the Retiree Medical Plan, consisting of 2,592 retirees and 1,490 of their spouses and children. The current projected cost of providing benefits under the Retiree Welfare Plans is approximately $1 million per month.

17.     Under the LTD Plan, the Debtors provide employer-paid long-term disability benefits for current participants.[9] As with the Retiree Welfare Plan, the LTD Plan has no assets and is funded on a pay-as-you-go basis. Currently, 280 participants are on long-term disability under the LTD Plan and the current projected cost of providing benefits under the LTD Plan is approximately $1 million per month.

---

[8] The description of the Retiree Welfare Plans and LTD Plan contained in this Motion is subject in all instances to the terms of the plans, as set forth in the relevant plan documents.

[9] The LTD Plan is included as part of the Nortel Networks FLEX Benefits Program (the "FLEX Plan"), which provides employees with the flexibility to choose benefits from a range of options. The FLEX Plan is a "cafeteria plan" under Section 125 of the U.S. Internal Revenue Code that enables employees of the Debtors to make contributions of base salary compensation towards coverage under one or more of the medical, dental, vision, hearing, health care and dependent day care reimbursement account plans maintained by NNI.

7

## Relief Requested

18. By this Motion, the Debtors seek an order under sections 105(a), 363(b)(1) and 1108 of the Bankruptcy Code authorizing them to terminate, effective August 31, 2010, (i) the Retiree Welfare Plans, so as to cease providing employer-paid post-employment medical benefits for current and future retirees, their spouses, surviving spouses, domestic partners and dependents and term life insurance coverage and long-term care expense coverage for current and future retirees as of that date, and (ii) the LTD Plan, so as to cease providing employer-paid long-term disability benefits for current and future participants as of that date.[10] The Debtors propose that in connection with the proposed termination of the Retiree Medical Plan on August 31, 2010, the Debtors would permit retirees to submit claims under the plan until December 31, 2010 for medical claims incurred before August 31, 2010. Although the terms of the plan authorize the Debtors to take such actions, the Debtors seek this relief in an abundance of caution.

19. While the Debtors recognize the importance of the benefits provided under the Retiree Medical Plan to their retired employees, the Debtors have determined that it is necessary to terminate the plan at this stage in the restructuring. In an effort to provide a smooth transition for retirees to the extent reasonably and commercially practical, the Debtors explored options and negotiated with external providers to arrange for individual medical insurance coverage in which retirees may elect to participate at their own cost without any reimbursement, credit, or contribution from the Debtors. As a result of these efforts, the Debtors have (i) negotiated

---

[10] As an administrative matter, the Debtors list employees on long-term disability under the LTD Plan as "active" employees even though the employees are not currently working full or part-time at the Debtors. Accordingly, in connection with the termination of the LTD Plan, the Debtors intend to formally terminate these employees as well. To the extent that such employees are not covered by another third-party medical plan, they may elect COBRA continuation coverage of medical benefits for limited periods and at their own expense.

8

arrangements with UnitedHealthcare Insurance Company and its affiliates to provide the Debtors' retirees and current employees that retire before December 31, 2011 with medical coverage options not readily available on the open market (the "Replacement Coverage"); and (ii) negotiated arrangements with Towers Watson Pennsylvania, Inc. to provide assistance in implementing the Replacement Coverage. Under the Replacement Coverage, the Debtors have been advised that all of their 65-and-over retiree population – as well as approximately 95% of their under-65 retirees who live in states where UnitedHealthcare or one of its affiliated companies offers under-65 medical coverage – will have the right to purchase such coverage. The approximately 100 retirees who live in states not covered by UnitedHealthcare or who live outside of the United States will receive guidance as to available options and assistance in securing coverage from a different provider. In connection with the implementation of the Replacement Coverage, the Debtors have executed and may execute additional ancillary agreements to implement such arrangements, provided that the Debtors do not intend to provide for the payment of fees or the reimbursement of costs related to services provided to current or future retirees.

### Basis for Relief

**A.    The Retiree Welfare Plans and the LTD Plan are Terminable at Will**

20.    Each of the Retiree Welfare Plans and the LTD Plan provide NNI with the unequivocal right to unilaterally amend or terminate the plans at any time. In each of the plan documents, NNI specifically and unequivocally reserves its unilateral right to terminate the plans and the benefits provided therein.

21.    *The Retiree Welfare Plans.* The Retiree Welfare Plan includes the following modification/termination provision that is applicable to both the Retiree Medical Plan and the Retiree Life Insurance and Long-Term Care Plan:

9

> The Company shall have the right to amend the Retiree Welfare Plan from time to time or terminate the Retiree Welfare Plan at any time. Any amendment to the Retiree Welfare Plan may reduce or eliminate benefits payable under the Retiree Welfare Plan to any or all persons including persons who are employees or Retirees as of the effective date of the amendment.

Retiree Welfare Plan, Section 3.2(a).[11] Although the Retiree Welfare Plan has been amended from time to time, no amendments have modified the foregoing termination provision. In addition, the summary plan description provided to employees with respect to the Retiree Medical Plan states that "[t]he Company reserves the right to change Plan features and Plan options at any time or to terminate the Retiree Medical Plan completely." 2010 Retiree Medical Plan Summary Plan Description, p. 3. The summary plan description further provides that "the Company reserves the right to change or end the plan described in this summary at any time . . . The Company may adopt such changes or terminate the plan at any time and for any reason." Id. at p. 99. The summary plan description for the Retiree Life Insurance and Long-Term Care Plan similarly provides that "In accordance with each plan or program, Nortel Networks reserves the right to amend or discontinue the plan program described in this summary at any time without prior notice to, or consent by, employees." 2010 Retiree Life Insurance and Long-Term Care Plan Summary Plan Description, p. 3. As discussed in greater detail below, no relief under section 1114 of the Bankruptcy Code is required because the Debtors reserved the right to unilaterally terminate the Retiree Welfare Plans.

22. *The LTD Plan.* Similarly, with respect to the LTD Plan, NNI, as plan sponsor, reserved its right to unilaterally modify or terminate benefits provided to retiree participants. The Nortel Networks Welfare Plan, which covers LTD Benefits, provides that NNI "reserves the

---

[11] "Company" is defined as "Northern Telecom Inc., a Delaware corporation and its affiliates participating in the Retiree Welfare Plan." Retiree Welfare Plan, Section 3.3. NNI was formerly known as Northern Telecom Inc. "Retiree Welfare Plan" is defined as "The Retiree Life Insurance and Long-Term Care Plan, the Retiree Medical Plan and all other provisions relating to these plans." Id.

right to terminate the Plan or a Benefit Program at any time by written instrument. The Plan or Benefit Program, as applied to any single Employer, may be terminated at any time by such Employer, subject to consent of NNI." Nortel Networks Welfare Plan, Section 3.5(a). Additionally, under the FLEX Program description, NNI stated that the "Plan may be terminated at any time." FLEX Plan, Section 7.2.[12] The 2010 LTD Plan Summary Plan Description states that "NNI may adopt changes or terminate the plan at any time and for any reason." 2010 LTD Plan Summary Plan Description, p. 31.

23. The Supreme Court has made clear that an employer is not required under the Employee Retirement Income Security Act of 1974, 29 U.S.C. §§ 1001 et seq. ("ERISA") to provide retiree welfare benefits. See, e.g., Curtiss-Wright Corp. v. Schooneiongen, 514 U.S. 73, 78 (1995) ("[W]e are mindful that ERISA does not create any substantive entitlement to employer-provided health benefits or any other kind of welfare benefits."). If the employer chooses to provide welfare benefits, the duration, terms, and conditions of the benefits are (unlike for pension benefits) governed solely by the plan documents. Under the plan documents, the Debtors always retained the unilateral authority to amend or terminate the Retiree Welfare Plans and the LTD Plan, and, in fact, have unilaterally made a number of changes in, and reductions to, benefits provided to plan participants over the years.[13]

---

[12] The FLEX Plan further provides that it "will automatically terminate if NNI is 1) legally dissolved, 2) makes a general assignment for the benefit of its creditors, 3) files for liquidation under the Bankruptcy Code, 4) merges or consolidates with any other entity and it is not the surviving entity, or if it sells or transfers substantially all of its assets, or goes out of business, unless NNI's successor in interest agrees to assume the liabilities under the plan." FLEX Plan, Section 7.2.

[13] For example, the Debtors unilaterally amended the Retiree Medical Plan in 2007 to exclude employees who were not both at least 50 years of age and employed at least 5 years from receiving company-subsidized retiree medical benefits upon retirement. For these individuals, retiree medical benefits continued to be provided at the retirees' cost and were only available to retirees enrolled in the active employees' medical plan immediately prior to retirement. Under the LTD Plan, the Debtors unilaterally discontinued an annual cost-of-living adjustment used to calculate LTD benefits for disabilities beginning on or after January 1, 2000.

24. ERISA does not contain automatic vesting provisions for welfare benefits. See Curtiss-Wright, 514 U.S. at 78; In re Unisys Corp. Retiree Medical Benefit "ERISA" Lit., 58 F.3d 896, 901 (3d Cir. 1995) ("In rejecting the automatic vesting of welfare plans, Congress evidenced its recognition of the need for flexibility with regard to an employer's right to change medical plans"). Accordingly, in the Third Circuit, and most other circuits, courts presume that welfare benefits are not vested. If the plan documents are silent on the issue or if the employer reserves in the plan documents its unilateral right to amend or terminate benefits, the employer may change or eliminate such benefits at any time and for any reason. See Int'l Union, U.A.W. v. Skinner Engine Co., 188 F.3d 130, 138 (3d Cir. 1999) (employers are "generally free . . . for any reason at any time, to adopt, modify or terminate welfare plans' . . . [unless they agree] to relinquish their right to unilaterally terminate those benefits and provide for lifetime vesting" (quoting Curtiss-Wright, 514 U.S. at 78)). Here, the terms of the plan documents preserve the Debtors' right to unilaterally amend or terminate the Retiree Welfare Plans and the LTD Plan.[14] Under the Third Circuit's jurisprudence, that reservation of rights is conclusive. See id.; Unisys, 58 F.3d at 902.

25. As the Third Circuit has noted "an employer's commitment to vest such benefits is not to be inferred lightly and must be stated in clear and express language. . . [in the documents that provide] the employee welfare benefits." Id. at 139 (internal citations omitted). Indeed, "there is a presumption against" finding that rights to welfare benefits have vested. Smathers v. Multi-Tool Inc., 298 F.3d 191, 196 (3d Cir. 2002). This is because courts are "reluctant to read more benefits into an ERISA plan than its plain language confers," John

---

[14] Under ERISA, "plan documents" include any written welfare benefit plan and summary plan description. See 29 U.S.C. § 1022; see also Unisys, 58 F.3d at 902 (noting that "written documents and summary plan descriptions are the statutorily established means of informing participants and beneficiaries of the terms of their plan and its benefits.").

12

Morrell & Co. v. United Food & Commercial Workers Int'l Union, 37 F.3d 1302, 1304 (8th Cir. 1994), particularly where such an interpretation would render the benefits "forever unalterable." Skinner, 188 F.3d at 139. Because of this presumption, plan participants, not the employer, "bear the burden of proving by a preponderance of the evidence, that the employer intended the welfare benefits to be vested." Unisys, 58 F.3d at 902.

26.    Here, the plain language of the Retiree Welfare Plans, the LTD Plan, and their associated documents make clear that future benefits under the plans are not vested. Because the Debtors retained the right to amend or terminate retiree benefits in the applicable plan documents, those benefits may be terminated at will.

**B.    Section 1114 of the Bankruptcy Code is Inapplicable**

27.    Section 1114 is inapplicable to the termination of the Retiree Welfare Plans because the plan documents unambiguously provide NNI the right to unilaterally modify or terminate the plan at any time.[15] The case law is well-established that, where the terms of a plan unambiguously state that the benefits can be modified or terminated at any time, section 1114 is inapplicable and a debtor may modify or terminate benefits without any obligation to comply with that section. See, e.g., Sprague v. General Motors Corp., 133 F.3d 388 (6th Cir. 1998) (en banc); Chiles v. Ceridian Corp., 95 F.3d 1505 (10th Cir. 1996); Alday v. Container Corp. of America, 906 F.2d 660 (11th Cir. 1990); In re Delphi Corp., 2009 WL 637315 (Bankr. S.D.N.Y. 2009).[16]

---

[15]    Section 1114 is not applicable to the LTD Plan because that section only applies to "retiree benefits."

[16]    See also Retired W. Union Employees Ass'n v. New Valley Corp. ( In re New Valley Corp.), 1993 WL 818245 (D.N.J. 1993) (affirming bankruptcy court holding that section 1114 was inapplicable where debtor reserved the right to terminate or modify retiree benefits); In re North Am. Royalties, Inc., 276 B.R. 860, 866 (Bankr. E.D. Tenn. 2002) ("Section 1114 . . . says nothing about whether the debtor can exercise a power reserved in the contract to terminate it and thereby end any obligation for retiree benefits as defined in § 1114(a). Despite § 1114, the debtor can terminate the contract as allowed by its terms."); In re Lykes Bros. Steamship Co., Inc., 233 B.R. 497, 517 (Bankr. M.D. Fla. 1997) (retiree benefits were terminable at will and effectively terminated

13

28. Section 1114 of the Bankruptcy Code does not apply unless a retiree's benefits are vested. Under Section 1114, vested retiree medical and health benefits may not be modified unless the debtor first confers with an authorized representative of retirees and then, if the parties are unable to reach an agreement, seeks court authority to unilaterally modify such benefits, among other requirements. See 11 U.S.C. § 1114. If the retirees have no contractual right to the benefits, however, the debtor is not modifying, but instead is enforcing, the contract and a debtor may modify or terminate benefits without following the procedures set forth in that section. See, e.g., Delphi, 2009 WL 637315, at *6 ("[I]f, in fact, the debtors have the unilateral right to modify a health or welfare plan, that modifiable plan is the plan that is to be maintained under Section 1114(e), with the debtors' pre-bankruptcy rights not being abrogated by the requirements of Section 1114."); In re Doskocil Companies Inc., 130 B.R. 870, 875 (Bankr. D. Kan. 1991) (holding that precursor to Section 1114 "was intended to operate only in those situations where a debtor had a continuing legal obligation to pay the retiree benefits . . . the termination of the Wage Agreement, and thus the [Debtors'] obligation to pay, is not unilateral action by the Debtors but a pre-existing contractual provision.")

29. In Delphi, the court noted that accepting the contention that Congress intended to override debtors' pre-petition rights to modify retiree benefits would mean that Section 1114 "creates a federal law overriding pre-petition contractual rights of the debtors." 2009 WL 637315, at *2. This "would violate a fundamental tenet of the Bankruptcy Code in that it would

---

during the chapter 11 case without requirement to comply with Section 1114); CF & I Steel Corp. v. Conners (In re CF & I Fabricators of Utah, Inc.), 163 B.R. 858, 874 (Bankr. D. Utah 1994) ("The Bankruptcy Code does not create new rights upon filing bankruptcy that were not in existence prior to filing."); In re Federated Dep't Stores, Inc., 132 B.R. 572, 574 (Bankr. S.D. Ohio 1991) ("old contract rights involving retiree benefits may operate to short-circuit the modification process outlined above [in section 1114]."); LTV Steel Co., Inc. v. Conners (In re Chateaugay Corp.), 111 B.R. 399, 404-05 (Bankr. S.D.N.Y. 1990) (holding that the debtor was not obligated to make continued payments because section 1114 was aimed at preventing the unilateral cancellation of bargained-for benefits, not the operation of contract provisions mutually agreed upon).

enhance the substantive non-bankruptcy rights of one set of creditors at the inevitable expense of other creditors simply because a bankruptcy petition has been filed." Id.

30. Accordingly, Section 1114 is not applicable to the termination of the Retiree Welfare Plans because the clear terms of the plan documents provide the Debtors the unilateral right to modify or terminate the plans at any time.

### C. Terminating the Retiree Welfare Plans and the LTD Plan Satisfies the Business Judgment Test

31. Section 1108 of the Bankruptcy Code authorizes the Debtors to operate their businesses. Section 363(b)(1) of the Bankruptcy Code further permits a debtor-in-possession to use property of the estate "other than in the ordinary course of business" after notice and a hearing. 11 U.S.C. § 363(b)(1). Although the Debtors believe that the exercise of their right to terminate the Retiree Welfare Plans and the LTD Plan is in the ordinary course of their business, to the extent that a termination is determined to be outside the ordinary course of business such that Court approval is required, then the Court should grant the requested relief under Section 363 of the Bankruptcy Code because the Debtors have "demonstrate[d] a sound business justification for the proposed transaction." Computer Sales Int'l, Inc. v. Federal Mogul, et al. (In re Federal Mogul Global, Inc.), 293 B.R. 124, 126 (D. Del. 2003).

[handwritten annotation: Nortel entered in Con Tradual agreement by Deducting 007 Payck for LTD]

32. Relief is proper under section 363(b)(1) where the Debtors show a legitimate business justification for the proposed action. See Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.), 722 F.2d 1063 (2d Cir. 1983); In re Del. & Hudson Ry. Co., 124 B.R. 169, 175-76 (D. Del. 1991) (noting that the Third Circuit has adopted the "sound business purpose" test for section 363(b)(1). If a valid business justification exists, the law vests a debtor's decision to use property out of the ordinary course of business with a strong presumption "that in making a business decision the directors of the corporation acted on an

15

informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company." Official Comm. of Subordinated Bondholders v. Integrated Res., Inc. (In re Integrated Res., Inc.), 147 B.R. 650, 656 (S.D.N.Y. 1992) (quoting Smith v. Van Gorkom, 488 A.2d 858, 872 (Del. 1985)).

33. After careful deliberation, the Debtors have determined, in the exercise of their reasonable business judgment, that at this time they must eliminate their current and future costs associated with providing benefits under the Retiree Welfare Plans and the LTD Plan in order to maximize the value of their estates. Absent termination of the Retiree Welfare Plans and the LTD Plan, the Debtors project they will spend approximately $1 million per month for the Retiree Welfare Plans and $1 million per month for the LTD Plan. Providing these benefits is a significant financial burden that does not provide any concomitant benefit to the Debtors' estates because the individuals currently receiving the benefits of such expenditures are not providing services to the Debtors. The proposed terminations will achieve a cumulative cash savings to the Debtors of $8 million for the remainder of 2010 alone (based on an August 31, 2010 effective termination date) and additional amounts after that time.

34. Thus, terminating the Retiree Welfare Plans and the LTD Plan will generate significant cost savings for the Debtors. For the foregoing reasons, the Debtors submit that the termination of the Retiree Welfare Plans and the LTD Plan is appropriate and in the best interests of the Debtors, their bankruptcy estates and their creditors.

### Notice

35. Notice of the Motion has been given via first class mail to the (i) U.S. Trustee; (ii) counsel to the Committee; (iii) counsel to the Bondholder Group; (iv) the general service list established in these chapter 11 cases; (v) participants of the Retiree Welfare Plans and the LTD

PLEASE TAKE FURTHER NOTICE THAT A HEARING ON THE MOTION WILL BE HELD ON **JULY 16, 2010 AT 10:00 A.M. (EASTERN TIME)** BEFORE THE HONORABLE KEVIN GROSS AT THE UNITED STATES BANKRUPTCY COURT FOR THE DISTRICT OF DELAWARE, 824 MARKET STREET, 6TH FLOOR, COURTROOM #3, WILMINGTON, DELAWARE 19801. ONLY PARTIES WHO HAVE FILED A TIMELY OBJECTION WILL BE HEARD AT THE HEARING.

IF YOU FAIL TO RESPOND IN ACCORDANCE WITH THIS NOTICE, THE COURT MAY GRANT THE RELIEF REQUESTED IN THE MOTION WITHOUT FURTHER NOTICE OR HEARING.

Dated: June 21, 2010
Wilmington, Delaware

CLEARY GOTTLIEB STEEN & HAMILTON LLP

James L. Bromley (*admitted pro hac vice*)
Lisa M. Schweitzer (*admitted pro hac vice*)
One Liberty Plaza
New York, New York 10006
Telephone: (212) 225-2000
Facsimile: (212) 225-3999

- and -

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

_____
Derek C. Abbott (No. 3376)
Eric D. Schwartz (No. 3134)
Ann C. Cordo (No. 4817)
Alissa T. Gazze (No. 5338)
1201 North Market Street
P.O. Box 1347
Wilmington, Delaware 19801
Telephone: (302) 658-9200
Facsimile: (302) 658-3989

*Counsel for the Debtors
and Debtors in Possession*

3623753.1