IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| ------------------------------------------------x | Chapter 11 |
| *In re*: | Case No. 09-10138 (KG) |
| Nortel Networks Inc., et al., | (Jointly Administered) |
| Debtors. | **Hearing Date: July 16, 2010 at 10:00 a.m. (ET)** <br> **Objections Due: July 6, 2010 at 4:00 p.m. (ET)** |
|  | Re: D.I. No. 3204 |
| ------------------------------------------------x |  |

## NORTEL US RETIREMENT PROTECTION COMMITTEE'S OBJECTION TO DEBTOR'S MOTION TO TERMINATE RETIREE AND DISABILITY PLANS

The Nortel US Retirement Protection Committee ("NUSRPC") objects to the motion by Nortel Networks Inc. ("NNI") and certain of its affiliates, as debtors and debtors in possession (collectively, the "Debtors") filed on June 21, 2010 [D.I. 3204] seeking authorization from this Court to terminate certain retiree and long-term disability plans (the "Benefit Termination Motion.")

## INTRODUCTION

1. The benefit plans the Debtors seek to terminate—health, prescription drug, life insurance and long-term disability benefits—are protected by Bankruptcy Code Section 1114, which imposes procedural and substantive requirements before these critical benefits for retirees and the disabled can be terminated during a Chapter 11 case. The Debtors have not attempted to comply with any of those statutory requirements. The Debtors' assertion instead that benefits terminable at will are not protected by Section 1114 is at odds with numerous bankruptcy court decisions, the clear language of the statute, the legislative history, and the 2005 statutory amendment, which expressly applied protections in Bankruptcy Code Section 1114(*l*) to

amendable benefits, even those that a debtor terminated or modified in the 180 days before a bankruptcy filing.

2. Termination of these benefits as of August 31, 2010 by the Debtors will also create unnecessary hardship, because that does not provide enough time for the most expensive and difficult to insure retirees—those aged 55-64—to stay in subsidized coverage until they can take advantage of an 80% subsidized health, prescription drug, vision care and dental benefit paid for by the Health Coverage Tax Credit, which is being established as an alternative by the NUSRPC, but which will not be available until as late as December 1, 2010.

3. The NUSRPC is an ad hoc steering committee of retired executives[1] of the Debtors established in early 2009 in association with the Nortel Networks Retiree Association ("NNRA"), a broad-based social association of Debtors' retirees, which maintains the website www.nnra.org . The original purpose of the NUSRPC included seeking to ensure that retirees received equitable treatment during the bankruptcy. Over 400 retirees of Debtors joined the NUSRPC as dues-paying members.

4. The NUSRPC retained an actuary to assist with the calculation of claim amounts for non-qualified pension claims, monitored the bankruptcy proceedings, provided updates to retirees on certain developments in the bankruptcy case through the NNRA website, and prepared to defend and protect the interests of member retirees should Debtors seek to terminate retiree medical and other benefits, including exploration of affordable alternatives. In connection with those activities, members of the NUSRPC were in repeated contact with counsel for the official unsecured creditors committee regarding the interests of retirees in connection with the bankruptcy case, including several scheduled conference calls.

---

[1] The members of the steering committee are Gary Donahee, chair, Lorne Hinz, Desmond Hudson, Marty Mand, Randy Nunn, Ed Pillman, and Vickie Yohe.

2

## I. RELEVANT FACTS

5. The Debtors are providing subsidized benefits to their retirees through the Nortel Networks Inc. Retiree Medical Plan and the Nortel Networks Inc. Retiree Life Insurance and Long Term Care Plan and the Nortel Networks Inc. Long-Term Disability Plan. (Benefit Termination Motion, p. 6, ¶ 15.) [D.I. 3204.] Over 4,000 retirees and dependents participate in the Retiree Medical Plan, at a cost of approximately $1 million per month to the Debtors. (*Id.*, p.7, ¶ 16.) Another 280 participants receive benefits under the Long Term Disability Plan at a cost of approximately an additional $1 million per month. (*Id.*, p. 7, ¶ 17.)

6. The retirees and their dependents impacted by the Debtors' proposed termination of benefits are already facing hardship, having had their under-funded pension plan terminated and turned over to the Pension Benefit Guaranty Corporation in the second half of 2009. http://www.pbgc.org/workers-retirees/find-your-pension-plan/PlanPage/plan_21391900.html

## II. OBJECTION TO THE TERMINATION OF RETIREE BENEFITS IN VIOLATION OF BANKRUPCY CODE SECTION 1114

7. Bankruptcy Code Section 1114(a) defines retiree benefits to include medical, prescription drug, life insurance, and disability benefits that are provided "under *any* plan, fund, or program . . . maintained or established . . . by the debtor prior to filing a petition commencing a case under this title" for the purpose of providing retired employees non-pension benefits. 11 U.S.C. § 1114(a) (emphasis added.). Section 1114(e)(1) provides that notwithstanding any other provision of Title 11, a debtor, "shall timely pay and shall not modify *any* retiree benefits" unless the court, after notice and hearing, orders such modification after the debtor complies with the rest of the process set up under Section 1114 or the debtor and an authorized representative of retirees agree to the modification of benefits. 11 U.S.C. § 1114(e)(1) (emphasis added); see also 11 U.S.C. § 1114(g)(3).

8. Bankruptcy Section 1114 establishes limited but critical protection for these crucial non-pension retiree benefits during a Chapter 11 case. The debtor may wait until confirmation, and then under Bankruptcy Code section 1129(a)(13) is free to cut or change any amendable benefit it has not committed during the process to maintain for a specific time. See 11 U.S.C. § 1129(a)(13) (plan need only commit debtor to provide retiree benefits "for the duration of the period the debtor has obligated itself".) If the debtor wishes to modify or terminate benefits prior to confirmation, however, it can only do so by complying with the process and by meeting the standards set forth in Section 1114: making a proposal, negotiating promptly with a retiree committee and either (A) reaching agreement or (B) imposing changes or cuts the retiree committee rejected "without good cause", but which the Court agrees are necessary for an effective reorganization, are "clearly favored by the balance of the equities," and ensure that all parties "are treated fairly and equitably." 11 U.S.C. § 1114(g)(3).

9. The Debtors point out that several courts, particularly prior to the 2005 clarifying amendments to the Bankruptcy Code, held under some circumstances that the protections of Section 1114 did not apply to benefits the debtor reserved the unfettered right to terminate or amend. See Benefit Termination Motion, at p. 13, ¶ 27 and n. 16. [D.I. 3204.] The plain language of the statute, the legislative history and other court decisions, however, have applied the protections of Section 1114 and its process even to retiree benefits that the bankruptcy debtor reserved the right to terminate, and the 2005 amendments to the Bankruptcy Code explicitly added section 1114(*l*), which makes it clear that Section 1114 extends protections to benefits the debtor not only reserved the right to modify or terminate, but actually did modify or terminate during the 180 days before the bankruptcy filing. 11 U.S.C. § 1114(*l*).

10. The plain language of the statute clearly applies the protections of Section 1114 to "*any* plan, fund, or program (through the purchase of insurance or otherwise) maintained or established in whole or in part by the debtor" prior to filing bankruptcy, for defined "retiree benefits," which include benefits for retired employees, their spouses and dependants, "for medical, surgical, or hospital care benefits, or benefits in the event of sickness, accident, disability, or death." 11 U.S.C. §1114(a) (emphasis added.) The statute applies to any plan, fund, or program to deliver those benefits, and is not limited to benefits that the debtor cannot terminate or modify outside bankruptcy.

11. Nowhere does the statute purport to recognize, much less carve out, an exception for benefits the debtor reserved the right to terminate. On the contrary, "the statute makes no distinction whatsoever about the basis on which retiree benefits are paid" – including "whether the employer has the power to modify such agreement or plan outside of bankruptcy" – "but rather includes 'any plan, fund, or program' maintained or established by the debtor prior to filing." Susan J. Stabile, Protecting Retiree Medical Benefits In Bankruptcy: The Scope Of Section 1114 Of The Bankruptcy Code, 14 Cardozo L. Rev. 1911, 1932 (1993).

12. Where the language of a statute is clear, the language must be deemed conclusive and applied according to its ordinary meaning.[2] Application of the plain meaning rule here means that Section 1114 reaches "any retiree benefit," amendable or not. "[T]he language of the statute makes it quite clear that – absent the occurrence of two statutory conditions – the debtor in possession is required to continue the payment of retirement benefits at prepetition levels ....

---

[2] See, Lamie v. U.S. Trustee, 540 U.S. 526, 534 (2004) ("It is well established that 'when the statute's language is plain, the sole function of the courts--at least where the disposition required by the text is not absurd--is to enforce it according to its terms.'"); INS v. Cardoza-Fonseca, 480 U.S. 421, 433 n.12 (1987) (explaining that "the plain language of this statute appears to settle the question before us" and noting the "strong presumption that Congress expresses its intent through the language it chooses").

*The statute contains no other basis for debtors to modify or cease the payment of retiree benefits.*" In re Speco Corp., 195 B.R. 674, 678 (Bankr. S.D. Ohio 1996) (emphasis added).

13. Any confusion some courts—or debtors—may have had over the reach of Section 1114 to protect terminable or amendable benefits should have been eliminated when Congress modified the statute in 2005 to add new Section 1114(*l*), which now requires a debtor to reinstate benefits that it terminated or modified in the 180 days before a bankruptcy filing while insolvent, unless the Court finds the modifications were "clearly favored by a balance of the equities." 11 U.S.C. § 1114(*l*). This provision only applies to benefits that the debtor could—and did—terminate or modify outside bankruptcy.

14. Given the reinstatement, in Bankruptcy Code Section 1114(*l*) of terminable benefits that were modified in the 180 days before the bankruptcy filing, the Debtors' assertion that Section 1114 does not protect those reinstated (or other) benefits during the case is logically untenable: Congress would not have insisted that benefits be reinstated if a debtor could freely eliminate them upon reinstatement without any of the other protections of Section 1114 that apply during a bankruptcy case.

15. The legislative history at the time of the original adoption of Section 1114 also makes it clear that the statute was intended to provide its limited protection to all retirees' benefits, not just those the debtor reserved no right outside bankruptcy to amend or modify. As Senator Hefflin explained, Section 1114: "would also provide with respect to *all* retirees that the employers can modify retiree insurance benefits in the absence of a negotiated settlement *only* if the court authorizes such modifications and when such modifications are necessary to enable the company to continue its business fairly and equitably to all parties." Retiree Benefits Security Act of 1987: Hearings on S.548 Before the Subcomm. on Courts and Administrative Practice of

the Senate Comm. on the Judiciary, 100th Cong., 1st Sess. 1 (1987) (statement of Senator Hefflin).

16. Even before the 2005 amendment making it abundantly clear that a debtor must go through the Section 1114 process before terminating benefits it reserved the right to terminate, numerous courts held that a debtor must comply with the statute even as to benefits terminable outside bankruptcy. As the court in In re Farmland Indus., Inc., 294 B.R. 903 (Bankr. W.D. Mo. 2003) concluded: "There is nothing in the language of the statute to suggest that Congress intended to allow the termination of retiree benefits in those instances where the debtor has the right to unilaterally terminate those benefits under the language of the plan or program at issue." Id. at 917. "In this Court's view, § 1114 prohibits a debtor from terminating or modifying any retiree benefits (as defined in that section) during a Chapter 11 case unless the debtor complies with the procedures and requirements of § 1114, regardless of whether the debtor has a right to unilaterally terminate the benefits." Id. at 914. Numerous other courts have reached the same result, holding that Section 1114 applies to amendable benefits. See In re Speco Corp., supra; In re New York Trap Rock Corp., 126 B.R. 19 (Bankr. S.D.N.Y. 1991), and In re Ames Dept. Stores, Inc., 1992 WL 373492 (S.D.N.Y. Nov. 30, 1992), rev'd on other grounds, 76 F.3d 66 (2d Cir. 1996) (finding "the Debtor's cavalier attempt to unilaterally terminate the Retired Employees' insurance benefits produces a drastic and most undeserving result" and ordering the Debtor to follow the requirements of Section 1114).

17. The Debtors do cite one post-2005 case, In re Delphi Corp., 2009 WL 637315 (Bankr. S.D.N.Y. 2009)[3] for the proposition that a Section 1114 retiree committee need not be appointed nor the statutory process followed before termination of benefits that a debtor reserved

---

[3] Although the Delphi bankruptcy petition was filed on October 8, 2005, prior to the applicable date of the BAPCPA amendments, and therefore the amended statute did not apply.

7

unfettered right to amend. In <u>Delphi</u>, however, the Court did appoint a Section 1114 retiree committee, specifically for the purpose of litigating whether any of the benefits at issue were vested in any way and to appeal or settle any appeal from the court's ruling that Section 1114 did not protect terminable benefits, and to explore obtaining a federal tax credit-subsidized benefit. 2009 WL 637315 at *8. The Section 1114 Committee in the Delphi case quickly negotiated an agreement with the debtors, dismissing the appeal and authorizing termination of the benefits, in return for over $8 million in funding for further retiree benefits, which allowed the committee to set up a retiree health plan eligible for Health Coverage Tax Credit subsidies and to provide hardship assistance to retirees impacted by the termination of benefits. <u>See</u> Chapter 11 Case No. 05-44481, Bankruptcy Ct. S.D.N.Y. docket no. 16545 (April 2, 2009 order approving settlement.) In this case, an $8 million settlement would pay for an additional 8 months of medical benefits for retirees or 8 months of disability benefits.

### III. CAUSE EXISTS FOR THE APPOINTMENT OF A SECTION 1114 COMMITTEE PRIOR TO TERMINATION OF RETIREE BENEFITS

18. In addition to the mandatory provisions of Section 1114, requiring appointment of a Section 1114 retiree committee and a process before retiree benefits are modified during the case, the statute allows the Court to appoint such a committee "if the court otherwise determines it is appropriate." 11 U.S.C. §1114(d). Here, appointment of such a committee could facilitate certainty over benefit modifications, eliminating uncertainty arising from appeal of any order terminating retiree benefits, and resolve issues regarding whether retirees are entitled to lifetime COBRA continuation coverage, which obligations might otherwise have to be borne by asset buyers from the Debtors. 29 U.S.C. § 1163(6) makes termination or modification of benefits in a

bankruptcy a "qualifying event" triggering COBRA continuation coverage rights[4], and 29 U.S.C. §1162(2)(A)(iii) permits that COBRA continuation coverage for life, at the retiree's expense. Under certain circumstances, asset buyers are responsible for assuming COBRA continuation coverage obligations, but a retiree committee under Section 1114 can negotiate to establish a benefit in lieu of COBRA continuation coverage. See IRS Private Letter Ruling 200432012, 2004 PLR LEXIS 479 (Section 1114 Committee negotiated health plan delivered through a voluntary employee benefit association is "in lieu of" COBRA continuation coverage and is eligible for the Health Coverage Tax Credit.)

### IV. OBJECTION TO TIMING OF BENEFITS TERMINATION, WHICH CREATES UNNECESSARY HARDSHIP AND IS UNFAIR TO US WORKERS

19. The NUSRPC is in the process of preparing a motion to have this Court authorize formation of a voluntary employee benefit association for the purpose of sponsoring a comprehensive health, prescription drug, vision care and dental plan for Nortel retirees and their spouses and dependents, eligible for the 80% federal subsidy in the form of the Health Coverage Tax Credit.

20. The Health Coverage Tax Credit ("HCTC"), codified in Internal Revenue Code Section 35(e)(1), 26 U.S.C. § 35(e)(1), provides a health care subsidy for those aged 55 or older who have had their pension plans turned over to the Pension Benefit Guaranty Corporation ("PBGC.") See 26 U.S.C. § 35(e)(1)(J)(iii). This tax credit now pays eighty percent (80%) of the cost of the retirees' health insurance and prescription drug premiums (and dental and vision

---

[4] Some employers take the position that this only applies to modifications that occur within one year of the bankruptcy filing, because the statute specifically notes that in "the case of an event described in paragraph (6), a loss of coverage includes a substantial elimination of coverage with respect to a qualified beneficiary . . . within one year before or after the date of commencement of the proceeding." 29 U.S.C. § 1163. (Emphasis added.) This provision, however, appears to be a safe harbor.

9

care premiums of any combined program) until they turn 65 and become eligible for Medicare.[5] (It also pays 80% of the premium cost for the benefits of their spouses and dependants, and continues to pay those costs for up to two years after the covered retiree turns 65.) See 26 U.S.C. § 35(g)(9)(A).

21. The HCTC is an unusual federal tax credit, because instead of being paid to the taxpayer only at the end of the year, the eligible retiree can participate in a monthly reimbursement program, the IRS HCTC advanced payment program, that pays a subsidy each month for the healthcare benefits of eligible retirees (and their spouses and dependents) enrolled in "qualified health insurance." Eligible retirees are those aged at least 55 but not yet 65 receiving payments from the PBGC.

22. Since the amendments to the law adopted in February 2009 as part of the American Recovery and Reinvestment Act ("ARRA") coverage under a benefit provided by a non-profit voluntary employee benefit association ("VEBA") that is either established (1) by a Section 1114 retiree committee in a bankruptcy case or (2) otherwise "pursuant to an order of a bankruptcy court"[6] qualifies for the HCTC subsidy. 26 U.S.C. § 35(e)(1)(K). By separate motion, the NUSRPC will seek an order from this Court authorizing formation of a VEBA that could offer a benefit eligible for the HCTC subsidy. Instead of expensive, high-deductible individual policies from United Healthcare, as the Debtors are proposing in the Benefit Termination Motion, retirees

---

[5] This subsidy will drop to 65% in future years if the existing provisions of the American Recovery and Reinvestment Act are not extended.

[6] Internal Revenue Code Section 35(e)(1)(k), added by Section 1899G(a) of the American Recovery and Reinvestment Act provides that qualifying coverage includes "eligible coverage months beginning before January 1, 2011, coverage under an employee benefit plan funded by a voluntary employees' beneficiary association (as defined in Section 501(c)(9)) established pursuant to an order of a bankruptcy court, or by agreement with an authorized representative, as provided in section 1114 of title 11, United States Code." 26 U.S.C. § 35(e)(1)(K). Internal Revenue Code section 501(c)(9) is the provision regarding non-profit corporations that applies to voluntary employee benefit associations. 26 U.S.C. § 501(c)(9).

could then enroll in affordable group coverage through the proposed VEBA plan, and for those aged 55-64, that coverage would be 80% subsidized through the HCTC.

23. It will, however, take months to roll out an HCTC-eligible (and 80% subsidized) benefit. The VEBA will need enrollment, census and claims data for the existing Retiree Medical Plan from the Debtors, its broker will have to send requests for proposal to national vendors, the winning vendors will need to be selected, and the new benefit plans will have to be rolled out to eligible retirees in conjunction with enrollment in the HCTC advanced payment program. That will not likely happen until December 1, 2010

24. Unfortunately, however, if retirees' existing coverage lapses on August 31, 2010, as sought in the Benefit Termination Motion, a number of problems threaten the viability of an HCTC program: (1) many retirees will lose coverage; (2) under 29 U.S.C. § 1181, if retirees are out of creditable coverage for more than 63 days, any subsequent group health plan can exclude coverage for extensive categories of preexisting conditions for up to twelve months; and (3) there may not be a critical mass of retirees to enroll in the HCTC-eligible program because some have enrolled in the United Healthcare individual policies. There will also be a potential "adverse selection" problem, as those who have major health problems that made individual policies cost-prohibitive are disproportionately willing to enroll in the HCTC-eligible plan.

25. It is also unfair to U.S. retirees of the Debtors that estate assets are used to pay for medical benefits of Canadian retirees through at least December 31, 2010[7], but U.S. retirees are losing their critical benefits four months earlier, timing that endangers their ability to obtain an effective HCTC-subsidized benefit through a viable program.

---

[7] See http://www2.nortel.com/go/news_detail.jsp?cat_id=-8055&oid=100266017&locale=en-US&lcid=-1

## CONCLUSION

26. The retiree benefits that the Debtors seek to terminate are protected by Bankruptcy Code Section 1114 until the earlier of confirmation of a plan, conversion of the case, or compliance with the limited requirements of Section 1114. Those requirements are in place because the benefits at stake—health, disability, life insurance—are critical to the well-being, survival, and financial stability of thousands of retirees and their dependents. This Court should deny the Debtors' motion as premature.

Dated: July 6, 2010
Wilmington, Delaware

CROSS & SIMON, LLC

By: _____
Christopher P. Simon (No. 3697)
Michael J. Joyce (No. 4563)
913 North Market Street, 11th Floor
P.O. Box 1380
Wilmington, DE 19899-1380
(302) 777-4200
Fax (302) 777-4224
csimon@crosslaw.com
mjoyce@crosslaw.com

-and-

FARELLA BRAUN + MARTEL LLP
Dean Gloster (*pro hac vice* application pending)
Gary Kaplan (*pro hac vice* application pending)
235 Montgomery St., 18th Floor
San Francisco, CA 94104
(415) 954-4400
Fax (415) 954-4480

*Attorneys for Nortel US Retirement Protection Committee*