Glenn R. Kantor - State Bar No. 122643
    Email: gkantor@kantorlaw.net
Brent Dorian Brehm - State Bar No. 248983
    E-mail: bbrehm@kantorlaw.net
KANTOR & KANTOR, LLP
19839 Nordhoff Street
Northridge, CA 91324
Telephone:  (818) 886-2525
Facsimile:  (818) 350-6272

Attorneys for Plaintiff,
LORRAINE PLACIDO

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| LORRAINE PLACIDO,<br><br>    Plaintiff,<br><br>VS.<br><br>THE PRUDENTIAL INSURANCE COMPANY OF AMERICA; NORTEL NETWORKS LONG TERM DISABILITY PLAN,<br><br>    Defendants. | CASE NO: CV 09-0668 WHA<br><br>*The Honorable William A. Alsup*<br><br>PLAINTIFF'S OPPOSITION TO THE PRUDENTIAL INSURANCE COMPANY OF AMERICA AND NORTEL NETWORKS LONG TERM DISABILITY PLAN'S JOINT MOTION FOR SUMMARY JUDGMENT, OR IN THE ALTERNATIVE PARTIAL SUMMARY JUDGMENT<br><br>[Filed Concurrently with Declarations of Brent Dorian Brehm, and Lorraine Placido]<br><br>DATE:      July 1, 2010<br>TIME:      8:00 a.m.<br>CTRM:     9, 19th FL |

PLAINTIFF'S OPPOSITION TO THE PRUDENTIAL INSURANCE COMPANY OF AMERICA
AND NORTEL NETWORKS LONG TERM DISABILITY PLAN'S JOINT MOTION FOR
SUMMARY JUDGMENT, OR IN THE ALTERNATIVE PARTIAL SUMMARY JUDGMENT

# TABLE OF CONTENTS

A.    INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

B.    STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

    1.    Placido Made a Disability Claim and the CIGNA Immediately Started Investigating Placido's Social Security Disability Benefits . . . . . . . . . 3

    2.    CIGNA Approved Benefits, Actively Made Benefit Adjustments, and Actively Pursued SSDB Information - While Incorrect Information Confirmed by Nortel Originally Caused the Problem at Hand . . . . . . . 4

    3.    Knowing Ms. Placido was not Receiving the Correct Amount of SSDB, CIGNA and Ms. Placido Worked to Correct the Error Caused by Nortel by Appealing the SSDB Amount . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

    4.    CIGNA Provided Social Security With Incorrect Information Which Caused Ms. Placido to Lose the SSDB Appeal . . . . . . . . . . . . . . . . . . 6

    5.    After Prudential Stepped Into CINGA's Shoes, Prudential Was Informed by Nortel That Ms. Placido was Receiving About $1,500.00 in Social Security Disability Benefits . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

    6.    Prudential Never Asked Ms. Placido What <u>Amount</u> of Social Security Disability Benefit She Was Receiving . . . . . . . . . . . . . . . . . . . . . . . . . 8

    7.    Over Five Years After Prudential Was Informed That Placido Was Receiving About $1,500.00 in Social Security Disability Benefits, Prudential Requests Confirmation of This Amount Via a Social Security Payment History . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

    8.    At Nortel's Direction, Prudential Begins to Reduce Ms. Placido's LTD Benefit . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

    9.    Ms. Placido Appeals the Reduction of Her LTD Benefit to Nortel . . . 10

    10.    Ms. Placido Appeal the Reduction of Her LTD Benefits to Prudential . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

PLAINTIFF'S OPPOSITION TO THE PRUDENTIAL INSURANCE COMPANY OF AMERICA AND NORTEL NETWORKS LONG TERM DISABILITY PLAN'S JOINT MOTION FOR SUMMARY JUDGMENT, OR IN THE ALTERNATIVE PARTIAL SUMMARY JUDGMENT

ii

C.    POINTS AND AUTHORITIES ................................. 11

   1.    The Standard of Review is *De Novo* Because the Plan Language Does Not Contain a Grant of Discretion ........................... 11

   2.    Because Genuine Issues of Material Fact Exist Regarding Defendants' Claims, Summary Judgment For Defendants Must Be Denied ...... 12

   3.    Defendants' Counterclaims for Money Damages Should Be Denied and Dismissed ............................................. 13

   4.    The Statute of Limitations Limits Any Recovery of Alleged Overpayments ........................................... 17

   5.    Defendants' Conduct Constituted a Waiver of the Reimbursement Requirement and Recoupment Should Not Be Allowed ........... 19

   6.    The Plan Does Not Count "Any Increase" in Social Security Benefits As a Reduction of LTD Benefits .................................. 21

   7.    Defendants' Benefit Calculations are Not Consistent With the Plan's Terms ................................................. 23

   8.    Potential Discovery ....................................... 23

D.    CONCLUSION ............................................. 25

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# TABLE OF AUTHORITIES

FEDERAL CASES

*Burger v. Life Insurance Co. of North America,*
     103 F.Supp.2d 1344 (N.D. Ga. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . 20, 21

*Conkright v. Frommert,*
     130 S.Ct. 1640 (2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 12

*FMC Med. Plan v. Owens,*
     122 F.3d 1258 (9th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Gaines v. The Sargent Fletcher, Inc. Group Life Insurance Plan,*
     329 F.Supp.2d 1198 (C.D. Cal. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . 20-21

*Great West Life & Annuity Insurance Company v. Knudson,*
     534 U.S. 204 (2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 16

*Kearney v. Standard Ins. Co.,*
     175 F.3d 1084 (9th Cir. 1999) (en banc) . . . . . . . . . . . . . . . . . . . . . . . . 12

*Massachusetts Mut. Life Ins. Co. v. Russell,*
     473 U.S. 134 (1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Meagher v. International Association of Machinists and Aerospace Workers Pension Plan,*
     856 F.2d 1418 (9th Cir. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Nolan v. Heald College,*
     551 F.3d 1148 (9th Cir. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Padfield v. AIG Life Ins. Co.,*
     290 F.3d 1121 (9th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Pilot Life v. Dedeaux,*
     481 U.S. 41 (1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

*Pitts v. American Security Life Ins. Co.*,
    931 F.2d 351 (5th Cir. 1991). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20, 21

*Porter v. Hartford Life & Accident Ins. Co.*,
    609 F.Supp.2d 817 (E.D. Ark. 2009) . . . . . . . . . . . . . . . . . . . . . . 21, 22

*Rhorer v. Raytheon Engineers and Constructors, Inc.*,
    181 F.3d 634 (5th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Sereboff v. Mid Atlantic Medical Services, Inc.*,
    547 U.S. 356, 362 (2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Westaff v. Arce*,
    298 F.3d 1164 (9th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Wetzel v. Lou Ehlers Cadillac Group Long Term Disability Insurance Program*,
    222 F.3d 643 (9th Cir. 2000) (en banc) . . . . . . . . . . . . . . . . . . . . . 17, 18

*Wise v. Verizon Communications, Inc.*,
    600 F.3d 1180 (9th Cir. 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . 15, 17-19


FEDERAL STATUTES

29 U.S.C. § 1132(a)(1)(B) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

29 U.S.C. § 1132(a)(3)(B) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18, 20

29 U.S.C. § 1132(e) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

29 U.S.C. § 1332 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 14

29 U.S.C. §§ 1104 & 1106 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

29 U.S.C. §§ 1132 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14


STATE RULES

California Code of Civil Procedure § 337 . . . . . . . . . . . . . . . . . . . . . . . 18

## A.    INTRODUCTION

In its Motion, Prudential has stated:

Prudential, unaware of the SSA's decision, continued to pay Placido the full benefit amount without taking an offset for the payments received from the SSA (Prudential Memorandum of Points and Authorities, 7:14-16).

The above statement is not entirely accurate.  Prudential's own claim file contains the following documentation of Prudential's receipt of knowledge regarding Plaintiff's Social Security Benefits:

"In 2001, a phone call was rec'd indicating that [Ms. Placido] was rec'g 1500/mo from [Social Security Disability Benefit], no action was taken and it appears it was done"

- Mary Vermont, Prudential Claim Manager

October 5, 2006 at PRU 0392

"Discussed with Carolyn.  She has info that [Ms. Placido] is receiving 1500.00/mo."

- Patsy Daugherty, Prudential

Telephone Call Log

Conversation with Carolyn Clark, Nortel

March 26, 2001 at PRU 0505

Lorraine Placido has been disabled under the terms of the Nortel Networks Long Term Disability Plan (the "Plan") since 1996 due to a stroke she suffered in 1993.  This is not an ERISA Long Term Disability benefits case regarding whether or not Ms. Placido was disabled, but rather it involves an alleged overpayment caused by an increase in Ms. Placido's Social Security benefits from $38.00 per month to over $1,500.00 per month.  Both Defendants claim they were unaware of such an increase

in Social Security benefits until October of 2006; at which time Ms. Placido's Social Security benefits were investigated and it was "discovered" that Plan benefits had been overpaid. Defendants claims do not accurately present the facts.

As the two quotes above show, Nortel (the plan administrator) and Prudential (the claims administrator) were fully aware in 2001 that Ms. Placido was not receiving $38.00 per month in Social Security benefits. It was at that time, and not five and one half years later, that an investigation should have taken place. Because Defendants voluntarily chose not to investigate this information, only Defendants can be faulted for any overpayment, and only Defendants should bear the harm caused by their own failures. Defendants waived the right to be reimbursed for the alleged overpayment.

As fiduciaries of the Plan, Defendants had an affirmative duty to investigate facts, accurately administer the Plan according to its terms, and accurately convey information regarding the Plan's benefits. The Plan's fiduciaries (CIGNA, Prudential, and Nortel) all failed in these duties, and now, having reduced her LTD benefit to zero, the only person harmed by these failures was Ms. Placido.

The record shows that whenever the Plan's fiduciaries asked for information, authorizations, or documentation, Ms. Placido promptly and accurately provided whatever was requested. This included multiple inquiries by CIGNA into the amount of Social Security benefits Ms. Placido was receiving. However, in 2000, CIGNA stopped administering the Plan, and from that date on so stopped the questions regarding the amount of Social Security benefits Ms. Placido was receiving. What changed in 2000? Prudential became the Plan's claim administrator. From 2000 through the present, Prudential chose not to ask Ms. Placido what amount of Social Security benefits she was receiving - directly in violation of their fiduciary duties.

Certainly if Prudential had done even the minimum to meet its fiduciary duties such action would have prevented the instant dispute, but Prudential was not the original cause of the problem. The original cause of the problem was that Nortel and

CIGNA conveyed inaccurate information to the Social Security Administration regarding Ms. Placido's LTD benefits. Not knowing that the information it had received from Nortel and CIGNA was incorrect, the Social Security Administration calculated Ms. Placido's Social Security benefits correctly. It was not until 2001 that Nortel finally conveyed accurate information regarding Ms. Placido's Social Security Benefits.

**B.    STATEMENT OF FACTS**

**1.    Placido Made a Disability Claim and the CIGNA Immediately Started Investigating Placido's Social Security Disability Benefits**

On October 24, 1996 and November 18, 1996, CIGNA (who was the claims fiduciary until January 1, 2000) received completed forms initiating Ms. Placido's Disability Claim. (953-961).[1] This information showed that due a stroke Ms. Placido had been hospitalized in November of 1993. (955). Subsequently, Ms. Placido left work on disability. *Id.* Optimistic that she would be able to regain her functionality, Ms. Placido returned to work for Nortel in limited and modified work capacities from May 1994 to May 28, 1996. *Id.* Since May 28, 1996, Ms. Placido has not been able to work due to stroke related dysfunctions including cognitive impairment, focus problems, and emotional control difficulties. (e.g. 263, 955). The fact that Ms. Placido was and is disabled is not contested.

From the very first disability claim form, CIGNA inquired about Social Security Disability Benefits (SSDB), and the amount of disability income Ms. Placido was receiving. (959). Ms. Placido provided all requested information. (953-54, 959).

---

[1]Unless otherwise stated, reference to supporting evidence in a "(###)" format is made as shorthand for the numbering contained in the Adminsitrative Record lodged with the Court.

1    On November 27, 1996, CIGNA wrote to Ms. Placido asking her to apply for SSDB

2    and asking her to sign and return a reimbursement agreement. (944). Ms. Placido did

3    as was requested. (374). On December 1, 1996, Ms. Placido signed a reimbursement

4    agreement with Northern Telecom in which she agreed to provide Northern Telecom

5    with any reasonable information about her Social Security. *Id.* Going beyond the

6    scope of the agreement, at all times prior and subsequent to this agreement, whenever

7    Northern Telecom or any disability plan administrator requested information

8    regarding SSDB, Ms. Placido provided the requested information. (e.g. 444, 453, 505,

9    508, 724, 757, 770, 777, 796, 802-04).

   **2.    CIGNA Approved Benefits, Actively Made Benefit Adjustments, and**
10
   **Actively Pursued SSDB Information - While Incorrect Information**
11
   **Confirmed by Nortel Originally Caused the Problem at Hand**
12
13    On December 20, 1996, CIGNA approved Ms. Placido's claim for disability

14    benefits. (882). On January 7, 1997, CIGNA notified Ms. Placido of an error in

15    calculating her benefits - which had resulted in an underpayment. (875). This was the

16    first of multiple communications by CIGNA regarding adjustments in her benefit
17
    payments. (See also 376, 381).
18
19    On April 10, 1997, contact was made between the Social Security

20    Administration and Nortel regarding whether Ms. Placido's LTD benefits were in lieu

21    of State Disability Insurance (SDI) benefits. Brehm Dec. Exhibit A at Plan0000144.

22    During the conversation it was confirmed that this was indeed the case. *Id.* This

23    confirmation was in error (LTD benefits were not made in lieu of SDI) and no protest

24    was made by Nortel that LTD benefits would be a "reverse offset against [Disability

25    Insurance Benefits]." *Id.* It was this contact, and possibly others with CIGNA, that

26    lead to the incorrect amount of SSDB payments which are at the root of the instant

27    dispute. *See id.*; Brehm Dec. Exhibit A at Plan0000133.

28    On April 28, 1997, CIGNA requested information from Ms. Placido regarding

SSDB. (820). In response, on May 2, 1997, CIGNA received from Ms. Placido a completed "Authorization to Secure Award or Disallowance Information Social Security Disability Benefits." (802). CIGNA reviewed this information and on May 7, 1997, CIGNA contacted the Social Security Administration directly to resolve questions it had regarding Ms. Placido's SSDB. (800).

Pursuant to CIGNA's request, the Social Security Administration informed CIGNA that Ms. Placido's Monthly Benefit was $38.00 and the Initial Entitlement Award Amount was $1,314.60. (800). The actual payable amount Ms. Placido was receiving was due to Social Security offsetting for Ms. Placido's Long Term Disability Benefits. (800). Social Security detailed to CIGNA exactly why the offset for LTD benefits was being taken. (804-07). Social Security had determined that the LTD benefits were being made in lieu of SDI. *Id.* The same day CIGNA received this information, CIGNA determined that Social Security was "not correct" in calculating the SSDB after Ms. Placido had stopped receiving Short Term Disability benefits (which, unlike LTD benefits, were paid to Ms. Placido in lieu of State Disability Insurance benefits). (808).

### 3. Knowing Ms. Placido was not Receiving the Correct Amount of SSDB, CIGNA and Ms. Placido Worked to Correct the Error Caused by Nortel by Appealing the SSDB Amount

On June 2, 1997, CIGNA called the Regional Social Security Administration office to discuss Ms. Placido's incorrect SSDB amount. (795). In the notes from this conversation CIGNA cited to the exact regulation which governed why the amount Ms. Placido was receiving in SSDB was incorrect. (795). That same day CIGNA wrote to Ms. Placido, informed her of the conversation, and instructed her on how to correct her SSDB amount. (445).

However, even with the incorrect SSDB amount, Ms. Placido's claim had been overpaid. (381). CIGNA requested Ms. Placido repay the overpayment. Two weeks

PLAINTIFF'S OPPOSITION TO THE PRUDENTIAL INSURANCE COMPANY OF AMERICA AND NORTEL NETWORKS LONG TERM DISABILITY PLAN'S JOINT MOTION FOR SUMMARY JUDGMENT, OR IN THE ALTERNATIVE PARTIAL SUMMARY JUDGMENT

5

1  thereafter, in satisfaction of the December 1, 1996 reimbursement agreement, Ms.

2  Placido mailed CIGNA a check and CIGNA recouped this overpayment. (785).

3  For the next year Ms. Placido worked to appeal the amount she received in

4  SSDB. (757). During this time CIGNA routinely followed up on the status of the

5  appeal and the amount of SSDB Ms. Placido was receiving. (761, 763, 769-72, 777,

6  780, 782). In December of 1997, following a request for information from CIGNA,

7  Ms. Placido informed CIGNA that her SSDB amount had increased from $38.00 to

8  $66.00. (777). Because this was not an increase in the original award amount,

9  CIGNA continued to offset only $38.00 per month from Ms. Placido's LTD benefit.

10  **4.    CIGNA Provided Social Security With Incorrect Information Which**

11  **Caused Ms. Placido to Lose the SSDB Appeal**

12  On January 5, 1998, knowing that Ms. Placido had appealed the amount of

13  SSDB she received and that SSA was incorrect in doing so, CIGNA informed Ms.

14  Placido that it expected her to be receiving "full" SSDB by that time. (772). In

15  response, Ms. Placido called CIGNA and stated that she had not heard a decision from

16  SSA regarding her appeal, but she had received an increase in SSDB to $66.00 per

17  month. (771). Ms. Placido also provided CIGNA with an executed Consent for

18  Release of Information - allowing CIGNA to obtain the SSA information it deemed

19  necessary. (770).

20

21  In March 1998, CIGNA was in contact with SSA and it was again affirmed that

22  Ms. Placido was receiving LTD benefits in lieu of State Disability Insurance benefits.

23  (Plan000133). Based on the erroneous information provided by CIGNA, SSA upheld

24  the SSDB amount it was paying to Ms. Placido. (*See id.*, 763).

25  On June 1, 1998, Ms. Placido informed CIGNA that SSA had denied her appeal

26  to correct her SSDB amount. (761). Placido also forwarded a copy of the SSA

27  decision to CIGNA. (763). CIGNA reviewed the SSDB situation and determined it

28  would send Ms. Placido's claim for a specialist review. (760). The first of these

---

1   CIGNA specialist reviews determined that the SSA appeal decision was questionable,

2   and thus a second specialist review was ordered. (672). Prior to this second specialist

3   review, CIGNA sought updated information from Ms. Placido in order to determine if

4   Ms. Placido met the Any Occupation definition of disability. (759). Along with this

5   request for updated information CIGNA made another request regarding the amount

6   of SSDB Ms. Placido was receiving. (755). As always, Ms. Placido provided the

7   information which had been requested. (755).

8        In November of 1998, CIGNA determined that Ms. Placido was disabled from

9   any occupation, and thus CIGNA continued with the referral of Ms. Placido's claim

10  for a second specialist review. (671). Once again, CIGNA determined that Ms.

11  Placido's SSDB amount was not correct. (672). Ms. Placido's claim was forwarded

12  to CIGNA's Economic Consultant for follow-up on Ms. Placido's SSDB adjustment.

13  (671). A review of the documents produced do not indicate what happened with this

14  follow-up, however, subsequent information shows that Ms. Placido continued to

15  appeal SSA's determination of her benefits - with the help of Nortel. What is

16  documented in the claim file is that CIGNA, knowing the SSDB amount was not

17  correct, continued to monitor the amount Ms. Placido was receiving in SSDB. (724).

18  On September 9, 1999, in response to CIGNA's request, Ms. Placido informed

19  CIGNA that she continued to receive $66.00 per month in SSDB. *Id.*

20

21       **5.    After Prudential Stepped Into CINGA's Shoes, Prudential Was**

22             **Informed by Nortel That Ms. Placido was Receiving About $1,500.00**

23             **in Social Security Disability Benefits**

24       On January 1, 2000, Prudential stepped into CIGNA's shoes as claims

25  administrator for the Plan. On December 5, 2000, Prudential reviewed CIGNA and

26  Ms. Placido's efforts regarding SSDB amounts, and SSA's response to those efforts.

27  (460). Prudential determined it was proper to continue to offset $38.00 for SSDB

28  because "cigna investigated this unusual claim. Altho [sic] it is unusual for SSA to

1  offset LTD, it has been known to happen in CA". *Id.*

2      That should have changed on March 26, 2001, when Carolyn Clark, a Nortel

3  employee, called Prudential to discussed Ms. Placido's SSDB amount. (505). The

4  reason for the call "[Ms. Placido] has SSDB of over 1500.00/mo." *Id.* During this

5  call Prudential was informed by Nortel that it had "info that [Ms. Placido] is receiving

6  [about] 1500.00" per month in SSDB. *Id.* The record does not document how Nortel

7  got this information, however, the record does document that Nortel was in

8  communication with Ms. Placido regarding her SSDB and LTD benefits at that time.

9  (444).

10      In fact, Nortel was actively working with Ms. Placido to resolve SSDB issues.

11  In an undated addendum to a December 6, 2001 letter, Nortel wrote a letter to Ms.

12  Placido setting forth a correction to the mis-information it had provided to the Social

13  Security Administration on April 10, 1997. (446) (the addendum, but not the

14  underlying letter, is in the record). This addendum transmits materially similar

15  information as was relied upon by the Social Security administration in February

16  2002, when it recognized that Ms. Placido's LTD benefits were not paid in lieu of

17  State Disability Insurance benefits. Brehm Dec. Exhibit A at Plan0000133.

18

19      **6.   Prudential Never Asked Ms. Placido What <u>Amount</u> of Social**

20               **Security Disability Benefit She Was Receiving**

21      Prudential never asked Ms. Placido how much money she was receiving in

22  SSDB. Even after the date Prudential was informed that Ms. Placido was receiving

23  over $1,500 in SSDB, Prudential chose not to investigate the right to offset the

24  amount Ms. Placido was receiving in SSDB. However, the record produced by

25  Prudential for the instant motion is incomplete regarding the administration of Ms.

26  Placido's claim for the five and one half years between the time Prudential was

27  informed by Nortel that Ms. Placido was receiving about $1,500.00 per month in

28  SSDB and when Prudential obtained a payment history regarding SSDB amounts

---

1    from Allsup Inc.

2       This is evident from a Supplemental Claimant Statement which Prudential

3    received around July 26, 2004. (449). This form indicates that it has three total pages,

4    but only the first two pages are represented in the record lodged with the Court. (449-

5    50). The third page is important because that page asked about Other Benefits Ms.

6    Placido was receiving. Brehm Dec. Exhibit A at Plan0000132. On the missing page,

7    Prudential chose to ask Ms. Placido only if she was receiving disability benefits from

8    Social Security, and in no way asked about the amount of those benefits. *Id.* Thus,

9    Ms. Placido properly answered "Yes". *Id.*

10       Interestingly, around that same time, Prudential also obtained information from

11    Ms. Placido that was unrelated to a determination of disability, but related only to

12    seeking Plan offsets for receipt of dependent Social Security benefits. (453). As

13    always, Ms. Placido provided the requested information. *Id.*

14

15      **7.**     **Over Five Years After Prudential Was Informed That Placido Was**

16           **Receiving About $1,500.00 in Social Security Disability Benefits,**

17           **Prudential Requests Confirmation of This Amount Via a Social**

18           **Security Payment History**

19       On October 5, 2006, Prudential reviewed Ms. Placido's SSDB offset amount.

20    (392). It was noted that the $38.00 SSDB offset amount had continued because

21    "AETNA had informed our office that this sometimes happens with [Social Security]

22    in California." *Id.* However, Prudential knew that this information was no longer

23    correct. *Id.* Prudential stated that "In 2001, a phone call was rec'd indicating that

24    [Ms. Placido] was rec'g 1500/mo from ssdb, no action was taken and appears it was

25    done". *Id.* Because Prudential knew the 2001 SSDB was greater than the amount

26    being offset, Prudential's plan was to "make necessary adjustment" after confirming

27    the SSDB amount. *Id.*

28       To confirm the information it already knew, Prudential did not ask Ms. Placido

for the information, but rather asked a third party vendor, Allsup Inc., to obtain a Social Security payment history dating back to Ms. Placido's date of disability. (470). With Ms. Placido's authorization, Allsup was able to obtain this information regarding SSDB amounts. (508, 695). Allsup confirmed that SSDB in March of 2001 was $1,501.00. (695). The Allsup report did not show that Ms. Placido received an increase in SSDB to $1332.00 due to an income adjustment. (695-97). Rather, this "fact" appears to trace its origin to a notation in Prudential's records. (508).

### 8.    At Nortel's Direction, Prudential Begins to Reduce Ms. Placido's LTD Benefit

On January 26, 2007, Prudential reviewed the Allsup findings and determined it would "confirm with nortel that we will no pursue [overpayment] on claim". (473). Following a presentation regarding Prudential's initial calculation of the overpayment amount, Nortel instructed Prudential to "Please pursue...why would we not?" (513). The ultimate impact of these determinations was that in January 2007, Ms. Placido began receiving an LTD benefit that included a SSDB reduction of $1,332.00 and then shortly thereafter her LTD benefit was further reduced to the point that she netted zero LTD benefit. (315).

### 9.    Ms. Placido Appeals the Reduction of Her LTD Benefit to Nortel

On April 14, 2007, Ms. Placido wrote to Nortel (the Plan Administrator) and appealed the reduction of her LTD benefits. (439). Therein, Ms. Placido noted the struggles she has endured due to problems created by others, problems created by her disability, and noted that she had completed all documents as requested. *Id.* Shortly after Ms. Placido sent her appeal, Prudential contacted Ms. Placido's physician's office. (569). During this conversation Prudential received confirmation from a Physician's Assistant that Ms. Placido was "competent to endorse checks & handle the proceeds." (516). Aside from these two very basic tasks, there was no further inquiry into Ms. Placido's cognitive abilities or limitations. *Id.*

On July 20, 2007, following a conversation with Prudential (569), Ms. Placido again wrote to Nortel in support of her appeal (Brehm Dec. Exhibit A at Plan0000115). On December 6, 2007, Nortel upheld the determination that an overpayment existed based on calculations that dated back to 1996 and that the Plan was going to offset future benefits as reimbursement. (405). This letter makes note of a taped hearing which has not been included as part of the record lodged with the Court. *Id.*

### 10.    Ms. Placido Appeal the Reduction of Her LTD Benefits to Prudential

On January 30, 2008, Ms. Placido, through counsel, sent an appeal letter to Prudential. (323). This letter detailed many deficiencies in the handling of Ms. Placido's claim, including that benefits were being improperly calculated and that the statue of limitations had run on large amounts of benefit payments. (323). In a letter dated April 29, 2008, Prudential made some modifications to its prior benefits calculation, but upheld the Plan's right to offset future benefits for overpayments it claimed had been made since 1996. (634). This letter stated that the decision was final and could not be appealed further. *Id.* Ms. Placido was advised of her right to bring suit. *Id.* On February 13, 2009, the instant suit was filed.

## C.    POINTS AND AUTHORITIES

### 1.    The Standard of Review is *De Novo* Because the Plan Language Does Not Contain a Grant of Discretion

The standard of review is *de novo* unless the language of the instrument creating the ERISA plan gives an entity the "power to construe disputed or doubtful terms." *Conkright v. Frommert*, 130 S.Ct. 1640, 1646 (2010) (quoting *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 111 (1989)). The entity claiming to have discretion must show that the language of the plan unambiguously states that entity was afforded discretion. *Kearney v. Standard Ins. Co.*, 175 F.3d 1084, 1090 (9th Cir.

1  1999) (en banc).  In the instant case, the Plan's language[2] does not give the

2  administrator or fiduciary discretionary authority, and thus the standard of review is

3  *de novo.* (685-694).

4      Defendants may argue that the Plan contains language that the Claims

5  Administrator will decide if proof of Total Disability was "satisfactory", but such

6  terms have been held to be ineffective in altering the standard of review from *de novo.*

7  *Kearney*, 175 F.3d at 1090.  Further, the grant of discretionary authority cited to by

8  Defendants was not contained in the instrument creating the Plan or the language of

9  the Plan, but rather in a separate, and later created, "Administrative Services

10  Agreement."  Def at 10:21-25.  Because this language is not found in the Plan, it is

11  inconsequential to the determination of the standard of review.  *See Conkright*, 130

12  S.Ct. at 1646.

13      **2.**    **Because Genuine Issues of Material Fact Exist Regarding**

14              **Defendants' Claims, Summary Judgment For Defendants Must Be**

15              **Denied**

16      Regardless of the standard of review, the traditional summary judgement

17  principles apply.  *Nolan v. Heald College*, 551 F.3d 1148, 1154-55 (9th Cir. 2009)

18  (applying "traditional rules of summary judgement" under abuse of discretion

19  standard of review); *Kearney*, 175 F.3d at 1091-94 (applying traditional genuine issue

20  of material fact analysis under *de novo* standard of review).  Therefore, summary

21  judgment must be denied if, viewing the evidence in the light most favorable to the

22  non-moving party, there remains a genuine issue of material fact.  *Id.*  The federal

23  common law of ERISA dictates that plan language will be interpreted in an ordinary

24

25  _____

26      [2] In this case the Plan serves as both the plan document and the Summary Plan

27  Description (SPD), and thus there are no other Plan documents to review for discretionary

28  language.  (622).

PLAINTIFF'S OPPOSITION TO THE PRUDENTIAL INSURANCE COMPANY OF AMERICA
AND NORTEL NETWORKS LONG TERM DISABILITY PLAN'S JOINT MOTION FOR
SUMMARY JUDGMENT, OR IN THE ALTERNATIVE PARTIAL SUMMARY JUDGMENT

and popular sense as would a person of average intelligence and experience. *Padfield v. AIG Life Ins. Co.*, 290 F.3d 1121, 1125 (9th Cir. 2002).

Herein, there exist multiple genuine issues of material fact. For example, Defendants claim that in 2006, Prudential first receive information regarding an increase in Ms. Placido's SSDB. (Def. Brief at 7:14-8:6). Ms. Placido claims that in 2001, Nortel informed Prudential of an increase in SSDB. (505). Defendants claim that the misclassification of Ms. Placido's benefits for SSDB purposes was initially made by the SSA and not CIGNA. (Def. Brief at 12:6-8). Ms. Placido claims that the misclassification of Ms. Placido's benefits for SSDB purposes (both originally and in her first appeal) was entirely the fault of Nortel and CIGNA. Brehm Dec. Exhibit A at Plan0000133, Plan0000144. Defendants claim that Ms. Placido is receiving all the benefits that she is entitled to under the Plan, and that there are no terms of the Plan Placido is seeking to enforce. (Def. Brief at 12:15-16). Placido claims that she is not receiving all the benefits that she is entitled to under the Plan, and that there are terms of the Plan that she is seeking to enforce. Plaintiff's First Amended Complaint, 2:4-9. Without a separate statement of material facts filed by Defendants, Ms. Placido will not attempt to cull out each an every genuine issue of material fact that exists in the instant dispute. However, the above examples show that genuine issues of material fact exist, and thus summary judgment for Defendants is not proper.

### 3.    Defendants' Counterclaims for Money Damages Should Be Denied and Dismissed

Defendants have each brought Counterclaims under ERISA by asserting jurisdiction under 29 U.S.C. § 1132(e). Plan Counterclaim at 5:6-7; Prudential Counterclaim at 7:26-27. Both Defendants specify that they are bringing two causes of action, one for Declaratory Relief and the other for Restitution of Benefits Paid. Plan Counterclaim at 9:23 and 10:19; Prudential Counterclaim at 6:22 and 7:23. However, neither Defendant has specified the subsection of 29 U.S.C. § 1332 under

PLAINTIFF'S OPPOSITION TO THE PRUDENTIAL INSURANCE COMPANY OF AMERICA AND NORTEL NETWORKS LONG TERM DISABILITY PLAN'S JOINT MOTION FOR SUMMARY JUDGMENT, OR IN THE ALTERNATIVE PARTIAL SUMMARY JUDGMENT

13

1 which these claims are being brought.

2    While Defendants have not specified what sections they claim support their

3 ability to maintain these causes of action, 29 U.S.C. § 1332 (a) sets forth which

4 entities may bring a civil action under that subsection[3]    Section 1132 however, does

5 not permit defendants to maintain this action. 29 U.S.C. Section 1132 provides the

6 "exclusive" civil enforcement remedies under ERISA. *Pilot Life v. Dedeaux*, 481 U.S.

7 41 (1987). ERISA, however, does not permit a plan or claim administrator to bring an

8 action for recovery of plan benefits. 29 U.S.C. § 1132(a)(1)(B). Rather, an action for

9 recovery of plan benefits may only be brought by a "participant" or "beneficiary." *Id.*

10 Under ERISA, the only claim for relief that may be asserted by a fiduciary is one for

11 equitable relief. 29 U.S.C. §§ 1132 (a)(2) & (a)(3). The U.S. Supreme Court has

12 expressly rejected the attempts of ERISA fiduciaries to classify analogous claims as

13 "equitable," when the nature of the action is to recover sums of money. *Great West*

14 *Life & Annuity Insurance Company v. Knudson*, 534 U.S. 204, 210-19 (2002). This

15 type of action was traditionally maintained by courts of law (as opposed to courts in

16 equity), therefore the claims are not equitable in nature.

17    While Defendants contend they are entitled to reimbursement on their

18 Counterclaim against Ms. Placido for an overpayment that allegedly resulted as a

19 consequence of Ms. Placido's receipt of Social Security benefits, there is no provision

20 in ERISA which permits an administrator to sue a beneficiary for such money

21

22 _____

23    [3] Neither of these Counterclaims stated the legal theory for its claim for relief, but

24 merely alleged that the Plan contains a "Reduction of Benefits Due to Other Income"

25 provision that allows Defendants to recover an overpayment of Plan benefits in various

26 alleged monetary amounts (presumably the differing amounts are due to the differing

27 times at which the Counterclaims were brought).

28

1  damages.  Under Section 1132(a)(1) a "participant or beneficiary" is permitted to

2  bring an action to recover benefits.  Ms. Placido's action herein is predicated on this

3  Section.  However, this Section does not confer similar rights upon an administrator or

4  fiduciary to bring an action for recovery of benefits.  This section also provides the

5  only right to bring suit to enforce and clarify rights under a plan - and reserves such

6  actions to participants or beneficiaries.  *Id.*  Because Defendants do not have such a

7  right, Defendants' declaratory relief action seeking clarification of rights and

8  obligations cannot be maintained.

9      Section 1132 (a)(2) permits the Secretary of Labor, a participant or fiduciary to

10  bring an action for breach of fiduciary duty.  However, defendants may not bring an

11  action for recovery of money damages under this subsection because actions for

12  breach of fiduciary duty are limited to equitable relief and do not include awards for

13  monetary damages against non-fiduciaries.  *See Massachusetts Mut. Life Ins. Co. v.*

14  *Russell*, 473 U.S. 134, 148 (1985).

15      The only remaining sub-section of Section 1132 which would permit a fiduciary

16  to bring a claim for relief is subsection (a)(3), which permits a fiduciary to enjoin any

17  act or practice which violates or ERISA or to obtain "appropriate equitable relief."

18  (Emphasis added).

19

20      Under Supreme Court authority, *Great West*, 534 U.S. at 210-219, it was firmly

21  established that an action for money damages, however it is framed, is not "equitable

22  relief" as envisioned by ERISA.  The recovery of past benefits via money damages is

23  a classic form of legal relief, and is not available under Section 1132 (a)(3).  *Wise v.*

24  *Verizon Communications, Inc.*, 600 F.3d 1180, 1190 (9th Cir. 2010).  Defendants are

25  not entitled to bring an affirmative action for payment of money damages.  The *Great*

26  *West* Court stated that such an action is in the nature of "legal relief" and as such, is

27  not one of the remedies available under the exclusive remedial provisions of ERISA.

28  *Great West*, 534 U.S. at 212-13.  The Ninth Circuit has followed this rule and

PLAINTIFF'S OPPOSITION TO THE PRUDENTIAL INSURANCE COMPANY OF AMERICA
AND NORTEL NETWORKS LONG TERM DISABILITY PLAN'S JOINT MOTION FOR
SUMMARY JUDGMENT, OR IN THE ALTERNATIVE PARTIAL SUMMARY JUDGMENT
15

1  prohibited actions by administrators against beneficiaries for collection of a money

2  judgment. *Westaff v. Arce*, 298 F.3d 1164, 1166-67 (9th Cir. 2002) (abrogated by

3  *Sereboff v. Mid Atlantic Medical Services, Inc.*, 547 U.S. 356, 362 (2006) (allowing

4  suit to recover specifically identifiable funds that were in the possession and control of

5  beneficiary through a constrictive trust or equitable lien, rather than asserting personal

6  liability for a contractual obligation to pay money).

7      The *Westaff* case has also made clear the rule in the Ninth Circuit, that

8  regardless of how the claim is labeled, i.e, specific performance or declaratory relief,

9  an attempt to enforce an obligation for the payment of money, is an action that is a

10  "classic" action at law and not an equitable claim:

11      Westaff is seeking to enforce a contractual obligation for the payment of

12      money, a classic action at law and not an equitable claim. 'Although they

13      often dance around the word, what petitioners in fact seek is nothing other

14      than compensatory damages—monetary relief for all losses their plan

15      sustained as a result of the alleged breach' of the reimbursement provision.

16      *FMC Med. Plan v. Owens*, 122 F.3d 1258, 1261 (9th Cir. 1997) (quoting

17      *Mertens [v. Hewett]*, 508 US. at 255, 113 S. Ct. 2063). The Supreme Court

18      has recently affirmed our approach in *Great West Life*, in which the Court

19      analyzed a similar action to enforce a reimbursement clause by looking past

20      the parties' chosen labels to the substance of the relief sought. [quotation

21      omitted]. The basis for petitioners' claim is that petitioners are contractually

22      entitled to *some* funds for benefits that they conferred.  The kind of

23      restitution that petitioners seek, therefore, is not equitable—the imposition

24      of a constructive trust or equitable lien on particular property–but legal–the

25      imposition of personal liability for the benefits that they conferred upon

26      respondents....

27      ...The action remains one for money damages.  The district court correctly

1    recognized this and dismissed the case for failure to state a claim. At 1166-

2    1167.

3    Defendants do not have a right under ERISA to recover money damages against

4    Ms. Placido. Defendants do not have the right under ERISA to clarify rights and legal

5    relationships. Thus, to the extent that Defendants' Counterclaims seek legal relief (in

6    the form of money damages from Ms. Placido) and clarification of rights and

7    obligations, these claims must be rejected and dismissed as falling to state a claim

8    within the exclusive remedial scheme of ERISA.

9        **4.    The Statute of Limitations Limits Any Recovery of Alleged**

10          **Overpayments**

11   On March 26, 2009, Prudential filed its Counterclaim (Docket Document 13),

12   and on January 29, 2010, the Plan filed its Counterclaim (Docket Document 41).

13   Because there is a four year statue of limitations for fiduciaries to bring ERISA

14   actions seeking to enforce a plan's terms, Defendants can only "look back" four years

15   in enforcing the Plan's terms once they had reason to know that a breach had

16   occurred. *See Wise v. Verison Communications Inc.*, 600 F.3d 1180, 1188 (9th Cir.

17   2010), *Meagher v. International Association of Machinists and Aerospace Workers*

18   *Pension Plan*, 856 F.2d 1418, 1423 (9th Cir. 1988) (limiting plaintiff's recovery of

19   benefits due under the plan to benefits issued within the applicable statue of

20   limitations period) (rolling accrual reasoning overruled by *Wetzel v. Lou Ehlers*

21   *Cadillac Group Long Term Disability Insurance Program*, 222 F.3d 643, 649 (9th

22   Cir. 2000) (en banc)). In the instant matter, the statue of limitations limits the

23   recoupment of any overpayment by Defendants, if at all, to benefits issued four years

24   prior to the date Defendants filed suit. *Id.*

25   As noted above, in both Counterclaims Defendants did not specify the section

26   of 1132 under which they have filed their actions. Yet a review of section 1132 shows

27   that Defendants' claims regarding enforcement the overpayment provision found in

1    the Plan's "Reduction of Benefits Due to Other Income" section can only properly fall

2    within the bounds of Section 1132(a)(3)(B). It is this section that provides a fiduciary

3    with the right to bring a civil action to "obtain other appropriate equitable relief...to

4    enforce any provisions of this subchapter or the terms of the plan". 29 U.S.C. §

5    1132(a)(3)(B). Thus, the statute of limitations for actions under this section applies.

6        However, ERISA does not contain its own statute of limitations for suits to

7    obtain equitable relief to enforce the terms of the plan under Section 1132(a)(3).

8    Therefore, Courts must apply the state statute of limitations that is most analogous to

9    an equitable action seeking to enforce the terms of a plan. *Wise*, 600 F.3d at 1184. It

10   has already been determined that California Code of Civil Procedure § 337's four year

11   statute of limitations applies to actions brought under 1132(a)(1)(B), but such a

12   judicial determination has not been made for section (a)(3) actions. *Wetzel v. Lou*

13   *Ehlers Cadillac Group Long Term Disability Insurance Program*, 222 F.3d 643, 648

14   (9th Cir. 2000) (en banc). However, because C.C.C.P. § 337 also applies to

15   obligations found upon a written instrument in general, it is the most analogous

16   California statute of limitation, and thus the statue of limitations for a Section (a)(3)

17   action is four years. *See Id.*

18

19       The next determination to be made is when a cause of action accrued. Accrual

20   of an ERISA action is a question of federal law. *Id.* at 649. An ERISA cause of

21   action accrues either at the time when the harm was done, or when the party who was

22   harmed had reason to know that harm has been done - whichever is earlier[4]. *See Wise*,

23   600 F.3d at 1188. Because accrual is determined by the earlier of when the harm was

24   done (when Ms. Placido received an erroneous LTD payment) or when Defendants

25   had reason to know that harm has been done (when LTD payments were issued by

26

27       [4] The application of the earliest of possible accrual date rule is subject to the

28   remedial purposes of ERISA. *Wise*, 600 F.3d at 1188 Fn 3.

PLAINTIFF'S OPPOSITION TO THE PRUDENTIAL INSURANCE COMPANY OF AMERICA
AND NORTEL NETWORKS LONG TERM DISABILITY PLAN'S JOINT MOTION FOR
SUMMARY JUDGMENT, OR IN THE ALTERNATIVE PARTIAL SUMMARY JUDGMENT

Defendants after being informed that SSDB benefits had increased), the four year limitation period started to accrue no later than March 26, 2001. *Id.* To determine what payments are actionable, if any, one must calculate four years from March 26, 2001. *Id.* As a result, the statue of limitations ran no later than March 26, 2005. The ability to retroactively seek a "proper" application of a plans terms was barred by the statute of limitations four years after the Defendants had reason to know that harm was being through the issuance of erroneous LTD benefit payments. *Id.*

Because the statute of limitations has expired for payments made prior to these dates, the Court cannot sanction Defendants actions in recouping alleged overpayments made four years prior to the dates Defendants filed suit. In the event the Court finds that Defendants were entitled to recoup any overpayment, Ms. Placido asks the Court to limit the recoupment to, at most, those benefit payments that were made after March 26, 2005 and January 29, 2006 respectively.

**5. Defendants' Conduct Constituted a Waiver of the Reimbursement Requirement and Recoupment Should Not Be Allowed**

No later than March 26, 2001, Defendants had information that Ms. Placido was receiving a dramatically increased SSDB. (505). From that date, Defendants had a reasonable amount of time to investigate this information and make a determination regarding whether this impacted Ms. Placido's LTD benefits under a proper application of the Plan's terms. Defendants, as fiduciaries, not only knew they had the right to investigate and properly apply the Plan's terms at that time, but had a duty to do so. *See e.g.* 29 U.S.C. §§ 1104 & 1106. By not doing so within a reasonable amount of time, Defendants voluntarily relinquished their right to require reimbursement for any alleged overpayments.

The Ninth Circuit has not yet ruled on the applicability of the doctrine of waiver in an ERISA case, but a number of circuits have employed this doctrine under ERISA. *Gaines v. The Sargent Fletcher, Inc. Group Life Insurance Plan,* 329 F.Supp.2d 1198,

1   1122 (C.D. Cal. 2004) (reviewing cases). *Gaines*, a decision within the Ninth Circuit,

2   applied the doctrine of waiver to an ERISA fiduciaries actions. *Id.* at 1221-22.

3        Waiver is the voluntary or intentional relinquishment of a known right. *Id.* at

4   1222; *Rhorer v. Raytheon Engineers and Constructors, Inc.*, 181 F.3d 634, 645 (5th

5   Cir. 1999); *Pitts v. American Security Life Ins. Co.*, 931 F.2d 351, 357 (5th Cir. 1991).

6   The doctrine focuses on the unilateral action of the fiduciary in failing to raise at the

7   outset a known defense to a claim, including the right to recalculate a beneficiaries

8   benefits. *Pitts*, 931 F.2d at 357; *Burger v. Life Insurance Co. of North America*, 103

9   F.Supp.2d 1344, 1348 (N.D. Ga. 2000). If it is ever appropriate to apply waiver

10  principles under ERISA, it is in cases such as this, where Defendants had information

11  that Ms. Placido was receiving a dramatically increased SSDB amount for over five

12  and one half years before Defendants took action. *Burger*, 103 F.Supp.2d at 1348.

13  Where a fiduciary sleeps on its rights, and the beneficiary relies thereon, the fiduciary

14  loses through waiver its right for equitable recovery. *Id.* at 1349 (ruling on plan

15  fiduciaries action which was brought under 29 U.S.C. § 1132(a)(3)(B)).

16       Herein,  Defendants knew they had the right, and duty, to reduce LTD benefits

17  by "other income," which included SSDB, Defendants knew Ms. Placido was

18  receiving SSDB, Defendants knew they had the right to investigate the amount of

19  SSDB Ms. Placido was receiving, Defendants knew that - due to the Plan fiduciaries

20  own misstatements to SSA - Ms. Placido's SSDB was subject to being increased

21  above the $38.00 SSDB amount she was receiving, Ms. Placido had at all times been

22  compliant with providing the information requested from her and performed her

23  obligations under the Plan, and Defendants knew that Ms. Placido's SSDB had

24  increased to over $1,500.00 yet waited five and one half years from receipt of this

25  information to investigate and take action on an alleged overpayment. (392, 445, 505,

26  688-90, 796, Brehm Dec. Exhibit A at  Plan0000133, Plan0000144, Placido Dec. ¶¶ 1-

27  2). This course of conduct is sufficient to construe a voluntary relinquishment of the

right to require reimbursement. *Gaines*, 329 F.Supp.2d at 1222; *see also Burger*, 103 F.Supp.2d at 1348-49 (Fiduciary waived right to recover overpayment because it knew of facts allowing for reduction of benefits and yet continued to pay unreduced benefits for three years); *Pitts*, 931 F.2d at 357 (accepting premium payments for five months after learning of change constituted waiver). While not strictly relevant to a finding of waiver, Ms. Placido has not been unjustly enriched by the alleged overpayments as she used these funds to pay bills and otherwise maintain her regular standard of living; whereas the reduction in her LTD benefit to recoup the alleged overpayment has worked a hardship upon her - including leading to a bounced check and the exhaustment of any "rainy day" funds. (439, 517, Brehm Dec. Exhibit A at Plan0000115).

Because Defendants waived the right to require reimbursement from Ms. Placido, Ms. Placido asks the Court to Order all moneys withheld from Ms. Placido's LTD benefits as repayment of the alleged overpayment were improperly withheld and that these sums be returned to Ms. Placido. *See Burger*, 103 F.Supp.2d at 1349; *Porter v. Hartford Life & Accident Ins. Co.*, 609 F.Supp.2d 817, 828 (E.D. Ark. 2009) (requiring return of amounts withheld to recoup overpayment).

**6.    The Plan Does Not Count "Any Increase" in Social Security Benefits As a Reduction of LTD Benefits**

Defendants claim that the Plan provisions governing Reduction of Benefits Due to Other Income are "crystal clear." (Def. at 15:12). However, in asserting that Placido was contractually bound to reimburse the Plan for overpayments, Defendants have failed to take the very first step necessary in determining whether LTD benefits have in fact been overpaid: determining how the Plan defines "other income". If the increase in Ms. Placido's Social Security benefits from $38.00 was not to be counted as "other income" as defined by the Plan, then there could not have been an overpayment. It turns out that this was exactly the case - the increase in benefits was

---

PLAINTIFF'S OPPOSITION TO THE PRUDENTIAL INSURANCE COMPANY OF AMERICA
AND NORTEL NETWORKS LONG TERM DISABILITY PLAN'S JOINT MOTION FOR
SUMMARY JUDGMENT, OR IN THE ALTERNATIVE PARTIAL SUMMARY JUDGMENT

1    not to be counted as "other income" and thus the overpayment provision never

2    applied.

3       Defendants' position regarding the application of the overpayment provision is

4    wrong because the Plan does not count *any* increase in Social Security benefits as

5    "other income" for the purposes of reducing LTD benefits. (Def. At 2:24-3:11;

6    quoting Plan language found on 688). The Plan language is clear, and it does not take

7    into consideration how or why such an increase happened. Rather, the Plan language

8    simplifies and streamlines the determination of "other income" by not counting *any*

9    increase in benefits: "For the purposes of this plan, 'other income' includes: ... Social

10   Security benefits,...but **not counting any increase** in benefits after STD benefit

11   payments have started under this plan". *Id.* (emphasis added).

12       Under the Plan's terms, any increase in Ms. Placido's SSDB above $38.00 does

13   not count for the purposes of reducing Ms. Placido's LTD benefit. Because CIGNA

14   and Prudential have been properly reducing Ms. Placido's LTD benefit by this

15   amount, there was and is no overpayment. This straight forward application of the

16   Plan language explains why in December of 1997, CIGNA did not count the increase

17   in Ms. Placido's SSDB from $38.00 to $66.00. (777). Also, the Plan's terms defining

18   "other income" do not mean that the overpayment provision has no affect. CIGNA

19   properly applied the overpayment provision in June of 1997 when CIGNA found that

20   the original Social Security benefit amount Ms. Placido received (which was not an

21   increase in Social Security benefits) was different than the amount used to determine

22   her prior LTD benefits. (381). Ms. Placido made the lump sum reimbursement

23   payment to CIGNA, and thereafter CIGNA continued to properly reduced Ms.

24   Placido's LTD benefits by $38.00 per month. (785). Under the Plan Defendants are

25   contractually bound not to count any increase in SSDB received as "other income"

26   when determining if there was an overpayment. When Defendants did just this,

27   Defendants breached the express terms of the Plan.

28

1   Ms. Placido asks that the Court enforce the terms of the Plan by finding that the
2   proper reduction in Ms. Placido's LTD benefit due to SSDB was $38.00, and that any
3   further increase in SSDB above this amount was not "other income" as defined by the
4   Plan.  Further, Ms. Placido asks the Court to Order Defendants to calculate Ms.
5   Placido's LTD benefits consistent with this finding in the future and to return to Ms.
6   Placido any underpayment that may have occurred as a result of Defendants reducing
7   Ms. Placido's LTD benefits by an SSDB amount greater than $38.00.

8   ### 7.    Defendants' Benefit Calculations are Not Consistent With the Plan's
9   ### Terms

10   The calculation of Ms. Placido's benefits involves determining what her total
11   benefit was, applying yearly increases to this total benefit via application of a fraction
12   of the Consumer Price index, increasing the total benefit to match the Medicare Part B
13   premiums Ms. Placido paid, and then reducing that sum by "other income".  Indeed,
14   this is a complicated endeavor.  Due to the complexity of this endeavor and the
15   variables which may result from the Court's various findings on the instant motions,
16   finite calculations of all the above requested outcomes have not been performed.
17   Once the Court issues its findings, the appropriate calculations will be performed.

18   However, Defendants have presented the Court with a benefits calculation
19   which, even if Defendants' were entitled to offset the increase in Ms. Placido's SSDB
20   back to 1996, is not consistent with the Plan's terms.  Initially, the increase from
21   $1,314.00 to $1,332.00 in January of 1997 is clearly not permitted by the definition of
22   "other income" contained in the Plan.  Further, Defendants' calculation of benefits is
23   deficient because it does not properly apply the COLA increases to total benefits - as
24   required by the Plan's terms.  COLA increases are to be applied to Total Benefits,
25   which denotes gross benefits rather than net benefits after reduction for "other
26   income."  Also, Defendants arbitrarily utilize the CPI-W rather than the CPI-U.  This
27   distinction makes a difference.  Finally, the proper CPI number is determined by the

1  annual increase for the previous full year.  When these changes are made, and

2  dependent upon choice of CPI-W or CPI-U, Ms. Placido's benefits are currently

3  underpaid.  Brehm Dec. at Ex. B.

### 8.  Potential Discovery

As part of the Motion for Summary Judgment procedure established by the Court, Ms. Placido has been requested to present topics for discovery that she anticipates for this case.  Foremost will be discovery aimed at ensuring a full record is before the Court.  In the Plan's initial disclosures there were several documents that were not lodged by Defendants as constituting the administrative record (claim file). Even in the limited records disclosed by the Plan in its initial disclosures, it is evident that the documents lodged by Defendants with the Court do not accurately reflect what happened in this claim.  Significantly, Defendants did not lodge with the Court documents evidencing that it was the Plan administrators who were directly responsible for the mis-information SSA utilized in determining that Ms. Placido's SSDB amount was to be offset by her LTD benefits.  Brehm Dec. Exhibit A at Plan0000133, Plan0000144.  In seeking to obtain a complete record, the entire record regarding Ms. Placido's LTD claim must be obtained from the Plan (Nortel), as well as CIGNA and Prudential. Other areas for discovery will seek CIGNA's claims processing and handling manuals and/or materials, Prudential's claims processing and handling manuals and/or materials, and, if any conflicts of interest or indications of bias exist, narrowly tailored discovery regarding these factors.

///

///

///

///

///

///

**D.    CONCLUSION**

Ms. Placido is the only party to this suit who is not at fault, yet currently she is the only party who has suffered harm.  For the reasons stated above, Ms. Placido asks the Court to deny Defendants' Motion for Summary Judgment, in whole or in part, and grant summary judgment in her favor, in whole or in part.

DATED: June 10, 2010                    KANTOR & KANTOR LLP

                              By:    /s/ Brent Dorian Brehm
                                      Glenn R. Kantor
                                      Brent Dorian Brehm
                                      Attorneys for Plaintiff
                                      Lorraine Placido