**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | : |
| | : Chapter 11 |
| Nortel Networks Inc., et al., | : |
| | : Case No. 09-10138 (KG) |
| | : |
| Debtors. | : Jointly Administered |
| | : |
| | : **Hearing Date: July 16, 2010 at 10:00 a.m. (E.T.)** |
| | : **Objection Deadline: July 9, 2010 at 4:00 p.m. (E.T.)** |
| | : **Relates to Docket No. 3231** |

**OBJECTION OF AVAYA INC. TO DEBTORS' MOTION
FOR ENTRY OF AN ORDER ENFORCING THE ORDER
AUTHORIZING THE SALE OF CERTAIN ASSETS OF, AND
EQUITY INTERESTS IN, THE DEBTORS' ENTERPRISE SOLUTIONS
BUSINESS, AND DIRECTING THE RELEASE OF CERTAIN ESCROWED FUNDS**

Avaya Inc. ("Avaya"), by and through its undersigned counsel, hereby objects to the

*Debtors' Motion for Entry of an Order Enforcing the Order Authorizing the Sale of Certain*

*Assets of, and Equity Interests in, the Debtors' Enterprise Solutions Business, and Directing the*

*Release of Certain Escrowed Funds* (the "Motion") [D.I. 3231].  In further support, Avaya

respectfully states as follows:

**PRELIMINARY STATEMENT**

By the Motion, the Debtors are asking the Court to rewrite the provisions of the Sale

Agreement (as defined below) to enable them to (i) circumvent previously-approved arbitration

procedures, (ii) force Avaya to accept highly dubious inventory values that fail to comply with

the Sellers' own accounting principles and guidelines, and (iii) compel the immediate release of

approximately $19.2 million from an escrow account established for the sole purpose of keeping

such funds out of the hands of disputing parties until questions of value can be fairly resolved.

The Sale Agreement, approved by order dated September 16, 2009 [D.I. 1514], clearly provides that: (a) the Closing Statement (as defined below) would be prepared and the determination of "Inventory Value"[1] thereunder would be made in accordance with the "Calculation Principles," which are defined by reference to the Debtors' accounting principles and accounting guidelines;[2] (b) any disagreement as to the Closing Statement would be referred to an Accounting Arbitrator, whose report would be "final and binding upon the Parties and the EMEA Sellers"; and (c) $30 million would be held in escrow pending resolution of disputed post-closing purchase price adjustments, if any.  Implicit in the relief sought in the Debtors' Motion is a call for this Court to prejudge the outcome of the arbitration mandated by the Sale Agreement (by finding that the Debtors complied with the Calculation Principles in preparing the Closing Statement) even though such a finding would not only amount to a rewriting of the Sale Agreement, but also needlessly require a full-blown evidentiary hearing on a multitude of accounting issues that the parties had agreed would be resolved by an Accounting Arbitrator.

The Debtors mischaracterize Avaya's position by incorrectly asserting that Avaya is challenging the terms of the Sale Agreement and, in particular, the Debtors' application of the Calculation Principles to the Closing Statement purchase price adjustment calculation.  Citing Avaya's Disagreement Notice (as defined below) and its appropriately exercised request for information to verify whether the valuation of inventory was proper, the Debtors erroneously assert that Avaya is challenging the accounting standard that was agreed upon by the parties and thereby attempting to rewrite the agreement and improperly bring the dispute before an Accounting Arbitrator.

---

[1] Capitalized terms used but not defined herein shall have the meaning ascribed to them in the Sale Agreement.

[2] Respectively, (i) the "Nortel Accounting Principles," as defined in the Sale Agreement and (ii) the "Accounting Guidelines," as referenced in the definitions of both Calculation Principles and Nortel Accounting Principles.

In fact, the opposite is true.  In accordance with the very terms of the Sale Agreement, the explanation which Avaya has been seeking, but which the Debtors have refused to provide, is how the Debtors arrived at the higher values for excess and obsolete inventory in the absence of the documented mitigation plans which, under Nortel's own accounting guidelines, should have been appropriately supported and sufficiently documented.

Avaya does not challenge the accounting standard mandated by the Sale Agreement, notwithstanding the Debtors' attempt to lead this Court to believe otherwise.  Indeed, by this Objection, Avaya expressly agrees with Nortel and reaffirms the Debtors' assertion that, pursuant to the Calculation Principles, Inventory Value must be calculated strictly in accordance with the Calculation Principles, including the Nortel Accounting Principles and Accounting Guidelines.  Avaya submits, however, that it is the Debtors who are attempting to rewrite the Sale Agreement and value inventory in contravention of the agreed upon Calculation Principles. It is the Debtors who have failed to comply with the Calculation Principles, including Nortel's Accounting Principles and Accounting Guidelines, in preparing the Closing Statement.

In particular, documentation supporting the Debtors' mitigation plans with regard to inventory initially identified as being excess and/or obsolete that was required to be in the Debtors' possession pursuant to the Calculation Principles has not been provided to Avaya.  Had the Debtors adhered to the Calculation Principles, including Nortel's Accounting Principles and Accounting Guidelines, the Debtors would be able to produce the supporting documentation required to justify the claimed E&O Mitigation Plans (as defined in the Accounting Guidelines). However, in numerous instances, the requisite and appropriate supporting documentation was not delivered to Avaya by the Debtors.  By the Debtors' singular focus on the word "reasonable" in the Motion, the Debtors are introducing a distraction from the true issue, which is that

mitigation plans under Nortel's own Accounting Guidelines must be supported and documented in order to be recognized. The dispute between the Debtors and Avaya fits squarely within the arbitration procedures approved by this Court and, as contemplated by the Sale Agreement, should be resolved by an Accounting Arbitrator.

In mid-June 2010, in light of the Debtors' unwillingness or inability to substantiate their purported mitigation plans, Avaya undertook the investigation itself, with the assistance of outside consultants (retained at Avaya's expense). After a comprehensive product-level review, Avaya discovered that, under the Calculation Principles, as applied according to their stated terms, the value attributable to the disputed excess and obsolete inventory falls short of the Debtors' assertions by approximately $7.2 million. This represents a downward adjustment in the Debtors' favor of approximately $14.9 million from the amount initially set forth in Avaya's Disagreement Notice which was delivered on April 19, 2010 in accordance with the Sale Agreement. Avaya has already agreed to release from escrow approximately $10.6 million representing undisputed amounts. Avaya, however, has not agreed to and strongly opposes the release of any additional disputed escrow amounts until such time as a determination can be made by the Accounting Arbitrator, as mandated by the Sale Agreement, regarding all the disputed purchase price adjustments, including the $7.2 million at issue with respect to excess and obsolete inventory values.

Based on the foregoing, the Motion must be denied because the Debtors' requests contradict the clear terms of the Court approved Sale Agreement and the Escrow Agreement (defined below), and because approximately $7.2 million of purported value for excess and obsolete inventory still cannot be substantiated by the Debtors as required by the Calculation Principles, including Nortel's Accounting Principles and Accounting Guidelines.

## **FACTUAL BACKGROUND**

**Sale of the Enterprise Solutions Business**

1.        On July 20, 2009, Avaya and the Debtors entered into a stalking-horse purchase agreement (the "Stalking Horse Agreement") for Nortel's Enterprise Solutions Business (the "Enterprise Business").

2.        Also on July 20, 2009, the Debtors filed the *Debtors' Motion For Orders (I)(A) Authorizing The Debtors' Entry Into The Asset And Share Sale Agreement, (B) Authorizing And Approving The Bidding Procedures, (C) Authorizing And Approving A Break-Up Fee And Expense Reimbursement, (D) Approving The Notice Procedures, (E) Approving The Assumption And Assignment Procedures, (F) Authorizing The Filing Of Certain Documents Under Seal, And (G) Setting A Date For The Sale Hearing, And (II) Authorizing And Approving (A) The Sale Of Certain Assets Of And Equity Interests In, Debtors' Enterprise Solutions Business, (B) The Assumption And Assignment Of Certain Contracts And Leases And (C) The Assumption And Sublease Of Certain Leases* [D.I. 1131] (the "Enterprise Sale Motion") seeking approval of the sale of the Enterprise Business to Avaya pursuant the Stalking Horse Agreement, subject to the receipt of a higher and better offer at auction.

3.        Following the Court's approval of the bidding procedures by order dated August 4, 2009 [D.I. 1278], and an auction at which Avaya emerged as the successful bidder, the Court approved the sale of the Enterprise Business to Avaya for a base purchase price of $900 million, subject to certain purchase price adjustments, pursuant to the Amended and Restated Asset and Share Sale Agreement, dated as of September 14, 2009, by and among the Sellers and Avaya (the "Sale Agreement") by order dated September 16, 2009 [D.I. 1514].

4.        On September 14, 2009, in connection with the Sale of the Enterprise Business to Avaya, the Debtors and Avaya entered into that certain Amended and Restated Escrow

Agreement with Wells Fargo Bank, National Association, as escrow agent (the "Escrow Agreement").  The Escrow Agreement was established, among other purposes, to hold $30 million of sale proceeds pending the final determination of post-closing purchase price adjustments that were to be made pursuant to Section 2.2.3 of the Sale Agreement.

5.     On December 18, 2009, the sale of the Enterprise Business to Avaya closed (the "Closing") and Avaya paid the estimated purchase price of $943.5 million, which included the agreed-upon base purchase price of $900 million, plus certain estimated purchase price adjustments as calculated by Debtors.

**Post-Closing Purchase Price Adjustment Calculation Methodology**

6.     Pursuant to the terms of the Sale Agreement, the estimated purchase price paid at Closing was subject to post-closing adjustments, including a "Closing Inventory Adjustment," that were to be set forth in a Closing Statement delivered by the Debtors within sixty (60) days of the Closing.

7.     The Sale Agreement provided that the Closing Statement was to be prepared "in accordance with the Calculation Principles and the terms hereof."  The Sale Agreement defined Calculation Principles as the "Nortel Accounting Principles" and "other accounting principles, methodologies and policies for the determination of the Inventory Value" set forth in Section 1.1(c) of the Sellers Disclosure Schedules.  The Sale Agreement defined Nortel Accounting Principles as the accounting principles employed in the preparation of the Financial Statements, as set forth in Section 1.1(i) of the Sellers Disclosure Schedules.  The definitions of both Calculation Principles and Nortel Accounting Principles incorporate the Accounting Guidelines by reference to the Sellers Disclosure Schedules.

8.     The Sellers Disclosure Schedules referenced specific guidelines for the accounting treatment of excess or obsolete inventory, including (i) Accounting Guideline No.

1033 (Inventory and Cost of Sales) which, with respect to excess and obsolete inventory, stated

that the net realizable value[3] of inventory "may be less than the product of the quantity and sales

price <u>if</u> quantities on hand are in excess of the amount that can <u>reasonably</u> be sold" (emphasis

added) and (ii) Accounting Guideline No. 1004 (Excess and Obsolete Inventory Provisions),

based on U.S. GAAP principles,[4] which required "adequate support [to] exist for the conclusions

reached" and that "sufficient and appropriate documentation" be maintained and "attached as

supporting documentation to the adjusting transaction."

     9.     Accounting Guideline No. 1004 further required that a full reserve provision be

recorded for all excess or obsolete inventory (the "<u>E&O Provision</u>"), meaning that no Inventory

Value could be attributable to such inventory, or that appropriate documentation be developed

and maintained to support any exception to that policy, pursuant to mitigation plans ("<u>E&O</u>

<u>Mitigation Plans</u>") or other exceptions ("<u>E&O Exceptions</u>").[5]  Appendix A to Accounting

---

[3] "Net realizable value" is defined in Accounting Guideline 1004, subsection 2.1(b)(i): "estimated selling
price…less reasonably predictable costs of…disposal."

[4] AG No. 1004 states "[t]his Guideline is based on US GAAP principles."

[5] See AG No. 1004 §§ 2.1(e),  3.1(a)(iii),  3.1(a)(v),  3.1(b)(ii),  3.2(b)(ii),  and 3.2(c)(i).

- AG No. 1004 section 2.1(e) provides that "[a] full E&O Provision must be recorded for all <u>Excess</u> and
  <u>Obsolete</u> Inventory to ensure that inventory is recorded at lower cost or market." (emphasis in original).

- AG No. 1004 section 3.1(a)(iii) provides, in the pertinent part, that "[s]ufficient and appropriate
  documentation for all procedures performed in connection with the E&O Review should be maintained and
  attached as supporting documentation to the adjusting transaction . . . "

- AG No. section 3.1(a)(v) provides, in the pertinent part, that the Initiator is responsible for "[ensuring] that
  the quarterly E&O Review is appropriately documented and that adequate support exists for the
  conclusions reached . . . "

- AG No. section 3.1(b)(ii) provides that the Materials Management Group is responsible for "[determining]
  the E&O Exceptions and the E&O Mitigation Plan and [for providing] the supporting documentation . . . "

- AG No. section 3.2(b)(ii) provides that the Reviewer is responsible for "[ensuring] that the assumptions and
  estimates used in the E&O Review are relevant and appropriate in the circumstances and that they are fully
  documented . . . "

- AG No. section 3.2(c)(i) provides that the Approver is responsible for "[ensuring] there is sufficient and
  appropriate documentation for the E&O Review . . . "

Guideline 1004 makes clear that adjustments to E&O Provisions may only be made when valid

E&O Exceptions and/or E&O Mitigation Plans exist:

> Where the balance on hand exceeded the AGR,[6] the excess was deemed
> to be Excess Inventory.  Any items on hand whose AGR was zero were
> deemed to be Obsolete Inventory.  A full E&O Provision must be made
> for all Excess and Obsolete Inventory.  The only reasons for not
> recording a full E&O Provision is when an E&O Exception and/or
> Mitigation Plan exists to support the assertion that, while the balance on
> hand may exceed AGR, the net realizable value of the inventory exceeds
> its cost basis. (emphasis added).

*See* Appendix A to Accounting Guideline 1004, ¶ 3.

**Post-Closing Purchase Price Adjustment Dispute Resolution**

10.    On February 16, 2010, the Sellers delivered to Avaya the Closing Statement

which included, among other things, Inventory Value of approximately $93.3 million for Voice

and Data inventory,[7] of which approximately $24.6 million was attributable to a write up of

excess or obsolete inventory on account of the claimed existence of E&O Mitigation Plans, as

defined in the Nortel Accounting Principles.

11.    Further, in contravention of the Sale Agreement, on April 16, 2010, 59 days after

they were required to deliver their "final calculation" of the Closing Inventory Adjustment as

mandated by Section 2.2.3.1(a) of the Sale Agreement and one (1) business day before Avaya's

Disagreement Notice was due, the Debtors attempted to deliver substantial revisions to the

Closing Statement.

12.    On April 19, 2010, Avaya delivered to the Debtors the Disagreement Notice,

asserting that the Inventory Value must be further decreased by approximately $25.5 million.  Of

the approximately $25.5 million, approximately $22.1 million of the requisite downward

---

[6] Annual Gross Requirements, which means the 12-month demand for a Product, as derived from internal sales and unit forecasts.

[7] This does not include Spares and Service Inventory.  Total Inventory Value on the Closing Statement, including Spares and Services Inventory, was $105.1 million.

adjustment was due to the lack of adequate substantiation by the Debtors with respect to E&O Mitigation Plans.[8]

13.    On April 21, 2010, the Debtors responded to Avaya's Disagreement Notice and requested "part level details" underlying Avaya's calculations with regard to, among other things, Adjustment A#1.  The Debtors also proposed, in light of the short period of time provided in Section 2.2.3.1(c) of the Sale Agreement to negotiate and resolve disagreements, to appoint Grant Thornton LLP as Accounting Arbitrator if referral of matters to an Accounting Arbitrator became necessary.  Section 2.2.3.1(c) of the Sale Agreement provides in part:

> If the Purchaser and the Main Sellers and the EMEA Sellers are unable to resolve any disagreement as contemplated by Section 2.2.3.1(b) within fourteen (14) days after delivery of a Disagreement Notice by the Purchaser, either the Main Sellers, the EMEA Sellers or the Purchaser may appoint the Accounting Arbitrator, on behalf of all Parities and the EMEA Sellers, to resolve such disagreement. (emphasis added).

14.    On April 26, 2010, Avaya provided some of the requested additional information supporting Avaya's calculation set forth in the Disagreement Notice, including code-level detail regarding certain excess and obsolete inventory which Avaya had objected to in Adjustment A#1 of the Disagreement Notice.  Avaya was not able to supply all of the requested information because of the Debtors' inability substantiate their compliance with the Calculation Principles, including Nortel's Accounting Principles and Accounting Guidelines, in preparing the Closing Statement.

15.    Also on April 26, 2010, Avaya requested details regarding all of the Debtors' purchase price adjustment calculations, including information supporting the calculation for

---

[8] This approximately $22.1 million adjustment is referred to as "Adjustment #A1" in the Disagreement Notice and in this document.  There are a number of other adjustments set forth in the Disagreement Notice that the parties have agreed are subject to the arbitration procedures set forth in the Sale Agreement.

excess and obsolete inventory (the "April 26 Request").  Specifically, Avaya requested

information regarding any potential E&O Mitigation Plans, including:

- Last Time Buys. Material purchased to support an existing product/design for an extended period of time because the material or any of its components were scheduled to be discontinued by the manufacturer.

- Reworks.   A plan to mitigate the excess inventory by reworking the material or part so that it can be used to support different products.

- Broker Sales.  Excess inventory identified as plausible for sale into the secondary market.

No such information, however, was delivered to Avaya notwithstanding that, under Nortel

Accounting Guideline 1004, such information should have been documented and maintained by

the Debtors in order for an E&O Mitigation Plan to be factored into inventory values.

16.      On May 21, 2010, the Debtors provided additional detail with respect to the

excess and obsolete inventory, but objected to Avaya's entitlement to dispute further the

Debtors' calculations of excess and obsolete inventory, mischaracterizing such dispute as being

based on the "reasonableness" of Nortel's E&O Mitigation Plans.  The Debtors concluded that

such issues "are not susceptible to resolution by an Accounting Arbitrator under the terms of the

[Sale] Agreement."

17.      On June 11, 2010, Avaya notified the Debtors that it disagreed with the Debtors

regarding arbitration, noting that the Sale Agreement did not make the distinction relied on by

the Debtors as to what disagreements were and were not susceptible to arbitration.

Notwithstanding the disagreement, Avaya stated that it would continue good faith negotiations

and would, at its own expense, conduct a comprehensive product-level investigation to verify

whether the E&O Mitigation Plans were consistent with the Calculation Principles and that

Avaya expected to share with the Debtors its conclusions by June 30, 2010.

18.     By letter dated June 14, 2010, notwithstanding the Debtors' knowledge that Avaya was engaged in a comprehensive product-level investigation of Adjustment #A1 as part of Avaya's continuing efforts to engage in good faith negotiations, the Debtors arbitrarily set June 18, 2010 as the deadline by which they demanded all outstanding issues relating to Adjustment #A1 be resolved.

19.     On June 18, 2010, Avaya reiterated to the Debtors that Avaya had retained outside consultants and had begun expeditiously collecting information regarding the E&O Mitigation Plans.  Avaya also stated that, based on its work completed to date, Avaya expected to revise downward the dollar amount in dispute as set forth in Adjustment #A1 and provide a summary of its findings by June 30, 2010.

**The Debtors' Motion**

20.     On June 25, 2010, despite Avaya's continuing efforts to engage in good faith efforts to resolve this dispute, the Debtors filed the Motion.  The Motion asks the Court to negate Avaya's contractual rights to challenge the Debtors' calculation of excess and obsolete inventory values, arguing that the Sale Agreement prohibits Avaya from questioning the plausibility of any E&O Mitigation Plan.  By the Motion, the Debtors further seek to circumvent the dispute resolution provision under the Sale Agreement, arguing that the issue of whether the E&O Mitigation Plans were accounted for in accordance with the Calculation Principles could not be submitted to an accounting arbitrator along with other disputed purchase price adjustments and that Avaya should be forced to accept the Debtors' calculation.

21.     Finally, by the Motion, the Debtors also requested this Court compel the release of approximately $19.2 million plus accumulated interest on the escrowed amounts from the Escrow Agent to the Debtors even though the procedures for access to the escrow account, which are an integral part of the Sale Agreement approved by this Court, have not been complied with.

To add insult to injury, the Debtors also requested this Court waive the stay applicable to the effectiveness of any order granting the relief sought in the Motion pursuant to Rule 6004(h) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") such that the allegedly "undisputed amounts held in escrow may be released upon entry of the order." *See* Motion at ¶ 21.

**Avaya's Findings**

22.     Notwithstanding the filing of Debtors' Motion, Avaya has proceeded to finalize its product-level review and to gather the information that the Debtors were unwilling or unable to provide with respect to the E&O Mitigation Plans.  Based on the considerable work Avaya completed during the three-week analysis, and despite the Debtors' failure to provide the required support and documentation, Avaya has concluded that the Inventory Value ascribed to a significant portion of the disputed inventory amount was roughly consistent with the Inventory Value that would have been applied had Sellers properly applied the Calculation Principles. However, based on its product-level analysis, Avaya still disputes approximately $7.2 million related to categories of products for which there was no supportable basis for an E&O Exception or E&O Mitigation Plan under the Nortel Accounting Principles.

<div align="center">

**OBJECTION**
</div>

I.      **There Continues to be a Bona Fide Dispute
        Because the Debtors' Calculation of Excess
        and Obsolete Inventory Value Was Not
        Consistent with the Calculation Principles**

23.     The Debtors assert that the Voice and Data inventory transferred to Avaya pursuant to the Sale Agreement has a total value of approximately $93.3 million.  This total includes approximately $24.6 million attributable to a write up of excess or obsolete inventory on account of the claimed existence of E&O Mitigation Plans (e.g., reallocation or redeployment

<div align="center">

12
</div>

to another business).  Under the Debtors' own accounting principles and guidelines, however, the

write-up of excess and obsolete inventory on the basis of an E&O Mitigation Plan must be

documented and sufficiently supportable.

24.     In addressing the valuation of inventory, including excess and obsolete inventory,

Section 2.2.7 of Accounting Guideline No. 1033 states, in relevant part:

> The net realizable value of Inventory may be less than the product
> of the quantity and sales price if quantities on hand are in excess of
> the amount that <u>can reasonably be sold</u> (emphasis added).

Addressing adjustments that may be made to the valuation of excess and obsolete inventory,

Accounting Guideline 1004 states, in relevant parts:

> The E&O Review is based on previous month-end balances and includes
> the following steps.  <u>Sufficient and appropriate documentation</u> for all the
> procedures performed in connection with the E&O Review should <u>be
> maintained and attached as supporting documentation to the adjusting
> transaction</u>.
>
> It is the responsibility of the Initiator or Finance Prime to ...[g]ather
> details of E&O Exceptions and the E&O Mitigation Plans that would
> result in reducing the E&O Provision otherwise calculated...[and to
> e]nsure that the quarterly E&O Review is <u>appropriately documented and
> that adequate support exists for the conclusions reached</u>.
>
> The Materials Management Group is responsible for providing
> documentation to support the E&O Exceptions and the E&O Mitigation
> Plans.  (emphasis added)

Similarly, Appendix A to the Accounting Guideline No. 1004 states that in order for items

representing specific E&O Exceptions and Mitigation Plans to "be factored out of the E&O

provision amount" the basis of such determinations must be "sufficiently supportable and

documented."

25.     Contrary to the Debtors' arguments, and as explicitly stated in the foregoing

Accounting Guidelines, "reasonableness" is a factor in determining the value of excess and

obsolete inventory under the Calculation Principles.  Moreover, the Debtors' obligation to

provide adequate support and sufficient documentation is absolute, and <u>not</u> optional.  The
Debtors have completely failed to comply with the support and documentation requirements
under Nortel's Accounting Guidelines, and the Motion thereby lacks merit and must be denied.

26.      As described above, Avaya initially requested, but the Debtors failed to provide,
substantiation with respect to approximately $22.1 million of mitigation related write-ups
challenged in Adjustment #A1 of the Disagreement Notice.  The Debtors attributed their failure
to an alleged limited access to both the Debtors' books and records and to the former employees
having knowledge of the E&O Mitigation Plans.  As a result, Avaya was compelled to conduct
the analysis that the Debtors should have performed prior to designating E&O Exceptions and
E&O Mitigation Plans under Nortel's own accounting standards.  Based on Avaya's analysis,
Avaya has concluded that Debtors' valuation of approximately $15 million of excess and
obsolete Inventory Value, while not in compliance with the Calculation Principles, is roughly
consistent with the Inventory Value that would have been attributable to such inventory had the
Sellers properly applied the Calculation Principles (including the Nortel Accounting Principles
and Accounting Guidelines) and Avaya, thus, will not dispute this amount.

27.      However, the Debtors have not provided any support and documentation, as
required by the Calculation Principles (including the Nortel Accounting Principles and
Accounting Guidelines), to justify mitigation of the remaining approximately $7.2 million of
disputed Inventory Value.  Therefore, no E&O Mitigation Plan or E&O Exception was
warranted and no Inventory Value should have been attributed to this disputed $7.2 million
amount.

**II.  The Dispute Over the Closing Inventory
Adjustment is Clearly an Arbitratable Issue
under the Terms of the Sale Agreement and
the Arbitration Provision Should be Enforced**

28.     Contrary to the Debtors' contention, the Closing Inventory Adjustment is subject

to arbitration under the terms of the Sale Agreement.  Section 2.2.3.1(b) permits the Purchaser to

deliver a Disagreement Notice setting forth "in reasonable detail, <u>any</u> disagreement with, and <u>any</u>

requested adjustment to the Closing Statement."  Section 2.2.3.1(c) of the Sale Agreement states,

> If the Purchaser and the Main Sellers and the EMEA Sellers are unable
> to resolve <u>any</u> disagreement contemplated under Section 2.2.3.1(b),
> either the Main Sellers, the EMEA Sellers of the Purchaser may appoint
> the Accounting Arbitrator, on behalf of all Parties and the EMEA Sellers,
> to resolve such disagreement.

Contrary to the baseless suggestion of the Debtors, the Sale Agreement simply does not limit the

scope of issues relating to the Closing Statement calculations that can be submitted to arbitration.

29.     Moreover, unlike the misleading suggestions set forth in the Motion, Avaya does

not challenge the methodology agreed to under the Sale Agreement.  Indeed, Avaya accepts that

the Closing Inventory Adjustment must be calculated in accordance with Calculation Principles,

including the Nortel Principles and Accounting Guidelines.  In fact, Avaya asserts it is the

Debtors who are attempting to rewrite the Sale Agreement and value inventory in contravention

of the agreed upon Calculation Principles.  If the Debtors had adhered to their own accounting

principles and guidelines, the Debtors would be able to produce the supporting documentation

required to justify E&O Mitigation Plans.  However, no proper supporting documentation was

delivered by the Debtors.  Due to the Debtors' singular focus on the word "reasonable," the

Sellers entirely obfuscate the point that mitigation plans under the Calculation Principles and

Nortel's own accounting standards must be substantiated in order to be recognized.

30.     Moreover, arbitration is especially appropriate in this instance, where the dispute at issue is not "substantively core," such as an automatic stay violation or an avoidance action (both contexts where courts have declined to enforce valid arbitration agreements).[9]  Here, by contrast, the dispute concerns a technical disagreement related to Closing Statement calculations whose resolution by an Accounting Arbitrator was explicitly contemplated and provided for in the Court-approved Sale Agreement.  *See* Sale Agreement, § 2.2.3(c).  This Court has previously noted that "even though it is generally preferable to have all issues pertaining to property of the estate and claims against the estate decided in a single forum, that rule is not without exception"[10] and held that arbitration clauses are enforceable where claims are not rooted in the Bankruptcy Code.[11]  Considerations of judicial economy also heavily favor arbitration here as three other purchase price-related adjustment disputes may be submitted by the Parties for arbitration.  Accordingly, the Debtors should not be permitted to cherry-pick one out of multiple Purchase Price adjustment disputes and present a dispute for resolution before this Court when the Debtors have expressly agreed to arbitrate under the Court-approved Sale Agreement.

31.     Furthermore, the Federal Arbitration Act requires arbitration provisions be vigorously enforced.  Under section 2 of the Federal Arbitration Act (the "FAA"), a court is required to compel parties to comply with a valid and enforceable arbitration agreement in any "contract evidencing a transaction involving commerce" to arbitrate disputes related to that

---

[9] *See, e.g., In re Cavanaugh,* 271 B.R. 414 (Bankr. D. Mass. 2001) (declining to enforce arbitration clause in litigation commenced by chapter 7 debtor for willful violation of the automatic stay); *In re Gandy,* 299 F.3d 489, 495-96 (5th Cir. 2002) (upholding bankruptcy court discretion to decline to refer to arbitration avoidance and recovery claims under Sections 548 and 550 of the Bankruptcy Code).

[10] *SFC Holdings, Inc. v. The Earth Grains Co. et al. (In re GWI, Inc.),* 269 B.R. 114, 119 (Bankr. D. Del. 2001).

[11] *Official Comm. of Unsecured Creditors of Teu Holdings v. Kemeny (In re Teu Holdings, Inc.),* 287 B.R. 26, 37 (Bankr. D. Del. 2002).

agreement.  9 U.S.C. § 2.[12]  The Supreme Court's interpretation of the phrase "involving

commerce" empowers courts to apply the FAA to the full extent of the Commerce Clause.

*Allied-Bruce Terminix Cos., Inc. v. Dobson*, 513 U.S. 265, 273-75 (1995).  Thus, the FAA

governs the construction of an arbitration clause so long as the subject of the transaction

underlying the contract affects interstate commerce.  *Id.*  The subject matter of the Sale

Agreement at issue here – the sale of the Enterprise -Business – constitutes interstate commerce.

Among other things, Purchaser (a company headquartered in the State of Delaware) acquired the

Enterprise Business, whose assets are located throughout multiple states in the United States and

the world.  Accordingly, the Sale Agreement involves interstate commerce and the FAA

mandates the enforcement of the Sale Agreement's arbitration provisions.

      32.     Contractual arbitration provisions are only unenforceable in the rare event that the

FAA's mandates are expressly overridden by Congress.  The Bankruptcy Code, as enacted in

1978, was premised on a broad grant of jurisdiction to the bankruptcy courts that fundamentally

conflicted with the mandate of the FAA.[13]  Following the passage of the Bankruptcy

Amendments and Federal Judgeship Act of 1984 and a succession of Supreme Court opinions

recognizing the strong federal policy favoring arbitration, however, bankruptcy courts were left

with significantly less discretion to override the FAA.  *See generally* Neufeld at 557-58 ("The

traditional reluctance of the bankruptcy courts to yield jurisdiction to arbitration proceedings is

---

[12] Section 2 of the FAA states in the pertinent part:

> A written provision in any maritime transaction or a contract evidencing a transaction involving commerce
> to settle by arbitration a controversy thereafter arising out of such contract or transaction, or the refusal to
> perform the whole or any part thereof, or an agreement in writing to submit to arbitration an existing
> controversy arising out of such contract, transaction, or refusals, shall be valid, irrevocable, and
> enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract.

  9 U.S.C. § 2.

[13] *See* Fred Neufeld, *Enforcement of Contractual Arbitration Agreements Under the Bankruptcy Code*, 65 AM.
BANKR. L.J. 525, 530-31 (1991) (hereinafter Neufeld).

no longer in step with the strong jurisprudence of the Supreme Court supporting arbitration" and

the bankruptcy statute thought to conflict with the FAA is "no longer the law."). As the Supreme

Court stated in *McMahon*:

> The Arbitration Act, standing alone, therefore mandates enforcement of agreements to arbitrate statutory claims. Like any statutory directive, the Arbitration Act's mandate may be overridden by a contrary congressional command. The burden is on the party opposing arbitration, however, to show that Congress intended to preclude a waiver of judicial remedies for the statutory rights at issue. If Congress did intend to limit or prohibit waiver of a judicial forum for a particular claim, such an intent 'will be deducible from [the statute's] text or legislative history' or from an inherent conflict between arbitration and the statute's underlying purposes.

*Shearson/Am. Express, Inc. v. McMahon*, 482 U.S. 220, 226-27 (1987). Applying the principles

of *McMahon* to the Bankruptcy Code, courts in this and other circuits have consistently

acknowledged the strong policy favoring arbitration despite the bankruptcy proceedings of one

party. *See, e.g.*, *Hays & Co. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 885 F.2d 1149,

1160 (3d Cir. 1989) (describing FAA's statutory mandate as "a clear congressional rejection of

judicial skepticism regarding the utility of arbitration"); *see also MBNA Am. Bank. v. Hill*, 436

F.3d 104, 108 (2d Cir. 2006).

**III.    This Court Should Not Compel the Immediate Release Of Escrow Funds Absent the Debtors' Strict Compliance With the Applicable Procedures Set Forth in the Sale Agreement and the Escrow Agreement**

33.    To add insult to injury, the Debtors request the Court compel the immediate

release of approximately $19.2 million plus accumulated interest of the escrowed purchase price

from the Escrow Agent to the Debtors even though the procedures for access to the escrow

account have not been complied with. Subsections 4(a) and 4(b) of the Escrow Agreement, an

integral part of the Sale Agreement which the Court has already approved, and subsection

2.2.6(b) of the Sale Agreement clearly set forth the procedures for the payment of escrow funds

(including the Purchase Price Adjustment Escrow Fund) and the procedures for addressing disputes arising in connection therewith.

34.    Under section 4(a) of the Escrow Agreement, funds may only be released from escrow either by delivery of a joint written instruction by the Debtors and Avaya to the Escrow Agent directing release of the funds or by a final, non-appealable court order directing the release of the funds.  Pursuant to the same subsection, however, Avaya is only required to execute instructions to the Escrow Agent at a time when the Sellers "become[ ] entitled to such payment from the relevant Escrow Account pursuant to the [Sale Agreement] . . . . "  Section 2.2.6(b) of the Sale Agreement approved by this Court reiterates the point, clearly stating that Avaya is only required to execute and deliver to the Escrow Agent joint instructions for the release of escrow funds when the Sellers "become entitled to such payment" pursuant to the Sale Agreement.

35.    The arbitration provisions set forth in subsection 2.2.3.1(c) of the Sale Agreement, however, plainly set forth when a party thereunder becomes "entitled" to release of escrow funds associated with a post-closing purchase price adjustment dispute.  The subsection states, in the relevant part:

> If the Purchaser and the [Sellers] are unable to resolve any disagreement as contemplated by Section 2.2.3.1(b) [regarding the Closing Statement,] either the [Sellers] or the Purchaser may appoint the Accounting Arbitrator . . . to resolve such disagreement.  (emphasis added)

36.    The arbitration provision further states that the Accounting Arbitrator's report and the Closing Statement, as adjusted thereby, "shall be final and binding upon the Parties and the EMEA Sellers."  The Sellers' naked assertion that approximately $19.2 million are not in dispute is an attempt to have this Court prejudge the outcome of the arbitration procedures required under subsection 2.2.3.1(b) of the Sale Agreement.  In so doing, the Debtors would have this Court believe it is Avaya who is refusing to comply with the terms of the arbitration procedures

and the procedures for the release of escrow funds, when, in fact, it is the Debtors who are

attempting to renege on the Court-approved dispute resolution and escrow release procedures.

Moreover, to compound the insult, the Debtors seek a waiver of the stay pending appeal

applicable pursuant to 6004(h) to any order granting the relief requested in the Motion.

      37.    Based on the foregoing, Avaya requests the Court deny the Motion because,

beyond heeding the strong federal policy favoring arbitration, the Sale Agreement already

approved by this Court provides the arbitration provisions governing the dispute at issue.  The

Court should not indulge the Debtors in their request to rewrite the Sale Agreement and the

Escrow Agreement, but should instead hold the Debtors to the terms of the Sale Transaction as

approved by the Court.  Granting the Motion would amount to rewriting the Sale Agreement and

needlessly call for an unnecessary evidentiary hearing in connection with the dispute.

**CONCLUSION**

WHEREFORE, for all the reasons set forth above, Avaya requests that the Court deny the Motion, and grant such other and further relief as is just and proper.

Dated: July 9, 2010
Wilmington, DE

PEPPER HAMILTON LLP

By: /s/ Michael J. Custer
David B. Stratton (DE 960)
Michael J. Custer (DE 4843)
Hercules Plaza - Suite 5100
1313 Market Street
P.O. Box 1709
Wilmington, DE 19801-1709
Telephone: (302) 777-6500
Facsimile: (302) 421-8390

-and-

ROPES & GRAY LLP
Steven T. Hoort (*pro hac vice admission pending*)
Anneliese H. Pak (*pro hac vice admission pending*)

1211 Avenue of the Americas
New York, New York 10036-8704
Tel: (212) 596-9000
Fax: (212) 596-9090

*Attorneys for Avaya Inc.*