**<u>EXHIBIT A</u>**

Court File No. 09-CL-7950

*ONTARIO*
**SUPERIOR COURT OF JUSTICE**
**(COMMERCIAL LIST)**

**IN THE MATTER OF THE *COMPANIES' CREDITORS***
***ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED**

**AND IN THE MATTER OF A PLAN OF**
**COMPROMISE OR ARRANGEMENT OF**
**NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED,**
**NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS**
**INTERNATIONAL CORPORATION AND NORTEL NETWORKS**
**TECHNOLOGY CORPORATION**

**FIFTY-SECOND REPORT OF THE MONITOR**
**DATED AUGUST 30, 2010**

## INTRODUCTION

1.  On January 14, 2009 (the "Filing Date"), Nortel Networks Corporation ("NNC" and
    collectively with all its subsidiaries "Nortel" or the "Company"), Nortel Networks Limited
    ("NNL"), Nortel Networks Technology Corporation ("NNTC"), Nortel Networks
    International Corporation and Nortel Networks Global Corporation (collectively the
    "Applicants") filed for and obtained protection under the *Companies' Creditors*
    *Arrangement Act* ("CCAA"). Pursuant to the Order of this Honourable Court dated January
    14, 2009, as amended and restated (the "Initial Order"), Ernst & Young Inc. ("EYI") was
    appointed as the Monitor of the Applicants (the "Monitor") in the CCAA proceedings. The
    stay of proceedings was extended to July 22, 2010 by this Honourable Court in its Order
    dated April 14, 2010.

2.  Nortel Networks Inc. ("NNI") and certain of its U.S. subsidiaries concurrently filed
    voluntary petitions under Chapter 11 of the U.S. Bankruptcy Code (the "Code") in the
    United States Bankruptcy Court for the District of Delaware (the "U.S. Court") on January
    14, 2009 (the "Chapter 11 Proceedings"). As required by U.S. law, an official committee
    of unsecured creditors (the "Committee") was established in January, 2009.

- 2 -

3.    An ad hoc group of holders of bonds issued by NNL, NNC and Nortel Networks Capital Corporation has been organized and is participating in these proceedings as well as the Chapter 11 Proceedings (the "Bondholder Group"). In addition, pursuant to Orders of this Honourable Court dated May 27, 2009, July 22, 2009, and July 30, 2009, respectively, representative counsel was appointed on behalf of the former employees of the Applicants, the continuing employees of the Applicants and the LTD Beneficiaries, and each of these groups is participating in the CCAA proceedings.

4.    Nortel Networks (CALA) Inc. ("NN CALA" and together with NNI and certain of its subsidiaries that filed on January 14, 2009, the "U.S. Debtors") filed a voluntary petition under Chapter 11 of the Code in the U.S. Court on July 14, 2009.

5.    Nortel Networks UK Limited ("NNUK") and certain of its subsidiaries and affiliates located in EMEA were granted administration orders (the "UK Administration Orders") by the High Court of England and Wales on January 14, 2009 (collectively the "EMEA Debtors"). The UK Administration Orders appointed Alan Bloom, Stephen Harris, Alan Hudson and Chris Hill of Ernst & Young LLP as administrators of the various EMEA Debtors, except for Nortel Networks (Ireland) Limited, to which David Hughes (Ernst & Young LLP Ireland) and Alan Bloom were appointed (collectively the "Joint Administrators"). On June 8, 2009, the Joint Administrators appointed in respect of NNUK filed a petition with the U.S. Court for recognition of the administration proceedings as they relate to NNUK (the "English Proceedings") under Chapter 15 of the Code. On June 26, 2009, the U.S. Court entered an order recognizing the English Proceedings as foreign main proceedings under Chapter 15 of the Code.

6.    Subsequent to the filing date, Nortel Networks SA commenced secondary insolvency proceedings within the meaning of Article 27 of the European Union's Council Regulation (EC) No 1346/2000 on Insolvency Proceedings in the Republic of France pursuant to which a liquidator and an administrator have been appointed by the Versailles Commercial Court.

7.    Subsequent to the Filing Date, certain other Nortel subsidiaries have filed for creditor protection in the local jurisdiction in which they are located.

- 3 -

**PURPOSE**

8.    The purpose of this Fifty-Second Report of the Monitor (the "Fifty-Second Report") is to

provide this Honourable Court with information regarding the Applicants' motion seeking:

- approval of an asset sale agreement dated August 26, 2010 (the "PSP Agreement"), amongst NNC, NNL and NNI (the "Main Sellers") and certain of their affiliates (the "Other Sellers" and, with the Main Sellers, the "Sellers"), and PSP Holding LLC ("PSP" or the "Purchaser") in respect of the sale of substantially all of the assets of Nortel's Multi-Service Switch business (the "MSS Business") as a "stalking horse" agreement;

- approval of the terms and conditions of the Seller Break-up Fee and Seller Expense Reimbursement (each as defined below);

- approval of the Side Agreement (as defined below);

- approval of the Bidding Procedures (as defined below);

- a sealing order in respect of the exhibits and the Sellers Disclosure Schedule to the PSP Agreement and the non-redacted Side Agreement for the reasons set out below;

and to provide the Monitor's support in respect thereof.

**TERMS OF REFERENCE**

9.    In preparing this Fifty-Second Report, EYI has relied upon unaudited financial information, the Company's books and records, financial information prepared by the Company and discussions with the management of Nortel.  EYI has not audited, reviewed nor otherwise attempted to verify the accuracy or completeness of the information and, accordingly, EYI expresses no opinion or other form of assurance on the information contained in this Fifty-Second Report.

- 4 -

10. Unless otherwise stated, all monetary amounts contained herein are expressed in U.S. dollars.

11. Capitalized terms not defined in this Fifty-Second Report are as defined in the Affidavit of John Doolittle sworn on January 14, 2009 (the "Doolittle Affidavit"), the Pre-Filing Report, previous Reports of the Monitor, the PSP Agreement or the Bidding Procedures.

12. The Monitor has made various materials relating to the CCAA proceedings available on its website at www.ey.com/ca/nortel. The Monitor's website also contains a dynamic link to Epiq Bankruptcy LLC's website where materials relating to the Chapter 11 Proceedings are posted.

## THE MULTI-SERVICE SWITCH BUSINESS

### Background

13. The MSS Business is not operated through a dedicated legal entity or stand-alone division. Generally, Nortel has one legal entity in each country in which it operates and sales of all Nortel products and services in that country are made through that single legal entity. A more detailed description of this structure is set out in the Pre-Filing Report.

14. The MSS product is a high capacity, high reliability multi-service switch that can aggregate and route different kinds of traffic such as data, video, voice and various other protocols for transmission in a combined fashion.

15. The MSS Business delivers products and services principally to telecommunications services providers and multi-system operators, and is also used by other former Nortel business units within various network products that they sell.

16. The MSS Business had global revenues of approximately $350 million in fiscal 2009, including Canadian revenue of approximately $4 million representing approximately 1% of global MSS revenue. The MSS Business previously operated as a division of Nortel's MEN

- 5 -

business, which was sold in March, 2010, and therefore it is difficult to produce and compare historical financial results and other detailed financial information.

17.  In addition, the Applicants have an interest in the intellectual property upon which the products of the MSS Business are based.  Generally speaking, the owner of the intellectual property in the Nortel group, which in most cases is NNL, licenses the intellectual property in question to various other Nortel legal entities around the world, in some cases on an exclusive basis and in other cases, on a non-exclusive basis.  These Nortel entities in turn license the intellectual property related to the MSS Business to customers in their respective geographic regions.

18.  The MSS Business utilizes the services of approximately 330 full time equivalent employees.  This includes approximately 250 individuals directly involved in the MSS Business (the "Employees") as well as additional individuals in other Nortel functional areas and corporate departments that support the MSS Business.  Of the 250 individuals dedicated to the MSS Business, approximately 66 are located in Canada.

*Sale Process*

19.  In February 2010, Nortel commenced efforts to market the MSS Business.  With the assistance of Lazard Frères & Co., the Company approached or was contacted by 51 buyers or buyer groups.  As a result of those efforts, 27 parties indicated an interest in purchasing the MSS Business, executed confidentiality agreements, and were provided with a confidential information memorandum.  Eighteen parties participated in management presentations and ultimately five parties were given access to a confidential electronic data room containing due diligence materials for the MSS Business.

20.  On June 7, 2010, Nortel entered into an agreement to negotiate exclusively with one of these bidders.  This agreement (and any extensions thereof) expired on June 25, 2010.  Despite extensive good faith negotiations during the exclusivity period and continuing for a further period subsequent to the expiration of the exclusivity agreement, Nortel and this bidder were unable to agree on the terms of a transaction that were mutually acceptable to both parties.

- 6 -

21.  As a result, following the expiration of the exclusivity agreement described above, Nortel resumed negotiations with two other bidders that had previously conducted extensive due diligence.  Following weeks of these resumed negotiations, Nortel ultimately entered into the PSP Agreement as described below.

22.  The Monitor has had extensive involvement in the sale process including attending and participating in management presentations and negotiations with prospective buyers as described above, performing its own review of materials submitted by prospective purchasers (including the PSP Agreement) and providing input to the Company with respect to these matters.


**THE PSP AGREEMENT**

23.  On August 26, 2010, the Sellers entered into the PSP Agreement with the Purchaser. Concurrently, the EMEA Sellers, the Joint Administrators and the Joint Israeli Administrators entered into a separate Asset Sale Agreement (the "EMEA ASA") with PSP dated August 26, 2010.  Collectively, the PSP Agreement and the EMEA ASA set forth the terms of the Sellers' and the EMEA Sellers' sale of the assets and certain associated liabilities of the MSS Business to PSP.  The PSP Agreement (excluding exhibits and the Sellers Disclosure Schedule) is attached as Appendix "A" hereto.  A copy of the exhibits and the Sellers Disclosure Schedule to the PSP Agreement is attached as confidential Appendix "B" hereto.  As these exhibits and schedules contain sensitive competitive information and information with respect to employees, the Monitor requests that confidential Appendix "B" to this Fifty-Second Report be sealed by this Honourable Court.

24.  PSP is a special purpose entity to be funded at closing of the transaction contemplated by the PSP Agreement by Marlin Equity Partners ("Marlin") and Samnite Technologies Inc., a communications technology company based in Ottawa.  Marlin is a private investment firm based in California with over $1 billion of capital under management. Since 2005, Marlin, through its group of funds and related companies, has acquired over 30 businesses across a variety of industries.

- 7 -

25.  A summary of the key provisions of the PSP Agreement is provided in the paragraphs that follow.  Reference should be made directly to the PSP Agreement, a copy of which is attached as Appendix "A" hereto, for a complete understanding of the terms governing the proposed transactions.

*Assets*

26.  The assets of the Sellers relating to the MSS Business being sold are as follows (collectively, the "Assets"):

- the Owned Inventory as of the Closing Date;

- the Owned Equipment as of the Closing Date;

- the Assigned Contracts;

- all rights of the Sellers as of the Closing Date under non-disclosure, confidentiality, non-compete or non-solicitation agreements that are Assigned Contracts or that relate exclusively to the MSS Business;

- the tangible embodiments of the Business Information existing as of the Closing Date;

- the Transferred Intellectual Property as of the Closing Date, subject to license rights granted to NNL, NNI and each of the EMEA Sellers pursuant to the Intellectual Property License Agreement and other licenses granted prior to the Closing Date, together with, amongst other things, all income, royalties, damages and payments due or payable after the Closing Date relating to the Transferred Intellectual Property and all claims against Third Parties for infringement, misappropriation or other violation of law with respect to the Transferred Intellectual Property;

- all consents of Government Entities that are exclusive to the Acquired Business to the extent assignable under applicable Law;

- 8 -

- all supplies owned by the Sellers and used exclusively in connection with the Acquired Business;

- all rights as of the Closing Date arising from any bid made prior to the Closing Date by any Seller, which is capable of acceptance after the Closing Date and, if accepted, would result in a Customer Contract (any such bid a "Seller Bid");

- all rights as of the Closing Date under all warranties, representations and guarantees made by suppliers, manufacturers and contractors to the extent related to the Assets;

- all assets of the Sellers described in the definition of Adjusted Net Working Capital Transferred as of the Closing Date and not otherwise assigned pursuant to the PSP Agreement;

- any net insurance proceeds in respect of Owned Equipment to the extent payable to the Purchaser pursuant to the terms of the PSP Agreement;

- any Tax records required by law to be transferred;

- any defences of the Sellers, to the extent relating to the Assumed Liabilities; and

- goodwill associated with the Business.

27. The Assets to be acquired by the Purchaser exclude, among other things, cash and cash equivalents, accounts receivable (including intercompany receivables but excluding CIP Unbilled Accounts Receivable), certain rights and refunds (including Tax refunds) relating to the pre-Closing period, security deposits (including cash collateral), any rights under any contracts (other than the Assigned Contracts), any right to any Intellectual Property other than the Transferred Intellectual Property, shares of any person, and any assets owned by certain subsidiaries and joint ventures of the Sellers including those assets owned by Nortel Networks Netas Telekomunikasyon A.S. ("NN Turkey") or Guangdong-Nortel Telecommunications Equipment Co. Ltd.

- 9 -

*Assumed Liabilities*

28. The Purchaser will assume the following liabilities:

- all liabilities of the Acquired Business arising after the Closing Date to the extent related to the operation of the Acquired Business by the Purchaser following the Closing Date including all liabilities: (i) with respect to the ownership and operation of the Assets; (ii) related to actions or claims brought against the Acquired Business; (iii) under Environmental Laws; (iv) under any product liability laws or similar laws concerning defective products manufactured or sold by the Acquired Business; and (v) under applicable laws in relation to telecommunications providers;

- all liabilities arising from or in connection with the performance (or breach) of the Assigned Contracts after the Closing Date and liabilities with respect to Cure Costs payable pursuant to the PSP Agreement, obligations to buy back from relevant resellers the products sold to resellers under Assigned Contracts, obligations under any warranty liabilities relating to MSS products and services which have been supplied under any Assigned Contract and all Contractual Liabilities under Customer Contracts that are Assigned Contracts;

- all liabilities resulting from any licensing assurances, declarations, agreements or undertakings relating to the Transferred Intellectual Property which the Sellers may have granted to third parties, solely to the extent that the terms of such licensing assurances, declarations, agreements or undertakings require assignees of the Transferred Intellectual Property to assume such liability and all liabilities resulting from the assurances, declarations and undertakings made to standard-setting bodies that are listed in the Sellers Disclosure Schedule;

- all liabilities for, or related to any obligation for, any Tax that the Purchaser bears pursuant to the PSP Agreement;

- 10 -

- except to the extent otherwise set forth in the PSP Agreement, all liabilities related to the Purchaser's: (i) employment or termination of employment (whether or not arising under or in respect of any Purchaser Employee Plan) of Transferred Employees after the Effective Hire Date; (ii) offers of employment or notice of continued employment to any Employees; (iii) decision to make or not make offers of employment to any Employee that violates applicable law; and (iv) failure to satisfy its obligations with respect to the Employees as set out in the PSP Agreement;

- all liabilities that relate to or arise under any Purchaser Employee Plan;

- all liabilities with respect to accrued and unpaid vacation days except to the extent provided in the PSP Agreement;

- all liabilities arising on or after the Closing Date that relate to the Seller Employee Plans and Collective Labour Agreements set forth in the Sellers' Disclosure Schedule;

- any obligation to provide continuation coverage pursuant to COBRA or any similar law under any Purchaser Employee Plan that is a "group health plan" (as defined in section 5000(b)(1) of the United States Internal Revenue Code of 1986, as amended) to Transferred Employees and/or their qualified beneficiaries who have a qualifying event on or after such Transferred Employees' Employee Transfer Date;

- certain other liabilities related to the Transferred Employees as set forth in the Sellers Disclosure Schedule or expressly assumed by the Purchaser as set out in the PSP Agreement;

- all liabilities relating to executory supply purchase orders for products or services (other than materials to be delivered to a contract manufacturer) entered into by the Sellers in connection with the MSS Business in the ordinary course before Closing with a person (other than a contract manufacturer) who is a supplier of

- 11 -

the MSS Business as of the date hereof and under which products and/or services have not been delivered as of the Closing Date;

- all liabilities related to the Seller Bids;

- certain other liabilities listed in the Sellers Disclosure Schedule;

- all liabilities of the Sellers described in the definition of Adjusted Net Working Capital Transferred as of the Closing Date and not otherwise transferred or assigned pursuant to the PSP Agreement; and

- all liabilities related to the obligation to repurchase Acquired Business related Inventory as specified in the Contract Manufacturing Inventory Agreements.

*Purchase Price*

29. The Purchase Price is $39 million (the "Base Purchase Price"), as adjusted in the manner described below, plus the Purchaser's obligation to pay, perform and discharge the Assumed Liabilities and the EMEA Assumed Liabilities.

30. At the Closing, the Purchaser shall deliver the Estimated Purchase Price (less the Good Faith Deposit and the various escrow amounts described below) to the Distribution Agent, as agent for the Sellers and the EMEA Sellers, being an amount equal to:

- the Base Purchase Price; minus

- the amount, if any, by which the Estimated Closing Adjusted Net Working Capital Transferred is less than the Target Adjusted Net Working Capital Transferred; minus

- the Estimated EMEA Downward Adjustment; minus

- the excess (if any) of the Estimated Total Prepaid Revenue Transferred over the Target Total Prepaid Revenue Transferred; minus

- an amount equal to the Estimated Pre-Closing Employment Payments.

- 12 -

31. The Monitor understands that the Purchase Price adjustments described above are currently estimated to result in a downward adjustment to the Purchase Price of approximately $6.9 million.

32. A Good Faith Deposit, being an amount equal to $1.25 million, shall be delivered by the Purchaser to the Escrow Agent on the Business Day following the entry of the U.S. Bidding Procedures Order. The Good Faith Deposit will be deducted from the Estimated Purchase Price to be delivered to the Sellers at Closing.

*Post-Closing Purchase Price Adjustment*

33. The PSP Agreement provides for adjustments to the Purchase Price based on the Closing Adjusted Net Working Capital Transferred, the Closing EMEA Downward Adjustment, the Closing Prepaid Revenue Transferred and the Closing Pre-Close Employment Payment relative to, as applicable, the estimated and target values for each such amount.

34. Within 60 days of Closing, the Purchaser shall deliver the Closing Statement to the Main Sellers and the EMEA Sellers, which shall contain the Purchaser's final calculation of the Adjusted Net Working Capital Transferred (including the underlying amounts used to calculate same) and the other purchase price adjustment amounts specified above in paragraph 33.

35. The Main Sellers shall have 60 days from the date of receipt of the Closing Statement to notify the Purchaser of a disagreement with same. The Purchaser and the Main Sellers shall use commercially reasonable efforts to resolve any disagreements within 14 days thereafter, after which the Accounting Arbitrator may be appointed to resolve any remaining disagreements.

*Employees*

36. The Purchaser has committed to offer employment to at least 95% of the Employees of the MSS Business (the "Transferred Employees"). Except to the extent otherwise required by Law, offers to the Applicants' Employees shall be for employment with: (i) an annual base salary and annual target incentive that is at least equal to the current annual base salary and

- 13 -

annual target incentive for such Employee (excluding the KEIP, KERP and the Nortel Special Incentive Plan); (ii) employment in a reasonably comparable position; and (iii) employment at a location reasonably contiguous to the Employee's current location. The Purchaser shall provide Transferred Employees with benefits substantially comparable in the aggregate to their current benefits under Seller Employee Plans and shall recognize the service date of each Transferred Employee for all purposes including membership and entitlement to benefits under all relevant Purchaser Employee Plans, but not for purposes of benefit accrual, vesting or otherwise for determination of the amount or duration of benefits under any defined benefit pension plan or under any equity incentive plan.

37.    The Purchaser or a Designated Purchaser shall establish or otherwise provide a registered pension plan for Transferred Employees employed in Canada and maintain such plan for a period of at least five years following the Closing Date, or such period as may be required by applicable Law.

38.    The Sellers shall be solely responsible for any required notice under the WARN Act or similar state or local laws with respect to terminations of employment of Employees other than Transferred Employees and Transitional Employees.

39.    With respect to Union Employees, as of the Closing Date the Purchaser will be bound by the terms and obligations of the relevant Collective Labour Agreements with respect to the employment of Union Employees as a successor, assignee or purchaser of the relevant Seller.

40.    The Sellers shall retain, and the Purchaser shall not assume, various employee liabilities, including: (i) liabilities related to the Seller Employee Plans; (ii) any obligation to provide continued coverage pursuant to COBRA under any Seller Employee Plan that is a "group health plan" to Employees with a qualifying event that occurs prior to such Employees' Effective Hire Date; (iii) liabilities relating to any Employee's or a former employee's employment or termination of employment with any of the Sellers; (iv) any other liabilities for Employees and independent contractors related to the Acquired Business that are not Transferred Employees; and (v) all Liabilities arising from the Amended and Restated Settlement Agreement dated March 30, 2010, among NNC, NNL and their various

- 14 -

Affiliates, the Monitor, the Former Employees Representative, Sue Kennedy, Koskie Minsky LLP and the CAW-Canada.

### Assignment of Contracts

41. The Sellers will assign certain Customer Contracts pursuant to Section 365 of the Code or otherwise, as applicable, and will sublease or license premises leased under certain Real Estate Leases to the Purchaser upon Closing as specified in the Sellers Disclosure Schedule. The Parties shall use commercially reasonable efforts to obtain all consents required to permit the assignment to the Purchaser of the Assigned Contracts in force as of the Closing Date.

### Cure Costs

42. To the extent that the assignment of any Customer Contract to the Purchaser entails the payment of any Cure Cost, the relevant Seller shall pay such amounts directly to such counterparty. The Purchaser will be responsible for the payment of Cure Costs relating to Designated Other 365 Contracts and Designated Other Non-365 Contracts. The Sellers Disclosure Schedule sets out the agreement between the Sellers and the Purchaser with respect to certain other potential Cure Costs.

### Sale Free and Clear

43. The Assets to be transferred by the Sellers will be transferred free and clear of all liens, claims and interests, other than those expressly assumed by the Purchaser or otherwise expressly permitted under the PSP Agreement.

### Representations and Warranties/Other Covenants

44. The PSP Agreement contains a number of representations, warranties and covenants by the Main Sellers or the Sellers, as applicable, with respect to various matters including title to assets, sufficiency of assets, material contracts, intellectual property, preparation of financial statements, compliance with laws, status of real property, environmental matters, labour and employee matters and taxes. In addition, the PSP Agreement includes a number of covenants with respect to matters including pre-Closing cooperation and access to

- 15 -

information, preparation and filings regarding antitrust and other Regulatory Approvals as necessary, the Purchaser's ability to request that the Sellers' independent accountants prepare, at the Purchaser's expense, Audited Financial Statements for the MSS Business, pre-Closing conduct of the Business, post-Closing assistance and maintenance of books and records, post-Closing arrangements with respect to certain non-assignable and/or Bundled Contracts, post-Closing assistance for litigation, negotiation and completion of the Transition Services Agreement, and insurance and sub-leasing matters.

### *Survival of Representations and Warranties or Covenants*

45.   No representations, warranties, covenants, or agreements contained in the PSP Agreement shall survive beyond the Closing Date, except for certain specified representations and covenants, and covenants that by their terms are to be satisfied after the Closing Date, which covenants will survive until satisfied in accordance with their terms.

### *Termination Rights*

46.   The PSP Agreement may be terminated prior to Closing:

- by mutual written consent of the Purchaser and the Main Sellers;

- by either the Purchaser or the Main Sellers:

    o   if the Closing does not take place on or prior to the date that is six months from the Auction or the date on which the Sellers determine that there shall not be an Auction;

    o   if the Purchaser is not selected as the Successful Bidder or the U.S. Bankruptcy Court and this Honourable Court otherwise approve an Alternative Transaction, subject to certain restrictions if the Purchaser is selected as the Alternate Bidder;

    o   if the EMEA ASA is terminated in accordance with its terms;

- 16 -

    o      if the Chapter 11 Proceedings are converted to a liquidation proceeding under Chapter 7 of the Code, and such conversion materially affects the Sellers' ability to consummate the transactions contemplated by this Agreement; or

    o      if the other party is in material breach of its obligation to close the transactions contemplated by the PSP Agreement at the Closing, which breach is not cured within five days from the receipt of a written notice regarding such breach.

- by the Purchaser:

    o      in the event of a material breach by the Sellers of the Sellers' representations, warranties, agreements or covenants set forth in the PSP Agreement, which breach would result in a failure of certain conditions to Closing;

    o      if the U.S. Debtors shall fail to file the U.S. Bidding Procedures and Sale Motion within five Business Days of the date of the PSP Agreement and/or the Canadian Debtors shall have failed to file the Canadian Sales Process Motion within seven Business Days of the date of the PSP Agreement;

    o      if the U.S. Bankruptcy Court or this Honourable Court have not entered the U.S. Bidding Procedures Order and the Canadian Sales Process Order, respectively, on or prior to the date that is 30 days from the date of the PSP Agreement;

    o      if the Purchaser is the Successful Bidder and the U.S. Sale Hearing and the Canadian Sale Hearing have not been commenced before the respective courts on or prior to the later of the tenth Business Day after the Auction or the first available date thereafter that the U.S. Bankruptcy Court and the Canadian Court are available to hold a joint hearing;

- 17 -

○    if the U.S. Bankruptcy Court has not entered the U.S. Sale Order on or prior to the date that is 60 days from the date of the PSP Agreement; or

○    if this Honourable Court has not entered the Canadian Approval and Vesting Order on or prior to the date that is 60 days from the date of the PSP Agreement.

### *Break-Up Fee and Expense Reimbursement*

47.    Collectively, the PSP Agreement and the EMEA ASA provide for an aggregate expense reimbursement payable by the Sellers and the EMEA Sellers to the Purchaser in certain circumstances in respect of its reasonable and documented fees, out-of-pocket costs and expenses, to a maximum of $1,500,000 (the "Expense Reimbursement"). The PSP Agreement and the EMEA ASA also provide for an aggregate break-up fee, in certain circumstances, of $2,500,000 minus any Expense Reimbursement to be paid by the Sellers and the EMEA Sellers to the Purchaser (the "Break-Up Fee"). The Sellers shall be responsible for two-thirds of the Expense Reimbursement and Break-Up Fee (the "Seller Expense Reimbursement" and "Seller Break-Up Fee", respectively).    Pursuant to the EMEA ASA, the EMEA Sellers shall be responsible for the remaining one-third of the Expense Reimbursement and Break-Up Fee.

48.    The Sellers shall pay the Seller Expense Reimbursement if the PSP Agreement is terminated in accordance with its terms, except where such termination is: by mutual written consent of the Main Sellers and the Purchaser; by the Purchaser upon written notice if the U.S. Debtors and/or the Canadian Debtors shall have failed to file their respective bidding procedures motions, or as a result of the U.S. Bankruptcy and/or this Honourable Court having not entered the U.S. Bidding Procedures Order and the Canadian Sales Process Order, respectively; or by either Primary Party as a result of the other party being in material breach of its obligation to close the transactions contemplated by the PSP Agreement at the Closing, subject, in each case, to certain restrictions.

- 18 -

49. The Sellers shall pay the Seller Break-Up Fee to the Purchaser if the PSP Agreement is terminated under the following circumstances and the Sellers enter into an agreement with respect to an Alternative Transaction within the nine months following such termination:

- if the Closing does not take place on or prior to the date that is six months from the Auction or the date on which the Sellers determine that there shall not be an Auction;

- if the Purchaser is not selected as the Successful Bidder or the U.S. Bankruptcy Court and this Honourable Court otherwise approve an Alternative Transaction;

- if the EMEA ASA is terminated in accordance with certain specified terms thereof;

- if the Chapter 11 Proceedings are converted to a liquidation proceeding under Chapter 7 of the Code, and such conversion materially affects the Sellers' ability to consummate the transactions contemplated by this Agreement;

- if the U.S. Bankruptcy Court has not entered the U.S. Sale Order on or prior to the date that is 60 days from the date of the PSP Agreement; or

- if this Honourable Court has not entered the Canadian Approval and Vesting Order on or prior to the date that is 60 days from the date of the PSP Agreement.

50. The Sellers shall also pay the Seller Break-Up Fee to the Purchaser if the Purchaser is the Successful Bidder and the PSP Agreement is terminated:

- due to a material breach by the Sellers of the Sellers' representations, warranties, agreements or covenants and such breach results in a failure to meet certain conditions to close the transactions; or

- if the U.S. Sale Hearing and the Canadian Sale Hearing have not been commenced before the respective Bankruptcy Courts on or prior to the later of the tenth Business Day after the Auction or the first available date thereafter that the

- 19 -

U.S. Bankruptcy Court and this Honourable Court are available to hold a joint hearing,

when the Purchaser is not in breach of the PSP Agreement or the EMEA ASA, which breach would result in a failure to satisfy the Closing conditions set forth in the PSP Agreement.

51.   Payment of the Seller Break-Up Fee and/or Seller Expense Reimbursement, if payable in accordance with the terms of the PSP Agreement, will be the sole and exclusive remedy of the Purchaser, whether at Law or in equity, for any and all breaches prior to Closing by the Sellers of the terms and conditions of this Agreement.

*Standstill Period*

52.   From the date of the PSP Agreement to the entry of the U.S. Bidding Procedures Order and from the conclusion of the Auction to Closing or termination of the PSP Agreement, the Sellers and their affiliates are prohibited from: (i) engaging in any negotiations with respect to any proposal or offer from any Person (other than the Purchaser or its Affiliates) relating to a Competing Transaction other than with respect to the provision of information regarding the Business and the Assets; (ii) executing any letter of intent or agreement providing for a Competing Transaction other than with respect to the provision of information regarding the MSS Business and the Assets; and (iii) seeking or supporting U.S. Bankruptcy Court or this Honourable Court's approval of a motion or Order inconsistent with the transactions contemplated in the PSP Agreement, provided, however, that the Sellers shall not be prohibited from providing any person with the Bidding Procedures and related documents, answering questions about the Bidding Procedures or announcing the execution of the PSP Agreement or the Auction.  Notwithstanding the foregoing, the Sellers may provide continued access to written due diligence materials and other information regarding the MSS Business or the Assets in an electronic data room, or in written or oral form.

- 20 -

*Ancillary Agreements*

53.  On or before Closing, the Purchaser and the relevant Sellers and EMEA Sellers will enter into the following ancillary agreements:

- Intellectual Property License Agreement - an intellectual property license agreement (the "IPLA") amongst NNL, NNI, the EMEA Sellers and the Purchaser pursuant to which NNL, NNI and the EMEA Sellers will grant to the Purchaser a non-exclusive, fully paid-up, perpetual and irrevocable license with respect to intellectual property which has not been assigned, to, among other things: (i) use, distribute and otherwise commercially exploit intellectual property, other than patents, used in connection with the MSS Business; and (ii) under the patents associated with the MSS Business, make, develop, use, support and otherwise dispose of products and services in connection therewith, in each case solely within a defined field of use. The licenses granted to the Purchaser under the IPLA include certain limited sublicensing rights and are not assignable except in certain limited circumstances and the IPLA provides for a license back to the Nortel parties off all Intellectual Property transferred to the Purchaser.

- Transition Services Agreement – an agreement between NNL, NNC, NNI, NNUK, NN Ireland, certain Other Sellers, the U.K. Administrators and the Purchaser pursuant to which the Sellers and their affiliates will agree to provide certain information technology, business transition and related services to the Purchaser until June 30, 2011, subject to possible extensions in the event the Sale Hearing and the Canadian Sale Hearing do not take place by September 30, 2010. The final form of the Transition Services Agreement will set forth the fees to be paid by the Purchaser to the Sellers for these services as well as certain other terms that will regulate the provision of services thereunder. The agreed form of Transition Services Agreement sets out the scope of transition services to be provided and the parties have agreed to finalize the schedules to the Transition Services Agreement as provided for in Exhibit 5.25 to the PSP Agreement. The parties have agreed to an arbitration procedure to resolve any disputes regarding,

- 21 -

among other things, the services to be provided or the amount to be billed for transition services.

- **Trademark License Agreement** – an agreement between NNL and the Purchaser granting a non-exclusive and royalty-free license to use certain Nortel trademarks in connection with the MSS products for a transitional period of 18 months, solely within the field of the MSS Business. The licenses granted to the Purchaser under the Trademark License Agreement include certain limited sublicensing rights and are not assignable except in certain limited circumstances.

- **Loaned Employee Agreement** – an agreement between the relevant Sellers and the Purchaser pursuant to which certain employees of the Sellers that cannot be transferred to the Purchaser at Closing will be seconded to the Purchaser for a period of up to two months. The Loaned Employees will remain on the payroll of the applicable Seller and the Purchaser shall reimburse the Sellers for the cost of retaining the Loaned Employees, subject to certain exceptions.

54.	On or prior to the Closing, the Purchaser and the Sellers will use their reasonable best efforts to negotiate in good faith:

- **Local Sales Arrangements** – To the extent necessary to effect the Closing, the Sellers and the Purchaser shall enter into agreements or instruments providing for the sale, transfer, assignment or other conveyance of the Assets in accordance with local law and the assumption of Assumed Liabilities.

- **Subleases** – Subleases for each Subleased Real Estate Lease with a term to expire on the one-year anniversary of the Closing Date.

- **Subcontract Agreement** – one or more agreements between the relevant Sellers and the Purchaser to be executed on or before Closing so as to pass through the benefits and burdens of Non-Assignable Contracts.

- 22 -

- <u>NN Turkey Distribution and Services Agreement</u> – an agreement between the Purchaser and NN Turkey governing the sale and servicing of certain MSS products by NN Turkey for release.

## Closing

55. Closing shall occur five Business Days after the date upon which all Closing conditions have been satisfied or waived.

## Closing Conditions

56. The Parties' obligation to effect the Closing is subject to the satisfaction of the following conditions:

- all Mandatory Regulatory Approvals shall have been obtained and remain in force (the Monitor understands that there are no Mandatory Regulatory Approvals required to complete the transactions contemplated by the PSP Agreement);

- there shall be in effect no law or order of any Court or other Governmental Entity in Canada, the U.S. or the United Kingdom, or any European Union Entity, prohibiting the consummation of any of the transactions contemplated by the PSP Agreement or the EMEA ASA and no proceedings pending by any Government Entity seeking same;

- the satisfaction of certain conditions to closing under the EMEA ASA;

- the contemporaneous consummation of the transactions contemplated by the EMEA ASA; and

- the U.S. Sale Order and the Canadian Approval and Vesting Order shall have been entered and shall be Final Orders.

57. The obligation of the Sellers to effect the Closing is subject to satisfaction of the following conditions:

- 23 -

- each of the Purchaser's representations and warranties being true and correct, except for any failure to be true and correct that has not had, and would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect;

- the Purchaser shall have performed in all material respects all material covenants, obligations and agreements contained in this Agreement required to be performed by the Purchaser on or before the Closing;

- The Sellers shall be furnished with a certificate of one of the executive officers of the Purchaser certifying that the above two conditions have been satisfied; and

- Certain specified conditions to Closing of the EMEA ASA shall have been satisfied or waived in accordance with the terms of the EMEA ASA.

58. The obligation of the Purchaser to effect the Closing is subject to satisfaction of the following conditions:

- each of the Sellers' representations and warranties being true and correct, except for any failure to be true and correct that has not had, and would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect;

- the Sellers shall have complied in all materials respects with all material covenants, obligations and agreements contained in the PSP Agreement required to be performed by the Sellers on or before Closing;

- the Purchaser shall be furnished with a certificate of an executive officer of one of the Main Sellers certifying that the above two conditions have been satisfied; and

- Certain specified conditions to Closing of the EMEA ASA shall have been satisfied or waived in accordance with the terms of the EMEA ASA

- 24 -

*MSS Side Agreement*

59.  In connection with the PSP Agreement and the EMEA ASA, the Sellers and the EMEA
     Sellers have negotiated and executed an MSS Side Agreement dated as of August 26, 2010
     (the "Side Agreement"), to address, among other matters, issues relating to the costs borne
     by NNC, NNL and NNI (the "IT Providers") in providing transition services to the
     Purchaser of the MSS Business in a scenario where transition services are no longer being
     provided to any other purchaser of the various other Nortel business units. The parties to
     the Side Agreement have agreed that a per diem amount will be payable out of the proceeds
     of the sale of the MSS Business to, on the one hand, NNC and NNL, and, on the other
     hand, the U.S. Debtors, for each day during the period from when the IT Providers cease to
     provide IT transition services to any other purchaser of the other Nortel business units until
     the IT Providers cease to provide IT transition services to the purchaser of the MSS
     Business, up to a maximum of $12 million. The Monitor's present expectation is that the
     term of any transition services agreement entered into with a purchaser of the MSS
     Business will expire prior to the above clause being triggered.

60.  A redacted copy of the Side Agreement is attached as Appendix "C" hereto and a non-
     redacted copy is attached as confidential Appendix "D".


**BIDDING PROCEDURES AND AUCTION PROCESS**

61.  Given that certain of the U.S. Debtors are parties to the PSP Agreement and given the
     desire to maximize value for the benefit of stakeholders in relation to the assets which are
     the subject of the PSP Agreement, Nortel has determined and has agreed with PSP that the
     PSP Agreement is subject to higher or better offers being obtained pursuant to a sale
     process under section 363 of the Code and that the PSP Agreement shall serve as a
     "stalking horse" bid pursuant to that process.

62.  A copy of the proposed bidding procedures is attached as Appendix "E" hereto (the
     "Bidding Procedures").  The Monitor notes that the Bidding Procedures are substantially

- 25 -

similar to the bidding procedures used in the sale of Nortel's other significant business units.

63.    The PSP Agreement provides that the Sellers that are U.S. Debtors shall file the U.S. Bidding Procedures and Sale Motion with the U.S. Court within five Business Days of the date of the PSP Agreement. This motion was filed with the U.S. Court on August 27, 2010. The PSP Agreement also provides that the Applicants shall file the Canadian Sales Process Order Motion with this Honourable Court within seven days of the date of the PSP Agreement. This motion was served on August 27, 2010, and will be filed on August 30, 2010.

64.    The Monitor understands that the Applicants and the U.S. Debtors will seek approval of the Bidding Procedures at a videoconference joint hearing between this Honourable Court and the U.S. Court scheduled for September 1, 2010, at 11:30 am conducted pursuant to the Cross-Border Insolvency Protocol previously approved by both Courts.

65.    The Bidding Procedures provide that all bids must be received by the Sellers not later than 12:00 p.m. (ET) on September 21, 2010, and that the Sellers will conduct an auction of the Assets on September 24, 2010, beginning at 9:00 a.m. (ET) (the "Auction").

66.    Pursuant to the PSP Agreement, the U.S. Debtors shall request that the U.S. Court, and the Applicants shall request that this Honourable Court, schedule a sale hearing on or prior to the tenth Business Day following the conclusion of the Auction and the Sellers shall use their commercially reasonable efforts to cause the sale hearings to be heard on that date or the earliest dated thereafter permitted by the schedules of the U.S. Court and this Honourable Court.

67.    The Monitor recognizes the expeditious nature of the proposed sale process. However, given the extensive process conducted to date and that there are likely to be a limited number of parties interested in acquiring the MSS Business, the Monitor is supportive of the proposed sale process. In addition, Nortel has consulted with the Committee and the Bondholder Group regarding the Bidding Procedures and believes that these parties are supportive of the timing of this sale process.

- 26 -

68.    The key provisions of the Bidding Procedures are outlined in the paragraphs that follow. Reference should be made directly to the Bidding Procedures for a complete understanding of the terms thereof.

**Bid Deadline**

69.    A Qualified Bidder (as defined below) that desires to make a bid will deliver written copies of its bid to: the Sellers, counsel and financial advisors to the Sellers, counsel and financial advisors to the Committee, counsel to the Bondholders' Committee, the Monitor, the U.K. Administrators and counsel to the U.K. Administrators (collectively, the "Notice Parties"), so as to be received not later than 12:00 p.m. (ET) on September 21, 2010 (the "Bid Deadline"). The Sellers, after consultation with the Creditors' Committee, the Bondholder Group and the Monitor, may, in accordance with the procedures set forth below under the heading "Reservation of Rights", extend the Bid Deadline once or successively, but they are not obligated to do so.

**Provisions Governing Qualifications of Bidders**

70.    Unless otherwise ordered by both the U.S. Court and this Honourable Court and accepted by the U.K. Administrators, for cause shown, or as otherwise determined by the Sellers, in consultation with the Committee, the Bondholder Group and the Monitor, in order to participate in the bidding process, each person (a "Potential Bidder") other than the Purchaser must deliver to the Notice Parties:

(a)    an executed confidentiality agreement (to be delivered prior to the distribution of any confidential information by the Sellers to a Potential Bidder) in form and substance satisfactory to the Sellers and on terms that are substantially similar to those contained in the confidentiality agreement executed by the Purchaser;

(b)    current audited financial statements and latest unaudited financial statements or such other form of financial disclosure of the Potential Bidder or the entity who will guarantee the obligations of the Potential Bidder that will allow the Sellers and their respective financial advisors, in consultation with the Committee, the Bondholder Group and the Monitor, to make a reasonable determination as to the

- 27 -

Potential Bidder's financial and other capabilities to consummate the transactions; and

    (c)    a statement demonstrating to the Sellers' satisfaction a bona fide interest in purchasing the Assets from the Sellers including: (i) the purchase price range (including liabilities to be assumed by the Potential Bidder); (ii) any Assets expected to be excluded or any additional assets desired to be included; (iii) the structure and financing of the transactions (including, but not limited to, the sources of financing for the purchase price and all requisite financial assurance); (iv) any anticipated corporate, stockholder, internal or regulatory approvals required to close the transaction and the anticipated time frame and any anticipated impediments for obtaining such approvals; (v) the proposed number of employees of the Sellers who will become employees of the Potential Bidder, and any proposed measures associated with their continued employment; and (vi) any conditions to closing that the Potential Bidder may wish to impose in addition to those set forth in the PSP Agreement and the EMEA ASA.

71.   A Potential Bidder that has delivered the documents described above, whose financial information and credit quality support or enhancement demonstrate in the Sellers' judgment, after consultation with their counsel and financial advisors, the Committee, the Bondholder Group and the Monitor, the financial capability of the Potential Bidder to consummate the transactions, that has submitted a reasonably competitive and realistic non-binding proposal, as described above, and that has executed a confidentiality agreement, as described above, and that the Sellers determine in their reasonable business judgement, after consultation with their counsel and financial advisors, the Committee, the Bondholder Group and the Monitor, is likely (based on availability of financing, experience and other considerations) to be able to consummate the transactions, will be deemed a "Qualified Bidder". As promptly as practicable after a Potential Bidder delivers all of the materials required above, the Sellers will determine, in consultation with the Committee, the Bondholder Group and the Monitor, and will notify the Potential Bidder if such Potential Bidder is a Qualified Bidder. At the same time that the Sellers notify the Potential Bidder

- 28 -

that it is a Qualified Bidder, the Sellers will allow the Qualified Bidder to begin or continue to conduct due diligence with respect to the Assets.

*Provisions Governing Qualified Bids*

72.    A bid submitted will be considered a Qualified Bid only if the bid is submitted by a Qualified Bidder and complies with all of the following (a "Qualified Bid"):

    (a)    it states that the Qualified Bidder offers to purchase the Assets upon the terms and conditions substantially as set forth in the PSP Agreement and the EMEA ASA, including without limitation with respect to certainty and timing of closing, or pursuant to alternate terms and conditions that the Sellers determine, after consultation with the Committee, the Bondholder Group and the Monitor, are no less favourable than the terms and conditions of the PSP Agreement and the EMEA ASA;

    (b)    it includes a letter stating that the offer is irrevocable until the selection of the Successful Bidder (as defined below) and, if applicable, the Alternate Bidder (as defined below), provided that if such bidder is selected as the Successful Bidder or the Alternative Bidder, its offer shall remain irrevocable until the earlier of (i) closing of the sale to the Successful Bidder or the Alternate Bidder, and (ii) (x) with respect to the Successful Bidder only, 180 days from the Sale Hearing, subject to further extension as may be agreed to under the applicable sale agreements and (y) with respect to the Alternate Bidder only, the Alternate Bid Expiration Date (as defined below);

    (c)    it includes duly authorized and executed sale agreements, including the purchase price for the Assets expressed in U.S. Dollars, together with all exhibits, schedules thereto and ancillary agreements as well as copies of such materials marked to show those amendments and modifications to the PSP Agreement, the EMEA ASA, ancillary agreements and proposed orders to approve the sale by the U.S. Court, this Honourable Court and any other applicable court(s) whose approval may be required, as proposed by the bidder;

- 29 -

(d)     it includes written evidence of a firm, irrevocable commitment for financing, or other evidence of ability to consummate the proposed transaction that will allow the Sellers, in consultation with the Committee, the Bondholder Group and the Monitor, to make a reasonable determination as to the Qualified Bidder's financial and other capabilities to consummate the transactions;

(e)     it is not conditioned on (i) the outcome of unperformed due diligence by the bidder and/or (ii) obtaining financing;

(f)     it fully discloses the identity of each entity that will be bidding for the Assets or otherwise sponsoring or participating in connection with such bid, and the complete terms of any such participation;

(g)     it has a value to the Sellers, in the Sellers' reasonable business judgment, after consultation with their financial advisors, the Committee, the Bondholder Group and the Monitor, that either individually or, when evaluated in conjunction with any other Qualified Bid for the Assets, is greater than or equal to the sum of the value offered under the PSP Agreement and the EMEA ASA, plus the amount of the Break-Up Fee and Expense Reimbursement, plus $1,000,000.

(h)     it includes an acknowledgement and representation that the bidder will assume the Sellers' obligations under the executory contracts and unexpired leases proposed to be assigned pursuant to the purchaser agreements (or identifies with particularity which of such contracts and leases the bidder wishes not to assume, or alternatively which additional executor contracts or unexpired leases the bidder wishes to assume), contains full details of the bidder's proposal for the treatment of related cure costs and identifies with particularity any executory contract or unexpired lease the assumption and assignment of which is a condition to closing;

(i)     it includes an acknowledgement and representation that the bidder: (i) has had an opportunity to conduct any and all required due diligence regarding the Assets prior to making its offer; (ii) has relied solely upon its own independent review, investigation and/or inspection of any documents and/or the Assets in making its

- 30 -

bid; (iii) did not rely upon any written or oral statements, representations, promises, warranties or guaranties whatsoever, whether express or implied (by operation of law or otherwise), regarding the Assets or the completeness of the any information provided in connection therewith or the Auction, except as expressly stated in its bid; and (iv) is not entitled to any expense reimbursement or break-up fee in connection with its bid;

(j)     it includes evidence, in form and substance reasonably satisfactory to the Sellers, of authorization and approval from the bidder's board of directors (or comparable governing body) with respect to the submission, execution, delivery and closing of the purchase agreements;

(k)     it is accompanied by a good faith deposit in the form of a wire transfer, certified check or such other form acceptable to the Sellers payable to the Sellers in an amount equal to $1,250,000;

(l)     it contains full details of the proposed number of employees of the Sellers (apportioned by jurisdiction) who will become employees of the Qualified Bidder and any proposed measures associated with their continued employment and identifies any pension liabilities and assets related to any employees currently covered under the Nortel Retirement Income Plan who will become employees of the Qualified Bidder that the Qualified Bidder intends to assume or purchase;

(m)     it includes evidence of the Qualified Bidder's ability to comply with Section 365 of the Code (to the extent applicable), including providing adequate assurance of such bidder's ability to perform in the future the contracts and leases proposed to be assigned or subleased to the Potential Bidder in a form that will permit the immediate dissemination of such evidence to the counterparties to such contracts and leases;

(n)     it contains other information reasonably requested by the Sellers; and

(o)     it is received by the Bid Deadline.

- 31 -

73. The Sellers will determine, in their reasonable business judgment, after consultation with the Committee, the Bondholder Group and the Monitor, whether to entertain bids for the Assets that do not conform to one or more of the requirements specified in the Bidding Procedures and deem such bids to be Qualified Bids, provided that the Sellers may not waive substantial compliance with any items in paragraphs (d), (e), (f), (i)(iv), (j) or (o) in paragraph 72, above, without the consent of the Committee, the Bondholder Group and the Monitor, provided further that such consent shall not be unreasonably withheld in connection with any bid that would (i) otherwise fully satisfy the requirements of a Qualified Bid hereunder but for a de minimus failure to comply with those criteria; and (ii) such noncompliance is cured within 24 hours of the Bid Deadline. Notwithstanding the foregoing, the Purchaser will be deemed a Qualified Bidder and the PSP Agreement and the EMEA ASA will be deemed a Qualified Bid.

74. The Sellers shall notify the Purchaser and all Qualified Bidders in writing as to whether or not any bids constitute Qualified Bids on the next Business Day after the day that the determination is made, provided that such notification shall be given no later than three Business Days following the expiration of the Bid Deadline. The Sellers shall provide the Purchaser and any Qualified Bidder that has previously submitted a Qualified Bid with a copy of any Qualified Bid received by the Sellers on the day that the determination is made that such bid is a Qualified Bid but in no event later than two Business Days prior to the commencement of the Auction.

75. The Sellers may aggregate separate bids from unaffiliated persons to create one Qualified Bid from a Qualified Bidder; subject to U.S. bankruptcy laws regarding collusive bidding.

***Evaluation of Competing Bids***

76. A Qualified Bid will be valued based upon several factors including, without limitation, items such as the purchase price and the net value provided by such bid, the claims likely to be created by such bid in relation to other bids, the counterparties to such transaction, the proposed revisions to the relevant transaction documents, the effect of the transaction on the value of the ongoing businesses of Sellers, other factors affecting the speed, certainty and value of the transaction, the assets included or excluded from the bid, the estimated

- 32 -

number of in-scope employees of the Sellers (apportioned by jurisdiction) to be offered post-closing employment by the Qualified Bidder and any proposed measures associated with their continued employment, the transition services required from the Sellers post-closing and any related restructuring costs, and the likelihood and timing of consummating such transaction, each as determined by the Sellers, in consultation with their advisors, the Committee, the Bondholder Group and the Monitor.

77. If the Sellers do not receive any Qualified Bids other than the PSP Agreement and the EMEA ASA, the Auction shall be cancelled and the Sellers shall promptly proceed to seek entry of the sale orders with respect to the transaction contemplated by the PSP Agreement.

*Auction Process*

78. If the Sellers receive one or more Qualified Bids in addition to the PSP Agreement and the EMEA ASA, the Sellers will conduct the Auction of the Assets at 9:00 am (ET) on September 24, 2010, which Auction may be cancelled or adjourned, subject to the terms of the PSP Agreement and the EMEA ASA.

79. The Auction shall run in accordance with the following procedures:

- only the Sellers, the Purchaser, the Committee, the Bondholder Group, the Monitor and the U.K. Administrators (and the advisors to each of the foregoing), any creditor of the U.S. Debtors or the Applicants and any other Qualified Bidder that has timely submitted a Qualified Bid shall attend the Auction in person, and only the Purchaser and such other Qualified Bidders will be entitled to make any subsequent bids at the Auction;

- each Qualified Bidder shall be required to confirm that it has not engaged in any collusion with respect to the bidding or the transaction;

- at least three business days prior to the Auction, each Qualified Bidder who has timely submitted a Qualified Bid must inform the Sellers whether it intends to attend the Auction;

- 33 -

- at least one business day prior to the Auction, the Sellers will provide copies of the Qualified Bid or combination of Qualified Bids which the Sellers believe, in their reasonable business judgment, after consultation with the Committee, the Bondholder Group and the Monitor, is the highest or otherwise best offer (the "Starting Bid") to the Purchaser and all other Qualified Bidders who have informed the Sellers of their intent to participate in the Auction;

- all Qualified Bidders who have timely submitted Qualified Bids will be entitled to be present for all Subsequent Bids (as defined below) at the Auction with the understanding that the true identity of each Qualified Bidder at the Auction will be fully disclosed to all other Qualified Bidders at the Auction and that all material terms of each Subsequent Bid will be fully disclosed to all other bidders throughout the entire Auction, provided that all Qualified Bidders wishing to attend the Auction must have at least one individual representative with authority to bind such Qualified Bidder attend the Auction in person;

- the Sellers, after consultation with their counsel and financial advisors, the Committee, the Bondholder Group and the Monitor, may employ and announce at the Auction additional procedural rules that are reasonable under the circumstances for conducting the Auction provided that such rules are (i) not inconsistent with the Bidding Procedures, the Code, or any order of the U.S. Court, this Honourable Court or any other applicable court order entered in connection herewith, and (ii) disclosed to each Qualified Bidder at the Auction; and

- bidding at the Auction will begin with the Starting Bid and continue, in one or more rounds of bidding, so long as during each round at least one subsequent bid is submitted by a Qualified Bidder that improves upon such Qualified Bidder's immediately prior Qualified Bid (a "Subsequent Bid") and the Sellers determine, in consultation with their advisers, the Committee, the Bondholder Group and the Monitor, that such Subsequent Bid is (A) for the first round, a higher or otherwise better offer than the Starting Bid, and (B) for subsequent rounds, a higher or

- 34 -

otherwise better offer than the Leading Bid (as defined below). Each incremental bid at the Auction shall provide additional net value to the estate of at least $1,000,000 over the Starting Bid or the Leading Bid as the case may be, provided that the Sellers, in consultation with the Committee, the Bondholder Group and the Monitor, shall retain the right to modify the increment requirements at the Auction. After the first round of bidding and between each subsequent round of bidding, the Sellers shall announce the bid or combination of bids (and the value of such bid(s)) that it believes to be the highest or otherwise better offer (the "Leading Bid").   A round of bidding will conclude after each participating Qualified Bidder has had the opportunity to submit a Subsequent Bid with full knowledge of the Leading Bid. Except as specifically set forth herein, for the purpose of evaluating the value of the consideration provided by Subsequent Bids (including any Subsequent Bid by the Purchaser), the Sellers will, at each round of bidding, give effect to the Break-Up Fee and Expense Reimbursement that may be payable to the Purchaser under the PSP Agreement and EMEA ASA as well as any additional liabilities to be assumed by a Qualified Bidder and any additional costs which may be imposed on the Sellers.

### Selection of Successful Bid

80.    Prior to the conclusion of the Auction, the Sellers, in consultation with their advisors, the Committee, the Bondholder Group and the Monitor, will (a) review each Qualified Bid and evaluate each Qualified Bid as set forth under the heading "Evaluation of Competing Bids", above, (b) identify the highest or otherwise best offer or offers for the Assets received at the Auction (the "Successful Bid" and the bidder(s) making such bid, the "Successful Bidder"), and (c) communicate to the Purchaser and the other Qualified Bidders the identity of the Successful Bidder, the Alternate Bidder (as defined below), if any, and the details of the Successful Bid and Alternate Bid (as defined below), if any.   The determination of the Successful Bid and Alternate Bid by the Sellers after consultation with the Committee, the Bondholder Group and the Monitor, at the conclusion of the Auction shall be final subject to approval by the U.S. Court and this Honourable Court.

- 35 -

81. The Sellers will sell the Assets to the Successful Bidder pursuant to the terms of the Successful Bid (or, under certain circumstances described below, the Alternate Bidder) upon approval of such Successful Bid by the U.S. Court, this Honourable Court and any other applicable court(s) and approval and execution by the U.K. Administrators of the relevant Successful Bid transaction documents (or, under certain circumstances described below, the Alternative Bid transaction documents with the Alternate Bidder).

### Closing with Alternative Bidders

82. If the Sellers receive one or more additional Qualified Bid(s), then, at the Sale Hearing and at any other hearings of any other applicable court(s) to approve the entering into agreements with respect to the Successful Bid, the Sellers will seek approval of the Successful Bid, and, at the Sellers' election, the next highest or best Qualified Bid (the "Alternate Bid," and such bidder, the "Alternate Bidder"), provided, however, that selection of the Purchaser as the Alternative Bidder shall be subject to the PSP Agreement. Following approval of the sale to the Successful Bidder, if the Successful Bidder fails to consummate the sale for any reason, then the Alternate Bid will be deemed to be the Successful Bid and the Sellers will be authorized, but not directed, to effectuate a sale to the Alternate Bidder subject to the terms of the Alternate Bid. The Alternate Bid shall remain open until the earlier of (a) the fortieth calendar day following the conclusion of the Auction, unless, prior to such date, the Main Sellers have delivered written notice to the Alternate Bidder that the transaction contemplated by the Successful Bid will not occur and the Main Sellers intend to consummate the transaction contemplated by the Alternate Bid, in which case the terms of the Alternate Bid shall be enforceable and shall govern or (b) the consummation of the sale to the Successful Bidder. All the Qualified Bids other than the Successful Bid and the Alternate Bid shall be deemed rejected by the Sellers on and as of the date of approval of the Successful Bid and Alternate Bid by the U.S. Court, this Honourable Court and any other applicable court(s) whose approval is required.

### Reservation of Rights

83. The Sellers, after consultation with their advisors, the Committee, the Bondholder Group and the Monitor and their respective advisors, a) may, after each round of bidding at the

- 36 -

Auction, determine which Qualified Bid, if any, is the highest or otherwise best offer and the value thereof; b) may reject, at any time, any bid (other than the Purchaser's initial bid) that is inadequate or insufficient, not in conformity with the requirements of the Code, the Bidding Procedures, any orders of this Honourable Court or any other applicable orders, contrary to the best interests of the Sellers, their estates and stakeholders as determined by the Sellers in consultation with the Committee, the Bondholder Group and the Monitor, or contrary to the statutory duties or legal obligations of the U.K. Administrators in relation to the exercise of their duties or function as administrators of certain EMEA Sellers; and c) except as otherwise expressly provided in the Bidding Procedures with respect to instances in which the consent of the Committee, the Bondholder Group and the Monitor is required, may modify the Bidding Procedures or impose at, or prior to, the Auction, additional customary terms and conditions on the sale of the Assets.

84.   Notwithstanding any of the foregoing, the Sellers may not, without the prior written consent of the Committee, the Bondholder Group and the Monitor, which consent may not be unreasonably withheld, (i) extend the deadlines set forth in the Auction procedures for more than five Business Days, (ii) adjourn the Auction for more than three Business Days, or (iii) subject to the availability of the U.S. Court and this Honourable Court, adjourn the Sale Hearing for more than three Business Days if the Auction has concluded. Each of the foregoing actions shall be made by the Sellers in consultation with the Committee, the Bondholder Group and the Monitor, and their respective advisors. Notwithstanding the foregoing, the Sellers may not, without the prior written consent of the Purchaser, impair or modify the Purchaser's rights and obligations under the PSP Agreement or the EMEA ASA or the Purchaser's right to credit the Break-Up Fee and the Expense Reimbursement as part of any subsequent bids (except as specifically set forth in the Bidding Procedures).


## ALLOCATION OF PROCEEDS OF SALE AMONGST NORTEL ENTITIES AND THE SIDE AGREEMENT

85.   As previously indicated, the MSS Business is not operated through a dedicated legal entity or stand-alone division.   The Applicants have, amongst other things, an interest in

- 37 -

intellectual property of the MSS Business which, in turn, is subject to various intercompany licensing agreements with other Nortel legal entities around the world, in some cases on an exclusive basis and in other cases, on a non-exclusive basis. Therefore, the task of allocating the sale proceeds stemming from a sale agreement amongst the various Nortel entities in the various jurisdictions is complex.

86. As set out in the Fifteenth Report, the Applicants, U.S. Debtors, and certain of the EMEA entities, through the U.K. Administrators, entered into the Interim Funding and Settlement Agreement ("IFSA") which was approved by this Honourable Court on June 29, 2009. Pursuant to the IFSA, each of the Applicants, U.S. Debtors, and EMEA Debtors agreed that their execution of definitive documentation with a purchaser of any material Nortel assets shall not be conditional upon reaching an agreement regarding the allocation of the sale proceeds or binding procedures for the allocation of the sale proceeds. In addition, the parties agreed that in the absence of any agreement regarding the allocation of any sale proceeds, the proceeds shall be deposited in an escrow account and any distribution from the escrow account shall be contingent upon (i) the agreement of all of the Selling Debtors (as defined in the IFSA) or (ii) in the case where the Selling Debtors fail to reach an agreement, a determination of the allocation by the relevant dispute resolvers.

87. As of the current date, no agreement has been reached regarding the allocation of any sales proceeds. Accordingly, the Monitor expects that the sale proceeds derived from the sale of the MSS Business will be paid into an escrow account pursuant to the terms of an escrow agreement which the Applicants will seek approval of at a later date.

## MONITOR'S ANALYSIS AND RECOMMENDATIONS

88. The Monitor has reviewed Nortel's efforts to divest the MSS Business and is of the view that the Applicants are acting in good faith to maximize value. Accordingly, the Monitor ecommends approval of the PSP Agreement as a "stalking horse" bid and approval of the Bidding Procedures as described above. In so doing, the Monitor considers the potential

- 38 -

payment of the Seller Break-Up Fee and Seller Expense Reimbursement as reasonable in the circumstances.

89. For the reasons described at paragraph 23, above, the Monitor also recommends that confidential Appendix "B" to this Fifty-Second Report be sealed by this Honourable Court.

90. The Monitor also supports the Applicants' request for approval of the Side Agreement and recommends that the non-redacted version of the Side Agreement (confidential Appendix "D" to this Fifty-Second Report) be sealed by this Honourable Court as it contains information which, if publically disclosed, could be harmful to the economic interests of the Applicants.


All of which is respectfully submitted this 30th day of August, 2010.

**ERNST & YOUNG INC.**
In its capacity as Monitor of the Applicants

Per:



Murray A. McDonald
President

**APPENDIX "A"**

**ASSET SALE AGREEMENT**

**[ATTACHED]**

**EXECUTION VERSION**

**ASSET SALE AGREEMENT**

BY AND AMONG

**NORTEL NETWORKS CORPORATION**

**NORTEL NETWORKS LIMITED**

**NORTEL NETWORKS INC.**

AND

**THE OTHER ENTITIES IDENTIFIED HEREIN AS SELLERS**

AND

**PSP HOLDING LLC**

**DATED AS OF AUGUST 26, 2010**

# TABLE OF CONTENTS

**Page**

ARTICLE I.        INTERPRETATION.................................................................... 3
  SECTION 1.1    Definitions.................................................................. 3
  SECTION 1.2    Interpretation............................................................ 30

ARTICLE II.       PURCHASE AND SALE OF ASSETS ............................................ 31
  SECTION 2.1    Purchase and Sale ....................................................... 31
  SECTION 2.2    Purchase Price ........................................................... 44
  SECTION 2.3    Closing .................................................................... 51
  SECTION 2.4    Designated Purchaser(s .................................................. 53

ARTICLE III.      REPRESENTATIONS AND WARRANTIES OF THE
                  PURCHASER ................................................................ 55
  SECTION 3.1    Organization and Corporate Power....................................... 55
  SECTION 3.2    Authorization; Binding Effect; No Breach ............................... 55
  SECTION 3.3    Adequate Assurance of Future Performance .............................. 56
  SECTION 3.4    Financing.................................................................. 56
  SECTION 3.5    The Purchaser's Acknowledgments; Exclusivity of
                  Representations and Warranties........................................... 57
  SECTION 3.6    Brokers .................................................................... 59

ARTICLE IV.       REPRESENTATIONS AND WARRANTIES OF THE
                  SELLERS................................................................... 59
  SECTION 4.1    Organization and Corporate Power....................................... 59
  SECTION 4.2    Authorization; Binding Effect; No Breach ............................... 59
  SECTION 4.3    Title to Tangible Assets; Sufficiency of Assets................................ 60
  SECTION 4.4    Material Contracts........................................................ 61
  SECTION 4.5    Intellectual Property..................................................... 63
  SECTION 4.6    Litigation.................................................................. 66
  SECTION 4.7    Financial Statements ..................................................... 66
  SECTION 4.8    Compliance with Laws; Consents.......................................... 67
  SECTION 4.9    Real Property ............................................................. 68
  SECTION 4.10   Environmental Matters.................................................... 68
  SECTION 4.11   Labor and Employee Benefits Matters .................................... 69
  SECTION 4.12   Brokers.................................................................... 71
  SECTION 4.13   Taxes ..................................................................... 71
  SECTION 4.14   Representations and Warranties by the Other Sellers...................... 72

ARTICLE V.        COVENANTS AND OTHER AGREEMENTS ............................... 73
  SECTION 5.1    U.S. Bankruptcy Actions ................................................. 73
  SECTION 5.2    Canadian Bankruptcy Actions ............................................ 74

i

## TABLE OF CONTENTS
(continued)

Page

| | | |
|---|---|---|
| SECTION 5.3 | Consultation; Notification | 75 |
| SECTION 5.4 | Pre-Closing Cooperation | 76 |
| SECTION 5.5 | Antitrust and Other Regulatory Approvals | 77 |
| SECTION 5.6 | Pre-Closing Access to Information | 79 |
| SECTION 5.7 | Public Announcements | 82 |
| SECTION 5.8 | Further Actions | 82 |
| SECTION 5.9 | Conduct of Acquired Business | 83 |
| SECTION 5.10 | Transaction Expenses | 85 |
| SECTION 5.11 | Confidentiality | 85 |
| SECTION 5.12 | Certain Payments or Instruments Received from Third Parties | 87 |
| SECTION 5.13 | Non-Assignable Contracts and Other Assets | 87 |
| SECTION 5.14 | Bundled Contracts | 90 |
| SECTION 5.15 | Post-Closing Assistance for Litigation | 91 |
| SECTION 5.16 | Tangible Asset Removal | 92 |
| SECTION 5.17 | Termination of Overhead and Shared Services | 94 |
| SECTION 5.18 | Insurance Matters | 94 |
| SECTION 5.19 | Sellers Deposits, Guarantees and Other Credit Support of the Business | 95 |
| SECTION 5.20 | Receivables | 96 |
| SECTION 5.21 | Use of the Sellers' Trademarks | 96 |
| SECTION 5.22 | Maintenance of Books and Records | 96 |
| SECTION 5.23 | Certain Ancillary Agreements | 98 |
| SECTION 5.24 | Subleases | 98 |
| SECTION 5.25 | Finalization of Transition Services Agreement | 99 |
| SECTION 5.26 | Financing | 99 |
| SECTION 5.27 | Competing Transactions | 100 |
| ARTICLE VI. | TAX MATTERS | 100 |
| SECTION 6.1 | Transfer Taxes | 100 |
| SECTION 6.2 | Withholding Taxes | 102 |
| SECTION 6.3 | Tax Characterization of Payments Under This Agreement | 103 |
| SECTION 6.4 | Apportionment of Taxes | 103 |
| SECTION 6.5 | Records | 103 |
| SECTION 6.6 | Tax Disclosure | 105 |
| SECTION 6.7 | Tax Returns | 105 |
| SECTION 6.8 | Canadian Tax Election | 107 |
| SECTION 6.9 | Other Tax Matters | 108 |
| SECTION 6.10 | Cooperation | 109 |
| ARTICLE VII. | EMPLOYMENT MATTERS | 109 |
| SECTION 7.1 | Employment Obligations with Respect to Non-Union Employees | 109 |

**TABLE OF CONTENTS**
(continued)

**Page**

SECTION 7.2    Employment Obligations with Respect to Union Employees.......... 114
SECTION 7.3    Excluded Employee Liabilities........................................................ 114
SECTION 7.4    Other Employee Covenants ............................................................ 115
SECTION 7.5    Sole Benefit of the Sellers and the Purchaser or Designated
                Purchaser......................................................................................... 117

ARTICLE VIII.    CONDITIONS TO THE CLOSING............................................... 117

SECTION 8.1    Conditions to Each Party's Obligation ........................................... 117
SECTION 8.2    Conditions to the Sellers' Obligation.............................................. 118
SECTION 8.3    Conditions to the Purchaser's Obligation ....................................... 119

ARTICLE IX.    TERMINATION............................................................................... 119

SECTION 9.1    Termination..................................................................................... 119
SECTION 9.2    Break-Up Fee/Expense Reimbursement.......................................... 121
SECTION 9.3    Effects of Termination ................................................................... 122

ARTICLE X.    MISCELLANEOUS .......................................................................... 123

SECTION 10.1    No Survival of Representations and Warranties or Covenants........ 123
SECTION 10.2    Remedies....................................................................................... 123
SECTION 10.3    No Third-Party Beneficiaries......................................................... 123
SECTION 10.4    Consent to Amendments; Waivers.................................................. 123
SECTION 10.5    Successors and Assigns.................................................................. 124
SECTION 10.6    Governing Law; Submission to Jurisdiction; Waiver of Jury
                  Trial.............................................................................................. 124
SECTION 10.7    Notices .......................................................................................... 126
SECTION 10.8    Exhibits; Sellers Disclosure Schedule ........................................... 128
SECTION 10.9    Counterparts................................................................................... 129
SECTION 10.10   No Presumption ............................................................................. 129
SECTION 10.11   Severability ................................................................................... 129
SECTION 10.12   Headings ....................................................................................... 129
SECTION 10.13   Entire Agreement........................................................................... 129
SECTION 10.14   Availability of Equitable Relief; Specific Performance ................. 130
SECTION 10.15   Bulk Sales Laws............................................................................. 130
SECTION 10.16   Main Sellers as Representatives of Other Sellers ........................... 130
SECTION 10.17   Obligations of the Sellers............................................................... 131
SECTION 10.18   Execution by Other Sellers ............................................................ 131

iii

## EXHIBITS

Exhibit A – Other Sellers

Exhibit B – EMEA Sellers

Exhibit C – Canadian Debtors; U.S. Debtors; Non-Debtor Sellers

Exhibit D – EMEA Asset Sale Agreement

Exhibit E – Contract Manufacturing Inventory Agreements Term Sheet

Exhibit F – Escrow Agreement

Exhibit G – Intellectual Property License Agreement

Exhibit H – Knowledge of the Purchaser

Exhibit I – Loaned Employee Agreement

Exhibit J – Mandatory Regulatory Approvals - Relevant Antitrust Jurisdictions / Authorities

Exhibit K – Form of Sublease

Exhibit L – Transitional Trademark License Agreement

Exhibit M – Transition Services Agreement

Exhibit 2.1.7(d) – Cure Costs and Related Agreements

Exhibit 5.1.1(b) – Form of U.S. Bidding Procedures Order

Exhibit 5.1.2(b) – Form of U.S. Sale Order

Exhibit 5.2.1 – Form of Canadian Sales Process Order

Exhibit 5.2.2 – Form of Canadian Approval and Vesting Order

Exhibit 5.4(a) – Form of Letter to Suppliers

Exhibit 5.7 – Certain Communications

Exhibit 5.16 – Form of Real Estate License

Exhibit 5.25 – Transition Services

## ASSET SALE AGREEMENT

This Asset Sale Agreement is dated as of August 26, 2010, among Nortel Networks Corporation, a corporation organized under the laws of Canada ("**NNC**"), Nortel Networks Limited, a corporation organized under the laws of Canada ("**NNL**"), Nortel Networks Inc., a corporation organized under the laws of Delaware ("**NNI**" and, together with NNC and NNL, the "**Main Sellers**"), the affiliates of the Main Sellers listed in Exhibit A hereto (the "**Other Sellers**" and, together with the Main Sellers, the "**Sellers**") and PSP Holding LLC, a limited liability company organized under the laws of Delaware (the "**Purchaser**").

## W I T N E S S E T H :

WHEREAS, the Sellers and the affiliates of the Main Sellers listed in Exhibit B hereto (the "**EMEA Sellers**") beneficially own and operate the Business (as defined below);

WHEREAS, on January 14, 2009 (the "**Petition Date**"), NNC, NNL and the Other Sellers listed in part 1 of Exhibit C hereto (together, the "**Canadian Debtors**") filed with the Canadian Court (as defined below) an application for protection under the Companies' Creditors Arrangement Act (the "**CCAA**") (the proceedings commenced by such application, the "**CCAA Cases**") and were granted certain initial creditor protection pursuant to an order issued by the Canadian Court on the same date, which also appointed Ernst & Young Inc. as "**Monitor**" in connection with the CCAA Cases and has been extended by further order of the Canadian Court from time to time, most recently on April 14, 2010, as the same may be amended and restated from time to time by the Canadian Court;

WHEREAS, NNI and the Other Sellers listed in part 2 of Exhibit C hereto are debtors-in-possession under the U.S. Bankruptcy Code (as defined below) which commenced cases under Chapter 11 of the U.S. Bankruptcy Code on the Petition Date by filing voluntary petitions for relief in the U.S. Bankruptcy Court for the District of Delaware (the "**Chapter 11 Cases**");

WHEREAS, the EMEA Sellers other than Nortel Networks (Northern Ireland) Limited on the Petition Date filed applications with the English Court (as defined below), pursuant to the Insolvency Act of 1986, as amended (the "**Insolvency Act**") and the European Union's Council Regulation (EC) No 1346/2000 on Insolvency Proceedings (the proceedings commenced by such applications, the "**EMEA Cases**") and the English Court issued orders appointing Alan Bloom, Stephen Harris, Christopher Hill and Alan Hudson of Ernst & Young LLP as joint administrators of each of the EMEA Sellers (other than Nortel Networks (Ireland) Limited, for which David Hughes of Ernst & Young Chartered Accountants and Alan Bloom serve as joint administrators) (the "**Joint Administrators**") under the Insolvency Act, which orders were extended for a 24-month period by further order of the English Court on January 10, 2010;

WHEREAS, the entities listed under the heading "Israeli Companies" in part 4 of Exhibit C hereto (the "**Israeli Companies**") on January 18, 2009 filed applications with the Tel-Aviv-Jaffa District Court (the "**Israeli Court**"), pursuant to the Israeli Companies Law, 1999, and the regulations relating thereto (collectively, the "**Israeli Companies Law**") for a stay of

proceedings, and the Israeli Court appointed Yaron Har-Zvi and Avi D. Pelossof (the "**Joint Israeli Administrators**") on January 19, 2009, as joint administrators of the Israeli Companies under the Israeli Companies Law;

WHEREAS, on May 28, 2009, the Commercial Court of Versailles, France ordered the commencement of secondary proceedings and the appointment of an administrator and a liquidator in respect of Nortel Networks S.A.;

WHEREAS, on July 14, 2009, Nortel Networks (CALA) Inc. (collectively with the Other Sellers listed in part 2 of Exhibit C hereto, the "**U.S. Debtors**") commenced a case under Chapter 11 of the U.S. Bankruptcy Code by filing a voluntary petition for relief in the U.S. Bankruptcy Court of the District of Delaware;

WHEREAS, the Other Sellers listed in part 3 of Exhibit C hereto (the "**Non-Debtor Sellers**") and Nortel Networks (Northern Ireland) Limited are not subject to any Bankruptcy Proceedings (as defined below) as of the date hereof;

WHEREAS, the Sellers have agreed to transfer to the Purchaser and/or the Designated Purchasers (as defined below), and the Purchaser has agreed to purchase and assume, and cause the Designated Purchasers to purchase and assume, including, to the extent applicable, pursuant to sections 363 and 365 of the U.S. Bankruptcy Code and pursuant to the Canadian Approval and Vesting Order, the Assets and the Assumed Liabilities (each as defined below) from the Sellers, upon the terms and conditions set forth hereinafter;

WHEREAS, simultaneously with the execution of this Agreement, the EMEA Sellers, the Joint Administrators and the Purchaser are entering into a separate agreement in the form set forth in Exhibit D hereto (the "**EMEA Asset Sale Agreement**") providing for the sale to the Purchaser (and/or the EMEA Designated Purchasers (as defined therein)) of the assets of the Business held by the EMEA Sellers;

WHEREAS, the Parties (as defined below) acknowledge and agree that the purchase by the Purchaser (and the Designated Purchasers and the EMEA Designated Purchasers, if any) of the Assets and the EMEA Assets (as defined below), the license of Intellectual Property under the Intellectual Property License Agreement and the Trademark License Agreement (each as defined below), and the assumption by the Purchaser, the Designated Purchasers and the EMEA Designated Purchasers, as the case may be, of the Assumed Liabilities and the EMEA Assumed Liabilities (as defined below) are being made at arm's length and in good faith and without intent to hinder, delay or defraud creditors of the Sellers, their Affiliates or the EMEA Sellers and each Seller acknowledges that the consideration to be paid is fair value and reasonably equivalent value for the acquisitions by the Purchaser, the Designated Purchasers and the EMEA Designated Purchasers of the Assets and the EMEA Assets, the license of Intellectual Property under the Intellectual Property License Agreement and the Trademark License Agreement (each as defined below) and the assumption by the Purchaser, the Designated Purchasers and the EMEA Designated Purchasers of the Assumed Liabilities and the EMEA Assumed Liabilities, as set forth hereunder and in the EMEA Asset Sale Agreement; and

2

WHEREAS, in addition, on or before the Closing, the Purchaser, certain Sellers (or Affiliates of the Sellers) and certain EMEA Sellers will enter into the following ancillary agreements (together, the "**Ancillary Agreements**"): (i) the Intellectual Property License Agreement, (ii) the Transition Services Agreement, (iii) the Trademark License Agreement and (iv) the Loaned Employee Agreement (each as defined below) and will use their reasonable best efforts to negotiate in good faith (v) the Local Sale Agreements, (vi) the Sublease, (vii) the Contract Manufacturing Inventory Agreements, and (viii) the Subcontract Agreement (each as defined below). On or before the Closing, the Purchaser will also use its reasonable best efforts to negotiate in good faith and enter into the NN Turkey Distribution and Services Agreement (each as defined below).

NOW, THEREFORE, in consideration of the respective covenants, representations and warranties made herein, and of the mutual benefits to be derived hereby (the sufficiency of which is acknowledged), the Parties agree as follows:

## ARTICLE I.

## INTERPRETATION

SECTION 1.1        Definitions. Capitalized Terms Used But Not Otherwise Defined Herein Shall Have The Meanings Set Forth Below:

"**Accounting Arbitrator**" means the auditing firm of international reputation that is (i) jointly selected by the Primary Parties and NNUK, or (ii) in case they cannot agree on any such firm, such other auditing firm of international reputation (or, if the Primary Parties and NNUK agree on other criteria, such Person as satisfies such other criteria) that is selected by the American Arbitration Association at the request of the first of the Primary Parties and NNUK to move.

"**Acquired Business**" means the Business of the Sellers to the extent to be acquired or assumed hereunder.

"**Action**" means any litigation, action, hearing, investigation, complaint, suit (whether civil, criminal, administrative or otherwise at law or in equity), charge, binding arbitration, Tax audit or other legal, administrative or judicial proceeding, including Intellectual Property litigation (including infringement, indemnification, and declaratory judgment actions).

"**Adjusted Net Working Capital Transferred**" means, as of any given date, an amount equal to the Inventory Value plus the CIP Unbilled Accounts Receivable plus Prepaid Expenses minus the Warranty Provision minus Transferred Employee Liabilities.

"**Affiliate**" means, as to any Person, any other Person that directly or indirectly through one or more intermediaries Controls, or is under common Control with, or is Controlled by, such Person; provided, however, that (i) no EMEA Seller or Subsidiary of an EMEA Seller shall be deemed an Affiliate of any Seller, and (ii) no joint venture listed in Section 1.1(a) of the Sellers Disclosure Schedule shall be deemed an Affiliate of any Seller.

3

"**Aggregate Escrow Amount**" means the aggregate of the Succession Tax Escrow Amount, the EMEA Tax Escrow Amount, and the Post-Closing Purchase Price Escrow Amount.

"**Agreement**" means this Asset Sale Agreement, the Sellers Disclosure Schedule and all Exhibits and Schedules attached hereto and thereto and all amendments hereto and thereto made in accordance with Section 10.4.

"**Alternative Transaction**" means (i) the sale, transfer or other disposition, directly or indirectly, including through an asset sale, stock sale, merger, amalgamation, plan of arrangements or other similar transaction, of all or a "substantial portion" of the Business or all or a "substantial portion" of the Assets and the EMEA Assets, considered as a whole, in a transaction or a series of transactions (A) with one or more Persons other than the Purchaser and/or its Affiliates or (B) with a Successful Bidder, other than the Purchaser or its Affiliates, which may include multiple bidders whose bids are combined or (ii) the retention by all or part of the Sellers (or their successor entities emerging from the Bankruptcy Proceedings) of all or a majority of the Business, or all or a majority of the Assets and the EMEA Assets taken as a whole, pursuant to a plan of reorganization under Section 1129 of the Bankruptcy Code filed or otherwise sponsored by one or more third-party creditors of the Sellers pursuant to which all or a majority of the reorganized entity (including such portion of the Business or such Assets) is acquired by one or more Persons (other than the third-party creditors or the Purchaser and/or the Purchaser's Affiliates) in a transaction announced prior to such reorganization or within six (6) months of such reorganization, rather than being retained by the creditors generally; provided, however, that an "Alternative Transaction" shall not include (1) except as specified in clause (ii) above, the retention of the Acquired Business by all or part of the Sellers  (or their successor entities emerging from the Bankruptcy Proceedings) under a standalone plan of reorganization or plan of arrangement approved by the U.S. Bankruptcy Court or another Bankruptcy Court or any plan of arrangement approved by the Canadian Court, (2) the sale, assignment, leasing, expiration, termination or other disposition by the Sellers of any real estate or real estate lease, as applicable, not in violation of this Agreement, in connection with the implementation of the Sellers' global real estate strategy and not as part of a sale of a going concern, or (3) the sale, transfer or other disposition, directly or indirectly, of any portion of the Business, the Assets or the EMEA Assets (other than as a going concern) in connection with the closure, liquidation or winding up of the Business or any of the Sellers. As used in this definition, "substantial portion" shall refer to 35% of the fair market value of the Business or the Assets and the EMEA Assets, considered as a whole, as applicable.

"**Ancillary Agreements**" has the meaning set forth in the recitals to this Agreement.

"**Antitrust Laws**" means the HSR Act, the EC Merger Regulation, and any competition, merger control and antitrust Law of the European Union, any applicable European Union member states and EFTA states, and any other applicable supranational, national, federal, state, provincial or local Law designed or intended to prohibit, restrict or regulate actions having the purpose or effect of monopolizing or restraining trade or lessening competition of any other country or jurisdiction, to the extent applicable to the transactions contemplated by this Agreement.

4

"**Assets**" has the meaning set forth in Section 2.1.1.

"**Assigned Contracts**" means all Seller Contracts except (i) the Excluded 365 Contracts, (ii) the Excluded Non-365 Contracts and (iii) the Non-Assigned Contracts.

"**Assumed and Assigned Contracts**" has the meaning set forth in Section 2.1.5(c).

"**Assumed Liabilities**" has the meaning set forth in Section 2.1.3.

"**Auction**" has the meaning attributed to such term in the U.S. Bidding Procedures Order.

"**Available Real Estate Leases**" has the meaning set forth in Section 2.1.6(b)(i).

"**Bankruptcy Consents**" has the meaning set forth in Section 4.1(a).

"**Bankruptcy Court**" means the U.S. Bankruptcy Court, the Canadian Court, the English Court or any other court before which Bankruptcy Proceedings are held.

"**Bankruptcy Laws**" means the U.S. Bankruptcy Code, the CCAA, the Insolvency Act and the other applicable bankruptcy, insolvency, administration or similar Laws of any jurisdiction where Bankruptcy Proceedings are held.

"**Bankruptcy Proceedings**" means the Chapter 11 Cases, the CCAA Cases, the EMEA Cases and, in each case, any proceedings occurring or authorized thereunder, as well as any other voluntary or involuntary bankruptcy, insolvency, administration or similar judicial or other proceedings concerning any of the Sellers or the EMEA Sellers that are held from time to time.

"**Base Purchase Price**" has the meaning set forth in Section 2.2.1.

"**Bid**" means any bid, proposal, offer or quotation which, if accepted, would result in the award of a Contract.

"**Bid Deadline**" has the meaning set forth in the Bidding Procedures.

"**Bidding Procedures**" means the procedures approved pursuant to the U.S. Bidding Procedures Order.

"**Break-Up Fee**" means a cash fee in the amount of $2,500,000 minus any Expense Reimbursement paid.

"**Bundled Contract**" has the meaning set forth in Section 5.14(a).

"**Business**" means, collectively, the following business segments of the Sellers and EMEA Sellers as described below:

5

(i)        the Multi-Service Switch (formerly known as "Passport", including the element management platform portion thereof, Shasta and DPN (and related element management products) business segments of the Sellers and the EMEA Sellers comprising Employees, customer and supplier relationships and the goodwill associated therewith, through which such entities, individually, jointly or in collaboration with or pursuant to contracts with Third Parties, and using any variety of technologies, research, design, develop, process, manufacture (through contract manufacturers), assemble, test, support, market and sell globally to end users and resellers the Products; and

(ii)       the global services business segment of the Sellers and the EMEA Sellers, which provides, individually or with Third Parties, the following services with respect to the Products (collectively, the "**Services**"):

(a)        implementation and enhancement services, including network planning, consultation, network management, engineering, installation, integration, convergence, optimization and security services;

(b)        support services, including the support of multi-vendor voice-data-video-converged networks, including providing software, technical support, hardware and software maintenance, corrective content management, equipment spares logistics, and on-site engineers;

(c)        managed and outsourced services, ranging from support of individual solutions to entire multi-vendor networks;

(d)        hosted services, including single and multi-tenant hosted services, hosted multimedia services and applications performance engineering;

(e)        application services, including application development, integration and communications-enabled application solutions; and

(f)        communications integration services provided in connection with third party equipment,

but, in each case, only to the extent that the services relate to, are ancillary to, implement, support and manage, the Products and Third Party equipment supplied in connection with the Products or equipment supplied by Third Parties if, as of the date hereof, the Sellers generally provide such services with respect to such equipment,

but excluding, in each of clauses (i) and (ii) above: (A) the LGN Joint Venture or NN Turkey, (B) any Excluded Asset or EMEA Excluded Asset, and (C) Overhead and Shared Services.

"**Business Day**" means a day on which the banks are opened for business (Saturdays, Sundays, statutory and civic holidays excluded) in (i) New York, New York, United States, (ii) Toronto, Ontario, Canada, and (iii) London, England, United Kingdom.

"**Business Information**" means, whether in paper, digital or other tangible form, (i) if used exclusively in connection with the Business, all books, records, files, ledgers, sales

6

literature or similar documents in the possession or under control of the Sellers and that, in each case, is used exclusively in connection with the Business, including information on past, present and prospective customers and suppliers, policies and procedures, Owned Equipment manuals and materials and procurement documentation exclusively used in the Business or in respect of any Asset or Assumed Liability, documents containing information relating to the research and development of the Products or the Services (whether relating to activities by the Sellers and the EMEA Sellers associated with the Products and Services as of the Closing or any time prior thereto), documents containing technical information, operating and production records, quality control records, blueprints, research and development notebooks and files, customer credit data, manuals, documents containing engineering and scientific data, sales and promotional literature, drawings, technical plans, business plans, budgets and price lists, and (ii) copies of the materials listed on Section 1.1(b) of the Sellers Disclosure Schedule; provided, that with regard to copies provided pursuant to clause (ii), "Business Information" shall not include (A) the competitively sensitive portions of the foregoing that relate to Excluded Assets, Excluded Liabilities or other business lines of the Sellers, and (B) any materials whose disclosure would (1) jeopardize any attorney-client or other legal privilege or (2) contravene any fiduciary duty or agreement existing on the date hereof (including any confidentiality agreement to which the Sellers or any of their Affiliates are a party); and provided, further, that "Business Information" shall not include the Employee Records.

"**Business Registered IP**" has the meaning set forth in Section 4.5(b).

"**Calculation Principles**" means the Nortel Accounting Principles, to the extent applicable to the determination of the Adjusted Net Working Capital Transferred, and the other accounting principles, methodologies and policies for the determination of the Adjusted Net Working Capital Transferred set forth in Section 1.1(c) of the Sellers Disclosure Schedule.

"**Canadian Approval and Vesting Order**" has the meaning set forth in Section 5.2.2.

"**Canadian Court**" means the Ontario Superior Court of Justice (Commercial List).

"**Canadian Debtors**" has the meaning set forth in the recitals to this Agreement.

"**Canadian Sale Hearing**" has the meaning set forth in Section 5.1.2.

"**Canadian Sales Process Order**" has the meaning set forth in Section 5.2.1.

"**Canadian Sales Process Order Motion**" has the meaning set forth in Section 5.2.1.

"**Cash Collateral**" means the cash collateralizing performance bonds or other credit support posted or procured by a Seller set forth on Section 1.1(d) of the Sellers Disclosure Schedule.

"**CCAA**" has the meaning set forth in the recitals to this Agreement.

7

"**CCAA Cases**" has the meaning set forth in the recitals to this Agreement.

"**Chapter 11 Cases**" has the meaning set forth in the recitals to this Agreement.

"**CIP Unbilled Accounts Receivable**" means, as of any given date, all amounts classified by the Sellers and the EMEA Sellers in Contracts in progress accounts and other uninvoiced accounts receivable relating to the Business with respect to Contracts in progress, as recognized by the Business pursuant to the Calculation Principles.

"**Claim**" has the meaning set forth in section 101(5) of the U.S. Bankruptcy Code.

"**Clean Team Confidentiality Agreement**" means the clean team confidentiality agreement by and between NNL and its Subsidiaries and the Purchaser and its Subsidiaries, dated as of April 20, 2010, as amended from time to time.

"**Clean Team Members**" has the meaning attributed to that term in the Clean Team Confidentiality Agreement.

"**Closing**" has the meaning set forth in Section 2.3.1.

"**Closing Adjusted Net Working Capital Transferred**" has the meaning set forth in Section 2.2.3.1(a).

"**Closing EMEA Downward Adjustment**" has the meaning set forth in Section 2.2.3.1(a).

"**Closing Date**" has the meaning set forth in Section 2.3.1.

"**Closing Pre-Close Employment Payments**" has the meaning set forth in Section 2.2.3.1(a).

"**Closing Statement**" has the meaning set forth in Section 2.2.3.1(a).

"**Closing Total Prepaid Revenue Transferred**" has the meaning set forth in Section 2.2.3.1(a).

"**COBRA**" means the continuation coverage required by Section 4980B of the Code.

"**Code**" means the United States Internal Revenue Code of 1986, as amended.

"**Collective Labor Agreement**" means any written agreement, or addendum appendix or side letter thereto, that a Person has entered into with any union or collective bargaining agent with respect to terms and conditions of employment of such Person's employees.

"**Committee**" means the Official Committee of Unsecured Creditors appointed in the Chapter 11 Cases.

"**Competing Transaction**" has the meaning set forth in Section 5.27.

"**Computer Hardware**" means any computer hardware, equipment and peripherals of any kind and of any platform, including desktop and laptop personal computers, handheld computerized devices, servers, mid-range and mainframe computers, process control and distributed control systems, and all network and other communications and telecommunications equipment.

"**Confidential Information**" has the meaning set forth in Section 5.11(b).

"**Confidentiality Agreement**" means the confidentiality agreement by and among the Purchaser and NNI, among other parties, dated March 4, 2010.

"**Consent**" means any approval, authorization, consent, order, license, permission, permit, qualification, exemption or waiver by any Government Entity or other Third Party.

"**Contract**" means any written binding contract, agreement, instrument, lease, ground lease or commitment.

"**Contractual Liabilities**" means all Liabilities of the Sellers that arise in the Ordinary Course under Customer Contracts or under the MSS Portion of any Bundled Contracts, including marketing, allowance funds, technical training, demonstration equipment, events, trade shows, advertising, other direct marketing activities and rebate programs, any obligations to buy back from resellers the Products sold by the Business to its resellers under the Seller Contracts or under the MSS Portion of any Bundled Contracts.

"**Contract Manufacturing Inventory Agreements**" means the agreements among the Purchaser and/or any Designated Purchasers, the relevant Sellers, and the contract manufacturers of the Business listed in Section 1.1(e) of the Sellers Disclosure Schedule that the relevant Parties will use their commercially reasonable efforts to execute on or before the Closing in the form that shall be negotiated in good faith pursuant to Section 5.23 and the term sheet attached hereto as <u>Exhibit E</u>.

"**Contract Rejection Date**" has the meaning set forth in Section 5.13(a).

"**Control**", including, with its correlative meanings, "Controlled by" and "under common Control with", means, in connection with a given Person, the possession, directly or indirectly, of the power to either (i) elect more than fifty percent (50%) of the directors of such Person or (ii) direct or cause the direction of the management and policies of such Person, whether through the ownership of securities, contract or otherwise.

"**Covered Assets and Persons**" has the meaning set forth in Section 5.18(a).

"**Cross-Border Protocol**" means that certain Cross-Border Insolvency Protocol approved by the U.S. Bankruptcy Court's Order Pursuant to 11 U.S.C. §§ 105(a) Approving Cross-Border Court-to-Court Protocol, dated January 15, 2009, and the Canadian Court in an order, dated January 14, 2009, as the same may be amended from time to time.

9

"**Cure Cost**" means (i) any amounts required by section 365(b)(1) of the U.S. Bankruptcy Code to cure any defaults by the relevant U.S. Debtor under a 365 Contract and to pay any actual pecuniary losses that have resulted from such defaults under such 365 Contract, (ii) with respect to any Non-365 Seller Contract (other than Contracts of a Canadian Debtor that are assignable to the Purchaser without the consent of the counterparty), any amounts necessary to cure any monetary defaults and to pay any actual pecuniary losses under such Seller Contract in respect of the period prior to the Petition Date, and (iii) any amounts required to cure any monetary defaults under a Subleased Real Estate Lease and to pay any actual pecuniary losses under such Subleased Real Estate Lease in respect of the period prior to the Petition Date.

"**Customer Contract**" means any Seller Contract pursuant to which a Seller provides Products and/or Services to an end-user or a reseller, distributor, system integrator or service provider (including the Seller Contracts for Products or Services to be utilized by such reseller or distributor itself).

"**Deferred Transfer Assumed Liability**" has the meaning set forth in Section 5.13(d).

"**Deferred Transfer Purchased Asset**" has the meaning set forth in Section 5.13(c).

"**Designated Courts**" has the meaning set forth in Section 10.6(b).

"**Designated Other Non-365 Contracts**" has the meaning set forth in Section 2.1.6(a)(ii).

"**Designated Other 365 Contracts**" has the meaning set forth in Section 2.1.5(b).

"**Designated Purchaser**" has the meaning set forth in Section 2.4.

"**Disagreement Notice**" has the meaning set forth in Section 2.2.3.1(b).

"**Distribution Agent**" means the Person that will act as distribution agent for the Sellers and the EMEA Sellers hereunder, to be notified by the Main Sellers to the Purchaser by and not later than five (5) Business Days before the Closing.

"**EC Merger Regulation**" means Council Regulation (EC) No 139/2004 of January 20, 2004 on the control of concentrations between undertakings, as amended.

"**Effective Hire Date**" means the day on which the employment of an Employee commences or continues with the Purchaser or its Affiliates as provided in this Agreement.

"**EMEA Asset Sale Agreement**" has the meaning set forth in the recitals to this Agreement.

"**EMEA Assets**" has the meaning attributed to that term in the EMEA Asset Sale Agreement.

10

"**EMEA Assumed Liabilities**" has the meaning attributed to that term in the EMEA Asset Sale Agreement.

"**EMEA Cases**" has the meaning set forth in the recitals to this Agreement.

"**EMEA Designated Purchaser**" has the meaning attributed to that term in the EMEA Asset Sale Agreement.

"**EMEA Downward Adjustment**" has the meaning attributed to such term in Schedule 8 of the EMEA Asset Sale Agreement.

"**EMEA Owned Inventory**" has the meaning attributed to that term in the EMEA Asset Sale Agreement.

"**EMEA Sellers**" has the meaning set forth in the recitals to this Agreement.

"**EMEA Tax Escrow Amount**" has the meaning attributed to that term in the EMEA Asset Sale Agreement.

"**Employee**" means any employee of the Sellers engaged in the Acquired Business, as listed in Section 4.11(b) of the Sellers Disclosure Schedule.

"**Employee Information**" has the meaning set forth in Section 4.11(b).

"**Employee Records**" means SAP electronic data files with respect to Transferred Employees.

"**Employee Transfer Date**" means, with respect to each jurisdiction where Employees will become Transferred Employees in accordance with this Agreement, 12:01 a.m. local time in such jurisdiction on the day immediately following the Closing Date.

"**Employment Contract**" means any Seller Employee Plan or other plan, program, agreement or arrangement pursuant to which any Person provides employment or consulting services to the Acquired Business.

"**English Court**" means the High Court of Justice of England and Wales.

"**Environmental Liabilities and Claims**" means any Liability (including, without limitation, remedial actions, punitive damages, consequential damages, treble damages, legal and expert fees, fines, penalties, sanctions, natural resource damages, or costs of feasibility studies, remedial investigation, and remedial actions to the extent required by Environmental Law), Action or other claim to the extent relating to (i) violations of Environmental Law prior to the Closing, (ii) any Releases or threatened Releases at, onto, from, beneath or migrating to or otherwise relating to (A) any assets or properties currently or formerly owned or operated by the Business or any predecessor in interest prior to the Closing, or (B) any facilities that received Hazardous Materials generated by the Business prior to the Closing, or (iii) natural resources damages related to conditions occurring prior to the Closing.

11

"**Environmental Law**" means any applicable Law relating to or regulating: (i) the management, Release or remediation of Hazardous Materials; (ii) the exposure of persons to Hazardous Materials; (iii) occupational health and safety; or (iv) pollution or protection of the environment or natural resources, including the United States Resource Conservation and Recovery Act, the Comprehensive Environmental Response Compensation and Liability Act, the Clean Air Act, the Federal Water Pollution Control Act, the Safe Drinking Water Act, the Occupational Safety and Health Act and the Toxic Substances Control Act, all as amended, and any requirements of a Government Entity promulgated pursuant to these applicable laws or any analogous foreign, state, provincial or local laws.

"**Environmental Permit**" means any Consent required under any Environmental Law for the Acquired Business as currently conducted.

"**Equipment**" means tangible personal property, excluding any Inventory, Intellectual Property and, to the extent required by Law, any items of tangible property personally assigned to the Transferring Employees, but including all equipment, apparatus, appliances, test equipment, test labs, trial equipment, tooling, business supplies, hardware (including Computer Hardware) and other articles of tangible personal property.

"**ERISA**" means the Employee Retirement Income Security Act of 1974, as amended.

"**ERISA Affiliate**" means any corporation which is a member of a controlled group or any trade or business (whether or not incorporated) which is under common control with the Sellers or any Subsidiary within the meaning of Sections 414(b) and 414(c) of the Code.

"**Escrow Account**" means the following four (4) escrow accounts to be set up by the Escrow Agent pursuant to the Escrow Agreement: (i) an escrow account for the Succession Tax Amount (the "**Succession Tax Escrow Account**"), (ii) an escrow account for the EMEA Tax Escrow Amount, (iii) an escrow account holding the Post-Closing Purchase Price Escrow Amount (the "**Post-Closing Purchase Price Escrow Account**"), and (iv) an escrow account holding the Good Faith Deposit.

"**Escrow Agent**" means Wells Fargo Bank, National Association.

"**Escrow Agreement**" means the escrow agreement among NNI, NNL, NNUK, the Purchaser and the Escrow Agent to be entered into in the form of Exhibit F hereto in accordance with Section 2.2.5(a).

"**Estimated EMEA Downward Adjustment**" has the meaning set forth in Section 2.2.2(a).

"**Estimated Closing Adjusted Net Working Capital Transferred**" has the meaning set forth in Section 2.2.2(a).

"**Estimated Closing Statement**" has the meaning set forth in Section 2.2.2(a).

12

"**Estimated Pre-Close Employment Payments**" has the meaning set forth in Section 2.2.2(a).

"**Estimated Purchase Price**" has the meaning set forth in Section 2.2.2(b).

"**Estimated Total Prepaid Revenue Transferred**" has the meaning set forth in Section 2.2.2(a).

"**European Union Entity**" means a Government Entity of the European Union. For the avoidance of doubt, "European Union Entity" means a supranational Government Entity and not a Government Entity of any member State of the European Union.

"**Excluded Assets**" has the meaning set forth in Section 2.1.2.

"**Excluded Employee Liabilities**" has the meaning set forth in Section 7.3.

"**Excluded Liabilities**" has the meaning set forth in Section 2.1.4.

"**Excluded Non-365 Contract**" has the meaning set forth in Section 2.1.6(a)(iii).

"**Excluded Products and Services**" means all products and services provided by businesses or business segments of any Seller or EMEA Seller other than the Business.

"**Excluded Taxes**" has the meaning set forth in Section 6.9(a).

"**Excluded 365 Contract**" has the meaning set forth in Section 2.1.5(e).

"**Exclusion Criteria**" means (i) non-competition provision in any Customer Contract or Bundled Contract that would materially restrict the Purchaser or its Affiliates after the Closing from competing in any material business activity or (ii) a provision requiring the Purchaser to produce products and deliver services other than the Products or Services.

"**Executory Contract**" means an "executory contract" for the purposes of the U.S. Bankruptcy Code.

"**Expense Reimbursement**" means the Purchaser's reasonable and documented out-of-pocket costs and expenses (including fees and expenses of the Purchaser's advisors and notification and filing fees) in connection with the preparation, execution and performance of this Agreement and the transactions contemplated hereby to the date of termination of this Agreement, in an aggregate amount which shall not exceed $1,500,000.

"**Final Contract Designation Date**" means (a) for an Other365 Contract, the later of (i) the twentieth (20th) day prior to the Closing Date and (ii) five (5) Business Days after such Other 365 Contract is listed on Schedule 2.1.5(b) of the Sellers Disclosure Schedule and a true, accurate and complete list thereof is delivered to the Purchaser and (b) for an Other Non-365 Contract, the later of (i) the third (3rd) Business Day prior to the Closing Date and (ii) five (5) Business Days after such Other Non-365 Contract is listed on Schedule 2.1.6(a)(ii) of the Sellers Disclosure Schedule; provided, that, in each case, if any U.S. Debtor confirms to the Purchaser a

13

plan under Chapter 11 of the U.S. Bankruptcy Code pursuant to an order of the U.S. Bankruptcy Court prior to either of such dates, the "Final Contract Designation Date" for either an Other 365 Contract or an Other Non-365 Contract shall be the effective date of such plan.

"**Final Order**" means an order of any Bankruptcy Court, any court of competent jurisdiction or other Government Entity (i) as to which no appeal, notice of appeal, motion for leave to appeal, motion to amend or make additional findings of fact, motion to alter or amend judgment, motion for rehearing or motion for new trial has been timely filed or, if any of the foregoing has been timely filed, it has been disposed of in a manner that upholds and affirms the subject order in all material respects without the possibility for further appeal or rehearing thereon; (ii) as to which the time for instituting or filing an appeal, motion for leave to appeal, motion for rehearing or motion for new trial shall have expired; and (iii) as to which no stay is in effect; provided, however, that, with respect to an order issued by the U.S. Bankruptcy Court, the filing or pendency of a motion under Federal Rule of Bankruptcy Procedure 9024 or Federal Rule of Civil Procedure 60 shall not cause an order not to be deemed a "Final Order" unless such motion shall be filed within fourteen (14) days of the entry of the order at issue.

"**Financial Statements**" has the meaning set forth in Section 4.7.

"**Financing**" has the meaning set forth in Section 3.4(b).

"**French Escrow Amount**" has the meaning attributed to the term in the EMEA Asset Sale Agreement.

"**GAAP**" means the United States generally accepted accounting principles, consistently applied.

"**Good Faith Deposit**" has the meaning set forth in Section 2.2.4(a).

"**Government Entity**" means any U.S., Canadian, UK, supranational, foreign, domestic, federal, territorial, provincial, state, municipal or local governmental authority, quasi-governmental authority, instrumentality, minister, governor in council, court, government or self-regulatory organization, commission, tribunal or organization or any regulatory, administrative or other agency, or any political or other subdivision, department or branch of any of the foregoing, including the European Commission.

"**GST/HST**" means goods and services tax or harmonized sales tax payable under Part IX of the Excise Tax Act (Canada).

"**Hazardous Materials**" means any chemical, material, waste or substance defined by or regulated under any Environmental Law as a hazardous waste, hazardous material, hazardous substance, extremely hazardous waste, restricted hazardous waste, pollutant, contaminant, toxic substance or toxic waste, including petroleum, petroleum products, asbestos, lead or polychlorinated biphenyls.

"**Headcount Forecast**" has the meaning set forth in the Transition Services Agreement.

14

**"HSR Act"** means the United States Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended.

**"Inactive Employees"** means Employees (other than Employees whose employment transfers to the Purchaser or a Designated Purchaser by operation of Law) who (i) have accepted the Purchaser's or a Designated Purchaser's Offer as provided in Section 7.1, and (ii) are on a Seller-approved leave of absence for military service, short- or long-term disability, medical leave, pregnancy or parental leave, Family and Medical Leave Act, jury duty or any other leave of absence provided under applicable Law as of the Employee Transfer Date and, in each case, are expected to return and actually work in the time permitted for such leave under applicable Law and, for any other leave, is expected to return to work and actually returns to work within six (6) months from the Closing Date.

**"Inbound License Agreements"** has the meaning set forth in Section 4.5(g)(i).

**"Indebtedness"** of any Person means at any date, without duplication, all obligations of such Person (i) for indebtedness for borrowed money (including any unpaid principal, premium and accrued and unpaid interest, penalties or fees), (ii) for indebtedness evidenced by promissory notes, bonds, debentures, notes or similar instruments, (iii) in respect of leases that are capitalized in accordance with GAAP under which such Person is the lessee, (iv) in respect of letters of credit issued for the account of such Person (to the extent drawn), (v) any "earn-out" obligations or other obligation for the deferred purchase price of property or services (excluding trade payables) and (vi) research and development funds received or invoices under any alliance agreement that may be required to be earned by future performance or repaid thereunder,(vii) in respect of guarantees of the obligations of other Persons of the type referred to in clauses (i) through (vi) above, (vii) any termination fees, prepayment penalties, "breakage" cost or similar payments associated with the repayment or default under any of the Indebtedness referred to in items (i) and (ii) above.

**"Insolvency Act"** has the meaning set forth in the recitals to this Agreement.

**"Intellectual Property"** means all intellectual and industrial property and all rights therein as recognized under the laws of the United States of America, Canada and/or other countries or jurisdictions, including rights in and to: (a) Trademarks; (b) Patents; (c) copyrights and works of authorship (including any registrations therefor or applications for registration thereof); (d) mask works and integrated circuit topographies (including any registrations therefor or applications for registration thereof); (e) trade secrets, know-how, and proprietary and confidential technical or business information; (f) any Software; (g) any technology; and (h) *sui generis* database rights.

**"Intellectual Property License Agreement"** means the agreement to be entered into between the relevant Sellers, on the one hand, and the Purchaser (or the relevant Designated Purchasers), on the other hand, on or prior to the Closing in the form attached hereto as Exhibit G.

**"Inventory"** means any inventories of raw materials, manufactured and purchased parts, works in process, packaging, stores and supplies, unassigned finished goods

15

inventories (which are finished goods not yet assigned to a specific customer order) and merchandise.

        **"Inventory Value"** means, as of any given date, the book value, net of all applicable reserves and provisions, of the Owned Inventory and the EMEA Owned Inventory calculated in accordance with the Calculation Principles.

        **"IP Escrow Agreements"** has the meaning set forth in Section 5.9(c).

        **"IRS"** means the United States Internal Revenue Service.

        **"Joint Administrators"** has the meaning set forth in the recitals to this Agreement.

        **"KEIP"** means the Nortel Networks Corporation Key Executive Incentive Plan approved by the U.S. Bankruptcy Court in part on March 5, 2009, and in part on March 20, 2009, and substantially approved by the Canadian Court in part on March 6, 2009, and in part on March 20, 2009, as the same has been and may further be amended, modified, supplemented or replaced from time to time in accordance with Section 5.9(d).

        **"KERP"** means the Nortel Networks Corporation Key Employee Retention Plan approved by the U.S. Bankruptcy Court on March 5, 2009, and approved by the Canadian Court on March 6, 2009, as the same has been and may further be amended, modified, supplemented or replaced from time to time in accordance with Section 5.9(d).

        **"Knowledge"** or **"aware of"** or **"notice of"** or a similar phrase shall mean, with reference to the Sellers, the actual knowledge of those Persons listed on Section 1.1(f) of the Sellers Disclosure Schedule, and, with reference to the Purchaser, the actual knowledge of those Persons listed on Exhibit H.

        **"KPD Provision"** means, as of any given date, the provisions for "Known Product Defects" (as defined in Nortel Accounting Principles) to be recognized and measured by the Business pursuant to the Calculation Principles with respect to defects (other than defects covered by the Non-KPD Warranty Provision) of Products and/or Services that have been sold by the Sellers and the EMEA Sellers.

        **"Law"** means any U.S., Canadian, UK, supranational, foreign, domestic, federal, territorial, state, provincial, local or municipal statute, law, common law, ordinance, rule, regulation, notice, order, writ, injunction, directive, judgment, decree or policy or guideline having the force of law.

        **"LGN Joint Venture"** means LG-Nortel Co. Ltd., which was established in November 2005 as a joint venture between NNL and LG Electronics Inc. for the purpose of jointly developing and marketing certain telecommunications equipment and network solutions. As of June 29, 2010 Nortel Networks Limited completed the sale of its 50% plus 1 share interest in LG-Nortel Co. Ltd with LG Electronics Inc., to Telefonaktiebolaget LM Ericsson (Publ).

"**Liabilities**" means debts, liabilities, commitments and obligations, whether accrued or fixed, direct or indirect, liquidated or unliquidated, absolute or contingent, matured or unmatured or determined or undeterminable, known or unknown, including those arising under any Law, Action or Claim and those arising under any Contract or otherwise, including any Tax liability.

"**Licensed Intellectual Property**" means the Intellectual Property being licensed to the Purchaser or the relevant Designated Purchaser(s) under the Intellectual Property License Agreement and the Trademark License Agreement.

"**Lien**" means any lien (statutory or otherwise), mortgage, pledge, security interest, charge, right of first refusal, hypothecation, encumbrance, easement, encroachment, right-of-way, restrictive covenant on real property, real property license, lease or conditional sale arrangement.  For the avoidance of doubt, "Lien" does not include any Intellectual Property license.

"**Loaned Employees**" has the meaning set forth in Section 7.1.1.

"**Loaned Employee Agreement**" means the agreement between the Main Sellers and certain of the Other Sellers, on the one hand, and the Purchaser and/or any Designated Purchasers, on the other hand, to be executed before the Closing in the form attached hereto as Exhibit I.

"**Local Sale Agreements**" has the meaning set forth in Section 2.1.8.

"**Losses**" means all losses, damages and reasonable and documented out-of-pocket costs and expenses.

"**LTD Representative**" has the meaning set forth in Section 2.1.4(o).

"**Main Sellers**" has the meaning set forth in the preamble to this Agreement.

"**Mandatory Regulatory Approvals**" means a decision, in whatever form (including a declaration of lack of jurisdiction or a mere filing or notification, if the Closing can take place, pursuant to the applicable Antitrust Law, without a decision or the expiry of any waiting period) by any Government Entity under the Antitrust Laws of any of the jurisdictions listed in Exhibit J (the "**Relevant Antitrust Jurisdiction / Authorities**") or the expiry of the applicable waiting period, as applicable, under the Antitrust Laws of any of the jurisdictions listed in Exhibit J, in each case authorizing or not objecting to the transactions contemplated by this Agreement (and/or by the EMEA Asset Sale Agreement) and including, in each case, as applicable, any decision or consent by any such Government Entity setting forth conditions or obligations on the Purchaser or any of its Affiliates if such conditions or obligations have been or, pursuant to Section 5.5(d), Section 5.5(e) hereof or Clause 10.8 or 10.9 of the EMEA Asset Sale Agreement are required to be, accepted by the Purchaser.

"**Material Adverse Effect**" means any event, change, circumstance, development, condition, fact, occurrence or effect that, individually or together with any other events, changes, circumstances, developments, conditions, facts, occurrences or effects has had,

17

or would reasonably be expected to have a material adverse effect on the business, operations, assets, liabilities, results of operation or condition (financial or otherwise) of the Business to be transferred hereunder and under the EMEA Asset Sale Agreement, taken as a whole, but in each case shall not include the effect of events, changes, circumstances, developments, conditions, facts, occurrences, or effects to the extent resulting from (a) changes, events and occurrences in the industries and markets in which the Business operates, but only to the extent that such changes, events or occurrences do not have a disproportionate effect on to the Business relative to other businesses in such industries and markets, (b) macroeconomic factors, interest rates, currency exchange rates, general financial market conditions, acts of God, war, terrorism or hostilities, but only to the extent that such factors or conditions, acts of God, war, terrorism or hostilities, in each case, do not have a disproportionate effect on the Business, relative to other businesses in the industries or markets in which the Business operates, (c) changes in Law, generally accepted accounting principles or official interpretations of the foregoing, (d) compliance with this Agreement, (e) the transactions contemplated hereby or any announcement hereof or the identity of the Purchaser, (f) the pendency of the Bankruptcy Proceedings, (g) the attrition of customers or employees prior to the Closing Date (provided, that the reason for customer attrition, if not otherwise excluded pursuant to the other clauses of this definition in determining whether there has been a Material Adverse Effect, shall be included in determining whether there has been a Material Adverse Effect), (h) actions taken by the Sellers at the specific written request of the Purchaser or (i) the failure of the Business to achieve internal or external financial forecasts or projections, provided, however, that the effect of any underlying event, change, circumstance, development, condition, fact, occurrence or effect giving rise to any such failure to meet forecasts or projections, if not otherwise excluded pursuant to the other clauses of this definition in determining whether there has been a Material Adverse Effect, shall be included in determining whether a Material Adverse Effect has occurred.

"**Material Contracts**" has the meaning set forth in Section 4.4(a).

"**Monetary Cost**" has the meaning set forth in the Transition Services Agreement.

"**Monetary Cost Schedule**" has the meaning set forth in the Transition Services Agreement.

"**Monitor**" means Ernst & Young Inc., in its capacity as the Canadian Court-appointed Monitor in connection with the CCAA Cases.

"**MSS Portion**" has the meaning set forth in Section 5.14(b).

"**New York Courts**" has the meaning set forth in Section 10.6(b).

"**NNC**" has the meaning set forth in the preamble to this Agreement.

"**NNFSAS Escrow Agent**" has the meaning set forth in the EMEA Asset Sale Agreement.

"**NNI**" has the meaning set forth in the preamble to this Agreement.

"**NNL**" has the meaning set forth in the preamble to this Agreement.

"**NNTC**" has the meaning set forth in Section 6.1(d).

"**NN Turkey**" means Nortel Networks Netas Telekomunikasyon A.S., a joint stock corporation formed under the laws of Turkey.

"**NN Turkey Distribution and Services Agreement**" means the agreement between the Purchaser and/or a Designated Purchaser, on the one hand, and NN Turkey, on the other hand, governing the sale and servicing of certain Products by the Business to NN Turkey for resale.

"**NNUK**" means Nortel Networks UK Limited.

"**Non-Assignable Contracts**" has the meaning set forth in Section 5.13(a).

"**Non-Assigned Contracts**" means the Non-Assignable Contracts, to the extent all applicable Consents to assignment thereof to the Purchaser or a Designated Purchaser have not been granted prior to the Closing Date.

"**Non-Exclusive Supply Contract**" means any supply Contract to which any Seller is a party that relates to the Business and also relates to one or more other businesses of any of the Sellers.

"**Non-Debtor Sellers**" has the meaning set forth in the recitals to this Agreement.

"**Non-KPD Warranty Provision**" means, as of any given date, the provision to be recognized and measured by the Business pursuant to the Calculation Principles for potential claims by customers under the Warranty Obligations (other than claims covered by the KPD Provision).

"**Non-Solicitation Period**" means the twenty-four (24) month period immediately following the Closing Date.

"**Non-Union Employee**" means an Employee whose terms and conditions of employment are not governed by a Collective Labor Agreement.

"**Non-365 Customer Contract List**" has the meaning set forth in Section 2.1.6(a)(i).

"**Non-365 Customer Contracts**" has the meaning set forth in Section 2.1.6(a)(i).

"**Non-365 Seller Contracts**" means Seller Contracts other than 365 Contracts.

"**Nortel Accounting Principles**" means the accounting principles employed in the preparation of the Financial Statements, as set forth in Section 1.1(g) of the Sellers Disclosure Schedule.

"**Nortel Retained Business**" has the meaning set forth in the Intellectual Property License Agreement.

"**Nortel Special Incentive Plan**" means the Nortel Special Incentive Plan approved by the U.S. Bankruptcy Court on March 4, 2010, and approved by the Canadian Court on March 3, 2010, as amended, modified, supplemented or replaced from time to time in accordance with Section 5.9(d).

"**Offer**" has the meaning set forth in Section 7.1.1.

"**Offer Consideration Period**" has the meaning set out in Section 7.1.1.

"**Omitted Inbound License Agreement**" has the meaning set forth in Section 4.5(g)(i).

"**Omitted Outbound License Agreement**" has the meaning set forth in Section 4.5(g)(ii).

"**Omitted Patent Cross-License Agreement**" has the meaning set forth in Section 4.5(g)(iii).

"**Ordinary Course**" means the ordinary course of the Business consistent with past practice since January 14, 2009, and as such practice may be modified from time to time (i) to the extent necessary to reflect the Bankruptcy Proceedings or (ii) as may be required in the reasonable judgment of the Sellers to further effectuate the separation of the Business from the other businesses of the Sellers in a manner consistent with the Transaction Documents.

"**Other Contract**" means any Seller Contract that is not a Customer Contract or an Employment Contract.

"**Other Loaned Employees**" means Employees to whom the Purchaser or a Designated Purchasers have offered employment pursuant to Article VII but who cannot commence employment with the Purchaser or such Designated Purchaser until an entity is established in the country in which such Employee was employed immediately prior to the Closing Date.

"**Other Non-365 Contract List**" has the meaning set forth in Section 2.1.6(a)(ii).

"**Other Non-365 Contracts**" has the meaning set forth in Section 2.1.6(a)(ii).]

"**Other Sellers**" has the meaning set forth in the preamble to this Agreement.

"**Other 365 Contract List**" has the meaning set forth in Section 2.1.5(b).

"**Other 365 Contracts**" has the meaning set forth in Section 2.1.5(b).

"**Outbound License Agreement**" has the meaning set forth in Section 4.5(g)(iii).

"**Overhead and Shared Services**" means corporate or shared services provided to or in support of the Business that are general corporate or other overhead services (or were provided prior to any recent divestiture by any Seller since the filing of the Bankruptcy Proceedings) and which are provided to both (a) the Business and (b) other businesses or business segments of any Seller, including travel and entertainment services, temporary labor services, office supplies services (including copiers and faxes), personal telecommunications services, Computer Hardware and Software used by Employees, fleet services, energy/utilities services, procurement and supply arrangements, corporate or shared research and development services, treasury services, public relations, legal, compliance and risk management services (including workers' compensation), payroll services, sales and marketing support services, information technology and telecommunications services, accounting services, tax services, human resources and employee relations management services, employee benefits services, credit, collections and accounts payable services, logistics services, property management services, environmental support services and customs and excise services, in each case including services relating to the provision of access to information, operating and reporting systems and databases and including all hardware and Software (in object code form) or other Intellectual Property necessary for or used in connection therewith.

"**Owned Equipment**" means (i) those items of Equipment (including, but not limited to, Computer Hardware) owned by any of the Sellers that are held or used exclusively in connection with the Business (excluding, subject to the proviso set forth at the end of this paragraph, all trade fixtures and fixtures, furniture, furnishings and fittings at any office or other facility where the Acquired Business is or has been conducted), including items of Equipment owned by any of the Sellers that are held or used exclusively in connection with the Business that are (A) located at the shared labs identified in Section 1.1(h) of the Sellers Disclosure Schedule or (B) on loan the Sellers' contract manufacturers or R&D Service providers as listed in Section 1.1(h) of the Sellers Disclosure Schedule , and (ii) the other Equipment listed in Section 1.1(h) of the Sellers Disclosure Schedule, provided, however, that "Owned Equipment" shall not include any (A) Owned Inventory, (B) any items of tangible property personally assigned to Employees who are not (1) Transferred Employees as of the Employee Transfer Date, or (2) Loaned Employees, (C) any Intellectual Property, or (D) information technology assets, such as data servers and large scale storage devices; provided, further, that if the Purchaser elects to have the relevant Seller enter into a Sublease with such Purchaser or a Designated Purchaser at the Sellers' Beijing, China facility, "Owned Equipment" shall include all trade fixtures, furniture, furnishings and fittings at such facility.

"**Owned Inventory**" means any Inventory owned by the Sellers and held or used exclusively in connection with the Business, including any Inventory which is owned by the Sellers but remains in the possession or control of a contract manufacturer or another Third Party (but excluding any inventory that is purchased by any of the Sellers from any contract manufacturer after the Closing Date under any agreement between such Sellers and contract manufacturers or under any Contract Manufacturing Inventory Agreement and excluding any inventory that is required to be purchased by any of the Sellers from a contract manufacturer after the date of this Agreement but prior to the Closing Date in connection with the Ordinary Course quarterly review process completed by such contract manufacturer to determine inventory levels in excess of the Sellers' forecasts). For the avoidance of doubt, Owned Inventory shall include assets on loan and would not include products shipped to customers or

related costs of services delivered for which a corresponding deferred cost of goods sold has been recorded.

"**Partial Allocation**" has the meaning set forth in Section 2.2.6(b).

"**Party**" or "**Parties**" means individually or collectively, as the case may be, the Sellers and the Purchaser.

"**Patent Cross-License Agreements**" has the meaning set forth in Section 4.5(g)(iii).

"**Patents**" means all national (of any country of origin) and multinational statutory invention registrations, patents, patent applications, provisional patent applications, and all reissues, divisions, continuations, continuations-in-part, extensions and reexaminations thereof, and all rights therein provided by multinational treaties or conventions.

"**Permitted Encumbrances**" means (i) statutory Liens for Taxes or governmental assessments, charges or claims the payment of which is not yet due or, if due, for Taxes the validity of which is being contested in good faith by appropriate proceedings and which are set forth on Section 1.1(i) of the Sellers Disclosure Schedule, in each case, for which adequate reserves have been established to the extent required by GAAP; (ii) mechanics', carriers', workers', repairers', landlords', warehouses and similar Liens arising or incurred in the Ordinary Course for sums not yet delinquent or overdue or which are being contested in good faith by appropriate proceedings; (iii) Liens arising hereunder or under any Assigned Contracts (after giving effect to the assignment hereunder); (iv) any Liens imposed by any Bankruptcy Court in connection with the Bankruptcy Proceedings that are to be discharged at Closing pursuant to the terms of the Canadian Approval and Vesting Order and the U.S. Sale Order; (v) any other Liens set forth in Section 1.1(j) of the Sellers Disclosure Schedule; and (vi) zoning, entitlement, building and land use regulations, customary covenants, defects of title, easements, rights of way, restrictions and other similar charges or encumbrances which do not impair in any material respect the use or value of the related assets in the Business as currently conducted.

"**Person**" means an individual, a partnership, a corporation, an association, a limited or unlimited liability company, a joint stock company, a trust, a joint venture, an unincorporated organization or other legal entity or Government Entity.

"**Petition Date**" has the meaning set forth in the recitals to this Agreement.

"**Plan of Record Products**" means the products related to the Business under development by the Sellers as of the date hereof, as set forth in Section 1.1(k) of the Sellers Disclosure Schedule.

"**Pre-Close Employment Payments**" has the meaning attributed to such term in Schedule 6 of the EMEA Asset Sale Agreement.

"**Post-Closing Purchase Price Escrow Amount**" means $10,000,000, minus the amount, if any, by which the Estimated Closing Adjusted Net Working Capital Transferred is less than the Target Adjusted Net Working Capital Transferred, as calculated pursuant to Section

22

2.2.2(b)(ii); provided, however, that the Post-Closing Purchase Price Escrow Amount shall not be less than $1,000,000.

"**Post-Closing Taxable Period**" means any taxable period or portion thereof beginning after the Closing Date.

"**Pre-Closing Taxable Period**" means any taxable period or portion thereof ending on or prior to the Closing Date.

"**Prepaid Expenses**" means prepaid expenses specifically identified as relating to the Business which have a future economic value.

"**Prepaid Revenue**" means the revenue collected by the Sellers on account of the Prepaid Services as of the Closing Date.

"**Prepaid Revenue Transferred**" means, for any Services Contract, the product of (x) Prepaid Revenue divided by the Prepaid Services Period and (y) the number of days remaining in the Prepaid Services Period as of the Closing Date. Notwithstanding the foregoing, the Sellers shall retain all Seller Receivables.

"**Prepaid Services**" means those services to be performed on a regular basis in a given period under any Services Contract for which the Sellers have collected payments in advance of performing such services prior to the Closing Date. For the avoidance of doubt, such services shall not include the satisfaction of any Warranty Obligations.

"**Prepaid Services Period**" means, for any Services Contract, the total number of days for which the Sellers (i) have issued or will issue an invoice to the customer or (ii) have received payment from the customer, in each case on account of the Prepaid Services.

"**Primary Party**" means (i) each of the Main Sellers, on the one hand, and (ii) the Purchaser, on the other hand.

"**Product Volume Forecast**" has the meaning set forth in the Transition Services Agreement.

"**Products**" means those products that are manufactured by or on behalf of and/or marketed by the Business, as set forth in Section 1.1(l) of the Sellers Disclosure Schedule and all prior versions thereof that are supported by or on behalf of the Business as of the date hereof.

"**Provider's Cost**" has the meaning set forth in the Transition Services Agreement.

"**Public Software**" means open source Software and any other Software that is subject to a license that requires as a condition of use, modification and/or distribution of the Software that such Software or other Software that is incorporated into, derived from or distributed or integrated with such Software be (1) disclosed or distributed in source code form, (2) licensed for the purpose of making derivative works, or (3) redistributable at no charge

23

whether as, shareware, "copyleft" Software, or similar Software.  Public Software includes Software subject to the GNU Lesser General Public License, and the Mozilla Public License.

"**Purchase Price**" has the meaning set forth in Section 2.2.1.

"**Purchaser**" has the meaning set forth in the preamble to this Agreement.

"**Purchaser Authorized Agents**" has the meaning set forth in Section 10.6(c).

"**Purchaser Authorized Canadian Agent**" has the meaning set forth in Section 10.6(c).

"**Purchaser Authorized U.S. Agent**" has the meaning set forth in Section 10.6(c).

"**Purchaser Employee Plan**" means any "employee benefit plan," whether or not in writing and whether covering a single individual or a group of individuals, within the meaning of Section 3(3) of ERISA and any other employee benefit plan, including any profit sharing plan, savings plan, bonus plan, performance awards plan, incentive compensation plan, deferred compensation plan, stock purchase plan, stock option plan, vacation plan, leave of absence plan, employee assistance plan, automobile leasing/subsidy/allowance plan, meal allowance plan, redundancy or severance plan, relocation plan, family support plan, pension plan, supplemental pension plan, retirement plan, retirement savings plan, post-retirement plan, medical, health, hospitalization or life insurance plan, disability plan, sick leave plan, retention plan, education assistance plan, expatriate assistance plan, compensation arrangement, including any base salary arrangement, overtime, on-call or call-in policy, death benefit plan, or any other similar plan, program, arrangement or policy that is maintained or otherwise contributed to, or required to be maintained or contributed to, by or on behalf of the Purchaser or any of its Subsidiaries or Affiliates with respect to their employees employed in those countries where they will employ Transferred Employees pursuant to this Agreement.

"**Purchaser Parties**" means the Purchaser, any Designated Purchasers and any EMEA Designated Purchasers, any of their respective Subsidiaries and any former, current or future general or limited partners, directors, officers, employees, agents, managers, members, Affiliates, stockholders, assignees and representatives of any of the foregoing in their capacity as such.

"**Qualified Expenditures**" has the meaning set forth in Section 6.5(b).

"**Real Estate Lease List**" has the meaning set forth in Section 2.1.6(b)(i).

"**Records Custodian**" means a Person of international reputation that is acceptable to the Purchaser and the Main Sellers, acting reasonably.

"**Release**" when used in conjunction with Hazardous Materials, means any spilling, leaking, pumping, emitting, emptying, pouring, discharging, depositing, injecting, escaping, leaching, migrating, dumping, or disposing of Hazardous Materials (including the

abandonment or discarding of barrels, containers or other receptacles containing Hazardous Materials) into the environment.

"**Respective Affiliates**" has the meaning set forth in Section 10.16(c).

"**Representative Counsel**" has the meaning set forth in Section 2.1.4(o).

"**Representatives**" has the meaning set forth in Section 5.27.

"**Restricted Technical Records**" means the Livelink database or any other similar database containing all necessary documents with respect to the technical aspects of the Qualified Expenditures of NNTC or NNL in their 2002 and subsequent taxation years.

"**Sale Hearing**" has the meaning set forth in the Bidding Procedures.

"**Selected Suppliers**" means those suppliers of the Acquired Business that are party to Other Contracts that the Purchaser wishes to have assigned to the Purchaser or a Designated Purchaser at Closing in accordance with Section 2.1.5 or Section 2.1.6, as applicable.

"**Seller Authorized Agents**" has the meaning set forth in Section 10.6(d).

"**Seller Authorized Canadian Agent**" has the meaning set forth in Section 10.6(d).

"**Seller Authorized U.S. Agent**" has the meaning set forth in Section 10.6(d).

"**Seller Bid**" has the meaning set forth in Section 2.1.1(i).

"**Seller Break-up Fee**" means an amount equal to two-thirds of the Break-up Fee.

"**Seller Consents**" has the meaning set forth in Section 2.1.1(g).

"**Seller Contracts**" means (i) those Contracts of a Seller that relate exclusively to the Acquired Business or to the Assets (including Inbound License Agreements that are used, as of the date hereof, exclusively in connection with the Acquired Business or any Asset, but excluding any other licenses of Intellectual Property) and (ii) the Contracts of a Seller that are listed on Section 1.1(m) of the Sellers Disclosure Schedule.

"**Seller Employee Plan**" means any "employee benefit plan," whether or not reduced to writing and whether covering a single individual or a group of individuals, within the meaning of Section 3(3) of ERISA and any other employee benefit plan including any profit sharing plan, savings plan, bonus plan, performance awards plan, incentive compensation plan, deferred compensation plan, stock purchase plan, stock option plan, vacation plan, leave of absence plan, employee assistance plan, automobile leasing/subsidy/allowance plan, meal allowance plan, redundancy or severance plan, relocation plan, family support plan, pension plan, supplemental pension plan, retirement plan, retirement savings plan, post retirement plan, medical, health, hospitalization or life insurance plan, disability plan, sick leave plan, retention plan, education assistance plan, expatriate assistance plan, compensation arrangement, including

any base salary arrangement, overtime, on-call or call-in policy, death benefit plan, or any other similar plan, program, agreement, arrangement or policy that is maintained or otherwise contributed to, or required to be maintained or contributed to, by or on behalf of the Sellers or any of their Subsidiaries or Affiliates (other than any EMEA Sellers, if any) with respect to Employees.

**"Seller Expense Reimbursement"** means an amount equal to two-thirds (2/3) of the Expense Reimbursement.

**"Seller Insurance Policies"** has the meaning set forth in 5.18(a).

**"Seller Receivables"** means all accounts receivable of the Sellers (excluding any CIP Unbilled Accounts Receivable) and other debts owing to the Sellers, in each case under any Seller Contract, which remain unpaid as of Closing, together with any interest accrued thereon.

**"Sellers"** has the meaning set forth in the preamble to this Agreement.

**"Sellers Disclosure Schedule"** means the disclosure schedule delivered by the Sellers to the Purchaser on the date hereof.

**"Sellers' Trademarks"** has the meaning set forth in Section 5.21.

**"Service Provider"** has the meaning set forth in Section 5.24(c).

**"Services"** means those services described in clause (ii) of the definition of "Business" hereunder.

**"Services Contract"** means a Customer Contract (or the MSS Portion of any Bundled Contract) for Services that is an Assigned Contract.

**"Settlement Agreement"** has the meaning set forth in Section 2.1.4(o).

**"Software"** means any and all computer programs, including operating system and application software, implementation of algorithms, development tools and program interfaces, whether in source code or object code form (including all of the foregoing that is installed on Computer Hardware), and all related documentation (including data entry and data processing procedures, report generation, quality control procedures and user manuals related to the foregoing).

**"Special Arrangements"** has the meaning set forth in Section 4.11(a).

**"Sponsor"** has the meaning set forth in Section 3.4(b).

**"Sponsor Commitment Letter"** has the meaning set forth in Section 3.4(b).

**"State Government"** means any state, territory or possession of the United States or any department or agency of any of such state, territory or possession with jurisdiction and responsibility throughout such state, territory or possession.