balance sheet accounts and income statements set forth therein for the Business, in each case as of the dates and for the periods presented therein. The Financial Statements (a) have been prepared in accordance with the Nortel Accounting Principles, (b) include estimated costs that do not necessarily represent the costs that were actually allocated to the Business for the relevant periods (or that the Business will incur after the Closing), (c) include assets that have not been tested for impairment or otherwise adjusted for fair value, (d) reflect the estimated historical operation of the Business (including the Overhead and Shared Services and the Excluded Assets) for the periods specified therein and (e) do not represent the balance sheet accounts or the income statements that would have occurred if the Business had been operated by the Sellers as a "stand alone" entity.

(b)     Except as set forth in Section 4.7(b) of the Sellers Disclosure Schedule, there are no Assumed Liabilities or EMEA Assumed Liabilities of a type that would be required to be included on a balance sheet of the Business prepared in accordance with Nortel Accounting Principles (or reflected in the notes thereto) except Liabilities that (i) in the aggregate are set forth or reflected in the Financial Statements; (ii) have been incurred in the Ordinary Course since the date of the last balance sheet included in the Financial Statements; (iii) have been incurred in connection with this Agreement or the transactions contemplated hereby; (iv) may be satisfied by the payment of Cure Costs; or (v) are not material to the Business as a whole.

(c)     Any CIP Unbilled Accounts Receivable assumed by Purchasers hereunder represent bona fide transactions.

SECTION 4.8     Compliance with Laws; Consents.

(a)     Since January 1, 2008, the Sellers have not received any notice alleging that any of them has been in violation of any applicable Law in connection with the Acquired Business, in each case except for such violations as would not reasonably be expected to be material to the Business as a whole. None of the Sellers has received any written notice or written claims from any Government Entity within the twelve (12) months preceding the date hereof relating to any material non-compliance of the Acquired Business or the Assets with any applicable Law nor are there, based on the Knowledge of the Sellers, any such notice or claims threatened or pending, except where such claims would not reasonably be expected to be material to the Business as a whole.

(b)     To the Knowledge of the Sellers (i) all the Consents of Government Entities necessary for, or otherwise material to, the conduct of the Acquired Business as conducted on the date hereof, have been duly obtained and are in full force and effect and (ii) the relevant Sellers are in compliance with the terms of each of such Consents, in each case except for such violations as would not reasonably be expected to be material to the Acquired Business taken as a whole. None of the Sellers has received any notice or written claims from any Government Entity relating to any material non-compliance of the Business or the Assets with such Consents nor are there, based on the Knowledge of the Sellers, any such notice or claims threatened or pending, except where such claims would not reasonably be expected to be material to the Business as a whole.

67

SECTION 4.9    Real Property.  Each parcel of real property leased pursuant to any Subleased Real Estate Lease is leased by a Seller free and clear of all Liens on such Seller's leasehold interest, as applicable, except for Permitted Encumbrances and encumbrances underlying the fee estate (provided that this representation is being made only with respect to that portion of the premises subject thereto which, following the completion of the segregation of such premises contemplated by Section 5.24, will be subject to a Sublease).  The Sellers have made available to the Purchaser true, correct and complete copies of any Subleased Real Estate Lease, in each case as amended or otherwise modified and in effect.  Following the completion of the segregation of the Subleased Real Estate Leases contemplated by Section 5.24, there will be no written or oral subleases, licenses, concessions, occupancy agreements or other contractual obligations granting to any other Person the right to use or occupancy of the premises subject to Sublease and there will be no Person (other than the Sellers) in possession of such premises.  Each Subleased Real Estate Lease is valid and binding and is in full force and effect, in accordance with its terms, subject to applicable bankruptcy, insolvency, moratorium and similar laws affecting creditors' rights generally (including, without limitation, the Sellers' rights under the Bankruptcy Proceedings) and general principles of equity (regardless of whether enforcement is sought in a proceeding in equity or at law).  Except for any such event resulting from the Bankruptcy Proceedings, to the Knowledge of Sellers, since the Petition Date no Seller has materially breached any Subleased Real Estate Lease and no event has occurred that would cause a material breach except for those breaches that can be cured under Section 2.1.7.  Since the Petition Date, neither any Seller nor any Affiliate of a Seller has given written notice to any landlord claiming a default by such landlord under a Subleased Real Estate Lease.  To the Knowledge of the Sellers, no landlord under a Subleased Real Estate Lease has notified a Seller or any of its Affiliates that it intends to terminate such Subleased Real Estate Lease prior to its scheduled expiration.

SECTION 4.10    Environmental Matters.

(a)    To the Knowledge of the Sellers, the Acquired Business is in compliance with Environmental Laws and has obtained and is in compliance with all Environmental Permits, except where failure to comply with Environmental Laws, or to obtain or comply with Environmental Permits, would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

(b)    There are no Actions relating to the Acquired Business or the Assets pending or, to the Knowledge of the Sellers, threatened against any of the Sellers pursuant to Environmental Laws, in each case except those Actions that would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

(c)    Sellers have received no written notice alleging any material violation of any Environmental Law relating solely to the Acquired Business within the prior six (6) months, nor have Sellers engaged in any discussions or negotiations with any Governmental Authority with respect to any alleged material violation of any Environmental Law solely relating to the Acquired Business within the prior six (6) months, in each case any other than any such notice, discussion, or negotiation that has been resolved.

(d)    Notwithstanding anything in this Article IV to the contrary, none of the representations and warranties in this Article IV other than this Section 4.10 shall relate to environmental matters.

SECTION 4.11    Labor and Employee Benefits Matters.

(a)    Section 4.11(a) of the Sellers Disclosure Schedule contains an accurate and complete list, by country, of (i) all material Seller Employee Plans and (ii) all employment agreements or other commitments for employment or engagement by the Sellers or their Affiliates with respect to Employees that deviate in any material respect from the standard form of offer letter for the applicable jurisdiction or provide for retention, severance or change in control payments or benefits to the Employees, excluding in each case Seller Employee Plans (collectively, the "**Special Arrangements**"). The Sellers have provided the Purchaser with a true and complete copy of the plan document or summary plan description for each material Seller Employee Plan and Special Arrangement, to the extent applicable, and, if no such plan document or summary plan description exists, an accurate written summary of the material terms of such Seller Employee Plan or Special Arrangement.

(b)    The information contained in Section 4.11(b) of the Sellers Disclosure Schedule in respect of the Employees (the "**Employee Information**") is accurate in all material respects as of the date hereof, and sets forth with respect to each Employee (except where that is not permissible under applicable data privacy Laws): (i) unique identifier, (ii) service date, (iii) job title/position, (iv) annual base salary and annual target incentive including, in each case, currency, (v) work location, (vi) visa type, if any, and expiry date (vii) the applicable Collective Labor Agreement, if any, (viii) vacation accrual rate, (ix) leave status, reason for the leave, the start date of the leave and expected return date, (x) status as full-time or part-time, (xi) home country of residence, (xii) Job Complexity Indicator, (xiii) country of payroll, (xiv) sales indicator, (xv) Exempt/Non-Exempt status (for Employees in the United States only), and (xvi) payment currency. Such information shall be updated in accordance with the requirements of Section 7.4(h).

(c)    There has not been for a period of twenty-four (24) consecutive months prior to the date hereof, nor is there existent or, to the Knowledge of the Sellers, has been threatened, any strike, material grievance under a Collective Labor Agreement, slowdown, lockout, picketing or work stoppage against any Seller by or on behalf of the Employees.

(d)    Section 4.11(d) of the Sellers Disclosure Schedule lists all the Collective Labor Agreements in effect with respect to the Employees and, for those that have expired, whether notice to bargain has been given and the status of the bargaining process. For a period of twenty-four (24) consecutive months prior to the date hereof, no petition has been filed or proceedings instituted by, or on behalf of, a union, works council, collective bargaining agent, employee or group of employees with any Government Entity seeking recognition of a collective bargaining agent with respect to any Employees, no voluntary recognition has been given by the Sellers or any Affiliates with respect to Employees, and, to any of the Sellers' Knowledge, no such organizational effort is currently being made or has been threatened by or on behalf of any union, employee, group of employees or collective bargaining agent to organize any Employees. The Sellers have provided the Purchaser with a true and complete copy of each of the Collective

69

Labor Agreements listed in Section 4.11(d) of the Sellers Disclosure Schedule. To the Knowledge of the Sellers, the execution of this Agreement and the consummation of the transactions contemplated by this Agreement will not result in any material breach or other violation of any Collective Labor Agreement set forth on Section 4.11(d) of the Sellers Disclosure Schedule.

(e)    To the Knowledge of the Sellers, all of the Employees employed in the United States are either United States citizens or are legally entitled to work in the United States under the Immigration Reform and Control Act of 1986, as amended, other United States immigration Laws and the Laws related to the employment of non-United States citizens applicable in the state in which the Employees are employed. To the Knowledge of the Sellers, all Employees employed outside the United States are legally entitled to work in the country in which they are employed.

(f)    There are no Seller Employee Plans that are multiemployer plans within the meaning of Section 3(37) or 4001(a)(3) of ERISA, and none of the Sellers or any of their ERISA Affiliates has, within the past six (6) years, ever maintained, contributed to or participated in, or been required to maintain, contribute to or participate in, any such multiemployer plans.

(g)    Except as set forth in Section 4.11(g) of the Sellers Disclosure Schedule, no Seller Employee Plan or Collective Labor Agreement (or any Liabilities or obligations related thereto) shall transfer to, or be assumed by, the Purchaser or a Designated Purchaser in connection with this Agreement, either alone or in combination with another event (whether contingent or otherwise), or by operation of Law.

(h)    To the Knowledge of the Sellers, no Employee who is an executive of any Seller is a party to any confidentiality, noncompetition, proprietary rights or other such agreement with any Person other than such Seller, which has a Material Adverse Effect on such executive's ability to perform his applicable services to the Acquired Business. To the Knowledge of the Sellers, no Employee is in violation of any term of any Employment Contract, confidentiality, noncompetition or other proprietary rights agreement or any other contract relating (i) to the right of such Employee to be employed by, or provide services to, such Seller with respect to the Acquired Business or (ii) to the knowledge or use of trade secrets or proprietary information with respect to any such Employee's employment with the Sellers, in each case except for such violation as would not have, individually or in the aggregate, a Material Adverse Effect.

(i)    None of the Sellers has, with respect to the Acquired Business, any Liability to provide retiree welfare benefits to any Person for any reason, except as may be required by COBRA, a Seller Employee Plan listed on Section 4.11(a) of the Sellers Disclosure Schedule, or applicable Law. Without limiting the generality of the foregoing, with respect to its Canadian Employees and former employees, pursuant to the Order of the Canadian Court dated March 31, 2010 approving the Settlement Agreement, NNC and NNL have no ongoing funding or administration obligations under the Nortel Networks Negotiated Pension Plan in respect of the period after September 30, 2010.

70

(j)     To the Knowledge of Sellers, and in each case except for such violations as would not reasonably be expected to be material to the Business as a whole, with respect to the Employees: (i) the Sellers are in compliance in all material respects with all applicable Laws relating to labor and employment, including the Laws relating to discrimination, disability, labor relations, hours of work, payment of wages and overtime wages, characterization of workers as employees or independent contractors, pay equity, immigration, workers compensation, working conditions, employee scheduling, occupational safety and health, family and medical leave, employment and reemployment of members of the uniformed services, employee terminations and mass layoffs; (ii) as of the date hereof, the Sellers have not incurred any Liability or obligation which remains unsatisfied under the WARN Act regarding the termination or layoff of such Employees; (iii) the Sellers have not incurred, and no circumstances exist under which the Sellers would reasonably be expected to incur, any material Liability arising from the misclassification of employees as exempt from the requirements of the Fair Labor Standards Act or analogous Laws or the misclassification of employees as independent contractors; and (iv) no arbitration, court decision or governmental order to which the Sellers are or would reasonably be expected to become a party, or are subject to in any way, limits or restricts any of the Sellers from relocating or closing any of the operations of such Seller.

(k)     Except as required under the terms of this Agreement, a Seller Employee Plan or Special Arrangement or under applicable Law, the execution or delivery of this Agreement, shareholder approval of this Agreement nor the consummation of the transactions contemplated by this Agreement could reasonably, either alone or in combination with another event (whether contingent or otherwise), (i) entitle any Transferred Employee to severance pay or any other payment (or an increase thereof) or results in the payment or funding (through a grantor trust or otherwise, or (ii) accelerate the time of payment or vesting, or increase the amount of any payment or benefit due to any such Transferred Employee.

(l)     Each Seller Employee Plan listed on Section 4.11(g) of the Sellers Disclosure Schedule has been established and administered in all material respects in accordance with its terms and in compliance with applicable Laws, rules and regulations.

SECTION 4.12     Brokers.  Except for fees and commissions that will be paid or otherwise settled or provided for by the Sellers, no broker, finder or investment banker is entitled to any brokerage, finder's or other similar fee or commission in connection with the transactions contemplated by this Agreement and the other Transaction Documents based upon arrangements made by or on behalf of the Sellers or any of their Affiliates.

SECTION 4.13     Taxes.

(a)     Subject to Section 4.13(g), the Sellers have timely filed with the appropriate Tax Authorities all material Tax Returns required to be filed with respect to the Assets and the Business (excluding the Business of the EMEA Sellers) and all such Tax Returns are true, correct and complete in all material respects. Subject to Section 4.13(g), all material Taxes due and payable with respect to the Assets and the Business (excluding the Business of the EMEA Sellers) have been timely paid.

71

(b)     Subject to Section 4.13(g), no deficiency for any material amount of Taxes has been claimed, proposed or assessed by any Tax Authority against any Seller and there is no pending audit, examination or other proceeding or Action in respect of material Taxes, in each case relating to any Asset or the Business.

(c)     Subject to Section 4.13(g), no Seller has entered into an agreement or waiver or been requested to enter into an agreement or waiver extending any statute of limitations relating to the payment or collection of material Taxes relating to any Asset or the Business.

(d)     There is no Lien for Taxes, other than Permitted Encumbrances, on any Asset.

(e)     None of the Assets located within the United States or which is owned by a U.S. Debtor (i) is property required to be treated as being owned by another person pursuant to the provisions of Section 168(f)(8) of the Internal Revenue Code of 1954, as amended and in effect immediately prior to the enactment of the Tax Reform Act of 1986, (ii) constitutes "tax-exempt use property" within the meaning of Section 168(h)(1) of the Code or (iii) is "tax-exempt bond financed property" within the meaning of Section 168(g) of the Code.

(f)     No Seller other than Sellers which are "United States persons" under section 7701 of the Code or applicable Treasury Regulations will transfer any United States real property interest (within the meaning of Section 897(c)(1) of the Code) to the Purchaser or any Designated Purchaser pursuant to this Agreement.

(g)     Notwithstanding the foregoing, the representations and warranties set forth in Sections 4.13(a) through 4.13(c) shall not be applicable to the extent that no Asset can be made subject to a Tax Lien and neither the Purchaser nor any Designated Purchaser could be held liable for Taxes of that Seller on the assumption that it has breached any of such representations or warranties.

SECTION 4.14     Representations and Warranties by the Other Sellers. Except (a) as set forth in the Sellers Disclosure Schedule, (b) as disclosed in the Financial Statements, (c) as contemplated by this Agreement or (d) to the extent relating to the Excluded Assets or the Excluded Liabilities, each Other Seller severally but not jointly will, as of the date such Other Seller executes a counterpart or accedes to this Agreement pursuant to Section 10.18, represent and warrant to the Purchaser as follows:

4.14.1 Organization and Corporate Power.

(a)     Such Other Seller is duly organized and validly existing under the Laws of the jurisdiction in which it is organized. Subject to the receipt of the Bankruptcy Consents, at the time it executes a counterpart or accedes to this Agreement such Other Seller will have the requisite corporate power and authority to enter into, deliver and perform its obligations pursuant to each of the Transaction Documents to which it is or, at the Closing Date, will become a party.

(b)     Such Other Seller is qualified to do business and to own, lease or otherwise hold its properties and assets, including the Assets, and to conduct its business as

presently conducted, as applicable in each jurisdiction in which its ownership of property or conduct of business relating to the Acquired Business requires it to so qualify, except to the extent that the failure to be so qualified would not have or would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

4.14.2 <u>Authorization; Binding Effect; No Breach</u>.

(a)     Subject to the receipt of the Bankruptcy Consents, the execution, delivery and performance by such Other Seller of the Transaction Documents to which such Other Seller will be a party will have been duly authorized by such Other Seller. Subject to receipt of the Bankruptcy Consents, and assuming due authorization, execution and delivery by the Purchaser and the Designated Purchasers parties thereto, the Transaction Documents to which such Other Seller will be a party will constitute a legal, valid and binding obligation of such Other Seller, enforceable against it in accordance with its terms, except to the extent that such enforceability may be limited by applicable principles of equity regarding the availability of remedies (whether in proceeding at law or in equity).

(b)     The execution, delivery and performance by such Other Seller of the Transaction Documents to which such Other Seller will be a party will not conflict with or result in a breach of the terms, conditions or provisions of, constitute a default under, result in a violation of, give to any Person any right of termination, amendment, modification, acceleration or cancellation or any preemptive right or right to the payment of any penalty under, result in the creation or imposition of any Lien upon any of the Assets, or (subject to the receipt of Consents in connection with the Assigned Contracts and other Consents expressly provided for herein) require any Consent of any Person (other than the Mandatory Regulatory Approvals and the Bankruptcy Consents) or other action by or declaration or notice to any Government Entity pursuant to (i) the articles, charter or by-laws of such Other Seller, (ii) any Material Contract to which the such Other Seller is a party or to which any of its assets is subject, (iii) any order of any Government Entity applicable to such Other Seller or by which any of its properties or Assets are bound or (iv) any Laws to which such Other Seller, or any of the Assets owned by such Other Seller is subject, except, in the case of (ii), (iii) and (iv) above, for such defaults, violations, actions and notifications that would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

## ARTICLE V.

## COVENANTS AND OTHER AGREEMENTS

SECTION 5.1     <u>U.S. Bankruptcy Actions</u>. On the timetables and subject to the terms set forth below, the U.S. Debtors shall (i) file with the U.S. Bankruptcy Court one or more motions and proposed orders as set forth below, (ii) notify, as required by the U.S. Bankruptcy Code, the U.S. Bankruptcy Rules, and an order of the U.S. Bankruptcy Court, all parties entitled to notice of such motions and orders, as modified by orders in respect of notice that may be issued at any time and from time to time by the U.S. Bankruptcy Court, and such additional parties as the Purchaser may reasonably request, and (iii) subject to the provisions of this Agreement, including the provisions of Section 9.1, and the U.S. Bidding Procedures Order,

73

if entered, use their commercially reasonable efforts to obtain U.S. Bankruptcy Court approval of such orders.

### 5.1.1    U.S. Bidding Procedures Order.

The U.S. Debtors shall file a motion with the U.S. Bankruptcy Court (the **"U.S. Bidding Procedures and Sale Motion"**) within five (5) Business Days of the date of this Agreement seeking the entry of the U.S. Bidding Procedures Order, in the form set forth in Exhibit 5.1.1, any modifications to which must be consented to by the Purchaser, such consent not to be unreasonably withheld (as approved, the **"U.S. Bidding Procedures Order"**). The U.S. Debtors shall use their reasonable best efforts to cause the U.S. Bankruptcy Court to enter the U.S. Bidding Procedures Order as soon as practicable after the filing of the U.S. Bidding Procedures and Sale Motion, but in no event later than thirty (30) days from the date of this Agreement.

### 5.1.2    U.S. Sale Hearing and U.S. Sale Order.

(a)    The U.S. Debtors shall request that the U.S. Bankruptcy Court and the Canadian Debtors shall request that the Canadian Court schedule, subject to the availability of each of the U.S. Bankruptcy Court and the Canadian Court, a hearing to approve the U.S. Sale Order and the transactions contemplated by this Agreement (the **"U.S. Sale Hearing"**) and a hearing to approve the Canadian Approval and Vesting Order and the transactions contemplated by this Agreement (the **"Canadian Sale Hearing"**) on or prior to the tenth (10th) Business Day following the conclusion of the Auction.   Each of the U.S. Debtors and Canadian Debtors shall use their reasonable best efforts to cause the U.S. Sale Hearing and Canadian Sale Hearing, respectively, to be heard on that date or the earliest date thereafter permitted by the schedules of the U.S. Bankruptcy Court and the Canadian Court.

(b)    At the U.S. Sale Hearing, if the Purchaser is the Successful Bidder, the Sellers shall seek the entry of the U.S. Sale Order, in the form set forth in Exhibit 5.1.2, any modifications to which must be consented to by the Purchaser, such consent not to be unreasonably withheld (as approved, the **"U.S. Sale Order"**) (it being understood that certain provisions thereof must constitute findings of fact or conclusions of Law to be made by the U.S. Bankruptcy Court as part of the U.S. Sale Order).

### SECTION 5.2         Canadian Bankruptcy Actions.

5.2.1    Canadian Sales Process Order.  The Canadian Debtors shall file a motion with the Canadian Court (the **"Canadian Sales Process Order Motion"**) within seven (7) Business Days of the date of this Agreement seeking an order approving the execution, delivery and performance of this Agreement, including payment of the Break-Up Fee and Expense Reimbursement in the form set forth in Exhibit 5.2.1 (any modifications to which must be consented to by the Purchaser, such consent not to be unreasonably withheld)(as approved, the **"Canadian Sales Process Order"**).  The Canadian Debtors shall use their reasonable best efforts to cause the Canadian Court to enter the Canadian Sales Process Order as soon as practicable after the filing of the Canadian Sales Process Order Motion, but in no event later than thirty (30) days from the date of this Agreement.

5.2.2    <u>Canadian Approval and Vesting Order</u>.  At the Canadian Sale Hearing, if the Purchaser is the Successful Bidder, the Canadian Debtors shall seek the issuance of the Canadian Approval and Vesting Order in the form set forth in <u>Exhibit 5.2.2</u> on notice satisfactory to the Purchaser, any modifications to which must be consented to by the Purchaser, such consent not to be unreasonably withheld (as approved, the **"Canadian Approval and Vesting Order"**).

5.2.3    <u>Additional Requests</u>.  In connection with the foregoing, the Canadian Debtors shall seek in good faith in the Canadian Approval and Vesting Order Motion to (i) have the Canadian Approval and Vesting Order include a finding that, to the extent permitted by Law, neither the Purchaser nor any relevant Designated Purchaser is a successor to the Sellers or their bankruptcy estate by reason of any theory of law or equity, and neither the Purchaser nor any Designated Purchaser shall assume or in any way be responsible for any Liability of any of the Sellers and/or their bankruptcy estates, except as otherwise expressly provided in this Agreement or the Transaction Documents; and (ii) have the endorsement of the Canadian Approval and Vesting Order or the order itself, include a finding that the consideration provided by the Purchaser and any Designated Purchaser pursuant to this Agreement constitutes reasonably equivalent value and fair consideration for the Assets. For greater certainty, nothing herein shall require the items in the preceding sentence to be included in the Canadian Approval and Vesting Order or any endorsement thereof, notwithstanding that such provisions may be included in the form of the order set forth in Exhibit 5.2.2.

SECTION 5.3        <u>Consultation; Notification</u>.

(a)        The Purchaser and the U.S. Debtors shall cooperate with filing and prosecuting the U.S. Bidding Procedures and Sale Motion, and obtaining entry of the U.S. Bidding Procedures Order and U.S. Sale Order, and the U.S. Debtors shall deliver to the Purchaser prior to filing, and as early in advance as is practicable to permit adequate and reasonable time for the Purchaser and its counsel to review and comment, copies of all proposed pleadings, motions, notices, statements schedules, applications, reports and other material papers to be filed by the U.S. Debtors in connection with such motions and relief requested therein.

(b)        The Purchaser and the Canadian Debtors shall cooperate with filing and prosecuting the Canadian Sales Process Order Motion and the Canadian Approval and Vesting Order Motion, and obtaining entry of the Canadian Sales Process Order and the Canadian Approval and Vesting Order, and the Canadian Debtors shall deliver to the Purchaser prior to filing, and as early in advance as is practicable to permit adequate and reasonable time for the Purchaser and its counsel to review and comment, copies of all proposed pleadings, motions, notices, statements schedules, applications and other material papers to be filed by the Canadian Debtors in connection with such motions and relief requested therein.

(c)        If the U.S. Sale Order or any other order of the U.S. Bankruptcy Court relating to this Agreement shall be appealed by any Person (or a petition for certiorari or motion for rehearing, re-argument or stay shall be filed with respect thereto), the U.S. Debtors agree to use their reasonable best efforts to defend against such appeal, petition or motion, and the Purchaser agrees to cooperate in such efforts. Each of the Parties hereby agrees to use its reasonable best efforts to obtain an expedited resolution of such appeal; provided, <u>however</u>, that,

subject to the conditions set forth herein, nothing contained in this Section shall preclude the Parties from consummating, or permit the Parties not to consummate, the transactions contemplated hereby if the U.S. Sale Order shall have been entered and shall not have been stayed, modified, revised or amended, in which event the Purchaser and the relevant Designated Purchasers shall be able to assert the benefits of section 363(m) of the U.S. Bankruptcy Code and, as a consequence of which, such appeal shall become moot.

(d)     If the Canadian Approval and Vesting Order or any other order of the Canadian Court relating to this Agreement shall be appealed by any Person (or a petition for certiorari or motion for rehearing, re-argument or stay shall be filed with respect thereto), the Canadian Debtors agree to take all reasonable steps, and use their reasonable best efforts to defend against such appeal, petition or motion, and the Purchaser agrees to cooperate in such efforts. Each of the Parties hereby agrees to use its reasonable best efforts to obtain an expedited resolution of such appeal; provided, however, that, subject to the conditions set forth herein, nothing in this Section shall preclude the Parties from consummating, or permit the Parties not to consummate, the transactions contemplated hereby if the Canadian Approval and Vesting Order shall have been entered and shall not have been stayed, modified, revised or amended.

SECTION 5.4     Pre-Closing Cooperation.

(a)     Prior to the Closing, upon the terms and subject to the terms and conditions of this Agreement, in addition to any obligations pursuant to Section 5.5, each of the Parties shall use its reasonable best efforts to take, or cause to be taken, all actions and to do, or cause to be done, and cooperate with each other in order to do, all things necessary, proper or advisable under applicable Law to consummate the transactions contemplated by this Agreement as soon as practicable and cause the fulfillment at the earliest practicable date of all of the conditions to the other Parties' obligations to consummate the transactions contemplated by this Agreement, including: (i) the preparation and filing of all forms, registrations and notices required to be filed to consummate the Closing and the taking of such actions as are necessary to obtain any requisite Consent, provided, that the Sellers shall not be obligated to make any payment or deliver anything of value to any Third Party in order to obtain any Consent (other than filing and application fees to Government Entities, and payment of Cure Costs if responsible therefor pursuant to Section 2.1.7) and provided, further, that the Purchaser shall be obligated to cooperate with the Sellers in order to obtain any required Consents from landlords under any Subleased Real Estate Leases (to the extent consent is required) and to enter into Subleases, (ii) defending all lawsuits and other proceedings by or before any Government Entity challenging this Agreement or the consummation of the Closing, (iii) using reasonable best efforts to cause to be lifted or rescinded any injunction, decree, ruling, order or other action of any Government Entity that would prohibit, prevent, restrict or materially delay the consummation of the transactions contemplated by this Agreement, and (iv) cooperating in any reorganization of the Sellers that the Sellers consider necessary for the Sellers to facilitate the transactions contemplated hereby, any such reorganization to occur on or prior to the Closing Date. With respect to all supply Contracts related to the Business, after the entry of the U.S. Sale Order, and in respect of the Canadian Debtors, after the entry of the Canadian Approval and Vesting Order, the Sellers shall (i) at the Purchaser's request to the extent permitted by Law (including any applicable Antitrust Laws), send a letter substantially in the form set forth in Exhibit 5.4(a) to each of the counterparties to such Contracts, as identified in writing by the

Purchaser to the Main Sellers, (ii) provide to the Purchaser such contact information as is reasonably requested by the Purchaser with respect to the counterparties to such Contracts and (iii) more generally, to facilitate an orderly transition at Closing, work with outside counsel on the prosecution of pending patent applications and maintenance of existing patents. For greater certainty, the obligations in this Section 5.4(a) do not include an obligation to negotiate, agree to or accept any form of remedy, condition, undertaking or divestiture with any Government Entity; provided, however, that nothing in this Section 5.4(a) shall limit the obligations of the Purchaser or any Designated Purchaser set forth in Section 5.5.

(b)     Each Primary Party shall promptly notify the other Primary Parties of the occurrence, to such Party's Knowledge, of any event or condition, or the existence, to such Party's Knowledge, of any fact, that would reasonably be expected to result in any of the conditions to any other Primary Party's obligation to effect the Closing set forth in Article VIII not being satisfied.

(c)     NNC and NNL shall execute, at or within a reasonable amount of time after Closing, upon the Purchaser's request, such documents as reasonably requested by the Purchaser and as contemplated or otherwise permitted under the Patent Cross-License Agreements listed on Section 4.5(g)(iii) of the Sellers Disclosure Schedule in order to provide a sublicense to the Business (to the extent permitted thereunder) or trigger any spin-off right thereunder, such that the Business may continue to be licensed or sublicensed thereunder, all in accordance with the relevant Section of each such Patent Cross-License Agreement that permits NNC or NNL to sublicense or spin off the license granted to NNC or NNL thereunder to a divested business unit or product line.  To the extent that any Patent Cross-License Agreement listed on Section 4.5(g)(iii) of the Sellers Disclosure Schedule, including, without limitation, (i) the Patent Cross License Agreement, effective as of June 16, 2006, between Ciena Corporation and NNL; (ii) the Patent Cross License Agreement, effective as of July 17, 2006, among Microsoft Corporation, NNC and NNL; and (iii) the License Agreement, effective as of January 1, 2001, between International Business Machines Corporation and NNC, contains a limitation on the number of times the relevant Seller may exercise any sublicense or spin off rights thereunder and such rights have not been exhausted prior to the date hereof, the Sellers agree that they shall not exhaust any such rights they may have between the date hereof and the Closing in a manner that would render this Section 5.4(c) ineffective. Notwithstanding the foregoing, the Sellers shall be under no obligation to execute any such documents prior to the completion of the Auction or to expend any amount (other than as directly resulting from the execution of relevant documents), incur any Liabilities or provide any other consideration in complying with their obligations under this section 5.4(c).

SECTION 5.5        Antitrust and Other Regulatory Approvals.

(a)     In furtherance and not in limitation of the provisions of Section 5.4, each of the Parties agrees to prepare and file as promptly as practicable, and in any event by no later than fifteen (15) Business Days from the date the U.S. Bidding Procedure Order and Canadian Sales Process Order shall have been entered, all necessary documents, registrations, statements, petitions, filings and applications for the Mandatory Regulatory Approvals, and any other Consent of any other Government Entities either required or that the Primary Parties mutually

and reasonably agree are advisable to satisfy the condition set forth in Section 8.1(a) as expeditiously as possible.

(b)     If a Primary Party or any of its Affiliates receives a request for information or documentary material from any Government Entity with respect to this Agreement or any of the transactions contemplated by this Agreement (and/or by the EMEA Asset Sale Agreement), then such Primary Party shall make, or cause to be made, as soon as reasonably practicable and after consultation with the other Primary Parties, an appropriate response in compliance with such request.

(c)     Each Primary Party shall keep the other Primary Parties apprised of the status of matters relating to the completion of the transactions contemplated by this Agreement (and/or by the EMEA Asset Sale Agreement) and work cooperatively in connection with obtaining the Mandatory Regulatory Approvals of each applicable Government Entity, including, to the extent permitted by Law or Government Entity:

(i)     cooperating with each other in connection with the filings required under the applicable Antitrust Laws or any Laws regulating foreign investment of any jurisdiction in connection with the transactions contemplated by this Agreement (and/or by the EMEA Asset Sale Agreement) and each Mandatory Regulatory Approval, and liaising with each other in relation to each step of the procedure before the relevant Government Entities and as to the contents of all communications with such Government Entities. In particular, to the extent permitted by Law or Government Entity, no Party will make any notification in relation to the transactions contemplated hereunder without first providing the Primary Parties with a copy of such notification in draft form (subject to reasonable redactions or limiting such draft, or parts thereof, on an outside-counsel only basis where appropriate) and giving such Primary Parties a reasonable opportunity to discuss its content before it is filed with the relevant Government Entities, and such first Party shall consider and take account in good faith of all reasonable comments timely made by the Primary Parties in this respect;

(ii)     furnishing to the other Primary Parties all information within its possession that is required for obtaining the Mandatory Regulatory Approvals, or required for any application or other filing to be made by the other Party pursuant to the applicable Antitrust Laws or any Laws regulating foreign investment of any jurisdiction in connection with the transactions contemplated by this Agreement (and/or by the EMEA Asset Sale Agreement);

(iii)     promptly notifying each other of any substantive communications from or with any Government Entity with respect to the transactions contemplated by this Agreement and/or by the EMEA Asset Sale Agreement and ensuring that each of the Parties is entitled to attend any meetings with, or other appearances before, any Government Entity with respect to the transactions contemplated by this Agreement and the EMEA Asset Sale Agreement; and

78

(iv)    consulting and cooperating with each other in connection with all analyses, appearances, presentations, memoranda, briefs, arguments, opinions and proposals made or submitted by or on behalf of any party hereto in connection with proceedings under or relating to the Mandatory Regulatory Approvals, the applicable Antitrust Laws or any Laws regulating foreign investment of any jurisdiction, in connection with the transactions contemplated by this Agreement (and/or by the EMEA Asset Sale Agreement).

(d)    In addition, the Purchaser shall, and shall cause each of the Designated Purchasers to, use its reasonable best efforts to satisfy (or cause the satisfaction of) the conditions precedent to the Purchaser's obligations hereunder as set forth in Section 8.1(a) to the extent the same is within its control and to take, or cause to be taken, all other action and to do, or cause to be done, all other things necessary, proper or advisable under all applicable Laws to consummate the transactions contemplated by this Agreement (and/or by the EMEA Asset Sale Agreement), including using its reasonable best efforts to make all required filings and obtain all Mandatory Regulatory Approvals, and any other Consent of a Government Entity required to be obtained in order for the Parties to consummate the transactions contemplated by this Agreement (and/or by the EMEA Asset Sale Agreement).

(e)    The obligations of the Purchaser pursuant to Section 5.5(d) shall include committing, and causing the Designated Purchasers to commit, to any and all undertakings, divestitures, licenses or hold separate or similar arrangements with respect to their respective assets or the Assets and/or the EMEA Assets or conduct of business arrangements or terminating any and all existing relationships and contractual rights and obligations as a condition to obtaining any and all Consents from any Government Entity necessary to consummate the transactions contemplated hereby and/or by the EMEA Asset Sale Agreement, including taking any and all actions necessary in order to ensure the receipt of the necessary Consents and Mandatory Regulatory Approvals; provided, however, that none of the Purchaser , the Designated Purchasers, or the EMEA Designated Purchasers are under any obligation under Section 5.5(d) or Section 5.5(e) of this Agreement or the applicable provisions of the EMEA Asset Sale Agreement, in respect of obtaining the Mandatory Regulatory Approvals, to commit, or cause the Designated Purchasers or the EMEA Designated Purchaser to commit, to any undertakings, divestitures, licenses or hold separate or similar arrangements with respect to their respective assets or the Assets and/or the EMEA Assets or conduct of business arrangements or terminate any and all existing relationships and contractual rights and obligations or take any other action where to do so would reasonably be expected to have a Material Adverse Effect on the Business or Assets being acquired pursuant to this Agreement and the EMEA Asset Sale Agreement.

(f)    For the avoidance of doubt, the covenants under this Section 5.5 shall not apply to any action, effort, filing, Consent, proceedings, or other activity or matter under any Bankruptcy Law relating to the Bankruptcy Courts, the Bankruptcy Proceedings and/or the Bankruptcy Consents.

SECTION 5.6        Pre-Closing Access to Information.

79

(a)     The Main Sellers shall, and shall cause the Other Sellers (other than the EMEA Debtors or EMEA Sellers) to, (i) give the Purchaser and its authorized representatives, upon reasonable advance notice and during regular business hours, reasonable access to (x) all books, records, personnel, officers and other facilities and properties of the Acquired Business and (y) only after the entry of the U.S. Sale Order and the Canadian Approval and Vesting Order, all product documentation and design specifications of the Acquired Business, including access to certain managerial Employees designated by the Sellers, who have knowledge of the skills and competencies of Employees relative to the Business and will provide such information to the Purchaser and Human Resources personnel designated by the Sellers who can provide information relevant to the Purchaser otherwise complying with the Purchaser's obligations pursuant to ARTICLE VII, (ii) permit the Purchaser and its representatives to make such copies and inspections thereof, upon reasonable advance notice and during regular business hours, as the Purchaser may reasonably request, (iii) cause the officers of the Sellers to furnish the Purchaser with such financial, business and operating data and other information with respect to the Acquired Business as is regularly prepared in the Ordinary Course that the Purchaser may from time to time reasonably request, (iv) without limiting the generality of subsections (i), (ii) and (iii), deliver to the Purchaser no later than ten (10) Business Days following the end of each fiscal quarter a report reflecting any changes to the headcount of the Business since the previous fiscal quarter; provided, however, that (A) any such access shall be conducted at the Purchaser's expense, in accordance with Law (including any applicable Antitrust Law and Bankruptcy Law), at a reasonable time, under the supervision of the Sellers' personnel and in such a manner as to maintain confidentiality and not to unreasonably interfere with the normal operations of the Business or the other businesses of the Sellers and their Affiliates, (B) except pursuant to Section 7.1.1 and Section 5.6(e), the Sellers will not be required to provide to the Purchaser access to or copies of any Employee Records, other than as provided in Section 5.6(e). If any requested documentation and information includes what can reasonably be considered competitively sensitive information relating to sales, marketing or pricing of the Sellers products or services, such information shall be shared with any employees or representatives of the Purchaser who are designated by the Purchaser and reasonably agreed upon by the Sellers, who reasonably require access to such information for any reasonable business purpose related to the acquisition of the Business by the Purchaser and who have executed the Clean Team Confidentiality Agreement, provided, however, that where such documentation or information relates to pricing or other material competitive terms offered to any customer of the Business, the employees of the Purchaser shall not have access to such information unless they are not involved in making decisions regarding pricing or other material competitive terms for a competing business to the Business, and if the transaction does not close, agree not to be employed in such a role for an agreed-upon minimum period of time.

(b)     Notwithstanding anything contained in this Agreement or any other agreement between the Purchaser and the Sellers executed on or prior to the date hereof (other than Section 6.5), the Sellers shall not have any obligation to make available to the Purchaser or its representatives, or provide the Purchaser or its representatives with, (i) any Tax Return filed by the Sellers or any of their Affiliates or predecessors, or any related material or (ii) more generally, any information if, in the good faith opinion of the Sellers, making such information available would (A) result in the loss of any attorney-client or other legal privilege or (B) cause the Sellers to be found in contravention of any applicable Law, or contravene any fiduciary duty or agreement existing on the date hereof (including any confidentiality agreement to which the

80

Sellers or any of their Affiliates are a party), it being understood that the Sellers shall cooperate in any reasonable efforts and requests that would enable otherwise required disclosure to the Purchaser to occur without so jeopardizing privilege or contravening such Law, duty or agreement.

(c)    To the extent not already made available to the Purchaser, the Purchaser's employees or the Purchaser's representatives (including its outside counsel), in order to facilitate the Purchaser's entry into new supply arrangements effective as of the Closing, upon request the Sellers shall make available to the Purchaser, its employees and representatives (including its outside counsel) unredacted copies of all Contracts relating to the Business with suppliers of the Business, or in the case of Non-Exclusive Supply Contracts, unredacted copies of any portion thereof that are applicable to the Business (other than pricing/cost information or other competitively sensitive information the sharing of which Sellers or their representatives reasonably determine may violate applicable Law), reasonably promptly following the date of such request (or in the event that such Contract is subject to confidentiality restrictions promptly following the receipt of any required consent which the Sellers will cooperate with the Purchaser to obtain as promptly as practicable). So long as the Purchaser is the Successful Bidder, the Sellers shall provide any competitively sensitive information redacted in accordance with the preceding sentence (including, but not limited to, Customer Contracts and Bundled Contracts) promptly following the later of the entry of the U.S. Sale Order, Canadian Approval and Vesting Order and the receipt of Antitrust Approvals; provided, that access to Bundled Contracts shall be limited to unredacted copies of any portion of any Bundled Contract that relates to the Business including any portion that relates to the Business and other businesses of the Sellers. Any access to Contracts pursuant to this Section 5.6(c) shall be subject to the available resources of the Sellers and availability of the Contracts and shall not interfere with the normal operations of the business of the Sellers. Any such disclosure shall be made to any employees or representatives of the Purchaser who are designated by the Purchaser, who reasonably require access to such information for any reasonable business purpose related to the acquisition of the Business by the Purchaser and who have executed the applicable addendums to the Clean Team Confidentiality Agreement; provided, however, that employees of the Purchaser shall not have access to such information unless they are not involved in making decisions regarding pricing or the other material competitive terms offered to any customer of a competing business to the Business.

(d)    Following the later of the entry of the U.S. Sale Order, the Canadian Approval and Vesting Order and the receipt of Antitrust Approvals, the Sellers and the Purchaser shall cooperate (consistent with applicable Laws and any confidentiality restrictions requiring consent of Third Parties) in developing a strategy with respect to transitioning customers of the Business to the Purchaser, including a plan for the engagement of customers of the Business by the Purchaser. Commencing reasonably in advance of the expected Closing Date, the Sellers shall make introductions of the Purchaser to such customers with whom the Purchaser does not have an existing customer relationship, by, subject to applicable Law, participating in telephone calls and meetings with such customers.

(e)    Within five (5) Business Days following the entry of the U.S. Sale Order and, in respect of the Canadian Debtors, the Canadian Approval and Vesting Order, the Sellers will provide the following additional information with respect to each of the Employees whose information was provided in Section 4.11(b) of the Sellers Disclosure Schedule: (i) full name and

(ii) work e-mail address. Following the expiration of the Offer Consideration Period, provided, that the Purchaser provides the Sellers with proof that an Employee has consented in the Offer to its release and, if applicable, transfer across geographical boundaries, the Sellers will provide the Purchaser with the following additional information with respect to such Employees as permitted under applicable Law and within five (5) Business Days following the receipt by the Sellers of such proof: the HR SAP data elements (excluding data related to protected status under applicable Law) with respect to each such Employee, including payroll information where applicable from vendors, with such data elements to be updated by the Sellers ten (10) Business Days prior to the Closing Date. Following the completion of the Auction, and upon the Purchaser being named the Successful Bidder, upon the Purchaser's reasonable request, the Sellers promptly will provide the Purchaser's benefit service provider with census data with respect to gender, birthday, salary and zip code (if applicable) of the Employees (without individually identifying any Employee and excluding any Employee unique identifier) for the sole purpose of calculating projected employee benefit costs and on the condition that census data is not disclosed to the Purchaser or any other Person.

SECTION 5.7    Public Announcements. Subject to (i) the provisions of Section 7.4(a) with respect to communications and announcements to the Employees and the employees of the Purchaser and the Designated Purchasers and the last sentence of this Section 5.7 and (ii) the Parties' disclosure obligations imposed by Law (including any obligations under any Bankruptcy Laws), the Parties shall (a) cooperate with each other in the development and distribution of all news releases, other public information disclosures and announcements, including announcements and notices to customers, suppliers and Employees, with respect to this Agreement, or any of the transactions contemplated by this Agreement and the other Transaction Documents and (b) not issue any such announcement or statement prior to consultation with, and the approval of, the Primary Parties (such approval not to be unreasonably withheld or delayed); provided, that approval shall not be required where a Party determines, based on advice of counsel and after consultation with the Primary Parties, that such disclosure is required by Law. For the avoidance of doubt, this Section 5.7 shall not impose any restrictions in addition to those set forth in the Confidentiality Agreement with respect to non-public communications between the Purchaser and its direct shareholders. The Parties shall comply with the provisions of Exhibit 5.7.

SECTION 5.8    Further Actions. From and after the Closing Date, each of the Parties shall execute and deliver such documents and other papers and take such further actions as may reasonably be required to carry out the provisions of this Agreement and give effect to the transactions contemplated herein, including the execution and delivery of such assignments, deeds and other documents (including Local Sale Agreements) as may be necessary to transfer any Assets as provided in this Agreement; provided, that subject to Section 2.1.6(d), Section 2.1.7(f), Section 5.4, Section 5.5 and Section 5.25, neither the Purchaser nor the Sellers shall be obligated to make any payment or deliver anything of value to any Third Party (other than filing and application fees to Government Entities and payment of Cure Costs for which such Party is responsible pursuant to Section 2.1.7) in order to obtain any Consent to the transfer of Assets or the assumption of Assumed Liabilities. If following the Closing, any Seller receives or becomes aware that it holds any asset, property or right which constitutes an Asset, then such Seller shall promptly transfer such asset, property or right to the Purchaser for no additional

consideration in accordance with Section 2.1.1 (provided, that any costs or expenses incurred by the Sellers in connection with such transfer shall be borne by the Purchaser).

SECTION 5.9    Conduct of Acquired Business.  The Sellers covenant that except as (i) the Purchaser may approve otherwise in writing (such approval not to be unreasonably withheld or delayed), (ii) set forth in Section 5.9 of the Sellers Disclosure Schedule, (iii) otherwise expressly contemplated or permitted by this Agreement or another Transaction Document, including Section 5.4, (iv) required by Law (including any applicable Bankruptcy Law or by order of a Bankruptcy Court), or (v) relates solely to Excluded Assets or Excluded Liabilities in a manner that does not materially and adversely affect the Acquired Business, Assets or Assumed Liabilities, the Sellers shall (A) conduct the Acquired Business and maintain the Owned Equipment in the Ordinary Course, (B) use commercially reasonable efforts in the context of the Bankruptcy Proceedings and taking into account employee and customer attrition to continue operating the Business as a going concern and to maintain the business organizations of the Business intact, and (C) abstain from any of the following actions:

(a)    sell, lease or otherwise dispose of a material portion of the Assets or any Assets material to the Acquired Business (other than sales of Inventory in the Ordinary Course);

(b)    incur any Lien on any Assets, other than (i) Liens that will be discharged at or prior to Closing or (ii) Permitted Encumbrances;

(c)    (x) grant any material license or sublicense of any rights under or with respect to any Transferred Intellectual Property other than (i) licenses or sublicenses granted in the Ordinary Course, (ii) such licenses or sublicenses as would be permitted by the grant back license rights set forth in the Intellectual Property License Agreement after the Intellectual Property License Agreement enters into effect, (iii) licenses or sublicenses granted pursuant to source code escrow arrangements listed in Section 5.9(c) of the Sellers Disclosure Schedule (the **"IP Escrow Agreements"**); or (y) enter into any exclusive license agreement that would restrict the Business or the Assets after the Closing in any material respect or which is in conflict with the provisions of this Agreement or the Intellectual Property License Agreement; or (z) sell, transfer, or assign any Licensed Intellectual Property (as defined in the Intellectual Property License Agreement) unless the relevant Seller(s) receive a written license from the buyer of such Licensed Intellectual Property sufficient for the Purchaser to retain all its rights in such Licensed Intellectual Property as set out in the Intellectual Property License Agreement;

(d)    increase or commit to increase the rate of cash compensation or other fringe, incentive, equity incentive, pension, welfare or other employee benefits payable to the Employees, other than (i) increases in base salary of any Employee in the Ordinary Course (which, with respect to each Employee, such increases shall not exceed any amount greater than ten percent (10%) of such Employee's base salary as of the date hereof) or as required by applicable Law, or under the terms and conditions of the Contracts or the Seller Employee Plans in effect as of the date hereof, or pursuant to the KEIP, KERP or Nortel Special Incentive Plan, or as otherwise approved by the Bankruptcy Court from time to time, or (ii) increases to welfare benefits that apply to substantially all similarly situated employees (including the Employees) of the Sellers or the applicable Affiliates of the Sellers, or (iii) increases in accordance with the

Order of the U.S. Bankruptcy Court made on March 4, 2010 and the Canadian Court made on March 3, 2010;

(e)      enter into any Collective Labor Agreement affecting Employees, except as required by applicable Law;

(f)      take any action, other than in the Ordinary Course, to cause any employee of the Sellers who would otherwise be an Employee not to be such an employee (other than termination for cause or termination of Employees who failed to receive an Offer (as defined below) from the Purchaser or a Designated Purchaser pursuant to this Agreement; provided, that the Sellers make a reasonable effort to provide notice to the Purchaser prior to any such employment termination);

(g)      amend or otherwise modify any

(i)      Material Contract,

(ii)     Cross-License Agreements referenced in Section 5.4(c), or

(iii)    Inbound License Agreement that is an Assigned Contract or Bundled Contract material to the Business (other than as necessary to effect the unbundling of any Bundled Contract required with respect to any other business or business segment of the Sellers), unless (A) such Contract has become a Non-Assigned Contract, an Excluded 365 Customer Contract, an Excluded Non-365 Customer Contract or will not be assigned to the Purchaser or any Designated Purchaser at Closing or (B) such amendment or modification is contemplated pursuant to Section 5.23 hereof,

in each case, in a manner materially detrimental to the Purchaser, or terminate any agreement referred to in clause (i), (ii) or (iii) to the material detriment of the Purchaser;

(h)      fail to make commercially reasonable efforts to maintain Owned Inventory at levels consistent with customer orders;

(i)      waive, release, assign, settle or compromise any material Action relating to the Acquired Business to the extent that such waiver, release, assignment, settlement or compromise imposes any binding obligation, whether contingent or realized, on the Acquired Business that will bind the Purchaser or a Designated Purchaser after the Closing Date and is materially adverse to the Acquired Business;

(j)      except with respect to endorsement of negotiable instruments in the Ordinary Course, incur, assume or guarantee any Indebtedness that will be an Assumed Liability, except for (A) purchase money borrowings and capitalized leases in the Ordinary Course in principal amount not exceeding $1,000,000 in the aggregate, and (B) pension accruals in the Ordinary Course under the Seller Employee Plans in existence on the date immediately prior to the date hereof;

(k)     enter into or amend any Employment Contract, or enter into any employment or independent contractor agreement with a Person employed, engaged, or to be employed or engaged, in the Acquired Business on a basis that is not terminable at will and with severance benefits other than, in each case, employment or independent contractor agreements providing for (i) total annual base remuneration not to exceed $200,000 per person and (ii) severance benefits pursuant to applicable Law or the Seller Employee Plans in accordance with past practice;

(l)     enter into any Material Contract pursuant to Section 4.4.(a)(ii) or amend any Contract to thereafter be a Material Contract pursuant to Section 4.4(a)(ii) that would reasonably be expected to bind the Purchaser or any of its Affiliates in any material respect after the Closing;

(m)     intentionally fail to make any filing, pay any fee, or take any other action necessary to maintain the ownership, validity and enforceability of any material Transferred Intellectual Property; provided that if the Sellers unintentionally fail to make any filing, pay any fee, or take any other action necessary to maintain the ownership, validity and enforceability of any material Transferred Intellectual Property, the Sellers will, upon becoming aware of any such failure, make all reasonable efforts to correct any adverse effects of such failure;

(n)     fail to use commercially reasonable efforts to maintain tangible property which, individually or in the aggregate, is material to the Business and which is included in the Assets, in the Ordinary Course;

(o)     fail to use commercially reasonable efforts to maintain the material Consents with respect to the Acquired Business in the Ordinary Course;

(p)     make, modify or rescind any material election in relation to Taxes that would reasonably be expected to materially and adversely impact the Purchaser or a Designated Purchaser after the Closing;

(q)     enter into any Contract granting an indemnity in respect of intellectual property infringement or misappropriation other than in the Ordinary Course that would bind the Purchaser or any of its Affiliates after the Closing in any material respect, except for Contracts that will not be, or that the Purchaser may elect not to have, assigned to the Purchaser hereunder; or

(r)     authorize, or commit or agree to take, any of the foregoing actions.

SECTION 5.10     Transaction Expenses.  Except as otherwise provided in this Agreement or the other Transaction Documents to which the Sellers are parties, each of the Purchaser and the Sellers shall bear its own costs and expenses (including brokerage commissions, finders' fees or similar compensation, and legal fees and expenses) incurred in connection with this Agreement, the other Transaction Documents and the transactions contemplated hereby and thereby.

SECTION 5.11     Confidentiality.

85

(a)      The Parties acknowledge that the Confidentiality Agreement (including all amendments thereto) and the Clean Team Confidentiality Agreement (including all addenda thereto) remain in full force and effect in accordance with their respective terms, which are incorporated herein by reference, and the Parties agree to be bound thereby in the same manner and to the same extent as if the terms had been set forth herein in full, except that the Sellers shall be at liberty to disclose the terms of this Agreement: (i) to the extent required by Law or any Action in respect of the Acquired Business, (ii) to any court, any liquidator or any member of any committee of creditors, Tax Authority or Government Entity, (iii) in connection with any auction process approved by the Bankruptcy Court, (iv) to show appropriate figures in their administration records, accounts and returns, or (v) subject to entering into a confidentiality agreement with the relevant Third Party, in connection with acquiring, merging or otherwise combining, or being acquired by, or selling all or part of their assets to any Third Party (whether in a single transaction or a series of related transactions and whether structured as an acquisition of assets, securities or otherwise); provided, that, with respect to information and data relating exclusively to the Business, the Purchaser's and the Purchaser's Representatives' confidentiality obligations under this Section 5.11, the Confidentiality Agreement (including all amendments thereto) and the Clean Team Confidentiality Agreement (including all addenda thereto) shall terminate after the Closing Date. The Purchaser's confidentiality obligations with respect to other Confidential Information relating to the Business and/or Assets under the Confidentiality Agreement and the Clean Team Confidentiality Agreement (including as incorporated herein) shall terminate after the Closing Date except with respect to information relating to any Patent Cross-License Agreement or Omitted Patent Cross-License Agreement listed in Section 4.5(g)(iii) of the Sellers Disclosure Schedule; provided, that the Purchaser shall treat such other Confidential Information with at least the same degree of care and confidentiality as it would treat its own confidential information of similar sensitivity were it in the Sellers' position. The Purchaser acknowledges that in the course of attempting to sell the Assets and the Business, one or more of the Sellers have entered into several confidential agreements with Third Parties in respect of information relating to the Assets and the Business and has disclosed such information to certain of those Third Parties.

(b)      For purposes of this Agreement, **"Confidential Information"** consists of all competitively sensitive information and data related to the Sellers, the Business, the Assets (including Transferred Intellectual Property and competitively sensitive Business Information existing as of the Closing Date), the Purchaser or its Affiliates that is not, in each case, already available to the public (it being agreed that disclosure of Confidential Information to prospective purchasers, their representatives and other Persons affiliated with the sale process of the Business shall not be public disclosure thereof). Nothing herein or in the other Transaction Documents shall be construed as precluding, prohibiting, restricting or otherwise limiting the ability of the Sellers, the Sellers' Affiliates or their respective representatives to (i) disclose the terms of any of the Transaction Documents to any court or to any liquidator or in connection with any auction process approved by a Bankruptcy Court and show appropriate figures in their administration records, accounts and return; (ii) exercise or enforce any of their rights, or perform any obligations under this Agreement or the other Transaction Documents, including the Transition Services Agreement and the Intellectual Property License Agreement, (iii) make permitted disclosures under Section 5.7; (iv) make any disclosures that are required by applicable Law; (v) own, use or disclose Confidential Information that is not exclusive to the Business to the extent necessary to (in the reasonable judgment of the Sellers) operate the other business segments of

86

the Sellers or their Affiliates or otherwise engage in any manner in any business activities unrelated to the Business; (vi) use Confidential Information to the extent necessary to perform any Seller Contracts not assigned to the Purchaser; (vii) share information to the extent reasonably necessary to allocate the purchase proceeds from the sale of the Assets; or (viii) make customary disclosures, subject to customary confidentiality agreements, regarding Confidential Information that is not exclusive to the Business and is primarily related to other business segments of the Sellers in connection with acquiring, merging or otherwise combining with, or being acquired by, or selling all or part of their assets to, any Person (whether in a single transaction or a series of related transactions or whether structured as an acquisition of assets, securities or otherwise).

SECTION 5.12      Certain Payments or Instruments Received from Third Parties.  To the extent that, after the Closing Date, (a) the Purchaser and/or any Designated Purchaser receives any payment or instrument that is for the account of a Seller according to the terms of any Transaction Document or relates primarily to any business or business segment of the Sellers other than the Acquired Business, the Purchaser shall, and shall cause the Designated Purchasers to, promptly deliver such amount or instrument to the relevant Seller, and (b) any of the Sellers receives any payment that is for the account of the Purchaser or any of the Designated Purchasers according to the terms of any Transaction Document or relates primarily to the Acquired Business, the Sellers shall, and shall cause the other Sellers to promptly deliver such amount or instrument to the Purchaser or the relevant Designated Purchaser, as applicable.  All amounts due and payable under this Section 5.12 shall be due and payable by the applicable Party in immediately available funds, by wire transfer to the account designated in writing by the relevant Party.  Notwithstanding the foregoing, each Party hereby undertakes to use reasonable best efforts to direct or forward all bills, invoices or like instruments to the appropriate Party.

SECTION 5.13      Non-Assignable Contracts and Other Assets.

(a)      To the extent that any Seller Contract or any Seller Consent is not capable of being assigned under Section 365 of the U.S. Bankruptcy Code (or, if inapplicable, pursuant to other applicable Laws or the terms of such Contract or Consent) to the Purchaser or a Designated Purchaser at the Closing, or that any Subleases cannot be entered into (A) without the Consent of the issuer thereof or the other party thereto, the master landlord or any Third Party (including a Government Entity) or (B) without the Sellers' and their Affiliates' compromising any right, asset or benefit or expending any amount or incurring any Liability or providing any other consideration (collectively, the "**Non-Assignable Contracts**"), this Agreement will not constitute an assignment thereof, or an attempted assignment, nor shall any Sublease be entered into under any Non-Assignable Contract, unless and until any such Consent is obtained, including any Consents obtained following Closing; provided, however, that the Sellers will use reasonable best efforts (without incurring any Third Party costs) to (i) cooperate with the Purchaser in any commercially reasonable arrangement to provide the Purchaser the same interest, benefits, rights and Liabilities under any such Non-Assignable Contracts as the applicable Seller had immediately prior to the Closing and the Purchaser and the Sellers shall use reasonable best efforts to enter into one or more mutually agreed Subcontract Agreements, and (ii) facilitate the Purchaser's negotiation with the other party to each Non-Assignable Contract that is a license of Intellectual Property to provide the Purchaser the same interest, benefits and rights under any such Non-Assignable Contracts as the applicable Seller had immediately prior

87

to the Closing (including that the Sellers shall request such Third Party's Consent if so requested by the Purchaser); provided, that there shall be no obligation on Sellers or their Affiliates to compromise any material right, asset or benefit or expend any amount or incur any Liability. As between the Sellers and the Purchaser (or the relevant Designated Purchaser), such Non-Assignable Contracts described above shall be deemed to be assigned or subleased, as the case may be, and the Purchaser (or the relevant Designated Purchaser) shall perform all obligations and covenants thereunder. Notwithstanding the foregoing sentences, (w) nothing in this Section 5.13 shall require any Seller to renew, modify or amend any Non-Assignable Contract once it has expired, (x) any efforts required of the Sellers pursuant to this paragraph shall be strictly on an interim basis and in no event shall such efforts or arrangements be required after the earlier of the (1) the date on which the Transition Services Agreement either expires or is terminated in accordance with its terms or (2) the effective date of a plan under Chapter 11 of the U.S. Bankruptcy Code confirmed by any of the U.S. Debtors pursuant to an order of the U.S. Bankruptcy Court (such date, the "**Contract Rejection Date**"), (y) the Sellers shall have the right, any time on or after the Contract Rejection Date, to exercise any right to terminate, reject or repudiate any Non-Assignable Contract, and (z) to the extent not prohibited, be of an administrative nature only, without any substantive function, and shall be carried out by employees of the Sellers under the Transition Services Agreement. In addition to performing and holding the Sellers harmless from any Liabilities under any Non-Assignable Contract, the Purchaser or the Designated Purchaser, as applicable, shall reimburse the relevant Seller for any direct, incremental and out-of-pocket costs and indemnify and hold each Seller harmless from and against all Liabilities, incurred or asserted, as a result of any actions taken pursuant to this Section 5.13. The Parties acknowledge that the fact that any Contract constitutes a Non-Assignable Contract shall not (i) constitute a breach of any covenant hereunder, (ii) entitle the Purchaser to terminate this Agreement or (iii) result in any reduction of the Purchase Price payable hereunder. Any Non-Assignable Contract assigned pursuant to the terms of this Section 5.13 shall, when assigned, constitute an Assigned Contract hereunder from and after such date.

(b)    For the purposes of this Agreement (including Section 5.13(a) and all representations and warranties of the Sellers contained herein), the relevant Sellers shall be deemed to have obtained all required Consents in respect of the assignment of any Assumed and Assigned Contract if, and to the extent that, pursuant to the U.S. Sale Order, the Sellers are authorized to assume and assign to the Purchaser or the Designated Purchasers such Seller Contract pursuant to section 365 of the U.S. Bankruptcy Code and any applicable Cure Cost has been satisfied as provided in Section 2.1.7.

(c)    If and to the extent that sale to the Purchaser or any Designated Purchaser of any Assets pursuant to Section 2.1.1 would be a violation of applicable Law or require any Consent or the approval of any Government Entity or the fulfillment of any condition that cannot be fulfilled by the Purchaser prior to the Closing, then, to the extent permitted by applicable Law, including any Antitrust Laws, and unless the Purchaser shall otherwise agree, the sale to the Purchaser or any Designated Purchaser of such Asset shall be, without any further action by any Party hereto, automatically deferred and any sale of such Asset pursuant to Section 2.1.1 or otherwise shall be null and void until such time as all such violations of applicable Law are eliminated, such Consents or approvals of Government Entities are obtained and such conditions are fulfilled. Any such Asset shall be deemed a "**Deferred Transfer Purchased Asset.**"

(d)    If and to the extent that the allocation to the Purchaser or any Designated Purchaser, and the Purchaser or any Designated Purchaser becoming responsible for, any Assumed Liabilities pursuant to Section 2.1.3 or otherwise would be a violation of applicable Law or require any Consent or the approval of any Government Entity, then, to the extent permitted by applicable Law, including any Antitrust Laws and unless the Parties shall otherwise agree, the allocation to the Purchaser or any of its Subsidiaries of, and the Purchaser or any such Designated Purchaser becoming responsible for, such Assumed Liability shall, without any further action by any party, be automatically deferred and any allocation or responsibility for such Assumed Liability pursuant to Section 2.1.3 or otherwise shall be null and void until such time as all violations of applicable Law are eliminated, such Consents or approvals of Government Entities are obtained. Any such Assumed Liability shall be deemed a **"Deferred Transfer Assumed Liability."**

(e)    With respect to any Deferred Transfer Purchased Asset or any Deferred Transfer Assumed Liability, insofar as it is reasonably possible and permitted under applicable Law, including any Antitrust Laws, (i) the Sellers shall, following the Closing, hold such Deferred Transfer Purchased Asset for the use and benefit of the Purchaser and its Subsidiaries (at the expense of the Purchaser) and (ii) in addition to performing and holding the Sellers harmless from any Deferred Transfer Assumed Liability, the Purchaser shall, or shall cause its applicable Subsidiary to, pay or reimburse the Sellers for all direct, incremental and out-of-pocket amounts paid or costs incurred in connection with the retention of such Deferred Transfer Assumed Liability. The Sellers shall, insofar as reasonably possible and to the extent permitted by applicable Law, including any Antitrust Laws, hold and treat such Deferred Transfer Purchased Asset in the Ordinary Course and take such other actions as may be reasonably requested by the Purchaser in order to place the Purchaser or any of its Subsidiaries, insofar as permissible under applicable Law, including any Antitrust Laws, and reasonably possible, in the same position as if such Deferred Transfer Purchased Asset had been sold to the Purchaser or a Designated Purchaser at the Closing and so that, to the extent possible, all the benefits and burdens relating to such Deferred Transfer Purchased Asset, including possession, use, risk of loss, potential for gain, and dominion, control and command over such Deferred Transfer Purchased Asset, are to inure from and after the Closing to the Purchaser or its applicable Subsidiary entitled to the receipt of such Deferred Transfer Purchased Asset.

(f)    If and when the violations of applicable Law are eliminated and such consents, approvals and/or conditions of Government Entities are obtained, the absence or non-satisfaction of which caused the deferral of transfer of any Deferred Transfer Purchased Asset pursuant to Sections 5.13(c), the sale of the applicable Deferred Transfer Purchased Asset shall be effected in accordance with and subject to the terms of this Agreement. If and when the violations of applicable Law are eliminated and such consents, approvals and/or conditions of Government Entities are obtained, the absence or non-satisfaction of which caused the deferral of the allocation of any Deferred Transfer Assumed Liability to the Purchaser or any Designated Purchaser pursuant to Sections 5.13(d), the allocation of the applicable Deferred Transfer Assumed Liability to the Purchaser or any Designated Purchaser shall be effected in accordance with and subject to the terms of this Agreement.

(g)    Notwithstanding any other provision of this Section 5.13, any efforts required of the Sellers pursuant to this Section 5.13 in respect of Deferred Transfer Purchased

Asset shall (i) be subject to receipt of adequate compensation in respect of all direct, incremental and out-of-pocket costs and expenses in respect of or related to such arrangement, (ii) be strictly on an interim basis and in no event required to continue after the expiration of the term of the Transition Services Agreement, (iii) to the extent not prohibited, be of an administrative nature only, without any substantive function, and be carried out by employees of the Sellers under the Transition Services Agreement. In no event shall the Sellers be under any obligation to compromise any right, asset or benefit or to expend any amount or incur any Liability in order to comply with its obligations under this Section 5.13 for which they are not reimbursed (other than filing and application fees to Government Entities and payment of Cure Costs for which the Sellers are responsible pursuant to Section 2.1.7) and the failure to transfer any Deferred Transfer Purchased Asset or any Deferred Transfer Assumed Liability shall not entitle the Purchaser to terminate this Agreement, not to complete the transactions contemplated hereby or reduce the Purchase Price payable hereunder.

SECTION 5.14        Bundled Contracts.

(a)        Section 5.14(a) of the Sellers Disclosure Schedule lists each Contract that the Sellers have entered into prior to the date hereof providing for the sale or provision of Products or Services and the sale or provision of other products or services of the Sellers or their Affiliates (as such list may be amended or supplemented pursuant to Section 5.14(c)) (each, a **"Bundled Contract"**). Subject to applicable Law, each of the Purchaser and the Sellers shall, and the Purchaser shall cause any relevant Designated Purchaser, as applicable, to, use its reasonable best efforts to, at least fifteen (15) Business Days prior to the Closing Date, enter into arrangements with the counterparty to each Bundled Contract to amend such Bundled Contract so as to delete all obligations and Liabilities therefrom as they relate to the Products and the Services and enter into a new Contract (effective as of, and conditioned upon the occurrence of, the Closing) with the applicable customer and which only relates to Products and Services in which event such new Contract shall be deemed to be a Seller Contract; provided, however, that the Sellers shall be under no obligation to compromise any right, asset or benefit or to expend any amount or incur any Liability in obtaining such arrangements and the failure to enter into such arrangements with respect to any Bundled Contract shall not entitle the Purchaser to terminate this Agreement, not to complete the transactions contemplated hereby or reduce the Purchase Price payable hereunder; provided, further, that the Purchaser shall not be obligated to enter into any such new Contract (i) if such new Contract meets the Exclusion Criteria, and Purchaser notifies the Main Sellers of its decision that such Contract satisfies such Exclusion Criteria no later than ten (10) days after any such Bundled Contract has been listed on Section 5.14(a) of the Sellers Disclosure Schedule. To the extent permitted by the terms of such Bundled Contract and applicable Law, each of the Sellers and the Purchaser shall notify the other Party if any customer has contacted such Party with regard to the matters set forth in this Section 5.14 and shall keep such other Party reasonably informed regarding the content of any discussions with the customer. For the avoidance of doubt, nothing in this Section 5.14(a) shall restrict the Sellers from taking any actions with respect to Bundled Contracts otherwise permitted pursuant to Section 5.9, including any amendments thereof. The Sellers shall, and shall cause their respective Affiliates (to the extent practicable) to, not enter into any Bundled Contracts after the date hereof.

90

(b)     Subject to applicable Law and the terms of such Bundled Contracts, for those Bundled Contracts for which the arrangements mentioned in Section 5.14(a) could not be entered into fifteen (15) Business Days prior to the Closing Date, (i) the relevant Seller shall, until the date that is the earlier of the (1) the date on which the Transition Services Agreement either expires or is terminated in accordance with its terms or (2) the effective date of a plan under Chapter 11 of the U.S. Bankruptcy Code confirmed by any of the U.S. Debtors pursuant to an order of the U.S. Bankruptcy Court , to the extent requested by the Purchaser, use its reasonable best efforts to facilitate the entry by the Purchaser or the relevant Designated Purchaser and the other party to each such Bundled Contract into a new Contract that only relates to the Business, including by making available those employees who are responsible for managing the customer relationships with the customers of such Bundled Contracts (to the extent reasonably practicable and to the extent such employees remain in the employ of the Sellers), reasonably cooperating with the Purchaser to jointly contact each counterparty to such Bundled Contracts by making such contacts (by phone or in person) as may be reasonably requested by the Purchaser and by sending a joint letter, in form and substance satisfactory to each of such Seller and the Purchaser notifying the counterparty to each such Bundled Contract of the transactions and requesting the counterparty to agree to amend such Bundled Contract after the Closing Date or (ii) the relevant Seller and the Purchaser shall use their reasonable best efforts to cooperate in any commercially reasonable arrangement to provide the Purchaser or a Designated Purchaser, as applicable, with the same interest, benefits, rights and Liabilities (including obligations relating to indemnification, warranties and Known Product Defects (as defined in the Nortel Accounting Principles)) as the applicable Seller had immediately prior to the Closing under any such Bundled Contract insofar as they relate to the Acquired Business, including by entering into Subcontract Agreements with respect to the portion of any such Bundled Contract that relates to the Acquired Business (the "**MSS Portion**") on the same terms and conditions as those set forth in the MSS Portion of the relevant Bundled Contract; provided, that (w) nothing in this Section 5.14 shall require any Seller to renew any Bundled Contract once it has expired, (x) the Sellers shall have the right after the Contract Rejection Date to exercise any right to terminate, reject or repudiate any Bundled Contract and (y) the Sellers shall be under no obligation with respect to the MSS Portion of any Bundled Contract that is, or is to be, subcontracted hereunder to compromise any right, asset or benefit or to expend any amount or incur any Liability in order to comply with its obligations under this sentence for which they are not reimbursed (other than filing and application fees to Government Entities, and payment of any Cure Costs for which the Sellers are responsible pursuant to Section 2.1.7) and the failure to enter into such arrangements with respect to any Bundled Contract shall not entitle the Purchaser to terminate this Agreement, not to complete the transactions contemplated hereby or reduce the Purchase Price payable hereunder.

(c)     Prior to the Closing Date, the Sellers shall be entitled to update and/or supplement from time to time the list of Bundled Contracts entered into prior to the date hereof by written notices to the Purchaser promptly after discovering any such Bundled Contracts; provided, that within five (5) Business Days of Closing no update and/or supplement shall be permitted without the Purchaser's prior written consent (such consent not to be unreasonably withheld, conditioned or delayed), and provided further that the Sellers shall use commercially reasonable efforts to update the list of Bundled Contracts as soon as commercially practicable.

SECTION 5.15     Post-Closing Assistance for Litigation.

(a)      Except with respect to Tax matters, after the Closing, the Purchaser shall, upon the reasonable request of the Sellers, and at no cost to the Sellers (other than reimbursement of direct, incremental and out-of-pocket expenses), make the Transferred Employees available at reasonable times and cooperate in all reasonable respects with the Sellers and their Affiliates in the preparation for, and defense of, any lawsuit, arbitration, Claim or other Action (whether disclosed or not disclosed in the Sellers Disclosure Schedule) filed or claimed against the Sellers or any of their Affiliates or any of the respective agents, directors, officers and employees of the Sellers and their Affiliates, whether currently pending or asserted in the future, concerning the operation or conduct of the Acquired Business prior to the Closing Date; provided, however, that the obligations of the Purchaser or its Affiliates hereunder shall only extend to the employees of such Purchaser or Purchaser's Affiliates as of the date such employees are to be made available and shall not apply to former employees of such Purchaser or Purchaser's Affiliates that have been terminated prior to such date.

(b)      Except with respect to Tax matters, after the Closing, the Sellers and their Affiliates shall, upon the reasonable request of the Purchaser, and at no cost to the Purchaser or its Affiliates (other than reimbursement of direct, incremental and out-of-pocket expenses), make employees of the Sellers or their Affiliates and all necessary documents available at reasonable times and cooperate in all reasonable respects with the Purchaser and its Affiliates in the preparation for, and defense of, any lawsuit, arbitration or other Action filed or claimed against the Purchaser or any of its Affiliates or any of the respective agents, directors, officers and employees of the Purchaser and its Affiliates, whether currently pending or asserted in the future, concerning the operation or conduct of the Acquired Business prior to the Closing Date; provided, however, that the obligations of the Sellers or their Affiliates hereunder shall only extend to the employees of such Sellers or Sellers' Affiliates as of the date such employees are to be made available and shall not apply to former employees of such Sellers or Sellers' Affiliates that have been terminated prior to such date.

SECTION 5.16      Tangible Asset Removal.

(a)      The Purchaser shall, and shall cause the relevant Designated Purchasers to, at the Purchaser's sole cost and expense, within five (5) Business Days after the Closing Date, relocate all tangible Assets and the Purchaser's activities from all premises owned or leased by the Sellers or their Affiliates after the Closing (other than any premises to be occupied by the Purchaser or any Designated Purchasers after the Closing Date pursuant to the provisions of a Sublease) with the Sellers' cooperation, and in each case where the Purchaser or a Designated Purchaser fails to so relocate, the Purchaser shall compensate the Sellers for 200% of the Sellers' actual, out-of-pocket rent and other occupancy costs with respect to such premises, plus 200% of the charges that the Sellers would impose on a subtenant in such premises for all services provided to such premises by a Seller or a third party services provider, and indemnify the Sellers for any liability or damages resulting from the Purchaser's or a Designated Purchaser's continued occupancy from one (1) Business Day after the Closing Date through the date upon which the Purchaser or such Designated Purchaser completes the relocation of all tangible Assets and the Purchaser's activities from such premises. Notwithstanding the foregoing, subject to receipt of landlord Consent where required (it being agreed that the Sellers shall only be obligated to use commercially reasonable efforts, without incurring any third-party costs, to obtain any such required Consents) and subject to the Purchaser's obligation to use commercially

92

reasonable efforts to vacate all such premises as soon as reasonably practicable following the Closing Date, (w) the Purchaser shall be permitted to remain in occupancy at the Sellers' Ottawa, Ontario facility through but no later than June 30, 2011, (x) the Purchaser shall be permitted to remain in occupancy at the Sellers' St. Laurent, Quebec facility (BAN1) until the earlier of (1) the day which is sixty (60) days immediately following the Closing Date and (2) December 31, 2010, (y) the Purchaser shall be permitted to remain in occupancy at the Sellers' St. Laurent, Quebec facility (BAN2) until December 31, 2010, and (z) the Purchaser shall be permitted to remain in occupancy at the Sellers' Research Triangle Park North Carolina facility through the day which is six (6) months from the Closing Date, in each case provided that the Purchaser compensates the Sellers for the Sellers' actual, out-of-pocket rent and other occupancy costs with respect to the space so licensed, compensates the Sellers for the services provided to the Purchaser or its Affiliate by a Seller or third party services provider at such facility, such services being those which have been normally and customarily provided to such facility prior to Closing, and indemnifies the Sellers for any liability or damages resulting from the Purchaser's or a Designated Purchaser's continued occupancy from the Closing Date through the date upon which the Purchaser or such Designated Purchaser actually surrenders such property in accordance with the requirements of a license agreement in the form of Exhibit 5.16 attached hereto, subject to the following conditions:

(i)    The Sellers' obligation to make any space available to the Purchaser or any other party on the date of or following Closing shall be subject to the Sellers' right to implement their global real estate strategy, as such strategy develops over time, and in connection therewith to dispose of or retain real estate assets as the Sellers deem appropriate in their sole discretion and the Sellers shall have no liability to the Purchaser or any other party resulting from the implementation of the Sellers' real estate strategy as contemplated hereby; provided, that, if the Sellers exercise their right to dispose of any real estate asset prior to the earlier of (A) the date on which the Purchaser vacates the related property at its own election and (B) thirty (30) days after the Closing Date, the Sellers shall give the Purchaser or the relevant Designated Purchaser reasonable prior notice of such disposal and a reasonable opportunity to remove the Assets located thereon; and provided, further, that such notice from the Sellers shall in no event be given later than ten (10) Business Days prior to such disposal.

(ii)    To the extent that the Sellers elect to, prior to Closing, terminate a lease or otherwise dispose of real property which is not included among the Assets and which is not a Subleased Real Estate Lease and at which Owned Equipment is located, the Sellers shall provide the Purchaser reasonable prior notice of such termination or disposal (provided, that such notice from the Sellers shall in no event be given later than ten (10) Business Days prior to such termination or disposal) and, following receipt of such notice, the Purchaser shall be permitted reasonable access to the real property for not less than ten (10) Business Days after receipt of the termination notice to identify any Assets acquired hereunder located at the subject premises. The Sellers agree that they will remove and store such Assets at the Sellers' sole cost until delivery to the Purchaser or a Designated Purchaser at Closing (it being understood that the Sellers shall not be obligated to remove trade fixtures or fixtures, furniture,

furnishings or fittings from any such real property or to store the same or to deliver the same at any point to the Purchaser or a Designated Purchaser unless the same are included in the Assets and are specifically identified by the Purchaser for removal). It is further agreed that transfer of any Assets stored in accordance herewith may be made by delivery of a receipt from any warehouse or storage facility entitling the Purchaser or a Designated Purchaser to retrieve all such Assets and the Purchaser shall be responsible for the cost of delivering such Assets to the Purchaser or a Designated Purchaser on or after the Closing Date. In the event the Purchaser fails to identify any Assets that it wishes to have stored, the Sellers shall be entitled to abandon or otherwise dispose of such Assets in their sole discretion without any liability to the Purchaser.

(b)     The Sellers shall, within five (5) Business Days after the Closing Date, relocate all the Excluded Assets and the Sellers' activities from any real property subject to a Sublease to be entered at Closing, with the Purchaser's cooperation.

(c)     In furtherance of the foregoing Sections 5.16(a) and 5.16(b), the Sellers and the Purchaser shall use reasonable efforts to agree on reasonable transition arrangements that provide for reasonable conditions under which each Party shall vacate those premises intended to be used exclusively by the other Party after the Closing Date.

SECTION 5.17     Termination of Overhead and Shared Services.  The Purchaser acknowledges and agrees that, except as otherwise expressly provided in the Transition Services Agreement, effective as of the Closing Date (i) all Overhead and Shared Services provided to the Business shall cease and (ii) the Sellers or their Affiliates shall have no further obligation to provide any Overhead and Shared Services to the Business; provided, however, that the Purchaser and the Sellers acknowledge that overhead costs of the Sellers associated with the provision of services under any Subleases will be included in the rental rates assessed under such Subleases.

SECTION 5.18     Insurance Matters.

(a)     The Purchaser acknowledges and agrees that coverage of the assets, tangible or intangible property, Liabilities, ownership, activities, businesses, operations, current and former shareholders, and current and former directors, officers, employees and agents of, the Business (collectively, the "**Covered Assets and Persons**") under all current or previous insurance policies of the Sellers and their Affiliates, including all environmental, directors' and officers' Liability, fiduciary Liability, employed lawyers, property and casualty flood, ocean marine, and contaminated products insurance policies and all other insurance policies or programs arranged or otherwise provided or made available by the Sellers or their Affiliates that cover (or covered) any of the Covered Assets and Persons at any time prior to the Closing (the "**Seller Insurance Policies**") shall cease as of the Closing Date and the Covered Assets and Persons will be deleted in all respects as insured (or additional insured, as the case may be) under all Seller Insurance Policies. Subject to Section 5.18(c), the Sellers shall retain any rights to, including any right to any proceeds received in respect of, any claim pending as of the date hereof or made after the date hereof under any Seller Insurance Policy, even if such claims relates to the capital assets or properties of the Business.

94

(b)     If after the Closing Date the Purchaser or the Sellers (or any of their respective Affiliates) reasonably require any information regarding claim data or other information pertaining to a claim or an occurrence reasonably likely to give rise to a claim (including any pre-Closing claims under the Seller Insurance Policies that are to be covered under the retrospective component of the new insurance policy) in order to give notice to or make filings with insurance carriers or claims adjustors or administrators or to adjust, administer or otherwise manage a claim, then the Sellers or the Purchaser, as the case may be, shall cause such information to be supplied to the other (or their designee), to the extent such information is in their possession and control or can be reasonably obtained by the Sellers or the Purchaser (or their respective Affiliates), as applicable, promptly upon a written request therefor. If the Purchaser desires access to, and utilization of, claims data or information maintained by an insurance company or other Third Party in respect of any claim (including any pre-Closing claims under any Seller Insurance Policies that are covered under the retrospective component of the new insurance policies), the Sellers, at the request of the Purchaser, shall use its commercially reasonably efforts to cause such insurance company or Third Party, at the Purchaser's sole cost and expense, to transfer such claims data or information to any insurance company or Third Party designated by Purchaser, in each case to the extent permitted by applicable Law. If any Third Party requires the consent of the Sellers or any of their Affiliates to the disclosure of such information, such consent shall not be unreasonably withheld.

(c)     Prior to Closing, the Sellers shall at all times maintain their current insurance in respect of the Owned Equipment, or in the event any such policies are cancelled or otherwise terminated, shall obtain other substantially comparable insurance policies that have substantially the same terms and conditions and make and pursue any applicable insurance claims related to damage or destruction to any Owned Equipment to the extent that it is in the ordinary course to do so. Notwithstanding anything in this Agreement to the contrary if and to the extent that any item of Owned Equipment, wherever located, is destroyed or damaged prior to Closing, and is not replaced or repaired or restored to its condition prior to such damage or destruction, then at Closing, the Sellers shall pay to the Purchaser the amount of any net insurance proceeds received in respect of such Owned Equipment (excluding any insurance proceeds related to business interruption insurance) that have not been applied to repair, replacement or restoration, as applicable, and assign any such claim and the rights to receive the proceeds of any such claim that has not yet been finally adjusted. For the avoidance of doubt, in the event that the Sellers transfer such proceeds to the Purchaser, the Sellers shall have no further obligations with respect to the Owned Equipment that was destroyed or damaged and the Purchaser shall not be entitled to rescind or terminate this Agreement and such events shall not result in any reduction of the Purchase Price.

SECTION 5.19     Sellers Deposits, Guarantees and Other Credit Support of the Business. Following the Closing, the Purchaser shall, or shall cause the applicable Designated Purchaser to:

(a)     unless previously returned and/or released, procure the return or release by the applicable counterparty, as soon as reasonably practicable but in no event later than thirty (30) days after the Closing Date, of any continuing obligation of any Seller or any Affiliate thereof with respect to any Assigned Contract or any Contract, asset or obligation of the Acquired Business (including any guarantee, counter guarantee or credit support provided or

95

procured by, or any letter of credit, performance bond or surety posted or procured by, any Seller or any of its Affiliates or any Third Party on behalf of the Sellers (and with a counter guarantee of the Sellers) in favor of Third Parties), all of which that involve the posting of cash or other collateral, any letter of credit, or any performance bond are set forth on Section 5.19(a) of the Sellers Disclosure Schedule; and

(b)    indemnify and hold harmless the Sellers and their Affiliates from and against any Loss resulting from, or relating to, any failure of the Purchaser or Designated Purchasers to comply with the obligations set forth in clause (a) of this Section 5.19.

SECTION 5.20    Receivables.  The Purchaser shall, and shall cause the Designated Purchasers to, use commercially reasonable efforts to cooperate with, and provide all necessary assistance to, any Seller to the extent necessary to enable or allow such Seller to collect any Seller Receivables (including, to the extent considered necessary by the Sellers in their reasonable good-faith judgment, collecting or facilitating the collection of any outstanding Seller Receivables on behalf of such Seller).  The Purchaser shall not, and shall procure that no Designated Purchaser shall, without the prior written consent of the relevant Seller (such consent not to be unreasonably withheld), (i) compromise, enter into any settlement with, or release any, Third Party in respect of any Seller Receivables or (ii) institute, take any part in, defend, compromise, abandon or call for judgment, any legal proceedings or arbitration in connection with any Seller Receivables.

SECTION 5.21    Use of the Sellers' Trademarks.  Except as expressly provided in the Trademark License Agreement, as of the Closing Date, neither the Purchaser nor any Designated Purchaser shall have the right to use the name "Nortel" or any other Trademarks owned by the Sellers or any of their Affiliates or any other Trademark employing the word "Nortel" or any confusingly similar Trademarks to any of the foregoing (collectively, the **"Sellers' Trademarks"**).  Without prejudice to the obligation of the Purchaser to cease and desist from the use of the Sellers' Trademarks, the Purchaser shall not use the Sellers' Trademarks in any manner that might dilute, tarnish, disparage or reflect adversely on any Seller or any of the Sellers' Trademarks or result in any Liability to any Seller.

SECTION 5.22    Maintenance of Books and Records.

(a)    Subject to the provisions of Section 6.5 with respect to Tax records, after the Closing, the Purchaser shall, and shall cause the Designated Purchasers to, preserve, until the fifth (5th) anniversary of the Closing Date (or such longer period as may be required under applicable Law), all pre-Closing Date records to the extent relating to the Acquired Business possessed by, or that comes into the possession of, such Person.  After the Closing Date and up until the fifth (5th) anniversary of the Closing Date (or such longer period as may be required under applicable Law), upon any reasonable request from the Sellers or their representatives, the Purchaser shall, and/or shall cause the Person holding such records to, (i) provide to the Sellers or their representatives reasonable access to such records during normal business hours and (ii) permit the Sellers or their representatives to make copies of such records (to the extent permitted by applicable Law or Contract), in each case at no cost to the Sellers or their representatives (other than for reasonable out-of-pocket expenses) and in such a manner not to interfere with the normal operations of the business of the Purchaser and its Affiliates; provided, however, that

96

nothing herein shall require the Purchaser to disclose any information to the Sellers if such disclosure would jeopardize any attorney-client or other legal privilege or contravene any applicable Law, fiduciary duty or agreement (it being understood that the Purchaser shall cooperate in any reasonable efforts and requests for waivers that would enable otherwise required disclosure to the Sellers to occur without so jeopardizing privilege or contravening such Law, duty or agreement) or, other than as provided in Section 6.5, require the Purchaser to disclose its Tax records. Such records may be sought under this Section 5.22(a) for any reasonable purpose, including to the extent reasonably required in connection with accounting, litigation, federal securities Law disclosure or other similar needs of the Sellers (other than claims between the Sellers and the Purchaser or any of their respective Subsidiaries under this Agreement or any Ancillary Agreement). Notwithstanding the foregoing, (i) any and all such records may be destroyed by the Purchaser if the Purchaser sends to the Sellers written notice of its intent to destroy such records, specifying in reasonable detail the contents of the records to be destroyed; such records may then be destroyed after the sixtieth (60th) day following such notice unless the Sellers notify the destroying party that the Sellers desire to obtain possession of such records, in which event the Purchaser shall transfer or cause to be transferred the records to the Sellers and the Sellers shall pay all reasonable expenses of the Purchaser in connection therewith and (ii) the Purchaser shall not be required to provide the Sellers access to, or copies of, any Tax records, the sharing of which shall be governed exclusively by Section 6.5 hereof, or audited financial statements covering any pre-Closing period.

(b)     Subject to the provisions of Section 6.5 with respect to Tax records, after the Closing, the Sellers shall preserve, until the fifth (5th) anniversary of the Closing Date (or such longer period as may be required under applicable Law), all pre-Closing Date records to the extent relating to the Acquired Business possessed by, or that comes into the possession of, such Person. After the Closing Date and up until the fifth (5th) anniversary of the Closing Date (or such longer period as may be required under applicable Law), upon any reasonable request from the Purchaser, any Designated Purchaser or their respective representatives, the relevant Seller shall, and/or shall cause the Person holding such records to, (i) provide to the Purchaser, any Designated Purchaser or their respective representatives reasonable access to such records (to the extent permitted by applicable Law or Contract), and to that portion of records or information relating to the Business that would constitute Business Information but for the fact that it does not relate exclusively to the Business, during normal business hours and (ii) permit the Purchaser, any Designated Purchaser or their respective representatives to make copies of such records or information referred to in clause (i), in each case at no cost to the Purchaser, such Designated Purchaser or their respective representatives (other than for reasonable costs of segregating information commingled with information not relating to the Business and out-of-pocket expenses) and in such a manner not to interfere with the normal operations of the business of the Sellers; provided, however, that nothing herein shall require any Seller or any of its Affiliates to disclose any information to the Purchaser, any Designated Purchaser or their respective representatives if such disclosure would jeopardize any attorney-client or other legal privilege or contravene any applicable Law, fiduciary duty or agreement (it being understood that the Sellers shall cooperate in any reasonable efforts and requests for waivers that would enable otherwise required disclosure to the Purchaser, any Designated Purchaser or their respective representatives to occur without so jeopardizing privilege or contravening such Law, duty or agreement) or, other than as provided in Section 6.5, require the Sellers to disclose their Tax records. Such records may be sought under this Section 5.22(b) for any reasonable purpose,

including to the extent reasonably required in connection with accounting, litigation, federal securities Law disclosure or other similar needs of the Purchaser, any Designated Purchaser or their respective representatives (other than claims between the Sellers and the Purchaser or any of their respective Subsidiaries under this Agreement or any Ancillary Agreement). Notwithstanding the foregoing, (y) any and all such records may be destroyed by the Sellers if the Sellers send to the Purchaser written notice of their intent to destroy such records, specifying in reasonable detail the contents of the records to be destroyed; such records may then be destroyed after the sixtieth (60th) day following such notice unless the Purchaser notifies the destroying party that the Purchaser or any Designated Purchaser desire to obtain possession of such records, in which event the Sellers shall transfer or cause to be transferred the records to the Purchaser and the Purchaser shall pay all reasonable expenses of the Sellers in connection therewith and (z) the Sellers shall not be required to provide the Purchaser, any Designated Purchaser or their respective representatives access to, or copies of, any Tax records, the sharing of which shall be governed exclusively by Section 6.5 hereof, or audited financial statements covering any pre-Closing period.

SECTION 5.23    Certain Ancillary Agreements.

(a)    The Primary Parties and, to the extent applicable, the relevant EMEA Sellers, shall use their reasonable best efforts to:

(i)    negotiate in good faith with the relevant contract manufacturers to finalize the terms of the Contract Manufacturing Inventory Agreements based on the term sheet attached hereto as Exhibit E; and

(ii)    negotiate in good faith the Subcontract Agreement.

(b)    The Purchaser shall use its reasonable best efforts to negotiate in good faith and enter into the NN Turkey Distribution and Services Agreement with NN Turkey.

(c)    On or before the Closing, the relevant Parties shall enter into the Transition Services Agreement, the Intellectual Property License Agreement and the Trademark License Agreement, each in the form attached hereto.

(d)    On or prior to the Closing Date, the relevant Parties shall enter into the Loaned Employee Agreement in the form attached hereto as Exhibit I.

SECTION 5.24    Subleases.

(a)    For each Subleased Real Estate Lease designated to be subleased pursuant to Section 2.1.6(b), the relevant Seller, as sublandlord, and the Purchaser or a Designated Purchaser, as subtenant, will enter into a sublease in the form attached hereto as Exhibit K (each such sublease a "**Sublease**") at Closing with a term to expire, on the one (1) year anniversary of the Closing Date, with respect to the portion of the applicable property to be used by the Purchaser or a Designated Purchaser for the Acquired Business.

(b)    The Sellers and the Purchaser will cooperate to determine how to segregate and demise the subleased premises, including the size and configuration of space to be

98

subleased to the Purchaser or a Designated Purchaser (which shall be based upon the employee headcount reasonably agreed between the Purchaser and the Sellers on or prior to the Closing Date, as adjusted to take into account any laboratory and other non-desk space to be subject to a Sublease, which shall also take into account the continued marketability and required contiguity of that portion of the premises to be subject to the related Sublease and the premises not to be subject to the related Sublease and which shall not, in any instance, take into account any plans of the Purchaser to relocate employees included in the aforementioned employee headcount to other locations) and provide relevant information (subject to confidentiality limitations) on the subleased premises to the other; provided, that it is understood and agreed that all costs of such segregation and demising will be the sole responsibility of the Purchaser and that the Purchaser's plans and specifications therefor will be subject to the Sellers' reasonable approval. Prior to Closing, the Sellers will not engage in any segregation and demising activities to be undertaken (x) in order to maintain the marketability of the applicable premises prior to Closing or (y) in order to move any Owned Equipment from the applicable premises.

(c)    The relevant Sellers shall provide, or cause a third party services provider (each, including any of its subcontractors, a "**Service Provider**") to provide, with respect to any space subject to a sublease, to the Purchaser or its Affiliate services which are substantially the same in scope as the services which have been normally and customarily provided to the applicable space prior to Closing. In the consideration of the provision of such services by the respective Seller or Service Provider, the Purchaser shall pay to the Sellers a monthly fee at each Site (as described in a schedule to the relevant sublease).

SECTION 5.25    Finalization of Transition Services Agreement. The Parties agree to enter into and finalize the schedules to the Transition Services Agreement in accordance with the provisions of Exhibit 5.25.

SECTION 5.26    Financing.

(a)    Until two (2) weeks after the entry of the U.S. Sale Order, the Purchaser, at its own expense, may engage the Sellers' independent accountants to prepare the audited balance sheets of the Business as of December 31, 2008 and December 31, 2009 and the related statement of earnings and cash flows for the Business for the one (1) year periods ended December 31, 2008 and December 31, 2009 (the "**Audited Financial Statements**"). The Sellers shall cooperate with the Purchaser's preparation of the Audited Financial Statements and provide reasonable and prompt access by such accountants to the financial records necessary to the preparation of the Audited Financial Statements. For the avoidance of doubt, the Parties acknowledge and agree that completion of the Audited Financial Statements shall not be a condition to Closing.

(b)    Notwithstanding anything to the contrary set forth herein, the Purchaser acknowledges and agrees that (i) its obligations to consummate the transactions contemplated by this Agreement are not conditioned or contingent in any way upon receipt of the Financing or any financing from any other Person, and (ii) failure to consummate the transactions contemplated herein as a result of the failure to obtain financing shall constitute a breach of this Agreement by the Purchaser (including its obligations pursuant to Section 2.3).

SECTION 5.27    Competing Transactions. From the date of this Agreement until the entry of the U.S. Bidding Procedures Order, and from the date of the conclusion of the Auction until the Closing Date or termination of this Agreement, neither any Seller nor any Affiliate of any Seller shall, directly or indirectly through any of its officers, directors, employees, agents, professional advisors or other representatives (collectively, the "**Representatives**"), (i) engage in negotiations with respect to any proposal or offer from any Person (other than the Purchaser or its Affiliates) relating to in each case any acquisition, divestiture, recapitalization, business combination or reorganization of or involving all or a substantial part of the business and operations of the Business (a "**Competing Transaction**") other than with respect to the provision of information regarding the Business and the Assets, (ii) execute any letter of intent or agreement providing for a Competing Transaction other than with respect to the provision of information regarding the Business and the Assets, or (iii) seek or support U.S. Bankruptcy Court or Canadian Court approval of a motion or Order inconsistent with the transactions contemplated herein (provided, however, that nothing contained herein shall prohibit the Sellers from providing any Person with the Bidding Procedures and related documents, answering questions about the Bidding Procedures or announcing the execution of this Agreement or the Auction). Notwithstanding the foregoing, the Sellers may provide access to written due diligence and other information regarding the Business or the Assets (excluding, for the avoidance of doubt, the Transaction Documents) in an electronic data room, or in written or oral form; provided, however, that the Sellers must provide the Purchaser at least equivalent access to all such due diligence materials and information. Without prejudice to any other methods or actions that may result in the cure of any breach of this Section 5.27, the Parties acknowledge and agree that in the event that any officer or other employee of any Seller acting alone (without the assistance of outside advisors) in violation of a corporate policy approved by the board of directors of NNC takes an action that constitutes a breach of clause (i) of this Section 5.27 but does not constitute a breach of any other clause of this Section 5.27, such breach shall be deemed cured in the event such action ceases and one or more of the Sellers notifies the counterparty or counterparties to the potential Competing Transaction in writing that the Sellers will not undertake such Competing Transaction, in each case no later than the fifth (5th) day after the Sellers become aware of such breach (for such purposes excluding the knowledge of the employee or officer whose action constitutes such breach), provided that such action that constituted the breach did not involve substantive negotiations regarding the terms of such Competing Transaction.

## ARTICLE VI.

## TAX MATTERS

SECTION 6.1    Transfer Taxes.

(a)    The Parties agree that the Purchase Price is exclusive of any Transfer Taxes. The Purchaser shall (on behalf of itself and the Designated Purchasers) promptly pay directly to the appropriate Tax Authority all applicable Transfer Taxes imposed upon or payable or collectible or incurred in connection with this Agreement or the transactions contemplated herein, or that may be imposed upon or payable or collectible or incurred in connection with the execution of any other Transaction Document; provided, that if any such Transfer Taxes are required to be collected, remitted or paid by a Seller or any Subsidiary, Affiliate, representative

or agent thereof, such Transfer Taxes shall be paid by the Purchaser to such Seller, Subsidiary, Affiliate, representative or agent, as applicable, at the Closing or thereafter, as requested of or by the applicable Seller. Upon request from the Sellers, the Purchaser shall provide to the Sellers an original receipt (or such other evidence as shall be reasonably satisfactory to the Sellers) evidencing the payment of Transfer Taxes by the Purchaser to the applicable Tax Authority under this Section 6.1. For the avoidance of doubt, the Purchaser shall remain liable in respect of any Transfer Taxes as provided in this Section 6.1 regardless of the date that the Assets are removed from the premises of a Seller or any Seller's supplier. The Sellers, the Purchaser and any Designated Purchasers shall cooperate in timely filing all Tax Returns as may be required in connection with the payment of Transfer Taxes that are the subject of this Section 6.1. The Sellers, on the one hand, and the Purchaser and the Designated Purchasers, on the other hand, shall, as appropriate, use commercially reasonable efforts to execute and deliver all instruments and certificates reasonably necessary to enable the other to comply with any filing requirements and Laws relating to any such Transfer Taxes.

(b)     The Parties shall make commercially reasonable efforts to cooperate in good faith to mitigate the Purchaser's liability for any Transfer Taxes for which the Purchaser is liable under Section 6.1(a), provided that any such cooperation to be provided in this Section 6.1(b) shall not include or extend to (a) a liquidation or restructuring of a Seller or any business of a Seller, including the transfer of any assets or Assets or liabilities or Assumed Liabilities between Sellers or their Affiliates, except in the Sellers' discretion, but in no case if there is a material cost to Seller or its Affiliates resulting from such liquidation or restructuring unless the Seller or the relevant Affiliate is indemnified (prior to such liquidation or restructuring) against any cost or expense of such liquidation or restructuring to its satisfaction (acting at all times reasonably and in good faith); (b) any action or omission that would result in the imposition on any Seller or any Affiliate of any Seller of any additional Tax liability or making any additional payment to any Tax Authority or Government Entity in respect of Tax which is an Excluded Liability, unless such Seller or Affiliate is (prior to the relevant action or omission) indemnified against such additional Tax liability or payment; (c) any action or omission that would result in any material out of pocket cost or expense for any Seller or any Affiliate of any Seller, unless such Seller or Affiliate is (prior to the relevant action or omission), indemnified against such cost or expense to their satisfaction (acting at all times reasonably and in good faith) by the Purchaser; (d) any action or omission which would cause the Sellers or any Affiliates of the Sellers to be in contravention of any applicable Law (including Bankruptcy Law) or published practice of a Tax Authority; (e) changing the identity or Tax residence of any Sellers, the location of any Assets or Assumed Liabilities, the nature or extent of any Assets or Assumed Liabilities, the Assets or Assumed Liabilities to be transferred by any particular Seller or the structure of the transaction as an asset sale rather than the sale of any form of entity, except in the Sellers' commercially reasonable discretion, but in no case if there is a material cost to Seller or its Affiliates resulting from such action, unless the Seller or the relevant Affiliate is indemnified (prior to such action) against any cost or expense of such action to its satisfaction (acting at all times reasonably and in good faith); or (f) any reduction in the obligations of the Purchaser or rights of the Sellers, in each case under Section 2.4.

(c)     If the Purchaser or any Designated Purchaser wishes to claim any exemption relating to, or a reduced rate of, or make an election with the effect of reducing, Transfer Taxes, in connection with this Agreement or the transactions contemplated herein, or in

101