connection with the execution of any other Transaction Document, the Purchaser or any Designated Purchaser, as the case may be, shall be solely responsible for ensuring that such exemption, reduction or election applies and, in that regard, shall provide the Sellers prior to Closing with its permit number, GST/HST, VAT, provincial sales taxes or other similar registration numbers and/or any appropriate certificate of exemption, election and/or other document or evidence to support the claimed entitlement to such exemption or reduction by the Purchaser or such Designated Purchaser, as the case may be. All Parties shall make commercially reasonable efforts to cooperate to the extent necessary to obtain any such exemption or reduction.

(d)    Provided that, in the opinion of the Sellers the sale qualifies for such an election or application, the Purchaser (or relevant Designated Purchaser) will jointly execute with the applicable Seller an election under Section 167(1) of Part IX of the Excise Tax Act (Canada) and any similar election or application provided under applicable provincial Laws, in the forms prescribed for such purposes, such that the sale and purchase of the Assets will take place without payment of any GST/HST. The Purchaser (or the relevant Designated Purchaser) will file such election with the relevant Tax Authority in the manner and within the time prescribed by Law and will provide the applicable Seller with a copy of the election and with satisfactory evidence that the election has been filed in a timely manner. The applicable Seller(s) confirms that it is registered for purposes of the Excise Tax Act (Canada) and its GST/HST registration number is 119409258RT0001 (in the case of NNL) and 118802974RT0001 (in the case of Nortel Networks Technology Corporation ("**NNTC**"). The Purchaser (or the relevant Designated Purchaser(s), as applicable) shall be responsible and indemnify and hold harmless the applicable Seller(s) for any GST/HST (and any comparable provincial Taxes) to the extent payable notwithstanding the elections contemplated by this Section 6.1, plus any interest and/or penalties payable as a consequence thereof.

SECTION 6.2    Withholding Taxes.

(a)    To the extent that the Purchaser or a Designated Purchaser is required under the Code or any provision of U.S. state or local or non-U.S. Law to deduct and withhold an amount from the Purchase Price, such withheld amounts shall be treated for all purposes of this Agreement as having been paid to the Persons in respect of which such deductions and withholdings were made. The Purchaser and the Designated Purchasers shall promptly remit such withheld amounts to the appropriate Government Entity. None of the Parties is aware of any obligation to deduct and withhold any material amounts from the Purchase Price under the Code or any provision of U.S. state or local, or non-U.S. Law, with respect to the making of such payment. If any of the Parties learns of any such obligation on or prior to the Closing Date, then (i) in the case of a Seller, such Seller shall promptly provide reasonable notice of such obligation to the Purchaser and (ii) in the case of the Purchaser, the Purchaser shall promptly provide reasonable notice of such obligation to the Sellers. The Parties shall make commercially reasonable efforts to cooperate in good faith to minimize the amounts that the Purchaser or Designated Purchasers, as the case may be, are required to deduct and withhold.

(b)    Notwithstanding the foregoing, if the Purchaser or a Designated Purchaser is required for any reason to deduct or withhold from any payment made pursuant to this Agreement or any other Transaction Document, which payment is for, or deemed to be for, the

purchase or use of Intellectual Property (including the license thereof), for any Tax imposed by a Tax Authority, and if the applicable Seller is unable to recover such Tax from such Tax Authority, the payment of the Purchase Price shall be increased to an amount which, after taking into account such deduction or withholding, will result in payment to the applicable Seller of the full amount such Seller would have received from the Purchaser or such Designated Purchaser had no such deduction or withholding been made. The Purchaser shall or shall cause such Designated Purchaser to promptly furnish the Sellers with such evidence as may be required by the applicable Tax Authorities to establish that any such Tax has been paid, and shall indemnify and hold harmless the Sellers on an after-Tax basis from any liability for penalties or interest due to the payor's failure to timely withhold and remit amounts in respect of Taxes to the applicable Tax Authority.

SECTION 6.3    Tax Characterization of Payments Under This Agreement. The Sellers and the Purchaser agree to treat all payments made either to or for the benefit of the other Party under this Agreement (other than payment of the Estimated Purchase Price and any interest payments) as adjustments to the Purchase Price for Tax purposes and that such treatment shall govern for purposes hereof to the extent permitted under applicable Tax Law.

SECTION 6.4    Apportionment of Taxes.

(a)    Except as otherwise provided in this Article VI, (i) the Sellers shall and shall cause the Other Sellers, as the case may be, to bear (A) all Taxes of any kind relating to the Assets or the conduct or operation of the Acquired Business for all Tax periods or portions thereof ending on or before the Closing Date and (B) all Taxes of any Seller imposed on or measured by such Seller's net income, gross income, capital, gross receipts, profits, and all Taxes of the same or of a similar nature, for any Tax period (excluding Transfer Taxes that are the responsibility of the Purchaser pursuant to Section 6.1(a)) and (ii) the Purchaser shall and shall cause the Designated Purchasers to bear all Taxes relating to the Assets or the conduct or operation of the Acquired Business for all Tax periods or portions thereof beginning after the Closing Date.

(b)    For purposes of this Agreement, any Taxes for a **"Straddle Period"** (a Tax period that includes, but does not end on, the Closing Date) shall be apportioned between the Sellers, on the one hand, and the Purchaser and the Designated Purchasers, on the other hand, based on the portion of the period ending on and including the Closing Date and the portion of the period beginning after the Closing Date, respectively. The amount of Taxes shall be allocated between portions of a Straddle Period in the following manner: (i) in the case of a Property Tax, the amount of Tax allocable to a portion of the Straddle Period shall be the total amount of such Tax for the period in question multiplied by a fraction, the numerator of which is the total number of days in such portion of such Straddle Period and the denominator of which is the total number of days in such Straddle Period, and (ii) in the case of all other Taxes (other than Transfer Taxes allocated under Section 6.1), such Taxes shall be determined from the books and records of the relevant Person as though the taxable period terminated at the close of business on the Closing Date.

SECTION 6.5    Records.

(a)     Except as provided elsewhere in this Section 6.5, after the Closing Date, (i) the Purchaser and the Designated Purchasers, on the one hand, and the Sellers, on the other hand, will make available to the other, as reasonably requested, and to any Tax Authority, all records or documents relating to liability for Taxes with respect to the Assets, the Assumed Liabilities, or the Business for all periods prior to the Closing (including any item relating to a Canadian tax deduction or Canadian tax credit in respect of scientific research and experimental development), and will preserve such records or documents until the expiration of any applicable statute of limitations or extensions thereof, and (ii) in the event that one party needs access to records or documents in the possession of a second party relating to any of the Assets, the Assumed Liabilities, or the Business for purposes of preparing Tax Returns or complying with any Tax audit request, subpoena or other investigative demand by any Tax Authority, or for any other legitimate Tax-related purpose (including conducting any proceeding with respect of Taxes) not injurious to the second party, the second party will allow representatives of the other party access to such records or documents during regular business hours at the second party's place of business for the sole purpose of obtaining information from records or documents for use as aforesaid and will permit such other party to make extracts and copies thereof as may be necessary or convenient, provided, however, that nothing herein shall require the Purchaser and the Designated Purchasers, on the one hand, and the Sellers, on the other hand, to disclose any information to the other if such disclosure would jeopardize any attorney-client or other legal privilege or contravene any applicable Law, fiduciary duty or agreement.  The obligation to cooperate pursuant to this Section 6.5 shall terminate at the time the relevant applicable statute of limitations expires (giving effect to any extension thereof).

(b)     Notwithstanding Section 6.5(a), the Sellers shall use their reasonable best efforts to calculate and provide to the Purchaser historical data relating to the qualified research expenses and gross receipts of the Business pursuant to Section 41 of the Code (including in particular Section 41(f)(3)(A) of the Code) and any analogous data under corresponding provisions of state, local or foreign law as requested by the Purchasers or the Designated Purchasers, provided that such historical data is available to the Sellers or could be made available to the Sellers with Sellers' reasonable best efforts. Sellers shall use their reasonable best efforts to update such historical data to reflect any relevant adjustments arising after the Closing and provide copies of any such updates to the Purchaser or the applicable Designated Purchaser within ten (10) days of the date on which such adjustment is made. Notwithstanding the foregoing, nothing herein shall require Sellers to indemnify the Purchaser to the extent a credit of the Purchaser under section 41 of the Code (or any corresponding provisions of state, local or foreign law) is unavailable or challenged by the relevant Taxing Authority.

(c)     At any time within the ten (10) years immediately following the Closing, NNL and NNTC may cause copies of Restricted Technical Records to be placed into escrow with the Records Custodian, who shall hold such Restricted Technical Records for a term ending no later than ten (10) years after the Closing Date in accordance with an escrow agreement between the Purchaser (or the relevant Designated Purchaser, as applicable), NNL and NNTC and the Records Custodian, in form satisfactory to the Purchaser (or the relevant Designated Purchaser), NNL and NNTC.  The escrow agreement will provide for access to the copies of the Restricted Technical Records only by the relevant Canadian Tax Authority or by Tax advisors of any purchaser ("**Tax Credit Purchaser**") relating to the scientific research and experimental development Tax credits of NNL and NNTC under the Income Tax Act (Canada), and only if

such advisors have executed an appropriate confidentiality agreement in form satisfactory to the Purchaser (or the relevant Designated Purchaser), acting reasonably. The access permitted by the escrow agreement shall be only for the limited purpose of defending any audit, claim or action by any Canadian Tax Authority in respect of the characterization of expenditures by NNL or NNTC as qualified expenditures on scientific research and experimental development for purposes of the applicable provisions of the Income Tax Act (Canada) ("**Qualified Expenditures**").

(d)     The Purchaser shall use reasonable efforts to make available to the relevant Taxing Authority or Tax advisors of the Tax Credit Purchaser, those former employees of NNL or NNTC, as the case may be, with direct knowledge of the Qualified Expenditures who are then employed by the Purchaser and whose cooperation is necessary for the purpose of defending any audit, claim or action by any Taxing Authority of the characterization of expenditures by NNL or NNTC, as the case may be, as Qualified Expenditures, and provided, that such advisors have executed an appropriate confidentiality agreement satisfactory to the Purchaser.

(e)     The Purchaser shall have no obligation to provide any access under this provision unless the Seller (if there is no Tax Credit Purchaser in respect of the request for access) or the Tax Credit Purchaser pays all the Purchaser's reasonable expenses in connection with the foregoing provisions, including a reasonable per diem rate for access to former employees of NNL or NNTC, as the case may be (based on the total compensation of the employee at the time access is provided).

(f)     At the request of the Purchaser, the Sellers shall provide reasonable access to records and employees of the Sellers to assist the Purchaser in claiming any future scientific research and experimental development Tax credits for Qualified Expenditures. The Sellers shall have no obligation to provide any access under this provision unless the Purchaser pays all of the Sellers' reasonable expenses in connection with the foregoing provisions, including a reasonable per diem rate for access to employees of the Sellers (based on the total compensation of the employee at the time access is provided).

SECTION 6.6     Tax Disclosure. Notwithstanding anything to the contrary in this Agreement, except as reasonably necessary to comply with applicable securities laws and regulations, any Party may (i) consult any Tax adviser regarding the U.S. federal income Tax treatment or Tax structure of the transactions contemplated by this Agreement, and (ii) disclose to any and all Persons, without limitation of any kind, the U.S. federal income Tax treatment and Tax structure of the transactions contemplated hereunder and all materials of any kind (including opinions or other Tax analyses) that are provided to such Person relating to such Tax treatment and Tax structure (but without disclosure of identifying information or any non-public commercial or financial information); provided, however, that clause (ii) of this paragraph shall not apply until the date of the public announcement of the execution of this Agreement and performance of the transactions contemplated hereunder. For this purpose, "Tax structure" is limited to any facts relevant to the U.S. federal income Tax treatment of the transactions contemplated hereunder.

SECTION 6.7     Tax Returns.

105

(a)      The Sellers shall be responsible for the preparation and timely filing (taking into account any extensions received from the relevant Tax Authorities) of all Tax Returns in respect of the Assets or the Acquired Business, for all Pre-Closing Taxable Periods (other than any Tax Returns with respect to Transfer Taxes (**"Transfer Tax Returns"**) described below in Section 6.7(b)). Such Tax Returns shall be true, correct and complete in all material respects. Except as otherwise provided in this Agreement, all Taxes indicated as due and payable on such Tax Returns shall be paid by (or shall be caused to be paid by) the Sellers as and when required by Law.

(b)      Each Transfer Tax Return with respect to Transfer Taxes imposed in respect of this Agreement and the transactions contemplated hereunder or in respect of the execution of any other Transaction Document shall be prepared by the Party that has primary responsibility for filing such Transfer Tax Return pursuant to the applicable Tax Laws. The Sellers shall make available to the Purchaser that portion of such Transfer Tax Returns prepared by the Sellers that is applicable to the sale and purchase transaction contemplated by this Agreement, and, to the extent not already disclosed, such information as will enable the Purchaser to review such portion of such Transfer Tax Returns, at least five (5) Business Days before such Tax Returns are due to be filed. The Purchaser shall be entitled to comment on any Transfer Tax Return prepared by a Seller prior to making any payment in respect thereof, such comments to be provided at least three (3) Business Days before such Transfer Tax Returns are due to be filed, and in the event of disagreement between the Parties, and the relevant Transfer Tax Return shall be filed in accordance with the Purchaser's reasonable comments, it being understood that the Purchaser shall remain responsible for any Transfer Taxes for which it is responsible pursuant to Section 6.1(a) whether or not shown on such Tax Return. The Purchaser shall pay to the Sellers any amount of Transfer Taxes payable in respect of Transfer Tax Returns to be filed by the Sellers pursuant to this Section 6.7(b) at least one (1) Business Day before such Transfer Tax becomes due and payable in each case to the extent such Transfer Taxes are the responsibility of the Purchaser pursuant to Section 6.1(a).

(c)      The Purchaser or a Designated Purchaser shall be responsible for the preparation and timely filing (taking into account any extensions received from the relevant Tax Authorities) of all Tax Returns with respect to the Assets or the Acquired Business for all Straddle Periods. Such Tax Returns shall be true, correct and complete in all material respects. All Taxes indicated as due and payable on such Tax Returns shall be paid by (or shall be caused to be paid by) the Purchaser or a Designated Purchaser as and when required by Law; provided, however, that Taxes that are the responsibility of the Sellers pursuant to this Article VI shall be paid by the Sellers to the Purchaser or Designated Purchaser no later than one (1) Business Day prior to the due date for the applicable Straddle Period Tax Return.

(d)      The Sellers shall be entitled to review and comment on any Tax Return (other than a Transfer Tax Return described in Section 6.7(b)) prepared by the Purchaser or a Designated Purchaser for any Straddle Period before any such Tax Return is filed. The Purchaser shall submit a draft of any such Tax Return to the Main Sellers at least thirty (30) days before the date such Tax Return is required to be filed with the relevant Tax Authority. The Main Sellers shall have ten (10) days after the date of receipt thereof to submit to the Purchaser, in writing, the Main Sellers' written comments with respect to such Tax Return. The Purchaser shall notify the Main Sellers within five (5) days after receipt of such comments of (a) the extent,

106

if any, to which the Purchaser accepts such comments and will file such Tax Return in accordance therewith and (b) the extent, if any, to which the Purchaser rejects such comments. To the extent the Purchaser rejects the comments of the Main Sellers, the Purchaser and the Main Sellers promptly shall negotiate in good faith to resolve their disagreements; if no agreement has been reached within three (3) days, the parties immediately shall appoint an Accounting Arbitrator to determine the correct manner for reporting the items that are in dispute and shall provide to the Accounting Arbitrator all relevant information. The Accounting Arbitrator shall have ten (10) days to submit its determination, which shall be binding upon the Parties, and the Purchaser shall file such Tax Return in accordance therewith. The fees and expenses of the Accounting Arbitrator shall be paid by the Party whose position is deemed to be least correct by the Accounting Arbitrator.

(e)     To the extent any Tax Returns of the Sellers that are listed in Section 4.13(a) of the Sellers Disclosure Schedule are required to be filed by the Sellers have not been filed by the Closing Date, such Tax Returns shall be filed as soon as reasonably practicable but in no event later than three (3) months after the Closing Date; provided, however, that this Section 6.7(e) shall not be applicable to the extent that no Asset can be made subject to a Tax Lien and neither the Purchaser nor any Designated Purchaser could be held liable for Taxes of that Seller.

SECTION 6.8     Canadian Tax Election.

(a)     Provided that a portion of the Assets transferred pursuant to this Agreement by the Sellers to the Purchaser or each Designated Purchaser which is a resident of Canada for purposes of the Income Tax Act (Canada) (and any equivalent provincial statute) is being transferred to the Purchaser (or the relevant Designated Purchaser) in consideration for the Purchaser (or the relevant Designated Purchaser) assuming prepaid obligations of the Seller to deliver goods or provide services in the future, the Sellers and the Purchaser (or the relevant Designated Purchaser) will prepare, execute and file, on a timely basis and using any prescribed form, a joint election under subsection 20(24) of the Income Tax Act (Canada) (and any equivalent provincial statute) as to such assumption hereunder, and prepare their respective Tax Returns in a manner consistent with such joint election. The elected amount will be jointly determined by the Sellers and the Purchaser (or relevant Designated Purchaser), acting reasonably. The Sellers and the Purchaser (or relevant Designated Purchaser) will make any required elections under corresponding provincial or territorial law and the foregoing provisions will apply mutatis mutandis in respect thereof.

(b)     To the extent the Seller and the Purchaser (or the relevant Designated Purchaser) cannot agree on the amount to be elected under subsection 20(24) of the Income Tax Act (Canada) (and any equivalent provincial statute), the Seller and the Purchaser (or the relevant Designated Purchaser) promptly shall negotiate in good faith to resolve their disagreements; if no agreement has been reached within five (5) days, the relevant parties immediately shall appoint an Accounting Arbitrator to determine the correct amount to be elected and shall provide to the Accounting Arbitrator all relevant information. The Accounting Arbitrator shall have thirty (30) days to submit its determination, which shall be binding upon the Parties, and the Parties shall file all relevant elections and Tax Returns in accordance therewith.

The fees and expenses of the Accounting Arbitrator shall be paid by the Party whose position is deemed to be least correct by the Accounting Arbitrator.

SECTION 6.9    Other Tax Matters.

(a)    In the event that any Tax Authority shall (A) make any claim against any Purchaser Parties for any Taxes that are Excluded Liabilities of any Seller or (B) have in its favor a Lien on any of the Assets arising out of the non-payment of any Taxes that are Excluded Liabilities of a Seller (any Taxes described in (A) and (B) above hereby are referred to collectively as "**Excluded Taxes**"), such Purchaser Party shall be entitled to recover all Losses arising out of or in connection with such Excluded Taxes promptly (in accordance with the following provisions) by obtaining cash from the Succession Tax Escrow Amount in an amount equal to the aggregate amount of such Losses, provided that (i) the aggregate amount to be recovered under this Section 6.9 in respect of such Losses shall not exceed the Succession Tax Escrow Amount (plus any accrued interest on the Succession Tax Escrow Amount); and (ii) the only Losses recoverable under this Section 6.9 shall be the amount of Excluded Taxes claimed, and any additional Losses incurred by a Purchaser Party after the earlier of the date on which a Tax Authority has made a claim described in (A) above or registered or imposed a Lien described in (B) above, as applicable.

(b)    If a claim for Losses under Section 6.9(a) (a "**Tax Claim**") is to be made by a Purchaser Party, the Purchaser shall give written notice (a "**Tax Claim Notice**") on behalf of such Purchaser Party to the Main Sellers promptly after such Purchaser Party becomes aware that a Tax Authority has made a claim against it for any Excluded Taxes or that such Taxes have given rise to a Lien described in clause (B) of subsection (a) above, as applicable, stating, with reasonable specificity, the basis for the Tax Claim, and including a copy of all relevant documents received from the relevant Tax Authority.  In the event that any Purchaser Party is entitled to recover the amount of any such Losses from the Succession Tax Escrow Amount, the Purchaser and the Main Sellers shall issue joint written instructions to the Escrow Agent authorizing distribution of the amount of such Losses to such Purchaser Party and such Purchaser Party shall be responsible for paying over to the relevant Tax Authority the amount of Excluded Taxes distributed to it from the Succession Tax Escrow Amount to the extent it has not already done so at the time of the distribution of such amount from such fund and shall provide Sellers with such written evidence as is reasonably requested in writing to confirm that payment to the relevant Tax Authority has been duly made.

(c)    On the date that is the first Business Day after the first anniversary of the Closing Date, the Purchaser and the Main Sellers shall deliver to the Escrow Agent joint written instructions to release to the Distribution Agent, on behalf of the Sellers and the EMEA Sellers, any remaining portion of the Succession Tax Escrow Amount (including any accrued interest thereon) in excess of an amount equal to the aggregate of all Tax Claims which have been asserted prior to such date evidenced by one or more Claim Notices and which remain pending and unresolved on such date.  Thereafter, as soon as reasonably practicable after the final resolution of the last Tax Claim, the Purchaser and the Main Sellers shall issue joint written instructions to the Escrow Agent to release to the Distribution Agent, on behalf of the Sellers and the EMEA Sellers, any remaining portion of the Succession Tax Escrow Amount (including any accrued interest thereon) after any distributions to Purchaser required hereby.

(d)    In the event that a Claim Notice is served, the Purchaser shall take such steps as are commercially reasonable to mitigate or otherwise defend the assessment(s) made by the relevant Tax Authority. In the event that a payment from the Succession Tax Escrow Amount is made to a Purchaser Party pursuant to this Section 6.9, and subsequently a Purchaser Party becomes entitled to and receives a refund that is attributable to Excluded Taxes that were paid to such Purchaser Party from the Succession Tax Escrow Amount (in whole or in part), then the Purchaser shall, or shall cause the relevant Purchaser Party to, promptly pay to the Distribution Agent, on behalf of the Sellers and the EMEA Sellers, an amount equal to the portion of such refund so attributable (including any interest paid in connection with such portion), net of reasonable out-of-pocket expenses (including taxes) incurred by the Purchaser Party in obtaining such portion, unless (i) such refund is received prior to the first anniversary of the Closing Date or (ii) at the time the refund is received, the Succession Tax Escrow Amount is less than the sum of the Tax Claims that are evidenced by one or more Claim Notices and which remain pending and unresolved on such date, then, in each case, the Purchaser Party shall pay the net amount of such portion to the Escrow Agent to be added to the Succession Tax Escrow Amount.

(e)    Notwithstanding anything to the contrary in this Agreement, recourse to the Succession Tax Escrow Amount under this Section 6.9 shall be the sole and exclusive remedy available to the Purchaser and any Designated Purchaser following the Closing in respect of any liability for Taxes that are Excluded Liabilities of a Seller or any liability for Taxes that give rise to any Lien on any Assets in each case in the jurisdictions set forth on Section 6.9(e) of the Sellers Disclosure Schedule.

SECTION 6.10    Cooperation. The Sellers and the Purchaser shall make commercially reasonably efforts (taking into account available resources) to cooperate with each other in connection with the conduct of any Tax audit, investigation, dispute, or appeal relating to the Business or the Assets.

## ARTICLE VII.

## EMPLOYMENT MATTERS

SECTION 7.1    Employment Obligations with Respect to Non-Union Employees. Except as provided in the first sentence of Section 7.1.1, and except as the schedules referenced in Section 7.1.2(c) may apply to Union Employees, the provisions of this Section 7.1 shall apply only to Non-Union Employees.

7.1.1    Employment Terms. The Purchaser hereby agrees to offer employment to at least ninety-five percent (95%) of the Employees. Promptly following the latest of the granting of the U.S. Sale Order and the Canadian Approval and Vesting Order and receipt of all Regulatory Approvals, the Purchaser shall, or shall cause a Designated Purchaser to, extend a written offer of employment (each, an **"Offer"** and collectively, **"Offers"**) in a manner that provides no less than a one-week Employee consideration period (**"Offer Consideration Period"**), in a form reasonably agreed by the Primary Parties (provided that the Seller provides feedback on any proposed offer letter or any revision thereof within two (2) Business Days following receipt from the Purchaser) and in compliance with applicable Law to each Employee

109

(other than Employees whose employment transfers automatically by operation of Law to the Purchaser or a Designated Purchaser) with such employment to take effect under the terms stated herein as of the Effective Hire Date, as defined below. Offers shall, except to the extent otherwise required by Law, be for employment with (a) an annual base salary and annual target incentive opportunity for each such Employee at least equal to the annual base salary and annual target incentive opportunity (excluding the KEIP, KERP and the Nortel Special Incentive Plan) for such Employee as set out in the Employee Information (provided that the form and performance metrics of such incentive opportunity shall be determined by the Purchaser in its sole discretion), (b) employment in a reasonably comparable position as set out for the Employee in the Employee Information, (c) a location reasonably contiguous to their current location as set out in the Employee Information, and (d) a deemed consent by the Employee to allow the Seller to transfer such Employee's Employee Records as of the Effective Hire Date. Employees whose employment transfers by operation of Law shall be employed on terms and conditions of employment that are no less favorable than those set out above. For purposes of this Agreement, to the extent certain terms and conditions of employment are required to be maintained under applicable Law in order to avoid the Sellers incurring severance or other termination obligations with respect to Employees at any time after the Closing Date, such terms and conditions shall be deemed required by applicable Law. The Sellers shall provide to the Purchaser available and relevant information, and the Sellers and the Purchaser shall cooperate in good faith, so as to enable the Purchaser to comply with its undertakings under this Section 7.1.1. Employees' employment with the Purchaser or a Designated Purchaser or, with respect to Employees whose employment transfers by operation of Law, continued employment after the Effective Hire Date, shall not include a probationary period and shall not be conditioned upon such employees satisfactorily completing a drug test or other employment screening processes unless such screening process is required by applicable Law; provided, however, that Employees' employment with the Purchaser or Designated Purchaser may be contingent on (i) if, and only to the extent, required pursuant to the terms and conditions of any Customer Contract or similar contract or arrangement to which the Purchaser or a Designated Purchaser is a party, with respect to Employees providing services pursuant to the terms and conditions of such Customer Contract or similar contract or arrangement only, satisfactory completion of a background check, to the extent permitted and consistent with applicable Law, (ii) Employees' providing evidence that they are legally permitted to be employed by the Purchaser or a Designated Purchaser, as required by applicable Law, (iii) in the case of an Inactive Employee (other than an Employee whose employment transfers by operation of Law), such Employee's return to active status with the Sellers and (iv) the Closing. The Purchaser shall notify the Main Sellers of the acceptance and rejections of Offers that have been received from each of the Employees (A) periodically during the Offer Consideration Period and (B) in total within three (3) Business Days following the end of the Offer Consideration Period. Any Employee who accepts an Offer and commences employment with the Purchaser or a Designated Purchaser, as applicable, pursuant to this Agreement and any Employees whose employment transfers by operation of Law shall all be deemed to be a Transferred Employee for all purposes of this Agreement. Inactive Employees shall remain employed by the relevant Seller until the first (1st) Business Day immediately following the date the Inactive Employee is released to return to active employment in accordance with the Sellers' leave policies and on which such Inactive Employee reports to work with the Purchaser or a Designated Purchaser. To the extent not already provided pursuant to Section 5.6(e), the Sellers will use commercially reasonable best efforts to provide to the

110

Purchaser Employee Records on or prior to seven (7) Business Days following the Effective Hire Date. The Purchaser or a Designated Purchaser shall use reasonable best efforts from the date hereof until the Closing Date to obtain, at its cost, such visas or permits as are required for it to employ Employees with visas or permits, as indicated in the Employee Information, who accept Offers. Visa Employees and Other Loaned Employees (collectively, the **"Loaned Employees"**) shall remain employed by the relevant Seller under the terms and conditions of the Loaned Employee Agreement. The Effective Hire Date for Non-Union Employees is (x) the Employee Transfer Date for those Employees other than Inactive Employees and Loaned Employees, (y) 12:01 a.m. on the first (1st) Business Day following the release to return to active employment from leave for all Inactive Employees and on which such Inactive Employee reports to work with the Purchaser or Designated Purchaser and (z) the date specified in the Loaned Employee Agreement with respect to Loaned Employees. Unless otherwise expressly provided, as of the Effective Hire Date for a period of not less than twelve (12) months after the Closing Date, the employment of Non-Union Employees shall be on the terms and conditions set forth in Section 7.1, including any applicable schedules thereto.

7.1.2   Employee Benefits.

(a)     The Purchaser or a Designated Purchaser shall, and shall cause its relevant Affiliates to, except as otherwise provided herein, recognize the service date of each Transferred Employee as set out in the Employee Information for all purposes, other than (x) benefit accrual or (y) otherwise for determination of the amount or duration of benefits under any defined benefit pension plan or equity incentive plan, to the extent that each such Transferred Employee was entitled to recognition of such service date under the corresponding Seller Employee Plan in which such Transferred Employee participated or was eligible to participate (including any Seller Employee Plan that is suspended or the benefits of which are suspended), and to the extent that such recognition would not result in a duplication of benefits or the funding thereof.

(b)     After the date hereof, the Sellers and the Purchaser shall cooperate promptly and in good faith in preparing the transition of the Transferred Employees (and their eligible dependents, as applicable) from coverage under the Seller Employee Plans to coverage under the Purchaser Employee Plans effective as of the Transferred Employee's Effective Hire Date. Except with respect to any Employee whose benefits are specified by applicable Law, the Purchaser or the relevant Purchaser's Affiliates shall use reasonable best efforts to cause each Transferred Employee (and their eligible dependents, as applicable) to be eligible as of the relevant Effective Hire Date to participate in and accrue benefits under the Purchaser Employee Plans, in each case under the terms of such Purchaser Employee Plans. Notwithstanding the foregoing, for a period of twelve (12) months following the Closing Date, Purchaser shall, or cause its relevant Affiliate to, provide Transferred Employees with employee benefits substantially comparable, in the aggregate, to the employee benefits (other than benefits under (i) the KEIP, (ii) the KERP or (iii) the Nortel Special Incentive Plan, retiree medical benefits, equity based compensation or defined pension benefits) provided to such Transferred Employees under Seller Employee Plans set forth on Section 4.11(a) of the Sellers Disclosure Schedule and as required by applicable Law prior to the Closing.

(c)     Without limiting the generality of the foregoing, the Purchaser shall, or shall cause its relevant Affiliates to, provide the following benefits to Transferred Employees:

111

(i)     For the period beginning on the Closing Date and ending on the date that is nine (9) months from the Closing Date, the Purchaser shall, or shall cause its relevant Affiliates to, provide Transferred Employees with the severance payments to which the Transferred Employee would have been entitled to under the applicable Seller Employee Plan covering the Transferred Employee in effect immediately prior to the Effective Hire Date.

(ii)     Section 7.1.2(c)(ii) of the Sellers Disclosure Schedule will set forth the amount of accrued and unused vacation days that are due and owing to the Transferred Employees as of the date hereof and such amount shall be updated by the Sellers as of the Closing Date. The Purchaser shall, or shall cause its relevant Affiliates to, grant each Transferred Employee paid time off in an amount equal to such accrued unused vacation days set forth for such Transferred Employee in the applicable Section of the Sellers Disclosure Schedule. If such Transferred Employee terminates employment with the Purchaser or an Affiliate of the Purchaser prior to receiving such paid time off, as described above, the Purchaser shall pay such Transferred Employee an amount equal to any such unused paid time off upon such employment termination.

(iii)     The vacation accrual rate and maximum accrual of each Transferred Employee on and after the Effective Hire Date shall be determined under the vacation policy of the Purchaser or its relevant Affiliate following the crediting of such Transferred Employee with service as provided in Section 7.1.2(a). For the avoidance of doubt, such vacation accrual rate and maximum accrual applicable to Transferred Employees whose accrued vacation is specified in Section 7.1.2(c)(ii) of the Sellers Disclosure Schedule shall not be decreased prior to the date which is twelve (12) months following the Closing Date, or later if required by applicable Law, by the Purchaser or its Affiliates as a result of the obligation in Section 7.1.2(c)(ii) that Purchaser or its Affiliates grant or compensate such Employees with respect to accrued and unused vacation days due and owing as of the Effective Hire Date.

(iv)     The Purchaser or Designated Purchaser shall provide each Transferred Employee employed in Australia with the benefit of the amount set forth on Section 7.1.2(c)(iv) of the Sellers Disclosure Schedule of long service leave and sick leave, at such time, if any, as payment of such amount is due and owing to each such Transferred Employee under applicable Law, taking into account in the calculation of such payment the service of such Transferred Employee as set forth in the Employee Information and such Transferred Employee's service with the Purchaser on and after the Closing Date. Section 7.1.2(c)(iv) of the Sellers Disclosure Schedule shall be updated as of the Closing Date to reflect employee hiring, promotions, demotions, transfers or other status changes and attrition, and further accruals or reductions or other changes from the date hereof to the Closing Date, in each case if and only to the extent permitted under Section 5.9.

112

(v)     For the avoidance of doubt, Inactive Employees and Loaned Employees, as of the Closing Date will be listed on Section 7.1.2(c)(ii) of the Sellers Disclosure Schedule and Section 7.1.2(c)(iv) of the Sellers Disclosure Schedule, as applicable; provided, however, that unless and until such Inactive Employees and Loaned Employees become Transferred Employees, the Purchaser shall have no obligation with respect to Inactive Employees and Loaned Employees under this Section 7.1.2(c).

(d)     With respect to each Transferred Employee (and their eligible dependents, as applicable), the Purchaser or the relevant Purchaser's Affiliates shall use reasonable best efforts to cause the Purchaser Employee Plans to (i) waive any eligibility periods, evidence of insurability or pre-existing condition limitations and (ii) honor any deductibles, co-payments, co-insurance or out-of-pocket expenses paid or incurred by such employees, including with respect to their dependents, under comparable Seller Employee Plans during the Purchaser Employee Plan year in which the relevant Effective Hire Date occurs, in each case to the extent waived, inapplicable to such Transferred Employee, or honored under the Seller Employee Plans in which such Transferred Employee participated immediately prior to the Closing and to the extent doing so will not result in the duplication of benefits; provided, that such Transferred Employee provides an explanation of benefits or similar documentation, as reasonably required by the Purchaser, of any expenses paid or incurred to the Purchaser or its Affiliates.  Nothing in this paragraph or otherwise in this Article VII shall be construed as constituting an amendment of any employee benefit plan.

(e)     As of the Closing Date, the Purchaser or a Designated Purchaser shall establish or otherwise provide a registered pension plan for Transferred Employees employed in Canada and maintain such plan for a period of at least five (5) years following the Closing Date, or such period as may be required by applicable Law and each such Transferred Employee's participation shall commence on such Transferred Employee's Employee Transfer Date.

(f)     The Sellers shall be solely responsible for any required notice under the WARN Act with respect to terminations of employment of Employees that occur on or prior to the Closing Date and for any individual who does not become a Transferred Employee regardless of the date of termination; provided, that the Purchaser or Designated Purchaser, as applicable, has satisfied its obligations as set out in this Article VII.  The Purchaser shall be solely responsible for any required notice under the WARN Act with respect to terminations of employment of Transferred Employees that occur after the Closing Date.  On the Closing Date, the Sellers shall provide to the Purchaser, in writing, the number of Employees, by facility and operating unit, who have experienced an "employment loss" (as defined under the WARN Act) during the ninety (90) days prior to Closing.

(g)     Nothing express or implied in this Agreement (including anything set forth in this Section 7.1) restricts the right of the Purchaser or any Designated Purchaser to terminate the employment of any Transferred Employee after the Closing, to modify the compensation or employee benefits of any Transferred Employee or relocate any Transferred Employee's principal place of employment; provided any such termination, modification or relocation is effected in accordance with applicable Law and the terms and conditions of this Section 7.1.

113

SECTION 7.2      Employment Obligations with Respect to Union
Employees. . The provisions of this Section 7.2 shall apply to Union Employees

(a)      As of the Closing Date, the Purchaser or its relevant Affiliate will be
bound by the terms and obligations of the Collective Labor Agreements specified in the
Employee Information with respect to the employment of the relevant Union Employees as a
successor, assign or purchaser of the relevant Seller and shall employ the Union Employees in
accordance therewith. Notwithstanding anything to the contrary herein, nothing in this Section
7.2 shall be deemed to preclude the Purchaser or the relevant Affiliates from renegotiating the
terms of any Collective Labor Agreement after the Closing Date.

(b)      During the period beginning on the later of (i) the approval of the U.S.
Sale Order and (ii) the Canadian Approval and Vesting Order, and ending on the Closing Date,
unless otherwise specifically required by applicable Law, the Sellers shall not limit the Purchaser
or the Designated Purchasers' ability to contact and communicate with the unions or any
collective bargaining agents that are parties to the Collective Labor Agreements listed in Section
4.11(d) of the Sellers Disclosure Schedule. For the avoidance of doubt, unless otherwise
specifically required by applicable Law, the Sellers shall not limit the Purchaser or the
Designated Purchasers' ability to negotiate with the union or any collective bargaining agent
regarding the terms and conditions of employment with respect to the Union Employees;
provided, however, that (i) the Purchaser or the Designated Purchasers shall not negotiate
directly or indirectly with any Union Employee who is not a recognized representative of a union
or a member of the union's collective bargaining team, (ii) the Purchaser or Designated Purchaser
shall provide, upon the Sellers' reasonable request, updated information regarding the
Purchaser's or Designated Purchaser's contact and communication with the unions or collective
bargaining agent, as applicable, and the status of any such negotiations, (iii) the Purchaser or the
Designated Purchasers shall not bind or purport to bind any of the Sellers to any amendment to
any collective agreement or any other agreement with any union, and (iv) any changes that the
Purchaser or the Designated Purchasers may negotiate with a union shall be conditional upon and
only take effect following Closing.

SECTION 7.3      Excluded Employee Liabilities. For purposes of clarity,
except as otherwise provided in the Loaned Employee Agreement, the Sellers shall retain, and
neither the Purchaser, any of the Designated Purchasers nor any Purchaser Employee Plan shall
assume at the Closing, any of the following Liabilities of the Sellers, their Affiliates or Seller
Employee Plans (the "**Excluded Employee Liabilities**"):

(a)      any Liabilities related to the Seller Employee Plans or any employee plans
or arrangements related to employees of the Business employed by the Sellers, including the
Sellers', any of their Affiliates' or Seller Employee Plans' obligations to contribute to, make
payments or provide benefits under any Seller Employee Plan, except with respect to any
payments or benefits provided for in Section 2.1.3(h);

(b)      any obligation to provide continuation coverage pursuant to COBRA or
any similar Law under any Seller Employee Plan that is a "group health plan" (as defined in
Section 5000(b)(1) of the Code) to any Transferred Employees and/or their qualified

114

beneficiaries who have a COBRA qualifying event that occurs prior to such Employees'
Effective Hire Date;

(c)    any Liabilities resulting from any Action (i) by any Employee relating to
his/her employment or termination of employment with any of the Sellers, except any Action
related to the Purchaser's failure to perform its obligations under this Article VII, or (ii) by an
applicant with respect to potential employment with any of the Sellers in the Acquired Business.

(d)    any other Liabilities for former employees, Employees and independent
contractors related to the Acquired Business that are not Transferred Employees; and

(e)    any Liability with respect to the KERP, the KEIP, the Nortel Special
Incentive Plan or any other retention plan, program or arrangement of the Sellers that provides
benefits to any Transferred Employee.

SECTION 7.4        Other Employee Covenants.

(a)    After the date hereof, and subject to each Party's disclosure obligations
imposed by Law or by Government Entities and each Party's obligations hereunder, the Parties
shall not, and shall procure that each of their Affiliates shall not, issue any announcement or
communication to their respective employees or the Employees, prior to consultation with, and
the approval of, the other Party (not to be unreasonably withheld or delayed) with respect to this
Agreement or any of the transactions contemplated hereby (including any announcement or
communication to any individual employee that the Purchaser is required to provide under
applicable Law). Each Party shall cooperate in respect of the development and distribution of
any announcement and communication to the employees of the other Party including Employees
thereof, with respect to this Agreement or any of the transactions contemplated hereby.

(b)    The Purchaser undertakes to keep the Employee Information in confidence
and that, until the relevant Employee Transfer Date with respect to those Employees who
become Transferred Employees, and at all times with respect to those Employees who do not
become Transferred Employees:

(i)    the Purchaser shall, and shall cause the Designated Purchasers to,
restrict the disclosure of the Employee Information only to such of its employees,
agents and advisors as is reasonably appropriate for the purposes of complying
with its obligations pursuant to this Agreement, and the Employee Information
shall not be disclosed to any other Person without the consent of the Main Sellers,
such consent not to be unreasonably withheld;

(ii)    the Employee Information shall not be used except for the
purposes of complying with the obligations of the Purchaser and the Designated
Purchasers pursuant to this Agreement, and for the purposes reasonably related to
the same, and shall be returned to the Sellers or destroyed, at the Sellers' election,
if this Agreement is terminated; and

115

(iii)    the Purchaser shall, and shall cause the Designated Purchasers to, comply with such additional obligations as may be reasonably required in any particular jurisdiction to comply with any applicable data privacy Laws.

(c)    The Purchaser and the Sellers shall cooperate with each other in order to provide for an orderly transition of the Transferred Employees from the Sellers to the Purchaser or the Designated Purchasers, as applicable, and to minimize the disruption to the respective businesses of the Parties resulting from the transactions contemplated hereby.

(d)    During the Non-Solicitation Period the Sellers shall not, and shall not permit, cause or encourage any of their Affiliates to, without the advance written consent of the Purchaser, either directly or indirectly solicit for employment, hire or otherwise engage to provide services any Transferred Employee or other employee of the Purchaser or Designated Purchaser unless the Purchaser or a Designated Purchaser involuntarily terminate the employment of such employee, without cause, prior to such action by the Sellers; provided, however, that nothing in this Section 7.4(d) shall prevent the Sellers from conducting generalized employment searches, including placing bona fide public advertisements, that are not specifically targeted at such Transferred Employees or other employees of the Purchaser or Designated Purchaser and hiring such Transferred Employees or other employees of the Purchaser or Designated Purchaser identified through such employment searches.  During the Non-Solicitation Period, the Purchaser and the Designated Purchasers shall not, and shall not permit, cause or encourage any of their Affiliates to, without the Seller's advance written consent, either directly or indirectly solicit for employment, hire or otherwise engage to provide services (i) any of the employees of the Sellers (other than Employees), unless the Sellers involuntarily terminate the employment of such employee, without cause, prior to such action by the Purchaser or the Designated Purchasers, or (ii) any Employees who have rejected an Offer of the Purchaser or a Designated Purchasers or objected to their transfer of employment to the Purchaser or a Designated Purchasers pursuant to this Agreement or Employees to whom the Purchaser or a Designated Purchaser did not make a compliant Offer pursuant to Section 7.1.1; provided, however, that nothing in this Section 7.4(d) shall prevent the Purchaser or the Designated Purchasers from conducting generalized employment searches, including placing bona fide public advertisements, that are not specifically targeted at such employees or former employees of the Sellers and hiring such employees or former employees of the Sellers identified through such employment searches.

(e)    As of the Effective Hire Date, the Sellers and their Affiliates shall release any non-competition or confidentiality obligations in respect of the Acquired Business or Assets binding to the Transferred Employees which would survive the termination of the employment relationship between the Sellers and the Transferred Employees.  For the avoidance of doubt, this release shall operate only to facilitate the Transferred Employees' employment with the Purchaser or a Designated Purchaser, as applicable, in the Acquired Business and the subject non-competition and confidentiality obligations shall remain in full force and effect as to all other aspects of the Sellers' business and all other Persons.

(f)    Each Party shall reasonably cooperate to communicate relevant information to Employees relating to this Agreement and the transactions contemplated hereunder, and shall provide copies of all notices required by Law and related to the transactions

116

contemplated by this Agreement to the other Party. Each Party shall provide copies of such communications to the other Party reasonably in advance of distribution, and shall provide an opportunity for such other Party to comment.

(g)    In the event and for so long as the Seller is actively contesting or defending against any third party Action or Claim in which the Employee Records are pertinent, the Purchaser or Designated Purchaser agrees to provide reasonable access to Employee Records solely for the purposes of such Action or Claim, at the cost of the Sellers.

(h)    The Sellers shall use reasonable efforts to provide updated Employee Information to the Purchaser on the first Business Day of each month beginning after the date hereof and shall provide the Purchaser with the final updated Employee Information with respect to Employees ten (10) Business Days prior to the Closing Date in order to reflect Employee hiring, promotions, demotions, transfers, or other status changes and attrition, and further accruals or reductions or, if and to the extent applicable to such schedule, other changes in each Employee's compensation from the date hereof to the Closing Date, in each case if and only to the extent permitted under Section 5.9.

SECTION 7.5    Sole Benefit of the Sellers and the Purchaser or Designated Purchaser. The terms and provisions of this Article VII are for the sole benefit of the Sellers and the Purchaser or Designated Purchaser. Nothing contained herein, express or implied (i) shall be construed to establish, amend, or modify any Seller Employee Plan, any Purchaser Employee Plan, or any other benefit plan, program, agreement or arrangement, (ii) shall alter or limit the ability of the Purchaser or Designated Purchaser, the Sellers, or any of their respective Affiliates to amend, modify or terminate any Seller Employee Plan, any Purchaser Employee Plan (other than as provided in Section 7.1.2(E), or any other benefit or employment plan, program, agreement or arrangement after the Closing Date, (iii) is intended to confer or shall confer upon any current or former employee any right to employment or continued employment, or constitute or create an employment agreement with any Transferred Employee, or (iv) is intended to confer or shall confer upon any individual or any legal representative of any individual (including employees, retirees, or dependents or beneficiaries of employees or retirees and including collective bargaining agents or representatives) any right as a third-party beneficiary of this Agreement.

ARTICLE VIII.

CONDITIONS TO THE CLOSING

SECTION 8.1    Conditions to Each Party's Obligation. The Parties' obligation to effect, and, as to the Purchaser, to cause the relevant Designated Purchasers to effect, the Closing is subject to the satisfaction or the express written waiver of the Primary Parties, at or prior to the Closing, of the following conditions:

(a)    Regulatory Approvals. All Mandatory Regulatory Approvals shall have been obtained and shall remain in force and effect and have not been set aside or modified, on appeal or otherwise.

117

(b)     No Injunctions or Restraints.  There shall be in effect no Law, or any material order, injunction, decree or judgment of any Court or other Government Entity in the U.S., Canada or the United Kingdom, or of any European Union Entity staying, enjoining, preventing or prohibiting the consummation of any of the transactions contemplated hereby or by the EMEA Asset Sale Agreement, and there shall not be any proceedings pending by any Government Entity in the U.S., Canada, U.K. or any European Union Entity seeking to stay, enjoin, prevent or prohibit the consummation of any of the transactions contemplated hereby or by the EMEA Asset Sale Agreement.

(c)     Satisfaction of Conditions under EMEA Asset Sale Agreement.  The conditions to Closing of the EMEA Asset Sale Agreement set out in Clause 15.1 thereof (other than the conditions regarding the satisfaction or waiver of the conditions set out in this Section 8.1) shall have been satisfied or waived in accordance with the terms of the EMEA Asset Sale Agreement (provided, that a Party may not assert the failure of this condition to be satisfied in the event that such failure is the result of, or has been caused by, a breach by such Party or its Affiliates of this Agreement or the EMEA Asset Sale Agreement that caused the applicable condition to Closing in the EMEA Asset Sale Agreement to not be satisfied).

(d)     Consummation of Closing under EMEA Asset Sale Agreement.  The transactions contemplated by the EMEA Asset Sale Agreement to be completed as of the Closing shall be completed contemporaneously with the Closing hereunder.

(e)     *U.S. Sale Order and Canadian Approval and Vesting Order.*  After notice and a hearing as required by section 363(b) and as defined in section 102(1) of the U.S. Bankruptcy Code, the U.S. Bankruptcy Court shall have entered the U.S. Sale Order and such Order shall be a Final Order.  In addition, the Canadian Court shall have granted the Canadian Approval and Vesting Order and such Order shall be a Final Order.

SECTION 8.2     Conditions to the Sellers' Obligation.  The Sellers' obligation to effect the Closing shall be subject to the fulfillment (or express written waiver by the Main Sellers), at or prior to the Closing, of each of the following conditions:

(a)     No Breach of Representations and Warranties.  Each of the representations and warranties contained in Article III (disregarding all materiality and material adverse effect qualifications contained therein) shall be true and correct (i) as if restated on and as of the Closing Date or (ii) if made as of a date specified therein, as of such date, except, in each case, for any failure to be true and correct that, individually and together with other such failures, has not had, and would not reasonably be expected to have, a material adverse effect on the ability of the Purchaser to consummate the transactions contemplated by this Agreement.

(b)     No Breach of Covenants.  The Purchaser shall have performed in all material respects all material covenants, obligations and agreements contained in this Agreement required to be performed by the Purchaser on or before the Closing.

(c)     Officer Certificate.  The Sellers shall be furnished with a certificate of one of the executive officers of the Purchaser certifying that the conditions set forth in Sections 8.2(a) and 8.2(b) have been satisfied.

(d)    Satisfaction of Conditions under EMEA Asset Sale Agreement.  The conditions to Closing of the EMEA Asset Sale Agreement set out in Clause 15.2 thereof (other than the conditions regarding the satisfaction or waiver of the conditions set out in this Section 8.2) shall have been satisfied or waived in accordance with the terms of the EMEA Asset Sale Agreement.

SECTION 8.3    Conditions to the Purchaser's Obligation.  The Purchaser's obligation to effect, and to cause the relevant Designated Purchasers to effect, the Closing shall be subject to the fulfillment (or express written waiver by the Purchaser), at or prior to the Closing, of each of the following conditions:

(a)    No Breach of Representations and Warranties.  Each of the representations and warranties set forth in Article IV, disregarding all materiality and Material Adverse Effect qualifications contained therein, shall be true and correct (i) as if restated on and as of the Closing Date or (ii) if made as of a date specified therein, as of such date, except in each case for any failure to be true and correct that, individually and together with other such failures, has not had and would not reasonably be expected to have a Material Adverse Effect.

(b)    No Breach of Covenants.  The Sellers shall have complied in all material respects with all material covenants, obligations and agreements contained in this Agreement required to be performed by the Sellers on or before the Closing.

(c)    Officer Certificate.  The Purchaser shall be furnished with a certificate of an executive officer of one of the Main Sellers certifying that the conditions set forth in Sections 8.3(a) and 8.3(b) have been satisfied.

(d)    Satisfaction of Conditions under EMEA Asset Sale Agreement.  The conditions to Closing of the EMEA Asset Sale Agreement set out in Clause 15.3 thereof (other than the conditions regarding the satisfaction or waiver of the conditions set out in this Section 8.3) shall have been satisfied or waived in accordance with the terms of the EMEA Asset Sale Agreement.

## ARTICLE IX.

## TERMINATION

SECTION 9.1    Termination.  This Agreement may be terminated at any time prior to the Closing:

(a)    by mutual written consent of the Primary Parties;

(b)    by either Primary Party, upon written notice to the other:

(i)    if the Closing does not take place on or prior to the date that is six (6) months following either the date of the Auction or the date on which the Sellers determine there shall not be an Auction;

119

(ii)     if the Auction has occurred and (A) the Purchaser is not the Successful Bidder or (B) the U.S. Bankruptcy Court and the Canadian Court otherwise approve an Alternative Transaction; provided, however, that if the Purchaser is selected as the Alternate Bidder (as defined in the U.S. Bidding Procedures Order), the Purchaser may exercise its termination rights pursuant to this clause (b)(ii) on or after the fortieth (40th) calendar day following the conclusion of the Auction, unless, prior to such date, the Main Sellers have delivered written notice to the Purchaser that the Alternative Transaction will not occur and the Main Sellers intend to consummate the transaction contemplated by this Agreement or by any Subsequent Bid (as defined in the U.S. Bidding Procedures Order) submitted by the Purchaser and is the basis on which the Purchaser is selected by the Main Seller to the Alternate Bidder;

(iii)    if the EMEA Asset Sale Agreement is terminated in accordance with its terms;

(iv)    if the U.S. Debtors Chapter 11 Cases are converted to a liquidation proceeding under Chapter 7 of the U.S. Bankruptcy Code, and such conversion materially affects the Sellers' ability to consummate the transactions contemplated by this Agreement;

(c)     (i) by the Purchaser, upon written notice to the Main Sellers, in the event of a material breach by the Sellers of the Sellers' representations, warranties, agreements or covenants set forth in this Agreement, which breach would result in a failure of the conditions to Closing set forth in Section 8.1(a), Section 8.1(c), Section 8.1(d), Section 8.3(a), Section 8.3(b) or Section 8.3(d), as applicable, or (ii) by the Main Sellers, upon written notice to the Purchaser, in the event of a material breach by the Purchaser of the Purchaser's representations, warranties, agreements or covenants set forth in this Agreement or the EMEA Asset Sale Agreement, which breach would result in a failure of the conditions to Closing set forth in Section 8.1(a), Section 8.1(c), Section 8.1(d), Section 8.2(a), Section 8.2(b) or Section 8.2(d), as applicable, and, in each case, which, if capable of being cured, has not been cured within twenty-five (25) days from receipt of a written notice thereof from the non-breaching Party;

(d)     by the Purchaser, upon written notice to the Main Sellers,

(i)     if the U.S. Debtors shall fail to file the U. S. Bidding Procedures and Sale Motion within five (5) Business Days of the date of this Agreement and/or the Canadian Debtors shall fail to file the Canadian Sales Process Motion within seven Business Days of the date of this Agreement;

(ii)    if the U.S. Bankruptcy Court shall fail to enter the U.S. Bidding Procedures Order and/or the Canadian Court shall have failed to enter the Canadian Sales Process Order on or prior to the date that is thirty (30) days from the date of this Agreement;

(iii)    if the Purchaser is the Successful Bidder and the U.S. Sale Hearing and the Canadian Sale Hearing have not been commenced before the respective

Bankruptcy Courts on or prior to the later of (A) the tenth (10th) Business Day after the Auction or (B) the first available date thereafter that the U.S. Bankruptcy Court and the Canadian Court are available to hold a joint hearing;

        (iv)     if the U.S. Bankruptcy Court has not entered the U.S. Sale Order on or prior to the date that is sixty (60) days from the date of this Agreement; or

        (v)     if the Canadian Court has not entered the Canadian Approval and Vesting Order on or prior to the date that is sixty (60) days from the date of this Agreement; or

        (e)     (i) by any of the Main Sellers upon written notice to the Purchaser, if the Purchaser is in material breach of its obligation to close the transactions contemplated hereby at the Closing, which breach is not cured within five (5) days from the receipt of a written notice thereof from any Main Seller or (ii) by the Purchaser upon written notice to the Main Sellers, if the Sellers are in material breach of any of their respective obligations to close the transactions contemplated hereby at the Closing, which breach is not cured within five (5) days from the receipt of a written notice thereof from the Purchaser;

provided, however, that the right to terminate this Agreement pursuant to Section 9.1 (b)(i), Section 9.1(b)(ii), 9.1(b)(iii) (pursuant to Sections 15.4.2.(A), 15.4.2(B), 15.4.2(C), 15.4.3, 15.4.4 or 15.4.5of the EMEA Asset Sale Agreement), Section 9.1(c), Section 9.1(d) or Section 9.1(e) shall not be available to the Party seeking to terminate if such Party is then in breach of this Agreement (or, in the case of 9.1(b)(iii) (pursuant to Section 15.4.2(C) of the EMEA Asset Sale Agreement, the EMEA Asset Sale Agreement) and such breach has been the cause of, or has resulted in, the event or condition giving rise to a right to terminate this Agreement (or, in the case of 9.1(b)(iii) (pursuant to Section 15.4.2(C) of the EMEA Asset Sale Agreement, the EMEA Asset Sale Agreement).

        SECTION 9.2     Break-Up Fee/Expense Reimbursement .

        (a)     The Sellers shall pay, or cause to be paid, to the Purchaser the Seller Break-Up Fee if this Agreement is terminated pursuant to Section 9.1(b)(i), 9.1(b)(ii), 9.1(b)(iii) (pursuant to Sections 15.4.2(A), 15.4.2(B), 15.4.2(C), 15.4.2(D), 15.4.4(D), 15.4.4(E)of the EMEA Asset Sale Agreement), Section 9.1(b)(iv), Section 9.1(d)(iv) or Section 9.1(d)(v) (A) when the Purchaser is not in breach of this Agreement or the EMEA Asset Sale Agreement, which breach would result in a failure to satisfy any of the conditions to Closing set forth in Section 8.1 or Section 8.2 of this Agreement, and (B) Sellers enter into an agreement with respect to an Alternative Transaction no later than the nine months following such termination, which Seller Break-Up Fee shall be paid no later than three (3) Business Days following the consummation by the Sellers of the Alternative Transaction.

        (b)     The Sellers shall pay, or cause to be paid, to the Purchaser the Seller Break-Up Fee if the Purchaser is the Successful Bidder and this Agreement is terminated pursuant to Section 9.1(c)(i) and 9.1(d)(iii) when the Purchaser is not in breach of this Agreement or the EMEA Asset Sale Agreement, which breach would result in a failure to satisfy any of the conditions to Closing set forth in Section 8.1 or Section 8.2 of this Agreement.

(c)    The Sellers shall pay, or cause to be paid, to the Purchaser the Seller Expense Reimbursement if this Agreement is terminated pursuant to Sections 9.1(b)(i), Section 9.1(b)(ii), 9.1(b)(iii) (pursuant to Sections 15.4.2(A), 15.4.2(B), 15.4.2(C), 15.4.2(D), 15.4.3(A), 15.4.4(C), 15.4.4(D), 15.4.4(E)of the EMEA Asset Sale Agreement), Section 9.1(b)(iv), Section 9.1(c)(i), Section 9.1(d)(iii), Section 9.1(d)(iv) and Section 9.1(d)(v) when the Purchaser is not in breach of this Agreement or the EMEA Asset Sale Agreement, which breach would result in a failure to satisfy any of the conditions to Closing set forth in Section 8.1 or Section 8.2 of this Agreement. The Seller Expense Reimbursement shall be paid no later than three (3) Business Days following such termination.

(d)    The Parties acknowledge that the damages resulting from termination of this Agreement under circumstances where the Purchaser is entitled to the Seller Break-Up Fee and/or Seller Expense Reimbursement are uncertain and incapable of accurate calculation and that the delivery of the Seller Break-Up Fee and/or Seller Expense Reimbursement to the Purchaser is not a penalty but rather shall constitute liquidated damages in a reasonable amount that will compensate the Purchaser in the circumstances where the Purchaser is entitled to the Seller Break-Up Fee and/or Seller Expense Reimbursement for the efforts and resources expended and opportunities foregone while negotiating this Agreement and in reliance on this Agreement and on the expectation of the consummation of the transactions contemplated hereby, and that, without these agreements, the Purchaser would not enter into this Agreement. If the Sellers fail to take any action necessary to cause the delivery of the Seller Break-Up Fee and/or Seller Expense Reimbursement under circumstances where the Purchaser is entitled to the Seller Break-Up Fee and/or Seller Expense Reimbursement and, in order to obtain such Seller Break-Up Fee and/or Seller Expense Reimbursement, the Purchaser commences a suit which results in a judgment in favor of the Purchaser requiring payment by the Sellers of the full amount of the Seller Break-Up Fee and Seller Expense Reimbursement, the Sellers shall pay to the Purchaser an amount in cash equal to the direct out of pocket costs and expenses (including reasonable out of pocket attorneys' and advisor fees) incurred by the Purchaser or its Affiliates and supported by reasonable and appropriate documentation in connection with such suit. Notwithstanding anything herein to the contrary, payment of the Seller Break-Up Fee and/or Seller Expense Reimbursement, if payable in accordance with the terms hereof, will be the sole and exclusive remedy of the Purchaser Parties, whether at Law or in equity, for any and all breaches prior to Closing by the Sellers of the terms and conditions of this Agreement.

(e)    Notwithstanding anything to the contrary herein, the Sellers' obligations to pay the Seller Break-Up Fee and/or Seller Expense Reimbursement pursuant to this Section 9.2 is expressly subject to entry of the U.S. Bidding Procedures Order and the Canadian Sales Process Order.

SECTION 9.3    Effects of Termination. If this Agreement is terminated pursuant to Section 9.1:

(a)    all further obligations of the Parties under or pursuant to this Agreement shall terminate without further liability of any Party to the other except for the provisions of (i) Section 2.2.4 (Good Faith Deposit), (ii) Section 2.2.5 (Escrow), (iii) Section 5.7 (Public Announcements), (iv) Section 5.10 (Transaction Expenses), (v) Section 5.11 (Confidentiality), (vi) Section 7.4(b)(ii) (Other Employee Covenants), (vii) Section 9.1 (Termination), (viii)

Section 9.2 (Expense Reimbursement and Break-Up Fee), (ix) this Section 9.3 (Effects of Termination) and (x) ARTICLE X (Miscellaneous); provided, that subject to the limitations set forth in Section 9.2(c) and Section 10.14, neither the termination of this Agreement nor anything in this Section 9.3 shall relieve any Party from liability for any breach of this Agreement occurring before the termination hereof;

      (b)    except as required by applicable Law, the Purchaser shall return to the Sellers all documents, work papers and other material of any of the Sellers relating to the transactions contemplated hereby, whether so obtained before or after the execution hereof to the extent and in the manner required by the Confidentiality Agreement; and

      (c)    the provisions of the Confidentiality Agreement shall continue in full force and effect.

## ARTICLE X.

## MISCELLANEOUS

      SECTION 10.1    No Survival of Representations and Warranties or Covenants. Except for the representations set forth in Section 3.5, no representations or warranties, covenants or agreements in this Agreement or in any instrument delivered pursuant to this Agreement shall survive beyond the Closing Date, except for covenants set forth in Section 5.8, Section 5.26 and Article VI and covenants and agreements that by their terms are to be satisfied after the Closing Date, which covenants and agreements shall survive until satisfied in accordance with their terms.

      SECTION 10.2    Remedies. No failure to exercise, and no delay in exercising, any right, remedy, power or privilege under this Agreement by any Party will operate as a waiver of such right, remedy, power or privilege, nor will any single or partial exercise of any right, remedy, power or privilege under this Agreement preclude any other or further exercise of such right, remedy, power or privilege or the exercise of any other right, remedy, power or privilege.

      SECTION 10.3    No Third-Party Beneficiaries. Except for any acknowledgments, rights, undertakings, representations or warranties expressed to be for the benefit of the EMEA Sellers or the Joint Administrators, this Agreement is for the sole benefit of the Parties and their permitted assigns and nothing herein, express or implied, is intended to or shall confer upon any other Person any legal or equitable right, benefit or remedy of any nature whatsoever under or by reason of this Agreement.

      SECTION 10.4    Consent to Amendments; Waivers. No Party shall be deemed to have waived any provision of this Agreement or any of the other Transaction Documents unless such waiver is in writing, and then such waiver shall be limited to the circumstances set forth in such written waiver. This Agreement and the Ancillary Agreements shall not be amended, altered or qualified except by an instrument in writing signed by all the parties hereto or thereto, as the case may be.

SECTION 10.5        Successors and Assigns. Except as otherwise expressly provided in this Agreement, all representations, warranties, covenants and agreements set forth in this Agreement or any of the Ancillary Agreements by or on behalf of the parties hereto or thereto will be binding upon and inure to the benefit of such parties and their respective successors and permitted assigns. Neither this Agreement nor any of the rights, interests or obligations hereunder may be assigned by any Party without the prior written consent of the Main Sellers in case of an assignment by the Purchaser or the Purchaser in case of an assignment by any Seller, which consent may be withheld in such Party's sole discretion, except for the following assignments which shall not require consent: (i) assignment to an Affiliate of a Party (provided, that such Party remains liable jointly and severally with its assignee Affiliate for the assigned obligations to the other Party), (ii) assignment by a U.S. Debtor to a succeeding entity following such U.S. Debtor's emergence from the Chapter 11 Cases, (iii) assignment by any of the Canadian Debtors pursuant to any plan of arrangement approved by the Canadian Court and (iv) designation by the Purchaser of Designated Purchasers pursuant to Section 2.4.

SECTION 10.6        Governing Law; Submission to Jurisdiction; Waiver of Jury Trial.

(a)        Any questions, claims, disputes, remedies or Actions arising from or related to this Agreement, and any relief or remedies sought by any Parties, shall be governed exclusively by the Laws of the State of New York applicable to contracts made and to be performed in that State and without regard to the rules of conflict of laws of the State of New York or any other jurisdiction.

(b)        To the fullest extent permitted by applicable Law, each Party: (i) agrees that any claim, action, proceeding by such Party seeking any relief whatsoever arising out of, or in connection with, this Agreement, or the transactions contemplated hereby shall be brought only in (A) the U.S. Bankruptcy Court, if brought prior to the entry of a final decree closing the Chapter 11 Cases, or the Canadian Court, if brought prior to the termination of the CCAA Cases, provided, that if (X) a final decree closing the Chapter 11 Cases has not been entered and (Y) the CCAA Cases have not terminated, the U.S. Debtors, the Canadian Debtors or the Purchaser may, in accordance with the Cross-Border Protocol, move the U.S. Bankruptcy Court and the Canadian Court to hold a joint hearing of the U.S. Bankruptcy Court and the Canadian Court to determine the appropriate jurisdiction for such claim, action or proceeding, or (B) in the Federal Courts in the Southern District of New York or the State Courts of the State of New York, County of Manhattan (collectively, the "**New York Courts**"), if brought after entry of a final decree closing the Chapter 11 Cases and termination of the CCAA Cases (the courts specified in clauses (A) and (B) collectively, the "**Designated Courts**"), and shall not be brought in each case, in any other court in the United States of America, Canada or any court in any other country; (ii) agrees to submit to the jurisdiction of the Designated Courts for purposes of all legal proceedings arising out of, or in connection with, this Agreement or the transactions contemplated hereby; (iii) waives and agrees not to assert any objection that it may now or hereafter have to the laying of the venue of such action brought in any Designated Court or any claim that any such action brought in any Designated Court has been brought in an inconvenient forum; (iv) agrees that the mailing of process or other papers in connection with any such action or proceeding in the manner provided in Section 10.7 or any other manner as may be permitted by Law shall be valid and sufficient service thereof, and (v) agrees that a final judgment in any

124

such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by applicable Law.

(c)     The Purchaser hereby appoints Cassels Brock & Blackwell LLP, Barristers & Solicitors, 2100 Scotia Plaza, 40 King Street West, Toronto, ON, Canada M5H 3C2, as its authorized agent (the "**Purchaser Authorized Canadian Agent**" and, together with the Purchaser Authorized Agent, the "**Purchaser Authorized Agents**") upon whom process and any other documents may be served in the CCAA Cases and any Action arising out of, or in connection with, this Agreement or the transactions contemplated hereby, which may be instituted in the Canadian Court by any other party hereto, which appointment in each case shall be irrevocable. The Purchaser further agrees to take any and all action, including the filing of any and all documents and instruments, which may be necessary to continue such appointments in full force and effect as aforesaid.  Service of process upon the applicable Purchaser Authorized Agent in respect of the relevant jurisdiction and written notice of such service to the Purchaser shall be deemed, in every respect, effective service of process upon the Purchaser in relation to such jurisdiction.

(d)     Each Seller hereby appoints (i) NNI as its authorized agent (the "**Seller Authorized U.S. Agent**") upon whom process and any other documents may be served in the Chapter 11 Cases and any Action arising out of, or in connection with, this Agreement or the transactions contemplated hereby, which may be instituted in the U.S. Bankruptcy Court or in the New York Courts by any other party hereto, and (ii) NNL as its authorized agent (the "**Seller Authorized Canadian Agent**" and together with the Seller Authorized U.S. Agent, the "**Seller Authorized Agents**") upon whom process and any other documents may be served in the CCAA Cases and any Action arising out of, or in connection with, this Agreement or the transactions contemplated hereby, which may be instituted in the Canadian Court by any other party hereto, which appointment in each case shall be irrevocable. Each such Seller further agrees to take any and all action, including the filing of any and all documents and instruments, which may be necessary to continue such appointment in full force and effect as aforesaid.  Service of process upon the applicable Seller Authorized Agent in respect of the relevant jurisdiction and written notice of such service to the Main Sellers shall be deemed, in every respect, effective service of process upon every such Seller.

(e)     Section 10.6(b) shall not limit the jurisdiction of (i) the Accounting Arbitrator set forth in Section 2.2.3.1 (c) or (ii) the arbitrator(s) entrusted with the resolution of disputes relating to the Transition Services Agreement pursuant to the provisions of Exhibit 5.25, although claims may be asserted in the courts referred to in Section 10.6(b) for purposes of enforcing the jurisdiction and judgments of the Accounting Arbitrator or such arbitrator(s).

(f)     EACH PARTY HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION DIRECTLY OR INDIRECTLY ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS AGREEMENT, ANY ANCILLARY AGREEMENT OR ANY TRANSACTION CONTEMPLATED HEREBY OR THEREBY. EACH PARTY (I) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE

125

THE FOREGOING WAIVER AND (II) ACKNOWLEDGES THAT IT AND THE OTHER
PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT AND
THE ANCILLARY AGREEMENTS, AS APPLICABLE, BY, AMONG OTHER THINGS,
THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION 10.6.

SECTION 10.7       Notices.  All demands, notices, communications and
reports provided for in this Agreement shall be in writing and shall be either sent by facsimile
transmission with confirmation to the number specified below or personally delivered or sent by
reputable overnight courier service (delivery charges prepaid) to any Party at the address
specified below, or at such address, to the attention of such other Person, and with such other
copy, as the recipient Party has specified by prior written notice to the sending Party pursuant to
the provisions of this Section 10.7.

If to the Purchaser to:

PSP Holdings LLC
c/o Marlin Equity Partners
2121 Rosecrans Avenue, Suite 4325
El Segundo, CA 90245
United States
Attention:  Andres Martinez
Facsimile:  +1 310-364-0110

With copies (that shall not constitute notice) to:

Schulte Roth & Zabel LLP
919 Third Avenue
New York, NY 10022
United States
Attention:  Rick Presutti
Facsimile:  +1 212-593-5955

and

Cassels Brock & Blackwell LLP
2100 Scotia Plaza
40 King Street West
Toronto, Ontario M5H 3C2
Canada
Attention:  Alison Manzer
Facsimile:  +1 416-350-6938

If to the Main Sellers or the Sellers, to:

**Nortel Networks Corporation**
5945 Airport Road
Suite 360

126

Mississauga, Ontario, Canada  L4V 1R9
Attention:   Anna Ventresca
                    General Counsel-Corporate, Corporate Secretary and
                    Chief Compliance Officer
Facsimile:   +1-905-863-2057

**Nortel Networks Limited**
5945 Airport Road
Suite 360
Mississauga, Ontario, Canada  L4V 1R9
Attention:   Anna Ventresca
                    General Counsel-Corporate, Corporate Secretary and
Chief Compliance Officer
Facsimile:  +1-905-863-2057

**Nortel Networks Inc.**
Legal Department
220 Athens Way, Suite 300
Nashville, Tennessee, USA  37228
Attention:      Lynn C. Egan
                       Secretary
Facsimile:   +1-615-432-4067

With copies (that shall not constitute notice) to:

**Nortel Networks Limited**
5945 Airport Road
Suite 360
Mississauga, Ontario
Canada  L4V 1R9
Attn:   Robert Fishman
          Senior Counsel
Facsimile:  +1-347-427-3815 & +1-615-432-4067

and

**Nortel Networks Inc.**
Legal Department
220 Athens Way, Suite 300
Nashville, TN  37228
USA
Attention:    Robert Fishman
                  Senior Counsel
Facsimile:    +1-347-427-3815 & +1-615-432-4067

and

Cleary Gottlieb Steen & Hamilton LLP
One Liberty Plaza
New York, NY 10006
United States
Attention:    James L. Bromley
                  Paul Marquardt
Facsimile:    +1-212-225-3999

and

Ogilvy Renault LLP
200 Bay Street
Suite 3800, P.O. Box 84
Royal Bank Plaza, South Tower
Toronto, Ontario M5J 2Z4
Canada
Attention:    Michael Lang
Facsimile:    +1-416-216-3930

Any such demand, notice, communication or report shall be deemed to have been given pursuant to this Agreement when delivered personally, when confirmed if by facsimile transmission, or on the calendar day after deposit with a reputable overnight courier service, as applicable.

SECTION 10.8          Exhibits; Sellers Disclosure Schedule.

(a)       The Sellers Disclosure Schedule and the Exhibits attached hereto constitute a part of this Agreement and are incorporated into this Agreement for all purposes as if fully set forth herein.

(b)       For purposes of the representations and warranties of the Sellers contained in this Agreement, disclosure in any section of the Sellers Disclosure Schedule of any facts or circumstances shall be deemed to be adequate response and disclosure of such facts or circumstances with respect to all representations or warranties by the Sellers calling for disclosure of such information, whether or not such disclosure is specifically associated with or purports to respond to one or more of such representations or warranties, if it is reasonably

128

apparent from the Sellers Disclosure Schedule that such disclosure is applicable. The inclusion of any information in any section of the Sellers Disclosure Schedule or other document delivered by the Sellers pursuant to this Agreement shall not be deemed to be an admission or evidence of the materiality of such item, nor that such item could have a Material Adverse Effect, nor shall it establish a standard of materiality for any purpose whatsoever.

SECTION 10.9    Counterparts. The Parties may execute this Agreement in two or more counterparts (no one of which need contain the signatures of all Parties), each of which will be an original and all of which together will constitute one and the same instrument.

SECTION 10.10    No Presumption. The Parties agree that this Agreement was negotiated fairly between them at arm's length and that the final terms of this Agreement are the product of the Parties' negotiations. Each Party represents and warrants that it has sought and received experienced legal counsel of its own choosing with regard to the contents of this Agreement and the rights and obligations affected hereby. The Parties agree that this Agreement shall be deemed to have been jointly and equally drafted by them, and that the provisions of this Agreement therefore should not be construed against a Party on the grounds that such Party drafted or was more responsible for drafting the provisions.

SECTION 10.11    Severability. If any provision, clause, or part of this Agreement, or the application thereof under certain circumstances, is held invalid, illegal or incapable of being enforced in any jurisdiction, (i) as to such jurisdiction, the remainder of this Agreement or the application of such provision, clause or part under other circumstances, and (ii) as for any other jurisdiction, all provisions of this Agreement, shall not be affected and shall remain in full force and effect, unless, in each case, such invalidity, illegality or unenforceability in such jurisdiction materially impairs the ability of the Parties to consummate the transactions contemplated by this Agreement. Upon such determination that any clause or other provision is invalid, illegal or incapable of being enforced in such jurisdiction, the Parties shall negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties as closely as possible in a mutually acceptable manner in order that the transactions contemplated hereby be consummated as originally contemplated to the greatest extent possible even in such jurisdiction.

SECTION 10.12    Headings. The headings used in this Agreement are for the purpose of reference only and shall not affect the meaning or interpretation of any provision of this Agreement.

SECTION 10.13    Entire Agreement.

(a)    This Agreement, the other Transaction Documents, the Confidentiality Agreement and the Clean Team Confidentiality Agreement together set forth the entire understanding of the Parties relating to the subject matter thereof, and all prior or contemporaneous understandings, agreements, representations and warranties, whether written or oral, are superseded by this Agreement, the other Transaction Documents, the Confidentiality Agreement and the Clean Team Confidentiality Agreement, and all such prior or contemporaneous understandings, agreements, representations and warranties are hereby terminated. In the event of any irreconcilable conflict between this Agreement and any other Transaction Documents, the Confidentiality Agreement or the Clean Team Confidentiality

129

Agreement, the provisions of this Agreement shall prevail, regardless of the fact that certain other Transaction Documents, such as the Local Sale Agreements, may be subject to different governing Laws.

(b)    For the sake of clarity, the provisions of the EMEA Asset Sale Agreement have been drafted separately from the provisions in the body of this Agreement to reflect differing market practices in the countries of jurisdiction of the EMEA Sellers. Unless the context specifically requires, the provisions contained in the body of this Agreement and the provisions of the EMEA Asset Sale Agreement shall be interpreted independently and without reference to each other.

SECTION 10.14    Availability of Equitable Relief; Specific Performance. The Parties agree that irreparable damage would occur in the event that any of the provisions of this Agreement were not performed in accordance with their specific terms or were otherwise breached. Accordingly, subject to the limitations set forth in this Section 10.14 and Section 9.2(d), each of the Parties shall, without the posting of bond or other security (any requirement for which the Parties hereby waive), be entitled to equitable relief to prevent or remedy breaches of this Agreement, without the proof of actual damages, including in the form of an injunction or injunctions or orders for specific performance in respect of such breaches. Each Party agrees to waive any requirement for the security or posting of any bond in connection with any such equitable remedy. Each Party further agrees that the only permitted objections that it may raise in response to any action for such equitable relief is that it contests the existence of a breach or threatened breach of the provisions of this Agreement or that equitable relief is not permitted pursuant to this Section 10.14, and no Party will allege, and each Party hereby waives the defense or counterclaim, that there is an adequate remedy at Law except as expressly provided in this Section 10.14. For the avoidance of doubt, the Parties agree that specific performance shall not constitute the sole and exclusive remedy of the Parties, whether at Law or equity, for any and all breaches after Closing of the terms and conditions of this Agreement. In no event shall any Party be liable for special, exemplary, consequential or punitive damages.

SECTION 10.15    Bulk Sales Laws. Subject to the entry of the U.S. Sale Order and the Canadian Approval and Vesting Order, each Party waives compliance by the other Party with any applicable bulk sales Law.

SECTION 10.16    Main Sellers as Representatives of Other Sellers.

(a)    For all purposes of this Agreement:

(i)    each Other Seller listed in Section 10.16(a)(i) of the Sellers Disclosure Schedule hereby irrevocably appoints NNC as its representative;

(ii)    each Other Seller listed in Section 10.16(a)(ii) of the Sellers Disclosure Schedule hereby irrevocably appoints NNL as its representative; and

(iii)    each Other Seller listed in Section 10.16(a)(iii) of the Sellers Disclosure Schedule hereby irrevocably appoints NNI as its representative.

130

(b)    Pursuant to Section 10.16(a), each of NNC, NNL and NNI shall expressly have the power to, in the name and on behalf of each of its Respective Affiliates (as defined below), (i) take all decisions and carry out any actions required or desirable in connection with this Agreement, including the execution of the Ancillary Agreements, (ii) send and receive all notices and other communications required or permitted hereby, and (iii) consent to any amendment, waivers and modifications hereof.

(c)    For the purposes of this Agreement, **"Respective Affiliates"** means: (i) with respect to NNC, each Other Seller listed in Section 10.16(a)(i) of the Sellers Disclosure Schedule, (ii) with respect to NNL, each Other Seller listed in Section 10.16(a)(ii) of the Sellers Disclosure Schedule, and (ii) with respect to NNI, all the other U.S. Debtors and each Other Seller listed in Section 10.16(a)(iii) of the Sellers Disclosure Schedule.

(d)    Each Respective Affiliate shall indemnify the Main Seller that acts as representative of such Respective Affiliate pursuant to this Section 10.16 for, and hold it harmless against, any loss, liability or expense, including reasonable attorneys' fees, incurred by such Main Seller without gross negligence, bad faith or willful misconduct, for serving in the capacity of representative of such Respective Affiliate hereunder.

SECTION 10.17    Obligations of the Sellers.  When references are made in this Agreement to certain Sellers causing other Sellers or other Affiliate(s) to undertake (or to not undertake) certain actions, or agreements are being made on behalf of certain other Sellers or other Affiliates, **"Sellers"** for purposes of such clause shall be deemed to mean, respectively, NNI (in the case of a U.S. Debtor) and NNL (in the case of a Canadian Debtor other than NNC and a Non-Debtor Seller).

SECTION 10.18    No Set-Off, Deduction or Counterclaim.  Every payment payable by the Purchaser, the Designated Purchasers and the EMEA Designated Purchasers under this Agreement, the EMEA Asset Sale Agreement or under any of the other Transaction Documents shall be made in full without any set-off or counterclaim howsoever arising and shall be free and clear of, and without deduction of, or withholding for or on account of, any amount which is due and payable by the Sellers or the EMEA Sellers whether under this Agreement, the EMEA Asset Sale Agreement, under any of the other Transaction Documents or otherwise.

SECTION 10.19    Execution by Other Sellers.  The Purchaser hereby acknowledges that the Other Sellers are not executing this Agreement as of the date hereof.  This Agreement shall be binding on all parties that have executed or acceded to this Agreement from the time of such execution or accession, regardless of whether all Sellers have done so.  Between the date hereof and the Closing Date, the Main Sellers hereby agree that they shall cause each Other Seller to execute a counterpart or accede to this Agreement no later than the Closing Date, agreeing to be bound as a Seller under this Agreement and authorizing NNC, NNL or NNI, as applicable, to act as its representative under Section 10.16.

**[Remainder of this page intentionally left blank.  Signature page follows.]**

IN WITNESS WHEREOF, the undersigned have duly executed this Agreement as of the date first written above.

**NORTEL NETWORKS CORPORATION**

By: _____
    Name:
    Title:

By:_____
    Name:
    Title:

**NORTEL NETWORKS LIMITED**

By:_____
    Name:
    Title:

By:_____
    Name:
    Title:

**NORTEL NETWORKS INC.**

By:_____
    Name:
    Title:

**PURCHASER**

By:_____
    Name:
    Title:

IN WITNESS WHEREOF, the undersigned have duly executed this Agreement as of the date first written above.

**NORTEL NETWORKS CORPORATION**

By: _____
    Name: Anna Ventresca
    Title: General Counsel-Corporate and
           Corporate Secretary

By: _____
    Name: Elena King
    Title: Senior Vice-President, HR

**NORTEL NETWORKS LIMITED**

By: _____
    Name: Anna Ventresca
    Title: General Counsel-Corporate and
           Corporate Secretary

By: _____
    Name: Elena King
    Title: Senior Vice-President, HR

**NORTEL NETWORKS INC.**

By: _____
    Name: Anna Ventresca
    Title: Chief Legal Officer

*Signature Page for the Asset Sale Agreement*

**PSP Holding LLC**

By:_____
Name:
Title:

*Signature Page for the Asset Sale Agreement*

EMEA Asset Sale Agreement

SIGNED for and on behalf of Nortel Networks )
UK Limited (in administration) by Christopher )      Christopher Hill
Hill )
as Joint Administrator (acting as agent and )
without personal liability) in the presence of:


Witness signature

............................................. )
Name:                                        )
Address:      Ernst & Young LLP              )
              1 More London Place
              London
              SE1 2AF

SIGNED for and on behalf of Nortel Networks )      .....................................................
(Ireland) Limited (in administration) by David )      David Hughes
Hughes as Joint Administrator (acting as agent )
and without personal liability) in the presence )
of: )


Witness signature

............................................. )
Name:                                        )
Address:                                     )


SIGNED for and on behalf of Nortel GmbH )      .....................................................
(in administration) by Christopher Hill )      Christopher Hill
)
as Joint Administrator (acting as agent and )
without personal liability) in the presence of:


Witness signature

............................................. )
Name:         JAN CORDELL                    )
Address:      Ernst & Young LLP              )
              1 More London Place
              London
              SE1 2AF

EMEA Asset Sale Agreement

**SIGNED** for and on behalf of **Nortel Networks**   )    ...........................................................................
**UK Limited** (in administration) by Christopher   )    Christopher Hill
Hill   )
as Joint Administrator (acting as agent and   )
without personal liability) in the presence of:

Witness signature

...........................................................................   )
Name:   )
Address:   )

**SIGNED** for and on behalf of **Nortel Networks**   )    ...........................................................................
**(Ireland) Limited** (in administration) by David   )    David Hughes
Hughes as Joint Administrator (acting as agent   )
and without personal liability) in the presence   )
of:

Witness signature

*Claire Madden*...........................................................................   )
Name: CLAIRE MADDEN   )
Address: Harcourt Centre, Harcourt St,   )
        Dublin 2.

**SIGNED** for and on behalf of **Nortel GmbH**   )    ...........................................................................
(in administration) by Christopher Hill   )    Christopher Hill
   )
as Joint Administrator (acting as agent and   )
without personal liability) in the presence of:

Witness signature

...........................................................................   )
Name:   )
Address:   )

EMEA Asset Sale Agreement

SIGNED for and on behalf of Nortel Networks )
France S.A.S. (in administration) by Kerry )   Kerry Trigg
Trigg acting as authorised representative for )
Christopher Hill )
as Joint Administrator (acting as agent and )
without personal liability) in the presence of:

Witness signature

Name: SHARON PERLMUTTER
Address: ERNST & YOUNG LLP
      1 More London Place
      London
      SE1 2AF

SIGNED for and on behalf of Nortel Networks )
SpA (in administration) by Christopher Hill )   Christopher Hill
                  )
as Joint Administrator (acting as agent and )
without personal liability) in the presence of:

Witness signature

Name:                         )
Address:                  )

SIGNED for and on behalf of Nortel Networks )
Hispania S.A. (in administration) by )   Christopher Hill
Christopher Hill )
as Joint Administrator (acting as agent and )
without personal liability) in the presence of:

Witness signature

Name:                         )
Address:                  )

**EMEA Asset Sale Agreement**

SIGNED for and on behalf of Nortel Networks ) ................................................................................
France S.A.S. (in administration) by Kerry ) Kerry Trigg
Trigg acting as authorised representative for )
Christopher Hill )
as Joint Administrator (acting as agent and )
without personal liability) in the presence of:

Witness signature

................................................................ )
Name: )
Address: )

SIGNED for and on behalf of Nortel Networks ) ................................................................................
SpA (in administration) by Christopher Hill ) Christopher Hill
)
as Joint Administrator (acting as agent and )
without personal liability) in the presence of:

Witness signature

................................................................ )
Name:    JAN CORDELL )
Address:    Ⅲ ERNST & YOUNG LLP )
1 More London Place
London
SE1 2AF

SIGNED for and on behalf of Nortel Networks ) ................................................................................
Hispania S.A. (in administration) by ) Christopher Hill
Christopher Hill )
as Joint Administrator (acting as agent and )
without personal liability) in the presence of:

Witness signature

................................................................ )
Name:    JAN CORDELL )
Address:    Ⅲ ERNST & YOUNG LLP )
1 More London Place
London
SE1 2AF

EMEA Asset Sale Agreement

SIGNED for and on behalf of Nortel Networks )
B.V. (in administration) by Christopher Hill )      Christopher Hill
)
as Joint Administrator (acting as agent and )
without personal liability) in the presence of: )


Witness signature

Name:        JAN CORDELL
Address:     ERNST & YOUNG LLP
             1 More London Place
             London
             SE1 2AF

SIGNED for and on behalf of Nortel Networks )
N.V. (in administration) by Christopher Hill )      Christopher Hill
)
as Joint Administrator (acting as agent and )
without personal liability) in the presence of: )


Witness signature

Name:        JAN CORDELL
Address:
             ERNST & YOUNG LLP
             1 More London Place
             London
             SE1 2AF

SIGNED for and on behalf of Nortel Networks )
(Austria) GmbH (in administration) by )            Christopher Hill
Christopher Hill )
as Joint Administrator (acting as agent and )
without personal liability) in the presence of: )


Witness signature

Name:        JAN CORDELL
Address:
             ERNST & YOUNG LLP
             1 More London Place
             London
             SE1 2AF

EMEA Asset Sale Agreement

SIGNED for and on behalf of Nortel Networks )
Polska Sp. z.o.o. (in administration) by )
Christopher Hill )      Christopher Hill
as Joint Administrator (acting as agent and )
without personal liability) in the presence of:


Witness signature

..................................................... )
Name:          JAN CORDELL )
Address:       ERNST & YOUNG LLP )
               1 More London Place
               London
               SE1 2AF

SIGNED for and on behalf of Nortel Networks )
Portugal S.A. (in administration) by )
Christopher Hill )      Christopher Hill
as Joint Administrator (acting as agent and )
without personal liability) in the presence of:


Witness signature

..................................................... )
Name:          JAN CORDELL )
Address:       ERNST & YOUNG LLP )
               1 More London Place
               London
               SE1 2AF

SIGNED for and on behalf of Nortel Networks )
Romania s.r.l. (in administration) by )
Christopher Hill )      Christopher Hill
as Joint Administrator (acting as agent and )
without personal liability) in the presence of:


Witness signature

..................................................... )
Name:          JAN CORDELL )
Address: )

               ERNST & YOUNG LLP
               1 More London Place
               London
               SE1 2AF

EMEA Asset Sale Agreement

SIGNED for and on behalf of Nortel )
Slovensko, s.r.o. (in administration) by )   Christopher Hill
Christopher Hill )
)

as Joint Administrator (acting as agent and
without personal liability) in the presence of:

Witness signature

................................................ )
Name:        JAN CORDELL )
Address:     ⊞ ERNST & YOUNG LLP )
             1 More London Place
             London
             SE1 2AF
SIGNED for and on behalf of Nortel Networks )
AB (in administration) by Christopher Hill )   Christopher Hill
)
)

as Joint Administrator (acting as agent and
without personal liability) in the presence of:

Witness signature

................................................ )
Name:        JAN CORDELL )
Address:     ⊞ ERNST & YOUNG LLP )
             1 More London Place
             London
             SE1 2AF
SIGNED for and on behalf of Nortel Networks )
s.r.o. (in administration) by Christopher Hill )   Christopher Hill
)
)

as Joint Administrator (acting as agent and
without personal liability) in the presence of:

Witness signature

................................................ )
Name:        JAN CORDELL )
Address:     ⊞ ERNST & YOUNG LLP )
             1 More London Place
             London
             SE1 2AF

EMEA Asset Sale Agreement

SIGNED by Simon Freemantle                )
duly authorised for and on behalf of Nortel  )    Simon Freemantle
Networks AG in the presence of:             )

Witness signature

*B. Scherwath*

.....................................................................)
Name: B. SCHERWATH                        )
Address: c/o NORTEL NETWORKS UK LTD
         MAIDENHEAD
         SL6 3QH
         UK

SIGNED by Richard Banbury                  )    ......................................................
duly authorised for and on behalf of Nortel  )    Richard Banbury
Networks o.o.o. in the presence of:          )

Witness signature

.....................................................................)
Name:                                      )
Address:                                   )

*EMEA Asset Sale Agreement*

**SIGNED** by Simon Freemantle                )       ...............................................................
duly authorised for and on behalf of Nortel      )       Simon Freemantle
Networks AG in the presence of:                )


Witness signature

...............................................................                )
Name:                                                          )
Address:                                                       )


**SIGNED** by Richard Banbury                )
duly authorised for and on behalf of Nortel      )       Richard Banbury
Networks o.o.o. in the presence of:            )


Witness signature

Name: Samothina Victoria               )
Address: Smolenskaya square 3
Moscow 121 099

*The effectuation of this agreement with respect to the Israeli Company is subject to the approval of the Israeli Court*

**EMEA Asset Sale Agreement**

| | |
|---|---|
| SIGNED for and on behalf of Nortel Networks Israel (Sales and Marketing) Limited by Yaron Har-Zvi and Avi D. Pelossof as Joint Israeli Administrators (acting jointly and without personal liability) in connection with the Israeli Assets and Liabilities: | ) ) ) ) ) ) ) ) ) |

הנאמן בהקפאת הליכים

....................................................

Yaron Har-Zvi

הנאמן בהקפאת הליכים

....................................................

Avi D. Pelossof

Witness signature    איתי לביא, עו"ד

מ.ר. 47667

)

....................................................

Name: Itay Lavi    )

Address: Lincoln 20, Tel - Aviv    )

EMEA Asset Sale Agreement

**SIGNED** by Alan Bloom           )

                                 )    ...................................................

in his own capacity and on behalf of the Joint    )    Alan Bloom

Administrators without personal liability and

solely for the purpose of obtaining the benefit of

the provisions of this Agreement expressed to be

conferred on or given to the Joint Administrators

in the presence of:

Witness signature

...................................................... )

Name:     WILMA GRAHAM                       )

Address:                                   )

           ERNST & YOUNG LLP

           1 More London Place

           London

           SE1 2AF

The effectuation of this agreement with
respect to the Israeli Company is subject
to the approval of the Israeli court

**EMEA Asset Sale Agreement**

הנאמן בהקפאת הליכים

**SIGNED** by Yaron Har-Zvi

)
)    .......................................................
)    Yaron Har-Zvi

in his own capacity and on behalf of the Joint
Israeli Administrators without personal liability
and solely for the purpose of obtaining the
benefit of the provisions of this Agreement
expressed to be conferred on or given to the
Joint Israeli Administrators in the presence of:

Witness signature    איתי לביא עו"ד
מר' 47667

)
.......................................................    )
Name: Itay Lavi                         )
Address: Lincoln 20, Tel-Aviv           )

הנאמן בהקפאת הליכים

**SIGNED** by Avi D. Pelossof

)    .......................................................
)    Avi D. Pelossof
)

in his own capacity and on behalf of the Joint
Israeli Administrators without personal liability
and solely for the purpose of obtaining the
benefit of the provisions of this Agreement
expressed to be conferred on or given to the
Joint Israeli Administrators in the presence of:

Witness signature    איתי לביא עו"ד
47687

)
.......................................................    )
Name: Itay Lavi                         )
Address: Lincoln 20, Tel-Aviv           )

The effectuation of this agreement
with respect to the Israeli company
is subject to the approval of the
Israeli court

**SIGNED** for and on behalf of **PSP HOLDING**
**LLC** by Andres Martinez in his capacity as the
Secretary in the presence of:

)
)
)

Andres Martinez

Witness signature

Name: Chloe Carver
Address: 2121 Rosecrans Ave. #4325
El segundo, CA 90245

)
)
)

**SIGNED** for and on behalf of **PSP HOLDING**
LLC by Andres Martinez in his capacity as the
Secretary in the presence of:

)
)
)

..........................................................

Andres Martinez

Witness signature

.........................................................

Name: Chloe Carver

Address: 2121 Rosecrans Ave. #4325
El Segundo, CA 90245

)
)
)

**APPENDIX "B"**

**EXHIBITS AND SELLERS DISCLOSURE SCHEDULES**

**[CONFIDENTIAL]**

**APPENDIX "C"**

**REDACTED MSS SIDE AGREEMENT**

**[ATTACHED]**

## MSS SIDE AGREEMENT

This MSS SIDE AGREEMENT (the "**Agreement**") is dated as of August 26, 2010, among (i) Nortel Networks Corporation, a corporation organized under the laws of Canada ("**NNC**"); (ii) Nortel Networks Limited, a corporation organized under the laws of Canada ("**NNL**" and, together with NNC, the "**Canadian Main Sellers**"); (iii) Nortel Networks Inc., a corporation organized under the laws of Delaware ("**NNI**" and, together with the Canadian Main Sellers, the "**Main Sellers**"); (iv) the affiliates of the Main Sellers listed in Schedule A hereto (the "**Other Sellers**" and, together with the Main Sellers, the "**Sellers**"); (v) the entities listed on Schedule B hereto (the "**EMEA Sellers**"), which in the case of the EMEA Debtors are acting by their joint administrators Alan Robert Bloom, Stephen John Harris, Alan Michael Hudson and Christopher John Wilkinson Hill of Ernst & Young LLP of 1 More London Place, London SE1 2AF, England (other than Nortel Networks (Ireland) Limited (in administration), for which David Hughes of Ernst & Young Chartered Accountants of Harcourt Centre, Harcourt Street, Dublin 2, Ireland and Alan Robert Bloom serve as joint administrators) who act as agents for the EMEA Debtors only and without any personal liability whatsoever (the "**Joint Administrators**"); (vi) Nortel Networks S.A. (in administration), a corporation incorporated under the laws of France ("**NNSA**"), represented by the French Liquidator (as defined below), who acts as agent for NNSA without any personal liability whatsoever (NNSA, the Sellers and the EMEA Sellers being, together, the "**Selling Parties**"); (ix) the Joint Administrators; and (ix) the Joint Israeli Administrators.

The Joint Administrators, the Joint Israeli Administrators and the NNSA Office Holders, in their individual capacities, shall be party to this Agreement solely for the purposes of Sections 3.1, 3.6, 3.7, 3.10 and 3.14.

## W I T N E S S E T H:

WHEREAS, on the Petition Date, the Canadian Debtors filed with the Canadian Court an application for protection under the CCAA and were granted certain initial creditor protection pursuant to an order issued by the Canadian Court on the same date, which also appointed Ernst & Young Inc. as "**Monitor**" in connection with the CCAA Cases and has been extended by further order of the Canadian Court from time to time, most recently on July 16, 2010, as the same may be amended and restated from time to time by the Canadian Court;

WHEREAS, the U.S. Debtors are debtors-in-possession under the U.S. Bankruptcy Code which commenced cases under Chapter 11 of the U.S. Bankruptcy Code on the Petition Date by filing voluntary petitions for relief in the U.S. Bankruptcy Court for the District of Delaware except for NN (CALA), which commenced its cases under the U.S. Bankruptcy Court on July 14, 2009;

WHEREAS, the EMEA Debtors on the Petition Date filed applications with the English Court pursuant to the Insolvency Act and the EC Regulation and the English Court appointed the Joint Administrators under the Insolvency Act;

WHEREAS, while the administration proceedings in respect of NNSA under the Insolvency Act are continuing, subsequent to the Petition Date, NNSA commenced secondary

insolvency proceedings within the meaning of Article 27 of the EC Regulation in the Republic of France pursuant to which Maître Cosme Rogeau, of 26, avenue Hoche, 78000 Versailles was appointed as the "Liquidateur Judiciaire" for NNSA (the **"French Liquidator"**) (Docket No. 2009P00492) and is assisted, for the purpose hereof, by Maître Franck Michel, *Mandataire ad hoc* for NNSA (together, the "NNSA Office Holders");

WHEREAS, the Israeli Company on January 18, 2009 filed applications with the Israeli Court, pursuant to the Israeli Companies Law 1999, and the regulations relating thereto for a stay of proceedings and the Israeli Court appointed the Joint Israeli Administrators on January 19, 2009, which was terminated in accordance with the Israeli Court ruling of November 24, 2009 approving the creditors' arrangement for the Israeli Company. Following such ruling, the material creditors of the Israeli Company applied to the Israeli Court to approve the continuation of all relevant rights, duties and obligations of the Joint Israeli Administrators with respect to the Israeli Company, as were previously vested in the Joint Israeli Administrators during and for the purpose of such stay of proceedings, such application was approved on December 10, 2009 by the Israeli Court in order, inter alia, that the Joint Israeli Administrators shall execute the creditors arrangement;

WHEREAS, the Non-Debtor Sellers and the EMEA Non-Debtor Sellers are not subject to any Bankruptcy Proceedings;

WHEREAS, on June 9, 2009, the U.S. Debtors, the Canadian Debtors, the EMEA Debtors and the Joint Administrators entered into an Interim Funding and Settlement Agreement (as may be amended from time to time in accordance with its terms, the **"IFSA"**) governing certain intercompany matters, including the obligation of the parties thereto to (a) negotiate in good faith and attempt to reach agreement on a timely basis on a protocol (the **"Interim Sales Protocol"**) for resolving disputes concerning the allocation of Sale Proceeds from Sale Transactions (each as defined in the IFSA), which Interim Sales Protocol shall provide binding procedures for the allocation of Sale Proceeds where the relevant parties in such Sale Transaction have been unable to reach agreement regarding such allocation, and (b) following entry into any Sale Transaction, negotiate in good faith and on a timely basis to attempt to reach agreement regarding the allocation of the Sale Proceeds from such Sale Transaction within a reasonable period of time or as may be otherwise provided in the Interim Sales Protocol (failing which the Interim Sales Protocol shall apply to determine the allocation of the relevant Sale Proceeds);

WHEREAS, the Sellers have, as of August 26, 2010, entered into an Asset Sale Agreement with PSP Holding LLC, a limited liability company organized under the laws of Delaware (the "**Purchaser**"), relating to the assets of the Business owned and operated by the Sellers and as may be amended in accordance with its terms and this Agreement (the "**North American Agreement**");

WHEREAS, the EMEA Sellers, the Joint Administrators and the Joint Israeli Administrators have entered into an Asset Sale Agreement, dated as of August 26, 2010, with Purchaser as may be amended in accordance with its terms and this Agreement relating to the assets of the Business owned and operated by the EMEA Sellers (the "**EMEA Agreement**" and, together with the North American Agreement, the "**Sale Agreements**");

2

WHEREAS, NNSA acceded to the IFSA on September 11, 2009 and, notwithstanding that NNSA is not a party to the Sale Agreements, NNSA is deemed to be a "Selling Debtor" under Section 12.a of the IFSA for the purposes of the  Sale Agreements and, as such, any reference in this Agreement to a Selling Party shall be construed as including NNSA;

WHEREAS, in accordance with Section 12.b and 12.g of the IFSA, the Selling Parties, the Monitor and the Committee (as defined in the U.S. Bidding Procedures Order) will enter into an escrow agreement with the Distribution Agent (the "**Distribution Escrow Agreement**") governing, among other things, the Distribution Agent's collection, holding in escrow in an escrow account at the Distribution Agent (the "**Distribution Escrow Account**") and distribution to the Sellers, the EMEA Sellers, NNSA and any other party deemed to be a Selling Debtor pursuant to the IFSA of the Total Proceeds (as defined below) and other payments to be made by the Purchaser (or any Designated Purchaser) to the Selling Parties under or in relation to the Sale Agreements;

WHEREAS, for the purpose of facilitating the completion of the Transaction and maximizing the value arising therefrom for their respective stakeholders, the Parties intend to assume certain mutual cooperation and other covenants relating to the allocation among the Parties of the benefits and burdens of the Transaction; and

NOW, THEREFORE, in consideration of the respective covenants made herein, and of the mutual benefits to be derived hereby (the sufficiency of which are acknowledged), the Parties hereto agree as follows:

ARTICLE I

INTERPRETATION

SECTION 1.1.  <u>Definitions</u>.

(a)     To the extent capitalized words used herein (including in the recitals hereof) are not defined in this Agreement, those words shall have the meanings given to them (i) in the North American Agreement, (ii) to the extent they are not defined in the North American Agreement, in the EMEA Agreement, or (iii) to the extent they are not defined in the Sale Agreements, the TSA (as defined below).

(b)     The following capitalized terms shall have the meanings set forth below:

(i)     "**Canadian IT Amount**" has the meaning assigned to in in <u>Section 2.2(a)(ii)</u>.

(ii)     "**Court Approval Condition**" has the meaning assigned to it in <u>Section 3.12</u>.

(iii)     "**EMEA Debtors**" means those entities listed in Schedule 3 of the EMEA Agreement and NNSA.

(iv)     "**IT Payment Date**" means the date that is ten (10) Business Days following the IT Payment Trigger Date.

3

(v)     "**IT Payment Trigger Date**" means the earlier of (i) the TSA Termination Date and (ii) the date that the accrued IT Total Payment Amount equals or exceeds $12,000,000.

(vi)    "**IT Providers**" means NNL, NNI, and NNC.

(vii)   "**IT Services**" means those Services listed in Schedules 1.A and 1.B of the TSA, and any Project in relation thereto.

(viii)  "**IT Total Payment Amount**" has the meaning assigned to it in Section 2.2(a)(ii).

(ix)    ███████████████████████████████

(x)     "**NNI IT Amount**" has the meaning assigned to it in Section 2.2(a)(ii).

(xi)    "**NNUK**" means Nortel Networks UK Limited.

(xii)   "**Party**"means (A) each of the Canadian Main Sellers and their respective Respective Affiliates, (B) each of NNI and its Respective Affiliates, (C) each of NNUK and its Respective Affiliates, and (D) for the purposes of Sections 3.1, 3.6, 3.7, 3.10 and 3.14 only, the Joint Administrators, the Joint Israeli Administrators, and the NNSA Office Holders and "Parties" shall have a corresponding meaning.

(xiii)  "**Respective Affiliates**" means (A) with respect to NNC, each Seller listed in Section 10.16(a)(i) of the Sellers Disclosure Schedule, (B) with respect to NNL, each Seller listed in Section 10.16(a)(ii) of the Sellers Disclosure Schedule, (C) with respect to NNI and all the other U.S. Debtors, each Seller listed in Section 10.16(a)(iii) of the Sellers Disclosure Schedule, and (D) with respect to NNUK, all the other EMEA Sellers listed in Schedule B of this Agreement and NNSA.

(xiv)   "**Total Proceeds**" means the aggregate amounts (A) paid by the Purchaser (or any Designated Purchaser) to the Selling Parties under or in respect of the Sale Agreements as Purchase Price (as defined in the North American Agreement and the EMEA Agreement, as applicable) and purchase price adjustments thereto and any damages, and (B) released to the Selling Parties under any escrow arrangement pursuant to which a portion of the Purchase Price (as defined in the North American Agreement and the EMEA Agreement, as applicable) or Good Faith Deposit (as defined in the North American Agreement and the EMEA Agreement, as applicable) has been placed in escrow, but for greater certainty shall exclude any amounts not constituting a portion of the Purchase Price (as defined in the North American Agreement and the EMEA Agreement, as applicable) paid or payable by the Purchaser (or any Designated Purchaser) to one or more Selling Party to compensate such Selling Party for costs incurred or to be incurred by such Selling Party, as contemplated to be paid directly to such Selling

Party in accordance with the terms of the North American Agreement, the EMEA Agreement, the TSA, or other Transaction Documents, as applicable.

(xv) **"Transaction"** means the sale of the Business to the Purchaser pursuant to the Sale Agreements (as each may be amended from time to time in accordance with such Agreement).

(xvi) **"Transaction Documents"** means the Transaction Documents (as the term is defined under the North American Agreement) and the Transaction Documents (as the term is defined under the EMEA Agreement).

(xvii) **"TSA"** means the Transition Services Agreement as attached in final form to the North American Agreement.

(xviii) **"TSA Termination Date"** means the first day on which none of the IT Providers perform IT Services for the Purchaser pursuant to the TSA, which for the avoidance of doubt shall be no later than the day following the Outside Date, as such date is defined in, and may be adjusted pursuant to, the TSA.

(xix) **"Under-Recovery Period"** means the period commencing on the Under-Recovery Start Date up to but not including the TSA Termination Date.

(xx) **"Under-Recovery Start Date"** means the first day on which none of the IT Providers provide IT services to any persons pursuant to any transition services agreement currently in effect as of the date of this Agreement (including such transition services agreements as are renewed, varied or novated after the date of this agreement, but, for the avoidance of doubt, not including the TSA).

SECTION 1.2. Interpretation.

(a) Gender and Number. Any reference in this Agreement to gender includes all genders and words importing the singular include the plural and vice versa.

(b) Certain Phrases and Calculation of Time. In this Agreement (i) the words "including" and "includes" mean "including (or includes) without limitation", (ii) the terms "hereof," "herein," and "herewith" and words of similar import shall, unless otherwise stated, be construed to refer to this Agreement and not to any particular provision of this Agreement, and Section, Schedule and Annex references are to the Sections, Schedules and Annexes to this Agreement unless otherwise specified, and (iii) in the computation of periods of time from a specified date to a later specified date, unless otherwise expressly stated, the word "from" means "from and including" and the words "to" and "until" each mean "to but excluding" unless otherwise expressly provided. If the last day of any such period is not a Business Day, such period will end on the next Business Day.

When calculating the period of time "within" which, "prior to" or "following" which any act or event is required or permitted to be done, notice given or steps taken, the date which is the reference date in calculating such period is excluded from the calculation. If the last day of any such period is not a Business Day, such period will end on the next Business Day.

5

(c)    Headings, etc. The division of this Agreement into Articles and Sections and the insertion of headings are for convenient reference only and are not to affect or be used in the construction or interpretation of this Agreement.

(d)    Currency. All monetary amounts in this Agreement are stated in United States currency.

ARTICLE II

COVENANTS

SECTION 2.1. Collection of Total Proceeds.

(a)    As may be agreed in the Distribution Escrow Agreement or otherwise documented in writing signed by all the Parties, in accordance with the provisions of Section 12.b of the IFSA, the Parties agree that any payment due by the Purchaser (and any Designated Purchaser) to the Selling Parties under the Sale Agreements or, upon release from escrow, any escrow agreement provided for in the Sale Agreements or the Transaction Documents (including the TSA Escrow Amount under the North American Agreement and the TSA Escrow Amount under the EMEA Agreement), that is included in the Total Proceeds shall be collected and held in escrow in the Distribution Escrow Account by the Distribution Agent (as agent for the Selling Parties), which will then allocate and distribute the Total Proceeds to the Selling Parties and other parties, as may be applicable, in accordance with this Agreement and the Distribution Escrow Agreement.

SECTION 2.2. Under-Recovery Period; Allocation of Payments Related to TSA IT Costs.

(a)    During the Under-Recovery Period the IT Providers shall use commercially reasonable efforts to wind-down all activities and costs in relation to the IT Services save as is reasonably necessary to support their respective obligations under the TSA, and the IT Providers agree to consult with and provide such information as may be reasonably requested by NNUK and the Joint Administrators in relation to such wind-down plans and activities and to use commercially reasonable efforts to update and inform the French Liquidator regarding the same; and

(i)    During the Under-Recovery Period, (i) an amount (the "**Canadian IT Amount**") shall accrue in respect of the Canadian Main Sellers at a per diem rate based (A) for the first thirty (30) days of the Under-Recovery Period on an amount of $1.6 million for such thirty (30) day period and (B) for each successive thirty (30) day period thereafter on an amount of $1.4 million for each such thirty (30) day period  and (ii) an amount (the "**NNI IT Amount**") shall accrue in respect of NNI at a per diem rate based (A) for the first thirty (30) days of the Under-Recovery Period on an amount of $2.4 million for such thirty (30) day period and (B) for each successive thirty (30) day period thereafter on an amount of $2.6 million for each such thirty (30) day period. The Canadian IT Amount and the NNI IT Amount (together the "**IT Total Payment Amount**") shall be capped at, and shall not accrue beyond $12,000,000  in the aggregate.

6